Page 364

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3

     _____
4

     IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
5    OPIATE LITIGATION                  Case No. 17-md-2804

6

     This document relates to:         Judge Dan
7                                       Aaron Polster
8    The County of Cuyahoga v. Purdue
     Pharma, L.P., et al.
9    Case No. 17-OP-45005
10   City of Cleveland, Ohio vs. Purdue
     Pharma, L.P., et al.
11   Case No. 18-OP-45132
12   The County of Summit, Ohio,
     et al. v. Purdue Pharma, L.P.,
13   et al.
     Case No. 18-OP-45090
14   _____
15

16

17                    VOLUME II
18      Videotaped Deposition of Joseph Rannazzisi
19                 Washington, D.C.
20                 May 15, 2019
21                  8:43 a.m.
22

23

24   Reported by:  Bonnie L. Russo
25   Job No. 3301884

Page 365

1 Videotaped Deposition of Joseph Rannazzisi held
2 at:
3
4
5
6
7
8          Covington & Burling, LLP
9          850 10th Street, N.W.
10          Washington, D.C.
11
12
13 Pursuant to Notice, when were present on behalf
14 of the respective parties:
15
16
17
18
19
20
21
22
23
24
25

Page 366

1 APPEARANCES:
2
3 On behalf of the Witness:
   GREGORY M. UTTER, ESQ.
4 KEATING MUETHING & KLEKAMP, PLL
   One East Fourth Street
5 Suite 1400
   Cincinnati, Ohio 45202
6 513-579-6540
7 On behalf of the U.S. Department of Justice:
   JAMES R. BENNETT, II, ESQ.
8 UNITED STATES ATTORNEY'S OFFICE
   801 West Superior Avenue
9 Suite 400
   Cleveland, Ohio 44113
10 216-622-3988
   james.bennett4@usdoj.gov
11
   On behalf of Cuyahoga County:
12 SALVATORE C. BADALA, ESQ.
   NAPOLI SHKOLNIK, PLLC
13 400 Broadhollow Road, Suite 305
   Melville, New York 11747
14 631-224-1133
   sbadala@napolilaw.com
15
   On behalf of Summit County:
16 DONALD A. MIGLIORI, ESQ.
   MOTLEY RICE, LLC
17 28 Bridgeside Boulevard
   Mt. Pleasant, South Carolina 29464
18 843-216-9241
   dmigliori@motleyrice.com
19 -and-
   JENNA N. FORSTER, ESQ.
20 MOTLEY RICE, LLC
   401 9th Street, N.W.
21 Suite 1001
   Washington, D.C. 20004
22 202-849-4960
   jforster@motleyrice.com
23
24
25

Page 367

1 APPEARANCES (CONTINUED):
2 On behalf of Plaintiffs:
   PAUL T. FARRELL, JR., ESQ.
3 GREENE KETCHUM, LLP
   419 Eleventh Street
4 Huntington, West Virginia 25701
   304-525-9115
5 paul@greeneketchum.com
   -and-
6 MICHAEL J. FULLER, ESQ.
   McHUGH FULLER LAW GROUP
7 97 Elias Whiddon Road
   Hattiesburg, Mississippi 39402
8 601-467-0788
   mike@mchughfuller.com
9 -and-
   MILDRED CONROY, ESQ.
10 THE LANIER LAW FIRM
   Tower 56
11 126E. 56th Street, 6th Floor
   New York, New York 10022
12 212-421-2800
   mildred.conroy@lanierlawfirm.com
13 -and-
   W. MARK LANIER, ESQ.
14 RACHEL LANIER, ESQ.
   6810 Cypress Creek Parkway
15 Houston, Texas 77069
   713-659-5200
16 wml@lanierlawfirm.com
   -and-
17 JAYNE CONROY, ESQ.
   LAURA FITZPATRICK, ESQ.
18 SIMMONS HANLY CONROY
   112 Madison Avenue
19 New York, New York 10016
   212-784-6402
20 jconroy@simmonsfirm.com
   lfitzpatrick@simmonsfirm.com
21
   On behalf of Purdue Pharma, L.P.:
22 DEBRA D. O'GORMAN, ESQ.
   DECHERT, LLP
23 Three Bryant Park
   1095 Avenue of the Americas
24 New York, New York 10036
   212-698-3593
25 debra.ogorman@dechert.com

Page 368

1 APPEARANCES (CONTINUED):
2 On behalf of Johnson & Johnson and Janssen
   Pharmaceuticals, Inc.:
3 JEFFREY A. BARKER, ESQ.
   O'MELVENY & MYERS, LLP
4 610 Newport Center Drive
   17th Floor
5 Newport Beach, California 92660
   949-823-7963
6 jbarker@omm.com
   -and-
7 JEFFREY C. SINDELAR, JR., ESQ.
   (Via Teleconference)
8 TUCKER ELLIS, LLP
   950 Main Avenue
9 Suite 1100
   Cleveland, Ohio 44113
10 216-592-5000
   jeffrey.sindelar@tuckerellis.com
11
   On behalf of Walmart, Inc.:
12 NEAL J. STEPHENS, ESQ.
   JONES DAY
13 1755 Embarcadero Road
   Palo Alto, California 94303
14 650-739-3939
   nstephens@jonesday.com
15 -and-
   PATRICK J. BEISELL, ESQ.
16 (Via Teleconference)
   JONES DAY
17 77 West Wacker
   Chicago, Illinois 60601
18 312-269-4066
   pbeisell@jonesday.com
19
   On behalf of Endo:
20 JOSHUA M. DAVIS, ESQ.
   ARNOLD & PORTER
21 601 Massachusetts Avenue, N.W.
   Washington, D.C. 20001
22 202-942-5000
   joshua.davis@arnoldporter.com
23
24
25

2 (Pages 365 - 368)

Page 369

```
 1  APPEARANCES (CONTINUED):
 2  On behalf of Rite Aid of Maryland:
      JOHN P. LAVELLE, JR., ESQ.
 3  MORGAN, LEWIS & BOCKIUS, LLP
      1701 Market Street
 4  Philadelphia, Pennsylvania 19103
      609-919-6688
 5  john.lavelle@morganlewis.com
 6  On behalf of Teva Pharmaceutical Industries:
      MORGAN LEWIS & BOCKIUS, LLP
 7  MAUREEN BARBER, ESQ.
      (Via Teleconference)
 8  One Oxford Centre
      Thirty Second Floor
 9  Pittsburgh, Pennsylvania 15219
      412-560-7463
10  maureen.barber@morganlewis.com
11  On behalf of Cardinal Health, Inc.:
      WILLIAMS & CONNOLLY, LLP
12  ENU MAINIGI, ESQ.
      COLLEEN McNAMARA, ESQ.
13  BRAD MASTERS, ESQ.
      725 12th Street, N.W.
14  Washington, D.C. 20005
      202-434-5000
15  emainigi@wc.com
      cmcnamara@wc.com
16  bmasters@wc.com
17  On behalf of CVS Indiana, LLC and CVS Rx
      Services, Inc.:
18  ANTHONY M. RUIZ, ESQ.
      ZUCKERMAN SPAEDER, LLP
19  1800 M Street, N.W.
      Suite 1000
20  Washington D.C. 20036
      202-778-1800
21  aruiz@zuckerman.com
22
23
24
25
```

Page 371

```
 1  APPEARANCES (CONTINUED):
 2  On behalf of H.D. SMITH:
      KATHLEEN L. MATSOUKAS, ESQ.
 3  BARNES & THORNBURG, LLP
      11 South Meridian Street
 4  Indianapolis, Indiana 46204
      317-236-1313
 5  kmatsoukas@btlaw.com
 6  On behalf of Anda, Inc.:
      JAMES W. MATTHEWS, ESQ.
 7  FOLEY & LARDNER, LLP
      111 Huntington Avenue
 8  Boston, Massachusetts 02199
      617-342-4000
 9  jmatthews@foley.com
10  On behalf of HBC:
      SCOTT D. LIVINGSTON, ESQ.
11  MARCUS & SHAPIRA, LLP
      One Oxford Centre, 35th Floor
12  301 Grant Street
      Pittsburgh, Pennsylvania 15219
13  412-338-4690
      livingston@marcus-shapira.com
14
      On behalf of Walgreen Co. and Walgreen Eastern
15  Co., Inc.:
      KASPAR STOFFELMAYR, ESQ.
16  BARTLIT BECK, LLP
      54 West Hubbard Street
17  Chicago, Illinois 60654
      312-494-4434
18  kaspar.stoffelmayr@barlitbeck.com
19  On behalf of Discount Drug Mart:
      ERIC J. WEISS, ESQ.
20  (Via Teleconference)
      CAVITCH FAMILO & DURKIN, CO., LPA
21  1300 E. 9th Street
      Cleveland, Ohio 44114
22  216-621-7860
      eweiss@cavitch.com
23
24
25
```

Page 370

```
 1  APPEARANCES (CONTINUED):
 2  On behalf of AmerisourceBergen Drug
      Corporation:
 3  SHANNON McCLURE, ESQ.
      REED SMITH, LLP
 4  Three Logan Square, Suite 3100
      1717 Arch Street
 5  Philadelphia, Pennsylvania 19103
      215-241-7910
 6  smclure@reedsmith.com
 7  On behalf of McKesson Corporation:
      MEGHAN E. MONAGHAN, ESQ.
 8  COVINGTON & BURLING, LLP
      One CityCenter
 9  850 Tenth Street, N.W.
      Washington, D.C. 20001
10  202-662-6000
      mmonaghan@cov.com
11      -and-
      CHRISTOPHER K. EPPICH, ESQ.
12  COVINGTON & BURLING, LLP
      1999 Avenue of the Stars
13  Los Angeles, California 90067
      424-332-4764
14  ceppich@cov.com
15  On behalf of Allergan Finance, LLC:
      JENNIFER LEVY, ESQ.
16  KIRKLAND & ELLIS, LLP
      655 Fifteenth Street, N.W.
17  Washington, D.C. 20005
      202-879-5907
18  jennifer.levy@kirkland.com
19  On behalf of Mallinckrodt and Specgx, LLC:
      ANDREW O'CONNOR, ESQ.
20  WILLIAM DAVISON, ESQ.
      ROPES & GRAY, LLP
21  Prudential Tower
      800 Boylston Street
22  Boston, Massachusetts 02199
      617-951-7000
23  andrew.o'connor@ropesgray.com
      william.davison@ropesgray.com
24
25
```

Page 372

```
 1  APPEARANCES (CONTINUED):
 2  On behalf of Rochester Drug Cooperative, Inc.
      LAUREN, PINCUS, ESQ.
 3  (Via Teleconference)
      ALLEGAERT BERGER & VOGEL, LLP
 4  111 Broadway, 20th Floor
      New York, New York 10006
 5  212-571-0550
      lpincus@abv.com
 6
 7  ALSO PRESENT:
      Special Master Cohen
 8  Peter H. Weinberger, Spangenberg Shibley &
      Liber, Plaintiffs
 9  Renee A. Bacchus, Esq., United States
      Department of Justice, United States Attorney's
10  Office
      David M. Finkelstein, Esq., United States
11  Department of Justice, Civil Fraud Section
      Patrick J. Forrest, United States Department of
12  Justice, Drug Enforcement Administration
      Jesse J. Alcorta, The Lanier Law Firm, Director
13  of Operations
      Amber Nona (Via Teleconference), The Lanier Law
14  Firm, Paralegal
      Daniel Lawlor, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

3 (Pages 369 - 372)

Page 373

C O N T E N T S

1
2  EXAMINATION OF JOSEPH RANNAZZISI        PAGE
3  BY MR. LANIER                    375
4                          631
5  BY MR. MAINIGI                   513
6  BY MR. EPPICH                    582
7  BY MR. STEPHENS                  610
8
9          EXHIBITS
10
    Exhibit 1  Letter dated 9-27-06        428
11            ALLERGAN_MDL_02467796-7799
12  Exhibit 2  Letter dated 12-27-07       463
            MCKMDL00478910-8911
13
    Exhibit 3  Settlement and Release      471
14            Agreement
              ABDCMDL00279854-9865
15
    Exhibit 4  Settlement and Release      473
16            Agreement and Administrative
              Memorandum of Agreement
17            MCKMDL00337001-7024
18  Exhibit 5  Administrative Memorandum   475
              of Agreement
19            MCKMDL00355350-5363
20  Exhibit 6  Settlement Agreement        484
              CVS-MDLT1-000060796-804
21
    Exhibit 7  Administrative Memorandum   486
22            of Agreement
              MNK-T1_0007027620-7650
23
    Exhibit 8  Handwritten Slides          512
24
    Exhibit 9  Title 21 United States Code  525
25            (USC) Controlled Substances Act
              Section 823

Page 374

1  EXHIBITS (CONTINUED):
2
    Exhibit 10  Title 21 Code of Federal     525
3             Regulations
              Section 1301.74
4
    Exhibit 11  Report to Congressional      576
5             Requesters
              June 2015
6
    Exhibit 12  DEA's Privilege/Redaction Log  595
7
    Exhibit 13  Handwritten Slides           610
8
    Exhibit 14  The Drug Enforcement         622
9             Administration's Role in
              Combating the Opioid Epidemic
10            Hearing
              3-20-18
11
12  Exhibit 15  Washington Post Article      634
              10-15-17
13
    Exhibit 16  Industry Compliance          648
14            Guidelines Healthcare
              Distribution Management
15            Association Industry
              Compliance Guidelines:
16            Reporting Suspicious Orders
              and Preventing Diversion of
17            Controlled Substances
18  Exhibit 17  NWDA Suspicious Order        652
              Monitoring System date
19            stamped 6-21-93
    CAH_MDL_PRIORPROD_DEA07_00869965-0002
20
    Exhibit 18  Administrative Memorandum    654
21            of Agreement
              CAH_MDL2804_00135203-5210
22
    Exhibit 19  Memorandum dated 3-1-07      671
23            Handwritten Slide
    CAH_MDL_PRIORPROD_DEA12_00010978-979
24
25  (Exhibits included with transcript.)

Page 375

P R O C E E D I N G S

1
2
3          THE VIDEOGRAPHER:  We are now on
4  the record.  My name is Dan Lawlor, I'm a
5  videographer with Golkow Litigation Services.
6  Today's date is May 15, 2019, and the time is
7  8:43 a.m.
8          This video deposition is being held
9  in Washington, D.C., in the matter of In RE:
10  National Prescription Opioid Litigation, MDL
11  No. 2804.  The deponent is Joseph Rannazzisi.
12          Counsel will be noted on the
13  stenographic record.  The court reporter is
14  Bonnie Russo and will now swear in the witness.
15
16          JOSEPH RANNAZZISI,
17  being first duly sworn, to tell the truth, the
18  whole truth and nothing but the truth,
19          testified as follows:
20  EXAMINATION BY COUNSEL FOR PLAINTIFFS
21  BY MR. LANIER:
22  Q.   Mr. Rannazzisi, thank you for your
23  time today.  My name is Mark Lanier.  You and I
24  have not met before you sat down here just a
25  few minutes ago; is that right?

Page 376

1  A.   That's correct.
2  Q.   You understand, though, that I
3  represent the claimants that are bringing this
4  lawsuit against the various opioid defendants
5  that are present in court today.
6          Do you understand?
7  A.   Yes.
8  Q.   All right.  I have got a picture
9  with some notes that I will make as we go
10  along.  That's you.
11          Did I spell your name right?
12  A.   Yes, sir.
13  Q.   Would you pronounce it for me so
14  that I can pronounce it right?
15  A.   Rannazzisi.
16  Q.   Rannazzisi.  All right.  And that
17  picture looks pretty much like you.  I don't
18  see much difference there.
19          Let me tell you where we would like
20  to go today and what all I need to ask you
21  about.  I have done a little roadmap for you
22  and for the jury so that we can follow along.
23  The roadmap, I am calling you the 60 Minute
24  Man.  You have been on 60 Minutes; is that
25  right?

4 (Pages 373 - 376)

Page 377

1    A.   Yes, sir.
2    Q.   All right.  So on 60 Minute Man
3  Road, I want to make a stop to talk about your
4  background, I want to make a stop to talk about
5  the 60 Minutes episode and then I want to ask
6  some follow-up questions and we will deal with
7  some roadblocks or some questions about your
8  testimony along the way.  Okay?
9    A.   Yes, sir.
10    Q.   So with that, if you have got any
11  questions as we go along, let me know but we're
12  going to begin with stopping at your background
13  and I will start a clean sheet on your
14  background so that we can look at it together.
15  All right?
16    A.   Yes, sir.
17    Q.   Would you please tell the jury a
18  little bit about where you are from, where you
19  grew up, just so they've got a feel for you.
20    A.   I grew up in a town on Long Island,
21  New York, Freeport, New York.  It's a smaller
22  town on the south shore of Long Island.  Went
23  to Freeport High School, from Freeport High
24  School, I went to Butler University.
25    Q.   And Butler university is in

Page 378

1  Indianapolis?
2    A.   Yes, sir.
3    Q.   What's their mascot, the Butler --
4    A.   Bulldogs.
5    Q.   -- bulldogs.
6    A.   Yes, sir.
7    Q.   All right.  So you were a bulldog
8  and when did you get out of college, out of
9  Butler?
10    A.   1984.
11    Q.   And what was your major?
12    A.   Pharmacy.
13    Q.   Are you actually a licensed
14  pharmacist or have you been at some point in
15  your life?
16    A.   Yes, sir.  I maintain my pharmacy
17  license, State of Indiana.
18    Q.   Okay.  So you are a licensed
19  pharmacist in Indiana.  What does that enable
20  you to do?
21    A.   It enables me to dispense medication
22  pursuant to physicians' prescriptions.
23    Q.   I assume that is if you are in
24  Indiana?
25    A.   If I am in Indiana, yes, sir.

Page 379

1    Q.   Fair enough.  All right.  Did you
2  ever work as a pharmacist?
3    A.   I interned at a community pharmacy,
4  Hooks Drugstore in Indianapolis and my primary
5  employment post-graduation was at the Veterans
6  Administration as a staff pharmacist.
7    Q.   So you were a pharmacy intern and
8  then a staff pharmacist for the VA?
9    A.   Yes.
10    Q.   All right.  Did you get any more
11  education beyond your bachelor's degree in
12  pharmacy?
13    A.   Yes, sir, I did.
14    Q.   What else -- where else did you go
15  to school?
16    A.   I went to Detroit College of Law at
17  Michigan State University and received my juris
18  doctor in 1999.
19    Q.   So Michigan State University?
20    A.   Detroit College of Law.
21    Q.   Detroit College of Law.  And you got
22  a law degree?
23    A.   Yes, sir.
24    Q.   What year was that?
25    A.   '99.

Page 380

1    Q.   Did you ever take the bar exam?
2    A.   Yes, sir.
3    Q.   Did you pass?
4    A.   Yes, sir.
5    Q.   So you are a lawyer as well?
6    A.   Yes, sir, State of -- a member of
7  the Michigan Bar.
8    Q.   All right.  Do you keep your law
9  license up as well?
10    A.   Yes, sir.
11    Q.   All right.  In addition to your --
12  by the way, did you ever do work as a lawyer
13  per se?
14    A.   Just in my daily functions as a
15  deputy assistant administrator.
16    Q.   All right.  That's what we will get
17  to in a moment.
18       You have worked for the DEA; is that
19  correct?
20    A.   Yes, sir.
21    Q.   Okay.  So I got on the Internet
22  because I am a visual guy and I looked up these
23  pictures and this is what I found.
24       Did you get one of those badges?
25    A.   Yes, sir, I did.

5 (Pages 377 - 380)

Page 381

1    Q.   So you had, like, one of these DEA
2  badges we see people flash on TV?
3    A.   Yes, sir.  Special agent badge.
4    Q.   All right.  When did you start
5  working for the DEA?
6    A.   1986 was when I was on board with
7  the DEA.
8    Q.   Spoiler alert.  Are you still with
9  the DEA?
10   A.   No, I retired.
11   Q.   When did you retire?
12   A.   2015.
13   Q.   And there is a story behind that
14  that we will get to later on, but for now, the
15  jury can know by the time we play your
16  2015?
17   A.   Yes, sir.
18   Q.   Can you give us a thumbnail sketch
19  of what kinds of jobs you did for our Drug
20  Enforcement Administration?
21   A.   Initially from '86 to '88, I was a
22  diversion investigator.
23   Q.   All right.  Now I think everybody is
24  going to know by the time we play your
25  deposition, but just in case they don't, define

Page 382

1  for us what is diversion.
2    A.   Diversion is when pharmaceuticals or
3  listed chemicals are taken from the normal
4  stream or the legitimate stream of commerce and
5  moved into the illicit marketplace.
6    Q.   So diversion happens when drugs are
7  diverted from their legal use?
8    A.   Basically, yes.
9    Q.   Okay.  So basically -- and does that
10  happen often?
11   A.   Unfortunately, yes.
12   Q.   So as a diversion investigator, what
13  would you do?
14   A.   We would investigate the methods
15  trying to determine why or how those drugs are
16  being removed from the illicit supply chain,
17  how they are getting to the illicit supply
18  chain and investigate and then take action to
19  stop that from happening.
20   Q.   All right.  In addition to your job
21  as a diversion investigator, what else did you
22  do for the DEA?
23   A.   In 1988, I became a special agent.
24   Q.   All right.  So this first job was in
25  '86, '88, special agent -- is that when you get

Page 383

1  the badge?
2    A.   Yes, sir.
3    Q.   Did you, like, carry a gun and
4  stuff?
5    A.   Yes, sir.
6    Q.   When we see the TV shows and they
7  make the drug busts of, like, the person
8  selling the street drugs or something like
9  that, are those DEA agents sometimes?
10       MS. MAINIGI:  Objection.
11       THE WITNESS:  Sometimes they are
12  portrayed as DEA agents, yes.
13       BY MR. LANIER:
14   Q.   I mean, did you ever, like, arrest
15  anybody or do any of that stuff?
16       MS. MAINIGI:  Objection.
17       THE WITNESS:  Yes, sir.
18       BY MR. LANIER:
19   Q.   All right.  In addition to your job
20  starting in '88 as a special agent, what else
21  did you do for the DEA?
22   A.   Well, in '88, I started in general
23  enforcement.  I was working just general
24  illicit drug cases concentrating on clandestine
25  laboratories, methamphetamine and amphetamine

Page 384

1  cases, up until that occurred -- up about
2  1995 or '96.
3       At that point in time, I was
4  promoted to the group supervisor of the Red Rum
5  Task Force which is a drug-related homicide
6  task force and we worked homicides,
7  drug-related homicides, street enforcement in
8  public housing project cases.  I guess from '96
9  or '97 to 2000.
10   Q.   All right.  We're going to pause for
11  just a moment.
12       Are you picking up the bam, bam,
13  bam, bam?
14       THE VIDEOGRAPHER:  A little bit.
15       MR. LANIER:  Is there somebody who
16  can stop the bam, bam, bam, bam?
17       Don't be charging my time to fixing
18  the bam, bam, bam, bam, please.
19       THE VIDEOGRAPHER:  Do you want to go
20  off the record?
21       MR. LANIER:  If we need to.  I don't
22  hear the bam, bam now.  Do you?
23       Let's go off the record.
24       THE VIDEOGRAPHER:  We are going off
25  the record.  The time is 8:54.

6 (Pages 381 - 384)

Page 385

1    (A short recess was taken.)
2    THE VIDEOGRAPHER:  This is the
3  beginning of Media File No. 2.  The time is
4  8:58.
5    BY MR. LANIER:
6    Q.  We had a brief break just now.
7  During the break, I asked you, did you get one
8  of those windbreakers that have the big DEA in
9  gold on the back and you had told me yes, but
10  you also started telling me about the overalls
11  or the jumpsuit.  Jumpsuit, not overalls.  What
12  was that you were telling me?
13    A.  We also had jumpsuits that we wore
14  as well, jumpsuits -- basically to cover --
15  cover our whole bodies because we were
16  sometimes in environments that were extremely
17  dirty, contaminated places, you know, to get
18  full coverage.  The windbreakers only cover the
19  top.
20    Q.  So the jury has got a full idea of
21  what DEA agents do and what you do and the
22  skill set it takes to be an agent.  I want you
23  to give us a little bit more detail about even
24  just the jumpsuits.  Why do you wear them?  We
25  will start there and then I will ask you

Page 386

1  another question afterwards.
2    MR. BENNETT:  Objection.  Scope.
3    Do you understand the limits of what
4  you are allowed to discuss?
5    BY MR. LANIER:
6    Q.  Yes, don't do it -- don't give me
7  any secret info, just what publicly is
8  available.  Thank you.
9    A.  We wear the jumpsuits just to
10  protect us from the environment that we are in,
11  just to make sure that we are -- we have
12  clothing that is not going to, you know, that
13  we could take off and wash so we are not
14  bringing anything home with us or any kind of
15  toxins or contaminates that might be on those
16  clothes.
17    Q.  What was it you were doing that
18  would expose you to toxins and contaminants if
19  you can tell me, publicly.  Don't divulge any
20  DEA secrets, please.
21    MS. MAINIGI:  Objection.
22    THE WITNESS:  We regularly would be
23  in environments, for instance, you know, crack
24  houses, clandestine labs, where we would go
25  into environments that have some chemicals,

Page 387

1  toxic chemicals in the confines of the
2  residence.
3    We would have to dismantle potential
4  clandestine lab, then remove those
5  contaminants, those gross contaminant, the
6  chemicals that we have encountered that are
7  being used to manufacture methamphetamine.
8    BY MR. LANIER:
9    Q.  Was your work as a DEA agent, in
10  regards to some of this, ever one that put your
11  life at risk?
12    A.  Yes, sir.  Yes, sir.
13    Q.  All right.  You worked then as -- in
14  general enforcement, you worked as a group
15  supervisor.  Had work in the homicide unit.
16    What -- what other job work did you
17  do with the DEA?
18    A.  In 2000, I was transferred to DEA
19  headquarters as a staff coordinator for the
20  dangerous drugs and chemical section or
21  domestic operations west, which became the
22  dangerous drugs and chemical section, and
23  shortly thereafter, I was promoted to section
24  chief of that section.
25    Q.  Dangerous drugs and chemical

Page 388

1  section.  What is that?
2    A.  Dangerous drugs and chemicals
3  handled pretty much everything except for
4  cocaine, heroin and marijuana.  So every -- all
5  the synthetic drugs that you see, all the
6  manufactured clandestine --
7  clandestinely-manufactured drugs, drugs like
8  MDMA, methamphetamine, amphetamine,
9  fenfluramine X, fentanyl, all those drugs that
10  are clandestinely-manufactured fall under
11  the dangerous drugs, ecstasy, LSD.
12    Q.  All right.  And you changed and went
13  from being the staff coordinator for that to
14  the chief you said?
15    A.  Section chief.
16    Q.  Section chief.  Do you remember
17  about when that was?
18    A.  Probably around 2001.  Late 2000,
19  early 2001.
20    Q.  And beyond that, did you have any
21  other jobs with the DEA?
22    A.  Yes.  In -- I was -- in 2002, I was
23  transferred back to the Detroit field division
24  as assistant special agent in charge,
25  overseeing enforcement groups, HIDTA, the high

7 (Pages 385 - 388)

Page 389

1 intensity drug -- high intensity drug
2 trafficking area groups and also
3 administration.
4    Q.   All right.  And as we continue, Mr.
5 Rannazzisi, to look at your background, how --
6 what was your next job within DEA beyond that?
7    A.   In 2004, I was transferred back to
8 DEA headquarters as a deputy director to the
9 office of diversion control.
10   Q.   And where is DEA headquarters?
11   A.   In Arlington, Virginia.
12   Q.   So a suburb of Washington, D.C.?
13   A.   Yes, sir.
14   Q.   All right.  Deputy director to the
15 office of diversion control.  What were your
16 job responsibilities there?
17   A.   I was the number two person to the
18 deputy assistant administrator, at the time was
19 Bill Walker and my day-to-day responsibilities
20 were to review cases, make sure Mr. Walker had
21 the information he -- that was required for him
22 to make policy decisions, reviewing documents,
23 just basically ensuring that the office ran
24 smoothly under his control.
25   Q.   And is that the ultimate job that

Page 390

1 you held?  Did you keep that to retirement or
2 something else?
3    A.   I was only in that position for
4 about three months and then I was transferred
5 to the deputy chief of enforcement operations.
6    Q.   And so is this still around '04 or
7 so?
8    A.   Yes, September of '04.
9    Q.   And you became the deputy chief of
10 -- what did you call it, enforcement?
11   A.   Office of enforcement operations.
12   Q.   And what did you do as that?
13   A.   I was the -- behind the chief of
14 enforcement operations, we controlled all
15 enforcement operations in the DEA worldwide.
16 We oversaw all the enforcement.
17   Q.   So the DEA, and we may later look at
18 the DEA budget.  The DEA has reached where?
19   A.   66 countries, over 66 countries in
20 the world plus throughout the United States, 21
21 field divisions throughout the United States.
22   Q.   All right.  And you were the deputy
23 chief for enforcement?
24   A.   Yes, sir.
25   Q.   And how long did you keep that job,

Page 391

1 or what was your next job after that?
2    A.   In 2005, Mr. Walker was deployed,
3 military service, and so the administrator
4 asked me to take over the office of diversion
5 control in addition to doing my duties as
6 deputy chief of enforcement operations.  And
7 that was from about July of 2005 to January of
8 2006.
9    Q.   Okay.  What was your next job within
10 the company or company -- within the
11 government, the DEA?
12   A.   In 2006, Administrator Tandy asked
13 me to take the permanent deputy assistant
14 administrator job in the office of diversion
15 control.  I believe that was because Mr.
16 Walker's time in the military was extended
17 quite a bit and they didn't want to leave it as
18 a part-time job.  They wanted to fill it.
19   Q.   All right.  And what was your next
20 job after that?
21   A.   Retirement.
22   Q.   And so that took you up through
23 retirement?
24   A.   Yes.
25   Q.   Now I want to talk about since

Page 392

1 retirement, things that you've done, but before
2 I do that, so that the jury can put this into a
3 context, would you help us understand what
4 diversion -- why is diversion relevant in the
5 opioid litigation?
6       MS. MAINIGI:  Objection.
7       MR. EPPICH:  Objection.
8       BY MR. LANIER:
9    Q.   To you?
10   A.   Diversion is relevant because as
11 these opioids, these tablets, liquids,
12 whatever, move into the illicit marketplace,
13 they cause harm to the general public.
14 Overdoses, deaths, you know, are because
15 diversion exists, and if diversion or even a
16 small amount of diversion could cause a serious
17 amount of harm in the communities where the
18 diversion is occurring.
19   Q.   All right.  And so did you have
20 frontline responsibility and observation and
21 ability to learn and understand about the
22 perils of diversion?
23      MS. McCLURE:  Objection.
24      THE WITNESS:  Yes, sir.
25      BY MR. LANIER:

8 (Pages 389 - 392)

Page 393

1    Q.   Since you retired, and we will talk
2  about why you retired shortly, but since you
3  retired, what have you done?
4         MS. MAINIGI:  Objection.
5         THE WITNESS:  I took time off, you
6  know, quite a few months and then I was working
7  with a tech company that was basically trying
8  to create software to help the diversion -- to
9  help identify diversion.
10        In December of 2000 -- I guess it
11 was December 2016, I went to work for the tech
12 company sometime in 2016, I believe it was May
13 of 2016.
14        In December of 2016, I underwent
15 heart surgery and I was -- I basically came
16 back to the tech company for a very small brief
17 period of time because of what was going on
18 health-wise, I left the tech company, and then
19 I really -- most of my time was spent helping
20 -- helping people in the opioid litigation.
21        BY MR. LANIER:
22    Q.   All right.  So you are what is
23 called a consultant for folks; is that fair?
24    A.   Yes.
25        MS. McCLURE:  Objection.

Page 394

1         BY MR. LANIER:
2    Q.   And as a consultant, do you consult
3  with legal teams for example?
4    A.   Yes, sir.
5    Q.   What do you -- and I've never hired
6  you but I would assume some different lawyers
7  who may have litigation have.  What do you
8  charge as a consultant?
9    A.   $500 an hour.
10   Q.   Are you getting paid for your
11 testimony today?
12   A.   No, sir, except for my witness fee.
13   Q.   Which is?
14   A.   $56.
15   Q.   Per hour?
16   A.   No.  I think I got a check for $56.
17   Q.   You got 56 bucks for a couple of
18 days of your time?
19   A.   Yes, sir.
20   Q.   That is like jury duty.
21        MR. STEPHENS:  Objection.
22        BY MR. LANIER:
23   Q.   You have given speeches, I saw that
24 in one of the write-ups, you gave?
25   A.   Yes.

Page 395

1    Q.   Sometimes you get paid to give
2  speeches?
3    A.   Yes, sir.
4    Q.   Sometimes you give speeches for
5  free?
6    A.   Yes, sir.  It's groups where
7  families have lost children or lost loved ones.
8  Those are free.  I generally just ask them to
9  pay for my way out and back.  Law enforcement,
10 free, except again, if they pay my way out and
11 back.
12        Pharmacy -- some pharmacy groups,
13 especially if it is, like, a state, they are
14 doing -- if they are doing continuing
15 education, I will do those for free as well.
16   Q.   What do you speak about?
17   A.   Generally my speeches are tailored
18 to what the audience, what they are interested
19 in.  Sometimes I will speak about the overall
20 opioid crisis where we will just talk about,
21 you know, how it occurred, historically what
22 happened.
23        For pharmacists, I generally stay
24 towards corresponding responsibility, helping
25 the states and the pharmacists understand what

Page 396

1  corresponding responsibility is and what is
2  required of a pharmacist with prescriptions and
3  what they are supposed to do, how they are
4  supposed to resolve red flags.
5         A lot of times, I go and speak and
6  then just help the parents, talk to parents,
7  you know, who have lost kids, talk to parents
8  who just want to tell their story which, you
9  know, is definitely -- it's tragic, all those
10 kids and all those people.  Very tragic.
11   Q.   All right.  That's going to do our
12 first stop on the road.  So we have got your
13 background information here.
14        It is going to be relevant as we go
15 along, but I want to move to the next stop on
16 the road, which is what I call the 60 Minute
17 stop.  Okay?
18   A.   Yes, sir.
19        MR. STEPHENS:  Object to form.
20        BY MR. LANIER:
21   Q.   All right.  Let's move to the 60
22 Minute stop and we will get a sheet set up for
23 that stop and talk to you about that.  Okay?
24   A.   Yes, sir.
25   Q.   First set of questions here, how on

9 (Pages 393 - 396)

Page 397

1 earth -- by the way, this 60 Minutes, that the
2 TV show, right?
3     A.  Yes, sir.
4     Q.  That's the one that's got on those
5 ads, the ticking clock, tick, tick, tick, tick,
6 tick?
7     A.  Yes, sir.
8     Q.  All right.  What -- how did you even
9 get involved to get on 60 Minutes?  How did
10 that come about?
11     MS. McCLURE:  Objection.
12     THE WITNESS:  I -- it basically
13 didn't start with 60 Minutes.  It started with
14 reporters calling asking certain things about
15 the opioid crisis and I never -- if a reporter
16 called and asked questions, I felt obligated to
17 answer them.
18     As more reporters called, reporters
19 obviously read other reports and they started
20 -- Washington Post called and they were looking
21 at a story and they asked several questions and
22 I explained how things happened and how things
23 occurred in the opioid crisis, and they were
24 very interested in the Insurance Patient Access
25 Act and one thing led to another and they

Page 398

1 started writing about different things and the
2 interplay between, you know, Congress and other
3 entities.
4     From there, 60 Minutes started
5 working with the Washington Post and we ended
6 up on 60 Minutes.
7     BY MR. LANIER:
8     Q.  Was not something you sought out?
9     A.  No, sir.
10     MR. STEPHENS:  Object to form.
11     BY MR. LANIER:
12     Q.  Why you?  Do you know?
13     MR. STEPHENS:  Object to form.
14     BY MR. LANIER:
15     Q.  Let me ask it this way.  Let me
16 re-ask the question.
17     In your mind, what made you
18 particularly important or useful for a 60
19 Minutes story?
20     MS. MAINIGI:  Objection.
21     MR. EPPICH:  Objection.
22     THE WITNESS:  I think because I was
23 -- I was there during that time period.  I was
24 there during the time period where the deaths
25 increased or the overdoses increased, and quite

Page 399

1 frankly, they saw -- they saw my testimony
2 before Congress and it wasn't difficult to see
3 in my testimony before Congress, you know, it
4 was -- there was a lot of -- there was quite a
5 bit of tension between what DEA was doing and
6 what Congress wanted us to do.
7     BY MR. LANIER:
8     Q.  All right.  If we -- I don't want to
9 go back necessarily to your background, but one
10 of the things that you did when you worked for
11 the DEA that we have left out is your testimony
12 to Congress.
13     You testified to Congress; is that
14 right?
15     A.  Yes, sir.
16     Q.  Do you recall how many times you got
17 called on to come give testimony to the United
18 States Congress?
19     A.  I believe it's right around 33,
20 maybe a little more.
21     Q.  So 33 times you were selected I
22 assume, or were you invited or how does that
23 work?
24     MR. STEPHENS:  Objection.
25     THE WITNESS:  Sometimes I was

Page 400

1 requested, other times, just a general witness
2 was requested to the department and DEA and I
3 was offered as the witness.
4     BY MR. LANIER:
5     Q.  You got served up to go testify?
6     MR. EPPICH:  Objection.
7     BY MR. LANIER:
8     Q.  Was that kind of a scary thing to do
9 at least the first few times?
10     A.  I think the first -- first couple of
11 times, it was a little unnerving but as you do
12 it, just like testifying in court.  Once you --
13 you know.  It is not a -- the difference is the
14 United States Congress, there is really no
15 rules.  I mean, they can pretty much ask
16 whatever they want and it could get -- it could
17 get a little adversarial sometimes.
18     Q.  I mean, it's not -- when you go to
19 court, you can drive and park in a garage
20 nearby.  There is not, like, parking right at
21 the U.S. Congress, is there?
22     MR. EPPICH:  Objection.
23     THE WITNESS:  No.
24     BY MR. LANIER:
25     Q.  How -- where would you be giving

10 (Pages 397 - 400)

Page 401

1  this testimony?
2     A.   Depending on what committee it was
3  and the committee offices, the different
4  buildings that surround Congress, that surround
5  the Capitol, generally we go there, we would be
6  dropped off and then picked up.
7     Q.   All right.  Okay.  So we are talking
8  about this in terms of 60 Minutes, that they --
9  you had been there.  You were at the DEA you
10  said.  You said that they had probably seen
11  your testimony before Congress and some things
12  like that.
13       What was the story that you were
14  there to testify about?
15       MR. STEPHENS:  Object to form.
16       BY MR. LANIER:
17    Q.   Not testify.  Let me re-ask that.
18       What was the story behind the 60
19  Minutes episode as you understood it?
20       MR. STEPHENS:  Same objection.
21       MR. EPPICH:  Objection.
22       THE WITNESS:  Congress had passed a
23  bill called the Insurance Patient Access Act
24  and that bill in my opinion, hampered DEA's
25  ability to go after large manufacturers and

Page 402

1  distributors with a tool that we had called an
2  immediate suspension order.  It also weakened
3  DEA's ability to do their administrative job,
4  to stop the flow of controlled substances into
5  the illicit marketplace quickly.
6       BY MR. LANIER:
7     Q.   Have I written this accurately, that
8  from your understanding, Congress passed a bill
9  that you, Joe Rannazzisi thought hampered the
10  DEA's ability to do its job stopping the flow
11  of drugs?
12     A.   Drugs -- the controlled substances
13  into the illicit marketplace.
14     Q.   That's diversion?
15     A.   That would be diversion, yes.
16     Q.   Had you spoken out against this
17  bill?
18       MR. EPPICH:  Objection.
19       THE WITNESS:  Yes.  Beginning --
20  when the bill was initially introduced the end
21  of '13, early '14, when I was still in my
22  former position, I was very vocal about what
23  the consequences of the bill would be, even in
24  the earliest form, that it would decrease DEA's
25  ability to go after these manufacturers and

Page 403

1  distributors because of the way the bill was
2  written.
3       BY MR. LANIER:
4     Q.   When you say, "go after
5  manufacturers and distributors," are we talking
6  about including on the opioid matters?
7     A.   Yes, sir.
8       MR. EPPICH:  Objection.
9       MS. MAINIGI:  Objection.  Form.
10       THE WITNESS:  Any controlled
11  substance, it doesn't matter, but yes, opioids.
12       BY MR. LANIER:
13     Q.   Was your concern in part -- at least
14  in large part, the opioid crisis?
15       MR. EPPICH:  Objection.
16       MS. MAINIGI:  Objection.
17       THE WITNESS:  Opioids and
18  benzodiazepines at that point, yes.
19       BY MR. LANIER:
20     Q.   And what do you mean by, "stop the
21  ability of the DEA to go after?"  What do you
22  mean by "go after?"
23     A.   We couldn't investigate
24  manufacturers and distributors for diversion,
25  just like pharmacists and doctors.  The

Page 404

1  difference is, when we made a decision that
2  there was an imminent threat, imminent danger
3  to public health and safety, we had a tool at
4  our disposal to stop, to do an immediate
5  suspension on a DEA registration and while
6  still affording due process, stopping the
7  action, stopping the hemorrhaging of drugs into
8  a community or into a state, and what we were
9  worried about was, we could still investigate
10  but the provisions of the bill that were passed
11  now prevented us from using that immediate
12  suspension tool against the upstream
13  manufacturers and distributors and it also gave
14  them -- it was almost like a get out of jail
15  free card.
16       They could basically submit a
17  corrective action plan and at that point in
18  time, we would have to determine whether to
19  stop the administrative action from occurring
20  and allowing them to continue, and the whole
21  idea behind this was, if we did an order to
22  show cause or administrative inspection or an
23  immediate suspension order, the fact was, that
24  we didn't believe, we didn't have confidence
25  that those manufacturers or distributors would

11 (Pages 401 - 404)

Page 405

1  continue to operate without diverting drugs.
2  Q.  You have used a lot of terms that
3  are -- perhaps depending upon the level of the
4  trial, at what point we are, that may be
5  unusual terms for some people.
6  So at the risk of making you be an
7  educator, will you help us understand some of
8  these terms, please?
9  A.  Sure.
10  Q.  First of all, what is a controlled
11  substance?
12  A.  A controlled substance is a
13  substance that is under one of five schedules
14  in the Controlled Substances Act.
15  Q.  There is an actual act passed by
16  Congress called the Controlled Substances Act?
17  A.  Yes, sir.  It's under Title 21
18  United States Code 800 throughout -- in fact,
19  scheduling actions, I believe are 21 USC 811 or
20  12.  I think it was 811.
21  And the Controlled Substances Act
22  set out five schedules.  Schedule I being the
23  most abused drugs that have no medical use.
24  Schedule II would be drugs that have a medical
25  use but they have a high incidence of physical,

Page 406

1  psychological dependence.
2  Q.  All right.  I'm going to pause
3  there.  There are five, but these are two that
4  help us out.
5  Schedule II, you said drugs that
6  have a medical use?
7  A.  Yes, sir.
8  Q.  But have a high incidence of
9  physical logical dependence?
10  MR. EPPICH:  Object to form.
11  BY MR. LANIER:
12  Q.  Explain that, please.
13  MR. EPPICH:  Object to form.
14  BY MR. LANIER:
15  Q.  Go ahead.
16  A.  It's physical or psychological --
17  Q.  Thank you.
18  A.  -- dependence.
19  Q.  All right.  So have a medical use,
20  but a high incidence -- is that what we would
21  commonly just call addiction?
22  MS. McCLURE:  Objection.
23  THE WITNESS:  You can -- you could
24  place addiction into that.
25  BY MR. LANIER:

Page 407

1  Q.  So it would be more than addiction
2  but it would include addiction?
3  A.  Yeah.
4  Q.  Physical, psychological abuse?
5  A.  Dependence.
6  Q.  Dependence.  Sorry.  Dependence.
7  And that would include addiction?
8  MR. EPPICH:  Objection.
9  THE WITNESS:  Yes.
10  BY MR. LANIER:
11  Q.  Are opioids in one of these -- are
12  opioids a controlled substance?
13  A.  Yes.
14  Q.  What type of a controlled substance
15  are opioids?
16  MS. MAINIGI:  Objection.
17  BY MR. LANIER:
18  Q.  What category?
19  A.  In Schedule I, heroin is an opioid.
20  It doesn't have a medical use but it is an
21  opioid and it's found in the illicit
22  marketplace.
23  Schedule II, you have drugs like
24  oxycodone, hydrocodone, fentanyl.  I mean,
25  those were the -- those were the big ones.

Page 408

1  Q.  And are those what we could commonly
2  call opioids?
3  A.  Yes, sir.  Morphine is -- morphine
4  is in Schedule II as well.  Morphine is a
5  natural product so it's included in an opioid,
6  as an opioid, but it's actually an opiate.
7  All the rest of those drugs are
8  semisynthetic or synthetic drugs.  Morphine is
9  a natural product that's derived from the
10  poppy.
11  Q.  So what, under the Controlled
12  Substances Act, what happens to these
13  controlled -- these opioids that are Category 2
14  controlled substances?
15  MS. McCLURE:  Object to form.
16  MS. MAINIGI:  Objection.
17  MR. EPPICH:  Objection.  Vague.
18  THE WITNESS:  I'm sorry.  Could you
19  --
20  BY MR. LANIER:
21  Q.  Yeah, yeah, yeah.  It may be too
22  vague.
23  We got to this because you said that
24  the bill made it more difficult to go after
25  manufacturers and distributors, you lost the

12 (Pages 405 - 408)

Page 409

1  tool to suspend and stop the actions, in
2  essence gave the companies a get out of jail
3  free card.
4      A.  Yes, sir.
5          MR. EPPICH:  Objection.
6          BY MR. LANIER:
7      Q.  So with that as the background, I
8  said what are the controlled substances and you
9  started telling us about the Act.  What is it
10  that the DEA had the ability to do?
11         MR. EPPICH:  Objection.  Form.
12         MS. MAINIGI:  Objection.
13         MS. McCLURE:  Objection.
14         THE WITNESS:  If we identified in
15  the supply chain diversion, moving drugs into,
16  you know, out of the legitimate supply chain to
17  an environment or climate of diversion where
18  people are abusing the drugs that they are
19  seeking or they're getting from that supply
20  chain, at that point in time, we could stop it.
21         We, you know, the administrator
22  makes a determination that the activity of
23  diversion that is occurring is an imminent
24  danger to public health and safety and at that
25  point in time, we execute, issue an immediate

Page 410

1  suspension order with an order to show cause
2  and that would stop them from doing any
3  controlled substance business, so that would
4  stop them from distributing oxycodone,
5  hydrocodone, fentanyl downstream.  That's how
6  it would work.
7          BY MR. LANIER:
8      Q.  So we will get to this in more
9  detail later, but did the Controlled Substances
10  Act put any responsibilities on the
11  manufacturers, the distributors, the retailers?
12         MR. EPPICH:  Objection.
13         THE WITNESS:  Yes, sir.  Every
14  registrant, every DEA registrant must maintain
15  effective controls against diversion.
16         BY MR. LANIER:
17     Q.  All right.  You just used another
18  word I want to make sure we define, a
19  registrant.  What do you mean -- what is a
20  registrant?
21     A.  A DEA registrant is a controlled
22  substance handler, a dispenser, a distributor
23  so a practitioner that prescribes is a DEA
24  registrant, if he prescribes controlled
25  substances.  A pharmacy that dispenses

Page 411

1  medication, they are -- that pharmacy is a DEA
2  registrant.  Not the pharmacist, but the
3  pharmacy.
4          The hospital is a DEA registrant, a
5  manufacturer is a DEA registrant, a distributor
6  is a DEA registrant, a nurse is not a DEA
7  registrant unless they are a prescribing nurse,
8  a practitioner, in which case they would be a
9  DEA registrant.
10         So the Controlled Substances Act and
11  the regulations specifically outline who is a
12  registrant and what their requirements are to
13  maintain a registration and all DEA registrants
14  must maintain effective controls against
15  diversion.  That's 1301.71.
16     Q.  All right.  So if the DEA registrant
17  is someone who is registered to handle opioids,
18  for example, we are segregating out opioids,
19  are manufacturers registrants, manufacturers of
20  opioids?
21     A.  Yes, sir.
22     Q.  Are the distributors of those
23  opioids from the manufacturers to the
24  pharmacies or hospitals or whatever --
25         MS. MAINIGI:  Objection.  Form.

Page 412

1          BY MR. LANIER:
2      Q.  -- are they registrants?
3      A.  Yes, sir.  If they are dealing with
4  controlled substances, absolutely.
5      Q.  And if the sellers are selling
6  opioids, are they registrants?
7      A.  The sellers being the pharmacies?
8      Q.  Yes.
9      A.  Yes.
10     Q.  And then prescribers of opioids,
11  would they be registrants?
12     A.  Yes.
13     Q.  Hospitals that dispense opioids,
14  would they be registrants?
15     A.  Yes.
16     Q.  In other words, can just anyone on
17  the street or any company or any business, can
18  the Kroger's grocery store outside of the
19  pharmacy section -- or maybe not Kroger's,
20  let's say mom and pop grocery stores, can
21  anyone handle or sell opioids openly?
22         MR. EPPICH:  Objection.
23         THE WITNESS:  No, sir.  You have to
24  have a controlled substance registration.  You
25  have to be licensed by the state and registered

13 (Pages 409 - 412)

Page 413

1  with DEA to handle a controlled substance.
2       BY MR. LANIER:
3       Q.   Is -- all right.  These are good
4  definitions.
5            Here is what I would like to do now.
6  I have got some quotes that you gave in the 60
7  Minute story and I want to ask you about some
8  of those quotations.  Okay?
9       A.   Sure.
10      Q.   So what we will do is, we will come
11 up here and we'll put those quotation across
12 the top here.
13           First of all, you spoke about the
14 three largest distributors.  Explain to the
15 jury what a distributor is.
16      MR. STEPHENS:  Object to form.
17      THE WITNESS:  A distributor obtains
18 drugs from a manufacturer, controlled
19 substances from a manufacturer, and then
20 distributes -- distributes those controlled
21 substances downstream to pharmacies, hospitals,
22 and in some cases nursing homes, to --
23 basically distributing to DEA registrants
24 that -- outlets that provide patient care that
25 are allowed to maintain stocks of controlled

Page 414

1  substances.
2       BY MR. LANIER:
3       Q.   You said, and I'm going to quota you
4  here -- let me put it up so that you can see
5  it.
6            The three largest distributors are
7  Cardinal Health, McKesson and
8  AmerisourceBergen.  They control probably 85 or
9  90 percent of the drugs going downstream.
10           Did that reflect what you believed
11 to be the truth?
12      MR. EPPICH:  Object to the form.
13      Object to the fact that we are not
14 seeing the citation or the identification of
15 where this quote is coming from.
16      MR. BENNETT:  I will object to scope
17 and remind Mr. Rannazzisi that you are not
18 allowed to base personal opinions on nonpublic
19 facts or information you've acquired in
20 performance of your official duties.
21           To the extent that you can answer
22 this question outside of nonpublic facts or
23 information you acquired with the DEA, you may
24 answer.
25      BY MR. LANIER:

Page 415

1       Q.   So that I am real clear, I am
2  reading word for word what you said on 60
3  Minutes and I am just asking you to explain
4  what you said already publicly on 60 Minutes.
5       A.   I believe that that is accurate,
6  based -- there is actually -- that was based on
7  a document that was done, industry document,
8  where they were talking about 80 to 90 percent
9  of the revenue for downstream sales were -- 80
10 to 90 percent of the revenue -- I think it was
11 85 to 90 percent of the revenue of downstream
12 sales were based on Cardinal, McKesson and
13 AmerisourceBergen.
14      Q.   Did you have experience interacting
15 with those distributors?
16      MR. EPPICH:  Object to form.
17      THE WITNESS:  Personally?  Maybe two
18 of the three, but for the most part, my staff
19 -- my staff interacted with all three of those
20 companies.
21      BY MR. LANIER:
22      Q.   You also said, this is an industry
23 that is out of control.  What they want to do
24 is, what -- is do what they want to do and not
25 worry about what the law is and if they follow

Page 416

1  the law and drug supply -- and if they don't
2  follow the law and drug supply, people die,
3  that's just it, people die.
4            Do you remember saying that on 60
5  Minutes?
6       A.   Yes, sir.
7       MR. STEPHENS:  Object to form.
8       BY MR. LANIER:
9       Q.   Was it an industry, based on your
10 experience and opinion, that was out of
11 control?
12      MR. EPPICH:  Object to form.
13      MR. BENNETT:  Objection.  Scope.
14      Same instruction.
15      THE WITNESS:  Yes, sir.
16      BY MR. LANIER:
17      Q.   Explain what you mean by that,
18 please.
19      A.   I think for starters, we -- when we
20 saw the initial problem, we sat down and
21 explained to them what the requirements were
22 under the law.  We kind of refreshed their
23 recollection on what the regulations were and
24 what their requirements were under the statute
25 and under the regulations, under 1301.74 and

14 (Pages 413 - 416)

Page 417

1 also under A23 -- 21 USC A23.
2      We sent letters, we tried to push
3 them, enforce them into compliance, but they
4 just -- they wouldn't comply, and my
5 observations were that when they decided they
6 didn't want to comply, they just used influence
7 to create a law or to change a law, so yeah, I
8 pretty much believed that they were out of
9 control.
10      BY MR. LANIER:
11      Q.   All right.  What I would like you to
12 do is explain to us, please, what the
13 requirements were for compliance.
14      What -- what was industry supposed
15 to be doing --
16      MS. MAINIGI:  Objection.  Form.
17      BY MR. LANIER:
18      Q.   -- that you thought they weren't
19 doing?
20      A.   Well, first of all, all DEA
21 registrants are required to maintain effective
22 controls against diversion.  Now, when you look
23 at the definition of maintaining effective
24 controls against diversion, that includes
25 security provisions and one of the security

Page 418

1 provisions was to create and operate a system
2 that identifies suspicious orders to the
3 registrant.
4      A suspicious order in the regulation
5 is an order of unusual size, frequency or
6 substantially deviating from the normal
7 ordering pattern.  The suspicious order is
8 supposed to be reported to DEA when found, when
9 discovered.
10      Q.   All right.  I'm going to break this
11 apart into subparts to make sure that I have
12 got it.
13      So what compliance is required, was
14 my question, and you started out by saying all
15 of the registrants.
16      So we remember, a registrant you
17 said is someone who is registered to handle --
18 we are talking opioids here, so it would
19 include manufacturers and distributors and
20 sellers, prescribers and hospitals?
21      A.   Uh-huh.
22      Q.   All registrants are required to
23 maintain effective control against diversion.
24 How?
25      A.   Well, again, in the regulations,

Page 419

1 when looking -- I think the regulations are
2 very specific.  It says when an administrator
3 is looking to see or to determine that the
4 registrant is maintaining effective controls
5 against diversion, the administrator is
6 directed to the regulations in 1301.72 to 75, I
7 think it is, and 1301.74 -- 1301.74(b) is the
8 provision that requires suspicious order
9 reporting, 1301.
10      Q.   So the registrants, these
11 manufacturers, distributors, sellers, et al.,
12 the registrants are required to report a
13 suspicious order?
14      A.   Yes, they are required to maintain a
15 system that identifies suspicious orders and
16 then they are supposed to report those
17 suspicious orders when discovered.
18      Q.   So in addition to reporting one, you
19 said they are supposed to maintain a system to
20 detect it?
21      A.   Yes.
22      Q.   What type of a system did -- would
23 DEA -- would the DEA dictate that system or --
24 explain that to us, please.
25      MR. EPPICH:  Object to form.

Page 420

1      THE WITNESS:  The systems that are
2 -- that are in place, that's a business
3 decision.  The company must determine what --
4 what system is correct for their business model
5 or how they are doing business, as long as it
6 identifies, you know, the definition of a
7 suspicious order, an order of unusual size,
8 frequency or substantially deviating from the
9 normal ordering pattern, that is what the
10 requirement is, and the -- it was the
11 industry's or the registrant's system so they
12 were to create that system.
13      BY MR. LANIER:
14      Q.   All right.  So it's a business
15 decision based upon, I guess it might be
16 different for a manufacturer than a distributor
17 than a seller, et cetera?
18      MR. EPPICH:  Object to form.
19      MR. STEPHENS:  Objection.
20      MS. MAINIGI:  Object to form.
21      THE WITNESS:  Yes.
22      BY MR. LANIER:
23      Q.   But whatever decision they make, was
24 it required that they identify these suspicious
25 orders?

15 (Pages 417 - 420)

Page 421

1    MR. EPPICH:  Object to form.
2    THE WITNESS:  They must identify the
3  suspicious orders and report them.
4    BY MR. LANIER:
5    Q.   All right.  You have now used
6  another word that I want to make sure we
7  define, a suspicious order.
8    What is a suspicious order?
9    A.   By definition, a suspicious order is
10  a controlled substance order that is of unusual
11  size, unusual frequency or substantially
12  deviating from the normal ordering pattern.
13    Q.   A substantial deviation from normal
14  pattern?
15    A.   Yes.
16    Q.   Does it have to be all three of
17  those?
18    A.   No.
19    MR. EPPICH:  Object to form.
20    THE WITNESS:  No, it doesn't.
21    BY MR. LANIER:
22    Q.   Two of them?
23    MR. EPPICH:  Object to form.  Calls
24  for a legal conclusion.
25    MS. McCLURE:  Object to form.

Page 422

1    BY MR. LANIER:
2    Q.   Based upon the practice -- I am
3  talking to you.  I know you are a lawyer, but I
4  am talking to you based upon the practice of
5  the DEA and what they would enforce.
6    A.   It doesn't -- it doesn't have to be
7  all three.  It doesn't have to be two of the
8  three.  Generally, it is multiple, but for the
9  most part, it could be just one.
10    Q.   Okay.  So the company -- the
11  registrants are required to maintain effective
12  control to detect suspicious orders and
13  identify them.
14    Who do they report these suspicious
15  orders to?
16    A.   The Drug Enforcement Administration.
17    Q.   Do they simply report them or does
18  it have any implications for whether or not
19  they ship them?
20    MR. EPPICH:  Object to the form.
21    THE WITNESS:  We -- we took the
22  position that if you're maintaining effective
23  controls against diversion and you have a
24  suspicious order, you wouldn't ship that
25  because by definition, it's suspicious, without

Page 423

1  doing due diligence to make a determination and
2  resolving suspicions.  So it was the position
3  that those orders should not be shipped unless
4  the suspicions were resolved.
5    BY MR. LANIER:
6    Q.   So unless a full due diligence
7  resolved suspicions, you don't ship?
8    MS. McCLURE:  Objection to form.
9    THE WITNESS:  That's correct.
10    MR. EPPICH:  Objection.  Leading.
11    BY MR. LANIER:
12    Q.   All right.  Now, your statement then
13  to 60 Minutes was, this industry's out of
14  control, what they want to do is do what they
15  want to do and not worry about what the law is.
16    What, that you can tell us about,
17  did you base that opinion on?
18    MR. STEPHENS:  Object to form.
19    MR. EPPICH:  Objection to the Touhy
20  authorization to the extent you are calling for
21  any information that he learned during his time
22  at the DEA.
23    MR. BENNETT:  Mr. Rannazzisi has
24  been authorized to disclose his personal
25  recollection regarding your interactions with

Page 424

1  manufacturers and distributors of opioids
2  during your tenure at the office of diversion
3  control and your recollection of communication
4  with those registrants regarding suspicious
5  orders.
6    So you are authorized to talk about
7  those communications and interactions.
8  However, you are not authorized to disclose any
9  information regarding nonpublic specific DEA
10  investigations or activities.
11    THE WITNESS:  Okay.  Thank you.
12    Initially in 2005, we sat down with
13  the three major distributors and explained to
14  them what the diversion problem was at that
15  point in time and what they needed to do.  We
16  reminded them that they must file suspicious
17  order reports with the DEA.
18    We gave them specific instances of
19  -- of orders for each distributor that would be
20  deemed suspicious, that should have been deemed
21  suspicious, should have been reviewed,
22  reconciled, and we explained that that is what
23  -- not only what we expect, but that is what
24  the law requires, what the regulation requires.
25    And we tied it back to maintaining

16 (Pages 421 - 424)

Page 425

1 effective controls against diversion explaining
2 that their -- their licenses, their DEA
3 registrations required them to maintain
4 effective controls against diversion.
5      After that, we sent out letters with
6 almost the same language explaining what the
7 requirements were, but it continued to happen.
8 It continued to not file suspicious orders or
9 to go around the suspicious order requirement
10 or creating systems where the systems looked
11 good but they were not executing systems as
12 required, and I think that is what I -- the
13 second round, after we served orders to show
14 cause and immediate suspension orders in 2007
15 and I guess '7 and '8 -- '6, '7 and '8, the
16 second round, when it still occurred, only
17 instead of the Internet, it was pain clinics
18 but the same patterns were occurring.
19      We took the same action against them
20 for doing the same things.  It was a different
21 type of -- a different type of diversion, but
22 it was the same pattern of activity and they
23 still didn't -- they still didn't comply.
24      And again, when they decided that,
25 you know, they just didn't want to get fined

Page 426

1 anymore, they just didn't want to have their --
2 their registrations revoked, suspended, they
3 brought it to Congress and changed the law.
4 That's what I meant by out of control.
5      BY MR. LANIER:
6      Q.  All right.  And then the last part
7 of your statement here, if they don't follow
8 the law in drug supply, people die.  That's
9 just it.  People die.
10      Explain what you meant when you said
11 that.
12      MR. STEPHENS:  Object to form.
13      MS. MAINIGI:  Object to form.
14      THE WITNESS:  Again, when you have
15 diversion and these drugs are -- are going out
16 into the community and getting into the wrong
17 hands, the drugs are being used without
18 supervision.  The drugs are being abused.  It
19 causes overdose, that causes death.
20      That is why our police officers had
21 to start carrying Naloxone because there were
22 overdoses.  Some communities were overrun with
23 overdoses.  We were losing people left and
24 right.  In '15 or '14, we lost over 16,000
25 people just to the pharmaceuticals.  That's

Page 427

1 what -- that's what I meant by people die.
2 Diversion causes death.
3      MR. LANIER:  Okay.  Can we take a
4 break for a moment, please.  Go off the record.
5      THE VIDEOGRAPHER:  We're going off
6 the record.  The time is 9:52.
7      (A short recess was taken.)
8      THE VIDEOGRAPHER:  We are going back
9 on record.  Beginning Media File No. 2.  The
10 time is 10:09.
11      BY MR. LANIER:
12      Q.  Okay.  Before the break, we had gone
13 through our roadmap, Mr. Rannazzisi, and we had
14 done background.  We talked about the 60
15 Minutes and you were starting to explain some
16 of the background behind the 60 Minute story,
17 so I'm going to transition us to follow up as
18 our last stop on the road.
19      What we're going to do with follow
20 up is, I want to follow up with some more
21 information and questions about the 60 Minute
22 things and about what you have said, but I also
23 want to talk about some potential roadblocks
24 that have been discussed with you.  Okay?
25      A.  Yes, sir.

Page 428

1      Q.  All right.  In that regard then, we
2 were on this sheet where we were talking about
3 the diversion methods and I am transitioning us
4 to overflow or follow up so that we can make
5 our subsequent notes.
6      Specifically, you said you sent
7 letters in 2006 and 2007 after you had already
8 sat with the distributors and explained the law
9 and what was expected.
10      Do you recall that testimony?
11      A.  Yes, sir.
12      Q.  I'd like to show you those letters,
13 two of the letters at least and talk to you
14 about them in some detail.
15      So the first letter we will mark as
16 exhibit number -- do you remember what the next
17 exhibit number is?  Am I safe saying Exhibit
18 No. 1?
19      All right.  We're going to call this
20 Exhibit No. 1 and let me give you a copy of it
21 as well, sir.
22      (Deposition Exhibit 1 was marked for
23 identification.)
24      MR. LANIER:  And counsel.
25      BY MR. LANIER:

17 (Pages 425 - 428)

Page 429

1    Q.   So what I have got here marked as
2  Exhibit No. 1 is U.S. Department of Justice
3  Drug Enforcement Administration.
4         By the way, what does that
5  Department of Justice mean on top of DEA?
6         MR. EPPICH:  Object to form.
7         MS. MAINIGI:  Objection to form.
8         THE WITNESS:  The Drug Enforcement
9  Administration is under the Department of
10 Justice, United States Department of Justice.
11        BY MR. LANIER:
12    Q.   Okay.  So if we were to chart
13 through the government and put, like, a
14 corporate tree of the government, the DEA is
15 under the DOJ, the Department of Justice?
16    A.   Yes, sir.
17    Q.   But the DEA here is the DEA where
18 you were sitting as -- they moved you up
19 through a bunch of different jobs.  That was
20 the DEA with the badge, right?
21        MR. EPPICH:  Objection.
22        THE WITNESS:  Yes, sir.
23        BY MR. LANIER:
24    Q.   All right.  So we've got a letter
25 here.  The letter seems to be about four pages

Page 430

1  and at the very end, it is signed by Joseph T.
2  Rannazzisi, deputy assistant administrator,
3  office of diversion control.  Is that you?
4     A.   Yes, sir.
5     Q.   And if we go back to the background
6  sheet where we started with you, deputy
7  assistant administrator, office of diversion
8  control, this is what you were moved to
9  permanently in 2006; is that right?
10    A.   Yes, sir.
11    Q.   All right.  So I would like to talk
12 to you about this letter that you sent and have
13 you help us understand some parts of it.
14        First of all, can you tell the jury
15 what the date of the letter was?
16    A.   September 27 of 2006.
17    Q.   And you're sending this letter, this
18 letter is being sent to every commercial entity
19 in the United States registered with the DEA to
20 distribute controlled substances.
21        Did I read that correctly?
22    A.   Yes, sir.
23        MR. LANIER:  Let's go off the
24 record.
25        THE VIDEOGRAPHER:  We're going off

Page 431

1  record.  The time is 10:13.
2         (A short recess was taken.)
3         THE VIDEOGRAPHER:  Going back on
4  record.  Beginning Media File No. 4.  The time
5  is 10:15.
6         BY MR. LANIER:
7     Q.   Every -- you sent this letter to
8  every commercial entity registered with the DEA
9  to distribute controlled substances.
10        Are those what you defined earlier
11 as DEA registrants?
12    A.   No.  It would just be the
13 distributors and the manufacturers.
14    Q.   All right.  You referenced
15 "industry" a few times in your testimony.  Is
16 that what industry would be to you?
17    A.   Distributors and manufacturers,
18 yeah, that would pretty much be industry.
19    Q.   So you sent this letter to each of
20 them.  The purpose of this letter is to
21 reiterate the responsibilities.
22        What do you mean by reiterate?
23    A.   This letter was sent as a follow up
24 to the face-to-face meetings we had with some
25 of the distributors and then also to the other

Page 432

1  distributors and manufacturers, again, just
2  making sure they understand what their
3  obligations were, what the obligations that
4  they signed on to when they became DEA
5  registrants.
6     Q.   Were these obligations already there
7  or were you making new policy?
8     A.   No, the --
9         MS. MAINIGI:  Objection.
10        THE WITNESS:  The obligations in
11 1301.74(b) and in 823(e) and (a), (b), were all
12 in place since the early stages of the
13 Controlled Substances Act, over 40 years.
14        BY MR. LANIER:
15    Q.   Since the 1970s?
16    A.   Yes.
17    Q.   So if lawyers or experts or someone
18 within industry were to suggest that you, Joe
19 Rannazzisi, were initiating a brand new
20 responsibility in this 2006 letter, would they
21 be correct?
22        MR. EPPICH:  Object to form.
23        MS. MAINIGI:  Object to form.
24        MR. STEPHENS:  Object to form.
25        THE WITNESS:  In -- in my opinion,

18 (Pages 429 - 432)

Page 433

1　no.  Absolutely not.  Again, 1301.74(b) has
2　been in place for -- since the '70s, well over
3　40 years.  This is nothing new.  We just wanted
4　to make sure they remembered what their
5　responsibilities were.
6　　　　BY MR. LANIER:
7　　Q.   All right.  So you're writing to
8　make sure that they remember their
9　responsibilities?
10　　　　MR. EPPICH:  Object to form.
11　　　　THE WITNESS:  Yes.
12　　　　BY MR. LANIER:
13　　Q.   Now, in this regard, let's look at
14　what you say about those responsibilities in
15　the letter that you sent out marked as Exhibit
16　No. 1.
17　　　　You were talking about the purpose
18　is to reiterate these responsibilities of
19　distributors in view of the prescription drug
20　abuse problem our nation currently faces.
21　　　　What was that drug abuse problem
22　that you were writing about in 2006?
23　　A.   The problem of the abuse, use and
24　abuse of hydrocodone, mostly hydrocodone and
25　then oxycodone that was diverted from the

Page 434

1　supply chain.
2　　Q.   So opioid diversion?
3　　A.   Yes, sir.
4　　Q.   And then you continued to say, as
5　each of you is undoubtedly aware, the abuse of
6　controlled prescription drugs is a serious and
7　growing health problem in this country.
8　　　　Did I read that correctly?
9　　A.   Yes, sir.
10　　Q.   You put in there, you chose these
11　words, as each of you are undoubtedly aware.
12　　　　Why did you feel confident saying
13　that they were undoubtedly aware of this?
14　　　　MS. MAINIGI:  Objection. Form.
15　　　　MS. McCLURE:  Objection. Form.
16　Foundation.
17　　　　MR. EPPICH:  Object to form.
18　　　　THE WITNESS:  Well, for the
19　companies that we had already done face-to-face
20　meetings with, we explained that to them, but
21　there was news reports out there, the states
22　were sending out their own reports, state
23　boards of pharmacy were sending out reports,
24　you know, identifying opioid abuse as a
25　problem, so between the state regulators, the

Page 435

1　news media and DEA, I think we laid a pretty
2　good foundation for the abuse problem plus
3　NIHTA and FDA were talking about the abuse
4　problem in the United States.
5　　　　BY MR. LANIER:
6　　Q.   Okay.  You then go on to talk about
7　enforcing the Controlled Substances Act and I
8　want -- the CSA is what you abbreviated it as.
9　　　　Do you see that?
10　　A.   Yes, sir.
11　　　　MR. EPPICH:  Object to form.
12　　　　BY MR. LANIER:
13　　Q.   Is that the same Controlled
14　Substances Act that when you were giving us
15　definitions, you said categorized drugs into
16　various categories.
17　　A.   Schedules, yes.
18　　Q.   Schedules.  Thank you.  And that's
19　where you said under that Act, if diversion was
20　identified back then, the DEA could stop it
21　hopefully.
22　　A.   Yes.
23　　　　MS. McCLURE:  Object to form.
24　　　　BY MR. LANIER:
25　　Q.   I guess the big "if" there is, if

Page 436

1　the diversion is identified.  Fair?
2　　　　MR. EPPICH:  Object to form.
3　　　　THE WITNESS:  Yes.
4　　　　BY MR. LANIER:
5　　Q.   Can't stop something you don't know
6　about, right?
7　　　　MR. EPPICH:  Object to form.
8　　　　THE WITNESS:  Yes, sir.
9　　　　BY MR. LANIER:
10　　Q.   All right.  So you talk here about
11　that Act in some detail to the registrants, the
12　manufacturers and distributors.
13　　　　You say the CSA, that's the
14　Controlled Substances Act, was designed by
15　Congress to combat diversion.  It does it by
16　providing for a closed system of drug
17　distribution.
18　　　　Explain what is meant by you when
19　you talk about a closed system.
20　　　　MR. EPPICH:  Object to form.
21　　　　THE WITNESS:  A closed system of
22　distribution in theory should be able to
23　account for all drugs from the manufacturer all
24　the way down -- all controlled substances from
25　the manufacturer all the way down to when they

19 (Pages 433 - 436)

Page 437

1 are put into the pharmacies or hospitals and
2 then dispensed out to the patients.
3      It's a system of accountability.
4 It's a system of recordkeeping, audits,
5 inventory, security, so the system is secure.
6 It is secure physically, it is secure by the
7 recordkeeping through inventory and through
8 accountability.
9      BY MR. LANIER:
10     Q.   So the system, you all kept track --
11 the system -- let me put it this way.
12      The system was designed to follow
13 these pills from the person who makes it all
14 the way to the person who is supposed to take
15 them; is that right?
16     A.   Yes, sir.  That's the system of
17 accountability.
18     Q.   And it is a closed system, meaning
19 that everybody in the system has to what?
20     A.   Has a legal obligation.  A legal
21 obligation to follow the security and
22 recordkeeping requirements under the Act and
23 under the regulations and to all maintain
24 effective controls against diversion so the
25 system is not breached.

Page 438

1     Q.   You're not a medical doctor,
2 correct?
3     A.   That is correct, sir.
4     Q.   You don't know when it's right to
5 prescribe or when it's not right to prescribe a
6 medicine from the extent of giving a medical
7 doctor's diagnosis, fair?
8     A.   That's fair.
9     Q.   But you are a licensed pharmacist,
10 aren't you?
11     A.   Yes, sir.
12     Q.   And as a licensed pharmacist, are
13 you trained and aware of the harms and hazards
14 of these opioid drugs if they are being used
15 improperly?
16      MR. EPPICH:  Objection.
17      MS. McCLURE:  Objection.
18      THE WITNESS:  Yes, sir.  Yes, sir, I
19 am.
20      BY MR. LANIER:
21     Q.   I mean, if somebody takes an extra
22 vitamin pill, maybe it's just passed out
23 through the urine or something, I don't know,
24 I'm not an expert, but if someone takes an
25 unnecessary and excessive quantity of these

Page 439

1 opioids, can it be dangerous?
2      MR. EPPICH:  Objection.
3      MS. McCLURE:  Objection.  Scope.
4      THE WITNESS:  Yes, sir.  The opioids
5 -- benzodiazepines, they have specific
6 pharmacologic effects on the body.  For
7 instance, opioids and an opioid naive patient
8 could cause excessive respiratory depression
9 and it is compounded if you take other
10 depressants with it.  It could lead to
11 respiratory arrest.
12      BY MR. LANIER:
13     Q.   Respiratory arrest means you quit
14 breathing?
15     A.   Yes, sir.
16     Q.   Can they be addictive?
17      MR. EPPICH:  Objection.  Calls for
18 expert conclusion.
19      MR. LANIER:  He is a pharmacist.
20      THE WITNESS:  Absolutely.
21      BY MR. LANIER:
22     Q.   Thank you.
23      Now, this closed system of
24 distribution you are talking about, if we were
25 to try and understand it a little bit more and

Page 440

1 put it into categories, you have got a group of
2 folks who make these pills.
3      What are they called in DEA speak?
4     A.   Those would be manufacturers.  They
5 manufacture the raw material and also the
6 dosage forms.
7     Q.   All right.  And in the chain from
8 the manufacturers, what comes next?
9     A.   Distributors.
10     Q.   And the distributors -- explain what
11 the distributors do so I can draw a good
12 picture.
13     A.   Distributors obtain the finished
14 form of the drug from the manufacturers, from
15 different manufacturers, because different
16 manufacturers manufacture different --
17 different types of drug in a basic class.  They
18 take all of those and then they distribute it
19 through their distribution chain down to
20 pharmacies, so they are a middleman between the
21 manufacturers and the patient care -- patient
22 care entities, like, pharmacies, hospitals.
23     Q.   All right.  In my drawing, that's a
24 pill.  It is not really a good one.  I think
25 most of these weren't that color or size, but

20 (Pages 437 - 440)

Page 441

1    that's a pill.
2        So the distributors are kind of,
3    like, the tree.  It takes those pills from the
4    manufacturer and sends them out?
5    A.   Yes, sir.  Through a system of
6    ordering, they will be sent to pharmacies,
7    hospitals.
8    Q.   And I assume the distributor is
9    making money off of distribution?
10   A.   I believe so, yes.
11       MS. McCLURE:  Objection.
12   BY MR. LANIER:
13   Q.   Manufacturers are making money off
14   manufacture?
15       MR. EPPICH:  Objection.
16       THE WITNESS:  Yes.
17   BY MR. LANIER:
18   Q.   And then this distribution goes from
19   the distributors to -- is that how the
20   pharmacies get them?
21   A.   Pharmacies, hospitals, yes.
22   Q.   So this is my storefront for the
23   pharmacy.
24       By the way, do you know what Rx
25   stands for?

Page 442

1    A.   Well, it stands for prescription,
2    but --
3    Q.   Where on earth did it come from?
4    A.   I, you know, all my years as a
5    pharmacist, I have never been asked that
6    question.  I have no idea.
7    Q.   They didn't, like, teach you that in
8    Pharmacy 101?
9    A.   No.  We were too bogged down with
10   Latin.
11   Q.   Okay.  All right.
12       MR. EPPICH:  Before we shift to
13   another line, Mr. Lanier, I just wanted to
14   object to this demonstrative because that -- I
15   don't know if you meant to do this, but the
16   quote you have up there, the system is for
17   legal obligation to secure, keep records and
18   control against diversion, you have that in
19   quotes, but that is not actually a quote from
20   Mr. Rannazzisi.
21       MR. LANIER:  You are right.  I
22   apologize.  It's my mistake.
23       BY MR. LANIER:
24   Q.   Sir, I put quotation -- let me clean
25   up the record.

Page 443

1        I put quotation marks around this in
2    the notes.  That is not -- I think you said all
3    of that stuff, but I don't think it is a direct
4    quote.  I need to put some dots in there.
5        And my -- what I do need to do to
6    make this something you agree with?
7    A.   Well, the legal obligation is to
8    maintain effective controls against diversion,
9    and the regulations set out what those
10   obligations are.  Those obligations include
11   security of the supply chain, the physical
12   security of the manufacture and distribution
13   facilities, the pharmacies, the recordkeeping.
14       Each -- each level of the supply
15   chain has a recordkeeping obligation that must
16   be maintained.  The system of auditing, where
17   each individual registrant must audit, must
18   inventory, and the system of recordkeeping,
19   where they must account for all the drugs that
20   were either sent downstream, destroyed, taken
21   back and moved to another entity, but that
22   system, that system of control which is
23   basically what it is, from scheduling the drugs
24   to putting them in classes so the pharmacists
25   understand what their obligations are, through

Page 444

1    security, recordkeeping, auditing and
2    accountability, all of that is a system that
3    creates the infrastructure for the Controlled
4    Substances Act.
5    Q.   So there is a lot that the companies
6    can do to maintain effective control; is that
7    right?
8    A.   Yes.
9        MR. EPPICH:  Object to form.
10   BY MR. LANIER:
11   Q.   And this obligation that you are
12   talking about applies to which of these three
13   groups?
14       MR. EPPICH:  Object to form.
15       THE WITNESS:  All registrants must
16   maintain effective controls against diversion.
17       BY MR. LANIER:
18   Q.   All right.  So that envelopes all of
19   these groups, fair?
20       MR. EPPICH:  Objection.  Leading.
21       THE WITNESS:  Yes.
22       BY MR. LANIER:
23   Q.   Okay.  Now you have said here in
24   your letter, talking about this closed system,
25   you have said distributors are of course one of

21 (Pages 441 - 444)

Page 445

1  the key components of the distribution chain.
2      Did I read that correctly?
3      A.  Yes, sir.
4      Q.  And that's this chain that you have
5  told us about, manufacturers, distributors,
6  retailers, hospitals, others, right?
7      A.  Yes, sir.
8      Q.  All right.  Distributors are one of
9  the key components.  What makes the
10  distributors a key component?
11      A.  They act as a bridge from the
12  manufacturers to the pharmacies.  They -- they
13  have this view of the distribution chain that,
14  you know, is wide-ranging.  They understand --
15  the customers downstream are their customers.
16  They could see what is going on downstream.
17      Q.  You call them a bridge.  I'll put
18  that in quotation marks.  It's your word.  I
19  will put down here key component.  That is
20  another one of yours.
21      Then you also say, if the closed
22  system is to function properly as Congress
23  envisioned, distributors must be vigilant in
24  deciding whether a prospective customer can be
25  trusted to deliver controlled substances only

Page 446

1  for lawful purposes.
2      Did I read that correct?
3      A.  Yes, sir.
4      Q.  Explain what you meant by "must be
5  vigilant."
6      A.  Those are the requirements for each
7  individual -- each individual registrant within
8  the system.  To be vigilant is just that.  To
9  know your customers.  To make sure you do due
10  diligence on your customers.  You look at
11  orders.  You look at orders that are
12  suspicious.  As a pharmacist, you would be
13  looking at individual prescriptions to -- under
14  the doctrine of corresponding responsibility,
15  you must determine that a prescription is
16  effective and valid before you could dispense.
17      Every manufacturer sending drugs
18  downstream, they are supposed to be vigilant.
19  Know what your middleman customers are doing.
20  Everybody has to be vigilant.  The only way the
21  supply chain works, the only way that the
22  infrastructure control works in the Controlled
23  Substances Act is if everybody complies with
24  their own obligations under the Act.
25      Q.  All right.  You say in your letter

Page 447

1  to them, this responsibility is critical.
2      Am I reading that correctly?
3      A.  Yes.
4      Q.  As Congress has expressly declared
5  that the illegal distribution of controlled
6  substances has a substantial and detrimental
7  effect on the health and general welfare of the
8  American people.
9      Did I read that correctly?
10      A.  Yes, sir.
11      Q.  When you talk about how this is
12  critical because of its effect on the health
13  and welfare of the American people, did you
14  mean that?
15      MS. MAINIGI:  Objection.
16      THE WITNESS:  Absolutely.  If -- if
17  the system is not followed according to the
18  regulations, then diversion will occur.  The
19  system is set up to prevent diversion.
20      If diversion occurs and the drugs
21  get out into the, you know, to those who
22  shouldn't have the drugs, those who are drug
23  seekers, people will be harmed and I think
24  that's in the preamble in 801, I think that is
25  what Congress was getting at in my opinion.

Page 448

1  They wanted us to prevent diversion and that's
2  why they set the Act up in the manner they did.
3      BY MR. LANIER:
4      Q.  All right.  In that regard, you talk
5  about the statutory scheme, how the statute
6  works and the legal duties of distributors as
7  well as registrants.
8      You say, although most distributors
9  are already well aware of the following legal
10  principles, they are reiterated here as
11  additional background for this discussion.
12      Do you see that?
13      A.  Yes, sir.
14      Q.  Second time you have used that word
15  "reiterate," isn't it?
16      A.  Yes, sir.
17      Q.  Again, is this something that was
18  brand new?
19      MR. EPPICH:  Object to form.
20      THE WITNESS:  No.  Again, these
21  requirements have been in place since the
22  nascent stages of the Controlled Substances
23  Act.
24      BY MR. LANIER:
25      Q.  You are saying, "the natient

22 (Pages 445 - 448)

Page 449

1  stages." I am from Lubbock, Texas.  I'm not
2  sure on that word.  The early stages?
3      A.   Early stages, yes.
4      Q.   Natient.
5      A.   Nascent.
6      Q.   Nascent.  All right.  Got it.
7          Your second page, and I'm not going
8  to go through the whole letter because we don't
9  have time, but the second page has another
10  sentence I want to make sure that we
11  understand.
12          Moreover, all registrants,
13  manufacturers, distributors, pharmacies,
14  practitioners share responsibility for
15  maintaining appropriate safeguards against
16  diversion.
17          Do you stand by that?
18      A.   Yes, sir.
19      Q.   And so if we are back to our picture
20  in that closed system, manufacturers,
21  distributors, retailers, the doctors writing
22  the prescriptions and others, what do you mean
23  when you say that all of them "share
24  responsibility for maintaining appropriate
25  safeguards against diversion?"

Page 450

1      MS. MAINIGI:  Objection.
2          THE WITNESS:  What I was getting at
3  was everybody within that delivery system had
4  an obligation, and appropriate safeguards are,
5  you are following the regulations and the
6  statutory requirements, so for a doctor, a
7  doctor must prescribe for legitimate medical
8  purpose in the usual course of professional
9  practice, but if the doctor is not doing that,
10  the pharmacist has a corresponding
11  responsibility under 1304 to ensure that the
12  prescription is valid and effective.
13          If the pharmacist is not doing that
14  and ordering significant amounts of drugs and
15  they're suspicious, the distributor must report
16  that suspicious order and he must do due
17  diligence and find out what is going on at that
18  pharmacy.
19      BY MR. LANIER:
20      Q.   All right.  Let me interrupt you for
21  a moment because you say some of that in the
22  letter and I want to make sure that we've got
23  it in your writings of what you provided to all
24  of these industries that you referenced before
25  2006.

Page 451

1      A distributor, you reiterate this.
2  Excuse me.  A distributor, and those are the
3  middlemen, right?
4      A.   Yes.
5      Q.   A distributor has a statutory
6  responsibility to exercise due diligence to
7  avoid filling suspicious orders that might be
8  diverted into other than legitimate medical,
9  scientific and industrial channels; is that
10  correct?
11      A.   Yes, sir.
12      Q.   Did you find that all of the
13  distributors were living up to what you
14  understood to be their legal responsibility
15  here?
16      MR. EPPICH:  Object to form.
17  Foundation.
18      MS. MAINIGI:  Objection.
19      MR. BENNETT:  Objection.  Scope.
20          You are not authorized to disclose
21  any information regarding specific nonpublic
22  DEA investigations or activities in answering
23  that question.
24      THE WITNESS:  We found that some
25  distributors were not and that's why we issued

Page 452

1  orders to show cause and immediate suspension
2  orders.
3      BY MR. LANIER:
4      Q.   All right.  We will look at some as
5  an example here in a moment, but before we do,
6  I want to look at what you said in the next
7  paragraph.
8          Given the requirement under the law
9  that a distributor maintain effective controls
10  against diversion, a distributor may not simply
11  rely on the fact that the person placing the
12  suspicious order is also registered and cannot
13  turn a blind eye to the suspicious
14  circumstances; is that right?
15      MR. EPPICH:  Objection.
16      THE WITNESS:  Yes, that's correct.
17      BY MR. LANIER:
18      Q.   Were you concerned that you needed
19  to reiterate this and say it over and over?
20      MR. EPPICH:  Objection.  Vague.
21      THE WITNESS:  I was -- I was
22  concerned, but I was trying to reinforce what
23  the requirements were.  Just because somebody
24  is a DEA registrant doesn't mean that they are
25  following the rules, they are following the

23 (Pages 449 - 452)

Page 453

1  law.
2       BY MR. LANIER:
3    Q.   All right.  In the third page, you
4  go on to say, here are some circumstances that
5  might indicate there is diversion going on; is
6  that right?
7    A.   Yes, sir.
8    Q.   And these -- you gave four examples,
9  much like you have told us in here before, were
10  concerns that you had or that people could look
11  at -- strike that.  Let me start that question
12  again.
13       You give four circumstances that
14  might indicate diversion; is that fair to say?
15    A.   Yes, sir.
16    Q.   Ordering excessive quantities of a
17  limited variety of controlled substance while
18  ordering few, if any, other drugs.
19       Why would that perhaps be indicative
20  or perhaps indicate diversion?
21    A.   Well, for the most part, pharmacies
22  generally follow a pattern of ordering for
23  controlled substances and depending on what we
24  have read, it could be anywhere as low as 9
25  percent to up to 12 or 13 percent as the

Page 454

1  average.  So it is a red flag when a pharmacy
2  is ordering, you know, 40, 50 percent of their
3  drugs has controlled substances, you know, and
4  looking at the legend or the noncontrolled
5  drugs, you've got to ask questions.
6       Why are you not ordering?  If you
7  are a full service pharmacy, why are you not
8  ordering noncontrolled legend drugs?
9    Q.   All right.  So we've got a red flag
10  on that.
11       The second one you gave is ordering
12  a limited variety of controlled substances in
13  quantities that are disproportionate, not in
14  proportion, to the quantity of noncontrolled
15  medications ordered.
16       Is that also a red flag?
17    A.   Again, same concept.  No. 1 handles,
18  you know, where we are only ordering large
19  quantities of oxycodone, hydrocodone, nothing
20  else or oxycodone, hydrocodone, alprazolam.
21  The second one is again, you are
22  taking the hydrocodone and the oxycodone and it
23  is far exceeding what you are ordering normal
24  noncontrolled drugs.  So it's disproportional.
25       If the normal pharmacy is ordering

Page 455

1  between 9 and 12 percent of the drugs of
2  controlled substances and this pharmacy is
3  ordering 40 or 50 percent and it is limited, it
4  is limited to oxycodone, hydrocodone --
5  oxycodone, hydrocodone and hydromorphone, that
6  should set up red flags.  It even goes deeper
7  if they were ordering a high dose of those
8  drugs.
9    Q.   All right.  Order excessive
10  quantities of limited varieties in combination
11  with excessive quantities of lifestyle drugs.
12  Another red flag?
13    A.   Yes.  That was tapping into the
14  three drug combination, the panel that we were
15  seeing, things like alprazolam, hydrocodone and
16  carisoprodol or hydrocodone -- or oxycodone,
17  carisoprodol and alprazolam, diazepam,
18  clonazepam, any of those different combinations
19  of drugs that is unusual.
20    Q.   You are throwing out a bunch of
21  words that most of us have never heard of in
22  our life because we just get told, go buy Advil
23  or something like that.
24       You're -- are these those -- these
25  are the chemical names that you are using for

Page 456

1  these drugs?
2    A.   Yeah.  So, for instance,
3  benzodiazepines -- the three most used
4  benzodiazepines would be alprazolam, clonazepam
5  and diazepam.  Those are antianxiety agents
6  and --
7    Q.   Chill pills?
8    A.   Yeah, I guess you could call them
9  chill pills.
10       When -- in and of themselves, they
11  are fine, but when you take them with a potent
12  opioid like hydrocodone or oxycodone, both of
13  the effects are enhanced.
14    Q.   All right.  So that becomes a thrill
15  pill at that point, I guess, instead of a chill
16  pill.  I will move to strike.
17       All right.  And No. 4 is ordering
18  the same controlled substance for multiple
19  distributors, multiple middlemen.
20       Now explain why that should -- might
21  be a red flag?
22    A.   The pharmacy is trying or attempting
23  to not raise suspicions with one distributor.
24    Q.   All right.
25    A.   So if they order for multiple, they

24 (Pages 453 - 456)

Page 457

1    are thinking that they could fly under the
2    radar.
3        Q.    How would a distributor know if
4    someone uses multiple distributors?
5            MR. EPPICH: Objection. Foundation.
6            BY MR. LANIER:
7        Q.    Based on your experience with the
8    DEA that you are allowed to talk to us about.
9            MR. EPPICH: Same objections.
10           THE WITNESS: There's -- there's
11   several ways. One is knowing your customer and
12   doing due diligence. When you on board your
13   customer, ask them where they are getting their
14   -- who was previously supplying your drugs.
15   Are you still supplying -- still getting
16   supplies from them.
17           Sending out questionnaires. Looking
18   at third-party aggregator information, seeing
19   if that pharmacy has purchased drugs or you
20   know how much you have supplied that pharmacy,
21   but look and see how much is being dispensed
22   out of the pharmacy. If they are dispensing
23   more than you supplied, chances are there is a
24   third party somewhere, a fourth party.
25           BY MR. LANIER:

Page 458

1        Q.    Now, you told us this earlier when
2    you were talking about these distributors and
3    why they must be vigilant that they need to
4    know their customers and you just said that is
5    part of knowing the customers, but you also
6    said they are supposed to look at suspicious
7    orders.
8            You put in this letter you sent to
9    all of them, a list of things that they may
10   wish to inquire about if they have a suspicion,
11   if they're -- to determine whether a suspicious
12   order indicates diversion, then they may wish
13   to inquire.
14           Are these some questions that they
15   could put into their policies to make sure that
16   they are doing their due diligence?
17           MS. MAINIGI: Objection.
18           THE WITNESS: This is a
19   nonexhaustive list of questions that are
20   suggested they ask to make a determination if
21   they are -- the pharmacy they are supplying is
22   operating within the confines of the Act or if
23   they are actually diverting.
24           BY MR. LANIER:
25       Q.    By nonexhaustive, there are more

Page 459

1    than just these?
2        A.    Yes, sir.
3        Q.    So if we look at a distributor's
4    program that they have in place by 2006, we
5    should already see some of this due diligence
6    but we may see other things as well, fair?
7            MR. EPPICH: Object to form.
8            THE WITNESS: I am just reading.
9    Yes. That's fair.
10           BY MR. LANIER:
11       Q.    But by the same token, once you have
12   sent this out, would it -- would you agree with
13   the proposition that surely a responsible
14   distributor would then incorporate these types
15   of questions into their due diligence, just
16   their routine. Would you agree?
17           MS. MAINIGI: Objection.
18           THE WITNESS: Yes. That's what the
19   basis of this letter was. We were trying to
20   explain how, you know, how we believe, you
21   know, questions that we believe are important
22   to be asking, in addition to whatever questions
23   they felt important to ask their customers.
24           BY MR. LANIER:
25       Q.    So did I write it right? Earlier

Page 460

1    you told us -- let me find the note card that
2    we had.
3            That -- when I asked you what
4    compliance was required, you said all the
5    registrants are to maintain effective control
6    against diversion, that they are required to
7    report a suspicious order and then you said
8    they are to maintain a system to detect
9    suspicious orders and they don't ship them
10   without full due diligence that resolves their
11   suspicion.
12           So this is -- do you remember
13   testifying about this earlier?
14       A.    Yes.
15       Q.    And so this list that you gave them,
16   this nonexhaustive list are things that they
17   should have had in their approach to make sure
18   before they sell these drugs that they are
19   being sold properly. Fair?
20           MS. MAINIGI: Objection.
21           THE WITNESS: Yes.
22           BY MR. LANIER:
23       Q.    And you even told the industry these
24   questions are not all-inclusive, nor will the
25   answer to any of these necessarily determine

25 (Pages 457 - 460)

Page 461

1 the answer.  Consider the totality of the
2 circumstances, correct?
3     A.   Yes, sir.
4     Q.   Now, again, if -- by the way, let me
5 digress for a minute.
6          Do you think industry, and by that I
7 mean manufacturers, distributors and sellers,
8 were tuned in to the fact that these drugs are
9 dangerous drugs?
10         MR. EPPICH:  Object to form.
11 Foundation.  Calls for speculation.
12         THE WITNESS:  I -- yes, I do.
13         BY MR. LANIER:
14     Q.   And you don't have to speculate on
15 that, do you?  You know that.  Why do you know
16 that to be true?
17     A.   Again, because when we sat down and
18 talked to the distributors, when we went out
19 and did presentations for the industry, we
20 talked about the drugs and the dangers of the
21 drugs, the dangers of addiction, the dangers,
22 all the way through -- all the way up until I
23 was -- I left in 2015.  That was standard in
24 our presentations, plus the fact that the news
25 media were reporting on this on a regular

Page 462

1 basis, the states were sending out guidance and
2 notifications of different problems that are
3 occurring with these opioids and the
4 benzodiazepines, so the information was out
5 there.  It was offered.  It was -- I can't
6 imagine that they didn't know what was going
7 on.
8     Q.   Were you aware during the time you
9 wrote this letter, that the way the economics
10 of this closed system was working, the more the
11 distributors sold, the more money they made?
12         MS. MAINIGI:  Objection.
13         MR. EPPICH:  Objection to form.
14         MS. MAINIGI:  Objection.  Scope.
15         MR. EPPICH:  Foundation.
16         BY MR. LANIER:
17     Q.   Were you aware of that?
18     A.   In volume-wise, yes.  I think -- I
19 think throughout the chain, that's -- money is
20 made on volume sales, yes.
21     Q.   Now, we have looked at the first
22 follow up letter of the 2006 letter, and that
23 was Exhibit No. 1.
24         You sent a second follow up letter,
25 didn't you?

Page 463

1     A.   Yes, sir.
2     Q.   And you sent it to a number but I
3 have pulled out one of the samples so the jury
4 can see how you specifically addressed these
5 various letters.
6          I would like to give you the letter.
7 We will mark it as Exhibit No. 2.
8          Here is a copy for you, Counsel.
9          (Deposition Exhibit 2 was marked for
10 identification.)
11         BY MR. LANIER:
12     Q.   Do you have Exhibit No. 2 in front
13 of you?
14     A.   Yes, sir.
15     Q.   All right.  Exhibit No. 2 is a
16 sample letter that you sent out to McKesson
17 Corporation.
18          Do you see that?
19     A.   Yes, sir.
20     Q.   And in our buckets, McKesson -- or
21 in our distribution center, is McKesson a
22 manufacturer, a distributor or a retailer?
23     A.   They would be a distributor.
24     Q.   The middleman?
25     A.   Yes, sir.

Page 464

1     Q.   All right.  And so you sent out
2 these letters and this is a sample to McKesson,
3 did you send this letter, in fact, to all of
4 the registrants that you were talking about
5 before?
6     A.   This letter went to all
7 manufacturers and distributors.
8     Q.   In fact, you say that at the
9 beginning.  This letter is being sent to every
10 entity registered with the DEA to manufacture
11 or distribute controlled substances, correct?
12     A.   That's correct.
13     Q.   And again, were you trying to
14 reiterate responsibilities that they had?
15     A.   Yes.  We were trying, again, explain
16 to them what their legal obligations were under
17 the Act and the regulations.
18     Q.   And you have been in here throwing
19 around numbers of laws and all the rest of this
20 stuff just from memory, but did you actually
21 put down, for example, the law that is entitled
22 21 Code of Federal Regulations 1301.74(b) that
23 specifically requires.
24         Is that the right word that you
25 wanted to use, requires?

26 (Pages 461 - 464)

1     A.   It's a regulation.  It's required,
2  yes.
3     Q.   Is it optional?
4     A.   No.
5     Q.   Requires that a registrant, quote,
6  design and operate a system to disclose to the
7  registrant suspicious orders of controlled
8  substances; is that true?
9     A.   Yes, sir.
10     Q.   Well, who -- whose responsibility is
11  it to design that system?
12     A.   The individual registrant.
13     Q.   You say that the regulation clearly
14  indicates it's the sole responsibility of the
15  registrant to design and operate such a system,
16  true?
17     A.   Yes, sir.
18     Q.   And you are reiterating this.  Is
19  this new law, is this some new guideline?
20     A.   It's the same regulation, same
21  statutory provision that has been in place
22  since the beginning of the Controlled
23  Substances Act.
24     Q.   Well, what if the lawyers or the --
25  the defendant companies want to tell the jury,

1  hey, don't blame us, the DEA didn't -- it's the
2  DEA responsibility to design and operate the
3  system.  Would that be true?
4          MR. EPPICH:  Objection.
5          MS. MAINIGI:  Form.
6          THE WITNESS:  No, that is just
7  incorrect.  It is very specific.  The
8  regulation is specific.
9          BY MR. LANIER:
10     Q.   Well, what if they say, oh, but the
11  DEA told us it is okay to do it this way?
12          MR. EPPICH:  Objection.  Form.
13          THE WITNESS:  No.  The DEA would not
14  tell them to do something outside of the
15  regulation.
16          BY MR. LANIER:
17     Q.   And did you specifically warn them
18  of this, that the DEA does not approve or
19  otherwise endorse any specific system for
20  reporting suspicious orders?
21          MS. MAINIGI:  Objection.
22          THE WITNESS:  Yes.
23          BY MR. LANIER:
24     Q.   All right.  So much of this is the
25  same as the 2006 letter.  I am just going to

1  set it aside in the interest of time.
2          MR. EPPICH:  Objection.
3          BY MR. LANIER:
4     Q.   But I am going to ask you whether or
5  not, even after these letters, you had any
6  issues or problems with the companies doing
7  what they were obligated to do?
8          MR. EPPICH:  Objection.  Form.
9  Vague.
10          MR. BENNETT:  Objection.  Scope.
11          THE WITNESS:  There were cases that
12  were done that were -- that were reported out
13  that involved manufacturers and distributors
14  that -- or manufacturers and distributors that
15  were not doing their obligations even after the
16  letters and after the face-to-face visits,
17  meetings.
18          BY MR. LANIER:
19     Q.   All right.  In this regard for
20  follow up, what types of actions did -- let me
21  get a piece of paper.
22          When the DEA under your oversight
23  found that there were problems and issues
24  before the law was changed --
25          MS. MAINIGI:  Objection.

1          BY MR. LANIER:
2     Q.   -- did you ever have to try and
3  enforce the law and again, within the confines
4  of what you can publicly say to us.
5          MS. MAINIGI:  Objection.
6          THE WITNESS:  Depending on the
7  violations, depending on the scope of the
8  violations and the potential for imminent
9  danger, yes, we did.  We would issue orders to
10  show cause and in cases of imminent danger, we
11  would issue immediate suspension orders.
12          BY MR. LANIER:
13     Q.   All right.  Those of us who don't do
14  what you do need to make sure we understand
15  what these are.
16          So what is an order to show cause?
17     A.   A show cause order is basically
18  notice.  It's notice of violations, and the
19  show cause gives them an opportunity for the
20  registrant to appear before an administrative
21  law judge and show cause why the government
22  should not take action against their
23  registration.
24          It's basically an order of notice
25  giving them an opportunity to be heard in front

27 (Pages 465 - 468)

Page 469

1 of an ALJ at the DEA.
2    Q.    An ALJ is an administrative law
3 judge?
4    A.    Yes.
5    Q.    And you all have those as well at
6 the -- that is in the DOJ, in the Department of
7 Justice, right?
8    A.    No.  The administrative law judges
9 actually sit at DEA.
10    Q.    Oh, at DEA?
11    A.    Yes, sir.
12    Q.    So you notice a violation and give
13 the company a chance to come in, in essence,
14 and defend themselves?
15    A.    Yes.  And during the proceedings,
16 they are allowed to maintain their business and
17 continue to handle and distribute or
18 manufacture, dispense controlled substances.
19    Q.    All right.  And then the suspension
20 order, what is that?
21    A.    Well, an immediate suspension order
22 is part of an order to show cause.  A show
23 cause order, like I said, they are allowed to
24 continue to do business.  But an immediate
25 suspension order attached to an order to show

Page 470

1 cause, it's at that point in time, the
2 violations are presenting an imminent danger to
3 public health, public safety.
4       So at that point in time, we take
5 the registration, the administrator of DEA
6 finds that there is an imminent danger, that
7 finding is incorporated into the show cause
8 order and we immediately take their
9 registration, we take their drugs, whatever
10 drugs they have on hand, secure their drugs, in
11 some cases take their files, make sure that
12 their order forms and make sure that they are
13 not operating until the conclusion of all the
14 proceedings related to the show cause order.
15    Q.    So you put a stop to their business
16 on those drugs; is that right?
17    A.    Yes.
18    Q.    Did you ever have to do this for any
19 distributors because of the opioid problems?
20    A.    Yes.
21       MR. BENNETT:  Objection.  Scope.
22       To the extent it has been made
23 public, you may answer.
24       THE WITNESS:  Yes.
25       MR. EPPICH:  Objection.

Page 471

1       BY MR. LANIER:
2    Q.    And I want to ask you a number of
3 these questions now as some examples, and I
4 will make it real clear, I am not being
5 exhaustive.  All I am talking about are
6 examples that are public that you are allowed
7 to talk about.  Okay?
8    A.    (Witness nodding head.)  Yes, sir.
9    Q.    So examples.  I saw a settlement
10 agreement with AmerisourceBergen that we will
11 mark as Exhibit No. 3.
12       (Deposition Exhibit 3 was marked for
13 identification.)
14       BY MR. LENIER:
15    Q.    I am sorry to be throwing documents
16 at you, sir.
17    A.    That's fine.
18       MS. McCLURE:  Excuse me, do you have
19 another one of those documents?
20       MR. LANIER:  Yes.  Ms. Singletary
21 Fitzpatrick is going to be passing those out.
22 Thank you.  She has got a full set to make sure
23 we can get as many out as possible.
24       BY MR. LANIER:
25    Q.    So I am marking this as Exhibit No.

Page 472

1 3. This is a settlement and release agreement
2 entered into in June of '07 between
3 AmerisourceBergen and the DEA.
4       MS. McCLURE:  Objection.  Form.
5       BY MR. LANIER:
6    Q.    Is that correct?
7    A.    Yes.
8    Q.    And so we are clear,
9 AmerisourceBergen in the closed system, what
10 are they?
11    A.    They are a --
12       MS. McCLURE:  Objection.  Form.
13       THE WITNESS:  Sorry.  They are a
14 distributor.
15       BY MR. LANIER:
16    Q.    All right.  So an example of someone
17 where you had to issue this, would be the
18 distributor AmerisourceBergen?
19       MS. McCLURE:  Form.
20       BY MR. LANIER:
21    Q.    Is that fair?
22    A.    Yes, sir.
23    Q.    Another example, McKesson.  Do you
24 recall having to do this for McKesson?
25    A.    Yes, sir.

28 (Pages 469 - 472)

Page 473

1     MR. EPPICH: Object to form.
2     BY MR. LANIER:
3     Q.   I'm going to give you a document we
4  will mark as Exhibit No. 4. Put it up here so
5  the jury can see it.
6     (Deposition Exhibit 4 was marked for
7  identification.)
8     BY MR. LANIER:
9     Q.   Did the DEA enter into a settlement
10  and release agreement, an administrative
11  memorandum of agreement between McKesson
12  Corporation and the DEA?
13    A.   Yes, sir.
14    Q.   And McKesson is what type of a
15  company in our closed system?
16    A.   They are a distributor.
17    Q.   Another example of how you had to
18  enforce the law and bring an action against the
19  company for what the DEA considered to be
20  violations?
21    MR. EPPICH: Object to form.
22    THE WITNESS: Yes, sir.
23    MR. EPPICH: Mr. Lanier, this
24  document is confidential and to the extent
25  there was any confusion in the record earlier,

Page 474

1  the document itself is confidential and not
2  public.
3     MR. LANIER: Okay.
4     BY MR. LANIER:
5     Q.   Is this when McKesson paid a $13.25
6  million fine?
7     A.   Yes.
8     Q.   2008?
9     A.   Yes, that's correct.
10    Q.   One year after your 2007 letter, two
11  years after your 2006 letter, after all the
12  meetings you all had, after the law had been in
13  place since the 1970s?
14    MR. EPPICH: Object to form.
15    THE WITNESS: Yes, sir, that's
16  correct.
17    BY MR. LANIER:
18    Q.   By the way, while we are on the
19  subject with McKesson, did you know that
20  McKesson continued to violate the law even
21  after they entered into this agreement with the
22  DEA?
23    MR. EPPICH: Object to form.
24    MR. BENNETT: Objection. Scope.
25    You are not authorized to disclose

Page 475

1  any information regarding specific nonpublic
2  DEA investigations or activities.
3     To the extent you can answer that
4  question based on publicly available
5  information, you may answer.
6     THE WITNESS: Could I have a second
7  with the DOJ attorney?
8     MR. LANIER: Sure. Go off the
9  record.
10    THE VIDEOGRAPHER: Going off record.
11  The time is 11:07.
12    (A short recess was taken.)
13    THE VIDEOGRAPHER: We are going back
14  on the record. Beginning of Media File No. 5.
15  The time is 11:19.
16    (Deposition Exhibit 5 was marked for
17  identification.)
18    BY MR. LANIER:
19    Q.   All right. You left the DEA in
20  2016, correct?
21    A.   '15, October of 2015.
22    Q.   Sorry. My mistake. 2015.
23    The document that I've handed you
24  now is Exhibit No. 5, is an administrative
25  agreement that was entered into McKesson --

Page 476

1  with McKesson after you left. The date on it
2  is January 2017.
3     Do you see that?
4     A.   Yes, sir.
5     Q.   Were you aware of this agreement
6  before I handed it to you?
7     MR. EPPICH: Object to form.
8  Foundation.
9     THE WITNESS: No. I have never seen
10  this agreement before you handed it to me.
11    BY MR. LANIER:
12    Q.   All right. I will represent to you
13  that this is an agreement that's been provided
14  to us. I want to read you some statements that
15  were agreed to by McKesson and ask you whether
16  or not you have any awareness that you are
17  allowed to testify about concerning those
18  actions.
19    So if you will look on first the
20  front page, you will see that this agreement
21  applies to McKesson and the DEA, or any
22  facility owned or operated by McKesson that is
23  registered with the DEA to distribute or
24  otherwise handle controlled substances.
25    Do you see that?

29 (Pages 473 - 476)

Page 477

1    MR. EPPICH:  Object to form.
2  Foundation.
3    THE WITNESS:  Yes, sir.
4    BY MR. LANIER:
5    Q.   And you will notice in Paragraph 2
6  under background, it references the fact that
7  this is not, as we would say in Lubbock, not
8  their first rodeo.  They had done this before.
9    Do you see that?
10    MR. EPPICH:  Object to form.
11  Foundation.  Characterization.
12    THE WITNESS:  Yes, sir.
13    BY MR. LANIER:
14    Q.   May 2008, McKesson entered into a
15  settlement and release agreement.
16    That's the one that was happening
17  under your watch that is referenced here in
18  background Paragraph No. 2; is that fair?
19    MR. EPPICH:  Objection.  Foundation.
20    THE WITNESS:  Yes, sir.
21    BY MR. LANIER:
22    Q.   If you will switch over to Page No.
23  3, there is a paragraph entitled:  "Acceptance
24  of Responsibility."
25    Do you see that paragraph?

Page 478

1    A.   Yes, sir.
2    Q.   On or about September 27, 2006,
3  February 7, 2007, and December 27, 2007, DEA's
4  deputy assistant administrator, office of
5  diversion control, sent letters to every entity
6  in the U.S. that was registered with DEA to
7  manufacture or distribute controlled substances
8  including McKesson.  Those are called the DEA
9  letters.
10    Do you see that?
11    A.   Yes, sir.
12    Q.   Now, this DEA deputy administrator,
13  assistant administrator, office of diversion
14  control, that is you, isn't it?
15    A.   Back then, yes.
16    MR. EPPICH:  I will object.
17    MR. EPPICH:  I'm sorry.
18    MR. EPPICH:  My objection is, you
19  are writing his name before he even responds to
20  the question.
21    BY MR. LANIER:
22    Q.   That is you, Joe Rannazzisi, isn't
23  it?
24    A.   Yes, sir.
25    Q.   Did your answer change on whether or

Page 479

1  not you had that job description because I
2  wrote your name down?
3    A.   No, sir.
4    Q.   I thought you told us that long ago.
5  We looked at two of those letters, didn't we?
6    A.   Yes, sir.
7    Q.   You sent these letters, including to
8  McKesson, we even used the McKesson example for
9  the 2007 letter, didn't we?  Exhibit 3.
10    A.   Yes, sir, we did.
11    Q.   The DEA letters contained, among
12  other things, guidance for the identification
13  and reporting of suspicious orders to the DEA
14  as required under the law.
15    That is, in fact, what your letters
16  did.  Would you agree with that
17  characterization?
18    A.   Yes, sir, that's why they were sent
19  out.
20    MR. EPPICH:  Object to foundation.
21    BY MR. LANIER:
22    Q.   McKesson acknowledges that at
23  various times during the period from January
24  2009 up through and including the effective
25  date of this agreement, it did not identify or

Page 480

1  report to DEA certain orders placed by certain
2  pharmacies which should have been detected by
3  McKesson as suspicious based on the guidance
4  contained in your letters.
5    Do you see that?
6    MR. EPPICH:  Objection.  Foundation.
7    THE WITNESS:  Yes, sir.
8    BY MR. LANIER:
9    Q.   At any time that you are allowed to
10  tell us about, based on the guidance in your
11  letters about the requirements of the law, I
12  left that part out.
13    You see where it says requirements?
14    A.   Yes.
15    Q.   Now at any point while you were
16  still in the DEA for the almost eight years or
17  so since you sent that last -- the 2007 letter,
18  that you're allowed to tell us about, did
19  McKesson ever come to you and say, hey, we are
20  not doing it.
21    MR. EPPICH:  Object to the form.
22  Foundation.
23    THE WITNESS:  I'm sorry.  I'm just
24  looking for clarification on the question.
25    Did they come to me directly and

30 (Pages 477 - 480)

Page 481

1  say, we are not following the law?
2          BY MR. LANIER:
3      Q.   Yeah.  Did they self-report?
4          MR. EPPICH:  Same objections.
5          MR. BENNETT:  You can -- you are
6  authorized to disclose your personal
7  recollection regarding your interactions with
8  manufacturers and distributors during your
9  tenure at office of diversion control and your
10  recollection of communication with registrants
11  regarding what makes an order suspicious.
12          So to the extent you had
13  communications that you recall, you may answer
14  those.  You may not disclose specific
15  investigative activities that are nonpublic.
16          THE WITNESS:  Okay.  No.  No, I
17  never received any kind of self-reporting from
18  McKesson.
19          BY MR. LANIER:
20      Q.   Did they ever tell you, this is
21  McKesson in 2017, this -- where they admit that
22  they had done that?
23          MR. EPPICH:  Objection.
24  Characterization.
25          MR. LANIER:  All right.  You are

Page 482

1  right.  Let me be more careful.
2          BY MR. LANIER:
3      Q.   This is 2017, where McKesson admits
4  that it, quote, did not identify or report to
5  the DEA certain orders placed by certain
6  pharmacies which should have been detected by
7  McKesson as suspicious based on the guidance
8  contained in the DEA letters about the
9  requirements set forth in the law.
10          Now my question to you is, did you
11  ever hear about the size of the fine that was
12  assessed in 2017?
13          MR. EPPICH:  Objection.  Foundation.
14          THE WITNESS:  Just in the media,
15  that was reported out.
16          BY MR. LANIER:
17      Q.   The media reported the fine of 150
18  million?
19          MR. EPPICH:  Objection.  Foundation.
20  Calls for speculation.
21          THE WITNESS:  That's what the media
22  reported.
23          BY MR. LANIER:
24      Q.   Now, I have pulled out
25  AmerisourceBergen, I have pulled out McKesson

Page 483

1  as examples.
2          Are they the only ones?
3          MR. EPPICH:  Objection.
4          MS. McCLURE:  Objection.  Form.
5  Foundation.
6          MR. BENNETT:  Objection.  Form.
7  Objection scope.
8          Same instructions regarding
9  nonpublic investigations.
10          THE WITNESS:  No.  There were other
11  investigations that resulted that were publicly
12  reported out that resulted in suspensions --
13  orders to show cause, suspension orders and
14  suspensions.
15          BY MR. LANIER:
16      Q.   We could look at CVS for example.
17          Do you remember anything about CVS
18  and their admissions in May of 2015?
19          MR. EPPICH:  Object to form.
20  Foundation.
21          THE WITNESS:  I remember the CVS
22  case, yes.
23          BY MR. LANIER:
24      Q.   Let me give you a copy of what we
25  will mark as Exhibit No. 6.

Page 484

1          (Deposition Exhibit 6 was marked for
2  identification.)
3          BY MR. LANIER:
4      Q.   Do you have Exhibit No. 6 in front
5  of you?
6      A.   Yes, sir.
7      Q.   Let's mark it for the jury.
8          This is a settlement agreement
9  entered into between the DEA and CVS Health and
10  all of its subsidiaries and affiliates.
11          Do you see that?
12      A.   Yes, sir.
13      Q.   Now, what part of our chain of
14  registrants would CVS be?
15      A.   CVS would be a pharmacy or a
16  retailer under that diagram.
17      Q.   Did you know whether or not they
18  were also a distributor for their own
19  pharmacies and retailers?
20      A.   They did distribute as well.
21      Q.   So CVS might actually be in two of
22  these categories, fair?
23          MR. EPPICH:  Objection.  Foundation.
24          THE WITNESS:  As a distributor, yes,
25  they could be in both categories.

31 (Pages 481 - 484)

1          BY MR. LANIER:
2      Q.   Okay.  Now, if we look at this
3   settlement agreement, and it's signed by CVS,
4   it says on Page 3:  "CVS acknowledges that
5   certain CVS pharmacy retail stores did
6   dispense" -- let's make this a little bit
7   bigger so people can read it.
8          "Did dispense certain controlled
9   substances in a manner not fully consistent
10   with their compliance obligations under the
11   Controlled Substances Act and its implementing
12   regulations."
13         Do you see that?
14         MR. EPPICH:  Objection.  Foundation.
15         THE WITNESS:  Yes, sir.
16         BY MR. LANIER:
17     Q.   And were you part of the reason CVS
18   agreed to pay the $22 million fine pursuant to
19   this?
20         MR. EPPICH:  Object to form.
21         MR. STEPHENS:  Objection.
22         MR. BENNETT:  Vague.
23         THE WITNESS:  I think the fine was
24   based on the investigations done by people
25   within my office in the Miami field division.

1          BY MR. LANIER:
2      Q.   Now, did you know anything about CVS
3   being written up and settling again in February
4   of 2016, or was that after your departure?
5          MR. EPPICH:  Objection.  Form.
6   Foundation.
7          THE WITNESS:  I was -- I retired in
8   October of '15.
9          BY MR. LANIER:
10     Q.   All right.  I'm going to leave that
11   one out for now.
12         Mallinckrodt.  Did Mallinckrodt have
13   problems, are they another example?
14         MR. EPPICH:  Objection.  Form.
15         MR. O'CONNOR:  Objection.  Form.
16         THE WITNESS:  Mallinckrodt, yes,
17   they -- there was an investigation of
18   Mallinckrodt as well.
19         BY MR. LANIER:
20     Q.   2011 is the first one that we've
21   got.  Well, no, let's digress.
22         In the interest of -- well, let me
23   hand you a document we will mark as Exhibit No.
24   7.
25         (Deposition Exhibit 7 was marked for

1   identification.)
2          BY MR. LANIER:
3      Q.   All right.  I want to put Exhibit 7
4   on the ELMO so the jury can look at it, too.
5          This is another settlement agreement
6   that the DEA entered into with Mallinckrodt.
7          Can you see that on this first page?
8      A.   Yes, sir.
9      Q.   And Mallinckrodt, from the time you
10   were working in the biz of the DEA dealing with
11   industry, what part of the chart would they be,
12   the chain?
13     A.   Manufacturer.
14     Q.   Manufacturer.
15     A.   Yes.
16     Q.   In this exhibit, you will notice on
17   page -- it's got an appendix that's attached
18   and the appendix has got a Page 3.
19         If you are looking at the real
20   little numbers in the corner, those real little
21   numbers end with 630, if that helps you find
22   the page.
23     A.   I got it.  Yes, sir.
24     Q.   It is talking about what
25   Mallinckrodt actually said here.

1          MR. O'CONNOR:  Objection.
2          BY MR. LANIER:
3      Q.   "Acceptance of responsibility.  This
4   settlement agreement is not an admission of
5   liability for civil penalties covered under the
6   CSA.  However, Mallinckrodt agrees" -- you see
7   where I am reading?
8      A.   Yes, sir.
9      Q.   "At certain times during the covered
10   time period prior to January 1, 2012, certain
11   aspects of Mallinckrodt's system to monitor and
12   detect suspicious orders did not meet the
13   standards outlined in letters from the DEA
14   deputy administrator, office of diversion
15   control," and that is you?
16     A.   Well, I got a promotion.  The deputy
17   administrator would have been my boss, so it
18   should be deputy assistant administrator.
19     Q.   Deputy assistant.  So misstated
20   here, but those were your letters dated
21   September 27 and December 27 of '06 and '07,
22   right?
23     A.   Yes, sir.
24     Q.   So my question to you is:  In your
25   conversations with Mallinckrodt, did they ever,

32 (Pages 485 - 488)

Page 489

1  at any point in time, come to you and
2  self-report and say, we are not doing what you
3  have told us and made clear to us the law
4  requires us to do.
5      MR. O'CONNOR: Objection. Form.
6      THE WITNESS: Up until the time of
7  my retirement, no, I did not hear anything from
8  Mallinckrodt about that.
9      BY MR. LANIER:
10     Q.  These are not the only ones, if we
11  want to tell the Cardinal story and we will
12  wait and see what Cardinal lawyers ask you, but
13  there is a story behind Cardinal as well, isn't
14  there?
15     MR. SMITH: Object to form.
16     MR. O'CONNOR: I'm going to object
17  to the 11 that you wrote down next to
18  Mallinckrodt, and the fact that you are
19  including this on a document that described
20  order to show cause.
21     MR. LANIER: I think it was actually
22  entered into in '17, 2017. I will change that,
23  or I will just take that out if it makes you
24  feel better. We will just leave it as
25  Mallinckrodt.

Page 490

1      BY MR. LANIER:
2      Q.  Walgreens. I mean, there are others
3  beyond these, fair?
4      A.  Yes, sir.
5      MR. STEPHENS: Objection. Form.
6      BY MR. LANIER:
7      Q.  All right. Now, what I would like
8  to do is -- before we finish with my time with
9  you and I pass you as a witness, I want to deal
10  with some things that have already been asked
11  of you in testimony by the companies' lawyers
12  and these are what I am going to call
13  roadblocks.
14     These are questions of whether or
15  not your testimony should be believed, whether
16  or not you should be believed, whether or not
17  the DEA was at fault, whether or not -- any
18  number of different things.
19     MR. EPPICH: Object to form.
20     BY MR. LANIER:
21     Q.  Do you follow what I am saying?
22  What I am asking you about?
23     MS. McCLURE: Objection.
24     THE WITNESS: Yes, sir.
25     BY MR. LANIER:

Page 491

1      Q.  Okay. Sir, I want to ask you about
2  some explanations and excuses that have been
3  used by the defendants in this case and give
4  you a chance to explain them. Okay?
5      MS. McCLURE: Object to the
6  commentary for the record.
7      MS. MAINIGI: Objection.
8      MR. EPPICH: Objection.
9      MR. STEPHENS: Objection.
10     BY MR. LANIER:
11     Q.  Let me ask you this: If the
12  defendants were to try to make a case that only
13  registrants get ARCOS data and they only get
14  their own ARCOS data, does that have anything
15  at all to do with what a registrant's
16  responsibility is under the law?
17     MR. EPPICH: Object to form.
18     MS. McCLURE: Objection.
19     MR. BENNETT: Objection. Vague.
20     THE WITNESS: No, it doesn't.
21     BY MR. LANIER:
22     Q.  Explain.
23     A.  ARCOS data is a tool that we use,
24  it's a statutory requirement under 827, and we
25  use it for any number of things, but it's

Page 492

1  retrospective data. It's generally -- it could
2  be anywhere from four to six months old. Okay.
3      We use ARCOS not necessarily for
4  cases, although it has been used for cases and
5  we have developed cases from ARCOS. However,
6  suspicious orders are the key because those are
7  real time. They are when discovered, and that
8  gives us insight into what is happening now,
9  not what's happened eight, ten months ago, six
10  months ago.
11     So the idea that -- well, you have
12  ARCOS, so ARCOS, you know, or we need ARCOS,
13  well, you could use ARCOS but if you notice the
14  cases that we have done, we have never ever
15  done cases where we have looked at a particular
16  distributor or a manufacturer and said, oh,
17  well, in addition to what you have sold, these
18  other pharmacies, these other distributors have
19  sold as well.
20     We only concentrate on what they
21  sold, so ARCOS wouldn't help in that respect.
22  The fact is that ARCOS helps us to do certain
23  things within our requirements, under our
24  charges, under the Controlled Substances Act,
25  suspicious orders is what they would -- what

33 (Pages 489 - 492)

Page 493

1  they could help us with by identifying
2  potential registrants that are diverting.
3      So the idea that they need ARCOS,
4  well, it is helpful, it could be helpful to
5  them.  It's really not a -- they shouldn't
6  necessarily rely on ARCOS.  They should rely on
7  the suspicious order monitoring.
8      Q.   All right.  To make sure we put this
9  into a time perspective, so we have got a
10  person ultimately who says to the distributor,
11  the manufacturer, whomever we are looking at,
12  the person says, get me opioids to sell.
13      Are you tracking with me?
14      A.   Yes.
15      MR. EPPICH:  Object to form.
16      BY MR. LANIER:
17      Q.   And then the distributor will say,
18  the middleman?
19      MR. EPPICH:  Object to form.
20      BY MR. LANIER:
21      Q.   -- supplies the opioids.  Okay?
22  Now, some of these opioids, this may be a
23  suspicious order if someone is actually looking
24  at it.
25      Are you following my hypothetical?

Page 494

1      A.   Yes.
2      Q.   You told the jury that the
3  distributor has an obligation to police these
4  suspicious orders and tell the DEA, right?
5      MR. EPPICH:  Object to form.
6  Misstates prior testimony.
7      BY MR. LANIER:
8      Q.   Am I right so far?
9      A.   Yes.
10      Q.   All right.  Now, ARCOS data, as the
11  jury will learn, is data that comes out four to
12  six months later after the sale of the product;
13  is that right?
14      A.   That is correct.
15      Q.   How can the companies' inability to
16  see data four to six months after the sale ever
17  be something that alleviates or helps them with
18  their responsibility to stop the sale to start
19  with?
20      MS. MAINIGI:  Objection.
21      MR. BENNETT:  Objection.  Form.
22  Objection.  Incomplete hypothetical.
23      THE WITNESS:  I'm -- I'm not sure
24  how that would help them.  Not with that lag
25  time, that four to six, eight month lag time.

Page 495

1  That is what a suspicious order is for.
2      BY MR. LANIER:
3      Q.   All right.  Next roadblock question.
4  What if -- by the way, you have given six hours
5  of testimony to industry lawyers before I got
6  started, right?
7      MR. EPPICH:  Objection.
8      THE WITNESS:  Yes, sir.
9      BY MR. LANIER:
10      Q.   And they have made already an
11  accusation or at least an allegation that the
12  quota levels increased under your watch.
13      MS. MAINIGI:  Objection.
14      MR. EPPICH:  Objection.
15      BY MR. LANIER:
16      Q.   Do you remember that testimony?
17      A.   Yes, sir.
18      Q.   First of all, I want you to explain
19  to the jury what a quota level is, and then I'm
20  going to have you explain a few other things
21  about this.
22      What is a quota level?
23      MR. BENNETT:  You can answer.
24      THE WITNESS:  Under Statute 21 USC
25  826, Congress set up a system to limit the

Page 496

1  amount of drugs that are potentially in the
2  system at any one time and we do that through
3  quota.
4      Quota is schedule -- for Schedule I
5  and II and certain Schedule III controlled
6  substances, and what it is basically is DEA
7  establishing an aggregate production quota for
8  each basic class of drug, so what is a basic
9  class.  Hydrocodone would be a basic class of
10  drug, oxycodone would be a basic class of drug.
11      So DEA through a system with
12  manufacturers establishes a ceiling and that
13  would be the aggregate production quota and at
14  that point in time, manufacturers can draw from
15  that ceiling.  Think of the aggregate
16  production as a pie and then each manufacturer
17  starts drawing from that pie.  We can never go
18  above that ceiling.  We can definitely go below
19  the ceiling, but we can never go above that
20  ceiling.
21      And then quota is also established
22  for procurement where dosage form manufacturers
23  take the amount of raw material or active
24  pharmaceutical ingredient that is made by the
25  manufacturers and they could produce pills.

34 (Pages 493 - 496)

Page 497

1    They could produce dosage forms from that which
2    are then sent downstream.
3        BY MR. LANIER:
4        Q.   All right.  I'm sorry.  So there is
5    a pie.  There is a total amount and the
6    different manufacturers can cut pieces out of
7    that pie but that pie is the quota amount,
8    fair?
9        A.   That's the basic class quota amount
10   for each basic class, that's the amount of the
11   ceiling.
12       Q.   That's the ceiling?
13       A.   Yes.
14       Q.   All right.  So the point was made in
15   your deposition earlier by the industry lawyers
16   that the quota levels increased under your
17   watch.
18       Lest the jury think you did anything
19   wrong, I want to ask you point blank, did you
20   do something wrong, Joe Rannazzisi?
21       MS. MAINIGI:  Objection.
22       THE WITNESS:  Absolutely not.
23       BY MR. LANIER:
24       Q.   Explain why you say, "absolutely
25   not."

Page 498

1        A.   Well, there -- there are certain
2    weaknesses in the quota system by statute.  One
3    is that I could not set quota by individual
4    dosage form.  I can't -- I can't tell a
5    manufacturer what they -- what they can and
6    can't manufacture.  They are the only ones,
7    it's a business decision.
8        But secondly and more importantly,
9    Congress set up a roadmap in 826 to explain
10   exactly what we have to look at in order to set
11   the quota, and as long as the industry sets
12   justifications for that amount that they are
13   seeking, I have to give it.
14       Because in 826, 826 requires the
15   Drug Enforcement Administration to establish or
16   set a quota that meets the legitimate medical,
17   scientific, industrial and export needs of the
18   country.  When Congress set that up, they also
19   laid out what we should be looking for and our
20   quota is set basically on 826.  It's very
21   difficult to deviate from 826 because it's
22   pretty straightforward in the statute what we
23   are required to do.
24       So if the quota increased, generally
25   it's because, one, there is increased research

Page 499

1    and development, they have to do stability
2    studies, there is an increase in prescriptions,
3    and the amount of prescriptions that are going
4    out the door have to be -- have to be accounted
5    for.  That's basically the quota.
6        We might be exporting large
7    quantities and at one point in time, we also
8    had a quota increase, not to put quota out on
9    the street, but to maintain a contingency quota
10   so if there was a catastrophic event within the
11   delivery system, a catastrophic event with the
12   manufacture or distribution system, we could
13   immediately reissue quota to make up for the
14   loss of drug that's in -- that was in the
15   system at the time.  That's what quota is.
16       Quota is not a tool to stop
17   diversion.  Quota is a tool to limit the amount
18   of drug available, you know, from a
19   manufacturer, a distributor, but in the end,
20   the reason Congress set it up that way and the
21   reason it was explained to me was that if there
22   is not enough quota to meet the legitimate
23   medical, scientific and industrial needs of the
24   country, legitimate patients could not --
25   would not be able to get their medicine.

Page 500

1        That is, if we have a quota and we
2    decide to cut the quota by 20 percent, you
3    still have the same amount of people kind of
4    drawing from that quota.  Well, if it's 20
5    percent less, patients might not get their
6    medication.  If it's a drug seeker, you know,
7    no one really cares, but if it's a -- if it's a
8    person who actually needs that opioid, a
9    hospice care patient, a palliative care
10   patient, somebody that indeed needs opioids for
11   transition or whatever, you know, their final
12   stages of life.  If they can't get that
13   medication, they are in pain, then we haven't
14   met our obligations under 826.
15       Q.   Okay.  Thank you.  Next roadblock
16   issue.  If there is an allegation that was made
17   that pain is undertreated in America, and you
18   were asked questions about this in your
19   deposition by the company lawyers, do you
20   remember those questions?
21       MR. EPPICH:  Object to form.  Object
22   to characterization.
23       THE WITNESS:  I don't remember the
24   exact question, but I do remember us talking
25   about it.

35 (Pages 497 - 500)

Page 501

1      BY MR. LANIER:
2      Q.   Yeah, they showed you the website
3   from the DEA about pain being undertreated or
4   something to that effect and you said you
5   hadn't noticed it before?
6         MR. EPPICH: Objection. Form.
7   Mischaracterization.
8         THE WITNESS: It was an old form.
9         BY MR. LANIER:
10     Q.   Do you remember that?
11     A.   I do remember that, yes.
12     Q.   All right. First of all, are you
13  qualified as a medical doctor to talk about
14  when opioids are proper treatment and when they
15  are not?
16     A.   I am not a medical doctor.
17     Q.   So if we need to know medical doctor
18  diagnoses and treatments, you are not the right
19  guy to be asking about that. Fair?
20        MS. MAINIGI: Objection.
21        THE WITNESS: That is correct.
22        BY MR. LANIER:
23     Q.   Is there, in fact though, times
24  where you recognize as a pharmacist that
25  opioids have an important role, namely end

Page 502

1   stage cancer patients?
2         MR. EPPICH: Objection.
3         THE WITNESS: That is correct.
4         BY MR. LANIER:
5      Q.   All right. Next roadblock. If
6   there is a suggestion to the jury that is made
7   that, gee, the distributors or the
8   manufacturers or the pharmacies were confused,
9   they just didn't know what they were supposed
10  to do. Would that be acceptable in your mind?
11        MR. EPPICH: Object to form. Vague.
12        MS. MAINIGI: Objection.
13        THE WITNESS: No.
14        BY MR. LANIER:
15     Q.   Most of the distributors that you
16  have dealt with, the big ones, most of the big
17  manufacturers you have dealt with, do they have
18  law firm -- lawyers working within them or law
19  firms on retainers?
20        MS. McCLURE: Form. Foundation.
21        MR. EPPICH: Form. Foundation.
22        BY MR. LANIER:
23     Q.   To your knowledge?
24     A.   To my knowledge, there -- each
25  company has both in-house and outside counsel.

Page 503

1      Q.   I mean, is it the DEA's job to give
2   legal advice to these companies?
3         MR. EPPICH: Object to form.
4         MR. BENNETT: Objection. Vague.
5         THE WITNESS: I wouldn't say we give
6   legal advice, no.
7         BY MR. LANIER:
8      Q.   In fact, have the companies been
9   able to hire people from the DEA and actually
10  bring them inside their companies?
11        MR. EPPICH: Objection. Foundation.
12  Calls for speculation.
13        MS. MAINIGI: Also scope.
14        THE WITNESS: Some of the companies
15  have hired DEA -- former DEA employees, some
16  within the office of diversion control, to --
17  to work on their systems or work in their
18  companies in compliance.
19        BY MR. LANIER:
20     Q.   Is that a problem that you have
21  seen? Has that caused a problem that you have
22  seen?
23        MR. EPPICH: Object to form.
24  Foundation. Vague.
25        MS. MAINIGI: Objection. Scope.

Page 504

1         MR. BENNETT: Objection. Vague.
2         THE WITNESS: I don't know if it
3   necessarily presents a problem. I would hope
4   that those former employees are trying to guide
5   or help guide the -- the particular registrants
6   through what their requirements are and what
7   their obligations are.
8         BY MR. LANIER:
9      Q.   If a company is confused about the
10  law, should they just keep selling the opioids
11  in the midst of their confusion?
12        MR. EPPICH: Objection.
13        THE WITNESS: The company has -- all
14  the companies, all the registrants have many
15  avenues to try and get their -- their questions
16  answered, through the local DEA offices, the
17  headquarters has a liaison and policy section
18  and that liaison and policy section, their sole
19  job is to provide guidance to the distributors.
20        We have on-site people, on-site
21  people who go in to do inspections at the -- at
22  the distributors and they can ask those people.
23        BY MR. LANIER:
24     Q.   Would you tell me --
25        MS. McCLURE: Counsel, are you

36 (Pages 501 - 504)

Page 505

1 representing what is up on the board --
2       MR. LANIER: I'm clarifying. No,
3 I'm not. I'm about --
4       MS. McCLURE: -- that the witness
5 has not actually stated in advance of him
6 suggesting that, so I also object to the fact
7 that your writing tends to be leading.
8       BY MR. LANIER:
9   Q.  Sir, if you will look at my writing
10 and excuse the interruption for a moment.
11       My question to you is: If they are
12 confused, should they stop selling until their
13 questions are answered?
14       MS. MAINIGI: Objection. Scope.
15       BY MR. LANIER:
16   Q.  Yes or no?
17       MS. MAINIGI: Foundation. Form.
18       MR. BENNETT: Objection. Incomplete
19 hypothetical.
20       MS. MAINIGI: Vague.
21       THE WITNESS: If they are confused
22 and they're -- and they -- and they continue to
23 sell in the midst of their confusion, no, they
24 shouldn't be selling.
25       BY MR. LANIER:

Page 506

1   Q.  Thank you. Next roadblock. Who is
2 this gentleman named Mr. Rosenberg that was
3 with the DEA?
4   A.  He was an acting administrator after
5 Administrator Lynn Hart retired.
6   Q.  So the acting ad man, Mr. Rosenberg,
7 supposedly said that the DEA is part of the
8 problem.
9       MR. EPPICH: Object to form.
10       BY MR. LANIER:
11   Q.  And that's not an exact quote, but
12 that's the essence of what has been suggested
13 Mr. Rosenberg said?
14       MR. SMITH: Object to form.
15 Characterization.
16       BY MR. LANIER:
17   Q.  First of all, do you believe that
18 the DEA was part of the problem?
19       MS. MAINIGI: Objection. Scope.
20 Form.
21       MR. EPPICH: Objection. Vague.
22       MR. BENNETT: Objection. Vague.
23       THE WITNESS: I do not believe that
24 DEA was part of the problem. DEA was trying to
25 stop diversion and -- and basically clean up

Page 507

1 the supply chain that was continuing to not
2 follow their obligations under the law.
3       BY MR. LANIER:
4   Q.  All right. Question. If the
5 companies don't break the law, does the DEA
6 even have a job to do on diversion through
7 corporate channels?
8       MR. EPPICH: Objection. Form.
9 Vague.
10       THE WITNESS: DEA's job is to -- to
11 investigate and -- and try to prevention
12 diversion from it happening, so even if the
13 companies -- the companies continue to -- to
14 meet their obligations, their legal obligations
15 under the Act, DEA would still be there because
16 we'd still have to do inspections, we'd still
17 have to do scheduling actions, we'd still have
18 to do accountability audits. DEA is always
19 going to be there whether they are, you know,
20 meeting their obligations under the law or not.
21       MS. McCLURE: I repeat my prior
22 request that you stop leading the witness and
23 putting testimony on the board in advance. I
24 do see that you have, in fact, covered up now
25 what you have written previously, but you

Page 508

1 wouldn't be in a position of having to do that
2 if you would simply let the witness -- you ask
3 the question with the witness supplying the
4 answer rather than supplying them for him.
5       MR. LANIER: With due respect to the
6 way you are reciting the record here, I am able
7 to write down questions that I'm going to be
8 asking, as well as questions that I have asked
9 and if I am doing that and I'm covering it up,
10 that's a fine thing to do.
11       And if there is a question that's
12 down here that is not one that he agrees with,
13 he will make it clear. You all will make it
14 clear, you will have this, so I want to make
15 sure you are clear on that.
16       MS. McCLURE: Special Master Cohen,
17 I request a instruction given to counsel to
18 advise him to stop writing on a sheet that is
19 visible to the screen, to the jury, to
20 counsels' room, and most importantly especially
21 to the witness in advance of the witness
22 providing that testimony.
23       SPECIAL MASTER COHEN: So you can do
24 what you are doing at the risk of it being not
25 allowed in a trial.

37 (Pages 505 - 508)

Page 509

1    MR. LANIER: Very good. Thank you.
2    SPECIAL MASTER COHEN: And maybe a
3 better way of doing it is to allow the witness
4 to testify before writing it, so that you avoid
5 what could be an objection that is sustained by
6 the Court, so that you are not allowed to play
7 it.
8    MR. LANIER: Thank you.
9    BY MR. LANIER:
10   Q.   Sir, so here is my question:  If the
11 company stopped the diversion, the DEA is or
12 isn't the issue?
13   MS. McCLURE:  Form.
14   MS. MAINIGI:  Same objection.
15   MR. BENNETT:  Objection.  Vague.
16   BY MR. LANIER:
17   Q.   In other words -- let me ask it this
18 way:  If the companies do their job properly,
19 they follow the law, does the DEA have the
20 problem of telling the companies you didn't
21 follow the law?
22   MS. McCLURE:  Object to form.
23   MR. EPPICH:  Object to form.
24   MS. MAINIGI:  Objection.  Let the
25 record reflect that Mr. Lanier engaged in the

Page 510

1 same conduct in terms of leading the witness.
2 The witness was shown what Mr. Lanier wanted
3 the answer to be, and then after the fact, Mr.
4 Lanier added additional words.
5    MS. McCLURE:  Same question.
6    THE WITNESS:  If the companies were
7 following the law, the DEA would not have to
8 take the measures that it took to try and bring
9 them into compliance, which is issuing orders
10 to show cause, issuing immediate suspension
11 orders, sending out countless reminders.  If
12 they were following the law, that wouldn't
13 happen.
14   BY MR. LANIER:
15   Q.   Let me use an example that is maybe
16 more everyday.  Do you drive a car?
17   A.   Yes, sir.
18   Q.   You are aware of speed limits?
19   A.   Yes, sir.
20   Q.   You are aware that sometimes there
21 are school zones where the speed limit is
22 reduced for the school zone.
23   A.   Yes, sir.
24   MS. MAINIGI:  Objection.
25   BY MR. LANIER:

Page 511

1    Q.   If someone speeds through the school
2 zone, a police officer might be there with a
3 radar gun, might catch them, might write them a
4 ticket.  That is something you can foresee
5 happening, fair?
6    MS. MAINIGI:  Objection.
7    THE WITNESS:  Yes, sir.
8    BY MR. LANIER:
9    Q.   If a person speeds through a school
10 zone and the police officer doesn't happen to
11 be there that day with a radar gun that day and
12 doesn't catch that person, does that mean that
13 the person is innocent?
14   MS. MAINIGI:  Objection.
15   MR. EPPICH:  Objection.
16   THE WITNESS:  No.
17   BY MR. LANIER:
18   Q.   Can the person blame the cop because
19 the person sped through the school zone and the
20 cop wasn't there?
21   MS. MAINIGI:  Objection.
22   THE WITNESS:  No.
23   BY MR. LANIER:
24   Q.   If the -- if the companies are not
25 diverting or allowing diversion of the product,

Page 512

1 then the DEA's job gets a whole lot easier,
2 doesn't it?
3    MR. EPPICH:  Objection.
4    MS. MAINIGI:  Objection.
5    THE WITNESS:  Absolutely.
6    MR. LANIER:  Next.  I'm going to
7 pass the witness and save my time for redirect.
8 Thank you.
9    THE VIDEOGRAPHER:  Going off record.
10 The time is 12:02.
11   (A lunch recess was taken.)
12   MR. LANIER:  I have marked for the
13 court reporter as Exhibit 8 the handwritten
14 notes and attached those, which I understand
15 defense has gotten a copy of, a color copy, so
16 that they can them use as well as being
17 attached to the exhibit.
18   Thank you.
19   (Deposition Exhibit 8 was marked for
20 identification.)
21   THE VIDEOGRAPHER:  We're going back
22 on record.
23   Beginning of Media File No. 6.
24   Time is 1:11.
25 EXAMINATION BY COUNSEL FOR CARDINAL HEALTH

38 (Pages 509 - 512)

Page 513

1     BY MS. MAINIGI:
2     Q.   Good afternoon, Mr. Rannazzisi.
3         My name is Enu Mainigi.  And I
4  represent Cardinal Health.  I questioned you on
5  day one of your deposition.
6         Do you recall that?
7     A.   Yes, ma'am.
8     Q.   And you recall there were some other
9  questioners in that day as well.
10         Do you remember that?
11     A.   Yes, ma'am.
12     Q.   So I'm going to start off the
13  questioning following Mr. Lanier's questioning
14  of you.  And there will be several others that
15  follow after me.
16         Is that okay?
17     A.   Yes, ma'am.
18     Q.   Mr. Lanier asked you, Mr.
19  Rannazzisi, about your time in enforcement.
20         Do you recall that?
21     A.   Yes, sir -- ma'am.  Yes, ma'am.
22     Q.   And I think he was talking about
23  when you were in the field in part for DEA
24  enforcement.
25         Do you remember that?

Page 514

1     A.   Yes.
2     Q.   And I think that was when he was
3  asking you about some of the gear that you
4  might have worn, the -- the jumpsuit, the
5  overalls.
6         Do you recall that?
7     A.   Yes.
8     Q.   Now, that took place before you took
9  over as head of antidiversion at headquarters,
10  correct?
11     A.   Yes.  That would have been in the
12  '80s and '90s.
13     Q.   Okay.  And when you took over
14  antidiversion at headquarters, that was
15  starting in the 2004 time period, really 2005,
16  right?
17     A.   Yes.
18     Q.   And I think, as we talked about on
19  day one of your testimony, it was in that time
20  period that you began to deal with
21  distributors, correct?
22     A.   Yes.
23     Q.   And just so the record is clear, by
24  "that time period" I mean in the 2004, 2005
25  time period forward, correct?

Page 515

1     A.   Yes.
2     Q.   Mr. Rannazzisi, you were asked a
3  bunch of questions about a bill that got passed
4  by Congress.
5         Do you remember that?
6     A.   Yes, ma'am.
7     Q.   And that was called -- that bill was
8  -- I don't recall if the name came up.  Was it
9  called the Marino bill?
10     A.   No, ma'am.
11     Q.   What bill were you referring to?
12     A.   The Ensuring Patient Access and
13  Effective Drug Enforcement Act of 2016.
14     Q.   Okay.  So that bill was passed in 2
15  -- 2016.
16     A.   Yes.  Which --
17     Q.   And -- I'm sorry.  Go ahead.
18     A.   Yes.
19     Q.   And so the bill that Mr. Lanier
20  asked you about that -- that essentially
21  hampered DEA's ability to control diversion, I
22  think the word that were used, that was
23  passed in 2016?
24     A.   Yes.
25     Q.   And that was prior -- you left prior

Page 516

1  to 2016, correct?
2     A.   Yes.
3     Q.   So that bill was passed after you
4  left the DEA?
5     A.   That is correct.
6     Q.   So you don't necessarily have any
7  firsthand knowledge of how that bill hampered
8  DEA's ability to control diversion, correct?
9     A.   DEA hasn't issued an immediate
10  suspension order that I'm aware of, except for
11  one, which was withdrawn, since the passage of
12  that bill related to manufacturers and
13  distributors.
14         So I believe, yes, that's probably
15  correct.
16     Q.   So you have firsthand knowledge
17  since 2016 as to how this 2016 bill has
18  hampered DEA's antidiversion efforts?
19     A.   I -- again, I -- I said that, based
20  on the news reporting, there was only one
21  instance where an immediate suspension order
22  was executed post-bill.  And that immediate
23  suspension order was withdrawn.  It was
24  withdrawn.
25         So I don't know of everything, but I

39 (Pages 513 - 516)

Page 517

1    know what's been reported.  And generally DEA
2    reports when they execute immediate suspension
3    orders in order to show cause.  And I -- I
4    pretty much keep up with the news and make sure
5    that I keep up with what's going on.
6        Q.   But you haven't been inside DEA
7    since when?
8        A.   October of 2015.
9        Q.   Okay.  So you don't know what was
10    going on at DEA that may or may not have
11    resulted in them pursuing suspension orders,
12    correct?
13        A.   That is correct.
14        Q.   But you were at DEA from 2005
15    through October 2015, right?
16        A.   Yes.
17        Q.   And you were the head of
18    antidiversion at DEA in that time period,
19    correct?
20        A.   The Office of Diversion Control,
21    yes.
22        Q.   And -- and tell us again, just in
23    case we didn't get it last time, what is the
24    role of the Office of Diversion Control?
25        A.   The Office of Diversion Control

Page 518

1    oversees all pharmaceutical, chemical,
2    synthetic drug investigations related to
3    controlled substances, listed chemicals and --
4    and any type of analog or synthetic.
5        We monitor, inspect the -- the
6    regulated industry, be it the registrants or
7    the chemical manufacturers and distributors, to
8    ensure that diversion does not occur in those
9    supply chains.
10        Q.   And so you -- part of what you do is
11    monitor the registrants in the Office of
12    Diversion Control, correct?
13        A.   Yes.
14        Q.   And if the registrants were not
15    doing their job, then you would take action,
16    correct?
17        A.   We would conduct investigations,
18    yes.
19        Q.   And one of the ways you would
20    conduct investigations is by looking at data;
21    is that right?
22        A.   There's -- there's many methods to
23    look at -- to conduct investigations.  Data
24    collection, data review is part of it.  It
25    depends on the type of investigation.  Depends

Page 519

1    on what investigation we're doing.
2        Q.   With respect to investigating
3    antidiversion, would you use ARCOS data?
4        A.   We can use it historically to
5    support information that we received.  But we
6    didn't have any current ARCOS data.
7        Q.   With respect to the use of ARCOS
8    data, the DEA has used ARCOS data to show
9    distributors where they could do better,
10    correct?
11        A.   We have -- yes.  2005 meetings we
12    did show ARCOS data, yes.
13        Q.   Is there any type of other data that
14    could be used that DEA had access to that would
15    be more timely?
16        MR. BENNETT:  Objection.  Scope.
17        You're not authorized to disclose
18    confidential law enforcement investigative or
19    intelligence gathering and dissemination
20    techniques whose effectiveness would be
21    impaired by the disclosure.
22        To the extent that there is publicly
23    available information regarding databases that
24    you could use or information you could use, you
25    may answer.

Page 520

1        THE WITNESS:  And that's not a
2    question I could answer.
3        BY MS. MAINIGI:
4        Q.   How about answering "yes" or "no"?
5        Was there other types of data that
6    could be used by the DEA to investigate
7    diversion, yes or no?
8        MR. BENNETT:  Objection.  Vague.
9        You can answer "yes" or "no" only.
10        THE WITNESS:  Yes.
11        BY MS. MAINIGI:
12        Q.   But you can't tell me what that data
13    is?
14        A.   I'm prohibited from telling you what
15    that data is.
16        Q.   Now, coming back to this 2016
17    bill -- or rather let -- let's go to the time
18    period before that.  Because that -- that
19    happened after you left, that 2016 bill.
20        So from 2005 to 2015, there wasn't
21    any sort of bill that Congress passed that
22    hampered the DEA's ability to control
23    diversion, was there?
24        A.   Well, that bill was introduced on at
25    least two occasions, from '14 up until I left

40 (Pages 517 - 520)

Page 521

1  in '15, before it was passed in -- in the form
2  it was passed in '16.
3      Q.   So only when a bill becomes a law
4  does it take effect, right?
5      A.   That's correct.
6      Q.   And so it took effect sometime in
7  '16 or thereafter, correct?
8      A.   Yes.
9      Q.   So let me ask my question again, Mr.
10  Rannazzisi.
11      From 2005 to 2015, did Congress pass
12  any sort of legislation that hampered DEA's
13  ability to control diversion?
14      A.   Up until that point in time, no.
15      Q.   Now, while you were head of the
16  office of antidiversion at the DEA, Mr.
17  Rannazzisi, from 2005 to 2015, did you make any
18  efforts to change the law -- or the laws
19  related to antidiversion yourself?
20      MR. BENNETT:  Objection.  Vague.
21      THE WITNESS:  When Congress --
22  Congress has asked us to review certain
23  provisions of the act, and we have provided
24  comments.  But we don't generally tell Congress
25  what changes need to be made unless we're

Page 522

1  asked, unless we're asked to provide technical
2  guidance, at which point in time then we -- we
3  can.
4      BY MS. MAINIGI:
5      Q.   Well, I think you told Mr. Lanier
6  you testified in front of Congress about 33
7  times?
8      A.   Yes, ma'am.
9      Q.   And in any of those 33 times, did
10  you suggest to Congress that there could be
11  enhancements to the antidiversion laws
12  instituted to help abate diversion?
13      A.   I don't necessarily remember every
14  time we testified.  However, at a congressional
15  request, we did send them opinions on what
16  could be changed in the law to make it more
17  effective.  And it was all throughout the
18  Controlled Substances Act.  As long as they are
19  making the request and asking us what needed to
20  be done, we -- we could provide guidance.
21      In a hearing there's certain
22  limitations that we have on how we could
23  testify regarding proposed legislation or
24  proposed legislative changes.  If you look at
25  most people when they're testifying, they have

Page 523

1  to say that, "The administration has not made a
2  -- not taken a position on that.  We'll have to
3  get back to you."
4      So, you know, we -- we're
5  constrained from talking about certain things
6  within the hearing process.
7      Q.   Did you ever advocate to Congress
8  that quota should be decreased?
9      A.   I never advocated to Congress that
10  quota should be in -- decreased.  I did
11  advocate, after requests that the quota 826
12  could be changed, to make it -- to make the
13  statute stronger.  But I've never advocated for
14  a decrease in quota.  Because I have to follow
15  the 826, the statute.
16      Q.   Did you ever advocate to Congress
17  that the definition of "suspicious order" in
18  the regulation should be clarified?
19      A.   No.  And Congress never asked for
20  that.  Again, we only -- we only provide
21  technical guidance when Congress asks us for
22  it.
23      Q.   Did you ever advocate the Congress
24  that there should be greater clarity provided
25  as to what an adequate suspicious order

Page 524

1  monitoring system should be?
2      A.   Again, we don't advocate to
3  Congress.  What we do is, when Congress asks us
4  or the administration decides that there might
5  need to be a change, it's brought to the
6  attention of Congress.
7      But generally Congress makes a
8  decision to review certain provisions of any
9  act, not just the Controlled Substances Act.
10      Q.   So the answer is no, Mr. Rannazzisi,
11  you never went in front of Congress and
12  advocated for greater clarity as to what would
13  be appropriate for an adequate suspicious order
14  monitoring system?
15      A.   Again, that would be an
16  administration decision.  And no, I personally
17  have never advocated for that.
18      Q.   And -- and is that, in part, because
19  your view, as I understood it from last time,
20  Mr. Rannazzisi, is you think that the
21  regulation is very clear, right?
22      A.   I think the regulation is very
23  straightforward and clear, yes.
24      MS. MAINIGI:  Okay.  We'll mark the
25  -- let me go ahead and mark an exhibit, Mr.

41 (Pages 521 - 524)

Page 525

1 Rannazzisi.  In fact, I'll -- I'll go ahead and
2 mark a couple at the same time.
3      We'll mark this as Exhibit 9.
4      And I'm going to give you a copy of
5 the Controlled Substances Act.
6      (Deposition Exhibit 9 was marked for
7 identification.)
8      MS. MAINIGI:  Here you go.
9      And I'm going to give you a copy as
10 Exhibit 10 of the C.F.R.
11      (Deposition Exhibit 10 was marked
12 for identification.)
13      MS. MAINIGI:  There you go, Mr.
14 Rannazzisi.  Sorry.
15      THE WITNESS:  Thank you.
16      BY MS. MAINIGI:
17 Q.   So tell us what -- let's -- let's
18 look at Exhibit 9 first.
19      Tell us what the Controlled
20 Substances Act is.
21 A.   The Controlled Substances Act is the
22 federal statute that governs laws and
23 provisions contain -- laws and provisions that
24 pertain to controlled substances and listed
25 chemicals.

Page 526

1 Q.   And does the Controlled Substances
2 Act speak to obligations of distributors,
3 manufacturers, pharmacies and other
4 registrants?
5 A.   Yes.
6 Q.   Now, if you take a look at it, it --
7 it appears that subparagraphs B and E of the
8 Controlled Substances Act relate to
9 distributors.
10      Do you see that?
11 A.   Yes.
12 Q.   And Subsection B -- or
13 Subparagraph B relates to Schedule I,
14 Schedule II controlled substances, right?
15 A.   Yes.
16 Q.   And then Subparagraph E relates to
17 Schedule III, IV and V substances, correct?
18 A.   Yes.
19 Q.   Okay.  Now, within the Controlled
20 Substances Act, and in particular those --
21 those subparagraphs the words "know your
22 customer" does not appear, correct?
23 A.   The words "know your customer" is
24 not in the Controlled Substances Act.
25 Q.   And the words "due diligence" are

Page 527

1 not in the Controlled Substances Act either,
2 right?
3 A.   That is correct.
4 Q.   Are the words "site inspections" or
5 "site visits" -- are those in the Controlled
6 Substances Act?
7 A.   I believe inspections are in the act
8 or in the regs.  Its' been a while since I -- I
9 rolled through that section.  But I'm pretty
10 sure there's a -- there's a section that
11 authorizes the attorney general to do on-site
12 inspections.
13 Q.   Okay.  Do you see that in -- so
14 right now we're on the Controlled Substances
15 Act.
16      Are site inspections or site visits
17 in the Controlled Substances Act?
18 A.   I don't have the full act.  I just
19 have Section 823.
20 Q.   An that's the section that governs
21 the registration of manufacturers, distributors
22 and dispensers of controlled substance,
23 correct?
24 A.   Yes.
25 Q.   Okay.  And in sections -- or

Page 528

1 subparagraphs B and E, do you see "site
2 inspections" or "site visits"?
3 A.   No.  It's not I -- I'm -- I'm
4 sure it's not within this section of the act.
5 Q.   The words "do not shift," they're
6 not in the Controlled Substances Act in
7 sections B and E, are they?
8 A.   No.
9 Q.   Does the Controlled Substances Act
10 expressly say that registrants must conduct an
11 independent analysis of suspicious orders prior
12 to completing a sale to determine whether the
13 controlled substances are likely to be diverted
14 from legitimate channels?
15 A.   I'm sorry.  Could you repeat that
16 question one more time.
17      MS. MAINIGI:  Could you read it
18 back, please.
19      (The record was read as requested.)
20      THE WITNESS:  No.  It's not
21 expressly outlined in the Controlled Substances
22 Act.  But it falls under maintenance, effective
23 controls against diversion.
24      BY MS. MAINIGI:
25 Q.   Does it say it in the Controlled

42 (Pages 525 - 528)

Page 529

1 Substances Act?
2    A.   No.  But to maintain effective
3 controls against diversion, there are steps you
4 have to take or -- you know, so if you're not
5 monitoring your customers, if you're not doing
6 due diligence, if you're not doing on-site
7 inspections, if you're not doing anything like
8 that, you're not truly maintaining effective
9 controls against diversion.
10    Q.   And what you just said, where is
11 that written down?
12    A.   It was -- it's not in the Act.  But
13 it was reinforced in our meetings and our
14 letters with the industry and in the other
15 on-site inspections that were done and our case
16 law that was established through the
17 administrative proceedings.
18    Q.   So all of that stuff, the letters
19 you're referring to, those were the letters
20 that Mr. Lanier showed you?
21    A.   Yes.
22    Q.   And those were letters from the end
23 of 2006, end of 2007; is that right?
24    A.   Yes.
25    Q.   And the Controlled Substances Act

Page 530

1 was passed when?
2    A.   In the '70s.
3    Q.   So prior --
4    A.   Early '70s.
5    Q.   I'm sorry.
6    A.   Yeah.
7    Q.   Prior to those letters, where are
8 the requirements you spoke of written down
9 somewhere?
10    A.   It's -- again, it's part of due
11 diligence.  It's not -- it's not written in the
12 Act, but it's part of their due diligence
13 obligations.  It's been developed over time.
14    Q.   So it's not written in the Act,
15 right?
16    A.   It's not in the Act.
17    Q.   Was there some other sort of
18 guidance or document?
19       Is that what you referred to got
20 written down in prior to 2006?
21    A.   Well, the meetings in 2005.
22    Q.   Was there a handout provided to
23 distributors that had those requirements on it?
24    A.   If I remember correctly, the
25 distributors -- distributors were provided with

Page 531

1 a binder full of information.
2    Q.   And that binder full of information
3 set out particular requirements; is that right?
4    A.   I wasn't at -- I wasn't at the
5 meetings.  But from what I understood, it --
6 everything that was put in those letter was
7 just a reflection of what came out of those
8 meetings.
9       And if we have the binder -- I don't
10 have the binders handy.  But if I had the
11 binders, I -- I could look through and find it.
12       But the binders basically discuss --
13 or those meetings discussed what due diligence
14 was, what a suspicious order was, and what the
15 requirements were.
16    Q.   So let's leave aside the binder.  We
17 can --
18    A.   Uh-huh.
19    Q.   -- pick up on the binder later.
20       Prior to the fall of 2005 and since
21 1970, where were the requirements you spoke of
22 written down somewhere and given to
23 distributors?
24    A.   I don't recall any -- any type of
25 document or guidance document where the

Page 532

1 distributors were told to do certain things
2 prior to 2005 that were related to maintaining
3 effective controls against diversion.
4    Q.   Now, let's turn to Exhibit 10.  That
5 is the Code of Federal Regulations.
6       Can you explain what the Code of
7 Federal Regulations is, just generally?
8    A.   Code of Federal Regulations is a
9 more detailed -- more detailed regulation
10 regarding certain statutory provisions.  So if
11 a statute is passed, Congress might say in the
12 statute and any regulation that DEA promulgates
13 pursuant to this -- or DEA must promulgate
14 regulations pursuant to this section.
15       And what the regulations are
16 just that.  It's a more detailed analysis of
17 what the statute is.
18    Q.   So you've got the Controlled
19 Substances Act, which is the statute.
20    A.   Yes.
21    Q.   And then you've got the C.F.R.
22 provision related to the Controlled Substances
23 Act, which provides more detail about what to
24 do.
25       Fair?

43 (Pages 529 - 532)

1    A.    Yes.

2    Q.    So let's take a look at Exhibit 10,

3  the -- the C.F.R. provision.

4         You're familiar with this

5  regulation, obviously based on your work in

6  antidiversion, correct?

7    A.    Yes.

8    Q.    And specifically what section of the

9  C.F.R. is this provision from?

10   A.    The security requirements under

11  Section 1301.

12   Q.    1301, and it's specifically 1301.74;

13  is --

14   A.    Yes.

15   Q.    -- that right?

16        Okay.  Now, does this -- does this

17  regulation set forth the obligation to design

18  and operate a system to disclose to the

19  registrant suspicious orders of controlled

20  substances?

21   A.    Yes.

22   Q.    And where is that?

23   A.    1301.74(b).

24   Q.    So that's where the obligation to

25  design and operate a system to disclose

1  suspicious orders comes from.

2         Fair?

3    A.    Yes.

4    Q.    Okay.  Now, in that section, does

5  the word or words "know your customer" appear?

6    A.    No, ma'am.

7    Q.    Do the words "due diligence" appear

8  in this regulation?

9    A.    No, ma'am.

10   Q.    Do the words "dispensing data"

11  appear in this regulation?

12   A.    No, ma'am.

13   Q.    Do the words "customer

14  questionnaire" appear in this regulation?

15   A.    No, ma'am.

16   Q.    Do the words "electronic order

17  monitoring system" appear in this regulation?

18   A.    No, ma'am.

19   Q.    Do the words "do not ship" appear in

20  this regulation?

21   A.    No, ma'am.

22   Q.    Do the word "dispensing data" appear

23  in this regulation?

24   A.    No, ma'am.

25   Q.    You can set those aside, Mr.

1  Rannazzisi.

2         Actually, I -- I apologize.  Why

3  don't you put it back in front of you for one

4  moment.

5    A.    Okay.

6    Q.    How does this regulation, the C.F.R.

7  provision, define a suspicious order?

8    A.    An order of unusual size, orders

9  deviating substantially from a normal pattern,

10  and orders of unusual frequency.

11   Q.    The phrase "unusual size," does this

12  regulation do anything more to explain what

13  "unusual size" could mean?

14   A.    The regulation is "of unusual size."

15  That's all it says.

16   Q.    So it doesn't do anything to further

17  explain what "unusual size" means, correct?

18   A.    No.  That was explained in the

19  meetings and the letters that we sent out.  The

20  meetings in 2005 that we had face to face with

21  each individual distributor, the big three, and

22  then some of the others; as well as the letters

23  that we sent out to every manufacturing,

24  distribution entity in the United States.

25   Q.    Well, we went over last time -- so I

1  won't belabor it --

2    A.    Uh-huh.

3    Q.    -- where "unusual size" was

4  appearing in the various communications.

5         Do you remember that?

6    A.    Uh-huh.

7    Q.    And with respect to "unusual size,"

8  I think -- I think -- well, I think you told me

9  that you only attend one of the distributor

10  briefings, right?

11   A.    It was a follow-up briefing.

12   Q.    So it wasn't one of the original

13  briefings?

14   A.    That's right.

15   Q.    Okay.  But Mr. Mapes and Mr. Wright,

16  they attend a lot of the distributor briefers,

17  correct?

18   A.    Yes.  They ran the distributor

19  briefings --

20   Q.    Okay.  And --

21   A.    -- for a while, yeah.

22   Q.    I'm sorry.

23        And -- and to the extent then they

24  have any recollection any more of those

25  meetings, they would have the best recollection

Page 537

1  of what actually got said in those meetings.
2      Fair?
3      A.  No.  There were other people in
4  those meetings.  But I think consistently they
5  were the ones who were in each -- each meeting.
6      Q.  Okay.  And I think you told me that
7  you did not typically, in any interactions you
8  had with distributors or registrants, define
9  yourself what "unusual size" meant, correct?
10      A.  No.  I -- I personally didn't have
11  any contact with them discussing that.  That
12  was done through the liaison and policy section
13  or the E-commerce section, the sections that
14  handled requests or questions from the
15  industry.
16      Q.  And I think you told me last time
17  that there was not necessarily some sort of
18  internal set of talking points that allowed
19  folks within DEA to further define the term
20  "unusual size," correct?
21      A.  Those questions went to E-commerce
22  or liaison and policy.  And they were the
23  people who were running the meetings.  So I --
24  I -- I think they just ran off exactly what
25  they were telling the distributors during the

Page 538

1  meetings.
2      Q.  But there was no guidebook or
3  playbook that they could refer to that allowed
4  them to specifically define "unusual size" a
5  certain way, right?
6      A.  I don't believe there was any
7  guidebook.  Yes.  No.
8      Q.  Did you ever think about putting one
9  together?
10      A.  No.  We thought it was pretty
11  straightforward.  An unusual size is just that.
12  An unusual frequency or -- is just that.
13      Q.  So when we met last time, you gave
14  me an example of unusual size.
15      A.  Uh-huh.
16      Q.  You gave me probably several
17  examples of unusual size.
18      Do you remember that?
19      A.  Yes.
20      Q.  And one of those examples, as I
21  recall it, was a pharmacy that had been
22  ordering 5,000 pills of Hydrocodone every
23  month --
24      A.  Uh-huh.
25      Q.  -- let's say for the last three

Page 539

1  years --
2      A.  Uh-huh.
3      Q.  -- and then all of a sudden it
4  bumped up into the 20,000 range or the --
5      A.  Uh-huh.
6      Q.  -- 50,000 range.  And then it bumped
7  up to the 100,000 range.
8      Do you recall that --
9      A.  Yes.
10      Q.  -- testimony?
11      And you defined the jump all of a
12  sudden from 5,000 to 20,000 as perhaps an order
13  of unusual size, correct?
14      A.  Yes.
15      Q.  And that was a pretty
16  straightforward example, in your mind, right?
17      A.  Yes.
18      Q.  But you also acknowledged that there
19  could be circumstances that were a bit less
20  straightforward, correct?
21      A.  I don't recall that.  I said that in
22  some cases you -- it could be a crossover
23  between two of the three.  So an unusual size
24  and an unusual frequency could cross over
25  together, so...

Page 540

1      Q.  Well, you agree with me that, in
2  some instances, it's harder to define what
3  unusual size is, correct, and to determine
4  whether unusual size has been met?
5      A.  No.  I don't -- if you know your
6  customer, you should know what an unusual size
7  is.
8      Q.  So it can vary from vary to customer
9  what an unusual size is.
10      Fair?
11      A.  Within reason.
12      Q.  So let's -- let's take your 5,000
13  example.
14      A.  Uh-huh.
15      Q.  5,000 Hydrocodone a month.
16      Would an order the following month
17  of 10,000 be suspicious?
18      MR. BENNETT:  Objection.  Incomplete
19  hypothetical.
20      THE WITNESS:  I would say it should
21  trigger a -- questions.  If you've gone from
22  5,000 to 10,000, you've doubled your purchases.
23  I think that should trigger some questions,
24  yes.
25      BY MS. MAINIGI:

45 (Pages 537 - 540)

Page 541

1  Q.   And it could be that follow-up due
2  diligence might, in fact, reveal good reasons
3  for that bump from 5,000 to 10,000 or not.
4  Fair?
5  A.   It -- again, it's a hypothetical.  I
6  don't know exactly what the reason is.  I --
7  like -- like the distributors, it's their
8  customer; it's their business decision.  They
9  have to look at it, perform due diligence and
10  make that decision whether it's appropriate or
11  not.
12  Q.   What -- what can you imagine could
13  be a reason that a bump from 5,000 to 10,000
14  after some due diligence might be legitimate
15  and not cause for concern?
16  MR. BENNETT:  Objection.  Vague.
17  THE WITNESS:  I -- I wouldn't know.
18  I mean in each -- in each instance is
19  different.  It's fact-specific on what they're
20  doing at the time.
21  So no.  I couldn't answer that.  I
22  -- I would have to see a particular set of
23  facts.  I'd have to look at all the information
24  that's available to me for that one registrant
25  that's making the purchase.  And then I could

Page 542

1  make a decision.
2  But just hypothetically, no, I
3  couldn't answer that question.
4  BY MS. MAINIGI:
5  Q.   You couldn't answer that question
6  just looking at the pure numbers?
7  A.   Again, I would have to look at the
8  pharmacy, where it's situated.  Is that -- it's
9  my customer.  If it's my customer, I should
10  know all of this stuff.
11  I'd -- I'd want to go and talk to
12  the pharmacist.  "Why did you increase this?"
13  I would document everything.  I would make sure
14  there's documents showing why I did release
15  that or why I didn't.  I would make sure that,
16  if it's suspicious, I file it with DEA to
17  ensure that DEA has that information.
18  Q.   And so if it's suspicious and you
19  file it with DEA, would a field investigator go
20  from DEA and go do some further follow-up on
21  that order?
22  MR. BENNETT:  Objection.  Calls for
23  speculation.  Objection.  Scope.
24  You are not authorized to disclose
25  investigative or intelligence gathering and

Page 543

1  dissemination techniques whose the
2  effectiveness would be impaired.
3  To the extent you can answer without
4  disclosing confidential techniques or internal
5  deliberative process, you may answer.
6  THE WITNESS:  I can't tell you how
7  the information is followed up.  But I can tell
8  you that -- I just can't tell you how the
9  information is followed up because I'm
10  prohibitive from doing so.
11  BY MS. MAINIGI:
12  Q.   Well, it's fair to say that DEA
13  followed up on reports of suspicious orders,
14  right?
15  A.   DEA would follow up on suspicious
16  orders, yeah.
17  Q.   So a company that report a
18  suspicious could have an expectation that the
19  DEA would do some follow-up on that suspicious
20  order reporting that they made, correct?
21  MR. BENNETT:  Objection to form.
22  THE WITNESS:  DEA would --
23  MR. BENNETT:  And scope.
24  Sorry.
25  THE WITNESS:  DEA would follow up on

Page 544

1  the suspicious order.
2  But I -- I don't understand what --
3  what would the company -- I'm just not -- I
4  guess I'm not catching what -- what the
5  question is.
6  BY MS. MAINIGI:
7  Q.   Would the DEA follow up on all
8  suspicious orders reported?
9  A.   The --
10  MR. BENNETT:  Objection.  Form.
11  Objection.  Scope.
12  THE WITNESS:  The DEA position is
13  that they would follow up on suspicious orders,
14  yes.
15  BY MS. MAINIGI:
16  Q.   My question was slightly more
17  nuanced.
18  Did the DEA follow up on all
19  suspicious orders that were reported to it?
20  MR. BENNETT:  Objection.
21  THE WITNESS:  I -- I couldn't tell
22  you if every suspicious order was followed up
23  on.
24  BY MS. MAINIGI:
25  Q.   Was it your intent that all

46 (Pages 541 - 544)

Page 545

1  suspicious orders be followed up on?
2      A.    It was any intent that the
3  suspicious order, as they came in, would be
4  looked at and followed up on --
5      Q.    And that --
6      A.    -- yes.
7      Q.    I'm sorry.
8          And the suspicious orders that got
9  reported were followed up by DEA by the local
10  field offices?
11     A.    That's who would get the suspicious
12  orders, yes.
13     Q.    Okay.  And so local field office
14  agents would do the follow-up on the suspicious
15  order reporting, correct?
16         MR. BENNETT:  Objection.  Scope.
17         THE WITNESS:  It would be at the
18  local level, yes.
19         BY MS. MAINIGI:
20     Q.    And they would send perhaps special
21  agents to the facility that had been reported
22  as part of the suspicious order?
23         MR. BENNETT:  Objection.  Scope.
24  Objection.  Speculation.
25         THE WITNESS:  I -- I can't answer

Page 546

1  that.  I -- they have -- they have their own
2  methods of -- of following up.  And I think I'm
3  prohibited from answering that question.
4          BY MS. MAINIGI:
5      Q.    Well, I'm just asking generically.
6          What are the different things that a
7  -- that the local field offices might do to
8  follow up on a suspicious order?
9      A.    Again, the local field office would
10  take the suspicious order and do -- follow --
11  follow whatever investigative process they deem
12  appropriate to look at the order and -- and
13  determine if the order -- if the order warrants
14  further investigation, yes.
15     Q.    And so would they actually visit the
16  facilities?
17         MR. BENNETT:  Objection.  Scope.
18  Objection.  Speculation.
19         THE WITNESS:  It just -- again, it's
20  fact-specific.  Just depends on the order.
21  Depends on -- on -- on the particular customer.
22  They may; they may not.  Just depends.
23         BY MS. MAINIGI:
24     Q.    And so if they didn't visit the
25  facility, what would they do perhaps instead?

Page 547

1      A.    Again --
2          MR. BENNETT:  Same objections.
3          THE WITNESS:  Again, I can't get
4  into that type of detail on suspicious orders.
5          BY MS. MAINIGI:
6      Q.    I'm just asking generically.  I'm
7  not asking about any --
8      A.    Generically --
9      Q.    -- particular --
10     A.    I -- I can't -- we would follow up.
11  We would follow up.
12     Q.    So there would be a lot of different
13  permutations as to how you could have follow
14  up, correct?
15     A.    Yes.
16     Q.    And where was all this documented?
17     A.    It -- it's part of their training.
18     Q.    So are there -- is -- is there
19  documentation that exists of the follow-up of
20  suspicious orders?
21     A.    I -- I don't know if I -- I don't
22  recall if there's any documentation within the
23  manual on follow-up of suspicious orders.  It's
24  an investigative tool.
25     Q.    There was no requirement that the

Page 548

1  local office DEA agents document their
2  follow-up?
3      A.    That's --it's -- that's -- again,
4  how they document is at the -- the division
5  level, what the division decides how they're
6  going to document, how they're going to pursue
7  a suspicious order.
8          But there's nothing written that
9  says, once you do a suspicious order, this is
10  what you must do.  It's part of the
11  investigative process.
12     Q.    Is it possible that they would also
13  just choose -- because they didn't need to,
14  they'd choose not to document a follow-up on a
15  suspicious order?
16         MR. BENNETT:  Objection.
17  Speculation.  Objection.  Scope.
18         THE WITNESS:  I -- I -- again, each
19  division operates differently.  I think that
20  most of the investigators are -- are trained
21  to -- when they do their follow-up, if -- if it
22  is indeed -- warrants further investigation,
23  there's something documented.
24          But I can't guarantee that happens
25  in every case.

47 (Pages 545 - 548)

Page 549

1      BY MS. MAINIGI:
2      Q.   Okay.  So let me -- let's come back
3  to the numbers we were talking about.
4          So you -- you thought that an
5  increase from 5,000 Hydrocodone a month to
6  10,000 Hydrocodone a month may be cause for at
7  least further due diligence, right?
8      A.   I believe yes.  Absolutely.
9      Q.   And it could wind up being a
10 suspicious order that's reported, or there may
11 be reasons why it didn't need to be reported as
12 a suspicious order, correct?
13     A.   If they --
14         MR. BENNETT:  Objection.
15 Mischaracterizes testimony.
16         THE WITNESS:  If they resolve the
17 suspicious -- the suspicions within the order,
18 then they wouldn't have to notify DEA.  But if
19 they didn't resolve the suspicious nature of
20 the order, then they would.
21     BY MS. MAINIGI:
22     Q.   So a jump from 5,000 to 10,000 after
23 some due diligence could, in fact, result in
24 there not being a suspicious order that needed
25 to be reported, correct?

Page 550

1          MR. UTTER:  Object.  He answered the
2  question three times.
3          Go ahead.  You can answer again.
4          THE WITNESS:  No.  Again, it's
5  hypothetical.  I don't know.  I don't know what
6  -- I don't know what the presentation was.  I
7  don't know all the background or the particular
8  pharmacy.  I don't know what they've done in
9  the past.  I don't know where they're situated.
10 I don't know what drugs there are.
11         I mean there's so many different
12 variables.  So no, I can't -- I can't answer
13 that.  A -- an increase from 5 to 10 should
14 trigger due diligence.  Maintaining effective
15 controls against diversion.
16         Looking at your customer, trying to
17 figure out what they are doing.  Why did they
18 have this increase?  What's -- why is it
19 necessary?  What are they doing with the drugs
20 that they are sending to this -- this pharmacy
21 or hospital, whatever.
22         So no.  I can't -- based on that
23 hypothetical, I can't answer that question.
24         BY MS. MAINIGI:
25     Q.   What about -- but you were pretty

Page 551

1  confident that a jump from 5,000 to 20,000 all
2  of a sudden would be cause for reporting a
3  suspicious order, correct?
4      A.   Again, just giving me numbers
5  without giving me the -- what is actually going
6  on, what -- where the pharmacy is situated,
7  what the pharmacy is doing, who the pharmacist
8  is -- there's just so many different variables
9  that is -- should it trigger a due diligence
10 analysis?  Absolutely.  Should it trigger a --
11 a -- a suspicious order?  Maybe.  Probably.
12 Because going from 5- to 20,000, that's --
13 that's quite a bit.
14         But until you do the whole analysis,
15 until you look at the pharmacy, until you look
16 at what their patterns were, I can't make that
17 statement.
18     Q.   What about a jump from 5,000 one
19 month Hydrocodone to 8,000 the next month of
20 Hydrocodone?
21     A.   The -- the answer's --
22         MR. BENNETT:  Objection.  Incomplete
23 hypothetical.
24         THE WITNESS:  The answer is the
25 same.  I have to see the -- the whole idea

Page 552

1  behind this is the distributor does their due
2  diligence.  To do their due diligence, they
3  have to look at all the variables surrounding
4  the particular order.
5          Without that, without knowing where
6  the pharmacy is, what the location is, I -- I
7  couldn't answer the question.
8          BY MS. MAINIGI:
9      Q.   So just looking at the numbers,
10 let's say 10,000 -- excuse me.
11         Just looking at the numbers of 5,000
12 jumping to 8,000 would not be enough the
13 trigger, in your mind, automatically a
14 reporting of a suspicious order based on
15 unusual size.
16         Fair?
17         MR. BENNETT:  Object -- objection.
18 Vague.
19         THE WITNESS:  I think that that
20 would trigger the company to do a due diligence
21 analysis.  That's what it would trigger.  And
22 if they can't justify, if they can't explain or
23 resolve why that increase occurred, then, you
24 know, they're required to report it as
25 suspicious and not ship.

48 (Pages 549 - 552)

Page 553

1     BY MS. MAINIGI:
2       Q.   And then DEA would follow up and
3   investigate that suspicious order, right?
4       A.   DEA would investigate suspicious
5   orders as they come in, yes.
6       Q.   And if DEA found there to be
7   validity to a suspicious order that was
8   reported, DEA would take some sort of action,
9   correct?
10          MR. BENNETT:  Objection.  Incomplete
11   hypothetical.  Objection.  Scope.
12          THE WITNESS:  Again, it's very
13   fact-specific.  You have to -- it's -- you
14   know, a suspicious order doesn't necessarily
15   give us the -- doesn't necessarily give us what
16   we need to open an investigation, take a
17   registration.  That -- that requires
18   investigation.
19          What a suspicious order does is
20   provide us with a -- a starting point -- it's a
21   pointer system -- so we could start our
22   investigation if that is indeed appropriate.
23          So yes.  Somewhere down the line
24   there would be some kind of potential order to
25   show cause if -- if we find that their

Page 554

1   orders -- their suspicious orders were leading
2   to or were involved in diversion, yes.
3          But I mean, again, it's a very
4   fact-specific -- I need the details.  I need to
5   know exactly what that pharmacy was doing in
6   their ordering patterns.
7     BY MS. MAINIGI:
8       Q.   And is it fair to say that
9   reasonable minds could vary on whether
10   something's a suspicious order?
11          MR. BENNETT:  Objection.  Form.
12          THE WITNESS:  Again, I think that,
13   because it's a suspicious order, and it's a
14   decision that's made by the company, it
15   involves further investigation by the company
16   before they send out a suspicious order or send
17   it.
18          But in either case, they should have
19   documentation showing what they have.  So if --
20   if it was suspicious, and they sent it anyway,
21   they should explain why.  Did they resolve the
22   suspicion.  If not, then they should send us
23   the suspicious order.
24          It's pretty straightforward.
25          BY MS. MAINIGI:

Page 555

1       Q.   Now, the documentation, they
2   certainly could have documentation at the time
3   they were investigating a potential suspicious
4   order, correct?
5       A.   It would be in the customer files or
6   due diligence files.
7       Q.   Is there any requirement in the DEA
8   regulations or guidance to maintain due
9   diligence documentation for a certain period of
10   time?
11      A.   There's no requirements.  But it's
12   in the company's best interest to do it.
13   Because, if -- if you continue to send drugs
14   downstream and there's no explanation why you
15   do that and those orders are suspicious in
16   nature, they're -- they're unusual -- unusual
17   size, frequency or substantially deviating, at
18   that point in time you've got to explain why
19   you're doing it.
20          So if you don't have due diligence
21   files, it becomes pretty -- the -- the
22   investigators are in the dark.
23      Q.   So you -- you gave some good advice
24   with your 2006, 2007 letters, right?
25      A.   I believe we did, yes.

Page 556

1       Q.   Did you put into your letters that
2   distributors ought to hold onto their due
3   diligence files for a certain period of time?
4       A.   I believe that due diligence files
5   had come up in the -- in the meetings and we
6   mentioned due diligence in all of those
7   letters.
8          And obviously, when you mention due
9   diligence, you should have some kind of
10   documentation of your due diligence.  But that
11   was mentioned in the meetings.
12      Q.   Okay.  So let's -- let's just talk
13   about with respect to the letters.
14          I -- you mentioned due diligence in
15   the letters, right?
16      A.   Yes.
17      Q.   But you didn't say in the letters
18   "Keep your due diligence for a certain period
19   of time" or anything like that, did you?
20      A.   It would -- it would be prudent and
21   common sense to, knowing that, if their --
22   their methodology was questioned on why they
23   were shipping drugs downstream without filing
24   suspicious orders, that you would have some
25   documentation showing why, showing that you

49 (Pages 553 - 556)

Page 557

1  reconciled your suspicions.
2      But if that's not there, I have
3  nothing to look at.  I can't make that
4  determination other than my investigation,
5  which is separate.
6      So if you're not covering yourself,
7  if you don't have suspicious -- you don't have
8  due diligence files that contains
9  reconciliation of a suspicious order, then
10  there's -- I -- I don't know how you would
11  explain yourself.
12      Q.  So everything you just said right
13  now about holding onto due diligence, is that
14  something you put into your letter?
15      A.  I don't recall if it was in the
16  letter or not.  But the term "due diligence"
17  was.  And the explanation of what due diligence
18  was was in the face-to-face meetings.
19      Q.  And what record do you have of the
20  explanation that was provided about holding on
21  to due diligence files in these meetings that
22  were held that you didn't attend?
23      A.  I don't have any records on those
24  meetings.  I -- when I left, I didn't, you
25  know, pack up the binders and move them with

Page 558

1  me.
2      I'm sure that, if we could find the
3  binders -- I -- I don't know.  Because there
4  was a lot of discussion within that meeting
5  that -- on what their obligations were under
6  the Act and under the regulations.
7      I don't know if it was in the -- in
8  the PowerPoint.  I don't know if it was in the
9  separate documents.  I don't know if it was in
10  -- embedded when we talked about specific
11  purchase -- purchases that were in the ARCOS
12  transaction reports.
13      But due diligence was discussed in
14  that meeting.
15      Q.  But you don't have a record of it
16  right now?
17      A.  No, ma'am.
18      Q.  Now, you said you follow the news on
19  opioids, right?
20      A.  Somewhat, yes.  Yes.
21      Q.  And do you remember -- do you know
22  who Scott Gottlieb is?
23      A.  Yes.
24      Q.  Who's Scott Gottlieb?
25      A.  Well, he was the former secretary --

Page 559

1  assistant secretary of health and former head
2  of the FDA.
3      Q.  He recently stepped down as head of
4  the FDA, right?
5      A.  Yes.
6      Q.  Do you remember, before he stepped
7  down, he spoke to the issue of opioids and said
8  something to the effect of that -- that FDA
9  certainly shared some responsibility for the
10  opioid crisis?
11      Do you remember that?
12      A.  I don't remember that.  I don't have
13  any doc --
14      Q.  You missed that?
15      MR. BENNETT:  Objection.  Form.
16      BY MS. MAINIGI:
17      Q.  You don't remember seeing the news
18  about that?
19      A.  No.  If you have a news article, I'd
20  be happy to look at it.  But no, I don't have
21  that.
22      Q.  Do you -- you've referenced Mr.
23  Rosenberg in your discussions with Mr. Lanier.
24      Do you remember that?
25      A.  Yes.

Page 560

1      Q.  And Mr. Rosenberg was your boss for
2  some period of time?
3      A.  Briefly.
4      Q.  And -- now, you indicated he was a
5  potential roadblock; is that right?
6      MR. BENNETT:  Objection.
7  Mischaracterizes testimony.
8      THE WITNESS:  I never said he was a
9  roadblock.
10      BY MS. MAINIGI:
11      Q.  Oh, I thought your discussion with
12  Mr. Lanier was that Mr. Rosenberg was a
13  roadblock.
14      A.  I never said he was a roadblock.
15      Q.  Okay.  Mr. Rosenberg testified in
16  front of Congress as well.
17      Do you remember that?
18      A.  I don't remember when he testified.
19  And I don't have the content of his testimony.
20      Q.  Do you remember Mr. Rosenberg saying
21  that the DEA could have done a better job when
22  it came to the oversight of diversion?
23      MR. UTTER:  Object to form.
24      THE WITNESS:  Based on what I heard
25  from the last deposition and recently, yeah, I

50 (Pages 557 - 560)

1   -- I don't have the document in front of me. I
2   don't have his transcripts. But I assume that
3   those are correct. So if he said that.
4         MS. MAINIGI: Let me -- let me see
5   if we can play --
6         THE WITNESS: Okay.
7         MS. MAINIGI: -- a clip. If we can't
8   get it working right now, we'll just go --
9         THE WITNESS: Sure.
10        MS. MAINIGI: -- off the record and
11  play it in a moment.
12        MS. McNAMARA: We have sound issues.
13  We should go off the record.
14        MS. MAINIGI: Why don't we go off
15  the record for one moment. But just bear --
16  bear with us. Just -- if everyone could sit
17  tight, let's see if we can make this work.
18        THE WITNESS: Could you tell me what
19  the date was on that?
20        MS. MAINIGI: Sure. We -- we can --
21        THE WITNESS: Great. Okay.
22        MS. MAINIGI: -- in just a --
23  second.
24        THE VIDEOGRAPHER: Okay. We're
25  going off record.

1         Time is 2:06.
2         (A short recess was taken.)
3         THE VIDEOGRAPHER: We're going back
4   on record.
5         Beginning Media File 7.
6         Time is 2:22.
7         BY MS. MAINIGI:
8   Q.   Mr. Rannazzisi, you -- you've
9   referenced a few times the letters that you
10  sent to registrants in 2006 and 2007, correct?
11  A.   Yes, ma'am.
12  Q.   Do you recall sending any more
13  letters like that prior to your departure in
14  2015?
15  A.   I don't recall any other letters
16  being sent.
17  Q.   So -- and I forget what you told me
18  last time.
19        Did you review those letters from
20  2006 and 2007 as -- as guidance of sorts?
21  A.   They -- they were DEA's position on
22  controlled -- on suspicious orders. So I guess
23  you could call them guidance, yes.
24  Q.   Okay. And you don't recall sending
25  any further guidance in 2008?

1   A.   Not by letter, no.
2   Q.   By any other written format?
3   A.   Well, 2008 is when everybody --
4   well, some of the companies as -- '7 and '8, when
5   they signed their original MOAs with the
6   government. So I think there was guidance
7   built into that MOA in the form of attorneys --
8   talking to the DEA attorneys and investigators
9   on what's expected of them. That's why they
10  signed the MOAs and they said they would comply
11  with the Act.
12  Q.   And that's -- that's DEA talking to
13  individual registrants, correct?
14  A.   Yes.
15  Q.   Was there any sort of written
16  guidance after the MOAs saying "Everybody take
17  a look at the MOAs and learn from it"?
18  A.   The -- the written guidance -- the
19  2007 written guidance had a reference to
20  Southwood Chemical, which explained DEA's
21  position in an agency decision.
22        I'm not -- I'm not -- I don't
23  believe there was any other written
24  documentation after the MOAs and the three
25  letters and the face-to-face visits.

1   Q.   And the three letters, two of them
2   were identical, right?
3   A.   Yes.
4   Q.   So there were really two letters,
5   correct, sent at different times?
6   A.   Yes.
7   Q.   Okay. And then you don't recall any
8   other letters of that variety being sent to
9   registrants than between 2008 and 2015 when you
10  departed?
11  A.   I don't recall of any letters sent.
12  I don't have knowledge of any letters sent at
13  that point -- after that.
14  Q.   And with respect to the -- and you
15  would know, right, because you were head of
16  Office of Diversion Control?
17  A.   I would hope so, yes.
18  Q.   Okay. Now, with respect to these
19  settlements, the settlements related to
20  individual facts and circumstances of those
21  registrants, right?
22  A.   Yes.
23  Q.   And you were aware that different
24  registrants used different suspicious order
25  monitoring systems?

1    A.    In -- in 2008 -- the '6, '7, and '8,
2  I don't know what suspicious order monitoring
3  systems they were using.  But they weren't
4  filing suspicious orders.  So I -- I don't
5  know.
6    Q.    Okay.  So registrants -- and let's
7  focus on the period where you didn't send any
8  letters.
9        So you didn't send any letters from
10  2008 to 2015, right?
11    A.    As far as I'm aware, that wouldn't
12  -- I didn't send any letters --
13    Q.    Okay.
14    A.    -- back at that point in time.
15    Q.    And in that time period, 2008 to
16  2015, you were aware that different registrants
17  were using different suspicious order
18  monitoring systems, right?
19    A.    Well, the monitoring the systems are
20  tailored to the -- each individual registrant's
21  needs.  Again, the -- the regulation is
22  specific.  The registrant shall create, operate
23  a suspicious order -- or a -- a system which
24  identifies suspicious orders to the registrant.
25        I'm sure they all tailored theirs to

1  their own specific needs.  So I -- I guess
2  that's accurate.  Yes.  They all have
3  different...
4    Q.    So any settlement related to
5  specific facts and circumstances for that
6  registrant, correct?
7    A.    I -- I -- I would be guessing.
8  Because I -- I just -- I haven't gone back and
9  looked at, in detail, each settlement to make a
10  determination.
11    Q.    Well, you just went over those
12  settlement agreement --
13    A.    I didn't --
14    Q.    -- with Mr. Lanier --
15    A.    -- read them.
16    Q.    -- right?
17    A.    I didn't read them in detail.  I was
18  just looking at certain areas of the
19  settlement.  I mean I could -- I could spend
20  time and go through each settlement.
21        I know that, again, the facts and
22  circumstances of each individual case that DEA
23  does is fact-specific.  And there's -- there's
24  differences between the cases.  So I can't
25  guarantee that each settlement is exactly the

1  same.  Depends on what violations were found
2  during those investigations.
3    Q.    But the DEA never took the learnings
4  from each one of those settlements and issued
5  some sort of further letter or guidance
6  explaining what the takeaway was, correct?
7        MR. UTTER:  Object to form.
8        Go ahead.
9        THE WITNESS:  I don't recall of any
10  -- I don't recall of anything that was written
11  that discussed each individual's --
12  registrant's violations and what resulted from
13  those violations.
14        I can tell you that the third letter
15  directed the attention of the reader to the
16  Southwood Pharmaceutical case, which basically
17  explained the agency's position and told them
18  in -- what to look for in those cases.
19        BY MS. MAINIGI:
20    Q.    And after that, no more discussion
21  to the registrants about particular
22  settlements, correct?
23    A.    I don't believe we talked to -- we
24  talked to the registrants about particular
25  settlements, no.

1    Q.    And there was a period of time where
2  you were not having distributor briefings; is
3  that right?
4    A.    I'm not aware of that.  But that
5  came up in the last deposition.  I still am not
6  aware of any time where we didn't -- there
7  were -- there was times where we did more than
8  normal, and there's times that we did less.
9        But I don't recall a time where we
10  never did a -- a -- a briefing.
11    Q.    Well, from 2008 to 2015, when did
12  you do more distributor briefings?
13    A.    It depends on the year.  It depends
14  on who was conducting the briefs and how many
15  we could schedule in one year.  It --
16  there's -- there was no -- it was just
17  dependent on -- on what we could schedule in
18  headquarters during that time period, so...
19    Q.    Why not get more distributors
20  reached by setting out specific written
21  guidance to everybody?
22    A.    Well, we did send out specific
23  written guidance in 2006 and 2007.  But we
24  wanted face-to-face meetings so we could answer
25  their questions, the questions that they may

52 (Pages 565 - 568)

Page 569

1    have.
2        We wanted to show them very specific
3    instances of orders that were suspicious.  We
4    wanted to lay out, you know, the ARCOS
5    transaction reports.  We wanted to explain to
6    them what their obligations were.
7        So it wasn't a question of -- we
8    wanted for them to have access to our -- our
9    experts, and, "This is the time.  Ask your
10   questions."
11   Q.   And so there were some distributors
12   that you may not have even met with for the
13   first time until 2010, 2011, correct?
14   A.   Some of the smaller distributors,
15   yes.  But I believe that they were offered mini
16   briefings when they were inspected.
17       So it wasn't a full headquarters
18   briefing, but they were -- they were asked
19   at -- at the inspection level with diversion
20   investigators, "Do you have any questions
21   or" -- and just going over different things
22   that the diversion investigators were seeing in
23   that area, so...
24   Q.   And so the diversion investigators
25   came and did inspections of the distributors.

Page 570

1        Fair?
2    A.   Yes.
3    Q.   And they would have taken a look at
4    suspicious order monitoring systems in many
5    cases, correct?
6    A.   I would say they would do a cursory
7    review.  You -- you can't look at a suspicious
8    order monitoring system unless -- I -- I --
9    unless you're actually watching it work.  And
10   to watch it work, you have to execute.  And to
11   execute, you have to follow your protocols and
12   procedures.
13       So you might have a great suspicious
14   order monitoring system.  But if you're not --
15   if you're not actually executing what's in your
16   protocols and procedures, the system is
17   worthless.
18   Q.   And what follow-up did you do to
19   determine whether the procedures were being
20   followed?
21   A.   The only way to follow up on whether
22   the procedures were being followed was to sit
23   somebody there and watch a period of time
24   orders coming in and how they were adjudicated.
25       And -- and that -- that's almost

Page 571

1    impossible unless we were able to leave
2    somebody there for a long period of time,
3    weeks.
4    Q.   And from -- after your December 2007
5    letter, you're not -- other than these
6    individual distributor briefings you're
7    referring to, DEA didn't elaborate in written
8    form how to identify orders of unusual size,
9    correct?
10   A.   Again, it was pretty straightforward
11   what an order of unusual size or frequently or
12   deviating substantially from the normal
13   ordering pattern is.
14   Q.   What was it?
15   A.   Orders that were unusual size,
16   frequency or deviating substantially from the
17   normal ordering pattern.  It's in the regs.
18   It's been there for 40 years.
19   Q.   That same language.
20   A.   That same language.  Never changed.
21   The language has been there since the beginning
22   of the Controlled Substances Act.
23   Q.   Since 1970?
24   A.   '73, I believe.  '72, '73.
25   Q.   Okay.  And from 2008 to the time you

Page 572

1    left, DEA didn't elaborate on how to identify
2    orders of unusual frequency, right?
3    A.   No.  I -- I -- I can't tell you how
4    many calls came into liaison and policy or to
5    regulatory affairs or to local offices.  I know
6    there were meetings.  I know there were
7    meetings with distributors where that was
8    discussed.  I wasn't present at those meetings.
9        But I -- I -- I know that there was
10   contact between industry, between distributors,
11   manufacturers and -- and DEA personnel during
12   that time period.
13   Q.   Did you attend any of those meetings
14   personally?
15   A.   No.
16   Q.   Did you attend any of those phone
17   calls personally?
18   A.   No.
19   Q.   Are you aware of any elaboration
20   that was provided in written form related to
21   how to define an order of unusual frequency
22   from 2008 till the time you left?
23   A.   I don't recall of any written
24   document that chose what order of unusual
25   frequency is.

53 (Pages 569 - 572)

Page 573

1    Q.   Okay.  Are you aware of any written
2    document that elaborated on how to identify an
3    order that deviates substantially from a normal
4    ordering pattern from 2008 to 2015?
5    A.   I believe that was in one of the
6    letters.
7    Q.   There was a letter from 2008 --
8    A.   No.  I mean --
9    Q.   -- to 2015?
10   A.   -- the 2 -- it was in the 2007
11   letter.
12   Q.   Okay.  Let -- from 2008 to 2015, Mr.
13   Rannazzisi, was there ever an elaboration by
14   DEA on how to identify an order that deviates
15   substantially from a normal ordering pattern?
16   A.   I don't recall any letter after
17   2007.
18   Q.   Is it fair to say, when new
19   leadership came into the DEA after you left,
20   that they made a commitment to have greater
21   communication with registrants about the
22   various requirements registrants were subject
23   to?
24       MR. BENNETT:  Objection.  Scope.
25       THE WITNESS:  I don't really know

Page 574

1    what the -- I -- I don't really know what
2    their -- their objectives were.  I always
3    thought that we were very clear in what their
4    obligations were dating back to 2005 and
5    before.
6        I think we had an open lines of
7    communication.  I don't -- you know, if that's
8    what they said or -- that's fine.  But I think
9    that that would take away from all of the
10   conversations and all of the contacts we had
11   with the industry, the distributors,
12   manufacturers, pharmacies, and even the
13   physicians through that whole time period,
14   so...
15   Q.   What's the GAO?
16   A.   Government Accountability Office.
17   Q.   And what does the Government
18   Accountability Office do?
19   A.   That's a great question.  I don't
20   know.  Other than investigate -- investigate
21   federal agencies, audit federal agencies to
22   determine how they're operating.
23   Q.   That's essentially their job, right?
24   A.   Yes.
25   Q.   And they themselves are an arm of

Page 575

1    the government; is that true?
2    A.   I guess they're an investigative arm
3    of Congress.
4    Q.   Okay.  Do you recall a GAO report
5    related to the DEA from the 2015 time period?
6        MR. BENNETT:  Objection.  Scope.
7        THE WITNESS:  I recall GAO issuing a
8    final report during that time period, yes.
9        BY MS. MAINIGI:
10   Q.   Do you recall being interviewed for
11   that report?
12   A.   I was interviewed for that report.
13   Q.   And do you recall submitting a
14   written response for that report?
15   A.   Yes.
16       MR. BENNETT:  I'm going to have a --
17   if it's okay -- a continuing objection to
18   questions regarding the GAO report as being
19   outside the scope of authorization.
20       MS. MAINIGI:  Okay.
21       MR. BENNETT:  If that's okay,
22   Counsel.
23       MS. MAINIGI:  Sure.
24       MR. BENNETT:  So I don't have to
25   keep objecting and --

Page 576

1        MS. MAINIGI:  Yes.  That's fine.
2    We'll take the continuing objection.
3        I'm going to give you, Mr.
4    Rannazzisi, Exhibit 11, which is a copy, I
5    believe, of that GAO report.
6        THE WITNESS:  Sure.
7        (Deposition Exhibit 11 was marked
8    for identification.)
9        BY MS. MAINIGI:
10   Q.   Tell me what this GAO report from
11   June 2015 is called.
12   A.   "Prescription Drugs, More DEA
13   Information About Registrants' Controlled
14   Substance Roles Could Improve Their
15   Understanding and Help Ensure Access."
16   Q.   What does that title mean?
17       MR. BENNETT:  Objection.
18       THE WITNESS:  I -- I don't know.  I
19   didn't --
20       MR. BENNETT:  Calls for speculation.
21       THE WITNESS:  -- write the report.
22       BY MS. MAINIGI:
23   Q.   So the name of the report itself is
24   "More DEA Information About Registrants'
25   Control Substances Roles Could Improve Their

54 (Pages 573 - 576)

Page 577

1 Understanding and Help Ensure Access," true?
2     A.   That's what it says, yes.
3     Q.   Okay.  And do you recall that one of
4 the themes in this report was that DEA
5 registrants would do better with a greater
6 amount of information provided by DEA?
7     A.   I -- I haven't read this report in a
8 while.  So I -- I can't tell you exactly what
9 the report says.
10     Q.   Do you remember --
11     A.   If you --
12     Q.   I'm sorry.
13     A.   If you --
14     Q.   Go ahead.
15     A.   If you want to direct me to where
16 that is in the report, I could actually --
17     Q.   Well, do you recall what the gist of
18 the report was?
19         MR. BENNETT:  Objection.  Form.
20         THE WITNESS:  The -- the --
21         BY MS. MAINIGI:
22     Q.   Let me -- let me put it this way:
23 Do you recall that one of the criticisms that
24 the GAO had of the DEA was that DEA was not
25 communicating enough with its registrants.

Page 578

1     A.   Well, I -- I don't remember that
2 being in here.  Again, I have to look at it.
3 But I would say that, if that was one of the
4 cases, I think that they're mistaken.  And I
5 think my response would have said that.
6     Q.   So it was not your view that the DEA
7 needed to communicate more with registrants?
8     A.   We were communicating with
9 registrants up and down the pharmaceutical
10 chain.  We were the first office to hold
11 pharmacy diversion awareness conferences where
12 both pharmacists and distributors attended.  We
13 were the first ones to hold -- you know, going
14 out into the medical community and talking to
15 the medical community.  We held pharmaceutical
16 -- we held distributor conferences,
17 manufacturer conferences.  We did all that
18 during this time period.
19         I don't know what more can -- our --
20 our web site had information on it.  We had a
21 call center where a distributor or manufacturer
22 or a pharmacist could call the call center.  We
23 had a liaison and policy group that would take
24 phone calls.  We had local offices that would
25 take phone calls.

Page 579

1     I think our communication was pretty
2 transparent.  We -- we -- we communicated fine.
3     So again, my response -- and I don't
4 recall exactly what I put in the response --
5 but I could tell you that I felt that we were
6 communicating very well.
7     Q.   And you told that to the GAO, right?
8     A.   I -- during my interview, I did.
9     Q.   And 2015, that's the same year that
10 you left the agency; is that right?
11     A.   Yes.
12     Q.   And Mr. Rosenberg came to the agency
13 in 2015?
14     A.   Yes.  May of 2015.
15         MS. MAINIGI:  Okay.  Let's go ahead
16 and show the clip from Mr. Rosenberg.  And tell
17 me if you recall it.
18         (Video clip played.)
19         MR. ROSENBERG:  "So we have 1.6
20 million registrants in the United States."
21         SPEAKER:  "Right."
22         MR. ROSENBERG:  "And frankly, if you
23 think about it, you know, logically and
24 holistically, the overwhelming majority,
25 99-plus percent, are our allies in this thing.

Page 580

1 And I think historically we" --
2         (Video clip malfunction.)
3         Mr. Rosenberg:  "So we have 1.6
4 million registrants in the United States.
5         SPEAKER:  "Right.
6         Mr. Rosenberg:  "And frankly, if you
7 think about it, you know, logically and
8 holistically, the overwhelming majority,
9 99-plus percent, are our allies in this thing.
10 And I think historically we've done a very good
11 job of alienating them.  I'm being sarcastic.
12 What we need is them as partners.
13         "Just give you a simple metric.  But
14 in 2015 we had sort of -- I -- I asked my
15 folks, 'How many times have we met with
16 industry, with organizations?  How many have we
17 set down -- sat down with prescribers or
18 doctors, with pharmacists?'  And we had 300
19 such interactions -- or 339 such interactions
20 in all of 2015.
21         "So far, just in the first six
22 months of this year, we're up to 300.  We --
23 we're going to probably double the number of
24 interactions.  Now, that doesn't mean they're
25 all as good as they should be.  But if we're

55 (Pages 577 - 580)

Page 581

1  listening to them, we're going to get better.
2      "We've also been opaque.  I think
3  we've been slow.  I think we've been opaque.  I
4  think we haven't responded to them.  We're
5  trying to issue guidelines for them more
6  quickly.  We're trying to answer their
7  questions."
8      BY MS. MAINIGI:
9      Q.   Do you remember hearing that
10  testimony from Mr. Rosenberg?
11      A.   I -- I saw clips of that.  But I --
12  you know, I didn't -- I haven't seen the
13  whole...
14      Q.   Were you still at the agency at that
15  point in time?
16      A.   I don't remember when it was, to be
17  honest with you.  I don't remember if it was in
18  2015, '16, or before he left.  I -- I just --
19      Q.   I gath --
20      A.   Do you have the date on that?
21      Q.   It's 2015.
22      A.   When is it?
23      Q.   Oh, I'm sorry.  2016.
24      A.   Okay.  What was the date in 2016?
25      Q.   June 22nd, 2016.

Page 582

1      So after your departure, correct?
2      A.   Yeah.
3      Q.   I take --
4      A.   So he's been there for about a year.
5      Q.   I take it you did not agree with his
6  comments that the agency had been too opaque
7  and needed to issue more guidance?
8      A.   No, I did not agree with that.
9      MS. MAINIGI:  Okay.  Thank you.
10      I'm going to pass the witness to one
11  of my colleagues.
12      THE VIDEOGRAPHER:  We're going off
13  record.
14      Time is 2:43.
15      (A short recess was taken.)
16      THE VIDEOGRAPHER:  We're going back
17  on record.
18      Beginning of Media File No. 8.
19      Time is 2:45.
20      EXAMINATION BY COUNSEL FOR McKESSON
21      BY MR. EPPICH:
22      Q.   Good afternoon, Mr. Rannazzisi.
23      Let me reintroduce myself to you.
24  My name is Chris Eppich.  I represent McKesson
25  in this litigation.

Page 583

1      We met last time during your first
2  deposition.
3      Do you remember our discussion?
4      A.   Yes, sir.
5      Q.   Mr. Rannazzisi, have you -- have had
6  any meetings with plaintiff's counsel since our
7  last deposition on -- on April 26?
8      A.   No.
9      Q.   Now, you -- you testified earlier
10  you didn't meet with Mr. Lanier, correct?
11      A.   Yes.
12      Q.   Have you had any kind of
13  communications with any of the plaintiff's
14  lawyer between your last deposition and today?
15      A.   No.
16      Q.   No -- no conversations at all?
17      A.   No.
18      Q.   No phone calls?
19      A.   No.
20      Q.   No e-mails?
21      A.   No.
22      Q.   No texts?
23      A.   No.  I -- quite frankly, I don't
24  know most of these people.  The only contact I
25  had was when we were here last time.

Page 584

1      Q.   Thank you.
2      Now, when -- when Mr. Lanier was
3  speaking with you earlier this morning, he
4  introduced what he calls a demonstrative and
5  marked as Exhibit 8.
6      Remember this -- this document?
7      A.   Yes.
8      Q.   See if we can work our magic.
9      Now, there's a couple pages in
10  Exhibit 8 that I'd like to follow up with you
11  on.
12      A.   Sure.
13      Q.   Now, the first -- the first is this
14  definition that -- that Mr. Lanier went over
15  with you about controlled substances.
16      And you testified earlier that there
17  is a schedule under the Controlled Substances
18  Act for classifying different controlled
19  substance, correct?
20      A.   Yes.
21      Q.   A Schedule I, a Schedule II.
22      That's what we have written here?
23      A.   Yes.
24      Q.   There --
25      A.   Five schedules.

56 (Pages 581 - 584)

Page 585

1  Q.  There's -- there's five schedules?
2  A.  Yes.
3  Q.  There's also a Schedule III,
4  correct?
5  A.  Yes.
6  Q.  And -- and what -- what types of
7  drugs do we find under Schedule III?
8  A.  Schedule III would have, as far as
9  opioids, Tylenol with codeine, acetaminophen
10  with codeine.
11  Q.  And, sir, let me interrupt you.  I'm
12  not asking for what kind of drugs are under
13  there.
14      What -- what is a broader definition
15  of what type of drugs are under Schedule III?
16  A.  A Schedule III drug has a legitimate
17  medical use but a less of a risk of physical
18  and psychological dependence than -- than a
19  Schedule II drug.
20  Q.  And you're aware, sir, that
21  Hydrocodone was listed under Schedule III until
22  2014, correct?
23  A.  Yes, sir.
24  Q.  And I want to, if I could, go to
25  another one of Mr. Lanier's demonstratives.

Page 586

1  And -- and you'll recall this one because he
2  drew a -- a person on the -- on the page.  And
3  he -- he -- this -- this person's depicted on
4  Plaintiff's Demonstrative No. 8.
5      My -- my -- and I -- my question for
6  you, sir, is distributors don't distribute
7  controlled substances directly to patients,
8  correct?
9  A.  Distribute to DEA registrants that
10  sell or administer to patients, yes.
11  Q.  And those registrants are
12  pharmacies, doctors, hospitals?
13  A.  Yes, among others.
14  Q.  So this is actually a doctor or a
15  hospital or a pharmacy, right?
16  A.  Yes, sir.
17  Q.  The -- the hospitals, doctors and
18  pharmacies, they don't ask, "Get me opioids to
19  sell," correct?
20      They actually submit order forms to
21  distributors?
22  A.  Orders -- order forms on
23  Schedule II.  Invoices on Schedule III, IV and
24  V.
25  Q.  Thank you.

Page 587

1      Now, there was some discussion
2  earlier today about your interview with "60
3  Minutes."
4      Do you remember that?
5  A.  Yes, sir.
6  Q.  And you interviewed with a Mr. Bill
7  -- Bill Whitaker.
8  A.  Yes, sir.
9  Q.  How many times did you meet with Mr.
10  Whitaker?
11  A.  I met with him for the initial
12  interview.  And then I met with him when he was
13  in D.C. a few months later I guess.
14  Q.  And how long was your initial
15  interview with Mr. Whitaker?
16  A.  A few hours.
17  Q.  Was that interview recorded?
18  A.  I -- I don't know exactly how
19  they -- they do their -- those interviews.
20  Q.  Was there --
21  A.  I --
22  Q.  -- a video camera present?
23  A.  There was a video camera present.
24  And I'm sure it was recorded because obviously
25  it -- it was taped.

Page 588

1  Q.  And you met again with him in DC; is
2  that what you said?
3  A.  Yes.
4  Q.  Do you remember what date you met
5  with him in D.C.?
6  A.  No, I don't recall.
7  Q.  And how long did you meet with
8  Mr. Whitaker when you met with him in D.C.?
9  A.  Maybe an hour or so.
10  Q.  So you --
11  A.  He was outside.  We were talking.
12  Q.  So you spent two or three hours with
13  Mr. Whitaker?
14  A.  Probably a little more than that.
15  But yeah, you know, several hours.
16  Q.  Did Mr. Whitaker ask you if there
17  was anything DEA could have done differently or
18  better to combat the opioid crisis?
19  A.  I don't recall that specific
20  questions.  He asked me a lot of question.  I
21  just don't recall that specific question.
22  Q.  Did he ask you any questions similar
23  to my question?
24  A.  I just don't recall.  It was a while
25  ago.

57 (Pages 585 - 588)

Page 589

1    Q.   Did Mr. Whitaker or the "60 Minutes"
2  organization provide you with a tape of your
3  interviews?
4    A.   No.
5    Q.   A transcript?
6    A.   No.
7    Q.   Mr. Rannazzisi, did you receive
8  authorization from the DOJ before you spoke to
9  Mr. Whitaker or "60 Minutes" or the Washington
10  Post?
11    A.   No.  I was retired.
12    Q.   Earlier today you spoke with Mr.
13  Lanier about immediate suspension orders.
14    A.   Yes, sir.
15    Q.   Let me find the demonstrative that
16  he placed in front of you, sir.
17        I believe this was it.
18        Do you remember that discussion?
19    A.   Yes.
20    Q.   Now, the immediate suspension order
21  is an enforcement power possessed by DEA,
22  correct?
23    A.   It's an administrative enforcement
24  tool.
25    Q.   And -- and an immediate suspension

Page 590

1  order is a process by which DEA immediately
2  suspends or revokes a registrant's controlled
3  substance license, correct?
4    A.   Yes.
5    Q.   Now, while -- while you were at the
6  DEA, DEA could issue an immediate suspension
7  order if there is an immediate danger to the
8  public health or safety, correct?
9    A.   No.  It's --
10    Q.   That -- that wasn't --
11    A.   -- an imminent --
12    Q.   -- the standard while you were at
13  the DEA?
14    A.   It's imminent.
15    Q.   Imminent.  Excuse me.
16    A.   There's a difference between
17  "imminent" and "immediate."
18    Q.   So let's me ask my question again.
19        While you were at the DEA, DEA could
20  issue an imminent suspension -- excuse me -- an
21  imminent suspension -- let me strike that.
22        While you were at DEA, DEA could
23  issue an immediate suspension order if there is
24  an imminent danger to the public health or
25  safety, correct?

Page 591

1    A.   Yes.
2    Q.   Now, during you time as the head of
3  the ODC, the Office of Diversion Control, DEA
4  did not issue an immediate suspension order
5  against McKesson, correct?
6    A.   I -- I just -- I don't recall what
7  -- if -- I know we issued orders to show cause
8  against McKesson facilities.  I don't recall if
9  we did an immediate suspension order.
10    Q.   You don't recall if you -- if -- if
11  you issued an immediate suspension order
12  against McKesson?
13        That's your testimony here today?
14    A.   Again, we issued orders to show
15  cause, which are part of the administrative
16  process.  I don't recall if there was an
17  immediate suspension order issued or not.
18    Q.   Now, it's true that DEA did not
19  issue an -- an -- even an order to show cause
20  against McKesson leading to the 2017 settlement
21  agreement, true?
22    A.   I was talking about 2008.
23        2017, they were negotiating after I
24  left.  So I'm not sure what --
25    Q.   You're not --

Page 592

1    A.   -- they did.
2    Q.   -- sure?
3    A.   Yes.
4    Q.   So if -- if we look at Mr. Lanier's
5  demonstrative, Exhibit 8, it's true that these
6  really aren't examples of orders to show cause
7  or immediate suspension orders because you
8  can't remember if McKesson received an
9  mediation suspension order, and if there was an
10  order to show cause, certainly wasn't to 2017,
11  correct?
12    A.   Well --
13        MR. UTTER:  Object to the form of
14  the question.
15        Go ahead.
16        THE WITNESS:  Again, in -- in 2008,
17  I know they issued orders to show cause.
18  Because I signed them.
19        I don't know what happened in 2017.
20  And I was under the impression that we were
21  talking about administrative actions, which
22  would be an order to show cause or an immediate
23  suspension order attached to an order to show
24  cause.
25        They're the same thing.  Only one is

58 (Pages 589 - 592)

Page 593

1  an immediate suspension, and the other one is
2  just a -- a notice.
3      Q.  Well, let me -- let me just clarify
4  your testimony --
5      A.  Okay.
6      Q.  -- for the record.
7          Sitting here today, you don't recall
8  if the DEA issued an immediate suspension order
9  against McKesson during your tenure at the DEA,
10  correct?
11      A.  I don't recall that.
12      Q.  And you don't recall or know if the
13  DEA issued an order to show cause against
14  McKesson leading to the 2017 settlement
15  agreement, correct?
16      A.  I don't know that for sure.  Again,
17  that settlement happened well after I was gone.
18      Q.  Thank you.
19          Now, last time we were together, Mr.
20  Rannazzisi, we discussed some e-mails that you
21  sent from DEA -- your DEA government account to
22  your personal account.
23          Do you remember that discussion?
24      A.  I believe so, yes.
25      Q.  And your personal e-mail address is

Page 594

1  JRALKES --
2      A.  Uh-huh.
3      Q.  -- @AOL.com --
4      A.  Yes.
5      Q.  -- correct?
6      A.  Yes.
7      Q.  Besides yourself, who has access to
8  your AOL e-mail account?
9      A.  Just me.
10      Q.  No one else has the password to your
11  account?
12      A.  No.
13      Q.  In addition to forwarding documents
14  to your personal account, you also took copies
15  of confidential DEA documents home from your
16  DEA office, correct?
17      A.  No.
18          MR. EPPICH:  No?  Okay.
19          Well, since your deposition, DOJ has
20  identified another 128 documents that you took
21  from DEA headquarters.
22          Let me introduce to you what we'll
23  mark as Exhibit 12.
24          (Deposition Exhibit 12 was marked
25  for identification.)

Page 595

1          BY MR. EPPICH:
2      Q.  Mr. Rannazzisi, if you could turn to
3  Page 3 with me of -- of Exhibit 12.  I'd like
4  to call your attention to what is identified as
5  Privileged Doc 4 in Exhibit 12.
6          It's -- it's identified as a
7  510-page e-mail from July 25, 2005, from
8  yourself to NA.
9          Do you see that?
10      A.  Okay.
11      Q.  And I'm sorry.  It's -- it's a
12  document, not an e-mail.  Pardon me.
13          And you see the file name, it says
14  "Rannazzisi Home Files, Redwell No. 6"?
15      A.  Uh-huh.
16      Q.  Sir, do you keep redwells of -- of
17  files at your home with documents from the
18  DEA --
19      A.  I don't --
20      Q.  -- collected in them?
21      A.  I don't know what a redwell is.
22      Q.  Okay.  Do you have any reason to
23  doubt this -- this document wasn't provided to
24  the DOJ when they collected documents from you?
25      A.  I don't --

Page 596

1          MR. BENNETT:  Objection to form.
2          THE WITNESS:  I mean this --
3          MR. EPPICH:  I'll strike.
4          THE WITNESS:  Document's --
5          MR. EPPICH:  -- the question.
6          THE WITNESS:  -- from -- this
7  document's from 2005.  During that time period,
8  a lot of documents were being sent back and
9  forth.  Because this -- this is an Internet
10  strategy.  And, you know, I -- we're required
11  to work on these Internet strategy.  We're
12  required to work on every strategy.
13          So I would be looking at it, making
14  changes and then sending it back.  That's --
15  that's common.
16          BY MR. EPPICH:
17      Q.  So, sir, the DOJ, under "Description
18  of this Document" -- and I -- I don't have a
19  copy of this document.  I apologize.  But the
20  DOJ describes the document as "DEA Internet
21  Strategy Draft, July 25, '05, Drug Threat" --
22      A.  Uh-huh.
23      Q.  -- "Need for an Internet Strategy."
24          Do you see that?
25      A.  Yes.

59 (Pages 593 - 596)

Page 597

1    Q.   The DOJ further describes the
2  document as discussing, one -- you see the
3  No. 1 there -- "DEA Internet strategy, July 25,
4  2005, which details law enforcement strategies
5  to identify major drug supply organizations in
6  order to fully dismantle drug trafficking
7  supply organizations."
8        Do you see that?
9    A.   Yes.
10   Q.   Now, Mr. Rannazzisi, who are the
11 major drug supply organizations that are
12 referred to in this document?
13       MR. BENNETT:  Objection.  I believe
14 that -- I believe that is privileged
15 information.  And I would need to talk to Mr.
16 Rannazzisi to determine what he knows about the
17 document that was withheld.
18       To the extent that it was withheld
19 based on deliberative process, law enforcement
20 and attorney-client privileged communication,
21 he would not be able to testify to the contents
22 of that document.
23       MR. EPPICH:  I'll move on, Mr.
24 Bennett.
25       BY MR. EPPICH:

Page 598

1    Q.   Sir, did --
2        MR. BENNETT:  And I -- I do want to
3  clarify.  I think you said it was a 510-page
4  document that was withheld.  I believe there
5  were only 8 pages out of 510 that were
6  withheld.
7        MR. EPPICH:  Thank you.  That's not
8  representing the document.  So thank you for
9  that.
10       MR. BENNETT:  It says:  "Pages 18
11 through 25 and 142 have been withheld."
12       MR. EPPICH:  Thank you.
13       MR. BENNETT:  So it is --
14       MR. EPPICH:  I missed that.
15       MR. BENNETT:  No problems there.  So
16 i believe the remaining 502 pages were
17 provided.
18       BY MR. EPPICH:
19   Q.   Now, Mr. Rannazzisi, did the
20 strategies discussed in this document include
21 changes to the requirements for pharmaceutical
22 distributors under the CSA?
23       MR. BENNETT:  Objection.
24 Privileged.
25       Same instruction.

Page 599

1        THE WITNESS:  I have no idea.  I
2  don't have the document handy.  This was from
3  2005.
4        MR. EPPICH:  Yes, sir.
5        BY MR. EPPICH:
6    Q.   Now, the -- you -- you see the
7  notes.  The DEA is withholding these documents
8  based on the law enforcement privilege and the
9  attorney-client privilege, among other things.
10       And DEA further provides that
11 Exhibit 12 -- in -- in Exhibit 12, under the
12 Basis, that Basis column, that the contents of
13 this document, if disclosed, would unduly
14 compromise the agency's deliberative process
15 and jeopardize sensitive predecisional
16 communications.
17       Do you see that?
18   A.   Yes.
19   Q.   Yet you've been keeping these
20 DEA-sensitive communications in your home for
21 the past 14 years; isn't that true?
22   A.   They were -- I guess they were on my
23 -- I guess they were on my Internet account.
24 But again, they're documents from 2005.  We did
25 a lot of business that way in 2005.

Page 600

1    Q.   Now, sir --
2    A.   And throughout my tenure at -- we
3  were doing business that way.
4    Q.   Sir, I'm not going to be able to
5  review every document in this log with you
6  today --
7    A.   Uh-huh.
8    Q.   -- with the time as short as it is.
9  But let me direct you to the last page of the
10 document.
11       And these are documents -- these are
12 two documents that are described in the
13 Description column as having highly sensitive
14 law enforcement financial data concerning
15 manufacturers, distributors and pharmacies
16 monitored for civil litigation, procedural and
17 regulatory compliance of controlled substances.
18       Do you see that, sir?
19   A.   Yes.
20   Q.   The DEA is not producing these
21 documents under the law enforcement privilege.
22       Do you see that?
23   A.   Yes.
24   Q.   But these documents are more than
25 just a law enforcement privilege, right?

Page 601

1 Documents 127 and 128 in this log
2 contain the confidential financial data and
3 information of defendants to this lawsuit.
4 Do you see that?
5 A. Again, I -- I -- I see what it says.
6 But I don't know what the documents are.
7 Q. But you have a copy of these
8 documents in your home, correct?
9 A. I haven't looked at-- I haven't
10 looked for these -- I -- I went through and
11 gave them the documents that I had. I don't
12 know what these documents are.
13 I -- I could tell you that these
14 documents, I probably had them because we were
15 either going into hearing or we had a court
16 appearance where I was preparing for. So...
17 Q. Mr. Rannazzisi, how many sensitive
18 DEA documents and e-mails do you have in your
19 home?
20 A. I --
21 MR. BENNETT: Objection to Form.
22 THE WITNESS: I don't -- I don't
23 have any sensitive -- I -- as far as I know, I
24 don't have any sensitive or -- or any -- any
25 documents like that. I've got to go back and

Page 602

1 look. But I just don't think I have those
2 documents.
3 BY MR. EPPICH:
4 Q. Mr. Rannazzisi, did you ask the
5 manufacturers, distributors and pharmacies for
6 permission to maintain copies of their
7 financial data and information at your home in
8 your personal e-mail account?
9 A. I don't --
10 MR. BENNETT: Objection.
11 Argumentative.
12 THE WITNESS: I don't know what
13 those documents are. And obviously I didn't
14 ask any permission because I don't even know
15 what those documents are.
16 BY MR. EPPICH:
17 Q. Did you share any of these or other
18 DEA documents with any other person or entity?
19 A. No.
20 Q. Where do you keep copies of hard
21 copy sensitive DEA documents in your home?
22 MR. BENNETT: Objection.
23 MR. UTTER: Object to form.
24 MR. BENNETT: Argumentative.
25 THE WITNESS: I don't have any hard

Page 603

1 copies of DEA --
2 BY MR. EPPICH:
3 Q. You don't have a filing cabinet full
4 of hard copy DEA documents?
5 A. No.
6 Q. Mr. Rannazzisi, have you been
7 disciplined by the DEA for removing
8 DEA-sensitive documents and e-mails from the
9 DEA headquarters?
10 A. No.
11 Q. Last time we were together, we also
12 talked about your attention as a consultant and
13 expert witness in the opioid litigations.
14 Do you remember that testimony?
15 A. Yes.
16 Q. Now, you're aware that the
17 plaintiffs have retained other consultants and
18 experts in this case and in the opioid
19 litigations in general?
20 A. I'm -- yes.
21 Q. You're familiar with Craig McCann?
22 A. Yes, I am.
23 Q. Jim Rafalski?
24 A. Yes.
25 Q. Seth Whitelaw?

Page 604

1 A. No.
2 Q. Frank Yonker?
3 A. Yes.
4 Q. Jim Geldhof?
5 A. Yes.
6 Q. David Schiller?
7 A. Yes.
8 Q. You attended a meeting in June 2008
9 with these experts and consultants along with
10 plaintiff's counsel, did you not?
11 MR. UTTER: Object to time frame.
12 Go ahead.
13 THE WITNESS: Yeah. I don't
14 recall -- I've attended meetings with Craig
15 McCann. But I don't recall any of those people
16 being there other than Craig McCann.
17 BY MR. EPPICH:
18 Q. When was your last meeting with Mr.
19 McCann?
20 A. It was probably around a year ago.
21 Q. And where was that meeting held?
22 A. It was probably at his offices.
23 Q. What did you discuss with Mr.
24 McCann?
25 A. That -- if I recall, that -- if I

61 (Pages 601 - 604)

Page 605

1  recall, we were talking about ARCOS.
2    Q.    And what did you share with him
3  about ARCOS?
4    A.    I didn't share anything.  We -- they
5  -- they -- I was just listening to what they
6  were doing with ARCOS information.
7    Q.    What do you mean when you say what
8  were they doing with ARCOS information?
9    A.    How they were looking at ARCOS
10  information that was given to them in
11  discovery.
12    Q.    Did Mr. McCann ask you any
13  questions?
14    A.    I believe the only question that
15  came up was on benzodiazepines.
16    Q.    Did you discuss any of the
17  methodologies that Dr. McCann was planning to
18  use in an expert report in this litigation?
19    A.    No.  I'm not a -- I'm not a
20  technical guy.  And it's not -- he was doing
21  all the tech work.
22    Q.    So you had a meeting with him in
23  May -- approximately one year ago in 2018.
24      What -- what other -- you mentioned
25  you may have had other meetings with him.

Page 606

1      What other meetings did you have
2  with Dr. McCann?
3    A.    I believe that was the only meeting
4  I had with him.
5    Q.    Did you have any other meetings with
6  experts that have been disclosed in this
7  litigation?
8      MR. UTTER:  Object.  I'm not sure he
9  knows who they are.
10      Go ahead.
11      THE WITNESS:  I -- I don't know of
12  any -- I'm just thinking to think of who I met
13  with.  I mean McCann definitely would -- I
14  mean, again, I -- I'm not -- I'm not part of
15  that MDL litigation, so...
16      BY MR. EPPICH:
17    Q.    Did you provide Mr. -- Dr. McCann
18  with any documentation?
19    A.    No.
20    Q.    Have you had --
21    A.    Absolutely not.
22    Q.    -- any communications that are
23  written with Dr. McCann?
24    A.    No.
25    Q.    Do you recall a meeting where there

Page 607

1  were approximately 30 people, plaintiffs'
2  lawyers as well as some experts, where you were
3  in attendance sometime last summer?
4    A.    That was the meeting I was talking
5  about, yes, with Dr. --
6    Q.    Oh, I see.
7    A.    -- McCann.
8    Q.    So -- so it was Dr. McCann and --
9  and several --
10    A.    And --
11    Q.    -- other people?
12    A.    Yeah.  But that -- but none of -- I
13  don't recall any of the people that you talked
14  about were there.
15    Q.    So at that meeting with counsel,
16  were there any presentations made?
17    A.    I believe there was a presentation
18  made.  But again, I wasn't there.  I mean I --
19  I didn't do any presentation.  I was just there
20  as an observer and to --
21    Q.    Were there --
22    A.    -- answer questions.
23    Q.    -- any documents provided to you?
24    A.    No.
25    Q.    Any documents e-mailed to you after

Page 608

1  the fact?
2    A.    There -- there were documents that
3  went to the attorneys, yes.
4    Q.    And what do you mean by "documents
5  that went to the attorneys," sir?
6    A.    They were documents related to the
7  case that went to the attorneys -- that -- that
8  went to the attorneys in both the MDL and I'm
9  sure the other litigation that was --
10    Q.    But -- pardon me.
11    A.    Yeah.
12    Q.    And -- and those are documents that
13  you sent to the attorneys or someone else --
14    A.    No, no, no --
15    Q.    -- sent to the attorneys?
16    A.    -- no, no.  I didn't send anything
17  to --
18    Q.    Okay.
19    A.    -- the attorneys.  I -- I was not
20  involved in any doc -- I was there to answer
21  questions if they had any.  That's the extent
22  of my --
23    Q.    And what was the --
24    A.    Involvement.
25    Q.    What was the -- the topic of the

62 (Pages 605 - 608)

Page 609

1  PowerPoint presentation?
2      A.   I just don't remember what -- it --
3  it was involved -- involving ARCOS.  And I
4  don't really recall.  I just know it was an
5  ARCOS presentation.
6          MR. EPPICH:  Thank you, Mr.
7  Rannazzisi.  Let me --
8          THE WITNESS:  You're welcome.
9          MR. EPPICH:  -- pass you to my
10 colleagues.
11         We're -- let's go off the record.
12         THE VIDEOGRAPHER:  We're off record.
13         Time is 3:09.
14         (A short recess was taken.)
15         THE VIDEOGRAPHER:  We're going back
16 on record.
17         Beginning of Media File 9.
18         Time is 3:12.
19         MR. EPPICH:  Mr. Rannazzisi, just
20 one quick housekeeping item.
21         I -- I'd marked up the plaintiff's
22 demonstrative, Exhibit 8.  And I'm going to
23 mark that as Exhibit No. 13 of your deposition.
24         THE WITNESS:  Okay.
25         MR. EPPICH:  Thank you again.

Page 610

1          THE WITNESS:  Thank you.
2          (Deposition Exhibit 13 was marked
3  for identification.)
4      EXAMINATION BY COUNSEL FOR WALMART
5          BY MR. STEPHENS:
6      Q.   Mr. Rannazzisi, good afternoon.
7      A.   Good afternoon.
8      Q.   It's good to see you again.
9          How are you?
10     A.   Fine.
11         How are you?
12     Q.   Good.
13         My time is short.
14     A.   Okay.
15     Q.   So I will try and be quick.
16         In your testimony earlier today, you
17 had -- you were talking about whether certain
18 registrants would comply.  And you used terms
19 like "they" or "industry."  Okay?
20         Do you recall that?
21     A.   I --- I don't recall it.  But "they"
22 and "industry" -- I don't understand "they" or
23 "industry."  I generally will say "industry."
24     Q.   Okay.
25     A.   I --

Page 611

1      Q.   Well, I'd just like to be a little
2  bit --
3      A.   Okay.
4      Q.   -- more precise.
5      A.   Okay.
6      Q.   Would you agree that, enforcing the
7  Controlled Substances Act, you believed that
8  every individual is entitled to due process in
9  every investigation DEA conducts?
10     A.   I agree that, yeah, due process is a
11 very important part of the -- of the overall
12 scheme, yes.
13     Q.   And do you believe that DEA must
14 assess the facts as to each individual
15 registrant separately to determine whether that
16 specific registrant has violated the Controlled
17 Substances Act?
18         MR. BENNETT:  Objection.  Scope.
19         THE WITNESS:  I think I made it
20 pretty clear that each -- each investigation is
21 fairly fact specific.  And we could only go on
22 the facts that are generated from the
23 investigation, yes.
24         BY MR. STEPHENS:
25     Q.   So you would agree with that

Page 612

1  statement?
2      A.   Yes.
3      Q.   Okay.  Would you also agree that
4  every manufacturer, distributor and retail
5  chain pharmacy is entitled to individualized
6  review of its own conducted by DEA before being
7  accused for any potential violation of the
8  Controlled Substances Act?
9          MR. BENNETT:  Objection.  Scope.
10         THE WITNESS:  I don't -- I don't
11 think I would necessarily -- I -- repeat the
12 question.  I want to make sure I get that
13 right.
14         BY MR. STEPHENS:
15     Q.   Each manufacturer, distributor and
16 retail chain pharmacy is entitled to
17 individualized review of its own conduct before
18 being accused of potential violations of the
19 Controlled Substances Act.
20     A.   I believe that the process of the
21 order to show cause letter of admonition,
22 memorandum of agreement is part of that review.
23         So if you're asking me does a --
24 does a registrant have the ability -- or should
25 they have the ability to -- to just forgo the

63 (Pages 609 - 612)

Page 613

1  investigation and just have DEA tell us -- tell
2  them what their conduct is that violates the
3  Act, that's what an order to show cause is for.
4      Q.  Okay.  Let me re -- ask it a little
5  bit differently --
6      A.  Okay.
7      Q.  -- so I know that we're talking kind
8  of apples --
9      A.  Okay.
10      Q.  -- to apples.
11         Is that fair?
12      A.  Yeah.
13      Q.  And let -- let me do it this way:
14  If Distributor A is supplying Customer X --
15      A.  Uh-huh.
16      Q.  -- and DEA has concerns about what
17  Distributor A is doing with Customer X --
18      A.  Uh-huh.
19      Q.  -- is it fair to charge Distributor
20  B with Distributor A's conduct?
21      A.  I -- I'm just curious.  Where did
22  Distributor B come -- come from?
23         We were talking about A and the
24  pharmacy, right?  And all of a sudden you're
25  talking about Distributor B.  Maybe I'm -- I'm

Page 614

1  just missing the point here.
2      Q.  Okay.  Let me re-ask the question.
3      A.  Okay.
4      Q.  Distributor A supplies to Customer
5  X.
6      A.  Yes.
7      Q.  Distributor B does not do business
8  with Distributor A and does not supply Customer
9  X.
10         Are you with me?
11      A.  Yes.
12      Q.  Do you think it's fair to lump
13  Distributor B into any investigation of
14  Distributor A and Customer X?
15      A.  Does distributor -- does Distributor
16  B -- are they committing violations?
17         Because again, a lot -- there's a
18  lot of fact-specific questions I -- I need to
19  ask.
20         If Distributor B is not doing
21  anything, not violating any kind of Controlled
22  Substances Act or regulation -- provision or
23  regulation, then I -- I guess no.  But if
24  they're involved in some kind of violation of
25  the regulation or the Act, I --

Page 615

1      Q.  Let me sharpen it one more time --
2      A.  Okay.
3      Q.  -- Mr. Rannazzisi.
4         Let's assume that we're only looking
5  at the transactions where Distributor A
6  supplies Customer X.  That's it for this --
7      A.  Okay.
8      Q.  -- hypothetical.
9      A.  Uh-huh.
10      Q.  Distributor B is not involved.
11      A.  Okay.
12      Q.  Distributor B does not do business
13  with Distributor A.  Distributor B does not
14  supply Customer X.
15      A.  Okay.
16      Q.  My point is -- is -- what I'm trying
17  to make is a -- what I think is a fairly simple
18  point.
19         DEA would not blame Distributor B
20  for the conduct that it's investigating of
21  Distributor A and Customer X.
22      A.  No.  We wouldn't do that.
23      Q.  Okay.  During your tenure as deputy
24  assistant administrator, if DEA learned about
25  potential diversion at a pain clinic, would you

Page 616

1  expect D -- DEA to investigate the pain clinic?
2      A.  DEA takes in information and then
3  conducts investigations based on that
4  information.  So yes, there would be an
5  investigation.
6      Q.  So that's a "yes."
7      A.  Yes.
8      Q.  Okay.  Is it fair to say --
9      A.  Again, it's fact-specific.  But for
10  the most part, if it's a rogue pain clinic and
11  they have good information, yes, they would
12  initiate an investigation.
13      Q.  Okay.  Is it fair to say that you
14  would have been troubled as deputy assistant
15  administrator if DEA received information about
16  diversion at a pain clinic and failed to act on
17  that information to stop the potential
18  diversion?
19         MR. BENNETT:  Objection to form.
20         MR. UTTER:  Same objection.
21         Go ahead.
22         THE WITNESS:  I would be surprised
23  if -- if DEA received information on a rogue
24  pain clinic, a clinic that was obviously
25  violating the law and they didn't act on it.

Page 617

1  I'd be very surprised, yes.
2      BY MR. STEPHENS:
3  Q.   Earlier today we -- we talked about
4  immediate suspension orders.
5  A.   Yes, sir.
6  Q.   Right.
7      And you're familiar --
8  A.   Uh-huh.
9  Q.   -- both on the questioning from
10  plaintiff's counsel and questioning from
11  defendant's counsel.  You received questions
12  about immediate suspensions orders, what they
13  are, and how DEA obtains them.
14  A.   Yes.
15  Q.   Fair?  All right.
16      Would you agree that an immediate
17  suspension order gives DEA the ability to
18  immediately stop diversion and then backtrack
19  and build a criminal case against the diverting
20  doctor?
21      MR. UTTER:  Object to form.
22      Go ahead.
23      THE WITNESS:  Well, you'd -- we
24  separate our -- our administrative
25  investigations from our criminal

Page 618

1  investigations.
2      Can parallel proceedings occur?
3  Yes.  But for the most part, our -- our
4  administrative investigations are just that,
5  administrative investigations.
6      BY MR. STEPHENS:
7  Q.   Okay.  But after obtaining an
8  immediate suspension order, could you backtrack
9  and then work the criminal case?
10  A.   I'm sure you could -- yeah.  You --
11  you could use the information obtained from an
12  immediate -- well, an immediate suspension
13  order is not a seizure order.  It's a -- it's
14  -- it's just an order that stops that
15  registrant -- suspends his ability to -- to
16  distribute controlled substances.  And it gives
17  him, again, a opportunity of due process to
18  appear in an administrative hearing.
19      I don't -- I -- can we use the
20  information obtained from that?  I -- I -- that
21  -- I --
22  Q.   That's not my question.
23      My question simply is, after DEA
24  obtains the immediate suspension order and is
25  able to stop the doctor from continuing to

Page 619

1  prescribe, as you described earlier today --
2  A.   Uh-huh.
3  Q.   -- DEA has the ability to -- in the
4  future, after getting the immediate suspension
5  order, to backtrack and work a criminal
6  investigation to see if DEA wants to bring a
7  criminal indictment against the doctor or the
8  pain clinic.
9  A.   Yes.  You could do that.
10  Q.   All right.  When we met last time,
11  you had mentioned that at times DEA delayed
12  obtaining administrative actions like immediate
13  suspension orders while a criminal
14  investigation was ongoing.
15      Do you recall that testimony?
16      MR. BENNETT:  Objection.  Misstates
17  testimony.
18      THE WITNESS:  No.  I don't recall
19  that.  I -- I recall you discussing that and
20  asking me if -- if -- if we had delayed based
21  on -- based on active criminal investigations.
22      MR. STEPHENS:  Right.
23      THE WITNESS:  Yeah.
24      BY MR. STEPHENS:
25  Q.   And -- and delayed pursuing

Page 620

1  administrative relief, correct?
2  A.   That's --
3      MR. BENNETT:  You're answer did he
4  ask the question.
5      I don't have the record in front of
6  me, Counsel.  But I believe that you did ask
7  that question.  And I believe that we
8  instructed the witness that he was not
9  authorized to answer that question.  And I
10  believe that was upheld by the special master.
11      So I don't -- I just want to make
12  sure the record's clear that he's not saying
13  that happened.  He's -- and please correct me
14  if I'm wrong.  He's saying you asked that
15  question.
16      So if you're asking whether you
17  asked the question or not, he remembers that.
18  I think that's fine.  But I believe in the
19  transcript we -- we objected.  But again, I
20  don't have it in front of me, so...
21      BY MR. STEPHENS:
22  Q.   Mr. Rannazzisi, directing to your
23  testimony to April 26, 2009, at Page 171, lines
24  9 to 15.
25      MR. LANIER:  Do you is a copy for

65 (Pages 617 - 620)

Page 621

1 the witness?
2        MR. STEPHENS:  I -- yeah.  I will
3 give that to him.  Just one second.
4        BY MR. STEPHENS:
5    Q.  Were you asked the -- this question?
6 Did you give the following response?
7    "Mr. Rannazzisi, did the Office of
8 Diversion Control ever delay an administrative
9 action while a criminal investigation was
10 ongoing?"
11        Answer:  "Yes."
12        MR. LANIER:  Note -- objection.
13        Note the -- there's an objection
14 that you're authorized to answer that question
15 "yes" or "no" only, is the instruction from Mr.
16 Bennett.
17        MR. BENNETT:  Thank you, Counsel.
18        BY MR. STEPHENS:
19    Q.  All right.  Were you asked that
20 question, and did you give that answer, sir?
21    A.  I -- can I see the transcript?  I --
22 yes.
23    Q.  It's 171, lines 9 to 15.
24    A.  Okay.  Yes.
25    Q.  Were you asked that question?  Did

Page 622

1 you give that response?
2    A.  Yes.
3    Q.  Okay.  I also ask you if you could
4 recall how long those delays were, and you
5 couldn't recall.
6    A.  That's true.
7    Q.  Remember that?  All right.
8    A.  Yes, sir.
9        MR. STEPHENS:  I'd like to mark this
10 as the next in order, Bonnie, No. 14.
11        And I'll just describe it for the
12 record.  It is a March 20th, 2018 hearing
13 before the Subcommittee of Oversight
14 Investigations, Committee on Energy and
15 Commerce, House of Representatives.
16        And I would direct your attention to
17 pages 54 and 55.
18        (Deposition Exhibit 14 was marked
19 for identification.)
20        BY MR. STEPHENS:
21    Q.  All right.  Mr. Rannazzisi, I would
22 direct your attention to Page 54 where there is
23 a discussion between Mrs. Brooks and Mr.
24 Patterson.
25        I'm about -- I'm about 60 percent of

Page 623

1 the way down the page where Mrs. -- Mrs. Brooks
2 says:  "Are you saying that the U.S. Attorneys
3 were asking -- as a former U.S. Attorney, are
4 you saying that's the U.S. Attorneys were
5 asking or telling DEA not to issue ISOs?"
6        Do you see that?
7    A.  Yes.
8    Q.  Did I read that accurately?
9    A.  Yes.  I'd like to read beforehand
10 what was leading up to that though.
11    Q.  Yeah.  And Mr. Rannazzisi, what I'm
12 hoping to do here is refresh your recollection
13 as to how long the delays were at the DEA on
14 filing administrative actions like immediate
15 suspension orders.
16        MR. BENNETT:  Objection.  I don't
17 believe he is authorized to discuss that.  I
18 think that was the whole thing that came up in
19 the last one.  I know he did answer that he
20 doesn't remember.
21        MR. STEPHENS:  I think this door --
22        MR. BENNETT:  Even if it's
23 refreshed, I would object and say that's
24 privileged, and he's not authorized to answer
25 it.

Page 624

1        And I will note that congressional
2 testimony does not waive privilege by the
3 Department of Justice.
4        MR. STEPHENS:  Door is wide open.
5        MR. BENNETT:  I don't believe so,
6 Counsel.  I disagree.
7        MR. STEPHENS:  Plaintiff's lawyers
8 talked for -- for quite a bit this morning
9 about immediate suspension orders.
10        MR. BENNETT:  That's fine.
11        BY MR. STEPHENS:
12    Q.  So, Mr. Rannazzisi, as far as the --
13 the time of the delay, I would direct your
14 attention to Page 55.  And you'll see at the
15 top of the page Mrs. Brooks asked a question to
16 Mr. Patterson.
17        Now, Mr. Patterson is Robert
18 Patterson, the acting administrator for the
19 Drug Enforcement Administration in 2018; is
20 that right?
21    A.  Yes.  He was the acting
22 administrator.
23    Q.  That is the number one position in
24 the Drug Enforcement Administration; is that
25 right?

66 (Pages 621 - 624)

Page 625

1    A.   Well, he was an acting
2 administrator.  Yes, he was acting in the
3 number one position.
4    Q.   Okay.  So -- and -- and let me just
5 read this here to -- to kind of frame it for
6 you.
7        If you see Mrs. Brooks says:  "And
8 what is the new guidance?  And I appreciate the
9 importance of gathering evidence, but what is
10 the new guidance relative to ISOs and criminal
11 investigations that you're contemplating or
12 that are in place now, and is that guidance in
13 writing?"
14        Mr. Patterson responds right below
15 that:  "So it is not formalized.  This is
16 conversations that I've been having with the
17 AGAC, the -- you know, the advisory."
18        And then, if you go down a couple
19 paragraphs, you'll see that -- a -- a paragraph
20 there where Mr. Patterson states:  "So I
21 understand that balance.  The concern I have,
22 like I said, is, if we are using an ISO, it
23 feels awful weird to be signing that ISOs a
24 year after we learned of that problem."
25        Do you see that?

Page 626

1    A.   Yes.
2    Q.   Does that refresh your recollection
3 that at times the Drug Enforcement
4 Administration waited up to a year to file an
5 ISO after learning of a problem with a doctor
6 or a pain clinic who might have been diverting
7 controlled substance?
8        MR. BENNETT:  Objection.  Improper
9 refreshing of recollection.
10        Your question was what's the longest
11 time.  He answered he did not know what the
12 longest time is.
13        Your new questions is what is -- has
14 it been a year or more.
15        I don't believe that's a proper
16 refresh.  Because those are two different
17 answers.
18        And I don't believe he has been
19 authorized to discuss the length of the delay.
20 We allowed him to say whether there had been
21 delays or not but not the length of any delays.
22 So I believe that's outside the scope and
23 privileged for Mr. Rannazzisi to answer those
24 questions.
25        MR. STEPHENS:  This is congressional

Page 627

1 testimony.  If -- if he's going to be denied
2 the right and -- and objected to the right to
3 answer this question, I'm going to move to
4 strike all of the testimony that Mr. Rannazzisi
5 provided in response to plaintiff counsel's
6 questions regarding immediate suspension
7 orders.
8        SPECIAL MASTER COHEN:  You can
9 answer this question with a "yes" or "no"
10 answer.  And the reporter can read it back to
11 you if you need it read back to you at
12 15:28.04.
13        THE WITNESS:  Okay.  Could you
14 please read it back.
15        (The record was read as requested.)
16        MR. UTTER:  Object to form.
17        MR. BENNETT:  And I will restate my
18 objection.
19        But I understand Special Master's
20 ruling.
21        THE WITNESS:  I -- I -- I'm
22 uncomfortable answering this.  Because I don't
23 know what Mr. Patterson is discussing.  I don't
24 know the case he's talking about.  I have no
25 idea what -- this is Mr. Patterson's testimony.

Page 628

1 It's not mine.
2        And -- and, quite frankly, it -- if
3 I said "yes" or "no," I -- I don't know what
4 he's talking about.
5        Mr. Patterson was never in the
6 Office of Diversion Control.  And he had very
7 limited knowledge of what the Office of
8 Diversion Control did.  He was an acting
9 administrator.  So if I say "yes" or "no," it's
10 an answer, but it's not necessarily the correct
11 answer.
12        BY MR. STEPHENS:
13    Q.   Mr. Rannazzisi, in the 33 times that
14 you've testified to Congress, did you ever
15 notify Congress that DEA was delaying the
16 filing of immediate suspension orders to allow
17 criminal proceedings or investigations to
18 proceed?
19    A.   I don't recall -- in my
20 pharmaceutical testimony, I don't recall ever
21 making that statement to Congress.
22    Q.   Did -- did you ever disclose to
23 Congress, in the 33 times that you've testified
24 before Congress, that DEA at times was delaying
25 the filing of immediate suspension orders when

67 (Pages 625 - 628)

Page 629

1  DEA understood at that time there might be an
2  imminent threat so that U.S. Attorney's Office
3  could investigate the subject of the ISO?
4      MR. SMITH: Objection to form.
5      THE WITNESS: Again, I don't recall
6  ever talking to Congress, testifying to
7  Congress, presenting the Congress delays due to
8  U.S. Attorney's active investigations. No, I
9  don't.
10     But again, this is Mr. Patterson's
11 testimony. It's not my testimony. And I have
12 no idea what he's drawing from when he makes
13 these statements.
14 BY MR. STEPHENS:
15     Q.  All right. As someone who's
16 testified 33 times before Congress, do you have
17 any reason to doubt Acting Administrator
18 Patterson's sworn testimony here?
19     A.  I -- it's his sworn testimony. I --
20 I can't doubt that he's correct. But I don't
21 know what information he's drawing from, who
22 provided the information to him. I -- I have
23 none of that background. So it's difficult for
24 me to say what's correct.
25     I'm sure Mr. Patterson didn't go

Page 630

1  before Congress an lie. But in the same token,
2  I don't know where this information came from.
3      Q.  During your tenure as deputy admin
4  -- assistant administrator, did DEA provide
5  distributors with national monthly average of
6  dosage units of oxycodone purchased by all
7  registered pharmacies in the United States?
8      A.  During my tenure, there was summary
9  -- there were summary ARCOS reports that didn't
10 identify -- there were summary ARCOS reports
11 with no identification of the distributors or
12 pharmacies. It was by ZIP code. And it talks
13 about how much of a base -- base -- basic class
14 was going into specific areas within the
15 country.
16     Actually, all ZIP codes, if I'm not
17 mistaken. It's still on -- well, it was on the
18 web site up -- up to a year ago. I don't know
19 if it's still there.
20     Q.  Would that include national monthly
21 average of dosage units of a specific
22 controlled substance?
23     A.  I just don't recall. There were
24 several reports. I think there was eight
25 different reports in that --

Page 631

1      MR. BENNETT: Counsel, I believe we
2  are now at the end of the time for the defense.
3  Thank you very much.
4      I think it's plaintiff's turn now.
5      MR. LANIER: All right. Let's go
6  off the record to make the shift, please.
7      THE VIDEOGRAPHER: We're going off
8  record.
9      Time is 3:33.
10     (A short recess was taken.)
11     THE VIDEOGRAPHER: We are going back
12 on record.
13     Beginning of Media File 10.
14     Time is 3:40.
15 EXAMINATION BY COUNSEL FOR PLAINTIFFS
16 BY MR. LANIER:
17     Q.  Okay. Mr. Rannazzisi, Mark Lanier
18 again for the -- the claimants in this case.
19     And what I'd like to do is give you,
20 again, a roadmap of where we're going. It's
21 not complicated.
22     A.  Okay.
23     Q.  Basically it's clean-up. I want to
24 clean up some questions you were asked and some
25 subject areas. Okay?

Page 632

1      A.  Yes, sir.
2      Q.  All right. In that regard, you were
3  asked a set of questions by one of the lawyers
4  who ask you about did you ever make an effort
5  to change the law.
6      Do you remember being asked those
7  questions?
8      A.  Yes.
9      Q.  Now, you testified over -- or around
10 33 times, was the best of your memory, correct?
11     A.  Yes.
12     Q.  Was the law good as the law existed,
13 while you were there, as long as that law was
14 being followed?
15     MR. EPPICH: Objection. Form.
16 Vague.
17     THE WITNESS: The -- in my opinion,
18 the law was fine the way it was presented in
19 the Controlled Substances Act and regulations.
20 BY MR. LANIER:
21     Q.  Is the key whether or not it was
22 followed?
23     A.  That's --
24     MR. EPPICH: Objection. Form.
25     THE WITNESS: -- basically it. If

Page 633

1   -- if the -- if the -- the statute and the
2   regulations were followed, it would
3   significantly, not totally eliminate,
4   diversion.
5           BY MR. LANIER:
6       Q.  All right.  In this regard, sir, one
7   more question about efforts to change the law.
8           You understand that the woman asking
9   that represents one of the distributors in this
10  case, one of the big three distributors in the
11  United States of America?
12          MR. EPPICH:  Objection.
13          BY MR. LANIER:
14      Q.  Did you know that?
15          MR. EPPICH:  Objection.
16          THE WITNESS:  I -- yes.
17          BY MR. LANIER:
18      Q.  Yeah.
19          My question is do -- did you at the
20  DEA have the number, size, quantity, budget of
21  lobbyists that the pharmaceutical companies and
22  their distributors had?
23          MS. McNAMARA:  Objection to form.
24          MR. EPPICH:  Objection.  Scope.
25          MR. BENNETT:  Objection to form and

Page 634

1   scope.
2           THE WITNESS:  DEA is not allowed to
3   lobby.  That would be a violation of federal
4   statute.
5           BY MR. LANIER:
6       Q.  So when the pharma people ask you
7   did you, in essence, make an effort to change
8   the law or lobby to change the law, are you
9   even allowed to lobby the way they do?
10          MS. McNAMARA:  Objection to form.
11          MR. BENNETT:  Objection.  Scope.
12          THE WITNESS:  No.  We're not allowed
13  to lobby Congress.
14          BY MR. LANIER:
15      Q.  So we read things like the
16  Washington Post putting out "The Drug
17  Industry's Triumph Over the DEA."  Came out in
18  2017.  It's got your picture on the front.
19          MR. BENNETT:  Counsel, what exhibit
20  number is this?
21          MR. LANIER:  This is Exhibit 15.
22  I'm sorry.
23          (Deposition Exhibit 15 was marked
24  for identification.)
25          BY MR. LANIER:

Page 635

1       Q.  Do you remember this coming out from
2   the Washington Post in 2017?
3       A.  Yes.
4       Q.  And if you'll look at the second
5   page, you'll see that the law and -- that
6   they're talking about:  "Passing was the
7   crowning achievement of a multifaceted campaign
8   by the drug industry to weaken aggressive DEA
9   enforcement efforts against drug distribution
10  companies that were supplying corrupt doctors
11  and pharmacists who peddled narcotics to the
12  black market.  The industry worked behind the
13  scenes with lobbyists and key members of
14  Congress, pouring more than a million dollars
15  into their election campaigns."
16          Do you see that?
17          MR. STEPHENS:  Object to form.
18          THE WITNESS:  Yes.
19          BY MR. LANIER:
20      Q.  And so when the -- the lawyer was
21  asking you did you make an effort to change the
22  law, did you pour over a million dollars into
23  election campaigns the way it was reported that
24  the drug industry did?
25          MR. STEPHENS:  Object to the form.

Page 636

1           THE WITNESS:  No, sir.
2           MR. LANIER:  All right.
3           THE WITNESS:  We're not allowed to
4   do that.
5           BY MR. LANIER:
6       Q.  Next set of questions.  Next
7   subject.
8           You were asked by the same lawyer
9   about other data that the DEA could have used.
10          Do you remember those questions?
11      A.  Yes.
12      Q.  I've made a list of information that
13  was available to the manufacturers and
14  distributors and a list of information that was
15  available to you and the DEA.
16          What I'd like to do is go through
17  the manufacturers and distributors and get you
18  to tell me whether or not the DEA had the
19  information or even knows what it is.  Okay?
20          You tracking with me?
21      A.  Yes, sir.
22      Q.  All right.  So --
23          MR. BENNETT:  And, Counsel, before
24  you go through your list, I just want to
25  instruct the witness that, to the extent DEA

Page 637

1  has this information and it's not publicly
2  known, you are not authorized to answer about
3  confidential information that you --
4      THE WITNESS:  Yes, sir.
5      MR. BENNETT:  -- do not have.
6      To the extent it's publicly known or
7  you don't know what this is, then you may
8  answer.
9      MR. LANIER:  Thank you.
10     BY MR. LANIER:
11  Q.   852 data?
12  A.   I have no idea what 852 data is.
13  Q.   So when the companies have their 852
14  data, you don't even know what it is, do you?
15  A.   No.
16     MR. EPPICH:  Object to form.
17     MR. STEPHENS:  Objection.
18     THE WITNESS:  No.  I have no idea.
19     BY MR. LANIER:
20  Q.   How about 867 data, as they call it?
21     MR. EPPICH:  Object to form.
22     THE WITNESS:  I never heard of 867
23  data.
24     BY MR. LANIER:
25  Q.   How about 844 data, as they call it?

Page 638

1      MR. EPPICH:  Object to form.
2      THE WITNESS:  No, sir.
3      BY MR. LANIER:
4  Q.   How about charge-back data that they
5  get from their pharmacies?
6      MS. McNAMARA:  Objection.  Form.
7      MR. EPPICH:  Object to form.
8      BY MR. LANIER:
9  Q.   Do you have access to that at the
10  DEA that you know of, all of the charge-back
11  data?
12  A.   We don't have charge-back data at
13  our -- well, DEA did not have charge-back data
14  at its disposal when we were there unless we
15  subpoenaed it.
16  Q.   And you have to have good cause to
17  subpoena it?
18  A.   We'd have to have an invest --
19     MR. EPPICH:  Objection.
20     THE WITNESS:  We'd have to have an
21  investigation.
22     BY MR. LANIER:
23  Q.   Okay.  How about IMS or IQV data?
24     MR. EPPICH:  Object to form.
25     BY MR. LANIER:

Page 639

1  Q.   If You can answer.
2  A.   Yeah.  Yeah.
3      MR. BENNETT:  You can answer that.
4  I believe the answer to this question has come
5  out in other depositions, and the --
6      THE WITNESS:  Okay.
7      MR. BENNETT:  -- DEA has authorized
8  it.
9      So I am going to object it's beyond
10  the scope of yours.  But I'm not going to
11  instruct you not to answer.  So you may answer
12  that question --
13     THE WITNESS:  Okay.
14     MR. BENNETT:  -- if you know.
15     THE WITNESS:  Yes.  We -- we have
16  used IMS, IQV data.
17     BY MR. LANIER:
18  Q.   Rebate data?
19     MS. McCLURE:  Object to form.
20     MR. O'CONNOR:  Objection.
21     THE WITNESS:  Again, we -- we
22  wouldn't have access to that unless we actually
23  subpoenaed it.
24     BY MR. LANIER:
25  Q.   The patient savings card data?

Page 640

1      MR. EPPICH:  Objection.
2      MS. McCLURE:  Form.
3      THE WITNESS:  Yeah -- no.  We
4  wouldn't have access to that.
5      BY MR. LANIER:
6  Q.   ARCOS data, we already know.
7  A.   Yes.
8  Q.   ILR data?
9      MS. McCLURE:  Form.
10     THE WITNESS:  I don't know what ILR
11  stands for.
12     BY MR. LANIER:
13  Q.   Actual orders, the actual order
14  sheets and forms that came in?
15     MR. EPPICH:  Object to form.
16     BY MR. LANIER:
17  Q.   Were they ever supplied to you?
18     MR. EPPICH:  Object to form.
19     BY MR. LANIER:
20  Q.   Absent subpoenas?
21     MR. EPPICH:  Object to form.
22     MS. McCLURE:  Form.
23     THE WITNESS:  I don't believe they
24  were supplied to us, no.
25     BY MR. LANIER:

70 (Pages 637 - 640)

Page 641

1    Q.   222 forms?
2        MR. EPPICH:  Object to form.
3        THE WITNESS:  We maintained the 220
4  -- the 222 forms, especially if it's
5  electronic.
6        BY MR. LANIER:
7    Q.   Suspicious order forms?
8        MR. EPPICH:  Object to form.
9        BY MR. LANIER:
10   Q.   Do you know if they were all given
11  to you?
12       MR. EPPICH:  Object to form.  Calls
13  for speculation.
14       THE WITNESS:  I -- I -- I don't
15  know.  I mean they were -- there was a period
16  of time where we received very few suspicious
17  orders.  So I don't know.
18       BY MR. LANIER:
19   Q.   Pharma center data?
20       MR. EPPICH:  Object to form.  Vague.
21       THE WITNESS:  I -- I've never heard
22  of pharma center data.
23       BY MR. LANIER:
24   Q.   So in terms of other data the DEA
25  could have used, would you agree with an

Page 642

1  assessment that the manufacturers and
2  distributors had access to a lot of data that
3  the DEA did not?
4        MS. McCLURE:  Form.
5        MR. EPPICH:  Object to form and
6  characterization.
7        BY MR. LANIER:
8    Q.   Especially absent a subpoena?
9        MS. McCLURE:  Form.
10       MR. EPPICH:  Object to form.
11       THE WITNESS:  Yeah.  I -- I don't
12  know -- most of that I've never even heard of.
13  So I didn't -- no.  We wouldn't have access to
14  it.
15       BY MR. LANIER:
16   Q.   All right.  Next subject.
17       You got asked a ton about the
18  Controlled Substances Act and what it
19  specifically says and what it doesn't
20  specifically say.
21       Do you remember those questions?
22   A.   Yes, sir.
23   Q.   And you pointed out and the lawyer
24  pointed out that the red flags you and I
25  discussed are not specified in the statute.

Page 643

1        You remember that?
2    A.   Yes, sir.
3    Q.   Okay.  But does the Act mandate that
4  registrants have effective controls against
5  diversion?
6        Is that there?
7    A.   Yes.  It's part of --
8        MS. McCLURE:  Form.
9        THE WITNESS:  It's part of the
10  registration process.  It's in 823.  And it's
11  also in 1301 in the regulations.
12       BY MR. LANIER:
13   Q.   And did the DEA give guidance on
14  what due diligence would be in that regard?
15   A.   Yes.  During the meetings and the
16  subsequent letters, yes.
17   Q.   Did -- in other words, over and over
18  again?
19       MR. EPPICH:  Objection.  Leading.
20  Form.
21       THE WITNESS:  Yes.
22       BY MR. LANIER:
23   Q.   Now, do -- does the DEA at any point
24  approve of lawyers trying to read loopholes
25  into the law and trying to figure out if

Page 644

1  something's not said exactly the right way,
2  they can figure out a way to get away with
3  something?
4        Is that the joint approach you all
5  were envisioning in dealing with this narcotic
6  epidemic in America?
7        MR. EPPICH:  Objection.  Form.
8  Leading.  Argumentative.
9        MR. BENNETT:  Objection.  Form.
10       THE WITNESS:  We were just trying to
11  make sure that they comply with the Act,
12  maintain effective controls against diversion,
13  so we could limit the amount of people that are
14  harmed by these drugs.
15       BY MR. LANIER:
16   Q.   Related question:  You were asked
17  the DEA could have done better with oversight.
18       Do you remember that?
19   A.   Yes.
20   Q.   And we got video clips and all the
21  rest of the stuff.
22       Do you remember my analogy about
23  driving through a school zone speeding?
24   A.   Yes, sir.
25   Q.   If a police officer could have

71 (Pages 641 - 644)

Page 645

1  written more tickets for speeding than the
2  police officer did, does that excuse someone
3  who speeds, in your mind?
4         MR. EPPICH:  Objection.  Incomplete
5  hypothetical.
6         THE WITNESS:  No.  Based on -- based
7  on your previous scenario, no.
8         BY MR. LANIER:
9    Q.   So if a speeder hits a pedestrian,
10  would you ever accept from the speeder the idea
11  of, "Hey, don't blame me for speeding.  The
12  cops didn't ever write me a ticket"?
13         MR. EPPICH:  Objection.  Leading.  A
14  statement is written on the document.
15         THE WITNESS:  No.
16         BY MR. LANIER:
17    Q.   And -- and as to the specific
18  language, did it say A, B or C?
19         This is my daughter.  It's Rachel.
20    A.   Oh, hi.
21    Q.   She's a lawyer too.
22    A.   I've got a Rachel too.
23    Q.   Do you?
24    A.   Yeah.
25    Q.   Well, I got four daughters but only

Page 646

1  one Rachel.
2         If I tell my daughters, back when
3  they were much younger and lived at home and
4  cared what I said in -- in these regards, if I
5  said, "Clean your room, please," do you think I
6  need to specify "pick up your clothes" as part
7  of that?
8         MR. EPPICH:  Object.  To the
9  hypothetical.
10         MR. O'CONNOR:  Objection.
11         MR. EPPICH:  Vague.  Form.
12         THE WITNESS:  No.  No.
13         BY MR. LANIER:
14    Q.   Well, I started to do it this way:
15  If someone says "Don't murder," does the word
16  "kill" have to appear?
17         MR. EPPICH:  Objection.
18         THE WITNESS:  No.
19         BY MR. LANIER:
20    Q.   Someone says "Don't steal," do you
21  have to put in there "from a supermarket"?
22    A.   No.
23    Q.   Someone says "Don't trespass on the
24  property," do you have to put "wearing tennis
25  shoes"?

Page 647

1    A.   No.
2    Q.   Next, you got asked:  "Well, you
3  never instructed the companies to keep their
4  files."
5         Do you remember that?
6    A.   Yes, sir.
7    Q.   Would old files be important in
8  monitoring -- in your ongoing monitoring?
9         Would bit important that a company
10  keep their files so that they can look back at
11  them?
12         MR. EPPICH:  Object to form.
13  Leading.  And vague.
14         THE WITNESS:  Absolutely.  That's
15  the -- the whole idea behind maintaining a due
16  diligence file is you have a history of
17  purchases.  That way you could see what they're
18  doing and where they're going with their
19  purchases.
20         BY MR. LANIER:
21    Q.   So more to the point for me, I want
22  to ask it this way:  Did you ever tell a
23  company to destroy their records?
24    A.   No.
25    Q.   Did you know that the company's knew

Page 648

1  that they were supposed to keep their records?
2         MS. McCLURE:  Objection to form.
3         MR. EPPICH:  Objection.  Calls for
4  speculation.
5         MR. LANIER:  Let's don't speculate.
6  Let's make it real clear.
7         I want to show you Exhibit No. 16.
8         (Deposition Exhibit 16 was marked
9  for identification.)
10         BY MR. LANIER:
11    Q.   Do you have Exhibit 16 in front of
12  you?
13    A.   Yes, sir.
14    Q.   Exhibit 16 are industry compliance
15  guidelines.  These are put out by the HDMA.
16         You ever heard of those folks?
17    A.   Yeah.  Healthcare Distribution
18  Management Association.
19    Q.   Yeah.
20         That's the one -- these companies
21  join together, and they fund this as their --
22  their group effort.
23         You with me?
24    A.   Yes.
25         MR. EPPICH:  Objection.  Form.

72 (Pages 645 - 648)

Page 649

1  Characterization.
2       BY MR. LANIER:
3       Q.   So this is something that you'll
4  find a lot of the opioid companies and
5  distributors were members of, and it
6  specifically talks about some of these issues.
7       If you'll look at the front page --
8       MR. EPPICH:  Object to form.
9  Narrative.
10      MR. O'CONNOR:  Object to form.
11      BY MR. LANIER:
12      Q.   -- it specifically says -- and this
13 is 2008, so that you got a -- and the jury's
14 got a date on this.
15      You with me?
16      A.   Yes, sir.
17      Q.   2008.
18      This says:  "Reporting suspicious
19 orders and preventing diversion have been
20 developed as part of the members distributors
21 ongoing commitment to safe and efficient
22 distribution of prescription medicines,
23 including controlled substance."
24      You see that?
25      MR. EPPICH:  Objection.  Foundation.

Page 650

1       THE WITNESS:  Yes.
2       BY MR. LANIER:
3       Q.   And it doesn't blame the DEA.  It
4  says:  "At the center of a sophisticated supply
5  chain, distributors are uniquely situated to
6  perform due diligence" --
7       MR. EPPICH:  Objection.
8       BY MR. LANIER:
9       Q.   -- "in order to help support the
10 security of the controlled substances."
11      Do you see where I read that?
12      MR. EPPICH:  Objection.
13      THE WITNESS:  Yes, sir.
14      BY MR. LANIER:
15      Q.   Do you agree with that?
16      MR. EPPICH:  Objection.  Foundation.
17      BY MR. LANIER:
18      Q.   Do you agree with that, sir?
19      MR. EPPICH:  Scope.
20      BY MR. LANIER:
21      A.   As I've testified before, the
22 distributors know their customers.  They're the
23 ones that can make that determination --
24      BY MR. LANIER:
25      Q.   And --

Page 651

1       A.   -- of performing due diligence.
2       Q.   In that regard, if you'll look at
3  Page 11, the companies themselves, in their
4  trade association, specify under Documentation:
5  "All investigations should be fully documented,
6  and all records of the investigation should be
7  retained in an appropriate location within the
8  firm."
9       Do you see that?
10      MR. EPPICH:  Object to form.
11 Foundation.
12      MR. STEPHENS:  Object to form.
13      THE WITNESS:  Yes, sir.
14      BY MR. LANIER:
15      Q.   So before the lawyer ask you in
16 front of the jury, "Did you ever tell them they
17 had to keep their records?" did the lawyer
18 inform you that the trade association had
19 already made it abundantly clear going back
20 2008?
21      MR. EPPICH:  Objection form.
22 Misstates facts.
23      THE WITNESS:  No.
24      MR. LANIER:  By the same token, if
25 we want to go back further than that, we can go

Page 652

1  back to the predecessor trade association.
2       And we'll mark this as Exhibit No.
3  17.
4       (Deposition Exhibit 17 was marked
5  for identification.)
6       BY MR. LANIER:
7       Q.   So here is Exhibit No. 17.  And this
8  is the suspicious -- it's upside down --
9  monitoring system for the NWDA, and that is the
10 pharma trade association.
11      You know about that?
12      A.   I think they were the --
13      MR. EPPICH:  Objection.
14      MS. McCLURE:  Form.
15      BY MR. LANIER:
16      Q.   You think they were what?
17      A.   I think they were the organization
18 before HDMA and had.
19      Q.   Exactly.
20      A.   Yes.
21      Q.   And if we look at what they had to
22 say, they specifically give the detail on Page
23 7.
24      "Single suspicious orders.  Single
25 orders of unusual size or deviation must be

73 (Pages 649 - 652)

Page 653

1  reported immediately.  The submission of a
2  monthly printout of after-the-fact sales will
3  not relieve a registrant from the
4  responsibility of reporting these single
5  excessive or suspicious orders.  DEA has
6  interpreted 'orders' to mean prior to
7  shipment."
8       Do you see that?
9  A.  Yes.
10       MR. EPPICH:  Object.  Form.
11  Foundation.
12       BY MR. LANIER:
13  Q.   And this is -- the date on this,
14  they knew about this in 1984 and 1993.
15       MR. EPPICH:  Objection.  Form.
16       MS. McCLURE:  Foundation.
17       BY MR. LANIER:
18  Q.  Did you know that was known by them
19  way back then?
20       MR. EPPICH:  Objection to form.
21  Assumes facts.
22       THE WITNESS:  This is the first time
23  I've seen this document.
24       BY MR. LANIER:
25  Q.   If they'd lived up to that, your

Page 654

1  world would have been a different world,
2  wouldn't it?
3       MR. EPPICH:  Objection.  Form.  And
4  argumentative.
5       THE WITNESS:  Okay.
6       BY MR. LANIER:
7  Q.   Next.  The Cardinal lawyer asked you
8  about the objectives of the DEA after you left
9  and did they make an objective to try to
10  communicate more and things of that nature.
11       Recall that?
12  A.  Yes, sir.
13  Q.   And that's the Cardinal lawyer.  She
14  represented Cardinal.
15       You understand?
16       MS. MAINIGI:  Objection.
17       MR. LANIER:  I'm going to hand you
18  the Cardinal -- after you left -- agreement to
19  settle as marked as Exhibit No. 8 so we can see
20  with precision what was done after you left
21  with Cardinal Health.
22       This is Exhibit No. 18.
23       (Deposition Exhibit 18 was marked
24  for identification.)
25       BY MR. LANIER:

Page 655

1  Q.   Do you have that in front of you?
2  A.   Yes.
3       MS. MAINIGI:  Objection.  Scope.
4  Objection form.
5       BY MR. LANIER:
6  Q.   Well, this is actually -- this is
7  the 2000 -- let's make sure I've got the right
8  one.
9       This is the 2008 when you were
10  there, isn't it?
11  A.   Yes, sir.
12       MR. LANIER:  All right.  Let me go
13  to the next one.
14       Here's the 2012 one.  We'll mark it
15  as Exhibit 18.  I gave you the wrong one.  And
16  I will fix that.
17       (Deposition Exhibit 18 was remarked
18  for identification.)
19       BY MR. LANIER:
20  Q.   Exhibit 18.  This is Cardinal.
21       You have Exhibit 18 in front of you?
22  A.   Yes, sir.
23       MS. MAINIGI:  Objection.
24       BY MR. LANIER:
25  Q.   Cardinal knew before you ever

Page 656

1  left -- because you'll look at the date on this
2  one, 2012.
3       It's while you were there, right?
4  A.   Yes, sir.
5  Q.   Cardinal knew before you left.  They
6  acknowledged and agreed the obligations
7  undertaken in this agreement don't fulfill the
8  totality of its obligations to maintain
9  effective controls against diversion.
10       They already knew that, didn't they?
11       MS. MAINIGI:  Objection.  Form.
12  Foundation.  Scope.
13       THE WITNESS:  Yes, sir.
14       BY MR. LANIER:
15  Q.   They already knew and pledged that
16  they would try to enhance their existing
17  processes and practices for conducting due
18  diligence reviews.
19       MS. MAINIGI:  Objection.
20       BY MR. LANIER:
21  Q.   Already done, right?
22       MS. MAINIGI:  Objection.  Form.
23  Foundation.  Scope.
24       THE WITNESS:  Yes, sir.
25       BY MR. LANIER:

74 (Pages 653 - 656)

Page 657

1    Q.   They already agreed to a continued
2  suspension of their authority to handle
3  controlled substances at Lakeland until May of
4  2014 so long as they meet the provisions of
5  what this agreement said.
6        Fair?
7        MS. MAINIGI: Objection.  Form.
8  Foundation.  Scope.
9        THE WITNESS:  Yes, sir.
10        BY MR. LANIER:
11    Q.   Did they seem to have any
12  communication problem with you in regard to
13  that?
14        MS. MAINIGI: Objection.  Form.
15  Foundation.  Scope.
16        THE WITNESS:  No.
17        BY MR. LANIER:
18    Q.   Next subject.
19        You were asked question about Mr.
20  Rosenberg's testimony, and he said that there
21  were 1.6 million registrants, and 90-some-odd
22  percent seemed to have no trouble complying.
23    A.   Yes.
24    Q.   You understand, at this point in
25  this case for these counties, we got 23 out of

Page 658

1  1.6 million that are defendants in this case?
2    A.   Yes, sir.
3    Q.   I mean that 1.6 million is every
4  doctor that can write a prescription for
5  opioids; every hospital that can give them to a
6  patient; every pharmacy, whether they follow
7  the law or not.
8        Fair?
9    A.   Yes, sir.
10    Q.   And so out of that, you've got to
11  sort the good apples from the bad apples.
12        Fair?
13    A.   Yes, sir.
14    Q.   And just because most people do it
15  right, has that ever been an excuse for those
16  who do it wrong?
17        MS. MAINIGI: Objection.  Scope.
18  Form.
19        MR. EPPICH: Objection.  Form.
20        THE WITNESS:  No, sir.
21        BY MR. LANIER:
22    Q.   Just because they say, "But most of
23  the people don't have the problems we have,"
24  have you ever found that to be an adequate
25  reason for companies to break the law?

Page 659

1        MR. EPPICH:  Object to form.
2        MS. MAINIGI: Objection.
3        THE WITNESS:  No, sir.
4        BY MR. LANIER:
5    Q.   Next subject.
6        She asked you about the GAO report
7  in 2015.
8        Do you remember those questions?
9    A.   Yes, sir.
10    Q.   And she suggested to you -- and that
11  was Exhibit 11.  It's the GAO report.
12        She suggested to you that the GAO
13  report says that the DEA is not communicating
14  with enough registrants.
15        I wrote it down.  That's what she
16  told you was the -- a takeaway from the report.
17        Do you remember her saying that?
18    A.   Yes.
19        MS. MAINIGI: Objection.
20        BY MR. LANIER:
21    Q.   I've actually got it to show the
22  jury instead of talk about it.
23        Here's what it says on Page I in the
24  table of contents.  It says: "Registrants vary
25  in extent of interaction with DEA and awareness

Page 660

1  of DEA resources.  And while generally
2  satisfied, some want additional information."
3        MR. BENNETT: Objection.  Scope.
4        BY MR. LANIER:
5    Q.   Do you see that?
6        MR. BENNETT: Objection.  Scope.
7  This is beyond the authorization for him to
8  talk about the GAO report.
9        May I have a continuing objection to
10  all your GAO report --
11        MR. LANIER: Yes.
12        MR. BENNETT: -- questions?
13        Thank you, sir.
14        BY MR. LANIER:
15    Q.   Do you see that, sir?
16        MR. EPPICH:  Object to the
17  foundation.
18        MS. MAINIGI: Form.
19        THE WITNESS:  Yes.
20        BY MR. LANIER:
21    Q.   I mean that doesn't say that the
22  DEA's not communicating enough with registrants
23  as a takeaway.  It says: "Generally people are
24  satisfied, but some want additional
25  information."

75 (Pages 657 - 660)

Page 661

1    Fair?
2       MR. EPPICH:  Object to the form.
3       THE WITNESS:  Yes, sir.
4       BY MR. LANIER:
5    Q.   By the same token, the same report
6    that she talked about but didn't show on Page 1
7    says that:  "The Center For Disease Control and
8    Prevention has declared the U.S. is in the
9    midst of an epidemic of prescription overdose
10   deaths.  In 2013 more than 22,000 Americans
11   died from drug overdose as attributable to
12   prescription drugs, and most of those deaths,
13   more than 16,000, were attributed to
14   prescription opioid pain relievers."
15          Is that consistent with the
16   testimony you gave?
17          MR. O'CONNOR:  Objection.
18          MR. EPPICH:  Objection.  Form.
19          THE WITNESS:  Yes, sir.
20          BY MR. LANIER:
21   Q.   It said:  "One study estimated that
22   the opioid pain" reliver -- "reliever abuse
23   cost health" insurance -- "insurers alone" --
24   this is just the health insurers.  Doesn't
25   count police, county and city, first responders

Page 662

1    and all the other -- child care and -- and all
2    the other expenses associated.  It's only
3    health insurers alone.
4          You follow me?
5    A.   Yes, sir.
6          MR. EPPICH:  Objection to form.
7          MR. O'CONNOR:  Objection.  Form.
8          BY MR. LANIER:
9    Q.   Up to 72.5 --
10         MS. McCLURE:  Objection.  Narrative.
11   Commentary.
12         BY MR. LANIER:
13   Q.   Up to 72.5 billion per year.  Per
14   year.
15         Sir, was this a good enough -- a big
16   enough problem to where you were willing to put
17   your reputation on the line to try and do
18   something about it?
19         MR. EPPICH:  Object to form.  Vague.
20         THE WITNESS:  Yes.
21         BY MR. LANIER:
22   Q.   Next subject.
23         So another one of the lawyers for
24   the companies put up some of my roadmaps and my
25   notes and tried to do some fixes to those.

Page 663

1          Do you remember that?
2    A.   Yes, sir.
3    Q.   And I don't see where their fixes
4    are.
5          MR. EPPICH:  Are you looking for
6    the original?  Exhibit 13.
7          MR. LANIER:  Exhibit 13?  Thank you.
8          MR. EPPICH:  If you're going to make
9    a -- mark this Exhibit 13, can we make a quick
10   copy?
11         MR. LANIER:  No.  We don't have time
12   for that.  I've got a better solution.  Thank
13   you though.  I won't destroy your records.
14         BY MR. LANIER:
15   Q.   Let's take the first one that he
16   marked up.  He marked up this one where he
17   didn't like the idea that I said people say,
18   "Get me opioids to sell," because he said,
19   "They're not people.  They're doctors."  And --
20         MR. EPPICH:  Objection.  Misstates.
21         BY MR. LANIER:
22   Q.   -- and hospitals.
23         MR. EPPICH:  Objection.  Misstates.
24         MR. LANIER:  I don't think I'm
25   misstating, but -- but we'll look at it.

Page 664

1          BY MR. LANIER:
2    Q.   So here's what he says.  He says:
3    "They're not people.  They're doctors,
4    hospitals and pharmacists."
5          You see that?
6    A.   Yes, sir.
7    Q.   How many pharmacists are people?
8          MR. EPPICH:  Objection.
9          THE WITNESS:  Every one that I know
10   is a people -- is a person.
11         BY MR. LANIER:
12   Q.   How many doctors are people?
13   A.   Every one that it know is a person.
14   Q.   How many hospitals, not the building
15   itself but the folks that make it a hospital
16   instead of a zoo, how many of those folks
17   inside the hospital are people?
18   A.   All the patient caregivers are
19   people.
20   Q.   So I may have drawn a person instead
21   of a doctor or a hospital full of people or a
22   pharmacy full of people, but the bottom line
23   doesn't change anything you and I talked about.
24   And that is you got to deal with suspicious
25   orders when they happen; you can't wait six,

76 (Pages 661 - 664)

Page 665

1   eight months later.
2         Fair?
3         MR. EPPICH:  Objection to form.
4   Mischaracterization.
5         MS. McCLURE:  Misstates prior
6   testimony.
7         MR. EPPICH:  Leading.
8         THE WITNESS:  Yes, sir.
9         BY MR. LANIER:
10   Q.   All right.  The other roadmap that
11   he took issue with was this one right here.
12   It's the definitions.
13         Remember that one?
14   A.   Yes, sir.
15   Q.   All right.  Let's put his in -- in a
16   sleeve so I can write on it.
17         He said:  "Wait.  There were five
18   categories of controlled substance, and I only
19   wrote two of them."
20   A.   Yes, sir.
21   Q.   He -- and he wrote a third.
22         But you had already said there were
23   five; I was just asking you about these two; is
24   that fair?
25   A.   Yes, sir.

Page 666

1   Q.   Were you playing hide the ball with
2   the other ones?
3         MR. EPPICH:  Objection.
4         THE WITNESS:  No, sir.
5         BY MR. LANIER:
6   Q.   So No. 3, less risk of physical and
7   psychological dependency then a No. 2, does
8   that mean no risk?
9   A.   No.
10   Q.   So there's still risk?
11   A.   Yes.
12   Q.   And Hydrocodone was there until
13   2014.
14         Where did it get moved to?
15   A.   Schedule II.
16   Q.   Why?
17   A.   Because --
18         MR. STEPHENS:  Objection.
19         THE WITNESS:  Based on the HHS, FDA
20   and DEA analysis of the drug, it met the
21   criteria of a Schedule II controlled substance
22   rather than a Schedule III controlled
23   substance.  It was misplaced in Schedule III.
24         BY MR. LANIER:
25   Q.   High risk of physical psych -- psych

Page 667

1   -- physiological dependence?
2   A.   Yes.
3   Q.   All right.  Thank you.
4         Next subject.
5         There was some implication that
6   perhaps you've been stashing away some
7   documents in your house.
8         MR. EPPICH:  Objection to the
9   narrative.
10         BY MR. LANIER:
11   Q.   Do you remember those questions?
12   A.   Yes, sir.
13   Q.   Have you been stashing away some
14   documents that you illegally took out of DEA at
15   your house?
16   A.   No --
17         MR. EPPICH:  Objection to the
18   narrative.  And misstates.
19         THE WITNESS:  No, sir.
20         BY MR. LANIER:
21   Q.   If there's any suggestion made to
22   the jury that the lawyers for the industry want
23   to taint you with the idea that you've secretly
24   taken documents home you weren't allowed to,
25   has that ever happened to you?

Page 668

1         MR. EPPICH:  Object to form and the
2   narrative.
3         THE WITNESS:  I've never taken
4   documents home.  I've -- I've worked on
5   documents at home.  I've worked on documents
6   that were transmitted to me at my -- but I've
7   never held them for some nefarious reason.
8         BY MR. LANIER:
9   Q.   So you go home, and you work in the
10   late hours on these documents.
11         Do you get paid overtime for that?
12   A.   No.
13         MR. EPPICH:  Objection.  Leading.
14         BY MR. LANIER:
15   Q.   As a government worker that we're
16   paying with our tax dollars to help keep our
17   country safe, you were working at home some
18   without getting paid overtime?
19         MR. EPPICH:  Objection.
20         THE WITNESS:  Yes.  And on the
21   weekends too.
22         BY MR. LANIER:
23   Q.   Thank you.
24         Next.
25         Did you ever divulge any of these

77 (Pages 665 - 668)

Page 669

1  DEA documents to anyone?
2  A.  No.
3  Q.  The log that we were shown is what's
4  called a privilege log.
5  Do you know what that is?
6  A.  I believe it's a log that the
7  department keeps in order to explain why
8  they're not going to release a document.
9  Q.  Yeah.  In other words, that is we're
10  not giving them out, at least in their
11  entirety, right?
12  A.  Yes, sir.
13  Q.  Now, if the McKesson lawyer wants
14  those documents that the government has told
15  you, your ex-employer told you are not to be
16  given out, are you going to voluntarily give
17  them to the McKesson lawyer just because
18  they're begging you for them?
19  MR. EPPICH:  Object to the form.
20  And misstates the testimony.
21  THE WITNESS:  No.
22  BY MR. LANIER:
23  Q.  Are you going to continue to
24  withhold those documents the way the government
25  says should be done for the national interest

Page 670

1  for our safety, health and welfare in America?
2  MR. EPPICH:  Object to the form.
3  THE WITNESS:  Absolutely.
4  BY MR. LANIER:
5  Q.  Thank you, sir.
6  Next subject.  No.  Let's stay on
7  that subject for a moment.
8  So you had mentioned before -- this
9  is still on documents from the DEA.
10  You had mentioned before that some
11  DEA folks went to work for industry, right?
12  A.  Yes, sir.
13  Q.  I think one example is Linden
14  Barber.
15  Do you know Linden Barber?
16  A.  Yes, sir.
17  MR. LANIER:  Want to see how much
18  time I got.  Hold on.  I have 12 minutes?  I
19  have time to burn.
20  BY MR. LANIER:
21  Q.  Did anybody from the pharma or did
22  you ever know whether or not any of those
23  ex-DEA folks who went to work for the companies
24  have their own sets of documents they took from
25  the DEA?

Page 671

1  MR. EPPICH:  Objection to form.
2  Calls for speculation.
3  MS. MAINIGI:  Scope.
4  THE WITNESS:  I have no idea.
5  BY MR. LANIER:
6  Q.  Do you know if Linden Barber may
7  have taken any?
8  MR. EPPICH:  Objection.
9  MS. MAINIGI:  Objection.  Form.
10  Scope.
11  THE WITNESS:  I have no idea.
12  MR. LANIER:  We've got a chance to
13  listen to Linden Barber.
14  (Deposition Exhibit 19 was marked
15  for identification.)
16  BY MR. LANIER:
17  Q.  Let me show you a document that
18  we'll mark as Exhibit No. 20, which is a
19  document he prepared -- or 19.  Excuse me.
20  Exhibit 19.
21  This is one he prepared when he was
22  still working for the DEA before he went to
23  work for industry.
24  MR. BENNETT:  Objection.  Counsel,
25  I'm not sure if you're aware of this, but the

Page 672

1  Department of Justice is seeking to claw this
2  document back, is my understanding.
3  I believe that this document is
4  privileged, contains attorney-client privileged
5  communications.
6  And so we intend to -- we are still
7  tracking down how Cardinal Health got this
8  document.  But we are intending to claw this
9  document back.  And so I do not believe this
10  witness can answer any questions regarding this
11  document.
12  MR. LANIER:  This was now attached
13  to the Walgreens expert report.  So this
14  thing's like all over the place.
15  MR. BENNETT:  I understand the
16  problem.
17  MR. LANIER:  So will you be
18  instructing him not to answer?  And do I have a
19  right to appeal on that or...
20  MR. BENNETT:  It will depend on what
21  your question is.
22  MR. LANIER:  Okay.  I don't think
23  it's a bad one.
24  MR. BENNETT:  However, I will say,
25  if we claw it back, we will ask this portion of

78 (Pages 669 - 672)

1  the transcript be redacted.
2      MR. LANIER:  Deal.  Deal.  And then
3  we don't have to retake a depo if I wind up
4  getting...
5      MR. BENNETT:  I'd objection.
6      BY MR. LANIER:
7   Q.   All right.  So --
8      MR. BENNETT:  And again, I don't
9  want this information shared.
10      MS. MAINIGI:  Mr. Bennett, we would
11  have an ongoing objection to that line of
12  questioning.
13      MR. BENNETT:  And I have an object
14  to this being used at all.  If you want to ask
15  him if he knows whether this was taken or not,
16  I would let him answer that question "yes" or
17  "no."  To the extent that you're showing any of
18  the contents of this document, we would object
19  to it.
20      MR. LANIER:  Object.  But will you
21  instruct him not to answer, or can I still ask?
22  I don't know what the rules are.
23      MR. BENNETT:  I don't know the
24  questions that you're going to ask.
25      SPECIAL MASTER COHEN:  You got ask

1  and see what happens.
2      MR. LANIER:  All right.
3      BY MR. LANIER:
4   Q.   Sir, did Linden Barber know and
5  report -- I guess I shouldn't show it yet --
6  that investigations of wholesale distributors
7  have revealed that many of the distributors are
8  not filing suspicious order reports?
9      MS. MAINIGI:  Objection.  Scope.
10  Objection.  Foundation.  Form.
11      MR. EPPICH:  Objection.
12      THE WITNESS:  I -- Linden Barber --
13      MR. BENNETT:  Hold on.  Hold on.
14      THE WITNESS:  Okay.  Sorry.
15      MR. BENNETT:  You can answer within
16  your personal knowledge "yes" or "no," if you
17  know.
18      THE WITNESS:  Could you repeat the
19  question.  I want to make sure I got it right.
20      BY MR. LANIER:
21   Q.   Yes, sir.  And I'm basing it on the
22  first sentence.
23      "Investigation of wholesale
24  distributors have revealed many distributors
25  are not filing suspicious order report."

1      Did you, on your personal knowledge,
2  know that to be true?
3   A.   Yes.
4   Q.   The second paragraph, it says:
5  "While it's appropriate" -- and this is the
6  second sentence.
7      "While it's appropriate for a
8  diversion investigator to provide guidance to
9  registrants with respect to their suspicious
10  order reporting system, it remains the sole
11  responsibility of the registrant to design and
12  operate such a system."
13      Do you agree with that assessment?
14      MR. BENNETT:  You may answer that
15  question.
16      MS. MAINIGI:  Objection.  Form.
17  Foundation.
18      THE WITNESS:  Yes.
19      BY MR. LANIER:
20   Q.   And do you know whether or not
21  Linden Barber took that knowledge with him when
22  he went to work for the distributor that he
23  went the work for?
24   A.   I don't know if he took --
25      MS. MAINIGI:  Objection.  Form.

1  Foundation.  Scope.
2      THE WITNESS:  I mean he knew what
3  was going on with the distributors not filing
4  suspicious orders.  I -- I don't know what he
5  took, what he didn't take.
6      BY MR. LANIER:
7   Q.   All right.  Next subject.
8      The Walmart lawyer went last, and he
9  started asking you some hypotheticals about
10  Distributor A and Distributor B.  And I'm not
11  sure I followed it, but I think I did.
12      You with me?
13   A.   Yes, sir.
14   Q.   I want to ask you some questions.
15      He basically got you to say, if
16  Distributor A or B is doing something wrong but
17  the other distributor is not, would you impute
18  from one to the other.
19      Do you remember all of that talk?
20   A.   Yes, sir.
21   Q.   Here's my question:  Would it matter
22  to you if the two had conspired to work
23  together by joining the same hospital
24  association or -- or healthcare association
25  or -- or working together in some way to

Page 677

1 further a plan?
2 Would that matter?
3 MR. STEPHENS:  Object to form.
4 Calls for legal conclusion.
5 THE WITNESS:  If --
6 MR. STEPHENS:  Foundation.
7 MR. BENNETT:  And I'll object to
8 scope.
9 You can answer.
10 THE WITNESS:  Yes, it did -- it does
11 matter.
12 BY MR. LANIER:
13 Q.  I mean you -- he kept saying would
14 you hold Distributor B if it was Distributor A
15 and you kept saying, "Give me more data.  Give
16 me more data.  Give me more data."
17 I'm giving you more data.
18 If they're in a conspiracy, does
19 that make a difference?
20 A.  Yes, it does.
21 MS. MAINIGI:  Objection.
22 BY MR. LANIER:
23 Q.  Does it matter if they're both
24 supplying excessive opioid?
25 A.  Yes.

Page 678

1 MS. MAINIGI:  Objection.
2 BY MR. LANIER:
3 Q.  Does it matter if you've got two
4 distributors that are supplying to the same
5 retailer, and both of them know that the other
6 one's supplying as well when they're trying to
7 figure out orders of unusual size?
8 MR. STEPHENS:  Objection.  Form.
9 MS. MAINIGI:  Objection.
10 THE WITNESS:  Yes.
11 BY MR. LANIER:
12 Q.  All right.  Next subject.
13 You got asked, if the DEA waited a
14 year to file.
15 Do you remember?
16 A.  Yes, sir.
17 I think this is --
18 Q.  And there --
19 A.  -- supposed to be ISOs.
20 Q.  ISOs not ASO.
21 And in that regard, there was
22 evidently, at least in one circumstance, a
23 delay of one year suspension orders for
24 investigation purposes.
25 Do you remember that?

Page 679

1 He showed it to you in the exhibit?
2 A.  It's -- yes.  It's what -- it's what
3 Patterson testified to.
4 Q.  What he left out when he showed you
5 that is this paragraph in the middle.  It says:
6 "I understand that their desire in a lot of
7 these cases is to be able to get
8 contemporaneous evidence, use undercover as
9 opposed to having to use witnesses that have
10 come in that may not have the best of
11 backgrounds."
12 Do you see that?
13 A.  Yes, sir.
14 Q.  Did you all have undercover agents?
15 Or was that FBI agents?  Or who had the
16 undercover agents?
17 MR. O'CONNOR:  Objection.
18 MR. BENNETT:  Objection.  Scope.
19 I'll remind you that you cannot
20 disclose confidential law enforcement
21 investigative techniques, the effectiveness of
22 which would be impaired.
23 You are authorized to answer that
24 question "yes" or "no" only.
25 THE WITNESS:  So the -- the question

Page 680

1 is --
2 BY MR. LANIER:
3 Q.  Is did you all have undercover
4 operatives?
5 A.  Yes.
6 Q.  Okay.  Then maybe you can answer
7 this one too:  Do you wanted to rat out your
8 undercover ops?
9 A.  You'd disclose their -- no.
10 Q.  All right.  And if the company is
11 not doing something illegal, this problem never
12 arises.
13 Fair?
14 MR. EPPICH:  Objection.  Form.
15 MS. MAINIGI:  Objection.
16 BY MR. LANIER:
17 Q.  Or if a registrant's not.  Let me
18 put it that way.
19 MR. EPPICH:  Objection.  Form.
20 Vague.
21 THE WITNESS:  Yes, sir.
22 MS. MAINIGI:  Objection.
23 MR. LANIER:  All right.  I think I'm
24 out of time as well.
25 I thank you very much, Mr.

80 (Pages 677 - 680)

Page 681

1 Rannazzisi. It has been a pleasure to get to
2 know you.
3         THE WITNESS: Thank you.
4         THE VIDEOGRAPHER: This concludes
5 today's deposition.
6         Going off record.
7         Time is 4:22.
8         (Whereupon, the deposition was
9 concluded at 4:22 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 682

1         CERTIFICATE OF NOTARY PUBLIC
2         I, Bonnie L. Russo, the officer before
3 whom the foregoing deposition was taken, do
4 hereby certify that the witness whose testimony
5 appears in the foregoing deposition was duly
6 sworn by me; that the testimony of said witness
7 was taken by me in shorthand and thereafter
8 reduced to computerized transcription under my
9 direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.
18
19         _Bonnie L. Russo_
20         Notary Public in and for
21         the District of Columbia
22
23 My Commission expires: June 30, 2020
24
25

Page 683

1                 Veritext Legal Solutions
                      1100 Superior Ave
2                        Suite 1820
                    Cleveland, Ohio 44114
3                  Phone: 216-523-1313
4
  May 20, 2019
5
  To: Gregory Utter, Esq.
6
  Case Name: In Re: National Prescription Opiate Litigation
7
  Veritext Reference Number: 3301884
8
  Witness: Joseph Rannazzisi     Deposition Date: 5/15/2019
9
10 Dear Sir/Madam:
11
  Enclosed please find a deposition transcript. Please have the witness
12
  review the transcript and note any changes or corrections on the
13
  included errata sheet, indicating the page, line number, change, and
14
  the reason for the change. Have the witness' signature notarized and
15
  forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
  If the errata is not returned within thirty days of your receipt of
19
  this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 684

1                 DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2
  ASSIGNMENT REFERENCE NO: 3301884
3 CASE NAME: In Re: National Prescription Opiate Litigation
  DATE OF DEPOSITION: 5/15/2019
4 WITNESS' NAME: Joseph Rannazzisi
5     In accordance with the Rules of Civil
  Procedure, I have read the entire transcript of
6 my testimony or it has been read to me.
7     I have made no changes to the testimony
  as transcribed by the court reporter.
8
  _____
9 Date          Joseph Rannazzisi
10    Sworn to and subscribed before me, a
  Notary Public in and for the State and County,
11 the referenced witness did personally appear
  and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed.
15
  I have affixed my name and official seal
16
  this _____ day of_____, 20____.
17
18    _____
      Notary Public
19    _____
      Commission Expiration Date
20
21
22
23
24
25

81 (Pages 681 - 684)

Page 685

```
 1        DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 3301884
 3   CASE NAME: In Re: National Prescription Opiate Litigation
         DATE OF DEPOSITION: 5/15/2019
 4   WITNESS' NAME: Joseph Rannazzisi
 5        In accordance with the Rules of Civil
         Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have listed my changes on the attached
         Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9        I request that these changes be entered
         as part of the record of my testimony.
10
             I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
         that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____
         Date            Joseph Rannazzisi
14
             Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
         the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
             They have listed all of their corrections
18       in the appended Errata Sheet;
             They signed the foregoing Sworn
19       Statement; and
             Their execution of this Statement is of
20       their free act and deed.
21   I have affixed my name and official seal
22   this _____ day of _____, 20____.
23   _____
             Notary Public
24
25       Commission Expiration Date
```

Page 686

```
 1        ERRATA SHEET
             VERITEXT LEGAL SOLUTIONS MIDWEST
 2            ASSIGNMENT NO: 3301884
 3   PAGE/LINE(S) /      CHANGE     /REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____   _____
20   Date            Joseph Rannazzisi
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
             Notary Public
24
25       Commission Expiration Date
```

Veritext Legal Solutions

**[& - 2005]** Page 1

| **&** |
| --- |
| **&**   365:8 366:4 |
| 368:2,3,20 369:3,6 |
| 369:11 370:8,12 |
| 370:16,20 371:3,7 |
| 371:11,20 372:3,8 |

| **0** |
| --- |
| **00010978-979** |
| 374:23 |
| **0007027620-7650** |
| 373:22 |
| **00135203-5210** |
| 374:21 |
| **00869965-0002** |
| 374:19 |
| **02199**   370:22 |
| 371:8 |
| **02467796-7799** |
| 373:11 |
| **04**   390:6,8 |
| **05**   596:21 |
| **06**   488:21 |
| **07**   472:2 488:21 |

| **1** |
| --- |
| **1**   373:10 428:18,20 |
| 428:22 429:2 |
| 433:16 454:17 |
| 462:23 488:10 |
| 597:3 661:6 |
| **1.6**   579:19 580:3 |
| 657:21 658:1,3 |
| **10**   374:2 525:10,11 |
| 532:4 533:2 |
| 550:13 631:13 |
| **10,000**   540:17,22 |
| 541:3,13 549:6,22 |
| 552:10 |
| **10-15-17**   374:12 |
| **100,000**   539:7 |

**1000**   369:19
**10006**   372:4
**1001**   366:21
**10016**   367:19
**10022**   367:11
**10036**   367:24
**101**   442:8
**1095**   367:23
**10:09**   427:10
**10:13**   431:1
**10:15**   431:5
**10th**   365:9
**11**   371:3 374:4
489:17 576:4,7
651:3 659:11
**1100**   368:9 683:1
**111**   371:7 372:4
**112**   367:18
**11747**   366:13
**11937**   682:19
**11:07**   475:11
**11:19**   475:15
**12**   374:6 405:20
453:25 455:1
594:23,24 595:3,5
599:11,11 670:18
**12-27-07**   373:12
**126e**   367:11
**127**   601:1
**128**   594:20 601:1
**12:02**   512:10
**12th**   369:13
**13**   374:7 402:21
453:25 609:23
610:2 663:6,7,9
**13.25**   474:5
**1300**   371:21
**1301**   419:9 533:11
533:12 643:11
**1301.71.**   411:15

**1301.72**   419:6
**1301.74**   374:3
416:25 419:7,7
432:11 433:1
464:22 533:12,23
**1304**   450:11
**14**   374:8 402:21
426:24 520:25
599:21 622:10,18
**1400**   366:5
**142**   598:11
**15**   364:20 374:12
375:6 426:24
475:21 486:8
521:1 620:24
621:23 634:21,23
**150**   482:17
**15219**   369:9
371:12
**15.28.04.**   627:12
**16**   374:13 521:2,7
581:18 648:7,8,11
648:14
**16,000**   426:24
661:13
**17**   364:5,9 374:18
489:22 652:3,4,7
**1701**   369:3
**171**   620:23 621:23
**1717**   370:4
**1755**   368:13
**17th**   368:4
**18**   364:11,13
374:20 598:10
654:22,23 655:15
655:17,20,21
**1800**   369:19
**1820**   683:2
**19**   374:22 671:14
671:19,20

**19103**   369:4 370:5
**1970**   531:21
571:23
**1970s**   432:15
474:13
**1984**   378:10
653:14
**1986**   381:6
**1988**   382:23
**1993**   653:14
**1995**   384:2
**1999**   370:12
379:18
**1:11**   512:24

| **2** |
| --- |
| **2**   373:12 385:3 |
| 408:13 427:9 |
| 463:7,9,12,15 |
| 477:5,18 515:14 |
| 573:10 666:7 |
| **20**   500:2,4 671:18 |
| 683:4 684:16 |
| 685:22 686:22 |
| **20,000**   539:4,12 |
| 551:1,12 |
| **2000**   384:9 387:18 |
| 388:18 393:10 |
| 655:7 |
| **20001**   368:21 |
| 370:9 |
| **20004**   366:21 |
| **20005**   369:14 |
| 370:17 |
| **2001**   388:18,19 |
| **2002**   388:22 |
| **20036**   369:20 |
| **2004**   389:7 514:15 |
| 514:24 |
| **2005**   391:2,7 |
| 424:12 514:15,24 |
| 517:14 519:11 |

[2005 - 4]                                                                 Page 2

520:20 521:11,17
530:21 531:20
532:2 535:20
574:4 595:7 596:7
597:4 599:3,24,25
**2006** 391:8,12
428:7 430:9,16
432:20 433:22
450:25 459:4
462:22 466:25
474:11 478:2
529:23 530:20
555:24 562:10,20
568:23
**2007** 425:14 428:7
474:10 478:3,3
479:9 480:17
529:23 555:24
562:10,20 563:19
568:23 571:4
573:10,17
**2008** 474:8 477:14
562:25 563:3
564:9 565:1,10,15
568:11 571:25
572:22 573:4,7,12
591:22 592:16
604:8 649:13,17
651:20 655:9
**2009** 479:24
620:23
**2010** 569:13
**2011** 486:20
569:13
**2012** 488:10
655:14 656:2
**2013** 661:10
**2014** 585:22 657:4
666:13
**2015** 374:5 381:12
381:16 461:23

475:21,22 483:18
517:8,15 520:20
521:11,17 562:14
564:9 565:10,16
568:11 573:4,9,12
575:5 576:11
579:9,13,14
580:14,20 581:18
581:21 659:7
**2016** 393:11,12,13
393:14 475:20
486:4 515:13,15
515:23 516:1,17
516:17 520:16,19
581:23,24,25
**2017** 476:2 481:21
482:3,12 489:22
591:20,23 592:10
592:19 593:14
634:18 635:2
**2018** 605:23
622:12 624:19
**2019** 364:20 375:6
683:4
**202-434-5000**
369:14
**202-662-6000**
370:10
**202-778-1800**
369:20
**202-849-4960**
366:22
**202-879-5907**
370:17
**202-942-5000**
368:22
**2020** 682:23
**20th** 372:4 622:12
**21** 373:24 374:2
390:20 405:17,19
417:1 464:22

495:24
**212-421-2800**
367:12
**212-571-0550**
372:5
**212-698-3593**
367:24
**212-784-6402**
367:19
**215-241-7910**
370:5
**216-523-1313**
683:3
**216-592-5000**
368:10
**216-621-7860**
371:22
**216-622-3988**
366:10
**22** 485:18
**22,000** 661:10
**220** 641:3
**222** 641:1,4
**22nd** 581:25
**23** 657:25
**25** 595:7 596:21
597:3 598:11
**25701** 367:4
**26** 583:7 620:23
**27** 430:16 478:2,3
488:21,21
**28** 366:17
**2804** 364:4,5
375:11
**29464** 366:17
**2:06** 562:1
**2:22** 562:6
**2:43** 582:14
**2:45** 582:19

**3**

**3** 373:13 471:11,12
472:1 477:23
479:9 485:4
487:18 595:3
666:6
**3-1-07** 374:22
**3-20-18** 374:10
**30** 607:1 682:23
**300** 580:18,22
**301** 371:12
**304-525-9115**
367:4
**305** 366:13
**3100** 370:4
**312-269-4066**
368:18
**312-494-4434**
371:17
**317-236-1313**
371:4
**33** 399:19,21 522:6
522:9 628:13,23
629:16 632:10
**3301884** 364:25
683:7 684:2 685:2
686:2
**339** 580:19
**35th** 371:11
**375** 373:3
**39402** 367:7
**3:09** 609:13
**3:12** 609:18
**3:33** 631:9
**3:40** 631:14

**4**

**4** 373:15 431:4
456:17 473:4,6
595:5

[40 - 90067]                                                                 Page 3

**40**   432:13 433:3
   454:2 455:3
   571:18
**400**   366:9,13
**401**   366:20
**412-338-4690**
   371:13
**412-560-7463**
   369:9
**419**   367:3
**424-332-4764**
   370:13
**428**   373:10
**44113**   366:9 368:9
**44114**   371:21
   683:2
**45005**   364:9
**45090**   364:13
**45132**   364:11
**45202**   366:5
**46204**   371:4
**463**   373:12
**471**   373:13
**473**   373:15
**475**   373:18
**484**   373:20
**486**   373:21
**4:22**   681:7,9

                    **5**

**5**   373:18 475:14,16
   475:24 550:13
   551:12
**5,000**   538:22
   539:12 540:12,15
   540:22 541:3,13
   549:5,22 551:1,18
   552:11
**5/15/2019**   683:8
   684:3 685:3
**50**   454:2 455:3

**50,000**   539:6
**500**   394:9
**502**   598:16
**510**   595:7 598:3,5
**512**   373:23
**513**   373:5
**513-579-6540**
   366:6
**525**   373:24 374:2
**54**   371:16 622:17
   622:22
**55**   622:17 624:14
**56**   367:10 394:14
   394:16,17
**56th**   367:11
**576**   374:4
**582**   373:6
**595**   374:6

                    **6**

**6**   373:20 425:15
   483:25 484:1,4
   512:23 565:1
   595:14
**6-21-93**   374:19
**60**   376:23,24 377:2
   377:5 396:16,21
   397:1,9,13 398:4,6
   398:18 401:8,18
   413:6 415:2,4
   416:4 423:13
   427:14,16,21
   587:2 589:1,9
   622:25
**601**   368:21
**601-467-0788**
   367:8
**60601**   368:17
**60654**   371:17
**609-919-6688**
   369:4

**610**   368:4 373:7
   374:7
**617-342-4000**
   371:8
**617-951-7000**
   370:22
**622**   374:8
**630**   487:21
**631**   373:4
**631-224-1133**
   366:14
**634**   374:12
**648**   374:13
**650-739-3939**
   368:14
**652**   374:18
**654**   374:20
**655**   370:16
**66**   390:19,19
**671**   374:22
**6810**   367:14
**6th**   367:11

                    **7**

**7**   373:21 425:15,15
   478:3 486:24,25
   487:3 562:5 563:4
   565:1 652:23
**70s**   433:2 530:2,4
**713-659-5200**
   367:15
**72**   571:24
**72.5**   662:9,13
**725**   369:13
**73**   571:24,24
**75**   419:6
**77**   368:17
**77069**   367:15

                    **8**

**8**   373:23 425:15,15
   512:13,19 563:4

**565**:1 582:18
   584:5,10 586:4
   592:5 598:5
   609:22 654:19
**8,000**   551:19
   552:12
**80**   415:8,9
**800**   370:21 405:18
**801**   366:8 447:24
**80s**   514:12
**811**   405:19,20
**823**   373:25 432:11
   527:19 643:10
**826**   495:25 498:9
   498:14,14,20,21
   500:14 523:11,15
**827**   491:24
**843-216-9241**
   366:18
**844**   637:25
**85**   414:8 415:11
**850**   365:9 370:9
**852**   637:11,12,13
**86**   381:15,21
   382:25
**867**   637:20,22
**88**   381:21 382:25
   383:20,22
**8:43**   364:21 375:7
**8:54**   384:25
**8:58**   385:4

                    **9**

**9**   373:24 453:24
   455:1 525:3,6,18
   609:17 620:24
   621:23
**9-27-06**   373:10
**90**   414:9 415:8,10
   415:11 657:21
**90067**   370:13

**90s** 514:12
**92660** 368:5
**94303** 368:13
**949-823-7963**
368:5
**950** 368:8
**96** 384:2,8
**97** 367:7 384:9
**99** 379:25 579:25
580:9
**9:52** 427:6
**9th** 366:20 371:21

**a**

**a.m.** 364:21 375:7
**a23** 417:1,1
**aaron** 364:7
**abate** 522:12
**abbreviated** 435:8
**abdcmdl002798...**
373:14
**ability** 392:21
401:25 402:3,10
402:25 403:21
409:10 515:21
516:8 520:22
521:13 612:24,25
617:17 618:15
619:3
**able** 436:22
499:25 503:9
508:6 571:1
597:21 600:4
618:25 679:7
**absent** 640:20
642:8
**absolutely** 412:4
433:1 439:20
447:16 497:22,24
512:5 549:8
551:10 606:21
647:14 670:3

**abundantly**
651:19
**abuse** 407:4
433:20,21,23,24
434:5,24 435:2,3
661:22
**abused** 405:23
426:18
**abusing** 409:18
**abv.com** 372:5
**accept** 645:10
**acceptable** 502:10
**acceptance** 477:23
488:3
**access** 397:24
401:23 515:12
519:14 569:8
576:15 577:1
594:7 638:9
639:22 640:4
642:2,13
**account** 436:23
443:19 593:21,22
594:8,11,14
599:23 602:8
**accountability**
437:3,8,17 444:2
507:18 574:16,18
**accounted** 499:4
**accurate** 415:5
566:2
**accurately** 402:7
623:8
**accusation** 495:11
**accused** 612:7,18
**acetaminophen**
585:9
**achievement**
635:7
**acknowledge**
684:11 685:16

**acknowledged**
539:18 656:6
**acknowledges**
479:22 485:4
**acquired** 414:19
414:23
**act** 373:25 397:25
401:23 405:14,15
405:16,21 408:12
409:9 410:10
411:10 432:13
435:7,14,19
436:11,14 437:22
444:4 445:11
446:23,24 448:2
448:23 458:22
464:17 465:23
485:11 492:24
507:15 515:13
521:23 522:18
524:9,9 525:5,20
525:21 526:2,8,20
526:24 527:1,6,7
527:15,17,18
528:4,6,9,22 529:1
529:12,25 530:12
530:14,16 532:19
532:23 558:6
563:11 571:22
584:18 611:7,17
612:8,19 613:3
614:22,25 616:16
616:25 632:19
642:18 643:3
644:11 684:14
685:20
**acting** 506:4,6
624:18,21 625:1,2
628:8 629:17
**action** 382:18
404:7,17,19

**acknowledged**
425:19 468:22
473:18 518:15
553:8 621:9
682:12,17
**actions** 405:19
409:1 467:20
476:18 507:17
592:21 619:12
623:14
**active** 496:23
619:21 629:8
**activities** 424:10
451:22 475:2
481:15
**activity** 409:22
425:22
**actual** 405:15
640:13,13
**ad** 506:6
**added** 510:4
**addiction** 406:21
406:24 407:1,2,7
461:21
**addictive** 439:16
**addition** 380:11
382:20 383:19
391:5 419:18
459:22 492:17
594:13
**additional** 448:11
510:4 660:2,24
**address** 593:25
683:15
**addressed** 463:4
**adequate** 523:25
524:13 658:24
**adjudicated**
570:24
**admin** 630:3
**administer** 586:10

administration
    372:12 379:6
    381:20 389:3
    422:16 429:3,9
    498:15 523:1
    524:4,16 624:19
    624:24 626:4
administration's
    374:9
administrative
    373:16,18,21
    374:20 402:3
    404:19,22 468:20
    469:2,8 473:10
    475:24 529:17
    589:23 591:15
    592:21 617:24
    618:4,5,18 619:12
    620:1 621:8
    623:14
administrator
    380:15 389:18
    391:3,12,14
    409:21 419:2,5
    430:2,7 470:5
    478:4,12,13
    488:14,17,18
    506:4,5 615:24
    616:15 624:18,22
    625:2 628:9
    629:17 630:4
admission 488:4
admissions 483:18
admit 481:21
admits 482:3
admonition
    612:21
ads 397:5
advance 505:5
    507:23 508:21

adversarial
    400:17
advice 503:2,6
    555:23
advil 455:22
advise 508:18
advisory 625:17
advocate 523:7,11
    523:16,23 524:2
advocated 523:9
    523:13 524:12,17
affairs 572:5
affiliates 484:10
affixed 684:15
    685:21
affording 404:6
afternoon 513:2
    582:22 610:6,7
agac 625:17
agencies 574:21
    574:21
agency 563:21
    579:10,12 581:14
    582:6
agency's 567:17
    599:14
agent 381:3
    382:23,25 383:20
    385:22 387:9
    388:24
agents 383:9,12
    385:21 456:5
    545:14,21 548:1
    679:14,15,16
aggregate 496:7
    496:13,15
aggregator 457:18
aggressive 635:8
ago 375:25 479:4
    492:9,10 588:25
    604:20 605:23

630:18
agree 443:6
    459:12,16 479:16
    540:1 582:5,8
    611:6,10,25 612:3
    617:16 641:25
    650:15,18 675:13
agreed 476:15
    485:18 656:6
    657:1
agreement 373:14
    373:16,16,18,20
    373:22 374:21
    471:10 472:1
    473:10,11 474:21
    475:25 476:5,10
    476:13,20 477:15
    479:25 484:8
    485:3 487:5 488:4
    566:12 591:21
    593:15 612:22
    654:18 656:7
    657:5
agrees 488:6
    508:12
ahead 406:15
    515:17 524:25
    525:1 550:3 567:8
    577:14 579:15
    592:15 604:12
    606:10 616:21
    617:22
aid 369:2
al 364:8,10,12,13
    419:11
alcorta 372:12
alert 381:8
alienating 580:11
alj 469:1,2
allegaert 372:3

allegation 495:11
    500:16
allergan 370:15
    373:11
alleviates 494:17
allies 579:25 580:9
allow 509:3
    628:16
allowed 386:4
    413:25 414:18
    457:8 469:16,23
    471:6 476:17
    480:9,18 508:25
    509:6 537:18
    538:3 626:20
    634:2,9,12 636:3
    667:24
allowing 404:20
    511:25
alprazolam
    454:20 455:15,17
    456:4
alto 368:13
amber 372:13
america 500:17
    633:11 644:6
    670:1
american 447:8,13
americans 661:10
americas 367:23
amerisourceberg...
    370:2 414:8
    415:13 471:10
    472:3,9,18 482:25
amount 392:16,17
    496:1,23 497:5,7,9
    497:10 498:12
    499:3,17 500:3
    577:6 644:13
amounts 450:14

amphetamine
  383:25 388:8
analog 518:4
analogy 644:22
analysis 528:11
  532:16 551:10,14
  552:21 666:20
anda 371:6
andrew 370:19
andrew.o'connor
  370:23
angeles 370:13
answer 397:17
  414:21,24 460:25
  461:1 470:23
  475:3,5 478:25
  481:13 495:23
  508:4 510:3
  519:25 520:2,9
  524:10 541:21
  542:3,5 543:3,5
  545:25 550:3,12
  550:23 551:24
  552:7 568:24
  581:6 607:22
  608:20 620:3,9
  621:11,14,20
  623:19,24 626:23
  627:3,9,10 628:10
  628:11 637:2,8
  639:1,3,4,11,11
  672:10,18 673:16
  673:21 674:15
  675:14 677:9
  679:23 680:6
answer's 551:21
answered 504:16
  505:13 550:1
  626:11
answering 451:22
  520:4 546:3

627:22
answers 626:17
anthony 369:18
antianxiety 456:5
antidiversion
  514:9,14 516:18
  517:18 519:3
  521:16,19 522:11
  533:6
anybody 383:15
  670:21
anymore 426:1
anyway 554:20
aol 594:8
aol.com 594:3
apart 418:11
apologize 442:22
  535:2 596:19
appeal 672:19
appear 468:20
  526:22 534:5,7,11
  534:14,17,19,22
  618:18 646:16
  684:11 685:15
appearance
  601:16
appearances
  366:1 367:1 368:1
  369:1 370:1 371:1
  372:1
appearing 536:4
appears 526:7
  682:5
appended 685:11
  685:18
appendix 487:17
  487:18
apples 613:8,10
  658:11,11
applies 444:12
  476:21

appreciate 625:8
approach 460:17
  644:4
appropriate
  449:15,24 450:4
  524:13 541:10
  546:12 553:22
  651:7 675:5,7
approve 466:18
  643:24
approximately
  605:23 607:1
april 583:7 620:23
arch 370:4
arcos 491:13,14,23
  492:3,5,12,12,12
  492:13,21,22
  493:3,6 494:10
  519:3,6,7,8,12
  558:11 569:4
  605:1,3,6,8,9
  609:3,5 630:9,10
  640:6
area 389:2 569:23
areas 566:18
  630:14 631:25
argumentative
  602:11,24 644:8
  654:4
arises 680:12
arlington 389:11
arm 574:25 575:2
arnold 368:20
arnoldporter.com
  368:22
arrest 383:14
  439:11,13
article 374:12
  559:19
aruiz 369:21

aside 467:1 531:16
  534:25
asked 385:7 391:4
  391:12 397:16,21
  442:5 460:3
  490:10 500:18
  508:8 513:18
  515:2,20 521:22
  522:1,1 523:19
  569:18 580:14
  588:20 620:14,17
  621:5,19,25
  624:15 631:24
  632:3,6 636:8
  642:17 644:16
  647:2 654:7
  657:19 659:6
  678:13
asking 397:14
  415:3 459:22
  490:22 501:19
  508:8 514:3
  522:19 546:5
  547:6,7 585:12
  612:23 619:20
  620:16 623:3,5
  633:8 635:21
  665:23 676:9
asks 523:21 524:3
aso 678:20
aspects 488:11
assess 611:14
assessed 482:12
assessment 642:1
  675:13
assignment 684:2
  685:2 686:2
assistant 380:15
  388:24 389:18
  391:13 430:2,7
  478:4,13 488:18

488:19 559:1 615:24 616:14 630:4

**associated** 662:2

**association** 374:15 648:18 651:4,18 652:1,10 676:24 676:24

**assume** 378:23 394:6 399:22 441:8 561:2 615:4

**assumes** 653:21

**attached** 469:25 487:17 512:14,17 592:23 672:12 685:7

**attempting** 456:22

**attend** 536:9,16 557:22 572:13,16

**attendance** 607:3

**attended** 578:12 604:8,14

**attention** 524:6 567:15 595:4 603:12 622:16,22 624:14

**attorney** 475:7 527:11 597:20 599:9 623:3 672:4 682:15

**attorney's** 366:8 372:9 629:2,8

**attorneys** 563:7,8 608:3,5,7,8,13,15 608:19 623:2,4

**attributable** 661:11

**attributed** 661:13

**audience** 395:18

**audit** 443:17 574:21

**auditing** 443:16 444:1

**audits** 437:4 507:18

**authority** 657:2

**authorization** 423:20 575:19 589:8 660:7

**authorize** 685:11

**authorized** 423:24 424:6,8 451:20 474:25 481:6 519:17 542:24 620:9 621:14 623:17,24 626:19 637:2 639:7 679:23

**authorizes** 527:11

**automatically** 552:13

**available** 386:8 475:4 499:18 519:23 541:24 636:13,15

**ave** 683:1

**avenue** 366:8 367:18,23 368:8 368:21 370:12 371:7

**avenues** 504:15

**average** 454:1 630:5,21

**avoid** 451:7 509:4

**aware** 434:5,11,13 438:13 448:9 462:8,17 476:5 510:18,20 516:10 564:23 565:11,16 568:4,6 572:19 573:1 585:20 603:16 671:25

**awareness** 476:16 578:11 659:25

**awful** 625:23

**b**

**b** 419:7 432:11,11 433:1 464:22 526:7,12,13 528:1 528:7 533:23 613:20,22,25 614:7,13,16,20 615:10,12,13,19 645:18 676:10,16 677:14

**bacchus** 372:9

**bachelor's** 379:11

**back** 385:9 388:23 389:7 393:16 395:9,11 399:9 424:25 427:8 430:5 431:3 435:20 443:21 449:19 475:13 478:15 512:21 520:16 523:3 528:18 535:3 549:2 562:3 565:14 566:8 574:4 582:16 596:8,14 601:25 609:15 627:10,11 627:14 631:11 638:4,10,12,13 646:2 647:10 651:19,25 652:1 653:19 672:2,9,25 683:15

**background** 377:4 377:12,14 389:5 396:13 399:9 409:7 427:14,16 430:5 448:11

477:6,18 550:7 629:23

**backgrounds** 679:11

**backtrack** 617:18 618:8 619:5

**bad** 658:11 672:23

**badala** 366:12

**badge** 381:3 383:1 429:20

**badges** 380:24 381:2

**balance** 625:21

**ball** 666:1

**bam** 384:12,12,13 384:13,16,16,16 384:16,18,18,18 384:18,22,22

**bar** 380:1,7

**barber** 369:7 670:14,15 671:6 671:13 674:4,12 675:21

**barker** 368:3

**barlitbeck.com** 371:18

**barnes** 371:3

**bartlit** 371:16

**base** 414:18 423:17 630:13,13

**based** 415:6,6,12 416:9 420:15 422:2,4 457:7 475:4 480:3,10 482:7 485:24 516:19 533:5 550:22 552:14 560:24 597:19 599:8 616:3 619:20,21 645:6,6 666:19

**basic** 440:17 496:8
496:8,9,10 497:9
497:10 630:13
**basically** 382:8,9
385:14 389:23
393:7,15 397:12
404:16 413:23
443:23 468:17,24
496:6 498:20
499:5 506:25
531:12 567:16
631:23 632:25
676:15
**basing** 674:21
**basis** 459:19 462:1
599:12,12
**beach** 368:5
**bear** 561:15,16
**beck** 371:16
**began** 514:20
**begging** 669:18
**beginning** 385:3
402:19 427:9
431:4 464:9
465:22 475:14
512:23 562:5
571:21 582:18
609:17 631:13
**behalf** 365:13
366:3,7,11,15
367:2,21 368:2,11
368:19 369:2,6,11
369:17 370:2,7,15
370:19 371:2,6,10
371:14,19 372:2
**beisell** 368:15
**belabor** 536:1
**believe** 391:15
393:12 399:19
404:24 405:19
415:5 441:10

459:20,21 506:17
506:23 516:14
527:7 538:6 549:8
555:25 556:4
563:23 567:23
569:15 571:24
573:5 576:5
589:17 593:24
597:13,14 598:4
598:16 605:14
606:3 607:17
611:13 612:20
620:6,7,10,18
623:17 624:5
626:15,18,22
631:1 639:4
640:23 669:6
672:3,9
**believed** 414:10
417:8 490:15,16
611:7
**bennett** 366:7
386:2 414:16
416:13 423:23
451:19 467:10
470:21 474:24
481:5 483:6
485:22 491:19
494:21 495:23
503:4 504:1
505:18 506:22
509:15 519:16
520:8 521:20
540:18 541:16
542:22 543:21,23
544:10,20 545:16
545:23 546:17
547:2 548:16
549:14 551:22
552:17 553:10
554:11 559:15

560:6 573:24
575:6,16,21,24
576:17,20 577:19
596:1 597:13,24
598:2,10,13,15,23
601:21 602:10,22
602:24 611:18
612:9 616:19
619:16 620:3
621:16,17 623:16
623:22 624:5,10
626:8 627:17
631:1 633:25
634:11,19 636:23
637:5 639:3,7,14
644:9 660:3,6,12
671:24 672:15,20
672:24 673:5,8,10
673:13,23 674:13
674:15 675:14
677:7 679:18
**benzodiazepines**
403:18 439:5
456:3,4 462:4
605:15
**berger** 372:3
**best** 536:25 555:12
632:10 679:10
**better** 489:24
509:3 519:9
560:21 577:5
581:1 588:18
644:17 663:12
**beyond** 379:11
388:20 389:6
490:3 639:9 660:7
**big** 385:8 407:25
435:25 502:16,16
535:21 633:10
662:15

**bigger** 485:7
**bill** 389:19 401:23
401:24 402:8,17
402:20,23 403:1
404:10 408:24
515:3,7,9,11,14,19
516:3,7,12,17,22
520:17,19,21,24
521:3 587:6,7
**billion** 662:13
**binder** 531:1,2,9
531:16,19
**binders** 531:10,11
531:12 557:25
558:3
**bit** 377:18 384:14
385:23 391:17
399:5 439:25
485:6 539:19
551:13 611:2
613:5 624:8 647:9
**biz** 487:10
**black** 635:12
**blame** 466:1
511:18 615:19
645:11 650:3
**blank** 497:19
**blind** 452:13
**bmasters** 369:16
**board** 381:6
457:12 505:1
507:23
**boards** 434:23
**bockius** 369:3,6
**bodies** 385:15
**body** 439:6
**bogged** 442:9
**bonnie** 364:24
375:14 622:10
682:2

**boss** 488:17 560:1
**boston** 370:22
　371:8
**bottom** 664:22
**boulevard** 366:17
**boylston** 370:21
**brad** 369:13
**brand** 432:19
　448:18
**breached** 437:25
**break** 385:6,7
　418:10 427:4,12
　507:5 658:25
**breathing** 439:14
**bridge** 445:11,17
**bridgeside** 366:17
**brief** 385:6 393:16
**briefers** 536:16
**briefing** 536:11
　568:10 569:18
**briefings** 536:10
　536:13,19 568:2
　568:12 569:16
　571:6
**briefly** 560:3
**briefs** 568:14
**bring** 473:18
　503:10 510:8
　619:6
**bringing** 376:3
　386:14
**broader** 585:14
**broadhollow**
　366:13
**broadway** 372:4
**brooks** 622:23
　623:1 624:15
　625:7
**brought** 426:3
　524:5

**bryant** 367:23
**btlaw.com** 371:5
**buckets** 463:20
**bucks** 394:17
**budget** 390:18
　633:20
**build** 617:19
**building** 664:14
**buildings** 401:4
**built** 563:7
**bulldog** 378:7
**bulldogs** 378:4,5
**bump** 541:3,13
**bumped** 539:4,6
**bunch** 429:19
　455:20 515:3
**burling** 365:8
　370:8,12
**burn** 670:19
**business** 410:3
　412:17 420:2,4,5
　420:14 469:16,24
　470:15 498:7
　541:8 599:25
　600:3 614:7
　615:12
**busts** 383:7
**butler** 377:24,25
　378:3,9
**buy** 455:22

**c**

**c** 366:12 368:7
　373:1 375:1
　645:18
**c.f.r.** 525:10
　532:21 533:3,9
　535:6
**ca** 683:25
**cabinet** 603:3
**cah** 374:19,21,23

**california** 368:5
　368:13 370:13
**call** 390:10 396:16
　406:21 408:2
　428:19 445:17
　456:8 490:12
　562:23 578:21,22
　578:22 595:4
　637:20,25
**called** 393:23
　397:16,18,20
　399:17 401:23
　402:1 405:16
　440:3 478:8 515:7
　515:9 576:11
　669:4
**calling** 376:23
　397:14 423:20
**calls** 421:23
　439:17 461:11
　482:20 503:12
　542:22 572:4,17
　576:20 578:24,25
　583:18 584:4
　641:12 648:3
　671:2 677:4
**camera** 587:22,23
**campaign** 635:7
**campaigns** 635:15
　635:23
**cancer** 502:1
**capitol** 401:5
**car** 510:16
**card** 404:15 409:3
　460:1 639:25
**cardinal** 369:11
　414:7 415:12
　489:11,12,13
　512:25 513:4
　654:7,13,14,18,21
　655:20,25 656:5

**672:7
**care** 413:24
　440:21,22 500:9,9
　662:1
**cared** 646:4
**careful** 482:1
**caregivers** 664:18
**cares** 500:7
**carisoprodol**
　455:16,17
**carolina** 366:17
**carry** 383:3
**carrying** 426:21
**case** 364:5,9,11,13
　381:25 411:8
　483:22 491:3,12
　517:23 529:15
　548:25 554:18
　566:22 567:16
　603:18 608:7
　617:19 618:9
　627:24 631:18
　633:10 657:25
　658:1 683:6 684:3
　685:3
**cases** 383:24 384:1
　384:8 389:20
　413:22 467:11
　468:10 470:11
　492:4,4,5,14,15
　539:22 566:24
　567:18 570:5
　578:4 679:7
**catastrophic**
　499:10,11
**catch** 511:3,12
**catching** 544:4
**categories** 435:16
　440:1 484:22,25
　665:18

categorized
435:15
category 407:18
408:13
cause 392:13,16
404:22 410:1
425:14 439:8
452:1 468:10,16
468:17,19,21
469:22,23 470:1,7
470:14 483:13
489:20 510:10
517:3 541:15
549:6 551:2
553:25 591:7,15
591:19 592:6,10
592:17,22,24
593:13 612:21
613:3 638:16
caused 503:21
causes 426:19,19
427:2
cavitch 371:20
cavitch.com
371:22
ceiling 496:12,15
496:18,19,20
497:11,12
center 368:4
463:21 578:21,22
641:19,22 650:4
661:7
centre 369:8
371:11
ceppich 370:14
certain 397:14
480:1,1 482:5,5
485:5,8 488:9,10
492:22 496:5
498:1 521:22
522:21 523:5

524:8 532:1,10
538:5 555:9 556:3
556:18 566:18
610:17
certainly 555:2
559:9 592:10
certificate 682:1
685:11
certification 684:1
685:1
certify 682:4
cetera 420:17
chain 382:16,18
409:15,16,20
434:1 440:7,19
443:11,15 445:1,4
445:13 446:21
462:19 484:13
487:12 507:1
578:10 612:5,16
650:5
chains 518:9
chance 469:13
491:4 671:12
chances 457:23
change 417:7
478:25 489:22
521:18 524:5
632:5 633:7 634:7
634:8 635:21
664:23 683:13,14
685:8 686:3
changed 388:12
426:3 467:24
522:16 523:12
571:20
changes 521:25
522:24 596:14
598:21 683:12
684:7 685:7,9

channels 451:9
507:7 528:14
characterization
477:11 479:17
481:24 500:22
506:15 642:6
649:1
charge 388:24
394:8 613:19
638:4,10,12,13
charges 492:24
charging 384:17
chart 429:12
487:11
check 394:16
chemical 387:20
387:22,25 455:25
518:1,7 563:20
chemicals 382:3
386:25 387:1,6
388:2 518:3
525:25
chicago 368:17
371:17
chief 387:24
388:14,15,16
390:5,9,13,23
391:6
child 662:1
children 395:7
chill 456:7,9,15
choose 548:13,14
chose 434:10
572:24
chris 582:24
christopher
370:11
cincinnati 366:5
circumstance
678:22

circumstances
452:14 453:4,13
461:2 539:19
564:20 566:5,22
citation 414:14
city 364:10 661:25
citycenter 370:8
civil 372:11 488:5
600:16 684:5
685:5
claimants 376:3
631:18
clandestine 383:24
386:24 387:4
388:6
clandestinely
388:7,10
clarification
480:24
clarified 523:18
clarify 593:3
598:3
clarifying 505:2
clarity 523:24
524:12
class 440:17 496:8
496:9,9,10 497:9
497:10 630:13
classes 443:24
classifying 584:18
claw 672:1,8,25
clean 377:13
442:24 506:25
631:23,24 646:5
clear 415:1 471:4
472:8 489:3
508:13,14,15
514:23 524:21,23
574:3 611:20
620:12 648:6
651:19

**clearly** 465:13
**cleveland** 364:10
  366:9 368:9
  371:21 683:2
**client** 597:20
  599:9 672:4
**climate** 409:17
**clinic** 615:25
  616:1,10,16,24,24
  619:8 626:6
**clinics** 425:17
**clip** 561:7 579:16
  579:18 580:2
**clips** 581:11
  644:20
**clock** 397:5
**clonazepam**
  455:18 456:4
**closed** 436:16,19
  436:21 437:18
  439:23 444:24
  445:21 449:20
  462:10 472:9
  473:15
**clothes** 386:16
  646:6
**clothing** 386:12
**cmcnamara**
  369:15
**cocaine** 388:4
**code** 373:24 374:2
  405:18 464:22
  532:5,6,8 630:12
**codeine** 585:9,10
**codes** 630:16
**cohen** 372:7
  508:16,23 509:2
  627:8 673:25
**colleagues** 582:11
  609:10

**collected** 595:20
  595:24
**collection** 518:24
**colleen** 369:12
**college** 378:8
  379:16,20,21
**color** 440:25
  512:15
**columbia** 682:21
**column** 599:12
  600:13
**combat** 436:15
  588:18
**combating** 374:9
**combination**
  455:10,14
**combinations**
  455:18
**come** 397:10
  399:17 413:10
  442:3 469:13
  480:19,25 489:1
  549:2 553:5 556:5
  613:22,22 639:4
  679:10
**comes** 440:8
  494:11 534:1
**coming** 414:15
  520:16 570:24
  635:1
**commentary**
  491:6 662:11
**comments** 521:24
  582:6
**commerce** 382:4
  537:13,21 622:15
**commercial**
  430:18 431:8
**commission**
  682:23 684:19
  685:25 686:25

**commitment**
  573:20 649:21
**committee** 401:2,3
  622:14
**committing**
  614:16
**common** 556:21
  596:15
**commonly** 406:21
  408:1
**communicate**
  578:7 654:10
**communicated**
  579:2
**communicating**
  577:25 578:8
  579:6 659:13
  660:22
**communication**
  424:3 481:10
  573:21 574:7
  579:1 597:20
  657:12
**communications**
  424:7 481:13
  536:4 583:13
  599:16,20 606:22
  672:5
**communities**
  392:17 426:22
**community** 379:3
  404:8 426:16
  578:14,15
**companies** 409:2
  415:20 434:19
  444:5 465:25
  467:6 490:11
  494:15 503:2,8,10
  503:14,18 504:14
  507:5,13,13
  509:18,20 510:6

511:24 563:4
  633:21 635:10
  637:13 647:3
  648:20 649:4
  651:3 658:25
  662:24 670:23
**company** 391:10
  391:10 393:7,12
  393:16,18 412:17
  420:3 422:10
  469:13 473:15,19
  500:19 502:25
  504:9,13 509:11
  543:17 544:3
  552:20 554:14,15
  647:9,23 680:10
**company's** 555:12
  647:25
**completed** 683:15
**completing** 528:12
**compliance**
  374:13,15 417:3
  417:13 418:13
  460:4 485:10
  503:18 510:9
  600:17 648:14
**complicated**
  631:21
**complies** 446:23
**comply** 417:4,6
  425:23 563:10
  610:18 644:11
**complying** 657:22
**component** 445:10
  445:19
**components** 445:1
  445:9
**compounded**
  439:9
**compromise**
  599:14

computerized 682:8
concentrate 492:20
concentrating 383:24
concept 454:17
concern 403:13 541:15 625:21
concerned 452:18 452:22
concerning 476:17 600:14
concerns 453:10 613:16
concluded 681:9
concludes 681:4
conclusion 421:24 439:18 470:13 677:4
conduct 510:1 518:17,20,23 528:10 612:17 613:2,20 615:20
conducted 612:6
conducting 568:14 656:17
conducts 611:9 616:3
conferences 578:11,16,17
confidence 404:24
confident 434:12 551:1
confidential 473:24 474:1 519:18 543:4 594:15 601:2 637:3 679:20
confines 387:1 458:22 468:3

confused 502:8 504:9 505:12,21
confusion 473:25 504:11 505:23
congress 398:2 399:2,3,6,12,13,18 400:14,21 401:4 401:11,22 402:8 405:16 426:3 436:15 445:22 447:4,25 495:25 498:9,18 499:20 515:4 520:21 521:11,21,22,24 522:6,10 523:7,9 523:16,19,21,23 524:3,3,6,7,11 532:11 560:16 575:3 628:14,15 628:21,23,24 629:6,7,7,16 630:1 634:13 635:14
congressional 374:4 522:14 624:1 626:25
connolly 369:11
conroy 367:9,17 367:18
consequences 402:23
consider 461:1
considered 473:19
consistent 485:9 661:15
consistently 537:4
conspiracy 677:18
conspired 676:22
constrained 523:5
consult 394:2
consultant 393:23 394:2,8 603:12

consultants 603:17 604:9
contact 537:11 572:10 583:24
contacts 574:10
contain 525:23 601:2
contained 479:11 480:4 482:8
contains 557:8 672:4
contaminant 387:5
contaminants 386:18 387:5
contaminated 385:17
contaminates 386:15
contemplating 625:11
contemporaneous 679:8
content 560:19
contents 597:21 599:12 659:24 673:18
context 392:3
contingency 499:9
continue 389:4 404:20 405:1 469:17,24 505:22 507:13 555:13 669:23
continued 367:1 368:1 369:1 370:1 371:1 372:1 374:1 425:7,8 434:4 474:20 657:1
continuing 395:14 507:1 575:17

576:2 618:25 660:9
control 389:9,15 389:24 391:5,15 414:8 415:23 416:11 417:9 418:23 422:12 423:14 424:3 426:4 430:3,8 442:18 443:22 444:6 446:22 460:5 478:5,14 481:9 488:15 503:16 515:21 516:8 517:20,24 517:25 518:12 520:22 521:13 564:16 576:25 591:3 621:8 628:6 628:8 661:7
controlled 373:25 374:17 390:14 402:4,12 403:10 405:10,12,14,16 405:21 407:12,14 408:11,13,14 409:8 410:3,9,21 410:24 411:10 412:4,24 413:1,18 413:20,25 421:10 430:20 431:9 432:13 434:6 435:7,13 436:14 436:24 444:3 445:25 446:22 447:5 448:22 453:17,23 454:3 454:12 455:2 456:18 464:11 465:7,22 469:18 476:24 478:7

485:8,11 492:24
496:5 518:3
522:18 524:9
525:5,19,21,24
526:1,8,14,19,24
527:1,5,14,17,22
528:6,9,13,21,25
529:25 532:18,22
533:19 562:22
571:22 576:13
584:15,17,18
586:7 590:2
600:17 611:7,16
612:8,19 614:21
618:16 626:7
630:22 632:19
642:18 649:23
650:10 657:3
665:18 666:21,22
**controls**  410:15
411:14 417:22,24
419:4 422:23
425:1,4 437:24
443:8 444:16
452:9 528:23
529:3,9 532:3
550:15 643:4
644:12 656:9
**conversations**
488:25 574:10
583:16 625:16
**cooperative**  372:2
**coordinator**
387:19 388:13
**cop**  511:18,20
**copies**  594:14
602:6,20 603:1
**cops**  645:12
**copy**  428:20 463:8
483:24 512:15,15
525:4,9 576:4

596:19 601:7
602:21 603:4
620:25 663:10
**corner**  487:20
**corporate**  429:14
507:7
**corporation**  370:2
370:7 463:17
473:12
**correct**  376:1
380:19 420:4
423:9 432:21
438:2,3 446:2
451:10 452:16
461:2 464:11,12
472:6 474:9,16
475:20 494:14
501:21 502:3
514:10,21,25
516:1,5,8,15
517:12,13,19
518:12,16 519:10
521:5,7 526:17,22
527:3,23 533:6
535:17 536:17
537:9,20 539:13
539:20 540:3
543:20 545:15
547:14 549:12,25
551:3 553:9 555:4
561:3 562:10
563:13 564:5
566:6 567:6,22
569:13 570:5
571:9 582:1
583:10 584:19
585:4,22 586:8,19
589:22 590:3,8,25
591:5 592:11
593:10,15 594:5
594:16 601:8

620:1,13 628:10
629:20,24 632:10
**corrections**  683:12
685:17
**corrective**  404:17
**correctly**  430:21
434:8 445:2 447:2
447:9 530:24
**corresponding**
395:24 396:1
446:14 450:10
**corrupt**  635:10
**cost**  661:23
**counsel**  375:12,20
428:24 463:8
502:25 504:25
508:17 512:25
575:22 582:20
583:6 604:10
607:15 610:4
617:10,11 620:6
621:17 624:6
631:1,15 634:19
636:23 671:24
682:11,15
**counsel's**  627:5
**counsels**  508:20
**count**  661:25
**counties**  657:25
**countless**  510:11
**countries**  390:19
390:19
**country**  434:7
498:18 499:24
630:15 668:17
**county**  364:8,12
366:11,15 661:25
684:10 685:15
**couple**  394:17
400:10 525:2
584:9 625:18

**course**  444:25
450:8
**court**  364:1
375:13 376:5
400:12,19 509:6
512:13 601:15
684:7
**cov.com**  370:10,14
**cover**  385:14,15
385:18
**coverage**  385:18
**covered**  488:5,9
507:24
**covering**  508:9
557:6
**covington**  365:8
370:8,12
**crack**  386:23
**craig**  603:21
604:14,16
**create**  393:8 417:7
418:1 420:12
565:22
**creates**  444:3
**creating**  425:10
**creek**  367:14
**criminal**  617:19
617:25 618:9
619:5,7,13,21
621:9 625:10
628:17
**crisis**  395:20
397:15,23 403:14
559:10 588:18
**criteria**  666:21
**critical**  447:1,12
**criticisms**  577:23
**cross**  539:24
**crossover**  539:22
**crowning**  635:7

[csa - dea]

csa 435:8 436:13 488:6 598:22
curious 613:21
current 519:6
currently 433:20
cursory 570:6
customer 445:24 457:11,13 526:22 526:23 534:5,13 540:6,8 541:8 542:9,9 546:21 550:16 555:5 613:14,17 614:4,8 614:14 615:6,14 615:21
customers 445:15 445:15 446:9,10 446:19 458:4,5 459:23 529:5 650:22
cut 497:6 500:2
cuyahoga 364:8 366:11
cvs 369:17,17 373:20 483:16,17 483:21 484:9,14 484:15,21 485:3,4 485:5,17 486:2
cypress 367:14

**d**

d 367:22 371:10 375:1 616:1
d.c. 364:19 365:10 366:21 368:21 369:14,20 370:9 370:17 375:9 389:12 587:13 588:5,8
daily 380:14
dan 364:6 375:4

danger 404:2 409:24 468:9,10 470:2,6 590:7,24
dangerous 387:20 387:22,25 388:2 388:11 439:1 461:9
dangers 461:20,21 461:21
daniel 372:14
dark 555:22
data 491:13,14,23 492:1 494:10,11 494:16 518:20,23 518:24 519:3,6,8,8 519:12,13 520:5 520:12,15 534:10 534:22 600:14 601:2 602:7 636:9 637:11,12,14,20 637:23,25 638:4 638:11,12,13,23 639:16,18,25 640:6,8 641:19,22 641:24 642:2 677:15,16,16,17
databases 519:23
date 374:18 375:6 430:15 476:1 479:25 561:19 581:20,24 588:4 649:14 653:13 656:1 683:8 684:3 684:9,19 685:3,13 685:25 686:20,25
dated 373:10,12 374:22 488:20
dating 574:4
daughter 645:19
daughters 645:25 646:2

david 372:10 604:6
davis 368:20
davison 370:20
day 368:12,16 389:19,19 511:11 511:11 513:5,9 514:19 684:16 685:22 686:22
days 394:18 683:18
dc 588:1
dea 380:18 381:1,5 381:7,9 382:22 383:9,12,21 385:8 385:21 386:20 387:9,17,18 388:21 389:6,8,10 390:15,17,18,18 391:11 399:5,11 400:2 401:9 403:21 404:5 409:10 410:14,21 410:23 411:1,4,5,6 411:6,9,13,16 413:1,23 414:23 417:20 418:8 419:23,23 422:5 423:22 424:9,17 425:2 429:5,14,17 429:17,20 430:19 431:8,11 432:4 435:1,20 440:3 451:22 452:24 457:8 464:10 466:1,2,11,13,18 467:22 469:1,9,10 470:5 472:3 473:9 473:12,19 474:22 475:2,19 476:21 476:23 478:6,8,12

479:11,13 480:1 480:16 482:5,8 484:9 487:6,10 488:13 490:17 494:4 496:6,11 501:3 503:9,15,15 504:16 506:3,7,18 506:24,24 507:5 507:15,18 509:11 509:19 510:7 513:23 516:4,9 517:1,6,10,14,18 519:8,14 520:6 521:16 532:12,13 537:19 542:16,17 542:19,20 543:12 543:15,19,22,25 544:7,12,18 545:9 548:1 549:18 553:2,4,6,8 555:7 560:21 563:8,12 566:22 567:3 571:7 572:1,11 573:14,19 575:5 576:12,24 577:4,6 577:24,24 578:6 586:9 588:17 589:21 590:1,6,6 590:13,19,19,22 590:22 591:3,18 593:8,9,13,21,21 594:15,16,21 595:18 596:20 597:3 599:7,10,20 600:20 601:18 602:18,21 603:1,4 603:7,8,9 611:9,13 612:6 613:1,16 615:19,24 616:1,2 616:15,23 617:13 617:17 618:23

619:3,6,11 623:5
623:13 628:15,24
629:1 630:4
633:20 634:2,17
635:8 636:9,15,18
636:25 638:10,13
639:7 641:24
642:3 643:13,23
644:17 650:3
653:5 654:8
659:13,25 660:1
666:20 667:14
669:1 670:9,11,23
670:25 671:22
678:13
**dea's** 374:6 401:24
402:3,10,24 478:3
503:1 507:10
512:1 515:21
516:8,18 520:22
521:12 562:21
563:20 660:22
**dea07** 374:19
**dea12** 374:23
**deal** 377:6 490:9
514:20 664:24
673:2,2
**dealing** 412:3
487:10 644:5
**dealt** 502:16,17
**dear** 683:10
**death** 426:19
427:2
**deaths** 392:14
398:24 661:10,12
**debra** 367:22
**debra.ogorman**
367:25
**december** 393:10
393:11,14 478:3
488:21 571:4

**dechert** 367:22
**dechert.com**
367:25
**decide** 500:2
**decided** 417:5
425:24
**decides** 524:4
548:5
**deciding** 445:24
**decision** 404:1
420:3,15,23 498:7
524:8,16 541:8,10
542:1 554:14
563:21
**decisions** 389:22
**declared** 447:4
661:8
**decrease** 402:24
523:14
**decreased** 523:8
523:10
**deed** 684:14
685:20
**deem** 546:11
**deemed** 424:20,20
683:19
**deeper** 455:6
**defend** 469:14
**defendant** 465:25
**defendant's**
617:11
**defendants** 376:4
491:3,12 601:3
658:1
**defense** 512:15
631:2
**define** 381:25
410:18 421:7
535:7 537:8,19
538:4 540:2
572:21

**defined** 431:10
539:11
**definitely** 396:9
496:18 606:13
**definition** 417:23
420:6 421:9
422:25 523:17
584:14 585:14
**definitions** 413:4
435:15 665:12
**degree** 379:11,22
**delay** 621:8
624:13 626:19
678:23
**delayed** 619:11,20
619:25
**delaying** 628:15
628:24
**delays** 622:4
623:13 626:21,21
629:7
**deliberative** 543:5
597:19 599:14
**deliver** 445:25
**delivery** 450:3
499:11
**demonstrative**
442:14 584:4
586:4 589:15
592:5 609:22
**demonstratives**
585:25
**denied** 627:1
**departed** 564:10
**department** 366:7
372:9,11,11 400:2
429:2,5,9,10,15
469:6 624:3 669:7
672:1 683:22
**departure** 486:4
562:13 582:1

**depend** 672:20
**dependence** 406:1
406:9,18 407:5,6,6
585:18 667:1
**dependency** 666:7
**dependent** 568:17
**depending** 401:2
405:3 453:23
468:6,7
**depends** 518:25,25
546:20,21,22
567:1 568:13,13
**depicted** 586:3
**deployed** 391:2
**depo** 673:3
**deponent** 375:11
**deposition** 364:18
365:1 375:8
381:25 428:22
463:9 471:12
473:6 475:16
484:1 486:25
497:15 500:19
512:19 513:5
525:6,11 560:25
568:5 576:7 583:2
583:7,14 594:19
594:24 609:23
610:2 622:18
634:23 648:8
652:4 654:23
655:17 671:14
681:5,8 682:3,5,9
682:13 683:8,11
684:1,3 685:1,3
**depositions** 639:5
**depressants**
439:10
**depression** 439:8
**deputy** 380:15
389:8,14,18 390:5

[deputy - dismantle]

390:9,22 391:6,13
430:2,6 478:4,12
488:14,16,18,19
615:23 616:14
630:3
**derived** 408:9
**describe** 622:11
**described** 489:19
600:12 619:1
**describes** 596:20
597:1
**description** 479:1
596:17 600:13
**design** 465:6,11,15
466:2 533:17,25
675:11
**designed** 436:14
437:12
**desire** 679:6
**destroy** 647:23
663:13
**destroyed** 443:20
**detail** 385:23
410:9 428:14
436:11 532:23
547:4 566:9,17
652:22
**detailed** 532:9,9
532:16
**details** 554:4
597:4
**detect** 419:20
422:12 460:8
488:12
**detected** 480:2
482:6
**determination**
409:22 423:1
458:20 557:4
566:10 650:23

**determine** 382:15
404:18 419:3
420:3 446:15
458:11 460:25
528:12 540:3
546:13 570:19
574:22 597:16
611:15
**detrimental** 447:6
**detroit** 379:16,20
379:21 388:23
**developed** 492:5
530:13 649:20
**development**
499:1
**deviate** 498:21
**deviates** 573:3,14
**deviating** 418:6
420:8 421:12
535:9 555:17
571:12,16
**deviation** 421:13
652:25
**diagnoses** 501:18
**diagnosis** 438:7
**diagram** 484:16
**diazepam** 455:17
456:5
**dictate** 419:23
**die** 416:2,3 426:8
426:9 427:1
**died** 661:11
**difference** 376:18
400:13 404:1
590:16 677:19
**differences** 566:24
**different** 394:6
398:1 401:3
420:16 425:20,21
429:19 440:15,15
440:16,17 455:18

462:2 490:18
497:6 541:19
546:6 547:12
550:11 551:8
564:5,23,24
565:16,17 566:3
569:21 584:18
626:16 630:25
654:1
**differently** 548:19
588:17 613:5
**difficult** 399:2
408:24 498:21
629:23
**digress** 461:5
486:21
**diligence** 423:1,6
446:10 450:17
451:6 457:12
458:16 459:5,15
460:10 526:25
529:6 530:11,12
531:13 534:7
541:2,9,14 549:7
549:23 550:14
551:9 552:2,2,20
555:6,9,20 556:3,4
556:6,9,10,14,18
557:8,13,16,17,21
558:13 643:14
647:16 650:6
651:1 656:18
**direct** 443:3
577:15 600:9
622:16,22 624:13
**directed** 419:6
567:15
**directing** 620:22
**direction** 682:9
**directly** 480:25
586:7

**director** 372:12
389:8,14
**dirty** 385:17
**disagree** 624:6
**disciplined** 603:7
**disclose** 423:24
424:8 451:20
465:6 474:25
481:6,14 519:17
533:18,25 542:24
628:22 679:20
680:9
**disclosed** 599:13
606:6
**disclosing** 543:4
**disclosure** 519:21
**discount** 371:19
**discovered** 418:9
419:17 492:7
**discovery** 605:11
**discuss** 386:4
531:12 604:23
605:16 623:17
626:19
**discussed** 427:24
531:13 558:13
567:11 572:8
593:20 598:20
642:25
**discussing** 537:11
597:2 619:19
627:23
**discussion** 448:11
558:4 560:11
567:20 583:3
587:1 589:18
593:23 622:23
**discussions** 559:23
**disease** 661:7
**dismantle** 387:3
597:6

**dispense** 378:21
412:13 446:16
469:18 485:6,8
**dispensed** 437:2
457:21
**dispenser** 410:22
**dispensers** 527:22
**dispenses** 410:25
**dispensing** 457:22
534:10,22
**disposal** 404:4
638:14
**disproportional**
454:24
**disproportionate**
454:13
**dissemination**
519:19 543:1
**distribute** 430:20
431:9 440:18
464:11 469:17
476:23 478:7
484:20 586:6,9
618:16
**distributes** 413:20
413:20
**distributing** 410:4
413:23
**distribution**
374:14 436:17,22
439:24 440:19
441:9,18 443:12
445:1,13 447:5
463:21 499:12
535:24 635:9
648:17 649:22
**distributor** 410:22
411:5 413:15,17
420:16 424:19
441:8 450:15
451:1,2,5 452:9,10

456:23 457:3
459:14 463:22,23
472:14,18 473:16
484:18,24 492:16
493:10,17 494:3
499:19 535:21
536:9,16,18 552:1
568:2,12 571:6
578:16,21 612:4
612:15 613:14,17
613:19,20,22,25
614:4,7,8,13,14,15
614:15,20 615:5
615:10,12,13,13
615:19,21 675:22
676:10,10,16,17
677:14,14
**distributor's**
459:3
**distributors** 402:1
403:1,5,24 404:13
404:25 408:25
410:11 411:22
413:14 414:6
415:15 418:19
419:11 424:1,13
428:8 431:13,17
431:25 432:1
433:19 436:12
440:9,10,11,13
441:2,19 444:25
445:5,8,10,23
448:6,8 449:13,21
451:13,25 456:19
457:4 458:2 461:7
461:18 462:11
464:7 467:13,14
470:19 481:8
492:18 502:7,15
504:19,22 514:21
516:13 518:7

519:9 526:2,9
527:21 530:23,25
530:25 531:23
532:1 537:8,25
541:7 556:2
568:19 569:11,14
569:25 572:7,10
574:11 578:12
586:6,21 598:22
600:15 602:5
630:5,11 633:9,10
633:22 636:14,17
642:2 649:5,20
650:5,22 674:6,7
674:24,24 676:3
678:4
**district** 364:1,1
682:21
**diversion** 374:16
381:22 382:1,2,6
382:12,21 389:9
389:15 391:4,14
392:4,4,10,15,15
392:16,18,22
393:8,9 402:14,15
403:24 409:15,17
409:23 410:15
411:15 417:22,24
418:23 419:5
422:23 424:2,14
425:1,4,21 426:15
427:2 428:3 430:3
430:7 434:2
435:19 436:1,15
437:24 442:18
443:8 444:16
447:18,19,20
448:1 449:16,25
452:10 453:5,14
453:20 458:12
460:6 478:5,13

481:9 488:14
499:17 503:16
506:25 507:6,12
509:11 511:25
515:21 516:8
517:20,24,25
518:8,12 520:7,23
521:13 522:12
528:23 529:3,9
532:3 550:15
554:2 560:22
564:16 569:19,22
569:24 578:11
591:3 615:25
616:16,18 617:18
621:8 628:6,8
633:4 643:5
644:12 649:19
656:9 675:8
**diverted** 382:7
433:25 451:8
528:13
**diverting** 405:1
458:23 493:2
511:25 617:19
626:6
**division** 364:2
388:23 485:25
548:4,5,19
**divisions** 390:21
**divulge** 386:19
668:25
**dmigliori** 366:18
**doc** 559:13 595:5
608:20
**doctor** 379:18
438:1 450:6,7,9
501:13,16,17
586:14 617:20
618:25 619:7
626:5 658:4

664:21
**doctor's**  438:7
**doctors**  403:25
449:21 580:18
586:12,17 635:10
663:19 664:3,12
**doctrine**  446:14
**document**  364:6
415:7,7 473:3,24
474:1 475:23
486:23 489:19
530:18 531:25,25
542:13 548:1,4,6
548:14 561:1
572:24 573:2
584:6 595:12,23
596:18,19,20
597:2,12,17,22
598:4,8,20 599:2
599:13 600:5,10
645:14 653:23
669:8 671:17,19
672:2,3,8,9,11
673:18
**document's**  596:4
596:7
**documentation**
547:19,22 554:19
555:1,2,9 556:10
556:25 563:24
606:18 651:4
**documented**
547:16 548:23
651:5
**documents**  389:22
471:15,19 542:14
558:9 594:13,15
594:20 595:17,24
596:8 599:7,24
600:11,12,21,24
601:1,6,8,11,12,14

601:18,25 602:2
602:13,15,18,21
603:4,8 607:23,25
608:2,4,6,12 667:7
667:14,24 668:4,5
668:5,10 669:1,14
669:24 670:9,24
**doing**  386:17
391:5 395:14,14
399:5 410:2
417:15,19 420:5
423:1 425:20
446:19 450:9,13
457:12 458:16
467:6,15 480:20
489:2 508:9,24
509:3 518:15
519:1 529:5,6,7
541:20 543:10
550:17,19 551:7
554:5 555:19
600:3 605:6,8,20
613:17 614:20
647:18 676:16
680:11
**doj**  429:15 469:6
475:7 589:8
594:19 595:24
596:17,20 597:1
**dollars**  635:14,22
668:16
**domestic**  387:21
**donald**  366:16
**door**  499:4 623:21
624:4
**dosage**  440:6
496:22 497:1
498:4 630:6,21
**dose**  455:7
**dots**  443:4

**double**  580:23
**doubled**  540:22
**doubt**  595:23
629:17,20
**downstream**
410:5 413:21
414:9 415:9,11
443:20 445:15,16
446:18 497:2
555:14 556:23
**dr**  605:17 606:2,17
606:23 607:5,8
**draft**  596:21
**draw**  440:11
496:14
**drawing**  440:23
496:17 500:4
629:12,21
**drawn**  664:20
**drew**  586:2
**drive**  368:4 400:19
510:16
**driving**  644:23
**dropped**  401:6
**drug**  370:2 371:19
372:2,12 374:8
381:19 383:7,24
384:5,7 389:1,1
416:1,2 422:16
426:8 429:3,8
433:19,21 436:16
440:14,17 447:22
455:14 496:8,10
496:10 498:15
499:14,18 500:6
515:13 518:2
585:16,19 596:21
597:5,6,11 624:19
624:24 626:3
634:16 635:8,9,24
661:11 666:20

**drugs**  382:6,15
383:8 387:20,22
387:25 388:2,5,7,7
388:9,11 402:11
402:12 404:7
405:1,23,24 406:5
407:23 408:7,8
409:15,18 413:18
414:9 426:15,17
426:18 434:6
435:15 436:23
438:14 443:19,23
446:17 447:20,22
450:14 453:18
454:3,5,8,24 455:1
455:8,11,19 456:1
457:14,19 460:18
461:8,9,20,21
470:9,10,10,16
496:1 550:10,19
555:13 556:23
576:12 585:7,12
585:15 644:14
661:12
**drugstore**  379:4
**due**  404:6 423:1,6
446:9 450:16
451:6 457:12
458:16 459:5,15
460:10 508:5
526:25 529:6
530:10,12 531:13
534:7 541:1,9,14
549:7,23 550:14
551:9 552:1,2,20
555:6,8,20 556:2,4
556:6,8,10,14,18
557:8,13,16,17,21
558:13 611:8,10
618:17 629:7
643:14 647:15

650:6 651:1
656:17
**duly**  375:17 682:5
**durkin**  371:20
**duties**  391:5
414:20 448:6
**duty**  394:20

**e**

**e**  370:7 371:21
373:1 375:1,1
432:11 526:7,16
528:1,7 537:13,21
583:20 593:20,25
594:8 595:7,12
601:18 602:8
603:8 607:25
**earlier**  431:10
458:1 459:25
460:13 473:25
497:15 583:9
584:3,16 587:2
589:12 610:16
617:3 619:1
**earliest**  402:24
**early**  388:19
402:21 432:12
449:2,3 530:4
**earth**  397:1 442:3
**easier**  512:1
**east**  366:4
**eastern**  364:2
371:14
**economics**  462:9
**ecstasy**  388:11
**education**  379:11
395:15
**educator**  405:7
**effect**  447:7,12
501:4 521:4,6
559:8

**effective**  410:15
411:14 417:21,23
418:23 419:4
422:11,22 425:1,4
437:24 443:8
444:6,16 446:16
450:12 452:9
460:5 479:24
515:13 522:17
528:22 529:2,8
532:3 550:14
643:4 644:12
656:9
**effectiveness**
519:20 543:2
679:21
**effects**  439:6
456:13
**efficient**  649:21
**effort**  632:4 634:7
635:21 648:22
**efforts**  516:18
521:18 633:7
635:9
**eight**  480:16 492:9
494:25 630:24
665:1
**either**  443:20
527:1 554:18
601:15
**elaborate**  571:7
572:1
**elaborated**  573:2
**elaboration**
572:19 573:13
**election**  635:15,23
**electronic**  534:16
641:5
**eleventh**  367:3
**elias**  367:7

**eliminate**  633:3
**ellis**  368:8 370:16
**elmo**  487:4
**email**  683:17
**emainigi**  369:15
**embarcadero**
368:13
**embedded**  558:10
**employed**  682:12
682:15
**employee**  682:14
**employees**  503:15
504:4
**employer**  669:15
**employment**  379:5
**enable**  378:19
**enables**  378:21
**enclosed**  683:11
**encountered**  387:6
**ended**  398:5
**endo**  368:19
**endorse**  466:19
**energy**  622:14
**enforce**  417:3
422:5 468:3
473:18
**enforcement**
372:12 374:8
381:20 383:23
384:7 387:14
388:25 390:5,10
390:11,14,15,16
390:23 391:6
395:9 422:16
429:3,8 498:15
513:19,24 515:13
519:18 589:21,23
597:4,19 599:8
600:14,21,25
624:19,24 626:3
635:9 679:20

**enforcing**  435:7
611:6
**engaged**  509:25
**enhance**  656:16
**enhanced**  456:13
**enhancements**
522:11
**ensure**  450:11
518:8 542:17
576:15 577:1
**ensuring**  389:23
515:12
**enter**  473:9
**entered**  472:2
474:21 475:25
477:14 484:9
487:6 489:22
685:9
**entire**  684:5 685:5
**entirety**  669:11
**entities**  398:3
440:22
**entitled**  464:21
477:23 611:8
612:5,16
**entity**  430:18
431:8 443:21
464:10 478:5
535:24 602:18
**enu**  369:12 513:3
**envelopes**  444:18
**environment**
386:10 409:17
**environments**
385:16 386:23,25
**envisioned**  445:23
**envisioning**  644:5
**epidemic**  374:9
644:6 661:9
**episode**  377:5
401:19

[eppich - exhibit]                                                    Page 20

**eppich** 370:11
373:6 392:7
398:21 400:6,22
401:21 402:18
403:8,15 406:10
406:13 407:8
408:17 409:5,11
410:12 412:22
414:12 415:16
416:12 419:25
420:18 421:1,19
421:23 422:20
423:10,19 429:6
429:21 432:22
433:10 434:17
435:11 436:2,7,20
438:16 439:2,17
441:15 442:12
444:9,14,20
448:19 451:16
452:15,20 457:5,9
459:7 461:10
462:13,15 466:4
466:12 467:2,8
470:25 473:1,21
473:23 474:14,23
476:7 477:1,10,19
478:16,18 479:20
480:6,21 481:4,23
482:13,19 483:3
483:19 484:23
485:14,20 486:5
486:14 490:19
491:8,17 493:15
493:19 494:5
495:7,14 500:21
501:6 502:2,11,21
503:3,11,23
504:12 506:9,21
507:8 509:23
511:15 512:3

582:21,24 594:18
595:1 596:3,5,16
597:23,25 598:7
598:12,14,18
599:4,5 602:3,16
603:2 604:17
606:16 609:6,9,19
609:25 632:15,24
633:12,15,24
637:16,21 638:1,7
638:19,24 640:1
640:15,18,21
641:2,8,12,20
642:5,10 643:19
644:7 645:4,13
646:8,11,17
647:12 648:3,25
649:8,25 650:7,12
650:16,19 651:10
651:21 652:13
653:10,15,20
654:3 658:19
659:1 660:16
661:2,18 662:6,19
663:5,8,20,23
664:8 665:3,7
666:3 667:8,17
668:1,13,19
669:19 670:2
671:1,8 674:11
680:14,19
**eric** 371:19
**errata** 683:13,18
685:7,10,18 686:1
**especially** 395:13
508:20 641:4
642:8
**esq** 366:3,7,12,16
366:19 367:2,6,9
367:13,14,17,17
367:22 368:3,7,12

368:15,20 369:2,7
369:12,12,13,18
370:3,7,11,15,19
370:20 371:2,6,10
371:15,19 372:2,9
372:10 683:5
**essence** 409:2
469:13 506:12
634:7
**essentially** 515:20
574:23
**establish** 498:15
**established** 496:21
529:16
**establishes** 496:12
**establishing** 496:7
**estimated** 661:21
**et** 364:8,10,12,13
419:11 420:17
**event** 499:10,11
**everybody** 381:23
437:19 446:20,23
450:3 563:3,16
568:21
**everyday** 510:16
**evidence** 625:9
679:8
**evidently** 678:22
**eweiss** 371:22
**ex** 669:15 670:23
**exact** 500:24
506:11
**exactly** 498:10
537:24 541:6
554:5 566:25
577:8 579:4
587:18 644:1
652:19
**exam** 380:1
**examination** 373:2
375:20 512:25

582:20 610:4
631:15
**example** 394:3
411:18 452:5
464:21 472:16,23
473:17 479:8
483:16 486:13
510:15 538:14
539:16 540:13
670:13
**examples** 453:8
471:3,6,9 483:1
538:17,20 592:6
**exceeding** 454:23
**excessive** 438:25
439:8 453:16
455:9,11 653:5
677:24
**excuse** 451:2
471:18 505:10
552:10 590:15,20
645:2 658:15
671:19
**excuses** 491:2
**execute** 409:25
517:2 570:10,11
**executed** 516:22
685:10
**executing** 425:11
570:15
**execution** 684:14
685:19
**exercise** 451:6
**exhaustive** 471:5
**exhibit** 373:10,12
373:13,15,18,20
373:21,23,24
374:2,4,6,7,8,12
374:13,18,20,22
428:16,17,17,20
428:22 429:2

433:15 462:23
463:7,9,12,15
471:11,12,25
473:4,6 475:16,24
479:9 483:25
484:1,4 486:23,25
487:3,16 512:13
512:17,19 524:25
525:3,6,10,11,18
532:4 533:2 576:4
576:7 584:5,10
592:5 594:23,24
595:3,5 599:11,11
609:22,23 610:2
622:18 634:19,21
634:23 648:7,8,11
648:14 652:2,4,7
654:19,22,23
655:15,17,20,21
659:11 663:6,7,9
671:14,18,20
679:1
**exhibits**  373:9
374:1,25
**existed**  632:12
**existing**  656:16
**exists**  392:15
547:19
**expect**  424:23
616:1
**expectation**
543:18
**expected**  428:9
563:9
**expenses**  662:2
**experience**  415:14
416:10 457:7
**expert**  438:24
439:18 603:13
605:18 672:13

**experts**  432:17
569:9 603:18
604:9 606:6 607:2
**expiration**  684:19
685:25 686:25
**expires**  682:23
**explain**  406:12
413:14 415:3
416:17 417:12
419:24 426:10
427:15 436:18
440:10 446:4
456:20 459:20
464:15 491:4,22
495:18,20 497:24
498:9 532:6
535:12,17 552:22
554:21 555:18
557:11 569:5
669:7
**explained**  397:22
416:21 424:13,22
428:8 434:20
499:21 535:18
563:20 567:17
**explaining**  425:1,6
567:6
**explanation**
555:14 557:17,20
**explanations**
491:2
**export**  498:17
**exporting**  499:6
**expose**  386:18
**expressly**  447:4
528:10,21
**extended**  391:16
**extent**  414:21
423:20 438:6
470:22 473:24
475:3 481:12

519:22 536:23
543:3 597:18
608:21 636:25
637:6 659:25
673:17
**extra**  438:21
**extremely**  385:16
**eye**  452:13

**f**

**face**  431:24,24
434:19,19 467:16
467:16 535:20,20
557:18,18 563:25
563:25 568:24,24
**faces**  433:20
**facilities**  443:13
546:16 591:8
**facility**  476:22
545:21 546:25
**fact**  404:23 405:18
414:13 452:11
461:8,24 464:3,8
477:6 479:15
489:18 492:22
501:23 503:8
505:6 507:24
510:3 525:1 541:2
541:19 546:20
549:23 553:13
554:4 566:23
608:1 611:21
614:18 616:9
653:2
**facts**  414:19,22
541:23 564:20
566:5,21 611:14
611:22 651:22
653:21
**failed**  616:16
**fair**  379:1 393:23
436:1 438:7,8

444:19 453:14
459:6,9 460:19
472:21 477:18
484:22 490:3
497:8 501:19
511:5 532:25
534:2 537:2
540:10 541:4
543:12 552:16
554:8 570:1
573:18 613:11,19
614:12 616:8,13
617:15 657:6
658:8,12 661:1
665:2,24 680:13
**fairly**  611:21
615:17
**fall**  388:10 531:20
**falls**  528:22
**familiar**  533:4
603:21 617:7
**families**  395:7
**familo**  371:20
**far**  454:23 494:8
565:11 580:21
585:8 601:23
624:12
**farrell**  367:2
**fault**  490:17
**fbi**  679:15
**fda**  435:3 559:2,4
559:8 666:19
**february**  478:3
486:3
**federal**  374:2
464:22 525:22
532:5,7,8 574:21
574:21 634:3
**fee**  394:12
**feel**  377:19 434:12
489:24

feels 625:23
felt 397:16 459:23
    579:5
fenfluramine
    388:9
fentanyl 388:9
    407:24 410:5
field 388:23
    390:21 485:25
    513:23 542:19
    545:10,13 546:7,9
fifteenth 370:16
figure 550:17
    643:24 644:2
    678:7
file 385:3 424:16
    425:8 427:9 431:4
    475:14 512:23
    542:16,19 562:5
    582:18 595:13
    609:17 626:4
    631:13 647:16
    678:14
files 470:11 555:5
    555:6,21 556:3,4
    557:8,21 595:14
    595:17 647:4,7,10
filing 556:23 565:4
    603:3 623:14
    628:16,25 674:8
    674:25 676:3
fill 391:18
filling 451:7
final 500:11 575:8
finance 370:15
financial 600:14
    601:2 602:7
financially 682:16
find 450:17 451:12
    460:1 487:21
    531:11 553:25

558:2 585:7
    589:15 649:4
    683:11
finding 470:7
finds 470:6
fine 456:11 471:17
    474:6 482:11,17
    485:18,23 508:10
    574:8 576:1 579:2
    610:10 620:18
    624:10 632:18
fined 425:25
finish 490:8
finished 440:13
finkelstein 372:10
firm 367:10
    372:12,14 502:18
    651:8
firms 502:19
first 375:17
    382:24 396:12,25
    400:9,10,10
    405:10 413:13
    417:20 428:15
    430:14 462:21
    476:19 477:8
    486:20 487:7
    495:18 501:12
    506:17 525:18
    569:13 578:10,13
    580:21 583:1
    584:13,13 653:22
    661:25 663:15
    674:22
firsthand 516:7,16
fitzpatrick 367:17
    471:21
five 405:13,22
    406:3 584:25
    585:1 665:17,23

fix 655:16
fixes 662:25 663:3
fixing 384:17
flag 454:1,9,16
    455:12 456:21
flags 396:4 455:6
    642:24
flash 381:2
floor 367:11 368:4
    369:8 371:11
    372:4
flow 402:4,10
fly 457:1
focus 565:7
foley 371:7
foley.com 371:9
folks 393:23 440:2
    537:19 580:15
    648:16 664:15,16
    670:11,23
follow 376:22
    377:6 415:25
    416:2 426:7
    427:17,19,20
    428:4 431:23
    437:12,21 453:22
    462:22,24 467:20
    490:21 507:2
    509:19,21 513:15
    523:14 536:11
    541:1 542:20
    543:15,19,25
    544:7,13,18
    545:14 546:8,10
    546:11 547:10,11
    547:13,19,23
    548:2,14,21 553:2
    558:18 570:11,18
    570:21 584:10
    658:6 662:4

followed 447:17
    543:7,9,13 544:22
    545:1,4,9 570:20
    570:22 632:14,22
    633:2 676:11
following 448:9
    450:5 452:25,25
    481:1 493:25
    510:7,12 513:13
    540:16 546:2
    621:6
follows 375:19
force 384:5,6
foregoing 682:3,5
    684:13 685:18
foresee 511:4
forget 562:17
forgo 612:25
form 396:19
    398:10,13 401:15
    402:24 403:9
    406:10,13 408:15
    409:11 411:25
    413:16 414:12
    415:16 416:7,12
    417:16 419:25
    420:18,20 421:1
    421:19,23,25
    422:20 423:8,18
    426:12,13 429:6,7
    432:22,23,24
    433:10 434:14,15
    434:17 435:11,23
    436:2,7,20 440:14
    444:9,14 448:19
    451:16 459:7
    461:10 462:13
    466:5,12 467:8
    472:4,12,19 473:1
    473:21 474:14,23
    476:7 477:1,10

| | | | |
|---|---|---|---|
| 480:21 483:4,6,19 | 668:1 669:19 | 656:12,23 657:8 | **full** 385:18,20 |
| 485:20 486:5,14 | 670:2 671:1,9 | 657:15 660:17 | 423:6 454:7 |
| 486:15 489:5,15 | 674:10 675:16,25 | 674:10 675:17 | 460:10 471:22 |
| 490:5,19 491:17 | 677:3 678:8 | 676:1 677:6 | 527:18 531:1,2 |
| 493:15,19 494:5 | 680:14,19 | **four** 429:25 453:8 | 569:17 603:3 |
| 494:21 496:22 | **formalized** 625:15 | 453:13 492:2 | 664:21,22 |
| 498:4 500:21 | **format** 563:2 | 494:11,16,25 | **fuller** 367:6,6 |
| 501:6,8 502:11,20 | **former** 402:22 | 645:25 | **fully** 485:9 597:6 |
| 502:21 503:3,23 | 503:15 504:4 | **fourth** 366:4 | 651:5 |
| 505:17 506:9,14 | 558:25 559:1 | 457:24 | **function** 445:22 |
| 506:20 507:8 | 623:3 | **frame** 604:11 | **functions** 380:14 |
| 509:13,22,23 | **forms** 440:6 | 625:5 | **fund** 648:21 |
| 521:1 543:21 | 470:12 497:1 | **frank** 604:2 | **further** 535:16 |
| 544:10 554:11 | 586:20,22 640:14 | **frankly** 399:1 | 537:19 542:20 |
| 559:15 560:23 | 641:1,4,7 | 579:22 580:6 | 546:14 548:22 |
| 563:7 567:7 571:8 | **forrest** 372:11 | 583:23 628:2 | 549:7 554:15 |
| 572:20 577:19 | **forster** 366:19 | **fraud** 372:11 | 562:25 567:5 |
| 592:13 596:1 | **forth** 482:9 533:17 | **free** 395:5,8,10,15 | 597:1 599:10 |
| 601:21 602:23 | 596:9 | 404:15 409:3 | 651:25 677:1 |
| 616:19 617:21 | **forward** 514:25 | 684:14 685:20 | 682:13 |
| 627:16 629:4 | 683:15 | **freeport** 377:21,23 | **future** 619:4 |
| 632:15,24 633:23 | **forwarding** | 377:23 | |
| 633:25 634:10 | 594:13 | **frequency** 418:5 | **g** |
| 635:17,25 637:16 | **found** 380:23 | 420:8 421:11 | |
| 637:21 638:1,6,7 | 407:21 418:8 | 535:10 538:12 | **g** 375:1 |
| 638:24 639:19 | 451:24 467:23 | 539:24 555:17 | **gao** 574:15 575:4,7 |
| 640:2,9,15,18,21 | 553:6 567:1 | 571:16 572:2,21 | 575:18 576:5,10 |
| 640:22 641:2,8,12 | 658:24 | 572:25 | 577:24 579:7 |
| 641:20 642:4,5,9 | **foundation** 434:16 | **frequently** 571:11 | 659:6,11,12 660:8 |
| 642:10 643:8,20 | 435:2 451:17 | **front** 463:12 | 660:10 |
| 644:7,9 646:11 | 457:5 461:11 | 468:25 476:20 | **garage** 400:19 |
| 647:12 648:2,25 | 462:15 476:8 | 484:4 522:6 | **gath** 581:19 |
| 649:8,10 651:10 | 477:2,11,19 | 524:11 535:3 | **gathering** 519:19 |
| 651:12,21 652:14 | 479:20 480:6,22 | 560:16 561:1 | 542:25 625:9 |
| 653:10,15,20 | 482:13,19 483:5 | 589:16 620:5,20 | **gear** 514:3 |
| 654:3 655:4 | 483:20 484:23 | 634:18 648:11 | **gee** 502:7 |
| 656:11,22 657:7 | 485:14 486:6 | 649:7 651:16 | **geldhof** 604:4 |
| 657:14 658:18,19 | 502:20,21 503:11 | 655:1,21 | **general** 383:22,23 |
| 659:1 660:18 | 503:24 505:17 | **frontline** 392:20 | 387:14 392:13 |
| 661:2,18 662:6,7 | 649:25 650:16 | **fulfill** 656:7 | 400:1 447:7 |
| 662:19 665:3 | 651:11 653:11,16 | | 527:11 603:19 |
| | | | **generally** 395:8,17 |
| | | | 395:23 401:5 |

422:8 453:22
492:1 498:24
517:1 521:24
524:7 532:7
610:23 660:1,23
**generated** 611:22
**generically** 546:5
547:6,8
**gentleman** 506:2
**getting** 382:17
394:10 409:19
426:16 447:25
450:2 457:13,15
619:4 668:18
673:4
**gist** 577:17
**give** 381:18 385:23
386:6 395:1,4
399:17 428:20
453:13 463:6
469:12 473:3
483:24 491:3
498:13 503:1,5
525:4,9 553:15,15
576:3 580:13
621:3,6,20 622:1
631:19 643:13
652:22 658:5
669:16 677:15,15
677:16
**given** 394:23
452:8 495:4
508:17 531:22
605:10 641:10
669:16 682:10
**gives** 468:19 492:8
617:17 618:16
**giving** 400:25
435:14 438:6
468:25 551:4,5
669:10 677:17

**go** 376:9,20 377:11
379:14 384:19,23
386:24 396:5,14
399:9 400:5,18
401:5,25 402:25
403:4,21,22
406:15 408:24
425:9 427:4 430:5
430:23 435:6
449:8 453:4
455:22 475:8
496:17,18,19
504:21 515:17
520:17 524:25
525:1,8,13 542:11
542:19,20 550:3
561:8,13,14
566:20 567:8
577:14 579:15
585:24 592:15
601:25 604:12
606:10 609:11
611:21 616:21
617:22 625:18
629:25 631:5
636:16,24 651:25
651:25 655:12
668:9
**goes** 441:18 455:6
**going** 377:12
381:24 384:10,24
386:12 393:17
396:11,14 406:2
414:3,9 418:10
426:15 427:5,8,17
427:19 428:19
430:25 431:3
445:16 449:7
450:17 453:5
462:6 466:25
467:4 471:21

473:3 475:10,13
486:10 489:16
490:12 495:20
499:3 507:19
508:7 512:6,9,21
513:12 517:5,10
525:4,9 548:6,6
551:5,12 561:25
562:3 569:21
575:16 576:3
578:13 580:23
581:1 582:10,12
582:16 600:4
601:15 609:15,22
627:1,3 630:14
631:7,11,20 639:9
639:10 647:18
651:19 654:17
663:8 669:8,16,23
673:24 676:3
681:6
**gold** 385:9
**golkow** 375:5
**good** 413:3 425:11
435:2 440:11,24
509:1 513:2 541:2
555:23 580:10,25
582:22 610:6,7,8
610:12 616:11
632:12 638:16
658:11 662:15
**gotten** 512:15
**gottlieb** 558:22,24
**government**
391:11 429:13,14
468:21 563:6
574:16,17 575:1
593:21 668:15
669:14,24
**governs** 525:22
527:20

**graduation** 379:5
**grant** 371:12
**gray** 370:20
**great** 561:21
570:13 574:19
**greater** 523:24
524:12 573:20
577:5
**greene** 367:3
**greeneketchum....**
367:5
**gregory** 366:3
683:5
**grew** 377:19,20
**grocery** 412:18,20
**gross** 387:5
**group** 367:6 384:4
387:14 440:1
578:23 648:22
**groups** 388:25
389:2 395:6,12
444:13,19
**growing** 434:7
**guarantee** 548:24
566:25
**guess** 384:8
393:10 420:15
425:15 435:25
456:8,15 544:4
562:22 566:1
575:2 587:13
599:22,23 614:23
674:5
**guessing** 566:7
**guidance** 462:1
479:12 480:3,10
482:7 504:19
522:2,20 523:21
530:18 531:25
555:8 562:20,23
562:25 563:6,16

563:18,19 567:5
568:21,23 582:7
625:8,10,12
643:13 675:8
**guide** 504:4,5
**guidebook** 538:2,7
**guideline** 465:19
**guidelines** 374:14
374:15 581:5
648:15
**gun** 383:3 511:3
511:11
**guy** 380:22 501:19
605:20

**h**

**h** 372:8
**h.d.** 371:2
**hampered** 401:24
402:9 515:21
516:7,18 520:22
521:12
**hand** 470:10
486:23 654:17
**handed** 475:23
476:6,10
**handle** 411:17
412:21 413:1
418:17 469:17
476:24 657:2
**handled** 388:3
537:14
**handler** 410:22
**handles** 454:17
**handout** 530:22
**hands** 426:17
**handwritten**
373:23 374:7,23
512:13
**handy** 531:10
599:2

**hanly** 367:18
**happen** 382:10
425:7 510:13
511:10 664:25
**happened** 395:22
397:22 492:9
520:19 592:19
593:17 620:13
667:25
**happening** 382:19
477:16 492:8
507:12 511:5
**happens** 382:6
408:12 548:24
674:1
**happy** 559:20
**hard** 602:20,25
603:4
**harder** 540:2
**harm** 392:13,17
**harmed** 447:23
644:14
**harms** 438:13
**hart** 506:5
**hattiesburg** 367:7
**hazards** 438:13
**hbc** 371:10
**hdma** 648:15
652:18
**head** 471:8 514:9
517:17 521:15
559:1,3 564:15
591:2
**headquarters**
387:19 389:8,10
504:17 514:9,14
568:18 569:17
594:21 603:9
**health** 369:11
393:18 404:3
409:24 414:7

434:7 447:7,12
470:3 484:9
512:25 513:4
559:1 590:8,24
654:21 661:23,24
662:3 670:1 672:7
**healthcare** 374:14
648:17 676:24
**hear** 384:22
482:11 489:7
**heard** 455:21
468:25 560:24
637:22 641:21
642:12 648:16
**hearing** 374:10
522:21 523:6
581:9 601:15
618:18 622:12
**heart** 393:15
**held** 365:1 375:8
390:1 557:22
578:15,16 604:21
668:7
**help** 392:3 393:8,9
396:6 405:7 406:4
430:13 492:21
493:1 494:24
504:5 522:12
576:15 577:1
650:9 668:16
**helpful** 493:4,4
**helping** 393:19,20
395:24
**helps** 487:21
492:22 494:17
**hemorrhaging**
404:7
**hereto** 682:16
**heroin** 388:4
407:19

**hey** 466:1 480:19
645:11
**hhs** 666:19
**hi** 645:20
**hide** 666:1
**hidta** 388:25
**high** 377:23,23
388:25 389:1
405:25 406:8,20
455:7 666:25
**highly** 600:13
**hire** 503:9
**hired** 394:5
503:15
**historically**
395:21 519:4
580:1,10
**history** 647:16
**hits** 645:9
**hold** 556:2 578:10
578:13 670:18
674:13,13 677:14
**holding** 557:13,20
**holistically** 579:24
580:8
**home** 386:14
594:15 595:14,17
599:20 601:8,19
602:7,21 646:3
667:24 668:4,5,9
668:17
**homes** 413:22
**homicide** 384:5
387:15
**homicides** 384:6,7
**honest** 581:17
**hooks** 379:4
**hope** 504:3 564:17
**hopefully** 435:21
**hoping** 623:12

hospice 500:9
hospital 411:4
550:21 586:15
658:5 664:15,17
664:21 676:23
hospitals 411:24
412:13 413:21
418:20 437:1
440:22 441:7,21
445:6 586:12,17
663:22 664:4,14
hour 394:9,15
588:9
hours 495:4
587:16 588:12,15
668:10
house 502:25
622:15 667:7,15
housekeeping
609:20
houses 386:24
housing 384:8
houston 367:15
hubbard 371:16
huh 418:21 531:18
536:2,6 538:15,24
539:2,5 540:14
594:2 595:15
596:22 600:7
613:15,18 615:9
617:8 619:2
huntington 367:4
371:7
hydrocodone
407:24 410:5
433:24,24 454:19
454:20,22 455:4,5
455:15,16 456:12
496:9 538:22
540:15 549:5,6
551:19,20 585:21

666:12
hydromorphone
455:5
hypothetical
493:25 494:22
505:19 540:19
541:5 550:5,23
551:23 553:11
615:8 645:5 646:9
hypothetically
542:2
hypotheticals
676:9

**i**

idea 385:20
404:21 442:6
492:11 493:3
551:25 599:1
627:25 629:12
637:12,18 645:10
647:15 663:17
667:23 671:4,11
identical 564:2
identification
414:14 428:23
463:10 471:13
473:7 475:17
479:12 484:2
487:1 512:20
525:7,12 576:8
594:25 610:3
622:19 630:11
634:24 648:9
652:5 654:24
655:18 671:15
identified 409:14
435:20 436:1
594:20 595:4,6
identifies 418:2
419:15 420:6
565:24

identify 393:9
420:24 421:2
422:13 479:25
482:4 571:8 572:1
573:2,14 597:5
630:10
identifying 434:24
493:1
ii 364:17 366:7
405:24 406:5
407:23 408:4
496:5 526:14
584:21 585:19
586:23 666:15,21
iii 496:5 526:17
585:3,7,8,15,16,21
586:23 666:22,23
illegal 447:5
680:11
illegally 667:14
illicit 382:5,16,17
383:24 392:12
402:5,13 407:21
illinois 368:17
371:17
ilr 640:8,10
imagine 462:6
541:12
immediate 402:2
404:4,11,23
409:25 425:14
452:1 468:11
469:21,24 510:10
516:9,21,22 517:2
589:13,20,25
590:6,7,17,23
591:4,9,11,17
592:7,22 593:1,8
617:4,12,16 618:8
618:12,12,24
619:4,12 623:14

624:9 627:6
628:16,25
immediately 470:8
499:13 590:1
617:18 653:1
imminent 404:2,2
409:23 468:8,10
470:2,6 590:11,14
590:15,17,20,21
590:24 629:2
impaired 519:21
543:2 679:22
implementing
485:11
implication 667:5
implications
422:18
importance 625:9
important 398:18
459:21,23 501:25
611:11 647:7,9
importantly 498:8
508:20
impossible 571:1
impression 592:20
improper 626:8
improperly
438:15
improve 576:14
576:25
impute 676:17
ims 638:23 639:16
inability 494:15
incidence 405:25
406:8,20
include 407:2,7
418:19 443:10
598:20 630:20
included 374:25
408:5 683:13

includes 417:24
including 403:6
478:8 479:7,24
489:19 649:23
inclusive 460:24
incomplete 494:22
505:18 540:18
551:22 553:10
645:4
incorporate
459:14
incorporated
470:7 685:12
incorrect 466:7
increase 499:2,8
542:12 549:5
550:13,18 552:23
increased 398:25
398:25 495:12
497:16 498:24,25
independent
528:11
indiana 369:17
371:4 378:17,19
378:24,25
indianapolis 371:4
378:1 379:4
indicate 453:5,14
453:20
indicated 560:4
indicates 458:12
465:14
indicating 683:13
indicative 453:19
indictment 619:7
individual 443:17
446:7,7,13 465:12
498:3 535:21
563:13 564:20
565:20 566:22
571:6 611:8,14

individual's
567:11
individualized
612:5,17
industrial 451:9
498:17 499:23
industries 369:6
450:24
industry 374:13
374:15 415:7,22
416:9 417:14
431:15,16,18
432:18 460:23
461:6,19 487:11
495:5 497:15
498:11 518:6
529:14 537:15
572:10 574:11
580:16 610:19,22
610:23,23 635:8
635:12,24 648:14
667:22 670:11
671:23
industry's 420:11
423:13 634:17
influence 417:6
info 386:7
inform 651:18
information
389:21 396:13
414:19,23 423:21
424:9 427:21
451:21 457:18
462:4 475:1,5
519:5,23,24 531:1
531:2 541:23
542:17 543:7,9
576:13,24 577:6
578:20 597:15
601:3 602:7 605:6
605:8,10 616:2,4

616:11,15,17,23
618:11,20 629:21
629:22 630:2
636:12,14,19
637:1,3 660:2,25
673:9
infrastructure
444:3 446:22
ingredient 496:24
initial 416:20
587:11,14
initially 381:21
402:20 424:12
initiate 616:12
initiating 432:19
innocent 511:13
inquire 458:10,13
inside 503:10
517:6 664:17
insight 492:8
inspect 518:5
inspected 569:16
inspection 404:22
569:19
inspections 504:21
507:16 527:4,7,12
527:16 528:2
529:7,15 569:25
instance 386:23
439:7 456:2
516:21 541:18
instances 424:18
540:2 569:3
instituted 522:12
instruct 636:25
639:11 673:21
instructed 620:8
647:3
instructing 672:18
instruction 416:14
508:17 598:25

621:15
instructions 483:8
insurance 397:24
401:23 661:23
insurers 661:23,24
662:3
intelligence
519:19 542:25
intend 672:6
intending 672:8
intensity 389:1,1
intent 544:25
545:2
interacted 415:19
interacting 415:14
interaction 659:25
interactions
423:25 424:7
481:7 537:7
580:19,19,24
interest 467:1
486:22 555:12
669:25
interested 395:18
397:24 682:16
intern 379:7
internal 537:18
543:4
interned 379:3
internet 380:21
425:17 596:9,11
596:20,23 597:3
599:23
interplay 398:2
interpreted 653:6
interrupt 450:20
585:11
interruption
505:10
interview 579:8
587:2,12,15,17

**interviewed**
575:10,12 587:6
**interviews** 587:19
589:3
**introduce** 594:22
**introduced** 402:20
520:24 584:4
**inventory** 437:5,7
443:18
**invest** 638:18
**investigate** 382:14
382:18 403:23
404:9 507:11
520:6 553:3,4
574:20,20 616:1
629:3
**investigating**
519:2 555:3
615:20
**investigation**
486:17 518:25
519:1 546:14
548:22 553:16,18
553:22 554:15
557:4 611:9,20,23
613:1 614:13
616:5,12 619:6,14
621:9 638:21
651:6 674:23
678:24
**investigations**
424:10 451:22
475:2 483:9,11
485:24 518:2,17
518:20,23 567:2
616:3 617:25
618:1,4,5 619:21
622:14 625:11
628:17 629:8
651:5 674:6

**investigative**
481:15 519:18
542:25 546:11
547:24 548:11
575:2 679:21
**investigator**
381:22 382:12,21
542:19 675:8
**investigators**
548:20 555:22
563:8 569:20,22
569:24
**invited** 399:22
**invoices** 586:23
**involved** 397:9
467:13 554:2
608:20 609:3
614:24 615:10
**involvement**
608:24
**involves** 554:15
**involving** 609:3
**iqv** 638:23 639:16
**island** 377:20,22
**iso** 625:22 626:5
629:3
**isos** 623:5 625:10
625:23 678:19,20
**issue** 409:25 468:9
468:11 472:17
500:16 509:12
559:7 581:5 582:7
590:6,20,23 591:4
591:19 623:5
665:11
**issued** 451:25
516:9 567:4 591:7
591:11,14,17
592:17 593:8,13
**issues** 467:6,23
561:12 649:6

**issuing** 510:9,10
575:7
**item** 609:20
**iv** 526:17 586:23

**j**

**j** 367:6 368:12,15
371:19 372:11,12
**jail** 404:14 409:2
**james** 366:7 371:6
**james.bennett4**
366:10
**janssen** 368:2
**january** 391:7
476:2 479:23
488:10
**jayne** 367:17
**jbarker** 368:6
**jconroy** 367:20
**jeffrey** 368:3,7
**jeffrey.sindelar**
368:10
**jenna** 366:19
**jennifer** 370:15
**jennifer.levy**
370:18
**jeopardize** 599:15
**jesse** 372:12
**jforster** 366:22
**jim** 603:23 604:4
**jmatthews** 371:9
**job** 364:25 382:20
382:24 383:19
387:16 389:6,16
389:25 390:25
391:1,9,14,18,20
402:3,10 479:1
503:1 504:19
507:6,10 509:18
512:1 518:15
560:21 574:23
580:11

**jobs** 381:19
388:21 429:19
**joe** 402:9 432:18
478:22 497:20
**john** 369:2
**john.lavelle** 369:5
**johnson** 368:2,2
**join** 648:21
**joining** 676:23
**joint** 644:4
**jones** 368:12,16
**jonesday.com**
368:14,18
**joseph** 364:18
365:1 373:2
375:11,16 430:1
683:8 684:4,9
685:4,13 686:20
**joshua** 368:20
**joshua.davis**
368:22
**jr** 367:2 368:7
369:2
**jralkes** 594:1
**judge** 364:6
468:21 469:3
**judges** 469:8
**july** 391:7 595:7
596:21 597:3
**jump** 539:11
549:22 551:1,18
**jumping** 552:12
**jumpsuit** 385:11
385:11 514:4
**jumpsuits** 385:13
385:14,24 386:9
**june** 374:5 472:2
576:11 581:25
604:8 682:23
**juris** 379:17

**jury** 376:22
377:17 381:15
385:20 392:2
394:20 413:15
430:14 463:3
465:25 473:5
484:7 487:4 494:2
494:11 495:19
497:18 502:6
508:19 651:16
659:22 667:22
**jury's** 649:13
**justice** 366:7
372:9,11,12 429:2
429:5,10,10,15
469:7 624:3 672:1
**justifications**
498:12
**justify** 552:22

**k**

**k** 370:11
**kaspar** 371:15
**kaspar.stoffelma...**
371:18
**kathleen** 371:2
**keating** 366:4
**keep** 380:8 390:1
390:25 442:17
504:10 517:4,5
556:18 575:25
595:16 602:20
647:3,10 648:1
651:17 668:16
**keeping** 599:19
**keeps** 669:7
**kept** 437:10
677:13,15
**ketchum** 367:3
**key** 445:1,9,10,19
492:6 632:21
635:13

**kids** 396:7,10
**kill** 646:16
**kind** 386:14 400:8
416:22 441:2
481:17 500:3
553:24 556:9
583:12 585:12
613:7 614:21,24
625:5
**kinds** 381:19
**kirkland** 370:16
**kirkland.com**
370:18
**klekamp** 366:4
**kmatsoukas** 371:5
**knew** 647:25
653:14 655:25
656:5,10,15 676:2
**know** 377:11
381:15,24 385:17
386:12,23 392:14
393:6 395:21
396:7,9 398:2,12
399:3 400:13
409:16,21 420:6
422:3 425:25
434:24 436:5
438:4,23 441:24
442:4,15 445:14
446:9,19 447:21
454:2,3,18 457:3
457:20 458:4
459:20,21 461:15
461:15 462:6
474:19 484:17
486:2 492:12
499:18 500:6,11
501:17 502:9
504:2 507:19
516:25 517:1,9
523:4 526:21,23

529:4 534:5 540:5
540:6 541:6,17
542:10 547:21
550:5,5,6,7,8,9,10
552:24 553:14
554:5 557:10,25
558:3,7,8,9,21
564:15 565:2,5
566:21 569:4
572:5,6,9 573:25
574:1,7,20 576:18
578:13,19 579:23
580:7 581:12
583:24 587:18
588:15 591:7
592:17,19 593:12
593:16 595:21
596:10 601:6,12
601:23 602:12,14
606:11 609:4
613:7 623:19
625:17 626:11
627:23,24 628:3
629:21 630:2,18
633:14 637:7,14
638:10 639:14
640:6,10 641:10
641:15,17 642:12
647:25 650:22
652:11 653:18
664:9,13 669:5
670:15,22 671:6
673:22,23 674:4
674:17 675:2,20
675:24 676:4
678:5 681:2
**knowing** 457:11
458:5 552:5
556:21
**knowledge** 502:23
502:24 516:7,16

564:12 628:7
674:16 675:1,21
**known** 637:2,6
653:18
**knows** 597:16
606:9 636:19
673:15
**kroger's** 412:18
412:19

**l**

**l** 364:24 371:2
682:2
**l.p.** 364:8,10,12
367:21
**lab** 387:4
**laboratories**
383:25
**labs** 386:24
**lag** 494:24,25
**laid** 435:1 498:19
**lakeland** 657:3
**language** 425:6
571:19,20,21
645:18
**lanier** 367:10,13
367:14 372:12,13
373:3 375:21,23
383:13,18 384:15
384:21 385:5
386:5 387:8 392:8
392:25 393:21
394:1,22 396:20
398:7,11,14 399:7
400:4,7,24 401:16
402:6 403:3,12,19
406:11,14,25
407:10,17 408:20
409:6 410:7,16
412:1 413:2 414:2
414:25 415:21
416:8,16 417:10

| | | | |
|---|---|---|---|
| 417:17 420:13,22 | 506:10,16 507:3 | 667:20 668:8,14 | 509:19,21 510:7 |
| 421:4,21 422:1 | 508:5 509:1,8,9,16 | 668:22 669:22 | 510:12 519:18 |
| 423:5,11 426:5 | 509:25 510:2,4,14 | 670:4,17,20 671:5 | 521:3,18 522:16 |
| 427:3,11 428:24 | 510:25 511:8,17 | 671:12,16 672:12 | 529:16 597:4,19 |
| 428:25 429:11,23 | 511:23 512:6,12 | 672:17,22 673:2,6 | 599:8 600:14,21 |
| 430:23 431:6 | 513:18 515:19 | 673:20 674:2,3,20 | 600:25 616:25 |
| 432:14 433:6,12 | 522:5 529:20 | 675:19 676:6 | 632:5,12,12,13,18 |
| 435:5,12,24 436:4 | 559:23 560:12 | 677:12,22 678:2 | 633:7 634:8,8 |
| 436:9 437:9 | 566:14 583:10 | 678:11 680:2,16 | 635:5,22 643:25 |
| 438:20 439:12,19 | 584:2,14 589:13 | 680:23 | 658:7,25 679:20 |
| 439:21 441:12,17 | 620:25 621:12 | **lanier's** 513:13 | **lawful** 446:1 |
| 442:13,21,23 | 631:5,16,17 | 585:25 592:4 | **lawlor** 372:14 |
| 444:10,17,22 | 632:20 633:5,13 | **lanierlawfirm.com** | 375:4 |
| 448:3,24 450:19 | 633:17 634:5,14 | 367:12,16 | **laws** 464:19 |
| 452:3,17 453:2 | 634:21,25 635:19 | **lardner** 371:7 | 521:18 522:11 |
| 457:6,25 458:24 | 636:2,5 637:9,10 | **large** 401:25 | 525:22,23 |
| 459:10,24 460:22 | 637:19,24 638:3,8 | 403:14 454:18 | **lawsuit** 376:4 |
| 461:13 462:16 | 638:22,25 639:17 | 499:6 | 601:3 |
| 463:11 466:9,16 | 639:24 640:5,12 | **largest** 413:14 | **lawyer** 380:5,12 |
| 466:23 467:3,18 | 640:16,19,25 | 414:6 | 422:3 583:14 |
| 468:1,12 471:1,20 | 641:6,9,18,23 | **late** 388:18 668:10 | 635:20 636:8 |
| 471:24 472:5,15 | 642:7,15 643:12 | **latin** 442:10 | 642:23 645:21 |
| 472:20 473:2,8,23 | 643:22 644:15 | **laura** 367:17 | 651:15,17 654:7 |
| 474:3,4,17 475:8 | 645:8,16 646:13 | **lauren** 372:2 | 654:13 669:13,17 |
| 475:18 476:11 | 646:19 647:20 | **lavelle** 369:2 | 676:8 |
| 477:4,13,21 | 648:5,10 649:2,11 | **law** 367:6,10 | **lawyers** 394:6 |
| 478:17,21 479:21 | 650:2,8,14,17,20 | 372:12,13 379:16 | 432:17 465:24 |
| 480:8 481:2,19,25 | 650:24 651:14,24 | 379:20,21,22 | 489:12 490:11 |
| 482:2,16,23 | 652:6,15 653:12 | 380:8 395:9 | 495:5 497:15 |
| 483:15,23 484:3 | 653:17,24 654:6 | 415:25 416:1,2,22 | 500:19 502:18 |
| 485:1,16 486:1,9 | 654:17,25 655:5 | 417:7,7 423:15 | 607:2 624:7 632:3 |
| 486:19 487:2 | 655:12,19,24 | 424:24 426:3,8 | 643:24 662:23 |
| 488:2 489:9,21 | 656:14,20,25 | 428:8 452:8 453:1 | 667:22 |
| 490:1,6,20,25 | 657:10,17 658:21 | 464:21 465:19 | **lay** 569:4 |
| 491:10,21 493:16 | 659:4,20 660:4,11 | 467:24 468:3,21 | **lead** 439:10 |
| 493:20 494:7 | 660:14,20 661:4 | 469:2,8 473:18 | **leadership** 573:19 |
| 495:2,9,15 497:3 | 661:20 662:8,12 | 474:12,20 479:14 | **leading** 423:10 |
| 497:23 501:1,9,22 | 662:21 663:7,11 | 480:11 481:1 | 444:20 505:7 |
| 502:4,14,22 503:7 | 663:14,21,24 | 482:9 489:3 | 507:22 510:1 |
| 503:19 504:8,23 | 664:1,11 665:9 | 491:16 502:18,18 | 554:1 591:20 |
| 505:2,8,15,25 | 666:5,24 667:10 | 504:10 507:2,5,20 | 593:14 623:10 |

643:19 644:8
645:13 647:13
665:7 668:13
**learn** 392:21
494:11 563:17
**learned** 423:21
615:24 625:24
**learning** 626:5
**learnings** 567:3
**leave** 391:17
486:10 489:24
531:16 571:1
**led** 397:25
**left** 393:18 399:11
426:23 461:23
475:19 476:1
480:12 515:25
516:4 520:19,25
557:24 572:1,22
573:19 579:10
581:18 591:24
654:8,18,20 656:1
656:5 679:4
**legal** 382:7 394:3
421:24 437:20,20
442:17 443:7
448:6,9 451:14
464:16 503:2,6
507:14 677:4
683:1 686:1
**legend** 454:4,8
**legislation** 521:12
522:23
**legislative** 522:24
**legitimate** 382:4
409:16 450:7
451:8 498:16
499:22,24 528:14
541:14 585:16
**length** 626:19,21

**lenier** 471:14
**lest** 497:18
**letter** 373:10,12
428:15 429:24,25
430:12,15,17,18
431:7,19,20,23
432:20 433:15
444:24 446:25
449:8 450:22
458:8 459:19
462:9,22,22,24
463:6,16 464:3,6,9
466:25 474:10,11
479:9 480:17
531:6 557:14,16
563:1 567:5,14
571:5 573:7,11,16
612:21 683:19
**letters** 417:2 425:5
428:7,12,13 463:5
464:2 467:5,16
478:5,9 479:5,7,11
479:15 480:4,11
482:8 488:13,20
529:14,18,19,22
530:7 535:19,22
555:24 556:1,7,13
556:15,17 562:9
562:13,15,19
563:25 564:1,4,8
564:11,12 565:8,9
565:12 573:6
643:16
**level** 405:3 443:14
495:19,22 545:18
548:5 569:19
**levels** 495:12
497:16
**levy** 370:15
**lewis** 369:3,6

**lfitzpatrick** 367:20
**liability** 488:5
**liaison** 504:17,18
537:12,22 572:4
578:23
**liber** 372:8
**license** 378:17
380:9 590:3
**licensed** 378:13,18
412:25 438:9,12
**licenses** 425:2
**lie** 630:1
**life** 378:15 387:11
455:22 500:12
**lifestyle** 455:11
**limit** 495:25
499:17 510:21
644:13
**limitations** 522:22
**limited** 453:17
454:12 455:3,4,10
628:7
**limits** 386:3
510:18
**linden** 670:13,15
671:6,13 674:4,12
675:21
**line** 442:13 553:23
662:17 664:22
673:11 683:13
685:7 686:3
**lines** 574:6 620:23
621:23
**liquids** 392:11
**list** 458:9,19
460:15,16 636:12
636:14,24
**listed** 382:3 518:3
525:24 585:21
685:7,17

**listen** 671:13
**listening** 581:1
605:5
**listing** 685:7
**litigation** 364:5
375:5,10 392:5
393:20 394:7
582:25 600:16
605:18 606:7,15
608:9 683:6 684:3
685:3
**litigations** 603:13
603:19
**little** 376:21
377:18 384:14
385:23 399:20
400:11,17 439:25
485:6 487:20,20
588:14 611:1
613:4
**lived** 646:3 653:25
**living** 451:13
**livingston** 371:10
371:13
**llc** 366:16,20
369:17 370:15,19
**llp** 365:8 367:3,22
368:3,8 369:3,6,11
369:18 370:3,8,12
370:16,20 371:3,7
371:11,16 372:3
**lobby** 634:3,8,9,13
**lobbyists** 633:21
635:13
**local** 504:16 545:9
545:13,18 546:7,9
548:1 572:5
578:24
**location** 552:6
651:7

**log** 374:6 600:5
601:1 669:3,4,6
**logan** 370:4
**logical** 406:9
**logically** 579:23
580:7
**long** 377:20,22
390:25 420:5
479:4 498:11
522:18 571:2
587:14 588:7
622:4 623:13
632:13 657:4
**longest** 626:10,12
**look** 377:14 389:5
390:17 417:22
433:13 446:10,11
452:4,6 453:10
457:21 458:6
459:3 476:19
483:16 485:2
487:4 498:10
505:9 518:23
522:24 525:18
526:6 531:11
533:2 541:9,23
542:7 546:12
551:15,15 552:3
557:3 559:20
563:17 567:18
570:3,7 578:2
592:4 602:1 635:4
647:10 649:7
651:2 652:21
656:1 663:25
**looked** 380:22
425:10 462:21
479:5 492:15
545:4 566:9 601:9
601:10

**looking** 397:20
419:1,3 446:13
454:4 457:17
480:24 487:19
493:11,23 498:19
518:20 542:6
550:16 552:9,11
566:18 596:13
605:9 615:4 663:5
**looks** 376:17
**loopholes** 643:24
**los** 370:13
**losing** 426:23
**loss** 499:14
**lost** 395:7,7 396:7
408:25 426:24
**lot** 396:5 399:4
405:2 444:5 512:1
536:16 547:12
558:4 588:20
596:8 599:25
614:17,18 642:2
649:4 679:6
**loved** 395:7
**low** 453:24
**lpa** 371:20
**lpincus** 372:5
**lsd** 388:11
**lubbock** 449:1
477:7
**lump** 614:12
**lunch** 512:11
**lynn** 506:5

**m**

**m** 366:3 368:20
369:18,19 372:10
**ma'am** 513:7,11
513:17,21,21
515:6,10 522:8
534:6,9,12,15,18
534:21,24 558:17

562:11
**madam** 683:10
**madison** 367:18
**magic** 584:8
**mail** 593:25 594:8
595:7,12 602:8
**mailed** 607:25
**mails** 583:20
593:20 601:18
603:8
**main** 368:8
**mainigi** 369:12
373:5 383:10,16
386:21 392:6
393:4 398:20
403:9,16 407:16
408:16 409:12
411:25 417:16
420:20 426:13
429:7 432:9,23
434:14 447:15
450:1 451:18
458:17 459:17
460:20 462:12,14
466:5,21 467:25
468:5 491:7
494:20 495:13
497:21 501:20
502:12 503:13,25
505:14,17,20
506:19 509:14,24
510:24 511:6,14
511:21 512:4
513:1,3 520:3,11
522:4 524:24
525:8,13,16
528:17,24 540:25
542:4 543:11
544:6,15,24
545:19 546:4,23
547:5 549:1,21

550:24 552:8
553:1 554:7,25
559:16 560:10
561:4,7,10,14,20
561:22 562:7
567:19 575:9,20
575:23 576:1,9,22
577:21 579:15
581:8 582:9
654:16 655:3,23
656:11,19,22
657:7,14 658:17
659:2,19 660:18
671:3,9 673:10
674:9 675:16,25
677:21 678:1,9
680:15,22
**maintain** 378:16
410:14 411:13,14
413:25 417:21
418:23 419:14,19
422:11 425:3
437:23 443:8
444:6,16 452:9
460:5,8 469:16
499:9 529:2 555:8
602:6 644:12
656:8
**maintained**
443:16 641:3
**maintaining**
417:23 419:4
422:22 424:25
449:15,24 529:8
532:2 550:14
647:15
**maintenance**
528:22
**major** 378:11
424:13 597:5,11

majority 579:24
580:8
making 405:6
432:2,7 441:9,13
522:19 541:25
596:13 628:21
malfunction 580:2
mallinckrodt
370:19 486:12,12
486:16,18 487:6,9
487:25 488:6,25
489:8,18,25
mallinckrodt's
488:11
man 376:24 377:2
506:6
management
374:14 648:18
mandate 643:3
manner 448:2
485:9
manual 547:23
manufacture
387:7 440:5,16
441:14 443:12
464:10 469:18
478:7 498:6
499:12
manufactured
388:6,7,10
manufacturer
411:5 413:18,19
420:16 436:23,25
441:4 446:17
463:22 487:13,14
492:16 493:11
496:16 498:5
499:19 578:17,21
612:4,15
manufacturers
401:25 402:25

403:5,24 404:13
404:25 408:25
410:11 411:19,19
411:23 418:19
419:11 424:1
431:13,17 432:1
436:12 440:4,8,14
440:15,16,21
441:13 445:5,12
449:13,20 461:7
464:7 467:13,14
481:8 496:12,14
496:22,25 497:6
502:8,17 516:12
518:7 526:3
527:21 572:11
574:12 600:15
602:5 636:13,17
642:1
manufacturing
535:23
mapes 536:15
march 622:12
marcus 371:11,13
marijuana 388:4
marino 515:9
mark 367:13
375:23 428:15
463:7 471:11
473:4 483:25
484:7 486:23
524:24,25 525:2,3
594:23 609:23
622:9 631:17
652:2 655:14
663:9 671:18
marked 428:22
429:1 433:15
463:9 471:12
473:6 475:16
484:1 486:25

512:12,19 525:6
525:11 576:7
584:5 594:24
609:21 610:2
622:18 634:23
648:8 652:4
654:19,23 663:16
663:16 671:14
market 369:3
635:12
marketplace
382:5 392:12
402:5,13 407:22
marking 471:25
marks 443:1
445:18
mart 371:19
maryland 369:2
mascot 378:3
massachusetts
368:21 370:22
371:8
master 372:7
508:16,23 509:2
620:10 627:8
673:25
master's 627:19
masters 369:13
material 440:5
496:23
matsoukas 371:2
matter 375:9
403:11 676:21
677:2,11,23 678:3
matters 403:6
matthews 371:6
maureen 369:7
maureen.barber
369:10
mccann 603:21
604:15,16,19,24

605:12,17 606:2
606:13,17,23
607:7,8
mcclure 370:3
392:23 393:25
397:11 406:22
408:15 409:13
421:25 423:8
434:15 435:23
438:17 439:3
441:11 471:18
472:4,12,19 483:4
490:23 491:5,18
502:20 504:25
505:4 507:21
508:16 509:13,22
510:5 639:19
640:2,9,22 642:4,9
643:8 648:2
652:14 653:16
662:10 665:5
mchugh 367:6
mchughfuller.com
367:8
mckesson 370:7
414:7 415:12
463:16,20,21
464:2 472:23,24
473:11,14 474:5
474:19,20 475:25
476:1,15,21,22
477:14 478:8
479:8,8,22 480:3
480:19 481:18,21
482:3,7,25 582:20
582:24 591:5,8,12
591:20 592:8
593:9,14 669:13
669:17
mckmdl003370...
373:17

**[mckmdl00355350-5363 - mischaracterization]**                    Page 34

mckmdl003553...
373:19
mckmdl004789...
373:12
mcnamara  369:12
561:12 633:23
634:10 638:6
md  364:5
mdl  364:4 373:11
374:19,23 375:10
606:15 608:8
mdl2804  374:21
mdlt1-00006079...
373:20
mdma  388:8
mean  383:14
400:15,18 403:20
403:22 407:24
410:19 416:17
429:5 431:22
438:21 447:14
449:22 452:24
461:7 490:2 503:1
511:12 514:24
535:13 541:18
550:11 554:3
566:19 573:8
576:16 580:24
596:2 605:7
606:13,14 607:18
608:4 641:15
653:6 658:3
660:21 666:8
676:2 677:13
meaning  437:18
means  439:13
535:17
meant  426:4,10
427:1 436:18
442:15 446:4
537:9

measures  510:8
media  385:3 427:9
431:4 435:1
461:25 475:14
482:14,17,21
512:23 562:5
582:18 609:17
631:13
mediation  592:9
medical  405:23,24
406:6,19 407:20
438:1,6 450:7
451:8 498:16
499:23 501:13,16
501:17 578:14,15
585:17
medication  378:21
411:1 500:6,13
medications
454:15
medicine  438:6
499:25
medicines  649:22
meet  488:12
499:22 507:14
583:10 587:9
588:7 657:4
meeting  507:20
537:5 558:4,14
604:8,18,21
605:22 606:3,25
607:4,15
meetings  431:24
434:20 467:17
474:12 519:11
529:13 530:21
531:5,8,13 535:19
535:20 536:25
537:1,4,23 538:1
556:5,11 557:18
557:21,24 568:24

572:6,7,8,13 583:6
604:14 605:25
606:1,5 643:15
meets  498:16
meghan  370:7
melville  366:13
member  380:6
members  635:13
649:5,20
memorandum
373:16,18,21
374:20,22 473:11
612:22
memory  464:20
632:10
mention  556:8
mentioned  556:6
556:11,14 605:24
619:11 670:8,10
meridian  371:3
met  375:24 500:14
538:13 540:4
569:12 580:15
583:1 587:11,12
588:1,4,8 606:12
619:10 666:20
methamphetamine
383:25 387:7
388:8
methodologies
605:17
methodology
556:22
methods  382:14
428:3 518:22
546:2
metric  580:13
miami  485:25
michael  367:6
michigan  379:17
379:19 380:7

middle  679:5
middleman
440:20 446:19
463:24 493:18
middlemen  451:3
456:19
midst  504:11
505:23 661:9
midwest  683:17
686:1
migliori  366:16
mike  367:8
mildred  367:9
mildred.conroy
367:12
military  391:3,16
million  474:6
482:18 485:18
579:20 580:4
635:14,22 657:21
658:1,3
mind  398:17
502:10 539:16
552:13 645:3
minds  554:9
mine  628:1
mini  569:15
minute  376:23
377:2 396:16,22
413:7 427:16,21
461:5
minutes  375:25
376:24 377:5
397:1,9,13 398:4,6
398:19 401:8,19
415:3,4 416:5
423:13 427:15
587:3 589:1,9
670:18
mischaracterizat...
501:7 665:4

**mischaracterizes**
549:15 560:7
**misplaced** 666:23
**missed** 559:14
598:14
**missing** 614:1
**mississippi** 367:7
**misstated** 488:19
**misstates** 494:6
619:16 651:22
663:20,23 665:5
667:18 669:20
**misstating** 663:25
**mistake** 442:22
475:22
**mistaken** 578:4
630:17
**mmonaghan**
370:10
**mnk** 373:22
**moa** 563:7
**moas** 563:5,10,16
563:17,24
**model** 420:4
**mom** 412:20
**moment** 380:17
384:11 427:4
450:21 452:5
505:10 535:4
561:11,15 670:7
**monaghan** 370:7
**money** 441:9,13
462:11,19
**monitor** 488:11
518:5,11
**monitored** 600:16
**monitoring** 374:18
493:7 524:1,14
529:5 534:17
564:25 565:2,18
565:19 570:4,8,14

647:8,8 652:9
**month** 494:25
538:23 540:15,16
549:5,6 551:19,19
**monthly** 630:5,20
653:2
**months** 390:4
393:6 492:2,9,10
494:12,16 580:22
587:13 665:1
**morgan** 369:3,6
**morganlewis.com**
369:5,10
**morning** 584:3
624:8
**morphine** 408:3,3
408:4,8
**motley** 366:16,20
**motleyrice.com**
366:18,22
**move** 392:12
396:15,21 456:16
557:25 597:23
627:3
**moved** 382:5
429:18 430:8
443:21 666:14
**moving** 409:15
**mt** 366:17
**muething** 366:4
**multifaceted**
635:7
**multiple** 422:8
456:18,19,25
457:4
**murder** 646:15
**myers** 368:3

**n**

**n** 366:19 373:1,1
375:1

**n.w.** 365:9 366:20
368:21 369:13,19
370:9,16
**naive** 439:7
**naloxone** 426:21
**name** 375:4,23
376:11 478:19
479:2 513:3 515:8
576:23 582:24
595:13 683:6
684:3,4,15 685:3,4
685:21
**named** 506:2
**names** 455:25
**napoli** 366:12
**napolilaw.com**
366:14
**narcotic** 644:5
**narcotics** 635:11
**narrative** 649:9
662:10 667:9,18
668:2
**nascent** 448:22
449:5,6
**natient** 448:25
449:4
**nation** 433:20
**national** 364:4
375:10 630:5,20
669:25 683:6
684:3 685:3
**natural** 408:5,9
**nature** 549:19
555:16 654:10
**neal** 368:12
**nearby** 400:20
**necessarily** 399:9
460:25 492:3
493:6 504:3 516:6
522:13 537:17
553:14,15 612:11

628:10
**necessary** 550:19
**need** 376:20
384:21 443:4,5
458:3 468:14
492:12 493:3
501:17 521:25
524:5 548:13
549:11 553:16
554:4,4 580:12
596:23 597:15
614:18 627:11
646:6
**needed** 424:15
452:18 522:19
549:24 578:7
582:7
**needs** 498:17
499:23 500:8,10
565:21 566:1
**nefarious** 668:7
**negotiating** 591:23
**neither** 682:11
**never** 394:5
397:15 442:5
455:21 476:9
481:17 492:14
496:17,19 523:9
523:13,19 524:11
524:17 560:8,14
567:3 568:10
571:20 628:5
637:22 641:21
642:12 647:3
668:3,7 680:11
**new** 366:13 367:11
367:11,19,24
367:24 372:4,4
377:21,21 432:7
432:19 433:3
448:18 465:19,19

573:18 625:8,10
626:13
**newport** 368:4,5
**news** 434:21 435:1
461:24 516:20
517:4 558:18
559:17,19
**nihta** 435:3
**nodding** 471:8
**nona** 372:13
**noncontrolled**
454:4,8,14,24
**nonexhaustive**
458:19,25 460:16
**nonpublic** 414:18
414:22 424:9
451:21 475:1
481:15 483:9
**normal** 382:3
418:6 420:9
421:12,13 454:23
454:25 535:9
568:8 571:12,17
573:3,15
**northern** 364:1
**notarized** 683:14
**notary** 682:1,20
683:25 684:10,18
685:15,23 686:23
**note** 460:1 621:12
621:13 624:1
683:12
**noted** 375:12
**notes** 376:9 428:5
443:2 512:14
599:7 662:25
**notice** 365:13
468:18,18,24
469:12 477:5
487:16 492:13
593:2

**noticed** 501:5
**notifications** 462:2
**notify** 549:18
628:15
**nstephens** 368:14
**nuanced** 544:17
**number** 389:17
428:16,17 463:2
471:2 490:18
491:25 580:23
624:23 625:3
633:20 634:20
683:7,13
**numbers** 464:19
487:20,21 542:6
549:3 551:4 552:9
552:11 685:7
**nurse** 411:6,7
**nursing** 413:22
**nwda** 374:18
652:9

**o**

**o** 373:1 375:1
**o'connor** 370:19
486:15 488:1
489:5,16 639:20
646:10 649:10
661:17 662:7
679:17
**o'gorman** 367:22
**o'melveny** 368:3
**object** 396:19
398:10,13 401:15
406:10,13 408:15
413:16 414:12,13
414:16 415:16
416:7,12 419:25
420:18,20 421:1
421:19,23,25
422:20 423:18
426:12,13 429:6

432:22,23,24
433:10 434:17
435:11,23 436:2,7
436:20 442:14
444:9,14 448:19
451:16 459:7
461:10 473:1,21
474:14,23 476:7
477:1,10 478:16
479:20 480:21
483:19 485:20
489:15,16 490:19
491:5,17 493:15
493:19 494:5
500:21,21 502:11
503:3,23 505:6
506:9,14 509:22
509:23 550:1
552:17 560:23
567:7 592:13
602:23 604:11
606:8 617:21
623:23 627:16
635:17,25 637:16
637:21 638:1,7,24
639:9,19 640:15
640:18,21 641:2,8
641:12,20 642:5
642:10 646:8
647:12 649:8,10
651:10,12 653:10
659:1 660:16
661:2 662:19
668:1 669:19
670:2 673:13,18
673:20 677:3,7
**objected** 620:19
627:2
**objecting** 575:25
**objection** 383:10
383:16 386:2,21

392:6,7,23 393:4
393:25 394:21
397:11 398:20,21
399:24 400:6,22
401:20,21 402:18
403:8,9,15,16
406:22 407:8,16
408:16,17 409:5
409:11,12,13
410:12 411:25
412:22 416:13
417:16 420:19
423:8,10,19 429:7
429:21 432:9
434:14,15 438:16
438:17 439:2,3,17
441:11,15 444:20
447:15 450:1
451:18,19 452:15
452:20 457:5
458:17 459:17
460:20 462:12,13
462:14 466:4,12
466:21 467:2,8,10
467:25 468:5
470:21,25 472:4
472:12 474:24
477:19 478:18
480:6 481:23
482:13,19 483:3,4
483:6,7 484:23
485:14,21,22
486:5,14,15 488:1
489:5 490:5,23
491:7,8,9,18,19
494:20,21,22
495:7,13,14
497:21 501:6,20
502:2,12 503:4,11
503:25 504:1,12
505:14,18 506:19

[objection - okay]                                                    Page 37

506:21,22 507:8
509:5,14,15,24
510:24 511:6,14
511:15,21 512:3,4
519:16 520:8
521:20 540:18
541:16 542:22,23
543:21 544:10,11
544:20 545:16,23
545:24 546:17,18
548:16,17 549:14
551:22 552:17
553:10,11 554:11
559:15 560:6
573:24 575:6,17
576:2,17 577:19
596:1 597:13
598:23 601:21
602:10,22 611:18
612:9 616:19,20
619:16 621:12,13
623:16 626:8
627:18 629:4
632:15,24 633:12
633:15,23,24,25
634:10,11 637:17
638:6,19 639:20
640:1 643:19
644:7,9 645:4,13
646:10,17 648:2,3
648:25 649:25
650:7,12,16
651:21 652:13
653:15,20 654:3
654:16 655:3,4,23
656:11,19,22
657:7,14 658:17
658:19 659:2,19
660:3,6,9 661:17
661:18 662:6,7,10
663:20,23 664:8

665:3 666:3,18
667:8,17 668:13
668:19 671:1,8,9
671:24 673:5,11
674:9,10,11
675:16,25 677:21
678:1,8,9 679:17
679:18 680:14,15
680:19,22
objections 457:9
481:4 547:2
objective 654:9
objectives 574:2
654:8
obligated 397:16
467:7
obligation 437:20
437:21 442:17
443:7,15 444:11
450:4 494:3
533:17,24
obligations 432:3
432:3,6,10 443:10
443:10,25 446:24
464:16 467:15
485:10 500:14
504:7 507:2,14,14
507:20 526:2
530:13 558:5
569:6 574:4 656:6
656:8
observation
392:20
observations
417:5
observer 607:20
obtain 440:13
obtained 618:11
618:20
obtaining 618:7
619:12

obtains 413:17
617:13 618:24
obviously 397:19
533:5 556:8
587:24 602:13
616:24
occasions 520:25
occur 447:18
518:8 618:2
occurred 384:1
395:21 397:23
425:16 552:23
occurring 392:18
404:19 409:23
425:18 462:3
occurs 447:20
october 475:21
486:8 517:8,15
odc 591:3
odd 657:21
offered 400:3
462:5 569:15
office 366:8
372:10 389:9,15
389:23 390:11
391:4,14 424:2
430:3,7 478:4,13
481:9 485:25
488:14 503:16
517:20,24,25
518:11 521:16
545:13 546:9
548:1 564:16
574:16,18 578:10
591:3 594:16
621:7 628:6,7
629:2
officer 511:2,10
644:25 645:2
682:2

officers 426:20
offices 401:3
504:16 545:10
546:7 572:5
578:24 604:22
official 414:20
684:15 685:21
oh 466:10 469:10
492:16 560:11
581:23 607:6
645:20
ohio 364:1,10,12
366:5,9 368:9
371:21 683:2
okay 377:8 378:18
380:21 382:9
391:9 396:17,23
401:7 413:8
422:10 424:11
427:3,12,24
429:12 435:6
442:11 444:23
466:11 471:7
474:3 481:16
485:2 491:1,4
492:2 493:21
500:15 513:16
514:13 515:14
517:9 524:24
526:19 527:13,25
533:16 534:4
535:5 536:15,20
537:6 545:13
549:2 556:12
560:15 561:6,21
561:24 562:24
564:7,18 565:6,13
571:25 573:1,12
575:4,17,20,21
577:3 579:15
581:24 582:9

593:5 594:18
595:10,22 608:18
609:24 610:14,19
610:24 611:3,5
612:3 613:4,6,9
614:2,3 615:2,7,11
615:15,23 616:8
616:13 618:7
621:24 622:3
625:4 627:13
631:17,22,25
636:19 638:23
639:6,13 643:3
654:5 672:22
674:14 680:6
**old** 492:2 501:8
647:7
**omm.com** 368:6
**once** 400:12
459:11 548:9
**one's** 678:6
**ones** 395:7 407:25
483:2 489:10
498:6 502:16
537:5 578:13
650:23 666:2
**ongoing** 619:14
621:10 647:8
649:21 673:11
**op** 364:9,11,13
**opaque** 581:2,3
582:6
**open** 553:16 574:6
624:4
**openly** 412:21
**operate** 405:1
418:1 465:6,15
466:2 533:18,25
565:22 675:12
**operated** 476:22

**operates** 548:19
**operating** 458:22
470:13 574:22
**operations** 372:13
387:21 390:5,11
390:14,15 391:6
**operatives** 680:4
**opiate** 364:5 408:6
683:6 684:3 685:3
**opinion** 401:24
416:10 423:17
432:25 447:25
632:17
**opinions** 414:18
522:15
**opioid** 374:9
375:10 376:4
392:5 393:20
395:20 397:15,23
403:6,14 407:19
407:21 408:5,6
434:2,24 438:14
439:7 456:12
470:19 500:8
559:10 588:18
603:13,18 649:4
661:14,22 677:24
**opioids** 392:11
403:11,17 407:11
407:12,15 408:2
408:13 411:17,18
411:20,23 412:6
412:10,13,21
418:18 424:1
439:1,4,7 462:3
493:12,21,22
500:10 501:14,25
504:10 558:19
559:7 585:9
586:18 658:5
663:18

**opportunity**
468:19,25 618:17
**opposed** 679:9
**ops** 680:8
**optional** 465:3
**order** 374:18
402:2 404:21,23
410:1,1 418:4,5,7
419:8,13 420:7,7
421:7,8,9,10
422:24 424:17
425:9 450:16
452:12 455:9
456:25 458:12
460:7 468:16,17
468:24 469:20,21
469:22,23,25,25
470:8,12,14
481:11 489:20
493:7,23 495:1
498:10 516:10,21
516:23 517:3
523:17,25 524:13
531:14 534:16
535:7,8 539:12
540:16 542:21
543:20 544:1,22
545:3,15,22 546:8
546:10,12,13,13
546:20 548:7,9,15
549:10,12,17,20
549:24 551:3,11
552:4,14 553:3,7
553:14,19,24
554:10,13,16,23
555:4 557:9
564:24 565:2,17
565:23 570:4,8,14
571:11 572:21,24
573:3,14 586:20
586:22 589:20

590:1,7,23 591:4,9
591:11,17,19
592:9,10,22,23,23
593:8,13 597:6
612:21 613:3
617:17 618:8,13
618:13,14,24
619:5 622:10
640:13 641:7
650:9 669:7 674:8
674:25 675:10
**ordered** 454:15
**ordering** 418:7
420:9 421:12
441:6 450:14
453:16,18,22
454:2,6,8,11,18,23
454:25 455:3,7
456:17 538:22
554:6 571:13,17
573:4,15
**orders** 374:16
418:2 419:15,17
420:25 421:3
422:12,15 423:3
424:5,19 425:8,13
425:14 446:11,11
451:7 452:1,2
458:7 460:9 465:7
466:20 468:9,11
479:13 480:1
482:5 483:13,13
488:12 492:6,25
494:4 510:9,11
517:3,11 528:11
533:19 534:1
535:8,10 543:13
543:16 544:8,13
544:19 545:1,8,12
547:4,20,23 553:5
554:1,1 555:15

556:24 562:22
565:4,24 569:3
570:24 571:8,15
572:2 586:22
589:13 591:7,14
592:6,7,17 617:4
617:12 619:13
623:15 624:9
627:7 628:16,25
640:13 641:17
649:19 652:24,25
653:5,6 664:25
676:4 678:7,23
**organization**
589:2 652:17
**organizations**
580:16 597:5,7,11
**original** 536:12
563:5 663:6
**ought** 556:2
**outcome** 682:17
**outlets** 413:24
**outline** 411:11
**outlined** 488:13
528:21
**outside** 412:18
414:22 466:14
502:25 575:19
588:11 626:22
**overall** 395:19
611:11
**overalls** 385:10,11
514:5
**overdose** 426:19
661:9,11
**overdoses** 392:14
398:25 426:22,23
**overflow** 428:4
**overrun** 426:22
**oversaw** 390:16

**overseeing** 388:25
**oversees** 518:1
**oversight** 467:22
560:22 622:13
644:17
**overtime** 668:11
668:18
**overwhelming**
579:24 580:8
**owned** 476:22
**oxford** 369:8
371:11
**oxycodone** 407:24
410:4 433:25
454:19,20,22
455:4,5,16 456:12
496:10 630:6

**p**

**p** 369:2 375:1
**p.m.** 681:9
**pack** 557:25
**page** 373:2 449:7,9
453:3 476:20
477:22 485:4
487:7,17,18,22
586:2 595:3,7
598:3 600:9
620:23 622:22
623:1 624:14,15
635:5 649:7 651:3
652:22 659:23
661:6 683:13,15
685:7 686:3
**pages** 429:25
584:9 598:5,10,16
622:17
**paid** 394:10 395:1
474:5 668:11,18
**pain** 425:17
500:13,17 501:3
615:25 616:1,10

616:16,24 619:8
626:6 661:14,22
**palliative** 500:9
**palo** 368:13
**panel** 455:14
**paper** 467:21
**paragraph** 452:7
477:5,18,23,25
625:19 675:4
679:5
**paragraphs**
625:19
**paralegal** 372:14
**parallel** 618:2
**pardon** 595:12
608:10
**parents** 396:6,6,7
**park** 367:23
400:19
**parking** 400:20
**parkway** 367:14
**part** 391:18
403:13,14 415:18
422:9 426:6
453:21 458:5
469:22 480:12
484:13 485:17
487:11 506:7,18
506:24 513:23
518:10,24 524:18
530:10,12 545:22
547:17 548:10
591:15 606:14
611:11 612:22
616:10 618:3
643:7,9 646:6
649:20 685:9
**particular** 492:15
504:5 526:20
531:3 541:22
546:21 547:9

550:7 552:4
567:21,24
**particularly**
398:18
**parties** 365:14
682:12,15
**partners** 580:12
**parts** 430:13
**party** 457:18,24
457:24
**pass** 380:3 490:9
512:7 521:11
582:10 609:9
**passage** 516:11
**passed** 401:22
402:8 404:10
405:15 438:22
515:3,14,23 516:3
520:21 521:1,2
530:1 532:11
**passing** 471:21
635:6
**password** 594:10
**patient** 397:24
401:23 413:24
439:7 440:21,21
500:9,10 515:12
639:25 658:6
664:18
**patients** 437:2
499:24 500:5
502:1 586:7,10
**patrick** 368:15
372:11
**pattern** 418:7
420:9 421:12,14
425:22 453:22
535:9 571:13,17
573:4,15
**patterns** 425:18
551:16 554:6

patterson 622:24
624:16,17,18
625:14,20 627:23
628:5 629:25
679:3
patterson's 627:25
629:10,18
paul 367:2,5
pause 384:10
406:2
pay 395:9,10
485:18
paying 668:16
pbeisell 368:18
peddled 635:11
pedestrian 645:9
penalties 488:5
pennsylvania
369:4,9 370:5
371:12
people 381:2
393:20 396:10
405:5 409:18
416:2,3 426:8,9,23
426:25 427:1
447:8,13,23
453:10 485:7,24
500:3 503:9
504:20,21,22
522:25 537:3,23
583:24 604:15
607:1,11,13 634:6
644:13 658:14,23
660:23 663:17,19
664:3,7,10,12,17
664:19,21,22
percent 414:9
415:8,10,11
453:25,25 454:2
455:1,3 500:2,5
579:25 580:9

622:25 657:22
perform 541:9
650:6
performance
414:20
performing 651:1
perils 392:22
period 393:17
398:23,24 479:23
488:10 514:15,20
514:24,25 517:18
520:18 555:9
556:3,18 560:2
565:7,15 568:1,18
570:23 571:2
572:12 574:13
575:5,8 578:18
596:7 641:15
permanent 391:13
permanently
430:9
permission 602:6
602:14
permutations
547:13
person 383:7
389:17 437:13,14
452:11 493:10,12
500:8 511:9,12,13
511:18,19 586:2
602:18 664:10,13
664:20
person's 586:3
personal 414:18
423:24 481:6
593:22,25 594:14
602:8 674:16
675:1
personally 415:17
524:16 537:10
572:14,17 684:11

685:15
personnel 572:11
perspective 493:9
pertain 525:24
peter 372:8
pharma 364:8,10
364:12 367:21
634:6 641:19,22
652:10 670:21
pharmaceutical
369:6 496:24
518:1 567:16
578:9,15 598:21
628:20 633:21
pharmaceuticals
368:2 382:2
426:25
pharmacies
411:24 412:7
413:21 437:1
440:20,22 441:6
441:20,21 443:13
445:12 449:13
453:21 480:2
482:6 484:19
492:18 502:8
526:3 574:12
586:12,18 600:15
602:5 630:7,12
638:5
pharmacist
378:14,19 379:2,6
379:8 396:2 411:2
438:9,12 439:19
442:5 446:12
450:10,13 501:24
542:12 551:7
578:22
pharmacists
395:23,25 403:25
443:24 578:12

580:18 635:11
664:4,7
pharmacologic
439:6
pharmacy 378:12
378:16 379:3,7,12
395:12,12 410:25
411:1,3 412:19
434:23 441:23
442:8 450:18
454:1,7,25 455:2
456:22 457:19,20
457:22 458:21
484:15 485:5
538:21 542:8
550:8,20 551:6,7
551:15 552:6
554:5 578:11
586:15 612:5,16
613:24 658:6
664:22
philadelphia
369:4 370:5
phone 572:16
578:24,25 583:18
683:3
phrase 535:11
physical 405:25
406:9,16 407:4
443:11 585:17
666:6,25
physically 437:6
physicians 378:22
574:13
physiological
667:1
pick 531:19 646:6
picked 401:6
picking 384:12
picture 376:8,17
440:12 449:19

[picture - presents]

634:18
pictures 380:23
pie 496:16,17
497:5,7,7
piece 467:21
pieces 497:6
pill 438:22 440:24
441:1 456:15,16
pills 437:13 440:2
441:3 456:7,9
496:25 538:22
pincus 372:2
pittsburgh 369:9
371:12
place 406:24 420:2
432:12 433:2
448:21 459:4
465:21 474:13
514:8 625:12
672:14
placed 480:1
482:5 589:16
places 385:17
placing 452:11
plaintiff 627:5
plaintiff's 583:6
583:13 586:4
604:10 609:21
617:10 624:7
631:4
plaintiffs 367:2
372:8 375:20
603:17 607:1
631:15
plan 404:17 677:1
planning 605:17
play 381:24 509:6
561:5,11
playbook 538:3
played 579:18

playing 666:1
pleasant 366:17
please 377:17
384:18 386:20
405:8 406:12
416:18 417:12
419:24 427:4
528:18 620:13
627:14 631:6
646:5 683:11,11
pleasure 681:1
pledged 656:15
pll 366:4
pllc 366:12
plus 390:20 435:2
461:24 579:25
580:9
point 378:14 384:3
403:18 404:17
405:4 409:20,25
424:15 456:15
470:1,4 480:15
489:1 496:14
497:14,19 499:7
521:14 522:2
553:20 555:18
564:13 565:14
581:15 614:1
615:16,18 643:23
647:21 657:24
pointed 642:23,24
pointer 553:21
points 537:18
police 426:20
494:3 511:2,10
644:25 645:2
661:25
policies 458:15
policy 389:22
432:7 504:17,18
537:12,22 572:4

578:23
polster 364:7
pop 412:20
poppy 408:10
porter 368:20
portion 672:25
portrayed 383:12
position 390:3
402:22 422:22
423:2 508:1 523:2
544:12 562:21
563:21 567:17
624:23 625:3
possessed 589:21
possible 471:23
548:12
post 374:12 379:5
397:20 398:5
516:22 589:10
634:16 635:2
potent 456:11
potential 387:3
427:23 468:8
493:2 553:24
555:3 560:5 612:7
612:18 615:25
616:17
potentially 496:1
pour 635:22
pouring 635:14
power 589:21
powerpoint 558:8
609:1
practice 422:2,4
450:9
practices 656:17
practitioner
410:23 411:8
practitioners
449:14

preamble 447:24
precise 611:4
precision 654:20
predecessor 652:1
predecisional
599:15
prepared 671:19
671:21
preparing 601:16
prescribe 438:5,5
450:7 619:1
prescribers
412:10 418:20
580:17
prescribes 410:23
410:24
prescribing 411:7
prescription 364:4
375:10 433:19
434:6 442:1
446:15 450:12
576:12 649:22
658:4 661:9,12,14
683:6 684:3 685:3
prescriptions
378:22 396:2
446:13 449:22
499:2,3
present 365:13
372:7 376:5 572:8
587:22,23
presentation
550:6 607:17,19
609:1,5
presentations
461:19,24 607:16
presented 632:18
presenting 470:2
629:7
presents 504:3

[pretty - purchased]

**pretty** 376:17
388:3 400:15
417:8 431:18
435:1 498:22
517:4 527:9
538:10 539:15
550:25 554:24
555:21 571:10
579:1 611:20
**prevent** 447:19
448:1
**prevented** 404:11
**preventing** 374:16
649:19
**prevention** 507:11
661:8
**previous** 645:7
**previously** 457:14
507:25
**primary** 379:4
**principles** 448:10
**printout** 653:2
**prior** 488:10 494:6
507:21 515:25,25
528:11 530:3,7,20
531:20 532:2
562:13 653:6
665:5
**priorprod** 374:19
374:23
**privilege** 374:6
599:8,9 600:21,25
624:2 669:4
**privileged** 595:5
597:14,20 598:24
623:24 626:23
672:4,4
**probably** 388:18
401:10 414:8
516:14 538:16
551:11 580:23

588:14 601:14
604:20,22
**problem** 416:20
424:14 433:20,21
433:23 434:7,25
435:2,4 503:20,21
504:3 506:8,18,24
509:20 625:24
626:5 657:12
662:16 672:16
680:11
**problems** 462:2
467:6,23 470:19
486:13 598:15
658:23
**procedural** 600:16
**procedure** 684:5
685:5
**procedures** 570:12
570:16,19,22
**proceed** 628:18
**proceedings**
469:15 470:14
529:17 618:2
628:17
**process** 404:6
523:6 543:5
546:11 548:11
590:1 591:16
597:19 599:14
611:8,10 612:20
618:17 643:10
**processes** 656:17
**procurement**
496:22
**produce** 496:25
497:1
**producing** 600:20
**product** 408:5,9
494:12 511:25

**production** 496:7
496:13,16 683:15
683:17,22
**professional** 450:8
**program** 459:4
**prohibited** 520:14
546:3
**prohibitive** 543:10
**project** 384:8
**promoted** 384:4
387:23
**promotion** 488:16
**promulgate**
532:13
**promulgates**
532:12
**pronounce** 376:13
376:14
**proper** 501:14
626:15
**properly** 445:22
460:19 509:18
**property** 646:24
**proportion** 454:14
**proposed** 522:23
522:24
**proposition**
459:13
**prospective**
445:24
**protect** 386:10
**protocols** 570:11
570:16
**provide** 413:24
504:19 522:1,20
523:20 553:20
589:2 606:17
630:4 675:8
**provided** 450:23
476:13 521:23
523:24 530:22,25

557:20 572:20
577:6 595:23
598:17 607:23
627:5 629:22
**provides** 532:23
599:10
**providing** 436:16
508:22
**provision** 419:8
465:21 532:22
533:3,9 535:7
614:22
**provisions** 404:10
417:25 418:1
521:23 524:8
525:23,23 532:10
657:4
**prudent** 556:20
**prudential** 370:21
**psych** 666:25,25
**psychological**
406:1,16 407:4
585:18 666:7
**public** 384:8
392:13 404:3
409:24 470:3,3,23
471:6 474:2 590:8
590:24 682:1,20
684:10,18 685:15
685:23 686:23
**publicly** 386:7,19
415:4 468:4 475:4
483:11 519:22
637:1,6
**pulled** 463:3
482:24,25
**purchase** 541:25
558:11
**purchased** 457:19
630:6

purchases 540:22
558:11 647:17,19
purdue 364:8,10
364:12 367:21
pure 542:6
purpose 431:20
433:17 450:8
purposes 446:1
678:24
pursuant 365:13
378:22 485:18
532:13,14
pursue 548:6
pursuing 517:11
619:25
push 417:2
put 387:10 392:2
410:10 413:11
414:4 429:13
434:10 437:1,11
440:1 442:24
443:1,4 445:17,19
458:8,15 464:21
470:15 473:4
487:3 493:8 499:8
531:6 535:3 556:1
557:14 577:22
579:4 646:21,24
648:15 662:16,24
665:15 680:18
putting 443:24
507:23 538:8
634:16

**q**

qualified 501:13
quantities 453:16
454:13,19 455:10
455:11 499:7
quantity 438:25
454:14 633:20

question 386:1
398:16 414:22
418:14 442:6
451:23 453:11
475:4 478:20
480:24 482:10
488:24 495:3
500:24 505:11
507:4 508:3,11
509:10 510:5
520:2 521:9
528:16 542:3,5
544:5,16 546:3
550:2,23 552:7
569:7 574:19
586:5 588:20,21
588:23 590:18
592:14 596:5
605:14 612:12
614:2 618:22,23
620:4,7,9,15,17
621:5,14,20,25
624:15 626:10
627:3,9 633:7,19
639:4,12 644:16
657:19 672:21
673:16 674:19
675:15 676:21
679:24,25
questioned 513:4
556:22
questioners 513:9
questioning
513:13,13 617:9
617:10 673:12
questionnaire
534:14
questionnaires
457:17
questions 377:6,7
377:11 396:25

397:16,21 427:21
454:5 458:14,19
459:15,21,22
460:24 471:3
490:14 500:18,20
504:15 505:13
508:7,8 515:3
537:14,21 540:21
540:23 568:25,25
569:10,20 575:18
581:7 588:20,22
605:13 607:22
608:21 614:18
617:11 626:13,24
627:6 631:24
632:3,7 636:6,10
642:21 659:8
660:12 667:11
672:10 673:24
676:14
quick 609:20
610:15 663:9
quickly 402:5
581:6
quit 439:13
quite 391:17 393:6
398:25 399:4
551:13 583:23
624:8 628:2
quota 414:3
495:12,19,22
496:3,4,7,13,21
497:7,9,16 498:2,3
498:11,16,20,24
499:5,8,8,9,13,15
499:16,17,22
500:1,2,4 523:8,10
523:11,14
quotation 413:11
442:24 443:1
445:18

quotations 413:8
quote 414:15
442:16,19 443:4
465:5 482:4
506:11
quotes 413:6
442:19

**r**

r 366:7 375:1
rachel 367:14
645:19,22 646:1
radar 457:2 511:3
511:11
rafalski 603:23
raise 456:23
ran 389:23 536:18
537:24
range 539:4,6,7
ranging 445:14
rannazzisi 364:18
365:1 373:2
375:11,16,22
376:15,16 389:5
402:9 414:17
423:23 427:13
430:2 432:19
442:20 478:22
497:20 513:2,19
515:2 521:10,17
524:10,20 525:1
525:14 535:1
562:8 573:13
576:4 582:22
583:5 589:7
593:20 595:2,14
597:10,16 598:19
601:17 602:4
603:6 609:7,19
610:6 615:3
620:22 621:7
622:21 623:11

624:12 626:23
627:4 628:13
631:17 681:1
683:8 684:4,9
685:4,13 686:20
**rat** 680:7
**raw** 440:5 496:23
**reached** 390:18
568:20
**read** 397:19
430:21 434:8
445:2 446:2 447:9
453:24 476:14
485:7 528:17,19
566:15,17 577:7
623:8,9 625:5
627:10,11,14,15
634:15 643:24
650:11 684:5,6,12
685:5,6,17
**reader** 567:15
**reading** 415:2
447:2 459:8 488:7
683:19
**real** 415:1 471:4
487:19,20 492:7
648:6
**really** 393:19
400:14 440:24
493:5 500:7
514:15 564:4
573:25 574:1
592:6 609:4
**reason** 485:17
499:20,21 540:11
541:6,13 595:22
629:17 658:25
668:7 683:14
685:8 686:3
**reasonable** 554:9

**reasons** 541:2
549:11
**rebate** 639:18
**recall** 399:16
428:10 472:24
481:13 513:6,8,20
514:6 515:8
531:24 538:21
539:8,21 547:22
557:15 562:12,15
562:24 564:7,11
567:9,10 568:9
572:23 573:16
575:4,7,10,13
577:3,17,23 579:4
579:17 586:1
588:6,19,21,24
591:6,8,10,16
593:7,11,12
604:14,15,25
605:1 606:25
607:13 609:4
610:20,21 619:15
619:18,19 622:4,5
628:19,20 629:5
630:23 654:11
**receipt** 683:18
**receive** 589:7
**received** 379:17
481:17 519:5
592:8 616:15,23
617:11 641:16
**recess** 385:1 427:7
431:2 475:12
512:11 562:2
582:15 609:14
631:10
**reciting** 508:6
**recognize** 501:24
**recollection**
416:23 423:25

424:3 481:7,10
536:24,25 623:12
626:2,9
**reconciled** 424:22
557:1
**reconciliation**
557:9
**record** 375:4,13
384:20,23,25
427:4,6,9 430:24
431:1,4 442:25
473:25 475:9,10
475:14 491:6
508:6 509:25
512:9,22 514:23
528:19 557:19
558:15 561:10,13
561:15,25 562:4
582:13,17 593:6
609:11,12,16
620:5 622:12
627:15 631:6,8,12
681:6 682:10
685:9
**record's** 620:12
**recorded** 587:17
587:24
**recordkeeping**
437:4,7,22 443:13
443:15,18 444:1
**records** 442:17
557:23 647:23
648:1 651:6,17
663:13
**red** 384:4 396:4
454:1,9,16 455:6
455:12 456:21
642:24
**redacted** 673:1
**redaction** 374:6

**redirect** 512:7
**reduced** 510:22
682:8
**redwell** 595:14,21
**redwells** 595:16
**reed** 370:3
**reedsmith.com**
370:6
**refer** 538:3
**reference** 563:19
683:7 684:2 685:2
**referenced** 431:14
450:24 477:17
559:22 562:9
684:11 685:15
**references** 477:6
**referred** 530:19
597:12
**referring** 515:11
529:19 571:7
**reflect** 414:10
509:25
**reflection** 531:7
**refresh** 623:12
626:2,16
**refreshed** 416:22
623:23
**refreshing** 626:9
**regard** 428:1
433:13 448:4
467:19 632:2
633:6 643:14
651:2 657:12
678:21
**regarding** 423:25
424:4,9 451:21
475:1 481:7,11
483:8 519:23
522:23 532:10
575:18 627:6
672:10

**regards** 387:10
646:4
**registered** 411:17
412:25 418:17
430:19 431:8
452:12 464:10
476:23 478:6
630:7
**registrant** 410:14
410:14,19,20,21
410:24 411:2,4,5,6
411:7,9,12,16
418:3,16 419:4
443:17 446:7
452:24 465:5,7,12
465:15 468:20
533:19 541:24
565:22,24 566:6
611:15,16 612:24
618:15 653:3
675:11
**registrant's**
420:11 491:15
565:20 567:12
590:2 680:17
**registrants** 411:13
411:19 412:2,6,11
412:14 413:23
417:21 418:15,22
419:10,12 422:11
424:4 431:11
432:5 436:11
444:15 448:7
449:12 460:5
464:4 481:10
484:14 491:13
493:2 504:5,14
518:6,11,14 526:4
528:10 537:8
562:10 563:13
564:9,21,24 565:6

565:16 567:21,24
573:21,22 576:13
576:24 577:5,25
578:7,9 579:20
580:4 586:9,11
610:18 643:4
657:21 659:14,24
660:22 675:9
**registration** 404:5
411:13 412:24
468:23 470:5,9
527:21 553:17
643:10
**registrations**
425:3 426:2
**regs** 527:8 571:17
**regular** 461:25
**regularly** 386:22
**regulated** 518:6
**regulation** 418:4
424:24 465:1,13
465:20 466:8,15
523:18 524:21,22
532:9,12 533:5,17
534:8,11,14,17,20
534:23 535:6,12
535:14 565:21
614:22,23,25
**regulations** 374:3
411:11 416:23,25
418:25 419:1,6
437:23 443:9
447:18 450:5
464:17,22 485:12
532:5,7,8,14,15
555:8 558:6
632:19 633:2
643:11
**regulators** 434:25
**regulatory** 572:5
600:17

**reinforce** 452:22
**reinforced** 529:13
**reintroduce**
582:23
**reissue** 499:13
**reiterate** 431:21
431:22 433:18
448:15 451:1
452:19 464:14
**reiterated** 448:10
**reiterating** 465:18
**relate** 526:8
**related** 384:5,7
470:14 516:12
518:2 521:19
532:2,22 564:19
566:4 572:20
575:5 608:6
644:16 682:11
**relates** 364:6
526:13,16
**relative** 625:10
682:14
**release** 373:13,15
472:1 473:10
477:15 542:14
669:8
**relevant** 392:4,10
396:14
**relief** 620:1
**relieve** 653:3
**reliever** 661:22
**relievers** 661:14
**reliver** 661:22
**rely** 452:11 493:6
493:6
**remaining** 598:16
**remains** 675:10
**remarked** 655:17
**remember** 388:16
416:4 418:16

428:16 433:8
460:12 483:17,21
495:16 500:20,23
500:24 501:10,11
513:10,25 515:5
522:13 530:24
536:5 538:18
558:21 559:6,11
559:12,17,24
560:17,18,20
577:10 578:1
581:9,16,17 583:3
584:6 587:4 588:4
589:18 592:8
593:23 603:14
609:2 622:7
623:20 632:6
635:1 636:10
642:21 643:1
644:18,22 647:5
659:8,17 663:1
665:13 667:11
676:19 678:15,25
**remembered**
433:4
**remembers**
620:17
**remind** 414:17
679:19
**reminded** 424:16
**reminders** 510:11
**remove** 387:4
**removed** 382:16
**removing** 603:7
**renee** 372:9
**repeat** 507:21
528:15 612:11
674:18
**report** 374:4
419:12,16 421:3
422:14,17 450:15

**[report - review]**

460:7 480:1 481:3
482:4 489:2
543:17 552:24
575:4,8,11,12,14
575:18 576:5,10
576:21,23 577:4,7
577:9,16,18
605:18 659:6,11
659:13,16 660:8
660:10 661:5
672:13 674:5,25
**reported** 364:24
418:8 467:12
482:15,17,22
483:12 517:1
544:8,19 545:9,21
549:10,11,25
553:8 635:23
653:1
**reporter** 375:13
397:15 512:13
627:10 684:7
**reporters** 397:14
397:18,18
**reporting** 374:16
419:9,18 461:25
466:20 479:13
481:17 516:20
543:20 545:15
551:2 552:14
649:18 653:4
675:10
**reports** 397:19
424:17 434:21,22
434:23 517:2
543:13 558:12
569:5 630:9,10,24
630:25 674:8
**represent** 376:3
476:12 513:4
582:24

**representatives**
622:15
**represented**
654:14
**representing**
505:1 598:8
**represents** 633:9
**reputation** 662:17
**request** 507:22
508:17 522:15,19
685:9,11
**requested** 400:1,2
528:19 627:15
**requesters** 374:5
**requests** 523:11
537:14
**required** 389:21
396:2 417:21
418:13,22 419:12
419:14 420:24
422:11 425:3,12
460:4,6 465:1
479:14 498:23
552:24 596:10,12
683:25
**requirement**
420:10 425:9
452:8 491:24
547:25 555:7
**requirements**
411:12 416:21,24
417:13 425:7
437:22 446:6
448:21 450:6
452:23 480:11,13
482:9 492:23
504:6 530:8,23
531:3,15,21
533:10 555:11
573:22 598:21

**requires** 419:8
424:24,24 464:23
464:25 465:5
489:4 498:14
553:17
**research** 498:25
**residence** 387:2
**resolve** 396:4
549:16,19 552:23
554:21
**resolved** 423:4,7
**resolves** 460:10
**resolving** 423:2
**resources** 660:1
**respect** 492:21
508:5 519:2,7
536:7 556:13
564:14,18 675:9
**respective** 365:14
**respiratory** 439:8
439:11,13
**responded** 581:4
**responders** 661:25
**responds** 478:19
625:14
**response** 575:14
578:5 579:3,4
621:6 622:1 627:5
**responsibilities**
389:16,19 410:10
431:21 433:5,9,14
433:18 464:14
**responsibility**
392:20 395:24
396:1 432:20
446:14 447:1
449:14,24 450:1
451:6,14 465:10
465:14 466:2
477:24 488:3
491:16 494:18

559:9 653:4
675:11
**responsible**
459:13
**rest** 408:7 464:19
644:21
**restate** 627:17
**result** 549:23
**resulted** 483:11,12
517:11 567:12
**retail** 485:5 612:4
612:16
**retailer** 463:22
484:16 678:5
**retailers** 410:11
445:6 449:21
484:19
**retained** 603:17
651:7
**retainers** 502:19
**retake** 673:3
**retire** 381:11
**retired** 381:10
393:1,2,3 486:7
506:5 589:11
**retirement** 390:1
391:21,23 392:1
489:7
**retrospective**
492:1
**returned** 683:18
**reveal** 541:2
**revealed** 674:7,24
**revenue** 415:9,10
415:11
**review** 389:20
518:24 521:22
524:8 562:19
570:7 600:5 612:6
612:17,22 683:12
684:1 685:1

**reviewed** 424:21
**reviewing** 389:22
**reviews** 656:18
**revoked** 426:2
**revokes** 590:2
**rice** 366:16,20
**right** 375:25 376:8
376:11,14,16,25
377:2,15 378:7
379:1,10 380:8,11
380:16 381:4,23
382:20,24 383:19
384:10 387:13
388:12 389:4,14
390:22 391:19
392:19 393:22
396:11,21 397:2,8
399:8,14,19
400:20 401:7
406:2,19 410:17
411:16 413:3
417:11 418:10
420:14 421:5
423:12 426:6,24
428:1,19 429:20
429:24 430:9,11
431:14 433:7
436:6,10 437:15
438:4,5 440:7,23
442:11,21 444:7
444:18 445:6,8
446:25 448:4
449:6 450:20
451:3 452:4,14
453:3,6 454:9
455:9 456:14,17
456:24 459:25
463:15 464:1,24
466:24 467:19
468:13 469:7,19
470:16 472:16

475:19 476:12
481:25 482:1
486:10 487:3
488:22 490:7
493:8 494:4,8,10
494:13 495:3,6
497:4,14 501:12
501:18 502:5
507:4 514:16
517:15 518:21
521:4 524:21
526:14 527:2,14
529:23 530:15
531:3 533:15
536:10,14 538:5
539:16 543:14
549:7 553:3
555:24 556:15
557:12 558:16,19
559:4 560:5 561:8
564:2,15,21
565:10,18 566:16
568:3 572:2
574:23 579:7,10
579:21 580:5
586:15 600:25
612:13 613:24
617:6,15 619:10
619:22 621:19
622:7,21 624:20
624:25 625:14
627:2,2 629:15
631:5 632:2 633:6
636:2,22 642:16
644:1 655:7,12
656:3,21 658:15
665:10,11,15
667:3 669:11
670:11 672:19
673:7 674:2,19
676:7 678:12

680:10,23
**risk** 387:11 405:6
508:24 585:17
666:6,8,10,25
**rite** 369:2
**road** 366:13 367:7
368:13 377:3
396:12,16 427:18
**roadblock** 495:3
500:15 502:5
506:1 560:5,9,13
560:14
**roadblocks** 377:7
427:23 490:13
**roadmap** 376:21
376:23 427:13
498:9 631:20
665:10
**roadmaps** 662:24
**robert** 624:17
**rochester** 372:2
**rodeo** 477:8
**rogue** 616:10,23
**role** 374:9 501:25
517:24
**roles** 576:14,25
**rolled** 527:9
**room** 508:20
646:5
**ropes** 370:20
**ropesgray.com**
370:23,23
**rosenberg** 506:2,6
506:13 559:23
560:1,12,15,20
579:12,16,19,22
580:3,6 581:10
**rosenberg's**
657:20
**round** 425:13,16

**routine** 459:16
**ruiz** 369:18
**rules** 400:15
452:25 673:22
684:5 685:5
**ruling** 627:20
**rum** 384:4
**running** 537:23
**russo** 364:24
375:14 682:2
**rx** 369:17 441:24

**s**

**s** 373:1 375:1
683:15 685:8,8
686:3
**safe** 428:17 649:21
668:17
**safeguards** 449:15
449:25 450:4
**safety** 404:3
409:24 470:3
590:8,25 670:1
**sale** 494:12,16,18
528:12
**sales** 415:9,12
462:20 653:2
**salvatore** 366:12
**sample** 463:16
464:2
**samples** 463:3
**sarcastic** 580:11
**sat** 375:24 416:20
424:12 428:8
461:17 580:17
**satisfied** 660:2,24
**save** 512:7
**savings** 639:25
**saw** 394:23 399:1
399:1 416:20
471:9 581:11

saying 416:4
418:14 428:17
434:12 448:25
490:21 560:20
563:16 620:12,14
623:2,4 659:17
677:13,15
says 419:2 480:13
485:4 493:10,12
535:15 548:9
577:2,9 595:13
598:10 601:5
623:2 625:7
642:19 646:15,20
646:23 649:12,18
650:4 659:13,23
659:24 660:23
661:7 664:2,2
669:25 675:4
679:5
sbadala 366:14
scary 400:8
scenario 645:7
scenes 635:13
schedule 405:22
405:24 406:5
407:19,23 408:4
496:4,4,5 526:13
526:14,17 568:15
568:17 584:17,21
584:21 585:3,7,8
585:15,16,19,21
586:23,23 666:15
666:21,22,23
schedules 405:13
405:22 435:17,18
584:25 585:1
scheduling 405:19
443:23 507:17
scheme 448:5
611:12

schiller 604:6
school 377:23,24
379:15 510:21,22
511:1,9,19 644:23
scientific 451:9
498:17 499:23
scope 386:2
414:16 416:13
439:3 451:19
462:14 467:10
468:7 470:21
474:24 483:7
503:13,25 505:14
506:19 519:16
542:23 543:23
544:11 545:16,23
546:17 548:17
553:11 573:24
575:6,19 611:18
612:9 626:22
633:24 634:1,11
639:10 650:19
655:3 656:12,23
657:8,15 658:17
660:3,6 671:3,10
674:9 676:1 677:8
679:18
scott 371:10
558:22,24
screen 508:19
se 380:13
seal 684:15 685:21
second 369:8
425:13,16 448:14
449:7,9 454:11,21
462:24 475:6
561:23 621:3
635:4 675:4,6
secondly 498:8
secret 386:7

secretary 558:25
559:1
secretly 667:23
secrets 386:20
section 372:11
373:25 374:3
387:20,22,23,24
388:1,15,16
412:19 504:17,18
527:9,10,19,20
528:4 532:14
533:8,11 534:4
537:12,13
sections 527:25
528:7 537:13
secure 437:5,6,6
442:17 470:10
security 417:25,25
437:5,21 443:11
443:12 444:1
533:10 650:10
see 376:18 381:2
383:6 388:5 399:2
414:4 419:3 435:9
445:16 448:12
457:21 459:5,6
463:4,18 473:5
476:3,20,25 477:9
477:25 478:10
480:5,13 484:11
485:13 487:7
488:6 489:12
494:16 507:24
526:10 527:13
528:1 541:22
551:25 561:4,17
584:8 595:9,13
596:24 597:2,8
599:6,17 600:18
600:22 601:4,5
607:6 610:8 619:6

621:21 623:6
624:14 625:7,19
625:25 635:5,16
647:17 649:24
650:11 651:9
653:8 654:19
660:5,15 663:3
664:5 670:17
674:1 679:12
seeing 414:14
455:15 457:18
559:17 569:22
seeker 500:6
seekers 447:23
seeking 409:19
498:13 672:1
seen 401:10 476:9
503:21,22 581:12
653:23
segregating
411:18
seizure 618:13
selected 399:21
self 481:3,17 489:2
sell 412:21 460:18
493:12 505:23
586:10,19 663:18
seller 420:17
sellers 412:5,7
418:20 419:11
461:7
selling 383:8 412:5
504:10 505:12,24
semisynthetic
408:8
send 464:3 522:15
545:20 554:16,16
554:22 555:13
565:7,9,12 568:22
608:16

**sending** 430:17
434:22,23 446:17
457:17 462:1
510:11 550:20
562:12,24 596:14
**sends** 441:4
**sense** 556:21
**sensitive** 599:15
599:20 600:13
601:17,23,24
602:21 603:8
**sent** 417:2 425:5
428:6 430:12,18
431:7,19,23
433:15 441:6
443:20 458:8
459:12 462:24
463:2,16 464:1,9
478:5 479:7,18
480:17 497:2
535:19,23 554:20
562:10,16 564:5,8
564:11,12 593:21
596:8 608:13,15
**sentence** 449:10
674:22 675:6
**separate** 557:5
558:9 617:24
**separately** 611:15
**september** 390:8
430:16 478:2
488:21
**serious** 392:16
434:6
**served** 400:5
425:13
**service** 391:3
454:7
**services** 369:17
375:5

**set** 385:22 396:22
396:25 405:22
443:9 447:19
448:2 455:6 467:1
471:22 482:9
495:25 498:3,9,10
498:16,18,20
499:20 531:3
533:17 534:25
537:18 541:22
580:17 632:3
636:6
**seth** 603:25
**sets** 498:11 670:24
**setting** 568:20
**settle** 654:19
**settlement** 373:13
373:15,20 471:9
472:1 473:9
477:15 484:8
485:3 487:5 488:4
566:4,9,12,19,20
566:25 591:20
593:14,17
**settlements** 564:19
564:19 567:4,21
567:25
**settling** 486:3
**shannon** 370:3
**shapira** 371:11
**shapira.com**
371:13
**share** 449:14,23
602:17 605:2,4
**shared** 559:9
673:9
**sharpen** 615:1
**sheet** 377:13
396:22 428:2
430:6 508:18
683:13 685:7,10

685:18 686:1
**sheets** 640:14
**shibley** 372:8
**shift** 442:12 528:5
631:6
**ship** 422:19,24
423:7 460:9
534:19 552:25
**shipment** 653:7
**shipped** 423:3
**shipping** 556:23
**shkolnik** 366:12
**shoes** 646:25
**shore** 377:22
**short** 385:1 427:7
431:2 475:12
562:2 582:15
600:8 609:14
610:13 631:10
**shorthand** 682:7
**shortly** 387:23
393:2
**show** 397:2 404:22
410:1 425:13
428:12 452:1
468:10,16,17,19
468:21 469:22,22
469:25 470:7,14
483:13 489:20
510:10 517:3
519:8,12 553:25
569:2 579:16
591:7,14,19 592:6
592:10,17,22,23
593:13 612:21
613:3 648:7
659:21 661:6
671:17 674:5
**showed** 501:2
529:20 679:1,4

**showing** 542:14
554:19 556:25,25
673:17
**shown** 510:2 669:3
683:16
**shows** 383:6
**signature** 682:19
683:14
**signed** 430:1 432:4
485:3 563:5,10
592:18 684:13
685:18
**significant** 450:14
**significantly** 633:3
**signing** 625:23
683:19
**similar** 588:22
**simmons** 367:18
**simmonsfirm.com**
367:20,20
**simple** 580:13
615:17
**simply** 422:17
452:10 508:2
618:23
**sincerely** 683:21
**sindelar** 368:7
**single** 652:24,24
653:4
**singletary** 471:20
**sir** 376:12 377:1,9
377:16 378:2,6,16
378:25 379:13,23
380:2,4,6,10,20,25
381:3,17 383:2,5
383:17 387:12,12
389:13 390:24
392:24 394:4,12
394:19 395:3,6
396:18,24 397:3,7
398:9 399:15

403:7 405:17
406:7 408:3 409:4
410:13 411:21
412:3,23 416:6,15
427:25 428:11,21
429:16,22 430:4
430:10,22 434:3,9
435:10 436:8
437:16 438:3,11
438:18,18 439:4
439:15 441:5
442:24 445:3,7
446:3 447:10
448:13,14 449:18
451:11 453:7,15
459:2 461:3 463:1
463:14,19,25
465:9,17 469:11
471:8,16 472:22
472:25 473:13,22
474:15 476:4
477:3,12,20 478:1
478:11,24 479:3,6
479:10,18 480:7
484:6,12 485:15
487:8,23 488:8,23
490:4,24 491:1
495:8,17 505:9
509:10 510:17,19
510:23 511:7
513:21 583:4
585:11,20,23
586:6,16 587:5,8
589:14,16 595:16
596:17 598:1
599:4 600:1,4,18
608:5 617:5
621:20 622:8
632:1 633:6 636:1
636:21 637:4
638:2 642:22

643:2 644:24
647:6 648:13
649:16 650:13,18
651:13 654:12
655:11,22 656:4
656:13,24 657:9
658:2,9,13,20
659:3,9 660:13,15
661:3,19 662:5,15
663:2 664:6 665:8
665:14,20,25
666:4 667:12,19
669:12 670:5,12
670:16 674:4,21
676:13,20 678:16
679:13 680:21
683:10
**sit** 469:9 561:16
570:22
**site** 504:20,20
527:4,5,11,16,16
528:1,2 529:6,15
578:20 630:18
**sitting** 429:18
593:7
**situated** 542:8
550:9 551:6 650:5
**six** 492:2,9 494:12
494:16,25 495:4
580:21 664:25
**size** 418:5 420:7
421:11 440:25
482:11 535:8,11
535:13,14,17
536:3,7 537:9,20
538:4,11,14,17
539:13,23 540:3,4
540:6,9 552:15
555:17 571:8,11
571:15 633:20
652:25 678:7

**sketch** 381:18
**skill** 385:22
**sleeve** 665:16
**slide** 374:23
**slides** 373:23
374:7
**slightly** 544:16
**slow** 581:3
**small** 392:16
393:16
**smaller** 377:21
569:14
**smclure** 370:6
**smith** 370:3 371:2
489:15 506:14
629:4
**smoothly** 389:24
**software** 393:8
**sold** 460:19 462:11
492:17,19,21
**sole** 465:14 504:18
675:10
**solution** 663:12
**solutions** 683:1
686:1
**somebody** 384:15
438:21 452:23
500:10 570:23
571:2
**something's**
554:10 644:1
**somewhat** 558:20
**sophisticated**
650:4
**sorry** 407:6
408:18 471:15
472:13 475:22
478:17 480:23
497:4 515:17
525:14 528:15
530:5 536:22

543:24 545:7
577:12 581:23
595:11 634:22
674:14
**sort** 520:21 521:12
530:17 537:17
553:8 563:15
567:5 580:14
658:11
**sorts** 562:20
**sought** 398:8
**sound** 561:12
**south** 366:17
371:3 377:22
**southwood** 563:20
567:16
**spaeder** 369:18
**spangenberg**
372:8
**speak** 395:16,19
396:5 440:3 526:2
**speaker** 579:21
580:5
**speaking** 584:3
**specgx** 370:19
**special** 372:7
381:3 382:23,25
383:20 388:24
508:16,23 509:2
545:20 620:10
627:8,19 673:25
**specific** 419:2
424:9,18 439:5
451:21 466:7,8,19
475:1 481:14
541:19 546:20
553:13 554:4
558:10 565:22
566:1,5,23 568:20
568:22 569:2
588:19,21 611:16

611:21 614:18
616:9 630:14,21
645:17
**specifically** 411:11
428:6 463:4
464:23 466:17
533:8,12 538:4
642:19,20 649:6
649:12 652:22
**specified** 642:25
**specify** 646:6
651:4
**speculate** 461:14
648:5
**speculation**
461:11 482:20
503:12 542:23
545:24 546:18
548:17 576:20
641:13 648:4
671:2
**sped** 511:19
**speeches** 394:23
395:2,4,17
**speed** 510:18,21
**speeder** 645:9,10
**speeding** 644:23
645:1,11
**speeds** 511:1,9
645:3
**spell** 376:11
**spend** 566:19
**spent** 393:19
588:12
**spoiler** 381:8
**spoke** 413:13
530:8 531:21
559:7 589:8,12
**spoken** 402:16
**square** 370:4

**stability** 499:1
**staff** 379:6,8
387:19 388:13
415:18,19
**stage** 502:1
**stages** 432:12
448:22 449:1,2,3
500:12
**stamped** 374:19
**stand** 449:17
**standard** 461:23
590:12
**standards** 488:13
**stands** 441:25
442:1 640:11
**stars** 370:12
**start** 377:13 381:4
385:25 397:13
426:21 453:11
494:18 513:12
553:21
**started** 383:22
385:10 397:13,19
398:1,4 409:9
418:14 430:6
495:6 646:14
676:9
**starters** 416:19
**starting** 383:20
427:15 514:15
553:20
**starts** 496:17
**stashing** 667:6,13
**state** 378:17
379:17,19 380:6
395:13 404:8
412:25 434:22,25
684:10 685:15
**stated** 505:5
**statement** 423:12
426:7 551:17

612:1 628:21
645:14 684:13,14
685:19,19
**statements** 476:14
629:13
**states** 364:1 366:8
372:9,9,10,11
373:24 390:20,21
395:25 399:18
400:14 405:18
429:10 430:19
434:21 435:4
462:1 535:24
579:20 580:4
625:20 630:7
633:11
**statute** 416:24
448:5 495:24
498:2,22 523:13
523:15 525:22
532:11,12,17,19
633:1 634:4
642:25
**statutory** 448:5
450:6 451:5
465:21 491:24
532:10
**stay** 395:23 670:6
**steal** 646:20
**stenographic**
375:13
**stephens** 368:12
373:7 394:21
396:19 398:10,13
399:24 401:15,20
413:16 416:7
420:19 423:18
426:12 432:24
485:21 490:5
491:9 610:5
611:24 612:14

617:2 618:6
619:22,24 620:21
621:2,4,18 622:9
622:20 623:21
624:4,7,11 626:25
628:12 629:14
635:17,25 637:17
651:12 666:18
677:3,6 678:8
**stepped** 559:3,6
**steps** 529:3
**stocks** 413:25
**stoffelmayr**
371:15
**stop** 377:3,4
382:19 384:16
396:12,15,17,22
396:23 402:4
403:20 404:4,19
409:1,20 410:2,4
427:18 435:20
436:5 470:15
494:18 499:16
505:12 506:25
507:22 508:18
616:17 617:18
618:25
**stopped** 509:11
**stopping** 377:12
402:10 404:6,7
**stops** 618:14
**store** 412:18
**storefront** 441:22
**stores** 412:20
485:5
**story** 381:13 396:8
397:21 398:19
401:13,18 413:7
427:16 489:11,13
**straightforward**
498:22 524:23

538:11 539:16,20
554:24 571:10
**strategies** 597:4
598:20
**strategy** 596:10,11
596:12,21,23
597:3
**stream** 382:4,4
**street** 365:9 366:4
366:20 367:3,11
369:3,13,19 370:4
370:9,16,21 371:3
371:12,16,21
383:8 384:7
412:17 499:9
**strike** 453:11
456:16 590:21
596:3 627:4
**stronger** 523:13
**studies** 499:2
**study** 661:21
**stuff** 383:4,15
443:3 464:20
529:18 542:10
644:21
**subcommittee**
622:13
**subject** 474:19
573:22 629:3
631:25 636:7
642:16 657:18
659:5 662:22
667:4 670:6,7
676:7 678:12
**submission** 653:1
**submit** 404:16
586:20
**submitting** 575:13
**subparagraph**
526:13,16

**subparagraphs**
526:7,21 528:1
**subparts** 418:11
**subpoena** 638:17
642:8
**subpoenaed**
638:15 639:23
**subpoenas** 640:20
**subscribed** 684:10
685:14 686:21
**subsection** 526:12
**subsequent** 428:5
643:16
**subsidiaries**
484:10
**substance** 403:11
405:11,12,13
407:12,14 410:3
410:22 412:24
413:1 421:10
453:17 456:18
527:22 576:14
584:19 590:3
626:7 630:22
649:23 665:18
666:21,23
**substances** 373:25
374:17 402:4,12
405:14,16,21
408:12,14 409:8
410:9,25 411:10
412:4 413:19,21
414:1 430:20
431:9 432:13
435:7,14 436:14
436:24 444:4
445:25 446:23
447:6 448:22
453:23 454:3,12
455:2 464:11
465:8,23 469:18

476:24 478:7
485:9,11 492:24
496:6 518:3
522:18 524:9
525:5,20,21,24
526:1,8,14,17,20
526:24 527:1,6,14
527:17 528:6,9,13
528:21 529:1,25
532:19,22 533:20
571:22 576:25
584:15,17 586:7
600:17 611:7,17
612:8,19 614:22
618:16 632:19
642:18 650:10
657:3
**substantial** 421:13
447:6
**substantially**
418:6 420:8
421:11 535:9
555:17 571:12,16
573:3,15
**suburb** 389:12
**sudden** 539:3,12
551:2 613:24
**suggest** 432:18
522:10
**suggested** 458:20
506:12 659:10,12
**suggesting** 505:6
**suggestion** 502:6
667:21
**suite** 366:5,9,13,21
368:9 369:19
370:4 683:2
**summary** 630:8,9
630:10
**summer** 607:3

**summit** 364:12
366:15
**superior** 366:8
683:1
**supermarket**
646:21
**supervision**
426:18
**supervisor** 384:4
387:15
**supplied** 457:20
457:23 640:17,24
**supplies** 457:16
493:21 614:4
615:6
**supply** 382:16,17
409:15,16,19
416:1,2 426:8
434:1 443:11,14
446:21 507:1
518:9 597:5,7,11
614:8 615:14
650:4
**supplying** 457:14
457:15 458:21
508:3,4 613:14
635:10 677:24
678:4,6
**support** 519:5
650:9
**supposed** 396:3,4
417:14 418:8
419:16,19 437:14
446:18 458:6
502:9 648:1
678:19
**supposedly** 506:7
**sure** 386:11
389:20 405:9
410:18 413:9
418:11 421:6

432:2 433:4,8
446:9 449:2,10
450:22 458:15
460:17 468:14
470:11,12 471:22
475:8 493:8
494:23 508:15
517:4 527:10
528:4 542:13,15
558:2 561:9,20
565:25 575:23
576:6 584:12
587:24 591:24
592:2 593:16
606:8 608:9
612:12 618:10
620:12 629:25
644:11 655:7
671:25 674:19
676:11
**surely** 459:13
**surgery** 393:15
**surprised** 616:22
617:1
**surround** 401:4,4
**surrounding**
552:3
**suspend** 409:1
**suspended** 426:2
**suspends** 590:2
618:15
**suspension** 402:2
404:5,12,23 410:1
425:14 452:1
468:11 469:19,21
469:25 483:13
510:10 516:10,21
516:23 517:2,11
589:13,20,25
590:6,20,21,23
591:4,9,11,17

592:7,9,23 593:1,8
617:4,17 618:8,12
618:24 619:4,13
623:15 624:9
627:6 628:16,25
657:2 678:23
**suspensions**
483:12,14 617:12
**suspicion** 458:10
460:11 554:22
**suspicions** 423:2,4
423:7 456:23
549:17 557:1
**suspicious** 374:16
374:18 418:2,4,7
419:8,13,15,17
420:7,24 421:3,7,8
421:9 422:12,14
422:24,25 424:4
424:16,20,21
425:8,9 446:12
450:15,16 451:7
452:12,13 458:6
458:11 460:7,9
465:7 466:20
479:13 480:3
481:11 482:7
488:12 492:6,25
493:7,23 494:4
495:1 523:17,25
524:13 528:11
531:14 533:19
534:1 535:7
540:17 542:16,18
543:13,15,18,19
544:1,8,13,19,22
545:1,3,8,11,14,22
546:8,10 547:4,20
547:23 548:7,9,15
549:10,12,17,19
549:24 551:3,11

552:14,25 553:3,4
553:7,14,19 554:1
554:10,13,16,20
554:23 555:3,15
556:24 557:7,9
562:22 564:24
565:2,4,17,23,24
569:3 570:4,7,13
641:7,16 649:18
652:8,24 653:5
664:24 674:8,25
675:9 676:4
**sustained** 509:5
**swear** 375:14
**switch** 477:22
**sworn** 375:17
629:18,19 682:6
684:10,13 685:14
685:18 686:21
**synthetic** 388:5
408:8 518:2,4
**system** 374:18
418:1 419:15,19
419:22,23 420:4
420:11,12 436:16
436:19,21 437:3,4
437:5,10,11,12,16
437:18,19,25
439:23 441:5
442:16 443:16,18
443:22,22 444:2
444:24 445:22
446:8 447:17,19
449:20 450:3
460:8 462:10
465:6,11,15 466:3
466:19 472:9
473:15 488:11
495:25 496:2,11
498:2 499:11,12
499:15 524:1,14

533:18,25 534:17
553:21 565:23
570:8,14,16 652:9
675:10,12
**systems** 420:1
425:10,10,11
503:17 564:25
565:3,18,19 570:4

**t**

**t** 367:2 373:1,1
430:1
**t1** 373:22
**table** 659:24
**tablets** 392:11
**tailored** 395:17
565:20,25
**taint** 667:23
**take** 380:1 382:18
386:13 391:4,13
427:3 437:14
439:9 440:18
456:11 468:22
470:4,8,9,11
489:23 496:23
510:8 518:15
521:4 526:6 529:4
533:2 540:12
546:10 553:8,16
563:16 574:9
576:2 578:23,25
582:3,5 663:15
676:5
**takeaway** 567:6
659:16 660:23
**taken** 382:3 385:1
427:7 431:2
443:20 475:12
512:11 523:2
562:2 570:3
582:15 609:14
631:10 667:24

| | | | |
|---|---|---|---|
| 668:3 671:7 | talks 630:12 649:6 | tends 505:7 | 669:20 682:4,6,10 |
| 673:15 682:3,7,13 | tandy 391:12 | tennis 646:24 | 684:6,7 685:6,9,12 |
| takes 385:22 | tape 589:2 | tension 399:5 | teva 369:6 |
| 438:21,24 441:3 | taped 587:25 | tenth 370:9 | texas 367:15 449:1 |
| 616:2 | tapping 455:13 | tenure 424:2 | texts 583:22 |
| talk 377:3,4 | task 384:5,6 | 481:9 593:9 600:2 | thank 375:22 |
| 391:25 393:1 | tax 668:16 | 615:23 630:3,8 | 386:8 406:17 |
| 395:20 396:6,7,23 | teach 442:7 | term 537:19 | 424:11 435:18 |
| 424:6 427:23 | teams 394:3 | 557:16 | 439:22 471:22 |
| 428:13 430:11 | tech 393:7,11,16 | terms 401:8 405:2 | 500:15 506:1 |
| 435:6 436:10,19 | 393:18 605:21 | 405:5,8 510:1 | 509:1,8 512:8,18 |
| 447:11 448:4 | technical 522:1 | 610:18 641:24 | 525:15 582:9 |
| 457:8 471:7 | 523:21 605:20 | testified 375:19 | 584:1 586:25 |
| 501:13 542:11 | techniques 519:20 | 399:13 522:6,14 | 593:18 598:7,8,12 |
| 556:12 597:15 | 543:1,4 679:21 | 560:15,18 583:9 | 609:6,25 610:1 |
| 659:22 660:8 | teleconference | 584:16 628:14,23 | 621:17 631:3 |
| 676:19 | 368:7,16 369:7 | 629:16 632:9 | 637:9 660:13 |
| talked 427:14 | 371:20 372:3,13 | 650:21 679:3 | 663:7,12 667:3 |
| 461:18,20 514:18 | tell 375:17 376:19 | testify 400:5 | 668:23 670:5 |
| 558:10 567:23,24 | 377:17 386:19 | 401:14,17 476:17 | 680:25 681:3 |
| 603:12 607:13 | 396:8 423:16 | 509:4 522:23 | theirs 565:25 |
| 617:3 624:8 661:6 | 430:14 465:25 | 597:21 | themes 577:4 |
| 664:23 | 466:14 480:10,18 | testifying 400:12 | theory 436:22 |
| talking 401:7 | 481:20 489:11 | 460:13 522:25 | thing 397:25 400:8 |
| 403:5 415:8 | 494:4 498:4 | 629:6 | 508:10 579:25 |
| 418:18 422:3,4 | 504:24 517:22 | testimony 377:8 | 580:9 592:25 |
| 428:2 433:17 | 520:12 521:24 | 394:11 399:1,3,11 | 623:18 |
| 435:3 439:24 | 525:17,19 543:6,7 | 399:17 401:1,11 | thing's 672:14 |
| 444:12,24 458:2 | 543:8 544:21 | 428:10 431:15 | things 392:1 |
| 464:4 471:5 | 561:18 567:14 | 490:11,15 494:6 | 397:14,22,22 |
| 487:24 500:24 | 572:3 576:10 | 495:5,16 507:23 | 398:1 399:10 |
| 513:22 523:5 | 577:8 579:5,16 | 508:22 514:19 | 401:11 425:20 |
| 537:18 549:3 | 601:13 613:1,1 | 539:10 549:15 | 427:22 455:15 |
| 563:8,12 578:14 | 636:18 646:2 | 560:7,19 581:10 | 458:9 459:6 |
| 588:11 591:22 | 647:22 651:16 | 591:13 593:4 | 460:16 479:12 |
| 592:21 605:1 | telling 385:10,12 | 603:14 610:16 | 490:10,18 491:25 |
| 607:4 610:17 | 409:9 509:20 | 619:15,17 620:23 | 492:23 495:20 |
| 613:7,23,25 | 520:14 537:25 | 624:2 627:1,4,25 | 523:5 532:1 546:6 |
| 627:24 628:4 | 623:5 | 628:20 629:11,11 | 569:21 599:9 |
| 629:6 635:6 | ten 492:9 | 629:18,19 657:20 | 634:15 654:10 |
| | | 661:16 665:6 | |

**think**  381:23
394:16 398:22
400:10 405:20
415:10 416:19
419:1,7 425:12
435:1 440:24
443:2,3 447:23,24
461:6 462:18,19
485:23 489:21
496:15 497:18
513:22 514:2,18
515:22 522:5
524:20,22 536:8,8
536:8 537:4,6,16
537:24 538:8
540:23 546:2
548:19 552:19
554:12 563:6
574:6,8 578:4,5
579:1,23 580:1,7
580:10 581:2,3,4
598:3 602:1
606:12 611:19
612:11 614:12
615:17 620:18
623:18,21 630:24
631:4 646:5
652:12,16,17
663:24 670:13
672:22 676:11
678:17 680:23
**thinking**  457:1
606:12
**third**  453:3 457:18
457:24 567:14
665:21
**thirty**  369:8
683:18
**thornburg**  371:3
**thought**  402:9
417:18 479:4

538:10 549:4
560:11 574:3
**threat**  404:2
596:21 629:2
**three**  367:23 370:4
390:4 413:14
414:6 415:18,19
421:16 422:7,8
424:13 444:12
455:14 456:3
535:21 538:25
539:23 550:2
563:24 564:1
588:12 633:10
**thrill**  456:14
**throwing**  455:20
464:18 471:15
**thumbnail**  381:18
**tick**  397:5,5,5,5,6
**ticket**  511:4
645:12
**tickets**  645:1
**ticking**  397:5
**tied**  424:25
**tight**  561:17
**till**  572:22
**time**  375:6,23
381:24 384:3,17
384:25 385:3
389:18 391:16,18
393:5,17,19
394:18 398:23,24
404:18 409:20,25
423:21 424:15
427:6,10 431:1,4
448:14 449:9
462:8 467:1 470:1
470:4 475:11,15
480:9 487:9
488:10 489:1,6
490:8 492:7 493:9

494:25,25 496:2
496:14 499:7,15
512:7,10,24
513:19 514:15,19
514:24,25 517:18
517:23 520:17
521:14 522:2,14
524:19 525:2
528:16 530:13
535:25 537:16
538:13 541:20
555:2,10,18 556:3
556:19 560:2
562:1,6,18 565:14
565:15 566:20
568:1,6,9,18 569:9
569:13 570:23
571:2,25 572:12
572:22 574:13
575:5,8 578:18
581:15 582:14,19
583:1,25 591:2
593:19 596:7
600:8 603:11
604:11 609:13,18
610:13 615:1
619:10 624:13
626:11,12 629:1
631:2,9,14 641:16
653:22 663:11
670:18,19 680:24
681:7
**timely**  519:15
**times**  396:5
399:16,21 400:1,9
400:11 431:15
479:23 488:9
501:23 522:7,9
550:2 562:9 564:5
568:7,8 580:15
587:9 619:11

626:3 628:13,23
628:24 629:16
632:10
**title**  373:24 374:2
405:17 576:16
**today**  375:23
376:5,20 394:11
583:14 587:2
589:12 591:13
593:7 600:6
610:16 617:3
619:1
**today's**  375:6
681:5
**token**  459:11
630:1 651:24
661:5
**told**  385:9 445:5
453:9 455:22
458:1 460:1,23
466:11 479:4
489:3 494:2 522:5
532:1 536:8 537:6
537:16 562:17
567:17 579:7
659:16 669:14,15
**ton**  642:17
**tool**  402:1 404:3
404:12 409:1
491:23 499:16,17
547:24 589:24
**top**  385:19 413:12
429:5 624:15
**topic**  608:25
**total**  497:5
**totality**  461:1
656:8
**totally**  633:3
**touhy**  423:19
**tower**  367:10
370:21

town   377:20,22
toxic   387:1
toxins   386:15,18
track   437:10
tracking   493:13
  636:20 672:7
trade   651:4,18
  652:1,10
trafficking   389:2
  597:6
tragic   396:9,10
trained   438:13
  548:20
training   547:17
transaction
  558:12 569:5
transactions   615:5
transcribed   684:7
transcript   374:25
  589:5 620:19
  621:21 673:1
  683:11,12 684:5
  684:12 685:5,11
  685:17
transcription
  682:8
transcripts   561:2
transferred
  387:18 388:23
  389:7 390:4
transition   427:17
  500:11
transitioning
  428:3
transmitted   668:6
transparent   579:2
treatment   501:14
treatments   501:18
tree   429:14 441:3
trespass   646:23

trial   405:4 508:25
tried   417:2 662:25
trigger   540:21,23
  550:14 551:9,10
  552:13,20,21
triumph   634:17
trouble   657:22
troubled   616:14
true   461:16 465:8
  465:16 466:3
  575:1 577:1
  591:18,21 592:5
  599:21 622:6
  675:2 682:9
truly   529:8
trusted   445:25
truth   375:17,18,18
  414:11
try   439:25 468:2
  491:12 504:15
  507:11 510:8
  610:15 654:9
  656:16 662:17
trying   382:15
  393:7 452:22
  456:22 459:19
  464:13,15 504:4
  506:24 550:16
  581:5,6 615:16
  643:24,25 644:10
  678:6
tucker   368:8
tuckerellis.com
  368:10
tuned   461:8
turn   452:13 532:4
  595:2 631:4
tv   381:2 383:6
  397:2
two   389:17 406:3
  415:17 421:22

422:7 428:13
  474:10 479:5
  484:21 520:25
  539:23 564:1,4
  588:12 600:12
  626:16 665:19,23
  676:22 678:3
tylenol   585:9
type   407:14
  419:22 425:21,21
  473:14 518:4,25
  519:13 531:24
  547:4 585:15
types   440:17
  459:14 467:20
  520:5 585:6
typically   537:7

## u

u.s.   366:7 400:21
  429:2 478:6 623:2
  623:3,4 629:2,8
  661:8
uh   418:21 531:18
  536:2,6 538:15,24
  539:2,5 540:14
  594:2 595:15
  596:22 600:7
  613:15,18 615:9
  617:8 619:2
ultimate   389:25
ultimately   493:10
uncomfortable
  627:22
undercover   679:8
  679:14,16 680:3,8
understand   376:2
  376:6 386:3 392:3
  392:21 395:25
  405:7 430:13
  432:2 439:25
  443:25 445:14

449:11 468:14
  512:14 544:2
  610:22 625:21
  627:19 633:8
  654:15 657:24
  672:15 679:6
understanding
  402:8 576:15
  577:1 672:2
understood
  401:19 451:14
  524:19 531:5
  629:1
undertaken   656:7
undertreated
  500:17 501:3
underwent   393:14
undoubtedly
  434:5,11,13
unduly   599:13
unfortunately
  382:11
uniquely   650:5
unit   387:15
united   364:1 366:8
  372:9,9,10,11
  373:24 390:20,21
  399:17 400:14
  405:18 429:10
  430:19 435:4
  535:24 579:20
  580:4 630:7
  633:11
units   630:6,21
university   377:24
  377:25 379:17,19
unnecessary
  438:25
unnerving   400:11
unusual   405:5
  418:5 420:7

421:10,11 455:19
535:8,10,11,13,14
535:17 536:3,7
537:9,20 538:4,11
538:12,14,17
539:13,23,24
540:3,4,6,9 552:15
555:16,16 571:8
571:11,15 572:2
572:21,24 652:25
678:7
**upheld**  620:10
**ups**  394:24
**upside**  652:8
**upstream**  404:12
**urine**  438:23
**usc**  373:25 405:19
417:1 495:24
**usdoj.gov**  366:10
**use**  382:7 405:23
405:25 406:6,19
407:20 433:23
464:25 491:23,25
492:3,13 510:15
512:16 519:3,4,7
519:24,24 585:17
605:18 618:11,19
679:8,9
**useful**  398:18
**uses**  457:4
**usual**  450:8
**utter**  366:3 550:1
560:23 567:7
592:13 602:23
604:11 606:8
616:20 617:21
627:16 683:5

**v**

**v**  364:8,12 526:17
586:24

**va**  379:8
**vague**  408:17,22
452:20 467:9
485:22 491:19
502:11 503:4,24
504:1 505:20
506:21,22 507:9
509:15 520:8
521:20 541:16
552:18 632:16
641:20 646:11
647:13 662:19
680:20
**valid**  446:16
450:12
**validity**  553:7
**variables**  550:12
551:8 552:3
**varieties**  455:10
**variety**  453:17
454:12 564:8
**various**  376:4
435:16 463:5
479:23 536:4
573:22
**vary**  540:8,8 554:9
659:24
**veritext**  683:1,7
686:1
**veritext.com.**
683:17
**veterans**  379:5
**video**  375:8
579:18 580:2
587:22,23 644:20
**videographer**
372:14 375:3,5
384:14,19,24
385:2 427:5,8
430:25 431:3
475:10,13 512:9

512:21 561:24
562:3 582:12,16
609:12,15 631:7
631:11 681:4
**videotaped**  364:18
365:1
**view**  433:19
445:13 524:19
578:6
**vigilant**  445:23
446:5,8,18,20
458:3
**violate**  474:20
**violated**  611:16
**violates**  613:2
**violating**  614:21
616:25
**violation**  469:12
612:7 614:24
634:3
**violations**  468:7,8
468:18 470:2
473:20 567:1,12
567:13 612:18
614:16
**virginia**  367:4
389:11
**visible**  508:19
**visit**  546:15,24
**visits**  467:16 527:5
527:16 528:2
563:25
**visual**  380:22
**vitamin**  438:22
**vocal**  402:22
**vogel**  372:3
**volume**  364:17
462:18,20
**voluntarily**  669:16
**vs**  364:10

**w**

**w**  367:13 371:6
**wacker**  368:17
**wait**  489:12
664:25 665:17
**waited**  626:4
678:13
**waive**  624:2
**waived**  683:19
**walgreen**  371:14
371:14
**walgreens**  490:2
672:13
**walker**  389:19,20
391:2
**walker's**  391:16
**walmart**  368:11
610:4 676:8
**want**  377:3,4,5
384:19 385:22
391:17,25 396:8
396:15 399:8
400:16 410:18
413:7 415:23,24
417:6 421:6
423:14,15 425:25
426:1 427:20,23
435:8 449:10
450:22 452:6
465:25 471:2
476:14 487:3
489:11 490:9
491:1 495:18
497:19 508:14
542:11 577:15
585:24 598:2
612:12 620:11
631:23 636:24
647:21 648:7
651:25 660:2,24
667:22 670:17

673:9,14 674:19
676:14
**wanted** 391:18
399:6 433:3
442:13 448:1
464:25 510:2
568:24 569:2,4,5,8
680:7
**wants** 619:6
669:13
**warn** 466:17
**warrants** 546:13
548:22
**wash** 386:13
**washington**
364:19 365:10
366:21 368:21
369:14,20 370:9
370:17 374:12
375:9 389:12
397:20 398:5
589:9 634:16
635:2
**watch** 477:17
495:12 497:17
570:10,23
**watching** 570:9
**way** 377:8 380:12
395:9,10 397:1
398:15 403:1
429:4 436:24,25
437:11,14 441:24
446:20,21 461:4
461:22,22 462:9
466:11 474:18
495:4 499:20
508:6 509:3,18
538:5 570:21
577:22 599:25
600:3 613:13
623:1 632:18

634:9 635:23
644:1,2 646:14
647:17,22 653:19
669:24 676:25
680:18
**ways** 457:11
518:19
**wc.com** 369:15,15
369:16
**we've** 429:24
450:22 454:9
486:20 580:10
581:2,3,3 671:12
**weaken** 635:8
**weakened** 402:2
**weaknesses** 498:2
**wear** 385:24 386:9
**wearing** 646:24
**web** 578:20 630:18
**website** 501:2
**weekends** 668:21
**weeks** 571:3
**weinberger** 372:8
**weird** 625:23
**weiss** 371:19
**welcome** 609:8
**welfare** 447:7,13
670:1
**went** 377:22,24
379:16 388:12
393:11 461:18
464:6 524:11
535:25 537:21
566:11 584:14
601:10 608:3,5,7,8
670:11,23 671:22
675:22,23 676:8
**west** 366:8 367:4
368:17 371:16
387:21

**whiddon** 367:7
**whitaker** 587:7,10
587:15 588:8,13
588:16 589:1,9
**whitelaw** 603:25
**wholesale** 674:6
674:23
**wide** 445:14 624:4
**william** 370:20
**william.davison**
370:23
**williams** 369:11
**willing** 662:16
**wind** 549:9 673:3
**windbreakers**
385:8,18
**wise** 393:18
462:18
**wish** 458:10,12
**withdrawn** 516:11
516:23,24
**withheld** 597:17
597:18 598:4,6,11
**withhold** 669:24
**withholding** 599:7
**witness** 366:3
375:14 383:11,17
386:22 392:24
393:5 394:12
397:12 398:22
399:25 400:1,3,23
401:22 402:19
403:10,17 406:23
407:9 408:18
409:14 410:13
412:23 413:17
415:17 416:15
420:1,21 421:2,20
422:21 423:9
424:11 426:14
429:8,22 432:10

432:25 433:11
434:18 436:3,8,21
438:18 439:4,20
441:16 444:15,21
447:16 448:20
450:2 451:24
452:16,21 457:10
458:18 459:8,18
460:21 461:12
466:6,13,22
467:11 468:6
470:24 471:8
472:13 473:22
474:15 475:6
476:9 477:3,12,20
480:7,23 481:16
482:14,21 483:10
483:21 484:24
485:15,23 486:7
486:16 489:6
490:9,24 491:20
494:23 495:8,24
497:22 500:23
501:8,21 502:3,13
503:5,14 504:2,13
505:4,21 506:23
507:10,22 508:2,3
508:21,21 509:3
510:1,2,6 511:7,16
511:22 512:5,7
520:1,10 521:21
525:15 528:20
540:20 541:17
543:6,22,25
544:12,21 545:17
545:25 546:19
547:3 548:18
549:16 550:4
551:24 552:19
553:12 554:12
560:8,24 561:6,9

**[witness - younger]**

561:18,21 567:9
573:25 575:7
576:6,18,21
577:20 582:10
592:16 596:2,4,6
599:1 601:22
602:12,25 603:13
604:13 606:11
609:8,24 610:1
611:19 612:10
616:22 617:23
619:18,23 620:8
621:1 627:13,21
629:5 632:17,25
633:16 634:2,12
635:18 636:1,3,25
637:4,18,22 638:2
638:20 639:6,13
639:15,21 640:3
640:10,23 641:3
641:14,21 642:11
643:9,21 644:10
645:6,15 646:12
646:18 647:14
650:1,13 651:13
651:23 653:22
654:5 656:13,24
657:9,16 658:20
659:3 660:19
661:3,19 662:20
664:9 665:8 666:4
666:19 667:19
668:3,20 669:21
670:3 671:4,11
672:10 674:12,14
674:18 675:18
676:2 677:5,10
678:10 679:25
680:21 681:3
682:4,6,10 683:8
683:11 684:1,4,11

685:1,4,15
**witnesses** 679:9
**witness'** 683:14
**wml** 367:16
**woman** 633:8
**word** 410:18 415:2
415:2 421:6
445:18 448:14
449:2 464:24
515:22 534:5,22
646:15
**words** 412:16
434:11 455:21
509:17 510:4
526:21,23,25
527:4 528:5 534:5
534:7,10,13,16,19
643:17 669:9
**wore** 385:13
**work** 379:2 380:12
387:9,15,16
393:11 399:23
410:6 503:17,17
533:5 561:17
570:9,10 584:8
596:11,12 605:21
618:9 619:5 668:9
670:11,23 671:23
675:22,23 676:22
**worked** 380:18
381:15 384:6
387:13,14 399:10
635:12 668:4,5
**worker** 668:15
**working** 381:5
383:23 393:6
398:5 462:10
487:10 502:18
561:8 668:17
671:22 676:25

**works** 446:21,22
448:6
**world** 390:20
654:1,1
**worldwide** 390:15
**worn** 514:4
**worried** 404:9
**worry** 415:25
423:15
**worthless** 570:17
**wright** 536:15
**write** 394:24
459:25 508:7
511:3 576:21
645:12 658:4
665:16
**writing** 398:1
433:7,22 449:21
478:19 505:7,9
508:18 509:4
625:13
**writings** 450:23
**written** 402:7
403:2 486:3
507:25 529:11
530:8,11,14,20
531:22 548:8
563:2,15,18,19,23
567:10 568:20,23
571:7 572:20,23
573:1 575:14
584:22 606:23
645:1,14
**wrong** 426:16
497:19,20 620:14
655:15 658:16
676:16
**wrote** 462:9 479:2
489:17 659:15
665:19,21

**x**

**x**  388:9 613:14,17
614:5,9,14 615:6
615:14,21

**y**

**yeah**  407:3 408:21
408:21,21 417:7
431:18 456:2,8
481:3 501:2 530:6
536:21 543:16
560:25 582:2
588:15 604:13
607:12 608:11
611:10 613:12
618:10 619:23
621:2 623:11
633:18 639:2,2
640:3 642:11
645:24 648:17,19
669:9
**year**  379:24
474:10 568:13,15
579:9 580:22
582:4 604:20
605:23 625:24
626:4,14 630:18
662:13,14 678:14
678:23
**years**  432:13
433:3 442:4
474:11 480:16
539:1 571:18
599:21
**yonker**  604:2
**york**  366:13
367:11,11,19,19
367:24,24 372:4,4
377:21,21
**younger**  646:3

**[zip - zuckerman.com]**                                                  Page 60

| z |
|---|
| **zip**  630:12,16 |
| **zone**  510:22 511:2 |
|   511:10,19 644:23 |
| **zones**  510:21 |
| **zoo**  664:16 |
| **zuckerman**  369:18 |
| **zuckerman.com** |
|   369:21 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.