Highly Confidential - Subject to Further Confidentiality Review

```
 1                  UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5   ----------------------------)

 6   IN RE:  NATIONAL PRESCRIPTION )

 7   OPIATE LITIGATION            ) Case No. 1:17-MD-2804

 8   ----------------------------) Hon. Dan A. Polster

 9   APPLIES TO ALL CASES         )

10   ----------------------------)

11

12                   HIGHLY CONFIDENTIAL

13        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

14

15            The videotaped deposition of WILLIAM

16   RATLIFF, called for examination, taken pursuant to the

17   Federal Rules of Civil Procedure of the United States

18   District Courts pertaining to the taking of

19   depositions, taken before JULIANA F. ZAJICEK, a

20   Registered Professional Reporter and a Certified

21   Shorthand Reporter, at the Hilton Garden Inn, 8910

22   Hatfield Drive, Indianapolis, Indiana, on December

23   19, 2018, at 9:36 a.m.

24
```

## Page 2

```
 1  APPEARANCES:
 2  ON BEHALF OF THE PLAINTIFFS:
 3     KELLER ROHRBACK L.L.P.
        1201 Third Avenue, Suite 3200
 4     Seattle, Washington 98101-3052
        206-623-1900
 5     BY: DEAN KAWAMOTO, ESQ.
           dkawamoto@kellerrohrback.com;
 6         DAVID J. KO, ESQ.
           dko@kellerrohrback.com
 7
 8  ON BEHALF OF THE STATE OF TENNESSEE PLAINTIFFS:
 9     BRANSTETTER, STRANCH & JENNINGS, PLLC
        The Freedom Center
10     223 Rosa L. Parks Avenue, Suite 200
        Nashville, Tennessee 37203
11     615-254-8801
        BY: TRICIA HERZFELD, ESQ.
12         triciah@bsjfirm.com
13
        ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
14  AMERISOURCEBERGEN DRUG CORPORATION:
15     JACKSON KELLY PLLC
        500 Lee Street East, Suite 1600
16     Charleston, West Virginia 25301-3202
        304-284-4138
17     BY: JON L. ANDERSON, ESQ. (Telephonically)
           jlanderson@JacksonKelly.com
18
19  ON BEHALF OF MALLINCKRODT LLC and SPECGX LLC:
20     ROPES & GRAY LLP
        Prudential Tower
21     800 Boylston Street
        Boston, Massachusetts 02199-3600
22     617-951-7910
        BY: ANDREW O'CONNOR, ESQ.
23         andrew.o'connor@ropesgray.com;
           ELISSA REIDY, ESQ.
24         elissa.reidy@ropesgray.com
```

## Page 3

```
 1  APPEARANCES: (Continued)
 2  ON BEHALF OF CARDINAL HEALTH, INC.:
 3     WILLIAMS & CONNOLLY LLP
        725 Twelfth Street, N.W.
 4     Washington, D.C. 20005
        202-434-5000
 5     BY: KATELYN ADAMS, ESQ. (Telephonically)
           kadams@wc.com
 6
 7  ON BEHALF OF McKESSON CORPORATION:
 8     COVINGTON & BURLING, LLP
        One City Center
 9     850 Tenth Street, NW
        Washington, D.C. 20001
10     202-662-5531
        BY: EMILY L. KVESELIS, ESQ.
11         ekveselis@cov.com
12
        ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
13  PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
    INC.:
14
        ARNOLD & PORTER KAYE SCHOLER LLP
15     777 South Figueroa Street, 44th Floor
        Los Angeles, California 90017-5844
16     213-243-4238
        BY: TIFFANY M. IKEDA, ESQ. (Telephonically)
17         tiffany.ikeda@arnoldporter.com
18
        ON BEHALF OF WALMART INC.:
19
        JONES DAY
20     2727 North Harwood Street
        Dallas, Texas 75201-1515
21     214-220-3939
        BY: LAURA JANE DURFEE, ESQ.
22         ldurfee@jonesday.com
23
24
```

## Page 4

```
 1  ALSO PRESENT:
 2     DONALD LOHMAN, ESQ.
 3     VP Legal, Mallinckrodt.
 4
 5
 6
 7  THE VIDEOGRAPHER:
 8     MR. MICHAEL NEWELL,
 9     Golkow Litigation Services.
10
11
12
13
14
15  REPORTED BY: JULIANA F. ZAJICEK, CSR 84-2604
16
17
18
19
20
21
22
23
24
```

## Page 5

```
 1            I N D E X
 2
 3  WITNESS:                    PAGE:
 4  WILLIAM RATLIFF
 5     EXAM BY MR. KAWAMOTO.................  14
 6     EXAM BY MS. HERZFELD.................  335
 7     EXAM BY MR. O'CONNOR.................  453
 8     FURTHER EXAM BY MR. KAWAMOTO.........  458
 9
10            *****
11
12        E X H I B I T S
13  MALLINCKRODT-RATLIFF EXHIBIT      MARKED FOR ID
14  No. 001  Excerpt from the National Drug      28
             Threat Assessment from 2011
15
16  No. 002  E-mail from Ratliff to Harper,      39
             3/22/11, Subject: H.D. Smith;
17           MNK-51-0000269884
18  No. 003  Mallinckrodt PowerPoint             66
             presentation: Overview
19           Presentation for New Employee
             Orientation, Updated 11/04/08;
20           MNK-T1 0000388159 - 187
21  No. 004  Mallinckrodt PowerPoint: Overview   73
             Presentation for Product and
22           Patient Safety Group, Update
             11/04/08; MNK-T1 0000420207 - 227
23  No. 005  E-mail from Kimberly France to      77
             Kate Muhlenkamp, 9/2/08, Subject:
24           Action Plan, w/attachment; MNK-T1
```

```
1       E X H I B I T S (Continued)
2  MALLINCKRODT-RATLIFF EXHIBIT         MARKED FOR ID
3  No. 006  Mallinckrodt PowerPoint,        86
             Controlled Substance Suspicious
4            Order Monitoring Program,
             Introductory Training for Field
5            Sales, June 5, 2008; MNK-T1
             0000277066 - 075
6
   No. 007  E-mail chain, top one from Karen   110
7            Harper to Bill Ratliff,
             12/13/2007, Subject: FW: Please
8            read important information; MNK-T1
             0004211219 - 226
9
   No. 008  E-mail chain, top one from Karen   126
10           Harper to Bill Ratliff, 2/29/2008,
             Subject: FW: DEA Suspicious Order
11           Monitoring Update; MNK-T1
             0007146630 - 633
12
   No. 009  E-mail chain, top one from Jim     137
13           Rausch to Bill Ratliff, among
             others, 4/1/08, Subject: RE:
14           Suspicious Order Monitoring;
             MNK-T1 0000268860
15
   No. 010  E-mail chain, top one from Karen   147
16           Harper to Bill Ratliff, 3/3/2008,
             Subject: DEA Compliance Monthly
17           Highlights, February 2008; MNK-T1
             0001308810 - 811
18
   No. 011  E-mail from Karen Harper to Bill   156
19           Ratliff, among others, 4/10/2008,
             Subject: Draft Procedure:
20           Mallinckrodt Controlled Substance
             Suspicious Order Monitoring,
21           w/attachments;
             MNK-T1 0000273902 - 909
22
   No. 012  E-mail from Karen Harper to Bill   171
23           Ratliff, 6/3/2008, Subject: DEA
             Compliance Monthly Report - May,
24           2008; MNK-T1 0002908468 - 469
```

```
1       E X H I B I T S (Continued)
2  MALLINCKRODT-RATLIFF EXHIBIT         MARKED FOR ID
3  No. 013  Interoffice Correspondence from   174
             Karen Harper to JoAnne Levy,
4            Subject: Controlled Substance
             Compliance Monthly Report, Date:
5            January 6, 2009;
             MNK-T1 0000502031 - 032
6
   No. 014  E-mail chain, top one from Karen   180
7            Harper to Bill Ratliff, 5/18/11,
             Subject: RE: Hydromorphone; MNK-T1
8            0000283602 - 603
9  No. 015  E-mail from Karen Harper to Kerry   186
             Hamilton and Bill Ratliff,
10           11/2/10, Subject: Explanation of
             Mallinckrodt Chargeback System;
11           MNK-T1 0000387492
12 No. 016  E-mail chain, top one from Bill    190
             Ratliff to Karen Harper, 7/21/10,
13           Subject: RE: Dea Dialog 7/20/10 -
             Suspicious Order Monitoring
14           Harvard Drug License Suspension;
             MNK-T1 0000561571 - 575
15
   No. 017  PowerPoint presentation,          194
16           Mallinckrodt Controlled Substance
             Suspicious Order Monitoring
17           Program, Presentation for
             Marketing Group, March 21, 2011;
18           MNK-T1 0000496098 - 124
19 No. 018  E-mail chain, top one from Bill    199
             Ratliff to Karen Harper, 5/2/2008,
20           Subject: FW: Suspicious Order
             Monitoring Miscellaneous Update;
21           MNK-T1 0000419903 - 904
22 No. 019  E-mail chain, top one from Eileen   210
             Spaulding to Karen Harper,
23           8/1/2008, Subject: RE: DEA Meeting
             Proposal; MNK-T1 0000274608 - 609
24
```

```
1       E X H I B I T S (Continued)
2  MALLINCKRODT-RATLIFF EXHIBIT         MARKED FOR ID
3  No. 020  E-mail from Karen Harper to        214
             Ratliff and Spaulding, 11/2/2010,
4            Subject: Draft DEA St. Louis
             Meeting Notes, w/attachment;
5            MNK-T1 0000421973 - 975
6  No. 021  E-mail chain, top one from Donald   221
             Lohman to Barbara Boockholdt,
7            among others, Subject: Meeting
             Agenda, w/attachment; MNK-T1
8            0000471744 - 750
9  No. 022  PowerPoint presentation: DEA &  222  237
             Regulations Training, October 20th
10           & 21st; MNK-T1 0002950399
11 No. 023  E-mail from Karen Harper to John   238
             Adams, among others, 6/6/08,
12           Subject: Suspicious Order
             Monitoring Notes from Bulk
13           Narcotics Sales Meeting
             Presentation;
14           MNK-T1 0000419956 - 957
15 No. 024  E-mail chain, top one from Karen   242
             Harper to Jim Rausch, George
16           Saffold, 6/9/10, Subject: RE:
             Suspicious Order Monitoring
17           Program; MNK-T1 0000264412 - 413
18 No. 025  Global Controlled Substance        247
             Compliance Procedure, Revision
19           Date: 01/04/11;
             MNK-T1 0000307322 - 324
20
   No. 026  Pharmacy Information Sheet,        251
21           10/11/11; MNK-T1 0000570903 - 905
22 No. 027  Pharmacy Information Sheet, Date:  256
             10/11/11; MNK-T1 0000571105 - 111
23
   No. 028  Handwritten notes by Bill Ratliff;  261
24           MNK-T1 0000386469 - 472
```

```
1       E X H I B I T S (Continued)
2  MALLINCKRODT-RATLIFF EXHIBIT         MARKED FOR ID
3  No. 029  Covidien PowerPoint entitled      265
             "EXALGO Utilization," by Julie
4            Milford; MNK-T1-002694677
5  No. 030  E-mail chain, to one from Bill    271
             Ratliff to Karen Harper, 5/20/08,
6            Subject: Fw: Sunrise Wholesale;
             MNK-T1 0000290601 - 603
7
   No. 031  E-mail chain, top one from Karen  276
8            Harper to Bill Ratliff, 5/20/08,
             Subject: FW: Sunrise Wholesale;
9            MAL-MI 000015271 - 273
10 No. 032  E-mail chain, top one from Bill   278
             Ratliff to Cathy Stewart, among
11           others, 5/24/08, Subject: Re:
             Intermediate Credit Update on
12           Sunrise Pharmaceutical;
             MNK-T1 0000290580 - 582
13
   No. 033  E-mail chain, top one from Cathy  283
14           Stewart to Bill Ratliff and Karen
             Harper, 5/20/08, Subject: FW:
15           Sunrise Wholesale;
             MNK-T1 0003028219 - 220
16
   No. 034  E-mail chain, top one from Karen  288
17           Harper to Bill Ratliff, 11/14/08,
             Subject: FW: Oxy 15 mg & 30 mg @
18           Sunrise; MNK-T1 0000307120 - 121
19 No. 035  E-mail chain, top one from Victor  294
             Borelli to Bill Ratliff, 7/27/09,
20           Subject: RE: Pete Kleissle, Oxy
             Investigation;
21           MNK-T1 0000307203 - 207
22 No. 036  E-mail chain, top one from Victor  300
             Borelli to Bill Ratliff, among
23           others, 8/4/09, Subject: RE:
             Florida medication coming into
24           Tennessee; MNK-T1 0000562325 -329
```

Page 10

```
1        E X H I B I T S (Continued)
2   MALLINCKRODT-RATLIFF EXHIBIT        MARKED FOR ID
3   No. 037  E-mail chain, top one is from Lisa    308
         Lundergan to Cathy Stewart, among
4        others, 8/11/09, Subject: RE:
         Sunrise Customer Chargebacks,
5        w/attachment;
         MNK-T1 0000456333 - 335
6
    No. 038  E-mail chain, top one from Cathy    310
7        Stewart to Charity Aranda and
         Karen Harper, 8/17/09, Subject:
8        FW: Sunrise Chargeback Summary,
         w/attachment;
9        MNK-T1 0000290041 - 053
10  No. 039  Controlled Substance Compliance    319
         Suspicious Order Monitoring,
11       Customer Audit Checklist, date
         completed: 08/18/09;
12       MNK-T1 0000307243 - 245
13  No. 040  Excerpt of chargeback data re    323
         Sunrise Wholesale Inc.;
14       MNK-T1 0000264291
15  No. 041  Administrative Memorandum of    330
         Agreement between the US DOJ, DEA
16       and Mallinckrodt, 7/2017
17  No. 042  Spreadsheet; MNK_TNSTA05224016 -    347
         029
18
    No. 043  Pharmacy Information Sheet,    356
19       10/17/11, Jabos Pharmacy;
         MNK_TNSTA01665655 - 656
20
    No. 044  Pharmacy Information Sheet,    366
21       10/17/11, Rippetoe, Inc.;
         MNK_TNSTA01666082 - 083
22
    No. 045  Pharmacy Information Sheet,    370
23       10/17/11, East Tennessee Discount
         Drug; MNK_TNSTA01665081 - 082
24
```

Page 11

```
1        E X H I B I T S (Continued)
2   MALLINCKRODT-RATLIFF EXHIBIT        MARKED FOR ID
3   No. 046  Pharmacy Information Sheet,    374
         2/26/12, East Tennessee Discount
4        Drug; MAL-NY00004465
5   No. 047  E-mail from Karen Harper to    377
         Christine Inman, 10/20/11,
6        Subject: AmerisourceBergen General
         SOM Notes and Individual Pharmacy
7        Comments, w/attachment;
         MNK_TNSTA05124366 - 373
8
    No. 048  Covidien Controlled Substance    381
9        Compliance/Suspicious Order
         Monitoring Distributor Customer
10       Audit Checklist, Audit Date:
         02/01/12; MNK_TNSTA05346757 - 764
11
    No. 049  Spreadsheet, ABC Top 40 and Multi    405
12       Dist Tab; MNK_TNSTA05323795 - 802
13  No. 050  E-mail from Bill Ratliff to Donald    411
         Walker, among others, 12/5/11,
14       Subject: Additional Pharmacies;
         MNK_TNSTA05310282
15
    No. 051  E-mail from Donald Walker to Bill    413
16       Ratliff, 12/12/11, Subject:
         Additional Pharmacies,
17       w/attachment;
         MNK_TNSTA05324116 - 117
18
    No. 052  Pharmacy Information Sheet,    417
19       3/20/12, Bradley Drug Co.;
         MAL-NY00004333
20
    No. 053  Consent Order by the Tennessee    424
21       Department of Health re
         Dr. Michael Rhodes, 7/21/09
22
    No. 054  Spreadsheet, May 2012 Top Oxy 30    426
23       Pharms; MNK_TNSTA05348540
24
```

Page 12

```
1        E X H I B I T S (Continued)
2   MALLINCKRODT-RATLIFF EXHIBIT        MARKED FOR ID
3   No. 055  Spreadsheet, chargeback data, TN    429
         oxy 15 through June 2012;
4        MNK_TNSTA0534773
5   No. 056  Spreadsheet, chargeback data, TN    444
         oxy 30 through June 2012;
6        MNK_TNSTA0534773
7   No. 057  Memorandum from Howard Davis to    458
         Karen Harper, 11/2/10, Subject:
8        Suspicious Order Monitoring
         Program No. C/S Comp 3.0; MNK-T1
9        0000269399 - 400
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 13

```
1        THE VIDEOGRAPHER:  We are now on the record.  My
2   name is Michael Newell.  I am a videographer for
3   Golkow Litigation Services.
4        Today's date is December 19th, 2018.  The
5   time is 9:36 a.m.
6        This video deposition is being held in
7   Indianapolis, Indiana, in the matter of National
8   Prescription Opiate Litigation.
9        The deponent today is Floyd Ratliff.
10       Counsel will be noted for the stenographic
11  record.
12       The court reporter is Juliana Zajicek and
13  will now swear in the witness.
14       (WHEREUPON, the witness was duly
15       sworn.)
16  MR. KAWAMOTO:  Dean Kawamoto, Keller Rohrback,
17  on behalf of the Plaintiffs.
18  MR. KO:  Good morning.  David Ko, Keller
19  Rohrback, also on behalf of the Plaintiffs.
20  MS. HERZFELD:  Tricia Herzfeld, Branstetter,
21  Stranch & Jennings, on behalf of the Tennessee
22  Plaintiffs.
23  MS. KVESELIS:  Emily Kveselis, Covington &
24  Burling, for McKesson.
```

Page 14

1    MS. DURFEE:  Laura Jane Durfee, Jones Day, for
2  Walmart.
3    MR. LOHMAN:  John Lohman in-house with
4  Mallinckrodt.
5    MS. REIDY:  Elissa Reidy of Ropes & Gray for
6  Mallinckrodt, LLC and SpecGX.
7    MR. O'CONNOR:  Andrew O'Connor of Ropes & Gray,
8  Mallinckrodt, LLC, SpecGX and Floyd Ratliff.
9    MR. KAWAMOTO:  Do you want any of the telephonic
10  appearances or -- okay.
11        WILLIAM RATLIFF,
12  called as a witness herein, having been first duly
13  sworn, was examined and testified as follows:
14        EXAMINATION
15  BY MR. KAWAMOTO:
16    Q.   Good morning, Mr. Ratliff.  Thank you for
17  being here.
18    A.   Good morning.
19    Q.   Have you ever been deposed before?
20    A.   Yes.
21    Q.   And can you briefly describe the matter
22  you were deposed in?
23    A.   It was a matter when I was with the FBI.
24  It was at the US Department of Justice.  It concerned

Page 15

1  an investigation.  I was one of the -- writers for
2  the final report.
3    Q.   And did this case involve -- or did this
4  matter involve narcotics?
5    A.   It did not.
6    Q.   So -- well, how -- how long ago was that?
7    A.   Approximately 1996.
8    Q.   Okay.  So some time ago.
9        In terms of the rules for the deposition
10  then, sir, just to help things go more smoothly, it is
11  very important for us to not speak -- speak over each
12  other.  If I ask a question and you don't understand
13  what the question is, please let me know and I will do
14  my best to rephrase it.  When you answer, you need to
15  answer audibly, so nodding your head isn't going to
16  work.  And if you want to take a break, let me know.
17  If there is a question pending, I think it probably
18  makes sense for you to answer the question, but then I
19  will -- we'll accommodate whatever breaks you need.
20        Does that sound agreeable?
21    A.   Understood.
22    Q.   Okay.  So with respect to this
23  deposition -- well, actually, let me take a step back.
24        You used to work for the Federal Bureau of

Page 16

1  Investigation.  Have you ever testified in court
2  before?
3    A.   Many times.
4    Q.   Okay.  And can you generally describe the
5  cases that you testified in?
6    A.   I testified in all matters that were
7  investigated by the FBI.  I was a special agent for
8  approximately 14-and-a-half years where I investigated
9  cases, and those cases involved bank robberies and
10  extortions, drug cases.  I was cross-trained with the
11  DEA in the early '80s.  Just...
12    Q.   And for the drug cases, did any of them
13  involve prescription opioids?
14    A.   No.
15    Q.   Now, you indicated that you cross-trained
16  with the DEA.  What -- what do you mean by that?
17    A.   In 19 -- this is going back a long way --
18  '82 -- '81, '82, '83, the FBI had received joint
19  jurisdiction with the Department -- or the Drug
20  Enforcement Administration to assist them with the
21  overwhelming drug crisis in the United States at that
22  time.  So they -- the FBI selected certain agents to
23  be trained to assist the DEA or to work their own
24  cases within the FBI but in coordination with the DEA.

Page 17

1    Q.   So you're familiar with the Controlled
2  Substances Act?
3    A.   I am.
4    Q.   Okay.  With respect to this deposition,
5  how did you prepare for it?
6    A.   I spoke with counsel from Ropes & Gray.
7    Q.   And do you recall roughly how many times
8  you spoke with counsel?
9    A.   Two times.
10    Q.   And were those in-person meetings or
11  telephonic?
12    A.   They were.  I'm sorry.  They were.
13    Q.   And roughly when did these meetings occur?
14    A.   One was yesterday and one was several
15  months back.
16    Q.   And how long did these meetings last,
17  approximately?
18    A.   Four or five hours.
19    Q.   So four or five hours per meeting?
20    A.   Yes.
21    Q.   And I'm going to ask you a question about
22  documents.  I'm not asking you to describe the
23  documents -- I'm not asking you to describe the
24  substance of the documents for me, but why don't we

Page 18

1  start with: Did you review any documents during these
2  meetings?
3      A.   Yes.
4      Q.   And did any of these documents refresh
5  your recollection?
6      A.   Yes.
7      Q.   Okay.  Do you know if these documents have
8  been produced in this case?
9      A.   No.
10     MR. KAWAMOTO:  And so I'm -- I'll make a general
11  request of counsel to provide any documents that --
12  that he reviewed.
13     MR. O'CONNOR:  I can say for the record they
14  have all been produced.
15  BY MR. KAWAMOTO:
16     Q.   Do you have any documents in your personal
17  possession relating to your work at Mallinckrodt?
18     A.   No.
19     Q.   Did you have a company phone?
20     A.   I did.
21     Q.   Did you ever send any text messages
22  related to your work at Mallinckrodt?
23     A.   I'm not certain that I did.  I -- I'm not
24  very technical.  As far as I know I carried a

Page 19

1  BlackBerry.  Is that a text?
2      Q.   I think they are somewhat different, but
3  I -- I take it from your answer you are not a heavy
4  texter?
5      A.   Correct.
6      Q.   Fair enough.
7           During your time at Mallinckrodt, were you
8  ever interviewed by any regulators or law enforcement
9  personnel?
10     A.   I spoke with law enforcement personnel
11  often but I was never interviewed in that sense.
12     Q.   And you've never been deposed while
13  employed by Mallinckrodt?
14     A.   I have not.
15     Q.   And how long did you work for Mallinckrodt
16  for?
17     A.   Approximately -- it was September of 2000
18  until June of 2012.
19     Q.   And what did you do after you left your
20  job at Mallinckrodt?
21     A.   Played golf.
22     Q.   Now, prior to joining Mallinckrodt, you
23  were with the FBI?
24     A.   That's correct.

Page 20

1      Q.   And what was your position with them right
2  before you joined Mallinckrodt?
3      A.   When I retired, I was special agent in
4  charge of the FBI in Albany, New York.  We covered
5  Vermont, all counties out to the Finger Lakes and just
6  north of New York City was our territory.
7      Q.   Did you ever work for the National Drug
8  Intelligence Center?
9      A.   I did.
10     Q.   And when was that from?
11     A.   I'm trying to associate this with other
12  movement in my career to give you an accurate date.
13     Q.   Sure.
14     A.   I would say 1996 and 1997.
15     Q.   And what position did you hold with them?
16     A.   I was the deputy director.
17     Q.   And what were your job responsibilities as
18  deputy director?
19     A.   It was basically to -- to manage the
20  entire operation.  There was a director, but those
21  specific duties fall to the deputy director.
22     Q.   Are you familiar with the "national drug
23  threat assessment"?
24     A.   I've heard that term, but I've been

Page 21

1  retired for six-and-a-half years and I seldom think
2  about any of this, so.  And that would have been in
3  the 1990s, 20 years ago, so I'm not certain how to
4  answer the question other than I believe I've heard
5  that term.
6      Q.   What was the job or what was the function
7  of the National Drug Intelligence Center?
8      A.   We employed our own analysts and analysts
9  from the FBI, the DEA, and most government agencies
10  with, I had like to describe it with three initials.
11  We were funded through the Department of Justice and
12  also through the Central Intelligence Agency.  And our
13  job was to gather information from agencies that
14  didn't have specific drug law enforcement type of
15  jurisdiction.
16          So, for instance, the Coast Guard might do
17  an interdiction and they might have a lot of
18  information that never gets to the Drug Enforcement
19  Administration or to the FBI or to the proper agency.
20  So the National Drug Intelligence Center employed all
21  of these different agencies so we could coordinate
22  that information, make reports, and put it back out to
23  the inf -- to the agencies that would most benefit
24  from that information.

Page 22

1    Q.   And is it your understanding that one of
2  the functions of the National Drug Intelligence Center
3  was to put out this report entitled "The National Drug
4  Threat Assessment"?
5    A.   That's -- I'm certain that's where I heard
6  that term, but it's been many years.
7    Q.   Do you ever recall working on a drug
8  threat assessment for the -- the NDIC?
9    A.   Not personally.
10   Q.   Would you agree that there is an opioid
11 crisis facing this country?
12   MR. O'CONNOR:  Objection.
13 BY THE WITNESS:
14   A.   I would.
15 BY MR. KAWAMOTO:
16   Q.   And roughly when did it start?
17   A.   I don't recall the exact timing.
18   Q.   If you had to estimate, though, what --
19 what -- roughly when would you put the date, pre 2000,
20 2012, if you had to ballpark it?
21   A.   I would rather not guess.
22   Q.   Were you concerned about the opioid
23 epidemic while you were employed at Mallinckrodt?
24   A.   Yes.

Page 23

1    Q.   And you joined Mallinckrodt in 2000, is
2  that correct?
3    A.   Correct, um-hum.
4    Q.   Did you ever hear the term "opioid
5  epidemic user" discussed while you were employed at
6  Mallinckrodt?
7    A.   Yes.  The -- what you need to understand,
8  if I might add some additional information, I worked
9  as the Security Manager for Mallinckrodt until they
10 were purchased by Tyco, Tyco International, and then
11 it became Tyco Healthcare, then I became the Director
12 of Security, director, not manager, but Director of
13 Security for Tyco Healthcare.  That eventually was
14 spun off into Covidien and I was the Chief Security
15 Officer for Covidien worldwide.
16   Q.   And so was it in the context of your work
17 as the Director of Security for Tyco that you heard
18 this term or you used this term -- or I'm sorry -- you
19 heard this term discussed?
20   MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22   A.   I just can't recall exactly when I heard
23 the term.  Did I hear that term, yes.
24 BY MR. KAWAMOTO:

Page 24

1    Q.   And what are the causes of this opioid
2  crisis?
3    A.   It would be abuse of narcotics.
4    Q.   Would you agree that overprescription by
5  doctors is a cause?
6    A.   Yes.
7    Q.   Would you agree that the over distribution
8  by pharmaceuticals is a cause?
9    MR. O'CONNOR:  Objection.
10 BY THE WITNESS:
11   A.   Yes.
12 BY MR. KAWAMOTO:
13   Q.   Do you know what a pill mill is?
14   A.   I do.
15   Q.   What is it?
16   A.   It's -- it's one that produces an excess
17 of narcotics for the street.
18   Q.   And when you say "produces an excess of
19 narcotics for the street," are you -- are you
20 referring to a manufacturer of narcotics?
21   A.   No.
22   Q.   So what -- what do you mean when you say
23 it produces -- a pill mill "produces an excess of
24 narcotics for the street"?

Page 25

1    A.   A manufacturer receives a quota from the
2  Drug Enforcement Administration.  They have an
3  overview of what pain medications are needed to be
4  distributed through distributors throughout the
5  United States.  They have the big picture.  The
6  manufacturers only have a small portion of the picture
7  because they were granted quota, normally not the
8  entire amount they request, but they were granted a
9  certain amount of quota by the Drug Enforcement
10 Administration.
11   MR. KO:  By the way, I believe everyone's
12 real-time is down.
13   MR. KAWAMOTO:  Do you want to take a quick ten
14 second break?
15   THE VIDEOGRAPHER:  We are going off the record
16 at 9:52.
17         (WHEREUPON, a recess was had
18          from 9:52 to 9:55 a.m.)
19   THE VIDEOGRAPHER:  We are back on the record at
20 9:55.
21 BY MR. KAWAMOTO:
22   Q.   So, Mr. Ratliff, before we went off the
23 record, we were discussing pill mills.
24         Are pill mills essentially pharmacies?

Page 26

1    MS. DURFEE:  Objection.
2  BY THE WITNESS:
3    A.   There is no way for me to answer that.  I
4  don't know that.
5  BY MR. KAWAMOTO:
6    Q.   Okay.  Well, what -- I think we
7  established that in your view a pill mill is not a
8  manufacturer, so what -- what is a pill mill?
9    A.   They are putting licit pills into the
10  illicit market.
11    Q.   And can you give me an example of a pill
12  mill?
13    A.   Well, there are countries, Mexico would be
14  one, China would be another, that introduce pills into
15  the United States at a -- at a large rate.  So those
16  would be pill mills.
17    Q.   And so your understanding of the term
18  "pill mill" is -- is that it would include China, for
19  example?
20    A.   Yes.
21    Q.   Could a local retail pharmacy be a pill
22  mill?
23    A.   Yes.
24    MS. DURFEE:  Objection.

Page 27

1  BY MR. KAWAMOTO:
2    Q.   Did you ever encounter such pill mills
3  while working for Mallinckrodt?
4    A.   I did.
5    Q.   Do you believe pill mills contributed to
6  the opioid crisis?
7    A.   I do.
8    Q.   And were you concerned about them while
9  you were employed at Mallinckrodt?
10    A.   Yes.
11    Q.   And did you believe it was -- strike that.
12    Do you believe Mallinckrodt had an
13  obligation to prevent its products from reaching pill
14  mills?
15    MR. O'CONNOR:  Objection.
16  BY THE WITNESS:
17    A.   Yes.
18  BY MR. KAWAMOTO:
19    Q.   And do you recall when you first became
20  concerned about pill mills?
21    A.   I can't give you a specific date or year.
22  There were -- there was a lot of information on the
23  news about the illicit, not licit, but illicit
24  distribution of narcotics and that it was causing

Page 28

1  deaths from that illicit product that was in the
2  market.
3    Q.   And by illicit distribution of narcotics,
4  does that include prescription opioids?
5    MR. O'CONNOR:  Objection.
6  BY THE WITNESS:
7    A.   Yes.
8  BY MR. KAWAMOTO:
9    Q.   In fact, weren't the majority of illicit
10  narcotics that were being distributed prescription
11  opioids?
12    MR. O'CONNOR:  Objection.
13  BY THE WITNESS:
14    A.   I don't know that.
15    MR. KAWAMOTO:  I'd like to mark as exhibit --
16    So this is going to be marked as
17  Exhibit 1, and I'm not quite sure what the best way to
18  get this to the other side of the table is, so if I
19  give it to you can you sort of circulate it.
20        (WHEREUPON, a certain document was
21         marked Mallinckrodt-Ratliff
22         Deposition Exhibit No. 001, for
23         identification, as of 12/19/2018.)
24  BY MR. KAWAMOTO:

Page 29

1    Q.   So, Mr. Ratliff, I've handed you what's
2  Exhibit 1.  It's an excerpt from the National Drug
3  Threat Assessment from 2011.  I put it up on the Elmo
4  for your convenience.
5    A.   Okay.
6    Q.   You'll note that it's put out by the US
7  Department of Justice and it is the National Drug
8  Intelligence Center is actually the institution that's
9  responsible for it.
10    Directing your attention to the top of
11  Page 37, and I'll high right this, this wording for
12  you.
13    Can you please read what I have just
14  highlighted?
15    A.   "The abuse of CPDs constitutes a problem
16  second only to the abuse of marijuana in scope and
17  pervasiveness in the United States; the problem is
18  particularly acute among adolescents."
19    Q.   Would you agree with that statement?
20    MR. O'CONNOR:  Objection.
21  BY THE WITNESS:
22    A.   Based on their assessment, yes.
23  BY MR. KAWAMOTO:
24    Q.   Well, do you have any reason to believe

Page 30

1  that the assessment is inaccurate?
2      A.   No.
3      Q.   That's all with that one.
4      A.   Okay.
5      Q.   So is it fair to say that the opioid
6  crisis is largely driven by prescription opioids?
7      MR. O'CONNOR:  Objection.
8  BY THE WITNESS:
9      A.   I would say yes.
10 BY MR. KAWAMOTO:
11     Q.   Are you aware of the term "migration" with
12 respect to -- strike that.
13          Are you familiar with the use of the term
14 "migration" in the context of opioid products?
15     A.   No, not that I recall.
16     Q.   Did you have particular concerns with
17 opioid products going to Florida and from there making
18 their way -- making their way to other parts of the
19 country?
20     MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22     A.   Yes.
23 BY MR. KAWAMOTO:
24     Q.   What were those concerns?

Page 31

1      A.   There came a time that we began to look at
2  our customer's customer.  We manufactured oxycodone.
3  We sold that to distributors and distributors sold
4  that to their customers.  And there came a time when
5  we started looking at our customer's customer.  So I
6  actually went to Florida and reviewed a number of
7  pharmacies to see if they were legitimate pharmacies
8  in my opinion or if they were, I guess what you would
9  call a pill mill.
10     Q.   And why go to Florida to do that?
11     A.   Because that was, I think, according to
12 DEA one of the hot spots.  There were others in the
13 United States that we also looked at, but Florida was
14 one that DEA was particularly concerned about.
15     Q.   And do you recall what some of the other
16 hot spots were?
17     A.   I do.  New Jersey would be one, Las Vegas,
18 Nevada would be another, as an example.
19     Q.   What about Kentucky?
20     A.   I'm certain we've discussed Kentucky in
21 those terms.
22     Q.   And what about West Virginia?
23     A.   I'm not certain if that was a term we used
24 or a state we looked at while I was still employed,

Page 32

1  but I know they've had a great deal of -- of problems.
2      Q.   So it would be fair to characterize West
3  Virginia as a hot spot as we are using that term,
4  would it not?
5      MR. O'CONNOR:  Objection.
6  BY THE WITNESS:
7      A.   Yes.
8  BY MR. KAWAMOTO:
9      Q.   What about Georgia?
10     A.   I don't know specifically that Georgia was
11 a hot spot.
12     Q.   What about Tennessee?
13     A.   Just for the record, I've been retired
14 six-and-a-half years and most of the information you
15 are asking much longer ago than that and I'm --
16 I'll do my very best, but I haven't really thought
17 about any of this since I retired.  So I'm going to do
18 my very best to answer those questions, but you are
19 asking questions about long ago for me.
20     Q.   No, I understand that, and I appreciate
21 your best efforts.
22     A.   I'm doing the best I can.
23     Q.   Sir, thank you.
24     A.   At the time I -- there were a number of

Page 33

1  states that were having issues, I believe, but it was
2  Florida was where DEA really wanted us to focus our
3  efforts at that time.
4      Q.   And in just going back briefly to the
5  issue of hot spots, do you -- do you recall
6  conversations about Tennessee?
7      MR. O'CONNOR:  Objection.
8  BY THE WITNESS:
9      A.   Not specifically.
10 BY MR. KAWAMOTO:
11     Q.   What about Ohio?
12     MR. O'CONNOR:  Objection.
13 BY THE WITNESS:
14     A.   Not specifically.
15 BY MR. KAWAMOTO:
16     Q.   Now, with respect to Florida, what were
17 your concerns about Florida?
18     A.   We were getting information that a number
19 of the pharmacies, these would be the customers of our
20 customer, were purchasing large amounts of oxycodone
21 30s, 30-milligram tablets.
22     Q.   And was the concern that this would --
23 this would -- these products were essentially being
24 diverted?

Page 34

1    MR. O'CONNOR:  Objection.
2  BY THE WITNESS:
3    A.   We didn't know that at the time.  The --
4  the effort was to go and obtain additional information
5  so we can make an assessment of those pharmacies.  You
6  know, one, for example, may be next to a Veterans
7  Administration hospital and maybe they had a reason
8  for purchasing large amounts, others may be putting
9  them back into the illicit market.  So we needed
10  additional information to make an assessment whether
11  or not that we would continue to supply our
12  distributor.  The distributor had a responsibility to
13  know their customers.  They have the same exact
14  responsibility that a manufacturer has to develop a
15  program to prevent diversion.  So they are supposed to
16  have security people just like myself that would go to
17  those pharmacies and review them.
18      So to obtain additional information, I
19  went to Florida and I obtained cooperation from two of
20  our forensic auditors from Covidien that didn't work
21  for Mallinckrodt to go to the east side of the state,
22  they were both fluent in Spanish, to review these
23  high -- they were high dosage pharmacies to see were
24  they good, solid pharmacies or were they very small

Page 35

1  pharmacies with no other products in their -- on their
2  shelves and signs that indicated Mallinckrodt products
3  sold for cash only.  So we went to Florida and we made
4  that review and then we made recommendations, not only
5  to DEA, that we were not going to provide product to
6  our distributors to go to those but that they should
7  also review our results because we, you know, stopped
8  selling to our distributor.  And the distributor's
9  responsibility then was to -- to go to that pharmacy
10  and make an assessment also.  And if they had
11  information that we didn't have, they could always
12  come forward.
13    Q.   And you indicated that you went to Florida
14  to make an assessment of these pharmacies and
15  essentially determine if they were pill mills or not,
16  is that fair?
17    MR. O'CONNOR:  Objection.
18  BY THE WITNESS:
19    A.   That's fair.
20  BY MR. KAWAMOTO:
21    Q.   And what were the results of that
22  assessment?  Did you identify pill mills in Florida?
23    A.   I did.
24    Q.   In your opinion, were there a higher

Page 36

1  number of pill mills in Florida than -- well, strike
2  that.
3      Based on your experience and in your
4  opinion were there a higher number of pill mills in
5  Florida than in other states?
6    MR. O'CONNOR:  Objection.
7  BY THE WITNESS:
8    A.   I don't -- I would have no way to assess
9  that.
10  BY MR. KAWAMOTO:
11    Q.   Would it be fair to say you identified a
12  large number of pill mills in Florida?
13    MR. O'CONNOR:  Objection.
14  BY THE WITNESS:
15    A.   I would say yes.
16  BY MR. KAWAMOTO:
17    Q.   And would you agree that the pills that
18  ended up with these pill mills in Florida -- well,
19  strike that.
20      The pills that went to these pill mills in
21  Florida didn't always stay in Florida, did they?
22    MR. O'CONNOR:  Objection.
23  BY THE WITNESS:
24    A.   I'd have no way to know that.

Page 37

1  BY MR. KAWAMOTO:
2    Q.   Do you recall ever being informed or
3  contacted by law enforcement in other states
4  indicating that they had -- they had possession of
5  Mallinckrodt product from the illicit market and it
6  appears that that product came from Florida?
7    A.   I believe that we received information
8  from Tennessee.  They requested assistance on
9  identifying the actual numbers the -- that are
10  contained on the bottles and that we provided that
11  information, and that's -- it's been a long time ago,
12  and I believe that was the case.
13    Q.   So that would be an example of pills
14  traveling from Florida to Tennessee in the illicit
15  market, is that fair?
16    A.   Fair.
17    Q.   And there is nothing to prevent a pill
18  that originally is shipped to Florida from being
19  transported to Kentucky, is there?
20    A.   No.
21    Q.   And were you aware that there were people
22  coming into Florida from out of state for the express
23  purpose of obtaining opioid products?
24    MR. O'CONNOR:  Objection.

Page 38

BY THE WITNESS:

1  A.  DEA -- I spoke with DEA frequently, Pete
2  Kleisele, and that information would have been gleaned
3  from conversations with Pete.
4  BY MR. KAWAMOTO:
5  Q.  And so DEA indicated to you that they were
6  concerned that people were coming from out of state
7  into Florida to obtain opioid products?
8  MR. O'CONNOR:  Objection.
9  BY THE WITNESS:
10  A.  That's correct.  And we also provided --
11  they are -- there is no oxy in the tablet, they are
12  placebos, would be the term, to law enforcement DEA so
13  they could have an undercover operation in Florida.
14  So we did know about that, and they couldn't
15  redistribute product that they took in without the
16  Attorney General personally approving that.  So we
17  provided placebos to them to assist them with their
18  investigation.
19  BY MR. KAWAMOTO:
20  Q.  And do you know where those placebos
21  ultimately ended up?  Do you know if they stayed in
22  Florida or if they were distributed up and down the
23  Eastern Seaboard?


Page 39

1  A.  They were --
2  MR. O'CONNOR:  Objection.
3  BY THE WITNESS:
4  A.  Well, I don't know specifically where they
5  ended up.  DEA requests assistance, but they never
6  come back and say, These are the results of your
7  assistance.
8  MR. KAWAMOTO:  So I'd like to mark this as
9  Exhibit 2, if I could.
10  (WHEREUPON, a certain document was
11  marked Mallinckrodt-Ratliff
12  Deposition Exhibit No. 002, for
13  identification, as of 12/19/2018.)
14  BY MR. KAWAMOTO:
15  Q.  So, Mr. Ratliff, I've handed you an
16  exhibit.  It is Bates numbered MNK-T 269884.  It is at
17  the very bottom.
18  And could you review that Exhibit and let
19  me know when you are ready?
20  A.  Okay.
21  Q.  So this is an e-mail that you sent to
22  Karen Harper on March 22nd, 2011.
23  Do you recall sending this e-mail?
24  A.  Not particularly, but I sent it because

Page 40

1  it's got my name from and to Karen.
2  And I remember basically what the e-mail
3  says, because they came to Mallinckrodt, to my office,
4  on occasion asking for assistance in how to
5  investigate the pharmacies, and so we -- we gave them
6  whatever we could in assistance, so.
7  Q.  And H.D. Smith was a Mallinckrodt
8  customer?
9  A.  Yes.
10  Q.  Now, do you see on the e-mail where it
11  says: "H.D. Smith has suspended all sales of oxy 30s
12  into Florida for the immediate future"?
13  A.  Correct.
14  Q.  Do you have an understanding of why they
15  did that?
16  A.  The owner -- I mean, this is from a -- you
17  have to remember how many years ago this has been.
18  I'm going to give you my best recollection of that
19  conversation.
20  Q.  That -- that would be appreciated.
21  A.  So the owner said:  There are problems in
22  Florida.  You guys go down there and see what's going
23  on.  And so he said:  And stop the sales until we
24  figure it out.

Page 41

1  Q.  And when you say, the owner said:  You
2  guys go down there, was he referring to his people or
3  was he referring to Mallinckrodt or both?
4  A.  He had no authority over us.  He was
5  talking about his people.
6  Q.  Okay.  And do you see further on in the
7  e-mail, it says: "He went on to explain, as he told
8  us, that they do not sell to pain management clinics."
9  A.  Okay.
10  Q.  Do you understand what the concern was
11  with pain management clinics?
12  MR. O'CONNOR:  Objection.
13  BY THE WITNESS:
14  A.  Pain management clinics.  We -- we
15  produced or manufactured oxycodone 5s, 15s and 30s.
16  The pain management clinics tended to prescribe the
17  oxycodone 30s, which is the highest dose at that time
18  that we manufactured.  So there is no way for us to
19  know if they are treating legitimate pain from
20  their -- their customers, but, I mean, that's
21  certainly an issue because of the volume that they
22  were selling.
23  Q.  And so you had a concern that the pain
24  management clinics may have been overprescribing, is

Page 42

1 that fair?
2 MR. O'CONNOR: Objection.
3 BY THE WITNESS:
4 A. I don't know that I knew that at the time,
5 but they were purchasing large amounts from their
6 customers. Let me restate this.
7 There the -- our customers, the
8 distributors, were selling to these pharmacies and
9 that the doctors were writing scripts to those
10 pharmacies for their patients. So it was far removed
11 from us. So for me to tell you today that -- that I
12 knew specifically this was going on, there is no way I
13 could do that.
14 BY MR. KAWAMOTO:
15 Q. Well, I understand that, but this e-mail
16 indicates that you had -- well, this -- this e-mail
17 indicates that the distributor had a concern with pain
18 management clinics.
19 And it sounds like you shared that
20 concern, is that fair?
21 MR. O'CONNOR: Objection.
22 BY THE WITNESS:
23 A. I'm trying to see where I agreed. I --
24 BY MR. KAWAMOTO:

Page 43

1 Q. Well, let me rephrase the question.
2 Did you -- while employed at Mallinckrodt,
3 did you share a concern regarding pain management
4 clinics and the prescription of oxy 30s?
5 MR. O'CONNOR: Objection.
6 BY THE WITNESS:
7 A. At a point when we started to review our
8 customers' customers.
9 BY MR. KAWAMOTO:
10 Q. And at the very bottom of the e-mail, do
11 you see the sentence that says: "He concluded that if
12 the pharmacies were filling too many scripts for pain
13 management doctors or were uncooperative that they
14 would no longer sell to that pharmacy"?
15 A. Yes.
16 Q. Did you agree with that conclusion?
17 A. That was their conclusion. I was
18 reporting what they were telling me.
19 Q. But do you think that conclusion was a
20 reasonable one for them to be making?
21 A. As I previously stated, at the time I
22 hadn't had an opportunity to review our customers'
23 customers and then the downstream with the pharmacies
24 and their patients. So to say -- I don't see anywhere

Page 44

1 in here in this e-mail -- or e-mail that I agree with
2 that. You know, did we have a concern, I think it was
3 on the news about pain management clinics, and so I
4 didn't live in a bubble. So there certainly -- you
5 know, if you believe the news, that there was a
6 problem with pain management doctors.
7 Q. And when you completed your review of your
8 customers' customers, that confirmed that there was a
9 problem with pain management doctors, isn't that
10 correct?
11 A. That is correct.
12 MR. O'CONNOR: Objection.
13 THE WITNESS: Sorry.
14 BY MR. KAWAMOTO:
15 Q. Do you recall when you first started
16 reviewing your customers' customers?
17 A. I would be guessing if I said a specific
18 time. I -- I just -- I hate to guess.
19 Q. What prompted you to start looking at your
20 customers' customers?
21 A. DEA was concerned that everyone -- they
22 wanted everyone to be involved in the suspicious order
23 monitoring program specifically and to delve into
24 their customer's customer. That was -- came out of a

Page 45

1 conference that DEA held, if I were guessing, I would
2 say '09. It may have been a different time. I just
3 don't want to misspeak. That's --
4 Q. No, I understand that, sir.
5 A. I'm trying to give you the best, and it's
6 been a long time.
7 Q. Now, the -- your customers, the
8 distributors, were also supposed to be vetting their
9 customers, is that fair?
10 A. That's fair.
11 MR. O'CONNOR: Objection.
12 BY MR. KAWAMOTO:
13 Q. Did you ever have concerns with the
14 vetting process that your customers were using to vet
15 their customers?
16 MS. KVESELIS: Object to form.
17 BY MR. KAWAMOTO:
18 Q. You can answer.
19 A. Yes.
20 Q. That -- the objection is preserved for the
21 record.
22 A. Um-hum, yes.
23 Q. And can you describe those concerns?
24 MS. KVESELIS: Object to form.

Page 46

BY THE WITNESS:

1    A.   We weren't sure that they were going to
2  their customers and doing an audit, so we came up with
3  a form that required a lot of information from those
4  pharmacies that purchased large amounts of our
5  products, and there were a number of questions on
6  there that would help us, it would give us more
7  information, additional information, and would -- it
8  would allow us to make an assessment then, too, of the
9  distributor if they were following up with those
10  pharmacies if there were any concerns.

11  BY MR. KAWAMOTO:

12    Q.   And do you recall any of the distribute --
13  strike that.

14       Do you recall any of the distributors that
15  you had concerns about?

16    MR. O'CONNOR:  Objection.

17    MS. KVESELIS:  Object to form.

18  BY THE WITNESS:

19    A.   Our job was to ensure our customers were
20  in compliance.  So if we had concerns about one of
21  their customers or more than one of their customers,
22  we would bring that to their attention.  And it was
23  the intent that they understood exactly what we

Page 47

1  expected as a manufacturer.

2  BY MR. KAWAMOTO:

3    Q.   And do you recall any specific
4  distributors, though, that you had concerns about
5  their compliance?

6    MR. O'CONNOR:  Objection.

7  BY MR. KAWAMOTO:

8    Q.   Do any -- do any names stand out for you?

9    MR. O'CONNOR:  Objection.

10  BY THE WITNESS:

11    A.   There was one that was dilatory.  We gave
12  them specific deadlines, like 30 days, provide this
13  information back to Mallinckrodt so we could make an
14  assessment in 30 days.  They didn't always make those
15  deadlines.  That doesn't necessarily mean that they
16  were out of compliance or had ill intent.  It meant
17  that they didn't provide the information.  So we would
18  have to go back to them and say, We need this
19  information to make an assessment.

20    Q.   And would --

21    A.   On one occasion we brought that to
22  management's -- the management of that distributor's
23  attention.  And they, to the best of my knowledge, you
24  know, fixed the -- the matter right away.

Page 48

1    Q.   And what distributor was this that we are
2  talking about?

3    A.   AmerisourceBergen.

4    Q.   Do you recall a distributor named
5  "Sunrise"?

6    A.   Yes.

7    Q.   And what do you recall about that
8  distributor?

9    A.   That they had hired a DEA either agent or
10  compliance analyst to assist them with their -- their
11  entry into the market.  And at some point our people,
12  not myself, went to Sunrise to review the operation
13  and make a determination if they were a legitimate
14  enterprise.

15    Q.   And do you recall that Sunrise voluntarily
16  surrendered its license to the DEA?

17    MR. O'CONNOR:  Objection.

18  BY THE WITNESS:

19    A.   I don't recall that specifically, but I
20  believe that's correct.

21  BY MR. KAWAMOTO:

22    Q.   Do you recall anything about Masters
23  Pharmaceuticals?

24    MR. O'CONNOR:  Objection.

Page 49

1  BY THE WITNESS:

2    A.   I know that I was involved in an audit of
3  Masters.

4  BY MR. KAWAMOTO:

5    Q.   And what do you recall about that audit?

6    A.   Almost nothing.  It's been so long ago,
7  and what happens is that the different audits, they
8  just kind of all meld together, and at my age I'm --
9  I'm having more difficulty remembering things that are
10  ten years old or -- or longer, so.

11    Q.   Do you know if Masters had its license
12  revoked by the DEA?

13    A.   I believe that to be the case.  I know we
14  made -- we sent information to DEA after the audit.  I
15  do remember that.  But we had two audits within a day
16  or so of each -- of those audits, and that's why I'm
17  somewhat confused if it's Masters or one of the other
18  distributors.

19    Q.   And do you recall what information you
20  sent to DEA about Masters Pharmaceuticals?

21    A.   No.

22    Q.   What about Harvard, do you recall them as
23  a distributor?

24    A.   I never have been to Harvard.  I've heard

Page 50

1 that name, but that's all I know.

2    Q.    And what about KeySource?

3    MR. O'CONNOR:  Objection.

4 BY THE WITNESS:

5    A.    I think KeySource, again, I'm almost

6 guessing, but I believe it's in Cincinnati and was one

7 of the ones that we audited during that two-day

8 period.

9 BY MR. KAWAMOTO:

10    Q.    And do you recall if they lost their

11 license to the DEA for Schedule II narcotics?

12    A.    Again, I'd be guessing.  I don't know, but

13 I believe they may have.  This has been, you know,

14 long ago.

15    Q.    Now, you indicated that you were the

16 secure -- that you were the security director for

17 Mallinckrodt, is that -- is that right?

18    A.    I was the security manager for

19 Mallinckrodt.  I was the security director when it

20 became Tyco Healthcare.

21    Q.    And so were you promoted into that

22 position?

23    A.    I was.

24    Q.    And roughly when did you become the

Page 51

1 security director for Tyco?  And I understand that

2 that -- this happened a while ago, so, you know, I'm

3 not --

4    A.    I'm trying to remember.

5    Q.    -- I understand that --

6    A.    It is difficult to...

7    Q.    -- yeah, you may not be exact.

8    A.    I would say sometime in 2001.  Is that --

9 and I may be wrong.  I may be off a year.  I think

10 it's --

11    Q.    Sure.  But the early 2000s, is that right?

12    A.    Yes, that would be fair.

13    Q.    What were your responsibilities as

14 security director for Mallinckrodt?  I'm sorry.

15         What were your responsibilities as

16 security director for Tyco?

17    A.    We had facilities all over.  We were

18 responsible for the pharmaceutical section, for

19 surgical instruments, for surgical materials.  That's

20 not a good way to say that.  It's surgical supplies.

21 And there was additionally one other division that had

22 to do with breathing apparatus for people that needed

23 oxygen.  That was sold off fairly early.  So we -- we

24 maintained those three divisions until Covidien spun

Page 52

1 off from -- from Tyco International.

2    Q.    And with respect to opioid products, what

3 were your responsibilities, for the opioid products?

4    A.    To prevent diversion, to ensure that in

5 the manufacturing sites that there were programs in

6 place.

7    Q.    And could you define diversion for me?

8 What's your understanding of that term?

9    A.    Diversion is taking a licit product, a

10 legitimate product and taking it away in an illi --

11 in an illicit way for one's own personal use or for

12 sale.

13    Q.    So would the overprescription by a doctor

14 constitute diversion in your opinion?

15    MR. O'CONNOR:  Objection.

16 BY THE WITNESS:

17    A.    There is no way for me to -- to without

18 additional information about a specific doctor to make

19 that generalization.

20 BY MR. KAWAMOTO:

21    Q.    But if a doctor is prescribing opioids for

22 non-medically valid reasons, that would be an example

23 of diversion?

24    A.    That's a hypothetical, it seems.  I don't

Page 53

1 know how I could answer that without specifics.

2    Q.    Well, what specifics would you need?

3    A.    I -- I'd need to know what type of

4 patients he sees and does he write the same script 90

5 tablets of 30-milligram for every patient he sees.

6 Now, would that be a -- something that I would want to

7 know, yes.  So if that's the case, but still without

8 additional information, it's really difficult for me

9 to make that assessment.

10    Q.    But in the example you gave, the 90

11 tablets of 30 of oxy 30 for every patient he sees, in

12 your -- in your view that would be an example of

13 diversion?

14    MR. O'CONNOR:  Objection.

15 BY THE WITNESS:

16    A.    No.  It would be suspicious, but I can't

17 make the assessment literally without having specifics

18 about his customers.  Would it be suspicious, yes.

19 BY MR. KAWAMOTO:

20    Q.    So it could be diversion?

21    A.    It's possible.

22    Q.    And the pill mills, the distribution of

23 Mallinckrodt products by pill mills, that would be

24 another example of diversion, would it not?

1  MR. O'CONNOR:  Objection.
2  BY THE WITNESS:
3      A.  It would.
4  BY MR. KAWAMOTO:
5      Q.  And so when you say your re -- one of your
6  responsibilities was to prevent diversion, it was to
7  prevent the pill mills from getting your product?
8  MR. O'CONNOR:  Objection.
9  BY MR. KAWAMOTO:
10     Q.  Fair?
11     A.  No, not fair.
12         We are the manufacturer.  The distributor
13  has a responsibility to know who their customers are
14  and where those pills are going.  So do -- do we have
15  a responsibility to monitor our distributors, yes.
16  And we were auditing those distributors just as you've
17  discussed with Masters and the other one that you
18  said.  So we were monitoring those people to make a
19  determination if they were doing due diligence on
20  their employees, but you can't take that information
21  and bring it all of the way back to the manufacturer.
22  You have to go back through DEA in the quota that they
23  allot to each of the manufacturers.  We were not by
24  any stretch the only manufacturer of oxy.  There is

1  OxyContin, oxycodone, other products manufactured.  So
2  you're trying to make a leap that's not necessarily in
3  my opinion appropriate.
4      Q.  But you had a responsibility to know your
5  customers' customers, did you not?
6  MR. O'CONNOR:  Objection.
7  BY THE WITNESS:
8      A.  At a certain point in time we were told we
9  should know our customer's customer, and that came
10  secondhand out of a meeting in DEA.  At that time we
11  didn't know how we would even make that determination,
12  how we would even determine who our customers'
13  customers were.  And at -- at some point we made
14  the -- we developed information that we had a system
15  called chargebacks, and if you want me to explain
16  that, I can't, but I know that we had a system so we
17  had information on our distributors' customers.
18         Once we had that information, that's when
19  we started with the forms, sending those out to the
20  distributors trying to determine if they had done due
21  diligence with all of their customers.  They weren't
22  our customers.  They were our customers' customers.
23  So we didn't have that responsibility from ad
24  infinitum.  It was at a certain point.

1         Let me just say one other thing.  We asked
2  DEA for assistance time and time again.  They were --
3  they were silent.  They gave us -- they said it's your
4  responsibility.  Yeah, but could you just give us a
5  hint about what you would like to see.  And they just
6  couldn't seem to come up with anything.  They said
7  it's not their responsibility.  To me it is their
8  responsibility.  They are the regulatory agency and
9  they are trying to say, no, this is all our
10  customers -- all of the registrants' issues, and they
11  should have been at least somewhat helpful and they
12  weren't.
13     Q.  But at some point in time they did
14  indicate to you that you should know your customers's
15  customer, right?
16     A.  Exactly, yes, they did.
17     Q.  And at that point would you agree that you
18  had an obligation to know your customer's customer?
19  MR. O'CONNOR:  Objection.
20  BY THE WITNESS:
21     A.  At that time we started identifying our
22  customers' customers.
23  BY MR. KAWAMOTO:
24     Q.  Because DEA indicated that you had that

1  responsibility, yes?
2  MR. O'CONNOR:  Objection.
3  BY THE WITNESS:
4      A.  They didn't ever say, You have that
5  responsibility.  It came from a conference in DC
6  with -- with the compliance group and that term at
7  some point came up.  And so it drifted back through
8  the grapevine, for lack of a better way to say it,
9  that they were talking about having their -- their
10  registrants know their customer's customer.
11         And basically at that time we had never
12  heard that term.  DEA had never come to us personally
13  and said, You need to know your customer's customer.
14  So -- and by the time DEA actually told us that, it
15  was late in -- in 2011.  It was the same date they had
16  the -- the earthquake in Washington, D.C.  And we felt
17  it.  Because they said, You need to know your
18  customer's customer.
19         And the very next week I was on a plane to
20  Florida because they said, You need to do this.  That
21  was really the first time they ever told us that we
22  needed to do that.  We had a good program, we did the
23  very best we could to prevent diversion, and once they
24  said, You need to do this, we did it.  We did it

Page 58

1 immediately.
2      And for -- furthermore, not only did we do
3 that, we started cancelling a lot of these. We were
4 going back to our distributors and telling them, We
5 are not going to -- to sell products to you that you
6 sell to these particular pharmacies. And so it
7 worked.
8 BY MR. KAWAMOTO:
9    Q. So you indicated that, I think you just
10 said: "We were going back to our distributors and
11 telling them that we are not going to sell products to
12 you that sell" -- "that you sell to these particular
13 pharmacies"?
14    MR. O'CONNOR: Objection.
15 BY THE WITNESS:
16    A. That's correct.
17 BY MR. KAWAMOTO:
18    Q. So shouldn't the distributors have done
19 that on their own?
20    MS. KVESELIS: Object to the form.
21    MR. O'CONNOR: Objection.
22 BY THE WITNESS:
23    A. Yeah, yes.
24 BY MR. KAWAMOTO:

Page 59

1    Q. And do you recall how many distributors
2 you went to to tell them: We are no longer going to
3 essentially -- well, strike that.
4      Do you recall how many distributors you
5 went to and told them, You need to cut off these
6 customers?
7    A. We took --
8    MS. KVESELIS: Object to form.
9 BY THE WITNESS:
10    A. We took the top three, McKesson, Cardinal,
11 and AmerisourceBergen, and we looked at their top ten
12 pharmacies in Florida. So that was -- there was --
13 were a total of 30 pharmacies. They were the ones
14 that purchased the most of the oxycodone 30s through
15 their distributors. And so when we identified
16 those -- and as I said, when DEA told us that, the
17 very next -- next week I was in Florida. And I had --
18 I caused two of our forensic auditors to cover the
19 east side of the state, because they had Spanish
20 speaking ability, and I covered the west side of the
21 state. And I went into a number of these pharmacies
22 to try to determine exactly what DEA had said, know
23 your customer's customer. In fact, I had testified in
24 the Fort Myers, Florida on behalf of DEA against one

Page 60

1 of those pharmacies because we felt very strongly that
2 they were selling products they shouldn't of.
3    Q. And do you recall what -- what the case
4 was that you testified on behalf of the DEA in?
5    A. Gulf Coast Pharmacy, I believe. That's
6 been a long time also.
7    Q. And you say you visited a total of 30
8 pharmacies, is that right?
9    MR. O'CONNOR: Objection.
10 BY MR. KAWAMOTO:
11    Q. To the best of your recollection?
12    A. Not by --
13    Q. But you and -- you and --
14    A. There were two.
15    Q. -- two other forensic officers from --
16    A. From Covidien, not from Mallinckrodt, but
17 from the corporation.
18    Q. Okay.
19    A. They did the -- the others, and I can't
20 recall exactly what the -- the separation was, but we
21 covered all of those 30 pharmacies.
22    Q. And with respect to those 30 pharmacies,
23 do you have a rough estimate from how many you decided
24 should not be receiving Mallinckrodt products?

Page 61

1    A. I don't know. Some of them were
2 absolutely legitimate pharmacies. You walk in and
3 they look like a Walgreens. And they have all of the
4 products out there. You talk to the pharmacist and
5 she is very aware of issues in Florida and, you know,
6 they would tell me what they were doing to prevent.
7 They looked at the -- the scripts written by the
8 doctors to make sure that they were consistent, and
9 sometimes they would contact the doctors. Others were
10 literally pill mills where they -- they had to buzz
11 you in at the door and they had stanchions and they
12 had a sign "Mallinckrodt Cash Only." To me that's a
13 pill mill.
14    Q. Is it fair to say it's not that difficult
15 to identify a pill mill if someone has your
16 experience?
17    MR. O'CONNOR: Objection.
18 BY THE WITNESS:
19    A. I don't think that's fair. There are so
20 many variables. You -- you know, for me, you know, I
21 spent years in law enforcement. I can look at a
22 situation much differently than one that's never been
23 in law enforcement. I mean, I look at the people that
24 are in and around the pharmacy and if they look like

Page 62

1 they are legitimate pain patients, are -- you know,
2 are there some elderly people on walkers, are there --
3 you just need information to be able to make that
4 assessment. You can't make a blanket assessment,
5 especially without a, in my opinion, a law enforcement
6 background.
7 BY MR. KAWAMOTO:
8    Q.   And so when you visit a pharmacy to
9 evaluate whether it's a pill mill or not, can you list
10 for me the things that you look for?
11    A.   One of the things you look for, like I
12 stated before, is do you have to be buzzed into the
13 pharmacy. So they look at you and they have to push a
14 buzzer to let you in. Very little product on the
15 shelf. A sign such as "Mallinckrodt products left
16 side, cash only, no insurance."
17    Q.   And these would -- these would all be
18 indicators that it's a pill mill?
19    A.   Absolutely.
20    Q.   And what else?
21    A.   No product on the shelf, just strictly
22 filling prescriptions in large numbers of -- of oxy 30
23 going into that and being prescribed. So that's
24 certainly information that you -- you would want

Page 63

1 more -- to make a proper assessment you need as much
2 information as possible. But those are things that I
3 would look for when trying to make an assessment.
4    Q.   Do you also look at the clientele of the
5 pill mill?
6    A.   No.
7    MR. O'CONNOR:  Objection.
8 BY THE WITNESS:
9    A.   There is no way to do that.
10 BY MR. KAWAMOTO:
11    Q.   But you can see who is going in and out of
12 the pharmacy?
13    A.   I can, yeah, physically see who is coming
14 and going depending on the length of time. That would
15 be, as I said before, do they have elderly people, do
16 they have walkers, are they all young people.
17    Q.   And if they are all young people, is that
18 a warning sign?
19    A.   Well --
20    MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22    A.   -- there are additional warning signs. Do
23 they have what we call meth mouth, which is bad teeth,
24 are they sitting down or kneeling down besides cars in

Page 64

1 the parking lot, and do they see me and recognize a
2 law enforcement person or a former law enforcement
3 person who is watching them. So if they got up and
4 ran, that's a sign.
5 BY MR. KAWAMOTO:
6    Q.   Do you look for out of plate license --
7 I'm sorry.
8       Do you look for out-of-state license
9 plates?
10    A.   Yes.
11    Q.   Why?
12    A.   Well, I'll give you a specific. In
13 Las Vegas there were out-of-state license plates all
14 over, a very large pharmacy, people in the -- in the
15 room, there were slot machines, they were dozing off,
16 appeared to -- again, with my law enforcement
17 experience, they appeared to be on some kind of
18 narcotic. And when they are selling large amounts
19 of -- of that product to people from out of state, you
20 know, that's a sign.
21    MR. O'CONNOR:  Counsel, we have been going about
22 an hour. Should we take a break?
23    MR. KAWAMOTO:  Sure. Why don't -- why don't we
24 take a break then.

Page 65

1    THE VIDEOGRAPHER:  We are going off the record
2 at 10:41.
3       (WHEREUPON, a recess was had
4        from 10:41 to 10:53 a.m.)
5    THE VIDEOGRAPHER:  We are back on the record at
6 10:53.
7 BY MR. KAWAMOTO:
8    Q.   So, Mr. Ratliff, as you've noted on
9 several occasions, I am asking you questions about
10 events that have occurred, you know, some years in the
11 past, and I understand that. So I think what it makes
12 sense to do is I'm going to start showing you
13 documents that I think will help refresh your memory.
14       You should review as much of the document
15 as you need to be comfortable, but as some of these
16 are, you know, several pages, I will probably -- well,
17 I will direct you to certain portions that I am
18 interested in. And, you know, as I said, you
19 should -- you should review as much of the document as
20 you feel is appropriate.
21       So why don't we start with what I believe
22 is going to be Exhibit 3. And I think the -- let's
23 see.
24       (WHEREUPON, a certain document was

Page 66

1   marked Mallinckrodt-Ratliff
2   Deposition Exhibit No. 003, for
3   identification, as of 12/19/2018.)
4 BY MR. KAWAMOTO:
5   Q.   And so I've handed you a document that's
6 Bates numbered 388159, and it's a Mallinckrodt --
7 Mallinckrodt PowerPoint presentation.  It's an
8 Overview Presentation for New Employee Orientation.
9      Do you recall this PowerPoint?
10  A.   Yes.
11  Q.   And what do you recall about it?  Well,
12 strike that.
13      Who did -- did you deliver this
14 PowerPoint?  Did you -- is this your PowerPoint
15 presentation?
16  MR. O'CONNOR:  Objection.
17 BY THE WITNESS:
18  A.   Normally it was delivered by Karen Harper.
19 BY MR. KAWAMOTO:
20  Q.   But you were involved in preparing it,
21 were you not?
22  A.   Yes.
23  Q.   And so it's several pages.  I would like
24 to focus your attention on the two org charts that are

Page 67

1 on Pages 3 and 4 of the PowerPoint.
2  A.   Okay.
3  Q.   So the first is the power -- is an org
4 chart for the Security Group Organization.
5  A.   Yes.
6  Q.   Is that your organization?  Or is that --
7 is that the organization you were working in, the
8 department you were -- you were working in?
9  MR. O'CONNOR:  Objection.
10 BY THE WITNESS:
11  A.   Yes.
12 BY MR. KAWAMOTO:
13  Q.   And then if you put this up there, you'll
14 see your name Corporate Security Director for
15 Covidien?
16  A.   Um-hum.
17  Q.   Who is John Griffin?
18  A.   Deputy legal counsel for Covidien.
19  Q.   And did you report directly to him?
20  A.   I did.
21  Q.   And how -- what was the nature of your
22 communication?  Did you provide monthly reports, or
23 how did you communicate?
24  MR. O'CONNOR:  Objection.

Page 68

1 BY THE WITNESS:
2  A.   Normally e-mails, occasional conversations
3 on the phone, occasional in-person meetings.
4 BY MR. KAWAMOTO:
5  Q.   And who is Jim O'Connor?
6  A.   He is a securities supervisor in
7 St. Louis.
8  Q.   And it's -- do you see where it says
9 "Security Officers"?
10  A.   Yes.
11  Q.   Who are those or what are those?
12  A.   They are -- there were 14 officers that
13 were all trained and duly -- in the law enforcement
14 academy, former police officers, and they were charged
15 with securing our facility there in St. Louis where we
16 manufactured products.
17  Q.   And so we are talking physical security,
18 is that correct?
19  A.   Yes.
20  Q.   And then there are a number of people that
21 are reporting to Jim O'Connor that are security
22 monitors.
23      Do you see that?
24  A.   Yes.

Page 69

1  Q.   What is a security monitor?
2  A.   Each building where narcotics are
3 manufactured has a monitor.  So anyone -- anyone
4 coming or going has to open their lunch box, their --
5 they have to show them their coat, they have to
6 basically take their hat off, pockets, pull their
7 pockets out, everything, to ensure they are not
8 diverting product.
9  Q.   Okay.  And then if you turn the page over,
10 it's going to be another org chart.  It's a Controlled
11 Substance Compliance Group Organization.
12  A.   Um-hum.
13  Q.   So who is Karen Harper?
14  A.   Karen Harper is the DEA compliance
15 manager.
16  Q.   And what did she do?
17  A.   She was responsible for quota for all of
18 the employees that controlled the quota in the
19 manufacturing.  Also she was responsible for
20 communicating with DEA, any discrepancies or -- she
21 just -- she had a -- a wide range of responsibilities.
22  Q.   And who was responsible for the suspicious
23 order monitoring program?
24  A.   Karen.

Page 70

1    Q.   Were you involved in that as well?
2    A.   I assisted her, yes.
3    Q.   And what were your responsibilities with
4 respect to the SOM program?
5    A.   Well, to assist as necessary.
6    Q.   So did you have sort of defined tasks that
7 you were responsible for or was it primarily whatever
8 Karen asked you to help her with?
9    MR. O'CONNOR:  Objection.
10 BY THE WITNESS:
11   A.   Primarily whatever Karen asked me to
12 assist her with.  Occasionally I did, I went to audits
13 when I was available, and I helped coordinate contact
14 with DEA, the local DEA in St. Louis, so.
15 BY MR. KAWAMOTO:
16   Q.   Were you involved in reviewing the
17 policies that -- well, strike that.
18        Were you involved in reviewing or revising
19 suspicious order monitoring -- suspicious order
20 monitoring program policies?
21   A.   Karen Harper wrote the program, but I
22 assisted in the process.
23   Q.   And who is JoAnne Levy or JoAnne Levy?
24   A.   VP of pharmaceutical logistics.

Page 71

1    Q.   And what -- what did she do, what were her
2 responsibilities?
3    A.   That's outside my purview.
4    Q.   So I take it you didn't work directly with
5 her?
6    A.   No.
7    Q.   What about Eileen Spaulding, what did she
8 do?
9    A.   She worked for Karen Harper in Hobart,
10 New York.
11   Q.   And was Hobart your primary -- well, I'm
12 sorry.  Strike that.
13        What was the -- what did the -- what
14 function did the Hobart facility fulfill?
15   MR. O'CONNOR:  Objection.
16 BY THE WITNESS:
17   A.   They took the raw product and made tablet
18 form and other products.  So it wasn't all just
19 tablets.
20 BY MR. KAWAMOTO:
21   Q.   And do you know who Carrie Johnson was?
22   A.   Not necessarily.
23   Q.   What about Mar- -- what about Mary Lewis?
24   A.   Mary Lewis worked in St. Louis and worked

Page 72

1 for Karen and she also worked at Webster Groves.  We
2 had a facility there with our -- they were developing
3 new products and so forth, so she helped with the
4 coordination there.
5    Q.   And I'm sorry.  What was -- what function
6 did the Webster Groves facility play?
7    A.   They were research and development.
8    Q.   And do you know who Lee Nelson is?
9    A.   I did.  He is now deceased.
10   Q.   What were his responsibilities?
11   A.   He monitored quota.
12   Q.   And what about Wender -- Wendy Slaby or
13 Slaby?
14   A.   She worked for Karen.
15   Q.   And what about Christine Greg -- I'm
16 sorry -- Christine -- Christie Kegg?
17   A.   She worked for Karen.
18   Q.   But other than working for Karen, you
19 don't know what their responsibilities were?
20   A.   I don't.
21   Q.   And I take it you didn't work with either
22 one of them?
23   A.   Well, they were in close proximity to my
24 office, but I didn't work specifically or -- with

Page 73

1 them.
2    Q.   You can put that aside.
3        Okay.  So I'm going to give you another
4 PowerPoint marked Exhibit 4.
5        (WHEREUPON, a certain document was
6        marked Mallinckrodt-Ratliff
7        Deposition Exhibit No. 004, for
8        identification, as of 12/19/2018.)
9 BY MR. KAWAMOTO:
10   Q.   And for this PowerPoint I'd like to direct
11 your attention to Page 4 of it which has another
12 organizational chart.
13   A.   Okay.
14   Q.   Now, Mallinckrodt had a suspicious order
15 monitoring program, did it not?
16   A.   Yes.
17   Q.   And it was required to have this program
18 by the applicable law and DEA regulations, is that
19 correct?
20   MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22   A.   Yes.
23 BY MR. KAWAMOTO:
24   Q.   Can you look at this org chart and

Page 74

1  identify for me all of the people that you believe
2  were involved in that suspicious order monitoring
3  program?
4      A.   Could you be more specific?
5      Q.   Well, there is a suspicious order
6  monitoring program, and I'm -- I would like to figure
7  out what employees were involved in implementing
8  that -- well, either designing or implementing that
9  program?
10     MR. O'CONNOR:  Objection.
11 BY THE WITNESS:
12     A.   Well, I would say Karen Harper
13 specifically, but everyone on this page had some
14 responsibility.  They were our logistics, they were
15 our transportation, moving product from one place to
16 another.  So they are all responsible to prevent
17 diversion.
18 BY MR. KAWAMOTO:
19     Q.   Well, so, do you see Michael Pheney?
20     A.   I do.
21     Q.   What were his diversion control
22 responsibilities?
23     MR. O'CONNOR:  Objection.
24 BY THE WITNESS:

Page 75

1      A.   He didn't work for me.  I know who Michael
2  is.  I know he controlled transportation of products.
3  Beyond that, I really don't know what his
4  responsibilities are.
5  BY MR. KAWAMOTO:
6      Q.   Well, how about Jim Rausch, do you see his
7  name?  He is underneath Michael.
8      A.   You are asking me questions about long ago
9  and employees that weren't employed by me or I didn't
10 work with on a daily basis or even sometimes didn't
11 see for long periods of time.
12     Q.   Well, why don't we do this --
13     A.   These were headquarters in Hazelwood and I
14 was at the St. Louis plant.  The times I was at
15 Hazelwood was -- they were brief and it was for a
16 specific meeting.
17     Q.   So what individuals on this org chart did
18 you work with the in the context of the suspicious
19 order monitoring program?
20     A.   Karen Harper.
21     Q.   Anyone else?
22     A.   And her team.  I mean, they were right
23 around the corner from my office.  So if there was
24 some questions, I could talk to them, but normally I

Page 76

1  did everything through Karen.
2      Q.   So do you -- you don't recall ever working
3  with Jim Rausch?
4      A.   If you are asking have I ever been in a
5  meeting with Jim Rausch, probably.
6      Q.   Or communicated with him via e-mail?
7      A.   Probably, but I can't tell you
8  specifically all of these years later if that's a
9  fact.
10     Q.   What about Cathy Stewart, do you recall
11 working with her?
12     A.   I know Cathy Stewart because her husband
13 is a security officer.
14     Q.   But other than through her husband, do you
15 recall working with Cathy Stewart in the context of
16 the suspicious order monitoring program?
17     A.   Not specifically.
18          If you have documents that you can refresh
19 my memory, I'd be happy to review them.
20     Q.   Okay.  Well, yeah, why don't -- why don't
21 we do that then.
22     MR. KAWAMOTO:  I'd like to mark this as exhibit,
23 I believe it's five.
24          (WHEREUPON, a certain document was

Page 77

1               marked Mallinckrodt-Ratliff
2               Deposition Exhibit No. 005, for
3               identification, as of 12/19/2018.)
4  BY MR. KAWAMOTO:
5      Q.   So, this is an e-mail and an attachment
6  with the Bates No. 448772, and the title of the
7  attachment is the:  "Oxycodone Extended Release
8  RiskMAC" -- "RiskMAP Action Plan."
9      A.   Okay.
10     Q.   Are you familiar with this RiskMAP action
11 plan?
12     A.   I don't recall it.
13     Q.   If you could turn to Page 3 of the
14 attachment.  It says "Supplay" -- "Supply Chain &
15 Security."
16          And do you see your name identified for a
17 number of these -- of these rows?
18     A.   Yes.
19     Q.   So the first row is:  "Provide
20 notification to DEA of any confirmed diversion."
21     A.   Um-hum.
22     Q.   Can you explain what -- what does that
23 mean?
24     A.   If we have a diversion, they should tell

Page 78

1  me.
2      Q.   And I'm sorry.  Who should tell you?
3      A.   The person that discovers the diversion or
4  whoever is in charge of that particular event.
5      Q.   And then you would then report that to
6  DEA?
7      A.   Unless there was an investigation that was
8  necessary, and then we would perform an investigation
9  to try to determine what happened in that specific
10 incident, and then we would report it to DEA.
11     Q.   Do you recall any specific incidents of
12 diversion while you were the security director?
13     A.   I'm certain there were some diversions,
14 but specifically, no.  I know that -- that DEA -- or
15 not DEA -- Hobart had several diversions.  And I know
16 they worked closely with DEA and the state police on
17 those.  I wasn't responsible for Hobart.  They had a
18 security manager there, but he would report all of
19 that to me so I would be aware of it.
20     Q.   And the incident -- the incidents that you
21 are describing, are they examples -- are they
22 essentially examples of theft, someone walks off from
23 the facility with -- with bottles of pills?
24     A.   Normally not bottles.  It would be -- it

Page 79

1  would be a few pills, normally.
2      Q.   The third row says:  "Investigate" --
3  "Investigate abnormal orders."  And it identifies
4  Karen Harper and you as the point people.
5          What did that entail?
6      MR. O'CONNOR:  Objection.
7  BY THE WITNESS:
8      A.   That entailed Karen at least advising me
9  about it, and she normally handled all of those
10 matters.  She worked -- there was a time she worked
11 for me and then there was a time she apparently worked
12 for JoAnne Levy and others, so.
13 BY MR. KAWAMOTO:
14     Q.   And roughly when did she work for you
15 from, if you can recall?
16     A.   I can't recall.  I just know that she that
17 did work for me from -- for a period of time.  That's
18 the best I can do.
19     Q.   And then was she promoted?
20     A.   They just realigned responsibilities.
21     Q.   Do you know why they did that?
22     A.   At the time JoAnne Levy wanted the DEA
23 compliance group under the logistics.  She thought it
24 better fit than with security.  That's what I was

Page 80

1  told.
2      Q.   Now, it says:  "Investigate abnormal
3  orders."
4          What is an abnormal order?
5      A.   From time to time Karen would be advised
6  that a customer had ordered a large amount, much more
7  than they had ever ordered in the past, so they would
8  automatically give that to Karen to do an
9  investigation to say, do you have any idea what's
10 going on with this customer, so.
11     Q.   Are you familiar with the term "peculiar
12 order"?
13     A.   Yes.
14     Q.   Okay.  What --
15     A.   Peculiar means it was excessive.
16     Q.   And is there a difference between an
17 abnormal order and a peculiar order or are they the
18 same?
19     MR. O'CONNOR:  Objection.
20 BY THE WITNESS:
21     A.   Not in my mind.  They are the same.
22 BY MR. KAWAMOTO:
23     Q.   What about a suspicious order?
24     MR. O'CONNOR:  Objection.

Page 81

1  BY THE WITNESS:
2      A.   I'm not sure how to define it at this
3  point.  It's a -- I just -- I don't know that there is
4  a difference in those terms.
5  BY MR. KAWAMOTO:
6      Q.   So an abnormal order -- I guess what I'm
7  trying to understand is was there a difference with
8  respect to Mallinckrodt's terminology between an
9  abnormal order and a suspicious order?
10     MR. O'CONNOR:  Objection.
11 BY THE WITNESS:
12     A.   Not in my mind.
13 BY MR. KAWAMOTO:
14     Q.   Now, can you turn to Page 5 of this
15 attachment.
16     A.   Okay.
17     Q.   It says "Pharmacovigilance, Surveillance &
18 Epidemiology."
19     A.   Say that again.
20     Q.   It says "Pharmacovigilance, Surveillance &
21 Epidemiology."
22         Do you see that?
23     A.   I do.
24     Q.   Okay.  And the first row references:

Page 82

1 "Receive, capture, and monitor adverse events."
2        Do you know what an adverse event is?
3    A.   Not necessarily.
4    Q.   So I take it it wasn't -- you didn't --
5 you didn't ever identify or report an adverse event?
6    MR. O'CONNOR:  Objection.
7 BY THE WITNESS:
8    A.   This has been a long time ago.  If you had
9 asked me contemporaneous when this was written or -- I
10 would have probably had an answer.  Today I would be
11 guessing if I said what that means.  You are showing
12 me documents that are -- you know, I haven't thought
13 about in all of these years.  And this is the first
14 time I've seen this document today since I probably
15 worked there six-and-a-half years ago or probably
16 years before that.
17 BY MR. KAWAMOTO:
18    Q.   Well, and so my question is, as you sit
19 here today, do you have any recollection of what's an
20 adverse -- what an adverse event means?
21    A.   No.
22    Q.   Okay.  Did you ever work with Maria
23 Chianti -- Chianta?
24    A.   That name is not familiar.  You know, if

Page 83

1 you have a document that identifies me working with
2 her, you could show it to me, and I'd be happy to talk
3 about it, but right now I could -- I have no idea who
4 she is.
5    Q.   Well, sir, your name appears in this
6 document.  Did you -- did you review it?
7    A.   Probably at that time I reviewed it.  But
8 it's been a great deal of time removed since I would
9 have done this, and maybe I would have reviewed it one
10 time.
11    Q.   Well, going back to the supply chain and
12 security, are -- are these tasks and responsibilities
13 accurate?
14    MR. O'CONNOR:  Objection.
15 BY THE WITNESS:
16    A.   Are you talking about everything written
17 here?
18 BY MR. KAWAMOTO:
19    Q.   No.  I'm talking about the ones that
20 reference you.
21    A.   Without going through every line of
22 everything, I would think that if it's written like
23 this, it would probably be accurate, but I can't make
24 that statement today because, you know, I haven't read

Page 84

1 every line of this document.
2    Q.   And then turning to Page 5, I'm just
3 trying to understand what interaction, if any, you had
4 with this group of people and the work they were
5 doing.
6        So this is now "Pharmacovigilance,
7 Surveillance & Epidemiology."
8        Do you see that?
9    A.   Okay.
10    Q.   Are you familiar with the AERS database,
11 that's A-E-R-S?
12    A.   No.  Not today I am not, so.
13    Q.   And are you familiar with a RiskMAP
14 report?
15    A.   It just doesn't ring a bell.
16    Q.   Okay.  What about one of the rows is:
17 "Monitor longitudinal patient data for patterns of
18 abuse."
19        Was that something you were ever involved
20 in?
21    A.   Please repeat.
22    Q.   One of the rows indicates:  "Monitor
23 longitudinal patient data for patterns of abuse."
24        Was that ever a task that you were

Page 85

1 involved in?
2    A.   I don't think so.
3    Q.   The next task is:  "Issue 15-day alert
4 report involving Oxycodone ER regardless of the
5 outcome the following:  All medication errors
6 involving breaking, chewing, crushing, accidental
7 overdoses, adverse events in children under 18."
8        Is that a responsibility that you were
9 ever involved in or a task that you were ever involved
10 in?
11    A.   No.
12        Are these employees of Mallinckrodt?
13    Q.   To be honest, sir, I don't know.  I'm just
14 reading them off of this.
15    A.   Yeah, well, the reason is I don't know who
16 these people are and I don't know that I have ever
17 heard their names.  So I was just wondering if you are
18 asking me questions about people that weren't even
19 with Mallinckrodt, so.
20    Q.   Well, and you don't have -- so you don't
21 have any familiarity with the RiskMAP action plan?
22    A.   To the best of my knowledge, no.
23    Q.   So you don't know if this was prepared
24 specific -- strike that.

Page 86

1    You don't know if this was prepared
2 specifically for oxycodone or whether this was
3 prepared for all of their products?
4    A.   I have no way -- no way to know that.
5    Q.   The e-mail is from Kimberly France to Kate
6 Muhlenkamp.
7        Do you know who Kimberly France is?
8    A.   No.
9    Q.   What about Kate Muhlenkamp?
10   A.   I don't.  I don't think so.
11   MR. KAWAMOTO:  So this is Exhibit 6.  Thank you.
12       (WHEREUPON, a certain document was
13        marked Mallinckrodt-Ratliff
14        Deposition Exhibit No. 006, for
15        identification, as of 12/19/2018.)
16 BY MR. KAWAMOTO:
17   Q.   So, Mr. Ratliff, I have handed you
18 Exhibit 6, which is another PowerPoint.  It is Bates
19 No. 277066.
20   A.   Um-hum, yes.
21   Q.   And it is the:  "Mallinckrodt Controlled
22 Substance Suspicious Order Monitoring Program,
23 Introductory Training for Field Sales."
24       Are you familiar with this PowerPoint?

Page 87

1    A.   This is 2008, ten years ago.  I know that
2 we had PowerPoints such as this.  I can't recall this
3 specifically.
4    Q.   But would you have helped prepare this
5 type of a PowerPoint?
6    MR. O'CONNOR:  Objection.
7 BY THE WITNESS:
8    A.   If I can't remember it, I can't tell you
9 if I helped prepare it.  I don't -- it doesn't seem --
10 I don't know.  I don't think so, but...
11 BY MR. KAWAMOTO:
12   Q.   Would you have ever delivered this type of
13 a PowerPoint?
14   A.   Normally not.
15   MR. O'CONNOR:  Objection.
16   THE WITNESS:  Sorry.
17 BY THE WITNESS:
18   A.   Normally not.
19 BY MR. KAWAMOTO:
20   Q.   So directing your attention to Page 3.
21   A.   What page?
22   Q.   Page 3 of the PowerPoint.
23   A.   Okay.
24   Q.   So it says:  "Mallinckrodt Suspicious

Page 88

1 Order Monitoring Procedure Team."
2        Do you see that?
3    A.   Yes.
4    Q.   And it identifies you as a member of this
5 team.  Is that accurate?
6    A.   Yes.
7    Q.   Okay.  And so -- well, strike that.
8        Do you recall when this team was formed?
9    A.   I don't recall the team specifically.  My
10 name was used in instances such as this because I
11 should be involved if there is a problem.  So, was I
12 on the team, probably.  Did they meet, I couldn't tell
13 you that today at all.
14   Q.   Well, do you recall being involved in a
15 suspicious order monitoring team while you were at
16 Mallinckrodt?
17   A.   No.
18   Q.   So you don't recall -- well, you've
19 indicated that you didn't work directly with JoAnne
20 Levy.
21       Do you recall working with John Adams?
22   A.   I don't know who he is.
23   Q.   Okay.  And we've -- you don't know who
24 Kimberly France is.  You know Karen Harper.

Page 89

1    A.   I do.
2    Q.   You don't know Michael Pheney, is that --
3    A.   I do know who Michael Pheney is.
4    Q.   Okay.  But you don't recall working with
5 him?
6    A.   He was not a direct report to me.  Did we
7 know one another, yes.
8    Q.   Well, my question is a little more
9 specific, sir.  I'm talking about in the context of
10 the suspicious order monitoring program for
11 Mallinckrodt, do you recall working with Mr. Pheney?
12   A.   I can say with some reasonable memory that
13 there may have been occasions where he and I discussed
14 something about transportation, so, but this is I
15 think eight -- about eight years ago -- or ten years
16 ago.
17   Q.   And we've already -- I think we've already
18 gone over Mr. Rausch.  And you don't recall working
19 with him in the context of the SOM program, is that
20 fair?
21   A.   I know who he is.
22   Q.   Okay.  Cathy Stewart you only know because
23 her husband was a security officer, is that right?
24   MR. O'CONNOR:  Objection.

Page 90

1 BY THE WITNESS:
2    A.   I know that Cathy and Karen had
3 interaction.
4 BY MR. KAWAMOTO:
5    Q.   And did those interactions involve you,
6 though?
7    A.   Normally not.
8    Q.   What about Susan Marlatt?
9    A.   I can't remember her at all.
10   Q.   And for the team advisors, do you know
11 what role they played -- well, strike that.
12       Do you recall ever interacting with Jerry
13 Moss in the context of this SOM program?
14   A.   I don't recall that today.
15   Q.   What about Jason Jones?
16   A.   I don't know who that is.
17   Q.   Jeff Burd?
18   A.   It means nothing.
19   Q.   Bob Lesnak?
20   A.   I don't know that I ever worked directly
21 with him.  I mean, I'd say no because I just can't
22 recall.
23   Q.   Okay.  And we've covered Eileen Spaulding,
24 right?

Page 91

1    A.   I know who Eileen is.  She worked for
2 Karen at Hobart.
3    Q.   So we've got a suspicious order monitoring
4 team, but you don't recall whether they had any
5 meetings and you don't recall participating in any
6 meetings, is that correct?
7    MR. O'CONNOR:  Objection; form.
8 BY THE WITNESS:
9    A.   I'm saying it was ten years ago and I
10 don't recall.  That's what I'm saying.
11 BY MR. KAWAMOTO:
12   Q.   But I understand that, sir.
13   A.   So, so to try to indicate that I never --
14 I don't know if I attended meetings or not because I
15 don't specifically remember this.
16   Q.   So, well, do you have any memory of what
17 this team was supposed to do?
18   A.   I have no memory of this at all.  There
19 were a number of things I was involved in and would
20 have met in and so forth ten years ago, but I don't
21 recall.  That's the best I can do.
22   Q.   Okay.  So if you turn over the page, it is
23 "DEA Policy on Suspicious Orders."
24       Do you see that?

Page 92

1    A.   Yes.
2    Q.   Okay.  So according to this PowerPoint,
3 DEA regulations "require registrants to design and
4 operate a suspicious order identification system."
5       Do you agree with this?
6    A.   Yes.
7    Q.   And it "requires that registrants report
8 suspicious orders to DEA when discovered through
9 monitoring."
10       Do you agree with that?
11   A.   I would, yes.
12   Q.   The "registrant is reminded that their
13 responsibility does not end merely with the filing of
14 a suspicious order report."
15       Do you agree with that?
16   A.   I do.
17   Q.   And what -- what do you interpret that to
18 mean, that the responsibility does not end merely with
19 the filing of a suspicious order report?
20   A.   It means if there is an investigation
21 needed that we conduct the investigation and we
22 provide follow-up information.
23   Q.   So put another way, it is not sufficient
24 to simply identify a suspicious order and then ship

Page 93

1 the order, is that fair?
2    MR. O'CONNOR:  Objection.
3 BY THE WITNESS:
4    A.   There is a difference in what you are
5 saying.  You are saying -- repeat what you were
6 asking, please.
7 BY MR. KAWAMOTO:
8    Q.   So one of the consequences of this
9 requirement is that it would not be adequate to simply
10 identify a suspicious order to the DEA and then ship
11 that order, is that cor- -- is that fair?
12   MR. O'CONNOR:  Objection.
13 BY THE WITNESS:
14   A.   If you go on, it says a "registrant must
15 conduct an independent analysis of suspicious orders
16 prior to completing a sale to determine whether the
17 controlled substances are likely to be diverted."
18       So to me if you go there, that's -- yes,
19 it's true.
20 BY MR. KAWAMOTO:
21   Q.   Okay.  And when it says "conduct an
22 independent analysis of suspicious orders," what does
23 it mean to conduct an independent analysis?
24   A.   I know that these came to Karen and that

Page 94

1 there were certain things that she would do. She
2 would do certain checks, she would check with DEA, but
3 she would also go on the internet and look at the --
4 she had the ability to look at the building and to see
5 if it was a real site, especially with new orders.
6 There were a number of things that she could do to
7 fulfill that.
8     Q.   And did you assist her in this independent
9 analysis of suspicious orders?
10     A.   On occasion.
11     Q.   And what type of assistance did you
12 provide?
13     A.   Going on the internet and looking up to
14 see if it was a legitimate building, that how long had
15 they been there and if they owned it or if they
16 rented, and if it appeared that they had the, you
17 know, the requisite storage facilities and so forth.
18 There were other things.  I just don't remember what
19 they all were, so.
20     Q.   And Mallinckrodt had these obligations by
21 virtue of the fact that it was a registrant under the
22 Controlled Substances Act, is that correct?
23     MR. O'CONNOR:  Objection.
24 BY THE WITNESS:

Page 95

1     A.   Correct.
2 BY MR. KAWAMOTO:
3     Q.   Now, the bottom bullet point is: "There
4 are currently 1,288,992 DEA registrants, DEA must rely
5 on the States and individual registrants to monitor."
6         Would you agree with that statement?
7     A.   It was my understanding that they had more
8 responsibility than just telling the registrants it's
9 their responsibility, especially in '08, so.  I don't
10 know who wrote this and I'm not -- I just don't know
11 who wrote it, so.  Am I absolutely clear and believe
12 that, not necessarily.
13     Q.   Well, if there are over a million DEA
14 registrants, don't they -- doesn't DEA have to rely on
15 these registrants to do their monitoring?
16     MR. O'CONNOR:  Objection.
17 BY MR. KAWAMOTO:
18     Q.   How else would the system work if that --
19 if that wasn't the case?
20     MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22     A.   We all have a program in place to do that.
23 So the answer is do they rely on us, yes.  Some of
24 these registrants are little tiny things that have

Page 96

1 one, you know, one product or whatever.  So it makes
2 it look like a huge number if you look at everyone
3 that is registered to do anything, but there are a lot
4 of people registered with DEA that don't manufacture
5 narcotics.  There aren't that many is what I'm saying.
6 BY MR. KAWAMOTO:
7     Q.   And when you say "there aren't that many,"
8 what you are saying is there are not -- there are not
9 that many registrants, that you think this number
10 is --
11     A.   I'm saying that manufacture pain medicine,
12 pain pills, pain products.  And I may be wrong.  But I
13 think that's -- I'm surprised by that number, how
14 about that.
15     Q.   But it's certainly fair to say that DEA
16 was re -- was relying on Mallinckrodt to do its part
17 to monitor suspicious orders?
18     MR. O'CONNOR:  Objection.
19 BY THE WITNESS:
20     A.   That's correct.
21 BY MR. KAWAMOTO:
22     Q.   And then if you flip the page to Page 5.
23     A.   Okay.
24     Q.   The first bullet point is:  "Failure to

Page 97

1 maintain effective div" -- "effective controls against
2 diversion is inconsistent with the public interest."
3         In other -- in other words, this is simply
4 that Mallinckrodt has a duty to maintain effective
5 controls against diversion, is that another way of
6 saying this?
7     MR. O'CONNOR:  Objection.
8 BY THE WITNESS:
9     A.   Yes.
10 BY MR. KAWAMOTO:
11     Q.   Now, there is a letter that seems to be
12 placed on the side.
13         Do you see that?  Or it is a picture of a
14 letter.  Do you see that?
15     A.   I see there is a letter there.
16     Q.   Okay.  And if you can make out the date,
17 it's December 27, 2007?
18     A.   Yeah, I can't see that good.
19     Q.   Okay.  Is this the 2007 Rannazzisi letter?
20     MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22     A.   I have my bifocals and I have my reading
23 glasses and I just can't see well enough to verify
24 what you were saying.

Page 98

BY MR. KAWAMOTO:

2  Q.  Fair enough.

3     Do you recall Mr. Rannazzisi sending out a

4  letter to registrants in 2007?

5  A.  I don't recall it specifically, no.

6  Q.  Okay.  What about sending out a letter in

7  2006?

8  A.  It's just too long ago.

9  Q.  Okay.  So Page 6 is:  "Recent DEA Actions

10  Involving Distributors."

11     Do you see that?

12  A.  Yes.

13  Q.  Did Mallinckrodt follow these DEA actions

14  involving their distributors?

15  MR. O'CONNOR:  Objection.

16  BY THE WITNESS:

17  A.  Yes.

18  BY MR. KAWAMOTO:

19  Q.  Why?

20  A.  DEA, if they suspended a license, then

21  they wouldn't be licensed to have our product.

22  Q.  Was Mallinckrodt concerned internally

23  about the DEA actions involving distributors?

24  MR. O'CONNOR:  Objection.

Page 99

1  BY THE WITNESS:

2  A.  Our customers are the distributors.  They

3  send it to their distribution centers.  So be clear

4  about what you are talking about.  A distribution

5  center is not -- I mean, it's our customer's

6  distribution center.  So did AmerisourceBergen -- we

7  did audits of -- of some of these, I can recall.

8  BY MR. KAWAMOTO:

9  Q.  Well, did the DEA actions involving the

10  distributors raise any concerns at Mallinckrodt

11  regarding either your SOM -- well, regarding your SOM

12  program?

13  MR. O'CONNOR:  Objection.

14  BY THE WITNESS:

15  A.  No.  And the reason is these distributors

16  had multiple distribution centers.  If they closed

17  one, that -- they didn't close all of the distribution

18  centers.  They closed one.  And it may be for whatever

19  reason, that they did an audit, they had product

20  mis -- you know, inappropriately stored, or it could

21  be a number of things.  I don't know.  But I think

22  what you are talking about are distribution centers

23  that they utilized to store their product when it went

24  out to their customers in those areas.

Page 100

1  BY MR. KAWAMOTO:

2  Q.  Well, underneath the heading it says:

3  "DEA suspends licenses of distributors for not

4  maintaining effective controls against diversion of

5  controlled substances."

6     Do you see that?

7  A.  I see that.

8  Q.  And do you recall what the DEA's concerns

9  were with respect to the failure to maintain effective

10  controls for these institutions?

11  A.  No.

12  Q.  So, can you turn to Page 8 of this

13  PowerPoint?

14  A.  I can.

15  Q.  And it says:  "Revise Controlled Substance

16  Suspicious Order Monitoring Procedure Highlights."

17     Do you see that?

18  A.  Okay.

19  Q.  Can you review that list for me and let me

20  know when you are done?

21  A.  Okay.

22  Q.  Is this an accurate description of your

23  suspicious order monitoring procedure?

24  A.  Yes.

Page 101

1  MR. O'CONNOR:  Objection.

2  BY MR. KAWAMOTO:

3  Q.  And when was this procedure in effect

4  from?

5  A.  Say again.

6  Q.  When was this procedure in effect from,

7  what time period did it cover, roughly?

8  A.  Based on the PowerPoint, it would be

9  June 5th of 2008.

10  Q.  And do you know how far back it went?

11  A.  I don't know.

12  Q.  Do you recall it changing at some point in

13  the future?

14  A.  I don't recall.

15  Q.  Now, it says:  "Security and DEA

16  Compliance will work closely with the Business in

17  reviewing peculiar orders and escalation to suspicious

18  order status."

19     Do you see that?

20  A.  Yes.

21  Q.  And security would be you, is that right?

22  A.  Correct.

23  Q.  What does it mean for security and DEA

24  compliance to work closely with the business?  Who is

Page 102

1 the business?

2　　A.　DEA compliance managed this. If there was

3 an issue, she would bring it to my attention, if she

4 needed additional assistance or guidance. Who she

5 dealt with at this time, I can't remember ten years

6 ago. I just -- I can't remember.

7　　Q.　Okay. Though it says security and DEA

8 Compliance, so both of you will work closely with the

9 business, and so I'm asking from your standpoint as

10 the security person --

11　　A.　Yes.

12　　Q.　-- you know, what -- what -- how did you

13 work with the business in reviewing peculiar orders

14 and the escalation of suspicious orders?

15　　A.　Now, all of this listed above that would

16 come to Karen Harper, and if she had an issue with it

17 and couldn't resolve it, she would bring it to me.

18　　　Does that help.

19　　Q.　Okay. But my question relates to the

20 bottom of the page. And I'm asking, you know, what is

21 your understanding of how you were going to work with

22 the business in reviewing peculiar orders and the

23 escalation to suspicious order status?

24　　MR. O'CONNOR: Objection.

Page 103

1 BY THE WITNESS:

2　　A.　I simply can't recall.

3 BY MR. KAWAMOTO:

4　　Q.　Okay. Now, the second part of that

5 phrase, "reviewing peculiar orders and escalation to

6 suspicious order status," what -- what does -- what do

7 you interpret that to mean?

8　　A.　It has been ten years. I don't recall. I

9 just don't remember.

10　　Q.　So one of the items above, it says: "An

11 algorithm is customized by customer category, class of

12 trade."

13　　　Do you see that?

14　　A.　I see it.

15　　Q.　And do you have any recollection of a --

16 of an algorithm being used?

17　　A.　We used algorithms at one point to -- if

18 anyone was -- had ordered more of a particular product

19 and we sent that to DEA. So, I remember that.

20　　Q.　But you don't recall anything about the

21 algorithm, what it's components were or anything like

22 that?

23　　A.　Ten years, I don't recall.

24　　Q.　Do you recall being asked to review

Page 104

1 peculiar orders?

2　　A.　There were times that Karen Harper would

3 bring something in that she couldn't resolve, and I

4 know that I would help her at that time, but I can't

5 be more specific than that. I just -- I just know

6 that we worked together on things like this.

7　　Q.　Do you recall any instances in which --

8 when Harper shared concerns from business managers

9 with you regarding suspicious orders?

10　　MR. O'CONNOR: Objection.

11 BY THE WITNESS:

12　　A.　I don't recall.

13 BY MR. KAWAMOTO:

14　　Q.　So turning to Page 9.

15　　A.　Okay.

16　　Q.　It is a "Revised Controlled Substance

17 Suspicious Order Customer Checklist."

18　　A.　Um-hum.

19　　Q.　Do you have any recollection of a customer

20 checklist?

21　　A.　I do.

22　　Q.　And what was -- what was -- who designed

23 that checklist?

24　　A.　Karen.

Page 105

1　　Q.　Did you have any input into it?

2　　A.　Karen is pretty -- pretty capable of doing

3 things like this. Did I approve it or did I look at

4 it, I'm certain that I probably looked at it at some

5 point, but did I make additions or deletions, it's

6 way -- way too long ago. I don't recall.

7　　Q.　Okay. And underneath it says: "To be

8 completed by Field Sales."

9　　A.　Um-hum.

10　　Q.　And it says: "Know your customer is the

11 goal."

12　　　Is that accurate?

13　　A.　I would say yes.

14　　Q.　So as of the -- date of this

15 PowerPoint, which is June 5th, 2008, your

16 understanding is that there was an obligation for

17 Mallinckrodt to know its customer, is that -- is that

18 accurate?

19　　MR. O'CONNOR: Objection.

20 BY THE WITNESS:

21　　A.　What we did is we developed a form to give

22 us additional information to do that, and that's what

23 that form did, it required all kinds of things to be

24 filled out to give us additional information, and that

Page 106

1  was, I think assisted us to know who our customers'
2  customers were.
3  BY MR. KAWAMOTO:
4      Q.   And part of this form is a description of
5  the neighborhood, requires an on-site visit, physical
6  description of a facility or photos, and it includes a
7  list of indicators.
8          So, are those statements accurate with
9  respect to what the information that was being
10 collected by this customer checklist?
11     MR. O'CONNOR:  Objection.
12 BY THE WITNESS:
13     A.   To the best of my memory, yeah.
14 BY MR. KAWAMOTO:
15     Q.   And to be clear, this was an obligation
16 that Mallinckrodt believed it had based on the
17 applicable law, correct, this wasn't a voluntary
18 endeavor?
19     MR. O'CONNOR:  Objection.
20 BY THE WITNESS:
21     A.   You are wrong.  It was a voluntary
22 endeavor to know more about those customers, to create
23 a better program to comply with the law.  So we did
24 this -- DEA didn't say, make a form and do this.  We

Page 107

1  did this on our own based on what Karen believed would
2  be helpful, so.
3  BY MR. KAWAMOTO:
4      Q.   And what she believed was necessary to
5  comply with your requirement or your obligation to
6  maintain effective controls against diversion,
7  correct?
8      A.   We were constantly trying to improve.
9      Q.   And in 2008, one of the ways you
10 believed -- well, strike that.
11         In 2008, one of the -- one of the factors
12 that you believed would help you improve would be
13 knowing your customer's customer, is that right?
14     A.   Yes.
15     MR. O'CONNOR:  Objection.
16     THE WITNESS:  Sorry.
17 BY MR. KAWAMOTO:
18     Q.   And why is it important to know the
19 description of the neighborhood?  I'm still on -- on
20 Slide 9 on Page 9.
21     A.   It is an additional factor.
22     Q.   But of what significance, why -- why does
23 it help you in your analysis?
24     A.   It is just an -- it is just an additional

Page 108

1  factor.  We had everything up and you'd like to know
2  where it is.  Is it a -- is it a legitimate building,
3  is it in a hospital complex or in a -- it depends on
4  where it is.  If it's something that doesn't appear to
5  be a legitimate business, that would be of concern to
6  us.  If it's down an alley in the back of a store,
7  that would be a concern for us.
8      Q.   And the line that says:  "Requires on-site
9  visit, inside and out," what is that in reference to?
10     A.   It is to the salespeople signing them up.
11     Q.   So prior to signing up a -- prior to
12 signing up a customer, the salesperson was required to
13 conduct an on-site visit?
14     MR. O'CONNOR:  Objection.
15 BY THE WITNESS:
16     A.   Say that again.
17 BY MR. KAWAMOTO:
18     Q.   Prior to signing someone up, the
19 salesperson was required to conduct an on-site visit?
20     MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22     A.   Apparently.
23 BY MR. KAWAMOTO:
24     Q.   And the last line is:  "Includes a list of

Page 109

1  indicators (watch outs) that require further review by
2  Security Director."
3          Security director is you, is that right?
4      A.   Yes.
5      Q.   Okay.  And so what is a list of indicators
6  that require further review?
7      A.   If they sent this to me, I would look at
8  it not only from a security director point of view but
9  a law enforcement point of view.  And we had customers
10 in the northeast that didn't appear to be pharmacies
11 at all and yet they were trying to buy our product and
12 somehow had gotten a registration.  So we wanted to
13 see exactly where and what the business was.  So there
14 are a lot of factors that you -- you look at, and
15 that's exactly what this is.
16     Q.   Okay.  And you reference pharmacies.  So
17 we are talking about your customer's customer at this
18 point, correct?
19     MR. O'CONNOR:  Objection.
20 BY THE WITNESS:
21     A.   Our -- the distributors sold to
22 pharmacies.
23 BY MR. KAWAMOTO:
24     Q.   And part -- and what these -- what these

Page 110

1  bullet points are referencing, though, is it's an
2  on-site visit to the pharmacy?
3      A.   We were trying to --
4      MR. O'CONNOR:  Objection.
5  BY MR. KAWAMOTO:
6      Q.   You can answer.
7      A.   We were trying to identify our customers'
8  customers to be more in tune with the program, to
9  improve our program.
10     Q.   Okay.  Thank you.  You can put that aside.
11     MR. KAWAMOTO:  So this is now going to be
12  Exhibit 7.
13         (WHEREUPON, a certain document was
14          marked Mallinckrodt-Ratliff
15          Deposition Exhibit No. 007, for
16          identification, as of 12/19/2018.)
17  BY MR. KAWAMOTO:
18     Q.   So this is an e-mail marked Bates
19  No. 4211219, and at the very top is an e-mail from
20  Karen Harper to you.
21         Do you recall receiving this e-mail?
22     A.   No.
23     Q.   But you don't have any doubt that you, in
24  fact, did receive it?

Page 111

1      A.   I don't have any doubt that this was sent.
2  You asked me if I had any -- if I recalled receiving
3  it in 2007, and I don't.
4      Q.   Okay.  And I'm going to -- my questions
5  primarily relate to the attachment.
6      A.   Okay.  Are you saying I received this?
7      Q.   Yes.  This -- the e-mail and the
8  attachment were forwarded to you on December 2007.
9  That's what the top e-mail indicates.  And my
10  questions are going to primarily relate to this
11  attachment.
12     A.   I'm still having a difficult time figuring
13  out where it says that this was sent to me.
14     Q.   Well, the -- the very top e-mail --
15     A.   Yes.
16     Q.   -- it's from Karen Harper and then "to",
17  it is to Bill Ratliff.
18         Do you see that?
19     A.   Yes.
20     Q.   Okay.  And it's forwarding an e-mail with
21  an attachment.
22     A.   Well, to be clear, E-9 and A-14 are our
23  policies.  They have nothing to do with the letters
24  and the things you said are attached.  So I'm just

Page 112

1  trying to make sure we are on the same page.
2      Q.   Okay.  Well, why -- why don't you review
3  the attachment and then --
4      A.   Okay.  But you're not --
5      Q.   -- I'll have questions to you about that?
6      A.   You are not saying I ever received it, you
7  are just asking me to review it now?
8      Q.   Yes.  I'm saying that -- I'm saying that
9  regardless of whether you received it or not, I -- I
10  would like to ask you some questions about this
11  attachment.
12     A.   Okay.  I've read it.
13     Q.   Okay.  So I guess my first question to you
14  is prior to -- prior to today, do you recall ever
15  reviewing this letter?
16     A.   No.
17     Q.   Do you recall ever discussing this letter
18  with anyone?
19     A.   Not to my knowledge.
20     Q.   Okay.
21     A.   This is '06, 2006.
22     Q.   Yes.
23     A.   Yeah, I don't recall that.
24     Q.   Okay.  Do you know who Joseph T.

Page 113

1  Rannazzisi is?
2      A.   Yes, I do.
3      Q.   Do you know him?
4      A.   No.
5      Q.   Do you respect his views?
6      A.   Not necessarily.
7      Q.   Why not?
8      A.   I've watched him on 60 Minutes and he was
9  in charge at that time but nes- -- didn't take any
10  necessary action to assist the registrants, and he
11  points fingers at everyone but himself, to be honest.
12     Q.   So this letter starts at the beginning:
13         "This letter is being sent to every
14  commercial entity in the United States registered with
15  the Drug Enforcement Administration to distribute
16  controlled substances."
17         So, that would include Mallinckrodt, would
18  it -- would it not?
19     A.   If they say "every registrant," the answer
20  is yes.
21     Q.   Okay.  Now, do you see in the middle of
22  Page 2, and actually let me put this up on the Elmo if
23  it helps you.
24         Okay.  So, do you see the sentence that I

Page 114

1 am highlighting?

2 　A.　Yes.

3 　Q.　Okay.　So:　"The DEA regulations require

4 all distributors to report suspicious orders of

5 controlled substances."

6 　　　And then underneath it there is the -- it

7 is the cite to the reg -- to the regulations.　And

8 then it says -- can you read that for me, what I'm --

9 what I just highlighted?

10 　A.　"The registrant shall design and operate a

11 system to disclose to the registrant suspicious orders

12 of controlled substances.　The registrant shall inform

13 the Field Division Office of the Administration in his

14 area of suspicious orders when discovered by the

15 registrant.　Suspicious orders include orders of

16 unusual size, orders deviate substantially from a

17 normal pattern, and orders of unusual frequency."

18 　Q.　And this obligation applies to

19 Mallinckrodt, correct?

20 　A.　It does.　It's a statute.

21 　Q.　And do you recall when -- when the statute

22 was enacted?

23 　MR. O'CONNOR:　Objection.

24 BY THE WITNESS:

Page 115

1 　A.　I have no clue.　Title 21 has many, many

2 statutes, but it also has many revisions and they are

3 all listed in the front of Title 21.　So without

4 having that information, there would be no information

5 for me to know that.

6 　Q.　But whenever the effective date of this

7 regulation is, it applies to all registrants,

8 including Mallinckrodt, correct?

9 　A.　Yes.

10 　Q.　Okay.　And then can you read this section

11 right underneath it?

12 　A.　"It bears emphasis that the foregoing

13 reporting requirement is in addition to, and not in

14 lieu of, the general requirement under Title 21" --

15 "under 21 U.S.C. 823(e) that a distributor maintain

16 effective controls against diversion."

17 　Q.　And you would agree that also applies to

18 Mallinckrodt?

19 　A.　It does.

20 　Q.　Then on Page 3, it shows circumstances

21 that may be indicative of diversion.

22 　　　Do you see that?

23 　A.　I do.

24 　Q.　And can you read the first one?　It's

Page 116

1 right underneath or right next to No. 1?

2 　A.　"Ordering excessive quantities of a

3 limited variety of controlled substances (e.g.,

4 ordering only phentermine, hydrocodone, and

5 Alprazolam) while ordering few, if any, other drugs."

6 　Q.　And would you agree that that is a

7 circumstance that would raise cause for concern?

8 　A.　I read it.

9 　Q.　Is that a red flag, sir?

10 　A.　I read it, but I don't know what you --

11 without additional information, I don't know.　I've --

12 I've never seen this document before and you are

13 asking me to read it into the record and then you are

14 asking me questions about is that a red flag and I

15 just don't have enough information to say it is or

16 isn't it.　So, you know, I'm not even sure what two of

17 the drugs are.

18 　Q.　Well, let me put it another way.

19 　　　The DEA is saying that "ordering excessive

20 quantities of a limited variety of controlled

21 substances," and then it gives examples of controlled

22 substances, "while ordering few, if any, other drugs"

23 is a red flag.

24 　　　Do you agree with that?

Page 117

1 　MR. O'CONNOR:　Objection.

2 BY THE WITNESS:

3 　A.　If that's what they are saying, that's

4 what they believe.

5 BY MR. KAWAMOTO:

6 　Q.　And I'm asking you, sir, what do you

7 believe?

8 　A.　I just don't know.　I don't -- as I said,

9 I don't know what the other products are.　I look at

10 it in a different way.　If they were ordering few of

11 these and a lot of -- of oxycodone, that would be a

12 red flag, but that doesn't seem to be their -- their

13 point, so.

14 　Q.　Well, but if -- if I -- if you were to

15 change this statement to say:　"Ordering excessive

16 quantities of a limited variety of controlled

17 substances (e.g. oxycodone) while ordering few, if

18 any, other drugs," would you agree with that

19 statement?

20 　A.　Yes.

21 　Q.　Then can you read No. 2 for me?

22 　A.　"Ordering a limited variety of controlled

23 substances in quantities disproportionate to the

24 quantity of non-controlled medications ordered."

Page 118

1    Q.   Do you agree with that statement?

2    A.   I do.

3    Q.   Okay.  What about No. 3, can you please

4 read that?

5    A.   "Ordering excessive quantities of a

6 limited variety of controlled substances in

7 combination with excessive quantities of lifestyle

8 drugs."

9    Q.   And do you agree with that statement?

10    A.   I don't know what those are, so I'm not

11 going to say "yes" or "no."

12    Q.   Well, when you say you don't know what

13 those are, you don't know what -- I take it you know

14 what controlled substances means.  Are you -- are you

15 referring to the lifestyle drugs?

16    A.   Well, what are lifestyle drugs?  What does

17 that mean?

18    Q.   Okay.  Well, moving on to point 4 then.

19    A.   Okay.

20    Q.   Can you read that?

21    A.   "Ordering the same controlled

22 substance" -- "substance from multiple distributors."

23    Q.   Do you agree that that is a red flag?

24    A.   There is no way that we would know that.

Page 119

1    Q.   Well, I understand that, but if you had

2 that information, would that be a red flag to you?

3    A.   So that's a hypothetical.  If we happen to

4 have that information somehow, would that be a red

5 flag, in that hypothetical, yes.

6    Q.   Okay.

7    A.   But we would have no way to make that

8 determination.

9    Q.   And then underneath that there is a list

10 of -- well, can you review the list underneath that?

11 It is another numeric list of one through ten.

12    A.   I've finished with No. 10.

13    Q.   Okay.  Are there any factors on this list

14 of ten that you do not agree are a red flag?

15    MR. O'CONNOR:  Objection.

16 BY THE WITNESS:

17    A.   If we had the information, enough

18 information to make that assessment, those would be

19 red flags, but you've gone from a manufacturer to a

20 distributor to a pharmacy to a doctor.  So what you

21 are saying is, do I agree if I had all of that

22 information, but we are -- you have to remember, we

23 were the manufacturer and we don't always have -- we

24 can't always mine down to, does a pharmacy accept

Page 120

1 insurance payments for controlled substances made via

2 the internet.  There is no way in the world we would

3 know that.  And there is a privacy issue there.  "Does

4 the pharmacy charge reasonable prices?"  How would we

5 know if it charges reasonable prices for their area?

6 "Does a pharmacy offer to sell controlled substances

7 without a prescription?"  How would we know that?

8    So, if you want me to agree with this, we

9 are going to have to get very specific on every line

10 and what it means so I'm correct when I answer your

11 question.

12    Q.   Okay.  So why don't we try that then.

13    Starting with No. 1:  "What percentage of

14 the pharmacy's business does dispensing controlled

15 substances constitute?"

16    Would you agree that that's a -- that's

17 something Mal- -- would you agree that that's

18 something that is -- well, strike that.

19    Would you agree that that's a red flag?

20    MR. O'CONNOR:  Objection.

21 BY THE WITNESS:

22    A.   I would agree that this is part of our

23 form that we sent so we would be able to delve into

24 that information to determine how much controlled

Page 121

1 substance versus non-controlled substances a pharmacy

2 orders.  So we believe that would be a red flag.

3 That's why we asked the pharmacies at that question.

4 BY MR. KAWAMOTO:

5    Q.   And I take it No. 2:  "Is the pharmacy

6 complying with the laws of every state in which it is

7 dispensing controlled substances?"

8    Clearly if it were not, that would be a

9 red flag, is that correct?

10    MR. O'CONNOR:  Objection.

11 BY THE WITNESS:

12    A.   There is no way we would have that

13 information, and so to -- you are asking me things

14 that there is no way that I would know.  So DEA should

15 know that, but Mallinckrodt wouldn't necessarily know

16 that, especially if the pharmacy is doing something

17 nefarious.  So would it be a red flag if -- if one

18 knew that?  Well, yes, but how would one know that?

19 So you are putting me in a position to answer

20 questions there is no way I would know.

21 BY MR. KAWAMOTO:

22    Q.   Well, for No. 3, it says:  "Is the

23 pharmacy soliciting buyers of controlled substances

24 via the internet or is the pharmacy associated with an

|  | Page 122 |
| --- | --- |

1 internet site that solicits orders for controlled
2 substances?"
3      I mean, that -- that would seem to be one
4 where you could both ask the pharmacy and go on the
5 internet, right?
6      MR. O'CONNOR: Objection.
7 BY THE WITNESS:
8      A.   Well, I don't know that you could find
9 that out over the internet or how you could do that.
10 I just don't know.  And I've told you before I am not
11 very technical.  So soliciting buyers via the
12 internet, I'm not certain how we would know that.
13 BY MR. KAWAMOTO:
14      Q.   Well, you could ask -- you could ask the
15 pharmacy if they engage in that practice, though,
16 right?
17      A.   Right.
18      Q.   Would it be worth it to ask them?
19      MR. O'CONNOR: Objection.
20 BY THE WITNESS:
21      A.   It would.  I don't know if that's on our
22 form or not.  I just don't know that.
23 BY MR. KAWAMOTO:
24      Q.   Okay.  Well, so let me take a step back

|  | Page 123 |
| --- | --- |

1 then.
2      For these -- these ten items, these are
3 all things that presumably the pharmacy would know, is
4 that correct?
5      MS. DURFEE: Objection; form.
6 BY THE WITNESS:
7      A.   The pharmacy should know if they are being
8 nefarious, I would think, if they are doing things
9 that are outside their, you know, filling
10 prescriptions.  Are there scripts written for those
11 prescriptions?  I mean, they are -- does the pharmacy
12 often sell controlled substances without a
13 prescription?  I'm not certain that the pharmacy would
14 tell you that if you asked them, so.
15 BY MR. KAWAMOTO:
16      Q.   Sure.  They might not tell you that, but
17 they can certainly provide -- some of these other
18 categories they could provide that information, is
19 that correct?
20      MS. DURFEE: Objection to form.
21 BY THE WITNESS:
22      A.   They could certainly provide that to their
23 distributor because the distributor is the person who
24 should know all of this.  They should be the ones

|  | Page 124 |
| --- | --- |

1 investigating this and making these determinations.
2 So we took it upon ourselves voluntarily to go into
3 these situations and get as much information as we
4 could through this form we developed, so.
5 BY MR. KAWAMOTO:
6      Q.   And these are the types of questions,
7 though, that distributors should be asking of their
8 customers, is that correct?
9      MR. O'CONNOR: Objection.
10      MS. KVESELIS: Object.
11 BY THE WITNESS:
12      A.   The distributor, possibly, but not the
13 manufacturer.  We did it voluntarily to get as much
14 information as possible and to better, you know, hone
15 our program so we could make those decisions in
16 concert with the distributor, too.
17 BY MR. KAWAMOTO:
18      Q.   And you did it because you believed it
19 would result in more effective diversion controls, is
20 that correct?
21      MR. O'CONNOR: Objection.
22 BY THE WITNESS:
23      A.   That's correct.
24      THE WITNESS: Sorry.

|  | Page 125 |
| --- | --- |

1 BY THE WITNESS:
2      A.   Are we through with that?
3 BY MR. KAWAMOTO:
4      Q.   Yes, we are done with that.
5      A.   Okay.
6      MR. O'CONNOR: Counsel, I think it has been
7 about an hour, maybe time for lunch?
8      MR. KAWAMOTO: Sure.  What -- about what time is
9 it?
10      MS. REIDY: 12:07.
11      MR. KAWAMOTO: Yeah, why don't we -- how long a
12 break do you want?  Do you want to do --
13      MR. O'CONNOR: We can go off the record here.
14      MR. KAWAMOTO: Yeah.
15      THE VIDEOGRAPHER: We are going off the record
16 at 12:07.
17      (WHEREUPON, a recess was had
18      from 12:07 to 12:49 p.m.)
19      THE VIDEOGRAPHER: We are back on the record at
20 12:49.
21      MR. KAWAMOTO: Okay.  I'd like to mark this as
22 Exhibit 8.
23      (WHEREUPON, a certain document was
24      marked Mallinckrodt-Ratliff

Page 126

1  Deposition Exhibit No. 008, for
2  identification, as of 12/19/2018.)
3  MR. O'CONNOR:  Is there more than one?  Are
4  there more copies?
5  MR. KAWAMOTO:  Yes, they should be behind.
6  THE WITNESS:  Here we go.
7  (WHEREUPON, there was a short
8  interruption.)
9  BY MR. KAWAMOTO:
10  Q.  Okay.  So this is another e-mail and
11  attachment.  The e-mail is Bates numbered 7146630.
12  And my questions are going to relate to
13  the attachment.
14  A.  Okay.
15  Q.  Okay.  So first in terms of establishing
16  the -- e-mail chain, the very top e-mail is an
17  e-mail from Karen Harper to you, Mr. Ratliff.  It's a
18  2/29/2008.
19  Do you see that, sir?
20  A.  I do.
21  Q.  Okay.  And it attaches -- it attaches a
22  letter from the DEA dated December 27, 2007.
23  Do you have any recollection of receiving
24  this letter?

Page 127

1  A.  In 2007...
2  I don't recall this specific letter, but
3  since it's attached and it appears to have come to me,
4  I'm certain that I received it at some point.
5  Q.  Okay.  Do you recall ever discussing this
6  letter with anyone?
7  A.  And the government letters such as this
8  are called boilerplate.  They send them out every once
9  in a while just to remind the registrants and/or --
10  and it comes into the government also, they do the
11  same thing, to remind people of the rules and
12  regulations.
13  Q.  And so I've -- if you could read the
14  portion of the letter towards the bottom that I'm
15  going to highlight for ease of reference?
16  A.  On the front page?
17  Q.  Ah, yes, on the front page.
18  A.  What you have highlighted, okay.
19  Q.  Yes, it starts with "the size."
20  A.  "The size of an order alone, whether or
21  not it deviates from a normal pattern, is enough to
22  trigger the registrant's responsibility to report the
23  order as suspicious."
24  Q.  And so you would agree that this is the

Page 128

1  DEA's interpretation of a requirement that registrants
2  are required to follow with respect to the size of an
3  order?
4  MR. O'CONNOR:  Objection.
5  BY MR. KAWAMOTO:
6  Q.  Is that correct?
7  A.  Yes.
8  Q.  And turning to the back of the letter --
9  A.  Okay.
10  Q.  -- the very top paragraph.
11  Could you read that top paragraph, it is
12  the first few sentences?
13  A.  "Registrants that rely on rigid formulas
14  to define whether an order is suspicious may be
15  failing to detect suspicious orders.  For example, a
16  system that identifies orders as suspicious only if
17  the total amount of a controlled substance ordered
18  during one month exceeds the amount ordered the
19  previous month by a certain percentage or more is
20  insufficient."
21  Q.  Do you agree with that statement, sir?
22  A.  I agree that DEA is telling us that.
23  Q.  And substantively, though, do you agree
24  that reliance on a rigid formula to define whether an

Page 129

1  order is suspicious may -- may be failing to detect
2  suspicious orders, do you agree with that as a matter
3  of substance, sir?
4  A.  Not necessarily.  The reason I say that is
5  there -- most all of the registrants that we dealt
6  with, and Karen Harper dealt with them, used an
7  algorithm to identify suspicious orders, in that they
8  were -- they deviated from the norm.  They sent that
9  to DEA.  There came a time that Pete Kleissle called
10  me and said, That's no longer effective.  We know
11  you've been sending us those.  Please cease and
12  desist, don't do that, you know, look at your program
13  and do something different.  And that's what started
14  the total reinforcement or the looking at the program
15  and trying to make it the -- the model of the
16  industry.
17  Q.  And I -- I understand that DEA is telling
18  you that in this letter, but in terms of the substance
19  of their concern, do you agree -- well, strike that.
20  Would you agree that DEA's concern that
21  reliance on rigid formulas to define whether an order
22  is suspicious may be failing to detect suspicious
23  orders is a valid concern?
24  MR. O'CONNOR:  Objection.

Page 130

1 BY THE WITNESS:

2  A.  I don't know that I agree with that.

3 BY MR. KAWAMOTO:

4  Q.  So you -- you think it would be fine to

5 rely on a rigid formula?

6  A.  At the time we relied on a rigid formula

7 because there were times we had more information than

8 DEA.  A particular registrant, DEA had pulled their

9 registration.  So another distributor came in and

10 wanted to order additional product.  We knew that.  So

11 to say just because it deviates it's suspicious isn't

12 always the case.

13  Q.  Well, but isn't DEA saying something

14 separate, they are saying that if you are using a

15 rigid formula to define whether an order is suspicious

16 without taking a broader view or looking at more data,

17 you may be failing to detect suspicious orders,

18 isn't -- isn't that what DEA is saying in that -- in

19 that first two -- the first couple of sentences?

20  MR. O'CONNOR:  Objection.

21 BY THE WITNESS:

22  A.  They are saying this system fails placed

23 by a pharmacy if the pharmacy -- see, you're -- we are

24 still confusing the manufacturer from the distributor

Page 131

1 to the pharmacy, so.  So what you did is you stopped

2 short of reading the rest of the facts that talk about

3 this is -- "This system fails to identify orders

4 placed by a pharmacy if the pharmacy placed unusually

5 large orders from the beginning of its relationship

6 with the distributor."  And you are trying to say, Oh,

7 well, this refers to the manufacturer also when it

8 doesn't say that.

9 BY MR. KAWAMOTO:

10  Q.  And so your interpretation of this letter,

11 then, is that there is nothing wrong with a

12 manufacturer relying on a rigid formula?

13  A.  Again, I'm going to say not necessarily

14 that I agree with that statement because I think it's

15 too rigid.  What I'm saying is this is with regard to

16 a distributor in pharmacies and you are trying to --

17 to put that on everyone that's a registrant, and I

18 just think that's far reaching.

19  Q.  Well, but the -- the -- the first page of

20 the letter says, it says; "This letter is being

21 sent" -- this is at the very top.  "This letter is

22 being sent to every entity in the United States

23 registered with the Drug Enforcement Administration to

24 manufacture or distribute controlled substances."

Page 132

1  So this is going to every registrant --

2  A.  It is.

3  Q.  -- both manufacturers and distributors?

4  A.  Exactly.

5  Q.  And the statement above relating to rigid

6 formulas, my question to you is:  For a manufacturer

7 like Mallinckrodt, is it okay for the manufacturer to

8 rely on rigid formulas in light of this DEA letter?

9  MR. O'CONNOR:  Objection.

10 BY THE WITNESS:

11  A.  I don't know if I have an opinion about

12 it.

13 BY MR. KAWAMOTO:

14  Q.  You were director of security, sir.  You

15 don't have any opinion --

16  A.  No.

17  Q.  -- as to whether or not rigid formulas are

18 appropriate with respect to detecting --

19  A.  No.

20  Q.  -- suspicious orders?

21  A.  Rigid formulas were used by almost all

22 manufacturing registrants for years.  So were they

23 always wrong, is that what you are saying, they have

24 always been wrong?  What we are saying is we got a

Page 133

1 great deal of information from that.  And from that we

2 were able to determine if it's suspicious.  What we

3 were telling DEA is this is a deviation by those rigid

4 numbers from what they've ordered in the past.  It was

5 my belief that they would use that information in

6 deciding who they would audit or not audit.  So when

7 they are coming out and telling us this, they are

8 saying that now it's your responsibility to -- don't

9 just send us this anymore because it's really not

10 helping.  So that's the time when we changed and did

11 what DEA required.  They are saying, Don't send us

12 rigid numbers any more.  But what I'm saying is, I

13 don't agree with the fact that those were wrong.

14  Q.  But you would -- you would agree that as

15 of the date of this letter, which is December 2007, it

16 was no longer appropriate to rely on a rigid formula

17 in light of DEA's letter?

18  MR. O'CONNOR:  Objection.

19 BY MR. KAWAMOTO:

20  Q.  Is that correct?

21  A.  Well, if we go back -- see, you're --

22 you're only taking part of that paragraph, and I just

23 have fault with that.  They -- it talks about

24 pharmacies.  So it's saying, if you read -- if the --

Page 134

1 the distributors, which is different than the
2 manufacturers, if they use rigid numbers in doing
3 this, they may be missing this. So it's not saying
4 just because all registrants received it doesn't
5 necessarily mean that they are talking to the
6 manufacturers.
7    Q.   Okay. And my question to you then, sir,
8 is: As a manufacturer, when you read this letter, and
9 you read that paragraph, and is it okay if you are a
10 manufacturer to rely on a rigid formula for
11 identifying suspicious orders?
12    MR. O'CONNOR: Objection.
13 BY MR. KAWAMOTO:
14    Q.   I understand that distributors may be
15 doing something different or they may be differently
16 situated, but with respect to a manufacturer, is it
17 okay for a distributor like Mallinckrodt to rely on a
18 rigid formula to define whether an order is
19 suspicious?
20    MR. O'CONNOR: Objection.
21 BY THE WITNESS:
22    A.   I'll just restate what I said. We
23 believed giving those numbers to DEA would allow them
24 to audit if they thought -- because they have

Page 135

1 additional information. They have information from
2 other -- other registrants. Maybe that distributor
3 was buying from five different manufacturers. So, we
4 don't know that. We were providing those numbers to
5 them in an -- in an effort to alert them that this is
6 a little out of the ordinary. And to say that's just
7 absolutely wrong is just not right.
8 BY MR. KAWAMOTO:
9    Q.   Well, I'm -- I'm not saying that's
10 absolutely wrong, sir. I'm asking a slightly
11 different question, which is going forward from 2007
12 onward -- I'm sorry -- going forward from December
13 2007 onward, was it acceptable to rely on a rigid
14 formula? I'm not asking you about rigid formulas
15 prior to December of 2007. I'm saying, after the date
16 of this letter, would it be appropriate for a
17 manufacturer to rely on a rigid formula in determining
18 whether an order is suspicious?
19    MR. O'CONNOR: Objection.
20 BY THE WITNESS:
21    A.   I received a telephone call from Pete
22 Kleissle at some time, and I don't think it was -- I
23 think it was after this where he said, Yeah, don't do
24 that anymore, don't said those. So at that point I

Page 136

1 said, Okay. And I called Karen in and I said, Pete
2 said don't send those, these monthly letters anymore.
3    So at that point DEA is saying to a
4 manufacturer, Yeah, we don't -- we don't want you to
5 do that anymore. So that is our -- when we knew that,
6 that's when our program started to change. We started
7 to fine -- to define knowing our customers's customer
8 and we developed that form that gave all of this
9 information from those pharmacies so we could make
10 better decisions. So we were trying to help DEA in
11 every way, but to say I'm basing that -- if I would
12 have read this at the time, I would have said, Well,
13 they are talking about pharmacies, not manufacturers.
14    Q.   So your interpretation of this letter, I
15 understand that you had a phone conversation with Pete
16 Kleissle, but your interpretation of this letter and
17 this paragraph is that this applies to distributors
18 and not manufacturers, is that correct?
19    A.   As I read it today, that's what I --
20 that's how I interpret it. But you have to remember
21 this is -- well, it's only ten years ago, over ten
22 years ago.
23    Q.   But you don't have any reason to believe
24 as you sit here today that you would have had a

Page 137

1 different interpretation of this letter ten years ago?
2    A.   Ten years ago I thought we had a great
3 program in place, so.
4    Q.   And what do you believe now, sir?
5    A.   I think our program has improved.
6    Q.   So you can put that aside.
7    A.   Okay.
8    MR. KAWAMOTO: Okay. So this is now Exhibit 9.
9       (WHEREUPON, a certain document was
10       marked Mallinckrodt-Ratliff
11       Deposition Exhibit No. 009, for
12       identification, as of 12/19/2018.)
13 BY MR. KAWAMOTO:
14    Q.   So this is an e-mail chain from Karen
15 Harper to you with the Bates No. 268860, and the
16 bottom e-mail is an e-mail from you, Mr. Ratliff, to a
17 number of people, cc'ing Karen Harper.
18    A.   Okay.
19    Q.   So can you review the bottom e-mail,
20 please?
21    A.   I can.
22       Okay.
23    Q.   Okay. So, sir, can you read the top
24 paragraph of your e-mail?

Page 138

1   A.  I can.
2       "Jim," I guess it's to Jim Rausch, "Pete
3   Kleissle, DEA Diversion Group Supervisor, St. Louis,
4   just called regarding several letters he has received
5   from you detailing suspicious orders" -- "suspicious
6   orders.  He advised that he needs more information, in
7   that, if it is suspicious why are we filling the
8   order.  I explained that we use a calculation based
9   on" -- "upon an amount previously order.  He stated,
10  'If you think it is suspicious, don't fill it.'  I
11  will go into more detail on Friday."
12  Q.  Okay.  Thank you.
13      So that is an e-mail that you sent to Jim
14  Rausch, Michael Pheney and Cathy Stewart.
15  A.  Um-hum.
16  Q.  Does this refresh your recollection as to
17  what Jim Rausch -- the role Jim Rausch was playing in
18  the suspicious order monitoring program?
19  A.  Yes.  Jim works with Pheney and he is --
20  they obviously are the ones that are gathering the
21  information, I guess, upon what orders are being sent.
22  You have to remember, he didn't work for me, so I
23  don't have a specific knowledge of what he did.
24  Q.  I understand that.

Page 139

1   A.  Okay.  But this is what I was speaking of
2   before when Pete called me and said, Don't do that
3   anymore.
4   Q.  And what you are referring to is Pete
5   called you and said don't send him any more letters,
6   is that correct?
7   A.  Yes.
8   Q.  And what -- what were the letters that Jim
9   was sending to Pete?
10  A.  They were a -- I can't tell you
11  specifically, but they had to do with the orders, and
12  I don't know what their calculations were, I don't
13  know anything about that.  I just know that they
14  filled out letters and sent them based on an algorithm
15  that had been developed and was being used.
16  Q.  Okay.  And do you see this -- this
17  sentence that I'm highlighting?  Could you repeat
18  that, please?
19  A.  Several letters he has received from me
20  detailing suspicious orders.  "He advised that he
21  needs more information, in that, if it is suspicious
22  why are we filling the order," is that what you are
23  asking?
24  Q.  Yes.

Page 140

1   A.  So that -- that e-mail sentence suggests
2   that the suspicious -- that you were supposed -- you
3   were -- well, strike that.
4       That line suggests that you were sending
5   out suspicious or you were filling suspicious orders
6   after notifying the DEA of those orders, is that
7   correct?
8   MR. O'CONNOR:  Objection.
9   BY THE WITNESS:
10  A.  No, it is not correct.  What he is saying
11  is, I need more information.  So what we've used is
12  that algorithm that we believed was helping them.  So
13  he is saying, Don't do that anymore, but he is not
14  saying, Oh, yeah, you are sending me this information
15  and it's suspicious.  We were providing the
16  information to them to assist them.  So to say that
17  any of those were suspicious, we don't really -- we
18  just know they didn't fit within the algorithm.
19  BY MR. KAWAMOTO:
20  Q.  But he also says:  "He advised that he
21  needs more information that if it is suspicious, why
22  are we filling the order."
23      So doesn't that last phrase, "if it is
24  suspicious why are we filling the order," suggest that

Page 141

1   you were filling suspicious orders?
2   A.  Well, the rest of that conversation with
3   Pete -- sorry, I didn't mean to talk over you.  Please
4   repeat yourself.
5   Q.  Doesn't that phrase "if it is suspicious
6   why are we filling the order," doesn't that suggest
7   that you were filling suspicious orders and he is
8   asking you why?
9   MR. O'CONNOR:  Objection.
10  BY THE WITNESS:
11  A.  That's not what he is -- that is not what
12  he related to me.  He is just saying, Don't do that
13  anymore.  If you -- if it's the algorithm, if it
14  doesn't fit, we don't have enough based on what you
15  are sending us based on your algorithm.  And I'll give
16  you more information on Friday about what's going on,
17  so.
18  BY MR. KAWAMOTO:
19  Q.  And so that -- that phrase then is
20  inaccurate?
21  A.  I would say it's poorly worded on my part.
22  Q.  And when he says:  "He stated, 'If you
23  think it is suspicious, don't fill it,'" why would
24  he -- why would he say that -- why would he say that

Page 142

1 to you?  And you have that in quotes, sir.
2     A.   Um-hum.
3     MR. O'CONNOR:  Objection.
4 BY MR. KAWAMOTO:
5     Q.   Why would he say that to you if he didn't
6 have a concern that you were filling suspicious
7 orders?
8     MR. O'CONNOR:  Objection.
9 BY THE WITNESS:
10    A.   I don't believe that Pete believed we were
11 filling suspicious orders.  If he had believed that,
12 he and his team would have been at Mallinckrodt going
13 through all of our records.  He was just explaining to
14 me in a very emphatic way to change what you are
15 doing.  And that came out of headquarters.  And so did
16 he say that, yes.
17 BY MR. KAWAMOTO:
18    Q.   And what did he want you to do -- well,
19 strike that.
20         What were you doing that he had concerns
21 about?
22    MR. O'CONNOR:  Objection.
23 BY THE WITNESS:
24    A.   We were using an algorithm, as all of the

Page 143

1 other registrants were, and he is saying don't use
2 that.
3 BY MR. KAWAMOTO:
4     Q.   And what did he want you to do instead
5 then?
6     A.   Provide him more information.
7     Q.   So I want to make sure I understand what
8 you mean by you say you were using an algorithm.
9     A.   Um-hum.
10    Q.   So you were applying a formula to a
11 group -- well, do you know if this algorithm was
12 applied to all of the orders for your opioid products
13 or only some?
14    MR. O'CONNOR:  Objection.
15 BY THE WITNESS:
16    A.   I don't know that.  Jim Rausch would be a
17 better source for that.  He is the one that filled out
18 the letters based on the orders that they received,
19 so.
20 BY MR. KAWAMOTO:
21    Q.   So Jim is running an algorithm on some
22 population of orders?
23    A.   You're putting words.  I -- I don't know
24 if he was running it on all of the -- I just don't

Page 144

1 know that.
2     Q.   Sure.  But he was clearly running them at
3 a minimum on some, correct?
4     A.   At a minimum on some, but I would think it
5 was -- the algorithm affected all of the customers.
6     Q.   Okay.  So I understand that you are not
7 sure whether it was all of them or some of them, but I
8 guess my point is, regardless of whether it was all of
9 the orders or some of the orders, he was running an
10 algorithm on these orders and that -- that algorithm
11 presumably identified various orders.
12         Is that your understanding?
13    MR. O'CONNOR:  Objection.
14 BY THE WITNESS:
15    A.   Yes, if they were -- if they were out
16 of -- if they were higher than they had been, if it
17 had increased at a certain time, there is a method to
18 all of that.  I don't profess to know what it is, but
19 I know we were doing that, and he was being very
20 specific about this, about us stopping with the --
21 with the algorithms.
22 BY MR. KAWAMOTO:
23    Q.   Okay.  So presumably after April
24 of 2008 -- well, strike that.

Page 145

1         I take it you responded to his direction
2 by stopping use of the algorithm, is that correct?
3     MR. O'CONNOR:  Objection.
4 BY THE WITNESS:
5     A.   I think that's what I did with this
6 e-mail.
7 BY MR. KAWAMOTO:
8     Q.   Okay.  And so what took its place?
9 Instead of using an algorithm to identify suspicious
10 orders, how did you identify them?
11    A.   Well, you'd have to ask Karen Harper.  We
12 started a new program.  I can't tell you the exact
13 date that we started sending out those forms to
14 identify all of our -- all of the other information.
15 I just don't know the answer to that.
16    Q.   And you reference in the second paragraph
17 "Frank Sapienza"?
18    A.   Yes.
19    Q.   Who is he?
20    A.   He was with DEA.
21    Q.   And the reference is, you have a call
22 planned with Frank Sapienza on Friday "to strengthen
23 our suspicious order monitoring system" -- I'm
24 sorry -- "our suspicious order identification system."

Page 146

1    Do you recall anything about that call
2  with Frank?
3    A.   I don't.
4    Q.   Do you have any recollection of how you
5  were going to strengthen your suspicious order
6  identification system?
7    A.   Not at this point I don't.
8    Q.   Who would have been in charge of that
9  program -- of that project?
10    A.   Karen Harper.
11    Q.   Do you have any recollection of your
12  involvement in that project as you sit here today?
13    A.   I'm sure I assisted, but I can't tell you
14  that -- Karen is very informed and knows everything
15  there is about DEA compliance, so she would have taken
16  this on as a responsibility to write a program.  Did I
17  read it, did I look at it, did I make recommendations,
18  at this point I can't tell you, you know.  Would that
19  be normal, yes.
20    Q.   Okay.  And when you say you will go into
21  more detail on Friday, that's in the top paragraph, do
22  you recall what any of those details were?
23    A.   I can't remember the conversation.
24    Q.   So all you recall right -- all you recall

Page 147

1  based on this e-mail today is that you received a call
2  from Pete Kleis- -- from --
3    A.   Pete Kleissle.
4    Q.   -- from Pete Kleissle, and as a result you
5  directed Jim to stop sending him letters and
6  Mallinckrodt stopped using the algorithm.
7    Is that accurate?
8    MR. O'CONNOR:  Objection.
9  BY THE WITNESS:
10    A.   I think that's accurate.
11    MR. KAWAMOTO:  I believe we are up to
12  Exhibit 10.
13    (WHEREUPON, a certain document was
14    marked Mallinckrodt-Ratliff
15    Deposition Exhibit No. 010, for
16    identification, as of 12/19/2018.)
17  BY MR. KAWAMOTO:
18    Q.   So this is an e-mail from Karen Harper to
19  you --
20    A.   Okay.
21    Q.   -- dated March 3rd, 2008.  It has got
22  Bates No. 1308810.
23    And the title of this e-mail -- the title
24  of this e-mail is: "DEA Compliance Monthly

Page 148

1  Highlights, February 2008."
2    Do you see that, sir?
3    A.   I do.
4    Q.   Okay.  Do you recall receiving -- do you
5  re -- well, strike that.
6    Were these e-mails that Karen sent out
7  every month?
8    MR. O'CONNOR:  Objection.
9  BY THE WITNESS:
10    A.   Well, it says: "DEA Compliance Monthly
11  Highlights," so there is an assumption to be made, but
12  you have to remember this is over ten years ago.  So
13  do I remember receiving this, I see my name on it, and
14  that's about all I can tell you about that.  It's over
15  ten years.
16  BY MR. KAWAMOTO:
17    Q.   And you are the only one that's receiving
18  this e-mail.  So why -- why is she sending this to
19  you?
20    A.   She may have worked for me at the time.  I
21  don't know.
22    Q.   Now, do you see the section marked
23  "Suspicious Order Monitoring"?
24    A.   Uh-huh, I do.

Page 149

1    Q.   And I guess the second line of that says:
2    "Further, the need for a comprehensive
3  review and upgrade of our Suspicious Order Monitoring
4  program has received elevated priority.  A conference
5  call on the matter with Corporate Logistics is
6  scheduled for tomorrow."
7    Do you -- do you see that?
8    A.   No.  Where is it?
9    Q.   Let me -- let me highlight it for you.
10    A.   Okay.  So you are saying: "Further, the
11  need for a comprehensive review and upgrade of our
12  Suspicious Order Monitoring program has received
13  elevated priority.  A conference call on the matter
14  will" -- "with Corporate Logistics is scheduled for
15  tomorrow."
16    I see that.
17    Q.   Okay.  Do you -- is this -- do you agree
18  with this statement?  Meaning in March of 2008, do you
19  recall there being -- do you recall the need for a
20  comprehensive review and upgrade of your suspicious
21  order monitoring program and do you recall it
22  receiving elevated priority?
23    MR. O'CONNOR:  Objection.
24  BY THE WITNESS:

Page 150

1    A.   We constantly tried to upgrade our program
2 to be the best for any manufacturer.
3         So when I read this, it does not surprise
4 me that it's written in that way, and I think we were
5 always striving to -- to have a better program, so, if
6 that answers your question.
7 BY MR. KAWAMOTO:
8    Q.   But this references a comprehensive review
9 and upgrade and it notes that that has received
10 elevated priority.
11    A.   I don't know what that means.
12    Q.   So that would -- that would suggest
13 something other than sort of routine improvement,
14 would it not?
15    A.   I will repeat, this has been way over ten
16 years, and for me to look at that and make a decision
17 on what that meant or who did it and when they did it
18 is really kind of -- I just can't tell you that.  I'm
19 saying we were constantly trying to upgrade our
20 program to be in compliance.  So, if we needed to have
21 a -- a better program or more up -- yeah, I think we
22 could all -- always say we can improve, so.  But you
23 are asking questions here, you know, we are going on
24 11 years here, so.  I have been retired

Page 151

1 six-and-a-half.  I -- I mean, I know you want me to
2 say certain things but I just can't, so.
3    Q.   Well, sir, I don't want you to say
4 anything.  I'm just interested in what your
5 recollection is and that's why we are going through
6 these records.
7    A.   Okay.  Well, that's my recollection.
8 Thank you.
9    Q.   Okay.  And do you have any recollection of
10 what triggered this comprehensive review and upgrade?
11    A.   Well, I don't know.  So, was it the 3/3 --
12 April 1st, no.
13    Q.   Okay.  And the reference to "received
14 elevated priority," do you know --
15    A.   I have no idea.  I have no idea in the
16 world.  I don't know who the elevated priority would
17 have come from or anything about it.
18    Q.   Well, you indicated that Karen Harper at
19 this time may have been working for you, is that
20 right?
21    A.   Well, I said may have been working for me.
22 So I don't remember.  She worked for me for a time.
23    Q.   But you don't recall any particular
24 urgency in early 2008 regarding the upgrade and review

Page 152

1 of your SOM program?
2    A.   You can ask me this for ten times.  I'm
3 going to tell you I don't recall this because of the
4 length of time that's passed.  I've been out of the
5 company for six-and-a-half years.  I'm doing my best
6 to cooperate, but if I don't remember, I don't
7 remember.
8    Q.   Well, and the purpose of these documents
9 is to see if they can refresh your recollection.
10    A.   And I'm saying they don't.
11    Q.   So, do you recall any concerns that
12 Mallinckrodt had in this time period, so early 2008,
13 regarding its SOM program?
14         MR. O'CONNOR:  Objection.
15 BY THE WITNESS:
16    A.   We wanted to have the best program
17 possible.
18 BY MR. KAWAMOTO:
19    Q.   Well, I understand that, sir.
20    A.   We were constantly trying to upgrade the
21 program and make it -- and obtain additional
22 information so we could assist.  You know, there was a
23 time we thought that our distributors were doing their
24 due diligence.  We reviewed -- they sent us all of

Page 153

1 their -- their programs in written form and they
2 looked really nice.  But unless you drilled down be --
3 beyond that, you don't really know if they are, you
4 know, doing what they should be doing, their due
5 diligence.  So that's when we started to develop the
6 form that we are asking our salespeople to go out on
7 all of our customers and give us this information so
8 we can make the best decision possible so we are
9 ensuring that we are not sending out anything that's
10 suspicious.
11    Q.   And my question to you is slightly
12 different, which is do you recall any concerns at this
13 time period, which would be March of 2008?
14         MR. O'CONNOR:  Objection.
15 BY THE WITNESS:
16    A.   I don't.
17    THE WITNESS:  Sorry.
18    MR. O'CONNOR:  That's okay.
19 BY MR. KAWAMOTO:
20    Q.   Now, sir, you've repeatedly referenced
21 that you were continuing to improve your program.
22 What's the basis for that statement?
23    A.   That's the form that we developed to ask
24 questions about the -- not -- not only the -- the --

Page 154

1 from the distributors but from their customers. So we
2 as a manufacturer sold to distributors, and in many
3 conversations with DEA we were looking at, Okay. Now
4 we are going to have to go to the customer, our
5 customer, the distributor, to their customers to
6 determine if they are actually doing what the
7 distributor -- distributor should be doing in
8 reviewing. So, yes, we were doing that. We were --
9 yeah, we were constantly trying to upgrade that to
10 make sure we had enough information to make decisions
11 like that.
12    Q.   And when did that occur?
13    A.   I can't tell you. I don't know.
14    Q.   Other than knowing your customer's
15 customer, what other steps did you take to improve and
16 upgrade your program, which you said you were doing
17 constantly?
18    A.   I mean, that's knowing our customer's
19 customer was the thrust of that -- that program at the
20 time.
21    Q.   So that was -- that was the improvement,
22 sir?
23    A.   To the best of my knowledge.
24    Q.   And so when Karen is in March of 2008

Page 155

1 talking to -- talking about improving the program,
2 your recollection is the component -- what she was --
3 well, strike that.
4       Your recollection is that that improvement
5 was knowing your customer's customer, is that correct?
6    MR. O'CONNOR: Objection.
7 BY THE WITNESS:
8    A.   I can't tell you at this time sitting here
9 exactly when the form was developed or when we started
10 doing that. I just can't tell you that. I just -- I
11 have no memory of exactly when that happened.
12 BY MR. KAWAMOTO:
13    Q.   Okay.
14    A.   But I know that we started to do that.
15 And the exact date, I can't -- I just can't tell you.
16 I don't know.
17    Q.   And what do you recall about the form? I
18 mean, this is -- we've repeatedly discussed this form.
19 What do you -- what do you recall about the form? Who
20 did it go to, what did it ask for, what type of
21 information was it trying to seek?
22    MR. O'CONNOR: Objection.
23 BY THE WITNESS:
24    A.   I mean, I'd love to see the form and I

Page 156

1 could explain it to you. Do you have the form?
2 BY MR. KAWAMOTO:
3    Q.   We have -- well, we've seen several forms.
4 They appear to be drafts. So, to be honest, I'm
5 not -- I'm not sure.
6    A.   Well, we had -- we had a -- I'm sorry.
7    Q.   So as you sit here now, and we'll go
8 through additional documents --
9    A.   Okay.
10    Q.   -- but what is it you recall about this
11 form?
12    A.   That it stated the name, it stated the
13 proportion of controlled substance to non-controlled
14 substances, the number of cash customers as opposed to
15 insurance customers or whatever, and I know it talked
16 in terms of the two highest prescribing doctors. You
17 have to remember, over ten years old, I just -- I
18 mean, that's just really a vague recollection, so.
19 I'm doing my best to help you.
20    MR. KAWAMOTO: Here we go.
21       (WHEREUPON, a certain document was
22       marked Mallinckrodt-Ratliff
23       Deposition Exhibit No. 011, for
24       identification, as of 12/19/2018.)

Page 157

1 BY MR. KAWAMOTO:
2    Q.   So this is an e-mail with several
3 attachments, and why don't we start with the e-mail.
4 So if you could review that and let me know when you
5 are ready.
6    A.   Okay. I have read that.
7    Q.   Okay. So this is an e-mail from Karen
8 Harper to you, Michael Pheney, Jim Rausch, Cathy
9 Stewart, and Kimberly France.
10    A.   Um-hum.
11    Q.   And it is dated April 10th, 2008. It's
12 Bates number is 273902.
13       And do you recall receiving this e-mail?
14    A.   May name is on it, so I must have received
15 it, but I don't recall receiving it.
16    Q.   Okay. Now, in this Karen is raising
17 various questions regarding improvements to the
18 suspicious order checklist.
19       Is that accurate?
20    A.   That's what it says.
21    Q.   Okay. And what -- what do you recall
22 about what the suspicious order checklist was?
23    A.   I don't really recall it at all.
24    Q.   Okay. Well, so why don't we look at some

Page 158

1  of the attachments then, because I believe one of them
2  is a -- a checklist.
3      A.   Okay.
4      Q.   Actually, two of them are checklists.
5      A.   Okay.
6      Q.   So the "Controlled Substance Order
7  Checklist," that's the first attachment.
8          Do you see that?
9      A.   I do.
10     Q.   And just so I understand how this
11  checklist was used, this would be completed by the
12  customer service representative.  So this wasn't --
13  this wasn't part of the effort to know your customer's
14  customer, was it?
15     A.   I think it was part of the overall --
16  excuse me -- suspicious order monitoring program.  Did
17  I ever see these, no.  Was I aware that there was a
18  checklist, probably at that time, but I think it was
19  part and parcel to the -- to the suspicious order
20  monitoring program.  They were trying to bring
21  everybody in on the same page.
22     Q.   The next attachment is an overview of
23  something called "The Integrichain Pilot Program."
24         Do you see that?

Page 159

1      A.   I do see that.
2      Q.   Do you recall anything about The
3  Integrichain Pilot Program?
4      A.   No.
5      Q.   The very top paragraph, right underneath
6  Background, could you read that for me, please?
7      A.   "As a growing leader in the pain
8  management category, Covidien has a social and
9  business obligation to prevent abuse, diversion and
10  theft of its" -- "and theft of its" whatever.  There
11  is something wrong there.  "Detailed data, through
12  surveillance and pharmacovigilance, is an important
13  resource for the company."
14     Q.   So recognizing that there appears to be a
15  word missing, other than that, would you generally
16  agree with that statement?
17     A.   I don't know what pharmacovigilance is.
18     Q.   Well, how about the sentence:  "As a
19  growing leader in the pain management category,
20  Covidien has a social and business obligation to
21  prevent abuse, diversion and theft" of something?
22     MR. O'CONNOR:  Objection.
23  BY THE WITNESS:
24     A.   As a manufacturer, I think -- I don't know

Page 160

1  how we have an obligation to do that.  It's -- I don't
2  know what "The Integrichain Pilot Program" is or who
3  wrote the document.  And sometimes they use -- they
4  use words and phrases that aren't necessarily in -- in
5  keeping with a manufacturer.  So they are saying,
6  whatever this program is that we should be doing that,
7  and we had some -- we had people at some point that
8  came in and tried to -- tried to provide information
9  that it was their -- their project, their pet project.
10  So am I saying that we were -- no, I don't think so.
11  I don't think that's the job of a manufacturer at all.
12  Our job is to prevent diversion.  But as a growing --
13  that's somebody's special project and they decided
14  that we should have this obligation.  So do I agree
15  with that, no.
16  BY MR. KAWAMOTO:
17     Q.   Well, so what part of the obligation do
18  you not agree with, because it says Covidien -- I
19  mean, "As a growing leader in the pain management
20  category, Covidien has a social and business
21  obligation to prevent abuse."
22         Do you agree that there is an obligation
23  to prevent abuse if you are a manufacturer?
24     MR. O'CONNOR:  Objection.

Page 161

1  BY THE WITNESS:
2      A.   We have an obligation to prevent
3  diversion, but there is no way as a manufacturer we
4  are going to be able to prevent abuse.  If down the
5  line, I'll give you an example, it's in a prison,
6  there is never a perfect system.  You are always going
7  to get drugs into a prison.  Even -- even the most
8  hardened prisoners -- prisons get contraband into that
9  prison.  So what you are saying is we have a -- an
10  obligation to prevent abuse.  The doctor has an
11  obligation.  The pharmacist has an obligation.  But
12  the manufacturer, I don't believe so.
13  BY MR. KAWAMOTO:
14     Q.   Okay.  So the manufacturer in your opinion
15  does not have any obligation to prevent abuse?
16     A.   It's our responsibility to prevent
17  diversion.
18     Q.   What's the difference between diver- --
19  diversion and abuse?
20     A.   Well, abuse would be someone going into a
21  pharmacy with a script from a -- a doctor who writes
22  them for a certain amount of money and going out and
23  either selling those drugs or taking them, and that's
24  abuse.  So is it our responsibility to prevent that,

Page 162

1 no. There is no way we could do that, so.
2 Q. Now, what you described, sir, is someone
3 coming in with a script that they paid a doctor to
4 obtain and then having it filled and then either
5 taking the pills themselves or selling the pills.
6 Isn't that what occurs at a pill mill?
7 A. At a what?
8 MR. O'CONNOR: Objection.
9 BY MR. KAWAMOTO:
10 Q. Isn't that what occurs at a pill mill,
11 isn't that what happens with pill mills, people come
12 in with scripts that are probably not legitimate, they
13 obtain -- they obtain products and then those opioid
14 products make their way into the illicit market?
15 MR. O'CONNOR: Objection.
16 BY MR. KAWAMOTO:
17 Q. Isn't that the problem with the pill mill,
18 sir?
19 A. Yes.
20 Q. Okay. And you do have an obligation, your
21 diversion obligation is to prevent your products from
22 ending up in pill mills?
23 MR. O'CONNOR: Objection.
24 BY THE WITNESS:

Page 163

1 A. Our obligation is to determine if our
2 distributor has a program in place to do exactly that.
3 So what we found out was they weren't fulfilling their
4 obligation in every instance. So then we went further
5 to go out and determine who those customers were to
6 see if they were providing licit or illicit pills in
7 the market. So the first responsibility is to the
8 distributor. So we took it upon ourselves to go out
9 and find out who those customers, our customers'
10 customers are to try to prevent that, so.
11 BY MR. KAWAMOTO:
12 Q. But if you determined that a customer's
13 customer was a pill mill, then you had an obligation
14 to cut them -- to direct the distributor to cut them
15 off, did you not?
16 MR. O'CONNOR: Objection.
17 BY THE WITNESS:
18 A. Absolute -- absolutely. And we did that
19 many times.
20 BY MR. KAWAMOTO:
21 Q. And then can you read the highlighted
22 section in the paragraph underneath "Compliance Need:
23 Simultaneous Abuse and Diversion Monitoring," please?
24 A. Could you tell me who wrote this?

Page 164

1 Q. Well, sir, to be honest, it is not clear
2 who did write this.
3 A. Okay.
4 Q. What I've got is the attachment to the
5 e-mail.
6 A. So -- okay. So we don't have any idea who
7 wrote it, if it was a pet project, if someone brought
8 it in at a time, you don't know that?
9 Q. Well, procedurally speaking, there is a --
10 there are limits to how many of your questions I can
11 answer, but --
12 A. Okay.
13 Q. -- I'm comfortable saying I don't know who
14 wrote this.
15 A. Thank you.
16 Q. And hence why I'm asking you about it.
17 A. I appreciate it because I don't know who
18 wrote it earlier.
19 Okay. "Covidien currently monitors
20 diversion of our product through transactional data
21 via electronic exchange and audit services from
22 manufacturer to direct customer. Although these
23 systems meet current standards for monitoring
24 diversion, we are limited by our inability to track

Page 165

1 resources simultaneously through a comprehensive
2 monitoring system that utilize" -- "utilizes all sales
3 and supply chain data. This is occurring at a time
4 when prescription drug abuse, misuse, and diversion
5 are increasing, which we anticipate will prompt the
6 enactment of stricter monitoring requirements."
7 Q. So focusing on that last sentence that you
8 just read --
9 A. Okay.
10 Q. -- "This is occurring at a time when
11 prescription drug abuse, misuse, and diversion are
12 increasing, which we anticipate will prompt the
13 enactment of stricter monitoring requirements," is
14 that an accurate statement in your opinion? And the
15 date of this e-mail and presumably this attachment is
16 going to be April of 2008.
17 A. So ten-and-a-half years ago. So I don't
18 know that. And I don't know who wrote the document.
19 I don't know what their -- their ability to have this
20 information would be, and I just don't know that I
21 can say with any specificity that -- that this is
22 accurate. I just -- you know, I don't know.
23 Q. Well, is it fair to say that over your
24 time at Mallinckrodt, which spanned from 2000 to 2012,

Page 166

1 there was an increase in drug abuse, misuse and
2 diversion, is that accurate?
3     MR. O'CONNOR: Objection.
4 BY THE WITNESS:
5     A. I think it's probably accurate.
6 BY MR. KAWAMOTO:
7     Q. And did that prompt the enactment --
8 enactment of stricter monitoring requirements, sir?
9     MR. O'CONNOR: Objection.
10 BY THE WITNESS:
11     A. DEA never gave us any advice on what we
12 should do or not do other than not to send anymore
13 letters with the algorithm, okay. But they never
14 said, You need to do this or that. At one point they
15 said, It would be nice if you know your customer's
16 customer. And that came, as I said, not directly, but
17 it came through a sidebar from DEA.
18     So, did -- did we do everything within our
19 power to start identifying those customers' customers,
20 yes. We were doing our very best to identify those
21 people. But did the DEA ever say in writing, until
22 much later when we had the earthquake meeting at the
23 end of '11 when they said, You need to know your
24 customer's customer. Before that it had been kind of,

Page 167

1 It would be nice if you knew that, but they would
2 never give us any instruction on what they meant.
3 BY MR. KAWAMOTO:
4     Q. Do you know if this pilot program was ever
5 implemented, this Integrichain Pilot Program?
6     A. I have no clue. I don't know who wrote
7 it, I don't know -- I just don't know. You would
8 think there would be something on here that would
9 identify the writer.
10     Q. Are you familiar with 852 sales data?
11     A. No. I don't know what that means.
12     Q. What about 867 sales data?
13     A. Is there someplace I can look at this? I
14 don't -- I don't --
15     Q. No, it's -- it's not going to be present
16 here. I'm just asking if you are familiar with it?
17     A. I'm not familiar with the sales data.
18     Q. Now, after the Integrichain overview,
19 there is this "New Customer Checklist."
20     A. Okay.
21     Q. Now, you'll -- do you recall that we were
22 discussing a form, you know, probably ten minutes ago?
23     MR. O'CONNOR: Objection.
24 BY THE WITNESS:

Page 168

1     A. Okay.
2 BY MR. KAWAMOTO:
3     Q. So is -- is this the form that you were
4 referencing with respect to -- to the form to help you
5 know your customer's customer?
6     A. It's familiar. So I -- you know, it very
7 well could be that form.
8     Q. And would you have been involved in
9 developing this form?
10     A. I don't think so.
11     Q. Do you recall ever reviewing this form
12 when it was filled out?
13     A. Yes.
14     Q. And what did you review it for? What was
15 the purpose of your review?
16     A. We needed additional information on -- on
17 registrants to see if we felt that they were
18 legitimate.
19     Q. And can you walk me through how this, how
20 the information in this form would have helped you
21 determine whether a -- well, strike that.
22     A. Do you have a -- where I can see the whole
23 thing? I -- it's cut off at the bottom.
24     Q. Yeah, it's -- it is in the back of your --

Page 169

1 it is towards the end of --
2     A. That's this?
3     MR. O'CONNOR: Can we have the Bates number?
4     MR. KAWAMOTO: Yeah. It's Bates No. 273907, so
5 it should be as part of that document.
6 BY THE WITNESS:
7     A. Thank you.
8 BY MR. KAWAMOTO:
9     Q. Sure.
10     A. Yeah, this isn't the form. This is not
11 the one I was talking about.
12     Q. Understood.
13     Would you -- do you recall ever reviewing
14 this particular form, though, when it was filled out?
15     A. No.
16     Q. Now, the next attachment, and it is Bates
17 No. 273908, it's a "Controlled Substance Suspicious
18 Monitoring" and it is a "DEA Compliance Procedure."
19 This appears to be on a standardized form.
20     Is that -- is that accurate?
21     A. Yes.
22     Q. Okay. And the originator is Karen Harper.
23     What -- what is this form, what is its
24 function?

Page 170

```
1       MR. O'CONNOR:  Objection.
2  BY MR. KAWAMOTO:
3       Q.   Let me put that another way.
4            How did -- how did Mallinckrodt use these
5  types of forms internally?  Is this a formal policy
6  document or -- I'm trying to understand what I'm
7  looking at?
8       MR. O'CONNOR:  Objection.
9  BY THE WITNESS:
10      A.   I know I've seen these and seen more than
11  one of them.  How it was implemented, I'd -- I'd be
12  guessing, so.
13  BY MR. KAWAMOTO:
14      Q.   Now, on the back page it has
15  responsibilities and then it identifies various
16  departments.
17           Do you see that?
18      A.   Yes.
19      Q.   Okay.  So you've got the "Customer Data
20  Integrity Group.  Perform Dun & Bradstreet information
21  check on new controlled" -- well, actually, strike
22  that.
23           Can you review this and let me know if you
24  recall this process ever being implemented?
```

Page 171

```
1       A.   After all of these years, I just can't
2  remember it.
3       Q.   You can't remember it.
4       A.   I mean, I just can't remember.
5       Q.   Now, with respect to security director,
6  that would have been you, is that correct?
7       A.   Yes.
8       Q.   Do you recall if -- if this was an
9  accurate description of your -- of your role in 2008?
10      MR. O'CONNOR:  Objection.
11  BY THE WITNESS:
12      A.   Again, I can't recall.  I just don't know.
13           (WHEREUPON, a certain document was
14           marked Mallinckrodt-Ratliff
15           Deposition Exhibit No. 012, for
16           identification, as of 12/19/2018.)
17  BY MR. KAWAMOTO:
18      Q.   So this is an e-mail from Karen Harper to
19  you.  It is entitled "DEA Compliance Monthly Report,
20  May 2008," and it has a Bates number of 2908468.  And
21  I only want to ask you about two things, the
22  regulatory interpretations and the suspicious order --
23  well, it says "Suspicious Order Mentoring."  I suspect
24  that may be a typo.
```

Page 172

```
1       A.   Okay.  I have read the "Regulatory
2  Interpretations."  What other?
3       Q.   Okay.  The one up top saying "Suspicious
4  Order Mentoring."
5       A.   Okay.
6       Q.   Okay.  So it says under Suspicious Order
7  Mentoring, I think that means monitoring:  "The team
8  continues work and three meetings were held in May."
9            Is the -- is the reference to the team the
10  SOM team?
11      A.   I -- yeah, I don't know.
12      Q.   Okay.  And I take it you don't recall
13  anything about meetings being held in May on
14  suspicious order monitoring or mentoring?
15      A.   No.
16      Q.   Okay.  Now, the next sentence references
17  a:  "Procedure that is in Draft 3 Revision and a
18  subcommittee which has become work on which algorithms
19  will be used to screen orders of unusual quantity,
20  frequency and pattern."
21      A.   Okay.
22      Q.   So, do you have any recollection of a
23  subcommittee?
24      A.   No.
```

Page 173

```
1       Q.   Now, the -- the -- this is dated June
2  of 2008 and it's referencing work on algorithms which
3  will be used to screen orders of unusual quantity,
4  frequency and pattern.
5            So if you will recall in April of 2008 you
6  had a conversation with Pete Kleissle.
7            Do you recall that?
8       A.   Yes.
9       Q.   And the upshot of that conversation is
10  that you were to stop -- well, Jim Rausch was to stop
11  sending him letters and using that algorithm?
12      MR. O'CONNOR:  Objection.
13  BY THE WITNESS:
14      A.   He said, Don't send us letters using the
15  algorithms.
16  BY MR. KAWAMOTO:
17      Q.   Okay.
18      A.   That doesn't mean that the algorithms
19  aren't effective, because that's what they are saying
20  here, I think, that they are -- the algorithms have
21  some benefit to us, so that's what I get from reading
22  it.  But do I recall it, no.
23      Q.   And so do you have any recollection of
24  whether the algorithm was changed or modified over
```

Page 174

1  time?
2      A.  I don't.
3      Q.  And actually, you don't -- you don't
4  recall whether the algorithm was still being used
5  after April of 2008?
6      A.  I don't.  I know that they weren't sending
7  letters to DEA with it.
8      Q.  Going to "Regulatory Interpretations" --
9      A.  Okay.
10     Q.  -- it says -- can you read that first
11 sentence?
12     A.  "As newly appointed Dosage Customer
13 Service Manager, Cathy Stewart requested several
14 regulatory interpretations pertaining to DEA 222 over
15 shipment and States versus Federal controlled
16 substance laws."
17     Q.  Do you know what that is in reference to?
18     A.  No.
19         Is that all from this?
20     Q.  That's all for that.
21     A.  Thank you.
22         (WHEREUPON, a certain document was
23         marked Mallinckrodt-Ratliff
24         Deposition Exhibit No. 013, for

Page 175

1          identification, as of 12/19/2018.)
2  BY MR. KAWAMOTO:
3      Q.  So the questions I have for you, sir,
4  relate to the back page under "Ongoing Projects," and
5  in particular it is the second bullet point.
6      A.  The second bullet?
7      Q.  Yes.  The one that I'll -- I'll highlight
8  it here.
9          Do you see that highlighted section, sir?
10     A.  I do.
11     Q.  Now, the first sentence references "HDMA
12 Industry Guidance."
13         Do you know what that -- what is HDMA
14 Industry Guidance?
15     A.  No.
16     Q.  It also references:  "One significant gap
17 will be worked wherein HDMA suggests that the customer
18 (as opposed to shipper's sales rep) fills out the
19 information gathering document requiring business
20 background, customer base, state and federal license,
21 and signs and notarizes the statement."
22         Do you see that statement?
23     A.  I do.
24     Q.  Do you know what that is in reference to?

Page 176

1      A.  I don't.
2      Q.  Okay.  Were you -- do you recall ever
3  becoming aware of a significant gap in the program?
4      A.  No.
5      Q.  The second line from the bottom, it says,
6  "Further, HDMA endorses an electronic order monitoring
7  system and we need to determine status (has pilot
8  program been run?)"
9          Well, do you know what HDMA is?
10     A.  I don't.
11     Q.  Okay.  And do you know -- do you have any
12 recollection of an electronic order monitoring system?
13     A.  At this time I don't.  I just don't.
14     Q.  And the last sentence says:  "More work on
15 suspicious order monitoring program will be on the
16 agenda for January."
17     A.  Okay.
18     Q.  So based on the document, sir, it appears
19 that Mallinckrodt was working on its suspicious order
20 monitoring program since early 2008 until early 2009.
21         Is that accurate?
22     A.  We were constantly refining, reviewing,
23 and improving the suspicious order monitoring program.
24 So if that's what you are saying, yes.

Page 177

1      Q.  But do you have any recollection of when
2  the enhanced or new suspicious order monitoring
3  program was implemented?
4      A.  I believe it was always in a stage of -- I
5  mean, it was always being used as it was being
6  reviewed and improved is my recollection.
7      Q.  But you don't -- you are not aware or
8  familiar with any of the details of that SOM program
9  as you sit here today?
10     A.  Say that one more time, please.
11     Q.  You are not aware or familiar with any of
12 the details of that SOM program as you sit here today?
13     MR. O'CONNOR:  Objection.
14 BY THE WITNESS:
15     A.  Was I aware of the suspicious order
16 monitoring program, is that what you are asking?
17 BY MR. KAWAMOTO:
18     Q.  No.  I'm asking -- I'm asking about the
19 specifics of its implementation.
20         Do you know whether there was an algorithm
21 in effect?  Do you know when the customer checklist
22 was rolled out?
23     MR. O'CONNOR:  Objection.
24 BY MR. KAWAMOTO:

| Page 178 |
|---|

1    Q.   I take it -- I mean, you don't -- you
2    don't recall any of those details?
3    A.   I don't.
4    MR. O'CONNOR:  Objection.
5    BY MR. KAWAMOTO:
6    Q.   So your basis for saying that there was
7    always some type of program in effect is what?  Is it
8    your general recollection or --
9    A.   Karen.
10   Q.   -- why would you say that?
11   A.   Karen would come in from time to time and
12   say, We are going to do this.  And I'd go, Okay.  She
13   was right next -- in the office right next to me.  And
14   so was -- did that mean did I know at the time, maybe.
15   This is only -- we are getting only nine years ago.
16   What I'm saying is would I have known at the time what
17   was going on, yes.  But what you are asking me is to
18   review things that I haven't thought about in all of
19   those years and today is the first time I'm looking at
20   this in nine years, ten years, eleven years and asking
21   me to recall those details.  And I apologize.  I
22   can't.  I just -- my memory is not good enough to go
23   back and look at this and say, Yep, that's what -- I
24   just don't remember that.

| Page 179 |
|---|

1    Q.   So if I wanted to determine what this --
2    what's this -- what suspicious order monitoring
3    program was in effect, say, in July of 2008, where
4    would I go -- how would I do that?
5    A.   I would talk to Karen Harper.
6    Q.   Okay.  Is there any formal document that
7    you are aware of that would tell me, you know, this is
8    a --
9    A.   If we have a specific date that said,
10   Okay.  Now the program is in place, I don't know.  I
11   don't think so.  I think it was a -- a gradual
12   implementation.
13         And I apologize for talking over you.
14   Q.   That's okay.
15   A.   I'll try not to do that.
16   Q.   So if you got a new president of specialty
17   generics and he wanted to know -- he comes in in
18   August of 2008 and he wants to know what your SOM
19   program is, I take it he would have gone to Karen
20   Harper, is that how he would have learned about it
21   or --
22   A.   Sure.
23   MR. O'CONNOR:  Objection.
24   THE WITNESS:  I'm sorry.

| Page 180 |
|---|

1    BY THE WITNESS:
2    A.   That's exactly the case, and she would
3    have made a presentation to him.  She would have done
4    a PowerPoint and the whole thing.
5    BY MR. KAWAMOTO:
6    Q.   But there is -- there is -- to the best of
7    your knowledge, there is no archive that has, you
8    know, this -- on this date this program was in fect --
9    was in effect?
10   A.   I don't know that.  I just don't know that
11   there was a specific date and we said, Okay.  Now we
12   are rolling it out today.  And so there was nothing
13   before or nothing -- no, that didn't happen.  It was a
14   gradual -- I mean, she worked on this all of the time,
15   trying to put it together, so.
16         (WHEREUPON, a certain document was
17             marked Mallinckrodt-Ratliff
18             Deposition Exhibit No. 014, for
19             identification, as of 12/19/2018.)
20   THE WITNESS:  Sorry.
21   BY MR. KAWAMOTO:
22   Q.   So this is an e-mail chain between you and
23   Karen Harper.
24   A.   Okay.

| Page 181 |
|---|

1    Q.   And its Bates number is 283602.
2         And you'll note that at the top there is a
3    discussion of, you know, flooring installation, and I
4    don't have any questions about that.
5    A.   Thank you.
6    Q.   But I do have questions about the e-mail
7    below that and then the e-mail below that.  So if you
8    can review that and the e-mail on the back of the
9    page.  Let me know when you are done.
10   A.   Okay.
11   Q.   Okay.  And so this e-mail, the very bottom
12   e-mail, can you please read that?  It is not very
13   long.
14   A.   "I agree with David and Kyle Wright" --
15   Q.   Oh, no, I'm sorry.  I meant the full
16   e-mail on 283603, so the back of the page.
17   A.   "Yesterday, I had a lengthy chat with Matt
18   Harbaugh and David Silver.  We spoke briefly about the
19   suspicious order monitoring program and its
20   importance.  David made the comment, that if a
21   distributor was ordering oxycodone and hydrocodone, a
22   good test of their legitimacy was to determine if they
23   were buying hydromorphone.  Interesting thought.
24   Let's discuss."

Page 182

```
 1    Q.   So what -- what is -- can you explain
 2  what's being -- well, strike that.
 3        Who is Matt Harbaugh and who is David
 4  Silver or who are?
 5    A.   David Silver was a VP.  Matt Harbaugh, I
 6  don't -- I remember the name, but I don't know what
 7  his position was.
 8    Q.   And David Silver was a VP at Mallinckrodt?
 9    A.   Yes.  He was at headquarters in -- in
10  Hazelwood.
11    Q.   And you are discussing -- you're -- well,
12  what -- what are you discussing in this e-mail?
13    A.   David was a computer wizard, a savant
14  almost.  He -- he just could do just about anything
15  with facts and figures, and that's my memory of what
16  he was doing with the company.
17        So he made the comment that: "If a
18  distributor was ordering oxycodone and hydrocodone, a
19  good test of their legitimacy was to determine if they
20  were buying hydromorphone.  Interesting thought.
21  Let's discuss."
22    Q.   And why would that have been a good test
23  of their legitimacy?
24    A.   I have no clue.  I know that sounds
```

Page 183

```
 1  terrible, but I -- I can't remember even in 2011, is
 2  what it says.  So we are back to only seven years ago.
 3  You know, if I were guessing, it's a pain medication.
 4    Q.   Hydromorphone -- hydromorphone is a pain
 5  medication?
 6    A.   Yes.
 7    Q.   So all three of those are pain
 8  medications, aren't they?
 9    A.   Correct.
10    Q.   Okay.  Well, why don't --
11    A.   There is not much else I could tell you.
12    Q.   Why don't we look at the e-mail above that
13  from Karen Harper to you.
14    A.   Okay.
15        Okay.
16    Q.   So based on this e-mail, Karen agrees or I
17  guess endorses the idea of looking at drug combination
18  purchase patterns?
19    A.   Yes.
20    Q.   Why -- why -- why would looking at drug
21  combination purchase patterns be helpful?
22    A.   You know, to -- to determine the
23  legitimacy of the pharmacy.  I mean, they are using --
24  they are looking for other tools to use, and that's
```

Page 184

```
 1  what I get from that.
 2    Q.   Well, and how -- how would -- how would
 3  looking at the drug combination purchase pattern help
 4  you determine the legitimacy of the pharmacy?  Is
 5  it -- is it if they are only purchasing oxycodone,
 6  that's a red flag, is that what this is about?
 7    A.   I don't know that.
 8    Q.   Now, then, your e-mail above is: "Thanks,
 9  I believe David was" -- "David was thinking more in
10  line with pain relievers that are not as addictive, as
11  opposed to only ordering those that are."
12        Do you have -- do you have any
13  recollection of what you meant by that statement?
14    A.   No.
15    Q.   Do you recall at a time in the context of
16  your "know your customer's customer push" that you
17  started looking at drug combination purchase patterns?
18    MR. O'CONNOR:  Objection.
19  BY THE WITNESS:
20    A.   I don't remember that.
21  BY MR. KAWAMOTO:
22    Q.   Would you agree, though, that if you had
23  a -- if you found out that a pharmacy was only
24  purchasing oxycodone from a distributor, that would be
```

Page 185

```
 1  a cause of concern for you?
 2    MR. O'CONNOR:  Objection.
 3  BY THE WITNESS:
 4    A.   I would say yes.
 5    MR. O'CONNOR:  We have been going a little over
 6  an hour.  Maybe a five-minute break?
 7    MR. KAWAMOTO:  Sure, that's fine.
 8    THE WITNESS:  I mean --
 9    MR. KAWAMOTO:  Well --
10    THE WITNESS:  I don't have a problem.
11    MR. O'CONNOR:  Actually, yeah, I'd like to take
12  a break.
13    THE WITNESS:  Okay.
14    MR. KAWAMOTO:  Fine.
15    THE VIDEOGRAPHER:  Going off the record at 2:03.
16        (WHEREUPON, a recess was had
17        from 2:03 to 2:21 p.m.)
18    THE VIDEOGRAPHER:  We are back on the record at
19  2:21.
20  BY MR. KAWAMOTO:
21    Q.   So, I have another e-mail for you,
22  Mr. Ratliff.  It is an e-mail from Karen Harper to a
23  woman named Kerry Hamilton at DOJ, cc'ing you, and the
24  Bates number is 387492.
```

Page 186

1    (WHEREUPON, a certain document was
2    marked Mallinckrodt-Ratliff
3    Deposition Exhibit No. 015, for
4    identification, as of 12/19/2018.)
5 BY THE WITNESS:
6    A.   Okay.
7 BY MR. KAWAMOTO:
8    Q.   Okay.  First, do you -- well, this is an
9 e-mail from Karen Harper to Ms. Hamilton and cc'ing
10 you and it is dated 11/2010.
11    The top -- the first sentence of the
12 e-mail references "information that Mallinckrodt
13 presented yesterday to DEA offices in St. Louis and
14 Albany, New York."
15    Do you have any recollection of those
16 meetings?
17    A.   I know Kerry Hamilton is with DEA.  She is
18 a compliance person.
19    Q.   And do you recall speaking to her?
20    A.   I've spoken to Kerry more than once --
21    Q.   Okay.
22    A.   -- in meetings at the DEA office there in
23 St. Louis.
24    Q.   And do you recall meeting with her

Page 187

1 regarding chargeback data?
2    A.   I know we met, but I can't tell you that
3 it was about this or this was -- well, what I'm
4 looking at, this relates to DEA offices, if this was
5 done via conference or -- or how New York and DEA
6 St. Louis would be done yesterday is the only problem
7 I'm having.
8    Q.   Sure.  So it may have been a conference
9 call, but regardless of --
10    A.   It could have been.
11    Q.   -- whether it was either a telephonic
12 meeting or an actual meeting, is that --
13    A.   Yeah.  Yeah, I don't remember it
14 specifically.
15    Q.   What is your understanding of
16 Mallinckrodt's chargeback data?
17    A.   That it is very confusing.  And I know
18 it's written out here, but it's -- it's more confusing
19 than this, in my opinion.  I've never really
20 understood, you know, when they pay it and how it
21 works, if they are given credit.  I just don't know
22 that answer, so.
23    Q.   So do you see the -- the portions that
24 I've highlighted -- well, first, is this general

Page 188

1 description accurate or do you -- do you believe it's
2 not accurate?
3    MR. O'CONNOR:  Objection.
4 BY THE WITNESS:
5    A.   If Karen -- if Karen Harper wrote it, I
6 would think it's accurate.
7 BY MR. KAWAMOTO:
8    Q.   Okay.  And then the highlighted -- could
9 you please read the highlighted sections of the
10 e-mail?
11    A.   "When submitting chargebacks, distributors
12 must provide Mallinckrodt with specific detailed
13 information indicating how much product was sold to
14 each end user pharmacy."  Also, "Based on this
15 chargeback data, Mallinckrodt" -- "Mallinckrodt has
16 some information regarding pharmacy buying practices."
17    Is that where you stopped?
18    Q.   And do you believe that that is consistent
19 with your understanding about Mallinckrodt's
20 chargeback data?
21    A.   If Karen Harper wrote it, that's accurate.
22    Q.   Okay.  And then the last sentence, let me
23 highlight that.
24    Okay.  Can you please read that sentence?

Page 189

1    A.   "That said, Mallinckrodt assumes that most
2 transactions would result in a chargeback request."
3    Q.   And you have no reason to disagree with
4 Ms. Harper on this, do you?
5    A.   I don't know if that's -- I don't have any
6 reason to disagree.
7    Q.   Okay.  How was chargeback data being used
8 in the context of knowing your customer's customer,
9 sir?
10    MR. O'CONNOR:  Objection.
11 BY THE WITNESS:
12    A.   I mean, at some point we were using it,
13 so.  Can I tell you exactly when it started and how it
14 was used, I know that we used a form, not the one you
15 showed me before, but a form to -- to glean as much
16 information as we could from pharmacies prior to the
17 chargeback information being available to us.
18 BY MR. KAWAMOTO:
19    Q.   And this e-mail indicates that by at least
20 11/2010, Mallinckrodt was using the chargeback data?
21    A.   Yes.
22    Q.   And from a diversion control standpoint,
23 what did the chargeback data help you do, what
24 information did it provide?

Page 190

1    MR. O'CONNOR: Objection.
2 BY THE WITNESS:
3    A. It identified the distributor's customers.
4 BY MR. KAWAMOTO:
5    Q. And it also indicated how much they were
6 purchasing from that distributor, correct? Meaning it
7 wasn't just -- it not only identified the customer, it
8 also identified the volume of product?
9    MS. KVESELIS: Objection to form.
10    MR. O'CONNOR: Objection.
11 BY THE WITNESS:
12    A. I assume that's the case. I shouldn't
13 assume, but...
14    MR. KAWAMOTO: Actually, can I take a 20 second
15 break? I just need to grab an exhibit.
16    THE VIDEOGRAPHER: Going off the record at 2:28.
17       (WHEREUPON, a recess was had
18        from 2:28 to 2:29 p m.)
19    THE VIDEOGRAPHER: We are back on the record at
20 2:29.
21       (WHEREUPON, a certain document was
22        marked Mallinckrodt-Ratliff
23        Deposition Exhibit No. 016, for
24        identification, as of 12/19/2018.)

Page 191

1 BY MR. KAWAMOTO:
2    Q. Mr. Ratliff, I understand that this e-mail
3 is fairly lengthy, so I'm going to question you on the
4 first three pages. So Bates range 571 to 573, if that
5 helps your review.
6    A. Where did you want me to stop?
7    Q. Well, why don't we look at the e-mail that
8 spans Pages 572 to 573.
9    A. On Harvard Drug?
10    Q. Yes.
11    A. Okay.
12    Q. Okay. And so the e-mail -- the e-mail is
13 about Mallinckrodt customer Harvard Drug.
14       Do you recall anything about that
15 customer?
16    MR. O'CONNOR: Objection.
17 BY THE WITNESS:
18    A. I know that -- that we did an audit at
19 some point, but I wasn't involved.
20 BY MR. KAWAMOTO:
21    Q. Okay. Now, the e-mail also references an
22 impromptu meeting following a site visit on July 21st,
23 2010.
24    A. Okay.

Page 192

1    Q. Do you recall being present at that
2 meeting?
3    A. No.
4    Q. Okay. Then can you read that sentence
5 starting from "within" that I've highlighted on my
6 copy of the document?
7    A. "Within that session, DEA announced a 'new
8 direction' initiative whereby enforcement action will
9 be aimed at all entities within the supply chain,
10 including manufacturing registrants."
11       Should I go on?
12    Q. Yes.
13    A. Okay. "The expectation is becoming that
14 suppliers have not only an obligation to know their
15 customers but an additional responsibility to know
16 their customers. DEA now has information that
17 indicates, as enforcement activity directed at pain
18 clinics in Florida as it relates to the diversion of
19 oxycodone 15 and 30-milligram is escalated, the pain
20 clinics are reestablishing their businesses in
21 Georgia, Ohio and Texas."
22    Q. Okay. Thank you.
23       So is it fair to say that as of July 2010,
24 the DEA was indicating that it believed you should

Page 193

1 know your customer's customer?
2    MR. O'CONNOR: Objection.
3 BY THE WITNESS:
4    A. Yes.
5 BY MR. KAWAMOTO:
6    Q. And do you recall anything about pain --
7 being informed that pain clinics were reestablishing
8 their businesses in Georgia, Ohio and Texas?
9    A. I don't recall that specifically.
10    Q. And then turning the page, could you
11 please read the -- what I have highlighted under
12 Action Plan?
13    A. "The team believes the suspicious order
14 monitoring program can be further enhanced by
15 analyzing chargeback data for indirect customers and
16 direct sales information available within existing
17 systems."
18    Q. Okay. And the reference to the "team,"
19 was that the suspicious order monitoring team?
20    A. I believe that's what she was referring
21 to.
22    Q. Okay. And so in re -- in response to
23 DEA's -- in response to DEA's direction that
24 Mallinckrodt and other manufacturers need to start

Page 194

1 knowing their customer's customer, Mallinckrodt's
2 response, and I'm not saying this is a complete
3 response, but a part of Mallinckrodt's response was to
4 start relying on chargeback data.
5      Is that accurate?
6 A.  I think so.
7 Q.  Okay.  Thank you.
8 A.  Is that all on that document?
9 Q.  Yes, that's all on that document.
10      (WHEREUPON, a certain document was
11      marked Mallinckrodt-Ratliff
12      Deposition Exhibit No. 017, for
13      identification, as of 12/19/2018.)
14 BY MR. KAWAMOTO:
15 Q.  So this is a PowerPoint, Bates numbered
16 496098, and I'm only going to ask you about certain
17 pages, but looking at the cover page, it is the
18 Mallinckrodt Controlled Substance Suspicious Order
19 Monitoring Program, Presentation for Marketing Group,
20 March 21st, 2011.
21      Do you have any recollection of this
22 PowerPoint?
23 A.  No.
24 Q.  Okay.  Would this PowerPoint have been put

Page 195

1 together by the compliance department?
2 A.  I would think, yes.
3 Q.  And it is a presentation for the marketing
4 group.  Do you know why that they -- why the
5 compliance department or why -- well, strike that.
6      Do you know why the marketing group would
7 be receiving a presentation on Mallinckrodt's
8 suspicious order monitoring program?
9 A.  I would believe it's to make sure
10 everybody is on the same page with the suspicious
11 order monitoring program.
12 Q.  And directing your attention to, I believe
13 it's Page 14 of this PowerPoint.
14 A.  Okay.
15 Q.  And it has information relating to Harvard
16 Drugs and Sunrise Distributors.
17 A.  Okay.
18 Q.  Do you see that?
19      Do you know why this information would be
20 conveyed to the marketing department -- well, strike
21 that.
22      What is -- what is the -- what is the
23 substance of the information in this PowerPoint
24 regarding Harvard Drug and Sunrise Distributors?

Page 196

1 A.  I would think just to inform them of
2 what's going on with Harvard and Sunrise.
3 Q.  And with respect to Sunrise, it says:
4 "License voluntarily surrendered."
5      What does that mean to you?
6 A.  That DEA asked for it and they gave it to
7 them without having to suspend them themselves.
8 Q.  Which means that after they voluntarily
9 surrender their license, that -- that is a -- I guess
10 a permanent status, isn't it?
11 MR. O'CONNOR:  Objection.
12 BY THE WITNESS:
13 A.  I don't know that.  I don't know that
14 they -- once they -- it could be a -- a matter of the
15 way they stored their material and if they came back,
16 I'm just giving you a hypothetical, if they -- they
17 remedied that, then they could reapply.  So I don't
18 know if it's permanent.  That's why I'm saying I don't
19 know.
20 BY MR. KAWAMOTO:
21 Q.  But if it were for failure to maintain
22 effective diversion controls, that voluntarily --
23 that -- I'm sorry -- that voluntary surrender would
24 likely be permanent, would it not?

Page 197

1 MR. O'CONNOR:  Objection.
2 BY THE WITNESS:
3 A.  I don't know that.
4 BY MR. KAWAMOTO:
5 Q.  To your knowledge, did Sunrise ever get
6 its license back?
7 A.  I don't know that.
8 Q.  Directing your attention to Page 15.
9 A.  Okay.
10 Q.  Can you please read -- could you please
11 read the statements under the DEA St. Louis
12 Conversation?
13 A.  "Mallinckrodt was named as a supplier of
14 Harvard at a DEA training session in Washington, D.C.
15 Pain clinic undercover operations reveal a 'cattle
16 call' scenario.  Mallinckrodt is viewed as the kingpin
17 within the drug cartel.  DEA is implementing a 'new
18 direction' initiative aimed at manufacturing [sic] of
19 oxycodone.  DEA expectation has evolved to require
20 that manufacturers know their customers' customers."
21 Q.  Okay.  So much of that is consistent with
22 the e-mail that we -- that we viewed previously?
23 A.  Yes.
24 Q.  Do you ever recall being informed that

Page 198

1 Mallinckrodt was viewed as the kingpin within the drug
2 cartel with reference to Harvard?
3     A.   Yes.
4     Q.   And what do you recall about that
5 discussion or conversation?
6     A.   We were outraged about it.  It's just
7 simply not true, and to -- to use terms like that in a
8 conference with DEA compliance personnel is disgusting
9 in my opinion.  Being from a Federal agency, we would
10 never do that in a wide open forum and make some
11 outlandish statement like that.
12     Q.   And to be clear, the entity that was
13 making the statement, though, was the Drug Enforcement
14 Administration, is that correct?
15     A.   Yeah.  It doesn't make them right.  It
16 just makes them the Drug Enforcement Administration.
17     Q.   And what's meant by "plain" -- "pain
18 clinic undercover operations reveal a cattle call
19 scenario"?
20          Do you know what that means?
21     MR. O'CONNOR:  Objection.
22 BY THE WITNESS:
23     A.   I really don't.
24 BY MR. KAWAMOTO:

Page 199

1     Q.   Okay.
2     A.   Are we still on the same document?
3     Q.   No.  We are done with that document.
4     A.   Okay.  Thank you.
5          (WHEREUPON, a certain document was
6           marked Mallinckrodt-Ratliff
7           Deposition Exhibit No. 018, for
8           identification, as of 12/19/2018.)
9 BY MR. KAWAMOTO:
10     Q.   Yeah, so this is an e-mail chain between
11 you and Karen Harper among other people.  It's Bates
12 number is 419903.
13     A.   Okay.
14     Q.   So directing your attention to the bottom
15 e-mail from Karen Harper to you and others.
16     A.   Okay.
17     Q.   It states:  "On 4/23/08, I attended a
18 meeting of the Midwest Controlled Substance Discussion
19 Group in Chicago.  Among the agenda items was
20 suspicious order monitoring."
21          Do you recall whether you attended that
22 meeting as well?
23     A.   I never attended these meetings ever.
24     Q.   What was the Midwest Controlled Substance

Page 200

1 Discussion Group?
2     A.   It's a group of manufacturers that get
3 together and compare notes.  They can't talk about
4 quota or manufacture, but they can talk about things
5 like the suspicious order monitoring program, DEA
6 letters and -- and different things like that.  They
7 can talk about all kinds of stuff.  They just have to
8 be careful about not discussing their quota issues and
9 so forth with other registrants.
10     Q.   And can you read this highlighted section
11 for me, please?
12     A.   "One member of industry indicated they
13 have received advice from DEA that the suspicious
14 order monitoring program should allow DEA registrants
15 to 'know their customer' and compare that activity to
16 a bank's obligation to report $10,000 transactions to
17 law enforcement for detection of money laundering
18 while having the ability to detect multiple
19 transactions at 9,999."
20     Q.   Okay.  And can you also read what's
21 underneath it?
22     A.   "Other suggestions included:  On-site
23 visits for all controlled substance customers, close
24 scrutiny of" -- "scrutiny of small, independent

Page 201

1 pharmacies, close scrutiny of pain management
2 clinics."
3     Q.   And so those suggestions, particularly the
4 "close scrutiny of small independent pharmacies" and
5 the "close scrutiny of pain management clinics," that
6 would be consistent with knowing your customer's
7 customer, would it not?
8     A.   It would be, but the people that attended
9 this meeting can also be distributors.  They don't
10 have to just be manufacturers.  They are in the
11 industry, so.
12     Q.   But as a -- as a general -- I mean, well,
13 from your standpoint in terms of the enhancements that
14 Mallinckrodt is seeking to make to its suspicious
15 order monitoring program, that -- those types of
16 enhancements, the close scrutiny of small independent
17 pharmacies and close scrutiny of pain management
18 clinics, were things that Mallinckrodt was
19 undertaking, is that correct?
20     MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22     A.   Well, if you read this, it says:  "On-site
23 visits for all controlled substance customers."
24          I mean, what you are saying is "all" and

Page 202

1 that's a -- I just can't agree with that. There are
2 pharmacies all over the United States that are as
3 legitimate as can be and then they order through their
4 parent or directly from one of our distributors. So
5 to say we have to go to all of those...
6     "Close scrutiny of small, independent
7 pharmacies." So -- "Close scrutiny of pain management
8 clinics."
9     So what you are saying is the manufacturer
10 bypasses the distributor and goes directly to all pain
11 management clinics; close scrutiny of small,
12 independent pharmacies. I'm not sure you understand
13 what that means.
14     Q.  Well, I don't know that -- I'm not sure
15 that that is what that's saying. I think what it's
16 saying is: On-site visits of all controlled substance
17 customers, and you've indicated that that's --
18     A.  Those are suggestions.
19     Q.  -- that that may not be feasible.
20     But close scrutiny of small, independent
21 pharmacies, that -- that is something that a
22 manufacturer could do, could it not, and isn't that
23 what Mallinckrodt was doing?
24     A.  These are --

Page 203

1     MR. O'CONNOR: Objection.
2 BY THE WITNESS:
3     A.  -- suggestions --
4 BY MR. KAWAMOTO:
5     Q.  No, I understand that.
6     A.  -- that you can include to -- I mean, it
7 is not a direct -- and you have to remember who is
8 meeting. These are manufacturers and distributors
9 meeting, and within that they are saying this is what
10 we are kind of hearing from DEA that, you know, in a
11 perfect world, because when you talk about the bank's
12 obligations and then the -- their ability -- you know,
13 9,999, that's a structuring violation. I used to have
14 a bank fraud squad and I got those every week, but
15 that didn't mean that those people were crooks. That
16 meant that they had either taken or deposited that
17 much money. So you have to at least -- do you see
18 what I'm saying? It's -- it's not an absolute. That
19 program is meant to determine if someone is abusing,
20 they're -- they're money laundering or selling or
21 drugs or some other illicit product, so.
22     Q.  But the suggestions for close scrutiny of
23 small, independent pharmacies and close scrutiny of
24 pain management clinics, those were suggestions that

Page 204

1 Mallinckrodt agreed with, did it not?
2     A.  I don't know that.
3     Q.  Isn't that --
4     A.  These are --
5     Q.  Well --
6     A.  These are other suggestions included, but
7 you are saying we agreed to that. I have no reason to
8 think that we agreed to that.
9     Q.  Well, isn't that part of knowing your
10 customer's customer though?
11     A.  I don't think so. I mean, how do we know
12 that the close scrutiny of small, independent
13 pharmacies, that they even buy from one of our
14 distributors. You understand that there are many,
15 many distributors and there are many manufacturers and
16 they a lot of times don't buy our product, they buy
17 someone else's.
18     Q.  But looking at your customer's customer,
19 meaning those customers of the customer of
20 Mallinckrodt, looking at that universe, it would make
21 sense to scrutinize small, independent pharmacies,
22 would it not?
23     MR. O'CONNOR: Objection.
24 BY THE WITNESS:

Page 205

1     A.  I don't know. I just -- I don't think so
2 because the thing I have a real hang-up with on-site
3 visits of all controlled substance. That's the first
4 recommendation. That's incredible, "all." You just
5 can't do that. And then close scrutiny of small,
6 independent pharmacies, have you -- well, I'm not
7 going to ask you a question.
8     In Florida there are literally hundreds
9 and hundreds of small, independent pharmacies, and
10 I've been in some of those. And while in there, they
11 say, Well, we deliver or We have a better price or We
12 can get this for a customer or They ordered this in
13 addition to that. So there is no way I could say they
14 are doing something nefarious because they are a
15 small, independent pharmacy, but to go to every single
16 one in Florida alone is just -- it's beyond how that
17 would be within anyone's capability, so.
18     Q.  But if you had a way to screen the small,
19 independent pharmacies and prioritize certain ones,
20 then it would make sense to focus on those, would it
21 not?
22     MR. O'CONNOR: Objection.
23 BY THE WITNESS:
24     A.  Some of those people don't get chargebacks

Page 206

1 because they don't buy enough product, so they
2 wouldn't be visible to us at all.
3 BY MR. KAWAMOTO:
4     Q.    But some of them would be in the
5 chargeback system, correct?
6     MR. O'CONNOR:  Objection.
7 BY THE WITNESS:
8     A.    I don't know that.
9 BY MR. KAWAMOTO:
10     Q.    And what about pain management clinics, I
11 mean, that was -- that was an area that Mallinckrodt
12 scrutinized, did it not?
13     A.    We looked at the pharmacies, not the
14 doctors.  So pain -- pain management clinics, that --
15 they write the script to the pharmacy.  So now you've
16 removed it one more time.  You have the -- you have
17 the manufacturer, the distributor, you have then the
18 distributor's customer would be the clinic, and then
19 beyond the clinic you have the doctor that writes the
20 script.  So now you don't just know your customer's
21 customer because the distributor doesn't know the
22 customers, the doctors.
23     Q.    But in certain instances don't pain
24 management clinics dispense opioid products strictly

Page 207

1 in Florida?
2     A.    I don't know that.  I just don't know
3 that.  The ones that I looked at were writing scripts
4 to the pharmacy and that's where we, you know, we were
5 looking at the pharmacy, was it legitimate, if you get
6 15 scripts and they are all 90 pills for 30-milligrams
7 and not everybody has the same pain threshold or
8 issues.
9     Q.    And when you say, "The ones that I looked
10 at were writing scripts," those -- did you -- those
11 were the pain management clinics that you looked at?
12     A.    No.
13     MR. O'CONNOR:  Objection.
14 BY MR. KAWAMOTO:
15     Q.    Then what -- what's the reference to
16 "ones," what were you looking at?
17     A.    We were looking at the pharmacies.  The
18 pharmacies -- the pain management, those are the
19 doctors.  So the doctors are writing a script to the
20 pharmacy for the patient.
21     Q.    Okay.  And so you didn't look at the pain
22 management clinics, you just looked at the pharmacies?
23     A.    Yes.
24     Q.    And to the degree the pharmacy was

Page 208

1 affiliated with the pain management clinic or the pain
2 management clinic opened up a pharmacy, then you would
3 look at them as well, correct?
4     MR. O'CONNOR:  Objection.
5 BY THE WITNESS:
6     A.    Please repeat that.  I'm -- you are losing
7 me on that.
8 BY MR. KAWAMOTO:
9     Q.    Did you ever encounter a situation where a
10 pain management clinic had a pharmaceutical license
11 that was giving out drugs to its patients?
12     A.    No.  You are asking me personally, right?
13 No.
14     Q.    Or in your experience working for
15 Mallinckrodt as the director of security?
16     A.    I never saw it.  I'm not saying it didn't
17 happen.  I just never saw it, so.
18     Q.    Now, the paragraph above where it says:
19 "Advice from DEA that sus"- -- "that the Suspicious
20 Order Monitoring program should allow DEA registrants
21 to 'know their customer' and compare that activity to
22 a bank's obligation to report $10,000 transactions to
23 law enforcement," that is a capability that the
24 chargeback data would have provided to you, is that

Page 209

1 correct?
2     MR. O'CONNOR:  Objection.
3 BY THE WITNESS:
4     A.    The $10,000 transaction is the law.
5 BY MR. KAWAMOTO:
6     Q.    No, I'm aware of that.
7     A.    Okay.
8     Q.    But if you were to translate that, for
9 example, on a certain threshold of pills, that is
10 something that chargeback data could have given you
11 insight into?
12     MR. O'CONNOR:  Objection.
13 BY THE WITNESS:
14     A.    This information is coming from a member,
15 one -- an attendee at this conference.  So, I don't
16 know how -- you know, how valid that information is
17 without -- I don't know that was, I don't know what
18 their background is or how they would know.  I don't
19 know that I can agree.  Do we know our -- should we
20 know our customer's customer, after DEA told us, yes.
21 So I can tell you that's the case.  But I don't know
22 how all of this other is even -- even important.
23         As I told you before, having a bank fraud
24 squad, I got this information every single week as the

Page 210

1  supervisor, and a lot of times it was -- it wasn't
2  consistent.  There was no pattern to it.  So what we
3  were looking for is a pattern.  So to say this --
4      Q.    Okay.  Well, putting -- okay.  Putting
5  aside this e-mail, sir --
6      A.    Say again.
7      Q.    Putting aside this e-mail.
8      A.    Okay.
9      Q.    So putting this e-mail aside.
10     A.    Okay.
11     Q.    The volume of oxy co -- of oxy 30s that
12 your customer's customer was obtaining from its
13 distributor, that was relevant information that
14 Mallinckrodt would pay attention to, would it not?
15     A.    Yes.
16     Q.    Okay.
17          (WHEREUPON, a certain document was
18           marked Mallinckrodt-Ratliff
19           Deposition Exhibit No. 019, for
20           identification, as of 12/19/2018.)
21 BY MR. KAWAMOTO:
22     Q.    So this is an e-mail chain with Bates
23 No. 274608, and the bottom e-mail includes you, the
24 top e-mail does not.  But the bottom e-mail includes

Page 211

1  a -- an agenda or a rough agenda for a DEA meeting in
2  Washington, D.C.
3          Do you see that, sir?
4      A.    Say that again.  I was reading.
5      Q.    The bottom e-mail from Karen Harper to
6  JoAnne Levy, cc'ing various people, including you --
7      A.    Okay.
8      Q.    -- contains an agenda for a meeting with
9  DEA in Washington, D.C.
10          Do you see that?
11     A.    I do.
12     Q.    Okay.  And for Mallinckrodt attendees, you
13 are listed as an attendee.
14          Do you see that?
15     A.    Yes.
16     Q.    Okay.  And do you also see under
17 Presentation by Mallinckrodt to include, it says:
18 "Suspicious Order Monitoring Initiative."
19          Do you see that?
20     A.    Yes.
21     Q.    Do you recall attending a meeting in
22 August at DEA offices in Washington, D.C.?
23     A.    Not specifically.
24     Q.    Well, do you generally recall anything

Page 212

1  about a meeting in that timeframe?
2      A.    I remember I met Michael Morley.  He was
3  with the DEA.  I met him on more than one occasion, I
4  believe.  Do I remember this particular meeting, no.
5      Q.    And who is Michael Morley?
6      A.    He was a -- he was in the Wash -- it is in
7  Virginia.  We call it the Washington, D.C. DEA
8  headquarters.  It is actually in Virginia, right
9  across the river, and he was one of their -- I believe
10 he was a supervisor, but he was also a lab-type person
11 and then he went into the supervisory position and
12 then back.  He transferred out of headquarters and
13 went to Texas, back in the labs, so.  I do know who he
14 is.  And I have met with him, but I just don't
15 remember being there with all of these people.
16     Q.    Okay.  And do you recall anything about
17 the suspicious order monitoring initiative that was
18 the subject of a presentation by Mallinckrodt?
19     A.    The problem is I don't remember
20 specifically about this meeting, and I really don't
21 remember all of these people, so I'm not certain I was
22 there.  You do understand I traveled quite a lot, so.
23 If I was available for a meeting, I would go.
24     Q.    How often did you have meetings at --

Page 213

1  well, the DEA headquarters are in Arlington, Virginia?
2      A.    Yes.
3      Q.    How often would you have meetings at DEA
4  headquarters?
5      A.    I would say once or twice a year.
6      Q.    Now, the fact the attendees include
7  Charles Bramlage, president of Pharmaceutical
8  Products, right?
9      A.    That's what it says.
10     Q.    And it includes the vice president JoAnne
11 Levy?
12     A.    Um-hum.
13     Q.    I mean, this would -- the attendance list
14 would suggest this was an import -- important meeting,
15 would it not?
16     MR. O'CONNOR:  Objection.
17 BY THE WITNESS:
18     A.    Okay.  It is a draft e-mail to Michael
19 Morley and it's suggestion -- suggesting these people
20 should attend.  So, if I was available, I probably
21 would have attended, but I can't tell you today that I
22 attended at all.  It's a draft.  These are who they
23 are recommending go to this meeting.
24 BY MR. KAWAMOTO:

Page 214

1    Q.   Do you know who Patricia Woz -- Woznick
2  was?
3    A.   I've seen the name before, but I don't
4  know who she is really.  Have I met her sometime in
5  the past, this is in '08, so it's ten years old, so,
6  yeah, I don't know that I know her.
7    Q.   So if I wanted to find out more about this
8  meeting, who would I talk to?
9    A.   I would talk to the writer.  It would be
10 Karen Harper.
11   Q.   That would be Karen Harper?
12   A.   Yeah.
13   Q.   Okay.
14   A.   I'm not saying I didn't attend.  I'm
15 saying I don't recall attending, and I don't recall
16 attending with all of these people anyway.  Okay.
17   Q.   Okay.
18        (WHEREUPON, a certain document was
19        marked Mallinckrodt-Ratliff
20        Deposition Exhibit No. 020, for
21        identification, as of 12/19/2018.)
22 BY MR. KAWAMOTO:
23   Q.   So this is an e-mail from Karen Harper to
24 you and Eileen Spaulding.  Its Bates number is 421973,

Page 215

1  and the attachment is meeting notes from a meeting at
2  DEA St. Louis in November of 2010.
3        Do you see that, sir?
4    A.   I do.
5    Q.   Now, if you look at the attachment which
6  are the meeting notes.
7    A.   Okay.
8    Q.   It says: "Representing Mallinckrodt."  It
9  identifies you and Karen Harper.
10   A.   Um-hum.
11   Q.   Do you have any recollection of this
12 meeting, sir?
13   A.   I actually do.
14   Q.   Okay.  What do you recall about it?
15   A.   That we met with them to provide them
16 details of our program and how it was evolving and
17 changing into what we thought was an exceptional
18 program and would be a leader in the industry.
19   Q.   Okay.  Now, the second paragraph down from
20 "General Feedback From St. Louis."
21        Okay.  So can you read that highlighted
22 paragraph for me, please?
23   A.   "Further, DPM advised that, nationally,
24 the DEA has been holding conferences to realign their

Page 216

1  resources focusing on inspection/investigations of
2  manufacturing registrants since DEA has been
3  ineffective at stopping the illicit sales of oxycodone
4  15 and 30-milligram tablets.  Additionally, the
5  Mal" -- "that Mallinckrodt has been mentioned
6  specifically at DEA conferences in Washington, D.C.
7  given that Mallinckrodt is the dominant manufacturer
8  of generic oxycodone 30-milligrams."
9    Q.   Do you recall that conversation from that
10 meeting, sir?
11   A.   I more recall the paragraph above it.  So
12 that's what I took away from the meeting, that it was,
13 you know, one of the best programs he had seen.  He
14 couldn't approve it, but he thought it was a --
15 certainly -- and that's what I looked at.  That's what
16 I brought back from that meeting, if that's what you
17 are asking.
18   Q.   Well, what is -- who is the DPM?
19   A.   He is the diversion program manager.  That
20 would be Scott Collier.
21        Do you see above where they -- they put
22 "Diversion Program Manager (DPM)" above --
23   Q.   Yes.
24   A.   -- DEA attendees?

Page 217

1        So he is the one that's saying the best
2  suspicious order monitoring process he has seen to
3  date and what he expected from a Mallin- -- from
4  Mallinckrodt as an industry leader, that's exactly
5  what I took away from that meeting.  And I was proud
6  of it, because we had developed and continued to
7  strive to put the very best program we could together
8  to ensure that we prevented diversion, so.
9    Q.   And you believe that DEA would be in a
10 position to know whether a program was good or not,
11 right?
12   A.   Yes, I think so, certainly someone at his
13 level.  That's a high level.
14   Q.   Okay.  But do you have -- you don't have
15 any recollection of DEA indicating that they had been
16 ineffective at stopping illicit sales of oxy 15 and
17 30-milligram tablets?
18   A.   That may have come up, but that was kind
19 of a common knowledge that they were having a
20 difficult time.  It's what I alluded to earlier this
21 morning that we thought they were using this to do
22 audits, and when we did -- sent them the letters and
23 so forth, it turns out they weren't doing that at all.
24 So we were a little surprised, but we -- I mean,

Page 218

1 that's all I have to say.
2    Q.   So did Mallinckrodt pay -- start paying
3 particular attention to oxy 15 and oxy 30 shipments as
4 a result of these concerns?
5    A.   We did all along.  It wasn't just because
6 of these concerns.  We were always concerned about
7 those shipments.
8    Q.   You were always concerned about the
9 shipment of oxy 15 and oxy 30?
10    A.   Yes.
11    Q.   Now, do you see the bottom paragraph that
12 says: "DEA had positive comments about Mallinckrodt
13 retaining Howard Davis"?
14    A.   Um-hum.
15    Q.   Who is Howard Davis?
16    A.   Howard Davis was a -- I believe he was a
17 diversion program manager in Atlanta, and so we were
18 trying to get a better understanding of what was
19 required by DEA.  So he retired.  He came to
20 St. Louis, we hired him as a consultant.  So he -- he
21 was supposed to look at our program and say, We can do
22 this or We can do that.  He was just taking our
23 program that was already written and maybe changing a
24 word here or there, but it was our program.  It had

Page 219

1 already been done.  And he worked on it for several
2 weeks.  And I was disappointed to say the least.  I
3 thought that having someone at that elevated position
4 would ensure we had the very best program possible for
5 an industry leader, and that's what we were, and he
6 were always striving to have the very best program
7 possible.  So we hired him and he was with us for a
8 short time.  I recommended him to go with another
9 registrant there in St. Louis.  And I know that he
10 eventually went over there and did work for them also.
11    Q.   And I'm sorry.  You indicated that you
12 were disappointed in him?
13    A.   I was hoping that he would have some magic
14 bullet, that he would come in and say, Oh, this is
15 what we are looking at, but he didn't have that.  He
16 took the program we had already written and was
17 basically copying it over and -- and polishing it a
18 little bit, but it really didn't change the substance
19 of that particular -- the program we had already
20 written, so.
21    Q.   And so you were looking for him to
22 substantively change the program or -- I'm not clear
23 on exactly why you were disappointed in him?
24    A.   Well, when you are always attempting to do

Page 220

1 better, you try to use every resource that you can,
2 and so that was a resource that we thought might be
3 able to help us.  And DEA recommended him.  Pete
4 Kleissle recommended the guy.  He said he was
5 wonderful, so, okay.
6    Q.   And he was a DPM, right?
7    A.   I believe so.
8    Q.   So he was the same level as Scott Collier?
9    A.   That's my memory, but he may have been the
10 same level as Pete Kleissle, but I believe he was a
11 DPM.
12    Q.   Okay.  So he had a very high level of
13 expertise, did he not?
14    MR. O'CONNOR:  Objection.
15 BY THE WITNESS:
16    A.   That was my hope.
17 BY MR. KAWAMOTO:
18    Q.   And you ultimately recommended him to
19 another manufacturer in St. Louis?
20    A.   I did.
21    Are we through with that document?
22    Q.   Yes.
23    (WHEREUPON, a certain document was
24    marked Mallinckrodt-Ratliff

Page 221

1    Deposition Exhibit No. 021, for
2    identification, as of 12/19/2018.)
3 BY THE WITNESS:
4    A.   Which one do you want me to read?
5 BY MR. KAWAMOTO:
6    Q.   Let's see.  Actually, why don't we focus
7 on the attachment.  So that's -- this document is
8 Bates No. 471744 and the attachment is Bates
9 No. 471750.
10    A.   Okay.
11    Q.   So this is an agenda from an August 23rd,
12 2011, meeting between you and the DEA at DEA
13 headquarters.
14    A.   Okay.
15    Q.   And do you see under Expected Attendees
16 that you are listed as an expected attendee?
17    A.   Um-hum.
18    Q.   Do you recall attending this meeting?
19    A.   I absolutely do.
20    Q.   Okay.
21    A.   That was the day they had the earthquake
22 in Washington, D.C.
23    Q.   And what do you recall about this meeting?
24    A.   That they were very specific about knowing

Page 222

1 our customer's customer, and they talked about some of
2 our distributors in detail, and we provided a lot of
3 information to them about what we were doing. And
4 they went, That's well and good, but you really need
5 to do this. And so when I left, this -- this is the
6 meeting I told you the following week I was in
7 Florida, this is what predicated that trip to Florida
8 was this specific -- this very meeting.
9      Q.   Now, prior to this meeting, though, you
10 had received indications that DEA expected you to know
11 your customer's customer, had you not?
12     A.   Yes.
13          MR. O'CONNOR:  Objection.
14          THE WITNESS:  I'm sorry.
15 BY MR. KAWAMOTO:
16     Q.   Do you recall any of the distributors that
17 were specifically discussed at this meeting?
18     A.   I do.
19     Q.   And who were they?
20     A.   The -- they call it the big three.
21     Q.   And so that would be?
22     A.   McKesson, Cardinal and AmerisourceBergen.
23     Q.   And did the DEA have concerns about these
24 distributors?

Page 223

1          MR. O'CONNOR:  Objection.
2          MS. KVESELIS:  Object to form.
3 BY THE WITNESS:
4      A.   They wanted to ensure that we looked at
5 their customers.
6 BY MR. KAWAMOTO:
7      Q.   And you say that -- I believe you said
8 that the DEA provided specific information about these
9 distributors.  Is that accurate or did I misunderstand
10 you?
11          MR. O'CONNOR:  Objection.
12 BY THE WITNESS:
13     A.   They named some of the people saying, If
14 it were me, I would look at these, their customers.
15 BY MR. KAWAMOTO:
16     Q.   And did they identify the -- or strike
17 that.
18          Did they identify specific customers'
19 customers that you should be looking at?
20     A.   No.
21     Q.   They just indicated that if they were you,
22 they would scrutinize the customers' customers of
23 these three -- these big three distributors?
24     A.   Right, because they are --

Page 224

1          MR. O'CONNOR:  Objection.
2 BY THE WITNESS:
3      A.   Right, because they are large and they --
4 they buy or they purchase large amounts of product and
5 distribute them, so, you know, that's why they were --
6 that's -- that's my opinion.
7 BY MR. KAWAMOTO:
8      Q.   And you indicated that when you went to
9 Florida, you and two other forensic analysts looked at
10 30 pharmacies, is that accurate?
11     A.   Yes.
12     Q.   Did that list of 30 pharmacies come from
13 this meeting or did you generate that independently?
14          MR. O'CONNOR:  Objection.
15 BY THE WITNESS:
16     A.   We used the -- the information that we
17 possessed to look at the customers of these -- these
18 three major distributors.  So we took the top ten
19 purchasers, that would be their customers, for each
20 one of those and then we divided those up into
21 territory and made assignments based on doing all 30
22 of those in a short period of time.
23 BY MR. KAWAMOTO:
24     Q.   Now, when you say you used the information

Page 225

1 that we possessed, are you referring to the chargeback
2 information, is that correct?
3      A.   Yes.
4      Q.   Do you know how long Mallinckrodt has been
5 collecting chargeback information for?
6          MR. O'CONNOR:  Objection.
7 BY THE WITNESS:
8      A.   No, no clue.
9 BY MR. KAWAMOTO:
10     Q.   Do you know if they had it in 2000?
11          MR. O'CONNOR:  Objection.
12 BY THE WITNESS:
13     A.   I didn't know about chargebacks until I
14 had been employed there a long time, so.  I didn't
15 know.
16 BY MR. KAWAMOTO:
17     Q.   But assuming this chargeback information
18 was available, you could have done this analysis
19 earlier?
20          MR. O'CONNOR:  Objection.
21 BY MR. KAWAMOTO:
22     Q.   It theoretically would have been possible?
23          MR. O'CONNOR:  Objection.
24 BY THE WITNESS:

Page 226

1     A.   Theoretically, if it was available and if
2 we knew it was available. The issue is that's
3 confidential customer data that if our -- our
4 competitors knew what we were selling to certain
5 customers, that would be valuable to them, and so that
6 was unknown to us for a long time because they were
7 protecting confidential information on our -- on our
8 customers. So --
9     Q.   And to be clear --
10     A.   -- and I understood that, so.
11        Sorry.
12     Q.   To be clear, when you say "they were
13 protecting confidential information," they were
14 protecting confidential information within the
15 company; in other words, they were protecting
16 confidential information from you and Karen Harper, is
17 that what you are saying?
18       MR. O'CONNOR: Objection.
19 BY THE WITNESS:
20     A.   They restricted access to that information
21 to all but need-to-know people within that department.
22 So, did they restrict it from Karen and I, one of
23 hundreds and hundreds of employees that didn't have
24 access to that information. So based on that, yes.

Page 227

1 But the answer is -- and I understood when they
2 explained initially that if this gets out, all of our
3 competitors will know how much we sell to everyone,
4 and that's really confidential, and I understood why
5 it was confidential. At that time I didn't know that
6 we could glean so much information or we needed to
7 know or customer's customer. You have to understand
8 that. Initially I didn't know that, one, we could do
9 that or that it was, you know, acceptable in the -- in
10 the manufacturing process with all of the
11 manufacturers that they could go out and see not only
12 to whom they are selling but whom those customers are
13 selling to, so.
14     Q.   But prior to 2011, the fact remains that
15 you and Karen Harper were not deemed to need to know
16 this information?
17       MR. O'CONNOR: Objection.
18 BY MR. KAWAMOTO:
19     Q.   Correct?
20     A.   No. I think we knew about it earlier and
21 I think we used it, and I think the first time that --
22 nah, that's just -- one of the pharmacies -- one of
23 the distributors had an issue and I know that they
24 pulled some information for us and told us it was

Page 228

1 highly confidential, so. So I think we -- we used it
2 at some point well before the 2011. I know we were
3 using it before that, so.
4     Q.   So, I mean -- so, are we talking about
5 2008, 2009 --
6     A.   Yeah, I --
7     Q.   -- roughly when?
8       MR. O'CONNOR: Objection.
9 BY MR. KAWAMOTO:
10     Q.   I mean, clearly 2011, you had access to it
11 before 2011?
12     A.   Um-hum.
13     Q.   But you don't have any idea how long
14 before then?
15     A.   Yeah, I -- I can't with specificity say it
16 was '09 or '0- -- you know, or '10 or -- I just can't.
17 I just don't recall.
18     Q.   And who made the decision to allow you to
19 have access to this chargeback information?
20     A.   I have no idea.
21     Q.   Did Karen Harper make that decision?
22     A.   Karen Harper didn't have the authority to
23 make that decision.
24     Q.   So who would have had the authority then?

Page 229

1     A.   I have no idea.
2     Q.   Well, the people -- I mean, the people
3 ahead of you and Karen Harper would have been the vice
4 presidents, or I'm just trying to now understand
5 Mallinckrodt's corporate structure?
6       MR. O'CONNOR: Objection.
7 BY THE WITNESS:
8     A.   I -- I literally don't know who possessed
9 the information or who was authorized to release the
10 information. That's -- I'm just telling you I don't
11 know.
12 BY MR. KAWAMOTO:
13     Q.   And you have no i- -- you don't have any
14 recollection of when you found out about it, or do you
15 recall how you found out about it?
16       MR. O'CONNOR: Objection.
17 BY THE WITNESS:
18     A.   I know at some point that we were able to
19 use some of that information.
20 BY MR. KAWAMOTO:
21     Q.   But this could have been in 2005, this
22 could have been in 2007, this could have been in 2009,
23 you just don't know?
24       MR. O'CONNOR: Objection.

Page 230

BY THE WITNESS:

1  A. I just don't know.
3 BY MR. KAWAMOTO:
4  Q. If I wanted to find out the answer to
5 this, who would I ask?
6  A. You'd have to find out who controls the
7 chargeback information.
8  Q. And so in terms of your access to the
9 chargeback information, did you have direct access or
10 did you make a request of someone and they provided
11 you with the data?
12  A. Karen Harper gave me the information on a
13 spreadsheet and said, These customers' customers are
14 buying this, and so I had a spreadsheet that listed
15 all of the names, okay, of those 30. So, who she
16 talked to, where she got that information, but she
17 provided it to me, and I was on a plane by myself to
18 go down and find all of these pharmacies to see, you
19 know, plus the additional help from the east side of
20 Florida.
21  Q. Now, you indicated at some point that
22 Mallinckrodt started using chargeback data in its
23 suspicious order monitoring program, right?
24  MR. O'CONNOR: Objection.

Page 231

1 BY THE WITNESS:
2  A. (Nodding head.)
3 BY MR. KAWAMOTO:
4  Q. So at that point who had access to this
5 information?
6  A. Well, it would have been Karen and if she
7 shared it with me, you know, the -- I'm just really
8 not trying to be -- I just don't remember. It's just
9 been too long ago to say it happened this time or this
10 person was present. At my age I'm -- I'm just doing
11 the best I can.
12  Q. Oh, I understand that. But we're talking
13 about highly sensitive information. And so you had
14 access to it, Karen Harper had access to it, so --
15  A. And I didn't have direct access. I
16 shouldn't have.
17  Q. But you didn't have direct access?
18  A. No.
19  Q. So Karen -- Karen Harper either had direct
20 access or could get it from someone?
21  A. Or she could ask for specific things that
22 she wanted.
23  Q. Okay. And she would provide that to you.
24 Did the --

Page 232

1  A. In this instance.
2  Q. Understood.
3     Did the national account managers have
4 access to this information via Karen Harper?
5  A. You are asking me questions I have no --
6 no clue as to who does. I just don't know.
7  Q. So you've indicated that you do recall
8 this August 2011 meeting. Do you have any specific
9 memories of any other meetings with DEA, or is it this
10 one and then you recalled the other one in St. Louis
11 from I believe 2010?
12  MR. O'CONNOR: Objection.
13 BY THE WITNESS:
14  A. I know that we had one where the plant
15 manager, Karen Harper and I were summoned to DEA about
16 some issue.
17 BY MR. KAWAMOTO:
18  Q. Do you recall the issue?
19  A. No. I just remember we went.
20  Q. Do you recall roughly when this occurred?
21  A. I have no clue.
22  Q. And the plant manager would have been who?
23  A. His first name was Paul.
24  Q. Okay. And I take if you don't recall the

Page 233

1 last name?
2  A. No.
3  Q. Okay.
4  A. I was lucky to recall Paul.
5  Q. Fair enough.
6     But at some point you, Karen Harper and
7 Paul were -- I assume DEA summoned you.
8     Would they -- do you know if they summoned
9 you to their St. Louis office or --
10  MR. O'CONNOR: Objection.
11 BY THE WITNESS:
12  A. No. That was in DC.
13 BY MR. KAWAMOTO:
14  Q. Okay. So you were summoned to DC?
15  A. Um-hum.
16  Q. Okay. Do you recall if it had anything to
17 do with diversion?
18  A. I don't think so, but I don't recall what
19 it was about. I mean, it wasn't an unpleasant
20 meeting.
21  Q. Would you describe the August 2011 meeting
22 as an unpleasant one?
23  MR. O'CONNOR: Objection.
24 BY THE WITNESS:

Page 234

1    A.   Based on my background and former Federal
2  law enforcement experience, it was unpleasant to me,
3  but not to everyone there.
4  BY MR. KAWAMOTO:
5    Q.   Okay.  Why was it unpleasant to you?
6    A.   They had -- they had diversion people from
7  other states, Detroit as I recall, St. Louis, and they
8  were being very stern in their presentation.  They had
9  never helped us before, they had never approved any of
10  our programs, but they were being very stern with us,
11  and I took that as being unpleasant.
12    Q.   And it's fair to say then that they were
13  very concerned, DEA was?
14    MR. O'CONNOR:  Objection.
15  BY THE WITNESS:
16    A.   That was my impression.
17  BY MR. KAWAMOTO:
18    Q.   Now, you indicated that you took this as
19  unpleasant but other people might not have.  Do you
20  have any -- do you have anyone in mind?  I mean, do
21  you know if Karen also took this meeting as an
22  unpleasant one?
23    MR. O'CONNOR:  Objection.
24  BY THE WITNESS:

Page 235

1    A.   You would have to ask Karen.
2  BY MR. KAWAMOTO:
3    Q.   Do you know if Karen was concerned about
4  this?
5    MR. O'CONNOR:  Objection.
6  BY THE WITNESS:
7    A.   I think we were both concerned.
8  BY MR. KAWAMOTO:
9    Q.   And you were concerned enough to get on a
10  plane the next day, is that correct?
11    MR. O'CONNOR:  Objection.
12  BY THE WITNESS:
13    A.   No.
14  BY MR. KAWAMOTO:
15    Q.   I'm sorry.
16    A.   We left the night before.
17    Q.   Yeah, you left earlier?
18    A.   We left -- no.  The earthquake occurred.
19  They closed down the airport for two-and-a-half, three
20  hours to make sure that all of the tanks, nothing had
21  cracked.  They had all kinds of issues, but we
22  eventually flew out that night to go back to
23  St. Louis.
24    Q.   And you flew to Florida from DC or did you

Page 236

1  fly first to St. Louis and then to Florida?
2    A.   To St. Louis.  We gathered the
3  information, it was given to me, and then I went to
4  Florida.
5    Q.   Okay.  So within 24 hours of this DEA
6  meeting, you were on a -- 48 hours your were on plane
7  going to --
8    A.   It was Friday, I believe, the meeting
9  occurred.
10    Q.   Okay.
11    A.   I could -- you could look up on the
12  calendar what day of the week it was, but it was the
13  following week when I left.
14    Q.   Okay.  Do you know what a 222 form is?
15    A.   Vaguely.  It's -- you transfor -- transfer
16  narcotics with it.  You have to have a 222 that says
17  what the product is to be transferred with the
18  product.  That's the best I can tell you.
19    Q.   Yeah.
20       And so Mal-- -- I'm just trying to
21  understand the mechanics.  Mallinckrodt would receive
22  this form along with the order request from its
23  customer?
24    A.   You are beyond me now.  I don't know.

Page 237

1    Q.   Okay.
2       (WHEREUPON, a certain document was
3       marked Mallinckrodt-Ratliff
4       Deposition Exhibit No. 022, for
5       identification, as of 12/19/2018.)
6  BY MR. KAWAMOTO:
7    Q.   So, directing your attention to the, I
8  guess the second page that says "Agenda," it says:
9  "Introduction - Bill Ratliff, Director" -- "Director
10  Security Tyco Healthcare."
11       Do you see that?
12    A.   Yes.
13    Q.   So did you present this PowerPoint?
14    A.   No.
15    Q.   Okay.  Did you help --
16    A.   I started "Welcome to the meeting" and
17  introduced everybody and more than likely I left.  I
18  had other responsibilities.
19    Q.   So you weren't -- you weren't involved in
20  the preparation of this PowerPoint --
21    A.   No.
22    Q.   -- to your recollection?
23    A.   No.  I'm not knowledgeable enough to
24  prepare this.

Page 238

1    Q.   And so if you count backwards, right
2  before the slide that says "Almost Over," you've got
3  this slide right here.  So it is almost at the very
4  end.
5    A.   Okay.
6    Q.   And so this is a presentation that --
7  well, strike that.
8         Do you see how it says:  "Refer any phone
9  calls to me concerning"?
10   A.   Say again.
11   Q.   The top line says:  "Refer any phone calls
12  to me concerning," and then it lists various items?
13   A.   I am on the wrong page here.
14   Q.   Okay.  So "Almost Over," it is going to be
15  the page right before.
16   A.   "Refer any phone calls"?
17   Q.   Yeah, "Refer any phone calls to me
18  concerning."
19        Do you know who the "me" is, is that --
20   A.   That would be Karen.
21   Q.   Okay.
22        (WHEREUPON, a certain document was
23        marked Mallinckrodt-Ratliff
24        Deposition Exhibit No. 023, for

Page 239

1        identification, as of 12/19/2018.)
2  BY MR. KAWAMOTO:
3    Q.   So this is an e-mail from Karen Harper to
4  you and others.  It is dated June 6th, 2008, and it is
5  419956.
6    A.   Okay.
7    Q.   If I could direct your attention to the
8  highlighted portion of this e-mail.
9         Can you please read that for me?
10   A.   "The group found it significant and
11  noteworthy that confirmation of the customer's current
12  DEA registration status and receipt of a DEA 222 form
13  are not alone adequate in determining whether an order
14  is suspicious."
15   Q.   Would you agree with that statement?
16   A.   If I could read it again, I'm --
17   Q.   Sure.
18   A.   Yeah, I don't know what it means.
19   Q.   Okay.
20   A.   It seems to be contradictory.
21   Q.   But you don't have any -- you don't have
22  any understanding of what this statement is referring
23  to or the requirement it is talking about?
24   A.   Well, normally if you have a DEA

Page 240

1  registration and you have a DEA 222, that wasn't -- or
2  not alone adequate in determining whether an order is
3  suspicious, that's -- if you had those, it would not
4  be deemed suspicious, so I don't know if they mixed up
5  their words or if Karen misspoke.  That doesn't sound
6  right.
7    Q.   But your understanding is that provided
8  that the customer had a current DEA registration and
9  it had a -- and it provided a 222 form, then its
10  orders were not suspicious -- were I guess de facto
11  not suspicious?
12   MR. O'CONNOR:  Objection.
13  BY THE WITNESS:
14   A.   Well, there are a lot of other factors
15  that go into that, so I'm not in a position to tell
16  you that that's -- makes it not suspicious.  I don't
17  know that, so.  You know, I know I was there at the
18  presentation.  I talked a little bit about security.
19  And Karen talked about the rest of this because I'm
20  not knowledgeable enough to really talk about it, so.
21  I would ask her about that specific statement if it
22  were me.
23  BY MR. KAWAMOTO:
24   Q.   Okay.  But your -- your understanding with

Page 241

1  respect to the DEA registration status and the 222
2  form is that if you have those two items, then your
3  order is -- you -- your order is -- is automatically
4  not suspicious or it's not suspicious?
5    A.   No.  Those things are necessary to process
6  an order and then a lot of other things go into it,
7  so.
8    Q.   So even if you have the registration
9  status and a valid 222 form, that's not the end of the
10  inquiry, is that your understanding?
11   A.   Correct, to the best of my knowledge.
12   Q.   So if I were to say -- if DEA were to
13  contact me and say we think this order is suspicious
14  and I were to tell them, No, I checked the
15  registration status and I got a 222 form that I
16  verified, that would not be adequate as a matter of
17  compliance?
18   MR. O'CONNOR:  Objection.
19  BY THE WITNESS:
20   A.   If DEA called and say thought -- they
21  thought it was suspicious, it's suspicious.  They are
22  our regulator.  So we would take their word as --
23  unless we had additional information, but we would
24  work with them to try to determine why they thought it

Page 242

1  was suspicious.
2  Q.  But it would not be proper to just rely
3  solely on the registration status and the 222 form in
4  determining whether or not to ship an order?
5  MR. O'CONNOR:  Objection.
6  MS. DURFEE:  Objection.
7  BY THE WITNESS:
8  A.  That's my opinion, but I'm certainly not
9  an expert in this.
10  (WHEREUPON, a certain document was
11  marked Mallinckrodt-Ratliff
12  Deposition Exhibit No. 024, for
13  identification, as of 12/19/2018.)
14  BY THE WITNESS:
15  A.  So I'm not named on this, so...
16  BY MR. KAWAMOTO:
17  Q.  No.
18  So I wanted to direct your attention to
19  the middle e-mail first.  It is from Jim Rausch to
20  Karen Harper, cc'ing George Saffold.
21  Do you know who Mr. Saffold is?
22  A.  No.
23  Q.  Okay.  And then can you read that sentence
24  that I highlighted?  And I understand you didn't

Page 243

1  receive this.
2  A.  "I have not had any orders in the
3  classification of peculiar that has not been cleared
4  and explainable thus far.  As we have discussed, it
5  takes time to get the information back from marketing
6  and sales, sometimes all day."
7  Q.  Again, the next sentence is?
8  A.  "Since I don't hold the orders up during
9  my due diligence, it's possible that the order could
10  ship."
11  Q.  Okay.  So, were you aware that Mr. Rausch
12  was not holding orders up while he was conducting his
13  due diligence on them?
14  MR. O'CONNOR:  Objection.
15  BY THE WITNESS:
16  A.  No.
17  BY MR. KAWAMOTO:
18  Q.  Okay.  If you had known that that was what
19  he was doing, would you have been concerned?
20  MR. O'CONNOR:  Objection.
21  BY THE WITNESS:
22  A.  It certainly should have been discussed
23  with -- or his boss.
24  BY MR. KAWAMOTO:

Page 244

1  Q.  And his boss would -- who would Jim's boss
2  have been?
3  A.  I have no clue.  I just don't know.  It
4  has been too many years.
5  Q.  Okay.  Fair enough.
6  All right.  I'm sorry.  Karen's -- Karen
7  Harper's e-mail at the very top, could you read the --
8  what she is saying, the highlighted sentence?
9  A.  "Jim, We absolutely did have the
10  discussion previously and there is no disagreement
11  now - I merely wanted to confirm that we have not
12  shipped any suspicious orders (even if we do the
13  investigation after the shipment).  The information is
14  being gathered for JoAnne and ultimately presentation
15  to Tim Wright about regulatory vulnerabilities.  Thank
16  you and have a great day."
17  Q.  Do you know who Tim Wright is?
18  A.  I think he was the present at the time.
19  Q.  And Karen is referencing a discussion, but
20  you weren't -- you weren't part of that discussion?
21  MR. O'CONNOR:  Objection.
22  BY THE WITNESS:
23  A.  No.
24  BY MR. KAWAMOTO:

Page 245

1  Q.  And you don't have -- you don't have any
2  opinion on this practice as you sit here today?
3  A.  I -- it's just been too long.
4  Q.  Okay.  Oh, I'm sorry.  I just -- I just
5  have two more questions.
6  A.  On that?
7  Q.  Yes, on that e-mail, so if you can look at
8  it.
9  The top e-mail on the back page, so that
10  would be Bates number 264413, that's from Jim Rausch
11  to Karen Harper again.
12  A.  Okay.
13  Q.  Can you read that e-mail from Jim?
14  A.  "Karen, yes, I run the checks every day as
15  I showed you.  As we discussed, I do not hold any
16  orders while I do my research due to the time" -- "due
17  to the time constraints."
18  Q.  Do you know what the reference to time
19  constraints means?
20  A.  When the trucks arrive or when it's
21  shipped, I don't know.
22  Q.  Okay.  And Jim --
23  A.  They don't ship out of headquarters.  Jim
24  worked at headquarters, so if that helps.

Page 246

```
1    Q.   And your understanding of -- or your
2  recollection of Jim's role is that he was reviewing
3  peculiar orders.
4        Is that accurate?
5    A.   Apparently based on this from Karen.
6    Q.   Okay.  Do you know if he was the only one
7  that was running checks on peculiar orders?
8    MR. O'CONNOR:  Objection.
9  BY THE WITNESS:
10   A.   I have no idea.
11   THE WITNESS:  Sorry.
12   MR. KAWAMOTO:  Could we take a break?
13   MR. O'CONNOR:  Sure.
14   MR. KAWAMOTO:  Is that fine with you?
15   THE WITNESS:  I'm good.
16   THE VIDEOGRAPHER:  We are going off the record
17  at 3:44.
18        (WHEREUPON, a recess was had
19        from 3:44 to 4:00 p.m.)
20   THE VIDEOGRAPHER:  We are back on the record at
21  4:00 p.m.
22   MR. KAWAMOTO:  So here is another exhibit.
23        (WHEREUPON, a certain document was
24        marked Mallinckrodt-Ratliff
```

Page 247

```
1        Deposition Exhibit No. 025, for
2        identification, as of 12/19/2018.)
3  BY MR. KAWAMOTO:
4    Q.   So this is a document Bates numbered
5  307322.  It's entitled "Global Controlled Substance
6  Compliance Procedure," and the subject is "Suspicious
7  Order Monitoring Customer Audit Program."
8    A.   Okay.
9    Q.   Mr. Ratliff, were you involved with this,
10  in the customer audit program?
11   A.   Yes.
12   Q.   And what was your role in it?
13   A.   On occasion I assisted Karen Harper with
14  conducting audits of our distributors.
15   Q.   And by "assisting," what do you mean by
16  that?
17   A.   We would travel to that distributor
18  together or she would fly in and I would be there from
19  another area and we would then do the audits.
20   Q.   And what did you look for when you were
21  conducting the audits?
22   A.   We had to provide their book or however
23  they con -- they had their suspicious order monitoring
24  program, if it was in a box or if -- whatever it was,
```

Page 248

```
1  but normally they had books that they would present
2  and they would -- Karen would go through the books and
3  I would be there and we would look at certain things
4  and we would ask questions about how they identified
5  their customers and that's pretty much it.  I mean,
6  there were -- we'd ask a number of questions, so.
7    Q.   What was the information that was
8  contained in these books?
9    A.   It was basically that -- in an attempt to
10  show they were in compliance with the -- with the
11  regulation requiring the -- they were preventing
12  diversion, so, it was basically their program.
13   Q.   And the revision date is 1/04/2011.
14        Do you recall when you started conducting
15  these audits?
16   A.   I don't.  But I believe it was before
17  that, would be my guess.  I shouldn't guess.  I can't
18  be accurate to know exactly when we started, but...
19   Q.   Do you have a rough sense of how far
20  before 2011 these started?
21   A.   The first audit -- there were two audits
22  and they were both in Cincinnati.  So if we could
23  detail that date, then I would know when it started.
24   Q.   And do you recall who was being audited?
```

Page 249

```
1    A.   Well, it was the Masters, maybe, and --
2  and I don't remember the other name.
3    Q.   And how were you identifying which
4  distributors to audit?
5    A.   Karen identified them and I went along to
6  assist.
7    Q.   Okay.  And do you recall how often a
8  distributor was audited, were they put on a cycle or
9  was it based on some other metric?
10   MR. O'CONNOR:  Objection.
11  BY THE WITNESS:
12   A.   These were the first audits that I was
13  involved in, so if they conducted other audits, I
14  don't know that.
15  BY MR. KAWAMOTO:
16   Q.   Do you recall any distributors that failed
17  their audits?
18   MR. O'CONNOR:  Objection.
19  BY THE WITNESS:
20   A.   I think Masters and the other one.  There
21  were some issues that we needed to address, so.  I
22  don't know that that's a pass/fail.
23  BY MR. KAWAMOTO:
24   Q.   And do you see Point 5 on Page 307323?
```

Page 250

1     A.   Um-hum.

2     Q.   It says: "In conjunction with Security,

3 notifies DEA in the event of adverse audit findings."

4        Do you recall doing that?

5     A.   I wouldn't have done it. Karen Harper

6 would have done that.

7     Q.   But do you have -- do you have -- well,

8 with respect to the -- with respect to the audits

9 where there were issues with the distributor, and I --

10 I believe you -- you think there were two of them that

11 you can recall, or is that number wrong?

12     MR. O'CONNOR: Objection.

13 BY THE WITNESS:

14     A.   Well, those were the initial -- those were

15 the initial ones that I was involved in. There was

16 another one in Kentucky. I can't remember the name of

17 the company. Those may have been the only -- the only

18 three that I was involved in.

19 BY MR. KAWAMOTO:

20     Q.   Now, you don't know if those results were

21 communicated -- were communicated to DEA?

22     MR. O'CONNOR: Objection.

23 BY MR. KAWAMOTO:

24     Q.   Well, let me rephrase that.

Page 251

1        You weren't involved in communicating

2 those results to DEA?

3     A.   Correct.

4     Q.   Okay. Do you have any specific

5 recollection or knowledge of Karen Harper doing so?

6     A.   Not a specific rec- -- recollection, I

7 don't.

8     Q.   Okay.

9        (WHEREUPON, a certain document was

10        marked Mallinckrodt-Ratliff

11        Deposition Exhibit No. 026, for

12        identification, as of 12/19/2018.)

13 BY MR. KAWAMOTO:

14     Q.   So this is a document entitled "Pharmacy

15 Information Sheet." It's Bates number is 570903.

16     A.   Okay.

17     Q.   Do you recognize this form?

18     A.   Yes.

19     Q.   What is it?

20     A.   This is the form I've been speaking of

21 that we used. We put all kinds of information in here

22 to help us make a determination if it should be a

23 continuing -- continuing with -- I'm getting really

24 tired, just so you know.

Page 252

1     Q.   Understood.

2     A.   Okay. I'm old.

3        That they should remain a customer of our

4 customer. So we -- we put down a lot of information

5 in there.

6     Q.   And so at the very bottom, do you see a

7 reference to "Suzanne Pea deactivated as customer on"

8 and then there is a blank.

9        Who was Suzanne Pea?

10     A.   I don't have a clue.

11     Q.   Now, at the very top it says: "If sales

12 of controlled substances restricted, effective date of

13 restriction: 10/5/11."

14        Do you see that?

15     A.   Where are you?

16     Q.   At the very top under "Current Status:

17 Sales of controlled substances restricted."

18     A.   Okay.

19     Q.   So as of 10/5/11, that's when the

20 restriction was imposed on Gulf Coast Medical

21 Pharmacy?

22     A.   Okay.

23     Q.   And then do you see that -- that the

24 information under Statistics?

Page 253

1     A.   Yes.

2     Q.   Can you review that?

3     A.   Okay.

4     Q.   And so the percentage of controlled

5 substances versus non-controlled substances was 90 to

6 10?

7     A.   Correct.

8     Q.   The top product by volume was oxy 30?

9     A.   Correct.

10     Q.   The volume of the oxy family was 3 million

11 tablets from 5/10 through 10/11 with approximately

12 225 -- 225,000 per month?

13     A.   Yes.

14     Q.   And the value of oxy 30 was 175,000 per

15 month?

16     A.   Okay.

17     Q.   And then it says cash sales versus

18 non-cash sales, 30 percent are in cash sales.

19        So would you find this -- this data to be

20 disturbing?

21     MR. O'CONNOR: Objection.

22 BY THE WITNESS:

23     A.   Yes. I testified in court and these

24 people were prosecuted by DEA.

Page 254

BY MR. KAWAMOTO:

Q. So this is pretty clearly a pill mill?

MR. O'CONNOR: Objection.

BY THE WITNESS:

A. That was my opinion.

BY MR. KAWAMOTO:

Q. Okay. Now, you also have your notes, because you visited this -- this pharmacy on September 13th, 2011?

A. I did.

Q. Okay. And you -- as you noted, you testified against them.

Now, under the status of Due Diligence, do you see that? It is on -- I'm sorry. It is on the front page.

A. Front page. Okay.

Q. It says: "Number of site visits and dates of each," and then it goes: "8/08, 4/09, 12/09, 10/10, 2/11 and 9/11."

Do you see that?

A. I do.

Q. Who was performing those visits?

A. I don't remember specifically at this time because of the time that's past, but I believe that

Page 255

was their distributor or their security person, so.

Q. So prior to you visiting this pill mill, it was visited five times by the security person for the distributor?

A. It's just been too long to -- to be absolutely positive that that's the case, but I received the information from someone, so.

Q. And that -- well, that -- that -- then that's what the data suggests, does it not?

A. Yes.

MR. O'CONNOR: Objection.

BY MR. KAWAMOTO:

Q. Okay. And yet this -- this pill mill was restricted on 10/5/2011.

In your opinion, shouldn't this pill mill have been shut down earlier?

MR. O'CONNOR: Objection.

BY THE WITNESS:

A. Should it have been shut down earlier?

BY MR. KAWAMOTO:

Q. Yes.

A. They were in a building with a number of pain doctors, and I would say yes.

Q. And so in your opinion this was a failure

Page 256

on the distributor's part, was it not?

MR. O'CONNOR: Objection.

BY THE WITNESS:

A. Yes.

MR. KAWAMOTO: Okay. Actually, could we go off the record very quickly.

THE VIDEOGRAPHER: We are going off the record at 4:11.

(WHEREUPON, a recess was had
from 4:11 to 4:18 p.m.)

(WHEREUPON, a certain document was
marked Mallinckrodt-Ratliff
Deposition Exhibit No. 027, for
identification, as of 12/19/2018.)

THE VIDEOGRAPHER: We are back on the record at 4:18.

BY MR. KAWAMOTO:

Q. So, sir, I've put another exhibit in front of you. Its Bates number is 571105, and it is another Pharmacy Information Sheet.

A. Yes.

Q. And the subject is this pharmacy is Lam's Pharmacy and it's in Las Vegas.

Okay. Could you quickly review this

Page 257

sheet?

A. Okay.

Q. So, if you look at the statistics, you have the percentage of controlled -- controlled substances versus non-controlled substances of 60/40.

A. Yes.

Q. You have the volume of controlled substances as 400,000 tablets per month.

A. Um-hum.

Q. The top product is once again oxy 30.

A. Um-hum.

Q. The volume of the oxy family is 3 million tablets from 5/10 through 10/11, approximately 160,000 per month, the volume of oxy 30 tablets ranges from 100,000 to 120,000 per month, and then the percent of cash sales versus non-cash sales is slightly more than 50 percent. And then in addition, apparently there was a recent indictment of a pharmacist, and then you also visited this site on 10/4/2011.

A. Um-hum.

Q. So in your opinion, is this a pill mill?

MR. O'CONNOR: Objection.

BY THE WITNESS:

A. Yes.

Page 258

BY MR. KAWAMOTO:

1  Q.  Okay.  Now, you'll note that under Due
2  Diligence you have site visit dates.
3  A.  Um-hum.
4  Q.  And it says:  "Mone visited CA 1/09."  And
5  there were a "Total of four visits by Mone, most
6  recent being 7/11," and yet this was shut down in
7  October of 2011.
8      Do you see that, sir?
9  MR. O'CONNOR:  Objection.
10 BY THE WITNESS:
11 A.  I do.
12 BY MR. KAWAMOTO:
13 Q.  Is this another instance where this pill
14 mill should have been shut down earlier --
15 MR. O'CONNOR:  Objection.
16 BY MR. KAWAMOTO:
17 Q.  -- given the due diligence that was
18 purportedly being done?
19 A.  Yes.
20 Q.  Okay.  Now, directing your attention to
21 the second page of this document, that's 571106.
22 A.  Um-hum.
23 Q.  Do you know why this was included in this

Page 259

1  file?  It's an e-mail from Mr. Lohman, and I will -- I
2  will represent to you that this came out of your
3  custodial file.
4  A.  Mine personally?
5  Q.  Yes.
6  A.  I was traveling with Mr. Lohman.
7  Q.  Okay.  And do you see the e-mail that
8  says:  "Ned called in to check SOM system and protect
9  Lam's in pharmacist sting/raid 8-2010"?
10 A.  I see it.
11 Q.  Okay.  And I believe Ned reference is a
12 reference to Ned Milenkovich, do you see that, because
13 it is a teleconference between Ted Milenkovich and
14 Donald Lohman?
15 MR. O'CONNOR:  Objection.
16 BY THE WITNESS:
17 A.  Okay.
18 BY MR. KAWAMOTO:
19 Q.  So Ned called Mr. Lohman and he wanted to
20 check the SOM system and protect Lam's in the
21 pharmacist sting/raid.
22     Do you know what that means?
23 MR. O'CONNOR:  Objection.
24 BY THE WITNESS:

Page 260

1  A.  No.
2  BY MR. KAWAMOTO:
3  Q.  Okay.  If Lam -- if -- if Ned were the --
4  representing the distributor, because I believe Ned is
5  an attorney, do you know why the distributor would
6  want to protect Lam's?
7  MR. O'CONNOR:  Objection.
8  BY THE WITNESS:
9  A.  I think Lam's changed hands and that after
10 the indictment, according to what the individual told
11 me, that's just based on my memory of it, he said, You
12 know, our pharmacist was indicted and we are -- we've
13 changed everything, DEA has been in here, and so.
14 BY MR. KAWAMOTO:
15 Q.  Okay.  Now, do you see the -- the heading
16 that says "Message"?
17 A.  Yes.
18 Q.  It says:  "No contractual relationship
19 with Lam's.  Suggested they call DEA.  Barb," I guess
20 Barb Boockholdt, "chief of regulatory section."
21 A.  Okay.
22 Q.  Do you know what's meant by "no
23 contractual relationship with Lam's"?
24 A.  I don't.

Page 261

1  Q.  Okay.  What about the -- the statement
2  "purpose - data review," do you see that?
3  A.  I do.
4  Q.  "Asked for our help.  I said no."
5      Do you know what that means?
6  A.  I don't.
7  Q.  Do you know if this was a request from
8  either Lam's or the distributor for access to
9  Mallinckrodt chargeback data?
10 MR. O'CONNOR:  Objection.
11 BY THE WITNESS:
12 A.  I don't remember ever seeing this
13 communication at all, and so I don't -- I don't know
14 the answer.
15 BY MR. KAWAMOTO:
16 Q.  Okay.  You can put that aside.
17     (WHEREUPON, a certain document was
18     marked Mallinckrodt-Ratliff
19     Deposition Exhibit No. 028, for
20     identification, as of 12/19/2018.)
21 BY MR. KAWAMOTO:
22 Q.  So, actually, this may be a relatively
23 short question.  Do you rec -- is this your
24 handwriting, sir?

Page 262

1   A.   Sadly it is.
2   Q.   Okay.
3   A.   It has gotten worse, too, just so you...
4   Q.   Fair enough.
5        Reviewing this, do you -- do you know what
6   these notes refer to?
7   A.   I know I met with George Euson at one
8   time.  And a lot of this information came from him.  I
9   don't know what -- what is confusing to me, those
10  other names.
11  Q.   Okay.
12  A.   But this was before he went down to
13  Florida to do the investigation.
14  Q.   But as you sit here today, you don't know
15  what these notes refer to?
16  A.   Well, they refer to that meeting with
17  George.
18  Q.   Okay.  And does this refresh your
19  recollection as to what you discussed in that meeting?
20  A.   Well, I can read it all to you, but
21  it's -- basically what he was telling me they were
22  doing.  He was --
23  Q.   And -- I'm sorry.
24  A.   He came over to discuss this with us and

Page 263

1   to explain to us that the owner had told him to go to
2   Florida and look at all of these pharmacies and they
3   weren't going to ship anything until -- until they
4   made their determination if it was a legitimate
5   pharmacy or not.
6   Q.   And this was the e-mail that we reviewed
7   near the beginning of the deposition, right --
8        MR. O'CONNOR:  Objection.
9   BY MR. KAWAMOTO:
10  Q.   -- regarding H.D. Smith and pain
11  management clinics?
12       MR. O'CONNOR:  Objection.
13  BY THE WITNESS:
14  A.   Okay.  Yeah, I don't remember that
15  exactly, but I take notes and then I write from the
16  notes.
17  BY MR. KAWAMOTO:
18  Q.   And then do you see at the end -- or
19  towards the bottom of Page 386471?
20  A.   Yes.
21  Q.   That's:  "106 pharmacies have been cut
22  off."  Is that -- does that mean that H.D. Smith had
23  stopped doing business with 106 pharmacies?
24  A.   There is 164 pharmacies have been cut off.

Page 264

1   It's a 1-6-4.
2   Q.   Yes.  So I'm sorry.  164 pharmacies have
3   been cut off?
4   A.   Yeah.  That information was given to me,
5   so.
6   Q.   Okay.
7   A.   I made a star by it because obviously -- I
8   put a star by it because normally when I do that to me
9   that is -- shows to me later that it was important.
10  Q.   And then at the very bottom of Page 472,
11  do you see the reference to "298 accounts walked
12  away"?
13  A.   Uh-huh.
14  Q.   Do you know what that means?
15  A.   I don't.  I just -- let me have a little
16  due diligence.
17       I don't know the answer to that.
18  Q.   Okay.  That's fine.
19       So I have another PowerPoint that I would
20  like you to look at.  This was produced to us in
21  native form, so I've manually put the Bates number on
22  it.  The Bates number is 2694677.
23       (WHEREUPON, a certain document was
24            marked Mallinckrodt-Ratliff

Page 265

1            Deposition Exhibit No. 029, for
2            identification, as of 12/19/2018.)
3   BY MR. KAWAMOTO:
4   Q.   And because this isn't numbered, I'll use
5   the Elmo to sort of identify what I want to direct you
6   to.
7        So the first page is EXALGO Utilization by
8   Julie Milford.
9        Do you know who Julie Milford is?
10  A.   No clue.
11  Q.   Okay.  And then if you turn into the
12  PowerPoint, there is "National Use of Opioids, Heat
13  Maps of Units Through Cash Transactions."
14  A.   Where are you?
15  Q.   I'm probably -- I'm around -- I'm on
16  Page 6 of the PowerPoint.
17  A.   Okay.
18  Q.   Okay.  So:  "National Use of Opioids, Heat
19  Maps of Units Through Cash Transactions."
20  A.   Okay.
21  Q.   And then the methodology is -- do you see
22  the -- do you see the second bullet point?
23  A.   "Product basket," is that what you are
24  asking?

Page 266

1    Q.   Yes.
2         "Product basket included therapies and
3    strengths known to be highly abused, as well as
4    EXALGO."
5    A.   Okay.
6    Q.   Do you know what -- what analysis is being
7    done or what analysis is being presented in this
8    PowerPoint?
9    A.   No.
10   Q.   Okay.  Were you aware that anyone in
11   Mal -- at Mallinckrodt was developing heat maps of
12   units through cash transactions?
13   A.   Okay.
14   Q.   Now, crash transactions are a potential
15   indicator of diversion, are they not?
16   MR. O'CONNOR:  Objection.
17   BY THE WITNESS:
18   A.   You are saying these are cash?  The last
19   two years...  Yeah, I don't know.  I don't know where
20   that information would come from even.
21   BY MR. KAWAMOTO:
22   Q.   And then if you look on the second page of
23   the methodology, do you see the two bullet points:
24   "Calculated the per capita rate of cash Rx tablets for

Page 267

1    each three-digit zip code"?
2         Do you see that?
3    A.   Yes.
4    Q.   And then underneath that:  "Coded per
5    capita rates into five different groupings to produce
6    heat maps."
7    A.   Okay.
8    Q.   Dark red is a "'Critical Spot' with 2 to 3
9    cash tablets per person."
10        Would this type of analysis have been
11   helpful in developing anti-diversion measures?
12   MR. O'CONNOR:  Objection.
13   BY THE WITNESS:
14   A.   I don't recall ever seeing it, but it's on
15   Covidien's -- you know, it was produced by someone
16   from Covidien apparently, so they were trying to -- to
17   make some sense of it, I guess.  I mean, I just don't
18   remember.
19        Do you know when it was produced?  Was I
20   even with the company?
21   BY MR. KAWAMOTO:
22   Q.   I'll be honest, I -- I don't know that.
23   A.   Yeah.
24   Q.   It says "April 2011" and then "Patient

Page 268

1    counts increased considerably since 2012."
2    A.   Yeah.
3    Q.   So...
4    A.   And the reason I say that is I have been
5    gone six-and-a-half years, as you've -- as I've noted
6    a number of times.  I just don't remember seeing
7    anything even like this.  And, you know, it's possible
8    that it was created while I was there, but I just
9    don't recall it, so.
10   Q.   Now, you weren't aware of anyone doing
11   this type of analysis while you were at Mallinckrodt?
12   MR. O'CONNOR:  Objection.
13   BY THE WITNESS:
14   A.   Not personally.
15   BY MR. KAWAMOTO:
16   Q.   So this is not something you recall Karen
17   Harper ever sharing with you?
18   A.   No.
19   Q.   Okay.  Would this information have been
20   helpful to you as director of security?
21   MR. O'CONNOR:  Objection.
22   BY THE WITNESS:
23   A.   I would say, yes, it would be helpful to,
24   but I don't know -- the problem I'm having with this

Page 269

1    is I don't know if it's just our customers or if it's
2    from some national database that has, you know, EXALGO
3    patient account trends.  I'm not -- did we manufacture
4    EXALGO?  I don't remember.
5    BY MR. KAWAMOTO:
6    Q.   Well, regardless --
7    A.   So, IMS NPA --
8    Q.   Oh, sorry.
9    A.   -- IMS, a Marketing -- a Market Dynamics.
10   That's the source.  IMS NPA, IMS NPA Market Dynamics.
11   So, without knowing who that is...  IMS Xponent
12   Plantrak.  I don't know where the information came
13   from, I don't know how I could accept -- how I could
14   determine how accurate it is without knowing or having
15   more information.
16   Q.   And you are not familiar with IMS Xponent
17   Plantrak, are you?
18   A.   No.
19   Q.   But a database that tracked cash
20   transactions of prescription opioids, that information
21   would be potentially helpful?
22   MR. O'CONNOR:  Objection.
23   BY MR. KAWAMOTO:
24   Q.   Assuming its accurate?

Page 270

1    A.   Right, and -- and assuming that it's our
2   customers.  See, we don't know it's our customers.  We
3   don't know based on the information provided if it's
4   all of the manufacturers or -- or where the
5   information came from.  There is no way even looking
6   at it at this time to say that these are our customers
7   or how they would be able to divide that out and how
8   IMS Xponent Plantrak would be able to divide that out.
9    Q.   So even if it weren't limited to just your
10  customers, it was national, so it was your customers
11  and others, would it knowing certain regions that
12  were -- that had a very high level of cash
13  transactions for opioids be helpful in terms of
14  targeting your own audit efforts?
15       MR. O'CONNOR:  Objection.
16  BY THE WITNESS:
17       A.   Oh, I think we knew a lot of this
18  information for our customers and that's what we were
19  focusing on, so.  But I -- I just don't have enough
20  information to know where this came from.
21  BY MR. KAWAMOTO:
22       Q.   But you had a sense for your customers
23  the -- the amount and the location of cash
24  transactions?

Page 271

1        MR. O'CONNOR:  Objection.
2   BY THE WITNESS:
3        A.   I don't know that I could separate down to
4   cash transactions.  Once we started sending those
5   forms out, the distributors had to fill out all of
6   that information.  And so when we talked previously,
7   the distributor filled out all of the information and
8   then I took that information and used it in our audits
9   of those -- our customer's customer.
10  BY MR. KAWAMOTO:
11       Q.   Okay.
12          (WHEREUPON, a certain document was
13           marked Mallinckrodt-Ratliff
14           Deposition Exhibit No. 030, for
15           identification, as of 12/19/2018.)
16  BY MR. KAWAMOTO:
17       Q.   So this is an e-mail chain between you and
18  Karen Harper regarding Sunrise Wholesale, and it's
19  Bates No. 290601.
20       A.   Okay.
21       Q.   Okay.  And if I could direct your
22  attention to -- let's start with the very back e-mail
23  on Page 290603.
24       A.   Sorry.  The back of --

Page 272

1        Q.   Sure.  It is on Bates number 290603.
2        A.   Okay.
3        Q.   So this is an e-mail from Victor Borelli
4   to Brenda Rehkop.
5          Do you know who Brenda was?
6        A.   No.
7        Q.   Okay.  Do you know who Victor Borelli is?
8        A.   He was one of our salespeople.
9        Q.   Did you work with him?
10       A.   No.
11       Q.   Did you -- no.
12          So that e-mail above it -- well, I'm
13  sorry.
14          The e-mail from Victor indicates that they
15  are -- they are setting up a new account for Sunrise,
16  is that accurate?
17       A.   Be more specific.  Which one are you
18  looking at, the very first one?
19       Q.   The very first one in the chain dated
20  May 20th, 2008, at 7:57 a.m.
21       A.   Okay.  "Who is going to be the customer
22  service manager for this new account and can I have
23  that person's phone, fax, e-mail, et cetera.  I am
24  traveling down to the account and want to supply them

Page 273

1   with all of the proper information.  Also, they will
2   buying -- be buying C2s as well.  What address to
3   they," but it should be "do they send that to?"
4        Q.   So this is -- this is a new account.
5        A.   Okay.
6        Q.   And then the e-mail above it is an e-mail
7   from Brenda to Victor Borelli along with Cathy --
8   Cathy Stewart and Connie Gregory.
9          Do you see that?
10       A.   I do.
11       Q.   And the -- the paragraph, do you see the
12  paragraph:  "The 222 forms total 195,000"?
13       A.   Yes.
14       Q.   Okay.  So could you please read that?
15       A.   "The 222 forms total 195,000.  I have put
16  the last" -- "the latest and largest order on hold (it
17  is also waiting to be allocated) till I hear from you.
18  Were you expecting Sunrise to place such a large
19  order?  And do they really want 2,520 bottles of
20  oxycodone HCL 30-milligram tabs USP, 100 count each?"
21       Q.   So this is the initial order from Sunrise
22  to Mallinckrodt, and right off the bat they want
23  2,520 bottles of oxy 30, is that accurate?
24       MR. O'CONNOR:  Objection.

Page 274

BY THE WITNESS:

1    A.   Yes.

BY MR. KAWAMOTO:

4    Q.   Okay.  And then there is an e-mail from
5 Cathy Stewart to you and Karen Harper.  That's on the
6 first page, 290601.

7    A.   Front page?

8    Q.   Front page, very top of the front page,
9 29 -- 290601.  I'm sorry.  I'll put it up on the Elmo.

10    A.   It says, "From Bill Ratliff"?

11    A.   Yes, exactly.

12    A.   To Harper?

13    Q.   Yep.

14         And so can you read your e-mail?

15    A.   "Karen seems" -- "Karen, seems to be a lot
16 of product for the first order especially in light of
17 the new customer status and credit limit.  Do you know
18 if they completed the D&B?" which would be
19 Dun & Bradstreet.

20    Q.   And what would the -- what would D&B be,
21 or what -- what was that?

22    A.   It tells a lot about their -- their
23 liability as a company, how long they've been in
24 business, the amount of cash that they have.  It's --

Page 275

1 there is a lot of information in a Dun & Bradstreet
2 report.

3    Q.   And so it's essentially their -- the
4 financial condition of the company, is that fair?

5    A.   That's correct.

6    MR. O'CONNOR:  Objection.

BY MR. KAWAMOTO:

8    Q.   Okay.  But given their status as a new
9 customer and their credit limit, and actually, if you
10 look down at the bottom of the page, do you see the
11 credit limit is 35,000?

12    A.   Um-hum.

13    Q.   So in light of their status as a new
14 customer and the credit limit of 35,000, you -- you --
15 you believe -- or your impression is that this is a
16 lot of product, is that fair?

17    A.   Yes, that's fair.

18    Q.   Okay.  So would it be accurate to say that
19 you had -- you felt that this order should be subject
20 to some review?

21    MR. O'CONNOR:  Objection.

BY THE WITNESS:

23    A.   Yes.

24    THE WITNESS:  I'm sorry.

Page 276

BY MR. KAWAMOTO:

2    Q.   Okay.

3         Okay.  So my apologies.  This is an
4 exhibit, but they are not stapled, so I'm going to try
5 to keep them separated, but there are three copies
6 right there.

7    MR. O'CONNOR:  Is there any chance you guys have
8 another copy or are we down to three here?

9    MR. KAWAMOTO:  There are -- yes, there are
10 three -- there are three copies.

11    MR. O'CONNOR:  Okay.

12         (WHEREUPON, a certain document was
13         marked Mallinckrodt-Ratliff
14         Deposition Exhibit No. 031, for
15         identification, as of 12/19/2018.)

16 BY MR. KAWAMOTO:

17    Q.   And I want to -- what I want to focus is
18 your attention on the very top e-mail, Mr. Ratliff.
19 It is from Karen Harper to you.

20    A.   Okay.

21    Q.   Okay.  So can you please read that?

22    A.   I can.

23         "I have placed a call to Sue Marlatt
24 (credit manager who is also working on our suspicious

Page 277

1 order monitoring team) to ask her for a better
2 interpretation of the Dun & Bradstreet and gave her my
3 cell number.  Rhonda Hart has been dealing with this
4 account and reports to Sue.  Rhonda indicated their
5 D&B results show an extremely small company.  Sunrise
6 has a two screen informational web page and a contact
7 us e-mail screen.  E-mail address is @Yahoo.com, so it
8 doesn't look like a very big company there either.
9 Web page says established in 2003."

10    Q.   So did this information do anything to
11 allay your concerns with their order, their initial
12 order?

13    MR. O'CONNOR:  Objection.

14 BY THE WITNESS:

15    A.   To be honest, I don't know if it was
16 filled or not at this time.  I just don't know.

17 BY MR. KAWAMOTO:

18    Q.   Okay.  But in light of this information,
19 you -- it's your opinion that this order should have
20 been subject to additional scrutiny?

21    MR. O'CONNOR:  Objection.

22 BY THE WITNESS:

23    A.   Yes.

24 BY MR. KAWAMOTO:

Page 278

1    Q.   Okay.
2         (WHEREUPON, a certain document was
3         marked Mallinckrodt-Ratliff
4         Deposition Exhibit No. 032, for
5         identification, as of 12/19/2018.)
6    BY THE WITNESS:
7    A.   Okay.
8    BY MR. KAWAMOTO:
9    Q.   Okay.  So directing your attention to the
10   front page of this e-mail -- oh, I'm sorry.  This is
11   an e-mail chain between you and Cathy Stewart, Susan
12   Marlatt and Karen Harper, among others.  Its Bates
13   number is 290580.
14   A.   Okay.
15   Q.   And the e-mail from Susan Marlatt, do you
16   see it says: "We have completed our check"?
17   A.   Um-hum.
18   Q.   And then your response is:  "This should
19   be your decision based on the credit checks.  If they
20   are qualified, Karen and I don't need to make the
21   decision.  This will become easier as we go.  Have a
22   good weekend."
23        So what -- what are you saying in that
24   e-mail?

Page 279

1    A.   That the -- there was nothing negative in
2    the credit checks to indicate that -- that the -- that
3    there were -- there was any background that would
4    prevent us from doing business with them based on what
5    Dun & Bradstreet came back with, so.
6    Q.   But the credit check doesn't address the
7    fact that their initial order, and they are an
8    extremely small company and with a Yahoo e-mail
9    address, was 2,500, correct?
10   MR. O'CONNOR:  Objection.
11   BY MR. KAWAMOTO:
12   Q.   So shouldn't you and Karen have been the
13   ones to sign off on that initial 2,500 order?
14   A.   I don't think so.  It's a -- I mean, there
15   are certain things that we do to ensure that they are
16   creditworthy, that they are a legitimate company, and
17   all of those things were done.  So what they are
18   saying is they -- they obviously broke the order up so
19   they didn't go over their -- their credit limit.
20   Q.   But your initial reaction was that 2,500
21   seems like an awfully large order for such a new
22   customer with such a small credit limit, and you later
23   learned that it is an extremely small company with an
24   @Yahoo e-mail address?

Page 280

1    A.   Um-hum.
2    Q.   And how -- how does a credit check
3    reassure you that this order isn't excessive for such
4    a small institution?
5    MR. O'CONNOR:  Objection.
6    BY THE WITNESS:
7    A.   Well, and there is -- there is certain
8    things we can do, and so, I mean, we do -- in the
9    normal course of business we do credit checks and --
10   and just to see if the company is viable, how long it
11   has been in business and so forth.  There were no --
12   nothing other than the amount was a flag at all.  It
13   just seemed it was a new customer and they were trying
14   to establish an amount that they could start their
15   distribution network with, so.
16   Q.   But it is a new customer asking for
17   2,500 bottles of oxy 30, and that -- and oxy 30 is, as
18   we've discussed is --
19   A.   Yeah.
20   Q.   -- one of Mallinckrodt's most heavily
21   abused products --
22   A.   Yeah.
23   Q.   -- is that true?
24   MR. O'CONNOR:  Objection.

Page 281

1    BY MR. KAWAMOTO:
2    Q.   Okay.  So at the very top, do you see
3    that, can you please read your e-mail right up here?
4    A.   I said: "Sorry for not being more clear.
5    This is a new customer that has cleared credit
6    references.  The salesman has not raised any issues of
7    substance.  Therefore, this should be approved in the
8    normal course of business, not by Karen or me.  If I
9    have missed something, please let me know."
10   Q.   So is what you are saying is that
11   notwithstanding the fact that this order appears
12   large, because the credit checks were clear and the
13   salesman doesn't have any concerns, you know, there is
14   nothing for you or Karen to approve?  Am I
15   interpreting that correctly?
16   A.   Yes.
17   Q.   Okay.  Now, if the salesman had raised
18   issues, then would that be a different matter?
19   A.   Absolutely.  Then we wouldn't have shipped
20   it at all.
21   Q.   Okay.  Does the salesman have an incentive
22   to let orders go through --
23   MR. O'CONNOR:  Objection.
24   BY MR. KAWAMOTO:

Page 282

1    Q.   -- because of their compensation scheme?

2    A.   I don't know how they are compensated.

3    Q.   And what does a clear -- what does a clear

4    credit reference tell you in terms of the risk of

5    diversion?  I mean, the clear -- I mean, credit

6    references measure the -- a company's financial

7    health, right?

8    A.   Yes.

9    Q.   And so if a company is profitable, that

10   doesn't necessarily tell you that, you know, their

11   orders aren't suspicious or their orders are proper,

12   does it?

13   A.   There was nothing negative in the -- in

14   the report at all to say they were late in paying or

15   that they had had any issues at all.  So,

16   Dun & Bradstreet is a very prominent source for -- we

17   used it in the FBI, so.

18   Q.   Well, sir, I mean, pill mills have the

19   potential to be highly profitable, don't they?

20   MR. O'CONNOR:  Objection.

21   BY THE WITNESS:

22   A.   At the time we didn't know it was a pill

23   mill, so.

24   (WHEREUPON, a certain document was

Page 283

1    marked Mallinckrodt-Ratliff

2    Deposition Exhibit No. 033, for

3    identification, as of 12/19/2018.)

4    BY MR. KAWAMOTO:

5    Q.   So this is another e-mail chain dated

6    5/22/2008 between Cathy -- and it's from Cathy Stewart

7    to you and Karen Harper.  And you can tell from the

8    subject line that this relates to the new customer

9    Sunrise Whole -- Wholesale, correct?

10   A.   Um-hum.

11   Q.   Okay.  Can you please read the top e-mail

12   that I just highlighted?

13   A.   I don't see it on the screen.

14   Q.   Oh, no, I'm sorry.  My apologies.

15   A.   Okay.  "FYI - the customer service reps

16   all state that Victor will tell them anything they

17   want to hear just so he can get the sale."

18   Q.   Okay.  And Victor is Victor Borelli,

19   correct?

20   A.   Correct.

21   Q.   And he is a sales -- he is the manager or

22   the sales rep for this new customer, is he not?

23   MR. O'CONNOR:  Objection.

24   BY THE WITNESS:

Page 284

1    A.   Apparently, yes.

2    BY MR. KAWAMOTO:

3    Q.   Okay.  And so you have Cathy Stewart

4    telling you that the customer service reps -- well,

5    strike that.

6    If you need to, you can -- you can

7    reference the prior e-mail, but one of the bases that

8    you were provided or you indicated for the approval of

9    the order was that the salesman had not raised any

10   issues of substance.

11   Do you recall that?

12   A.   Yes.

13   Q.   So here you have an e-mail from Cathy

14   Stewart to you and Karen Harper --

15   A.   Um-hum.

16   Q.   -- indicating that the sales rep Victor is

17   going to tell people anything they want to hear just

18   so he can get the sales through?

19   A.   Um-hum.

20   MR. O'CONNOR:  Objection.

21   BY MR. KAWAMOTO:

22   Q.   Didn't that concern you?

23   A.   This is after the fact that the order --

24   the other is in --

Page 285

1    Q.   Well --

2    A.   -- May 24th -- well, no, it's not.  I know

3    that Victor wasn't a very popular person, so.

4    Q.   Do you think he was an honest person?

5    A.   I don't know that.

6    Q.   Do you think he was reliable?

7    MR. O'CONNOR:  Objection.

8    BY THE WITNESS:

9    A.   I don't know that either.  I just know he

10   wasn't very popular.

11   BY MR. KAWAMOTO:

12   Q.   Do you know why he wasn't popular?

13   A.   No.

14   Q.   In light of this information from Cathy

15   regarding Victor, did you or Karen do anything to try

16   to verify, you know, Victor's assessment of this new

17   customer?

18   A.   I think that's --

19   MR. O'CONNOR:  Objection.

20   BY THE WITNESS:

21   A.   I think that's when they did the audit, or

22   did they do the audit shortly thereafter?

23   BY MR. KAWAMOTO:

24   Q.   I'll represent to you I don't believe that

Page 286

1 they did audit in -- in the summer of 2008.

2     A. Okay. I don't know that, so.

3     Q. So to the best of your recollection,

4 nothing was -- was done in response to this

5 particular --

6     A. No.

7     Q. -- piece of information?

8     A. I do know that they represented there was

9 a DEA agent that was working with them to ensure they

10 were in total compliance. And in talking to DEA after

11 the fact they said, Well, he is not the most reliable

12 person either. But there was no way for us to

13 determine that earlier, so.

14     Q. And so just so I'm clear, in terms of

15 the -- the origination history for Sunrise

16 Wholesale --

17     A. Um-hum.

18     Q. -- you have an extremely small company

19 with a Yahoo e-mail address that contacts Mallinckrodt

20 asking for 2500 bottles of oxy 30. The sales rep,

21 Mr. Borelli, is someone that his colleagues indicated

22 is unpopular. And, in fact, Cathy says, you know,

23 "Victor will tell them anything they want to hear just

24 so he can get the sale." And nevertheless, this --

Page 287

1 this customer was accepted and this order was approved

2 in the ordinary course.

3     Is that correct, sir?

4     MR. O'CONNOR: Objection.

5 BY THE WITNESS:

6     A. I was just looking at the order amount

7 again.

8 BY MR. KAWAMOTO:

9     Q. Well, the order amount is at the bottom of

10 3028219, so the e-mail we were just looking at from

11 Cathy Stewart.

12     A. 2,520 bottles. Okay. Yeah.

13     Q. Doesn't this suggest a -- a breakdown in

14 the review process?

15     MR. O'CONNOR: Objection.

16 BY MR. KAWAMOTO:

17     Q. For either -- for both no clients and

18 orders, sir?

19     MR. O'CONNOR: Objection.

20 BY THE WITNESS:

21     A. It has been ten years ago. I know

22 initially we did an audit and that they are no longer

23 in business, so.

24 BY MR. KAWAMOTO:

Page 288

1     Q. But you didn't audit them before shipping

2 this order for 2,500 bottles of oxy 30?

3     A. No.

4     Q. Okay. Should you have?

5     MR. O'CONNOR: Objection.

6 BY THE WITNESS:

7     A. Well, if you are saying is hindsight

8 20/20, you know, maybe we should have -- should have

9 at least looked at it, so, but we did what we thought

10 was appropriate at the time.

11         (WHEREUPON, a certain document was

12         marked Mallinckrodt-Ratliff

13         Deposition Exhibit No. 034, for

14         identification, as of 12/19/2018.)

15 BY MR. KAWAMOTO:

16     Q. So, Mr. Ratliff, this is an e-mail from

17 Mr. Harper -- I'm sorry -- Ms. Harper to you. It is

18 dated November of 2008. And you'll see from the the --

19 the e-mail string that this, once again, is Sunrise

20 Wholesale. So if I can direct your attention to the

21 bottom e-mail that spans 307120 and 307121.

22     A. Okay. I'm just trying to figure out,

23 there is a from Karen to me, FYI.

24     Q. Yes, understood.

Page 289

1     A. Okay.

2     Q. She is forwarding you this e-mail chain.

3     And actually, sir, if I can ask you to

4 read the e-mail on the back page, which I've -- I've

5 highlighted?

6     A. "Just a quick FYI regarding Sunrise. As

7 you know, they have been growing in sales each and

8 every month and when I was visiting them this week,

9 they introduced me to their new sales manager. He was

10 Anda's No. 1 salesman and brings a wealth of knowledge

11 and systems to Sunrise. This salesman is extremely

12 tied to the Florida market and has been the cause of

13 most of the growth (new customers, contacts" --

14 "contacts, et cetera). In addition to the recently

15 hired sales manager, they are adding five additional

16 salespeople, as well as additional states to

17 distribute product to. To make a long story short, I

18 wanted to" -- "you to be aware of their growth and to

19 supply you with some new monthly sales projections for

20 this account. Beginning in January, can we raise our

21 projections for Sunrise: Oxy 15-milligrams: 3,000

22 bottles; oxy 30s: 12,000 bottles. Hope this" --

23     Q. So the date of this -- I'm sorry, sir.

24     A. I'm sorry. You wanted me to read more?

Page 290

1    Q.   The date of this e-mail is November, 2008,
2  so this would be approximately five or six months
3  after they first became a Mallinckrodt customer?
4    A.   Yes.
5    Q.   And they are increasing their oxy 30 order
6  from 2,500 bottles to 12,000 bottles per month.
7       Do you see that?
8    A.   I do.
9    Q.   Doesn't that increase -- shouldn't that
10  increase cause some concern?
11    A.   That's easy to say now.  I don't know that
12  I knew that at the time.
13    Q.   Well, but, sir, at the time, this is what
14  you did know, this is an extremely small company, they
15  start off right off the bat asking for 2,520 bottles
16  of OxyContin.  The sales rep that's in charge of this
17  account, you receive an e-mail that he will say
18  anything to get his sales through.  And then five or
19  six months later he is sending another e-mail saying
20  to everyone, They are going to increase their volume
21  from 2,520 to 12,000 bottles and they are then going
22  to add 3,000 bottles of oxy 15.
23       Isn't this problematic, sir?
24    MR. O'CONNOR:  Objection.

Page 291

1  BY THE WITNESS:
2    A.   I'm just wondering when we did our audit.
3  Do you have that information?
4  BY MR. KAWAMOTO:
5    Q.   I believe it was in 2009.
6    A.   Okay.  Early 2009 or --
7    Q.   Well, I think we'll -- I think we'll get
8  to it, but it's -- let me see if I can find that
9  information for you.
10       I be -- I believe it is August of 2009.
11    A.   Okay.  Six months after this, so.
12    Q.   Well, actually, sir, that would be nine --
13  that would be nine months after this, because August
14  of 2009, this is November of 2008.
15    A.   Okay.
16    Q.   Did -- did anyone do anything to try to
17  verify Mr. Borelli's information about Sunrise?
18    A.   I don't know.
19    Q.   In your opinion, should something have
20  been done to try to verify this information?
21    MR. O'CONNOR:  Objection.
22  BY THE WITNESS:
23    A.   Based on what we know now, yes.
24  BY MR. KAWAMOTO:

Page 292

1    Q.   But what you knew back then, sir, because
2  this is a -- I mean, well, you would agree this is a
3  sub -- this is a massive increase in their order?
4    A.   Um-hum.
5    Q.   Correct?
6    MR. O'CONNOR:  Objection.
7  BY MR. KAWAMOTO:
8    Q.   And it's being -- I mean, to say that the
9  person providing you with this information,
10  Mr. Borelli, you know, is someone that will say
11  anything to get a sale, and so he is telling you that
12  Sunrise is asking for 12,000 -- well, now 15,000
13  bottles of oxy and the reason they are doing this is
14  because they are going to -- they have hired new
15  salespeople and they are going to look to additional
16  states to distribute product to.
17       Do you know if anything was done to
18  actually ascertain whether in fact they were going to
19  distribute products to additional states?
20    MR. O'CONNOR:  Objection.
21  BY THE WITNESS:
22    A.   I don't know.
23  BY MR. KAWAMOTO:
24    Q.   If you had known that all of this was

Page 293

1  going to Florida, sir, would you have been concerned?
2    MR. O'CONNOR:  Objection.
3  BY THE WITNESS:
4    A.   In -- and so, okay.  Ten years ago, I'm
5  not certain that this had exploded like it has in more
6  recent times.  So I don't know that that would have
7  been as big an exception for us, so.
8  BY MR. KAWAMOTO:
9    Q.   Okay.  But suffice to say that based on
10  this e-mail chain, this -- this increase -- this
11  increase didn't draw any increased scrutiny?
12    MR. O'CONNOR:  Objection.
13  BY MR. KAWAMOTO:
14    Q.   That you were aware of?
15    A.   I don't know that.
16    Q.   Well, sir, as you sit here today, I mean,
17  I understand that you said hindsight is 20/20, but as
18  you sit here today, do you think something should have
19  been done to scrutinize this customer and this order?
20    MR. O'CONNOR:  Objection.
21  BY THE WITNESS:
22    A.   As we sit here today, it's easy to -- to
23  scrutinize or question our judgment, so yes.
24       (WHEREUPON, a certain document was

Page 294

1      marked Mallinckrodt-Ratliff
2      Deposition Exhibit No. 035, for
3      identification, as of 12/19/2018.)
4   BY MR. KAWAMOTO:
5      Q.   Okay.  So this is another long e-mail
6   chain, but I'm going to take it from the -- the back
7   going forward.  So I'm going to start at Page 307207
8   and go up to 307203.
9      A.   Okay.
10     Q.   So, if you look at the e-mail on
11  Page 307207, it is an e-mail from Paul Kleissle to you
12  and Karen.  And he says:  "When you can, can you give
13  me a call regarding the oxy case?"
14     A.   Right, but --
15     Q.   Do you know what the reference to the oxy
16  case is?
17     A.   Well, based on the other e-mails, it is
18  going to be Sunrise.
19     Q.   Okay.  And then do you see the e-mail on
20  Page 307206, and I'll highlight it for you.
21     A.   "The DEA Diversion Group Supervisor
22  recommended that we audit Sunrise as soon as possible.
23  Please let me know the best way to accomplish this.
24  Please give me a call to discuss."

Page 295

1      Q.   So DEA is telling that you need -- telling
2   you that you need to audit Sunrise as soon as
3   possible?
4      A.   Yes.
5      Q.   Is this an unusual call?
6      MR. O'CONNOR:  Objection.
7   BY THE WITNESS:
8      A.   We spoke with DEA a lot.  I don't know
9   that I had ever been asked to go audit someone though,
10  so I will say it is unusual.
11  BY MR. KAWAMOTO:
12     Q.   Okay.  And this is -- as you saw from the
13  previous e-mail, this is when they were receiving
14  15,000 bottles of Mallinckrodt oxy product a month,
15  correct?
16     MR. O'CONNOR:  Objection.
17  BY THE WITNESS:
18     A.   I don't know exactly what they were
19  shipping them or if they approved the entire order.  I
20  don't -- I mean...
21  BY MR. KAWAMOTO:
22     Q.   Well, but, I mean, looking at the previous
23  e-mail, and we can --
24     A.   Okay.

Page 296

1      Q.   -- we can go back to it --
2      A.   They wanted to go up to that.
3      Q.   -- they wanted to go up to it and there is
4   no indication that they weren't allowed to and, in
5   fact, isn't that what your sales department was
6   advocating?
7      A.   Beginning in January, raise to 12,000
8   bottles, yeah.  That's a lot.
9      Q.   Okay.  So for -- presumably for five
10  months or six months, because you got the call from
11  the DEA in July of 2009 -- I'm sorry -- in July
12  of 2009, you had been shipping them around 15,000
13  bottles of oxy?
14     MR. O'CONNOR:  Objection.
15  BY THE WITNESS:
16     A.   Okay.
17  BY MR. KAWAMOTO:
18     Q.   Okay.
19     I'm sorry.  Actually, if I could direct
20  your attention to the previous exhibit, so that -- is
21  that Exhibit 34 or 35?  Okay.  So 35.
22     It is John Adams e-mailing Cathy Stewart,
23  Victor Borelli and Karen Harper.  He says:  "For
24  suspicious order monitoring, this is a potential

Page 297

1   increase on the horizon."
2      Do you -- do you know why he is conveying
3   that information in the context of suspicious order
4   monitoring?
5      A.   You've lost me here.
6      Q.   I'm sorry.
7      MR. O'CONNOR:  I think there is no Exhibit 36,
8   as far as I know.
9   BY MR. KAWAMOTO:
10     Q.   Oh, okay.  That may be my mistake then.  I
11  apologize.
12     Okay.  So we are -- we are on
13  Exhibit 30- --
14     A.   35.
15     Q.   -- 35 and the previous e-mail -- e-mail is
16  Exhibit 34?
17     A.   Correct.
18     Q.   So looking back at Exhibit 34, this is the
19  one where you are learning that they are increasing
20  their oxy order?
21     A.   Okay.
22     Q.   At the very bottom of Page 307120, it
23  says:  "For the suspicious order monitoring, this is a
24  potential increase on the horizon."

Page 298

1    Do you know -- I mean, who is John Adams?
2    A.   I don't recall.
3    Q.   Okay.  And why is -- but why is he telling
4 you and Karen about this increase?
5    A.   At this time I don't remember.
6    Q.   I mean, as you sit here, you have no
7 reason to believe that this order was either denied or
8 subject to heightened scrutiny?
9    MR. O'CONNOR:  Objection.
10 BY THE WITNESS:
11   A.   I have no way to know that.
12 BY MR. KAWAMOTO:
13   Q.   Okay.  So turning back now to Exhibit 35.
14   A.   Okay.
15   Q.   So the DEA is asking you to audit this
16 company and this in your recollection is that this the
17 first time that they are -- or this is the first time
18 you recall them doing that?
19   A.   Yes.
20   Q.   Do you see the e-mail in the middle of the
21 page on 307205?
22   A.   I do.
23   Q.   Okay.  And it says:  "Bill, I know that we
24 don't want to make this audit 'a cast of thousands',

Page 299

1 and assume the scope of audit review will be at a
2 fairly high" -- "a fairly high security and compliance
3 level?"
4    Do you know what Karen means by that?
5    A.   Not exactly.
6    What -- what is your question?
7    Q.   Well, I'm asking about the scope of the
8 audit being at a fairly high security and compliance
9 level, and I guess my question is:  Given what you
10 know about this company, meaning it's an extremely
11 small company, it's now asking for 15,000 bottles of
12 oxy and the DEA has called you up and specifically
13 said you should audit these, shouldn't your audit be a
14 fairly detailed one?
15   MR. O'CONNOR:  Objection.
16 BY THE WITNESS:
17   A.   Yes.
18 BY MR. KAWAMOTO:
19   Q.   So why would it be a high security and
20 compliance -- why would it be at a high level?
21   MR. O'CONNOR:  Objection.
22 BY THE WITNESS:
23   A.   I really don't know what she is
24 recommending here, other than not taking in 10 or 15

Page 300

1 people, not that we had that many people to do that,
2 but...
3    Q.   So that's all for that exhibit.
4    MR. KAWAMOTO:  And so this I believe is now
5 Exhibit 36.  Okay.
6        (WHEREUPON, a certain document was
7         marked Mallinckrodt-Ratliff
8         Deposition Exhibit No. 036, for
9         identification, as of 12/19/2018.)
10 BY MR. KAWAMOTO:
11   Q.   So I'd like to direct your attention to
12 the e-mail at the very back, which would be spanning
13 Pages 562328 to 562329.
14   A.   Okay.
15   Q.   Okay.  So this bottom e-mail is from
16 Dwayne Collins to you.
17    And who is Dwayne Collins?
18   A.   He is a Morristown police officer --
19   Q.   And what --
20   A.   -- who worked in the HIDTA out of the
21 Morristown resident agency under Kevin Keithly.  HIDTA
22 is a high intensity drug trafficking area.  And they
23 often are on loan to the FBI to help with
24 investigations.

Page 301

1    Q.   And what is he writing to tell you?
2    A.   He is writing to say that they have a
3 large amount of 30-milligram oxycodone coming into his
4 area and he is asking for my assistance.
5    Q.   And this oxy 30, it's a Mallinckrodt
6 product, is it not, sir?
7    A.   Oxycodone 30 is, yes.
8    Q.   Okay.  And then can -- could you please
9 look at the e-mail above that, so at the e-mail at the
10 top of the page, 562328.
11   A.   Yes.
12   Q.   So who is -- you were able to trace back
13 this product, were you not?
14   A.   We were, through our system.
15   Q.   And that's a chargeback system?
16   MR. O'CONNOR:  Objection.
17 BY THE WITNESS:
18   A.   I don't think so.  Well, it may have been,
19 but they -- the SKU on this, and the NDC number, that
20 tells us where it was manufactured, and I don't know
21 if it was through chargebacks we determined those
22 bottles.  I'm not sure it's with that specificity that
23 we are able to track chargebacks.
24 BY MR. KAWAMOTO:

Page 302

1    Q.    Okay.
2    A.    We were able to determine where those
3  shipments were -- went through our Hobart office, and
4  this is just from memory.
5    Q.    I see.  So you were --
6    A.    So they could identify them going to
7  Sunrise.
8    Q.    So the distributor for this product was
9  Sunrise Wholesale?
10   A.    That's where it was shipped to.
11   Q.    Okay.  And this is, once again, the same
12 company that asked for 15 -- or was receiving 15,000
13 bottles of oxycodone starting in January of 2009,
14 correct, sir?
15   A.    Okay.
16   MR. O'CONNOR:  Objection.
17   MR. KAWAMOTO:  Okay.  Why don't we take a really
18 quick break and then we'll come right back.
19   THE VIDEOGRAPHER:  We are going off the record
20 at 5:16.
21       (WHEREUPON, a recess was had
22        from 5:16 to 5:21 p.m.)
23   THE VIDEOGRAPHER:  We are back on the record at
24 5:21.

Page 303

1  BY MR. KAWAMOTO:
2    Q.    Okay.  And so this e-mail exchange is
3  between you and Dwayne Collins of Morristown.
4        And Morristown is in Tennessee, is it not,
5  sir?
6    A.    I believe so.
7    Q.    So what we are seeing is an example of
8  medication that is initially sent to Florida and then
9  migrates to Tennessee, is that accurate?
10   MR. O'CONNOR:  Objection.
11 BY THE WITNESS:
12   A.    I think that's accurate.
13 BY MR. KAWAMOTO:
14   Q.    Okay.  And then do you see the e-mail --
15 well, let me highlight it for you.  It is going to be
16 on Page 562327.
17   A.    Okay.
18   Q.    And let me try to -- so can you -- can you
19 read that e-mail, sir?
20   A.    Where it says "Dwayne"?
21   Q.    Yes, please.
22   A.    "Dwayne, the doctor we discussed ordered
23 the following during the last 12 months:  78 bottles
24 of oxy, 15-milligram; 204 oxy 30-milligram; 20

Page 304

1  methadone 10-milligram; and 4 hydromorphone.  All came
2  from the customer we discussed except the
3  hydromorphone."
4    Q.    Okay.  And the customer is, I think we've
5  established, is Sunrise, correct?  And that -- that
6  would be the e-mail that spans 562 and 327.
7    A.    Okay.
8    Q.    Okay.  So if you see where I've
9  highlighted.
10   A.    "The only shipment of this lot..."  I
11 don't know where that is.
12   Q.    It is at the very top of the page, 562328.
13 So it's a --
14   A.    Okay.
15   Q.    So you've received a call from a -- from
16 law enforcement in Tennessee?
17   A.    Um-hum.
18   Q.    And they've identified Mallinckrodt oxy 30
19 in their jurisdiction?
20   A.    Um-hum.
21   Q.    And you've traced the -- product back
22 to Sunrise Wholesale.  Is that accurate?
23   A.    Yes.
24   Q.    Okay.  And then in addition, you

Page 305

1  communicate again with the officer, Dwayne, and you
2  tell him, "Dwayne, the doctor we discussed ordered the
3  following during the last 12 months, all came from the
4  customer we discussed except the hydromorphone."
5        And so I just want to clarify that the
6  customer you are referring to is Sunrise?
7    A.    Okay.
8    Q.    And you also have a reference to the
9  doctor, so that means you -- you know, you know both
10 the customer and the end user, is that accurate?
11   MR. O'CONNOR:  Objection.
12 BY THE WITNESS:
13   A.    I don't know that we've named the doctor
14 in here, have we?
15 BY MR. KAWAMOTO:
16   Q.    Well, you state:  "The doctor we
17 discussed," so presumably you know who he is?
18   A.    Okay.  I'll go with that.
19   Q.    The final thing I want to note is an
20 e-mail in the middle of the page that's 562326.
21        Do you see that?
22   A.    Yes.
23   Q.    Okay.
24   A.    "After discussions with his supervisor,

Page 306

1  the DEA Diversion Group Supervisor recommended that we
2  audit Sunrise distributors as soon as possible.  The
3  investigation in Eastern Tennessee" -- "Eastern
4  Tennessee has substantially slowed because of
5  infighting between the subjects.  The audit has been
6  scheduled for August 18th and 19th in Sunrise,
7  Florida, which is close to Ft. Lauderdale.  The team
8  is being selected and it will be handled like a normal
9  customer audit."
10     Q.   And so the reason I'm noting this is
11  because that the audit is now scheduled for Sunrise?
12     A.   Um-hum.
13     Q.   It is August 18th and 19th?
14     A.   Um-hum.
15     Q.   And going into this audit you have the
16  following information.  You've got an extremely small
17  company that is a relatively new Mallinckrodt customer
18  that has increased its orders from 2,500 to 15,000,
19  and the product that you are shipping, the oxy product
20  that you are shipping to them has now appeared in
21  Tennessee where it's the subject of law enforcement
22  scrutiny.
23        Is that all accurate?
24     MR. O'CONNOR:  Objection.

Page 307

1  BY THE WITNESS:
2     A.   Yes.
3  BY MR. KAWAMOTO:
4     Q.   Okay.  And so for this audit, though, "The
5  team is being selected and it will be handled like a
6  normal customer audit."
7     A.   Um-hum.
8     Q.   What do you mean by "a normal customer
9  audit"?
10     A.   Protocols.  I mean, they go in and they do
11  the regular audit.  They -- they talk to them about
12  their suspicious order monitoring program, who does
13  that, and at the time I think they told them that they
14  had a -- that's when they -- I think we knew before
15  that about the DEA agent that assisted in identifying
16  customers and -- and doing due diligence to ensure
17  that they were operating correctly.
18     Q.   But based on the information available to
19  you at this time, sir, I mean, they are not a normal
20  customer, are they?
21     MR. O'CONNOR:  Objection.
22  BY MR. KAWAMOTO:
23     Q.   Based on all of the information you have
24  about Sunrise, I mean, how -- how can you characterize

Page 308

1  them as a normal customer?
2     A.   I didn't characterize them as a normal
3  customer.  That's the way they are going to conduct
4  the audit.
5     Q.   Well --
6     A.   What would you suggest?
7     Q.   Well, I mean, I would -- I would have
8  suggested shutting them down, but, you know, that's --
9     A.   Um-hum, okay.
10     Q.   -- that's between the two of us.
11     MR. O'CONNOR:  Object.
12  BY MR. KAWAMOTO:
13     Q.   Okay.
14        (WHEREUPON, a certain document was
15         marked Mallinckrodt-Ratliff
16         Deposition Exhibit No. 037, for
17         identification, as of 12/19/2018.)
18  BY MR. KAWAMOTO:
19     Q.   So this is an e-mail chain with an
20  attachment.  Its Bates number is 456333.  The subject
21  of this e-mail is "Sunrise Customer Chargebacks."
22        Do you see that, sir?
23     A.   Yes.
24     Q.   Okay.  And when you look at the chargeback

Page 309

1  data in the attachment --
2     A.   Okay.
3     Q.   -- it contains the DEA number, the ship to
4  customer name, pricing contract, the SKU, product
5  description, the pricing quantity and net sales.
6        Do you see that, sir?
7     A.   Yes.
8     Q.   Okay.  So this tells you who Sunrise
9  customers are, doesn't it?
10     MR. O'CONNOR:  Objection.
11  BY THE WITNESS:
12     A.   Yes.
13  BY MR. KAWAMOTO:
14     Q.   And it also tells you the product that
15  they are ordering is oxy 30?
16     A.   Correct.
17     Q.   And it also tells you the amount, the
18  pricing quantities, is that what it is?
19     A.   Yes.
20     MR. O'CONNOR:  Objection.
21  BY MR. KAWAMOTO:
22     Q.   Okay.  And this is all information that
23  you had available to you in advance of your audit, is
24  that correct -- correct, sir?

Page 310

1  A.  I wasn't involved in the audit, so.  The
2  persons -- or Karen conducted the audit and so this
3  would have been in her possession, so.
4       (WHEREUPON, a certain document was
5       marked Mallinckrodt-Ratliff
6       Deposition Exhibit No. 038, for
7       identification, as of 12/19/2018.)
8  BY MR. KAWAMOTO:
9  Q.  So this is another e-mail exchange with an
10 attachment.
11 A.  Yep.
12 Q.  Sunrise Chargeback Summary.  The Bates
13 number is 290041.  And it is from Cathy Stewart to you
14 and Karen, among others.  And then at the top e-mail
15 it says: "Cathy, Here's the other file....the doctor
16 in question is in column CX."
17      And if you look at the attachment, sir,
18 which I believe starts on -- starts on Bates
19 No. 290042, it appears to be a breakdown of the
20 doctors along with the comparative amount or the
21 relative amount that they are purchasing or obtaining
22 from Sunrise.
23      Is that accurate?
24      MR. O'CONNOR:  Objection.

Page 311

1  BY THE WITNESS:
2  A.  I don't know that I -- I don't know really
3  what this says, just so you know, what the documents
4  say.  You are saying that they are -- I just want to
5  be clear before I say yes or no.
6       You are saying that this identifies the
7  doctors, is that what you are saying?
8  BY MR. KAWAMOTO:
9  Q.  Yes.  This attachment.
10 A.  So all of these pages?
11 Q.  I believe so.  If you look at row one, I
12 believe those are the last names of doctors.
13 A.  Row one.  I'm trying to find row one, so.
14 Q.  Well, I'm sorry.  Let me help you out with
15 that, okay.  So if you look on the Elmo, I think those
16 are doctors.
17 A.  So they would be B, C, D, E, is that what
18 you are saying?
19 Q.  Yes.
20 A.  Okay.  So let --
21 Q.  One doctor is in B, another doctor is in
22 C, and another doctor is in D.
23 A.  Okay.  I've got that.
24      So you've identified those as doctors?

Page 312

1  Q.  I believe so.  You have doctors, you have
2  the number of orders, you have the total quant --
3  quantity and equivalent API.
4       MR. O'CONNOR:  Objection.
5  BY MR. KAWAMOTO:
6  Q.  And you know the -- the measure for total
7  quantity and equivalent APIs, is that essentially the
8  number of pills?
9  A.  I'm still trying to figure out what the
10 chart says.
11 Q.  Okay.
12 A.  What's all of the information at the
13 bottom?
14 Q.  I think that is a comparative analysis of
15 the API for the different doctors.
16 A.  Say that again.
17 Q.  I believe that on the assumption that the
18 total quantity and equivalent API is the measure of
19 essentially the pills that these doctors have been
20 ordering, the chart is going to be the differing --
21 the differing volumes of pills that each doctor has
22 ordered.  That's my reading of the chart.
23 A.  So you are saying one has purchased 10
24 million pills?

Page 313

1  Q.  I believe so.  Where do you see that?
2  A.  Well, on the side where the numbers are,
3  when you look at the chart, it is over 10 million.
4  Q.  Yes, I believe that means that they
5  purchased 10 million in equivalent API.
6       MR. O'CONNOR:  Objection.
7  BY THE WITNESS:
8  A.  So how does the chart below compare to the
9  above, how do you separate that?
10 BY MR. KAWAMOTO:
11 Q.  Well, I think the -- I think Beretsky, for
12 example, you have got four orders for 702,000.  I
13 think that's his little block.
14 A.  Okay.  Okay.  I can read that, but what
15 does this at the bottom mean?
16 Q.  I think that is a visual depiction of the
17 total quantity and equivalent API that these doctors
18 are obtaining.
19      MR. O'CONNOR:  Objection.
20 BY MR. KAWAMOTO:
21 Q.  And I think if you look at Bates number --
22 I believe if you can turn to page Bates No. 290048,
23 sir, and it's got a -- it would be column CX.
24 A.  CX, okay.

Page 314

1  Q.  So that's Schultz?
2  A.  Yes.
3  Q.  And do you see that there underneath it is
4  one and 612,000?
5  A.  Okay.
6  Q.  So I believe that means one order for 612
7  API?
8  MR. O'CONNOR:  Objection.
9  BY MR. KAWAMOTO:
10  Q.  612,000 API?
11  A.  Yeah.  I don't know how to read the chart,
12  so I'm going to have to go with -- I don't know what
13  to say.  I've never seen this before that I remember,
14  and I don't really know what it's stating or how I
15  should have been involved in this, so.
16  Q.  Well, but it does indicate for -- I mean,
17  these are -- you would agree these are the customers'
18  customers for Sunrise?
19  MR. O'CONNOR:  Objection.
20  BY THE WITNESS:
21  A.  Okay.  I -- okay.  I -- if that's what you
22  are saying, okay.
23  BY MR. KAWAMOTO:
24  Q.  Well, isn't that a plausible

Page 315

1  interpretation of the e-mail on this chart?  I mean --
2  A.  Well, it's plausible.  I'm just saying
3  that I don't know that to be a fact is what I'm
4  saying.
5  Q.  Okay.  But if you -- assuming this
6  cover --
7  A.  Should we have known every one of these
8  customers, did we run a thing at the time, so the
9  answer is I don't know now, so.
10  Q.  So next to Schultz, do you see column CW?
11  Well, actually, let me step back.
12  So column CX is Schultz.  Did you ever
13  recall hearing about a Dr. Schultz?
14  A.  I lost the page now, so.
15  Q.  The page is 290048.
16  A.  Okay.
17  Q.  So column CX with Dr. Schultz.
18  A.  Um-hum.
19  Q.  Do you ever recall --
20  A.  This is ten years ago.  No.
21  Q.  Okay.  Would it surprise you to learn that
22  Dr. Schultz is in prison?
23  A.  Good.
24  MR. O'CONNOR:  Objection.

Page 316

1  BY MR. KAWAMOTO:
2  Q.  Moving over to CW, do you see that column?
3  A.  I do.
4  Q.  It's Shook, right?
5  A.  Yes.
6  Q.  And do you see the volume -- or the volume
7  of API?
8  A.  If that's what that means, API --
9  Q.  Okay.  So what -- what is the volume
10  indicated there?
11  A.  So you are saying it's API.  I don't know
12  that.  It says "12,597,000."
13  Q.  Well, do you know what API means?
14  A.  Active pharmaceutical ingredient.
15  Q.  Okay.  So is that essentially a measure of
16  pills?
17  MR. O'CONNOR:  Objection.
18  BY THE WITNESS:
19  A.  I'm trying to see on here where it
20  specifies that that's API.  I --
21  BY MR. KAWAMOTO:
22  Q.  Well, fair enough.
23  If you turn to the first page, that's
24  going to be 209942.

Page 317

1  Do you see that?
2  A.  Okay.
3  Q.  And do you see that notation?  I'm sorry.
4  It is a little blurry, but --
5  A.  Total quantity equivalent to API in column
6  three.
7  Q.  Well, row three?
8  A.  Row three.
9  So you are saying that corresponds with
10  Schultz and Shook or --
11  Q.  Yes.  So that --
12  A.  So the column then, again, would be --
13  Q.  The value for -- the value for row three
14  for Shook is as you indicated --
15  A.  Okay.
16  Q.  -- 12 million?
17  A.  I'll go with that.
18  Q.  Okay.
19  A.  I understand.
20  Q.  So Shook is getting 12,597,000, you know,
21  API or active pharmaceutical ingredients?
22  A.  Um-hum.
23  Q.  Doesn't that strike you as suspicious,
24  sir?

Page 318

1    A.    That's a lot of pills.

2    Q.    Given that Mallinckrodt had access to this

3  data, shouldn't they have investigated Mr. Shook?

4    MR. O'CONNOR:  Objection.

5  BY THE WITNESS:

6    A.    Well, what you are saying is this is in

7  '08 or '9.  I don't know that we were using the

8  chargeback system for that.  I mean, I see that

9  they've pulled this information and we did an audit,

10  but I don't know that this information was available

11  to me or was sent to me personally and said, You need

12  to look at this.  I know Pete Kleissle with DEA said

13  you need to audit these people right away.  So we went

14  down to audit those people.

15  BY MR. KAWAMOTO:

16    Q.    Well, regardless, certainly -- well,

17  actually, sir, if you -- if you look at the e-mail on

18  Page 290041 --

19    A.    Okay.

20    Q.    -- your -- your -- it was actually sent to

21  you.  It was sent to Karen Harper and Bill Ratliff.

22    A.    Um-hum.

23    Q.    So you received this information, sir?

24    A.    If this is properly marked, yes.  And the

Page 319

1  answer is I just don't remember it, so.

2    Q.    Well, shouldn't -- as you sit here today,

3  shouldn't you have taken a look at Dr. Shook --

4    MR. O'CONNOR:  Objection.

5  BY MR. KAWAMOTO:

6    Q.    -- with his 12 million plus API?

7    MR. O'CONNOR:  Objection.

8  BY THE WITNESS:

9    A.    I mean, that's reasonable.

10    May I add something?

11  BY MR. KAWAMOTO:

12    Q.    Yes, you can.

13    A.    I'm not certain we were looking at our

14  customers' customers during that time, so.

15    Q.    But you certainly had the capability of

16  looking at them had you chosen to do so?

17    MR. O'CONNOR:  Objection.

18  BY MR. KAWAMOTO:

19    Q.    You got the chargeback reports?

20    A.    That -- that -- yeah, okay.

21        (WHEREUPON, a certain document was

22        marked Mallinckrodt-Ratliff

23        Deposition Exhibit No. 039, for

24        identification, as of 12/19/2018.)

Page 320

1  BY THE WITNESS:

2    A.    These just aren't stapled, is that

3  correct?

4  BY MR. KAWAMOTO:

5    Q.    Yes.

6    MR. O'CONNOR:  How many copies do we have?

7    MR. KAWAMOTO:  We just have two, one for you and

8  one for the witness.

9  BY MR. KAWAMOTO:

10    Q.    So, sir, this is a document Bates numbered

11  307243.  It is titled "Controlled Substance Compliance

12  Suspicious Order Monitoring, Custom" -- "Customer

13  Audit Checklist."

14    A.    Okay.

15    Q.    Do you see that, sir?  Are you familiar

16  with this form?

17    A.    I've seen this form.  Not this particular

18  one, but I've seen this form before.

19    Q.    And so this is the audit report for

20  Sunrise Wholesale, is it not, sir?

21    A.    It appears, yes.

22    Q.    And this is the result of the audit that

23  the DEA urged you to conduct immediately, correct?

24    A.    Yes.

Page 321

1    Q.    Okay.  Is it fair to say that Sunrise

2  passed its audit?

3    MR. O'CONNOR:  Objection.

4  BY THE WITNESS:

5    A.    Are there any more pages, just these two?

6  BY MR. KAWAMOTO:

7    Q.    That's -- that's all we have, sir.

8    A.    Okay.  Well, "Does the subject company

9  fill prescriptions issued by practitioners based

10  solely on an online questionnaire without a medical

11  examination...?  Yes.  Is the prescribing practitioner

12  licensed to practice...?  Yes.  Is there any evidence

13  the physician offers to sell controlled substances

14  without a prescription?  Yes.  Does the physician

15  charge reasonable prices?  Yes."

16        I mean, they were willing to fill it

17  with -- we are missing some pages here.  This says

18  Page 3.  There is nothing in between.  This is not a

19  complete audit.

20    Q.    No, I apologize.  I think Page 2 may have

21  been omitted from there, so why don't we...

22        (WHEREUPON, the document was tendered

23        to the witness.)

24  BY THE WITNESS:

Page 322

1    A.   Okay.  I'm still looking for the place
2  where it says they passed.  Can you direct me to that
3  page?
4  BY MR. KAWAMOTO:
5    Q.   Well, I believe this is what I have for
6  the audit.  It is actually one, two --
7    A.   Three pages.
8    Q.   -- three pages.
9         Is your recollection -- is your
10 recollection that these -- these audits --
11   A.   I don't recall.
12   Q.   -- are more pages?
13   A.   I don't recall.  I wasn't on the audit.  I
14 can't recall even reviewing the completed audit after
15 it was -- after it was completed.  I recall talking to
16 Karen and they placed a lot of credence in the DEA
17 person that was assisting them with their -- their
18 business.  So later we came to learn that he was not
19 as reputable as one would like, but we didn't know
20 that at the time when she did the audit, so.
21   Q.   So your understanding or recollection,
22 though, is that Sunrise passed its audit?
23   A.   I don't remember that.  I don't know.  I
24 mean, if they voluntarily gave up their -- their --

Page 323

1  their registration, that would tell me that there was
2  some -- some issues, so.
3    Q.   Okay.  Well, I'm going to -- this is
4  another exhibit.  And what this is is this is an
5  excerpt of chargeback data that was produced to us.
6    A.   Okay.
7    Q.   And I've limited it to Sunrise.
8         (WHEREUPON, a certain document was
9          marked Mallinckrodt-Ratliff
10         Deposition Exhibit No. 040, for
11         identification, as of 12/19/2018.)
12 BY MR. KAWAMOTO:
13   Q.   And there are three copies there.
14   A.   Let's see if that's everything there.  Oh,
15 here is another.  Thank you.
16   Q.   So the chargeback -- looking at Page 1 of
17 2, the chargeback system indicates that they received
18 in 2010, 21,368,000 sales in terms of government UOM.
19        So given that the audit was conducted in
20 2009 and they were receiving product in 2010, does
21 that indicate they passed?
22   MR. O'CONNOR:  Objection.
23 BY THE WITNESS:
24   A.   That would -- that would be logical.

Page 324

1  BY MR. KAWAMOTO:
2    Q.   Okay.  Now, this audit, does it -- does
3  it -- the audit pages that we have, does it indicate
4  any -- does it provide any explanation for how a
5  Mallinckrodt product that was shipped to Sunrise ended
6  up in Tennessee where it was in the possession of law
7  enforcement?
8    MR. O'CONNOR:  Objection.
9  BY THE WITNESS:
10   A.   Well, that's my memory that it was sold to
11 a doctor and the doctor was, in fact, the person who
12 was selling those tablets, so that's just from memory.
13 So it wasn't directly from Sunrise.  It was to their
14 customer who was selling it to -- to a doctor.  And
15 it's -- it's just from memory.
16 BY MR. KAWAMOTO:
17   Q.   But Mallinckrodt knew who Sunrise
18 customers were and they knew -- and Mallinckrodt knew
19 the amount of oxy that customers were provided, isn't
20 that correct?
21   MR. O'CONNOR:  Objection.
22 BY THE WITNESS:
23   A.   That's correct.
24 BY MR. KAWAMOTO:

Page 325

1    Q.   And so does this audit address the fact
2  that Dr. Shook is getting 12 million, 12 million plus
3  API from Sunrise?
4    A.   I don't know that that was included.  I --
5  I just don't know.
6    Q.   Shouldn't it have?
7    MR. O'CONNOR:  Objection.
8  BY THE WITNESS:
9    A.   It is subjective.  I don't know.
10 BY MR. KAWAMOTO:
11   Q.   Looking at these totals and assuming that
12 this extrapolation from the -- the data that was
13 produced is accurate, for a three-year time span, do
14 you see how many pills were provided -- were sent to
15 Florida, that's going to be Total Sales Quantity
16 Government UOM?
17   A.   I see those figures.
18   Q.   And so what -- what figure is that?
19   A.   At the bottom?
20   Q.   Yes.
21   A.   Total Sales Quantity Government UOM --
22 UOM, is that it or...?
23   Q.   That's correct.
24   A.   49,348,900.

Page 326

1    Q.   And then do you see Florida Percentage
2  Sales Quantity Government UOM?  And I will represent
3  to you that my understanding is that's the percentage
4  of their total sales that went to Florida.
5        MR. O'CONNOR:  Objection.
6  BY THE WITNESS:
7    A.   49,196,500.
8  BY MR. KAWAMOTO:
9    Q.   Or 99.7 percent?
10       MR. O'CONNOR:  Objection.
11 BY MR. KAWAMOTO:
12   Q.   Do you recall the e-mail where Victor
13 Borelli said the justification for their increase in
14 orders is because they were expanding to other states?
15 Do you recall that, sir?
16   A.   I recall reading that, yes.
17   Q.   Okay.  Does that appear accurate based on
18 this chargeback data?
19       MR. O'CONNOR:  Objection.
20 BY THE WITNESS:
21   A.   Based on the chargeback data, it would
22 not.
23 BY MR. KAWAMOTO:
24   Q.   So once -- so it appears that Victor was

Page 327

1  saying whatever he needed to do to make a sale, is
2  that fair?
3        MR. O'CONNOR:  Objection.
4  BY THE WITNESS:
5    A.   That's not for me to judge, so.
6  BY MR. KAWAMOTO:
7    Q.   But that's what the data suggests, sir,
8  isn't it?
9        MR. O'CONNOR:  Objection.
10 BY MR. KAWAMOTO:
11   Q.   Sir, they shipped 99.7 percent of their
12 product to Florida.  That was 49 mil -- 49 million
13 plus of UOM, which I assume had some relationship to
14 pills, and they passed an audit.  They passed
15 Mallinckrodt's audit.
16       Doesn't that suggest problems with your
17 audit system?
18       MR. O'CONNOR:  Objection.
19 BY THE WITNESS:
20   A.   So you have two different sheets.  And so
21 you are doing Oxycodone HCL 15-milligram tablets.  So
22 you are combining those for Florida?
23 BY MR. KAWAMOTO:
24   Q.   Yes.

Page 328

1    A.   So it's not all just oxy 30s.  It's oxy
2  15s and 30s?
3    Q.   Yes.
4    A.   Okay.
5    Q.   And they -- their order was for 3,000
6  bottles of oxy 15 starting January of 2009, sir.
7        Do you recall that?
8        MR. O'CONNOR:  Objection.
9  BY THE WITNESS:
10   A.   Yes.
11 BY MR. KAWAMOTO:
12   Q.   So my question is:  We've now spent a fair
13 amount of time looking in detail at Sunrise --
14   A.   Um-hum.
15   Q.   -- both how Mallinckrodt decided to do
16 business with them and how Mallinckrodt responded when
17 it started receiving information regarding them, and,
18 you know, and the fact that Mallinckrodt did an audit
19 of Sunrise and they presumably passed.
20       So my question to you, sir, is doesn't
21 this suggest a problem with Mallinckrodt's screening
22 of its customers and its audit process?
23       MR. O'CONNOR:  Objection.
24 BY THE WITNESS:

Page 329

1    A.   You are talking about one distributor.
2  BY MR. KAWAMOTO:
3    Q.   One distributor that sent 49 million pills
4  to Florida over a three-year span, sir.
5    A.   Um-hum.
6        MR. O'CONNOR:  Same objection.
7  BY MR. KAWAMOTO:
8    Q.   Doesn't that strike you as troubling?
9        MR. O'CONNOR:  Objection.
10 BY THE WITNESS:
11   A.   Based on what we know today, yes.
12       MR. KAWAMOTO:  Okay.  Why don't we take a quick
13 break.
14       THE VIDEOGRAPHER:  Going off the record at 5:54.
15            (WHEREUPON, a recess was had
16            from 5:54 to 6:05 p.m.)
17       THE VIDEOGRAPHER:  We are back on the record at
18 6:05.
19       MR. O'CONNOR:  And before we get started again,
20 I just wanted to say, as the witness has mentioned, he
21 is getting up there in years and he is physically
22 getting tired, so we would appreciate anything that
23 you can do and your colleague to -- to move along.
24       MR. KAWAMOTO:  Sure.  Well, this is the last

Page 330

1 exhibit that I have, so. I mean, I can -- I can tell
2 you that.
3 MR. O'CONNOR: Yeah.
4 (WHEREUPON, a certain document was
5 marked Mallinckrodt-Ratliff
6 Deposition Exhibit No. 041, for
7 identification, as of 12/19/2018.)
8 BY MR. KAWAMOTO:
9 Q. So, Mr. Ratliff, and I appreciate that we
10 have been going at this for a while, this is the last
11 exhibit, and the document that I've handed you is the
12 Administrative Memorandum of Agreement between the DEA
13 and Mallinckrodt.
14 Are you aware that Mallinckrodt has
15 entered into a settlement with the Drug Enforcement
16 Administration?
17 A. When, when was this?
18 Q. I believe if you check the back date, it
19 was in 2017, July of 2017.
20 A. No.
21 Q. Okay.
22 A. I've been retired since '12.
23 Q. Okay. So if you turn to Page 2 of this
24 agreement, do you see "Covered Conduct"?

Page 331

1 A. Page 2?
2 Q. Yes, Page 2.
3 A. Okay.
4 Q. And it is going to be Paragraph 3, Covered
5 Conduct.
6 A. Okay.
7 Q. Okay. And then it's got subheading, do
8 you see the little paragraph (a)?
9 A. Um-hum.
10 Q. And it says: "With respect to its
11 distribution of oxycodone and hydrocodone products,
12 Mallinckrodt's alleged failure to distribute these
13 controlled substances in a manner authorized by its
14 registration and Mallinckrodt's alleged failure to
15 operate an effective suspicious order monitoring
16 system and report suspicious orders to the DEA when
17 discovered as required by and in violation of 21 CFR
18 1301.74(b). The above is includes, but not limited
19 to, Mallinckrodt's alleged failure to." And then the
20 first, the little (i) is "conduct adequate due
21 diligence of its customers."
22 Do you have any knowledge of the factual
23 basis for that statement?
24 A. I don't.

Page 332

1 Q. Okay. What about the second statement,
2 "Detect and report to the DEA orders of unusual size
3 and frequency"?
4 A. I have been retired a long time. I don't
5 know what that means, but...
6 Q. Okay. Turning to Page 3, do you see
7 paragraph (b)?
8 A. What did you say?
9 Q. Paragraph (b) on Page 3, it says: "With
10 respect to the manufacture of controlled substances at
11 Mallinckrodt's Hobart, New York facility."
12 A. Are you saying (b)?
13 Q. (b), (b) as in boy.
14 A. (b), I'm sorry. I thought you said (e).
15 Okay.
16 Q. Okay. And do you see the paragraph
17 underneath it that says: "Failure to take actual
18 weights of controlled substances at all stages of the
19 manufacturing process"?
20 A. I do.
21 Q. Were you aware of any concerns by the DEA
22 regarding this topic?
23 A. No.
24 Q. Okay. Do you see Topic ii: "Use of a

Page 333

1 'target' tablet weight for purposes of rec" -- "of
2 reconciling batch records and determining the number
3 of units of finished form manufactured even though the
4 average weight of the tables in any specific batch
5 sometimes deviated from the target weight"?
6 Do you see that paragraph?
7 A. I do.
8 Q. Do you have -- were you aware of any
9 concerns from the DEA regarding that topic?
10 A. No.
11 Q. Okay. What about Topic iii: "Commingling
12 of dust collector waste and assignment of dust
13 losses"?
14 A. No.
15 Q. Okay. What about Topic iv: "Failure to
16 check-weigh controlled substances received into the
17 facility"?
18 A. No.
19 Q. Okay. Topic v: "Failure to maintain
20 accurate records of substances transferred from the
21 manufacturing process to Mallinckrodt's analytical
22 laboratories"?
23 A. No.
24 Q. You have no knowledge of that, okay.

Page 334

1    What about any knowledge of Topic vi:
2  "Failure to include substances held in certain
3  vaults/storage as part of the biennial inventory"?
4    A.   No.
5    Q.   Okay.  And I believe you testified
6  previously that you were not interviewed by the DEA or
7  DOJ in connection with this settlement agreement or
8  this Administrative Memorandum of Agreement?
9    A.   Correct.
10   Q.   Okay.  So you have no knowledge of the
11  basis for this agreement?
12   A.   No.  I was retired many years and...
13   Q.   Okay.
14   A.   And I was not -- they had a security
15  manager in Hobart and so I really wasn't involved.
16   Q.   Okay.  So that concludes my -- my
17  examination.  Thank you for your time, sir.
18   A.   Sure.
19   MR. KAWAMOTO:  Andrew, I would note that, as I
20  indicated to Jennifer Patina yesterday, we are
21  objecting to the late production of documents.  I
22  believe it's 45 documents or 400 pages, and so we are
23  reserving our rights on that issue.
24   MR. O'CONNOR:  Okay.  I'll just state for the

Page 335

1  record, you had them with plenty of time to review 45
2  documents, but I understand your objection.
3    MR. KAWAMOTO:  Okay.
4    THE VIDEOGRAPHER:  We are going off the record
5  at 6:10 p.m.
6       (WHEREUPON, a recess was had
7        from 6:10 to 6:13 p.m.)
8    THE VIDEOGRAPHER:  We are back on the record at
9  6:13.
10       EXAMINATION
11  BY MS. HERZFELD:
12   Q.   Okay.  Mr. Ratliff, good evening.  My name
13  is Tricia Herzfeld, and I'm an attorney representing
14  the Plaintiffs in Tennessee in the Tennessee State
15  litigation.
16       How are you doing this evening?
17   A.   I'm tired.
18   Q.   Yeah.  I've offered to your attorneys that
19  we could reset this for tomorrow morning.
20       Are you fine going ahead now?
21   A.   I'm willing to do it tomorrow.  I mean,
22  I'm worn out.
23   Q.   Do you want to take --
24   MR. O'CONNOR:  Can we go off the record for a

Page 336

1  minute?
2    MS. HERZFELD:  Yeah, let's go off the record for
3  a minute.
4    THE VIDEOGRAPHER:  We are going off the record
5  at 6:14.
6       (WHEREUPON, a recess was had
7        from 6:14 to 6:19 p.m.)
8    THE VIDEOGRAPHER:  We are back on the record at
9  6:19.
10  BY MS. HERZFELD:
11   Q.   Okay.  Mr. Ratliff, we are back on the
12  record.  And before we took a break and you had a
13  chance to speak with your counsel, you were saying you
14  were a bit tired, and I understand that we have been
15  here the whole day.
16   A.   Sure.
17   Q.   But this is probably my only opportunity
18  to examine you, so --
19   A.   That's fine.
20   Q.   -- or to examine you at all.
21       So you -- you are fine going forward this
22  evening and that's not going to prevent --
23   A.   I am.
24   Q.   -- you being able to give accurate and

Page 337

1  complete testimony today?
2    A.   That's -- that's absolutely correct.
3    Q.   Okay.  Great.  Fantastic.
4    MS. HERZFELD:  I just want to lodge our
5  continuing objection to the late disclosure of
6  documents in this case and also continue with our
7  objection from the Tennessee State case that it's
8  under different -- different rules, same objections
9  we've made to every deposition.
10   MR. O'CONNOR:  And we would repeat our response.
11  You had plenty of time to review the documents and we
12  are complying with all relevant rules and protocol.
13   MS. HERZFELD:  Great.  Okay.  We'll move along.
14  BY MS. HERZFELD:
15   Q.   Mr. Ratliff, have you ever been to
16  Tennessee?
17   A.   I have.
18   Q.   Okay.  For business or for pleasure?
19   A.   Both.
20   Q.   Okay.  And when have you been for
21  business?
22   A.   We audited FedEx in -- in Memphis to see
23  how our packages were handled.
24   Q.   Okay.  Is that the only time for business?

Page 338

1    A.    I might have been there more than once to
2 the FedEx hub.  I don't recall exactly when or the
3 dates.
4    Q.    Did you ever go to anyplace other than the
5 FedEx in Memphis for business in Tennessee?
6    A.    No.
7    Q.    Okay.  And then --
8    A.    To the best of my knowledge.
9    Q.    Do you know roughly what year that audit
10 was of the FedEx in Memphis?
11    A.    Not a clue.
12    Q.    And how often have you gone for vacation,
13 pleasure?
14    A.    I've been to Nashville.  I drive through
15 there frequently because I live in Florida --
16    Q.    Okay.
17    A.    -- and I have a home here, so we travel
18 through Tennessee often.
19    Q.    Okay.  And here is Indiana?
20    A.    Here is Indiana.
21    Q.    Okay.  Great.
22        And have you ever been to upper East
23 Tennessee, the Appalachian portion of Tennessee?
24    A.    I've traveled through there through

Page 339

1 Knoxville, through Pigeon Forge.  I've actually
2 vacationed in -- close to Pigeon Forge in a log cabin.
3 I've traveled through that area going to play golf
4 in -- in North Carolina.
5    Q.    Okay.  Have you ever made a report to
6 Tennessee law enforcement about any opioid diversion
7 or any suspected diversion?
8    A.    No.
9    Q.    Okay.  Have you ever heard of anyone at
10 Mallinckrodt making, pardon me, a report to law
11 enforcement in Tennessee about suspected opioid
12 diversion?
13    A.    Well, I might need to correct that.  I
14 dealt with one of the officers there who was
15 associated with HIDTA, and I assisted him with an
16 investigation.  We had located bottles that contained
17 identifying information that led it back to -- to one
18 of the distributors in Florida.
19    Q.    Okay.  And that was that Morristown e-mail
20 that you discussed earlier in your testimony today?
21    A.    That's correct.
22    Q.    Okay.  And other than that investigation,
23 have you been involved in any other investigations
24 involving diverted opioids in Tennessee?

Page 340

1    A.    At this time I don't recall.
2    Q.    Okay.  And in that one dealing with
3 Morristown, that officer actually approached
4 Mallinckrodt, Mallinckrodt didn't approach the
5 officer, is that correct?
6    A.    That's correct.
7    Q.    Okay.  And you mentioned the HIDTA.  Do
8 you know what that is?
9    A.    HIDTA?
10    Q.    HIDTA, is that how you call it?
11    A.    It is high intensity drug trafficking
12 area.
13    Q.    Okay.  And have you heard it called the
14 Appalachian high intensity drug trafficking area?
15    A.    I have not.
16    Q.    Do you know if there are certain drug --
17 high drug trafficking areas across the country?
18    A.    There are.
19    Q.    Okay.  And do you know how it is the DEA
20 makes those classifications?
21    MR. O'CONNOR:  Objection.
22 BY THE WITNESS:
23    A.    I'm not certain I understand your
24 question.

Page 341

1 BY MS. HERZFELD:
2    Q.    Sure.
3        Do you know how a particular area ends up
4 classified as a high intensity drug trafficking area
5 based on your law enforcement experience?
6    A.    Well, normally those are associated with
7 the FBI.
8    Q.    Okay.
9    A.    So, if we have a drug problem in that area
10 we have assessed, then we collaborate with local law
11 enforcement, state and local, and bring them in
12 because of their specific expertise in those areas.  A
13 lot of times the FBI wouldn't have the street
14 knowledge as officers would, so we bring them in to --
15 to help with the investigations.
16    Q.    Okay.  So based on your training,
17 knowledge and experience in law enforcement, would you
18 consider counties that have been designated within a
19 particular high intensity drug trafficking area for
20 that to be a reliable indicator that there is drug
21 problems within those -- within those counties?
22    MR. O'CONNOR:  Objection.
23    MS. DURFEE:  Object to form.
24 BY THE WITNESS:

Page 342

1    A.   I think I would agree with that.  Those
2  are all over the country, though.  They are not just
3  in Tennessee.
4  BY MS. HERZFELD:
5    Q.   Okay.  Were you ever involved in -- or had
6  you ever reported anyone in Tennessee to a licensing
7  board?
8    A.   Personally, no.
9    Q.   Yes, sir.
10         Do you know if anybody at Mallinckrodt
11  has?
12    A.   I don't know.
13    Q.   Okay.  Do you know -- know whether
14  Mallinckrodt looks at media reports to gain
15  information about pharmacies engaged in suspected
16  diversion?
17    A.   I don't know that.
18    Q.   Okay.  Have you ever personally done that,
19  sir?
20    A.   No.
21    Q.   Okay.  What about looking at media reports
22  to gain information about physicians suspected of
23  diversion?
24    A.   Personally?

Page 343

1    Q.   Yes, sir.
2    A.   No.
3    Q.   Okay.  Do you know if anyone else had that
4  responsibility at Mallinckrodt?
5    A.   I know that we looked at doctors and we
6  had people that would do that, so.
7    Q.   Do you know who that was?
8    A.   I think Karen Harper would be involved in
9  that program and...
10    Q.   Do you know of anybody else?
11    A.   Not -- not immediately, no.
12    Q.   Okay.
13         Okay.  And did you ever review the
14  decisions of licensing boards about physicians or
15  pharmacies in doing your job at Mallinckrodt?
16    A.   No.
17    Q.   Okay.  And you retired in 2012?
18    A.   Correct.
19    Q.   Okay.  Was there someone who replaced you?
20    A.   Yes.
21    Q.   Okay.  Who was that?
22    A.   I have no idea.
23    Q.   Okay.  Do you know if there was a
24  transition plan in place to go from you to that

Page 344

1  person?
2    A.   That individual had been the special agent
3  in charge of the FBI in St. Louis and also in Miami,
4  Florida.  Do I know his name, no.  I can't recall it.
5    Q.   Did you have --
6    A.   At one time I did know it, so.
7    Q.   That's okay.
8         So you knew it at one point, you just
9  can't remember it as we sit here today?
10    A.   Correct.
11    Q.   Okay.  And did you have any overlap at
12  all, the two of you?
13    A.   We did, but I was actually -- they kept
14  delaying my retirement and I worked the last three
15  months from home, and he really didn't need any
16  overlap or training.
17    Q.   Okay.  And all your files, did you leave
18  those at Mallinckrodt?
19    A.   Yes.
20    Q.   So if he needed any information about
21  pharmacies or distributors that you suspected of
22  diversion, that would have been contained within
23  your -- your files?
24    A.   Correct.

Page 345

1    Q.   Okay.  And he would have had access to
2  those files, to your knowledge?
3    A.   To the best of my knowledge.
4    Q.   Okay.  And you spoke a little before, I
5  just want to clarify this, because I'm not quite sure
6  I understood it, you -- I've got it down here, whether
7  a pharmacy -- you spoke about whether a pharmacy
8  should be continuing as a customer of your customer,
9  the distributor, and that you guys could block that.
10    MR. O'CONNOR:  Objection.
11  BY MS. HERZFELD:
12    Q.   Did I understand that correctly?
13    A.   What we would do, we would recommend to
14  our -- the distributor, it was our distributor, one of
15  our customers, we could say, We are going to deny
16  chargebacks, and so that distributor normally would
17  then deny product to that particular end user, which
18  would be a pharmacy.
19    Q.   Okay.  And do you ever know of a time that
20  you recommended that the -- that the chargebacks be
21  denied and the distributor continued to -- to service
22  that -- that client?
23    A.   No, because I got many, many, many calls
24  in the evening and during the day from pharmacies that

Page 346

1 had been refused oxycodone or hydrocodone or our
2 products and they wanted -- their distributors told
3 them that it was my fault, that we did it, and I would
4 instruct them they needed to talk to their
5 distributor, show them what they were doing
6 differently, convince them that they were a -- a
7 trustworthy customer, and then they would come back
8 and try to convince us.
9     Q.   Okay.  And --
10     A.   I don't know that that ever happened.
11     MS. KVESELIS:  Late objection.
12 BY THE WITNESS:
13     A.   Okay.
14 BY MS. HERZFELD:
15     Q.   Okay.  Yeah, I'm going to go through some
16 documents with you, and hopefully we'll get through
17 them pretty quickly, okay.
18     A.   Okay.
19     Q.   I know it looks bad that there is so many
20 but that's because I brought five copies, so it is not
21 as bad as it looks.
22     A.   That's fine.
23     Q.   Okay.  I'm going to hand you what we are
24 going to mark as -- I don't know what exhibit we are

Page 347

1 on -- what we've marked as Plaintiff's Exhibit 42 --
2 or I guess Ratliff Exhibit 42.
3         (WHEREUPON, a certain document was
4         marked Mallinckrodt-Ratliff
5         Deposition Exhibit No. 042, for
6         identification, as of 12/19/2018.)
7 BY THE WITNESS:
8     A.   Okay.
9 BY MS. HERZFELD:
10     Q.   Okay.  So my understanding from your
11 previous testimony is that after the August 23rd
12 meeting, 2011 meeting with the DEA, there were various
13 reports that were pulled on the top pharmacies within
14 Florida and then the top pharmacies outside of
15 Florida, is that correct?
16     MR. O'CONNOR:  Objection.
17 BY THE WITNESS:
18     A.   It would be the -- we went to the top
19 three distributors.
20 BY MS. HERZFELD:
21     Q.   Okay.
22     A.   And looked at their -- their top ten
23 customers that ordered product in Florida.
24     Q.   Okay.  And then based on that, there were

Page 348

1 various charts that were created, is that correct?
2     A.   Various charts, I'm not certain what that
3 means.  I received that information based on those
4 three distributors.
5     Q.   Okay.  So if you'll turn with me to the
6 page that's marked MNK_TNSTA05224022, it's about
7 halfway through.  It looks like this.
8     A.   I have it.
9     Q.   Do you recognize this document, sir?
10     A.   I do.
11     Q.   Okay.  And what do you recognize it to be?
12     A.   Well, this is the -- the pharmacies that
13 they identified.
14     Q.   Okay.  So that would be like the top
15 pharmacies nationwide?
16     A.   In Florida, yes, where we were
17 concentrating initially.
18     Q.   Okay.  And then looking at starting on
19 this Page 4022, that ends in 4022, it looks like there
20 are a whole bunch much pharmacies on there that are
21 also not in Florida.
22         Do you see where I am referring?
23     A.   I do.
24     Q.   Okay.  And so is it possible that this --

Page 349

1 this chart is, indeed, the -- the list of the top
2 pharmacies in all of the country?
3     MR. O'CONNOR:  Objection.
4 BY THE WITNESS:
5     A.   I recognize -- this is not the list that I
6 had, just so you know.
7 BY MS. HERZFELD:
8     Q.   Okay.
9     A.   So the list I had was very specific to
10 those three distributors.
11     Q.   Okay.  Maybe --
12     A.   And it was a much smaller list.  It didn't
13 contain all of these --
14     Q.   Okay.  So maybe --
15     A.   -- which --
16     Q.   I don't mean to interrupt you.  Sorry.  Go
17 ahead.
18     A.   Well, we started in Florida and then we
19 started doing investigations in other parts of the
20 country.
21     Q.   Okay.  So looking at this page and then
22 kind of flipping through, it looks like there are
23 quite a few, if you'll take a moment, pharmacies that
24 are located in Tennessee.  Specifically I'm looking at

Page 350

1 15 lines down on that first page. It indicates Lowe's
2 Drugs in Maryville, Tennessee.
3 　　　Do you see where I'm talking about? It is
4 right under that last little checkmark. Maybe my
5 highlighting will show you.
6 　A.　Okay.
7 　Q.　And then if you go down kind of midway
8 through the page, there is another one, Riggs Ten- --
9 Riggs Drug in Powell, Tennessee.
10 　　　Do you see where I'm at there? Do you see
11 that, sir?
12 　A.　I haven't found it yet. I'm looking.
13 　Q.　Okay. If you look at the fourth kind
14 of -- there is like a dashed line on the side, it is
15 the second above that.
16 　A.　And what's the name?
17 　Q.　Riggs Drug.
18 　A.　I found that. Okay.
19 　Q.　In Powell, Tennessee.
20 　A.　Okay.
21 　Q.　And if you flip through for the various
22 other pages, and I won't spend the time going through
23 each one, I would submit to you that there are various
24 other pharmacies in Tennessee.

Page 351

1 　A.　Um-hum.
2 　Q.　Do you agree with me there?
3 　A.　Say again.
4 　Q.　That there are other pharmacies in
5 Tennessee on this list for top pharmacies in the
6 country, would you agree with that statement?
7 　A.　Well, are you saying there were two on
8 that front page?
9 　Q.　Um-hum.
10 　A.　And then on this page there are additional
11 ones, is that what you are saying?
12 　Q.　Yes, sir.
13 　　　If you look at the fifth pharmacy?
14 　A.　Um-hum.
15 　Q.　-- LaFollette --
16 　A.　Yep.
17 　Q.　-- in Tennessee, do you see that one?
18 　　　And then about the 10th or 11th, there is
19 another one, Macs Pharmacy, Knoxville.
20 　　　Do you see that?
21 　A.　I do.
22 　Q.　Okay. So you would agree with me that
23 there are multiple Tennessees -- pharmacies on this
24 list of top pharmacies within the country?

Page 352

1 　A.　Right, but I don't know that I've ever
2 seen this list.
3 　Q.　Okay. But my question is you would agree
4 with me that they are identified in this?
5 　A.　Yes.
6 　Q.　Okay. Thank you, sir.
7 　　　Okay. And then switching over to the
8 page that I think this might be more of what you were
9 thinking about, the very first page, the one marked
10 MNK_TNSTA05224016, the very first page.
11 　A.　Okay.
12 　Q.　Do you see it?
13 　A.　I do.
14 　Q.　Okay. And on this list do you recognize
15 what this chart is?
16 　A.　I don't recall it, so.
17 　Q.　Okay. Have you ever -- do you recall
18 seeing ever a chart that has on the various
19 distributors broken down by three-digit zip code?
20 　A.　No.
21 　Q.　Okay. And do you recall having these
22 reports run as being part of a diversion prevention
23 program?
24 　MR. O'CONNOR:　Objection.

Page 353

1 BY THE WITNESS:
2 　A.　I don't know when these were run, so.
3 BY MS. HERZFELD:
4 　Q.　Okay.
5 　A.　Do you know?
6 　Q.　I -- I don't have a date on this. Sorry.
7 　A.　Yeah, so, you have to remember I've been
8 retired six-and-a-half years, so.
9 　Q.　Sure. I understand.
10 　A.　I don't know if this was run before or I
11 just don't know the answer to that.
12 　Q.　I believe it was in your custodian file,
13 so I thought you might know.
14 　　　You don't know?
15 　A.　In my custodian file?
16 　Q.　I believe so, sir, yes.
17 　A.　My personal custodian file?
18 　Q.　I believe so, yes, sir.
19 　A.　Well, I would probably disagree with that
20 because I don't think so.
21 　Q.　You don't think this is a document --
22 　A.　This was not -- this could have been in
23 the DEA compliance file which is not mine.
24 　Q.　Okay. So what you are saying is you don't

Page 354

1 recognize this and you didn't create it?
2     A.    Correct.
3     Q.    Okay.  And you don't think you have ever
4 seen it before?
5     A.    Correct.
6     Q.    Okay.  Well, then I guess we'll move on.
7         Do you have any idea who might have
8 created it?
9     A.    I don't know.  But I assure you this
10 wasn't in my file.
11     Q.    Okay, sir.
12         Okay.  Moving along then, do you know
13 specifically about there being an opioid problem in
14 Appalachia?
15         MR. O'CONNOR:  Objection.
16 BY THE WITNESS:
17     A.    I have seen news reports to that effect.
18 BY MS. HERZFELD:
19     Q.    Okay.  And have you seen those during your
20 time when you were employed at Mallinckrodt or since
21 you've left?
22     A.    Since I've left.
23     Q.    Okay.  Were you aware of the opioid
24 problem in Appalachia at that time that you were

Page 355

1 employed at Mallinckrodt?
2     A.    I think I know there were problems in West
3 Virginia, I think there were problems in other states,
4 but most of that, to my memory, was after I left
5 Mallinckrodt.
6     Q.    Okay.  Did you ever --
7     A.    Actually left Covidien, Mallinckrodt being
8 one of the corporations.
9     Q.    Okay.  Did you ever -- other than your
10 conversation with the gentleman in Morristown, did you
11 know about there being an opioid problem in Tennessee?
12         MR. O'CONNOR:  Objection.
13 BY THE WITNESS:
14     A.    I don't know that I knew specifically that
15 they had an opioid problem.  I knew that there was an
16 opioid problem in Florida, so.
17 BY MS. HERZFELD:
18     Q.    Okay.  Do you recall participating in the
19 auditing of ABC, a distributor named ABC?
20     A.    AmerisourceBergen Corporation, yes.
21     Q.    Yes, AmerisourceBergen -- no.  ABC?
22     A.    Now, is that a pharmacy?
23     Q.    Oh, no.  It is AmerisourceBergen, yes,
24 sir.  ABC, yes.

Page 356

1     A.    Okay.
2     Q.    Do you recall being involved in that --
3     A.    I do.
4     Q.    -- audit?
5         Okay.  Do you recall taking notes in --
6 during your participation in that audit, sir?
7     A.    I would normally and usually take notes.
8     Q.    You would usually?
9     A.    Yes.
10     Q.    Okay.  And do you know what happened to
11 your notes?
12     A.    I don't.
13     Q.    Okay.  I'm going to hand you what we will
14 mark as Exhibit 43.
15         (WHEREUPON, a certain document was
16             marked Mallinckrodt-Ratliff
17             Deposition Exhibit No. 043, for
18             identification, as of 12/19/2018.)
19 BY MS. HERZFELD:
20     Q.    Do you recognize this document, sir?
21     A.    Yes.
22     Q.    Okay.  And there is some handwritten notes
23 that are on this document.  Is that your handwriting?
24     A.    No.

Page 357

1     Q.    Do you know whose it is?
2     A.    No.
3     Q.    Okay.  Did you prepare this document
4 absent the handwriting?
5     A.    The problem I'm having is I don't ever
6 recall going to Jabos Pharmacy, Jabos Pharmacy in
7 Newport, Tennessee.  I have no memory of that at all.
8     Q.    Okay.  Well, let's just go through this
9 sheet for a second.  So this --
10     A.    Source of information, AmerisourceBergen.
11 What they do, just to be helpful, they provide this
12 information to us.
13     Q.    Okay.
14     A.    So this information would have come to us
15 from AmerisourceBergen.
16     Q.    Okay.
17     A.    So what's -- 10/17 of '11.  Well, it says
18 I prepared the document.  This document came from
19 AmerisourceBergen and was sent to us.
20     Q.    Okay.  So I want to make sure I
21 understand.
22         So this document is a Pharmacy Information
23 Sheet for Jabos Pharmacy in Newport, Tennessee, is
24 that correct?

Page 358

1    A.   Correct.
2    Q.   And it is dated 10/17/11, is that correct?
3    A.   That's correct.
4    Q.   Okay.  And you believe that the
5  information contained within this worksheet came from
6  AmerisourceBergen Health, is that correct?
7    A.   Well, it says: "Source of information:
8  AmerisourceBergen Health."
9    Q.   And when it says: "Prepared by:  B.
10  Ratliff," is it possible you got that information from
11  them and typed it up?
12        Why would it say prepared by you?
13    MR. O'CONNOR:  Objection.
14  BY THE WITNESS:
15    A.   I'm stumped because I don't...
16  BY MS. HERZFELD:
17    Q.   Well, at the very least you would have
18  been responsible for reviewing this sheet, is that
19  correct, sir?
20    MR. O'CONNOR:  Objection.
21  BY THE WITNESS:
22    A.   Okay.  Let's go back to the handwriting.
23  "Need to visit, leave on CB list."  What I was saying
24  in that list -- that is my writing.

Page 359

1  BY MS. HERZFELD:
2    Q.   That is your handwriting, sir, the
3  handwriting?
4    A.   It is.
5    Q.   And what does it say?
6    A.   The note that I said, we would have taken
7  these to -- or with us once we received them from
8  AmerisourceBergen.  And when I'm saying "Need" -- when
9  I'm saying "Need to visit," they need to visit this
10  based on what we read here or what I read.
11    Q.   Okay.  When you said "take this sheet with
12  us," take this sheet with us where?
13    A.   No.  It was -- I was telling -- I was
14  saying, leaving it on our list because they need to go
15  visit this.
16    Q.   Okay.  And so you --
17    A.   And so, "Karen Harper notes:  Customer
18  since... risk based..."
19        We received a lot of this information, so,
20  from them, and I'm -- it has just been so long ago.
21  It says prepared by me, so I may have prepared it
22  based on the information they provided to me.  But the
23  thing that's -- I was having difficulty with is I've
24  never been to Newport, Tennessee.

Page 360

1    Q.   Okay.
2    A.   So -- so this is one of our Pharmacy
3  Information Sheets that we had AmerisourceBergen fill
4  out and give to us or at least the information.  So
5  it's possible that I -- I had it typed up, so.
6    Q.   Okay.  Okay.  So now that we've
7  established that and that it is your handwriting on --
8  let's go through it a little bit, if we could, okay.
9    A.   10/17 of '11.
10    Q.   So here at the bottom it says --
11    A.   Okay.
12    Q.   -- "Karen Harper Notes."
13        Do you know where "Karen Harper Notes"
14  comes from?  What does that mean?
15    A.   They came from Karen Harper.
16    Q.   Okay.  And so she -- these are her notes
17  inputted into this --
18    A.   Um-hum.
19    Q.   -- chart, is that correct, this sheet?
20    A.   We conducted the audit together.
21    Q.   Okay.  So is this, perhaps, a summary of
22  your notes and Karen Harper's notes?
23    MR. O'CONNOR:  Objection.
24  BY THE WITNESS:

Page 361

1    A.   It appears that these are Karen's notes.
2  BY MS. HERZFELD:
3    Q.   Where it says "Karen Harper's Notes"?
4    A.   Yes.
5    Q.   Okay.  So in Karen Harper's notes, it
6  classifies Jabos Pharmacy or Jabos Pharmacy as:
7  "Medium risk based on volume."
8        Do you see where it says that?  Do you see
9  where it says: "Karen Harper's Notes"?
10    A.   I do.
11    Q.   Okay.  And so --
12    A.   "Medium risk based on volume," okay.
13    Q.   Okay.  And then it says:  "No site visits
14  from compliance."
15        Do you know what that means?
16    A.   From AmerisourceBergen compliance.
17    Q.   So they had not visited --
18    A.   Right.
19    Q.   -- that pharmacy?
20    A.   And so the 29.4 percent controlled to
21  non-controlled, that means that was a -- they had more
22  non-controlled than controlled.  So that's a low
23  amount for a pharmacy, and I think that's why they
24  were saying it was a medium risk.

Highly Confidential — Subject to Further Confidentiality Review

Page 362

1    Q.   Okay.  So you considered 29.4 percent
2  controlled to non-controlled to be a low number?
3    A.   That's less than a third of what they
4  purchase.
5    Q.   So that's considered a low number?
6    A.   Yes.
7    Q.   Okay.  And then it says:  "No site visits
8  from compliance."
9        Was that a problem?
10   MR. O'CONNOR:  Objection.
11 BY THE WITNESS:
12   A.   We asked them to visit.
13 BY MS. HERZFELD:
14   Q.   Before or after this report?
15   A.   I don't know.
16   Q.   Okay.  And then it says:  "Waiting for
17 updated questionnaire and photographs.  Other than
18 numbers ABC has no issue with them, this customer has
19 been difficult when it comes to responding to
20 questionnaire."
21        Do you know what that means, "difficult
22 when it comes to responding to questionnaire"?
23   MR. O'CONNOR:  Objection.
24 BY THE WITNESS:

Page 363

1    A.   Well, we are talking about ABC providing
2  the information.
3  BY MS. HERZFELD:
4    Q.   Okay.  So when you say:  "This customer
5  has been difficult when it comes to responding to
6  questionnaire," that means ABC has been difficult, not
7  Jabos?
8    A.   Right.
9    Q.   Okay.  And:  "Other than numbers, ABC has
10 no issue with them."
11        What -- do you know what was concerning
12 about the numbers, if you say 29.4 percent of
13 controlled to non-controlled is low?
14   MR. O'CONNOR:  Objection.
15 BY THE WITNESS:
16   A.   I'm just looking at the volume of
17 oxycodone, 30-milligram tablets per month, 55,200.
18 That's tablets.
19 BY MS. HERZFELD:
20   Q.   Is that high, sir?
21   MR. O'CONNOR:  Objection.
22 BY THE WITNESS:
23   A.   I don't know that.
24 BY MS. HERZFELD:

Page 364

1    Q.   Okay.
2    A.   Cash sales versus non-cash sales reported
3  by the pharmacy, 10 percent, that's low.
4    Q.   Okay.  So do you know what it was about
5  this pharmacy that would -- would have been a flag for
6  Mallinckrodt to put on the chargeback restriction
7  list?
8    MR. O'CONNOR:  Objection.
9  BY THE WITNESS:
10   A.   Well, what we were doing is just based on
11 the volume, we wanted more information from
12 AmerisourceBergen about this customer.
13 BY MS. HERZFELD:
14   Q.   Okay.  And so the volume was inappropriate
15 here?
16   A.   No.
17   MR. O'CONNOR:  Objection.
18 BY THE WITNESS:
19   A.   I'm not saying it was inappropriate.  I'm
20 saying that we looked at it based on their other
21 customers and this came up on our list to look at
22 them.
23 BY MS. HERZFELD:
24   Q.   Okay.  And do you know what factor put it

Page 365

1  on your list?
2    A.   No.
3    Q.   Okay.  And then if you go, it says:
4  "Late" -- pardon me -- "Latest Site Visit:  Once per
5  month by sales manager will be providing photos,
6  difficult customer."
7        Do you know what that means?
8    A.   No.  I just know that we said, We want you
9  to visit this pharmacy and we would like to have
10 photo -- photographs and -- and a site visit, so
11 that's basically all I know.
12   Q.   And it says:  "Top prescribers
13 identified?:  Yes."
14        Do you know who those top prescribers
15 were?
16   A.   No.
17   Q.   Okay.  And did you do anything to verify
18 any of this information that was reported to you by
19 AmerisourceBergen about Jabos Pharmacy on this sheet?
20   A.   No.
21   Q.   Okay.  And do you know if
22 AmerisourceBergen ever visited this pharmacy as you
23 requested?
24   A.   Not at this point I don't know that.

Page 366

1    Q.   Okay.  And do you know if the photographs
2   were ever provided that you requested?
3    A.   I didn't know that either.
4    Q.   Okay.  Sorry.  I'm losing my voice a
5   little bit.
6    A.   I am too.  I think I can use more water.
7    MR. O'CONNOR:  Do you want some water?
8    THE WITNESS:  Yeah, please.
9   BY MS. HERZFELD:
10   Q.   Okay.  The next exhibit is 45, I believe.
11   A.   That one was 43.
12   Q.   Oh, then 44.  Thank you for your help with
13  that.
14       (WHEREUPON, a certain document was
15        marked Mallinckrodt-Ratliff
16        Deposition Exhibit No. 044, for
17        identification, as of 12/19/2018.)
18  BY THE WITNESS:
19   A.   Thank you.
20  BY MS. HERZFELD:
21   Q.   Hopefully we'll get through it a little
22  quicker this time.
23       Okay.  Do you recognize this document,
24  sir?

Page 367

1    A.   I do.
2    Q.   Okay.  And is this your handwriting at the
3   top?
4    A.   It is.
5    Q.   Okay.  And what does your handwriting say
6   there?
7    A.   "Need to visit and report."
8    Q.   Okay.  And this is a Pharmacy Information
9   Sheet?
10   A.   It is.
11   Q.   And it is dated 10/11 -- 10/17/11, is that
12  correct?
13   A.   Correct.
14   Q.   It says it was prepared by you and the
15  source of information was AmerisourceBergen, is that
16  correct?
17   A.   Correct.
18   Q.   Okay.  And it says the pharmacy name here
19  is Rippetoe, Inc. in Morristown, Tennessee.
20       Is that correct?
21   A.   That's correct.
22   Q.   Okay.  And if you take a second to look
23  over this sheet, my first question is:  Did you
24  receive all of this information from

Page 368

1   AmerisourceBergen?
2    A.   Yes.
3    Q.   Okay.  And did you do anything
4   independently, did Mallinckrodt to your knowledge do
5   anything independently to verify the information
6   contained within this sheet?
7    MR. O'CONNOR:  Objection.
8   BY THE WITNESS:
9    A.   No.
10  BY MS. HERZFELD:
11   Q.   I'm sorry, sir?
12   A.   No.
13   Q.   Okay.  And so if you'll take a look with
14  me down on where it says "Karen Harper Notes"?
15   A.   Um-hum.
16   Q.   "Customer since 03/04, medium risk based
17  on volume.  Have requested an updated questionnaire.
18  No visits by Compliance."
19       Did I read that correctly?
20   A.   Correct.
21   Q.   "Don't have photographs in the file.  They
22  are coming."
23       Do you know if the photographs ever came?
24   A.   I don't.

Page 369

1    Q.   "This customer is in Tennessee market and
2   'always on the radar.'"
3        Do you know why they were always on the
4   radar?
5    A.   I do not know.
6    Q.   Do you know what that means?
7    A.   I don't.
8    Q.   Do you know if they ended up on your
9   chargeback list, your no charge -- no chargeback list?
10   A.   I don't know that.
11   MR. O'CONNOR:  Objection.
12  BY MS. HERZFELD:
13   Q.   Okay.  Do you know after this report if
14  Mallinckrodt continued shipping to AmerisourceBergen
15  and AmerisourceBergen shipped to Rippetoe?
16   MR. O'CONNOR:  Objection.
17  BY THE WITNESS:
18   A.   I don't know that either.
19  BY MS. HERZFELD:
20   Q.   Okay.
21   A.   There is nothing on this that would
22  indicate -- if they are medium risk, we wouldn't deny
23  them through the chargeback system.
24   Q.   Okay.  And so when it says:  "Need to

Page 370

1  visit and report," what did you mean by that?

2     A.  We are saying that AmerisourceBergen needs

3  to visit and report to us.

4     Q.  Report to you the findings of their visit?

5     A.  Yeah, sure, and the photos and...

6     Q.  Okay.  Exhibit 45.

7        (WHEREUPON, a certain document was

8        marked Mallinckrodt-Ratliff

9        Deposition Exhibit No. 045, for

10       identification, as of 12/19/2018.)

11 BY MS. HERZFELD:

12    Q.  Okay.  Sir, have you seen this document

13 before?

14    A.  Yes.

15    Q.  Okay.  And it is a Pharmacy Information

16 Sheet, is that correct?

17    A.  Correct.

18    Q.  Okay.  And it is dated 10/17/11, is that

19 correct?

20    A.  All of these have been dated the same

21 date.

22    Q.  Okay.  And this one also says to be

23 prepared by you based on information from

24 AmerisourceBergen, is that correct?

Page 371

1     A.  Correct.  That's correct.

2     Q.  Okay.  And the pharmacy in this one is

3  East Tennessee Discount Drug in Strawberry Plains,

4  Tennessee.

5        Am I correct on that?

6     A.  Yes.

7     Q.  Okay.  And this is your handwritten notes

8  on the -- on the document?

9     A.  The ones on the upper left are.  "To be

10 visited in the process of being scheduled," that's not

11 my writing.

12    Q.  Do you know whose writing it is?

13    A.  No.

14    Q.  Do you recognize it?

15    A.  I don't.

16    Q.  Okay.  And so that hand writing on the

17 left-hand side, what does that say?

18    A.  "Leave on no CB list, problem" is what I

19 said.

20    Q.  Do you know what the problem was with this

21 pharmacy, sir?

22    A.  It appears there was a spike in oxy

23 purchases.  It said they were supplying to a clinic in

24 Nashville, Tennessee.  "'Back to Wellness' driven out

Page 372

1  of Knoxville."

2     Q.  Okay.  And how did you get that

3  information, sir?

4     A.  We would have received it from

5  AmerisourceBergen.

6     Q.  Okay.  And did you do anything to

7  independently verify the information that was given to

8  you from AmerisourceBergen?

9     A.  We asked them to -- to visit the pharmacy.

10    Q.  Okay.  And do you know if they did?

11    A.  I don't know.

12    Q.  Okay.  And do you know what the

13 significant red flags were about this particular

14 pharmacy?

15    A.  (Witness reading to himself.)

16       Well, the ABC Pharmacy in Las Vegas, red

17 flag, flag, that was a totally different issue, so.

18 That got on there by mistake.  That's not yours, the

19 pharmacy in Las Vegas.

20    Q.  Okay.  So that doesn't have anything to do

21 with this pharmacy?

22    A.  No.

23    Q.  Okay.  So it says: "Significant red flags

24 about East Tennessee Discount Drug...RED FLAG RED

Page 373

1  FLAG," in all caps.

2       Do you know what the significance --

3     A.  "Significant red flags about East

4  Tennessee Drug" -- "Discount Drug..."

5       45,900 tablets would be a lot of -- that's

6  the overall oxycodone family.  32,500 of 30s is not

7  particularly high.  The percentage of oxycodone sales,

8  30-milligram tablets versus all oxycodone SKUs,

9  70 percent, that is high.

10    Q.  Okay.  And so is that the reason that this

11 was identified as high risk by the wholesaler, would

12 that be your understanding?

13    MR. O'CONNOR:  Objection.

14 BY THE WITNESS:

15    A.  To the best of my knowledge.  It has just

16 been a long time.

17 BY MS. HERZFELD:

18    Q.  Okay.  And would you agree with me, sir,

19 that suspect pharmacies can indicate suspect

20 physicians in the area?

21    MR. O'CONNOR:  Objection.

22 BY THE WITNESS:

23    A.  I think that's an assumption, but it's a

24 reasonable assumption, so.

Page 374

BY MS. HERZFELD:

1  BY MS. HERZFELD:
2      Q.   Do you know who Ed Hazewski is?
3      A.   It has been a long time.
4      Q.   Does the name ring a bell to you at all?
5      A.   It rings a bell, but I'm not certain who
6  he is.
7           (WHEREUPON, a certain document was
8            marked Mallinckrodt-Ratliff
9            Deposition Exhibit No. 046, for
10           identification, as of 12/19/2018.)
11  BY MS. HERZFELD:
12      Q.   I'm going to hand you what is the next
13  exhibit which I believe is No. 46. I'll submit to you
14  that it is yet another Pharmacy Information Sheet.
15      A.   Okay. Thank you.
16      Q.   Take a look at it for a second.
17           Do you know who would receive these
18  pharmacy information sheets at Mallinckrodt?
19      A.   Karen Harper would have maintained them.
20  Is there more than --
21      Q.   Would they have been provided to you at
22  some point during your -- in your job
23  responsibilities?
24      A.   It would have been provided by me to

Page 375

1  Karen. She maintained the files.
2      Q.   Okay. So you would have seen them and
3  they would have crossed your desk?
4      A.   Yes.
5      Q.   Okay. So, sir, this appears to be a
6  Pharmacy Information Sheet dated 2/26/2012 prepared by
7  Ed Hazewski with the source of information being
8  AmerisourceBergen?
9      A.   Um-hum.
10      Q.   Did I say all of that correctly?
11      A.   You did.
12      Q.   Okay. And do you believe that this one
13  also would have crossed your desk in the regular
14  course of business?
15      A.   I don't recall it and my name isn't on it
16  and nor do I have any notes on it. And this is 2/26
17  of '12. That was the time I was transitioning out of
18  Mallinckrodt, going back home to Indiana, working my
19  final days, so there is a strong chance I never saw
20  this.
21      Q.   Okay. And if you didn't see it, who would
22  have been responsible for seeing it?
23      A.   It would have gone to Karen Harper.
24      Q.   It would have gone to Karen Harper, okay.

Page 376

1  So let's just take a look at it for a second.
2      A.   Okay.
3      Q.   On -- it's, again, it's another
4  information pharmacy sheet for East Tennessee Discount
5  Drug in Strawberry Plains, Tennessee, the one we just
6  talked about before. Yes, sir?
7      A.   Okay.
8      Q.   I'm looking down here all of the way at
9  the bottom, and it says: "Top prescribers identified?
10  Yes."
11           Do you know who those top prescribers
12  were?
13      A.   I'm saying I don't know that I ever saw
14  this, so there is no way I would know that.
15      Q.   Okay.
16      A.   Ed Hazewski, I believe, is their security
17  director or security manager for AmerisourceBergen.
18      Q.   Okay.
19      A.   I'm not absolutely positive about that,
20  but --
21      Q.   Okay. So then this says --
22      A.   -- that's what comes to mind.
23      Q.   Okay. And then at the bottom, it says:
24  "Visited on 1/18/2012. Pharmacy is located in a

Page 377

1  supermarket. Spoke personally to the owner/PIC,"
2  which I'm guessing is person in charge, "who is well
3  aware of the," O-X, "OX issue in Tennessee. Customer
4  is being held to strict threshold."
5      A.   Yeah, that would be a pharmacy --
6      MR. O'CONNOR: Objection.
7  BY THE WITNESS:
8      A.   -- pharmacist in charge.
9  BY MS. HERZFELD:
10      Q.   Oh, pharmacist in charge is --
11      A.   PIC is.
12      Q.   Okay. And do you know anything about this
13  conversation that was had with the pharmacist in
14  charge about the oxy issue in Tennessee?
15      A.   No, because I don't think I've ever seen
16  this.
17      Q.   Very good, sir.
18           Okay. I'm going to hand you what we'll
19  mark as exhibit --
20      A.   47.
21      Q.   -- 47. Thank you.
22           (WHEREUPON, a certain document was
23            marked Mallinckrodt-Ratliff
24            Deposition Exhibit No. 047, for

Page 378

1    identification, as of 12/19/2018.)
2  BY MS. HERZFELD:
3    Q.   If you'll take a look at the first page,
4  sir, it appears to be an e-mail from Karen Harper to
5  Christine Inman.
6    Do you know who Christine Inman is?
7    A.   Not right offhand.
8    Q.   Okay.  And I'll cut through some of it
9  here.  You are not copied -- you are not copied on
10  this exact e-mail, but looking at the attachment --
11    A.   Um-hum.
12    Q.   -- it says: "ABC Visit Notes 10/17/2011."
13    Have you seen those before?
14    A.   I would have been involved in that audit,
15  I believe.  So...
16    Q.   I'll submit to you that your name shows up
17  on the metadata for this document, just to kind of
18  push things along a little bit here.
19    Okay.
20    Q.   So you were involved in the audit of ABC
21  on 10/17/2011, is that correct?
22    A.   I believe so, yes.
23    Q.   Okay.  And so looking through these notes
24  for a second here, on Page 2, if you'll flip with me

Page 379

1  to the second page of this audit.
2    A.   Okay.
3    Q.   The very first sentence says: "Some of
4  the Top 40 predate due diligence, ABC requested that
5  the account manager update the questionnaire in
6  advance of the Mallinckrodt visit."
7    Do you know if that occurred?
8    A.   Eventually we talked to management at ABC
9  to ensure that they understood our needs, and
10  eventually, it's my understanding, that they provided
11  all of the necessary documents, but I can't say that
12  unequivocally.
13    Q.   Okay.  So you don't know if the
14  questionnaire itself was updated per your request --
15  per ABC's request?
16    MR. O'CONNOR:  Objection.
17  BY THE WITNESS:
18    A.   I just don't recall.
19  BY MS. HERZFELD:
20    Q.   Okay.  And then it says: "ABC has not
21  necessarily made the decision to visit based upon Top
22  40."
23    Do you know what that refers to?
24    A.   Tell me your question again.

Page 380

1    Q.   Sure.
2    It says, at the top of that document:
3  "ABC has not necessarily made the decision to visit
4  based upon the Top 40."
5    Do you know what that refers to?
6    A.   Not -- not really.
7    Q.   Okay.  Do you know if you created this
8  document?
9    A.   No, I didn't.
10    Q.   Okay.  Do you know if Karen Harper created
11  this document?
12    A.   It's reasonable.
13    Q.   Okay.  Who else was on -- at the audit
14  besides you and Karen Harper?
15    A.   Just the two of us.
16    Q.   Okay.  So if it's notes that were created
17  by Karen Harper, do you find her notes to be generally
18  reliable?
19    MR. O'CONNOR:  Objection.
20  BY THE WITNESS:
21    A.   Yes.
22  BY MS. HERZFELD:
23    Q.   Do you have any reason to doubt the
24  veracity of notes that she has taken at the audit?

Page 381

1    A.   No.
2    Q.   Okay.
3    Okay.  On -- do you know at that audit if
4  Mallinckrodt required copies of AmerisourceBergen's
5  suspicious order monitoring procedures?
6    A.   I know we reviewed them at some point.
7  Excuse me.
8    Q.   Okay.  You reviewed them.  Did you ever
9  get copies?
10    A.   I don't recall.
11    Q.   Okay.
12    MS. HERZFELD:  Okay.  I'm having a really hard
13  time with this microphone today.  My apologies.
14  BY MS. HERZFELD:
15    Q.   Okay.  I'm going to mark -- hand you what
16  we will mark as the next sequential exhibit.  No. 48?
17    A.   Correct.
18    Q.   Yes.
19    (WHEREUPON, a certain document was
20    marked Mallinckrodt-Ratliff
21    Deposition Exhibit No. 048, for
22    identification, as of 12/19/2018.)
23  BY MS. HERZFELD:
24    Q.   Do you recognize this document, sir?

Page 382

1   A.   Let me look at it.

2        Okay.  I recognize it.

3   Q.   Okay.  What do you recognize it to be?

4   A.   An audit report.

5   Q.   Okay.  And is the audit report for

6   AmerisourceBergen?

7   A.   It is.

8   Q.   Okay.  And this audit report was completed

9   2/1/12 according to this document, is that correct?

10  A.   Yes.

11  Q.   Okay.  And did you have input into this

12  document?

13  A.   I would have, yes.

14  Q.   Okay.  So going with me to the second

15  page of this document, if you look down to Section 2,

16  and we are going to look at some of the bolded answers

17  here.

18  A.   Okay.

19  Q.   Okay.  On Page 2 --

20  A.   I see it.

21  Q.   -- it says: "Does the distributor visit

22  the customer's facility to assess clientele, check for

23  out-of-state license plates, long lines, et cetera?"

24  The answer is: "ABC Compliance performance some

Page 383

1   pharmacy on-site inspections.  ABC Sales calls on some

2   pharmacies.  Not all pharmacies are visited by ABC."

3   And then it's blank, the "yes" or "no" beside it.

4        Do you know why it's blank?

5   A.   I don't.

6   Q.   Okay.  Is that something that's supposed

7   to be checked off there?

8        MR. O'CONNOR:  Objection.

9   BY THE WITNESS:

10  A.   Well, I think it's because they do visit

11  some, they don't visit all, so it is not really yes or

12  no, so.

13  BY MS. HERZFELD:

14  Q.   Okay.

15  A.   That's why the information was typed in

16  the box and this is something Karen would have done.

17  Q.   Okay.  So it says here, though, they are

18  supposed to visit at the customer's facility to assess

19  the clientele, check the out-of-state license plates

20  and long lines.

21       That's to check for signs of diversion, is

22  that correct?

23       MR. O'CONNOR:  Objection.

24  BY THE WITNESS:

Page 384

1   A.   Say that one more time, please.

2   BY MS. HERZFELD:

3   Q.   I'll back it up.

4        In your previous testimony about things

5   that can be indicative of diversion at various

6   pharmacies --

7   A.   Um-hum.

8   Q.   -- you talked about different factors

9   that --

10  A.   Okay.

11  Q.   -- could be indicative of diversion, is

12  that correct?

13  A.   Okay.  Yes.

14  Q.   Okay.  And one of those was long lines?

15       MR. O'CONNOR:  Objection.

16  BY THE WITNESS:

17  A.   Correct.

18  BY MS. HERZFELD:

19  Q.   One of those was out-of-state tags in the

20  parking lot?

21       MR. O'CONNOR:  Objection.

22  BY THE WITNESS:

23  A.   Correct.

24  BY MS. HERZFELD:

Page 385

1   Q.   Okay.  And was one of those kind of

2   looking at the clientele, you talked about, you know,

3   old people or young people, people in the parking lot,

4   is that generally what you testified to earlier?

5        MR. O'CONNOR:  Objection.

6   BY THE WITNESS:

7   A.   Correct.

8   BY MS. HERZFELD:

9   Q.   Okay.  And so when you are looking at this

10  question here, it says: "Does the distributor visit

11  the customer's facility to assess clientele, check for

12  out-of-state license plates, long lines, et cetera,"

13  that's essentially a question asking for signs of

14  diversion, is that correct?

15       MR. O'CONNOR:  Objection.

16  BY THE WITNESS:

17  A.   Correct.

18  BY MS. HERZFELD:

19  Q.   Okay.  And here it says that: "ABC

20  Compliance performs some pharmacy on-site inspections"

21  but "not all pharmacies are visited," so they are not

22  looking for diversion at all pharmacies that are on

23  their clientele list according to this answer, is that

24  correct?

Page 386

1    MR. O'CONNOR: Objection.
2  BY THE WITNESS:
3    A.  It is a reasonable assumption.
4  BY MS. HERZFELD:
5    Q.  Okay.  And it is not marked off "yes" or
6  "no" on this audit checklist, is that correct?
7    A.  It appears not.
8    Q.  Okay.  Then the next question says: "Does
9  the distributor have an established procedure for
10  reporting suspicious orders to the DEA before
11  shipment?"  And the answer is: "ABC indicated that
12  they have written SOM procedures and provided
13  Mallinckrodt a listing of those procedure titles."
14    Do you know why it is only the titles were
15  provided to Mallinckrodt?
16    A.  From memory, they said that they were
17  confidential.
18    Q.  Okay.  And so did you -- to your
19  knowledge, you never got a copy of those because they
20  were confidential?
21    A.  They said they were confidential, so they
22  didn't provide us a copy.
23    Q.  Okay.  So how do you know they were --
24  they were adequate if you didn't see a copy?

Page 387

1    A.  Well, they had copied the numbers and so
2  forth and it appeared that it was in sequence and
3  would have been with the titles, we saw those.  We
4  just didn't see the procedures themselves.
5    Q.  Okay.  So you had to make an assumption
6  based on the titles that they were adequate?
7    MR. O'CONNOR: Objection.
8  BY THE WITNESS:
9    A.  Yes.
10  BY MS. HERZFELD:
11    Q.  Okay.
12    Okay.  And then also looking at Page 2, it
13  says, towards the bottom there, the next kind of
14  bolded answer, it says:  "Does the distributor track
15  changes in pharmacy buying patterns?"
16    Do you see where it says that?
17    A.  I do.
18    Q.  Okay.  And then it says: "ABC tracks
19  purchasing patterns in terms of dollars and is
20  converted to dosage unit as needed," and then it
21  checks off "Yes."
22    A.  Um-hum.
23    Q.  Did I read that correctly?
24    A.  Yes.

Page 388

1    Q.  Okay.  On -- do you know what that means?
2    A.  There is -- there is more than one way to
3  track it.  We would prefer if they did it in dosage
4  units.
5    Q.  Okay.  And why is that?
6    A.  Well, because it is easier for us to read.
7    Q.  Okay.
8    A.  So this is not the only company that did
9  it this way, the only distributor.
10    Q.  Okay.
11    Okay.  If you will switch -- if you'll go
12  with me to the one that's marked Page 4 of 8, flip two
13  pages.
14    Under Section 5 at the very bottom, it
15  says "Additional Comments."
16    A.  Okay.
17    Q.  Okay.  Under Additional Comments, it says:
18  "ABC metrics on pharmacy purchases including the
19  following data points are tracked in dollars," dollar
20  sign, "purchased versus dosage units.  ABC compliance
21  director performs conversion from dollars purchased to
22  dosage units 'on the fly.'"
23    Did I read that correctly?
24    A.  You did.

Page 389

1    Q.  Okay.  And was that of concern to -- to
2  Mallinckrodt?
3    MR. O'CONNOR: Objection.
4  BY THE WITNESS:
5    A.  It is one way to do it.  We would prefer
6  if they did it in dosage units.  It would make it much
7  simpler for us.
8  BY MS. HERZFELD:
9    Q.  I'm going to stop for a second because I
10  don't think I actually finished reading that sentence.
11    If you will flip with me to the next
12  page, so we'll go "on the fly as requested.
13  Mallinckrodt auditors suggested that ABC consider
14  implementing dosage unit measurements for the purposes
15  of," suspicious order monitoring, "SOM."
16    A.  Yeah.
17    Q.  Did I read that correctly?
18    A.  That is correct.
19    Q.  Okay.  So your preference was that it
20  would be do in -- done in dosage unit measurements?
21    A.  Um-hum.
22    Q.  But ABC did it according to dollars?
23    MR. O'CONNOR: Objection.
24  BY MS. HERZFELD:

Page 390

1    Q.   Yes, sir?  Is that a yes?
2    A.   Would we prefer it in dosage units?
3    Q.   Yes, sir.
4    A.   Absolutely.
5    Q.   Okay.  And that's because it is easier to
6  track suspicious orders that way, is that correct?
7    MR. O'CONNOR:  Objection.
8  BY THE WITNESS:
9    A.   Correct.
10  BY MS. HERZFELD:
11    Q.   Okay.  And do you know if they ever
12  changed the way they did it?
13    A.   I don't know.
14    Q.   Okay.  Do you know what they meant by "on
15  the fly"?
16    A.   If needed he would do it, because it's on
17  the fly.
18    Q.   So it wasn't done regularly, just if
19  somebody requested it?
20    A.   That's my memory of it.
21    Q.   Okay.  Great.
22        Okay.  Switching back to Page 3 of 8.
23    A.   Back to 3 of 8?
24    Q.   Yes, sir.  Section 3.

Page 391

1    A.   Section 3.  Okay.
2    Q.   Go to the one that's the first bolded one,
3  that's probably the easiest way to get there.
4        "Does the distribute" -- "Does the
5  distributor audit pharmacy customers and review Rx
6  data to check for patterns of excessive prescribing by
7  physicians?"  The answer is:  "ABC audits some but not
8  all pharmacies to screen for excessive prescribing by
9  physicians."  And then "yes" or "no" is not checked.
10        Did I read that correctly, sir?
11    A.   You did.
12    Q.   Okay.  So if AmerisourceBergen is not
13  checking all pharmacies for excessive prescribing by
14  physicians, it wouldn't be seeing if people were -- if
15  pharmacies were filling excessive prescriptions by
16  particular physicians, is that correct?
17    MR. O'CONNOR:  Objection.
18  BY THE WITNESS:
19    A.   If they didn't do all.
20  BY MS. HERZFELD:
21    Q.   So there could be some pill mills that
22  were writing prescriptions filled by some of those
23  pharmacies and they wouldn't be caught, is that
24  correct?

Page 392

1    MR. O'CONNOR:  Objection.
2  BY THE WITNESS:
3    A.   That's an assumption.
4  BY MS. HERZFELD:
5    Q.   Okay.  So it's possible, yes, sir?
6    A.   It's possible.
7    Q.   Okay.
8        Okay.  And then if you'll go down to
9  Section No. 4, the second question.
10    A.   Um-hum.
11    Q.   "That the physician complies with the laws
12  in every state in which controlled substances are sold
13  or shipped?"  Answer:  "ABC checks discipline history
14  for top dispensing physicians when they obtain that
15  information from pharmacies, but such information is
16  not gathered for all pharmacies."
17        Did I read that correctly?
18    A.   You did.
19    Q.   Okay.  So it looks like only top
20  prescribing physicians get their discipline history
21  checked from that.
22        Was that concerning to you in the audit?
23    MR. O'CONNOR:  Objection.
24  BY THE WITNESS:

Page 393

1    A.   Yes.
2  BY MS. HERZFELD:
3    Q.   Okay.  And it's marked "no" in the check
4  box, is that correct?
5    A.   That's correct.
6    Q.   Okay.  And what do the yes or noes
7  indicate here?
8    A.   We ask questions to see how robust their
9  sus-- suspicious order monitoring program is.
10    Q.   Okay.
11    A.   So we've developed this, Karen did, to
12  cover a lot of those questions that would help us
13  better assess, give us more information to make a
14  determination.
15    Q.   Okay.  And then switching back to Page 6
16  of 8, if you go halfway down the page, it says:  "ABC
17  Non-Florida Top Dispensing Oxy 30 Pharmacies:  Twenty
18  Pharmacies Reviewed With ABC Previous Quarterly
19  Meeting."
20        And then it says:  "ABC was not prepared
21  with any updated statistical information to re-review
22  the 20 non-Florida pharmacies discussed in the
23  previous quarterly meeting 10/17/11."
24        Did I read that correctly?

Page 394

1    A.   You did.
2    Q.   Okay.  And were you concerned that they
3  were not prepared with updated statistical information
4  since your last audit?
5         MR. O'CONNOR: Objection.
6  BY THE WITNESS:
7    A.   Concerned enough to contact their
8  management to determine what they knew about their
9  process and what they were going to do to meet our
10 requirements.
11 BY MS. HERZFELD:
12   Q.   Okay.  And is there a memo or something
13 somewhere that reflects that conversation with
14 management?
15   A.   Our attorneys were the responsible parties
16 that made the contact.  We were in the room, but we
17 didn't speak and I don't know if there was a document.
18 We were assured at that time that they were unaware
19 that they weren't being as compliant as they should
20 and they would take care of the situation, so.
21   Q.   Okay.  And do you know if any of those
22 things were updated that were requested to be updated?
23   A.   I don't know that.
24   Q.   Okay.  So finishing off just that

Page 395

1  sentence: "ABC Compliance Director committed to
2  updating the pharmacy information sheets and providing
3  information for Mallinckrodt for further review."
4         Was that after the conversation with the
5  lawyers?
6    A.   I don't recall exactly when that occurred,
7  the conversation with attorneys.  This was when I was
8  phasing out of the company.
9    Q.   Okay.
10   A.   And I just -- I don't know.
11   Q.   Okay.
12        Okay.  And then looking at Page 6, it
13 talks about some specific pharmacies that were of
14 concern for that were mentioned in this report.  The
15 first one is Munsey Pharmacy in Tennessee.
16        Do you see where I am at, on Page 6 of 8?
17   A.   Where in the page, it is a big page?  Oh,
18 Munsey down at the bottom.
19   Q.   Yeah, do you see it?
20   A.   Okay.  ABC 11/30.
21   Q.   Okay.  So here it says: "ABC provided
22 Mallinckrodt information 11/30/11 that ABC had
23 discontinued selling controlled drugs to this
24 pharmacy.  Mallinckrodt discussed this account with Ed

Page 396

1  and Mallinckrodt agrees with ABC's decision based on
2  ABC's surveillance results and the pharmacist's
3  conversation in which the pharmacist was behaving
4  erratically and emotionally crying."
5         Do you know what happened -- oh, sorry.
6  I'll finish that.
7         "When ABC discussed current oxy diversion
8  trends."
9         Were you involved at all in that
10 conversation with the pharmacist?
11   A.   No.
12   Q.   Okay.  Was it reported to you what was
13 said and kind of what was your understanding of it?
14        MR. O'CONNOR: Objection.
15 BY THE WITNESS:
16   A.   That's -- it's in the notes here.  That's
17 what I note.
18 BY MS. HERZFELD:
19   Q.   That's it.  Okay.
20        And so do you know what the current oxy
21 diversion trends are that's referred to here?
22   A.   I don't.
23   Q.   Okay.
24        Okay.  Then the next one on the list is

Page 397

1  Jabos Pharmacy, which we talked about a little bit
2  earlier.
3    A.   Um-hum.
4    Q.   I'm looking at where it says Jabos, it
5  says: "ABC previously provided Mallinckrodt
6  (11/30/11) that ABC had discontinued selling
7  controlled drugs to this company."
8         Did I read that correctly?
9    A.   To this pharmacy.
10   Q.   Oh, sorry.  "To this pharmacy."
11   A.   Yes.
12   Q.   Okay.  "However, ABC stated in the meeting
13 with Mallinckrodt 2/1/12 that they've reconsidered
14 their decision and are continuing business with
15 Jabos."
16        Did I read that correctly?
17   A.   You did.
18   Q.   "Mallinckrodt expressed concerns about
19 this decision when ABC indicated that a customer who
20 exited Jabos during ABC's surveillance of the Jabos
21 parking lot attempted to sell oxycodone 30-milligram
22 tablets to the ABC investigator.  ABC indicates they
23 have fired the ABC sales rep who formerly called on
24 Jabos because ABC determined that the sales rep was

Page 398

1 incorrectly representing Jabos Pharmacy business and
2 asking ABC to increase Jabos controlled substance
3 purchasing limits."
4        Did I read that correctly?
5    A.   You did.
6    Q.   Okay.  And do you know any other
7 information than what's contained in this paragraph
8 about what happened at Jabos?
9    A.   No, but I -- I remember distinctly him
10 talking about the customer coming out and trying to
11 sell their security person some drugs, so.
12   Q.   Okay.  And that's something that would
13 indicate diversion, is it not?
14   A.   Absolutely.
15   Q.   Okay.  And do you know if ABC reconsidered
16 their decision and decided to continue their business
17 with Jabos?
18   A.   I don't know that.
19   Q.   But it indicates in this paragraph
20 that that's what they were considering, is that right?
21   A.   That's what it says.
22   Q.   Okay.  And do you know if Mallinckrodt
23 took any action -- action to stop having -- stop
24 having their product go from ABC to Jabos?

Page 399

1        MR. O'CONNOR:  Objection.
2 BY THE WITNESS:
3    A.   I don't know that.
4 BY MS. HERZFELD:
5    Q.   Okay.  And do you know if Mallinckrodt
6 products continued to ship to Jabos Pharmacy in
7 Tennessee?
8        MR. O'CONNOR:  Objection.
9 BY THE WITNESS:
10   A.   I don't know that.
11 BY MS. HERZFELD:
12   Q.   Okay.  Do you know if Jabos at this time,
13 the two -- 2/1/12, do you know if Jabos was put on a
14 chargeback restriction list?
15   A.   I don't know that.
16   Q.   Okay.
17        Okay.  You can set that document down,
18 sir.
19   A.   Okay.
20   Q.   Okay.  So you personally didn't conduct
21 any site visits of these pharmacies, is that correct,
22 sir?
23   A.   That's correct.
24   Q.   Okay.  And the ones we've just talked

Page 400

1 about in Tennessee?
2    A.   Yes.
3    Q.   Okay.  And to your knowledge, Mallinckrodt
4 didn't personally conduct any site visits to those
5 pharmacies in Tennessee, is that correct?
6        MR. O'CONNOR:  Objection.
7 BY THE WITNESS:
8    A.   Some audits were conducted by the person
9 who took my position once I left.
10 BY MS. HERZFELD:
11   Q.   Okay.
12   A.   I don't know if he conducted any in
13 Tennessee or not.  That's a possibility.
14   Q.   Okay.  So to clarify my question then,
15 during your tenure --
16   A.   No.
17   Q.   -- you don't know of any site visits that
18 were done in Tennessee on behalf of Mallinckrodt?
19   A.   Correct.
20   Q.   Okay.  Do you agree that there are some
21 signs of diversion that can only be detected through a
22 site visit?
23        MR. O'CONNOR:  Objection.
24 BY THE WITNESS:

Page 401

1    A.   Yes.
2 BY MS. HERZFELD:
3    Q.   Okay.  Like long lines?
4    A.   Correct.
5    Q.   Customers engaging in drug seeking
6 behaviors, like trying to sell oxy in the parking lot?
7    A.   Yes.
8    Q.   Okay.  Cars full of pharmacy customers?
9    A.   Yes.
10   Q.   Okay.  Cars in the parking lot with
11 license plates from other states or far away counties?
12   A.   Yes.
13   Q.   Okay.  Pharmacies with minimal or no
14 front-end merchandise?
15   A.   Yes.
16   Q.   Pharmacies with little or no walk-in
17 business?
18   A.   Yes.
19   Q.   Evidence of illicit drug use around the
20 facility?
21   A.   Yes.
22   Q.   Okay.  Mailing materials or other evidence
23 of operation of an internet pharmacy?
24   A.   I don't know that.  What are you saying?

Page 402

1    Q.   If you show up and it looks like it's just
2  like a computer and there are some pamphlets there
3  because it's an address for nothing but an internet
4  pharmacy?
5    A.   Yeah, I don't -- I've never encountered an
6  internet pharmacy.
7    Q.   Okay.  Primarily cash transactions, is
8  that something you could see with a site visit?
9    A.   That's information that would be furnished
10 by the pharmacy.
11   Q.   Okay.
12   A.   There is no way by a site visit that we
13 would see if it was cash or -- or other.
14   Q.   Okay.  What about if there was only one
15 employee that was responsible for the order,
16 monitoring and invoicing of products, is that
17 something you could determine at a site visit?
18   A.   Not necessarily.
19   Q.   Okay.  What about photographs, is there a
20 way to obtain photographs if you haven't done a site
21 visit?
22   A.   Are you asking about if we did the site
23 visit or if we required the distributor to do the site
24 visit?

Page 403

1    Q.   Well, I guess I'm asking, site visits
2  would provide the best opportunity for photographs of
3  a particular site, is that correct?
4    A.   We always requested photographs from the
5  distributors.
6    Q.   Okay.  It sounds like the distributors
7  didn't always give them to you, is that right?
8    A.   Correct.
9    Q.   Okay.  Did you sometimes look up
10 pharmacies on things like Google Maps or Google --
11 Google Earth back in 2012?  I don't even know if it
12 existed.
13   A.   I don't know if it was in 2012, but we did
14 that on occasion.
15   Q.   Okay.  And would that be sufficient to
16 satisfy the photographs element of what it is you
17 required?
18   MR. O'CONNOR:  Objection.
19   BY THE WITNESS:
20   A.   No.  It was done not for that purpose.
21   BY MS. HERZFELD:
22   Q.   Okay.
23   A.   We were trying to determine if a building
24 existed or an address existed and where it was in

Page 404

1  location to other businesses, was it a prominent
2  location or in an isolated location.
3    Q.   Okay.  And did you do anything to verify
4  that AmerisourceBergen's information that they gave
5  you about those Tennessee pharmacies was accurate?
6    A.   Personally?
7    Q.   Yes, sir.
8    A.   No.
9    Q.   Do you know if anyone within Mallinckrodt
10 did?
11   A.   Not while I was there.  I don't know.
12   Q.   Okay.
13        When you were looking for potential
14 diversion at pharmacies, was one of the things that
15 you would take into -- into account is whether
16 multiple distributors were providing oxycodone to one
17 pharmacy?
18   A.   There is no way we would know that.
19   Q.   Okay.  So how would you not know that?
20   A.   Because we don't have access to other
21 manufacturers' records.
22   Q.   I'm sorry.  I must not have asked the
23 question very well.  I apologize.
24        So I guess what I'm trying to figure out

Page 405

1  is if you had multiple customers, it's possible that
2  AmerisourceBergen and McKesson could have both been
3  shipping Mallinckrodt oxycodone to Jabos Pharmacy, for
4  example, is that correct?
5    MS. KVESELIS:  Object to the form.
6  BY THE WITNESS:
7    A.   I don't know.  I really don't.  I mean,
8  if -- so if we had -- yeah, I just don't know that.
9  BY MS. HERZFELD:
10   Q.   Okay.  I'm going to show you a document
11 that's been listed in your custodian file, and maybe
12 we can see each other on the same page on this, okay.
13 We'll mark this as Exhibit 49.
14        (WHEREUPON, a certain document was
15         marked Mallinckrodt-Ratliff
16         Deposition Exhibit No. 049, for
17         identification, as of 12/19/2018.)
18 BY MS. HERZFELD:
19   Q.   Take a minute and look at it.
20   A.   "Custodian Bill Ratliff," who -- who put
21 that on there?
22   Q.   Oh, I think that's probably my notes.
23   A.   On the front, it says:  "ABC Top 40 and
24 Multi Dist Tab, Custodian:  Bill Ratliff."

Page 406

1      (WHEREUPON, there was a short
2      interruption.)
3  BY THE WITNESS:
4      A.   Okay.  These were mine.
5  BY MS. HERZFELD:
6      Q.   That's probably my note on the front just
7  to know what it is.
8      Okay.  So if you look with me, sir, for
9  the second page here, it says at the top:
10  "AmerisourceBergen All Other States 30-milligram
11  2011," year to date, "YTD."
12      Did I read that correctly?
13      A.   Well, let me look at this again because I
14  was --
15      MR. O'CONNOR:  Which page?
16      MS. HERZFELD:  The second page.  Well, the
17  second graph page.  This one.
18      MR. O'CONNOR:  So the third page of the packet.
19      MS. HERZFELD:  Third page of the packet.
20  BY THE WITNESS:
21      A.   Right, I remember this page.
22  BY MS. HERZFELD:
23      Q.   So you remember the first page with the
24  yellow highlighting on it?

Page 407

1      A.   Yes.
2      Q.   Okay.  And that says "Florida" at the top?
3      A.   Right.
4      Q.   Okay.  So switch to the next page with me.
5      A.   I don't remember this at all.
6      Q.   Okay.  What does the second one say?  It
7  says: "All Other States 30-milligram," is that
8  correct?
9      A.   Yes.
10      Q.   Okay.  So looking through that list,
11  the -- the second -- the second pharmacy there is
12  Rippetoe, Inc. --
13      A.   Um-hum.
14      Q.   -- in Morristown, Tennessee.
15      Did I read that correctly?
16      A.   You did.
17      Q.   Okay.  And then if you look all of the way
18  over to the right, it's in that little blue box, it
19  says "Multi Dist."
20      Does that stand for multiple distributors?
21      A.   That would be my opinion about it, yes.
22      Q.   Okay.  And then looking down midway
23  through this chart, one, two, three, four, five, six,
24  seven, eight, nine, the ninth one down is, there we go

Page 408

1  again, Jabos Pharmacy, do you see it, in Newport,
2  Tennessee?
3      A.   I do.
4      Q.   Okay.  And that one also says "Multi Dist"
5  all of the way to the right?
6      A.   Um-hum.
7      Q.   Okay.  And I'm sorry.  It says at the top,
8  right there, "Sales Quantity Government UOM," that
9  stands for unit of measure?
10      A.   I don't know.
11      MR. O'CONNOR:  Objection.
12  BY MS. HERZFELD:
13      Q.   Do you know what a unit of measure is, a
14  government unit of measure?
15      A.   No.
16      Q.   Okay.  And then going down four more from
17  Jabos Pharmacy, it says:  "East Tennessee Discount
18  Drugs, Strawberry Plains, Tennessee."
19      Do you see where I'm at?
20      A.   Um-hum.
21      Q.   And then that one doesn't say Multi Dist?
22      A.   Um-hum.
23      Q.   So from looking at this, the ones that say
24  "Multi Dist," does that mean they have multiple

Page 409

1  distributors that were distributing to them?
2      A.   I still have a problem with who put on the
3  front of this "Custodian Bill Ratliff."
4      Q.   Sir, all I'm doing is telling you it was
5  presented to us as being in your custodian file.
6      A.   Because I don't recall these other two
7  pages.
8      Q.   Okay, sir.
9      A.   I just -- you know, the one page I do
10  recall.
11      Q.   Okay.
12      A.   Because I had that for the two other --
13  these were all Florida.  So somebody added this to it,
14  and I don't know who the source is of that.
15      Q.   Okay.
16      A.   Or that I should know about this.
17      Q.   So did you only look at the top
18  distributors for Florida?
19      A.   Yes.
20      MR. O'CONNOR:  Objection.
21  BY MS. HERZFELD:
22      Q.   Did -- did you look at the top
23  distributors outside of Florida?
24      A.   Well, not originally, so.  I mean, there

Page 410

1 may have been a time that they started looking at
2 those, but we literally concentrated on Florida
3 initially. And you have to remember then shortly
4 after the first of the year, I was transitioning out
5 of the company, so. When you are asking did we do it,
6 I didn't do it.
7     Q.   Okay.  Okay.  Okay.  Then you can set that
8 one aside.
9     A.   Okay.
10     Q.   Okay.  You also participated in reviewing
11 McKesson's top pharmacies, is that correct?
12     A.   Correct.
13     Q.   And McKesson had only one pharmacy listed
14 in Tennessee, Bradley Drug Company.  Do you recall
15 that?
16     A.   No.
17     MS. KVESELIS:  Object to form.
18 BY MS. HERZFELD:
19     Q.   Okay.  Do you ever recall hearing about
20 Bradley Drug Company in Nashville?
21     A.   I did -- I did Florida.
22     Q.   You only did Florida?
23     A.   Yes.
24     Q.   Okay.  I'm going to hand you what we are

Page 411

1 going to mark as Exhibit 50.
2         (WHEREUPON, a certain document was
3          marked Mallinckrodt-Ratliff
4          Deposition Exhibit No. 050, for
5          identification, as of 12/19/2018.)
6 BY MS. HERZFELD:
7     Q.   Okay.  Sir, this appears to be an e-mail
8 that was sent from you to Donald Walker, December 5th,
9 2011?
10     A.   Okay.
11     Q.   Is that correct?
12     A.   Yes.
13     Q.   Okay.  And it copies Donald Lohman and
14 Karen Harper.
15         Who was Donald Walker?
16     A.   He was the vice president in charge of --
17 I don't know his exact title, but he was with
18 McKesson.
19     Q.   Okay.  And Donald Lohman?
20     A.   He is sitting right there.
21     Q.   Do you know who that is?
22         Oh, there he is.  Hello.
23         Okay.  So in this e-mail, it says:  "Don,
24 as you may recall, the original list presented to

Page 412

1 McKesson contained 20 pharmacies in and 20 out of the
2 State of Florida.  15 of the pharmacies out of the
3 State of Florida were handled by Michael Oriente
4 leaving five that we have not addressed.  They are as
5 follows."  And the last one on that list is:  "Bradley
6 Drug Company, Tennessee."
7         Did I read that correctly?
8     A.   You did.
9     Q.   Okay.  "It would be helpful if we could
10 identify the persons that handle those pharmacies," et
11 cetera, et cetera.  "Thanksgiving," et cetera.
12         Did I read that correctly?
13     MR. O'CONNOR:  Objection.
14 BY MS. HERZFELD:
15     Q.   Okay.  And then switching to the second
16 page, it appears to be an e-mail from Don Walker to
17 you, 12/12/2011, Additional Pharmacies.
18         "Bill, attached is the documentation for
19 all of the remaining pharmacies with the exception of
20 Laabs," and then there is an attachment to that
21 e-mail.
22     MR. O'CONNOR:  Counsel, the Bates numbers are
23 not consecutive here.  Are you suggesting that
24 these --

Page 413

1     MS. HERZFELD:  Oh, you know what, I think
2 somebody probably put them together.  We can label
3 them as separate exhibits, if you prefer.
4     MR. O'CONNOR:  Yeah, I think so, so to be clear,
5 are you saying that Bates number ending in 282 is
6 Exhibit 50?
7     MS. HERZFELD:  50.  And let's do the ones ending
8 4116 and 4117 as 51.  My apologies for that.
9         (WHEREUPON, a certain document was
10          marked Mallinckrodt-Ratliff
11          Deposition Exhibit No. 051, for
12          identification, as of 12/19/2018.)
13 BY MS. HERZFELD:
14     Q.   Okay.  So now looking at document 51, it
15 appears to be an e-mail from Don Walker to you, is
16 that correct?
17     A.   Yes.
18     Q.   Okay.  And do you have any reason to think
19 that this wasn't sent to you?
20     A.   No.
21     Q.   Okay.  And so it talks about additional
22 pharmacies on 12/12/2011.
23     A.   Um-hum.
24     Q.   And then there is an attachment which is

Page 414

1  the second page.
2       Will you take a look at that for me,
3  please?
4       A.   Yes.
5       Q.   Okay.  And do you know what this document
6  is?
7       A.   It's our form that we would give the --
8  the companies to fill out to give us the information.
9       Q.   So it looks like it's a version of the
10 pharmacy information sheets we were going over
11 earlier?
12      A.   Yes.
13      Q.   Okay.  And the pharmacy name on this one
14 is Bradley Drug Company in Nashville, Tennessee, is
15 that correct?
16      A.   Correct, yes.
17      Q.   Okay.  So going through this --
18      A.   It says:  "Active/sales of controlled
19 substances restricted."
20      Q.   Yes, sir.
21           Okay.  So it says in that e-mail, if
22 you'll flip back, in that first paragraph --
23      A.   Um-hum.
24      Q.   -- "Bill, attached is the documentation

Page 415

1  for all remaining pharmacies with the exception of
2  Laabs.  We ceased all controls to Laabs in October
3  after action taken by DEA and FBI.  The one I have
4  directed some additional work on is Bradley given the
5  prescribing physicians."
6       Do you know what he meant by "given the
7  prescribing physicians"?
8       MS. KVESELIS:  Object to the form.
9  BY THE WITNESS:
10      A.   I don't know.
11 BY MS. HERZFELD:
12      Q.   You don't know what he was referring to?
13      A.   No.
14      Q.   Okay.  So looking at the Pharmacy
15 Information Sheet then on the second page --
16      A.   Okay.
17      Q.   -- it says:  "Top prescribers identified:
18 As of 10/25/2011," at the bottom of the page.
19           Do you see where I am at?
20      A.   Yes.
21      Q.   Okay.  It says "James Pogue, RT Cochran,
22 Junior, Luis Yarzagaray, Cindy Scott, and Michael
23 Rhodes," is that correct?
24      A.   Yes.

Page 416

1       Q.   Okay.  And it says:  "If so, background
2  checks?  Pogue had reprimand for unprofessional
3  conduct in 9/9 for injecting multiple patients with
4  HGH for pain.  Cochran, Yarzagaray, Scott and Rhodes
5  are clear."
6       Did I read that correctly?
7       A.   You did.
8       Q.   Okay.  And this form came attached to this
9  e-mail on 12/12/2011, is that correct?
10      A.   Correct.
11      Q.   Okay.  Did you do anything to verify the
12 information that was contained within this worksheet?
13      A.   No.
14      Q.   Okay.  And did you yourself fill out this
15 worksheet, the Pharmacy Information Sheet?
16      A.   No.
17      Q.   Okay.  The information was given to you by
18 the distributor?
19      A.   Yes.
20      Q.   Okay.  In this case that would be
21 McKesson, is that right?
22      A.   Correct.
23      Q.   Okay.  I'm going to hand you what we'll
24 mark as Exhibit 52.

Page 417

1            (WHEREUPON, a certain document was
2            marked Mallinckrodt-Ratliff
3            Deposition Exhibit No. 052, for
4            identification, as of 12/19/2018.)
5  BY MS. HERZFELD:
6       Q.   Do you recognize this document as a
7  Pharmacy Information Sheet for Bradley Drug Company,
8  sir?
9       A.   Yes.
10      Q.   Okay.  And it is dated 3/20/2012, is that
11 correct?
12      A.   Correct.
13      Q.   It says it is prepared by Bill Mahoney.
14           Do you know who that is?
15      A.   No.
16      Q.   Okay.  Do you know whose handwriting this
17 is on the document?
18      A.   It's mine.
19      Q.   Okay.  Could you read it for me, please?
20      A.   And I wrote at the top, "Bill Mahoney," I
21 wrote "3/22/12, blister packing for" --
22      Q.   I thought it might be nursing?
23      A.   -- "nursing homes, 15,000 square feet,
24 near the hospital district near Vanderbilt," and then

Page 418

1 it says, "Comfortable."
2 Q. Okay. Do you know what you meant by your
3 notes there?
4 A. That was the location, I believe.
5 Q. Where did you obtain information about
6 where that pharmacy was located?
7 A. Well, from Bill Mahoney. It appears that
8 I talked to him on 3/20/2012.
9 Q. Okay. And Bill Mahoney, did he work for
10 McKesson?
11 A. That's an assumption. I -- I don't really
12 remember at this point.
13 Q. Okay. Did you do anything to verify that
14 information about it being near Vanderbilt or near the
15 hospital district?
16 A. No.
17 Q. Okay. In fact, sir, it is not near
18 Vanderbilt or the hospital district.
19 A. Say again.
20 Q. It is not near Vanderbilt or the hospital
21 district. Has anyone told you that?
22 MR. O'CONNOR: Objection.
23 BY THE WITNESS:
24 A. If he said -- I mean, I wrote down what he

Page 419

1 told me.
2 BY MS. HERZFELD:
3 Q. Okay. But you didn't do anything else to
4 verify that?
5 A. I didn't.
6 Q. Okay. Would one of the things that you
7 were looking for for a pharmacy that may be
8 potentially engaged in diversion the area in which
9 it's located?
10 MR. O'CONNOR: Objection.
11 BY THE WITNESS:
12 A. Occasionally that will tell us something,
13 but it also tells us why they would be using a lot of
14 our product, be it they are near a hospital or -- or
15 an area where there are a lot of doctors and so forth.
16 BY MS. HERZFELD:
17 Q. Okay. But if it wasn't and it was a high
18 crime area, for example, is that something that could
19 be indicative of diversion?
20 MR. O'CONNOR: Objection.
21 BY THE WITNESS:
22 A. It could be, but not necessarily.
23 BY MS. HERZFELD:
24 Q. What if you went to that pharmacy and you

Page 420

1 saw -- if you were doing a site visit and you saw that
2 it was surrounded by check cashing places and liquor
3 stores and pawn shops and things of -- of that nature
4 in a high crime area --
5 MR. O'CONNOR: Objection.
6 BY MS. HERZFELD:
7 Q. -- would that be indicative of you that
8 you might need to look a little bit closer for
9 diversion at that pharmacy?
10 MR. O'CONNOR: Objection.
11 BY THE WITNESS:
12 A. Possibly.
13 At that point I was dealing with McKesson
14 and they were being very -- they had hired a new
15 person to -- to help develop a program and they did
16 everything that we had asked them to do, so no longer
17 filling except for long-term patients. They are more
18 careful, Pogue is allegedly. "All clear except for
19 Pogue." So that was also a note that he told me at
20 the time, so.
21 Q. Okay. So based on your notes here and
22 your conversation with Mr. Mahoney, you felt
23 comfortable --
24 A. Based on what he told me, yes.

Page 421

1 Q. -- continuing to allow Mallinckrodt
2 products to go through McKesson to Bradley Drug, is
3 that correct?
4 MR. O'CONNOR: Objection.
5 MS. KVESELIS: Object to the form.
6 BY THE WITNESS:
7 A. Yes.
8 BY MS. HERZFELD:
9 Q. Okay. Did you do anything independently
10 to verify the information that was provided to you on
11 this sheet by McKesson?
12 A. I did not.
13 Q. Did anyone at Mallinckrodt look at IMS
14 data for any of these physicians?
15 MR. O'CONNOR: Objection.
16 BY MS. HERZFELD:
17 Q. Or I'm sorry. For the area?
18 MR. O'CONNOR: Objection.
19 BY THE WITNESS:
20 A. So you are saying where this is located?
21 BY MS. HERZFELD:
22 Q. Yes, sir.
23 A. Not to my knowledge.
24 Q. Okay.

Page 422

1    A.   I'm not certain that I was -- I think I
2  was already in Indiana when this occurred, so.
3    Q.   Okay.  Do you know why Bradley Drug
4  Company was placed on a chargeback restriction list?
5    MR. O'CONNOR:  Objection.
6  BY THE WITNESS:
7    A.   I don't.
8  BY MS. HERZFELD:
9    Q.   Okay.  Or if it ever was?
10   A.   I don't know that.
11   Q.   Okay.  This should go pretty quickly now.
12        When it said in the previous exhibit that
13  Pogue had been disciplined in 2009 for use of HGH
14  treatment for pain, do you know what the circumstances
15  were of that discipline?
16   A.   No.
17   Q.   Did Mallinckrodt do any additional
18  research to find out more information about that
19  disciplinary infraction?
20   A.   They basically put the information there
21  as why he was disciplined in 2009.  He supplied HGH in
22  treatment of pain.
23   Q.   Okay.  And do you know if Dr. Pogue is
24  prescribing now?

Page 423

1    A.   I don't know that.
2    Q.   Okay.  Do you know if Dr. Pogue still has
3  a medical license or prescribes -- a license to
4  prescribe?
5    A.   I have no idea.
6    Q.   Okay.
7        Okay.  What about Robert Cochran, do you
8  know if Robert Cochran is still able?
9    A.   I have no idea.
10   Q.   Okay.  What about Michael Rhodes, if
11  Michael Rhodes had --
12   A.   I have no idea.
13   Q.   -- if he had been reprimanded for
14  prescribing controlled substances without documenting
15  appropriate medical histories or performing adequate
16  physical examinations back in 2009, is that
17  information you would have wanted to have known?
18   A.   Yes.
19   MR. O'CONNOR:  Objection.
20   THE WITNESS:  Sorry.
21  BY MS. HERZFELD:
22   Q.   Okay.  Is an order like that in a
23  physician's file something that could be indicative of
24  diversion?

Page 424

1    MR. O'CONNOR:  Objection.
2  BY THE WITNESS:
3    A.   It would have been -- it would have been
4  interesting to know.
5    MS. HERZFELD:  Okay.  We'll mark the next
6  exhibit 54.
7    THE WITNESS:  53.
8    MS. HERZFELD:  53.
9        (WHEREUPON, a certain document was
10       marked Mallinckrodt-Ratliff
11       Deposition Exhibit No. 053, for
12       identification, as of 12/19/2018.)
13  BY MS. HERZFELD:
14   Q.   If you'd take a look at this document,
15  sir, I'll submit to you that it's a copy of the
16  Consent Order by the Tennessee Department of Health.
17  Again, Dr. Michael Rhodes.  If you'd take a look at
18  the back page, it is dated July 21st of 2009.
19        Have you ever seen this document before,
20  sir?
21   A.   I have not.
22   Q.   Okay.  And you weren't aware of this
23  previous disciplinary history of Dr. Rhodes?
24   A.   I was not.

Page 425

1    Q.   And what about Cindy Scott, the nurse we
2  discussed earlier, do you know if she still has a
3  license to prescribe?
4    MR. O'CONNOR:  Objection.
5  BY THE WITNESS:
6    A.   I have no idea.
7  BY MS. HERZFELD:
8    Q.   Okay.
9        Okay.  You testified earlier that you have
10  some familiarity with chargeback data in your -- in
11  the context of your job at Mallinckrodt, is that
12  correct?
13   A.   No.  I have very little information.
14   Q.   Okay.
15   A.   I am still totally confused by it.
16   Q.   Okay.  Did you review chargeback data
17  regularly as part of your job?
18   A.   No.
19   Q.   I'll come back to that in one second.
20        Do you recall on any discussion about a
21  Food City in Tennessee from your time at Mallinckrodt?
22   MR. O'CONNOR:  Objection.
23  BY THE WITNESS:
24   A.   I don't -- I don't recall.

Page 426

BY MS. HERZFELD:

1  BY MS. HERZFELD:
2      Q.   I'm going to show you what we will mark as
3  54.
4          (WHEREUPON, a certain document was
5          marked Mallinckrodt-Ratliff
6          Deposition Exhibit No. 054, for
7          identification, as of 12/19/2018.)
8  BY MS. HERZFELD:
9      Q.   No. 54, ignore this top page if it makes
10  you nervous.  As I'm handing this to you, I will
11  submit to you that this was not in your custodian
12  file.  It was in a general file.
13     A.   Okay.
14     Q.   But my question is, take a look at it, the
15  file name on this document was:  "May 2012 Top Oxy 30
16  Pharmacies."  If you look down, they are classified by
17  state.
18     A.   Um-hum.
19     Q.   And if you look at the second page and you
20  get to where it says "Tennessee," if you'll take a
21  look with me there, sir, it should be on the last
22  page.
23          Do you see where I am at?
24     A.   I have never seen it before.

Page 427

1      Q.   That's okay.
2          So down on Tennessee, there is a couple of
3  different ones that are highlighted yellow.  Do you
4  see where I am at?
5      A.   I see them.
6      Q.   Okay.  And there are two that are Food
7  City, Chapman Highway and Seymour, Tennessee?
8      A.   I see that.
9      Q.   So one is AmerisourceBergen and the other
10  is DBS Trading, Inc. Masters Pharmacy.
11          Do you see that?
12     A.   I do.
13     Q.   Okay.  And then there are some notes all
14  of the way to the right there.  One of the notes says
15  "PIS."
16          Do you know what PIS means?
17     A.   I don't know.
18     Q.   Okay.  And then the next note says:  "B.
19  Ratliff," I'm assuming that's you --
20     A.   Yes.
21     Q.   -- "recommends restricting" --
22     A.   Okay.
23     Q.   -- that Food City.
24          Do you know why you would have recommended

Page 428

1  restricting that Food City in Tennessee?
2      MR. O'CONNOR:  Objection.
3  BY THE WITNESS:
4      A.   Well, the only thing I would tell you is,
5  I was no longer with the company.  I was already
6  retired.
7  BY MS. HERZFELD:
8      Q.   Okay.  Well, it looks like some of this
9  data is back from June 2011, and it says you
10  recommended restricting it.
11     A.   Okay.
12     Q.   So do you have any memory why you would
13  have recommended restricting that pharmacy?
14     A.   If it's the one that says Masters?
15     Q.   Yes, sir.
16     A.   That would be one of the audits that we
17  did that we discussed at great length.
18     Q.   Okay.
19     A.   So that would probably --
20     Q.   And do you know --
21     A.   -- as I say, I can't recall it, but that
22  would certainly be a reason.
23     Q.   Okay.  And do you know if that pharmacy
24  was ever restricted?

Page 429

1      A.   I don't know that.
2      Q.   Okay.
3      A.   This says:  "Date Created:  7/17.  Date
4  Last Modified:  7/19."  I'm just saying I was retired,
5  so.
6      Q.   Understood, sir.
7      A.   Okay.
8      Q.   Okay.
9          Okay.  Almost, almost done.
10     A.   Okay.
11     Q.   Okay.  I'm going to hand you two sets of
12  chargeback data, and we'll see if we can work through
13  it together, okay.  Number -- the first one first, the
14  second one second.  55, Exhibit 55.
15          (WHEREUPON, a certain document was
16          marked Mallinckrodt-Ratliff
17          Deposition Exhibit No. 055, for
18          identification, as of 12/19/2018.)
19  BY MS. HERZFELD:
20     Q.   Okay.  If you'll take a look with me, I'll
21  represent to you that we put chargeback data for
22  Tennessee.  This is only Tennessee on this chart.
23     A.   Okay.
24     Q.   So I'm not expecting you to have seen it

Page 430

1 before, okay?

2    A. Okay.

3    Q. OKAY. So looking at this, the number one

4 for chargeback says: "Bradley Drug Company."

5    Do you see where it says that?

6    A. Brad -- are you saying Bradley Drug

7 Company?

8    Q. Um-hum, where it says No. 3, Bradley Drug

9 Company --

10    A. I see that.

11    Q. -- Charlotte Avenue.

12    And then some of this stuff here is in red

13 and it looks like their total oxy 15 --

14    A. Uh-huh.

15    Q. -- shipment for, it says the past

16 12 months --

17    A. Yeah.

18    Q. -- through June 2012 is 87,400.

19    Do you know what that is, units?

20    A. I was retired, I believe, at this time.

21    Q. I believe this covers a year's worth back

22 through July of 2011.

23    Were you still employed in July 2011?

24    A. I was in '11, yes.

Page 431

1    Q. Okay. So I'm looking at those numbers

2 there, 87,400 is -- do you see that?

3    A. Okay.

4    Q. Do you know if that's tablets or bottles?

5    A. I don't know.

6    Q. Okay.

7    A. And part of it is when I was retired, so.

8    Q. Correct. I understand that.

9    Part of it was when you were there and

10 part of it was when you were not?

11    A. Correct.

12    Q. Okay.

13    And then looking down, the one that

14 said -- next to No. 5, it says Rippetoe, Inc.?

15    A. Yes.

16    Q. Morristown, Tennessee?

17    A. I see it.

18    Q. And if you look all of the way over to the

19 end, it says 59,200 units, whatever those are, right,

20 for 12 months.

21    Do you see where I am at?

22    A. I do see that.

23    Q. Okay. And does that seem like a high

24 number to you?

Page 432

1    MR. O'CONNOR: Objection.

2 BY THE WITNESS:

3    A. Well, the thing I don't know is, is this

4 all of the products they purchased from us, is it one

5 particular product they purchased from us? It's --

6 you know, normally when you say 59,200, if they are

7 purchasing multiple products from us, that's a low

8 number.

9 BY MS. HERZFELD:

10    Q. Okay.

11    A. If it's a -- and especially when you are

12 looking at the length of time, so it's a full year,

13 you'd have to give me more information to be able

14 to -- to substantiate what you are saying because I

15 can't based on what I see here.

16    Q. Okay. I'll try to give you some

17 information.

18    So if you look at the top of this sheet,

19 it says "Oxy 15," so it looks like it is for that

20 product.

21    Do you see at the very top?

22    A. Tennessee only -- oxy 15s and 30s

23 through June 20- -- okay. So that's --

24    Q. This sheet says --

Page 433

1    A. -- both of the --

2    Q. -- oxy 15, do you see?

3    A. What's that?

4    Q. This sheet says: "Sheet: Oxy 15"?

5    A. Doesn't it say and 30s through June --

6    Q. I think that's the file name because the

7 next one I'm going to show you is oxy 30. I have

8 another one. So, look, see where it says at the

9 top --

10    A. Uh-huh.

11    Q. -- "Tennessee oxy 15 and 30 through

12 June 2012," and it says, "Path:/suspicious order

13 monitoring/distributor information, Sheet:", the sheet

14 here --

15    A. Oh.

16    Q. -- "oxy 15 Tennessee?"

17    Do you see that?

18    A. Okay.

19    Q. Okay. So it appears that this is the

20 chargeback data for oxy 15s from pharmacies in

21 Tennessee, is that correct?

22    MR. O'CONNOR: Objection.

23 BY THE WITNESS:

24    A. Based on what you are telling me because I

Page 434

1  didn't deal with this information.
2  BY MS. HERZFELD:
3      Q.   I understand.  If you'll just be patient
4  with me, too, because it took me kind of a minute.
5      Okay.  So looking at that and knowing that
6  it's oxy 15 and the number for the Rippetoe Pharmacy
7  in Morristown, Tennessee is 59,200, if I told you --
8  well, first, did you ever take into consideration the
9  population of any particular areas when evaluating
10  potential suspicious orders?
11      MR. O'CONNOR:  Objection.
12  BY THE WITNESS:
13      A.   Personally, I -- I don't recall taking in
14  the population, so.
15  BY MS. HERZFELD:
16      Q.   Okay.  And do you know if anyone at
17  Mallinckrodt did?
18      MR. O'CONNOR:  Objection.
19  BY THE WITNESS:
20      A.   So, are you asking do we know the
21  population of Morristown, Tennessee?
22  BY MS. HERZFELD:
23      Q.   No, no.  I'm just asking if you know if
24  anybody considered the populations where particular

Page 435

1  pharmacies were located in looking for suspicious
2  orders?
3      MR. O'CONNOR:  Objection.
4  BY THE WITNESS:
5      A.   That's not the way we -- we did things.
6  We -- we had distributors there to do it.  We
7  identified their major purchasers there, our
8  customers' customers, and we did look at those people.
9  So, did we look at the size of the town, I don't know
10  that we did that, so.
11  BY MS. HERZFELD:
12      Q.   Okay.  You don't specifically recall doing
13  it?
14      A.   Correct.
15      Q.   Okay.  So back to the Rippetoe Pharmacy
16  here in Morristown, Tennessee, it has like the third
17  highest number for this time period for the oxy 15s at
18  59,200.
19      Did you know that the population of
20  Morristown, Tennessee is 29,137 during that year?
21      MR. O'CONNOR:  Objection.
22  BY THE WITNESS:
23      A.   No.
24  BY MS. HERZFELD:

Page 436

1      Q.   Okay.  So if the population of a town
2  where a pharmacy is located is 29,137 people, yet the
3  number of oxys are 59,200 being supplied by
4  Mallinckrodt, does that seem high to you?
5      MR. O'CONNOR:  Objection.
6  BY THE WITNESS:
7      A.   There is no way I'd know.  Is this the
8  only pharmacy in town?  I don't know that.
9  BY MS. HERZFELD:
10      Q.   Does that matter?
11      A.   If it's the only pharmacy in town, it
12  might.
13      Q.   Okay.
14      A.   I mean, are they supplying the hospital,
15  are they supplying, you know, multiple doctors, how
16  many -- you know, I just don't know.  What's the aging
17  population of that area?  I don't know that, so.
18      Q.   Okay.  So would that information cause you
19  to do a deeper inquiry, do you think it should have
20  flagged an inquiry?
21      MR. O'CONNOR:  Objection.
22  BY THE WITNESS:
23      A.   I just don't know that.
24  BY MS. HERZFELD:

Page 437

1      Q.   Okay.
2      Okay.  Let's go then to the next one, the
3  one next to No. 10 is Jabos Pharmacy, the one we've
4  talked about before, in Newport, Tennessee.
5      Have you ever been to Newport, Tennessee,
6  sir?
7      A.   Not to my knowledge.
8      Q.   Okay.  And that one appears to have 42,000
9  units of oxy 15.
10      A.   Um-hum.
11      Q.   Do you know what the population is of
12  Newport, Tennessee?
13      A.   I have no idea.
14      Q.   Okay.  If I told you that the population
15  of Newport, Tennessee -- well, that Newport,
16  Tennessee, first off, is in Cocke County, which is
17  very rural, do you know that?
18      MR. O'CONNOR:  Objection.
19  BY THE WITNESS:
20      A.   There is no way I would know that.  I have
21  never been there, so.
22  BY MS. HERZFELD:
23      Q.   Okay.  So if I tell you that Newport,
24  Tennessee has a population of 6,833 people as of the

| Page 438 |
| --- |

1 2010 census, would that at all impact your opinion of
2 whether 42,000 units of oxy 15s at the Jabos Pharmacy
3 in Newport, Tennessee was concerning?
4     MR. O'CONNOR: Objection.
5 BY THE WITNESS:
6     A.   So, didn't they all -- already cancel
7 Jabos?
8 BY MS. HERZFELD:
9     Q.   I'm just asking, sir, if that's a flag for
10 you?
11     MR. O'CONNOR: Objection.
12 BY THE WITNESS:
13     A.   It is and it may be why they were
14 cancelled.  I don't know.
15 BY MS. HERZFELD:
16     Q.   Okay.  Do you know that that's why they
17 were cancelled?
18     A.   I don't know that.
19     Q.   Okay.  So --
20     A.   I'm saying it's -- that seems based on the
21 population of 6,000, I mean, so.
22     Q.   It seems high?
23     MR. O'CONNOR: Objection.
24 BY THE WITNESS:

| Page 439 |
| --- |

1     A.   I mean, it seems high, yeah.
2 BY MS. HERZFELD:
3     Q.   Okay.  So could that be an indicator of --
4 of a diversion to you?
5     MR. O'CONNOR: Objection.
6 BY THE WITNESS:
7     A.   I don't know that and I can't speculate,
8 so.
9 BY MS. HERZFELD:
10     Q.   Okay.  So if you've got one pharmacy in a
11 tiny rural town that's supplying 42,000 15 oxys --
12 42,000 oxy 15s for a population in that town of 6,833,
13 do you think that could indicate that there is a pill
14 mill?
15     MR. O'CONNOR: Objection.
16 BY THE WITNESS:
17     A.   I don't know that, but are they supplying
18 the whole county?  I mean, you'd have to understand
19 that counties sometimes have larger populations than a
20 town, so.
21 BY MS. HERZFELD:
22     Q.   Do you think that that's information that
23 should have been inquired into when you see these
24 numbers?

| Page 440 |
| --- |

1     A.   Well, we --
2     MR. O'CONNOR: Objection.
3 BY THE WITNESS:
4     A.   -- we inquired into Jabos when we were at
5 McKesson -- or not McKesson, but AmerisourceBergen,
6 so.
7 BY MS. HERZFELD:
8     Q.   But you didn't know the population of
9 Newport, so that wasn't something that was taken into
10 consideration, was it?
11     A.   No.
12     Q.   Okay.  So moving on to the next one,
13 you've got No. 21, East Tennessee Discount Drug in
14 Strawberry Plains, Tennessee.
15     Do you see where we are at?
16     A.   I do.
17     Q.   Okay.  And over there it says
18 24,900 units --
19     A.   Okay.
20     Q.   -- of oxy 15 --
21     A.   Okay.
22     Q.   -- for the year from East Tennessee
23 Discount Drug.
24     Do you see where I am at?

| Page 441 |
| --- |

1     A.   I do see it.
2     Q.   Okay.  And do you know what the population
3 is of Strawberry Plains, Tennessee?
4     A.   I don't.
5     Q.   Okay.  If I told you that the population
6 of Strawberry Plains is 4,667 people, do you think it
7 should have merited some inquiry that there are 24,900
8 oxy 15s going into that pharmacy?
9     MR. O'CONNOR: Objection.
10 BY THE WITNESS:
11     A.   By AmerisourceBergen, yes.
12 BY MS. HERZFELD:
13     Q.   Okay.  But not by Mallinckrodt?
14     MR. O'CONNOR: Objection.
15 BY THE WITNESS:
16     A.   Not necessarily.  We take the information
17 that they provide us initially to try to make a
18 determination if they are -- if they are doing due
19 diligence.
20 BY MS. HERZFELD:
21     Q.   Okay.
22     A.   And we -- we're -- we met with them more
23 than once, so.
24     Q.   Okay.  So going over these three

Page 442

1  pharmacies that we just talked about, Rippetoe, Jabos
2  and East Tennessee Discount Drug, do you think based
3  on population and the number of oxy 15s going into
4  those areas that there should have been some red flags
5  for diversion inquired into?
6      MR. O'CONNOR:  Objection.
7  BY THE WITNESS:
8      A.   Are you saying by -- by Mallinckrodt?
9  BY MS. HERZFELD:
10     Q.   Let's start with by the distributors.
11     MR. O'CONNOR:  Objection.
12 BY THE WITNESS:
13     A.   By the distributors, yes.
14     Q.   Okay.
15     A.   I mean, that's their job to have a program
16 to prevent diversion.  If they are selling that many
17 tablets into a tiny little town, it may be that's why
18 they were slow in getting us the information.  I don't
19 know.
20     Q.   Okay, sir.  But you don't think that was
21 the responsibility of Mallinckrodt?
22     MR. O'CONNOR:  Objection.
23 BY THE WITNESS:
24     A.   There was a time when they were saying

Page 443

1  "know your customer's customer" to us, not initially,
2  so there are a lot of customers' customers, so.
3      Q.   Okay.  And if at that point you had known
4  your customer's customer, would that have been a red
5  flag for you for diversion for East Tennessee Discount
6  Drug?
7      MR. O'CONNOR:  Objection.
8  BY THE WITNESS:
9      A.   We would have liked to have had additional
10 information.
11 BY MS. HERZFELD:
12     Q.   Okay.  But to your knowledge, nobody
13 considered the population factor, is that correct?
14     MR. O'CONNOR:  Objection.
15 BY THE WITNESS:
16     A.   Correct.
17 BY MS. HERZFELD:
18     Q.   Okay.  And the same for Jabos Pharmacy?
19     MR. O'CONNOR:  Same objection.
20 BY THE WITNESS:
21     A.   Did we talk about how many people were in
22 Newport?
23 BY MS. HERZFELD:
24     Q.   Yes, we did, sir.

Page 444

1      A.   How many?
2      Q.   6,833.
3      A.   Yeah, okay.
4          Yeah, that's -- again, we don't know how
5  many pharmacies are there.  We don't know if they are
6  supplying the whole county.  You know, I...
7      Q.   But you would have liked answers to those
8  questions?
9      A.   Yeah, it would have been nice.
10     Q.   Okay.  To your knowledge, nobody -- nobody
11 inquired as to those questions, is that right?
12     A.   To the best of my knowledge.
13     Q.   Okay.  If you'll give me just one moment.
14 Okay.  Last one and then we are done.
15         No. 57?
16     A.   56.
17     Q.   56.  Gosh, I'm always off on this.
18         (WHEREUPON, a certain document was
19          marked Mallinckrodt-Ratliff
20          Deposition Exhibit No. 056, for
21          identification, as of 12/19/2018.)
22 BY MS. HERZFELD:
23     Q.   Okay.  I'll submit to you that this is the
24 same document except this one the sheet says "oxy 30."

Page 445

1          Do you see that at the top?
2      A.   I do.
3      Q.   Okay.  So all of that information we just
4  went through, let's go through it again, but not quite
5  as long.
6          No. 5 there talks about Rippetoe Pharmacy
7  in Morristown.  Do you see where I am at?
8      A.   I do.
9      Q.   Okay.  And it says there that there are
10 224,100 units of oxy 30 from Tennessee during that
11 time, is that correct?
12     A.   It is.
13     Q.   Okay.  And Bradley Drug had 212,700 units
14 of oxy 30?
15     A.   So, that -- you are saying that's for a
16 whole year?
17     Q.   Yes, sir.
18     A.   So --
19     Q.   Yes.
20     A.   So divide it up 12 months, it would be --
21 and the number of pills in a bottle, I know you -- it
22 seems excessive when you just look at the number, but
23 that's for 12 months.
24     Q.   Okay.  So let's look at No. 9, Jabos

Page 446

1 Pharmacy in Newport.
2    A.   Okay.
3    Q.   160,800, and we just talked about the
4 population of Jabos.  Should that have been concerning
5 to Mallinckrodt?
6    MR. O'CONNOR:  Objection.
7 BY THE WITNESS:
8    A.   For an entire year?
9 BY MS. HERZFELD:
10   Q.   Yes, sir.
11      The population --
12   A.   I'm not --
13   Q.   -- of Newport we just discussed was 6,833
14 people?
15   A.   Right, right.
16   MR. O'CONNOR:  Objection.
17 BY MS. HERZFELD:
18   Q.   Did that merit further inquiry for
19 potential diversion, sir?
20   MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22   A.   For a whole year for 160,000 tablets, not
23 necessarily.
24 BY MS. HERZFELD:

Page 447

1    Q.   Not for a town with a population of 6,833
2 people?
3    A.   Well, I didn't know the population, but
4 you need to tell me population of the county.
5    Q.   Okay, sir.
6    A.   Because not everybody lives in the city.
7    Q.   Okay.  Sir, if I tell you Cocke County is
8 very rural, does that make a difference?
9    MR. O'CONNOR:  Objection.
10 BY THE WITNESS:
11   A.   Do you know how many people live there in
12 the county?
13 BY MS. HERZFELD:
14   Q.   No, I'm not going to tell you that right.
15   A.   Do you know how many people are elderly?
16 Or do they say --
17   Q.   No, but I can Google it.
18   A.   But do you understand what I'm saying?
19   Q.   I do.
20   A.   There are a lot of reasons people would
21 take material.  I'm not discounting the fact that
22 maybe some of it was diverted by doctors or
23 unscrupulous people, but what I'm saying is, if you
24 look at that for a whole year, we have a lot of people

Page 448

1 or a lot of customers that buy a lot more than that,
2 and if it's for a whole year, it doesn't seem unusual
3 to us, so what you are saying is it's a little tiny
4 town and you should have known that.  Well, if you
5 look at it for a whole year, it doesn't seem nearly as
6 large as what you are saying, so.
7    Q.   Don't you think somebody should ask those
8 questions, though?
9    MR. O'CONNOR:  Objection.
10 BY MS. HERZFELD:
11   Q.   You said all of these questions, how many
12 elderly people, how big is the county --
13   A.   Yeah.
14   Q.   -- how many hospitals, don't you think
15 somebody should have asked those questions?
16   MR. O'CONNOR:  Objection.
17 BY THE WITNESS:
18   A.   The distributor should have asked that.
19 BY MS. HERZFELD:
20   Q.   Okay.  But not Mallinckrodt?
21   MR. O'CONNOR:  Objection.
22 BY THE WITNESS:
23   A.   We look at this number and it's not that
24 large.  Had we looked behind and said, Okay.  Let's

Page 449

1 just figure out for this one customer, you have to
2 remember there are -- our distributors have thousands
3 of customers, okay.
4 BY MS. HERZFELD:
5    Q.   Yes, sir.
6    A.   And so we have to go through every one of
7 them and determine the size of the town and then
8 divide out how much they got for a whole year and how
9 many people live in the county, how many are elderly
10 and how -- you know, I know what you are saying, but
11 it's not nearly as big a red flag as you are making it
12 to be, in our -- in my opinion.  In your opinion, you
13 are doing an admirable job, but what I'm saying is,
14 that's not a lot of tablets for a year.
15   Q.   Okay.  The question -- my question, sir,
16 is you said that the question should have been asked
17 by the distributor and my question is actually pretty
18 simple.  It is should those questions have been asked
19 by Mallinckrodt?
20   MR. O'CONNOR:  Objection.
21 BY THE WITNESS:
22   A.   Based on the number, I don't think so.
23 BY MS. HERZFELD:
24   Q.   Okay.  And what about Strawberry Plains,

Page 450

1 if we look here at East Tennessee Discount Drug, No.
2 12, it says Strawberry Plains had a 115,600 oxy
3 30 units --
4    A.   Okay.
5    Q.   -- sent during that year to that pharmacy?
6    A.   I'm sorry.  How many.
7    Q.   115,600.
8    A.   Okay, I've got that.
9    Q.   Strawberry Plains, as we discussed, had a
10 population of 4,667 --
11    A.   Okay.
12    Q.   -- people during that year.
13        Do you think that that number could have
14 been indicative of diversion in Strawberry Plains?
15    A.   For a -- for a year --
16    MR. O'CONNOR:  Objection.
17 BY THE WITNESS:
18    A.   -- it's a -- if you divide it by 12, it's
19 not a great number.
20 BY MS. HERZFELD:
21    Q.   I bet you it is a great number to the
22 people of Strawberry Plains?
23    MR. O'CONNOR:  Objection.
24 BY THE WITNESS:

Page 451

1    A.   Well, I'm certain it is.  I don't discount
2 that at all.  But what I'm saying is, if you look at
3 that as a manufacturer, to me those are things that
4 the -- the distributor should note.
5 BY MS. HERZFELD:
6    Q.   Okay.  So it could --
7    A.   And they should say -- and maybe they
8 should say, This is a rural area and there are only so
9 many people, but there are a lot of factors that they
10 look at or should look at when they are selling to
11 some of those areas.
12    Q.   Okay.  So you think that that's a
13 potential sign of diversion that should have been
14 looked into by the distributor?
15    MR. O'CONNOR:  Objection.
16 BY THE WITNESS:
17    A.   They are the ones that are supposed to do
18 the on-site visits.  They should know if it's a town
19 of 4,000.  They should be able to tell us when we
20 inquire, you know, how -- you know, how big a town it
21 is or what, you know, what their -- their aging
22 population is or things like that.  I don't know that
23 we've asked that.  We did that in Florida now, asking
24 what the aging population is, because the excuse was

Page 452

1 constantly, Well, we have all of these old people.
2 Well, one, the old people, do they not take 5s or 15s.
3 Why does everybody take 30s, so.
4    Q.   To your knowledge --
5    A.   Folks, that's a legitimate question.
6    Q.   Okay.  And to your knowledge, those
7 questions weren't asked of these pharmacies in
8 Tennessee?
9    MR. O'CONNOR:  Objection.
10 BY THE WITNESS:
11    A.   To the best of my knowledge, I don't know.
12    MS. HERZFELD:  Okay.  If you'll give me just a
13 moment, just take a break real quick.
14    THE VIDEOGRAPHER:  We are going off the record
15 at 8:10.
16        (WHEREUPON, a recess was had
17        from 8:10 to 8:16 p m.)
18    THE VIDEOGRAPHER:  We are back on the record at
19 8:16.
20    MS. HERZFELD:  Okay.  Mr. Ratliff, I appreciate
21 your time this evening.  I don't have any more
22 questions for you.
23    THE WITNESS:  Thank you.
24    MS. HERZFELD:  Thank you.

Page 453

1    MR. KAWAMOTO:  So, Andrew, for your cross, do
2 you want me to change places with you or do you want
3 me just to sit there and object?
4    MR. O'CONNOR:  I'm happy for you to sit there.
5 I think it will be literally two minutes.
6    MR. KAWAMOTO:  Okay.
7        EXAMINATION
8 BY MR. O'CONNOR:
9    Q.   Mr. Ratliff, I'm going to show you Exhibit
10 No. 16 which you looked at earlier today.
11        Do you recall reviewing this document this
12 afternoon?
13    A.   Yes.
14    Q.   Okay.  I'm going to direct your attention
15 to the second page, and near the bottom of that
16 document, earlier today Mr. Kawamoto had you read from
17 a section of the document beginning with "within that
18 session"?
19    A.   Yes.
20    Q.   And I believe you testified that you
21 understood the sentences that follow to be related to
22 the "know your customer's customer" concept, is that
23 fair?
24    A.   Yes.  Fair.

Page 454

1    Q.  Okay.  Are you aware of any instance
2  before this e-mail in which you had heard about any
3  obligation whatsoever to know your customer's
4  customer?
5    MR. KAWAMOTO:  Counsel, what's the date of the
6  e-mail?  I don't have the exhibit.
7    MR. O'CONNOR:  It is July 21st, 2010.
8  BY THE WITNESS:
9    A.  I don't recall that, but it -- it's not
10  part of the statute.  It's -- at all, "know your
11  customer's customer."  That's something that the DEA
12  came up with to -- to assist us or cause us to go
13  deeper and do a deeper dive, but it's not part of the
14  statute.
15  BY MR. O'CONNOR:
16    Q.  And before July 21st, 2010, had DEA to the
17  best of your recollection ever communicated to
18  Mallinckrodt that it should know its customer's
19  customer?
20    MR. KAWAMOTO:  Objection.
21  BY THE WITNESS:
22    A.  It's been a long time ago.  I -- I don't
23  recall that, so.
24  BY MR. O'CONNOR:

Page 455

1    Q.  Do you recall any instance in which DEA
2  communicated that Mallinckrodt should know its
3  customer's customer before July 21st, 2010?
4    MR. KAWAMOTO:  Objection.
5  BY THE WITNESS:
6    A.  I don't recall.
7    MR. O'CONNOR:  What's the objection?
8    MR. KAWAMOTO:  Again, it's been asked and
9  answered.
10    MR. O'CONNOR:  How about the first objection?
11    MR. KAWAMOTO:  I believe he has already
12  testified on this.
13    MR. O'CONNOR:  Okay.  All right.
14  BY MR. O'CONNOR:
15    Q.  Exhibit No. 20.
16    A.  Should we put these back in order?
17    Q.  Don't worry about it.
18    A.  Okay.
19    Q.  All right.  Mr. Ratliff, earlier today you
20  reviewed this document marked as Exhibit 20.  Do you
21  recall that?
22    A.  I do recall that.
23    Q.  Can you direct your attention to the
24  bottom paragraph on the second page where it mentions

Page 456

1  Howard Davis as a consultant.
2    Do you see that?
3    A.  I do.
4    Q.  Do you recall testifying earlier today
5  that you had hoped that Howard Davis had expertise
6  that he could lend to the company?
7    A.  Correct.
8    Q.  In actuality, do you have a view about
9  whether Howard Davis had expertise that was useful to
10  the company on the issue of suspicious order
11  monitoring?
12    MR. KAWAMOTO:  Objection.
13  BY THE WITNESS:
14    A.  It was my belief that he didn't have any
15  additional information that would assist us.
16  BY MR. O'CONNOR:
17    Q.  What was your opinion about his level of
18  expertise on the subject of suspicious order
19  monitoring?
20    A.  He asked -- he asked us a lot of the
21  questions about what we would be doing or what we
22  should be doing.
23    Q.  Did he know the answers?
24    A.  He was asking us to -- to try to school

Page 457

1  himself on that information.
2    Q.  Thank you.
3    A.  He didn't have, in my opinion, any
4  knowledge about this -- the program or as it was
5  evolving.  Now, he had retired, so I don't know that
6  they had the know your customer's customer
7  recommendations at that time, so.
8    MR. O'CONNOR:  Thank you, Mr. Ratliff.  That's
9  all I have.
10    MR. KAWAMOTO:  Can I take a quick break to see
11  if I want to recross?  How much time did you use?
12    MR. O'CONNOR:  What's that?
13    MR. KAWAMOTO:  How much time did you use?
14    THE VIDEOGRAPHER:  We are going off the record
15  at 8:21.
16    (WHEREUPON, a recess was had
17    from 8:21 to 8:23 p.m.)
18    THE VIDEOGRAPHER:  We are back on the record at
19  8:23.
20    MR. KAWAMOTO:  Okay.  I would like to mark this
21  as whatever the latest exhibit is.
22    THE WITNESS:  57.
23    MR. KAWAMOTO:  Yeah.
24    (WHEREUPON, a certain document was

Page 458

1    marked Mallinckrodt-Ratliff
2    Deposition Exhibit No. 057, for
3    identification, as of 12/19/2018.)
4    MR. O'CONNOR:  Do you have copies of this?
5    MR. KAWAMOTO:  Yes, it should be underneath
6  there.
7    FURTHER EXAMINATION
8  BY MR. KAWAMOTO:
9    Q.   Mr. Ratliff, I've handed you an
10  exhibit marked 269399.  It's a memo to Karen Harper
11  from Howard Davis.
12    Do you recall receiving this memo?
13    A.   I'm certain that I saw it at the time.
14    Q.   Okay.  And do you -- do you recall
15  reviewing it?
16    A.   I don't recall specifically because of the
17  length of time.  It's been eight plus -- eight plus
18  years, so.
19    Q.   Okay.  So directing your attention to the
20  bottom paragraph, this is by way of example, do you
21  see the bottom paragraph of the memo?
22    A.   I do.
23    Q.   It starts with "an order."  Could you
24  please read that?

Page 459

1    A.   "An order must not be processed and filled
2  if it is either suspicious or excessive.  The existing
3  SOP excels to meet this requirement through a specific
4  evaluation process.  However, the numeric formula is
5  problematic.  For example, should an occasion arise
6  where an order is three times over the historical
7  average for that customer and an item or a situation
8  where the order meets but not does not exceed the
9  ▓▓▓ criteria, it would theoretically be filled
10  through normal processing without further question.
11  In doing so in certain cases, as noted in recent
12  immediate suspensions of other large DEA registrants,
13  which are all a matter of public record, Mallinckrodt
14  would be unnecessarily exposing itself to a potential
15  liability.  The fundamental basis of the immediate
16  suspensions in question were suspicious order
17  monitoring deficiencies."
18    Q.   So do you agree with that paragraph?
19    MR. O'CONNOR:  Objection.
20  BY THE WITNESS:
21    A.   I do agree in that we would have
22  already -- we wouldn't send it out if it was three
23  times, though, what they had been ordering.  I mean,
24  that's a simplistic view of that.  You know, we

Page 460

1  already knew everything in this, that paragraph.  So
2  what he is doing is trying to be formal by saying, Oh,
3  if you did this, this would happen, but the answer is,
4  we were already doing this.
5    Q.   And so, sir, your testimony is that if an
6  order was three times the -- if an order was three
7  times the prior historical average, Mallinckrodt would
8  not have shipped that, is that correct?
9    A.   That's correct, yeah.
10    Q.   Okay.  And if they did ship that, that
11  would have been improper?
12    MR. O'CONNOR:  Objection.
13  BY THE WITNESS:
14    A.   I would say yes.
15  BY MR. KAWAMOTO:
16    Q.   Okay.  Can you please read the second
17  paragraph -- the first paragraph at the very top?
18    A.   "Numeric formulas do not identify
19  circumstances that might be indicative of a diversion,
20  such as ordering larger quantities of a limited
21  variety regularly that would otherwise not be viewed
22  as suspicious (like ordering controlled substance" --
23  "substances with few, if any, other drugs or products
24  whether controlled or non-controlled); ordering highly

Page 461

1  abused controlled substances in limited quantities
2  disproportionate to other products or even ordering
3  them" -- "ordering the same controlled substances from
4  multiple suppliers."
5    Q.   Okay.  Thank you, sir.
6    I take it you don't have any disagreement
7  with that statement, do you?
8    MR. O'CONNOR:  Objection.
9  BY THE WITNESS:
10    A.   Part of our form asks controlleds to
11  non-controlleds.  So we should be able to pick up the
12  fact if they say the majority of their business is oxy
13  30s, then that's a red flag.  And we already had that
14  in a form.
15  BY MR. KAWAMOTO:
16    Q.   So essentially your criticism of this memo
17  is that you were already doing everything that the
18  memo called for, is that correct?
19    A.   Pretty much.
20    Q.   And if you were not doing that, then that
21  means that you -- you would -- that would not be
22  proper, correct?
23    MR. O'CONNOR:  Objection.
24  BY THE WITNESS:

| Page 462 | Page 464 |
|---|---|

**Page 462**

1  A.  No, I'm not saying that.  I'm saying we
2  were doing almost -- almost everything that he came up
3  with, and that was already in our files and already in
4  our procedures, that's what I'm saying.
5  BY MR. KAWAMOTO:
6  Q.  Okay.  And can you identify anything he
7  has come up with that you weren't doing?
8  A.  Do you want me to read the whole thing?
9  Because I'm saying right now we were already asking
10  those questions in our file, in our --
11  Q.  And to the degree that you were shipping
12  orders that violated these general criteria that he is
13  laying out here, that would not have been proper,
14  that's all I'm trying to get at?
15  MR. O'CONNOR:  Objection.
16  BY THE WITNESS:
17  A.  I'm saying we weren't shipping out orders
18  that he is pointing out would -- these are
19  hypothetical situations that he is pointing out.  They
20  are not actual situations.  They are hypothetical.
21  MR. O'CONNOR:  Counsel, you have about -- you
22  have about ten seconds.
23  MR. KAWAMOTO:  Okay.  Nothing further.  Thank
24  you.

**Page 463**

1  THE WITNESS:  Thank you.
2  THE VIDEOGRAPHER:  We are going off the record
3  at 8:28.
4  (Time Noted:  8:28 p.m.)
5  FURTHER DEPONENT SAITH NAUGHT.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 464**

1  REPORTER'S CERTIFICATE
2
3  I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
4  a Certified Shorthand Reporter, do hereby certify:
5  That previous to the commencement of the
6  examination of the witness herein, the witness was
7  duly sworn to testify the whole truth concerning the
8  matters herein;
9  That the foregoing deposition transcript
10  was reported stenographically by me, was thereafter
11  reduced to typewriting under my personal direction and
12  constitutes a true record of the testimony given and
13  the proceedings had;
14  That the said deposition was taken before
15  me at the time and place specified;
16  That I am not a relative or employee or
17  attorney or counsel, nor a relative or employee of
18  such attorney or counsel for any of the parties
19  hereto, nor interested directly or indirectly in the
20  outcome of this action.
21  IN WITNESS WHEREOF, I do hereunto set my
22  hand on this 24th day of December, 2018.
23  _____
24  JULIANA F. ZAJICEK, Certified Reporter

**Page 465**

1  DEPOSITION ERRATA SHEET
2
3
4  Case Caption:  In Re: National Prescription
5  Opiate Litigation
6
7  DECLARATION UNDER PENALTY OF PERJURY
8
9  I declare under penalty of perjury that I
10  have read the entire transcript of my Deposition taken
11  in the captioned matter or the same has been read to
12  me, and the same is true and accurate, save and except
13  for changes and/or corrections, if any, as indicated
14  by me on the DEPOSITION ERRATA SHEET hereof, with the
15  understanding that I offer these changes as if still
16  under oath.
17
18  WILLIAM RATLIFF
19
20  SUBSCRIBED AND SWORN TO
21  before me this      day
22  of        , A.D. 20__.
23
24  Notary Public

Page 466

```
 1        DEPOSITION ERRATA SHEET
 2    Page No._____ Line No._____ Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____ Line No._____ Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____ Line No._____ Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____ Line No._____ Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____ Line No._____ Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____ Line No._____ Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____ Line No._____ Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____ DATE:_____
24            WILLIAM RATLIFF
```

Page 467

```
 1        DEPOSITION ERRATA SHEET
 2    Page No._____ Line No._____ Change to:_____
 3    _____
 4    Reason for change:_____
 5    Page No._____ Line No._____ Change to:_____
 6    _____
 7    Reason for change:_____
 8    Page No._____ Line No._____ Change to:_____
 9    _____
10    Reason for change:_____
11    Page No._____ Line No._____ Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____ Line No._____ Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____ Line No._____ Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____ Line No._____ Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____ DATE:_____
24            WILLIAM RATLIFF
```