```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                      - - -

 5   IN RE:  NATIONAL            :

     PRESCRIPTION                :  MDL No. 2804

 6   OPIATE LITIGATION           :

     _____ :  Case No.

 7                               :  1:17-MD-2804

     THIS DOCUMENT RELATES       :

 8   TO ALL CASES                :  Hon. Dan A. Polster

 9                      - - -

10           Friday, December 21, 2018

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

12

                        - - -

13

14        Videotaped deposition of PETER RATYCZ, held at

15   the offices of Cavitch, Familo & Durkin,

16   1300 East Ninth Street, Cleveland, Ohio, commencing at

17   8:59 a.m., on the above date, before Carol A. Kirk,

18   Registered Merit Reporter and Notary Public.

19

20                      - - -

21

22           GOLKOW LITIGATION SERVICES

         877.370.3377 ph | 917.591.5672 fax

23              deps@golkow.com

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    A P P E A R A N C E S:
 2     On behalf of the Plaintiffs:
 3           COHEN & MALAD, LLP
             BY:  GABRIEL ADAM HAWKINS, ESQUIRE
 4               ghawkins@cohenandmalad.com
                 EDWARD "NED" B. MULLIGAN, ESQUIRE
 5               nmulligan@cohenandmalad.com
             One Indiana Square, Suite 1400
 6           Indianapolis, Indiana  46204
             317-214-0321
 7
 8     On behalf of Discount Drug Mart:
 9           CAVITCH FAMILO & DURKIN CO., LPA
             BY:  TIMOTHY JOHNSON, ESQUIRE
10               tjohnson@cavitch.com
             1300 East Ninth Street, 20th Floor
11           Cleveland, Ohio  44114
             216-621-7860
12
13     On behalf of the Cardinal Health, Inc.:
14           WILLIAMS & CONNOLLY LLP
             BY:  JULI ANN LUND, ESQUIRE
15               jlund@wc.com
             725 Twelfth Street, N.W.
16           Washington, DC  20005
             202-434-5000
17
18     On behalf of the AmerisourceBergen:
19           JACKSON KELLY PLLC
             BY:  ANDREW N. SCHOCK, ESQUIRE
20               anschock@jacksonkelly.com
             50 South Main Street, Suite 201
21           Akron, Ohio  44308
             330-252-9060
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   On behalf of HBC (via teleconference):
 2        MARCUS & SHAPIRA LLP
          BY:  PAUL M. MANNIX, ESQUIRE
 3             pmannix@marcus-shapira.com
          One Oxford Center, 35th Floor
 4        301 Grant Street
          Pittsburgh, Pennsylvania  15219-6401
 5        412-338-3344
 6
     On behalf of Walmart (via teleconference and live
 7   stream):
 8        JONES DAY
          BY:  NICOLE LANGSTON, ESQUIRE
 9             nlangston@jonesday.com
          77 West Wacker Drive
10        Chicago, Illinois  60601
          312-269-4164
11
12   On behalf of Endo Pharmaceuticals, Inc. and
     Endo Health Solutions Inc. (via live stream and
13   teleconference):
14        ARNOLD & PORTER KAYE SCHOLER, LLP
          BY:  ROSS H. NEIHAUS, ESQUIRE
15             ross.neihaus@apks.com
          70 West Madison Street, Suite 4200
16        Chicago, Illinois  60602
          312-583-2300
17
18   On behalf of Johnson & Johnson and
     Janssen Pharmeceuticals:
19
          TUCKER ELLIS LLP
20        BY:  GIUSEPPE W. PAPPALARDO, ESQUIRE
               gwp@tuckerellis.com
21        950 Main Avenue, Suite 1100
          Cleveland, Ohio  44113
22        216-592-5000
23
24
```

```
 1   On behalf of McKesson:

 2           ULMER & BERNE, LLP

             BY:  DOLORES (LOLA) GARCIA-PRIGNITZ, ESQUIRE

 3                dgarciaprignitz@ulmer.com

             1660 West 2nd Street, Suite 1100

 4           Cleveland, Ohio  44113

             216-583-7000

 5

 6

 7   ALSO PRESENT:

 8        Darnell Brown, Videographer

          Zachary Hone, Trial Technician

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1        VIDEOTAPED DEPOSITION OF PETER RATYCZ

 2               INDEX TO EXAMINATION

 3   WITNESS                                    PAGE

 4   PETER RATYCZ

 5        CROSS-EXAMINATION BY MR. HAWKINS:       11

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        VIDEOTAPED DEPOSITION OF PETER RATYCZ
 2                  INDEX TO EXHIBITS
 3   DDM-RATYCZ      DESCRIPTION                    PAGE
 4   DDM-Ratycz 1    Plaintiffs' Notice of Oral      23
                     Videotaped Fact Deposition of
 5                   Peter Ratycz
 6   DDM-Ratycz 2    Inventory Controls Policy,      98
                     Date Adopted:  12/1/2016,
 7                   Bates-stamped DDM00000467
                     through 469
 8
     DDM-Ratycz 3    Discount Drug Mart, Inc.       112
 9                   Responses to Plaintiffs' First
                     Set of Interrogatories
10
     DDM-Ratycz 4    E-mail string ending with an   125
11                   e-mail to Ms. Strang from
                     Mr. Briscoe, dated 4/5/2016,
12                   Bates-stamped DDM00083190
                     through 83191
13
     DDM-Ratycz 5    Controlled Substances Model    132
14                   Policy, Bates-stamped
                     DDM00031932 through 31965
15
     DDM-Ratycz 6    Discount Drug Mart Controlled  138
16                   Substances Model Policy,
                     Bates-stamped DDM00091606
17                   through 91629
18   DDM-Ratycz 7    E-mail string ending with an   153
                     e-mail to Mr. Ratycz from
19                   Ms. Golob, dated 8/26/13,
                     Bates-stamped DDM00143260
20                   through 143261
21   DDM-Ratycz 8    E-mail to Mr. Brinks from      161
                     Mr. Ratycz, dated 10/23/13,
22                   Bates-stamped DDM00169025
23   DDM-Ratycz 9    E-mail to Mr. Briscoe from     165
                     Mr. Ratycz, dated 2/10/14,
24                   Bates-stamped DDM00075738
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)
 2    DDM-RATYCZ       DESCRIPTION                   PAGE
 3    DDM-Ratycz 10    Bulletin sent to All          167
                       Pharmacists, Technicians,
 4                     and Interns from Pharmacy
                       Operations, Effective:
 5                     September 9, 2015, Bates-
                       stamped DDM0012909 through
 6                     12919
 7    DDM-Ratycz 11    Letter to Registrant dated    184
                       December 27, 2007,
 8                     Bates-stamped DDM00068279
 9    DDM-Ratycz 12    Document titled "Confidential. 193
                       Attention:  Chief Pharmacist.
10                     Store #17.  Date:  9/18/12."
                       Bates-stamped DDM00440510 and
11                     440511
12    DDM-Ratycz 13    Document titled "Confidential. 201
                       Attention:  Chief Pharmacist.
13                     Store  #13.  Date:  11/11/13."
                       Bates-stamped DDM00440512
14                     through 440514
15    DDM-Ratycz 14    Document titled "Confidential. 203
                       Attention:  Chief Pharmacist.
16                     Store #33.   Date:  1/2/08,"
                       Bates-stamped DDM00440516
17
      DDM-Ratycz 15    Document titled "Confidential. 205
18                     Attention:  Chief Pharmacist.
                       Store #15," Bates-stamped
19                     DDM00440507 through 440509
20    DDM-Ratycz 16    Document titled "Confidential. 206
                       Attention:  Chief Pharmacist.
21                     Store #5.  Date:  5/5/08,"
                       Bates-stamped DDM00440505 and
22                     440506
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)

 2    DDM-RATYCZ     DESCRIPTION                   PAGE

 3    DDM-Ratycz 17  E-mail string ending with an   208
                     e-mail to Mr. McConnell from
 4                   Mr. Stuyck, dated 1/17/18,
                     Bates-stamped DDM00178756
 5                   through 178761

 6    DDM-Ratycz 18  E-mail string ending with an   217
                     e-mail to Mr. Boodjeh from
 7                   Mr. McConnell, dated 9/11/13,
                     Bates-stamped DDM00013519 and
 8                   13520

 9    DDM-Ratycz 19  Letter to the U.S. Department   217
                     of Justice from Mr. Ratycz,
10                   dated November 13, 2001,
                     Bates-stamped DDM0011545
11
      DDM-Ratycz 20  E-mail string ending with an   227
12                   e-mail to Ms. Miler from
                     Mr. McConnell, dated 10/17/11,
13                   Bates-stamped DDM00008884
                     through 8887
14
      DDM-Ratycz 21  E-mail string ending with an   230
15                   e-mail to Mr. Ratycz from
                     Mr. Wilkins, dated 10/16/13,
16                   Bates-stamped DDM00168903 and
                     168904
17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   - - -

 2           P R O C E E D I N G S

 3                   - - -

 4           THE VIDEOGRAPHER:  Good morning.

 5       We are now on the record.  My name is

 6       Darnell Brown, and I am the videographer

 7       with Golkow Litigation Services.

 8       Today's date is December 21, 2018, and

 9       the time is 8:59 a.m.

10           This video deposition is being

11       held in Cleveland, Ohio, in the matter

12       of National Prescription Opioid

13       Litigation for the United States

14       District Court for the Northern District

15       of Ohio.  The deponent is Peter Ratycz.

16           Counsel, please identify

17       yourselves for the record.

18           MR. HAWKINS:  Gabe Hawkins, Ned

19       Mulligan, for Plaintiff.

20           MR. JOHNSON:  Tim Johnson for

21       Discount Drug Mart.

22           MS. LUND:  Juli Ann Lund from

23       Williams & Connolly on behalf of

24       Cardinal Health.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. PAPPALARDO:  Giuseppe
 2         Pappalardo from Tucker Ellis on behalf
 3         of Johnson & Johnson and Janssen
 4         Pharmaceuticals.
 5                MR. SCHOCK:  Andrew Schock from
 6         Jackson Kelly for AmerisourceBergen Drug
 7         Corporation.
 8                THE VIDEOGRAPHER:  Counsel on the
 9         phone.
10                MS. LANGSTON:  Nicole Langston
11         from Jones Day on behalf of Walmart.
12                MR. MANNIX:  On the phone, Paul
13         Mannix with Marcus & Shapira on behalf
14         of HBC Services.
15                MR. NEIHAUS:  Ross Neihaus from
16         Arnold & Porter on behalf of the Endo
17         Defendants.
18                THE VIDEOGRAPHER:  The court
19         reporter is Carol Kirk who will now
20         swear in the witness.
21                       - - -
22                    PETER RATYCZ
23    being by me first duly sworn, as hereinafter
24    certified, deposes and says as follows:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CROSS-EXAMINATION

 2   BY MR. HAWKINS:

 3           Q.    Good morning, Mr. Ratycz.

 4           A.    Good morning.

 5           Q.    My name is Gabriel Hawkins.  I'm

 6   an attorney for Plaintiffs in this litigation.

 7   You understand there's currently litigation

 8   pending against various Plaintiffs, usually

 9   municipal entities, and Discount Drug Mart, or

10   DDM, is one of the Defendants in that

11   litigation, correct?

12           A.    Yes, I do.

13           Q.    And you understand that you're

14   here as a deponent on behalf of DDM in this

15   litigation, correct?

16           A.    Yes.

17           Q.    Thank you.

18                 What did you do to prepare for

19   today's deposition?

20           A.    I had a deposition preparation

21   session with our attorney Tim and probably

22   looked at some policies and procedures, probably

23   about two hours worth of preparation.

24           Q.    Okay.  And did you do anything --
```

1    well, we'll talk about that two hours in a

2    moment.

3          A.    Okay.

4          Q.    But outside that two hours, did

5    you did anything in relationship to this

6    litigation in preparation or anything related to

7    this litigation?

8          A.    No, no.

9          Q.    So it's fair to say that two hours

10   is basically your exclusive preparation?

11         A.    Yeah.

12         Q.    Okay.  I'm going to break this

13   rule more than you will, but one of the things

14   that's very important to do is, if I'm talking,

15   you can't talk, and if you're talking, I can't

16   talk, because she has to write down everything

17   we say.  I talk fast and it gets really hard for

18   her.

19               You referenced some documents that

20   you reviewed.  Do you recall what documents you

21   reviewed?

22         A.    I reviewed our control substance

23   quality assurance program, reviewed some -- some

24   other ancillary documents related to just --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    some of our reporting based on our SOMS.  I

 2    looked at some past e-mails that came from the

 3    DEA, possibly, or we may have sent, so ...

 4         Q.    Okay.  Did you review any

 5    deposition testimony?

 6         A.    Yes, I did.

 7         Q.    What deposition testimony did you

 8    review?

 9         A.    Jason Briscoe's.

10               And I might add, too, if I may,

11    going back, there was probably -- two hours of

12    that preparation was reading that testimony.

13    However, before that, it was probably more like

14    seven or eight hours preparation.

15         Q.    Okay.

16         A.    I just wanted to make that clear.

17         Q.    So I'm a little confused and I'm

18    sure it's me.

19         A.    Sure, sure.

20         Q.    So there were two hours reading

21    Mr. Briscoe's deposition and before that, you

22    had seven or eight hours of preparation with

23    attorneys and whatnot?

24         A.    And we had -- yeah.  Yeah, that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would be fair.

 2           Q.    Okay.  And did you read any other

 3    depositions, for instance, Mr. McConnell --

 4           A.    No, I did not.

 5           Q.    Okay.

 6           MR. JOHNSON:  Let him get his

 7           question all the way out.

 8           A.    Okay.  Sorry.

 9           Q.    That's all right.  I will break

10    the rule more than you will.

11           MR. JOHNSON:  I'll referee.

12           MR. HAWKINS:  Thank you.

13    BY MR. HAWKINS:

14           Q.    Did you review anything from

15    litigation experts, any reports or anything like

16    that?

17           A.    No, I did not.

18           Q.    How about any databases?  Did you

19    go into DDM's databases and look for documents

20    or anything of that nature?

21           A.    No, I did not.

22           Q.    How about court documents?  There

23    was a complaint filed in this complaint -- this

24    case.  Did you review that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes, I did.

 2              Q.    Did you read the entire complaint?

 3              A.    Most of it, yes.

 4              Q.    Okay.  It's a fairly long

 5    document, correct?

 6              A.    Correct.

 7              Q.    Okay.  And we talked about that

 8    seven- to eight-hour period.  Did that

 9    include -- did you do that within that seven- to

10    eight-hour period?

11              A.    That would be additional.

12              Q.    Okay.  So was that before or after

13    the seven- to eight-hour review?

14              A.    That would be after.

15              Q.    Okay.  How about any publications?

16              A.    Can you --

17              Q.    Sure.  I mean, there are various

18    industry publications, a lot of which relating

19    to opioids and whatnot.  Did you review anything

20    of that nature in preparation?

21              A.    For this?

22              Q.    Yes.

23              A.    No.

24              Q.    Okay.  And you kind of anticipated
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    my next question.  You started to say -- you're

 2    in the industry, right?

 3            A.    Correct.

 4            Q.    So you probably come across a lot

 5    of such articles just in the regular course of

 6    your business.  Yes?

 7            A.    Yes.

 8            Q.    And you review them in the regular

 9    course of your business, correct?

10            A.    Yes.

11            Q.    Okay.  Is that -- well, we'll get

12    into that, but that's part of your job duties

13    and whatnot?

14            A.    Yes.

15            Q.    How about your own files?  Did you

16    go through your own files or anything to look

17    for material that might be related to today's

18    deposition?

19            A.    Not really.

20            Q.    Did you -- do you have your own

21    kind of file base or anything like that that you

22    keep of important documents?

23            A.    I have a file system, yes,

24    probably just like everybody else, so ...
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    How large is that file system?  I

 2     mean, can you estimate how many documents are in

 3     it?

 4              A.    I would probably say -- that's a

 5     tough -- I mean, I would probably have about 100

 6     files.  And then within those files are other

 7     files and it just keeps layering so ...

 8              Q.    I see.  At any time have you

 9     reviewed those files in response for document

10     production in this litigation?

11              A.    No.

12              Q.    Do you know if anyone went through

13     those files to look for material that might be

14     responsive to discovery requests in this

15     litigation?

16              A.    I believe somebody did, yeah.

17              Q.    Your files?

18              A.    Yes.

19              Q.    Okay.

20              MR. JOHNSON:  I don't think we

21              established whether we're talking about

22              paper or electronic.

23              MR. HAWKINS:  That was going to

24              be -- I'm asking general and then I --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JOHNSON:  Okay.

 2                    MR. HAWKINS:  Thank you.  And

 3         that's a fair question.

 4    BY MR. HAWKINS:

 5         Q.    Now, when you said -- you gave a

 6    number of documents.  So I kind of assumed you

 7    were talking about paper, correct?

 8         A.    Correct.

 9         Q.    Okay.  And then you have

10    electronic -- an electronic database as well,

11    correct?

12         A.    Yes.

13         Q.    Okay.  So we talked about someone

14    going through and looking for responsive

15    documents.  Do you know how that was done?

16         A.    I mean, we have a file system,

17    okay, in our department, so somebody could

18    have -- are you talking about just providing

19    information for the -- this for case or just for

20    my deposition or -- I'm just curious.

21         Q.    For this case.

22         A.    Okay.  Yes, they would have gone

23    through the file system that we have at work,

24    okay?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    When you say "they," do you mean

 2     the electronic documents, the physical documents

 3     or both?

 4              A.    It would have been both, yeah.

 5              Q.    Okay.  So your physical paper file

 6     went there as well?

 7              A.    Yeah.  Yes.

 8              Q.    And to your knowledge, that was

 9     part of what was reviewed for document prep?

10              A.    Correct.

11              Q.    Thank you.  All right.  And you

12     indicated that there was a seven- to eight-hour

13     session with your attorney.  And to be clear,

14     I'm not asking you anything that your attorneys

15     told you or even what you told your attorneys,

16     but which attorneys were present?

17              A.    Tim Johnson.

18              Q.    Anyone else?

19              A.    No.

20              Q.    Anyone besides attorneys present

21     during this time?

22              A.    Yes.

23              Q.    Who?

24              A.    Tom McConnell and Jason Briscoe,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and probably Keith Miller.  Yes.  And that

 2   wasn't for the full duration.  That was just

 3   initially when we were talking about the

 4   deposition process and what to expect, and then

 5   we broke off into individual groups.

 6          Q.    Okay.  And when you broke off into

 7   individual groups, then it was just you and

 8   Mr. Johnson?

 9          A.    And Mr. Briscoe.

10          Q.    And Mr. Briscoe?

11          A.    For a portion of time, yeah.

12          Q.    Okay.  How long of a time was

13   Mr. Briscoe in the room with you?

14          A.    I don't remember.  He was in and

15   out.

16          Q.    Now, you understand that there are

17   numerous other Defendants in this litigation,

18   correct?

19          A.    Yes, I do.

20          Q.    And did you talk to any attorneys

21   for those Defendants before today's deposition?

22          A.    No, I didn't.

23          Q.    You're in the industry.  You

24   probably talk to other companies that do similar
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    things as you, yes?  I mean, people who work for

2    other companies, correct?

3           A.    Yes, I do.

4           Q.    Do you ever talk to them about

5    this case?

6           A.    No.

7           Q.    Fair to say you've never had any

8    conversations with them about this litigation?

9           A.    Correct.

10          Q.    Apart from your wife or anyone

11   related to you, did you have any conversations

12   about this litigation with anyone else?

13          A.    No.

14          Q.    Would you agree with me that this

15   litigation is pretty big news within the

16   pharmaceutical industry?  I mean, this is a --

17   kind of a once in a lifetime event.  No?

18                MR. JOHNSON:  Objection.

19          A.    It's very big, yes.

20          Q.    Fair to say a lot of people in the

21   industry have heard about it?

22          A.    Yes.

23          Q.    Is there a reason why you haven't

24   talked to anyone about this litigation, I mean
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    given that it's kind of big news and whatnot?

 2          A.    It's not unusual that when I talk

 3    to other people in the industry -- I don't talk

 4    to them that frequently.  Typically when I do

 5    talk to them, I see them at trade shows.  So

 6    that might be a couple of times a year.  And we

 7    may be talking about other items, so ...

 8          Q.    What I'm getting at, is it a

 9    conscious decision on your part not to talk

10    about this litigation?

11          A.    I wouldn't say it's conscious.  If

12    it were to come up in -- you know, potentially

13    we could talk about it, but we're -- sometimes

14    we're just talking about other items that might

15    be, you know, fighting PBMs or doing this and

16    that, so -- any other headwinds that we may be

17    facing, so ...

18          Q.    Sure.  And to be clear, I'm just

19    asking the reason.

20          A.    Yeah.  Understood.

21          Q.    My colleague is now going to hand

22    you what will be marked as Plaintiff's

23    Exhibit 1.

24                         - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (DDM-Ratycz Exhibit 1 marked.)

 2                      - - -

 3              MR. HAWKINS:  I'll apologize.

 4         Maybe this is standard practice here,

 5         but apparently the exhibits were printed

 6         double-sided.  I think that's not how I

 7         would prefer to go about things, but

 8         that's what we're working with.

 9              MR. JOHNSON:  Okay.

10    BY MR. HAWKINS:

11         Q.    Now, there will be some instances

12    where I hand you an exhibit.  I'm going to say,

13    "You might want to keep this one kind of

14    nearby."  This isn't one of those examples, but

15    some, you're going to want to keep by because we

16    might want to come back to.

17              Do you recognize this document,

18    sir?

19         A.    Yes, I do.

20         Q.    When's the first time that you saw

21    this document or one like it?

22         A.    Probably about a few months ago.

23         Q.    And what was the circumstance in

24    which you saw it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    It was e-mailed to me.

 2            Q.    Okay.  And how did you find out

 3    that you'd be deposed in this case?

 4            A.    I found out from Tom McConnell.

 5            Q.    Okay.  And what was said to you?

 6            A.    Just said that I would be deposed

 7    on this case, basically that.

 8            Q.    Was that before you received this

 9    document?

10            A.    I don't remember.

11            Q.    Did Mr. McConnell say anything

12    other than, "You're going to be deposed?"  Did

13    he give you any advice or --

14            A.    No.  He just said that we'll be

15    talking to Tim and he'll be following up and

16    we'll be doing deposition preparation and, you

17    know, that was it.

18            Q.    What company do you currently work

19    for?

20            A.    Discount Drug Mart.

21            Q.    Okay.  And we can refer to that as

22    DDM, correct?

23            A.    Absolutely.

24            Q.    What is your current job title?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Senior vice president of pharmacy.

 2              Q.     To the best of your ability, can

 3     you give me a thorough description of your job

 4     duties and responsibilities.

 5              A.     Absolutely.  Pretty much oversee

 6     many of the aspects of pharmacy from an

 7     operations perspective, financial side of it,

 8     PBM management, procurement, okay, which would

 9     include the pharmacy warehouse, do some

10     compliance, and also I'm involved heavily in our

11     specialty pharmacy operation.

12              Q.     All right.  You referenced "PBM

13     management."  What is that?

14              A.     That's just basically third-party

15     contracting.  Network access basically.

16              Q.     And you said you do a lot of work

17     with your specialty pharmacy?

18              A.     Correct.

19              Q.     What is that?

20              A.     That's just -- it's a wholly-owned

21     subsidiary of Discount Drug Mart.  It's Gentry

22     Health Services.  And so I'm involved in that

23     and trying to grow that business.

24              Q.     And what are your -- strike that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Is there anything you do with

 2      respect to that involving preventing diversions

 3      or government compliance?

 4           A.    No, I don't.

 5           Q.    Now, you went through a fairly

 6      long litany of your job responsibilities.  Which

 7      of those responsibilities have relationships to

 8      controlled substance, at least in terms of

 9      preventing diversions or government compliance?

10           A.    I mean, I would probably -- can

11      you repeat that question?

12           Q.    Sure.  There's probably a better

13      way to go about this.

14                    You understand what "diversion"

15      is, correct?

16           A.    Yes, I do.

17           Q.    And what is your understanding --

18      do you understand what "government compliance"

19      is?

20           A.    Yes.

21           Q.    Okay.  Is that part of your job

22      responsibility?

23           A.    A part of it is, yes.

24           Q.    And what is your role with it and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    how do you fulfill that responsibility?

 2            A.    So the way we were set up -- and

 3    we are a smaller organization, so obviously

 4    different individuals within the company are

 5    going to wear many hats, and so from that

 6    perspective, compliance, typically we would

 7    sometimes divide up.  I might be -- I spend a

 8    lot of time working on HIPAA, okay, but I had a

 9    different individual -- we would split duties

10    with the State Board of Pharmacy and the DEA,

11    okay.

12            Moving forward, somebody else did

13    fraud, waste and abuse, for example.  I would

14    have a hand on that, but I wouldn't be

15    necessarily doing fraud, waste and abuse.  It's

16    just an example, okay?

17            Now, fast forward to today, we've

18    got a director of compliance.  So we have

19    somebody trying to funnel in and put it all

20    under one silo.

21            Q.    Okay.  There's a lot to digest

22    there.  First of all, who's the director of

23    compliance that you just referenced?

24            A.    Presently that's Joe Muha.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  And how long has he held

2    that position?

3              A.    Joe has been with us for probably

4    a year and a half.

5              Q.    Okay.  And who held that -- I

6    assume you held that before him?

7              A.    Well, it wasn't -- we didn't --

8    that position wasn't a compliance position, but

9    it was basically -- yeah, most of that at that

10   particular point would funnel, but through the

11   years sometimes it was carved out.

12             Q.    Okay.  And when you say "carved

13   out," what do you mean by that?

14             A.    Well, again, we -- I might be -- I

15   solely did HIPAA, okay, so nobody else did that.

16   Somebody else was in charge of fraud, waste and

17   abuse.  With DEA, we would typically split those

18   responsibilities, and as well as working with

19   the State Board of Pharmacy.

20             Q.    All right.  So someone else did

21   fraud, waste and abuse?

22             A.    Correct.

23             Q.    Who did that?

24             A.    Fraud, waste and abuse was Tom
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Nameth.
 2          Q.    And how long was Tom -- is he
 3   still involved in that capacity?
 4          A.    No.  He's retired.  He retired, I
 5   would say, like 2014, maybe '15.  I don't -- I
 6   don't recall when specifically, but it's one of
 7   those two.
 8          Q.    And did Mr. Briscoe replace him?
 9          A.    Yes.  Mr. Briscoe worked --
10   replaced him, worked about a year, probably,
11   before that in training in preparation for Tom's
12   departure.
13          Q.    And then you referenced as a
14   second category DEA, as a category, and you said
15   several people, I think, were involved in with
16   that?
17          A.    I think initially, prior to Jason,
18   I think Tom and I both worked with the DEA.
19          Q.    Okay.  Did you have a specific
20   delineation of duties, or did you both wear the
21   same hat, so to speak?
22          A.    So to speak.  I mean, obviously
23   everything rose to me.  So if you want to put it
24   that way, that would be my responsibility, I
```

Highly Confidential - Subject to Further Confidentiality Review

1    guess, but we both had our hands in the pot.

2         Q.    Okay.  And what were your

3    responsibilities?  What did you do in terms of

4    DEA compliance and whatnot?

5         A.    Well, just tried to make sure that

6    we had, for example, a controlled substance

7    quality assurance program, make sure that we had

8    a program -- make sure that we were effectively

9    using 106s to report any diversion or theft that

10   might be occurring that we encountered that was

11   known.

12               Working with the State Board of

13   Pharmacy.  We, again, split those duties with

14   regard to working with the agent if we had a

15   situation of pilferage or something along

16   those -- of that nature, so ...

17        Q.    You referenced 106s.  What is a

18   "106"?

19        A.    It's if you're reporting a theft

20   or a known loss.

21        Q.    Okay.  And to whom did you report

22   it?  Who does 106 --

23        A.    The 106 would be reported by the

24   store pharmacist, and they would involve the

```
 1   store pharmacy supervisor.  And often we would

 2   be aware of an issue.  So if somebody was a few

 3   tablets short on their monthly count or daily

 4   count, on a back count, and they noticed that

 5   they're a few pills short, they would go ahead

 6   and submit that.

 7          Q.    Submit it to whom, is my question?

 8          A.    I'm sorry.  The DEA.  And they

 9   would notify the State Board of Pharmacy as

10   well.

11          Q.    Thank you.  Now, we talked about

12   Mr. Briscoe, Mr. Muha and Mr. Nameth.  Does

13   anyone else share these roles with you, that you

14   can think of?

15          A.    No.

16          Q.    Is it Ms. Strang?  Is that -- am I

17   pronouncing her name correct?

18          A.    Yeah.

19          Q.    Does she do this role at all or

20   is -- it's kind of on a lower tier, so to speak?

21          A.    Lower tier and she's predominantly

22   our buyer.

23          Q.    Okay.  You say your "buyer."  What

24   does that mean?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    She procures.  She works with the

 2   pharmaceutical vendors, and so she is going to

 3   determine what we're going to -- what generics

 4   we're going to stock from a utilization

 5   perspective and works with the vendors in

 6   bringing that in.

 7              She works on making sure that it's

 8   being pulled and then being sent out to the

 9   stores.  Works on the schedule, delivery

10   schedules, and any other hiccups that might

11   occur, you know, from a distribution of any

12   medication from our warehouse.

13        Q.    Now, I've heard on more than one

14   occasion that everyone at DDM is responsible for

15   preventing diversions.

16              Have you ever heard that before?

17        A.    I would say that's true.

18        Q.    Okay.  I've heard it from other

19   witnesses.

20              Who at DDM would you say, "and

21   that's kind of mostly their responsibility"?  I

22   mean, is it funneled to one person saying, you

23   know, this is, you know, things related to

24   diversion, this is certainly the person you
```

```
 1   would talk to is most within their job focus and

 2   responsibility?

 3           A.    I guess it depends on how we

 4   define, you know, diversion, but I mean

 5   ultimately that would either be myself -- it

 6   would either float up to me.  Typically, because

 7   we are a -- we are a smaller organization, it's

 8   very easy that -- and most people do -- they

 9   would include me and Jason.  So there's not

10   multi layering that's going on.  So, you know,

11   we're sending it to one person, it goes to

12   another person and finally it gets to me.  Often

13   it's me and Jason being aware of a situation.

14           Q.    Okay.  So that you and Jason would

15   be the -- fair to say, primarily responsible for

16   preventing diversion at DDM?

17           A.    I would say that's a fair

18   statement.

19           Q.    Thank you.  And earlier you wanted

20   to qualify saying, "depends on how you define

21   diversion."  Can you explain that a little a

22   bit?

23           A.    No, I was just meaning where the

24   diversion -- I mean, if that's -- for example,
```

 1   pilferage -- I mean normally we would involve --

 2   we're always going to involve loss prevention,

 3   too, I guess is where I was going with that,

 4   so ...

 5          Q.    Can you explain that just a little

 6   bit.

 7          A.    Well, yeah, so if we have a case

 8   where we've got a short in a store and let's say

 9   it's ten tablets and we're aware of it, then

10   we're obviously going to a involve the pharmacy

11   supervisor and then we're going to involve loss

12   prevention and an investigation is going to take

13   place.  That's assuming that we can't explain

14   why we're ten pills off.

15          Q.    Okay.  And loss prevention is a

16   separate category within DDM; is that accurate?

17          A.    Yeah.  Yes.

18          Q.    Who's responsible -- who's in

19   charge of loss prevention?

20          A.    That would be Buddy Graf.

21          Q.    Okay.  And do they have a -- I

22   mean -- strike that.

23                Who's your immediate supervisor?

24          A.    My immediate supervisor is Doug

1    Boodjeh.

2         Q.    Okay.  And who is Mr. Boodjeh, and

3    I mean in terms of title and whatnot?

4         A.    He's the chief operating officer

5    for Discount Drug Mart.

6         Q.    And he's worked there for some

7    time?

8         A.    Yes.

9         Q.    How often do you have interaction

10   with Mr. Boodjeh in terms of compliance and

11   diversion issues?

12        A.    From a compliance and diversion --

13   I mean, diversion, I mean, he may be involved if

14   it's something that's significant.  I would not

15   say that he's made aware of a situation that

16   we're investigating somebody at a store because

17   we think that we have a technician that might be

18   pilfering and -- I mean, I don't think he's

19   involved at that level.  If there was something

20   significant, he was -- he would be.

21        Q.    Can you give me an example of

22   something what you deem as significant that he

23   would be involved in with respect to that?

24        A.    I mean, again, typically, with --

Highly Confidential - Subject to Further Confidentiality Review

```
 1    if I am aware of a situation as such, I normally
 2    would not include Doug because I'd be working
 3    with loss prevention and I'd be working with my
 4    team, which would be Jason and usually the
 5    pharmacy supervisor.
 6               So normally I would not bring --
 7    now, if it was -- and I don't recall having a
 8    significant issue of pilferage where we needed
 9    to bring him in --
10         Q.    Okay.  And --
11         A.    -- into the circle as far as
12    being -- now, it doesn't mean somebody can't
13    copy him and may copy him.  But normally, I
14    mean, I think there was enough trust in the
15    system where we would handle that.
16         Q.    All right.  And I'll make this
17    easy for you.  What I'm -- you indicated earlier
18    that there is a point where he might be involved
19    in this, and I'm just trying to figure out where
20    that point is.  So can -- I'll ask a more
21    open-ended question.  Can you tell me what are
22    the instances he gets involved in these type of
23    issues?
24         A.    I think he just is made aware of
```

1    it from an exterior standpoint.  So, you know,

2    normally if there's any losses that we're

3    having, he's not being copied.  He's not being

4    made aware of them, that I can tell.

5              Now, I can tell you if it was

6    something that was significant -- and I don't

7    recall anything major of involving him -- he

8    would certainly probably be made aware of.

9         Q.   Okay.  And we'll get into the

10   specific documents later in the deposition, but

11   there are numerous, or at least several, DDM

12   policies and procedures and protocols with -- as

13   it relates to loss prevention and control --

14   sorry, strike that.

15             You understand what I'm referring

16   to?

17        A.   No, I'm not.

18        Q.   Okay.  DDM has policies concerning

19   diversions and to try to prevent them, correct?

20        A.   Yes.

21        Q.   Okay.  And some of those policies

22   were implemented at various periods of time.

23   Are you with me so far?

24        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Would he have been involved in

 2     those in terms of overseeing the policies or

 3     being made aware of the change?

 4            A.     Doug?

 5            Q.     Yes?

 6            A.     No.

 7            Q.     So basically it would get to you

 8     and stop?

 9            A.     Yeah.  Yes.

10            Q.     How many people do you directly

11     supervisor?

12            A.     My direct reports are Jason, Jill.

13     However, Jill probably spends more time with

14     Jason, as far as meeting with vendors and stuff

15     like that.  So there's a split there, but she

16     reports to me.  I have Joe Muha, okay.  And then

17     we have a director of clinical operations, and

18     she reports to me.  And then the -- we have

19     three pharmacy supervisors in the field, and all

20     three would report to me as well.

21            Q.     All right.  Describe, what is

22     "clinical"?

23            A.     Medication therapy management.  So

24     it's providing a service and trying to be paid
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for it from a pharmacy standpoint.  She's in

 2    charge of our immunization program.  That type

 3    of stuff.

 4         Q.    All right.  And then after

 5    clinical, you mentioned that you have three

 6    pharmacy supervisors in the field.  Can you tell

 7    me what they do?

 8         A.    Yes.  They oversee -- each

 9    pharmacy supervisor has a district or a zone,

10    and they have a responsibility.  For example,

11    they may have 20 stores.  So they're responsible

12    for overseeing the operation of those stores or

13    helping -- it could be recruitment, personnel

14    issues within the store relayed from a pharmacy

15    tech or a pharmacist, any HR issues that may

16    rise would be funneled through them.

17              It wouldn't be unusual if somebody

18    had a -- you know, said "Hey, I'm short ten

19    pills" or "We have an issue."  They're usually

20    going to be the first ones that are going to be

21    involved at that particular point.  Again,

22    typically it would be operations and the

23    pharmacy supervisor would be notified by the

24    pharmacist.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    There could be a situation where

 2      they feel just comfortable talking to the

 3      supervisor, and then the supervisor would

 4      escalate that.  They'd be responsible for

 5      implementing programs, making sure that any --

 6      if our stores were executing programs or

 7      initiatives that we had in place, that they were

 8      properly doing that.

 9                    In addition, we had a pharmacy

10      inspection and a form, and they were responsible

11      for doing an annual inspection.  And so that

12      would basically consist of them going out to the

13      stores.  And they would tackle, you know, HIPAA.

14                    There was some items on there with

15      regard to controlled substances, verifying

16      counts, making sure that counts were being done,

17      verifying security of the pharmacy, okay, and

18      then verifying, you know, cleanliness of the

19      pharmacy.  Making sure that training was up to

20      date, and so on and so forth.

21           Q.    Thank you.

22                    So several things that you just

23      mentioned in that list kind of touch on

24      diversions, don't they?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    For instance, fraud, theft, that

 3      would be kind of a diversion issue?

 4              A.    Yes.

 5              Q.    And it's -- so fair to say they're

 6      kind of the first rung on the ladder that would

 7      be triggered with that, correct?

 8              A.    Could be.

 9              Q.    When would it not be?

10              A.    Again, it's a small organization,

11      so where I sit, as a senior vice president, I

12      could probably -- I can tell you that I've hired

13      many of our pharmacists.  I know them by first

14      and last name.  I could probably tell you the

15      kids' names for many of them.  So we're a very

16      personal group.

17                    So there could be a comfort level

18      to go to me directly just because I may have

19      hired them 15, 20 years ago, and -- or they may

20      be going to Jason to that extent.  There's

21      another example there.  So it typically would go

22      to the supervisor, but it could come to us as

23      well.

24              Q.    Okay.  And I'm not challenging
```

Highly Confidential - Subject to Further Confidentiality Review

1    anything on this.  I'm just trying to understand

2    the structure.

3            A.    Yes.

4            Q.    So there's not really a chain of

5    command issue with respect to that?  I mean, in

6    terms of, okay, we've got a theft, it's okay --

7    it's not a big deal to kind of skip that first

8    rung in the ladder, so to speak?

9            A.    Ultimately everybody is involved.

10   So everybody is going to get brought in.

11           Q.    Okay.

12           A.    So if there is an e-mail that I

13   get, it's not me solely handling that.  So

14   obviously I'm going to bring in loss prevention,

15   the pharmacy supervisor, and I always copy

16   Jason.  Jason will always copy me as well.

17           Q.    Okay.  And we'll get more into the

18   specifics of this, and I'm going to try to

19   tangentally touch on it.  But occasionally there

20   are orders placed for controlled substances that

21   are unusual and raise a red flag.  Are you with

22   me so far?

23           A.    Yes.

24           Q.    Okay.  Do these three field

Highly Confidential - Subject to Further Confidentiality Review

```
 1   supervisors have any involvement and touch on

 2   those issues when that happens?

 3           A.    From the -- no.  No, they would

 4   not.  From the distribution center?

 5           Q.    Yeah, from the distribution center

 6   or as it relates to the pharmacy -- I mean,

 7   because there's -- it's kind of connected,

 8   correct?

 9           A.    Yes.

10           Q.    Okay.  And are they -- do they

11   have any involvement on the pharmacy end of

12   that?

13                 MR. JOHNSON:  Objection.

14           A.    Can you repeat that question?  I

15   apologize.

16           Q.    Sure.  Sometimes when you have one

17   of these orders, and we'll go into it more

18   later, what DDM has done is they've called a

19   physician, for instance, and said -- you know,

20   to verify the order.  Are you with me?

21           A.    Yes.

22           Q.    Okay.  When those decisions are

23   made, are -- do these three field supervisors,

24   are they consulted with respect to those
```

Highly Confidential - Subject to Further Confidentiality Review

1   decisions?

2          A.     In order to process a

3   prescription?

4          Q.     Yes.

5          A.     That would be very rare.

6          Q.     Okay.  To your knowledge, has it

7   ever happened?

8          A.     It could happen.

9          Q.     In what circumstance?

10         A.     And that could happen from a

11  situation where you have a new grad pharmacist

12  who's unsure of what to do with regard to a

13  possible prescription, should I fill it, should

14  I not, I don't feel comfortable, that type of

15  thing.  So there could be some guidance in

16  coaching that -- that pharmacist.

17         Q.     Have you ever been involved in a

18  decision to terminate someone at DDM?

19         A.     Unfortunately, yes.

20         Q.     How many times?

21         A.     That's a good question.  I

22  couldn't give you an accurate answer to that.  I

23  would say five, six, perhaps more.

24         Q.     Okay.  And how long have you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    worked at DDM?

 2            A.    I've worked there since '89.

 3            Q.    Did any of those decisions --

 4            A.    In this position -- I'm sorry --

 5    where I would terminate a pharmacist probably

 6    from 1999 on.

 7            Q.    Thank you for that clarification.

 8    And we'll get more into the specifics of your

 9    career.

10                 Did any of those circumstances

11    involve controlled substance at all in any way,

12    shape, or form?

13            A.    Yes.

14            Q.    How many?

15            A.    Again, I don't know.  I would

16    probably say there were a few of them, two, or

17    three, maybe more.

18            Q.    When's the last time you can

19    remember this happening?

20            A.    A termination or a termination

21    involving a controlled substance?

22            Q.    The latter.

23            A.    I don't think it's happened in a

24    few years.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  So four years ago maybe?

 2          A.    Maybe.

 3          Q.    Okay.  Can you recall the

 4   instance?

 5          A.    No, I don't.

 6          Q.    Can you recall what the

 7   relationship was with the controlled substance

 8   and what caused the termination as it related to

 9   controlled substance?

10          A.    Typically it's somebody who is --

11   would be the ones -- that I would recall, would

12   be somebody that was taking the medication and

13   using it.

14          Q.    Okay.

15          A.    So ...

16          Q.    How often has that happened in the

17   course of your career?

18          A.    Not very often, fortunately.

19          Q.    How often is "not very often"?

20          A.    Again, I mean, I would think --

21   off the top of my head I probably -- there's

22   probably about two or three instances in that

23   span from 1999 until now.  And, again, I -- that

24   I was involved with at least.
```

Highly Confidential - Subject to Further Confidentiality Review

1           Q.    All right.  And we've talked that,

2    you know, DDM is a smaller company and you

3    kind -- everyone knows each other.  Do you know

4    what level these employees are?

5           A.    I thought we were talking about

6    pharmacists.

7           Q.    Yeah, it's --

8           A.    Yes.

9           Q.    Okay.  They're pharmacists,

10   they're pharmacists assistants, I mean --

11   correct?  Are they head pharmacists?  Are

12   they --

13               MR. JOHNSON:  I object.  I think

14          your original question was just about

15          pharmacists, and I don't think you have

16          expanded it since then, so ...

17               MR. HAWKINS:  I'm just asking him

18          to clarify who he's referring to.

19               MR. JOHNSON:  Yeah.  Okay.

20          A.    It could be a head pharmacist --

21   we call them chief pharmacists -- or it could be

22   a staff pharmacist or it could be a floater.

23          Q.    Okay.  So it can -- the

24   terminations we talked about could include all

Highly Confidential - Subject to Further Confidentiality Review

```
 1    three of those categories?

 2            A.    Yes.

 3            Q.    Thank you.  Do you know if you've

 4    ever given anyone -- I'm sorry.  Strike that.

 5    Let me lay a foundation.

 6                  Are you in charge of giving people

 7    reviews at DDM?

 8            A.    Yes.  I'm involved in that

 9    process.

10            Q.    What is your involvement?

11            A.    So I will obviously review the

12    individuals that report to me.  The individuals

13    that -- for example, the pharmacy supervisors

14    would be responsible for helping to review the

15    store pharmacist.  There may be times, based on

16    my role, I didn't get too involved in that, just

17    too many pharmacists.  You know, from that

18    perspective we had somebody doing that.

19                  So I would oversee Jill, Jason,

20    Joe, and Michelle in terms of reviews with those

21    individuals.

22            Q.    Jill and Jason, they're the only

23    two that kind of touch on diversion type issues,

24    correct?
```

```
 1            A.    Yes.

 2            Q.    Okay.  Have you ever given Jill or

 3    Jason a negative review or a reprimand or

 4    anything of that nature as it relates to

 5    controlled substances?

 6            A.    No, I have not.

 7            Q.    What year did you graduate high

 8    school?

 9            A.    1982.

10            Q.    And from where did you graduate?

11            A.    Lorain Admiral King.

12            Q.    And is that in Ohio?

13            A.    Yes, it is.  It's in Lorain, Ohio.

14            Q.    I'm sorry.  I'm not from the area.

15                  And you went on to attend college

16    from there?

17            A.    Yes.  University of Toledo.

18            Q.    What degree did you obtain?

19            A.    A pharmacy degree.

20            Q.    When?

21            A.    '88.

22            Q.    Did you have a job while in

23    college?

24            A.    I'm sorry?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Did you have -- did you work while

 2    you were in college?

 3              A.    Yes, I did.

 4              Q.    How did you work?

 5              A.    I worked as a pharmacy intern in a

 6    hospital.

 7              Q.    What hospital?

 8              A.    Mercy Hospital in Toledo, which

 9    has since closed.

10              Q.    And what were your

11    responsibilities when you were doing that?

12              A.    Just fill -- we had unit dose

13    trays that would go up to the hospital beds, so

14    I was responsible for filling those.  Inventory

15    of controlled substances, checking in some

16    orders, doing IV add mixtures, helping with

17    chemos, preparations, things along that line.

18              Q.    Okay.  You say "inventory of

19    controlled substances."  Is it possible for you

20    to tell me how that works kind of at the

21    pharmacy level?

22              A.    I'm going back a ways.  Are you

23    talking about that specific --

24                    MR. JOHNSON:  Are you talking
```

```
 1              about Mercy Hospital?

 2         Q.    I'm talk -- well, I'll break it

 3    down.  I mean, I'm -- let's start with Mercy

 4    Hospital.  How did that work?

 5         A.    What would happen would be, there

 6    would be -- and, again, I thought it was monthly

 7    at that time.  I might be wrong.  I would go

 8    in -- and again, I wasn't the person doing the

 9    inventory, but as part of the pharmacy

10    internship experience, I would go in with

11    another individual, and we would -- he would

12    count, and I would count, and then he'd do the

13    other side, and I would do the other side, and

14    we would report a discrepancy, if there was any.

15         Q.    Okay.  And that was done monthly?

16         A.    I thought so, yeah.  But it could

17    have been weekly or something.  But, again,

18    based on when -- I didn't work there full time,

19    so that might have been -- you know, it might

20    have been just when I was there, I was able to

21    do it.  And that wasn't one of my

22    responsibilities either.

23         Q.    Does this happen at DDM's

24    pharmacies in the present day, like now, so to
```

```
 1    speak?

 2           A.    Are you talking about in the

 3    pharmacies or in the warehouse?

 4           Q.    The pharmacies.

 5           A.    Yes.

 6           Q.    How long has it occurred?

 7           A.    Excuse me.  We have a -- we do

 8    cycle counts on our medications, so -- on all

 9    our medications because our perpetual inventory

10    is tied to that, so even if it's a

11    non-controlled substance, we want to make sure

12    that the inventory is accurate.

13                 What we've done is we've cycled in

14    our controlled substances and our Schedule IIs

15    so that they would hit on a threshold of -- I'm

16    not sure about controls III through IV, but I

17    know of Schedule IIs.  They would be hit once in

18    a 90-day period where we would be asking them to

19    randomly verify.

20                 So, in other words, every day

21    they'll get 25, 30 drugs that they have to

22    verify the count.  If they do not verify the

23    count, an e-mail is sent to the pharmacy

24    supervisor notifying them.  So that's how we get
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the stores to make sure that they're executing

 2    on that, because obviously if these e-mails are

 3    going out and they're not doing it, our

 4    inventory is going to be wrong.

 5                In addition to that, we do a

 6    monthly C-II count, so -- and in addition to

 7    that, when we're processing a prescription for a

 8    Schedule II, what we would do -- and -- is do a

 9    back count on that item as well.  So if

10    there's -- if your inventory says that you

11    should be at 120, you would -- and you just

12    dispensed, you know -- let's say you were at 150

13    and you dispensed 30, now your inventory says

14    you should be at 120, the pharmacist should

15    verify that 120 is the what you have.

16           Q.    And how long has DDM had this

17    protocol?

18           A.    We've been -- it's been there a

19    few years -- we've been refining it.  Prior to

20    that, we weren't doing cycle counts but we were

21    doing monthly Schedule IIs.  And actually those

22    were pretty much daily anyways because we had a

23    perpetual inventory book where if you went ahead

24    and dispensed a medication of Schedule II, you
```

1    would go ahead and verify that count at that

2    particular point.

3           Q.    All right.  So --

4           A.    It was just mandatory that once a

5    month they would send us a confirmation that

6    a -- an inventory was done and note if there was

7    any discrepancy.

8           Q.    I want to make a mistake here and

9    go ahead of myself.  But one of the -- there

10    have been thefts at DDM in the past, correct?

11           A.    Unfortunately.

12           Q.    Sure.  And thefts of controlled

13    substances specifically, correct?

14           A.    Yes.

15           Q.    And some of those thefts involved,

16    at least over some period of time, drugs being

17    taken, correct?

18           A.    Correct.

19           Q.    What I'm trying to understand is,

20    wouldn't that have been caught in the inventory

21    check?  I mean, if there was an inventory check,

22    you would think that those thefts wouldn't make

23    it past the first inventory check?

24           A.    I mean, there's going to be -- it

```
 1    depends on -- for starters, I think any system,

 2    once somebody knows how it's being run, there's

 3    a potential for diversion within that -- within

 4    that system.  And by that, I mean, so, you know,

 5    the -- somebody is verifying a count, they say

 6    it's 120.  If there was diversion and I was the

 7    one diverting -- you know, responsible for that

 8    diversion, my initials at that time that there's

 9    a 120, even though there's less, okay, I've

10    technically contributed to that problem.

11              So it's going to be hopefully the

12    next pharmacist that fills a prescription is

13    going to verify that, okay, we've got an issue

14    here.  If that's the case, then I know we can go

15    back to the other pharmacist.  If there's a

16    situation where -- and, again, somebody doesn't

17    do a back count because maybe they're busy,

18    "Well, I'm going to do the back count later,"

19    there can be an issue where something can go on

20    a couple times before it's caught.  I think

21    we've gotten much better at catching diversion

22    now than maybe we did many, many moons ago.

23         Q.    Okay.  You say many, many moons.

24    How many moons are --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I mean, I think, you know,

 2    certainly when I came on board, I mean, in '99,

 3    I mean, we were -- you know, what was expected

 4    at store level as a pharmacist has gotten

 5    better.  There are more -- there's more

 6    responsibilities with regard to managing, you

 7    know, controlled substance inventory.

 8              Q.    Okay.  And just to focus --

 9              A.    There's more awareness about it as

10    well.

11              Q.    And when did that awareness kind

12    of blossom, in your opinion?

13              A.    I think it started blossoming as,

14    you know, the opiate issue became more and more

15    relevant.

16              Q.    Can you put an approximate year to

17    that?

18              A.    I would be making up a date, but I

19    would suspect in the 2000- -- mid 2000s or so,

20    probably.

21              Q.    Okay.  And I'm just trying to

22    figure out how the process works as it

23    relates -- I mean, so the two explanations -- I

24    mean, you would think if you're counting each
```

1    pill, so to speak, and pills are gone, that's

2    going to show up pretty quickly, right?

3         A.    Correct.

4         Q.    All right.  So the two

5    possibilities that I heard you tell me on how

6    this could be get past us:  Is one, if the

7    person doing the counting is part of the

8    diversion; and two, is if someone, kind of, for

9    lazy, too busy, or whatever, just kind of

10   skipped a process for a little bit.

11             Can you think of any other types

12   of way that the inventory wouldn't catch that?

13        A.    It potentially could be a

14   situation where maybe a prescription gets

15   filled, the count's verified, but what goes into

16   the bottle, the patient gets shorted.  So in

17   that situation, instead of getting, you know,

18   50 -- 50 tablets, they end up with 45.

19        Q.    Well, in that case you'd have a

20   surplus --

21        A.    No, because the inventory is

22   correct, but what happens is, perhaps it could

23   be a situation where somebody takes the five

24   from the bottle and it's sold to the customer on

1    the premise that the customer or the patient is

2    not going to count it.

3            Q.    I understand.

4            A.    That would be another opportunity,

5    I think.

6            Q.    Did you go on any postgraduate

7    education after graduating college?

8            A.    No, I did not.

9            Q.    After graduating, where were

10   you -- where were you employed?

11           A.    I worked at Metro Hospital.  And

12   then I was moonlighting for, at that time, Revco

13   and Discount Drug Mart.  But I worked in

14   inpatient and outpatient at Metro Hospital here

15   in Cleveland.

16           Q.    Okay.  So Metro is in Cleveland,

17   inpatient and outpatient.  What did that consist

18   of?

19           A.    Again, inpatient was doing, you

20   know, fulfilling unit dose orders and doing the

21   IV add mixtures, making sure everybody got

22   those.  And then they had a separate ambulatory

23   division, which eventually I migrated to.  The

24   hours were better.  And that was just processing

Highly Confidential - Subject to Further Confidentiality Review

```
1    prescriptions, you know, for the patients.

2           Q.    Okay.

3           A.    The outpatients.

4           Q.    And then you said you were

5    moonlighting at two companies at the same time?

6           A.    Yes.

7           Q.    What is Revco?

8           A.    Revco ended up as -- would be --

9    would be CVS today.

10          Q.    Okay.  And what were your --

11   sorry, go ahead.

12          A.    Through the multiple acquisitions,

13   so ...

14          Q.    There was a period of

15   consolidation within the pharmaceutical

16   industry, right?

17          A.    Absolutely, yes.

18          Q.    What were your job

19   responsibilities at Revco?

20          A.    I was a floating pharmacist.  So I

21   would just -- there was -- this -- actually,

22   there was a store that I worked at where there

23   were two female pharmacists who had children and

24   they wanted to dial their hours back, and Revco
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    told them that they could dial it back if they

 2    found somebody that would work.  So I would work

 3    ten hours there.  Usually one shift a week type

 4    of thing.  It was on a weekend.

 5              And then I would work at Discount

 6    Drug Mart as a floater going to any location

 7    that they had an opening.  So at that time, I

 8    lived in Euclid, Ohio.  I might drive to

 9    Willard, Ohio, to cover a shift if it was

10    available and I was willing to do so.

11         Q.   Okay.  And so basically just doing

12    basic pharmacy work?

13         A.   Absolutely, yes.

14         Q.   I'm sure there's a better term I

15    could use.

16              All right.  And how long did you

17    work at Metro?

18         A.   Worked at Metro for probably two

19    years or so.

20         Q.   And I know I could do the math

21    here, but too many questions in my head.  Can

22    you give me those approximate two years?

23         A.   That would be about 1990.

24         Q.   Okay.  And earlier I think you
```

1    told me you came on with DDM in '89 so --

2         A.    Excuse me.  Yeah, it would have

3    been '89 to '90 at Metro.  Sorry.  Yeah.

4         Q.    Okay.  So earlier when you

5    testified that you came on at DDM in '89, you're

6    counting kind of that floater work, right?

7         A.    Correct.  And that could have been

8    a year later as well.  '90 as well.  I don't

9    really delve on the earlier years that much.

10        Q.    I'm just trying to get

11   approximations.

12        A.    Understood.

13        Q.    So you quit Metro after about two

14   years.  What did you do after you quit Metro?

15        A.    So at that particular point, I

16   wanted to get into retail pharmacy, just found

17   it better, a better experience for me, more

18   patient centered.  And so the decision was to

19   either work at Revco -- I interviewed with Revco

20   and I interviewed with Discount Drug Mart.  So I

21   took a position with Discount Drug Mart.

22        Q.    And that would be in '89, right?

23        A.    Thereabouts, yeah.

24        Q.    Okay.  What was your -- what was

Highly Confidential - Subject to Further Confidentiality Review

1    the position that you took at DDM?

2         A.    At that time I was a -- I think I

3    worked as a floater for a short stint, but then

4    I eventually ended up working in the Euclid

5    store.  And that was as a staff pharmacist.

6         Q.    Okay.  Did DDM ever give you any

7    training in terms of -- at that level, okay,

8    "This is what a diversion is and this is what we

9    do to prevent it" or anything of that nature?

10        A.    Yeah.  I mean, back at that time I

11   would say that we had -- and we still do have

12   semi -- we have two meetings a year.  And the

13   requirement, because we are a smaller

14   organization, is that every pharmacist attend.

15             There are exceptions.  There may

16   be, you know, 10 percent of the workforce that's

17   unable to go to these meetings because they're

18   on vacation.  Sometimes they're covering

19   multiple shifts for those two days to allow our

20   store and our staff pharmacists to go.  But we

21   would track to make sure that, you know, there

22   wasn't a chief pharmacist who wasn't going to

23   any meetings.

24             These meetings were -- we would

Highly Confidential - Subject to Further Confidentiality Review

```
 1    talk about -- we would almost always -- I don't

 2    recall when we didn't have somebody from the

 3    State Board of Pharmacy.  So when we talk about

 4    diversion, they would always talk about upcoming

 5    legislation.  They would talk about the need to

 6    report.  They would talk about addiction as far

 7    as amongst professionals and a variety of

 8    subjects.

 9              During that span, we would have as

10    well -- at every meeting we would have the State

11    Board of Pharmacy.  Maybe every few years we'd

12    have somebody from the DEA that would come in

13    and talk to us about diversion and what they're

14    seeing and that type of thing, and what to do

15    when you encounter diversion and that type of --

16    and we still do that today.

17         Q.    Okay.  On the pharmacy level, you

18    talked about the need to report.  Are you with

19    me so far?

20         A.    Correct.

21         Q.    Okay.  And you said you still do

22    that today.  If this has changed through the

23    years, let me know, but tell me what's said

24    about the need to report at the pharmacy level.
```

```
 1              A.    At the pharmacy level, I mean we
 2      address that at our pharmacists' meetings.  I
 3      mean, that's -- we make -- sometimes we will go
 4      ahead at a meeting, and if we feel the need to
 5      recirculate a bulletin or a memo that might
 6      have -- you know, that has not changed but was
 7      last posted, you know, let's say five years ago
 8      or three years ago, we may go ahead and
 9      recirculate it into the meeting packet and then
10      a representative or a supervisor from the
11      pharmacy team will talk about that.
12              Q.    Okay.  And I assume -- I mean, in
13      part of this training it's, okay, "These are the
14      circumstances when you report, and this is who
15      you report to"?  Is -- anything else with
16      respect to -- does that kind of put it in a
17      nutshell, so to --
18              A.    I think, yeah.  When in doubt,
19      report.
20              Q.    Okay.  Can you narrow -- can you
21      kind of define that a little better?  What
22      circumstances do you report -- or is a report
23      expected, I should say?
24              A.    So if a pharmacist, let's say, on
```

Highly Confidential - Subject to Further Confidentiality Review

1    a month end is doing a count and they find that

2    they're short on their inventory on a specific

3    drug, the first thing they would do is they

4    would run a utilization report to determine --

5    they would investigate it on their own, okay,

6    and just to see if there was maybe a

7    prescription that wasn't logged into -- you

8    know, and accounted because it was a perpetual

9    type of thing that was done on a monthly basis.

10                So you would scan all the

11   prescriptions for that month against the report

12   and determine, okay, "Do I have a deficit?"  If

13   you had a deficit at that time, it was pretty

14   much, you were done.  You needed to report it to

15   somebody else.  Typically what would happen is a

16   prescription wouldn't get logged in the book and

17   there could have been a situation where --

18   that's why we morphed into doing back counts

19   more religiously to avoid the issue if it's a

20   Monday and it's my day to do the inventory and

21   now I have a partner who maybe forgot to log a

22   specific prescription, now I've got to go and

23   reconcile that report.  So it made it a lot

24   easier for our pharmacists from that

Highly Confidential - Subject to Further Confidentiality Review

1   perspective.

2           But what they would do is, they

3   would escalate that to their pharmacy supervisor

4   and they would include us as well.

5           Q.   Okay.  And you say you find the

6   discrepancy, you're basically done.  What's the

7   step there?  Who do you report to?  Do you

8   report -- you mentioned a 106, I think, to the

9   DEA?

10          A.   Well, what -- yeah.  I'm sorry.

11  They would, at that particular point, complete a

12  106.  They would go ahead and send 106, notify

13  the state board, okay, by telephone to let them

14  know, and then they would send a 106 following

15  up to the state board.  And obviously, then, at

16  that particular point, loss prevention would get

17  involved.

18          Q.   Okay.  Were they expected to

19  contact anyone at DDM corporate before sending

20  that 106?

21          A.   There may be times -- no.  I mean,

22  there wasn't a policy that said, "You must

23  contact corporate before sending a 106."  I

24  mean, if a pharmacist did his -- or she did the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    due diligence with regard to, "I'm short right

 2    here," they would typically -- I would probably

 3    say it was 50/50.  Some would go ahead and send

 4    a 106.  Some would call us and say, "I have a

 5    short."

 6              "Okay.  Well, send the 106.  Go

 7    ahead and send it.  Notify the state board."

 8              And, again, you know, the state

 9    board was coming into our pharmacies or coming

10    to our meetings every single year, and that was

11    always a topic on what to do when you had a

12    short and how to report it.  And they even

13    referenced the DEA from that perspective.  So

14    the process and what to do in those steps I

15    think was very good as far as execution from the

16    store level.

17         Q.    In any event, pharmacists had the

18    individual discretion to make the 106 directly

19    to the DEA?

20         A.    We would always make sure.  If we

21    were made aware that there was an issue, then we

22    would make sure that that 106 was sent.  But a

23    pharmacist could send a 106 knowing that it's

24    short.  It wasn't -- we weren't sending the 106,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is what I'm trying to say.

 2         Q.    But they could do that without

 3    your directive and without repercussion,

 4    correct?

 5         A.    Yes.

 6         Q.    All right.  So you're basically

 7    going -- shifting back to your career, you're

 8    basically on the pharmaceutical level, at the

 9    store level '89, '90.  When was the next career

10    jump for you?

11         A.    I believe I took over from staff

12    to chief pharmacist, which is head pharmacist,

13    at the Euclid store.  I don't recall how long I

14    was there.

15         Q.    Do you recall the approximate

16    year?

17         A.    It would have been in the '90s.

18    And I was there for probably about, I would say,

19    four or five years.  And then I became chief

20    pharmacist in Independence.  And from there -- I

21    was there for probably two --

22         Q.    Can I stop you?

23         A.    Yes.

24         Q.    Because that way it will be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   faster.  How did your duties as chief pharmacist

 2   change, particularly as it related to diversions

 3   or compliance?

 4        A.   They didn't.  Just a different

 5   location.  So my responsibilities as chief

 6   necessarily didn't change.  My challenges might

 7   be different.

 8        Q.   Okay.  Sorry to interrupt you.

 9   Please continue.

10        A.   Yeah.  And so from there I went to

11   the -- I was chief for probably one year -- or

12   actually a staff.  We had a pharmacist who was

13   chief and we had a situation where either a

14   medical leave and they needed stability in the

15   store so I went back in as a staff pharmacist at

16   our Lakewood store, and then from there I went

17   to Westlake where I was -- I was there for the

18   rest of my career until I moved up to corporate.

19        Q.   Okay.  And when did the move up to

20   corporate occur?

21        A.   That occurred in June of 1999.

22        Q.   Okay.  Did you apply for that

23   position?

24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    How did you learn it was vacant?
2   What prompted you to apply, is a better
3   question.
4          A.    There was -- the individual that
5   was -- there was -- somebody was stepping down
6   and going back to store level, okay, and so that
7   became -- you know, word traveled, and so I
8   contacted management saying I was interested.  I
9   didn't know if anybody else was.  I don't know
10  how many people interviewed, but I was
11  interviewed.  And shortly thereafter, I was
12  notified that I was selected.
13         Q.    Do you know who hired you
14  specifically, the individual?
15         A.    Yeah.  I mean, I was interviewed
16  by actually Tom Nameth at that time, and I know
17  that the owner of Discount Drug Mart had
18  interviewed me as well.
19         Q.    Okay.  And fair to say you've now
20  superseded Tom in terms of the level of the
21  corporate structure, right?
22         A.    Correct.
23         Q.    Okay.  So what were your positions
24  when you moved into corporate?  What was your
```

Highly Confidential - Subject to Further Confidentiality Review

 1    position -- I'm sorry -- in the singular, when

 2    you moved into corporate?

 3            A.    I was director of pharmacy

 4    operations.

 5            Q.    And what were the duties

 6    associated with that?

 7            A.    Again, it would be anything that

 8    was tied to operations at store level.  So if we

 9    were rolling out a program, if we were rolling

10    out technology, I had to make sure the stores

11    were prepared to handle that.  There was some

12    training involved there as well.  But that was

13    essentially the responsibilities.

14                  Again, at that time Tom and I

15    shared -- we played out of the same sand box, so

16    to speak, essentially with regard to

17    responsibilities and duties.  We had some store

18    responsibilities.  So we would manage those

19    stores.  And obviously, if there was an issue at

20    a store with regard to diversion, I would handle

21    it if it was my store.  If it was Tom's store,

22    he would handle it.

23                  "Handle it" being he would take

24    the reins there, involve loss prevention and,

Highly Confidential - Subject to Further Confidentiality Review

1  you know, the head pharmacist.  So at that time

2  we didn't have pharmacy supervisors.

3          Q.    I'm sorry.  I know you told me

4  this, but what was your exact position at that

5  time?

6          A.    Director of pharmacy operations.

7          Q.    Okay.  And how long did you hold

8  that position?

9          A.    Until 2010.

10         Q.    Okay.  And what happened in 2010?

11         A.    So in 2010 -- it was probably

12  around June or July again, we -- there was -- I

13  became vice president of pharmacy -- pharmacy,

14  and Tom became director of pharmacy operations.

15         Q.    Okay.  And how did your duties and

16  responsibilities change?

17         A.    Again, they really didn't very

18  much.  Over a course of time, what I tried to do

19  was to differentiate our responsibilities to

20  make us more efficient, because I thought that

21  there was -- we weren't being efficient with

22  regard to being able to drive performance at

23  store level, possibly execution, so on and so

24  forth, because we were sometimes working on the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   same project without -- without the other person

 2   knowing.

 3             So we tried to silo those

 4   responsibilities.  So HIPAA comes along, "I'll

 5   take HIPAA and I'll work HIPAA and that will be

 6   mine."  And fraud, waste and abuse came by, Tom

 7   would take that.  When it came to, for example,

 8   you know, monitoring our SOMS program, that was

 9   something that Tom was doing, so he continued to

10   do that piece.  We didn't change that.

11        Q.    What is the SOMS program?

12        A.    Suspicious ordering monitoring.

13        Q.    Okay.  And you said Tom took that?

14        A.    Yeah.  He -- that was something

15   that he was doing at that time, so he continued

16   on doing that.  He had worked well with Jill as

17   well and with the pharmacy vendors and buyers,

18   so he assumed that responsibility as well, and

19   so I did not really meet with too many of the

20   brand or generic vendors.  So he had a good

21   relationship with Jill and so we didn't break

22   that up.

23        Q.    Okay.  And earlier you indicated

24   you tried to silo this as much as possible.  So
```

Highly Confidential - Subject to Further Confidentiality Review

 1    you had very little involvement in the SOMS post

 2    2010?

 3            A.    No, I wouldn't say very little

 4    involvement, but as far as monitoring the

 5    reports that we had on a monthly basis and --

 6    no, I -- that was something that he pretty much

 7    oversaw.

 8            Q.    How about -- I mean, you know,

 9    there's various, you know, suspicious order

10    policies that we've seen, I mean, for lack of --

11    just to use a global generic term, that have

12    been issued since then.  I've seen your name

13    connected to a lot of them.  Did you have any

14    involvement in determining what those policies

15    are?

16            A.    It depends on the policies.

17            Q.    Okay.

18            A.    So it depends on where, yeah.

19            Q.    So situation specific?

20            A.    Yes.

21            Q.    Did your job title change after

22    2010?  I think you're a senior vice president

23    now?

24            A.    Yes.  In something about June,

1    July, I think this was -- April or May of 2016 I

2    became senior vice president.

3              Q.    And how did your duties and

4    responsibilities change with that?

5              A.    At that particular point, they

6    changed in the sense that the lay of the land

7    was a little bit different.  We had more

8    pharmacy supervisors.  So it allowed me to be

9    more visionary with regard to where pharmacy was

10   going, business development and focusing on

11   growing, you know -- and trying to come up with

12   opportunities where we could thrive better.

13             Pharmacy was very, very difficult

14   from the standpoint of, you know, there was some

15   consolidation that was happening in the

16   industry.  And so that allowed me to kind of

17   focus more at the top while I had subject matter

18   experts, if you will, below me that were

19   concentrating on other facets of the business.

20             Q.    Okay.  So shifting gears a little

21   bit.  We talked about a suspicious order policy.

22   Does DDM have a suspicious order policy?

23             A.    We have a system in place,

24   correct.

Highly Confidential" - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  You have a system in place.

 2   Would that system be fairly characterized as

 3   "the policy"?

 4              A.    I would, yes.

 5              Q.    Okay.  When did DDM first

 6   implement a suspicious order policy?

 7              A.    When I came in in 1999, I think

 8   that process was already in place.

 9              Q.    Can you describe that process in

10   1999?

11              A.    The process at that particular

12   point in 1999 was -- to the best of my

13   knowledge, was a -- was a -- we would look at a

14   rolling 12-month average report.  So it would --

15   so basically a report would kick out on the

16   first day of the month and it would look at

17   anything that was above a certain threshold for

18   that previous month based on 12 months worth of

19   data, okay?  So if it was above that average, it

20   would kick out on a report.

21                   And then Tom would go ahead and

22   review that report and see if there was

23   something there that was, what we would call,

24   glaring or needed further inspection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.     Okay.  And so fair to say since it
2      was there when you came on in 1999, you didn't
3      have any role in developing that policy,
4      correct?
5              A.     No.
6              Q.     Okay.  And at least some component
7      of that policy -- I mean, you still do that
8      today, correct?
9              A.     Correct.
10             Q.     Did the policy change -- have any
11     additions put on it throughout the years?  Is
12     there anything else that's been added to the
13     policy since the time you came on to -- 1999
14     till present day?
15             A.     Yeah.  We've added another report,
16     which is our six-week average report.  That's
17     more of an order inventory function, but there's
18     some usage there to help with SOMS in that if a
19     PO was created at store -- by a pharmacy, what
20     will happen is, the store will get a printout of
21     anything that's over the six-week average and
22     that would be inclusive for any medication,
23     C-IIs or controlled substances or not.  And
24     that's by NDC, okay?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     And so that would kick out at the

 2     store so a pharmacist then could review that and

 3     say, "No, I didn't want, you know, ten bottles,

 4     I only wanted one bottle."  And then also that

 5     would be -- in the order manifest would be noted

 6     so that when somebody was picking a medication,

 7     that they would see that, okay, there's -- this

 8     is above the six-week average.

 9                     Depending on what that amount

10     might be, it might be a notice to let Jill know.

11     And Jill at that particular point would go ahead

12     and if there was a discrepancy as such where

13     somebody said, "Ten bottles.  The weekly --

14     six-week average is one bottle.  What do I do?"

15     She would go ahead then and go into the

16     inventory management system -- and I believe she

17     had probably a few years worth of data, and she

18     could probably speak more clearly to this -- to

19     her part in the process.  But she would review

20     that.

21                     And if -- typically she would go

22     ahead and call the pharmacy, speak to the

23     pharmacist and say, "Do you want ten or one?"

24                     "No, I only want one."
```

1          Okay.  So there was an order

2    error, okay?

3          You know, if they said, "I want

4    ten," for example.  But her reviewing that would

5    say one, one, one, one, two, and the average is

6    1.2 or something, and they want ten bottles, she

7    would go ahead then and escalate that to

8    somebody in pharmacy operations.  That would be

9    myself, Tom, or Jason.

10         Q.    As you sit here today, can you

11   think of an instance where she's ever done that,

12   that escalation that you've referred to?

13         A.    Not to me, no.

14         Q.    Do you know -- do you have

15   firsthand knowledge of her ever doing it?

16         A.    I don't know.  I don't know.

17         Q.    Right.  So she may have done it,

18   she may not have.  You just don't know?

19         A.    Correct.

20         Q.    And the six-month -- I'm sorry.

21   Is it six-month report that we're talking about,

22   that's how we characterize that?

23         A.    I'm sorry.  Repeat that.

24         Q.    Is it -- you refer to this as the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    six-month report?

 2         A.    No.  It's got different names.  I

 3    mean, some people refer to it as the -- there's

 4    a six --

 5              MR. JOHNSON:  Six weeks.

 6         A.    Six-week average report, yeah.

 7    The other report has got multiple names.

 8         Q.    I'm sorry.  I just wrote it

 9    down -- okay.  So we can call it the six-week

10    average report; is that a fair --

11         A.    Yes.

12         Q.    Okay.  It's in DDM's interest not

13    to have too much inventory on the shelf, right?

14         A.    That's true.

15         Q.    I mean, it makes the store more

16    efficient to kind of have -- just in time is the

17    wrong term, but closer to what sales are

18    expected on the shelf, right?

19         A.    True.

20         Q.    And that's kind of what the

21    six-week average report is aimed at, is to make

22    DDM more efficient, right?

23         A.    I would agree.

24         Q.    Okay.  It's kind of what gave rise
```

Highly Confidential - Subject to Further Confidentiality Review

1   to this report, so to speak, or at least its

2   purpose?

3           MR. JOHNSON:  Objection.

4       A.    That's what gave -- that's what

5   gave rise to it.  However, it served a function

6   also from the standpoint of identifying if there

7   were any oddities or discrepancies that

8   potentially there was either an amount that

9   didn't need to be ordered or potentially was

10  ordered and needed to or could be then escalated

11  to pharmacy operations for review.

12      Q.    So what I hear you saying -- and

13  please correct me if I misstate it -- is, okay,

14  inventory concerns were what gave rise to it but

15  it could serve the function as a trip wire?

16      A.    Yes.  We found value in it in the

17  sense that it was being printed at store level,

18  and it was being printed at the pharmacy, and

19  stores would obviously know -- there could be

20  times that Jill could be reaching out to them.

21  So there was a set of eyes on that.  And then

22  also they would be watching it themselves as

23  well.  So there were two.  So we saw value in it

24  from that perspective.

```
 1              Q.    Right.  And earlier we talked

 2    about your personal knowledge as it related to

 3    Jill ever doing something.  You recall that?

 4              Can you ever think of -- to your

 5    knowledge, was there ever an instance where the

 6    trip wire was successfully triggered and you

 7    say, "Aha, we've got an instance here where the

 8    six-week average caught something that should

 9    not have happened"?  Sorry.

10              A.    When you say that, that would be

11    basically an order error.

12              Q.    Mm-hmm.

13              A.    Yes.

14              Q.    Okay.  So --

15              A.    So I would call you and say, "Do

16    you want" -- or she would call and say, "Do you

17    want the ten bottles?"  "No, no.  I only want --

18    I only want the one bottle."

19              Q.    Okay.  But an order error is

20    really not a diversion, though, that's not --

21              A.    Correct.

22              Q.    That's just -- the problem there

23    is you've got too many controlled substance or

24    whatever the drug is on your shelf, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1            A.    Correct.

2            Q.    Okay.  Aside from order errors,

3    can you think of an instance where the trip wire

4    was -- you know, "Okay.  We've got a problem

5    here.  This is not an order error.  This is

6    something we need to alert the DEA" or anything

7    of that nature?

8            A.    Not to my knowledge, no.

9            Q.    All right.  So going back

10   globally, you've got your suspicious order

11   policy where you talk about the 12-month

12   average, and then you say at some point

13   subsequently you've got the six-week report

14   that's supplemented.

15              Is there any other supplementation

16   that was done to DDM's suspicious order policy?

17           A.    When you say "supplementation,"

18   are you just referring to reports or --

19           Q.    No.  I'm sorry.  I'll clarify.

20              What I'm interested in, you

21   described the process as it existed as you came

22   in 1999.  Are you with me so far?

23           A.    Correct.

24           Q.    Okay.  And my first -- I asked

Highly Confidential - Subject to Further Confidentiality Review

1  you, had that process changed, and your answer

2  to that was, yes, it changed because

3  subsequently we added the six-week report.

4  Okay.

5              I'm asking, is there anything else

6  that was added to the policy, supplemented to

7  the policy to improve DDM's ability to

8  trigger -- you know, "We've got a suspicious

9  order here"?

10             A.    No, not to my knowledge.

11             Q.    Do you know if DDM's suspicious

12  order policy was ever reviewed by you or anyone

13  else saying, you know, "We might need to make

14  this more hefty or add any protections"?

15             A.    No, it was not -- I don't recall

16  reviewing it, but I will tell you that the

17  suspicious ordering monitoring system was -- we

18  have very little turnover at our company so

19  we're very fortunate from that respect.  So, you

20  know, in the course of 20-plus years, you may

21  have only had two directors of pharmacy.  We've

22  had one pharmacy buyer.  And so the people that

23  were essentially responsible for SOMS that were

24  working it or had a role in it, that -- they

```
 1    never changed, okay?

 2              So, you know, so if there was --

 3    you know, they -- if there was ever a need to do

 4    something, they would -- they could naturally

 5    make -- perfect the system or make it better and

 6    always make changes to it, but the system was

 7    working based in their eyes.

 8         Q.   Okay.  I don't understand what you

 9    just told me, or at least the purpose of what

10    you just told me.

11         A.   I'm sorry.

12         Q.   No.  It's my fault.  And one of my

13    jobs here is to try to gain knowledge of the

14    process.

15              Now, what I hear you saying is

16    there's some virtue in the fact that DDM has

17    little turnover and that improves the process

18    somehow.  Is that fair, kind of a 600,000 feet

19    encapsules it?

20         A.   That's fair.

21         Q.   Okay.  How does that help the

22    process?  I mean, what's the virtue in that?

23         A.   The virtue in there is that when

24    you're looking -- over a course of time you get
```

Highly Confidential - Subject to Further Confidentiality Review

1  comfortable -- we don't have thousands of

2  stores.  We have 70 stores -- 74 stores.

3          Over a course of time -- and keep

4  in mind, let's say -- let's reference Jason --

5  and Jill to some extent here.  They know which

6  stores are busy, okay?  They know where our

7  stores are.  They know -- they know our

8  customers -- they know who the customer is.

9          So when you're able to look at a

10  store and you know that it's a high volume

11  store, you know exactly where that store is, it

12  might be in an area where -- "Potentially, you

13  know what, I worry about maybe overutilization

14  of something," you're going to look at that data

15  a little bit differently as you scan that

16  report.

17          Whereas, somebody who is just

18  looking at numbers, it's a store, it's a store,

19  it's a store, they don't have sales data.  They

20  don't have prescription knowledge.

21          But I think many of us in our

22  organization, when we look at our 74 stores, we

23  can tell you where they rank.  I could tell you

24  where they sit with customer service.  I could

1    tell you which are my top immunizing stores,

2    which are my top stores with regard to order

3    inventory management.

4              I don't know many operators that

5    were -- that can do that.  And I think that

6    speaks to, you know, the intimacy of our

7    organization and the size of it as well.  So

8    from -- that was a virtue, you know, for the

9    SOMS.

10        Q.    Okay.  And I think I'm getting

11   closer to understanding what you're saying,

12   so -- sorry.

13              How does that prevent a diversion,

14   though?  So I mean -- so they know the specific

15   nature of the store is -- like if the volume

16   increases aberrantly, that makes them more able

17   to say, "Okay.  We've got a problem here."  Are

18   you saying that?

19        A.    It's just more intelligence that

20   they have when they're making a decision.

21   That's what that is.

22        Q.    Okay.  And what I'm not getting

23   is, how does that intelligence -- I understand

24   what you're saying.  They're more intelligent.

1    They've got the intimate knowledge.  I'm trying

2    to figure out where the rubber meets the road

3    and how that intelligence translates on their

4    ability to say, "You know what?  This is a

5    potential diversion here.  We need to do

6    something."

7            A.    Can you -- the potential would be

8    location of the store.

9            Q.    Okay.  So --

10           A.    I'm just bringing that up as an

11   example.

12                 So you may notice -- and as you do

13   that report over a course of time -- for

14   example, let's just talk about -- and you

15   encounter -- you start seeing, perhaps, these

16   potential increases above the six-week average,

17   or increases above the rolling 12-month report.

18   You're the one doing that report.  It's not five

19   different people over the course of a year or

20   five years or ten years.  It's really you doing

21   that report.  You really get to know the

22   players, "the players" being the customers, that

23   are in that -- on that report.

24                 And it doesn't take long when

Highly Confidential - Subject to Further Confidentiality Review

1    you -- you know, you may -- you may think about

2    an issue at another -- I want to do more

3    reporting on this specific store.  It seems like

4    multiple drugs are kind of falling on this

5    report.  So maybe I want to talk to the pharmacy

6    supervisor.  Maybe I want to run some data,

7    okay?  I mean, that's what I'm trying to say.

8         Q.    Okay.  And I think I'm getting

9    there, but maybe I can go about this in a

10   different way.

11              Can you think of an instance where

12   that more intimate knowledge actually triggered

13   saying, "Okay.  We've got a potential diversion

14   here.  We need to do something"?

15        A.    No, I cannot, but I didn't run

16   that report.  I didn't use that report on a

17   monthly basis.

18        Q.    Who would be the best person to

19   ask whether that -- you know, whether an

20   incidence like that happened where someone with

21   that intimate knowledge triggered knowledge

22   that, you know, this -- "We've got a potential

23   diversion here and we're going to stop it"?  Who

24   at DDM would be the person with that knowledge?

```
 1            A.    Well, again, the two individuals

 2     that ran that -- the rolling 12-month report --

 3     or I called it a controlled substance monitoring

 4     report, but -- it didn't have a title, but

 5     different folks use a different name for it.

 6     But that report was run by Tom and then Jason

 7     took over.

 8            Q.    Okay.  So if -- would it be fair

 9     to say if -- I'm not saying they couldn't think

10     of an instance, but if Tom or Jason couldn't

11     think of an instance, it would fair to say there

12     wasn't an instance.  Are you with me?

13            A.    Yes.

14            Q.    Okay.  That's accurate?

15            A.    Yes.

16            Q.    Thank you.

17            MR. HAWKINS:  Entering a

18            transition point, if -- I could keep

19            rolling if you want, but we've been at

20            this for about an hour and 20 minutes,

21            if you want to take a break now --

22            MR. JOHNSON:  Yeah, this is fine.

23     Yeah.  Makes sense.

24            THE VIDEOGRAPHER:  The time is now
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              10:13.  We're going off the record.

 2              (Recess taken.)

 3              THE VIDEOGRAPHER:  Okay.  The time

 4       is now 10:27.  Back on the record.

 5   BY MR. HAWKINS:

 6       Q.    All right.  Before we broke, we

 7   were talking about DDM's suspicious order

 8   policy, and we kind of dovetailed off into the

 9   six-week average report.

10              Now going back to the monthly

11   average of the policy -- are you with me so far?

12       A.    Yes.

13       Q.    Now, my understanding is, it's

14   kind of like 99 percent increase of the monthly

15   average.  Is that kind of it in a nutshell?

16       A.    Yes, that's it.

17       Q.    Okay.  What happens if a report

18   goes beyond that 99 percent period?

19       A.    So what would happen is, we would

20   call it an oddity or, you know, anomaly or what

21   have you, but it would show up on a report and

22   now that that would require, you know, pharmacy

23   operations to do something, okay?  So -- and,

24   again, to the best of my ability since I don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    work that report, but what I would see or expect

 2    is that Jason would look at that, look at the

 3    numbers, do a utilization report, okay, to try

 4    to determine, "All right.  Are scripts coming

 5    in?  Where is that -- are the numbers aligning?"

 6              There might be -- there might be

 7    situations that are explainable.  For example,

 8    perhaps we have a situation where we have a --

 9    we brought in a controlled substance into our

10    warehouse that we didn't have before.  It's

11    going to pop up on that report.  There may be a

12    situation if we had a robbery or a known

13    diversion or, loss, that we need to replenish

14    the controlled substance, and that would

15    cause -- so there are going to be situations

16    there -- and there's multitude of other ones --

17    that would kind of speak to how you would work

18    that report.

19              But at the end if Jason or Tom did

20    not feel comfortable that they were -- "I still

21    can't -- I can't pinpoint to why, you know, this

22    number is where it's at," they would send out a

23    due diligence form.  I don't think the form had

24    a title, but it would essentially be a form that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   would be sent to the store that Jason and Tom

2   would complete identifying the drug,

3   typically -- the NDC and what the specifics of

4   that report as far as your average was compared

5   to where you're at with this order.  And they

6   would ask for an accounting or some background

7   on why they needed this.

8              They would send that out.

9   Pharmacists were very good about getting that

10  back to us and acting on that.  So they would

11  reply with it and then the pharmacy operations

12  would, at that particular point, evaluate the

13  response and make the determinate --

14  determination, excuse me, to see if it was a

15  suspicious order or not.

16       Q.   Okay.  I'm not going to mark this

17  as an exhibit thus far.  I'm just trying to

18  speed things along.

19              Is this what you're talking about

20  roughly?  Is that --

21       A.   Yes, this would be it.

22       Q.   Okay.  Thank you.

23              MR. JOHNSON:  The form he was

24              referring to?
```

```
 1                    MR. HAWKINS:  Yes.

 2   BY MR. HAWKINS:

 3        Q.    Okay.  So that form would be sent.

 4   There would be back and -- the pharmacist would

 5   fill it out.  Then what?

 6        A.    The pharmacist would complete it.

 7   It would come back to pharmacy operations, and

 8   then Jason and Tom would then review what it

 9   was, what the comment was, what the -- to see if

10   there is reason to determine -- for example, you

11   know, when there was a situation where -- with

12   acetaminophen toxicity, right, and there was --

13   the FDA was saying, "You need to cut back on

14   your acetaminophen with your hydrocodone

15   products, cut back because there's too much

16   overdosage on acetaminophen's side."

17                    What was happening was, some

18   doctors, then, that were writing for that might

19   scale back and go to a product with less

20   acetaminophen in it, knowing that the patient

21   might take four or five tablets a day if that's,

22   you know, what their ailment required.

23                    So as they migrated to a product

24   with lesser acetaminophen, that would naturally
```

Highly Confidential - Subject to Further Confidentiality Review

1    possibly create a bump up in -- and a

2    justification on why they needed a -- you know,

3    more than what the report was saying, more than

4    their 12-month average, because a physician

5    informed the pharmacy that, "No, I'm switching

6    my patients that need this medication to the

7    lower dose."

8         Q.    What would happen if Jason or Tom

9    found the pharmacist's excuse -- or not

10   excuse -- or explanation unsatisfactory?  What

11   then happens?

12        A.    What should happen at that

13   particular point is we have a suspicious order.

14        Q.    Okay.  So that's what makes it a

15   suspicious order.  First, the 99 percent thing

16   is triggered.  A letter is sent to the

17   pharmacist.  The explanation is reviewed by Tom

18   or Jason.  And at the point if the explanation

19   is not satisfactory, it then, in DDM's term,

20   becomes a suspicious order?

21        A.    Prospectively, though, you'd still

22   have the six-week average report that would

23   happen at the store and happen at the

24   distribution center.  So that would still be

Highly Confidential - Subject to Further Confidentiality Review

```
 1   there.  But, yes, that was a component of our

 2   SOMS.  And then would be the rolling 12-month,

 3   because it would hit retrospectively.

 4              Then would be a -- pharmacy

 5   operations then looking at that report, making

 6   the evaluation.  And if they didn't feel

 7   comfortable with that amount, that would trigger

 8   a due diligence, in other words, sending that

 9   form that you just showed me, that would go to

10   the store.  The store would send it back.  And

11   if the response is not appropriate, then at that

12   particular point, that would constitute a

13   suspicious order.

14        Q.    Okay.  So the only thing I heard

15   you change in my explanation there was adding

16   the six-week average report, correct?

17        A.    Yes.

18        Q.    Okay.  And that's -- and you -- we

19   talked about that extensively, right?

20        A.    Correct.

21        Q.    And does the six-week average do

22   anything to detect suspicious orders that we

23   didn't already discuss?

24        A.    I mean, again, it's -- if a
```

Highly Confidential - Subject to Further Confidentiality Review

1   pharmacist -- well, the other report would catch

2   that.  So if it was a report that was an

3   inventory order error, that would still get

4   picked up in this report.  It's just we would

5   catch it sooner potentially.

6          Q.    Okay.

7          A.    What I'm trying to say -- and

8   that's why I introduced that as another piece on

9   there or bolted on to that -- is that -- and,

10  again, I don't recall it happening, but if it

11  showed up as being ten is a six-week average --

12  six-week average of one, somebody requested ten,

13  Jill contacts the store, the store says, "Yeah,

14  I want ten."

15          Despite her going into the

16  inventory management system seeing there's

17  nothing that says that they should be getting

18  ten, you would think that she -- or she would --

19  would come to us and get approval.  She would

20  take it up, say, "Something doesn't seem right.

21  If you guys want to approve it, let me know."

22          Q.    Okay.  And you used an important

23  word in that explanation.  I think you used the

24  word "prospective."  Remember saying that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    Okay.  And I think what you used

 3      is that the six-week report is prospective.  Is

 4      that what you said?

 5            A.    Correct.

 6            Q.    Okay.  And I think there is kind

 7      of a pregnant negative there in that the monthly

 8      average is retrospective, correct?

 9            A.    That's correct.

10            Q.    So fair to say that the 12-month

11      is retrospective where the six-week is

12      prospective?

13            A.    That's correct.

14                         - - -

15             (DDM-Ratycz Exhibit 2 marked.)

16                         - - -

17            Q.    Okay.  I'm now handing you what --

18      I think we're on Plaintiff's Exhibit 2.

19                  Do you have it in front of you

20      sir?

21            A.    Yes, I do.

22            Q.    Do you need time to review it?

23      And I'll -- you can review the whole document if

24      you'd like, but I'll tell you the first
```

Highly Confidential - Subject to Further Confidentiality Review

1    paragraph is the only thing I'm going to

2    question you on.

3            A.    Okay.  I'm fine.

4            Q.    Okay.  Have you ever seen this

5    document before today?

6            A.    Yes.

7            Q.    All right.  We talked about your

8    deposition review earlier, the seven- to

9    eight-hour period.  Did you see this document in

10   your review?

11           A.    Yes, I did.

12           Q.    Okay.  So you're familiar with

13   that first paragraph there?

14           A.    Yes, I am.

15           Q.    Okay.  And as I'm sure you're

16   aware, my interest in that paragraph, starting

17   with the second sentence, "We do not sell any

18   items outside our own company, so there is no

19   policy in place for ordering patterns or

20   payments amounts that would identify potential

21   diversion or criminal activity."

22                 First of all, do you believe

23   that's an accurate statement?

24           A.    Absolutely not.

```
 1            Q.    Okay.  Why not?

 2            A.    Because we do have a procedure --

 3    what happened here is that -- this was tied to

 4    our VAWD accreditation.  And there's some

 5    background on that.  We thought we needed to

 6    have this VAWD accreditation.  VAWD stands for

 7    Verified Accredited Wholesaler Distributor.

 8                  And this accreditation is for

 9    anybody who's selling, you know, medications.

10    It was a requirement by a payer to have this in

11    place.  There was a gray area there in our

12    interpretation.  And I'll answer your question.

13    It's just some background there.

14            Q.    No, no.  Please continue.

15            A.    There was a gray area there that

16    we did not -- since we're a distributor to our

17    own stores, whether we needed that.  Because

18    we're not distributing to a customer.

19    Essentially our stores, I guess, are our

20    customer.

21                  So we didn't think we needed it.

22    It was recommended that we go through this VAWD

23    accreditation process.  We got halfway through

24    that process.  The payer said, "No, you don't
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    need that because you're only sending it to your

 2    own stores.  If you were selling this to another

 3    entity outside of Discount Drug Mart, then that

 4    would be required."

 5              So the steam sort of came -- the

 6    wind was sort of out of the sails for this

 7    entire process with the VAWD here.  So, in other

 8    words, I don't think that there was a great deal

 9    maybe spent on formalizing our policies

10    correctly.

11              But in this situation, when I read

12    it, the word that threw me off was -- I mean,

13    there's obviously, do not sell any items outside

14    our own company, but payment amounts, because

15    that made no sense.  Because we don't -- we move

16    product from our distribution center to our

17    store.  We don't make revenue off of that move.

18    Certainly if there's a sale at that particular

19    point at the store, we would.

20              So as I read that, "payment

21    amounts" made absolutely no sense.  And what

22    happened here was, when Jill completed a

23    template -- VAWD would provide you a template

24    and you would answer questions.  And those,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   based on your answers in -- for that template,

 2   you would create -- it would help you create

 3   policies and procedures.

 4                    And one of those questions was,

 5   "Do you sell outside of your own company?"  And

 6   so when she incorporated that into the policy,

 7   what it should say is, the highlighted part

 8   there, "We do not sell any items outside of our

 9   own company so there is no policy in place for

10   ordering patterns or payment amounts that would

11   identify potential diversion or criminal

12   activity, if -- comma, if we were to sell to an

13   entity outside of Discount Drug Mart."

14                    So that's what it should say, and

15   that was her interpretation.

16          Q.    Okay.  I want to be very clear

17   about this.  I'm not questioning the accuracy or

18   the honestly of what you just told me.  In fact,

19   it will become clear why I'm asking.  It's

20   personal knowledge, is what I'm really trying to

21   get at.  You gave me a very detailed explanation

22   of why that sentence is in there.

23                    Did you have that explanation --

24   if this litigation had never happened, you never
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    had the eight-hour prep for the -- would you be

 2    able to look at this document and immediately

 3    give that answer that you just gave?

 4            A.    I could tell you right away if

 5    I -- without any preparation that's -- that that

 6    is incorrect.

 7            Q.    Okay.

 8            A.    Yes.

 9            Q.    That's one answer.  I mean, that's

10    part of it.  I get that.  But your larger

11    explanation that you talked about that

12    referenced Jill and everything like that --

13            A.    No, no.

14            Q.    Okay.  That -- so in other words,

15    you've researched this, you've talked to other

16    people and you've created an explanation.  I'm

17    not challenging the accuracy.  But you created

18    the explanation after this -- after you saw this

19    in relation this litigation, correct?

20                  MR. JOHNSON:  Objection to the

21            word "created," but anyhow ...

22                  MR. HAWKINS:  I don't know what

23            other.

24
```

```
 1   BY MR. HAWKINS:

 2          Q.    Have you fab --

 3                MR. JOHNSON:  Okay.  Fabricated is

 4          not ...

 5                MR. HAWKINS:  Yeah, I was going to

 6          say, that's -- yeah, you're not going to

 7          like that one either.

 8   BY MR. HAWKINS:

 9          Q.    But you formulated, for lack of a

10   better -- I'm trying to use a nonpejorative

11   term.  But you formulated this explanation after

12   you saw this in the litigation, correct?

13          A.    That would be correct, but I only

14   spoke to one person, not multitude.

15          Q.    Okay.  And that's actually what

16   I'm getting at.  Okay.  Because it sounds like

17   there's a lot going on here and you obviously --

18   in order to give that explanation, you had to

19   talk to some people.  So I want to know everyone

20   you talked to to come up with that explanation.

21          A.    I spoke to Jill.

22          Q.    Okay.  And so basically what you

23   just told me, you heard of through Jill?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  As you sit here today, do

2    you have any reason to doubt any part of the

3    accuracy of what Jill told you?

4              A.    No, I don't.  Jill, for

5    background, has been with us for 30-plus years

6    as our pharmacy buyer, and she's thought of with

7    very high regard and does a very, very good job

8    for us in her role.  And that would come from --

9    anybody at our company would tell you that.  So

10   from that standpoint, no.

11             Q.    Okay.  And I'm sorry.  I probably

12   misunderstood there.  I'm not questioning Jill's

13   integrity either.  The only thing is, sometimes

14   people have different ideas, understandings of

15   things.  I just want to know if yours matches

16   that of Jill.

17             A.    No.  I agree with what she said.

18             Q.    Okay.  What point did you -- when

19   did you make this investigation to come up with

20   this -- or add this explanation?

21             A.    I'm sorry.  Repeat that.

22             Q.    Yeah.  We talked about you kind of

23   conducted an investigation.  You went and talked

24   to Jill.  When did you do that?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     When I was reviewing Jason's

2     deposition, this was one of the exhibits.  And

3     so I read it, and I said, it doesn't make sense

4     because it's not what we do.  And as I read it,

5     I -- you know, it didn't make sense, it was

6     contradictory.

7               Also, the word "payment amounts" I

8     could not understand why that would be in there,

9     okay?  That part made no sense to me.  Because,

10    again, we're moving product to our stores, so --

11    and, again, after speaking with Jill, payment

12    amounts would correlate to selling outside of

13    Discount Drug Mart, which we don't do.

14         Q.     Okay.  So fair to say, by way of

15    your deposition review is what kind of prompted

16    and triggered all of this?

17         A.     Yes.

18         Q.     Was Jill the one to create this

19    document?

20         A.     Yes.

21         Q.     Do you know if she had assistance

22    from anyone else?

23         A.     That, I don't know.  When we

24    originally started this process, I had asked

Highly Confidential - Subject to Further Confidentiality Review

1    her -- I had tasked her with getting the VAWD

2    accreditation, and I told her that she had all

3    the resources available in our department.

4    Anybody from administrative help, if she needed

5    it, to Jason, myself, if necessary, and

6    certainly Joe Muha as well.

7                What ended up happening here is

8    halfway through this process, when we got the

9    direction from the payer that, "No, Discount

10   Drug Mart is fine, you're not in jeopardy of a

11   violation of a contract because you do not have

12   this VAWD accreditation," we were contemplating

13   on whether to continue with this accreditation.

14               However, we had paid.  So it made

15   sense to just go through the process.  So --

16   and, again, you would have to speak to her,

17   because I did not speak to her on this accord.

18   But my opinion is that she realized that this

19   accreditation was probably not going to be

20   renewed, more than likely, at its next time.

21               And so she developed these SOPs

22   and really just got it -- built them in a way so

23   that they would be there, but not necessarily

24   use other resources in the department.  Again,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that's my opinion, so ...

 2         Q.    Is there anyone else you know that

 3    shares your opinion?  I mean, why the

 4    qualification, I guess, is my question.

 5         A.    So when you asked who I spoke to

 6    regarding this, so I spoke with her.

 7         Q.    You were delineating what was

 8    Jill's opinion and what was your opinion?

 9         A.    Yes.  Now -- yes.

10         Q.    I understand.  All right.  I

11    don't -- I'd like not to have to put all these

12    documents in front of you.  But you said you

13    reviewed all of Jason's deposition exhibits?

14         A.    Yes.

15         Q.    So you saw that there's more than

16    one document like this?

17         A.    Yes.

18         Q.    And I don't need to waste your

19    time by going through each one of these, right?

20         A.    Correct.

21         Q.    So you would agree with me that

22    there's several documents with this statement in

23    there, correct?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  Who would review these
 2    documents?
 3              A.    Typically --
 4              MR. JOHNSON:  I'm going to object
 5         to that last question.  I'm not sure --
 6         there are several with this statement in
 7         there?
 8              MR. HAWKINS:  Yes.  I think --
 9              MR. JOHNSON:  I just remember 112,
10         but ...
11              MR. HAWKINS:  I know there are --
12         well, it's my understanding there were
13         at least three.
14              MR. JOHNSON:  And it could be I
15         haven't seen them.
16              MR. HAWKINS:  I think --
17              MR. JOHNSON:  Were they all
18         introduced as exhibits?
19              MR. HAWKINS:  I know several were,
20         or at least multiple were.  I mean,
21         "several" may be a loaded term, but
22         multiple were introduced as exhibits and
23         there's -- I will state, to the best of
24         my understanding, there is -- there are
```

Highly Confidential - Subject to Further Confidentiality Review

1           multiple iterations of this document.

2                 MR. JOHNSON:  Okay.  Well, I'm not

3           questioning you.  I just -- I didn't --

4           I don't have that recollection.  I just

5           remember this one.

6     BY MR. HAWKINS:

7           Q.    So who would review these

8     documents?

9           A.    This typically would be reviewed

10    by myself, Jason, and because of the pharmacy

11    warehouse, it would be Joe, as well, Muha.

12          Q.    Okay.  So -- Joe?

13          A.    Muha.

14          Q.    Muha.  Okay.

15          A.    Yeah.

16          Q.    So you, Jason, Joe Muha, all

17    have -- substantial parts of your tasks at DDM

18    is government compliance.  You understand

19    there's rules and regulations with DEA.  Three

20    people, right?

21          A.    Correct.

22          Q.    Okay.  So when all three of you

23    read this and saw this statement, you didn't

24    say, "Whoa, wait a minute, this isn't something

Highly Confidential - Subject to Further Confidentiality Review

 1   we can say."  Right?  I mean, did that ever

 2   happen when you reviewed these documents?

 3           A.    I don't recall reviewing them.

 4           Q.    Okay.  Can you think of any

 5   explanation how someone like you, Joe, or

 6   Mr. Muha could review this document and not say,

 7   "Wow.  That's an -- not an inaccurate -- that's

 8   not an accurate statement"?

 9           A.    I'm sorry.  Repeat that again.

10           Q.    Sure.  Can you think -- as you're

11   sitting here today, can you think of any

12   explanation how someone like you, Mr. Briscoe,

13   or Mr. Muha could review this document and not

14   say, "Oh, wait a minute.  This isn't accurate."

15           A.    If we were to review it, we would

16   catch that.

17           Q.    Okay.  So if you were -- so it's

18   possible you just never reviewed it?

19           A.    Yes.

20           Q.    Okay.  Because you'd understand

21   that the DEA requires such a policy to be in

22   place, right?

23           A.    Correct.

24           Q.    We're on 3, I believe.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2          (DDM-Ratycz Exhibit 3 marked.)

 3                    - - -

 4          Q.    Mr. Mulligan is now handing you

 5   what has been marked as Plaintiff's Exhibit 3.

 6                    Now, you have the option to read

 7   through the whole thing.  I hope you don't

 8   exercise that option because there are only two

 9   that I'm going to be interested in.

10                    If you could direct your attention

11   to interrogatory number 5 on page 3.  And I'll

12   read it.  "Please identify any persons" -- I'm

13   sorry.  Strike that.

14                    Have you ever seen this document

15   before today?

16          A.    Yes, I have.

17          Q.    Did you see it in relation to your

18   litigation deposition review?

19          A.    Yes.

20          Q.    Did you play any part in helping

21   answer these questions?

22          A.    To some extent.  There were some

23   that I participated in.

24          Q.    Which ones?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    I mean, there were some collection

2    of data where I could find it, that type of

3    thing.  I don't recall specifically.

4          Q.    Okay.  Can you do me a favor so I

5    don't have to do this.  If we're talking about

6    an interrogatory response and you did play any

7    part in formulating it, will you alert me of

8    that?

9          A.    Yes, I will.

10         Q.    Thank you.  So Interrogatory

11   Number 5, "Please identify any persons employed

12   by you or who received compensation from you,

13   including any former employees, who reviewed or

14   analyzed data regarding the distribution and/or

15   dispensing of opioids or your opioid products."

16              And then from 1990 to present.

17              You're identified on there,

18   correct?

19         A.    Correct.

20         Q.    Okay.  Please tell me everything

21   that you do with respect to, quote/unquote,

22   analyzing data regarding the distribution or

23   dispensing of opioids or your opioid products.

24         A.    What I do?
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Yes.  Your name is listed.  In

2    other words, I want to know why your name is

3    listed there, shorter answer -- shorter

4    question, I should say.

5    A.    I mean, there may be times where,

6    you know, when we were -- there could -- there

7    could be instances where, for example, on the

8    monthly -- rolling 12-monthly report where

9    possibly Jason, and even Tom, would get a

10   response back and maybe they wanted to speak to

11   me in regards to, "Look at this response.  How

12   do you feel about that?  Do you feel comfortable

13   about it?"  That type of thing.

14   Q.    Can you recall that incident ever

15   happening?

16   A.    Yeah.  I recall one that happened.

17   And I actually recall the specifics of it.  I

18   don't recall the medication.  But it was a

19   situation where there was -- we went from zero

20   of a medication that was ordered to something

21   that was in the high 15s or something that was

22   way up there.  So it went zero to 50 real quick.

23   Not 50 being the quantity but --

24   Q.    22 ring a bell?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I don't recall the exact number,

 2   but I do know that the issue at that time was we

 3   were having -- it was blamed on the order --

 4   reorder system that we had.  And we were having

 5   some issues with it, and so we spoke about that,

 6   and that was -- that was fine.

 7              Q.    Okay.  So one of your involvements

 8   is -- so you get these -- the report I showed

 9   you earlier, you'd get that and you'd help

10   analyze it with Jason?

11              A.    I could if he needed assistance.

12              Q.    Okay.  But you have done that,

13   is --

14              A.    Not with Jason.  I have not.

15              Q.    With Tom?

16              A.    With Tom, yeah.  And that didn't

17   happen very much.  But, again, that would be if

18   we sent out a due diligence form to the stores

19   and the response back, perhaps we just wanted

20   another opinion, then that would be me.

21              Q.    Okay.  And it doesn't matter -- I

22   mean, it does matter if these are accurate.  But

23   in terms -- I'm not faulting anyone for being

24   inaccurate.  But in terms of actually analyzing
```

1    data, you don't do that, and it's inaccurate --

2    to the extent this is saying, you know, you

3    analyze data, that is inaccurate then?

4           MR. JOHNSON:  Objection.  It's an

5        ambiguous term anyhow.

6           Q.    Okay.  How do you understand

7    "analyzing data," sir?

8           A.    I mean, I look at data all day.

9           Q.    Okay.  With relation to opioid

10   sales?

11          A.    Yes and no.  I mean, in terms of

12   determining, you know, whether we're moving

13   product, what to do on our -- with our wholesale

14   contracts with specific C-IIs.  I mean, I do

15   look at data from that perspective, so ...

16          Q.    And how do you analyze it?

17          A.    You analyze it in different ways.

18   So am I analyzing it from a standpoint to look

19   for, you know, a suspicious order, no, not from

20   that perspective.

21          Q.    Okay.  So there are three other

22   names listed in that interrogatory response:

23   Tom Nameth, Jill Strang and Jason Briscoe.

24   We've talked about all three of those

Highly Confidential - Subject to Further Confidentiality Review

```
 1    individuals.

 2              Can you think of anything they do

 3    that we haven't talked about?  You've told us

 4    what they do.  Can you think of anything that

 5    they do with respect to this that we've not

 6    discussed?

 7         A.    No.  I think we've covered most of

 8    it.

 9         Q.    And to be clear, I'm just trying

10    to be courteous of your time and not go over --

11         A.    Sure.

12         Q.    Please turn to page 7.  And I will

13    read the pertinent part.

14              MR. JOHNSON:  Which one?

15              MR. HAWKINS:  14.  I'm sorry.

16         Q.    "Please identify all persons who

17    are responsible for administering, overseeing

18    developing or implementing any and all policies,

19    procedures, systems or programs designed to

20    detect and report suspicious orders to --

21    suspicious orders or to maintain -- suspicious

22    orders or to maintain effective controls against

23    diversion or controlled substances from

24    January 1st, 1990 to present."
```

Highly Confidential - Subject to Further Confidentiality Review

1              Sorry.  I botched that reading

2    pretty poorly, so -- but you're familiar with

3    the language in question?

4           A.    Yes.

5           Q.    Thank you.  All right.  Your name

6    is on here, correct?

7           A.    Yes.

8           Q.    All right.  What policies and

9    procedures did you help implement?

10          A.    As I stated before, the rolling

11   12-month was already in play --

12          Q.    Right.

13          A.    -- at that particular point.  I

14   believe the six-week average was implemented

15   sometime in the early 2000s.  And so that more

16   than likely was Tom's involvement.  So I

17   didn't -- I didn't have a hand in that.  And

18   that could have been, again, somebody else's

19   involvement from an IT perspective, but -- yeah,

20   that would be it.

21          Q.    Okay.  So really no policy is

22   developed by you, correct?

23          A.    Correct.

24          Q.    All right.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Now, you're talking about --

 2    you're talking specific to SOMS, correct?

 3              Q.    Yes.

 4              A.    Okay.

 5              Q.    And just for the record, what are

 6    SOMS?

 7              A.    Suspicious order monitoring

 8    system.

 9              Q.    Thank you.  And if you don't

10    have -- you're not charged with having personal

11    knowledge of these answers, so I just want to

12    know what your knowledge is.

13              So for each name, can you think of

14    what Tom's -- Mr. Nameth's involvement would be?

15              A.    Tom worked the -- Tom worked the

16    report.  So if there were some changes made --

17    and there were some that were implemented that

18    had to do with our pharmacy management system

19    when we changed, and I know that either Jason

20    and him had made some recommendations to how

21    that report was running.  But that's why he

22    would have been named there.

23              Q.    Can I stop you there?  Okay.  So

24    pharmacy management systems change, can you tell
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   me about that?

 2          A.    Yeah.   That was, we went from a --

 3   an old Legacy system to a newer PioneerRx, which

 4   is our pharmacists, how we process

 5   prescriptions.  And so there were some changes

 6   made there that allowed the report to run

 7   better.

 8          Q.    Okay.  And how did that relate to

 9   suspicious orders?

10          A.    It was tied, I believe, to the

11   12-month rolling report.

12          Q.    So that's kind of how the 12-month

13   rolling got its information?

14          A.    No.  They made some changes to it,

15   I think, as far as making it more family

16   oriented.  And, again, I didn't run that report

17   or use that report, so I do know that through

18   Pioneer, we were able to make some changes to

19   that report, so ...

20          Q.    Okay.

21          A.    I can't speak to that

22   specifically.

23          Q.    So that's one of the things that

24   Tom made a change.  Can you think of anything
```

Highly Confidential - Subject to Further Confidentiality Review

1   else?

2        A.   It would be Tom or Jason.  I don't

3   know who made that change.

4        Q.   But sticking with Tom -- or

5   Mr. Nameth.  I'm sorry, I don't mean to be

6   impolite.  With respect to Mr. Nameth, can you

7   think of anything else that he changed with

8   respect to policies?

9        A.   No.

10        Q.   Okay.  And then there's

11   P.J. Ferut?

12        A.   Mm-hmm.

13        Q.   Okay.  Tell me about

14   Mr.[sic] Ferut with relation to this --

15        A.   P.J. was vice president of IT.

16        Q.   Is he still there?

17        A.   It's a she.

18        Q.   I'm sorry.

19        A.   No.  She retired.

20        Q.   Okay.  And I assume this just kind

21   of falls in data compilation and whatnot?

22        A.   Yeah.  Yes.

23        MR. JOHNSON:  And I just wanted to

24        register an objection.  In going back a

```
 1              few questions, you only asked him as a

 2              follow-up question about implementing,

 3              but the -- it does call for

 4              administrating, overseeing,

 5              development -- developing or

 6              implementing in the answer to

 7              interrogatory.

 8                   MR. HAWKINS:  Are you talking

 9              about number 7 or number 5, or are you

10              talking about --

11                   MR. JOHNSON:  No.  I'm talking

12              about Interrogatory Number 14.

13                   MR. HAWKINS:  Okay.

14                   MR. JOHNSON:  Yeah.  But -- yeah,

15              I mean you narrowed it then later.  But

16              these people are listed because they may

17              fall under one of those categories.

18                   MR. HAWKINS:  I understand that,

19              and the only thing I want to know right

20              now is about policy and I'm just trying

21              to figure out what personal knowledge he

22              has.

23                   MR. JOHNSON:  Well, that's fine.

24              I just -- I didn't know if you were
```

```
 1              questioning the accuracy of the

 2              interrogatories.

 3                    MR. HAWKINS:  I'll state on the

 4              record I'm not stating the accuracy of

 5              any interrogatories.  I just want to

 6              know what knowledge --

 7                    MR. JOHNSON:  Okay.

 8                    MR. HAWKINS:  -- he has to -- with

 9              respect to them.

10                    I'm sorry for talking over each

11              other, making your job hard.

12    BY MR. HAWKINS:

13         Q.   Ms. Strang, again, zeroing in on

14    policies.  What involvement did she have on any

15    policy level?

16         A.   If there was a decision that -- I

17    mean, being a user of the six-week average -- I

18    mean, that would be her role, would be if she

19    wanted to make a change, that -- to make it

20    easier, create less false positives, for

21    example, that would be -- that would be tied to

22    her.

23         Q.   Okay.  Do you know if she's ever

24    done that or --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    I don't know.  I don't think so.

 2            Q.    Okay.  And Mr. Briscoe, we talked

 3     about him quite a bit.  Is there anything else

 4     you can think of solely as it relates to

 5     policies?

 6            A.    Not that I'm aware of.

 7            Q.    Okay.  And you, of course.  And

 8     then Mr. Miller?

 9            A.    Yes.

10            Q.    With respect to policies, can you

11     think of anything that he was involved in or

12     responsible as it related to policies?

13            A.    No.

14            Q.    Okay.  And then the only other

15     term I'm interested in Interrogatory Number 14,

16     is it talks about overseeing, responsible for

17     administering and overseeing.  I assume

18     overseeing, that's something that pretty

19     squarely falls in your end of it, correct?

20            A.    Yes.

21            Q.    I mean, you're kind of the

22     overseer.

23                  Would that be true for the rest of

24     the individuals listed on there?
```

```
1            A.    The one that would probably, I

2   would say, would be Jason as well.

3            Q.    Okay.  And what role does he have

4   in overseeing such issues?

5            A.    Just from an operations

6   standpoint, so -- and, again, he's a user of the

7   CSMR, the controlled substance monthly report,

8   which we call the rolling 12-month average

9   report.  So from that standpoint, I would say

10  that, you know, he's got role in that policy as

11  well.

12           Q.    Okay.  I hand you what will be

13  marked as Plaintiff's Exhibit 4.  I should say

14  Mr. Mulligan will.

15                         - - -

16       (DDM-Ratycz Exhibit 4 marked.)

17                         - - -

18           MR. JOHNSON:  I'm sorry.  Can we

19       go off the record just a second?

20           MR. HAWKINS:  Of course.

21           THE VIDEOGRAPHER:  The time is now

22       11:01.  Going off the record.

23       (Discussion held off the record.)

24           THE VIDEOGRAPHER:  Okay.  The time
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              is now 11:03.  Back on the record.

 2   BY MR. HAWKINS:

 3         Q.    All right.  You have been handed

 4   what is Plaintiff's Exhibit 4 starting at Bates

 5   number 83190.  And it is -- and it starts with

 6   a -- the top of the e-mail chain with an

 7   April 5, 2016 e-mail from Mr. Briscoe.

 8              Have you ever seen this e-mail

 9   before, sir?

10         A.    No, I have not.

11         Q.    Okay.  And can you take some

12   time -- it's relatively short -- to review it.

13         A.    Yeah, I read it during the break.

14         Q.    Oh, perfect.  All right.  So at

15   the bottom, it's a letter from Mr. Tony Bruce,

16   and it looks like Hometown Pharmacy.  Do you

17   know what Hometown Pharmacy is?

18         A.    Yes.  It's a small chain.

19         Q.    Okay.  A competitor of yours, yes,

20   or --

21         A.    We don't compete with them so --

22   but they're -- I'm not sure -- what part of

23   town -- or excuse me, what part of the country

24   they're from, but they're -- we definitely don't
```

Highly Confidential - Subject to Further Confidentiality Review

1    compete with them.

2           Q.    Okay.  And they're asking your

3    help, basically, for -- to develop a suspicious

4    order monitoring policy?

5           A.    That's what it appears to be, yes.

6           Q.    Okay.  Is that common?

7           A.    I couldn't tell you.

8           Q.    Okay.

9           A.    Yeah.

10          Q.    Have you ever seen anything like

11   that before?

12          A.    No.

13          Q.    All right.  And then Jill, going

14   up, asks someone to forward her the suspicious

15   order monitoring policy, and then she

16   responds -- I mean, there's another indication,

17   "I don't even know if we have anything in

18   writing."

19               First of all, is there anything in

20   writing?

21          A.    We have a system in place.

22          Q.    Right.

23          A.    I don't necessarily know if it's

24   in writing, and that is -- the reason for that

1    is the people that are in the -- that are

2    responsible for SOMS or work with SOMS, that

3    playlist hasn't changed.  It's been the same

4    people for the last 20-plus years.

5                  And, you know, being a smaller

6    company, you know what?  We've -- it could be

7    its strengths, and at the same time we may not

8    be big on formalized operating procedures.  I

9    don't want to make that sound negative, because

10   if it's involving 100 pharmacists or 200

11   pharmacists, we should have a policy and

12   procedure in place, and we would.

13                  What's unique about this is that

14   we've got three or four people that are

15   responsible for our SOMS, so -- and we're not

16   constantly having a new pharmacy buyer every

17   year where it would sit there and think, "Well

18   probably need to have something in writing to

19   provide direction for that employee."

20                  The circle is small, and it's not

21   changing.  And because of that I think we fall

22   into a comfort level of we know how we're

23   operating, and we're operating with

24   confidence -- and that we don't have to have a,

Highly Confidential - Subject to Further Confidentiality Review

1    or don't need, that operating procedure that

2    we're necessarily ever going to look at.

3         Q.    Okay.  And I'm just trying to

4    understand your testimony.  You said, you know,

5    if you had 100 to 200 pharmacists, that might be

6    different, right?

7         A.    I am sorry.  Yeah.  It depends on

8    what we're communicating.  So, for example,

9    let's just talk HIPAA as an example.  We have a

10   HIPAA policy and procedure manual because HIPAA

11   is at store level from a standpoint that

12   reporting a breach, those individuals we

13   wouldn't want to say, "Yeah, everybody knows how

14   to report a breach."

15            No.  We want to give them -- they

16   may only report one breach, you know, a year or

17   whatever.  They might not know what a breach is.

18   So we want to give them a resource to look at,

19   you know, from that standpoint.

20            So the circle now isn't three or

21   four people.  The circle for HIPAA is hundreds

22   of people, okay?  So in that example, having a

23   policy, yes, a written policy is -- makes sense.

24         Q.    Okay.  But as it relates to

Highly Confidential - Subject to Further Confidentiality Review

```
1    suspicious orders, you said that if you had 100

2    to 200 pharmacists, then it might make more

3    sense.  Remember that testimony?

4           A.    That was relative to -- no,

5    that -- I mean, I was just using that as a

6    number.

7           Q.    Okay.

8           A.    Yeah, it had nothing to do --

9    yeah.

10          Q.    It's fair to say you have 74

11   pharmacists, right?

12          A.    I'm talking pharmacists, not

13   pharmacies.  So sorry, my bad.

14                MR. JOHNSON:  And I'm going to

15          object to the line of questioning in

16          that it's unclear whether or not you're

17          referring to our distribution system or

18          the store level.  So -- I mean, that was

19          all intermixed in there, so ...

20          Q.    Okay.  How would it -- how would

21   it change if it referred to the distribution

22   level as opposed to the store level?

23          A.    Well, again, distribution is --

24   is -- there's -- it's a finite group.  They're a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    very intimate group of three or four people,

 2    okay?  So when we start going to store level, we

 3    can't control.  We don't -- that group has

 4    gotten bigger, okay, and that circle, so having

 5    an operating procedure, something that's

 6    written, something that's a resource that they

 7    could turn to makes sense.

 8          Q.    And earlier I said you have more

 9    than -- you have 74 pharmacists.  I meant to say

10    you have 74 pharmacies, correct?

11          A.    We have 74 pharmacies, and my

12    example there was just to say that, you know,

13    there's -- it's impossible to train 100

14    pharmacists in that example without a standard

15    operating procedure.  It would not be easy.

16          Q.    Okay.  Do you know if the DEA -- I

17    mean, if the DEA asked you for that policy, what

18    would you do?

19          A.    We would annotate something.  We'd

20    put it together.  We would describe it.  It's a

21    system.  I would also say that the DEA has been

22    to our facility.  They come every two years and

23    they stay for a week.

24          Q.    What do they do when they're
```

Highly Confidential - Subject to Further Confidentiality Review

1    there?

2         A.    You would have to talk to Jill,

3    Jason and Tom.  They're typically involved

4    there.  And if I -- if there's an issue, I get

5    involved from the exterior.  We've not had a

6    problem.  They will evaluate security, I know

7    that.  They will look at -- they look at some

8    data, that type of thing, you know, and -- but

9    they're there for typically a week.

10        Q.    Do you know what data they look

11   at?

12        A.    I don't know.  That would be --

13   Jill sits with them and usually will have

14   somebody from operations, which would be Tom

15   or -- would have been Tom or Jason.

16        Q.    Thank you.

17             Mr. Mulligan will now be handing

18   you what will be marked as Plaintiff's Exhibit 5

19   starting on Bates number 31932, a document

20   entitled Chain Drug Consortium Controlled

21   Substances Model Policy.

22                   - - -

23        (DDM-Ratycz Exhibit 5 marked.)

24                   - - -

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JOHNSON:  Bates number?

 2                    MR. HAWKINS:  I read that, I

 3          think.

 4                    MR. JOHNSON:  Oh did you?  I'm

 5          sorry.

 6                    MR. HAWKINS:  He doesn't get it

 7          twice.  General principles.

 8   BY MR. HAWKINS:

 9          Q.    Have you seen this document before

10   today, sir?

11          A.    I have seen it, yes.

12          Q.    Okay.  How about in your review,

13   did you review this particular document at all?

14          A.    No, I did not.

15          Q.    Okay.  When did you see this

16   document?

17          A.    Actually, I did see this document

18   yesterday -- this morning.

19          Q.    In what context did you see it

20   this morning?

21          A.    It was provided to me.

22          Q.    By whom?

23          A.    By my attorney.

24          Q.    Okay.  Did you review it?
```

```
 1              A.    On my phone, yes.

 2              Q.    Had you seen this document before

 3     this morning?

 4              A.    Yes.

 5              Q.    Okay.  First of all, what is this

 6     document?

 7              A.    This document -- and I would have

 8     to -- again, this is a -- Chain Drug Consortium

 9     is a group of chain drugstores that we belong

10     to.  So we would basically aggregate our volume

11     to try to find vendors and land on best possible

12     costs with pharmacy services, okay?

13                   And this individual that worked at

14     this -- we called it the CDC, had come out with

15     a policy -- I don't know where he got this.  I

16     don't recall --

17              Q.    Can I stop you?

18              A.    Yes.

19              Q.    You said "this individual."  What

20     individual are you referring to?

21              A.    I'm sorry.  It was compiled by Ed

22     McGinley --

23              Q.    Okay.

24              A.    -- and he was actually in charge
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of the CDC, our Chain Drug Consortium.  And so
 2    he had brought this up as a -- or sent this out
 3    as a resource.  I don't recall the specifics of
 4    why he sent that out, if there was a member
 5    request or what have you.  I'd have to see the
 6    e-mail.
 7          Q.    Okay.  And it's fair to say, then,
 8    that DDM had no role in its creation?
 9          A.    In this creation, absolutely not.
10          Q.    Okay.  And do you remember when it
11    was initially sent out to DDM?
12          A.    I don't.  That's -- obviously
13    11/1/2013 is when Ed compiled this, but I don't
14    know when it was sent out.
15          Q.    Okay.  Do you recall if you ever
16    reviewed this and saying, Oh, boy, this is
17    something we should take a look at, or we should
18    implement these things, not implement these
19    things?
20          A.    The mindset for me at that
21    particular point -- and, again, I don't recall
22    when I received this, but obviously it was
23    compiled 11/1.  So it's safe to say it was after
24    that period of time.  Hydrocodone was going to
```

Highly Confidential - Subject to Further Confidentiality Review

1    be going to a Class II, so it was my thought

2    process that potentially we would maybe not be

3    warehousing controlled substances after that.

4    That was a decision that we would make.

5              So from a standpoint of having a

6    controlled substance model policy with regard to

7    our distribution center, I didn't spend time on

8    it specifically.  I knew that the amount of SKUs

9    that we were going to have once hydrocodone was

10   going to go C-II was going to diminish

11   significantly and, again, perhaps not even have

12   controlled substances at our warehouse, so ...

13         Q.    What decision was made with

14   respect to warehousing on hydrocodone?

15         A.    It went to a Schedule II.  So at

16   that particular point, it was -- once it was

17   dried up, we ordered it from our wholesaler.

18         Q.    Okay.  So the decision was made

19   not to warehouse it and just order it directly

20   from the wholesaler?

21         A.    Yes, yes.  Because we don't do

22   Schedule IIs.

23         Q.    So fair to say, aside from your

24   review this morning, you weren't terribly

Highly Confidential - Subject to Further Confidentiality Review

```
 1    familiar with this document by way of your work

 2    at DDM?

 3            A.    I mean, I read pieces and parts,

 4    and I know that in reading this, that there were

 5    some things that we incorporated.  You know, it

 6    talks about red flags on one of the pages.  You

 7    know, I remember specifically there's some

 8    things that we cut and paste and tried to

 9    implement in our pharmacies to make us better

10    from that respect, so ...

11                If you're asking me if there was

12    anything that I took and cut out of here to

13    implement within our SOMS, the answer would be

14    no.  And, again, that would be because at that

15    particular point, we were leaning on maybe not

16    warehousing controls.  Because right now I think

17    we only have 14 opiates that we even stock, and

18    I think five of them are partial opiate

19    agonists, which they're used for addiction and

20    not even used for pain.

21            Q.    Would it be fair to say this

22    document is more aimed at the pharmacy level

23    rather than the warehousing suspicious order

24    monitoring policy?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    Okay.  I mean, the fact -- please

 3    correct me if I'm wrong since I don't understand

 4    this stuff nearly as well as you.  But to me

 5    this really doesn't even address SOMS, right?

 6          A.    I didn't get far enough in the

 7    weeds in here in the back, no, but I know that

 8    there were some things here that we implemented

 9    at stores, yes.

10          Q.    Okay.  Mr. Mulligan will now be

11    handing you what will be marked as Plaintiff's

12    Exhibit 5 beginning in Bates number -- we're at

13    6?  I'm sorry.  Plaintiff's 6 at 91606.

14                      - - -

15          (DDM-Ratycz Exhibit 6 marked.)

16                      - - -

17          Q.    Have you seen this document

18    before?

19          A.    No.

20          Q.    Okay.  So you've never seen this

21    document at all?

22          A.    Well, I'm still looking at it.

23          Q.    Sure.

24          A.    So ...
```

```
 1          Q.    I'm sorry.  I didn't mean to --

 2          A.    No.  It's a -- I'm trying to

 3    understand the difference between this document

 4    and the one you just gave me.

 5          Q.    That's my next round of questions.

 6    I will represent that there are some

 7    differences.  Not a lot, but there are some.

 8                MR. JOHNSON:  Well, that would

 9          take a while to -- for him to review

10          both of these.

11          A.    Yeah.

12                MR. HAWKINS:  Well, I'm going to

13          ask if he's aware of them.  I'm not

14          asking him to speak as a corporate

15          representative.  I just want to know

16          what's in his personal knowledge.

17          A.    I remember this.  I have not seen

18    this one.

19          Q.    I'm sorry.

20          A.    "This" being 5.

21                MR. JOHNSON:  When you say this --

22          A.    Exhibit 5.  I'm sorry.

23          Q.    And you've not seen Exhibit 6?

24          A.    No, I have not seen it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Exhibit 6.  I'm sorry.  So you

2   have no idea how this document came about,

3   Plaintiff's 6?

4              A.    I do not.

5              Q.    Okay.  Do you know who might?

6              A.    No, I don't.  I mean, within our

7   department -- somebody like -- would either be

8   Jason or myself or Jill.

9              Q.    So one of those three, it would

10  have to be them?

11             A.    I would think, yeah.

12             Q.    Okay.  And -- strike that.

13                   Does DDM have a controlled

14  substance model policy?

15             A.    Controlled substance model -- we

16  have policies on controlled substances, yes.

17  There's some things that we do.  I wouldn't say

18  that we have something called a controlled

19  substance model policy that's filed like this.

20  Do we do some things with controlled substance

21  quality assurance, yes.  Do we have policies on

22  how to report, you know, theft, yes.  Do we --

23  you know, so there's bits and pieces of all of

24  this that's in policy -- or SOPs, if you will.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  So what I hear you saying

 2    is, "We have a bunch of policies but there's no

 3    unified almost Bible, so to speak, of our

 4    policies."

 5              Is that a fair characterization?

 6              A.    There would not be a compilation,

 7    yes, of this.

 8              Q.    Okay.  And given your position, if

 9    there were such a compilation, you'd know about

10    it, right?

11              A.    Yes.

12              Q.    And so fair to say -- I have to

13    ask for the record.  I know the answer, but fair

14    to say you don't know the differences between

15    the two documents, Plaintiff's Exhibit 5 and

16    Plaintiff's Exhibit 6?

17              A.    No.  I could read them and --

18              Q.    Sure.  I'm not asking your -- what

19    I want to know is what's in your personal

20    knowledge, not --

21                   MR. JOHNSON:  At this moment?

22                   MR. HAWKINS:  At this moment,

23         right.

24
```

```
 1   BY MR. HAWKINS:

 2           Q.    Please turn to page 8 of -- we'll

 3   call it 5, Plaintiff's 5.  It's the first one I

 4   handed you.

 5           A.    I'm sorry?

 6           Q.    Page 8 of --

 7           A.    Page 8, okay.

 8           Q.    -- Exhibit 5.

 9           A.    We're still looking at this?  Oh,

10   this one.

11           Q.    Sorry.  We'll call that one 6 and

12   the one you're looking at now 5 for -- yeah,

13   please take your time.  I'm not trying to rush

14   you.

15           A.    Again, it's page 8, right?

16           Q.    Correct.

17           A.    Okay.

18           Q.    And at the bottom, the bottom,

19   say, fifth of the document, there's "Government

20   Identification Required."

21                 Do you see that here?  I've got it

22   highlighted.

23           A.    Yes.

24           Q.    Okay.  Now, I am notorious for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    missing things, but I read through 6 and

 2    couldn't find that in 6.  Now, since you don't

 3    know about 6, I'm not going to ask you why it

 4    isn't in there, but what I will ask you is, does

 5    DDM ask people purchasing opiates or controlled

 6    substances to provide a government ID at the

 7    pharmacy level?

 8            A.    No, we do not.  It's not required.

 9    There's been some legislation at the state level

10    that has looked at introducing that, but that's

11    not presently a requirement.

12            Q.    Okay.

13            A.    And if there was a concern of a

14    pharmacist that you're not who you think -- you

15    know, there's a concern there that you're not

16    the person who's picking this prescription up,

17    if there's some type of -- something not right,

18    they certainly can ask, but we did not make that

19    a policy.

20            Q.    Okay.  And you do have familiarity

21    with 5, that's the one we talked about.  You had

22    review that before, correct?

23            A.    Parts -- pieces and parts.

24            Q.    Do you remember going through it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and saying, "Okay.  Wow, they have a government

 2   identification requirement.  Is that something

 3   we should consider?"

 4              MR. JOHNSON:  Object for the

 5              record here and just make a continuing

 6              objection to these pharmacy or

 7              store-related issues, and I'll just

 8              state that on the record and you can

 9              continue on.

10              A.    So what we do in that situation

11   is, we do not ask for an identification of any

12   sort.  However, we will ask for another type of

13   identifier.  So if you were to pick up a

14   prescription, typically you should know the

15   birth month of the person that you're picking

16   up.  We do that for a variety of reasons.  Not

17   the date of birth.  We need a birth month, okay?

18              And there should be also -- you

19   should know the address.  There might be some

20   folks that don't know the address of who they're

21   picking up for completely.  "It's on Elm Street.

22   I don't know the number."  But we would expect

23   that that requirement would be -- if not, then

24   they involve the pharmacist at that particular
```

Highly Confidential - Subject to Further Confidentiality Review

1    point.

2            Q.    Okay.  And my question is -- and

3    perhaps I wasn't clear.  Irrespective of this

4    document, do you know if there was ever like a

5    policy level discussion at DDM saying, "Should

6    we require a government ID?"

7            A.    That did come up, yeah.

8            Q.    When did it come up?

9            A.    I don't recall.  I think it might

10   have been -- there was -- again, I'm going to

11   speak to some legislation that was in the

12   Cincinnati area that was proposed by a diversion

13   inspector who wanted to make it a mandate, and

14   it didn't go through.

15                 And so there was some discussion,

16   should we, should we not.  We actually spoke

17   with some other pharmacy operators who we

18   compete with with regard to what they were

19   thinking at that time.  And a decision was

20   not -- was made not to.

21           Q.    Do you know what your competitors

22   were thinking?  Did they tell you what they were

23   thinking with respect to that?

24           A.    You know, again, I think they

```
 1    probably had similar concerns of, you know,

 2    okay, "So you're picking up" -- so are we

 3    documenting -- what are we doing with this

 4    information?  So you're picking up for Tim

 5    Johnson a prescription."

 6                  "You know, so what am I doing with

 7    that information that's got your name -- I'm

 8    verifying who you are," but I'm not collecting

 9    that information, right?  So there was, "How do

10    we enforce this," you know.  So we decided not

11    to go ahead and implement a procedure like that.

12    And I think those are concerns from some of the

13    operators.

14          Q.    Okay.  So that was the reason DDM

15    didn't implement that?

16          A.    Yes.

17          Q.    Okay.  Now, going back to 6, which

18    is the DDM document.  I'm going to ask you to

19    turn to page 13, which is at Bates number 91619.

20                  And it's at the bottom of the page

21    where it says, "Determining high risk

22    prescribers."

23                  Are you with me yet, sir?

24          A.    High-risk patients?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Prescribers.  It's bottom half of

 2      the page, just under the bottom half.  Here I'll

 3      show you.

 4              A.    Page 13?

 5              MR. JOHNSON:  Do you have the

 6              right exhibit?  Page 13.

 7              A.    I'm on Exhibit 5.

 8              Q.    We're on 6 now.  I'm sorry.

 9              A.    I'm sorry.

10              MR. JOHNSON:  He switched.

11              Q.    I'm going fast for you.  It's my

12      fault.

13              A.    We'll get there.  I'll just look

14      up here.

15              Q.    All right.  And it says,

16      "Determining high-risk prescribers."  Are you

17      familiar with the term of "high-risk

18      prescribers"?

19              A.    Yes, I am.

20              Q.    What does that connote to you?

21              A.    A prescriber that may be obviously

22      writing prescriptions for unusually high number

23      of controlled substances.  Could be Schedule

24      IIs.  Could be a certain type of medications.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  And it has a list of bullet

2    points on how to make that determination there.

3    Now, again, since you're not familiar with this

4    document, I'm not asking you to speak to the

5    document.  But do you know if DDM has

6    implemented this in one of its many policies in

7    terms of making that determination?

8              A.    I mean, I believe that this is

9    incorporated to some extent within our

10   controlled substance quality assurance program.

11             Q.    Okay.

12             A.    Okay.  And that's basically a red

13   flag for filling, processing prescriptions for

14   controls.

15             Q.    All right.  And then on the

16   following -- well, at the very bottom of that

17   page, it says, "Reporting patients and

18   prescriptions -- and prescribers, a concern."

19   And on the following page, last paragraph it

20   states, "Pharmacists should report practitioners

21   about whom they have substantiated concern to

22   the Board of" --

23             A.    I'm sorry.  I'm lost here because

24   it's not highlighting.  Where is it at on page
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    14?

 2           Q.    It's the last full paragraph

 3    starting with "If a prescriber."  Okay.  But I'm

 4    reading the last sentence, okay?

 5           A.    Okay.

 6           Q.    "Pharmacists should report

 7    practitioners about whom they have substantiated

 8    concern to the Board of Pharmacy, Board of

 9    Medical Examiners and/or state DEA should be

10    contacted after consulting with corporate

11    pharmacy management."

12                 Okay.  Does DDM have a policy like

13    that?

14                 MR. JOHNSON:  I'm going to

15           reassert my continuing objection.

16                 Go ahead.

17           A.    I know that our pharmacists will

18    contact state board inspectors and the state

19    board.  They don't -- and there are times that

20    they don't contact us.  They don't need to

21    contact us.

22                 So in that situation, if a

23    pharmacist feels that a prescription -- or a

24    physician -- there's a concern, they can contact
```

Highly Confidential - Subject to Further Confidentiality Review

1 the State Board of Pharmacy.  They don't

2 necessarily need to go through us.  And they

3 typically will involve us, though.

4          Q.    That was, in fact, my question, is

5 why --

6          A.    Yeah.

7          Q.    So you're telling me -- I was

8 going to ask why there is that requirement.

9 You're telling me that requirement just simply

10 does not exist?

11          A.    Not that it has to come to us, no.

12          Q.    Okay.  Do you know if there's any

13 policy anywhere that requires the pharmacist to

14 come to you before making that contact?

15          A.    Not to my knowledge.

16          Q.    Sorry.  Since you're not familiar

17 with that document, that's kind of

18 fast-forwarding some of my questions here.

19              All right.  So pharmacists have

20 the ability to report a high-risk prescriber,

21 right?

22          A.    Yes.

23          Q.    Has that ever been done by a DDM

24 pharmacist?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Oh, yeah.  Yes.

 2              Q.    Do you know how many occasions?

 3              A.    I couldn't tell you.  I mean,

 4    there have been times that they may contact us

 5    and let us know that, "I've got a concern about

 6    a doctor."  In that situation, what we would

 7    typically do is we would contact the state

 8    board, deal with the inspector.

 9                    We may go down and talk a little

10    bit further if we have a store that's nearby.

11    Try to talk to the pharmacist there.  Run some

12    utilization reports off of that physician.

13    There are times that the pharmacist may contact,

14    just on their own, and do that route, too.

15    That's happened as well, so ...

16              Q.    To be clear, I'm not doubting your

17    representation, but if you had to substantiate

18    that on numerous occasions pharmacists did that,

19    how would you do that?

20              A.    I'm sorry.  Repeat the question.

21              Q.    Could you prove that?  In other

22    words, aside from -- you know, I -- aside from

23    your belief that it happens, is there any way

24    you could go about proving that, like, "Oh, here
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    are our -- here's reports we keep any time a

 2    pharmacist makes this" --

 3            A.    We had a pharmacist not too long

 4    ago that contacted us that had a concern, and he

 5    let us know that the physician was writing for

 6    what he thought was inappropriate amount of

 7    controlled substances.  And so he contacted the

 8    physician, let us know that he contacted him.

 9    Told him not to send the patients to -- you

10    know, to our store.

11            That precipitated the physician

12    calling us back, and he was concerned about his

13    reputation and said that he was not being

14    investigated by anybody.  And I don't remember

15    the specifics of it, but it ended up being that

16    that store would not process prescriptions for

17    that -- the doctor wouldn't send them to us

18    anymore.

19            Q.    Okay.  My question, is a record

20    kept of that or anything to that nature?

21            A.    There might be a file.  I -- it

22    didn't come to me directly, is what I'm saying.

23    I was copied in an e-mail, put it that way.

24            Q.    Has DDM been doing this for years?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yeah.

 2          Q.    Now, handing you what will be

 3   marked as Plaintiff's 7 -- or Mr. Mulligan is, I

 4   should say.  Starting at Bates number DDM

 5   143260.

 6                        - - -

 7           (DDM-Ratycz Exhibit 7 marked.)

 8                        - - -

 9          Q.    And I'll give you a chance to read

10   it, but I want to represent for the record, this

11   is an e-mail from Michael --

12          A.    Michele.

13          Q.    Michele, I'm sorry.  I was more

14   focused on the last name, which is -- how do you

15   pronounce it?

16          A.    Golob.

17          Q.    Golob.  I'm sorry.  To you on

18   8/26/13.

19                All right.  Are you familiar with

20   this e-mail?

21          A.    I remember -- yeah.

22          Q.    Did you review it in your review

23   of deposition material?

24          A.    No, I did not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Okay.  So what does it indicate

 2    that CVS Caremark is doing in the back of the

 3    e-mail, so to speak, just in --

 4            A.     They identified a list of

 5    prescribers and cut them off.

 6            Q.     Okay.  And then you indicated that

 7    CVS was fined $6 million on -- kind of at the

 8    top, correct?

 9            A.     Evidently, yes.

10            Q.     Okay.  What was your belief that

11    the fine was for?

12            A.     I don't recall the specifics.  I

13    mean this is in 2013.  So there might have been

14    something -- there might have been -- this might

15    be pointed to an article.  Click here to read

16    the story.  It might even speak to that to some

17    extent.  I don't know.

18            Q.     Okay.  That's --

19            A.     Obviously they were given a fine

20    and they addressed it.

21            Q.     All right.  Did DDM make any

22    effort to say, "Okay.  CVS got this fine.  We

23    need to make sure we're not doing the same thing

24    CVS did"?
```

```
 1           A.    We -- no.  We didn't make any

 2   changes.  We operated a little bit differently

 3   from the standpoint that I think that in many

 4   contexts where there's a Discount Drug Mart,

 5   there's not going to be another Discount Drug

 6   Mart two miles down the road.

 7                So I think from their exposure --

 8   and this is just me hypothetically -- you know,

 9   there could be a situation if you had a bad

10   physician or group of bad physicians in a

11   certain area, there would be multiple CVSs that

12   would be affected, just because -- just basing

13   that off of CVS and the model and how they

14   sprawl, if you will.

15                Discount Drug Marts, that's not

16   the case.  Where I live, there's one in my

17   community.  There might not be another Drug Mart

18   until maybe, you know, three cities over.  So

19   while we do have 74 locations, we're all over

20   the state.

21           Q.    Okay.  And then after you note

22   that they were fined $6 million and they had no

23   choice, you go on to say, "As we develop our own

24   internal CS monitoring program, we may be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   encroaching on similar practices."

 2            What similar practices?

 3        A.    This might be a decision where we

 4   may want to do some data mining on a physician,

 5   on a group of physicians, and do something

 6   similar.  We continue to have those discussions,

 7   as a matter of fact, a couple months ago

 8   actually, regarding, you know, do we want to

 9   send notices or letters to physicians if we

10   identify them?

11        Q.    Okay.  But this is something that

12   CVS is doing now, though, apparently, right?

13        A.    Yes.

14        Q.    Okay.  So -- and is the reason

15   you're not doing what CVS is doing what you just

16   told me about having two stores close together,

17   is that --

18        A.    I mean, we don't do everything

19   that CVS does.  And there's some things that we

20   do that CVS doesn't either.  So -- and I think

21   sometimes the industry is that way.  It's

22   reactive.

23            I mean, you know, here we are in

24   2018, almost '19, and we're looking at doing
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    something similar, so ...

2            Q.    Okay.

3            A.    It might just be from our

4    experience it was less -- less impactful from

5    that standpoint.

6            Q.    All right.

7            A.    I don't know where those stores

8    were in relation to that CVS.  Maybe they were

9    in Florida.  We had a huge epidemic there in

10   Florida.  There are obviously issues in Ohio.

11   Pockets here and there.  So I don't -- there's

12   probably more to that story on why they had to

13   do what they did.

14           Q.    Okay.  I mean, CVS's policy that

15   we're talking about is obviously aimed at trying

16   to prevent diversions, correct?

17           A.    Correct.

18           Q.    All right.  Was there ever any

19   concern of saying, wait a minute, since we're

20   not implementing this policy, diversions might

21   be happening at our stores since we're not

22   implementing a policy that CVS is?

23           A.    We're small enough and we know our

24   pharmacists very, very well.  We -- no.  If
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    there's a communication that -- there's not

 2    layers and layers and layers of communication

 3    before decision-making.  And so, again, if

 4    somebody were to single out to us that there was

 5    a pill mill operating across the street, we

 6    would certainly take action on that from that

 7    perspective.

 8              Now, could -- you know, we didn't

 9    data mine that, but we relied on feedback from

10    our stores and it would work.

11         Q.   So how -- I don't quite understand

12    again how that works.  So you -- because you

13    know your pharmacists or pharmacies -- which is

14    it?

15         A.    Pharmacists, and our pharmacies.

16         Q.    You would know that there's a pill

17    mill across the street and you might be able to

18    stop it, is that your --

19         A.    No.  What I'm trying to say is, is

20    I think we know the -- we know our pharmacists

21    and we know how they practice.  And I think

22    we're small enough.  I think when you get to a

23    large number of stores -- I don't know what that

24    number is -- this type of instance, I think, is
```

1    probably necessary and it might be a better idea

2    than for a smaller regional.  That's all I'm

3    saying.

4          Q.   Okay.  And I understand that.  And

5    I'm sorry, I have to keep going until I

6    understand, but you'd agree that pill mills are

7    a significant problem with the opioid crisis,

8    right?

9          A.   Yes.

10         Q.   And that's -- in fact, that's what

11   you identified as, I think correctly, as one of

12   the issues here, right?

13              And what I -- the part I'm missing

14   here is, how knowing your pharmacists would help

15   you know that there's a pill mill across the

16   street and that you need to do something?  Do

17   you see where the disconnect is?

18         A.   Because they would communicate to

19   us.

20         Q.   Okay.  So because you know your

21   pharmacists, you know that the pharmacists would

22   say, "Well there's a pill mill two towns over

23   and that's -- and we need to stop that."  Is

24   that what you're saying?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Basically that's how it would

2   work, yeah.

3          Q.    Okay.  How would the pharmacists

4   know that something constitutes a pill mill?

5          A.    Potentially they may see

6   prescriptions coming in.  And they're coming in

7   and they're just not going to fill them, or they

8   don't feel comfortable based on your controlled

9   substances quality assurance program where

10  there's too many red flags.

11               You've got patients that are

12  coming in from, you know, four counties away and

13  that's their address, or -- you know, there's

14  certain red flags that could probably say, okay,

15  we may have a physician who is prescribing an

16  overabundance of controlled substances in that

17  area.  Pharmacists talk as well.  That could be

18  another thing.

19         Q.    Why wouldn't that be true of a CVS

20  pharmacist?  Wouldn't a CVS pharmacist be able

21  to make that same determination of, "Oh, no,

22  we've got a pill mill across the street.  We've

23  got these red flags."

24               I mean, they -- I mean, I'm sure
```

Highly Confidential - Subject to Further Confidentiality Review

1    your pharmacists are high quality, but

2    presumably they have high-quality pharmacists

3    too, right?

4              A.    Potentially could.  My -- just

5    my -- again, my opinion is that there's a

6    layering effect there.  So who do you

7    communicate that to?  You communicate that to

8    your DM.  Where does it go from that point?

9                   With us, it would communicate to

10   us and we would act on it.

11             Q.    Okay.  So you're -- and I'm not

12   trying -- I want you to clarify.

13             A.    Sure.

14             Q.    But you're thinking that same

15   communication doesn't occur at CVS because of

16   its size; is that it?

17             A.    I think to a lesser extent maybe,

18   yes.

19             Q.    Going on to -- where are we at?

20   Plaintiff's Exhibit 8?  Yeah, 8.

21                        - - -

22          (DDM-Ratycz Exhibit 8 marked.)

23                        - - -

24             Q.    Oh, I'm sorry.  It's Bates numbers

Highly Confidential - Subject to Further Confidentiality Review

```
 1    169025.

 2            A.    Okay.

 3            Q.    All right.  Are you familiar with

 4    this e-mail, sir?

 5            A.    I am now, yes.

 6            Q.    I see.  I assume you haven't

 7    reviewed it recently?

 8            A.    No.

 9            Q.    Okay.  And the sentence I'm

10    interested in is, "We are in the final process

11    of implementing a more aggressive controlled

12    substance monitoring, handling, dispensing and

13    reporting at the store level and corporate."

14                  Okay.  Are you with me so far?

15            A.    Yes.

16            Q.    Okay.  What is more aggressive?  I

17    mean, with -- what was -- what was going to be

18    more aggressive about what you were implementing

19    as opposed to what you had implemented in the

20    past?

21                  MR. JOHNSON:  So I'm going to

22            assert my continuing objection to this.

23            A.    So we were looking at possibly

24    putting in a threshold limit.  So instead of
```

Highly Confidential - Subject to Further Confidentiality Review

1    encountering a fat finger or an order inventory

2    on the report where we would never let you get

3    to ordering 20.  So an example, if you're

4    ordering one a month or one two, one two, one

5    two, and your average is one and a half or

6    whatever, you would never get to the point of

7    10.  We would put a quota in there -- a

8    threshold in there that would just knock your

9    order down to four or five or six.

10          Q.    Because that would be the change,

11   you'd just simply not allow that to happen?

12          A.    Yes.  Instead of having it go

13   to -- you know, to somebody to make a

14   determination or pick up the phone to kind of

15   reduce some of the noise if it happens, so ...

16          Q.    Okay.  And that would be at

17   corporate level as well, so I mean, that would

18   certainly affect the corporate level?

19          A.    Yes.

20          Q.    Anything else that this more --

21   quote, more aggressive policy that you're

22   referring to?

23          A.    No, no.

24          Q.    Do you know when this more

Highly Confidential - Subject to Further Confidentiality Review

1    aggressive policy was eventually implemented?

2            A.    It was not implemented.  I don't

3    recall -- I don't know if I ever got anything

4    back from Scott in regards to that, into the

5    methodology, and if I'm -- I don't know.  I --

6    there might be an e-mail there.  I don't know if

7    you collected it or not.  But it seems like

8    Scott's approach or -- from a DEA's

9    interpretation, was -- it was up to the company

10   to make up their own -- you know, their own

11   algorithms, if you will, to designate -- you

12   know, to make the reporting better and that was

13   up to, you know, up to the company.

14           Q.    I see.  Who is Scott?

15           A.    Scott Brinks was a -- he worked at

16   the Cleveland office DEA.  So we had a good

17   relationship with him.

18           Q.    Do you know if you ever

19   specifically said, "This is our suspicious

20   monitoring policy" to Scott?

21           A.    At one particular -- not in this

22   realm.  I mean, we might have had conversations

23   about what we do.  I don't know.

24           Q.    Okay.  But to your knowledge, you

```
1    don't recall having that conversation with him?

2         A.    No, I don't -- I don't know.  That

3    might have been brought up not with Scott, but

4    could have been brought up with somebody else

5    when they did a -- you know, when they did their

6    inspection every two years.  I --

7         Q.    Do you know if it was ever?

8         A.    I don't know.

9         Q.    Going on to Plaintiff's 9, Bates

10   number DDM 75738.

11                    - - -

12        (DDM-Ratycz Exhibit 9 marked.)

13                    - - -

14        A.    Okay.

15        Q.    All right.  Thank you.

16             MR. JOHNSON:  I'm renewing my

17        continuing objection here.

18             MR. HAWKINS:  Thank you.

19   BY MR. HAWKINS:

20        Q.    First sentence is what I'm

21   interested in.  "I would like to see us have a

22   code of conduct in controlled substance QA

23   program."

24             What is a QA -- controlled
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   substance QA program?

 2         A.    Controlled substance QA program is

 3   a program where it allows -- it provides -- you

 4   know, when you get a prescription, it's a tool

 5   that the pharmacist can use to make sure that

 6   we're not filling a prescription that might be

 7   not indicated for legitimate medical purposes or

 8   it's coming from a pill mill or what have you.

 9   So more consistency to when we're saying, no,

10   versus when we're processing and vice versa.

11         Q.    Okay.  By not having that program,

12   could that give DDM the knowledge that

13   diversions are more likely to happen with

14   respect to its stores?

15               MR. JOHNSON:  Objection.

16         A.    Not having the program?

17         Q.    Yeah, in the absence of such a

18   program.  I mean, it indicates there's currently

19   no program in place.  Might that give DDM an

20   awareness that, you know, there are more likely

21   to be diversions happening within our stores,

22   the stores that we're shipping this material to?

23               MR. JOHNSON:  Objection.

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2          (DDM-Ratycz Exhibit 10 marked.)

 3                    - - -

 4          Q.    Now, handing you what will be

 5  marked as 10 -- or Mr. Mulligan will, I should

 6  say, and it is DDM 12909.

 7                 Now, if you want, you can read the

 8  whole document.  I'm just going to ask you one

 9  direct -- so it's up to you if you -- do you

10  want to read the whole document or --

11          A.    No, I don't need to.

12          Q.    Okay.  First of all, do you know

13  what this document is?

14          A.    Yes, this is our controlled

15  substance quality assurance procedure.

16          Q.    Okay.  So this is --

17          A.    Policy.

18          Q.    This is what was eventually

19  implemented from -- in reference to that last

20  e-mail; is that fair?

21          A.    Yes.

22          Q.    Okay.  So when did this policy

23  initially -- when did this -- the

24  implementation -- kind of when was it nascent
```

1    stages, I guess, for lack of a better term.

2    When did it start -- when DDM start developing

3    this program?

4          A.    We always had pieces and parts of

5    this program in play.  What we didn't have was

6    consistency.  And when I say "consistency," was

7    that pharmacists are going to be -- and I don't

8    want to say this in a negative way, but a

9    pharmacist, when we have our state board come

10   in, we have the DEA come in and they talk about

11   diversion, they talk about, you know, filling

12   prescriptions.  Most pharmacists are going to

13   look at a controlled substance prescription and

14   they're going to look at it many different ways.

15                And there is a reluctance in many

16   instances to fill that prescription.

17   Unfortunately.  And I say only unfortunately

18   when it's written for legitimate medical

19   purposes, okay?

20                And there's a reluctance because

21   they're licensed.  They're afraid they're going

22   to lose their license potentially, right?  And

23   so we wanted to provide them some guidance on

24   going through the right -- you know, the right

 1    circumstances to fill a prescription.

 2              And at the same time, identify if

 3    there was situations where you shouldn't be

 4    filling a prescription even though it looked

 5    like it might be okay, to provide them guidance

 6    to say, "No, you shouldn't fill this

 7    prescription, because, as a reminder, the

 8    patient doesn't live in your community and keeps

 9    coming back to you, or doesn't have an ICD code

10    attached to it, or the physician was reluctant

11    to provide additional commentary or information

12    on treatment" and so on and so forth.

13              So to answer your question, pieces

14    and parts of this was being done at our stores.

15    We found it necessary to go ahead, put it

16    together, so that it would be a resource for our

17    stores and so that we can now document that it

18    was being done as well.

19         Q.   I see.  Okay.  The part I'm

20    most -- I mean, you talked about the reluctance

21    of the pharmacists.  Can you describe that -- I

22    don't understand.

23         A.   I'm sorry.  And when I say "the

24    reluctance," I only mean that from a standpoint

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that a pharmacist is going to get paid a salary.

 2    It's not, you know, Tim Johnson Drugs and Tim's

 3    the pharmacist.  So there's no incentive

 4    monetarily to process controlled substances and

 5    look the other way and fill these prescriptions,

 6    okay?  There's none.

 7              They're going to collect their --

 8    you know, we didn't have a bonus structure that

 9    was tied to controlled substances or anything.

10    There's no incentive, okay, for that pharmacist

11    to fill a prescription.  That's all I meant by

12    that.

13         Q.    Okay.  Well --

14         A.    Not that their --

15              THE COURT REPORTER:  Can we go off

16         the record?

17              MR. HAWKINS:  Sure.

18              THE VIDEOGRAPHER:  Time is now

19         11:48.  Going off the record.

20                        - - -

21         Thereupon, at 11:48 a.m. a luncheon

22          recess was taken until 12:23 p.m.

23                        - - -

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          Friday Afternoon Session

                            December 21, 2018

 2                          12:23 p.m.

 3                          - - -

 4              THE VIDEOGRAPHER:  Okay.  The time

 5         is now 12:23.  Back on the record.

 6    BY MR. HAWKINS:

 7         Q.    All right, Mr. Ratycz, before we

 8    broke for lunch, we were talking about

 9    reluctance of the pharmacist, do you recall

10    that?  And one of the things you used to explain

11    the concept you were getting at was the bonus

12    structure.  Do you recall that?

13         A.    Yes.  I was just trying to make a

14    point that, we don't incentivize our pharmacists

15    from that perspective of filling, you know,

16    controlled substances.  Within -- our bonus

17    parameters have changed over the years,

18    obviously, as the pharmacy profession has

19    changed.

20              But over the course of even when

21    we go back in time, there was different factors,

22    you know, perhaps pharmacy sales, which was a

23    small component, and script count was a small

24    component.  Ultimately payroll and inventory
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   control and other things have always been at the

 2   top.

 3              And even if we look at our

 4   pharmacy structure today, only 3 percent is tied

 5   to prescription growth.  That's just

 6   prescription growth.  And obviously controlled

 7   substances are a small piece of that.  And

 8   that's -- so 3 percent of your bonus.  The rest

 9   of the parameters are all about patient-centered

10   services.

11              So there isn't incentive enough.

12   I mean, and, again, our bonuses aren't -- we're

13   not talking about bonuses for chief pharmacists

14   that are $25,000 at the end of the year.  I

15   mean, our bonuses will range anywhere from $500

16   to as high as $4000.  And even the 4000s might

17   be just one or two pharmacists.

18         Q.   Okay.  So a lot to breakdown

19   there.  You said pharmacy sales are only

20   3 percent of the bonus structure?

21         A.   Pharmacy sales today aren't

22   included in that.

23         Q.   Are not included?

24         A.   No, they're not.  It's script
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    count.  So just prescription count.

2              Q.    Prescription count is included?

3              A.    Yes.

4              Q.    Okay.  How do -- explain how

5    prescription count works --

6              A.    So we just have a minimum

7    requirement that you be over like a two and a

8    half percent threshold of growth to be eligible

9    for that component of the 3 percent.  So if you

10   get a 2.5 percent prescription growth, you would

11   then be eligible for 3 percent of that bonus.

12   You would have just met that requirement.

13             Q.    Okay.  So if you get more than

14   2.5 percent growth, you get a 3 percent bonus?

15             A.    No.  Your bonus calculation at

16   total --

17             Q.    Yes.

18             A.    -- the 2 and a half percent

19   increase on the script side, 3 percent would be

20   representative of your bonus dollars.

21             Q.    I'm sorry.  I went to law school

22   to avoid math.

23             A.    Yeah.  What we'll have -- maybe

24   it's something -- I'm probably bad at
```

1   communicating that.  So we will have, for

2   example, script count will be 3 percent.

3   Payroll might be 20 percent.  And you'll add it

4   up until you get to 100.

5           Q.    I see.  So, I mean, I guess why

6   I'm a bit confused is -- I mean, 3 percent seems

7   so picky in that it's as if -- like, for

8   instance a $500 bonus, 3 percent would be what?

9   About $24 -- I mean $15?

10          A.    Right.

11          Q.    So that's -- we're talking about

12  $15 here?  That's --

13          A.    It's not a big -- yeah, it's not a

14  big piece.

15          Q.    I see.

16          A.    If our -- if you look at our

17  pharmacists' bonus structure today, it's off

18  immunization.  It's about medication therapy

19  management, it's about inventory management,

20  customer service, and there might be -- there

21  might be some other things that are tied to

22  patient services.

23          Q.    How's customer service measured?

24          A.    Customer service is measured by --

Highly Confidential - Subject to Further Confidentiality Review

```
 1   it's a number of ways, customer complaints,

 2   compliments.  We have the ability to throw out a

 3   complaint.  So if somebody says -- you know, if

 4   we determine that the complaint was not really

 5   truly legitimate, then we're not going to ding

 6   the store, so we remove that.

 7              So you get -- for a customer

 8   compliment you'll get a couple points.

 9   Negative, minus one for a complaint.  There's

10   other metrics that we incorporate into customer

11   service.  That's any feedback that we get

12   through social media or anything else is also

13   embedded in that.

14         Q.   And again, I'm not doubting the

15   accuracy of your testimony.  I just want to make

16   sure, because it's sounds almost

17   incomprehensible to me that -- your testimony is

18   that 3 percent of a pharmacist bonus is script

19   sales and that's it?

20         A.   Script count.

21         Q.   Script count.

22         A.   Script count.

23         Q.   Which is, I assume, somewhat

24   related to sales, yes?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    And nothing else related to sales

 3     affects the bonus?

 4            A.    No.  We used to have a small

 5     percentage was tied to pharmacy sales.  Again,

 6     it might be 3 percent was prescription growth

 7     and 3 percent was sales.  So that would give you

 8     exposure of 6 on those, but we removed the

 9     pharmacy sales piece because we were trying to

10     move the needle in other ways with regard to

11     patients services and, you know, stuff like

12     that.

13                 So we felt imperative that that

14     bonus already -- is it big bonus?  That we want

15     it really tied to things that matter.  Flu

16     shots, just as an example.

17            Q.    Out of morbid curiosity, has

18     anyone said that, you know, "Why are we even

19     messing with 3 percent?  Why don't we just get

20     rid of this altogether?  No one cares about

21     $15."

22            A.    It probably will be gone, yeah.

23     We'll probably incorporate something here soon.

24     We make changes to it ongoing, so ...
```

```
 1            Q.    And it seems like it's more a
 2   problem to administer than you would get any
 3   use --
 4            A.    Script count is still important, I
 5   think, so you don't -- it's like one of those
 6   things you probably want out there so if you
 7   have a store that's actively growing and they're
 8   at 5 percent growth, and not to have it on a
 9   bonus as a parameter that's being measured, that
10   could potentially be a negative conversation
11   with that pharmacist, but ...
12            Q.    How can the pharmacist affect
13   script count?
14            A.    It's a good question.  I think
15   that's really, really tied to everything else
16   that we do within that bonus in that customer
17   service.  Good physician relationship,
18   physician -- some of our pharmacists will
19   actually go out to physicians' offices, and we
20   have a generic prescription program so they'll
21   provide some brochures to a physician's office
22   to let them know.
23                  So I mean there might be some --
24   and those circumstances aren't very, very
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    common.  They might be more typical in, you

 2    know, rural pharmacies than you would have here

 3    in Northeast Ohio, but, yeah, I don't think they

 4    really impact it too much at all.

 5         Q.    Perhaps it's because I'm from the

 6    framework of usually suing them, but have you

 7    ever observed that doctors kind of stick

 8    together, they're a bit of a -- they're kind of

 9    a tight-knit community.  Is that fair from the

10    pharmacy perspective, too, or --

11         A.    I'm married to one, so yes.

12         Q.    Well, there you go.

13              Is there ever a concern -- I mean,

14    do you think there's a concern there for a

15    pharmacist that, you know, if I turn in this

16    physician, if I bar this physician from writing

17    prescriptions, that, you know, you're not only

18    losing the business of that physician, but, you

19    know, other physicians often kind of -- is there

20    ever that concern with --

21         A.    I don't think that concern.

22    There's that concern I think if you had a

23    physician who was practicing medicine in a

24    correct way and potentially he had a rare
```

Highly Confidential - Subject to Further Confidentiality Review

1    circumstance where he had a patient in a certain

2    condition that maybe warranted high opiate

3    therapy or something along those lines, but his

4    business practice or his patient clientele was,

5    you know -- let's say he was internal medicine

6    and they were legitimate, he was treating

7    hypertension, diabetes, and he had a patient who

8    looked like a perceived outlier, that -- maybe

9    in that situation, yeah, if a pharmacy didn't

10   want to fill that prescription.

11            And I'm going to base it on the

12   premise that that prescription was legitimate,

13   okay, that patient needed it, but maybe they

14   thought there was a potential red flag that they

15   didn't fill it, that could maybe alienate that

16   physician and he may say, "Well, I'm not going

17   to send you these prescriptions."

18            Q.    Fair to say physicians don't like

19   being told they're practicing medicine

20   incorrectly, right?

21            A.    True, true.  Now, if you had

22   somebody who was overprescribing opiates or

23   controlled substances, I don't know who -- and

24   he may talk to another overprescribing opiate

Highly Confidential - Subject to Further Confidentiality Review

```
 1    physician, if he knew of another physician that

 2    maybe -- I don't know.  You know, that

 3    potentially could be a conflict, but those are

 4    probably prescriptions you wouldn't want unless

 5    it was quote/unquote a legitimate pain

 6    management facility that was licensed by the

 7    board and being maintained by it, and those

 8    exist out there.

 9          Q.    How do you tell the difference?

10          A.    There's a -- you can contact the

11    state board -- you have to have a certain

12    license with pain management, and that allows

13    them an ability to distinguish versus --

14                THE VIDEOGRAPHER:  Counsel on the

15          phone, could you put your phone on mute

16          please.  I think we can hear your

17          feedback.

18          A.    Versus a designation of, let's say

19    you're an endocrinologist and now you're

20    treating pain and you keep seeing pain.

21                Now, conversely there have been

22    pain management docs that have gone awry and

23    been bad as well.  So there's always that.  But

24    the state board has gotten better at labeling
```

1   pain management clinics as such, so ...

2          Q.    And earlier, you know, we were

3   talking about, you know, kind of the close

4   relationship and how the pharmacists on the

5   ground -- you know, the close relationship

6   between DDM and its pharmacists allows you to

7   kind of prevent diversions that way.  How can

8   those pharmacists make that determination of,

9   you know, the legitimate pain management

10  clinics?  I mean, because what you're telling me

11  is kind of fine-tuned a bit.

12         A.    I think that's -- part of this, I

13  think, helps -- this policy helps with that.

14               MR. JOHNSON:  Exhibit 10?

15         A.    I'm sorry.

16         Q.    Sure.  No, no.  That's a good

17  point.

18         A.    That's Exhibit 10, and that's the

19  controlled substance quality assurance, because

20  it allows them to, again, identify where those

21  red flags are and where there's issues.

22         Q.    Okay.  So that policy gives them a

23  bunch of tools that they can use to make those

24  determinations, and that's how they might make

1    that.  What did they have before that policy?

2           A.    They had pieces and parts of that

3    policy, so ...

4           Q.    But fair to say this policy didn't

5    exist before 2015?

6                 MR. JOHNSON:  Objection.

7           A.    No.  It did not exist as it is

8    today.  There were pieces -- there were parts

9    that we were being done.  What we tried to do

10   was provide them one area and a policy where

11   they would go in.  And actually, when they

12   complete some of these forms, if you look at the

13   policy in its entirety, there's pieces here like

14   a tier one red flag resolution piece.  Well, a

15   tier one is pretty substantial.

16                It means we've got -- this is

17   really not a very good prescription, so tell me

18   why I can fill it, why you should fill it, if

19   you're the pharmacist.  So that requires you to

20   complete that.  And what that does is that

21   allows us to then scan it in our pharmacy system

22   so then if another pharmacist comes in and has a

23   question, they can kind of look at this as well.

24   So ...

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    I'm sorry.  Am I interrupting you?

 2            A.    Yes.

 3            Q.    Before September 9, 2015, where

 4    would the pharmacists go to look for that tier

 5    one thing you referred to that's in here?

 6            A.    They -- the tier one did not

 7    exist.  So they wouldn't have that.

 8            Q.    That's one benefit --

 9            A.    That's a benefit, yes.

10            Q.    Okay.  So they'd have that benefit

11    at 2015 onwards --

12            A.    Yes.

13            Q.    -- but not before?

14                  It's fair to say there are other

15    benefits like that that are in here now that

16    weren't in there -- that did not exist before

17    2015?

18            A.    There might be some.

19            Q.    Can you think of any?

20            A.    I'd have to read it.

21            Q.    I'm not going to do that to you.

22                  All right.  We're to Plaintiff's

23    11.  Mr. Mulligan will be handing --

24                  MR. MULLIGAN:  12.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. HAWKINS:  Is it 12?

 2                    MR. MULLIGAN:  I'm sorry.  11.  My

 3          bad.

 4                         - - -

 5          (DDM-Ratycz Exhibit 11 marked.)

 6                         - - -

 7   BY MR. HAWKINS:

 8          Q.    Do you need time to review this,

 9   sir?  I'm going to go over individual sentences,

10   so ...

11          A.    If you're going over individual

12   sentences, I'll go that way.

13          Q.    Have you seen this document before

14   today?

15          A.    I may have.

16          Q.    Did you review it in preparation

17   for your deposition today?

18          A.    No, I did not.

19          Q.    Okay.  You said you read

20   Mr. Briscoe's deposition, correct?

21          A.    Correct.

22          Q.    And this document was discussed a

23   good deal in that deposition, right?

24          A.    Then I've seen that, so ...
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2      A.    I thought it was a different date

3  for some reason.

4      Q.    I was going to make that

5  clarification.  I'll represent there are

6  documents like this.

7      A.    Okay.

8      Q.    There are similar documents, but

9  kind of the same focus, so to speak.

10          So you -- perhaps in Mr. Briscoe's

11  deposition -- have you ever encountered this

12  document professionally as an employee of DDM?

13      A.    I may have, yes.

14      Q.    Okay.  And part of your job duties

15  and responsibilities is to get documents like

16  these and say, "Okay, this is what we need to

17  do," correct?

18      A.    Correct.

19      Q.    Okay.  So on the first page of the

20  document --

21          MR. JOHNSON:  I just want to point

22      out, there's multiple documents in

23      this -- in this exhibit.

24          MR. HAWKINS:  There are?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. JOHNSON:  Well, I see a letter

 2         dated December 27th, 2007, a letter

 3         dated February 7, 2007, and a letter

 4         dated September 27, 2006.

 5              MR. HAWKINS:  I should dock my

 6         paralegal her bonus, but I don't know

 7         why that is.  It's the -- thank you for

 8         that clarification.

 9              MR. JOHNSON:  I'm not trying to

10         mess up your paralegal's bonus, but

11         there are three of them together.

12              MR. HAWKINS:  In fact, if you

13         could, at least for the operative

14         exhibit, do you mind taking -- the first

15         two pages --

16              MR. JOHNSON:  You didn't intend

17         that?

18              MR. HAWKINS:  Exactly.  I don't

19         know why it's there.  I don't know what

20         happened.

21              MR. JOHNSON:  Okay.

22              MR. HAWKINS:  But the one thing I

23         do know is this is the only -- the two

24         pages of December 27 is the only thing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I'm interested in.
 2   BY MR. HAWKINS:
 3         Q.    So do you recall if, as an
 4   employee -- not in preparation of litigation or
 5   anything -- of DDM who reviews documents like
 6   this, if you ever reviewed this document or one
 7   like it?
 8         A.    I may have.  I mean, one thing --
 9   I mean, in reading the first paragraph, it seems
10   as if this letter is being sent to every entity
11   in the U.S. registered with the DEA, okay.  So
12   it's safe to say that that went to Discount Drug
13   Mart.  I just don't know to whose attention.
14              Now, I could tell you that in
15   2007, I don't believe I was signing off on our
16   DEA license.  So I'm just saying that this
17   may -- I don't know how this came.
18         Q.    Sure.
19         A.    It could have came to the
20   attention of that person whose name it was, and
21   I may not have seen it, or it could have been we
22   made copies and it did come to me.  I don't
23   know.
24         Q.    I appreciate that.  And to be
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    clear, I'm not asking for precision.  I'm just

2    asking what you remember.

3            A.    Okay.

4            Q.    If it wasn't you, it would likely

5    be Mr. Nameth, correct?

6            A.    Yes.

7            Q.    Okay.  And in fact, I think

8    earlier you seemed to testify that, you know,

9    this end kind of was more on Mr. Nameth's

10   bailiwick, correct?

11           A.    Correct.

12           Q.    So he might be the more

13   appropriate individual to have memory of this

14   document?

15           A.    Perhaps, yes.

16           Q.    Perhaps, okay.  Thank you.

17                 Directing your attention to the

18   third full paragraph starting with "The

19   regulation."  Are you with me so far?

20           A.    Yes.

21           Q.    All right.  "The regulation also

22   requires that the registrant inform the local

23   DEA division office of suspicious orders when

24   discovered by the registrant."
```

```
 1                    How do you interpret that?

 2                    MR. JOHNSON:  Objection.

 3          A.    I mean, just what it says there,

 4    that if there is a suspicious order, that we

 5    should notify the DEA.

 6          Q.    Okay.  Then the next -- two

 7    sentences down it says, "Registrants must

 8    conduct an independent analysis of suspicious

 9    orders prior to completing a sale to determine

10    whether the controlled substances are likely to

11    be diverted from legitimate channels."

12                    How does DDM do that?

13          A.    We currently have a process right

14    now where we -- again, going back to our

15    reports, but if you want to focus on the -- we

16    have the six-week average, and then we have the

17    rolling 12-month report.  And anything that

18    shows up as a -- you know, on that report at

19    that particular point is considered an anomaly,

20    so there might be -- this requires human

21    invention in terms of looking at it,

22    challenging, trying to figure out why that

23    number is where it's at.

24                    We talked about before, maybe it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    a product where, you know, we're bringing into
2    our warehouse now.  So there's volume, or it
3    could be a variety of reasons.  We could be --
4    it could be as simple as a -- we're in a new
5    network that we weren't before and our
6    competition is not in that network and now we
7    have a bunch of lives that are migrating to our
8    store.  That could create a lift.
9              So there's a variety of things.
10   So we would go ahead through that.  Again, if we
11   could not resolve the oddity at hand, we would
12   then go ahead and send that form.  And that form
13   would be completed by a pharmacist with regard
14   to trying to explain why that number resides
15   where it is.
16             And based on the pharmacist's
17   answer, there would be a determination at that
18   particular point if we had a suspicious order.
19   That was our interpretation.
20        Q.   Okay.  Please turn to the second
21   page.  I'll read you the second sentence from
22   the top.  "For example, a system that identifies
23   orders as suspicious only if the total amount of
24   a controlled substance ordered during one month
```

Highly Confidential - Subject to Further Confidentiality Review

1    exceeds the amount ordered the previous month by

2    a certain percentage or more is insufficient."

3              Why is the system that you just

4    described for me not insufficient under that

5    interpretation?

6              MR. JOHNSON:  Objection.

7         A.    If you're referring then to the

8    six-week average, that could probably be a

9    situation where, okay, that statement may be

10   tied to that.  Again, that wasn't our only --

11   part of our SOMS program.  That was another

12   spoke that we had, another set of eyes on the

13   drugs both at the store level and at the

14   distribution center.

15             But what we used was a rolling

16   12-month average, and I think -- if I'm -- the

17   way I read this -- again, I could be wrong -- is

18   that it's a month-to-month comparison.  We were

19   at least using a 12-month comparison to identify

20   an outlier.

21        Q.    Okay.  So you're saying because

22   it's 12 months instead of a single month?

23        A.    Yes.  And, again, that, at the end

24   of the day, wasn't the only thing that, you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    know -- I mean, we were still the human piece

 2    that would determine whether it was suspicious

 3    or not.

 4           Q.    The human piece?

 5           A.    Well, just evaluation of the data.

 6    Pharmacists then going in -- Jason or Tom going

 7    in to run reports, trying to recuse that it's --

 8    that it's not an anomaly but a suspicious order

 9    so ...

10           Q.    And earlier remember we talked

11    about the contrast between the six-week and the

12    12-month cycle, and you agreed with me that the

13    12-month cycle is retroactive as opposed to

14    proactive, right?  And that's accurate

15    testimony?

16           A.    Yes.

17                 MR. JOHNSON:  Objection.

18           Q.    Thank you.

19                 We're at 12, which I'm sorry I

20    forgot.  DDM -- Bates number DDM 440510.  Let me

21    know when you think you're ready to answer

22    questions about this document, sir.

23           A.    Okay.

24                            - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          (DDM-Ratycz Exhibit 12 marked.)

 2                    -  -  -

 3   BY MR. HAWKINS:

 4          Q.    Are you ready?  Now, if you

 5   remember, towards the beginning of this

 6   deposition, I even -- I showed you a document

 7   and this is the kind of document I showed you,

 8   correct?

 9          A.    Yes.

10          Q.    Okay.  At the front of this

11   document, it says, "The DEA has requested that

12   Discount Drug Mart pharmacy operations maintains

13   records of controlled substances, purchases that

14   exceed an average of purchases calculated from

15   the previous 12 months or that deviate

16   substantially from national average per month."

17                First of all, where has -- when

18   has the DEA told DDM that?

19          A.    Again, I would defer to Tom in

20   that situation only because I think of when this

21   form was developed was before I was moved up.  I

22   would actually complete these at store level.

23   So it was before my time.  So I don't know if

24   there was dialogue with the DEA at that
```

Highly Confidential - Subject to Further Confidentiality Review

1    particular point, and I can't speak to that.

2        Q.    So tell me if I'm misstating your

3    testimony.  So it's possible it may exist, you

4    just don't know where it exists?

5        A.    I'm sorry.  I must have

6    misunderstood.

7        Q.    The background for -- the DEA --

8        A.    Oh, yes.

9        Q.    It's possible that the DEA gave a

10   directive like that.  But as you sit here today,

11   you don't know where that directive came from?

12       A.    Correct.

13       Q.    All right.  Thank you.

14             And then it says, "That deviate

15   substantially from the national average."

16             How does DDM take the national

17   average into account for monitoring suspicious

18   orders?

19       A.    We don't have a national average.

20       Q.    Okay.  So here it says the DEA

21   requires that you do that, right?

22       A.    Yes.

23       Q.    All right.  And you don't, right?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Now, what is the drug that is

 2    listed on here?

 3              A.    This is hydrocodone.

 4              Q.    And I know -- what kind of family

 5    of drugs is that?

 6              A.    This would be probably a

 7    Schedule IV.  I mean, it's a

 8    hydrocodone/acetaminophen combination product

 9    like a Vicodin.

10              Q.    Fair to say it's a controlled

11    substance?

12              A.    Oh, I'm sorry.  Yes.

13              Q.    Sorry.  All right.  And then it

14    lists the average monthly purchase, and then it

15    says the bottles that were ordered, correct?

16              A.    Yes.

17              Q.    You have any -- I mean, what

18    percentage increase would you estimate that to

19    be?

20              A.    It's a big increase.

21              Q.    It's 400 percent?  I'm --

22              A.    Yes.

23              Q.    Like I said, math is not my --

24              A.    Mine either, but yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    All right.  So we described this

2       process, okay, you -- something is flagged,

3       which is, this is what happened, right?

4              A.    Mm-hmm.

5              Q.    Okay.  And then it kind of goes up

6       the chain, and then a pharmacist gets an

7       explanation.  Are we on the same page so far?

8              A.    Mm-hmm, yes.

9              Q.    And that's what happened here?

10             MR. JOHNSON:  He's saying "mm-hmm"

11             I was just going to correct -- remind

12             him it's better to say yes or no.

13             A.    Yes.

14             Q.    All right.  Can you explain this

15      explanation to me?

16             A.    It sounds like -- it sounds like

17      patients are switching to a lower dose Tylenol.

18      So this physician who is writing, and so hence

19      what was 3.1 is now increased, because he's

20      going to a low dose Tylenol formulation.

21             Q.    Okay.  But to me if you're going

22      to a low dose Tylenol, that means less of the

23      order, correct, rather than more, right?

24             A.    Oh, no, not really.  Typically the
```

1   dosage would stay the same.  Dosage units would

2   stay the same.

3           Q.    Can you -- I'm sure you're right.

4   I just -- please explain this to me.

5           A.    Oh.  So, again, I think this

6   speaks to the issue of Tylenol.  So there was

7   worry about Tylenol toxicity by the FDA, so it

8   required that some of the hydrocodone

9   formulations -- this obviously occurred before

10  that FDA requirement to reformulate products

11  with lower acetaminophen.

12               As I read this, his patients are

13  switching to low dose Tylenol formulations.  So

14  the hydrocodone content might be the same, but

15  the acetaminophen component is less.

16          Q.    And hydrocodone is in Tylenol?

17          A.    Hydrocodone is the -- no.  That's

18  the control.

19          Q.    That's the control.

20          A.    Yes.

21          Q.    Can you -- I mean, I think I

22  understand but can you break it down just for --

23          A.    Right.  So I'm sorry.  This drug

24  contains 7 and a half milligrams of hydrocodone

1    and 500 milligrams of acetaminophen.

2           Q.    I see.  So the explanation is

3    because of the change in the Tylenol structure,

4    that there are more units ordered?

5           A.    I don't think it would be more

6    units because what would -- the dose -- so, in

7    other words, if you were taking one tablet three

8    times a day of the old formulation, and we

9    switched you to the low dose, you would take

10   one -- you could take one a little bit more or

11   you would still take the same amount.

12          Q.    All right.  And that's -- therein

13   lies my confusion, because I think I understand

14   what you're saying, and what I don't understand

15   is how that can explain for a 400 percent

16   increase?

17          A.    Again, I didn't do the -- I'd have

18   to look at this more and maybe run more -- there

19   could have been more reports that were run.

20          Q.    All right.  But you would agree

21   that there's at least another explanation that

22   is required from this?

23          A.    Well, I mean, I -- it says here

24   that the patients are switching to a lower

```
 1    dose -- I mean, so part of that makes sense.

 2          Q.    But the 400 percent -- I mean,

 3    from your explanation of you might be an extra

 4    tablet, there's got to be more math there

 5    somewhere to explain that, you would agree,

 6    correct?

 7          A.    Perhaps.

 8          Q.    Can you think of another

 9    explanation, besides not more math?

10          A.    Again, I didn't run this.  I

11    didn't work this report, so --

12          Q.    All right.  Well, let's just break

13    that down.  You don't -- I agree you didn't

14    write this report, but you --

15          A.    No.  I'm just saying I didn't work

16    the report in terms of me working it on a

17    daily -- on a monthly basis to a point where I

18    had a system in place, me personally.

19          Q.    Correct.

20          A.    So I can't speak to that entire

21    process as far as the exceptions or what

22    additional they might have done or to how this

23    was filled, or how it was determined that it was

24    not suspicious.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    But these type of documents are

 2     something that you're used to working with,

 3     correct?

 4              A.    I've seen them before, yes.

 5              Q.    And you're used to interpreting

 6     them?

 7              A.    No, no.  Not this specific one, I

 8     didn't interpret.  I interpreted one where we

 9     had the increase in a medication that I talked

10     about.  Yeah, I remember that.

11              Q.    Okay.  But you're used to having

12     documents like this, doing the follow-through

13     and kind of supervising this process, right?

14              A.    I don't understand the question.

15     You're asking me if I used these forms.  No, I

16     did not.  Am I aware of them?  Yes.

17                    I'm not sure if I understand the

18     question, I guess.

19              Q.    Sure.  I'm seeing if I can break

20     it down in a manner that -- my understanding

21     is -- and perhaps I misunderstood your

22     testimony -- is you're part of the supervisory

23     process for these forms.  When a suspicious

24     order is potentially identified, these forms are
```

```
 1    filled out and you're part of the process in

 2    which these forms are created?

 3            A.    I could be, yes.

 4            Q.    Okay.  And occasionally, as part

 5    of the process in that, you see these forms,

 6    correct?

 7            A.    I may if it's brought to my

 8    attention.

 9            Q.    You recall seeing these forms in

10    the past, correct?

11            A.    I've seen these forms.

12            Q.    Okay.  And to see them and to

13    exercise some supervisory control over them, you

14    have to have an idea how they work, right?

15            A.    Yes.

16            Q.    Okay.  Now, I'm now handing you

17    what is marked as Plaintiff's 13.

18                        - - -

19            (DDM-Ratycz Exhibit 13 marked.)

20                        - -

21            Q.    Oh, I'm sorry, Bates number

22    440512.  And obviously you can be more precise

23    in this, but this -- right here we've got a

24    greater than 500 percent increase, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Correct.

 2            Q.    Okay.  Can you explain the

 3    explanation from this?

 4            A.    No, I cannot.

 5            Q.    Do you know who might be able to?

 6            A.    This would have been -- this would

 7    have been Tom.

 8            Q.    And at the very -- there might be

 9    an explanation for this, but you can't determine

10    what the explanation is from this form; is that

11    accurate?

12            A.    Yes.

13            Q.    Okay.  So if you came across this

14    in your supervisory control -- like "Someone's

15    got a complaint about this one, we're worried

16    about it."

17                  How would you go about resolving,

18    you know, what the explanation is here?

19            A.    I would sit down with Tom, yeah.

20    Or Jason.

21            Q.    And I understand clerical

22    deficiencies happen, but are physicians --

23    pharmacists expected to clearly state what the

24    explanation is on these forms?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     They should, yes.

2                      - - -

3          (DDM-Ratycz Exhibit 14 marked.)

4                      - - -

5          Q.     We're at Plaintiff's 14.

6    DDM440516 is the Bates number.

7               Now, the language on here is hard

8    to write [sic].  But if you can, try to read it

9    to yourself and let me know if ...

10              Did you complete it?

11         A.     Yeah.

12         Q.     All right.  Again, we've got a

13   500 percent increase here that obviously exceeds

14   the monthly average.  And what I see here is

15   spike in prescriptions filled is the first

16   sentence.  Do you agree with me?  The

17   handwriting is not terribly good, but I'm pretty

18   sure that's what it says.

19              Do you agree?

20         A.     Yes.

21         Q.     Isn't that the whole point?

22         A.     Excuse me?

23         Q.     Isn't that the whole point of

24   why -- I mean, a spike in prescriptions filled,

1    that's the whole point of a suspicious order to

2    begin with.  I mean, that's -- that's what it --

3    that's what this process is designed to catch,

4    correct?

5              MR. JOHNSON:  Objection.

6         A.   If you can justify why it's

7    spiked, then I would say no.  For example, if

8    you had a situation where you had a new

9    pharmacy -- or excuse me -- a new physician that

10   opened up next door, or you had a pharmacy that

11   closed down, or you had new patients, new lives

12   coming from a plan that you didn't have before,

13   you would see a spike in prescriptions filled,

14   you would be able to determine that that anomaly

15   or that spike is not suspicious in that nature.

16        Q.   Okay.  Do you see that -- you read

17   the report.  Do you see that on there as an

18   explanation?

19        A.   No, I do not.  But I did not

20   complete this, so there might be more to that

21   story.

22        Q.   Okay.  There might be.  And there

23   might be a benign explanation.

24        A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     But fair to say it's, at the very

2    least, not on here, correct?

3          A.     Yes.

4          Q.     And it's fair to say spike in

5    prescriptions filled is definitely not an

6    excuse, right?

7          A.     Correct.

8                          - - -

9          (DDM-Ratycz Exhibit 15 marked.)

10                         - - -

11

12         Q.     We are at 15, I think, and Bates

13   number 440405.

14                You know what?  Have you ever seen

15   this document before?

16         A.     Am I on the right one?  I'm on 15,

17   right?

18         Q.     Correct.

19         A.     I have -- I've not seen this one.

20         Q.     I'll ask you one question.  That

21   will probably do it.  Can you read the

22   handwriting?

23         A.     I can't.  I was just going to say

24   I was looking at the screen and looking on this.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    We'll just skip to the next one.

2    Let's go to 16.

3                          - - -

4              (DDM-Ratycz Exhibit 16 marked.)

5                          - - -

6              Q.    And we're at DDM440505.

7                    Have you ever seen this document

8    before, sir?

9              A.    Yes, I did.

10             Q.    Tell me the context in which you

11   saw it.

12             A.    I saw it during -- through Jason

13   Briscoe's deposition.

14             Q.    Okay.  Had you seen it before that

15   time?

16             A.    No.

17             Q.    Okay.  And you read the colloquy

18   about that during the deposition, too, as well,

19   correct?

20             A.    Yes.

21             Q.    All right.  You'd agree it's just

22   under a 400 percent increase?

23             A.    Yes.

24             Q.    Okay.  And what's the explanation
```

Highly Confidential - Subject to Further Confidentiality Review

1    given here?

2           A.    You had two or three large

3    prescriptions for larger amounts than usual.

4    Quantities were verified with physician.

5           Q.    Okay.  Is that an explanation

6    that's satisfactory?

7           A.    It could be, yes.

8           Q.    I see.  Earlier we talked about

9    problematic physicians that, you know, some

10   overprescribed.  How do we know the physician

11   isn't one of those --

12          A.    I don't know that.  However, I'm

13   going to make the assumption that when Tom did

14   his diligence on this, he ran a report, looked

15   at the physician.  And I could tell you that the

16   pharmacist that's been there -- the pharmacist

17   that worked for us for 40-plus years and had a

18   very good reputation with us.  So maybe that's a

19   little bit of knowing our customer from that

20   perspective may help, but I would -- but

21   definitely we would need to look at the

22   physician before we could make that

23   determination.

24          Q.    So at the very least, there would

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have to be some kind of effort to determine what
 2    physician we're dealing with?
 3           A.    I would think so, yes.
 4           Q.    Thank you.
 5                      - - -
 6           (DDM-Ratycz Exhibit 17 marked.)
 7                      - - -
 8           Q.    All right.  Mr. Mulligan will now
 9    be handing you Plaintiff's 17.
10                 I'll give you a chance to review
11    it.  But before you do, have you seen this
12    before?
13           A.    Yes.
14           Q.    Okay.  I'll let you review it.
15    Let me know when you're done with your review.
16                 Bates number -- can you tell me
17    the Bates number?
18           A.    Actually, I don't know if I saw
19    this one.  I probably did, yeah.  But let me
20    read it, if you don't mind.
21                 MR. HAWKINS:  Could you read the
22           Bates number?  My Bates number is --
23                 MR. JOHNSON:  Yes.  It's
24           DDM00178756.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. HAWKINS:  Thank you.

 2   BY MR. HAWKINS:

 3          Q.    And you can read the whole part if

 4   you want.  I'll tell you right now the only

 5   thing I'm going to direct you to is the nature

 6   of the presentation, the person on the e-mail

 7   chain, and on page 3, the part about the

 8   opioids.  But please feel free to read the whole

 9   document if you prefer.

10          A.    If you want to direct me there,

11   I'll kind of work that way --

12          Q.    Sure.

13          A.    -- versus reading.  There's a lot

14   here to read, so ...

15          Q.    Sure.  Whatever you want to do.

16   I'm just trying to help you.

17                 Do you see the highlighted part?

18          A.    And it's on page --

19          Q.    3, the third page of the --

20          A.    Okay.

21                 Okay.

22          Q.    Okay.  Earlier you indicated you

23   thought you had seen this before.  Is that

24   accurate?
```

1            A.     I may have, yes.

2            Q.     Do you recall the context in which

3    you saw it?

4            A.     No, I don't.

5            Q.     Okay.  Was it in relation to this

6    litigation?

7            A.     No.

8            Q.     Okay.

9            A.     No, it was not.

10           Q.     So you likely saw it in your

11   capacity as a DDM employee?

12           A.     Yes.

13           Q.     And this is an e-mail that was to

14   Mr. McConnell who's here with us today, correct?

15           A.     Yes.

16           Q.     And on the first page, it says,

17   "McKesson Investor Presentation."

18           A.     Yes.

19           Q.     Can you -- do you have any idea

20   what that is?

21           A.     I assume that's to their

22   shareholders potentially, and I think the

23   individual that sent this is basically somebody

24   who sits on those calls, listens, and takes

Highly Confidential - Subject to Further Confidentiality Review

```
 1   notes from any of the key players in the

 2   pharmacy industry, so ...

 3          Q.    And then directing yourself to the

 4   Opioids, it says, "Over the" -- I'm sorry.  Are

 5   you there?

 6          A.    Yes.

 7          Q.    "Over the last couple years, we

 8   have reported hundreds of thousands of

 9   suspicious orders and customers."

10                It's reasonable to assume reported

11   means to the DEA?

12                MR. JOHNSON:  Objection.

13          A.    Yes, I would think so.

14          Q.    Okay.  How many reports has DDM

15   made to the DEA?

16          A.    We have not made any.  We have not

17   had a suspicious order.

18          Q.    Okay.  When you reviewed this

19   e-mail, did you say, "Well, wait a minute.

20   Hundreds of thousands reported.  We haven't

21   reviewed any.  Is there a discrepancy there

22   or" -- did you have any thought like that?

23          A.    No.  That's assuming I even read

24   this.  But from a standpoint of reading it now,
```

```
 1   McKesson is ginormous.  They're large.  So, I

 2   mean, when they're reporting hundreds of

 3   thousands suspicious orders, I don't know who

 4   their customers are.  Okay.  I can only speak

 5   about Discount Drug Mart with 74 stores, and I

 6   can only speak about that.  So that number --

 7   I'm not shocked.  I know McKesson is very, very

 8   large in the wholesale world and has tons of

 9   customers.

10        Q.   Okay.  McKesson aside, I mean, you

11   do have 74, right?

12        A.   Yes.

13        Q.   Do you find it remarkable that

14   not -- with 74, that not once there was

15   something suspicious about a sale?  I mean, can

16   you explain that to me?

17             MR. JOHNSON:  Objection.

18        A.   We had anomalies, and we had

19   evidently taken those anomalies and run them

20   through the process and felt comfortable that

21   they were not suspicious orders.

22             Again, if you point to our

23   distribution center, we -- I mean, we were

24   pulling from multiple sources, from Cardinal or
```

Highly Confidential - Subject to Further Confidentiality Review

1   from whoever our wholesaler was at that time.

2   We weren't just -- all our controlled drugs

3   weren't coming out of our pharmacy warehouse.

4              So -- and, again, I speak to the

5   fact that it's about knowing your customer.

6   It's about, you know, making sure they have a

7   DEA number, making sure that they -- they're

8   practicing pharmacy correctly, and so on and so

9   forth.

10             From a wholesaler perspective,

11  that is extremely difficult to do.  At the end

12  of the day, all they know is an address, okay,

13  and the dispensing data that they may have.

14  They have no idea where that pharmacy is, what's

15  around it, and so on and so forth.

16             So from that standpoint, that's

17  why I would think that we would probably have a

18  lesser amount, significantly lesser, if any at

19  all, suspicious orders.

20        Q.   Okay.  I mean, you would agree,

21  though, there's nothing about people who abuse

22  opioids that would make them go to CVS as

23  opposed to DDM, correct?

24        A.   I'd say that's true.

1        Q.    Okay.  Now, I don't want to

2  mischaracterize your testimony, but a bit

3  earlier you said, "You know, a lot of the drugs

4  we get from Cardinal and other distributors."

5            Do you remember that just like a

6  minute ago?

7        A.    Yeah.

8        Q.    Can you explain the relevancy of

9  that?

10        A.    I'm just saying that, you know,

11  we're -- we're not pulling -- we're pulling a

12  small portion of our controls through our DC,

13  and we're pulling another portion through the

14  wholesaler.

15            So, I mean, just to do basic math

16  on 60 stores over a ten-year period, we deliver

17  to our stores once a week, okay?  Wholesaler, we

18  have five-day delivery.

19            So in that context, you're going

20  to have 150-, 160,000 deliveries to the stores

21  potentially going suspicious.  I don't know.

22  But we have far less orders is what I'm saying

23  going out.

24            And I think there's less SKUs that

1   are going out from a control perspective.  So I

2   think when you're making that comparison, it's

3   not entirely apples to apples.

4           Q.    I see.  And the comparison that

5   I'm making is?  What comparison is not apples to

6   apples?

7           A.    Well, the fact that you're

8   comparing us to McKesson from that standpoint,

9   and the fact that we would not have any

10  suspicious orders.

11          Q.    And I swear to you I'm not being

12  sarcastic here.  This is a genuine question.

13              Are -- is McKesson -- do you think

14  the orders that McKesson has placed are hundreds

15  of thousands of times greater than DDM's orders?

16          A.    I know they're very large, so I --

17  I mean, we have none.  I guess I'm missing that

18  question.

19          Q.    No.  It's -- in other words --

20  you're saying the distinction is because

21  McKesson is much larger --

22          A.    Correct.

23          Q.    -- than DDM?

24              And McKesson has hundreds of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    thousands of suspicious orders that they've

 2    reported, correct?

 3             A.    Correct.

 4             Q.    And I'm wondering if McKesson is

 5    hundreds of thousands of times larger than DDM,

 6    at least in terms of orders placed, if that's --

 7    in other words, does the ratio line up is what

 8    I'm trying to figure out.

 9             A.    I don't know because I --

10                   MR. JOHNSON:  Objection.  You left

11             out one factor.  He also mentioned that

12             we're delivering to our own stores and

13             know our customer.

14                   MR. HAWKINS:  That's fine.

15    BY MR. HAWKINS:

16             Q.    Please answer the question.

17             A.    And, again, I don't know who their

18    customer is.  So when you talk about hundreds of

19    thousands of suspicious orders, if you've got

20    some bad actors in that system, okay, as

21    customers, that number can go way up.

22             Q.    And presumably when a suspicious

23    order is placed, you say bad actor as a

24    customer, that's probably not going to repeat
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    too often, right, because it's turned over to

 2    the DEA, and if there's a real problem there,

 3    that's presumably going to end the problem,

 4    right?

 5            A.    I don't know.  I can't speak to

 6    what the DEA does.

 7            Q.    I see.

 8                  Let's go to 17 -- 18.  I'm sorry.

 9    Mr. Mulligan is going to hand you what has been

10    marked as Plaintiff's Exhibit 18.

11                         - - -

12            (DDM-Ratycz Exhibit 18 marked.)

13                         - - -

14                  MR. HAWKINS:  You know, just to

15            expedite things, hand him 19 as well,

16            please.  And the Bates number are 11545

17            and 13519.  In the interest of time, I'm

18            going to refer to these two

19            collectively.

20                         - - -

21            (DDM-Ratycz Exhibit 19 marked.)

22                         - - -

23    BY MR. HAWKINS:

24            Q.    These are two e-mails.  You're
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    involved in both -- I'm sorry.  One is a letter

 2    and one is an e-mail.

 3         A.    I didn't read the letter yet.  Do

 4    you want me to read the letter?  I'm not sure.

 5         Q.    You're welcome to.  I'm just going

 6    to ask you if you recollect the incident, so

 7    that's --

 8         A.    Okay.

 9               MR. JOHNSON:  These are two

10         different incidents.

11               MR. HAWKINS:  I understand that.

12               MR. JOHNSON:  Okay.

13         A.    Okay.  I thought we were just -- I

14    didn't read Exhibit 19.

15         Q.    You're welcome to.  I'm just going

16    to ask you if you recall the incident.

17         A.    I'd like to read it then.

18         Q.    Whatever you'd like.

19               MR. JOHNSON:  He's got to know

20         what the incident is, I guess, right?

21         Q.    Some might look at it and say,

22    "Oh, yeah, I remember that as" --

23         A.    Okay.

24         Q.    All right.  It's fair to say that
```

Highly Confidential - Subject to Further Confidentiality Review

1    there have been some thefts occurring at DDM

2    throughout the years, correct?

3              A.    Yes.

4              Q.    And that's really not surprising,

5    right?  I mean, as a store -- any time you have

6    74 stores, sooner or later you're going to

7    encounter some bad apples and you're going to

8    see that, right?

9              A.    It can happen, yes.

10             Q.    Okay.  Do you recall -- there are

11   three thefts referenced in these two exhibits,

12   correct?

13             A.    Three?  I only saw two.  I'm

14   sorry.

15             MR. JOHNSON:  You're going to have

16        to maybe point that out to us.

17             THE WITNESS:  Yeah.

18             Q.    It references DDM 35, which I

19   assume is a store, and then DDM 19, which I

20   assume is a separate store.

21             A.    Where is --

22             MR. JOHNSON:  In which?

23             Q.    Do you see the e-mail string --

24   look under September 10, 2013.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JOHNSON:  Yeah.  Exhibit 18?

 2                    MR. HAWKINS:  Yeah.

 3    BY MR. HAWKINS:

 4          Q.    It's fair to say that represents

 5    two separate stores, right?

 6          A.    Yes.

 7          Q.    Okay.  So we're talking about

 8    three thefts between these two documents,

 9    correct?

10          A.    Correct.

11          Q.    Now, the only thing that I find

12    remarkable -- or not remarkable.  The only thing

13    I want to understand about these thefts is,

14    remember your inventory system that we talked

15    about?  Do you have any knowledge, as you sit

16    here today, why your inventory system was not

17    able to pick that up -- pick them up, or maybe

18    it did pick them up.  I mean, do you -- I'd like

19    to know how these thefts related to your

20    inventory system's ability to detect the thefts.

21                    MR. JOHNSON:  Okay.  And I'm going

22          to object, only that -- one incident is

23          in 2001, and other two are in 2013.

24                    MR. HAWKINS:  Correct.
```

```
 1                    MR. JOHNSON:  And, I mean, that's

 2          a pretty big span of time between them.

 3                    MR. HAWKINS:  So?

 4                    MR. JOHNSON:  Well -- because

 5          you're asking him what's -- about the

 6          inventory system.  I mean, over a

 7          12-year period, it may be a different

 8          inventory system.

 9                    MR. HAWKINS:  Well, that would be

10          something the witness can explain, is

11          that "We had a different inventory

12          system in 2001, and it didn't detect the

13          theft, and we changed it, and this is

14          why" -- there could be a dozen

15          explanations.

16                    I just want to know from the

17          witness why the inventory systems were

18          not able to detect them.  Or maybe it

19          did.  That's what I'm trying to figure

20          out.

21          A.    I'm sorry.  Does it say what the

22     amount was that was --

23          Q.    The -- in the e-mail, the thefts

24     actually looked somewhat -- pretty large.  I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   mean, granted, I don't know what a large -- but

 2   they reference, you know, significant amounts.

 3          A.    Okay.

 4          Q.    Obviously caught the attention of

 5   Buddy and, you know -- I'm sorry to use a first

 6   name, but the e-mail.

 7          A.    No.  As far as the OxyContin --

 8   I'll speak to that one -- at Store 35 first.

 9   Again, that's a Schedule II, so that's

10   inventoried on a monthly basis.  It should be

11   done on a daily basis as well.  I don't think we

12   had cycle counts going at that time.  But, you

13   know, I -- it would have been caught at some

14   particular point.  I don't know the specifics of

15   when.  It looks like they caught him.

16              It could have -- I don't -- again,

17   I don't know how much he stole here.  Does it

18   say?  I don't see any reference.  It's hard for

19   me to talk about what our inventory is going to

20   catch.  And the key is when, you know, when it

21   happened with regard to the actual pilferage is

22   I guess -- is key to this.

23          Q.    Maybe I can clear things up.  I

24   mean, what I'm hoping happened is these things
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    don't appear to happen too often as evidenced by

 2    the fact I'm using a 2001 and a 2013 event.  So

 3    I imagine they're fairly significant events at

 4    DDM.  Yeah?

 5            A.    Yes.

 6            Q.    And you're kind of involved in

 7    this stuff.  It obviously makes -- so I'm hoping

 8    maybe -- if you don't, that's fine.  It's

 9    perfectly -- you might remember the incidents

10    and say "Aha.  This was a theft back in '01.

11    This was a theft in '13.  This is -- we

12    investigated, and this is what we found."

13                  That's what I'm hoping for.

14    Maybe -- maybe that's not the case, but --

15            A.    I don't recall that much about

16    them, other than I did recall the one about

17    the -- just from a standpoint of the whole

18    scenario of the person at Store 35 with the real

19    bad heroin problem.

20            Q.    Okay.  And that was -- I mean,

21    they -- I don't know how well you read the

22    e-mail, but they seemed to capture a lot of

23    drugs with him, correct?

24            A.    Yes.  I don't know if they were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    all ours though.  I don't -- you know, I'd have

 2    to look at the DEA 106.

 3            Q.    And then it references inventory

 4    count.

 5                  I'm sorry.  I'm talking over you.

 6            A.    Yeah.  I'd have to dig deeper into

 7    that.  I don't recall that.

 8            Q.    Okay.

 9            A.    I recall the event.  I don't

10    recall the specifics as far as how the person --

11    the inventory piece on that, so ...

12            Q.    You would agree with me, though,

13    that is something the inventory count should

14    eventually catch though, right?

15            A.    Yes, unless -- and, again, that's

16    why I brought up the issue of timing, because if

17    it happens at a specific time of when right

18    after a count was done, you know, then it's

19    going to get caught.  It's just not going to get

20    caught right away.

21                  The other piece could be was this

22    an episode of where somebody is just shorting

23    patients as the medication is being counted.

24                  Now, in our stores, our
```

Highly Confidential - Subject to Further Confidentiality Review

1   pharmacists count the C-IIs.  We don't let the

2   technicians do it.  But in that example, you

3   know, like in any other example, or any other

4   pharmacy, a pharmacist may step out to help a

5   patient, may step out to go to the restroom, and

6   now if a patient -- potentially a technician is

7   looking at a -- knows that there's a

8   prescription there that's sitting there, she can

9   take those and take some of those out and short

10  a customer.

11          Q.    Okay.  So to the best of your

12  knowledge, there are two possible explanations.

13  One is timing, and the other is shorting --

14          A.    There could be more.  I'd have to

15  give it some thought, so ...

16          Q.    And I -- I'm not saying there

17  aren't more, but I'm just saying to the best of

18  your recollection right now, you thought of two

19  possible explanations --

20          A.    Yes.

21          Q.    -- right?

22          A.    Yes.

23          Q.    One is -- well, we'll start with

24  shorting patients.  You seem to indicate that's

1    less likely, although possible, because

2    pharmacists usually count the C-II

3    prescriptions, right?

4           A.    Yes.  But, again, a pharmacist

5    will step out and go to the restroom or help a

6    patient.  So there could be a situation where,

7    you know, that -- yeah.

8           Q.    All right.  And, secondly, the

9    timing, what's the longest period of time you

10   think it could go without the inventory system

11   being able to catch it?  I understand you're

12   saying, you know, depending on the time, it

13   might take longer to catch them.  What's the

14   longest imaginable period of time it would take

15   for that accounting system to catch such a

16   problem?

17          A.    On a Schedule II, it would be 30

18   days.

19          Q.    30 days?

20          A.    Yeah.

21          Q.    So if it's longer than 30 days,

22   there's a problem somewhere?

23          A.    There's a problem, yeah.

24                MR. HAWKINS:  We're at 20?  And

Highly Confidential - Subject to Further Confidentiality Review

```
 1              just for the record, we're getting close

 2              to the end.

 3                   THE WITNESS:  Great.

 4                        - - -

 5         (DDM-Ratycz Exhibit 20 marked.)

 6                        - - -

 7   BY MR. HAWKINS:

 8         Q.    And you're welcome to read the

 9   whole bit.  I'll just tell you right now I'm

10   going to question you about item number 2 in the

11   e-mail from you.

12              Oh, I'm sorry.  We're at Bates

13   number 8884.

14         A.    Okay.

15         Q.    So directing your attention to

16   paragraph 2, you state, "I am not sure we want

17   to give them" -- them being the DEA -- "reason

18   to enter our stores."

19              Please explain why you don't want

20   to give the DEA reason to enter your stores.

21         A.    I -- that statement is said in a

22   way that we don't want to do something wrong and

23   have them come into our stores that way, so --

24   does that make sense?  Do you see what I'm
```

```
 1    saying?

 2           Q.    I see.

 3           A.    We don't want -- we want to make

 4    sure we -- I'm not sure we want to give them a

 5    reason in our stores.  In other words, the way I

 6    view is that we wouldn't want to do something

 7    wrong.

 8           Q.    I see.  And following that

 9    sentence, you then state, "Also, pharmacy

10    supervisors continue to see problems with the

11    manual logbooks, ranging from incompleteness and

12    even situations with missing entries."

13                 That doesn't have anything to do

14    with the reason you don't want the DEA to enter

15    your stores?

16                 MR. JOHNSON:  Objection.

17           A.    That partly could be, yes.

18           Q.    You think the DEA would have

19    problems with logs of that nature?

20                 MR. JOHNSON:  Objection.

21           A.    We were -- we were using a system,

22    and the issue became that some of the drivers

23    licenses -- if I recollect, this incidence was

24    not being captured, which was leading to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    incomplete purchases.  So that led to us going

 2    ahead and moving these to the pharmacy is what

 3    we ended up doing.

 4              So yes.  Were there some issues

 5    with pseudoephedrine?  Absolutely.  I don't

 6    think anybody is denying that.  And that's

 7    evident in the fact that we were getting some

 8    issues -- or complaints with the manual logbooks

 9    not being completed properly, and that's why we

10    moved it to the pharmacy.

11         Q.    Okay.  So that's how you addressed

12    the problem, is moving it to the pharmacy?

13         A.    Yes.

14         Q.    When did you address that problem?

15         A.    I don't know.  And based on this

16    e-mail, I would think -- I couldn't tell you.

17         Q.    So, I mean, it would have to be

18    some --

19         A.    Yeah.  I wasn't involved in that

20    process, so ...

21         Q.    It would have to be sometime

22    thereafter, because obviously if it were fixed,

23    then you wouldn't have the concern over the

24    logbooks, right?
```

1          A.     I would think so, yeah.

2                        - - -

3          (DDM-Ratycz Exhibit 21 marked.)

4                        - - -

5          Q.     Handing you what I hope will be

6     the last exhibit, Plaintiff's Exhibit 21.  It is

7     DDM168903.

8          A.     Okay.

9          Q.     All right.  Kind of like this

10    earlier -- an earlier exhibit we talked about,

11    you'd have no reason to dispute that there's

12    several e-mails like this and several

13    notifications like this, right?

14         A.     Correct.

15         Q.     And that would be consistent with

16    the first sentence there, "I guess it's about

17    that time of month," implying it happens

18    regularly, right?

19                MR. JOHNSON:  Objection.

20         A.     It could be a situation where he's

21    sending them all out for his other customers

22    that he has.

23         Q.     I see.  Who is he?

24         A.     That would be Brandon.

```
 1              Q.    Okay.  In any event, you wouldn't

 2     doubt me if I told you I could produce several

 3     more like this?

 4              A.    I don't dispute that, no.

 5              Q.    Okay.

 6              A.    I'm just saying that -- when he

 7     says "it's about that time of month," I'm just

 8     saying something tells me he's probably sending

 9     others at that time of the month to other

10     customers, and it wasn't necessarily a statement

11     that was made about Discount Drug Mart.  That's

12     all.

13              Q.    That's a fair characterization.

14                    Describe what this is.  What's

15     being conveyed here?

16              A.    It's an outlying order.  And so

17     what's happening here is the wholesaler is

18     notifying us that we have a store that has

19     exceeded its threshold for purchases, and the

20     order is going to be cut.  However, it does go

21     on to say if there's been any change in the

22     business model, you know, to let them know.

23              Q.    Okay.  When you see these e-mails,

24     does it raise concern that this might be a
```

1    diversion here?  I mean, when you see increases

2    like that, it's being triggered -- that

3    Cardinal's trip wire is being set off that this

4    might be a diversion?

5            A.    Yes.  Yes, it could be.

6            Q.    Okay.  Tell me everything DDM has

7    done to investigate to go forward to make sure

8    that that's not the case?

9            A.    So in this example, I think it

10   goes back to speaking about knowing your

11   customer.  If I'm not mistaken, there was a

12   network access issue by some of our competition

13   in that area, one large chain, and business at

14   that specific pharmacy grew.  And I would

15   suspect that that grew on controls and it grew

16   on non-controls, just as a byproduct of that

17   double digit growth.

18           Q.    I see.  Do you know if there --

19   okay.  So you're recalling a specific instance

20   here; are you not?

21           A.    I think so, yes.

22           Q.    Is there any documentation of that

23   explanation like, "Okay.  We've conducted an

24   investigation, and we came up with that

Highly Confidential - Subject to Further Confidentiality Review

 1    explanation, and here it is."

 2              Would I be able to find that in

 3    the records anywhere?

 4        A.    No.

 5        Q.    Why not?

 6        A.    Because, again, I think it's

 7    basically us looking at that and making that

 8    inference and that determination and knowing our

 9    customer, so ...

10              This is -- this is one of 1,000

11    stores, okay.  I wouldn't be able to tell you

12    much about Store 18.  I could tell you where

13    Store 18 is.  I can tell you exactly -- not from

14    that time period, but I could tell you what

15    their business, like, is today.  So if I got

16    this order or this e-mail today, I'd be able to

17    speak to the business model at hand as a

18    reference right there.

19              At that particular point, I might

20    make the determination that, yes, we're seeing

21    new lives that we have access to that we didn't

22    have before.  It could be a variety of other

23    reasons.  Whatever those may be, they make the

24    determination that, no, okay, I'm not going to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    worry about that store at that particular point.

 2              MR. HAWKINS:  I see.  All right.

 3         Mr. Ratycz, if you could give me ten

 4         minutes, if that, I'd like to go over my

 5         notes with my colleague, and likely

 6         we're done, but not so long.

 7              THE WITNESS:  Sure.

 8              MR. JOHNSON:  Okay.  We'll get up

 9         and stretch a little bit.

10              THE VIDEOGRAPHER:  The time is now

11         1:26.  Going off the record.

12              (Recess taken.)

13              THE VIDEOGRAPHER:  Okay.  The time

14         is now 1:30.  Back on the record.

15    BY MR. HAWKINS:

16         Q.    Mr. Ratycz, we were talking about,

17    you know, knowing your individual pharmacist and

18    how that aids -- allegedly aids DDM's ability to

19    determine whether diversions are taking place.

20              Is there any effort to make sure

21    that the pharmacists act uniformly with respect

22    to diversions?

23              MR. JOHNSON:  Objection.

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.     What is that effort?

2              A.     I think part of that is our

3    controlled substance quality assurance program.

4    And even before that, you know, our procedure on

5    theft reporting, okay, our requirement to -- for

6    inventory counts and things along that line.

7    So, I mean, there were processes in place, I

8    think, to bring -- to make sure that there was

9    consistent effort to thwart theft.

10             Q.     Oh, theft reporting or diversion?

11             A.     Yeah.

12             Q.     Okay.  So theft.  How about with

13   regard to problematic prescribers?

14             A.     Yes, I think so.

15             Q.     And how is that handled uniformly?

16   What procedures are in place to make sure that's

17   handled --

18             A.     That was discussed at every single

19   pharmacist meeting we ever had.  And, again, it

20   goes back to my original testimony where we had

21   state board in, and state board every meeting,

22   and we talked about that.  And we talked

23   about -- you know, we told our pharmacists if

24   they never felt comfortable in filling a
```

Highly Confidential - Subject to Further Confidentiality Review

1   prescription, they didn't have to.  And our

2   pharmacists were good at either reporting to us

3   or reporting to the state board.  And they

4   worked with investigators many times.

5           Q.    And earlier you indicated that

6   pharmacists might be reluctant to fill a

7   prescription that they otherwise would fulfill.

8   Can you explain that again?

9           A.    Say that again.  I'm sorry.

10          Q.    Yeah.  Earlier when we had the

11  break and, you know, I had a line of questioning

12  I had -- and I forgot about it until you just

13  said that -- you indicated that there are

14  instances where pharmacists were reluctant to

15  fill prescriptions.  What are you referring to

16  with that?

17          A.    I think pharmacists in general are

18  always reluctant to fill controlled substances.

19  I just think that's the nature of the beast.  I

20  just think that's gotten that way, and it's even

21  more so now.  That's all.  That's all I was

22  trying to make in that comment.

23               MR. HAWKINS:  Fair enough.  I have

24          no further questions unless there's

Highly Confidential - Subject to Further Confidentiality Review

```
 1           redirect.
 2               MR. JOHNSON:  I don't think so.
 3               MR. HAWKINS:  Thank you,
 4       Mr. Ratycz.  I appreciate your time.
 5               THE VIDEOGRAPHER:  The time is now
 6       1:33.  This concludes the deposition.
 7       Going off the record.
 8          (Signature not waived.)
 9                    - - -
10          Thereupon, at 1:33 p.m., on Friday,
11   December 21, 2018, the deposition was concluded.
12                    - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE

 2   STATE OF OHIO        :

                             SS:

 3   COUNTY OF _____:

 4

 5         I, PETER RATYCZ, do hereby certify that I

 6   have read the foregoing transcript of my

 7   cross-examination given on December 21, 2018; that

 8   together with the correction page attached hereto

 9   noting changes in form or substance, if any, it is

10   true and correct.

11                       _____

                        PETER RATYCZ

12

13         I do hereby certify that the foregoing

14   transcript of the cross-examination of PETER RATYCZ

15   was submitted to the witness for reading and signing;

16   that after he had stated to the undersigned Notary

17   Public that he had read and examined his

18   cross-examination, he signed the same in my presence

19   on the _____ day of _____, 2018.

20

                        _____

21                      NOTARY PUBLIC - STATE OF OHIO

22

23   My Commission Expires:

24   _____, _____.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2   STATE OF OHIO        :
                                SS:
 3   COUNTY OF FRANKLIN   :
 4           I, Carol A. Kirk, a Registered Merit
     Reporter and Notary Public in and for the State of
 5   Ohio, duly commissioned and qualified, do hereby
     certify that the within-named PETER RATYCZ was by me
 6   first duly sworn to testify to the truth, the whole
     truth, and nothing but the truth in the cause
 7   aforesaid; that the deposition then given by him was
     by me reduced to stenotype in the presence of said
 8   witness; that the foregoing is a true and correct
     transcript of the deposition so given by him; that the
 9   deposition was taken at the time and place in the
     caption specified and was completed without
10   adjournment; and that I am in no way related to or
     employed by any attorney or party hereto or
11   financially interested in the action; and I am not,
     nor is the court reporting firm with which I am
12   affiliated, under a contract as defined in Civil Rule
     28(D).
13
             IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of office at Columbus, Ohio
     on this 27th day of December 2018.
15
16
17
18                         _____
                           CAROL A. KIRK, RMR
19                         NOTARY PUBLIC - STATE OF OHIO
20   My Commission Expires:  April 9, 2022.
21                      - - -
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2    I, PETER RATYCZ, have read the transcript

      of my deposition taken on the 21st day of December

 3    2018, or the same has been read to me.  I request that

      the following changes be entered upon the record for

 4    the reasons so indicated.  I have signed the signature

      page and authorize you to attach the same to the

 5    original transcript.

 6    Page  Line  Correction or Change and Reason:

 7    ____  ____  _____

 8    ____  ____  _____

 9    ____  ____  _____

10    ____  ____  _____

11    ____  ____  _____

12    ____  ____  _____

13    ____  ____  _____

14    ____  ____  _____

15    ____  ____  _____

16    ____  ____  _____

17    ____  ____  _____

18    ____  ____  _____

19    ____  ____  _____

20    ____  ____  _____

21    ____  ____  _____

22    ____  ____  _____

23    ____  ____  _____

24    Date _____  Signature _____
```