```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF OHIO

3                      EASTERN DIVISION

4

5

6    *****************************

7    IN RE:

8    NATIONAL PRESCRIPTION OPIATE    MDL NO. 2804

     LITIGATION

9

     This document relates to:      Case No. 17-MD-2804

10

     All cases                      Hon. Dan A. Polster

11

     *****************************

12

13            HIGHLY CONFIDENTIAL - SUBJECT TO

14             FURTHER CONFIDENTIALITY REVIEW

15              VIDEOTAPED DEPOSITION OF:

16                   STEVE REARDON

17               ALOFT BOSTON SEAPORT

18                 401-403 D Street

19               Boston, Massachusetts

20          November 30, 2018      9:03 a.m.

21

22               Darlene M. Coppola

23             Registered Merit Reporter

24             Certified Realtime Reporter
```

```
 1    APPEARANCES:

 2    Representing the Plaintiffs:

 3        LEVIN PAPANTONIO THOMAS MITCHELL

 4        RAFFERTY PROCTOR PA

 5        316 South Baylen Street

 6        Pensacola, FL 32502

 7        BY:  MICHAEL PAPANTONIO, ESQUIRE

 8             ARCHIE C. LAMB, JR., ESQUIRE

 9             CAROL G. MOORE, CLI

10             ANNA L'HOMMEDIEU, PARALEGAL

11             LAUREN E. MASSEY, PARALEGAL

12        T 850.485.4160

13        E mpapantonio@levinlaw.com

14          alamb@levinlaw.com

15

16    Representing the Plaintiffs:

17        MCHUGH FULLER LAW GROUP

18        97 Elias Whiddon Road

19        Hattiesburg, MI 39402

20        BY:  MICHAEL J. FULLER, ESQUIRE

21             AMY QUEZON, ESQUIRE (via telephone)

22        T 800.939.5580

23        E mike@mchughfuller.com

24    (Continued on next page)
```

```
 1    APPEARANCES (Continued):

 2   Representing the Plaintiffs:

 3        SWEENEY MERRIGAN LAW, LLP

 4        268 Summer Street

 5        Boston, MA 02210

 6        BY:  J. TUCKER MERRIGAN, ESQUIRE

 7             PETER MERRIGAN, ESQUIRE

 8        T 617.391.9001

 9        E tucker@sweeneymerrigan.com

10          peter@sweeneymerrigan.com

11

12   Representing the Plaintiffs:

13        GRAY AND WHITE LAW

14        713 East Market Street

15        Suite 200

16        Louisville, KY 40202

17        BY:  MARK K. GRAY, ESQUIRE

18        T 502.210.8942

19

20

21

22

23   (Continued on next page)

24
```

```
 1   APPEARANCES (Continued):

 2   Representing Cardinal Health and the Witness:

 3        WILLIAMS & CONNOLLY LLP

 4        725 Twelfth Street NW

 5        Washington, DC 20005

 6        BY:  STEVEN M. PYSER, ESQUIRE

 7             MATTHEW MONAHAN, ESQUIRE

 8        T 202.434.5686

 9        E spyser@wc.com

10          mmonahan@wc.com

11

12   Representing the Defendant Prescription

13   Supply:

14        PELINI, CAMPBELL & WILLIAMS, LLC

15        Bretton Commons

16        Suite 400

17        8040 Cleveland Avenue NW

18        North Canton, OH 44720

19        BY:  NICOLE H. RICHARD, ESQUIRE

20        T 330.305.6400

21        E nrichard@pelini-law.com

22

23

24   (Continued on the next page)
```

```
 1    APPEARANCES (Continued):

 2    Representing the Defendants Endo Health Solutions

 3    Inc., Endo Pharmaceuticals Inc.,

 4    Par Pharmaceutical, Inc.; Par Pharmaceutical

 5    Companies, Inc. (FKA Par Pharmaceutical Holdings,

 6    Inc.):

 7         ARNOLD & PORTER KAYE SCHOLER, LLP

 8         250 West 55th Street

 9         New York, NY 10019

10         BY:  ANGELA R. VICARI, ESQUIRE

11         (Via telephone and streaming):

12         BY:  ANDREW BERGMAN, ESQUIRE

13         T 212.836.7408

14         E angela.vicari@arnoldporter.com

15         E andrew.bergman@arnoldporter.com

16

17

18

19

20    (Continued on next page)

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):

 2    Representing the Defendant Walmart:

 3     (Via telephone)

 4         JONES DAY

 5         325 John H. McConnell Boulevard

 6         Suite 600

 7         Columbus, OH 43215

 8         BY:  CASTEEL BORSAY, ESQUIRE

 9         T 614.469.3939

10         E cborsay@jonesday.com

11

12    Representing the Defendant McKesson:

13         COVINGTON & BURLING LLP

14         One City Center

15         850 Tenth Street, NW

16         Washington, DC 20001

17         BY: MEGHAN E. MONAGHAN, ESQUIRE

18         T 202.662.5531

19         E mmonaghan@cov.com

20

21

22     (Continued on next page)

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES (Continued):

 2

 3    Representing the Defendants AmerisourceBergen Drug

 4    Corporation, AmerisourceBergen Corporation:

 5         REED SMITH LLP

 6         Three Logan Square

 7         1717 Arch Street

 8         Suite 3100

 9         Philadelphia, PA 19103

10         BY:  THOMAS P. REILLY, ESQUIRE

11         T 215.851.8270

12         E treilly@reedsmith.com

13

14    Representing the Defendant Validus Pharmacy:

15    (Via telephone)

16         FOX ROTHSCHILD LLP

17         2000 Market Street

18         Suite 2000

19         Philadelphia, PA 19103

20         BY:  MAURA L. BURKE, ESQUIRE

21         T 215.299.2872

22         E mburke@foxrothschild.com

23    (Continued on next page)

24
```

```
 1    APPEARANCES (Continued):

 2    Representing the Defendant HBC Company:

 3    (Via streaming)

 4         MARCUS & SHAPIRA LLP

 5         One Oxford Centre

 6         35th Floor

 7         Pittsburgh, PA 15219

 8         BY:  JAMES ROSENBERG, ESQUIRE

 9         T 412.471.3490

10         E rosenberg@marcus-shapira.com

11

12    Representing the Defendant Cardinal Health:

13    (Via telephone)

14         COLLINSON, DAEHNKE, INLOW & GRECO

15         2110 E. Flamingo Road

16         Suite 305

17         Las Vegas, NV 89119

18         BY:  AMANDA E. ROSENTHAL, ESQUIRE

19         T 702.979.2132

20         E amanda.rosenthal.@cdiglaw.com

21

22

23    (Continued on next page)

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   APPEARANCES (Continued):

 2   Representing the Defendant Cardinal Health:

 3    (Via telephone)

 4        WILLIAMS & CONNOLLY LLP

 5        725 Twelfth Street, NW

 6        Washington, DC 20005

 7        BY:  ENU MAINIGI, ESQUIRE

 8        T 202.434.5686

 9        E emainigi@wc.com

10

11   Representing the Defendant UCB:

12    (Via telephone)

13        HUGHES HUBBARD & REED LLP

14        2345 Grand Boulevard

15        Kansas City, MO 64108

16        BY:  TINA SCHAEFER, ESQUIRE

17        T 816.709.4159

18        E tina.schaefer@hugheshubbard.com

19

20

21    (Continued on next page)

22

23

24
```

```
 1   APPEARANCES    (Continued):

 2   Representing the Defendant G&L Pharmacy:

 3   (Via telephone)

 4        COLLINSON, DAEHNKE, INLOW & GRECO

 5        2110 E. Flamingo Road

 6        Suite 305

 7        Las Vegas, NV 89119

 8        BY:  LINDA RURANGIRWA, ESQUIRE

 9        T 702.979.2132

10        E linda.rurangirwa@cdiglaw.com

11

12   Also Present:

13   Gina Veldman, Trial Services

14   Robert Martignetti, CLVS

15

16

17

18

19

20

21

22

23

24
```

```
 1                         INDEX
 2                      EXAMINATION
 3   Witness Name                                    Page
 4   STEVE REARDON
 5     Direct By Mr. Papantonio ......................... 17
 6     Direct By Mr. Fuller ............................. 409
 7     Cross By Mr. Pyser ............................... 496
 8     Redirect By Mr. Papantonio ....................... 534
 9
                          EXHIBITS
10
     Cardinal-Reardon      Description              Page
11
     No. 1             E-mail, MCH MDL2804           29
12                     00013635 through 3637
13   No. 2             E-mail, ECAH 002              29
                       001250321
14
     No. 3             E-mail, MCKMDL00545341        32
15                     through 5347
16   No. 4             Government's                  53
                       Prehearing Statement,
17                     CAH MDL PRIORPROD DEA
                       12 00000001 through
18                     054
19   No. 5             E-mail, 00828657              93
                       through 674
20
     No. 6             Settlement and Release       116
21                     Agreement, 00001571
                       through 1618
22
     No. 7             Statistical Map              124
23
     No. 8             Role Profile, 00108999       135
24                     through 000
```

```
 1                          INDEX

 2                        EXHIBITS

 3    Cardinal-Reardon      Description            Page

 4    No. 9            Cardinal Health, Bares      138
                       CAH MDL 2804 0152227
 5                     through 234

 6    No. 10           PowerPoint, CAH 014956      143
                       through 5026
 7
      No. 12           E-mail, 00827893  and       193
 8                     894

 9    No. 13           Letter Dated July 27,       210
                       2018
10
      No. 14           Statistical Map             236
11
      No. 11           Diagram                     236
12
      No. 15           US DOJ Document,            260
13                     December 27, 2007

14    No. 16           E-mail, 000821541           278
                       through 1543
15
      No. 17           E-mail, 00866792            278
16
      No. 18           E-mail, 00865925            282
17                     through 00865927

18    No. 19           E-mail, ECAH 002            289
                       000959004 through 9023
19
      No. 20           State of Prescription       295
20                     Drug Abuse,
                       MCKMDL00336833 through
21                     6886

22    No. 22           DEA Presentation, CAH       307
                       MDL 2804 00094605
23                     through 4835

24
```

Highly Confidential - Subject To Further Confidentality Review

```
 1                      INDEX
 2                     EXHIBITS
 3    Cardinal-Reardon      Description              Page
 4    No. 23           One-page Statistical          339
                       Map
 5
      No. 25           Assurance of                  375
 6                     Discontinuance
                       Pursuant to Executive
 7                     Law 63(15)
 8    No. 21           Purchases of                  387
                       Hydrocodone by Known
 9                     or Suspected Rogue
                       Internet Pharmacies -
10                     2006
11    No. 26           December 23, 2016,            388
                       Manhattan US Attorney
12                     Announces $10 Million
                       Civil Penalty
13
      No. 27           Consent Order                 389
14
      No. 28           Declaration of Michele        399
15                     Leonhart
16    No. 24           Declaration of Ruth           408
                       Carter
17
      No. 29           Diagram                       412
18
      No. 30           US Department of              412
19                     Justice Letter,
                       December 27, 2007
20
      No. 31           Bates CAH MDL                 423
21                     PRIORPROD DEA 07
                       01120515 through 21149
22
      No. 32           DEA Compliance Manual,        429
23                     CAH SWE 019032
24    No. 33           IGL Reports                   453
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX

 2                       EXHIBITS

 3   Cardinal-Reardon       Description              Page

 4   No. 34          Report CAH MDL                   458

                     PRIORPROD DEA 07

 5                   01696166 through 96738

 6   No. 35          Report, CAH MDL                  458

                     PRIORPROD DEA 07

 7                   01525200 through 5688

 8   No. 36          E-mail, CAH MDL                  460

                     PRIORPROD DEA 07

 9                   00869802 and 803

10   No. 37          New Choice Pharmacy              497

                     Document

11

     No. 38          Internet Pharmacy                517

12                   Data, CAH MDL2804

                     01457737 through 7751

13

     No. 39          E-mail, CAH MDL2804              521

14                   02102229

15   No. 40          E-mail, CAH MDL2804              524

                     02102142 through 146

16

     No. 41          Document, CAH MDL2804            528

17                   02101840 through 1847

18   No. 42          E-mail, CAH MDL                  529

                     PRiorprod dea07

19                   00832705 through 2718

20   No. 43          E-mail, CAH MDL                  537

                     PRIORPROD DEA07

21                   01198345 through 8358

22   No. 44          Prescription Drug                556

                     Abuse, CAH MDL 2804

23                   00228386 through 8390

24
```

```
 1                        INDEX

 2                       EXHIBITS

 3   Cardinal-Reardon        Description              Page

 4   No. 45            E-mail, CAH MDL               560

                       PRIORPROD DEA07

 5                     00110916 thorough 0920

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    THE VIDEOGRAPHER:  We are now on

 2    the record.  My name is Robert Martignetti.  I'm a

 3    videographer for Golkow Litigation Services.

 4    Today's date is November 30, 2018 and the time is

 5    9:03 a.m.  This video deposition is being held in

 6    Boston, Massachusetts.  In re:  National

 7    Prescription Opiate Litigation.  The deponent is

 8    Steve Reardon.  Counsel will be noted on the

 9    stenographic record.  The court reporter is

10    Darlene Coppola and will now swear in the witness.

11

12                    STEVE REARDON,

13         witness, having first been satisfactorily

14    identified and duly sworn, testifies and states as

15    follows:

16

17                    MR. PAPANTONIO:  First of all, let's

18    begin with who is on the telephone, just so we can

19    have that on the record one more time.  Who's on

20    the phone?

21                    MS. QUEZON:  Amy Quezon from McHugh

22    Fuller on behalf of the plaintiff.

23                    MR. PAPANTONIO:  Who else is on the

24    phone?
```

```
 1                      MS. RURANGIRWA:  Linda Rurangirwa

 2      from Collinson Daehnke on behalf of G&L Pharmacy.

 3                      MR. PAPANTONIO:  Who else?

 4                      MS. BURKE:  Maura Burke for Validus.

 5                      MR. PAPANTONIO:  Okay.  Go ahead.

 6                      VOICE: AJ (Inaudible), McHugh Fuller

 7      for the plaintiff.

 8                      MR. PAPANTONIO:  Okay.  Anybody

 9      else?

10                      MS. SCHAEFER:  Tina Schaefer from

11      Hughes Hubbard & Reed for UCB, Inc.

12                      MR. PAPANTONIO:  All right.  Anybody

13      else?

14                      All right.  Let's go around the

15      room.  I'm Mike Papantonio for the plaintiff.

16      Mark, why don't you pick up?

17                      MR. GRAY:  Mark Gray for the

18      plaintiff.

19                      MR. T. MERRIGAN:  Tucker Merrigan

20      for the plaintiff.

21                      MR. P. MERRIGAN:  Peter Merrigan for

22      the plaintiff.

23                      MR. FULLER:  Mike Fuller for the

24      plaintiff.
```

```
 1                    MS. VICARI:  Angela Vicari from

 2    Arnold & Porter for defendants, Endo

 3    Pharmaceuticals, Inc.

 4                    MR. BORSAY:  Casteel Borsay, Jones

 5    Day on behalf of Walmart.

 6                    MS. MONAGHAN:  Meghan Monaghan on

 7    behalf of McKesson.

 8                    MR. REILLY:  Tom Reilly from Reed

 9    Smith on behalf of AmerisourceBergen Corporation.

10                    MS. RICHARD:  Nicole Richard.

11                    MR. MONAHAN:  Matthew Monahan,

12    Williams & Connolly, on behalf Cardinal Health.

13                    MR. PYSER:  Steven Pyser of Williams

14    & Connolly on behalf of Cardinal Health, Inc. and

15    the witness.

16

17                    DIRECT EXAMINATION

18    BY MR. PAPANTONIO:

19        Q.   Sir, state your name, please.

20        A.   Steve Reardon.

21        Q.   Please put up Document No. 4253.

22                    MR. PAPANTONIO:  Let's give the

23    witness a copy of 4253, please.

24    BY MR. PAPANTONIO:
```

```
 1          Q.   Sir, what is the Hot Topics that the

 2    company -- Cardinal ran a program called Hot

 3    Topics.  Tell the jury what Hot Topics is.

 4          A.   I just need a minute to look at it.

 5          Q.   Sure.

 6          A.   (Witness reviews document.)

 7          Q.   As you're looking though, do you know what

 8    Hot Topics is?

 9          A.   I don't recall this document.

10          Q.   But do you know what Hot Topics is?

11          A.   I do not.

12          Q.   The program?

13          A.   I do not.

14          Q.   Do you know what the program Daily Dose

15    is?

16          A.   I do not.

17          Q.   The Daily Dose?

18          A.   I do not.

19          Q.   All right.  And you've never seen this --

20    let's go through this -- let's go through this

21    document.

22               This is a 5/15/2014 document.  Who is

23    Christopher Forst?

24          A.   Christopher was part of Michael Mone's
```

1    anti-diversion team.

2        Q.   And the jury's already heard what

3    anti-diversion means, but you had a team that was

4    put together to stop diversion of narcotic drugs,

5    correct?

6        A.   Correct, but this -- this is after my time

7    in the anti-diversion role.

8        Q.   Who is -- who is Debbie Mitchell?

9        A.   I'm not sure.

10       Q.   Had you ever heard of anything called the

11   Oxy Express, sir?

12       A.   No, sir.

13       Q.   Is that the first time that you have

14   personally heard about it?

15       A.   Yes.

16       Q.   And do you see where this document is

17   actually sent to the folks at Cardinal?

18       A.   I recognize certain names.

19       Q.   Well, you see where it's from Debbie

20   Mitchell.  And then it has names "sent to," then

21   it has a fairly extensive list of names.

22            How many of those names do you recognize?

23       A.   (Witness reviews document.)

24            Twenty-nine.

```
1        Q.   So you recognize 29 of the names on this

2   document.  The 29 you recognize were Cardinal

3   employees; is that correct?

4        A.   Correct.

5        Q.   And then if you look down to where it says

6   "Daily prescription drug media wrap up" -- and

7   what I'm -- what you've told the jury is that you

8   have never even heard of what Hot Topics is?

9        A.   I don't recall.

10                MR. PYSER:  Objection.  Asked and

11   answered.

12   BY MR. PAPANTONIO:

13        Q.   You weren't familiar with a program called

14   Hot Topics at Cardinal, correct?

15                MR. PYSER:  Asked and answered.

16        A.   Correct.

17   BY MR. PAPANTONIO:

18        Q.   You were not familiar with the program

19   called Hot Topics?

20                MR. PYSER:  Objection.  Objection to

21   form.  You can answer the question.

22        A.   Correct.

23   BY MR. PAPANTONIO:

24        Q.   And you were not familiar with the program
```

1    called the Daily Dose that the company had in

2    place, correct?

3                   MR. PYSER:  Object to form.  You can

4    answer.  When I make an objection, you can go

5    ahead and answer the question.

6        A.   Correct.

7    BY MR. PAPANTONIO:

8        Q.   All right.  Let's read this then.  It

9    says -- and I think you told us you did not ever

10   know what the Oxy Express was; is that true?

11                  MR. PYSER:  Object to form.

12       A.   Correct.  I don't recall.

13   BY MR. PAPANTONIO:

14       Q.   It says "Wow, uttered senator Dianne

15   Feinstein during the second senate hearing on

16   America's opioid epidemic Wednesday."

17             Now, first of all, what did you -- were

18   you ever asked to testify at the hearings that

19   were put in place on Cardinal's conduct in front

20   of the U.S. Senate?

21       A.   No.

22       Q.   Were you ever involved in any hearings in

23   front of Congress dealing with Cardinal's conduct

24   in the opioid crisis?

```
 1        A.   No.

 2        Q.   It says "Given the upsetting statistics

 3   that five of the U.S.'s leading drug policy

 4   experts were revealing on the Senate floor, her

 5   shock was understandable.  While only accounting

 6   for about 5 percent of the population, the U.S.

 7   now consumes 99 percent of the world's Vicodin and

 8   84 percent of its OxyContin."

 9             Prior to you just seeing that number, were

10   you familiar with the fact that America was

11   consuming 84 percent of the OxyContin that was

12   produced in this country?

13             MR. PYSER:  Object to form.

14        A.   I was not.

15   BY MR. PAPANTONIO:

16        Q.   Had you -- did you have a number that you

17   believed that you understood the amount of

18   OxyContin that was being produced -- that was

19   being consumed by Americans -- did you have a

20   number in mind prior to coming here today?

21        A.   No.

22        Q.   According to the Centers for Disease

23   Control, 12 million people reporting prescription

24   painkillers nonmedically in 2010, meaning without
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     a prescription for -- only for the feeling.  The

2     most recent year for which there is data -- and

3     then what I want to ask you is you were there in

4     2010, right?  You were at Cardinal in 2010,

5     true?

6                  MR. PYSER:  Object to form.

7         A.   Yes.

8     BY MR. PAPANTONIO:

9         Q.   What were you doing in 2010?

10        A.   I was the vice president of quality and

11    regulatory affairs overseeing DC operations.

12        Q.   And you were overseeing a man by the name

13    of Eric Brantley, weren't you?

14                 MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16        Q.   He worked under you, didn't he, Eric

17    Brantley?

18        A.   Correct.

19        Q.   How many people were in your department in

20    2010 that were actually reviewing -- doing the

21    same type of reviews that Eric Brantley did?

22                 MR. PYSER:  Object to form.

23    Misstates evidence.  Vague as to time.

24        A.   In 2010.  I believe there were three, to
```

Highly Confidential - Subject to Further Confidentiality Review

1    the best of my recollection.

2    BY MR. PAPANTONIO:

3        Q.   What were those three people doing?  They

4    were reviewing sales orders; is that correct?

5        A.   They were reviewing our ingredient limit

6    reports and identifying any red flags or potential

7    customers that they should look at and visit and

8    investigate.

9        Q.   Called suspicious orders, correct?

10       A.   If they were on the report, it would be a

11   suspicious order.

12       Q.   So it was you and Brantley, and who else

13   were reviewing suspicious orders?

14                 MR. PYSER:  Object to form.  Vague

15   as to time.

16       A.   We also -- I believe at the time we had

17   Tim Dunham and Nick Rausch.

18   BY MR. PAPANTONIO:

19       Q.   All right.  And then do you -- were you

20   familiar with -- anybody ever told you that -- in

21   2010 that the company had more than 30,000

22   employees?  Did you know how many employees were

23   working with Cardinal?

24       A.   That sounds about right on a global basis.

```
1          Q.   And you had three people out of 30,000

2     that were actually reviewing these types of orders

3     for narcotics?

4               MR. PYSER:  Object to form.  Vague

5     as to time.

6          A.   At corporate.

7     BY MR. PAPANTONIO:

8          Q.   At corporate.  That's what I'm wondering.

9     At corporate you had --

10         A.   Just at corporate.

11         Q.   You had three people?

12              MR. PYSER:  Object to form.

13    BY MR. PAPANTONIO:

14         Q.   Correct?

15         A.   Correct.

16         Q.   And those three people determined how many

17    narcotics would be sent out throughout the United

18    States from Cardinal.  They could determine

19    whether to ship or whether not to ship, correct?

20              MR. PYSER:  Object to form.

21    Misstates evidence.

22         A.   The ingredient limit report was a

23    DEA-approved report that accumulated sales through

24    the month and identified any customers that
```

1    exceeded the threshold for a family of drugs.

2    Those customers showed up on the report.  They --

3    the reports were submitted to DEA.

4         Now, in conjunction with that, we had a

5    process in our distribution centers where our

6    employees that filled orders in the cage involved,

7    based on their knowledge, had the ability to stop

8    an order, review and investigate, and make a

9    determination as to whether or not to ship.

10   BY MR. PAPANTONIO:

11   Q.   That's -- okay.  That's what I'm

12   wondering, Mr. Reardon.

13        An order would come in.  And if it was

14   deemed suspicious, one of those three people could

15   stop the order, correct, from being shipped?

16        MR. PYSER:  Object to form.  Vague

17   as to time.

18   A.   No.

19   BY MR. PAPANTONIO:

20   Q.   What could they do?

21   A.   They could identify what would be

22   considered a red flag that would warrant further

23   investigation of the customer.  They could

24   investigate that customer, visit that customer,

Highly Confidential -- Subject to Further Confidentiality Review

1    and then make a determination as to whether or not

2    we should continue business with them.

3         Q.   Well, you had -- there's a system that's

4    called suspicious order monitoring system,

5    correct?

6         A.   Correct.

7         Q.   Did your company have a suspicious order

8    monitoring system?

9         A.   We did.  We had one that was approved by

10   the DEA.

11        Q.   And you considered it a workable -- let me

12   write that down.

13             You considered it a workable suspicious

14   order monitoring system.  Is that your

15   testimony?

16        A.   Yes.  The regulation said design and

17   operate a suspicious order monitoring system to

18   identify suspicious orders.

19        Q.   And your testimony is that you did that,

20   correct?

21        A.   Correct.

22             MR. PAPANTONIO:  Show the witness,

23   please, document 4631.

24             MR. PYSER:  Do you have a copy for,

Highly Confidential - Subject to Further Confidentiality Review

```
1    counsel?

2               MR. PAPANTONIO:  Yes.  Another copy,

3    please.

4               MS. MOORE:  It's Reardon 2.

5

6         (Exhibit No. 1 marked for

7    identification.)

8

9         (Exhibit No. 2 marked for

10   identification.)

11

12   BY MR. PAPANTONIO:

13      Q.   Sir, this has got your name at the top,

14   Steve Reardon, correct?

15      A.   Correct.

16      Q.   And the date on it is 2005; is that true?

17      A.   Correct.

18      Q.   So it says "Cassie and Steve, a couple of

19   particular items of interest came out of the

20   quarterly meeting.  We, the wholesales, were asked

21   by Greg Jones if we have specific protocol to

22   monitor possible drug diversion outside of ARCOS

23   activity with Internet pharmacies or wholesaler

24   accounts.  Nobody volunteered to answer.  To my
```

1    knowledge, we do not.  If a distributor Internet

2    pharmacy customer is properly licensed and is

3    legally entity of purchase from us, we typically

4    do not monitor what they purchase or track who

5    they sell to."

6            Now, that sure is different from what you

7    just told me, isn't it?  You said you had a

8    monitor system in place, right?

9        A.   Correct.

10       Q.   All right.  So -- but here Mark

11   Mitchell -- tell the jury who Mark Mitchell is?

12       A.   To the best of my knowledge, Mark

13   Mitchell -- he was a VP of sales.

14       Q.   So did you just forget, when you told me

15   that you had a monitoring system in place, that

16   maybe you didn't have a monitoring system in

17   place?

18       A.   No.

19            MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21       Q.   No what?

22       A.   We did have a system in place.  This has

23   nothing to do with the suspicious orders of

24   controlled substances.  This has to do with

1    pricing diversion, contract pricing, where a

2    customer who, under contract, can purchase from a

3    manufacturer at a discounted price, and then turn

4    around and they sell that for an inflated price to

5    another distributor or wholesaler.

6              It's pricing diversion, not the diversion

7    of controlled substances.

8         Q.   And you had a -- you had a responsibility

9    to monitor that as well, didn't you?

10             MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12        Q.   Yes or no?

13             MR. PYSER:  Object.

14        A.   Not under -- not under my

15   responsibilities.

16   BY MR. PAPANTONIO:

17        Q.   Okay.  Well, not under your

18   responsibilities, but under what the CFR told you,

19   you had to a duty to monitor that, didn't you?

20             MR. PYSER:  Object to form.

21        A.   Price --

22             MR. PYSER:  Object to form.

23   Misstates evidence.  Go ahead.

24        A.   Not pricing.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PAPANTONIO:

 2        Q.   All right.  Well, let's take -- take a

 3    look at 1941.

 4               MR. PAPANTONIO:  Show him 1941.

 5

 6               (Exhibit No. 3 marked for

 7    identification.)

 8

 9    BY MR. PAPANTONIO:

10        Q.   Now, Mr. Reardon, on the record you told

11    us that Cardinal had a monitoring system in place.

12    That was your testimony, correct?

13        A.   Correct.

14        Q.   Take a look at this, please.  This is from

15    Bill with McKesson and the subject is HDMA notes.

16    It says "Gary and I attended the HDMA conference

17    last week.  These are my notes.  Perhaps the most

18    surprising revelation was Steve Reardon and

19    Gilberto Quintero saying Cardinal does not report

20    suspicious orders to the DEA, no upside."

21               Now, who is -- that's you.  You're Steve

22    Reardon, right?

23        A.   Yes.

24        Q.   And what year is this?
```

```
 1        A.    2013.

 2        Q.    2013.  And you know who -- you know who

 3   this fellow is, Mahoney?

 4        A.   I believe I've met him at industry

 5   conferences.

 6        Q.   Well, you had dinner with him, didn't you?

 7        A.   Possibly.

 8        Q.   Yeah.  And this says "perhaps the most

 9   surprising revelation was Steve Reardon and

10   Gilberto Quintero saying Cardinal does not report

11   suspicious orders to the DEA."

12             Sir, would you agree that if you don't

13   report suspicious orders to the DEA you are

14   breaking the law, correct?

15                  MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17        Q.   You agree that you're breaking the law if

18   you don't -- if you fail to comply with the CFRs,

19   you're breaking the law?

20        A.   We have --

21                  MR. PYSER:  Object to form.  Calls

22   for a legal conclusion.

23        A.   We have an obligation to report suspicious

24   orders.
```

```
 1   BY MR. PAPANTONIO:

 2       Q.   And if you don't, you're breaking the law,

 3   true?

 4                MR. PYSER:  Object to form?

 5       A.   We're violating a regulation.

 6   BY MR. PAPANTONIO:

 7       Q.   And a regulation is a law; is that

 8   correct?

 9                MR. PYSER:  Object to form.

10       A.   I view it as a regulation.

11   BY MR. PAPANTONIO:

12       Q.   Is it hard for you to say that your

13   company was breaking the law, sir?

14                MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.   I mean, is that difficult for you this

17   morning, to say, in light of what we're reading

18   right here, that your company was breaking the law

19   in not having a monitoring system?

20                MR. PYSER:  Object to form.

21   Misstates evidence.  Assumes fact not in -- not

22   established.

23       A.   We had a monitoring system.  I don't know

24   what the conversation was here.  I don't recall
```

```
1    it.  At this point in time, in 2013, I was out of

2    anti-diversion and focusing on regulatory

3    operations.  I don't know what conversation may

4    have been had and I don't know why Mr. Mahoney

5    would have interpreted the conversation to say

6    that we do not report suspicious orders.

7    BY MR. PAPANTONIO:

8        Q.   That's what he says here though, right?

9               MR. PYSER:  Object to the form.

10   BY MR. PAPANTONIO:

11       Q.   That's what this says.  You said that you

12   had a monitoring system and this gentleman said

13   that you admitted to him that you don't have a

14   monitoring system?

15       A.   I did not admit to him.

16               MR. PYSER:  Object to form.

17   Misstates evidence.

18   BY MR. PAPANTONIO:

19       Q.   Now, you were a policeman at one time,

20   right?

21       A.   Yes.

22       Q.   Did you ever give a speeding ticket?

23       A.   Yes.

24       Q.   All right.  Well, you gave a speeding
```

Highly Confidential - Subject to Further Confidentiality Review

1    ticket because they were breaking the law, true?

2        A.   Yes.

3        Q.   Somebody was speeding.  They were breaking

4    the law, right?

5                  MR. PYSER:  Object to form.  Asked

6    and answered.

7    BY MR. PAPANTONIO:

8        Q.   Is that correct?

9        A.   Correct.

10       Q.   Okay.  Here -- and that's regulation.

11   It's a regulation that you don't speed; is that

12   true?

13                 MR. PYSER:  Object to form.

14   Misstates evidence.

15       A.   Correct.

16   BY MR. PAPANTONIO:

17       Q.   And so you gave tickets to people who

18   broke the law because they were speeding,

19   correct?

20                 MR. PYSER:  Object to form.

21       A.   Correct.

22   BY MR. PAPANTONIO:

23       Q.   So you know what breaking the law means,

24   don't you, Mr. Reardon?

```
 1                    MR. PYSER:  Object to the form.

 2        A.   Correct.

 3   BY MR. PAPANTONIO:

 4        Q.   All right.  So let's go to the next page

 5   here.  At the bottom of the page, if you look, it

 6   says "Later had dinner with the group.

 7   Interesting gossip came from Reardon, Quintero,

 8   who relayed that Cardinal is not reporting

 9   suspicious orders to the DEA on the advice of

10   outside counsel and that appears to be Linden

11   Barber."

12             Now, in defense of you, Linden Barber did

13   tell you that you didn't have to repeat -- that

14   you didn't have to report suspicious orders.  I

15   don't want to put this on you.  You're simply

16   relating what Linden Barber told you, correct?

17                    MR. PYSER:  Object to form.

18        A.   Did not tell me that.

19   BY MR. PAPANTONIO:

20        Q.   Well, then -- he didn't tell you that?

21   Did you just make that up?

22                    MR. PYSER:  Object to form.

23        A.   I never said it.

24   BY MR. PAPANTONIO:
```

1      Q.   Okay.  So what he's saying here, that --

2      where he says that you and Quintero related that

3      Cardinal is not reporting suspicious orders to the

4      DEA on the advice of outside counsel, you didn't

5      say that?  He just -- he's just making this up?

6      A.   I did not say that.

7              MR. PYSER:  Object to form.  Hold

8      on.  Go ahead and answer.

9      A.   I did not say it.

10     BY MR. PAPANTONIO:

11     Q.   Okay.  Do you -- Mr. Mahoney here -- do

12     you have some kind of ongoing fight with Mr.

13     Mahoney?  Are you all friends, enemies, or what?

14             MR. PYSER:  Object to the form.

15     A.   I don't really know Mr. Mahoney.

16     BY MR. PAPANTONIO:

17     Q.   But you -- did anybody show you this

18     document before you came in here today where you

19     admitted, apparently according to Mahoney, that

20     Cardinal doesn't have a suspicious order system to

21     report to the DEA and they don't have it because

22     the lawyers tell them they don't need it?

23             MR. PYSER:  Object to the form.

24     A.   I was not told that.

```
 1    BY MR. PAPANTONIO:

 2         Q.   You were not told that?

 3         A.   No.

 4         Q.   And nobody showed you this document before

 5    you came in here today, true?

 6                   MR. PYSER:  Object to form.

 7         A.   I don't know that I saw the document.

 8    BY MR. PAPANTONIO:

 9         Q.   How many -- how many hours did you prepare

10    for this deposition?

11                   MR. PYSER:  You can answer that

12    question but not reveal the content of any

13    communications with counsel.

14         A.   Two days.

15    BY MR. PAPANTONIO:

16         Q.   Two solid days you prepared for this

17    deposition, right?

18                   MR. PYSER:  Object to the form.

19         A.   Right.

20    BY MR. PAPANTONIO:

21         Q.   And in those two solid days, nobody had

22    told you that there was a statement made where you

23    had admitted or said to Mr. Mahoney that Cardinal

24    is not reporting suspicious orders to the DEA on
```

1    the advice of its lawyers?

2                    MR. PYSER:  Hold on.  Before you

3    answer, I'm going to object to that question and

4    instruct the witness not to answer as to anything

5    that counsel told you.  Do not reveal the content

6    of any conversation --

7    BY MR. PAPANTONIO:

8        Q.   You don't have to tell me anything counsel

9    told you, but counsel -- nobody -- let's just --

10   nobody told you what we're reading here prior to

11   you coming here today, true?

12                   MR. PYSER:  Object to form asked and

13   answered.  To the extent --

14   BY MR. PAPANTONIO:

15       Q.   Is that correct?

16                   MR. PYSER:  To the extent you had a

17   conversation outside of counsel, you can go ahead

18   and answer.

19   BY MR. PAPANTONIO:

20       Q.   Is that correct?

21       A.   I did not have a conversation outside of

22   counsel.

23       Q.   Did you not, okay.

24            So it says "We don't get any credit" --

```
 1                     MR. PYSER:  Move to strike the last

 2    part of his response --

 3    BY MR. PAPANTONIO:

 4        Q.   This goes on to say --

 5                     MR. PYSER:  -- "outside of counsel."

 6    BY MR. PAPANTONIO:

 7        Q.   This goes on to say, this question, "We

 8    don't get any credit for doing it.  Appears there

 9    is no upside."  And then it says "Apparently Steve

10    Reardon now reports to Gilberto Quintero.  Michael

11    Mone been moved to an Ann Berkey -- Berkey-like

12    role.  What's an Ann Berkey-like role?

13                     MR. PYSER:  Object to form.

14    BY MR. PAPANTONIO:

15        Q.   What is that?

16        A.   I'm not sure.  I know the name Ann Berkey.

17        Q.   You know it from McKesson, don't you?

18        A.   I believe so.

19        Q.   Have you -- did you actually deal with her

20    on a daily basis or did you have contact with Ann

21    Berkey?

22        A.   No.

23                     DEFENSE COUNSEL:  Objection.

24        A.   No.
```

```
 1    BY MR. PAPANTONIO:

 2        Q.   It says "We don't get any credit for doing

 3    it.  Appears there's no upside."

 4             You realize that the CF --

 5                  MR. PAPANTONIO:  Hand me that CFR,

 6    please.

 7    BY MR. PAPANTONIO:

 8        Q.   You understand the upside to the -- to

 9    reporting to the DEA is that there's something

10    called 21 CFR.  You know what that is, don't

11    you?

12                  MR. PYSER:  Object to form.

13        A.   Yes.

14    BY MR. PAPANTONIO:

15        Q.   Tell the jury what 21 CFR is.

16        A.   Code of federal regulations.

17        Q.   And it's a federal regulation that you

18    have a responsibility as a distributor to design

19    and operate a system and to disclose to the

20    registrants suspicious orders of controlled

21    substances, right?  You knew you had that

22    responsibility.  It's called a monitoring system,

23    correct?

24                  MR. PYSER:  Object to form.
```

```
 1     A.   Correct.

 2   BY MR. PAPANTONIO:

 3     Q.   What it is, is it's a system in place

 4   that's supposed to monitor suspicious orders.  And

 5   this says -- is that right?  It's something in

 6   place that is supposed to monitor suspicious

 7   orders?

 8               MR. PYSER:  Object to form.

 9   BY MR. PAPANTONIO:

10     Q.   Is that correct?

11     A.   Correct.

12     Q.   And it says "The registrant" -- which

13   would be Cardinal that you were working for --

14   that's a registrant, right?

15     A.   Correct.

16     Q.   "The registrant shall inform the field

17   division of the administration in his area of

18   suspicious orders when discovered by the

19   registrant," which is Cardinal, true?

20     A.   True.

21     Q.   Cardinal had a duty under the law to

22   actually report these suspicious orders, correct?

23               MR. PYSER:  Object to form.  Calls

24   for legal conclusion.
```

```
 1    BY MR. PAPANTONIO:

 2         Q.   According to this --

 3         A.   Correct.

 4         Q.   -- you knew what the -- well, let me --

 5    your attorney just made an objection, legal

 6    conclusion.

 7              Did you not know what the laws were when

 8    you were working in regulatory?

 9                   MR. PYSER:  Object to form.

10         A.   I knew what the regulation was.

11    BY MR. PAPANTONIO:

12         Q.   You knew what the regulations were.  You

13    read the regulations, right?

14         A.   Yes.

15         Q.   DEA had met with you and talked to you

16    about the specifics of the regulations, right?

17         A.   Possibly.

18         Q.   Well, we're going to talk about some

19    meetings that you had, but you don't remember

20    having any meetings with the DEA?

21                   MR. PYSER:  Object to the form.

22         A.   No.  I had meetings with DEA.  I can't

23    speak to the specific content at a given time.

24    BY MR. PAPANTONIO:
```

```
1         Q.   Well, you remember the DEA actually going

2    around and actually having PowerPoint

3    presentations for people explaining in detail what

4    the statute from 1971 meant, right, 1971?

5         A.   Right.

6         Q.   And they would go around and they would

7    give actual seminars, and they would talk about

8    the statute that was the CFR 1301.74.  They would

9    talk about the fact A) it's been around since

10   1971, right?

11                  MR. PYSER:  Object to form.

12        A.   Right.

13   BY MR. PAPANTONIO:

14        Q.   And they would say, B) you, as a company,

15   have a responsibility to make sure you comply with

16   it, correct?

17        A.   Correct.

18        Q.   And C) if you don't, you're breaking the

19   law, correct?

20                  MR. PYSER:  Object to the form.

21   BY MR. PAPANTONIO:

22        Q.   Correct?

23        A.   Violating the regulation, yes.

24        Q.   Yes.  And they even told you -- they
```

1    said -- the DEA was so specific as far back in

2    1971 when this was -- when this was given to your

3    company, that suspicious orders include orders of

4    unusual size, orders deviating substantially from

5    a normal pattern, and orders of unusual frequency.

6             Do you remember that?

7                  MR. PYSER:  Object to form.

8        A.   Yes.

9    BY MR. PAPANTONIO:

10       Q.   Do you remember those standards that

11   were -- that were not only written in 1971 for all

12   distributors that were selling narcotics, but they

13   actually went around and met with companies and

14   told them what their obligations were, correct?

15   DEA did that?

16       A.   Correct.

17       Q.   All right.  And so you're saying that --

18   according to this document that came from

19   Mr. Mahoney, where you said that Cardinal is not

20   reporting suspicious orders to DEA on advice of

21   outside counsel, you said you never said that?

22       A.   I did not.

23       Q.   Well, sir, do you know Linden Barber?

24       A.   Yes.

```
 1        Q.   How often did you meet with Linden

 2   Barber?

 3             MR. PYSER:  Object to form.  You can

 4   answer how often you met with Mr. Barber.  But if

 5   he was serving as counsel, don't reveal the

 6   content of any communications with him.

 7   BY MR. PAPANTONIO:

 8        Q.   How often did you meet with Mr. Barber?

 9        A.   If I did, it was very infrequent.

10        Q.   Did he give directions to the company

11   about what was legal and not legal?  Was that his

12   role there?

13             MR. PYSER:  Object to form.  Don't

14   reveal the content of any communications from

15   Mr. Barber.

16   BY MR. PAPANTONIO:

17        Q.   That was his role though, to tell the

18   company what was legal and what was illegal,

19   correct?

20        A.   Correct.

21        Q.   And how many years did Mr. Barber do -- in

22   that process, how many years was he in the -- in

23   that role of telling the company -- or directing

24   the company about what was legal or illegal?  How
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    many years do you recall?

 2         A.   I don't recall.

 3         Q.   Are you working as a consultant right now?

 4         A.   Yes.

 5         Q.   Who do you work for?

 6         A.   Cardinal Health.

 7         Q.   How many years have you worked still as a

 8    consultant for Cardinal Health?

 9         A.   Since I retired in March of '16.

10         Q.   And then they hired you on as a

11    consultant?

12         A.   Hired me on as a consultant on non-DEA

13    matters.

14         Q.   Were they asked -- did anybody from

15    Cardinal Health ask to meet with you or have any

16    meetings with you about the history of what

17    actually occurred within Cardinal before the

18    congressional hearings took place in Washington,

19    D.C.?  Did anybody meet with you just to talk to

20    you about what you remember about the history?

21              MR. PYSER:  Object to form.  If you

22    had any meetings with counsel, don't reveal the

23    content of them.

24         A.   I don't recall.
```

```
 1   BY MR. PAPANTONIO:

 2       Q.   You don't recall meeting or don't recall

 3   what the -- what the meeting was about?

 4       A.   I don't recall the meeting.

 5       Q.   Well, let's go back -- let's go back to

 6   4253.  You remember that's the article that we

 7   were talking about, the Oxy Express.  It says

 8   that -- let's pick up with -- see where it says

 9   "12 million people reported using prescription

10   painkillers nonmedically in 2010, meaning without

11   a prescription or only for the feeling.  The most

12   recent year for there is data since 1999.  The

13   number has led to an over 400 percent increase in

14   female deaths and 265 percent increase in male

15   deaths involving opioids."

16           Were you aware that, while you were

17   working with the company, there were that many

18   people dying throughout the United States from

19   opioid overdoses?  Do you remember those numbers

20   being that high?

21               MR. PYSER:  Object to form.

22       A.   I do not.

23   BY MR. PAPANTONIO:

24       Q.   Since you're a consultant, have you kept
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    up the with the numbers of people still dying in

 2    America from opioid overdoses?

 3                    MR. PYSER:  Object to form.

 4    BY MR. PAPANTONIO:

 5        Q.   Do you know what the number is?

 6        A.   No.  In my role as a consultant, I don't

 7    work on DEA matters.

 8        Q.   All right.  Had anybody -- prior to coming

 9    here, had anybody shared with you that somewhere

10    between 115 and 150 people will die today because

11    of opioid overdoses?

12                    MR. PYSER:  Objection.  Misstates

13    evidence.

14    BY MR. PAPANTONIO:

15        Q.   Did you know that?

16        A.   No.

17        Q.   It goes on to say, "In 2008" -- and you

18    were with the company in 2008 -- "the CDC reported

19    14,800 deaths from prescription painkillers.  Two

20    years later, that number increased to 16,651.

21    Opioid overdose deaths in America are now greater

22    than heroin and cocaine combined."

23                    So I want to begin with this, sir, because

24    I want to ask you, were you -- are you aware of
```

```
1    the opioid epidemic that exists in this country

2    today?

3              MR. PYSER:  Object to the form.

4         A.   I'm aware that there is an opioid

5    epidemic.  I don't know the numbers.

6    BY MR. PAPANTONIO:

7         Q.   Were you aware of the opioid epidemic that

8    was existing while you were actually in the role

9    of quality regulatory?

10        A.   I was in that role up until 2007.

11        Q.   Up until 2007.  And then what did you do

12   after 2007?

13        A.   Let me clarify.  I was in the role of

14   anti-diversion up until 2007.  After that,

15   anti-diversion split off and moved under Michael

16   Mone.

17        Q.   Did you work for Michael Mone?

18        A.   I did not.

19        Q.   What did you do -- well, what were you

20   doing after that?

21        A.   It was primarily DC operations, regulatory

22   compliance.

23        Q.   Regulatory compliance in Washington, D.C.

24   for Cardinal; is that correct?
```

```
 1                    MR. PYSER:  Object to form.

 2     Misstates evidence.

 3     BY MR. PAPANTONIO:

 4          Q.   Excuse me, excuse me.

 5               Regulatory operations, correct?

 6          A.   In our distribution centers.

 7          Q.   Right.  So were you -- were you working

 8     with corporate?

 9          A.   Yes.

10          Q.   You were paid through corporate?

11          A.   Yes.

12          Q.   What -- where was your office?

13          A.   At corporate.

14          Q.   And that is where?  Columbus, Ohio?

15          A.   Dublin, Ohio.

16          Q.   Dublin, Ohio.  You were there at the

17     headquarters for Cardinal for how many years

18     total?

19          A.   Twenty-one.

20          Q.   You were there 21 years, right?

21          A.   Right.

22          Q.   Did you have a chance to talk to Mr.

23     Brantley about his testimony that he gave this

24     week?
```

```
 1      A.   I did not.

 2      Q.   Well, let me show --

 3              MR. PAPANTONIO:  Show this witness

 4    4085, 4085.

 5              MS. MOORE:  Reardon 4.

 6

 7          (Exhibit No. 4 marked for

 8    identification.)

 9

10    BY MR. PAPANTONIO:

11      Q.   Sir, when did you have a chance -- you see

12    the heading -- it's United States Department of

13    Justice, Drug Enforcement, Cardinal Health.

14    There's a docket number.  Down at the bottom, the

15    date is February 22, 2012.

16          And you were working for Cardinal right

17    there at headquarters in corporate in 2012,

18    correct?

19      A.   Correct.

20      Q.   And you saw this, I take it?

21      A.   (Witness reviews document.)

22          I don't recall seeing this.

23      Q.   You don't recall it.  Okay.  Well, let's

24    go through it and see what parts of this you knew
```

```
 1    about that since -- in other words, is your

 2    testimony nobody with company showed this to

 3    you?

 4                    MR. PYSER:  Object to form.

 5    BY MR. PAPANTONIO:

 6       Q.   Is that your testimony, nobody with the

 7    company showed you this document?

 8       A.   Correct.

 9       Q.   That's fair enough for me to say.  Okay,

10    good.

11            It starts off "Pursuant" -- next page,

12    "Pursuant to February 13, 2012 order for

13    prehearing statements, the United States

14    Department of Justice Drug Enforcement

15    Administration by and through its undersigned

16    attorneys hereby submit its prehearing statement."

17            Now, I want to ask you some questions

18    about this.

19            "Government requests revocation of

20    respondent's DEA certificate," do you see that

21    right there, "Government requests revocation of

22    respondent's DEA certificate"?

23       A.   Yes.

24       Q.   Now, respondent here is Cardinal.  So
```

```
 1    every time we hear the word "respondent," you know

 2    that means Cardinal, correct?

 3              MR. PYSER:  Object to form.

 4        A.   Correct.

 5    BY MR. PAPANTONIO:

 6        Q.   And then it's got a list of people that --

 7    you see the list of witnesses, Joseph Rannazzisi,

 8    Ruth Carter, Kyle Wright, Heather Whirl

 9    (phonetic), Amy Radcliff, Michael Arpaio --

10    Arpaio, excuse me, Arpaio.

11              You know these people, don't you?

12              MR. PYSER:  Object to form.

13    Compound.

14        A.   I don't know all of them.

15        Q.   Which ones do you know?

16        A.   I know Ruth Carter, Kyle Wright, and

17    Michael Arpaio.

18        Q.   And you've actually had dealings with them

19    over the phone and face-to-face, haven't you?

20        A.   I believe so.

21        Q.   So this says "Summary of testimony, Office

22    of Division Control -- Diversion Control, Deputy

23    Assistant Administrator Joseph Rannazzisi."  It

24    says "Deputy Assistant Administrator Rannazzisi
```

 1    testified to his background, his education and

 2    training as a DEA Deputy Assistant Administrator,

 3    a law enforcement officer and a licensed

 4    pharmacist.  He will testify as follows."

 5           Now, first of all, had you ever had any

 6    dealings with Mr. Rannazzisi?

 7                   MR. PYSER:  Object to form.  Hearsay

 8    upon hearsay.

 9       A.   No.

10    BY MR. PAPANTONIO:

11       Q.   Excuse me?

12       A.   No.

13       Q.   You never dealt directly with Rannazzisi?

14       A.   No.

15       Q.   Did anybody ever show you any reports that

16    Rannazzisi had prepared in regard to the conduct

17    of Cardinal?

18       A.   I don't recall.

19       Q.   You don't recall or -- you don't recall

20    the content or you don't recall anybody ever

21    showing you what Rannazzisi actually sent as far

22    as letters to Cardinal about their conduct?

23       A.   I've seen some letters.

24       Q.   So you have seen letters from

```
 1      Rannazzisi?

 2          A.   Correct.

 3          Q.   All right.  So this says "Prescription

 4      drug abuse occurs in the United States at a

 5      alarming rate.  2010 national survey on drug use

 6      and health reveals that approximately 7 million

 7      Americans abused controlled substance

 8      pharmaceutical purposes, second only to marijuana.

 9      Controlled substance prescription drugs are abused

10      by more people than cocaine, heroin,

11      hallucinogenics and inhalant combined."

12              Now, did you know that when you were the

13      person in -- when you were working in quality

14      regulatory, did you know these numbers?

15                   MR. PYSER:  Object to form.

16      Misstates time frame.  He's already testified he

17      wasn't working in that area of QRA in 2010.  He

18      told you he was out of anti-diversion by that

19      point.

20      BY MR. PAPANTONIO:

21          Q.   2010, you were right at corporate

22      headquarters, correct, in Columbus, Ohio?

23          A.   Correct.

24          Q.   And what were you doing in 2010?
```

```
 1        A.   I was outside of anti-diversion,

 2   monitoring DC activities, compliance.

 3        Q.   You were monitoring compliance, correct?

 4        A.   Within the distribution centers.

 5        Q.   Right.  Exactly.  So a distribution

 6   center -- how many distribution centers were

 7   there?

 8        A.   It varied over time, but somewhere in the

 9   twenties.

10        Q.   So you were monitoring Cardinal's business

11   distribution centers throughout the United States,

12   correct?

13             MR. PYSER:  Object to form.

14        A.   Their operations to facilitate compliance.

15   BY MR. PAPANTONIO:

16        Q.   And you didn't know these numbers that we

17   just talked about here, did you?

18             MR. PYSER:  Object.

19   BY MR. PAPANTONIO:

20        Q.   You didn't know that approximately 7

21   million Americans abused controlled substances?

22   This is 2010, you didn't know that, correct?

23             MR. PYSER:  Object to form.  Asked

24   and answered.
```

```
 1        A.   I was outside of anti-diversion at this

 2   time.

 3   BY MR. PAPANTONIO:

 4        Q.   Sir, you were monitoring compliance for

 5   all of the distribution centers throughout the

 6   country.  Is that a yes or a no?

 7                  MR. PYSER:  Object to the form.

 8        A.   Not the anti-diversion program.

 9   BY MR. PAPANTONIO:

10        Q.   You were monitoring the system throughout

11   the country for your distribution centers, correct

12   or incorrect?

13                  MR. PYSER:  Object to form.  Vague.

14        A.   Not anti-diversion.

15   BY MR. PAPANTONIO:

16        Q.   What were you monitoring?

17        A.   Well, there's a host of other regulations

18   that we need to meet.

19        Q.   Right, exactly.  That's what I'm asking

20   you about.

21             You knew that you had to monitor

22   regulations throughout the country for your

23   distributors, correct?

24                  MR. PYSER:  Object to form.
```

```
 1       A.   Outside of anti-diversion.

 2   BY MR. PAPANTONIO:

 3       Q.   That's fine.  I don't care whether it's a

 4   mile outside anti-diversion.

 5            You were monitoring regulatory standards

 6   for distribution centers throughout the United

 7   States --

 8                 MR. PYSER:  Object.

 9   BY MR. PAPANTONIO:

10       Q.   -- for Cardinal, yes or no?

11                 MR. PYSER:  Object to form.

12       A.   Yes.

13   BY MR. PAPANTONIO:

14       Q.   In monitoring, you didn't know, as early

15   2010, 7 million Americans were abusing

16   pharmaceuticals?  You didn't know that?

17                 MR. PYSER:  Object to form.

18       A.   No.

19   BY MR. PAPANTONIO:

20       Q.   You didn't know that it was -- you did not

21   know that the abuse was so serious that it was

22   second only to marijuana, controlled substances

23   prescription drugs were abused by more people than

24   cocaine, heroin, hallucinogenics, inhalants
```

```
 1   combined?  Nobody had ever told you that, had

 2   they?

 3                    MR. PYSER:  Object to form.

 4        A.   No.

 5   BY MR. PAPANTONIO:

 6        Q.   Let's go to the next page.

 7             Top of the page, see where it says

 8   "Florida is epicenter for these illegal pain

 9   clinics"?

10        A.   Yes.

11        Q.   Did you know that?

12        A.   I was aware of that.

13        Q.   It says "DEA, state and local law

14   enforcement investigations reveal thousands of

15   drug seekers flock to these Florida-based pain

16   clinics to obtain their supply of oxycodone and

17   other controlled substances such as alprazolam,

18   which is, in turn, illegally redistributed in

19   states along the entire east coast and midwest.

20             Do you see that?  You knew that was going

21   on while you were working in your prior job in

22   regulatory, right?

23                    MR. PYSER:  Object to form.

24        A.   Yes.
```

```
 1    BY MR. PAPANTONIO:

 2        Q.   And you knew that while you were working

 3    in your role of -- at headquarters there in

 4    Columbus, Ohio, correct?

 5        A.   Correct, but to that point -- Cardinal's

 6    role -- we would buy only from duly-licensed

 7    manufacturers and distribute to only duly-licensed

 8    pharmacies whether it be hospital, independent

 9    retail, chain pharmacies long-term care, et

10    cetera, and then those locations -- their

11    pharmacists would dispense pursuant to a

12    legitimate prescription.

13        Q.   Sir, the jury has already heard what your

14    responsibilities are and what you actually did.

15    And we're going to take some time today and we're

16    going to review how far off your compliance was

17    with federal standards.

18            So as we go through, that's what I'm going

19    to be talking about, what you knew

20    about personally, about how far off the track

21    Cardinal had become -- had gotten in its

22    compliance with federal drug narcotic standards,

23    okay?

24                    MR. PYSER:  Object to form.
```

```
 1   BY MR. PAPANTONIO:

 2       Q.   Fair enough?

 3              MR. PYSER:  Move to strike the

 4   counsel's speech.

 5   BY MR. PAPANTONIO:

 6       Q.   Do you understand what we're doing here

 7   today?

 8              MR. PYSER:  Object to form.

 9       A.   Yes.

10   BY MR. PAPANTONIO:

11       Q.   So let me begin with this:  You supplied

12   the drugs that were sold to pain clinics, right?

13              MR. PYSER:  Object to the form.

14       A.   Multiple distributors could have supplied,

15   it may not have been Cardinal Health.

16   BY MR. PAPANTONIO:

17       Q.   But you did.  That's one thing you did, is

18   you supplied pain clinics, correct, yes or no?

19   That's all it takes.  You did or didn't?

20              MR. PYSER:  Object to the form.

21       A.   I don't know who the customers were at

22   that time.

23   BY MR. PAPANTONIO:

24       Q.   Sir, did your company supply pain clinics
```

1    in Florida?

2                    MR. PYSER:  Object to form.

3    BY MR. PAPANTONIO:

4        Q.   Yes or no?

5                    MR. PYSER:  Object to form.

6        A.   I don't know.

7    BY MR. PAPANTONIO:

8        Q.   You simply don't have a recall of whether

9    or not your company supplied pain clinics in

10   Florida; is that your testimony?

11                   MR. PYSER:  Object.

12       A.   Again, I was not in anti-diversion.

13                   MR. PYSER:  Object to form.  Vague.

14   BY MR. PAPANTONIO:

15       Q.   You were in headquarters working in

16   Columbus, Ohio for -- how many years did you say?

17       A.   Twenty-one.

18       Q.   Twenty-one years.  Okay.  Let's go ahead.

19            It says -- you see where it says down --

20   "According to the Florida medical examiner's

21   office"?  Do you see that?  According to the

22   Florida medical examiner's office, they have seen

23   a 345 percent increase in the number of overdose

24   deaths associated with oxycodone between 2005 and

```
 1    2010.

 2              Now, what were you doing in 2005?  Tell

 3    the jury what you were doing in 2005 for Cardinal.

 4                   MR. PYSER:  Object to the form.

 5        A.   One of my responsibilities was

 6    anti-diversion at the time.  The other part was

 7    the regulatory aspect of DC operations.

 8    BY MR. PAPANTONIO:

 9        Q.   And see it says 2005 to 2010.  What were

10    you doing in 2006?  Tell the jury what you were

11    doing in 2006.

12        A.   As I stated --

13                   MR. PYSER:  Object to form.

14    BY MR. PAPANTONIO:

15        Q.   Go ahead.

16        A.    -- I was doing both regulatory compliance

17    and DC operations and anti-diversion.

18        Q.   And what were you doing in 2007?

19                   MR. PYSER:  Object to the form.

20        A.   That was a transition year.  That got

21    turned over to Michael Mone.

22    BY MR. PAPANTONIO:

23        Q.   And then in 2010, you're working in

24    headquarters on -- as far as overseeing all the
```

```
 1    distributors -- distributorships in the United

 2    States for Cardinal, correct?

 3                    MR. PYSER:  Object to form.

 4    Misstates evidence.

 5    BY MR. PAPANTONIO:

 6         Q.   Didn't you just tell me that?

 7         A.   Correct.

 8         Q.   All right.  Because your lawyer just said

 9    I misstated something, so I want to make sure I

10    don't misstate anything because you did say that,

11    didn't you?

12                    MR. PYSER:  Object to form.  Asked

13    and answered.

14                    MR. PAPANTONIO:  I'll move on.

15    BY MR. PAPANTONIO:

16         Q.   For 2010 their data showed approximately

17    4,091 persons died in Florida alone in an overdose

18    caused by just five drugs, methadone, oxycodone,

19    hydrocodone, benzodiazepine, morphine.

20              Now, your company sold every one of those

21    drugs, right?

22         A.   Correct.

23         Q.   This is an average of 11.2 persons dying

24    in the State of Florida every day from just these
```

```
1     five drugs.

2            Sir, do you understand -- I'm just curious

3     just about what you understand about the -- about

4     the physiology of the human body where it comes

5     into a possibility of a drug overdose.

6            Do you know how drug overdose takes

7     place?

8                MR. PYSER:  Object to form.

9        A.  I do not.

10       Q.  Have you taken any time in the 20 years

11    that you've worked for the company to find out

12    what happens in a overdose death?  How does -- how

13    does a young man die from an overdose death?

14               MR. PYSER:  Object to form.

15       A.  I don't know.

16    BY MR. PAPANTONIO:

17       Q.  But were you aware that there were

18    overdose deaths taking place all over the United

19    States, right?

20       A.  I was aware that some -- yes.

21       Q.  You were aware that Cardinal was selling

22    the very drugs that was -- that had the potential

23    to cause overdose deaths, true?

24               MR. PYSER:  Object to the form.
```

```
1        A.   I don't know that we sold those specific

2   drugs.

3   BY MR. PAPANTONIO:

4        Q.   Okay.  Well, I just asked you.  Which one

5   of these drugs did you not sell, methadone,

6   oxycodone, hydrocodone, benzo -- which one of

7   these did you not sell?

8        A.   We sold the drugs.  I'm just saying they

9   may not have been the drugs that caused the

10  overdose.

11       Q.   Sir, you were -- let me just be clear

12  about something.

13            There was the top three narcotics sales

14  distributors in the country was your company,

15  Cardinal, McKesson -- you know who McKesson is,

16  right?

17                 MS. MONAGHAN:  Object to form.

18  BY MR. PAPANTONIO:

19       Q.   -- and ABC, AmerisourceBergen, right?

20       A.   Correct.

21       Q.   You know, as we sit here, that those were

22  the top three drug narcotic distributors in the

23  country?  You know that --

24                 MR. PYSER:  Object to form.
```

```
1    BY MR. PAPANTONIO:

2        Q.   -- true?

3        A.   Correct.

4        Q.   It says "This combination is often

5    referred to as the trinity."  Have you ever heard

6    of term "trinity"?

7                 MR. PYSER:  Object to form.  Vague.

8        A.   I'm not sure.

9    BY MR. PAPANTONIO:

10       Q.   So you're not sure that you've ever heard

11   the term "trinity" in relationship to drug

12   overdoses; is that correct?

13       A.   Correct.

14                MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.   And trinity is hydrocodone, oxycodone used

17   in combination with alprazolam and benzodiazepine.

18   Do you see that?

19            Have you ever known that there was a

20   combination that of drugs that people were buying

21   called "The Holy Trinity," which increased the

22   number of deaths in the country?  Did you ever

23   know anything about that?

24                MR. PYSER:  Object to the form.
```

```
 1        A.   I don't recall seeing it.

 2   BY MR. PAPANTONIO:

 3        Q.   Did your company sell each one of these

 4   things, oxycodone, alprazolam, benzodiazepine?

 5   Did you all sell that?

 6                  MR. PYSER:  Object to form.

 7        A.   Yes.

 8   BY MR. PAPANTONIO:

 9        Q.   According to the medical examiner's

10   office, they have seen a 127 percent increase in

11   the number of deaths associated with

12   benzodiazepines in the State of Florida between

13   2005 and 2010.

14             You were there in 2005 as -- in charge of

15   quality regulation, right?

16        A.   Yes.

17        Q.   You were there in 2006 in that position,

18   correct?

19        A.   Correct.

20        Q.   You were there in 2007 in that position,

21   correct?

22        A.   Part of the year.

23        Q.   And then it goes on to say -- as a matter

24   of fact, you were a leader in those positions,
```

```
 1    weren't you, sir?

 2            I mean, part of your job was to be a

 3    leader in those positions, correct?

 4       A.   Correct.

 5       Q.   It says "Approximately February 2009

 6    through 2010, monthly oxy -- oxycodone sales to

 7    Florida practitioners steadily increased and well

 8    surpassed monthly oxycodone sales in the remaining

 9    states."

10            Now, did you know that Florida actually

11    had the highest sales in the country during that

12    period of time?

13                 MR. PYSER:  Object to form.

14       A.   I was not aware.

15    BY MR. PAPANTONIO:

16       Q.   But you were there in 2005, what was

17    your -- daily, in 2005, you would review orders

18    that would come in from the company, correct?

19                 MR. PYSER:  Object to form.

20       A.   Not personally.

21    BY MR. PAPANTONIO:

22       Q.   Not personally, but you had a department

23    that did that.  There was three of you all?

24       A.   Correct.
```

```
1        Q.   Out of 30,000 employees, there were three

2    of you, correct?

3                 MR. PYSER:  Object to form.  Asked

4    and answered.

5        A.   Correct.

6    BY MR. PAPANTONIO:

7                 You see where it says "On July 1,

8    2011, the State Health Officer and Surgeon

9    General, Frank Farmer, issued a statewide public

10   health emergency declaration in response to the

11   ongoing problem of prescription drugs in the

12   division of Florida titled the State General --

13   State Surgeon General Declares Public Health

14   Emergency Regarding Prescription Drug Abuse

15   Epidemic.

16          Now, did you -- you reviewed, that didn't

17   you?

18                 MR. PYSER:  Object to form.

19       A.   Did not.

20   BY MR. PAPANTONIO:

21       Q.   You didn't review the Surgeon General

22   writing an article called State Surgeon General

23   Declares Public Emergency Regarding Prescription

24   Drug Abuse Epidemic in Florida?
```

```
 1                    MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3        Q.   You did not review that?

 4        A.   I did not.

 5        Q.   And you haven't reviewed it prior to

 6   coming in here today --

 7        A.   No.

 8        Q.   -- right?

 9                    MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11        Q.   And you never even heard of this -- of the

12   term "Oxy Express" prior to the time I showed it

13   to you in a document?

14                    MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16        Q.   Oxy Express --

17        A.   No.

18        Q.   -- never heard it?

19        A.   No.

20        Q.   The press release noted that "In 2010, 98

21   of the top 100 doctors dispensing oxycodone

22   nationally were in Florida."

23             Do you see that?

24             It goes on to say, "More oxycodone is
```

 1   dispensed in the State of Florida than in the

 2   remaining states combined."

 3          Now, you -- Florida was something that you

 4   had to oversee.  That was part of your role,

 5   right?

 6              MR. PYSER:  Object to form.

 7   BY MR. PAPANTONIO:

 8      Q.   You --

 9              MR. PAPANTONIO:  Excuse me, I'm

10   going to finish my question.

11   BY MR. PAPANTONIO:

12      Q.   You had to over oversee orders that were

13   going to Florida, correct?

14              MR. PYSER:  Object to form.

15   Misstates testimony.  Vague as to time frame.

16      A.   Not at this time.

17   BY MR. PAPANTONIO:

18      Q.   Sir --

19      A.   I was out of anti-diversion at this time.

20      Q.   Sir, 2005, you did that, didn't you?

21      A.   Did you not just reference 2010?

22      Q.   2005, you did that, correct?

23              MR. PYSER:  Object to the form.

24      A.   Correct.

```
 1   BY MR. PAPANTONIO:

 2        Q.   Florida?

 3        A.   Correct.

 4        Q.   2006, you did that for Florida, correct?

 5             MR. PYSER:  Object to form.

 6        A.   Correct.

 7   BY MR. PAPANTONIO:

 8        Q.   2007, you did that for Florida, correct?

 9             MR. PYSER:  Object to form.

10        A.   For the part of year.

11   BY MR. PAPANTONIO:

12        Q.   As a matter of fact, there's

13   distributor -- there's a distributor right there

14   in the State of Florida, wasn't there, when you

15   were working with the company?

16             MR. PYSER:  Object to the form.

17        A.   Correct.

18   BY MR. PAPANTONIO:

19        Q.   What was the distributor?  Tell the jury

20   what the distributor -- what's the name of the

21   distributor?

22        A.   Cardinal Health, Lakeland.

23        Q.   Cardinal Health, Lakeland.

24             And you're all familiar with what happened
```

```
 1    in your distributorship that you were overseeing

 2    in Lakeland, Florida.  You know what happened down

 3    there as far as the DEA being involved with

 4    uncovering criminal conduct in that area of the

 5    Florida, right?

 6                    MR. PYSER:  Object to form.

 7    Misstates evidence.

 8                    DEFENSE ATTORNEY:  Also object to

 9    form.

10    BY MR. PAPANTONIO:

11        Q.   Did you not know that there were

12    investigations of criminal conduct in the very

13    area where your distribution site was?

14                    MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16        Q.   Had nobody told you that prior to coming

17    here today?

18                    MR. PYSER:  Object to the form.

19        A.   I knew there was an investigation.

20    BY MR. PAPANTONIO:

21        Q.   All right.  Well, let's see what the

22    investigation was.  You don't want to use the term

23    "criminal," do you?

24                    MR. PYSER:  Object.
```

```
 1   BY MR. PAPANTONIO:

 2       Q.   You don't want to use the term

 3   "criminal"?

 4                 MR. PYSER:  Object to form.

 5   BY MR. PAPANTONIO:

 6       Q.   There was a criminal investigation going

 7   on.  You don't want to say that here today, do

 8   you?

 9                 MR. PYSER:  Object to form.

10       A.   I don't know that it was criminal.

11   BY MR. PAPANTONIO:

12       Q.   Well, let's take a look and see what it

13   was, okay.

14            It says "Wholesale distributors are

15   required" -- you've already talked about this.

16   They're required "to design and operate a system

17   that would detect suspicious orders and report

18   those suspicious orders to the DEA, though the

19   DEA's distribution initiative program, DEA has

20   discussed with registrant, including Cardinal, the

21   firm's due diligence responsibility under the CSA,

22   including knowing one's customer, suspicious order

23   monitoring, trends and controlled substances

24   abuse, theft and division, and a thorough review
```

1    of the distributor's own sales of controlled

2    substances data obtain through DEA."

3              Do you see that?

4                   MR. PYSER:  Object to form.  Move to

5    exclude this entire line of testimony as hearsay.

6    BY MR. PAPANTONIO:

7       Q.   According to your -- according to what

8    we've already seen, you say you didn't say this,

9    but the folks from McKesson said you never had a

10   monitoring system there at Cardinal?

11                  MR. PYSER:  Object to form.

12   Misstates evidence.  That's not what the document

13   says.

14   BY MR. PAPANTONIO:

15      Q.   Isn't that what the document -- well,

16   let's look again.  Your lawyer doesn't remember

17   what the document said.  Do you remember what it

18   said?

19                  MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21      Q.   Well, let me help the lawyer out.  Get the

22   document up here again.  Pull it out in front of

23   you right there.  This is not for you.  This is

24   for your lawyer since he wants to review what it

```
 1    said.
 2            Go to page 2 of that document.  Why don't
 3    you read -- read for me the last paragraph on that
 4    document.  What number is it?
 5                    MR. PYSER:  Counsel, if this is for
 6    my benefit, can you go back to your question and
 7    tell me where it says that Cardinal never had a
 8    suspicious order monitoring system?
 9    BY MR. PAPANTONIO:
10        Q.   What number is that document, sir?
11                    MR. PYSER:  Object to the form.
12    BY MR. PAPANTONIO:
13        Q.   Sir, look at the number on the document.
14    What does it say?
15        A.   Three.
16        Q.   And what's -- and the document number is
17    1941.  Go to page 2, so we can read this again
18    since I want to be sure that everybody understood
19    what this said.
20            Why don't you read for me the -- that
21    paragraph?  Why don't you read for me that
22    paragraph, okay?
23        A.   "Later had dinner with the group.
24    Interesting gossip came from Reardon and Quintero,
```

```
 1    who relayed that Cardinal is not reporting

 2    suspicious orders to DEA on the advice of outside

 3    counsel, appears to be Linden Barber.  We don't

 4    get any credit for doing it, appears there is no

 5    upside.  Apparently Steve Reardon now reports to

 6    Gilberto Quintero.  Michael Mone has been moved to

 7    an Ann Berkey-like role."

 8                     MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10       Q.   Okay.  Now, let me proceed with this.

11            You were back on the document where the

12    investigation is being done by the DEA.  And

13    that's the document in front of you, 4085, and

14    it's talking about the idea that you were -- you

15    absolutely were required to have a monitoring

16    system in place for suspicious orders, correct?

17    According to this, that was a requirement, that

18    you have a monitoring system in place for

19    suspicious orders, yes?

20                     MR. PYSER:  Object to form.

21       A.   Correct.

22    BY MR. PAPANTONIO:

23       Q.   And if you don't, then you're breaking the

24    law, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2        A.   Violating the regulation.

 3   BY MR. PAPANTONIO:

 4        Q.   Right.  And you just told us earlier, when

 5   a -- somebody speeding gets a speeding ticket,

 6   they're breaking the law, aren't they?

 7                    MR. PYSER:  Object to form.

 8        A.   Yes.

 9   BY MR. PAPANTONIO:

10        Q.   And then let's go down to the -- let's go

11   to the next page.  That first -- excuse me, the

12   first full paragraph.

13             "In addition, on September 27, 2006, DEA

14   sent a letter to all distributors including

15   respondent."

16             Respondent's Cardinal; you understand

17   that, sir?

18        A.   Yes.

19        Q.   "Detailing the distributor's

20   responsibility to ensure that their products are

21   not diverted for illicit use."

22             So you actually got a letter -- first of

23   all, you know about the statute.  It was 1971 that

24   told you exactly how you had to comply with the
```

```
1    law.  That's 1971 CFR, right?

2              MR. PYSER:  Object to form.

3        A.   Right.

4    BY MR. PAPANTONIO:

5        Q.   Here, this is talking about a letter.

6    September 2006, DEA sent a letter to Cardinal

7    detailing what your responsibilities were.

8         You see that?

9        A.   Yes.

10       Q.   Did you review a -- do you remember

11   reviewing a letter in 2006?

12       A.   I did.

13       Q.   It says "The letter reminded distributors

14   that they have a statutory responsibility to

15   exercise due diligence to avoid filling suspicious

16   orders that might be diverted into legitimate --

17   illegitimate channels and warned that the failure

18   to exercise such due diligence could provide a

19   statutory basis for revocation or suspension of

20   the distributor's registration."

21         And you know, sir, that Cardinal had

22   multiple -- had multiple suspensions of their

23   license to sell narcotics throughout the country

24   by this time?
```

```
 1                    MR. PYSER:  Object to form.

 2    BY MR. PAPANTONIO:

 3        Q.   2010, you know they had multiple times

 4    where the DEA said, you're not complying with the

 5    law, and we are suspending your right to sell

 6    narcotics?  You know that?

 7                    MR. PYSER:  Object to form.

 8        A.   There were suspensions.  There were

 9    allegations.  There were no admissions and I don't

10    think anything was proven.

11    BY MR. PAPANTONIO:

12        Q.   You were a policeman at one time, right?

13    You were a policeman?

14                    MR. PYSER:  Object to form.  Asked

15    and answered.

16    BY MR. PAPANTONIO:

17        Q.   You told us you were a policeman, right?

18        A.   Correct.

19        Q.   Did you arrest a few people --

20        A.   Yes.

21        Q.   -- in your time as a police --

22        A.   Yes.

23        Q.   Did you have some of those people tell you

24    that they didn't do it?
```

```
 1                    MR. PYSER:  Object to form.

 2    BY MR. PAPANTONIO:

 3        Q.   Did that happen to you as a policeman,

 4    where people said, I didn't do that?

 5        A.   On occasion.

 6                    MR. PYSER:  Object to form.

 7    BY MR. PAPANTONIO:

 8        Q.   And then you find out they did, right?

 9                    MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11        Q.   Later on, you find out they did --

12                    MR. PYSER:  Object to form.

13    BY MR. PAPANTONIO:

14        Q.   -- true?

15        A.   Sometimes.

16        Q.   Now, this says that -- so you saw -- you

17    saw the letter that was sent in 2006.  And it said

18    that the letter reminded distributors they have a

19    statutory responsibility to exercise due diligence

20    and failure would be possible revocation or

21    suspension of the license to sell narcotics.  We

22    just read that, true?

23        A.   Correct.

24        Q.   It says "The letter cautioned that a
```

1  distributor may not simply rely on the person

2  placing the suspicious order, as the DEA

3  registrant, and turn a blind eye to suspicious

4  circumstances."

5          Do you remember them telling you that you

6  can't turn a blind eye to suspicious

7  circumstances, right?

8      A.  I remember the letter.  I -- I haven't

9  reviewed it recently, so I can't remember that.

10     Q.  Well, let me ask you this:  While we're

11 talking about turning a blind eye, you -- one of

12 your biggest accounts that the company had was

13 CVS, true?

14     A.  Yes.

15     Q.  And you let CVS do their own policing as

16 to whether or not suspicious orders were being

17 made, correct?

18              MR. PYSER:  Object to form.

19     A.  I can't speak to that.  That was after my

20 time in the anti-diversion.

21 BY MR. PAPANTONIO:

22     Q.  Sir, I'm not talking about diversion.  I'm

23 talking about -- you were in charge of the actual

24 distributorships throughout the country.  From

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Washington state all the way down to Lakeland, you

 2    were the guy in charge, right?

 3                    MR. PYSER:  Object to form.

 4    Misstates evidence.

 5    BY MR. PAPANTONIO:

 6       Q.   Yes or no?  If you're not the guy in

 7    charge, just tell me.  I'll go on from it.  But

 8    were you the guy in charge?

 9       A.   Yes.

10       Q.   Okay.  So you knew, didn't you?  When

11    anything was abnormal within the area of a

12    distributorship, you knew what was going on,

13    true?

14                    MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16       Q.   That was your job, to know what was going

17    on, right?

18       A.   Correct.

19       Q.   And you can't turn -- and you know that

20    some of your distributorships that you were

21    overseeing throughout the country -- that CVS was

22    getting drugs from those -- narcotics from those

23    distributorships, right?

24       A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And you knew that several of them had

 2   been -- actually were so out of -- so out of line

 3   with what the law required that they actually

 4   tried to shut them down, DEA shut them down?

 5                  MR. PYSER:  Object to form.

 6        A.   I don't know that.

 7   BY MR. PAPANTONIO:

 8        Q.   You don't know that?

 9                  MR. PYSER:  Object to form.

10        A.   (Witness nodding.)

11   BY MR. PAPANTONIO:

12        Q.   Do you remember any suspensions taking

13   place for the distribution centers?

14                  MR. PYSER:  Object to form.

15        A.   I recall something.  Again, it was outside

16   the scope of what I was doing at that time.

17   BY MR. PAPANTONIO:

18        Q.   Sir, you were the number one guy in charge

19   of distributorships.  I just want to be sure of

20   that.  I mean, I'll go through it.

21             You know you have -- you prepared kind of

22   a CV telling everybody what you're supposed to do.

23   You were the number one guy in charge of these

24   distributorships, right?
```

```
 1                    MR. PYSER:  Object to form.

 2        A.   For DC operations.

 3                    MR. PYSER:  Object to form.

 4   BY MR. PAPANTONIO:

 5        Q.   That's all I want to know.

 6        A.   Not anti-diversion.

 7        Q.   I understand, sir.  This all ties into

 8   some things that you knew and could have known,

 9   right?

10                    MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12        Q.   We're talking about things you knew and

13   could have known, whatever was happening around a

14   distributorship, true?

15                    MR. PYSER:  Object to form.  Vague.

16        A.   Possibly.

17   BY MR. PAPANTONIO:

18        Q.   Yeah, possibly.  Well, was there

19   somebody -- who was your boss?  Maybe we can talk

20   to them.  Who was your boss?

21        A.   Gilberto Quintero.

22        Q.   So Quintero was the guy that was in that

23   letter.  They said you were at the dinner and

24   Quintero was at the dinner and that you said that
```

```
 1    there's no responsibility to do any monitoring.

 2    Quintero was with you when that was said?

 3              MR. PYSER:  Object to form and

 4    misstates evidence.

 5    BY MR. PAPANTONIO:

 6       Q.   Is that true?

 7              MR. PYSER:  Object to form.

 8       A.   I did not say that.

 9    BY MR. PAPANTONIO:

10       Q.   I know.  But according to that letter,

11    Quintero was there with you?

12              MR. PYSER:  Object to form.

13       A.   Correct.

14    BY MR. PAPANTONIO:

15       Q.   All right.  So tell me, what did you --

16    what kind of monitoring system did you have for

17    big chains like CVS and Walgreens?  You didn't

18    have one, did you?

19       A.   Time frame?

20       Q.   Ever.

21       A.   Ever?

22       Q.   Ever.

23              MR. PYSER:  Object to form.

24       A.   My time in anti-diversion, which would
```

```
 1    have been up until 2007, we used a DEA-approved

 2    ingredient limit report that would have included

 3    the chains.  And that was submitted to DEA on a

 4    monthly basis to the local office.  That report

 5    was reviewed at the distribution centers and by

 6    Eric Brantley and his team.  Anything that looked

 7    out of line warranted an investigation.  They

 8    investigated and, if necessary, terminated the

 9    customer.

10    BY MR. PAPANTONIO:

11        Q.   Okay.  So your testimony is that, yes, we

12    sure did investigate CVS when we sold them drugs.

13    Your testimony, Mr. Reardon, is, oh yeah, we

14    monitored what they did, CVS, with suspicious

15    orders.

16             Is that your testimony?

17                  MR. PYSER:  Object to form.

18        A.   My testimony is that they were included in

19    the report.

20    BY MR. PAPANTONIO:

21        Q.   Your testimony -- well, I want to be sure

22    about this now.

23             Your testimony is that Cardinal actively

24    monitored the sales of CVS pharmacies as far as
```

```
 1    narcotics drugs that you sold to them.  Is that

 2    your testimony?

 3                   MR. PYSER:  Object to form.

 4         A.   In my time in anti-diversion, they would

 5    have been part of the ingredient limit report that

 6    we submitted to DEA.

 7    BY MR. PAPANTONIO:

 8         Q.   Did you monitor their conduct, yes or

 9    no?

10                   MR. PYSER:  Object to form.  Asked

11    and answered.

12         A.   We monitored their sales through the

13    ingredient limit report.

14    BY MR. PAPANTONIO:

15         Q.   And then you -- okay.  So we'll go with

16    that.  We'll go with that because we're going to

17    talk about it right here in this very document.

18                   But as far as you're concerned, you do

19    believe that -- that you did monitor, and so I

20    want to be sure about you -- you actually

21    monitored and actually approved thresholds for

22    them, the threshold number of drugs that they

23    could sell, true?

24                   MR. PYSER:  Object to form.
```

```
 1        A.    Not in my time.  The thresholds were

 2   preset.  They weren't individualized to a customer

 3   up until 2007.

 4   BY MR. PAPANTONIO:

 5        Q.    Tell the jury what a threshold is.

 6        A.    Threshold is a quantity of prescription

 7   drug products, primarily controlled substances,

 8   that if a customer hits, it -- it's a red flag

 9   that warrants further investigation.

10        Q.    And you want to -- you want to stick with

11   this idea that you all had a monitoring system in

12   place.

13              Is that your testimony?

14        A.    In my time in anti-diversion up until

15   2007, the report we used, which was DEA approved,

16   included chain customers.

17        Q.    The DEA told you that what you were doing

18   with that system was inadequate, didn't they,

19   sir?

20        A.    Not --

21              MR. PYSER:  Object to form.

22        A.    Not until September of 2007.

23   BY MR. PAPANTONIO:

24        Q.    2007, the DEA said, this system that
```

```
 1    you're using is inadequate, right?  They told you

 2    that straight up, didn't they?

 3                    MR. PYSER:  Object to form.

 4    Misstates testimony.

 5        A.   They never specifically told us it's

 6    inadequate.  They issued additional guidance.

 7    BY MR. PAPANTONIO:

 8        Q.   They told you what you were doing was not

 9    in compliance with the law, yes or no?

10                    MR. PYSER:  Object to form.

11        A.   They never said that.

12    BY MR. PAPANTONIO:

13        Q.   Well, let's look.

14                    MR. PAPANTONIO:  Pull up 4444,

15    please, for this witness.  Keep that document you

16    have open where you are there, but we're going to

17    jump over here.  4444, give him a copy of it.

18                    MS. MOORE:  Reardon 5.

19

20             (Exhibit No. 5 marked for

21    identification.)

22

23    BY MR. PAPANTONIO:

24        Q.   You see this is 2006.  Do you see that?
```

```
 1        A.   Yes.

 2        Q.   And your name is in there with Eric

 3   Brantley, Steve Reardon.  Do you see that, your

 4   name in that big bunch of names down there?

 5              MR. PYSER:  Feel free to review the

 6   document.

 7   BY MR. PAPANTONIO:

 8        Q.   And then the first page, you see "Attached

 9   find the report detailing the findings of

10   compliance assessment conducted at the

11   pharmaceutical distribution in Birmingham,

12   Alabama, June 26, 29 -- through 29, 2006."

13              That was a facility that you were supposed

14   to oversee, correct?

15              MR. PYSER:  Vague as to time frame.

16        A.   Correct.

17   BY MR. PAPANTONIO:

18        Q.   And then it says -- if you go to page 2,

19   it says "A regulatory compliance review was

20   conducted at the pharmaceutical distribution

21   Dohmen facility in Birmingham, Alabama."

22              Do you see that?

23        A.   Yes.

24        Q.   And then if you go to page 4, it says
```

```
 1    "Executive summary, significant issues."  See

 2    where it says "DEA."  It's 4444.4, Executive

 3    summary at the top of it, Significant issues:

 4    DEA.

 5            It says "DEA theft loss reports are not

 6    submitted to the DEA within seven days of

 7    discovery.  Customers were receiving scheduled

 8    product that they were not entitled to receive due

 9    to their DEA registrations not being reviewed and

10    set up correctly in the computer system."

11            Now, this is one of facilities you're

12    supposed to be overseeing, right?

13                    MR. PYSER:  Object to form.  Vague

14    as to time.

15    BY MR. PAPANTONIO:

16        Q.  Is it really vague to time?  It says 2006

17    right here.  I mean, your lawyer wants to tell

18    us -- is that vague as to time, 2006?

19        A.  So this report --

20        Q.  Yes.

21        A.  -- is for a facility in Birmingham known

22    as Dohmen.

23        Q.  Right.

24        A.  We bought them --
```

```
 1        Q.    Yeah, I know this.

 2        A.    -- this month, in June --

 3        Q.    We're going to get to that.

 4        A.    -- of 2006.

 5              MR. PYSER:  Let him finish his

 6    answer, Counsel.

 7    BY MR. PAPANTONIO:

 8        Q.    Listen to my question.

 9              MR. PYSER:  Counsel, let him finish

10    his answer.

11    BY MR. PAPANTONIO:

12        Q.    Listen to my question.

13              MR. PAPANTONIO:  I'm going to move

14    to strike.

15              MR. PYSER:  He can finish his

16    answer.

17    BY MR. PAPANTONIO:

18        Q.    Sir, let me phrase the question.

19    First of all, had you seen this prior to coming

20    here today?

21        A.    Yes.

22        Q.    Okay.  When did you see this?

23        A.    When it was initially issued.

24        Q.    And so this executive summary that we're
```

1    talking about here is about a facility in

2    Birmingham, Alabama that Cardinal was in charge

3    of, correct?

4        A.   That we just bought.

5        Q.   Right, right.  But Cardinal at this time

6    was selling drugs to these people, true?

7                MR. PYSER:  Object to form.

8        A.   I don't believe we were -- they were a

9    customer.

10   BY MR. PAPANTONIO:

11       Q.   Well, let's go to the front -- who is --

12   who is -- Mignette Strife?

13       A.   She's -- she was administrative assistant

14   to regulatory counsel.

15       Q.   And she's sending this out.  She's with

16   Cardinal, correct?

17       A.   Correct.

18       Q.   And she's what kind of counsel with

19   Cardinal?

20       A.   Regulatory.

21       Q.   Regulatory counsel.

22                MR. PYSER:  Object to form.  Not

23   counsel.  I don't think that's what he said.  He

24   never called her counsel.

```
 1   BY MR. PAPANTONIO:

 2        Q.   Okay.  It says "Attached please find the

 3   report detailing the findings of the compliance

 4   assessment conducted at the pharmaceutical

 5   distribution center in Birmingham, Alabama.

 6             Now, she's writing about a facility in

 7   Birmingham, Alabama, right?  It says "This report

 8   is confidential and should not be reproduced.  The

 9   recipient is responsible for its security and

10   should destroy it."

11             Wow.  Did you get a copy of this?  Did you

12   destroy your copy?

13        A.   I don't recall.

14        Q.   Well, this -- this is supposed to be

15   destroyed.

16                  MR. PYSER:  Object.

17   BY MR. PAPANTONIO:

18        Q.   Was that a common thing, for you to be

19   sent documents from management or anybody with the

20   company saying, look, after you read this, destroy

21   it.  I guess you could chew it up or set it on

22   fire.  What was your way of -- well, let me strike

23   that.

24             What was your way of destroying documents?
```

```
 1    What method did you use to destroy documents?

 2        A.   Shred them.

 3              MR. PYSER:  Object.

 4   BY MR. PAPANTONIO:

 5        Q.   You would shed them, okay.  So Cardinal --

 6   in-house, you didn't burn --

 7              MR. PYSER:  Object to form.

 8   BY MR. PAPANTONIO:

 9        Q.   -- you shredded documents, correct?

10              MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12        Q.   True?  I'm just trying to figure out --

13        A.   Personally?

14        Q.   The way to do it was to shred it, true?

15              MR. PYSER:  Object to form.

16        A.   For me personally.

17   BY MR. PAPANTONIO:

18        Q.   For you personally.  And so this --

19   according to this, this is saying this recipient

20   is responsible for its security and should destroy

21   and delete.

22              Do you remember whether you shredded this

23   one?

24        A.   I don't recall.
```

```
 1        Q.   All right.  But it says -- in the

 2    executive summary, it says "Significant issues."

 3             We went through customers receiving

 4    scheduled products that they were not entitled to

 5    receive due to their DEA registrations not being

 6    reviewed and set up correctly in the computer

 7    system.

 8             Then it says "DEA Schedule II paperwork is

 9    not kept separate from other documents."  Then it

10    goes "There is no" -- I want to make sure I get

11    this right.

12                      MR. PAPANTONIO:  Underline this for

13    me, would you, ma'am?

14    BY MR. PAPANTONIO:

15        Q.   It says "There's no system to determine

16    excessive suspicious ordering by customers of

17    controlled substance products."  That's what that

18    says, right?

19                      MR. PYSER:  Object to form.

20    BY MR. PAPANTONIO:

21        Q.   There is no system to determine excessive

22    or suspicious ordering by customers of controlled

23    substances, right?

24        A.   Right.
```

1      Q.   And that's consistent with that document I

2   showed you where the fellow from McKesson was

3   saying that you told him straight up that there

4   was no monitoring system at Cardinal?

5                MR. PYSER:  Object.

6   BY MR. PAPANTONIO:

7      Q.   It's at least consistent with that?

8                MR. PYSER:  Object to form.

9   Misstates evidence.

10     A.   So this, again, is our first visit to a

11   newly-acquired company for the purpose of

12   evaluating their existing programs and then

13   putting together a corrective action plan to bring

14   them to Cardinal's standards.

15   BY MR. PAPANTONIO:

16     Q.   Well, we're going to talk about what the

17   correction plan was here in just a second, okay.

18   We're going to talk about whether or not your

19   corrective action worked, all right.  And to do

20   that, we're going to go back to the very document

21   we've been talking about, 4085.

22                MR. PYSER:  Object to form of the

23   speech and colloquy by counsel.

24   BY MR. PAPANTONIO:

1      Q.   It says -- back on page 7 of that

2   document, it says -- okay.  So first of all, I

3   want to be clear on something.  1971 was the first

4   time that the company was told what the rules are,

5   CFR, in selling narcotic drugs, 1971, correct?

6      A.   Correct.

7      Q.   And then this is talking about 2006.  Tell

8   me about -- was there anything in between 1971 and

9   2006 where the DEA contacted you and told you what

10   you were supposed to do?

11      A.   I don't recall.

12      Q.   Well, 2006 comes next.  And then we go

13   down here, "DEA" -- very last paragraph, "DEA sent

14   a similar letter to all distributors" --very last

15   paragraph, "DEA sent a similar letter to all

16   distributors including respondent" -- which is

17   Cardinal, correct?  Correct?

18      A.   Correct.

19      Q.   -- "on December 27, 2007.  The letter

20   reminded distributors of their obligation to

21   maintain effective controls against diversion and

22   emphasized it is the sole responsibility of the

23   registrant."

24           Would you underline that for me, please,

1    "the sole responsibility of the registrant"?

2           In other words, sir, you -- it would be

3    improper for you to delegate a responsibility to a

4    pharmacy to do your job for you.  They -- your job

5    was separate from their job as far as selling

6    narcotics correct?

7                MR. PYSER:  Object to form.

8        A.   Correct.

9    BY MR. PAPANTONIO:

10       Q.   You don't delegate your responsibility

11   under CFR to somebody else.  You couldn't do that,

12   true?

13       A.   Correct.

14       Q.   And to do that would be illegal?

15               MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   Correct?

18       A.   It would be a violation if we didn't meet

19   the requirements of the regulation.

20       Q.   Let's go back to speeding tickets.  A

21   speeding ticket is a violation and it's illegal,

22   isn't it?

23               MR. PYSER:  Asked and answered.

24   BY MR. PAPANTONIO:

1        Q.    Correct?

2        A.    Speeding is, correct.

3        Q.    And you get a ticket.  That means you've

4    broken the law, true?

5              MR. PYSER:  Object to form.

6        A.    True.

7    BY MR. PAPANTONIO:

8        Q.    And here you have a regulation.  And if

9    you don't follow it, you've broken the law,

10   correct?

11             MR. PYSER:  Object to form.

12       A.    Violated the regulation.

13   BY MR. PAPANTONIO:

14       Q.    Yeah.  Okay.  So let's go to page 8.

15   Halfway down it says "In addition to DEA" -- "In

16   addition, DEA offers a variety of conferences

17   which are opened up to DEA registrants, including

18   distributors."

19             In fact, records indicate that Cardinal

20   Health sent three representatives including

21   Mr. Mone, Mr. Reardon to the DEA's pharmaceutical

22   industry conference October 2009.

23             So you attended -- at least we know that

24   you attended the one in 2009 that DEA gave about

```
 1    how a distributor should avoid breaking the law

 2    where it comes to selling narcotics, correct?

 3                MR. PYSER:  Object to form.

 4        A.   I was at the conference.

 5    BY MR. PAPANTONIO:

 6        Q.   Actually, you had DEA agents face-to-face.

 7    You had a chance the talk to them face-to-face,

 8    didn't you?

 9        A.   If the opportunity presented, yes.

10        Q.   Did it present itself?

11        A.   I know at some conferences I interacted

12    with DEA investigators.  I don't recall if I

13    specifically did at this one.

14        Q.   Then the bottom paragraph -- it says "DEA

15    also provides presentations and holds meetings

16    with the industry trade group HDMA" -- Healthcare

17    Distribution Management Association, HDMA -- "of

18    which Cardinal is an active member."

19            Now, you actually went to HDMA meetings,

20    didn't you?

21        A.   Yes.

22        Q.   And Cardinal truly was an active member as

23    this says.  You were an active member in HDMA,

24    correct?
```

1        A.    Correct.

2        Q.    Between May 6, 2008 and December 31, DEA

3    representatives gave presentations and held

4    meetings with HDMA in Maryland, District of

5    Columbia, and Florida and Virginia on 11

6    occasions.

7            Did you go to any of these DEA meetings

8    where they said, okay, these are the rules you got

9    to play by?

10              MR. PYSER:  Object to form.

11       A.    I would say I was an attendee at at least

12   some of them.

13   BY MR. PAPANTONIO:

14       Q.    Do you remember being an attendee?  Do you

15   remember they gave PowerPoints and showed you

16   specifics about what you could and couldn't do as

17   a distributor?

18              MR. PYSER:  Object to form.

19       A.    That was essentially their agenda at every

20   meeting, so I can't speak specifically to any of

21   these meetings.

22   BY MR. PAPANTONIO:

23       Q.    We have some of their PowerPoints we'll

24   talk about this afternoon.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2    BY MR. PAPANTONIO:

 3        Q.   Okay.  Next question.

 4             "Cardinal Health is one of nation's

 5    largest wholesale pharmaceutical distributors.

 6    Cardinal Health distributes pharmaceuticals,

 7    including oxycodone and medical products, for

 8    dispensing and retail sale.

 9             "From January through December 2010,

10    Florida distributors distributed 597,215,253

11    dosage units of OxyContin to retail registrants."

12             Those would be your customers, right,

13    retail registrants?

14                    MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16        Q.   Correct?

17        A.   Correct.

18        Q.   It says "Respondent" -- that's Cardinal,

19    correct?

20                    MR. PYSER:  Object to form.

21        A.   Correct.

22    BY MR. PAPANTONIO:

23        Q.   "Respondent distributed 132,281,020 dosage

24    units of the total oxycodone distributed or
```

1    approximately 22 percent of the total 2010 Florida

2    distributions."

3          Do you remember those numbers being that

4    high?

5      A.   I do not.

6      Q.   But were you the person that were -- first

7    of all, you were in charge of -- let's just call

8    it quality -- what do you want to call it, quality

9    review?  When you were with working with Brantley,

10   what was that job?  What did you call the job, so

11   we can use the same term?

12     A.   Anti-diversion.

13     Q.   Anti-diversion.  Okay.  And then you went

14   to -- after that, you're overseeing all the

15   distributorships, correct?

16             MR. PYSER:  Object to form.  Object

17   to form.

18     A.   Correct.

19   BY MR. PAPANTONIO:

20     Q.   One of the distributorships is right there

21   in Florida, Lakeland, Florida, correct?

22     A.   Correct.

23     Q.   And you don't remember these numbers that

24   it's talking about, 132 million dosage units of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    oxycodone?

 2         A.    The numbers would have been reviewed by

 3    the centralized anti-diversion program.

 4         Q.    But you saw them, too?

 5         A.    I did not.

 6         Q.    You saw them day-to-day come across your

 7    desk, didn't you?

 8                    MR. PYSER:  Object to form.

 9         A.    No.

10    BY MR. PAPANTONIO:

11         Q.    So you -- is that number -- is that

12    number -- well, let me ask you this way:  Do you

13    remember the numbers in Florida being higher than

14    most other places?

15         A.    I wouldn't have any knowledge of that.

16         Q.    So they didn't -- so whatever group was

17    looking at that, you're saying you weren't in that

18    group, correct?  You had nothing to do with

19    numbers?

20                    MR. PYSER:  Objection.

21    BY MR. PAPANTONIO:

22         Q.    You didn't look at thresholds or anything

23    like that, true?

24                    MR. PYSER:  Objection.  Vague as to
```

```
 1    time.

 2        A.   Correct.

 3    BY MR. PAPANTONIO:

 4        Q.   So the people that were, they didn't share

 5    with quality -- they didn't share with

 6    anti-diversion what the numbers were.  Is that

 7    your testimony?

 8                 MR. PYSER:  Objection.  Vague as to

 9    time.

10        A.   No, anti-diversion would see the numbers,

11    not me.

12    BY MR. PAPANTONIO:

13        Q.   Well, that's what I mean.  You worked in

14    anti-diversion?

15        A.   Not at this time.

16        Q.   At any time that you worked in

17    anti-diversion, you saw the numbers, yes or no?

18                 MR. PYSER:  Objection.

19    BY MR. PAPANTONIO:

20        Q.   You saw the numbers, didn't you?

21                 MR. PYSER:  Objection.  Form.

22        A.   No.

23    BY MR. PAPANTONIO:

24        Q.   Okay.
```

```
 1        A.   No.

 2        Q.   So your testimony is that you never saw

 3   the numbers of what was being sold throughout the

 4   country when you were working in anti-diversion?

 5             MR. PYSER:  Objection.  Form.

 6   Misstates testimony.

 7   BY MR. PAPANTONIO:

 8        Q.   Is that your testimony, that Reardon never

 9   saw the numbers of the -- numbers of narcotics

10   that were being sold throughout the country when

11   he was working in anti-diversion?  Is that your

12   testimony?

13        A.   I did not review the reports.

14        Q.   Did you know the numbers, is my question

15   to you, yes or no?  It's real simple.

16             MR. PYSER:  Object.

17   BY MR. PAPANTONIO:

18        Q.   Yes or no?

19             MR. PYSER:  Object to form.

20        A.   No.

21   BY MR. PAPANTONIO:

22        Q.   Okay.  And then, if I understand you

23   right, you didn't even know the numbers when you

24   were the person in charge of the distributorships
```

1    all over the country.  You didn't know the numbers

2    there either, did you?

3                    MR. PYSER:  Object to form.  Vague.

4    BY MR. PAPANTONIO:

5        Q.   Yes or no?

6                    MR. PYSER:  Unclear what it means,

7    "in charge of the distributorships."

8    BY MR. PAPANTONIO:

9        Q.   When you took your job in -- overseeing

10   distributorships, sir, you're telling the jury, if

11   I understand, you didn't see the numbers there

12   either, did you?

13                   MR. PYSER:  Object to form.

14       A.   I was not -- when you say in charge of the

15   distributorships --

16   BY MR. PAPANTONIO:

17       Q.   No, you said that.

18       A.   I said I was in charge of facilitating

19   regulatory compliance.  I was not in charge of

20   operations or sales.

21       Q.   But, sir, regulatory and compliance is

22   exactly what we're talking about here.  Regulatory

23   and compliance means that you have to get involved

24   when the facility is selling too many narcotics to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the people around them, yes or no?

 2                   MR. PYSER:  Object to form.

 3        A.   It's the responsibility of anti-diversion

 4    to monitor the sales and the distribution centers.

 5    BY MR. PAPANTONIO:

 6        Q.   You told me just a minute ago that when

 7    you were working for the anti-diversion you never

 8    saw the numbers?

 9        A.   It was delegated to Eric Brantley and his

10    team.

11        Q.   You were head of that division, weren't

12    you?  You were in charge of -- Brantley worked for

13    you in anti-diversion true?

14                   MR. PYSER:  Object to form.

15        A.   True.

16    BY MR. PAPANTONIO:

17        Q.   And you're telling me that as -- that you

18    never saw the numbers of narcotics that were being

19    sold by your company and your role was

20    anti-diversion.

21             Did I just get that right?

22                   MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24        Q.   I mean, seriously, did I just get that
```

```
 1    right?

 2         A.   That was part of my role.

 3         Q.   Listen to what I said.  You're telling

 4    this jury right here -- you're telling the jury

 5    that in your role of being in charge of

 6    anti-diversion, that Steve Reardon never saw the

 7    numbers of what was being sold in this country.

 8    Yes or no?

 9                   MR. PYSER:  Object to form.

10         A.   Yes.

11    BY MR. PAPANTONIO:

12         Q.   That's -- in other words, that's your

13    testimony?

14                   MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16         Q.   Correct?

17         A.   Correct.

18         Q.   And then you're also telling me that when

19    you took over the position of being in charge of

20    distribution centers -- regulatory for

21    distribution centers, you never saw the numbers

22    there either, right?

23                   MR. PYSER:  Object to form.

24         A.   Correct.
```

1    BY MR. PAPANTONIO:

2        Q.   And you know that the DEA concluded that

3    all of Cardinal's distribution centers had

4    breached their responsibility for following the

5    law.  You know that.

6                    MR. PAPANTONIO:  Give me 42 -- give

7    me 4230, please.

8                    MR. PYSER:  Object to form.

9    BY MR. PAPANTONIO:

10       Q.   You know that DEA actually came out and

11   said that the conduct at Cardinal was so bad that

12   all of the distribution centers had breached the

13   law?

14                   MR. PYSER:  Object to form.

15   Misstates evidence.

16   BY MR. PAPANTONIO:

17       Q.   Did you know that?

18                   MR. PYSER:  Object to form.

19   Misstates evidence.

20   BY MR. PAPANTONIO:

21       Q.   Did you know that, yes or no?  Did you

22   know that prior to coming here today?

23                   MR. PYSER:  Object to form.

24   Misstates evidence.

```
 1        A.   Would you repeat that?

 2   BY MR. PAPANTONIO:

 3        Q.   Did you know that the DEA said that all

 4   the distribution facilities that -- throughout the

 5   country, that you had -- that you had maintained

 6   inadequate controls where it comes to diversion?

 7        A.   I would need to see the document.

 8                  MS. MOORE:   Reardon 6.

 9

10        (Exhibit No. 6 marked for

11   identification.)

12

13                  MR. PYSER:   Object to form.

14   BY MR. PAPANTONIO:

15        Q.   Now, you see, I mean, you've -- you've

16   seen this document haven't you, sir?

17        A.   Yes.

18        Q.   And you know what I just said is in this

19   document, that all of the distributorships in this

20   country -- well, let me just make it even easier.

21   How about let's just go -- go to page 3.

22             All right.  It says "The alleged failure

23   of Cardinal to maintain an adequate controls

24   against the diversion of controlled substances on
```

```
 1    or prior -- on or prior to September 2008 at all

 2    distribution facilities listed in Appendix A."

 3              And then it even lists -- let's look at

 4    Appendix A, page 13.  Flip to page -- flip to page

 5    13.  Bottom of the page, you'll have 1-3.

 6              It actually lists all of the facilities

 7    that were not in compliance with the law.  Is this

 8    the first time you have you've seen this?

 9                   MR. PYSER:  Object to form.

10    Misstates evidence.  Rule of completeness.

11    BY MR. PAPANTONIO:

12         Q.   Have you seen that before?

13         A.   Yes.  Now, my understanding of this is

14    that this is covered conduct, not that these

15    facilities actually had any allegations

16    specifically against them.

17         Q.   Well --

18         A.   This was just part of the agreement that,

19    on a go-forward basis, any historical issues were

20    taken care of.

21         Q.   Well, let's read it.  I mean, the document

22    kind of says what it says.  It's -- on page 3, it

23    says "The alleged failure of Cardinal to maintain

24    adequate controls against diversion of controlled
```

1    substances on or prior to September 2008 at all

2    distribution centers facilities."

3            All of them.  Do you see that?

4                MR. PYSER:  Same objections.

5    BY MR. PAPANTONIO:

6        Q.   Now, I want to ask you about page 13.

7    You -- what was your involvement with overseeing

8    the Syracuse, New York distribution center prior

9    to 2008?

10               MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12       Q.   What was your role?

13       A.   Same role.  Regulatory compliance in the

14   distribution centers.

15       Q.   And how about Lakeland, Florida?  What was

16   your role?

17       A.   Same.

18       Q.   Madison, Wisconsin, what was your role?

19       A.   Same.

20       Q.   All of these, you just -- let's make it

21   easier.  Which one of these did you not have a

22   responsibility for?  Let's just go through them.

23   Which one of these did you not have responsibility

24   for as far as overseeing whether or not regulatory

```
 1    was proper or improper?

 2                 MR. PYSER:  Object to form.

 3        A.   It would have been all of them.

 4    BY MR. PAPANTONIO:

 5        Q.   It would have been all of them, correct?

 6        A.   Correct.

 7        Q.   All right.  So let's go back to Document

 8    4085.  We've been talking about the DEA

 9    investigation of Cardinal.  Do you recall that,

10    the one in front of you?

11        A.   Yes.

12        Q.   So I left off with "Respondent," which is

13    Cardinal.  In that middle paragraph, "Respondent

14    distributed 132 million dosage units of the total

15    oxycodone distributed at approximately 22 percent

16    of the total 2010 Florida distributions.  From

17    January through December 2011, Florida distributed

18    572,274 dosage units of oxycodone to retail

19    registrants in the State of Florida.

20    "Respondent" -- again that's Cardinal --

21    "distributed 146 million dosage units of the total

22    OxyContin distributed or 25 percent of the total

23    2011 distribution."

24                 Now, here's my question:  Were you ever
```

1    aware of what market percentage Cardinal had in

2    Florida prior to you seeing this document?

3                  MR. PYSER:  Object to form.

4         A.   No.

5    BY MR. PAPANTONIO:

6         Q.   Were you ever aware of what market

7    percentage that Cardinal had of the national sales

8    of narcotics prior to being here today?

9         A.   Not a specific number.

10        Q.   Well, what's the number do you think?

11                 MR. PYSER:  Counsel, let's take a

12   break when you get to logical breaking point.

13                 MR. PAPANTONIO:  Well, we can break

14   right here.  We'll pick up from this.

15                 MR. PYSER:  Let's strike the

16   question so that we're --

17                 MR. PAPANTONIO:  Strike the

18   question.  I'll pick up.

19                 THE VIDEOGRAPHER:  Time is 10:32

20   a.m. and we're off the record.

21                 MR. PAPANTONIO:  Sir, I do want to

22   be clear.  I have a pending question right now.

23   The pending question -- before we take a break --

24   here's why I'm doing it.  You're not supposed to

```
 1    talk to counsel about a pending question, so the

 2    pending question that I want to pose here for you

 3    is -- we're talking about the numbers of narcotics

 4    sold throughout the country at various

 5    distribution centers, and I'm asking questions

 6    about that.

 7                 MR. PYSER:  I object to counsel's

 8    colloquy or any instruction to the witness.

 9    Counsel struck the question.  There is no pending

10    question.

11                 MR. PAPANTONIO:  No.  That's a --

12    well, let me ask him before we leave, okay?

13                 MR. PYSER:  No.  You already took a

14    break.  We're off the record.

15                 MR. PAPANTONIO:  Well, sir, if you

16    talk to him about what we talked about --

17                 MR. PYSER:  Counsel, we're not going

18    to do anything improper.  We've never done

19    anything improper.

20          You have no reason for this and the game

21    playing is ridiculous.  The game playing is

22    ridiculous.  You struck the question.  There's no

23    pending question.

24                 MR. PAPANTONIO:  Well, here's --
```

1           MR. PYSER:  Counsel, we're done

2    here.

3           MR. PAPANTONIO:  The company has

4    committed --

5           MR. PYSER:  That's ridiculous.

6           MR. PAPANTONIO:  -- criminal

7    conduct.

8           MR. PYSER:  Enough, enough.

9           MR. PAPANTONIO:  So we'll get back

10   here in about ten minutes.

11

12   (Recess was taken from 10:36 a.m. to 10:46 a.m.)

13

14           THE VIDEOGRAPHER:  10:46 a.m.  On

15   the record.

16   BY MR. PAPANTONIO:

17       Q.  Sir, now we left off talking about

18   numbers.  And I'm assuming that there's been no

19   discussion about numbers with you and your

20   attorney during the break?

21       A.  No, no discussion.

22       Q.  Okay.  All right.  So as far as numbers,

23   did you keep up with the numbers of dead people

24   who were dying of opioid overdoses over the years,

1    just curious?

2                    MR. PYSER:  Object to form.

3        A.   Did not.

4    BY MR. PAPANTONIO:

5        Q.   Okay.  So you didn't keep up with the

6    numbers of narcotics that were sold by your

7    company.  You told us that --

8                    MR. PYSER:  Object to form.

9    BY MR. PAPANTONIO:

10       Q.   -- true?

11       A.   True.

12       Q.   You didn't keep up with those  numbers in

13   either job that you had, which the first one was

14   regulatory quality control --

15                   MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   -- correct?

18       A.   Quality and regulatory affairs.

19       Q.   And then you didn't keep up with those

20   numbers when you were -- when you were heading up

21   your role of overseeing distribution centers all

22   over the country?

23       A.   Just to clarify that, the DC operations

24   piece, I was not in charge of the DC.  My team

```
 1    created policies and procedures to facilitate

 2    compliance with other DEA regulations and Board of

 3    Pharmacy regulations.  It was around physical

 4    security, making sure the physical security was in

 5    place --

 6         Q.   Right.

 7         A.   -- making sure that they had the

 8    appropriate inventory processes in place.

 9         Q.   All right.

10         A.   It -- recordkeeping.

11         Q.   And so you -- the number of distribution

12    centers throughout the country, you told us -- how

13    many distribution centers were there?

14         A.   It varied at times, but it was in the

15    twenties.

16         Q.   In the twenties?

17         A.   Yes.

18              MR. PAPANTONIO:  And so show him

19    Document 324, please.

20              MS. MOORE:  Reardon 7.

21

22         (Exhibit No. 7 marked for

23    identification.)

24
```

```
 1   BY MR. PAPANTONIO:

 2      Q.   Now, sir, when did you first see this

 3   document that I just handed you?  When's the first

 4   time you saw this document?

 5      A.   (Witness reviews document.)

 6           I've never seen this.

 7      Q.   No.  I mean, while you were working for

 8   Cardinal, when's the first time you saw it?

 9                MR. PYSER:  Object to form. Asked

10   and answered.

11      A.   I did not see it.

12   BY MR. PAPANTONIO:

13      Q.   This is the first time you've seen the

14   document?

15                MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17      Q.   Is that correct?

18      A.   Correct.

19                MR. PAPANTONIO:  Would you put up --

20   or put up on the slide 324.18, please?

21   BY MR. PAPANTONIO:

22      Q.   And that will be -- if you'll take a look

23   at 1, 8, sir, 1, 8 -- .18 is what we're looking

24   for there.
```

1          Well, no, I'll tell you what.  You know,

2     back up.  Just since he's never seen it, I want to

3     make sure it's clear.  Go ahead and back up to the

4     first one, 1999.

5          Now, you see 1999.  Take a look at what

6     1999 looks like up there on the screen.  Do you

7     know what -- do you know what the colors here

8     mean?  Take a look.  Take a minute and take a look

9     at the what the colors mean?

10               MR. PYSER:  Object to form on the

11    prelude and colloquy.

12    BY MR. PAPANTONIO:

13         Q.   Do you see where it says "Estimated age

14    adjusted death rate per 100,000 people"?

15               Do you see that?

16         A.   Yes.

17         Q.   And you see the very bottom of it, it says

18    "30+."

19               Do you see that?

20         A.   Yes.

21               MR. PYSER:  Objection to the use of

22    this document.  Standing objection to the use of

23    this document.  Improper.  Misleading.

24    BY MR. PAPANTONIO:

```
 1       Q.   And then you also see -- at the bottom of

 2   it, this says "The national" -- "The national

 3   center for health statistics, national vital

 4   statistics, mortality data."  And then it even

 5   gives a site you can go to right on the Internet.

 6            Do you see that, www?  Do you see that?

 7       A.   Yes.

 8       Q.   And then it even gives citations, doesn't

 9   it?  Do you what the CDC is?

10       A.   Center for Disease Control.

11               MR. PYSER:  Objection.

12   BY MR. PAPANTONIO:

13       Q.   You've reviewed information about Center

14   for Disease Control in the past, correct?

15       A.   Possibly.

16       Q.   Well, tell us why you would.  I mean,

17   Center for Disease Control is an organization that

18   kept up with the drug overdose problem in the

19   United States.

20            You know that, right?  Did you know that?

21       A.   I did not.

22       Q.   Did you know that you could just make a --

23   you could just make a telephone call to CDC to

24   find out what statistics are of dead people from
```

```
 1   opioid use throughout the United States?

 2                   MR. PYSER:  Object to form.

 3   BY MR. PAPANTONIO:

 4        Q.   Did you know that?

 5        A.   I did not.

 6        Q.   Did you know that they had a website that

 7   they actually -- anybody could go to the website

 8   and they could say, wow, people are really dying

 9   in Florida.  They had a site that could -- they

10   could show them how many people were dying,

11   right?

12                   MR. PYSER:  Object to form.

13   BY MR. PAPANTONIO:

14        Q.   You didn't know that?

15        A.   Did not.

16        Q.   And in either of your jobs, you didn't

17   know that, did you?

18                   MR. PYSER:  Object to form.

19        A.   Did not.

20   BY MR. PAPANTONIO:

21        Q.   And as a matter of fact, if we take

22   these -- let's go back to -- we have a list up

23   here.

24                   MR. PAPANTONIO:  Show him the just
```

```
1     the plain document of the distribution sites.

2     BY MR. PAPANTONIO:

3         Q.   I want to ask you this -- a question about

4     that, just the distribution sites.  I want to make

5     sure that these are correct, these distribution

6     sites are correct.

7             Take a look at these distribution sites,

8     sir.  And tell me, does that look a fair and

9     accurate representation of what you recall about

10    where the distribution sites were in the country?

11    Take a minute to look at that.

12        A.   (Witness reviews document.)

13             MR. PYSER:  Object to form.

14        A.   Yes, with -- may have been some changes

15    since my time, openings, closings, but it's fair.

16    BY MR. PAPANTONIO:

17        Q.   But the -- so these would have been most

18    of the sites that you were involved with in

19    working and overseeing distribution sites,

20    correct?

21        A.   Again, I clarify that I didn't oversee the

22    distribution.  It was facilitating compliance with

23    DEA, Board of Pharmacy, FDA, through the

24    development of policies, procedures and processes
```

1    tied to physical security, recordkeeping,

2    inventory management, receiving, pick-packing and

3    shipping, transportation.

4        Q.   Right.  And so let's -- so -- but you

5    recognize these sites, right?

6        A.   Right.

7        Q.   And now, let's take that map.  Would you

8    go to the last -- I think it's .18, it's 2016.

9    Now, were you with the company in 2016?

10       A.   What was the --

11       Q.   It's .18.  It's 324.18.

12       A.   Okay.

13       Q.   It's up here on the screen, too.  What I

14   have on the screen is what you're looking at,

15   right, 2016?

16       A.   Yes.

17       Q.   And you see it says "Estimated age

18   adjusted death rate per 100,000."

19            You see that?

20                 MR. PYSER:  For clarification,

21   that's different than what's on the screen right

22   now.

23                 MR. PAPANTONIO:  Well, okay.

24   BY MR. PAPANTONIO:

```
 1       Q.   This is -- this is a representation of

 2   what you're looking at here.  That's my point.

 3   Look at that, then look at the screen.  Same

 4   thing, isn't it?

 5                MR. PYSER:  Object to form.

 6       A.   Similar.

 7   BY MR. PAPANTONIO:

 8       Q.   Yes.  All right.  Well, now let's -- what

 9   I want to do is I want to put the distribution

10   sites -- I want to superimpose them on this screen

11   and then ask you, do you understand, as you look

12   at this -- as you look at this document, you

13   understand what brown represents, what the color

14   brown represents?

15       A.   Yes.

16       Q.   And if you look the map up here, do you

17   see that you had distribution sites virtually in

18   every area where there's brown?

19                MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21       Q.   Do you see that?

22       A.   I guess I've got a question because this

23   talks to, as I look at the citation, drug

24   poisoning mortality.
```

```
 1        Q.   Yes.

 2        A.   There's got to be more than just legal

 3   drugs in here, so -- so it could be inflated in

 4   some sense.

 5        Q.   It could be.  But you've never even seen

 6   it, so you can't give an opinion one way or

 7   another, can you?

 8              MR. PYSER:  Object to form.

 9   BY MR. PAPANTONIO:

10        Q.   Right?

11        A.   I guess I could question what's included.

12        Q.   Well, by the time this is seen by a jury,

13   there will be an expert that talks about this that

14   actually did review the numbers that you never

15   reviewed, okay.

16              So it's safe to say you wouldn't know one

17   way or another whether this is accurate or not

18   because you never even reviewed the numbers,

19   true --

20              MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22        Q.   -- of death -- of dead people?

23        A.   I didn't say it wasn't accurate.  I was

24   just questioning what types of drugs were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    included.

 2                    MR. PYSER:  Object to form.

 3    BY MR. PAPANTONIO:

 4        Q.   Had you ever seen -- have you ever seen a

 5    map where your distribution centers are

 6    superimposed on the areas where they have the

 7    highest level of death in the United States?

 8                    MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10        Q.   Have you ever seen that?

11        A.   No.

12        Q.   First time you've seen it, isn't it?

13                    MR. PAPANTONIO:  Offer -- make sure

14    we offer a copy of that.  Thank you, sir.

15    BY MR. PAPANTONIO:

16        Q.   Now, we're going to go back -- again,

17    talking about numbers here.  So these numbers --

18    we just established you didn't know the numbers in

19    your first job -- well, you didn't know the

20    numbers of what was being sold by Cardinal in your

21    first job, which dealt with -- you want -- put it

22    in your words.  Your first job with Cardinal was

23    what?

24        A.   Very first job --
```

```
 1        Q.   Yes.

 2        A.   -- going all the way back to 1988?

 3        Q.   Yes.

 4        A.   I was hired as a manager of security and

 5   compliance in their Peabody, Mass  distribution

 6   center.

 7        Q.   Okay.  And then around 2005 what was your

 8   job?

 9        A.   I had relocated to Dublin, Ohio, and took

10   on a corporate role prior to that, and it was

11   quality and regulatory affairs.

12        Q.   Okay.  Stop right there.  In quality and

13   regulatory affairs, you did not ever review the

14   numbers of narcotics being sold in the United

15   States, correct?

16             MR. PYSER:  Object to form.

17        A.   Correct.

18   BY MR. PAPANTONIO:

19        Q.   Tell us your job after that.

20        A.   Transitioning from 2007?

21        Q.   Uh-huh.

22        A.   2007, I moved away from anti-diversion and

23   strictly focused on regulatory compliance,

24   facilitating compliance in the distribution
```

```
 1    centers, regulations tied to DEA, Boards of

 2    Pharmacy, FDA, Department of Transportation,

 3    creating policies, procedures, to facilitate that

 4    compliance primarily tied to DEA physical

 5    security, DEA recordkeeping, procedural security

 6    around how to handle controlled substances.

 7                    MR. PAPANTONIO:  Okay.  And so as a

 8    matter of fact, show him, please, Document No.

 9    4622.

10

11             (Exhibit No. 8 marked for

12    identification.)

13

14             MS. MOORE:  Reardon 8.

15    BY MR. PAPANTONIO:

16        Q.   What is this, sir?

17        A.   (Witness reviews document.)

18        Q.   You prepared this, didn't you?

19                    MR. PYSER:  Object to form.

20    BY MR. PAPANTONIO:

21        Q.   Well, it says "Role profile, vice

22    president."  Now let me make sure we get this

23    right.

24                    Underline -- I mean highlight vice
```

1    president, anti-diversion and supply chain

2    integrity.  That's your role.  That's what this

3    document says, correct?  Your role is vice

4    president -- this is 2008 we're talking about --

5    anti-diversion and supply chain integrity.

6           That's what that document says?

7                MR. PYSER:  Object to form.

8      A.   Then this would not have been my role.

9      Q.   Well --

10     A.   2008, no.

11     Q.   Let's read on with it.  Okay.  It says

12   "Role title, vice president, anti-diversion supply

13   chain integrity."  Then it goes, "Primary purpose

14   of job family."

15           What is job family?

16     A.   Job family would be all of those jobs that

17   fall under quality and regulatory affairs.

18     Q.   Okay.  "Lead program, investigations, and

19   training as mandated by Cardinal Health

20   anti-diversion compliance pharmacy."

21           You actually led programs, didn't you, in

22   anti-diversion?

23                MR. PYSER:  Object to form.

24     A.   Not in 2008.

1      Q.   What year did you do that?

2      A.   Up until 2007.

3      Q.   Up until 2007.  And then "Establish, lead,

4   and develop the anti-diversion organization within

5   healthcare supply chain services."

6           What years did you do that?

7               MR. PYSER:  Object to form.

8      A.   Up until 2007.

9   BY MR. PAPANTONIO:

10     Q.   "Lead and establish and deployment of

11  Cardinal Health anti-diversion programs, systems,

12  and processes associated with requirements related

13  to Drug Enforcement Administration."

14          Did you do that?

15     A.   Up until 2007.

16     Q.   And then it says "Establish programs to

17  monitor anti-diversion activities."

18          Did you do that?

19     A.   We had a program in place.

20     Q.   Well, it says establish it.  Right there

21  it says "Establish programs to monitor

22  anti-diversion activities," right?

23              MR. PYSER:  Object to form.

24     A.   As I read this, this would have been the

```
 1    job profile for the position that Michael Mone

 2    went into.

 3    BY MR. PAPANTONIO:

 4        Q.   Okay.  But you -- you did that position

 5    yourself, didn't you?  These are positions you did

 6    yourself, correct?

 7        A.   This is a new role profile.

 8        Q.   Well, let's be sure.  I want to make sure

 9    that you understood what you were supposed to do.

10              MR. PAPANTONIO:  Show him document

11    3750, please.

12

13              (Exhibit No. 9 marked for

14    identification.)

15

16              MS. MOORE:  Reardon 9.

17              MR. PYSER:  Counsel, we're going to

18    object and take a break until we can see whether

19    this document is privileged.  Put the document

20    down.

21              MR. PAPANTONIO:  We're not going to

22    take a break.  We're going to move on.  You all

23    look at it.  We'll move on to another -- we're not

24    going to take any more breaks until I call the
```

```
 1    break, okay?

 2                    MR. PYSER:  We're clawing back this

 3    document then.

 4                    MR. PAPANTONIO:  Look at it right

 5    now.  We're not going to claw it back.  We're

 6    going to talk about this document because right

 7    now what he's saying is inconsistent with this

 8    document.

 9                    MR. PYSER:  If we claw it back --

10                    MR. PAPANTONIO:  You know that and

11    we're going to talk about.

12                    MR. PYSER:  If we claw it back

13    you're not going to use it.

14                    MR. PAPANTONIO:  We are going to use

15    it, okay.  So you take a minute.  You do what you

16    want to do, review any document.  I'm going to put

17    it on the record.  And then if you want to remove

18    it from the record after that, we can, but we're

19    going to talk about this document.

20                    MR. PYSER:  We'll determine how to

21    you do it once we make our decision on what the

22    document is.

23    BY MR. PAPANTONIO:

24         Q.  Sir, we're going to go back.  And before
```

1    we go into that document, I want to ask you

2    something.

3             You understood, sir -- in 2007, it was

4    clear to you that you were QRA VP with

5    anti-diversion and other regulatory

6    responsibilities.  2005 to 2007, you knew that,

7    right?

8        A.    Correct.

9        Q.    And you knew -- you had been told that --

10   DC staff to identify and report potentially

11   suspicious or excessive purchases of controlled

12   substances after shipment.  You knew that was part

13   of what the DC staff did, right, to identify and

14   report potentially suspicious or excessive

15   purchases of controlled substances?  That's what

16   the DC staff did.  You knew that, right?

17       A.    That was an expected role.

18               MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20       Q.    And that's the role you took after you

21   left your first role, correct?

22       A.    No.

23       Q.    You -- didn't you just tell us you worked

24   with DC?  After 2007, didn't you go to work with

1    DC?

2                     MR. PYSER:  Object to form.

3    BY MR. PAPANTONIO:

4        Q.   Didn't you tell us that?

5        A.   Yes, but I explained to you what my role

6    was and what it covered.

7        Q.   Well, it says "DC staff to identify and

8    report potentially suspicious or excessive

9    purchases of controlled substances."

10            You didn't know that was your job?  Is

11   that what you're telling me?

12       A.   No.  That's -- that's a cage-involved

13   process where employees are trained during the

14   auto-filling process.  If they see something out

15   of the ordinary, they can stop that order, work

16   with a supervisor, investigate it, and call DEA,

17   if necessary --

18       Q.   And were you --

19       A.   -- so yes.

20       Q.   -- were you involved in training other

21   employees, how to keep up with suspicious orders?

22       A.   That would have been delegated.

23       Q.   Who was it delegated to?

24       A.   Different members of my staff.

Highly Confidential -- Subject to Further Confidentiality Review

```
 1        Q.   Okay.  But were you in charge of the staff

 2    that was supposed to be in charge of training,

 3    correct?

 4        A.   Certain regulatory training.

 5        Q.   And regulatory training was -- had to do

 6    with whether or not Cardinal was breaking the law

 7    in the way that it was selling narcotics in the

 8    United States, correct?

 9             You were supposed to train people to

10    identify when Cardinal is or is not breaking the

11    law as far as regulatory standards, correct?

12        A.   We had --

13             MR. PYSER:  Object to form.

14        A.   -- a training program in place.

15             MR. PYSER:  Go ahead and answer.

16    BY MR. PAPANTONIO:

17        Q.   I'm sorry, you had training programs in

18    place, right?  And one thing -- while you were

19    there, as far as the training program --

20             MR. PAPANTONIO:  Give me 4765.

21    BY MR. PAPANTONIO:

22        Q.   Quality was not a mindset where it came to

23    training, was it?

24        A.   Could you repeat that?
```

```
1       Q.   Yeah.  In 2005 --

2            MR. PAPANTONIO:  4765, please.

3   BY MR. PAPANTONIO:

4       Q.   In 2005, you would admit that quality, as

5   far as the way that the company operates its

6   training program, was not a mindset, true?

7       A.   I -- I need to see the document.

8       Q.   Well, we're going to show it to you.

9            MR. PAPANTONIO:  Show him 4765,

10  please.

11

12            (Exhibit No. 10 marked for

13  identification.)

14

15            MS. MOORE:  Reardon 10.

16  BY MR. PAPANTONIO:

17      Q.   You see the front of the document,

18  1/13/2005, it says -- well, it says "Operation

19  One, Cardinal Health Quality Management."

20            Where -- what were you doing in 2005?

21      A.   (Witness reviews document.)

22            I was in QRA.

23      Q.   Okay.  Tell the jury what QRA is just one

24  more time just so we don't --
```

```
 1      A.   Quality and Regulatory Affairs.

 2      Q.   Okay.  But look at page -- look at

 3   4765.64.  6, 4, just look for 6, 4, the last two

 4   numbers.

 5           Do you see that?  Why don't you read

 6   that -- see it says "Internal client perspective

 7   of QRA."  It says "QRA model.  Quality is not a

 8   mindset at Cardinal Health.  We are not proactive.

 9   This is not a high enough priority today."

10           Would you underline not -- "Quality is not

11   a mindset"?

12           Now, was that your memory of the training

13   program in the way that training took place at --

14      A.   Just to clarify, this one, Cardinal

15   Health, was tied to Cardinal's manufacturing,

16   repackaging sites.  I'm not even a member of the

17   team.

18      Q.   Sir, your name is on this, isn't it?

19               MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21      Q.   You know -- you received --

22      A.   Further on --

23      Q.   Wait a second.  No, wait a second.

24           You received this because it was talking
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about your program, right?

 2                 MR. PYSER:  Object to form.  Let the

 3    witness finish his answer before you ask another

 4    question.  Sir, if you didn't finish your answer,

 5    you can go ahead.

 6         A.   So not part of the overall team, but I was

 7    assigned to participate in exploring whether or

 8    not training could be centralized as opposed to

 9    have it within different subsidiaries within

10    Cardinal Health.

11    BY MR. PAPANTONIO:

12         Q.   And you knew about this document.  You

13    actually saw this document before you came here

14    today, when I asked you about training, right?

15         A.   Correct.

16         Q.   And then the next thing it says "When

17    financials are tight, quality suffers."

18               Did you write that?

19                 MR. PYSER:  Object to form.

20    BY MR. PAPANTONIO:

21         Q.   "When financials are tight, quality

22    suffers."

23         A.   No.

24         Q.   How about this, "Corporate quality
```

```
 1    organization not sure what their role is or should

 2    be."

 3             Did you write that?

 4        A.   No.

 5        Q.   And then the last one, "Would like to see

 6    stronger regulatory, i.e., FDA affairs could be a

 7    strategic advantage," right?

 8             Do you see that?

 9        A.   Yes.

10        Q.   Now, you agree, sir, that the idea of

11    following regulatory standards was undersourced.

12    You agree with that?

13                  MR. PYSER:  Object to form.

14    BY MR. PAPANTONIO:

15        Q.   It was undersourced.  You see the next

16    one.  It says "People undersourced today"?

17        A.   Again, this piece of it speaks to the

18    manufacturing side of the business.

19        Q.   Yeah, which is a Cardinal business.  I

20    want to be sure.  It's a Cardinal business,

21    correct?

22        A.   Correct.

23        Q.   All right.  "People have -- people we have

24    are good, don't have enough bench strength."
```

1          Do you see that?

2          And then last one says "Not enough

3    people."

4          Do you see that?

5     A.   Right.

6     Q.   So --

7     A.   So what that would mean is you have good

8    people in the role.  This is succession planning.

9    You want to make sure you have enough people on

10   your bench that are ready to go, so you would do

11   succession planning.  You would say, who's ready

12   now, who's ready in 1 to 3 months, who's ready in

13   6 to 12, et cetera.  That's what that's all about.

14    Q.   And you had 30,000 people working with the

15   company, but you had three people in charge of

16   quality regulatory, right?

17             MR. PYSER:  Object to form.

18    A.   Three people --

19   BY MR. PAPANTONIO:

20    Q.   At corporate.

21    A.   Looking at the ingredient limit reports.

22    Q.   Right, exactly, three people.  Is it three

23   people or isn't it three people?

24             MR. PYSER:  Object to form.

```
 1        A.   I had other staff.

 2   BY MR. PAPANTONIO:

 3        Q.   But you were in charge of three people?

 4             MR. PYSER:  Object to form.

 5        A.   Yes.

 6   BY MR. PAPANTONIO:

 7        Q.   So then if we go back to 48 -- I mean

 8   4085, let's pick up with the -- let's pick up with

 9   the Cardinal investigation of the DEA and

10   Department of Justice investigation of Cardinal.

11   We're on page 9.

12             It says "DEA suspended" -- if you look

13   down, the last paragraph -- next to the last

14   paragraph, "DEA suspended operations at three

15   Cardinal Health distribution facilities, including

16   respondent, through a series of immediate

17   suspension orders."

18             Tell the jury what an immediate suspension

19   order is.

20             MR. PYSER:  Object to form.

21        A.   DEA would suspend your registration and

22   your ability to distribute controlled substances.

23   BY MR. PAPANTONIO:

24        Q.   Okay.  And then it says that -- let me
```

```
 1    see.  It says "ISO" -- what's an ISO.  That's an

 2    immediate suspension order, right?

 3         A.   Right.

 4         Q.   "ISOs issued between November 28, 2007 and

 5    January 2008 based on DEA's conclusion that they"

 6    -- and we're talking about Cardinal here, right --

 7    "they failed to maintain effective controls

 8    against diversion," right?  That's what it says?

 9                   MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11         Q.   Now, it says between 2007 and 2008, your

12    company, based on DEA conclusions, failed to

13    maintain effective controls against diversion,

14    right?

15                   MR. PYSER:  Object to form.

16    BY MR. PAPANTONIO:

17         Q.   That's what it says?

18         A.   Right.

19         Q.   Tell the jury what diversion is.

20         A.   Diversion is the illegal distribution of

21    controlled substances.

22         Q.   This says "DEA immediately suspended

23    respondent" -- that's Cardinal, right -- "based on

24    its conclusion that for approximately two years
```

1    and two months, between August 2005 and October

2    2007, the facility distributed over 8 million

3    dosage units of hydrocodone-combination products

4    to customers it knew or should have known were

5    diverting hydrocodone into the -- into other than

6    legitimate medical, scientific industrial

7    channels."

8           That's what it says, right?

9       A.   Right.

10      Q.   And those were the very years that you

11   were in charge of quality regulatory, correct?

12      A.   Correct.

13      Q.   2005, I mean, this is talking about you

14   right here, right, Mr. Reardon?

15              MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17      Q.   Am I right?

18      A.   It's the time frame I was in the role.

19      Q.   Right.  And it -- so this says -- while

20   you were in the role, you distributed 8 million

21   pills to people that you knew or should have known

22   were using those pills illegally, right?

23              MR. PYSER:  Object to form.

24   Misstates evidence.

```
 1    BY MR. PAPANTONIO:

 2        Q.   That's what it says, doesn't it?

 3        A.   Well, we distributed controlled substances

 4    that we purchased from licensed manufacturers to

 5    licensed pharmacies who dispensed them pursuant to

 6    prescriptions.

 7        Q.   And according to this, you knew, when you

 8    were doing that, that they were using them

 9    illegally.  That's what this says, doesn't it?

10              MR. PYSER:  Object to form.

11    BY MR. PAPANTONIO:

12        Q.   It says you knew they were being used for

13    illegal purposes?

14        A.   I didn't know that.

15              MR. PYSER:  Object to form.

16    Misstates evidence.

17    BY MR. PAPANTONIO:

18        Q.   Well, that's what this --

19              MR. PYSER:  Object to form.

20    Misstates evidence.  You've got to give me a

21    chance to get the objection on the record.

22    BY MR. PAPANTONIO:

23        Q.   This -- well, let me read it again just so

24    it's very clear.  I think the jury can read this
```

```
 1    all right, but it says --

 2                    MR. PYSER:  You're not reading it

 3    clearly.  You're missing words as you go through

 4    it.

 5    BY MR. PAPANTONIO:

 6        Q.   Let's read it again.  We won't miss any

 7    words.

 8                    "DEA" -- that's the Drug Enforcement

 9    Agency, correct, right?

10        A.   Right.

11        Q.   Those are the people that go after people

12    who break the law where it comes to selling

13    narcotics, right?

14                    MR. PYSER:  Object to form.

15    BY MR. PAPANTONIO:

16        Q.   Right?  They're the people in charge of

17    going after people who break laws where narcotics

18    are sold illegally, correct?

19        A.   Correct.

20        Q.   And it says "The DEA immediately

21    suspended" -- what does that mean, "Immediately

22    suspended Cardinal's license to sell narcotics"?

23    What does that mean?

24                    MR. PYSER:  Object to form.  It was
```

```
 1     not Cardinal's license.  It was one facility.

 2     BY MR. PAPANTONIO:

 3        Q.   What does that mean?

 4             No.  Wait, wait, wait, no.

 5             You don't -- first of all, he's trying to

 6     tell you what to say.  And just in the rule

 7     vernacular, that's not how this happens.

 8             But -- so let me ask the question this

 9     way.  You know what respondent means, don't you?

10     In that situation, you know it's Cardinal,

11     correct?

12        A.   Correct.

13        Q.   Okay.  So it's saying Cardinal's license

14     was suspended, correct?

15        A.   But not every distribution center.

16        Q.   I know.  We're going to talk about a lot

17     of them.  We're just on number one right now,

18     buddy.

19             MR. PYSER:  Object to form.

20     BY MR. PAPANTONIO:

21        Q.   So as number one, it was suspended,

22     correct?  Cardinal license was suspended by the

23     very people who were in charge of making sure that

24     narcotics are not sold to illegal purposes
```

1    throughout the country, yes or no?

2                    MR. PYSER:  Object to form.

3        A.    Three distribution centers.

4        Q.    Yes.  Well, we -- there are a lot more

5    here.  Okay.

6              So anyway, you would agree with that

7    though.  And you knew or should have known that

8    was going on.  That's what this says, you knew or

9    should have known it was going on?

10                   MR. PYSER:  Object to form.

11       A.    We had a program in place that DEA

12   approved.

13   BY MR. PAPANTONIO:

14       Q.    That was your watch.  2005 through 2007

15   was your watch, wasn't it?

16       A.    And we had our report that DEA approved

17   that we submitted to them on a regular basis.

18       Q.    Well, it must not have been a very good

19   report because here the DEA is busting you for not

20   doing it right, correct?

21                   MR. PYSER:  Object to form.

22       A.    It was a report they reviewed and approved

23   with the trade association.

24       Q.    Well, somebody didn't approve it because

1    here you're being busted for doing it illegally,

2    correct?

3                    MR. PYSER:  Object to form.

4    BY MR. PAPANTONIO:

5        Q.  Am I right?  I mean, am I right?

6                    MR. PYSER:  Object to form.

7        A.  Based on this -- based on this, the

8    licenses were suspended.

9    BY MR. PAPANTONIO:

10       Q.  Right.  And based on this, you knew or

11   should have known that the drugs were being used

12   illegally --

13                   MR. PYSER:  Object to form.

14   BY MR. PAPANTONIO:

15       Q.  -- based on this?

16       A.  Based on this.

17       Q.  All right.  It says "The ISO noted that

18   although the average retail pharmacy in Florida

19   distributes less than 8,000 dosage units of

20   hydrocodone per month, the ten retail pharma" --

21   the ten retail, you see that number ten? -- "the

22   ten retail pharmacies that respondent supplied

23   distributed considerably more."

24                   Do you see that?  So we're talking about a

```
 1     Florida average of 8,400.  Do you understand that?

 2         A.   Yes.

 3         Q.   They're saying the typical Florida average

 4     is 8,400.  Then this goes to say "Monthly averages

 5     at those ten pharmacies range from 11,000 to

 6     287,000 dosage units."

 7             Let's see.  My quick calculation that's

 8     about 30 times what the Florida average is, about

 9     30 times.

10                 MR. PYSER:  Object to form.

11     BY MR. PAPANTONIO:

12         Q.   Do you see that?

13                 MR. PYSER:  Ongoing objection.

14     Ongoing objection to the use of this document.

15     BY MR. PAPANTONIO:

16         Q.   8,400 versus 287,000, about 30 times,

17     right?

18         A.   Correct.

19         Q.   It says "The ISO alleged that the unusual

20     size of some of the orders, among other factors,

21     should have prompted Cardinal to conclude that

22     orders were suspicious."

23             What does that mean, "orders were

24     suspicious," within the vernacular of regulatory
```

```
 1    as you've been involved with for so many years?

 2         A.   Unusual size, pattern, or frequency.

 3         Q.   Well, this is certainly an unusual size if

 4    the average -- Florida average is 8,000 pills and

 5    you're selling 280,000 pills.

 6              That certainly is higher than the average,

 7    isn't it?

 8                   MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10         Q.   Right?

11         A.   Yes.

12         Q.   Then it goes on to say "The ISO alleged

13    that the unusual size of some of the orders were,"

14    as you pointed out, suspicious -- "were suspicious

15    as that term is used in the regulations."

16              So the term "suspicious orders" is well

17    defined in regulations, isn't it, well defined,

18    isn't it?

19                   MR. PYSER:  Objection.

20         A.   Unusual size, pattern or frequency.

21    BY MR. PAPANTONIO:

22         Q.   "Respondents in other facilities seized

23    all distribution of controlled substances on the

24    day they received the ISO."
```

1          Do you see that?

2                    MR. PYSER:  Object to form.

3     BY MR. PAPANTONIO:

4          Q.   In other words, it -- do you see that --

5          A.   Yes.

6          Q.   -- where I read that?

7          A.   Uh-huh.

8          Q.   In other words, it took an investigation

9     by the drug enforcement agency to actually have --

10    to stop the sale of these kind of numbers to these

11    facilities, right?

12                   MR. PYSER:  Object to form.

13    BY MR. PAPANTONIO:

14         Q.   That's what it took, you selling these

15    numbers until they started their investigation,

16    right?

17         A.   It appears so.

18         Q.   It says "DEA also issued an order to show

19    cause to revoke the registration of Cardinal

20    Health's Stafford, Texas" -- so first of all,

21    we're talking about Florida, right?  First -- the

22    paragraph right at top talking about Florida, and

23    then, underneath, all of a sudden now we're

24    shifting to Texas.

```
 1              "DEA also issued an order to show cause to

 2     revoke the registration of Cardinal Health's

 3     Stafford, Texas facility based on failure to

 4     conduct appropriate due diligence."

 5              Now, do you know what -- you know what

 6     your responsibility was for due diligence --

 7                   MR. PYSER:  Object to form.

 8     BY MR. PAPANTONIO:

 9         Q.   -- while you were in charge of quality

10     regulatory?

11         A.   To know your customer.

12         Q.   Yeah.  You've got to know your customer?

13         A.   Verify they have an appropriate license --

14         Q.   And to do that --

15         A.   -- which they did.

16         Q.   So to do that, one thing you do is know

17     your customer.  You've got to show up.  You have

18     to see the facility, don't you, to know the

19     customer, right?

20         A.   And our sales reps visit customers they

21     put in, new customers.

22         Q.   As a matter of fact, the sales reps --

23     that's an interesting point because I want to ask

24     you about that.
```

```
 1                    MR. PAPANTONIO:  Give me -- give me

 2     Elber or Elmo.

 3                    MR. PYSER:  Object to form.

 4                    MR. PAPANTONIO:  It was the wrong

 5     form.  It' Elmo, not Elber.  But are we all on

 6     this?

 7     BY MR. PAPANTONIO:

 8         Q.   So you had -- let's talk salesperson,

 9     salesperson.  Okay.  So you would have -- a

10     salesperson very often was living in the same town

11     where the narcotics were being sold, right?

12         A.   I --

13         Q.   In other words, Mary -- well, here, let me

14     put -- Mary, salesperson, lived here and pill mill

15     might have been right down the street.

16              Do you know that -- what -- whether or not

17     salespeople actually lived in the towns where

18     there were actually pill mills?

19                    MR. PYSER:  Objection to form.

20     Improper hypothetical.  Object to all questions

21     related to this, whatever the --

22     BY MR. PAPANTONIO:

23         Q.   Do you know?  Tell --

24         A.   I wouldn't know that.
```

```
 1        Q.   Well, tell the jury what a pill mill is.

 2   Do you know what that is?

 3              MR. PYSER:  Object to form.

 4        A.   As I understand a pill mill, it's -- it

 5   would be a pharmacy that just dealt primarily in

 6   pain pills with -- dealing with most likely

 7   doctors who were writing prescriptions without a

 8   doctor-patient --

 9   BY MR. PAPANTONIO:

10        Q.   As a matter of fact, you allowed a lot of

11   that to go on because you sold pills through --

12   you sold narcotics through the Internet, didn't

13   you, where there weren't any doctors involved?

14              MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16        Q.   Right?  Your company actually sold

17   Internet pills where somebody could just get on

18   the Internet and order pills without -- you never

19   knew whether a doctor ever saw them or not,

20   right?

21              MR. PYSER:  Object to form.

22        A.   I don't believe Cardinal Health sold pills

23   through the Internet.

24   BY MR. PAPANTONIO:
```

```
 1        Q.    Really?  Is that your testimony?  As far

 2   as you're sitting here, you were with the company

 3   how many years?

 4                MR. PYSER:  Object to form.

 5   BY MR. PAPANTONIO:

 6        Q.    How many years?

 7        A.    Twenty-eight.

 8        Q.    Twenty-eight years.  And as you sit here

 9   today, you're unaware that Cardinal sold pills

10   through the Internet?

11                MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13        Q.    Yes or no.  That's the first time you've

14   heard that, isn't it?

15        A.    Well, to clarify, are you talking about an

16   Internet pharmacy?

17        Q.    Yes.

18              So you do know about Internet pharmacies,

19   don't you?

20                MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22        Q.    Right?

23        A.    I'm just thinking through Cardinal's

24   subsidiaries.
```

```
 1        Q.   Well, I'm just asking you a simple

 2   question.  Cardinal allowed Internet pharmacies to

 3   sell their product all over the country, yes or

 4   no?

 5                  MR. PYSER:  Object to form.

 6        A.   You're asking if we sold to pharmacies.

 7        Q.   This isn't a Bill Clinton kind of

 8   question.  This is pretty clear, okay.

 9             Did your company sell narcotics to

10   Internet pharmacies, yes or no?

11                  MR. PYSER:  Object to form.

12        A.   Yes.

13   BY MR. PAPANTONIO:

14        Q.   Okay.  Good.  Okay.  We're moving ahead.

15   All right.  Let's go back to my little picture

16   right here.  This is a -- this is a salesperson

17   lives in the community.

18             Now, have you ever been to pill mill where

19   people actually stood up and they're lined up

20   outside the door 8:00 in the morning to get pills?

21   Have you ever seen something like that?

22                  MR. PYSER:  Object to form.

23        A.   I've seen pictures.

24   BY MR. PAPANTONIO:
```

```
1         Q.   Yeah, there's pictures of it.  As a matter

2    of fact, DEA took pictures all over the country of

3    your facilities, Cardinal facilities, where you

4    were selling pills to pill mills where people were

5    standing outside the pill mills at 8:00 in the

6    morning to get pills.  Did you know that?

7                   MR. PYSER:  Object to form.

8    Misstates evidence.

9              Ongoing objection to whatever that drawing

10   is that's up on the screen.

11   BY MR. PAPANTONIO:

12        Q.   Did you know that?

13        A.   Did not know that.

14        Q.   So you -- but just agree you did see --

15   you did see pictures where people were standing

16   outside pill mills to get their pills, right?

17                   MR. PYSER:  Object to form.

18        A.   Yes.

19   BY MR. PAPANTONIO:

20        Q.   And then you had a salesperson living in

21   those same cities where there were pill mills?

22        A.   I don't know.

23        Q.   You have no independent knowledge because

24   you never actually took time to go to these places
```

1    where they were selling your narcotics, did you?

2              MR. PYSER:  Objection.

3    BY MR. PAPANTONIO:

4      Q.   You never even went to the facilities

5    where they were selling your narcotics, did you?

6              MR. PYSER:  Object to form.  Object

7    to form on the last question as well.

8    BY MR. PAPANTONIO:

9      Q.   Right?

10      A.   Right.

11      Q.   And you know one responsibility that you

12    should have is know your customer.  That's part of

13    what the DEA told you, know your customer, right?

14      A.   Right.

15      Q.   And there's a whole list of things that

16    you're supposed to know.  You're supposed to know,

17    if they're selling our drugs, are people buying

18    the drugs from other states.  You know that's one

19    thing you're supposed to know, are people coming

20    in from out of state to buy the drugs, right?

21              MR. PYSER:  Object to form.

22      A.   Correct.

23    BY MR. PAPANTONIO:

24      Q.   One thing you're suppose to look at are

```
 1    people lined up outside pharmacies to get their

 2    pills.  A whole list of things you knew you had to

 3    know about, right?

 4                  MR. PYSER:  Object to form.

 5           Just as you're going through, answer the

 6    questions, but you have to give me a second to put

 7    an objection on the record.

 8      A.   Okay.

 9    BY MR. PAPANTONIO:

10      Q.   Right?

11      A.   Right.

12      Q.   And you know that if you show up in a

13    parking lot and there's a bunch of tags -- car

14    tags from other parts of the country, that's

15    something that should be suspicious, right?

16      A.   Right.

17      Q.   And you know that if a facility is doing

18    primarily cash business, that's something that you

19    should be suspicious of as far as know your

20    customer kind of analysis, right?

21      A.   Right.

22      Q.   And there's a whole list of things that

23    your company actually said -- the -- excuse me,

24    there's -- scratch that.
```

```
1              There's a whole list of things that the

2    DEA told you that you needed to look at, correct,

3    Cardinal and all the distributors?

4        A.   Through the letters.

5        Q.   They told you by way of letters.  You

6    could sit there and read the letters.  They would

7    tell you, do this, look for that, if you see this,

8    that's a problem.  They told you all that, didn't

9    they?

10       A.   Correct.

11       Q.   But you never one time went to a facility

12   and actually met at the facility to know your

13   customer, did you?

14              MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.   Never?

17       A.   Eric Brantley and his team visited

18   customers.

19       Q.   But you were his supervisor?

20              MR. PYSER:  Object to form.

21       A.   Correct.

22   BY MR. PAPANTONIO:

23       Q.   Right.  And you never did, correct, and

24   you were his supervisor?
```

 1                    MR. PYSER:  Object to form.

 2        A.   Correct.

 3   BY MR. PAPANTONIO:

 4        Q.   So one thing that you were told, as far as

 5   understanding what might be happening in a

 6   community, is that you have to -- that the people

 7   selling the drugs needed to be aware of what the

 8   news is in that community.  DEA said that's

 9   something you ought to be aware of, are there

10   reports about abuse, right?

11                    MR. PYSER:  Object to form.

12   Misstates evidence.

13   BY MR. PAPANTONIO:

14        Q.   I mean, you know that.  That's -- we're

15   going to get that list, but you already know that

16   without going to the list?

17        A.   Right.

18                    MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20        Q.   So you're supposed to start -- check out

21   news.  You're supposed to be aware of issues that

22   might be unusual on a facility such as

23   out-of-state tags, cash business.

24             How about where they show up in -- how

1    about where they show up in groups, where you have

2    a facility where people are actually showing up

3    five or six at a time, coming in in a group and

4    leaving in a group.  That's one of things DEA told

5    you that you should be aware of, right?

6              MR. PYSER:  Object to form.

7        A.    Right.

8    BY MR. PAPANTONIO:

9        Q.    Well, we'll mark this and put this into --

10   you agree with -- you agree that salesperson --

11   you don't know if they live in the city or not.

12   You're not aware of whether your salespeople live

13   in cities where there's pill mills anywhere in the

14   United States?

15             MR. PYSER:  Object to form.

16       A.    I wouldn't know that.

17             MR. PAPANTONIO:  Let's put this in.

18   BY MR. PAPANTONIO:

19       Q.    If we go to this -- let's go to page -- on

20   page 10, Mr. Reardon.

21             MS. MOORE:  Cardinal 11.

22             MR. PAPANTONIO:  Reardon 11.

23   BY MR. PAPANTONIO:

24       Q.    I left off with the idea that respondent

```
 1     and other facilities ceased all distribution of

 2     controlled substances on the date they received

 3     the ISO.  And the ISO is an immediate suspension

 4     order, correct, right?

 5         A.   Correct.

 6         Q.   Then the next paragraph says "DEA also

 7     issued order to show cause to revoke registration

 8     of Cardinal Health's Stafford, Texas, facility

 9     based on failure to conduct appropriate due

10     diligence.

11              "In addition, the three Cardinal Health

12     distribution facilities that received ISOs, DEA

13     also alleged that Cardinal Health failed to

14     maintain effective controls against the diversion

15     of controlled substances at three other

16     facilities.  In total, DEA had reason to believe

17     that 7 of Cardinal Health's 27 distribution

18     centers roughly 25 percent were not adhering to

19     their responsibility as registrants."

20              You do see where I read that, right?

21         A.   Correct, yes.

22         Q.   I want to be sure about something.  Not

23     everybody can go out and sell narcotics, can they?

24         A.   No.
```

```
 1        Q.   You have to have a special license to sell

 2   narcotics, correct?

 3        A.   Correct.

 4        Q.   And distributors had that special license.

 5   Cardinal had that license, McKesson had that

 6   license, ABC had that license, right, and other

 7   people had the license to sell narcotics?

 8                    DEFENSE COUNSEL:  Objection to

 9   form.

10   BY MR. PAPANTONIO:

11        Q.   Right?

12        A.   Correct.

13        Q.   And one thing that you would agree -- in

14   your agreement to be able to sell narcotics, one

15   thing that would you agree is to follow the

16   standards that were laid out to you by the DEA,

17   correct?  We already talked about that, right?

18                    MR. PYSER:  Object to form.

19        A.   Correct.

20   BY MR. PAPANTONIO:

21        Q.   It says -- go down to the last paragraph,

22   it says "Cardinal Health's 2008 memorandum of

23   agreement."

24             Now, sir, you know -- were you aware
```

1    of the fine that was paid to the DEA because of

2    this particular investigation?

3        A.   Yes.

4        Q.   Now, I want to get this right.  You were a

5    police officer.  Did you ever -- did you ever

6    arrest anybody that was selling drugs on the

7    street corner?

8             MR. PYSER:  Object to form.

9        A.   No.

10   BY MR. PAPANTONIO:

11       Q.   Well, you would agree -- you understand

12   that a person selling drugs on the street

13   corner -- if they get caught selling drugs

14   illegally, they can go to prison.  You're aware of

15   that, right?

16            MR. PYSER:  Object.

17   BY MR. PAPANTONIO:

18       Q.   As a police officer?

19            MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21       Q.   Right?

22       A.   Yes.

23       Q.   And they go to prison because they're

24   breaking the law and selling drugs, correct?

```
 1                    MR. PYSER:  Object to form.

 2        A.   Correct.

 3   BY MR. PAPANTONIO:

 4        Q.   But here your company paid a fine of 35 --

 5   $35 million -- $34 million right?  You paid a fine

 6   of $34 million?

 7        A.   Correct.

 8        Q.   Nobody went to prison, as far as you

 9   know?

10                    MR. PYSER:  Object to form.

11        A.   Not to my knowledge.

12   BY MR. PAPANTONIO:

13        Q.   So let me -- let me make sure I've got

14   this right.  You know that this -- we're -- this

15   document is a 2012 document.

16            Do you see the front of it?  2012,

17   right?

18        A.   Right.

19        Q.   You had already been -- in 2008, had

20   already been ordered to show cause and had

21   already, in 2008, had some of these Florida

22   facilities, these Florida pharmacies, have their

23   license suspended, 2008.  Do you remember the MOU

24   for 2008?
```

```
1                    MR. PYSER:  Object to form.

2         A.   Yes.

3    BY MR. PAPANTONIO:

4         Q.   Well, tell the jury what you remember

5    about the trouble that Cardinal got into in 2008.

6                    MR. PYSER:  Object to form.

7    BY MR. PAPANTONIO:

8         Q.   What do you remember about that?

9         A.   It was essentially a similar issue.

10        Q.   The same thing, wasn't it?  You were

11   selling drugs and you weren't doing it pursuant to

12   the way that the government told you you had to do

13   it, correct?

14                    MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16        Q.   2008?

17        A.   We -- we had a computer program approved

18   by the DEA that we submitted to them, as

19   requested, on a monthly basis.  We had our

20   employees in the cage involved --

21        Q.   And you thought --

22        A.   -- with the ability to raise their hand,

23   to question orders, and report those to the DEA.

24        Q.   Well -- and they did.  In 2008, they
```

1    looked at what were you doing and they busted you

2    for doing it wrong.  They actually accused you of

3    breaking the law again in 2008, right?

4              MR. PYSER:  Object to form.

5    BY MR. PAPANTONIO:

6        Q.   True?  Do you remember 2008 or you want

7    the see the document?  You know what, let's go

8    ahead and pull it out so we -- you have it in

9    front of you?

10            You see it says "2008 Settlement and

11   Release Agreement."  You see that?  This is

12   virtually the same thing that we're looking at in

13   2012, right?

14             MR. PYSER:  Object to form.

15       A.   Right.

16   BY MR. PAPANTONIO:

17       Q.   It's the same thing.  You were accused of

18   the same thing.  You did the same thing in 2008,

19   and then didn't you promise them, in 2008, that

20   you were going to have a system to solve all those

21   problems?

22             MR. PYSER:  Object.

23   BY MR. PAPANTONIO:

24       Q.   You were going to put in place, your

1    obligation -- let me scratch that.

2         Your obligation after 2008 was to pay $34

3    million and put in place a system that the DEA

4    thought was acceptable in monitoring your

5    customers, correct?

6              MR. PYSER:  Object to form.

7    A.   In 2008 and after, I wasn't involved in

8    that process, but I know there was a creation of

9    an anti-diversion team that put together a new

10   program based in consultation with the DEA.  DEA

11   came in and looked at that program and blessed it.

12   BY MR. PAPANTONIO:

13   Q.   Right.  In other words, if you had

14   actually performed your program like you promised

15   you were going to do, your -- that's what you told

16   the government, we promise that we're going to do

17   a program that you can approve of.  That was what

18   happened in 2008, right?

19             MR. PYSER:  Object to form.

20   A.   I can't speak to what was told to the

21   government.  I wasn't involved in that.

22   BY MR. PAPANTONIO:

23   Q.   Did you ever see what the -- what your

24   company agreed to in 2008 as far as putting

Highly Confidential - Subject to Further Confidentiality Review

1    together an anti-diversion system?

2         A.   I believe I saw the settlement.

3         Q.   Yeah.  And the settlement was that you

4    would have in place a system that prevented the

5    very kind of drug diversion that we're talking

6    about in 2012, correct?

7                   MR. PYSER:  Object to form.

8         A.   In 2012, I can't speak to what the system

9    did or didn't do.

10   BY MR. PAPANTONIO:

11        Q.   Well, we're looking at what the system did

12   because you were -- Lakeland was -- you had a

13   distribution center in Lakeland, didn't you?

14        A.   Yes.

15        Q.   And then -- okay.  So that's 2008, when

16   you agreed to have a system that was in place for

17   anti-diversion, right?

18             And then you know that in 1971 the

19   government told you what you had to do to prevent

20   diversion, right?  CFR told you clearly what you

21   had to do to prevent diversion, correct?

22                  MR. PYSER:  Object to form.

23   Misstates evidence.

24   BY MR. PAPANTONIO:

```
 1        Q.   All the way back to 1971, the government

 2   specifically told you what you had to do to

 3   maintain your license, correct?

 4        A.   That's when the regulation came.

 5        Q.   Right, 1971.  So then in 2006 -- we just

 6   saw Rannazzisi.  He writes you a letter and says,

 7   hey, you need to take another look at what you're

 8   doing, here's another -- here's another letter to

 9   tell you how you're supposed to do this properly,

10   right, Rannazzisi with the DEA?

11                  MR. PYSER:  Object to form.

12        A.   Right.  And we looked at our program and

13   we were submitting the DEA-approved report --

14   BY MR. PAPANTONIO:

15        Q.   Right, exactly.

16        A.   -- which during numerous cyclical

17   inspections was reviewed and looked at, what our

18   process was, without issue.

19        Q.   And then nevertheless, in 2012, you're

20   still breaking the law, correct?

21                  MR. PYSER:  Object to form.

22   BY MR. PAPANTONIO:

23        Q.   2012, you're still doing the same thing,

24   breaking the law?
```

```
 1        A.   I would disagree.

 2                  MR. PYSER:  Object to form.

 3   BY MR. PAPANTONIO:

 4        Q.   We're going to go through it, but -- so so

 5   far -- let me just make sure we have this right,

 6   okay, because I want the jury to understand what

 7   you knew, when you knew it.

 8                  MR. PAPANTONIO:  Could I get an

 9   Elmo, please, or is that -- is it on?

10   BY MR. PAPANTONIO:

11        Q.   Here we go.  So let's get this right.

12             1971, CFR, right, that tells you the law

13   relating to narcotic distribution.  You remember

14   that -- you've read it, you've reviewed it, right?

15        A.   Yes.

16        Q.   Correct.  Now, there's some other stuff in

17   between here, but we know that in 2006 -- 2006,

18   you got another letter from the DEA telling you

19   again what your responsibilities were.  Do you

20   recall that?  We already talked about that.

21        A.   Yes.

22        Q.   And then in -- the next year, 2007, you

23   get another letter, another DEA letter, telling

24   you what your responsibilities are, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Correct.  And we reviewed our programs and

2    the report that they approved.  We had that in

3    place.

4        Q.    Yeah.  Well, I think you -- I think you

5    believe that, but let's go ahead with what

6    happened here.

7              MR. PYSER:  Object to form and

8    objection to the last question, too.

9    BY MR. PAPANTONIO:

10       Q.    So the truth is -- so we're 2007 here.

11   And in between here, you have the DEA, is they're

12   putting on seminars, right?  Am I right?  DEA

13   putting on seminars for you to tell you -- tell

14   you again the rules, right?  We've already talked

15   about that and you agreed to it?

16             MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18       Q.    Am I right?

19       A.    And that was a conference where DEA for

20   the -- probably the first time came out and

21   specifically said, this is our expectation.

22       Q.    No, sir, that wasn't the first time

23   because in 2005 --

24             MR. PAPANTONIO:  Give me the
```

1    document where he actually met with the DEA in

2    2005, please.

3    BY MR. PAPANTONIO:

4        Q.   -- you actually met face-to-face,

5    Reardon -- I wanted to see whether you were going

6    to tell me about this, so let's look.

7            "Reardon met with DEA."  Now, does that

8    help you remember better?

9                MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11       Q.   You remember it being face-to-face with

12   the DEA?

13       A.   Yes.

14       Q.   And they're telling you what your

15   responsibilities are, correct?

16               MR. PYSER:  Object to form.

17       A.   The meeting was about a growing problem

18   with Internet pharmacies.

19   BY MR. PAPANTONIO:

20       Q.   Oh, so now you do recall Internet

21   pharmacies, right?

22               MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24       Q.   You remember Internet pharmacies.  We

1    talked about them, right?

2              MR. PYSER:  Object to form.

3         A.   Right.

4    BY MR. PAPANTONIO:

5         Q.   And you met face-to-face with the DEA

6    about diversion, didn't you?

7              MR. PYSER:  Object to form.

8         A.   Yes.

9    BY MR. PAPANTONIO:

10        Q.   So 1971 -- do you want to fill anything

11   for 2005?  Because we're going to fill it in as we

12   go today, but is there anything you want to offer?

13   Just tell me before we have to get into any more

14   detail.

15        Do you have anything you want to offer as

16   far as what you knew or should have known about

17   your obligation to control the sale of narcotics

18   in America?

19              MR. PYSER:  Object to form.

20        A.   In that time frame, again, we were

21   submitting the DEA-approved report regarding

22   suspicious orders.

23   BY MR. PAPANTONIO:

24        Q.   And then we find that in 2012 -- I'm going

1    to put this down here, 2012.  Why do you think I'm

2    putting that down there?

3                   MR. PYSER:  Object to form.

4    Vague.

5    BY MR. PAPANTONIO:

6       Q.   I'm putting it down there because of all

7    the things that happened between 2007 and 2012,

8    okay.  As we go forward, we're going fill that in,

9    so --

10                  MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12      Q.   So the next thing that occurs is in

13   2012 -- I'm going to leave a box here.  We'll fill

14   some stuff in as we go.

15           In 2012, the DEA, again, after 2008 --

16   well, I forgot 2008.  2008 is up here and that's

17   where you're busted for diversion, right?  That's

18   what I just showed you.  That's where DEA busted

19   you for improper diversion, right?

20                  MR. PYSER:  Object to form.  Ongoing

21   objection to the use of this document.  Move to

22   strike the document and all testimony concerning

23   it.

24   BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Am I right?

2        A.   There was an issue in 2008.

3        Q.   2008, right.  So you're busted there?

4                  MR. PYSER:  Object to form.  Object

5   to the use of word "busted" on the document and in

6   the testimony.

7   BY MR. PAPANTONIO:

8        Q.   And when you were busted, some of it

9   involved the same pharmacies that we're talking

10  about in 2012, doesn't it?

11                 MR. PYSER:  Objection to form.

12       A.   I don't have knowledge of that.

13  BY MR. PAPANTONIO:

14       Q.   Well, let's go ahead and help -- see if I

15  can help you with knowledge.  Let's take it off

16  here.  Let's go back to the document.  Let's go

17  back to -- 4085.11 is where we are.

18            So you see where it says "The MOA"?  Tell

19  the jury what an MOA is.

20       A.   Memorandum of understanding -- or

21  agreement.

22       Q.   So the MOA and corresponding settlement

23  also required Cardinal Health to pay $34 million

24  in civil penalties.  Now, you remember -- you
```

```
1    understand that's in 2008 where that's happening.

2    2008.  You were -- 2008, you paid $34 million,

3    right?

4        A.   Correct.

5        Q.   Nobody went to jail.  You just paid $34

6    million --

7                 MR. PYSER:  Object to form.

8    BY MR. PAPANTONIO:

9        Q.   -- correct?

10       A.   Correct.

11       Q.   But again, just so it can be clear, a

12   child -- a young man selling three ounces of

13   marijuana on the street corner can go to jail for

14   that, can't he?

15                MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   Am I right?

18       A.   I don't know the specific laws around

19   that.

20       Q.   Well, you were a police officer.  Did you

21   ever arrest anybody for selling drugs?

22                MR. PYSER:  Object to form.

23       A.   Possession, not dealing.

24   BY MR. PAPANTONIO:
```

```
1         Q.   Possession, just the mere possession.  A

2    young man out on the street corner with just the

3    mere possession of marijuana could go to jail,

4    right?

5                   MR. PYSER:  Object to form.

6    Objection to this entire line of questioning.

7    BY MR. PAPANTONIO:

8         Q.   Am I right?

9         A.   Correct.

10        Q.   That's -- in your police experience,

11   that's been your experience.  Now, here not only

12   were you in possession of millions of drugs,

13   Cardinal, but you were actually illegally

14   distributing those illegal drugs, correct?

15                  MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17        Q.   According to this?

18                  MR. PYSER:  Objection to form.

19   That's not what it says.  Object to form.

20        A.   We distributed drugs through -- to

21   entities that had a valid DEA registration and a

22   valid state license.

23        Q.   But you did it illegally --

24                  MR. PYSER:  Object to form.
```

```
 1   BY MR. PAPANTONIO:

 2       Q.   -- according to these documents?

 3                   MR. PYSER:  Object to form.

 4   Misstates evidence.

 5   BY MR. PAPANTONIO:

 6       Q.   Well, let's go on.  Your attorney says it

 7   misstates it.  Let's see if I misstated it, okay?

 8   Read on with me.

 9                   MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11       Q.   It says "The MOA and corresponding

12   settlement also required that Cardinal pay $34

13   million in civil penalties."  That was in 2008 you

14   had to do that, correct?

15       A.   Correct.

16                   MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18       Q.   That was a different incident where you

19   were involved in the -- not following the law

20   where it comes to distribution of narcotics.  That

21   was in 2008, correct?

22                   MR. PYSER:  Object to form.

23       A.   2008.

24   BY MR. PAPANTONIO:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   2008, correct?

2            Then it goes on, "34 million in civil

3    penalties and settlement of claims, potential

4    claims for civil penalties made by the United

5    States of America, for failing to report

6    suspicious orders of controlled substances.  Of

7    that sum, Cardinal agreed to pay 16 million for

8    conduct alleged to have occurred within the middle

9    district of Florida," right?

10           Do you see that?

11      A.   It's what it says.  I was --

12      Q.   Right.

13      A.   -- not aware of that.

14      Q.   So the very thing that we're looking at --

15   you know where Lakeland, Florida is?

16      A.   Yes.

17      Q.   It's in the middle of Florida, isn't it?

18      A.   Yes.

19      Q.   In 2008 was the same problem that you had

20   in middle Florida, correct?  You paid a $35

21   million fine for it, correct?

22      A.   Correct.

23      Q.   And you -- and did you know prior to

24   coming here that the Oxy Express actually
```

1    originated in Florida, started in Florida and went

2    all the way up the East Coast?  Has anybody ever

3    told you that?

4              MR. PYSER:  Object to form.

5         A.   No.

6    BY MR. PAPANTONIO:

7         Q.   First time you've ever heard the term "Oxy

8    Express" was today, correct?

9              MR. PYSER:  Object to form.

10        A.   Correct.

11   BY MR. PAPANTONIO:

12        Q.   It says "Middle district of Florida where

13   respondent is located."  So you actually had a

14   business location right there where all of this

15   was going on, right?

16             MR. PYSER:  Object to form.  Vague.

17        A.   Correct.

18   BY MR. PAPANTONIO:

19        Q.   "The remainder was appropriated -- was

20   apportioned among the six other districts housing

21   Cardinal Health distribution centers at issue in

22   amounts of 1- to $8 million."

23             Now, it says "Prior to the DEA and

24   Cardinal Health MOA, the largest" -- I don't know

```
 1   if you know this.  But "Prior to the DEA and

 2   Cardinal 2008 MOA, the largest civil monetary

 3   penalty paid by a DEA registrant in violation of

 4   CSA was $13 million."

 5          That was McKesson.  Do you remember when

 6   they were hit with -- McKesson was hit for $13

 7   million?

 8              MS. MONAGHAN:  Object to form.

 9      A.   I'm familiar with it.

10   BY MR. PAPANTONIO:

11      Q.   You followed the news, certainly.  They

12   were one of your competitors and you followed the

13   news when they were busted for illegally complying

14   with standards of the CSA?

15              MS. MONAGHAN:  Object to form.

16      A.   I was aware of it.

17   BY MR. PAPANTONIO:

18      Q.   You were aware of it.  Why were you aware

19   that McKesson also had been accused by the DEA and

20   paid a fine for improperly conducting business

21   pursuant to the CFR?  Why did you know about that?

22              MS. MONAGHAN: Object to form.

23      A.   I believe I saw a DEA press release.

24   BY MR. PAPANTONIO:
```

```
 1        Q.   That's what I was going to ask.  Press

 2   releases were sent out every time they were --

 3   every time they would -- they would create --

 4   revoke a license, every time they would do a

 5   immediate suspension.  DEA would communicate that

 6   to all the distributors, correct?

 7                 MR. PYSER:  Object to form.

 8        A.   I don't believe it came directly to

 9   distributors.  It was either on their website or

10   in a publication.

11                 MR. PYSER:  I also just want to

12   pause for a second and note for the record that

13   the attorney for McKesson objected to the last

14   rounds of questions.  I don't know if the court

15   reporter can hear her because she's not mic'd up,

16   but there were objections to some of the questions

17   related to McKesson.

18   BY MR. PAPANTONIO:

19        Q.   "Prior to the DEA and Cardinal Health 2008

20   MOA, the largest monetary penalty paid the DEA

21   registrant pursuant to the CSA was 13.25 million

22   civil penalty against McKesson" -- it says against

23   McKesson -- "in April of 2008.  Standing alone,

24   the civil penalties assessed against the
```

1    respondent surpassed the existing record

2    settlement in the McKesson case."

3            Sir, now you understand that what the --

4    what the DEA right here was doing, they were

5    putting you in what they call a penalty box,

6    correct?  I mean you've heard the term penalty

7    box --

8                    MR. PYSER:  Object to form.

9    BY MR. PAPANTONIO:

10       Q.   -- right?

11       A.   Hockey term.

12       Q.   Yeah, it's a hockey term.  You know,

13   there's different penalty boxes, I guess.

14           But you know what a penalty box is,

15   right?

16                   MR. PYSER:  Object to form.

17       A.   Yes.

18   BY MR. PAPANTONIO:

19       Q.   And you know that you -- that your

20   organization --

21                   MR. PAPANTONIO:  4391 please.

22   BY MR. PAPANTONIO:

23       Q.   -- your organization was put in a penalty.

24   And we're talking about a penalty box right here

Highly Confidential - Subject to Further Confidentiality Review

```
 1    where your license is being suspended because

 2    you're not following the law.  We can agree to

 3    that, right?

 4                    MS. MOORE:  Reardon 12.

 5

 6             (Exhibit No. 12 marked for

 7    identification.)

 8

 9                    MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11        Q.   Right?

12                    MR. PYSER:  Object to form.

13        A.   We paid a fine.

14    BY MR. PAPANTONIO:

15        Q.   Yes, you certainly did.

16             Now, it says -- if you look at the first

17    page on this, it says Mike Kaufmann.  Who is Mike

18    Kaufmann?

19        A.   Mike Kaufmann is currently the Cardinal

20    Health CEO.

21        Q.   What did you all do to Barrett?

22                    MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24        Q.   Where's Barrett?
```

```
1                    MR. PYSER:  Object to form.

2    BY MR. PAPANTONIO:

3        Q.   Is he gone?

4                    MR. PYSER:  Object to form.

5    BY MR. PAPANTONIO:

6        Q.   He's objecting because he doesn't want you

7    to answer the question.

8                    MR. PYSER:  I'm objecting because

9    it's a ridiculous question.  It's an improper

10   question in its form.

11   BY MR. PAPANTONIO:

12       Q.   Where is Mr. Barrett?  Because we're going

13   to see some video clips of Mr. Barrett, so tell

14   the jury who Mr. Barrett is.

15                   MR. PYSER:  Object to form on the

16   prelude from counsel.

17       A.   Former CEO.

18   BY MR. PAPANTONIO:

19       Q.   Former CEO.  And then Mike Kaufmann took

20   it over, right?

21       A.   I don't know the exact succession, but

22   Mike is currently, I believe, in that role.

23       Q.   Now, Mr. Barrett is the guy that appeared

24   in front of Congress, isn't he?  And he testified
```

```
1    in front of Congress about what Cardinal -- what

2    their history was and what their actions were in

3    the opioid crisis, right?  Mr. Barrett?

4         A.   I believe.

5              MR. PYSER:  Objection.

6         A.   I believe so.

7    BY MR. PAPANTONIO:

8         Q.   And then how long after that did they get

9    another CEO after he testified about the conduct

10   of Cardinal?  When did he lose his job?

11             MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13        Q.   When did he lose his job?

14             MR. PYSER:  Object to form.

15        A.   I think he retired.

16        Q.   Okay.  When did he retire?

17        A.   I don't know the exact date.

18        Q.   But you know that Mr. Barrett personally

19   was being sued, along with all the board of

20   directors, for improperly running the company

21   allowing diversion to take place in the United

22   States and they were sued by here other

23   shareholders.

24             Did you know that?
```

1          MR. PYSER:  Object to form.

2     Misstates evidence.

3          A.   Unaware of that.

4          Q.   Nobody ever told you that, did they?

5          A.   No.

6          Q.   Well, you'll probably get a chance to

7     testify there too, so --

8          MR. PYSER:  Object to form.

9     BY MR. PAPANTONIO:

10         Q.   All right.  So if you look -- so it

11    goes -- who is Kerry Clark?  Do you see down at

12    the bottom?  Who is Kerry Clark?

13         A.   Former CEO.

14         Q.   Another CEO of the company, correct?

15    Where's Kerry Clark now?

16         A.   I don't know.

17         Q.   Did Kerry -- did Kerry Clark retire did

18    they ask Kerry Clark to leave?

19         MR. PYSER:  Object to form.

20         A.   I don't know the circumstances of his

21    departure.

22    BY MR. PAPANTONIO:

23         Q.   Look at -- go to page 2 and look at the

24    third paragraph.  It says "Obviously the biggest

1    are the SEC issue, two consecutive Alaris recalls,

2    a number of MBT recalls, and the DEA controlled

3    substances license suspension."

4            Now, first of all, you're still a

5    consultant with them, aren't you?

6                    MR. PYSER:  Object to form and the

7    prelude.

8    BY MR. PAPANTONIO:

9        Q.   Are you still a -- are you still a

10   consultant with Cardinal?

11       A.   Yes.

12       Q.   And do you not know about the SEC case

13   where the board of directors are being sued for

14   not properly handling the opioid crisis in their

15   sale of narcotics throughout the United States?

16                   MR. PYSER:  Object to form.  Vague

17   as to time.

18   BY MR. PAPANTONIO:

19       Q.   Do you know about that?

20                   MR. PYSER:  Object to form.  This is

21   ten years old and you're mixing and matching

22   things.  This is purposefully misleading.

23   BY MR. PAPANTONIO:

24       Q.   Did you know about that?

1                    MR. PYSER:  Object to form.

2         A.   I was aware of a prior SEC issue years

3    back.

4         Q.   Right, right.  So there's actually a

5    couple of SEC -- do you know what this SEC issue

6    is?

7                    MR. PYSER:  Object to form.

8         A.   I don't know the specifics.

9    BY MR. PAPANTONIO:

10        Q.   But you know that, right now as we speak,

11   there's another SEC issue where the board of

12   directors of Cardinal are being sued for their

13   failure to follow the law where it comes to sale

14   of narcotics in the United States and they're

15   being sued by their own shareholders.  Did you

16   know that?

17                   MR. PYSER:  Object to form.

18   Misstates evidence.

19   BY MR. PAPANTONIO:

20        Q.   Yes or no?  You're a consultant working --

21   do you get a paycheck from them?

22        A.   If I work.

23        Q.   Okay.  So you're a consultant for them,

24   right, and you don't know that there's a

```
1    shareholder derivative suit pending against all

2    the people who made decisions about the sale of

3    narcotics in America?

4            You don't know anything about that; that's

5    your testimony?

6                    MR. PYSER:  Object to form.

7        A.   I do not.

8    BY MR. PAPANTONIO:

9        Q.   Fair enough.  And then DEA controlled

10   substances abuse, so these -- obviously the

11   biggest are the SEC issues, two consecutive Alaris

12   recalls, a number of MBT recalls, and the DEA

13   controlled substance license suspension in three

14   locations.

15           Do you see that?  That's what we're

16   talking about.  I mean, we -- back in 2008 -- you

17   know that the Lakeland suspensions took place back

18   in 2008?

19                   MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21       Q.   Correct?

22       A.   Correct.

23       Q.   So then it goes, "Beyond these, Gary

24   Dolch's QRA report listed a startling number of
```

1    issues."

2            Now, who is Gary Dolch?

3                MR. PYSER:  Object to form, to the

4    prelude to the question.

5        A.  Gary Dolch was, I believe, at the time, an

6    Executive Vice President of Quality and Regulatory

7    Affairs.

8    BY MR. PAPANTONIO:

9        Q.  So it says "Gary Dolch's quarterly QRA

10   report."  What's a QRA report?

11       A.  I'm not sure what Gary's report is.

12       Q.  But what is a QRA report?

13       A.  QRA report could be anything.

14       Q.  Quality regulatory?

15       A.  Quality and Regulatory Affairs.

16       Q.  And that's what you did.  That was your

17   job for how many years?

18       A.  Twenty-eight.

19       Q.  Right.  So it says "QRA report lists a

20   startling number of issues, including six OSHA

21   violations and a significant fine at our Syracuse,

22   New York facility."

23            Do you know what the fine was in the

24   Syracuse, New York facility?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2        A.   I do not.  OSHA was not within the scope

 3   of my responsibilities.

 4   BY MR. PAPANTONIO:

 5        Q.   "If you added up our fines, settlements

 6   and lost business over the last 18 months, the

 7   total would come to close to $1 billion."  And

 8   then it says "Shocking, isn't it?"

 9             Is that shocking to you?

10                    MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12        Q.   Mr. Reardon, is that shocking that fines

13   and settlements and costing close to a billion

14   dollars?

15        A.   Well, it's -- in reading this, it looks

16   like the SEC was the major share and a lot of it

17   was dollars spent on managing recalls.

18        Q.   So you're saying that the SEC case was

19   even bigger than $34 million?

20                    MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22        Q.   Is that what you just told us?  Because I

23   just read this and it says that $34 million was

24   the biggest DEA fine in the history of the world.
```

```
 1    That's what it just said.

 2                    MR. PYSER:  Object to form.

 3        A.   I'm just going by what was in this

 4    document where it states "I recognize that the SEC

 5    settlement is the major share."

 6    BY MR. PAPANTONIO:

 7        Q.   Okay.  But one major -- so in other words,

 8    that's even bigger than $34 million.  That's what

 9    you're saying?

10                    MR. PYSER:  Object to form.

11        A.   That's how --

12        Q.   Because you want to focus on that.  You

13    wanted to focus on that just now, and so why are

14    you focusing on it -- I want to know what you

15    know.

16             Was the SEC conduct -- did it require a

17    fine bigger than $34 million?

18                    MR. PYSER:  Object to form.

19    Argumentative.

20        A.   I don't know that.  I'm just interpreting

21    what's written.

22    BY MR. PAPANTONIO:

23        Q.   And then it says -- it says, the last

24    line, "This is a big issue and the leaders of
```

1    Cardinal Health -- of the leaders of Cardinal

2    Health, we need to address it.  Accountability of

3    leadership is essential."

4         Do you agree with that, "accountability of

5    leadership is essential"?  Would that be something

6    you would agree with?

7              MR. PYSER:  Object to form.

8         A.   Yes.

9    BY MR. PAPANTONIO:

10        Q.   Why?

11        A.   In any -- in any job anyone has, doesn't

12   have to be a leadership, there's accountability to

13   do your job.

14        Q.   Yeah.  There is an accountability to do

15   your job, especially when you're dealing with

16   narcotics that had created an opioid epidemic in

17   the United States.  It actually raises the

18   responsibility a little higher, doesn't it?

19              MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21        Q.   Right?  Would you agree with that?

22        A.   You need to comply with the regulations

23   around it.

24        Q.   So let's go to the next page, .12.  "At

```
 1    the time of the initial investigation,

 2    respondent's top four retail pharmacy customers

 3    were Holiday CVS, CVS Pharmacy No. 0029, CVS 219,

 4    and then Gulf Coast Pharmacy located at 3685

 5    Doctors Way."

 6            Do you see that?

 7    A.   Yes.

 8    Q.   CVS was your biggest customer, wasn't it?

 9    A.   I believe so.

10    Q.   And so what you allowed CVS to do was to

11    monitor themselves where it came to -- where it

12    came to exceeding thresholds -- legal threshold

13    for the sale of narcotics.  You allowed your own

14    customer to do that, didn't you?

15            MR. PYSER:  Object to form.

16    BY MR. PAPANTONIO:

17    Q.   Right?

18    A.   No.  They were included in the reports

19    that we submitted to DEA.

20    Q.   Okay.  So your testimony is -- because

21    we're going to get a lot more in here.

22            But your testimony is, no, you did not

23    allow CVS to do their own threshold monitoring.

24    That's your testimony?
```

```
 1                     MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3      Q.   Correct?

 4                     MR. PYSER:  Asked and answered.

 5      A.   Not when I was in the anti-diversion role.

 6   BY MR. PAPANTONIO:

 7      Q.   And if that was done, that would be a --

 8   that would be a violation of standards according

 9   to the law of distribution of narcotics.  It would

10   be a violation of standards to allow your customer

11   to do their own monitoring.

12                     MR. PYSER:  Object to form.

13   BY MR. PAPANTONIO:

14      Q.   Correct?

15                     MR. PYSER:  Object to form.  Legal

16   conclusion.  Speculation.

17      A.   It could be an issue with the regulation.

18   BY MR. PAPANTONIO:

19      Q.   It could be an issue with the regulation?

20   What do you mean by that?

21      A.   Depending on what the facts and

22   circumstances were, yes.

23      Q.   Well, the facts and circumstances were,

24   looking at right here, is the DEA is saying that
```

1    you didn't comply with the law.  We can agree to

2    that, correct?

3                   MR. PYSER:  Object to form.

4    BY MR. PAPANTONIO:

5        Q.   Right here in this document we've gone

6    over?

7        A.   Saying we violated the regulation.

8        Q.   Right.  It says "DEA has communicated with

9    Cardinal" -- I'm on the second paragraph.

10            "DEA has communicated to Cardinal that it

11   is required to conduct its own due diligence in

12   its retail pharmacy chains.  Specifically, in July

13   28, 2009, DEA conducted a compliance review at

14   Cardinal's Health distribution center located in

15   Peabody, Massachusetts."

16       Q.   So far we talked about Lakeland, talked

17   about Texas.  Now talking about Massachusetts.

18            "DEA investigators asked the distribution

19   center for due diligence files from a number of

20   chain pharmacies" -- CVS was a chain pharmacy,

21   right?

22       A.   Yes.

23                   MR. PYSER:  Object to form on the

24   prelude to that question.

```
1    BY MR. PAPANTONIO:

2        Q.   -- "from a number of chain pharmacies, but

3    Cardinal could not produce the requested due

4    diligence."

5            Do you see that?  Did you not keep records

6    of the sale of narcotics --

7                    MR. PYSER:  Object to form.

8    BY MR. PAPANTONIO:

9        Q.   -- in places like Massachusetts or Ohio or

10   Florida?  Did you not keep records?  I mean,

11   that's what it says.

12                   MR. PYSER:  Object to form.

13   BY MR. PAPANTONIO:

14       Q.   It says you couldn't produce them.

15                   MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   I mean -- but Cardinal could not

18   produce -- underline "could not produce the

19   requested due diligence file."

20           What is a due diligence file?

21                   MR. PYSER:  Object to form.

22   BY MR. PAPANTONIO:

23       Q.   Tell the jury what a due diligence file

24   is.
```

```
 1        A.   First, this is in a time frame where I was

 2    not involved with anti-diversion.

 3        Q.   Okay, that's fine.  You were in corporate,

 4    weren't you --

 5        A.   Yes.

 6        Q.   -- up in Columbus, Ohio where all the

 7    suits do business for Cardinal --

 8                    MR. PYSER:  Object.

 9    BY MR. PAPANTONIO:

10        Q.   -- correct?

11                    MR. PYSER:  Object to form.

12    Argumentative.

13    BY MR. PAPANTONIO:

14        Q.   You were up there with all the other

15    suits, correct?

16                    MR. PYSER:  Object to form.

17        A.   I was there.

18    BY MR. PAPANTONIO:

19        Q.   Yeah.  And you knew when you were there

20    that Cardinal did not have the ability to produce

21    requested due diligence files.  You knew that,

22    right?

23                    MR. PYSER:  Object to form.

24    BY MR. PAPANTONIO:
```

```
 1          Q.    That was in Massachusetts; is that right?

 2          A.    It's part of the anti --

 3          Q.    Yes or no?

 4          A.    It's part of the anti-diversion program,

 5    which I was not a part of.

 6                     MR. PYSER:  Object to form.

 7    BY MR. PAPANTONIO:

 8          Q.    Now, I'm interested in a couple of things.

 9    First of all, go to the next page, .13.  "U.S.

10    distributor" -- second paragraph.  "U.S.

11    distributor registrants are subject to scheduled

12    investigations by diversion investigation every

13    three years."

14                Do you see that?

15          A.    Yes.

16          Q.    And you remember being actually involved

17    in one of those investigations where they were

18    investigating Cardinal?

19                     MR. PYSER:  Object to form.

20          A.    I --

21    BY MR. PAPANTONIO:

22          Q.    Do you remember that?

23          A.    I don't recall that I was specifically

24    involved with the investigation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Before I -- before I get to this part of

 2    the investigation, here's what I want to ask you:

 3    Do you know, sir, that --

 4                    MS. MOORE:  This is Reardon 13.

 5

 6            (Exhibit No. 13 marked for

 7    identification.)

 8

 9    BY MR. PAPANTONIO:

10        Q.   Now, we were just talking about

11    Massachusetts.

12                    MR. PYSER:  Do you have a copy for

13    counsel?

14                    MR. PAPANTONIO:  Yes, we do.

15    BY MR. PAPANTONIO:

16        Q.   We were just talking about Massachusetts,

17    about their inability to produce records.

18            Did -- while you were a consultant, did

19    anybody from Cardinal ask you whether or not you

20    could produce records from Ohio -- Cleveland,

21    Ohio, Cuyahoga County?  Did anybody sit down with

22    you and say, We're involved in a lawsuit, can you

23    please produce records from Cleveland or Cuyahoga

24    County as far as sales of narcotics?
```

```
 1                    MR. PYSER:  Object to form.

 2        A.   As a consultant?

 3   BY MR. PAPANTONIO:

 4        Q.   Yes, as a consultant.

 5        A.   As a consultant, I'm not involved in any

 6   DEA activities.

 7        Q.   Okay.  Well, let's read this too.  Bottom

 8   of the page, "Documents bearing Bates stamp," then

 9   gives a Bates stamp.

10             You see that last -- you know what a Bates

11   stamp is, sir?

12        A.   Not specifically.

13        Q.   What do you think it is?

14        A.   I think it's code or a way to identify

15   documents.

16        Q.   Right.  And it says -- it goes on to say

17   "Reflects Cardinal's distribution of opioid

18   medications to customers in the city of Cleveland

19   and Cuyahoga County and Summit County from January

20   '96 to December 2012."

21             All right.  So then it says "Cardinal has

22   previously produced centralized records of orders

23   placed by Cardinal Health customers in the City of

24   Cleveland, Cuyahoga County and Summit County" --
```

1    that the company reported to the DEA and the state

2    regulators from January to May 2018.

3         "Based on reasonable investigation to

4    date, we have determined Cardinal does not have

5    centralized records of orders for opioids placed

6    by Cardinal customers in the City of Cleveland,

7    Cuyahoga County, Summit County, and the company

8    reported to the DEA and state regulations before

9    January 2013."

10        What do you know about recordkeeping as

11   far as records that are kept about the sale of

12   narcotics in various areas of the country?  What

13   do you know about that process?

14             MR. PYSER:  Object to form on

15   everything until we got to the actual question.

16        A.   There's a two-year DEA recordkeeping

17   requirement.

18   BY MR. PAPANTONIO:

19        Q.   Right, right.  And does the company

20   itself, Cardinal -- do you keep your records?

21             MR. PYSER:  Object to form.

22        A.   Yes, there's recordkeeping requirements.

23   BY MR. PAPANTONIO:

24        Q.   Now, have any records -- you talked about

```
 1    one way you get rid of records.  Earlier on, you

 2    said you would shred them, correct?  Did you tell

 3    me that, you would shred records?

 4                    MR. PYSER:  Object to form.  We're

 5    mixing --

 6    BY MR. PAPANTONIO:

 7        Q.   Did you not say that you personally would

 8    shred documents?

 9                    MR. PYSER:  Object to form.  You're

10    mixing and matching and misstating his prior

11    testimony.

12    BY MR. PAPANTONIO:

13        Q.   Am I right?  Did you say that, you would

14    shred documents?

15        A.   Yes, yes.

16        Q.   Okay.  Now, do you know whether any of

17    these documents about Cuyahoga County or Cleveland

18    were shredded, as far as you know?

19                    MR. PYSER:  Object to form.

20        A.   I have no knowledge of that.

21    BY MR. PAPANTONIO:

22        Q.   And you would agree that CVS accounts for

23    about -- would you agree that it accounts for

24    about 20 percent of the gross trade of Cardinal?
```

```
 1      A.   I don't know.  I don't know the percentage

 2   that they account for.

 3      Q.   Would 20 percent sound reasonable to

 4   you?

 5      A.   I could only say that they're the largest

 6   customer.

 7      Q.   Okay.  They're the largest customer.

 8           And go to page .13.  It says "U.S.

 9   distributor registrants are subject to scheduled

10   investigations."  That's where we left off, right?

11           And you have actually participated in

12   those investigations, haven't you?

13      A.   I would not be on-site for the

14   investigation.

15      Q.   But you know about them?

16      A.   I would be alerted that there was an

17   ongoing investigation at a distribution center.

18      Q.   And what's a letter of admonition?

19      A.   It's a letter issued by the DEA notifying

20   a registrant of deficiencies found during a cyclic

21   inspection.

22      Q.   And it's telling you you're doing

23   something wrong, right?

24                MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PAPANTONIO:

 2         Q.   During the inspection, they find you're

 3    doing something wrong?

 4         A.   It's an observation of your activities.

 5         Q.   How many letters of admonition do you

 6    recall the company receiving while you were

 7    there?

 8                   MR. PYSER:  Object to form.

 9         A.   I don't have a number.

10    BY MR. PAPANTONIO:

11         Q.   Was it in the dozens, do you recall?

12                   MR. PYSER:  Object to form.

13         A.   All I can state is that we had a pretty

14    good inspection history with the agency.

15    BY MR. PAPANTONIO:

16         Q.   So you didn't receive any letters of

17    admonition?

18         A.   We did receive letters of admonition.  I

19    just don't know how many.

20         Q.   Well, here in this one facility it just

21    says "As a result of the scheduled investigation,

22    two letters of admonition were issued and further

23    investigations were conducted."

24              So -- but again, you weren't aware of what
```

1    was going on down in Lakeland?  Was that your

2    testimony?  You weren't aware of these people --

3    these facilities having their license suspended

4    immediately in Lakeland?  You didn't know about

5    that?

6              MR. PYSER:  Object to form.  It's

7    not what he testified to.

8    BY MR. PAPANTONIO:

9        Q.   Or you did know about it?

10             MR. PYSER:  Object to form.

11       A.   I was aware that -- I was aware the

12   license had been suspended.

13   BY MR. PAPANTONIO:

14       Q.   Last paragraph down here, it says "On

15   August 23, 2011, DEA headquarter's representative

16   met with representatives of Mallinckrodt?  Who is

17   Mallinckrodt?

18       A.   They are a prescription drug manufacturer.

19       Q.   And you bought drugs from them, right?

20       A.   I specifically didn't buy them.  I'm sure

21   the company did.

22       Q.   Cardinal bought drugs from Mallinckrodt?

23       A.   I would assume so.

24       Q.   Then would you distribute drugs all over

1    the country, Cardinal would?

2        A.   Yes.

3        Q.   And so it says "Met with representative,

4    Mallinckrodt, manufacturer, that sells hydrocodone

5    to wholesale distributors, including Cardinal.

6    About three weeks after the meeting with DEA,

7    Mallinckrodt sent a letter to 43 distributors,

8    including Cardinal, and the letter stated that

9    they were no longer -- that there was no longer a

10   chargeback process."

11           Tell us -- tell the jury what a chargeback

12   process is.

13              MR. PYSER:   Object to form.

14       A.   I'm not really familiar with the

15   chargeback process.

16   BY MR. PAPANTONIO:

17       Q.   Well, what is -- what are discounts?  Do

18   you know what discounts are?

19       A.   I'm not really familiar with the process

20   that manufacturers have with the company.

21       Q.   So in -- I'm sorry, how many years

22   totaling were you with the company?

23       A.   Twenty-eight.

24       Q.   In 28 years nobody ever told you that --

1    that the company would give discounts -- that

2    Mallinckrodt would give discounts to your

3    customers depending on how much narcotics they

4    sold?

5              MR. PYSER:  Objection.

6    BY MR. PAPANTONIO:

7        Q.   You didn't know about that, correct?

8              MR. PYSER:  Object to form.

9    Misstates evidence.

10       A.   Correct.

11   BY MR. PAPANTONIO:

12       Q.   Is that a correct statement?  You don't

13   even know what a chargeback is?

14       A.   I've heard the term.

15       Q.   But the term you heard, is it consistent

16   with this:  If a facility sells a lot of drugs,

17   they get a discount in purchasing drugs?

18              MR. PYSER:  Object to form.

19       A.   I don't specifically know the term.  I've

20   heard the term.

21   BY MR. PAPANTONIO:

22       Q.   Where -- where did you hear that term if

23   this -- this is not the first time you've heard

24   the idea that your company was permitting.

```
1    Discounts for selling drugs, the more you sold,

2    the bigger the discounts you get.

3                 MR. PYSER:  Object to form.

4    Misstates evidence.

5    BY MR. PAPANTONIO:

6       Q.  Did you know your company was doing

7    that?

8                 MR. PYSER:  Object to form.

9       A.  Didn't know.  I don't know how it works.

10   BY MR. PAPANTONIO:

11      Q.  And if I recall, you didn't even know how

12   many numbers -- you had no way to follow even the

13   numbers of narcotics that were being sold in the

14   United States when you're with regulatory

15   quality --

16                MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18      Q.  -- correct?

19                MR. PYSER:  Object to form.

20   Misstates.

21      A.  Correct.

22   BY MR. PAPANTONIO:

23      Q.  How were you -- how were you avoiding

24   diversion?  How were you helping in avoiding
```

1    diversion when you don't even know how many pills

2    are being sold all over the United States?

3              MR. PYSER:  Object to form.

4        A.   The regulation is a two-step process for

5    us.  You know, you've got to operate and design a

6    system, design and operate a system.  We had a

7    system.  The DEA approved.  We continued to submit

8    that to them up through 2007.

9    BY MR. PAPANTONIO:

10       Q.   Well, you would agree --

11             MR. PYSER:  Let him -- Counsel, let

12   him finish his answer.

13   BY MR. PAPANTONIO:

14       Q.   Are you finished?

15       A.   No, I'm not.

16       Q.   Go ahead.

17       A.   And also within our distribution

18   centers -- also within our distribution centers,

19   our employees were trained to identify anything

20   that they -- orders they were filling in the cage

21   or vault that may look out of the ordinary and

22   flag those for further investigation and then make

23   a determination should we report those to the

24   DEA.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   So Mallinckrodt is telling your company

 2     that they're not going to allow for discounts

 3     anymore, and you did not know prior to today that

 4     your company was providing discounts according to

 5     how many drugs were being sold throughout the

 6     country.

 7               You did not know that.  That's your

 8     testimony, correct?

 9                    MR. PYSER:  Object to form.

10     Misstates evidence.  Misstates what the document

11     says.

12     BY MR. PAPANTONIO:

13          Q.   Is that a correct statement, you did not

14     know about that?

15                    MR. PYSER:  Object to form.

16     BY MR. PAPANTONIO:

17          Q.   You did not know what a chargeback even

18     was prior to the time I just raised it with you,

19     did you?

20          A.   Did not know about the charge -- didn't

21     know about the chargeback process and how it

22     works.

23                    MR. PYSER:  Object to form.  The

24     question changed about three times on that last
```

```
 1    one.

 2    BY MR. PAPANTONIO:

 3        Q.   Go to page 15.15 there, please.

 4             The second paragraph, "On October 26,

 5    2011, DEA executed an AIW at respondent's

 6    location."

 7             Tell the jury what an AIW is.

 8        A.   Administrative inspection warrant.

 9        Q.   It's a warrant.  It's a search warrant,

10    correct?

11                  MR. PYSER:  Object to form.

12    BY MR. PAPANTONIO:

13        Q.   It's a search warrant, isn't it?

14        A.   Correct.

15                  MR. PYSER:  Object to form.

16    BY MR. PAPANTONIO:

17        Q.   Just like going to somebody's house and

18    you want to do a search warrant to find out if

19    they've got drugs in their house.  You have to get

20    a search warrant to do it.  You've had to get

21    search warrants before, right?

22                  MR. PYSER:  Objection to form on the

23    prelude.

24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2       Q.   So in other words, as a police officer,

 3   you're well aware of what a search warrant

 4   requires, right?

 5       A.   Yes.

 6       Q.   And a search warrant requires probable

 7   cause, doesn't it?

 8               MR. PYSER:  Object to form and

 9   relevance.

10   BY MR. PAPANTONIO:

11       Q.   Right?

12       A.   Yes.

13       Q.   As a matter of fact, before you can get a

14   search warrant, you have to show that the conduct

15   of that site you want to search -- there's some

16   bad things going on, before you have a chance the

17   get a search warrant, right?

18               MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20       Q.   True?

21       A.   Probable cause.

22       Q.   Probable cause.  So "On October 2011, DEA

23   executed an AIW at respondent's location.  The

24   affidavit supporting" -- and that's your location.
```

1    We're talking about Cardinal's location, right?

2        A.   Yes.

3        Q.   "The affidavit supporting the warrant --

4    search warrant stated that because DEA's

5    investigating Cardinal's top four customers to

6    determine whether the pharmacies are dispensing

7    controlled substances outside their scope of

8    registration, DEA also needs to determine whether

9    Cardinal has failed to report suspicious orders to

10   the DEA."

11        Now, you know that you did fail to report

12   suspicious orders to the DEA, right?  As you sit

13   here, you're well aware that your company failed

14   to report suspicious orders to the DEA?

15        MR. PYSER:  Object to form.

16   Misstates evidence.  Confusing a criminal search

17   warrant with an administrative inspection warrant.

18        A.   We reported suspicious orders to the DEA

19   during my time in anti-diversion with an approved

20   DEA report.

21   BY MR. PAPANTONIO:

22        Q.   Do you understand who's writing this

23   report that we're reading here right now?  Who is

24   it?

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MR. PYSER:  Object to form.

2    BY MR. PAPANTONIO:

3         Q.   It's the DEA, isn't it?

4         A.   Yes.

5         Q.   *So you're telling the jury right now --

6    I'm having trouble following this, so let me ask

7    the question this way:  You're reading a report

8    where the DEA is making a statement about all the

9    things that Cardinal did wrong as far as following

10   the law on the sale of narcotics, correct?  Can we

11   agree to that?

12                   MR. PYSER:  Object to form.

13   BY MR. PAPANTONIO:

14        Q.   Right?

15        A.   I'm speaking to my time in anti-diversion

16   up until 2007.

17        Q.   Listen to my question.

18                   MR. PAPANTONIO:  Madam Reporter,

19   read the question back again.

20   BY MR. PAPANTONIO:

21        Q.   I want you to answer this question so

22   we're very clear on what we're talking about here.

23                   MR. PAPANTONIO:  Could you read my

24   question back?
```

```
1                    MR. PYSER:  Object to form.

2              *(Question read.)

3    BY MR. PAPANTONIO:

4       Q.   Listen to the question.

5                    MR. PYSER:  Object to form.

6    BY MR. PAPANTONIO:

7       Q.   Can we agree to that?  That's what this

8    report is, right?

9                    MR. PYSER:  Object to form.

10      A.   I can agree that that's what the report

11   sets.

12   BY MR. PAPANTONIO:

13      Q.   Yeah, but you just told us that you did

14   everything right.  You said you had a system that

15   did DEA approved.  Didn't you just tell us that?

16                   MR. PYSER:  Object to form.

17      A.   My time in anti-diversion, when I was part

18   of that, yes.

19   BY MR. PAPANTONIO:

20      Q.   Okay.  So if you're telling me that, then

21   you're saying in 2008 where you were busted --

22   where Cardinal was busted the first time and had

23   to write an MOU -- you're saying you were doing

24   everything right there, according to the DEA?
```

```
1                    MR. PYSER:  Object to form.

2        A.   Based on the guidance we received from

3    DEA, the approval of the report, we were doing --

4    making good-faith effort to meet the requirements.

5    BY MR. PAPANTONIO:

6        Q.   This document is right in front of you.

7    It's a 2008 document and the DEA is busting you

8    for not doing this properly.  And you're saying

9    you had a system that worked, didn't you?

10                   MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12       Q.   So which is true --

13                   MR. PYSER:  Object to form.

14   BY MR. PAPANTONIO:

15       Q.   -- the DEA or you?

16                   MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18       Q.   Who do we believe here?

19                   MR. PYSER:  Object to form.

20       A.   We had a system.  They approved.

21   BY MR. PAPANTONIO:

22       Q.   Well, you had a system.  You say they

23   approved again in 2012, where they're busting you

24   again, where you're not complying with the law as
```

```
 1    far as the sale of narcotics in this country --

 2                    MR. PYSER:  Object to form.

 3    BY MR. PAPANTONIO:

 4        Q.   -- right?

 5                    MR. PYSER:  Object to form.

 6    BY MR. PAPANTONIO:

 7        Q.   That's what this is about?

 8                    MR. PYSER:  Object to form.

 9        A.   I was no part of the anti-diversion in

10    2012.  I can't speak to the system.

11        Q.   But you were in 2008?

12                    MR. PYSER:  Object to form.

13    BY MR. PAPANTONIO:

14        Q.   All the things -- don't you remember when

15    I showed you the 2008 document?  It was definitely

16    right during your watch when all those bad things

17    were taking place that they -- they suspended

18    licenses for.  That was during your watch, wasn't

19    it?

20        A.   And during that time we submitted the

21    report that DEA approved.

22        Q.   Right.  Okay.  So you're saying, oh, you

23    did everything right and you don't understand why

24    the DEA might have taken your license away in
```

1    several facilities.  You just don't understand why

2    they did that?

3              MR. PYSER:  Object to form.  Object

4    to form on the last one.  You've got to give me a

5    minute to interject an objection.  Go ahead and

6    answer the question.

7    BY MR. PAPANTONIO:

8         Q.  You really don't understand that the --

9    you're -- scratch that.

10             A) You're telling me you had a system that

11   did DEA approved of; B) we're seeing and the jury

12   is seeing that in 2008 the DEA said -- they fined

13   you $34 million.  You know that, right?

14             MR. PYSER:  Object to form.

15        A.  Yes.

16   BY MR. PAPANTONIO:

17        Q.  Does that sound like you're doing things

18   right?

19             MR. PYSER:  Object to form.

20        A.  Not in the eyes of the agency.

21   BY MR. PAPANTONIO:

22        Q.  Okay.  There we go.

23             Okay.  And in 2012, again, who is writing

24   this report that we're -- we've been talking about

Highly Confidential - Subject to Further Confidentiality Review

```
1    all morning?

2                    MR. PYSER:  Object to form.

3    BY MR. PAPANTONIO:

4        Q.   The DEA, isn't it?

5                    MR. PYSER:  Object to form.  It's

6    not a report.

7    BY MR. PAPANTONIO:

8        Q.   It's the DEA?

9                    MR. PYSER:  Object to form.

10       A.   DEA authored it.

11   BY MR. PAPANTONIO:

12       Q.   Yeah, DEA authored it.  And you just told

13   us, gee whiz, we're doing everything the DEA

14   requires.  Didn't you tell us that just a minute

15   ago?

16                   MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18       Q.   You're doing everything DEA requires,

19   right?

20                   MR. PYSER:  Object to form.

21       A.   We felt that we were.

22   BY MR. PAPANTONIO:

23       Q.   Yeah, well, apparently you weren't --

24                   MR. PYSER:  Object to form.
```

```
1    BY MR. PAPANTONIO:

2         Q.   -- according to this report, right?

3                    MR. PYSER:  Object to form.

4    Counsel, let's --

5    BY MR. PAPANTONIO:

6         Q.   Do you have any idea?

7                    MR. PYSER:  Before your next

8    question, Counsel, in the next two or three

9    minutes, let's take a lunch break.  You can reach

10   a normal --

11                   MR. PAPANTONIO:  Well, we'll take it

12   right now.  We'll take -- we'll take a 30-minute,

13   40 -- let's do 45 minutes.

14                   MR. PYSER:  To be clear, there's no

15   pending question right now.

16                   MR. PAPANTONIO:  Well, let me do one

17   then.

18                   MR. PYSER:  No.  You're not doing a

19   pending question so we can take a lunch break.

20                   MR. PAPANTONIO:  No, no.  We're

21   going to put it on the record.

22                   MR. PYSER:  We are off the record.

23                   MR. PAPANTONIO:  This is the pending

24   question.
```

```
 1                      MR. PYSER:  We are off the record.

 2                      MR. PAPANTONIO:  No, we are not off

 3      the record.

 4                      MR. PYSER:  We are off the record.

 5                      MR. PAPANTONIO:  We're going to go

 6      back on the record.

 7                      MR. PYSER:  Counsel, you don't have

 8      the right to ask a pending question.

 9                      MR. PAPANTONIO:  We haven't gone off

10      the record.

11      BY MR. PAPANTONIO:

12         Q.   Okay.  So this is the pending -- this is

13      the pending question.  Here's the pending

14      question:  I want to ask you about any involvement

15      that you had in making decisions that affected the

16      DEA taking away suspended licenses in facilities

17      anywhere in America.

18              What was your role in that decision-making

19      process?

20                      MR. PYSER:  Objection.  Move to

21      strike.

22                      MR. PAPANTONIO:  That's the pending

23      question.

24                      MR. PYSER:  But before we go to
```

1    lunch, go ahead and answer the question.

2                    MR. PAPANTONIO:  Well, it's a

3    multi-part question.  There's going to be a lot of

4    parts to that question.

5    BY MR. PAPANTONIO:

6       Q.   But you want to answer that question?

7    What role did you have?

8                    MR. PYSER:  That's a single

9    question.  Counselor --

10                   MR. PAPANTONIO:  No.

11   BY MR. PAPANTONIO:

12      Q.   What role did you --

13                   MR. PYSER:  You know what, move to

14   strike.  We're already off the record.

15                   MR. PAPANTONIO:  Counsel, do not --

16   do not -- do not talk to this witness because I

17   will --

18                   MR. PYSER:  I'm talking to you,

19   Counselor.

20                   MR. PAPANTONIO:  I promise you.

21                   MR. PYSER:  We will --

22                   MR. PAPANTONIO:  If you talk to this

23   witness about what we've talked about, you will be

24   embarrassed when you come back.  Thank you for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    taking --

 2                    MR. PYSER:  We are not going to do

 3    anything improper.

 4                    MR. PAPANTONIO:  Good.

 5                    MR. PYSER:  Your behavior is wildly

 6    inappropriate.

 7                    MR. PAPANTONIO:  Okay.  Well, do a

 8    motion on it.

 9                    MR. PYSER:  When you go on a lunch

10    break --

11                    MR. PAPANTONIO:  Do a motion.

12                    MR. PYSER:  -- you don't get to ask

13    a question so there's a pending question.  The

14    question is -- the question is stricken.  The

15    rules from the Court are clear.  Your attempts to

16    violate them are inappropriate.  We are done.  We

17    are on lunch.

18                    THE VIDEOGRAPHER:  The time is 12:23

19    p.m.  We are off the record.

20                    MR. PAPANTONIO:  I recommend you

21    don't talk to this witness, okay.

22                    MR. PYSER:  Counsel, I am allowed to

23    talk to the witness, not about pending questions.

24    The deposition protocol is clear -- I'd like to go
```

```
 1   back on the record to read the deposition

 2   protocol.

 3              MR. PAPANTONIO:  I know the

 4   deposition protocol.  Why don't you take --

 5              MR. PYSER:  You clearly don't --

 6              MR. PAPANTONIO:  We're going to get

 7   on the record about what you did talk to this

 8   witness about, okay.  I have to go eat.

 9

10   (Mr. Papantonio exits conference room.)

11

12              MR. PYSER:  You don't know the

13   deposition protocol.  The deposition protocol is

14   states as follows:  "Communications between a

15   witness and his or her counsel during a break

16   taken with no question pending shall not be the

17   subject of inquiry.  Such conversations are

18   subject to the attorney-client work product

19   privileges."

20         There is no question pending.  We will not

21   violate the protocol, but we are allowed to speak

22   to the witness.  I want to talk to him about the

23   Celtics game he's going to tonight with his

24   daughter and wife.  I have every right to do that.
```

```
 1    And counselor is wrong and inappropriate and

 2    violating the rules of deposition protocol.

 3                    We can go off the record.

 4

 5            (Recess was taken at 12:24 p.m.)

 6

 7                    MS. MOORE:  I'm putting in Cardinal

 8    Reardon 14, which is the distribution center map

 9    overlaid onto the death map of 2016.

10

11            (Exhibit No. 14 marked for

12    identification.)

13

14                    MS. MOORE:  We're going to put in

15    plaintiffs' counsel's drawing of salesperson,

16    Cardinal Reardon 11.

17

18            (Exhibit No. 11 marked for

19    identification.)

20

21            (On the record at 1:11 p.m.)

22

23                    THE VIDEOGRAPHER:  The time is 1:11

24    p.m., and we're on the record.
```

1

2    BY MR. PAPANTONIO:

3        Q.   So, sir, you're looking at document 4085,

4    go to .15.  4085.15.

5            Do you remember we were talking about the

6    warrant as being issued by the DEA, the AIW?

7                MR. PYSER:  Ongoing objection to the

8    use of this document.

9    BY MR. PAPANTONIO:

10       Q.   You remember the AIW search warrant issued

11   by the drug enforcement agency?

12       A.   Yes.

13       Q.   Now, that warrant, the second paragraph,

14   "On October 26, 2011, DEA executed an AIW to

15   respondent's location.  The affidavit supporting

16   the warrant stated the DEA is investigating

17   Cardinal's top four customers to determine whether

18   pharmacies are dispensing controlled substances

19   outside the scope of the registration."

20           Now, that would be called diversion,

21   correct?

22               MR. PYSER:  Object to form.

23       A.   Correct.

24   BY MR. PAPANTONIO:

```
 1        Q.    "DEA also needs to determine whether

 2   Cardinal has failed to report suspicious orders to

 3   the DEA."

 4            Do you see that?

 5        A.    Yes.

 6        Q.    You remember you told me -- you've been

 7   telling me that what you did is you would do these

 8   things that you called ingredient reports, right?

 9   Something called ingredient reports?  Right?  And

10   you would send them to the DEA?  Did you tell me

11   that?

12        A.    In this time frame?

13        Q.    Well, any time frame.  Tell me about your

14   ingredient reports that you sent those to the DEA,

15   correct?

16        A.    Correct, up until 2007 and maybe in the

17   first three months of 2008, there was a

18   transition.

19        Q.    All right.  Well, let's get this right.

20            Your company started selling narcotics as

21   early as what year?

22            When did you start -- when did Cardinal

23   first start distributing narcotics all over the

24   country?
```

```
1        A.    I don't know the answer to that question.

2        Q.    Was it prior to 2000?

3              Well, you were with the company then.  You

4    started with the company when?

5                   MR. PYSER:  Object to form.

6        A.    The company existed before I started.

7    BY MR. PAPANTONIO:

8        Q.    Okay.  When did you start?

9        A.    1988.

10       Q.    Were they distributing narcotics

11   throughout the country in 1988?

12       A.    Yes.

13       Q.    And you were following the law that you

14   were supposed to follow -- if you were complying

15   with the law, you were following    CFR 21,

16   correct?

17                  MR. PYSER:  Object to form.

18       A.    Correct.

19   BY MR. PAPANTONIO:

20       Q.    Because CFR 21 had already been written in

21   1971, correct?

22                  MR. PYSER:  Object to form.

23       A.    Correct.

24   BY MR. PAPANTONIO:
```

```
1         Q.   So in 1988, we can establish that you

2    already involved -- as far as you knew, the

3    company was already involved in selling narcotics

4    throughout the United States, true?

5         A.   Not throughout the United States.

6         Q.   Well, they were selling narcotics in the

7    country, in the United States, weren't they?

8         A.   Yes.

9         Q.   And you were having to comply supposedly

10   with CFR 21, true?

11             MR. PYSER:  Object to form.

12        A.   Correct.

13   BY MR. PAPANTONIO:

14        Q.   And you knew, sir, that it wasn't enough

15   for just -- just reporting a suspicious order was

16   not enough?  That did not fulfill your obligation.

17   Simply just reporting a suspicious order to the

18   DEA was not where your obligation stopped, is

19   it?

20             MR. PYSER:  Object to form.

21        A.   We were required to design and operate a

22   system to identify suspicious orders and report

23   those to DEA.

24   BY MR. PAPANTONIO:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.   And you felt like that's all you were

2    supposed to do, identify the order and report it

3    to the DEA?  Is that your testimony?

4              MR. PYSER:  Object to form.

5    Misstates testimony.

6         A.   In two steps.  In the second step of what

7    we did, our employees in our distribution centers

8    who were filling orders would also identify

9    anything that they felt warranted further

10   investigation and then contact the local DEA to

11   make a determination as to whether or not they

12   could ship it.

13   BY MR. PAPANTONIO:

14        Q.   Well, sir, we're going to see -- you

15   understand that you identified suspicious orders

16   and shipped the narcotic anyway after you

17   determined that it was a suspicious order.  Your

18   company did that routinely, didn't they?

19              MR. PYSER:  Object to form.

20   Misstates evidence.

21   BY MR. PAPANTONIO:

22        Q.   Yes or no?

23        A.   The requirement was to report them.

24        Q.   Okay.  But -- so okay.  So your -- in your
```

 1    head, the only requirement was for you to report

 2    them?  We can agree on that, right?

 3                    MR. PYSER:  Object to form.

 4        A.    Correct.

 5                    MR. PYSER:  Object to form.  Asked

 6    and answered.  Misstates testimony.

 7    BY MR. PAPANTONIO:

 8        Q.    Report them?  Is that your testimony?

 9        A.    That's what the regulation states.

10                    MR. PYSER:  Object to form.

11    BY MR. PAPANTONIO:

12        Q.    And you know the regulation was written in

13    1971, and it told you you had to do a lot more

14    than just report the suspicious order to the DEA?

15    You know that as we sit here today, that your

16    obligation was to do more than report it to the

17    DEA, correct?

18                    MR. PYSER:  Object to form.

19        A.    Based on additional guidance from DEA that

20    evolved over time, yes.

21    BY MR. PAPANTONIO:

22        Q.    Wait a second.  Now, you started -- you --

23    right now we understand you're selling the drug

24    all the way back to -- you know that they're

```
 1    selling it in 1988, correct?  Selling the drug in

 2    1988?

 3        A.   Correct.

 4                 MR. PYSER:  Object to form.

 5    BY MR. PAPANTONIO:

 6        Q.   Let's put --

 7                 MR. PYSER:  Vague as to "the drug."

 8    BY MR. PAPANTONIO:

 9        Q.   Let's put this on the chart.  Let's put

10    this on the Elmo.  Could you give me that Elmo,

11    please.  It's coming up.

12             Do you have a piece of tape?  I'm going to

13    make this all one document.

14             So your company starts -- as far as you

15    know, you knew that they were selling drugs --

16    narcotics in 1988, correct?

17             Is that right?

18        A.   Correct.

19        Q.   And you knew that there was already a law

20    that they had to follow that was written in 1971,

21    correct?

22        A.   Correct.

23        Q.   And so let me write, selling narcotics.

24                 MR. PYSER:  An ongoing objection to
```

1    this demonstrative.

2              MR. PAPANTONIO:  Yeah, okay, I hear

3    you.

4    BY MR. PAPANTONIO:

5        Q.   So the next thing is we find out you

6    know -- well, actually, let's just show it to him.

7    Show him 4008.  Show him 4008, please.

8              Sir, tell me who -- you said you never met

9    Mr. Rannazzisi, is that correct?  You told me

10   that?

11       A.   Correct.

12       Q.   Give one to your counsel there, if you

13   would.

14              MR. PYSER:  Thank you.

15   BY MR. PAPANTONIO:

16       Q.   So this document, I don't believe you've

17   ever seen, I don't think so.  It's 2007.  December

18   2007, right?

19              MR. PYSER:  Object to form.

20       A.   Correct.

21   BY MR. PAPANTONIO:

22       Q.   And it says right up at the top, Cardinal

23   Health, and it gives the address, Syracuse,

24   New York.  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   Yes.

2        Q.   It says "Dear Registrant."

3             First of all, let's look at who it's from.

4    Look on the last page.  You see who that's from

5    Joseph Rannazzisi.  Do you see that?

6        A.   Yes.

7        Q.   And you knew Joseph, correct?

8                  MR. PYSER:  Object to form.

9        A.   I knew of him.

10   BY MR. PAPANTONIO:

11       Q.   You knew of him.

12            It says "Dear Registrant.  This letter is

13   being sent to every entity in the United States

14   registered with the Drug Enforcement

15   Administration, DEA, to manufacture or distribute

16   controlled substances."

17            Then it says "The purpose of this letter

18   is to reiterate the responsibilities of controlled

19   substance manufacturers and distributors to inform

20   DEA of suspicious orders in accordance with 21

21   CFR."

22            Do you see that?  And you're familiar with

23   what 21 CFR is, right?

24       A.   Yes.
```

```
 1      Q.    "In addition to, and not in lieu of, the

 2   general requirement under 21 USC 823 that

 3   manufacturers and distributors maintain effective

 4   controls against diversion, DEA regulations

 5   require that all manufacturers and distributors to

 6   report suspicious orders of controlled

 7   substances."

 8          Do you see that?

 9      A.    Yes.

10      Q.    And then it goes on to say, if -- if you

11   look at the next paragraph, look at what that is

12   controlling -- this control of suspicious orders.

13          It says "The regulation also requires that

14   the registrant inform local DEA division office of

15   suspicious orders when discovered by the

16   registrant."

17          You're saying you did?  That's your

18   testimony, right?

19          Right?

20      A.    In using the ingredient limit report and

21   the process that we employed by our -- used by our

22   employees in the distribution centers.

23      Q.    And we've seen the results of you using

24   the ingredient report.  We know that in 2008 that
```

```
 1    you had to pay $34 million fine because you were

 2    not following the laws pursuant to the CFR,

 3    correct?  We've already talked about that, right?

 4        A.   That was the allegation.

 5        Q.   And you paid a $34 million fine?

 6                   MR. PYSER:  Object to form.

 7    BY MR. PAPANTONIO:

 8        Q.   Correct?  You didn't, but your company

 9    did?

10        A.   Correct.

11        Q.   And it says, if you look at the last

12    paragraph -- the last line of that      Paragraph

13    3, it says "Reporting an order" -- here it is,

14    "Reporting an order as suspicious will not absolve

15    the registrant of responsibility if the registrant

16    knew or should have known that the controlled

17    substances were being diverted."

18           Right?  That's what it says, isn't it?

19    It's very clear.

20                   MR. PYSER:  Object to form.

21    BY MR. PAPANTONIO:

22        Q.   Right?  "Reporting an order as suspicious

23    will not absolve the registrant of responsibility

24    if the registrant" -- underline "knew or should
```

```
 1    have known," please -- "knew or should have known

 2    that the controlled substances were being

 3    diverted."

 4             That's what it says?

 5                  MR. PYSER:  Object to form.

 6       A.   Yes.

 7    BY MR. PAPANTONIO:

 8       Q.   Did I read that right?

 9       A.   Yes.

10       Q.   So in other words, sir, your

11    responsibility is more than just reporting to the

12    DEA.  This is telling you that's not enough.  You

13    can't just report to the DEA and be absolved of

14    your responsibility.  You know that, don't you?

15                  MR. PYSER:  Object to form.

16    BY MR. PAPANTONIO:

17       Q.   True?

18       A.   As of the meeting they had in September of

19    '07 and then subsequently this letter.

20       Q.   Because truthfully, you weren't doing --

21    you were not doing anything except sending in

22    reports to the DEA.  That's all you did, true?

23                  MR. PYSER:  Object to form.

24    Misstates evidence.
```

```
 1   BY MR. PAPANTONIO:

 2        Q.   Yes?

 3        A.   No.  The employees in the distribution

 4   centers were identifying orders and contacting the

 5   local office of the DEA.

 6        Q.   Right.  And even if you knew or should

 7   have known that there was some illegal activity

 8   going on, that's all you did was send in the

 9   report of a suspicious order?

10             MR. PYSER:  Object.

11   BY MR. PAPANTONIO:

12        Q.   True?

13             MR. PYSER:  Object to form.

14   Misstates evidence.

15        A.   No.  The employees were contacting the

16   local office on orders.

17   BY MR. PAPANTONIO:

18        Q.   Well, what are we talking about?  Let's

19   look at the second page here.

20             Have you seen this letter, by the way,

21   prior to me showing it to you today?

22             Has anybody -- has anybody with the

23   company taken the time to actually share with you

24   what your responsibilities were?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. PYSER:  Object to form.

 2    BY MR. PAPANTONIO:

 3        Q.   In this letter?

 4        A.   I've seen it.

 5        Q.   Okay.  You see the second paragraph, it

 6    says "Daily, weekly, or monthly reports submitted

 7    by registrant indicating excessive purchases do

 8    not comply with the requirement to report

 9    suspicious orders even if the registrant calls to

10    report suspicious reports."

11             Did you know that that was the standard?

12    That, look it's not -- you're not complying with

13    it simply by saying, hey, we've got a suspicious

14    order.  You understand that, right?

15                    MR. PYSER:  Object to form.

16        A.   I became aware of this at the September

17    DEA conference.

18    BY MR. PAPANTONIO:

19        Q.   2007?  Is that when you're saying?

20        A.   Yes.

21        Q.   So were you selling drugs between 1988 and

22    2007 without ever complying with what this letter

23    is saying here, right?

24        A.   We --
```

```
 1                    MR. PYSER:  Object to form.

 2        A.   Object to form.  Misstates evidence.

 3   BY MR. PAPANTONIO:

 4        Q.   You were not complying with what this

 5   letter says between 1988 when you were selling

 6   narcotics and 2007, correct?

 7                    MR. PYSER:  Object to form.

 8        A.   We were submitting what the DEA approved

 9   with our trade association to them on a monthly

10   basis, along with what our employees did in our

11   distribution centers by contacting the local DEA

12   when they came across something that was

13   suspicious to them.

14   BY MR. PAPANTONIO:

15        Q.   Well, how about this last paragraph that

16   says "Lastly, registrants that routinely report

17   suspicious orders yet fill these orders without

18   first determining that the order is not being

19   diverted into other legitimate medical,

20   scientific, and industrial channels may be failing

21   to maintain effective controls against diversion."

22             Did I read that right?

23        A.   Yes.

24        Q.   And that's what exactly, exactly what you
```

 1    were accused of in 2008, a year after this letter

 2    was written to you -- to your company?

 3                    MR. PYSER:  Objection.

 4    BY MR. PAPANTONIO:

 5        Q.   2008, you had to sign an MOU where your

 6    company paid $34 million because you weren't

 7    following the law.  We already talked about that

 8    today, haven't we?

 9                    MR. PYSER:  Object to form.

10        A.   Yes.

11    BY MR. PAPANTONIO:

12        Q.   And the letter -- this is -- this document

13    is 2007.  That's a year before, right?

14                    MR. PYSER:  Object to form.

15        A.   After the '07 September meeting and

16    subsequent to receiving this letter, Cardinal

17    moved to change the program to meet what we were

18    told was a standard at the Houston DEA meeting as

19    well as this letter.

20    BY MR. PAPANTONIO:

21        Q.   Well, how about all the years in between

22    1988 and 2007, we're just -- where you have drugs

23    being sent -- narcotics being sent all over the

24    country and you're not doing it in compliance with

1    these standards?

2         Is that just okay?  Do we forgive the 1988

3    to 2007?  Is that what you're asking us to do?

4    A.   We submitted.

5              MR. PYSER:  Objection.  Wait.

6    Object to form.  Objection.  Argumentative.

7    BY MR. PAPANTONIO:

8    Q.   Is that what you -- is that what you're

9    telling the jury right now that, yes, between 1988

10   and 2007, we didn't do any of this -- what the DEA

11   is talking about in 2007?

12             MR. PYSER:  Objection.

13   BY MR. PAPANTONIO:

14   Q.   Is that what you're telling us?

15             MR. PYSER:  Object to form.

16   Objection.  Argumentative.

17   BY MR. PAPANTONIO:

18   Q.   Yes or no?

19             MR. PYSER:  Objection.

20   A.   We provided to DEA what they approved.

21   BY MR. PAPANTONIO:

22   Q.   Well, we saw what -- how that worked out.

23   In 2007, they're telling you again, again they're

24   telling you.  They told you in 2006 what you could

```
 1    or couldn't do.  Then they told you in 2007 what

 2    you could or could not do.  And then in 2008, sure

 3    enough, you're busted again.  You have to pay a

 4    $34 million fine for not doing it right.

 5            Is that -- is that what we've been --

 6    that's exactly the history we've been talking

 7    about today, right?

 8                    MR. PYSER:  Object to form.

 9    Objection, compound.  Objection, argumentative.

10    BY MR. PAPANTONIO:

11        Q.   Is that right?  Isn't that what we've just

12    been reviewing all morning?

13                    MR. PYSER:  Object to form.

14    BY MR. PAPANTONIO:

15        Q.   Yes or no?

16        A.   We have been discussing that, yes.

17        Q.   So now we're talking about clearly -- it

18    was very clear that you can't just report a

19    suspicious order, that you have an obligation to

20    go ahead and do research and to find out what's

21    going on with that facility, don't you?

22            You have an obligation -- a legal

23    obligation to do that, don't you?

24                    MR. PYSER:  Object to form.
```

```
1    BY MR. PAPANTONIO:

2        Q.   Yes or no?

3                    MR. PYSER:  Object to form.

4    Objection.  Vague as to time.

5    BY MR. PAPANTONIO:

6        Q.   Yes or no?

7        A.   Based on what we determined to be new

8    guidance from the DEA in 2007, we moved in that

9    direction.

10       Q.   Oh, so you said we had new -- so you're

11   saying 2007 is the first time you had new guidance

12   from the DEA?  Is that what you're telling us?

13                   MR. PYSER:  Object to form.

14   Objection.  Misstates testimony.

15   BY MR. PAPANTONIO:

16       Q.   Does that misstate what you just said?

17   You just told me that 2007, they provided guidance

18   for you, the DEA, for the first time.  Isn't that

19   what you told me?

20                   MR. PYSER:  Object to form.  You're

21   making a statement that's broader than what the

22   witness said.  You're misstating what he said.

23                   MR. PAPANTONIO:  Sir, objection as

24   to form.  Keep it at that.  Do not coach this
```

```
 1    witness.

 2                    MR. PYSER:  I'm not coaching him,

 3    Counsel.

 4                    MR. PAPANTONIO:  Yes, you are.  It's

 5    very apparent that you're coaching the witness.

 6    BY MR. PAPANTONIO:

 7        Q.  Sir, I'm going to ask you the question.

 8    He can blab as much as he wants.  You need to

 9    listen to my question and answer it.  Give him a

10    chance to object.  He is going to say "objection

11    to form," and I need the questions answered.

12            Do you understand that?

13                    MR. PYSER:  Objection.

14    BY MR. PAPANTONIO:

15        Q.  Do you understand that, sir?

16                    MR. PYSER:  Objection.  Please stop

17    shouting at the witness.  That's enough --

18    BY MR. PAPANTONIO:

19        Q.  Do you understand?  Do you understand?

20                    MR. PYSER:  That's enough

21    instruction from you to the witness.  You're

22    raising your voice to the witness.  It's

23    inappropriate.

24                    MR. PAPANTONIO:  And you quit
```

1    objecting beyond form.  Okay?  Stop it right now

2    and we'll do fine here today.  But otherwise,

3    you're going to have follow the rules, the same

4    kind of rules that you put on the record here.

5    Stop it now.

6                MR. PYSER:  I've been following the

7    rules all day.

8    BY MR. PAPANTONIO:

9        Q.   Okay.  Here's the question.  Here's the

10   question again.

11               You said the first time that the DEA made

12   it -- made you aware of what the rules were is

13   2007.  Was that your testimony?

14               MR. PYSER:  Object to form.

15       A.   In 2007, at the DEA conference, there was

16   a presentation about a new program that another

17   wholesaler developed, and DEA commented that this

18   is the new industry standard, this is what we

19   expect you to do.

20   BY MR. PAPANTONIO:

21       Q.   No, sir, they told you the same thing in

22   2006, didn't they?  They told you the same thing

23   in 2006 that I just read in 2007, didn't they?

24   Didn't Rannazzisi tell you -- send you another

```
 1    letter in 2006?

 2        A.   The letters were slightly different.

 3                   MR. PYSER:  Object to form.

 4    BY MR. PAPANTONIO:

 5        Q.   Well, how about this, how about when you

 6    met face-to-face with the DEA in 2005?  They told

 7    you then, sir, didn't they?  In 2005, they told

 8    you that any sales -- monthly sales in excess of

 9    5,000 pills per month would be considered

10    excessive.  The DEA told you that face-to-face,

11    didn't they?

12                   MR. PYSER:  Object to form.

13        A.   That meeting was with respect to

14    identifying who might be Internet pharmacies.

15    BY MR. PAPANTONIO:

16        Q.   That's not my question.  I want to ask you

17    again.

18             You were told in 2005 that any sales above

19    5,000 would be considered excessive.  You were

20    told that face-to-face, weren't you?  Face-to-face

21    with the DEA they told you that, right?

22                   MR. PYSER:  Object to form.

23    Misstates testimony.

24    BY MR. PAPANTONIO:
```

```
 1       Q.   Yes or no?  Yes or no?

 2       A.   As it applies to Internet pharmacies.

 3       Q.   Okay.  So Internet pharmacies, you're

 4  saying you knew clearly -- and you were in the

 5  business of selling drugs to Internet pharmacies,

 6  right, your company was?

 7                 MR. PYSER:  Object to form.

 8  BY MR. PAPANTONIO:

 9       Q.   Right?

10                 MR. PYSER:  Object to form.

11  BY MR. PAPANTONIO:

12       Q.   4781, please.

13       A.   Yes.

14       Q.   You met with the DEA in 2005,

15  face-to-face.  Show him this document, please,

16  4781.

17            Sir, while she's looking for that, you

18  were told point blank that the norm for -- the

19  norm for a pharmacy -- an Internet pharmacy should

20  be 5,000, right?

21                 MR. PYSER:  Object to form.

22  Counsel, what's the exhibit number on this?

23                 MR. PAPANTONIO:  4781.

24                 MR. PYSER:  Mr. Reardon, what's the
```

 1    exhibit number on the document you're looking at?

 2

 3              (Exhibit No. 15 marked for

 4    identification.)

 5

 6    BY MR. PAPANTONIO:

 7        Q.   Do you see this?  Did anybody show this to

 8    you before you came in here today?

 9        A.   (Witness reviews document.)

10              MR. PYSER:  Objection.  I caution

11    the witness not to reveal the content of

12    communications with counsel.

13    BY MR. PAPANTONIO:

14        Q.   Did anybody show this to you before you

15    came in here today, let's say from the company?

16        A.   (Witness reviews document.)

17        Q.   Sir, I mean, do you recognize --

18        A.   I'm reading it.

19        Q.   You recognize it, don't you?  And you know

20    that in 2005, you -- well, look at the top.

21              "We should potentially keep an eye on the

22    new customer in Austin." I believe it was Smart

23    Choice, right?  That's the first line there.  And

24    then it says, from Steve Ray -- I mean, Pete, Pete

```
 1    Stoy.  Tell me who that is.

 2                  MR. PYSER:  Object to form.

 3    BY MR. PAPANTONIO:

 4        Q.   Who is Pete Stoy?

 5        A.   I believe he was in operations.

 6        Q.   And it was sent to, let's see, Eric --

 7    Eric -- let's see.  Eric Bolling.  Who is that?

 8        A.   I'm not sure.

 9        Q.   Well, it was sent to these people

10    underneath there, and it says, the next thing is

11    "Please let me know if any of these types of

12    prospects may be on our radar now or if any come

13    up."

14            Now, it's got your name after that, Steve

15    Reardon, very clearly, right there, Steve Reardon

16    right on -- right up on top of that, right?

17                  MR. PYSER:  Object to form.

18    BY MR. PAPANTONIO:

19        Q.   Do you see that?

20        A.   Yes.

21        Q.   And the date underneath it is 2005,

22    correct?  Correct?

23        A.   Correct.

24        Q.   It says "Internet pharmacies," true?
```

```
 1        A.   Correct.

 2        Q.   So he's talking to you about Internet

 3   pharmacies.  It says "DEA has recently initiated

 4   investigations of Internet pharmacies who are

 5   purchasing excessive quantities of controlled

 6   substances, primarily phentermine and hydrocodone,

 7   and dispensing these controlled substances without

 8   a valid prescription, in that there was no -- in

 9   that there was not the required doctor/patient

10   relationship."

11             Sir, you understood -- you understand you

12   were sending narcotics, you were -- you were

13   supplying -- scratch that.

14             You were supplying the Internet businesses

15   with narcotics that you understood were being sent

16   all over the country.  You know that as we sit

17   here today, don't you?

18                  MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20        Q.   True?  Did you not know that?

21        A.   I know we sold to Internet pharmacies.

22        Q.   And you know that you were told in 2005

23   that these Internet pharmacies, some of them

24   actually had never even made consultations with
```

```
1    doctors about the patients that they were filling

2    the prescriptions for, true?

3                   MR. PYSER:  Object to form.

4    BY MR. PAPANTONIO:

5        Q.   You knew that?

6                   MR. PYSER:  Objection.

7    BY MR. PAPANTONIO:

8        Q.   2005?

9                   MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11       Q.   Correct?

12       A.   We had the meeting with the DEA in August

13   of 2005.

14       Q.   Well, we -- it was you.  It says you were

15   face-to-face with the DEA, and that's where this

16   whole thing started.

17                  Remember, I was asking you, you knew about

18   it in 1971, CFR.  You were told -- you started

19   selling narcotics in 1988.  2005, you meet with

20   the DEA.  So here's where we are, 2005.

21                  You met with the DEA and it says "As part

22   of this ongoing initiative, the DEA has been

23   meeting with drug distributors, including

24   Cardinal."
```

1        Do you see that?  Underline "including

2   Cardinal" for me, please.

3        "And soliciting their assistance in the

4   monitoring Internet pharmacies activity.  As a

5   result of these meetings, we have become aware

6   that one wholesaler has recently ceased doing

7   business with 24 pharmacies located in Florida and

8   Texas."

9        That wasn't you, was it?

10            MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12   Q.    That wasn't -- Cardinal didn't cease doing

13   in business in Florida and Texas, did they?

14            MR. PYSER:  Object to form.

15   Misstates what the e-mail says.

16   BY MR. PAPANTONIO:

17   Q.    In other words, you see what this says,

18   don't you?

19        It says "As a result of that meeting, one

20   wholesaler," -- underline that, please -- "one

21   wholesaler ceased doing business with 24

22   pharmacies located in Florida and Texas."

23        That was not Cardinal, was it?

24            MR. PYSER:  Object to form.

```
 1      A.   I don't believe so.

 2   BY MR. PAPANTONIO:

 3      Q.   No, I know it's not, and so let's go on

 4   with it.

 5           So next question --

 6                MR. PYSER:  Object to form.

 7   BY MR. PAPANTONIO:

 8      Q.   -- "Please let me know if you are

 9   approached by potential new retail pharmacy

10   customers in those states so that we may conduct

11   the appropriate due diligence prior to taking on

12   the new business."

13           Now, it says "Additionally, DEA has

14   identified Colorado as a state that has an

15   Internet pharmacy problem."

16           What was the Internet pharmacy problem out

17   in Colorado?

18                MR. PYSER:  Object to form.

19      A.   I don't recall the specifics they

20   provided.

21   BY MR. PAPANTONIO:

22      Q.   "Your excessive purchase reports should be

23   reviewed to see if you have customers that are

24   purchasing over 3,000 dosage units of phentermine
```

1    or 5,000 dosage units of hydrocodone a month."

2         Do you see that?

3    A.   (Witness nodding.)

4    Q.   Do you see that?

5    A.   Yes.

6    Q.   All right.  Now, you know, don't you, that

7    in 2005 -- excuse me -- 2008 they actually went as

8    far as telling you the exact facilities --

9    Internet facilities that were exceeding 5,000?  Do

10   you recall that?

11        MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13   Q.   Do you recall that?

14   A.   I -- I don't.  Where are you?

15   Q.   Well, look at 4230.  There's a box, 4230.

16   That is the MOU that your company paid $34 million

17   for.  Do you remember that?

18        MR. PYSER:  Ongoing objection on

19   this document.

20   BY MR. PAPANTONIO:

21   Q.   Take a minute and look at that document

22   because we haven't really talked about it.

23        Now, sir, you understand that you were

24   told clearly that an Internet pharmacy should not

```
 1    sell drugs in excess of 5,000 a month, true?

 2                  MR. PYSER:  Objection.  Misstates

 3    evidence.

 4    BY MR. PAPANTONIO:

 5       Q.   You were told that?

 6                  MR. PYSER:  Object to form.

 7    BY MR. PAPANTONIO:

 8       Q.   He's objected to the form.  Let's read it

 9    again.  I will take as long as it takes to get

10    this across.

11            Here's my question, new question.  You

12    were told in 2005 that if you have an Internet

13    pharmacy that's selling more than 5,000 a month,

14    there's something wrong there, right?

15                  MR. PYSER:  Object to form.

16       A.   That it warrants investigation, take a

17    look at the customer.

18    BY MR. PAPANTONIO:

19       Q.   Right.  Warrants investigation.  And you

20    know as we sit here today that you had dozens of

21    Internet pharmacies that were exceeding 5,000

22    pills a month.  You know that as we sit here,

23    don't you?

24                  MR. PYSER:  Object to form.
```

```
1    BY MR. PAPANTONIO:

2         Q.   Don't you?

3         A.   I -- I don't have --

4         Q.   Why don't you go to -- go to page 21 of

5    4230.

6                   MR. PYSER:  Object to form.

7         Let him finish his answers.

8    BY MR. PAPANTONIO:

9         Q.   Exhibit 6.  But 4230.21, do you see that?

10   Can you -- look up here.  It's on the screen.  It

11   actually -- now right above it, go to the

12   paragraph right above that big box.

13             The paragraph right above that big box

14   says "Retail pharmacies in Florida order an

15   average of less than 8,400 dosage units of

16   hydrocodone per month."

17             Do you see that?

18        A.   Yes.

19        Q.   "Retail pharmacies in Florida order an

20   average of less than 8,400 dosage units a month."

21             Do you see where I'm reading?

22        A.   Yes.

23        Q.   It says "Respondent," -- that is Cardinal,

24   right?  "Respondent distributed hydrocodone to
```

```
 1    pharmacies engaged in the diversion of controlled

 2    substances as reflected in the chart below.

 3    Respondent" -- which is Cardinal -- "knew or

 4    should have known that these pharmacies were

 5    diverting hydrocodone into other than legitimate

 6    medical, scientific, industrial channels."

 7              Now, why don't you go there and let's take

 8    one by one how many of these pharmacies were

 9    exceeding 5,000 a month.  How about MedaPharm.  Do

10    you see that?

11                   MR. PYSER:  Object to form.  Object

12    to the premise of the question.

13              Are you saying these are Internet

14    pharmacies or not?

15    BY MR. PAPANTONIO:

16         Q.  Do you see MedaPharm?

17                   MR. PAPANTONIO:  I'm going to ask

18    him the question.  Let me ask the questions.

19    BY MR. PAPANTONIO:

20         Q.  Do you see MedaPharm?

21                   MR. PYSER:  Object to form.

22         A.  Yes.

23    BY MR. PAPANTONIO:

24         Q.  How many pills are they selling?
```

```
1        A.   The monthly average?

2        Q.   The monthly average, yes.

3        A.   155,007.

4        Q.   Go down to United Prescription Services,

5    Incorporated.  How many pills are they selling?

6        A.   287,025.

7        Q.   And then QRG, how many are they selling?

8        A.   242,640.

9        Q.   And this says "Retail pharmacies in

10   Florida" -- right above it, it says "Retail

11   pharmacies in Florida order an average of less

12   than 8,400 pills."  That's what that says, doesn't

13   it?

14               MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.   Right?

17       A.   Yes.

18       Q.   But every one of these people on this list

19   is a Cardinal customer, true?

20               MR. PYSER:  Object to form.  Vague.

21   BY MR. PAPANTONIO:

22       Q.   Everybody in this list is a Cardinal

23   customer?  You understand what I'm asking you,

24   don't you?
```

```
 1                      MR. PYSER:  Object to form.

 2        A.   You know, as I look at MedaPharm, it looks

 3   like it was a new customer that was taken on.

 4   BY MR. PAPANTONIO:

 5        Q.   Fine.  Fine.

 6        A.   And sales were monitored and they were --

 7   I believe they were shut off in December.

 8        Q.   Yeah, they were shut off because the DEA

 9   told you what they were doing.  That's the only

10   reason you shut them off.  We're going to get to

11   that in this document.

12                      MR. PYSER:  Object to form.

13   Misstates evidence.

14   BY MR. PAPANTONIO:

15        Q.   Sir, you understand that the only reason

16   that anybody on this list was shut down is because

17   the DEA introduced a warrant for the people then

18   sent you a copy of the warrant.  You know that,

19   don't you?

20                      MR. PYSER:  Object to form.

21   Misstates evidence.

22             You're just making stuff up.

23                      MR. PAPANTONIO:  Okay.  Well, let's

24   see if we're making this up.  Keep those side by
```

```
 1   side right there.

 2   BY MR. PAPANTONIO:

 3       Q.   And then on one of them, on the left, it

 4   says, 5,000 drugs is too many every month,

 5   right?

 6               MR. PYSER:  Object to form.

 7   BY MR. PAPANTONIO:

 8       Q.   It says Internet pharmacies, 5,000 is too

 9   many, correct?

10               MR. PYSER:  Object to form.

11       A.   It's a trigger.

12   BY MR. PAPANTONIO:

13       Q.   It's a trigger, right?

14       A.   To go look.

15       Q.   Well, let me just ask you something.  How

16   many pharmacies -- Internet pharmacies did you

17   have that were selling in excess of 5,000 a month?

18          You don't know, do you?

19       A.   I don't know the answer to that.

20       Q.   Because you never looked into it, did

21   you?

22               MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24       Q.   You never looked into it?  After you met
```

```
 1    with the DEA and they told you that 5,000 was too

 2    many, you never looked into find out how many

 3    Internet pharmacies were you selling to that were

 4    selling in excess of 5,000?  You never did that,

 5    did you?

 6        A.   No.

 7             MR. PYSER:  Object to form

 8    Objection.  Asked and answered.

 9    BY MR. PAPANTONIO:

10        Q.   That was a no, wasn't it, before he

11    interrupted you?  The answer was no, correct?

12             MR. PYSER:  Object.

13        A.   No, the answer --

14             MR. PYSER:  Object to form.  Just

15    wait, then answer the question.

16         Go ahead and answer.

17    BY MR. PAPANTONIO:

18        Q.   He said no.

19        A.   Not personally.

20        Q.   Not personally.  Okay.

21         But this was a personal conversation they

22    had with you?

23             MR. PYSER:  Object to form.

24    BY MR. PAPANTONIO:
```

```
 1        Q.   Mr. Reardon, this was where you were

 2   face-to-face with the DEA and they told you, A,

 3   that you shouldn't allow an Internet pharmacy to

 4   sell more than 5,000 a month, and, B, the reason

 5   is is because a lot of the Internet pharmacies

 6   don't even have doctors involved in the

 7   prescription.  That's what that letter just said,

 8   isn't it?

 9                MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11        Q.   Yes or no?

12                MR. PYSER:  Object to form.

13   Misstates evidence.

14        A.   I don't believe they told us don't let

15   them buy more than this.  It was a way to have a

16   trigger to go look.

17   BY MR. PAPANTONIO:

18        Q.   So the trigger is 5,000, if I get it

19   right, and isn't it true that you sold some

20   Internet pharmacies -- let's take a look -- you

21   sold some Internet pharmacies tens of thousands a

22   month, didn't you?

23                MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:
```

1       Q.   Correct?

2       A.   I don't know that.

3       Q.   Well, you know who MedaPharm is?  You know

4    who MedaPharm is, right?

5               MR. PYSER:  Object to form.

6    BY MR. PAPANTONIO:

7       Q.   True?

8       A.   True.

9       Q.   And the DOJ told you that -- the DOJ

10   actually told you that they had restricted

11   MedaPharm's sales.  They told you that straight

12   up.  Right?

13      A.   I don't know that.

14              MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16      Q.   Well, do you know as we sit here that

17   MedaPharm -- we're talking about MedaPharm

18   Internet pharmacy sold 15,500,000 dosage of

19   narcotics across the Internet.  Did you know that

20   prior to coming in here today?

21              MR. PYSER:  Object to form.

22   BY MR. PAPANTONIO:

23      Q.   Do you want me to show you the document,

24   sir?  I'll be glad to.

```
 1        A.   I don't know that.

 2        Q.   This is the first time you've heard that,

 3   right?  Is that right?

 4        A.   Yes.

 5        Q.   Okay.  So the -- how about this, did you

 6   know how many Acumed Rx, Incorporated -- who is

 7   that?  Acumed Rx, Incorporated?  Who are they?

 8             MR. PYSER:  Object to form.

 9        A.   I'm not familiar with them.

10   BY MR. PAPANTONIO:

11        Q.   Well, would you be surprised to know that

12   Cardinal actually provided them narcotics to sell

13   across the Internet?  Did you know that?

14             MR. PYSER:  Object to form.

15        A.   Did not know that.

16   BY MR. PAPANTONIO:

17        Q.   And did you know that the DOJ told you,

18   you personally, that the DOJ and the DEA made the

19   decision to restrict the -- to restrict what

20   Acumed was doing?  Do you remember that

21   conversation?

22             MR. PYSER:  Object to form.

23   Misstates evidence.

24        A.   To restrict what Acumed was doing?
```

```
 1    BY MR. PAPANTONIO:

 2        Q.  Yes.  Well, you don't remember who they

 3    are, right?

 4                 MR. PYSER:  Object to form.

 5    BY MR. PAPANTONIO:

 6        Q.  You don't remember who Acumed is, do

 7    you?

 8        A.  I don't.

 9                 MR. PAPANTONIO:  Start pulling

10    these, please.

11    BY MR. PAPANTONIO:

12        Q.  So as a matter of fact, you know that --

13    you don't know as you sit here today that this

14    Internet pharmacy that you were selling narcotics

15    to was selling 8,760,000 dosage units?

16                 MR. PYSER:  Object to form.

17           Are you claiming those are Cardinal dosage

18    units?

19                 MR. PAPANTONIO:  I don't know what

20    they are.  We're going to find out in a minute.

21    BY MR. PAPANTONIO:

22        Q.  We do know it was 8 million dosage units,

23    right?

24                 MR. PYSER:  Object to form.
```

1    Misstates evidence.

2                    MR. PAPANTONIO:  Let's look at the

3    document itself.  Okay.  Show him 4784, please.

4

5              (Exhibit No. 16 marked for

6    identification.)

7

8              (Exhibit No. 17 marked for

9    identification.)

10

11                   MS. MOORE:  Reardon 17.

12   BY MR. PAPANTONIO:

13        Q.   Who is Michael Mapes?

14        A.   Mapes.

15        Q.   Mapes.  Excuse me.  Tell us who Michael

16   Mapes is.

17        A.   He works for the DEA.

18        Q.   He works with the Department of Justice,

19   doesn't he?

20        A.   Yes.

21        Q.   And you see your name right there in this

22   document, this e-mail?  It's right there, the

23   second -- it's the third from the bottom.

24             Steve Reardon, that's you, isn't it?

```
 1      A.   Yes.

 2      Q.   And according to this, "A distributor in

 3  Florida has significantly restricted the sale of

 4  controlled substances to the following Florida

 5  pharmacies."

 6           Do you see this?  Acumed, that was a

 7  Cardinal -- that was a Cardinal customer, wasn't

 8  it?

 9                MR. PYSER:  Object to form.

10  BY MR. PAPANTONIO:

11      Q.   Do you know even whether Acumed was a

12  Cardinal pharmacy?

13      A.   I don't recall if they were a customer.

14      Q.   And you certainly don't know -- the first

15  time you heard is that Acumed was selling

16  8,760,000 dosage units, if that number is the

17  number, that's the first time you've ever heard

18  that, right?

19                MR. PYSER:  Object to form.

20      A.   It doesn't mean it was all purchased from

21  Cardinal Health.

22  BY MR. PAPANTONIO:

23      Q.   I'm not saying it is.  I'm not saying it

24  is.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Cardinal Health was one of the top three

 2    distributors in America, correct, of narcotics?

 3                    MR. PYSER:  Object to form.  Asked

 4    and answered.

 5    BY MR. PAPANTONIO:

 6        Q.   Right?

 7        A.   Yes.

 8        Q.   And then how about AV's Pharmacy,

 9    Incorporated?  Do you know whether you were -- do

10    you know whether or not you were selling them

11    narcotics to sell over the Internet?

12                    MR. PYSER:  Object to form.

13        A.   Are you looking at No. 2?

14    BY MR. PAPANTONIO:

15        Q.   Yes.

16        A.   AV?

17        Q.   Yes.  Clearwater, Florida.

18        A.   I don't recall.

19        Q.   How about BI Wise Drugs, Pearl Harbor,

20    Florida?

21                    MR. PYSER:  Object to form.

22        A.   I don't recall.

23    BY MR. PAPANTONIO:

24        Q.   How about MedaPharm Rx, Incorporated,
```

```
 1    Tampa, Florida?  Is that your customer?  Do you

 2    recall that?

 3        A.   I believe so.

 4        Q.   And then -- well, while we're on

 5    MedaPharm, let's show him 4642.

 6             Can I get a split screen on this, please.

 7             You say MedaPharm was your customer,

 8    right?

 9                 MR. PYSER:  Object to form.  Asked

10    and answered.

11    BY MR. PAPANTONIO:

12        Q.   Is that right?  MedaPharm was your

13    customer, right?

14        A.   I believe so.

15                 MR. PYSER:  Asked and answered.

16    BY MR. PAPANTONIO:

17        Q.   And you know that MedaPharm was put into

18    an anti-diversion investigation report, that

19    MedaPharm was actually mentioned in an

20    anti-diversion investigation report that the DEA

21    conducted?

22                 MS. MOORE:  Reardon 18.

23

24
```

```
 1              (Exhibit No. 18 marked for

 2    identification.)

 3

 4                   MR. PYSER:  Object to form.

 5    BY MR. PAPANTONIO:

 6        Q.   Correct?  You've seen this document

 7    before.  It's got your name on it.  Look at

 8    4642.2.  Look at the second page.

 9              Do you see where the issue -- it says

10    "Issue:  Steve Reardon was contacted by the DEA

11    regarding MedaPharm on November 30, 2005.  A look

12    at six months of purchase history and excessive

13    purchase reports revealed the following."

14              It says "MedaPharm, Rx Internet," then it

15    has hydrocodone.  Then what does it say -- tell

16    the jury, why don't you read it for us?  What does

17    it say right out next to hydrocodone?  Do you see

18    where it says?

19        A.   "DEA limit is 5,000 dosage units."

20        Q.   Right.  And you were told that

21    face-to-face by the -- by the DEA, true?

22                   MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24        Q.   They told you 5,000 is the unit?
```

```
 1                    MR. PYSER:  Object to form.

 2     BY MR. PAPANTONIO:

 3         Q.   Correct?

 4         A.   As a trigger.

 5         Q.   Well, it doesn't say "trigger."  It says

 6     "the limit."

 7              Where do you see the word "trigger"?

 8              Why don't you point out for the jury where

 9     the word "trigger" appears there.

10                    MR. PYSER:  Object to form.

11     BY MR. PAPANTONIO:

12         Q.   Please take a minute and find anywhere on

13     this document -- take your time, you find anywhere

14     on that document where it says "the trigger."

15              It's not "the trigger," it's "the limit."

16     Right?

17                    MR. PYSER:  Object to form.

18         A.   The report says "limit."

19     BY MR. PAPANTONIO:

20         Q.   Well, no, you want to use the word

21     "trigger."  Why don't you point out for the jury

22     where the word "trigger" appears?

23                    MR. PYSER:  Object to form.  He

24     didn't claim the word "trigger" was in the
```

```
 1    document.

 2    BY MR. PAPANTONIO:

 3        Q.   Find it and tell me where it is, because

 4    you said it was a trigger, that 5,000 was a

 5    trigger.

 6             You're just making that up, aren't you?

 7                  MR. PYSER:  Object to form.

 8    BY MR. PAPANTONIO:

 9        Q.   You are making that up that 5,000 was a

10    trigger?  You're just making that up, aren't

11    you?

12                  MR. PYSER:  Object to form.

13        A.   That was the discussion --

14                  MR. PYSER:  Object to form.  Move to

15    strike.  Argumentative.

16             You can answer the question.

17    BY MR. PAPANTONIO:

18        Q.   Sir, are you making up -- when you say

19    that 5,000 was a trigger, are you making that up

20    as we sit here today?

21                  MR. PYSER:  Object to form.

22    Argumentative.

23    BY MR. PAPANTONIO:

24        Q.   Yes or no?
```

```
 1       A.   No.

 2       Q.   Well, show me where in this report it uses

 3    the term "trigger."  It doesn't, does it?

 4                 MR. PYSER:  Object to form.

 5    BY MR. PAPANTONIO:

 6       Q.   It says "limit," "5,000 is the limit."

 7    That's what it says, correct?

 8                 MR. PYSER:  Object to form.

 9    Counsel's misstating evidence.

10    BY MR. PAPANTONIO:

11       Q.   5,000 is the limit, it says it right here.

12    Did I read that right?

13                 MR. PYSER:  Object to form.

14       A.   It says "limit."

15    BY MR. PAPANTONIO:

16       Q.   Yes.  Then it even goes down and it tells

17    you how many dosage units the Internet -- that

18    were sold by MedaPharm.

19            Do you see  May, 13,700; June, 13,400;

20    July, 18,700; August, 18,200; September, 122,000.

21            You pretty good at math?

22                 MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24       Q.   Why don't you tell me how many times
```

1    122,000 -- how many times that is times 5,000?

2                    MR. PYSER:  Object to form.

3    Argumentative.

4    BY MR. PAPANTONIO:

5        Q.   Do you want to take a guess?

6                    MR. PYSER:  Object to form.

7    Argumentative.

8    BY MR. PAPANTONIO:

9        Q.   How many-- 5,000 versus 122,000.  Right?

10   Those are the two numbers we're talking about; am

11   I correct?

12                   MR. PYSER:  Object to form.

13           Are you asking him to do a multiplication

14   problem?  What are you doing here, Counselor?

15   BY MR. PAPANTONIO:

16       Q.   Did I just state that the two numbers are

17   that 5,000 was the limit that an Internet pharmacy

18   was supposed to sell, correct?  Am I right there?

19                   MR. PYSER:  Object to form.

20       A.   It's what the report states.

21   BY MR. PAPANTONIO:

22       Q.   B) MedaPharm is a -- is a client, a

23   customer for Cardinal.  You're selling them

24   narcotics, correct?  Am I right?

```
 1        A.   Correct.

 2        Q.   C) MedaPharm in September alone sold

 3   122,000 dosage units, correct, according to this

 4   report?

 5        A.   Correct.

 6        Q.   And the limit is supposed to be 5,000,

 7   true?

 8                  MR. PYSER:  Object to form.

 9        A.   That's what the report states.

10   BY MR. PAPANTONIO:

11        Q.   And then in October, if you go to the next

12   page, October 2005, 189,400 dosage units is what

13   was sold for -- through MedaPharm?  That's what

14   this says, doesn't it?

15        A.   Yes.

16        Q.   And look at the year out next to it.  Why

17   don't you tell us what you were doing in that

18   year, 2005?

19                  MR. PYSER:  Object to form.  Asked

20   and answered.

21   BY MR. PAPANTONIO:

22        Q.   What was your role in 2005?

23                  MR. PYSER:  Object to form.  Asked

24   and answered.
```

```
 1        A.    It was quality and regulatory affairs.

 2   BY MR. PAPANTONIO:

 3        Q.    And this is after you had already met with

 4   the DEA where they told you that 5,000 is the

 5   limit, right?

 6        A.    My recollection is, at that meeting, they

 7   told us that 5,000 would warrant a look at the

 8   customer.

 9        Q.    Well, this document doesn't say warrant a

10   look.  It says 5,000 is the limit, right?

11              MR. PYSER:  Object to form.

12   Argumentative.

13              MR. PAPANTONIO:  I'm going to move

14   to strike any hearsay of what they told him.

15   BY MR. PAPANTONIO:

16        Q.    They didn't tell you -- they didn't say

17   5,000 was a trigger, did they?

18              MR. PYSER:  Object to form.  You

19   don't need to tell the witness that you're going

20   to move to strike.

21   BY MR. PAPANTONIO:

22        Q.    The DEA did not tell you that 5,000 was

23   only a trigger, did they?

24              MR. PYSER:  Object to form.
```

```
 1        A.   That's my recollection of the meeting.

 2   BY MR. PAPANTONIO:

 3        Q.   All right.  Then -- oh, here it is.  Did

 4   you know that the DEA closed this, took away their

 5   license, and then your company reopened the

 6   license temporarily?

 7             Did you know that, after they were selling

 8   189,000 dosage units a month?

 9        A.   I don't recall that.

10        Q.   All right.  Well, then, the other customer

11   that you wanted to talk about was -- that was

12   MedaPharm.

13             So you want -- you said Acumed was one of

14   your customers, right?

15                  MR. PYSER:  Object to form misstates

16   the testimony.

17        Q.   Acumed was one of your Internet

18   pharmacies?

19        A.   I don't know that.

20        Q.   You don't?  You've never heard that?

21                  MR. PYSER:  Object to form.

22        Q.   Well, let's show you.  Why don't you take

23   a look at document 4816.  4816.

24                  MS. MOORE:  Reardon 19.
```

1

2              (Exhibit No. 19 marked for

3      identification.)

4

5      BY MR. PAPANTONIO:

6          Q.   Now, who is Peter Flanagan?

7               Do you know who Peter Flanagan is?

8          A.   Based on his title here, he's in sales.

9          Q.   Sales with what company?

10         A.   Cardinal Health.

11         Q.   The same company that you were in quality

12     regulatory, correct?

13         A.   Correct.

14         Q.   And then in the front of this, just to

15     show that this is your company, it says -- excuse

16     me, not your company, but this is somebody you

17     were selling narcotics to.

18              It says "Acumed" -- do you see the first

19     line?  "Acumed is trying to send back a large

20     return, plus 57,000.  They only bought from us for

21     two months, and the amount was only 23,000."

22              Now, 23,000 is more than 5,000 a month for

23     two months, right?

24                   MR. PYSER:  Object to form.

1    $23,000.

2        A.   It's dollars.

3    BY MR. PAPANTONIO:

4        Q.   Oh, excuse me.  We're talking about

5    dollars here.  Let me ask you this -- you're

6    right, it is dollars, but the truth is they wanted

7    to send back 57,000.  Was that money or is that --

8        A.   That's dollars.

9        Q.   They wanted to send out -- to return

10   $57,000.  "They bought from us for two months."

11           Correct?

12           So they're your customer is what I'm

13   trying to understand here.  Are they your

14   customer?

15              MR. PYSER:  Object to form.

16       A.   It appears so.

17   BY MR. PAPANTONIO:

18       Q.   Now, your lawyer's laughing about the fact

19   that it's your customer, but did you know, as he's

20   chuckling over there, that this customer bought

21   8,760 units of narcotics?

22              MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24       Q.   Did you know that --

 1                    MR. PYSER:  Object to form.  Object

 2    to form.  Move to strike the commentary of

 3    counsel.

 4    BY MR. PAPANTONIO:

 5        Q.   In the chuckle moment, sir, in the chuckle

 6    moment that we've just been hearing from your

 7    counsel, he is a giggling about this.

 8                    MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10        Q.   So as he giggles, let me ask this

11    question.

12                    MR. PYSER:  Object to form.  Move to

13    strike --

14    BY MR. PAPANTONIO:

15        Q.   I just want to ask the question.

16             You understand that Acumed was selling 8

17    million dosage of narcotics as an Internet

18    pharmacy?  Did you know that prior to being here

19    today?

20                    MR. PYSER:  Object to form.  There's

21    no -- object to form.

22    BY MR. PAPANTONIO:

23        Q.   Did you know that?

24        A.   Did not.

1    Q.   Well, would it be a surprise -- would you

2    be surprised to know that the DEA actually told

3    you that?

4              MR. PYSER:  Object to form.

5    Misstates evidence.

6    BY MR. PAPANTONIO:

7    Q.   How about that?  You want a chuckle moment

8    here?  Let's go to the document.

9              MR. PYSER:  Object to form.

10   BY MR. PAPANTONIO:

11   Q.   Chuckle, chuckle.  1165.

12             MR. PYSER:  Object to form.  Move to

13   strike.

14   BY MR. PAPANTONIO:

15   Q.   Is any of this funny to you?

16             MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18   Q.   Are people -- I'm interested in --

19             MR. PYSER:  Objection.

20   Argumentative.

21   BY MR. PAPANTONIO:

22   Q.   I'm interested in knowing this.

23             MR. PYSER:  This is a ridiculous

24   line of questioning.

```
 1   BY MR. PAPANTONIO:

 2        Q.   I'm interested in knowing this.

 3                  MR. PYSER:  Object to form.  Move to

 4   strike.

 5   BY MR. PAPANTONIO:

 6        Q.   Is there anything funny about the number

 7   of deaths in the United States, 115 to 150 people

 8   dying today from opioid overdoses?  Is there

 9   anything funny about that to you?

10                  MR. PYSER:  Object to form.  Move to

11   strike.  Objection.  Argumentative.

12   BY MR. PAPANTONIO:

13        Q.   Yes or no?  Is there anything funny about

14   that to you?

15                  MR. PYSER:  Same objections.

16        A.   Not at all.

17   BY MR. PAPANTONIO:

18        Q.   Not at all.  It's awful, isn't it?

19                  MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21        Q.   It's awful, isn't it?

22                  MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24        Q.   Yes?
```

1      A.   Yes.

2      Q.   Mothers losing children, correct, from

3   opioid overdoses.  Fathers losing mothers, opioid

4   overdoses.  Children losing parents, opioid

5   overdoses.

6           That's serious, serious business, isn't

7   it?

8                MR. PYSER:  Object to form.

9   BY MR. PAPANTONIO:

10     Q.   Yes?

11     A.   It's serious business.

12     Q.   And it was serious back when you were

13  making the decisions about how many drugs you were

14  going to let out on the market?  It was pretty

15  serious back then, too, wasn't it?

16               MR. PYSER:  Object to form.

17  BY MR. PAPANTONIO:

18     Q.   Let's go ahead and show him this.

19               MS. MOORE:  Reardon 20.

20

21          (Exhibit No. 20 marked for

22  identification.)

23

24  BY MR. PAPANTONIO:

```
 1       Q.   Why don't you go to 1165.15.  Let's see if

 2   we can find something to chuckle about about this.

 3   Put it up on the screen.

 4                  MR. PYSER:  Object to form.  Move to

 5   strike.

 6   BY MR. PAPANTONIO:

 7       Q.   Now, is this -- .15, see there?  1165.15.

 8            Is this the first time you've seen this?

 9                  MR. PYSER:  Object.

10       A.   This is -- this is a McKesson document.  I

11   would not see this.

12   BY MR. PAPANTONIO:

13       Q.   Right.  Oh, you wouldn't have seen this?

14       A.   No.

15       Q.   Oh, Cardinal -- this wasn't sent to

16   Cardinal.  Is that your testimony?

17                  MR. PYSER:  Object to form.  He

18   can't testify for the entire company.  You're

19   showing him a McKesson document.

20                  MR. PAPANTONIO:  Objection as to

21   form.  Hold it there, or we well get on the phone.

22            I am tired of you doing this speech to the

23   witness.  You know what you're doing.  You know

24   the rules.  If you didn't know the rules and you
```

Highly Confidential - Subject to Further Confidentiality Review

1    were an idiot, I would tell you, okay, that's all

2    right.  But you're not an idiot.  You're a trained

3    lawyer.  You know the rules.  So hush, give us an

4    objection, and then move on.

5                MR. PYSER:  My objection is clear.

6    Your questions are inappropriate.  Your commentary

7    is inappropriate.

8           Calling counsel an idiot is wildly --

9                MR. PAPANTONIO:  I didn't call you

10   an idiot.  I said you're a smart boy, that that's

11   why you know the rules.

12               MR. PYSER:  I would appreciate it if

13   you didn't call me a boy again.  That's also

14   inappropriate.

15               MR. PAPANTONIO:  Young man.  How

16   about that?

17               MR. PYSER:  Everything you've been

18   doing today has been inappropriate and in

19   violation of the rules.

20   BY MR. PAPANTONIO:

21      Q.  Sir, you just told us that you didn't get

22   this document I'm showing you because it's a

23   McKesson document.  Did you tell me that?

24               DEFENSE COUNSEL:  Object to form.

```
 1   BY MR. PAPANTONIO:

 2       Q.   Did you tell me that, that you didn't get

 3   this document because it was a McKesson

 4   document?

 5                  MR. PYSER:  Object to form.

 6       A.   Yes.

 7   BY MR. PAPANTONIO:

 8       Q.   Well, let's look at it.  I want to know

 9   whether you've had anything do with all this.

10           Did you remove any of the names -- did

11   somebody show you a document like this where you

12   removed the registrants' names in that third

13   column there, where you actually took the names

14   out of there?

15                  MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   Huh?

18       A.   No.

19       Q.   You wouldn't do that, would you?

20                  MR. PYSER:  Object to form.

21       A.   No.

22   BY MR. PAPANTONIO:

23       Q.   It's important that those names be there

24   so we can see who we're talking about, correct?
```

```
 1              MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3       Q.   Am I right?

 4       A.   I would assume.

 5       Q.   Yeah, and the DEA number, that would be

 6   pretty important, too, wouldn't it?

 7              MR. PYSER:  Object to form.

 8       A.   Yes.

 9   BY MR. PAPANTONIO:

10       Q.   Now, you understand this is a McKesson

11   document you're looking at right there, right?

12       A.   That's what it says on the front.

13       Q.   Well, why don't you look over where it

14   says "MedaPharm."  You see where it says, to the

15   right, "MedaPharm"?

16            That was your customer, correct?

17   15,596,000 dosage units sold.

18              MR. PYSER:  Object to form.  You're

19   purposefully misleading.

20   BY MR. PAPANTONIO:

21       Q.   Do you see that?

22              MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24       Q.   Do you see that, sir?
```

1            In between all these objections, here's my

2    question, do you see that number 15,586,000?

3                    MR. PYSER:  Object to form.

4    BY MR. PAPANTONIO:

5        Q.   Do you see that?

6                    MR. PYSER:  Okay.

7        A.   Yes.

8    BY MR. PAPANTONIO:

9        Q.   And you agree that MedaPharm is your

10   customer?

11                   MR. PYSER:  Object to form.  Vague

12   as to time.

13   BY MR. PAPANTONIO:

14       Q.   MedaPharm was an Internet customer of

15   yours, correct?

16                   MR. PYSER:  Object to form.  Vague

17   as to time.

18       A.   At one point.

19   BY MR. PAPANTONIO:

20       Q.   All right.  Good.

21            So as a matter of fact, they were your

22   customer in 2006, weren't they?

23                   MR. PYSER:  Object to form.

24       A.   I can't be sure.  I'd have to look at the

```
 1    documents.

 2    BY MR. PAPANTONIO:

 3        Q.   Well, let's go.  How about this next one.

 4    How about, let's go to Acumed.  I asked you about

 5    Acumed.  Look to the right of Acumed.  Look at

 6    that number, 8,760,000 dosage units next to

 7    Acumed, and Acumed was one of your customers in

 8    2006, weren't they?

 9             We already showed you that they were a

10    customer.

11        A.   Yes, but this doesn't indicate that all of

12    this was purchased from Cardinal Health.

13        Q.   No, I'm not saying it did.  But you

14    sold -- you sold narcotics to Acumed Rx,

15    Incorporated, didn't you?

16                 MR. PYSER:  Object to form, and

17    object to the demonstrative.

18    BY MR. PAPANTONIO:

19        Q.   Cardinal sold narcotics to Acumed Rx,

20    true?

21                 MR. PYSER:  Object to form.

22        A.   If they were a customer, they could have

23    purchased narcotics.

24    BY MR. PAPANTONIO:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And the -- you were told that 5,000 is the

 2   limit of what an Internet pharmacy ought to sell.

 3   We already went over that a couple of times,

 4   right?

 5                  MR. PYSER:  Object to form.

 6   Misstates testimony.

 7   BY MR. PAPANTONIO:

 8        Q.   We were told, we saw the document, it said

 9   limit, 5,000.  That was from the DEA, right?

10                  MR. PYSER:  Object to form.

11   Misstates evidence.

12   BY MR. PAPANTONIO:

13        Q.   Did I misstate that?  That the DEA met

14   with you and told you that an Internet pharmacy,

15   that 5,000 should be the limit?

16        A.   That report was not from DEA.

17        Q.   I don't care.  You met with the DEA, sir.

18                  MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20        Q.   You met with the DEA?

21                  MR. PYSER:  Object to form.

22   BY MR. PAPANTONIO:

23        Q.   Didn't you?

24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   And they told you personally that 5,000

2    for an Internet pharmacy is the limit, period?

3                   MR. PYSER:  Object to form.  Asked

4    and answered --

5    BY MR. PAPANTONIO:

6        Q.   Correct?

7                   MR. PYSER:  -- many times.

8        A.   Not my recollection of the meeting.  It

9    was, here's the amount of dosage units, here's the

10   amount that should trigger a look.

11   BY MR. PAPANTONIO:

12       Q.   Right.  I didn't see -- we didn't think --

13   remember we looked for the word "trigger," and it

14   was not there?

15                  MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17       Q.   Do you remember we looked for the word

18   "trigger" and it wasn't there?

19                  MR. PYSER:  Object to form.

20       A.   Not a DEA document.

21   BY MR. PAPANTONIO:

22       Q.   Right.  Okay.  So, then, according to

23   this, this says, Acumed was selling 8,760,000

24   doses, right?  That's what that says?
```

```
 1                    MR. PYSER:  Object to form.

 2        A.   That's what it says.

 3   BY MR. PAPANTONIO:

 4        Q.   And then the next one, New Care Home

 5   Health Services, that's your customer, too, right?

 6   Do you see these up on the red?

 7        A.   Yes.

 8        Q.   Those are your customers.  Now, if you

 9   have any exception to it, you tell me that's

10   wrong.

11                    MR. PYSER:  Object to form.  Vague.

12   Object to form.  Vague as to time.  Objection,

13   compound.

14   BY MR. PAPANTONIO:

15        Q.   New Care Home Health was your customer,

16   yes?

17                    MR. PYSER:  Objection.

18   BY MR. PAPANTONIO:

19        Q.   Right?

20        A.   At one time.

21        Q.   Okay.  And they were an Internet pharmacy,

22   right?

23                    MR. PYSER:  Object to form.

24        A.   According to this.
```

```
 1   BY MR. PAPANTONIO:

 2       Q.   And they were your customer in 2006,

 3   weren't they?

 4                MR. PYSER:  Object to form.

 5       A.   I believe so.

 6   BY MR. PAPANTONIO:

 7       Q.   And so that pharmacy was selling -- that

 8   Internet pharmacy was selling 5,876,000 dosage,

 9   right?

10                MR. PYSER:  Object to form.

11       A.   Yes.

12   BY MR. PAPANTONIO:

13       Q.   Well, we'll introduce this.

14            Sir, take a minute on this and tell me any

15   one of those that are highlighted red that you

16   don't remember being your customer.  Do that for

17   me.

18                MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20       Q.   Take a minute.  You tell me which one of

21   these weren't your customers.

22                MR. PYSER:  Object to form.

23       A.   (Witness reviews document.)

24            I don't know.
```

```
 1    BY MR. PAPANTONIO:

 2        Q.   You don't know?

 3        A.   No.

 4        Q.   Okay.  So if the jury hears about them

 5    being your customers, you would agree that for an

 6    Internet pharmacy to be selling -- well, how about

 7    15,000,596 dosage a year would be too many,

 8    wouldn't it?

 9                  MR. PYSER:  Object to form.

10        A.   It appears to be.

11    BY MR. PAPANTONIO:

12        Q.   It appears to be, yes.

13             Now, you remember I asked you when we

14    first started, I asked you were you responsible

15    for removing the names and the DEA number off a

16    form that was sent to you -- well, let me scratch

17    that.  I'll make it easier than that.

18             This form that we've been going over, you

19    see that form in front of you?

20        A.   Yes.

21        Q.   Did you -- were you responsible for making

22    the decision to remove the names of the pharmacy

23    and the names of the registration number before

24    that was published?
```

```
 1                    MR. PYSER:  Object to form.

 2        A.   This is not a Cardinal report.

 3    BY MR. PAPANTONIO:

 4        Q.   Right.  I'm about to show you the Cardinal

 5    report.

 6                    MR. PYSER:  Object to form.

 7    BY MR. PAPANTONIO:

 8        Q.   You want to see it?  You want to see it?

 9                    MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11        Q.   Do you want to see the Cardinal report?

12                    MR. PYSER:  Object to form.

13    Argumentative.

14    BY MR. PAPANTONIO:

15        Q.   Let's go ahead and show it to you.  How

16    about --

17                    MS. MOORE:  Reardon 22.

18

19           (Exhibit No. 22 marked for

20    identification.)

21

22    BY MR. PAPANTONIO:

23        Q.   This is 4831.

24                    MR. PYSER:  Object to form.  Object
```

1    to the reference by counsel of this document as a

2    Cardinal report.

3    BY MR. PAPANTONIO:

4        Q.   Now, you said that this was never sent to

5    Cardinal, didn't you?

6                  MR. PYSER:  Object to form.

7    BY MR. PAPANTONIO:

8        Q.   You told me that this document that's up

9    there that has all the names of the Internet

10   pharmacies was never sent to Cardinal?  Did you

11   tell me that?

12                 MR. PYSER:  Object to form.  Vague

13   as to time frame.

14   BY MR. PAPANTONIO:

15       Q.   Did you tell me that the -- that nobody

16   sent you this list of Internet pharmacies that was

17   sent to Cardinal?

18                 MR. PYSER:  Object to form.

19       A.   I did not get it.

20   BY MR. PAPANTONIO:

21       Q.   You didn't get it?

22       A.   No recollection of getting it.

23       Q.   Well, you see what's in front of you right

24   now?  What does it say?  What's the first page?

```
 1              It says "Drug Enforcement Administration.

 2    The trafficking and abuse of prescription

 3    controlled substances."

 4              Do you see that?

 5                   MR. PYSER:  Object to form.  Rule of

 6    completeness.

 7              Read the full title if you're going to

 8    read the title, Counselor.

 9        Q.   Do you see that?

10                   MR. PYSER:  Object to form.

11        Same objections --

12    BY MR. PAPANTONIO:

13        Q.   Well, why don't you read the title?  Your

14    lawyer is worried about the whole title.  Why

15    don't you read the whole -- how about this, read

16    the whole title for the jury, would you?

17        A.   "United States Department of Justice, Drug

18    Enforcement Administration.  The trafficking and

19    abuse of prescription controlled substances,

20    legend drugs, and over-the-counter products.

21    Medical Board of California.  California Board of

22    Pharmacy.  Joint forum to promote appropriate

23    prescribing and dispensing, San Francisco,

24    California, February 21, 2013."
```

```
1       Q.   And you were there, weren't you?

2                 MR. PYSER:  Object to form.

3    BY MR. PAPANTONIO:

4       Q.   You were at this -- when this was

5    presented, you were there for one of these

6    presentations of what the DEA had prepared,

7    correct?

8                 MR. PYSER:  Objection.

9       A.   I don't have any recollection.

10   BY MR. PAPANTONIO:

11      Q.   You don't remember at all?

12           So if we go to this -- go to .175 there,

13   please.  1.175.

14                MR. PYSER:  Counselor, I'm going to

15   put an objection on the record to what you're

16   doing with this document.  I'm happy to have the

17   witness leave the room if you don't want him to

18   hear the objection.

19                MR. PAPANTONIO:  I don't care if he

20   hears the objection.

21           Look, somebody removed the names.  There's

22   no -- there's no surprise here.  Somebody removed

23   the names.  I hope it wasn't a law firm.  He's

24   telling me it wasn't him.  This was published on
```

1    the Internet without the names being put in.  We

2    know that one of them has the names, and the other

3    one doesn't.

4         Now, where this goes, that's for lawyers

5    to take up.  That's what we do for a living.

6              MR. PYSER:  And my objection is your

7    implication that anyone from Cardinal had any

8    involvement with the removal of any of the

9    information here is wildly inappropriate when in

10   the last deposition, I pointed you to the publicly

11   available website from the State of California

12   with this information removed from it, and you

13   insist on maintaining a frivolous accusation

14   against Cardinal of having removed information

15   that we did not remove that is removed by a

16   government agency.

17        If you have a problem with that removal,

18   you should go and take it up with that government

19   agency.

20              MR. PAPANTONIO:  No, sir, I'm going

21   to take it up with a sanctions order.  We're going

22   to investigate.  Just so you know, we're going --

23   we're right now investigating whether your

24   organization intentionally removed the names and

1    the numbers so that the public could not follow

2    which pharmacy was guilty of what.

3         So I have it on the record.  I hear your

4    objection.  I'm going to ask him some questions

5    now.

6              MR. PYSER:  My objection stays.

7    Your accusation is ridiculous.  It is frivolous.

8              MR. PAPANTONIO:  We'll see.  We'll

9    see.

10             MR. PYSER:  It is frivolous, and I

11   welcome your supposed investigation, which does

12   not exist --

13             MR. PAPANTONIO:  Time will tell.

14   Time will tell, won't it?

15             MR. PYSER:  Counsel, I hope you're

16   investigating the DEA and the board that you claim

17   are acting wrongfully by having removed this

18   information.

19             MR. PAPANTONIO:  You got it.

20        Put this document, if you would, ma'am,

21   put it up right next to the one that does show the

22   names and the -- and the one we just did that

23   shows the names and it shows the numbers.

24   BY MR. PAPANTONIO:

1        Q.   What I want you to do is put up -- well,

2    you have them right in front of you, if we can't

3    find them, on the screen.

4             You know that one of them you can see has

5    the names, and the one that was just up there

6    didn't have names or the -- or the DEA number, did

7    it?

8                     MR. PYSER:  Same objections.

9    BY MR. PAPANTONIO:

10       Q.   I'm just asking you, did you have anything

11   to do with removing names and numbers from what

12   has been put up there on the screen?

13                    MR. PYSER:  Same objections.  Object

14   to the demonstrative.

15                    MR. PAPANTONIO:  Take the second one

16   down.

17                    MR. PYSER:  Object to the

18   demonstrative.

19   BY MR. PAPANTONIO:

20       Q.   Sir, did you have anything to do with

21   removing the names of the pharmacies or the

22   numbers there?

23                    MR. PYSER:  Same objections.  This

24   is argumentative.  It's frivolous.  You've been

```
 1    corrected already, Counselor.

 2    BY MR. PAPANTONIO:

 3        Q.  Did you having anything to do with it?

 4    Yes or no?

 5        A.  Absolutely not.

 6        Q.  All right.  That's all I want to know.

 7            So we know you didn't do it.  But it's

 8    very clear that on one of them, we have the names

 9    and we have the numbers, and then on the other

10    one, we don't, correct?

11                MR. PYSER:  Same objections.  There

12    is zero basis for this line of questioning.

13    There's zero basis for the accusation that's being

14    made against Cardinal Health.

15    BY MR. PAPANTONIO:

16        Q.  Did you know that Cardinal Health sent

17    that one on the right to us when we asked for

18    discovery?

19                MR. PYSER:  Object.

20    BY MR. PAPANTONIO:

21        Q.  Did you know anything about this prior to

22    coming here today?

23                MR. PYSER:  Same objections.

24            Counselor, are you upset that we produced
```

1    the document to you as it existed in your files at

2    it was downloaded from the Internet?

3    BY MR. PAPANTONIO:

4        Q.   You don't know anything about this, I take

5    it, so we'll move on.

6             All right.  So let's go back to where we

7    started, which is document 4085.15.

8             Now, we're on page 15 here right now.

9    4085.15.

10            Now you see halfway through there, right,

11   you see where it picks up right here, Mr. Reardon,

12   it says "On November 8."

13            Do you see that?

14       A.   Yes.

15       Q.   "On November 8, DEA issued an

16   administrative subpoena to Cardinal Health for

17   information regarding its sales of oxycodone and

18   its compliance mechanism.  On October 27, 1911

19   (sic), Cardinal sent DEA a letter, asking the --

20   asking the agency to inform Cardinal if the

21   identity of any" -- underline "any Cardinal

22   customer" -- "that the agency has determined is

23   engaged in the diversion of controlled

24   substances."

1              Do you see that?

2                   MR. PYSER:  Ongoing objection to the

3      use of this document.

4      BY MR. PAPANTONIO:

5         Q.   Do you see that?

6                   MR. PYSER:  Ongoing objection to the

7      use of this document.  Pure hearsay.

8      BY MR. PAPANTONIO:

9         Q.   Do you see that?

10                  MR. PYSER:  Object to form.

11        A.   Yes.

12     BY MR. PAPANTONIO:

13        Q.   And then it says "Cardinal promised to

14     immediately cease distribution of controlled

15     substances to any customer that the DEA so

16     identified."

17             Do you see that?

18                  MR. PYSER:  Object to form.

19        A.   Yes.

20     BY MR. PAPANTONIO:

21        Q.   Now look at the date there.  That's --

22     this all took place October 27, 2011.

23             Do you see that?  That's when Cardinal

24     made their promise that they were going to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    immediately take care of people on the list the

 2    DEA had sent them.  Do you see that?

 3              MR. PYSER:  Object to form.

 4        A.   Yes.

 5    BY MR. PAPANTONIO:

 6        Q.   And then go down to the next paragraph.

 7    "As of this filing of the government's prehearing

 8    statement on    February 22, 2012, DEA has not

 9    received the compliance-related communication

10    responsive to November 2000."

11              How many months is that?

12              So you made the promise in February of

13    2012.  Right?

14              No.  Excuse me.  You made the promise in

15    October of 2011.  Right?  You made the promise

16    that what you were going to do is you were going

17    to immediately cease distribution of controlled

18    substances to any customers that DEA has

19    identified for you, right?

20                  MR. PYSER:  Object to form.

21        A.   That's what it looks like.

22    BY MR. PAPANTONIO:

23        Q.   Then this says that you didn't do that,

24    did you?
```

```
 1                    MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3       Q.   You didn't do what you promised -- the

 4   company didn't do what they promised they were

 5   going to do?

 6                    MR. PYSER:  Object to form.

 7   BY MR. PAPANTONIO:

 8       Q.   Right?

 9       A.   That's what it states.

10       Q.   As a matter of fact, five months passed

11   and they still had not kept their promise,

12   correct?

13                    MR. PYSER:  Object to form.

14       A.   That's what it states.

15   BY MR. PAPANTONIO:

16       Q.   Does it sound like they're hiding

17   something to you?

18                    MR. PYSER:  Object to form.

19   Argumentative.  Calls for speculation.

20   BY MR. PAPANTONIO:

21       Q.   Does it sound like they're hiding

22   something?  The DEA is -- let me just be clear

23   about something.  Let me ask this question.

24            The DEA has said, here is a list,
```

1    Cardinal, and on the list, these are people that

2    we're pretty suspect of.  And then your company,

3    Cardinal, makes a promise, oh, well, we're going

4    to look into it, we're going to do a report for

5    you.

6              Right?

7              And that happens -- that happens in

8    October.  And then five months later, they still

9    haven't done that?

10             MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12       Q.   That's what that paragraph says right

13   there, doesn't it?

14             MR. PYSER:  Object to form.

15   Misstates evidence.  It is not what the paragraph

16   says.

17   BY MR. PAPANTONIO:

18       Q.   Well, let's read it again because maybe

19   I'm not reading it right.

20             "On October 27, 2011, Cardinal sent DEA a

21   letter asking the agency to inform Cardinal of the

22   identity of any Cardinal customer that the

23   agency" -- could you underline this so Counsel can

24   see it this time -- "of the identity of any

1    Cardinal Health customer that the agency has

2    determined is engaged in diversion of controlled

3    substances."

4            Did I read that right just now?

5                MR. PYSER:  Object to form.

6    BY MR. PAPANTONIO:

7        Q.   Is that right?

8        A.   Yes, it's accurate.

9        Q.   Then it says, talking about Cardinal, "and

10   promising to immediately cease distribution of

11   controlled substances to any customer that DEA so

12   identifies."

13           Do you see that?

14               MR. PYSER:  Object to form.

15       A.   Yes.

16   BY MR. PAPANTONIO:

17       Q.   Just so we can be clear, that's October

18   2011.  Then we go to, as of the filing of the

19   government's prehearing, which is February the

20   next year, 2012, the DEA has not received the

21   compliance-related communication.

22           Do you see that?

23               MR. PYSER:  Object to form.

24       A.   Yes.

```
 1   BY MR. PAPANTONIO:

 2        Q.   Well, is there anything you don't

 3   understand?  I don't care whether your lawyer

 4   understands it or not.  Do you -- let me ask you

 5   this, do you understand that?

 6                MR. PYSER:  Object to form.

 7   BY MR. PAPANTONIO:

 8        Q.   What was just read to you?

 9                MR. PYSER:  Object to form.

10        A.   I'm rereading it.

11             (Witness reviews document.)

12                MR. PAPANTONIO:  Would you do me a

13   favor and circle "November 2011" there for me,

14   please.  And then also circle for me "February" --

15   there you go.  Thank you.

16   BY MR. PAPANTONIO:

17        Q.   Now you want to reread this again.  Why

18   don't you read it out loud.  Maybe I'm not clear

19   about it.  Maybe I'm just reading bad.

20             Why don't you go ahead and read it for the

21   jury.  Let's hear your interpretation of it.

22                MR. PYSER:  Object to form.

23   Argumentative.

24        A.   "On October 27, 2011, Cardinal Health sent
```

```
 1    DEA a letter asking the agency to inform Cardinal

 2    of the identity of any Cardinal Health customer

 3    that had the agency -- that the agency has

 4    determined is engaged in the diversion of

 5    controlled substances and promising to immediately

 6    cease distribution of controlled substances to any

 7    customer that the DEA so identifies.

 8            "On October 28, 2011 and November 18,

 9    2011, Cardinal Health provided information

10    responsive to the October 26, 2011 AIW and the

11    November 8, 2011 administrative subpoena."

12    BY MR. PAPANTONIO:

13        Q.   Read the next line.

14        A.   "As of the filing of the government's

15    prehearing statement on February 22, 2012, DEA has

16    not received the compliance-related communications

17    responsive to the November 8, 2011 administrative

18    subpoena."

19        Q.   Now my question, did you have anything --

20    were you in charge of sending that type of

21    communication to the DEA if they asked for it?

22        A.   No.

23        Q.   Who was?

24        A.   It would have been the anti-diversion
```

```
1     group.

2         Q.   But you -- in other words, you weren't

3     responsible for not doing this; is that correct?

4              MR. PYSER:  Object to form.

5         A.   Correct.

6     BY MR. PAPANTONIO:

7         Q.   Let's go to the next page.  It says --

8     408516.  It says -- let's pick up, you see where

9     it says "The investigation at respondent revealed

10    a persistent failure -- a persistent failure to

11    exercise due diligence to ensure that controlled

12    substances were not being diverted."

13            Do you see that?

14        A.   Yes.

15             MR. PYSER:  Object to form.  Same

16    objections on this document.

17    BY MR. PAPANTONIO:

18        Q.   Now, DEA concluded that over a period of

19    approximately three years, November 2008 to 2011,

20    "Respondent's anti-diversion controls were

21    inadequate to meet their due diligence

22    responsibilities."

23            Do you see that?

24             MR. PYSER:  Object to form.
```

```
 1        A.   Yes.

 2   BY MR. PAPANTONIO:

 3        Q.   Underline that for me, please.

 4             Because didn't you just tell me that when

 5   2007 came along and you knew what all the rules

 6   were that you started playing by those rules?

 7   Isn't that what you told me earlier?

 8                  MR. PYSER:  Object to form.

 9   BY MR. PAPANTONIO:

10        Q.   Right?

11        A.   Yes, that was a transition.

12        Q.   Yes.  So you said there was a transition

13   that took place, but it says right here, DEA

14   concluded that over a period of approximately

15   three years, November 2008 to 2011, respondent's

16   anti-diversion controls were inadequate to meet

17   their due diligence responsibilities.

18             That doesn't sound -- I mean, you told me

19   that after 2007, you made this adjustment and you

20   did things right.

21             Didn't you tell me that just earlier

22   today?

23                  MR. PYSER:  Object to form.  Ongoing

24   objection on this document.  Hearsay.
```

```
 1        A.   I did not make the adjustment.  They

 2   created a new anti-diversion team.

 3   BY MR. PAPANTONIO:

 4        Q.   Well, apparently, according to this

 5   document, the anti-diversion team wasn't working

 6   very well, was it?

 7             At least between 2008 and 2011, the

 8   anti-diversion team wasn't working, was it?

 9                  MR. PYSER:  Object to form.

10        A.   I can't speak to that.

11   BY MR. PAPANTONIO:

12        Q.   Well, I think this speaks for it, don't

13   you?

14             It says "Respondent's anti-diversion

15   controls were inadequate."

16             Would you circle "inadequate" for me,

17   please.

18                  MR. PYSER:  Object to form.

19        Q.   "Were inadequate to meet their due

20   diligence responsibilities."  All right.

21             "This conclusion was based on the totality

22   of several factors.  The most important factor,

23   number one, exceedingly large increasing volume of

24   shipment of oxycodone to its largest retail
```

1    customer."

2              Do you see that?  Who was your largest

3    retail customer in Florida?  Who was it?

4                   MR. PYSER:  Object to form.

5         A.   I don't know offhand.

6    BY MR. PAPANTONIO:

7         Q.   And then it says "that largest retail

8    customer, which volumes were supported by

9    inadequate documentation."

10                  MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12        Q.   You had to document the -- you were

13   supposed to document the volumes -- the acceptable

14   volumes that one of your customers was buying, you

15   were supposed to document that, right?

16        A.   I can't speak to what the anti-diversion

17   team was doing at this time.

18        Q.   Well, you could speak to what you were

19   doing back in 2005.  You weren't documenting

20   anything, were you?

21                  MR. PYSER:  Object to form.

22        A.   We documented the reports that we provided

23   to the DEA, the ones they approved, and we were

24   documenting visits and we were documenting

1    identification of orders that were stopped at the

2    distribution center and questioned.

3    BY MR. PAPANTONIO:

4        Q.    Right.  So what we know is this:  We know

5    that all that you just described didn't work,

6    because in 2008 you had to pay $43 million fine

7    for that system that you just described, right?

8                    MR. PYSER:  Object to form.

9    BY MR. PAPANTONIO:

10       Q.    Correct?

11                   MR. PYSER:  Objection.  Misstates

12   evidence.

13       A.    34 million.

14   BY MR. PAPANTONIO:

15       Q.    34 million, excuse me.  Okay.

16             And then we know this now, so 2007 is when

17   you said there was this new change in how things

18   were being done.

19             Remember, we talked about that, right?

20       A.    Yes.

21       Q.    The new change?

22       A.    Yes.

23       Q.    And after the new change took place in

24   2007, this document says that even as late as 2011

Highly Confidential - Subject to Further Confidentiality Review

```
 1     that your respondent's anti-diversion controls

 2     were inadequate to meet their due diligence

 3     responsibilities.  That's what that says, right?

 4                    MR. PYSER:  Object to form.  Ongoing

 5     objection to the use of this document.

 6        A.   Yes.

 7     BY MR. PAPANTONIO:

 8        Q.   Am I right?

 9        A.   That's what it says.

10        Q.   And then if you go to the next paragraph,

11     it says "Between November 2008 and December 2011

12     you -- Cardinal sold over 12.9 million dosage

13     units of oxycodone to its top four retail pharmacy

14     customers."

15             True?

16                    MR. PYSER:  Object to form.

17     BY MR. PAPANTONIO:

18        Q.   That's what it says?

19        A.   That's what it says.

20        Q.   And it says "From 2008 to 2009,

21     respondent's oxycodone sales to its top four

22     retail pharmacies increased approximately

23     803,000."

24             803,000.
```

```
 1                      MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3       Q.   Did you know that your company -- I mean,

 4   we're -- do you understand that this is one year,

 5   2008 to 2007.

 6            I have to write this down.  Give me a

 7   piece of paper.  Here it is.  Make sure I've got

 8   this right.

 9            From 2008 to 2007, that Cardinal increased

10   their sales to this company by     803 percent?

11                      MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13       Q.   Did you know that?  That's a startling --

14   that's a big number.  That's a big percentage

15   increase, isn't it, for a year between 2008 and

16   2009?

17       A.   I don't know all the facts and

18   circumstances around it.  I can't comment on it.

19       Q.   You can't comment that an 803 percent

20   increase in one year in the sales of narcotics to

21   one customer is a big increase?

22                      MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24       Q.   You don't know whether that's a big
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    increase or not?

 2                  MR. PYSER:  Object to form.

 3        A.   It's to four customers, I think.

 4    BY MR. PAPANTONIO:

 5        Q.   Oh, four customers.

 6        A.   Yeah.

 7        Q.   So all four customers, there was an 803

 8    percent increase?

 9                  MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11        Q.   And that doesn't seem like a big number to

12    you?

13        A.   On face value, it seems like a big number.

14        Q.   Yeah.  It says then, it says after that,

15    "From 2009 to 2010," that's another one year,

16    "respondent's oxycodone sales increased

17    approximately 162 percent.

18           Do you see that?

19                  MR. PYSER:  Object to form.

20    BY MR. PAPANTONIO:

21        Q.   And then between 2009 and 2011,

22    respondent's oxycodone sale to its top four retail

23    pharmacies increased 241 percent.

24           Now, sir, you have to agree, those are big
```

```
 1    increase numbers for a year period of time, isn't

 2    it?

 3                    MR. PYSER:  Object to form.

 4    BY MR. PAPANTONIO:

 5        Q.   I mean, those are big numbers?  For the

 6    increase of sale of narcotics, those are big

 7    increases of numbers, aren't they?

 8                    MR. PYSER:  Object to form.

 9        A.   On the face, but I -- I think it -- at

10    this time DEA continued to increase the quota for

11    oxycodone, right?

12    BY MR. PAPANTONIO:

13        A.   Let's see if they did, because it's going

14    to talk about that right here.

15             It says "Compared to the advantage

16    number" -- "Compared to the average number of

17    dosage units distributed monthly to respondent's

18    other Florida retail pharmacies, the average" --

19    stay with me here -- "the average monthly

20    distribution to respondent's top four customers is

21    staggering."

22             That's their word, staggering.  Do you see

23    that?

24                    MR. PYSER:  Object to form.
```

```
 1    BY MR. PAPANTONIO:

 2        Q.   Would you please circle the word

 3    "staggering."

 4                 MR. PYSER:  Object to form.  Move to

 5    strike Counsel's commentary at the beginning of

 6    the question.

 7    BY MR. PAPANTONIO:

 8        Q.   Would you move -- would you please, madam,

 9    you have "staggering."

10         What does staggering mean to you, sir?

11    Staggering.  The term staggering, what does that

12    mean when you hear that's staggering, what does

13    that mean to you?

14        A.   Significant.

15        Q.   Yeah, okay, I'll go with significant.

16                 MR. PYSER:  Object to form.

17    BY MR. PAPANTONIO:

18        Q.   It says "Respondent's other Florida retail

19    pharmacies received on average," is that --

20    "received on average 5,364 dosage units per month

21    from October 1, 2008 to December 2011."

22         Do you see that?

23         The average per month -- put an arrow next

24    to that, if you would, the dosage, 5,364, put an
```

```
1    arrow next to that, because I want to make a

2    comparison.

3           And then it says "Units per month, October

4    2008 through 2011, based on 66,286 pharmacies."

5           So, in other words, you understand that

6    DEA took 66,000 pharmacies and they said the

7    average number for those pharmacies is only 5,364.

8           Do you see that?

9                MR. PYSER:  Object to form.

10        A.   Yes.

11   BY MR. PAPANTONIO:

12        Q.   And then it goes on to say, "In contrast"

13   -- do you see where it says "In contrast"?

14          "In contrast, CVS 5195 received

15   approximately 58,000 dosage units per month from

16   respondent."

17          That would be -- that would be your

18   company, Cardinal, right?

19                MR. PYSER:  Object to form.

20   BY MR. PAPANTONIO:

21        Q.   Right?

22        A.   Right.

23        Q.   So the average dosage is 5,300, and you

24   were shipping to your customer 58,223 units,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right, according to this?

 2            And, sir, would you agree as sales

 3    increase, if you followed the death map or you

 4    followed any kind of indicator of the number of

 5    deaths in this country, as sales increased, so did

 6    the number of opioid overdoses?  You know that,

 7    don't you?

 8                    MR. PYSER:  Object to form.

 9        A.   I'd have to see.

10    BY MR. PAPANTONIO:

11        Q.   Is that the first time you've heard that,

12    really?  The first time you've heard that as sales

13    increase, so does the number of narcotic deaths in

14    the America?  Is that first time you heard that?

15        A.   Yes.

16                    MR. PYSER:  Object to form.

17    BY MR. PAPANTONIO:

18        Q.   The first time?  Okay.

19            Then it says, CareMed received 59,264

20    units per month from respondent, which is your

21    company.  Right?

22        A.   Yes.

23        Q.   And Gulf Coast received 96,640 -- 96,664

24    dosage units per month, right?
```

```
 1              And then CVS received 137,994 dosage units

 2      per month.  Right?

 3              And you know that every one of those,

 4      first of all -- first of all, let me ask you this,

 5      you agree every one of those were your

 6      customers?

 7                      MR. PYSER:  Object to form.

 8          A.   It's what the document states.

 9      BY MR. PAPANTONIO:

10          Q.   And every one of those is -- 137,994

11      compared to 5,364, which is the average dosage

12      units in Florida, you would have to agree that's

13      substantially out of the average for dosage units

14      in Florida, isn't it?

15                      MR. PYSER:  Object to form.

16          A.   On the face value, it's obviously higher.

17      BY MR. PAPANTONIO:

18          Q.   Well, you keep saying "on the face value,"

19      sir.

20              You had -- you had a duty -- Cardinal had

21      a duty to look more than face value.  Cardinal had

22      a duty to show up at the facility and do an

23      investigation if the numbers looked too high,

24      didn't they, right?
```

```
 1                    MR. PYSER:  Object to form.

 2        A.   Yes.

 3   BY MR. PAPANTONIO:

 4        Q.   But you didn't do it?

 5                    MR. PYSER:  Object to form.

 6        A.   I can't speak to that.

 7   BY MR. PAPANTONIO:

 8        Q.   Well, you didn't do it when you were in

 9   charge of quality regulatory, were you?

10                    MR. PYSER:  Objection.

11   BY MR. PAPANTONIO:

12        Q.   You never one time went and looked out to

13   see whether your customers were playing by the

14   rules or not, did you?

15                    MR. PYSER:  Object.

16   BY MR. PAPANTONIO:

17        Q.   Not one time?

18                    MR. PYSER:  Object to form.  Vague

19   as to time.

20   BY MR. PAPANTONIO:

21        Q.   Am I right?

22        A.   We conducted site visits.

23        Q.   Did you conduct site visits?

24                    MR. PYSER:  Object to form.
```

```
 1        A.    Not me personally.

 2   BY MR. PAPANTONIO:

 3        Q.    Yeah.  You had two other people in your

 4   organization?

 5                    MR. PYSER:  Object to form.

 6   Misstates evidence.

 7   BY MR. PAPANTONIO:

 8        Q.    Two other people that worked in that area

 9   that you're talking about, quality, regulatory?

10        A.    Three in the group.

11        Q.    What?

12        A.    Three in the group that focused on

13   anti-diversion.

14        Q.    And how many pharmacies over the United

15   States were you responsible for?

16        A.    I don't know the number.

17        Q.    Were there thousands?

18              Have you ever seen a map, sir, of just how

19   many pharmacies CVS has?

20              Show me that.  Let me have that map on

21   CVS.

22              Do you realize that just CVS, which is one

23   of your number one customers, right?

24        A.    Yes.
```

```
 1        Q.   They sell -- 20 percent of your business

 2   was from CVS, correct?

 3              MR. PYSER:  Object to form.

 4        A.   That's what you stated.  I don't know the

 5   exact number.

 6   BY MR. PAPANTONIO:

 7        Q.   You don't know the answer.  But if I

 8   stated that it was 20 percent, that would not

 9   surprise you; is that correct?

10              MR. PYSER:  Object to form.

11        A.   Correct.

12   BY MR. PAPANTONIO:

13        Q.   Have you ever seen any map showing how

14   many pharmacies CVS has around the country?

15              MR. PAPANTONIO:  Show him 3821,

16   please.

17              MR. PYSER:  Is this an exhibit?

18              MR. PAPANTONIO:  Yes, it's an

19   exhibit.

20        3821.  Why don't you just take mine.

21   She'll find another one.  Would you put that up on

22   the screen, please.  3821.  Is that it?

23

24              (Exhibit No. 23 marked for
```

```
 1      identification.)

 2

 3                      MS. MOORE:  Reardon 23.

 4                      MR. PAPANTONIO:  3821, on the

 5      screen, if you have it.  If not, I'll go to Elmo.

 6      BY MR. PAPANTONIO:

 7          Q.   Have you seen this before?

 8          A.   No.

 9          Q.   CVS was -- if I tell you CVS was 20

10      percent, only 20 percent of your business, would

11      that surprise you?

12                      MR. PYSER:  Object to form.

13                      MR. PAPANTONIO:  Here it is right

14      here.  I'm sorry.  I thought you had this loaded

15      in.  I apologize.

16      BY MR. PAPANTONIO:

17          Q.   What -- so you see that this is -- these

18      are CVS pharmacies all over the country.

19          Had anybody ever shown you that before?

20      That's just CVS.

21          A.   I have not seen this.

22          Q.   Do those numbers surprise you that there's

23      that many CVSes in the country?

24                      MR. PYSER:  Object to form.
```

```
 1    A.   No.

 2  BY MR. PAPANTONIO:

 3    Q.   In other words, they really were your

 4  number one customer, right?

 5              MR. PYSER:  Object to form.

 6    A.   Yes.

 7  BY MR. PAPANTONIO:

 8    Q.   Do you know how many billions of dollars

 9  you made every year by selling narcotics to CVS?

10              MR. PYSER:  Object to form.

11    A.   I do not.

12  BY MR. PAPANTONIO:

13    Q.   And this investigation we're looking at

14  right here, CVS is one, two, three, of the four --

15  of the four pharmacies that we're talking about,

16  CVS is three out of the four, right?

17              MR. PYSER:  Object to form.

18    A.   I see Gulf Coast, CareMed, and CVS,

19  another CVS, two CVS.

20  BY MR. PAPANTONIO:

21    Q.   You only see two, right?

22    A.   Yeah.

23    Q.   There's more to this and we'll get to this

24  in this document.
```

```
 1                    MR. PYSER:  Object to form.

 2      Misstates.  Move to strike.

 3      BY MR. PAPANTONIO:

 4          Q.   So you understand, sir, that your company

 5      did not even make visits to CVS to monitor their

 6      thresholds because you allowed CVS to do their own

 7      monitoring?  You know that already, don't you?

 8                    MR. PYSER:  Object to form.  Asked

 9      and answered.

10      BY MR. PAPANTONIO:

11          Q.   Yes or no?

12          A.   I can't speak to that.  I was not part of

13      the anti-diversion team.

14          Q.   So you don't know one way or another; is

15      that your testimony?

16                    MR. PYSER:  Object to form.

17          A.   Yes.

18      BY MR. PAPANTONIO:

19          Q.   And this says "In 2011 respondent

20      collectively," -- back to the same document,

21      4085.17.  "In 2011, respondent collectively

22      distributed 3,144,000 dosage units of oxycodone to

23      six Sanford, Florida pharmacies.  Of this volume,

24      respondent shipped 3,012,000 thousand dosage
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    units, or 96, 96 percent to two CVS stores."

 2              How about that?  Is that first time you've

 3    seen that?

 4                   MR. PYSER:  Object to form.

 5    BY MR. PAPANTONIO:

 6        Q.   96 percent of what was involved here, the

 7    question of three million doses, 96 percent of it

 8    was sold by CVSes.

 9                   MR. PYSER:  Object to form.

10    BY MR. PAPANTONIO:

11        Q.   Right?

12        A.   That's what it says.

13        Q.   That's what that says?

14        A.   Yes.

15        Q.   And you're selling to CVSes all over the

16    country, aren't you, your company?

17                   MR. PYSER:  Object to form.

18    BY MR. PAPANTONIO:

19        Q.   True?

20        A.   They are a national chain, yes.

21        Q.   Yeah, the national chain.  And we just

22    showed the jury what the size of that national

23    chain looks like.

24                   MR. PAPANTONIO:  Make sure we attach
```

```
 1    that as an exhibit, please.

 2    BY MR. PAPANTONIO:

 3        Q.   All right.  Now, let's go to -- go to page

 4    19.  I want to show you something.

 5             Tell the jury what a threshold limit is.

 6        A.   That's a quantity of a controlled

 7    substances that if a customer hits --

 8        Q.   Okay.  Let's go to 4085.19.  That's the

 9    same document we've been talking about all day

10    here, right?  Correct?

11        A.   Yes.

12        Q.   And you see at the bottom of that

13    document, right here --

14             Put that up on the screen for us, would

15    you.

16             Now, this says -- this is a list of

17    pharmacies where Cardinal exceeded its own

18    threshold.

19             Do you see that?

20        A.   Yes.

21        Q.   And it even lays it out.  It tells you

22    specifically what it was?

23                 MR. PYSER:  Object to form.

24    BY MR. PAPANTONIO:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Correct?

2        A.   They tell you exactly what they had --

3    they had a threshold of -- it was a threshold of

4    25,000.  It tells you if they exceeded the 25,000,

5    doesn't it?

6                   MR. PYSER:  Object to form.

7        A.   Yes.

8    BY MR. PAPANTONIO:

9        Q.   Now, you're not supposed to exceed

10   threshold limit values, are you?

11                  MR. PYSER:  Object to form.  Vague

12   as to time frame.

13   BY MR. PAPANTONIO:

14       Q.   You're not at any time -- at any time a

15   store that -- one of your customers that's

16   exceeding threshold limit values, your duty is to

17   go and inspect that store, right?

18       A.   I can't speak to the process and the

19   approach that this anti-diversion team took with

20   all of this.

21       Q.   Now --

22       A.   That's -- I was not part of the team.

23       Q.   When you say this anti-diversion team,

24   they were anti-diversion for the very distributors
```

1    that you were involved with in your job after

2    2007, right?

3                    MR. PYSER:  Object to form.

4    BY MR. PAPANTONIO:

5        Q.   The same company?

6        A.   Yes.

7        Q.   Okay.  And you see where this actually

8    shows you, it even gives you the detail of how

9    much the threshold was violated place by place?

10                   MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12       Q.   Right?

13       A.   Yes.

14       Q.   Did you see anything like that when you

15   were working between 2005 and 2007 in your role in

16   regulatory/quality, did you see anything -- had

17   anybody gotten you a list like that and said, hey,

18   these are -- these are various customers and

19   they're exceeding thresholds by this much?

20           Do you recall that?

21                   MR. PYSER:  Object to form.

22       A.   I don't recall that.

23   BY MR. PAPANTONIO:

24       Q.   Let's go to page -- let's go to     page

1    21.  You see the top says "No on-site visits for

2    chain retailers."

3             Do you see that?

4        A.   Yes.

5        Q.   And a chain retailer is CVS, what we've

6    been talking about, CVS, correct?  That's a chain

7    retailer?

8        A.   Yes.

9        Q.   And the one -- the chain retailer that we

10   just saw in this document where they said that 96

11   percent of all the narcotics sold to those

12   pharmacies down in central Florida went to CVS,

13   that's what it said, right?  96 percent?

14             MR. PYSER:  Object to form.

15       A.   Yes.

16   BY MR. PAPANTONIO:

17       Q.   And it says "No on-site visits for chain

18   retailers."  It says "According to DEA review,

19   Cardinal Health's SOM policies do not exclude

20   chain retailers from the site visit requirement.

21             "Indeed, the written policies made

22   available to DEA do not indicate any company

23   policy of treating chain retailers differently

24   from independent retailers in terms of due

1    diligence Cardinal Health's distribution centers

2    are required to conduct."

3         Now, your own policy says we need to go

4    out and we need to treat CVS the same way we

5    treated everybody, right?

6              MR. PYSER:  Object to form.

7    BY MR. PAPANTONIO:

8    Q.   That's your own policy?

9    A.   That is what it appears to say.

10   Q.   And this says "Cardinal failed to conduct

11   site visits for its retail chain pharmacies."

12        Do you see that?

13             MR. PYSER:  Object to form.

14   BY MR. PAPANTONIO:

15   Q.   "Thus, failing to maintain effective

16   controls to prevent diversion."

17        Do you see that?  Right?

18   A.   Yes.

19   Q.   Right?

20   A.   Yes.

21   Q.   So this says "Cardinal suspicious order

22   monitoring policy, its potential indicators of

23   diversion, many of these indicators of diversion

24   could not only have been" -- excuse me, "many of

```
 1    these indicators of diversion could only have been

 2    ascertained by conducting site visits."

 3            Now you understand what -- you understand

 4    what they're saying there?  They're saying there's

 5    no way that you can comply without actually doing

 6    site visits, with your own policy.  That's what

 7    that says, doesn't it?

 8                    MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10        Q.   It says, site visits required.

11            So where's that map, again, of -- here it

12    is right there.

13            So this map that I showed you of CVS, tell

14    me how many site visits you did -- you involved

15    yourself with with CVS.

16                    MR. PYSER:  Object to form.  Asked

17    and answered.

18    BY MR. PAPANTONIO:

19        Q.   While you were working in quality

20    regulatory, or any time after, how many site

21    visits did you do of a CVS pharmacy?

22                    MR. PYSER:  Object to form.  Asked

23    and answered.

24        A.   None.
```

```
 1    BY MR. PAPANTONIO:

 2        Q.   None.  And this says -- but this says that

 3    your own policy for the company was that you're

 4    supposed to treat a chain the same way you treat

 5    an independent?  Is that right?

 6             There's no difference in the way you treat

 7    a chain and the way you treat an independent.  Did

 8    I get that right?  I'm going to start that with

 9    the first part of this discussion.  That's a

10    correct statement, isn't it?

11                  MR. PYSER:  Object to form.

12        A.   That's what the policy states.  I can't

13    speak to the policy because I was not part of this

14    anti-diversion team.

15    BY MR. PAPANTONIO:

16        Q.   Sir, you were working in corporate

17    headquarters in Columbus, Ohio, and you were in

18    charge of overseeing the absolute -- the

19    distributorships all over the country?

20                  MR. PYSER:  Objection.

21    BY MR. PAPANTONIO:

22        Q.   Right?  Isn't that what you told us?

23        A.   It's the anti-diversion team that conducts

24    the site visits.
```

```
 1        Q.   Sir, you have -- it's all the employees

 2   responsible for stopping diversion.  It's not just

 3   a team.  You know that.  The DEA -- the DEA told

 4   you that.  All employees with Cardinal are

 5   responsible for stopping diversion.

 6             Do you remember them telling you that?

 7                  MR. PYSER:  Object to form.

 8        A.   Yes.

 9   BY MR. PAPANTONIO:

10        Q.   So let's look and see.  By not actually

11   going to the site and looking at them, you see the

12   bottom of this page right here?

13             Just blow that up right there.  Just this

14   part, "Potential indicators of diversion."

15             Now, let's talk about, how do you

16   possibly -- well, scratch that.

17             There was a whole list of things that the

18   DEA told you that you were supposed to be looking

19   for where it came to understanding diversion,

20   right?

21             One thing is customers of licensed --

22   customer exhibit drug-seeking behaviors.

23             How do you know that unless you do a site

24   visit?
```

```
 1                    MR. PYSER:  Object to form.

 2    BY MR. PAPANTONIO:

 3        Q.   How do you know that?

 4        A.   You don't.

 5        Q.   How do you know that if you put the

 6    responsibility of managing drug thresholds in the

 7    hands of the customer that you're selling

 8    narcotics to like CVS?

 9                    MR. PYSER:  Object to form.

10    Misstates evidence.

11    BY MR. PAPANTONIO:

12        Q.   You don't know that, you do?

13                    MR. PYSER:  Object to form.

14        A.   I don't know that that was the case.  I

15    don't know.

16    BY MR. PAPANTONIO:

17        Q.   How about cars full of pharmacy customers?

18    You've actually seen pictures where people come up

19    to the very customers that Cardinal was selling

20    narcotics to where they're showing up in loads --

21    cars loaded up with people wanting to buy

22    narcotics.  You're aware of that, right?

23                    MR. PYSER:  Object to form.

24        A.   I don't know if the pictures you've seen
```

```
 1    were of Cardinal customers.

 2    BY MR. PAPANTONIO:

 3        Q.   Well, sir, have you -- but you had the

 4    right to go out and inspect the sites themselves

 5    as you managed the quality regulatory employees;

 6    you had a right to get in a car and go see for

 7    yourself what was going on in pharmacies, right,

 8    all the way back to 2005?

 9               MR. PYSER:  Object to form.

10        A.   I could.  I could.

11    BY MR. PAPANTONIO:

12        Q.   You could.  That's all I want to say.  You

13    could have, right?

14               MR. PYSER:  Finish your answer.

15        A.   It wasn't my role.

16    BY MR. PAPANTONIO:

17        Q.   Sir, you just said the DEA told you --

18    first of all, let me -- scratch that.

19             You were in charge of -- how many people

20    worked under you between 2005 and 2007?

21        A.   Six.

22        Q.   Six.  Okay.  You had the right to go out

23    and inspect sites just like they did, as their

24    supervisor, didn't you?
```

```
1        A.   Yes.

2        Q.   And you never did it, not one time,

3   correct?

4        A.   Correct.

5        Q.   So this next thing says "Potential

6   indicators of diversion.  Pharmacy customers who

7   appear to be from outside the reasonable drawing

8   area for the facility."

9             You know what that means, right?

10  "Pharmacy customers who appear to be from outside

11  reasonable drawing area for the facility."

12            That's something you would look at to

13  identify whether or not the pharmacy may be doing

14  wrong, right?

15                 MR. PYSER:  Object to form.

16       A.   Yes.

17  BY MR. PAPANTONIO:

18       Q.   And the next thing that you find out about

19  the pharmacy, whether they're doing wrong or not,

20  it says "Evidence of illicit drug use around the

21  facility:  Used syringes, empty prescription

22  containers."

23            Do you realize that there were facilities

24  throughout the country that had -- I mean,
```

1    pharmacies that there were used syringes and empty

2    prescription containers right outside the

3    pharmacy.

4                    MR. PYSER:  Object to form.  Assumes

5    fact not established.

6    BY MR. PAPANTONIO:

7        Q.   Did he ever hear anything like that?

8                    MR. PYSER:  Object to form.

9        A.   Not that specifically.

10   BY MR. PAPANTONIO:

11       Q.   How about "mailing materials or other

12   evidence of operation of Internet pharmacy"?

13                   MR. PYSER:  Object to form.

14       A.   Yes.

15   BY MR. PAPANTONIO:

16       Q.   "High ratio of prescriptions for regulated

17   drugs versus other drugs."

18            You know that if a pharmacy is selling

19   more narcotics than they are aspirin, there's

20   probably a problem, right?

21                   MR. PYSER:  Object to form.

22   BY MR. PAPANTONIO:

23       Q.   Right?

24       A.   Yes.

1    Q.   And "High ratio of regulated prescriptions

2    stocked to other prescriptions.  Primarily cash

3    transactions for regulated drug prescriptions.

4    One employee responsible for ordering, monitoring,

5    and invoicing of products.  A high number of

6    customers compared to their peers."

7         Now, you would agree that every one of

8    those things would be a red flag for you to be

9    involved with signs, maybe something's not right

10   at this CVS facility, correct?

11             MR. PYSER:  Object to form.

12   A.   Correct.

13   BY MR. PAPANTONIO:

14   Q.   But in order to do that, you have to go to

15   the CVS facility to find this out, right?

16             MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18   Q.   Somebody has to go there and check?

19   A.   Correct.

20             MR. PYSER:  Let's take a break.

21             MR. PAPANTONIO:  Okay, we'll take a

22   ten-minute break.

23             THE VIDEOGRAPHER:  The time is 2:50

24   p.m., and we're off the record.

```
1

2                    (Recess taken from 2:50 p.m.

3                    to 3:06 p.m.)

4

5                    THE VIDEOGRAPHER:  The time is 3:06

6     p.m., on the record.

7     BY MR. PAPANTONIO:

8        Q.   So looking at 4085 still, the document

9     we've been dealing with most of the day, it says,

10    4085.22.  Look for the .22.

11              It says "Low numbers of suspicious orders

12    reported."

13              So on -- there on 22, it says "Low numbers

14    of suspicious orders reported.  Respondent's

15    electronic suspicious order monitoring system

16    flags certain orders as suspicious, which required

17    respondent to place a hold on the order until it

18    decides whether to release the order or cancel --

19    or cut the order."

20              Then it says this -- highlight this,

21    please, for me.

22              "From October 1, 2008, through

23    October 26, 2011, respondent reported only 41

24    suspicious orders to DEA."
```

1       So in four years, your company reported 41

2   suspicious orders, according to this.  And you

3   don't have any way -- you don't have any -- you

4   don't dispute that, you do?

5           MR. PYSER:  Object to form.

6       A.   That's what it states.

7   BY MR. PAPANTONIO:

8       Q.   "Based on information provided by

9   Cardinal, respondent suspended sales of controlled

10  substances to 19 DEA registrants from December

11  2010 to October 2011 at the service of the AIW."

12          You remember what the AIW is?

13          MR. PYSER:  Same ongoing objections

14  to this document.

15  BY MR. PAPANTONIO:

16      Q.   Do you remember the AIW?  It was a

17  warrant, right?

18      A.   Right.

19      Q.   And it says "Only three of the 41

20  suspicious orders reported were orders from 19

21  customers respondent suspended."

22          "Only 3 of the 41 suspicious orders

23  reported were orders from the 19 customers

24  respondent suspended."

1          Now, it goes on and says "Between October

2   26, 2011," the day following the execution of the

3   AIW, "and January 31, 2012, respondent terminated

4   28 customers."

5          So according to this, Cardinal gets

6   wind -- well, they actually get copies of the fact

7   that the -- the warrants have been issued for

8   their facilities, right, Cardinal businesses?

9                MR. PYSER:  Object to form.  Calls

10   for speculation.

11   BY MR. PAPANTONIO:

12      Q.   Right?

13      A.   That's...

14      Q.   That's what it says?

15      A.   I don't know.  I mean, it says that the

16   service of.

17      Q.   Yeah, right.  So after --

18                MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20      Q.   After the -- after they receive the AIW,

21   the warrant, then respondent terminated 28

22   customers after they received that warrant.

23          That's what that says, doesn't it?

24                MR. PYSER:  Object to form.

```
 1        A.   That's what it states.

 2   BY MR. PAPANTONIO:

 3        Q.   So you really only terminated 28 customers

 4   because the DEA had filed an AIW, a warrant,

 5   true?

 6                   MR. PYSER:  Object to form.  Calls

 7   for speculation.

 8        A.   I can't speak to that.  I wasn't part of

 9   this team.

10   BY MR. PAPANTONIO:

11        Q.   Sir, but you understand that this team --

12   this team that you keep saying "this team," --

13   this team was working for Cardinal, correct?

14                   MR. PYSER:  Object to form.

15        A.   Correct.

16   BY MR. PAPANTONIO:

17        Q.   Is that right?

18        A.   Correct.

19        Q.   And you were in corporate up in Columbus,

20   Ohio with Cardinal, correct?

21                   MR. PYSER:  Object to form.

22        A.   Correct.

23   BY MR. PAPANTONIO:

24        Q.   And part of your job was to oversee, as
```

```
 1    we've talked about, the distribution centers

 2    throughout the entire United States?

 3                    MR. PYSER:  Object to form.

 4    BY MR. PAPANTONIO:

 5        Q.   Correct?

 6        A.   Correct, but not what is described here.

 7        Q.   Well, that's fair enough.

 8             But let me ask you this, a facility -- all

 9    of the facilities we've been talking about were

10    supplied by the Lakeland -- by the Lakeland

11    Cardinal distributor center, correct?

12        A.   That's what is stated.

13        Q.   And that was one that you had oversight

14    of, correct?

15                    MR. PYSER:  Object to form.

16        A.   This activity that's described here?

17    BY MR. PAPANTONIO:

18        Q.   Yes.

19        A.   Took place at corporate.

20        Q.   Right.  Corporate.  And where were you?

21                    MR. PYSER:  Object to form.

22    BY MR. PAPANTONIO:

23        Q.   Corporate?

24        A.   At corporate, but not part of this team
```

1    and not responsibility for any of these

2    activities.

3        Q.   Well, you were responsible for making sure

4    that the distributor locations were operating

5    within the realm of the law, correct?

6                MR. PYSER:  Object to form.

7        A.   Correct.

8    BY MR. PAPANTONIO:

9        Q.   And Lakeland was one of those

10   distributors, correct?

11               MR. PYSER:  Object to form.

12       A.   Correct.

13   BY MR. PAPANTONIO:

14       Q.   And the pharmacies that we were talking

15   about received their narcotics from the Lakeland

16   distributorship, right?

17               MR. PYSER:  Object to form.

18       A.   Correct.

19   BY MR. PAPANTONIO:

20       Q.   All right.

21       A.   But this was a centralized process that

22   was managed by the anti-diversion team in Dublin,

23   Ohio.

24       Q.   And nobody told you about it, is that your

1    testimony?

2              All this was going on, nobody told you

3    that this was going on?  Is that your testimony?

4                   MR. PYSER:  Object to form.

5         A.   I knew there was an issue.  I did not know

6    the specifics, this detail.

7    BY MR. PAPANTONIO:

8         Q.   Well, that's what we're here for right.

9              So then --

10                  MR. PYSER:  Object to form.  Move to

11   strike.

12   BY MR. PAPANTONIO:

13        Q.   Next question, it says "Respondent

14   reported no suspicious orders at either -- at

15   either of its CVS facilities or the independent

16   retail pharmacy locations."

17             Do you see that?

18        A.   That's what it states.

19        Q.   Then go to the top of the next page.

20             The top four customers -- do you know how

21   much money was generated by Cardinal's top four

22   customers that we've been talking about here?  Do

23   you know?

24        A.   I do not know.

```
 1        Q.   It says "Following the service of AIW" --

 2   which is the warrant -- "from              January

 3   1, 2012 through February 3, 2012" -- the date of

 4   service of the ISO -- "Cardinal" -- after the

 5   warrant -- "reported 173 suspicious orders, none

 6   of which concerned its top four pharmacy

 7   customers."

 8             Do you see that?

 9        A.   That's what it states.

10        Q.   So you didn't report the -- you didn't

11   report your people that you're making the most

12   money from, which is your top four customers; you

13   reported suspicious orders for other pharmacies,

14   according to this?

15             MR. PYSER:  Object to form.

16   Misstates evidence.  Assumes facts not in

17   evidence.

18   BY MR. PAPANTONIO:

19        Q.   Right?  This says none of your top four

20   customers did you report suspicious orders for,

21   right?

22             MR. PYSER:  Object to form.

23        A.   I don't know the -- that's what it states

24   here.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2       Q.   Then it says -- let's go to the next page.

 3            Now, you know who Carter -- I asked you

 4   who Carter is, the investigator for the DEA.  Do

 5   you know who she is, Miss Carter?

 6       A.   Yes, I'm familiar with her name.

 7       Q.   Ruth Carter?

 8       A.   Yes.

 9       Q.   As we go through this, I'm going to offer

10   this -- we're going to attach this to the

11   deposition.

12            This is the DEA Ruth Carter affidavit

13   marked 4109.  I'm going to attach that to the

14   deposition.

15            Go ahead and do that, make sure it's

16   attached.

17            It says "GS Carter will testify that

18   respondent's top four customers failed to

19   exercise," -- I'm on page 24 there, "GS Carter

20   will testify that respondent's top four customers

21   failed to exercise their corresponding

22   responsibility regarding the proper prescribing

23   and dispensing of controlled substances and have

24   failed to maintain effective controls to prevent
```

1    the diversion of controlled substances."

2         Those are your top four customers we're

3    talking about here, right?

4              MR. PYSER:  Object to form.

5         A.   That's what it states.

6    BY MR. PAPANTONIO:

7         Q.   "She will testify that until the service

8    of the AIW, or the warrant, "two of respondent's

9    top customers" -- both of them CVS, do you see

10   that? -- "continued to dispense controlled

11   substances based on prescription issued for other

12   than legitimate medical purposes and outside the

13   usual course of professional practice."

14        Now your four customers, if they're

15   selling more drugs, then -- more narcotics, then

16   certainly Cardinal is making more money, right?

17             MR. PYSER:  Object to form.

18        Q.   They sell more drugs, Cardinal is making

19   more money; isn't that right?

20             MR. PYSER:  Object to form.

21        A.   Makes sense.

22   BY MR. PAPANTONIO:

23        Q.   So if they exceed -- if they exceed an

24   average of 8,000 units a month and instead they're

```
 1    selling 200,000 units a month, that's more money

 2    in the pocket for Cardinal, true?

 3            You sold more -- you sold more drugs to

 4    them, haven't you?

 5                    MR. PYSER:  Object to form.

 6        A.   I would assume more volume.

 7    BY MR. PAPANTONIO:

 8        Q.   More volume, more money?

 9        A.   Would be more revenue.

10        Q.   Yes.  More volume, more revenue?

11                    MR. PYSER:  Object to form.

12    BY MR. PAPANTONIO:

13        Q.   Isn't that how that works?  More volume,

14    more revenue.

15            And then the other thing we know is more

16    volume, more revenue, more drug overdoses and

17    people die.  We know that from the statistics,

18    correct?

19                    MR. PYSER:  Object to form.  Assumes

20    facts not in evidence.

21    BY MR. PAPANTONIO:

22        Q.   You know that, that the sales go up -- the

23    sales went up historically and continue -- they've

24    gone up, the number of deaths from opioids have
```

1    increased, too.  You know that?

2                    MR. PYSER:  Object to form.  Assumes

3    facts not in evidence.

4    BY MR. PAPANTONIO:

5         Q.   True?

6         A.   I -- I don't know if there's enough

7    information there to make that correlation.

8         Q.   You don't know that?  You've never seen

9    anything that showed you a graph showing that as

10   sales went up, death of human beings went up, too,

11   from overdoses?  Nobody's ever shown that to you,

12   have they?

13                   MR. PYSER:  Object to form.

14        A.   Not that I recall.

15   BY MR. PAPANTONIO:

16        Q.   And you recall going to DEA PowerPoint

17   presentations where they made PowerPoints, and you

18   don't ever remember the DEA showing you that graph

19   that as sales increased for Cardinal so did deaths

20   of people all over the United States?

21                   MR. PYSER:  Object to form.

22   Speculation.

23   BY MR. PAPANTONIO:

24        Q.   You don't recall that, do you?

```
 1                    MR. PYSER:  Object to form.

 2        A.   I don't recall it.

 3   BY MR. PAPANTONIO:

 4        Q.   So this says -- so the way the system

 5   works, it's called a closed system, right?

 6        A.   Yes.

 7        Q.   The closed system is that the distributor

 8   needs the manufacturer to manufacture the drugs,

 9   correct?

10        A.   Yes.

11        Q.   And then the pharmacy needs the

12   distributor to sell them the drugs, correct?

13        A.   Yes.

14        Q.   And then the doctor needs the pharmacy to

15   sell them the drugs, right?

16                    MR. PYSER:  Object to form.

17        A.   Well, the doctor would issue the

18   prescription, and then the patient would go to the

19   pharmacy.

20   BY MR. PAPANTONIO:

21        Q.   And it's a closed system.  The

22   manufacturer -- in other words, you all are doing

23   business together.  The manufacturer is doing

24   business with the distributor.  The distributor is
```

```
 1    doing business with the pharmacy.

 2           Correct?

 3                  DEFENSE COUNSEL:  Objection to

 4    form.

 5    BY MR. PAPANTONIO:

 6       Q.   Is that right?

 7       A.   Registrant to license -- to license.

 8       Q.   Right.  Everybody is working together in

 9    putting these drugs out on the street -- I mean

10    out to pharmacies, correct?

11                  MR. PYSER:  Object to form.

12                  DEFENSE COUNSEL:  Object to form.

13    BY MR. PAPANTONIO:

14       Q.   Correct?

15       A.   That's the process.

16       Q.   Yes.  All right.  It says -- talking about

17    Miss Carter here.  "Additionally, GS Carter will

18    testify respondent knew or should have known that

19    the large quantities of oxycodone it distributed

20    to its top four customers were not dispensed for

21    legitimate medical purposes."

22           Did you see that?

23       A.   That's what it reads.

24       Q.   That Cardinal knew that these drugs that
```

```
 1    were going to their top four -- their top four

 2    customers were not being dispensed with legitimate

 3    medical purposes, which means diversion,

 4    correct?

 5                    MR. PYSER:  Object to form.  Ongoing

 6    objection to this document.  Hearsay.

 7    BY MR. PAPANTONIO:

 8         Q.   Correct?

 9         A.   If that was the case, it would be.

10         Q.   Which is criminal conduct?

11                    MR. PYSER:  Object to form.

12    BY MR. PAPANTONIO:

13         Q.   If this is true, that's criminal conduct

14    we're talking about?

15         A.   It's a violation of the regulation.

16         Q.   Well, no.  It's not -- if you -- if you

17    sell drugs to somebody, that it's not supposed to

18    be for a legitimate purpose, that is breaking the

19    law, you're selling drugs illegally.

20                    MR. PYSER:  Object to form.

21    BY MR. PAPANTONIO:

22         Q.   Right?

23         A.   I view it as a violation of the

24    regulations.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   How about the young man on the street

 2   corner selling 3 ounces of marijuana?  Do you view

 3   that as a regulatory violation, or is he breaking

 4   the law?

 5                    MR. PYSER:  Object to form.

 6        A.   He's breaking the law because he's

 7   distributing an illicit drug that hasn't been

 8   approved by the FDA.

 9   BY MR. PAPANTONIO:

10        Q.   And, sir, your company was distributing

11   drugs out of what it was told as far as how those

12   drugs should be distributed.  Your company was

13   doing that, right?

14                    MR. PYSER:  Object to form.

15        A.   No.  They were distributed to a pharmacy

16   that had a valid DEA registration.

17   BY MR. PAPANTONIO:

18        Q.   Right, that you did business with, your

19   top four customers -- let me make sure you

20   understand what I'm saying.

21             Your top four customers were breaking the

22   law in the way they were selling drugs.  That's

23   what this says, right?

24                    MR. PYSER:  Object to form.
```

```
1      A.   That's -- I can't speak to that.  That's

2    what it states.

3    BY MR. PAPANTONIO:

4      Q.   Okay.  "Additionally, GS Carter will

5    testify respondent knew or should have known that

6    the large quantities of oxycodone it distributed

7    to its top four customers were not being dispensed

8    for legitimate medical purposes.

9           "She will testify to the due diligence

10   files associated with the four pharmacies and will

11   testify that had the respondent conducted proper

12   due diligence, Cardinal would have realized that

13   the volume of oxycodone ordered by these four

14   pharmacies well exceeded that of any other Florida

15   retail pharmacy supplied by Cardinal."

16          Do you see that?

17              MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19     Q.   Now --

20     A.   That's what it states.

21     Q.   -- understand, this is -- this is to your

22   company, first of all --

23          I left something out as far as the number

24   of times that your company was put on notice of
```

1    doing wrong.  I said -- I talked about 2005.  I

2    talked about 2006 and 2007 and 2008.

3            I didn't talk about the fact that you know

4    your company had already been busted also by the

5    New York Attorney General for breaking the law in

6    2006 while you were in charge of

7    regulatory/quality.

8            Show him document 3850.

9            You know -- did you know that?  Did

10   anybody tell you that the New York Attorney

11   General actually had you  -- had your company

12   investigated and came up with a decision that your

13   company had to sign off on saying that you had

14   done things improperly?  Did you know that?

15           MR. PYSER:  Object to form.

16       A.   I was --

17           MR. PAPANTONIO:  Show it to him.

18   Give me the right -- let me find it.  New York,

19   3850 is what I've got.  Find it if you don't have

20   it.

21   BY MR. PAPANTONIO:

22       Q.   Nobody had ever told you that?  We're

23   going to get it for you and show it to you in a

24   minute.

```
 1              But nobody had ever told you that the New

 2   York Attorney General had actually -- that your

 3   company had to enter into an MOU with them because

 4   of the conduct that you were -- that you were

 5   engaged in up in New York?

 6                   MR. PYSER:  Object to form.

 7   Misstates.

 8        A.   I was aware there was --

 9   BY MR. PAPANTONIO:

10        Q.   Well, tell me what --

11        A.   -- something with --

12        Q.   -- tell me what you were aware of.  How

13   about that.  Let's do it like that, while she's

14   trying to find that document.

15        A.   That there was some type of agreement with

16   the NY AG.

17                   MR. PAPANTONIO:  Give me 4167.  See

18   if that's it.  4167.

19   BY MR. PAPANTONIO:

20        Q.   What's an MOU?

21                   MR. PYSER:  Object to form.

22   BY MR. PAPANTONIO:

23        Q.   What's an MOU?

24        A.   Memorandum of understanding.
```

```
 1        Q.    4167, please.

 2              And the memorandum of understanding,

 3    please give him a copy of it.

 4              You're aware of the memorandum of

 5    understanding that was reached in 2006?

 6                    MS. MOORE:  Reardon 25.

 7

 8              (Exhibit No. 25 marked for

 9    identification.)

10

11                    MR. PYSER:  Object to form.

12    BY MR. PAPANTONIO:

13        Q.    Now, this is in addition -- this is a new

14    document here that we haven't looked at.

15              We talked about earlier, Mr. Reardon, you

16    met with the DEA and you made certain promises to

17    them about how you would conduct Internet pharmacy

18    sales, correct?

19        A.    Would you repeat that?

20        Q.    Yes.  You met with the DEA face-to-face in

21    2005 and you made promises to them that you would

22    operate your business within the realm of what

23    they were suggesting to you on Internet

24    pharmacies, right?
```

```
 1                    MR. PYSER:  Object to form.

 2         A.   Yes.

 3    BY MR. PAPANTONIO:

 4         Q.   And then in 2006, you got a letter from

 5    the DEA stating clearly what your responsibilities

 6    and duties were, correct?

 7                    MR. PYSER:  Object to form.

 8         A.   Correct.

 9    BY MR. PAPANTONIO:

10         Q.   And selling -- then in 2007, you got

11    another letter from the DEA stating what your

12    responsibilities and duties were in relationship

13    to the sale of narcotics in America, correct?

14                    MR. PYSER:  Object to form.

15         A.   Correct.

16    BY MR. PAPANTONIO:

17         Q.   And then in 2008, we find out you had to

18    pay a $34 million fine for not complying with DEA

19    standards, correct?

20                    MR. PYSER:  Object to form.

21         A.   We paid the fine, yes.

22    BY MR. PAPANTONIO:

23         Q.   And so here's one we didn't talk about.

24    This is 4167, and this is where you were
```

1    actually -- Cardinal was actually buying drugs

2    from other suppliers and selling them illegally in

3    secondary markets.

4              Do you remember that?

5                   MR. PYSER:  Object to form.

6    Misstates.

7    BY MR. PAPANTONIO:

8         Q.  Do you remember that?

9                   MR. PYSER:  Object to form.

10        A.  I don't know -- I don't remember the

11   specifics.  I know there was an issue.

12   BY MR. PAPANTONIO:

13        Q.  Well, let's see what it says.

14             2005, excuse me, it's 2005.  This is at

15   the same time you were meeting with Reardon and

16   the -- the same time you were meeting with the DEA

17   in relationship to Internet pharmacies, this was

18   happening, too.

19             Let me see if I've got this right.  Here's

20   the question:  "In 2005, the Office of Attorney

21   General, the OAG, began an investigation focusing

22   on the trading in secondary market for

23   pharmaceuticals."

24             Do you see that?  Tell the jury what the

1    secondary market for pharmaceuticals is.

2        A.   The secondary market is a wholesale market

3    that wholesalers trade amongst each other.

4        Q.   You trade among each other, and why do you

5    do that?

6                   MR. PYSER:  Object to form.

7    BY MR. PAPANTONIO:

8        Q.   It's cheaper?

9        A.   I don't -- I don't know the specifics.  It

10   could be inventory issues.

11       Q.   Well, there's a reason.  You actually make

12   more money by trading in the secondary markets,

13   don't you?

14                  MR. PYSER:  Object to form.

15       A.   Possibly.

16   BY MR. PAPANTONIO:

17       Q.   Well, let's see what it says.  Go to the

18   next page.

19            It says "Cardinal is one of the three

20   primary distributors of pharmaceuticals in the

21   United States.  Up until it ended its practice in

22   December 2005, Cardinal, like other national

23   full-line distributors, bought and sold drugs in

24   secondary market, buying from selling to

```
1     wholesalers known as alternate source vendors."

2              And you knew, sir, you know that was

3     illegal, right?

4                   MR. PYSER:  Object to form.

5     Misstates evidence.  Calls for speculation.

6     BY MR. PAPANTONIO:

7         Q.   It was legal to do that.

8                   MR. PYSER:  Object to form.

9     Misstates evidence.  Calls for a legal conclusion.

10    BY MR. PAPANTONIO:

11        Q.   Did you know whether or not it was illegal

12    to do that?

13                  MR. PYSER:  Object to form.  Same

14    objections.

15        A.   I don't understand this enough to make a

16    determination.

17    BY MR. PAPANTONIO:

18        Q.   Sir, you don't understand secondary

19    market.  This is a 2005 document.  Where were you

20    in 2005?

21        A.   I understand secondary market.  I don't

22    understand how the pricing worked.

23        Q.   Okay.  Well, let's look at this.

24             You were -- what were you doing in 2005?
```

```
 1    You've already told us.  The jury knows what you

 2    were doing in 2005.  Quality and regulatory,

 3    right?

 4                    MR. PYSER:  Object to form.

 5        A.   Right.

 6    BY MR. PAPANTONIO:

 7        Q.   And you didn't know that this was going on

 8    in New York?

 9                    MR. PYSER:  Object to form.

10        A.   I knew that there was an issue with the NY

11    AG.

12    BY MR. PAPANTONIO:

13        Q.   What is that?  The New York Attorney

14    General.  You knew that?

15        A.   I knew there was an issue.

16        Q.   Right.  And you were, nevertheless, still

17    distributing drugs in New York, correct?

18                    MR. PYSER:  Object to form.

19        A.   This -- my understanding of this, it's all

20    about pricing.

21    BY MR. PAPANTONIO:

22        Q.   It's not.  Let's go ahead and read it.

23                    MR. PYSER:  Object to form.

24    BY MR. PAPANTONIO:
```

```
 1        Q.   It says "Executive law 63-12 forbids any

 2   person or business from engaging in repeated

 3   fraudulent or illegal acts, including any

 4   evidence, scheme, or artifice to defraud and any

 5   deception, misrepresentation, concealment,

 6   suppression, false pretense, false promise."

 7            Do you understand what we're talking

 8   about?  We're talking about fraud here in

 9   Paragraph 3.  Is that clear to you?  Is that clear

10   enough that we're talking about fraud?

11            Underline "fraud" --

12                 MR. PYSER:  Object.

13   BY MR. PAPANTONIO:

14        Q.   -- and "misleading," please.

15                 MR. PYSER:  Object to form.

16   BY MR. PAPANTONIO:

17        Q.   Is it clear to you what we're talking

18   about here right now?

19        A.   That's what it states.

20        Q.   Yes.  Okay.  And then it goes -- look at

21   No. 5.  "In a 2003 internal Cardinal e-mail to a

22   compliance officer, one executive addressed the

23   issue as smaller vendors which provided unique

24   opportunities to Cardinal.  Although acknowledging
```

```
 1    that the vendors are high risk" -- do you know why

 2    they were high risk?

 3                      MR. PYSER:  Object to form.

 4         A.   I do not.

 5    BY MR. PAPANTONIO:

 6         Q.   It says "The writer concluded that since

 7    we feed the margin from these high-risk vendors,

 8    we will continue to buy from them."

 9              So Cardinal is buying from what they

10    considered high-risk vendors, correct?

11                      MR. PYSER:  Object to form.

12         A.   That's what it states.

13    BY MR. PAPANTONIO:

14         Q.   "As late as 2004, internal Cardinal

15    documents continued to discuss the risks inherent

16    in the secondary market.  Cardinal Health is

17    taking significant steps to make sure that the

18    product distributed is authentic and safe.  Also

19    reported Cardinal Health has a vested interest in

20    maintaining the secondary distribution market.  It

21    is believed that many -- that this market is the

22    weakest point in the chain for the introduction of

23    counterfeit product."

24              Now, did you know what your company agreed
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    to do as far as the MOU after they were -- after

2    this occurred with the New York Attorney

3    General?

4                    MR. PYSER:  Object to form.  Object

5    to form.  Now go ahead and answer.

6        A.   I don't recall the specifics.

7    BY MR. PAPANTONIO:

8        Q.   So nobody ever told you -- nobody ever

9    told Mr. Reardon that this document had to be

10   signed by Cardinal management where you agreed to

11   have a monitoring system in place that caught

12   excessive orders?  Did you know that?

13                   MR. PYSER:  Object to form.

14       A.   Excessive orders?

15   BY MR. PAPANTONIO:

16       Q.   Yes, do you --

17       A.   With this?

18       Q.   Let me ask it a different way.  Yes.

19            Do you understand that there was a MOU put

20   in place by the New York Attorney General that

21   you -- that your company agreed to?

22                   MR. PYSER:  Object to form.

23       A.   Yes, I know there was --

24   BY MR. PAPANTONIO:
```

```
1         Q.   Well, let's --

2                   MR. PYSER:  Go ahead and let him

3    finish the answer, Counsel.

4    BY MR. PAPANTONIO:

5         Q.   Go ahead.  Yes.

6         A.   Yes, I was aware that there was an

7    agreement.

8         Q.   Well, what we're going to do is attach the

9    agreement right to this deposition so the jury can

10   he see what you agreed to again in 2005 about what

11   you were going to agree to as far as your

12   responsibility in stopping diversion.

13                  MR. PYSER:  Object to form.  Move to

14   strike the colloquy of counsel.

15                  MR. PAPANTONIO:  I'm going to put,

16   2005, and this is the New York Attorney General

17   MOU.

18   BY MR. PAPANTONIO:

19        Q.   All right.  And then --

20                  MR. PYSER:  Same -- hold on, please.

21   The same objections to the demonstrative, and a

22   new objection to the demonstrative that was just

23   shown.

24                  The relevance to the New York AG to this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    litigation is zero.

 2    BY MR. PAPANTONIO:

 3        Q.   Southern District of New York.  Who is --

 4    what is Kinray?

 5        A.   Kinray is a distribution center in the

 6    New York area that was an acquisition of

 7    Cardinal's.

 8        Q.   Kinray was opened by Cardinal, correct?

 9        A.   At some point.  I -- I don't know the date

10    the acquisition was made.

11        Q.   Well, it says -- if I were to tell you

12    that we got the document and it says it was made

13    on 11/18/2010, you wouldn't take exception to

14    that, would you?

15              MR. PYSER:  Object to form.

16        A.   I couldn't.  I don't know the date.

17    BY MR. PAPANTONIO:

18        Q.   Well, the jury will see the date.  But

19    Kinray --

20              MR. PYSER:  Object to form.  Move to

21    strike.

22    BY MR. PAPANTONIO:

23        Q.   But Kinray was already -- if they were --

24    if they were -- if the deal was made with Kinray
```

1    on 2010, then you understood that by 2016, the New

2    York Attorney General had announced a fine against

3    them for $10 million because of the way they were

4    conducting business in New York, correct?

5            MR. PYSER:  Object to form.

6    Misstates.

7    BY MR. PAPANTONIO:

8        Q.  Did you know that?

9            MR. PYSER:  Object to form.  Same

10   objections.

11   BY MR. PAPANTONIO:

12       Q.  Tell me, did you know that Kinray paid a

13   $10 million fine?

14           MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.  For the way they were conducting business

17   in New York and admitted that they had done wrong

18   in the way they were doing business?

19           MR. PYSER:  Object to form.

20       A.  I don't recall that.

21           MR. PAPANTONIO:  Let's attach this.

22   This is 4201.  Let's attach this to the

23   deposition.

24   BY MR. PAPANTONIO:

```
1        Q.   What is this document?

2                  MR. PYSER:  Counsel, you've attached

3    things to the deposition and marking them as

4    exhibits --

5                  MR. PAPANTONIO:  Yes.

6                  MR. PYSER:  If you're marking this

7    as an exhibit, can you provide a copy --

8                  MR. PAPANTONIO:  We did provide you

9    one, didn't we.  Get him a copy.

10                 MS. MOORE:  This is 4422.

11

12           (Exhibit No. 21 marked for

13    identification.)

14

15                 MR. PAPANTONIO:  Give me 4422.

16                 MR. PYSER:  Before we move on, I

17    would like a copy of the exhibits that you're

18    marking.

19                 MR. PAPANTONIO:  We'll give them to

20    you.

21    BY MR. PAPANTONIO:

22        Q.   Now, while we're looking for that, nobody

23    ever told you what the result of the Kinray

24    investigation was and how they were forced to pay
```

1    $10 million?

2        Nobody ever told you that prior to coming

3    here today, did they?

4            MR. PYSER:  Object to form.

5    BY MR. PAPANTONIO:

6        Q.   Right?

7        A.   I don't recall.

8        Q.   Nobody ever showed you these documents I'm

9    showing you right now that as late as 2016 that

10   your company still is not doing it right according

11   to standards of selling narcotics in the United

12   States?

13           MR. PYSER:  Object to form.

14   Misstates evidence.  Assumes facts not in

15   evidence.

16   BY MR. PAPANTONIO:

17       Q.   Let's see if it misstates.  Show him the

18   document.

19           MS. MOORE:  42301 is Reardon

20   Cardinal 26.

21

22           (Exhibit No. 26 marked for

23   identification.)

24

```
1                    MS. MOORE:   42322 is Cardinal

2     Reardon 27.

3

4              (Exhibit No. 27 marked for

5     identification.)

6

7     BY MR. PAPANTONIO:

8         Q.   Now I want you to look at 4222, since this

9     is the first time you've ever heard of a consent

10    order being entered between Kinray and your

11    company, Cardinal.  Okay?  Take a look at the

12    front of it.

13             Pretty clear what it is, isn't it?

14        A.   (Witness reviews document.)

15        Q.   Southern District -- United States

16    Attorney General, Southern District of New York

17    and it says United States of America versus

18    Kinray, and it says "Consent Order," and the date

19    on this is 2016.

20             Let's go to the next page.

21             "Between January 1, 2011, and May 14,

22    2012, defendant committed reporting violations of

23    the CSA."

24             What is the CSA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   Controlled Substances Act.

2       Q.   And that's the one that was written all

3   the way back in 1971, correct?

4                 MR. PYSER:  Object to form on this

5   and the prior question.

6   BY MR. PAPANTONIO:

7       Q.   Correct?

8       A.   Correct.

9       Q.   And "regulations by failing to adequately

10  operate a system designed to identify suspicious

11  orders of controlled substances and inform the DEA

12  of those suspicious orders pursuant to 21 CFR

13  131."

14           So what are the two things that you've

15  been accused of here according to what you're

16  reading?

17                MR. PYSER:  Object to form.

18      A.   Failing to adequately operate a system

19  designed to identify suspicious orders of

20  controlled substances and inform the DEA of those

21  suspicious orders.

22  BY MR. PAPANTONIO:

23      Q.   And I think we've established that, prior

24  to coming here, nobody showed this to you, right?
```

1    Correct?

2            MR. PYSER:  Object to form.

3        A.   Correct.

4    BY MR. PAPANTONIO:

5        Q.   And you didn't know about this prior to

6    coming here today.  As late as 2016, your still --

7    your company still is not doing things right as

8    far as suspicious orders?

9            MR. PYSER:  Object to form.

10   Misstates evidence.

11   BY MR. PAPANTONIO:

12       Q.   Right?

13           MR. PYSER:  Object to form.

14   Misstates evidence.

15   BY MR. PAPANTONIO:

16       Q.   Am I right?

17           MR. PYSER:  Object to form.

18   Misstates evidence.

19       A.   I had already left the company.

20   BY MR. PAPANTONIO:

21       Q.   You left the company and became a

22   consultant.  You're a consultant as we sit here

23   today.  You get paychecks from the company.

24   Right?

```
 1        A.   I work on non-DEA matters.

 2        Q.   But you get paychecks from the company?

 3                  MR. PYSER:  Object to form.  Asked

 4   and answered.

 5   BY MR. PAPANTONIO:

 6        Q.   Right?

 7        A.   Yes.

 8        Q.   So you have a direct -- even though you're

 9   not with the company, you certainly get paychecks

10   from them still, don't you?

11                  MR. PYSER:  Object to form.  Asked

12   and answered.

13   BY MR. PAPANTONIO:

14        Q.   Right?

15        A.   To work on non-DEA matters.

16        Q.   Okay.  But you get money from them is what

17   we're trying to say.  Right?

18                  MR. PYSER:  Object to form.

19        A.   Yes.

20   BY MR. PAPANTONIO:

21        Q.   And then it says "Now, therefor" -- you

22   see where it says "Now therefor ordered that" --

23   number two, you see -- "Defendant admits" -- it

24   says it admits.  Circle that, please -- "it
```

1    acknowledges," -- Circle that, please.  And "it

2    accepts responsibility for the following

3    violations of the regulations promulgated by the

4    DEA."

5         Do you see that?

6              MR. PYSER:  Object.

7    BY MR. PAPANTONIO:

8    Q.   You admit that you did it wrong, you

9    acknowledge you did it wrong, and you accept

10   responsibility.

11             MR. PYSER:  Object to form.

12   BY MR. PAPANTONIO:

13   Q.   That's what it says there, doesn't it?

14             MR. PYSER:  Object to form.  Vague

15   as to who the defendant is.

16   BY MR. PAPANTONIO:

17   Q.   Is there -- do you not understand who the

18   defendant is here?  Because your lawyer doesn't

19   seem to understand who the defendant is here.

20        Let's help him.  Let's help your lawyer

21   understand who the defendant is.

22             MR. PYSER:  Object to form.  Move to

23   strike.

24   BY MR. PAPANTONIO:

1    Q.   Let's go to the front of it.

2         It says "United States versus Kinray." Who

3    owns Kinray?

4              MR. PYSER:  Object to form.  Vague

5    as to time.

6    BY MR. PAPANTONIO:

7    Q.   Who owns Kinray?

8              MR. PYSER:  Same objection.

9    A.   I -- as of right now, Cardinal Health.

10   BY MR. PAPANTONIO:

11   Q.   Cardinal Health.  Right.  And what's the

12   date on this?  12/22/16.

13        Who owned Kinray on 12/22/16?

14   A.   Cardinal Health.

15   Q.   Good.  We've cleared that up for your

16   lawyer.  Now let me ask you some questions.

17              MR. PYSER:  Object to form.  Move to

18   strike.

19   BY MR. PAPANTONIO:

20   Q.   Let me ask you some questions.

21        It says here, "Defendant admits,

22   acknowledges, and accepts responsibility for the

23   following violations."

24        Here, let's go through the following

1    violations.

2           "Between January 1, 2011 and May 12 -- May

3    14, 2012, defendant failed to inform the DEA that

4    certain orders for controlled substances it

5    received from some customers were suspicious as

6    required by 21 CFR."

7           Then it says "Defendant shall pay the sum

8    of $10 million to the United States."

9           That's pretty big fine, isn't it?

10          MR. PYSER:  Object to form.

11    A.   Yes.

12    BY MR. PAPANTONIO:

13    Q.   And did you -- and nobody had told you

14    prior to the time you came in here today that even

15    as late as 2011 and 2012 that your system that you

16    described was the new, improved system that came

17    about in 2007 still wasn't working right, right?

18          MR. PYSER:  Object to form.

19    A.   I can't speak do that.  I -- I haven't

20    seen this.  I don't...

21          MR. PAPANTONIO:  All right.  You got

22    that introduced, right?

23          Michael, how much time have we got?  I

24    want to save you what you need.

```
 1    BY MR. PAPANTONIO:

 2        Q.   Okay.  Do you see the bottom of .27 on

 3    this -- the document we've been dealing with all

 4    day long, the jury will have in front of them to

 5    review.

 6                 MR. PYSER:  Object to form.

 7    BY MR. PAPANTONIO:

 8        Q.   .27, "GS Carter will testify to her

 9    investigation of CVS, one of respondent's top

10    pharmacy customers, located in Sanford, Florida,

11    based on her investigation between January 2010

12    and October 2011, 58 percent of all oxycodone 30

13    milligram sales were paid for in cash."

14            Did you see that?

15                 MR. PYSER:  Object to form.

16        A.   That is what it states.

17    BY MR. PAPANTONIO:

18        Q.   Do you remember that list I showed you of

19    things that you're supposed to look for when a

20    pharmacy is doing wrong?

21            You remember it says if you're seeing

22    people pay with cash, that's a red flag, isn't it?

23        A.   Yes.

24        Q.   And then it says "Had Cardinal" -- listen
```

```
 1    to this, "Had Cardinal conducted a site visit at

 2    CVS, it would have learned of the 58 percent of

 3    oxycodone 30 milligram sales were paid for in

 4    cash."

 5            Now, you would agree you actually have to

 6    show up on the site to figure out what's going on

 7    on the site, right?

 8                    MR. PYSER:  Object to form.

 9    BY MR. PAPANTONIO:

10        Q.   You would agree with that, right?

11        A.   You would have to go to the site.

12        Q.   But look at page 29.

13            In other words, Cardinal has to go to the

14    site.  Correct?

15            People, bodies, living people have to go

16    to the site, that work for Cardinal, correct?

17                    MR. PYSER:  Object to form.

18        A.   Correct.

19    BY MR. PAPANTONIO:

20        Q.   And look at page 29.  It says, in the

21    middle of the page, it says "According to the

22    conversation, Ms. Gibbs stated that a

23    representative from respondent contacted CVS

24    corporate offices to report that Mallinckrodt, a
```

1    supplier of respondent's, had noticed high

2    oxycodone sales to three Florida pharmacies and

3    asked that CVS go out to the three pharmacies to

4    ensure that oxycodone purchases were legitimate."

5            Now, it would be completely improper and

6    absolutely violating the regulations to ask CVS to

7    monitor itself, wouldn't it?

8                    MR. PYSER:  Object to form.

9    BY MR. PAPANTONIO:

10       Q.  You would agree that it would be totally

11   improper to ask one of your customers to go out

12   and check to see if things were being done

13   right?

14                   MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.  Right?  That would be wrong, wouldn't

17   it?

18                   MR. PYSER:  Object to form.

19       A.  I would think you would want an employee

20   to visit.

21   BY MR. PAPANTONIO:

22       Q.  And the next page, the very top, it says,

23   .3, "She will further testify that respondent

24   not -- that had respondent not relied on CVS to

Highly Confidential - Subject to Further Confidentiality Review

 1    conduct their own due diligence and had CVS

 2    properly conducted due diligence, respondent and

 3    CVS would have been aware that their sales of

 4    controlled substances were being diverted to

 5    illegitimate channels."

 6              That's what Miss Carter said, right?

 7                   MR. PYSER:  Object to form.

 8         A.   That's what she said.

 9                   MR. PAPANTONIO:  Let's go and

10    introduce 4093, the declaration of Michael

11    Leonhart -- excuse me, Michele Leonhart.  Let's

12    introduce that.

13

14         (Exhibit No. 28 marked for

15    identification.)

16

17                   MS. MOORE:  This is Cardinal Reardon

18    28.

19    BY MR. PAPANTONIO:

20         Q.   Now let me ask you something.  You

21    understand what the standards of -- the industry

22    standards of how a company should conduct

23    business.  You understand what an industry

24    standard is, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   Yes.

2       Q.   And you were familiar with McKesson?  You

3   know who they are, correct?

4       A.   Yes.

5       Q.   You're familiar with McKesson?  You're

6   familiar with ABC, true?

7       A.   Correct.

8       Q.   And you were familiar with their

9   standards, correct?

10           MR. PYSER:  Object to form.

11      A.   Somewhat.

12  BY MR. PAPANTONIO:

13      Q.   Well, you were familiar with how they

14  conducted business, right?

15           MR. PYSER:  Object to form.

16           DEFENSE COUNSEL:  Object to form.

17      A.   I can't speak to their entire business,

18  how they conducted business.

19  BY MR. PAPANTONIO:

20      Q.   Well, did they use the same routines you

21  used as far as suspicious orders?

22           MR. PYSER:  Object to form.

23      A.   I believe they did use, up until 2007, the

24  ingredient limit report.  I know from a
```

```
1    presentation done by another wholesaler at a DEA

2    conference in Houston that they were developing or

3    had developed a new process.

4    BY MR. PAPANTONIO:

5        Q.   You haven't seen the depositions we took

6    of either one of those companies, have you?

7        A.   No.

8        Q.   You don't know -- you haven't seen the

9    depositions of McKesson, for sure, have you?

10                   DEFENSE COUNSEL:  Objection to form.

11       A.   No.

12   BY MR. PAPANTONIO:

13       Q.   Did you ever see the depositions we took

14   of their company where we asked them questions

15   about that?

16                   DEFENSE COUNSEL:  Objection to form.

17       A.   No.

18   BY MR. PAPANTONIO:

19       Q.   It says -- look at -- this document is

20   4093.  Look at page 13, please, .13.

21            You see right down here, so we can move

22   through this, I don't have much time, but it says

23   "I had information before me that Cardinal

24   Lakeland was improperly relying on chain
```

```
1    pharmacies to police themselves rather than

2    performing independent due diligence, despite

3    having been told that that was unacceptable."

4           And you -- my question is you would agree

5    it would be unacceptable for CVS to do its own

6    independent due diligence?  You would agree with

7    that?

8                 MR. PYSER:  Object to form.  And

9    objection, hearsay.

10       A.   No.

11   BY MR. PAPANTONIO:

12       Q.   Is that right?

13       A.   Based on what this is saying.

14       Q.   Well, let's not even say what this is

15   saying.

16           It would be improper for Cardinal to allow

17   its own customers to do their own due diligence

18   surveys, correct?

19                 MR. PYSER:  Object to form.

20       A.   You would expect that a Cardinal employee

21   would conduct the visit.

22   BY MR. PAPANTONIO:

23       Q.   Did you know that the conduct that was

24   taking place in the Lakeland area was actually
```

1    quantified as constituting an imminent danger to

2    public health and safety?

3            Had anybody ever he told you the conduct

4    of those pharmaceutical companies, those

5    pharmacies we're talking about, that the conduct

6    had actually risen to being an imminent danger to

7    the public health and safety?

8            MR. PYSER:  Object to form.

9        A.   I had not heard that.

10   BY MR. PAPANTONIO:

11       Q.   Well, now that you have, look at      page

12   18 of this affidavit that you have in front of

13   you, this declaration by Michele Leonhart.  Take a

14   look at that.  Look at page 18.

15           MR. PYSER:  Object to form, and move

16   to strike "now that you have" commentary by

17   Counsel.

18   BY MR. PYSER:

19       Q.   Do you see that page 18?

20       A.   Yes.

21       Q.   It says "Collectively, these findings led

22   me to conclude that Cardinal, Lakeland's continued

23   registration while these proceedings are pending,

24   constitutes an imminent danger to the public

```
 1    health and safety."

 2            And then you see where down there, it says

 3    "Possibility of public harm resulting from" -- you

 4    see where it says "possibility of public harm"?

 5        A.   Yes, I see that.

 6        Q.   You understand that's how they're

 7    describing the company that you're selling

 8    narcotics to is that the conduct is so bad,

 9    they're describing it as imminent danger to the

10    public health and safety?

11            Is that the first time you've seen that?

12                MR. PYSER:  Object to form.

13        A.   This?  Yes.

14    BY MR. PAPANTONIO:

15        Q.   I'm sorry.  That is the first time you saw

16    that?

17        A.   Yes.

18        Q.   I want you to go to page 35 of document

19    4085 that we've been talking about all day.

20            Do you see where it says,

21    "November 18, 2008, CareMed's owner, Roscoe Heim,

22    stated on a survey response that he used the

23    following distributors:  Cardinal, API, ExpertMed,

24    Spectrum, PCCA, Hawkins, and Masters."
```

1          It says "On March 29, Mr. Heim sent a

2    letter to respondent" -- that's Cardinal?  We're

3    still talking about Cardinal, right?

4        A.   Yes.

5        Q.   -- "sent a letter to Cardinal

6    representative Steve Morse and stated that

7    respondent Carl -- excuse me -- Cardinal and API

8    were their primary source for controlled

9    substances.  On April 15th, respondent

10   representative Chris Forst acknowledged via e-mail

11   that he was aware that CareMed had another

12   distributor, despite respondent's knowledge of the

13   other distributors.  GS Carter will testify to the

14   routine oxycodone monthly threshold statements to

15   the ESOM amounting to a 609 percent increase over

16   13 months."

17          Now, do you understand what that says?

18               MR. PYSER:  Objection.

19   BY MR. PAPANTONIO:

20       Q.   Do you understand what we just read

21   there?

22               MR. PYSER:  Object to form.

23       A.   Yes, I can see what it states.

24   BY MR. PAPANTONIO:

```
1        Q.   Tell the jury what an ESOM is.

2        A.   I don't know what an ESOM is.

3        Q.   You never heard of a -- okay, you just

4   don't know what it is.

5             So do you know that according to the ESOM,

6   which is a way that the records are kept, and

7   you've never heard of that in the 30 years or 28

8   years you've been with Cardinal, ESOM?

9        A.   I have not --

10            MR. PYSER:  Object to form.

11       A.   -- I have not heard that acronym.

12   BY MR. PAPANTONIO:

13       Q.   You never heard of electronic -- well, you

14   just haven't heard of it.  I'll just move on from

15   there.

16            MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18       Q.   609 percent of narcotics increase over 13

19   months.  That's a big number.  609 percent

20   increase of sale of narcotics over a 13-month

21   period.

22            Would that be something that you would see

23   as a suspicious order?

24       A.   It's a significant increase, would warrant
```

```
1      looking into.

2          Q.   Carl Wright -- Kyle Wright.  You're

3      friends with Kyle Wright right?  He works with

4      DEA?

5                    MR. PYSER:  Object to form.

6      BY MR. PAPANTONIO:

7          Q.   You're friends with him, aren't you?

8          A.   Not friends.

9          Q.   How do you know him?

10         A.   Just through his position at DEA.

11         Q.   Do you know he did an affidavit, he did a

12     declaration in the investigation of your company

13     that was taking place in 2012?  Did you know that

14     he was involved in that investigation?

15                   MR. PYSER:  Object to form.

16         A.   I was not.

17     BY MR. PAPANTONIO:

18         Q.   Excuse me?

19         A.   No, no.

20                   MR. PAPANTONIO:  I think we're done

21     here.

22              Let me introduce this.

23                   MS. MOORE:  This is Cardinal Reardon

24     29, and then the declaration of Ruth Carter will
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    be Cardinal Reardon 24.

 2

 3            (Exhibit No. 24 marked for

 4    identification.)

 5

 6    BY MR. PAPANTONIO:

 7       Q.   Let me be sure about something.

 8            The document we've been talking about is a

 9    2012 document, and it's a DEA investigation

10    document, right?

11            That's what we've been talking about all

12    day.  Did you know that?

13                 MR. PYSER:  Object to form.

14    BY MR. PYSER:

15       Q.   Did you know that?

16       A.   This one here?

17       Q.   The one -- 4085.  The one we've been

18    talking about all day.  What does it say on the

19    front?

20       A.   "Prehearing statement."

21       Q.   It says "In the matter of Cardinal

22    Health," right?

23       A.   Right.

24       Q.   Okay.  And you never -- none of this that
```

1   we've covered so far anybody shared with you prior

2   to coming in here today, correct?

3                MR. PYSER:  Object to form.

4        A.   Not to my recollection.

5                MR. PAPANTONIO:  All right.  Well,

6   we're going to introduce 629, and I'm going to

7   clear this out and let my partner Mike take over.

8        Let's take a quick break so he can get set

9   up.

10               MR. PYSER:  Before we go off the

11  record, the same objections to the demonstrative.

12         What exhibit number is it again?

13               MS. MOORE:  This is 29.

14               MR. PYSER:  Same objections that

15  have already been stated on the record to Exhibit

16  29.

17               THE VIDEOGRAPHER:  The time is 3:53

18  p.m.  We are off the record.

19

20               (Recess taken from 3:53 p.m.

21               to 4:10 p.m.)

22

23               THE VIDEOGRAPHER:  The time is 4:10

24  p.m., and we're on the record.

```
 1

 2                    DIRECT EXAMINATION

 3    BY MR. FULLER:

 4        Q.   Mr. Reardon, I'm Mike Fuller.  I'm going

 5    to be taking over for Mr. Papantonio for a little

 6    bit.  Okay?

 7        A.   Okay.

 8        Q.   Tell me, when did you start in the

 9    anti-diversion division at Cardinal?

10        A.   Well, I started with Cardinal in January

11    of -- June of 1988.

12        Q.   Correct.

13        A.   So at that particular point in time, I

14    worked in the Peabody distribution center.  It

15    wasn't a corporate role.

16        Q.   Okay.

17        A.   As the company grew, the role expanded and

18    we started to centralize activities, and I would

19    say we were really going full ahead on that

20    starting early '90s.

21        Q.   So what was your title again from 2005 to

22    2007?

23        A.   At the end?

24        Q.   2005 to 2007.
```

```
1      A.   Vice president quality and regulatory

2   affairs.

3      Q.   And how far back did that title go?

4      A.   I believe I got that title in 2005.

5      Q.   What was your title prior to that?

6      A.   It was a director.  I'm not sure if it was

7   QRA or director of regulatory compliance.  It

8   varied.

9      Q.   So fair to say prior to 2000, you were

10  still in QRA or regulatory, right?

11     A.   Yes.

12     Q.   And I think you testified repeatedly to

13  Mr. Papantonio that the system that was in place

14  were these indicator -- or excuse me -- ingredient

15  limit reports, correct?

16     A.   Correct.

17     Q.   And you stated that that changed the end

18  of 2007, beginning of 2008, fair?

19     A.   Yes.

20     Q.   How far back were those ingredient limit

21  reports being provided to the DEA, based on your

22  recollection?

23     A.   Roughly '94, '95.

24     Q.   And you mentioned also that you had seen
```

1    Mr. Rannazzisi's 2006 letter.

2             Can we get a copy of that.  3763.

3             No, it's not 3763, it's 4650.  I'm sorry.

4

5             (Exhibit No. 29 marked for

6    identification.)

7

8             (Exhibit No. 30 marked for

9    identification.)

10

11             MR. FULLER:  Gina, if you go to page

12    7.

13             MS. MOORE:  Exhibit Reardon 30.

14             MR. FULLER:  This is going to be

15    entered as Plaintiffs' Exhibit 30, for the record.

16    BY MR. FULLER:

17       Q.   Do you have 4650 in front of you,

18    Mr. Reardon?

19       A.   Yes.

20       Q.   And if you'll turn to page 7, I think that

21    is the September 27, 2007 letter.

22             Do you see that there?

23       A.   I have it.

24       Q.   Now, earlier you looked at the December

```
 1     2007 letter with Mr. Papantonio, correct?

 2          A.   Correct.

 3          Q.   Now let's look at this letter as well.

 4               You see it starts out much the same as the

 5     December 2007 letter did.

 6               "This letter is being sent to every

 7     commercial entity in the United States registered

 8     with the Drug Enforcement Administration, DEA, to

 9     distribute controlled substances.  The purpose of

10     this letter is to reiterate the responsibilities

11     of controlled substance distributors in view of

12     the prescription drug abuse problem our nation is

13     currently facing."

14               You agree that during 2007 we were facing

15     an opioid epidemic, right?

16                    MR. PYSER:  Object to form.

17          A.   Based on the statement here, yes.

18     BY MR. FULLER:

19          Q.   Well, not based on the statement here.

20     Based on your own knowledge.

21               You were in regulatory related to opioids

22     in 2006, correct?

23          A.   Yes.

24          Q.   You were aware of what was going on in our
```

```
 1    society and the epidemic that this country was in

 2    the middle of, weren't you?

 3         A.   I was aware that there's opioid abuse.

 4         Q.   Now let's continue.

 5              It says, in the next paragraph,

 6    "Background:  As each of you know" -- excuse me.

 7    "As each of you is undoubtedly aware, the abuse of

 8    nonmedical use of controlled prescription drugs is

 9    a serious and growing health problem in this

10    country."

11              And it cites to the National Institute on

12    Drug Abuse & Research report.

13              Do you see that there as well?

14         A.   I do.

15         Q.   Now, you do recall getting this letter and

16    reviewing this letter at the time; is that right?

17         A.   That's correct.

18         Q.   And it was during this time that you were

19    over the anti-diversion department, correct?

20         A.   That's correct.

21         Q.   Let's continue in the next paragraph.

22              "The Controlled Substances Act, or CSA,

23    was designed by Congress to combat diversion by

24    providing a closed system for drug distribution in
```

```
 1    which all legitimate handlers of controlled

 2    substances must obtain a DEA registration as a

 3    condition for maintaining their registration and

 4    must make reasonable steps to ensure their

 5    registration is not being utilized as a source of

 6    diversion."

 7            Do you see that?

 8       A.   I do.

 9       Q.   Let's go down just a little bit here where

10    it says "If the closed system is to function

11    properly as Congress envisioned, distributors must

12    be vigilant in deciding whether a perspective

13    customer can be trusted to deliver controlled

14    substances only for lawful purposes."

15            And you agree with that, correct?

16            If the closed system is going to work the

17    way it was designed, you must be vigilant as a

18    wholesale distributor, Cardinal must be vigilant

19    in the drugs it sends out?

20                MR. PYSER:  Object to form.

21       A.   It's a valid statement.

22    BY MR. FULLER:

23       Q.   Turn to the next page.  This is where

24    Rannazzisi sets out some of your obligations,
```

1    right?

2           You remember this?

3           If you go down to the third paragraph on

4    the page, he states that "Statutory factor -- the

5    statutory factors DEA must consider in deciding

6    whether to revoke a distributor's registration are

7    set forth in 21 USC 823(e)."

8           Are you familiar with that code section,

9    that rule, that safety rule?

10    A.    No.

11    Q.    "Listed among other factors that the duty

12    of the distributor is to maintain effective

13    controls against diversion of controlled

14    substances"?

15    A.    I'm familiar with the regulations.

16    Q.    And you are aware that you are required to

17    have a system that maintained effective controls

18    against diversion of controlled substances and to

19    other legitimate medical scientific and industrial

20    channels, correct?

21           MR. PYSER:  Object to form.

22    A.    I understand that we needed to design and

23    operate a system to identify and --

24    BY MR. FULLER:

```
1        Q.   Suspicious orders?

2        A.   Suspicious orders.

3        Q.   Well, those are two separate requirements,

4    are they not?

5             So here, Mr. Rannazzisi is talking about

6    21 USC 823, which is an United States code.

7    That's what USC stands for, right?

8        A.   Yes.

9        Q.   And then if you look down further on the

10   page, he's then talking about 21 CFR Code of

11   Federal Regulation 1301.74(b), which is your

12   suspicious orders requirement, isn't it?

13       A.   Correct.

14       Q.   And then what does he say in the next

15   sentence?  Read that to us.  "It bears emphasis."

16       A.    "It bears emphasis that the foregoing

17   reporting requirement is in addition to and not in

18   lieu of the general requirement under 21 USC

19   823(e) that a distributor maintain effective

20   controls against diversion."

21       Q.   So as a distributor, you take on a dual

22   requirement; isn't that right?

23                MR. PYSER:  Object to form.

24       A.   That's what it appears, based on the
```

```
 1    letter.

 2    BY MR. FULLER:

 3        Q.   And you didn't know that before today; is

 4    that right?

 5        A.   My focus was on the regulation.

 6        Q.   You were focusing on the suspicious order

 7    requirements, right?

 8        A.   Right.

 9        Q.   Okay.  So that's one part of the system,

10    correct?

11             And according to Mr. Rannazzisi the United

12    States Code enacted by Congress, the other part is

13    to maintain effective controls against diversion,

14    correct?

15             MR. PYSER:  Object to form.

16        A.   It seems to appear that way.

17    BY MR. FULLER:

18        Q.   And let's talk as a moral company.  If

19    you're going to operate a company that operates

20    with a moral basis, you're dealing with highly

21    addictive and dangerous medications, particularly

22    in Schedule IIs, are you not?

23        A.   Yes.

24        Q.   And you want to maintain effective
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    controls against diversion, don't you?

2         A.   That would make sense, yes.

3         Q.   And I mean, you want to protect the public

4    from the harm that these drugs can do.  That's why

5    we have this closed system, isn't it?

6                   MR. PYSER:  Object to form.

7         A.   We want to meet the requirements that will

8    take us in that direction.

9    BY MR. FULLER:

10        Q.   Well, do you also want to protect the

11   public from the harm that these drugs can cause?

12                  MR. PYSER:  Object.

13        A.   I think we do that by meeting the

14   requirements.

15   BY MR. FULLER:

16        Q.   So you would agree that we have two

17   separate requirements, based on Mr. Rannazzisi's

18   letter, right?

19        A.   That's what it appears to be.

20        Q.   Do you disagree with that?

21        A.   No.  I'm going by the letter that --

22        Q.   And this is a letter you read back in

23   2006?

24        A.   Yes.
```

1     Q.   And if you had any questions, you could

2     have called the DEA about it, right?

3     A.   Yes.

4     Q.   So then it then says "Thus, in addition to

5     reporting all suspicious orders, a distributor has

6     a statutory responsibility to exercise due care to

7     avoid filling suspicious orders that might be

8     diverted into other legitimate medical,

9     scientific, or industrial channels;" doesn't it?

10    A.   Yes.

11    Q.   And that's what's known as the shipping

12    requirement or not shipping requirement, isn't

13    it?

14              MR. PYSER:  Object to form.

15    A.   Well, yes.

16   BY MR. FULLER:

17    Q.   Well, let me ask you, when you say a

18    suspicious order and you have to report suspicious

19    orders, suspicious of what?  Potential diversion,

20    correct?

21    A.   Yes, it would be an order of unusual size,

22    pattern, or frequency that would make it

23    suspicious.

24    Q.   But when we're talking about suspicious,

1    what we're trying to do is prevent diversion,

2    isn't it?

3         A.   Yes.

4         Q.   So if we have an order that we've

5    determined is suspicious, we wouldn't want to give

6    it to the people we think are placing the

7    suspicious order, would we?

8                   MR. PYSER:  Object to form.

9    BY MR. FULLER:

10        Q.   That wouldn't make sense?

11        A.   No.

12        Q.   We would want to do whatever due diligence

13   we need to do to confirm that it is not a

14   suspicious order before we ship it, correct?

15                  MR. PYSER:  Object to form.

16        A.   Correct.

17   BY MR. FULLER:

18        Q.   Now, let's talk a little bit more about

19   these ingredient limit reports.  And I've heard

20   you say several times today that these ingredient

21   limit reports were approved by the DEA.

22             Tell the jury who at the DEA approved

23   these ingredient limit reports.

24        A.   I believe there's a letter out there by

```
 1    Thomas Gitchel.

 2        Q.   Thomas who?

 3        A.   Gitchel.

 4        Q.   Can you help me out with the spelling of

 5    that last name?

 6        A.   G-i-t-c-h-e-l.

 7        Q.   And when was that letter sent?

 8        A.   It was around 1990.

 9        Q.   And in 1990, you believe some letter is

10    out there that exists that says it's okay to

11    provide the ingredient limit reports?

12        A.   There was a collaboration between the DEA

13    and the trade association to develop the report.

14        Q.   You don't happen to have a copy of that

15    letter, do you?

16        A.   I do not.

17        Q.   Because any communications between the DEA

18    and Cardinal, there's been an order that that's

19    supposed to be produced to the plaintiffs, and I

20    have not seen that letter.

21        A.   I --

22              MR. PYSER:  Object to form.

23    BY MR. FULLER:

24        Q.   Might that be one of those documents that
```

```
 1     you shredded?

 2                   MR. PYSER:  Object to form.

 3     Argumentative.

 4         A.   No, I wouldn't -- no.

 5     BY MR. FULLER:

 6         Q.   You wouldn't have shredded that one?

 7         A.   No.

 8         Q.   Just other documents?

 9                   MR. PYSER:  Object to form.

10     BY MR. FULLER:

11         Q.   Right?

12                   MR. PYSER:  Object to form.

13         A.   Other documents that required shredding.

14                   MR. FULLER:  Sure.  So these

15     ingredient limit reports -- let me see 3756.

16     That's a big one.

17             This is going to be Plaintiffs' Exhibit

18     31.

19

20             (Exhibit No. 31 marked for

21     identification.)

22

23     BY MR. FULLER:

24         Q.   Have you seen this type of document
```

1    before?  It appears to be an ingredient limit

2    report, correct?

3        A.   Not in this format, but yes.

4        Q.   It is an ingredient limit report?

5        A.   Yes.

6        Q.   And this is something Cardinal kept in the

7    normal course of business; is that right?

8        A.   Yes.

9        Q.   And I'll represent to you that Cardinal's

10   produced this to the plaintiffs in this case,

11   amongst other ingredient limit reports, some of

12   them going back to 2005.  We should have, at least

13   according to your testimony, ingredient limit

14   reports going back prior to that; is that right?

15              MR. PYSER:  Object to form.  You can

16   testify about what you should have.

17       A.   It was implemented '94, '95.

18   BY MR. FULLER:

19       Q.   So you believe ingredient limit reports

20   started being created by Cardinal in 1994 or '95.

21   Correct?

22       A.   Correct.

23       Q.   And it's your understanding that these

24   documents were provided to the DEA; isn't that

```
 1    true?

 2        A.   Correct, on a monthly basis.

 3        Q.   And it's also your testimony that this

 4    document, this 535-page document, if I can get my

 5    copy.

 6

 7             (Brief pause in proceedings.)

 8

 9                  MR. FULLER:  You stay right there.

10                  MR. PYSER:  Move to strike.

11

12        (Brief pause in proceedings.)

13

14    BY MR. FULLER:

15        Q.   These, again, were kept in the normal

16    course of business at Cardinal and provided to the

17    DEA; is that correct?

18        A.   Correct.

19        Q.   And this is 535 pages of suspicious

20    orders; isn't that true?

21        A.   I haven't counted the pages, but...

22        Q.   If you go to the last page, I think it

23    will tell you what it was.

24                  MR. PYSER:  I'm going to object to
```

1    the claims and the length of this.  The way it's

2    presented has added significantly to the page

3    number.

4                    MR. FULLER:  This is the way it was

5    produced.

6        A.   Not the format that it typically comes

7    in.

8    BY MR. FULLER:

9        Q.   Fair enough.  You may see it in a

10   different format?

11       A.   Yes.

12       Q.   But this document is inclusive of, at

13   least out of the Wheeling distribution center,

14   right you see that at the top?

15       A.   Yes.

16       Q.   Out of the Wheeling distribution center

17   for July of 2007, if this report was run

18   accurately and produced to us in the format that

19   Cardinal kept it in, this would be how many ever

20   pages are here, I'm saying there's 535, whatever

21   the page count is, this is all suspicious orders,

22   right?

23       A.   Based on the criteria that the DEA agreed

24   to.

1      Q.   Based on whatever.  These are all

2   suspicious orders under your CFR reporting

3   requirement, correct?

4      A.   Correct.

5      Q.   And Cardinal shipped all these orders out

6   into our communities across the country, didn't

7   they?

8            MR. PYSER:  Object to form.

9      A.   It may have been some that were caught at

10   the distribution center and investigated.

11   BY MR. FULLER:

12      Q.   Well, this report isn't generated until

13   the end of the month, right?

14      A.   But it's a two-step process.

15      Q.   I understand, but just listen to my

16   question.

17         This report isn't generated until the end

18   of month, correct?

19      A.   Correct.

20      Q.   And any shipments that have gone, have

21   long gone out because it's usually 24-hour

22   turnaround, correct?

23      A.   Correct.

24      Q.   So if you look, there's, actually, I

1    think, a run date of August 5, 2007 on here,

2    right?

3        A.   Yes.

4        Q.   So these orders were gone by the time this

5    report was printed.  You agree?

6        A.   Correct.

7        Q.   We'll come back to that document in just a

8    minute, but you're talking about the second part

9    of this process.

10           The second part of this process is for

11   pickers and checkers to pick up on excessive

12   orders in the distribution centers; is that true?

13       A.   Correct.

14       Q.   And pickers and checkers are the people

15   filling the orders at the distribution facilities,

16   right?

17       A.   Correct.

18       Q.   And if a picker and checker finds an order

19   that exceeds some sort of internal limit, then

20   they are to pull that order and report that

21   specific order as suspicious; isn't that right?

22       A.   They're required to -- not necessarily a

23   limit.  If something they see based on their

24   experience with the customer or other customers,

1    they can pull the order and do further

2    investigation and contact the DEA.

3        Q.   And how long was this system in place,

4    these ingredient limit reports and the picker and

5    checkers?  That system was in place from back in

6    the '90s?

7        A.   Early '90s until --

8        Q.   About 2007, right?

9        A.   Correct.  However, the order-filler

10   process at least still existed when I retired.

11       Q.   And when you mean the order-filler

12   process, you're talking about the pickers and

13   checkers?

14       A.   Correct.

15              MR. FULLER:  So let's go to 4924.

16   This is going to be plaintiffs' exhibit -- I'm

17   sorry, did I say for the record, Plaintiffs'

18   Exhibit 31 is going to be P-3756.

19           Plaintiffs' Exhibit 32 is going to be

20   4924.

21

22            (Exhibit No. 32 marked for

23   identification.)

24

1    BY MR. FULLER:

2        Q.   Now, this is a manual that Mr. Brantley

3    was just shown the other day when he was being

4    deposed.  And let's go to page 144.

5            144 is required reports to DEA, correct?

6        A.   Correct.

7        Q.   And that's the system you were talking

8    about, isn't it?

9        A.   It would fall under this section.

10       Q.   If you turn to page 146, you see halfway

11   down the page, three-quarters down the page,

12   "Suspicious orders"?

13       A.   Yes.

14       Q.   Now, suspicious orders, this requirement

15   is fulfilling our Code of Federal Regulations

16   1301.74(b), correct?

17       A.   Correct.

18       Q.   We also have the obligation under the US

19   Code to have an adequate system to prevent

20   diversion as well, right?

21       A.   Correct.

22       Q.   Okay.  So this is filling part of our

23   obligation.

24            And if you look there, "Establishing

```
 1    suspicious orders criteria."  Do you see that?

 2         A.   Yes.

 3         Q.   And the first sentence says "Wholesaler

 4    should establish a written criteria of what

 5    constitutes a suspicious order."

 6              Did I read that correctly?

 7         A.   Yes.

 8         Q.   So where is the written criteria for

 9    suspicious orders that Cardinal had?

10         A.   The criteria is part of the ingredient

11    limit report and the document that goes with it.

12         Q.   I want to know the written criteria.

13    Where is the written criteria?

14         A.   Yes, written criteria, there's a document

15    that has the written criteria that the trade

16    association and the DEA agreed to.

17         Q.   Turn to page 271 of the same document.

18    You can look on the big screen or you can try to

19    find that page, either way, Mr. Reardon.

20              Is that the document you're referring to?

21         A.   No.

22         Q.   What other document are you referring; to?

23    Do you know?

24         A.   Again, it was a document that the trade
```

```
 1    association had.

 2         Q.   The HDMA?

 3         A.   Yes, it was NWDA at the time.

 4         Q.   NWDA.  And how do you know -- strike that.

 5              All right.  This is in this manual,

 6    obviously?

 7         A.   Yes.

 8         Q.   It has a suspicious order reporting system

 9    of 1998.  Do you see that?

10         A.   Yes.

11         Q.   Have you seen this document before?

12         A.   Yes.

13         Q.   Is it your understanding, is that how the

14    limit amounts were created in the audit -- or

15    excuse me -- the ingredient limit reports?

16                   MR. PYSER:  Object to form.

17         A.   Not the ingredient limit reports.

18    BY MR. FULLER:

19         Q.   What was this used for?  Do you know?

20         A.   I believe this was used for List 1

21    chemicals.

22         Q.   So this applies only to List 1 chemicals

23    is your understanding?

24         A.   Yes.
```

1    Q.   And, therefore, not controlled substances,

2    unless they include list 1 chemicals, right?

3    A.   Yes.

4    Q.   All right.  Great.  If you turn to page

5    266 in this document.  266, "Excess Purchase,

6    Schedule II."

7         Do you see that?

8    A.   Yes.

9    Q.   This is the system we were talking about

10   earlier with pickers and checkers, right?

11   A.   Yes.

12   Q.   So if we have pickers and checkers, if you

13   look down there near the bottom, we have three

14   categories of oxycodone.

15        Do you see that?

16   A.   Yes.

17   Q.   And we have limits.  We have -- it applies

18   to all strengths, correct?

19   A.   Correct.

20   Q.   We have hospital limits, then we have

21   retail limits.  Right?

22   A.   Right.

23   Q.   And the retail limits apply to both chain

24   and nonchain pharmacies, don't they?

1      A.   Yes.

2      Q.   And then based on the policy and procedure

3   we were looking at earlier -- again, going back to

4   page -- now it's on page 147 -- this is the second

5   part of the system you were describing earlier,

6   correct?

7      A.   Correct.

8      Q.   And it says "Second, on a daily basis,

9   cage-involved personnel should be policing and

10  identifying individual orders that appear

11  excessive."

12         Do you see that?

13     A.   Yes.

14     Q.   "Policing and identifying."

15         Do you know if these persons that were

16  hired to police on behalf of Cardinal had any DEA

17  background?

18              MR. PYSER:  Object to form.

19     A.   They went through training.

20  BY MR. FULLER:

21     Q.   What kind of training did they go through?

22     A.   Controlled substance training.  This is

23  actually a training manual that we're looking at.

24     Q.   And this trained them how to pick and

1    check?

2                    MR. PYSER:  Object to form.

3        A.  Oh, no, no, no, no.  No.  They were

4    trained through the ops teams how to pick, pack,

5    and ship.

6    BY MR. FULLER:

7        Q.  And pick, packing, and shipping -- they

8    have to know what they're picking before they can

9    point out an excessive order, right, because if

10   they don't know what substance they're picking,

11   then it doesn't do them any good, does it?

12                   MR. PYSER:  Object to form.

13       A.  Correct.

14   BY MR. FULLER:

15       Q.  And if you had a distribution center

16   director of operations that didn't care if his

17   pickers and checkers knew what they were picking

18   and checking, you would agree that that's not an

19   appropriate system to satisfy this part of the

20   regulatory requirement, right?

21                   MR. PYSER:  Object to form.  Vague

22   as to time.

23       A.  Yeah, I don't -- I don't know what kind of

24   system you're describing.  I'm not familiar with

1    something like that.

2    BY MR. FULLER:

3        Q.   What do you mean you're not familiar with

4    something like that?  Let me ask it differently.

5        A.   I mean a system where --

6        Q.   Let me ask it differently.

7             If someone testified that pickers and

8    checkers pick by location, based on SKUs, instead

9    of actually knowing a product, that would sort of

10   defeat the purpose of them knowing what they're

11   picking to be able to set out the numbers on the

12   excessive purchase report, right?

13                  MR. PYSER:  Object to form.  Vague

14   as to time.

15       A.   Based on my understanding when I was

16   there, that was the process in the general

17   warehouse.

18   BY MR. FULLER:

19       Q.   Right.  But my question --

20       A.   But not the cage or the vault.

21       Q.   Okay.  You believe they only pick by

22   location or SKU throughout the rest of the

23   warehouse, not dealing with controls?

24                  MR. PYSER:  Object to form.  Vague

```
1    as to time.

2        A.   It was a different process.

3    BY MR. FULLER:

4        Q.   For controls?

5        A.   For controls.

6             MR. PYSER:  Object to form.

7    BY MR. FULLER:

8        Q.   If you learned that it was not a different

9    process and they still only picked by location and

10   not by particular substance, even in the vault,

11   that would cause you concern as the one overseeing

12   that regulatory obligation, right?

13            MR. PYSER:  Object to form.  Vague

14   as to time.

15       A.   It would depend if they had the

16   appropriate quality control process in place,

17   where every order picked in the cage or vault gets

18   double-checked.

19   BY MR. FULLER:

20       Q.   Well, let's look at what's supposed to

21   happen.

22            It says, if the -- on the second, on a

23   daily basis, we have the individuals policing and

24   identifying individual orders that appear
```

1    excessive in relation to what other customers are

2    buying and/or customers are -- excuse me -- and/or

3    customer's purchase history.  In these situations,

4    the DEA should be notified.

5            So if we have an excessive order that's

6    picked up on, they exceed one of these parameters

7    in our sheet or they just think it's excessive, we

8    have to notify the DEA, according to our own

9    policies and procedures, correct?

10            MR. PYSER:  Object to form.

11       A.   After investigating to see if they believe

12    the order is legitimate.

13   BY MR. FULLER:

14       Q.   Where does it say "after investigating"?

15            Does it say "after investigating" on this

16    policy?  And if it does, you tell me.

17       A.   (Witness reviews document.)

18            I don't see it.

19       Q.   It doesn't, does it?

20       A.   No.

21       Q.   It says "In these situations where we have

22    an excessive -- identified an excessive order, the

23    DEA should be notified, if possible before the

24    order is shipped," right?

```
 1                    MR. PYSER:  Object to form.

 2        A.   Yes.

 3   BY MR. FULLER:

 4        Q.   That's what Cardinal says is its

 5   obligation in trying to comply with the

 6   regulations, right?

 7        A.   It's what it states.

 8        Q.   You don't disagree with that, do you?

 9        A.   I can't disagree with what it states.

10        Q.   It's a policy and procedure of the

11   company, isn't it?  You agree with that,

12   correct?

13        A.   Correct.

14        Q.   And they should be held to comply with

15   their own policies and procedures, shouldn't they?

16        A.   Yes.

17        Q.   Then it goes on to say that "And a copy of

18   such order should be maintained in the division's"

19   -- meaning whatever distribution center, right?

20        A.   Yes.

21        Q.   -- "the division's suspicious order file,

22   along with a regulatory agency contact form, see

23   Form No. 1, notifying of any specific instructions

24   from the DEA."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Did I read that correctly?

 2      A.   Yes.

 3      Q.   So not only are we providing it to the

 4  DEA, but we should be able to go to that

 5  distribution center and find all these suspicious

 6  order forms, whatever the form is, correct?

 7                 MR. PYSER:  Object to form.

 8      A.   Correct, they should be on file.

 9  BY MR. FULLER:

10      Q.   So, for example, and to save you -- let me

11  ask you first, the ingredient limit reports, do

12  you know how the ingredient limit was determined?

13      A.   I don't know specifically.  I do know that

14  it was based on family of drugs.

15      Q.   Right.

16      A.   Assigned a certain base code for all those

17  drugs, and they were looked at cumulatively.

18      Q.   It was based on the quantity of the active

19  ingredient, correct?

20      A.   Correct.

21      Q.   Not dosage units or not pills?

22      A.   Correct.

23      Q.   And then there's also a multiplier in

24  there, isn't there?
```

```
 1        A.    There is a multiplier.

 2        Q.    And if you look at 3556 and you turn to

 3    page 18.

 4        A.    Did you say 3756?

 5        Q.    Yes, sir.  That big monster.  Yes, sir.

 6              MR. PYSER:  Object to form.

 7    BY MR. FULLER:

 8        Q.    If you just want to look at the top and go

 9    to 18.

10        A.    Got it.

11        Q.    Do you see there -- is there an indicator

12    of a -- so this is an ingredient limit report for

13    non-ARCOS reports.

14              Do you see the factor used section?

15        A.    Yes.

16        Q.    That's the multiplier that's used,

17    correct?

18        A.    Yes.

19        Q.    And for non-ARCOS reportables, it's eight.

20    Is that what it indicates?

21        A.    Yes.

22        Q.    Do you know what it was for reportables?

23        A.    Two or three.  I can't remember

24    specifically.
```

```
 1        Q.   Would it surprise you if it was four?

 2               MR. PYSER:  Object to form.

 3        A.   That doesn't sound --

 4   BY MR. FULLER:

 5        Q.   Doesn't sound right?

 6        A.   It doesn't -- it's not what I recall.  It

 7   was the factors given to the program by the DEA.

 8        Q.   Well, if we look back at that report we

 9   went to, it gives the factors of three for C-IIs

10   and IIIs and eight for noncontrols, right?

11        A.   Correct.

12        Q.   So we know there's a factor.  So basically

13   what the limit is that's set is an average, and

14   then we multiply it by whatever the factor is,

15   correct?

16        A.   That's my understanding of how it works.

17        Q.   Okay.  So everything that is listed in

18   this report exceeded that limit?

19               MR. PYSER:  Object to form.

20   BY MR. FULLER:

21        Q.   Correct?

22               MR. PYSER:  Object to form.

23   Misstates evidence.

24        A.   Correct.
```

```
1    BY MR. FULLER:

2        Q.   So -- and we can roll through the report,

3    but let's see if my understanding is right.

4            So whatever pharmacies are listed and

5    whatever drug base codes are separated into, it

6    will give us a calculation, list all the orders,

7    right, for the month?

8        A.   Right, right.

9        Q.   And at the bottom, it gives us what the

10   customer ordered and what the limit was, correct?

11       A.   Correct.

12       Q.   And the only way you make it into this

13   report is if you exceed the limit?

14       A.   Correct.

15       Q.   Okay.  So I went through this report and

16   pulled some examples.

17               MR. FULLER:  Let's go to the -- IGL

18   report, PowerPoint.  Bring up the first one for

19   me.

20   BY MR. FULLER:

21       Q.   According to this report, we have -- I'll

22   tell you not just July but October, December, as

23   well as some others for the Wheeling distribution

24   center.  I want you to assume my numbers are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    accurate.

 2          So we have -- and ignore the LECO number.

 3    That's just the Bates number for counsel, okay.

 4    That's the Bates stamps that Mr. Papantonio was

 5    talking to you about.

 6       A.   Okay.

 7       Q.   So this is Ohio CVS store, LLC, 322.  I'll

 8    represent it's a store in Cleveland, Ohio, where

 9    our track one cases are, cases that we're getting

10    ready for trial on, okay?

11       A.   Uh-huh.

12       Q.   And if you look there, we have

13    hydrocodone -- or excuse me, oxycodone

14    hydrochloride limit.  And it gives limits for the

15    different months and you see that they're

16    increasing through that time frame, right?  And

17    that's the active ingredient limit, right not the

18    pill count, correct?

19       A.   Correct.

20       Q.   And then we see the oxycodone -- excuse

21    me.  Yes, the oxycodone totals for those

22    respective months that we pulled out of the

23    reports, 361, 483, 600 -- excuse me, 461, right?

24               MR. PYSER:  Object to form.  At
```

```
 1     least, Mike, on the first one, that Bates number

 2     is not right.  If you can point me in the right

 3     direction, I'd appreciate it.

 4                    MR. FULLER:  What do you mean be

 5     Bates number's not right?

 6                    MR. PYSER:  1120515, unless I'm

 7     misreading it, which is possible, it's not the CVS

 8     store you have up there.

 9                    MR. FULLER:  No.  Isn't it the first

10     document on that document?

11                    MR. PYSER:  It's the first page.

12                    MR. FULLER:  That's it.  I'm just

13     giving you the first page of document.

14                    MR. PYSER:  Not showing where that

15     store is somewhere in this document?

16                    MR. FULLER:  No, sir.  No, sir.

17                    MR. PYSER:  Object to that process

18     if you're not going to provide the Bates number

19     you're reading.

20     BY MR. FULLER:

21        Q.   So the first one exceeded it by 210

22     percent.  The second one exceeded it by 226

23     percent.  The third one exceeded it by 178

24     percent.  That's quite a bit over the limit,
```

1    right?

2                    MR. PYSER:  Object to form.

3    BY MR. FULLER:

4        Q.   We can agree on that?

5        A.   Significant percentage.

6        Q.   Now, this isn't just a limit that is at

7    the average.  This is the average and then times

8    by a multiplier, correct?

9                    MR. PYSER:  Object to form.

10       A.   Correct.

11   BY MR. FULLER:

12       Q.   So we're not looking at the average.

13   We're looking at three or four, whatever the

14   factor is, standard deviations above the average,

15   and then they're still exceeding it by 200

16   percent.  Would that cause any concern to you as a

17   regulator?

18                   MR. PYSER:  Object to form.

19       A.   I can only speak to the report and the

20   report was developed and approved by the DEA.  I

21   didn't determine the factors.

22   BY MR. FULLER:

23       Q.   I'm not saying you did, okay.  But the

24   factors keep changing.  As far as the

```
1    hydrochloride limit, those numbers are changing,

2    right --

3         A.   Yes.

4         Q.   -- at least according to the PowerPoint,

5    correct?

6         A.   Yes.

7         Q.   Okay.  But the fact that you have a

8    limiter that's a multiple of the average and then

9    you have customers exceeding it by 200 percent,

10   that doesn't cause you some concern as a

11   regulator --

12             MR. PYSER:  Object to form.

13   BY MR. FULLER:

14        Q.   -- at least, hey, why are we exceeding it

15   by 200 percent, right?

16             MR. PYSER:  Object to form.

17        A.   Makes sense.

18   BY MR. FULLER:

19        Q.   And certainly, like you mentioned earlier,

20   you can go do some due diligence, but you would

21   want to see that due diligence documented to

22   justify why we're still shipping such an excessive

23   number to these particularly this pharmacy,

24   correct?
```

```
 1        A.    Correct.

 2        Q.    Okay.  So let's go to the next one.

 3    Overholt's Champion Pharmacy in Warren.  I'll tell

 4    you Warren is just outside of Cuyahoga and Summit

 5    County.  It's not in Cuyahoga and Summit County,

 6    but this pharmacy -- again, we see the same

 7    limiters because we're dealing with the same

 8    months, and then we see the number of opium that

 9    they've ordered, correct?

10        A.    Yes.

11              MR. PYSER:  Object to form.

12    BY MR. FULLER:

13        Q.    855, 930, 769.  Then let's go to the next

14    column, which is 635 percent for the first one in

15    July.  The next one is 528 percent, and then 363

16    percent, over the multiplied average.

17              Let's go to the final one.  This one, New

18    Choice Pharmacy, Cuyahoga Falls.  This is in

19    Summit County, okay.  Again, we see the same

20    limiter amounts because we're looking at the same

21    months, 786, 1,089, 1,254.  And the percentage

22    overages are 576 for the first one in July, then

23    in October we're at 635 percent, then finally 655

24    percent in December.
```

```
 1              Did you know that you were over the

 2     limit -- Cardinal was shipping over the limiters

 3     by that type of an amount when this was going on?

 4     Because this was your time frame, right, still

 5     2007, correct?

 6                  MR. PYSER:  Object to form.

 7        A.   The end, yes.

 8     BY MR. FULLER:

 9        Q.   But at the end of your time?

10        A.   Yes.

11        Q.   The change didn't actually occur until the

12     very end of 2007, correct?

13        A.   Correct.

14        Q.   Okay.  So maybe December is not, but

15     certainly July would be.

16              Did anybody bring these type of issues to

17     your attention?

18                  MR. PYSER:  Object to form.

19        A.   No, but people were reviewing the reports.

20     BY MR. FULLER:

21        Q.   Right.  And we talked to Mr. Brantley.  He

22     was one of reviewers, right?

23        A.   Correct.

24        Q.   And he testified the same as you, that
```

1    these were all constituted of suspicious orders,

2    but we believed our obligation was just to send in

3    the orders, right?

4        A.   Based on the letter from the DEA.

5        Q.   From, according to you, 1990?

6        A.   In that time frame.

7        Q.   Okay.  Now, maybe that satisfies our

8    suspicious orders requirement, correct?  That's

9    the Code of Federal Regulations, 130 whatever?

10       A.   Correct.

11       Q.   But as you recognized when you looked at

12   the Rannazzisi letter, we have the 21 USC 7823

13   requirement as well, don't we?

14              MR. PYSER:  Object to form.

15       A.   Yes.

16   BY MR. FULLER:

17       Q.   And according to that, again,

18   Mr. Rannazzisi told all of you back in 2006 it

19   bears emphasis that the foregoing reporting

20   requirement is in addition to and not in lieu of

21   the general requirement under 21 USC 823(e), that

22   a distributor must maintain effective controls

23   against diversion, right?

24              MR. PYSER:  Object to form.

1      A.   Right.

2    BY MR. FULLER:

3      Q.   Two separate requirements.  This is

4    satisfying the reporting, at least according to

5    what you've testified to.  But sending 600 percent

6    above what our limit is isn't meeting our

7    requirement under effective controls against

8    diversion, is it?

9              MR. PYSER:  Object to form.  Calls

10   for legal conclusion.

11     A.   Well, we --

12   BY MR. FULLER:

13     Q.   Strike that the question.  Let me ask you

14   differently.

15          You've already testified earlier that if

16   we're maintaining effective controls against

17   diversion, we're not just going to ship suspicious

18   orders, because suspicious orders are orders that

19   we have a concern that may be diverted, whether

20   it's based on size, pattern or frequency, correct?

21              MR. PYSER:  Object to form.

22     A.   Correct.  And we did that with our

23   employees.

24   BY MR. FULLER:

```
 1        Q.   You -- you've explained that process.  And

 2   if we're shipping suspicious orders, we need to do

 3   some sort of due diligence to make sure that it's

 4   okay still to ship them?

 5                MR. PYSER:  Object to form.

 6   BY MR. FULLER:

 7        Q.   Right?

 8                MR. PYSER:  Object to form.  Calls

 9   for legal conclusion.

10        A.   That's what the review of the report did.

11   BY MR. FULLER:

12        Q.   Well, let's talk about that because we're

13   not reviewing the report until the pills have

14   already gone, correct?

15        A.   Correct.

16        Q.   So Mr. Papantonio has shown you earlier

17   the amount, that the tens, if not hundreds of

18   thousands, of pills that were being ordered by

19   some of these pharmacies every month.

20             But by the time we're reviewing the

21   report, those pills are already gone and out on

22   the street, aren't they?

23                MR. PYSER:  Object to form.

24        A.   Correct.
```

```
 1   BY MR. FULLER:

 2       Q.   It's not an effective system to prevent

 3   diversion if we've already sent out the pills, and

 4   then we're reviewing the report, is it?

 5                MR. PYSER:  Object to form.

 6       A.   It could be suspect; we could prevent it.

 7   BY MR. FULLER:

 8       Q.   You would agree, right, that if we're

 9   having concerns about a pharmacy, we need to

10   justify those concerns so it's safe to send those

11   pills before we send them, correct?

12                MR. PYSER:  Object to form.  Calls

13   for speculation.

14       A.   Again, that's what we did for the process

15   with our employees.

16   BY MR. FULLER:

17       Q.   We're relying on pickers and checkers?

18       A.   That was the second step of the process.

19                MR. FULLER:  And so that PowerPoint

20   is going to be Plaintiffs' Exhibit No. 33 for the

21   record.

22

23                (Exhibit No. 33 marked for

24   identification.)
```

1

2          MR. FULLER:  I'll just attach that.

3

4    BY MR. FULLER:

5        Q.   So what I also did, Mr. Reardon, is I took

6    the ingredient limit report and I went through it

7    based on what you've testified earlier is

8    excessive purchase Schedule II, all right.

9            And you see down there at the bottom, the

10   different types of oxys.  It's either 1,200

11   tablets, 500 tablets or 600 tablets, which is the

12   limit?

13       A.   Yes.

14       Q.   And according to the company's own

15   policies and procedures, according to Cardinal's

16   policies and procedures, if we exceed those limits

17   on a single order, we need to try to notify the

18   DEA before it's shipped, correct?

19           MR. PYSER:  Object to form.

20       A.   Correct.

21   BY MR. FULLER:

22       Q.   We need to report it as a suspicious

23   order, right?

24           MR. PYSER:  Object to form.

```
 1      A.   If warranted.

 2  BY MR. FULLER:

 3      Q.   Well, again, let's look at the policy and

 4  procedure.  Does the policy and procedure say "if

 5  warranted"?  You show me in that -- that's Page

 6  147.  Let's go back to that.  Does it say in there

 7  "if warranted"?

 8      A.   (Witness reviews document.)

 9           It does not.

10      Q.   Okay.  So we should reporting it, correct,

11  as a suspicious order if they exceed these

12  limits?

13           MR. PYSER:  Object to form.

14  BY MR. FULLER:

15      Q.   Right?

16      A.   Based on what's written.

17      Q.   And we should also be sticking a copy of

18  the suspicious order report, as well as the

19  communication form with the DEA, in our suspicious

20  order file that's maintained at the distribution

21  center, correct?

22      A.   That's what the policy requires.

23      Q.   And that's the policy you were trying to

24  enforce at Cardinal, right?
```

```
 1        A.   Correct.

 2        Q.   When you were over and you saw all those

 3   distribution centers that you oversaw across the

 4   entire country -- and let's be clear.  This is a

 5   systemic approach, right?  And by that, I mean

 6   you're applying the same systems to the entire

 7   country from Washington state all the way down to

 8   Florida, correct?

 9        A.   It was the same system.

10        Q.   And you expected it to be implemented the

11   same way in all your distribution centers; is that

12   fair?

13        A.   That's fair.

14        Q.   And you were trying to ensure that

15   everybody was trained on the system and that it

16   was being operated in the same form or fashion,

17   whether it was in Lakeland, Florida, Wheeling,

18   West Virginia, or -- I think it's Valencia,

19   California, right?

20        A.   Correct.

21             MR. PYSER:  Counsel, let's take a

22   little break.  We've been going about an hour.

23   It's getting late in the day.

24             THE VIDEOGRAPHER:  The time is 4:55
```

```
 1    p.m. and we're off the record.

 2

 3              (Recess taken from 4:55 p.m. to 5:07 p.m.)

 4

 5                    THE VIDEOGRAPHER:  The time is 5:07

 6    p.m.  We're on the record.

 7    BY MR. FULLER:

 8         Q.   All right.  Mr. Reardon -- oh, yes, I

 9    know.  I turned those a certain way.

10         A.   I got it.

11         Q.   I think that's Page 33 or 34?

12         A.   Yes, 33.

13         Q.   And if you look halfway down that page --

14    so this is 3756.

15              If you go to Page 33.  So I believe this

16    is actually a control section, is that right, for

17    ARCOS report and ingredient limit report?

18              Do you see that?

19         A.   Yes.

20         Q.   What's the factor when dealing with

21    controls used in the ingredient limit report from

22    2007 July?

23         A.   Looks like it's for hospitals and managed

24    care and the factor is four.  The report breaks it
```

```
 1    out by --

 2         Q.   It does, but the retail section is just

 3    the same?

 4                   MR. PYSER:  Object to form.

 5                   MR. FULLER:  All right.  So for the

 6    record, I'm going to also enter 3827 as Exhibit

 7    34.  And 3828 as Exhibit 35.

 8

 9              (Exhibit No. 34 marked for

10    identification.)

11

12              (Exhibit No. 35 marked for

13    identification.)

14

15    BY MR. FULLER:

16         Q.   And Exhibit 34, if you look at that,

17    Mr. Reardon, is October of 2007, the ingredient

18    limit report; is that right?

19         A.   Yes.

20         Q.   And Exhibit 35 is December of 2007; is

21    that correct?

22         A.   Yes.

23         Q.   And these are both, again, documents that

24    Cardinal keeps in the normal course of business.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Is that your understanding?

 2         A.   Yes.

 3         Q.   And these are documents that you and your

 4    staff relied on to do your due diligence or your

 5    regulatory function at Cardinal Health?

 6         A.   Correct.

 7         Q.   Is this the type of documents or the

 8    actual documents or the form of documents that

 9    would have been reviewed by Eric Brantley and his

10    team and also submitted to the DEA during this

11    time frame?

12         A.   Correct.

13         Q.   And you can put them aside.  I'm not going

14    to do anything with them.  I just wanted to get

15    them entered for the record.

16              Now, you know Mr. Brantley -- when

17    Cardinal was getting investigated by the DEA and

18    getting busted the first time in late 2007, early

19    2008, they actually hired Dendrite -- Dendrite to

20    do some work for them related to the suspicious

21    order monitoring systems; is that correct?

22              MR. PYSER:  Object to form.

23         A.   Correct.

24              MR. FULLER:  Okay.  So 3825 is going
```

```
 1    to be plaintiff's Exhibit No. 36.

 2

 3              (Exhibit No. 36 marked for

 4    identification.)

 5

 6    BY MR. FULLER:

 7        Q.    And if you take a look at that, this is an

 8    e-mail from a Paul Hamby; is that right?

 9        A.    Familiar.

10        Q.    You are familiar or not familiar?

11        A.    The name is familiar.

12        Q.    And this is December 15 of 2007.  And for

13    some reason he's e-mailing you at 3:46 am.

14              Do you see that?

15                  MR. PYSER:  Object to form.

16        A.    Yes.

17    BY MR. FULLER:

18        Q.    And you are also listed on this e-mail,

19    aren't you?

20        A.    Yes.

21        Q.    If you look on the screen, it's

22    highlighted.  It may make it a little easier.

23        A.    Uh-huh.

24        Q.    Now, this is Cegedim Dendrite SOM review,
```

1    correct?

2        A.   Correct.

3        Q.   If you look down in the body of the

4    e-mail, it actually talks about -- and you're

5    aware that Cegedim Dendrite was hired to do a

6    review of the Cardinal system; isn't that right?

7        A.   A review of --

8        Q.   Suspicious order monitoring systems.  So

9    let's go through --

10       A.   Right.

11       Q.   -- the e-mail.

12            It says "Suspicious order monitoring

13   review and consulting prevalidation."

14            Do you see that?

15       A.   Correct.

16       Q.   So this is, again, Cegedim Dendrite being

17   hired by Cardinal to do a review of their system.

18   Do you recall that?

19       A.   I recall Dendrite being on-site, but this

20   would have been after my time with anti-diversion.

21       Q.   Well, this was still sent to you, right?

22       A.   Agreed.

23       Q.   And Mr. Hartman testified that while there

24   was two subcategories, your category and

 1    Mr. Mone's, that everybody sort of worked together

 2    too; is that not true?

 3                    MR. PYSER:  Object to form.

 4        A.   I would have been in some of the

 5    discussions, I believe.

 6    BY MR. FULLER:

 7        Q.   I mean, listen.  You have institutional

 8    knowledge of Cardinal going back to 1988, right?

 9        A.   Right.

10        Q.   Why wouldn't they involve you in revamping

11    this process to fix any leaks that it may have

12    had.  I would make sense, would it not?

13                    MR. PYSER:  Object to form.

14        A.   Yes, I would -- I remember them being

15    there.

16    BY MR. FULLER:

17        Q.   So were you involved or did they cut you

18    out completely?

19                    MR. PYSER:  Object to form.

20        A.   I was involved in some discussions with

21    Dendrite.

22    BY MR. FULLER:

23        Q.   Okay.  So it says there, at the first

24    bullet point, "On-site review of Cardinal's

```
 1    suspicious order monitoring program system,

 2    including verification of the system's operational

 3    effectiveness, system integrity and regulatory

 4    stability."

 5            Do you see that?

 6    A.   Yes.

 7    Q.   And then "Review of Cardinal's suspicious

 8    order monitoring SOPs that describe its SOM," and

 9    then "Recommendations and findings related to

10    Cardinal SOM systems."

11            Do you see that?

12    A.   Yes.

13    Q.   So did you get a copy of the report that

14    Cegedim Dendrite did related to this evaluation?

15    A.   I don't recall getting it.

16    Q.   Do you know who may have gotten it?

17            MR. PYSER:  Object to form.

18    A.   May have gotten it?

19    BY MR. FULLER:

20    Q.   Who should have gotten it, Mr. Mone?

21            MR. PYSER:  Object to form.

22    Speculation.

23    A.   Possibly, it would have been Mone.

24    BY MR. FULLER:
```

```
 1        Q.   He took over that part of your role.  Is

 2   that what you had testified to earlier?

 3        A.   Yes.

 4        Q.   And during the time that you were

 5   overseeing the whole regulatory division -- I

 6   think you testified repeatedly to Mr. Papantonio

 7   about the number of employees -- you tried to push

 8   for more employees, didn't you?

 9             You tried to push for more financial

10   support, more budgetary support, because you felt

11   what you were given was not enough to get the job

12   done right, didn't you?

13        A.   It's needing additional resources based on

14   the direction we wanted to go in, and I requested

15   additional head count.

16        Q.   Well, the direction we wanted to go in is

17   to do a good job monitoring for suspicious orders

18   and preventing any potential diversion.  That's

19   the direction you wanted to go in, right?

20        A.   Correct.

21        Q.   When you asked for additional resources to

22   go that direction, you weren't given everything

23   you were asked for, were you?

24             MR. PYSER:  Object to form.
```

```
 1       A.   I believe I requested for two head count

 2    and ultimately got two head count.

 3    BY MR. FULLER:

 4       Q.   So you took your three people to five

 5    people, right?

 6       A.   Right.

 7       Q.   So you're monitoring the entire country

 8    for suspicious orders with five people --

 9       A.   No.

10       Q.   -- an upgrade from three people,

11    correct?

12                 MR. PYSER:  Object to form.

13       A.   Additionally, there were people in the

14    distribution centers that had -- operations had

15    responsibility.

16    BY MR. FULLER:

17       Q.   Right.  There were some people in the

18    distribution center --

19                 MR. PYSER:  Hold on.  Let him

20    finish.

21    BY MR. FULLER:

22       Q.   Go ahead, if you're not done.

23       A.   That had responsibility for reviewing

24    ingredient limit reports and then working in the
```

1    cage and the vault.

2        Q.   And the jury's already heard about some of

3    those.  They weren't full-time -- they didn't get

4    full-time people there until Mr. Hartman came

5    along, correct?

6              MR. PYSER:  Object to form.

7    BY MR. FULLER:

8        Q.   And when Mr. Hartman came along, he

9    actually revamped the whole system and got -- and

10   more than doubled the employees you had, didn't

11   he?

12             MR. PYSER:  Object to form.

13       A.   What occurred was, people in the

14   distribution centers that were tasked with

15   compliance responsibilities moved over and changed

16   in the reporting structure, reporting up through

17   my organization.

18   BY MR. FULLER:

19       Q.   And he got full-time personnel at each of

20   the distribution centers, something you didn't

21   have the benefit of, right?

22       A.   I did not.

23       Q.   You -- again, you got the increase from,

24   you testified, three to five, but let's be honest.

1    Mr. Baranski -- do you know who Mr. Baranski is?

2    Have you seen any of his testimony in this case?

3        A.   I have not.  I believe he's the Director

4    of Operations in Wheeling.

5        Q.   Absolutely.  He testified that the

6    Wheeling distribution center -- they get over 1.7

7    million orders a month.  This is just one month of

8    suspicious orders out of his building.

9             How do you properly investigate this many

10   suspicious orders with three people?  You can't do

11   it, can you?

12               MR. PYSER:  Object to form.

13       A.   Well, based on the program we had in place

14   and at the time what DEA had required us to do,

15   submit that report, and we reviewed that report.

16   BY MR. FULLER:

17       Q.   That covers your regulatory obligation.

18   That doesn't cover your U.S. Code obligation, does

19   it?

20               MR. PYSER:  Object.

21   BY MR. FULLER:

22       Q.   We have to have effective processes in

23   place to prevent diversion.  You've already

24   testified, sir, that suspicious orders shouldn't

1    just be shipped.  They should be looked at.  And

2    you can't look at this many suspicious orders with

3    three people when you have 27 other distribution

4    centers, can you?

5        A.   If I recall, the Rannazzisi letters, at

6    least one of them, states that suspicious orders,

7    if you believe they're going to be diverted,

8    should be reported.

9        Q.   So --

10                MR. PYSER:  Hold on.  Are you done

11   with your answer?

12                THE WITNESS:  Yes.

13   BY MR. FULLER:

14       Q.   If you recall the Rannazzisi letters,

15   which letter are you referring to?

16       A.   I don't -- I don't know which date, but

17   that -- that's the language in one of them.

18       Q.   Well, we looked at the language, right?

19   You said you had two requirements, didn't you?

20   You have a reporting requirement, correct?

21       A.   Right.

22                MR. PYSER:  Object to form.

23   BY MR. FULLER:

24       Q.   And then you have a requirement to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    maintain effective controls against diversion.

 2             You've already testified, sir, that

 3    shipping suspicious orders isn't necessarily

 4    maintaining effective controls unless you're going

 5    to look into them.  And you and I both know,

 6    sitting here today, that your people didn't look

 7    into all of the suspicious orders in this

 8    document, did they?

 9                  MR. PYSER:  Object to form.

10    Misstates.

11    BY MR. FULLER:

12        Q.   They didn't go out and investigate all

13    these --

14                  MR. PYSER:  Object to form.

15    Misstates evidence.

16    BY MR. FULLER:

17        Q.   -- did they?

18        A.   I don't believe they went out on every

19    one.

20        Q.   You had three people sitting in corporate

21    headquarters looking at this document.  And that's

22    just from one distribution center, right?

23        A.   Correct.

24        Q.   This was done for all 20-some-odd
```

```
 1     distribution centers, so this times 27.  Nobody

 2     can investigate all those with three people.  We

 3     can agree on that, can't we --

 4                    MR. PYSER:  Object to form.

 5     BY MR. FULLER:

 6         Q.   -- at least not investigate them the way

 7     they should be investigated, correct?

 8         A.   I guess.

 9         Q.   Don't guess.  You used to be a law

10     enforcement officer.  I used to be a prosecute

11     other.

12              You and I both know there's no way to do a

13     proper investigation of all these with three

14     people, correct?

15                    MR. PYSER:  Object to form.

16         A.   I agree.

17     BY MR. FULLER:

18         Q.   At least not to the standard you want to

19     do it, correct?

20                    MR. PYSER:  Object to form.

21         A.   Correct.

22     BY MR. FULLER:

23         Q.   Let's go to 3892.  Strike that.  Let's not

24     go to 3892.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Let's go back to 4230, which was

 2    previously Exhibit 6.  This is the memorandum

 3    agreement that you and Mr. Papantonio looked at

 4    earlier, right?

 5         A.   I have to find it.  What was the number

 6    again?

 7         Q.   4230.  That's it.

 8         A.   Got it.

 9         Q.   If you turn to Page 4 of that document.

10    If you -- Section F, Page 4 of that document.

11              You're aware of -- part of what Cardinal

12    agreed to do was do an 18-month lookback on

13    suspicious orders, didn't they?  You see it in

14    section F?

15         A.   (Witness reviews document.)

16              Yes.

17         Q.   What were the results of that 18-month

18    lookback, do you know?

19         A.   I don't recall.

20         Q.   Were those not shared with you?

21         A.   I don't believe so.

22         Q.   Did you see the report that was done

23    related to those?

24                   MR. PYSER:  Object to form.
```

```
 1        A.   I don't believe so.

 2   BY MR. FULLER:

 3        Q.   So the record's clear, it says "Cardinal

 4   agrees, within 180 days of effective date of this

 5   agreement, it will review the distributions of

 6   oxycodone, hydrocodone, alprazolam, and

 7   phentermine to retail pharmacy customers as well

 8   as physicians for the period of 18 months

 9   immediately preceding the execution of this

10   agreement and identify customers purchases of the

11   same drugs that exceed the thresholds established

12   in its compliance program on the date of such

13   review."

14             And then it says "Cardinal shall conduct

15   an investigation for each customer where such

16   review reveals purchasing patterns substantially

17   deviating from the normal purchasing patterns and

18   take appropriate action."

19             Do you see that?

20        A.   Yes.

21        Q.   That basically means go back and look and

22   see if you missed any suspicious orders,

23   correct?

24                  MR. PYSER:  Object to form.
```

```
 1      A.   Correct.

 2   BY MR. FULLER:

 3      Q.   And you don't know, sitting here today,

 4   what the result of that was that Cardinal

 5   conducted or should have conducted?

 6               MR. PYSER:  Object to form.

 7      A.   It would have been conducted by the

 8   anti-diversion team.

 9   BY MR. FULLER:

10      Q.   Let's do the pill comparison, please.  So

11   during the time frame that you were there, part of

12   your job was to look for -- we talked about

13   suspicious orders and to look for patterns,

14   right?

15      A.   Correct.

16      Q.   Did you -- well, you testified earlier you

17   didn't look at any pill counts, correct?

18               MR. PYSER:  Object to form.

19      A.   I did not personally.

20   BY MR. FULLER:

21      Q.   Well, let's start.  So Ohio is -- I mean,

22   you know where Ohio is.  You were based in

23   Columbus or the Columbus area, correct?

24      A.   Correct.
```

```
1          Q.   Illinois is two states over.  Are you

2     aware that the states are similarly situated?  I

3     mean, Illinois has about a million more people

4     than Ohio.  Are you aware of that?

5          A.   No.

6          Q.   Both considered midwest states.  Can we

7     agree on that?

8          A.   Yes.

9          Q.   And it's a neighboring state.  It's got

10    some unimportant state in between the two of them,

11    right?

12         A.   Yes.

13         Q.   Kidding.  They're geographically similar.

14    They're similar in size and, based on my

15    representations, about the same population, right?

16         A.   Yes.

17         Q.   And if we're looking at pills distribution

18    across the entire country, we can say safely

19    there's probably not -- or shouldn't be a

20    significant difference between Ohio and Illinois,

21    fair enough?

22                   MR. PYSER:  Object to form.  Calls

23    for speculation testimony.

24         A.   I wouldn't know enough about it to --
```

1    BY MR. FULLER:

2        Q.   If we saw a significant difference, it

3    might be something we would want to look into,

4    correct?

5                MR. PYSER:  Object to form.

6        A.   May raise a question to say why.

7    BY MR. FULLER:

8        Q.   Let me ask.  You're a cop, worked the

9    street, right, here in Boston, correct?

10       A.   Outside of Boston.

11       Q.   Outside of Boston.  If you were driving

12   doing your patrol and you see something suspicious

13   going on, you're going to take initiative and

14   investigate it, aren't you?

15               MR. PYSER:  Object to form.

16       A.   Yes.

17   BY MR. FULLER:

18       Q.   May not be that there is anything with it.

19   There may not be any laws being broken, but until

20   you do your investigation you're not going to know

21   that, are you?

22       A.   Correct.

23       Q.   I mean, I don't want to insult you, but

24   let's go back.  I prosecuted a ton of DUIs.  You

```
 1    may see somebody weaving on the road.  Well,

 2    doesn't mean they're drunk, does it?

 3        A.   Not necessarily.

 4        Q.   But it's an indicator, hey, there may be

 5    something going on.  It could be a health concern.

 6    It could be that they're texting and driving at

 7    least now probably, not when you were a cop not,

 8    when I was a prosecutor.  But that's the type of

 9    thing you would want to investigate to see what

10    the issue is, correct?

11        A.   Correct.

12        Q.   So let's look at the comparison between

13    Illinois and Ohio.  Let's go for 2006.  4.9

14    million -- and this is just oxycodone, okay?  You

15    understand?

16        A.   Yes.

17        Q.   Okay.  4.9 million dosage units, pills,

18    into Illinois.  67 million pills into Ohio in the

19    same year.  This is just Cardinal alone.  That

20    causes you some concern, doesn't it,

21    Mr. Reardon?

22             MR. PYSER:  Object to form.

23        A.   It would --

24    BY MR. FULLER
```

1       Q.    Now --

2       A.    -- warrant a further look.

3       Q.    Exactly.  We're not saying that there's

4    anything nefarious going on yet, but we're not

5    going to know unless we investigate, are we?

6       A.    Correct.

7       Q.    And we both know Cardinal had this

8    information.  This is your sales data.  And I say

9    yours.  I mean the royal you and Cardinal,

10   correct?

11      A.    Correct.

12      Q.    Somebody could have had this information

13   pulled, right?

14      A.    (Witness nodding.)

15      Q.    In 2006, you've already told us -- Mr.

16   Hartman has already testified, as well as others,

17   that we are in the middle of an opioid crisis, we

18   should be doing comparisons like this.  Would you

19   agree with that?

20              MR. PYSER:  Object to form.

21      A.    It would make sense.

22   BY MR. FULLER:

23      Q.    So let's go to 2007.  5.9 million in

24   Illinois.  72 million in Ohio.  Again, huge

1    disparity.

2              MR. FULLER:  Let's keep going, Gina.

3    BY MR. FULLER:

4        Q.   2008, 2009, 2010, 2011, 2012.  Let's stop

5    there for a second.

6              2012, 10 million pills into Illinois, 100

7    million pills into the state of Ohio with a

8    million less people.  This pattern causes you

9    concern, sitting here today, doesn't it,

10   Mr. Reardon?

11             MR. PYSER:  Object to form.

12       A.   It raises the question of why.

13   BY MR. FULLER:

14       Q.   Exactly.  Let's keep going, 13, 14.

15   Mr. Brantley raised a good question, well, did we

16   have more customers in Ohio than we did Illinois?

17             Let's go.  Cardinal customers in Illinois,

18   1,716.  Cardinal customers in Ohio, 1,744.  We can

19   agree that statistically that's close enough,

20   right?

21             MR. PYSER:  Object to form.

22   BY MR. FULLER:

23       Q.   That's not going to provide the

24   explanation for the significant difference between

```
 1   the two states, is it?

 2        A.   I think you have to dig deeper --

 3        Q.   So that's my question.

 4             MR. PYSER:  Were you done with your

 5   answer?

 6   BY MR. FULLER:

 7        Q.   Go ahead.

 8        A.   -- and determine types of customers.

 9        Q.   So you tell me who at Cardinal -- because

10   they had this information, who was it that dug

11   deeper?

12             MR. PYSER:  Object to form.

13        A.   I don't -- I don't have that knowledge.

14   BY MR. FULLER:

15        Q.   I mean, you would agree with me, would you

16   not, that it shouldn't take a lawsuit against

17   Cardinal before it would look into something like

18   this going on in its company, correct?

19             MR. PYSER:  Object to form.

20        A.   Correct.

21   BY MR. FULLER:

22        Q.   So there we have it, 798 million dosage

23   units for that time frame into a population of

24   11.7 million for Ohio.  Only 76 million with a
```

```
 1    million more people, 12.8, correct?

 2         A.   Correct.

 3         Q.   I mean, sitting here today, you didn't

 4    know this before today, right?

 5         A.   No.

 6         Q.   No one shared this with you?  No one

 7    pulled the numbers for you even back when you were

 8    there at Cardinal, correct?

 9         A.   Correct.

10         Q.   I mean, do you find that shocking, that

11    disparity?  I mean, it's ten times the amount of

12    pills.

13         A.   I -- I still think you need to dig deeper,

14    customers.

15         Q.   Now, we also know -- and the jury will

16    have heard by now -- that back in 2003 the GOA,

17    Government Office of Accounting, did a report,

18    OxyContin and its abuse and -- abuse and addiction

19    or something like that and they found that opioid

20    epidemic was hitting certain states more than

21    others.  That would also be something that

22    Cardinal would want to be aware of.  Can we agree

23    with that?

24         A.   I think so.
```

1    Q.   I mean, let's go back to our -- again, our

2    investigative days.  You want to gather all the

3    information you can, correct --

4                  MR. PYSER:  Object to form.

5    A.   Correct.

6    BY MR. FULLER:

7    Q.   -- particularly when you're one that has

8    been entitled, been privileged with the ability to

9    operate in this closed system.  Cardinal -- no one

10   forced this licensing, this registrant status, on

11   Cardinal, did they?

12   A.   No.

13   Q.   Cardinal went out and wanted to get into

14   this business so they could distribute and make

15   money, correct?

16   A.   Correct.

17   Q.   But they took on an obligation when they

18   did that.  We've looked at that.  Based on

19   Rannazzisi's letters, they took on obligations to

20   ensure to do the best job they could to keep our

21   community safe, right?

22   A.   Correct.

23   Q.   And doing an analysis of this kind of

24   data, this disparity between Illinois and Ohio, is

```
1    part of what follows within that obligation,

2    doesn't it?

3              MR. PYSER:  Object to form.

4        A.   It would warrant a look to see why the

5    disparity -- the digger.

6    BY MR. FULLER:

7        Q.   Like you said --

8        A.   Deeper down.

9        Q.   -- deeper dig down.  Sitting here today,

10   you don't know of anybody at Cardinal that

11   bothered to do that you, do?

12             MR. PYSER:  Object to form.

13       A.   I have no knowledge.

14             MR. FULLER:  Let's go on, Gina, next

15   slide.  Yes, West Virginia.  Oh, this is the

16   total.  Yeah, let's go to the total.

17   BY MR. FULLER:

18       Q.   Another explanation Mr. Brantley mentioned

19   was maybe other wholesaler distributors were more

20   primary in Illinois versus Ohio.  Fair part of our

21   investigation, you would agree, correct?

22       A.   It's a possibility.

23       Q.   So this is all distributors.  The graph

24   looks the same, doesn't it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   (Witness nodding.)

 2      Q.   From --

 3      A.   Very similar.

 4      Q.   -- from 2006 to 2014, over that entire

 5   year, all distributors into these respective

 6   states only put in 351 million pills into

 7   Illinois, and 2.1 billion pills into Ohio, six

 8   times?

 9                DEFENSE COUNSEL:  Objection to

10   form.

11   BY MR. FULLER:

12      Q.   Six times the difference, right?

13                DEFENSE COUNSEL:  Objection to form.

14      A.   Right.

15   BY MR. FULLER:

16      Q.   I mean, how do people take that many pills

17   in the state of Ohio?

18                MR. PYSER:  Object to form.

19   BY MR. FULLER:

20      Q.   It doesn't seem right, does it?

21      A.   I don't -- without having further

22   information, I can't speculate.

23      Q.   It's the investigative process that should

24   have been done years ago, right?
```

```
 1                    MR. PYSER:  Object to form.

 2    BY MR. FULLER:

 3        Q.   Let me ask you.  Back on the street doing

 4    our investigations, are we going to wait to get to

 5    that extreme before we start our investigation?

 6    Or as soon as we see this disparity, we're going

 7    to start investigation right away?

 8        A.   I would think you would at least want to

 9    look in and do a deeper dive and understand why.

10                    MR. PYSER:  Object to form.

11    BY MR. FULLER:

12        Q.   Right away --

13                    MR. PYSER:  Object.  One second,

14    Counsel.  Object.  Calls for -- calls for

15    speculation.  I apologize I stepped on your

16    question there.

17    BY MR. FULLER:

18        Q.   Right away, correct?  We're not going to

19    wait four, five, six years down the road, are we,

20    not if we're doing what the law requires us to do,

21    correct, Mr. Reardon?

22        A.   It would make sense.

23                    MR. PYSER:  Object to form.

24    BY MR. FULLER:
```

1      Q.   Let's go to West Virginia.  Now, West

2    Virginia is another state over from Ohio, right,

3    going east?  You're aware of West Virginia is --

4      A.   Correct.

5      Q.   -- a much smaller state though, right?

6      A.   I...

7      Q.   I'll tell you.  You'll see.  1.8 million

8    people compared to the 12.8 of Illinois.  You

9    would expect to see more pills going into Illinois

10   than West Virginia, all things being equal,

11   correct?

12     A.   Possibly.

13     Q.   I mean, seven times smaller?

14     A.   Again, depends.

15     Q.   It depends on whether we're dumping pills

16   into a state or we're complying with our

17   regulatory requirements, right?

18              MR. PYSER:  Object to form.

19     A.   It depends on the number of pharmacies,

20   customer type.

21   BY MR. FULLER:

22     Q.   Let's look at it.  2006, 4.9 million pills

23   into Illinois again.  Same number, 10.5 million

24   into West Virginia.

```
 1            2007, let's keep going, 2008, 2009, 2010,

 2    '11, '12, all the way to '14.  Let's do the total.

 3            Population of 12.8 in Illinois, only 1.8

 4    in West Virginia, 7 times the difference and yet

 5    you've got almost double the pills.  Someone at

 6    Cardinal should have picked up on this as well,

 7    correct?

 8                 MR. PYSER:  Object to form.

 9    BY MR. FULLER:

10        Q.   Right?

11        A.   If they had the info.

12        Q.   This is Cardinal's numbers.  Cardinal had

13    the info, right?  I mean, come on.  Cardinal's

14    making these sales.  You know that Cardinal tracks

15    where its making sales.  You know they do track

16    where they're making sales, don't you?

17        A.   They would.

18        Q.   They do all sorts of analysis on sales and

19    distribution of pills, don't they?

20                 MR. PYSER:  Object to form.

21        A.   I don't know the detail on what they do.

22    BY MR. FULLER:

23        Q.   You know they do a lot of it though,

24    correct?
```

```
 1                    MR. PYSER:  Object to form.

 2        A.   They would do sales analysis.

 3   BY MR. FULLER:

 4        Q.   And then let's look at the number of

 5   customers.  There are less than half as many

 6   customers in West Virginia that Cardinal is

 7   serving, 765 pharmacies compared to 1,700 in

 8   Illinois, right?

 9        A.   It's what it says.

10        Q.   So that means they must have been dumping

11   nearly double the amount of pills through each

12   pharmacy in West Virginia if the numbers are going

13   to make sense, correct?

14                    MR. PYSER:  Object to form.

15        A.   I don't have enough information to --

16   BY MR. FULLER:

17        Q.   Well --

18        A.   I can see totals.

19        Q.   Right.  And you can see that there's more

20   than double the amount of pills having to run

21   through those 765 pharmacies to make up that pill

22   count, correct?

23        A.   That's what the numbers say.

24        Q.   And based on your investigative
```

1    background, that's going to send up red flags

2    that -- hey, what's going on in West Virginia, we

3    need to take a look at this.

4           That's the whole idea behind the

5    suspicious order system, isn't it?

6                MR. PYSER:  Object to form.

7        A.  To monitor customer purchases.

8    BY MR. FULLER:

9        Q.  Monitor the purchases, monitor how many

10   pills are going into the different communities

11   around the country, right?

12       A.  Well, that would tie to -- the customer

13   monitoring would tell you.

14       Q.  Right.  Because all these pharmacies are

15   in, you know, Cleveland, Ohio; Summit County,

16   Ohio; West Virginia; Mount Gay; Kermit, West

17   Virginia.  I'm sure you've heard some of the --

18   did you watch the congressional testimony of that

19   Mr. Barrett gave?

20               MR. PYSER:  Object to form.

21   Objection compound.

22       A.  I did not.

23   BY MR. FULLER:

24       Q.  Why not?

```
 1                    MR. PYSER:  Object to form.

 2        A.   Don't know why.

 3   BY MR. FULLER:

 4        Q.   I mean, he was your boss at one point in

 5   time -- well, still is as a consultant, right --

 6   well, no, he's not.  He's not there anymore.

 7        A.   He retired.

 8        Q.   Can we agree that between what

 9   Mr. Papantonio and myself have shown you today,

10   there was a lot going on that you didn't know

11   about?

12                    MR. PYSER:  Object to form.

13   BY MR. FULLER:

14        Q.   That there is additional diligence that

15   you would have done had somebody brought some of

16   these facts to your attention, correct?

17                    MR. PYSER:  Object to form.  Calls

18   for speculation?

19        A.   I would look into it.

20   BY MR. FULLER:

21        Q.   You would have done an investigation,

22   right?  That's what looking into it is, isn't

23   it?

24                    MR. PYSER:  Object to form.
```

```
 1      A.   Correct.

 2  BY MR. FULLER:

 3      Q.   You want to look and see why is this

 4  happening.  And here's the shocking thing.  The

 5  people within Cardinal -- there are people within

 6  Cardinal that had this information.  You can't

 7  deny that, can you?

 8              MR. PYSER:  Object to form.

 9      A.   I can't deny it.  I just don't know for

10  sure, but --

11  BY MR. FULLER:

12      Q.   It's their sales data?

13      A.   I would assume that's sales data, yeah.

14      Q.   You also know they knew who their

15  customers were?

16              MR. PYSER:  Object to form.

17  BY MR. FULLER:

18      Q.   Right?  They have to, correct?

19      A.   Correct.

20      Q.   And no one ever brought this to your

21  attention?

22              MR. PYSER:  Object to form.

23      A.   Not that, no.

24  BY MR. FULLER:
```

```
1        Q.   Did they ever bring any other problems

2    with diversion to your attention?

3        A.   Yeah, there were times we would get calls

4    from distribution centers or something Eric would

5    raise.

6               MR. FULLER:  Did we do that list?

7    Let's do that list.

8    BY MR. FULLER:

9        Q.   So do Choice Pharmacy.  We looked at that

10   a little while.  Do you remember that?  It's one

11   of the pharmacies in the Cuyahoga, Summit County

12   area?

13       A.   Right.

14               MR. PYSER:  Is this an exhibit or

15   just a demonstrative --

16               MR. FULLER:  This is demonstrative.

17   BY MR. FULLER:

18       Q.   And what I did is I pulled out of the

19   ingredient limit report items that exceeded your

20   limiter numbers.  And if you see the amount

21   ordered versus the amount in excess, so for

22   example, on July 2 of 2007, for -- New Choice they

23   ordered oxycodone, APAP, 6,000 pills, right?

24               Well, we know the limit is 1,200 from what
```

1    we saw earlier, correct?

2              MR. PYSER:  Object to form.

3        A.    Are you talking about the dosage limit

4    charts?

5    BY MR. FULLER:

6        Q.    Yes, sir.

7        A.    So that's -- that's those dosage limit

8    charts are just to assist in the cage vault

9    process and the order filling process --

10       Q.    Right.

11       A.    -- to cause an order filler to look

12   further at the order.

13       Q.    Well, order filler -- you're talking about

14   pickers, right?

15       A.    Pickers.

16       Q.    How does is picker -- a picker is not

17   going to do due diligence on the facility or the

18   pharmacy, correct?

19              MR. PYSER:  Object to form.

20       A.    No, but they have the ability based on

21   experience with the customer and -- ability to

22   look at customer purchase patterns through their

23   access to the ordering system.

24   BY MR. FULLER:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   But these are limited numbers that,

 2   according to the policy and procedure, were there

 3   to help the pickers for excessive orders, correct?

 4   I mean, that's the title of the document, is

 5   Excessive Orders for Schedule II, isn't it?

 6        A.   To help them flag orders that they may

 7   possibly have to look at.

 8        Q.   And any that were excessive -- and again,

 9   the name of the document is Excessive Orders for

10   Schedule II, right?

11                  MR. PYSER:  Object to form.

12        A.   Right.

13   BY MR. FULLER:

14        Q.   And so if they set off a trigger, we need

15   to see some sort of documentation related to that,

16   correct?

17                  MR. PYSER:  Object to form.

18        A.   Correct.

19   BY MR. FULLER:

20        Q.   Okay.  So we should see, in the due

21   diligence file for New Choice Pharmacy, when it

22   orders 6,000 pills and the limiter is at 1,200,

23   it's an extra 4,800 pills, if I'm doing my math

24   correctly, right?
```

1     A.   Right.

2     Q.   And we should see something in the due

3     diligence file related to that order either

4     justifying it or we should see the report to the

5     DEA, correct?

6               MR. PYSER:  Object to form.  Calls

7     for speculation.  Facts not in evidence.

8     A.   I would expect that that would be the

9     practice.

10    BY MR. FULLER:

11    Q.   And on July 3, when they ordered the same

12    thing, another 4,000 pills, we should see the same

13    thing in the due diligence file or a suspicious

14    order report in the distribution center suspicious

15    order report folder, correct?

16               MR. PYSER:  Object to form.

17    A.   I would expect that that would be the

18    practice.

19    BY MR. FULLER:

20    Q.   And if they're not, they're not following

21    their own policies and procedures relating to

22    identifying suspicious orders, correct?

23               MR. PYSER:  Object to form.

24    Misstates evidence.

1      A.   Possibly.

2   BY MR. FULLER:

3      Q.   Well, that's what the policy required,

4   isn't it?

5              MR. PYSER:  Object to form.

6      A.   The dosage limit chart is just, hey, if

7   you see something like this.  But we also tell

8   them, if you understand the customer and you know

9   the customer and it's not out of the ordinary

10  ordering pattern, then there's no need.

11  BY MR. FULLER:

12     Q.   But there should be some documentation to

13  justify that in the due diligence file, correct?

14             MR. PYSER:  Object to form.

15     A.   If they stop the order.

16  BY MR. FULLER:

17     Q.   And let's talk about that.  So prior to

18  2012, it was Cardinal's practice to identify

19  suspicious customers, not suspicious orders,

20  correct?

21             MR. PYSER:  Object to form.

22  Misstates evidence.

23     A.   Prior to 2012, I -- I can't speak to 2007

24  to 2012.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. FULLER:

 2         Q.   Okay.  Well, let's limit my question to up

 3    to the end of 2007.

 4              It was Cardinal's practice to report

 5    suspicious customers, not suspicious orders,

 6    right?

 7                   MR. PYSER:  Object to form.

 8    Misstates evidence.

 9         A.   Well, the ingredient limit report showed

10    both, the customer and the orders.

11    BY MR. FULLER:

12         Q.   Fair enough, fair enough.

13              And those are all the orders -- the

14    suspicious orders that Cardinal shipped over the

15    years, right?

16                   MR. PYSER:  Object to form.

17         A.   They did ship.

18    BY MR. FULLER:

19         Q.   And that was the same practice.  Whether

20    it was out at the Wheeling center, the Lakeland

21    center, the Valencia center, wherever else they

22    had distribution centers, that was the same

23    practice everywhere, right, correct?

24         A.   Correct.
```

1           MR. FULLER:  Let's take a quick

2    break.  I think I'm done.

3           THE VIDEOGRAPHER:  The time is 5:45

4    and we're off the record.

5

6       (Recess taken from 5:45 p.m. to 6:03 p.m.)

7

8           THE VIDEOGRAPHER:  The time is 6:03

9    p.m. and we're on the record.

10          MR. PYSER:  Good afternoon,

11   Mr. Reardon.  My name's Steven Pyser.  I represent

12   Cardinal.  I have a few questions for you here

13   today.

14          MR. FULLER:  Not to interrupt, but

15   plaintiff's last DSM-5 is going to be entered as

16   Exhibit No. 37.

17

18       (Exhibit No. 37 marked for

19   identification.)

20

21          MR. PYSER:  Thank you.  I'm sorry, I

22   forgot you had asked.

23

24                   CROSS-EXAMINATION

```
 1   BY MR. PYSER:

 2       Q.   Mr. Reardon, can you please introduce

 3   yourself to the jury?

 4       A.   Steve Reardon.

 5       Q.   Where are you from originally,

 6   Mr. Reardon?

 7       A.   Originally from Massachusetts.

 8       Q.   Come a time when you started work at

 9   Cardinal Health?

10       A.   Yes.

11       Q.   When was that?

12       A.   June of 1988.

13       Q.   How long were you with Cardinal Health?

14       A.   Ant about 28 years.

15       Q.   So 1988 through roughly 2016?

16       A.   March of 2016.

17       Q.   Are you retired now?

18       A.   I am retired.

19       Q.   Prior to joining Cardinal Health, what did

20   you do?

21       A.   I was in law enforcement.

22       Q.   From your perspective, having been

23   employed at Cardinal Health for roughly 28 years,

24   can you describe what Cardinal Health's role is in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the healthcare distribution system?

 2        A.   Yes.  Cardinal purchases prescription drug

 3    products from duly-licensed manufacturers and

 4    distributes those prescription drug products to

 5    duly-licensed hospitals, hospital pharmacies,

 6    independent retail pharmacies, chain pharmacies,

 7    long-term care facilities, managed care, VA at one

 8    time.

 9        Q.   And do the products that Cardinal Health

10    ships, do they run the gamut across all types of

11    healthcare?

12              MR. PAPANTONIO:  Objection.

13    Leading.

14    BY MR. PYSER:

15        Q.   What types of products does Cardinal

16    Health ship?

17        A.   Prescription drug products,

18    over-the-counter products, hospital supply

19    products, OTC products.

20        Q.   Does Cardinal Health ever interact

21    directly with patients?

22        A.   No.

23        Q.   How about doctors?

24        A.   No.
```

1      Q.   What was your first job at Cardinal?

2      A.   First job at Cardinal when I got hired in

3   June of '88 was as a security and compliance

4   manager at the Peabody distribution center.

5      Q.   And did there come a point in time when

6   you left Peabody and had a job that focused on

7   anti-diversion across a larger part of Cardinal

8   Health?

9      A.   Yes.

10      Q.   When was that?

11      A.   I moved to corporate in Dublin in December

12   of '94.

13      Q.   And from that time until roughly 2007, was

14   your work in anti-diversion?

15      A.   Anti-diversion in addition to overall

16   regulatory compliance.

17      Q.   In addition to the people who were your

18   direct reports, working for you when you were

19   working in anti-diversion, were there other

20   Cardinal Health employees who also worked

21   anti-diversion on issues?

22      A.   Yes.  People in the distribution centers

23   had responsibilities around anti-diversion.

24      Q.   I want to pause for a minute.  I'm going

1    to ask you some questions.  You were asked a lot

2    of questions about an exhibit, Exhibit 4.  I'll

3    just put it on the Elmo, if I could.

4            And Exhibit 4, do you recall answering

5    questions about this document?

6        A.   Yes.

7        Q.   The document was from roughly 2012, right?

8        A.   Yes.

9        Q.   And the events you were asked about were

10   in the time period 2008 through 2012, right?

11       A.   Yes.

12       Q.   Were any of the events you were asked

13   about things that you were personally involved

14   in?

15       A.   No.

16       Q.   So anything were you commenting on related

17   to Exhibit 4, were those based on what were you

18   reading from the document?

19       A.   Yes.

20       Q.   You were asked a lot of questions earlier

21   today about issues related to anti-diversion after

22   2007.  Had you transitioned to a role within the

23   company outside of the anti-diversion work after

24   2007?

```
 1        A.   Yes.

 2        Q.   Were there other people charged by

 3   Cardinal Health with ensuring Cardinal Health met

 4   its regulatory obligations with regard to

 5   anti-diversion after 2007?

 6        A.   Yes.

 7        Q.   You were also shown a document earlier

 8   today, Exhibit 3.  I'm actually going to use the

 9   Elmo again.  Thank you.

10             Do you remember Exhibit 3?

11        A.   Yes.

12        Q.   There was someone from McKesson in Exhibit

13   3 who claimed Cardinal was not reporting

14   suspicious orders to the DEA.  Do you recall that?

15        A.   I recall the document.

16        Q.   You recall the document?

17        A.   Yes.

18        Q.   To your knowledge, is Mr. Mahoney the

19   person in that document, claimed that Cardinal was

20   not reporting suspicious orders.  Is that claim

21   correct?

22             MR. PAPANTONIO:  Object to form.

23        A.   No.

24   BY MR. PYSER:
```

```
 1       Q.   You had a chance to review this document

 2  earlier, correct?

 3       A.   Correct.

 4       Q.   Are the statements in this document about

 5  Cardinal Health's reporting suspicious orders

 6  true?

 7       A.   No.

 8       Q.   To the best of your knowledge, at all

 9  times did Cardinal Health report suspicious orders

10  it identified to the DEA?

11       A.   Yes.

12       Q.   Did you ever hear Mr. Quintero state that

13  Cardinal was not reporting suspicious orders?

14       A.   No.

15       Q.   Did you ever state to anyone that Cardinal

16  Health was not reporting suspicious orders?

17       A.   No.

18       Q.   During the time that you were in charge of

19  anti-diversion efforts at Cardinal Health, did you

20  have the resources necessary to perform your

21  work?

22       A.   Yes.

23       Q.   Showing you the DEA compliance manual that

24  was marked earlier today as Exhibit 32, do you
```

```
1     recall that document?

2         A.   Yes.

3         Q.   And what is it?

4         A.   It was the manual in place outlining our

5     policy and processes related to DEA.

6         Q.   Was it in effect during the time you were

7     working in anti-diversion?

8         A.   Yes.

9         Q.   Does it discuss suspicious order

10    monitoring and suspicious order reporting?

11        A.   Yes.

12        Q.   I'd like to direct your attention to the

13    page -- it has Bates page, so I'm going to use the

14    bottom right pages.

15        A.   Okay.

16        Q.   It ends with 937, Page 7-1.  Does it begin

17    by discussing ARCOS reports?

18        A.   Yes.

19        Q.   What are ARCOS reports?

20        A.   So registrants are required -- at least

21    distributors and manufacturers are required to

22    report ARCOS to the DEA ARCOS unit.  We reported

23    it on a monthly basis.

24             It's all transactions of Schedule II
```

1    controlled substances and some ARCOS reportables

2    that are in Schedule III.

3           So there's daily reporting, and then you

4    have to submit an annual inventory of all your

5    controlled substances.  And then if there's a

6    newly -- a new ARCOS reportable controlled

7    substances, you have to report initial inventory.

8       Q.   So beyond ARCOS reports, there was also

9    some discussion of other reporting that was done

10   for suspicious orders.  Do you recall that?

11      A.   Yes.

12      Q.   The beginning of Cardinal Health's manual

13   where it references 21 CFR 130.74 (b), it states,

14   "Wholesalers are responsible for designing and

15   operating a system that will disclose to the

16   wholesalers suspicious orders."

17           Do you see that?

18      A.   Yes.

19      Q.   Did Cardinal Health have such a system?

20      A.   Yes.

21      Q.   In fact, this document, it is dated in the

22   bottom left April 5, 2000, right?

23      A.   Correct.

24      Q.   Were there similar manuals before that

1    date?

2         A.   Yes.  That's a revision date.

3         Q.   Were there similar manuals after that

4    date?

5         A.   Yes.

6         Q.   And next states that "The wholesaler

7    informs the DEA field office in that area of all

8    suspicious orders."

9              Is that something that Cardinal Health

10   did?

11        A.   Yes.

12        Q.   On the next page, Page 7-4, there's a

13   discussion of how Cardinal Health complies with

14   1301.74 (b).

15             Do you see that?

16        A.   Yes.

17        Q.   And it's described as a two-step

18   process?

19        A.   Yes.

20        Q.   Can you tell me what the two steps are?

21        A.   So step one is the submission of the

22   ingredient limit report to the local DEA field

23   office on a monthly basis.

24        Q.   And if you turn with me to Exhibit M which

1    is -- let's see.  Using the page in the bottom --

2    excuse me, in the top right, it's Page 263.  This

3    may be a little bit hard to read on the Elmo.

4        A.   Got it.

5        Q.   Can you tell me what each ingredient limit

6    report for each customers tells the DEA when you

7    submit it?

8        A.   So each report will show customer name,

9    DEA number, and then it will go through each

10   family of a controlled substance that's identified

11   by a base code.  All the families are lumped

12   together.

13          It will show the quantity the customer

14   ordered.  It will show the item -- the active

15   ingredient in grams, then total grams purchased,

16   and then it will add all of that up for a given

17   month and compare that to the ingredient limit

18   within the report.

19          And if the customer exceeds that

20   ingredient limit, they'll show up on the report.

21       Q.   Where did the parameters that were used

22   for the ingredient limit report -- where did those

23   come from?

24       A.   They were developed between the trade

Highly Confidential - Subject to Further Confidentiality Review

```
 1    association and WDA at the time and the DEA.

 2         Q.   During your time running anti-diversion

 3    programs at Cardinal Health, did you believe DEA

 4    was aware of Cardinal Health's process to monitor

 5    and report suspicious orders?

 6              MR. PAPANTONIO:  Objection form.

 7         A.   Yes.

 8    BY MR. PYSER:

 9         Q.   Did you ever come to an understanding of

10    whether or not DEA was aware of Cardinal Health's

11    process for reporting suspicious orders including

12    ingredient limit reports?

13              MR. PAPANTONIO:  Objection form.

14         A.   Yes.  The reports were submitted to them

15    on a monthly basis.  And during cyclic

16    inspections, they were looked at as part of

17    inspection.

18    BY MR. PYSER:

19         Q.   What did it mean to you to know that DEA

20    was aware of this information?

21              MR. PAPANTONIO:  Objection.  Form.

22         A.   It allowed me to believe that we were in

23    compliance with the requirements based on the

24    processes we had in place.
```

1    BY MR. PYSER:

2        Q.   Where did you believe that DEA was aware

3    of these forms?

4        A.   First of all, they approved the report and

5    we were submitting the report to them.  And they

6    were expecting us on a regular basis and we never

7    had any observations or issues related to what we

8    were doing.

9        Q.   You were shown, earlier today, some

10   exhibits that referenced specific pharmacies

11   including Ohio CVS and Brook Park, Overholt's

12   pharmacy and a pharmacy call New Choice.  Do you

13   recall --

14       A.   Yes.

15       Q.   -- do you recall that exhibit?

16       A.   Yes.

17       Q.   And plaintiff's counsel showed you that

18   exhibit and it was based off ingredient limit

19   reports.  Do you recall that?

20       A.   Yes.

21       Q.   Each of -- each piece of the information

22   that was in that exhibit, would that have also

23   been submitted to DEA?

24                    MR. PAPANTONIO:  Objection.  What

```
 1    was submitted to DEA?

 2         A.   Yes.

 3    BY MR. PYSER:

 4         Q.   Just to be clear about who's submitting it

 5    to the DEA, that is something Cardinal Health,

 6    your employer, would have submitted the DEA?

 7         A.   Yes.

 8                   MR. PAPANTONIO:   Objection form.

 9    Move to strike.

10    BY MR. PYSER:

11         Q.   To your knowledge, did DEA take action

12    against any of those pharmacies?

13         A.   Yes.

14         Q.   Which ones?

15         A.   Of the --

16         Q.   I'm sorry.

17         A.   Of the --

18         Q.   To be clear, I'm talking about Ohio CVS,

19    Brook Park, Overholt's pharmacy, or New Choice

20    Pharmacy.  Did DEA takes action against any of

21    those three?

22         A.   No.

23         Q.   But there were times when DEA did take

24    action against pharmacies that Cardinal Health had
```

```
 1   reported to them --

 2                  MR. PAPANTONIO:  Objection.  Form.

 3   BY MR. PYSER:

 4      Q.   -- to your knowledge?

 5                  MR. PAPANTONIO:  Objection.  Form.

 6      A.   I believe so.

 7   BY MR. PYSER:

 8      Q.   Did DEA conduct inspections of Cardinal

 9   Health distribution centers?

10      A.   Yes.

11      Q.   And when they did so, do you know whether

12   or not they reviewed Cardinal Health's processes

13   for suspicious order monitoring and reporting?

14      A.   That would have been part of the process,

15   part of the cyclic inspection.

16      Q.   To your knowledge, from the late '80s when

17   you joined Cardinal Health until you transitioned

18   roles in 2007, did DEA ever state that the

19   processes in place for Cardinal Health for

20   monitoring and reporting suspicious orders were

21   inadequate?

22      A.   No.

23      Q.   We also talked a little bit about a second

24   way, during your testimony earlier today, that
```

```
 1    Cardinal Health complied with 21 CFR 1301.74(b).

 2    Can be describe that for me?

 3         A.   Yes.  Employees who worked in the cage

 4    involved -- that filled orders were tasked with

 5    monitoring the auto process, and if there was

 6    anything that they identified based on their

 7    knowledge of customers, like customers, and

 8    they -- they had the obligation and the ability to

 9    pull that order and hold that order.

10         Q.   You were also asked about Exhibit P in the

11    DEA compliance manual.  You can just look at it on

12    the screen.

13         A.   Yes.

14         Q.   Do you recall some questions on that?

15         A.   Yes.

16         Q.   Is every order above the limit in Exhibit

17    P, the poster that's up in the cage and vault --

18    is that necessarily a suspicious order?

19         A.   No.

20         Q.   In the event that someone working in the

21    cage and vault saw an order above the posted limit

22    but did not think it was of unusual size,

23    frequency or pattern, what would Cardinal Health's

24    policies have expected them to do?
```

```
 1                    MR. PAPANTONIO:  Objection as to

 2    what anybody thought about a pattern.

 3        A.   They would process the order and allow it

 4    to be shipped.

 5    BY MR. PYSER:

 6        Q.   Were there times when Cardinal Health

 7    sought guidance from DEA as to what to do next on

 8    an order that had been flagged as an order of

 9    interest?

10        A.   Yes.

11        Q.   How did that work?

12        A.   Local distribution center would contact

13    the local DEA office.

14        Q.   Now, the process may be different today,

15    but back, say, in 2007, how did the process work

16    for filling orders of a controlled substances for

17    say a hospital in the cage and vault?

18        A.   Well, depending on the product -- so if

19    it's a Schedule II product, DEA form 222 comes in

20    and that's reviewed by the order entry person to

21    make sure that it's filled out completely and

22    according to the regulations.

23             And if there are no alterations, it's

24    signed and dated.  And if it looks okay per the
```

Highly Confidential - Subject to Further Confidentiality Review

1    regulation, then the order is entered and

2    processed.  The order picker will pick, compare

3    what they're picking to the 222, and then record

4    on Cardinal's copy what was -- the quantity

5    shipped and the date shipped, and then there's

6    also a green copy of that that goes into the DEA.

7           The customer kept a blue copy.  And once

8    they received the product, they received the

9    quantity shipped and the date, and record the date

10   received.

11       Q.   So all those steps are done for each form

12   222.  That's the order form; is that right?

13       A.   Correct.

14       Q.   And were there procedures for the folks

15   working, say, in the vault where the Schedule II

16   medications are kept to describe order filling and

17   quality control?

18       A.   Yes.

19       Q.   I just showed you on the screen here,

20   Section 13-2.  Are those the processes for order

21   filling and quality control?

22       A.   Yes.

23       Q.   Were you in periodic contact with DEA

24   throughout the time period you worked in

```
 1    anti-diversion?

 2         A.   Yes.

 3         Q.   Did DEA ever ask you for different reports

 4    than the ones you were providing?

 5         A.   No.

 6         Q.   Was part of your job to make sure that DEA

 7    received reports consistent with the regulations

 8    and guidance?

 9         A.   Yes.

10         Q.   Do you believe you accomplished that

11    goal?

12         A.   Yes.

13         Q.   Have you ever heard of DEA's Internet

14    pharmacy initiative?

15         A.   Yes.

16         Q.   What is it?

17         A.   The initiative, DEA had met with different

18    distributors and explained to them that Internet

19    pharmacies were becoming a growing problem and

20    asked for wholesaler assistance in monitoring that

21    activity.

22              They did a presentation for us, gave us a

23    take-away binder, and identified certain items

24    that an Internet pharmacy may purchase.
```

```
1        Q.   Did DEA recognize in their presentation to

2   you that some pharmacies are lawful?

3        A.   Yes.

4                 MR. PAPANTONIO:  Objection to what

5   DEA recognized by the presentation.

6   BY MR. PYSER:

7        Q.   Let me rephrase the question.

8             Did DEA inform you of any accreditations

9   that were available for Internet pharmacies?

10       A.   Yes.  There's is an accreditation through

11  the National Association of Boards of Pharmacy.

12       Q.   And do some pharmacies have that

13  accreditation?

14       A.   Yes.

15       Q.   You were asked by plaintiffs' counsel

16  whether Cardinal Health shipped to Internet

17  pharmacies.  Did Cardinal Health ship to any

18  pharmacy that wasn't licensed by the DEA?

19       A.   No.

20       Q.   If Cardinal Health learned that any

21  Internet pharmacy that was a customer of it was

22  dispensing improperly, did it cut that customer

23  off and report it to DEA?

24       A.   Yes.
```

```
 1
 2              (Exhibit No. 38 marked for
 3      identification.)
 4
 5      BY MR. PYSER:
 6          Q.   I'm showing you a document that's been
 7      marked as Exhibit 38.  Do you recognize it?
 8          A.   Yes.
 9          Q.   Is it a true and accurate copy of the
10      presentation given to you by DEA on August 22
11      2005?
12          A.   (Witness reviews document.)
13              Yes.
14          Q.   Is this some of the guidance that you
15      received from DEA?
16          A.   Yes.
17          Q.   What did you do in response to receipt of
18      this exhibit?
19          A.   I went back to the office and immediately
20      started developing a process and program to
21      monitor Internet pharmacy activity.
22          Q.   And in doing that, did you work with
23      someone named Eric Brantley?
24          A.   Yes.
```

```
 1        Q.   And what were Mr. -- what was Mr.

 2   Brantley's role?

 3        A.   Mr. Brantley's role was to review the

 4   ingredient limit reports, identify any customers

 5   whose ordering was out of line, to then to conduct

 6   a due diligence visit inspection of that pharmacy.

 7        Q.   You spoke with -- strike that.

 8             Would Mr. Brantley report the results of

 9   any of his investigations to you?

10        A.   Yes.

11        Q.   You spoke to counsel for the plaintiffs

12   about whether it was possible for Mr. Brantley's

13   team to investigate every suspicious orders.  Do

14   you remember that?

15        A.   Yes.

16        Q.   After -- and when we're talking about

17   suspicious orders, just to be clear, are those

18   orders that were already reported to DEA?

19        A.   Yes.

20        Q.   And in Mr. Brantley's process, did he and

21   his team make decisions about what suspicious

22   orders that had been reported to DEA posed a risk

23   and warranted further investigation?

24        A.   Yes.
```

```
 1        Q.   Did you rely on Mr. Brantley and his team

 2   to make the decisions as to what reviews were

 3   necessary and what was done?

 4        A.   Yes.

 5        Q.   Sitting here today, are you aware of any

 6   investigation that should have been done but

 7   wasn't?

 8        A.   No.

 9        Q.   In the event that an investigation by Mr.

10   Brantley determined that a pharmacy posted an

11   unreasonable risk of diversion, what would

12   happen?

13        A.   Customer would be terminated and DEA

14   notified.

15        Q.   And when we're talking about notifying

16   DEA, was there a particular person at DEA who

17   received some of Cardinal Health's

18   notifications?

19        A.   Yes.

20        Q.   Who is that?

21        A.   That would be Kyle Wright.

22        Q.   Did you have conversations with Mr. Wright

23   about Cardinal Health's system?

24        A.   Yes.
```

```
 1        Q.   Did Mr. Wright express support of Cardinal

 2   Health's program in 2006?

 3                  MR. PAPANTONIO:  Objection as to his

 4   expression of support.

 5        A.   Yes.

 6   BY MR. PYSER:

 7        Q.   What did Mr. Wright tell you about

 8   Cardinal Health's program around 2006?

 9                  MR. PAPANTONIO:  Objection as to

10   what he was told by Mr. Wright.

11        A.   He said we were heading in the right

12   direction and that Eric Brantley had established a

13   great working relationship with him.

14   BY MR. PYSER:

15        Q.   Did Mr. Wright ever tell you --

16                  MR. PAPANTONIO:  Move to strike, by

17   the way.

18   BY MR. PYSER:

19        Q.   Did Mr. Wright ever tell you that Cardinal

20   Health's anti-diversion program was deficient in

21   any way?

22        A.   No.

23                  MR. PAPANTONIO:  Objection as to

24   form as to what Mr. Brantley -- what was told to
```

```
1    this man by another source.  You have you have a

2    document.  Show him the document.  Objection to

3    form.

4    BY MR. PYSER:

5        Q.   You can answer.

6        A.   Would you repeat?

7        Q.   Did --

8                 MR. PYSER:  And your objection is

9    noted counsel.

10   BY MR. PYSER:

11       Q.   Did Mr. Wright ever tell you that Cardinal

12   Health's anti-diversion program was deficient in

13   any way?

14       A.   No.

15

16           (Exhibit No. 39 marked for

17   identification.)

18

19   BY MR. PYSER:

20       Q.   Showing you what's been marked as Exhibit

21   39, can you tell me what it is?

22       A.   This would be my handwritten notes

23   documenting my conversation with Kyle Wright.

24       Q.   Do you remember why you called Mr. Wright?
```

```
 1        A.   Yes.  I became aware of what occurred with

 2    AmerisourceBergen and its relationship to Internet

 3    pharmacy.  And I wanted to speak with Kyle, that

 4    it was Eric Brantley and myself that contacted

 5    Kyle, just to make sure that we were doing the

 6    right thing.

 7        Q.   Explain to the jury what you remember

 8    about that call.

 9        A.   Essentially, contacted Kyle, just

10    explained to him why we were calling, and asked

11    him are we okay with what we're doing.

12                 MR. PAPANTONIO:  Objection as to any

13    conversation with a DEA agent in regard to what

14    this man remembers or wrote down about the

15    conversation.  If you have a document, where

16    Mr. Kyle Wright says this -- I think you do have a

17    document.  Why don't we go ahead and move to that?

18                 MR. PYSER:  Counsel, the speaking

19    objection can --

20                 MR. PAPANTONIO:  Okay.  You're

21    wasting your time.  This is all -- this is not

22    even admissible.

23                 MR. PYSER:  Finish your answer.

24                 MR. PAPANTONIO:  Objection as to
```

```
 1    form.  Hearsay.

 2    BY MR. PYSER:

 3        Q.   Finish your answer, please, sir.

 4        A.   So we wanted to know if what we were doing

 5    was the right process.  He responded that we were

 6    heading in the right direction.

 7                    MR. PAPANTONIO:  Objection.  Move to

 8    strike what Mr. Wright said.  The --

 9                    MR. PYSER:  Counsel, let him

10    finish.

11                    MR. PAPANTONIO:  Well, no.  I'm not

12    going to let him finish.  When he says it, I'm

13    going to object to each part of what he says.

14                    MR. PYSER:  You don't have the right

15    to do that.  You have to right to object to

16    form.

17                    MR. PAPANTONIO:  No.  I move to

18    strike.  I have the right to strike an answer.

19    And I move to strike --

20                    MR. PYSER:  Do that at the end of

21    his --

22                    MR. PAPANTONIO:  -- based on

23    hearsay.  Go ahead with your questioning,

24    Counselor.
```

```
1    BY MR. PYSER:

2        Q.   You can finish.

3        A.   So he thinks -- he said he thought we were

4    doing the right thing.

5                 MR. PAPANTONIO:  Continued

6    objection.  Move to strike.

7        A.   Gave us some guidance about if there was

8    any suspicion on a customer, just walk away, offer

9    to meet with us, said his -- the decision on ABC

10   was not made by his office, shared with us a

11   little bit about pain management clinics, and that

12   if we ever came across anything, to let him know

13   and just to document everything we were doing.

14                 MR. PAPANTONIO:  Continuing

15   objection.  Move to strike.

16   BY MR. PYSER:

17       Q.   Showing you what's been marked as Exhibit

18   40.

19

20                 (Exhibit No. 40 marked for

21   identification.)

22

23   BY MR. PYSER:

24       Q.   Do you recognize Exhibit 40?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Is this an e-mail you wrote based on your

 3   call with Mr. Wright?

 4        A.   Yes.

 5        Q.   Does the e-mail accurately describe the

 6   content of that phone call?

 7        A.   Yes.

 8        Q.   And was it written the day after the call?

 9        A.   Yes.

10        Q.   If you look at the first bullet point,

11   does it state that -- well, let's go right above

12   that first -- "Key feedback from Kyle included,"

13   do you see that?

14        A.   Yes.

15             MR. PAPANTONIO:  Objection to form.

16   BY MR. PYSER:

17        Q.   And under that, does it say, "He thinks we

18   are doing the right things and heading in the

19   right direction"?

20        A.   Yes.

21             MR. PAPANTONIO:  Continuing

22   objection.

23   BY MR. PYSER:

24        Q.   Do you recall, in 2006 and 2007, a series
```

1    of letters from DEA to all distributors?

2        A.    Yes.

3        Q.    You were asked about some of those letters

4    earlier today by Mr. Fuller?

5        A.    Yes.

6        Q.    From your perspective, was Cardinal Health

7    in compliance with all of the guidance in

8    Mr. Rannazzisi's September 27, 2006 letter?

9        A.    Yes.

10       Q.    As part of that letter -- I believe it's

11   Exhibit 30.

12            In Exhibit 30, Mr. Rannazzisi wrote that

13   "DEA recognized that the overwhelming majority of

14   registered distributors act lawfully and take

15   appropriate measures to prevent diversion.

16            I think we're on the wrong page.  I draw

17   your attention here -- it's exhibit, so I can't

18   highlight it, but the second paragraph.        Do

19   you see where it says "DEA recognizes the

20   overwhelming majority" --

21       A.    Yes.

22       Q.    -- "of registered distributors act

23   lawfully and take appropriate measures to prevent

24   diversion"?

```
1        A.   Yes.

2        Q.   Did you believe Cardinal was among those

3    distributors that was acting lawfully and taking

4    appropriate measures?

5        A.   Yes.

6        Q.   Why?

7        A.   A couple of reasons.  Based on the fact

8    that we were using a report that DEA approved,

9    submitting it to them as required, having it

10   reviewed during cyclic inspections with no

11   negative findings, the process we put in place in

12   our cage and vault, and then the steps we took

13   after our meeting with the DEA around Internet

14   pharmacy.

15       Q.   Now, there's also -- as part of Exhibit 30

16   on Page 9, there's a list of circumstances that

17   may be indicative of diversion.

18            Was Cardinal Health using those

19   suggestions from the DEA to look for circumstances

20   that might be indicative of diversion?

21       A.   Yes.

22       Q.   In your view, was there a time when DEA

23   guidance regarding shipment of suspicious orders

24   changed?
```

```
 1        A.   Yes.

 2        Q.   Approximately when was that?

 3        A.   September 2007.

 4        Q.   I'm showing you what's been marked as

 5   Exhibit 41.

 6

 7             (Exhibit No. 41 marked for

 8   identification.)

 9

10   BY MR. PYSER:

11        Q.   Can you tell me what Exhibit 41 is?

12        A.   This is the presentation given at the drug

13   enforcement industry conference by

14   AmerisourceBergen.

15        Q.   And there's some handwriting on Exhibit 41

16   throughout the exhibit.  Can you tell us whose

17   handwriting that is?

18        A.   That's mine.

19        Q.   Tell the jury what you remember about the

20   presentation.

21        A.   That essentially this was going to be the

22   new standard for the industry with respect to how

23   suspicious orders were monitored, reported and

24   handled.
```

1     Q.   And did you subsequently draft an e-mail

2   to others in anti-diversion as a result of what

3   you had seen at that industry conference?

4     A.   Yes.

5     Q.   In exhibit -- and excuse me, and is that

6   e-mail Exhibit 42?

7

8          (Exhibit No. 42 marked for

9   identification.)

10

11          (Witness reviews document.)

12  BY MR. PYSER:

13    Q.   Is the e-mail you wrote Exhibit 42?

14    A.   Yes.

15    Q.   And you wrote "DEA is setting a new

16  standard, which we must comply."

17          What did you mean by "a new standard"?

18    A.   It was a change in the way that -- moving

19  away from the ingredient limit report and there

20  was -- the biggest thing that came out to me here

21  was they were clear-cut that -- do not ship.

22    Q.   And was that new to you?

23    A.   That was new to me.

24    Q.   And what steps did Cardinal Health take

```
 1    after the presentation by AmerisourceBergen and

 2    DEA?

 3        A.  Well, immediately upon return to the -- to

 4    our corporate office, we started pulling together

 5    the appropriate team to start developing a new

 6    program.

 7        Q.  Earlier, when you were being asked

 8    questions by plaintiffs, you were shown some

 9    differences between Ohio and Illinois.

10            Do you remember that?

11        A.  Yes.

12        Q.  Would every one of the pills, every piece

13    of medication that was in that chart, have been

14    reported to DEA through the ARCOS system?

15        A.  Yes.

16        Q.  And to your knowledge, would every

17    prescription that was filled in either Ohio or

18    Illinois or West Virginia, or any other state for

19    that matter, would that have required a doctor's

20    prescription?

21        A.  Yes.

22        Q.  And for every prescription and pill

23    dispensed, would there have had to have been a

24    pharmacist with the corresponding responsibility
```

```
1    who made a decision to dispense that medication?

2                   MR. PAPANTONIO:  Objection.  Form.

3         A.   Yes.

4    BY MR. PYSER:

5         Q.   You were also shown a chart that purported

6    to have oxycodone for all distributors.  Do you

7    recall that?

8         A.   Yes.

9         Q.   Is that information that Cardinal Health

10   would have known at the time for all

11   distributors?

12                  MR. PAPANTONIO:  Objection as to

13   what a Cardinal Health would have known from

14   asking this one witness.

15   BY MR. PYSER:

16        Q.   Strike that.

17             Is that information that you understand

18   was available to distributors like Cardinal

19   Health?

20        A.   No.

21        Q.   Would DEA have had that information?

22        A.   Yes.

23        Q.   You spent some time earlier today with

24   counsel for plaintiffs discussing some suspension
```

```
 1    orders of Cardinal Health facilities.  Do you

 2    recall that?

 3         A.   Yes.

 4         Q.   Approximately how many distribution

 5    facilities does Cardinal Health have?

 6         A.   They could have -- I mean approximately in

 7    the mid twenties.

 8         Q.   Do the distribution centers for Cardinal

 9    Health distribute to specific geographic areas?

10         A.   Yes.

11         Q.   To your knowledge, was there ever a

12    suspension order for any facility that shipped to

13    northern Ohio?

14         A.   No.

15         Q.   Was there ever a suspension order to any

16    facility that shipped to West Virginia?

17         A.   No.

18         Q.   You were asked briefly some questions

19    about this document.  It was marked earlier today.

20    It was Exhibit 10.

21              Do you recall that it's an Operation 1

22    Cardinal Health quality management meeting?

23         A.   Yes, yes.

24         Q.   How, if at all, does this document and the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    comments in it relate to anti-diversion work at

2    Cardinal Health?

3         A.   It does not.

4         Q.   You were also asked earlier today about

5    Exhibit 5.  Exhibit 5 concerned a facility

6    assessment in Birmingham, Alabama.  Do you recall

7    that?

8         A.   Yes.

9         Q.   When did Cardinal Health acquire the

10   facility in Birmingham, Alabama?

11        A.   In June of 2006.

12        Q.   And this assessment is also dated June 26

13   through 29, 2006.  Do you see that?

14        A.   Yes.

15        Q.   The questions you were asked regarding

16   controlled substances order filling and other

17   issues at the Birmingham, Alabama facility, did

18   that concern Cardinal Health System?

19        A.   No.  It was the existing Dohmen systems.

20        Q.   So is it fair to say that the critiques

21   and criticisms in this document, Exhibit 5, are

22   unrelated to Cardinal Health's --

23              MR. PAPANTONIO:  Objection to form.

24   BY MR. PYSER:
```

```
 1        Q.   -- anti-diversion process?

 2                  MR. PAPANTONIO:  Objection.  Form.

 3   BY MR. PYSER:

 4        Q.   Let me ask it this way.  To your

 5   knowledge, are any of the criticisms or critiques

 6   in this document related to Cardinal Health's

 7   anti-diversion process?

 8        A.   No.

 9        Q.   Mr. Reardon, in your experience at

10   Cardinal Health over 25 years, did you ever see

11   Cardinal Health ship an order that you believed

12   would be diverted?

13        A.   No.

14                  MR. PYSER:  No further questions.

15                  MR. PAPANTONIO:  How long was that?

16                  THE VIDEOGRAPHER:  Thirty-six

17   minutes.

18

19             (Pause in proceedings.)

20

21                  MR. PAPANTONIO:  Well, I want the

22   exhibits stacked here.  I want all the exhibits

23   together.

24                  MR. PYSER:  Does that -- does that
```

```
 1    include the ones that are blue?

 2                    MR. PAPANTONIO:  That includes --

 3    all the exhibits, I want, right, stacked up with

 4    the exhibit.  See, that's what I'm concerned

 5    about.  Exhibits shouldn't be on the floor.

 6

 7              (Pause in proceedings.)

 8

 9                    REDIRECT EXAMINATION

10    BY MR. PAPANTONIO:

11         Q.  Sir, now, you were asked -- you were asked

12    about -- let's see.  You were asked about changes

13    that took place -- you remember the -- being asked

14    about ABC changing the policy of how they had a

15    reporting system?

16         A.  Yes.

17         Q.  Do you remember that?

18                    DEFENSE COUNSEL:  Objection.  Form.

19    BY MR. PAPANTONIO:

20         Q.  Do you remember being asked just a minute

21    ago by your -- you remember that?

22         A.  Yes.

23         Q.  Okay.  Show me 4195.

24              When you gave that answer about how you
```

 1   wanted to -- you thought ABC system was great.  Is

 2   that your testimony?

 3                   MR. PYSER:  Object to form.

 4   BY MR. PAPANTONIO:

 5       Q.   4195, please.

 6                   MS. MOORE:  Reardon 38.

 7   BY MR. PAPANTONIO:

 8       Q.   Is that what you told --

 9       A.   I did not think it was great.  I knew it

10   was new.

11       Q.   Well, so sir you thought --

12                   MR. PYSER:  Objection, counsel.

13   BY MR. PAPANTONIO:

14       Q.   I'm sorry, what did you say about --

15                   MR. PYSER:  I think you're using the

16   wrong exhibit number, just so you know.

17                   MR. PAPANTONIO:  4195.

18                   MR. PYSER:  Which I don't believe --

19   I think that's --

20                   MR. PAPANTONIO:  Well, we're going

21   to talk about 4195.

22                   Give him the right document, please.

23

24                   (Pause in proceedings.)

```
 1

 2              (Exhibit No. 43 marked for

 3      identification.)

 4

 5      BY MR. PAPANTONIO:

 6          Q.   What do you have in front of -- you see

 7      what we're reading in front of you right now?

 8          A.   I have --

 9          Q.   It's got your name on top of it, right?

10          A.   Yes.

11          Q.   And it says -- now, this is -- I don't

12      believe they asked you about this when they

13      brought this up, so let me ask you about it.

14      "HDMA met with DEA officials last Friday,

15      September 7."  You were at that meeting, is that

16      right, Mr. Reardon?

17          A.   No.

18          Q.   Well, is -- this is your -- you simply are

19      passing this on, is that correct?  It's got your

20      name on top of it, right?

21          A.   Correct.

22          Q.   It says "Summary of DEA meeting."

23               Do you see that?

24          A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   And this is your summary, correct?

2        A.   It's my summary of the DEA conference, not

3    the HDMA meeting.

4        Q.   Okay.  Well, let's see what you said about

5    the conference.

6             "HDMA met with DEA officials last Friday,

7    September 7, to discuss the agency's current

8    policy position on suspicious orders of controlled

9    substances.  A summary highlight, the key points

10   made during the meeting are attached for your

11   review.

12            "DEA is setting a new standard with which

13   we must comply.  This is all coming about as a

14   result of the problems with the Internet

15   pharmacies and controlled substances diversion.

16   Recently, they suspended an ABC registration and

17   used the suspension to get them to implement a

18   complex and onerous suspicious order monitoring

19   program that meets the criteria spelled out in the

20   HDMA."

21            What is the HDMA?

22                 MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24       Q.   What is the HDMA?
```

```
 1        A.    Trade association.

 2        Q.    Right.  It's the trade association you

 3   were a member of, correct?

 4        A.    Yes.

 5        Q.    And you're describing the new standard

 6   that I think you just talked about.  You're

 7   describing it as complex, onerous.  That's --

 8   those are your words, right, "complex" and

 9   "onerous"?

10        A.    Yes.

11        Q.    And then it's -- what's complex and

12   onerous about it?

13        A.    Primarily it's a change to the business

14   model and the impact on customers who are going to

15   have to come up with new inventory management

16   processes and how they manage their inventory and

17   how they order their stock and then opening up to

18   site visits.

19        Q.    So you were worried about your customers.

20   Is that what you're telling me?  This new change,

21   you're worried about your customers.  Is that your

22   testimony?

23               MR. PYSER:  Object to form.

24   Misstates testimony.
```

```
 1    BY MR. PAPANTONIO:

 2         Q.    Right?

 3                    MR. PYSER:   Object to form.

 4    BY MR. PAPANTONIO:

 5         Q.    You said it was going to be too onerous

 6    and complex for customers?

 7         A.    It's a change in the business model for

 8    the customers.

 9         Q.    It says "Recently they suspended the ABC

10    registration."  Then goes on to say,

11    "ABC presented their program at the DEA industry

12    conference this week that I attended."

13                    DEFENSE COUNSEL:   Objection to form.

14    BY MR. PAPANTONIO:

15         Q.    It says "I attended," right?

16         A.    This is two separate meetings.

17         Q.    Okay.  Well, let's ask.  It says "ABC

18    presented their program at the DEA industry

19    conference" -- were you there --

20         A.    Yes.

21         Q.    Okay.  -- "this week that I attended and I

22    have attached a copy of the presentation.  DEA

23    referred to ABC program as the new industry

24    standard.  I will be setting up a meeting to
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    initiate discussions on this topic in the near

2    future.  Additionally, I'm aware that MCK" -- what

3    is MCK?

4        A.   McKesson.

5        Q.   -- "is in ongoing negotiations DEA related

6    to -- related to an order to show cause.  An order

7    to show cause effects the registrant and the

8    opportunity to argue why a registration should be

9    suspended," right?

10           Is that what it said?

11       A.   Correct.

12       Q.   Look at the last paragraph.  These are

13   your words, aren't they?  These are your words?

14       A.   Yes.

15       Q.   "We need to be proactive and implement a

16   program that we develop that will satisfy DEA

17   expectations and that is not dictated to us by the

18   agency pursuant to the regulatory actions."

19           You didn't want to be dictated to by the

20   DEA.  That's what this says, right?

21               MR. PYSER:  Objection.

22       A.   No, we didn't.

23               MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:
```

```
 1      Q.   You didn't want to be -- you did not want

 2   to be dictated to by the DEA, correct?

 3      A.   We did --

 4                 MR. PYSER:  Object to form.

 5      A.   We did not want to have a regulatory

 6   action taken against us.  We wanted to get out in

 7   front of this and develop a program that would

 8   meet the new standard that they talked about at

 9   the meeting.

10      Q.   And that new standard that you created we

11   just saw in 2008.  You had to pay $34 million

12   because the standard you created didn't work,

13   correct?

14                 MR. PYSER:  Object to form and

15   misstates.

16   BY MR. PAPANTONIO:

17      Q.   $34 million under this standard that

18   you're talking about?

19                 MR. PYSER:  Object to form.

20   Misstates evidence.

21   BY MR. PAPANTONIO:

22      Q.   Right.  Didn't we just spend all day

23   talking about the fact that of what happened in

24   2008?
```

```
 1                    MR. PYSER:  Object to form.

 2   BY MR. PAPANTONIO:

 3      Q.   Remember us talking about what happened in

 4   2008 when your company was fined $34 million

 5   because of your failure to comply with your own

 6   standards?  Do you remember that?

 7                    MR. PYSER:  Object to form.

 8   BY MR. PAPANTONIO:

 9      Q.   Yes or no?

10      A.   We paid a fine.

11      Q.   Right.  But that was because the

12   standards -- these new standards you're talking

13   about.  You didn't even comply with your own

14   standards, did you?

15                    MR. PYSER:  Object to form.

16   Objection.  Misstates evidence.

17   BY MR. PAPANTONIO:

18      Q.   Do you remember us talking about that?

19      A.   We put a program.

20      Q.   The jury is going to remember if you don't

21   remember.  Do you remember that your own standards

22   failed and you were fined $34 million, yes or

23   no?

24                    MR. PYSER:  Object.
```

```
 1      A.   Yes.

 2                 MR. PYSER:  Object to form and move

 3      to strike counsel's colloquy.

 4      BY MR. PAPANTONIO:

 5      Q.   And then you remember also 2012, what we

 6      spent most of day talking about, that MOU of 2012,

 7      right?

 8                 MR. PYSER:  Object to form.

 9      BY MR. PAPANTONIO:

10      Q.   Do you remember that?

11      A.   Yes.

12      Q.   And they said that you didn't follow your

13      standards there, correct?

14                 MR. PYSER:  Object to form.

15      Hearsay.  Move to strike.

16      BY MR. PAPANTONIO:

17      Q.   They didn't -- you didn't even follow your

18      standards in 2008, correct?

19                 MR. PYSER:  Object to form.

20      BY MR. PAPANTONIO:

21      Q.   Yes or no?

22      A.   That was the alleged.

23      Q.   You didn't follow your standards in 2012,

24      correct?
```

```
 1              MR. PYSER:  Object to form.

 2      A.   Alleged.

 3  BY MR. PAPANTONIO:

 4      Q.   You didn't follow your standards in --

 5  well, let's -- just so that the jury can remember

 6  what we went through.  Because your lawyer tried

 7  to make it sound like you had these new standards

 8  and they were going to solve the problem of

 9  diversion for your company, so let's go back and

10  look.

11          Give me -- if you would, give me that Elmo

12  because I want to make sure that we get this done

13  right.  Because you just testified that you had

14  developed standards, didn't you?

15              MR. PYSER:  Object to form.

16  BY MR. PAPANTONIO:

17      Q.   Yes?

18      A.   Yes.

19      Q.   And you said -- you said initially that

20  the standards were onerous and complex, correct?

21  That's what you said?

22      A.   That's what the e-mail states.

23      Q.   Well, that's what -- those are your words.

24  What do you mean that's what the e-mail states?
```

1    Those are your words, right?

2                    MR. PYSER:  Object to form.

3    Argumentative.

4    BY MR. PAPANTONIO:

5        Q.   True, those are your words?

6        A.   I wrote it.

7        Q.   You wrote it.  And you also wrote that,

8    "We need to be proactive and to implement a

9    program that we develop that will satisfy the DEA

10   expectations and that is not dictated to us by the

11   agency pursuant to regulatory action.  The ABC

12   program is not customer friendly and results in

13   delayed filing and delivery of controlled

14   substances orders to the customer."

15       That's what you wrote, correct?  So you

16   developed a new -- you developed a new standard.

17   Isn't that what you're trying to tell the jury --

18                    MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20       Q.   -- that Cardinal developed a new

21   standard?

22                    MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24       Q.   That's your testimony, isn't it?

```
 1                    MR. PYSER:  Object to form.

 2    BY MR. PAPANTONIO:

 3         Q.   Right?

 4         A.    We developed a standard.

 5         Q.   Under that standard -- we already

 6    established you developed the standard in 2007,

 7    correct?

 8         A.   We began --

 9         Q.   Is that when you developed your new

10    standard?

11         A.   Began work in 2007.

12         Q.   How many people became addicted to opioids

13    under your old standard, do you know?  Did you

14    ever do a lookback to find out how many Americans

15    became addicted while you were using the old

16    system between 1999 and 2007?  Did you ever do a

17    lookback on that?

18                    MR. PYSER:  Object to form.

19         A.   No.

20    BY MR. PAPANTONIO:

21         Q.   Did you ever find out how many people died

22    because of opioid overdoses between -- well, the

23    four you put in your new system in 2007?

24                    MR. PYSER:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   BY MR. PAPANTONIO:

2       Q.   Do you know how many died?

3                 MR. PYSER:  Object to form.

4   Argumentative.  Also --

5   BY MR. PAPANTONIO:

6       Q.   Do you know how many died, sir?

7                 MR. PYSER:  Object to form.

8   Argumentative.  Also, object to the counsel's use

9   of air quotes on the video.

10  BY MR. PAPANTONIO:

11      Q.   Do you know how many died --

12      A.   No.

13      Q.   -- prior to the time that you put in your

14  brand new improved standard?

15                MR. PYSER:  Object to form.

16  BY MR. PAPANTONIO:

17      Q.   You don't know, do you?

18      A.   No.

19      Q.   You never did a lookback to find out,

20  what's the difference between the number of people

21  dying with our new standard and the number of

22  people that died with our old standard?  You never

23  did any kind of lookback on that, did you?

24                MR. PYSER:  Object to form.  Asked
```

```
 1    and answered.

 2    BY MR. PAPANTONIO:

 3         Q.   Yes or no?

 4                   MR. PYSER:  Object to form.

 5         A.   No.

 6    BY MR. PAPANTONIO:

 7         Q.   All right.  That would be interesting to

 8    know though, wouldn't it, to see if your old

 9    standard that you used -- how many people died

10    under the old standard and how many people died

11    under the new standard from sales of opioids?

12    That would be interesting to you, wouldn't it?

13                   MR. PYSER:  Object to form.

14    BY MR. PAPANTONIO:

15         Q.   Wouldn't it?

16         A.   Maybe.

17         Q.   What do you mean, "maybe"?

18                   MR. PYSER:  Object to form.

19    BY MR. PAPANTONIO:

20         Q.   What do you mean, "maybe"?

21                   MR. PYSER:  Object to form.

22    Argumentative.

23    BY MR. PAPANTONIO:

24         Q.   What do you mean when you say maybe it
```

1    would be interesting to find out how many people

2    died under our old standard prior to the 2007 as

3    opposed to the new standard after 2007?

4              MR. PYSER:  Object to form.

5    Argumentative.  Misstates evidence.

6    BY MR. PAPANTONIO:

7       Q.   What do you mean by "maybe"?

8       A.   That, depending on what the lookback

9    showed, it may be interesting.

10      Q.   Yeah, okay.  Your testimony is it will be

11   interesting?

12             MR. PYSER:  Object to form.  Move

13   the strike.

14   BY MR. PAPANTONIO:

15      Q.   Let me go on to some -- let me go on to

16   some more interesting facts.

17             Okay.  2007 you come up with your new

18   standard.  That's right here on -- we did -- used

19   this document.  It's 29, Reardon 29, on direct

20   examination.

21             And then in 2008, again, this says "Busted

22   for diversion, paid a fine for $34 million,"

23   right?

24             MR. PYSER:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PAPANTONIO:

 2       Q.   We talked about that, correct?

 3                MR. PYSER:  Object to form.  Ongoing

 4   objection to this demonstrative.

 5   BY MR. PAPANTONIO:

 6       Q.   Correct?

 7       A.   Correct.

 8       Q.   And the new system was in place then in

 9   2008, wasn't it?

10                MR. PYSER:  Object to form.

11   BY MR. PAPANTONIO:

12       Q.   Right?

13       A.   Right.

14       Q.   And the new system was also in place --

15   this new improved system that you're talking

16   about, well, it was in place in 2012, wasn't it?

17                MR. PYSER:  Object to form.

18   BY MR. PAPANTONIO:

19       Q.   Yes?

20       A.   Yes.

21       Q.   Nevertheless, you had to sign another MOU

22   in 2012 because you -- the system wasn't working,

23   correct?

24                MR. PYSER:  Object to form.
```

```
 1        A.   Allegation that it wasn't working.

 2   BY MR. PAPANTONIO:

 3        Q.   Yeah, pretty serious allegation.  Do you

 4   know how much fine you paid there?

 5                  MR. PYSER:  Object to form.

 6   BY MR. PAPANTONIO:

 7        Q.   Do you know how much fine you paid, not

 8   first time but the second time?

 9        A.   I don't recall.

10        Q.   Well, I'll let you find out.  The jury

11   will hear about it.

12                  MR. PYSER:  Object to form.

13   BY MR. PAPANTONIO:

14        Q.   Then Kinray --

15                  MR. PYSER:  Object to form.  Move to

16   strike colloquy by counsel and comments from

17   counsel.

18   BY MR. PAPANTONIO:

19        Q.   Kinray, 2016.  Kinray, what was that, a

20   $10 million fine?  I think it was 10 million,

21   right?  And that was under your new system Kinray

22   was using your new system, right?

23                  MR. PYSER:  Object to form.

24   Misstates evidence.
```

```
 1        A.   I don't know that.

 2   BY MR. PAPANTONIO:

 3        Q.   Well, did you ever take time to find out

 4   why they had to pay $10 million using your new

 5   system?

 6        A.   I had retired by then.

 7        Q.   So you -- you're still a consultant with

 8   the company?

 9        A.   Non-DEA matters.

10        Q.   The company pays you to be a consultant,

11   don't they?

12        A.   Yes.

13        Q.   And you were paid to come here today,

14   weren't you?

15        A.   No.

16        Q.   You were -- you're not being paid by the

17   hour to be here today?

18        A.   I don't know that.

19        Q.   Have you been paid by the hour to prepare

20   for this deposition?

21        A.   No.  I have to consult with my contact at

22   Cardinal Health to see whether or not it falls

23   within my contract.

24        Q.   Okay.  So you don't know whether you're
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      going to be paid today or not, correct?

 2                  MR. PYSER:  Object.

 3          A.   Correct.

 4      BY MR. PAPANTONIO:

 5          Q.   Is that right?

 6                  MR. PYSER:  Object to form.

 7      BY MR. PAPANTONIO:

 8          Q.   You want to go get paid?

 9                  MR. PYSER:  Object to form.

10      BY MR. PAPANTONIO:

11          Q.   Do you hope to be paid today, sir?  For

12      coming here to testify about what you remember,

13      you hope to be paid?

14                  MR. PYSER:  Object to form.

15          A.   To me it doesn't matter.  I'm happy to be

16      here.

17      BY MR. PAPANTONIO:

18          Q.   You're happy to be here.  Are you happy to

19      hear -- were you happy to hear about all the

20      things that your company did wrong when we talked

21      about the 2020 investigation -- the 2012

22      investigation by the DEA?  Did that make you happy

23      to hear that?

24                  MR. PYSER:  Object to form.
```

```
 1   BY MR. PAPANTONIO:

 2       Q.   Did that make you happy, sir?

 3       A.   No.  It was disheartening.

 4       Q.   Very disheartening, wasn't it?  It was

 5   also disheartening when you learned in 2008 that

 6   that new system that Cardinal had in place -- it

 7   wasn't working then either, right?

 8               MR. PYSER:  Object to form.

 9       A.   Alleged that it didn't work.

10   BY MR. PAPANTONIO:

11       Q.   Well, sir, I mean, alleged.  You paid $34

12   million for the alleged failure to work right?

13   Correct?

14               MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.   And while you're talking about this

17   program that you had, you're well aware that even

18   in 2009 Cardinal Health's -- in Cardinal Health's

19   own word, they had no real program.  Did you know

20   that?

21               MR. PAPANTONIO:  Show him this

22   document.  I don't think he saw it, 3851.

23               MR. PYSER:  Object to form.

24   BY MR. PAPANTONIO:
```

```
 1        Q.   3851.  I want you take a look at this

 2   based on the answer that you gave, that in 2007

 3   you had a brand new program that worked.

 4              MR. PAPANTONIO:  Okay.  Let's let

 5   him look at this.

 6              MR. PYSER:  Object to form.

 7   Counsel, while we're putting that out, do you want

 8   the prior document that was marked Exhibit 38?  I

 9   don't want it to get mixed up.

10              MR. PAPANTONIO:  We're not going to

11   waste time with that.

12              MS. MOORE:  This will be Cardinal --

13   Reardon 44.

14

15         (Exhibit No. 44 marked for

16   identification.)

17

18   BY MR. PAPANTONIO:

19        Q.   Now, you've seen this document, right?

20        A.   (Witness reviews document.)

21        Q.   Do you see that, 2009 document, right?

22        A.   I don't recall seeing it.

23        Q.   Well, you weren't shown this before you

24   were asked the question about whether or not the
```

1    system -- whether you had a system in place to

2    report suspicious orders after 2007?  Nobody

3    showed this to you, right --

4                 MR. PYSER:  Object to form.

5    BY MR. PAPANTONIO:

6         Q.   -- before you gave that testimony?

7         A.   Correct.

8         Q.   Right?

9         A.   I have not seen this.

10        Q.   Well, see -- Page, 2 you see it says

11   "Prescription drug abuse"?

12        A.   Yes.

13        Q.   "Rogue Internet pharmacies easy access,

14   pain clinics, 3-DC suspension, CAH," then gives

15   some names.

16             Who's Kerry, Jeff, Ivan, DEA meeting?  Do

17   you know who those people are?

18                 MR. PYSER:  Object to form.

19   Misstates evidence.  This was sometime after the

20   new system was in.

21   BY MR. PAPANTONIO:

22        Q.   Do you know who those people are?

23                 MR. PYSER:  Object to form.

24        A.   I believe it's Kerry Clark.

1    BY MR. PAPANTONIO:

2        Q.    What's the date on this?

3        A.    April 13, 2009.

4        Q.    And it says down at the bottom -- let's

5    read this together -- "Feeling from DEA Cardinal

6    people are the" -- "feeling from DEA, Cardinal

7    people".  You see that in quotes?

8              Let's make sure we get that.  Underline

9    "Cardinal people are the problem."

10             Did you know that the DEA had said that

11   the Cardinal employees were the problem with

12   diversion?  Had you ever heard that before?

13                  MR. PYSER:  Object to form.

14   BY MR. PAPANTONIO:

15       Q.    Have you ever heard that before, sir?

16                  MR. PYSER:  Object to form.  Object

17   to hearsay.

18       A.    No.

19   BY MR. PAPANTONIO:

20       Q.    Okay.  And then it goes on to say that

21   "New York AG settlement addresses diversion but

22   was not enforced."

23             Do you see that?

24                  MR. PYSER:  Object to form?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   Yes.

2    BY MR. PAPANTONIO:

3       Q.   "Was not enforced."

4            Do you realize you had a diversion system

5    that was not enforced?  Did you know that?

6                 MR. PYSER:  Object to form.

7       A.   No.

8    BY MR. PAPANTONIO:

9       Q.   This first time you've seen this?

10      A.   Yes.

11      Q.   And it says "Cardinal's knee-jerk

12   reaction."

13           Do you see this, "November/December, blunt

14   force, cutoff pharmacies, no real program."

15           Do you see that?

16                MR. PYSER:  Object to form.

17   BY MR. PAPANTONIO:

18      Q.   And then again it says "December 12, 2007,

19   letter warning Cardinal about customer

20   communication."

21           Do you remember that?

22                MR. PYSER:  Object to form.

23   BY MR. PAPANTONIO:

24      Q.   Do you remember any of these -- this thing
```

Highly Confidential - Subject to Further Confidentiality Review

1    I'm showing you?

2        A.   Never seen it.

3        Q.   You've never seen this?

4        A.   Never seen this.

5        Q.   And before you were asked about how well

6    your system was working, you had never seen this

7    document, correct?

8                MR. PYSER:  Object to form.

9    Misstates evidence.

10   BY MR. PAPANTONIO:

11       Q.   Correct?  Am I correct?

12       A.   Correct.

13               MR. PAPANTONIO:  Show him 4371.

14   BY MR. PAPANTONIO:

15       Q.   Sir, do you respect your CEOs -- the CEOs

16   that you worked under?  How many different CEOs

17   have you worked under?  4371.  How many CEOs have

18   you worked under?

19               MR. PYSER:  Object to form.

20               MS. MOORE:  Reardon 45.

21

22          (Exhibit No. 45 marked for

23   identification.)

24

```
1        A.    I'm thinking.  Probably three.

2    BY MR. PAPANTONIO:

3        Q.    Well, Gary Dolch, do you know who he is?

4        A.    Yes.

5        Q.    Tell me who Gary Dolch is.

6        A.    He was the Executive Vice President of

7    Quality and Regulatory Affairs.

8        Q.    Quality and Regulatory Affairs.  That's

9    exactly what you did between 2005 and 2007, right?

10       A.    Correct.

11       Q.    And this says Gary Dolch -- it says

12   "Illegal online sellers Feds say."  And then it

13   goes -- see where it says -- well, let's just

14   say -- "It looks like I am scheduled for call for

15   both of you at 4:30"," and then it -- attaches

16   where you -- here's what I want you to take a look

17   at.

18            You know there was an article attached --

19   do you see Page 3?  There's an article attached to

20   this e-mail.  Do you see the article that actually

21   is attached to the e-mail?

22       A.    Yes.

23       Q.    And it says "Cardinal loses third facility

24   to drug case.  Pills ended up being sent to
```

```
 1    illegal online sellers, Feds say."

 2              And that's in the Columbus Dispatch,

 3    right?  That's where it says is Columbus Dispatch?

 4         A.   Correct.

 5         Q.   And that's right where headquarters was,

 6    right?

 7                   MR. PYSER:  Object to form.

 8    Objection to prior question as well.  Objection.

 9    Hearsay.

10    BY MR. PAPANTONIO:

11         Q.   That's where the Columbus Dispatch is,

12    right?

13         A.   Correct.

14         Q.   Do you understand that somebody from your

15    company is attaching this news article to this

16    e-mail?  Can you see that?

17         A.   Yes.

18         Q.   So they attach this because -- well, I

19    don't know why, but they attach it to the e-mail

20    that says Columbus Dispatch.  And that's where the

21    headquarters is, correct?

22                   MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24         Q.   Right, Ohio?
```

```
 1        A.    Correct.

 2        Q.    And then my partner showed you that in

 3    Ohio the numbers of -- the numbers of narcotics

 4    exceeded the numbers in Illinois six times.

 5            Did you remember him going through all

 6    those charts with you and everything?

 7                MR. PYSER:  Object to form and

 8    objection, misstates evidence.

 9    BY MR. PAPANTONIO:

10        Q.    Do you remember that?

11        A.    Yes.

12        Q.    It says "A third Cardinal Health facility

13    has been barred from distributing controlled

14    substances in a federal investigation into alleged

15    diversion of pharmaceutical orders to elicit

16    online drug sellers.  The latest license

17    suspension" -- you understand -- do you realize

18    these are not even license suspensions we talked

19    about earlier in your direct examination?

20                MR. PYSER:  Object to form.

21    Misstates evidence.

22    BY MR. PAPANTONIO:

23        Q.    Do you know that?

24                MR. PYSER:  Object to form.
```

1    Misstates evidence.

2    BY MR. PAPANTONIO:

3        Q.   Are you able to tell that we're talking

4    about different problems here?

5                 MR. PYSER:  Object to form.

6    BY MR. PAPANTONIO:

7        Q.   Correct me if I'm wrong.

8                 MR. PYSER:  Misstates evidence.

9    You're purposely misleading the witness.

10   BY MR. PAPANTONIO:

11       Q.   Correct me if I'm wrong.  Look at this

12   document.  We're talking about suspensions and we

13   haven't even talked about this today, right?

14                MR. PYSER:  Object to form.

15   Misstates evidence.

16   BY MR. PAPANTONIO:

17       Q.   Right?

18                MR. PYSER:  You're purposefully

19   misleading the witness.

20                MR. PAPANTONIO:  No, I'm not.  I'm

21   asking him, a witness.

22   BY MR. PAPANTONIO:

23       Q.   Did I mislead that or does this document

24   say that?

```
 1                    MR. PYSER:  Object to form.

 2                    MR. PAPANTONIO:  Let him answer the

 3     question.  You want to testify, I'll put you under

 4     oath.  Right now I'm asking him a clear question.

 5                    MR. PYSER:  I'm making an objection

 6     because your question's improper.

 7                    MR. PAPANTONIO:  Question's very

 8     clear.

 9     BY MR. PAPANTONIO:

10         Q.   First of all, this is a Columbus Dispatch

11     that's addressed to -- that's Columbus that is

12     attached to an e-mail right inside the Cardinal

13     Health facility, correct?

14                    MR. PYSER:  Object to form.

15         A.   Correct.

16     BY MR. PAPANTONIO:

17         Q.   And we're talking about -- it says

18     "Cardinal loses third facility" -- that's the way

19     it starts out, right -- "to drug case.  Pills

20     ended up being sent to illegal online sellers."

21              Now, did we talk -- we haven't even talked

22     about that today, have we?

23                    MR. PYSER:  Object to form.

24     Misstates evidence.
```

```
1    BY MR. PAPANTONIO:

2        Q.   This is the first time we've talked about

3    it, right?

4              MR. PYSER:  Object to form.

5    Misstates evidence.

6    BY MR. PAPANTONIO:

7        Q.   Do you remember me talking to you about

8    this before today -- I mean, before this -- do you

9    remember me talking -- let me scratch that.

10             Before your witness -- your lawyer asked

11   you whether or not you had a system in place that

12   worked after 2007, do you remember ever seeing

13   this document?

14             MR. PYSER:  Object to form.

15   Misstates evidence.  Object to form.  Misstates

16   evidence, misstates testimony.

17   BY MR. PAPANTONIO:

18       Q.   Do you remember?

19             MR. PYSER:  Object to form.

20       A.   Do I remember seeing this document?

21   BY MR. PAPANTONIO:

22       Q.   Yes.

23       A.   No.

24       Q.   Okay.  Well, let's look at the document.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    It says "A third Cardinal Health facility has been

 2    barred."  What's the word "barred" mean?

 3              We're not talking about suspension here.

 4    We're talking about it being "barred".

 5              What's the difference between "suspension"

 6    and "barred"?

 7                   MR. PYSER:  Object to form.

 8    BY MR. PAPANTONIO:

 9       Q.   What is the difference?

10                   MR. PYSER:  Object to form.  Relying

11    on hearsay from a newspaper article.

12    BY MR. PAPANTONIO:

13       Q.   What's the difference?

14                   MR. PYSER:  Objection.

15    BY MR. PAPANTONIO:

16       Q.   What is the difference between barred and

17    being suspended?

18                   MR. PYSER:  Object to form.

19    BY MR. PAPANTONIO:

20       Q.   What's the difference?

21                   MR. PYSER:  Object to form.

22       A.   I don't know.

23    BY MR. PAPANTONIO:

24       Q.   Well, it says -- this newspaper article
```

```
1    that's attached to a Cardinal e-mail says "A third

2    Cardinal Health facility has been barred from

3    distributing controlled substances in a federal

4    investigation into the alleged diversion of

5    pharmaceutical orders to illicit online drug

6    sellers."

7           Do you see that?

8                 MR. PYSER:  Object to form.

9    BY MR. PAPANTONIO:

10      Q.   Do you know what "illicit" means?

11                MR. PYSER:  Object to form.

12      A.   Yes.

13   BY MR. PAPANTONIO:

14      Q.   What does the word illicit mean in your 28

15   years of this business?  What does that mean?

16      A.   Illegal.

17      Q.   Illegal, right.

18           It says "The latest license suspension

19   went into effect yesterday and affects Cardinal's

20   New Jersey distribution center, Swedesboro, New

21   Jersey distribution center, right?

22      A.   That's what it states.

23      Q.   Well, didn't you just tell the lawyer that

24   none of distribution centers had ever been
```

```
 1    suspended or disbarred?  Did you tell us that?

 2                    MR. PYSER:  Objection.  Form.

 3    Objection.  Form.  Misstates testimony.

 4    BY MR. PAPANTONIO:

 5        Q.   Did you tell, on direct examination, that

 6    none of the distribution centers in the country

 7    had been suspended or disbarred?

 8                    MR. PYSER:  Object to form.

 9    Misstates testimony.

10    BY MR. PAPANTONIO:

11        Q.   Yes or no?

12                    MR. PYSER:  You know very well

13    that's not what he said.  This is ridiculous.

14    BY MR. PAPANTONIO:

15        Q.   Yes or no?  Yes or no?

16        A.   No.

17        Q.   You did not say that?

18        A.   No.

19        Q.   Because you know that there were several

20    distribution centers that were suspended from

21    doing business, correct?

22                    MR. PYSER:  Object to form.

23    BY MR. PAPANTONIO:

24        Q.   Right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   You're twisting my words.

 2      Q.   Well, I don't want to twist your words.

 3  You know, as we sit here, sir, that there were

 4  several distribution centers that were told by the

 5  DEA, you can't do business anymore because you're

 6  not complying with the rules, yes or no?

 7                MR. PYSER:  Object to form.

 8      A.   The question I was asked was whether or

 9  not, for example, the distribution center that

10  serviced Ohio was ever suspended.

11  BY MR. PAPANTONIO:

12      Q.   Oh, so I must have missed that.  Okay.  In

13  fairness to you, if that was the question, good.

14           There was nothing in Ohio that was

15  suspended, right, no distribution center in Ohio?

16      A.   The distribution center that services Ohio

17  was not suspended.

18      Q.   But the rest of the story is that there

19  were distribution centers all over the country

20  that were suspended, yes or no?

21                MR. PYSER:  Objection.  Misstates

22  testimony.

23  BY MR. PAPANTONIO:

24      Q.   Yes or no?
```

```
 1                    MR. PYSER:  Object to form.

 2   Misstates evidence.

 3        A.   There were others.

 4   BY MR. PAPANTONIO:

 5        Q.   There were others.  Tell the jury how many

 6   other Cardinal distribution centers you remember

 7   that were told they can't do business because

 8   they're not playing by the rules.  How many?

 9                    MR. PYSER:  Object to form.  Object

10   to form.

11        A.   There were three.

12   BY MR. PAPANTONIO:

13        Q.   Three.  And it says "In the past two

14   weeks, Cardinal's facilities in Auburn,

15   Washington -- in Auburn, Washington and in

16   Lakeland, Florida also have been ordered by the

17   U.S. Drug Enforcement Administration to stop

18   distributing drugs such as narcotics until further

19   notice."

20             Do you see that?

21                    MR. PYSER:  Object to form.

22        A.   Yes.

23   BY MR. PAPANTONIO:

24        Q.   Did I read that right?
```

```
 1       A.   Yes.

 2       Q.   It says "After the Lakeland suspensions

 3   last week, a spokesman for the DEA said such moves

 4   on the agency's part are not very common."

 5            Did you know that suspension of

 6   distribution centers was not very common?

 7                 MR. PYSER:  Object to form.

 8       A.   That's what it states.

 9   BY MR. PAPANTONIO:

10       Q.   Well, would you consider suspension of a

11   license for a drug distributor to be a common

12   occurrence within the narcotics business?

13                 MR. PYSER:  Object to form.

14       A.   It happens.

15   BY MR. PAPANTONIO:

16       Q.   It happens.  And it happened to you how

17   many times?

18                 MR. PYSER:  Object to form.

19   BY MR. PAPANTONIO:

20       Q.   How many times?

21       A.   Three.

22       Q.   It says "Cardinal plans to put one of

23   several new controls in place this month.

24   Spokesman Jim Mazzola said he knew an automated
```

    1    feature is being added to Cardinal's computer."

    2           Sir, did you have computers back when you

    3    started with the company all the way back in 1988?

    4    Did you -- did they give you a computer?

    5                 MR. PYSER:  Object to form.

    6      A.   Are you asking about a laptop?

    7    BY MR. PAPANTONIO:

    8      Q.   I don't care.  Any kind of computer,

    9    laptop, fixed computer?  Did you have any

   10    computers back in 1988?

   11                 MR. PYSER:  Object to form.

   12      A.   I did not initially.

   13    BY MR. PAPANTONIO:

   14      Q.   When's the first time you were given a

   15    computer there at Cardinal?

   16      A.   I don't recall.

   17      Q.   There were systems that were computerized,

   18    systems that took care of monitoring things like

   19    overabundance of -- oversale of thresholds,

   20    overuse of thresholds.

   21           There were computer systems in place when?

   22    Tell us when the first time a computer system was

   23    in place, as far as you know, monitoring

   24    thresholds rather than having pickers and checkers

1    and whatever you want to call them monitoring

2    thresholds.

3                    MR. PYSER:  Object to form.

4    BY MR. PAPANTONIO:

5        Q.   When's the first time that a computer

6    actually came into Cardinal?

7        A.   There were warehouse management systems

8    when I started.  I was answering with respect to a

9    personal computer.

10       Q.   Yeah, but there were computers.  You had a

11   -- you had every ability to put a computer system

12   in to monitor these threshold issues rather than

13   counting on pickers and checkers, didn't you?

14                   MR. PYSER:  Object to form.

15   BY MR. PAPANTONIO:

16       Q.   You have a system like that now, don't

17   you?

18                   MR. PYSER:  Object to form.

19   Misstates evidence.

20       A.   We had a system.

21   BY MR. PAPANTONIO:

22       Q.   Okay.  And when did the -- when was the

23   system first used?

24       A.   The ingredient limit report was

1    implemented in early '90s.

2        Q.   So you had a computer system to keep up

3    with diversion.  Is that your testimony?

4        A.   We had the ingredient limit report that

5    was approved by the agency.

6        Q.   Well, let's see what this says right here.

7    It says "In the past two weeks, Cardinal

8    facilities in Auburn, Washington and Lakeland also

9    have been ordered by the U.S. Drug Enforcement

10   Administration to stop distributing drugs such as

11   narcotics until further notice."

12        And then it says -- see the paragraph

13   that says "Cardinal plans to put one of several

14   new controls in place this month.  Spokesman Jim

15   Mazzola said" -- he said "A new automated feature

16   is being added to Cardinal's computer system that

17   will identify and file order activity that could

18   be unusual."

19        Do you see that?

20             MR. PYSER:  Object to form.

21        A.   Yes.

22   BY MR. PAPANTONIO:

23        Q.   Do you see that?

24        A.   Yes.

```
1        Q.   And what's the year here, 2007?  Is that

2   what we're talking about, 2007?

3                MR. PYSER:  Object to form.

4        A.   That's the date on the article.

5   BY MR. PAPANTONIO:

6        Q.   And how long -- and you know -- and you

7   had computers there long before 2007, right?

8        A.   Yes.

9        Q.   And there were automated systems that

10  other companies used to follow exactly what we're

11  talking about, which is suspicious orders.  You

12  know that, right?

13               MR. PYSER:  Object to form.

14       A.   We had a system in place prior to this.

15  BY MR. PAPANTONIO:

16       Q.   Yes.  And those -- and that's the system

17  that you were fined $34 million for and you

18  were -- the New York -- the New York AG fined you,

19  the DEA fined you, right?  That's the system

20  you're talking about, right?

21               MR. PYSER:  Object to form.

22  BY MR. PAPANTONIO:

23       Q.   Okay.  And then it goes on.  It says --

24  look here.
```

1          It says, the next paragraph, "In a

2    statement last week, Cardinal Chairman, Chief

3    Executive Kerry Clark" -- chief executive, this is

4    the person at the top of the line, said -- they

5    called -- "called in laxness and control is

6    unacceptable and vowed to work with the DEA to

7    resolve this matter."

8          Read that.  Why don't you read that?  I

9    think I chopped that up.  Why don't you read that

10   paragraph for me, okay?

11              MR. PYSER:  Object to form.

12       A.   "In a statement last week, Cardinal

13   Chairman and Chief Executive, R. Kerry Clark,

14   called any laxness in controls unacceptable and

15   vowed to work with the DEA to resolve this

16   matter."

17   BY MR. PAPANTONIO:

18       Q.   This was during your watch, that CEO of

19   the president says that the conduct is

20   unacceptable.  Your own CEO is saying that in

21   2007, right?

22              MR. PYSER:  Object to form.

23   Misstates evidence.

24   BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.   Does this misstate what I just said?

2     Let's look at it again.  Read it again for the

3     jury because I want to be sure that I got this

4     right.

5               "In a statement last week" -- pick up from

6     there.

7                    MR. PYSER:  Object to form.

8          A.   "Cardinal Chairman and Chief Executive R.

9     Kerry Clark called any laxness in controls

10    unacceptable and vowed to work with the DEA to

11    resolve this matter."

12    BY MR. PAPANTONIO:

13         Q.   And this was when you were supervisor of

14    the people who were supposed to be handling this

15    system of avoiding diversion, correct?

16                   MR. PYSER:  Object to form.

17    BY MR. PAPANTONIO:

18         Q.   Correct?

19         A.   Correct.

20         Q.   You were the guy at the top that -- did he

21    come and tell you that personally that it was

22    unacceptable?

23                   MR. PYSER:  Object to form.

24         A.   He did not.
```

```
1   BY MR. PAPANTONIO:

2       Q.   Well, he said it in this newspaper

3   article, didn't he?

4              MR. PYSER:  Object to form.

5   Hearsay.

6   BY MR. PAPANTONIO:

7       Q.   Right?

8       A.   That's what it says.

9       Q.   And it's connected to -- that document is

10  connected to an e-mail that was sent around the

11  company at Cardinal, correct?

12             MR. PYSER:  Object to form.

13  BY MR. PAPANTONIO:

14      Q.   Right?  Am I right?

15      A.   Correct.

16      Q.   Now, sir, let me ask you.  You talked

17  about how Mr. -- you said Carl Wright told you

18  everything -- knew everything you were doing was

19  good and it was all working, right?

20             Is that what you just told the jury?

21             MR. PYSER:  Object to form.

22  Misstates testimony.

23  BY MR. PAPANTONIO:

24      Q.   Did you tell us that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   He said we were doing the right things and

2    heading in the right direction.

3        Q.   Yeah.  Do you remember me showing you the

4    affidavit from Mr. Wright?

5             MR. PYSER:  Object to form.

6    BY MR. PAPANTONIO:

7        Q.   Let me show --

8        A.   I don't know.

9             MR. PAPANTONIO:  Give me that

10   affidavit for Mr. Wright, if you would, please.

11   BY MR. PAPANTONIO:

12       Q.   Okay.  Do you remember me showing you the

13   document on the MOU where Mr. Wright actually gave

14   statements about the misconduct of Cardinal?  Do

15   you remember that at all?

16            MR. PYSER:  Objection.

17       A.   I don't think we --

18            MR. PYSER:  Hold on.  Object to

19   form.

20   BY MR. PAPANTONIO:

21       Q.   We didn't get to that.

22            MR. PYSER:  Go ahead and answer.

23   Object to form.

24       A.   I don't remember seeing that.
```

```
 1   BY MR. PAPANTONIO:

 2       Q.   You don't remember seeing that.  Well, let

 3   me see if can find it.

 4            This is what we went over today.  Do you

 5   remember I spent all this time going over the

 6   document and there were actually affidavits that

 7   were attach to it?

 8                  MR. PAPANTONIO:  Could somebody give

 9   me my document, please?

10                  MS. MOORE:  4230.

11   BY MR. PAPANTONIO:

12       Q.   4230.  Do you remember us doing that?

13                  MR. PAPANTONIO:  4230.  Would

14   somebody please give me my document, 4230?

15                  MR. PYSER:  Object to form.

16                  MR. PAPANTONIO:  Thank you.

17   BY MR. PAPANTONIO:

18       Q.   Now, you were talking about how Mr. Wright

19   was -- Mr. Wright was talking about how you had

20   done everything right.

21                  MR. PAPANTONIO:  This is not what I

22   want.  I want the MOU from 2012, and then this is

23   the last question I have.  Where is the MOU 4085?

24   BY MR. PAPANTONIO:
```

```
 1        Q.   This is the last question I have, okay.  I

 2   know you've had a long day, but this is the last

 3   thing I want to ask you about because you talked

 4   about how Mr. Wright --

 5             MR. PAPANTONIO:  Can I have my

 6   document, please?

 7   BY MR. PAPANTONIO:

 8        Q.   -- how Mr. Wright had told you what, that

 9   you were doing things right?

10             MR. PYSER:  Object to form.

11        A.   He said that we were doing the right

12   things and heading in the right direction.

13   BY MR. PAPANTONIO:

14        Q.   Well, do you know that Mr. Wright actually

15   prepared an affidavit, a declaration affidavit, in

16   2012 where he pointed out specifically about all

17   the things that you had done wrong.

18        Did you know that?

19        A.   Did not.

20             MR. PYSER:  Object to form.

21   BY MR. PAPANTONIO:

22        Q.   Let me show it to you because I want you

23   to see that so you don't think I'm just making

24   this up.  Because according to you, Mr. Wright --
```

Highly Confidential - Subject to Further Confidentiality Review

1    Kyle Wright correct?

2        A.   Correct.

3        Q.   Is that right?

4        A.   Correct.

5        Q.   Well, on Page 41 of this document -- here,

6    let me get it for you.  It's in the evidence.

7                  MR. PAPANTONIO:  No. 4.  Give me No.

8    4, if you would.  We're short on time, so I'm

9    going to have some help here.

10   BY MR. PAPANTONIO:

11       Q.   The MOU -- nobody told you that Carl

12   Wright was one of the investigators about the

13   misconduct of your company, correct?

14                  MR. PYSER:  Object to form.

15   Misstates evidence.

16   BY MR. PAPANTONIO:

17       Q.   Is that right, nobody told you that Carl

18   Wright, the person that you said told you you were

19   doing everything right, that that was not a --

20                  MR. PAPANTONIO:  Oh, here it is

21   right here.  4085, is that it?

22   BY MR. PAPANTONIO:

23       Q.   Take a look at this.

24                  MR. PYSER:  Object to form.

```
 1   BY MR. PAPANTONIO:

 2       Q.   Take a look at that and go to page 41.  Go

 3   to .41.

 4            Do you see where it says "Office Diversion

 5   Control Unit, Chief Kyle Wright"?  Is that the

 6   same Mr. Wright you're talking about?

 7                 MR. PYSER:  Object to form.  And

 8   Counsel, I believe you're out of time.

 9   BY MR. PAPANTONIO:

10       Q.    Is that the same Mr. Wright you're talking

11   about?

12                 MR. PYSER:  Object to form.  The

13   videographer just told me you're out of time.

14   BY MR. PAPANTONIO:

15       Q.   Yes or no, is that the same Mr. Wright?

16       A.   Yes.

17       Q.   Okay.  Well, the jury is going to read

18   what Mr. Wright said about your company.

19                 MR. PYSER:  Object to form.  Move to

20   strike counsel's colloquy at the end.

21                 MR. PAPANTONIO:  Thank you.

22                 THE VIDEOGRAPHER:  The time is 7:18

23   p.m.  This deposition has --

24                 MR. PYSER:  One thing before we go
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    off the record.  There was an exhibit earlier

 2    today.  When we find the number for the court

 3    reporter -- I'm not sure.  I believe it was either

 4    Exhibit 3 or 4 that is -- that was clawed back,

 5    that should be withheld from the record.  It's a

 6    privileged document.  Cardinal Health has clawed

 7    it back.  It shouldn't have been used in this

 8    deposition in the first place.

 9                 THE VIDEOGRAPHER:  The time is 7:18

10    p.m.  This deposition has concluded.

11                 MR. PAPANTONIO:  Keep it then.

12    We'll put it under seal.

13                 MR. PYSER:  The exhibit being clawed

14    back and being withheld from the record is Exhibit

15    9, which is Bates number CAH_MDL2804_01522227.

16

17

18                 (Deposition concluded at 7:19 p.m.)

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        CERTIFICATION

 2          I, DARLENE M. COPPOLA, a Notary Public, do hereby certify

 3     that STEVE REARDON, after having satisfactorily identifying

 4     himself, came before me on the 30th day of November, 2018 in

 5     Boston, Massachusetts, and was by me duly sworn to testify to

 6     the truth and nothing but the truth as to his knowledge touching

 7     and concerning the matters in controversy in this cause; that he

 8     was thereupon examined upon his oath and said examination

 9     reduced to writing by me; and that the statement is a true

10     record of the testimony given by the witness, to the best of my

11     knowledge and ability.

12          I further certify that I am not a relative or employee

13     of counsel/attorney for any of the parties, nor a relative or

14     employee of such parties, nor am I financially interested in the

15     outcome of the action.

16          WITNESS MY HAND THIS 4th day of December, 2018.

17

18

19

20     DARLENE M. COPPOLA            My commission expires:

21     NOTARY PUBLIC                 November 11, 2022

22     REGISTERED MERIT REPORTER

23     CERTIFIED REALTIME REPORTER

24
```

```
1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF OHIO

3                       EASTERN DIVISION

4

5

6       ***********************************

7       IN RE:

8       NATIONAL PRESCRIPTION OPIATE

        LITIGATION

9

        This document relates to:

10

        All cases

11

        ***********************************

12

13          I, STEVE REARDON, say that I have read the foregoing

14      deposition and hereby declare under penalty of perjury the

15      foregoing is true and correct:

16      (as prepared)  (as corrected on errata.)

17          Executed this _____ day of _____ 20____, at

18      _____, _____.

19

20

21

22      _____

23                 STEVE REARDON

24
```

```
 1                    CORRECTION PAGE

 2       DEPONENT:  STEVE REARDON

 3       DATE TAKEN: NOVEMBER 30, 2018

 4       CASE:      NATIONAL PRESCRIPTION OPIATE LITIGATION

 5       **************************************************

 6       PAGE / LINE / SHOULD READ/REASON

 7       _____/_____/_____

 8       _____/_____/_____

 9       _____/_____/_____

10       _____/_____/_____

11       _____/_____/_____

12       _____/_____/_____

13       _____/_____/_____

14       _____/_____/_____

15       _____/_____/_____

16       _____/_____/_____

17       _____/_____/_____

18       _____/_____/_____

19       _____/_____/_____

20       _____/_____/_____

21       _____/_____/_____

22       _____/_____/_____

23       _____/_____/_____

24       _____/_____/_____
```