Highly Confidential - Subject to Further Confidentiality Review

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                      -   -   -
 5   IN RE:  NATIONAL      :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION            :
     -----------------------------------------
 7                         :  CASE NO.
     THIS DOCUMENT         :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                           :  Hon. Dan A.
 9                         :  Polster
10                      -   -   -
            Thursday, January 24, 2019
11                      -   -   -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                        -   -   -
14
              Videotaped deposition of
15   LARRY RINGGOLD, taken pursuant to notice,
     was held at Homewood Suites by Hilton
16   4170 Philadelphia Road, Bel Air, Maryland
     21015, beginning at 5:01 p.m., on the
17   above date, before Amanda Dee
     Maslynsky-Miller, a Certified Realtime
18   Reporter.
19                      -   -   -
20
21
22
              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: WILLIAM POWERS, ESQUIRE
EMMA KABOLI, PARALEGAL
600 New Hampshire Avenue NW
Suite 10A
Washington, DC 20037
Wpowers@baronbudd.com
Ekaboli@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: JOHN P. LAVELLE, JR., ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-4824
John.lavelle@morganlewis.com
- and -
BY: MATTHEW R. LADD, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6141
Matthew.ladd@morganlewis.com
Representing the Defendant,
Rite Aid

Page 3

APPEARANCES: (Continued)
VIA TELEPHONE/LIVESTREAM:

GIBBONS PC
BY: PAUL E. ASFENDIS, ESQUIRE
One Pennsylvania Plaza
37th Floor
New York, New York 10119
(212) 613-2000
Pasfendis@gibbonslaw.com
Representing the Defendant,
AmerisourceBergen Corporation

JONES DAY
BY: JASON Z. ZHOU, ESQUIRE
77 West Wacker
Chicago, Illinois 60601
(312) 782-3939
Jzhou@jonesday.com
Representing the Defendant,
Walmart

ARNOLD & PORTER KAYE SCHOLER LLP
BY: JOHN D. LOMBARDO, ESQUIRE
44th Floor
777 South Figueroa Street
Los Angeles, California 90017
(213) 243-4000
John.lombardo@arnoldporter.com
Representing the Defendant,
Endo Pharmaceuticals, Endo Health,
and Par Pharmaceuticals

ALSO PRESENT:
Dan Lawlor, Videographer
Jeff Sayres, Trial Technician

Page 4

- - -
I N D E X
- - -

Testimony of: LARRY RINGGOLD

By Mr. Powers          8
By Mr. Lavelle         107

E X H I B I T S
- - -

NO.      DESCRIPTION          PAGE
Rite Aid-Ringgold
Exhibit-1   Rite_Aid_OMDL_0049982-993  39

Rite Aid-Ringgold
Exhibit-2   Rite_Aid_OMDL_0032421   46
Rite Aid-Ringgold
Exhibit-3   Rite_Aid_OMDL_0032422   46

Rite Aid-Ringgold
Exhibit-4   Rite_Aid_OMDL_0027551-552  57
Rite Aid-Ringgold
Exhibit-5   Rite_Aid_OMDL_21461-463    64

Rite Aid-Ringgold
Exhibit-6   Rite_Aid_OMDL_23456-457    69
Rite Aid-Ringgold
Exhibit-7   Rite_Aid_OMDL_0012020-021  79

Rite Aid-Ringgold
Exhibit-8   Rite_Aid_OMDL_0011115-116  90

Page 5

- - -
E X H I B I T S
- - -

NO.      DESCRIPTION          PAGE
Rite Aid-Ringgold
Exhibit-9   Rite_Aid_OMDL_0003108-109  95

Rite Aid-Ringgold
Exhibit-10  Rite_Aid_OMDL_0010795-796  100
Rite Aid-Ringgold
Exhibit-11  Rite_Aid_OMDL_0003562      111

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
1             - - -
2        DEPOSITION SUPPORT INDEX
3             - - -
4
5   Direction to Witness Not to Answer
6   Page Line   Page Line   Page Line
7   None
8
9
10  Request for Production of Documents
11  Page Line   Page Line   Page Line
12  None
13
14
15  Stipulations
16  Page Line   Page Line   Page Line
17  7    1
18
19
20  Question Marked
21  Page Line   Page Line   Page Line
22  None
23
24
```

Page 7

```
1             - - -
2        (It is hereby stipulated and
3    agreed by and among counsel that
4    sealing, filing and certification
5    are waived; and that all
6    objections, except as to the form
7    of the question, will be reserved
8    until the time of trial.)
9             - - -
10        VIDEO TECHNICIAN:  We are
11   now on the record.  My name Ray
12   Moore, I'm a videographer for
13   Golkow Litigation Services.
14   Today's date is January 24, 2019,
15   and the time is 5:01 p.m.
16        This video deposition is
17   being held in Bel Air, Maryland,
18   in the matter In Re National
19   Prescription Opiate Litigation for
20   the United States District Court
21   for the Northern District of Ohio,
22   Eastern Division, MDL Number 2804.
23        The deponent is Larry
24   Ringgold.  Counsel will be noted
```

Page 8

```
1   on the stenographic record.  The
2   court reporter is Amanda Miller
3   and will now swear in the witness.
4             - - -
5        LARRY RINGGOLD, after having
6   been duly sworn, was examined and
7   testified as follows:
8             - - -
9        EXAMINATION
10            - - -
11  BY MR. POWERS:
12       Q.   Good evening, Mr. Ringgold.
13  My name is Will Powers, and I represent
14  the plaintiffs in this litigation.
15       Before we get started, can
16  you please just state your full name and
17  spell it for the record?
18       A.   Larry Ringgold, Junior,
19  L-A-R-R-Y, R-I-N-G-G-O-L-D.
20       Q.   And we're here for your
21  deposition today.
22       Do you understand that?
23       A.   Yes.
24       Q.   Have you ever been deposed
```

Page 9

```
1   before?
2        A.   No.
3        Q.   I want to just go over a
4   couple of ground rules before we get
5   started to make sure we're all on the
6   same page.
7        Because the court reporter
8   is writing down what is being said, it's
9   important that only one of us is speaking
10  at a time.  So even if you think you know
11  where I'm going with a question, please
12  don't jump in.  We want to make sure I
13  finish my question before you answer --
14  give your answer, and I'll let you give
15  your answer before I ask the question.
16       Is that okay?
17       A.   Yes.
18       Q.   And also, when you're
19  answering my questions, I need verbal
20  answers; so no nods of the head, shrugs
21  of the shoulders, uh-huh or uh-uh, stuff
22  like that.
23       Is that all right?
24       A.   That's all right.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    Q.   And if for any reason you
2 don't understand a question or it
3 requires some sort of clarification, you
4 have to tell me, and we can get that
5 matter resolved before you answer the
6 question.
7        Is that okay?
8    A.   Yes.
9    Q.   So I'll assume, then, if you
10 answer a question, you understand my
11 question.
12        Is that all right?
13    A.   Yes.
14    Q.   Are you currently suffering
15 from any medical diseases or illnesses
16 that in any way interfere with your
17 ability to answer truthfully and
18 completely my questions here tonight?
19    A.   No.
20    Q.   And I just ask that you keep
21 your voice up a little bit, because
22 everything is being recorded as well,
23 okay?
24    A.   Yes.

Page 11

1    Q.   Are you currently taking any
2 medication or drugs that may in any way
3 interfere with your ability to answer my
4 questions truthfully and completely?
5    A.   No.
6    Q.   And do you understand the
7 court reporter has sworn you in and
8 you're under oath here today just as you
9 would be in a courtroom at trial?
10    A.   Yes.
11    Q.   And because you are under
12 oath, if you lie or provide intentionally
13 misleading answers, you may be subject to
14 criminal or civil penalties.
15        Do you understand that?
16    A.   Yes.
17    Q.   And your counsel may, from
18 time to time, object.  But I'm still
19 entitled to answer to my question, unless
20 your counsel specifically instructs you
21 not to answer.
22        Do you understand that?
23    A.   Yes.
24    Q.   And we can take breaks when

Page 12

1 you need them.  But if you have a
2 question pending while -- I need you to
3 answer that question before we take the
4 break.
5        Is that okay?
6    A.   Yes.
7        MR. LAVELLE:  The witness
8    reserves the right to consult with
9    counsel on issues of privilege.
10 BY MR. POWERS:
11    Q.   Okay, Mr. Ringgold.  I want
12 to start with your educational
13 background.
14        Did you complete high
15 school?
16    A.   Yes.
17    Q.   Where did you complete high
18 school?
19    A.   Aberdeen Senior High School.
20    Q.   And what year was that?
21    A.   1985.
22    Q.   Any education beyond high
23 school?
24    A.   Yes.

Page 13

1    Q.   What education do you have
2 beyond high school?
3    A.   Some years at Bowie State
4 University.
5    Q.   And that's spelled
6 B-O-W-I-E, right?
7    A.   Yes, sir.
8    Q.   Did you get a degree from
9 Bowie State?
10    A.   I didn't finish, no.
11    Q.   Did you ever complete a
12 college degree?
13    A.   No.
14    Q.   Besides your years at Bowie
15 State, any other education beyond high
16 school?
17    A.   Just military, military
18 stuff.
19    Q.   When were you in the
20 military?
21    A.   From 1990 to 1998.
22    Q.   What did you do after you
23 left the military in 1998?
24    A.   I think I worked at, in

Page 14

1 19 -- when I got out -- I think while I
2 was still in, I was still working, it was
3 the Army National Guard. So I worked at
4 The Gap.
5 Q. So just to be clear, when
6 you're in the military, you were with the
7 Army National Guard?
8 A. Yes, sir.
9 Q. And you also had employment
10 at The Gap while you were concurrently
11 employed with the Army National Guard?
12 A. Yes.
13 Q. And you said you had some
14 education while you were in the military.
15 What was the nature of that
16 education?
17 A. I worked on the Arcola
18 helicopter weapon systems. So they would
19 send us out to different schools, and we
20 would do different things in Texas to
21 kind of keep us up to speed on different
22 electronics and troubleshooting the
23 aircraft.
24 Q. Any other education that we

Page 15

1 have not talked about yet?
2 A. Not that I can recall. I
3 have some other stuff that I'm missing,
4 but that's basically it.
5 MR. LOMBARDO: Apologies for
6 the interruption. The telephone
7 is not picking up the witness's
8 testimony. Is there a mic near
9 the witness?
10 - - -
11 (Whereupon, a discussion off
12 the record occurred.)
13 - - -
14 BY MR. POWERS:
15 Q. So, Mr. Ringgold, as you
16 just heard, I think we both have to just
17 keep our voices up a little bit so
18 everyone on the phone can hear.
19 Is that okay?
20 A. Yes.
21 Q. You said that there might
22 be -- might be some other education that
23 you might be missing.
24 Do you have any idea what

Page 16

1 that would be?
2 A. I'm just thinking, I mean,
3 just general stuff with the job. They
4 would send us on little stuff. I can't
5 really recall at the moment.
6 Q. Any education on controlled
7 substances?
8 A. Education on controlled
9 substances? The only thing we did do a
10 DEA -- like a little thing they sent us
11 to, I think it was Fort Lauderdale once.
12 Q. And who is "they"?
13 A. The job.
14 Q. When you say "the job," you
15 mean your job at --
16 A. Rite Aid.
17 Q. -- Rite Aid?
18 MR. LAVELLE: And just wait
19 until the question is finished
20 before you answer the question.
21 THE WITNESS: Yes, sir.
22 BY MR. POWERS:
23 Q. So besides what you just
24 talked about there when you were with

Page 17

1 Rite Aid, any other education about
2 controlled substances prior to joining
3 Rite Aid?
4 A. No.
5 Q. And when did you join Rite
6 Aid?
7 A. September of 2000.
8 Q. And you mentioned previously
9 there that they, meaning Rite Aid, sent
10 you to Fort Lauderdale once.
11 When was that?
12 A. I don't remember. It was a
13 long time ago.
14 Q. More than ten years ago?
15 A. Possibly.
16 Q. And why did Rite Aid send
17 you to Fort Lauderdale?
18 A. It was a DEA conference.
19 Just to get the experience of being
20 around some of the DEA and things like
21 that.
22 Q. Did anyone else go with you
23 to this conference from Rite Aid?
24 A. They meaning who?

Page 18

1  Q.  You said you went to a DEA
2 conference in Fort Lauderdale.
3      Did anyone else from Rite
4 Aid come with you to go to that DEA --
5  A.  Yes.
6  Q.  -- conference?
7      Let me finish my question.
8 I know you know where I'm going with it,
9 but just let me finish and then you can
10 answer, okay?
11  A.  Yes.
12  Q.  So let me ask that again.
13      The DEA conference that Rite
14 Aid sent you to in Fort Lauderdale, did
15 anyone else from Rite Aid come with you?
16  A.  Yes.
17  Q.  Who?
18  A.  Debra Chase.
19  Q.  And who is Debra Chase?
20  A.  At the time, Debra Chase was
21 DEA coordinator for the Rx department.
22  Q.  And you called it a DEA
23 conference.
24      Was it a conference that was

Page 19

1 put on by the DEA?
2  A.  They did have actual DEA
3 folks there.  We wasn't privy to that.
4 We was with the -- I guess the store
5 side, not the actual DEA.
6      I think the gentleman's name
7 was Mr. Buzzeo who was in charge of the
8 conference, which somehow he was
9 connected with Rite Aid.
10  Q.  What kind of topics were
11 discussed at the DEA conference you went
12 to?
13  A.  I don't remember.
14  Q.  Did you get any written
15 materials from that conference?
16  A.  I don't remember.  It's been
17 so long.
18  Q.  Do you remember, just
19 generally, what the topics were at the
20 DEA conference?
21      MR. LAVELLE:  Object to
22      form.  Objection.  Asked and
23      answered.
24      THE WITNESS:  I don't

Page 20

1 remember.
2 BY MR. POWERS:
3  Q.  Do you know, when you went
4 back to your job at Rite Aid, did you
5 talk to anyone about what you saw at the
6 conference?
7  A.  No.
8  Q.  Did you go to any other
9 conferences put on by Buzzeo besides the
10 one in Fort Lauderdale?
11  A.  No.
12  Q.  Did you go to any other
13 conferences where the DEA had a presence?
14  A.  No.
15  Q.  Did you talk to any DEA
16 agents at the Buzzeo conference in Fort
17 Lauderdale?
18  A.  No.
19  Q.  Do you know if Debra Chase
20 talked to any DEA agents at the
21 conference in Fort Lauderdale?
22  A.  I would not know that.
23  Q.  Did you ever go to any other
24 conferences as part of your job duties at

Page 21

1 Rite Aid?
2  A.  Yes.
3  Q.  Can you give me an example?
4  A.  My -- I went to a conference
5 in, I think, Virginia.  And that was on
6 the lines of -- if I can recollect, on
7 the lines of, I guess, pharmacists
8 stealing product, writing scripts or
9 something, people -- you know, something
10 along that line.
11      That was a while ago, too.
12  Q.  Was that also over ten years
13 ago?
14  A.  That was probably, if I
15 would have to say, 2008, maybe; '07 or
16 '08.
17  Q.  And you referred to the
18 conference in Fort Lauderdale as a
19 conference put on by Buzzeo.
20      Do you know who the VA --
21 the Virginia conference was put on by?
22  A.  I don't remember.
23  Q.  Who else was at that
24 conference with you from Rite Aid?

Page 22

1  A.  Rick Snyder.
2  Q.  Who is Rick Snyder?
3  A.  Rick Snyder was one of the
4  leads, at the time, for security.
5  Q.  Was he working at the
6  Perryman distribution center?
7  A.  Yes.
8  Q.  Anyone else besides Rick
9  Snyder go to that conference with you?
10  A.  Yes.
11  Q.  Who else?
12  A.  Ms. Joyce Sweitzer.
13  Q.  And who is Joyce --
14  A.  She was --
15  Q.  -- Sweitzer?
16  MR. LAVELLE:  Wait until the
17  question is finished before you
18  answer.
19  THE WITNESS:  Go ahead.
20  BY MR. POWERS:
21  Q.  Who is Joyce Sweitzer?
22  A.  They was the asset
23  protection manager.
24  Q.  And was that also for the

Page 23

1  Perryman distribution center?
2  A.  Yes.
3  Q.  Anyone else besides Rick
4  Snyder and Joyce Sweitzer?
5  A.  No.
6  Q.  Besides the conference down
7  in Virginia and the Fort Lauderdale
8  conferences, any other conferences you
9  went to as a Rite Aid employee?
10  A.  No.
11  Q.  Did you receive any written
12  materials from the conference that you
13  went to in Virginia?
14  A.  Yes.
15  Q.  What kind of written
16  materials did you get?
17  A.  Some printouts, brochures.
18  Q.  What did you do with those
19  written materials?
20  A.  We left them at the middle
21  office, we call it, if anybody wanted to
22  take a look at any of that material.
23  Q.  You say you left them at the
24  middle office?

Page 24

1  A.  Right, at my job.
2  Q.  At the Perryman distribution
3  center?
4  A.  Yes.  We have a security,
5  like a middle meeting area, we left the
6  information in case anybody wanted to
7  look at it.  That was about it.
8  Q.  Did you ever talk to anyone
9  about what you learned at that conference
10  in Virginia?
11  A.  No.
12  Q.  Do you know what those
13  brochures that you left in the middle
14  area were about?
15  A.  I believe, like I said, it
16  was about information on people that
17  would try to get extra scripts.  That's
18  about all I can remember of that.
19  As I say, that's been a
20  while ago as well.
21  Q.  So you said that you started
22  working at Rite Aid in September of 2000,
23  right?
24  A.  Yes.

Page 25

1  Q.  And are you currently still
2  employed by Rite Aid?
3  A.  Yes, I am.
4  Q.  And from September 2000
5  until current, have you always worked at
6  the Perryman distribution center?
7  A.  Yes.
8  Q.  What was your title when you
9  first started at the Perryman
10  distribution center?
11  A.  Security associate.
12  Q.  How long did you hold the
13  position of security associate?
14  A.  If I can recollect, maybe
15  six months.
16  Q.  After security associate,
17  did you have a different position?
18  A.  Yes.
19  Q.  What was that position?
20  A.  They created a position
21  called DEA coordinator for security.
22  Q.  How long were you the DEA
23  coordinator for security?
24  A.  I want to say 2001 until

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 present.
2     Q. Have you ever had any
3 different titles besides security
4 associate or DEA coordinator for
5 security?
6     A. Yes.
7     Q. What other titles have you
8 had?
9     A. Lead.
10     Q. And the title is just lead?
11 There's no --
12     A. Security lead.
13     Q. Security lead, okay.
14     A. Yes.
15     Q. When did you first get the
16 title of security lead?
17     A. 2002.
18     Q. How long were you a security
19 lead for?
20     A. Pretty much up until the --
21 well, we got the -- we got promoted maybe
22 two years ago. So I would say from 2002
23 to 2016, maybe.
24     Q. You said "we got promoted,"

Page 27

1 what are -- who are you referring to
2 when --
3     A. Everybody. Because we went
4 from leads to supervisors.
5     Q. So everyone who was a
6 security lead got promoted to security
7 supervisor around 2016?
8     A. Yes, sir.
9     Q. Why was that?
10     A. They did a change and
11 decided to do without the leads
12 throughout the whole facility. So for
13 security, they changed us to -- from
14 leads to supervisors.
15     Q. So you were both a security
16 lead and the DEA coordinator for security
17 from 2002 until around 2016?
18     A. Until present.
19     Q. Well, you're not a security
20 lead any more, you're a security
21 supervisor, right?
22     A. Yes, sir.
23     Q. So you stopped being a
24 security lead in 2016, correct?

Page 28

1     A. Yes.
2     Q. So from 2002 to 2016, you
3 were both a security lead and the DEA
4 coordinator for security, right?
5     A. Yes.
6     Q. Any other titles besides the
7 ones we've already talked about?
8     A. No, sir.
9     Q. As the DEA coordinator for
10 security, who did you report to?
11     A. Still to my boss, which was
12 Nathan Williams at the time.
13     Q. Was Nathan Williams your
14 boss the entire time you were a DEA
15 coordinator for security?
16     A. No.
17     Q. Who else was your boss?
18     A. A gentleman named Joseph
19 Beck.
20     Q. Anybody else?
21     A. Joyce Sweitzer.
22     Q. Besides Williams, Beck and
23 Sweitzer, anyone else?
24     A. In security, I think that

Page 29

1 should be it.
2     Q. Did you report to anyone
3 different as a security lead?
4     A. No.
5     Q. What department in the
6 distribution center were you a part of as
7 a DEA coordinator for security?
8     A. Could you repeat the
9 question, please?
10     Q. Sure.
11     What department were you a
12 part of as the DEA coordinator for
13 security?
14     A. Security.
15     Q. There's a department called
16 the security department at the
17 distribution center?
18     MR. LAVELLE: Object to
19     form.
20     THE WITNESS: The security
21     department. Asset protection now.
22 BY MR. POWERS:
23     Q. Do you know when it switched
24 from security to asset protection?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    A.   I don't remember.

2    Q.   Are there other people who

3 have held the role of DEA coordinator for

4 security at the Perryman distribution

5 center?

6    A.   No.

7    Q.   You're the only one who has

8 that title?

9    A.   Yes.

10   Q.   How about security lead,

11 does anyone else have the title of

12 security lead for the period of 2002

13 through 2016?

14   A.   Yes.

15   Q.   Who else were the security

16 leads?

17   A.   All right.  You're going --

18 I got to go back.

19   Q.   The ones you can remember.

20   A.   Okay.  Ronald Welsh, Derrick

21 Johnson, Howard Johnson, Richard Snyder,

22 Jesse Jones.

23       Let's see, who else can I

24 remember?  Cindy Smith.

Page 31

1        That's all I can remember.

2    Q.   When you started your job as

3 the DEA coordinator for security, how

4 were you trained for your -- for that

5 job?

6    A.   I was partnered up with

7 Kevin Mitchell.

8    Q.   And who is Kevin Mitchell?

9    A.   At the time, Kevin Mitchell

10 was the DEA for corporate.

11   Q.   Kevin Mitchell worked in the

12 corporate office, not the distribution

13 center; is that right?

14   A.   Yes, sir.



Page 32

Page 33

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 38

Page 40

Page 39

23    Q.   I'm going to hand you what's
24    been marked as Ringgold Exhibit-1.  It's

1    Bates number Rite_Aid_OMDL_0049982
2    through 49993.
3              - - -
4         (Whereupon,
5         Rite Aid-Ringgold Exhibit-1,
6         Rite_Aid_OMDL_0049982-993, was
7         marked for identification.)
8              - - -
9    BY MR. POWERS:
10        Q.   Just take a brief look at
11    that and just let me know when you're
12    done.
13            Does this document,
14    Exhibit-1, look familiar to you?
15        A.   Yes, it does.
16        Q.   What is the document
17    reflected in Exhibit-1?

Page 41



Highly Confidential - Subject to Further Confidentiality Review

Page 46



```
 2       Q.    You can put that exhibit
 3   aside.
 4              -  -  -
 5          (Whereupon,
 6   Rite Aid-Ringgold Exhibit-2,
 7   Rite_Aid_OMDL_0032421, was marked
 8   for identification.)
 9              -  -  -
10          (Whereupon,
11   Rite Aid-Ringgold Exhibit-3,
12   Rite_Aid_OMDL_0032422, was marked
13   for identification.)
14              -  -  -
15   BY MR. POWERS:
16       Q.    I'm going to hand you next
17   what's been marked as Exhibits-2 and 3.
18   The first exhibit, Exhibit-2, is Bates
19   stamped Rite_Aid_OMDL_0032421.  And then
20   Exhibit-3, which is the e-mail attachment
21   to Exhibit-2, is Bates stamped
22   Rite_Aid_OMDL_0032422.
23          And the Exhibit-3 is -- has
24   a bunch of pages.  I'm just going to ask
```

Page 47

```
 1   you about a couple of questions -- I'm
 2   just going to ask you a couple of
 3   questions about a couple particular
 4   pages.
```

Page 48

Page 49

Highly Confidential - Subject to Further Confidentiality Review



Page 52

1 time limit on trying to close cases.
2     Q.   Those would be shortage
3 claim cases?
4     A.   Yes.
5     Q.   What was the time limit to
6 close those?
7     A.   I believe we had 48 hours.
8     Q.   And what did you do to close
9 a shortage claim case?
10     A.   Just investigate.
11     Q.   What did you do to
12 investigate?
13     A.   I would start getting
14 information from either Debra Chase,
15 Marian Woods or Keith Frost.
16     Q.   What kind of information
17 would you get from those individuals?
18     A.   Who picked, who was the
19 person that picked it, who was the person
20 that inventoried it at the desk.  And
21 from there,

Page 53

9     Q.   So when you have an X in the
10 column closed here on Page 3 of
11 Exhibit-3, what does the X there mean in
12 the closed column?
13     A.   Meaning we were done.
14 Meaning, we close it out on the security
15 side.
16     Q.   Does that mean you found the
17 missing product?
18     A.   On that particular one, I
19 can't -- I could not say yes or no to.
20 But it was closed out on our end.
21     Q.   Where would you find the
22 information about how this was closed
23 out?
24     A.   Repeat that question,

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 please.
2      Q.   Yes.  Maybe it wasn't the
3 best question.
4           So it's marked closed on
5 this tracking sheet.  Where would I find
6 the information about how this particular
7 claim for negative 2 bottles of
8 hydrocodone/APAP went?
9      A.   Where it went?  Normally, if
10 I can go back in my memory, I believe
11 when I say closed, meaning it was found.
12     Q.   Was there any record of
13 where the -- where the product was found,
14 besides just the information here that it
15 was closed?
16     A.   I don't remember.
17     Q.   In the next row down, it
18 looks like it's for Store 7766?
19     A.   Yes.
20     Q.   And over in the shortage
21 claim column, it says, One each, and in
22 parentheses, Rx overstock.
23          Do you see that?
24     A.   I do.

Page 55

1      Q.   What does that mean?
2      A.   That might have been the
3 area where it was.  I don't remember.
4      Q.   Would a positive number in
5 the shortage claim column here represent
6 that the store got an extra unit of
7 whatever the product name was?
8      A.   I don't remember.
9      Q.   Do you still use these sort
10 of weekly investigation tracking sheets?
11     A.   No.
12     Q.   When did you stop using
13 them?
14     A.   Once we stopped doing the
15 drug investigations back in 2014.
16     Q.   So these weekly
17 investigation tracking sheets were only
18 for controlled drugs?
19     A.   I can't remember.
20     Q.   Did you personally fill out
21 these weekly investigation tracking
22 sheets?
23     A.   Yes.
24     Q.   Did anyone else?

Page 56

1      A.   I can't remember.
2           But I'm sure if I was out,
3 my boss -- I mean, they still -- things
4 still have to go on if I'm not there,
5 so --
6      Q.   And what did you use these
7 tracking sheets for after they were
8 filled out?
9      A.   I didn't use them for
10 anything.
11     Q.   Do you know if your boss
12 used them for anything?
13     A.   I could not say.
14     Q.   Do you know if anyone else
15 used them for anything?
16     A.   I could not say.  I would
17 not know.
18     Q.   So besides just filling
19 these out, that's your involvement with
20 them?
21     A.   Yes.  Like I said, my role
22 was small.  Yes.
23     Q.   You can put that exhibit
24 over to the side, Mr. Ringgold.

Page 57

1           - - -
2           (Whereupon,
3           Rite Aid-Ringgold Exhibit-4,
4           Rite_Aid_OMDL_0027551-552, was
5           marked for identification.)
6           - - -
7 BY MR. POWERS:
8      Q.   I've got an Exhibit-4 here.
9 And the Bates number on this exhibit is
10 Rite_Aid_OMDL_0027551 through 7552.
11          Go ahead and take a look at
12 that.
13     A.   Thank you.



Highly Confidential - Subject to Further Confidentiality Review



Page 58

Page 60

Page 59

Page 61

Highly Confidential - Subject to Further Confidentiality Review



Page 62

Page 63

Page 64

2      Q.   Okay.  That's all.  We're
3  done with that exhibit.
4           - - -
5      (Whereupon,
6      Rite Aid-Ringgold Exhibit-5,
7      Rite_Aid_OMDL_21461-463, was
8      marked for identification.)
9           - - -
10  BY MR. POWERS:
11      Q.   I want to hand you what's
12  been marked as Exhibit-5.  It is an
13  e-mail string, and the Bates number is
14  Rite_Aid_OMDL_21461 through 21463.
15           Take a second to review
16  that.
17      A.   Thank you.
18      Q.   I'll direct your attention
19  to the second-to-last page of Exhibit-5.

Page 65

2           Do you see that?
3      A.   I do.
4      Q.   Who is Kim Brown?
5      A.   She might have had something
6  to do with Rx at the time.  I can't
7  remember her exact position.
8      Q.   How about Tahir Senoussa?
9      A.   Same.  He was one of the
10  managers at the time.  He might have been
11  in Rx at the time as well.
12      Q.   And is M. Wood, Marian Wood?
13      A.   That is correct.
14      Q.   And D. Chase, is that Debra
15  Chase?
16      A.   Yes.
17      Q.   And L.N. Ringgold, is that
18  you, Larry Ringgold?
19      A.   That is correct.
20      Q.   How come you copied yourself
21  on this e-mail?
22      A.   I don't remember.
23      Q.   You say in the e-mail, Hello
24  to all.  I would like to have a quick

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 briefing with day and night shift
2 associates that work in the cage. I just
3 want to go over a few procedures with the
4 scanning of their badges in and out of
5 the cage. I would like to get with all
6 the cage associates next week.
7          Do you see that?
8     A.   I do.
9     Q.   What were you referring to
10 here when you wanted -- when you were
11 referring to the procedures about
12 scanning their badges in and out of the
13 cage?
14     A.   We had a few folks that was
15 getting locked in the cage. So what was
16 happening, they weren't doing a proper
17 swipe. They would swipe in. But to go
18 out, sometimes if you hit it twice, it
19 would think you were still in the cage
20 but you would actually be out.
21          So I just had to explain to
22 them how to swipe in and out, because we
23 were getting a lot of calls to the front,
24 hey, I'm stuck in the cage. So we had to

Page 67

1 let them know, hey, when it happens,
2 don't swipe it, just call us and we would
3 hit the anti-passback button.
4          So I just wanted to brief
5 folks on that. That was it.
6     Q.   Going to the first page of
7 Exhibit-5, at the bottom there, it looks
8 like an e-mail from Marian Wood to you
9 saying, Larry, would it be possible for
10 Kim and I to see what you are going over
11 with them?
12          Do you see that?
13     A.   I do.
14     Q.   In the e-mail above that,
15 it's Marian Wood just to Kim Brown,
16 saying, Kim, I want to be sure what he is
17 going over and make sure it is in line
18 with our procedures.
19          Do you see that?
20     A.   I do.
21     Q.   And Marian -- excuse me, Kim
22 Brown responded, at the top e-mail, there
23 to Marian Wood, Good call, dot, dot, dot.
24          Do you see that?

Page 68

1     A.   I do.
2     Q.   Why did -- do you know why
3 Marian Wood and Kim Brown wanted to see
4 what you were going over with the cage
5 associates?
6          MR. LAVELLE: Object to
7     form.
8          THE WITNESS: I would -- I
9     don't know why, no.
10 BY MR. POWERS:
11     Q.   It sounds like Marian Wood
12 wanted to make sure it's in line with the
13 procedures of the distribution center,
14 right?
15          MR. LAVELLE: Object to
16     form.
17          THE WITNESS: According to
18     the e-mail.
19 BY MR. POWERS:
20     Q.   Was there any time when you
21 gave procedures that were not in line
22 with the procedures at the Rite Aid
23 distribution center?
24     A.   Not that I'm aware of.

Page 69

1     Q.   It seems like Marian Wood
2 thinks there were, right, from that
3 e-mail on the first page of Exhibit-5?
4          MR. LAVELLE: Object to
5     form.
6          THE WITNESS: I couldn't
7     speculate for Marian.
8 BY MR. POWERS:
9     Q.   And it seems like Kimberly
10 Brown agrees, because she says, Good
11 call.
12          Do you see that at the top
13 there?
14     A.   I see that.
15          MR. LAVELLE: Object to
16     form.
17 BY MR. POWERS:
18     Q.   You can place that exhibit
19 to the side.
20              - - -
21          (Whereupon,
22          Rite Aid-Ringgold Exhibit-6,
23          Rite_Aid_OMDL_23456-457, was
24          marked for identification.)



Page 70

1      - - -
2   BY MR. POWERS:
3      Q.   I'm going to hand you what's
4   been marked as Ringgold Exhibit-6.  It is
5   Bates stamped Rite_Aid_OMDL_23456 through
6   23457.
7      A.   Thank you.

Page 71

Page 72

Page 73

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    Do you see that?

2    A.   I do.

3    Q.   So Marian Wood is saying

4 that you kept a log of all the Rx cage

5 and vault tests, right?

6    MR. LAVELLE:  Object to

7    form.  Objection.  Vague.

8    The question is about the

9    e-mails that Mr. Ringgold was not

10   copied on and did not send or

11   receive.

12   MR. POWERS:  John, just

13   objection to form is fine.

14 BY MR. POWERS:

15   Q.   Mr. Ringgold, did you keep a

16 log of the Rx cage and vault tests?

17   A.   I did not keep a log.

18   Q.   You did not keep a log?

19   A.   No.

20   Q.   Did anyone keep a log of the

21 Rx cage and vault tests?

22   A.   Not a log.  I kept a -- an

23 actual report.

24   Q.   So you kept all of the

Page 75

1 reports that were generated from the

2 tests?

3    A.   We had to.

4    Q.   What kind of report was

5 generated from these tests?

6    A.   Just to show that the alarms

7 were working and the motion tests were

8 going off.

9    Q.   Was it a written report?

10   A.   It was -- yes.  Not really

11 written, but just showed actual motion 1,

12 motion 2, whatever, that it would go off.

13   And that was part of the DEA

14 compliance.

15   Q.   Was that a -- was that,

16 like, a printout or something or --

17   A.   Yes, it was a printout

18 from --

19   MR. LAVELLE:  Wait until the

20   question is finished before you

21   answer it.

22   THE WITNESS:  Yes.

23   MR. LAVELLE:  Otherwise the

24   record is going to be messed up.



Highly Confidential - Subject to Further Confidentiality Review



Page 78

22    MR. LAVELLE: Counsel, is
23  this a convenient time? We've
24  been going for over an hour. Can

Page 79

1   we take a break?
2         MR. POWERS: We can take a
3   break if you'd like. I'll say, if
4   you want to power through for
5   another 20 minutes or so, we might
6   be all ready to go home.
7         MR. LAVELLE: I appreciate
8   that, but I do need to use the
9   restroom.
10        MR. POWERS: We'll take a
11  short break, then.
12        VIDEO TECHNICIAN: The time
13  is now 6:07 p.m. We are going off
14  the record.
15        -  -  -
16        (Whereupon, a brief recess
17  was taken.)
18        -  -  -
19        VIDEO TECHNICIAN: The time
20  is now 6:20 p.m. We are back on
21  the record.
22  BY MR. POWERS:
23    Q.   Welcome back, Mr. Ringgold.
24        -  -  -

Page 80

1         (Whereupon,
2         Rite Aid-Ringgold Exhibit-7,
3         Rite_Aid_OMDL_0012020-021, was
4         marked for identification.)
5         -  -  -
6   BY MR. POWERS:
7     Q.   I'm going to hand you what
8   has been marked as Exhibit-7. And the
9   Bates number on this exhibit is
10  Rite_Aid_OMDL_0012020 through 12021.
11        Take a look at that e-mail.
12    A.   Thank you.

Page 81



Highly Confidential - Subject to Further Confidentiality Review



Page 90



```
 9        Q.   I'm going to move on to a
10   new exhibit here.  You can put that one
11   to the side.
12             -  -  -
13          (Whereupon,
14       Rite Aid-Ringgold Exhibit-8,
15       Rite_Aid_OMDL_0011115-116, was
16       marked for identification.)
17             -  -  -
18   BY MR. POWERS:
19        Q.   I marked Ringgold Exhibit-8,
20   it is a two-page document with the Bates
21   number Rite_Aid_OMDL_0011115 through
22   11116.
```

Page 92

Page 91

Page 93

Highly Confidential - Subject to Further Confidentiality Review

Page 94

Page 96

Page 95

 4      - - -
 5          (Whereupon,
 6      Rite Aid-Ringgold Exhibit-9,
 7      Rite_Aid_OMDL_0003108-109, was
 8      marked for identification.)
 9          - - -
10   BY MR. POWERS:
11      Q.   You can put that exhibit to
12   the side.  I'm going to hand you what's
13   been marked as Exhibit-9.  It's a
14   two-page document with the Bates stamp of
15   Rite_Aid_OMDL_0003108 through 3109.
16          Take a look at that one.
17      A.   Thank you.

Page 97





Page 98

Page 99

Page 100

```
 5          - - -
 6         (Whereupon,
 7     Rite Aid-Ringgold Exhibit-10,
 8     Rite_Aid_OMDL_0010795-796, was
 9     marked for identification.)
10          - - -
11  BY MR. POWERS:
12      Q.   I'll hand you an exhibit
13  that's been marked Exhibit-10.  It's
14  Bates stamped Rite_Aid_OMDL_0010795
15  through 0010796.
16      A.   Thank you.
```

Page 101

Highly Confidential - Subject to Further Confidentiality Review



Page 102

Page 104

19  Q.   You can put that exhibit to
20  the side.
21       I want to go back to
22  something we were talking about earlier,
23  the Buzzeo conference that you went to
24  down in Fort Lauderdale.

Page 103

Page 105

1       Do you know why you were
2  selected to go to that particular
3  conference?
4       A.   I don't remember.  I believe
5  because I was security DEA.
6       Q.   Who made that decision that
7  you would go to that conference?
8            MR. LAVELLE:  Object to
9       form.
10           THE WITNESS:  I wouldn't
11      know.  It could have possibly been
12      the GM.  I'm not sure.
13  BY MR. POWERS:
14      Q.   And how about the conference
15  in Virginia that you went to with Rick
16  Snyder, Joyce Sweitzer, do you know why
17  you were selected to go to that
18  conference?
19      A.   I do not.
20      Q.   Who told you that you could
21  go to that conference?
22      A.   Ms. Joyce Sweitzer.
23      Q.   Is there any reason why you
24  didn't attend any other Buzzeo

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 conferences after the one you attended in
2 Fort Lauderdale?
3     A.    Budget.
4     Q.    How do you know that?
5     A.    I think we were -- we wanted
6 to go to some other stuff, but they said
7 because of budgets, we could not go.
8     Q.    Do you know when that was?
9     A.    I do not remember, no.
10     Q.    Did anyone from the Perryman
11 distribution center go to those other
12 Buzzeo conferences that you were not able
13 to?
14     A.    I wouldn't know.
15         MR. POWERS:  That's all I
16 have.
17         MR. LAVELLE:  I have some
18 brief questioning of the witness,
19 but I guess we should switch
20 places.
21         VIDEO TECHNICIAN:  The time
22 is now 6:47 p.m.  We're going off
23 the record.
24         - - -

Page 107

1         (Whereupon, a brief recess
2 was taken.)
3         - - -
4         VIDEO TECHNICIAN:  The time
5 is now 6:54 p.m.  We are back on
6 the record.
7         - - -
8         EXAMINATION
9         - - -
10 BY MR. LAVELLE:
11     Q.    Hello, Mr. Ringgold.  John
12 Lavelle, representing Rite Aid.  I have
13 just a few questions for you.
14         I'd like to ask you first
15 to -- following up on the documents
16 Ringgold-8 and 9 that were discussed with
17 you by counsel for plaintiff earlier.
18         Do you have those in front
19 of you, sir?
20     A.    Yes, I do.





Page 110

Page 112

1 Ringgold-11.
2   A.  I've read it.
3   Q.  Mr. Ringgold, do you
4 recognize this document we've marked for
5 identification as Ringgold-11?
6   A.  Yes, I do.
7   Q.  What is it?

Page 111

8   Q.  All right.  I'd like to mark
9 an exhibit.
10        - - -
11      (Whereupon,
12      Rite Aid-Ringgold Exhibit-11,
13      Rite_Aid_OMDL_0003562, was marked
14      for identification.)
15        - - -
16 BY MR. LAVELLE:
17   Q.  Mr. Ringgold, I'm going to
18 give you what we've marked for
19 identification as Ringgold-11.
20      Please take a look at it and
21 tell me when you've had a chance to
22 review it.
23      It is Bates number
24 Rite_Aid_OMDL_0003562.  Again, that's

Page 113

Highly Confidential - Subject to Further Confidentiality Review



Page 114

Page 116

Page 115

Page 117

18    Q.    What do you have -- what did
19  you say in the next sentence of this
20  e-mail?
21    A.    Shannon started the tote and
22  did go by the pick list order.
23    Q.    And what does that mean?
24    A.    We get an actual pick list

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 126

██████████████████████
███████████████
████████████
█████████████████
████████████████████
██████████████████
██████
█████████

11        MR. LAVELLE:  I have no
12   further questions.
13        MR. POWERS:  I don't have
14   any follow-up.
15        VIDEO TECHNICIAN:  The time
16   is now 7:11 p.m.  This concludes
17   today's deposition.  We're going
18   off the record.
19        - - -
20        (Whereupon, the deposition
21   concluded at 7:11 p.m.)
22        - - -
23
24

Page 127

1        CERTIFICATE
2
3
4        I HEREBY CERTIFY that the
5   witness was duly sworn by me and that the
6   deposition is a true record of the
7   testimony given by the witness.
8
9
10
11        Amanda Maslynsky-Miller
          Certified Realtime Reporter
          Dated:  January 27, 2019
12
13
14
15
16
17        (The foregoing certification
18   of this transcript does not apply to any
19   reproduction of the same by any means,
20   unless under the direct control and/or
21   supervision of the certifying reporter.)
22
23
24

Page 128

1        INSTRUCTIONS TO WITNESS
2
3        Please read your deposition
4   over carefully and make any necessary
5   corrections.  You should state the reason
6   in the appropriate space on the errata
7   sheet for any corrections that are made.
8        After doing so, please sign
9   the errata sheet and date it.
10       You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14       It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 129

1        - - - - - -
         E R R A T A
2        - - - - - -
3   PAGE  LINE  CHANGE/REASON
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____

Page 130

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 126, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
LARRY RINGGOLD            DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

Page 131

LAWYER'S NOTES
PAGE  LINE

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____