```
 1              UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3                      - - -

 4   IN RE:  NATIONAL       )

     PRESCRIPTION OPIATE    )  MDL No. 2804

 5   LITIGATION             )

     _____)  Case No. 1:17-MD-2804

 6                          )

     THIS DOCUMENT RELATES  )

 7   TO ALL CASES           )  Hon. Dan A. Polster

 8

 9                      - - -

10            Friday, January 25, 2019

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12             CONFIDENTIALITY REVIEW

13          ATTORNEYS' EYES ONLY PORTIONS

14                      - - -

15

16        Videotaped deposition of Bruce Ritchie,

17   held at Robbins Geller Rudman & Dowd LLP, 120 East

18   Palmetto Park Road, Suite 50, Boca Raton, Florida,

19   33432, commencing at 8:40 a.m., on the above date,

20   before Karen Kidwell, Registered Merit Reporter,

21   Certified Realtime Reporter.

22                      - - -

23

24            GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

25               deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S:
 2
 3   On behalf of the Plaintiffs:
 4        MOTLEY RICE LLC
          BY:  DAVID I. ACKERMAN, ESQUIRE
 5             dackerman@motleyrice.com
          401 9th Street NW
 6        Suite 1001
          Washington, DC  20004
 7        202.849.4962
 8
 9   On behalf of Johnson & Johnson and
       Janssen Pharmaceuticals:
10
          O'MELVENY & MYERS LLP
11        BY:  SABRINA H. STRONG, ESQUIRE
               sstrong@omm.com
12        400 South Hope Street
          Los Angeles, California  90071
13        213.430.6000
14        and
15        O'MELVENY & MYERS LLP
          BY:  DANIEL J. FRANKLIN, ESQUIRE
16             dfranklin@omm.com
          Times Square Tower
17        7 Times Square
          New York, New York  10036
18        212.326.4310
19
20   On behalf of Endo Pharmaceuticals, Inc., and
     Endo Health Solutions Inc. and Par:
21
          ARNOLD & PORTER KAYE SCHOLER, LLP
22        BY:  JOHN D. CELLA, ESQUIRE
               john.cella@arnoldporter.com
23        601 Massachusetts Avenue, NW
          Washington, DC  20001
24        202.942.5041
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES CONTINUED:
 2    On behalf of Rochester Drug Cooperative, Inc.:
 3         ALLEGAERT BERGER & VOGEL LLP
           BY:  CHRISTOPHER ALLEGAERT, ESQUIRE
 4             callegaert@abv.com
           111 Broadway, 20th Floor
 5         New York, New York  10006
           212.616.7050
 6
 7    On behalf of AmerisourceBergen:
 8         JACKSON KELLY PLLC
           BY:  SYLVIA WINSTON NICHOLS, ESQUIRE
 9             (Via Videoconference)
               sylvia.winston@jacksonkelly.com
10         150 Clay Street
           Suite 500
11         Morgantown, West Virginia  26501
           304.284.4138
12
13    On behalf of Walmart:
14         JONES DAY
           BY:  CHRISTINE D. PROROK, ESQUIRE
15             (Via Videoconference)
               cprorok@jonesday.com
16         77 West Wacker
           Chicago, Illinois  60601
17         312.269.4113
18
19    On behalf of McKesson:
20         COVINGTON & BURLING, LLP
           BY:  WEISS NUSRATY, ESQUIRE
21             (Via Videoconference)
               wnusraty@cov.com
22         One City Center
           850 Tenth Street, NW
23         Washington, DC  20001
           202.662.5703
24
25    ALSO PRESENT:   Jeffrey Fleming, Videographer
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      I N D E X
 2  WITNESS/EXAMINATION                          Page
 3  BRUCE RITCHIE
 4    By Mr. Ackerman                              7
 5    By Ms. Strong                              162
 6    Further By Mr. Ackerman                    179
 7
 8  *** ATTORNEYS' EYES ONLY PORTION
 9                              Pages 86 through 120
10
11                   E X H I B I T S
12  Janssen-Ritchie       Description            Page
13  Janssen-Ritchie Exhibit 1  ....................11
                 Bruce A. Ritchie, Partial
14               Curriculum Vitae,
                 Confidential, Bates
15               JAN-MS-03077094-96
16  Janssen-Ritchie Exhibit 2      ...............59
                 E-mail chain, top e-mail
17               1/3/2001, Steve Zollo to Gary
                 Vorsanger, Subject: RE: JCAHO
18               Standards on Pain Management,
                 Confidential, Bates
19               JAN-MS-00286988-89
20  Janssen-Ritchie Exhibit 3  ....................63
                 4/2/2001 E-mail, Beth Woodhead
21               to Kati Chupa and others,
                 Subject: Early View to field,
22               Confidential, Bates
                 JAN-MS-00247173
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                E X H I B I T S (Cont'd)
 2    Number          Description              Page
```

```
 3  Janssen-Ritchie Exhibit 4  ...................67
                PowerPoint presentation, 2002
 4              Janssen Pain Franchise Review,
                March 25, 2001, Confidential,
 5              Bates JAN-MS-03065505-574
 6  Janssen-Ritchie Exhibit 5  ...................86
                PowerPoint presentation,
 7              Duragesic, Focused & Targeted
                Execution, 2004 Business Plan,
 8              August 6, 2003, Natively
                produced Bates
 9              JAN-MS-02774660, Attorneys'
                Eyes Only
10
    Janssen-Ritchie Exhibit 6  ..................114
11              12/1/2003 E-mail, Jenna Kelly
                to same and others, Subject:
12              Duragesic Functionality
                Messages, Highly Confidential
13              - Attorneys' Eyes Only, Bates
                JAN-MS-00779044
14
    Janssen-Ritchie Exhibit 7  ..................121
15              Presentation entitled
                Duragesic Brand Protection
16              Using Dendrite Segmentation
                and Analytics, Confidential,
17              Bates JAN-MS-02758275-287
18  Janssen-Ritchie Exhibit 8  ..................124
                9/3/2004 E-mail, James Burrus
19              to Michael Chester and others,
                Subject: Urgent:  DDMAC Action
20              on Duragesic with 9/2/2004 FDA
                Warning Letter to James
21              Burrus, Confidential, Bates
                JAN-MS-00779344-9350
```

```
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E X H I B I T S (Cont'd)
 2    Number          Description                Page
```

```
 3   Janssen-Ritchie Exhibit 9  .................132
               9/30/2004 E-mail, Bruce
 4             Ritchie to Kati Chupa,
               Subject: Duragesic promotion
 5             by HSR Sales Force Rationale,
               with attachment PowerPoint
 6             slides natively produced Bates
               JAN-MS-00315091, Confidential,
 7             Bates JAN-MS-00315090-91
 8   Janssen-Ritchie Exhibit 10  .................140
               Duragesic Marketing Strategy
 9             Executive Summary prepared by
               Ryan Hagey and others to Bruce
10             Ritchie, Confidential, Bates
               JAN-MS-03076731-6761
11
     Janssen-Ritchie Exhibit 11  .................145
12             E-mail chain, top e-mail
               5/2/2006, Bruce Ritchie to
13             David Moore and others,
               Subject: FW: Unbranded Speaker
14             Bureau for Pain, Confidential,
               Bates JAN-MS-01136186-187
15
     Janssen-Ritchie Exhibit 12  .................155
16             8/18/2003 E-mail, William
               Parks to Kati Chupa and
17             others, Subject: Oxycontin
               Article, Confidential, Bates
18             JAN-MS-00725328-330
19   Janssen-Ritchie Exhibit 13  .................160
               E-mail chain, top e-mail
20             1/27/2006, Gary Vorsanger to
               Bruce Ritchie, Subject: RE:
21             abuse data, Confidential,
               Bates JAN-MS-02108736-738
22
23   *** ATTORNEYS' EYES ONLY PORTION
24                           Pages 86 through 120
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      FRIDAY, JANUARY 25, 2019, BOCA RATON, FLORIDA

 2                  P R O C E E D I N G S

 3                        -oOo-

 4           VIDEOGRAPHER:  Okay.  Stand by.  We are

 5      now on the record.  My name is Jeff Fleming.  I

 6      am a videographer for Golkow Litigation

 7      Services.  Today's date is January 25th, 2019.

 8      The time is 8:40 a.m.

 9           This video deposition is being held in

10      Boca Raton, Florida in the matter of National

11      Prescription Opiate Litigation, MDL Number 2804,

12      for the United States District Court for the

13      Northern District of Ohio, Eastern Division.

14           The deponent is Bruce Ritchie.  Counsels'

15      appearances will be noted on the stenographic

16      record.  The court reporter is Karen Kidwell,

17      and she will now swear in the witness.

18                      BRUCE RITCHIE

19   having been first duly sworn, was examined and

20   testified as follows:

21                      EXAMINATION

22   BY MR. ACKERMAN:

23      Q.   Good morning, Mr. Ritchie.

24      A.   Morning.

25      Q.   My name is David Ackerman.  We met off the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    record, but I am an attorney representing the

 2    Plaintiffs in this action.

 3              Have you ever had your deposition taken

 4    before?

 5         A.   Once.

 6         Q.   And when was that?

 7         A.   It was -- I'm not exactly sure, about

 8    20-plus years ago.

 9         Q.   What type of matter -- litigation was

10    that?

11         A.   I was a witness to a sexual harassment.

12         Q.   So it's been a little while since you've

13    sat for a deposition, so let me just briefly go over

14    the ground rules --

15         A.   Okay.

16         Q.   -- and explain what's going to happen.  I

17    will be asking questions.  You hopefully will be

18    giving answers.

19              Sitting next to you is probably the most

20    talented person in the room, who is the court

21    reporter, who manages to write down everything that

22    we say.  And as talented as she is, there are a few

23    things that she can't take down.  She can't take down

24    when you and I speak over each other.  So even though

25    it may be painfully obvious where my questions are

going, I'd ask that you let me complete my questions before you start your answer.

And similarly, I will do my best to do the same; that I will allow you to complete your answers before I start my questions, and if at any time I interrupt you, please let me know, and I'll let you finish your answer.

In addition, the court reporter is taking everything down, and we do have a video camera here as well, but for purposes of the written record, the court reporter can't transcribe nods or shakes or shrugs of the shoulders. So all answers have to be verbal: Yes, no, maybe, if necessary.

Do you understand?

A. I do.

Q. Thank you. If at any time you don't understand a question that I ask, please let me know, and I will do my best to explain it or explain whatever it is that you are having difficulty understanding. If you do answer a question, I will assume that you understood it.

Is that clear?

A. Yes.

Q. All right. We are -- I think we're a little bit time-limited today, as we've decided, but

Highly Confidential - Subject to Further Confidentiality Review

1  we still have plenty of time and should be able to

2  get through everything.

3           We're going to take breaks probably about

4  every hour, hour and a half, not for too long.  But

5  if at any time you need a break, just let me know.

6  I'll let your counsel know.  We can take a break to

7  accommodate you.  I just ask that we not break while

8  a question is pending.

9           Are you under the influence of any

10  substance or medication today that would affect your

11  ability to testify truthfully?

12      A.   No.

13      Q.   Okay.  Let's go ahead and get started.

14           Mr. Ritchie, are you currently employed?

15      A.   Yes.

16      Q.   And where are you employed?

17      A.   At Janssen Pharmaceuticals.

18      Q.   And what is your present job title at

19  Janssen Pharmaceuticals?

20      A.   I'm a regional business director with our

21  CAM sales force.

22      Q.   I'm sorry.  With the what?

23      A.   CAM.  It's a specialty sales force that

24  calls on high levels of institutional people.

25      Q.   I tell you what.  We have what is very

Highly Confidential - Subject to Further Confidentiality Review

1  helpful, I think, a copy of your CV.  So let's go

2  ahead and mark this as Exhibit 1, and this can

3  hopefully shortcut what is often some somewhat

4  tedious questioning.

5       A.   Okay.

6       (Janssen-Ritchie Exhibit 1 was marked for

7  identification.)

8  BY MR. ACKERMAN:

9       Q.   Mr. Ritchie, the court reporter has handed

10  you what has been marked as Deposition Exhibit

11  Number 1.  It is a multipage document numbered

12  JAN-MS-3077094 through -- -3077096.

13       Take a moment to review this document and

14  let me know when you've had a chance to review it.

15       A.   Yeah.

16       Q.   All right.  Do you recognize this

17  document?

18       A.   I do.

19       Q.   And what is it?

20       A.   It's a partial résumé.

21       Q.   Okay.  Does this document accurately state

22  your employment history?

23       A.   Until 2000 and maybe '7 or '8.  It's not

24  the most current version.  There's been new jobs

25  since then, but to all intents and purposes, it

Highly Confidential - Subject to Further Confidentiality Review

```
 1    works.

 2         Q.   Okay.  So let's go with the current stuff

 3    that's not on here first.

 4         A.   Okay.

 5         Q.   You mentioned that you are currently a

 6    regional business director.  What are your

 7    responsibilities as a regional business director?

 8         A.   Right now, I have a team of nine people

 9    across the southeast part of the country, and they

10    are responsible for the different institutional

11    systems.  So I manage those nine people, all

12    managers.

13         Q.   Are those nine people sales

14    representatives?

15         A.   They are sales managers.

16         Q.   Okay.  Apologies.  I need to fix the

17    screen here.

18              And the sales -- do the sales managers

19    oversee sales representatives?

20         A.   Not in this situation.  They are managers

21    unto themselves, so they are individual contributors.

22         Q.   Okay.  And what products are the sales

23    managers selling?

24         A.   Currently, we are selling Xarelto and

25    Invokana.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    What kind of medicine is Xarelto?

 2          A.    It's an anticoagulant.

 3          Q.    And Invokana?

 4          A.    Is a diabetic drug.

 5          Q.    How long have you been in your current

 6    position?

 7          A.    Since the beginning of 2018.

 8          Q.    Prior to 2018, what position -- have you

 9    been employed by Janssen continuously since, it

10    appears, 1992 through the present?

11          A.    Yes.

12          Q.    All right.  So prior to 2018, what is the

13    position that you held at Janssen?

14          A.    It was a regional business director for

15    the Great Lakes area.

16          Q.    And one of those painfully obvious things,

17    but where is the Great Lakes area?  What does that

18    include?

19          A.    It included Michigan and Indiana and the

20    western part of Ohio.

21          Q.    As a regional business director, did you

22    oversee sales representatives?

23          A.    In that role, I oversaw five district

24    managers and a team of about fifty representatives.

25          Q.    Was this a specialized sales force?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    It was institutionally based.

 2         Q.    And what does that mean, "institutionally

 3    based"?

 4         A.    Call on large hospitals and other

 5    specialties as well.

 6         Q.    The Ohio portions of the Great Lakes

 7    territory, did that include Summit County, Ohio?

 8         A.    I do not know the counties.  It included

 9    Dayton, Toledo, and what's in the middle there?  It's

10    all on the very western part.  I'm not sure what the

11    counties are.

12         Q.    So it didn't include Cleveland?

13         A.    Did not include Cleveland.

14         Q.    And it didn't include Akron?

15         A.    No.

16         Q.    Okay.  What drugs were the -- if any -- or

17    medical devices were the sales representatives

18    selling?

19         A.    Xarelto and Invokana as well.

20         Q.    And for how long were you a regional

21    business director overseeing the Great Lakes area?

22         A.    Approximately three years.

23         Q.    So if my math is right, that takes us to

24    about 2014, I think?

25         A.    Correct.
```

1      Q.   And what was the position that you held at

2  that point?

3      A.   Before that, I was a regional business

4  director in the New England area.

5      Q.   I assume that covers states in the

6  Northeast?

7      A.   It does, yes.

8      Q.   And did you oversee sales reps --

9  representatives in that position?

10      A.   I did.  A mixture of people calling on

11  institutions and specialty offices.

12      Q.   How many sales representatives?

13      A.   I'm not 100 percent sure, but it would

14  have been virtually the same type of size:

15  50 people, 5 or 6 district managers.

16      Q.   And what drugs or medical devices were

17  those sales representatives selling?

18      A.   I'm not 100 percent sure initially, but

19  for a portion of that time, it was Xarelto and

20  Invokana as well.

21      Q.   And at any portion of the time, were they

22  selling Nucynta?

23      A.   I don't believe so.  I don't recall.

24      Q.   And how long were you a regional business

25  director for the New England area?

```
 1          A.   I would have gone approximately two years.

 2          Q.   So if my math is right, I think we're at

 3     about 2012?

 4          A.   We're getting close.

 5          Q.   So what was the position that you held

 6     prior -- immediately prior to regional business

 7     director --

 8          A.   I was a regional business director --

 9     sorry.

10          Q.   Again, just -- yeah, just let me finish my

11     question.

12          A.   Yeah.

13          Q.   And, again, it was painfully obvious, so I

14     understand.

15               What was the position that you held

16     immediately prior to being regional business director

17     for the New England area?

18          A.   I was regional business director in, I

19     think, it was the D.C. region, Washington, D.C.

20          Q.   What is included in the D.C. region?

21          A.   Virginia, Maryland, Washington, D.C.

22          Q.   Was it a specialized sales force?

23          A.   This was actually more office-based type,

24     calling on not -- no institutions; just more

25     internists and family practice physicians.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   And how many sales reps -- representatives

2   did you oversee?

3       A.   It would have been approximately the same

4   number again:  50 reps, 6 district managers.

5       Q.   With the same number of district managers?

6       A.   Roughly, yes.

7       Q.   And what drugs or medical devices were the

8   sales reps in the D.C. region selling at that time?

9       A.   I'm not 100 percent sure, to be honest.  I

10  don't know.

11      Q.   Did it -- did -- were those sales reps

12  selling Nucynta?

13      A.   I don't recall.

14      Q.   How long were you regional business

15  director for the D.C. region?

16      A.   I would have gone two, three years.

17      Q.   And so what position did you hold

18  immediately prior to being regional business director

19  for the D.C. region?

20      A.   I was the product director for Duragesic.

21      Q.   Okay.  And that is -- so if you look at

22  Exhibit 1 -- well, at the top of Exhibit 1, it says

23  that you were regional business director responsible

24  for all sales activities throughout the state of

25  North Carolina?

```
 1          A.    Yes.

 2          Q.    Okay.  Is that the position that you held?

 3          A.    That region that I mentioned before, the

 4   North -- I think the alignments changed over that

 5   time.  So I think it might have started in North

 6   Carolina and ended up being D.C.  It was an

 7   evolution.

 8          Q.    Okay.  And again here, it says:  "Key

 9   products include Levaquin, Aciphex, and Ultram ER."

10                Do you see that?

11          A.    Yes, I do.

12          Q.    Does that refresh your recollection as to

13   what drugs the sales reps were selling in that D.C.

14   or North Carolina region?

15          A.    It does.

16          Q.    And it was those three; is that correct?

17          A.    I believe so, yes.

18          Q.    What are the job responsibilities of a

19   regional business director?

20          A.    The primary function of my -- of the

21   regional business director is to manage the district

22   managers that report in to you, but you have an

23   overall leadership of all the representatives as

24   well.  So while it's not a direct span of control --

25   they're in your span of control, but it's not just --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they're not your direct reports.  So it's a people

 2    centric job.

 3         Q.   Okay.  And when you say "manage district

 4    managers," what is it exactly that you're managing?

 5    What are your goals?

 6         A.   I'm helping them establish business goals.

 7    I'm helping them accomplish their business goals.  I

 8    am developing them to be better people.  I'm ensuring

 9    that they, you know, are managing their teams

10    appropriately and that everything that they do is

11    compliant to the FDA.

12         Q.   Is one of the goals of a regional business

13    director to increase the sales within the region that

14    that person oversees?

15         A.   Not specifically.  The -- as I mentioned

16    before, the goal is to go ahead and ensure that they

17    are doing their -- their job appropriately; that

18    everything that they're doing is -- that they're

19    managing their team.  It's much more of a development

20    and ensuring the fullest execution than focus just on

21    sales.

22         Q.   Okay.  If you look at Exhibit 1, there is

23    a bullet, the first bullet point under "Regional

24    business director."  It says:  "Implemented a new

25    sales model that helped the team improve from second
```

```
 1    last in the nation to a current ranking of third in

 2    the nation."

 3              Do you see that?

 4         A.   I do.

 5         Q.   Okay.  What are the metrics that were used

 6    to rank that team?

 7              MS. STRONG:  Objection to form.

 8              THE WITNESS:  The -- there is a -- there

 9         is above-base compensation that is in play every

10         year.  It varies.  It can vary from every six

11         months.  It's not a constant thing.  But it --

12         depending on the metrics of the -- the sales

13         contest or the sales -- above-base sales

14         campaign, every team is ranked.

15    BY MR. ACKERMAN:

16         Q.   Is that a current practice that still

17    exists at Janssen?

18              MS. STRONG:  Objection to form.

19              THE WITNESS:  I'm not sure.

20              What do you mean?  Can you be more

21         specific, please?

22    BY MR. ACKERMAN:

23         Q.   Sure.  Does Janssen today still have sales

24    contests that result in, as you described it,

25    "above-base compensation"?
```

Highly Confidential - Subject to Further Confidentiality Review

 1          A.   Yes.

 2               MS. STRONG:  Objection to form.

 3               And please, if you could wait to make sure

 4      I have an opportunity to provide an objection on

 5      the record.

 6               THE WITNESS:  Yes.

 7  BY MR. ACKERMAN:

 8          Q.   When was the last contest that Janssen

 9  held that was used to rank sales teams?

10          A.   So we're using the word "contest" here.

11  "Contest" is different from this "above-base

12  compensation."  The compensation is more of a -- it's

13  a sale.  It's a plan designed on an annual basis for

14  the -- our contests are held sporadically.  So I'm

15  not sure if you're asking about the contests or

16  asking about the actual -- the above-base comp

17  portion of every rep's business every year.

18          Q.   Okay.  Thank you for clarifying.

19               What I'm -- what I'm trying to get at is,

20  there is a reference in your CV to a ranking of the

21  sales teams.

22               And so my question is:  What -- how are

23  those sales teams ranked?  What are the categories or

24  what are the metrics that are used?

25               MS. STRONG:  Just a moment, please.

Highly Confidential - Subject to Further Confidentiality Review

 1                  Objection to form.

 2                  Do you understand the question?

 3                  THE WITNESS:  I do not.

 4      BY MR. ACKERMAN:

 5          Q.   Okay.  Let's just look at Exhibit 1.

 6      Okay?

 7                  And the bullet point says:  "Implemented a

 8      new sales model that helped the team improve from

 9      second last in the nation to a current ranking of

10      third in the nation."

11                  Do you see that?

12          A.   I do.

13          Q.   Who ranks the sales teams?

14          A.   We have a -- in the company, there is a

15      team that does compensation.  And they put the --

16      they put the contest together or the plans

17      together -- I use the word -- not contest, but the

18      plans together.  They get the data, and they then

19      rank people based upon the parameters of that

20      compensation plan.

21          Q.   So the ranking is tied to compensation?

22          A.   It is.

23          Q.   The ranking that is referenced here in

24      Exhibit 1, do you recall the metrics that were used

25      to rank the sales teams?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Not specifically, no.

 2          Q.    Okay.  Are you aware of rankings of sales

 3   teams that are based upon total sales?

 4                MS. STRONG:  Objection to form.

 5                THE WITNESS:  Not -- no, not total sales.

 6   BY MR. ACKERMAN:

 7          Q.    Okay.  Let me ask this differently.

 8                It sounds like there are different metrics

 9   used for different rankings, is that right, at

10   different times?

11          A.    Every plan is different, yes.

12          Q.    Okay.  What are some of the metrics that

13   Janssen has used during the course of your experience

14   as a regional business director to rank sales teams?

15                MS. STRONG:  Objection to form.

16                THE WITNESS:  There would be a sales, a

17       growth versus -- growth over base component.

18       There would be a -- potentially a shared

19       component.  Those would be the two major ones.

20   BY MR. ACKERMAN:

21          Q.    So let's start with that first one, the

22   growth over base component.  What is that component

23   measuring?

24          A.    The -- depending on the drug and the

25   category you're selling, there is a -- a basket of
```

Highly Confidential - Subject to Further Confidentiality Review

1   drugs that are defined as the pool that you are

2   judged against.  So would be competitor drugs,

3   similar drugs, are part of this base.  And then your

4   individual brand is then compared to that basket, and

5   either you're getting shared growth or shared -- or

6   avoiding shared decline.

7        Q.   And it's growth in what?

8        A.   In prescriptions.

9        Q.   And that's prescriptions written by

10  prescribers in the business -- or in the district; is

11  that right?

12       A.   It is.  It also can be sale, depending --

13  I'm talking office based right now so for this

14  particular job, yes.

15       Q.   Okay.  So for your particular job now, it

16  would be prescriptions written?  Is that what I

17  understand?

18       A.   No.  So for my particular job now, it's

19  more of a -- it's institutional focus.  So it's

20  actually -- institutional purchases are a key, a big

21  component of it.

22       Q.   For the sales teams that are visiting

23  prescribers, not the institutional-based sales teams,

24  would there still -- was there a growth over base

25  component?

```
 1              MS. STRONG:  Objection to form.

 2              THE WITNESS:  I'm not sure what period

 3         you're talking to, because every year, the

 4         contest is different.

 5  BY MR. ACKERMAN:

 6         Q.   I understand that every year they're

 7  different, and what I've asked is:  What are the

 8  metrics that are typically used in these contests?

 9              I don't have a contest to refer to

10  specifically.  So I'm just asking based on your

11  experience, and it sounds like you have roughly 10,

12  12 years as a regional business director; is that

13  right?

14         A.   Approximately, yes.

15         Q.   And so how often does Janssen hold one of

16  these contests that you've described?

17              MS. STRONG:  Objection to form.

18              THE WITNESS:  So as mentioned before,

19         contests are separate to these above based

20         pieces.  I'm not sure which one you're referring

21         to.

22  BY MR. ACKERMAN:

23         Q.   Okay.  So let's go back again.

24              What is used to rank the sales teams?

25         A.   There is an annual compensation plan that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    is -- that is in place every year, and they -- they

 2    change annually and potentially even every six

 3    months.

 4         Q.   So the sales teams are ranked based on

 5    their annual compensation earned?

 6         A.   No.  They're based upon the contest

 7    parameters, and then there is a compensation

 8    component that is paid out, based -- depending on the

 9    results.

10         Q.   Okay.  I understand that -- I think what

11    you're saying is contests are linked to compensation;

12    is that correct?

13         A.   No.  Not saying that.

14         Q.   All right.  I worry that we're talking

15    past each other, and I'm trying to figure this one

16    out.

17              Let's go back to this.  It appears, over

18    the last 10, 12 years, that you've been a regional

19    business director for two to three years on a certain

20    location and then moved on to a different location;

21    is that correct?

22         A.   Yes.

23         Q.   Is that typical in Janssen?

24         A.   Yes.

25         Q.   Do you have the opportunity to choose the
```

```
 1   regions to which you're assigned?

 2       A.   No.

 3       Q.   To whom does a regional business director

 4   report?

 5       A.   National sales director.

 6       Q.   So if we're working through the sales

 7   hierarchy, there are sales reps who then report to

 8   district managers; is that correct?

 9       A.   Yes.

10       Q.   And then the district managers report to

11   regional business directors; is that correct?

12       A.   Yes.

13       Q.   And then the regional business directors

14   report to national sales managers?

15       A.   Directors, yes.

16       Q.   Sorry.  National sales directors.

17            And then to whom does the national sales

18   director report?

19       A.   It varies over time, but usually to a VP.

20       Q.   Okay.  So according to Exhibit 1, between

21   2003 and 2005 you were the product director for

22   analgesia; is that correct?

23       A.   Yes.

24       Q.   The first line here says:  "Responsible

25   for multiple aspects of marketing for Duragesic."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2        A.    Yes.

 3        Q.    So what were the aspects of marketing for

 4   Duragesic that you were responsible for?

 5              MS. STRONG:  Objection to form.

 6              THE WITNESS:  They varied over time.  But

 7        everybody on the brand team has specific

 8        projects that they were -- they were tasked

 9        with, and you stayed in your lanes and you

10        managed those specific projects.

11   BY MR. ACKERMAN:

12        Q.    Okay.  Was the product director a member

13   of the brand team for Duragesic?

14        A.    Yes.

15        Q.    Who else comprised the brand team for

16   Duragesic?

17        A.    It varied over time, but you would have

18   senior product director, you would have directors,

19   and you would have managers and associate managers.

20        Q.    During the period of time that you were

21   product director for Duragesic, to whom did you

22   report?

23        A.    I believe for most of the time, it was to

24   Kati Chupa.

25        Q.    And what was Ms. Chupa's job title?
```

```
 1          A.    Senior product director, I believe.

 2          Q.    And did you have any direct reports to

 3     you?

 4          A.    For one year, I had an associate director

 5     reporting to me.

 6          Q.    Who was the associate director?

 7          A.    First name Julie, not sure last name.

 8          Q.    So looking back at Exhibit 1 and talking

 9     about your role as product director of analgesia, it

10     says you were responsible for sales force activities.

11                Do you see that?

12          A.    I do.

13          Q.    Can you just provide more detail about in

14     what way you were responsible for sales force

15     activities?

16                MS. STRONG:  Objection to form.

17                THE WITNESS:  The roles changed over time,

18           but I was a primary liaison with the sales

19           leadership.  I helped work with sales training.

20           And then I had certain regions that I was the

21           contact person for.  So if they had a need for

22           information, they would reach out to me.

23     BY MR. ACKERMAN:

24          Q.    Who was the sales leadership at that time?

25          A.    It varied over time.  But normally, the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   national sales directors were my -- would be my

 2   points of contact.

 3        Q.   Do you recall who the national sales

 4   directors were at that point?

 5        A.   I don't recall all of them.  I remember a

 6   Dominic LaSelva, Barry Gibson, Marc Marano, and I

 7   know I'm missing one or two.

 8        Q.   You mentioned you had involvement with

 9   sales training; is that correct?

10        A.   It is.

11        Q.   Were you responsible for training the

12   sales representatives?

13        A.   No.

14        Q.   So in what way were you involved with the

15   sales training?

16        A.   I was the liaison with training so that

17   they were aware of the brand intentions and they then

18   created programs to match those intentions.

19        Q.   And you say "brand intentions."  Does that

20   mean the marketing messages?

21             MS. STRONG:  Objection to form.

22             THE WITNESS:  Yes.

23   BY MR. ACKERMAN:

24        Q.   Does "brand intentions" refer to anything

25   else?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No.

 2        Q.    And then you mentioned you were a contact

 3   person for specific regions?

 4        A.    Yes.

 5        Q.    For which regions were you the contact

 6   person?

 7        A.    I cannot recall.

 8        Q.    Do you remember whether any of the regions

 9   included Cleveland or Akron, Ohio?

10        A.    No clue.

11        Q.    Okay.  So the next piece here on Exhibit 1

12   says you were responsible for advisory boards.  Do

13   you see that?

14        A.    Yes.

15        Q.    What are advisory boards?

16        A.    Advisory boards were a format where

17   physicians would give us feedback on what they were

18   seeing in the pain world.

19        Q.    And were you responsible for organizing

20   the advisory boards?

21        A.    I was responsible for logistics of the

22   advisory boards, not for the attendees.

23        Q.    What does that mean?

24        A.    I found the hotel, I put the agenda

25   together, I made sure that the content was all --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   everything was in place.  So it was more just to make

 2   sure that everything flowed smoothly throughout the

 3   meeting.

 4        Q.   Who was responsible for determining the

 5   attendees for these advisory boards?

 6        A.   I'm not 100 percent sure.

 7        Q.   Did you attend the advisory boards?

 8        A.   I did.

 9        Q.   How often were the advisory boards held?

10        A.   It varied.  Different customers, maybe

11   twice a year.

12        Q.   Were the advisory boards nationally

13   focused, or were they regional?

14             MS. STRONG:  Objection to form.

15             THE WITNESS:  They were normally

16        regionally focused.

17   BY MR. ACKERMAN:

18        Q.   Okay.  In what locations do you recall

19   advisory boards being held for Duragesic?

20        A.   Be more specific on the location.  Are you

21   looking for hotel or are you looking for area?

22        Q.   Oh, I'm sorry.  Just area, the name of the

23   city if you can remember it.

24        A.   I don't recall all of them.  I know

25   Orlando was one of them.  And I know there was some
```

```
 1    in California, not specifically where.

 2         Q.   Do you recall any in Ohio?

 3         A.   I do not.

 4         Q.   Who from Janssen attends these advisory

 5    board meetings?

 6              MS. STRONG:  Objection to form.

 7    BY MR. ACKERMAN:

 8         Q.   Does anyone from Janssen attend the

 9    advisory board meetings?

10         A.   Yes.

11         Q.   Who?

12              MS. STRONG:  Objection to form.

13              THE WITNESS:  It varies over time.  So

14         there is no constant answer.  All the --

15         generally, the brand people would all be there,

16         and occasionally some of the regional business

17         directors would be there.

18    BY MR. ACKERMAN:

19         Q.   Are there written records made of the

20    advisory board meetings?  Minutes or memoranda?

21              MS. STRONG:  Objection to form.

22              THE WITNESS:  Not that I'm aware.

23    BY MR. ACKERMAN:

24         Q.   How is the feedback from physicians at

25    these advisory board meetings captured, or how was it
```

 1   captured --

 2              MS. STRONG:  Objection.

 3   BY MR. ACKERMAN:

 4        Q.   -- if at all?

 5        A.   There were -- during the meeting, it would

 6   be questions and answers after each of the different

 7   sessions, and I think we had a vendor that would

 8   capture those questions.

 9              And then on the Q -- during the Q and A

10   sessions, those were -- there was -- somebody would

11   be hosting that session, and they would take -- they

12   would capture the key takeaways that would be

13   pertinent to the brand.

14        Q.   This is going back a ways, I understand,

15   but do you recall the name of the vendor who would

16   capture the Q and A?

17              MS. STRONG:  Objection to form.

18   BY MR. ACKERMAN:

19        Q.   Do you recall the name of the vendor who

20   was involved in these advisory board sessions?

21              MS. STRONG:  Same objection.

22              THE WITNESS:  I do not.

23   BY MR. ACKERMAN:

24        Q.   Did you ever receive reports of the

25   advisory board meetings?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.   I did not, to the best of my recollection.

 2              Q.   I apologize if I already asked this, but

 3   what was the purpose of the advisory board meetings?

 4              MS. STRONG:  Objection to form.

 5              THE WITNESS:  It was to give people that

 6         we were working, provide a chance to interact

 7         with their peers and for the brand to get a

 8         better -- to stay -- to stay in tune with what

 9         was going around in the marketplace.

10   BY MR. ACKERMAN:

11              Q.   You mentioned that there were sessions

12   that -- let me back up for a minute.

13              Did the advisory board meetings follow a

14   set -- a set format or a standard format?

15              A.   It was fairly consistent from program to

16   program, yes.

17              Q.   And what was that format?

18              A.   We had a faculty of presenters that

19   presented on different topics.  These were all key

20   opinion leaders, not employees of Janssen, and the

21   subject matter varied from session to session.

22              Q.   And then, if I understand you, after each

23   session with -- there was an opportunity for a

24   question and answer period; is that correct?

25              A.   Usually, yes.
```

1      Q.   Were these advisory boards opportunities

2    for prescribers to receive continuing medical

3    education?

4      A.   No.

5            Can you just -- I answered.  Can you just

6    go back and make --

7      Q.   Yes.

8      A.   I want to make sure your definition of

9    "continuing medical education" is the same as mine.

10     Q.   Sure.  And what is your definition of

11   "continuing medical education"?

12     A.   Mine is that's where you get credits.  You

13   need a certain number of credits each year, so you

14   use a formal process to go ahead and get credits.

15     Q.   That is what I was referring to, yes, and

16   thank you.  Thank you for clarifying.

17           Were the advisory boards multiday

18   meetings, or were they -- strike that question.

19           How long did a typical advisory board

20   meeting last?

21     A.   In general, they would start on Friday

22   evening and be done by Sunday lunchtime.

23     Q.   Your logistical responsibilities for these

24   advisory boards, did that include arranging for the

25   presenters?

```
 1                MS. STRONG:  Objection to form.

 2                THE WITNESS:  Be more -- just be more

 3           specific when you say "arranging," sir.

 4    BY MR. ACKERMAN:

 5           Q.   Who -- who was responsible for selecting

 6    who would -- who would present at these advisory

 7    board meetings?

 8                MS. STRONG:  Objection to form.

 9                THE WITNESS:  We had a vendor that was

10           partly involved, but the brand team would have

11           an idea.  So there would be a -- the vendor

12           would bring a suggestion of topics, and then the

13           brand team -- I'm not sure who exactly on the

14           brand team -- would go ahead and decide which

15           topics were thought to be best, most relevant.

16    BY MR. ACKERMAN:

17           Q.   And, again, you don't recall the name of

18    the vendor?

19           A.   It will come.  I don't think -- I can't

20    think right now, yeah.

21           Q.   Is that the same vendor who would be

22    capturing the Q and A?

23                MS. STRONG:  Objection to form.

24                THE WITNESS:  Yes.

25
```

```
 1   BY MR. ACKERMAN:

 2        Q.   When that vendor suggested topics for the

 3   advisory board, did the vendor also suggest

 4   presenters who would present on those topics?

 5        A.   Yes.

 6        Q.   Did you personally attend presentations at

 7   the advisory boards?

 8        A.   Yes.

 9        Q.   All of them?

10        A.   The majority.

11        Q.   How many prescribers would attend a

12   typical advisory board meeting?

13             MS. STRONG:  Objection to form.

14             THE WITNESS:  I'm not sure of an exact

15        number.  Round about 30 to my best recollection.

16   BY MR. ACKERMAN:

17        Q.   So typically, these were gatherings of

18   less than 100 prescribers?

19        A.   To my best recollection, yes.

20        Q.   Did sales representatives typically attend

21   the advisory board meetings?

22             MS. STRONG:  Objection to form.

23             THE WITNESS:  No.

24   BY MR. ACKERMAN:

25        Q.   Did district managers typically attend the
```

```
 1    advisory board meetings?

 2        A.   Not at any of the ones I was at.

 3        Q.   Did the advisory boards have a name?

 4        A.   No.  The --

 5        Q.   I didn't mean to interrupt you.

 6        A.   No.  The "advisory board" was the name,

 7   yeah.

 8        Q.   Okay.  And that is how individuals at

 9   Janssen referred to this type of gathering, as an

10   "advisory board"?

11        A.   Members of the brand, yes.

12        Q.   So the next topic says "Business plan

13   development" on Exhibit 1.  Do you see that?

14        A.   Yes.

15        Q.   What was your involvement with business

16   plan development?

17        A.   So in one of the years, and I'm not sure

18   which one it was, I was responsible for coordinating

19   the plan.  So it was more the -- it was sort of

20   essentially compiling the different inputs from a

21   variety of people into the finished version.

22        Q.   Okay.  And then if you move to bullet

23   points underneath "Product director for analgesia,"

24   it says:  "Created and implemented strategies that

25   helped the brand maintain significant market share
```

 1    even while facing generic competition."

 2            Do you see that?

 3        A.   I do.

 4        Q.   Is that an accurate description of your

 5    job performance as product director of analgesia?

 6        A.   For one of the years, yes.

 7        Q.   And what were these strategies that you

 8    created and implemented that are -- that you're

 9    referring to, that are referred to in this document?

10        A.   The biggest campaign was a grow and defend

11    campaign.

12        Q.   And what was the grow and defend campaign?

13        A.   It was designed to maintain Duragesic

14    market share while generic products came to market.

15    But there was a second phase.  There was a unique

16    situation that the generic was a different

17    formulation to the branded product, and we had

18    customers that liked a reservoir patch, and you had a

19    matrix patch coming into the mix, so there was

20    uncertainty as to how that product would work when it

21    was different to what they were used to using.

22        Q.   So the -- at this time, the Duragesic was

23    a reservoir patch; is that correct?

24        A.   That's correct.

25        Q.   And what does that mean, a "reservoir

Highly Confidential - Subject to Further Confidentiality Review

1   patch"?

2        A.   The construction of the patch is that

3   there's multiple layers in the patch.  One of those

4   layers is fentanyl, but there are some other mixes in

5   there.  The -- so the reservoir -- that reservoir

6   formulation allowed for a steady state of drug

7   delivered over a period of time.

8             It also, due to the reservoir nature, was

9   a lot more difficult to extract any fentanyl out of

10  the patch with a needle because you wouldn't show you

11  where it was or how much you could get, so it

12  became -- it was a formulation that doctors trusted.

13       Q.   And the generic was a matrix patch; is

14  that correct?

15       A.   There were two generics:  One was a matrix

16  patch, and one was a reservoir patch.

17       Q.   What is a "matrix patch"?

18       A.   I'm no scientist, but it's essentially

19  just a single layer.  There's no reservoir.  It's

20  just a transfer, like a sticker.

21       Q.   Was it -- was the matrix patch

22  cross-hatched in any way?

23            MS. STRONG:  Objection to form.

24            THE WITNESS:  I have no idea.

25

 1   BY MR. ACKERMAN:

 2        Q.   Did the grow and defend campaign that you

 3   created and implemented involve specific marketing

 4   messages?

 5             MS. STRONG:  Objection to form.

 6             THE WITNESS:  There were messages.  I'm

 7        not sure.  There was a message that was -- it

 8        was a rollout of this campaign, yes.

 9   BY MR. ACKERMAN:

10        Q.   And so what was that message?

11        A.   Grow and defend.  There was a -- part of

12   the message was -- it was -- was educating customers

13   about the difference between the two patches.

14        Q.   And so what was the difference between the

15   two patches that was the focus of this grow and

16   defend campaign?

17        A.   The reservoir patch and the matrix patch.

18        Q.   And what aspects of those patches did

19   sales reps -- or what aspects of those -- of those

20   patches were the subject of the grow and defend

21   campaign?

22             MS. STRONG:  Objection to form.

23             THE WITNESS:  I'm not sure what you're

24        really asking.

25

```
 1   BY MR. ACKERMAN:

 2       Q.   How did the grow and defend campaign

 3   differentiate the reservoir patch from the matrix

 4   patch?

 5       A.   To my best recollection, there was a

 6   graphic on one of the pieces that had a schematic of

 7   what the reservoir patch was and what a matrix patch

 8   was.

 9       Q.   And was the message -- was the message the

10   campaign intended to convey that the reservoir patch

11   was superior to the matrix patch?

12            MS. STRONG:  Objection to form.

13            THE WITNESS:  No.  The message was

14       intended to let the customers know that there

15       was a different formulation.

16            You had two generics on the market as

17       well.  One was -- so our biggest concern was

18       that no one would know which generic the patient

19       was going to get.  You might get the matrix one

20       time.  You might get the reservoir the next

21       time.  So we wanted to ensure that patients were

22       getting consistency of therapy.

23   BY MR. ACKERMAN:

24       Q.   Was it Janssen's position at the time that

25   the -- that the matrix patch was inferior to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reservoir patch?

 2              MS. STRONG:  Objection to form.

 3              THE WITNESS:  I'm not sure what Janssen's

 4         position was at that time.

 5    BY MR. ACKERMAN:

 6         Q.   So the next bullet point says:  "Created

 7    programs that helped the brand grow from 500K to over

 8    a billion in net sales."

 9              Do you see that?

10         A.   I do.

11         Q.   And what were the programs that you

12    created that helped -- let me back up.

13              First of all, I assume the reference to

14    "brand" is the Duragesic brand; is that correct?

15         A.   Yes.

16         Q.   And what were the programs that you

17    created that are described in this -- that are

18    referenced in this document?

19         A.   Most of it was the messaging and ensuring

20    that, you know, physicians were getting the knowledge

21    they needed to correctly prescribe this drug.

22         Q.   And specifically, what was the messaging?

23              MS. STRONG:  Objection to form.  Sorry.

24              THE WITNESS:  I don't recall specifically

25         the messaging.
```

```
 1    BY MR. ACKERMAN:

 2        Q.   Was there a point in time when Duragesic

 3    was marketed using the catch phrase "Life

 4    uninterrupted"?

 5        A.   Yes.

 6        Q.   Is that a program that you created as

 7    product director?

 8        A.   It was a program I was involved in.  I'm

 9    not sure specifically I created it.

10        Q.   In what way were you involved in that

11    program?

12        A.   I was -- as I mentioned before, I was one

13    of the liaisons with the sales force and sales

14    training.  So we would have taken that concept to the

15    field sales and made sure the messaging around it was

16    correct and then that any necessary training was in

17    place as well.

18        Q.   The next bullet point says:  "Developed

19    new programs to increase customer interactions and

20    information flow with the brand team."

21             Do you see that?

22        A.   I do.

23        Q.   And so what are the "programs" that are

24    referenced in this document?

25        A.   I'm not -- I'm not 100 percent sure.  The
```

1    one I can remember is I was involved in recreating

2    our website, the Duragesic website.  I was just

3    the -- we had a vendor doing it, and I was just --

4    oversaw that initiative.

5           Q.   Any other programs?

6           A.   Not that I can recall.

7           Q.   And the last bullet point there says:

8    "Key resource for all marketing and sales management

9    meetings and brand plan POAs."

10              Do you see that bullet point?

11          A.   I do.

12          Q.   What is a "POA"?

13          A.   It's a cycle meeting.  It's a meeting they

14   have in the field to go ahead and roll out the new

15   messaging.  I can't think what the acronym means

16   right now.

17          Q.   How often are the POAs held?

18          A.   It varies over time.  Every year is a

19   little different, and at this time, I think there

20   were about three a year.

21          Q.   And were these national meetings?

22              MS. STRONG:  Objection to form.

23              THE WITNESS:  There -- they could be

24       different meetings.  You could have a district

25       meeting, a regional meeting.  I do -- I can't

Highly Confidential - Subject to Further Confidentiality Review

```
 1          recall there being a national meeting, but there
 2          may have been one in that time.
 3     BY MR. ACKERMAN:
 4          Q.   And so what was your involvement in the
 5     POAs?
 6          A.   I made sure that all the materials
 7     necessary for a successful meeting at a remote site.
 8     When I say "all materials," that the brand-specific
 9     materials were available to the different managers
10     and that they would be able to go ahead and correctly
11     portray what we were trying to -- our intentions to
12     the sales reps.
13          Q.   As product director analgesic, did you
14     have any involvement in identifying key opinion
15     leaders?
16          A.   I did not.
17          Q.   Who was responsible for identifying key
18     opinion leaders for Duragesic?
19               MS. STRONG:  Objection to form.
20               THE WITNESS:  I don't recall anyone
21          specifically being responsible for that.
22     BY MR. ACKERMAN:
23          Q.   Did you have any responsibility for
24     suspicious-order monitoring for the Duragesic brand?
25          A.   No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Who was -- who, if anyone, was responsible

 2   for suspicious order-monitoring for the Duragesic

 3   brand?

 4          A.   To be honest, I don't recall that term

 5   ever being utilized.

 6          Q.   Did you have any responsibility as product

 7   director analgesia for reporting of adverse events

 8   with respect to Duragesic?

 9          MS. STRONG:  Objection to form.

10          THE WITNESS:  I specifically did not have

11      any responsibility.  It was a different process

12      involved for reporting adverse events.

13   BY MR. ACKERMAN:

14          Q.   And what was the process for reporting

15   adverse events?

16          A.   It's one of the backbones of our company.

17   There is a -- there is a -- there is a process

18   that -- I believe it goes to the medical department.

19   Any adverse -- any adverse events need to be reported

20   in a timely fashion, and there is a format to do it.

21   I think back then, it was a paper format.  Now it's

22   strictly an electronic format.  And every rep is

23   well-trained to go ahead and complete that process.

24          Q.   Did you -- as product director with

25   responsibility for the Duragesic brand, did you have
```

1    any involvement in investigating reports of abuse or

2    diversion of the Duragesic product?

3        A.   I did not.

4        Q.   Was there -- was there anyone who was

5    responsible for investigating reports of abuse and

6    diversion of the Duragesic product during that time

7    frame?

8            MS. STRONG:  Objection to form.

9            THE WITNESS:  There would have been.  I

10       don't know who that person would have been.

11   BY MR. ACKERMAN:

12       Q.   And why do you say, "There would have

13   been"?

14       A.   Because we -- as a company -- well, we

15   are a credo-based company, and the patient safety is

16   always -- it's the number one concern we have.  And

17   so any time you would get a report, someone in the

18   company would -- there is a department that would

19   investigate to make sure that if there was a claim,

20   that it was -- you know, that we found a way to take

21   care of it.  And if it -- and sometimes, a lot of

22   times, which was usually, the claims were just --

23   were not accurate.

24       Q.   Okay.

25           MS. STRONG:  Can we take a break?  We've

Highly Confidential - Subject to Further Confidentiality Review

```
 1           been going about an hour.

 2                 MR. ACKERMAN:  Yeah.  Let's go off the

 3           record.

 4                 VIDEOGRAPHER:  Off the record.  9:37 a.m.

 5                 (A recess transpired from 9:37 a.m. to

 6                 9:50 a.m.)

 7                 VIDEOGRAPHER:  On the record at 9:50 a.m.

 8     BY MR. ACKERMAN:

 9           Q.   We are back on the record, Mr. Ritchie.

10     Turning your attention back to Exhibit 1.

11                 At the bottom of the first page, it says

12     that your position was a field sales director; is

13     that correct?

14           A.   Yes.

15           Q.   And what were your job responsibilities as

16     a field sales director?

17           A.   I was responsible for, at different times,

18     up to seven regional business directors.  They were

19     my direct reports.  Each of them had their own team

20     of people.  I didn't have direct responsibility for

21     those groups.  I had responsibility for the entirety.

22                 I had the pain sales force, and I had the

23     hospital sales force reporting to me at that time.

24     This was a people centric job.

25           Q.   You said the "pain sales force"; is that
```

Highly Confidential - Subject to Further Confidentiality Review

1  correct?

2       A.   Yes.

3       Q.   And what was the pain sales force?

4       A.   It was a team dedicated to selling

5  Duragesic.

6       Q.   How many members were -- how large was the

7  pain sales force?

8       A.   At the start, it was 275 people.

9       Q.   When did it start?

10      A.   I don't know.  It was in place when I came

11  with the job.

12      Q.   I'm sorry.  I thought you had said at the

13  start it was 275 people, so I'm just trying to figure

14  out what time frame you're referring to.

15      A.   I think the numbers changed over time.

16  One of the consistencies of our company is nothing

17  stays constant so, yeah.

18      Q.   I see.  So at what point in time was the

19  pain force, the pain sales force, comprised of 275

20  people?

21      A.   In -- it definitely was there in 1999.

22      Q.   Did that sales force grow at any point?

23      A.   I do believe it grew slightly, yes.

24      Q.   After 1999, it grew?

25      A.   At some point, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   Is that a -- was the pain sales force

 2    still in existence during the time period you were

 3    product director?

 4            MS. STRONG:  Objection to form.

 5            THE WITNESS:  Not specifically, no.

 6    BY MR. ACKERMAN:

 7        Q.   Can you provide more detail?

 8            MS. STRONG:  Objection to form.

 9            THE WITNESS:  At some point, the -- the

10        Duragesic -- the people selling Duragesic were

11        merged into other sales forces, and you no

12        longer had a dedicated pain team.

13    BY MR. ACKERMAN:

14        Q.   At what point in time was the pain sales

15    force merged into other sales forces?

16        A.   I don't recall the timing.

17        Q.   Was it during the period that you were

18    product director?

19        A.   As I mentioned before, I don't recall the

20    time.  I believe so.

21        Q.   Were you involved in the decision to merge

22    the pain sales force into other sales forces?

23        A.   I was not.

24        Q.   Who made that decision, if you know?

25        A.   That would have been a company decision at
```

```
 1   high levels that I'm not aware of.

 2       Q.  When you say "high levels," what -- what

 3   specific job titles would comprise "high levels"?

 4          MS. STRONG:  Objection to form.

 5   BY MR. ACKERMAN:

 6       Q.  What do you mean by "high levels"?

 7       A.  The VP level and higher.

 8       Q.  Were you consulted in connection with the

 9   decision to merge the pain sales force --

10       A.  No, I was not.

11       Q.  -- into other sales forces?

12          Did you agree with the decision to merge

13   the pain sales force into other sales forces?

14          MS. STRONG:  Objection to form.

15          THE WITNESS:  I didn't have a thought

16       positive or negative, either way, yeah.

17   BY MR. ACKERMAN:

18       Q.  So looking back at Exhibit 1, the second

19   line here under "Field sales director" says you were

20   "responsible for the leadership and motivation of

21   approximately 400 sales representatives and their

22   managers."

23          Do you see that?

24       A.  I do.

25       Q.  Is that -- I assume that includes the pain
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   sales force; is that correct?

 2        A.   Yes.

 3        Q.   Are there any other sales representatives

 4   included in that approximately 400 number?

 5        A.   The hospital sales force.

 6        Q.   And I assume the hospital sales force was

 7   tasked with selling to hospitals?

 8        A.   Yes.

 9        Q.   Did the hospital sales force sell

10   Duragesic to hospitals?

11        A.   They did, yes.

12        Q.   And did the pain sales force also sell

13   Duragesic to hospitals?

14        A.   No.

15        Q.   So to whom did the pain sales force sell

16   Duragesic?

17             MS. STRONG:  Objection to form.

18             THE WITNESS:  The -- the primary focus was

19        on pain specialists and oncology offices.

20   BY MR. ACKERMAN:

21        Q.   I can see the other positions that you've

22   held at Janssen here.  Just very quickly, I just want

23   to ask whether any of these involved the sales of

24   Duragesic.  Otherwise, I think they're fairly

25   self-explanatory.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.   No, they did not.

2          Q.   So your first experience with selling

3    Duragesic, was that as field sales director in 19 --

4    when you became field sales director in 1999?

5          A.   Yes.

6          Q.   Okay.  So at that time, how did you learn

7    about Duragesic?

8          A.   Be more specific?  Sorry.

9          Q.   Sure.  Did you, in -- when was Duragesic

10   launched?

11         A.   I'm not 100 percent sure.

12         Q.   It was prior to 1999, though, right?

13         A.   Yes.

14         Q.   And it was already on the market in 1999?

15         A.   Yes.

16         Q.   So in 1999, you became responsible for

17   sales representatives who were selling Duragesic,

18   correct?

19         A.   Yes.

20         Q.   Did you take any steps to educate yourself

21   regarding what Duragesic was and the marketing

22   messages and so forth?

23         A.   Yes.  So every person that is involved,

24   from any level in the sales team, goes through the

25   same training.  So I went through exactly the same
```

 1   training as the representatives would have gone

 2   through.  There was no abbreviated version.

 3            So it was home study.  It was attending

 4   training, the formal training classes.  And that was

 5   not just for Duragesic.  It would have been for the

 6   other drugs, Aciphex and Levaquin as well.  They were

 7   new to me as well.

 8        Q.   And what were -- I think you may have

 9   already just described it, but what were the

10   components of that training?

11        A.   So there are modules in place from anatomy

12   to the marketplace to the competitors that I would

13   have gone through and had to have -- I had to pass

14   the various assessments.  You had to get 90 percent

15   on each of the assessments, exactly the same for me

16   as it was for the representatives.

17        Q.   And so you mentioned there was home study?

18        A.   Yes.

19        Q.   And what -- when you say "home study,"

20   what is -- can you explain what that means?

21        A.   Yes.  I was at home studying.

22        Q.   Were you -- what -- how did you obtain the

23   materials that you were studying?

24        A.   I believe -- at some point, it changed and

25   went online.  I'm not sure if I either got manuals or

1  I got the materials in some type of online format.

2  It was study manuals, just -- yeah.

3      Q.  So just to be clear, the company provided

4  sales representatives and you with study materials;

5  is that right?

6      A.  That is correct.  All the materials would

7  have gone through the copy clearance and the review

8  necessary for them to become tools that we could --

9  that reps would utilize to go ahead and study, yes.

10      Q.  And then you review those tools on your

11  own at home, and that's why it's called "home study";

12  is that correct?

13      A.  Yes.

14      Q.  You mentioned "training sessions"?

15      A.  Yes.

16      Q.  Are those in-person training sessions, or

17  are they -- how are those conducted?

18      A.  So the training sessions are conducted in

19  formal classes at -- usually in the home office

20  environment.

21          There is a dedicated training department

22  that has people that are more knowledgeable.  And so

23  they help ensure that the -- the book learning is

24  fully understood; that they go deep into some

25  components.  They ensure that the people going to

 1    training classes can verbalize.  And then there is

 2    also a messaging component so that you need to be

 3    able to be conversant with the subject matter as

 4    well.

 5         Q.   Are the classes in person?

 6         A.   It's a team of people.  It's a group of

 7    people.

 8              I'm sorry.  Be more specific.

 9         Q.   Sure.  The group of people, I assume, are

10    trainers; is that correct?

11         A.   I'm not sure what you're asking.

12         Q.   Let me ask the question again.

13              The formal training classes that you

14    described, are those in-person training classes, or

15    are they held -- or do people participate -- sales

16    representatives and others -- participate remotely?

17         A.   Oh.  They're in person.  They were back

18    then anyway.

19         Q.   Do you recall how many formal class in

20    training or in-person training classes you attended?

21         A.   I believe it was two.

22              MR. ACKERMAN:  Let's mark an exhibit.

23         Let's mark this as Exhibit 2, please.

24         (Janssen-Ritchie Exhibit 2 was marked for

25    identification.)

```
 1    BY MR. ACKERMAN:

 2         Q.   Mr. Ritchie, I've handed you what has been

 3    marked as Deposition Exhibit Number 2.  It is a

 4    two-page document, Bates number JAN-MS-0286988

 5    through -89.  Take a moment to review this document

 6    and let me know when you've had a chance to review

 7    it.

 8              Do you recognize this document?

 9         A.   Not specifically, no.

10         Q.   It's an e-mail chain, and I don't believe

11    you are on the e-mails at the top, but beginning

12    probably about three-quarters down on the page, there

13    is an e-mail from Bruce Moskovitz.  Do you see that?

14         A.   I do.

15         Q.   And who -- what position at the time did

16    Bruce Moskovitz hold?

17         A.   Reading it on the sheet here, I knew he

18    was in the medical department.  I wasn't sure of his

19    position.

20         Q.   Sure.  And then there is an e-mail below

21    that from Steve Zollo.  Do you see that?

22         A.   I do.

23         Q.   Do you recall what position Steve Zollo

24    held?

25         A.   He was the vice president of analgesia.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.  So looking at Mr. Zollo's e-mail

2   which is dated January 2nd, 2001, and then continues

3   onto the second page, the subject line is "JCAHO

4   standards on pain management."

5             Are you familiar with JCAHO?

6        A.    I've heard of the acronym before, but I

7   don't specifically know what they do.

8        Q.    I think it's described in here a few lines

9   down as the Joint Commission on Accreditation of

10  Health Care Organizations, correct?

11       A.    Yeah.

12       Q.    And Mr. Zollo writes:  "One year ago, the

13  Joint Commission on Accreditation of Health Care

14  Organizations adopted standards relative to adequate

15  treatment of pain that was to be instituted in

16  hospitals across the country in January."

17             And then the next paragraph begins:  "A

18  question is:  Are we prepared to communicate these

19  sales -- these changes to the sales force, and have

20  we considered how we would leverage these revised

21  standards to increase sales for Duragesic?"

22             Do you see that line?

23       A.    I see that line, yes.

24       Q.    Okay.  Do you recall any discussions at --

25  participating in any discussions at Janssen

1  concerning communicating the JCAHO standards on pain

2  management to the sales force?

3      A.   I do not recall.

4      Q.   The next sentence says:  "Bruce, I would

5  be curious to see if you thought this was an

6  opportunity worth exploiting."

7          Were you involved in any discussions with

8  Mr. Zollo or any of the other recipients of this

9  e-mail regarding exploiting the JCAHO standards on

10  pain management?

11          MS. STRONG:  Objection to form.

12          THE WITNESS:  I really can't remember any

13      conversations.

14  BY MR. ACKERMAN:

15      Q.   During this time period, did Janssen sales

16  representatives reference the JCAHO standards on pain

17  management in their sales calls with prescribers?

18          MS. STRONG:  Objection to form.

19          THE WITNESS:  I do not recall that ever

20      being a focus of ours.

21  BY MR. ACKERMAN:

22      Q.   If you move up to the next e-mail in the

23  chain which is on the first page, Bruce Moskovitz

24  writes:  "The JCAHO directive is driving an NPC,

25  National Pharmaceutical Council, initiative that

Highly Confidential - Subject to Further Confidentiality Review

```
 1    several pharmaceutical firms are participating in.

 2    I've asked Gary Vorsanger to take the lead in

 3    representing Janssen with the NPC."

 4              Do you see that --

 5         A.   I see it.

 6         Q.   -- line?

 7         A.   Yeah.

 8         Q.   And were you involved at all with the

 9    National Pharmaceutical Council?

10         A.   No.

11         Q.   Did you participate in any discussions

12    concerning a National Pharmaceutical Council

13    initiative?

14         A.   Not to any recollection, no.

15         Q.   During the time period that you were

16    overseeing sales representatives selling Duragesic,

17    how did -- how did the sales representatives know

18    which prescribers to visit or to call on?

19              MS. STRONG:  Objection to form.

20              THE WITNESS:  Each representative would

21         have been given a list of prescribers from our

22         analytics department.

23    BY MR. ACKERMAN:

24         Q.   As -- I think it was field sales manager?

25    Was that your title?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.   Yes.

2          Q.   Did you have any input into the

3     formulation of those lists?

4          A.   I did not.

5          Q.   Let's go to another document.  This will

6     be Number 3.

7          (Janssen-Ritchie Exhibit 3 was marked for

8     identification.)

9     BY MR. ACKERMAN:

10         Q.   Mr. Zollo -- I'm sorry.

11              Mr. Ritchie, the court reporter has handed

12    you what has been marked as Deposition Exhibit

13    Number 3 which is a one-page document with Bates

14    Number JAN-MS-00247173.  Take a moment to review the

15    document and let me know when you've had a chance to

16    review it.

17         A.   Okay.

18         Q.   This is an e-mail that you received,

19    correct?

20         A.   I believe so, yes.

21         Q.   I just want to ask about some of the terms

22    that are used in this e-mail and see if -- whether

23    you can help decipher some of the -- some of the code

24    language.

25         A.   Yeah.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   The first sentence says:  "The 500G and

 2   275 office based representatives currently receive

 3   the top 100 chronic pain targets in their territory

 4   on an Early View Report."

 5               So let's break some of that down.  Do you

 6   know what the reference to "500G" refers to?

 7               MS. STRONG:  I just want to make an

 8        objection to much of the commentary that was

 9        just made.

10               THE WITNESS:  "500G" is the sales force.

11        I believe it was the 500 green, 500 reps.

12   BY MR. ACKERMAN:

13          Q.   Okay.  And what was the "500 green sales

14   force"?

15          A.   It -- at that time, I believe, the best

16   recollection, it would be one of the teams that was

17   selling Duragesic.

18          Q.   Is that the pain sales force or a separate

19   sales force?

20          A.   That would be a separate sales force.

21          Q.   And so, then, the next reference is the

22   "275 office."  Do you see that?

23          A.   I do.

24          Q.   And what is the reference to the "275

25   office"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   That is the pain sales force.

 2          Q.   Does this mean that there were roughly 775

 3   sales representatives selling Duragesic around this

 4   time period, April 2001?

 5               MS. STRONG:  Objection to form.

 6               THE WITNESS:  I believe so.

 7   BY MR. ACKERMAN:

 8          Q.   And then the last part of this sentence

 9   references an "Early View report."

10               Do you recall viewing an Early View

11   report?

12          A.   I must have, but I don't recall.

13          Q.   Do you know what data was used to compile

14   the Early View report?

15          A.   Not specifically, no.

16          Q.   You mentioned earlier that, I think, it

17   was the analytics department that created the lists

18   of prescribers; is that right?

19          A.   I may have the name wrong, but it was the

20   people that did that, I think it was, yes.

21          Q.   This e-mail is sent by Beth Woodhead?

22          A.   Yes.

23          Q.   And at the bottom, it says that her -- I

24   assume it -- or at least underneath her name, it says

25   "Manager Business Information," correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    Is business information an individual that

 3    would have been in -- within that analytics

 4    department that you were describing?

 5                MS. STRONG:  Objection to form.

 6                THE WITNESS:  They would have been, yes.

 7    BY MR. ACKERMAN:

 8          Q.    Other than Early View, do you recall any

 9    other data or tools that were used to select

10    prescribers that sales representatives would call on?

11                MS. STRONG:  Objection to form.

12                THE WITNESS:  I am not familiar with the

13        tools, no.

14    BY MR. ACKERMAN:

15          Q.    And you weren't involved in that process?

16                MS. STRONG:  Objection to form.

17                THE WITNESS:  Which process?

18    BY MR. ACKERMAN:

19          Q.    In the process of identifying target

20    prescribers?

21          A.    No, I was not.

22                MR. ACKERMAN:  Let's put that document

23        aside.

24                Can you mark this as Exhibit 4?

25          (Janssen-Ritchie Exhibit 4 was marked for
```

Highly Confidential - Subject to Further Confidentiality Review

1    identification.)

2    BY MR. ACKERMAN:

3         Q.   Mr. Ritchie, the court reporter has handed

4    you what's been marked as Deposition Exhibit

5    Number 4.  It's a multipage document beginning with

6    the Bates number JAN-MS-03065505 and continuing

7    through JAN-MS-03065574.  Take a moment to review

8    this document and let me know when you've had a

9    chance to get through it.

10             MS. STRONG:  I would just note it's a

11        69-page document.  Are you asking that he review

12        all of it?

13             MR. ACKERMAN:  Just leaf through it, yeah.

14        There are specific pages I'll ask about.

15    BY MR. ACKERMAN:

16        Q.   Do you recognize this document?

17        A.   Not specifically, no.

18        Q.   Turn to -- the first page is titled

19    "2002 Janssen Pain Franchise Review."  It says

20    "March 25th, 2002," correct?

21        A.   It's what it says, yes.

22        Q.   And then the second page lists members of

23    the pain franchise team.  Do you see that?

24        A.   Yes.

25        Q.   Do you recall being a member of the pain

Highly Confidential - Subject to Further Confidentiality Review

```
 1    franchise team?

 2         A.   I do.

 3         Q.   And is this the brand team that you were

 4    referring to earlier?

 5              MS. STRONG:  Objection to form.

 6              THE WITNESS:  I'm not sure everybody on

 7         this team is, but it's bigger than the brand

 8         team.

 9    BY MR. ACKERMAN:

10         Q.   I just want to walk through each of these

11    names, and if you can just tell me the role that each

12    person played at this point in time on the pain

13    franchise team.

14              How about -- Janet Burns is the first

15    name?

16              MS. STRONG:  And I just have an objection

17         to form as to each of these, the way that was

18         set up.

19    BY MR. ACKERMAN:

20         Q.   What role did Janet Burns play on the --

21         A.   She was --

22         Q.   -- on the pain franchise team at this

23    point in time?

24         A.   She was a secretary.

25         Q.   And what -- for Kati Chupa, what were her
```

```
 1    responsibilities on the pain franchise team at this

 2    point in time?

 3            MS. STRONG:  Objection to form.

 4            THE WITNESS:  You see now, the roles and

 5       things changed, so I'm going to go with my best

 6       recollection.

 7  BY MR. ACKERMAN:

 8       Q.   That's all I can ask for.

 9       A.   Kati Chupa was on the brand team.

10       Q.   Were there any specific issues or aspects

11  that Kati Chupa was responsible for?

12            MS. STRONG:  Objection to form.

13            THE WITNESS:  I believe she was the senior

14       person on the team at that point.  I'm not sure

15       when she assumed that role.

16  BY MR. ACKERMAN:

17       Q.   How about Pam Dotter?

18       A.   I believe she was on the brand team.

19       Q.   And again, did Pam Dotter have specific

20  responsibilities within the brand team?

21       A.   Not that I'm aware of.

22       Q.   Alison Heightchew?

23       A.   I don't know her role.

24       Q.   Mike Lee?

25       A.   Don't know his role.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   Rene Lenstra?

 2          A.   Don't know her role or his role.

 3          Q.   Jeff Mathis?

 4          A.   Don't know his role.

 5          Q.   Molly McDonald?

 6          A.   She was on the brand team.

 7          Q.   Was Molly McDonald responsible for any

 8   specific issues or tasks within the brand team?

 9               MS. STRONG:  Objection to form.

10               THE WITNESS:  Not that I'm aware of.

11   BY MR. ACKERMAN:

12          Q.   Adrienne Minecci?

13          A.   Minecci.  She was on the brand team.

14          Q.   And did Ms. Minecci have specific roles or

15   responsibilities within the brand team?

16               MS. STRONG:  Objection to form.

17               THE WITNESS:  Not that I'm aware of.

18   BY MR. ACKERMAN:

19          Q.   Bruce Moskovitz, I think we've already

20   identified, correct?

21          A.   Yes.

22          Q.   Cheryl Pavia?

23          A.   I believe she was in the medical side.

24          Q.   When you say "the medical side," what do

25   you mean by that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   On the -- she would have -- I think would

 2   have worked with Bruce Moskovitz on the medical side,

 3   medical team.

 4          Q.   Tina Pinto?

 5          A.   Don't know.

 6          Q.   Marsha Phillips?

 7          A.   She was part of the medical team.

 8          Q.   And that next name is you, right?

 9          A.   Yes.

10          Q.   Jeff Schein?

11          A.   Part of the medical team.

12          Q.   And Gary Vorsanger?

13          A.   Part of the medical team.

14          Q.   Bill Whyte?

15          A.   He was on the brand team.

16          Q.   Beth Woodhead?

17          A.   She was the analytics person.

18          Q.   And Ramineh Zoka?

19          A.   Don't know.

20          Q.   Okay.  Did any of these individuals report

21   to you at this point in time?

22          A.   At this specific time, I was on the field

23   side, so I was -- I was a sales representative for

24   this team.

25          Q.   I see.  This is before you became the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    product director?

 2         A.   I believe so, yes.

 3         Q.   So do you recall whether you participated

 4    in an in-person meeting on or about March 25th, 2002?

 5         A.   I do not recall.

 6         Q.   Regarding this document I mean.

 7         A.   I don't know.

 8         Q.   If you would turn to the page that's

 9    marked 14, and it's Bates number -65518.  So there is

10    a list here, and the first column says "Growth

11    drivers."  Do you see that?

12         A.   I see it.

13         Q.   Okay.  And then the first bullet point

14    says:  "Recognized undertreatment of pain."

15              And then underneath that, it says:

16    "Increased awareness legislation to treat pain," and

17    it says:  "JCAHO fifth vital sign."

18              Do you see that?

19         A.   I do.

20         Q.   Okay.  As the field sales representative,

21    do you recall any discussions regarding JCAHO as a

22    growth driver of Duragesic?

23         A.   No, I do not.

24         Q.   And during the time you were a field sales

25    representative, do you recall any discussions
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    regarding "fifth vital sign" as a growth driver for

 2    Duragesic?

 3         A.   To the best of my recollection, no.

 4         Q.   Do you know whether "fifth vital sign" was

 5    a growth driver for Duragesic?

 6              MS. STRONG:  Objection to form.

 7              THE WITNESS:  This slide comes out of a

 8         deck from Bruce Moskovitz, so these would have

 9         been situations that are much more focused on

10         the medical side.  I don't recall them ever

11         translating to field sales.

12    BY MR. ACKERMAN:

13         Q.   The next bullet point there says:

14    "Acceptance of opioids for nonmalignant pain."

15              Do you see that?

16         A.   I see it.

17         Q.   Do you recall any discussions regarding

18    acceptance of opioids for nonmalignant pain as a

19    growth driver of Duragesic?

20              MS. STRONG:  Objection to the form.

21              THE WITNESS:  It would be the same answer,

22         that these -- everything on this slide would

23         have been medical-driven, and I don't recall any

24         of it coming to the field.

25
```

```
 1   BY MR. ACKERMAN:

 2       Q.   Is it your belief that this slide was not

 3   relevant to the sales efforts for Duragesic?

 4            MS. STRONG:  Objection to form.

 5            THE WITNESS:  I don't have a belief either

 6       way.  I just know that this component of the

 7       deck was designed more for a medical update than

 8       it was a pain update, or for that matter sales

 9       update.

10   BY MR. ACKERMAN:

11       Q.   Is there a portion of this deck that you

12   believe that was designed for a sales update?

13       A.   I do not believe it, no.

14       Q.   Okay.  Under the category "Growth

15   inhibitors," do you see that on this same slide?

16       A.   I do.

17       Q.   And it says:  "Perceived risks of

18   opioids"?

19       A.   Yeah.

20       Q.   And then the second bullet point under

21   there says:  "Fear of government DEA."

22            Were any instructions given to the sales

23   representatives concerning fear of government DEA as

24   a perceived risk of opioids?

25       A.   Not to my recollection.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   The sales representatives that you oversaw

2   at this time were visiting prescribers, correct?

3     A.   Yes.

4     Q.   And so these are issues, if I understand

5   what you're saying, that affect prescribers; is that

6   right?

7          MS. STRONG:  Objection to form.

8          THE WITNESS:  No.  I didn't say that.

9   BY MR. ACKERMAN:

10    Q.   Okay.  The issues on this slide, when you

11  say they are "medical issues," what do you mean by

12  that?

13    A.   They were issues raised by our medical

14  department.  They would have been seeing things in a

15  bigger scope than what we were seeing in the field.

16    Q.   And why were they raised by the medical

17  department?

18         MS. STRONG:  Objection to form.

19         THE WITNESS:  I'm not sure why they were

20     raised.

21  BY MR. ACKERMAN:

22    Q.   This is a slide deck for the Janssen pain

23  franchise, correct?  That's what the title page says?

24    A.   Yes.  Pain franchise team, yes.

25    Q.   And at this point in time, what was the

```
1    Janssen pain franchise?

2              MS. STRONG:  Objection to form.

3              THE WITNESS:  I don't specifically know

4        what this exact team was about.

5    BY MR. ACKERMAN:

6        Q.   If you just look at the first page, the

7    very first page of this document, it says:  "Janssen

8    pain franchise review," correct?

9        A.   Yes.

10       Q.   You heard that term used during your

11   tenure at Janssen, "Janssen pain franchise."

12       A.   I've heard it used, but I am not sure

13   specifically what it was in reference to.

14       Q.   Okay.  If you turn to page 28 of this

15   document, and it's titled "SWOT analysis," right?

16             Do you have an understanding of what

17   "SWOT" stands for?

18       A.   I do.

19       Q.   What is that?

20       A.   Strengths, Weakness, Opportunities, and

21   Threat.

22       Q.   Is that a term that's used regularly at

23   Janssen?

24             MS. STRONG:  Objection to form.

25             THE WITNESS:  When business plans are put
```

Highly Confidential - Subject to Further Confidentiality Review

1      together, yes.

2   BY MR. ACKERMAN:

3      Q.   If you would turn to the next page,

4   please, which is page 30, and this appears to list

5   the strengths and weaknesses.  I can see that you're

6   flipping through the document.

7           Were you looking for something in

8   particular?

9      A.   I was trying to see who would have

10  generated this specific page.

11     Q.   I was curious about that, too, actually,

12  and that was going to be one of my questions, whether

13  you knew who would have generated this page.

14     A.   I do not.

15     Q.   Okay.  Is it -- is this something that was

16  likely to have come from the brand team?

17          MS. STRONG:  Objection to form.

18          THE WITNESS:  I could -- I have no idea

19     who would have created this.

20  BY MR. ACKERMAN:

21     Q.   If you'd look under "Strengths," the list

22  of strengths, there is a reference to the focused

23  chronic pain sales force, correct?

24     A.   Yes.

25     Q.   And that's the pain sales force that you

1    described earlier?

2              MS. STRONG:  Objection to form.

3    BY MR. ACKERMAN:

4         Q.   Is that the pain sales force that you

5    described earlier?

6         A.   Not knowing who created this document,

7    it's impossible to know who they're referencing here.

8         Q.   Was there more than one pain sales force

9    at Janssen?

10             MS. STRONG:  Objection to form.

11             THE WITNESS:  At different times, we had

12        different people selling Duragesic.

13   BY MR. ACKERMAN:

14        Q.   At this time in 2002, what sales force was

15   selling Duragesic?

16        A.   I don't know.  I'm not sure -- you know,

17   we talked about the 500G before.  I'm not sure when

18   they came in and when this went out.  Different

19   times -- you know, this was a very dynamic time, and

20   so different sales forces came in and out so I don't

21   know the exact who was selling at this time.

22        Q.   If you wanted to find out who was selling

23   at this time, who would you ask?

24             MS. STRONG:  Objection --

25             THE WITNESS:  I would go to -- sorry.

```
 1              MS. STRONG:  Objection to form.

 2              THE WITNESS:  I would go back to analytics

 3         department because they would have generated

 4         core plans for the different sales forces, and

 5         they would have included Duragesic.

 6    BY MR. ACKERMAN:

 7         Q.   The next bullet point says "Alza

 8    expertise."  Do you know what Alza is?

 9         A.   I believe it's a company that J&J bought,

10    but -- I know the name, but I'm not exactly sure what

11    they do.

12         Q.   Okay.  There are bullet points underneath

13    this box.  The third bullet point says:  "Alza

14    equals" -- and it's got an arrow up -- "Duragesic

15    profitability."

16              Do you recall any discussions with anyone

17    regarding Alza potentially increasing Duragesic

18    profitability?

19         A.   I do not.

20         Q.   The next page, which is page 31 of this

21    document, lists "Opportunities and threats," correct?

22         A.   Yes.

23         Q.   Under "Threats," the first one is "Generic

24    competition/internal patent expertise."

25              I think you had already described the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    generic competition for Duragesic; is that right?

 2              MS. STRONG:  Objection to form.

 3              THE WITNESS:  A couple of things; if you'd

 4         just tease out which one you're asking first,

 5         please?

 6    BY MR. ACKERMAN:

 7         Q.   Sure, sure.  And so what at this time in

 8    2002 was the generic competition for Duragesic?

 9              MS. STRONG:  Objection to form.

10              THE WITNESS:  I don't believe -- I don't

11         know if the generic competition was there or it

12         was anticipated.

13    BY MR. ACKERMAN:

14         Q.   Do you know what the reference to

15    "internal patent expertise" is referring to?

16         A.   No.  Sorry.  No.

17         Q.   And same question for competition for

18    "Alza development resources."  Do you know what that

19    refers to?

20         A.   I do not.

21         Q.   Then the next bullet point says:  "Abuse

22    publicity - increased media, regulatory, political,

23    and legal scrutiny."

24              Do you see that?

25         A.   I see it.
```

1    Q.   Do you recall any discussion with the

2  sales force concerning abuse publicity?

3    A.   I do not.

4    Q.   If you move down this list, the

5  second-to-last bullet point says -- and this is

6  italicized -- "Lack of expert consensus on 'limited

7  abuse potential.'"

8         Do you see that?

9    A.   I see it.

10   Q.   Do you know what this bullet point is

11 referring to?

12   A.   I do not.

13   Q.   Did you participate in any discussions in

14 Janssen with anyone regarding a lack of expert

15 consensus on limited abuse potential?

16   A.   I do not recall that conversation.

17   Q.   And the last bullet point says:

18 "Analgesic guidelines require data, risk" -- I think

19 that's "management programs EBM."

20        Do you see that?

21   A.   I see it.

22   Q.   First question:  Are you familiar with the

23 acronym "EBM"?

24   A.   I am not.

25   Q.   Neither am I.

Highly Confidential - Subject to Further Confidentiality Review

1              Do you know or do you have any knowledge

2    as to what this bullet point might be referring to?

3         A.   I do not.

4         Q.   And did you participate in any discussions

5    with anyone at Janssen concerning analgesic

6    guidelines requiring data?

7         A.   Not to my recollection.

8         Q.   And I assume when you look -- go to the

9    bottom of the page, there is a bullet point that

10   says:  "No clinical data."  Do you see that?

11        A.   Yeah.

12        Q.   And do you know what that refers to?

13        A.   I do not.

14        Q.   And did you recall any discussions with

15   anyone at Janssen concerning the presence or absence

16   of clinical data with respect to Duragesic?

17             MS. STRONG:  Objection to form.

18             THE WITNESS:  I do not.

19   BY MR. ACKERMAN:

20        Q.   If you turn to page 34 -- and, actually,

21   so page 33 of this document says "Strategic

22   objectives."  Do you see that?

23        A.   I do.

24        Q.   And then there is a slide on page 34 --

25   what I assume is a slide -- and there are bullet

Highly Confidential - Subject to Further Confidentiality Review

```
1    points at the bottom.  The last bullet point says:

2    "Alza and L.A."  Do you know what that refers to?

3         A.   I do not.

4         Q.   All right.  Thought maybe it might jog

5    your memory as to what Alza was, but -- it was worth

6    a shot.

7              Next page says:  "Strategy formation."

8              And then there is a slide following that

9    on page 36, and the second bullet point says:  "Drive

10   development of BLOCK," B-L-O-C-K, in capital letters,

11   "to replace Duragesic."

12             Do you see that bullet point?

13        A.   I see it.

14        Q.   Do you know what "BLOCK" refers to on this

15   document?

16        A.   No.

17        Q.   Okay.  There is a -- in parentheses, it

18   says:  "01/05."

19             Does that mean anything to you?

20        A.   No, it doesn't.

21        Q.   Okay.  The last bullet point in this box,

22   again, says:  "Fully develop all new products," and

23   then it says:  "Alza, L&A."

24             Does that help as to whether you recall

25   what "Alza" or "L&A" might stand for?
```

1          A.    In this definition, I believe "L&A" is

2     licensing and acquisition, and there might have been

3     an "A" missing in the previous line.

4          Q.    Got it.

5          A.    But I don't know -- it still doesn't jog

6     my memory what Alza is, sorry.

7          Q.    That's -- thank you.  There is a reference

8     at the bottom to "Project BLOCK."  You ever heard of

9     Project BLOCK?

10         A.    No.

11         Q.    And then the next page says:  "Key

12    initiatives," right?

13              And then the next slide, which is page 38,

14    has what is unfortunately some very small text, but I

15    think we can, at the least, see it on the screen

16    here.

17              MS. STRONG:  What page is this?

18              MR. ACKERMAN:  I'm sorry.  It's page 38 of

19       the -- of the exhibit.

20              MS. STRONG:  Thank you.

21    BY MR. ACKERMAN:

22         Q.    And do you recall ever seeing this slide

23    before?

24         A.    Not to my recollection.

25         Q.    Okay.  So the first -- I don't even know

```
 1   how to describe this -- but there is a -- four

 2   columns that look sort of like arrows, I guess.

 3            And the first column, the header says:

 4   "Maximize Duragesic product life cycle," and then the

 5   second bullet point there, it says:  "Reposition

 6   matrix patches."

 7            You see that?

 8       A.   I do.

 9       Q.   Do you know what that might refer to?

10       A.   I do not.

11       Q.   Do you have -- recall any discussions with

12   anyone at Janssen concerning repositioning matrix

13   patches?

14       A.   I do not.

15       Q.   Then there is another reference to "BLOCK"

16   in the next column over.

17            I assume that doesn't jog your memory as

18   to what "BLOCK" might be.

19       A.   No.

20       Q.   The last column says:  "Fully develop all

21   new products, Alza, L&A."

22            Still no idea what Alza might be?

23       A.   No.

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            (Attorneys' Eyes Only.)

 2   (*** The following documents, Janssen-Ritchie Exhibit

 3   5 and Janssen-Ritchie Exhibit 6, and any testimony

 4   pertaining thereto are separated as Attorneys' Eyes

 5   Only, beginning as follows:)

 6            (Janssen-Ritchie Exhibit 5 was marked for

 7   identification.)

 8   BY MR. ACKERMAN:

 9       Q.   All right.  Let's put that one aside.

10            The next document is one that was produced

11   to us in native format, so I believe we've printed

12   the native.  Unfortunately, we don't have the slip

13   cover sheet with it.  So I can -- I have the

14   reference to the --

15       A.   What does "native" mean?

16       Q.   It was produced to us as -- instead of as

17   images, it was produced to us as a file.

18       A.   Okay.

19       Q.   As a computer file.  So this document that

20   I believe we're marking as Exhibit 5, is

21   JAN-MS-02774660.

22            Take a moment to leaf through this

23   document and let me know when you have a chance to

24   review it.  Again, I have questions on specific

25   pages.
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.   Okay.

2       Q.   Do you recognize this document?

3       A.   I recognize the graphics but not the

4   document.

5       Q.   It's a -- it's titled "2004 Business

6   Plan."  And you testified earlier that you were

7   involved in the formation of a business plan for

8   Duragesic.

9            Is this the business plan that you were

10  involved in?

11      A.   I don't -- I'm not sure.

12      Q.   August 6th, 2003, is the date.  Do you

13  recall whether you were product director by this

14  time?

15      A.   This is a cusp moment.  I'm not sure,

16  yeah.

17      Q.   Sure.  So I have a couple questions and,

18  unfortunately, I think the pages are not numbered, so

19  it might be a little bit difficult.  But if you turn

20  to the page -- maybe four pages in -- that's

21  referenced -- it's titled "Market Analysis."

22      A.   Okay.

23      Q.   And then it's the next slide behind that

24  which, again, is titled "Market Analysis."  And some

25  of these -- some of these bullet points, I think, are

```
 1    similar to the bullet points that we saw earlier.

 2              So looking at "Growth drivers," the first

 3    one says:  "Recognized undertreatment of pain."

 4              And as product director, do you recall any

 5    discussions with anyone at Janssen concerning

 6    recognized undertreatment of pain as a growth driver

 7    for Duragesic?

 8        A.   As I mentioned, I wasn't sure if I was

 9    product director at this time.  And I'm also, while I

10    recognize some of the graphics, I don't know what

11    this document was generated for, so I don't recall

12    that conversation.

13        Q.   Okay.  And do you recall any discussions

14    regarding the next bullet point:  "Increased

15    awareness legislation to treat pain as a growth

16    driver for Duragesic"?

17        A.   I do not.

18        Q.   And same for the next one:  "Mandatory

19    CE/CME training"?

20        A.   Yes, and I don't recognize it at all.

21        Q.   Did Janssen provide CE/CME training to

22    prescribers in connection with Duragesic?

23        A.   I don't know for sure, no.

24              MS. STRONG:  I just want to note for the

25         record that I believe this document is an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          attorneys' eyes only document and that it ought
 2          to be protected as such.
 3               I think it's fine to be showing it to this
 4          particular witness, but just wanted to note that
 5          it's marked -- I believe it's marked that way in
 6          connection with the production.
 7               MR. ACKERMAN:  Thank you.  Thank you for
 8          that clarification.
 9     BY MR. ACKERMAN:
10          Q.   And then the same question for the next --
11     well, the next major bullet point that says:
12     "Acceptance of opioids for noncancer pain."
13               Again, do you recall any discussion at
14     Janssen regarding acceptance of opioids for noncancer
15     pain as a growth driver for Duragesic?
16          A.   Not specifically, no.
17          Q.   Moving over to the other side, the other
18     column, again, "Perceived risks of opioids," do you
19     recall any discussion at Janssen concerning perceived
20     risks of opioids as a growth inhibitor for Duragesic?
21          A.   Not specifically, no.
22          Q.   And same question for "Increased
23     regulatory scrutiny."
24               Do you recall any discussions?
25          A.   I do not, to the best of my recollection.
```

1     Q.   Next bullet point, "Limited evidence-based

2  scientific data."  Do you know what that refers to?

3     A.   I do not.

4     Q.   And do you recall any discussions at

5  Janssen concerning limited evidence-based scientific

6  data as a growth inhibitor for Duragesic?

7     A.   No, I don't, sir.

8     Q.   If you move to the next -- I believe it's

9  the next section that was titled "Customer Analysis."

10  And then the next slide says:  "Duragesic customer

11  analysis," but it's actually two slides later that I

12  want to look at that's titled "PC Green Sales Force

13  Targets."

14          Do you see this slide?

15     A.   I do.

16     Q.   And do you know what "PC Green" refers to?

17     A.   It was the name of a sales force, Primary

18  K Green.

19     Q.   Is that the 500 Green that we saw earlier?

20     A.   I believe so, but I'm not 100 percent

21  sure.

22     Q.   Okay.  And then I just want to see if I

23  can understand what this chart means if you

24  understand it.

25          The first column says "CP."  Do you know

Highly Confidential - Subject to Further Confidentiality Review

```
1    what "CP" refers to there?

2         A.   I believe it's chronic pain.

3         Q.   And then "April '03 decile."  Do you know

4    what that refers to?

5         A.   The target universe or the universe that

6    we were calling on was broken into deciles.  So if

7    you had 1,000 doctors, it would be -- 100 would be

8    9s, 100 would be 8s, 100 would be 7s, based upon

9    their volume of prescribing, not

10   specifically Duragesic, to the market.

11        Q.   I understand.  So the 90 is the top

12   10 percent in volume of prescribers or volume of

13   prescriptions?  The top 10 percent of prescribers

14   measured by volume of prescriptions?

15             MS. STRONG:  Objection to form.

16             THE WITNESS:  Yes.

17   BY MR. ACKERMAN:

18        Q.   And then the next column says:  "Mean

19   dollars"?

20        A.   I don't know what that definition means.

21        Q.   Okay.  And the next column says:  "Mean

22   TRXs."

23             MS. STRONG:  Just wait for a question,

24        please.

25
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ACKERMAN:

2        Q.   Do you know what the -- what that column

3    means, "TRXs" means?

4        A.   I speculate that the "mean" is the mean.

5    It would be the -- the average or the -- just in data

6    terms, "mean" is the -- I guess it's the number

7    that's in the middle.

8        Q.   Right.

9        A.   But that's speculation.

10       Q.   I think so.  It's been a while since I've

11   dealt with means and medians.

12            What does "TRX" stand for?

13       A.   Total prescriptions.  I believe it's total

14   prescriptions.

15       Q.   "Number of physicians."  Do you know what

16   that means?

17       A.   This is the number of physicians in each

18   of the deciles.

19       Q.   And then "Total TRXs."  Do you have an

20   idea as to what that means?

21       A.   Yes.  So that's the total number of

22   prescriptions that would be generated by that decile.

23   I'm not sure if they're specific to chronic pain or

24   to any specific brand.

25       Q.   All right.  And then the last one, the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   last column is "Percentage of total CP TRXs."

 2             Do you know what that might refer to?

 3        A.   Not specifically.  Sorry.

 4        Q.   Then, again, if you turn to two pages

 5   down?

 6        A.   There you go.

 7        Q.   And this, under "2003 LAO deployment," do

 8   you see that?

 9        A.   Yes.

10        Q.   Perhaps this may help with the question we

11   were discussing earlier, but the first column says

12   "Janssen," right?  Or the first row?

13        A.   Yes.

14        Q.   Or the second row, I guess.  The first row

15   is the headers.

16             And then it says:  "SOV equals

17   27 percent/24 percent."

18             Do you know what that refers to?

19        A.   Share of voice.

20        Q.   What does "share of voice" mean?

21        A.   It was the amount of time that we were

22   seeing the customers versus the competition.  That's

23   my definition.

24        Q.   Understand.  And then the next column,

25   "Sales force."
```

```
 1              So does this indicate that there were

 2    three separate sales forces selling Duragesic to --

 3    at this point in time?

 4         A.   To my recollection, yes.

 5         Q.   So the first one is the "Green sales

 6    force"?

 7         A.   Yes.

 8         Q.   And to whom was the green sales force

 9    selling Duragesic?

10         A.   I'm not 100 percent sure.  To my

11    recollection, it was the pain sales force.

12         Q.   The pain sales force was the green sales

13    force?

14         A.   Yeah.  As I mentioned before, there was

15    evolution.  That's why I wasn't be able to give you

16    numbers before.  These things morphed, and there was

17    a dynamic process where different sales forces became

18    relevant in different years.  So at this time, I

19    believe the Green sales force was the primary sales

20    force selling Duragesic.

21         Q.   I understand.  And the pain sales force by

22    this point in time, what had happened to it?

23         A.   I believe it morphed into the Green.

24         Q.   Thank you.

25              The "Hospital sales force" may be obvious,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    but to whom were the hospital sales force selling

 2    Duragesic?

 3         A.   They were calling on hospitals, yeah.

 4         Q.   And then the "Elder sales force," to whom

 5    would the elder care sales force be selling?

 6         A.   Not 100 percent sure, but I believe their

 7    key focus was long-term care.

 8         Q.   And then the last, so the next column

 9    says:  "Number of reps."

10              And, I assume -- is it correct that that

11    refers to the number of sales representatives in each

12    of these sales forces?

13         A.   That's how I read it, yes.

14         Q.   And then the last column says:  "Detailing

15    prioritization."  Do you see that?

16         A.   I do.

17         Q.   I just want to understand what each of

18    these acronyms means.  I think I know many of them,

19    but let's just make sure we're on the same page.

20              "DUR," what does "DUR" stand for?

21         A.   Duragesic.

22         Q.   And then "ACX," what does "ACX" stand for?

23         A.   Aciphex.

24         Q.   What was Aciphex?

25         A.   It was a cardiovascular drug.
```

```
 1          Q.    "ULT"?

 2          A.    Ultram.

 3          Q.    And what is Ultram?

 4          A.    It's an analgesic.

 5          Q.    Okay.  And then "SPX"?

 6          A.    Sporidex.

 7          Q.    And what is Sporidex?

 8          A.    An antifungal.

 9          Q.    The next line, we have got "DUR" again.

10                "RIS"?

11          A.    Risperdal.

12          Q.    And what is Risperdal?

13          A.    Antipsychotic.

14          Q.    And then "REM"?

15          A.    It's Remicade.

16          Q.    What is Remicade?

17          A.    I don't recall specifically.

18          Q.    And then --

19          A.    For Alzheimer's, I believe.

20          Q.    Okay.  And it looks like that covers all

21   of the unique acronyms in that box, so thank you very

22   much.

23          A.    Yeah.

24                MS. STRONG:  Are you done with the

25        document?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. ACKERMAN:  I'm not, but we have been
2        going about an hour.  If you want to take a
3        break now, I'm happy to do it.  If you want to
4        go a little further, we can as well.
5              MS. STRONG:  Yeah, I think we probably
6        ought to take a break.
7              THE WITNESS:  Yeah, if you wouldn't mind.
8              MR. ACKERMAN:  Okay.
9              MS. STRONG:  Thanks.
10             MR. ACKERMAN:  Let's go off the record.
11             VIDEOGRAPHER:  Off the record at
12       10:57 a.m.
13             (A recess transpired from 10:57 a.m. until
14             11:13 a.m.)
15             VIDEOGRAPHER:  On the record 11:13 a.m.
16  BY MR. ACKERMAN:
17      Q.   All right.  Back on the record, still
18  working with Exhibit 5.
19             And, Mr. Ritchie, if you would turn a few
20  pages in, there is a -- or a few pages further, there
21  is a title page titled "Internal Assessment."
22             And then the first slide after that, which
23  also is titled "Internal Assessment," the first
24  header says "Lessons Learned."
25             Do you know what that means, "Lessons
```

1    Learned"?  From what?

2         A.   I don't know what it specifically means

3    here, but it -- generally when this has been used in

4    our company, it's just since the last plan, what have

5    we learned from that?

6              But that's my definition.  I've seen this

7    as a Janssen term, but I don't know how to

8    specifically utilize it.

9              MS. STRONG:  Okay.  Can I have a moment,

10        just a technical issue?

11             MR. ACKERMAN:  Yeah.

12             (Discussion had off the record.)

13             MR. ACKERMAN:  Ready?

14             MS. STRONG:  Thank you.  All good.  Thank

15        you.

16             MR. ACKERMAN:  Sure.

17   BY MR. ACKERMAN:

18        Q.   The first bullet point under "Lessons

19   Learned" says:  "Functionality positioning, alliance

20   with physician, and patient's end goal of therapy."

21             Do you see that?

22        A.   I read it, yes.

23        Q.   Okay.  The phrase "functionality

24   positioning," is that a phrase that you've heard used

25   at Janssen before?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. STRONG:  Objection to form.
 2                    THE WITNESS:  Not specifically, no.
 3    BY MR. ACKERMAN:
 4         Q.   You say "not specifically."
 5              Have you generally heard discussions
 6    regarding functionality or functionality positioning?
 7         A.   I have a vague recollection of
 8    functionality being included in some of what we've
 9    done, yes.
10         Q.   And what do you -- do you have an idea of
11    what this means by "functionality," what it's
12    referring to?
13         A.   It would be nice to know who was
14    discussing this.  And I'm not even sure this internal
15    assessment was.
16              It wasn't a field document, so it would
17    have been something more to the brand, so I don't
18    really know where they were going.
19         Q.   Okay.  The next bullet point says:
20    "Focused sales force efforts drives results."
21              Do you know what that bullet point is
22    referring to?
23         A.   Not specifically.  I'm sure I could
24    speculate.
25         Q.   Okay.  And then if you move across the
```

Highly Confidential - Subject to Further Confidentiality Review

 1    page under the "Implications" header, it says:

 2    "Targeting SOV and resources drive growth."

 3            Do you see that?

 4    A.    I do.

 5    Q.    What does "SOV" stand for?  Do you know?

 6    A.    Yes, share of voice.

 7    Q.    That's right.

 8            Moving back to the left-hand side of the

 9    page, there is a bullet point that says:  "PCP focus

10    is critical."

11            MS. STRONG:  Question?

12    BY MR. ACKERMAN:

13    Q.    What -- do you have an understanding as to

14    what "PCP" means?

15    A.    Primary care physician.

16    Q.    Thank you.  Do you recall any discussion

17    at Janssen concerning whether focused sales efforts

18    drive results for Duragesic?

19    A.    I do not recall that conversation.

20    Q.    Okay.  Do you recall whether you've seen

21    this slide deck before today?

22    A.    As mentioned before, there are certain

23    graphics that pop at me, but I don't recall the

24    specific document, no.

25    Q.    In the course of discussing it today, has

Highly Confidential - Subject to Further Confidentiality Review

1    that jogged your memory at all as to whether you had

2    participated in a meeting or discussed this with

3    anyone at Janssen?

4         A.   It has not.

5         Q.   Turn a few more pages in.  There is a

6    header that says "Strategy Formation."  That page

7    says:  "Duragesic Positioning Statement.  Duragesic

8    significantly improves physical and social

9    functioning by providing the only chronic pain relief

10   that is consistent and effective for 72 hours."

11           Do you see that?

12        A.   I see it, yes.

13        Q.   Do you know whether -- do you have an

14   understanding as to what this document means by

15   "Duragesic Positioning Statement"?

16        A.   Yeah.  To my understanding, this is a

17   document that was going to help drive the

18   communication focus for the field, but I don't know

19   if this was the final version or what version this

20   was and if this became real or was just a proposed.

21        Q.   Okay.  So the date of this document is

22   August 6th, 2003?

23        A.   Yeah.

24        Q.   In the years prior to this document, you

25   were a field sales representative, correct, or a

1    field sales director?  Is that what it was called?

2         A.   I was, prior years.  And as I mentioned, I

3    wasn't sure if I was a field sales director or on the

4    brand at this point, either.  I could have still been

5    a field sales director during this piece.  It was

6    close.

7         Q.   Right.  But part of your responsibilities

8    in the years prior to this Exhibit 5, or at least the

9    date on the Exhibit 5 --

10        A.   Yeah.

11        Q.   -- involved oversight of the Duragesic

12   sales force; is that correct?

13        A.   Correct.  Oversight of the people.  I

14   mean, it was, as I said, the job was more -- was more

15   people centric than product centric because there

16   were other brands that we potentially could have sold

17   as well.

18        Q.   Can you explain what that means, "the job

19   was more people centric than product centric"?

20        A.   I wasn't creating the messaging.  My job

21   was more to ensure the execution of the messaging

22   was -- was -- went through as, you know, without a

23   hitch.

24        Q.   You weren't creating the messaging, but

25   were you aware of the messaging?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Before it went to the sales force, yes.

 2          Q.   And now turning back to Exhibit 5, this

 3   notion that -- or this statement that "Duragesic

 4   significantly improves physical and social

 5   functioning by providing the only chronic pain relief

 6   that is consistent and effective for 72 hours," was

 7   that a message that had been communicated to the

 8   sales force during your tenure as field sales

 9   director?

10          A.   I don't believe that that specific

11   language was the -- was what was communicated.

12          Q.   Okay.  The next page looks to me to

13   have -- and I don't know whether this is an actual ad

14   or a sample ad -- but it says:  "1,360 loaves and

15   counting, work uninterrupted."

16               Do you see that?

17          A.   I do.

18          Q.   And then underneath, it says:  "Chronic

19   pain relief that supports functionality."

20               Do you see that?

21          A.   I do.

22          Q.   Do you recall whether this -- have you

23   seen -- putting aside the Exhibit 5 document, have

24   you seen this particular marketing piece before?

25          A.   So I have seen the graphic.  I'm not -- I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   don't know for sure that this was the language we

 2   would have finally utilized.

 3        Q.   Okay.  I understand.

 4             Did Janssen utilize something similar in

 5   form to this document as a marketing piece for

 6   Duragesic?

 7        A.   I believe so.  The words I recognize, I

 8   recognize the picture, and I recognize the "work

 9   uninterrupted."

10             As I say, the language on the right could

11   be draft form.  I don't know if that specific

12   language was used.

13        Q.   And so my question is:  Had this marketing

14   piece, or at least the form of this marketing piece,

15   the "work interrupted" [sic] message -- let me ask

16   only one question.

17             Had the "work interrupted" marketing

18   message been distributed to the sales force prior to

19   August 2003?

20             MS. STRONG:  Objection to form.

21             THE WITNESS:  I don't know the timing.

22   BY MR. ACKERMAN:

23        Q.   Do you recall whether, when you were field

24   sales director of the sales force, whether sales

25   representatives were using this "work interrupted"
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    message?

 2            MS. STRONG:  Objection to form.

 3            THE WITNESS:  Yeah, I just don't know.  I

 4        recall the message, the language.  I don't know

 5        when it went into play and what my role was at

 6        the time it went into use, yeah.

 7    BY MR. ACKERMAN:

 8        Q.   And did you have any input into this

 9    message?

10        A.   I did not.

11        Q.   Is this "work uninterrupted" marketing

12    piece a functionality or an example of a

13    functionality message?

14            MS. STRONG:  Objection to form.

15            THE WITNESS:  I don't know for sure.

16    BY MR. ACKERMAN:

17        Q.   If you would turn to the next page.  And

18    this page at the top says:  "Strategy Formation," and

19    then on the right side says:  "Brand Strategy

20    Development."

21            Do you see that?

22        A.   I do.

23        Q.   The first bullet point under "Duragesic

24    Core Strategies" says:  "Leverage functionality

25    positioning to differentiate Duragesic from the
```

Highly Confidential - Subject to Further Confidentiality Review

1    competition."

2             Do you see that bullet point?

3        A.   I do.  I read it, yes.

4        Q.   Do you recall any discussions regarding

5    leveraging functionality positioning to differentiate

6    Duragesic from the competition?

7        A.   I do not recall any conversations.

8        Q.   Do you have an understanding as to what

9    "functionality positioning" means?

10       A.   I do.

11       Q.   And what does that mean?

12       A.   The same concept that we had before with

13   this "work uninterrupted" would be a functionality

14   component, I guess.

15       Q.   And why is the "work uninterrupted" a

16   functionality component?

17             MS. STRONG:  Objection to form.

18             THE WITNESS:  To my recollection, that

19        just seemed that those -- that's what I'm

20        recalling in my head.  I'm not sure exactly why.

21   BY MR. ACKERMAN:

22       Q.   So does the word "functionality" refer to

23   the ability of the patient to function in everyday

24   life?

25       A.   I'm not sure, for sure, but that seems to

1    be about right.

2        Q.   Thank you.  The next page, if you look in

3    this first column, couple of -- in the last bullet

4    point -- I think we've talked about the rest of

5    this -- but "Continue to leverage KOL relationships."

6            Did you have any involvement in key

7    opinion leader relationships for Duragesic?

8        A.   At any time?

9        Q.   Yes.

10       A.   I mean, I -- I knew who they were, and I

11   would have conversations with specific ones, but I

12   never specifically introduced or developed anybody.

13       Q.   As product director, did you --

14       A.   As product director -- sorry.  Finish your

15   question.

16       Q.   Well, that was, I guess, my next question

17   since you said "at any point in time."

18           What position did you hold at the time

19   that you knew who the key opinion leaders were and

20   had conversations with them from time to time?

21       A.   It was when I was in the brand.

22       Q.   As product director?

23       A.   Product director, yes.

24       Q.   Do you know what "NPEC" stands for?  First

25   column, second-to-last bullet point there, says

1    "NPEC"?

2         A.   I can speculate, but I'm not sure.

3         Q.   Have you heard that acronym before?

4         A.   I have, but this is an acronym.

5         Q.   Sure.  In what context have you heard that

6    acronym?

7         A.   It's in the back of my mind.  I believe it

8    would have been when I was in the brand.  I think it

9    means National Pain Executive Committee, but I'm not

10   sure.

11        Q.   And what is the National Pain Executive

12   Committee?

13        A.   As soon as I said it, I don't know what

14   that is either so --

15        Q.   All right.  I assume you hadn't.  Did you

16   have any involvement with the National Pain Executive

17   Committee?

18        A.   I did not.  To my best recollection, yeah.

19        Q.   Is that a Janssen committee, or an outside

20   entity?

21             MS. STRONG:  Objection to form.

22             THE WITNESS:  I do not know.

23   BY MR. ACKERMAN:

24        Q.   And then the next bullet point says:

25   "National Pain Summit."  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I do.

 2        Q.   Do you know what that is?

 3        A.   Not specifically.

 4        Q.   Generally, do you know what it is?

 5        A.   I believe it's a summit that we hosted as

 6   the brand, but I'm not sure.  It's one of those ones,

 7   it's in there somewhere, but it doesn't do

 8   anything -- too specifics to it.

 9        Q.   Okay.  Next page says:  "Market Research -

10   2004 Key Projects."

11             And there are some things listed here as

12   major projects.  I'm just -- the first one says:

13   "PhysPulse A&U Tracking Study."

14             Do you see that?

15        A.   I do.

16        Q.   Do you know what that refers to?

17        A.   Not that specific language, no.

18        Q.   Do you know what "A&U" stands for?

19        A.   I do not.

20        Q.   Have you heard the term "PhysPulse"

21   before?

22        A.   I have.

23        Q.   In what context?

24        A.   I would be speculating.  I believe this

25   was surveys that were done following references, but
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I'm not sure.
 2         Q.   I guess my question is:  Is PhysPulse an
 3    entity, or is it a -- a --
 4         A.   I don't know.  I'm sorry.
 5         Q.   You don't know the name?
 6         A.   No.
 7         Q.   Okay.  Thank you.
 8         A.   Actually, I was wrong.  My previous was
 9    wrong.  I'm looking down further down.  That message
10    recall would have been something different, so sorry.
11    I don't know that at all.
12         Q.   Okay.  And so let's address that one,
13    "Regional message recall studies."
14              Do you have an understanding of what that
15    refers to?
16         A.   I do.
17         Q.   And what is that?
18         A.   There is a vendor that -- I don't know how
19    they contact the customer.  So they would have a list
20    of the customers that a representative has seen.
21    They would then ask them questions as to what part of
22    the message was, did they recall seeing.  And then we
23    would get a report back on that message.
24              It was directional only because normally
25    the number of customers that were contacted would be
```

```
 1   very small.  So some one I remember, like, six people

 2   So you try to see trends over time, but it was -- it

 3   -- you know, you would get six good ones and six bad

 4   ones.  It's hard to tell.  It was just purely

 5   information.

 6        Q.   Do you recall the name of the vendor who

 7   conducted the --

 8        A.   I do not.

 9        Q.   -- message recall studies?

10        A.   I do not.

11        Q.   Above that, there is a reference to

12   "campaign tracking analysis."

13            Do you know what that refers to?

14        A.   I'm assuming it has the -- the "campaign"

15   would have been the functionality campaign, so that

16   would be some analysis done to track the campaign,

17   but I don't know.

18        Q.   Okay.  And then in that next box down, it

19   says:  "Secondary data analysis."  Do you know what

20   that refers to?

21        A.   I do not.  No, I do not.

22        Q.   The next box references "Fastape Plus

23   Studies."  Have you ever heard that phrase before?

24        A.   I have not.

25        Q.   Do you know what that refers to?
```

1        A.   I do not, sorry.

2        Q.   The next page, it says:  "Results

3    required," and then there is a slide after that.

4             The fourth bullet point down says:

5    "Continue to build a solid foundation for the Janssen

6    pain franchise and future launch of AP48."

7             Do you see that?

8        A.   I do.

9        Q.   Do you know what "AP48" refers to?

10       A.   I know it was a project that someone was

11   working on, but I don't know the specifics.

12       Q.   Was it a drug that was in development?

13       A.   I don't know if it was a drug or a

14   campaign.

15       Q.   Okay.  And then the last page, it says

16   "Summary."

17       A.   Uh-huh.

18       Q.   And the second bullet point says:

19   "Duragesic will 'own' functionality and differentiate

20   versus competition," and the word "own" is in

21   quotation marks.

22             Were you involved in any discussions with

23   anyone at Duragesic -- at Janssen concerning

24   Duragesic owning functionality?

25       A.   I do not recall that I was.  I don't

```
 1   recall that I was.

 2        Q.   Okay.  Was functionality an important

 3   message for the Duragesic brand?

 4        A.   I don't know if it was important enough,

 5   but I do know it was a campaign, yeah.

 6        Q.   Let's put that document aside.

 7             I want to ask you one question about your

 8   time as field sales director when you were overseeing

 9   the sales force that I had forgotten to ask, and that

10   is:  During your time as field sales director, were

11   there procedures in place for sales representatives

12   to report incidents of potential diversion?

13        A.   Not that I recall.

14        Q.   Okay.  And do you have a -- do you

15   understand -- what is your understanding of the

16   meaning of the term "diversion"?

17        A.   I was actually going to ask you the same

18   thing, as I gave you my answer.  So maybe it would be

19   if you gave me yours, then, yeah.

20        Q.   Sure.  So here's how I am using

21   "diversion," and that is that "diversion" is a -- a

22   prescription drug that is not used for its intended

23   purpose, so it is diverted in some way.

24        A.   Okay.

25        Q.   Is that consistent with your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   understanding?

 2        A.   That would be my general, yeah,

 3   common-sense approach, yes.

 4        Q.   So with that understanding, were there any

 5   procedures for sales representatives to report

 6   potential incidences of diversion?

 7             MS. STRONG:  Objection to form.

 8             THE WITNESS:  To my best recollection,

 9        there was so little diversion of Duragesic, if

10        someone had seen something that was out of

11        character, they would have brought it to the

12        district manager, who would have brought it up

13        the chain of response.  There wasn't a formal

14        process.  I can't recall any such situations

15        occurring in the Duragesic.

16             MR. ACKERMAN:  Thank you.  Let's mark this

17        next one as Exhibit 6.

18        (Janssen-Ritchie Exhibit 6 was marked for

19   identification.)

20             MR. ACKERMAN:  This document is also

21        highly confidential, attorneys' eyes only.

22             MS. STRONG:  Thank you.

23             So for the record, all of the testimony

24        about Exhibit 5 is going to be marked, as we

25        discussed, off the record to make sure it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           flagged as attorneys' eyes only.

2                And now with respect to Exhibit 6, I

3           expect we'll follow the same protocol.

4                Is that correct, Mr. Ackerman?

5                MR. ACKERMAN:  Yes, although we would

6           reserve any right to challenge the designation

7           consistent with the protective order.

8                MS. STRONG:  Understood.

9    BY MR. ACKERMAN:

10        Q.   Mr. Ritchie, the court reporter has handed

11   you what has been marked as Deposition Exhibit

12   Number 6.  It is a one-page document, Bates number

13   JAN-MS-00779044.  Take a moment to review this

14   document and let me know when you've had a chance to

15   review it.

16        A.   Okay.

17        Q.   Okay.  Have you seen this document before?

18        A.   Not that I recall.

19        Q.   This is an e-mail from Jenna Kelly.  Are

20   you familiar with that name?

21        A.   I am not.

22        Q.   There is an e-mail address in the header

23   that is "mporter@kprny.com."

24                Do you see that?

25        A.   Yes, I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.   Do you know who that might be?

 2           A.   I do.

 3           Q.   Who is that?

 4           A.   It's Mark Porter.  KPRN was our agency for

 5    the brand.

 6           Q.   An advertising agency?

 7           A.   Advertising.

 8           Q.   This e-mail says:  "Hello, everyone.

 9    Today we decided to roll out the following messages

10    to the Duragesic sales forces via the cycle 1

11    workshop."

12                Do you see that?

13           A.   I do.

14           Q.   What is the "cycle 1 workshop"?

15           A.   I think I covered this earlier.  The --

16    the way that we communicated message changes to the

17    field were done through cycle meetings.  And I think

18    we have a district meeting, a regional meeting, or a

19    national meeting.  And I'm not sure what this meeting

20    was going to be, but there was about three meetings a

21    year that take place.

22                And so there is -- the intent of those

23    meetings is to go ahead and roll out new messaging or

24    new tactics or new education and then to certify the

25    representatives so that they are proficient with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    their messaging before they go into -- into the
 2    field.
 3         Q.   Okay.  So the date of this e-mail is
 4    December 1, 2003?
 5         A.   Yes.
 6         Q.   Does this indicate that the messages that
 7    are listed in this e-mail are -- were provided to the
 8    sales force on that date?
 9         A.   No.  My interpretation of this is that
10    this is from an internal document that was going
11    through final review and getting prepared for the
12    meetings that would have taken place in either late
13    January or February, the next year, so they're
14    preparing for meetings coming up.
15         Q.   Okay.  Thank you.
16              The bullet points have letters in front of
17    them:  L, R, and Q.  Do you know what those letters
18    stand for?
19         A.   I do not.
20         Q.   Have you seen letters used in that manner
21    at Janssen?
22         A.   I have not.  I know this is a market
23    research person, so I'm only assuming that this is
24    market research jargon.
25         Q.   Sure.  And by this time, this point in
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   time, December 2003, were you still in the role of

2   field sales director, or had you become product

3   director for Duragesic?

4       A.   I believe I was a product director.

5       Q.   Okay.  So as product director for

6   Duragesic, what responsibilities did you have for

7   overseeing the rollout of this message, if any?

8       A.   At this time, I believe I was so new I

9   wasn't sure what I was doing with the brand, to be

10  honest.  I can tell you later on, but I don't know at

11  this specific time.

12      Q.   Okay.  Did you oversee as product director

13  the rollout of any other product messages concerning

14  Duragesic?

15          MS. STRONG:  Objection to form.

16          THE WITNESS:  At some -- at some timing, I

17      was the liaison with the -- with the field.  And

18      so I would have been the key contact that would

19      have taken this messaging.  And I would be the

20      conduit of the messaging to the field, yes.

21      Different messages.  I'm not specifically sure

22      what the messages were.

23  BY MR. ACKERMAN:

24      Q.   Okay.  But I think my question was a

25  little bit more specific.
```

```
 1        A.    Okay.

 2        Q.    And that is:  As product director, did you

 3   oversee the introduction of a new message to the

 4   sales force concerning Duragesic?

 5             MS. STRONG:  Objection to form.

 6             THE WITNESS:  I thought I just answered

 7        that.

 8             Not at this specific time.  But it's -- my

 9        role at some point, I was the person that got

10        that -- was the conduit of that information to

11        the field, yes.

12   BY MR. ACKERMAN:

13        Q.    Okay.  And what was the sales message that

14   was introduced that you oversaw?

15        A.    There were numerous ones.  I don't recall

16   the specifics of those messages.

17        Q.    Do you recall any of them?

18        A.    I do not.

19        Q.    Do you recall generally what those

20   messages might have been?

21        A.    Yeah, I mentioned earlier one of them was,

22   you know, the defend campaign that we talked about.

23   That's the one that comes to mind.  I don't recall

24   the other messages.

25        Q.    What were the marketing messages involved
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   in the defend campaign?

 2            MS. STRONG:  Objection to form.

 3            THE WITNESS:  That was the conversation we

 4       had before regarding the differences in the

 5       patches, the matrix versus the reservoir.

 6            MR. ACKERMAN:  I see.  Let's go off the

 7       record for a minute.

 8            VIDEOGRAPHER:  Off the record 11:43 a.m.

 9            (Attorneys' eyes only portion ended.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (A luncheon recess transpired

 2               from 11:43 a.m. until 12:39 p.m.)

 3              VIDEOGRAPHER:  On the record 12:39 p.m.

 4   BY MR. ACKERMAN:

 5       Q.   All right.  We are back on the record.

 6   Let's mark this as Exhibit 7, please.

 7       (Janssen-Ritchie Exhibit 7 was marked for

 8   identification.)

 9   BY MR. ACKERMAN:

10       Q.   Mr. Ritchie, I've handed you what has been

11   marked as Deposition Exhibit Number 7, which is a

12   multipage document beginning with the number

13   JAM-MS-2758275 through JAN-MS-02758287.  Take a

14   moment to review the document and let me know when

15   you've had a chance to review it.

16              Mr. Ritchie, have you had a chance to

17   review the document?

18       A.   I glanced through it, yes.

19       Q.   Have you -- do you recognize this

20   document?

21       A.   I do not.

22       Q.   Okay.  On the front page at the bottom, it

23   says:  "Submitted to Bruce Ritchie, Brand

24   Management."

25              Is that you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   And that is me.

 2        Q.   Okay.  Do you recall any discussions with

 3   Dendrite regarding their using Dendrite segmentation

 4   and analytics?

 5        A.   I do not.  I'm not even sure if this is a

 6   proposal to me that someone was canvassing business,

 7   or something that we requested.

 8        Q.   Do you recall any discussions, internal or

 9   external, regarding --

10        A.   I just don't.  I don't even know I was

11   copied on this message at all, yeah.

12        Q.   If you turn to page -- the page that says

13   "page 4 of 13."

14        A.   Yeah.

15        Q.   Under "Executive Summary," it does say:

16   "Dendrite International, Inc.  Dendrite is pleased to

17   provide this proposal to Janssen Pharmaceutica

18   Products."

19             Do you see that?

20        A.   I do.

21        Q.   Do you know whether this was a solicited

22   proposal or an unsolicited proposal?

23             MS. STRONG:  Objection to form.

24   BY MR. ACKERMAN:

25        Q.   Do you know whether this proposal was
```

 1  solicited?

 2      A.   I do not know.  This is normally -- was

 3  something that would have gone through the analytics

 4  department.  That's why this is -- it's catching me

 5  unawares.  I might have been the person of the brand

 6  that was paying for stuff, but I would not have

 7  requested this.  This information is just beyond my

 8  scope of knowledge.

 9      Q.   So just to be clear, you have no

10  recollection of receiving this proposal?

11      A.   I -- no recollection, no.

12      Q.   And you don't know -- and you don't know

13  whether Janssen ever contracted with Dendrite for the

14  information described in this proposal?

15      A.   I do not know that, no.

16      Q.   Okay.  Thank you.

17           At that point in time, did the -- did you

18  implement or did Janssen implement the Grow and

19  Defend campaign?

20      A.   I don't know the exact date, but it was

21  around about the time when generics came into the

22  marketplace.  So it would have been, I'm guessing,

23  2005ish.

24      Q.   Okay.

25      A.   Maybe early '6.

1      Q.   Did there come a point in time when

2    Janssen received a -- a warning letter from the

3    government concerning Duragesic advertising?

4      A.   I am aware of one warning letter.  Don't

5    know the specifics, but I remember a warning letter.

6           MR. ACKERMAN:  Okay.  Let's mark the next

7      exhibit.  This is the one e-mail and the

8      attachment.  What I'd like to do is mark it as

9      one exhibit, and then we'll staple it when we

10     get a chance when we're off the record.

11       (Janssen-Ritchie Exhibit 8 was marked for

12    identification.)

13           MR. ACKERMAN:  This will be Exhibit 8.

14    BY MR. ACKERMAN:

15     Q.   Mr. Ritchie, the court reporter has handed

16    you Deposition Exhibit Number 8, which is an e-mail

17    and attachment with Bates number JAN-MS-00779344

18    through -9349.  Take a moment to review this document

19    and let me know when you've had a chance to review

20    it.

21     A.   Both documents?

22     Q.   Yes, please.

23     A.   Yes.

24     Q.   Okay.  Do you recognize this document?

25     A.   Not specifically.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Is the attachment the FDA warning letter

2   that you were aware of?

3        A.   It is.

4        Q.   Did you participate in any discussions

5   with anyone at Janssen concerning this FDA warning

6   letter?

7             MS. STRONG:  Objection to form.

8             THE WITNESS:  Pretty broad.  I'm not sure

9        exactly where you're looking.

10            Please rephrase the question?

11   BY MR. ACKERMAN:

12        Q.   Sure.  Do you recall any discussions with

13   anyone at Janssen concerning the substance of this

14   FDA warning letter?

15            MS. STRONG:  Objection to form.

16            THE WITNESS:  My recollection is more

17        about when this went to the field, when the

18        letter was announced to the field.  That's -- so

19        I was aware of the end product, not the

20        discussions during the process.

21   BY MR. ACKERMAN:

22        Q.   Okay.  So tell me -- would you explain,

23   please, how this FDA warning letter was distributed

24   to the field?

25            MS. STRONG:  Objection to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ACKERMAN:

 2        Q.   Let me ask a question first.  Were you

 3    involved in distribution of this FDA warning letter

 4    to the -- the -- to the sales representatives?

 5             MS. STRONG:  Objection to form.

 6             THE WITNESS:  I'm not 100 percent sure of

 7        my role.  And with regard communicated.  But I

 8        do -- I am aware that there was an announcement

 9        and information that was sent to the field

10        letting them know that this warning letter was

11        in place and they should be aware of it in case

12        there were any questions.

13             And there would have been a response that

14        they would have -- an approved response that

15        they would have given should this letter have

16        come up or be any question to them.

17    BY MR. ACKERMAN:

18        Q.   And did you play any role in drafting the

19    announcement to the field?

20        A.   I did not.

21        Q.   Did you play any role in distributing the

22    announcement to the field?

23             MS. STRONG:  Objection to form.

24             THE WITNESS:  I did not.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. ACKERMAN:

 2        Q.   Did you play any role in drafting the

 3   approved response that you just described?

 4        A.   I did not.

 5             MS. STRONG:  Objection to form.

 6             THE WITNESS:  Sorry.

 7             MS. STRONG:  Objection to form.

 8   BY MR. ACKERMAN:

 9        Q.   Did you field any questions from regional

10   business directors or district managers concerning

11   the FDA warning letter?

12        A.   It's not impossible.  I don't know any

13   specifics.

14        Q.   Did you have any involvement in responding

15   to the FDA warning letter?

16             MS. STRONG:  Objection to form.

17             THE WITNESS:  I did not.  All responses

18        generally come out of the -- the -- what's his

19        job title here?  Medical affairs, regulatory

20        affairs group.  So it's a separate department

21        that would have handled any type of response.

22             There's a lawyer -- I know there's a

23        lawyer, a couple lawyers on this sheet, so it

24        was more internal people that would be focused

25        on that.  This was not a marketing letter of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      creation.

2   BY MR. ACKERMAN:

3      Q.   Okay.  Did Duragesic change its marketing

4   in response to this FDA warning letter?

5           MS. STRONG:  Objection to form.

6           THE WITNESS:  I believe we pulled the file

7      card that was -- the relevant piece from the --

8      from promotion.

9   BY MR. ACKERMAN:

10      Q.   Okay.  Did there come a time when Janssen

11  considered stopping promotion of Duragesic?

12           MS. STRONG:  Objection to form.

13           THE WITNESS:  Not that I'm aware.

14  BY MR. ACKERMAN:

15      Q.   Does Janssen still promote Duragesic with

16  its sales representatives?

17           MS. STRONG:  Objection to form.

18           MR. ACKERMAN:  What's the basis of the

19      objection?

20           MS. STRONG:  Lack of foundation.

21  BY MR. ACKERMAN:

22      Q.   Okay.  Go ahead.

23      A.   Duragesic has not been promoted for the

24  last 13 years by representatives.

25      Q.   So when did Janssen stop promoting
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Duragesic via its sales representatives?

 2              MS. STRONG:  Objection to form.

 3              THE WITNESS:  I'm not sure of the exact

 4        date, but it was sometime, I believe, in 2006.

 5    BY MR. ACKERMAN:

 6        Q.   Were you involved in discussions regarding

 7    the decision to stop promoting Duragesic with --

 8    using Janssen sales representatives?

 9        A.   I would have been part of a group of

10    people, but I was not the one making the decision.

11        Q.   Who were the group of people who were

12    involved?

13        A.   Would have been the VPs and presidents of

14    the company.

15        Q.   Can you provide names of the people who

16    were in that group of people you just described?

17              MS. STRONG:  Objection to form.

18              THE WITNESS:  My superior at the time was

19        David Pass, I believe was the VP, and the

20        president of the company was Jeff Smith.

21              Here again, I was not part of the final

22        decision-making, so I'm assuming that those are

23        the people that made this decision.  I know it

24        didn't come from me.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. ACKERMAN:

 2        Q.   Okay.  Did you have any discussions with

 3   Kati Chupa regarding that decision, the decision to

 4   stop promoting Duragesic using Janssen sales

 5   representatives?

 6        A.   I believe Kati was no longer in the brand

 7   when that decision was made.  And there was a period

 8   of time when I was the only person on the brand,

 9   towards the end.  I just don't know when that kicked

10   in, and I don't know when this decision was made.

11   But for the last -- the last period of time, it was

12   just me.

13        Q.   Okay.  When you say "the last period of

14   time," what period of time would that have been?

15        A.   So I know it was when the brand -- there

16   was generics involved.  So I couldn't give you a

17   date, but it was once generics were enrolled, and we

18   just -- we had decided to move in a different

19   direction, promote other products.  We -- the

20   company.

21        Q.   And when -- you say you were the "only

22   person on the brand," did your responsibilities

23   change at that point?

24        A.   Yes.

25        Q.   And how did they change?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    They changed substantially when the sales

 2   force wasn't there.  There was no longer a need to

 3   create messages, so there, the whole promotion

 4   component was no longer a factor.  My roles were

 5   largely to ensure that there was sufficient product

 6   created, developed, made.  And then I worked a lot

 7   with finance and forecasting.  And then there was a

 8   website that I oversaw as well.

 9          Q.    Look back at Exhibit 1, which is your CV,

10   and that exhibit states that you were product

11   director of analgesia from 2003 to 2005.  Is that

12   correct?

13          A.    Right.

14          Q.    For what period of that time were you the

15   only person on the brand?

16          A.    Nothing specific, but I would say the last

17   six months.

18          Q.    Was the sales force, was it -- had

19   Duragesic stopped promoting -- I'm sorry.

20                Had Janssen stopped promoting Duragesic

21   using its sales force prior to you becoming the only

22   person on the brand, or during the period when you

23   were the only person on the brand?

24          A.    I'm not 100 percent sure on exact timing.

25   But I do know for that last period of time, there was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    no promotions.  So it could have happened earlier in

 2    2005.  I just don't know the exact timing.

 3         Q.   And when you say "that last period of

 4    time," I'm just trying to --

 5         A.   The last period when I was on the brand,

 6    the last six months of my time.

 7         Q.   So for at least the last six months, there

 8    was no promotion of Duragesic using sales

 9    representatives?

10         A.   To the best of my recollection, yes.

11              MR. ACKERMAN:  Let's mark this as

12         Exhibit 9.  And again, this is an e-mail and

13         attachment, and I'll -- we'll staple them when

14         we get a chance during the break.

15         (Janssen-Ritchie Exhibit 9 was marked for

16    identification.)

17    BY MR. ACKERMAN:

18         Q.   Mr. Ritchie, the court reporter has handed

19    you what's marked as Deposition Exhibit Number 9.

20    This is an e-mail and attachment.  The e-mail has

21    Bates number JAN-MS-00315090.  The attachment has --

22    was produced natively but is at the Bates number

23    JAN-MS-00315091.

24              Take a moment to review this document and

25    let me know when you've had a chance to review it.
```

1      A.   Yes.

2      Q.   Do you recognize this document?

3      A.   Not specifically.

4      Q.   This is an e-mail that -- this is an

5  e-mail that you sent to Kati Chupa; is that correct?

6      A.   That's correct.

7      Q.   And the date is September 30, 2004?

8      A.   Yes.

9      Q.   The first line, you write:  "I have listed

10  a number of points that I believe are important when

11  it comes to reconsidering whether or not the HSR

12  sales force should promote Duragesic in the first

13  half of 2005 or until Ionsys is launched."

14           Do you see that sentence?

15      A.   Yes, I read it.

16      Q.   Were you involved in discussions with Kati

17  Chupa on or about September 30th, 2004, concerning

18  whether or not Janssen sales representatives would

19  promote Duragesic in the first half of 2005?

20      A.   I don't remember the specifics, but I'm

21  aware of the concept, yes.

22      Q.   Okay.  What conversations did you have

23  with Ms. Chupa regarding the concept?

24           MS. STRONG:  Objection to form.

25           THE WITNESS:  So no specifics, but I do

Highly Confidential - Subject to Further Confidentiality Review

```
 1          know that we were as a brand trying to decide

 2          what the promotion efforts would be in 2005, and

 3          we were just evaluating one of those arms, which

 4          is the hospital sales force.

 5   BY MR. ACKERMAN:

 6          Q.   I see.  "HSR" is the hospital sales force?

 7          A.   Yes.

 8          Q.   Okay.  There is a heading that says

 9   "Rationale" and then a number of bullet points

10   underneath it.  What does "DDD" stand for?

11          A.   I'm not exactly sure what the "DDD" is,

12   but what it is in concept, it's the hospital sales.

13   It's the way we track hospital sales.

14          So this is not prescriptions.  This is --

15   it's a number generated by what the -- what the

16   hospitals buy.

17          Q.   I see.  At this point in time, in

18   September of 2004, had any decision been made

19   concerning whether the -- Janssen's nonhospital sales

20   force, whether it was the green sales force or the

21   pain force or whichever force was promoting

22   Duragesic, whether that force would continue to

23   promote Duragesic in the first half of 2005?

24          MS. STRONG:  Objection to form.

25          THE WITNESS:  I really don't recall.  But
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          to my best recollection, we did -- our sales
 2          force, one of them was selling it in 2005 for
 3          the first part.  My best recollection, yeah.
 4   BY MR. ACKERMAN:
 5          Q.   Did discussions occur at the same time
 6   concerning the hospital sales force's continued
 7   selling of Duragesic in 2005 and the regular sales
 8   force's continued selling of Duragesic in 2005?
 9          MS. STRONG:  Objection to form.
10          THE WITNESS:  I remember conversations
11          taking place about promotion in general.  To my
12          best recollection, a decision was made for a
13          office-based campaign for Duragesic, and I
14          believe that there was planned for the hospital
15          sales force to no longer sell.  So this response
16          was for -- to try and see if we could maybe
17          change that decision, to my best recollection.
18   BY MR. ACKERMAN:
19          Q.   When you say "an office-based campaign,"
20   what do you mean by that?
21          A.   Just calling on the pain specialists.  So
22   everything outside the hospitals, promotion outside
23   the hospitals.
24          Q.   I see.  I take it it's -- it appears from
25   this e-mail that you were in favor of the hospital
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   sales force continuing to promote Duragesic; is that

 2   correct?

 3        A.   That is correct.  I was the hospital sales

 4   director, so I had a big affinity for this team.

 5        Q.   And were there individuals who were -- who

 6   held the opposite view?

 7        A.   I don't recall -- sorry.

 8             MS. STRONG:  Objection to form.

 9   BY MR. ACKERMAN:

10        Q.   Were there individuals at Janssen who were

11   not in favor of the hospital sales force promoting

12   Duragesic during the first half of 2005?

13        A.   As I mentioned before, my recollection was

14   that someone was -- had made a proposition for them

15   to no longer to promote.  So I don't know who that

16   was.  But it did -- does seem, to my recollection, be

17   that someone thought it would be a good idea not to

18   promote in 2005.

19        Q.   And was Ms. Chupa involved in this

20   decision to -- of whether or not the hospital sales

21   force would continue to promote Duragesic?

22        A.   Yes, she was.

23        Q.   Was she the decision-maker?

24             MS. STRONG:  Objection to form.

25             THE WITNESS:  She would have needed to be
```

1          the major sponsor to take this to higher levels

2          in the company.

3     BY MR. ACKERMAN:

4          Q.   I see.  Did you -- do you recall any

5     discussions with Ms. Chupa regarding the arguments

6     laid forth -- set forth in this e-mail?

7          A.   As mentioned before, I -- I don't recall

8     specifics of a conversation, but there would have

9     been a conversation following this e-mail.  This

10    e-mail would have not just stood by itself.

11         Q.   Ultimately, what did Ms. Chupa decide?

12         A.   I was smiling before because I don't know

13    the answer to that question, so, yeah.

14         Q.   Did the hospital sales force promote

15    Duragesic in the first half of 2005?

16         A.   I do not know.

17         Q.   If you look at Exhibit 8, the date on

18    Exhibit 8 is September 3rd, 2004; is that correct?

19         A.   Yes.

20         Q.   And the date on Exhibit 9 is

21    September 30th, 2014; is that correct?

22         A.   Yes.

23         Q.   So is it correct to say that discussions

24    regarding whether or not the hospital sales force

25    would continue to promote Duragesic occurred within a

```
 1    month of Duragesic receiving the FDA warning letter?
 2              MS. STRONG:  Objection to form.
 3              THE WITNESS:  I agree with you on the
 4         dates, but I don't see any relationship between
 5         the two, and I'm not aware of any relationship
 6         between the two.
 7    BY MR. ACKERMAN:
 8         Q.   Actually, hold on before we move from that
 9    document.  If you look at the last several of the
10    bullet points.
11         A.   I'm sorry.  I'm not sure which document.
12         Q.   Under -- I'm sorry.  On Exhibit 9.  You
13    write:  "The institutional-based KOLs are important
14    components of Duragesic Grow and Defend campaign."
15              Do you see that?
16         A.   I see that.  I read that.
17         Q.   Okay.  So what -- what does that sentence
18    mean?
19         A.   I'm not exactly sure what my intent was.
20    I can speculate potentially, but I'm not exactly sure
21    what I meant.
22         Q.   Who were the "institutional-based KOLs"?
23         A.   I don't believe it was a specific group of
24    people.  It was just the thought leaders that were in
25    the institutions.  "KOL" is a pretty broad, so --
```

Highly Confidential - Subject to Further Confidentiality Review

1   yes.

2          Q.   Okay.  The next bullet point says:  "The

3   institutional-based KOLs will be vital to the success

4   of AP77."

5               You see that?

6          A.   I see that.

7          Q.   What is "AP77"?

8          A.   You know, we saw this acronym.  I wasn't

9   sure what it is then.  I don't know if it's not

10  referring to Ionsys, but that would be a pure guess.

11         Q.   There is a reference to Ionsys in the

12  first paragraph of this e-mail.  What is Ionsys?

13         A.   Ionsys is a -- was going to be a pain

14  patch that you could push a button on to get a bolus

15  of drug.  It never came to market, that I'm aware.

16         Q.   Did you have any involvement in the

17  establishment of a risk management program for

18  Duragesic?

19              MS. STRONG:  Objection to form.

20              THE WITNESS:  I did have no involvement.

21  BY MR. ACKERMAN:

22         Q.   Are you aware of a risk management program

23  for Duragesic that was implemented?

24              MS. STRONG:  Objection to form.

25              THE WITNESS:  I was in meetings, and I

Highly Confidential - Subject to Further Confidentiality Review

```
 1          knew that one was discussed, but I had no -- I
 2          was not part of any of its creation.
 3     BY MR. ACKERMAN:
 4          Q.   Who were the meetings with that you were
 5     in?
 6          A.   It was -- there was general team meetings,
 7     and different people would give updates on projects.
 8     And I remember this being a project, but I don't know
 9     who owned it or who was dealing with it.
10          Q.   Did anyone ever mention the reasons that a
11     risk management program was being discussed in these
12     meetings?
13          A.   Not that I'm aware.
14          Q.   Did there come a time when the Duragesic
15     patch switched from a reservoir patch to a matrix
16     patch?
17          A.   Not while I was in the brand.
18          MR. ACKERMAN:  Let's mark the next
19       document.
20       (Janssen-Ritchie Exhibit 10 was marked for
21       identification.)
22     BY MR. ACKERMAN:
23          Q.   Mr. Ritchie, the court reporter has handed
24     you what has been marked as Deposition Exhibit Number
25     10.  I can see that you are chuckling, so maybe you
```

Highly Confidential - Subject to Further Confidentiality Review

1   remember this one.  It is a multipage document

2   numbered JAN-MS-03076731 through -03076761.  Take a

3   moment to review this document and let me know when

4   you've had a chance to review it.

5           Have you had a chance to review it?

6       A.   I have.

7       Q.   Do you recognize this document?

8       A.   No.  I was laughing because I didn't

9   recognize the document at all.  You found documents

10  I've never seen, so I don't recall.

11      Q.   I see.  If you look at the title page of

12  this document, it says "Duragesic Marketing

13  Strategy."  It's addressed to you, correct?

14      A.   (Nodding head up and down.)

15      Q.   From Ryan Hagey, Ryan Martins, Padraig

16  O'Mathuna, Smital Shah, Jennifer Wong, and Beidi

17  Zheng, who are identified as the marketing project

18  team at the University of California at Berkeley,

19  Walter A. Haas School of Business.

20      A.   Do we have a date on this document?

21      Q.   Let me ask my question first, and then

22  we'll get to it.

23          Do you recall any interaction with anyone

24  at the University of -- the University of California

25  at Berkeley School of Business concerning the

1   Duragesic marketing strategy?

2        A.   No.

3        Q.   Do you recall receiving this document?

4        A.   I have no recollection of receiving this

5   document.

6        Q.   Do you have -- you have asked for a date,

7   and this is the manner in which it was produced to

8   us.  It says -- unfortunately, it says "auto date" at

9   the top.  So it's not clear to us the date on which

10  this document was produced.

11            But there are some -- some hints.  If

12  you'd turn to page 3 of the memorandum, what I will

13  call a "memorandum."

14            At the bottom, it says:  "The product" --

15  referring to Duragesic -- "was J&J's fourth largest

16  pharmaceutical brand."

17            And then continuing on:  "The Duragesic

18  patent expired in 2005, and generics entered the

19  market."

20            There is a reference to the "first

21  nonauthorized competitor patch.  Mylan

22  Pharmaceuticals entered the market in February 2005."

23  And then, it says:  "Within three months, Duragesic

24  lost 70 percent of its market share to the two

25  generics but has since held steady at 30 percent."

1          Do you see that reference?

2     A.   I do.

3     Q.   So does that suggest to you when this

4  document was generated?

5     A.   Not specifically, but it gives me a hint

6  that I was the only person on the team.  So this is

7  towards the end of my stint in the brand.

8     Q.   Okay.

9     A.   What I -- there were a number of occasions

10  when companies would send us proposals, almost on

11  fishing expeditions, to get business.  I have no

12  recollection of ever requesting this work.

13     Q.   I see.  Do you think this was a -- do you

14  think this was a proposal?

15     A.   In my mind, that's all it can be.

16     Q.   You don't recall any discussions with the

17  authors of this paper?

18     A.   Not at all.

19     Q.   You recall -- you don't recall receiving

20  this paper at all?

21     A.   I do not.  In all honesty, something like

22  this should have gone to another department.  It

23  would have needed to have gone to a medical side.

24  Someone else would have had to be involved to

25  validate who this company was.  This is -- this is

Highly Confidential - Subject to Further Confidentiality Review

```
 1    not normally the scope of marketing, to be -- to work

 2    with a group on something like this.

 3         Q.   Well, the paper says "marketing strategy,"

 4    right?

 5         A.   I understand.  But as I've glanced at the

 6    contents here, there would be components of this that

 7    other departments would have needed to align with.

 8         Q.   Well, which departments were responsible

 9    for setting the marketing strategy for Duragesic?

10              MS. STRONG:  Objection to form.

11              THE WITNESS:  The marketing department,

12         which is what I was a part of.  But people call

13         "marketing" -- "marketing" can have different

14         definitions.  And as I look through this, in

15         some of these components, I do not believe what

16         we were doing was marketing.

17    BY MR. ACKERMAN:

18         Q.   So what components in here did you not

19    believe were marketing?

20         A.   So if I look at page 15, there is a

21    component here to MSLs, which is the medical group,

22    "Encourage collaboration with medical science."  Our

23    marketing was strictly to our sales force.  We didn't

24    have a sales force, I believe, at this time, or we

25    were getting to a point where we weren't going to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have a sales force.  So there would have been nothing

 2    in this that I would have requested because we would

 3    have had no way to get this information out to

 4    people.

 5         Q.   Okay.  Is it possible that someone else

 6    solicited or someone else was responsible for --

 7    strike that.

 8              Let's move on to the next exhibit.

 9         (Janssen-Ritchie Exhibit 11 was marked for

10    identification.)

11              MR. ACKERMAN:  This will be Exhibit 11.

12    BY MR. ACKERMAN:

13         Q.   Mr. Ritchie, I've handed you what has been

14    marked as Exhibit 11.  Take a moment to review this

15    document, and let me know when you've had a chance to

16    review it.

17         A.   Okay.

18         Q.   This is -- well, first of all, this is a

19    two-page document, Bates number JAN-MS-01136186

20    through -6187.

21              This is an e-mail that you sent; is that

22    correct?

23         A.   I believe so, yes.

24         Q.   And the bottom e-mail appears to be an

25    e-mail that was sent to a distribution list; is that
```

Highly Confidential - Subject to Further Confidentiality Review

 1   right?

 2        A.   Appears so.

 3        Q.   And by this time, you were no longer

 4   product director of Duragesic?

 5        A.   Correct.

 6        Q.   The e-mail at the bottom references an

 7   "unbranded speaker bureau for pain."

 8             Did you have any involvement in

 9   establishing or working with an unbranded speaker

10   bureau of pain -- or for pain?

11        A.   Did I have -- no.

12        Q.   No?  Were you -- your e-mail at the top

13   says:  "I like this concept."

14             What did you like about the unbranded

15   speaker bureau for pain concept?

16        A.   I'm not so sure it wasn't just a nicety in

17   language.  But, you know, any time we could interact

18   with our customers and help educate people, that was

19   a good -- that's a good thing.

20        Q.   Okay.  Did Duragesic utilize an unbranded

21   speaker bureau?

22             MS. STRONG:  Objection to form.

23             THE WITNESS:  I don't recall specifically.

24   BY MR. ACKERMAN:

25        Q.   Apologies if we went over this, but as

1    product director, did you have any involvement in

2    the -- a speaker bureau for Duragesic if one existed?

3         A.   I don't recall that I ever was a lead

4    person for speaker bureaus.

5         Q.   Okay.  But did you have -- other than as a

6    lead person, did you have any involvement?

7         A.   I was aware of speaker programs.  I would

8    have attended the trainings, potentially, but I

9    didn't select the training, the speakers.

10        Q.   So there came a point in time when you

11   were no longer the product director for Duragesic and

12   became the -- I forget -- was it regional --

13        A.   Regional business.

14        Q.   Regional business director?

15        A.   Yes.

16        Q.   How did you learn of that change?

17        A.   Which change?

18        Q.   The change from product director to

19   regional business director?

20        A.   It was my choice.

21        Q.   Okay.  Please explain.

22             MS. STRONG:  Objection to form.

23             THE WITNESS:  Duragesic had got to a point

24        where we -- my -- my activities were fairly

25        mundane.  The part I liked about the job was,

Highly Confidential - Subject to Further Confidentiality Review

1          you know, the working, was the promotion that

2          was no longer in place, and so I wanted a

3          different job opportunity.  And so I went back

4          to a job that I liked, which was in the field

5          management.

6     BY MR. ACKERMAN:

7          Q.   At that point, had Nucynta launched?

8          A.   I do not believe so.

9          Q.   When you left the position of product

10    director at Duragesic, did someone else assume your

11    responsibilities?

12              MS. STRONG:  Objection to form.

13              THE WITNESS:  I believe the -- the

14         position rolled into a job title of managing of

15         nonpromoted brands, and I don't know who the

16         person was.  I can't recall the person's name.

17         I know who it was.  I can't recall the name.

18         But it was no longer a -- just an individual

19         job.

20    BY MR. ACKERMAN:

21         Q.   Let's go back to Exhibit 10.  Would you

22    turn to page 6?  And there is a heading there that

23    says "Target Customers."

24              Do you see that?

25         A.   I read that, yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   And the second paragraph says:  "The

2   target customer for Duragesic cares for" -- I'm sorry

3   -- "The target physician customer for Duragesic cares

4   for patients with long-term, debilitating pain.

5   These physicians are typically oncologists, pain

6   specialists who specialize in chronic pain

7   treatments, and rural primary care physicians."

8            Do you see that sentence?

9        A.   I read the sentence.

10       Q.   Is that an accurate statement as to what

11  the target physician customer for Duragesic was?

12       A.   It's not a definition we would have used.

13  This is not our language.

14       Q.   Do you know what -- I understand it's not

15  your language, but is it -- is it an accurate

16  description?

17       A.   There are --

18            MS. STRONG:  Objection to form.

19            THE WITNESS:  There are certain words I

20       agree with, but other words don't fit into any

21       definition we would have used.

22  BY MR. ACKERMAN:

23       Q.   Okay.  So which ones, which parts of this

24  do you agree with?

25       A.   Patients with long-term pain --

Highly Confidential - Subject to Further Confidentiality Review

```
1    "debilitating pain" is not a word we've ever used.

2         Q.   I understand.

3         A.   Okay.

4         Q.   How about in the second sentence, that the

5    target --

6         A.   These physicians are --

7         Q.   -- are typically oncologists; is that

8    correct?

9         A.   Yes.  I'm sorry.

10             MS. STRONG:  I didn't hear a question.

11             MR. ACKERMAN:  I said, "Is that correct?"

12             MS. STRONG:  But what correct?

13   BY MR. ACKERMAN:

14        Q.   Is it an accurate statement that target

15   physicians for Duragesic are typically oncologists,

16   pain specialists who specialize in chronic pain

17   treatments, and rural primary care physicians?

18        A.   So I would align with the oncology and

19   pain specialists.  The definition around "rural

20   primary care physicians" is way too vague for me to

21   give you an answer.

22        Q.   Thank you.

23             But Duragesic was marketed to primary care

24   physicians, correct?

25        A.   With certain requirements, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.   And what were those requirements?

 2            A.   That they need to be -- need to be

 3     actively working with and have a significant

 4     knowledge of opioids.

 5            Q.   I'm sorry.  A significant -- oh,

 6     knowledge.

 7            A.   Knowledge, of opioids, yes.

 8            Q.   And how would you determine whether a

 9     primary care physician had a significant knowledge of

10     opioids?

11            MS. STRONG:  Objection to form.

12            THE WITNESS:  So first of all, it wouldn't

13        have been me who was determining that.

14     BY MR. ACKERMAN:

15            Q.   I understand.

16            How would Janssen determine that?

17            MS. STRONG:  Objection to form.

18            THE WITNESS:  Janssen, the analytics

19        department would continually run lists of

20        customers that had -- that met certain opioid

21        thresholds based upon the drugs that someone

22        would have identified, a basket of drugs, all

23        opioids, yeah.

24     BY MR. ACKERMAN:

25            Q.   You mean met certain prescribing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    thresholds?  Is that what you mean?

 2         A.   And also volumes, yes.

 3         Q.   Turn to page 4.

 4         A.   Same document?

 5         Q.   Yes, same document.

 6              How much experience do you personally have

 7    in the pharmaceutical industry?

 8         A.   Looking for time?

 9         Q.   Yes.

10         A.   About 32 years.

11         Q.   Okay.  There is a paragraph here about a

12    third of the way down the page that begins:  "The

13    pharma industry's profits are traditionally driven by

14    patented products that create high barriers to entry,

15    high R&D costs, risks associated with winning FDA

16    approval, and high investment in manufacturing

17    capabilities."

18              Do you believe that's an accurate

19    statement?

20              MS. STRONG:  Objection to form.

21              THE WITNESS:  It's the first time I'm

22         reading it and seeing it.  Let me read it again.

23              That is not a definition that I agree

24         with.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. ACKERMAN:

 2        Q.   And why do you disagree with it?

 3        A.   Because there is a lot more that goes into

 4   deciding why we promote drugs.  There's no component

 5   of patient benefit in this statement.

 6        Q.   Okay.  Turn to page 3, if you would.

 7             And that paragraph begins:

 8   "Traditionally" -- I'm sorry.  That page, the first

 9   paragraph on the page begins:  "Traditionally,

10   patients debilitated by chronic pain have had few

11   options for help.  Until recently, pain was deemed

12   merely a symptom of an underlying disease.  This view

13   changed with the training of dedicated pain

14   specialists and the introduction of new

15   pharmaceutical products addressing the full spectrum

16   of pain."

17             Do you see this sentence?

18        A.   I read the sentence, yes.

19        Q.   Do you agree with -- are those sentences

20   accurate, to the best of your knowledge?

21             MS. STRONG:  Objection to form.

22             THE WITNESS:  Once again, this is not a

23        document that we generated.  So you'd be asking

24        me for my own opinion on this.  This is not a

25        company opinion.  This is not a company
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        document.
 2   BY MR. ACKERMAN:
 3        Q.   I understand that.  But you were --
 4   you have 30 years of experience in the pharmaceutical
 5   industry, correct?
 6        A.   Yes.
 7        Q.   And you were a regional business director?
 8   Correct?
 9        A.   Yes.
10        Q.   And a field sales director?
11        A.   Yes.
12        Q.   And how much of the 30 years' experience
13   in the pharmaceutical industry is spent -- do you
14   have overseeing sales representatives?
15             MS. STRONG:  Objection to form.
16             THE WITNESS:  20-plus years.
17   BY MR. ACKERMAN:
18        Q.   So in your experience, is this statement
19   accurate, these sentences at the beginning of this
20   first paragraph on page 3 of this document?
21             MS. STRONG:  Objection to form.
22             THE WITNESS:  First of all, my 32 years,
23        only about 8, 9 of those were dedicated to
24        analgesia, so I need to clarify that.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. ACKERMAN:

 2        Q.   Okay.

 3        A.   In my personal opinion, I do believe there

 4   was a period of time when pain was undertreated.

 5        Q.   Okay.  Thank you.  Let's mark another

 6   document.

 7             MS. STRONG:  We've just gone an hour.  Do

 8        you want to take a break?

 9             THE WITNESS:  Can we turn the temperature

10        down in here as well?  It's getting a little

11        warmer in here.

12             MR. ACKERMAN:  Let's go off the record.

13             VIDEOGRAPHER:  Off the record 1:34 p.m.

14             (A recess transpired from 1:34 p.m. until

15             1:47 p.m.)

16             VIDEOGRAPHER:  On the record 1:47 p.m.

17   BY MR. ACKERMAN:

18        Q.   Mr. Ritchie, let's go ahead and mark

19   another document.  This is Number 12.

20        (Janssen-Ritchie Exhibit 12 was marked for

21   identification.)

22   BY MR. ACKERMAN:

23        Q.   Deposition Exhibit 12 is an e-mail number

24   JAN-MS-00725328 through -00725330.  Take a moment to

25   review this document and let me know when you have
```

```
 1   had a chance to review it.

 2        A.   Okay.

 3        Q.   Okay.  Do you recognize this e-mail?

 4        A.   I do not.

 5        Q.   This is an e-mail from William Parks to

 6   you and some other people; is that correct?

 7        A.   Yes, correct.

 8        Q.   And who was William Parks?

 9        A.   He was the director of trade relations.

10        Q.   And what is the director of trade

11   relations' responsibilities?

12        A.   I'm not 100 percent sure, but I believe to

13   a high degree, they -- he would work with the

14   different pharmacies and distribution centers to

15   ensure that there was sufficient drugs available, not

16   just for Duragesic, but for all analgesia drugs.

17        Q.   Okay.  So he was not a member of the

18   Duragesic brand team?

19        A.   No.

20        Q.   At this point, August 2003, were you a

21   member of the Duragesic brand team?

22        A.   I'm not 100 percent sure, but I believe

23   so.

24        Q.   And the other recipients of this e-mail,

25   were they all members of the Duragesic brand team?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. STRONG:  Objection to form.

 2                THE WITNESS:  I believe all were except

 3          Dominic LaSelva and maybe Barry Pritchard.  They

 4          were -- I believe they were salespeople.  Barry

 5          could have been part of the brand.  I'm not

 6          sure.  He had different jobs.  I'm not sure when

 7          he took the job.

 8   BY MR. ACKERMAN:

 9          Q.   Did the Duragesic brand team monitor the

10   activities of Purdue Pharma's sales force?

11                MS. STRONG:  Objection to form.

12                THE WITNESS:  Not that I'm aware.

13   BY MR. ACKERMAN:

14          Q.   Okay.  Was there any -- not at all?

15                MS. STRONG:  Objection to form.

16                THE WITNESS:  I say, not that I'm aware.

17   BY MR. ACKERMAN:

18          Q.   Okay.  Did the Duragesic brand team track

19   the activity of Purdue's sales force?

20                MS. STRONG:  Objection to form.

21                THE WITNESS:  Be more specific in

22          "activity," please.

23   BY MR. ACKERMAN:

24          Q.   Did the Duragesic brand team maintain

25   statistics or information regarding the size of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Purdue's sales force or the number of visits?

 2          MS. STRONG:  Objection to form.

 3          THE WITNESS:  I know from an earlier

 4      document today, we talked about share of voice?

 5      So, for example, we knew what the share of

 6      voice, we knew the size of their sales force,

 7      and we definitely knew the total market.

 8          But there again, it wasn't the brand team

 9      that did that.  There would be analytics

10      department, other departments would be doing

11      that, seeking that data.

12   BY MR. ACKERMAN:

13      Q.   And I think we said before, but do you

14   know what data formed the basis for that share of

15   voice analysis?

16      A.   Yes.  The share of voice is the number of

17   physician detail equivalents.  So every -- every

18   sales force has sales -- most of the time, we sell

19   more than one drug.  So you saw before that we had

20   Duragesic, Aciphex, and I can't remember the other

21   one.

22          And every one of those is then -- has a --

23   like, the first program might be twelve calls, the

24   twelve and the six and the three, and then you add

25   that up so you know how many times a physician is
```

Highly Confidential - Subject to Further Confidentiality Review

1   detailing to -- a physician is being detailed for

2   each drug.

3          So while our sales force -- I might have

4   mentioned before, we had 700 sales reps.  Not all of

5   those would be selling Duragesic in the first

6   position.  Some might be selling it in the third

7   position.  So they would only be maybe talking about

8   it once a quarter or something.  If it was a primary

9   detail, they would be selling it more frequently.  So

10  we were aware of that piece.

11         Q.   There is a reference in this -- so this

12  article concerns the -- the article -- back to

13  Exhibit 12.

14         A.   Yes.

15         Q.   Mr. Parks forwards an article concerning

16  Oxycontin sales rep -- representatives; is that

17  right?

18         A.   That's what it appears to be.

19         Q.   Do you recall any discussion at Janssen

20  following or concerning this article?

21         A.   I do not.

22         Q.   Do you -- there is a reference here to --

23  in the first line of the article, it says:

24  "Colleagues were giving him grief over the amount of

25  the potent pain killer he was prescribing, he told

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Oxycontin salesman Shane Foster over lunch in early

 2    February."

 3              Do you see that sentence?

 4         A.   I read the sentence, yes.

 5         Q.   Yes.  Are you aware of any prescribers

 6    complaining to Duragesic sales reps that they were

 7    getting grief over the amount of Duragesic they were

 8    prescribing?

 9         A.   I do not.

10              MR. ACKERMAN:  All right.  We can put that

11         document aside.

12              Let's mark this as Number 13.

13         (Janssen-Ritchie Exhibit 13 was marked for

14    identification.)

15              MR. ACKERMAN:  For the record, Exhibit

16         Number 13 is an e-mail, Bates number

17         JAN-MS-02108736 through -02108738.

18    BY MR. ACKERMAN:

19         Q.   Have you had a chance to review this

20    document?

21         A.   I glanced through it, yes.

22         Q.   Do you recognize this document?

23         A.   Not specifically.

24         Q.   The bottom of page 1 is an e-mail that

25    Mr. Vorsanger sends to you; is that correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.   Yes.

2          Q.   And it's -- the subject is "Forward:

3     Abuse data."

4               And Mr. Vorsanger writes, "For the third

5     Bruce."  Does that mean you?

6          A.   I believe so.

7          Q.   And it says --

8          A.   Yeah, Bruce Williamson, Bruce Moskovitz,

9     and Bruce Ritchie.

10         Q.   I see.  And would you please read into the

11    record your response to that e-mail?

12         A.   As regards what?

13         Q.   So Mr. Vorsanger sends you an e-mail at

14    the bottom of this document, correct?  And then you

15    sent a response to Mr. Vorsanger at -- on Friday,

16    January 27, 2006, at 12:59 p.m., correct?

17         A.   Correct.

18         Q.   Would you please read the substance of

19    that response into the record?

20         A.   "Very interesting.  Anyone for tea?"

21         Q.   Thank you very much.

22              I have nothing further.

23              MR. ACKERMAN:  I want to make one note,

24         which is that there was some personnel files for

25         Mr. Ritchie produced yesterday and then early
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          this morning.  We have not yet had a chance to

2          review them.  I don't know whether we would want

3          to recall Mr. Ritchie based on those

4          productions, but Plaintiffs reserve our rights

5          in that respect.

6               MS. STRONG:  We understand your position

7          on that.

8               MR. ACKERMAN:  Should we go off the record?

9               MS. STRONG:  Yes.

10              VIDEOGRAPHER:  Off the record.  2:01 p.m.

11              (A recess transpired from 2:01 p.m. until

12              2:27 p.m.)

13              VIDEOGRAPHER:  On the record 2:27 p.m.

14                        EXAMINATION

15    BY MS. STRONG:

16         Q.   Good afternoon, Mr. Ritchie.

17         A.   Afternoon.

18         Q.   You've worked for Janssen for

19    approximately 31 years; is that right?

20         A.   That's correct.

21         Q.   How many medications have you worked on

22    over that period of time?

23         A.   I don't have a specific answer, but

24    approximately about 40 drugs, medications.

25         Q.   And when was the last time you worked with
```

1    Duragesic?

2          A.    I believe it was 2006.

3          Q.    Approximately 13 years ago?

4          A.    That's correct.

5          Q.    And as we saw, your résumé indicated that

6    you became a national sales director for pain

7    medications in 2003; is that correct?

8          A.    Correct.

9          Q.    Before you became a national sales

10   director in 2003, did you have involvement at the

11   company with the training of sales representatives?

12         A.    I did.

13         Q.    And can you briefly describe how you were

14   involved with the training of sales representatives

15   at the company in your prior positions?

16         A.    Sure.  So I was involved in training in

17   every position that I -- that I was involved in.

18               Started out as a representative of the

19   company, and so I went through the full initial

20   training with McNeil Consumer Products at the time,

21   and I had to pass the assessments and pass the -- all

22   of the necessary testing to become proficient at

23   selling the drug.  So as a representative, I was part

24   of the process.

25               My second job was actually as a sales

Highly Confidential - Subject to Further Confidentiality Review

1    trainer where I actually was responsible for the

2    teaching of representatives on the various drugs I

3    did.  So I became fairly proficient with the process.

4           And as I moved through my career, that

5    baseline that I achieved that I was able to build as

6    a trainer helped me when -- with my future jobs.  So

7    knowing exactly what the process was and what we

8    needed to do to be proficient and ensuring our

9    representatives were actually able to go ahead and

10   interact with the customers at the right level and

11   compliantly.

12          I was a district manager, and I had new

13   drugs, and I went through the same training program

14   as a district manager.  And then I became a regional

15   business director, and I had new drugs, and I went

16   through the same process again.

17          So every -- every job I had, even

18   including the national sales director job, I had to

19   go through the process of ensuring that I was as

20   proficient as the representatives, not only in the

21   knowledge, but also the verbalization of the drugs.

22      Q.   Now, focusing on Duragesic specifically,

23   what was your role as to the training of Duragesic

24   sales representatives?

25      A.   So I had two different jobs.  As the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   national sales director, while the sales training

 2   department didn't report directly to me, I did have a

 3   very strong involvement with the training department

 4   to ensure that the training met the highest levels;

 5   met the needs of the field.

 6              We have always had a very strong focus on

 7   ensuring that -- it's even more so with Duragesic --

 8   ensuring that there was a strong safety message.

 9              When we have a black box on our drugs, we

10   do spend a lot more time making sure people

11   understand the black box because it is the -- it is a

12   requirement by the representatives to go ahead and

13   convey the black box warning to their physicians in

14   every interaction.

15              So I was working with the sales training

16   department.  I would go and spend time in the class

17   when the class would be there, just to make sure that

18   the different students were doing what they needed to

19   do and that the trainers were doing what they were

20   supposed to be doing as well.

21              The other part that I got involved in is

22   that we have certifications and testing that takes

23   place.  When -- you know, throughout the home study

24   process.  And I talked about the home study processes

25   earlier.  And then when they come into the actual
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    live, face-to-face training, they need to pass the

 2    different assessments, and you need to get a

 3    90 percent as a passing grade.

 4              The representatives have -- it's varied

 5    over time, but for the majority of my tenure, the

 6    representatives have two tries.  If they don't get

 7    90 percent on their first try, they have a second

 8    chance to get it done.  And if they fail the second

 9    time, I would not offer to get involved at that point

10    because they would now be on a warning.  There would

11    be -- there is language in our hiring process that

12    they need to be able to -- be able to sell our drugs

13    appropriately, and so I would get involved.

14              A lot of times, these people would get one

15    more chance.  And if they did not pass in that last

16    time, we have had people be terminated at that point.

17    So it's very, very necessary to go ahead and get

18    90 percent.

19         Q.   Okay.  And let's back up a little bit.  If

20    you could briefly describe what is the training for a

21    Duragesic sales rep when they first come onto the

22    brand and the product.

23         A.   Sure.  So it's a fairly lengthy training,

24    so I'll give you some approximate time.  So there is

25    a home study.  And the home study is, you know,
```

```
 1    roughly four to six weeks, depending where the person

 2    comes on board.

 3            That -- generally, there is a bunch of

 4    modules and new modules that they cover:  Physiology,

 5    anatomy, depending on the categories.  We talk about

 6    Duragesic specifically.

 7            There was a lot of focus on, you know,

 8    understanding pain.  You know, how is pain generated

 9    in the body?  And then, more specifically, what --

10    what's fentanyl?  What's the patch?  How do you --

11    how does the patch work?  What happens if there is

12    challenges with the patch?

13            Then also the competition.  We knew what

14    the other drugs were in the marketplace.  That was

15    part of our modules.

16            And also just what pain was in general;

17    what you could expect from the different prescribers

18    that were prescribing pain.  So why would an

19    oncologist focus on pain would be a module, why would

20    a pain specialist be focusing.  So the different

21    people would be -- the different physician types were

22    covered in that as well.

23        Q.   Okay.  So after the home study, what would

24    be next for the training of the sales

25    representatives?
```

```
 1          A.    So after home study -- and here again, the

 2   whole time, you would have had to pass the

 3   assessments to get into -- once you completed all the

 4   assessments, you would then go to live training.

 5                Live training, it's varied over time, but

 6   back then, I believe it was three weeks of training

 7   in-house.  And this was a class of people,

 8   approximately 20 different people.  And I mentioned

 9   before they were sales trainers that are proficient.

10                You would bring into those classes -- you

11   would have -- physicians would come in and talk about

12   what they did, not specific to what they prescribed,

13   but, you know, what their role was, when they saw a

14   patient, what they were thinking, just to try to give

15   the reps a better understanding of what was -- what

16   was going on.  So you have this live training.

17                There would be an assessment on knowledge

18   once again.

19                And then the last part of this was the

20   verbalization of the message, you know.  So having

21   all this book knowledge is one thing, but being able

22   to translate it into the -- into language that made

23   sense for the customer was -- is one piece, but also

24   there was marketing messages that they needed to know

25   and be proficient at.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And as I mentioned before, they needed to
 2    know how to do -- particularly sell the sale -- the
 3    safety page and the black box with Duragesic.
 4              And they would be certified -- there was a
 5    hierarchy of points that they needed to make sure
 6    they were verbalizing.  And here again, if they
 7    didn't verbalize it appropriately, they would fail.
 8    You had two chances to get it passed, and if they
 9    really struggled to get the messaging done, you
10    potentially could get terminated on that piece.
11              They would then go back into the field.
12    But they were -- they were -- they had -- essentially
13    had safety rules.  You'd either -- they had a trainer
14    that was assigned to them, and they had their
15    district manager.
16              So their first week or two coming out of
17    training, they would be working with the trainer in
18    their -- another person's territory, and they would
19    be hearing what this rep was doing on a day-in and
20    day basis.  So they were getting it modeled to them.
21         Q.   So I want to be clear on where we are.
22    This is after the in-person training.  You're now
23    talking about the sales representatives going out in
24    the field, supervised; is that correct?
25         A.   That's correct.  First, they're going out
```

1    into the other -- not with their own customers.

2    They're going to someone else's customers.

3        Q.   Okay.  And so you can continue.  What

4    happens when they do that?

5        A.   So, then, once they have gone through that

6    and they have a better understanding or they've seen

7    this in action, they've seen it modeled, they then go

8    into their own territory for the first time, once

9    again, either with a district manager or trainer.

10            So there is somebody there that is

11   watching to make sure that their language is correct,

12   that they are selling both efficacy and safety, that

13   they are communicating the black box appropriately.

14            And that goes on until the person is

15   proficient.  And then there's a feeling that they can

16   go out by themselves.

17            A lot of times, the second training class

18   comes at a period of time where they really wouldn't

19   have been by themselves.  See, there's a second

20   training where you take everything to a different

21   level.  And -- but sometimes, depending on the number

22   of people, that might -- there might be a gap between

23   the two so the person would be -- by themselves.

24   They then go back in for full territory.

25            Once again, they get more prior knowledge

1   assessment.  They get more testing on verbalization.

2   They just get higher levels of information so that

3   they could become even more proficient.

4        Q.   Okay.  And is there more to that initial

5   training, or does that take them to the end of their

6   initial training on Duragesic?

7        A.   So that is the end of the -- that's the

8   end of the formal training, but training never really

9   stops.  You know, there is numerous ways that

10  additional training takes place so --

11       Q.   Before you talk about additional training,

12  how long, then, is that first period that you just

13  described, from starting with the at-home study and

14  continuing to the field training that you just

15  described?

16       A.   It ranges from four to six months.

17       Q.   Okay.  And now you just referenced that

18  there is additional training that sales

19  representatives have after that initial training.

20  Can you briefly describe for us what is it that's

21  involved in the additional training of Duragesic

22  sales representatives?

23       A.   Yes.  So there's a number of things.  The

24  first one is the -- the cycle meetings.  I know we

25  talked about cycle meetings before.  So cycle

Highly Confidential - Subject to Further Confidentiality Review

 1    meetings are local meetings.  They're done either at

 2    a district, regional, national level.  They happen

 3    approximately three times a year, every four months

 4    or so on average.

 5              There's -- the purpose of those meetings

 6    is to make sure that any new messaging is updated so

 7    that people get the new verbalization with the new

 8    brand strategy, and they need to go ahead and certify

 9    on that.

10              But there is other trainings that come

11    into play.  You know, if there's -- if there's a new

12    drug that's come on the market or there's a new study

13    that's come out, the representatives are updated or

14    brought up to speed on that information.  And

15    sometimes, you might even have some sales techniques

16    and things that they would be covering in those

17    meetings, so the training is ongoing.

18              And, as I say, the representative gets

19    certified before they leave those -- the training.

20    So that's the cycle meeting.

21              The other form of training --

22         Q.   And one question as to the cycle meetings.

23    Who is involved in the cycle meetings?

24         A.   So the meeting, depending on the scope, if

25    it's a district meeting, the district manager would

1    normally host that meeting.  There's often a regional

2    trainer that would be there as well.

3            So we have a hierarchy of meetings.  So

4    you have a -- you have a meeting with the RBDs to

5    start with at a high level.  So they go ahead and get

6    this information.

7        Q.  And the "RBDs" are who?

8        A.  Regional business directors.

9            You then would have a meeting with the

10   regional business directors and the district

11   managers.  And so they get this content and

12   information at a higher level.  And so that they are

13   proficient.  So when they actually get to have their

14   team -- their local teams, they've already seen this

15   information, they have done their own certifications.

16   And so this information is well known to them.

17           They are then given decks to go ahead and

18   present.  And if it's a district meeting, they would

19   then present to their team this information, all

20   scripted, all gone through compliance.  And they're

21   going to be following these decks for -- you know,

22   from start to finish.

23       Q.  And when you say the regional business

24   directors meet with their team, you were talking

25   about the team of sales representatives?

1      A.   Well, the regional business -- sorry.  The

2  regional business directors meet with the district

3  managers.  And then the district managers usually

4  host the meetings with their representatives.  So,

5  yeah.

6      Q.   So in addition to cycle meetings, what are

7  some other types of training that would continue for

8  sales representatives after that initial four to six

9  months of training you described?

10     A.   Yeah.  So the biggest training actually

11 takes place in the field with the district manager.

12 The district manager spends approximately two days

13 every six weeks with each of the representatives.

14         And that -- those field sessions are

15 divided into two components.  There is a sort of a

16 business review, business understanding piece.  So

17 the district manager would be looking to see what the

18 numbers were, you know, be discussing what's going on

19 in the territory, anything that's unique or different

20 in the territory, and those varied.  And then they

21 would spend time in the field watching the

22 representative with the physicians or their

23 customers.

24         And there was -- there was a couple things

25 there.  So obviously, they wanted to make sure that

Highly Confidential - Subject to Further Confidentiality Review

1    the message was fully compliant, that the -- you

2    know, all aspects of the messaging were in place,

3    that the safety measures were being presented, that

4    the necessary materials that should be left behind

5    were left behind.

6          But they also were responsible just to

7    make sure that the representative couldn't do, maybe

8    say something slightly differently or bring the call

9    to a conclusion a different way, they would be

10   enhancing those skill sets as well.

11         So as I said, that happened once, you

12   know, every six weeks.  If a representative seemed to

13   be having a problem doing something, then that

14   frequency would be increased to make sure that the

15   person was --

16         Q.   The frequency of observation?

17         A.   Observation, yes.

18         And then the last piece is that, you know,

19   we have -- back then, I think, it was a voice mail

20   system.  Now it's an e-mail system.  And we get lots

21   of education through -- through either one of those

22   systems.  So we don't need to wait for a formal

23   meeting to go ahead and convey something.

24         So if you say a new trial came out or

25   something, there's a market dynamic, you bring that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   to the rep's attention.  And, you know, if necessary,

 2   there will be a scripted response.

 3            So if there is a new study the competition

 4   came out, and you would have a response to the

 5   doctor.  The doctor says, "I see there's a new

 6   study," there would be a canned response:  "Yes,

 7   study such-and-such.  I don't know the specifics.  If

 8   you need more information, you should call our

 9   medical science liaison," something along those

10   lines.

11            And whenever there is a training need, you

12   know, that's the vehicle that we -- was utilized for

13   the -- just to keep people on top of things all the

14   time.

15       Q.   You previously testified that in the

16   period around April 2001, there were approximately

17   775 sales reps selling Duragesic.  Do you remember

18   that testimony?

19       A.   I do.

20       Q.   Do you know whether any of those sales

21   representatives were marketing any medications in

22   addition to Duragesic at that same time?

23       A.   I don't know specifically what they would

24   be marketing, but it was most likely they would be

25   selling at least three different drugs.
```

```
 1          Q.   And why is it that you believe that those

 2    775 sales representatives likely were selling or

 3    marketing other drugs at the same time?

 4          A.   It would just be a standard business.  A

 5    standard business for us is that if you have someone

 6    in the office, and we -- there is a feeling that

 7    there is a capacity to be able to sell at least two

 8    or three different drugs.  And, you know, so that's

 9    been a standard as long as I've been with the

10    company.

11          Q.   Why have you stayed with the company for

12    31 years?

13          A.   I love my job.  I really -- it's -- it's

14    been the best 31 years of my life.  I've been very,

15    very fortunate to be with J&J.  I mentioned before

16    I've sold, you know, 40 different drugs.  I've had

17    the pleasure and -- you know, to sell some very, very

18    good drugs, and I know I've made a difference in

19    patients' lives.

20               J&J also is a credo-based company, and the

21    first line in our credo is, you know, we put patients

22    first.  And every marketing campaign that I've seen

23    that I can recall, that is -- that comes out.  That

24    plays out.  So we -- we do make a difference to

25    patients' lives.  And so it's just -- just been a joy
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to make a difference.

 2         Q.   And thinking back on your time with

 3    Duragesic, what is most memorable for you about your

 4    time working on Duragesic?

 5              MR. ACKERMAN:  Objection to form.

 6    BY MS. STRONG:

 7         Q.   I'm going to rephrase the question.

 8              What is most memorable for you as you

 9    think back on your time with Duragesic?

10              MR. ACKERMAN:  Objection to form.

11              THE WITNESS:  So Duragesic has a real

12         special place in my heart.  You know, I had a

13         chance -- it's a drug I sold the longest -- but

14         I also believe it's a drug that made the biggest

15         difference to patients.

16              And I clearly can recall being --

17         visited -- being in the field with one of the

18         representatives, and the representative was at

19         the front counter to speak to the nurse, and

20         they were putting some Duragesic tools on the

21         counter.  And a patient happened to see it was

22         Duragesic.

23              And the patient ran over and asked, "Are

24         you -- are you here -- do you guys sell

25         Duragesic?"
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            And we say, "Yeah.  We work for Janssen.
 2      We sell Duragesic."
 3            And this person hugged us because we --
 4      they told us we had made such a big difference
 5      to their lives.  You know, this person said they
 6      were bedridden, they couldn't get out of bed.
 7      They had to be in a chair the whole time.  And
 8      she was bragging that she could actually walk
 9      into the office that day; that, you know, the
10      patch had just changed her life.  She could
11      exercise.  She could get back to a normal life.
12      And, you know, she stood there crying and
13      hugging us.  It was -- you knew at that point
14      you were making a difference in patients' lives.
15            MS. STRONG:  Thank you.  No further
16      questions.
17            MR. ACKERMAN:  I just have a couple follow
18      ups.  Let's switch back.
19            VIDEOGRAPHER:  Off the record 2:46 p.m.
20            (A recess transpired from 2:46 p.m.
21             until 2:48 p.m.)
22            VIDEOGRAPHER:  On the record 2:48 p.m.
23                FURTHER EXAMINATION
24   BY MR. ACKERMAN:
25       Q.  Mr. Ritchie, I just have a few follow-up
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   questions.

 2          If you could pull out Exhibit 8, please,

 3   and turn to the -- to the attachment which is the FDA

 4   warning letter.  What I'd like to do is direct your

 5   attention to --

 6          A.   This one?

 7          Q.   Yes.  Yes, it's that one.  The first two

 8   full paragraphs on what is page 3 of the FDA or the

 9   page that is numbered page 3 -- it's got the Bates

10   number -779348 at the bottom.  Let me know when

11   you're there.

12          A.   Yes.

13          Q.   And on the paragraph -- so, again, this is

14   the FDA's warning letter to Janssen concerning

15   Duragesic marketing; is that correct?

16          A.   Yes.

17          Q.   And in that first full paragraph, the

18   warning letter says on pages 6 and 7:  "The file card

19   includes the claims long-term effects, 12-month

20   open-label study, significant improvement in physical

21   functioning summary score, and significant

22   improvement in social functioning along with figures

23   illustrating these claims."

24          And then at the end of the paragraph, the

25   FDA writes:  "We are not aware of substantial
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    evidence or substantial clinical experience to

 2    support these claims."

 3             Is that correct?

 4        A.   That's what it says.

 5        Q.   And then in the next paragraph, it begins

 6    on pages 8 and 9:  "The file card includes the claims

 7    improved patient outcomes, open-label crossover

 8    comparison study, significant improvement in physical

 9    functioning summary score, and significant

10    improvement in social functioning."

11             And then the paragraph ends:  "We are not

12    aware of substantial evidence or substantial clinical

13    experience to support these claims."

14             Is that -- did I read that correctly?

15        A.   Yes.

16        Q.   And then in the final paragraph, the FDA

17    writes:  "Finally, the file card prominently presents

18    the claims 1,360 loaves and counting.  Work

19    interrupted" -- I'm sorry -- "work uninterrupted,

20    life uninterrupted, game uninterrupted, chronic pain

21    relief that supports functionality, helps patients

22    think less about their pain, and improvements in

23    physical and social functioning."

24             And then the paragraph ends:  "We are not

25    aware of substantial evidence or substantial clinical
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    experience to support these claims."

 2              Did I read that correctly?

 3         A.   I believe, yes.

 4              MR. ACKERMAN:  Thank you.  I have nothing

 5         further.

 6              MS. STRONG:  No further questions from me,

 7         either.

 8              MR. ACKERMAN:  All right.

 9              VIDEOGRAPHER:  Off the record 2:52 p.m.

10              (The deposition was concluded

11               at 2:52 p.m.)

12              (Signature reserved.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 CERTIFICATE OF REPORTER

 2

 3              I, KAREN K. KIDWELL, Registered Merit

 4    Reporter and Certified Realtime Reporter, Notary

 5    Public, do hereby certify that the foregoing

 6    transcript is a true, accurate, and complete record.

 7

 8              I further certify that I am neither

 9    related to nor counsel for any party to the cause

10    pending or interested in the events thereof.

11

12              This the 28th day of January, 2019.

13

14

15

16              _____

                Karen K. Kidwell, RMR, CRR

17              Registered Merit Reporter

                Certified Realtime Reporter

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I, BRUCE RITCHIE, do hereby certify that I

 4    have read the foregoing pages and that the same is a

 5    correct transcription of the answers given by me to

 6    the questions therein propounded, except for the

 7    corrections or changes in form or substance, if any,

 8    noted in the attached Errata Sheets.

 9

10

11         _____

                BRUCE RITCHIE        Date

12

13

14

15         Subscribed and sworn to before me this _____ day

16    of_____, 20_____.

17

18

           _____

19                   Notary Public

20    My Commission Expires:

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              E R R A T A

 2        VIDEOTAPED DEPOSITION OF BRUCE RITCHIE

 3   PAGE    LINE        CHANGE

 4   _____   _____    _____

 5   REASON:        _____

 6   _____   _____    _____

 7   REASON:        _____

 8   _____   _____    _____

 9   REASON:        _____

10   _____   _____    _____

11   REASON:        _____

12   _____   _____    _____

13   REASON:        _____

14   _____   _____    _____

15   REASON:        _____

16   _____   _____    _____

17   REASON:        _____

18   _____   _____    _____

19   REASON:        _____

20   _____   _____    _____

21   REASON:        _____

22   _____   _____    _____

23   REASON:        _____

24   _____

25    (DATE)                    (SIGNATURE)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        _ _ _ _ _ _
 2                        LAWYER'S NOTES
 3                        _ _ _ _ _ _
 4      PAGE    LINE    _____
 5      _____   _____   _____
 6      _____   _____   _____
 7      _____   _____   _____
 8      _____   _____   _____
 9      _____   _____   _____
10      _____   _____   _____
11      _____   _____   _____
12      _____   _____   _____
13      _____   _____   _____
14      _____   _____   _____
15      _____   _____   _____
16      _____   _____   _____
17      _____   _____   _____
18      _____   _____   _____
19      _____   _____   _____
20      _____   _____   _____
21      _____   _____   _____
22      _____   _____   _____
23      _____   _____   _____
24      _____   _____   _____
25      _____   _____   _____
```