1

1                UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3   IN RE: NATIONAL          )   MDL No. 2804
    PRESCRIPTION OPIATE      )
4   LITIGATION               )   Case No.
                             )   1:17-MD-2804
5                            )
    THIS DOCUMENT RELATES TO )   Hon. Dan A. Polster
6   ALL CASES                )
                             )

7

8

9

                    —  —  —
10
              Friday, February 22, 2019
11                  —  —  —

12      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
13                  —  —  —

14

15

16

17         Videotaped Deposition of MATTHEW ROGOS,
       held at Marcus & Shapira LLP, One Oxford
18     Centre, Suite 3500, Pittsburgh, Pennsylvania,
       commencing at 1:09 p.m., on the above date,
19     before Michael E. Miller, Fellow of the
       Academy of Professional Reporters, Registered
20     Diplomate Reporter, Certified Realtime
       Reporter and Notary Public.

21

22

                    —  —  —
23

24         GOLKOW LITIGATION SERVICES
       877.370.3377 ph | fax 917.591.5672
25             deps@golkow.com

2

1    A P P E A R A N C E S:

2        WAGSTAFF & CARTMELL LLP
         BY:  ERIC D. BARTON, ESQUIRE
3            ebarton@wcllp.com
             BRITT WICKLUND, ESQUIRE
4            bwicklund@wcllp.com
         4740 Grand Avenue
5        Suite 300
         Kansas City, Missouri 64112
6        (816) 701-1100
         Counsel for MDL Plaintiffs

7

8        MARCUS & SHAPIRA LLP
         BY:  JOSHUA A. KOBRIN, ESQUIRE
9            jkobrin@marcus-shapira.com
         One Oxford Centre
10       301 Grant Street, 35th Floor
         Pittsburgh, Pennsylvania 15219
11       (412) 471-3490
         Counsel for HBC Service Company

12

13       PIETRAGALLO GORDON ALFANO BOSICK &
         RASPANTI LLP
14       BY:  JENNIFER H. BOURIAT, ESQUIRE
             jhb@pietragallo.com
15       One Oxford Centre
         301 Grant Street, 38th Floor
16       Pittsburgh, Pennsylvania 15219
         (412) 263-2000
17       Counsel for Cardinal Health

18

19       JACKSON KELLY PLLC
         BY:  GRETCHEN M. CALLAS, ESQUIRE
20           gcallas@jacksonkelly.com
             (via teleconference)
21       500 Lee Street
         Suite 1600
22       Charleston, West Virginia 25301
         (713) 469-3842
23       Counsel for AmerisourceBergen Drug
         Corporation

24

25

3

1    A P P E A R A N C E S:

2        JONES DAY
         BY:  PATRICIA OCHMAN, ESQUIRE
3            pochman@jonesday.com
             (via teleconference)
4        North Point
         901 Lakeside Avenue
5        Cleveland, Ohio  44114-1190
         (216) 586-3939
6        Counsel for Walmart Corporation

7

8        ARNOLD & PORTER KAYE SCHOLER LLP
         BY:  DAVID KOUBA, ESQUIRE
9            david.kouba@arnoldporter.com
             (via teleconference)
10       601 Massachusetts Ave, NW
         Washington, DC 20001-3743
11       (202) 942-5000
         Counsel for Endo Health Solutions
12       Inc., Endo Pharmaceuticals Inc., Par
         Pharmaceutical, Inc. and Par
13       Pharmaceutical Companies, Inc.

14

15       COVINGTON & BURLING LLP
         BY:  MARY ZHAO, ESQUIRE
16           mzhao@cov.com
             (via teleconference)
17       3000 El Camino Real
         5 Palo Alto Square
18       Palo Alto, California 94306
         (650) 632-4700
19       Counsel for McKesson Corporation

20

21

22

23

24

25

4

1    A P P E A R A N C E S:

2    TRIAL TECHNICIAN:

3        MICHAEL KAUFFMANN,
         Precision Trial

4

5    VIDEOGRAPHER;

6        DEVYN MULHOLLAND,
         Golkow Litigation Services

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                               INDEX

2

3    APPEARANCES                              2

4    PROCEEDINGS                              8

5

6    EXAMINATION OF MATTHEW ROGOS:

7          BY MR. BARTON                      8

8          BY MR. KOBRIN                      132

9          BY MR. BARTON                      140

10          BY MR. KOBRIN                      152

11

12    CERTIFICATE                             153

13    ERRATA                                  155

14    ACKNOWLEDGMENT OF DEPONENT              155

15    LAWYER'S NOTES                          157

16

17

18

19

20

21

22

23

24

25

6

```
 1                    DEPOSITION EXHIBITS
                         MATTHEW ROGOS
 2                     February 22, 2019

 3    HBC SERVICE-ROGOS EXHIBITS                PAGE

 4    Exhibit 1     P-GEN-00145                  11
                    Resume
 5                  [No Bates]

 6    Exhibit 2     P-HBC-6009                    21
                    Meeting Presentation
 7                  HBC_MDL00068314

 8    Exhibit 3     P-HBC-6021                    23
                    E-mail(s) w/Attachment(s)
 9                  HBC_MDL00136653 -
                    HBC_MDL00136654
10
      Exhibit 4     P-HBC-6022                    27
11                  E-mail(s) w/Attachment(s)
                    HBC_MDL00136141 -
12                  HBC_MDL00136213

13    Exhibit 5     P-HBC-05040                   38
                    E-mail(s) w/Attachment(s)
14                  HBC_MDL00140166 -
                    HBC_MDL00140204
15
      Exhibit 6     P-HBC-01266                   52
16                  E-mail(s) w/Attachment(s)
                    HBC_MDL00180061 -
17                  HBC_MDL00180088

18    Exhibit 7     P-HBC-01271                   66
                    Inventory Control Doc
19                  HBC_MDL00052107 -
                    HBC_MDL00052110
20
      Exhibit 8     P-HBC-01272                   78
21                  10/13/14 Memo
                    w/Attachment(s)
22                  HBC_MDL00132908 -
                    HBC_MDL00132924
23
      Exhibit 9     P-HBC-05045                   90
24                  E-mail(s) w/Attachment(s)
                    HBC_MDL00133435 -
25                  HBC_MDL00133463
```

1   HBC SERVICE-ROGOS EXHIBITS                    PAGE

2

    Exhibit 10   P-HBC-05042                       97
3                E-mail(s) w/Attachment(s)
                 HBC_MDL00181521 -
4                HBC_MDL00181555

5   Exhibit 11   P-HBC-05043                      107
                 E-mail(s) w/Attachment(s)
6                HBC_MDL00181482 -
                 HBC_MDL00181511
7
    Exhibit 12   P-HBC-05003                      118
8                E-mail(s) w/Attachment(s)
                 HBC_MDL00078594 -
9                HBC_MDL00078668

10  Exhibit 13   P-HBC-01184                      127
                 E-mail(s) w/Attachment(s)
11               HBC_MDL00133670 -
                 HBC_MDL00133748
12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

```
 1                    PROCEEDINGS
 2             (February 22, 2019 at 1:09 p.m.)
 3             THE VIDEOGRAPHER:  We're now on
 4        the record.  My name is Devyn
 5        Mulholland.  I am the videographer for
 6        Golkow Litigation Services.  Today's
 7        date is February 22nd, 2019.  The time
 8        is 1:09 p.m.
 9             This video deposition is being
10        held in Pittsburgh, Pennsylvania in
11        the matter of National Prescription
12        Opiate Litigation.  The deponent is
13        Matthew Rogos.
14             Counsel will be noted on the
15        stenographic record.  The court
16        reporter is Mike Miller, and he will
17        now swear in the witness.
18                  MATTHEW ROGOS,
19             having been duly sworn,
20             testified as follows:
21                   EXAMINATION
22   BY MR. BARTON:
23        Q.    All right.  Mr. Rogos, my name
24   is Eric Barton.  We met just before the
25   deposition.  I am one of the attorneys
```

1    representing the plaintiffs in some

2    litigation involving the opioid epidemic, and

3    we're here to take your deposition today.

4              Have you ever had your

5    deposition taken?

6         A.    No.

7         Q.    Okay.  I'll explain a little

8    bit about the process, and I know that you've

9    probably talked with counsel about the

10   process as well.

11             But first, do you understand

12   that you have just taken an oath the same as

13   if you were sitting in a courtroom in front

14   of a jury?

15        A.    I do.

16        Q.    Okay.  And so the oath is to

17   tell the truth under penalty of perjury, and

18   you understand that, correct?

19        A.    I do.

20        Q.    Thank you.

21             The -- because we have a court

22   reporter who will be making a transcript of

23   what we say today, I will need you to give

24   audible answers and try not to interrupt me

25   as I try not to interrupt you.

1              Is that okay?

2         A.    That's fine.

3         Q.    All right.  If you don't

4    understand a question that I ask, please feel

5    free to tell me so and ask me to try to

6    clarify it for you.  Is that all right?

7         A.    That's fine.

8         Q.    Okay.  And you are represented

9    today in this deposition?

10        A.    I am.

11        Q.    Okay.  And your counsel is here

12   with you, correct?

13        A.    That's correct.

14        Q.    Okay.  Who is your current

15   employer?

16        A.    ABARTA Coca-Cola.

17        Q.    Okay.  And how long have you

18   worked for Coca-Cola?

19        A.    Since May of 2015.

20        Q.    We're here today to ask you

21   questions primarily about your work for Giant

22   Eagle's HBC Service Company.

23              Do you understand that?

24        A.    I do.

25        Q.    When did you work for Giant

1    Eagle's HBC Service Company?

2         A.    I worked for them from the time

3    period approximately November 2013 to May of

4    2015.

5         Q.    Okay.  Let me hand you -- let's

6    just use this one as Exhibit 1.

7              (HBC-Rogos Deposition Exhibit 1

8         marked.)

9    BY MR. BARTON:

10        Q.    Okay.  I've marked a document

11   as Exhibit 1, I'm handing it to you.  I'll

12   represent this document Exhibit 1 has an

13   identifying number, our own identifying

14   number at the top that's P-GEN-00145.

15             But does this appear to be a

16   r?sum? of yours that summarizes your

17   education and experience?

18        A.    Yes.

19        Q.    Is this something that you

20   prepared?

21        A.    It is.

22        Q.    Okay.  And does it fairly and

23   accurately summarize your education and work

24   history?

25        A.    It does.

1        Q.      When you first started working

2    for Giant Eagle's HBC Service Company, was

3    that in the title of distribution operations

4    manager?

5        A.      In 2013, yes.

6        Q.      Okay.  And you retained that

7    role for the entirety of your tenure with

8    HBC?

9        A.      Until I left, yep.

10        Q.      Okay.  And so prior to working

11    for HBC, you had been working for other

12    divisions or subsidiaries of Giant Eagle; is

13    that right?

14        A.      That's correct.

15        Q.      And those are listed there on

16    the second page of your r?sum??

17        A.      Uh-huh.

18        Q.      During those positions, from

19    2003 up until November of 2013, had you --

20    had you had any experience or training in any

21    of those positions dealing with controlled

22    substances or pharmaceuticals?

23        A.      Prior to getting to HBC, you

24    mean?

25        Q.      Correct.

1        A.      No.

2        Q.      Okay.  When you left HBC in May

3    of 2015, was that -- was that a voluntary

4    decision on your part?

5        A.      It was.

6        Q.      The role of distribution

7    operations manager, did you have essentially

8    kind of overall supervisory responsibility

9    for all operations of the warehouse?

10       A.      Yes.

11       Q.      And your counsel almost

12   objected.  That reminded me just as a process

13   point.  There may be some objections to

14   questions that I ask today, and if there are,

15   unless your counsel instructs you not to

16   answer, you understand that you will go ahead

17   and try to answer my question?

18       A.      I'll try.

19       Q.      Okay.  So the operations of the

20   HBC warehouse, as I understand it, it was

21   only a portion of the overall warehouse that

22   was identified and specific to the

23   pharmaceutical distribution piece, correct?

24       A.      That's correct.

25       Q.      And within that pharmaceutical

```
 1   distribution piece, there was also a separate

 2   defined area that was secured for controlled

 3   substances; is that true?

 4          A.     It is.

 5          Q.     Okay.  But in terms of the

 6   entire HBC warehouse, the pharmaceutical and

 7   controlled substances part of that warehouse

 8   was a relatively small part of the entire

 9   warehouse; is that true?

10          A.     That's correct.

11          Q.     Okay.  I asked you if you'd had

12   any, I think, training or experience prior to

13   HBC with -- dealing with distribution of

14   pharmaceuticals or controlled substances, and

15   you said you had not, correct?

16          A.     That's correct.

17          Q.     Do you recall any education --

18   and I'll ask you a little bit about your

19   education here in a second, but had you had

20   any education concerning Federal laws or

21   regulations concerning controlled substances?

22          MR. KOBRIN:  Object to form.

23   Do you mean formal education or job

24   training, anything?

25          MR. BARTON:  Well, yeah.  I
```

15

1           mean, really anything.

2    BY MR. BARTON:

3           Q.      Anything you would consider

4    education, whether it be formal education or

5    education through job training or anything.

6           A.      Prior to getting to HBC?

7           Q.      Correct.

8           A.      No.

9           Q.      Let's -- let me ask a little

10   bit about your education quickly, just -- it

11   appears you graduated from Penn State with a

12   Bachelor of Science in marketing; is that

13   right?

14          A.      It is.

15          Q.      With a minor in business

16   logistics?

17          A.      Uh-huh.

18          Q.      And that was 1997?

19          A.      That's correct.

20          Q.      Okay.  And then after entering

21   the workforce, it appears you got an M.B.A.

22   from University of Pittsburgh, correct?

23          A.      I did.

24          Q.      That was in 2008?

25          A.      It was.

1      Q.    Okay.  So did you leave work to

2   be a full-time student in the M.B.A., or were

3   you able to do that while working at Giant

4   Eagle?

5      A.    I took night classes while

6   working at Giant Eagle.

7      Q.    Okay.  In your role as

8   distribution operations manager, did you

9   directly supervise managers underneath you,

10   so to speak?

11      A.    I did.

12      Q.    And how many managers were

13   under you at HBC?

14            MR. KOBRIN:  Object to form.

15   BY MR. BARTON:

16      Q.    How many managers did you

17   directly supervise?

18      A.    I'm trying to think.  I think

19   there was a minimum of three.

20      Q.    Did any of those managers have

21   exclusive responsibilities to the

22   pharmaceutical area of the warehouse?

23      A.    Not that I can remember.

24      Q.    Okay.  Yeah, I just wondered

25   if -- if there was someone who kind of had

 1   that role who you supervised, but you don't

 2   recall that being the way managerial

 3   responsibilities were divided underneath you?

 4        A.     No.

 5        Q.     Okay.  Let me just ask you

 6   about the physical setup for you at the HBC

 7   warehouse.

 8             I assume your -- you spent your

 9   days at the warehouse, correct?

10        A.     That's correct.

11        Q.     And did you have an office

12   there on site?

13        A.     I did.

14        Q.     And was that an office that,

15   you know, kind of had walls and a door, or

16   was it just an area?

17        A.     It was a walls-and-door office.

18        Q.     Okay.  Like a full-on office?

19        A.     Full-on office.

20        Q.     All right.  And you had a

21   computer?

22        A.     I did.

23        Q.     I assume you had an office

24   phone?

25        A.     I did.

18

```
 1          Q.     The computer that you had, was
 2   that like a desktop computer with a monitor,
 3   or did you just use a laptop?
 4          A.     I can't recall.  I think it
 5   might have been a laptop, but I can't recall.
 6          Q.     Okay.  I assume, but you tell
 7   me if -- otherwise, that your computer was
 8   linked or networked to a company network of
 9   some kind?
10          A.     I would assume, yes.
11          Q.     Yeah.  And for e-mail
12   communications, did you occasionally e-mail
13   people through the course of your work?
14          A.     I did.
15          Q.     And was that -- if you recall,
16   did you use -- did you and the company use an
17   Outlook, Microsoft Outlook-based system for
18   e-mail, or was it some other e-mail provider,
19   if you recall?
20          A.     I believe it was Outlook.
21          Q.     And likewise, for word
22   processing, if you worked on documents and
23   drafted or edited and sent documents, word
24   processing, did you use Microsoft Word there,
25   do you recall?
```

19

1          A.      Yes.

2          Q.      Okay.   Was there -- in addition

3     to any e-mails that you might use in the

4     course of your work, was there also a company

5     intranet, if you will, where you could do

6     instant messaging directly to other employees

7     without using e-mail?

8          A.      I believe there was.

9          Q.      Okay.   Is that -- do you know

10    what -- do you know what that -- did it have

11    a name?

12         A.      I don't recall.

13         Q.      Okay.   Was that something that

14    you often used, if you recall?

15         A.      I don't think I used it too

16    much.

17         Q.      Was there any other way,

18    besides direct face-to-face conversations

19    with people or using the office telephone or

20    using e-mail or the instant messaging

21    function, if you used that, were there any

22    other ways that you communicated with other

23    people at HBC?

24         A.      I think we communicated with

25    supervisors over a walkie-talkie system.

1      Q.     Okay.  And so that -- that was

2   just for kind of talking to people who might

3   be in another part of the warehouse far

4   enough away that you can't have a

5   face-to-face conversation, but you're just

6   having kind of an immediate communication

7   with them that way?

8      A.     That's correct.

9      Q.     All right.  Any other ways you

10   can think of?  I'm just trying to understand

11   what all those were.

12      A.     I think there might have been

13   an intercom, so if we had to call somebody to

14   the office there was an intercom that would

15   communicate a message across the warehouse.

16      Q.     Okay.  How many offices like

17   yours were there at the HBC warehouse?

18             MR. KOBRIN:  Object to form.

19      A.     You mean where other people

20   would also perform work that had walls and

21   doors?

22   BY MR. BARTON:

23      Q.     Yeah.

24      A.     Okay.  My recollection, one,

25   two, three, four -- we had four on the same

21

```
1    kind of platform and location where I was,

2    and then there was -- there were two others

3    in the center of the warehouse that served as

4    an inventory warehouse office.

5         Q.    Okay.  And who were the people

6    who had the other four -- or the other three,

7    I guess.  There were four you said in your

8    area.

9         A.    Uh-huh.

10        Q.    Who were the other people and

11   like, kind of what were their titles?  Just

12   getting a sense of who --

13        A.    We had a maintenance supervisor

14   who had his own office.  There was an office

15   administrator.  Our HR department had an

16   office and our payroll support had an office.

17   And I recollect we also had -- I want to say

18   a receptionist.  She had an office as well.

19             MR. BARTON:  Okay.

20             (HBC-Rogos Deposition Exhibit 2

21        marked.)

22   BY MR. BARTON:

23        Q.    I'm going to hand you a series

24   of documents and just ask you questions about

25   them, and that's how we'll largely proceed
```

22

1    here.

2              First of all, I'll hand you

3    what we marked as Exhibit 2.  I may not have

4    many questions about this.  This is a

5    document that was produced by HBC.  The

6    metadata associated with the document on the

7    first page seems to suggest it was created

8    perhaps before you came to HBC, in March of

9    2013.

10              So I point that out only to

11   suggest -- my first question about this is,

12   is this a document that you recognize or

13   recall seeing?

14              MR. KOBRIN:  Do you know who's

15        the custodian on it?

16              MR. BARTON:  I don't.

17              MR. KOBRIN:  You don't, okay.

18              MR. BARTON:  If it's not

19        listed, and it isn't, I don't know who

20        it is.

21              MR. KOBRIN:  So it may not be

22        from his custodial file either.  He

23        may have never seen it.

24              MR. BARTON:  Yeah, which is

25        really my question.  And if he hasn't,

23

1         then I don't have any other questions.

2         A.     This is the first time I've

3    seen this.

4    BY MR. BARTON:

5         Q.     Okay.  If you had authored this

6    or edited it or something, I'd have more

7    questions about it, but if you've never seen

8    it before, I don't need to have you answer

9    any other questions about it because you

10   haven't seen before.  Okay.

11              And from looking at that real

12   quick, you can't discern who may have

13   authored it, or can you, just based on having

14   worked at HBC?

15              MR. KOBRIN:  If you can tell.

16        You don't need to speculate.

17        A.     Yeah, unless there's a name at

18   the end, I can't tell.

19              MR. BARTON:  Okay.  That's

20        fine.

21              (HBC-Rogos Deposition Exhibit 3

22        marked.)

23   BY MR. BARTON:

24        ███████████████████████████████

25   ████████████████████████████████



















33



34



35



36



37



38



39





41



42



43





45















52











57



58







60

19          MR. KOBRIN:  Do you want to

20     take a break?  We've been going about

21     an hour, an hour ten.

22          MR. BARTON:  Yeah, that's fine.

23     We can do it.

24          THE VIDEOGRAPHER:  Off the

25     record at 2:12 p.m.

61

```
 1              (Recess taken, 2:12?p.m. to
 2        2:27 p.m.)
 3              THE VIDEOGRAPHER:  We're back
 4        on the record at 2:27 p.m.
 5  BY MR. BARTON:
 6        Q.    Okay.  Mr. Rogos, a few more
 7  questions about Exhibit 6 that you have in
 8  front of you.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



63



64



65



66



67



68





70

1      A.     Myself personally?

2      Q.     Yes.

3      A.     No.

4      Q.     Okay.  Did -- by this time of

5  August of 2014, do you recall having had any

6  role in reviewing this inventory control

7  policy and, you know, approving it or

8  anything like that, or was it just a

9  preexisting policy that was in your set of

10  policies?

11      A.     It was a preexisting policy --

12      Q.     Okay.

13      A.     -- that we were using.

14      Q.     Okay.  So it was -- but as part

15  of the VAWD certification process, do you

16  then recall taking this policy and, you know,

17  adding to it or revising it consistent with

18  VAWD's expectations?

19              MR. KOBRIN:  Object to form.

20      A.     What I recall is the inventory

21  policy that was in the library of SOPs was in

22  a different format than VAWD -- the VAWD

23  application asked us to put the policies in.

24              As we transferred the

25  information from our previous policies into

71

1    the format, there might have been some edits

2    that, as a group, the pharmacy key team, if

3    we had questions amongst us, we would ask to

4    see how we wanted to, I guess, update the

5    policy, or if there were things in the VAWD

6    checklist that we needed to ensure that were

7    in the policies to get the certification, we

8    needed to put those in.

9    BY MR. BARTON:

10        Q.    Okay.  So as of August of 2014,

11   looking kind of at the effective date shown

12   here for this policy on this document, on

13   Exhibit 7, as of -- as of August 1st of 2014,

14   do you recall having directed at HBC that

15   there be any training of HBC employees on how

16   one might identify an order from a pharmacy

17   of controlled substances as suspicious?

18             MR. KOBRIN:  Object to form.

19        A.    What employees?

20   BY MR. BARTON:

21        Q.    Any.  Anyone at the warehouse,

22   I guess.  Anyone under your supervision

23   ultimately.

24        A.    I don't recall any specific

25   training.  There were employees that were in

1    place prior to my arrival at HBC that might

2    have gotten training.

3         Q.    Okay.  Do you recall whether,

4    at HBC at the time we're talking about now,

5    in 2014, was there like a learning management

6    system for employees to get all kinds of

7    training that they may need for their jobs?

8              MR. KOBRIN:  Object to form.

9         A.    I can't recall.

10   BY MR. BARTON:

11        Q.    Okay.  You understand what I'm

12   referring to, though, in terms of like an

13   LMS, learning management system, for employee

14   training?  Is that something you have had

15   familiarity with in your career?

16        A.    It is.

17        Q.    And one of the things that an

18   LMS system can do if an employer sets it up

19   this way is to have training for its

20   employees, for example, on policies and

21   procedures, correct?

22        A.    I would assume, yes.

23        Q.    Okay.  But as you sit here, you

24   don't recall whether that existed in that --

25   whether that functionality existed in HBC at





75





77

1    identify if a certain pharmacy within our

2    Giant Eagle system was ordering over -- or I

3    guess overordering a certain prescription.

4              I know that they did monitor

5    that and would send out monthly reports on

6    thresholds to us if any store was over the

7    threshold.

8         Q.    Okay.  So there was a company

9    system, what you're referring to, that you

10   understood was in place to be monitoring for

11   orders that somehow were flagged by the

12   system as potentially suspicious?

13        A.    Correct.

14        Q.    Based on quantity or frequency

15   or size or anything that the system might be

16   flagging?

17        A.    I don't know what the specifics

18   were on the flags, but yes.

19        Q.    Right.  You didn't set up that

20   system to kind of put in whatever parameters

21   it had, correct?

22        A.    No.

23        Q.    So that -- and my question was

24   really just about what's -- what was in this

25   written policy as of this point in time

78

1    that -- none of that that you've just

2    described, the companywide system or any

3    other criteria that employees might use for

4    identifying an order of suspicious -- an

5    order as suspicious, that's not -- that's not

6    explained in this document, correct?

7         A.    No.

8         Q.    Okay.  What this document does

9    do is it addresses how HBC intended to

10   respond if it identified or suspected an

11   order as suspicious?

12              MR. KOBRIN:  Object to form.

13        A.    That's correct.

14              MR. BARTON:  Okay.

15              (HBC-Rogos Deposition Exhibit 8

16        marked.)

17   BY MR. BARTON:

18        Q.    I'm handing you Exhibit 8.

19   Exhibit 8 is a multiple-page document

20   starting with page Bates number

21   HBC_MDL00132908; is that correct?

22        A.    Yes.

23        Q.    And the last page of this

24   exhibit, Bates HBC_MDL00132924; is that

25   right?









83



84





86









90



91













97



98











103













109







112



113



21          MR. KOBRIN:  You want to take

22     another break?  We're at about two

23     hours.

24          MR. BARTON:  Yeah, we can do

25     that.

114

```
1              THE VIDEOGRAPHER:  Off the
2         record at 3:35 p.m.
3              (Recess taken, 3:35?p.m. to
4         4:08?p.m.)
5              THE VIDEOGRAPHER:  We're back
6         on the record at 4:08 p.m.
7    BY MR. BARTON:
```





116





















126



127



128









131

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23        MR. BARTON:  Okay.  Give me --
24     let's just take a very short break.  I
25     think I'm done, but let me just make
```

132

```
 1        sure.

 2              THE VIDEOGRAPHER:  Off the

 3        record at 4:30 p.m.

 4              (Recess taken, 4:30 p.m. to

 5        4:40?p.m.)

 6              THE VIDEOGRAPHER:  We're back

 7        on the record at 4:40 p.m.

 8              MR. BARTON:  Mr. Rogos, I

 9        appreciate your time today, and I

10        don't have any further questions.

11              THE WITNESS:  Thank you.

12                  EXAMINATION

13  BY MR. KOBRIN:

14        Q.    Mr. Rogos, I just have a couple

15   of follow-up questions for you.

16        ███████████████████████

17   ████████████████████████

18   ████████████████████

19   ███████████

20   ████████████████████████

21   ███████████████████

22   █████████████████████████

23   ███████████████████

24   ████████████████████████

25   ██████████████
```



134







137





138





141

1          A.     My understanding, yes, uh-huh.

2          Q.     There -- was there ever, during

3     the time that you were director of warehouse

4     operations, was there ever any specific

5     training that you directed or conducted of

6     your employees on suspicious order

7     monitoring?

8          A.     Not that I did.

9          Q.     Okay.  Did it ever occur?  I

10    mean, apart from whether you actually did the

11    training, did you -- do you know whether your

12    employees ever got training on the specifics

13    of suspicious order monitoring while you were

14    director of warehouse operations?

15         A.     No.

16         Q.     Okay.  And I think you've

17    testified there wasn't, to your recollection,

18    or at least you're not able to say there was,

19    an LMS training system where it would be

20    documented somewhere that every employee was

21    trained on these policies, correct?

22         A.     I'm not aware of that.

23         Q.     Okay.  After -- after this

24    policy was revised to include the suspicious

25    order criteria that counsel was just pointing



143



144



145



146



147











151

152



20        MR. BARTON:  Nothing further.

21        THE VIDEOGRAPHER:  This

22    concludes this deposition.  The time

23    is 5:02 p.m.  Off the record.

24        (Proceedings recessed at

25    5:02 p.m.)

153

| | |
|---|---|
| 1 | CERTIFICATE |
| 2 | I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, |
| 3 | Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter |
| 4 | and Notary Public, do hereby certify that prior to the commencement of the examination, |
| 5 | MATTHEW ROGOS was duly sworn by me to testify to the truth, the whole truth and nothing but |
| 6 | the truth. |
| 7 | I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the |
| 8 | testimony as taken stenographically by and before me at the time, place and on the date |
| 9 | hereinbefore set forth, to the best of my ability. |
| 10 | |
| 11 | I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was |
| 12 | not requested by the witness or other party before the conclusion of the deposition. |
| 13 | I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney |
| 14 | nor counsel of any of the parties to this action, and that I am neither a relative nor |
| 15 | employee of such attorney or counsel, and that I am not financially interested in the |
| 16 | action. |
| 17 | |
| 18 | _____ |
| 19 | MICHAEL E. MILLER, FAPR, RDR, CRR Fellow of the Academy of Professional Reporters NCRA Registered Diplomate Reporter |
| 20 | NCRA Certified Realtime Reporter Certified Court Reporter |
| 21 | |
| 22 | Notary Public My Commission Expires:  7/9/2020 |
| 23 | Dated: February 24, 2019 |
| 24 | |
| 25 | |

154

1                INSTRUCTIONS TO WITNESS

2

3           Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the

6    appropriate space on the errata sheet for any

7    corrections that are made.

8                After doing so, please sign the

9    errata sheet and date it.

10               You are signing same subject to

11   the changes you have noted on the errata

12   sheet, which will be attached to your

13   deposition.

14               It is imperative that you return

15   the original errata sheet to the deposing

16   attorney within thirty (30) days of receipt

17   of the deposition transcript by you.  If you

18   fail to do so, the deposition transcript may

19   be deemed to be accurate and may be used in

20   court.

21

22

23

24

25

155

1                          ERRATA

2     PAGE   LINE   CHANGE

3     _____  _____  _____

4            REASON: _____

5     _____  _____  _____

6            REASON: _____

7     _____  _____  _____

8            REASON: _____

9     _____  _____  _____

10           REASON: _____

11    _____  _____  _____

12           REASON: _____

13    _____  _____  _____

14           REASON: _____

15    _____  _____  _____

16           REASON: _____

17    _____  _____  _____

18           REASON: _____

19    _____  _____  _____

20           REASON: _____

21    _____  _____  _____

22           REASON: _____

23    _____  _____  _____

24           REASON: _____

25

156

1              ACKNOWLEDGMENT OF DEPONENT

2

3          I, MATTHEW ROGOS, do hereby
   certify that I have read the foregoing pages
4  and that the same is a correct transcription
   of the answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or substance,
6  if any, noted in the attached
   Errata Sheet.

7

8

9

10

11  _____

12   MATTHEW ROGOS                    DATE

13

14  Subscribed and sworn to before me this

15  _____ day of _____, 20 _____.

16  My commission expires: _____

17

18  _____

19  Notary Public

20

21

22

23

24

25

157

1                    LAWYER'S NOTES

2

3        PAGE     LINE

4        _____    _____    _____

5        _____    _____    _____

6        _____    _____    _____

7        _____    _____    _____

8        _____    _____    _____

9        _____    _____    _____

10       _____    _____    _____

11       _____    _____    _____

12       _____    _____    _____

13       _____    _____    _____

14       _____    _____    _____

15       _____    _____    _____

16       _____    _____    _____

17       _____    _____    _____

18       _____    _____    _____

19       _____    _____    _____

20       _____    _____    _____

21       _____    _____    _____

22       _____    _____    _____

23       _____    _____    _____

24       _____    _____    _____

25