UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


-----------------------------x

IN RE: NATIONAL PRESCRIPTION    ) Case No.

OPIATE LITIGATION               ) 1:17-MD-2804

APPLIES TO ALL CASES            ) Hon. Dan A. Polster

-----------------------------x


HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW
VIDEOTAPED DEPOSITION OF LARRY W. ROMAINE

CHARLOTTESVILLE, VIRGINIA

THURSDAY, JANUARY 10, 2019

9:06 A.M.


Pages: 1 - 531

Reported by: Leslie A. Todd

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1        Deposition of LARRY W. ROMAINE, held in the
 2   conference room at:
 3
 4   .
 5             OMNI HOTEL
 6             212 Ridge McIntire Road
 7             Charlottesville, Virginia 22903
 8
 9
10
11
12        Pursuant to notice, before Leslie Anne Todd,
13   Court Reporter and Notary Public in and for the
14   Commonwealth of Virginia, who officiated in
15   administering the oath to the witness.
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1   APPEARANCES (Continued):
 2
 3        SANDRA DI LORIO, ESQUIRE
 4        ENDO
 5        1400 Atwater Drive
 6        Malvern, Pennsylvania 19355
 7        (4840 574-2921
 8
 9   ON BEHALF OF WALMART:
10        CHRISTOPHER LOMAX, ESQUIRE
11        JONES DAY
12        600 Brickell Avenue
13        Suite 3300
14        Miami, Florida 33131
15        (305) 714-9700
16
17   ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC :
18        BRUCE CLARK, ESQUIRE (Telephonically)
19        CLARK MICHIE, LLP
20        220 Alexander Street
21        Princeton, New Jersey 08540
22        (609) 206-1104
23
24
```

Page 3

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3        JENNIFER SCULLION, ESQUIRE
 4        ERICA KUBLY, ESQUIRE
 5        SEEGER WEISS, LLP
 6        77 Water Street, 8th Floor
 7        New York, New York 10005
 8        (212) 584-0780
 9
10   ON BEHALF OF THE TENNESSEE PLAINTIFFS:
11        JOE P  LENISKI, JR , ESQUIRE
12        BRANSTETTER, STRANCH & JENNINGS, PLLC
13        223 Rosa L  Parks Avenue, Suite 200
14        Nashville, Tennessee 37203
15        (615) 254-8801
16
17   ON BEHALF OF ENDO PHARMACEUTICALS AND THE WITNESS:
18        SEAN MORRIS, ESQUIRE
19        NEDA HAJIAN, ESQUIRE (Telephonically)
20        ARNOLD & PORTER KAYE SCHOLER, LLP
21        777 South Figueroa Street
22        44th Floor
23        Los Angeles, California 90017-5844
24        (213) 243-4222
```

Page 5

```
 1   APPEARANCES (Continued):
 2
 3   ON BEHALF OF AMERISOURCEBERGEN:
 4        MARY BALASTER, ESQUIRE (Telephonically)
 5        REED SMITH, LLP
 6        811 Main Street, Suite 1700
 7        Houston, Texas 77002-6110
 8        (713) 469-3800
 9
10
11   ALSO PRESENT:
12        SABRINA TYJER (Paralegal - Seeger Weiss)
13        DANIEL HOLMSTOCK (Videographer)
14        RICK CHRISTIAN (Trial Technician)
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1            C O N T E N T S
2   EXAMINATION OF LARRY W. ROMAINE        PAGE
3     By Ms. Scullion          17
4     By Mr. Leniski          414
5     By Mr. Morris          472
6
7
8
9            E X H I B I T S
10       (Attached to transcript)
11   ENDO-ROMAINE DEPOSITION EXHIBITS      PAGE
12   No. 1   Amended Notice of Deposition of
13        Larry Romaine          26
14   No. 2   Subpoena to Testify at a
15        Deposition in a Civil Action   30
16   No. 3   Separation Agreement & General
17        Release          28
18   No. 4   Chart showing Endo's history    45
19   No. 5   E-mail re Deck, and attachment,
20        Bates ENDO-CHI_LIT-00151712 to
21        00151713          51
22   No. 6   ENDOSell Training Program, Power
23        Point presentation, Bates E0842.1
24        to 0842.19          94

Page 7

1         E X H I B I T S (Continued)
2       (Attached to transcript)
3   ENDO-ROMAINE DEPOSITION EXHIBITS      PAGE
4   No. 7   Demonstrative Script, Bates
5        ENDO-CHI_LIT-00207903      101
6   No. 8   E-mail re Voice Mail Message
7        (2 minutes 35 seconds), Bates
8        ENDO-CHI_LIT-00207902 to
9        00207903          101
10   No. 9   PowerPoint presentation, OPANA
11        Titration MD Workshop, Bates
12        ENDO-CHI_LIT-00473817 to 00473883   111
13   No. 10   Oxymorphone Learning System,
14        Module 3, Bates ENDO-OPIOID_MDL-
15        05654763 to 05654814      111
16   No. 11   E-mail string re OPANA ER Successful
17        Rep Research Final Report & Brand
18        IQ Summary Attached, Bates
19        ENDO-OPIOID_MDL-02162731 to
20        02162734          123
21   No. 12   E-mail string re ECRs, Bates
22        ENDO-OPIOID_MDL-02147122 to
23        02147123          171
24

Page 8

1         E X H I B I T S (Continued)
2       (Attached to transcript)
3   ENDO-ROMAINE DEPOSITION EXHIBITS      PAGE
4   No. 13   E-mail re Opana FIR 11-30-06,
5        with attachment, Bates
6        ENDO-OPIOID_MDL-00881701 to
7        00881704          187
8   No. 14   E-mail re Final OPANA and OPANA
9        ER MVA and Navigator, with
10        attachment, Bates ENDO-OPIOID_MDL-
11        01655584 to 01655647      203
12   No. 15   Document entitled "For your
13        appropriate patients with moderate
14        to severe pain.  Designed for
15        Durable Pain Control," Bates
16        ENDO00000105 to 00000118     206
17   No. 16   Package Insert for Opana ER,
18        Bates ENDO-CHI_LIT-00032928 to
19        00032943          206
20   No. 17   E-mail re Pharmacies that stated
21        RECALL as a Decline Reason/REFUSAL-
22        PRESCRIBING PHYSICIAN/REFUSAL-NOT
23        NOT ACCEPTING NEW PATIENTS, Bates
24        ENDO-OPIOID_MDL-00468003 to 00468004 212

Page 9

1         E X H I B I T S (Continued)
2       (Attached to transcript)
3   ENDO-ROMAINE DEPOSITION EXHIBITS      PAGE
4   No. 18   E-mail re ECR (with attachment),
5        Bates ENDO-OPIOID_MDL-00684000 to
6        00684001          217
7   No. 19   ENDOSell Coaching Report, Bates
8        E0879.1 to E0879.4      217
9   No. 20   E-mail re BMT Meeting - Brand
10        Strat's for Review, Bates
11        E0502.1 to E0502.35      225
12   No. 21   Brochure "New Options to Help
13        Physicians," Bates ENDO-OPIOID_MDL-
14        04929187 to 04929194      233
15   No. 22   E-mail re Slides from Turnberry,
16        (with attachment), Bates E1180.1
17        to E1180.53          235
18   No. 23   2003 Objectives Update, May 7, 2003,
19        Bates ENDO-OPIOID_MDL-05589327 to
20        05589328          244
21   No. 24   Spreadsheet, Bates E1218.1 to
22        E1218.76          245
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 10

E X H I B I T S (Continued)

(Attached to transcript)

ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE

No. 25   Percocet History, Time & Events
in the News Media, Bates E0142.1 to
E0142.18          250

No. 26   E-mail string re OPANA and OPANA ER
Pls, Bates ENDO-OPIOID_MDL-00879677
to 00879738          259

No. 27   E-mail re Info for your meeting on
Tuesday, Bates ENDO-OPIOID_MDL-
04920194          259

No. 28   E-mail string re OPANA and OPANA ER
Marketing Update, Bates E1200.1 to
E1200.2          262

No. 29   E-mail string re Opana Weekly -
11/17, Bates ENDO-OPIOID_MDL-
00858402 to 00858403          265

No. 30   CMR Summary (2006 - 2017) Opana
Net Sales, Bates ENDO_DATA_OPIOID_
MDL-000000008 to 00000019          272

No. 31   E-mail re Play to WIN! - Weekly
Update, Bates E1187.1 to E1187.50   276

Page 12

E X H I B I T S (Continued)

(Attached to transcript)

ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE

No. 39   E-mail re OPANA ER Response Memo,
Bates ENDO-CHI_LIT-00166187 to
00166188          334

No. 40   Brochure entitled "ENDO
Pharmaceuticals, Opana ATU Pulse 3
Summary of Findings, June 2007,"
Bates E0974.1 to E0974.17          340

No. 41   Opana ATU Final Report Wave 6,
Bates E0914.1 to E0914.115          347

No. 42   E-mail string re Opana mentioned
in Pitts. Post story on abuse --
FYI, Bates E1178 1 to E1178.3          369

No. 43   E-mail re Library Program
Utilization Update - November,
Bates E1230.1 to E1230.282          364

No. 44   Document Bates E1247.1 to
E1247.122          378

No. 45   E-mail re Opana ER WPS Report -
National 5.25.12, Bates E1212.1 to
E1212.9          385

Page 11

E X H I B I T S (Continued)

(Attached to transcript)

ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE

No. 32   2009 Performance Coaching and
Development, Bates ENDO-OPIOID_MDL-
02312040 to 02312054          280

No. 33   E-mail string re Opana ER speaker
program update - Midwest Region,
Bates ENDO-OPIOID_MDL-00644449          286

No. 34   E-mail re Opana Top 50 Writers
(with attachment), Bates
E1175.1 to E1175.8          293

No. 35   E-mail re IMPORTANT - Walgreens
stores that have stocked Opana,
Bates E0524.1 to E0524.58          305

No. 36   E-mail re Documents, Bates
E0832.1 to E0832 100          312

No. 37   E-mail re West Opana ER Feedback,
Bates E1215.1 to E1215.4          318

No. 38   E-mail string re Primary Care MDs
and Opioids, Bates E0924 1 to
E0924.2          331

Page 13

E X H I B I T S (Continued)

(Attached to transcript)

ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE

No. 46   Attachment 16, Bates ENDO-OR-CID-
00694084 to 00694087          390

No. 47   E-mail re Request to move Opana ER
NDA 21-610 to the Orange Book
Discontinued List, Bates
ENDO-CHI_LIT-00008100 to 00008101   392

No. 48   E-mail string re Communication to
the field, Bates ENDO-OPIOID_MDL-
01968698 to 01968700          399

No. 49   E-mail re TENNCARE Medicaid Win,
Bates ENDO-OPIOID_MDL-01067350 to
01067351          421

No. 50   Larry Romaine, 2011 Objectives,
Bates ENDO-OPIOID_MDL-01006528 to
01006529          426

No. 51   E-mail string re FW: "Don't Be
Blue" Opana ER BCBS of Tennessee
Initiative - Update,
Bates ENDO-OPIOID_MDL-00361036 to
00361037          432

Highly Confidential - Subject to Further Confidentiality Review

Page 14

```
 1        E X H I B I T S (Continued)
 2         (Attached to transcript)
 3   ENDO-ROMAINE DEPOSITION EXHIBITS         PAGE
 4   No. 52   E-mail string re BCBS TN Opana ER
 5      Performance, Bates ENDO-OPIOID_MDL-
 6      01005844 to 01005851      436
 7   No. 53   E-mail re Opana ER conf call,
 8      Bates ENDO-OPIOID_MDL-01018226 to
 9      01018227              438
10   No. 54   E-mail string re Request for
11      Information, Bates ENDO-OPIOID_MDL-
12      02317224 to 02317226           445
13   No. 55   E-mail re 11/4/2011 5:27:25 PM,
14      Bates EPI001232307 to 001232322    452
15   No. 56   E-mail string re Lower Performing
16      OER Footprints, Bates ENDO-OPIOID_
17      MDL-01007694 to 01007695        459
18   No. 57   E-mail string re Pharmacry Report -
19      Update (with attachment), Bates
20      EPI002036707 to 002036708        464
21   No. 58   E-mail re Report of Suspected
22      Diversion Form, Bates ENDO00747664   484
23   No. 59   E-mail string re RBD Prescriber
24      Removals for 2P13 (with attachment)  487
```

Page 15

```
 1        E X H I B I T S (Continued)
 2         (Attached to transcript)
 3   ENDO-ROMAINE DEPOSITION EXHIBITS         PAGE
 4   No. 60   E-mail string re Physician removed
 5      from Opana ER call plan by Colleen
 6      Craven, Bates ENDO-OPIOID_MDL-
 7      01861288 to 01861292       516
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 16

```
 1            P R O C E E D I N G S
 2            --------------------
 3          THE VIDEOGRAPHER:  We are now on the
 4   record.
 5          My name is Daniel Holmstock.  I am the
 6   videographer for Golkow Litigation Services.
 7          Today's date is January 10th, 2019.  The
 8   time on the video screen is 9:06 a.m.
 9          This video deposition is being held at
10   the Omni Hotel at 212 Ridge McIntire Road in
11   Charlottesville, Virginia, in the matter of In Re:
12   National Prescription Opiate Litigation.  It's
13   pending before the United States District Court
14   for the Northern District of Ohio, Eastern
15   Division.
16          Our deponent today is Mr. Larry
17   Romaine.
18          Counsel will be noted for appearances on
19   the stenographic record.
20          Our court reporter is Leslie Todd, who
21   will now administer the oath to the witness.
22          LARRY W. ROMAINE,
23       and having been first duly sworn,
24       was examined and testified as follows:
```

Page 17

```
 1          DIRECT EXAMINATION
 2   BY MS. SCULLION:
 3      Q   Good morning, Mr. Romaine.
 4      A   Good morning.
 5      Q   We met briefly off the record, but I'm
 6   Jennifer Scullion, counsel for the plaintiffs in
 7   this action.
 8          Mr. Romaine, have you been deposed
 9   before?
10      A   I have.
11      Q   How many times?
12      A   Once.
13      Q   When was that?
14      A   I believe it was in 2011, but I'm not
15   specific on the date.
16      Q   Was that in connection with a particular
17   lawsuit?
18      A   It was in connection with overtime pay
19   for employees in the pharmaceutical industry.
20      Q   And that was with respect to Endo
21   employees?
22      A   Yes.
23      Q   Was that for sales reps' overtime?
24      A   Sales reps.
```

5  (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

```
 1      Q   Okay.  Have you testified in any other
 2   depositions?
 3      A   No.
 4      Q   Have you ever testified in court?
 5      A   No.
 6      Q   All right.  Have you ever submitted any
 7   sworn testimony?
 8      A   No.
 9      Q   Were you -- did you testify before the
10   New York Attorney General --
11      A   No, I did not.
12      Q   -- ever?  Okay.  Okay.  Great.
13          Well, so you've been through one
14   deposition, and I'm sure counsel has explained to
15   you some of the -- the rules and guidances, but
16   let me just go over some that I think are really
17   helpful.
18          First is I'm going to be asking
19   questions and asking you to answer those
20   questions.  If you don't understand my questions,
21   would you please let me know?
22      A   Okay.
23      Q   Thank you.  Otherwise, I'm going to
24   assume that you understood it.
```

Page 19

```
 1          There may be objections from time to
 2   time, but unless you're instructed not to answer
 3   on the ground of privilege and you choose to
 4   follow that instruction, you will need to answer
 5   the questions.
 6          Do you understand that?
 7      A   Yes.
 8      Q   Okay.  I'm going to try not to speak
 9   over your answers, and I'd ask that you not try to
10   speak over my questions.
11      A   Okay.
12      Q   It can get a little difficult.  The
13   reason for that is Leslie, our court reporter,
14   will have difficulty taking everything down if
15   we're talking over each other.
16      A   Okay.
17      Q   Thank you.  We're also going to need to
18   make sure that you give verbal answers, so you
19   can't just nod your head or say "uh-huh" or
20   "huh-uh."  It's got to be actual words so, again,
21   that Leslie can record those.
22      A   Okay.
23      Q   Thank you.
24          We're going to be taking breaks from
```

Page 20

```
 1   time to time.  If you need a break, please let me
 2   know, and we'll try to do that.  The only thing is
 3   I would ask that we can't take a break during a
 4   question.  So if I ask you a question and it
 5   hasn't been answered, we can't take a break.
 6   Okay?
 7      A   Okay.
 8      Q   Okay, great.  Is there any reason that
 9   you can't give your best testimony today?
10      A   No.
11      Q   No medication that impairs your -- your
12   cognitive abilities?
13      A   No.
14      Q   Okay.  Fantastic.
15          Are you represented by counsel today?
16      A   I am.
17      Q   And who is that?
18      A   Arnold & Porter.
19      Q   Did you do anything to prepare for
20   today's deposition?
21      A   Yes.
22      Q   What did you do?
23      A   I met with Arnold & Porter and the Endo
24   attorney on Tuesday afternoon and then yesterday,
```

Page 21

```
 1   which was Wednesday.
 2      Q   Did you meet with anyone at any other
 3   time to prepare for today's deposition?
 4      A   No, I did not.
 5      Q   Did you speak with anybody on the phone
 6   to prepare for the deposition?
 7      A   I spoke with Joanna about the logistics
 8   of this prior to coming here.
 9      Q   Okay.  Did you speak with anyone else
10   about -- in preparation for the deposition?
11      A   No, I did not.
12      Q   Okay.  Did you -- did you review any
13   documents to prepare for the deposition?
14      A   I did.
15      Q   And what did you review?
16          MR. MORRIS:  I'm going to object and
17   instruct the witness not to answer.  If you want
18   to ask about a specific document, that's fine, but
19   he's not going to give you a list of documents
20   that he reviewed.
21   BY MS. SCULLION:
22      Q   Let me ask you this:  Did you review any
23   documents other than in the presence of counsel to
24   prepare for the deposition?
```

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    A   I did not.
2    Q   Did you go, for example, and look at any
3  former e-mails or calendars, any journals,
4  diaries, notes, anything of that sort?
5    A   I did not.
6    Q   Okay.  When you reviewed documents with
7  counsel, did any of those refresh your
8  recollection about events from your employment at
9  Endo?
10   A   Yes.
11   Q   Do you recall what events you had your
12  recollection refreshed on?
13   A   I do.
14   Q   What were those?
15   A   The risk map and the director removal
16  process.
17   Q   The director removal process?
18   A   Mm-hmm, to remove physicians from the
19  call plan.
20   Q   Okay.  The -- the risk map, was that the
21  risk map for Opana ER?
22   A   Correct.
23   Q   Was that a document you had been
24  familiar with when you were employed by Endo?

Page 23

1    A   I was familiar with it at one time, but,
2  obviously, over time I -- I had forgotten about
3  it.
4    Q   Hadn't committed that to memory?
5    A   No.
6    Q   And the -- you said the director removal
7  process.  Is that the -- a prescriber removal
8  process?
9    A   Correct.
10   Q   Okay.  And that's a process to remove
11  prescribers from a -- from call plans?
12   A   That's correct.
13   Q   Okay.  And was that something you were
14  familiar with when you were employed with Endo?
15   A   I was familiar with it.
16   Q   Okay.  Any other topics on which your
17  recollection was refreshed by reviewing documents
18  for the deposition?
19   A   We reviewed a lot of documents, but
20  nothing that stands out.
21   Q   Okay.  Was there anything that you
22  wanted to see that you weren't able to see to take
23  a look at?
24   A   No, not that I remember.

Page 24

1    Q   Anything you asked for?
2    A   No.
3    Q   Okay.  All right.  Putting aside
4  preparation for the deposition, did you discuss
5  today's deposition with anyone other than your
6  counsel?
7    A   Just one other person.
8    Q   And who is that?
9    A   My wife.
10   Q   And what did you discuss with her about
11  it?
12   A   That I was coming to the deposition and
13  would be giving a deposition for the next three
14  days.
15   Q   Okay.  Did you have any communication
16  with any former Endo colleagues about today's
17  deposition?
18   A   I did not.
19   Q   Have you had any communication with any
20  former Endo colleagues about this litigation, and
21  that is the In Re:  National Prescription Opiates
22  MDL?
23   A   I have not.
24   Q   Okay.  How did -- how did you come to be

Page 25

1  familiar with this litigation?  How did you come
2  to know about it?
3    A   I was contacted by Joanna.
4    Q   Had you heard about the case before
5  that?
6    A   No.
7    Q   Do you recall approximately when
8  Ms. Percio -- when Ms. Percio contacted you?
9    A   Actually, I take that back.  It was
10  Jobina, and I don't know her last name, at Endo
11  that contacted me first.
12   Q   Okay.  And I apologize, I don't remember
13  Jobina's last name.
14   A   I don't either.
15       MR. MORRIS:  Jones --
16       MS. SCULLION:  Jones?
17       MR. MORRIS:  Jones-McDonnell.
18       MS. SCULLION:  Jones-McDonnell.  Thank
19  you.
20   BY MS. SCULLION:
21   Q   Do you recall approximately when
22  Ms. Jones-McDonnell contacted you?
23   A   It was either late June or early July
24  of -- of last year.

7  (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    MR. MORRIS:  And I'll just jump in.
2    Obviously these kinds of questions are fine, and
3    I'm sure that Ms. Scullion is not going to ask
4    you, but don't reveal the content of any
5    discussions that you had with counsel.
6    THE WITNESS:  Okay.
7    (Romaine Exhibit No. 1 was marked
8    for identification.)
9    BY MS. SCULLION:
10   Q   Okay.  Let's show you what's been marked
11   as Exhibit No. 1.
12   And this is the Amended Notice of
13   Deposition of Larry Romaine.  Mr. Romaine, have
14   you seen Exhibit 1 before?
15   A   I have not.
16   Q   So Exhibit 1 is the amended notice of
17   your deposition here today.
18   A   Okay.
19   Q   And in the second paragraph at the end,
20   we've indicated that you were to bring a copy of
21   your most recent curriculum vitae or similar
22   summary of education and work history.
23   Did you bring such a document with you
24   today?

Page 27

1    A   I did not.
2    Q   Were you asked --
3    THE VIDEOGRAPHER:  We never set up the
4    speakerphone.
5    (A discussion was held off the record.)
6    MS. SCULLION:  So for the record, we
7    just got notice that the speakerphone was not set
8    up for the dial-in.  So we're going to take a
9    quick break, get that set up, and we'll continue.
10   THE VIDEOGRAPHER:  The time is 9:16 a.m.
11   We're going off the record.
12   (Pause.)
13   THE VIDEOGRAPHER:  The time is 9:19 a.m.
14   We're back on the record.
15   BY MS. SCULLION:
16   Q   So we're back on.
17   Mr. Romaine, do you have a -- a CV or a
18   resume that you keep?
19   A   I -- I don't.
20   Q   Okay.  Do you have any summary of
21   your -- of your work history that you maintain?
22   A   I don't have anything with me.
23   Q   I'm sorry.  I meant, do you -- just at
24   home or on a computer, is that something you keep

Page 28

1    is a CV or a resume?
2    A   I probably have a hard copy somewhere in
3    my home.
4    Q   Okay.
5    MS. SCULLION:  Counsel, we -- we have
6    asked for these documents to be produced to
7    release in the deposition.  I'm not sure why that
8    hasn't happened, but we would like to get a copy
9    of his -- of his CV as we've asked for.
10   MR. MORRIS:  Okay.  Well, we'll take
11   that under submission, and you can ask him
12   obviously his employment history.
13   MS. SCULLION:  More quickly, let me have
14   that.
15   MS. SCULLION:  Let's give -- number 3.
16   (Romaine Exhibit No. 3 was marked
17   for identification.)
18   BY MS. SCULLION:
19   Q   I'm going slightly out of order on the
20   exhibits, so just bear with me.
21   I'm going to hand you what's marked as
22   Exhibit No. 3.
23   A   Do you want this one back?
24   Q   No, you should keep all the exhibits as

Page 29

1    they're handed to you.
2    A   Okay.
3    Q   You can put them aside if you like, but
4    we'll be coming back to exhibits, so just so you
5    know.
6    So Exhibit No. 3 is the Separation
7    Agreement and General Release entered into between
8    Larry Romaine and Endo Pharmaceuticals, Inc.
9    And if you turn to the very last --
10   sorry, second to last page of the exhibit, it is
11   signed by, it looks like, Mr. Romaine on
12   September 1st, 2013.  And this was provided to us
13   today by counsel for Endo.
14   Mr. Romaine, do you recognize Exhibit 3?
15   A   I do.
16   Q   And what is it?
17   A   It was my separation agreement from
18   Endo.
19   Q   Okay.  And on the page 7 of the
20   agreement, that is your signature?
21   A   Yes.
22   ████████████████████████
23   ████████████████████████
24   ████████████████████████

8  (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30



19      Q   Okay.  All right.  Let's put Exhibit 3
20  aside.
21          (Romaine Exhibit No. 2 was marked
22              for identification.)
23  BY MS. SCULLION:
24      Q   And I'm going to hand you what's been

Page 31

1   marked as Exhibit No. 2.
2       A   Thank you.
3       Q   Sure.  And Exhibit No. 2 is a copy of
4   the subpoena to testify at deposition in a civil
5   action dated December 31st, 2018, directed to
6   Mr. Romaine in care of Arnold & Porter.
7           And, Mr. Romaine, have you seen
8   Exhibit No. 2 before?
9       A   I have not.
10      Q   Okay.  Were you aware that a subpoena
11  had been served calling for your testimony as well
12  as documents?
13      A   I was aware that when I talked to
14  Jobina that I was being subpoenaed to be -- to do
15  a deposition.
16      Q   Were you aware you were also being
17  subpoenaed to produce documents in connection with
18  the deposition?
19      A   I was requested to bring any documents
20  that I had in my possession.
21      Q   Okay.  Did you search for documents?
22      A   I did.
23      Q   Okay.  And did you find any?
24      A   I did not.

Page 32

1       Q   All right.  When you were with Endo,
2   your principal responsibility was -- was in
3   connection with sales, correct?
4       A   Correct.
5       Q   All right.  And from time to time there
6   were pieces of promotional materials that were
7   used in sales, correct?
8       A   Correct.
9       Q   So it might be, for example, a master
10  visual aid, slim jim, some piece of premium like a
11  lanyard or a pen or anything.  Do you have in your
12  possession at home any such promotional materials
13  with respect to Endo?
14      A   I do not.
15      Q   Okay.  Sometimes people keep these
16  things.
17      A   It's been a while since I left.
18      Q   Okay.  So let's go through your
19  employment history just really very quickly.
20      A   Okay.
21      Q   To remind me, when did you graduate from
22  college?
23      A   1980.
24      Q   Okay.  And what was your degree?

Page 33

1       A   Bachelor in business administration.
2       Q   Okay.  And that was from James Madison?
3       A   Correct.
4       Q   Okay.  And did you then go to work for
5   Bristol-Myers Squibb?
6       A   I actually worked for a year and a half
7   for my father.
8       Q   Okay.  And what were you doing for him?
9       A   He owned a glass company, so I worked
10  with him.
11      Q   Okay, fantastic.  And then you worked
12  for Bristol-Myers Squibb?
13      A   Correct.  It was Bristol-Myers at the
14  time, and then after the merger, Bristol-Myers
15  Squibb.
16      Q   Got it.  And that was as marketing
17  director?
18      A   Well, I started as a sales
19  representative and went through many different
20  roles within the company, but I eventually became
21  a marketing director.
22      Q   Can you just give me a brief overview of
23  the roles that you had.
24      A   I was a sales representative, and then a

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    hospital representative, and then I was a home
2    office trainer, and then a district manager, and
3    then a manager of promotion in the home office.
4    And then I was a product manager, and then a
5    director of one of the divisions.  In marketing.
6        Q    Did you sell or promote any opioids?
7        A    No.
8        Q    When you were product manager, what
9    products did you manage?
10        A    It was a product called Duricef, which
11    was an antibiotic.
12        Q    All right.  And you said you were --
13    ended as a director of a division within
14    marketing.  Which division?
15        A    The anti-infective division.
16        Q    All right.  As a home office trainer,
17    what were you providing training on?
18        A    All the promoted products for the
19    division that I supported, which was the
20    anti-infective division.
21        Q    Were you training on sales techniques,
22    disease state, all of the above?
23        A    Product knowledge and sales skills.
24        Q    Okay.  Thank you.

Page 35

1            Did you provide training on the legal or
2    regulatory constraints on sale and promotion of
3    pharmaceuticals?
4        A    I did not, but we had a department that
5    did that.
6        Q    Okay.  And as a sales rep, you were out
7    calling on physicians?
8        A    Correct.
9        Q    What territory were you in, what area?
10        A    Richmond, Virginia.
11        Q    How long did you do that for?
12        A    About a year.
13        Q    Okay.  And why did you leave
14    Bristol-Myers?
15        A    I got an offer from another
16    pharmaceutical company.
17        Q    And that was ESI?
18        A    Correct.
19        Q    And were you a field sales director
20    there?
21        A    I was a regional director there.
22        Q    Let me make sure I got the dates -- we
23    have some dates, let me make sure they're right.
24    My understanding is Bristol-Myers, you were

Page 36

1    employed from approximately April 1981 to about
2    May 1996; is that right?
3        A    Yes.
4        Q    Okay.  You joined -- is it Eisai?
5        A    Eisai.
6        Q    Thank you.  Eisai.  Whew.  All right.
7            You joined Eisai in around June 1996?
8        A    Yes.
9        Q    And you said as field sales director,
10    correct?
11        A    I was -- started as a regional director
12    and --
13        Q    Thank you.
14        A    -- then became a fields sales director.
15        Q    And did you stay with Eisai till May
16    2003?
17        A    Correct.
18        Q    Did you sell -- sell or promote any
19    opioid products there?
20        A    No.
21        Q    Any controlled substances?
22        A    No.
23        Q    What kind of products were you selling
24    and promoting with Eisai?

Page 37

1        A    We had a product for Alzheimer's
2    disease, and we had a product for GERD, the
3    stomach.
4        Q    Okay.  And then am I correct you joined
5    Endo in June 2003?
6        A    Correct.
7        Q    And what was your title when you joined
8    Endo?
9        A    Director of specialty sales.
10        Q    Let's make sure I have then the whole
11    sequence.
12            Did you -- were you promoted from
13    director of specialty sales directly to VP of
14    sales?
15        A    Correct.
16        Q    When were you promoted?
17        A    June of 2007.
18        Q    Were you the immediate successor to Ron
19    Wickline?
20        A    Yes.
21        Q    Thank you.  And you stayed on as VP of
22    sales through September of 2013; is that right?
23        A    Correct.
24        Q    Okay.  Who hired you at Endo?

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review



**Page 38**

```
 1      A   Ron Wickline.
 2      Q   Did you know Mr. Wickline before?
 3      A   I did not.
 4      Q   When you were hired as director of
 5  specialty sales, Mr. Wickline was then VP of
 6  sales, correct?
 7      A   Correct.
 8      Q   So you reported to him.
 9      A   Yes.
10      Q   And do you know who he reported to, by
11  title?
12      A   I believe at the time it was Peter
13  Lankau, who was the, I think, executive
14  vice president of sales and marketing.
15      Q   Okay.  All right.  And you said you were
16  director of specialty sales.  What was specialty
17  sales?
18      A   Specialty sales was the division that
19  called on specialists.
20      Q   As opposed to primary care physicians?
21      A   Primary -- correct.
22      Q   Were there particular specialities that
23  Endo's sales force was calling on at that time
24  when you joined?
```

**Page 39**

```
 1
 2
 3
 4
 5      Q   Okay.  And we'll get into some more
 6  detail of that, but when you then became
 7  vice president of sales, I take it you then had
 8  responsibility for both the specialty and the --
 9  is it called pharma --
10      A   Yes.
11      Q   -- side of the sales?
12      A   Correct.
13      Q   And pharma would have been handling the
14  primary care physicians, correct?
15      A   Correct.
16      Q   All right.  When you were promoted in
17  June of 2007, who gave you that promotion?
18      A   David -- I reported to David Kerr at
19  that time.
20      Q   And he was senior vice president for
21  commercial?
22      A   Commercial, mm-hmm.
23      Q   Okay.  And why did you leave Endo in
24  September 2013?
```

**Page 40**

```
 1      A   We went through a downsizing, and my
 2  position was eliminated.
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22      MR. MORRIS:  Objection to form.
23  BY MS. SCULLION:
24      Q   Is that correct?
```

**Page 41**

```
 1      A   Correct.
 2      Q   Okay.  Thanks.
 3      And then after the downsizing, did you
 4  join inVentiv Health?
 5      A   I did.
 6      Q   And health -- sorry.  Thank you.
 7      And that was September 2013?
 8      A   Yes.
 9      Q   And did you stay with inVentiv until May
10  2014?
11      A   No, I stayed with them until September
12  of 2018.  They actually merged --
13      Q   To Syneos?
14      A   Yes.
15      Q   Yeah.  Thank you.
16      Okay.  What was your title -- when you
17  first joined inVentiv Health, were you VP of sales
18  and sales support?
19      A   Yes.
20      Q   Okay.  Did you then become senior vice
21  president of sales?
22      A   Yes.
23      Q   And that was in June 2014?
24      A   Yes.
```

11 (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1  Q  Okay.  And you said you stayed with --
2  and that was when it became Syneos in 2014; is
3  that right?
4  A  I actually -- I think it was later than
5  that.  I don't know the specific date.
6  Q  But at some point in Ventiv became
7  Syneos.
8  A  Syneos.
9  Q  All right.  And you stayed with then
10  Syneos through September 2018?
11  A  Correct.
12  Q  And why did you leave Syneos?
13  A  We also went through a downsizing --
14  Q  Okay.
15  A  -- and my position was eliminated.
16  Q  Do you know what caused that downsizing?
17  A  Syneos is a consulting type company, and
18  we had lost some clients.
19  Q  Were there particular major clients that
20  were lost?
21  A  In my division, in my group, I didn't
22  lose any major clients, but the company in
23  general, so they restructured.
24  Q  Okay.  And have you been employed since

Page 43

1  leaving Syneos?
2  A  I have not.
3  Q  Okay.  Since you left Endo, have you
4  kept in touch with any of your former Endo
5  colleagues?
6  A  Several.
7  Q  Which ones?
8  A  Kevin O'Brien, Ron Jackson, and Janett
9  Mendez DeTore.
10  Q  Any others?
11  A  No, not really.
12  Q  Ron Wickline?
13  A  No.
14  Q  David Kerr?
15  A  No.
16  Q  Demir Bingol?
17  A  No.
18  Q  Kristin Vitanza?
19  A  No -- I actually saw Kristin.  She
20  worked for a company that I did some work for when
21  I was at Syneos.
22  Q  Okay.
23  A  But I just saw her one time in a
24  meeting.

Page 44

1  Q  And that was just in the work context?
2  A  Mm-hmm.
3  Q  I apologize, we're going to need to say
4  "yes" and "no."
5  A  Yes.  Yes.
6  Q  It's not easy to remember.
7  MR. MORRIS:  You've been doing great so
8  far, but good -- good reminder.
9  MS. SCULLION:  Yeah.
10  BY MS. SCULLION:
11  Q  Linda Kitlinski?
12  A  No.
13  Q  Okay.  Neil Shusterman?
14  A  No.
15  Q  Okay.  Brian Lortie?
16  A  No.
17  Q  Okay.
18  A  I -- I have seen Brian Lortie since --
19  actually, in a restaurant one time, but I have not
20  kept in contact with him.
21  Q  Have you kept in contact with any sales
22  reps from Endo?
23  A  None that I can recall.
24  Q  And just to make sure, with Mr. Jackson,

Page 45

1  have you ever discussed this litigation with
2  Mr. Jackson?
3  A  No.
4  Q  Have you since leaving Endo discussed
5  with any of the folks you mentioned, Mr. O'Brien,
6  Mr. Jackson, Ms. DeTore -- or Mendez-DeTore,
7  Endo's sale or promotion of opioids?
8  A  No.
9  MS. SCULLION:  Let me get the
10  demonstrative.  We're going to mark.
11  So we have two demonstratives we plan to
12  use today.  I was thinking about marking those
13  separately than just regular exhibits as DX, or do
14  you have a preference?
15  MR. MORRIS:  Well, let's mark them -- I
16  think just mark them as exhibits.
17  MS. SCULLION:  Just mark them as
18  exhibits.  All right.  So this will be Exhibit 4.
19  Sorry about that.
20  (Romaine Exhibit No. 4 was marked
21  for identification.)
22  BY MS. SCULLION:
23  Q  So, Mr. Romaine, I'm handing you what
24  has been marked as Exhibit No. 4, and this is just

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    a timeline that we thought would be helpful for
2    orientation throughout the day about certain
3    events.
4         A   Okay.
5         Q   I'll present to you we have put at the
6    bottom of the -- of Exhibit 4 in footnotes
7    citations to documents from where we're getting
8    these dates for various events.  If at any point
9    you believe any of these dates are actually wrong,
10   please let me know, but they really are just --
11   just for orientation purposes today.
12        A   Okay.
13        Q   Because it has been I think some years,
14   and these -- this spans some years, and I think it
15   will be helpful.
16            MR. MORRIS:  And I'll just insert an
17   objection noting that, you know, foundation.
18   Whether he knows whether dates are wrong, he may
19   not know any of that too.  But you asked him to
20   note if the dates are wrong, he may not even know.
21   So...
22   BY MS. SCULLION:
23        Q   I certainly only want you to speak today
24   on things you actually know.

Page 47

1         A   Okay.
2         Q   Before you get into the timeline, we've
3    been talking today about -- or I've been using the
4    term "Endo."  I just want to be clear when I'm
5    using the term "Endo," I'm talking about both the
6    defendants in this action, which are Endo
7    Pharmaceuticals, Inc. -- I believe that was --
8    that was your employer, correct?
9         A   Correct.
10        Q   Okay.  That's on the separation
11   agreement we looked at.
12            -- as well as Endo Health Solutions,
13   Inc.  I'm going to just call them both together
14   Endo.
15            And Endo Health Solutions, Inc., I
16   think, used to be called Endo Pharmaceuticals
17   Holdings, Inc., was the former name.  That also is
18   included when I say "Endo."
19        A   Okay.
20        Q   And if -- if there were any companies
21   that were acquired, brought in as operating
22   companies, subsidiaries of Endo, those are
23   going -- those are included within the term "Endo"
24   when I use that.

Page 48

1         Q   Is that okay?
2         A   Yes.
3             MR. MORRIS:  And I'm going to object
4    on -- to form, legal conclusion, and lack of
5    foundation.  He may or may not know the details of
6    any of those companies.
7    BY MS. SCULLION:
8         Q   I'm just -- I'm just -- I'm not asking
9    you to sort of separate out Endo and any Endo
10   subsidiaries that may have come in while you were
11   employed with them.  If they're under Endo, I'm
12   just calling it all Endo.
13        A   Okay.
14        Q   If you have any questions about that
15   along the way, if you want to be clear about
16   whether I'm talking about one entity or a
17   subsidiary, please let me know.
18        A   Okay.
19        Q   Okay.  Thanks.
20            MR. MORRIS:  I'll still object to form,
21   foundation, legal conclusion.
22   BY MS. SCULLION:
23        Q   So, Mr. Romaine, just to make sure we're
24   all on the same page, do you recall Endo was

Page 49

1    founded in 1997; is that correct?
2             MR. MORRIS:  Objection to form.
3             THE WITNESS:  I think so.
4    BY MS. SCULLION:
5         Q   Okay.  Do you remember Carol Emon --
6    Ammon and some others had acquired a portfolio of
7    products from DuPont Merck when they formed Endo?
8         A   Yes.
9         Q   Okay.  And -- and those products
10   included Percocet, correct?
11        A   Correct.
12        Q   Those products also included something
13   called Numorphan, correct?
14            MR. MORRIS:  Objection to form and
15   foundation.
16            THE WITNESS:  I'm not familiar with
17   Numorphan.
18   BY MS. SCULLION:
19        Q   Okay.  But do you -- do you recall that
20   the Endo name itself though went back to like the
21   1920s and had quite a history?
22            MR. MORRIS:  Objection.  Form,
23   foundation, legal conclusion.
24            THE WITNESS:  I wasn't -- I didn't have

13  (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1   the knowledge of that.
2   BY MS. SCULLION:
3     Q  Okay. Do you recall that Percocet
4   itself was introduced in 1976?
5     A  I --
6       MR. MORRIS: Objection. Form and
7   foundation.
8       THE WITNESS: I don't know the date of
9   that.
10      MS. SCULLION: Okay. Just one second.
11      (Counsel conferring.)
12   BY MS. SCULLION:
13     Q  Percocet was a product that you sold
14   when you were with Endo?
15     A  They were phasing it out as I was coming
16   in.
17     Q  But it was sold while -- while you were
18   with Endo, correct?
19     A  By our sales force.
20     Q  Okay. And do you recall that's a
21   product that was oxycodone and APAP?
22     A  Yes.
23     Q  Okay. And oxycodone, that's a class 2
24   narcotic, correct?

Page 51

1     A  Yes.
2     Q  All right. And it's the same narcotic
3   that's in OxyContin?
4     A  I -- yes.
5     Q  Okay.
6       MS. SCULLION: Can we mark this as the
7   next exhibit.
8      (Romaine Exhibit No. 5 was marked
9      for identification.)
10      MS. SCULLION: No, I marked my copy.
11     Thanks.
12   BY MS. SCULLION:
13     Q  Let me hand you what's been marked as
14   Exhibit No. 5. And this is Bates-stamped
15   ENDO-CHI_LIT-00151712.
16      Mr. Romaine, before we look through the
17   document, I just want to orient you a little bit
18   to one of the things we tried to do here.
19      If you look in the upper right-hand
20   corner of the document, you see it says E1186.1?
21     A  I'm sorry. Can --
22     Q  The top right.
23     A  Oh, yes. I'm sorry.
24     Q  Yeah. So what we try to do throughout

Page 52

1   the day is we're going to try and have these "E"
2   numbers on the documents so it's a little bit
3   easier to follow through than the lengthy numbers
4   at the bottom, but just to give you some
5   orientation.



Page 53

Highly Confidential - Subject to Further Confidentiality Review



Page 54

Page 55

13    Q   Okay.  All right.  So put this aside for
14  a moment.
15         When you joined Endo in 2003, the
16  specialty sales force was at that point detailing
17  on Percocet, right?
18    A   Yes.
19    Q   Okay.  And when you left Endo in 2013,
20  Endo as a company was still selling Percocet,
21  correct?
22    A   I wasn't involved in that.  I don't -- I
23  don't know.
24    Q   Are you aware that Endo, even if it

Page 56

1  wasn't promoting it for the sales force, was still
2  selling Percocet in 2013?
3    A   I'm assuming other areas or functions in
4  the company had responsibility for that.  I did
5  not.  So I was taken away from that.
6    Q   Okay.  But from time to time did you see
7  reports that would show they were still selling
8  Percocet in 2013, sales numbers?
9    A   I never -- I don't recall.  I don't
10  recall seeing reports.
11    Q   Okay.  If you go back to Exhibit No. 4,
12  the little timeline.  Now, you joined in
13  June 20 -- 2013 -- no, sorry, June 2003.
14    A   Correct.
15    Q   And do you recall, though, that Endo had
16  launched some various strengths and variants on
17  Percocet over the years?  So on this timeline,
18  January of 2003, there was a launch of a couple of
19  variants, 7.5/500, 10/650, 2.5/325, and then in
20  January of 2002, there is a launch of the 7.5/325
21  and the 10/325.
22         Do you recall that?
23         MR. MORRIS:  Objection.  Form and
24  foundation.

Page 57

1         THE WITNESS:  I don't recall.
2  BY MS. SCULLION:
3    Q   Okay.  And then in January of 2004, do
4  you recall that Endo had a relaunch of the 2.5/325
5  strength?
6    A   Yes.
7    Q   All right.  That was something that you
8  were involved in?
9    A   Yes.
10    Q   All right.  And then next on the
11  timeline, you see "June 2005, Launch of generic
12  oxycodone."  Do you recall that Endo for a period
13  did sell generic oxycodone?
14    A   I -- I don't recall that.
15    Q   Do you recall one way or the other?
16    A   No.
17    Q   Okay.  And then next is June 2006, the
18  approval of Opana ER/IR.  Do you recall that?
19    A   Yes.
20    Q   Okay.  And then in December 2011, there
21  was approval for a reformulated version of -- of
22  Opana ER, correct?
23    A   Correct.
24    Q   All right.  And do you recall that in

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  February of 2012, there was discontinuation of the
2  original version of Opana ER?
3       MR. MORRIS: Objection to form.
4       So my -- I have an objection to form and
5  foundation, but if you can answer the -- if you
6  can answer the question, you can.
7       THE WITNESS: Oh, I didn't hear the
8  question. I'm sorry.
9  BY MS. SCULLION:
10   Q  So I apologize. Let me try a new
11 question. It may be easier.
12      So there was approval for reformulated
13 Opana ER in December of 2011.
14   A  Yes.
15   Q  Do you recall then after that in 2012,
16 the original version of Opana ER was discontinued,
17 and then approximately April 2012 there was the
18 actual commercial launch of the reformulated
19 version?
20   A  Yes.
21   Q  Okay. And I think you explained that
22 then in 2013, Opana ER faced generic competition
23 for -- from a generic version of oxymorphone,
24 correct?

Page 59

1    A  Correct.
2    Q  As VP of sales, were you aware that Endo
3  was also selling not only Opana in tablet oral
4  form but also in IV and suppository forms?
5    A  Yes.
6    Q  Okay. And those were also oxymorphone
7  preparations, correct?
8    A  Correct. That was outside of my scope
9  of responsibility, though.
10   Q  But you were aware those were being
11 sold.
12   A  I was aware that there was --
13   Q  In fact, there -- there was some effort
14 to have a continuum of care between the forms
15 used in the hospital setting and -- and after
16 hospital?
17      MR. MORRIS: Objection. Foundation.
18      THE WITNESS: I don't recall that.
19 BY MS. SCULLION:
20   Q  Okay.
21   A  I didn't have hospital responsibility.
22   Q  All right. "Outpatient" was the
23 word I was looking for and lost. Thank you.
24      MR. MORRIS: Noted for the record. It

Page 60

1  never kicked in.
2       MS. SCULLION: There are more coming.
3  That happens these days.
4  BY MS. SCULLION:
5    Q  And do you recall that the -- that the
6  IV and suppository preparations of oxymorphone had
7  at one point been branded as Numorphan?
8    A  I don't recall that.
9    Q  Don't remember the name at all for
10 Numorphan?
11   A  No.
12   Q  Okay. Are you aware, though, that the
13 IV and suppository forms of oxymorphone had been
14 sold by Endo prior to the June 2006 approval of
15 Opana ER and IR?
16      MR. MORRIS: Objection. Form and
17 foundation --
18      THE WITNESS: I don't recall that.
19      MR. MORRIS: -- legal conclusion.
20      Just as a reminder, you've been doing
21 great, but not speaking over also includes my
22 objections. It's hard for the court reporter. So
23 we apologize. Question, if I object, then go
24 ahead with your answer.

Page 61

1       THE WITNESS: Okay.
2       MR. MORRIS: You're doing great, though.
3       THE WITNESS: Sorry.
4       MR. MORRIS: No, that's okay. You're
5  doing great. This is a totally unnatural
6  environment.
7  BY MS. SCULLION:
8    Q  So we spoke a little bit about the
9  concept of controlled substances. Let's make sure
10 that we're on the same page.
11      You understand that opioids are a
12 controlled substance?
13   A  Yes.
14   Q  And they are classified as a class 2
15 narcotic?
16   A  Yes.
17   Q  All right. And is it fair to say
18 class 2 narcotics are not regulated the same as
19 other prescription medications, correct?
20   A  I -- I believe so.
21   Q  Okay. They're tightly controlled due to
22 the known inherent risks of those products?
23   A  Right, with a black box warning.
24   Q  Okay. What are some of the risks that

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  you understand are inherent in prescription
2  opioids?
3      A  I think if they're taken inappropriately
4  or prescribed inappropriately, based on the black
5  box warning, there is risk for addiction.
6      Q  So the risk for addiction, your
7  understanding, is only if they're taken
8  inappropriately?
9      A  It -- there's a black box warning, so,
10  you know, patients have to be aware.
11      Q  Just to make sure I understand, though,
12  is there a risk of addiction if they are taken
13  inappropriately?
14      A  There's risk for addiction when you're
15  taking those.  So physicians have to warn
16  patients, and patients have to be aware of that.
17         Does that answer your question?
18      Q  I guess the question is, are those
19  risks -- those risks exist only when the product
20  is being taken inappropriately?
21         MR. MORRIS:  Objection.  Form,
22  foundation.
23  BY MS. SCULLION:
24      Q  I'm just trying -- and you said --

Page 63

1  that's how you initially phrased it.  I'm just
2  making sure I understand.
3      A  Yeah, the risks -- the risk exists, and
4  patients and physicians have to be aware of that.
5      Q  Okay.  Do those risks exist if the
6  product is being taken appropriately?
7      A  The risk is at any time.  Hence, the
8  black box warning.
9      Q  Okay.  Are there other risks associated
10  with prescription opioids?
11         MR. MORRIS:  Objection.  Foundation.
12         THE WITNESS:  I don't -- I don't recall.
13  BY MS. SCULLION:
14      Q  Do you recall there's risks of abuse?
15      A  I think based on the black box warning
16  that there is -- there is abusive potential.
17      Q  Okay.  A risk of misuse?
18      A  Risk of misuse.
19      Q  Risk of diversion?
20      A  Risk of diversion.
21      Q  What do you understand "diversion" to
22  mean?
23      A  Being prescribed inappropriately or
24  taken when you're not -- it's not really

Page 64

1  indicated.
2      Q  Does diversion also include phony
3  prescriptions, for example?
4      A  Yes.
5      Q  What other channels of diversion did you
6  become aware of with respect to prescription
7  opioids?
8         MR. MORRIS:  Objection.  Form.
9         THE WITNESS:  I don't recall.
10  BY MS. SCULLION:
11      Q  Internet pharmacies?
12      A  I wasn't aware of internet pharmacies.
13      Q  Okay.  You weren't aware that there was
14  a widespread problem of internet pharmacies
15  selling prescription opioids?
16      A  I don't recall that.
17      Q  Okay.  How about just plain theft of
18  opioids from a relative's medicine cabinet?
19      A  Yes.
20      Q  That was a problem?
21         MR. MORRIS:  Objection to form.
22         THE WITNESS:  Obviously it could be a
23  problem.
24  BY MS. SCULLION:

Page 65

1      Q  That was a problem you became aware did
2  occur from time to time?
3      A  I -- I have heard of it in the news,
4  yes.
5      Q  Okay.  How about patients getting
6  multiple prescriptions for opioids and selling
7  their pills?
8      A  I'm not -- I'm not specifically aware of
9  any of that.
10      Q  Were you aware that that was an issue
11  that did occur, though, with prescription opioids?
12      A  I've heard that in the news, yes.
13      Q  Okay.  You only heard it in the news?
14      A  I -- I don't recall any other time.
15      Q  As vice president of sales for Endo, you
16  were overseeing Endo's sale of Opana ER, correct?
17      A  I was overseeing our sales organization.
18      Q  Okay.  And that included the sales
19  organization with respect to Opana ER, correct?
20      A  Correct.
21      Q  And they were also selling Opana IR,
22  correct?
23      A  For a short period of time, yes.
24      Q  Okay.  And when you first joined Endo,

17  (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

```
 1     I'm sorry, as director of specialty --
 2        A   Specialty sales.
 3        Q   -- specialty sales, you were overseeing
 4     the specialty sales -- sales force that was
 5     selling Percocet, at least for some time, correct?
 6        A   Correct.
 7        Q   And those are all prescription opioids,
 8     right?
 9        A   Correct.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 68

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 67

```
 1        A   Mm-hmm.
 2        Q   We're going to need you to say "yes" or
 3     "no."
 4        A   Yes.
 5        Q   Thank you.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 69

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



18  (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review



**Page 70**

**Page 71**

13    Q   All right.  What's your understanding of
14  what a pill mill is?
15    A   My understanding of a pill mill is that
16  it's a -- it's a -- it was physicians' offices
17  that were prescribing but maybe didn't have a
18  brick and mortar office, and they were just
19  prescribing for patients who were looking for
20  opioids.

**Page 72**

6    Q   Okay.  And so -- going back to our
7  discussion of the risks inherent in a prescription
8  opioid, was overdose a -- an inherent risk?
9    A   I think it is a risk, and that was
10  included in the black -- issues in the black box
11  warning.
12    Q   Okay.  And the risks that are in the
13  black box and that we've talked about, addiction,
14  abuse, misuse, diversion, overdose, those are real
15  risks with prescription opioids, correct?
16    MR. MORRIS:  Objection.  Form.
17    THE WITNESS:  Yes.
18  BY MS. SCULLION:
19    Q   They're not some theoretical phobia,
20  anything like that; those are actual risks.
21    A   Correct.
22    Q   Okay.  And you would agree that
23  companies that manufacture and sell and distribute
24  prescription opioids have obligations to -- to

**Page 73**

1  take reasonable steps to -- to address those
2  risks.
3    A   Correct.
4    Q   Okay.  And so, for example, an
5  obligation to monitor for possible diversion.
6    A   Yes.
7    MR. MORRIS:  Objection to form.
8  BY MS. SCULLION:
9    Q   And an ob- --
10    MR. MORRIS:  Legal conclusion.
11  BY MS. SCULLION:
12    Q   And an obligation to -- to report
13  suspected diversion.
14    MR. MORRIS:  Objection to form, legal
15  conclusion, foundation.
16    THE WITNESS:  Yes.
17  BY MS. SCULLION:
18    Q   Okay.  And an obligation to try to -- to
19  prevent potential diversion?
20    MR. MORRIS:  Objection to form, legal
21  conclusion, foundation.
22    THE WITNESS:  Yes.
23  BY MS. SCULLION:
24    Q   And your counsel is raising an objection

Highly Confidential - Subject to Further Confidentiality Review



Page 74

1 to legal conclusion.
2        I'm asking -- let me ask the same
3 questions about an obligation to try to prevent
4 diversion, monitor for diversion, report
5 diversion.  Even putting aside legal obligations,
6 you would agree that a reasonably responsible
7 corporation should be undertaking those -- those
8 steps, correct?
9        MR. MORRIS:  Objection.  Form,
10 foundation, legal conclusion still.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 75

1
2
3
4
5
6
7
8
9
10        MR. MORRIS:  Objection.  Form,
11 foundation.
12        THE WITNESS:  I did not, because, again,
13 it was out of my area of responsibility and
14 expertise.
15        MS. SCULLION:  Okay.  We've actually
16 been going just about an hour.  I was going to
17 suggest we take a quick break and then come back.
18 Is that okay?
19        MR. MORRIS:  Sure.
20        THE WITNESS:  Yes.
21        THE VIDEOGRAPHER:  The time is
22 10:07 a.m.  We're going off the record.
23        (Recess.)
24        THE VIDEOGRAPHER:  The time is

Page 76

1 10:23 a.m., and we're back on the record.
2 BY MS. SCULLION:
3    Q   Welcome back, Mr. Romaine.  You
4 understand that you're still under oath?
5    A   I do.
6    Q   Thank you.
7        When you joined Endo in 2003, is it
8 correct that Endo was in the process of revamping
9 its -- its sales force?
10        MR. MORRIS:  Objection to form.
11        THE WITNESS:  I don't recall the
12 specifics.
13 BY MS. SCULLION:
14
15
16
17
18
19
20
21
22
23
24

Page 77

1
2
3
4
5
6
7
8
9
10        MS. SCULLION:  Oh, that's Exhibit 5?
11 Thank you very much.
12 BY MS. SCULLION:
13    Q   Can we look back at Exhibit 5.
14        And if you will turn --
15    A   Let me double-check this it -- this --
16 okay.
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 82

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 84

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 83

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 85

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18    Q   Correct?  Okay.
19        We talked about some of the numbers over
20    time.  Okay.
21        So for the sale -- the field
22    salespeople, those are sometimes called sales
23    reps, correct?
24    A   Mm-hmm.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q   If I use the term --
2    A   Yes.
3    Q   -- salespeople --
4    A   Yes.
5    Q   -- that means the same thing?
6    A   Yes.
7    Q   Okay.  And the principal activity they
8    engaged in was going out and calling on healthcare
9    professionals in their territory, correct?
10   A   That's correct.
11   Q   And that's called detailing?
12   A   Yes.
13   Q   Okay.  How many days a week were they
14   out detailing on average?
15   A   It was --
16       MR. MORRIS:  Objection to form.
17       THE WITNESS:  The -- can you clarify,
18   the sales representative?
19   BY MS. SCULLION:
20   Q   Yes.
21   A   Five.
22   Q   And they're generally trying to see
23   around eight to ten healthcare providers a day?
24   A   Usually around six.

Page 87

1    Q   Okay.  Sometimes more, sometimes less?
2    A   Mm-hmm.
3    Q   I need you to say "yes" or "no."
4    A   Yes.  I'm sorry.
5    Q   Thank you.
6        And when we talk about a detailing, can
7    you describe what detailing would entail, what it
8    would look like?
9    A   A representative would go in for a sales
10   presentation to a physician and they would give
11   full prescribing information.  So there may be
12   several products that they're talking to that
13   individual physician about, so they would go
14   through their -- their sales presentation and
15   they would have materials that would guide them,
16   that were marketing pieces that they would use to
17   guide them.  And then they would talk about the
18   benefits the product might have for a particular
19   patient or the dosing of that particular product
20   and -- and the side effects that could potentially
21   happen with a product like that.
22   Q   Okay.  When a salesperson is going to --
23   to detail, they're also talking to the office
24   staff?

Page 88

1    A   That's correct.
2    Q   The nurses?
3    A   Yes.
4    Q   Physicians assistants?
5    A   Yes.
6    Q   They're expected to sort of get to know
7    the entire office, correct?
8    A   They had -- yeah, they built a
9    relationship with the office, yes.
10   Q   Okay.  What was the value of building a
11   relationship for a salesperson?
12       MR. MORRIS:  Objection.  Form.
13       THE WITNESS:  To enhance their
14   relationship in the overall office.
15   BY MS. SCULLION:
16   Q   And why was that important for a
17   salesperson?
18   A   It's a trusting relationship that
19   they -- they created and built.
20   Q   Okay.  And they're building that
21   trusting relationship with -- again, with the
22   staff of the -- of the office?
23   A   The entire office, yes.
24   Q   Including the -- the physicians.

Page 89

1    A   Yes.
2    Q   Okay.  Were they -- I think you
3    mentioned they're using marketing materials, so
4    those would include, for example, what, brochures?
5    A   Brochures.
6    Q   Dosing guides?
7    A   Yes.
8    Q   It could include reprints of articles --
9    of studies?
10   A   That were approved for use.
11   Q   Correct.  Okay.
12       I think also we talked about they can
13   include premiums like pens, lanyards, things that
14   just have the brand name on them, correct?
15       MR. MORRIS:  Objection to form.
16       THE WITNESS:  Yes, but those were phased
17   out based on pharma guidelines.
18   BY MS. SCULLION:
19   Q   Can you explain what you mean by that?
20   A   Pharma guidelines changed where you
21   couldn't use promotional -- we called it
22   tchotchkes in -- in the industry.  So they only
23   used promotional pieces with information about the
24   product.

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1     Q    Okay.  And the promotional pieces
2  would -- would include, for example, as we said,
3  sort of the dosing guides, correct?
4     A    Correct.
5     Q    Approved reprints?
6     A    Correct.
7     Q    Okay.  And you said that sales reps
8  would talk to the physicians, correct?
9     A    Correct.
10    Q    And they're trying to persuade the
11 physician about why this product may be
12 appropriate for certain patients, correct?
13        MR. MORRIS:  Objection to form.
14        THE WITNESS:  I don't know if I would
15 use the word "persuade."  I think they're -- they
16 built a trusting relationship, and they're
17 educating and providing resources as far as what
18 the product can and can't do.
19 BY MS. SCULLION:
20    Q    Okay.  Sometimes they would also have
21 lunch with the -- the office staff, correct?
22    A    That's correct.
23    Q    Would they have lunch with the
24 physician?

Page 91

1     A    Yes.
2     Q    Might be showing a promotional video on
3  a portable CD player, for example?
4     A    Correct.
5     Q    All right.  And on average, how much
6  time would a salesperson have with a physician to
7  be presenting information about a product?
8        MR. MORRIS:  Objection to form and
9  foundation.
10        THE WITNESS:  Just to clarify, for --
11 for a lunch are you speaking of?
12 BY MS. SCULLION:
13    Q    Actually, let me put aside -- putting
14 aside lunches, if they're just coming in and just
15 speaking --
16    A    Okay.
17    Q    -- on average, how much time are they
18 getting?
19    A    They're independent.  Could be 5
20 minutes, it could be 15 minutes.
21    Q    Okay.  But that -- that would -- in your
22 experience, that would be sort of the --
23    A    The window.
24    Q    -- the window.  Okay.

Page 92

1        It could be a lot less than 5 minutes
2  sometimes?
3     A    At times it could be less than
4  5 minutes.
5     Q    Okay.  As you said, sometimes they --
6  they would have lunch, and those presumably would
7  be a little bit longer?
8     A    Correct.
9     Q    Okay.  And were representatives,
10 salespeople also going out and visiting
11 pharmacies?
12    A    Throughout the course of my tenure at
13 Endo, there were times that we did call on
14 pharmacies and there were times when we did not.
15    Q    So you said "call on pharmacies."  When
16 did representatives calls on pharmacies?
17    A    From -- just to clarify, from like what
18 years did they call an pharmacies?
19    Q    Yes.
20    A    I don't recall specifics there.  I do
21 remember towards the end we didn't call on
22 pharmacies.
23    Q    Okay.  And when you say "call on
24 pharmacies," what do you mean by "call on

Page 93

1  pharmacies"?
2     A    Typically we would stop in and just say
3  that you're in this area, you're calling on
4  several physicians in this area, and what products
5  you're actually promoting to see if they had any
6  questions.
7     Q    Okay.  Would the representatives be
8  expected to also check in on whether their
9  products -- sorry, the products that they were
10 promoting with Endo were being stocked by the
11 pharmacies?
12    A    They could potentially ask that
13 question.
14    Q    Okay.
15    A    Most of the time they would know.
16    Q    Most of the time, I say --
17    A    They would know if they --
18    Q    -- they would already know?
19    A    Yeah.
20    Q    Okay.  They were expected to know that?
21        MR. MORRIS:  Objection to form.
22        THE WITNESS:  I don't -- I wouldn't say
23 they were expected to know that, but -- but they
24 did know it.

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

```
 1    BY MS. SCULLION:
 2        Q    They generally did know.
 3        A    Yeah.
 4        Q    Okay.  All right.
 5            MS. SCULLION:  Can we have E842, please.
 6            (Romaine Exhibit No. 6 was marked
 7            for identification.)
 8    BY MS. SCULLION:
 9        Q    I hand you what's been marked as
10    Exhibit No. 6, and it's Bates-stamped ENDO_OPIOID_
11    MDL-02489842.
12            And, Mr. Romaine, again, to make it a
13    little bit easier, especially with a document like
14    this, in the top corner we've put these "E"
15    numbers.  This says E0842.1 on the front page.
16        A    Okay.
17        Q    And if you see, the "E" numbers continue
18    in the upper right-hand corners of the PowerPoint
19    presentation.
20            Mr. Romaine, do you recognize Exhibit 6,
21    the PowerPoint attached?
22        A    I do not.
23        Q    Okay.  Do you see that this is -- on the
24
```

Page 95

```
16            MR. MORRIS:  Objection to form and
17    foundation.
18    BY MS. SCULLION:
19        Q    You can look through it.
20        A    I need to look it over, yeah.  (Peruses
21    document.)  I'm sorry.
22        Q    Have you had a chance to look through
23    the document?
24        A    Yes.
```



Highly Confidential - Subject to Further Confidentiality Review



Page 98

Page 99

Page 100

Page 101

```
 1        MS. SCULLION:  Well, let's get E1203 and
 2   the demonstrative that goes along with that.
 3        Let's mark the demonstrative first and
 4   then the other.
 5        (Romaine Exhibit Nos. 7 and 8 were
 6        marked for identification.)
 7   BY MS. SCULLION:
 8     Q   Mr. Romaine, I'm going to hand you
 9   what's marked as Exhibits 7 and 8.
10     A   Thank you.
11     Q   And Exhibit 7 is a demonstrative we put
12   together, which is a transcription of what is in
13   Exhibit 8, which is a voicemail recording produced
14   to us.
15        And, Mr. Romaine, what I was going to
16   suggest is if you read along -- along in Exhibit 7
17   while we play Exhibit 8.
18     A   Okay.
19        MS. SCULLION:  Can we play Exhibit 8.
20        (Exhibit No. 8 played:)
21
22
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 110

Page 112

```
 1    Q   Thank you.  I handed you the right one.
 2        So Exhibit 9, for folks on the phone, is
 3   ENDO-CHI_LIT-00473817, and we marked it E396, and
 4   Exhibit 10 is Bates-stamped ENDO-OPIOID_
 5   MDL-05654763, and we've marked it as E247.
 6
 7
 8
 9
10
11
12
13
14
15        MR. MORRIS:  Objection to form and
16   foundation.
17        THE WITNESS:  I'm just taking a moment
18   to --
19   BY MS. SCULLION:
20    Q   Yeah, please.
21    A   -- to review the document.
22        (Peruses document.)
23    Q   So, Mr. Romaine --
24    A   I'm sorry, I don't remember your
```

Page 111

Page 113

```
 1
 2
 3
 4
 5
 6        MS. SCULLION:  Can I have 1202?
 7        I'm sorry, you know what, actually you
 8   can hold it.  We can hold it.
 9   BY MS. SCULLION:
10    Q   So we looked at the sales skills
11   training, one example of sales skill training.
12   That was the ENDOSell, Engender Thinking
13   PowerPoint?
14    A   Yes.
15        MS. SCULLION:  Okay.  Can we look at 396
16   and 247.  Thank you.
17        (Romaine Exhibit Nos. 9 and 10
18        were marked for identification.)
19   BY MS. SCULLION:
20    Q   I hand you what's been marked as
21   Exhibits 3 -- oh, sorry -- 9 and 10.  And is it --
22   9 is -- is that -- is that what you have your hand
23   on, 9?
24    A   This is -- yes, this is 9.
```

```
 1   question.
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Page 114

Page 116

18  Q   Okay.  Mr. Romaine, in addition to
19  training -- and we've talked about some training
20  on sales skills, training on risks associated
21  with -- with prescription opioids -- sales
22  representatives were also provided with various
23  sales tools, correct?
24  A   Yes.

Page 115

Page 117

1   Q   Those could be, for example, master
2   visual aids.
3   A   Yes.
4   Q   Correct?
5   All right.  Sell sheets?
6   A   Yes.
7   Q   Slim jims?
8   A   Yes.
9   Q   Approved reprints, we talked about.
10  A   Yes.
11  Q   Right?
12  Dosing guides?
13  A   Yes.
14  Q   Conversion guides with respect to
15  opioids?
16  A   Yes.
17  Q   Okay.  And we talked about videos,
18  correct?
19  A   Mm-hmm.  Yes.

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 122

Page 124

1    A   Thank you.
2    Q   And it is Bates-stamped ENDO_OPIOID_
3    MDL-02167 -- I'm sorry, 6273, and there's a number
4    cut off.
5        MS. SCULLION:  Do you have the last
6    digit?
7        MR. MORRIS:  It's 1.
8        MS. SCULLION:  Thank you.
9    BY MS. SCULLION:
10   Q   So 2162731.
11       All right.  And in the top right-hand
12   corner, again we have the E numbers.  This is
13   E1249.  It starts at 1249.1.
14       So, Mr. Romaine, at the top of the first

Page 123

Page 125

1    A   Yes.
2    Q   All right.  And just -- we'll talk in
3    some more specifics, but just to orient you to the

12   A   It's hard to find.
13   Q   -- rest of this document you'll see this
14   looks like it's a presentation --
15   A   I'm trying to find the number here.
16       MR. MORRIS:  Hold on, Counsel, because
17   the numbers are harder to see.
18   BY MS. SCULLION:
19   Q   You know what, so it's the first page of
20   the PowerPoint --
21   A   This one here.  Okay.

17       MS. SCULLION:  So let's mark the --
18   1249, please.
19       And this is 11, right?  Thank you.
20       (Romaine Exhibit No. 11 was marked
21       for identification.)
22   BY MS. SCULLION:
23   Q   Mr. Romaine, I'm going to hand you
24   what's been marked as Exhibit No. 11.

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 130

Page 132

1    "objection to form," but keep your objections to
2    the appropriate level, but you cannot cross into
3    coaching, or we will go to the special master.
4       BY MS. SCULLION:

Page 131

21    He's already said he didn't remember the
22    information on this.
23         MS. SCULLION:  Here -- Counsel, you have
24    now crossed the line to coaching.  You can say

Page 133

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 158

3   MR. MORRIS:  Counsel, we've been going
4   for close to an hour and a half, so at some point,
5   if we could --
6   MS. SCULLION:  Yeah, we can take a quick
7   break.  Sure.
8   THE VIDEOGRAPHER:  The time is 11:46
9   a m., and we're going off the record.
10   (Recess.)
11   THE VIDEOGRAPHER:  The time is
12   12:04 p m., and we're back on the record.
13   BY MS. SCULLION:
14   Q   Mr. Romaine, welcome back.
15   A   Thank you.
16   Q   A reminder, you're still under oath.
17   A   Yes.
18   Q   Looking -- staying on Exhibit 11, if you
19   go all the way towards almost the end of the
20   document to slide 55.  Okay.  And to make sure
21   we're on the same page, at the top it says
22   "Challenging aspects of job," correct?
23   A   Yes.
24   Q   All right.  And do you see the second

Page 159

1   quoted paragraph, it says:  "Territory size with
2   two reps.  I don't know if we will be able to
3   generate the numbers.  The goals are very, very
4   aggressive.  I wonder if it's even attainable.
5   This year from market share to goal, I did well at
6   the beginning of the year, but the second half I
7   did not even get one-third of my goal.  In some
8   regard it is punitive for doing well at the
9   beginning."
10   And again, it's quoting a specialty rep.
11   Do you recall -- putting aside the
12   document, do you recall in 2007 sales reps being
13   concerned about sales goals being aggressive?
14   A   I don't recall that.
15   Q   Okay.  Did you ever think that the sales
16   goals were too aggressive?
17   A   No.

Page 160

Page 161

Highly Confidential - Subject to Further Confidentiality Review



Page 162

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 163

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18    BY MS. SCULLION:
19      Q    Okay.  Now, coming back to Exhibit 11.
20      A    Okay.
21
22
23
24
```

Page 164

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 165

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 166

Page 167

Q   Okay.  Let's put Exhibit 11 aside.
Okay.  Mr. Romaine, we talked about this
a little bit already in terms of salespeople in
the field getting to know obviously the physicians
on whom they're calling, they're trying to get to
know those physicians, correct?
A   Correct.
Q   And they're trying to get to know people

Page 168

in the office, right?
A   Yes.
Q   Okay.  And -- they also were going
to pharmacies in their territories and trying to
understand, for example, the stocking at the
pharmacy, correct?
A   Yeah, just to clarify, there was a
period of time when they did that, and then
they -- we stopped calling on pharmacies.
Q   Thank you.  I -- I -- you did say that
before.
But there was a period of time when that
was part of their responsibility as well.
A   Yes.

Page 169

43  (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review



Page 170

```
 1
 2
 3
 4
 5
 6
 7
 8
 9        Q    Okay.  We discussed a little bit earlier
10   the district managers working with the salespeople
11   within their district.
12        A    Yes.
13        Q    And -- and that they were working with
14   them on sort of a day-to-day basis?
15        A    Yes.
16
17
18
19
20
21
22
23
24
```

Page 171

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12        Q    Okay.
13        MS. SCULLION:  Do we have 1184?
14        (A discussion was held off the record.)
15        (Romaine Exhibit No. 12 was marked
16        for identification.)
17        MS. SCULLION:  Thank you.
18   BY MS. SCULLION:
19        Q    I hand you what's marked as
20   Exhibit No. 12.
21        A    Thank you.
22        Q    And this is Bates stamped ENDO_OPIOID_
23   MDL-02147122, and we've marked it E1184 in the top
24   right-hand corner.
```

Page 172

```
 1        A    Mm-hmm.
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 173

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

44 (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 187

12    A    Correct.
13         MS. SCULLION:  Can I have 1183?
14         (Romaine Exhibit No. 13 was marked
15         for identification.)
16  BY MS. SCULLION:
17    Q    I'm going to hand you what's been marked
18  as Exhibit No. 13.
19    A    Thank you.
20    Q    And this is Bates-stamped ENDO_OPIOID_
21  MDL-00881701, and we've numbered it E1183.1 at the
22  top.
23         This is 13; is that right?  Yeah.
24         And, Mr. Romaine, looking at the first

Highly Confidential - Subject to Further Confidentiality Review



Page 190

Page 191

Page 192

Page 193

24   Q   Just to go back a bit, when you joined

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1   Endo in 2003, Ms. Ammon was still with the
2   company, correct?
3       A   She was the CEO at the time, yes.
4       Q   Did you ever have a chance to meet her?
5       A   I did.
6       Q   Okay.  Did you find her to be a -- a
7   thoughtful person?
8       A   Yes.
9       Q   Good business person?
10      A   Yes.
11      Q   Honest?
12      A   Yes.
13      Q   Proud of how Endo built its business?
14      A   Yeah.  I didn't know her very well.  I
15  only met her once at a Christmas party.
16      Q   Okay.
17      A   But -- but she seemed --
18      Q   That was the impression.
19      A   -- like a very nice person.
20      Q   Okay.  But that was the impression, that
21  she was a -- I mean, putting aside being at a
22  Christmas party, did she have a reputation for
23  being a good business leader?
24      A   A lot of integrity.

Page 195

1           MR. MORRIS:  Objection to form.
2   BY MS. SCULLION:
3       Q   Okay.  A lot of integrity.
4           THE REPORTER:  Excuse me.
5           MR. MORRIS:  Yeah, sorry.
6           THE REPORTER:  I can't get --
7           MR. MORRIS:  Same rule of talking over,
8   I've got to get my words in too.
9           THE WITNESS:  My fault.
10          MS. SCULLION:  I was also speaking over.
11  BY MS. SCULLION:
12      Q   And so if Ms. Ammon had said that the
13  use of thought leaders to help move the medical
14  community around the treatment of chronic pain was
15  an important part of Endo's success, would you
16  believe that was probably a pretty accurate
17  statement?
18          MR. MORRIS:  Objection.  Form and
19  foundation.
20          THE WITNESS:  I -- I don't know.  I --
21  I've never heard her make that statement, so I --
22  I don't know.  I can't imagine she would get to
23  that level in the business.
24  BY MS. SCULLION:

Page 196

1       Q   But if -- but if she did make that kind
2   of statement, you would expect that she would know
3   what she was talking about, right?
4       A   Yes.



Page 197

Highly Confidential - Subject to Further Confidentiality Review



Page 198

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 200

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 199

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 201

```
 1
 2
 3
 4
 5
 6   BY MS. SCULLION:
 7       Q   We're going to pull that MVA just so you
 8   can --
 9       A   Okay.
10       Q   -- you can take a look at it.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



Page 202

Page 203

19    MR. MORRIS: Objection. Foundation.
20    (Romaine Exhibit No. 14 was marked
21        for identification.)
22  BY MS. SCULLION:
23    Q    Okay.  Let me -- let me hand you what's
24  been marked as Exhibit 14.

Page 204

1    A   Thank you.
2         MS. SCULLION:  And I apologize, I don't
3  have another one.
4         THE WITNESS:  Oh, are we done with this
5  one for now?
6  BY MS. SCULLION:
7    Q   We might come back to it, so just hold
8  on to it.
9    A   Okay.
10    Q   So I've handed you exhibit -- I'm sorry,
11  this is 14, right?
12    A   Yes.
13    Q   Okay.  Exhibit 14, which is Bates-
14  stamped ENDO_OPIOID_MDL-01655584, and we've
15  numbered at the top E1023.

Page 205

Highly Confidential - Subject to Further Confidentiality Review

| Page 206 | Page 208 |
|---|---|

**Page 206**

1   Q   Okay.
2        MS. SCULLION:  Do we have the others?
3        I'm just going to let you see the others
4   as well.
5        THE WITNESS:  Okay.
6        (Romaine Exhibit Nos. 15 and 16
7        were marked for identification.)
8   BY MS. SCULLION:
9     Q   I'm handing you what's marked as
10  Exhibit 15.  And Exhibit 16.  If you give me a
11  moment, I'll read the numbers into the record.
12       So Exhibit 17 -- I apologize for
13  starting that out of order -- Exhibit 17 is
14  ENDO_CHI_LIT -- I apologize.  I got it wrong?  So
15  16.
16       MR. MORRIS:  Yeah, we only got up to 16,
17  I think.
18       THE WITNESS:  Yeah.
19       MS. SCULLION:  Yeah, no, I thought I
20  definitely got it.
21       MR. MORRIS:  Okay.
22       MS. SCULLION:  So thank you.
23  BY MS. SCULLION:
24     Q   Exhibit 16 is ENDO_CHI_LIT-00032928, and

**Page 207**

1   it's marked E786.
2        And Exhibit 15 is Bates-stamped a couple
3   different numbers.  ENDO-0000105.  It also has a
4   number E0049029.  And those are in the lower
5   right-hand corner.
6     A   Oh, okay.  I'm sorry.
7     Q   There's a lot of numbers.
8     A   Yeah.
9     Q   There's a lot of numbers.  We're just
10  doing that for the record --
11    A   Okay.
12    Q   -- so later on someone can find it --
13    A   Yeah.
14    Q   -- and people on the phone can find it.
15    A   Okay.
16       MR. MORRIS:  You won't be tested on the
17  numbers later.
18  BY MS. SCULLION:
19
20
21
22
23
24



**Page 209**

21       And let's -- hold on one second.  I got
22  off track here.  Right.
23       So back in Exhibit 13, field
24  intelligence report.

Highly Confidential - Subject to Further Confidentiality Review



Page 210

1    A   Okay.

Page 212

1        (Lunch recess.)
2        THE VIDEOGRAPHER:  The time is
3    1:55 p.m., and we're back on the record.
4    BY MS. SCULLION:
5        Q   Welcome back, Mr. Romaine.
6        A   Thank you.
7        Q   We're still under -- you're still under
8    oath.
9        A   Yes.
10       Q   Okay.
11       (Romaine Exhibit No. 17 was marked

Page 211

19       MS. SCULLION:  I was going to suggest
20   that we take a break here for lunch is a good
21   place.  Is that good?  All right.
22       MR. MORRIS:  That sounds good.
23       THE VIDEOGRAPHER:  The time is 12:57
24   p m.  We're going off the record.

Page 213

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 214

19    A  I don't recall that.
20    Q  Do you recall it either way?
21    A  No.
22    Q  You don't recall.
23    A  No, neither way.
24

Page 215

4         MR. MORRIS:  Objection to form.
5         THE WITNESS:  I -- I just -- I don't
6    know if I have an opinion on that one way or the
7    other.
8    BY MS. SCULLION:

Page 216

Page 217

17         (Romaine Exhibit Nos. 18 and 19
18         were marked for identification.)
19    BY MS. SCULLION:
20    Q    Let me hand you what's been marked as
21    Exhibit 18 and 19.
22         For the record, Exhibit 18 is Bates-
23    stamped ENDO_OPIOID_MDL-0068400 -- is there
24    another -- I have it cut off.  I apologize.

Highly Confidential - Subject to Further Confidentiality Review



Page 218

1    MR. MORRIS:  Ours is cut off too.  Let's
2  see --
3         MS. SCULLION:  We'll try to -- we'll try
4  to get the number for the record.  We can look
5  that up.
6  BY MS. SCULLION:
7     Q   We have marked it as E966, and it is
8  Exhibit 18.
9         And Exhibit 19, similarly, the Bates
10  number is cut off.  We will get it.  We have
11  marked it as E879.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 220

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 219

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 221

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

56 (Pages 218 to 221)

Highly Confidential - Subject to Further Confidentiality Review



Page 222

Page 224

Page 223

Page 225

```
21          MS. SCULLION: Can I have E502 and
22   E1180, please.
23          (Romaine Exhibit No. 20 was marked
24          for identification.)
```

57 (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review

Page 226

```
 1        MS. SCULLION:  I need an extra copy too.
 2   Mine is --
 3        (Counsel conferring.)
 4   BY MS. SCULLION:
 5        Q   Let me hand you what's been marked as
 6   Exhibit 20.
 7        A   Thank you.
 8        Q   And it's Bates-stamped ENDO_OPIOID_
 9   MDL-04908831.  And again, we've marked it in the
10   upper right-hand corner E502.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



Page 228

Page 227

Page 229

Highly Confidential - Subject to Further Confidentiality Review



Page 230

Page 232

Page 231

Page 233

```
1     A   Right.
2     Q   Okay.  All right.
3         MS. SCULLION:  Can I have E1214?
4         (Romaine Exhibit No. 21 was marked
5         for identification.)
6   BY MS. SCULLION:
7     Q   I'll hand you what's marked as
8   Exhibit 21.
9     A   Thank you.
10    Q   And it's Bates-stamped ENDO_OPIOID_
11  MDL-04929187.  And at the top right-hand corner
12  we've marked it as E1214.1.  Do you see that?
13    A   Yes.
14    Q   Would you prefer -- I can give you like
15  the color copy.  Let me switch those out.
16    A   Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review



Page 234

Page 236

Page 235

3       (Counsel conferring.)
4       (Romaine Exhibit No. 22 was marked
5       for identification.)
6    BY MS. SCULLION:
7       Q   Let me hand you what's been marked as
8    Exhibit 22.  And this is Bates-stamped
9    ENDO_OPIOID_MDL-04911467, and we've stamped it as
10   E1180 in the top right-hand corner

Page 237

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 242

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 244

```
1
2
3
4
5
6
7
8
9
10
11
12      Q    Thank you.  That is helpful for me to
13   orient.
14          MS. SCULLION:  And then can I have
15   E1172.
16          (Romaine Exhibit No. 23 was marked
17          for identification.)
18   BY MS. SCULLION:
19      Q    I hand you what's marked as Exhibit 23,
20   which is Bates-stamped ENDO_OPIOID_MDL-05589327,
21   and we've marked it E1172.  And it's entitled
22
23
24
```

Page 243

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 245

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19      Q    Okay.
20          MS. SCULLION:  Can I have 1218, and then
21   also pull out 142, please.
22          (Romaine Exhibit No. 24 was marked
23          for identification.)
24   BY MS. SCULLION:
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1        Q   I'm going to hand you what's been marked
2    as Exhibit 24.  And this is Bates-stamped ENDO_
3    DATA_OPIOID_MDL- -- we're going to get the Bates
4    number.  I apologize, I didn't realize these were
5    cut off.
6        MR. MORRIS:  Sometimes if it comes on
7    the screen, you can see it, so if you want to pop
8    that there.
9        MS. SCULLION:  Yeah, E1218.
10       MR. MORRIS:  Yeah.
11       MS. SCULLION:  Thank you.
12       MR. MORRIS:  So the first -- oh, what's
13   happening, I think, is there's a cover page that
14   isn't on here maybe.
15       MS. SCULLION:  No, it's a different --
16   that's a different document.  The history is
17   different.  1218 --
18       MR. MORRIS:  Oh, yeah, this one --
19       MS. SCULLION:  It's a data- -- it's a
20   datasheet.  I apologize, we will get the Bates
21   numbers.
22       Sabrina, can you keep track of which
23   ones we have to read into the record later?  Thank
24   you.

Page 247

1    BY MS. SCULLION:
2        Q   So Exhibit 24.
3        A   No, there's no cover sheet with this
4    one.
5        MR. MORRIS:  No, no, there's
6    different --
7    BY MS. SCULLION:
8        Q   There is not.
9        MR. MORRIS:  A different document.
10   BY MS. SCULLION:
11       Q   This is -- I'll represent to you this is
12   a printout of a datasheet that was produced to us
13   in this litigation --
14       A   Okay.
15       Q   -- by Endo.
16
17
18
19
20
21
22
23
24

Page 248

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22       MR. MORRIS:  Form.
23       MS. SCULLION:  Okay.  I'm not sure, and
24   I'm certainly not going to testify today, only

Page 249

1    because that would be problematic.
2        MR. MORRIS:  You could try that for a
3    while.
4        MS. SCULLION:  No, it's not good.
5    BY MS. SCULLION:
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21       Q   I -- I doubt that it was.  Again,
22   this -- this form was produced to us specifically
23   in this litigation, but it comes from a -- a
24   database of some sort, I understand.



63 (Pages 246 to 249)

Highly Confidential - Subject to Further Confidentiality Review

Page 250

```
1        A   Okay.
2        MS. SCULLION:  See, I testified.
3        May I have E142.  Thank you.
4        (Romaine Exhibit No. 25 was marked
5        for identification.)
6    BY MS. SCULLION:
7        Q   Now, I'm going to hand you what's been
8    marked as Exhibit 25.  And the Bates number is
9    ENDO_CHI_LIT-00543478, and we've marked it E142 in
10   the top right corner of the --
11       A   Yes.
12       Q   -- PowerPoint pages.
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 252

Page 251

Page 253



Highly Confidential - Subject to Further Confidentiality Review



Page 254

12    Q   Let's now go back and talk about Opana.
13    A   Okay.
14        MS. SCULLION:  We can take this exhibit
15   down.  Thank you.
16   BY MS. SCULLION:
17    Q   So I think we established earlier -- and
18   again, it may help to look at this demonstrative,
19   Exhibit 4.  We've been through a lot of dates at
20   this point.
21        Do you recall that Endo launched
22   Opana ER as well as Opana IR in June of 2006,
23   correct?
24    A   Correct.

Page 255

1     Q   Do you recall if that was later than
2    Endo had hoped -- had hoped to actually launch it
3    earlier?
4     A   I don't recall that.
5     Q   Okay.  Would it surprise you to know if
6    that was the case?
7         MR. MORRIS:  Objection to form.
8         THE WITNESS:  I don't even know if it
9    would surprise me.  I just don't -- I don't
10   remember if it was due to be launched before that
11   or not.
12   BY MS. SCULLION:
13    Q   Okay.  And it's correct, isn't it, that
14   Endo launched Opana ER just using the -- the
15   package insert, right?
16    A   I don't recall that either.  That
17   was in -- 12 years ago.  I don't recall what
18   materials we had at the time.
19        (Romaine Exhibit No. 25 was marked
20         for identification.)
21   BY MS. SCULLION:
22    Q   Let me hand you what's been marked as
23   Exhibit 25.  And it's Bates-stamped ENDO_OPIOID_
24   MDL-00879677, and at the top we've marked it E964.

Page 256

Page 257

Highly Confidential - Subject to Further Confidentiality Review



Page 258

Page 260

```
 1    MR. MORRIS:  Ah.  I see.  Got it.
 2    MS. SCULLION:  I apologize.
 3    MR. MORRIS:  I wrote it down wrong.
 4    MS. SCULLION:  Someone was paying
 5  attention.
 6    MR. MORRIS:  Excellent.  Thank you.
 7    MS. SCULLION:  So is it E964 is 26?
 8  Thank you.  I apologize for that.
 9  BY MS. SCULLION:
10    Q   All right.  So Exhibit 27 we have in
11  front of you.
12    A   Yes.
```

Page 259

```
 2            SCULLION:  Can I have E1219?
 3            (Romaine Exhibit Nos. 26 and 27
 4            were marked for identification.)
 5  BY MS. SCULLION:
 6    Q   I'll hand you what's been marked as
 7  Exhibit 27.
 8    A   Thank you.
 9    MS. SCULLION:  Thank you.  Somehow I got
10  the wrong number.
11  BY MS. SCULLION:
12    Q   And It's Bates-stamped ENDO_OPIOID_
13  MDL-04920194, and we've marked it E1219.1.
14    MR. MORRIS:  Before -- excuse me, I am
15  confused.  Do we have a 26?
16    MS. SCULLION:  Let's stop and make sure
17  then.
18    MR. MORRIS:  I'm not trying to interrupt
19  unnecessarily.
20    MS. SCULLION:  That's okay.
21    THE WITNESS:  This -- this is 26, I
22  think.
23    MR. LOMAX:  On the record, I think she
24  said 25 --
```

Page 261

Highly Confidential - Subject to Further Confidentiality Review



Page 262

14          MS. SCULLION:  So let's have E1200.
15          (Romaine Exhibit No. 28 was marked
16          for identification.)
17          MS. SCULLION:  Thank you.
18  BY MS. SCULLION:
19      Q    This is Exhibit 28.  It's Bates-stamped
20  ENDO_OPIOID_MDL-00880262, and we've labeled it
21  E1200.

Page 264

Page 263

Page 265

18          MS. SCULLION:  And then E1202.
19          And then I need the exhibit number we
20  used for the MVA.
21          (Counsel conferring.)
22          (Romaine Exhibit No. 29 was marked
23          for identification.)
24  BY MS. SCULLION:

Highly Confidential - Subject to Further Confidentiality Review

| Page 266 | Page 268 |
|---|---|

Page 266

1  Q  I'm going to hand you what's been marked
2  Exhibit 29.  And Exhibit 29 is Bates-stamped
3  ENDO_OPIOID_MDL-02309518, and we've stamped it --
4  oops, I got two documents together.  This is not
5  correct.
6      MS. SCULLION:  May I have that back.  I
7  apologize.
8      MR. MORRIS:  I think the one you gave me
9  actually doesn't have the --
10     MS. SCULLION:  We -- we need to take a
11 look at this document.  There's like three
12 different versions going on there.  So...
13     MR. MORRIS:  We've been going for about
14 an hour.  Do you want to just take a quick break?
15 You can do that while you're doing that or --
16     MS. SCULLION:  Yeah, we can do that, but
17 this just needs to be a quick break, we'll fix
18 that.  That's good.
19     THE VIDEOGRAPHER:  The time is 2:54 p.m.
20 We're going off the record.
21     (Recess.)
22     THE VIDEOGRAPHER:  The time is 3:04
23 p.m., and we're back on the record.
24     (Romaine Exhibit No. 29 was marked

Page 267

1      for identification.)
2  BY MS. SCULLION:
3      Q  Mr. Romaine, I'm going to hand you
4  what's been marked as Exhibit 29.  And this is
5  Bates-stamped ENDO_OPIOID_MDL-00858402.  And at
6  the bottom you will see an e-mail from David Kerr
7  to yourself, Mr. Wickline, and others.  Subject
8  matter, "Forward:  Opana Weekly, November 17th."
9      Do you see that?
10     A  Yes.
11     Q  And at the time David Kerr, as you say,
12 was senior vice president, commercial business,
13 correct?
14     A  Yes.
15     Q  He was at that point Mr. Wickline's
16 boss.
17     A  Correct.
18
19
20
21
22
23
24



Highly Confidential - Subject to Further Confidentiality Review



Page 270

9 BY MS. SCULLION:
10    Q   Okay.  In response to Mr. Kerr,
11 Mr. Wickline does provide some -- some ideas, and
12 one of the things he says is, in the second
13 paragraph:  "This week we are kicking off a
14 five-week context -- contest for growth in each
15 district between now and December 29th."
16       So that's an indication there's going to
17 be a contest to try to grow Opana ER sales?
18    A   I just want to read the entire e-mail.
19    Q   Sure.
20    A   (Peruses document.)  Okay.
21    Q   So there's an indication that there's
22 going to be a contest to try and grow Opana ER
23 sales, correct?
24    A   Correct.

Page 271

1    Q   All right.  And he's also indicating
2 that reps are being asked to concentrate on the
3 top five customers in their territory, which he
4 calls the Fab Five, right?
5    A   I'm not sure what the Fab Five refers
6 to, but --
7    Q   Well, if you go up to the first
8 paragraph --
9    A   Okay.
10    Q   -- the second sentence he says:  "Since
11 the completion of the meetings, we've provided
12 direction to concentrate on the top five customers
13 in each territory (Fab Five)."
14    A   Yes.  Okay, got you.
15    Q   And that's -- so he's saying go see
16 those top five customers in each territory and to
17 target them twice per week.
18    A   Correct.
19    Q   All right.  Okay.  So there's some
20 activity happening to try to increase Opana ER
21 sales, right?
22       MR. MORRIS:  Objection to form.
23       THE WITNESS:  Oh, I'm sorry.  Based on
24 his e-mail, that's what he's saying.

Page 272

1 BY MS. SCULLION:
2    Q   Okay.  So there's --
3       MS. SCULLION:  And then can we have the
4 CMR demonstrative.
5 BY MS. SCULLION:
6    Q   Do you recall that sales did begin to
7 build for Opana ER 2007, 2008, 2009?  They did
8 build over time, right?
9    A   Sales did grow over that period of time.
10    Q   Okay.
11    A   Again, in context, compared to other
12 opioids, it was much smaller.
13    Q   I understand.  I'm just talking about
14 the growth for Opana ER.
15       (Romaine Exhibit No. 30 was marked
16       for identification.)
17 BY MS. SCULLION:
18    Q   Let me hand you what's been marked as
19 Exhibit 30.
20       MS. SCULLION:  And, Counsel, let me
21 explain what we've done here.  Exhibit 30 in front
22 of the witness has a summary sheet of the CMR data
23 that was produced to us.  The Bates numbers at the
24 top here, ENDO_DATA_OPIOID_MDL-8 through 19, which

Page 273

1 are each individual CMR summary sheets, behind the
2 witness's exhibit is a copy of each of those CMR
3 summary sheets.  So the exhibit for the deposition
4 will be the complete set of those CMRs as well as
5 the summary.  So we're just going to proceed from
6 there.
7       MR. MORRIS:  Okay.  I'll object to the
8 use of this demonstrative, particularly on
9 foundation and form.
10       MS. SCULLION:  Okay.
11 BY MS. SCULLION:
12    Q   So, Mr. Wickline, we summarized some of
13 the data.
14    A   Romaine.  Romaine.
15    Q   I'm so sorry.
16    A   That's okay.
17    Q   I'm so sorry.  That's terrible.
18    A   He's older than I am, so...
19    Q   Mr. Romaine, we've summarized for you
20 the data provided to us in this litigation with
21 respect to Opana and Opana ER net sales.  The
22 information is in the sheets that are attached to
23 your Exhibit 30 --
24    A   Okay.

69 (Pages 270 to 273)

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    Q   -- if you wanted to look at them, but I
2  just really wanted to -- to look at the growth
3  over time.
4    A   Okay.
5    Q   So it starts -- let's look at Opana ER's
6  net sales.  It starts at about 23 million.  That's
7  starting midyear or so.
8    A   Correct.
9    Q   So it's a half year.
10      MR. MORRIS:  Objection.  Form and
11  foundation.
12  BY MS. SCULLION:
13    Q   And in 2007, we see net sales of 66 --
14  about 66 million, and then it more than doubles to
15  2008 to about 142 million, right?
16      MR. MORRIS:  Objection.  Form and
17  foundation.
18      THE WITNESS:  Yeah, the report says
19  142 million.
20  BY MS. SCULLION:
21    Q   Okay.  And then again, 2009 further
22  increased to 172.  And in 2010 were increasing up
23  to 239 million.  And by 2011, it's at 384,300 --
24  340,359.  Do you see that?

Page 275

1    A   I see that number.
2    Q   And that's just for --
3      MR. MORRIS:  Objection.  Form and
4  foundation.
5  BY MS. SCULLION:
6    Q   And that's just for Opana ER.
7      So as you said, although Opana sounds
8  like it didn't meet -- make the market share that
9  Endo had hoped, it did have some pretty nice
10  growth over time --
11      MR. MORRIS:  Objection --
12  BY MS. SCULLION:
13    Q   -- correct?
14      MR. MORRIS:  Objection.  Form and
15  foundation.
16      THE WITNESS:  It had growth over time.
17  BY MS. SCULLION:
18    Q   Okay.  I mean, we saw again almost
19  double sales -- more than double sales, rather,
20  from 2007 to 2008, there is a 40 percent increase
21  from 2009 to 2010, another 60 percent increase
22  from 2010 to 2011.  Those are some increases to be
23  proud of, correct?
24    A   Well --

Page 276

1      MR. MORRIS:  Objection.  Form and
2  foundation.
3      THE WITNESS:  -- I guess to put it in
4  context with the other promoted opioids, it was
5  much smaller.
6  BY MS. SCULLION:
7    Q   I understand it was much smaller, but
8  that was -- that was growth that was generated
9  through the efforts -- the promotional efforts by
10  Endo, correct?
11      MR. MORRIS:  Objection.  Form.
12      THE WITNESS:  Correct.
13      MS. SCULLION:  All right.  Can we have
14  1187?
15      (Romaine Exhibit No. 31 was marked
16      for identification.)
17  BY MS. SCULLION:
18    Q   I'm handing you what's been marked as
19  Exhibit 31.
20    A   Thank you.
21    Q   And Exhibit 31 is Bates-stamped
22  END0097420, and we've marked it E1187.  And this
23  is an e-mail chain.  It starts with an e-mail from
24  Greg -- Pyszczymuka?

Page 277

1    A   Pyszczymuka.
2    Q   -- Pyszczymuka, dated November 3rd,
3  2011.  Subject matter, "Play to Win Weekly
4  Update."
5      Do you recall the Play to Win initiative
6  in 2011?
7    A   I don't.
8      MR. MORRIS:  Objection.  Form and
9  foundation.
10  BY MS. SCULLION:
11    Q   Okay.  If you go down to -- in
12  Mr. Pyszczymuka's e-mail at the bottom of the
13  page, he notes:  "Opana ER" -- the very bottom --
14  "Opana ER weekly TRx highs achieved post-Nucynta
15  ER launch."
16      Do you see that?
17    A   Yes.
18    Q   And he says for September 30th, the
19  sales were -- the TRx's were at an all-time high,
20  right?
21    A   Yes.
22    Q   And again, in the week of October 7th,
23  Opana ER weekly TRx's were at an all-time high,
24  right?

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    A   Yes.
2          MR. MORRIS:  Objection.  Form and
3    foundation.
4    BY MS. SCULLION:
5    Q   We talked earlier about what a sales rep
6    does on a -- on a daily basis, right?  So -- and
7    as you said, they're going out average five days a
8    week, they're visiting, trying to -- trying to see
9    six prescribers.
10         I assume that they work roughly 48 weeks
11   a year?
12   A   Mm-hmm.
13   Q   Yes?
14   A   Yes.
15   Q   Okay.  And by 2011, Endo's been
16   promoting Opana ER for a full five years, 2007 to
17   2011, right?
18   A   Correct.
19   Q   So that's going to be well in excess of
20   200 actual -- 200,000 actual details being
21   delivered during that time period, correct?
22         MR. MORRIS:  Objection.  Form and
23   foundation.
24         THE WITNESS:  Well, I would have to do

Page 279

1    the math, but --
2    BY MS. SCULLION:
3    Q   It's --
4    A   -- I'm assuming you're correct.
5    Q   It's a substantial number of details
6    over that time period.
7          And during that period, 2007 to 2011,
8    was Opana ER -- strike that.
9          So those are the details.  You also had
10   the lunches, the speaker series, the approved
11   reprints, these were all the promotional efforts
12   that were going on at this time?
13   A   That were used by the sales force.
14   Q   Okay.  And 2007 to 2011, most of that
15   period you were VP of sales, right?
16   A   Yes.
17   Q   Okay.  And it was -- it was your job to
18   make those -- make sure that the sales efforts
19   were as successful as they could be, correct?
20   A   Well, it was to make sure that they were
21   educated, trained effectively, and could
22   communicate the promotional message effectively,
23   yes.
24   Q   Okay.  But they -- but they were

Page 280

1    executing their sales as effectively as they
2    could?
3    A   Executing the company strategy, yes.
4    Q   Okay.  And the company strategy,
5    execution was with respect to sales within your
6    department.  That was -- you were responsible for
7    the execution of the sales, correct?
8    A   By using the approved promotional
9    pieces.
10   Q   But through sales.  It's the sales
11   department --
12   A   Yes.
13   Q   -- that's doing that?
14   A   Yes.
15   Q   Okay.  And if we look at E1243.
16         (Romaine Exhibit No. 32 was marked
17         for identification.)
18   BY MS. SCULLION:
19   Q   Do you recall that Mr. Lortie in fact
20   commended you for your leadership in helping
21   achieve those sales levels?
22         Sorry, I apologize.  I will hand you --
23   do you recall Mr. Lortie commending you for your
24   leadership?

Page 281

1    A   Brian Lortie was my -- my supervisor, so
2    we had many meetings on my performance.
3    Q   Okay.  Let me hand you what's been
4    marked as Exhibit No. 32.  And it's marked
5    ENDO_OPIOID_MDL-02312040.
6          Do you recognize Exhibit 32 as a copy of
7    your 2009 performance coaching and development
8    report?
9    A   I don't -- don't recognize it as a copy,
10   but it looks like it is.
11   Q   Okay.
12   A   It's been a long time since I saw one of
13   these.
14   Q   Okay.  If you go to the second page of
15   the exhibit, E1243.2.
16   A   .2.  Okay.
17   Q   Just to orient you again, it lists your
18   name as the employee, correct?
19   A   Correct.
20   Q   And it lists your manager as Brian
21   Lortie, right?
22   A   That's correct.
23   Q   And it says this is -- goals and
24   development plan were finalized on March 31st,

71  (Pages 278 to 281)

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  '09, and the discussion was had on February 16th,
2  2010, correct?
3      A   Correct.
4      Q   So this is really reviewing your
5  performance with respect to that goal and
6  development plan from March 2009, right?
7      A   Correct.
8      Q   All right.  And if you go to the next
9  page, E1243.3, in the bottom half of the page
10  under the box on the left side that says
11  "Year-end."  Do you see that?
12      A   Yes.
13      Q   It starts with the revenue number and
14  ERS guidance?
15      A   Oh, yes, I'm sorry.  Mm-hmm.
16      Q   We're in the same place?  Good.
17      A   Yes.
18      Q   And at the bottom it says, Opana
19  franchise year-to-date, October, 566,749
20  prescriptions, 123.7 percent to plan.
21          So that's above plan for prescriptions,
22  right?
23      A   Correct.
24      Q   And 200 -- 230.8 million.  Do you see

Page 283

1  that?
2      A   Yes.
3      Q   Okay.  And then on the -- just in the
4  box next to that indicates this is Mr. Lortie's
5  comments on that performance.
6          He says: "Larry's strong leadership of
7  the pain solutions sales team through a
8  challenging year has contributed in a very
9  significant way to the success of the enterprise."
10          Would you agree that you did contribute
11  to the success of the enterprise in that year?
12      A   Yes.
13      Q   In a very significant way?
14      A   In --
15      MR. MORRIS:  Objection.
16      THE WITNESS:  -- what was asked of me.
17      MR. MORRIS:  Foundation.
18  BY MS. SCULLION:
19      Q   Okay.  And the success of the enterprise
20  year is being measured by the sales of the
21  products within the pain solutions team, correct?
22      A   Well, I think he was measuring me not
23  only through the results but also through my
24  leadership --

Page 284

1      Q   Okay.
2      A   -- and behaviors.
3      Q   Well, he goes on to say, he does comment
4  on your -- "Several points during the year, the
5  achievement of the forecast is uncertain," he
6  says, sorry, "and during these times of
7  uncertainty," he comments on your clarity of
8  thinking, focus and positive attitude, right?
9      A   Yes.
10      Q   And then he says:  "He also demanded
11  these things from his leadership team, and that
12  this contributed to a focused, energized sales
13  team, which ultimately delivered an above-budget
14  result."  Right?
15      A   Yes.
16      Q   So again, so he's commending you for
17  achieving -- delivering, rather, an above-budget
18  result that year, right?
19      A   I think he's commending me for the
20  skills that I used which allowed us to achieve
21  above-plan budget performance.
22      Q   Right.  And part of the above-budget
23  performance was with respect to the Opana
24  franchise, the 123 --

Page 285

1      A   And all the other business as well.
2      THE REPORTER:  Wait, wait, wait.
3      MS. SCULLION:  Sorry.
4      THE WITNESS:  Oh, I'm sorry.
5      THE REPORTER:  You're talking at the
6  same time.  I think you need to repeat that.
7      MS. SCULLION:  That's fine.
8  BY MS. SCULLION:
9      Q   But part of the above-budget result was
10  with respect to the Opana franchise for which you
11  achieved 123.7 percent to plan result?
12      A   Yes.  But also in clarity, all the other
13  brands performed well also.
14      Q   Understood.
15          So we saw the growth over time for
16  Opana ER from 2006 to 2011.  And similarly, there
17  was -- there was growth for the reformulated
18  version of Opana ER, right?
19      A   Correct.
20      Q   All right.  Now, Opana ER launched -- it
21  was approved in December of 2011, correct?
22      A   I don't remember the exact date,
23  honestly.
24      Q   If you look at Exhibit 4.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1     A   Oh, I'm sorry.
2     Q   Okay.  The approval in December of 2011,
3  right?
4         MR. MORRIS:  Objection.  Form and
5  foundation.
6         THE WITNESS:  That's what this document
7  says, yes.
8  BY MS. SCULLION:
9     Q   And then it was actually commercially
10  launched in the spring of 2012, correct?
11     A   That sounds accurate.
12     Q   Okay.
13         MS. SCULLION:  Can I have 1189?
14         (Romaine Exhibit No. 33 was marked
15          for identification.)
16  BY MS. SCULLION:
17     Q   And when it launched in the spring of
18  2012, do you recall you were trying to -- to lift
19  sales at that point for Opana ER?
20         MR. MORRIS:  Objection.  Form.
21         THE WITNESS:  I --
22  BY MS. SCULLION:
23     Q   Do you recall that?
24     A   I recall that we had a sales number that

Page 287

1  we were held accountable to.
2     Q   Okay.  Let me hand you what's been
3  marked as Exhibit 33.  And it's Bates-stamped
4  ENDO_OPIOID_MDL-00644449.
5         And I'm looking at the top of
6  Exhibit 33, which is your e-mail to Kenneth Price
7  on June 24th, 2012, concerning the Opana ER
8  speaker program update for the Midwest region.  Do
9  you see that?
10     A   I do.
11     Q   And you write to Mr. Price:  "All these
12  programs are critical to our ability to lift
13  Opana ER."  And you end with:  "Please keep your
14  teams focused on how important it is right now to
15  get the lift."
16         Do you see that?
17     A   Yes.
18     Q   And again, that was a reference to
19  lifting Opana ER sales during this period, right?
20     A   Yes.
21     Q   Okay.
22     A   But this was in reference to doing
23  speaker programs in his geography.
24     Q   Understood.

Page 288

1     A   Right.
2     Q   But in general, you were looking to --
3  to lift Opana ER during this period.
4     A   Right, but I was responding back to his
5  e-mail --
6     Q   Sure.
7     A   -- that I read below on speaker
8  programs.
9     Q   So that was one of the ways that you
10  were hoping to lift Opana ER sales during this
11  period.
12     A   One of the ways to continue to support
13  the business.
14     Q   Okay.  And to support business here
15  meant to lift Opana ER sales, right?
16         MR. MORRIS:  Objection to form.
17         THE WITNESS:  To continue to grow sales.
18  BY MS. SCULLION:
19     Q   Okay.  And then we heard your -- your
20  voicemail earlier that during 2012, you described
21  that there was a crisis period, and that you were
22  being very direct with your sales management team
23  that if the Endo sales reps could not get doctors
24  to clinically write Opana ER, those sales reps

Page 289

1  should no longer be with Endo, correct?
2         MR. MORRIS:  Objection to form.
3         THE WITNESS:  Yeah, I think the way it
4  was stated is that they had to be able to be a
5  good education and good resource and clinically
6  provide information to physicians so they could
7  prescribe the product if it was fit for the
8  patient population.
9  BY MS. SCULLION:
10     Q   But you -- but that was because Endo was
11  in crisis mode at that point, and you need to have
12  the sales reps being very effective at that point,
13  correct?
14     A   Yes.
15         MR. MORRIS:  Objection to form.
16         THE WITNESS:  Because if I recall back,
17  that was right after we had an outage and we
18  were -- and I think we talked about this earlier,
19  we were trying to make sure that patients who were
20  on Opana ER were able to get Opana ER.
21  BY MS. SCULLION:
22     Q   Okay.  And then if you can go back to
23  Exhibit 30, which is that summary of the net
24  sales, I want to focus now on the right-hand

73 (Pages 286 to 289)

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1  column --
2      A   Okay.
3      Q   -- which is entitled "Opana TRF ER-2."
4  Do you see that?
5      A   Yes.
6      Q   And Opana TRF ER-2, that's referring to
7  the reformulated version of Opana ER?
8         MR. MORRIS:  Objection.  Form,
9  foundation, and continuing objection with respect
10  to the use of the demonstrative.
11  BY MS. SCULLION:
12      Q   Is that correct?
13      A   Opana -- yes.
14      Q   That's how it was referred to internally
15  within Opana TRF ER?
16      A   I don't recall that.  We referred to it
17  as Opana with -- with INTAC technology.
18      Q   Okay.  Do you recall seeing Opana TRF ER
19  being used within Endo?
20      A   You know, I don't -- I don't
21  specifically recall that title, but yeah.
22      Q   Okay.  So then -- so looking at the --
23  the figures, it begins in 2012.
24      A   Yes.

Page 291

1      Q   And you've got 221 million in net sales
2  for 2012, and that's just for the reformulated
3  version, correct?
4      A   Correct.
5      Q   As we said, that reformulated version,
6  it launched sometime in the spring, so it's not
7  even a full year, right?
8      A   Yes.
9      Q   Okay.  And then in 2013, we see some
10  growth in the sales to 222 million, correct?
11         MR. MORRIS:  Objection.  Form and
12  foundation.
13         THE WITNESS:  That's on this paper, yes.
14  BY MS. SCULLION:
15      Q   Okay.  And I think you explained
16  earlier, in 2013 is when a variety of products
17  came off patent.  Opana ER was one of those
18  products that came off patent, correct?
19      A   That's correct.
20      Q   So -- and so in 2013, Opana ER began to
21  face generic competition, correct?
22      A   I probably left by the time that
23  happened, but -- yeah.
24      Q   Okay.  In your experience in

Page 292

1  pharmaceutical sales when a product faces generic
2  competition, do the branded product sales
3  generally decline?
4      A   Yes.
5         MR. MORRIS:  Objection.  Foundation.
6  BY MS. SCULLION:
7      Q   So there wasn't time to make too much of
8  a -- of a track record with the reformulated
9  version of Opana ER, but again, that's a
10  respectable showing in terms of the sales efforts
11  and the results, right?
12         MR. MORRIS:  Objection.  Form and
13  foundation.
14         THE WITNESS:  Yes.
15  BY MS. SCULLION:
16      Q   Okay.  And again, these are the results
17  from the sales force out there.  They're calling
18  on healthcare providers, they're delivering
19  approved reprints, they're inviting people to
20  speaker series, and that's helping to generate
21  those sales, correct?
22      A   Yes.
23         MS. SCULLION:  Could we have E1175,
24  please.

Page 293

1         (Romaine Exhibit No. 34 was marked
2         for identification.)
3  BY MS. SCULLION:
4      Q   I hand you what I just marked as
5  Exhibit 34, and it's Bates-stamped ENDO_OPIOID_
6  MDL-00869053, and we have Bates -- and we stamped
7  it in the top right corner E1175.
8         Mr. Romaine, if you look at the first
9  page of Exhibit 34, do you see this is an e-mail
10  and attachment from you to Mr. Kerr, Mr. Baglin,
11  Mr. Bingol, and Deanne Melloy in September of 2007
12  entitled -- or subject matter, rather, "Opana Top
13  50 Writers"?
14      A   Yes.
15      Q   Okay.  And if you'd just turn to the
16  attachment, which begins at E1175.5.  Is this a
17  set of data that you received in September of 2007
18  concerning the top 50 Opana ER writers for the
19  period January 7th to July -- sorry, January '07
20  to July '07?
21      A   I don't recall specifically receiving
22  this, but it looks like a document I would have
23  gotten in my position.
24      Q   Okay.  Did you from time to time ask for

74  (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  reports of the top 50 or top other segment of --
2  of Opana ER writers?
3      A   You know, I don't recall if I asked for
4  it or if it was provided.
5      Q   Okay.  So this is information that --
6  that was available --
7      A   Yes.
8      Q   -- to you at Endo.
9      A   Yes.
10     Q   So you could -- you could go in and say,
11 Let me see which prescribers are prescribing the
12 most at any given period for a given product.
13 That was available to you to do?
14     A   Yes.
15     Q   All right.  And then if you go back to
16 the front page --
17     A   Mm-hmm.
18     Q   -- of Exhibit 34, you're explaining that
19 -- you said:  "This is some very interesting
20 data."  And you're looking to quantify why certain
21 physicians are jumping up in their sales -- or
22 prescriptions, rather, of Opana and starting to
23 write at a point in time.  And you give an example
24 of one doctor, Dr. Plotnick, who's served by the

Page 295

1  pharma division.
2          Do you see that?
3      A   Yes.
4      Q   Okay.  And you say at the end:  "The
5  point that we need to find is what triggered
6  individuals to start and see if there is a common
7  thread."
8      A   Right.
9      Q   Do you see that?
10     A   Yes.
11     Q   So you're trying to figure out for
12 these -- these top writers, Okay, well, what's --
13 what's triggering them for Opana ER, because you
14 thought that might help understand how you might
15 support sales more broadly for Opana ER, correct?
16     A   Well, I think it was looking at are
17 there tools or resources that the sales force
18 might need or have and not used that somebody is
19 using that is important to the physicians that
20 we're calling on.
21     Q   Okay.  And -- but you're -- you're
22 making an inquiry by looking at, Well, who's
23 writing -- who's prescribing the most?  Let's look
24 at our top customers and see what we can learn

Page 296

1  from them, correct?
2      A   Correct.
3      Q   All right.  Now, if you go back to the
4  exhibit for the -- I'm sorry, the attachment to
5  the exhibit, which is the actual data for the
6  top 50.
7      A   Yes.
8      Q   Let's look at page E1175.5.  There's
9  obviously a good deal of information here.  You've
10 got in the left hand the information about the
11 representative, right, that's servicing the
12 doctor?
13     A   Correct.
14     Q   And the district manager, correct?
15     A   Correct.
16     Q   All right.  And then for the prescriber
17 information, again, you know their name, their
18 prescriber ID, their specialty, correct?
19     A   That's correct.
20     Q   And their address, correct?
21     A   Yes.
22     Q   And then we see the column for "Monthly
23 Sales."  So this is again a -- data showing
24 monthly prescriptions, in this case for Opana ER,

Page 297

1  for each of those individual providers, correct?
2      A   Correct.
3      Q   All right.  And then you have
4  information on the right-hand side that tells you
5  the total that they've written during that period,
6  correct?
7      A   Yes.
8      Q   All right.  So you could tell in any
9  given period again which prescriber is writing the
10 most number of prescriptions for Opana ER,
11 correct?
12     A   Correct.
13     Q   All right.  And when it says "market
14 volume," that's referring to the total
15 prescriptions for Opana ER in that given
16 provider's market?
17     A   I think what that refers to, market
18 volume is the total prescriptions of all opioids
19 in that -- for that physician has written.
20     Q   Okay.  So you could also tell not only
21 how many -- how many prescriptions for Opana ER
22 the prescriber has written but for all opioids
23 during the period.
24     A   Correct.  Market class.

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1      Q    Okay.  And when it says "share," is that
2  Opana's share of that prescriber's total market
3  volume?
4      A    That's correct.  That's the way I read
5  this.
6      Q    Okay.  And just looking -- stay on this
7  page, in this period -- so if I read it correctly,
8  two of the top five Opana writers served by the
9  specialty division are in Ohio, correct?
10     A    Let me -- just one second, let me
11  just --
12     Q    Sure.
13         MR. MORRIS:  Objection.  Form and
14  foundation.
15  BY MS. SCULLION:
16     Q    I'm starting with the top is -- it says
17  Edwin Villalobos --
18     A    Yes.
19     Q    -- that gentleman is in Florida.
20         The next two are in Ohio, correct?
21     A    Correct.
22         MR. MORRIS:  Objection to form and
23  foundation.
24  BY MS. SCULLION:

Page 299

1      Q    And as you say, and one is in -- one --
2  sorry.
3         And two are also in Florida, the top
4  five:  Mr. Villalobos at the top and Mr. Scott
5  Tennanbaum is number five, correct?
6      A    That's what the report says, yes.
7      Q    Okay.  And then again, if you look on
8  the next page, 1175.7, this is the top 50 Opana
9  prescribers for the period that were serviced by
10  the pharma division, correct?
11     A    Yes.  Sorry, I wanted to make sure that
12  was specialty on the first.
13     Q    Sure.  So this -- this page, 1175.7,
14  this is the pharma division, correct?
15     A    Correct.
16     Q    All right.  And again, within the top
17  five prescribers you've got a gentleman from
18  Florida, David Hicks, and a gentleman from Ohio,
19  Howard Schertzinger, correct?
20         MR. MORRIS:  Objection.  Form and
21  foundation.
22         THE WITNESS:  There is someone from Ohio
23  there, yes.
24  BY MS. SCULLION:

Page 300

1      Q    It says Howard Schertzinger, right?
2      A    Yes.
3      Q    Okay.  So using the data available to
4  you, you would have been able to see whether a
5  prescriber's volume had changed over the course of
6  any given period.  Right?
7      A    Correct.  I had information available to
8  me.
9      Q    Okay.  And you could have been able to
10  tell if there was an unusual spike in
11  prescriptions for any given prescriber, correct?
12         MR. MORRIS:  Objection.  Form and
13  foundation.
14         THE WITNESS:  Over the month period --
15  prior period, yes.
16  BY MS. SCULLION:
17     Q    Okay.  You could have been able to use
18  it to look to see if there was some unusual
19  pattern in the prescribing for a particular
20  provider, correct?
21         MR. MORRIS:  Objection to form and
22  foundation, legal conclusion.
23         THE WITNESS:  At my level, though, I
24  rarely looked at -- down to that granular.

Page 301

1  BY MS. SCULLION:
2      Q    But this is data that one could have
3  looked at to -- to look at patterns of prescribing
4  for individual doctors, right?
5      A    Correct.
6         MR. MORRIS:  Same objection.
7  BY MS. SCULLION:
8      Q    And similarly, because you have
9  information obviously that tells you that the
10  geographic territory in which each doctor is in,
11  you could also tell whether that doctor's
12  prescriptions were fairly high compared to other
13  prescribers in any given territory, correct?
14         MR. MORRIS:  Objection.  Form.
15         THE WITNESS:  The -- just to clarify,
16  the number of prescriptions that they're writing,
17  is that what you're asking?
18  BY MS. SCULLION:
19     Q    Yes.
20     A    Yes, that was available.
21     Q    Okay.  So you could have seen if
22  Doctor X had ten times the number of prescriptions
23  as the next highest doctor in that territory,
24  right?

76  (Pages 298 to 301)

Page 302

1   A   Based on this report, yes.
2   Q   You could have done that. Okay.
3       MS. SCULLION: Can I have E524.
4   BY MS. SCULLION:
5   Q   While they are getting that, and just to
6   be clear, did you ever undertake any -- any
7   analysis to see if any prescriber was suspiciously
8   prescribing too much based on information you were
9   seeing?
10  A   I don't recall that. But I know the
11  organization, the company, in marketing did that
12  at times to look and see if there was any
13  suspicious activity, and then that would have been
14  reported.
15  Q   Okay. So -- but you did not -- you did
16  not analyze it for that purpose?
17  A   I did not analyze it to that level.
18  Q   Who do you understand within marketing
19  conducted any analysis to look for anything, I
20  think you said, suspicious?
21  A   Well, I would assume -- and I shouldn't
22  use the word "assume" -- but the brand group would
23  look at that. The regional directors would look
24  at it that close, and if there was suspicion then,

Page 303

1   then that would be reported and handled through
2   the appropriate channels in the company.
3   Q   So let's make sure that we're talking
4   about the same thing. Start with the regional
5   directors.
6       Would the regional directors, were they
7   required to review sales data within their region
8   to see if there was any unusual pattern?
9       MR. MORRIS: Objection. Form and
10  foundation.
11      THE WITNESS: I don't recall if that
12  was -- I don't recall if that was a directive, but
13  I know that they looked at the data.
14  BY MS. SCULLION:
15  Q   But you don't know if it was actually a
16  compliance directive?
17  A   No, I don't know.
18  Q   Did you ever have any discussions with
19  any regional directors about their review of -- of
20  data to -- to look for suspicion patterns?
21  A   I don't recall.
22  Q   Do you recall anyone ever coming to you
23  and saying, We have identified what we think is a
24  suspicious pattern?

Page 304

1   A   I don't recall that.
2   Q   And by suspicious pattern here, we're
3   talking about a suspected pill mill. Is that what
4   we're talking about?
5       MR. MORRIS: Objection to form.
6       THE WITNESS: Is that what you're
7   asking?
8   BY MS. SCULLION:
9   Q   Yeah.
10  A   So I don't recall -- I mean, I don't
11  recall ever having those discussions.
12  Q   All right. You said also that folks
13  within brand, the brand group would have been
14  looking at data. Were they looking at data to try
15  to look for suspicions of pill mills?
16  A   I don't know why they would look at it.
17  It's probably a question you'd have to ask them.
18  Q   Okay. So you don't know if they were
19  looking at data for that purpose?
20  A   I don't know that. I know they looked
21  at data. I don't know for what purpose.
22  Q   And just to be clear, do you know
23  whether regional directors were looking at data
24  for the purpose of trying to see if there were

Page 305

1   suspicious -- suspicions of a pill mill?
2   A   I don't know specifically for that
3   reason. I know they looked at data.
4   Q   But none of them ever talked to you
5   about having any suspicions about a potential pill
6   mill based on their review of data, right?
7       MR. MORRIS: Objection to form.
8       THE WITNESS: I don't recall that.
9   BY MS. SCULLION:
10  Q   Okay. In your entire, you know --
11  A   Tenure.
12  Q   -- tenure with Endo, you don't ever
13  recall that?
14  A   I don't recall that.
15      MR. MORRIS: Objection to form.
16      MS. SCULLION: Do you have 524? Thank
17  you.
18      (Romaine Exhibit No. 35 was marked
19  for identification.)
20  BY MS. SCULLION:
21  Q   Let me hand you what's been marked as
22  Exhibit 35. And this is Bates-stamped
23  ENDO_OPIOID_MDL-00856807, and we've stamped it
24  E524 in the top right-hand corner.

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1 And, Mr. Romaine, I'm focusing on the
2 e-mail on the bottom half of the first page from
3 Mike Weber to the pharma DMs, cc'ing you twice, it
4 looks like. It says Larry Romaine, Larry Romaine.
5     A   Mm-hmm.
6     Q   Did you have more than one e-mail
7 address?
8     A   No.
9     Q   Just somebody typed it twice.
10    A   Yeah.
11    Q   Okay. And others.
12        And the subject of the e-mail is
13 "Important - Walgreens stores that have stocked
14 Opana," and this is October 20th, 2006. Do you
15 see that?
16    A   Yes.
17    Q   And as I understand it, Mr. Weber is
18 writing to advise the pharma DMs of a list of
19 approximately -- it says: "1500 Walgreens, high
20 opioid potential stores that have stocked Opana
21 5 milligram, Opana ER 5 milligram, and Opana ER
22 20 milligram." Is that right?
23    A   Do you mind if I read -- read the
24 e-mail?

Page 307

1     Q   Please, go ahead.
2     A   (Peruses document.) Okay, thank you.
3     Q   So do I understand correctly that that's
4 what Mr. Weber is writing about, to advise that
5 there's approximately 1500 Walgreens, high opioid
6 potential stores that have stocked with the
7 indicated strengths of Opana and Opana ER?
8     A   Yes.
9     Q   All right. What's a high opioid
10 potential store, do you know?
11    A   It must -- I don't recall what he's
12 referring to there, and so I shouldn't assume.
13 So, I don't know.
14    Q   Okay. Now, this is stocking of these
15 stores in October 2006, and if I understand
16 correctly, the stores are being stocked before
17 prescriptions have been written for all of the
18 Opana that's being stocked in those stores, right?
19    A   Can -- can you restate --
20    Q   You're putting -- putting the Opana in
21 the stores to then go out and get prescriptions,
22 correct?
23    A   To begin promotion of -- of Opana ER,
24 yes.

Page 308

1     Q   Okay. So it's not as if you have
2 prescriptions backed up, and you're saying, Okay,
3 now -- now we have the prescriptions, we can go
4 fill the Walgreens stores with Opana in order to
5 fill those prescriptions.
6     A   Correct.
7     Q   All right. And if you look in the
8 second paragraph, the last sentence, Mr. Weber
9 refers to "Let's show Walgreens that our Endo team
10 can pull through this product quickly."
11        Do you see that?
12    A   Yes.
13    Q   Did you ever discuss the concept of
14 pulling through product from Walgreens or a
15 similar store?
16    A   I don't -- I don't recall those -- that
17 terminology.
18    Q   Do you have any understanding about what
19 "pull through" means?
20    A   Yes.
21    Q   What does it mean?
22    A   For not -- for a product to be stocked
23 and then be utilized by a physician, by
24 prescribing for a patient.

Page 309

1     Q   And why is Mr. Weber saying, "Let's show
2 Walgreens that our Endo team can pull through this
3 product quickly"? Why would you need to show
4 Walgreens anything?
5     A   I don't know --
6         MR. MORRIS: Objection to form.
7         THE WITNESS: -- what he's referring to
8 here.
9 BY MS. SCULLION:
10    Q   Okay. I mean, was it -- was she saying
11 that Endo had convinced Walgreens to go ahead and
12 stock this -- this product, and now we want to
13 show them that we can move the product off their
14 shelves for prescriptions?
15    A   I --
16        MR. MORRIS: Objection to form and
17 foundation.
18        THE WITNESS: I don't -- I don't know
19 what he's referring to here.
20 BY MS. SCULLION:
21    Q   Okay. But was that something that --
22 that was one of Endo's goals during this time
23 period was to try to get Opana off of the retail
24 shelves as quickly as it could after it was

78 (Pages 306 to 309)

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1   stocked?
2       A   Well, our -- our goal was to ensure that
3   we had adequate stocking of the product so we
4   could promote the product to healthcare providers.
5       Q   Okay. And was it a goal to -- to have
6   product pulled through quickly?
7       A   I don't know if I would term it quickly,
8   but obviously to have it stocked so that it's
9   available.
10      Q   Okay. And remind me, at this point in
11  time Mr. Weber's position was what?
12      A   He was the director of the pharma
13  division.
14      Q   Thank you. I had forgotten.
15          And he's writing to his district
16  managers in the pharma division, right?
17      A   In the -- in the -- yes, the pharma
18  division.
19      Q   Okay. And then in the last paragraph,
20  second sentence, his directive -- following up on
21  the communications from the regional directors,
22  his directive to the pharma DMs is: "Let's get
23  five high opioid decile MDs in each territory to
24  try Opana ER for the first time on at least one

Page 311

1   patient next week." Right?
2       A   Yes, I see that.
3       Q   Okay.
4           MR. MORRIS: Objection. Form and
5   foundation.
6   BY MS. SCULLION:
7       Q   And he's referring to high opioid decile
8   doctors in each territory, correct?
9           MR. MORRIS: Objection. Form and
10  foundation.
11  BY MS. SCULLION:
12      Q   MDs is doctors.
13      A   That's what he's written here.
14      Q   Okay. And -- and again, so that was his
15  directive as to, Let's get the five high opioid
16  doctors to try Opana ER for the first time on at
17  least one patient in each territory this week.
18          MR. MORRIS: Objection to form.
19          THE WITNESS: That's what this statement
20  says.
21  BY MS. SCULLION:
22      Q   Pretty aggressive goal, correct?
23          MR. MORRIS: Objection to form.
24          THE WITNESS: I -- I don't know that.

Page 312

1           MS. SCULLION: Okay. Let's take a quick
2   break, we'll get some documents together, and then
3   we can try and move quickly.
4           MR. MORRIS: Okay.
5           THE VIDEOGRAPHER: The time is
6   3:50 p.m., and we're going off the record.
7           (Recess.)
8           THE VIDEOGRAPHER: The time is 4:06 p.m.
9   We're back on the record.
10          (Romaine Exhibit No. 36 was marked
11          for identification.)
12  BY MS. SCULLION:
13      Q   Mr. Romaine, welcome back.
14      A   Thank you.
15      Q   I hand you what's been marked as
16  Exhibit 35, which is Bates-stamped ENDO_OPIOID_
17  MDL-02324335. And in the lower right-hand corner,
18  we also have our E832.
19          MR. MORRIS: Oh, it's 36.
20          MS. SCULLION: She has 30 -- I'm sure
21  you're right. Erica likes to keep me on my toes.
22          THE WITNESS: This is 35.
23          MR. MORRIS: Yeah, so you want to --
24          MS. SCULLION: We're going to restamp

Page 313

1   it. Yeah, we're going to restamp it. It's all
2   right.
3           THE WITNESS: Thank you.
4   BY MS. SCULLION:
5       Q   Mr. Romaine, Exhibit 36, if you look at
6   the first page, starts with an e-mail from Vanessa
7   Costa to Jon Smollen, and she's attaching a number
8   of documents and she's sending them to him on
9   April 11th, 2013.
10          My questions are going to refer to the
11  documents attached, not the e-mail, but you're
12  welcome to read the e-mail if you'd like.
13      A   Okay.
14      Q   So I'm going to actually start with
15  page 832.2, the next page.
16      A   Yes.
17
18
19
20
21
22
23
24

79 (Pages 310 to 313)

Highly Confidential - Subject to Further Confidentiality Review



Page 314

Page 316

1
2    Q   Okay.  While we're in this document --
3    it's right here -- if you could quickly turn to
4    page 0832.7, you'll see a big map.
5        Do you see that?
6    A   Yes.
7    Q   Okay.  If I understand correctly, this
8    is a -- a map of -- of the territories assigned to
9    reps, correct?
10   A   Yes.
11   Q   Okay.  And I see -- if you look on the
12   map where Ohio is, do you see that on the map?
13   A   Bear with me just one moment.
14   Q   It's okay.  Look just below the word
15   "Chicago" and a little to the right.
16   A   Okay.  Yes, I have it.

Page 315

Page 317

Highly Confidential - Subject to Further Confidentiality Review



Page 318

```
 6      Q   Okay.
 7          MS. SCULLION:  Can we have 1215?
 8          (Romaine Exhibit No. 37 was marked
 9          for identification.)
10   BY MS. SCULLION:
11      Q   I'm going to hand you what's been marked
12   as -- thank you -- Exhibit 37.  And this is
13   Bates-stamped ENDO_OPIOID_MDL-01968614.
14          And it's an e-mail from Ellen Keane to
15   Ian McConkey, copying you and Kathleen Cronshaw in
16   August of 2012, and titled "West Opana ER
17   Feedback."
18          Do you see that?
19      A   Yes.
20      Q   West Opana ER refers to the western
21   region for -- sorry, the -- yeah, the western
22   region?
23      A   Correct.
24      Q   Okay.  And if you go to page E1215.2.
```

Page 320

Page 319

```
 1      A   Yes.
```

Page 321

```
12          Do you see that?
13      A   Yes.
14      Q   And so Dr. Jutla was an invited speaker
15   to the speaker program in Seattle, correct?
16          MR. MORRIS:  Objection.  Form and
17   foundation.
18          THE WITNESS:  I don't know who that
19   doctor is.
20   BY MS. SCULLION:
```

81  (Pages 318 to 321)

Highly Confidential - Subject to Further Confidentiality Review



Page 322

23    BY MS. SCULLION:
24       Q   Okay.

Page 324

Page 323

1        A   What I don't know, and just to bring
2    clarity, is that that doctor, I don't know if they
3    were actually the speaker or they happened to be
4    attending and made a comment.
5        Q   I understand that you don't know.
6    That's why I'm saying if she -- if this doctor
7    were --
8        A   Oh.
9        Q   -- a presenting doctor, those comments
10   would have been reviewed and approved by Endo --
11       MR. MORRIS:  Objection.  Form and
12   foundation.
13   BY MS. SCULLION:
14       Q   -- before being delivered.
15       A   I don't -- I don't know that because I
16   wasn't -- I didn't attend the reviewing committee.
17       Q   Okay.  And if we can look back at
18   Exhibits 9 and 10.
19       And we can start with Exhibit 9 when you
20   find that.
21       A   Okay.  I'm there.
22
23
24

Page 325

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 330

22    MS. SCULLION:  And do you have 924?
23    THE WITNESS:  Are -- should we refile
24    these?

Page 331

1    MR. MORRIS:  Just put them on the side.
2    MS. SCULLION:  I would just put them on
3    the side for now.  Thank you.
4    THE WITNESS:  Okay.
5    (Romaine Exhibit No. 38 was marked
6    for identification.)
7    BY MS. SCULLION:
8    Q   I'm handing you what's been marked as
9    Exhibit 38.
10    A   Thank you.
11    Q   And this is Bates-stamped --
12    MS. SCULLION:  I don't have a Bates
13    stamp number on here.  Is there a Bates stamp
14    number?  Thank you.
15    MR. MORRIS:  It looks like somebody --
16    somebody wrote one in.
17    THE WITNESS:  I have one on this one.
18    Is that what you're referring to as a Bates stamp?
19    BY MS. SCULLION:
20    Q   No.  So the Bates number for this for
21    the record is ENDO_OPIOID_MDL-00773070 through 71,
22    and we've stamped it E924.
23
24

Page 332

Page 333

Highly Confidential - Subject to Further Confidentiality Review



Page 334

```
 1
 2
 3
 4
 5
 6
 7      Q    Okay.
 8           MS. SCULLION:  Can I have E873 and 974
 9   and 914.  I'll take one at a time.
10           (Romaine Exhibit No. 39 was marked
11           for identification.)
12   BY MS. SCULLION:
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 335

```
 1
 2
 3
 4
 5
 6
 7
 8      Q    Okay.  Let me hand you what's been
 9   marked as Exhibit 39.  And Exhibit 39 is
10   Bates-stamped ENDO_CHI_LIT-00166187.
11           And, Mr. Romaine, the second page of the
12   exhibit is a -- a memorandum, I guess I would call
13   it, from you to the Endo pharma and specialty
14   sales teams dated August 2008, correct?
15      A    Correct.
16
17
18
19
20
21
22
23
24
```

Page 336

Page 337

Highly Confidential - Subject to Further Confidentiality Review



Page 340

11      for identification.)

12  BY MS. SCULLION:

13     Q   All right.  Let me hand you what's been

14  marked as Exhibit 40, which bears Bates No.

15  ENDO_OPIOID_MDL-00685033.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 346

23    BY MS. SCULLION:
24        Q   Well, let's look at --

Page 347

1         MS. SCULLION:  Can I see E914?
2         (Romaine Exhibit No. 41 was marked
3         for identification.)
4    BY MS. SCULLION:
5         Q    Let me hand you what's been marked as
6    Exhibit 41.
7         A   Thank you.
8         Q    Yeah.  And Exhibit 41 is Bates-stamped
9    ENDO_CHI_LIT-00547543.
10        And if you turn to the page we've marked
11    as E914.3 in the lower right-hand corner, it's the
12    first page of the presentation.
13        A   Okay.
14        Q   Do you see that?
15        A   Yes.
16        Q   And this is a final report for Opana ATU
17    W6.  That means Wave 6, right?
18        A   Correct.
19        Q   All right.  It's dated in December 2008,
20    so after your mandatory reading memo had gone out,
21    correct?
22        A   Correct.
23        Q   And what is reported in December of
24    2008, if you go to page E914.12, as key insights,

Page 348

1    the very first one:  "On the most important
2    characteristics, physicians rate Opana ER
3    significantly lower than all other ER opioids on
4    insurance/formulary availability, and
5    significantly higher than all others on does not
6    have reputation for street abuse."  Correct?
7         A   I see that in your document.
8         Q    Okay.  So this is a report that
9    physicians are rating Opana ER as having a better
10    reputation than other ER opioids with respect to
11    reputation for street abuse, correct?
12        MR. MORRIS:  Objection.  Form and
13    foundation.
14        THE WITNESS:  It's in this document.  I
15    just want to put it back in context that, again,
16    these physicians, it might be their
17    interpretation, so they may believe it has to this
18    point not much street value or low street value.
19    I don't know whether -- where the information was
20    received from.
21    BY MS. SCULLION:
22        Q    And then the report goes on to state:
23
24

Page 349



Page 350

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17   BY MS. SCULLION:
18       Q   So you say you're sure.  I mean, do you
19   know -- do you actually know or you're just
20   assuming?
21       A   I don't know.  I do not know.
22       Q   Okay, you don't.
23
24
```

Page 351

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17   BY MS. SCULLION:
18       Q   The next key insight states:  "MDs" --
19   that is doctors, right?
20       A   Yes.
21
22
23
24
```

Page 352

Page 353

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 356

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19        MR. MORRIS:  Objection.  Form and
20    foundation.
21        THE WITNESS:  I see that here.  I'm just
22    reading through this document.  I'm sorry, I'm
23    just trying to catch up.
24    BY MS. SCULLION:

Page 355

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 357

1        Q    Sure.  Do you want to read through this
2    page?
3        A    Yeah, I do want to read through this
4    page.
5        Q    Okay.
6        A    (Peruses document.)  Okay.  I'm sorry.
7        Q    That's okay.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Page 358

Page 360

BY MS. SCULLION:

Q   Now, you mentioned Exhibit 39, the

Page 359

Page 361

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 362

```
 7      Q    Okay.  We looked at -- I believe it's
 8   exhibit -- I apologize.
 9           (Counsel conferring.)
10   BY MS. SCULLION:
11      Q    Okay.  Look at Exhibit 9.  Thank you.
12      A    Okay.
13      Q    That's why we keep them there.
14      I -- I --
15      A    Yes.  Oh, that's 7.  Sorry.
16      Q    You know what, I -- I --
17      A    I've lost my --
18      Q    That's okay.  Before you go further,
19   actually what I want is Exhibit 10.  That's my
20   fault.
21           That's the learning module.
22      A    Yes.
23      Q    That's okay.  We'll -- we can -- we can
24   just move on because I mislaid my copy of
```

Page 363

```
 1   Exhibit 10 for the moment.
 2      A    Do you want mine?
 3      Q    No, that's okay.  Thank you.  That won't
 4   work.
 5           We talked about various tools that reps
 6   used in connection with the promotion of Opana ER,
 7   and those included dosing guides, correct?
 8      A    Correct.
 9      Q    Conversion guides to help convert from
10   one opioid to another, correct?
11      A    Correct.
12      Q    All right.  Thank you.
13           Do they also provide educational
14   information to doctors about titration for opioid
15   products?
16      A    Yes.
```

Page 364

```
 6      A    I don't recall that.
 7      Q    Okay.
 8           MS. SCULLION:  Now would be a good place
 9   for a good quick break so we can get some
10   documents together.
11           THE WITNESS:  Okay.
12           THE VIDEOGRAPHER:  The time is 4:57 p.m.
13   We're going off the record.
14           (Recess.)
15           THE VIDEOGRAPHER:  The time is 5:09
16   p m., and we're back on the record.
17           (Romaine Exhibit No. 43 was marked
18           for identification.)
19   BY MS. SCULLION:
20      Q    Mr. Romaine, I'm going to hand you
21   what's been marked as Exhibit 43.  I know that we
22   have 42 coming.  We're taking this a little bit
23   out of order.
24      A    Thank you.
```

Page 365

```
 1      Q    So this is 43.  There you go.
 2           And Exhibit 43 is Bates-stamped
 3   ENDO_OPIOID_MDL-817302.  And as you can see, it
 4   includes an attachment that has a fairly sizable
 5   set of data that we've attached.
 6           And Exhibit 43 is dated December 5,
 7   2010.  The e-mail is from Molly Fiore to Chad
 8   Simon.  Subject matter, "Library Program
 9   Utilization Update."
10           Do you see that?
11      A    Yes.
12      Q    Do you recall that there was a library
13   program at Endo through which physicians could be
14   provided textbooks?
15      A    I don't remember specifically that
16   program, but -- but it looks like we had one.
17      Q    Okay.  I mean that -- that's described
18   here by Ms. Fiore in her note to Mr. Simon,
19   correct?
20      A    Yes.
21      Q    His library program utilization as of
22   December 1st, 2010.
23      A    Yes.
24           MR. MORRIS:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review



Page 366

BY MS. SCULLION:

1

2    Q    Okay.  And then she references the
3    spreadsheets attached, which she says contain the
4    financial budget information, and a second that
5    can be forwarded to your field sales managers so
6    they can see their activity in their particular
7    area or region, correct?
8    A    Yes.
9    Q    Okay.  So this is information that she
10   is sending on to be used in the ordinary course
11   of -- of Endo's business, correct?
12          MR. MORRIS:  Object -- objection to form
13   and foundation.
14          THE WITNESS:  I don't -- I don't know
15   that, but I see the document.  So...
16   BY MS. SCULLION:
17   Q    She's sending it on to be used, yes?
18          MR. MORRIS:  Objection.  Form and
19   foundation.
20          THE WITNESS:  I guess if that's what
21   it's for, yes.
22   BY MS. SCULLION:
23   Q    She's sending it on so that --
24   A    I was just trying to read through -- I

Page 367

1    was trying to read through the e-mail.  I'm sorry,
2    I was --
3    Q    That's okay.  Bless you.
4          Do you want to read through the e-mail?
5    A    Yeah, do you mind?  I just want to take
6    a minute to do that.
7    Q    No problem.
8    A    (Peruses document.)  Okay.
9
10
11
12
13
14   Q    Okay.  If you could go -- we've tabbed
15   it for you in the spreadsheet, there's a little
16   pink tab on the --
17   A    Yes.
18   Q    -- side.  Because there's no page --
19   A    Oh, on the side.  Okay.  Got you.
20   Q    -- there that's useful.
21          The page is numbered by us as E1230.156
22   in the upper right hand.
23   A    Yep.
24   Q    Great.  And it should be highlighted for

Page 368

1    you.  Do you see a highlighted line, P108F1?
2    A    Yes.
3    Q    Okay.  And if you follow that across to
4    the middle of the page, you see it says Oliver
5    Herndon?
6    A    Yes, I do.
7    Q    And if you look, that's the column for
8    the clinicians' first and last name.  Do you see
9    that?
10   A    Yes.
11   Q    At the top of the page?
12   A    Yes.
13
14
15
16
17
18
19
20
21
22
23          MR. MORRIS:  Objection.  Form,
24   foundation.

Page 369

1    BY MS. SCULLION:
2    Q    Does Dr. Herndon's name ring a bell?
3    A    It does not.
4    Q    Let me --
5          MS. SCULLION:  Can we have Exhibit 42.
6          (Romaine Exhibit No. 42 was marked
7          for identification.)
8    BY MS. SCULLION:
9    Q    I hand you what's been marked as
10   Exhibit 42.
11   A    Thank you.
12   Q    And this is Bates-stamped ENDO_OPIOID_
13   MDL-02314929, and we've marked it as E1178.
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 374

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 375

Page 376

Page 377

16    Q   Okay.  Do you recall discussing the
17 concept of an exclusion list?
18    A   Yes.
19    Q   Okay.
20       MS. SCULLION:  Can we have Exhibit 44.
21 Thank you.
22       THE WITNESS:  We're done with this --
23 this one for temporarily right now?
24       MS. SCULLION:  Actually, yes.



Page 378

1        (Romaine Exhibit No. 44 was marked
2        for identification.)
3    BY MS. SCULLION:
4        Q   I'm going to hand you what's been marked
5    as Exhibit 44.  And again, this is a rather large
6    set of data.  The Bates stamp is ENDO_OPIOID_
7    MDL-0924490.
8        And it doesn't have the cover e-mail,
9    but we've pulled up on the screen the metadata
10   that came with it when it was produced to us.  And

Page 380

Page 379

Page 381

Highly Confidential - Subject to Further Confidentiality Review



Page 382

Page 384

Page 383

Page 385

(Romaine Exhibit No. 45 was marked

Highly Confidential - Subject to Further Confidentiality Review



Page 386

1         for identification.)
2    BY MS. SCULLION:
3         Q    We have -- I'm sorry.  I'm handing you
4    what's been marked as Exhibit 45, and Exhibit 45
5    is Bates-stamped END00562948.  And we've stamped
6    it E1212.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 388

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 387

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 389

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    Q    When you were VP of sales for Endo, was
24    your office in Chadds Ford, PA?

Highly Confidential - Subject to Further Confidentiality Review



Page 390

```
 1    A   Yeah, Chadds Ford and Malvern.
 2    Q   And then Malvern?
 3    A   Yes.
 4    Q   Okay.  And that's right near Philly --
 5    A   Yeah.
 6    Q   -- Philadelphia, correct?
 7    A   Yes.
 8    Q   Okay.
 9        MS. SCULLION:  Can I have E563?
10        (Romaine Exhibit No. 46 was marked
11        for identification.)
12  BY MS. SCULLION:
13    Q   Let me hand you what's been marked as
14  Exhibit 46.  And this is Bates-stamped
15  ENDO-OR-CID-000694084, and we've stamped it E563
16  at the top.
17        And you're welcome to read the document.
18    A   Okay.
19
20
21
22
23
24
```

Page 392

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21        MS. SCULLION:  Do you have 419?
22        (Romaine Exhibit No. 47 was marked
23        for identification.)
24  BY MS. SCULLION:
```

Page 391

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 393

```
 1    Q   Okay.  I'm handing you what's been
 2  marked as Exhibit 47.  And it's Bates-stamped
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

99 (Pages 390 to 393)



Page 396

19    BY MS. SCULLION:
20        Q    Do you recall that we looked earlier --
21             MS. SCULLION:  Do we have that -- the
22    exhibit.
23    BY MS. SCULLION:
24



Page 398

20 BY MS. SCULLION:
21     Q   Do you -- having seen it, do you
22 remember it?
23     A   Yes.
24     Q   You do remember seeing that?

Page 399

1     A   Today.
2     Q   Do you remember seeing it at the time?
3     A   No, I do not remember.
4     Q   Okay.  In fact, I want to start with
5 that.
6         MS. SCULLION:  Do you have that?  Oh,
7 these are all the copies.  Don't give me all the
8 copies.
9         (Romaine Exhibit No. 48 was marked
10         for identification.)
11 BY MS. SCULLION:
12     Q   I will hand you what's been marked as
13 Exhibit 48.  Exhibit 48 is Bates-stamped
14 ENDO_OPIOID_MDL-01968698, and we've stamped it
15 E1179.

Page 400

Page 401

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 410

Page 412

24    Q   Okay.  Ever see the movie "Drugstore

Page 411

Page 413

1  Cowboy"?
2      A   No.
3      Q   Okay.  Would it surprise you to learn
4  "Drugstore Cowboy," the movie, mid-'80s, Gus Van
5  Sant, in the opening dialogue in that movie talks
6  about abuse of Blues, of oxymorphone pills?
7        MR. MORRIS:  Objection.
8  BY MS. SCULLION:
9      Q   Would it surprise you to know that?
10       MR. MORRIS:  Objection.  Form.
11       THE WITNESS:  You're surprised I didn't
12  know that?
13  BY MS. SCULLION:
14     Q   Are you surprised to know that?
15     A   No, I don't know anything about the
16  movie.
17       MR. MORRIS:  What's the time, please?
18       THE VIDEOGRAPHER:  6 hours, 45.
19       MS. SCULLION:  We can take a break.
20       THE VIDEOGRAPHER:  The time is 6:06 p.m.
21  We're going off the record.
22       (Recess.)
23       THE VIDEOGRAPHER:  The time is 6:21
24  p m., and we're back on the record.

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1          MS. SCULLION:  Mr. Romaine, welcome
2    back.
3          THE WITNESS:  Thank you.
4          MS. SCULLION:  We have no further
5    questions for you today.  Thank you for your time.
6    I believe my colleague will be questioning you
7    now.
8          THE WITNESS:  Thank you.
9          THE VIDEOGRAPHER:  Do you want to go off
10   the record?
11         MR. MORRIS:  I guess so.
12         THE VIDEOGRAPHER:  The time is 6:21 p.m.
13   We're going off the record.
14         (Pause.)
15         THE VIDEOGRAPHER:  The time is 6:23 p.m.
16   We're back on the record.
17              DIRECT EXAMINATION
18   BY MR. LENISKI:
19         Q    Good afternoon, Mr. Romaine.  My name is
20   Joe Leniski.  We were introduced earlier.  I
21   represent district attorneys and babies born with
22   prenatal neo-abstinence syndrome in Tennessee, and
23   I'm going to ask you some questions specifically
24   about some areas about my case.

Page 415

1          A    Okay.
2          MR. LENISKI:  Before we go on the
3    record, I just want to state that our clients have
4    an objection -- we're taking these depositions
5    while reserving all rights due to our standing
6    objection to cross-notices in the MDL as a result
7    of production failures under the standing NDA
8    order and lack of sufficient notice, and on the
9    basis there is no time limits in Tennessee when it
10   comes to depositions.
11         But, nonetheless, we're cooperating and
12   here to take the deposition today.
13         MR. MORRIS:  Okay.  And I'll just simply
14   note that we disagree with that position, but
15   nothing more needs to be said on the record about
16   it today.
17         MR. LENISKI:  Okay.  Thank you.
18   BY MR. LENISKI:
19         Q    During your employment at Endo, did you
20   have any understanding as to the level of opioid
21   use in Tennessee relative to other states?
22         A    I can't say specifically that I recall
23   anything different regarding the use of -- of
24   opioids in that area.

Page 416

1          Q    Okay.  So you had no understanding
2    whether the use of opioids in Tennessee was
3    relatively high when compared to other states
4    while you were employed at Endo?
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 417

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Highly Confidential - Subject to Further Confidentiality Review



Page 418

Page 419

1    Q   Is that information that you believe was
2  relevant to the performance of your job duties at
3  Endo?
4    A   Well, my -- my responsibilities was to
5  ensure that the sales force was well educated, a
6  resource for offices, professional, and provide a
7  full, fair balance when they're calling on
8  physicians.  So to that answer, no.

Page 420

Page 421

19    (Romaine Exhibit No. 49 was marked
20      for identification.)
21  BY MR. LENISKI:
22    Q   Mr. Romaine, I've handed you a document
23  identified as Exhibit 49 to your deposition.
24    A   Okay.

Highly Confidential - Subject to Further Confidentiality Review



Page 422

1      Q    My question to you is going to be
2   whether you recognize the document.
3      A    I don't recall the document.
4      Q    Okay.  This is a document Bates-stamped
5   ENDO_OPIOID_MDL-01067350.
6          It's an e-mail from Albert Weeks.
7      A    Yes.
8      Q    Who is that?
9      A    I know Albert Weeks.  I don't recall his
10   title in the organization.
11     Q    Okay.  And he's e-mailing several
12   people, including yourself in the cc line,
13   correct?
14     A    Correct.

Page 424

Page 423

Page 425

Highly Confidential - Subject to Further Confidentiality Review



Page 426

```
15      Q   Okay.  I'm done with that.
16      A   Okay.
17          (Romaine Exhibit No. 50 was marked
18          for identification.)
19          MR. LENISKI:  I have one more copy.  I
20   apologize.
21   BY MR. LENISKI:
22      Q   Did I give you the one that I wrote on?
23      A   No.  Oh, unless it's on the back.  No.
24      Q   Okay, got one more.  Here you go.
```

Page 428

```
 1   been -- do you want the name?
 2      Q   Yes.
 3      A   Brian Lortie.
 4      Q   Okay.  And under item number 3, "Pain
 5   products" --
 6      A   Yes.
```

Page 427

```
 1          I've handed you a document we've
 2   identified as Exhibit 50 to your deposition.  Do
 3   you recognize the document?
 4      A   I -- it looks familiar.  I don't
 5   remember, but it looks familiar.
 6      Q   And it says, "Larry Romaine, 2011" --
 7          MR. MORRIS:  Before you go on, can I
 8   read the number?
 9          MR. LENISKI:  Sure, absolutely.
10          MR. MORRIS:  It's ENDO_OPIOID_
11   MDL-01006528.
12          MR. LENISKI:  Thank you.
13   BY MR. LENISKI:
14      Q   This says at the top "Larry Romaine,
15   2011 Objectives," correct?
16      A   Correct.
17      Q   Do you think -- is it likely you drafted
18   this document?
19      A   I have a -- I think these were the
20   object -- objectives that I probably received that
21   I was responsible for.
22      Q   And who would have assigned you those
23   objectives, to your knowledge?
24      A   My manager at the time, which would have
```

Page 429

Golkow Litigation Services - 877.370.DEPS



Page 430

Page 432

14  Q   Okay.  We're done with that.
15      (Romaine Exhibit No. 51 was marked
16      for identification.)
17  BY MR. LENISKI:
18      Q   Mr. Romaine, I've handed you a document
19  identified as Exhibit -- what number's on this
20  one?  What is that, 52?
21      A   51.
22      Q   51, I apologize.  It is Bates-stamped
23  first page ENDO_OPIOID_MDL-00361036.
24          My question to you is if you recognize

Page 431

Page 433

1   the document.
2       A   I don't recognize it.
3       Q   This is an e-mail from John Gilbert, and
4   I think you talked about him earlier, correct?
5       A   Correct.
6       Q   And it's addressed to, among others,
7   yourself dated February 11th, 2011.
8       A   Yes.
9       Q   Do you see that?
10      A   Actually I'm copied on it.  It's
11  addressed to others, but I'm copied on it.
12      Q   That's fair.

Highly Confidential - Subject to Further Confidentiality Review



Page 434

Page 436

14    Q   Okay.
15        (Romaine Exhibit No. 52 was marked
16        for identification.)
17   BY MR. LENISKI:
18    Q   I hand you a document identified as
19   Exhibit 52 to your deposition.  And this is a
20   document Bates-stamped ENDO_OPIOID_MDL-01005844.
21        The question will be if you recognize
22   the document.
23    A   I don't recognize the document, but I --
24   I am copied on the document.

Page 435

Page 437

1    Q   Okay.  And this document is another
2   e-mail forward from John Gilbert, similar in
3   subject to the one we saw previously.  He's

Highly Confidential - Subject to Further Confidentiality Review



Page 438

1       ▮▮▮▮▮▮
2          (Romaine Exhibit No. 53 was marked
3          for identification.)
4   BY MR. LENISKI:
5          Q   I hand you a document identified as
6   Exhibit 53 to your deposition.  This is Bates-
7   stamped ENDO_OPIOID_MDL-01018226.
8          A   Yes.
9          Q   Do you recognize the document?
10         A   I don't recognize the document, but I
11  have -- I have the copy in front of me.
12         Q   Okay.  And this is an e-mail from
13  Kenneth Price, correct?
14         A   Yes.
15         Q   And he was the regional business manager
16  for the Midwest region include -- which included
17  Tennessee, correct?
18         A   Correct.  I think there were changes to
19  geographies over time, yes, so he would have
20  picked it up from John.
21
22
23
24

Page 439

Page 440

Page 441

20  you were shown earlier.
21          It would have been some of the last --
22  one of the last documents you were shown.
23         A   Yeah, unfortunately, they're not in
24  sequence any longer.

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1      THE WITNESS:  Did you -- can you find
2   it?
3      MR. MORRIS:  I can -- I have it for you
4   here.
5      THE WITNESS:  Do you mind if I look at
6   his?
7   BY MR. LENISKI:
8      Q    Yes.
9      A    Okay.
10      Q    Exhibit 48, you were asked some
11   questions about -- and this was with respect to
12   the abuse that had occurred where Endo discovered
13   that patient -- or that individuals were
14   injecting --
15      A    Mm-hmm.
16      Q    -- the reformulated Opana ER.  Is
17   that -- is that correct?
18      A    Yes, that's correct.
19      Q    Okay.  And we didn't -- you weren't
20   asked questions about this specifically, but
21   according to this e-mail, those cases were being
22   reported at least some of that was occurring in
23   Tennessee.
24      A    Okay.

Page 444



Page 443

1      Q    Correct?
2      A    Yes.

Page 445

8      (Romaine Exhibit No. 54 was marked
9      for identification.)
10   BY MR. LENISKI:
11      Q    Mr. Romaine, I've handed you a document
12   we've identified as Exhibit 55 (sic) to your
13   deposition.  This is ENDO_OPIOID_MDL-02317224.
14      Do you recognize the document?
15      A    I don't recognize the document.
16      Q    Okay.  The top e-mail in this chain is
17   from yourself to Mike Newbould -- I'm sorry, Bill
18   Newbould, correct?
19      A    Yes.
20      Q    And it's dated September 11th, 2006.
21      A    Yes.
22      Q    Who is Bill Newbould?
23      A    Bill Newbould was in -- I -- I think he
24   was in corporate communications.  It's 12 years

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1  ago -- 13 years ago, hard to remember, but I think
2  he was in corporate communications.
3      Q   Okay.  And the first e-mail in this
4  chain looks -- well, actually, go to the second
5  e-mail --
6      A   Yes.
7      Q   -- down, do you see from Amy Romero?
8      A   Yes.
9      Q   And she's writing to yourself and Mike
10  Weber on December 8th.
11      A   Yes.
12      Q   And she's forwarding what's called
13  Requests for Information.  Do you see that?
14      A   Yes.



Highly Confidential - Subject to Further Confidentiality Review



Page 450

Page 452

```
 4        (Romaine Exhibit No. 55 was marked
 5        for identification.)
 6   BY MR. LENISKI:
 7        Q   I hand you Exhibit 50 -- what is that?
 8        A   Five.
 9        MR. MORRIS:  You handed him 55, but I
10   think we're on 56.  No?
11        (A discussion was held off the record.)
12        THE WITNESS:  No, 50 -- yeah, this was
13   54.
14        MR. MORRIS:  Oh, I see.  I think maybe
15   you said 55 when you meant 54.  But it's been
16   marked as 54, so we're now on 55.
17        MR. LENISKI:  Okay.
18        THE WITNESS:  Okay.
19   BY MR. LENISKI:
20        Q   I hand you Exhibit 55.  This is a
21   document Bates-stamped EPI001232307.  Correct?
22        A   Correct.
23        Q   Do you recognize the document?
24        A   I don't recognize the specific document,
```

Page 451

Page 453

```
 1   but I recognize John Gilbert wrote this document.
 2        Q   And he wrote it to you on November 4th,
 3   2011?
 4        A   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 458

Page 460

1    Q   This is an exhibit we've labeled 56 to
2  your deposition.  It's ENDO_OPIOID_MDL-01007694.
3      Do you recognize the document?
4    A  It's an e-mail that -- that I had sent
5  back to John Gilbert.
6    Q  Okay.  And you're responding to an
7  e-mail from Mr. Gilbert below dated June 25th,
8  2012, correct?
9    A  Correct.
10    Q  Okay.  And he starts the e-mail saying:
11  "Larry, just a bit of commentary directly from
12  some of the footprints and DMs that are performing
13  at the lower end of goal attainment in the
14  Mid-Atlantic region."  Correct?
15    A  Correct.
16    Q  If you skip down, do you see the header
17  "N Knoxville"?
18    A  Yes.
19    Q  That's -- do you understand that meant
20  North Knoxville?
21    A  Yes.
22
23
24

Page 459

Page 461

13    Q  Okay.
14      MR. MORRIS:  Okay.  So, Counsel, when we
15  were off the record, I asked you how long you had,
16  and you said about 30 or 45 minutes, and we've
17  been going about 45.  How much longer?
18      MR. LENISKI:  I've got -- hold on.
19  Thanks for your patience.
20      We're on 56 now, right?
21      THE WITNESS:  Yes.
22      (Romaine Exhibit No. 56 was marked
23      for identification.)
24  BY MR. LENISKI:

Highly Confidential - Subject to Further Confidentiality Review



Page 462

Page 464

6    A   -- with John.
7    Q   I've got one more exhibit for you.
8    57.  This is one of those fun oversized
9  ones.
10       (Romaine Exhibit No. 57 was marked
11       for identification.)
12  BY MR. LENISKI:
13    Q   I've handed you a document that we've
14  labeled Exhibit 57 to your deposition.  The cover
15  is an e-mail that's Bates-stamped EPI002036707.
16    A   Yes.
17    Q   I will represent to you that we have
18  only attached an excerpt from the attachment to
19  the e-mail in Exhibit 57.  And there's a -- should
20  be a cover page that explains that.  So it's a --
21  it's a demonstrative --
22    A   Okay.
23    Q   -- as well.
24    A   Okay.

Page 463

Page 465

1    Q   Okay?  I'll represent that to you.
2        So let's first look at the e-mail.  Do
3  you recognize the e-mail?
4    A   I don't recognize the e-mail.  I know it
5  came from me, but I don't recall sending it and --
6  it's six years ago.

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 470

Page 472

```
 1   the exhibits --
 2         MR. MORRIS:  Oh, of the -- yes.
 3         THE VIDEOGRAPHER:  The time is 7:19 p.m.
 4   We're going off the record.
 5         (Recess.)
 6         THE VIDEOGRAPHER:  The time is 7:59 p.m.
 7   We're back on the record.
 8              CROSS-EXAMINATION
 9   BY MR. MORRIS:
10     Q   Mr. Romaine, thank you again for being
11   here today.  I know it's been a long day.  I have
12   a few questions myself for you.
13         And there's a few questions that I'm
14   going to go over your background, not to retread
15   old ground necessarily, but kind of orient us
16   for our series of questions.
17     A   Okay.
18     Q   Can you remind us again when you began
19   at Endo.
20     A   June of 2003.
21     Q   And how long did you remain at the
22   company?
23     A   I left in September of 2013.  So 10
24   years.
```

Page 471

Page 473

```
18   questions at this time.
19         MR. MORRIS:  Thank you.
20         So let's take a break.  I will have
21   questions.  I'm going to organize, and we'll come
22   back in 15 minutes or so.
23         MS. SCULLION:  Let me suggest when we
24   start, then we will read the numbers in of
```

```
 1     Q   Okay.  So what title did you have when
 2   you left the company?
 3     A   Vice president of sales.
 4     Q   So you left in 2013, so how many years
 5   ago approximately is that?
 6     A   Yeah, six years -- six years -- six-ish
 7   years ago.
 8     Q   So it's been quite a while since you've
 9   been at the company, correct?
10     A   Yes.
11     Q   Have you been required to think much
12   about Endo Opana sales in those intervening six
13   years?
14     A   No.
15         MS. SCULLION:  Objection to form.
16   BY MR. MORRIS:
17     Q   You said that when you left the company,
18   you held the title of VP sales.  How long did you
19   hold that title?
20     A   From 2007 until -- June of 2007 until I
21   left in September of 2013.
22     Q   And I know you described earlier some of
23   your job duties, but can you describe in general
24   what your responsibilities were as VP of sales.
```

Highly Confidential - Subject to Further Confidentiality Review

| Page 474 | Page 476 |
|---|---|
| 1   A   Yeah, my role and responsibility was |  |
| 2  to -- to lead the sales organization.  So I was | |
| 3  responsible to make sure that they were well | |
| 4  trained, they would continually be tested to | |
| 5  ensure that they were well trained, and that they | |
| 6  could go out and deliver a clinical message to | |
| 7  physicians. | |
| 8   Q   Are you proud of the time that you | |
| 9  worked at Endo? | |
| 10   A   Absolutely. | |
| 11   Q   And why is that? | |
| 12   A   I worked with great people.  I felt like | |
| 13  we achieved very good results.  I thought, you | |
| 14  know, everybody I worked with, both in the home | |
| 15  office as well as in the field, were ethical, high | |
| 16  integrity, a passion to -- to do what's right for | |
| 17  patients and for the physician offices that they | |
| 18  called on. | |
| 19   So there was a lot of energy around the | |
| 20  company and the work that we did every day and | |
| 21  what we achieved. | |
| 22   Q   Now, eventually you were downsized from | |
| 23  the company, right? | |
| 24   A   That's correct. | |

| Page 475 | Page 477 |
|---|---|
| 1   Q   Did anybody at the company tell you why | |
| 2  you were being downsized? | |
| 3   A   No, not at the time. | |
| 4   Q   Now, you mentioned that the Endo sales | |
| 5  representatives received training on how to do | |
| 6  their job.  How did the sales representatives | |
| 7  receive that training from Endo? | |

Highly Confidential - Subject to Further Confidentiality Review



Page 478

Page 480

```
1    A   Here's 15. 16. 14.  Okay.  I'm sorry.
2    Q   That's okay.  A lot of documents over
3  there.
4        Can you take a look at what had been --
5  what's been marked as Exhibit 14.  You talked
6  about this document earlier today.  Can you just
7  describe what that document is again.
8    A   It's the master visual aid.
9    Q   Okay.  And if you go into the document
10 to the page that at the top has E1023.37.
11       And before I ask you some specific
12 questions about this portion of the document, can
13 you describe again what master visual aid is.
14   A   It's the -- the detail aid that the
15 representatives would use in front of a physician.
16   Q   And if you just take a quick peek at the
17 first page of this exhibit, do you see what date
18 is on the e-mail that's on there?
19   A   September 18th, 2006.
20   Q   And when did -- approximately when did
21 Opana launch, come onto the market?
22   A   June of 2006, I think was the time
23 frame.
24   Q   Okay.  Now, I'm drawing your attention
```

Page 479

Page 481

```
14   Q   If you could look at Exhibit 14, please.
15   A   I don't know if --
16   Q   And I know it might take you a minute to
17 find that, but that could also be called -- called
18 up.
19   A   I -- I don't think I'm going to find it
20 here.
21   Q   It's the one that looks like that
22 (indicating).
23   A   What was the number again?
24   Q   14.
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 482

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 484

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16        MR. MORRIS: I can't figure out what
17    number that is. Oh, it's because there isn't a
18    number yet.
19        Anybody know what number we're on?
20        MS. SCULLION: I do not know. Joe?
21        MR. LENISKI: 58, I think.
22        MR. MORRIS: Okay, we'll go with 58.
23    (Romaine Exhibit No. 58 was marked
24        for identification.)
```

Page 483

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 485

```
 1    BY MR. MORRIS:
 2      Q   I'm handing you Exhibit 58.
 3        MS. SCULLION: Thank you.
 4    BY MR. MORRIS:
 5      Q   And that bears the production number at
 6    the very bottom END00747664.
 7        I'll ask you to take a look at that.
 8    It's an e-mail from you dated September -- I'm
 9    sorry -- July 30th, 2012.
10        Do you recognize what's been marked as
11    Exhibit 58?
12      A   Yes.
13      Q   And what is Exhibit 58?
14      A   It's an e-mail that I sent out to the
15    region business directors.
16      Q   And what was the purpose of your sending
17    out this e-mail?
18      A   Reinforcing tools and resources that the
19    reps had available to them to report diversion.
20      Q   Okay. And so can you read what you
21    wrote in the body of the e-mail.
22      A   Yes.
23        MS. SCULLION: Objection. Form.
24
```

Highly Confidential - Subject to Further Confidentiality Review



Page 486

Page 488

1  different document.  Mine does not have any Bates
2  numbers on it.
3      MR. MORRIS:  I think it may be because
4  of the copy.
5      MS. SCULLION:  Oh, okay.
6      MR. MORRIS:  It should be the same --
7  let's just make sure.  It's the e-mail entitled
8  "RBD Removals."
9      MS. SCULLION:  April 5th, 2013?
10      MR. MORRIS:  April 5th, 2013.
11      MS. SCULLION:  Yeah.  Thank you.
12  BY MR. MORRIS:
13      Q   First, I'll ask whether you recognize
14  the cover e-mail on this exhibit.
15      A   I do recognize the e-mail.  Not
16  specifically, but I do recognize this e-mail.
17      Q   Okay.  And you're a cc on that e-mail?
18      A   Correct.

Page 487

Page 489

12      (Romaine Exhibit No. 59 was marked
13      for identification.)
14  BY MR. MORRIS:
15      Q   Let me show you what has been marked as
16  Exhibit 59.
17      MS. SCULLION:  Thank you.
18  BY MR. MORRIS:
19      Q   Mr. Romaine, do you -- and, I'm sorry, I
20  should identify it with the production numbers.
21  Hold on just one second.
22      It has production number at the bottom
23  ENDO_OPIOID_MDL-00770609.
24      MS. SCULLION:  Sean, you may have a

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 494



Page 496

1    A   It might take me a while.
2        Can I look on here?  Okay.
3    Q   Do you recall the voicemail message that
4    was played earlier today?
5    A   Yes.
6    Q   And I believe on the second page, there
7    is a transcript.
8        MS. SCULLION:  I think we may have
9    marked that as a separate exhibit.
10       MR. MORRIS:  Oh, that was 8?
11       MS. SCULLION:  Yeah.
12       MS. TYJER:  The transcript is 7.  The
13   e-mail is 8.
14       MR. MORRIS:  Right, I -- I'm sorry, I
15   asked for 7.
16       MS. SCULLION:  I believe we marked it as
17   a demonstrative -- as a demonstrative.
18       MR. MORRIS:  Right.  I have it marked as
19   Exhibit 7, the actual transcript.  Is that not
20   correct?
21       (A discussion was held off the record.)
22       MR. MORRIS:  Oh, I'm sorry.  Do you need
23   a different number for that?  E -- E1203.
24   BY MR. MORRIS:

Page 495

18   BY MR. MORRIS:
19   Q   Earlier today counsel also asked you
20   some questions about -- I'm going to pull it up as
21   Exhibit 7.
22   A   Oh, gosh.  Okay.
23   Q   And maybe we can do it just by pulling
24   it --

Page 497

Highly Confidential - Subject to Further Confidentiality Review



Page 498

Page 500

BY MR. MORRIS:
1
2     Q   How many people would have received the
3  documents like that?
4        MS. SCULLION:  Objection.  Form,
5  foundation.
6  BY MR. MORRIS:
7     Q   Let me ask it this way:  Market
8  research, do you know how many people within the
9  company would receive that kind of information?
10    A   30 to 40, approximately.
11    Q   And as the VP of sales, were you
12  expected to do anything in response to receiving
13  that market research if you received it?
14    A   No.
15        MS. SCULLION:  Objection to form.
16        MR. MORRIS:  Why don't we just take a
17  quick pause here.  We don't even have to leave.  I
18  just want to confer and see if there's any further
19  questions.
20        THE WITNESS:  Okay.
21        THE VIDEOGRAPHER:  The time is 8:28 p.m.
22  We're going off the record.
23        (Pause.)
24        THE VIDEOGRAPHER:  The time is 8:29 p.m.

Page 499

11    Q   I'm going to show you now Exhibits 40
12  and 41.  And so you don't have to look through
13  your pile, I'm just going to give you my copies
14  that I marked.
15        Do you recall those exhibits?
16    A   From today, yes.
17    Q   From today.  And had you seen those
18  documents prior to today?
19    A   I don't recall them.
20    Q   And what are those two documents?  What
21  kind of documents are they?
22        MS. SCULLION:  Objection.  Form.
23        THE WITNESS:  They're summaries of
24  market research.

Page 501

1  We're back on the record.
2        MR. MORRIS:  Mr. Romaine, thank you very
3  much.  I don't have any further questions at this
4  time.
5        THE WITNESS:  Thank you.
6        THE VIDEOGRAPHER:  The time is 8:29 p.m.
7  We're going off the record.
8        (Recess.)
9        THE VIDEOGRAPHER:  The time is 8:51 p.m.
10  We're back on the record.
11        REDIRECT EXAMINATION
12  BY MS. SCULLION:
13    Q   Welcome back, Mr. Romaine.
14    A   Thank you.
15    Q   You realize you're still under oath?
16    A   Yes.
17    Q   Thank you.

126 (Pages 498 to 501)



Page 502

Page 504

```
1    on the sides of the master visual aids?
2        A   Yes.
3        Q   And you were asked:  What was the
4    purpose of having these types of boxes pulled out
5    for the training material that was provided to the
6    sales force?
7            And your answer was:  To ensure that
8    they knew exactly what were important pieces if
9    they need to reinforce to physicians when they're
10   making the sales presentations.  Correct?
11       A   Correct.
12       Q   And so that would include, for example,
13   on page E1023.19 --
14       A   Okay.
```

Page 503

```
15       Q   Correct.  Okay.
16           And then you were asked about the master
17   visual aid, and that was Exhibit 14.
18       A   Okay.  I have it right here.
19       Q   And I believe Mr. Morris took you back
20   to the navigator portion, which begins at
21   E1023.18. Can you turn to that page?
22       A   Yes.  Okay.  I'm sorry.
23       Q   Okay.  And do you recall Mr. Morris was
24   asking you about in this section the callout boxes
```

Page 505



Page 506

BY MS. SCULLION:

Q   Okay.  Can you pull back Exhibit 59, which Mr. Morris reviewed with you.

A   Do you know which -- what that was actually?

Q   Yeah, it's the removal list.

A   Okay.

Q   Thank you.

A   Yes.

Q   Do you have Exhibit 59 in front of you?

And Mr. Morris had you turn to some of the pages attached at the back where it was noted in various places -- let's go to page 26 of 59.  I think that's what you were on.

Page 508

Page 507

A   Okay.

Q   It was noticed -- I'm sorry.  It's

Page 509

Highly Confidential - Subject to Further Confidentiality Review



Page 510

18    A   Well --
19    Q   Let me make this easier.
20        MS. SCULLION:  Do we have the exhibit?
21        THE WITNESS:  This one, yes.
22   BY MS. SCULLION:
23    Q   What is the exhibit number, please?
24    A   58.

Page 512

Page 511

1    Q   58.  Thank you.
2        MS. SCULLION:  Do we have that?  That's
3   okay.
4   BY MS. SCULLION:
5    Q   You have Exhibit 58 in front of you --
6    A   Yes.
7    Q   -- and you were asked about that, and

Page 513

Highly Confidential - Subject to Further Confidentiality Review



Page 514

Page 516

```
     10                                        --
     11   what are we on?  60?  Thank you.
     12        (Romaine Exhibit No. 60 was marked
     13        for identification.)
     14   BY MS. SCULLION:
     15     Q    Let me hand you what's been marked as
     16   Exhibit 60.  This is an e-mail from -- it's
     17   Bates-stamped ENDO_OPIOID_MDL-01861288.
     18        And if you turn back, you can see this
     19   is an -- an e-mail chain that starts on page
     20   E852.3.  It starts as an e-mail from Margaret
     21   Takasu-Cronan to Paul Badley, Kevin Johnston, and
     22   is cc'd to Ron Jackson.
     23     A    Yes.
```

Page 515

Page 517

Highly Confidential - Subject to Further Confidentiality Review



Page 518

Page 520

```
 1    included on the -- on the call plan, and you said
 2    that these would have to be experienced
 3    physicians, correct?
 4        A   Experienced in the therapeutic class
 5    that we were calling on for, yes.
```

Page 519

Page 521

```
14         MS. SCULLION:  And then can we pull up
15    1207 again, please.  Is that 1207, the script?
16         MS. TYJER:  1203.
17         MS. SCULLION:  I'm so sorry.  Thank you.
18    BY MS. SCULLION:
19        Q   Okay.  So Mr. Morris brought you back to
20    the -- the voicemail from June of 2012 --
21        A   Yes.
```

```
22    make.
23        Q   Okay.  And then Mr. Morris was asking
24    you about the criteria for a physician to be
```

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 526

9    MS. SCULLION:  Thank you.  I have no
10   further questions for today.
11       THE WITNESS:  Okay.
12       MR. MORRIS:  Yes, except weren't you
13   going to read something?
14       MS. SCULLION:  Yes.  So --
15       MR. MORRIS:  The -- the numbers.
16       MS. SCULLION:  I have them in my pocket.
17       So for the record, here's the Bates
18   numbers for certain exhibits where the Bates
19   numbers were cut off.
20       Exhibit 18 was ENDO_OPIOID_MDL-00684008
21   through 011.
22       Exhibit 19 was ENDO_OPIOID_MDL-00686202
23   through zero -- 205.  So 202 through 205.
24       And Exhibit 24 was

Page 527

1    ENDO_DATA_OPIOID_MDL-0000021.
2        MR. MORRIS:  Okay.  Now we're done.
3        THE VIDEOGRAPHER:  The time is
4    9:15 p.m., January 10th, 2019.  Going off the
5    record, concluding the videotaped deposition.
6        (Whereupon, the deposition of
7        LARRY W. ROMAINE was concluded
8        at 9:15 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 528

1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2        The undersigned Certified Shorthand Reporter
3    does hereby certify:
4        That the foregoing proceeding was taken before
5    me at the time and place therein set forth, at
6    which time the witness was duly sworn; That the
7    testimony of the witness and all objections made
8    at the time of the examination were recorded
9    stenographically by me and were thereafter
10   transcribed, said transcript being a true and
11   correct copy of my shorthand notes thereof; That
12   the dismantling of the original transcript will
13   void the reporter's certificate
14       In witness thereof, I have subscribed my name
15   this date:  January 15, 2019
16
17       _____
18       LESLIE A. TODD, CSR, RPR
19       Certificate No  5129
20   (The foregoing certification of
21   this transcript does not apply to any
22   reproduction of the same by any means,
23   unless under the direct control and/or
24   supervision of the certifying reporter )

Page 529

1        INSTRUCTIONS TO WITNESS
2        Please read your deposition over carefully and
3    make any necessary corrections. You should
4    state the reason in the appropriate space on the errata
5    sheet for any corrections that are made.
6    After doing so, please sign the errata sheet
7    and date it.
8        You are signing same subject to the changes
9    you have noted on the errata sheet, which will be
10   attached to your deposition.  It is imperative
11   that you return the original errata sheet to the
12   deposing attorney within thirty (30) days of
13   receipt of the deposition transcript by you. If
14   you fail to do so, the deposition transcript may
15   be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24

133  (Pages 526 to 529)

Highly Confidential - Subject to Further Confidentiality Review

Page 530

```
1           ------
2          E R R A T A
3           ------
4    PAGE LINE CHANGE
5    ___ ___ _____
6    REASON: _____
7    ___ ___ _____
8    REASON: _____
9    ___ ___ _____
10   REASON: _____
11   ___ ___ _____
12   REASON: _____
13   ___ ___ _____
14   REASON: _____
15   ___ ___ _____
16   REASON: _____
17   ___ ___ _____
18   REASON: _____
19   ___ ___ _____
20   REASON: _____
21   ___ ___ _____
22   REASON: _____
23   ___ ___ _____
24   REASON: _____
```

Page 531

```
1          ACKNOWLEDGMENT OF DEPONENT
2          I,_____, do hereby
3    certify that I have read the foregoing pages, and
4    that the same is a correct transcription of the
5    answers given by me to the questions therein
6    propounded, except for the corrections or changes
7    in form or substance, if any, noted in the
8    attached Errata Sheet.
9
10   _____
11   LARRY W. ROMAINE              DATE
12
13
14   Subscribed and sworn to
15   before me this
16   _____day of_____,20___.
17   My commission expires:_____
18   _____
19   Notary Public
20
21
22
23
24
```

134 (Pages 530 to 531)