```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4

 5     ----------------------------x

 6   IN RE: NATIONAL PRESCRIPTION   ) Case No.

 7   OPIATE LITIGATION              ) 1:17-MD-2804

 8   APPLIES TO ALL CASES           ) Hon. Dan A. Polster

 9     ----------------------------x

10        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11                 CONFIDENTIALITY REVIEW

12

            VIDEOTAPED DEPOSITION OF BURT E. ROSEN

13

                     WASHINGTON, D.C.

14

              WEDNESDAY, JANUARY 16, 2019

15

                     9:06 A.M.

16

17

18

19

20

21

22

23   Pages: 1 - 325

24   Reported by: Leslie A. Todd
```

Page 2

1   Deposition of BURT E. ROSEN, held at the law
2   offices of:
3
4
5       DECHERT, LLP
6       1900 K Street, N.W.
7       Washington, D.C. 20006
8
9
10
11
12   Pursuant to notice, before Leslie Anne Todd,
13   Court Reporter and Notary Public in and for the
14   District of Columbia, who officiated in
15   administering the oath to the witness.
16
17
18
19
20
21
22
23
24

Page 3

1           A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFFS:
4       CHARLES J. CRUEGER, ESQUIRE
5       ERIN DICKINSON, ESQUIRE
6       CRUEGER DICKINSON, LLC
7       4532 North Oakland Avenue
8       Whitefish Bay, Wisconsin 53211
9       (414) 210-3900
10
11      ELLYN HURD, ESQUIRE
12      SIMMONS HANLY CONROY, LLC
13      112 Madison Avenue
14      New York, New York 10016-7416
15      (212) 784-6400
16
17      BONNIE A. KENDRICK, ESQUIRE
18      THE DUGAN LAW FIRM
19      365 Canal Place
20      Suite 1000
21      New Orleans, Louisiana 70130
22      (504) 648-0810
23
24

Page 4

1   APPEARANCES (Continued):
2
3   ON BEHALF OF THE STATE OF SOUTH CAROLINA:
4       REBECCA McCORMACK, ESQUIRE (Telephonically)
5       ASSISTANT ATTORNEY GENERAL
6       Columbia, South Carolina
7
8   ON BEHALF OF THE WITNESS:
9       MICHAEL T. COLE, ESQUIRE
10      JOSEPH E. FORNADEL, III, ESQUIRE
11       (Telephonically)
12      NELSON MULLINS RILEY & SCARBOROUGH LLP
13      151 Meeting Street
14      Charleston, South Carolina 29401-2239
15      (843) 720-4325
16
17  ON BEHALF OF THE WITNESS AND PURDUE PHARMA:
18      ERIK W. SNAPP, ESQUIRE
19      NICOLAS A. NOVY, ESQUIRE
20      DECHERT LLP
21      35 West Wacker Drive, Suite 3400
22      Chicago, Illinois 60601
23      (312) 646-5800
24

Page 5

1   APPEARANCES (Continued):
2
3   ON BEHALF OF WALMART:
4       SHIRLETHIA V. FRANKLIN, ESQUIRE
5       JONES DAY
6       51 Louisiana Avenue, N.W.
7       Washington, D.C. 20001-2113
8       (202) 879-3939
9
10  ON BEHALF OF ENDO PHARMACEUTICALS AND PAR:
11      WREDE SMITH, ESQUIRE
12      ARNOLD & PORTER KAYE SCHOLER LLP
13      601 Massachusetts Avenue, N.W.
14      Washington, D.C. 20001-3743
15      (202) 942-5435
16
17  ON BEHALF OF McKESSON CORPORATION:
18      GABRIEL FULMER, ESQUIRE
19      COVINGTON & BURLING, LLP
20      One City Center
21      Washington, D.C. 20001-4956
22      (202) 662-5598
23
24

Page 6

1  APPEARANCES (Continued):

2

3  FOR AMERISOURCEBERGEN:

4      GRETCHEN M. CALLAS, ESQUIRE (Telephonically)

5      JACKSON KELLY, PLLC

6      500 Lee Street East, Suite 1600

7      Charleston, West Virginia 25301-3202

8      (304) 340-1169

9

10  FOR JANSSEN PHARMACEUTICALS:

11      STEPHANIE FUNG, ESQUIRE (Telephonically)

12      O'MELVENY & MYERS, LLP

13      2765 Sand Hill Road

14      Menlo Park, California 94025

15      (650) 473-2600

16

17  ALSO PRESENT:

18      DANIEL HOLMSTOCK (Videographer)

19

20

21

22

23

24

Page 7

1           C O N T E N T S

2  EXAMINATION OF BURT E. ROSEN           PAGE

3      By Mr. Crueger                16

4

5

6

7           E X H I B I T S

8      (Attached to transcript)

9  PURDUE-ROSEN DEPOSITION EXHIBITS        PAGE

10  No. 1    E-mail forwarding Burt E. Rosen

11      Highlights.doc and Burt E.

12      Rosen Resume.doc, Bates

13      PPLPC031000172359 to 031000172363    29

14  No. 2    E-mail re Follow-up to our

15      meeting Bates PPLPC021000025053 to

16      021000025074           33

17  No. 3    E-mail forwarding 2005 Federal

18      Government Affairs Objectives Form

19      Revisions As of 6-27-2005.doc,

20      Bates PPLPC022000075789 to

21      022000075792           46

22  No. 4    AMDG Interagency Guideline on

23      Opioid Dosing for Chronic Non-

24      Cancer Pain           51

Page 8

1           E X H I B I T S (Continued)

2      (Attached to transcript)

3  PURDUE-ROSEN DEPOSITION EXHIBITS        PAGE

4  No. 5    Chart entitled "3 Waves of the

5      Rise in Opioid Overdose Deaths"     53

6  No. 6    E-mail re PCF May Meeting Documents,

7      Bates PPLP004021796 to 004021810    57

8  No. 7    Spreadsheet entitled "Response to

9      Request 1)," Bates SFC00000001      82

10  No. 8    Chart                82

11  No. 9    Spreadsheet entitled "Organizational

12      Payments - 2001 through 2/13/2015,

13      Bates PPLPC017000604922         90

14  No. 10   Letter to James Schoeneck (Depomed)

15      from Senator Claire McCaskill,

16      dated March 28, 2017           93

17  No. 11   List of various organizations     102

18  No. 12   HSGAC Minority Staff Report

19      entitled "Fueling an Epidemic,"

20      Report Two                104

21  No. 13   E-mail re Washington State Opioid

22      Dosing Guideline, Bates PPLP004024280112

23  No. 14   Various Lobbying Reports        115

24

Page 9

1           E X H I B I T S (Continued)

2      (Attached to transcript)

3  PURDUE-ROSEN DEPOSITION EXHIBITS        PAGE

4  No. 15   Purdue Educational Grant, Bates

5      PPLP003477086 to 003477125       143

6  No. 16   Plea Agreement in United States of

7      America v. Howard R. Udell       152

8  No. 17   E-mail re POPAN activities in the

9      past months, Bates ENDO-OPIOID_MDL-

10      02210851 to 02210852           155

11  No. 18   E-mail re Washington State

12      Guidelines Relevant Docs, Bates

13      ENDO-OPIOID_MDL-02808826 to

14      02808853                160

15  No. 19   E-mail re Pain Care Forum, Bates

16      PPLP00408626              163

17  No. 20   E-mail re Minutes CEAC December 20th,

18      Bates PPLPC012000357204 to

19      012000357272              167

20  No. 21   2013 OxyContin Annual Marketing

21      Plan, Updated September 19, 2013,

22      Bates PPLP003428932 to 003528965    186

23

24

Page 10

1          E X H I B I T S (Continued)

2          (Attached to transcript)

3   PURDUE-ROSEN DEPOSITION EXHIBITS          PAGE

4   No. 22   E-mail re Pink Sheet Articles &

5          Meeting Next Week, Bates

6          ENDO-OPIOID_MDL-01485646 to

7          01485653                193

8   No. 23   E-mail re Draft (with attachment),

9          PPLPC019000247613 to 019000247617   198

10  No. 24   E-mail re PCF REMS Task Force,

11         Bates PPLP004300356 to 004300362   206

12  No. 25   E-mail re PCF REMS Task Force,

13         Bates PPLPC019000248978 to

14         019000248985            210

15  No. 26   E-mail re Invitation: PCF REMS

16         Task Force (Jan 30 12:00 PM EST),

17         Bates PPLP004333136 to 004333153   215

18  No. 27   USFDA Risk Evaluation and Mitigation

19         Strategies for Certain Opioid Drugs

20         Public Meeting December 4, 2009,

21         Industry Working Group (IWG)    222

22  No. 28   E-mail re Potential Questions for

23         Ad-Com Meeting to Consider, Bates

24         JAN-MS-01154004 to 01154036    227

Page 11

1          E X H I B I T S (Continued)

2          (Attached to transcript)

3   PURDUE-ROSEN DEPOSITION EXHIBITS          PAGE

4   No. 29   Pain Care Forum Media Committee,

5          Report from July 16, 2009, Call

6          Draft Submitted July 17, 2009,

7          Bates PPLP004051807 to 004051809   233

8   No. 30   E-mail re July 9th Pain Care Forum

9          Meeting with Guest Speaker,

10         Dr. Douglas C. Throckmorton MD,

11         Deputy Director, CDER, FDA, Bates

12         PPLP004051877 to 004051878    238

13  No. 31   E-mail re FYI: Pharmacists,

14         Distributors Back New House GOP

15         Prescription Drug Abuse Bill,

16         Bates PPLPC017000518587 to

17         017000518589            241

18  No. 32   Agenda - Pain Care Forum

19         Communications Working Group

20         Conference Call Agenda, April 15,

21         2:00 pm (Eastern) Bates PPLPC

22         018000962773            244

23

24

Page 12

1          E X H I B I T S (Continued)

2          (Attached to transcript)

3   PURDUE-ROSEN DEPOSITION EXHIBITS          PAGE

4   No. 33   E-mail re Reintroduction of

5          Ensuring Patient Access and

6          Effective Drug Enforcement Act,

7          Bates PPLP004267695 to 004267707   244

8   No. 34   E-mail re Reintroduction of

9          Ensuring Patient Access and

10         Effective Drug Enforcement Act,

11         Bates PPLP004267626 to 004267638   247

12  No. 35   E-mail re Final Letter of Support

13         for Ensuring Patient Access and

14         Effective Drug Enforcement Act of

15         2015, Bates PPLP004267408 to

16         004267411               250

17  No. 36   E-mail string re DEA's probe

18         slowing Cardinal, Bates PPLPC

19         004000147352 to 004000147354    255

20  No. 37   E-mail string re Final Letter of

21         Support for Ensuring Patient

22         Access and Effective Drug

23         Enforcement Act of 2015, Bates

24         PPLP004267403 to 004267405    259

Page 13

1          E X H I B I T S (Continued)

2          (Attached to transcript)

3   PURDUE-ROSEN DEPOSITION EXHIBITS          PAGE

4   No. 38   E-mail re Notes from PhRMA Federal

5          Steering Committee meeting today,

6          Bates PPLPC017000681743 to

7          017000681744            263

8   No. 39   E-mail string re Release: Hatch and

9          Whitehouse's Ensuring Patient

10         Access and Effective Drug Enforcement

11         Act Passes Senate, Bates PPLPC

12         0200001006177 to 0200001006181    266

13  No. 40   E-mail string re Release: Hatch and

14         Whitehouse's Ensuring Patient

15         Access and Effective Drug

16         Enforcement Act Passes Senate,

17         Bates PPLPC020001006733 to

18         020001006735            267

19  No. 41   E-mail string re Fwd: S.483

20         (Ensuring Patient Access and

21         Effective Drug Enforcement Act)

22         Bates PPLPC017000701492 to

23         017000701493            268

24

Page 14

1     E X H I B I T S (Continued)

2       (Attached to transcript)

3   PURDUE-ROSEN DEPOSITION EXHIBITS          PAGE

4   No. 42   E-mail string re Fwd: S.483 Passes

5       the House by UC, Bates

6       PPLP004325223 to 004325225        274

7   No. 43   E-mail string re Fwd: S.483 Signed

8       Into Law, Bates PPLPC017000704684 to

9       017000704688        276

10  No. 44   E-mail string re S.483 Passes the

11      House by UC, Bates PPLPC019001265046

12      to 019001265050        277

13  No. 45   Article: Current Navigation Points

14      in Drug Diversion Law: Hidden Rock

15      in Shallow, Murky, Drug-Infested

16      Waters, Winter 2017        284

17  No. 46   E-mail re CEAC Minutes January 26th,

18      Bates PDD8901572742 to 8901572751   288

19  No. 47   E-mail from Burt Rosen to Alan Must

20      (retained by counsel.)        289

21  No. 48   E-mail from Burt Rosen to various

22      people at Purdue, forwarding CEAC

23      minutes (retained by counsel.)        317

24

Page 15

1          P R O C E E D I N G S

2       --------------------

3       THE VIDEOGRAPHER:  We are now on the

4   record.  My name is Daniel Holmstock.  I am the

5   videographer for Golkow Litigation Services.

6   Today's date is January 16th, 2019, and the time

7   is 9:06 a.m.

8       This deposition is being held at the law

9   offices of Dechert LLP, at 1900 K Street,

10  Northwest, in Washington, D.C. in the matter of

11  In Re:  National Prescription Opiate Litigation.

12  It is pending before the United States District

13  Court for the Northern District of Ohio, Eastern

14  Division.

15      The deponent today is Mr. Burt Rosen.

16      Counsel will be noted on the

17  stenographic record for appearances.

18      The court reporter is Leslie A. Todd,

19  who will now administer the oath.

20          BURT E. ROSEN,

21      and having been first duly sworn,

22      was examined and testified as follows:

23          DIRECT EXAMINATION

24  BY MR. CRUEGER:

Page 16

1   Q   Good morning, Mr. Rosen.

2   A   Good morning.

3   Q   Have you been deposed before?

4   A   I have many years ago.

5   Q   Did you work for Purdue at the time?

6   A   I did work for Purdue at the time.

7   Q   What was -- were you deposed as part of

8   a lawsuit?

9   A   I was.

10  Q   What was the lawsuit about?

11  A   I served on the board of directors of a

12  medical device company in California.  We sold the

13  company to Johnson & Johnson, and we received more

14  than double our stock price, 104 percent, and we

15  were sued by a plaintiffs' firm representing some

16  stockholders who claimed that we did not get

17  enough money for the company.

18  Q   And what was the medical device company?

19  A   It was called Mentor.

20  Q   What kind of devices did they make?

21  A   Well, it made a variety of products.  It

22  made breast implants.  It made what I would call

23  dermalogical products.  Hyaluronic acid.  Things

24  of that nature.

Page 17

1   Q   And you said you were at Purdue at the

2   time?

3   A   I did work for Purdue at the time.

4   Q   And you served on the board of directors

5   for this company?

6   A   Of the company, yes.

7   Q   Do you currently serve on any other

8   board of directors?

9   A   No, I don't.

10  Q   Have you served on any other board of

11  directors in the past?

12  A   No, that's the only board of directors

13  that I had served on.

14  Q   Well, since it's been a little while,

15  I'll just go over the basic rules of the

16  deposition.  It's fairly simple.  I'll just ask

17  you questions, and then you answer the questions.

18      The only difference from a normal

19  conversation is you actually really do have to

20  adhere to the rules of etiquette and not talk over

21  people, and it's not because of etiquette, it's

22  because she can't take down what I'm saying --

23  A   Of course.

24  Q   -- and you're saying if we're talking at

Page 18

1 the same time. And she'll get increasingly angry
2 if we do it. So --
3     A   I'll try not to do that.
4     Q   What did you do to -- to prepare for
5 today's deposition?
6     A   I had several meetings with my lawyers
7 here.
8     Q   Did you talk to anyone else besides your
9 lawyers?
10     A   No. Not about the substance. My wife
11 of course knows I'm being deposed, but not about
12 the substance.
13     Q   Did you review any documents to prepare
14 for the deposition?
15     A   I did.
16     Q   Did you bring those documents with you
17 today?
18     A   I did not. I brought nothing with me
19 today.
20     Q   Do you know what documents you reviewed?
21     A   I could not name them. I'm sure that my
22 attorneys know what documents I used.
23     Q   Do you know about how many there were?
24     A   I don't know the number.

Page 19

1     Q   Large, small?
2     A   I don't know how to answer that
3 question. There were a number of documents. I
4 don't know how many.
5     Q   What kind of documents -- were they
6 e-mails?
7     A   Some of them were e-mails. I'm trying
8 to remember. I think -- I think they were all
9 e-mails, but I could be wrong.
10         MR. CRUEGER: Did you want to interject
11 something?
12         MR. SNAPP: No, go ahead.
13 BY MR. CRUEGER:
14     Q   Can you tell me what the subject matter
15 of these documents were?
16         MR. SNAPP: I will object on the grounds
17 of attorney-client privilege and attorney work
18 product.
19         And instruct you not to answer.
20 BY MR. CRUEGER:
21     Q   Did you ask to review these documents?
22     A   I --
23         MR. SNAPP: And if this -- I'm going to
24 object to the extent that this question calls for

Page 20

1 you to divulge discussions you had with attorneys.
2 If you can answer without talking about
3 conversations with attorneys, you can answer.
4         THE WITNESS: I did not.
5 BY MR. CRUEGER:
6     Q   Did you see the notice of deposition?
7     A   I did not.
8     Q   Okay. Did you bring any -- I asked
9 that.
10         We will just sort of run through your
11 background quickly just to get an idea of what it
12 is, and we're not going to -- not going to make it
13 into a memory test and stuff like that and have
14 you live through your entire life.
15         I know you graduated from college. What
16 was your degree in?
17     A   Business economics.
18     Q   Where did you graduate from?
19     A   University of South Carolina.
20     Q   And I also know you went to law school.
21     A   I did.
22     Q   Where did you go to law school?
23     A   I also went to the University of South
24 Carolina.

Page 21

1     Q   And did you graduate, I believe to just
2 verify this, about 1973?
3     A   I did.
4     Q   Okay. And what did you do after you
5 graduated from law school?
6     A   I moved here to Washington. I worked
7 for Senator Ernest Hollings from South Carolina as
8 what's called a legislative aide.
9     Q   And what does a legislative aide do?
10     A   I followed legislation on the senate
11 floor and in committee -- committees where Senator
12 Hollings served, or at least a couple of his
13 committees, and tried to keep him apprised of what
14 was happening at the time any -- just generally.
15     Q   About how long did you do that?
16     A   I was with Senator Hollings for four --
17 about four and a half years.
18     Q   And about -- what did you do after that?
19     A   I moved to New York City, where I took a
20 job with a company called the Continental Group,
21 which was the Continental Can Company. They made
22 cans, and they had other businesses as well.
23     Q   What did you do for them?
24     A   I worked for the -- essentially I worked

Page 22

1  in the government relations group, and I primarily
2  staffed the chairman of the board at the Business
3  Roundtable back here in Washington.
4      Q   And what does that actually mean, like
5  what did you actually do, sir?
6      A   Well, the Business Roundtable is an
7  organization that's made up of chief executive
8  officers of some of the major companies in the
9  United States, and then he was a member of the
10 Business Roundtable.  And my work primarily
11 revolved around antitrust issues that were going
12 on at the time in Congress.
13     Q   And how long did you do this job?
14     A   I was with Continental Group for about
15 two years.
16     Q   And what did you do after?
17     A   Well, the Continental Group actually
18 moved its headquarters to Connecticut, and I
19 didn't want really to live in Connecticut, so I
20 moved back from New York City and took a job as an
21 assistant vice president of a trade association
22 representing property and casualty insurance
23 companies.
24     Q   What is the name of that association?

Page 23

1      A   Let's see if I can remember.  I think it
2  was the National Association of Independent
3  Insurers.
4      Q   And how long did you -- did you do that
5  job?
6      A   I was there just under a year, I
7  believe.
8      Q   And what did you do after that?
9      A   I went to work for Pfizer
10 Pharmaceuticals.
11     Q   What did you do for Pfizer?
12     A   I worked in their government relations
13 department here in Washington.  And I was living
14 in Washington.  I don't remember if I mentioned I
15 moved back from New York City.
16     Q   And what kind of work did you do for
17 Pfizer in government relations?
18     A   Well, I -- it varied.  You mean subject
19 matter or what do you really mean?
20     Q   Well, for someone who doesn't do it as a
21 living, I'm not sure what a government relations
22 person does.  So...
23     A   Well, I was in their government
24 relations department.  I worked -- we reported to

Page 24

1  our legal department.  Our job was really to try
2  to find public policies that -- that -- or to work
3  on public policies that -- that affected the
4  company.
5          And my work, as I recall it, you know,
6  varied.  I worked on patent issues, I worked on
7  some antitrust issues.  Again, I actually had met
8  my boss at Pfizer through the Business Roundtable,
9  and he had sought me out, recruited me to come and
10 work for -- for Pfizer.  I just worked on a
11 variety of issues over the years.
12         I was there -- I don't remember exactly,
13 but about eight -- eight and a half years, or
14 something like that.
15     Q   And what did you do after you worked for
16 Pfizer?
17     A   I left Pfizer.  I had been recruited to
18 work for Bristol-Myers at the time and did a
19 similar job there.
20     Q   Still here in D.C.?
21     A   Yes.  Here in D.C.
22     Q   And you said it's a similar job.  Can
23 you give some examples of what you did at
24 Bristol-Myers?

Page 25

1      A   Well, Bristol -- both Pfizer and
2  Bristol-Myers were fairly broad-based companies.
3  They not only made pharmaceuticals; they -- they
4  had medical device companies.  They had consumer
5  over -- what are called over-the-counter products.
6  They had cosmetics products, both of them.  Pfizer
7  owned Coty Cosmetics.  Bristol-Myers owned
8  Claire -- pardon me -- Clairol.  So had a fairly
9  broad portfolio of issues that affected those
10 kinds of products.
11     Q   Why did you leave Pfizer, by the way?
12     A   I was recruited by Bristol.  They had a
13 gentleman who ran their office and he was nearing
14 retirement age, and asked me to come there and
15 work for a short time until he retired, and then
16 take over the office as the vice president.
17     Q   And about how long did you work for
18 Bristol-Myers?
19     A   I ended up at Bristol-Myers -- I forget
20 the exact dates, I'm sure they're in my bio, but
21 it's about three -- three, three and a half years,
22 something like that.
23     Q   So I'm not asking you about exact dates
24 because I can't -- I remember the year I got

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 married, but after that it gets a little fuzzy.
2      So where did you go after Bristol-Myers?
3      A   I went from Bristol-Myers to SmithKline
4 Beecham, where I was offered a job to be the
5 vice president of their government relations
6 program.
7      Q   And why did you leave Bristol-Myers?
8      A   Because I had a better job offer.
9      Q   Were you looking for a job?
10     A   No.
11     Q   And what did you do for SmithKline
12 Beecham?
13     A   Same kind of work.  They also were a
14 very broad-based company.  They had consumer
15 brands, over-the-counter brands, as well as
16 pharmaceuticals.  They also had a vaccine
17 business, so I spent a lot of time working on
18 vaccine issues.
19     Q   And how long did you work for them?
20     A   Again, I don't know the exact -- but it
21 was about, again, eight or nine years.
22     Q   And what did you do after that?
23     A   SmithKline Beecham merged with Glaxo,
24 and I left and took a similar job with Novartis

Page 27

1 Pharmaceuticals.
2      Q   By the way, SmithKline Beecham, you were
3 still in D.C.?
4      A   I -- I've never left D.C. since I came
5 back from New York.
6      Q   Okay.
7      A   And -- as far as my residence and my
8 place of work.
9      Q   So you went to Novartis.  What did you
10 do for them?
11     A   Same thing.
12     Q   Government relations?
13     A   I was the vice president of their
14 government relations program, yes.  And they again
15 were a very broad-based company with consumer
16 products as well as pharmaceuticals.  They also
17 had a nutritional business that made things like
18 infant formula.
19     Q   So how long did you work for Novartis?
20     A   I was there for about two years.
21     Q   Then what did you do?
22     A   Well, I was recruited to come to work
23 for Purdue Pharmaceuticals.
24     Q   Was that about 1992?

Page 28

1      A   No.  I came to Purdue in December of
2 2001.
3      Q   Okay.  Oh, yeah, sorry about that.
4      Who recruited you?
5      A   A search firm.
6      Q   Did you interview with people at Purdue?
7      A   I did.
8      Q   Who did you interview with?
9      A   I interviewed with Michael Friedman;
10 Howard Udell; a gentleman who was the head of
11 human resources, David Long.  I'm trying to
12 remember.  I'm sure I met with more people than
13 that, but I think it was a guy who was the head of
14 the communications group.
15     Q   So I'm not sure, is the -- when you say
16 you're doing government relations, is that the
17 same thing as lobbying or --
18     A   Yes, it is.
19     Q   Okay.
20     A   Well, yes.  Some of my job is actual
21 lobbying.
22     Q   And what would the other part be?
23     A   Well, when you're in government
24 relations, a lot of what you do is you monitor

Page 29

1 things.  You -- you know, you try to keep track of
2 a variety of activities that are taken by the
3 government, proposals that are introduced,
4 legislations that's discussed or debated.
5      In many cases you don't actually lobby
6 it.  You don't go up and try to influence.  You
7 just want to know what's going on.  In other cases
8 you may have an interest and you may actually try
9 to, what I would call, lobby it.  But -- so you
10 don't -- you're not up there doing that all the
11 time.  In fact, it turns out it's a fairly small
12 proportion of your time.
13      And then it may be that if you're trying
14 to achieve something, you actually proactively
15 come up with a public policy that you may go up
16 and ask people if they would be willing to
17 consider sponsoring it or offering it as an
18 amendment.
19     Q   So I'm just going to hand you what we're
20 going to label as Exhibit 1.
21      (Rosen Exhibit No. 1 was marked
22      for identification.)
23      MR. CRUEGER:  Thank you.
24 BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    Q   You want to just quickly look at that
2  so --
3    A   Sure.  (Peruses document.)
4    Q   I just want to talk to you about -- so.
5        You don't have to read the whole
6  thing -- the second page that starts with "Career
7  Highlights."  So...
8    A   (Peruses document.)  Okay.
9    Q   You wrote this document, correct?
10   A   I don't recall this document, but I see
11 that I did.  And I don't know who Chuck is.  I
12 assume he's at Pfizer.
13   Q   And I was just interested in -- this is
14 just a list of what you labeled as your career
15 highlights, correct?
16   A   Mm-hmm.
17   Q   And some of these things just I want --
18 so you say, "Enacted" -- that's about the middle
19 of the row, it starts:  "Enacted SB specific tax
20 laws, creating approximately $45 million in tax
21 savings."
22       And then there's other entries there
23 talking about you -- resulting in approximately
24 $36 million in sales, $150 million in SB Canadian

Page 31

1  sales.
2        So I'm just saying, is your job as a
3  government relations, is it measured by impact on
4  sales at these companies?
5    A   It can be, but not always.
6    Q   And one of them is just -- who is SB, by
7  the way?
8    A   SmithKline Beecham.
9    Q   It says:  "Delay Watson's generic
10 Nicorette for three months through FDA
11 intervention.  This resulted in protecting
12 approximately 36 million in SB sales."
13       Can you just tell me exactly how you
14 would delay something for --
15   A   I don't recall that specifically, to be
16 honest with you.  This was back in 2004 that this
17 was written, and I see at a time when Purdue had
18 lost the patent on its product.  And I don't
19 specifically recall what happened with Watson.
20   Q   Did you work for any tobacco companies?
21   A   No.
22   Q   And the next document that's --
23   A   SmithKline Beecham made Nicorette.  Is
24 that what you're asking?

Page 32

1    Q   Well, I was just wondering in general.
2  I don't know what --
3    A   Nicorette is chewing gum.
4    Q   Yeah.
5    A   Yeah.
6    Q   And then the next document, though,
7  would have been your resume, which is with all
8  this "Non-Responsive."  Do you see that?
9    A   I don't know.  I don't really recall
10 this e-mail, so I don't know.
11   Q   Well, if you look at the first page, the
12 second document on the list is Burt E. Rosen
13 Resume, correct?
14   A   Okay, I see that now, yes.  So I -- I
15 guess that would be the case.
16       MR. CRUEGER:  So, Counsel, I'm just
17 going to point out, I think you guys produced like
18 2,000-plus documents for Mr. Rosen yesterday.  So,
19 you know, we haven't had any chance to review any
20 of this, so probably just -- we will consider the
21 deposition as held open.  I assume you're going to
22 object, but --
23       MR. SNAPP:  Yes, we will.
24       MR. CRUEGER:  -- I'm making my record.

Page 33

1  BY MR. CRUEGER:
2    Q   Do you know what was in the --
3        MR. CRUEGER:  This is Exhibit 2.
4        (Rosen Exhibit No. 2 was marked
5        for identification.)
6  BY MR. CRUEGER:
7    Q   I'm going to hand you what is labeled as
8  Exhibit 2.
9        To save us some time, you don't have to
10 read the whole thing.  I'm really just going to
11 ask you about the first page.
12   A   Well, let me read the first page.  This
13 is a document from 2002.  And as I look at it, I
14 have no memory of it.  (Peruses document.)
15   Q   So, this is right about right after you
16 were hired in December of 2001, correct?
17       MR. SNAPP:  Let me just make sure, have
18 you had a chance to look at the document?
19       THE WITNESS:  I haven't.  Let me just
20 read the first page.
21 BY MR. CRUEGER:
22   Q   Oh, first page -- by the first page, I
23 meant the cover page.
24   A   Oh.

Highly Confidential – Subject to Further Confidentiality Review

Page 34

1    Q    Yeah, even -- even less for you to read.
2    A    Well, I -- I would like to just
3  familiarize myself with what I'm reading because I
4  don't --
5    Q    Sure.
6    A    -- have any memory of it whatsoever.
7  (Peruses document.)
8         I do see the date is 11/16/02.  So, yes,
9  I had been at Purdue some months, yes.
10   Q    And this is just a document, and you had
11  forwarded it to your -- an AOL.com address?
12   A    Yes.
13   Q    Do you still have that AOL.com address?
14   A    I don't believe I do have that AOL.com
15  address.  I don't.
16   Q    Do you have a personal e-mail address
17  that --
18   A    I have one, but I don't use it often.
19  I mostly use my Purdue.
20   Q    Do you use your personal e-mail address
21  for work at all?
22   A    I -- I don't.  And I wouldn't -- I have
23  no idea why this was sent to my AOL.
24   Q    Do you have -- I assume you have a cell

Page 35

1  phone, correct?
2    A    I do.
3    Q    Do you use your cell phone for -- is it
4  a Purdue cell phone, by the way?
5    A    Yes.
6    Q    Just to remind you, I do have to finish
7  the sentence before you --
8    A    Sorry.
9    Q    -- respond.  Your eagerness is
10  appreciated, though.
11   A    You're welcome.
12   Q    Do you use your cell phone for texting?
13   A    I do text, but not too frequently.
14   Q    Do you use it for texting for work?
15   A    Primarily for my family, friends.
16   Q    Did you search your texts at all for
17  producing documents in this case?
18   A    I did not.
19   Q    Did anyone ask you to?
20   A    Not that I recall, no.
21   Q    So you started at Purdue in December
22  2001.  You were still here in D.C.?
23   A    Yes.
24   Q    Did Purdue have a D.C. office at the

Page 36

1  time?
2    A    No.  I opened one.
3    Q    And how many people were in the office
4  when you opened it?
5    A    Me.
6    Q    Did you hire anyone else?
7    A    I hired an admin some months after.
8    Q    What -- what's an admin?  Just a
9  secretary or --
10   A    Yes.
11   Q    Okay.  Has the office grown since then?
12   A    I had -- in the early years -- again, I
13  don't remember the dates -- but I had hired
14  another person part-time, and she worked in a
15  professional capacity.  But she was a retired
16  employee, a federal employee, and she only stayed
17  with the company a year or so.  She decided she
18  really wanted to spend her time -- they had a
19  house on the shore, and they -- she wanted to
20  spend her time there.
21   Q    And --
22   A    And then -- I'm sorry.  And then last
23  year, January, I hired a professional with the
24  idea that he would take my job when I retire.

Page 37

1    Q    Do you plan on retiring soon?
2    A    Well, I'm turning 70 in two weeks, and I
3  don't think I'll work forever.
4    Q    Not past 80, huh?
5    A    I certainly -- probably not.  I should
6  never say "certainly."  Probably not.
7    Q    So the professional you hired you said
8  last year, who is that?
9    A    His name is Will Nordwind.
10   Q    He works in the D -- in the D.C. office?
11   A    Yes.
12   Q    And what's his background?
13   A    Will is a lawyer.  He came out of a law
14  firm, Venable Baetjer.  Before that he had worked
15  on Capitol Hill in a couple of different jobs.
16   Q    About how old is he?
17   A    Oh, gosh.
18   Q    You can ballpark it.
19   A    I'm not good at that, but I would say
20  late forties or early fifties.  I never asked him
21  his age.
22   Q    Do you have an office at Purdue's
23  headquarters?
24   A    I don't.

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    Q   Do you travel there often?
2    A   Not often.  Occasionally.
3    Q   I actually just -- do you still maintain
4  your law license?
5    A   No.  I haven't maintained it for a long
6  time.
7    Q   Okay.  So just out of curiosity, you
8  don't need to have a law license to be a lobbyist?
9    A   No, that's not a requirement, and you
10  don't have to be a lawyer.
11    Q   By the way, one of the things I forgot
12  to tell you is you can take a break at any time.
13  It's not an endurance contest.
14    A   Thank you.
15    Q   So the only rule is if I have a question
16  pending that I ask that you not take a break.
17  So...
18    A   Certainly.
19    Q   And just remind you of that, because I'm
20  going to take a quick break here.
21    A   Okay.
22        MR. CRUEGER:  So if we can just take a
23  short break.
24        MR. SNAPP:  Sure.

Page 39

1        THE VIDEOGRAPHER:  The time is
2  9:35 a.m., and we're going off the record.
3        (Recess.)
4        THE VIDEOGRAPHER:  The time is
5  9:42 a.m., and we're back on the record.
6  BY MR. CRUEGER:
7    Q   So let's talk about what you do at
8  Purdue.  Just give me a general overview of what
9  your job is.
10    A   Well, I think it's very similar to what
11  I explained to you earlier.  I try to monitor
12  activities that are occurring in Washington.  My
13  job is a federal government relations job, and
14  many times that is just what I do is monitor.  And
15  then on occasion I do get involved in either
16  something that's happening or -- in terms of
17  legislation, or I may proactively, as I said, try
18  to put something forward that makes sense from a
19  public policy point of view.
20    Q   And who directs your activities at
21  Purdue?
22    A   Currently?
23    Q   We will start with currently, yeah.
24    A   I report to a fellow by the name of Alan

Page 40

1  Must, who is in Connecticut.
2    Q   Let's actually back it up to when you
3  started in like 2001, 2002, who did you originally
4  report to?
5    A   I reported to Howard Udell, who was the
6  general counsel of the company.
7    Q   He's no longer with the company,
8  correct?
9    A   Correct.
10    Q   When did he leave?
11    A   I don't remember the year, but it was
12  quite some time ago.  Many years ago.
13    Q   And after Mr. Udell, who did you report
14  to?
15    A   I reported to John Stewart, again in
16  Connecticut.
17    Q   What was Mr. Stewart's role at the
18  company?
19    A   He was the chief executive.
20    Q   How long did you report to Mr. Stewart?
21    A   Again, I don't remember the number of
22  years, but it was -- it was somewhere around three
23  to five years, I would just guess.
24    Q   And then after that, who did you report

Page 41

1  to?
2    A   I reported to a fellow by the name of
3  Raul Damas.  I don't remember his exact title, but
4  he was the head of corporate affairs.
5    Q   What does that mean?
6    A   I think he had the communications,
7  federal, state, government relations, public
8  policy, and maybe some other things reporting to
9  him.
10    Q   So what -- can you maybe just try to
11  give me a better idea of what that meant?  Like
12  what did he do?  Like those are all just kind of
13  titles.  Like what did he do during the day, and
14  what would he be --
15    A   I don't know what he did during the day.
16  He was in Connecticut.  My job function didn't
17  change through that time.
18    Q   So like how would you know what bills to
19  monitor or -- or issues to try to influence?  I
20  mean who would give you that direction?
21        MR. SNAPP:  Object to the form.
22        THE WITNESS:  Pardon me?
23        MR. SNAPP:  Object to the form.
24        You can answer.

Page 42

BY MR. CRUEGER:

Q   He'll just object, and then you can answer unless he instructs you not to answer.

A   Okay.  Well, as far as monitoring, it was -- you know, you tried to monitor whatever you thought might be relevant to a pharmaceutical company or maybe even to a company generally.  And of course, when there was something that might have an impact on us, you know, we would -- we had a process really at Purdue where there was a public policy group, and they reviewed the policies, you know, the -- the initiatives.  In our world we call them public policies.  And we would try to determine, you know, whether or not to take a position; and if so, what position to take.

Q   And that would be a group of people?

A   It would normally be a group of people, yes.

Q   After Raul Damas, who did you report to?

A   It gets a little complicated, just because there was transition.  I think for a few months, Dr. David Haddox, who was up in Connecticut, and ran the policy group.  Again, I

Page 43

think it was for a few months.

Then for -- to a woman by the name of Josie Martin, who replaced Raul Damas in the corporate affairs function, and then that was again for a number of months.  And then to Alan Must, my current direct reporting.

Q   And about how long have you been reporting to Alan Must?

A   Probably a year, year and a half.

Q   What's Mr. Must's role in the company?

A   Well, he's -- he's in charge of the state government relations, the federal government relations, and the policy function.

Q   How long has he worked for Purdue?

A   I don't know exactly, but he predated me by a little, not a lot -- a lot, but I don't know his starting date.

Q   Has he always been working in state government relations?

A   Since I've been here, yes.  I don't know what his --

Q   Has he --

A   -- total background is.

Q   Has he always been working in federal --

Page 44

well, since you've known him at Purdue, let's just make sure we limit --

A   Okay.  Yes.

Q   -- the questions, and they're not his entire life.  Since he --

A   Yes, state government relations, he has worked in it.

Q   And has he always been working in federal as well?

A   No, he just took that function over whenever he -- I started reporting to him.  As I said, about a year ago or maybe a little more.

Q   And is Mr. Must Purdue -- in Purdue's headquarters in --

A   He is.

Q   -- in Stamford?

A   He is.

Q   Do you know Pamela Bennett?

A   I do.

Q   Does she report to you?

A   No.

Q   Do you know who she reports to?

A   I don't think she works for the company anymore.

Page 45

Q   Who did she report to when she worked for the company?

A   I believe she worked for Alan Must.  I think she reported to Alan.

Q   What did -- what did she do at the company while you've been there?

A   Pamela is a nurse, and she -- I'm sorry, I'm not real good at knowing everybody's titles, and I don't even know what her title is, if she worked in the advocacy department or -- I don't even know if it was advocacy.  I'd better not say that because I'm not sure.

Q   Well, what did --

A   Her role, which I think is what you're interested in, is she interacted with third-party organizations outside of the company.

Q   And what does that mean, third-party organizations?

A   I don't know the exact organizations.  I couldn't list them for you.

Q   Okay.

A   But -- I'm sure that there's somebody who could answer that for you.

Q   Do you mean individuals or professional

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 organizations?
2     A   I believe professional organizations,
3 yes.
4     Q   So an organization like the American
5 Association for Pain Medicine?
6         MR. SNAPP:  Objection to form.
7         THE WITNESS:  I don't know exactly all
8 of her organizations, but that could be.
9 BY MR. CRUEGER:
10     Q   I'm going to ask you -- this is more of
11 a curiosity question that came up out of looking
12 at documents.  So there's also a -- there's two
13 other people named Rosen at the company.  Are you
14 related to any of them?
15     A   Gee, I -- oh, I know who the two are.
16 I'm sorry.  I was thinking I knew one.  Yes, I
17 know both of them, but I am not related to any of
18 them.  No.
19         (Rosen Exhibit No. 3 was marked
20         for identification.)
21 BY MR. CRUEGER:
22     Q   So I think we're on Exhibit 3.
23     A   (Peruses document.)
24     Q   You have to tell me when you're done.

Page 47

1     A   I'm sorry.  I finished reading the
2 document.
3     Q   That's okay.
4         So this is a June 27th, 2005 e-mail with
5 an attachment, correct?
6     A   Yes, it is.
7     Q   And it's just -- it's from you to you,
8 correct?
9     A   It is.  I'm trying to figure out why,
10 but, yes, it is.
11     Q   And if you go to the -- the second page,
12 the one that says "Objectives 2005."  And there's
13 both -- two paragraphs:  One that's a situation
14 statement, and the other is goal.
15         Did you write those paragraphs?
16     A   I don't remember writing this document,
17 but I see that it's my document with my name on
18 it.
19     Q   Well, who -- who would set your goals at
20 Purdue, was that you or was that somebody else?
21     A   It would be collaborative.
22     Q   Collaborative with who?
23     A   With my superior, with Howard Udell in
24 this case.

Page 48

1     Q   And the first goal says:  "Ensure that
2 Purdue products are available to patients without
3 unnecessary restrictions, and that appropriate and
4 effective pain care and pain medicines are
5 accessible to patients and healthcare
6 professionals."
7         I always ask this:  I read that
8 correctly, right?
9     A   Those are the words, yes.
10     Q   And the second goal you have is:  "To
11 assist Purdue in revenue," correct?
12     A   Yes.
13     Q   And -- "and in finding new products."
14 What does that mean?
15     A   Well, I think it was recognized at
16 Purdue that, you know, we're a small company, that
17 we had a limited number of products, and that we
18 needed to diversify our portfolio.
19     Q   Were you ever successful in helping the
20 company find new products?
21     A   Well, as you've heard from my
22 background, I worked for a number of
23 pharmaceutical companies over a long period of
24 time, and I have, you know, a lot of friends and

Page 49

1 contacts in the industry, and I tried to use those
2 to introduce different people to the -- this was
3 not really my area of responsibility, but my role
4 or my value was to just try to introduce people
5 who may have products that they were interested in
6 selling or -- I had friends from other companies
7 that worked in what I would call venture firms
8 that were developing products or had investments
9 in new companies with new products, and so mostly
10 my role there was introducing people to people.
11     Q   And the other part is "Assisting Purdue
12 in preserving revenue."
13         What does that mean?
14     A   It would mean just what it is, that
15 there was -- there were different times where
16 there might be a -- a tax provision, a rebate
17 provision, a -- and really just to be a cost-
18 effective company, to try to operate my own
19 function as cost effectively as possible.
20     Q   Does "preserving revenue" mean
21 maintaining -- helping Purdue maintain sales?
22     A   Well, as you see from the first bullet,
23 my goals in public policy were really to attempt
24 to -- to allow patients who needed these products

Page 50

1  and benefitted from them, to continue to have
2  access to them, and at the same time to do what I
3  could in the realm of public policy to mitigate
4  the diversion, the misuse and the abuse of -- of
5  our products.
6      Q   By "products," you mean opioids?
7      A   I do.
8      Q   Primarily OxyContin, correct?
9      A   Well, OxyContin was the largest opioid,
10  yes.
11      Q   By the way, prior -- prior to coming to
12  Purdue, had you worked on anything that was
13  related to opioids in your previous jobs?
14      A   No.
15      Q   How about in the treatment of pain?
16      A   Oh, gosh.  I -- well, it would be hard
17  for me to go through all my jobs and all my
18  companies and all the products, but I do remember
19  that, for example, Pfizer made a product called
20  Feldene, which was an antiinflammatory --
21  nonsteroidal antiinflammatory, which would treat
22  pain.
23          And of course, I mentioned to you that a
24  variety of companies that I worked for had

Page 51

1  over-the-counter products and made essentially
2  aspirin products.  Like Excedrin I think was a
3  Bristol-Myers product.
4          So in that sense, yes is my answer.
5      Q   But Purdue is the first time you started
6  working with opioids, correct?
7      A   Yes.
8      Q   Did you have any expertise in opioids
9  before you came to Purdue?
10      A   No, I didn't.
11      Q   Did you really know anything about
12  opioids before you came to Purdue?
13      A   Not really.
14
15
16
17
18
19
20
21
22      Q   So, let's do the next one.
23          (Rosen Exhibit No. 4 was marked
24          for identification.)

Page 52

1          THE WITNESS:  Are you through with this?
2  BY MR. CRUEGER:
3      Q   Yes.  So just to let you know, if you
4  just collect them in a pile there, occasionally
5  we'll refer back to them, but also the court
6  reporter takes them at the end of the day.  So...
7          Now, the document I've handed you is
8  Exhibit 4, and these are guidelines, correct?
9      A   They are stated, Interagency Guidelines
10  on Opioid Dosing for Chronic Non-Cancer Pain.
11      Q   And they're published by the State of
12  Washington, correct?
13      A   I see here at the bottom, "Washington
14  State Agency Medical Directors Group, March 2007."
15      Q   Do you recall these guidelines?
16      A   I do not.  I don't ever recall seeing
17  this document.
18      Q   Do you recall the State of Washington
19  issuing guidelines on prescribing opioids?
20      A   I recall that the State of Washington
21  was active in initiating guidelines.  I -- I don't
22  recall this, though.  I don't -- I've never seen
23  this document, to the best of my knowledge.
24      Q   Do you recall what Purdue's reaction to

Page 53

1  the guidelines was?
2      A   I don't.
3          (Rosen Exhibit No. 5 was marked
4          for identification.)
5  BY MR. CRUEGER:
6      Q   I'm just going to hand you what's
7  Exhibit 5.
8          Have you seen this document before?
9      A   I do not recall seeing this document
10  before.  I don't see a date on it.
11      Q   I will tell you it's from the Centers
12  for Disease Control website.
13      A   Okay.
14      Q   Are you aware of the rise in
15  prescription opioid deaths over the years?
16          MR. SNAPP:  Object to the form.
17          THE WITNESS:  I'm generally familiar,
18  but I'm not -- you know, I'm not conversant in the
19  statistics.
20          Do you know what date this was
21  published?
22  BY MR. CRUEGER:
23      Q   It's currently on their website, so --
24      A   Oh, it's currently on their website.

Page 54

1 Okay. Thank you.
2    Q   Are you aware of the increase in abuse
3 of OxyContin over the years?
4    A   I'm aware of OxyContin's use. I mean
5 it's basically been a fairly flat sales line over
6 its lifetime. It rose obviously in the beginning,
7 and then it's been relatively flat.
8    Q   Are you aware of the increase in the
9 abuse of opioids over the past decade in the
10 United States?
11        MR. SNAPP: Object to the form.
12        THE WITNESS: I am aware that opioids
13 are abused, and there is an increase in substance
14 abuse disorder.
15 BY MR. CRUEGER:
16    Q   Are you aware of the increase in
17 prescriptions of opioids over the past decade?
18        MR. SNAPP: Object to the form.
19        THE WITNESS: I'm generally familiar
20 with -- I've seen charts over the past with a rise
21 in the number of prescriptions, and then in -- and
22 then in the fall, the decline in the number of
23 prescriptions.
24 BY MR. CRUEGER:

Page 55

1    Q   So you're aware that there is what some
2 people are referring to as an opioid epidemic in
3 the United States?
4    A   Of course.
5        MR. SNAPP: Object to the form.
6 BY MR. CRUEGER:
7    Q   Do you believe it's an epidemic?
8    A   I'm not really qualified to say, you
9 know, what is an epidemic or not. It's a serious
10 problem.
11    Q   If you go back to Exhibit 4, which is
12 the Washington guidelines.
13    A   Yes. Should I take some time here and
14 read them? I don't -- I'm not familiar with this
15 document or with the guideline.
16    Q   Well, sure. You know, we can just
17 take -- if you want to look at the guideline, we
18 can just take a two-minute break, five-minute
19 break off the record, and you can look through it.
20        MR. SNAPP: Well, I would prefer that we
21 stay on the record.
22        MR. CRUEGER: I prefer that we not spend
23 a lot of time reading documents if he says he's
24 not familiar with them and wants to read the

Page 56

1 entire document.
2        MR. SNAPP: You could have sent us the
3 documents in advance, and he could have reviewed
4 them ahead of time, but we didn't get those, so --
5        MR. CRUEGER: Well, I didn't get 2,500
6 documents until last night, so...
7        We'll just go off the record for about
8 five minutes while you review the document, okay?
9        MR. SNAPP: And we object to going off
10 the record, and we count this time against your
11 seven hours.
12        THE VIDEOGRAPHER: I've just got to make
13 sure, to be clear, with the rules, I have to have
14 an agreement to go off the record, so --
15        MR. SNAPP: We don't agree.
16        MR. CRUEGER: Okay. Can you mark the
17 time?
18        THE VIDEOGRAPHER: All right.
19        MR. CRUEGER: Okay.
20        THE WITNESS: (Peruses document.)
21        MR. SNAPP: Is there a specific portion
22 of this document you would like Mr. Rosen to be
23 able to answer questions on, Chuck? Maybe he
24 doesn't need to read the entire thing, but --

Page 57

1        MR. CRUEGER: Well, if he just wants to
2 look at the -- the summary of the recommendations
3 on page 2, that would be fine. But it's whatever
4 he feels comfortable doing.
5        THE WITNESS: (Peruses document.)
6        I'm unclear what you are asking me to
7 do. So I've now looked at page 2 and the summary
8 on page 3. Is that what you're asking me?
9 BY MR. CRUEGER:
10    Q   Oh, sure. I just want to make sure
11 you're comfortable. You said you wanted to read
12 the --
13    A   Well, I -- how about if you start, and
14 if I need to read the rest, I'll read it. I'm not
15 familiar with the document, and this is the first
16 time that I believe I've ever seen it. So...
17    Q   Well, do you recall Purdue's reaction to
18 this document?
19    A   I don't.
20        (Rosen Exhibit No. 6 was marked
21        for identification.)
22 BY MR. CRUEGER:
23    Q   I'll hand you what's labeled Exhibit 6,
24 I believe.

Page 58

1    And just if you can look at the -- the
2  first page, which ends in numbers 96, of the
3  e-mail, and then just the last paragraph on the
4  page that ends in 98.  I won't read the entire
5  Bates number in.
6    A  (Peruses document.)
7    Q  Oh, the last paragraph.  Sorry.  You
8  don't need to read the entire -- if you want to,
9  that's fine.
10    A  The last paragraph of what?
11    Q  Page 98 -- the last -- page 98, I think
12  is the page you're looking at.  It says "Pain Care
13  Forum Meeting Summary."
14    A  Sure. (Peruses document.)  Okay.
15    Q  If you look --
16    A  Do I need to read the rest of this or --
17    Q  No.
18       If you look on the first page,
19  Mr. Rosen.  Just to be clear, this is an e-mail
20  from Solana Shaw, correct?
21    A  Yes.
22    Q  Who was that?
23    A  She was my secretary, my admin.
24    Q  And you're on the bcc, if you look two

Page 59

1  lines above her name, correct?
2    A  I am.
3    Q  And this was sent out on May 11th, 2007,
4  correct?
5    A  That is correct.
6    Q  And it refers to "PCF May Meeting
7  Minutes."  Is PCF the Pain Care Forum?
8    A  Yes.
9    Q  Let's talk a second about the Pain Care
10  Forum.  What is the Pain Care Forum?
11    A  The Pain Care Forum was a group of
12  organizations that came together and they
13  facilitated a meet- -- meetings to share
14  information and to exchange points of view.
15    Q  You used the past tense.  Is it
16  currently in existence?
17    A  It is in existence.
18    Q  Does it still meet?
19    A  It does.  It meets once a month for an
20  hour.
21    Q  And were you one of the people who
22  founded the Pain Care Forum?
23    A  I am one of the people who helped
24  organize it, yes.

Page 60

1    Q  When was that?
2    A  I don't recall the date, but it was -- I
3  believe it was around 2005.
4    Q  And was it your idea to organize the
5  Pain Care Forum?
6    A  No.  And I don't know exactly whose idea
7  it was.  There was a small group of people that
8  were talking, I was one of them, and the
9  suggestion was made I believe by -- I can't say
10  who it was.  I don't -- it was not by me, but the
11  idea was to try to expand a larger group for the
12  purpose that I just stated, to share information
13  and exchange ideas.
14    Q  Is the Pain Care Forum, is it an actual
15  entity or is it just a name?
16    A  It's just a name.
17    Q  Does the Pain Care Forum have a budget?
18    A  There's no budget.  The -- and I had
19  better explain that.  The -- the Pain Care Forum
20  was voluntary on everybody's part.  Anyone who
21  pretty much wanted to participate could.  And when
22  it was organized, it was asked that people make a
23  voluntary contribution.  And it was asked that no
24  one make a contribution greater than $2,000 on an

Page 61

1  annual basis, and that was because the goal was to
2  have one meeting a month for an hour, as I
3  mentioned, and the goal was to have a speaker at
4  least every quarter, and the budget was to
5  basically pay for lunch.
6    Q  Does the Pain Care Forum -- does it
7  actually hire any outside entities?
8    A  No.
9    Q  Does it pay any lobbyists as an entity?
10    A  No.
11    Q  It has no employees?
12    A  No employees.
13    Q  So how do you join the Pain Care Forum?
14    A  In essence, the way it worked with --
15  and I guess still works, is that if someone wanted
16  to join, an organization wanted to join, they
17  simply sent an e-mail and -- or made a phone call
18  or both, and they explained what their
19  organization was in a couple of sentences and that
20  they wanted to participate.  It was a fairly
21  informal process.
22    Q  Was the HDMA -- are they a member of the
23  Pain Care Forum?
24    A  The HDMA, the -- wholesale distributors,

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  they -- they've changed their name. I can't
2  remember what it is right now.
3      Q   Yeah.
4      A   But they did participate in the Pain
5  Care Forum.
6      Q   And how long did they participate?
7      A   I can't -- I don't know. I can't say.
8  I'd have to --
9      Q   The American Academy of Pain Management
10 still participates in the Pain Care Forum?
11     A   They participate in the Pain Care Forum.
12     Q   The American Academy of Pain Medicine,
13 they still participate in the Pain Care Forum?
14     A   I believe so. You know, I -- I don't
15 know the dates that someone started or ended or --
16     Q   Yeah.
17     A   -- and I honestly can't name every
18 organization. But I believe they still
19 participate.
20     Q   Why don't you just name a few
21 organizations, and I don't really care about the
22 dates as much that they participated. It's just
23 whether they were in the Pain Care Forum.
24         So the RADARS System, they were in the

Page 63

1  Pain Care Forum?
2      A   They were participating.
3      Q   Well, why? What was their interest in
4  the Pain Care Forum?
5      A   Again, I --
6          MR. SNAPP: Objection.
7          THE WITNESS: The RADARS System tracked
8  poison control centers. It was a system out at
9  the University of Colorado. Or one of the health
10 systems in Colorado. I'm not sure which -- which
11 one. And of course, they had an interest in
12 tracking drug abuse, and they had an interest in
13 sharing information and exchanging points of view.
14 BY MR. CRUEGER:
15     Q   And that was a company started by
16 Purdue, correct?
17     A   RADARS was started by Purdue many years
18 ago, and then it was gifted or given away, to the
19 best of my knowledge, to the health system in
20 Colorado.
21     Q   The Federation of State Medical Boards
22 was a member of the Pain Care Forum?
23     A   They did participate.
24     Q   The Wisconsin Pain & Policy Studies

Page 64

1  Group?
2      A   Yes.
3      Q   Let's see. The American Pain
4  Foundation?
5      A   Yes.
6      Q   The American Pain Society was also a
7  member?
8      A   I'm pretty sure they were. Again, I'm
9  sorry, but I confuse a lot of the acronyms and the
10 names because they're similar.
11     Q   And Abbott Laboratories participated in
12 the Pain Care Forum, correct?
13     A   Abbott did, yes.
14     Q   Endo participated in the Pain Care
15 Forum?
16     A   Endo, yes.
17     Q   Johnson & Johnson did?
18     A   Yes.
19     Q   Teva was a participant in the Pain Care
20 Forum?
21     A   I'm -- we have a list somewhere of the
22 participants. I think Teva was. But I honestly
23 am -- I'm sorry, yes, Teva did. I do remember. I
24 was trying to think of individuals.

Page 65

1      Q   So was Richard Sackler, have you -- have
2  you met Richard Sackler?
3      A   I have.
4      Q   Was he involved in setting up the Pain
5  Care Forum?
6      A   Not at all, to my knowledge.
7      Q   Did you ever talk to him about the Pain
8  Care Forum?
9      A   I don't think I ever had a personal
10 conversation with Richard about the Pain Care
11 Forum, none that I remember.
12     Q   How about a conversation that wasn't
13 personal?
14     A   Well, I might have mentioned the Pain
15 Care Forum at a board meeting, if that's what you
16 mean.
17     Q   So you attended Purdue board meetings?
18     A   I have attended Purdue board meetings,
19 but I don't attend them as a rule.
20     Q   And why would you attend Purdue board
21 meetings?
22     A   I might be asked to, you know, inform
23 the board what was going on in Washington, you
24 know, information.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Q   Do you -- you said you -- the Pain Care
2  Forum meets regularly.  They meet here in D.C.?
3    A   The Pain Care Forum has -- has basically
4  rotated its meeting place.  It has met in a
5  variety of conference rooms, and when -- I'm
6  explaining because when it meets, some people show
7  up in person and others are on the telephone.
8  There's a conference call number.  And so some
9  people meet in person.  Some people participate
10  over the telephone, because a number of the people
11  who participate don't live in Washington.
12    Q   Is there a document that has like the
13  dates that companies would have participated in
14  the Pain Care Forum?
15    A   I don't know if there's a document or
16  not that says that.  I mean the Pain Care Forum
17  didn't -- to my knowledge, didn't keep a record in
18  that fashion.
19    Q   But you did keep, as you see on
20  Exhibit 6, meeting minutes for the Pain Care
21  Forum, correct?
22    A   No.  In fact, this surprised me.  There
23  was no formal keeping of minutes, but apparently
24  somebody from the APF, the American Pain

Page 67

1  Foundation, took minutes, but -- and of course,
2  any individual who participated was free to do as
3  they pleased.  But, no, there was no formal minute
4  taking or record.
5    Q   And did you decide what issues the Pain
6  Care Forum would address?
7    A   Did who decide?
8        MR. SNAPP:  Object to the form.
9  BY MR. CRUEGER:
10    Q   Well, I assume the meetings would have
11  an agenda, correct?
12    A   Yes.
13    Q   And who would set the agenda?
14    A   Well, the agenda was set collectively.
15  Our typical practice was about a week or so before
16  a meeting, an e-mail would go to the group and
17  say, Does anybody have an agenda item?  There was
18  no screening.  If anyone had an agenda, it was
19  placed on -- I'm sorry, an issue that they wanted
20  to talk about, it was automatically placed on the
21  agenda with their name by it, you know, in
22  parentheses.
23        And then at the meeting, we just went
24  through that agenda, and as the issue arose, I

Page 68

1  would, you know, call on whoever it was to speak.
2  You know, that John Smith had this issue, would
3  you go ahead and tell the forum what you want to
4  tell them.  And that's how it worked.  So it was a
5  collective forum -- or agenda setting.
6    Q   And the -- the topics largely revolved
7  around opioids, correct?
8    A   A lot of the topics revolved around
9  opioids, and -- and really around what I had
10  stated earlier, the appropriate use of opioids for
11  patients who benefitted from them.  And also
12  the -- the issues surrounding how to try to
13  mitigate the diversion issues and abuse of the
14  products.  I mean, they kind of -- it's hard to
15  talk about one without the other sometimes.
16    Q   And when -- about when did the Pain Care
17  Forum start?
18    A   Well, I think I said it was around 2005,
19  but I don't remember the exact date.  I'm sure
20  there's a record somewhere that would tell you
21  that.
22    Q   And would you start talk -- were you
23  talking about diversion in 2005?
24    A   Well, I've been talking about diversion

Page 69

1  since the time I started at Purdue.
2    Q   But is that a "yes," that the Pain Care
3  Forum, they would be talking about --
4    A   I'm sure that the issue -- I mean I
5  can't remember every meeting over whatever it was,
6  13, 14 years, but I'm sure that the topic came up,
7  yes.
8    Q   Again, just a reminder --
9    A   I'm confident that it came up.
10    Q   Just as a reminder, I have to finish the
11  sentence --
12    A   I'm sorry.
13    Q   -- before you start.
14        Yep.  No, it's hard to do.  It's not a
15  regular conversation.
16        Was the HDMA involved in these
17  discussions about diversion?
18    A   I'm sure they would be if -- if the --
19  you know, when you say involved, I mean, everyone
20  was there to listen and learn, and some people
21  spoke out and others didn't.  So I couldn't say at
22  any given time.
23    Q   Mallinckrodt was a member of the Pain
24  Care Forum too, weren't they?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  A  Again, I believe they were.
2  Q  Did Cardinal -- Cardinal Health ever
3 attend the Pain Care -- Pain Care Forum?
4  A  I don't recall Cardinal participating.
5  Q  How about McKesson?
6  A  It -- I don't recall.
7  Q  How about any of the other HDMA members?
8  A  I don't recall any specific company.
9  Q  Can you just briefly explain what the
10 HDMA is?
11  A  It's a trade association that represents
12 drug wholesalers.
13  Q  And what are drug wholesalers?  Can you
14 name a few?
15  A  You just did.  McKesson, Cardinal.  They
16 take shipments from manufacturers generally and
17 they distribute it to pharmacies, of all kinds of
18 drugs.
19  Q  So why were they interested in the Pain
20 Care Forum?
21      MR. SNAPP:  Object to the form.
22      THE WITNESS:  I guess you'd have to ask
23 them.  I don't know.
24 BY MR. CRUEGER:

Page 71

1  Q  Did you -- did you invite the HDMA or
2 did they ask to participate?
3  A  I don't recall that.  I -- I think when
4 the Pain Care Forum began, there were somewhere
5 around 20 organizations that participated
6 initially.  And then over time, groups would come
7 in.  I don't recall who asked to come or who was
8 invited to come or --
9  Q  And who at the HDMA would regularly
10 participate in these meetings?
11  A  Oh, gosh.  What -- I -- there were
12 different people at different times.  I think
13 probably a woman by the name of Anita Ducca, I
14 think she was in their regulatory group, but I'm
15 not certain.  And I'm sure there would be a record
16 of that in the e-mails.
17  Q  And the meetings of the Pain Care Forum
18 are -- are secret, aren't they?
19      MR. SNAPP:  Object to the form.
20      THE WITNESS:  No, there was nothing
21 secret about them.
22 BY MR. CRUEGER:
23  Q  Does the Pain Care Forum have a website?
24  A  No.

Page 72

1  Q  It's not held in an open -- a place
2 that's generally open to the public, correct?
3  A  That's correct.  It was, as I explained,
4 in a conference room at different places.  Some
5 people would attend in person, and there was an
6 open phone.  We didn't take the roll.  We simply
7 announced who was in the room so that people on
8 the phone would know who they were talking to, and
9 we asked people on the phone to announce who was
10 on the phone so we would know who was talking.
11 But there was no rollcall.  We had no idea who was
12 on the phone or how many people were in the room.
13  Q  And the meetings for the Pain Care
14 Forum, you wouldn't publicly announce them,
15 correct?
16  A  They weren't publicly announced.  They
17 were e-mailed.
18  Q  And as you said, generally they
19 weren't -- you also did not take meeting minutes
20 for the meetings, correct?
21  A  There were no official meeting minutes.
22 As I said, I was a little surprised to see this,
23 but obviously this person from the American Pain
24 Foundation had taken minutes of the 2007 meeting.

Page 73

1  Q  And if you look at Exhibit 6, it's
2 marked as "Confidential," correct?
3  A  I don't know where that would have come
4 from, but it is marked as "Confidential."  That's
5 not my marking obviously.
6      MR. CRUEGER:  Well, we've been at it for
7 about an hour, so why don't we take a break.
8      THE VIDEOGRAPHER:  The time is
9 10:32 a.m.  We're going off the record.
10      (Recess.)
11      THE VIDEOGRAPHER:  The time is
12 10:48 a.m., and we're back on the record.
13 BY MR. CRUEGER:
14  Q  So, Mr. Rosen, I just want to make a few
15 different things clear, so -- about this Pain Care
16 Forum.  So I'm correct it consisted of opioid
17 manufacturers, correct?
18  A  There were opioid manufacturers.
19  Q  So like Endo was an opioid manufacturer,
20 correct?
21  A  They made opioids, yes.
22  Q  Mallinckrodt is a manufacturer of
23 opioids, correct?
24  A  Yes.

Page 74

1    Q   So is Teva, correct?

2    A   Yes.

3    Q   And the HDMA, who represented wholesale

4 distributors, they also participated in the Pain

5 Care Forum?

6    A   They did.

7    Q   And those are the people who distributed

8 opioids, correct?

9    A   That's correct.

10    Q   And including Purdue's opioids, correct?

11    A   I -- yes, I would assume so.

12    Q   And the Federation of State Medical

13 Boards was a member, correct?

14    A   That's correct.

15    Q   And the Federation of State Medical

16 Boards, they issued guidelines on opioid

17 prescribing, correct?

18    A   They -- my understanding is, is that the

19 Federation of State Medical Boards represents

20 state medical boards and state -- and they -- the

21 state medical boards I think set regulations for

22 doctors.

23    Q   And the Federation of State Medical

24 Boards is a private organization, correct?

Page 75

1    MR. SNAPP:  Object to the form.

2    THE WITNESS:  I don't know their

3 organization structure.

4 BY MR. CRUEGER:

5    Q   So was anyone from the FDA a member of

6 the Pain Care Forum?

7    A   I don't believe so.  I don't believe so.

8    Q   How about anyone from the DEA, the Drug

9 Enforcement Agency, did they participate in Pain

10 Care Forum meetings?

11    A   There were -- yes, they participated.

12 There were speakers -- as I had mentioned, there

13 was a goal to have speakers come every quarter.

14 Sometimes we didn't have them every quarter, and

15 sometimes we had them other -- you know, not in

16 the quarter, but, yes, we had speakers come from

17 the FDA, from the DEA.

18    Q   But how about anyone from the DEA who

19 sat in meetings at the Pain Care Forum?

20    A   I don't recall that anyone from the

21 government sat in meetings on a regular basis.

22    Q   Do you recall a name, I think it's Mark

23 Caverly from the U.S. Department of Justice?

24    A   I -- I think I remember the name Mark

Page 76

1 Caverly, yes.

2    Q   And would he participate in Pain Care

3 Forum meetings?

4    A   Not to my recollection.  My best

5 recollection is, is that he came with others.

6 Oftentimes more than one person would come and

7 speak, and I think that -- I know that the DEA

8 came more than once to speak at the Pain Care

9 Forum.

10    Q   Nathaniel Katz, do you know who that is?

11    A   I don't know Nathaniel Katz.  I've heard

12 his name.  I believe he's a physician.

13    Q   Did he ever participate in the Pain Care

14 Forum?

15    A   I don't recall.  I don't recall him

16 participating.  Honestly, I don't remember whether

17 he participated even as a speaker, but I -- I just

18 don't recall.

19    Q   And the main issues that were discussed

20 at the Pain Care Forum, they're all about opioids,

21 correct?

22    A   Well, I think you have probably seen the

23 agendas, and the discussion, I think it's fair to

24 say, revolved around the topic that I said, and

Page 77

1 that's methods to try to maintain access for

2 patients who needed and benefitted from opioids,

3 and at the same time to discuss issues that may

4 help to mitigate the diversion, misuse and abuse

5 of the products.

6    Q   And just to be clear, there are no --

7 there's no more -- no formal meeting minutes, no

8 one wrote down what you discussed, correct?

9    A   That's --

10    MR. SNAPP:  Object to the form.

11    THE WITNESS:  That's my understanding,

12 yes.  As I said before, that there may be

13 individuals who kept minutes or kept notes, but

14 there was no official minute taking, to my

15 knowledge.

16 BY MR. CRUEGER:

17    Q   And at the Pain Care Forum, these

18 people, the -- well, also the professional

19 organizations were a member of the Pain Care

20 Forum, correct?

21    MR. SNAPP:  Object to the form.

22    THE WITNESS:  There were professional

23 organizations.

24 BY MR. CRUEGER:

Page 78

1    Q   And those professional organizations
2  also, like the American Pain Foundation, would
3  promote opioid use, correct?
4        MR. SNAPP:  Object to the form.
5        THE WITNESS:  Well, I don't know what --
6  I was not part of their charter or their meetings,
7  and I don't know what their objectives and goals
8  were.
9  BY MR. CRUEGER:
10    Q   Well, what was -- do you -- you know
11 what the American Pain Foundation is, correct?
12    A   They represented pain patients is my
13 understanding, and I think they had involvement
14 from doctors who treated pain.  But I'm not
15 conversant on what the pain -- American Pain
16 Foundation's goals and --
17    Q   So did you know the -- the head of the
18 American Pain Foundation?
19    A   Well, I think when I came here, there --
20 I did know the head of the -- the executive
21 director or whatever his title was.  I think there
22 were more than one in my time at Purdue.
23    Q   And isn't it fair to say that the Pain
24 Care Forum, you would be discussing policies that

Page 79

1  impact opioids, correct?
2    A   I think we would be sharing information
3  and discussing -- having points of view on
4  policies that might affect opioids, yes.
5    Q   And policies that would affect opioid
6  sales, correct?
7        MR. SNAPP:  Object to the form.
8        THE WITNESS:  I don't recall any -- ever
9  having conversations where sales were discussed.
10 As I said, I think it was where medicines were
11 appropriately available for patients who needed
12 them and benefitted from them.
13 BY MR. CRUEGER:
14    Q   But the Pain Care Forum, you don't
15 commission medical studies, correct?
16    A   Not to my knowledge.  The Pain Care
17 Forum did not, no.
18    Q   Do you think the Pain Care Forum could
19 have commissioned medical studies without your
20 knowledge?
21    A   I doubt it.  There was no budget to do
22 anything other than basically to have lunch.
23    Q   Are you trying to say the point of the
24 Pain Care Forum was just to have lunch and --

Page 80

1        MR. SNAPP:  Object to the form.
2        THE WITNESS:  I said before that the
3  Pain Care Forum was meant to convene meetings so
4  that a variety of organizations could share
5  information and exchange ideas.  And sometimes we
6  had lunch.
7  BY MR. CRUEGER:
8    Q   And at the Pain Care Forum, you would
9  also discuss policies that would impact the
10 distribution of opioids, correct?
11       MR. SNAPP:  Object to the form.
12       THE WITNESS:  I don't recall every
13 subject that was discussed, but I wouldn't be
14 surprised.
15 BY MR. CRUEGER:
16    Q   Do you recall any policies that would
17 have had an impact on opioid distribution that
18 were discussed at the Pain Care Forum?
19    A   Not specifically, I don't.
20    Q   Is it fair to say that the -- one of the
21 purposes of the Pain Care Forum was to coordinate
22 policies amongst manufacturers, distributors and
23 professional organizations?
24       MR. SNAPP:  Object to the form.

Page 81

1        THE WITNESS:  I think the purpose was
2  exactly what I said, and that was to share
3  information and exchange points of view.
4  BY MR. CRUEGER:
5    Q   Now, you're aware that Purdue had
6  financial ties with a lot of the organizations in
7  the Pain Care Forum?
8        MR. SNAPP:  Object to the form.
9        THE WITNESS:  I am aware that -- that
10 Purdue made contributions to some of those
11 organizations.
12 BY MR. CRUEGER:
13    Q   Well, let's just start with the easier
14 ones, though.  The distributors, you had -- Purdue
15 actually had business relationships with
16 distributors who were members of the HDMA,
17 correct?
18    A   Yes.
19    Q   And you said you were aware that Purdue
20 had made financial contributions, I think is the
21 term you used, to certain professional
22 organizations that were members of the Pain Care
23 Forum, correct?
24    A   That's correct.

Page 82

1    Q    How were you aware of that fact?
2    A    I just understood that there had been
3    contributions to participate in their -- I think
4    what were called corporate -- there was a name for
5    it -- corporate committee or whatever.
6    Q    And when did you first learn of that?
7    A    I don't recall when I first learned of
8    it.
9    Q    Do you recall who told you?
10   A    I don't recall specifically, no.
11   Q    Do you recall seeing any dollar numbers?
12   A    I don't recall seeing any dollar
13   numbers, no.
14   Q    Did you ever ask?
15   A    I never asked.
16   Q    Is there a reason you never asked?
17   A    I didn't feel I needed to know.
18   Q    Why is that?
19   A    It just didn't seem important to me.
20        (Rosen Exhibit Nos. 7 and 8 were
21        marked for identification.)
22   BY MR. CRUEGER:
23   Q    I'm giving you what's been labeled as
24   Exhibits 7 and 8.

Page 83

1    A    Okay.  You've given me 8 first and 7.
2    Is there a --
3    Q    The one that's smaller is a summary of
4    the other.
5    A    Okay.
6    Q    And we'll put the other one --
7        MR. SNAPP:  Sorry, which one is which?
8        MR. CRUEGER:  This one, the spreadsheet
9    is 7.  And the one that's up on the ELMO is 8.  We
10   only have one copy of that.  I apologize.  So...
11       THE WITNESS:  Do you need to make copies
12   or --
13       MR. CRUEGER:  Well, two copies.
14       THE WITNESS:  What do you want me to do?
15       MR. SNAPP:  Can I just look at it,
16   please?
17       THE WITNESS:  Yes.  Both or --
18       MR. SNAPP:  I have the other one.  Thank
19   you.
20   BY MR. CRUEGER:
21   Q    I'll represent to you one is just a
22   summary of the figures that are on the -- the
23   other one.  So...
24       The document that's Exhibit 7, which is

Page 84

1    the spreadsheet -- by the way, I'll assume it's
2    labeled as "Confidential," but since it's an Excel
3    spreadsheet, it doesn't print out.  It does have
4    the Bates label SFC00000001.  Actually, I don't
5    know if it's confidential.
6    A    Are you noting that for me, or are
7    you --
8    Q    No, just noting it for the record
9    because it's unclear when you print out
10   spreadsheets.
11       And Exhibit 8 is just the name and then
12   the total that's on the other end of the
13   spreadsheet that's more closely correlated to the
14   name, so we don't have to look at two sheets of
15   paper or read them.
16       So the first one, the American Pain
17   Foundation, we said they're a member of the Pain
18   Care Forum, correct?
19   A    Yes, they participated in the Pain Care
20   Forum.
21   Q    And here it says between '97 and 2012
22   that Purdue had provided approximately $3.6
23   million to the American Pain Foundation, correct?
24       MR. SNAPP:  Object to the form.

Page 85

1        THE WITNESS:  That's what it says.
2    BY MR. CRUEGER:
3    Q    Were you aware of that?
4    A    I'm not aware of that.  This is the
5    first time I've seen this document to the best of
6    my knowledge.
7    Q    So were you aware of the levels of
8    support that Purdue was providing to these
9    organizations who were a member of the Pain Care
10   Forum?
11   A    I was not familiar with the numbers.  I
12   see this is from 1997 until 2012.  And of course,
13   I wasn't even here until basically 2002.  But, no,
14   I was not aware.
15   Q    And same with the American Academy of
16   Pain Medicine, they received approximately
17   $2 million from Purdue, correct?
18   A    Yes, in that same time period, 1997 to
19   2012 is what the document says.
20   Q    The American Pain Society, they received
21   approximately $3 million from Purdue, correct?
22   A    That's what it says.
23       MR. SNAPP:  Object to the form.
24   BY MR. CRUEGER:

Page 86

1     Q   American Geriatric Society, it looks
2 like they received about 400-some thousand
3 dollars, correct?
4     A   It does say that. I don't recall them
5 participating, though, in the Pain Care Forum.
6     Q   Pain & Policy Study Group, though, they
7 participated, correct?
8     A   Yes. That's Wisconsin.
9     Q   That's the Wisconsin Pain & Policy Study
10 Group, correct.
11     A   Yes.
12     Q   So that's about $1.4 million, correct?
13      MR. SNAPP: Object to the form.
14      THE WITNESS: That's what the document
15 says, yes.
16 BY MR. CRUEGER:
17     Q   The Federation of State Medical Boards?
18     A   Yes.
19     Q   That's about $900,000, is it, correct?
20      MR. SNAPP: Object to the form.
21      THE WITNESS: That's what the number
22 says, yes.
23 BY MR. CRUEGER:
24     Q   And above that is the Joint Commission

Page 87

1 on Accredit- -- on Accreditation, do you know what
2 that is?
3     A   I've heard of it, but I've never had any
4 activity or connection with it to my knowledge.
5     Q   Did they participate in the Pain Care
6 Forum?
7     A   I don't think they did, no.
8     Q   And according to this, Purdue provided
9 them about $2.1 million, correct?
10     A   That's what --
11      MR. SNAPP: Object to the form.
12      THE WITNESS: -- the document says.
13 BY MR. CRUEGER:
14     Q   Are you familiar with Dr. Portenoy?
15     A   I know the name. I'm not sure I've ever
16 met him.
17     Q   Did he participate in the Pain Care
18 Forum?
19     A   Not to my recollection, no.
20     Q   How about Dr. Lynn Webster?
21     A   Again, I've heard the name. I actually
22 have seen Lynn Webster at meetings, you know, of
23 like at the FDA or something, but I don't know
24 him. I don't believe I've ever talked to him.

Page 88

1     Q   Did he participate in Pain Care Forum
2 meetings?
3     A   I don't recall him ever participating,
4 no.
5     Q   Is there a record that we could ever
6 find out if he participated?
7     A   There was no record of -- there was no
8 rollcalls or anything of that nature taken. The
9 only record I could think of is if the person was
10 a speaker, it would have been on the agenda. I
11 don't recall him speaking at the Pain Care Forum.
12     Q   And Purdue paid him a substantial amount
13 of money, $1.4 million, correct?
14      MR. SNAPP: Objection to form.
15      THE WITNESS: That's what the document
16 says.
17 BY MR. CRUEGER:
18     Q   Have you ever heard the opinion -- the
19 term "key opinion leader"?
20     A   I have heard the term.
21     Q   Were -- how have you heard that term
22 used at Purdue?
23     A   I've just heard it used. Key opinion
24 leaders, I've heard it referred to.

Page 89

1     Q   Do you know who -- who -- anyone on this
2 list, was it used to refer to them as a key
3 opinion leader?
4     A   I don't know who was on the list of key
5 opinion leaders. I don't know how they were
6 chosen or anything really of that nature.
7     Q   Did you have any involvement -- just to
8 make the record clear, I'm just going to assume
9 you did not have any involvement in whether Purdue
10 decided to give any of these professional
11 organizations money?
12     A   Not that I --
13      MR. SNAPP: Object to the form.
14      THE WITNESS: Not that I recall.
15 BY MR. CRUEGER:
16     Q   Do you know who at Purdue would?
17     A   I don't know, and it might be -- I just
18 don't know. It might be different for different
19 organizations, but I don't know who decided.
20     Q   And did you ever talk with anyone at
21 Purdue about this issue of the funding of the
22 professional organizations who were members of the
23 Pain Care Forum?
24     A   Not that I remember.

Page 90

1  (Rosen Exhibit No. 9 was marked
2  for identification.)
3  BY MR. CRUEGER:
4  Q  Let me give you a document that is both,
5  unfortunately, large and in small print.  So I
6  assume you're going to need your reading glasses.
7  A  That's why I brought them, if I needed
8  them.
9  Q  So this has been labeled as Exhibit 9.
10  A  Oh, boy.
11  Q  We're not going to go through the entire
12  thing, so don't worry about it.  So...
13  A  Well, what exactly would you like me to
14  do with this?
15  Q  I'm just going to -- actually, this --
16  this document is a summary of grants that -- grant
17  payments that Purdue provided to various third-
18  party organizations.
19  Were you aware of -- did you have any
20  involvement in Purdue's decision to provide grants
21  to various organizations?
22  A  Not that I recall.  I'm looking at this
23  list and -- I mean it's massive.  I don't recall
24  having any participation in these grants.

Page 91

1  Q  You're aware that Purdue provided
2  millions of dollars in grants to these third-party
3  organizations?
4  MR. SNAPP:  Object to the form.
5  THE WITNESS:  I'm generally familiar
6  that Purdue provided grants to a variety of
7  organizations, but I don't know any of the
8  specifics.
9  BY MR. CRUEGER:
10  Q  And all of these organizations were
11  related to opioids, correct?
12  MR. SNAPP:  Object to the form.
13  THE WITNESS:  I don't know.  I mean
14  you've just handed me, I don't know how many,
15  hundreds of pages.  I couldn't answer a question
16  like that.  If you want me to look through every
17  one of them, I'll be glad to do so.
18  BY MR. CRUEGER:
19  Q  No, that's okay.  I just want to see if
20  you were involved at all in that process.
21  A  Not to my knowledge.
22  Q  Who at Purdue would have been involved
23  in that process?
24  A  I don't know what the process was.

Page 92

1  Q  But do you know who at Purdue would have
2  been involved in it?
3  A  I really can't say.  I don't know how
4  it -- the process worked.
5  Q  So if you had to find out who at Purdue
6  was involved in deciding who was paid grants, who
7  would you ask?
8  A  I would -- I mean there were a number of
9  people I could ask.  I don't know specifically who
10  to go to first.
11  Q  But who would you go to?
12  A  I would have to search.
13  Q  But who would you ask?
14  A  I might ask our general counsel or
15  somebody in the law department.
16  Q  How about Mr. Must?
17  A  I could ask Alan, but I don't know that
18  he has any knowledge of this -- these kinds of
19  grants or not.
20  Q  Apart from the Pain Care Forum, did you
21  have any involvement with the FSMB?
22  A  The Federation of State Medical Boards?
23  Q  Yes.
24  A  Not really.  My participation -- I knew

Page 93

1  them -- I knew the Washington office of the FSMB
2  because of their participation in the Pain Care
3  Forum.
4  Q  Was the Federation of State Medical
5  Boards, were they one of the original participants
6  in the Pain Care Forum?
7  A  I honestly don't remember who the
8  original 20 or so were.
9  Am I through with this?
10  Q  Yeah, if you want to put the rubber band
11  around that too so we don't have pages fluttering
12  all over the place.
13  A  Just trying to --
14  Q  Now, you're aware that the Senate -- a
15  Senate Committee investigated Purdue's payments to
16  third parties, correct?
17  A  I am aware that -- that I'm not sure
18  what you're referring to.  Are you referring --
19  I'm not sure what you're referring to.
20  Q  Well, we'll give you a bit of help.
21  A  Okay.  Thank you.
22  (Rosen Exhibit No. 10 was marked
23  for identification.)
24  BY MR. CRUEGER:

Highly Confidential – Subject to Further Confidentiality Review

Page 94

1    Q   So Exhibit 10. Here you go.
2        If you look to the last --
3    A   The letter to Depomed?
4    Q   If you look to the last three pages,
5 actually.
6    A   I -- I see this letter signed by Claire
7 McCaskill. So I am aware that Senator McCaskill
8 made this request.
9        And it's the last three pages, you said?
10    Q   The last three pages. It's the -- it
11 starts with the March 28, 2017 letter that's
12 addressed to the --
13    A   Yes, I see that.
14    Q   -- the president and CEO of Purdue.
15        Were you aware that the request was
16 coming?
17        MR. SNAPP: Object to the form.
18        THE WITNESS: I don't recall being aware
19 that it was coming.
20 BY MR. CRUEGER:
21    Q   Did you talk to anyone on the Senate
22 staff about this request?
23    A   I do not recall talking to anyone from
24 her staff about it, no.

Page 95

1    Q   How about any other government staff,
2 Senate or the House of Representatives?
3    A   I don't recall. I really wasn't
4 involved in this.
5    Q   That was going to be the other question.
6 Did you have any involvement in -- in preparing
7 the response to this letter?
8    A   No, I did not. That was handled by I
9 think our law department.
10    Q   Did they reach out to you, the law
11 department, to gather any information about -- to
12 respond to this request?
13    A   Not that I recall.
14    Q   And if you see at page 3 of the
15 letter --
16    A   Yes.
17    Q   -- the first full paragraph starts with
18 "The manufacturers." It says: "The manufacturers
19 have also worked with licensing and accreditation
20 bodies to influence physician behavior."
21        MR. SNAPP: Sorry, Chuck, where are you?
22        MR. CRUEGER: Page 3. It's the first
23 full paragraph that starts "The manufacturers."
24        MR. SNAPP: Thank you.

Page 96

1 BY MR. CRUEGER:
2    Q   Actually, if you just want to read that
3 paragraph. That way I don't have to --
4    A   (Peruses document.) Okay, you just want
5 me to read that one paragraph?
6    Q   Yeah, if you want to just read that.
7    A   Okay, I've read it.
8    Q   Are you aware of any of the activities
9 that they talk about Purdue engaging in in this --
10 or that are listed in this paragraph?
11        MR. SNAPP: Object to the form.
12        THE WITNESS: Well, I -- I was not
13 involved in these activities. I am aware that the
14 Joint Commission issued standards, but that was in
15 2001 prior to my arriving at Purdue.
16        I am aware that the federation of
17 medical boards -- well, I'm just trying to
18 remember. I mean --
19 BY MR. CRUEGER:
20    Q   Well, I will just ask --
21    A   -- I guess I have a general awareness,
22 but I was not involved in any of these activities.
23    Q   So did you -- were you aware of how it
24 says that manufacturers have allegedly provided

Page 97

1 funding to advocacy groups, like the American
2 Geriatric Society and the American Academy of Pain
3 Medicine to develop materials supportive of opioid
4 use?
5        MR. SNAPP: Object to the form.
6        THE WITNESS: I'm not aware of that. I
7 don't know what activities they supported or
8 didn't support. I don't know any specifics.
9 BY MR. CRUEGER:
10    Q   So would you ever review materials by
11 the American Pain Foundation, for example?
12    A   Not that I remember.
13    Q   How about materials that were put out by
14 the American Academy of Pain Medicine?
15    A   Not that I recall.
16    Q   Do you know whether other members of the
17 Pain Care Forum also provided money to these
18 third-party professional organizations, like the
19 American Pain Foundation or the American Academy
20 of Pain Medicine or any other --
21    A   I don't know what other --
22        MR. SNAPP: Object to the form.
23        THE WITNESS: -- organizations
24 contributed or didn't. No, I don't.

Page 98

BY MR. CRUEGER:

Q   Did you ever ask?

A   No, I never asked that I recall.

Q   And there's -- on page 5, there's a list of organizations at the end. It starts with A through R or -- A through Q, actually.

Can you tell me on this list which of these -- you don't have to name them all -- which were participant -- participating in the Pain Care Forum?

A   I was just beginning to read it, and I can attempt to do so, but I can't guarantee --

Q   And you can do it by letter so we don't have to --

A   -- any accuracy. I think -- I think that A, the American Academy of Pain Medicine, American Pain Society, American Pain Foundation. I don't recall the American Geriatric Society participating. American Chronic Pain Association, I'm trying to remember, I can't be certain. American Society of Pain Educators, I can't be certain. National Pain Foundation, again, I can't be certain because of the similarity in names.

Pain & Policy of Wisconsin, I already

Page 99

stated. Yes, the Federation of Medical -- State Medical Boards, yes. The American Society of Pain Management Nursing, yes, I believe so. The Academy of Interactive Pain Management, I'm uncertain. The U.S. Pain Foundation, yes. Cancer Action Network, yes. Washington Legal Foundation, no. Center for Practical Bioethics, I believe so. The Joint Commission, no.

The Pain Care Forum was the Pain Care Forum. And any other organizations, so I don't know.

Q   Do you know whether Purdue provided any financial support to the Washington Legal Foundation?

A   I believe they did.

Q   Do you know why?

A   I can't state the exact reasons why. I know that I'm familiar with the Washington Legal Foundation.

Q   Did you ever have to work with the Washington Legal Foundation during your time at Purdue?

A   I -- I did. I -- I know that they filed a brief in a patent case that I spoke to them

Page 100

about.

Q   Did you -- what was that patent case? What was that patent case?

A   They filed a brief in a patent case that dealt with -- Purdue and Endo on OxyContin.

Q   Unfortunately, that doesn't really narrow it down, does it? Was that dealing with the patent on OxyContin or was that dealing with a patent on the abuse deterrent formulation?

A   That specifically dealt with -- that I recall was with the -- Purdue lost the patent on OxyContin and the product went generic. And there were, I don't recall, but about five or six generic companies that were making OxyContin. And that was back around 2004, and the Washington Legal Foundation filed an amicus brief in that patent litigation.

Q   Did you ever ask the Washington Legal Foundation to look at other issues relating to the availability of opioids?

MR. SNAPP:  Object to the form.

THE WITNESS:  Not that I recall.

BY MR. CRUEGER:

Q   How about -- how about looking at any

Page 101

opioid prescribing guidelines issued by the CDC or a state in the United States?

MR. SNAPP:  Object to the form.

THE WITNESS:  Well, I know that the Washington Legal Foundation sent a letter to the CDC questioning their process or procedure in which they issued their guidelines.

BY MR. CRUEGER:

Q   Were you involved in having the Washington Legal Foundation send that letter?

MR. SNAPP:  Object to the form.

THE WITNESS:  I don't recall being involved in -- in that. I can't say with certainty whether I spoke to someone or not, but I certainly didn't write the letter or the content of the letter.

BY MR. CRUEGER:

Q   Was Purdue involved in having the Washington Legal Foundation write that letter?

MR. SNAPP:  Object to the form.

THE WITNESS:  I don't have any knowledge beyond what I've stated.

BY MR. CRUEGER:

Q   How about a member of the Pain Care

Page 102

1 Forum?

2     A   I don't have any knowledge that I can

3 recall.

4     Q   I'm just going to give you an exhibit

5 that we're just going to label as -- what are we

6 at, 11?

7       (Rosen Exhibit No. 11 was marked

8       for identification.)

9 BY MR. CRUEGER:

10     Q   And for this one we have absolutely no

11 copies. I'm not going to really ask you any other

12 question than I'll just represent to you that this

13 was an attachment to an e-mail that said it was a

14 list of members in the Pain Care Forum. If --

15 yeah, I think your attorneys want to quickly look

16 at it.

17     A   I'm sorry.

18     Q   I'm just going to ask you, does that

19 look like to --

20     A   I noticed at the bottom right, it says

21 updated in 2013, and I haven't had an opportunity

22 to really look at all of them, but --

23       MR. SNAPP: Is there a Bates number for

24 this document?

Page 103

1       MR. CRUEGER: You know, I was just going

2 to look for that. So...

3       MR. SNAPP: We can do it off the record,

4 that's fine.

5       MR. CRUEGER: Yeah, I -- I was hoping

6 that I had it right here, but --

7       MS. DICKINSON: (Inaudible) or the

8 attachment, the Excel spreadsheet.

9       THE WITNESS: I'm sorry, I can't hear

10 you.

11       MS. DICKINSON: It's okay. I was just

12 talking to your lawyer. We'll figure it out.

13       THE WITNESS: Do you want me to read all

14 of these names?

15 BY MR. CRUEGER:

16     Q   No, no, no. I just want you to confirm

17 whether you believe that that is an accurate list

18 of members in the Pain Care Forum as of the date

19 on the bottom of the -- the document.

20     A   Well, I guess I better read it.

21     Q   Sorry. I thought you meant read off all

22 the names. I didn't want to listen to that.

23     A   Oh, I'm sorry. (Peruses document.)

24       Okay, I've read the names, and this

Page 104

1 certainly looks like -- like it. I'm not actually

2 familiar with every organization on here, but --

3 and there's at least one where I'm not sure what

4 it stands for, RnRx. But this does look like an

5 accurate list.

6     Q   Okay. You can just put that to the

7 side. For -- what was the exhibit number? For

8 the record, Exhibit 11 --

9     A   Yes.

10     Q   -- the Bates number is PPLP004272096.

11       (Rosen Exhibit No. 12 was marked

12       for identification.)

13 BY MR. CRUEGER:

14     Q   So I'll just give you what's labeled

15 Exhibit 12.

16       Have you seen this report before,

17 Mr. Rosen?

18     A   You know, it does not look familiar to

19 me. I'm trying to look to the back to see whose

20 report this was. I see it's the minority staff

21 report from HSGAC, and that that's the Senate

22 Homeland Security and Government Affairs Committee

23 ranking member's office. I do not recall this

24 actual document.

Page 105

1       Is it signed by somebody? It's not.

2     Q   I do not believe it's signed.

3     A   Am I allowed to look back at this? I

4 really forget which subcommittee --

5     Q   Oh, sure.

6     A   Senator McCaskill, was this her report?

7     Q   I believe so.

8     A   Okay. Because I see that she was --

9 this was Homeland Security. I had forgotten which

10 committee she had written a letter from. Because,

11 as you know, most members serve on a number of

12 committees. But I don't recall reading this

13 document.

14     Q   Do you recognize the HSGAC?

15     A   Well, as I've just stated, I -- I see at

16 the bottom U.S. Senate Homeland Security and

17 Government Affairs Committee.

18     Q   And this is a report that's called

19 Fueling the Epidemic; Exposing the Financial Ties

20 Between Opioid Manufacturers and Third Party

21 Advocacy Groups, correct?

22     A   That's -- yes, that's what it says.

23     Q   And your position is government

24 relations, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1   A   That's correct.
2   Q   So -- but you do not recall seeing this
3 report?
4   A   I don't.  I don't recall seeing it in
5 this format for sure.  I don't recall seeing it.
6   Q   Would you believe this is a fairly
7 important report in respect to your job?
8       MR. SNAPP:  Object to the form.
9       THE WITNESS:  I think it -- it's
10 generally that I'm aware that various companies --
11 or I'm aware that we, and I assume that other
12 companies, have made contributions to some of
13 these organizations, but I didn't really -- I
14 wasn't involved in this, as I mentioned to you
15 earlier.  This was something that was done by
16 others in the company.
17 BY MR. CRUEGER:
18   Q   But the -- the document discusses your
19 employer Purdue extensively, correct?
20   A   Yes, it does.  Well, I assume it does.
21 I don't recall really reading the report, to be
22 honest with you.
23   Q   If you look at page 4 of the report.
24   A   Yes.

Page 107

1   Q   And those are -- it's a table that's
2 Figure 1, "Manufacture payments to selected groups
3 2012 to 2017," correct?
4   A   That's what it is labeled, yes.
5   Q   And then Purdue is in the second column,
6 correct?
7   A   Yes, they are.
8   Q   And the first column is a list of
9 various organizations, correct?
10   A   Yes.
11   Q   So -- so such as the American Academy of
12 Pain Medicine, correct?
13   A   American Academy of Pain Medicine is
14 there, yes.
15   Q   And again, they're a member of the Pain
16 Care Forum.
17   A   They do participate in the Pain Care
18 Forum.
19   Q   And since then, between 2012 and 2017,
20 Purdue has given $725,584 to that organization,
21 correct?
22       MR. SNAPP:  Object to the form.
23       THE WITNESS:  That's what the number
24 says.  I'm not familiar with how much was given.

Page 108

1 BY MR. CRUEGER:
2   Q   Are you familiar with any of these
3 numbers of how much was given to these various
4 organizations?
5   A   No, I'm not.
6   Q   The American Pain Foundation, it's about
7 midway down.  Do you see where I am, sir?
8   A   American Pain Foundation, $25,000.
9   Q   Correct.  The American Pain Foundation,
10 are they still in existence?
11   A   No, I don't believe they are.
12   Q   And they closed in about 2012, correct?
13   A   I don't recall what year they closed.
14   Q   Did they close -- do you recall if they
15 closed approximately after they received the
16 requests from the Senate to provide financial
17 information?
18       MR. SNAPP:  Object to the form.
19       THE WITNESS:  I don't recall.  Was this
20 20 -- I don't recall.  This was a 2017 report?  I
21 don't recall is the answer.
22 BY MR. CRUEGER:
23   Q   I don't recall exactly.  It was probably
24 a 2017 or 2018 report, correct?

Page 109

1   A   I mean, I believe they closed long
2 before 2017.  I don't recall when.
3   Q   About 2012, correct?  Is that --
4       MR. SNAPP:  Object to the form.
5       THE WITNESS:  I really don't remember
6 the date.  Sorry.
7 BY MR. CRUEGER:
8   Q   If you look at the executive summary.
9   A   And where is that?
10   Q   The first --
11   A   The beginning or the end?
12   Q   I guess we would call it the second page
13 of the document.  The first inside page, it's
14 titled "Fueling An Epidemic."
15   A   Yes.  You read it.
16   Q   The final paragraph says:  "The fact
17 that these same manufacturers," and by
18 manufacturers, it's referring to Purdue and other
19 manufacturers, correct?
20       MR. SNAPP:  Object to the form.
21       THE WITNESS:  I would assume so.
22 BY MR. CRUEGER:
23   Q   And those are manufacturers of opioids,
24 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    A   I assume so.
2    Q   And so it says:  "The fact that these
3  same manufacturers provided millions of dollars to
4  the groups described below," and you assume that's
5  the groups that are listed in that table that we
6  just looked at, correct?
7        MR. SNAPP:  Object to the form.
8        THE WITNESS:  I am assuming it refers to
9  their table, yes.
10 BY MR. CRUEGER:
11   Q   It says that they've concluded, "it
12 suggests, at the very least, a direct link between
13 corporate donations and the advancement of opioid
14 friendly messaging."  Correct?
15       MR. SNAPP:  Object to the form.
16       THE WITNESS:  That's their conclusion.
17 BY MR. CRUEGER:
18   Q   Do you agree with that conclusion?
19   A   I don't have any knowledge that it is in
20 any way, shape, or form tied to messaging.
21   Q   You have no knowledge one way or the
22 other?
23   A   No.
24   Q   So when this report came out, was it

Page 111

1  e-mailed around at Purdue?
2    A   I don't recall.
3    Q   Do you recall anyone discussing the
4  report?
5    A   I -- I don't recall having a discussion
6  about the report.  I'm sure we were aware it was
7  issued.
8    Q   But you're the person at Purdue who
9  deals with the -- the Senate, for example,
10 correct?
11   A   I do when it comes to legislative
12 activities, but I -- I'm not involved in the --
13 this kind of an inquiry.
14   Q   And so it's your testimony that you
15 don't recall the report and you don't recall
16 reading the report, correct?
17   A   No, that's not my testimony.  I said
18 that I recall the activity.  I recall that the
19 report was issued, but I don't recall seeing this
20 document.
21   Q   Do you recall reading the report?
22   A   I don't honestly remember if I read the
23 report or not.  And if I did -- well, I just don't
24 remember reading it.  Or the specifics of it.

Page 112

1    Q   But it's not a flattering report of your
2  employer, is it?
3        MR. SNAPP:  Object to the form.
4        THE WITNESS:  I don't really know.  I
5  would have to read through it and make a
6  conclusion, I guess, or speculation.
7        (Rosen Exhibit No. 13 was marked
8        for identification.)
9  BY MR. CRUEGER:
10   Q   Are you in charge of lobbying at Purdue?
11   A   In a federal -- at the federal level.
12   Q   Okay.  And what does that -- what does
13 that mean that you're -- what I just asked you,
14 that you're in charge of lobbying, so what does
15 that mean?  Are you in charge of deciding who to
16 pay, who to hire?  Or can you just give me a
17 better description of how that works when you say
18 you're in charge of lobbying?
19   A   Well, I tried to explain that to you
20 earlier at the beginning of our discussion, that
21 it involves, you know, a lot of monitoring, and
22 just trying to stay in touch with activities that
23 are occurring that may affect the pharmaceutical
24 industry generally, businesses generally, and then

Page 113

1  more specifically, you know, revolving around our
2  products, and -- and report those activities.
3        And then on occasion, to -- to maybe
4  react or go see somebody to discuss a particular
5  piece of legislation.  And at times to be more
6  proactive and actually try to draft something and
7  provide it to someone who, you know, if you're
8  trying to put forward a public policy that -- that
9  you think makes sense, and --
10   Q   And the law at the federal level
11 requires -- strike that.
12       The law at the federal level requires
13 you to file disclosure forms for your lobbying,
14 correct?
15   A   There are lobbying reports filed
16 periodically, yes, with the Clerk of the -- either
17 the House or the Senate.  If you file with one,
18 you file with both.
19   Q   And you -- you sign those reports,
20 correct?
21   A   I do.
22   Q   And those reports are publicly
23 available, correct?
24   A   And they are publicly available.

**Page 114**

1   Q  And do you believe they're accurate?
2   A  I believe they're accurate.  I'm not
3 going to say I never made a mistake on them, but I
4 believe they were accurate.
5   Q  Do you -- do you compile the information
6 in those reports?
7   A  Generally my administrative person did,
8 and I would look at them and sign them.
9   Q  And for what -- she compiles that
10 information from a database of some sort?
11   A  Well, I think it was more of an ongoing
12 document.  Things, you know, that we worked on.
13 Very little happens in a short time frame.  So
14 there would -- there might be issues that you
15 would look at over a number of years.
16   Q  But one of the things I'm saying is the
17 disclosure forms, you have to report both -- so
18 for you as Purdue, you have to report the money
19 that you spend on lobbying, correct?
20   A  There is a report filed -- I'm not
21 conversant, honestly, on the lobby law law, but
22 there is a report filed that discloses
23 contributions made by the company.  And I believe
24 that report is filed either by our political

**Page 115**

1 action committee or by our law department.
2   Q  But the reports you sign actually have
3 disclosures of dollar amounts, correct?
4   A  I don't recall signing PAC contri- -- a
5 disclosure of PAC contribution documents.
6   Q  Well, just the -- just a document that
7 discloses Purdue's contributions, it has the
8 amount or -- just the -- just the disclosure that
9 you signed, it has a dollar amount, correct?
10   MR. SNAPP:  Object to the form.
11   THE WITNESS:  I don't recall that I
12 signed those documents for the PAC disclosures.  I
13 think that's a document that's filed by somebody
14 in headquarters.
15   If I'm wrong and you have such a
16 document, I --
17 BY MR. CRUEGER:
18   Q  Well -- the answer is, yes, we do have
19 the report.
20   A  Okay.  I would be glad to look at it.
21   Q  I'm just going to give you an example.
22 We're not going to go through all of them.
23   (Rosen Exhibit No. 14 was marked
24   for identification.)

**Page 116**

1 BY MR. CRUEGER:
2   Q  We've labeled this as Exhibit 14.
3   (Counsel conferring.)
4   THE WITNESS:  So just to be clear, I
5 mean, do you want me to read through all of these
6 documents?
7 BY MR. CRUEGER:
8   Q  Oh, heck no.  We're not going to do that
9 today.
10   These are just -- I just wanted to use
11 these as an example of a -- of lobbying -- the
12 disclosure forms that you filed.
13   A  Yes.
14   Q  So if you look at -- and we'll just use
15 the example, the second full page on the back, I
16 think at the top there's 698 is the last three.
17 Do you see where I am?
18   A  I don't see 698.  Can you --
19   Q  Oh, it's 0000360698.
20   A  It's the next page?
21   Q  Yeah, it might be.
22   A  I'm sorry.  So the first page is labeled
23 1 of 3.  The second is page 2 of 3.  Are you on 3
24 of 3?

**Page 117**

1   Q  We will do this the easy way.  It is
2 this (indicating).  It's got to be one of those
3 first two pages.
4   A  I'm sorry, but my document says 349 at
5 the top, and it says 350.
6   MR. SNAPP:  So does mine.
7   THE WITNESS:  I don't --
8 BY MR. CRUEGER:
9   Q  Okay.  Well, let's just -- let's just
10 use 349.  I have that here too.  So --
11   A  Okay.  Sorry.  I just wasn't sure what
12 you were talking about.
13   Q  No, no, that's fine.  It's just easier
14 to do.
15   So this is a lobbying report, correct?
16   A  Yes, it is.
17   Q  And I'll just let you know I went online
18 and we downloaded all these because they're all
19 publicly available.
20   A  They are.  Yes, I know that.
21   Q  That's your signature at the bottom,
22 correct?
23   A  Yes, it is.
24   Q  And this is from 2003, February 24th is

Page 118

1 the day it was filed, but that doesn't matter.
2     What I'm just asking is, the box there
3 says "Income and Expense."
4     A   Correct.
5     Q   And you have the number of $430,000 in
6 expense, correct?
7     A   Yes.
8     Q   So one is -- where does that number come
9 from?  And two, if you want to answer a compound
10 question, is, what does it represent?  So...
11     A   Well, this is not what you were asking
12 me.  You were asking me about contributions.
13     Q   Okay.  Then I was using the wrong
14 terminology, so...
15     A   And so this is -- I don't know exactly
16 how this number was derived, but this is a
17 compilation where I believe you just take a --
18 there's some outside law firm that kind of advises
19 and comes up with this, and it's the way it all
20 works.  And it is -- it's an allocation of a
21 variety of expenses.
22     I don't know how the exact number is
23 derived, but it might be if you belong to, say, a
24 trade association and you pay dues to the trade

Page 119

1 association, they allocate a certain portion of
2 that contribution to lobbying expenditure, and
3 then you put that in your number.  And if you --
4 and you take a certain amount of the expense of my
5 office, and you put it in that number.  And if you
6 hire a law firm or a consulting firm, they also
7 attribute a certain percentage of that to the --
8 to lobbying activities.  And those are collected
9 and -- and then reported.
10     Q   Okay.  That's the question I --
11     A   But those are not what I would call
12 contributions.
13     Q   Okay.  I was using the wrong term.
14     A   Yeah.  I'm sorry.
15     Q   So that's what I was wondering.
16     A   Okay.
17     Q   And so that number does include the
18 number -- so say if you hire Sidley & Austin for
19 lobbying work, that number that you would pay
20 Sidley & Austin for lobbying, and this is just an
21 example, would be included in that number that's
22 reported in this form, correct?
23     A   It would be their allocation of what
24 they -- they expended through -- for lobbying

Page 120

1 activity.  Because some of the work they do
2 would -- might be and probably was legal work
3 and -- or monitoring, as I had stated earlier, and
4 not actually lobbying.  So that's an allocation.
5 And I'm sorry, I just don't know how each of these
6 numbers is derived --
7     Q   Okay.
8     A   -- in any more specificity than I've
9 given you.
10     Q   And so --
11     MR. COLE:  This is 12, I think.
12     MR. CRUEGER:  We may or may not have --
13 it's 14.  We might be skipping 13.  It's not the
14 luckiest number in the world.
15 BY MR. CRUEGER:
16     Q   So I just want to make sure about
17 something.  So you said you work on -- on
18 government affairs at the federal level, correct?
19     A   That's correct.
20     Q   Do you do anything at the state level?
21     A   No.  I don't recall ever going out to
22 the state and being involved in any activities.
23     Q   Did you participate in the passage of
24 the 1998 Intractable Pain Act in Ohio?

Page 121

1     A   No, I don't recall ever participating in
2 that.  That happens to be where another Rosen is.
3 Brian Rosen is a state government relations
4 person.
5     Q   How long has Brian Rosen been at Purdue?
6     A   I don't know.
7     Q   Do you ever interact with him on
8 coordinating state and federal efforts?
9     A   Not really.  I mean, I've spoken to him,
10 but I don't coordinate my work with his.
11     Q   Who does he report to?
12     A   He reports to Alan Must.
13     Q   So do you know -- do you know anything
14 about the passage of the 1998 Intractable Pain Act
15 in Ohio?
16     A   I'm not familiar with its specifics, no.
17     Q   So you're not familiar with any of the
18 amendments that were made to that act, correct?
19     A   I'm not familiar with them.
20     Q   Are you familiar whether Purdue worked
21 with the federal state -- the state medical board
22 of Ohio -- strike that.
23     If Purdue worked with the State Medical
24 Board of Ohio in passing that act?

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    A   I'm not aware of what activity they
2  were -- how they did it or how they were involved
3  in it.
4    Q   By the way, who worked -- did someone
5  handle state -- the state efforts prior to Brian
6  Rosen?
7    A   I don't know if they did or not.  That's
8  before I was here.
9    Q   Oh, has Brian Rosen been here the entire
10  time that you've been here at Purdue?
11    A   I don't recall when -- whether Brian
12  preceded me or came after me.  But he's the only
13  person I remember that handled that region of the
14  country.
15    Q   And so if I wanted to learn more about
16  the 1998 Intractable Pain Act in Ohio, I should go
17  talk to Brian Rosen?
18    A   I think so, yes.
19    MR. SNAPP:  Chuck, we've been going just
20  a little bit over an hour.  Would this be a good
21  time for another break?
22    MR. CRUEGER:  You know, I'm almost at
23  the end of this.  So I was actually looking at the
24  time too, so I think we'll be good if we just go

Page 123

1  for a few more minutes, and then we'll be -- we'll
2  be done.
3    MR. SNAPP:  Are you okay?
4    THE WITNESS:  I'm fine, yes.
5    MR. SNAPP:  Okay.
6    MR. CRUEGER:  Again, yeah, if you need
7  to take a break, please just tell me.
8    THE WITNESS:  I'm fine.  Thank you.
9  BY MR. CRUEGER:
10    Q   Now, Purdue, you -- so are you the only
11  person at Purdue who does the federal, I'll call
12  it, the federal lobbying efforts?
13    A   As I explained to you, yes, but I did
14  hire somebody last January with the anticipation
15  that I would be retiring at some point.
16    Q   And do -- do you track in any way the
17  different issues that you lobby on in both the
18  Senate or Congress or even agencies?
19    A   I don't track it in the sense of -- I
20  don't have like a list, you know, of every
21  activity that I work on.
22    Q   Is there a -- is there a record, though,
23  somewhere in Purdue that would track the
24  activities that Purdue has spent money lobbying on

Page 124

1  at the federal level?
2    A   Well, I filed this report that we just
3  discussed.  And those reports often list issues
4  that you're working on at the time, and they would
5  change over time.
6    Q   Well, they're very general disclosures,
7  correct?
8    A   They are.
9    Q   And let's just, as an example, with the
10  CDC guidelines -- I don't know if we're going to
11  look at this -- is Purdue lobbying either you or
12  through a third party anyone on the CDC
13  guidelines?
14    A   Not to my knowledge.  I don't think we
15  had anything to do with the drafting of the CDC
16  guidelines.
17    Q   But how about any legislation that may
18  affect the CDC guidelines?
19    A   You would have to be more specific.  I'm
20  not sure what legislation would affect the CDC
21  guidelines.
22    Q   Are you aware of any legislation that
23  would effect the CDC guidelines?
24    A   None comes to mind, no.

Page 125

1    Q   Are you aware of any regulations that
2  may affect the CDC guidelines?
3    A   I'm not aware of any regulation.  I
4  think it's just a guideline that was issued and
5  it's final.
6    Q   So has Purdue done anything that you're
7  aware of to try to change or otherwise modify the
8  CDC guidelines?
9    MR. SNAPP:  Object to the form.
10    THE WITNESS:  Not that I'm aware of.
11  BY MR. CRUEGER:
12    Q   Have you talked with any entity at
13  Health and Human Services about changing the
14  guidelines?
15    A   No, not that I recall.
16    Q   Have you talked with any entity at any
17  other -- let's start with the Executive Branch,
18  any Executive Branch agency about the CDC
19  guidelines about changing them?
20    A   No, not that I recall.
21    Q   How about someone else at Purdue?
22    MR. SNAPP:  Object to the form.
23    THE WITNESS:  Not that I recall.  I
24  don't remember any discussion about changing the

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 guidelines.
2 BY MR. CRUEGER:
3    Q   So I guess what I'm asking -- let's go
4 back to the disclosure forms.  The disclosures are
5 fairly general, correct?
6    A   They are fairly general.
7    Q   Where would I get more specific
8 information at Purdue about specific issues that
9 were being -- that Purdue was lobbying on?
10    A   Well, I think they generally would be on
11 these issues.  I'm not exactly sure what you're
12 asking.
13    Q   Well, let me see if I can't find an
14 example.
15       So I think it will be the fourth page
16 from the back.
17       And I will just show you the page I'm
18 looking at so that we don't have a -- we'll get it
19 to you.
20    A   This page (indicating)?
21    Q   Yes, that's it.
22    A   Okay.
23       MR. SNAPP:  Oh, okay.  It's 204.  Got
24 it.

Page 127

1       THE WITNESS:  So, is there a date on
2 this?
3 BY MR. CRUEGER:
4    Q   Just looking at 1 of 4, this is 1/7/2019
5 is up in the left-hand corner.
6    A   Oh, okay.  So this would have been
7 recent.
8    Q   Yes, this is recent --
9    A   And I -- I assume --
10       MR. SNAPP:  I think there's another
11 date.  I'm sorry, I just want to make sure the
12 record is clear, Chuck.  I don't -- there's a date
13 down on the bottom right-hand corner on the first
14 page of the document as well.
15       MR. CRUEGER:  Ah, yes, there's --
16       MR. SNAPP:  10/22/18.
17       THE WITNESS:  7/20/18?
18 BY MR. CRUEGER:
19    Q   7/20/2018, correct.
20       MR. SNAPP:  10 -- I see 10/22.  Is
21 that -- am I on the wrong document?
22       THE WITNESS:  I'm sorry, it's just
23 confusing --
24 BY MR. CRUEGER:

Page 128

1    Q   It is confusing.
2    A   -- because I'm going backwards and
3 they're double-sided, and I'm not sure I'm even
4 keeping them in order.
5    Q   But I only want to ask you --
6       MR. SNAPP:  Oh, I see.  Okay.  I found
7 the document you're on.  Thank you.
8       THE WITNESS:  I do see that Will --
9 William Nordwind is on there, and he's the person
10 I hired last year, last January, so he's been with
11 us just one year.
12 BY MR. CRUEGER:
13    Q   So the section that's just called
14 "Lobbying Activity," paragraph 16.
15    A   Yes.
16    Q   So it just has the general abuse
17 deterrent formulations of opioid analgesics?
18    A   Right.
19    Q   So how would I find out more about what
20 that -- specifically what is going on with that,
21 that entry?
22    A   Well, I don't know that we kept a list
23 of anything.  I'm not sure how --
24    Q   So what I'm trying to get at is there's

Page 129

1 no more detailed list that you're aware of than
2 what's in this document?
3    A   There is no more detailed list that I'm
4 aware of.
5       MR. CRUEGER:  Okay.  Why don't we break
6 for lunch.
7       MR. SNAPP:  Sure.
8       THE VIDEOGRAPHER:  The time is 11:58
9 a m., and we're going off the record.
10       (Lunch recess.)
11       THE VIDEOGRAPHER:  The time is 12:42
12 p.m.  We're back on the record.
13 BY MR. CRUEGER:
14    Q   Mr. Rosen, let's go back to the
15 Washington guidelines.  That would be Exhibit 4 in
16 your stack.
17    A   Okay, I pulled them out.
18    Q   So these guidelines, again they were
19 issued in 2007, correct?
20    A   That's what it says, yes.
21    Q   And they were aimed at primary care
22 physicians, correct?
23       MR. SNAPP:  Object to the form.
24       THE WITNESS:  Geez, I would have to read

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 it again. This morning is the first time I've
2 seen the document.
3 BY MR. CRUEGER:
4     Q   If you look at page 2, the introduction.
5     A   "Educational Pilot."
6     Q   The sentence starting as, "It is
7 intended as a resource for primary care
8 providers" --
9     A   Okay. I see that.
10     Q   -- "treating patients who receive
11 healthcare through state agency programs."
12     A   I see that.
13     Q   Again, the reminder that we can't talk
14 over each other, as much as we would love to
15 sometimes.
16     A   Okay, thank you. I'm sorry.
17     Q   So -- and these guidelines, they do not
18 apply to the treatment of acute pain, correct?
19     A   It says it does not apply to the
20 treatment of acute pain.
21     Q   And acute pain would be like pain after
22 a surgery, correct?
23         MR. SNAPP:  Object to the form.
24         THE WITNESS:  I'm certainly not an

Page 131

1 expert. I -- I told you I suffer from kidney
2 stones. I consider that to be acute pain.
3 BY MR. CRUEGER:
4     Q   It's short-term pain, correct?
5     A   Normally, yes.
6     Q   The guidelines don't apply to cancer
7 pain, correct?
8     A   That's correct, what it says.
9     Q   They don't apply to end-of-life or
10 hospice care, correct?
11     A   Yes, that's what it says.
12     Q   And the third paragraph on the left-hand
13 column, it talks about how recent studies have
14 indicated an increase in accidental deaths
15 associated with the use of prescription opioids
16 since 1999.
17         Do you see that?
18     A   I do.
19     Q   And how there's been a long-term -- a
20 dramatic increase in the average daily morphine
21 equivalent dose of the most potent Schedule II
22 long-acting opioids, correct?
23     A   That's what it says, yes.
24     Q   And OxyContin, that's a Schedule II

Page 132

1 narcotic, correct?
2     A   It is a Schedule II narcotic.
3     Q   And it's a -- what's known as a
4 long-acting opioid, correct?
5     A   It is.
6     Q   And this guideline put out by the State
7 of Washington notes that the overall number of
8 opioid-related deaths has more than doubled
9 between 1995 and 2004, correct?
10         MR. SNAPP:  Object to the form.
11         THE WITNESS:  That's what it says.
12 BY MR. CRUEGER:
13     Q   And it also says that prescription
14 opioid-related deaths now exceed non-prescription
15 opioid-related deaths, right?
16         MR. SNAPP:  Object to the form.
17         THE WITNESS:  It cites a study or
18 something from 2006 and states that.
19 BY MR. CRUEGER:
20     Q   And so this is the State of Washington
21 trying to put out guidelines to teach primary care
22 physicians how to prescribe long-acting opioids,
23 correct?
24         MR. SNAPP:  Object to the form.

Page 133

1         THE WITNESS:  That's what it says, yes.
2 BY MR. CRUEGER:
3     Q   And you agree that opioids are dangerous
4 drugs, correct?
5     A   I would agree with that. They are
6 scheduled by the DEA, and by definition,
7 dangerous, yes.
8     Q   And you agree that the state has an
9 interest in teaching primary care physicians how
10 to use this dangerous drug?
11         MR. SNAPP:  Object to the form.
12         THE WITNESS:  Well, it's not an area
13 that I have any expertise in, but I certainly
14 don't disagree.
15 BY MR. CRUEGER:
16     Q   Well, you're in the job of influencing
17 government, though, correct?
18         MR. SNAPP:  Object to the form.
19         THE WITNESS:  Well, I don't -- I have
20 not worked on these guidelines or on the state
21 guidelines. I don't work on state government
22 activities.
23 BY MR. CRUEGER:
24     Q   But a government, state or federal, has

Page 134

1 an interest in protecting the public health of its
2 citizens, correct?
3          MR. SNAPP: Object to the form.
4          THE WITNESS: Yes.
5 BY MR. CRUEGER:
6     Q    And a government, state or federal, if
7 it wants to protect the public health of its
8 citizens, can prescribe guidelines for opioids,
9 correct?
10          MR. SNAPP: Object to the form.
11          THE WITNESS: They are doing so, yes.
12 BY MR. CRUEGER:
13     Q    And if you're a patient, you would want
14 your doctor to know how to use these dangerous
15 drugs, correct?
16          MR. SNAPP: Object to the form.
17          THE WITNESS: I would assume so.
18 BY MR. CRUEGER:
19     Q    Now, if you look at Exhibit 6, which is
20 also in your stack.
21     A    Okay.
22     Q    Now, isn't it fair to say that Purdue
23 did not like these guidelines, correct?
24          MR. SNAPP: Object to the form.

Page 135

1          THE WITNESS: I don't know. As I said
2 to you earlier this morning, I didn't work on
3 them. I didn't see them, this document, until
4 today, and I don't really recall what our position
5 was.
6 BY MR. CRUEGER:
7     Q    And this document, Exhibit 6, is a Pain
8 Care Forum meeting minute document, correct?
9     A    It is a document from 2007, in which
10 somebody took some -- somebody from the American
11 Pain Foundation took some notes or minutes. They
12 call them minutes, yes.
13     Q    But it's your administrative assistant,
14 Solana Shaw, who is distributing these to all of
15 the Pain Care Forum members, right?
16     A    She -- she did distribute it, and I
17 think it says that she was forwarding the document
18 that was provided to her. Yes.
19     Q    And one of the issues then that was
20 talked about at this Pain Care Forum meeting is
21 the Washington State Guidelines, correct?
22     A    According to this person's minutes,
23 there is an item at the bottom of that page that
24 refers to the Washington State Guidelines.

Page 136

1     Q    And members of the Pain Care Forum were
2 opposed to the Washington State Guidelines as
3 well, correct?
4          MR. SNAPP: Object to the form.
5          THE WITNESS: I don't know who may have
6 been or may not have been supportive of the
7 guidelines. I don't really recall this discussion
8 in 2007.
9 BY MR. CRUEGER:
10     Q    And if you look at the Bates number that
11 ends PPLP004021798, which is the second page, it's
12 the first page of the meeting minutes -- are we on
13 the same page?
14     A    I believe so. "APF met"?
15     Q    Yes. And APF is the American Pain
16 Foundation?
17     A    That's what it says, yes.
18     Q    And it says it met with the Washington
19 governor, correct?
20     A    Right.
21     Q    And it did so to present a physician
22 statement expressing concerns unfavor- -- of
23 unfavorable state guidelines, correct?
24     A    That's what it says.

Page 137

1     Q    And again, the APF is financed by
2 Purdue, correct?
3     A    Well, as you --
4          MR. SNAPP: Object to the form.
5          THE WITNESS: -- pointed out to me this
6 morning -- I'm sorry.
7          MR. SNAPP: Object to the form.
8          THE WITNESS: As you pointed out to me
9 this morning, Purdue made contributions to the
10 American Pain Foundation.
11 BY MR. CRUEGER:
12     Q    Substantial contributions, correct?
13          MR. SNAPP: Object to the form.
14          THE WITNESS: Contributions.
15 BY MR. CRUEGER:
16     Q    You're not willing to use the word
17 "substantial"?
18          MR. SNAPP: Object to the form.
19          THE WITNESS: Well, it was over a long
20 period of time, and it's relative.
21 BY MR. CRUEGER:
22     Q    Is over a million dollars substantial
23 contributions?
24     A    It is, but it was over a number of

Page 138

1 years. I don't recall the number.
2     MR. SNAPP: Are you finished with No. 6?
3     MR. CRUEGER: For now, yes.
4 BY MR. CRUEGER:
5   Q  So we're back on Exhibit 13.
6   A  I don't have an Exhibit 13.
7   Q  You will in just a second.
8   A  Okay.
9   Q  There you go.
10     If you want to just quickly review
11 the -- the e-mail.
12   A  Yes, please.
13   Q  By the way, Exhibit 13, your copies have
14 the Bates number cut off. It is PPLP004024280.
15   A  (Peruses document.) I've read the
16 document.
17   Q  So this is an e-mail. If you look at
18 the -- I guess you call it the second e-mail on
19 the first page, not the part on top, so it says
20 from Will Rowe.
21     We're on the same page?
22   A  January 24th, 2008, 5:19 p.m.?
23   Q  That is correct.
24   A  Okay. Yes.

Page 139

1   Q  And it's to Pamela Bennett, correct?
2   A  It's to a number of people.
3   Q  But she's on the "to" line, correct?
4   A  Including Pamela Bennett, correct.
5   Q  Pamela Bennett, did she participate in
6 Pain Care Forum meetings?
7   A  She very well may have participated in
8 some of the meetings.
9   Q  Well, can you say definitively whether
10 she ever did or did not?
11   A  She did participate in some of the
12 meetings. I couldn't say when she did and when
13 she didn't.
14   Q  You are also on the "to" line in this
15 e-mail, correct?
16   A  Yes, I am.
17   Q  And the subject is "The Washington state
18 opioid dosing guideline," correct?
19   A  Correct.
20   Q  And apparently the people in the "to"
21 line and maybe even the "cc" line had a call on
22 about the Washington State guidelines on
23 January 24th, 2008, correct?
24     MR. SNAPP: Object to the form.

Page 140

1     THE WITNESS: I don't remember the
2 e-mail or the phone call, but it does say, "Thank
3 you for participating on a call today."
4 BY MR. CRUEGER:
5   Q  And the purpose of that meeting was to
6 form a strategy on how to respond to the
7 Washington State Guidelines, correct?
8     MR. SNAPP: Object to the form.
9     THE WITNESS: Again, I don't really
10 remember the discussion or the e-mail, but it --
11 there is discussion in the e-mail about a
12 consensus on a strategy.
13 BY MR. CRUEGER:
14   Q  And a lot of these people in the "to"
15 line, are they also participants in the Pain Care
16 Forum, correct?
17     MR. SNAPP: Object to the form.
18     THE WITNESS: There are some names I
19 recognize and there are some names that I don't
20 recognize.
21 BY MR. CRUEGER:
22   Q  And which names do you recognize?
23   A  Will Rowe, Brian Munroe, June Dahl. The
24 next name I do not recognize. Aaron Gilson, Mary

Page 141

1 Pat Aardrup. I do not know who Mark Rasmussen is.
2 Micke Brown, I know. Pamela Bennett. I don't
3 know who Adam Clark is. I know who Rebecca Kirch
4 is. I do not know who Ned Masin is. I do not
5 know who H. Petty is. I'm not sure who Mary
6 Bennett is. Lisa Robin, I know. Mayssa Sultan, I
7 do not know. Michelle Lonchar, I'm not familiar
8 with. Scott Fishman, I know he's a doctor.
9 I'm -- I'm not sure if I've met him before or not,
10 but that's my recollection.
11   Q  And again, a lot of these individuals
12 participate in the Pain Care Forum, correct?
13   A  Some of them do, and as I said, some of
14 them I don't really know who they are.
15   Q  And Lisa Robbins -- Lisa Robbins, she is
16 with the Federation of State Medical Boards?
17   A  She is. She runs their Washington
18 office, and I don't know what her title or
19 function is, but she has spent time here in
20 Washington as I think as well as her headquarters.
21   Q  And she was a regular participant in the
22 Pain Care Forum, correct?
23   A  She did participate in the Pain Care
24 Forum. Again, I don't have a way of knowing who

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 was at any given meeting or not, though.
2    Q   And that's because you didn't keep any
3 notes or records of the meetings, correct?
4    A   We didn't take roll or --
5    Q   And the third paragraph in this that
6 starts with "There was."
7    A   Yes.
8    Q   It says: "There was a consensus on a
9 strategy to promote the FSMB model guideline to
10 the Washington State Medical Board, and to add
11 clinical material to that guideline by promoting
12 and excerpting Dr. Scott Fishman's book."
13 Correct?
14    A   That's what it states.
15    Q   And that consensus -- the people on that
16 consensus included Purdue, correct?
17       MR. SNAPP:  Object to the form.
18       THE WITNESS:  I don't really recall this
19 meeting or this e-mail, and I -- I really couldn't
20 say who supported it or didn't support anything.
21 BY MR. CRUEGER:
22    Q   But you don't recall Purdue objecting
23 to --
24    A   I don't recall supporting or objecting.

Page 143

1 I just don't recall.
2    Q   And are you familiar with the FSMB model
3 guideline?
4    A   Generally familiar, but I don't think I
5 could give you any specifics.
6       (Rosen Exhibit No. 15 was marked
7       for identification.)
8 BY MR. CRUEGER:
9    Q   So I will give you Exhibit 16.
10    A   Let me put this back.  Do you want --
11 13.
12    Q   Oh, I'm sorry.  I guess it's Exhibit 15.
13 I just didn't --
14    A   This first page is kind of hard to
15 decipher, but what exactly do you want me to do
16 with this?
17    Q   Well, on the first page, it says up in
18 the top left-hand corner, it's an educational
19 grant, correct?
20    A   "Educational Grant" under "Group," yes.
21    Q   And the grant is -- the title is
22 "Federation of State Medical Boards, Responsible
23 Opioid Prescribing:  A Physician Guide," correct?
24    A   Correct.

Page 144

1    Q   And so this grant shows how -- and this
2 is a Purdue document, correct?
3    A   I've never seen this document before.
4    Q   Well, this is Purdue giving a grant,
5 correct?
6    A   Okay.  I don't see where -- does it
7 identify Purdue on the document?  I've just never
8 seen this form before.
9    Q   Well, the sponsor is David Haddox,
10 correct?
11    A   Correct.  Thank you.
12    Q   And he works for Purdue, correct?
13    A   Yes, that's correct.
14    Q   And this is -- the date is -- it looks
15 like it's in September of 2007, correct?  The --
16    A   It's dated 9/4/2007, yes, that's
17 correct.
18    Q   And it's a $100,000 grant to support the
19 distribution -- the purchase and distribution of
20 Scott Fishman's book to 700,000 medical doctors,
21 correct?
22    A   It's --
23       MR. SNAPP:  Object to the form.
24       THE WITNESS:  -- a $100,000 educational

Page 145

1 grant to support purchase and distribution of
2 Scott Fishman's book.
3 BY MR. CRUEGER:
4    Q   And -- and Purdue is not the only entity
5 that supported this book, correct?
6       MR. SNAPP:  Object to the form.
7       THE WITNESS:  I -- I have no information
8 as to --
9 BY MR. CRUEGER:
10    Q   If you look at the -- it's going to be
11 Bates label page -- ends in 112.  So -- and the --
12 it's pretty close to the back.
13    A   As long as I'm going, let me just leaf
14 through this so I know -- I -- (Peruses document.)
15 112 did you say?
16    Q   Yes.  The last three, 112, yes.
17    A   Okay.  I'm sorry.  I haven't reached
18 that yet.  I was at 102.  I'm sorry.
19       Okay, I see page 112.  What's your
20 question?
21    Q   So if you look --
22    A   I haven't read it, but --
23    Q   Well, if you just -- if you just want to
24 read the bottom of 112, it's the e-mail that

Page 146

1 starts with "From Pamela Bennett." You're on the
2 e-mail in the "to," and then the text of the
3 e-mail.
4 A (Peruses document.) Okay.
5 Q And so according to this e-mail from
6 Ms. Bennett, the companies Alpharma, Endo and
7 Cephalon also gave $100,000 each to distribute
8 Mr. Fishman's book, correct?
9 A "... is limiting the number of pharma
10 funders to those that they currently have onboard,
11 Alpharma, Endo and Cephalon, and Purdue, if we
12 choose to participate." I don't see the
13 wording --
14 Q The sentence after --
15 A -- that you asked.
16 Q The sentence after that: "Each company
17 has provided a $100,000 unrestricted grant" --
18 A Mm-hmm.
19 Q -- "and the same will be in the grant
20 request made to Purdue."
21 A Okay.
22 Q So each company, Alpharma, Endo and
23 Cephalon, each provided $100,000 to distribute
24 Mr. Fishman's book, correct?

Page 147

1 A If they in fact did, I -- I don't really
2 know.
3 Q And those three companies, Alpharma,
4 Endo and Cephalon, they all manufacture opioids,
5 correct?
6 A I believe that's correct. I really
7 don't remember Alpharma. Is that still in
8 existence?
9 Q I don't know.
10 A I don't either.
11 Q But at least you can verify Endo and
12 Cephalon manufactured opioids, correct?
13 A To -- yes, that's my knowledge.
14 Q And Mr. Fishman's book is generally
15 favored -- favorable to prescribing opioids,
16 correct?
17 MR. SNAPP: Object to the form.
18 THE WITNESS: I can't answer that
19 question. Dr. Fishman, I'm generally familiar
20 that he -- he wrote a book, but I don't -- I
21 really couldn't tell you what the content of the
22 book is.
23 BY MR. CRUEGER:
24 Q Now, this e-mail was sent on Monday,

Page 148

1 August 27th, 2007. Correct?
2 A That's what it says, yes.
3 Q And if you go back to the -- the page
4 that ends in 112, the paragraph that starts
5 "Originally."
6 A Yes.
7 Q "Originally FSMB was not going to
8 approach Purdue because of our recent legal
9 issues."
10 Do you know what Ms. Bennett is
11 referring to?
12 A I don't.
13 Q Do you recall Purdue having to plead
14 guilty for felony misbranding of OxyContin?
15 A I --
16 MR. SNAPP: Object to the form.
17 THE WITNESS: I do recall the -- the
18 lawsuit that was brought, and it settled around --
19 was settled around 2007. I don't recall the date.
20 I'm sorry.
21 BY MR. CRUEGER:
22 Q Well, I guess --
23 A But I think it was around 2007.
24 Q A settlement. You understand Purdue

Page 149

1 pled guilty, correct?
2 A I do, yes.
3 Q So -- and they pled guilty to felony
4 misbranding of OxyContin, correct?
5 MR. SNAPP: Object to the form.
6 THE WITNESS: I don't honestly recall
7 the charges. They're certainly a matter of public
8 record. I was not involved in the litigation.
9 BY MR. CRUEGER:
10 Q Did you ever read the -- the information
11 charging Purdue?
12 A I probably did back in that time frame,
13 but I haven't recently.
14 Q Did you ever read the agreed statement
15 of facts?
16 A I probably did back in that time frame,
17 but I don't recall the specificity of it.
18 Q Do you recall that Mr. Udell was also a
19 defendant in that case?
20 A I do.
21 Q So if you look at the other page.
22 A The other page, can you be specific?
23 Q Oh, sorry. The page that's above
24 Ms. Bennett's e-mail on 111. Oh, it's on -- it's

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  the Bates numbers ending 111.
2      A   Yes.
3      Q   And there's Ms. Bennett's e-mail and
4  above it is an e-mail from Howard Udell, correct?
5      A   Yes.
6      Q   And he was your -- was he your boss at
7  the time?
8      A   Yes, he would have been.
9      Q   And this is August 27th, correct?
10     A   It's correct.
11     Q   And he appears to be approving the grant
12  request to pay $100,000 to distribute
13  Mr. Fishman's book, correct?
14         MR. SNAPP:  Object to the form.
15         THE WITNESS:  He states that -- I mean
16  I -- would you ask your question again?  I'm
17  sorry.  I just want to be responsive.
18  BY MR. CRUEGER:
19     Q   Well, he is -- is it fair to say that
20  Mr. Udell is approving the grant request?
21         MR. SNAPP:  Object to the form.
22         THE WITNESS:  I can't say that -- and
23  this is just the way I read it.  Again, I don't
24  remember the e-mail or -- or the content of it.

Page 151

1  He seems to be saying it's a lot of money.  He
2  feels that it should be part of the companies --
3  that we should be part of the companies doing
4  this.
5         He said:  "I'd hate to see Alpharma,
6  Endo and Cephalon and a fourth company do this and
7  our name be missing.  "My view is base," and I
8  think that's probably a typo, "based on the
9  assumption that the names of the funders will be
10  widely circulated either by having their names on
11  the book or otherwise."
12         I just don't that I would read that as
13  his approval but rather his opinion.  But again, I
14  don't remember it.
15  BY MR. CRUEGER:
16     Q   But there's nothing in here from him
17  blocking it, correct?
18     A   No, there's not.  It's a short e-mail.
19  That's why I read it.
20     Q   And Mr. Udell is signing this as the
21  executive vice president and chief legal officer
22  of Purdue?
23     A   That's on the e-mail and his title, yes.
24     Q   And again, this is August 27th, 2007,

Page 152

1  correct?
2      A   It's August 27th, 2007, yes.
3      Q   Do you understand that Mr. Udell pled
4  guilty on May 27th, 2007?
5      A   As I said, I didn't remember the date.
6  I knew it was around 2007.
7      Q   Well, let's just make it an exhibit.
8         (Rosen Exhibit No. 16 was marked
9          for identification.)
10  BY MR. CRUEGER:
11     Q   So this one is Exhibit 16.  So...
12     A   Do you want me to read this entire --
13  this document?
14     Q   You don't have to read the entire
15  document.  I'm looking more just for the date.
16     A   May -- May --
17     Q   May 10th?
18     A   -- and 20- -- it's kind of blurred here,
19  but it looks like 2007.  The middle two numbers
20  are blurred, but --
21     Q   And this is Mr. Udell pleading guilty,
22  it looks, to the -- to the offense of strict
23  liability misdemeanor of misbranding a drug in
24  violation of Title 21, correct?

Page 153

1         MR. SNAPP:  Object to the form.
2         THE WITNESS:  I would have to read the
3  document.  I'm reading the first sentence, it
4  says:  "I've entered into a plea agreement with
5  the United States by counsel."  It gives some
6  rules, cites some rules.
7  BY MR. CRUEGER:
8      Q   And if you look at the top of page 2.
9      A   All right.
10     Q   Where Mr. -- Mr. Udell says:  "I am
11  pleading guilty as described above because I am in
12  fact guilty."  I read that correctly?
13     A   Yes.
14     Q   Yet Mr. Udell is still at the company on
15  August 27th, 2007?
16         MR. SNAPP:  Object to the form.
17         THE WITNESS:  He was.
18  BY MR. CRUEGER:
19     Q   And he's still the chief legal officer
20  for Purdue?
21         MR. SNAPP:  Object to the form.
22         THE WITNESS:  He is not still the chief
23  legal officer.
24  BY MR. CRUEGER:

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    Q    But as of --
2    A    He's passed away.
3    Q    But as of August 27th, 2007, he was the
4  chief legal officer.
5    A    He was, yes.
6    Q    And so after he pled guilty, he was not
7  fired?
8        MR. SNAPP:  Object to the form.
9        THE WITNESS:  Apparently not.  He was
10  still the -- whatever the title was on that
11  document.
12  BY MR. CRUEGER:
13    Q    Did Purdue ever explain why Mr. Udell
14  was still the chief legal officer after pleading
15  guilty?
16        MR. SNAPP:  Object to the form.
17        THE WITNESS:  Not to me.
18  BY MR. CRUEGER:
19    Q    Did you find that curious?
20    A    No.
21    Q    So you didn't find it curious at all
22  that Mr. Udell pled guilty to a federal offense
23  and remained in his job as the chief legal officer
24  for Purdue?

Page 155

1        MR. SNAPP:  Object to the form.
2        THE WITNESS:  I -- I did not.
3  BY MR. CRUEGER:
4    Q    Do you remember if Mr. Udell was still
5  at Purdue in 2008?
6    A    I don't remember when Howard Udell left
7  the company.  I don't remember the date.
8    Q    Did he retire?
9    A    I -- I don't honestly know what his
10  agreement was with the company, whether he retired
11  or what.
12    Q    But at this time in 2007, he was your
13  boss, correct?
14    A    At that time in 2007, he was still with
15  the company and I still reported to him.
16    Q    You're going to need your reading
17  glasses again for this one.
18    A    They're not very far away.
19        (Rosen Exhibit No. 17 was marked
20        for identification.)
21    MR. SNAPP:  Is this 17?
22    MR. CRUEGER:  Yeah.
23    MR. SNAPP:  Thanks.
24        THE WITNESS:  (Peruses document.)  I'm

Page 156

1  sorry, this is taking a little longer.  It's very
2  small print.
3  BY MR. CRUEGER:
4    Q    Yes.
5    A    I'm having trouble.  (Peruses document.)
6        Okay.  I've read it.
7    Q    And the second e-mail on the first page,
8  it starts with the from -- well, the date is
9  two -- February 7th, 2008, at 9:3 p.m., so we're
10  both looking at the same part.
11    A    I'm -- oh, yes, that's the third e-mail
12  reference?  Not the second.
13    Q    Oh, yeah.  Sorry, I didn't realize that
14  that's a -- there's a second e-mail in there.
15        Do you recognize any of the people who
16  are on the "to" or cc?
17    A    I seem to recognize the name Mary
18  Bennett, but that's the only one.  And I'm not
19  exactly sure who Mary Bennett is, but it's a
20  familiar name to me.
21    Q    And it refers to POPAN activities in the
22  past month.  Do you know what POPAN --
23    A    I don't.  I don't know what that stands
24  for.

Page 157

1    Q    Is that an organization that's
2  associated with the American Pain Foundation?
3    A    I don't know what POPAN is.  I'm sorry.
4    Q    How about the -- there's another acronym
5  in the paragraph -- that's paragraph 1, which is
6  W-A -- W-A-K-P-I.
7    A    I'm sorry, where is it?
8    Q    If you look at number 1, it starts "Pain
9  Care Forum."
10    A    Yes.  Okay.
11    Q    So the W --
12    A    No, I -- that's not something I'm
13  familiar with either.  I -- this is not an e-mail
14  I've ever seen to my knowledge.  My name is not on
15  it, and I have no recollection of any of this
16  activity, and I don't know what that stands for.
17    Q    So do you recognize the Power Over Pain
18  Action Network?
19    A    Can you tell me where that is?
20    Q    It's not.  Would that be the acronym for
21  POPAN, Power Over Pain Action Network?
22    A    Oh.  I'm not --
23    Q    And so here this item number 1, it says:
24  "The Pain Care Forum, a group in Washington, D.C.,

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 has been listening and strategizing with WAKPI
2 president and POPAN state Professional leader
3 (Dionetta) about the situation in Washington
4 state." And "We have had two meetings so far."
5 Correct?
6     A    That's what it says.
7     Q    And the situation in Washington state
8 would be the -- the Washington State Guidelines,
9 correct?
10         MR. SNAPP:  Object to the form.
11         THE WITNESS:  Well, that's also what it
12 refers to is Washington.
13 BY MR. CRUEGER:
14     Q    And so these people are -- well, it says
15 that the Pain Care Forum has been strategizing
16 with these outside groups about the Washington
17 State Guidelines, correct?
18     A    That's what it says.
19     Q    So -- so the Pain Care Forum was coming
20 up with a strategy on how to respond with -- to
21 the Washington prescribing guidelines?
22         MR. SNAPP:  Object to the form.
23         THE WITNESS:  Well, I -- I would
24 personally not agree that that's a correct

Page 159

1 statement. The Pain Care Forum was simply a -- an
2 organization that convened meetings to share ideas
3 and -- and share information and exchange ideas.
4 The Pain Care Forum as an organization never
5 really took a position on anything, for or
6 against.
7 BY MR. CRUEGER:
8     Q    But the Pain Care Forum was an
9 organization where it could share information
10 on -- and ideas on how to respond to the
11 Washington state prescribing guidelines, correct?
12     A    Well, the pain -- certainly the Pain
13 Care Forum was a place where they could share
14 information and points of view, but the Pain Care
15 Forum itself never took positions.
16     Q    And they could use the Pain Care Forum
17 to coordinate a strategy on how to respond to an
18 issue such as the Washington state prescribing
19 guidelines?
20     A    Well, they certainly could get together
21 with organizations that participated and respond,
22 yes.
23     Q    And then, of course, the Pain Care Forum
24 members, they would take positions on issues,

Page 160

1 correct?
2     A    The members --
3         MR. SNAPP:  Object to the form.
4         THE WITNESS:  -- were free to do
5 anything they chose, yes.
6 BY MR. CRUEGER:
7     Q    And they could take positions based on
8 what they did to coordinate with other members in
9 the Pain Care Forum, correct?
10     A    They --
11         MR. SNAPP:  Object to the form.
12         THE WITNESS:  They could in fact take
13 positions and coordinate.
14         (Rosen Exhibit No. 18 was marked
15         for identification.)
16 BY MR. CRUEGER:
17     Q    We're on 18.
18     A    Again, do you want me to read through
19 this entire document, which says it's a draft of
20 an interagency guideline?  I've never seen -- I
21 don't recall seeing this.
22         Obviously, it was sent to me for
23 purposes of distributing, but I don't recall ever
24 seeing this document.

Page 161

1     Q    That's correct.  So Exhibit 18, that's
2 an e-mail on January 4th, 2008, correct?
3     A    That's correct.
4     Q    And it was sent by Will Rowe, correct?
5     A    Yes.
6     Q    And again, he's the executive director
7 of the American Pain Foundation?
8     A    He -- he was, yes.
9     Q    And it was sent to you and your
10 administrative assistant, correct?
11     A    Correct.
12     Q    And it's to distribute information about
13 the Washington State Guidelines --
14     A    That's correct.
15     Q    -- for the upcoming Pain Care Forum
16 meeting, correct?
17     A    Can be distributed -- yes, before the
18 Thursday meeting.
19     Q    And that was so that members could read
20 the attached documents and discuss on how to
21 respond to the Washington State Guidelines,
22 correct?
23     A    That would be sharing the information,
24 and I don't really recall what occurred at -- at

Page 162

1  the meeting.
2      Q    And so -- so if you're a manufacturer of
3  opioids, you were concerned about these state
4  guidelines because it could decrease sales,
5  correct?
6          MR. SNAPP:  Object to the form.
7          THE WITNESS:  As I said, I really didn't
8  work on this issue.  I didn't -- wasn't involved
9  in any activities in the state of Washington.  I
10 can't tell you what the guidelines said or didn't
11 say, and I don't know what their impact would be.
12 I don't recall ever reading the document.  I see
13 that it was sent to me for distribution, and I'm
14 assuming either my admin or I distributed it.
15 BY MR. CRUEGER:
16     Q    Well, it was --
17     A    But I don't know that.
18     Q    It was an important issue to Purdue,
19 though, correct?
20         MR. SNAPP:  Object to the form.
21         THE WITNESS:  It may have been.  Again,
22 others in the company would have been involved
23 with it if they -- if they were indeed.
24 BY MR. CRUEGER:

Page 163

1      Q    So -- and you would have participated in
2  that Pain Care Forum meeting, correct?
3      A    I would have probably been present at
4  that Pain Care Forum.  Again, I can't say that --
5  for sure that I -- every one I attended or didn't
6  attend.  But...
7      Q    Well, weren't -- were you generally the
8  moderator of the Pain Care Forum?
9      A    I was generally, not -- but there were
10 obviously times I'm sure that over the number of
11 years that I, for one reason or another, may not
12 have attended a meeting.
13     Q    And a -- strike that.
14         (Rosen Exhibit No. 19 was marked
15          for identification.)
16 BY MR. CRUEGER:
17     Q    I'll give you what's labeled as
18 Exhibit 19.
19     A    Thank you.  (Peruses document.)
20     Q    And so this is a -- an e-mail from -- it
21 starts from Scott Melville, correct?
22     A    That's correct.  May -- I mean, sorry,
23 March of 2008.
24     Q    And Mr. Melville works at the HDMA,

Page 164

1  correct?
2      A    At that time he did work for HDMA.
3      Q    And in this he was referring to a PCF
4  call that happened on that day, March 13th,
5  correct?
6      A    He does reference "on today's call."  So
7  I'm assuming that's correct, that there was a
8  meeting day.
9      Q    And so apparently it looks like at that
10 meeting it was discussed that FSMB is looking for
11 help to support -- to publish and distribute the
12 responsible opioid prescribing book that Mr. Scott
13 Fishman wrote, correct?
14     A    It does appear that way.
15     Q    By the way, do you understand -- are you
16 aware of whether David Haddox had any role in
17 editing that book?
18         MR. SNAPP:  Object to the form.
19         THE WITNESS:  I'm not aware.
20 BY MR. CRUEGER:
21     Q    Did he ever talk to you about it?
22     A    Not that I recall, no.
23     Q    And this e-mail from Mr. Melville is
24 saying there may be some interest among the HDMA

Page 165

1  members to support the distribution of that book,
2  correct?
3      A    That's what he says.
4      Q    And the HDMA members are McKesson and
5  Cardinal Health.  Those are two he names, correct?
6      A    He does.
7      Q    So McKesson and Cardinal Health are
8  expressing interest in distributing a book on
9  opioid prescribing, correct?
10         MR. SNAPP:  Object to the form.
11         THE WITNESS:  That's what he says.
12 Well, I'm sorry, he says we represent them.  He
13 doesn't really represent their interest or not.
14 BY MR. CRUEGER:
15     Q    Right.  But he -- he mentions interest
16 among by membership, correct?
17     A    Yes.  That's right.
18     Q    And it's reasonable to assume if he
19 mentions McKesson and Cardinal Health that he was
20 using -- that he was referring to two of them as
21 examples of people who might be interested in
22 distributing the book, correct?
23     A    It appears that he was -- yes, that he
24 was showing them as examples.

Page 166

1    Q    And your e-mail just says, "Thanks,
2  Scott," your e-mail in response.
3    A    That's what it says.
4    Q    Okay.  And did you do anything else with
5  respect to this issue?
6    A    I -- I don't really remember the e-mail
7  or, frankly, the discussion at that meeting, but
8  I'm not -- I just obviously acknowledged it.  I
9  don't really remember doing anything.  Lisa seemed
10  to write back and say, Thank you, I'll follow up."
11    Q    And did any of the HDMA membership
12  provide financial support to distribute --
13    A    I --
14    Q    Again, you have to wait.
15    A    Sorry.  Yeah.
16    Q    I know it's tough to do.
17    A    Yeah, I'm sorry.
18    Q    He's going to want you to do it because
19  he wants to object about every third question.
20    A    No problem.
21    Q    So if -- do you recall or -- or not do
22  you recall.
23        Did any of the HDMA membership support
24  the publishing or distribution of the responsible

Page 167

1  opioid prescribing book?
2    A    Not to my knowledge.
3        (Rosen Exhibit No. 20 was marked
4        for identification.)
5  BY MR. CRUEGER:
6    Q    So Exhibit 20, you do not have to read
7  through this.  We can actually just start with the
8  cover page.
9        This is an e-mail from you to various
10  people at Purdue, correct?
11    A    Yes.  It appears to be from 2011.
12    Q    And the subject is "The minutes of the
13  CEAC December 20th meeting," I assume that is,
14  correct?
15    A    I assume so.
16    Q    What is CEAC?
17    A    Oh, boy.  I -- let me try to remember
18  what the acronym meant.
19    Q    It's actually on the next page.
20    A    Oh, is it?  Thank you.  Because I
21  really don't -- Communications and External
22  Affairs Committee.
23    Q    And you chaired that committee, correct?
24    A    I did.

Page 168

1    Q    And it met weekly?
2    A    You know, I don't recall whether it met
3  weekly.
4    Q    Does it -- are you still on this
5  committee?
6    A    I don't think it's functioned for a
7  number of years.
8    Q    Okay.
9    A    I -- if I'm technically still on it or
10  not, I -- I don't recall.  I certainly haven't
11  chaired it for a number of years.
12    Q    And Pamela Bennett was on this
13  committee, correct?
14    A    As I recall, Pamela was on this.  Was
15  she copied here?
16    Q    And Alan Must was on this committee,
17  correct?
18    A    As I recall, he was.
19    Q    And Robin Abrams was on this committee,
20  correct?
21    A    As I recall, she was as well, yes.
22    Q    And she's an attorney, right?
23    A    She is an attorney -- was an attorney at
24  Purdue.  She's no longer with Purdue.

Page 169

1    Q    And she would also be involved in
2  business aspects of the company, correct?
3        MR. SNAPP:  Object to the form.
4        THE WITNESS:  I honestly don't know
5  the -- the -- you know, what her portfolio was or
6  was not.  I don't know what she -- she was
7  involved with or not.
8  BY MR. CRUEGER:
9    Q    Well, this committee, the Communications
10  and External Affairs Committee, its responsibility
11  was not to develop legal positions, correct?
12        MR. SNAPP:  Object to the form.
13        THE WITNESS:  You know, I'm not -- I
14  don't know if I need to consult with you on this
15  or not, whether it's privileged or -- or not.  And
16  I don't really -- I don't really know the
17  technicality of legal opinion or not.
18        MR. SNAPP:  Well --
19        THE WITNESS:  Can you be -- can somebody
20  help me here?
21  BY MR. CRUEGER:
22    Q    Let me just -- let me just rephrase the
23  question.
24        Was the -- the purpose of this committee

Page 170

1 was not to provide legal advice, correct?
2     A    No.  The purp- -- no.
3     Q    What was the purpose of the committee?
4     A    The purpose was really I think, as I
5 recall it -- again, it was a number of years
6 ago -- but it was to just share information and
7 discuss issues that were happening at the time.
8     Q    It was really to shape the message --
9 Purdue's message as it was portrayed to the
10 public, correct?
11         MR. SNAPP:  Object to the form.
12         THE WITNESS:  I'm -- I'm not sure that's
13 an accurate description of it.  I think that there
14 were people in the company whose job it was to
15 prepare external messaging, and I think that was
16 all reviewed by the law department.
17 BY MR. CRUEGER:
18     Q    But this committee did much more than
19 just sit around and talk, correct?
20         MR. SNAPP:  Object to the form.
21         THE WITNESS:  Well, I mean, in essence,
22 that's what we did.  Of course, I think most of
23 the time I was on the phone, because I was here
24 and they were there, but there could have been

Page 171

1 times when I was present just because I happened
2 to be there on that day.
3 BY MR. CRUEGER:
4     Q    Mr. Rosen, in essence, we are just
5 talking, but that's not the purpose of this
6 deposition.
7         So what was the actual purpose of the
8 Communications and External Affairs Committee?
9         MR. SNAPP:  Object to the form.
10         THE WITNESS:  It was to share
11 information among the people who were involved in
12 communications and external affairs, which
13 basically involved the communications group, the
14 federal and state government relations group, and
15 I guess involved people from the law department,
16 and I think from the policy -- the people who
17 developed policies.
18 BY MR. CRUEGER:
19     Q    So it was to coordinate actions within
20 Purdue, correct?
21     A    It certainly discussed those activities,
22 yes.
23     Q    Well, after -- let's just look at
24 item 1, action items --

Page 172

1     A    Yeah, sure, let's be specific.
2     Q    And at the end of it, it has "Action
3 responsibility, Burt Rosen ongoing," correct?
4     A    That's correct.
5     Q    So what --
6     A    What that meant is that that person
7 would be responsible for any action items that
8 would take place under that.  It doesn't
9 necessarily mean they were responsible for doing
10 the action, but they were responsible for, you
11 know, making sure that if there was an action to
12 be taken that that person would sort of dog it, if
13 you will, and make sure that it got done.
14     Q    And if it didn't got -- get done, you
15 would go see -- for action item number 1, I would
16 go see Burt Rosen, correct?
17     A    Right.  You might do that and say, Has
18 this been completed? if there was an action item.
19     Q    So can you just read item 1, just
20 quickly look through it.
21     A    Yeah, certainly.  (Peruses document.)
22         Okay, I have read item number 1.
23     Q    So if you look at item number 1, and the
24 first page where it starts about halfway down, it

Page 173

1 starts with the sentence, "On April 20th."
2     A    Yes.
3     Q    It says: "On April 20th, Representative
4 Bono Mack sent a letter to FDA Commissioner asking
5 the FDA to change the indication for extended-
6 release oxycodone."  Correct?
7     A    That's correct.
8     Q    And extended-release oxycodone, that
9 would be referring to OxyContin, correct?
10     A    That would be OxyContin, correct.
11     Q    And it was to make the label more
12 restrictive, correct?
13     A    That's correct.
14     Q    And the next sentence says:  "The Pain
15 Care Forum has established a legislative task
16 force to address her registration -- her
17 legislation."  Correct?
18     A    Correct.
19     Q    So this is an example of the Pain Care
20 Forum coordinating in order to respond to
21 legislation, correct?
22         MR. SNAPP:  Object to the form.
23         THE WITNESS:  Yes.  That -- let me
24 answer it this way:  The Pain Care Forum, as I

Page 174

1 stated, did not take positions on anything. There
2 was really no mechanism within the Pain Care Forum
3 to do so.
4       But the -- the -- and this is my -- my
5 fault. It became shorthand for a lot of people,
6 including myself, to refer to the Pain Care Forum
7 as the Pain Care Forum, and rather than longhand,
8 which was organizations that participated at the
9 Pain Care Forum.
10       But the answer to your question is, is
11 that organizations that voluntarily chose to do so
12 would coordinate for, against, or would and could
13 coordinate as they so chose.
14 BY MR. CRUEGER:
15       Q    And --
16       A    And that's what that meant.
17       Q    So the members of the Pain Care Forum
18 who would meet during Pain Care Forum meetings to
19 discuss how to coordinate the response to
20 legislation, correct?
21       MR. SNAPP:  Object to the form.
22       THE WITNESS:  I don't think that's
23 accurate.  What happened was the Pain Care Forum
24 did exactly as I've explained.  They shared

Page 175

1 information and exchanged ideas.  If a group
2 within the Pain Care Forum chose to work on an
3 issue together, they would go off and separately
4 do that.  But not necessarily at the Pain Care
5 Forum meeting.
6 BY MR. CRUEGER:
7       Q    And then the second sentence says:  "The
8 Pain Care Forum will also work on DEA legislation
9 as it relates to REMS training."  Correct?
10       A    And that would be the same, that a group
11 of companies or organizations that participated in
12 the Pain Care Forum would go off separately and
13 may coordinate an effort on -- on a particular
14 issue.
15       Q    So you would discuss Representative, at
16 a Pain -- well, let me strike that.
17       At a Pain Care Forum meeting, you would
18 discuss Representative Bono Mack's legislation,
19 correct?
20       MR. SNAPP:  Object to the form.
21       THE WITNESS:  It's possible that that
22 would come up at an actual Pain Care Forum meeting
23 if it was on the agenda, and it might be
24 discussed.  But if there was activity to attempt

Page 176

1 to affect any legislation or any issue, for that
2 matter, companies or -- and other organizations
3 would organize separately.
4 BY MR. CRUEGER:
5       Q    So -- but we don't have any record of
6 what was discussed generally at Pain Care Forum
7 meetings, correct?
8       MR. SNAPP:  Object to the form.
9       THE WITNESS:  I think that's correct,
10 there were no official records kept of the
11 discussion.  Only the agenda items.
12 BY MR. CRUEGER:
13       Q    And there were no transcripts of the
14 discussions, correct?
15       A    Not to my knowledge.
16       Q    And the meetings were not publicly
17 announced, correct?
18       MR. SNAPP:  Object to the form.
19       THE WITNESS:  Not publicly announced.
20 They were basically scheduled at the beginning of
21 each year for the year and shared with the -- all
22 the participants.
23 BY MR. CRUEGER:
24       Q    But the person working at Walgreens,

Page 177

1 they wouldn't know about the Pain Care Forum
2 meeting, would they?
3       MR. SNAPP:  Object to the form.
4       THE WITNESS:  I -- they could have, but
5 I don't really know.  I mean they weren't sent the
6 communication because they didn't participate, but
7 that doesn't mean they didn't know that the Pain
8 Care Forum existed and --
9 BY MR. CRUEGER:
10       Q    Well, you didn't have a website, did
11 you, correct?
12       A    No, we didn't have a website.
13       Q    So you wouldn't schedule a public
14 meeting of the Pain Care Forum ever, correct?
15       MR. SNAPP:  Object to the form.
16       THE WITNESS:  No, there weren't public
17 meetings.
18       MR. SNAPP:  We've been going a little
19 more than an hour.  Can we take a short break?
20       MR. CRUEGER:  Sure.
21       MR. SNAPP:  Thanks.
22       THE VIDEOGRAPHER:  The time is
23 1:47 p.m., and we're going off the record.
24       (Recess.)

Page 178

1    THE VIDEOGRAPHER: The time is 2:01
2  p.m., and we're back on the record.
3  BY MR. CRUEGER:
4    Q   So if we turn back to Exhibit 20.  If
5  you look at the page that ends with the Bates
6  number 06, and at the bottom it starts with
7  "Washington Pain" -- "Washington State
8  Guidelines."
9    A   Yes.
10   Q   If you just want to quickly read -- it
11 starts on there, and then it goes down to the
12 bottom on the next -- the middle of the next page
13 with "Action Responsibility, Alan Must."
14   So if you just want to read that
15 paragraph?
16   A   I would, sure.  (Peruses document.)
17   Okay, I've read through "Action
18 Responsibility Ongoing, Alan Must."
19   Q   So if you start on the -- the first part
20 of that sentence where it says, "Washington State
21 Guidelines."  So this issue was discussed at this
22 Communications and External Affairs Committee
23 meeting, correct?
24   A   It -- yes.  I don't recall it myself,

Page 179

1  but it was 2011.  But it is here in the document.
2    Q   And based on the length of this entry,
3  it sounds like it was discussed somewhat
4  extensively, correct?
5    A   Well, my recollection of this document
6  was it was a cumulative document.  So any given
7  entry might, you know, it would start with the
8  beginning, and then you would add to it.
9    Q   Okay.
10   A   So I don't -- I don't honestly remember,
11 but I don't think that any topic was the topic of
12 any particular meeting but, rather, an ongoing
13 discussion.
14   Q   And that might be why it's called
15 "Action items pending," correct?
16   A   That might be it.  I don't really
17 remember why those words were chosen, but -- but
18 that was my recollection of how this document
19 worked.
20   Q   And again, you were the -- the chair of
21 this committee, correct?
22   A   I was.  I -- I basically convened it and
23 ran the meeting, if you will.
24   Q   And the activities of this

Page 180

1  Communications and External Affairs Committee were
2  reported to the board of directors, correct?
3    MR. SNAPP:  Object to the form.
4    THE WITNESS:  You know, I don't recall
5  that.
6    And I want to go back and say that being
7  the chair of this committee gave me no special
8  power.  It was really that it was just my task, if
9  you will, to -- to chair the meeting, try to make
10 sure it happened on time, and to follow the
11 activities, and that -- in this document.  I don't
12 recall making any presentation.
13 BY MR. CRUEGER:
14   Q   So again, back to this part where it
15 starts, "Washington State Guidelines."
16   A   Yes.
17   Q   So it refers to under the -- the "XX MED" --
18 sorry, under "XX MED," I was going to start
19 reading that sentence.  "The current" --
20   Do you follow where I am?
21   A   I see "XX MED."  It's in the middle of a
22 sentence that says "Of particular concern."
23   Q   Yes, and then right underneath that is,
24 "The current AMDG guidelines."  So...

Page 181

1    A   Yes.
2    Q   So, "The current AMDG guidelines have a
3  120 morphine equivalent dose as the threshold for
4  consultation."
5    A   Can you tell me what AMDG stands for?  I
6  don't recall.
7    Q   I assume they refer to the Washington
8  State Guidelines, correct?
9    A   I don't know.  I don't recall that
10 acronym.
11   Q   So -- they're published by the
12 Washington State Agency Medical Directors' Group,
13 AMDG.
14   A   Thank you.
15   Q   And it has a 120-milligram morphine
16 equivalent dose as a threshold for consultation.
17 That's what it says, correct?
18   A   That's what it says.
19   Q   And Purdue did not like that threshold,
20 correct?
21   MR. SNAPP:  Object to the form.
22   THE WITNESS:  Again, I don't really -- I
23 wasn't working on this guideline or this issue
24 personally.  I don't recall specifics.

Page 182

BY MR. CRUEGER:

Q   Well, the next sentence says "we," and I assume that refers to "we" the committee, correct?

A   Where are you?

Q   Right after --

A   Yes.  "We have begun."

Q   So, "We have recommended this issue be raised with by the Pain Care Forum with IOM."

Do you follow me?

A   I'm there now, yes.  I'm sorry.  "We have recommended" --

Q   -- "this issue be raised with by the Pain Care Forum with IOM for consideration in their reports on the treatment of pain, which is due in June 11 -- in June 2011."

Who is IOM?  Is it the Institute of Medicine?

A   That could be the Institute of Medicine.

Q   And they were getting ready to prepare a report on pain?

A   They did have a report on pain.  I don't recall the date.  So, I'm not -- I'm -- that may be that report.

Q   And here Purdue is recommending that the

Page 183

Pain Care Forum raise this issue with the Institute of Medicine, correct?

MR. SNAPP:  Object to the form.

THE WITNESS:  That's what -- what the words say.

BY MR. CRUEGER:

Q   And again, just based on what you're reading in that paragraph and what we've read so far, Purdue is trying to undermine these guidelines, these Washington State Guidelines, correct?

MR. SNAPP:  Object to the form.

THE WITNESS:  I couldn't say that "undermine" is an appropriate word.

BY MR. CRUEGER:

Q   But Purdue does not believe that they will have a positive effect on sales, correct?

MR. SNAPP:  Object to the form.

THE WITNESS:  I don't think it says anything about sales.

BY MR. CRUEGER:

Q   And Purdue believes that it would have a negative impact on sales, these Washington State Guidelines, correct?

Page 184

MR. SNAPP:  Object to the form.

THE WITNESS:  I also don't see that here as well.  As I've said many times, that, you know, we attempted to balance the appropriate use of the medicines for people in pain who benefitted from them, and at the same time we attempted to become -- to the degree possible, to support positions that mitigated the diversion, misuse and abuse of the products, and attempted to find the balance and be part of the solution.

BY MR. CRUEGER:

Q   Purdue's business is to sell OxyContin and other opioids, correct?

A   Purdue is in business --

MR. SNAPP:  Object to the form.

THE WITNESS:  Sorry.

MR. SNAPP:  Object to the form.

THE WITNESS:  Purdue is in the business to manufacture, discover, and sell medicines, yes.

BY MR. CRUEGER:

Q   More specifically, though, its business is to sell OxyContin, correct?

MR. SNAPP:  Object to the form.

THE WITNESS:  It's part of their

Page 185

business to sell its medicine, yes.

BY MR. CRUEGER:

Q   And OxyContin makes up a substantial percentage of Purdue's revenues or it did at the time, correct?

MR. SNAPP:  Object to the form.

THE WITNESS:  I don't know the numbers, but it is a substantial part of the -- of the business, yes.

BY MR. CRUEGER:

Q   In fact, when Purdue lost its patent in 2004, the business suffered, did it not?

A   The product became generic, and I can't -- I think there were five or six generic copies of the product, and -- and so the sales shifted to the generic products.

Q   But Purdue's business suffered, correct?

MR. SNAPP:  Object to the form.

THE WITNESS:  It would have suffered.

BY MR. CRUEGER:

Q   And Purdue as a company suffered, correct?

MR. SNAPP:  Object to the form.

THE WITNESS:  Purdue suffered as a

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1  company. It laid off a number of employees.
2  BY MR. CRUEGER:
3    Q   About half the employees?
4    A   About half the employees is my
5  recollection.
6    Q   And you were understandably at that time
7  looking for a new job, correct?
8      MR. SNAPP: Object to the form.
9      THE WITNESS: Yes. I was surprised by
10 the first e-mail you gave me because I didn't
11 remember that, but obviously if you lost your
12 patent and the company was laying off half the
13 employees, I thought it might be prudent to --
14     MR. CRUEGER: And --
15     (Rosen Exhibit No. 21 was marked
16     for identification.)
17 BY MR. CRUEGER:
18   Q   Well, I'm just going to hand you what is
19 Exhibit 21.
20     And this is a 2013 OxyContin annual
21 marketing plan, correct?
22   A   Yes, that's what it states. I really
23 don't recognize this document. I'm not sure if
24 I've ever seen it before.

Page 187

1      I'm sorry, are you through with this
2  document? I'm just trying to --
3    Q   Yes, you can put it off to the side.
4    A   -- keep it clean. As clean as I can.
5      Yes, that's what is stated. As I said,
6  I don't recall ever seeing this document.
7    Q   And if you look at page 11 of the
8  document -- we won't have to read through the
9  whole thing -- section 1.4.
10   A   Section 1.4. Yep.
11   Q   It's on page 11, so -- found it.
12   A   I found it. "Issues and Challenges"?
13   Q   Correct. And it's issues and challenges
14 to sales of OxyContin, correct?
15   A   It says "Critical Issues for 2013."
16   Q   And if you then turn to page 13.
17   A   I am on page 13.
18   Q   The second bullet -- bullet point.
19   A   Yes.
20   Q   States: "Federal (example, DEA) and
21 state (example, New York I-STOP Act, Washington
22 State guidelines), regulatory changes may have
23 negative impacts on OxyContin, such as limiting
24 daily dose (equivalent to 100-milligram morphine)

Page 188

1  and LoT (90 days)."
2      So that's why Purdue is concerned about
3  the Washington guidelines, correct?
4      MR. SNAPP: Object to the form.
5      THE WITNESS: Once again, I really
6  didn't work on the Washington guidelines. I don't
7  know the specifics of it, and I don't know the
8  specific concerns.
9  BY MR. CRUEGER:
10   Q   But you sat in on meetings of the -- the
11 CEAC committee that discussed the Washington
12 guidelines, correct?
13   A   I -- I did sit in on meetings that
14 discussed the guidelines, but I do not recall any
15 specifics.
16   Q   And you sat in on Pain Care Forum
17 meetings that discussed the guidelines?
18   A   I did, and I don't recall any of the
19 specifics. It was not something that I had
20 responsibility for, and I really don't remember
21 any specifics.
22   Q   And does this document that we're
23 looking at right now, page 13 of Exhibit 21, state
24 a concern of the Washington State Guidelines as it

Page 189

1  may have a negative impact on OxyContin sales,
2  right?
3      MR. SNAPP: Object to the form.
4      THE WITNESS: May have a negative
5  impact.
6  BY MR. CRUEGER:
7    Q   And we had discussed the Bono Mack
8  letter to the FDA that was in that CEAC committee
9  meeting. You recall that?
10   A   You referenced it, yes.
11   Q   And that was -- she had wrote -- she had
12 written a letter to the FDA wanting to change the
13 label, correct?
14   A   That's my recollection, yes.
15   Q   So -- and as this identifies:
16 "Narrowing opioid indication from moderate to
17 severe pain -- severe pain only could have a
18 negative impact on OxyContin sales." Correct?
19     MR. SNAPP: Object to the form.
20     THE WITNESS: That's what the words say.
21 BY MR. CRUEGER:
22   Q   And so that's why there was a Pain Care
23 Forum legislative task force to address that
24 issue, correct?

Page 190

1    MR. SNAPP:  Object to the form.
2    THE WITNESS:  That was one of the
3 issues, yes.
4 BY MR. CRUEGER:
5    Q    You can put that to the side now.
6    Are you familiar with something called
7 REMS?
8    A    I am familiar with REMS.  It stands for
9 Risk Evaluation Mitigation Strategy.
10    Q    And just to kind of set a background, I
11 don't know if you'll know the -- recall the year
12 perfectly, but in 2007, Congress passed a law that
13 gave the FDA authority to require companies, such
14 as Purdue, to do Risk Evaluation mitigate -- and
15 Mitigation Strategies, correct?
16    A    That's my recollection.  It's not
17 something I was really familiar with at the time,
18 but -- but it did -- it was -- I do recall that
19 there was a law passed that gave, I thought it
20 was, additional authority for risk evaluation and
21 mitigation strategies, or I think there may be
22 something similar existed under another name.  I'm
23 not sure which.  But -- but it was an extension of
24 that authority, I think.

Page 191

1    Q    And right around 2008, you learned that
2 the FDA was thinking of requiring a REMS program
3 for extended-release opioids, correct?
4    A    That's correct.  I -- again, I don't
5 recall the date, but I -- it was around 2008,
6 that's probably accurate.
7    Q    And extended-release opioids would
8 include OxyContin, correct?
9    A    It would.
10    Q    And in response, the Pain Care Forum set
11 up a task force, correct, a REMS task force?
12    A    That --
13    MR. SNAPP:  Object to the form.
14    THE WITNESS:  That is my memory, yes.
15 BY MR. CRUEGER:
16    Q    And the point of the REMS task force was
17 to coordinate strategy and how to address the
18 FDA's REMS proposals, correct?
19    A    I think that's fair, yes.
20    Q    And so the FDA, when it was proposing a
21 risk evaluation/mitigation strategy, one of the
22 things it was looking at was a -- a doctor
23 certification, correct?
24    A    I'm really not sure how to answer your

Page 192

1 question.  I don't know what the FDA specifically
2 considered.  I know that -- I seem to recall that
3 there were -- let me think of a word -- elements
4 of what a REMS might have or not have based on
5 examples of other drugs.  And I know that a -- a
6 registry -- a physician registry was one of those
7 elements that had existed in prior REMS.
8    Q    Well, the FDA was considering mandatory
9 training for physicians who would prescribe --
10 prescribe long-term acting opioids, correct?
11    MR. SNAPP:  Object to the form.
12    THE WITNESS:  I think the training was
13 another element, and of course, it would be either
14 voluntary or mandatory training.
15 BY MR. CRUEGER:
16    Q    Well, let's just -- let's just be clear,
17 because the REMS can have multiple elements,
18 correct?
19    A    That's correct.  That's what I'm trying
20 to explain to you.
21    Q    So I just want to talk about the
22 physician certification or physician training
23 element.
24    A    Training element.  Okay.

Page 193

1    Q    So -- and one of the issues the FDA was
2 considering was having a -- a mandatory training
3 element, correct?
4    A    There -- yes, there were two sides.  A
5 training program obviously could be a voluntary or
6 a mandatory training program.
7    (Rosen Exhibit No. 22 was marked
8    for identification.)
9 BY MR. CRUEGER:
10    Q    I hand you what's labeled Exhibit 22.
11    A    (Peruses document.)
12    Q    You don't have to read all the articles.
13 We're not going to -- we could -- we could spend
14 all day talking about REMS, but we're going to be
15 very focused.  So...
16    A    All right.  I'll just -- let me just
17 look at the second one and just see the titles,
18 and if you ask me a specific question that's in
19 the article, then I would like to go back and read
20 it.
21    Q    No problem.
22    A    All right.  And your question?
23    Q    So this is a February 2009 e-mail,
24 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    A   It is.

2    Q   And you're on the "to" list on the
3  e-mail, correct?

4    A   Well, I'm sorry, but I don't see my name
5  in the e-mail. I don't know who Erin Fry is,
6  first of all, and I don't see my name there. Am I
7  copied on this e-mail?

8    Q   Well, it's hard to see them sometimes in
9  these. So after -- you see in that first line
10  starts with A.Fleming?

11    A   Yes.

12    Q   That's you at the end of the first line,
13  correct, Burt.Rosen?

14    A   Yes, it is. I'm sorry. I see it's not
15  in capital letters or anything. "Thank you for
16  sharing the attached articles." Okay.

17        I don't recall who Erin Fry is, but go
18  ahead.

19    Q   And the TRF coalition members, what is
20  the TRF?

21    A   Well, I was struggling with that, to be
22  honest with you.

23    Q   Could it be tamper-resistant
24  formulation?

Page 195

1    A   That -- that could be.

2        And my confusion now, that you say that,
3  is that these form- -- these types of formulations
4  have been referred to as tamper resistant, and
5  they've also been referred to as abuse deterrent.
6  And as I recall, the change occurred at the
7  request of the FDA, and the more recent is abuse
8  deterrent.

9    Q   And what I'm actually a little more
10  interested in isn't so much the -- the e-mail.
11  It's just the attached -- the pink sheet.

12    A   Oh, well, okay.

13    Q   And it's the first one.

14    A   Yes.

15    Q   And actually if you --

16    A   Well, then --

17    Q   If you just want to --

18    A   -- do you want me to read that article?

19    Q   You don't have to read the whole thing.
20  Will you just start at the bottom of page -- it
21  says -- the bottom page of 1 of 3, it starts --

22    A   1 of 3?

23    Q   Yeah. So the first page of this article
24  of "Record-setting REMS. FDA's classwide opioid

Page 196

1  program will be massive," and there's a section
2  that starts: "What can REMS do that risk plans
3  didn't?"

4        And if you just want to quickly read
5  that until the next section, which is "REMS in the
6  Works." We're just going to talk about that
7  little issue.

8    A   (Peruses document.) Okay, I've just
9  read that section.

10    Q   Okay. And it refers to a person
11  Jenkins, and that is -- let's just agree, it's up
12  early in the article, it's John Jenkins, who is
13  the Office of New Drug directors at the FDA.

14    A   I'm familiar with his name. I don't
15  know Dr. Jenkins, but I know who he is.

16    Q   And in here Dr. Jenkins is quoted on
17  talking about the educational part of a potential
18  classwide REMS for opioids, correct?

19    A   Yes. He says that: "The risk programs
20  are voluntary and are mainly education and
21  surveillance based."

22    Q   And in the last sentence of that section
23  that you read, it says: "Mandatory training and
24  registration of doctors and a restriction -- a

Page 197

1  restriction distribution system are also among the
2  elements that FDA is considering."

3        Do you see that?

4    A   Well, I see "mandatory training for or
5  registration of prescribing physicians." Where's
6  the other part?

7    Q   I don't know if we're on the same part
8  then. It's the -- right above the section that
9  says, "REMS in the work for some time." It
10  starts --

11    A   That paragraph, "The programs really" --

12    Q   Yeah. And then the --

13    A   (Peruses document.) Okay.

14    Q   And so the FDA was considering as part
15  of the REMS having a mandatory training and
16  registration of doctors who would prescribe
17  long-term opioids, right?

18    A   I think that's correct. As I stated
19  earlier, they were looking at education programs
20  that could be either voluntary or mandatory.

21    Q   And again, we've already established,
22  and it's not very controversial, that opioids such
23  as OxyContin are dangerous, correct?

24        MR. SNAPP: Object to the form.

Page 198

1    THE WITNESS:  They are Schedule II
2  drugs, and by definition, I believe that's
3  true, yes.
4  BY MR. CRUEGER:
5    Q    And you would agree that it's a good
6  thing for a doctor to be trained on how to
7  prescribe these dangerous drugs?
8    A    I would agree.
9    Q    And you would also agree, especially as
10  a one-time patient, that a patient would want
11  their doctor to be trained on how to use these
12  dangerous drugs, correct?
13    A    As a patient, I would think so, yes.
14    Q    So if we look at the next one, which
15  is --
16    (Rosen Exhibit No. 23 was marked
17    for identification.)
18  BY MR. CRUEGER:
19    Q    So I'll hand you Exhibit 23.
20    A    (Peruses document.)
21    Q    We're only going to talk about a very
22  short part of the letter itself, so you don't have
23  to -- you're free -- feel free to read it --
24    A    Yeah, let me read it since it's a letter

Page 199

1  and it's only a few pages, if you don't mind.
2    Q    Oh, no problem.
3    A    (Peruses document.)  Okay.
4    Q    So this is the -- is the cover of the
5  e-mail.  The first page of Exhibit 23 shows this
6  is an e-mail from you to Will Rowe at the American
7  Pain Foundation, correct?
8    A    That's correct.
9    Q    And it's dated Wednesday, 11/26/2008,
10  correct?
11    A    That's correct.
12    Q    And the subject is "A draft"?
13    A    That's correct.
14    Q    And it's attaching the document that you
15  just read through, which is the draft of the PCF
16  REMS task force letter, correct?
17    A    That's correct.
18    Q    And that means Pain Care Forum, right,
19  the PCF?
20    A    It would refer to the Pain Care Forum.
21    Q    So it was a draft of a letter that the
22  Pain Care Forum task force was putting together,
23  correct?
24    A    That appears to be what it is.  I mean,

Page 200

1  I don't remember this specific e-mail, but I -- I
2  do see it and that's what it refers to.
3    Q    And did you draft the letter?
4    A    I doubt it.  I'm sure I did not.  It's
5  much more detailed than anything that I would have
6  the knowledge to -- to draft.
7    Q    But it did come from Purdue?
8    A    I -- I don't know who drafted it, to be
9  honest with you.  I'm sure I didn't write this
10  letter.
11    Q    Is there a way to find out who drafted
12  it?
13    A    I don't know.
14    Q    And the idea is you were -- this was
15  going to be circulated at the Pain Care Forum
16  meeting or prior to the meeting potentially?
17    A    Well, it appears at the task force.
18    Q    To the task force.  Okay.
19    A    But I don't -- I mean, it's a long time
20  ago, and I don't remember the exact --
21    Q    So there were -- there were separate
22  Pain Care Forum REMS task force meetings?
23    MR. SNAPP:  Object to the form.
24    THE WITNESS:  There would be -- there

Page 201

1  could be, yes.  Whenever anyone created a task
2  force or a -- whatever they wanted to call it, a
3  separate -- as I've explained, the Pain Care Forum
4  itself really took no positions, but groups within
5  the Pain Care Forum were free to do so or not.
6  BY MR. CRUEGER:
7    Q    So that's -- I want to actually flesh
8  that out a little.  So if you turn the page.
9    A    Yes.
10    Q    It says, "To:  FDA."
11    A    Yes.
12    Q    And it says:  "The undersigned write to
13  urge the Food and Drug Administration to adopt a
14  classwide Risk Evaluation and Mitigation
15  Strategy."
16    So -- so what you mean by the Pain Care
17  Forum doesn't take a -- a position is that the
18  Pain Care Forum itself is not going to be a
19  signatory to this letter, correct?
20    A    That's correct.  The Pain Care Forum had
21  no -- there was no -- no one or nothing or nobody
22  or no process where -- which would authorize
23  anyone to speak for the Pain Care Forum.  It just
24  wasn't that kind of an organization.  It simply

Page 202

1 convened meetings for information and sharing
2 points of view.
3     Q   So it would be members of the Pain Care
4 Forum.
5     A   It would be anyone who chose to do so.
6     Q   And in this case, members of the Pain
7 Care Forum who got together to form a Pain Care
8 Forum REMS task force, correct?
9     A   That's correct.
10     Q   And the point of this letter was to try
11 to influence the FDA's decision-making on REMS,
12 correct?
13         MR. SNAPP:  Object to the form.
14         THE WITNESS:  It appears that the
15 purpose of this letter was to encourage the FDA to
16 go ahead and do exactly what they were intending
17 to do.
18         And as you've read this yourself, I'm
19 sure, it states that, you know, opioids are
20 dangerous drugs, that they can misused, abused and
21 diverted.  And basically it, I think, the way I
22 read it, speaks very positively towards moving
23 forward but moving forward as a class.
24 BY MR. CRUEGER:

Page 203

1     Q   And --
2     A   If I could just finish explaining.
3     Q   Sure.
4     A   That would be preferable to having
5 single REMS on single products.  And the reason
6 for that is, as the letter states, is that it
7 would be a very cumbersome process if a -- if a
8 prescriber was required or even voluntarily to
9 look at say dozens of REMS, all of which were --
10 the purpose of which was to do essentially the
11 same thing.  Because all opioids, and certainly
12 all extended-release opioids, have the same or
13 nearly the same risks and benefits, and therefore
14 it just seemed to make sense to do a class REMS as
15 opposed to dozens of individual REMS.  It would
16 duplicate.
17     Q   And by encourage the FDA, though, you
18 mean that the members of the Pain Care Forum
19 task -- REMS task force who signed on to this
20 letter were trying to influence the FDA's ultimate
21 decision on what types of REMS to have for
22 long-term acting -- long-acting opioids, correct?
23         MR. SNAPP:  Object to the form.
24         THE WITNESS:  Well, as I've stated, I

Page 204

1 think what -- the way I read this letter is it
2 basically says that the FDA should create a single
3 REMS.
4         This appears to be early in the process,
5 and I don't think it's -- I don't read it as being
6 very specific on exactly how the REMS ultimately
7 would come out.  I do see that it mentions
8 elements of a REMS, but it really just -- I think
9 the purpose, again the way I read it, is to
10 encourage the FDA to do a class REMS as opposed to
11 single, multiple, duplicative REMS.
12 BY MR. CRUEGER:
13     Q   Right.  And by "encourage," you mean to
14 influence their ultimate decision-making process?
15     A   Yes, sir.  With respect to a classwide
16 REMS.
17     Q   So if you want to turn to page -- it
18 would be page 3 of the letter.  It ends in 15, and
19 the Bates number --
20     A   Yes.  15.
21     Q   It's the "Elements of a Classwide REMS"
22 section.
23     A   Yes.
24     Q   That last paragraph says:  "In

Page 205

1 considering the appropriate elements to include in
2 a class REMS for opioid analgesics, we encourage
3 FDA to implement targeted physician and pharmacist
4 education and certification requirements as a
5 prerequisite to prescribing and dispensing these
6 products."
7         Correct?
8     A   That's what it says.
9     Q   So in this draft, you are also asking or
10 encouraging the FDA to have a certification
11 requirement for prescribers who wish to prescribe
12 long-acting opioids, correct?
13     A   Of training, yes.  Of education.
14     Q   And that would be a prerequisite to them
15 being able to prescribe the products, correct?
16     A   "In considering the appropriate elements
17 to include in a class REMS for opioid analgesics,
18 we encourage FDA to implement targeted physician
19 and pharmacy -- pharmacist education and
20 certification requirements as a prerequisite to
21 prescribing and dispensing these products."
22     Q   And that was the draft that was
23 circulated amongst the REMS --
24     A   That was the draft, yes, sir.

Page 206

1      MR. SNAPP:  Object to the form.
2  BY MR. CRUEGER:
3      Q   I'm sorry, I just have to finish the
4  question.
5          This was the draft that was then
6  circulated to the PCF REMS task force members,
7  correct?
8          MR. SNAPP:  Object to the form.
9          THE WITNESS:  I assume so, but I don't
10 know what happened to this, whether this -- I
11 don't know what happened after this.  I didn't
12 remember this e-mail specifically, and I don't
13 know what followed.  I don't have a vivid rec --
14 recollection.
15 BY MR. CRUEGER:
16     Q   Okay.  And then next one.  You can put
17 that to the side.
18         (Rosen Exhibit No. 24 was marked
19         for identification.)
20 BY MR. CRUEGER:
21     Q   So Exhibit 24.
22         So this is an e-mail that comes a little
23 bit after the e-mail that we saw in Exhibit 23,
24 correct?

Page 207

1      A   Yes.
2      Q   So your Exhibit 23 was November 26 and
3  this is December 10th.
4      A   That's correct.
5          So shall I read this one?
6      Q   Well, let's just look at the cover, and
7  then -- let's start with that, and if you want to
8  read the entire attachment, you can.
9          But -- and this e-mail from Will Rowe is
10 to various members of the PCF REMS task force,
11 correct?
12     A   I would assume so.  But I can't honestly
13 say who volunteered to participate and who didn't.
14     Q   And you're on this e-mail, correct?
15     A   I am.
16     Q   And then you forward this e-mail to
17 various people at Purdue, correct?
18     A   I did.
19     Q   And -- and this includes Mr. Howard
20 Udell, correct?
21     A   I did forward this to Howard Udell.
22     Q   And so Mr. Udell in 2000 -- December of
23 2008 is still working at Purdue, correct?
24     A   That's my assumption, yes.

Page 208

1      Q   Was he still your boss in December of
2  2008?
3      A   Yes.  I mean apparently he hadn't left
4  at that date.  I'm not trying to be evasive.  It's
5  just I don't recall when he left.  But, yes, if he
6  was -- if I sent it to him, I'm sure he was there.
7      Q   And then you also sent it to Dr. David
8  Haddox, correct?
9      A   I did.
10     Q   And the e-mail talks about the -- the
11 continuing -- the Pain Care Forum's work on REMS,
12 correct?
13     A   It does refer to -- it would be an
14 agenda item.
15     Q   And it's circulating a draft to the --
16 the people who are attached -- or people who are
17 included in this e-mail, correct?
18     A   It is.
19     Q   And -- if you look at the attachment.
20     A   Yes.
21     Q   The draft, so it starts -- the last two
22 numbers are 58.
23     A   Yes.
24     Q   And then this draft, there's actually --

Page 209

1  it's addressed to someone a bit more specific at
2  the FDA than just the FDA, correct?
3      A   Correct.  I don't -- it's terrible to
4  say, I don't recall Eschenbach, but he must have
5  been the Commissioner in -- in those years.
6      Q   And if you turn to what is -- the last
7  two numbers of the page of this letter are 60 in
8  the bottom on the Bates number.
9      A   Yes.
10     Q   And that -- I guess we call it the --
11 the final paragraph that starts "In considering."
12     A   "In considering."
13     Q   So, "In considering the appropriate
14 tools to include in a classwide REMS for opioid
15 analgesics, we encourage FDA to implement targeted
16 prescriber and pharmacist education with
17 appropriate confirmation requirements as a
18 prerequisite to prescribing and dispensing these
19 products."
20         Have I read that correctly?
21     A   That's what it says, yes.
22     Q   And so in this draft of the letter,
23 the -- the Pain Care Forum task force members are
24 still considering encouraging the FDA to adopt

Page 210

1 a -- what would be a mandatory prescriber
2 education requirement, correct?
3     A   Yes.  I'd have to go back.  I don't
4 think that's a change, is it?
5     Q   I -- in substance, I don't believe it
6 is.  So...
7     A   Okay.
8     Q   So we will go to the next one.
9     A   I mean I -- I could read this letter.
10 I'm not sure without a lot of analysis I could
11 tell the differences or the changes.
12     Q   Oh, just the change in that one
13 sentence.  I'm not worried about the rest of the
14 letter.  So...
15     A   Okay.
16         (Rosen Exhibit No. 25 was marked
17         for identification.)
18         THE WITNESS:  Are you through with that?
19 BY MR. CRUEGER:
20     Q   Yes.  You can put that to one side.
21     A   (Peruses document.)
22         Okay.  And I see another draft of the
23 letter, and I -- again, without some comparison
24 and analysis, I can't tell if this is the same

Page 211

1 draft, a different draft, a third draft or what,
2 but I have read the -- the cover e-mail.
3         Now, let me just look here.  I don't
4 know what this is at the very end.  Oh,
5 background.  I think that was in the first one,
6 but -- so, again, I just can't verify without --
7 which I'm glad to take if you want, but I can't
8 verify which draft was which.
9     Q   No, we're not -- we're not going to look
10 at the attachment actually this time.
11     A   Okay.
12     Q   We're just going to focus on the --
13 really the first page.
14     A   Okay.
15     Q   So the -- the third e-mail down, it
16 starts, "From Anita Ducca."
17     A   Correct.
18     Q   And she is the senior director of
19 Regulatory Affairs and Healthcare Policy at the
20 HDMA, correct?
21     A   That is her title, yes.
22     Q   And that's the organization that
23 represents distributors like McKesson and Cardinal
24 Health as well as pharmacies, correct?

Page 212

1     A   They represent distributors and
2 wholesalers, yes.  That's what they say.
3     Q   Yeah.  And -- the HDMA
4 representative in the Pain Care Forum was also
5 participating in the Pain Care Forum REMS task
6 force, correct?
7     A   It appears that somebody was.  Scott --
8 Scott, who had forwarded this to her.
9     Q   And --
10     A   Because she asks to be included in
11 future e-mails.
12     Q   And in her -- the text the first
13 sentence after, Dear -- "Dear Will," and she has a
14 few comments on the -- on the letter, correct?
15     A   That is correct.
16     Q   And she references that there was a
17 phone call, correct?
18     A   She does.
19     Q   And that phone call was obviously to
20 discuss the draft of the letter about the -- about
21 REMS, correct?
22         MR. SNAPP:  Object to the form.
23         THE WITNESS:  I would assume so.  I
24 mean, as I had explained earlier, meetings of the

Page 213

1 forum itself were in person for some people and on
2 the phone for others.
3         I don't honestly recall if this meeting
4 was just a phone call or similarly a combination.
5 BY MR. CRUEGER:
6     Q   And she is stating that she agrees with
7 others that the letter shouldn't mention a
8 certification requirement for physicians or anyone
9 else, for that matter, correct?
10     A   She says that:  "For now we shouldn't
11 mention a certification requirement for physicians
12 or anyone else, for that matter."
13     Q   So -- and then you forward -- actually,
14 Will Rowe forwards that comment to you, correct?
15     A   That's correct.
16     Q   And then you forward that to other
17 people at Purdue, correct?
18     A   That's correct.
19     Q   Including Dr. Haddox, correct?
20     A   Yes.
21     Q   Again, your -- your boss, Mr. Udell?
22     A   Yes.
23     Q   Dr. Craig Landau, what was his role
24 in -- in the Pain Care Forum?

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    A   He had no role in the Pain Care Forum.
2 I believe at that time he was -- he has had
3 several jobs at the company.  I don't recall at
4 that date what his job was.  It could have been
5 medical affairs or research.
6    Q   And this is obviously forwarding
7 comments, because these people at Purdue that
8 you've forwarded the comments to, were they
9 involved in formulating Purdue's position on what
10 a FDA REMS for long-acting opioids should look
11 like?
12   A   I can't say that they were the people
13 who were formulating any position.  As I said, I
14 don't recall what position Dr. Landau held at that
15 time.  I know that Anthony Santopolo was the head
16 of Regulatory Affairs, so obviously FDA issues.
17       And -- again, those were -- you know,
18 lawyers, and I don't know, you know, who formed
19 exactly the positions at that point in time.  I
20 think at this point it was just informational.
21   Q   And so here the -- the HDMA and others
22 are -- are proposing that there should not be --
23 or at least in this letter, they should not be
24 proposing that the FDA adopt a mandatory training

Page 215

1 requirement for physicians to prescribe opioids,
2 correct?
3       MR. SNAPP:  Object to the form.
4       THE WITNESS:  It -- it says that they --
5 "We shouldn't mention certification requirements
6 at this time."
7       (Rosen Exhibit No. 26 was marked
8       for identification.)
9 BY MR. CRUEGER:
10   Q   Exhibit 26.
11   A   (Peruses document.)
12       This is 2009, so this is a little bit
13 later.  Okay.
14   Q   It's about a month later, I guess.
15   A   Yes.
16   Q   So it's January 23rd, 2009.
17       If you just turn the page, at the top it
18 says "PCF REMS" letterhead -- or
19 "Letterfinal1.doc," right?  We'll say that --
20   A   It does.  Is that an attachment or --
21   Q   I assume that refers to the letter
22 that's attached to this --
23   A   Okay.
24   Q   -- e-mail.

Page 216

1       I just want to point out, though, in
2 this, what appears to be, a calendar entry that's
3 somehow copied into this e-mail, it's -- the
4 subject says "PCF REMS Task Force."
5       Do you see that?
6   A   I do.
7   Q   And it just has different people.  I
8 assume this is who was being e-mailed and
9 participating in the PCF REMS task force.
10      MR. SNAPP:  Object to the form.
11      THE WITNESS:  I assume so.  This is --
12 not from me, and I don't really recall this --
13 whatever this is.  Is this a form?
14 BY MR. CRUEGER:
15   Q   I couldn't tell you.  It looks like
16 someone somehow copied in a calendar entry.  I --
17   A   Okay.
18   Q   But they've attached what it seems --
19 what is the -- a final letter, correct?  And
20 starting at page -- it's -- the last Bates numbers
21 are 41.
22   A   (Peruses document.)  It does -- so, I'm
23 sorry, just the first thing that I see is it's not
24 addressed to Eschenbach anymore but rather to

Page 217

1 somebody by the name of Frank Torti, who is the
2 Acting Commissioner, so something changed.
3       But let's see, the undersigned -- so
4 this appears to be a different letter.
5   Q   And just -- just so we're clear, if
6 you -- if you turn to the page, the last two Bates
7 numbers are 39, is the text of the e-mail.
8   A   Yes.
9   Q   And it says:  "Attached is the FDA REMS
10 letter with final signatories."
11   A   Yes.
12   Q   So -- and that's what he's referring to
13 here -- or the attachment is what he's referring
14 to, correct?
15   A   That's correct.
16   Q   And it discussed the ideas and
17 strategies that were developed at the last Pain
18 Care Forum REMS meeting, correct?
19   A   At the last REMS meeting.
20   Q   Yes.
21   A   So, yes, I guess, because of the
22 previous page, the Pain Care Forum task force
23 meeting.
24   Q   And --

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1    A   Task force meeting -- yes, REMS task
2  force meeting.
3        And he says: "We concluded it would be
4  wise to begin the process with the following
5  submission of our meeting requests.  We would like
6  to hold the first meeting, planning."  So this is
7  obviously early in the process.  And --
8    Q   And this letter --
9    A   -- this letter changed.
10    Q   And if you look at page 43, which would
11  be the last page of the letter, it's all the
12  signatories.
13    A   Yes.
14    Q   And Purdue Pharma is on this letter,
15  correct?
16    A   Correct.
17    Q   So is Endo, correct?
18    A   Yes.
19    Q   I don't see that the HDMA joined this
20  letter, correct?
21    A   I do not see their signature.
22    Q   Even though they were involved in the
23  process of drafting the letter and had commented
24  on it, correct?

Page 219

1        MR. SNAPP:  Object to the form.
2        THE WITNESS:  They are not on the
3  letter.  I -- and they did comment earlier.
4  BY MR. CRUEGER:
5    Q   And --
6        MR. SNAPP:  I'm sorry.  Are you saying
7  this is the same letter as the previous one?
8        MR. CRUEGER:  I just said they were
9  involved in the process of drafting the REMS task
10  force letters.
11        MR. SNAPP:  Okay.  I'm sorry, I didn't
12  mean to interrupt.
13        THE WITNESS:  I mean it's not the same
14  letter.  Correct?
15  BY MR. CRUEGER:
16    Q   I didn't say it was same the letter.
17    A   Okay.
18    Q   I said the HDMA was involved in
19  drafting --
20    A   Right.
21    Q   -- and commented --
22    A   And -- and I agreed with you.
23    Q   Remember, we can't talk over each other.
24    A   Yes.  Sorry.

Page 220

1    Q   So -- and I just want you to read
2  through this letter and confirm that there is no
3  longer a request that the FDA adopt a mandatory
4  certification requirement.
5    A   (Peruses document.)  I -- I have read
6  the letter.
7    Q   And the language that we were looking at
8  in earlier drafts about a mandatory certification
9  requirement, it's no longer in this letter, is it?
10        MR. SNAPP:  Object to the form.
11        THE WITNESS:  Pardon me?
12        MR. SNAPP:  Object to the form.
13        THE WITNESS:  That language is not in
14  there, and obviously the letter is a condensed
15  version.  There's a number of things that were in
16  the original letter that are no longer there.
17  BY MR. CRUEGER:
18    Q   Including the language about the
19  mandatory --
20    A   Including the language about the
21  mandatory.  I think with this letter, the way I
22  read it is, and it's kind of where I started, this
23  was a letter suggesting to the FDA that they
24  should move forward with the REMS.  It highlighted

Page 221

1  the risks and -- of opioids, the diversion, the
2  misuse of the products, the safety.  It references
3  the need for patients in -- you know, appropriate
4  patients not to interfere with their access to
5  medicines that might, you know, benefit them.
6        And it's the beginning of a process in
7  which they -- they're asking for a meeting, and
8  they are asking to be included in the process to
9  have input.  So that's exactly what -- what the
10  letter seems to do.  I guess it's in the record
11  and anyone can read it.
12    Q   Well, all the drafts aren't in the
13  record, are they?
14    A   I don't know.  You handed them to me.
15    Q   But they're all marked "Confidential,"
16  correct?
17        MR. SNAPP:  Object to the form.
18        THE WITNESS:  I don't know.  I didn't --
19  I'd have to go back and look at them.
20  BY MR. CRUEGER:
21    Q   All those drafts, I assume you didn't
22  make all those -- you're not aware of you making
23  -- publishing those e-mails on the internet
24  anywhere, are you?

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    A   I don't recall --
2        MR. SNAPP:  Object to the form.
3        THE WITNESS:  -- these e-mails.  I'm
4   reading them now for the first time in years.
5   BY MR. CRUEGER:
6    Q   Well, I'm just saying the drafts, the
7   e-mails, the REMS -- the PCF task force e-mails,
8   those aren't part of a public docket anywhere that
9   you're aware of, are they?
10   A   No.
11        (Rosen Exhibit No. 27 was marked
12        for identification.)
13   BY MR. CRUEGER:
14   Q   I'm handing you Exhibit 27.
15        MR. SNAPP:  We've been going about 65
16   minutes again.  Is this a good time for a break?
17        MR. CRUEGER:  We'll go like five more
18   minutes and then we'll --
19        MR. SNAPP:  Do you need a break,
20   Mr. Rosen?
21        THE WITNESS:  I'm fine.
22        MR. SNAPP:  Is five more minutes okay?
23        THE WITNESS:  Yeah, okay.
24        MR. SNAPP:  Okay.

Page 223

1        MR. CRUEGER:  We'll just get through
2   this last one.
3   BY MR. CRUEGER:
4    Q   What exhibit number did I tell you it
5   was?
6    A   I'm sorry.  27.
7    Q   And I'll just tell you I downloaded this
8   from the FDA's public docket.
9        You're familiar that there was an
10   Industry Working Group on REMS, correct?
11   A   There was.
12   Q   And this was a public meeting, it says,
13   on December 4th, 2009, correct?
14   A   Correct.
15   Q   And Purdue was a member of the Industry
16   Working Group, correct?
17   A   Yes, we were.  As I recall, the Industry
18   Working Group was established when the FDA at some
19   point -- this is about a year after the first
20   document you handed me on the REMS.  I do recall
21   at some point the FDA had a meeting with more than
22   20 companies that made extended-release opioids,
23   and concluded that there was value in having one
24   REMS rather than dozens of REMS.  And they asked

Page 224

1   the industry to go out and organize itself, and
2   try to come up with recommendations and
3   suggestions.
4        And I do recall that they hired an
5   antitrust lawyer to attend every meeting because
6   it would be sensitive for competitors to be
7   meeting, and they didn't want to be accused of
8   doing anything that might be anticompetitive.
9    Q   And if you look at page 6 of this
10   letter, this PowerPoint presentation, it's on the
11   back page.  It's the Industry Working Group
12   participants?
13   A   Yes.
14   Q   So -- and these are just various
15   manufacturers of extended-release, long-acting
16   opioids, correct?
17   A   That's correct.
18   Q   And --
19   A   And I haven't counted them, but it looks
20   like what I said, that there were somewhere around
21   20 companies or more.
22   Q   And some of these were also members of
23   the Pain Care Forum, correct?
24   A   A few of them were, yes.

Page 225

1    Q   And if you go to page 93.  It's -- the
2   title is "REMS Components," correct?  Make sure
3   we're on the same page.
4    A   Pardon me?
5    Q   The title is "REMS Components," just to
6   make sure we're on the same page.  I believe we
7   are.
8    A   Page 93, "REMS Components," yes, sir.
9    Q   And it's -- it says in the indented
10   bullet point:  "At this time Industry Working
11   Group does not support inclusion of any elements
12   to assure safe use, including mandatory prescriber
13   training or certification."  Is that correct?
14   A   That's what it says, yes.
15   Q   And that is really the opposite of what
16   was in your earlier drafts of the letter to the
17   FDA that were circulated among the Pain Care Forum
18   task force, correct?
19        MR. SNAPP:  Object to the form.
20        THE WITNESS:  This says that the IWG
21   does not support the inclusion.  That's a
22   collective, I guess, position of the 20 or so
23   companies.
24   BY MR. CRUEGER:

Page 226

1    Q   Well, and as we saw in the e-mails with
2   the Pain Care Forum REMS task force, it's also the
3   conclusion of other entities such as the HDMA,
4   correct?
5       MR. SNAPP:  Object to the form.
6       THE WITNESS:  They said they didn't
7   support certification, I think at this time.
8   BY MR. CRUEGER:
9    Q   And that's because a certification
10  requirement could potentially decrease sales,
11  correct?
12      MR. SNAPP:  Object to the form.
13      THE WITNESS:  I don't know why any
14  individual would have taken a position for or
15  against.
16      MR. CRUEGER:  Well, now would be a good
17  time for a break then.
18      THE VIDEOGRAPHER:  The time is 3:11 p.m.
19  We're going off the record.
20      (Recess.)
21      THE VIDEOGRAPHER:  The time is 3:25
22  p.m., and we're back on the record.
23      MR. SNAPP:  I just want to confirm for
24  the record that all those present here in the room

Page 227

1   and on the phone agree to be bound by the MDL
2   confidentiality protective order.  If that's not
3   the case, please speak up now.  And I'm talking
4   about as to the entire deposition starting this
5   morning at 9:06 a.m. through the end.  If that's
6   not the case, please speak up.
7       Hearing nothing, please go ahead, Chuck.
8   Thanks.
9   BY MR. CRUEGER:
10   Q   If we can --
11   A   Am I through with this document?
12   Q   Oh, yes.
13      (Rosen Exhibit No. 28 was marked
14       for identification.)
15  BY MR. CRUEGER:
16   Q   I'm just going to give you what's
17  labeled as Exhibit 28.  I don't believe you're on
18  any of the -- the e-mails, although you can -- you
19  can verify that if you'd like.  I'm not even
20  really going to ask you about the e-mail, though.
21  So...
22   A   (Peruses document.)  I don't think I've
23  ever seen this e-mail, but I -- are you asking me
24  to read this document?

Page 228

1    Q   No, I'm actually just going to ask you
2   about a very specific point to see if -- if the
3   issue ever came up that you're aware of in the
4   Pain Care Forum meeting.
5       So -- so this document is, if you see in
6   the -- just from the title, it's prepared by what
7   is apparently an outside associate, Pinney
8   Associates, for the Industry Working Group on
9   REMS, correct?
10      MR. SNAPP:  Object.
11      Could I ask you to read the Bates number
12  for those on the phone given that this appears to
13  be a Janssen document?
14      MR. CRUEGER:  Yes.  It is one of these
15  interesting Bates numbers, JAN-MS-01154004.
16      MR. SNAPP:  Thank you.
17      THE WITNESS:  Just to be accurate, it
18  seems that this is a -- the memo itself is
19  potential questions the advisory committee may ask
20  the IWG, and then it's titled "Pinney
21  Associates/Roxanne Laboratories."
22      Is that what you're --
23  BY MR. CRUEGER:
24   Q   Yeah, let me push you a little bit

Page 229

1   deeper into the document.
2    A   Okay.
3    Q   So if you go to the page that ends with
4   10 is the Bates number.
5    A   The last page?  Oh, I'm sorry, it
6   ends --
7    Q   No, it ends with 10.  And it's -- the
8   title is "Summary and comparison of proposed REMS
9   for long-acting and extended-release opioids:
10  Proposals from the Food and Drug Administration
11  and the Industry Working Group."
12   A   Okay.  The page that ends in 10 seems to
13  be -- oh, "Summary and comparison of the REMS for
14  long-acting" --
15   Q   Yeah.
16   A   -- is that what you're referring to?
17   Q   That's what I'm referring to.
18   A   And it looks like an index or something,
19  a content --
20   Q   Looks like a table of contents.
21      And then if you go to page 4 of 27.
22   A   I'm on page 4.
23   Q   And then I'll just direct you to --
24  because I'll just -- I'll just read this part for

Page 230

1 the record. It starts with, "The FDA proposed
2 goal."
3      A   Yes.
4      Q   So in here this document says: "The FDA
5 proposed goal of the REMS is to reduce serious
6 adverse outcomes resulting from inappropriate
7 prescribing, misuse and abuse of long-acting and
8 extended-release opioids while maintaining patient
9 access to these medications. Adverse outcomes of
10 concern include addiction, unintentional overdose
11 and death."
12          And then the next sentence is a
13 parenthetical that says: "This goal differs from
14 the goal proposed by the Industry Working Group
15 (IWG)."
16          Did -- what I'm asking you, though, is
17 did this issue come up in the Pain Care Forum REMS
18 task force about how there was a difference
19 between the FDA proposed goal and the Industry
20 Working Group goal for REMS?
21      A   Well, I'd like to read this further.
22          I mean, it says -- I'm not sure which --
23 is the goal the same goal we've been talking about
24 here? Let's see.

Page 231

1          "The FDA believes the REMS goal can be
2 accomplished through prescriber education. The
3 Agency states that of the proposed REMS elements
4 originally proposed by FDA, only prescriber
5 education is being required because the only
6 element of REMS that was proposed on March 3rd and
7 had some evidence of effectiveness."
8          So are we specifically referring to the
9 prescriber education?
10     Q   No, we're not actually referring to the
11 prescriber. It's just the actual FDA stated
12 proposed goal, which is to reduce serious adverse
13 outcomes, that -- that statement.
14          And this document, prepared for the
15 Industry Working Group, states that this goal, the
16 FDA's goal, differs from the goal proposed by the
17 Industry Working Group.
18     A   I honestly don't know what they're
19 referring to. "To reduce serious outcomes
20 resulting from inappropriate prescribing." I
21 just -- it's -- I wasn't -- again, I didn't see
22 this document until just now, and I obviously
23 wasn't party to this discussion. I don't recall
24 any specific discussion at the Pain Care Forum,

Page 232

1 which I believe was your question on this issue.
2     Q   That was my question actually, if --
3     A   Okay.
4     Q   -- if that -- that issue, the difference
5 that was being referred to between the Industry
6 Working Group goal and the FDA goal was ever
7 discussed at the Pain Care Forum.
8     A   I don't recall that, no.
9     Q   And just to be clear, if you look at the
10 cover page of Exhibit 28, the e-mail, there are at
11 least -- there are members of Purdue Pharma who
12 are included on this e-mail, correct? Dr. Craig
13 Landau, Laura Silva, and Paul Copeland.
14     A   I do see Dr. Landau. I do see Paul
15 Copeland. And I don't see Laura, so --
16     Q   Right next --
17     A   But she must be there.
18     Q   Well, right next to Paul.
19     A   I see. I'm sorry. It's just hard to
20 look at that.
21     Q   And so presumably those three
22 individuals would have gotten this Industry
23 Working Group document, correct?
24     A   They were on the e-mail.

Page 233

1     Q   You can put that to the side.
2          (Rosen Exhibit No. 29 was marked
3          for identification.)
4 BY MR. CRUEGER:
5     Q   Okay. We're on Exhibit 29.
6          If you want to just quickly review the
7 document.
8     A   (Peruses document.)
9     Q   Okay?
10    A   Yes, I've read it.
11    Q   So this document, Exhibit 29, it's -- at
12 the top it says "Pain Care Forum Media Committee,"
13 and then it lists the participants, correct?
14    A   That's correct.
15    Q   Were there other participants in the
16 Pain Care Forum media committee?
17    A   I don't recall.
18    Q   And is it a fair characterization to say
19 that the goal of this Pain Care Forum media
20 committee was to coordinate on media strategy on
21 REMS?
22        MR. SNAPP:  Object to the form.
23        THE WITNESS:  Let's see. It says:
24 "Consideration was given (i.e. the focus on FDA

Page 234

1 REMS issues) or to wrap efforts into a broader
2 pain awareness campaign."
3 BY MR. CRUEGER:
4    Q    And so this is -- this is you, Purdue,
5 and other entities such as the American Academy of
6 Pain Management, Center for Advanced Palliative
7 Care, the American Pain Foundation, Cephalon
8 talking about how to coordinate a media strategy
9 on REMS, correct?
10    A    That is -- appears to be what it is.  I
11 really don't recall this e-mail from 2009 or --
12 it's not an e-mail.  I'm sorry.  Or I don't think
13 it's an e-mail.  It's a -- it looks more like a --
14 I don't know what it is.
15    Q    And it lays out a variety of issues,
16 such as, you know, the objectives and scope of --
17    A    Correct.
18    Q    -- a media campaign, the campaign goals
19 and messages, correct?
20    A    Correct.
21    Q    "Such as the need for some level of
22 controversy, rather than an educational approach,
23 would likely be required to garner significant
24 media attention," correct?

Page 235

1    A    Where are you reading?
2    Q    The second point made under "Campaign
3 goals and messages."
4    A    Yes.  I don't know what's meant by that.
5 I'm not a media person myself, but...
6    Q    And the "Role of Industry" on page 2
7 of 3.  The first point is:  "Consensus was
8 developing that this program should be driven by
9 the not-for-profit community, potentially with
10 multiple industry sponsors."
11       Correct?
12    A    That's what it says.
13    Q    And so isn't it fair to -- to conclude
14 that it should be driven by the not-for-profit
15 community because you want the message to appear
16 like it's coming from patients?
17       MR. SNAPP:  Object to the form.
18       THE WITNESS:  I honestly don't remember.
19 I didn't write the document.  I don't remember
20 what people were doing or thinking.  I really
21 don't even remember the meeting.
22 BY MR. CRUEGER:
23    Q    But you were a participant in the
24 meeting.

Page 236

1    A    I was apparently a participant.  I am
2 listed here as one.
3    Q    And you were -- and this was a Pain Care
4 Forum activity, correct?
5    A    It was a communications committee
6 meeting, it says.
7    Q    Yeah.  And, again, the point is to
8 influence the FDA's results on REMS through a
9 media campaign that appears to come from the
10 not-for-profit community, correct?
11       MR. SNAPP:  Object to the form.
12       THE WITNESS:  Again, that's -- it does
13 state that, and it states from other
14 organizations, including those outside of the Pain
15 Care Forum who may have an interest.
16 BY MR. CRUEGER:
17    Q    And that's so that the -- the message
18 can appear to come from patients, correct?
19       MR. SNAPP:  Object to the form.
20       THE WITNESS:  Again, I don't know
21 whether it would be patients or what specific
22 organizations they would be referring to.
23 BY MR. CRUEGER:
24    Q    But I'm saying that's how -- by not

Page 237

1 having Purdue's name on it or Cephalon's name on
2 it, it would appear to be coming from someone
3 other than the drug industry, correct?
4       MR. SNAPP:  Object to the form.
5       THE WITNESS:  Well, it says not --
6 not-for-profit organizations.  So that's what it
7 says.
8 BY MR. CRUEGER:
9    Q    And Purdue is definitely not a
10 not-for-profit organization, correct?
11    A    That's correct.
12    Q    Oh, by the way, just as a quick aside,
13 you had mentioned when you were talking about the
14 Industry Working Group that they had retained a
15 antitrust counsel to attend their meetings.
16    A    That's correct.
17    Q    When you were doing the PC -- Pain Care
18 Forum REMS task force, did you retain an antitrust
19 counsel to attend those meetings?
20    A    No.
21    Q    How about any of the other regular Pain
22 Care Forum meetings?
23    A    No.  Those meetings were broadly
24 attended by industry as well as non-industry.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    (Rosen Exhibit No. 30 was marked
2    for identification.)
3 BY MR. CRUEGER:
4    Q    I will hand you what is labeled
5 Exhibit 30.
6        If you can just read through, I guess,
7 the set of e-mails.
8    A    (Peruses document.)  Okay.
9    Q    So Exhibit 30 starts, as almost all
10 e-mails do, at the end, at page 178, which is the
11 first e-mail in this chain.  And that's from you
12 to what I'm -- we can just assume are members of
13 the Pain Care Forum, correct?
14    A    I assume this is to -- to people who
15 participated in the Pain Care Forum.
16    Q    Right.  It's --
17    A    I can read every name if you'd like,
18 but --
19    Q    No.  The point is you're just announcing
20 that the --
21    A    There's a meeting.
22    Q    That there's a meeting and --
23    A    Yes.
24    Q    -- Dr. Throckmorton, who is the deputy

Page 239

1 director of the FDA, will be a speaker at the
2 meeting, correct?
3    A    That's correct, that he would be our
4 guest speaker.
5    Q    And a focus of that meeting is actually
6 going to be on the opioid -- the classwide opioid
7 REMS initiative, correct?
8    A    It does say that Will Rowe will moderate
9 the meeting, and the discussion will focus on the
10 FDA's classwide opioid REMS initiative.
11    Q    And then there's an e-mail from Stewart
12 Leavitt to you and Will Rowe.  That's Tuesday,
13 July 7th, 2009, correct?
14    A    That's correct.
15    Q    And Mr. Leavitt is, according to this,
16 is the executive director of Pain Treatment
17 Topics.  Correct?  That's --
18    A    Yes, that's what it says.
19    Q    Do you know whether that's true or not.
20 Do you know Mr. Leavitt?
21    A    I knew Mr. Leavitt.  I'm not sure if I
22 ever met -- met him, but I know I had spoken to
23 him on the phone.  And he's passed away.  I
24 don't -- some years ago.  I think he had cancer.

Page 240

1    Q    And in this e-mail, what he's saying is
2 he's obviously aware of the Pain Care Forum media
3 committee and the -- the media campaign, correct?
4    A    Yes.  Was he a participant?  He was, I
5 see, looking back at your other document.
6    Q    And he is concerned about whether
7 Dr. Throckmorton at the FDA may feel it was rather
8 duplicitous of the Pain Care Forum to meet with
9 him and not to mention that the media campaign and
10 the Congressional letter was in the works,
11 correct?
12        MR. SNAPP:  Object to the form.
13        THE WITNESS:  That is what his e-mail
14 says.
15 BY MR. CRUEGER:
16    Q    And Mr. Will Rowe responded.  And his
17 statement, if you read it, is that they're going
18 to keep silent on the Congressional and media
19 strategies, correct?
20        MR. SNAPP:  Object to the form.
21        THE WITNESS:  He says -- I don't see
22 where he says we're going to keep silent, but he
23 says that he doesn't -- essentially he says: "I
24 appreciate your bringing up the issue."  Oh, I'm

Page 241

1 sorry.  He says: "Allow me to explain the need to
2 keep silent."
3        I mean I don't recall this.  Again, it's
4 2009, but I see that I am copied on it.
5        MR. CRUEGER:  Let me take a quick second
6 to shift gears here.
7        (Rosen Exhibit No. 31 was marked
8        for identification.)
9 BY MR. CRUEGER:
10    Q    So I'll hand you what's been labeled
11 Exhibit 31.  Here you go.
12        So before we talk about this, have you
13 heard of the Ensuring Patient Access and Effective
14 Drug Enforcement Act?
15    A    I don't recognize that title.
16    Q    Do you recognize it as the Marino bill?
17    A    I do recall the Marino bill, yes.
18    Q    And that was addressed to the DEA's --
19 the Drug Enforcement Agency's authorities,
20 correct?
21    A    It -- I can't really tell you the exact
22 provisions of the bill, but it did relate to -- as
23 I recall it, it did relate to DEA authorities,
24 yes.

Page 242

1    Q   And so if you just look at the cover of
2 this e-mail.
3    A   Can I -- yeah, I was going to read it.
4 (Peruses document.)
5        I'm going to take a moment and read the
6 article because I really don't remember the
7 content of -- of it, and this might help me.
8    Q   Of the act, you mean?
9    A   Yes.
10    Q   Okay.
11    A   (Peruses document.)  Okay.
12    Q   So this is an e-mail, February 20th,
13 2014, from Lynne Batshon, and originally he sends
14 it to Craig Engesser.  I'm not a hundred percent
15 sure if that's the correct pronunciation.
16 Correct?
17    A   I think it is.
18    Q   And it attaches this article that you
19 just read.
20    A   It does.
21    Q   And Craig then seems to have forwarded
22 it to you, correct?
23    A   That's correct.
24    Q   And then he's asking about, you know,

Page 243

1 the -- well, he's directing you to see Lynne's
2 question about a working group, correct?
3    A   That's correct.
4    Q   And then you responded to Craig, and you
5 cc'd Pamela Bennett, correct?
6    A   That's correct.  Craig --
7    Q   And --
8    A   Craig worked for Pamela.
9    Q   And also Alan Must, correct?
10    A   That's correct.
11    Q   And then -- so you were apparently at
12 the time aware of the bill being introduced,
13 correct?
14    A   I said it's "Early days.  Just
15 introduced, and may never move.  Much of this is
16 being accomplished at NABP."  I think that's the
17 Boards of Pharmacy.
18    Q   And then you say --
19    A   And I suspect that it will come up at
20 some point at the Pain Care Forum as pharmacies
21 and wholesalers are behind the proposal.
22    Q   And the pharmacy and wholesalers, they
23 participate in the Pain Care Forum generally
24 through the HDMA and some other organizations,

Page 244

1 correct?
2    A   That's correct.
3        (Rosen Exhibit No. 32 was marked
4        for identification.)
5 BY MR. CRUEGER:
6    Q   If you look at Exhibit 32.  You see
7 there the e-mail on Exhibit 31 was February 20th
8 of 2014, and this looks like April 15th, correct?
9    A   Correct.
10    Q   And it's an agenda for a Pain Care Forum
11 communications working group conference call,
12 correct?
13    A   Correct.
14    Q   And it does -- this Ensuring Patient
15 Access and Effective Drug Enforcement Act of 2013
16 is on the -- on the agenda for that call, correct?
17    A   It is.
18        (Rosen Exhibit No. 33 was marked
19        for identification.)
20 BY MR. CRUEGER:
21    Q   And I'll give you what's Exhibit 33.
22        I'm not going to ask you about the
23 attachments, so you don't have to --
24    A   (Peruses document.)  Okay.

Page 245

1    Q   And the --
2    A   Do you want me to read the bill itself
3 or --
4    Q   No, we're not going to look at the text
5 of the bill, so --
6    A   Okay.
7    Q   The more -- the thing I want to focus on
8 is on the first page of Exhibit 33.  It's an
9 e-mail from -- is it pronounced Jewelyn?
10    A   I believe that's correct.
11    Q   So Jewelyn Cosgrove, and she is at the
12 HDMA, correct?
13    A   That's correct.
14    Q   And according to this, on the second
15 page of the e-mail, it says she's the associate
16 director for Federal Government Affairs at the
17 HDMA.
18    A   That's correct.  That's what her title
19 says.
20    Q   And she's sending you an e-mail just
21 attaching some information that she would like you
22 to share with the rest of the Pain Care Forum,
23 correct?
24    A   That's correct.  "Can you share this

Page 246

1  with the rest of the Pain Care Forum?"
2      Q    And -- and she's looking for people to
3  sign onto a letter that they have drafted that
4  would support the legislation, correct?
5      A    She refers to that, but I don't see a
6  letter here.  Is there one attached?  There is.
7      Q    The last three pages are two
8  different -- two different letters, so one to the
9  United States Senators and another one to -- for
10  Representatives.  So...
11     A    Okay.
12     Q    And she's looking for members of the
13  Pain Care Forum who wished to sign on and support
14  the -- the bill, correct?
15     A    That's correct.
16     Q    And so the -- this act was obviously
17  being discussed at Pain Care Forum meetings,
18  correct?
19     A    This is 2015, and she says:  "I know
20  when we discussed this last week, I did not have a
21  specific date for reintroduction.  Now we're
22  looking at next week.  Thank you."
23         She says, Can you share this?  I didn't
24  know -- when we discussed it, I didn't know, and

Page 247

1  can you share this?  So we must have.
2      Q    And then you forwarded the e-mail to
3  Brian Munroe, who's at Endo, correct?
4      A    That is correct.
5      Q    And you asked him to call you?
6      A    I did.
7      Q    And why did you want him to call you?
8      A    I'm sorry, I have no idea.
9      Q    And did he call you?
10     A    I don't know.
11     Q    So do you have any recollection of
12  talking with someone from Endo about the bill?
13     A    I have no recollection of whether we
14  talked or not, or why I asked him to call me.
15         (Rosen Exhibit No. 34 was marked
16         for identification.)
17  BY MR. CRUEGER:
18     Q    I'll give you Exhibit 34.
19     A    (Peruses document.)
20     Q    And you can just look at the first two
21  pages.  Otherwise, it's a repeat of your -- of an
22  earlier e-mail, actually the e-mail we just looked
23  at.
24     A    (Peruses document.)

Page 248

1      Q    And so this is an e-mail of
2  January 20th, 2015, correct?
3      A    Yes.
4      Q    And it's from Ms. Cosgrove, who is at
5  the HDMA, correct?
6      A    That's correct.
7      Q    And it seems to be -- well, it is
8  addressed to you and other members of the Pain
9  Care Forum, correct?
10     A    That's correct.
11     Q    And she is again reminding people that
12  she would like people to support the Ensuring
13  Patient Access and Effective Drug Enforcement Act
14  of 2015, correct?
15     A    That's correct.  It appears that from
16  your last No. 33 exhibit, I simply forwarded her
17  e-mail, and then she replied to that and asked
18  people if they wanted to sign onto the letter.
19     Q    And then you also forwarded the e-mail
20  to Dr. Haddox, correct?
21     A    I don't know.  It says from Dr. Haddox
22  to Dr. Haddox.  It doesn't seem to say from me.
23     Q    So somehow, though, Dr. Haddox has a
24  copy of --

Page 249

1      A    Somehow Dr. Haddox has a copy of it.
2      Q    So did members of the Pain Care Forum
3  support this -- this legislation?
4      A    Some members of the Pain Care Forum.  I
5  saw on her -- I noticed that on this letter, it's
6  a blank asking people to sign it.  But on the
7  exhibit you had just given me a few minutes ago, I
8  noticed that there were some organizations that
9  had signed onto a previous letter, the one to
10  Senator Hatch and Whitehouse, and the one to -- to
11  four Congress people.
12     Q    Did --
13     A    And I'm sorry, that one doesn't have
14  signatures on it either.  I see that some people
15  signed a letter to the two senators.
16     Q    Did Purdue sign onto the letter?
17     A    It doesn't appear so.
18     Q    Do you -- well, I'm talking about the
19  final letter.
20     A    Not that I remember.  I wouldn't -- I
21  wouldn't remember.
22     Q    But Purdue did support the legislation,
23  correct?
24     A    I don't recall that we did, as a matter

Page 250

1 of fact. I don't -- my best memory is, is that we
2 took no position on it as a whole.
3    Q  Let's see.
4    (Rosen Exhibit No. 35 was marked
5    for identification.)
6 BY MR. CRUEGER:
7    Q  Now, Exhibit 35.
8    A  All right. (Peruses document.) Okay.
9    Q  And so this attaches the -- the final
10 signed letter, correct?
11    A  That appears to be what it is. She
12 forwards it to me and says: "Attached is a final
13 letter of support from members. Please circulate
14 it when you have a chance."
15    Q  And she's saying --
16    A  And I seemed -- I forwarded it as she
17 requested.
18    Q  And this e-mail that is from you,
19 Thursday, March 5, 2015?
20    A  Correct.
21    Q  And that's to various people who are
22 inside Purdue, correct?
23    A  These certainly appear to be Purdue
24 employees.

Page 251

1    Q  And your -- your e-mail to them says:
2 "Please see the signed letter. Strong showing.
3 And this is the legislation being supported by
4 HDMA and the chain drugs aimed at easing DEA
5 tensions." Correct?
6    A  That's correct.
7    Q  Let's talk about that easing of DEA
8 tensions.
9    A  Mm-hmm.
10    Q  So 2015 is around the time that certain
11 distributors, like McKesson and Cardinal Health
12 and Mallinckrodt, are being investigated by the
13 DEA, correct?
14    MR. SNAPP: Object to the form.
15    THE WITNESS: I don't recall when that
16 occurred.
17 BY MR. CRUEGER:
18    Q  But you do recall that McKesson,
19 Cardinal Health, and Mallinckrodt were
20 investigated by the DEA and --
21    A  I'm generally familiar.
22    Q  And they entered into settlement
23 agreements with the United States Department of
24 Justice?

Page 252

1    A  I'm generally familiar, but I have no
2 specific knowledge.
3    Q  And those settlement agreements were
4 related to McKesson and Cardinal Health and
5 Mallinckrodt's failure to report suspicious
6 orders, correct?
7    MR. SNAPP: Object to the form.
8    THE WITNESS: Again, I don't know the
9 details of what those agreements were.
10 BY MR. CRUEGER:
11    Q  Well, do you recall that McKesson paid
12 approximately $150 million in fines in 2017?
13    A  I don't recall --
14    MR. SNAPP: Object to the form.
15    THE WITNESS: -- the specifics.
16 BY MR. CRUEGER:
17    Q  Do you recall whether McKesson paid
18 approximately $13 million in fines in 2008?
19    MR. SNAPP: Object to the form.
20    THE WITNESS: I don't recall the
21 specifics.
22 BY MR. CRUEGER:
23    Q  And how about Cardinal Health?
24    A  I don't recall the specifics of any of

Page 253

1 them.
2    Q  Do you recall this was related to
3 failure to report suspicious orders going to --
4 potentially going to pill mills in Florida for
5 Cardinal Health?
6    MR. SNAPP: Objection.
7    THE WITNESS: Again, I'm not familiar
8 with the agreements or what they entailed.
9 BY MR. CRUEGER:
10    Q  And it's a -- it's actually a federal
11 crime to not report suspicious orders, correct?
12    MR. SNAPP: Object to the form.
13    THE WITNESS: I -- I don't know the --
14 I'm not capable of answering that question. I'm
15 not an expert on the DEA provisions.
16 BY MR. CRUEGER:
17    Q  And the suspicious orders, these were
18 suspicious orders of opioids, correct?
19    MR. SNAPP: Object to the form.
20    THE WITNESS: Again, I -- I'm not
21 familiar with the details of these agreements.
22 BY MR. CRUEGER:
23    Q  But you understand that these companies,
24 McKesson, Cardinal Health and Mallinckrodt,

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 they -- they ship opioids, correct?

2    A  I -- I certainly presume they do, yes.

3    Q  Well, they ship Purdue's opioids,

4 correct?

5    A  Yes. I'm assuming they do. I don't

6 know the specific wholesalers who actually ship

7 our products.

8       Excuse me, I just need to take a sip.

9    Q  Oh, that's fine.

10    A  But I am generally familiar that

11 distributors distribute pharmaceuticals, including

12 opioids.

13    Q  And you're aware that distributors have

14 a -- a duty under the law to report suspicious

15 orders, correct?

16       MR. SNAPP: Object to the form.

17       THE WITNESS: Again, I'm not familiar

18 with the law that governs their requirements. I'm

19 not familiar with --

20 BY MR. CRUEGER:

21    Q  You're familiar with the general concept

22 that they --

23    A  I am familiar with the general concept.

24    Q  And as a matter of fact, Purdue has an

Page 255

1 obligation under the federal law to report

2 suspicious orders, correct?

3       MR. SNAPP: Object to the form.

4       THE WITNESS: Again, I'm generally

5 familiar, but I'm not specifically familiar with

6 the law or how it applies.

7       (Rosen Exhibit No. 36 was marked

8       for identification.)

9 BY MR. CRUEGER:

10    Q  I hand you Exhibit 36.

11    A  (Peruses document.) Okay. I -- do you

12 want me to read this article?

13    Q  Sure, I think it would be fine for you

14 to read the article.

15    A  (Peruses document.) Okay.

16    Q  That's Exhibit 36, correct?

17    A  Are you asking me?

18    Q  Yeah.

19    A  Yes, you marked it No. 36.

20    Q  So if you look at Exhibit 36, it starts

21 with the -- an e-mail from you to Rita Norton, who

22 is at AmerisourceBergen, correct?

23    A  That's correct.

24    Q  And you -- you say: "I just left" --

Page 256

1    A  Well, I'm sorry. It -- it starts with

2 an e-mail from Rita to me.

3    Q  Oh, sorry about that. I read it the

4 wrong way around.

5    A  Yes.

6    Q  Yes, you are correct. It starts from an

7 e-mail from Rita to you, and this is January 30th,

8 2008.

9    A  That's right.

10    Q  And she tells you -- and the subject is

11 "DEA's probe slowing Cardinal," and she had

12 forwarded an article.

13    A  Right. And that's the title of the

14 article, I believe.

15    Q  Correct. And it says: "Just left you a

16 message. Glad to get together if useful to you."

17       And -- and then "DEA's probe slowing

18 Cardinal." So...

19    A  Yeah, that confuses me just a little

20 bit, but -- but it appears --

21    Q  Yeah.

22    A  -- she left me a message. I wrote to

23 her. I apologize, I see what you're --

24    Q  Yeah.

Page 257

1    A  Maybe you were all the way at the

2 bottom. It appears she left me a voicemail. I --

3 or I left her a voice message. She must have left

4 me one, and I replied and said, "Glad to get

5 together if useful to you."

6    Q  Right. And what's kind of confusing

7 about this e-mail is it doesn't -- it seems here

8 at the bottom it's doubtful that you wrote an

9 e-mail to her starting out "Burt." I'm guessing

10 that's Rita Norton's e-mail to you or message to

11 you.

12    A  Correct.

13    Q  So --

14    A  That's right. And then she wrote and

15 said, yeah, we would appreciate getting together

16 on the 13th.

17    Q  Right.

18    A  And she mentions somebody that I don't

19 know. Their head of regulatory.

20    Q  And --

21    A  And security.

22    Q  -- she says they would like to meet

23 informally with you and talk about our issues and

24 how to work with the coalition.

Page 258

1   A   Correct.
2   Q   By "our issues" --
3   A   I assume they're her issues, yes.
4   Q   And her issues being the DEA's
5   investigation of Cardinal Health, correct?
6   A   I would assume that's what the article
7   she attached.  I don't really know what she was
8   talking about.
9   Q   And when she refers to the coalition, is
10  she referring to the Pain Care Forum?
11      MS. CALLAS:  Object to the form.
12      THE REPORTER:  Can you identify
13  yourself, please?
14      MR. CRUEGER:  Yeah, no idea.
15      MS. CALLAS:  Gretchen Callas, counsel
16  for AmerisourceBergen.
17  BY MR. CRUEGER:
18  Q   So you can answer, though.
19  A   I don't know.  I mean she says "the
20  coalition."
21  Q   Do you know what coalition she's
22  referring to?
23  A   I don't in that.  I did forward the
24  e-mail to Steve Seid and Howard Udell, and I said,

Page 259

1   you know, Here's the note.  It's not necessary for
2   you to come.  Glad to have you.  It appears they
3   want to talk about how to work with the Pain Care
4   Forum, which is a coalition.
5   Q   And so these are AmerisourceBergen.
6   They're a member of the HDMA, correct?
7   A   I assume they are a member.  I -- I'm
8   not avoiding.  I don't know -- I've never actually
9   seen the HDMA membership list.
10  Q   And did AmerisourceBergen participate in
11  the Pain Care Forum at all?
12  A   I don't believe they did.
13  Q   And did you meet with Ms. Norton and
14  anyone else from AmerisourceBergen?
15  A   Well, again, this was in 2008, and I
16  don't remember meeting with them.
17  Q   Do you recall what happened as a result
18  of these e-mails from Ms. Norton?
19  A   I don't.
20      (Rosen Exhibit No. 37 was marked
21      for identification.)
22      MS. CALLAS:  I'd like to ask for the
23  Bates numbers of the documents that were just
24  referenced, please.

Page 260

1       MR. CRUEGER:  PPLPC004000147352.
2   BY MR. CRUEGER:
3   Q   Were you involved in lobbying for the
4   Ensuring Patient Access to and Effective Drug
5   Enforcement Act?
6   A   I don't recall lobbying for it.  I
7   noticed on the letter that it was co-signed by --
8   the final letter, we were not a signatory.
9   Q   This is 2015, correct?
10  A   When the letter was sent?
11  Q   About when the act was going through
12  Congress, correct?
13  A   I don't recall exactly, but I think --
14  and my recollection just from the last 30 minutes
15  or however long when you handed me these
16  documents, I think it was introduced one Congress
17  and then introduced in another Congress.  So like
18  many issues, it's an issue that was around for
19  several years.
20  Q   So if you look at Exhibit 37.
21  A   Yes.
22  Q   The bottom e-mail, that's just part of
23  an exhibit that we had actually just discussed.
24  A   Okay.  The one that we did not sign?

Page 261

1   Q   Right.  Where you forwarded the signed
2   letter to various people at Purdue.
3   A   Right.
4   Q   And then it looks like David Xu
5   forwarded this e-mail to a few other people at
6   Purdue, correct?
7   A   Yes.  He forwarded it to some other
8   people, FYI --
9   Q   And then --
10  A   -- and I was not copied on that.
11  Q   No.  Then Gary Lewandowski did respond
12  to you or asked you a question, correct?
13  A   "But what does this mean to us
14  commercially?  What does ensuring access" -- I'm
15  trying to understand the implications.
16  Q   Who's Gary -- who is Gary?
17  A   I know Gary's name, and I'm sure I
18  probably met him.  I don't know what his title was
19  at this time.
20  Q   What's his role, though, in Purdue?
21  A   I don't know.  I'm sorry.
22  Q   And then your response was --
23  A   "This bill was created by HDMA and
24  NACDS.  It basically says DEA needs to warn them

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    if the DEA thinks there's a problem with
2    distribution of controlled substances and give
3    them a chance to correct, rather than charging
4    them for criminal activity.  It attempts to
5    balance the system and not allow DEA to charge in
6    and close them down.  If that happens, of course
7    DEA cuts the supply chain and access.  I'm glad to
8    discuss."
9        Q    And so when you write that if the DEA
10   comes in and closes them down, it cuts -- it cuts
11   your supply chain, Purdue's, correct?
12            MR. SNAPP:  Object to the form.
13            THE WITNESS:  Well, it would cut the
14   supply chain for that particular distributor.
15   BY MR. CRUEGER:
16       Q    And so it would potentially impact
17   Purdue's sales, correct?
18       A    It is possible.
19       Q    And so Purdue actually had a financial
20   interest in this legislation passing, correct?
21            MR. SNAPP:  Object to the form.
22            THE WITNESS:  Again, I -- I don't know
23   where I got this summary.  And again, I was just
24   trying to describe to him what the bill did, so --

Page 263

1    it speaks for itself I think.
2            (Rosen Exhibit No. 38 was marked
3            for identification.)
4    BY MR. CRUEGER:
5        Q    So you've been in Washington, D.C., here
6    for many, many years, right, Mr. Rosen?
7        A    I have.
8        Q    So you've heard of PhRMA, correct?
9        A    Yes.
10       Q    And at the top, is this an e-mail from
11   Kathleen Konka?
12       A    Yes.
13       Q    Who is she?
14       A    She works for Purdue in a position in
15   what they call public policy.
16       Q    What's her job?
17       A    Reviewing regulations, proposed
18   regulations, and looking at a variety of policy
19   issues, and attempting to understand what they --
20   they say or do.  And also she's part of the
21   process at Purdue to help develop policies, public
22   policies.
23       Q    And the subject is "Notes from PhRMA
24   Federal Steering Committee Meeting," correct?

Page 264

1        A    That are -- that is, I'm sorry, what the
2    notes are -- or what it says: "Colleagues, here
3    are my notes."
4        Q    And so Kathleen Konka would attend the
5    PhRMA steering committee meetings, correct?
6        A    I assume she attended this meeting, yes,
7    if she took the notes from it.
8        Q    And if you look at the second page of
9    Exhibit 38.
10       A    Is it okay just to give this a glance
11   and see what it says?
12       Q    Oh, sure.
13       A    (Peruses document.)  Okay.
14       Q    And on page 2 of her notes, the entry
15   that starts "Judiciary will mark up."
16       A    Yes.
17       Q    So it says:  "Judiciary will mark up
18   CARA" --
19       A    Yes.
20       Q    -- "which is S.524" --
21       A    Right.
22       Q    -- "and Ensuring Patient Access and
23   Effective Drug Enforcement Act" --
24       A    Yes.

Page 265

1        Q    -- S.483, on February 11th."
2        A    Yes.
3        Q    "We have reviewed, and Burt is in touch
4    with senate staff regularly."
5            Is she referring to you, Burt Rosen?
6        A    Yes.
7        Q    "And we are in the process of providing
8    final feedback to PhRMA so they may forward any
9    concerns or sticking points to committee staff."
10       A    That's correct.
11       Q    So PhRMA supported the bill, correct?
12       A    Which bill, the CARA or the Ensuring
13   Patient Access bill.
14       Q    The Ensuring Patient Access bill.
15       A    I honestly don't know whether PhRMA
16   supported it or not.  But I don't think she's
17   referring to that bill.  I think she's referring
18   to the CARA bill, which was the comprehensive
19   opioid legislation that became law in 2016, and
20   that Purdue supported.
21       Q    Ah.  So when she says:  "We have
22   reviewed, and Burt is in touch with senate staff
23   regularly," you don't think she's talking about
24   the Ensuring Patient Access and Effective Drug

Page 266

1 Enforcement Act?
2     A   I do not.  I don't think Purdue took a
3 position on that bill.  I don't think we supported
4 or opposed it.  I think she's referring to the
5 CARA bill, which is -- I've forgotten the exact
6 bill, I apologize, but that was a comprehensive
7 piece of legislation that dealt with the opioid
8 issues, multi-faceted legislation that became law
9 and was signed by President Obama, I think at the
10 end of 2016, and we, as I said, supported that
11 act.
12        (Rosen Exhibit No. 39 was marked
13        for identification.)
14 BY MR. CRUEGER:
15     Q   So Exhibit 39.
16     A   Yes.
17     Q   And this is an e-mail from someone at
18 Senator Hatch's office, correct?
19     A   That's correct.  And I just need to read
20 it.  It's a -- an e-mail with a -- it looks like a
21 press release or something on it.
22     Q   And the press release is saying that the
23 Senate has passed the Ensuring Patient Access and
24 Effective Drug Enforcement Act, correct?

Page 267

1     A   It says:  "Today the Senate unanimously
2 passed the Ensuring Patient Access and Effective
3 Drug Enforcement Act to help ensure that
4 prescription drugs land in the hands of patients
5 and not those who would abuse them."
6     Q   And you responded to Mr. Richardson in
7 Senator Hatch's office, and you said, "Thanks
8 again," correct?
9     A   I did.
10     Q   Why is it "thanks again"?
11     A   That's a good question.  That was -- two
12 or three years ago, and I don't really recall the
13 e-mail.  Again, it's just a press release, and I
14 said, "Thanks again."
15        (Rosen Exhibit No. 40 was marked
16        for identification.)
17 BY MR. CRUEGER:
18     Q   So Exhibit 40.  And I'm just giving you
19 this e-mail that's just all on the first page.
20 It's an e-mail from you to what appear to be
21 various members of the Pain Care Forum, correct?
22     A   This appears to be -- is this the same
23 press release?  I'd have to go back and look, but,
24 yes.  "Today the Senate unanimously passed the

Page 268

1 Ensuring Patient Act" -- this appears to be the
2 same press release, and I forwarded it to -- it
3 looks like I forwarded it to the Pain Care Forum,
4 and I said, "The Hatch-Waxman" -- I'm sorry, "The
5 Hatch-Whitehouse bill has passed the Senate.  It
6 is expected to be accepted by the House."
7     Q   And so you're just keeping the members
8 of the Pain Care Forum appraised of the progress
9 of the Ensuring Patient Access and Effective Drug
10 Enforcement Act, correct?
11     A   That's what it appears to do, yes.
12        (Rosen Exhibit No. 41 was marked
13        for identification.)
14 BY MR. CRUEGER:
15     Q   So Exhibit 41.  Very close.
16     A   (Peruses document.)  Okay.
17     Q   And so this is an e-mail from you to --
18 it's dated April 12th, 2016, and you sent it to
19 various people inside of Purdue, correct?
20     A   That's correct.
21     Q   And it's updating these people at Purdue
22 about the progress of the Ensuring Patient Access
23 and Effective Drug Enforcement Act, correct?
24     A   It says:  "This evening the House passed

Page 269

1 the bill which had previously passed the Senate.
2 Now sent -- will now be sent to the President."
3     Q   And that he is expected to sign it into
4 law, correct?
5     A   Yes.
6     Q   And then you say:  "The bill is one we
7 have been working on with HDMA and NACDS for the
8 past two years."  Correct?
9     A   That is what it says.
10     Q   And by "we," do you mean Purdue?
11     A   I don't remember sending the e-mail.
12 But I think working on is what I've just been
13 through with you, that we've been sending
14 information out, but -- you know, obviously we
15 didn't sign the letter.  I don't recall supporting
16 the bill.
17     Q   Well, it says at the end -- and again,
18 you wrote this e-mail --
19     A   Yes, I did.
20     Q   -- correct?
21     A   Yes, I did.
22     Q   And it says:  "Purdue was very active in
23 influencing the ultimate definition of an imminent
24 danger to the public's health or safety."

Page 270

1 Correct?

2    A   Yes.  Yes, it does.

3    Q   And by Purdue, that would be you,

4 Mr. Burt Rosen?

5        MR. SNAPP:  Object to the form.

6        THE WITNESS:  That is correct.

7        So I'm reminded by this that there was

8 a -- what I would call a technical amendment

9 because I couldn't explain it myself, and an

10 outside lawyer, now that I'm reminded, did go up

11 and meet with the Whitehouse and Hatch staff, and

12 they gave them that language, and the DEA accepted

13 that as acceptable, and it was meant to be some

14 kind of a clarifying amendment.

15       Again, I don't really recall the exact

16 other than this description, that you have now

17 reminded me, and so there was involvement.  But we

18 did not take a position, to my knowledge, on the

19 entire -- the entirety of the bill, but, rather,

20 there was a -- what I would call a technical

21 amendment that one of the lawyers flagged.

22 BY MR. CRUEGER:

23    Q   So Purdue took a -- a position on the

24 definition of "an imminent danger to the public

Page 271

1 health or safety" that was in that bill, correct?

2    A   At least it referred to the definition

3 of "an imminent danger," yes.

4    Q   And in your own words, Purdue was very

5 active in influencing that definition, correct?

6    A   As I said, an outside lawyer went in and

7 met with the staff, gave them the technical

8 change.  They, as I recall, reviewed it with the

9 DEA.  The DEA said it was acceptable and they

10 included it.

11   Q   Who was the outside lawyer?

12   A   His name was Peter Mathers.  He's an

13 FDA/DEA type lawyer.

14   Q   Where does he work?

15   A   Epstein Becker.

16   Q   Who directed him at Purdue to go to the

17 White House and -- and propose this amendment?

18   A   It wasn't to the White House.  It was to

19 Senator Whitehouse --

20   Q   Oh.

21   A   -- who was the Democratic sponsor of the

22 bill.

23   Q   So same question, who directed him to go

24 to Senator Whitehouse?

Page 272

1    A   Well, he had raised -- he had reviewed

2 the bill, as I recall, and he had raised the issue

3 as one --

4        MR. SNAPP:  Hold on.  I'm going to

5 object on the grounds of attorney-client

6 privilege.

7        To the extent that you're going to

8 discuss any communications from a lawyer hired by

9 the company with the company related to legal

10 analysis, I would instruct you not to answer.  If

11 you can answer the question without going into

12 attorney-client communications, please go ahead.

13 BY MR. CRUEGER:

14   Q   To -- to be clear, I'm not asking you

15 what he did or what his analysis -- I'm asking who

16 at Purdue was directing him to look at this issue.

17   A   I don't remember who specifically.  What

18 I do recall is that he had reviewed the

19 legislation, and he had flagged that there was --

20       MR. SNAPP:  Again, if you're --

21       THE WITNESS:  Okay.

22       MR. SNAPP:  -- going to discuss

23 communications between --

24       THE WITNESS:  Well, then I had better

Page 273

1 stop, and if you want to confer, I'll be glad to

2 confer.

3 BY MR. CRUEGER:

4    Q   But it was somebody at Purdue who

5 directed him to look at the legislation.

6    A   I don't recall that specifically or

7 whether he just had followed it and seen the --

8 the language and flagged it.  But I don't recall

9 specifically that there was anybody at Purdue that

10 asked him to do so.

11   Q   Who at Purdue -- well, did you ask him?

12   A   I did not ask him to --

13   Q   And would -- who at Purdue would I have

14 to ask?

15   A   I don't know who you would have to ask.

16 I don't recall who.

17   Q   But your position is government affairs,

18 and -- and you obviously knew that Purdue was very

19 active in influencing this language, correct?

20   A   As I stated, I -- I recall our

21 outside -- this outside lawyer, Peter Mathers,

22 raising this issue --

23   Q   Again, he's going to go nuts as you --

24 as you start to talk about whatever he said or

Page 274

1 thought. So we'll just stop you there.
2 But what I want to know is who else at
3 Purdue was then working on this act if it wasn't
4 just you.
5 A I don't recall anyone working on this
6 act. We did not really support the bill or oppose
7 the bill. As I said, we didn't sign the letter
8 supporting it. We were pretty inactive until the
9 very end when this was flagged.
10 Q And these -- again, these are your
11 words, though, Mr. Rosen, that Purdue was very
12 active in influencing that definition, correct?
13 A That's correct.
14 (Rosen Exhibit No. 42 was marked
15 for identification.)
16 BY MR. CRUEGER:
17 Q I'm giving you Exhibit 42. It's a lot
18 of e-mail addresses but not a lot of words on it,
19 so...
20 So the second e-mail on the first page,
21 it's an e-mail from you to what we'll just
22 summarize as a lot of people, correct?
23 A I'm sorry. The one on the front?
24 Q Well, there's Pamela Bennett sending it

Page 275

1 to -- to a few people, but she's forwarding some
2 message from you, right, Burt Rosen, on April 2nd?
3 A Correct, to a whole lot of people.
4 Q To a whole lot of people.
5 A And --
6 Q And the subject is "The House passes
7 S.483," correct?
8 A That's correct.
9 Q And you're forwarding Ms. Cosgrove's
10 message to you.
11 A I am forwarding her message to me.
12 Q And the end of her message is: "We at
13 the HDMA couldn't -- couldn't have done this
14 without their help." Correct?
15 A Yes.
16 Q And "their" refers to the Pain Care
17 Forum members, correct?
18 MR. SNAPP: Object to the form.
19 THE WITNESS: I assume it was those
20 members who participated in supporting the bill.
21 MR. SNAPP: Is this a good time for a
22 short break?
23 MR. CRUEGER: Sure, we can take a short
24 break.

Page 276

1 THE VIDEOGRAPHER: The time is 4:41 p.m.
2 We're going off the record.
3 (Recess.)
4 THE VIDEOGRAPHER: The time is 4:55
5 p.m., and we're back on the record.
6 (Rosen Exhibit No. 43 was marked
7 for identification.)
8 BY MR. CRUEGER:
9 Q So I'm just going to hand you
10 Exhibit 43.
11 A (Peruses document.)
12 Q And it looks like -- not the first
13 e-mail that forwarded it, but the second e-mail
14 below is from you on April 19th, 2016.
15 A Could you just give me a second?
16 Q Oh, sure.
17 A I'm reading the last page. (Peruses
18 document.) Okay. Please go ahead.
19 Q So, the second e-mail that's April 19th,
20 2016, is from you and then again to a whole lot of
21 people who are outside of Purdue, correct?
22 A Yes.
23 Q And it looks like it's members of the
24 Pain Care Forum updating them or forwarding a

Page 277

1 message from the HDMA, correct?
2 A That's correct.
3 Q And Ms. Cosgrove in her -- her e-mail
4 saying: "Hi, Burt." At the bottom it says:
5 "HDMA is extremely proud of this effort and
6 grateful for all the members of the Pain Care
7 Forum who supported this bill and took part in the
8 group letter sent two years ago." Is that
9 correct?
10 A That's correct.
11 Are you through with that?
12 Q I'm through with that.
13 (Rosen Exhibit No. 44 was marked
14 for identification.)
15 BY MR. CRUEGER:
16 Q Exhibit 44.
17 A (Peruses document.)
18 Q And I'm not interested in the e-mail
19 that starts from Burt Rosen, April 12th, 2016, and
20 then there's a lot of recipients. Instead,
21 there's the e-mail above it that's from you where
22 you write, "Congratulations again, Bob."
23 And are you referring to Mr. Robert
24 Giacalone?

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    A   I assume I am.

2    Q   And am I saying that last name correctly
3 or --

4    A   I don't know.  I never met this
5 gentleman, but I -- I did -- obviously I e-mailed
6 him, and I at one point recall now speaking to
7 him.  But I never met him, so I don't honestly
8 know.

9    Q   And he's from Cardinal Health, correct?

10    A   I honestly don't recall where he's from,
11 but I -- I think that's correct.

12        (Counsel conferring.)

13 BY MR. CRUEGER:

14    Q   And then you say -- after you say,
15 "Congratulations again, Bob.  I still credit you
16 and Alan for breaking the logjam."

17        Are you referring to Alan Must?

18    A   I think I am.  I seem to have sent this
19 to them.

20    Q   And -- and Mr. Giacalone writes back to
21 you?

22    A   Yes.

23    Q   And to Mr. Alan Must too, correct?

24    A   Yes.

Page 279

1    Q   And he says, "Thanks, Burt, but still
2 consider this a team effort by all of us,"
3 correct?

4    A   That's what he says, yes.

5    Q   "And thanks for helping to make this
6 happen, Bob."

7    A   That's correct.

8    Q   And he's referring to you, Thanks for
9 making -- helping to make it happen, correct?

10    A   I think that's correct.

11    Q   You and Alan Must, correct?

12    A   That's correct.

13    Q   So was Alan Must involved in -- in
14 having the Ensuring Patient Access Act passed?

15    A   I don't think so.  I -- I'm trying to
16 recall this.  Alan I believe knew this gentleman.
17 And as I had mentioned to you just before we
18 broke, a lawyer had raised a concern, a tech --
19 what I would call a technical amendment, because I
20 don't think I could explain the act.

21    Q   He's going to once again --

22    A   Well, I won't --

23        MR. SNAPP:  I don't want you to discuss
24 any privileged --

Page 280

1        THE WITNESS:  I won't go there.

2        MR. SNAPP:  -- communications between --

3        THE WITNESS:  I won't go there, but I'm
4 just trying to refer to the incident.

5        And I believe what he's referring to is
6 that, you know, they were trying to clarify that
7 language, and they did, and the DEA signed off on
8 it, as I had mentioned to you.  And I think that
9 was -- had just -- as I recall, that had clarified
10 the issue surrounding that technical amendment.

11 BY MR. CRUEGER:

12    Q   But in this letter, Mr. Giacalone is
13 crediting you and Alan Must for breaking the
14 logjam -- well, he is actually crediting
15 Mr. Giacalone and Alan Must for breaking the
16 logjam, correct?

17    A   I did say that.  And I don't really
18 recall beyond what I've just stated what the
19 logjam was.  I think that was it, or there was at
20 least with that one issue.  But I would repeat
21 that I don't think that Purdue supported or
22 opposed the bill generally, and nor did we sign
23 the letter of support.

24    Q   But, Mr. Rosen, it sounds like Purdue

Page 281

1 was a little bit more than neutral, correct, if
2 Cardinal is -- is considering it a team effort by
3 all of us, and you're congratulating -- and you're
4 crediting Mr. Must for breaking the logjam?

5        MR. SNAPP:  Object to the form.

6        THE WITNESS:  I would read that as just
7 a friendly back and forth.  I think that what
8 happened, as I recall, this was about a four-year
9 effort on the part of the proponents of the bill.
10 As I recall, this had passed the House of
11 Representatives and not the Senate the first
12 Congress it was introduced.  The second Congress,
13 it was unanimously approved by the House and the
14 Senate, which means that it was non controversial.

15        And my role was very specific, as I --
16 as I have stated to you, with regard to this
17 amendment that was -- or technical amendment that
18 was flagged by the lawyer at the very end of the
19 process, and it was signed off on by the DEA.  I
20 didn't speak to the DEA, but the Congressional
21 staff had it signed off on by the DEA and accepted
22 by the DEA, and then obviously accepted by the
23 committee and the Congress generally and the
24 President of the United States.

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    But I honestly -- if you looked at the
2  bill, I just glanced at it, it's very technical.
3  It amends sections of the existing law, and I'm
4  not qualified or competent to tell you the
5  specific nature of each provision or word that was
6  in the bill.
7  BY MR. CRUEGER:
8    Q    But you lobby --
9    A    So I stated it as honestly as I know
10  how.
11    Q    You lobby Congress all the time, though,
12  correct, on -- on federal bills?
13    MR. SNAPP:  Object to the form.
14    THE WITNESS:  I lobby Congress on
15  federal bills.
16  BY MR. CRUEGER:
17    Q    And this was only just a little over two
18  years ago, right?
19    A    That's correct.
20    Q    And your words that you wrote only a
21  little over two years ago are crediting you --
22  crediting Mr. Giacalone and Alan Must for breaking
23  the logjam, correct?
24    A    That's correct.

Page 283

1    Q    And -- but at the same time you also say
2  that I shouldn't read it in the way that you're --
3  you've written it, but you also don't have that
4  much recollection of these events, correct?
5    A    I --
6    MR. SNAPP:  Object to the form.
7    THE WITNESS:  That's exactly what I've
8  stated, yes, sir.
9  BY MR. CRUEGER:
10    Q    And Mr. Giacalone, who is at Cardinal
11  Health, considers it a team effort, correct?
12    A    That's his words, yes.
13    Q    So he credits Purdue for being involved
14  in -- in getting this act passed, correct?
15    A    Well, I think again this is just people
16  being nice to each other at the end of the
17  process, because it is what it is, and it was as I
18  stated it to be.
19    Q    Well, if you look back again at
20  Exhibit 41, if you want to pull that in.
21    Again, your words, Mr. Rosen, is that
22  Purdue was very active in influencing the ultimate
23  definition of "an imminent danger to the public
24  health and safety," correct?  Those are your

Page 284

1  words, correct?
2    A    Those are my words, and I've explained
3  them to you.
4    Q    And you're saying that you don't really
5  know what the bill did.  Is that your testimony?
6    A    That's -- yes, sir, I don't know what
7  the overall bill did and every provision within
8  it.
9    (Rosen Exhibit No. 45 was marked
10    for identification.)
11  BY MR. CRUEGER:
12    Q    So I'll give you what's been labeled
13  Exhibit 45, Mr. Rosen.  There's no need for you to
14  read the entire article.
15    A    I'm sorry, this is an article?
16    Q    It's a --
17    A    "Current navigation points" -- (reading
18  to himself).
19    Q    This is an article, Mr. Rosen, that was
20  published in the Marquette Law Review.  Do you see
21  the --
22    A    I'm not familiar with it, and I believe
23  this is the first time I've ever seen it.
24    Q    And it was published by Judge Mulrooney,

Page 285

1  who is a -- or written -- the article is written
2  by Judge Maroney -- Mulrooney, sorry, who is at
3  the Department of Justice, Drug Enforcement
4  Administration, Chief Administrative Law Judge.
5  Do you see that?
6    A    I do.  I'm not familiar with him.
7    Q    And also another author --
8    A    Or with the -- the lady who -- it says,
9  "and Katherine --
10    Q    Katherine --
11    A    -- Legel"?
12    Q    -- Legel, who is a judicial law clerk at
13  the Drug Enforcement Administration.
14    And this article is about this law,
15  Ensuring Patient Access and Effective Drug
16  Enforcement Act.
17    And if you turn to page 9 of 84.
18    A    I'm going to have to take your clip off
19  to see the whole page.
20    Q    Oh, that's fine.
21    Do you see where they discuss the phrase
22  "imminent danger to the public health or safety"?
23    A    I'm seeing that, yes.
24    Q    And so that's the language that you

Page 286

1 were -- that you said that Purdue was very active
2 in influencing, correct?
3    A   There was a technical amendment to that
4 section.
5    Q   Again, I'm just using your words --
6    A   Yes.
7    Q   -- right, Mr. Rosen?
8    A   Yes, you are.
9    Q   So if you look at page 10.
10   A   Yes.  Oh, I'm sorry.
11   Q   Page 10, the next page.
12   A   (Peruses document.)
13   Q   Right above Section C, the last sentence
14 in that paragraph.
15   A   I'm just trying to read what he said
16 here on page 9.  (Peruses document.)
17   Q   Have you gotten it, page 10?
18   A   I'm on page 10.  Where do you want me to
19 stop?
20   Q   Well, just the last conclusion here
21 right above Section C.
22   A   I'm reading that paragraph now.
23 (Peruses document.)  Okay.
24   Q   And so Judge Mulrooney in that last

Page 287

1 sentence concludes that: "If it had been the
2 intent of Congress to completely eliminate the
3 DEA's ability to ever impose an immediate
4 suspension on distributors or manufacturers, it
5 would be difficult to conceive a more effective
6 vehicle for achieving that goal."  Correct?
7       MR. SNAPP:  Object to the form.
8       THE WITNESS:  That's what he says.
9 BY MR. CRUEGER:
10   Q   And I recall earlier in this deposition,
11 you talked that you're always -- you told me that
12 you're always talking about diversion at Purdue,
13 correct?
14   A   Correct.
15   Q   And yet this bill that Purdue -- you say
16 Purdue was very active in influencing.  Between
17 you, Purdue, the HDMA and other Pain Care Forum
18 members, it stripped the DEA of its ability to
19 enforce the law and stop suspicious orders of
20 opioids, correct?
21       MR. SNAPP:  Object to the form.
22       THE WITNESS:  I don't know if that's
23 correct or not.  I don't -- how did the final
24 passage actually affect -- I couldn't answer your

Page 288

1 question.  And this --
2 BY MR. CRUEGER:
3    Q   So you don't know?
4    A   I don't know.  I think that the -- the
5 change that was made in the bill -- I can't really
6 remember it -- as I said, it was a technical one,
7 and I didn't understand all of the provisions of
8 the bill.  I think the way the bill was written is
9 amending sections of the law, which wouldn't mean
10 anything to me.  That's why an outside lawyer came
11 in and explained it.
12       But I -- I really don't recall.  I don't
13 believe that the -- the law as it was changed took
14 away the ability of the -- the DEA to enforce
15 their statute.  Somebody -- somebody smarter than
16 I would have to explain the detail of that.  I'm
17 not sure I agree with this conclusion.
18       (Rosen Exhibit No. 46 was marked
19       for identification.)
20 BY MR. CRUEGER:
21   Q   Well, Exhibit 46 --
22       By the way --
23   A   Yes.
24   Q   -- I just want to clear up, because you

Page 289

1 seem to be unsure of it, Mr. Robert Giacalone --
2    A   Yes.
3    Q   -- this is a text file of the same
4 e-mail that we looked at earlier.
5    A   Mm-hmm.
6    Q   Just an excerpt of it from Exhibit --
7 I'm trying to find which exhibit it was -- 44.  So
8 Exhibit 44.  And he is at Cardinal Health,
9 correct?
10   A   Yes.
11   Q   Okay.  Does that refresh your
12 recollection?
13   A   It does.  I really didn't recall
14 where -- which company he was from.
15       MR. SNAPP:  Do you have any copies of
16 that?
17       MS. HURD:  I don't have -- I just have
18 three.
19       THE WITNESS:  Here.
20       (Rosen Exhibit No. 47 was marked
21       for identification.)
22 BY MR. CRUEGER:
23   Q   So I've just passed you what's labeled
24 as Exhibit 47.  If you want to take a -- if you

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 want to just quickly read through it.
2     A    (Peruses document.)  Okay.
3     Q    And this is a -- an e-mail from you to
4 Alan Must, correct?
5     A    That's correct.
6     Q    And again, Mr. Alan Must, who was,
7 according to your e-mail, involved in ensuring the
8 passage of the Ensuring Patient Access and
9 Effective Drug Enforcement Act, correct?
10        MR. SNAPP:  Object to the form.
11        THE WITNESS:  Just as I had explained to
12 you in the e-mail.
13 BY MR. CRUEGER:
14     Q    And you were forwarding him a letter
15 from 44 state attorneys general, correct?
16     A    I didn't count them, but that's probably
17 correct.
18     Q    And the first page of that letter, "Dear
19 Congressional Leaders," correct?
20     A    Yes.
21     Q    And the 44 state attorneys generals are
22 urging Congress to repeal the law, correct?
23     A    That's correct.
24     Q    And that law being the Ensuring the

Page 291

1 Patient Access and Effective Drug Enforcement Act,
2 correct?
3     A    Yes, that's correct.
4     Q    Because they say, and I'll quote:  The
5 Act is a step backward in our collective effort to
6 prevent the diversion and misuse of prescription
7 drugs and address our worsening epidemic of opioid
8 addiction and overdose deaths, period.  Correct?
9        MR. SNAPP:  Object to the form.
10        THE WITNESS:  Correct.
11 BY MR. CRUEGER:
12     Q    And do you agree with their
13 characterization of the law?
14        MR. SNAPP:  Object to the form.
15        THE WITNESS:  I don't agree or disagree.
16 I told you before I don't really know all of the
17 details of the law.  I do know that it was
18 unanimously approved by the United States Congress
19 and signed by President Obama, and my
20 understanding was that it had been -- that DEA had
21 been consulted throughout the process.  But I --
22 BY MR. CRUEGER:
23     Q    And if you look at page 2 of that
24 letter, it starts:  "The 44 state attorneys

Page 292

1 general" --
2     A    Yes.
3     Q    -- "write that in the midst of this
4 deepening public health crisis, at a time when our
5 nation needs every available weapon at its
6 disposal to combat the opioid epidemic, the Act
7 effectively strips the Drug Enforcement
8 Administration (DEA) of a mission critical tool;
9 namely, the ability to issue an immediate
10 suspension order against the drug manufacturer or
11 distributor whose unlawful conduct poses an
12 imminent danger to the public health and safety."
13        I read that correctly, right?
14     A    That's what the letter says.
15     Q    And again, that's an act that, in your
16 words, Purdue was involved in passing, correct?
17        MR. SNAPP:  Object to the form.
18        THE WITNESS:  Well, in my words, Purdue
19 had a very specific technical amendment that it
20 put forward, and it was accepted by the staff on
21 both sides of the aisle, and -- as I
22 understood it, accepted by the DEA.  But we did
23 not support or oppose the entirety of the bill to
24 the best of my knowledge.

Page 293

1 BY MR. CRUEGER:
2     Q    And so you're saying it was a very
3 narrow involvement, but it happens to be
4 influencing the language that stripped the DEA of
5 its power, correct?
6        MR. SNAPP:  Object to the form.
7        THE WITNESS:  I don't believe that to be
8 true.
9 BY MR. CRUEGER:
10     Q    You don't believe it to be true.
11     A    No.
12     Q    But you don't really know what's in the
13 act, correct?
14     A    No, that's right.
15     Q    So how do you not believe it to be true?
16        MR. SNAPP:  Object to the form.
17        THE WITNESS:  Well, I'm -- as I said, I
18 can't imagine that a -- a technical change which
19 was accepted by all parties would have done such a
20 thing.
21 BY MR. CRUEGER:
22     Q    So the 44 state attorneys general are
23 wrong?
24        MR. SNAPP:  Object to the form.

Page 294

1      THE WITNESS:  I don't know if they're
2  right or wrong.  I just know that the bill was
3  unanimously approved by the United States Congress
4  without opposition, without a single vote against
5  it, and signed by the President of the United
6  States, and I assume after it had been reviewed by
7  the DEA and the Justice Department.  So you would
8  have to go somewhere else to get the real answer.
9  BY MR. CRUEGER:
10      Q   So you do know all those details,
11  correct?
12      A   That's what I've been told, and that,
13  you know, that when I was with the outside counsel
14  and met with the staff, they had told us that --
15  that they had no objection to the language, and
16  that they later informed us that the DEA had no
17  objection.
18      Q   So when -- you met with the Senate
19  staff?
20      A   Yes, when I accompanied the outside
21  attorney who explained the amendment.
22      Q   Oh, so you -- you went and met with
23  Senator Whitehouse's staff?
24      A   Both Senator Whitehouse's staff and

Page 295

1  Senator Hatch's staff.  I think that's what I told
2  you earlier.
3      Q   And --
4      A   Along with the outside lawyer.
5      Q   And how did you know to go along in this
6  meeting?
7      A   Because the lawyer had flagged the
8  issue, and -- and I accompanied him to take him to
9  see the staff, and he spoke to them about the
10  technicality of the amendment.  It was beyond
11  my --
12      Q   And is it -- it's your testimony you --
13      A   It was beyond my knowledge.
14      Q   It's your testimony you know nothing
15  about what was going on in the amendment that you
16  were there to see the senators about?
17      MR. SNAPP:  Object to the form.
18      THE WITNESS:  That is my testimony, that
19  he was the one who understood the technicality.  I
20  was not -- I did not understand it.  I don't think
21  I would have been capable of explaining it to
22  them.
23  BY MR. CRUEGER:
24      Q   And who at Purdue told you to go to this

Page 296

1  meeting?
2      A   Again, this is back to where we were, I
3  don't recall any -- specifically who told me to do
4  it.  It was flagged by the outside attorney.
5      Q   But who at Purdue probably would have
6  told you to go to this meeting?
7      A   Probably somebody from the law
8  department.
9      Q   And who would've that been?
10      A   I'm not sure which lawyer it would have
11  been.
12      Q   Who do you regularly interact with on
13  legal issues?
14      A   I regularly interact with a lot of the
15  lawyers in the legal department.
16      Q   Who do you regularly interact with on
17  lobbying issues?
18      A   It would depend on the issue, and I
19  guess it would go back to what we discussed
20  earlier today, the policy committee at Purdue and
21  the -- well, I don't think the CEAC group was even
22  active at that point in time.  I don't recall the
23  exact dates, but it was different on different
24  issues depending on what the issue involved.

Page 297

1      Q   So there would have been a committee at
2  Purdue that was reviewing or monitoring this
3  legislation.
4      MR. SNAPP:  Object to the form.
5      THE WITNESS:  I don't recall there being
6  a committee actually monitoring this legislation.
7  It was not a bill that -- that we supported or
8  opposed.  It was something that we were basically
9  pretty neutral on.  As I explained to you, it was
10  about a four-year process for Congress to consider
11  it and pass it unanimously, and that at the end of
12  the process this was flagged to me --
13  BY MR. CRUEGER:
14      Q   So --
15      A   -- by the outside counsel.
16      Q   So let me just understand and make sure
17  this is your testimony, that you believe Purdue
18  was neutral on the bill but wanted to go to the
19  senators' office to discuss amending the bill to
20  add additional language in it that eventually
21  stripped the DEA of its authority to enforce the
22  law.
23      MR. SNAPP:  Object to the form.
24      THE WITNESS:  Again, I'm just repeating,

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1 I don't think that's accurate.
2 BY MR. CRUEGER:
3    Q    Which part is not accurate, my
4 interpretation of the law or --
5    A    The interpretation that it stripped
6 authority from the DEA.
7    Q    Right.
8        So your testimony is that Purdue took no
9 position on the law, was neutral on it, but paid
10 an outside attorney to go to the senators' office,
11 with you, to advocate for an amendment to the act?
12        MR. SNAPP:  Object to the form.
13        THE WITNESS:  Again, I don't think
14 that -- that it stripped any provision from the
15 bill.  I think it made a word change in the bill,
16 and it was one that was considered technical, and
17 it was accepted by all parties, the staff on both
18 sides of the aisle, and they represented that they
19 had reviewed it with the DEA, who found the
20 language acceptable as well.
21 BY MR. CRUEGER:
22    Q    That's not my question, though.
23        My question is, your testimony is that
24 Purdue was neutral on the bill, but that they

Page 299

1 hired an outside counsel and paid you as well to
2 go to the senators' office and advocate for an
3 amendment to the bill?
4        MR. SNAPP:  Object to the form.
5        THE WITNESS:  Pardon me?
6        MR. SNAPP:  Object to the form.
7        THE WITNESS:  I suppose at least with
8 respect to the lawyer, my understanding is that
9 that lawyer did work for the company on an annual
10 basis, on a retainer, and he followed DEA and FDA
11 regulations.  And I did not specifically hire him,
12 and I don't think anyone specifically hired him
13 for that purpose, but it was something that he had
14 flagged.
15 BY MR. CRUEGER:
16    Q    But again, what I'm trying to get to is
17 you're trying to tell me that Purdue was
18 neutral -- this is not -- I'm just trying to make
19 sure I get your testimony correct, that Purdue was
20 neutral on the bill, but it advocated for an
21 amendment.
22        MR. SNAPP:  Object to the form.
23        THE WITNESS:  It was neutral on the
24 bill, and the -- the lawyer had raised what he

Page 300

1 considered to be a technical change, and it was
2 something that he explained to them and that they
3 accepted, and that the DEA reviewed it and
4 accepted the language as well.
5 BY MR. CRUEGER:
6    Q    Does --
7    A    That was what I was told.
8    Q    Are you aware of the -- is this lawyer,
9 is he also retained by our parties to advocate for
10 this bill?
11        MR. SNAPP:  Object to the form.
12        THE WITNESS:  Not to my knowledge.  I
13 don't have any knowledge of that.
14 BY MR. CRUEGER:
15    Q    So Purdue was neutral but took a
16 position on an amendment.
17    A    I'm just repeating myself.  I -- I think
18 I've answered your question.
19    Q    I'm just trying to figure out how you
20 can be neutral but take a position.
21        MR. SNAPP:  Object to the form.
22        THE WITNESS:  Well, I think I've
23 explained that to you.  We don't -- I don't know
24 what was the entirety of the bill.  It was -- I

Page 301

1 would have to go back and look at it, and I don't
2 even know if what you gave me was the final
3 version of it.  I think it was only the introduced
4 version.  It was many pages long, it amended many
5 sections of the DEA act.  And at the end of the
6 four-year process, a lawyer flagged what he
7 considered to be a technical amendment.  I -- I
8 don't recall if it was a one-word change or a
9 two-word change, and it was presented and accepted
10 by both parties, Senator Whitehouse, a Democrat;
11 Senator Hatch, the Republican.  It was unanimously
12 approved by the United States Senate, the United
13 States House of Representatives, signed by the
14 President of the United States, and I was --
15 represented to me that that language was approved
16 by the DEA.
17 BY MR. CRUEGER:
18    Q    Who represented that to you?
19    A    The Congressional staff.
20    Q    Did you talk to anyone -- anyone else at
21 Purdue besides Alan Must about the bill?
22    A    Not that I recall.
23    Q    So let's just circle around to the
24 start.  So you're a lobbyist, correct?  Is that a

Page 302

1 good way to describe your job?
2    A   It is.
3    Q   And you've been a lobbyist for -- in
4 Washington, D.C., for 30 years plus?
5    A   Whatever the number of years are, yes.
6    Q   So decades, correct?
7    A   Yes.
8    Q   Would you be -- you're considered what
9 we would all outside of Washington call a
10 Washington insider, correct?
11       MR. SNAPP:  Object to the form.
12       THE WITNESS:  I do -- I did work for a
13 United States Senator, and I do lobby the
14 govern- -- the Congress, the federal government.
15 BY MR. CRUEGER:
16    Q   You've heard the term, though,
17 "Washington insider," correct?
18    A   I have.  I couldn't really define it for
19 you.
20    Q   And since 2001, you've probably been a
21 lobbyist at Purdue, correct?
22    A   Since December of 2001, that's correct.
23    Q   And lobbying, as you described to me
24 earlier, it's influencing, correct?

Page 303

1       MR. SNAPP:  Object to the form.
2       THE WITNESS:  Lobbying is trying to --
3 as I would define it, it's trying to develop
4 public policies and try to find the balance
5 between any issues, and attempting to work with
6 members of Congress to see if they would agree on
7 your interpretation or policy of any given
8 subject.
9 BY MR. CRUEGER:
10    Q   And you're not a neutral arbitrator,
11 though, correct?
12    A   I don't know what you really mean by
13 that.
14    Q   Well, you're not -- you represent -- in
15 this case, you represent Purdue, correct?
16    A   I do.
17    Q   And your job is to advance Purdue's
18 interests, correct?
19       MR. SNAPP:  Object to the form.
20       THE WITNESS:  Pardon me?
21       MR. SNAPP:  Object to the form.
22       THE WITNESS:  I do attempt to advance
23 those interests.
24 BY MR. CRUEGER:

Page 304

1    Q   And you don't advance interests that are
2 contradictory to Purdue, correct?
3       MR. SNAPP:  Object to the form.
4       THE WITNESS:  Well, I don't really know
5 what you mean.  Can you be specific?
6 BY MR. CRUEGER:
7    Q   Purdue tells you what interests to
8 advance, correct?
9    A   My instructions at Purdue or my general
10 focus at Purdue with respect to these issues that
11 we've talked about today were as I've stated.  It
12 was to attempt to find a balance in the public
13 policy arena between allowing access for medicines
14 that were used and beneficial to patients, and at
15 the same time to attempt to find policies or
16 support policies that mitigated the diversion, the
17 misuse and the abuse of those products.
18    Q   Such as the DEA bill that we just
19 discussed, correct?
20       MR. SNAPP:  Object to the form.
21       THE WITNESS:  Which DEA bill?
22 BY MR. CRUEGER:
23    Q   The one we just discussed for the past
24 25, 30 minutes.

Page 305

1    A   As I told you before, we didn't support
2 or -- or oppose that particular piece of
3 legislation.
4    Q   And you've always been lobbying on
5 issues related to opioids, correct?
6    A   At Purdue --
7    Q   Working for Purdue.
8    A   -- I have worked on issues that related
9 to opioids.
10    Q   So that's really your sole job is to
11 lobby and work on issues that are related to
12 opioids, correct?
13    A   I don't think it's my sole job.  As I
14 told you before, I -- you know, we review issues
15 that may pertain to the pharmaceutical industry
16 generally, to businesses generally, and -- and
17 certainly to the issues that we've discussed
18 today.
19    Q   And again, you would agree with me that
20 your -- your job is to advance Purdue's interests
21 on Capitol Hill, correct?
22    A   My job is to advance Purdue's interests,
23 yes.
24    Q   So when you give me this language about

Page 306

1 finding balances in policy and all this other
2 stuff, again you are not a neutral policymaker
3 trying to come up with the best policy for the
4 United States, correct? You don't represent the
5 people of the United States, do you?
6     MR. SNAPP: I would object to the form.
7     THE WITNESS: Yeah, I wouldn't agree
8 with that. I think that we -- we truthfully tried
9 to become part of the solution to the degree that
10 that's possible, and I think that we balanced many
11 times positions that would help to address the
12 diversion, misuse and the abuse of our products.
13 BY MR. CRUEGER:
14     Q You have a budget for lobbying, correct?
15     A I have a -- a budget for my office, is
16 that what you're asking me?
17     Q I guess. Do you have a budget for how
18 much you can spend on lobbying?
19     A I do have a budget.
20     Q Does it actually go to how much you can
21 spend on lobbying?
22     A Well, as I explained to you earlier, I
23 mean I am a government relations person, and I
24 monitor issues, and then sometimes I engage in --

Page 307

1 in actual lobbying activity. But what I do every
2 day is not necessarily what is defined as
3 lobbying, the actual act of lobbying.
4     Q But you don't have a rein to just write
5 a free -- you don't have free rein to just write a
6 check to whoever you want to hire third parties to
7 lobby on behalf of Purdue, correct?
8     MR. SNAPP: Object to the form.
9     THE WITNESS: No, I don't.
10 BY MR. CRUEGER:
11     Q So when you say you have a budget, you
12 do have some sort of a budget that you can spend
13 on lobbying, correct?
14     A I've answered that question, I have a
15 budget to run my office.
16     Q Now, we've seen that Purdue spends a lot
17 of -- well, what's your -- what is your budget,
18 your annual budget?
19     A My budget has changed over time. Are
20 you talking about my -- before I start, I can't
21 give you an exact number because my budget is
22 actually encompassed in a larger budget that Alan
23 Must manages, but there is a portion of that. I
24 haven't seen an exact number. And it has changed

Page 308

1 over time.
2     The office was originally myself and my
3 admin. I told you I had for about a year or so a
4 part-time employee, and then last year I hired
5 someone that would presumably take my position
6 when I retire. So it's changed.
7     Q And -- and also I want to be clear about
8 what the -- the Pain Care Forum is, because I
9 think we've talked about that a lot. You would
10 agree we've talked about that a lot today, haven't
11 we? So...
12     A I would agree.
13     Q So you would meet approximately -- the
14 Pain Care Forum met approximately once a month,
15 correct?
16     A That's correct.
17     Q And it was in a room here in Washington,
18 D.C., and also on the telephone, correct?
19     A A variety of rooms, yes.
20     Q And the meetings include members of
21 industry, correct?
22     A Correct.
23     Q So manufacturers of opioids and
24 distributors of opioids, correct?

Page 309

1     A Right. The organizations that we
2 discussed earlier.
3     Q And it also includes organizations such
4 as the American Pain Foundation and -- and other
5 such organizations, correct?
6     A Correct, when it existed.
7     Q Right. And organizations that Purdue --
8 at least we know Purdue has given in total
9 millions of dollars to, correct?
10     MR. SNAPP: Object to the form.
11     THE WITNESS: We did review that, over a
12 number of years.
13 BY MR. CRUEGER:
14     Q It also includes organizations like the
15 FSMB, correct?
16     A Correct.
17     Q And that's another organization that
18 Purdue has given substantial amounts of money to,
19 correct?
20     A Again --
21     MR. SNAPP: Object to the form.
22     THE WITNESS: Sorry. Again, we reviewed
23 that earlier, and there were contributions over a
24 number of years.

Page 310

BY MR. CRUEGER:

1 Q   And the issues that the Pain Care Forum
addressed are really related to opioids in
general, correct?

5    MR. SNAPP:  Object to the form.

6    THE WITNESS:  Some of them are related
to opioids.

BY MR. CRUEGER:

9    Q   And the Pain Care Forum would set up
task force or would form task force to -- to
address various issues, correct?

12   A   That's correct.

13   Q   And people such as myself, we don't know
what was discussed in those meetings because
there's no recording or transcript of the
discussions, correct?

17   MR. SNAPP:  Object to the form.

18   THE WITNESS:  That's correct.

19 BY MR. CRUEGER:

20   Q   And we don't always know what people
even attended, correct?

22   A   We don't.  There was no calling of the
roll or record of that.

24   Q   And so really the -- the contents of

Page 311

1 those meetings, like what the Pain Care Forum did
in detail, it's -- it's secret from the public,
correct?

4    MR. SNAPP:  Object to the form.

5    THE WITNESS:  Well, I -- I think the
issues would all be on the agendas that -- that
were issued, but it wasn't anything that was
published.

9 BY MR. CRUEGER:

10   Q   But it's -- it's -- it's secret from the
public.  The public doesn't know what goes on in
the Pain Care Forum, correct?

13   MR. SNAPP:  Object to the form.

14   THE WITNESS:  Well, it -- if what you're
trying to say is that the Pain Care Forum was
somehow a secret, it was anything but a secret.
We were a number of organizations that
participated.  There were sometimes a number of
people within an organization that participated.
We had no way of knowing or even attempted to know
who was on the telephone, or -- anyone from the
group was welcome to participate in the meetings.

23   And so from that perspective, there were
dozens and dozens of people who were there and

Page 312

1 knew what was going on, but, no, there was not a
published document that was broadcast to the
public at large.

4 BY MR. CRUEGER:

5    Q   And so you really consider those
meetings to be -- like there was no
confidentiality for those meetings?

8    MR. SNAPP:  Object to the form.

9    THE WITNESS:  Well, I don't really know
what you're talking about with confidentiality.
It's just what I stated.  The meetings were open
to the participants.  The phone calls were open
lines.  Somebody would have to advise me on
confidentiality.

15   But they were -- they were open meetings
for the people who participated.  I had no way of
knowing who was in a room on a phone across the
country really, because people participated were
from all over the United States.

20 BY MR. CRUEGER:

21   Q   But it was only -- by the way, it was
only members of the Pain Care Forum who were
invited to attend the meetings, correct?

24   A   Yes, that's correct.  And outside

Page 313

1 speakers, of course, as I mentioned to you.

2    Q   And to be a member of the Pain Care
Forum, people would have to approve their
participation, correct?

5    MR. SNAPP:  Object to the form.

6    THE WITNESS:  Well, it was a very loose
process.  As I said, when the forum started, I
think, or when the idea came up and -- and it got
organized and started, I think there were about 20
organizations or so that participated from the
beginning, and then organizations were added on.
But...

13 BY MR. CRUEGER:

14   Q   Well, just to use as an example, if I
wanted to become a member of the Pain Care Forum
and attend meetings, it probably would be
discouraged, correct?

18   A   Well, there was a loose criteria, and
the criteria was, as I -- the best that I could
state it was that if you represented an
organization that had an interest in either the
treatment of pain or the -- the -- for that
matter, the treatment of addiction or any of the
issues surrounding these -- these -- this

Page 314

1  discussion of balance, if you will, between the
2  appropriate treatment of pain and diversion and
3  misuse and abuse of products.
4      But there were companies involved that
5  made medical devices that treated pain, and there
6  were many other organizations who participated
7  that were what I would call antidrug coalitions.
8  And I think there was even somebody there who
9  represented addiction treatment specialists.
10     And so that was the criteria. We
11 really I don't think would have accepted an
12 individual who had no real interests. And -- and
13 that would be my explanation.
14     Q   And if you go back to actually
15 Exhibit 1, so it's probably at the bottom of your
16 stack. So...
17     A   Yes. Yes.
18     Q   And so this was -- again, I understand
19 why 1990 -- well, actually -- and this is the
20 career highlights, correct?
21     A   2004 --
22     Q   2004.
23     A   -- highlights, yes.
24     Q   I understand why Purdue was having

Page 315

1  financial problems with the loss of exclusivity,
2  so you're looking for a job, correct? And this is
3  you explaining your job, right?
4      A   This was me, yes, I was obviously -- I
5  don't recall. I think I mentioned to you earlier
6  when you presented me with this, I was surprised.
7  I don't remember the e-mail itself. I'm not
8  certain even who Chuck is because of the way this
9  obviously is sent from me to me. I don't really
10 remember if it was sent.
11     But I do -- did it looks like it was
12 at the point in time when we lost the patent, the
13 product had gone generic, and the -- you know,
14 really the future of the company was in question.
15     Q   And -- but you wrote this while you were
16 working at Purdue, correct?
17     A   Yes, correct.
18     Q   And so --
19     A   I worked there in 2004.
20     Q   And so you wrote here that in the first
21 paragraph starting, "I always." So, "I always
22 work closely with the product teams and legal
23 group to drive products and put SB at a
24 competitive advantage" --

Page 316

1      A   Yes.
2      Q   This is when you were talking about
3  SmithKline?
4      A   SmithKline Beecham.
5      Q   -- "and at the same time I always tried
6  to drive pharma and industry agenda." Correct?
7      A   That's what it says.
8      Q   And that's really -- that describes your
9  job, driving the industry agenda at Purdue,
10 correct?
11     MR. SNAPP: Object to the form.
12     THE WITNESS: It -- I don't think that
13 would be a fair statement at Purdue. At
14 SmithKline Beecham we were a fairly large and
15 diverse pharmaceutical company who played a much
16 more active and stronger role at the trade
17 association.
18     I think Purdue, being a much smaller
19 company with a less diverse portfolio, we were
20 very much less interested in driving the agenda of
21 the industry. But we were interested in what was
22 going on with respect to the industry generally.
23 BY MR. CRUEGER:
24     Q   Well, you were interested in driving the

Page 317

1  agenda of Purdue and other manufacturers of
2  opioids, correct?
3      MR. SNAPP: Object to the form.
4      THE WITNESS: I answered your question.
5  I -- I -- I don't think that our role at Purdue
6  was similar to the role that you would play when
7  you work for a larger pharmaceutical company like
8  SmithKline Beecham.
9  BY MR. CRUEGER:
10     Q   And in the end, your effectiveness is
11 measured by your impact on sales, correct?
12     MR. SNAPP: Object to the form.
13     THE WITNESS: No, I don't think that's
14 correct.
15 BY MR. CRUEGER:
16     Q   Well, if you look at page 3, it starts
17 with "Career Highlights."
18     A   Yes, "Career Highlights."
19     Q   So in that first paragraph, you've --
20 you've measured yourself a success of your ability
21 by the $2 billion in direct sales opportunities
22 you've created for your customers, correct?
23     A   I did.
24     (Rosen Exhibit No. 48 was marked

Page 318

1     for identification.)
2  BY MR. CRUEGER:
3     Q   So I'm just going to give you
4  Exhibit 48.
5       You can put the other one away.
6       And these -- this is an e-mail from you
7  to various people at Purdue forwarding the CEAC
8  minutes for January 26, correct?
9     A   Of 2010.  January 27th, actually.
10    Q   Oh.
11    A   Oh, I'm sorry, the e-mail was January 27
12  of 2010.
13    Q   And if you look at page -- it ends in
14  44.  It's item number 6.
15       Now, Purdue has spent a lot of money
16  lobbying and third parties that we've seen,
17  correct?
18       MR. SNAPP:  Object to the form.
19       THE WITNESS:  I see it.
20  BY MR. CRUEGER:
21    Q   But you -- Purdue spent a lot of money
22  on -- we saw it spent a lot of money on third
23  parties, correct?
24       MR. SNAPP:  Object to the form.

Page 319

1       THE WITNESS:  Are you referring to the
2  documents you showed me earlier this morning?
3  BY MR. CRUEGER:
4     Q   Yes.
5     A   Yes.
6     Q   Spent millions of dollars with the FSMB,
7  correct?
8       MR. SNAPP:  Object to the form.
9       THE WITNESS:  They spent sums of money
10  that you showed me over time, over -- I think it
11  was about a decade or more.
12  BY MR. CRUEGER:
13    Q   So item 6 in these meeting minutes says:
14  "Following a discussion of how Purdue should
15  respond to requests for contributions and
16  financial support for substance abuse treatment,
17  it was determined that we should continue our
18  policy of not supporting individual treatment
19  programs."  And it says: "David Haddox will draft
20  a statement for CEAC consideration and ECO
21  approval," period.  Correct?
22    A   That's what it says, yes.
23       MR. CRUEGER:  Let's take a few minutes,
24  and then I'll be done.

Page 320

1       THE VIDEOGRAPHER:  The time is 5:48
2  p.m., and we're going off the record.
3       (Recess.)
4       THE VIDEOGRAPHER:  The time is 5:55
5  p.m., and we're back on the record.
6       MR. CRUEGER:  I have no further
7  questions at the time, but as I said at the
8  beginning, we received about 2,000-plus documents
9  last night and haven't had a chance to review
10  them, so we consider the deposition as held open.
11       And I assume you will object to that.
12       MR. SNAPP:  We disagree, but we don't
13  need to talk about that today.
14       MR. CRUEGER:  Nope.
15       MR. SNAPP:  And I have no questions for
16  you, Mr. Rosen.
17       THE VIDEOGRAPHER:  Okay.  That's it.
18  The time is 5:56 p.m. on January 16th, 2019.
19  Going off the record, completing the videotaped
20  deposition.
21       (Whereupon, the deposition of
22       BURT E. ROSEN was concluded at
23       5:56 p.m.)
24

Page 321

1    CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2      The undersigned Certified Shorthand Reporter
3  does hereby certify:
4      That the foregoing proceeding was taken before
5  me at the time and place therein set forth, at
6  which time the witness was duly sworn; That the
7  testimony of the witness and all objections made
8  at the time of the examination were recorded
9  stenographically by me and were thereafter
10  transcribed, said transcript being a true and
11  correct copy of my shorthand notes thereof; That
12  the dismantling of the original transcript will
13  void the reporter's certificate.
14      In witness thereof, I have subscribed my name
15  this date:  January 20, 2019.
16
17      _____
18      LESLIE A. TODD, CSR, RPR
19      Certificate No. 5129
20  (The foregoing certification of
21  this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1     INSTRUCTIONS TO WITNESS
2       Please read your deposition over carefully and
3    make any necessary corrections. You should state
4    the reason in the appropriate space on the errata
5    sheet for any corrections that are made.
6     After doing so, please sign the errata sheet
7    and date it.
8       You are signing same subject to the changes
9    you have noted on the errata sheet, which will be
10   attached to your deposition.  It is imperative
11   that you return the original errata sheet to the
12   deposing attorney within thirty (30) days of
13   receipt of the deposition transcript by you. If
14   you fail to do so, the deposition transcript may
15   be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24

Page 324

1     ACKNOWLEDGMENT OF DEPONENT
2       I,_____, do hereby
3    certify that I have read the foregoing pages, and
4    that the same is a correct transcription of the
5    answers given by me to the questions therein
6    propounded, except for the corrections or changes
7    in form or substance, if any, noted in the
8    attached Errata Sheet.
9
10   _____
11   BURT E. ROSEN                DATE
12
13
14   Subscribed and sworn to
15   before me this
16   _____day of_____,20___.
17   My commission expires:_____
18   _____
19   Notary Public
20
21
22
23
24

Page 323

1            - - - - - -
2            E R R A T A
3            - - - - - -
4    PAGE LINE CHANGE
5    ____ ____ _____
6    REASON: _____
7    ____ ____ _____
8    REASON: _____
9    ____ ____ _____
10   REASON: _____
11   ____ ____ _____
12   REASON: _____
13   ____ ____ _____
14   REASON: _____
15   ____ ____ _____
16   REASON: _____
17   ____ ____ _____
18   REASON: _____
19   ____ ____ _____
20   REASON: _____
21   ____ ____ _____
22   REASON: _____
23   ____ ____ _____
24   REASON: _____