```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION               )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7

 8

 9                     __ __ __
10             Saturday, May 4, 2019

                       __ __ __
11

          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
                       __ __ __
13

14

15

16        Videotaped Deposition of MEREDITH B.
      ROSENTHAL, Ph.D., held at Robins Kaplan LLP,
17    800 Boylston Street, Suite 2500, Boston,
      Massachusetts, commencing at 8:04 a.m., on
18    the above date, before Michael E. Miller,
      Fellow of the Academy of Professional
19    Reporters, Registered Diplomate Reporter,
      Certified Realtime Reporter and Notary
20    Public.
21

22

23                     __ __ __
24           GOLKOW LITIGATION SERVICES
           877.370.3377 ph | fax 917.591.5672
25                 deps@golkow.com
```

```
 1    A P P E A R A N C E S:

 2         HAGENS BERMAN SOBOL SHAPIRO LLP
           BY:  THOMAS M. SOBOL, ESQUIRE
 3              tom@hbsslaw.com
           55 Cambridge Parkway
 4         Suite 301
           Cambridge, Massachusetts 02142
 5         (617) 482-3700
           Counsel for MDL Plaintiffs
 6
 7         BRANSTETTER STRANCH & JENNINGS PLLC
           BY:  ANTHONY ORLANDI, ESQUIRE
 8              aorlandi@bsjfirm.com
                (via teleconference)
 9              TRICIA HERZFELD, ESQUIRE
                triciah@bsjfirm.com
10              (via teleconference)
           223 Rosa L. Parks Boulevard
11         Suite 200
           Nashville, Tennessee 37203
12         (615) 254-8801
           Counsel for Tennessee Plaintiffs
13
14         KIRKLAND & ELLIS LLP
           BY:  MARTIN L. ROTH, ESQUIRE
15              martin.roth@kirkland.com
           300 North LaSalle
16         Chicago, Illinois 60654
           (312) 862-2000
17         Counsel for Allergan Finance LLC
18
19         KIRKLAND & ELLIS LLP
           BY:  CATIE VENTURA, ESQUIRE
20              catie.ventura@kirkland.com
           1301 Pennsylvania Avenue N.W.
21         Washington, D.C. 20004
           (202) 879-5000
22         Counsel for Allergan Finance LLC
23
24
25
```

```
 1    A P P E A R A N C E S:

 2         O'MELVENY & MYERS LLP
           BY:  CHARLES C. LIFLAND, ESQUIRE
 3              clifland@omm.com
                MATTHEW KAISER, ESQUIRE
 4              mkaiser@omm.com
           400 South Hope Street
 5         18th Floor
           Los Angeles, California 90071
 6         (213) 430-6000
           Counsel for Janssen Pharmaceuticals Inc.
 7
 8         COVINGTON & BURLING LLP
           BY:  RONALD G. DOVE, JR., ESQUIRE
 9              rdove@cov.com
           850 Tenth Street, NW
10         Washington, D.C. 20001
           (202) 662-5575
11         Counsel for McKesson Corporation
12
13         ROPES & GRAY LLP
           BY:  NICHOLAS BRADLEY, ESQUIRE
14              nick.bradley@ropesgray.com
           1211 Avenue of the Americas
15         New York, New York 10036
           (212) 256-9000
16         Counsel for Mallinckrodt
           Pharmaceuticals
17
18
           BARTLIT BECK LLP
19         BY:  PETER B. BENSINGER, JR., ESQUIRE
                peter.bensinger@bartlit-beck.com
20         54 West Hubbard Street
           Suite 300
21         Chicago, Illinois 60654
           (312) 494-4400
22         Counsel for Walgreens Company
23
24
25
```

```
 1    A P P E A R A N C E S:
 2         JONES DAY
           BY:  STEVEN N. GEISE, ESQUIRE
 3             sngeise@jonesday.com
           4655 Executive Drive
 4         Suite 1500
           San Diego, California 92121
 5         (858) 314-1200
           Counsel for Walmart Corporation
 6
 7         DECHERT LLP
           BY:  WILL W. SACHSE, ESQUIRE
 8             will.sachse@dechert.com
           Cira Centre
 9         2929 Arch Street
           Philadelphia, Pennsylvania 19104
10         (215) 994-4000
           Counsel for Purdue Pharma
11
12         ARNOLD & PORTER KAYE SCHOLER LLP
           BY:  SAMUEL N. LONERGAN, ESQUIRE
13             samuel.lonergan@arnoldporter.com
           250 West 55th Street
14         New York, New York 10019
           (212) 836-8000
15         Counsel for Endo Health Solutions
           Inc., Endo Pharmaceuticals Inc., Par
16         Pharmaceutical, Inc. and Par
           Pharmaceutical Companies, Inc.
17
18         MORGAN LEWIS & BOCKIUS LLP
           BY:  WENDY WEST FEINSTEIN, ESQUIRE
19             wendy.feinstein@morganlewis.com
           One Oxford Center
20         Thirty-Second Floor
           Pittsburgh, Pennsylvania 15219
21         (412) 560-3300
           Counsel for Teva Pharmaceuticals USA
22         Inc., Cephalon Inc., Watson
           Laboratories Inc., Actavis LLC, and
23         Actavis Pharma Inc. f/k/a Watson
           Pharma Inc.
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2        REED SMITH LLP
          BY:  LOUIS W. SCHACK, ESQUIRE
 3            lschack@reedsmith.com
          1717 Arch Street
 4        Suite 3100
          Philadelphia, Pennsylvania 19103
 5        (215) 851-8100
          Counsel for AmerisourceBergen Drug
 6        Corporation
 7
 8        WILLIAMS & CONNOLLY LLP
          BY:  CARL R. METZ, ESQUIRE
 9            cmetz@wc.com
          725 Twelfth Street, N.W.
10        Washington, D.C. 20005
          (202) 434-5000
11        Counsel for Cardinal Health Inc.
12
13        MORGAN LEWIS & BOCKIUS LLP
          BY:  CATHERINE ESCHBACH, ESQUIRE
14            ceschbach@morganlewis.com
              (via teleconference)
15        1000 Louisiana Street
          Suite 4000
16        Houston, Texas 77002
          (713) 890-5000
17        Counsel for Rite Aid
18
19        LOCKE LORD LLP
          BY:  ANNA K. FINGER, ESQUIRE
20            anna.k.finger@lockelord.com
              (via teleconference)
21        2200 Ross Avenue
          Suite 2800
22        Dallas, Texas 75201
          (214) 740-8000
23        Counsel for Henry Schein, Inc. and
          Henry Schein Medical Systems, Inc.
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2       MARCUS & SHAPIRA LLP
         BY:  RICHARD I. HALPERN, ESQUIRE
 3            halpern@marcus-shapira.com
              (via teleconference)
 4       One Oxford Centre
         35th Floor
 5       Pittsburgh, Pennsylvania 15219
         (412) 471-3490
 6       Counsel for HBC Services
 7
 8       FOLEY & LARDNER LLP
         BY:  KRISTINA J. MATIC, ESQUIRE
 9            kmatic@foley.com
              (via teleconference)
10       777 East Wisconsin Avenue
         Milwaukee, Wisconsin 53202
11       (414) 271-2400
         Counsel for Anda Inc.
12
13
14    VIDEOGRAPHER:
15         VINCENT ROSICA,
           Golkow Litigation Technologies
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX
 2
      APPEARANCES                                2
 3
      PROCEEDINGS                               10
 4
 5
      EXAMINATION OF MEREDITH B. ROSENTHAL, Ph.D.:
 6
           BY MR. ROTH                          10
 7
 8
      CERTIFICATE                              472
 9
      ERRATA                                   474
10
      ACKNOWLEDGMENT OF DEPONENT               475
11
      LAWYER'S NOTES                           476
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                   DEPOSITION EXHIBITS
                 MEREDITH B. ROSENTHAL, Ph.D.
 2                      May 4, 2019
 3      NUMBER              DESCRIPTION          PAGE
 4      Rosenthal-1    3/25/19 Expert Report          12
 5      Rosenthal-2    Errata to Expert Report        12
 6      Rosenthal-3    Medicare Program               25
                       Policies & Procedures
 7
        Rosenthal-4    Second Amended Complaint       39
 8                     and Jury Demand
 9      Rosenthal-5    2016 Datta and Dave            74
                       Publication
10
        Rosenthal-6    2015 Cutler et al              92
11                     Working Paper
12      Rosenthal-7    2002 Azoulay Publication      225
13      Rosenthal-8    2001 Berndt et al             229
                       Publication
14
        Rosenthal-9    2004 Mizik and Jacobson       263
15                     Publication
16      Rosenthal-10   2001 G?n?l et al              265
                       Publication
17
        Rosenthal-11   The Use of Opioids for        310
18                     the Treatment of Chronic
                       Pain Consensus Statement
19
        Rosenthal-12   Rosenthal Declaration         338
20                     re: Zyprexa
21      Rosenthal-13   Rosenthal Declaration         345
                       re: Neurontin
22
        Rosenthal-14   2003 Kaiser Family            348
23                     Foundation Report
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

1                    DEPOSITION EXHIBITS
2

Rosenthal-15    Regression Instruments        356
3                Spreadsheet

4       Rosenthal-16    3/25/19 Perri Expert          360
                Report

5       Rosenthal-17    2007 Steinman et al          378
6                Publication

7       Rosenthal-18    2010 Spiess and Neumeyer     392
                Publication

8       Rosenthal-19    Kadian                       417
9                Defendant/Non-Defendant
                Spreadsheet

10      Rosenthal-20    Alpharma Form 8-K            421
11

        Rosenthal-21    Bloomberg Company            426
12               Overview of Purepac
                Pharmaceutical Holdings
13               Inc.

14
15
16
17
18
19
20
21
22
23
24
25

```
 1                    PROCEEDINGS
 2             (May 4, 2019 at 8:04 a.m.)
 3             THE VIDEOGRAPHER:  We're now on
 4       record.  My name is Vince Rosica.  I'm
 5       a videographer for Golkow Litigation
 6       Services.  Today's date is May 4th,
 7       2019 and the time is 8:04 a.m.
 8             This video deposition is being
 9       held in Boston, Massachusetts in the
10       matter of National Prescription Opiate
11       Litigation, MDL No. 2804, for the
12       Northern District of Ohio, Eastern
13       Division Court.  The deponent is
14       Meredith Rosenthal.
15             Counsel will be noted on the
16       stenographic record.  The court
17       reporter is Mike Miller and will now
18       swear in the witness.
19         MEREDITH B. ROSENTHAL, Ph.D.,
20             having been duly sworn,
21             testified as follows:
22                   EXAMINATION
23    BY MR. ROTH:
24        Q.    Good morning, Professor
25    Rosenthal.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Good morning.

2      Q.      My name is Martin Roth.  We met

3   off the record.  I'll be taking your

4   deposition here today.

5           Can you please state your full

6   name for the record?

7      A.      Meredith Beaven Rosenthal.

8      Q.      And do you understand you're

9   testifying under oath here today?

10     A.      I do.

11     Q.      And you've testified at

12  depositions and in court and before Congress

13  in the past?

14     A.      I have.

15     Q.      Approximately how many times

16  altogether have you testified?

17     A.      Perhaps 30 or 35.

18     Q.      There's nothing that would

19  prevent you from testifying truthfully here

20  today?

21     A.      There is not.

22     Q.      If I ask you a question and you

23  give me an answer, I'm going to assume you

24  understood my question.

25           Is that fair?

1    A.    Yes.

2    Q.    And if for some reason you

3  don't understand one of my questions, you'll

4  ask me for clarification?

5    A.    Yes, I will.

6    Q.    Okay.  I'm going to start by

7  marking as Exhibit 1 to your deposition your

8  expert report, and I'm also going to

9  simultaneously give you Exhibit 2, which is

10  the errata sheet we received on Thursday

11  night.

12         (Whereupon, Deposition Exhibit

13         Rosenthal-1, 3/25/19 Expert Report,

14         was marked for identification.)

15         (Whereupon, Deposition Exhibit

16         Rosenthal-2, Errata to Expert Report,

17         was marked for identification.)

18  BY MR. ROTH:

19    Q.    So first, if you could look at

20  Exhibit 1 and just confirm that that appears

21  to be your expert report in this case along

22  with Attachments A through D.

23    A.    It is correct.

24    Q.    And if you look at page 75, is

25  that your signature on the report?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes, it is.

2        Q.      Exhibit 2 is a memo dated

3    May 2nd from Forrest McCluer at GMA to

4    yourself and Mr. Tom Sobol, your -- the

5    attorney sitting with you; is that correct?

6        A.      That's correct.

7        Q.      And GMA is Greylock McKinnon?

8        A.      That's correct.

9        Q.      And who is Mr. McCluer?

10       A.      Mr. McCluer is a senior

11   economist there who worked with me on this

12   matter.

13       Q.      And I take it, given that

14   Mr. McCluer went through the report to error

15   check, that you believe that your report,

16   along with the errata sheet, is accurate as

17   of today?

18       A.      I do.

19       Q.      You didn't see any other errors

20   that aren't contained in the errata?

21       A.      I have not.

22       Q.      And all of the opinions that

23   you plan to give at trial in this matter are

24   contained in your report as corrected by your

25   errata?

1      A.      That's correct.

2      Q.      Professor Rosenthal, you're a

3  healthcare economist; is that correct?

4      A.      Yes, that's right.

5      Q.      You're not a medical doctor?

6      A.      I am not.

7      Q.      You're not an expert in the

8  treatment of addiction?

9      A.      I am not.

10      Q.      You're not an expert in opioid

11  use disorder?

12      A.      I am not.

13      Q.      And I looked at your CV.  I

14  don't think you've published on either

15  addiction or opioid use disorder; is that

16  correct?

17      A.      I don't believe I have.

18      Q.      You're not an expert in

19  pharmacology?

20      A.      I am not.

21      Q.      You're not an expert in

22  epidemiology?

23      A.      I am not, although I do have

24  some knowledge of epidemiology.

25      Q.      You've reviewed epidemiological

1    studies, but you're not an epidemiologist?

2        A.    That's correct.  An

3    epidemiology class was required for my Ph.D.,

4    so I took an epidemiology class.  I operate

5    in the environment of public health research

6    where epidemiology is an important strand

7    that I frequently encounter, but I'm not an

8    epidemiologist.

9        Q.    And you're not a toxicologist?

10       A.    I am not a toxicologist.

11       Q.    You're not a pain management

12   physician?

13       A.    I am not.

14       Q.    You don't diagnosis or treat

15   pain?

16       A.    No, I do not.

17       Q.    You're not an expert in the

18   FDA?

19       A.    I am not an expert in the FDA,

20   although, again, as you know, my work has

21   frequently concerned FDA rules.

22       Q.    But you've never worked for the

23   FDA?

24       A.    I have not.

25       Q.    And you've never consulted a

1    company regarding the meaning of FDA

2    regulations or regulatory requirements?

3         A.    I have not.

4         Q.    You do understand that

5    prescription opioids are FDA-approved

6    products?

7         A.    Yes, I do.

8         Q.    And, in fact, if you look at

9    your report, at paragraph 19, which is the

10   bottom of page 15.  Let me know when you're

11   there.

12        A.    Yes.

13        Q.    You acknowledge that since 1962

14   the FDCA and related regulations have

15   required sponsors of new drug products to

16   present scientific evidence of both efficacy

17   and safety before a new product can be

18   marketed.

19             Do you see that?

20        A.    Yes, I do.

21        Q.    And you cite to the FDA website

22   when you write that?

23        A.    That's right.

24        Q.    And then turning the page, you

25   say in paragraph 20:  By regulation,

Highly Confidential - Subject to Further Confidentiality Review

1    prescription drug labels indicate the

2    diseases, conditions and/or patients for

3    which the sponsor has presented

4    scientifically required evidence to the FDA.

5              Right?

6       A.    Yes, that's what it says.

7       Q.    And for that proposition, you

8    cite to a number of federal regulations in

9    footnote 31?

10      A.    I do.

11      Q.    You're not an expert on drug

12   labeling.

13      A.    I am not.

14      Q.    In paragraph 21 of your report,

15   you say:  FDA regulations specify that

16   promotional materials may only make claims

17   that are supported by scientific

18   evidence, i.e., supported by studies meeting

19   scientific standards, and they may not be

20   false or misleading.

21              Did I read that correctly?

22      A.    You did.

23      Q.    And you're not an expert on FDA

24   regulations, are you?

25      A.    I am not.

 1        Q.      And then in paragraph 22 you

 2    say:  FDA oversight of drug promotion is

 3    intended to ensure that physicians and

 4    consumers understand both the benefits and

 5    risks of a drug.  FDA regulations call for

 6    fair balance in all promotional claims and

 7    materials.  The risks as well as the benefits

 8    must be clearly identified and risks must be

 9    given appropriate prominence.

10             Do you see that?

11        A.      Yes, I do.

12        Q.      And there's another citation to

13    a Code of Federal Regulations section for

14    that paragraph, correct?

15        A.      Yes.

16        Q.      You understand that the FDA

17    regulates labeling for prescription drugs,

18    based on what you've said in your report?

19        A.      I do.

20        Q.      And the FDA approves

21    prescription drugs even if they have known

22    risks?

23        A.      Yes.

24        Q.      Do you understand that the FDA

25    also regulates promotional materials for

1    prescription drugs?

2                    MR. SOBOL:   Objection.

3           A.      Yes, I do.

4    BY MR. ROTH:

5           Q.      And the FDA has authority to

6    police advertising that it believes would

7    result in prescription drugs being misbranded

8    under the federal regulations?

9                    MR. SOBOL:   Objection.

10          A.      I'm not sure exactly what you

11   mean by "police," but as I've described in my

12   report, I understand that materials are

13   reviewed by the FDA.

14   BY MR. ROTH:

15          Q.      And the FDA has the authority

16   to tell a drug manufacturer to either modify

17   or refrain from using materials that it may

18   review?

19          A.      I just want to be careful that

20   I don't try to convey any legal expertise

21   here, but I am aware that the FDA, for

22   example, issues warning letters pertaining to

23   specific marketing tactics and messages.  If

24   that's what you're referring to then, yes, I

25   understand that.

1    Q.    Well, more than warning

2  letters, the FDA may tell a manufacturer when

3  it reviews draft promotional materials, for

4  example, that it does not approve their

5  dissemination.

6           Are you aware of that?

7           MR. SOBOL:  Objection, asked

8     and answered.

9    A.    I guess I would have thought of

10  that as similar -- again, not being a legal

11  expert -- similar to those warning letters

12  that say that you may not do this.  The

13  specifics of how the enforcement flows after

14  that, what the FDA can and can't do in terms

15  of enforcement, I'm a little less clear on.

16  BY MR. ROTH:

17    Q.    Okay.  And I appreciate that

18  you're not a legal expert, but do you

19  understand that in addition to issuing

20  warning letters after materials may have gone

21  out, the FDA, sometimes before materials are

22  utilized, may give input and feedback to

23  manufacturers about the materials that they

24  plan to use?

25    A.    Yes, I believe that's true.

1    Q.    And you did not study which, if

2    any, of the promotional materials for

3    prescription opioids were submitted to FDA

4    for its review before they were used?

5          MR. SOBOL:  Objection.

6    A.    I did not study that, no.

7    BY MR. ROTH:

8    Q.    And you did not study which of

9    the detailing contacts in your regression

10   models, which we'll talk about, involve

11   promotional materials that had been submitted

12   for FDA review?

13         MR. SOBOL:  Objection.

14   A.    I did not, no.

15   BY MR. ROTH:

16   Q.    Do you agree that opioids have

17   legitimate medical uses for certain diseases

18   and conditions?

19   A.    Yes, I would say that's true.

20   According to their label, yes.

21   Q.    And you understand that the FDA

22   has approved opioids for certain of these

23   conditions in their labels?

24   A.    Yes, I understand that the

25   approved labels include those conditions for

1    which the FDA has deemed them appropriate.

2         Q.    Did you review any drug labels

3    in connection with your work in this case for

4    prescription opioids?

5         A.    I have looked at some of the

6    drug labels, yes.

7         Q.    Do you recall which drug labels

8    you reviewed?

9         A.    I believe for OxyContin and

10   hydrocodone.

11        Q.    Did you review any labels

12   beyond that that you recall?

13        A.    Not that I recall.

14        Q.    And I've looked at

15   Attachment B.  I don't think I saw drug

16   labels on your reliance list; is that

17   correct?

18        A.    That's correct.

19        Q.    Do you understand that

20   prescription opioids are approved in their

21   labels for the treatment of chronic pain?

22             MR. SOBOL:  Objection.

23        A.    As I sit here, I couldn't tell

24   you which drugs have approvals for chronic

25   pain on their labels, no.

1    BY MR. ROTH:

2         Q.    Do you recall whether the

3    OxyContin and hydrocodone labels you reviewed

4    contained approvals for chronic pain for

5    those drugs?

6              MR. SOBOL:  Objection, scope.

7         A.    I do not.

8              MR. SOBOL:  Just give me a

9         little bit of a chance to get my

10        objections in, Professor.  Just a

11        nanosecond.

12        A.    I do not recall.

13   BY MR. ROTH:

14        Q.    Have you ever taken a

15   prescription opioid before?

16        A.    I have not.

17        Q.    Have you reviewed any medical

18   literature or guidelines on which uses

19   prescription opioids are FDA approved for?

20        A.    In the context of my report, I

21   discuss some of the guidelines, so I -- and

22   I've certainly reviewed those, for example,

23   the CDC guidelines.  I don't know if that's

24   what you're referring to.  I'm not

25   specifically myself offering an opinion on

Highly Confidential - Subject to Further Confidentiality Review

1    those guidelines.  As you know, as we just

2    discussed, I'm not a clinical expert or a

3    pharmacologist, but I'm certainly aware of

4    guidelines that talk about the appropriate

5    uses of opioids.

6         Q.    Do you know the most common

7    uses of opioids for which health insurers and

8    federal Medicare or state Medicaid agencies

9    reimburse use?

10             MR. SOBOL:  Objection.

11        A.    As I sit here, do I know which

12   uses are most prevalent across all those

13   payors?  No.  No, I do not.

14   BY MR. ROTH:

15        Q.    Do you know whether Medicare,

16   for example, reimburses patients for the use

17   of prescription opioids for the treatment of

18   chronic pain?

19             MR. SOBOL:  Objection.

20        A.    Well, I think you would be

21   talking about Medicare Part D.  Just to be

22   clear, those are private insurers that are

23   acting in the service of Medicare

24   beneficiaries, and each, of course, has a

25   different formulary and may use different

1    mechanisms to ensure appropriate drug use.

2              So I think it would be hard to

3    characterize that as Medicare as a whole.

4    BY MR. ROTH:

5         Q.    Do you know whether any of the

6    Medicare Part D insurers approve the use of

7    opioids on their formularies for the

8    treatment of chronic pain?

9              MR. SOBOL:  Objection.

10        A.    I do not know one way or the

11   other.  I do not believe that -- I do not

12   know one way or the other whether there are

13   restrictions relative to the uses of

14   particular drugs for particular indications.

15   BY MR. ROTH:

16        Q.    Okay.  I'm going to mark as

17   Exhibit 3 to your deposition a document that

18   I pulled from your reliance list.  It's

19   titled Medicare Program Policies and

20   Procedures, and it was linked to the Excellus

21   Blue Cross Blue Shield page.

22              (Whereupon, Deposition Exhibit

23         Rosenthal-3, Medicare Program

24         Policies & Procedures, was marked for

25         identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ROTH:

 2         Q.    Do you see that document?

 3         A.    I do.

 4         Q.    And do you recognize this

 5    document as one that you reviewed?

 6         A.    I do.

 7         Q.    Okay.  So why did you have your

 8    team pull this document and why did you

 9    review it in your work in this case?

10         A.    I'd actually have to look in my

11    report to see what I cite it for

12    specifically.

13         Q.    Okay.  If you look on the first

14    page, it says:  Summary of Formulary Level

15    Opioid POS for Calendar Year 2019.

16               Do you see that?

17         A.    I do.  And just to be clear,

18    this is a single Medicare Part D carrier.

19    This is not official Medicare policy per se.

20         Q.    Right.

21         A.    But yes.

22         Q.    So if you look at page 3 of

23    this document, it talks about the review

24    criteria for Blue Cross Blue Shield for

25    opioid, seven-day supply limits.
```

Highly Confidential - Subject to Further Confidentiality Review

1                    Do you see that?

2          A.      I do.

3                    MR. SOBOL:   Objection.

4    BY MR. ROTH:

5          Q.      And then the first bullet -- or

6    it says before the bullets:  An exception to

7    the seven-day quantity limit of a shorter

8    long-acting opioid may be permitted in

9    patients who meet one of the following

10   criteria, A through F below.

11                   Do you see that?

12         A.      I do.

13         Q.      And then the first bullet says:

14   Approval will be a 30-day override for

15   scenarios A, B, C, D and E below.

16                   And then there's a second

17   bullet below that.  Do you see that?

18         A.      Yes.

19         Q.      And it says:  Approval will be

20   a 30-day override for scenario F below.

21                   Do you see that?

22         A.      I do.

23         Q.      And then under that bullet is E

24   where it says:  The requesting physician

25   provides a supporting statement/attests that

1      a prescription for greater than a seven-day

2      supply is medically necessary to manage the

3      patient's pain.

4              Do you see that?

5      A.     I do.

6      Q.     And so at least for Blue Cross

7      Blue Shield, it appears in their formulary

8      they have a mechanism for approving the use

9      of opioids to treat pain for longer than

10     seven days?

11             MR. SOBOL:  Objection.  Blue

12         Cross Blue Shield of?  Question mark.

13             THE WITNESS:  Are you waiting

14         for me to answer your question?

15             MR. ROTH:  I was.

16     A.     This -- in this Excellus

17     formulary, they do indicate -- obviously this

18     is 2019.  They do indicate that mechanism.

19     You had asked me before about chronic pain.

20     I don't know if you're trying to infer that

21     anything longer than seven days is chronic.

22     I think that's not exactly the definition of

23     chronic pain, so...

24     BY MR. ROTH:

25     Q.     We'll get there.

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Okay.

2          Q.      I promise.

3                  MR. SOBOL:  I'll write that

4      down.

5      BY MR. ROTH:

6          Q.      Your direct and indirect

7      regressions do not make any attempt to

8      differentiate legitimate prescriptions from

9      medically unnecessary ones; is that correct?

10                 MR. SOBOL:  Objection.

11         A.      The goal of my analysis is to

12     examine the impact of the alleged misconduct,

13     and so I appropriately quantify all

14     prescriptions caused by the alleged unlawful

15     marketing.

16     BY MR. ROTH:

17         Q.      You're not an expert in

18     pharmaceutical marketing practices, correct?

19         A.      I am not an expert in

20     pharmaceutical marketing practices, although,

21     again, I have studied pharmaceutical

22     marketing and its effects and so I have a

23     high degree of familiarity.

24         Q.      But you're not opining on which

25     of defendants' marketing practices were

1    unlawful?

2         A.    That's correct.  I have been

3    asked to assume that the marketing practices

4    during the period from 1995 through the end

5    of my data were unlawful.

6         Q.    And do you rely on anything

7    besides counsel's instruction to you to make

8    that assumption?

9         A.    Well, as you can see in my

10   report, I have reviewed documents, testimony

11   from other experts.  I understand the context

12   in which the alleged misconduct took place,

13   and so I have examined that assumption using

14   my expertise.

15        Q.    But you're not offering an

16   opinion as to whether that assumption is

17   correct, or not?

18        A.    I am not offering an opinion

19   about that assumption, no.

20        Q.    And one of the sources you

21   relied on to test the instruction that all of

22   defendants' misconduct was unlawful was

23   Dr. Perri; is that right?

24        A.    Yes, he is one of the other

25   experts I refer to.

1    Q.    And are you aware that

2  Dr. Perri testified last week that he didn't

3  evaluate whether defendants' marketing was

4  lawful or appropriate?

5              MR. SOBOL:  Objection.

6    A.    Well, Dr. Perri is not a

7  lawyer, so I would not expect him to deem

8  anything lawful.  He describes how

9  defendants' marketing efforts work, the

10  extent to which they conformed with standard

11  marketing practices, the extent to which he

12  deemed them appropriate as a pharmaceutical

13  marketer, as opposed to unlawful.

14  BY MR. ROTH:

15    Q.    So there's no expert that

16  you're relying on that makes that legal

17  conclusion as to whether defendants'

18  marketing was lawful or not.  Is that your

19  understanding?

20    A.    I'm relying on instructions

21  from counsel about the -- is lawfulness a

22  word?  About the legality of the connect

23  conduct in question.

24    Q.    You're relying on counsel's

25  confidence that they can prove that all of

1   defendants' marketing was unlawful when they

2   try their case some day?

3             MR. SOBOL:  Objection.

4        A.     I'm relying on instructions

5   from counsel, yes.

6   BY MR. ROTH:

7        Q.     You're not an expert on the

8   DEA?

9        A.     I am not an expert on the DEA.

10       Q.     And you're not an expert in

11  suspicious order monitoring?

12       A.     I am not.

13       Q.     Your analyses do not attempt to

14  attribute any causality to opioid

15  manufacturers or distributors for alleged

16  suspicious order monitoring deficiencies,

17  correct?

18       A.     I'm sorry.  Could you just

19  repeat that question?  There was a lot there.

20       Q.     Your analyses do not attempt to

21  attribute any causality to opioid

22  manufacturers or distributors for alleged

23  suspicious order monitoring deficiencies?

24       A.     No, my analysis does not

25  attribute causality related to those

```
 1    distributors.

 2         Q.     And, in fact, your analysis

 3    does not attempt to attribute any causality

 4    to distributors or pharmacies for any

 5    activities that they conducted related to the

 6    opioid issue?

 7              MR. SOBOL:  Objection.

 8         A.     I was not asked to examine

 9    issues of causality related to the

10    nonmarketing defendants.  Is it okay if I use

11    that term, "marketing defendants," to

12    describe what is in my report?

13    BY MR. ROTH:

14         Q.     I'll use a different term if I

15    need to, but I understand what you're saying.

16         A.     Okay.

17         Q.     You're not an expert in the

18    diversion of drugs for illicit use?

19         A.     I'm not an expert in diversion,

20    no.

21         Q.     And your analyses do not

22    attribute any causality for the -- what you

23    call the opioid epidemic to criminal

24    diversion or drug cartels?

25         A.     I have not examined the
```

Highly Confidential - Subject to Further Confidentiality Review

1    question of causality related to diversion

2    and criminal activity.

3         Q.    Your analyses do not attribute

4    any causality to government agencies for

5    approving opioids for certain medical uses --

6              MR. SOBOL:  Objection.

7    BY MR. ROTH:

8         Q.    -- in the scope of the opioid

9    epidemic?

10             MR. SOBOL:  Objection.

11        A.    I have not tried to examine --

12   I guess I'm not entirely sure what that

13   analysis would look like, but I have not

14   tried to examine the effects of specific

15   scope -- of the scope of approval for opioids

16   and whether it had been different, whether

17   the results would have been different.

18   BY MR. ROTH:

19        Q.    Okay.  If you turn to

20   paragraph 6 of your report, you describe the

21   allegations in the bellwether complaints.

22             Do you see that?

23        A.    Yes.

24        Q.    You say:  I understand that

25   this litigation brought by the City of

1    Cleveland, the City of Akron, Cuyahoga County

2    and Summit County, collectively the

3    bellwether governments, alleges -- and then

4    it goes on.

5              Do you see that?

6        A.    Yes.

7        Q.    Do you understand that the City

8    of Cleveland and the City of Akron are not

9    bellwether plaintiffs at this time?

10       A.    I do understand that.

11       Q.    And then when you describe what

12   the complaints say, you say:  The bellwether

13   governments allege, among other things, that

14   the defendants' conduct in promoting opioid

15   use, addiction, abuse, overdose and death has

16   had severe and far-reaching public health,

17   social services and criminal justice

18   consequences, including the fueling of

19   addiction and overdose from illicit drugs

20   such as heroin.

21             Do you see that?

22       A.    I do.

23       Q.    And then you go on to say:  The

24   governments further allege that the opioid

25   epidemic and the need for increased services

1   arose from the opioid manufacturers'

2   deliberately deceptive marketing strategy to

3   expand opioid use, together with the

4   distributors' equally deliberate efforts to

5   evade restriction on opioid distribution.

6            Do you see that?

7        A.    I do.

8        Q.    Who are the manufacturers

9   you're referring to in paragraph 6?

10       A.    The manufacturers who are the

11  defendants in this matter who marketed any of

12  the drugs at issue here.

13       Q.    And what is the misconduct that

14  you're referring to in paragraph 6 that those

15  manufacturers engaged in?

16       A.    Its allegedly unlawful

17  marketing, deceptive marketing of opioids.

18       Q.    And what do you understand that

19  deceptive marketing strategy to include?

20       A.    That deceptive marketing

21  strategy includes classical marketing tactics

22  such as detailing which we'll no doubt

23  discuss later is the most prominent form of

24  marketing in this sector, as well as

25  so-called unbranded advertising, which may

1    come in the form of patient information,

2    payments made to patient and professional

3    organizations that created guidelines around

4    the use of opioids for pain.  All of those

5    tactics that I describe in greater detail in

6    my report.

7         Q.    And who are the distributors

8    you're referring to in paragraph 6?

9         A.    The distributors are McKesson,

10   AmerisourceBergen.  And there's a third, I'm

11   sorry, memory test on the defendants that I

12   did not look at.  At the moment the third one

13   is escaping me.

14        Q.    When you refer to the

15   distributors' deliberate efforts to evade

16   restriction on opioid distribution, what are

17   you referring to?

18        A.    Well, again, here, as you see,

19   I'm quoting the complaint, and I understand

20   that the distributors have an obligation to

21   prevent so-called suspicious orders.

22        Q.    And you didn't evaluate or

23   analyze how the distributors complied with

24   those obligations and how that might affect

25   causality; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. SOBOL:  Objection.

2         Objection, asked and answered.

3         A.    I did not evaluate the

4    distributors' conduct, no.

5    BY MR. ROTH:

6         Q.    So your models provide no

7    analysis of causation by distributors or

8    pharmacies for what plaintiffs allege is the

9    opioid epidemic, correct?

10             MR. SOBOL:  Objection, asked

11        and answered.

12        A.    The distributors' conduct was

13   outside the scope of my report.

14   BY MR. ROTH:

15        Q.    I want to take a look at the

16   complaints you site in footnote 18 and 19.  I

17   assume you looked at those complaints?

18        A.    I did.

19        Q.    Okay.  So I'm going to mark as

20   Exhibit 4...

21        A.    That is clearly not the whole

22   complaint because I happen to know that it's

23   several inches thick.

24        Q.    Correct.  You're right.  I'm

25   going to mark as Exhibit 4 just the cover
```

1    page and the paragraph I want to ask you

2    about, from the Second Amended Complaint

3    filed by Summit County.

4                  (Whereupon, Deposition Exhibit

5          Rosenthal-4, Second Amended Complaint

6          and Jury Demand, was marked for

7          identification.)

8    BY MR. ROTH:

9          Q.     Do you have that in front of

10   you?

11         A.     I do.

12         Q.     And if you look at

13   paragraph 10, which I excerpted from the

14   complaint.  Do you see it?

15         A.     Yes.

16         Q.     It says:  On the demand side,

17   the crisis was precipitated by the defendants

18   who manufacture, sell and market prescription

19   opioid painkillers, defined as the marketing

20   defendants.

21                Do you see that?

22         A.     I do.

23         Q.     And then it says:  Through a

24   massive marketing campaign premised on false

25   and incomplete information, the marketing

 1    defendants engineered a dramatic shift in how

 2    and when opioids are prescribed by the

 3    medical community and used by patients.

 4              Do you see that?

 5        A.    I do.

 6        Q.    What do you understand to be

 7    the false and incomplete information that the

 8    alleged marketing campaign was premised on?

 9        A.    There are a number of

10    components.  At a high level, the main issue

11    as I understand it as a health economist, not

12    as a clinician, is -- was the -- that it was

13    conveyed to physicians and to the public that

14    opioids were safe; that the possibility of

15    addiction was relatively low; that these

16    drugs were effective, not just for cancer

17    pain, but for a wide variety of acute and

18    chronic pain.

19              And then there were other

20    messages that were conveyed that supported

21    those general premises, including the fact

22    that extended release formulations of opioids

23    would smooth out the peaks and valleys of

24    pain control; that as patients became

25    tolerant to these drugs, that this was a

1    natural phenomenon and not a sign of

2    addiction.

3              There were certain notions such

4    as pseudoaddiction that were promoted through

5    communication by the marketing defendants.

6    And at the same time, it was also conveyed

7    that physicians could identify some small

8    group of patients who might be more likely to

9    abuse opioids and prevent and control abuse,

10   that this was an issue related to the

11   individual characteristics and not to the

12   products themselves.

13        Q.    Okay.  What analysis did you do

14   to test whether the detailing visits you

15   analyzed communicated that false and

16   incomplete information as you just described

17   it during those visits?

18        A.    Well, I think you misunderstand

19   the entire premise here.  As I noted earlier,

20   detailing, while it is the promotional tactic

21   that I can best measure and use in my

22   analysis, the allegations suggest that this

23   campaign of misinformation permeated through

24   many other vehicles.

25              And so it's not in my view,

1  again, as a health economist, a question of

2  ascertaining what was in a particular detail,

3  but what was available in -- through key

4  opinion leaders, what was available through

5  professional guidelines, all of that setting

6  the context.  So it's not so much about

7  looking for one co-mission as a much broader

8  picture of what the information was that was

9  conveyed.

10      Q.    Okay.  You've testified as a

11  causation or damages expert before, correct?

12          MR. SOBOL:  Objection.

13      A.    I have.

14  BY MR. ROTH:

15      Q.    And in general, you understand

16  that to opine on causation or damages, you

17  have to tie the theory of liability to

18  damages?

19          MR. SOBOL:  Objection.

20      A.    Yes, and I have done that in my

21  report.

22  BY MR. ROTH:

23      Q.    Okay.  The complaint defines a

24  theory of liability here as false and

25  incomplete information, correct?

1          A.     Yes, correct.

2          Q.     What have you done to confirm

3     that the detailing visits you analyzed

4     actually contained false and incomplete

5     information as the complaint or you define

6     it?

7                 MR. SOBOL:  Objection, just

8          asked and answered.

9          A.     As we talked about earlier,

10    I've been asked to assume that counsel will

11    prove that all or virtually all marketing

12    during the period from 1995 to the end of my

13    data was unlawful.

14                So I have tested the

15    reasonableness of that assumption in the

16    review of the documents that we've talked

17    about, in the review of other expert

18    opinions.

19                I have not, nor do I believe

20    it's necessary to make that causal step,

21    looked at individual details throughout the

22    period for my analysis.

23    BY MR. ROTH:

24         Q.     You would agree that detailing

25    in and of itself is not unlawful?

1           MR. SOBOL:  Objection.

2      A.     Well, again, if that detailing

3  is conveying false and misleading

4  information, I understand -- I'm not a

5  lawyer, but I understand that it would be

6  unlawful.  And so, you know, I do not -- I am

7  not making an assumption that detailing in

8  general is unlawful but that this detailing

9  can be proved to be unlawful.

10  BY MR. ROTH:

11      Q.     A pharmaceutical rep going to a

12  doctor to drop off a pizza could be

13  considered a detailing visit, correct?

14           MR. SOBOL:  Objection.

15      A.     A detailing visit generally

16  involves the conveyance of some information,

17  maybe a pizza in addition, but the details

18  that I'm looking at, there is a specific

19  product mentioned.

20  BY MR. ROTH:

21      Q.     But detailing visits can take

22  many forms, correct?

23           MR. SOBOL:  Objection.

24      A.     Well, I'm not sure exactly what

25  you mean by it.  There's information conveyed

1    about a product or a set of products, and

2    detailing visits are face-to-face visits

3    between the salesperson and someone in the

4    physician's office.

5    BY MR. ROTH:

6        Q.    But you know that detailing

7    could just be the sales rep dropping off a

8    placard with the product's label on it?

9            MR. SOBOL:  Objection.

10       A.    I think you misunderstand,

11   again, the interconnectedness of all of this.

12   And so if a detail were something like you

13   just described -- I don't know about a

14   placard, how about a coffee mug -- those

15   details are intended to reinforce messages

16   that have been conveyed in previous details

17   that have been conveyed by key opinion

18   leaders.

19           I don't think it's appropriate

20   to pull these individual pieces out as if

21   they were not part of an integrated marketing

22   scheme, which is really precisely what

23   Dr. Perri talks about in his report.

24   BY MR. ROTH:

25       Q.    But you're not offering the

Highly Confidential - Subject to Further Confidentiality Review

1    opinion that every time a sales rep detailed

2    a doctor for an opioid product, that was

3    unlawful?

4                MR. SOBOL:  Objection.

5        A.    I am not offering any opinion

6    about the unlawfulness of detailing, as we

7    have spoken about before.  I was asked to

8    assume that plaintiffs' counsel would prove

9    that marketing was unlawful.

10   BY MR. ROTH:

11       Q.    We'll come back to this, but

12   I'll give you a break from it.

13             If you look back at

14   paragraph 7, you say in paragraph 7 of your

15   report -- sorry:  In this report I refer to

16   the manufacturers' deceptive marketing

17   strategy and tactics as manufacturer

18   misconduct.  This report does not address

19   nonmarketing misconduct.

20             Do you see that?

21       A.    Yes.

22       Q.    What is your definition of

23   nonmarketing misconduct?

24       A.    By that, I mean to describe

25   misconduct related to identifying and

Highly Confidential - Subject to Further Confidentiality Review

1    intervening with suspicious shipments, the

2    distributor misconduct, as I understand it,

3    yes.

4         Q.    Okay.  And then in paragraph 8

5    you say:  My assignment is to answer the

6    following questions framed by plaintiffs'

7    counsel.

8              Do you see that?

9         A.    I do.

10         Q.    And each of the bullets is

11    bounded -- I guess with the exception of the

12    sensitivity -- each of the first three

13    bullets is bounded by the year 1995.

14              Do you see that?

15         A.    Yes.

16         Q.    So since 1995 I'm going to look

17    at causation.

18              Can you explain why 1995 was

19    selected?

20              MR. SOBOL:  Objection.

21              No discussions with counsel,

22         but if you have a general

23         understanding, that's fine.

24         A.    My general understanding is

25    that counsel for plaintiffs intend to prove

Highly Confidential - Subject to Further Confidentiality Review

1    that marketing since 1995 was unlawful.

2    BY MR. ROTH:

3        Q.    Do you have any independent

4    understanding as to why that would be a good

5    measuring date?

6        A.    As I sit here specifically, no.

7    It will get into the specific facts that I

8    describe in my report in terms of what is

9    happening in opioid prescribing in the world

10   in 1995, and that is certainly a turning

11   point in the -- in opioid use, as you can see

12   from the sales data I have.

13       Q.    Is there a specific event that

14   happened in 1995 that you believe was the

15   start of the unlawful marketing scheme

16   alleged in the complaint?

17       A.    As I sit here, I can't think of

18   anything specifically, no.

19       Q.    Okay.  I'm sure we'll talk

20   about this later, but I know from sitting

21   through Professor McGuire's deposition and

22   Professor Cutler's deposition, that as

23   Professor McGuire described it, there was a

24   triumvirate of damages experts in this case?

25       A.    Quadrumvirate.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    If you include Professor

2    Gruber?

3    A.    Yes.

4          MR. SOBOL:  You can't forget

5    John.

6    BY MR. ROTH:

7    Q.    So you understand, I take it,

8    that Professor Cutler calculates harms

9    beginning in 2006?

10   A.    Yes.

11   Q.    And did you review his report

12   before finalizing your report?

13   A.    Before finalizing my report, I

14   believe I did.

15   Q.    And you had conversations with

16   him about your models and I assume about his

17   models as well?

18   A.    With counsel present, we talked

19   about the work as a whole.

20   Q.    Okay.  Do you know why

21   calculating a harm from 2006 forward as he

22   does requires looking at misconduct dating

23   back to 1995?

24          MR. SOBOL:  You can answer only

25   if it's not based on counsel.

1      A.      Based on my understanding of

2    the economic phenomena of interest, yes.  So,

3    as I'm sure we will discuss and you know, my

4    model examines the effects of marketing over

5    time, and marketing has long-lasting effects.

6    So what happened in 1995 is still affecting

7    the world in 2006.

8               Moreover, of course, harms such

9    as overdose deaths are lagged somewhat to the

10   start of someone's experience taking an

11   opioid.  So it's important to take a look at

12   the entire time period.

13   BY MR. ROTH:

14      Q.      And we will talk about the

15   stock of promotion and how you calculate

16   that.

17               But the way you calculate that,

18   if you started back in 1990 or 1985, it would

19   still have an impact on 2006; isn't that

20   right?

21               MR. SOBOL:  Objection.

22      A.      What's important is when the

23   but-for marketing departs from actual

24   marketing, so that is why those earlier

25   periods matter and going back to 1985

Highly Confidential - Subject to Further Confidentiality Review

1    wouldn't matter because but-for and actual

2    marketing are the same.

3    BY MR. ROTH:

4        Q.    And the reason you say but-for

5    and actual marketing are the same is the

6    assumption that the scheme started in 1995?

7            MR. SOBOL:  Objection.

8        A.    Yes, the assumption that I used

9    to calculate but-for marketing is that the

10   defendants' marketing after 1995 was

11   unlawful.

12   BY MR. ROTH:

13       Q.    You have not done any analysis

14   of causation as to non-defendant

15   manufacturers; is that correct?

16           MR. SOBOL:  Objection.

17       A.    Well, my model includes all

18   opioids in this category.  We can talk about

19   I exclude the injectables.  There's some

20   exclusions.

21           But I examined the effect of

22   marketing on sales beyond the defendants, so

23   I provide causal estimates of the effective

24   marketing on sales for non-defendants.  And

25   then separately, again, I'm sure we will get

1    to this, I break out non-defendant marketing

2    on behalf of defendants in my Table 3.

3              So I am looking at causation

4    for non-defendants.  I'm simply not

5    attributing it to misconduct and therefore

6    passing it on to Professor Cutler.

7    BY MR. ROTH:

8         Q.    And with respect to the

9    non-defendants, you're doing it on an

10   aggregate basis as opposed to specific

11   companies; is that correct?

12        A.    My main analysis is on an

13   aggregate basis, and then I do some

14   sensitivity analysis where I remove

15   individual defendants and then all the

16   non-defendants' marketing on behalf of

17   defendants.

18        Q.    Do you know whether any of the

19   non-defendant manufacturers utilize similar

20   messaging in their promotional visits to the

21   ones that the defendant manufacturers did

22   that you described as the fraudulent scheme

23   earlier?

24        A.    I have not examined that

25   question, no.

1       Q.      And if a court or jury were to

2    find that those types of messages were

3    unlawful for defendants, how would that

4    affect how you calculate causation with

5    respect to the non-defendants?

6              MR. SOBOL:  Objection.

7       A.      That seems to me to be a legal

8    question.  This matter has a specific set of

9    defendants, and I am calculating impact for

10   those defendants.  I'm not sure if you're

11   suggesting if I could include other

12   manufacturers in those calculations?

13   Absolutely.  But that seems like it would be

14   outside the scope of this matter.

15   BY MR. ROTH:

16      Q.      And I think we talked about the

17   illegal drug trade, but specifically, have

18   you done any analysis as to causation with

19   respect to pill mills?

20             MR. SOBOL:  Objection.

21      A.      No, I have not.

22   BY MR. ROTH:

23      Q.      Or cartels or Internet sales of

24   opioids?

25      A.      No, I have not.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      You've done no analysis as to
2   causation due to changes in reimbursement
3   policies for prescription opioids?
4              MR. SOBOL:  Objection.
5      A.      I have not looked at changes in
6   reimbursements specifically, no.
7   BY MR. ROTH:
8      Q.      You've done no analysis as to
9   causation as to changes in medical guidelines
10  for the use of opioids?
11     A.      Well, I do, as you know, in one
12  model look at the effects of certain
13  guideline-related events, so that happens in
14  my Model C.  But aside from that, I have not
15  modeled other changes in guidelines, but to
16  some extent there, yes.
17     Q.      You've done no analysis of
18  causation as to patients or users of
19  prescription opioids?
20             MR. SOBOL:  Objection.
21     A.      I'm not really sure what you
22  mean by that.  My analysis is an
23  industry-level analysis, so the patients of
24  course are the ones filling the prescriptions
25  that I'm counting and measuring.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So in the indirect analysis, I
 2   look at population characteristics as they
 3   are associated with shipments,
 4   cross-sectionally, so that is in some sense a
 5   patient-level analysis.  I'm not entirely
 6   sure what you had in mind, however.
 7   BY MR. ROTH:
 8        Q.    You don't attribute any
 9   causality to prescribing doctors?
10              MR. SOBOL:  Objection.
11        A.    Again, I am -- marketing is to
12   doctors, and the doctors have to write the
13   prescriptions, so they are in the causal
14   chain of my analysis.
15              The mechanism is a detailing
16   contact.  If doctors did not respond to those
17   details, then they -- my results would be
18   quite different.
19   BY MR. ROTH:
20        Q.    I understand they're in the
21   causal chain.  What I'm trying to understand
22   is how your models assign a percentage of
23   causality to prescribing doctors.
24              MR. SOBOL:  Objection.
25        A.    Again, from my point of view,
```

Highly Confidential - Subject to Further Confidentiality Review

1    the question doesn't make a lot of sense to

2    me because of the fact there is this causal

3    chain, and what I've been asked to undertake

4    is an analysis of the impact of the allegedly

5    unlawful marketing.

6            It goes through doctors, so

7    there -- the idea that there's a separate

8    analysis of the effect of doctors on

9    prescribing, they're already in my analysis.

10   The question about parsing liability for

11   those groups, I have not undertaken that

12   because I'm not a lawyer, and I was not asked

13   to offer an opinion on that.

14   BY MR. ROTH:

15       Q.    And when you say the doctors

16   are already in the analysis, they're in the

17   analysis to the extent you're talking about

18   detailing, but other factors that may

19   influence the doctors' prescribing decision

20   are not accounted for in your analysis,

21   correct?

22           MR. SOBOL:  Objection.

23       A.    Well, again, I would say that's

24   not entirely correct because these other

25   factors that I capture in my model using

Highly Confidential - Subject to Further Confidentiality Review

1    those eras, in addition in Model C, using the

2    specific dummy variables, those operate

3    through physicians.

4              And again, because these are

5    prescribed products, the doctor has to write

6    the prescription in every case, so even, you

7    know, efforts, for example, to change the way

8    state medical boards enforce prescribing

9    around opioids, that's -- that's ultimately

10   directed at doctors.

11   BY MR. ROTH:

12        Q.    You agree that doctors act as a

13   trusted intermediary when it comes to

14   prescribing opioids?

15             MR. SOBOL:  Objection.

16        A.    As a matter of the way this

17   market works, yes, that doctors are intended

18   to be the agents of their patients.

19   BY MR. ROTH:

20        Q.    You say in your report,

21   paragraph 14:  Physicians act as a trusted

22   intermediary in prescription drug

23   decision-making.

24             MR. SOBOL:  Objection.

25        A.    Yes.

1    BY MR. ROTH:

2         Q.    And, in fact, you just said

3    patients cannot lawfully obtain prescription

4    opioids without a doctor's prescription.

5              MR. SOBOL:  Objection.

6         A.    Yes, that is correct.

7    BY MR. ROTH:

8         Q.    So the doctor's an essential

9    link in a patient legally obtaining

10   prescription opioids.

11        A.    Yes, physicians must write

12   those prescriptions for them to be legal.

13        Q.    And you agree that while

14   patient preferences play a role in the choice

15   of therapy, physicians have enormous

16   influence over healthcare decisions?

17             MR. SOBOL:  Objection.

18        A.    Yes, I believe you just quoted

19   me.

20   BY MR. ROTH:

21        Q.    And to quote you again:

22   Professional norms encourage physicians to

23   use their clinical skills, knowledge and

24   experience to make therapeutic choices that

25   are in the best interest of their patients?

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      Just to be clear, I make those

2    points because this is the reason why

3    physicians are the target for this kind of

4    misleading marketing, but it would not be

5    enough, for example, to mislead patients

6    through some direct-to-consumer advertising

7    campaign.

8                   This is why physicians are the

9    target of this misinformation is because

10   patients trust them.

11          Q.      Okay.  But clearly, marketing

12   is not the only thing that controls a

13   doctor's prescribing decision, correct?

14          A.      Marketing -- I think it depends

15   on how you describe marketing, and in my

16   report, I give a sort of ecosystem around

17   which physician behavior is affected and

18   patient behavior.  So we can think about

19   marketing as details.  That is clearly not

20   the only thing that affects physician

21   decision-making, but professional guidelines

22   also do.  What their peers say and do also

23   does.

24                  All of those things were

25   affected by the alleged misconduct.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So other than detailing

2    visits, professional guidelines and what

3    physicians' peers do, can you think of any

4    other factors that influence a doctor's

5    prescribing decisions when it comes to a

6    product like prescription opioids?

7    A.    Well, clearly doctors rely in

8    part on the product label.  I think there's

9    some debate as to how much they rely on the

10   product label, and if you've tried to read

11   them, they're -- they tend to be very dense.

12        The beauty of marketing

13   messages is that they are very simple, easy

14   to follow.

15   Q.    Okay.  You understand that

16   opioids have black box warnings on their

17   product label?

18   A.    Yes, I do understand that.

19   Q.    And you understand that the FDA

20   has issued a REMS program for certain

21   opioids?

22   A.    Yes, I understand that.

23   Q.    And do you know what a REMS is?

24   A.    The acronym, actually, I cannot

25   say exactly what it is, but it is a condition

1    for prescribing.  They differ by drug, so a

2    well-known one is that females who want to be

3    on Accutane, they all have to be on some kind

4    of contraceptive.  Products come with some

5    conditions to ensure their safe use.

6         Q.     Have you performed any study or

7    analysis of the effect that a black box

8    warning has on the prescription of a product

9    with a black box warning like opioids?

10              MR. SOBOL:  Objection.

11        A.     I haven't specifically examined

12   the effects of a black box warning.  Again,

13   in my description of the timeline of events

14   here, I include those -- the black box

15   warning, the REMS, for extended release and

16   long-acting opioids as part of my timeline.

17              You know, as a matter of the

18   way the -- both the marketing schemes and the

19   public health responses unfolded in this

20   matter, there were many changes, all around

21   the same time, making it difficult to

22   identify the effect of any one of them.

23              So I haven't done a regression

24   specifically with the black box warning in

25   it.  If you look at the data, however,

Highly Confidential - Subject to Further Confidentiality Review

1  there's no sharp fall-off when the black box

2  warning comes up.

3  BY MR. ROTH:

4      Q.    Are you aware of any literature

5  that reviews how a black box warning affects

6  the impact of marketing for the product with

7  a black box warning on prescribing

8  physicians?

9      A.    I'm aware that such literature

10  exists, and I've certainly looked in detail

11  at that matter in the case of other products

12  such as antipsychotics, where marketing

13  essentially was designed to counteract the

14  black box warning, so I think that's commonly

15  a strategy by manufacturers is to try to

16  soften the effects of the black box warning.

17              And in published literature,

18  there's a mixed view about how effective

19  black box warnings are in changing behavior.

20      Q.    And can you think of any study

21  as you sit here today that says that even in

22  the face of a black box warning, physicians

23  will prescribe the products in a way that is

24  antithetical to the black box warning?

25              MR. SOBOL:  Objection.

1    A.    I can't think of a specific

2  paper.  I can recall a specific analysis that

3  I did looking at antipsychotics when the

4  black box warning went into effect that

5  basically said there's a substantial increase

6  in mortality for the elderly for -- using

7  antipsychotics, which was generally done as a

8  method of chemical control for patients in

9  long-term care in particular.  And

10  physicians, while there was an initial drop

11  in prescribing it, very quickly went back to

12  existing levels despite the fact that there

13  were these very severe consequences.

14  BY MR. ROTH:

15    Q.    But you haven't performed that

16  analysis for any prescription opioid product

17  at issue in this case?

18    A.    I have not.

19    Q.    So you don't know how the black

20  box warning or the REMS impacted the

21  effectiveness of defendants' marketing on

22  opioids?

23         MR. SOBOL:  Objection.

24    Objection.

25    A.    Again, I attempt to capture

Highly Confidential - Subject to Further Confidentiality Review

1    some of those factors in the nature of my

2    model, which we will no doubt talk about,

3    and, in fact, the effectiveness of marketing

4    begins to decline around the period that

5    these policies went into effect.

6              And so I do capture that by

7    allowing the environment to change the

8    effectiveness of the marketing.

9    BY MR. ROTH:

10        Q.    Have you performed or reviewed

11   any study or analysis of the information

12   available to doctors regarding opioids over

13   time?

14        A.    I have reviewed some materials

15   that you can see in my report at a high level

16   in terms of, for example, what -- what the

17   CDC was saying in their guidelines.  That's a

18   channel for information, and certainly the

19   REMS, the fact of those coming out.

20             I have not systematically

21   looked at the broader information.  I rely in

22   part on other experts to describe that.

23   Again, Dr. Perri's report does quite a bit of

24   that.

25        Q.    You understand that opioids

Highly Confidential - Subject to Further Confidentiality Review

1     have been used for the treatment of pain for

2     centuries?

3                     MR. SOBOL:   Objection.

4          A.      I do understand that opioids,

5     yes, opium and morphine in particular, yes,

6     have been used for many, many decades.

7     BY MR. ROTH:

8          Q.      And the addictive property of

9     opiates, whether they be opium or opioids,

10    has also been long known.

11                    Would you agree with that?

12         A.      Yes.  Again, I wouldn't rely on

13    my own expertise for that, but I understand

14    that, certainly, from reading the clinical

15    experts' reports, and as a general matter I

16    believe it's long been known that opium and

17    morphine were addictive, in the Civil War and

18    before that.

19         Q.      You say in paragraph 15 of your

20    report that both physicians and patients --

21    let me know when you're there.  Got it?

22         A.      Yes.

23         Q.      Both physicians and patients

24    face an information problem in selecting

25    pharmaceutical treatments that challenges

1    typical conclusions about well-functioning

2    markets.

3              Do you see that?

4    A.      Yes.

5    Q.      And that paragraph goes on to

6    talk about how these are experienced goods,

7    and further down:  For example, and in the

8    present matter, the stigma associated with

9    opioid addiction likely compounded the

10   information problems.

11             And then the last sentence:  In

12   light of these information problems, it would

13   be reasonable to expect that market forces

14   alone would fail to protect consumers against

15   false claims of product efficacy and safety.

16             Do you see that?

17   A.      Yes, I do.

18   Q.      I notice you don't call out

19   addictiveness separately.  I mean, do you

20   think that there's insufficient market

21   information for doctors or the general public

22   to know about the addictiveness of

23   prescription opioids?

24   A.      I intended to include

25   addiction, which is clearly the biggest risk

1    of opioids, when I was talking about risks

2    and side effects.  It's a more general

3    statement here, but that was my intention.

4                  And, yes, as I -- as I

5    understand the facts here, while doctors

6    understood that opiates and opioids had

7    addictive properties, that because of the

8    defendants' misconduct, there was essentially

9    a shift in the belief about the relative

10   trade-offs between addiction risk and pain

11   control, and that again, the addiction risks

12   were downplayed substantially, despite prior

13   knowledge that these newer products were

14   somehow different and would somehow not

15   deliver the same addiction risk.

16        Q.    Okay.  But at a certain point

17   in time market information can become robust

18   enough that the players in the market

19   understand the true nature of what they're

20   dealing with.

21                  Do you agree with that as a

22   general proposition?

23                  MR. SOBOL:  Objection.

24        A.    No, I would not agree with that

25   as a general proposition.

1    BY MR. ROTH:

2         Q.    So you think the market just

3    never has enough information for people to

4    make informed decisions?

5         A.    I'm an empirical economist, and

6    like you, I was aware that opiates had been

7    around for a long time, and yet, in the

8    middle 1990s, we see this dramatic increase

9    in opioid prescribing.  To what -- that is

10   clear evidence that something dramatic

11   shifted, and I understand that if the

12   allegations are proven, that something is

13   marketing.

14              I don't think that there's any

15   truth in the world that could not be reversed

16   by good marketing.

17        Q.    So your view is even today,

18   with the publicity that the opioid issues

19   have gotten and the CDC guidelines, there

20   still are people with incomplete information

21   that are continuing to be fooled by

22   marketing?

23              MR. SOBOL:  Objection.

24        A.    I would say that that is very

25   likely, that there are still people who

1    continue to believe that opioid treatment is

2    a relatively safe prescribing opportunity,

3    and certainly, while we've seen a fairly

4    substantial decline in prescribing, it has

5    not yet gone back to 1995 levels.

6    BY MR. ROTH:

7        Q.    And you would attribute some of

8    the substantial decline in prescribing to

9    market information coming to light, would you

10   not?

11       A.    I would attribute it to public

12   health interventions, some of which are

13   informational, some of which are more

14   restrictive, just simply putting limits on

15   prescribing.

16            So it's a combination of

17   informational and command and control efforts

18   on the public health side.

19       Q.    Okay.  I think we talked about

20   this, but I'm going to ask again because I'm

21   not sure.

22            You would agree that doctors

23   are motivated by many factors beyond just

24   marketing?

25            MR. SOBOL:  Objection.

1          A.      I guess I'm not sure the

2    context for that statement, so I -- I would

3    agree that physicians do not rely solely on

4    marketing for decision-making.  You said

5    motivated, and I guess I don't know what you

6    mean by that.

7    BY MR. ROTH:

8          Q.      I'll take your answer.

9                  Physicians do not rely solely

10   on marketing when making a prescribing

11   decision?

12         A.      Yes, I think that's true, and

13   still, marketing has a really important

14   effect on their behavior.

15         Q.      Physicians rely on clinical

16   results and scientific publications to make

17   prescribing decisions?

18                 MR. SOBOL:  Objection.

19         A.      In some cases, they may do so,

20   and as I note in my report, relying on

21   clinical results when there's not a clear

22   feedback loop, there's not a -- there's not a

23   blood test for pain, so, you know, when I put

24   you on Lipitor, I can check your cholesterol

25   and know whether it's working or not.

1           But when I put you on an

2    opioid, I have to take you at your word about

3    what you're feeling and reporting to me.

4           So I think relying on results

5    is a very tenuous notion in this case.

6    BY MR. ROTH:

7        Q.    Is that true for

8    antidepressants as well?

9        A.    It may well be true for

10   antidepressants as well.

11       Q.    So in your world, are there

12   certain drugs that we just never know the

13   efficacy of because they're essentially

14   subjective in whether or not they're taking

15   effect?

16           MR. SOBOL:  Objection.

17       A.    I don't yet have my own world.

18   I'm working on that.  But in the actual

19   world, there are certain properties of drugs,

20   of certain drugs, that -- where it's really

21   hard to ascertain their effectiveness, and so

22   that's one of the reasons, of course, we rely

23   on randomized control trials that have -- try

24   to clear out a lot of dust and capture

25   information in a systematic way, and purely

Highly Confidential - Subject to Further Confidentiality Review

1   observing patients over time is a very

2   difficult way to ascertain whether an

3   antidepressant is working, whether an opioid

4   is working, and how.

5           As I noted earlier in our

6   discussion that my understanding of one of

7   the allegations is that defendants encouraged

8   doctors to ignore what would have been signs

9   of addiction by just saying, no, no, that's

10  just the patient adjusting.  Of course, you

11  need to titrate up the dose.

12          So I think it's a very

13  complicated situation for physicians or

14  patients to really ascertain what's happening

15  in terms of effectiveness.

16  BY MR. ROTH:

17      Q.    You understand, though, that

18  for opioids, the FDA requires randomized

19  clinical trials on efficacy before they

20  approve use of those drugs?

21      A.    Yes, I do understand that.

22  Those randomized control trials do not cover

23  every use that physicians ultimately

24  prescribed opioids for, and I think that's

25  part of what the concern here, is the -- what

1    we might in health policy call indication

2    creep.

3             So also, those randomized

4    control trials are very short term.  They're

5    always short term by definition because of

6    the cost of undertaking those trials.

7         Q.    Okay.  None of your models

8    account for the impact of published clinical

9    results for opioids on prescribing doctors,

10   correct?

11            MR. SOBOL:  Objection.

12        A.    My models do not explicitly

13   account for publications, no.

14   BY MR. ROTH:

15        Q.    Do you agree that prescribing

16   habits may be confounded by other unobserved

17   doctor-specific characteristics?

18        A.    In a time series analysis, such

19   confounding would only be of concern if the

20   trend in those characteristics was in some

21   way negatively or positively correlated with

22   marketing.  I can't think of anything that

23   would fit that category.

24        Q.    I'm not talking about your

25   regressions.  I'm just asking a more global

Highly Confidential - Subject to Further Confidentiality Review

1    question, which is:  An individual doctor's

2    prescribing habits can be confounded by other

3    unobserved characteristics?

4              MR. SOBOL:  Objection.

5         A.    I don't know what you mean by

6    confounded.  When you say confounded, I am

7    assuming -- and please correct me if I'm

8    wrong -- that you're asking that in a sort of

9    statistical sense.

10   BY MR. ROTH:

11        Q.    Yeah.  Okay.  So, I am.

12              (Whereupon, Deposition Exhibit

13        Rosenthal-5, 2016 Datta and Dave

14        Publication, was marked for

15        identification.)

16   BY MR. ROTH:

17        Q.    Let me mark as Exhibit 5 is

18   Datta and Dave study --

19        A.    I keep thinking it's "Dah-vay."

20        Q.    You know, I did too.  Well,

21   however you pronounce the gentleman's name, I

22   apologize, Effects of Physician-directed

23   Pharmaceutical Promotion on Prescription

24   Behaviors:  Longitudinal Evidence.

25              Do you have that in front of

Highly Confidential - Subject to Further Confidentiality Review

1    you?

2          A.     I do.

3          Q.     And this is a study you rely on

4    and cite in your report?

5          A.     That's correct.

6          Q.     And this study actually looked

7    at longitudinal evidence and developed a

8    regression to determine the effect of

9    marketing and other behaviors?

10         A.     Yes.  But just to be clear,

11   when they say longitudinal, they're not

12   wrong, but they're talking about two years of

13   data.  This is -- this is a bit different

14   than the aggregate time series that I used.

15   So just to be clear, they have multiple

16   observations per physician over a two-year

17   period.

18         Q.     Okay.  If you turn to page 456,

19   and at the bottom of the page -- or sorry,

20   let me get myself to the right place.  Sorry,

21   it's -- yeah, it's 456, bottom of the page.

22         A.     Okay.

23         Q.     The very last sentence, it

24   says:  Furthermore, the link between DTPP and

25   prescribing habits may be confounded by other

1    unobserved physician-specific characteristics

2    such as inertia in prescribing patterns,

3    brand loyalty, patient mix, tolerance for

4    risks and preferences toward trade-offs

5    between efficacy, contraindications and

6    long-term use for prophylactic purposes.

7              Do you see that?

8         A.    Yes.  And again, those are all

9    cross-sectional concerns, so when one is

10   doing an analysis, as they do, that

11   incorporates both cross-sectional and time

12   series variation, so they have a panel of

13   physicians that they're looking at their

14   prescribing for a particular herpes drug and

15   its competitors.

16             And when you're looking

17   cross-sectionally like that at

18   physician-level data, you would need to

19   account for those physician characteristics

20   when you're looking at aggregate data over

21   time that you would not need to look for

22   those characteristics.

23        Q.    And you look at aggregate data?

24        A.    That's correct.

25        Q.    Did you try to look at

Highly Confidential - Subject to Further Confidentiality Review

1    physician-specific cross-sectional data?

2            MR. SOBOL:  Objection.

3        A.      Unlike Datta and Dave, I do not

4    have promotional data at the individual

5    physician level.  As you no doubt noted in

6    their literature review, it's fairly uncommon

7    to be able to get data that have

8    physician-level detailing, which is what they

9    use, as well as prescribing habits.  So there

10   are a few marketing scholars who essentially

11   have had good relationships with companies

12   and have been able to get those kinds of

13   data.  I don't have access to those data.

14   BY MR. ROTH:

15       Q.     Well, you understand that all

16   these companies are defendants in the case

17   and have produced documents as part of the

18   lawsuit, correct?

19            MR. SOBOL:  Objection.

20       A.      I understand that these

21   companies have produced documents as part of

22   the lawsuit.  They have not produced data

23   with detailing information by physician that

24   can be identified and linked to prescribing.

25            ///

1    BY MR. ROTH:

2         Q.    And --

3         A.    I did look for those data.

4         Q.    You did look for it.  And

5    that's true of every single manufacturer

6    defendant, there is no physician-level

7    detailing data available?

8               MR. SOBOL:  Objection.

9         A.    There were no physician-level

10   detailing data for any manufacturer that

11   covered the period of interest.  So in order

12   for me to do my analysis, I would need those

13   data for all the defendants for the entire

14   time period.

15              So where -- to the extent that

16   we found any data, they were bits and pieces

17   of contact registries, essentially sales

18   databases, which are not the same level as

19   what these folks have -- they have actual

20   linked data, linkable.

21   BY MR. ROTH:

22        Q.    But you didn't take the

23   specific data you had for individual

24   defendants for whatever time period you had

25   to test the results of your regression

1    against a model you could do on just that

2    data?

3              MR. SOBOL:  Objection, form and

4         asked and answered.

5         A.      There would be no such test.

6    These -- the goal of my analysis and the goal

7    of Datta and Dave's analysis are completely

8    different.  So there -- there would be no

9    point in comparing those results.

10              They are trying to ascertain

11   the extent to which detailing across

12   physicians drives marketing impact, so

13   they're really interested in questions like,

14   you know, what -- how -- how much does it

15   make sense for a company to detail high

16   prescribers versus low prescribers to a

17   greater degree.

18              I'm interested in the aggregate

19   impact, and so that is what my model does

20   best.  Their model would not be appropriate

21   for ascertaining the aggregate impact.

22   BY MR. ROTH:

23        Q.      I understand you're interested

24   in the aggregate impact, but if one were

25   interested in the individual impact of any

1  single manufacturer's detailing, you could

2  run an analysis similar to Datta and Dave

3  using whatever data were available for that

4  manufacturer?

5          MR. SOBOL:  Objection.

6      A.      There are two levels of

7  aggregation here.  One is from the doctors up

8  to the total product level, and the other is

9  from the product to the defendant to the

10  whole class, if I can use that term to

11  describe all the opioids that we're

12  interested in here.

13          So Datta and Dave are at the

14  most granular level, the individual doctor

15  prescribing for an individual drug.

16          I am interested in

17  understanding how marketing as a whole drove

18  sales in this market and I want to capture

19  all of the spillover effects.  They're trying

20  to tease out other kinds of effects.

21          This analysis could not be used

22  to get an answer to the question what would

23  have happened if these manufacturers had not

24  marketed their products.

25          ///

1    BY MR. ROTH:

2         Q.    And the reason you're

3    interested in the aggregate question is that

4    was the charge you were given by plaintiffs'

5    counsel was to look at the aggregate impact

6    as opposed to an individual

7    defendant-specific impact?

8         A.    Well, again, there are multiple

9    levels of aggregation here, so if I -- my

10   model, as you know, can be used to parse out

11   individual defendants as I have done in

12   Table 3 of my report, so it can look at an

13   individual defendant, and I've shown you

14   results excluding individual defendants.  So

15   it is already doing that.

16              It's the cross-sectional nature

17   of what they're modeling here with the

18   physician-fixed effects.  They're really

19   trying to tease apart how manufacturers go

20   about targeting doctors for marketing and

21   what effect that has.

22              I'm not interested in that

23   effect, and so it wouldn't be appropriate

24   even if I were only looking for one

25   defendant.

1    Q.    So you're not interested in

2    trying to ascertain how manufacturers'

3    targeting for marketing has an effect.

4          What is the question you're

5    seeking to answer?

6          MR. SOBOL:  Objection.

7    A.    The question that I'm seeking

8    to answer is what is the effect of marketing

9    by defendants for opioid products on their

10   sales, and if that effect --

11   BY MR. ROTH:

12   Q.    I'm sorry to stop you.  At an

13   aggregate level, I assume you mean?

14   A.    At an aggregate level.  Again,

15   my model can look -- pull out the effect for

16   individual defendants, but at an aggregate

17   level.

18         And so all I'm saying is that

19   if that effect comes because one manufacturer

20   targets just the high prescribers and is very

21   effective there and another manufacturer

22   details everybody, that is not relevant to

23   what I have been asked to undertake in this

24   case, and so I don't go into the level of --

25   the physician level the way Datta and Dave do

Highly Confidential - Subject to Further Confidentiality Review

1   because it's -- it's not relevant to my

2   conclusions.

3        Q.    Have you tried, for any of the

4   individual manufacturers for which you have

5   specific data, to pressure test your

6   conclusions in Table 3, from removing them

7   from the aggregate data to see if those hold?

8              MR. SOBOL:  Objection, form.

9        A.    Can you repeat?  Because I just

10  want to make sure I understand the question

11  you're asking.

12  BY MR. ROTH:

13       Q.    Yeah.  So as I understand your

14  model -- and again, we will get into the

15  details, I promise -- but you essentially

16  back out from the aggregate model individual

17  defendants, and you present those in Table 3.

18             MR. SOBOL:  Objection.

19       A.    That's correct.

20  BY MR. ROTH:

21       Q.    So my question is:  Have you

22  run a Datta and Dave type of analysis for any

23  of the individual manufacturers listed in

24  Table 3 to compare how the aggregate results

25  in Table 3 hold compared against the Datta

1    and Dave type analysis we've been discussing?

2              MR. SOBOL:  Objection, asked

3         and answered.

4         A.    I think, again, you

5    misunderstand what the utility of the Datta

6    and Dave analysis is.  It is an analysis that

7    is designed to dig into how marketing works

8    and not whether.

9              There would be no utility in

10   comparing results of a Datta and Dave

11   analysis, if one were possible, with my

12   aggregate results because the questions

13   they're looking at are entirely different.

14   BY MR. ROTH:

15        Q.    And why is the question you

16   answer only about how marketing works as

17   opposed to whether?

18        A.    No.  Sorry.  Their how.

19        Q.    Okay.  Why is -- So how are you

20   answering the question through your aggregate

21   model whether marketing works if you're not

22   looking at it on an individualized

23   doctor-specific level?

24             MR. SOBOL:  Objection.

25        A.    My analysis is a model of the

1    effect of detailing as a whole for this

2    class, its effect on sales in the form of

3    milligrams of morphine equivalent, just to be

4    clear.

5              So my right-hand side variable

6    is detailing.  My left-hand side variable is

7    MMEs.  Datta and Dave -- so that tells me, if

8    marketing increases in this area as a whole,

9    what happens to MMEs?  That's the question

10   that relates to my assignment.

11             Datta and Dave are asking, you

12   know, can we examine and tease out to what

13   extent manufacturers target specific types of

14   physicians and whether the prescribing of

15   physicians is more driven by this targeting

16   question or by the marketing effectiveness.

17             They're doing so on a very

18   short time period in the scheme of things,

19   right?  So two years of data doesn't --

20   doesn't allow them to look, for example, at

21   what happened before that two-year time

22   period in terms of the buildup of knowledge

23   about these products, all of those things

24   that are captured in the stock of detailing

25   that I use.

Highly Confidential - Subject to Further Confidentiality Review

1      And so they have this

2   interesting work that tells us something

3   about responsiveness of physicians, but it

4   doesn't get us to the aggregate question

5   about how -- to what extent does marketing

6   across all of their drugs affect the size of

7   the market.

8   BY MR. ROTH:

9      Q.    What have you done to answer

10   the individualized question of whether

11   targeting certain physicians by the

12   manufacturers in this case was the cause of

13   additional MMEs as opposed to the

14   effectiveness of the marketing overall?

15          MR. SOBOL:  Objection.

16      A.    That question is not relevant

17   to my charge.  I want to understand what is

18   the total effect.  I have -- I do not know

19   why the court would want to understand what

20   aspects of the targeting of specific

21   physicians that drive marketing increases.

22   BY MR. ROTH:

23      Q.    What have you done to answer

24   the individualized question of whether

25   certain messaging by individual manufacturers

1    led to an increase in MMEs?

2             MR. SOBOL:  Objection.

3        A.      As we have discussed, I am

4    taking an assumption from counsel, as experts

5    always do, that they will prove their case,

6    and specifically, the relevant assumption I

7    have made is that all or virtually all

8    marketing by defendants from 1995 to the end

9    of my data was unlawful.

10            I have reviewed documents and

11   other expert reports.  I have not parsed out

12   individual messages and in any way parsed out

13   the marketing that I assume to be unlawful in

14   my model to differentiate from one to

15   another.

16   BY MR. ROTH:

17       Q.     Do you agree that standards of

18   care influence prescribing decisions?

19       A.     What -- do you mean by

20   standards of care something very general or

21   do you mean that in the sort of the

22   negligence sense, since you're a lawyer?

23       Q.     That's fair.  You've done this

24   a lot because you went somewhere that I

25   wasn't going.

1          I meant the more general.  Do

2    you agree that sort of the prescribing and

3    treatment standards of care can influence

4    prescribing decisions?

5          A.    Again, I would say if we looked

6    at my ecosystem, I don't know that I call out

7    standards of care specifically, but if those,

8    for example, are set in part by what your

9    peers are doing, if those are set in part by

10   professional guidelines, then, yes, I believe

11   that those are relevant determinants of

12   physician behavior.

13         And as I said earlier, I also

14   believe that those would be affected by the

15   alleged misconduct.

16         Q.    Although detailing is not the

17   same as affecting the standards of care,

18   right?  Those are two different marketing

19   channels?

20         A.    It's not clear to me that

21   detailing would not affect the standards of

22   care.  Detailing could, for example, try to

23   convince individual physicians that it's okay

24   to prescribe opioids more broadly by citing

25   guidelines, by citing peers and key opinion

Highly Confidential - Subject to Further Confidentiality Review

1   leaders.  So I think it could well be wrapped

2   up.  I don't know why they'd be independent.

3        Q.    Do you agree that patient

4   preference can affect a physician's

5   prescribing decision?

6        A.    Yes, of course patient

7   preference can affect a physician's

8   prescribing decision.

9        Q.    Loyalty to certain drugs can

10  affect a physician's prescribing decision?

11       A.    Physicians -- it has been found

12  in the literature that physicians have a

13  tendency to prescribe a particular drug once

14  they've gotten used to it, so in the

15  antidepressant class, for example, that's

16  been shown.

17       Q.    Drug reimbursement policy can

18  affect physician's prescribing decisions?

19            MR. SOBOL:  Objection.

20       A.    Yes, all of these factors, the

21  last two factors, I would say they're most

22  likely to affect physician prescribing

23  patterns by the specific brand or brand -- in

24  the case of reimbursement, brand versus

25  generic as opposed to whether the physician

Highly Confidential - Subject to Further Confidentiality Review

1    prescribes an opioid.

2    BY MR. ROTH:

3        Q.      And we'll get to this later,

4    but to the extent you're looking at detailing

5    visits, you don't differentiate between

6    detailing visits that are just driving at

7    rivalrous marketing to get a prescriber to

8    switch opioids versus detailing visits that

9    are trying to get doctors to prescribe

10   opioids as a class of therapy?

11       A.      I don't differentiate on the

12   right-hand side, and so if, in fact,

13   detailing was all rivalrous, my results would

14   show that marketing doesn't affect sales.  So

15   that is the point of the analysis, is to

16   ascertain.

17              So you could imagine doing an

18   analysis in a market that has a fixed size,

19   where all marketing is rivalrous, and there's

20   some discussion for other drugs where

21   marketing appears to be more about market

22   share and not about driving the size of the

23   market as a whole.

24              But, in fact, my analysis shows

25   that the market expansion effects were

1    important, whether or not there was also

2    rivalry.

3         Q.     You agree, though, that if a

4    manufacturer was only engaged in rivalrous

5    marketing, for example, that would be

6    qualitatively different than trying to make

7    the market and convince prescribers to move

8    patients on to opioids?

9         A.     I don't believe in the

10   conceptual premise that you have just put

11   forth that there's such a thing as purely

12   rivalrous marketing, in the case where the

13   market is not fixed by some reason.

14              So even if, you know, I go and

15   I market for Coke and it's not that I'm

16   trying to get you to drink more

17   sugar-sweetened beverages, I just want you to

18   stop drinking Pepsi, that will still remind

19   some people that, oh, yeah, I should think

20   about having a Coke this afternoon instead of

21   my usual coffee.

22              So I think there will be

23   market-increasing spillovers even from purely

24   rivalrous marketing.

25        Q.     The economic literature doesn't

1    agree with you on that, though?

2         A.    I'm not sure that that's true.

3         Q.    We'll look at it.

4               A doctor's own medical judgment

5    can affect prescribing decisions?

6         A.    I think it would be very

7    difficult to say that that was not true.

8         Q.    And in fact, I think Professor

9    Cutler has got a working paper where he draws

10   that conclusion.  Have you studied that or

11   read that paper?

12        A.    You'd have to put it in front

13   of me.

14        Q.    We can look at it quickly.

15              (Whereupon, Deposition Exhibit

16              Rosenthal-6, 2015 Cutler et al Working

17              Paper, was marked for identification.)

18   BY MR. ROTH:

19        Q.    So I'll mark as Exhibit 6

20   Physician Beliefs and Patient Preferences:  A

21   New Look at Regional Variation in Health Care

22   Spending.

23              And if you look at page 5, do

24   you see in the middle of the page there's a

25   paragraph that starts with "Ultimately"?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Uh-huh.

 2              Q.      He says --

 3                      MR. SOBOL:  Wait, is this an

 4         excerpt or is this the whole article?

 5                      THE WITNESS:  It's an excerpt.

 6                      MR. ROTH:  It's an excerpt.

 7         It's an excerpt.

 8              A.      I just want to just review the

 9         front piece so I can --

10    BY MR. ROTH:

11              Q.      Sure.

12              A.      -- understand what it's about.

13                      (Document review.)

14              A.      Okay.

15    BY MR. ROTH:

16              Q.      So in the paragraph I was

17         pointing you to, it says:  Ultimately, the

18         largest degree of residual variation appears

19         to be explained by differences in physician

20         beliefs about the efficacy of particular

21         therapies.  Physicians in our data have

22         starkly different views about how to treat

23         the same patients.  These views are not

24         strongly correlated with demographics,

25         financial incentives, background or practice
```

Highly Confidential - Subject to Further Confidentiality Review

1    characteristics and are often inconsistent

2    with evidence-based professional guidelines

3    for appropriate care.

4           Do you see that?

5    A.    Yes, I do.

6    Q.    And do you have any reason to

7    believe that is not true of physicians when

8    they prescribe opioids?

9           MR. SOBOL:  Objection.

10   A.    Well, just to be clear, the

11   context that they're looking at is not one

12   that's subject to marketing, but in any case,

13   there's no presumption here that those

14   beliefs are not set by some other factors,

15   right.

16          So they're -- they're --

17   they're trying to identify all the forces

18   that they can measure, including financial

19   incentives and other characteristics, and so

20   they're putting in beliefs everything else.

21          But that's not to say that

22   those beliefs couldn't be shaped by

23   marketing.  So I think it would be a mistake

24   to consider beliefs as independent.  I

25   wouldn't say that they're a hundred percent

Highly Confidential - Subject to Further Confidentiality Review

1    set by marketing, but they're clearly

2    influenced by marketing.  That's really the

3    issue at hand here.

4    BY MR. ROTH:

5        Q.    Are there physicians in the

6    world who don't allow detailing in their

7    offices?

8            MR. SOBOL:  Objection.

9        A.    Yes.  But again, I think

10   conceptually, that's the wrong way to look at

11   this, as I have noted in my report, that even

12   if you never have someone detail you,

13   you're -- you're connected with peers, you

14   are getting messages through professional

15   societies.

16           It would be hard to imagine a

17   physician who's completely untouched by the

18   alleged misconduct in this matter.

19   BY MR. ROTH:

20       Q.    Do you agree that

21   characteristics of individual patients can

22   obviously affect prescribing decisions?

23       A.    Yes.  I would hope that

24   physician characteristics matter to -- sorry,

25   patient characteristics matter to physicians

Highly Confidential - Subject to Further Confidentiality Review

1   when they're prescribing.

2          Q.     And then you also mentioned

3   this earlier, but risk aversion or potential

4   medical malpractice liability could also

5   influence prescribing decisions?

6          A.     That is possible.  That is

7   possible, and I believe that is part of what

8   the model guidelines for state medical boards

9   is intended to address.

10         Q.     Okay.  And just so I understand

11  your position on this, do you believe there

12  are aspects of a doctor's prescribing

13  decision that are unaffected by marketing, or

14  is it your view that marketing infiltrates

15  everything in their mind at the time they

16  decide to prescribe a product like a

17  prescription opioid?

18                MR. SOBOL:  Objection.

19         A.     I don't know exactly what you

20  mean by that, but I can tell you what I

21  believe.  I believe that modern

22  pharmaceutical marketing, including the

23  tactics that are described in the complaint

24  in this matter, is comprehensive and

25  ubiquitous.

Highly Confidential - Subject to Further Confidentiality Review

1           Does that mean it is strictly

2   determinative of what every physician does

3   for every patient?  No, I do not believe

4   that.  I do believe that marketing, it can't

5   be teased out in terms of looking just at

6   what physicians were detailed, but it has an

7   influence that is quite broad.

8           Other factors will certainly be

9   important, but the question here is really

10  what is the incremental effect of marketing

11  on the prescriptions that physicians write.

12  BY MR. ROTH:

13      Q.    Have you reviewed the facts of

14  any prescription by a doctor of an opioid in

15  this case?

16      A.    I don't think so, no.

17      Q.    And you don't know how, on an

18  individual level, a specific doctor was

19  affected by a detailing visit in your model

20  because you haven't done that analysis?

21      A.    I have not looked at individual

22  physician-level data as we discussed, and I

23  do not believe it is the most appropriate

24  path to fulfilling my assignment.

25      Q.    Okay.  And your model does not

Highly Confidential - Subject to Further Confidentiality Review

1      attribute any percentage of causality to

2      prescribing doctors for the increased volume

3      of MMEs that you calculate?

4              MR. SOBOL:  Objection, asked

5          and answered.

6          A.     As we've discussed earlier,

7      that notion, just conceptually, I struggle

8      with the idea that you're asking me to

9      consider.  Every prescription in my data was

10     written by a physician.

11     BY MR. ROTH:

12         Q.     Right.  But I asked a little

13     bit of a different question.

14             You don't have a percentage

15     line in your report for doctors the way you

16     do in Table 3?

17             MR. SOBOL:  Objection, asked

18         and answered.

19         A.     Well, again, just that would

20     make no sense to me, so the marketing in

21     question operates through doctors.

22             MR. ROTH:  Why don't we take a

23         five-minute break.

24             MR. SOBOL:  Okay.

25             THE VIDEOGRAPHER:  The time is

Highly Confidential - Subject to Further Confidentiality Review

1          9:31 a.m.  We're now off the record.

2                (Recess taken, 9:31 a.m. to

3          9:46 a.m.)

4                THE VIDEOGRAPHER:  The time is

5          9:46 a.m.  We're back on the record.

6    BY MR. ROTH:

7          Q.    Professor Rosenthal, if you

8    could turn to page 13 of your report,

9    paragraph 16, and tell me when you're there.

10         A.    Yes.

11         Q.    You've got a heading, The Role

12   of Public and Private Health Insurance.

13               Do you see that?

14         A.    Yes.

15         Q.    And you say in paragraph 16:

16   Another distinguishing feature of

17   pharmaceutical demand is the widespread

18   presence of insurance coverage.  As of 2017,

19   approximately 88% of nonelderly adults have

20   insurance coverage through a private or

21   public health insurance plan.

22               Do you see that?

23         A.    I do.

24         Q.    And then you go on to talk

25   about the Affordable Care Act and then you

Highly Confidential - Subject to Further Confidentiality Review

1    say:  Insurance coverage among the elderly is

2    virtually universal, and among those enrolled

3    in Medicare, the vast majority have

4    prescription drug coverage either through

5    Medicare Part D or retiree plan.

6             Do you see that?

7        A.    Yes.

8        Q.    We talked about this a little

9    bit earlier, but are you aware of pharmacy

10   benefit managers?

11       A.    Yes, I am.

12       Q.    What are they?

13       A.    Pharmacy benefit managers are

14   essentially specialty health insurers.  They

15   manage only the pharmaceutical part of the

16   health benefit, and they typically contract

17   either with a primary health insurer or a

18   self-insured employer.

19       Q.    And what role do they play in

20   providing insurance coverage or approving

21   prescriptions of opioids?

22       A.    Pharmacy benefit managers, they

23   have pharmacy networks, so they negotiate

24   contracts with pharmacies.  They adjudicate

25   claims electronically.  They typically define

1    formularies, so which drugs are covered, and

2    they offer employers and health plans

3    alternative copayment structures.  So those

4    are their main roles.

5           Q.    And you just mentioned

6    formularies.  How would you define what a

7    formulary is?

8           A.    A formulary is a list of

9    covered drugs.  An open formulary means that

10   the list is preferred drugs, but other drugs

11   are still eligible for reimbursement.  A

12   closed formulary is a list of drugs that are

13   exclusively covered by a health plan.

14          Q.    Given the pervasiveness of

15   insurance and the role that PBMs and

16   formularies play, what analysis did you

17   perform on the role of insurers in assessing

18   the volume of MMEs in your models?

19          A.    Well, if I understand you

20   correctly, I think we have a very similar

21   situation conceptually to the one we talked

22   about earlier with physicians, not a hundred

23   percent the same.

24                But PBMs and health insurers

25   adjudicate and pay for claims associated with

Highly Confidential - Subject to Further Confidentiality Review

 1    opioid prescriptions.  There is a small

 2    percentage of consumers that pays for their

 3    own prescription drugs.  It varies from drug

 4    class to drug class, but perhaps 5 or 10% of

 5    individuals pay out of pocket, and therefore

 6    PBMs and health insurers have no role, but in

 7    the context of insured patients, the insurer

 8    is on the causal chain between the sales data

 9    we see and the marketing I measure.

10         Q.      And did you do any analysis as

11    to how the insurer influences the MMEs

12    ultimately prescribed through their role in

13    the causal chain?

14              MR. SOBOL:  Objection, asked

15         and answered.

16         A.      Like many of the individual

17    factors we talked about when it comes to

18    patient characteristics and physician

19    characteristics, characteristics of the

20    health insurance coverage are included in my

21    analysis implicitly but not explicitly.

22              Because my analysis is

23    concerned with looking at these aggregate

24    trends, there's not an appropriate place to

25    look at the variation in health benefits, as

Highly Confidential - Subject to Further Confidentiality Review

1    I believe I think you're asking.

2    BY MR. ROTH:

3         Q.    Did you study how insurance

4    coverage for prescription opioids compares to

5    substitutes or alternatives for the

6    conditions prescription opioids are

7    prescribed for?

8              MR. SOBOL:  Objection.

9              MR. ROTH:  Let me rephrase the

10        question because that came out

11        muddled.

12   BY MR. ROTH:

13        Q.    Did you study how insurance

14   coverage for prescription opioids compares to

15   insurance coverage for their substitutes?

16             MR. SOBOL:  Objection.

17        A.    I did not study individual

18   benefit designs for opioids, and I am not a

19   hundred percent sure I know where you're

20   going with that question, but if you're

21   asking about physical therapy, for example, I

22   did not look at coverage.

23             Again, in the context of my

24   analysis, if, for example, there were

25   differences in coverage for opioids versus

1    physical therapy, that would affect the level

2    of sales.  It would not be correlated with

3    and therefore confound the effect of

4    marketing.

5    BY MR. ROTH:

6         Q.     Okay.  Talking about physical

7    therapy, nonsteroidal antiinflammatory drugs,

8    other things that could be used to treat the

9    same things as opioids, so we're on the same

10   page.

11        A.     Okay.  When you say "things,"

12   do you mean pain?

13        Q.     Pain -- primarily, yeah, pain,

14   I would say.

15             MR. SOBOL:  Why don't we start

16        again.

17             MR. ROTH:  Okay.

18   BY MR. ROTH:

19        Q.     I'm talking about substitutes

20   that could be used to treat pain other than

21   prescription opioids, including your example

22   of physical therapy, nonsteroidal

23   antiinflammatory drugs and other such

24   therapies, okay?

25        A.     Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And just so we have a clean
2    transcript, you have not studied how
3    insurance coverage for prescription opioids
4    compares to insurance coverage for substitute
5    therapies for the treatment of pain?
6    A.    I have not studied that because
7    it is not appropriately captured in the
8    analysis that I do, no.
9    Q.    Do you agree that insurers will
10   sometimes create formularies to pursue less
11   costly therapies?
12   A.    Yes, I would say the
13   formularies are typically designed to balance
14   affordability and accessibility of effective
15   treatment.  So costs are one of the
16   considerations in creating a formulary.
17   Q.    And to the extent formularies
18   prefer prescription opioids because they cost
19   less than other therapies, that might drive
20   consumption of prescription opioids?
21             MR. SOBOL:  Objection.
22   A.    I'm just -- I just want to
23   understand, make sure I understand the
24   question.
25             If formularies had more

1    generous coverage for opioids than some

2    alternative pain therapy, that that might

3    again -- it might affect the level of sales

4    of opioids relative to other pain therapies.

5              It would not -- that difference

6    would not be correlated with the intensity of

7    marketing in a given period, and therefore,

8    it would not be confused with the effect of

9    marketing.

10             So I think it's really

11   important that we get very clear that there

12   are factors, such as patient characteristics,

13   such as these formulary differences that will

14   affect in a cross-sectional way the

15   difference between whether I get opioids and

16   whether you get opioids, the use of opioids.

17             But that does not mean that

18   they will affect opioid sales over time or,

19   more specifically, in a way that's correlated

20   with marketing, and therefore, would confound

21   my estimates.

22   BY MR. ROTH:

23        Q.   How do you know that those

24   issues would not affect opioid sales over

25   time or be correlated with marketing?

Highly Confidential - Subject to Further Confidentiality Review

1              A.      Well, a couple of things.  One,

2      we do know from the research of others that

3      insurance expansion does not appear to have

4      caused increased opioid prescribing, so that,

5      as a high-level matter, suggests that these

6      factors are not important.

7                      The -- we also know from

8      looking at detailing that, you know, clearly,

9      aggregate detailing in this market has been

10     substantial over these particular time

11     periods, leading to a stock of detailing that

12     I'm sure we'll look at, but is visually

13     depicted in my report.

14                     The cross-sectional variation

15     in the generosity of coverage for particular

16     drugs is a phenomenon that just could not be

17     correlated with those marketing increases

18     over time.

19         Q.      You say it's a phenomenon that

20     could not be correlated, but you did not

21     include variation in the generosity of

22     coverage as an independent variable in either

23     of your models, correct?

24             A.      It is not included in my model,

25     no, and again, I do not believe it's

1    appropriate to include in there.

2        Q.    So you didn't test it as a

3    variable to confirm your presumption based on

4    your model's output that it wasn't

5    correlated?

6            MR. SOBOL:  Objection, form,

7        asked and answered.

8        A.    You've created this

9    hypothetical about differences in formulary

10   coverage.  When you say you didn't test it as

11   a variable, I don't think that's a variable

12   exactly.  I'm not sure how one would measure

13   the relative coverage generosity, so I have

14   not looked at that, no.

15   BY MR. ROTH:

16       Q.    You said there's literature

17   saying that insurance expansion did not cause

18   increased opioid prescriptions.  What are you

19   thinking of?

20       A.    There's a paper by Brendan

21   Saloner.  I believe it's cited in my report,

22   but I'm just going to look at my Documents

23   Relied on.  It does not appear to be there.

24       Q.    So it's something you reviewed

25   outside of the context of this case that is

1   not on your Attachment B or cited in your

2   report?

3        A.    Yes.  I didn't rely on it in my

4   analysis, but I -- it's a paper that I've

5   reviewed.  Brendan Saloner happens to be a

6   student of ours from Harvard and, in general,

7   I try to keep up with the literature in areas

8   that I'm interested in.

9        Q.    Because it wasn't disclosed in

10  your report, I haven't seen it yet, but I'll

11  look at it between now and the end of your

12  deposition and we can talk about it.

13       A.    Yes.

14       Q.    If you look at --

15            MR. SOBOL:  Do you have a

16        spelling on the last name then?

17       A.    S-A-L-O-N-E-R.

18  BY MR. ROTH:

19       Q.    And do you know what kind of

20  study it was or the title or the date?  Any

21  identifying information would be helpful.

22       A.    It would have been in the last

23  couple of years, and, yes, I don't -- I think

24  it would have had the Affordable Care Act in

25  its name.

1    Q.    Okay.  But you do agree that if

2    there is insurance coverage for opioids, that

3    could lead to more utilization of opioids?

4    A.    I guess I believe that

5    insurance coverage at some level has an

6    effect on sales, and -- and that -- that

7    effect is captured in the aggregate sales

8    data.

9        So to the extent that coverage

10   for some people was less generous, sales are

11   lower, so that's captured in the data.  And

12   like other factors, my model uses, for

13   example, changes in prices.  It uses the

14   specific eras that I have delineated that

15   show the environment in which marketing was

16   generating sales changed.  Health insurance

17   might be part of that change.

18       And so I believe that this fact

19   is appropriately captured in my model.  The

20   cross-sectional variation that you're talking

21   about, differences among people, that does

22   not belong in an aggregate time series model.

23   Q.    Do you agree that there is

24   price sensitivity with respect to the

25   prescription and consumption of prescription

Highly Confidential - Subject to Further Confidentiality Review

1   opioids?

2               MR. SOBOL:  Objection.

3        A.      Well, I think there are two

4   parts to what you just asked, and I'm a

5   health economist, so I won't say I don't

6   believe in price sensitivity.

7               As you may know, healthcare is

8   less sensitive to prices than other goods,

9   and I describe the reasons why that is true

10  in my report.  But consumers do respond to

11  the out-of-pocket cost, and that may again

12  mean that people are more likely to use a

13  generic if one is available.  It may affect

14  the level -- the extent to which people fill

15  prescriptions at all.  So there may be an

16  effect on aggregate sales.

17              I would expect on the patient

18  side it would have an effect on which opioid

19  they would use more likely than whether.

20              On the physician side, which I

21  thought was implicit in the way you framed

22  the question, it's not at all clear that

23  physicians are price sensitive.  They

24  frequently lack information on things like

25  benefit design, and I address that in my

Highly Confidential - Subject to Further Confidentiality Review

1    report, is that one of the challenges in this

2    market is that physicians are making the

3    decisions and they are neither financially

4    responsible for nor them generally aware

5    about prices.

6    BY MR. ROTH:

7         Q.    No, that's helpful.

8              If you look at paragraph 17,

9    the reason I asked the question is you say:

10   The lack of price sensitivity on the part of

11   physicians and patients due to insurance has

12   had two important consequences.

13             If I understand your testimony,

14   really, we should focus on the physicians

15   more than the patients.  Patients may, in

16   fact, be price sensitive.

17        A.    So when I'm using the term

18   there -- and thank you for pointing me to

19   that -- I'm really talking about the total

20   price of the drug.  And so generally, because

21   patients have insurance, they see a small

22   copayment, and so those copayment -- they may

23   be sensitive to those copayments, which are

24   the relevant price at the pharmacy for an

25   insured consumer, but they're not sensitive

1    to the total price of the drugs.

2         Q.     Well, they're sensitive to

3    whether it's covered by insurance or not in

4    the first instance, though.

5         A.     Yes.  I mean, I would think

6    about that as a continuous thing, right.

7    Coverage is a function of whether, but also

8    the generosity of coverage.

9         Q.     Yeah.  Just to give you a

10   concrete example, so Mrs. Smith goes to the

11   doctor for back pain and he says you could do

12   occupational therapy with Dr. Jones down the

13   street for six months and try that out, or I

14   can write you a prescription for hydrocodone.

15   One is covered, one is not.  She's going to

16   prefer the covered choice, I would think, as

17   a consumer.

18        A.     Well, that's not how I would

19   approach that question as an economist, but,

20   you know, I would say that the out-of-pocket

21   cost of those alternatives is one factor, and

22   there are other kinds of costs and benefits.

23        Q.     All things being equal, if

24   she's solely driven by the price tag, she's

25   going to prefer the covered therapy as

Highly Confidential - Subject to Further Confidentiality Review

1  opposed to the uncovered therapy, recognizing

2  as you did that there may be other reasons

3  why she might have a preference?

4  A.    Such as addiction risk and the

5  like.  I think the out-of-pocket cost will be

6  relevant to that decision.

7  Q.    I promise we're almost to your

8  models.  Just one more general area first.

9  Your direct model is based on

10  national data with respect to detailing,

11  correct?

12  A.    Yes, it is.

13  Q.    And nationwide data with

14  respect to MMEs dispensed as well?

15  A.    Yes, it is.

16  Q.    Your indirect model is based on

17  the ARCOS data, which you describe as county

18  level, and we can talk about that later; is

19  that right?

20  A.    Yes.

21  Q.    Okay.  That was a terrible

22  question.

23  So your indirect model is based

24  on the ARCOS data, which is then subdivided

25  into county-level data.

Highly Confidential - Subject to Further Confidentiality Review

1      A.      It is.  I guess when you say

2      subdivided, I think it comes that way, but

3      yes, right.

4          Q.      And your indirect model does

5      not have a detailing variable because you're

6      essentially solving for marketing by

7      including other variables in that approach?

8          A.      Yes.  The purpose of the

9      indirect model is to go another way around

10      and ignore the detailing data.

11          Q.      If you take out -- put another

12      way, if you take out everything else that

13      would be relevant, what is left is detailing

14      in the indirect model?

15          A.      Yes.

16          Q.      Okay.  So the only model with

17      detailing data is the direct model, and for

18      that you use national data?

19          A.      That's correct.

20          Q.      So you don't have any model

21      that measures the effect of detailing within

22      either Summit or Cuyahoga County?

23              MR. SOBOL:  Objection.

24          A.      My model looks at detailing as

25      a national phenomenon, which as I note in my

1    report, detailing is generally a national

2    phenomenon.

3              And I take the relationship

4    between detailing and sales, and I apply it

5    to Summit and Cuyahoga, or it ultimately gets

6    applied downstream rather, but I do not have

7    detailing at a level other than national and

8    so cannot run a model at a lower level of

9    geography.

10             It's my belief that these

11   patterns are the same across the country, and

12   I believe there's some testimony to that

13   effect.

14   BY MR. ROTH:

15        Q.    So you did not model marketing

16   within either Summit or Cuyahoga County

17   against MMEs within Summit or Cuyahoga

18   County?

19        A.    As we've discussed, my model

20   looks at these relationships at a national

21   level because that is really the level at

22   which manufacturers set their strategy and

23   the appropriate level to look at the

24   effectiveness of marketing.

25        Q.    Do you know how many of the

Highly Confidential - Subject to Further Confidentiality Review

1    detailing visits in your data occurred in

2    Summit County or Cuyahoga County?

3         A.    In the IMS -- or, rather,

4    excuse me, the IQVIA data specifically, there

5    is not a method for apportioning those from

6    county to county.

7         Q.    Did you do any analysis as to

8    whether the impact of defendants' marketing

9    varied by county, or was it not done because

10   you assumed it was national in scope?

11             MR. SOBOL:  Objection.

12        A.    I believe that is appropriate

13   to assume that the effectiveness, the

14   relationship between marketing and sales is

15   the same across counties, and -- and again,

16   my data do not allow me to parse out

17   detailing at a county level.

18             So where -- where it is

19   possible to parse out sales at a county

20   level, it is not possible to do so for

21   detailing.  So I did not test that.

22   BY MR. ROTH:

23        Q.    Okay.  Professor Cutler takes

24   your percentage, though, and applies it to

25   his regression, which is done at a county

Highly Confidential - Subject to Further Confidentiality Review

```
 1    level; is that right?

 2                 MR. SOBOL:  Objection.

 3         A.      Professor Cutler's

 4    calculations, once he has looked at the

 5    effect of shipments on harms, he then applies

 6    my percentage to that, yes.

 7    BY MR. ROTH:

 8         Q.      Did you have any conversations

 9    with Professor Cutler about the fact that he

10    was taking your national model and then

11    applying it to his county model and what that

12    might mean for his results?

13                 MR. SOBOL:  That's a yes or a

14         no.

15         A.      Yes.

16    BY MR. ROTH:

17         Q.      Did you have any of those

18    conversations outside of the presence of

19    counsel?

20         A.      No.

21         Q.      Do you have any view about the

22    propriety of taking a national model as

23    you've done and then inputting that into a

24    county-specific model as Professor Cutler has

25    done?
```

1     A.     Yes.  I believe the national

2    model is appropriate.  Again, because

3    marketing strategy is a national phenomenon,

4    the national data are a reliable way to

5    ascertain the relationship between marketing

6    and sales.

7            I have used the same

8    methodology, for example, in the Neurontin

9    matter concerning Kaiser.  We used a national

10   model to estimate the relationship between

11   marketing and sales and applied that to a

12   single healthcare system.

13       Q.     So if marketing is, in your

14   view, nationally done and substantially

15   similar, why is there a difference in

16   shipments on a county level the way Professor

17   Cutler's modeled it?

18           MR. SOBOL:  Objection, scope.

19       A.     This of course is the subject

20   of Professor Cutler's report, and I -- I'm

21   not sure as I sit here I could tell you

22   exactly the factors, but it is obviously

23   counties are situated differently in ways

24   that he captures in his cross-sectional model

25   of harms that could absolutely affect the

1    shipments in that county, conditional on

2    marketing.

3    BY MR. ROTH:

4        Q.     Put another way, though, you

5    would not expect differences in shipments

6    across counties to be caused by marketing

7    where you presume all marketing is national

8    in scope?

9            MR. SOBOL:  Objection.

10       A.     I don't believe that that's the

11   right way of looking at it.  So if there's a

12   specific relationship between marketing and

13   sales and -- it could well be that counties

14   start at different levels of use, and so the

15   incremental effect of those relationships, as

16   you see in Professor Cutler's analysis,

17   materializes differently in those counties.

18               That doesn't mean the effect of

19   marketing was different.  It's just the

20   baseline was different.

21   BY MR. ROTH:

22       Q.     But I think you said that's an

23   issue you would defer to Professor Cutler.

24   You don't have an opinion on how your

25   national model plugs into his county model

Highly Confidential - Subject to Further Confidentiality Review

1    and why the differences may occur in

2    shipments?

3                MR. SOBOL:   Objection.

4         A.     It's my opinion that it's

5    appropriate to take my national estimates.

6    National-level analysis is the most robust

7    analysis.  It's the place where the data are

8    really reliable.  I think it's appropriate

9    for Professor Cutler to use those estimates

10   in the way that he has.

11   BY MR. ROTH:

12        Q.     But you have no opinion that

13   explains why we may be seeing variation

14   between county-level shipments in his model

15   despite him using your national model on

16   marketing?

17                MR. SOBOL:   Objection, asked

18        and answered.

19        A.     I do not have an opinion

20   specifically on that, no.

21   BY MR. ROTH:

22        Q.     You do not attempt to link any

23   specific prescription to any specific

24   defendant's marketing; is that fair?

25        A.     Are you asking me whether I'm

Highly Confidential - Subject to Further Confidentiality Review

```
 1    looking prescription by prescription, these
 2    ones were caused and those ones were not?
 3    The analysis -- the but-for analysis is a
 4    world that did not occur, of course.  Would
 5    you agree?
 6              The but-for world where the
 7    marketing didn't happen, didn't happen.  So
 8    my analysis can tell me about the correct
 9    aggregate amount.  It does not identify one
10    prescription at a time.
11        Q.    Okay.  Yeah.  Just so the
12    record is clear, we've been through this, but
13    you did an aggregate model.  You didn't build
14    it from the ground up on a
15    prescription-by-prescription,
16    detail-by-detail basis?
17              MR. SOBOL:  Objection.
18        A.    Right.  If I may, the -- I did
19    an aggregate model.  The aggregate sales of
20    course are the sum of individual
21    prescriptions, but I am looking at the
22    national level at total marketing on total
23    sales.
24              It's not that it's unknowable
25    what those prescriptions were underneath the
```

 1    sales data.  That's not the -- that's not the

 2    challenge.  The challenge is a conceptual

 3    one.

 4              The but-for scenario didn't

 5    happen, so I cannot say precisely which

 6    prescriptions would not have been written,

 7    only that there is some group of them.

 8    BY MR. ROTH:

 9         Q.    I know you said earlier you

10    looked for manufacturer-specific detailing

11    notes and marketing information.  Did you

12    find or learn of any manufacturer-produced

13    data on detailing to specific doctors within

14    Summit or Cuyahoga County?

15         A.    I don't recall.

16         Q.    And it's fair to say if that

17    does exist, it's not something you reviewed

18    or relied on for Attachment B?

19              MR. SOBOL:  Objection.

20         A.    I did not use individual

21    physician-level data, no.

22    BY MR. ROTH:

23         Q.    And individual physician-level

24    data, as you may have used in other cases,

25    would be drug specific and doctor specific,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2                MR. SOBOL:  Objection.

3         A.      Well, it depends on really what

4    you're talking about.  When I have had

5    individual physician-level data in the past,

6    they are sales data.  So again, I think the

7    challenge is not disaggregating the sales

8    data.

9                There are products that exist;

10   sometimes they require subpoenas to get them,

11   but there are products that exist that allow

12   us to look at prescribing at a physician

13   level, but not at detailing at a physician

14   level.  So those data I have not used because

15   I have not seen them.

16        Q.      Well, but, for example, an

17   individual manufacturer may keep detailed

18   call notes of the doctor visits that their

19   sales representatives engage in, correct?

20        A.      Well, I have seen call notes in

21   the past, and I have always found them to be

22   unusable.

23        Q.      And why is that, out of

24   curiosity?

25        A.      They often do not include

1    provider identifiers, so they can't be linked

2    to other data.  They are incomplete, and

3    they -- they are often produced -- so

4    incomplete in the sense of the call notes

5    have a lot of blank fields, and they're often

6    produced for short time periods.

7         Q.    But you didn't look at any

8    individual manufacturer call notes in this

9    case in conjunction with your expert report

10   or opinions?

11        A.    I looked to see if there was a

12   source of complete data for -- in order to do

13   such an analysis, and my staff worked with

14   counsel to identify documents or databases

15   and did not find any.

16        Q.    Pivoting back to Professor

17   Cutler for one more second.  Have you worked

18   as an expert in other cases where you've only

19   modeled causation and then another expert has

20   taken that forward and put into it a damages

21   model as Professor Cutler has done here?

22        A.    Yes.

23        Q.    And what case was that or

24   cases, if there's more than one?

25        A.    Yes.  In Neurontin, I did the

1  same, in that order.  In other cases I've

2  done the reverse where I've done damages and

3  someone else has done causation.

4      Q.     Okay.  And in Neurontin or

5  those other cases, whether you were on the

6  causation side or the damages side, have you

7  before encountered the issue you have here

8  where you have a national model and then a

9  localized model communicating with each other

10  to calculate damages?

11          MR. SOBOL:  Objection.

12      A.     Yes.  As I noted earlier, in

13  Neurontin, I used a national model to connect

14  to damages for Kaiser.

15  BY MR. ROTH:

16      Q.     And the damages -- you used a

17  national model, but what was the damages

18  model based on?  What was it localized, or

19  was it also national?

20      A.     It was localized.  It was based

21  on Kaiser.

22      Q.     Based on a single company it

23  sounds like you're saying.  When you say

24  Kaiser, what do you mean?

25      A.     Yes, that's right.  Kaiser was

1    the plaintiff in that matter.

2        Q.    Right.  But that wasn't a model

3    of geography.  That was a model of damages to

4    a particular company's sales, I would assume?

5            MR. SOBOL:  Objection.

6    BY MR. ROTH:

7        Q.    So for a typical -- an insurer,

8    right.  Kaiser is an insurer?  Am I right

9    about that?

10       A.    Kaiser is a group health plan,

11   so it is both a delivery system and an

12   insurer, all rolled into one, and it is

13   geographically distinct.

14           So Kaiser is not like United.

15   It is not everywhere diffusely.  It is

16   largely in California and the Pacific

17   Northwest with a few smaller sites elsewhere.

18           So again, those were national

19   estimates and those were connected to damage

20   calculations for a particular payer and

21   delivery system.

22       Q.    And do you recall how they were

23   connected in that case?  Were there any kind

24   of localization factors taken into account or

25   any way to differentiate the national level

Highly Confidential - Subject to Further Confidentiality Review

1    marketing from where the damages were being

2    calculated?

3         A.     As I sit here, I can't recall

4    all the calculations.  I believe, again, I

5    produced the same kinds of but-for

6    percentages and passed those along to the

7    damage model.

8         Q.     Okay.  Other than the Kaiser

9    case, can you think of any other examples

10   like that one?

11        A.     Not absolutely, but it wouldn't

12   surprise me if I had done something like this

13   before.  I have been involved in some state

14   cases.  I just can't recall.

15        Q.     Okay.  What is regression

16   analysis?

17        A.     Regression analysis is a

18   statistical methodology that uses data to try

19   to understand the relationships among

20   variables, and in particular, to identify the

21   effects of certain explanatory variables on

22   some dependent variable of interest.

23        Q.     And what is a time series

24   regression?

25        A.     A time series regression is a

1    model that looks at these patterns over time,

2    so how -- how changes in these explanatory

3    variables over time explain changes in the

4    dependent variable over time.

5        Q.    Your direct model in this case

6    is a time series regression?

7        A.    That's correct.

8        Q.    When is it appropriate to use a

9    time series regression model?

10       A.    As in cases like this one where

11   there are dynamic relationships among the

12   variables of interest, and what I mean by

13   that is that marketing has an effect that is

14   path dependent.  It depends on what happened

15   in the last period as well as this period.

16       Q.    What are the other types of

17   regressions you could run, apart from a time

18   series regression?

19            MR. SOBOL:  Objection.  You

20        mean like here or like is she capable

21        of?

22            THE WITNESS:  I was going to

23        ask you that question.

24   BY MR. ROTH:

25       Q.    Generally in the world --

Highly Confidential - Subject to Further Confidentiality Review

 1    generally in the world, you've got a time

 2    series -- so the way I think about this,

 3    right, you've got regression analysis, and

 4    one type of regression analysis is a time

 5    series regression, okay?  Are you with me so

 6    far?

 7            A.     Okay.  I'm with you.

 8            Q.     What are the other types of

 9    regression analyses that one could perform?

10    I'm not asking specific to this case.  Just

11    in the universe.

12            A.     There are cross-sectional

13    regressions, panel data regressions.  There's

14    machine learning.

15            Q.     Okay.  And what is a

16    cross-sectional regression?

17            A.     A cross-sectional regression is

18    like the one we run in the indirect model,

19    which is looking at a set of observations

20    where there's no time dimension.  We're just

21    looking across observations at a point in

22    time.

23            Q.     That Datta and Dave article we

24    looked at, how would you classify that

25    regression they ran?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     That's a panel model.

2     Q.     Okay.  And what --

3     A.     They call it longitudinal, but

4   I would call it panel.

5     Q.     And what is a longitudinal or

6   panel model, assuming those two things are

7   the same?

8     A.     It has multiple observations

9   per unit of time, but also multiple units of

10  time.

11    Q.     And when is it appropriate to

12  use a cross-sectional model?

13    A.     Well, I think it's sort of hard

14  to say in general, but, I mean, it's hard to

15  say without being reductive.  We run

16  cross-sectional models when we want to

17  understand cross-sectional relationships.  So

18  there may be things like gender, for example,

19  that typically don't vary over time.  I

20  should say sex doesn't vary over time.

21          So we may want to understand

22  the relationship between sex and wages.  We

23  would run that cross-sectionally.  That's not

24  something where we necessarily need a time

25  dimension.

1      So cross-sectional models are

2  often used for these kinds of immalleable

3  features that we're trying to understand as

4  opposed to things that can change.

5      Q.    When would it be appropriate to

6  use a panel data model?

7      A.    You know, in theory, you can

8  answer many of the same questions with all of

9  these models, but a panel data model allows

10  one, as we were looking at with the Datta and

11  Dave paper, allows one to understand the

12  effects of the individual units, particularly

13  in the way that they do, which is mostly by

14  looking at the variance around those

15  individual units as opposed to the

16  characteristics of the physicians, and

17  looking at decomposing that -- that variance

18  against something that's operating in a time

19  series way and being able to tease those two

20  things apart as they do.

21      Q.    Did you consider running either

22  a cross-sectional model or a panel data model

23  in this case?

24      A.    My belief is that an aggregate

25  time series model is the appropriate model

1    for the question at hand, so as I have done

2    in other cases, I selected the aggregate time

3    series model.

4              MR. SOBOL:  You both just meant

5         on the direct side, right?

6              MR. ROTH:  Correct.  Good

7         clarification.

8    BY MR. ROTH:

9         Q.    Why did you believe that the

10   aggregate time series model was the

11   appropriate model for your direct approach

12   for the question at hand?

13        A.    Because, as I mentioned in

14   describing the general purposes of these

15   alternative types of models, the key

16   relationship I'm interested in is this

17   path-dependent relationship between marketing

18   and sales, and aggregate time series model

19   is -- zones right in on that.  So that's

20   exactly what it's looking at.

21              It's not trying to understand

22   some of the mechanisms that Datta and Dave

23   are looking at.  I want a model that will

24   capture this total effect as reliably as

25   possible.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you agree with the statement

2    that although a time series correlation may

3    be striking, it does not necessarily

4    determine a causal effect?

5    A.    With any regression model,

6    economists will need to use theory and tests

7    and judgment to determine causality.  So

8    there may be time series relationships that

9    are not causal, yes, that is correct.

10    Q.    And do you agree that when

11    there's a slow-moving trend in one variable

12    through time, it is very difficult to infer

13    its causal effects on another variable?

14         MR. SOBOL:  Objection.

15         You can answer.

16    A.    I believe that you're

17    describing again the well-known limitations

18    of any time series model, and there are ways

19    to examine those challenges.

20         So again, we first have to

21    start with an appropriate theoretical model.

22    Of course, you could put two variables that

23    trend together in a model and there's no

24    sensible relationship, and clearly that would

25    be spurious.

1    On the other hand, marketing is

2    clearly designed to increase sales, so we

3    start with the theory.  And in developing the

4    model, we examine the kinds of time series

5    questions that you just raised with that

6    comment.

7    BY MR. ROTH:

8        Q.    I mean, in some ways the

9    conclusion that marketing influences sales is

10   tautological, right?  If you're marketing

11   correctly, you should be increasing sales.

12            MR. SOBOL:  Objection.

13            You can answer.

14       A.    I don't think that's

15   tautological.  It is -- to an economist,

16   again, we would start with economic theory,

17   and if you take the theory of profit

18   maximization and put marketing in that

19   context, it would only make sense for

20   marketing to be undertaken if it increased

21   sales.

22            I think as a noneconomist, if

23   you grab someone on the street in Boston and

24   ask them why do companies market, they would

25   agree with that basic premise, right?  So

1    that's -- that's the starting place.

2                   It's not where we end the

3    discussion, but I wouldn't say it's

4    tautological.  I would say it's theoretically

5    consistent.

6    BY MR. ROTH:

7         Q.    As an economist, if companies

8    are rational actors, they're not going to

9    spend money on marketing if they don't have

10   some sales increase.

11        A.    I would agree with that

12   statement, yes.

13        Q.    What are the standard

14   diagnostic tests you perform in running time

15   series regressions?

16        A.    In this model, of course, you

17   can see that we looked particularly about the

18   fit of the model over time and where -- I'm

19   picturing in my head the chart with Model A

20   on it where we had a single coefficient for

21   promotional effectiveness, and clearly we

22   were departing from the underlying data, so

23   those kinds of tests we conducted Wald tests,

24   two-dimensional Wald tests to examine the

25   appropriate turning points, and likewise,

Highly Confidential - Subject to Further Confidentiality Review

1    because part of this time series model of

2    course is the stock of marketing and its

3    appropriate depreciation rate, we conducted

4    statistical tests around that as well.

5         Q.    So you answered about this

6    model, which I want to get to.

7         A.    Sure.

8         Q.    But I'm talking generally when

9    you do time series models, what are the

10   standard diagnostic tests you might be

11   perform, whether or not you actually did it

12   in this case?

13        A.    Right.  I don't believe that

14   they're reported here, but early on in

15   looking at the data, we looked for -- we

16   looked at a Dickey-Fuller test, which is

17   basically testing for unit roots.

18             I'm thinking about the simple

19   explanation goes to what you said before

20   about two slow-moving trends and whether

21   there might be spurious correlation, and we

22   found that those concerns were not warranted

23   based on the Dickey-Fuller results.

24             MR. SOBOL:  Can you spell that?

25             THE WITNESS:  Dickey,

1        D-I-C-K-E-Y, dash, Fuller.

2               MR. ROTH:  F-U-L-L-E-R?

3        A.     Yes.

4    BY MR. ROTH:

5        Q.     What is nonstationarity?

6        A.     Nonstationarity relates to that

7    unit root.  It has to do with the trends --

8    that these two trends are moving together.

9        Q.     The mean or variance of the

10   variable is not constant over time?

11       A.     It's -- again, it's related to

12   the way the variable of interest and the

13   right-hand side variable are regressing

14   together, so it has to do with the variance

15   over time.

16       Q.     And why is nonstationarity an

17   issue with time series models?

18       A.     If you have this problem, which

19   again, we do not, then you can get spurious

20   results.

21       Q.     Do you know when your team or

22   you performed the Dickey-Fuller test?

23       A.     I believe it was early on in

24   the analysis that we were doing.

25       Q.     Okay.  And do you have the

1    results of those tests somewhere that you

2    could produce to us?

3            A.      I do not.

4            Q.      And why is that?  Is it a

5    computer model test that...

6            A.      Generally we don't save the log

7    files for those kinds of tests.

8            Q.      Okay.  Could one be performed

9    using the backup data you've produced?

10               MR. SOBOL:  Objection.

11           A.      Yes, I believe so.

12   BY MR. ROTH:

13           Q.      Do you know if the MME

14   prescriptions in your model are stationary?

15           A.      As I sit here, no.

16           Q.      Do you know if the stock of

17   detailing variable is stationary?

18           A.      Again, as I sit here, no.

19           Q.      And would the presence of

20   nonstationarity lead you to overstate the

21   impact of promotion in your direct model?

22           A.      Well, again, if the -- if there

23   was a unit root problem, then it could

24   overstate the results, yes.

25           Q.      And I assume because your

Highly Confidential - Subject to Further Confidentiality Review

1    Dickey-Fuller test showed no unit root

2    problem, you did not make any effort to

3    correct for nonstationarity?

4         A.     That's correct.

5         Q.     What is autocorrelation?

6         A.     Autocorrelation is essentially

7    when the residuals from one time period are

8    correlated with the residuals from the next

9    time period, so autocorrelation from period

10   to period.

11        Q.     And autocorrelation can

12   overstate the impact of a predictor variable?

13        A.     No, that's not quite correct.

14   Autocorrelation can affect the standard

15   errors.  It does not bias the coefficient.

16        Q.     Could the presence of

17   autocorrelation lead to an overstatement of

18   the impact of an independent variable?

19        A.     No, the presence of

20   autocorrelation could lead to an

21   overstatement of the statistical significance

22   of an independent variable, but not its

23   effect.

24        Q.     Did you run any tests to detect

25   autocorrelation in your direct model?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I believe there were some tests

2     for autocorrelation also early on when we

3     were beginning our work, and we found that,

4     particularly in the late period, that while

5     there was some early autocorrelation, that

6     the autocorrelation goes away in a later

7     period of the data, and we did not correct

8     for it.

9          Q.      Is that a Durbin-Watson test?

10         A.      I believe that is a

11    Durbin-Watson.

12         Q.      Do you have the results of that

13    test readily available, or no, because you

14    didn't save the log file?

15         A.      As far as I know, the log file

16    was not saved.

17         Q.      But again, that's a test that

18    could be replicated on your model with the

19    backup data that you've provided?

20         A.      Yes, it could be.

21         Q.      When is it appropriate to

22    aggregate versus utilizing cross-sectional

23    information in putting together a regression?

24               MR. SOBOL:  Generally?

25               MR. ROTH:  Correct.

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Well, aggregation has a number

2    of advantages in specific contexts.  I would

3    say -- go back to my first answer, which is

4    we are interested here in an aggregate

5    question.  If you were interested in an

6    individual question, you wouldn't aggregate.

7        So we are at first principles

8    interested in the -- I am interested in the

9    impact of opioid marketing in this class on

10    sales, and so I start there.

11        Aggregation can provide

12    benefits in that it cuts down on certain

13    kinds of noise, and it also -- it steps away

14    from certain kinds of endogeneity problems,

15    but I'm sure we will talk more about -- but

16    we talked a little bit about --

17    BY MR. ROTH:

18        Q.    How did you know?

19        A.    -- in terms of Datta and Dave,

20    the endogeneity problem that they're

21    interested in is that physicians who have a

22    propensity to prescribe your drug are the

23    ones you detail.  But when we aggregate, when

24    we go up to the aggregate level, we don't

25    have that same endogeneity problem, so...

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Thank you for saying

2    endogeneity before I did so I made sure I got

3    it right.  And we will talk about it.

4              But is it also true that

5    aggregation can sometimes mask patterns in

6    the data?

7    A.    Well, yes, but you have to be

8    interested in those patterns for that to be a

9    problem.  So if, in fact, there are patterns

10   in the data, my task as I understand it is to

11   look at the aggregate effect of marketing, so

12   that's just not a question that I was

13   particularly interested in here.

14             It's true that an average

15   effect will mask differences, if there are

16   any.

17   Q.    Okay.  So going back to

18   paragraph 11 of your report.

19   A.    Yeah.

20   Q.    This is your summary of

21   opinions.  Do you see that?

22   A.    Yes.

23   Q.    And you also have a handy

24   chart, which we'll talk about later, but I

25   just want to focus on paragraph 11 first.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yeah.

2    Q.    So the last bullet on page 8

3    says:  Using econometric models, I

4    demonstrate that I can reasonably identify

5    the extent to which the sale of prescription

6    opioids measured by the number of milligrams

7    of morphine equivalents, or MMEs, was caused

8    by any quantum of the defendants' promotional

9    efforts that counsel can prove was unlawful.

10         Do you see that sentence?

11    A.    I do.

12    Q.    And we'll get more into the

13    specifics on that, but how is that so, where

14    your assumption was that everything was

15    unlawful?  How could you particularize your

16    model to any quantum that counsel proves?

17         MR. SOBOL:  Objection.

18    A.    Sure.  My Table 3 does that,

19    for example, by backing out individual

20    defendants and saying, okay, let's just

21    assume that, in fact, defendant X was not

22    involved.  So it can be done that way.

23         It could be done

24    propositionally.  It could be done by saying,

25    no, it wasn't 1995; it really didn't start

1   until 2000.  That's what I mean by "any

2   quantum," is that we could divide the

3   marketing in any measurable way over my

4   model.

5   BY MR. ROTH:

6        Q.    What if the quantum of

7   promotional efforts that counsel proved

8   unlawful was influencing key opinion leaders

9   to change prescribing standards, how would

10  your model be used to evaluate conduct in

11  that situation?

12       A.    I haven't been asked to look at

13  that, so I'd need to really give that some

14  thought.  I wouldn't call that a quantum.  I

15  would call that something else, and I'm not

16  going to make up words, but that's more of a

17  sort of qualitative piece.  But in theory,

18  that's possible.  I have not looked at that.

19       Q.    And that's a good

20  clarification.  When you say quantum, you

21  mean quantitative, not qualitative, right?

22       A.    That's what I meant, yes.

23       Q.    So you could take out specific

24  defendants or percentages, but you could not

25  modify your model using a qualitative test

Highly Confidential - Subject to Further Confidentiality Review

1    for unlawfulness to determine what the impact

2    is?

3                  MR. SOBOL:  Objection.

4         A.      I would not conclude that

5    without giving some thought.  I'm sure it

6    couldn't be done for every qualitative

7    example that you could come up with, but I

8    think that there are ways of doing it

9    qualitatively, as I, again, did in the

10   Neurontin matter, looking at promotion to

11   psychiatrists as opposed to other physicians.

12   BY MR. ROTH:

13        Q.      But since you have an aggregate

14   national model with aggregate detailing, is

15   there a way to go, for example, and figure

16   out where the details only to dentists were

17   if the court concludes that that was the

18   unlawful activity as opposed to detailing

19   writ large?

20        A.      I'm not a hundred percent sure

21   about dentists, but as I used in the

22   Neurontin matter, there are detailing data

23   available that would allow you to look

24   nationally by specialty.

25        Q.      But the detailing data you used

Highly Confidential - Subject to Further Confidentiality Review

1    in the Neurontin matter for that exercise is

2    not the same detailing data you used in this

3    matter for your direct model, correct?

4         A.    It's not exactly the same

5    because it was disaggregated by specialty,

6    but I believe those -- that is possible to

7    disaggregate by specialty.  I've not done

8    that here.

9         Q.    And you haven't even tested

10   whether it can be done yet, right?

11              MR. SOBOL:  Objection.

12        A.    I have not.

13   BY MR. ROTH:

14        Q.    I'll give you a quantitative

15   measure.  What if the court concludes that

16   any detail over five minutes in length were

17   presumed unlawful, but anything shorter than

18   that isn't?  How can you quantify the impact

19   of the over-five-minute visits in your model?

20        A.    As I sit here, I don't know

21   because I haven't thought about it.  Clearly

22   I would need some data on the length of

23   details.

24        Q.    We'll come back to this, I

25   promise, but back to paragraph 11 for a

1    minute.

2                So on page 9, the bullet says:

3    Based upon my analyses and assumptions from

4    counsel about the extent of promotion that

5    can be proven to be unlawful, I can

6    reasonably identify approximately ███████

7    of MMEs during the period of my analysis as

8    caused by unlawful promotion.

9                Did I read that correctly?

10        A.      You did.

11        Q.      And the ██ is the direct

12   number, and the ██ is the indirect number

13   from your models?

14        A.      That's correct.

15        Q.      Okay.  And then if you look at

16   paragraph 75 -- and we talked about this

17   earlier already.  But paragraph 75, which is

18   on page 50 under Calculation of But-For MMEs.

19                Do you see that?

20        A.      Yes.

21        Q.      You say:  I have been

22   instructed by counsel to assume in my but-for

23   scenarios that the fact finder, judge or

24   jury, finds that all or virtually all

25   promotion by the manufacturer defendants from

Highly Confidential - Subject to Further Confidentiality Review

1    1995 to present was unlawful.

2              Do you see that?

3    A.    Yes.

4    Q.    And then after the parentheses,

5    it says:  Thus, to calculate impact for the

6    purpose of damages beginning in 2006, I

7    modeled a world in which this promotion did

8    not occur, i.e., but-for promotion equals

9    actual promotion for opioids, less all

10   promotion for opioids by the defendants and

11   their surrogates.

12             Do you see that?

13   A.    I do.

14   Q.    And then in Table 2 on the next

15   page, there's actually a note that says:  The

16   percent of MMEs attributable to challenged

17   promotion is calculated as the difference

18   between predicted actual and predicted

19   but-for MMEs, assuming all defendants'

20   promotion is set to zero starting in 1995

21   divided by predicted actual MMEs.

22             Do you see that?

23   A.    Yes.

24   Q.    So your model assumption is

25   actually, not virtually, all promotion by

Highly Confidential - Subject to Further Confidentiality Review

1    defendants is unlawful; it's that all

2    promotion by defendants is unlawful?

3         A.    Yes.  I guess the -- sort of

4    the legal formulation of that, I'm repeating

5    there when I say all and virtually all.  I'm

6    not sure what virtually all would be

7    quantified as, 99%, but I do all, yes.

8         Q.    Okay.  And does that not equate

9    to assuming that all MMEs prescribed due to

10   defendants' promotion were medically

11   unnecessary?

12        A.    No, that does not equate to

13   that.

14        Q.    So in your model, you could

15   have unlawful promotion that leads to

16   medically necessary scripts still?

17        A.    I was asked to quantify the

18   impact of the alleged unlawful promotion, not

19   to examine that question about whether that

20   prescription itself was medically

21   unnecessary, so -- so it's something I

22   haven't looked at and I don't believe it's

23   related to my charge.

24             The fact that the promotion was

25   unlawful to me does not equate to the fact

Highly Confidential - Subject to Further Confidentiality Review

1   that a prescription was medically

2   unnecessary.

3        Q.    So if promotion, whether lawful

4   or unlawful, results in a medically necessary

5   prescription, how does that prescription

6   cause damage?

7            MR. SOBOL:  Objection, scope.

8        A.    I'm not a lawyer, as you know.

9   And sort of what the theory of liability is

10  and what -- what plaintiffs can recover for

11  and what they can't is -- I do not know.

12           I have only been asked to

13  examine the extent to which this unlawful

14  conduct caused sales.

15  BY MR. ROTH:

16       Q.    Okay.  You're not a lawyer, but

17  you're a good economist.  You've testified a

18  lot about causation and damages, okay, and

19  you're familiar with what a but-for world is,

20  right?

21       A.    Yes.

22       Q.    You have one here?

23       A.    I do.

24       Q.    So how does your but-for world

25  treat medically necessary prescriptions?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Again, this is --

2            MR. SOBOL:  Objection.

3            But go ahead.

4            THE WITNESS:  Sorry.

5     A.     The model treats the right-hand

6     side variable as the thing that will be

7     proven to be unlawful, and any sales gained

8     from that unlawful conduct as subject to

9     recovery.  This I know as a, thank you, good

10    economist and someone who's done that, that

11    downstream of my analysis there's a damage

12    number that plaintiffs I believe will try to

13    recover.

14            So as an economist, to me, the

15    theory is that any gains, whether or not they

16    resulted in medically necessary

17    prescriptions, are subject to recovery.  As

18    an economist, that seems like a reasonable

19    theory if we wanted to deter fraudulent and

20    misleading information.  This is the same

21    analysis that I did in the Neurontin case.

22    BY MR. ROTH:

23    Q.     Stated differently, your model

24    will calculate causation by defendants'

25    marketing even for medically necessary

1    prescriptions?

2         A.    It does not distinguish.  And

3    to be clear, whether or not there were

4    medically necessary prescriptions caused by

5    the misconduct, I can't say for sure.

6         Q.    And as an economist, is that

7    not something you think you should take into

8    account in your but-for world where you're

9    opining that but for the defendants' conduct,

10   fewer of these MMEs would be out in the

11   world?

12        A.    Absolutely not.  Again, as an

13   economist, to me, if the allegations are

14   true, I can see a strong economic rationale

15   for ensuring that liability is attached to

16   all these ill-gotten gains from the alleged

17   misconduct.

18        Q.    But there is a parallel world

19   where a manufacturer may promote lawfully and

20   that lawful promotion would result in

21   medically necessary prescriptions, correct?

22             MR. SOBOL:  Objection.

23        A.    I -- you have a lot of parallel

24   worlds I've noticed, but yes, I think we

25   agreed at the beginning of the day that there

Highly Confidential - Subject to Further Confidentiality Review

1    is such a thing as lawful marketing, and it

2    does generate sales.

3             Some of those sales may be

4    medically necessary, some may be medically

5    unnecessary, even if there's no unlawful

6    conduct.

7    BY MR. ROTH:

8        Q.    I asked some of these

9    questions, but I did promise I'd come back.

10            How would your model work if

11   the court finds that only detailing visits

12   where the representative spoke about

13   addiction risk were unlawful?

14       A.    I don't know the answer to that

15   question.  I have not thought about how one

16   could parse that out, so I don't know as I

17   sit here.

18       Q.    You did mention time could be

19   quantified, so I guess to clarify, would you

20   be able to calculate causation if the court

21   found, for example, that only detailing that

22   happened between 1996 and 2000 were unlawful?

23       A.    Yes, my model is capable of

24   doing any combination of manufacturer and

25   time.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What about drug?

2    A.    And drug.

3    Q.    Okay.  So you could do -- you

4    could take out manufacturers, right?

5    A.    Yes.

6    Q.    You could take out drugs?

7    A.    Yes.

8    Q.    And you could take out years?

9    A.    Yes.

10    Q.    Okay.  Beyond that, is there

11    anything you can take out of your model?

12              MR. SOBOL:  Objection.

13    A.    Well, as I said earlier, I

14    believe that it's possible to take out

15    physician specialties.

16    BY MR. ROTH:

17    Q.    Right.  And we talked about

18    that.  But you're not certain it can be done,

19    and you haven't tested it yet?

20              MR. SOBOL:  Objection.

21    A.    I haven't tested that.

22    BY MR. ROTH:

23    Q.    What if the court finds that

24    only off-label marketing was unlawful?  Is

25    there any way your model can be adjusted to

1     account for just the unlawful off-label

2     detailing?

3           A.     I assume that you're talking

4     about specific off-label messages.  Again, I

5     haven't -- I haven't thought about how the

6     detailing itself could be parsed in that way.

7     There would need to be another source of

8     information for that to be possible.

9           Q.     You need a different dataset

10    basically?

11          A.     Yes.  The thing with detailing

12    is that it's a face-to-face visit, so we can

13    see what messages the detailer brought on

14    paper with them but not what came out of

15    their mouths.

16          Q.     What if the court finds that

17    only journal advertising were unlawful?  How

18    would your model account for that?

19          A.     Well, as I believe I say in my

20    report, the journal advertising data is very

21    spotty for these drugs, so I've not included

22    that as a separate factor.  It's already out

23    of my model.  I would have to give that some

24    consideration.

25          Q.     Okay.  If we look at

1    Attachment D, which is towards the back, I

2    want to go to page D6.  And there's a section

3    at the bottom --

4                  MR. SOBOL:  I'm sorry.  Wait.

5                  MR. ROTH:  D6 of Attachment D.

6                  MR. SOBOL:  Is it the table?

7                  MR. ROTH:  No, it's the text.

8         It's the technical write-up of the

9         regression.

10                 THE WITNESS:  Yeah.

11                 MR. ROTH:  I feel like it's

12        always Attachment D in every case, by

13        the way.

14                 THE WITNESS:  Is it?

15        Interesting.

16   BY MR. ROTH:

17        Q.    Are you in Attachment D, D6?

18                 MR. SOBOL:  It's just the same

19        attachment.

20        A.    I am.

21   BY MR. ROTH:

22        Q.    It's all in the same report,

23   right?

24        A.    You didn't notice?  Yeah.

25        Q.    Well, Tom is involved for sure.

1     All right.

2              So looking at Attachment D,

3     page D6.  This may be from one of the same

4     attachments.  I don't know.  Do you see

5     there's a section that says Comcast

6     Considerations?

7          A.     Yes, I do.

8          Q.     What is the reference to

9     Comcast there?

10         A.     Well, again, I'm not lawyer,

11    but I understand that there was a case

12    involving Comcast, and that the -- what it

13    concerns, again, from a layperson's

14    understanding, is about the ability of the

15    damages as presented to the court to conform

16    to different conclusions about the but-for

17    scenario.

18         Q.     Essentially the issue we've

19    been talking about for the last --

20         A.     The issue we've been talking

21    about.

22         Q.     And why were you concerned

23    about the application of Comcast to this

24    case?

25              MR. SOBOL:  Objection, assumes

1       a fact not in evidence.

2   BY MR. ROTH:

3       Q.    Assuming you were.

4       A.    As you recall, the last part of

5   my assignment was to report on how my

6   conclusion would be different if there were

7   different considerations with regard to who's

8   in, who's out by defendant, for example.  So

9   yes.

10      Q.    Okay.  I'm trying to streamline

11  here because we've covered more ground --

12      A.    We're going to cover 14 hours

13  no matter what --

14      Q.    That's true.

15      A.    -- so streamlining may be good

16  for you, but it's not good for me.

17          MR. ROTH:  I'm having fun.  I

18      think you are too.

19          THE WITNESS:  Of course.

20          MR. LONERGAN:  What about us?

21  BY MR. ROTH:

22      Q.    Do you agree that your model

23  does not measure the impact -- we went over

24  this.  I'm not going to ask that again.

25  Strike that.

1          Could you have modeled an

2    individual manufacturer separately?

3          MR. SOBOL:  Objection, asked

4       and answered.

5       A.    It was not something I

6    attempted to do.  I think mechanically it is

7    possible.  But as I noted, one of the reasons

8    for using an aggregate time series is that we

9    smooth over a lot of noise in the data, so I

10   don't know whether an individual

11   manufacturer-level model would be feasible.

12   BY MR. ROTH:

13      Q.    Okay.  In a but-for world,

14   where all of the unlawful detailing, which is

15   your assumed all defendants' detailing, were

16   replaced with lawful detailing, would there

17   be any change in overall prescribing?

18      A.    Sorry.  I just -- so the model

19   doesn't itself have a presumption about

20   lawful and unlawful.  The but-for scenario is

21   where that presumption is incorporated, so

22   the model is the model.

23      Q.    I asked a bad question and you

24   properly called me on it.  Let me ask a

25   better question.

Highly Confidential - Subject to Further Confidentiality Review

1           If we assume that all unlawful

2    detailing is lawful, then the actual

3    prescribing and the but-for prescribing in

4    your models would be equal to each other?

5         A.    Yes, that's correct.  Those two

6    predicted values would be identical.

7         Q.    So the percent of MMEs

8    attributed to unlawful detailing in that

9    scenario would be zero percent.

10        A.    Yes.  If marketing were the

11   same in both scenarios, then there would be

12   no difference.

13        Q.    Assume for a minute that a

14   manufacturer's detailing is found to be

15   unlawful but it did not engage in any of the

16   other marketing misconduct alleged by

17   plaintiffs with respect to the key opinion

18   leaders, journal advertising and the other

19   factors.

20            How would your model account

21   for harm for that specific manufacturer?

22            MR. SOBOL:  Objection.

23        A.    In my opinion, that would be a

24   legal question because, again, all the

25   manufacturers are operating in the same

1    ecosystem.  According to the complaint and

2    everything I know as a health economist, the

3    effects of one manufacturer's unbranded

4    marketing -- I use that to refer to the

5    guidelines and those kinds of activities --

6    will spill over on to another manufacturer,

7    and I don't know whether it would be

8    appropriate to pull that out or not.

9    BY MR. ROTH:

10        Q.    That's a long answer.  I want

11   to -- I think I asked a more specific

12   question.

13        A.    Sure.

14        Q.    So if detailing is unlawful --

15        A.    Yes.

16        Q.    -- and let's say also the other

17   stuff, okay, key opinion leaders influencing

18   standards of care is also unlawful, and a

19   manufacturer just detailed, they're going to

20   have the same percentage of liability in your

21   direct model whether or not they engaged in

22   the other unlawful conduct, correct?

23             MR. SOBOL:  Objection.

24        A.    Yes, that's true.  Although

25   it's true in terms of what I calculate in

Highly Confidential - Subject to Further Confidentiality Review

 1    Table 3.  Just to be clear, I don't have an

 2    opinion on liability.  That's a legal matter.

 3    But what I do in Table 3 is I say, okay,

 4    well, what would happen if we said the

 5    detailing by Purdue were lawful, what would

 6    happen there?

 7               So whether or not that quantum

 8    is exactly what liability is, I don't -- I

 9    don't really know how the court is going to

10    see that, and so that's why I don't really

11    know if you would need to say, well, some of

12    why your detailing was so productive was

13    caused by somebody else's activity.  I don't

14    know whether it would make sense to back that

15    out.

16    BY MR. ROTH:

17         Q.    So let's take the opposite.

18         A.    Yeah.

19         Q.    Someone's detailing is entirely

20    lawful.  There's no issue there.  But they've

21    influenced the standards of care through key

22    opinion leaders, they've paid off doctors,

23    they've done all of the parade of horribles

24    that the plaintiffs allege, and the court

25    finds that that in fact is unlawful.  In your

Highly Confidential - Subject to Further Confidentiality Review

1    model, that manufacturer has no liability,

2    correct?

3              MR. SOBOL:  Objection.

4        A.      Well, again, my model is

5    looking at the aggregate causation between

6    marketing and sales; it is not designed to

7    assign liability to individual manufacturers

8    nor, again, am I certain how counsel or the

9    courts would do so.

10             The purpose of Table 3 is to

11   show that I can back out individual levels of

12   detailing, not to assign liability.  So I --

13   I don't know exactly how that would proceed,

14   even -- even without having these variable

15   assumptions across defendants.  I have not

16   looked defendant by defendant at something

17   like liability.

18   BY MR. ROTH:

19       Q.    Okay.  So let's look aggregate.

20             If for all the manufacturers

21   the conclusion is that the detailing is

22   entirely lawful, but the manufacturers

23   engaged in other conduct that the court finds

24   is unlawful, what would the result of your

25   model be in that world?

```
 1                    MR. SOBOL:  Objection.
 2          A.      I would have to give it some
 3   thought, but again, my preferred model
 4   ultimately captures the effect of all that
 5   other stuff that we're calling as really is
 6   the what happens -- in part, a chunk of it is
 7   what happens to the promotional effectiveness
 8   after the first turning point and before the
 9   second turning point.  And so in theory, one
10   could look at that, but it would really
11   depend on the specific set of facts.
12   BY MR. ROTH:
13          Q.      It would require a new model
14   probably?
15                    MR. SOBOL:  Objection.
16          A.      I don't know that it would
17   require a new model.  It would require a new
18   but-for analysis.
19   BY MR. ROTH:
20          Q.      Back to your body of your
21   report, paragraph 64.  You say:  The
22   econometric analyses serve two purposes.
23   First, they indicate that in economic terms
24   there is a causal relationship between the
25   defendants' promotion and prescriptions of
```

Highly Confidential - Subject to Further Confidentiality Review

1  opioids so that if the allegations of

2  misconduct are proven true, impact can be

3  found.

4           Do you see that?

5    A.     Yes.

6    Q.     But you actually didn't assess

7  specifically a causal relationship between

8  promotion and prescriptions, right?  Those

9  are not the two variables on your X and Y

10 axis?

11          MR. SOBOL:  Objection.

12   A.     Well, I look at the stock of

13 detailing, which I argue and believe is a

14 reasonable proxy for promotion.  It is not,

15 strictly speaking, all promotion.  To the

16 extent that it is measured with error, it

17 understates the effect of promotion.

18 BY MR. ROTH:

19   Q.     If we wanted to be precise,

20 though, what your model actually shows is a

21 correlation between detailing and MMEs?

22          MR. SOBOL:  Objection.

23   A.     Well, as we talked about

24 earlier and will no doubt talk about again,

25 any regression analysis can have a causal

Highly Confidential - Subject to Further Confidentiality Review

1    interpretation or not, depending on a number

2    of factors.

3              I interpret this regression

4    analysis as showing causation between

5    marketing and sales, and it does, in fact,

6    use detailing contacts as the measure of

7    marketing.

8    BY MR. ROTH:

9        Q.    And if we want to be even more

10   precise, when we're talking about defendants

11   detailing, we're talking about all detailing

12   without distinguishing between lawful and

13   unlawful as we've talked about?

14             MR. SOBOL:  Objection, asked

15        and answered.

16       A.    For the purposes of my

17   analysis, I've been asked to assume that all

18   detailing in this period was unlawful, so

19   that distinction is not relevant.

20   BY MR. ROTH:

21       Q.    So your model does not analyze

22   causation between the false promotion as

23   alleged in the complaint and the number of

24   MMEs prescribed?

25             MR. SOBOL:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      I would disagree.  That is
 2    exactly what my model does.  Again, we can
 3    agree that I have not separately proven that
 4    that detailing was unlawful, but I understand
 5    that counsel for plaintiffs intend to prove
 6    that, and so I have undertaken to examine the
 7    causal effect of that allegedly unlawful
 8    conduct.
 9    BY MR. ROTH:
10            Q.      Which is all promotion by
11    defendants?
12            A.      Which is all promotion by
13    defendants from 1995 to the end of my data.
14            Q.      And when does your data end?
15            A.      Mid 2018.
16            Q.      Okay.  Do you plan on updating
17    it if we go to trial in 2019 to take us
18    through today?
19                    MR. SOBOL:  Objection.
20            A.      I haven't been asked to do
21    that.  I don't know if I would be asked to do
22    that.
23                    MR. ROTH:  Why don't we take a
24            break, because I realize we've
25            probably covered some of these next
```

Highly Confidential - Subject to Further Confidentiality Review

 1              questions and I can streamline.

 2                   THE WITNESS:  Okay.

 3                   THE VIDEOGRAPHER:  The time is

 4         10:58 a.m.  We're now off the record.

 5                   (Recess taken, 10:58 a.m. to

 6         11:13 a.m.)

 7                   THE VIDEOGRAPHER:  The time is

 8         11:13 a.m.  We're back on the record.

 9    BY MR. ROTH:

10         Q.    Professor Rosenthal, if you

11    would please turn to paragraph 59, which is

12    on page 42.  All right.  So we're going to go

13    step by step here.

14         A.    Okay.

15         Q.    You say:  My primary dependent

16    variable, the outcome to be explained, is the

17    number of MMEs for all drugs at issue in this

18    matter.

19                   Do you see that?

20         A.    Yes.

21         Q.    Okay.  Why did you look at MMEs

22    as opposed to prescriptions or some other

23    measure?

24         A.    Sure.  Because, as I note in

25    this paragraph, the intensity of the medicine

1    that the patient is getting is a function not

2    just of the number of prescriptions, but the

3    number of pills and the strength of those

4    pills, and specifically the milligrams of

5    morphine equivalence is a way of being able

6    to cross-walk across drugs that have

7    different -- I'm going to use the term

8    "strength."  I'm not sure that would strictly

9    be correct, but different strength in terms

10   of how much morphine they deliver.

11        Q.     You agree that doctors

12   prescribe drugs, they don't prescribe MMEs to

13   patients?

14        A.     They prescribe drugs, dosages,

15   durations, all of which translate into MMEs.

16        Q.     And if you're looking at things

17   in terms of MMEs, you're not breaking it down

18   by drug molecule; is that correct?

19        A.     Well, again, in my analysis as

20   we've talked about, I -- even if I were

21   looking at -- I do a version of the model as

22   you know, that's in Attachment D somewhere,

23   where I look at pills.  And I don't

24   distinguish across drugs there either, again,

25   because my goal is to look at the market as a

1    whole.

2          Distinguishing by drugs is

3    not -- it's not unique to the fact that I'm

4    looking at MMEs.

5          Q.    I know you're not a medical

6    doctor, but you do understand that these

7    drugs have different chemical compounds and

8    might have differences in their labeling and

9    indications?

10         A.    Yes, I do understand that there

11   may be some differences, and again, I use

12   MMEs as a common unit of impact, as it were,

13   that is more nuanced than prescriptions or

14   pills but does not distinguish beyond the

15   morphine equivalence.

16         Q.    But because you're looking at

17   MMEs, you're losing data with respect to the

18   length or course of treatment, correct?

19         A.    Well, no.  Actually, I'm not

20   specifically looking at the length, but if,

21   for example, patients are getting longer

22   courses of treatment, that will show up as

23   more MMEs.

24         Q.    And similarly, if patients are

25   getting stronger molecules, that will also

Highly Confidential - Subject to Further Confidentiality Review

 1    show up as more MMEs?

 2         A.    That is correct.

 3         Q.    So you could have one patient

 4    taking 100 MMEs over the course of ten days

 5    and ten patients taking ten MMEs over the

 6    course of the same period of time, and your

 7    model makes no distinction between those two

 8    circumstances?

 9         A.    Yes, that's correct.  Again,

10    because I am -- I am responsible for looking

11    at the effect of marketing on sort of the

12    quantity of morphine equivalence that were

13    out in the world.  Whereas Professor Cutler

14    is then going to look at the effect of those

15    MMEs on harms, and his model will establish

16    the relationship between MMEs and harms.

17         Q.    So if the court, for example,

18    found that certain dosages were more prone to

19    abuse, okay, or dosages given over a certain

20    period of time are more prone to abuse, would

21    you have any way in your model to drill down

22    on that distinction and segregate out the,

23    quote, lawful MMEs that don't fit whatever

24    definition the court crafts on that?

25         A.    It seems to me that you've put

1    two things into your question, so maybe it's

2    just I don't understand the way you used the

3    terms "if the court determines."

4              So if the court determines that

5    certain packaging is subject to abuse, but

6    are you saying that the court determines that

7    any --

8         Q.    Let me try it again.

9         A.    Yeah.

10        Q.    Suppose the court or jury finds

11   that messaging related to higher-dosage drugs

12   was false but messaging for lower-dosage

13   drugs was not, how would your model that

14   looks at total MMEs account for that?

15        A.    Well, if I understand you

16   correctly, you're asking again about whether

17   I could narrow down my analysis by drug,

18   which I can do.

19        Q.    Not by drug, but by MMEs, if it

20   were by drug and strength?

21        A.    Yes.  So the observations

22   ultimately -- I can see you haven't played

23   around with the enormous dataset, but they

24   ultimately go to the NDC level, and an NDC

25   code is a drug, manufacturer, strength,

Highly Confidential - Subject to Further Confidentiality Review

1    formulation, I think those four dimensions.

2         Q.    Okay.  But what if it's

3    strength over a certain period of time in the

4    prescription?  What if it's, you know,

5    400 milligrams for a week or more is a

6    problem, but less than 400 for a shorter

7    period of time is not?

8         A.    I think you're confusing again

9    inputs and outputs here, so -- of course, I

10   can't -- I don't presume to know what the

11   court would think.  But as we talked about

12   before, what I'm really looking at is the

13   effect of some set of marketing efforts on

14   all the prescriptions that flowed from it.

15             So it's hard for me to imagine

16   that the court would say, yes, the conduct

17   was unlawful but some prescriptions that

18   flowed from it we won't count against damages

19   and some we will.  And so --

20        Q.    You can't conceive of that

21   happening?

22        A.    It's just not clear to me.  It

23   just seems, again, as we talked about before,

24   I'm not a lawyer, so I don't know exactly how

25   liability would work that way.

Highly Confidential - Subject to Further Confidentiality Review

 1              My analysis is really intended
 2     to look at all MMEs.  To the extent that only
 3     MMEs that were packaged a certain way, if
 4     that's my shorthand for, you know, dose and
 5     duration, for a given patient at a given
 6     point in time, if -- if those are the only
 7     things that create harms, then Professor
 8     Cutler will find a very weak relationship
 9     between the MMEs and the harms that he's
10     looking at.  I don't believe that's what he
11     finds, but that question could have a
12     downstream effect, but I know of no theory
13     like that.
14          Q.    Okay.  When you mentioned the
15     drugs at issue in this matter, what are the
16     drugs at issue in this matter?
17          A.    Well, it's a very long list.
18     They're in Attachment C, if you'd like to go
19     through them with me.
20          Q.    We don't have to go one by one,
21     but the drugs contained in Attachment C is
22     what you mean?
23          A.    Yes.
24              MR. SOBOL:  We could spend an
25          hour or so doing that.

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. ROTH:

 2         Q.    So -- but if I understand,

 3    though, the drugs contained in Attachment C

 4    are just drugs that someone has associated

 5    with one of the manufacturer defendants in

 6    this case, correct?

 7         A.    I actually need to look at

 8    Attachment C to see that it doesn't have an

 9    "all other" category.

10         Q.    It may.  Take a minute to look

11    for it, if you want.

12         A.    Yeah.  Yeah, I will.

13              (Document review.)

14         A.    I think Table C.1 is all of the

15    drugs.  It's not listed by manufacturer, but

16    it has all the drug names.

17    BY MR. ROTH:

18         Q.    So these are all of the --

19         A.    Yes, I believe --

20         Q.    -- chemical compounds?

21         A.    -- these are all the drug

22    names.

23         Q.    Okay.  So when you say drugs at

24    issue in this matter, you're referring to the

25    drugs listed in Table C.1?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    That's correct.

2    Q.    Now, you say in Attachment D

3    that your intent was to include all drugs

4    that have been scheduled as Schedule II at

5    any point in time; is that correct?

6    A.    That's correct.

7    Q.    Does your model differentiate

8    between detailing visits for drugs that were

9    Schedule III at the time they were detailed

10   but later became Schedule II?

11   A.    It does not.

12   Q.    And did you have any discussion

13   about doing that?

14   A.    I don't recall specifically,

15   but again, I make clear the assumption that

16   because those drugs were rescheduled that

17   they're considered to be Schedule II for my

18   analysis in every way.

19         If that assumption were proven

20   wrong, it could easily be adapted, as we

21   talked about before.  Changing what's in the

22   but-for scenario by drug by year by defendant

23   is relatively straightforward.

24   Q.    So you could take a drug that

25   you've included detailing for prior to 2014,

Highly Confidential - Subject to Further Confidentiality Review

1    for example, when oxycodone -- hydrocodone

2    got reformulated --

3            A.     I could.

4            Q.     -- and take out everything

5    before 2014?

6            A.     That's correct.

7            Q.     And that would change the

8    numbers in Table 3 of your report?

9            A.     Presumably, yes.

10           Q.     So you understand obviously

11   that some opioids have higher potency than

12   others, and that's why you used MMEs it

13   sounds like?

14           A.     Yes, that's correct.

15           Q.     And the conversion factors in

16   your data appendix, which we can look at in a

17   little bit, do you know where you got those

18   numbers from?  Was it the DEA website?

19           A.     They mostly come from the CDC

20   actually, but they didn't have all of them,

21   so assuming some of them come from that

22   Excellus document, I'd have to just look at

23   what I cite, but I know we had to go to a

24   second document.

25           Q.     Okay.  By definition, a

Highly Confidential - Subject to Further Confidentiality Review

1    prescription of a drug with a higher MME

2    conversion would have a greater impact on

3    overall MMEs?

4         A.    Yes, I think that that is a

5    statement on its face that must be true.

6         Q.    Does your model differentiate

7    between immediate and extended release

8    opioids?

9         A.    My model does not differentiate

10   between immediate and extended release.

11        Q.    And your model does not

12   differentiate between opioids prescribed for

13   short-term use versus long-term use?

14        A.    As we talked about before, I am

15   counting all MMEs, whether they were in a

16   3-day prescription or a 30-day prescription.

17        Q.    And your model does not

18   differentiate between abuse-deterrent

19   formulations and nonabuse-deterrent

20   formulations?

21        A.    Again, of course, that would be

22   a product-level characteristic.  One could do

23   so, but I have not, no.

24        Q.    Your model does not

25   differentiate between a hundred patients each

1    taking one MME versus one patient taking a

2    hundred MMEs?

3         A.    For the purposes of my

4    analysis, that is irrelevant.  I'm trying to

5    understand the total sales, yes.

6         Q.    And you don't differentiate

7    between product differences like, for

8    example, a fentanyl patch versus a Vicodin

9    pill?

10        A.    I am not distinguishing.

11   Again, I do not include injectables, but

12   otherwise, I include these other

13   formulations.

14        Q.    Otherwise, all MMEs are created

15   equal in your world?

16        A.    Yes.  For the purposes of my

17   analysis, I'm counting all MMEs.

18             MR. SOBOL:  In your world.

19             THE WITNESS:  Again.

20   BY MR. ROTH:

21        Q.    In your analysis, all MMEs are

22   created equal.

23        A.    That's correct.

24        Q.    It's nice that we all get our

25   own worlds.

Highly Confidential - Subject to Further Confidentiality Review

1       MR. SOBOL:  "Your analysis," is

2       that one or two words?

3       MR. ROTH:  It's not starting

4       with a U.

5    BY MR. ROTH:

6       Q.      And you don't differentiate

7    between the indications for which the MMEs

8    are prescribed in your analysis, correct?

9       A.      That's correct.  I'm looking at

10   total sales.

11      Q.      Right.  So whether an MME is

12   prescribed for surgery or chronic pain

13   doesn't matter for your direct model?

14      A.      As we talked about earlier, I'm

15   really focusing on the unlawful nature of the

16   conduct and looking at all the prescriptions

17   or all the MMEs that resulted from that.

18      Q.      Okay.  So now let's look at

19   paragraph 60 of your report.

20      A.      Okay.

21      Q.      Which is the same page we were

22   on, I think.  It's on page 42.

23      A.      Okay.

24      Q.      Are you there?

25      A.      Yep.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    It says:  The key explanatory

2    variable in the model is the number of

3    detailing contacts for opioids.

4          Do you see that?

5    A.    I do.

6    Q.    And we've been talking about

7    that, that that's sort of what you use for

8    your stock of promotion are the detailing

9    contacts at a given point in time, multiplied

10   by the depreciation factor?

11   A.    That's correct.

12   Q.    And you -- we agree that

13   detailing is just one of a variety of methods

14   a drug company may use to promote its

15   products to physicians?

16   A.    Yes.  And again, the data

17   suggest that it's a dominant one here.

18   Q.    If you look at paragraph 66,

19   you say:  While the defendants actively

20   sought to manipulate the scientific and

21   popular understanding of the risks of opioids

22   prior to 1999, according to plaintiffs'

23   marketing expert Perri, the release of the

24   American Pain Society and American

25   Association of Pain Medicine consensus

1    statement on pain, followed by the Federation

2    of State Medical Board Model Guidelines and

3    the Joint Commission on Accreditation of

4    Healthcare Organizations, pain management

5    standards were also important marketing

6    tools.

7              Do you see that?

8         A.    Yes.

9         Q.    And then you say:  Through such

10   advocacy, as well as traditional marketing

11   vehicles, Dr. Perri finds that defendants

12   sought to change the narrative about opioid

13   therapy, opening the floodgates to

14   prescribing.

15             Do you see that?

16        A.    Yes.

17        Q.    But, again, your model does not

18   look at non-detailing promotion as part of

19   the stock?

20        A.    Non-detailing promotion is not

21   included in the stock; it's incorporated in

22   my model in two ways.

23             One, in Model B, I used the

24   different eras during which these activities

25   were going on to allow promotional

1    effectiveness to be either increased or

2    decreased by those factors.

3            And two, in Model C, I

4    incorporate several of the events to see

5    whether any of that changes my results, and

6    find that they do not.

7    Q.    Did you consider using other

8    measures of promotion beyond detailing as

9    your explanatory variable?

10   A.    I did.  I believe there's a

11   footnote somewhere.  I just need to find the

12   right paragraph.  I know this paragraph moved

13   at one point, so now I can't remember whether

14   it's early or late.  Oh, here, paragraph 56.

15   Q.    Yep, I was going to take you

16   there.

17   A.    Okay.  Perfect.  Well, you just

18   let me struggle instead.  Yeah.

19            So as I note there, IQVIA,

20   where we get the data on promotion, has no

21   spending on professional journal

22   advertisements or direct-to-consumer

23   advertising, and the free sample data seemed

24   very spotty, and from what I could

25   understand, free samples were used

Highly Confidential - Subject to Further Confidentiality Review

 1    infrequently, perhaps for obvious reasons in

 2    this particular class.

 3         Q.    On the journal advertisements

 4    or the direct-to-consumer advertising, you

 5    did look at marketing budgets for the

 6    manufacturers, correct?

 7         A.    Yes.

 8         Q.    They're cited in your report I

 9    think in an earlier section.

10         A.    Yes.

11         Q.    Did you consider using those to

12    try to measure journal advertisements or some

13    of these other categories?

14         A.    I think those data would

15    just -- A, they're not monthly, and B,

16    they're -- they're very incomplete with

17    regard to the drugs, right?  If we were

18    trying to get this for every drug, we do have

19    product profit and loss statements for

20    specific drugs, and then aggregate marketing

21    budgets for the companies as a whole, but

22    it's simply not precise enough to use here.

23         Q.    Okay.  So I want to go through

24    this paragraph carefully.

25         A.    Sure.

Highly Confidential - Subject to Further Confidentiality Review

1   Q.    I suspect you knew I would.

2         So you mentioned that you

3   thought that detailing was the most dominant

4   form of promotion in a prior answer, and, in

5   fact, you write that as your first reason in

6   paragraph 56.

7         Do you see that?

8   A.    Yes.

9   Q.    And your citation for that is

10  just to Dr. Perri's report.

11        Do you see that?

12  A.    Yes, and then I go on to

13  describe what the data show.

14  Q.    Right.  So that's a good

15  clarification.

16        So when you're saying it's the

17  most dominant form of promotion, what you

18  really mean is in the data you reviewed, it

19  was the most dominant form of promotion that

20  was tracked?

21  A.    That's correct.

22  Q.    Okay.  Do you have any basis to

23  think beyond the data you reviewed that

24  detailing is the most dominant form of

25  promotion in the opioid market by, for

1    example, dollars spent?

2        A.    Well, I guess in the product

3    profit and loss statements that I looked at,

4    detailing was clearly in the majority.

5    Obviously -- so the detailing expenditures

6    that you can get in profit and loss

7    statements, they look a little different than

8    what you can get from IMS Health because the

9    sales force is -- is an expense that itself

10   isn't typically dedicated to one product, so

11   there's some allocation, versus the IQVIA

12   data are aggregating up from reported visits.

13            So they're a little bit apples

14   and oranges, but in the product and loss

15   statements that I looked at, yes, that

16   confirmed my understanding that detailing was

17   certainly the largest marketing tool.

18       Q.    Pausing on the IQVIA data, you

19   don't know that those are limited to one

20   product either, right?  There could be a

21   detail where the physician was detailed on

22   five drugs and it gets reported to all five

23   in the IQVIA data?

24       A.    That's correct.  So whatever

25   was discussed is what gets flagged for the

Highly Confidential - Subject to Further Confidentiality Review

1    IQVIA data.  It could be multiple drugs.

2        Q.     So when you're looking at the

3    IQVIA data for your detailing data, you don't

4    know whether opioids were the focus of the

5    conversation or not, if more than one drug

6    was reported for that contact?

7        A.     If more than one drug was

8    reported, I don't know the specific time

9    allocation.

10       Q.     And you didn't do any analysis

11   to try to dissect that issue?

12       A.     Well, there's no analysis that

13   I could imagine that you could

14   retrospectively go back and figure out what

15   was talked at for how long, and it's not

16   totally clear that time would be the best

17   measure.

18            So maybe you came and talked

19   about three drugs to me and I was convinced

20   to prescribe on all three of them, so is the

21   detail only one-third as value than the

22   detail dedicated to one of those drugs?  It

23   doesn't seem to me that it would be.

24       Q.     Then sticking with

25   paragraph 56, your second reason you focused

1    on detailing is pharmaceutical marketing

2    programs typically combine various forms of

3    marketing such that were there to be an

4    increase or decrease in promotional

5    detailing, it is reasonable to expect that

6    some other forms followed that course.  And

7    then you go on to say it's a good proxy for

8    that reason.

9              Do you see that?

10   A.    Yes.

11   Q.    And what is your basis for that

12   expectation, that other forms of marketing

13   follow detailing?

14   A.    Sure.  My experience doing

15   research in this area, and particularly using

16   the IQVIA data, the two that are most heavily

17   correlated tend to be detailing and sampling,

18   but there's correlation across all mechanisms

19   where there are data reported for all of

20   them.

21   Q.    Okay.  Did you perform any

22   study or analysis on the IQVIA data or any

23   other data in this case to confirm that in

24   the opioid market your experience holds true

25   with regard to how detailing and other forms

1    of promotion are correlated?

2         A.    Well, as I mentioned, when I

3    looked at the IQVIA data for journal

4    advertisements, direct-to-consumer

5    advertising, sampling, there was very little

6    data there.  I have no reason to believe that

7    they're just not measuring it.  It may be

8    that there are some kinds of advertising that

9    we see in the marketing budgets that IQVIA

10   doesn't capture.  But to the extent that the

11   IQVIA data are complete, it was not really

12   possible to do a correlation analysis because

13   there was so little data for these other

14   tools.

15        Q.    So when you say it's a

16   reasonable expectation that other forms of

17   marketing follow detailing, that's really

18   just an assumption based on your experience

19   with other drugs in other cases?

20        A.    It's based on my experience

21   with very similar kinds of analyses with

22   other drugs.  And again, I cite to

23   Dr. Perri's report at the beginning of this

24   where he talks about the coordination of

25   marketing mechanisms, so it's very consistent

Highly Confidential - Subject to Further Confidentiality Review

1  with his opinions as well.

2       Q.     Yeah.  But to be clear, that's

3  an assumption you're making that's not

4  supported by any specific work you've done to

5  confirm it's true that detailing and other

6  forms of promotion are correlated for

7  opioids?

8           MR. SOBOL:  Objection, asked

9      and answered.

10      A.     Again, the analysis -- the

11  correlation analysis was not possible here,

12  so I'm relying on my past experience and

13  Dr. Perri's expertise.

14  BY MR. ROTH:

15      Q.     Okay.  Then you say:  Third,

16  alternative measures of promotion that I

17  could obtain from available sources have

18  substantial missing data, e.g., estimates of

19  payments to pain advocacy groups can only be

20  obtained from the records of some, but not

21  all manufacturers.

22           Do you see that?

23      A.     Yes.

24      Q.     And that's what we've been

25  talking about.

1        A.      Yes.

2        Q.      Are you certain that every

3    manufacturer in this case has made payments

4    to pain advocacy groups for opioids?

5        A.      Well, given -- that's -- it's

6    hard to be certain about something for which

7    I have incomplete data, so I -- there are a

8    number of documents that I cite to that show

9    these kinds of payments, and I believe other

10   experts have tracked these payments as well.

11              But am I certain that every

12   defendant has evidence of that type?  No, I'm

13   not certain.

14       Q.      And then you wrap up this

15   paragraph saying:  Note that in this case

16   there appears to be substantial evidence that

17   through means other than promotional

18   spending, the defendant manufacturers

19   fundamentally changed opioid prescribing

20   standards.  The direct approach does not

21   calculate the efforts -- the effects,

22   sorry -- of the nonpromotional marketing and

23   is thus conservative.

24              Do you see that?

25       A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But that's not universally true

2    for all manufacturers, is it?

3            MR. SOBOL:  Objection.

4    A.    Again, my opinions here really

5    are to look at the market as a whole, and

6    even if there were a defendant that did not

7    incur this kind of spending, the effects of

8    changing things like guidelines would --

9    would flow through to everyone's drugs,

10   right.

11           So these are sort of broad

12   changes in the environment of prescribing,

13   and so again, I don't have an opinion on the

14   liability question of whether there's a

15   defendant who has not undertaken the

16   unbranded advertising, whether they therefore

17   should not be liable for its effects.  I

18   don't know the answer to that.

19   BY MR. ROTH:

20   Q.    What if a manufacturer engages

21   only in limited detailing and not other types

22   of promotional activities?  It would not be

23   conservative for that manufacturer to only

24   look at detailing, correct?

25   A.    The purpose of my analysis is

Highly Confidential - Subject to Further Confidentiality Review

1    not to assign liability to individual

2    defendants.  It's to look at the aggregate

3    effect.  So I don't know what would be

4    appropriate.  That to me seems like a legal

5    question.

6         Q.    Would it be conservative from

7    an economic perspective if a manufacturer

8    purchases an opioid product in, say, 2008 and

9    engages in detailing but no other marketing?

10        A.    I do not calculate any

11   estimates at the individual defendant level,

12   so I cannot characterize them as conservative

13   or otherwise.  I'm only looking at aggregate

14   effects.

15        Q.    Okay.  I'm just trying to get

16   at what you mean when you say the direct

17   approach is conservative.  It strikes me that

18   for a defendant who didn't participate in the

19   market ecosystem until late in the game and

20   only detailed, it's actually the opposite of

21   conservative the way your model calculates

22   damages.

23             MR. SOBOL:  Objection.

24        A.    I believe that is inaccurate.

25   My model does not calculate damages for any

Highly Confidential - Subject to Further Confidentiality Review

1    individual defendant, period.

2    BY MR. ROTH:

3        Q.    Causation, sorry, I should have

4    said.

5        A.    So again, because I am not

6    looking at impact for an individual

7    defendant, we cannot characterize my analysis

8    as conservative or otherwise for an

9    individual defendant.  It is for the market

10   as a whole.

11       Q.    Okay.  So when you say in

12   paragraph 56 that the approach is

13   conservative, you mean on an aggregate basis

14   it is conservative because it looks at

15   detailing and not other things?

16       A.    That's correct.

17       Q.    Okay.  Sort of implicit in that

18   statement and other things you've said today

19   is an assumption that all manufacturers

20   market opioids the same way.

21             MR. SOBOL:  Objection.

22   BY MR. ROTH:

23       Q.    Do you agree with that?

24       A.    I don't believe so.  Again, I

25   include in my model detailing.  To the extent

1    that there's variation in the way

2    manufacturers detail, the specific details

3    may generate more prescriptions or fewer, and

4    my model captures the average effect.  That's

5    what the coefficients basically tell us is

6    the average effects.

7                    So there may be variation in

8    there, but for the purposes of calculating

9    aggregate impact, the average is appropriate.

10        Q.    So for manufacturers who have

11   detailing that's below average, they're being

12   brought up to the average by the way you've

13   aggregated the model in terms of causation?

14        A.    Well, by definition, an average

15   will be not the same as all the individual

16   components unless there's no variation, and

17   so there will be some who are brought up and

18   some who are brought down.

19                    It's my belief, as we talked

20   about before, that this aggregate model is

21   the most reliable model; because there's

22   substantial spillover effects, because there

23   can be noise in the data when we try to

24   disaggregate it too much.  I think for that

25   reason, the aggregate model is preferable.

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.    You know, though, that not

 2   every manufacturer markets products the same

 3   way?

 4      A.    I guess -- I'm not exactly sure

 5   how to answer that question.  As we've talked

 6   about before, I am not a pharmaceutical

 7   marketing expert.  I leave that to Dr. Perri.

 8   I think it's reasonable to assume that there

 9   is some variation in tactics and the like

10   across manufacturers and perhaps across

11   products.

12      Q.    Well, let's look at one thing

13   you do talk about.  So there's a difference

14   in the way promotion is engaged in by brand

15   companies and marketing may be engaged in by

16   generic companies, correct?

17      A.    Yes, brand companies are

18   primarily the ones that engage in marketing.

19      Q.    A generic company might still

20   detail but may just talk about price and

21   formulary status?

22            MR. SOBOL:  Objection.

23      A.    Generally, manufacturers will

24   not detail physicians for generics.  They may

25   have other sales force activities that they

Highly Confidential - Subject to Further Confidentiality Review

1    do that relate to price, but individual

2    physicians are not generally making a

3    decision about one generic versus the other.

4    That decision happens at the pharmacy.

5    BY MR. ROTH:

6         Q.     But Attachment C contains a

7    slew of generics on that list?

8         A.     That's correct.  Some of them

9    have contacts related to them.  Some of them

10   don't.  Some of those contacts relate to

11   marketing agreements that are really for

12   brand drugs.

13        Q.     So how do you square your

14   testimony a minute ago that generics

15   generally don't detail with the fact that you

16   have a lot of promotional contacts in your

17   model for generic drugs?

18             MR. SOBOL:  Objection.

19        A.     I believe I just squared it.  I

20   think a lot of those contacts relate to

21   marketing agreements.

22   BY MR. ROTH:

23        Q.     And so if there's marketing

24   under a marketing agreement, that gets

25   attributed to the generic drug, even though

Highly Confidential - Subject to Further Confidentiality Review

1    it may be different in kind than a branded

2    drug promotional visit?

3                MR. SOBOL:  Objection.

4         A.    No.  The marketing of a

5    particular drug is identified, and if the

6    drug is sold by a defendant manufacturer,

7    even if it's detailed by a different

8    manufacturer, that gets counted in my model.

9    And then in Table 3, I take out those

10   marketing agreement related drugs.

11               So -- so it's -- the marketing

12   is associated with -- I mean, I look at

13   aggregate marketing, so it's all in the

14   aggregate marketing.  But I do have a

15   mechanism for pulling out marketing that's

16   for someone else's drug.

17   BY MR. ROTH:

18        Q.    So if that's the mechanism

19   you're using, how are any of these detailing

20   contacts being attributed to generic drugs in

21   your model?

22               MR. SOBOL:  Objection.

23        A.    I think you misunderstand the

24   nature of the model.  The model uses

25   aggregate MMEs and aggregate detailing, so

1    there's not an attribution underneath that.

2         And furthermore, as we know,

3    that detailing for the brand drug will spill

4    over to the generic drugs too, and so it's

5    entirely appropriate that the model allows

6    that to happen.

7         Q.    So maybe we're talking past

8    each other.

9         I understand the model works

10   that way.

11        A.    Yeah.

12        Q.    What I'm talking about, which

13   we'll get to later, is your Table 3 allocates

14   drugs to specific manufacturers, including

15   generic manufacturers, and I'm just trying to

16   understand how that works in a world where we

17   agree that generic drugs generally aren't

18   detailed.

19        A.    So Table 3, it sits on top of a

20   somewhat more complicated analysis, but what

21   it in effect does is it takes the detailing

22   associated with each of those defendants and

23   treats it separately, depending on where we

24   are in the table.

25        So, you know, at the top for

1    Actavis, to the extent that Actavis has

2    detailing in my data, the row that says,

3    well, what would the damages look like or

4    what would impact look like if Actavis'

5    detailing was deemed to be lawful?  Basically

6    we've taken out their detailing, out of --

7    we've left it in basically in a but-for

8    world.  It happens because it's lawful.

9              So that's how -- that's how the

10   allocation works, is in Table 3, it's by

11   manufacturer.

12        Q.    Okay.  We'll get there.

13        A.    Okay.

14        Q.    But that's helpful.

15              If you look back at

16   paragraph 55, I mean, you acknowledge that

17   detailing is undertaken by the brand name

18   drugs in the class, typically peaks during

19   initial launch, and ceases shortly before or

20   after the AB-rated bioequivalent generic

21   drugs enter.

22        A.    That's correct.

23        Q.    And how does your model account

24   for detailing at different points of a

25   product's life cycle, close-to-launch

Highly Confidential - Subject to Further Confidentiality Review

1    detailing versus the period right before

2    generic entry?

3         A.    My model is an aggregate model,

4    so I'm looking across drugs in the entire

5    market, and those drugs are at different

6    stages in their life cycle.  And so the

7    important input to my model is the level of

8    detailing, not where it is in the course of a

9    product's life cycle.

10             But we know that the bolus of

11   detailing happens for these new products, and

12   so that is incorporated into the data.

13        Q.    So it's incorporated in the

14   sense that you'll see more contact at the

15   beginning of the life cycle than at the end

16   of the life cycle?

17        A.    That's correct.

18        Q.    But the detailing that happens

19   at the beginning of the life cycle could be

20   qualitatively different than the detailing

21   that happens at the end of the branded life

22   cycle.

23             Would you agree with that?

24             MR. SOBOL:  Objection.

25        A.    I don't know that to be true.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ROTH:

2        Q.    As an economist, I mean, when a

3    product is launched, you would expect more

4    detailing about clinical studies and things

5    designed to promote a new product that

6    physicians might be unaware of, right?

7        A.    It may be that there is more of

8    that sort of baseline information at the

9    beginning.

10       Q.    Right.  And at the end of a

11   product's life cycle, when the generics are

12   about to come on the market, you might expect

13   the detailing to focus more on things like

14   price and availability and formulary status

15   and things of that nature, right?

16       A.    I have seen no detailing

17   information that pertains to price.  I can't

18   say that it never happens, but I've certainly

19   never seen that.

20           What that sort of -- what

21   you've just described here is on the one hand

22   saying, hey, there's this new drug early on,

23   and don't forgot your old friend at the end,

24   something to that effect.  Those -- those

25   differences are not relevant to the question

1    of does the detail generate more MMEs.

2            So for my purposes, I really

3    only want to understand does the detail

4    generate more MMEs.  And again, because I'm

5    looking at the aggregate, the fact that some

6    drugs are ending and others are beginning,

7    that -- that sort of -- that mix, it may

8    change a little bit over time, but I'll be

9    looking across a set of drugs at different

10   stages.

11        Q.    Okay.  But what I described

12   might be relevant to the question of whether

13   the detailing was lawful, correct?

14        A.    I don't know what you mean by

15   that.

16        Q.    Right.  So we've established

17   this, I think, but just to try it one more

18   time:  Because your model is just focusing on

19   whether detailing impacts the aggregate

20   number of MMEs, you don't evaluate any

21   qualitative difference in the kind of

22   detailing that is occurring?

23            MR. SOBOL:  Objection, asked

24        and answered.

25            ///

1    BY MR. ROTH:

2         Q.    Is that a fair statement?

3               MR. SOBOL:  Asked and answered.

4         A.    I -- you had a "because" at the

5    beginning of that sentence, which doesn't

6    make sense to me.  I am not looking at the

7    content of the detailing as we talked about

8    this morning.  I am assuming the plaintiffs

9    will prove their case.

10              I understand that you think

11   differently and you're trying to probe

12   whether I've tried to disaggregate the

13   detailing.

14              I have not tried to

15   disaggregate the detailing by drug or over

16   time.  It is possible to do that, but I have

17   not done that.

18   BY MR. ROTH:

19        Q.    So in your direct model, just

20   like all MMEs are created equal, all

21   detailing contacts are created equal?

22              MR. SOBOL:  Objection.

23        A.    Again, I would acknowledge that

24   there's variation in detailing and that my

25   model captures the average effect.

1    BY MR. ROTH:

2         Q.    And it captures the average

3    effect by treating each contact the same?

4              MR. SOBOL:  Objection.

5         A.    Well, I guess sort of an

6    average effect means that sort of

7    tautologically, I'm summing up all of the

8    effects.

9    BY MR. ROTH:

10        Q.    Does your model account for

11   rivalrous marketing?

12        A.    I'm so happy that we've gotten

13   back to this.

14             MR. SOBOL:  That makes one of

15        us.

16        A.    The aggregate model that I put

17   forth is intended to essentially obscure the

18   rivalrous marketing, so to the extent that

19   marketing only moves people from hydrocodone

20   to oxycodone or the other direction, whatever

21   it is, that will show up as a noneffect in my

22   model.

23             So I'm only looking at market

24   expansion because the question I care about

25   is market expansion.

1    BY MR. ROTH:

2        Q.    I'm not sure I followed your

3    answer.  So how does it show up as a

4    noneffect if you're including that contact in

5    your regression analysis, whether it was new

6    drug promotion or rivalrous marketing?

7        A.    I think the way you're looking

8    at rivalrous marketing is a bit different

9    than the way I would look at it.  And this

10   goes back to a conversation we had before

11   where I think there was a little bit of a

12   disconnect.

13            So it may well be that you go

14   to the detail and what you want to talk about

15   is why you're better than the other guy.  But

16   still, what happens is you actually increase

17   the use of any product in this class.

18            So what I'm concerned about is

19   not the intent of the marketing but the

20   effect of the marketing.  You seem focused on

21   the intent.

22       Q.    I do.  But now I think you've

23   helped me, and your answer is actually the

24   opposite of what I understood it to be

25   before.

Highly Confidential - Subject to Further Confidentiality Review

1             When you say that rivalrous

2     marketing is a noneffect, what you mean is

3     you don't assess whether the marketing was

4     rivalrous or not, because in either case,

5     your view is it will potentially lead to

6     increased MMEs, so it gets counted?

7             MR. SOBOL:  Objection, form,

8         asked and answered.

9         A.     I am interested only in a

10    particular kind of impact, and that impact is

11    an increase in the number of MMEs.  If there

12    is marketing that changes the drug people

13    take without affecting their MMEs, then I

14    ignore that.

15            Let's just say there's unlawful

16    conduct and you earn money off of it, but

17    it's really only because you've switched

18    brands.  That, I'm not counting, so that's a

19    kind of rivalrous marketing effect that's not

20    being counted in my impact assessment.

21            I'm only concerned about market

22    expansion by definition.  Economists can be

23    interested in both of those things, but for

24    my purpose, I'm only interested in market

25    expansion.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ROTH:

2        Q.    I'm just trying to understand

3    functionally how that happens.

4             So the reason you're saying

5    that is because you're only looking at the

6    delta, the change in MMEs, and so if there's

7    no change, then the rivalrous marketing

8    doesn't get counted?  I'm just struggling

9    with the mechanics.

10       A.    Sure.  Let me try to explain.

11            If we had two drugs in the

12   market and we looked at their marketing

13   separately, we could ascertain whether your

14   marketing increases your sales, right, and --

15   and then what we wouldn't know is, is that

16   increase coming from new patients, or is it

17   coming from the decrease in someone else's

18   sales.  So we could use a system kind of

19   analysis to show what's happening.

20            So people have done this in

21   prescription drugs.  I know you've spent some

22   time with the literature, and they're curious

23   about when you increase your sales, does it

24   come at someone else's expense or are you

25   just growing the market.  And in different

Highly Confidential - Subject to Further Confidentiality Review

1    drug classes, those two things seem to

2    operate differently.

3              But if you were to add those

4    two drugs together and say, okay, for any

5    herpes treatment, what's the total effect of

6    marketing?  Then what you would get is only

7    the market expansion effect.  You would wash

8    out any of the market stealing because your

9    gain is my loss.  And so those two things

10   would net out and you'd only get the net

11   result.  So that's what I'm doing here.

12        Q.    So the mechanics are because

13   it's an aggregate model that's aggregating

14   all contacts and aggregating all scripts, it

15   comes out in the wash if it's rivalrous?

16        A.    Exactly.  Rivalrous, again, my

17   definition of rivalrous is my sales come from

18   you and that those two things fully offset.

19        Q.    Okay.  But the detail itself is

20   still counted in the model, because you're

21   not actually looking substantively at the

22   detail to determine what happened?

23              MR. SOBOL:  Objection.

24        A.    That is correct.  The detail is

25   still in the model, and where the rivalrous

Highly Confidential - Subject to Further Confidentiality Review

1   piece shows up is that it dampens the

2   effectiveness of marketing that we measure.

3   BY MR. ROTH:

4        Q.    Okay.  We're finally on the

5   same page then.

6              How does your model account for

7   unbranded marketing?

8        A.    Well, in two ways.  In Model C,

9   I explicitly put in some of those events.  We

10  can look at exactly which ones they are.

11       Q.    I was saving this for later,

12  but we can --

13       A.    I know, it sounds like an

14  after-lunch conversation, but the consensus

15  statement from the American Academy of Pain

16  Management and the American Pain Society, the

17  Federation of State Medical Boards

18  Guidelines, the JCAHO pain standards

19  released.

20             So these, I understand that

21  plaintiffs intend to prove they were

22  manipulated by the defendants.  So I put

23  those explicitly in Model C.

24             And then as I describe Model B

25  and my rationale and the way I interpret the

Highly Confidential - Subject to Further Confidentiality Review

1    turning points is that they -- that is

2    incorporating these many different events and

3    tactics.

4         Q.    So the unbranded marketing is

5    captured by the way you do the breaks and the

6    way you test for these five events in

7    Model C, correct?

8         A.    That's correct.

9         Q.    But the unbranded marketing is

10   not captured in the detailing contacts you

11   use for your stock of promotion?

12        A.    That's correct.

13        Q.    How does your model account for

14   the peer-to-peer marketing that I think you

15   or Dr. Perri describes as a contagion

16   phenomenon in paragraph 25?

17        A.    Yeah.  So that phenomenon will

18   get picked up in marketing effectiveness,

19   because again, we're looking at aggregate

20   prescribing and not just the prescribing of

21   the targeted physicians.

22             So, you know, as -- we can go

23   back to our favorite paper by Datta and Dave,

24   they're looking at individual physicians.

25             It could well be, of course,

1    detailing physician A causes physician B's

2    prescribing to increase; they're not really

3    looking at that because they're only looking

4    within physician.  But we, for the same

5    reasons that I can capture market expansion

6    appropriately, aggregating up across doctors

7    here allows me to capture that contagion

8    effect.

9        Q.    We do agree, though, that at an

10   individual prescriber, individual detail

11   visit level, there could be variation in the

12   impact that visit has?

13       A.    There may be variation in the

14   impact of detailing on an individual

15   prescriber and her network and my model will

16   average that, will generate a result that

17   captures the average.

18       Q.    And we talked a little bit

19   earlier about some of the variability in the

20   way detailing occurs.  I think I used the

21   pizza example.

22            Do you remember that?

23       A.    I remember pizza.

24       Q.    Okay.  I want to come back to

25   that for a minute maybe because it's

1      lunchtime.

2              Not every detail visit occurs

3      the same way in terms of time spent and what

4      is disseminated from the pharmaceutical sales

5      representative to the doctor, correct?

6              MR. SOBOL:  Objection, asked

7          and answered.

8          A.     I would not disagree that

9      details can be different day of the week,

10     whether there's food involved, how much time.

11     BY MR. ROTH:

12         Q.     And frankly, who is detailed,

13     because it could be a prescribing doctor or

14     it could be a nurse practitioner, it could be

15     some other healthcare professional in the

16     doctor's office, right?

17         A.     Yes, that's correct.

18         Q.     And does the IQVIA data you've

19     looked at distinguish between the target of

20     the detail?

21         A.     It distinguishes between

22     office-based and hospital-based physicians,

23     but it does not distinguish by licensure as

24     you've just described.

25              And again, what I'm interested

1    in is the aggregate impact, and therefore,

2    the average across that variation is

3    appropriately subsumed in my analysis.

4         Q.    Right.  And because you used

5    the average, whether the sales rep makes

6    contact with the prescribing doctor and

7    spends 15 minutes discussing the virtues of

8    opioids or whether the sales rep quickly

9    speaks to a nurse practitioner to leave the

10   coffee mug will get treated the same as an

11   average in your model?

12        A.    Yes.  And that is appropriate

13   if you're interested in the aggregate effect.

14   If I were interested in comparing the

15   difference between a detail with pizza versus

16   a detail without pizza, then I would want to

17   look at them.  But I'm only interested in the

18   aggregate effect.

19        Q.    Are you aware that detailing

20   could be limited to simply providing

21   literature that contains information

22   contained in the package insert or approved

23   by the FDA in promotional materials?

24             MR. SOBOL:  Objection.

25        A.    I'm not exactly sure what you

1     mean by simply.  I think we're getting into a

2     question about what and how will be proven to

3     be unlawful.  And if the question is was

4     certain information omitted, then the fact

5     that the information that was provided was in

6     some way not challenged, to me, seems like it

7     could still be a problem.

8                But the larger issue is that I

9     think it's not appropriate to try to pull

10    these detail visits off one at a time.  If

11    there was some messaging around the utility

12    of treating patients with opioids at an

13    earlier visit and these later visits are just

14    reminder visits, again, I'm not -- I'm not

15    trying to prove liability here, but to me as

16    an economist, it seems like they could well

17    be connected.

18    BY MR. ROTH:

19         Q.    And they all count the same way

20    as the average?

21         A.    All -- all details in my data

22    are included in the right-hand side, and they

23    produce an average effect, and then I back

24    out those particular ones deemed unlawful.

25         Q.    And similarly, if the detail is

1    corrective messaging designed to dampen the

2    effects of some prior materials that FDA has

3    issued a warning letter on, those detail

4    visits get picked up by your data as well?

5              MR. SOBOL:  Objection.

6        A.    I think you need to understand

7    what the regression is doing.  It is not just

8    saying sales are strictly promotional to

9    detailing.  It's trying to look at that

10   effect, and, in fact, in the last period of

11   my three-period model, the effective

12   promotion is declining.

13             To the extent that there's

14   corrective messaging, that may be one of the

15   factors that is decreasing the effectiveness

16   of promotion, and so there are not MMEs

17   assigned to have been produced by that

18   detail.

19   BY MR. ROTH:

20       Q.    Let me just ask a simpler

21   question:  Yes or no, are details that are

22   simply designed to provide corrective

23   messaging included in your stock of

24   promotion?

25             MR. SOBOL:  Objection, asked

Highly Confidential - Subject to Further Confidentiality Review

1      and answered.

2      A.     I really have no idea about

3   whether such details exist.  My model

4   includes all detailing over the period from

5   1995 to 2018 based on the instruction that I

6   was given to consider that unlawful.

7   BY MR. ROTH:

8      Q.     Okay.  Without distinguishing

9   between the quality or extent of those

10  detailing visits?

11         MR. SOBOL:  Objection, asked

12      and answered.

13     A.     I do not distinguish among

14  those details, no.

15  BY MR. ROTH:

16     Q.     And I think we talked about

17  this, but I'm not sure.

18         You don't differentiate between

19  which physician practice groups were targeted

20  by the details in your model?

21         MR. SOBOL:  Objection, asked

22      and answered.

23     A.     As I noted, my detailing

24  measure is national.  It's aggregate.  It

25  does not distinguish at a level below that.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ROTH:

2        Q.    Do you have any view as to

3    whether allegedly deceptive marketing is more

4    impactful than truthful marketing?

5        A.    I think I do discuss this in my

6    report, and there's an economic theory

7    related to the profitability of fraud and

8    some evidence from other sectors that suggest

9    that for something unlawful to be undertaken

10   when lawful activities are possible, that it

11   must be more profitable because there's some

12   cost associated with matters such as this

13   one.  And so that would suggest that that

14   kind of marketing must be more profitable

15   than marketing to other physicians.

16            I think this is -- it depends

17   on what assumptions we're making about the

18   intention and knowledge of the various

19   actors.  So I think it could go either way.

20       Q.    But within your model, within

21   the time periods of your model, you treat

22   each of the details equally because in your

23   view, you assume them all to be equally

24   unlawful at this point in time?

25            MR. SOBOL:  Objection.

1          A.      I am, as we've noted earlier,

2     operating on the assumption that the

3     defendants' conduct during the relevant

4     period was unlawful, and my model uses a

5     single measure of detailing and therefore

6     averages across allegedly lawful and unlawful

7     details.

8     BY MR. ROTH:

9          Q.      Let's look back at Datta and

10    Dave because you asked to.

11         A.      Okay.

12         Q.      It's Exhibit 5, for the record,

13    and I -- can you turn with me to page 454.

14         A.      Okay.

15         Q.      So at the top of the page it

16    says:  Thus, detailing plays a role in

17    educating providers about newer drugs and

18    their attributes and may have information

19    value early in a product's life cycle,

20    whereas later in the life cycle, its role can

21    be predominantly persuasive and chiefly

22    relegated to delivering samples and

23    reminders.

24              Do you see that?

25         A.      I do.

1     Q.    And then at the end of the

2     paragraph, they say:  Because detailing can

3     affect both selective (brand centric) and

4     primary (market) demand under these views --

5     citation to Dave and Kelly, 2014 -- the

6     question cannot be resolved based on theory

7     alone, and empirical evidence needs to bear

8     upon the question.

9              Do you see that?

10    A.    Yes.  Just to be clear, what

11    they're talking about there is the welfare

12    effects of marketing, and that is a separate

13    question than the one that we're discussing

14    here.

15    Q.    It's the same issue that we've

16    been going around on, right?  You're not

17    looking at the welfare, you're not looking at

18    the quality; you're just looking to see if

19    there's a correlation between detailing

20    visits as a stock of promotion against

21    MMEs --

22              MR. SOBOL:  Objection, asked

23         and answered.

24    BY MR. ROTH:

25    Q.    -- on an aggregate basis.

```
 1              MR. SOBOL:  And there's a lot
 2         in there, so be careful.
 3         A.    I just want to say that the
 4    sentence that you just said had a number of
 5    pieces that I think are entirely unrelated to
 6    one another.
 7              So a welfare analysis is -- is
 8    an economic analysis that is based on the
 9    theory of demand and is -- is specific to
10    this idea that consumers make rational
11    decisions, so what he's talking about in this
12    sentence really has nothing to do with this
13    question about the quality of detailing or
14    not.
15              That sentence is not connected
16    to the "thus detailing plays a role in
17    educating providers."  They have a marketing
18    theory that you related before about what
19    happens early versus late in the life cycle,
20    but this last sentence is really just about
21    are consumers better off because of
22    promotion, or not.
23              And the way economists do a
24    welfare analysis like this one is to assume
25    that consumers are perfectly informed and
```

1  perfectly rational and that if marketing is

2  only about stealing market share and it

3  doesn't increase the size of the market, that

4  consumers are worse off.  But if it does

5  increase the size of the market, that

6  consumers are better off.

7            As a health economist and a

8  person who sits in the School of Public

9  Health, I would like to say that if this

10  marketing was only about market expansion, as

11  it seems to have been quite a bit about

12  market expansion, I don't think consumers are

13  better off as a result.  They're just

14  operating from a totally different framework.

15  BY MR. ROTH:

16       Q.    Okay.  Let's go back to the

17  first sentence, which I think was more

18  relevant.

19            They theorized that based on

20  their results, there is a difference between

21  marketing early in the life cycle and

22  marketing later in the life cycle?

23       A.    They are positing a theory

24  about the intent of marketing and the focus

25  of marketing, but they do not say anything

1    about whether that generates more sales at

2    the beginning or more sales at the end.

3              There again, they're really

4    focused on this are you getting a new unit

5    from a patient who hasn't been treated versus

6    a new unit from a rival.

7         Q.    Got it.

8              MR. ROTH:  I think now is a

9         decent time to take lunch.

10             THE WITNESS:  Okay.

11             THE VIDEOGRAPHER:  The time is

12        12:09 p.m.  We're now off the record.

13             (Recess taken, 12:09 p.m. to

14        12:51 p.m.)

15             THE VIDEOGRAPHER:  The time is

16        12:51 p.m.  We're back on the record.

17   BY MR. ROTH:

18        Q.    Professor Rosenthal, before

19   lunch we were talking about how your stock of

20   promotion just includes detailing visits

21   multiplied by a coefficient as a single

22   variable; is that correct?

23        A.    Just to be perfectly clear,

24   it's a cumulative sum of detailing in one

25   period -- all the preceding periods with the

Highly Confidential - Subject to Further Confidentiality Review

1    depreciation rate applied.

2         Q.    Are you aware that there are

3    other economic studies of the effect of

4    marketing that model detailing using multiple

5    variables?

6         A.    I know that detailing has been

7    modeled as both a stock and a flow, and both

8    at the same time.  I don't know if that's to

9    what you're referring.

10        Q.    It may be.

11             (Whereupon, Deposition Exhibit

12             Rosenthal-7, 2002 Azoulay Publication,

13             was marked for identification.)

14   BY MR. ROTH:

15        Q.    So let me mark as Exhibit 7 the

16   Azoulay study, Do Pharmaceutical Sales

17   Respond to Scientific Evidence.

18             Do you have that in front of

19   you?

20        A.    I do.

21        Q.    And the Azoulay study is a

22   document that I think you quote from and --

23   in your report and rely on in your

24   attachment.

25        A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    So if you'd turn with me to
 2   page 558, and if you have to look before or
 3   after to answer this question, feel free, but
 4   did Azoulay run a time series regression in
 5   this study similar to yours in this case?
 6              MR. SOBOL:  Objection to the
 7         form.
 8         A.    Yes.  I should look just to be
 9   sure.  He's effectively doing a panel model,
10   so he has multiple antacid drugs, and looking
11   at them over time, so I would call it a panel
12   model as we discussed this morning.
13   BY MR. ROTH:
14         Q.    Okay.  And if you look at
15   page 558, there's a description of his
16   variables.  And it looks like in his
17   description he has three variables related to
18   the flow of detailing and then also a stock
19   of detailing variable.
20              Do you see that?
21         A.    Yes, I do.
22         Q.    And then he actually also
23   models the flow of journal advertising and a
24   stock of journal advertising.
25         A.    Yes, that's correct.
```

1    Q.     And in the flow of detailing

2    variables, he has variables both for the flow

3    of monthly detailing minutes for a drug and

4    the flow of monthly detailing minutes for

5    competitors of the drug, and then a third

6    variable for the flow of monthly detailing

7    minutes for the firm selecting the drug.

8         Do you see that?

9    A.     Yes.

10   Q.     So he's, it looks like,

11   measuring the time and length of details in

12   his model?

13   A.     Yes, that -- excuse me.  That

14   is what it appears he's doing, and I would

15   note, of course, the purpose of his model is

16   different.  We talked about the fact that

17   he's doing a panel data model, so of course

18   he has own and other detailing.  That's --

19   the second detailing is for competitors.

20   Q.     Well, the purpose of his model

21   is to determine whether doctors respond to

22   scientific evidence; is that right?

23   A.     That's one of his purposes.

24   That's the title of his -- of his paper, but

25   he's -- he's looking at detailing and

1    scientific evidence at the same time in this

2    model.

3         Q.    And he's trying to see how

4    doctors respond to both sources, detailing as

5    well as clinical studies and scientific

6    articles?

7         A.    Yes.  I'm just saying that

8    because he's using a product-level model and

9    he's interested in how drugs are competing

10   with one another, he naturally includes

11   different variables.

12        Q.    And that's not something you've

13   done in this case?

14             MR. SOBOL:  Objection.

15        A.    That was not my question of

16   interest, and therefore, I've selected a

17   model that is appropriate to the question

18   that I was assigned, which is what is the

19   aggregate impact of marketing of opioids.

20   BY MR. ROTH:

21        Q.    Okay.  And then I'm going to

22   mark as Exhibit 8 a study by Dr. Ernst Berndt

23   and others, Information, Marketing and

24   Pricing in the U.S. Antiulcer Drug Market.

25             (Whereupon, Deposition Exhibit

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Rosenthal-8, 2001 Berndt et al
 2              Publication, was marked for
 3              identification.)
 4    BY MR. ROTH:
 5         Q.    Do you have the Berndt study?
 6         A.    I do.
 7         Q.    And if you look at page 102 --
 8         A.    Sorry.  Oh, there it is.  I
 9    couldn't find the page numbers for a moment.
10              Yes, go ahead.
11         Q.    It looks like Professor Berndt
12    and his colleagues are also doing an
13    econometric regression to look at the impact
14    of marketing for drugs in this study; is that
15    correct?
16         A.    Yes.  Again, they have a panel
17    model for the same drugs.  I believe,
18    actually, they're the same data.  Ultimately,
19    I know that Dr. Berndt worked with
20    Dr. Azoulay.
21         Q.    On page 102, in the first
22    column towards the bottom, it says:  In terms
23    of marketing efforts, we distinguish three
24    channels: the minutes of detailing to
25    physicians, the number of pages of medical
```

Highly Confidential - Subject to Further Confidentiality Review

1    journal advertising, and the target rating

2    points of direct-to-consumer advertising.

3              Do you see that?

4         A.    Yes, I do.

5         Q.    So in this study as well, they

6    were looking at variables to measure the

7    magnitude of marketing, whether by minutes or

8    by pages or by rating points.

9         A.    Yes, they used a different

10   measurement.

11        Q.    Okay.  If you turn to page 51

12   of your report -- I'm sorry, paragraph 51 of

13   your report.  It's the section Data Source

14   and Trends, if that helps, on page 34.

15        A.    Yeah, got it.  Sorry, I just

16   need to move the clip.  Okay.

17        Q.    So you're describing the data

18   you used, and you say:  The primary data I

19   used for the direct analysis come from the

20   data tracking and consulting firm IQVIA.

21              Do you see that?

22        A.    I do.

23        Q.    And then you describe the data:

24   IQVIA maintains a number of data streams that

25   capture information on sales, promotion and

1    other statistics by individual drug over

2    time.

3              And then you say that

4    specifically, the specific products you

5    incorporate are the National Prescription

6    Audit and the Integrated Promotional

7    Service's data.

8              Do you see that?

9        A.    Yes.

10       Q.    So the NPA and IPS.

11             Does IQVIA have other marketing

12   or sales data than the NPA or IPS that you

13   could have used in your models?

14             MR. SOBOL:  Objection.

15       A.    Well, the National Prescription

16   Audit data, those are sales data.  Those are

17   retail sales, so I just wanted to be clear

18   those are not the promotional data.

19             The promotional data are the

20   IPS data.  And I believe the IPS data, which

21   as we discussed earlier today, do

22   traditionally include samples, journal

23   advertising and direct-to-consumer

24   advertising.  I believe that that is their

25   main product.  I can't be sure that they

1    don't have another promotional product.  I'm

2    not aware of one.

3    BY MR. ROTH:

4         Q.    And as I think we talked about

5    earlier, the IPS data is survey based?

6         A.    That's correct.

7         Q.    And I think you said you didn't

8    run models with samples or journal spend data

9    given gaps in the data?

10        A.    Because there were big gaps in

11   the data, yes, I did not.

12        Q.    Have you used those data

13   sources in other cases where you had more

14   robust data?

15        A.    Yes, I have.

16        Q.    Including in the Neurontin

17   case, I think?

18        A.    We included professional

19   journal articles because there were -- there

20   were monthly data available in those.

21        Q.    Are you aware of any other

22   sources of data regarding prescriber-specific

23   promotion?

24        A.    I am not specifically, but it

25   depends a little bit on what you mean.  As

1    you perhaps know, the federal government has

2    required that pharmaceutical manufacturers

3    report certain transfers of value at the

4    physician level, and those are publicly

5    available, I think, starting 2014.  I may

6    have the year wrong.

7              So for some years, for some

8    types of activities that are clearly

9    marketing, there are some physician-level

10   data, and I describe some of the papers that

11   use those.

12        Q.    And that's not a dataset you

13   considered using in this case because it

14   started late or --

15        A.    It starts very late, yes.

16        Q.    Okay.  Have you heard of

17   something called the Scott-Levin Personal

18   Selling Audit?

19        A.    Yes, Scott-Levin doesn't exist

20   anymore.  It's part of IQVIA.

21        Q.    And what years does that audit

22   data cover?

23        A.    I don't believe it's possible

24   to obtain those data anymore since IQVIA

25   purchased Scott-Levin, which must be at least

Highly Confidential - Subject to Further Confidentiality Review

1    five years ago.

2         Q.    So you can't even get old data

3    from Scott-Levin?  IQVIA won't allow

4    purchase?

5         A.    I don't recall all the details,

6    but I do recall -- IMS and Scott-Levin had

7    these competing products, and at different

8    times I've used Scott-Levin data and there

9    were some differences.  And at one time I

10   tried to get the Scott-Levin data because I

11   preferred it for whatever the project was.  I

12   don't recall what the difference was, but I

13   know that I did actually try to get the

14   Scott-Levin data and was unable to.

15        Q.    Did you consider any other

16   sources of prescriber-specific promotion data

17   beyond IQVIA or maybe Scott-Levin for this

18   case?

19        A.    Well, in general, as I noted

20   earlier, I and my staff asked counsel to

21   identify any materials in discovery that

22   would help us with physician-level detailing,

23   and we did not find anything that was

24   comprehensive that we could use.

25        Q.    And when you asked counsel to

1  help you identify that data, did you receive

2  like the full suite of data produced in the

3  case?  Like what specifically did you get

4  that you looked through to find data that was

5  usable?

6       A.    My staff had access to

7  everything that was produced in the case, and

8  as you know, it's a rather large, complex

9  case, so we made those requests through

10  counsel for help navigating.  And I believe

11  that everyone looked to their best ability to

12  find the data that I had asked for.

13       Q.    And when you say your staff,

14  you're referring to Greylock McKinnon?

15       A.    Excuse me.  Yes.  Greylock

16  McKinnon.

17       Q.    Did you work with Compass

18  Lexecon at all on your report or your models?

19       A.    I attended meetings with them

20  and conversations.  I wouldn't say I worked

21  with them directly.

22       Q.    So you had the Greylock

23  McKinnon team working under you, and that was

24  separate from Professor Cutler and Gruber and

25  McGuire's Compass Lexecon team?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      That's correct.
 2              Q.      Do you know whether your teams
 3     interacted with each other?
 4              A.      Yes, they did.
 5              Q.      Do you know how frequently?
 6              A.      I do not.
 7              Q.      And I think we talked about
 8     this earlier, but let me just ask you an
 9     open-ended question.
10                      What data did you review that
11     was -- sorry, strike that.
12                      Did you review any data
13     produced by the manufacturers that was
14     prescriber-specific promotion data?
15              A.      I can't recall whether I
16     actually reviewed prescriber-specific data.
17     I requested it, and what I requested was
18     determined not to be available.  I'm not sure
19     if I saw any pieces of data.
20                      I did see marketing documents
21     and product P&Ls that referred to marketing
22     expenditures specifically, but that's not
23     really what you're asking about.
24              Q.      And when you say the data was
25     determined not to be available, was that a
```

1    determination you made or that someone at

2    Greylock made?

3         A.    Well, again, I made a very

4    specific request for detailing data,

5    promotional data over time and across

6    physicians, and I was told that it didn't

7    exist.

8         Q.    But you did have access to some

9    of the marketing budgets which are cited in

10   your report I think in footnote 70?

11        A.    I could check that, but, yes, I

12   did.  As I mentioned, I did review marketing

13   reports and product and loss -- profit and

14   loss statements by product.

15        Q.    And did you ask for a

16   comprehensive set of all of the marketing

17   budgets produced in the case?

18        A.    I did, and I don't believe I

19   used them systematically like that, but I did

20   ask for marketing budgets for all of the

21   defendants.

22        Q.    Did you consider using the

23   marketing budgets to measure marketing by

24   dollars spent as opposed to through the IQVIA

25   data?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Yes.  And as you know, because

2  there's some missing data for OxyContin, I do

3  actually use the marketing budgets to help me

4  interpolate.  But it's not a -- I can't --

5  it's not monthly data, and -- and I don't

6  have complete marketing budgets for every

7  product for every time period, so it's simply

8  impractical to use that as an alternative.

9      Q.     Did you review prescriber-level

10  prescription data?

11      A.     No, I did not have any

12  prescriber-level prescription data.

13      Q.     Did you ask for that?

14      A.     Because the rate-limiting step

15  is the promotional data, I'm not sure I asked

16  for it.  I asked for the promotional side.

17      Q.     But for the other side of your

18  model, the MMEs, you could have ostensibly

19  used prescription data for that, right?

20           MR. SOBOL:  Objection.

21      A.     That would not make sense to

22  have an aggregate independent variable and a

23  disaggregated dependent variable.  It would

24  have -- it would have given nonsensical

25  results.

1    BY MR. ROTH:

2        Q.    Got it.

3              So when you say the

4    rate-limiting side --

5        A.    Yes.

6        Q.    -- you only had aggregate data

7    on the promotion side, so you wanted to use

8    aggregate data for everything?

9        A.    Yes.  As I mentioned earlier, I

10   considered whether it was possible to take

11   this approach, and I knew that the problem

12   was in quantifying promotion at the

13   individual physician level.

14       Q.    Did you have access to data

15   about payments to key opinion leaders?

16       A.    Again, I believe that some of

17   those payments are tracked in the marketing

18   documents that I looked at.  Right now I can

19   mostly think of the ones that go to

20   organizations rather than individual key

21   opinion leaders.  I believe some of the other

22   experts examined some of those payments, but

23   I did not directly.

24       Q.    And you anticipated my next

25   question.  So you've also seen data about

Highly Confidential - Subject to Further Confidentiality Review

1    payments to pain advocacy organizations, it

2    sounds like?

3        A.    Yes.  And again, I think I cite

4    a few examples of those.  But if you can't

5    track something systematically over time, you

6    can't include it in a statistical model like

7    this one.

8        Q.    So if I understand your

9    testimony, you did not have access to

10   promotion data that was disaggregated by drug

11   manufacturer and geography?

12           MR. SOBOL:  Objection.

13       A.    I don't think that's -- well,

14   it's not wrong, but it's not right either.

15   BY MR. ROTH:

16       Q.    It's too broad.

17           You did not have, on a global

18   basis for all manufacturers, disaggregated

19   promotion data by drug and geography?

20           MR. SOBOL:  Objection.

21       A.    My data allow me to

22   disaggregate by drug, by defendant.  And as

23   we talked about earlier, the IQVIA data make

24   it possible to disaggregate by specialty.

25           I cannot disaggregate by

1   geography or by physician.

2   BY MR. ROTH:

3        Q.      Why did you believe it was

4   appropriate to use a national model?

5        A.      Again, the question at hand is

6   an aggregate question.  The question is to

7   what extent did the conduct of these

8   defendants affect the expansion of the use of

9   opioids in the United States and in the

10  specific bellwether counties.

11              And ultimately, marketing is a

12  national phenomenon.  I believe the most

13  reliable way to estimate the effect of

14  marketing on sales is to do so at the

15  national level.  It smooths out variability

16  in the data in ways that make the analysis

17  more likely to show a true effect.

18              It also overcomes certain data

19  challenges that we've been talking about

20  where if we only focused on those physicians

21  who were detailed versus those who were not,

22  we might get the wrong results.

23              So in sum, the aggregate

24  analysis in my mind is the most reliable way

25  to estimate the impact of the alleged

1    misconduct.

2         Q.     If you did not use aggregated

3    national data, would there be more

4    variability in the data that make it more

5    likely there would not be a true effect shown

6    from promotion?

7              MR. SOBOL:  Objection.

8         A.     Anytime we disaggregate data,

9    we will increase the amount of variability,

10   and that creates statistical noise which can

11   essentially overwhelm the effects.

12   BY MR. ROTH:

13        Q.     Did you test your hypothesis

14   that marketing is national in scope by

15   comparing the impact of detailing stock

16   across geographies?

17             MR. SOBOL:  Objection.

18        A.     It's -- I began the analysis on

19   the premise that this was a national campaign

20   of misinformation, allegedly, and so an

21   aggregate model is the right place to begin.

22             To the extent that there's

23   geographic variation, it would nonetheless be

24   true that the aggregate effect would capture

25   all of that variation.

Highly Confidential - Subject to Further Confidentiality Review

1          In all of the instances where

2   we have talked about variation today, that

3   variation is appropriately subsumed in my

4   model.  I do show an average effect, but that

5   is what is meaningful for constructing

6   aggregate impact.

7   BY MR. ROTH:

8          Q.     Do you have any opinion as to

9   what is causing the geographic disparity in

10   the number of opioid shipments, given your

11   view that the marketing campaign was national

12   in scope?

13          MR. SOBOL:  Objection, scope.

14          A.     The geographic variation in

15   opiate prescribing and deaths is really the

16   subject of Professor Cutler's report.  I do

17   not have an independent opinion on that

18   question.

19   BY MR. ROTH:

20          Q.     But you are aware from studies

21   and data that the opioid issues affect

22   certain geographies of this county more than

23   others?

24          A.     Yes, and I believe Professor

25   Cutler addresses that directly in his report.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     That's not an issue that you've

2    studied or have an opinion on?

3      A.     That's correct.

4      Q.     If you look at paragraph 61,

5    we've finally gotten to your equation.  And

6    can you just confirm, I don't believe this

7    was changed by your errata, although I saw

8    some equations did change so --

9           MR. SOBOL:  That's my copy.

10    I'm kidding.  Actually, I think it is.

11      A.     Just checking, myself.  I think

12    it's in the appendix that the equations were

13    changed, yeah.  They're all in Attachment D,

14    yeah.

15    BY MR. ROTH:

16      Q.     So this equation on page 43, Qt

17    equals --

18      A.     Checking your Greek.

19      Q.     -- alpha -- no epsilon?

20      A.     That's alpha.

21      Q.     Alpha.  I thought it was.  Qt

22    equals alpha plus -- why don't you just say

23    it in words, because if I try, I'm going to

24    massively fumble it.

25      A.     We could say it in actual

Highly Confidential - Subject to Further Confidentiality Review

1    words.  So Q is the quantity of opioid MMEs

2    for a particular month.  Alpha is just the

3    constant term.  That's just the intercept.  S

4    prime of t is -- this is the -- in this case,

5    it is the stock of detailing.  Beta is the

6    coefficient on that, just using the standard

7    for doing matrix algebra in reverse.

8                    So -- and then X is the vector

9    of other factors.  So in Model C, right, it

10   includes those dummy variables in addition to

11   price.  And then e is the error term.  And

12   gamma, sorry, is the coefficient on those X

13   variables.

14         Q.    And in terms of the other

15   factors variable, the only things being

16   picked up there are price and then the

17   Model C events?

18         A.    That's correct.

19         Q.    And essentially what this

20   equation allows you to do is plot total

21   opioid MMEs over time against your stock of

22   detailing over time?

23         A.    I guess I don't know what you

24   mean by "plot."  This equation is intended to

25   represent the regression line that is being

1    determined by the statistics, which

2    essentially looks at the variance and

3    covariance of the underlying valuable --

4    variables to ascertain what that relationship

5    would be to calculate the alpha, beta, gamma.

6            So I guess plot is one way of

7    thinking about it, but it's in

8    multidimensional space, so...

9        Q.    My mathematical mind is more

10    limited than yours --

11        A.    Okay.

12        Q.    -- so I used the term "plot."

13    I apologize if that's too narrow.

14        A.    That's okay.

15        Q.    What is a stock of detailing?

16        A.    Well, stock of detailing is

17    like a stock of anything else, that it's

18    cumulative and it has a depreciation rate so

19    that we can ascertain how the cumulative

20    effects relate to things that happened in the

21    distant past versus the near past.

22        Q.    And why did you decide to use a

23    stock instead of just the number of contacts?

24        A.    The stock of detailing -- I

25    know you've gone over a couple of papers, but

Highly Confidential - Subject to Further Confidentiality Review

1    if you look across the literature, probably

2    about half of them use the stock of

3    promotion.

4              It's conceptually appealing

5    because the idea that you don't just forgot

6    something because you were detailed two

7    months ago, that makes sense, that detailing

8    in one period would have effects in a later

9    period.  So that's the main reason for doing

10   it.

11        Q.    It's true, then, that your

12   stock of promotion is a calculated value in

13   your model; it's not some observable number

14   out there in the world?

15        A.    I'm not 100% sure what you mean

16   by that, but -- so the stock is -- it's

17   observable by adding up things that are

18   observable.

19              The depreciation rate is

20   estimated in the context of the model using a

21   specification test, so that part, you know,

22   again, it comes from the underlying data, but

23   it is estimated.

24        Q.    Okay.  And then in

25   paragraph 62, you say:  Detailing contacts

Highly Confidential - Subject to Further Confidentiality Review

1    were entered into the model as a stock,

2    including the number of current contacts and

3    the depreciated value of past contacts.

4            Do you see that?

5    A.    Yes.

6    Q.    And what does the word

7    "depreciated" mean to you?

8    A.    Depreciated in this context is

9    multiplied by one minus the depreciation

10    rate, which I know we're getting to this.  In

11    some cases it inflates the stock, and in some

12    cases -- well, it doesn't inflate the stock

13    per se, but it inflates past promotion versus

14    deflates it, yes.

15    Q.    In general, though,

16    depreciation means reduce or diminish the

17    effect, right?

18            MR. SOBOL:  Objection.

19    A.    I think if you look it up in

20    the dictionary, it would do that, but we

21    think about negative interest rates even

22    though we think about interest rate just

23    literally being something that increases the

24    value of your asset, we can have negative and

25    positive interest rates by the same token.

1    BY MR. ROTH:

2        Q.      Your coefficient on the stock

3    of detailing actually assumes the effect of

4    detailing increases over time?

5              MR. SOBOL:  Objection.

6        A.      I don't know what you mean

7    by -- when you say assumes, because it's

8    empirically estimated, but, yes, it is

9    consistent with the idea that past promotion

10   increases in effect over time.

11   BY MR. ROTH:

12       Q.      So as time goes on from that

13   detail visit, the impact just gets stronger

14   and stronger in your model?

15             MR. SOBOL:  Objection.

16       A.      As you know, my model is

17   estimating the relationship between promotion

18   and sales for an addictive good, and so what

19   we're saying is let's say promotion caused

20   them -- the physician to write a hundred MMEs

21   in a prescription today, as the patient gets

22   more tolerant, not only do they continue

23   writing that prescription because the patient

24   comes back, but also the dose goes up.  So

25   that is really what the negative depreciation

Highly Confidential - Subject to Further Confidentiality Review

1    rate is about here.

2    BY MR. ROTH:

3          Q.     So is your suggestion that the

4    doctors are addicted to writing

5    prescriptions?

6                 MR. SOBOL:  Objection.

7          A.     I didn't say that.

8    BY MR. ROTH:

9          Q.     So when you say it's the

10   addictiveness, your suggestion is because the

11   patient may become addicted, the doctor is

12   going to continually ratchet up the dosage

13   for that patient?

14                MR. SOBOL:  Objection.

15         A.     You make it sound like the

16   opioid epidemic is speculative.  It is

17   clearly true that patients who started on a

18   particular dose of opioids get higher and

19   higher doses.  That has -- that is just

20   common knowledge, and other experts have

21   opined on that.

22                And so it is a fact of the

23   matter that some patients will require

24   escalating values in terms of the number of

25   MMEs, whether they're addicted or not, and

1    then also it is true that some of those

2    patients will become addicted.  I think

3    there's no question in the literature about

4    whether prescribed opioids cause addiction.

5    So that is true.

6              And the fact of the matter is

7    that I'm not describing physician behavior as

8    addictive; but if those patients come back to

9    their physician and say, "My pain is getting

10   worse, I need another prescription," then in

11   some instances it will be filled.

12   BY MR. ROTH:

13       Q.    What percentage of patients

14   need escalating doses of opioids?

15             MR. SOBOL:  Objection, scope.

16       A.    I'm not a clinical expert.  My

17   analysis is entirely empirical.  If this were

18   not happening, my analysis would not find

19   that these MMEs are inflating over time in

20   the way they are.

21   BY MR. ROTH:

22       Q.    I know you're not a doctor, so

23   I'm just trying to understand, like what --

24   you say it's common knowledge.

25             What basis in science or

1    literature do you have to opine that the

2    addictiveness of opioids means that doctors

3    are prescribing higher and higher dosages to

4    their patients?

5              MR. SOBOL:  Objection, asked

6         and answered.

7         A.    If you look at Figure 3, this

8    is where I empirically demonstrate what's

9    happening with the strength --

10             MR. SOBOL:  Page?

11             THE WITNESS:  Oh, sorry.

12        Page 37.

13   BY MR. ROTH:

14        Q.    Right.  That's on an aggregate

15   basis.  I asked you a different question.

16   With --

17        A.    No, no, no.  I'm sorry, but the

18   aggregate basis means that the average MMEs

19   per prescription is escalating at this very

20   high rate.  That means that some large number

21   of patients under it -- for it to increase at

22   this rate, it cannot be that just a handful

23   of patients are getting more.

24        Q.    It could just be, though, that

25   stronger drugs are prescribed.  It doesn't

Highly Confidential - Subject to Further Confidentiality Review

1   mean that a specific patient is getting

2   higher and higher doses because of the

3   addictiveness of opioids.

4           MR. SOBOL:  Objection.

5       A.     I do not derive that -- these

6   data really show that higher and higher doses

7   of MM- -- of opioids are being prescribed.  I

8   mean, that's just literally what they show.

9   The MMEs per prescription is increasing.

10          So that is showing that --

11  whether it's addiction or not, that patients

12  are getting higher and higher doses.  That

13  mechanically will have the effect of making

14  it look like past promotion is suddenly more

15  effective today than it was yesterday.

16  BY MR. ROTH:

17      Q.     And so, in effect, your

18  depreciation rate is an appreciation rate in

19  your model.

20          MR. SOBOL:  Objection.

21      A.     You may use that term.  I think

22  it's more standard to call it a depreciation

23  rate.  Also, as you know, I estimate multiple

24  models, and they don't all have a negative

25  depreciation rate.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ROTH:

2        Q.    What do your models say about a

3    single detailing visit in January 1995 with

4    regard to its impact today?

5              MR. SOBOL:  Objection.

6        A.    Can you explain what you mean

7    by that?

8    BY MR. ROTH:

9        Q.    Yeah.

10             So the way your stock of

11    promotion is calculated, it keeps

12    aggregating.  So would a visit in

13    January 1995 still be growing in impact in

14    your model?

15       A.    In the fact -- in the models

16    with the negative depreciation rates, the

17    past promotion continues to grow, yes.

18       Q.    And at what point does it reach

19    its maximum impact?

20       A.    Well, I think you should not

21    try to extend the analysis out of sample.

22    Again, what I show in my model is while on

23    average, because I estimate a single negative

24    depreciation rate, we see this negative

25    depreciation rate, but we also find that the

1    effectiveness of promotion is falling.

2              And so while the stock may be

3    increasing, its effectiveness is decreasing.

4         Q.    Yeah, and we'll get to the

5    other adjustments.  I just want to talk about

6    the depreciation rate first.

7              So under your model, the

8    detailing that happens today is 8.3% more

9    impactful next year than it is today?

10             MR. SOBOL:  Objection.

11        Objection.

12        A.    For a given quarter, after a

13   year, the appreciation is 8.3%, yes.

14   BY MR. ROTH:

15        Q.    And after ten years, detailing

16   that happens today would be 223% more

17   impactful than it was today?

18        A.    I think you'd have to give me a

19   calculator, but I'm willing to trust your

20   math.

21             And just to be clear, it's not

22   exactly impactful because, again, you have to

23   recognize that the coefficient on promotion

24   is changing over this same period, and

25   because that -- that coefficient is dropping,

1   we're actually seeing reductions in sales.

2        Q.     You agree that an appreciating

3   depreciation rate is at odds with the usual

4   marketing literature in economics?

5               MR. SOBOL:  Objection.

6        A.     I don't know that it's at odds

7   with the underlying theory of marketing.

8   Because this is an addictive good, I think

9   it's a very different set of circumstances.

10              Usually we do see depreciation

11  falling, but I would note also that this is a

12  special case, as we've talked about many

13  times today.  I'm interested in this entire

14  market and not one drug.

15              And so usually when the

16  marketing literature is looking at this,

17  they're looking at an individual drug, maybe

18  even an individual physician.  And here we're

19  really talking about the growth of an entire

20  set of practices around the use of opioids.

21  BY MR. ROTH:

22       Q.     You say in your report:  A

23  negative depreciation rate indicates that the

24  stock of promotion grows over time.

25              Correct?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Yes.

2          Q.     And then you say:  This

3     prediction may be at odds with the usual

4     marketing literature.

5          A.     Yes.  But I want it to be

6     clear, however, that it's not a theoretical,

7     the theory that I've just described, whereby

8     the role of addiction is entirely consistent

9     with a negative depreciation rate.

10          Q.     And in your report, where you

11     say that, you've got a footnote and you cite

12     to Perri's report?

13          A.     Yes.

14          Q.     And you quote him in saying:

15     Additionally, because prescription opioids

16     may result in tolerance, dependence, and/or

17     addiction, the overall demand for opioids is

18     distorted by pharmaceutical marketing aimed

19     at increasing the use of these drugs.  I

20     refer to this as a distortion because,

21     whether due to tolerance, dependence, or

22     addiction, some patients who use opioids

23     require and/or seek more opioids over time.

24               Did I read that correctly?

25          A.     You know, I thought I saw that

1    correct footnote, and then I was looking at

2    the wrong one.

3            Q.      Sorry.  It's page 49, 103.

4            A.      49.

5                    Yes.

6            Q.      And based on that statement,

7    you believe that a negative depreciation

8    rate, although at odds with the usual

9    marketing literature, is perfectly consistent

10   in this case?

11           A.      Just to be clear, I'm not

12   relying on Dr. Perri for my understanding

13   that opioids are addictive.  I'm relying on

14   the broad facts of this case, my knowledge in

15   public health, and that is the reason why I

16   think, while marketing studies that have

17   looked at other goods have not found this, it

18   is entirely theoretically consistent that we

19   would find a negative depreciation rate here.

20           Q.      Have you looked at marketing

21   studies relating to other addictive goods?

22           A.      I don't know of any other

23   marketing studies related to addictive goods.

24           Q.      Tobacco?

25           A.      Yes, I have -- I'm certainly

1    familiar with the tobacco literature.  That

2    literature, as you may know, focuses largely

3    on taxes and the effect of a marketing ban in

4    terms of broadcast advertising.

5              I don't know that the

6    literature has looked at the stock of

7    promotion at all.

8         Q.    What about marketing literature

9    related to alcohol?

10        A.    I have not seen any of that

11   literature, no.

12        Q.    What about marketing literature

13   related to marijuana?

14        A.    I --

15             MR. SOBOL:  Wait.  Is that

16        addictive?

17             THE WITNESS:  Wait, is there

18        marketing?  But now, you're right,

19        there may be a market.

20             I would be interested to know

21        if such literature exists.  I'm not

22        familiar with any literature like

23        that.

24   BY MR. ROTH:

25        Q.    Okay.  As you sit here right

Highly Confidential - Subject to Further Confidentiality Review

1   now, do you know of any literature, whether

2   related to nonaddictive or addictive

3   products, that has a negative depreciation

4   rate?

5       A.    I cannot point to any other

6   study, no.

7       Q.    Let's look at the Datta and

8   Dave study again.  So if you look at page --

9       A.    Sorry, I lost Datta and Dave.

10      Q.    Sorry, it's okay.

11      A.    Yeah.  Okay.  I got it.

12      Q.    Page 457, footnote 23.

13            Do you see that?

14      A.    Yes.

15      Q.    So in this study, it says:  We

16  chose to rely on the literature for fixed

17  estimates of the depreciation rate rather

18  than estimate it as an unknown parameter.

19      A.    Yes.

20      Q.    And they say:  An unbiased

21  estimate of the depreciation rate would

22  require a detailed structural modeling of

23  promotion and prescription behaviors, without

24  which it would be difficult to disentangle

25  the coefficient of the detailing stock from

1    the depreciation rate.

2              And there's then a cite to

3    Iizuka and Jin.

4              Do you see that?

5         A.    I do.

6         Q.    And in what way did you

7    structurally model prescription behaviors in

8    your model?

9         A.    Well, I followed the same

10   practice that Professor Berndt and others

11   have used, which in effect simultaneously

12   estimates the two parameters.  It's not,

13   strictly speaking, a structural model.  It

14   really requires that we reestimate the model

15   with a whole range of estimates and then see

16   which one has the best fit.  It's an

17   alternative approach to the structural

18   modeling approach.

19        Q.    Datta and Dave go on to say:

20   Prior research on consumer behavior suggests

21   that advertising effects fully depreciate

22   within six months to a year, consistent with

23   decay rates of 0.1 to 0.2, which have also

24   been found to apply to pharmaceutical

25   advertising.

Highly Confidential - Subject to Further Confidentiality Review

1                   Do you see that?

2          A.     I do.

3          Q.     Okay.  And then --

4          A.     I would note that Professor

5    Berndt's article that you shared with me

6    earlier finds a depreciation rate of zero,

7    and he concludes there and elsewhere that

8    it's consistent with our understanding that

9    pharmaceutical marketing is long-lived

10   because of the habit formation, so there's

11   clearly some disagreement in the literature

12   about what's the right answer.

13         Q.     Right.  But he has no

14   depreciation rate.  He doesn't have an

15   appreciation rate in his study.

16         A.     The difference between zero and

17   a small negative is -- they're both kind of

18   getting at the same notion, which is that

19   marketing from many periods ago is still

20   persistent today.

21         Q.     And the Berndt study you're

22   citing predated this Datta and Dave study; is

23   that right?

24         A.     I believe it did, yes.  It's an

25   earlier study.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Whereupon, Deposition Exhibit

 2             Rosenthal-9, 2004 Mizik and Jacobson

 3             Publication, was marked for

 4             identification.)

 5    BY MR. ROTH:

 6         Q.     Okay.  And now I'm going to

 7    show you Exhibit 9, which is the Mizik and

 8    Jacobson study, Are Physicians "Easy Marks"?

 9    Quantifying the Effects of Detailing and

10    Sampling on New Prescriptions.

11                    Do you have Exhibit 9 in front

12    of you?

13         A.     I do.

14         Q.     And this is another document

15    you relied on and quoted in your report.

16         A.     Yes.

17         Q.     And if you look at page 1710,

18    under the chart, do you see there's a heading

19    Detailing?

20         A.     Under -- in Table 2?

21         Q.     Yes.  There's a Detailing

22    heading on the column underneath Table 2.

23         A.     I'm sorry.

24         Q.     Sorry, I'm below Table 2.  Left

25    side.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Oh, yes.  In the text.

2      Q.      In the text.

3      A.      I'm sorry, I was looking in the

4   table for a column heading.  Yes.  Yes.  I'm

5   sorry.

6      Q.      Okay.  So in the column heading

7   in the text, it says Detailing, and then it

8   says:  For each of the three drugs in the

9   study, we observed statistically significant

10  positive albeit modest effects of detailing

11  on prescriptions.

12              Do you see that?

13     A.      Yes.

14     Q.      And then it says:  Both current

15  term and carryover effects exist.  For

16  drug A, statistically significant positive

17  effects are present contemporaneously and for

18  the subsequent four months.

19              Do you see that?

20     A.      Yes.

21     Q.      And then if you jump to the

22  next column, the bottom paragraph says:  The

23  estimated response to a change in PSR visits

24  for drug B is similar to drug A in that we

25  observe a statistically significant response

1    the month of the visit that diminishes over

2    the subsequent six months.

3              Do you see that?

4        A.    Yes.

5        Q.    And then you referred already

6    to the Berndt study, which I believe you have

7    there.

8        A.    Yes.

9        Q.    If we look at that at

10   page 104 -- it's Exhibit 8 -- I thought you

11   said the depreciation rate was zero, but

12   looking at page 104 on the second column, it

13   actually looks like it's 0.03.

14       A.    It may be there's another

15   Berndt paper that I believe that I cite.  I

16   know there's a zero depreciation rate in one

17   of them.  That may be -- if we look at my

18   literature summary, it may be clearer.

19       Q.    Okay.  We can do that on the

20   next break, but for now let me just mark

21   Exhibit 10.

22       A.    Okay.

23             (Whereupon, Deposition Exhibit

24       Rosenthal-10, 2001 G?n?l et al

25       Publication, was marked for

1          identification.)

2    BY MR. ROTH:

3          Q.     Which is the G?n?l study,

4    Promotion of Prescription Drugs and Its

5    Impact on Physicians' Choice and Behavior.

6          A.     I'm sorry, were you going to

7    ask me a question about this study?

8                 MR. SOBOL:  Which one?

9    BY MR. ROTH:

10          Q.     I think I did.  I was just

11    asking what the depreciation rate was and you

12    said --

13          A.     I'd just like to remind you,

14    when we talk about these marketing studies,

15    and Mizik and Jacobson is similar to the

16    Datta and Dave one, it's a short period of

17    time for a few select drugs.  It doesn't have

18    the ability to look over the long term the

19    way we do.

20          Q.     No, I understand.

21                 And for those drugs, the

22    depreciation happened within months.  In your

23    model, the appreciation happens forever.

24          A.     Yes.

25          Q.     So if we look at Exhibit 10,

1    the G?n?l study, if you look at page 85,

2    there's a paragraph, Cumulative Discounted

3    Sums of Detailing and Samples.

4              Do you see that?

5    A.    You're on 85?

6    Q.    85.

7    A.    Yes.

8    Q.    And in that paragraph it says:

9    For each prescription physicians write, they

10   are likely to be influenced by past personal

11   selling efforts.  We discount the cumulative

12   personal selling effort consistently with the

13   methods used in the advertising literature.

14   The major premise of these methods is that

15   physicians are influenced by the recent

16   visits of sales representatives more than by

17   the distant ones.

18             Do you see that?

19   A.    I do.

20   Q.    And it looks like in this

21   study -- well, maybe you can help me find it.

22   I don't know if it's on this page.

23   A.    They don't -- they don't

24   estimate a depreciation rate.  It says they

25   set one.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Got it.

 2          A.     I think it must be in the

 3    footnote.  Yes.

 4          Q.     Yeah.  I don't see the exact

 5    number.  But in any event, they depreciated

 6    their stock somehow, and if we took the time

 7    to review this, we could probably find the

 8    exact number.

 9                 So switching gears for a

10    second.  So you said you're not aware of any

11    article.  Have you ever done any work in your

12    litigation consulting or expert practice

13    where you've modeled a negative depreciation

14    rate before this case?

15                 MR. SOBOL:  Objection, asked

16          and answered.

17          A.     I would return to the fact that

18    this matter concerns a class of drugs that is

19    different from any other class of drugs for

20    which I have looked at marketing, and I

21    believe that the negative depreciation rate

22    is entirely consistent with that underlying

23    phenomenon.

24                 I have not worked on opiate

25    addiction in the past.  I have not worked on
```

1    a marketing study for an addictive product.

2    BY MR. ROTH:

3        Q.    Okay.  And as you sit here now,

4    you're not aware of any peer-reviewed

5    publication or study that suggests that a

6    negative depreciation rate is ever

7    appropriate?

8            MR. SOBOL:  Objection, asked

9        and answered.

10       A.    It's my belief that a negative

11   depreciation rate is entirely theoretically

12   consistent with this product.  I cannot cite

13   a paper that has estimated one, but I do not

14   find it surprising.

15   BY MR. ROTH:

16       Q.    Okay.  Let's look at

17   paragraph 55 of your report and Figure 4

18   below that.  Are you there?

19       A.    I'm sorry, you're at

20   paragraph 55 -- I'm sorry, I went to the next

21   page.

22       Q.    Yeah, and it spills -- sorry,

23   it spills to the next page, which is

24   Figure 4.

25       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Are you there?

2    A.    Uh-huh.

3    Q.    And in this chart it looks like

4    you actually model your depreciation rate in

5    red against what your model would look like

6    with no depreciation rate or even a small

7    positive depreciation rate.

8    A.    I show you what that would look

9    like, yes.

10    Q.    So with even a very slight

11    positive depreciation rate, the line looks

12    almost flat.

13    A.    You mean the .01?

14    Q.    Correct.

15    A.    Yes.

16    Q.    And if you hold the

17    depreciation rate at zero, it's got a small

18    increase, but not anywhere close to what you

19    show with your negative depreciation rate?

20    MR. SOBOL:  Objection.

21    A.    But as you've described the

22    lines, the line that represents the

23    depreciation rate I estimated grows more

24    rapidly, as would be expected because of

25    compounding.

Highly Confidential - Subject to Further Confidentiality Review

1          Just to be clear, the fact that

2    the stock of promotion grows in this pattern,

3    that is a question of fitting the model

4    appropriately.  It's not driving my results

5    in that same relationship.

6    BY MR. ROTH:

7          Q.    I'm not sure I understood your

8    last answer.  What do you mean it's not

9    driving your results?

10          A.    Well, the results aren't

11    inflated in the same way that the stock of

12    promotion is inflated.  The estimate in my

13    model, again, where I have promotional

14    effectiveness coefficients, they're now

15    responding -- they'll be lower than otherwise

16    because the average level of promotion is

17    higher, and so it effectively makes promotion

18    look less effective on an incremental basis.

19          And this is really a question

20    of just getting the best fit in terms of the

21    timing.

22          Q.    Okay.  The blue line on this

23    line graph you describe as the flow of the

24    data.  Can you explain what that means?

25          A.    Sure.  Those are the monthly

Highly Confidential - Subject to Further Confidentiality Review

 1    levels of contacts.

 2         Q.    So with no adjustment for a

 3    stock, this is just the ebb and flow of where

 4    the IQVIA data shows promotion is?

 5         A.    Yes, it's the unadjusted IQVIA

 6    total detailing contacts.

 7         Q.    So it spikes up and down over

 8    the course of the entire period?

 9         A.    It does have the pattern that

10    you see there.

11         Q.    Okay.  Have you run your models

12    with positive depreciation rates other than

13    the 0.01 you depict on Figure 4?

14              MR. SOBOL:  Objection.

15         A.    That's not running the model.

16    That's just showing you what the stock would

17    look like.

18    BY MR. ROTH:

19         Q.    Okay.  So have you even run the

20    model with the stock at 0.01?

21         A.    I have not.

22         Q.    Okay.  So you don't know what

23    that would look like, and you don't know what

24    it would look like if we used a higher

25    depreciation rate?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SOBOL:  Objection.

2     A.     I don't.

3  BY MR. ROTH:

4     Q.     And I think you said this, but

5  your model selects the depreciation rate that

6  produces the best fit?

7     A.     Yes, that's correct.  It uses a

8  Wald test.

9     Q.     Okay.  We'll come back to the

10  Wald test.  But let's look at Figure 2,

11  which, I believe, is a few pages earlier.

12     A.     Page 36?

13     Q.     You got it.  So Figure 2 is a

14  line graph of the MMEs over time.

15     A.     That's correct, and it also

16  includes extended units in blue.

17     Q.     And what does that mean,

18  "extended units"?

19     A.     Extended units are pills.

20     Q.     Okay.  So you've got both the

21  pills and the MMEs on this graph?

22     A.     Yes, and you can see they track

23  almost perfectly.

24     Q.     And you can tell, I think, the

25  first thing I see when I look at this graph

Highly Confidential - Subject to Further Confidentiality Review

1  is a pretty stark decline that starts in

2  2010.

3              Do you see that?

4      A.    It does have a clear peak, both

5  of those trends.

6      Q.    And do you have any

7  understanding as to why MMEs began to drop

8  off starting in 2010?

9      A.    Well, I think I write about

10  that pretty extensively in my report.

11      Q.    In paragraph 46 -- yeah, let's

12  look at paragraph 46.

13      A.    Maybe not 46.  Maybe 56?

14      Q.    Oh, you know what, that's

15  Gruber 46.  We'll get to him next.

16      A.    I'm sorry.  Okay.

17      Q.    Sorry, which paragraph were you

18  taking me to?

19      A.    I am looking for where I

20  discuss the peak.

21      Q.    All of your reports magically

22  have the same font and type space, so it's

23  hard to differentiate.

24      A.    I think it's later when I talk

25  about --

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      67 --

2      A.      -- estimating the breaks.

3      Q.      67.

4      A.      Yeah?

5      Q.      Yeah.  I think I found it.

6      A.      Yes.

7      Q.      Okay.

8      A.      So that's sort of the -- that's

9    where I talk about the first break.

10     Q.      Yeah.  So you say:  The

11   accelerated growth in opioid prescribing that

12   followed the guideline and messaging changes

13   continued for approximately a decade before

14   it was finally arrested and ultimately

15   reversed by the cumulative effects of

16   physician leadership, media attention, public

17   health surveillance and regulation.

18             Do you see that?

19     A.      I do.

20     Q.      And you agree that all of those

21   efforts, doctors, media and public health,

22   did not just simultaneously happen in

23   August 2010?

24     A.      They did not, which is why I

25   don't assume that.

1       Q.      And when you refer to

2   regulation in that paragraph, what

3   specifically are you talking about?

4       A.      Well, so, for example, certain

5   states required that physicians use a

6   database to look at prescribing for the

7   patient before they could write a

8   prescription, so prescription drug monitoring

9   programs and educational requirements around

10  those prescription drug monitoring programs.

11          In some places there are --

12  like Massachusetts, for example, there have

13  also been prescribing limits that were

14  passed.  So those kinds of things.

15      Q.      And then did you review

16  Professor Gruber's report?

17      A.      I did.

18      Q.      Before yours was finalized or

19  at some point after?

20      A.      Perhaps before.

21      Q.      Okay.  So I'll -- I could mark

22  it, but I'm just going to read to you from

23  it.  And if you want me to mark it, I will.

24          But he says in paragraph 46:

25  Beginning around 2010, increased enforcement

1    actions by DEA and DOJ, criminal actions and

2    litigation, the growth of state PDMP laws and

3    increased awareness of addiction risks

4    associated with prescription opioids

5    contributed to a reduction in aggregate

6    shipments of prescription opioids after more

7    than 20 years of rapid growth.

8          Are you aware of that passage

9    in his report?

10      A.    Yes, and I think that there's

11    absolutely nothing inconsistent with what he

12    says.  He uses a couple of different

13    examples, but we're in agreement that it's

14    multifactorial and gradual.

15      Q.    Agree.  And you both mention

16    PDMP laws, and I think he's got a couple of

17    other examples about the DEA and DOJ.

18          But that was what I was going

19    to ask you is, are you in agreement with him

20    that these multifactorial events contributed

21    to the decline in 2010?

22      A.    That is the environment that I

23    capture using that third era in which these

24    events are essentially reducing the

25    effectiveness of promotion.

1          Q.    Okay.  So let's talk about your

2   eras.  So if you go to paragraph 71, you're

3   talking about Model B, and I think you called

4   this in your report your preferred model.

5          A.    I do.

6          Q.    Okay.  And just so we

7   differentiate, we'll get to Model C.

8               Model A, as you describe it in

9   paragraph 70, is assuming the effectiveness

10  of detailing is constant, so meaning, if I

11  look at Table 1, you just used the stock of

12  promotion and the depreciation rate without

13  adjusting for different eras in Model A.

14        A.    Yes, that's correct.  I mean,

15  they both have a single depreciation rate,

16  but there's a single stock of promotion in

17  Model A, and the price index, of course.

18        Q.    And then in Model B, it's those

19  two things plus you've added these two eras

20  in?

21        A.    That's correct.

22        Q.    And in Model C, it's Model B

23  with the five events mapped onto it?

24        A.    That's correct.

25        Q.    Okay.  So let's start with

Highly Confidential - Subject to Further Confidentiality Review

1    Model B.  71 says:  Model B allows the

2    effectiveness of promotion to change at two

3    points in time, determined using

4    specification tests.  Thus, this model

5    captures three different periods or eras of

6    the opioid market: the initial era, an

7    increase in MME sales during the second era,

8    and a third era marking the gradual decline

9    of MME sales.

10             Do you see that?

11        A.    Yes.

12        Q.    What do you mean, "determined

13   using specification tests"?

14        A.    Well, we essentially -- we do

15   much the same as what Professor Cutler does

16   in his report, which is basically conduct an

17   F-test, which is looking at the fit of

18   alternative models, and we have these -- we

19   have two time points, so we're looking at a

20   two-dimensional space and looking to see

21   which model fits the data best by, again,

22   iterating over -- I think it says in --

23        Q.    Yeah, let's look at Attachment

24   D5.  I'll help you out.

25        A.    That's right, iterating over, I

1    don't know, 1600 models, something like that.

2        Q.    You get how this goes.  I get

3    your memory first, and then we can look at

4    the report.

5        A.    Yes.  I know I should just tell

6    you that I don't remember.

7        Q.    That's okay.  All right.  D5,

8    Determining Turning Points in Effectiveness

9    of Promotion.

10        A.    Okay.

11        Q.    Tell me when you're there.

12        A.    D5.  Okay.  Yes.

13        Q.    So it says:  In Model B, the

14    two dates that would delineate the early and

15    late change in the effectiveness of

16    promotional stock were determined through a

17    two-dimension search.  The first turning

18    point was chosen between January 1999 and

19    January 2003, and the second turning point

20    was chosen with the date between January 2010

21    to December 2011.

22            Do you see that?

23        A.    Yes.

24        Q.    So let me stop there.

25            So when you say "it was

1    determined between," were you just conducting

2    the searches within those date ranges?

3         A.    Yes, that's right.

4         Q.    So you didn't just search the

5    whole model for the breaks; you limited the

6    dimensions you were looking for?

7         A.    Well, as you can see, there

8    were 1,176 combinations already, so there's a

9    bit of a scale issue in looking at every

10   combination.

11             And also, the way the tests

12   work out, it seemed fairly clear that we

13   weren't getting better and better fit by

14   going out further, that the solutions were

15   closer to the middle, and so that's why we

16   didn't feel like we needed to go outside of

17   those ranges.

18        Q.    How long did it take the

19   computer to run 1,176 combinations?

20        A.    Fortunately, I did not have to

21   run those myself.  Probably not that long.

22        Q.    I feel bad for Greylock.

23             And so you ultimately chose

24   these two breaks based on the maximum Wald

25   statistic produced from running the model

1    almost 11 -- 1,176 times?

2          A.    That's correct.

3          Q.    And what is a Wald statistic?

4          A.    It's -- like I said, it's like

5    an F-test that's looking at the joint

6    significance.  We talk about an F-test

7    elsewhere in this model, looking at the joint

8    significance -- actually, in my errata you

9    see I talk about the F-test, doing

10   significance of a set of variables and seeing

11   the formulation in which those variables

12   explain -- effectively explain the model

13   best.

14         Q.    And is it a common practice in

15   econometrics to choose a model based on

16   maximum fit?

17         A.    It's one of the considerations

18   that one does in a model.  And here we're

19   talking about a set of parameters that we're

20   trying to optimize with regard to

21   depreciation.  It's not the only thing that

22   we use to select the model.

23               As you know, I also report the

24   adjusted R-squared, and that was part of my

25   decision-making across models.  And there are

```
 1    other factors.
 2         Q.     Okay.  If we turn back to the
 3    body of the report, paragraph 57 introduces
 4    Figure 5.
 5                Do you see that?
 6         A.     Uh-huh.
 7         Q.     So you say:  Figure 5 -- which
 8    is on the next page -- is a timeline of key
 9    events.  According to plaintiffs' experts and
10    the published literature, the perceptions of
11    physicians and the public evolved as a direct
12    result of the alleged misconduct.
13                Do you see that?
14         A.     Yes.
15         Q.     You cite Dr. Perri.
16         A.     Yes.
17         Q.     And then you say:  These
18    changes, which were the result of the
19    defendants' actions, would have affected the
20    receptiveness of prescribers and patients to
21    promotional messages about the safety and
22    effectiveness of opioids.
23                Do you see that?
24         A.     Yes.
25         Q.     And then you describe how the
```

1    key events identified by plaintiffs that

2    helped promote expanded prescribing are in

3    green and the subsequent public health and

4    regulatory events that signaled the growing

5    realization about the dangers are in red.

6         A.    Yes.

7         Q.    All right.  So let's look at

8    Figure 5 on page 41, and we're going to do

9    our best job to articulate on the deposition

10   transcript the picture that we're looking at.

11            So it looks to me like Figure 5

12   is --

13            MR. SOBOL:  Why don't you show

14       it to the camera for a second.

15       Seriously.  Just get a shot of that.

16            MR. ROTH:  It's a work of art.

17            THE WITNESS:  It is a work of

18       art.

19            MR. SOBOL:  Christmas.

20   BY MR. ROTH:

21        Q.    So if you look at Figure 5,

22   you've got the MME trend graph that we looked

23   at in Figure 4 with a timeline and the events

24   described in the paragraph above it, right?

25        A.    That's correct.

1    Q.    And so we'll talk about the

2    five you picked to test in Model C, but did

3    you think about using any of the events on

4    this timeline to choose where you do your

5    testing for the breaks?

6    A.    I considered and rejected that

7    idea for reasons I think I do describe in my

8    report.  And I'm happy to explain further.

9    Q.    Yeah, if you don't mind.

10    A.    So as you can see from the

11    timeline, there are a number of discrete

12    events.  They're marked on the timeline at

13    the time they were either announced or passed

14    or in some way published, and still, they are

15    clearly events that could have had both

16    anticipation effects and sort of long

17    adoption curves.

18          And so just the notion that

19    these -- any one of these points would have

20    determined a break in the promotional

21    effectiveness, it seems like it was not quite

22    the right model.  Although, again, I included

23    them in Model C to explore this further.

24          It's my opinion that these

25    should be treated more cumulatively and that

1    is why I used the multi-era model, and I

2    think that's entirely consistent with the way

3    Dr. Perri describes the events, particularly

4    the green ones, the ones that were

5    influencing the adoption of opioids.

6        Q.    Just so I understand it, your

7    break based on the Wald statistic is sometime

8    in early 2002; is that right?

9        A.    It's probably not a good idea

10   ever for me to trust my memory, so I'm going

11   to go and look at that.

12       Q.    Yeah.  It's in the report.

13       A.    Yes, it is, it's absolutely in

14   the report.

15       Q.    And it may be in the errata,

16   because I saw some of the dates changed a

17   little bit last night.

18       A.    Paragraph 71.

19       Q.    Paragraph 71, yeah.

20       A.    Right.  So March 2002 is the

21   first break.

22       Q.    In the report it says

23   April 2002.  That was one of the errata?

24       A.    Yes.  I think someone was

25   reading the first month versus the last

Highly Confidential - Subject to Further Confidentiality Review

1    month, the first of the old era versus the

2    last of the -- first of the new era.

3         Q.    So it changes as of April 1st?

4         A.    It changes as of March 1st.  I

5    mean, the data are monthly, so -- not daily,

6    so it changes as of March.

7         Q.    Okay.

8         A.    And then the second turning

9    point changes as of August.

10        Q.    So if we were to plot

11   March 2002 on Figure 5, it would be after the

12   first five events in green but before the

13   last two events in green?

14        A.    That -- I can affirm that.

15        Q.    And then if we were to plot the

16   August 2010 break on the curve in Figure 5,

17   it would be -- it looks like after maybe

18   three or four of the red events but before

19   the other six or seven.

20        A.    I -- that may be true.  I think

21   it's a lot harder to say.  That's just a

22   dense part of the chart, and I wouldn't trust

23   my eyeballs on it.

24        Q.    Okay.  But again, as we

25   discussed, those breaks are not correlated

Highly Confidential - Subject to Further Confidentiality Review

1    with these events; they're the function of

2    searching using the Wald statistic for where

3    the curve breaks?

4        A.    Yes.  And again, to be clear,

5    they're telling us where the relationship

6    between the stock of detailing and sales

7    seems to change in a statistically

8    significant way.  And they're entirely

9    consistent with some kind of S-curve at the

10   beginning, when we think about a standard

11   diffusion curve, that there -- there is sort

12   of a point at which diffusion accelerates,

13   and that is what we're estimating on the

14   first one.

15            And the second turning point I

16   guess would be a reverse diffusion curve.  I

17   think de-innovation is a word, and not one

18   that I use a lot, but that seems to be what's

19   happening.  And again, it's not like you've

20   turned on a light switch and everyone

21   changes, but cumulatively over time, that's

22   putting the brakes on.

23       Q.    Okay.  But your model, the way

24   you account for that is you do actually turn

25   on the light switch and change the stock of

Highly Confidential - Subject to Further Confidentiality Review

1    promotion as of those dates?

2        A.    I -- no.  That's not -- that's

3    not true.  So what I do is I allow for the

4    promotional effectiveness to change in the --

5    in the first instance as a level shift and in

6    the second instance as a trend shift.

7        Q.    And so we'll talk about each of

8    those, but in paragraph 68 you talk about how

9    this led you to adopt a piecewise model.

10   What is a piecewise model?

11       A.    Well, it's essentially where I

12   assume there's a linear relationship between

13   the stock of promotion and sales that differs

14   over these different eras.

15       Q.    And when is it appropriate to

16   use a piecewise model in econometrics?

17       A.    Well, in this case, this is an

18   aggregate time series model, and we believe

19   that the fundamentals of that relationship

20   are changed by something in the environment.

21       Q.    So in addition to your

22   appreciating depreciation rate, we now have

23   adjustments in these two eras to fit the MME

24   curve.

25                MR. SOBOL:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Just to be clear, it's about

2   fitting -- the R-squared is about fitting the

3   MME curve, but really, the test that we're

4   doing is about understanding the relationship

5   between detailing and sales and fitting that.

6   BY MR. ROTH:

7      Q.     I understand that, but you're

8   making modifications to the detailing stock

9   that is allowing it to fit better with the

10  MME curve?

11     A.     Well, the detailing stock

12  and -- you're talking about the depreciation

13  rate.  That is being determined, again, based

14  on the fit of the overall statistical model.

15  It's not just trying to make it fit the shape

16  of the MMEs, which I think is what you said.

17     Q.     Right.  But when you make the

18  depreciation rate change to the stock of

19  promotion and then you allow the model to

20  tell you where the effectiveness of promotion

21  also changes, are you not then essentially

22  fitting the detailing curve to the MME curve?

23     A.     I do not believe so, no.

24  That's not what I'm doing.  What I'm trying

25  to do is establish a relationship that best

1    fits the data.  Over time, that relationship

2    could be that promotion has very little

3    effect on sales.  And so the quantum of the

4    impact here is not what I'm fitting the data

5    to.

6         Q.    Okay.  As you describe it in

7    your report, the coefficients on the stock of

8    detailing are estimated separately during

9    each of the three eras; is that correct?

10        A.    Well, in effect, we can look at

11   the results, so maybe it will be a little

12   clearer than my hand-waving without having it

13   in front of me.

14        Q.    Table 1, is that what you

15   wanted or do you want --

16        A.    Yes, Table 1, that's right.  So

17   we have the stock of promotion through --

18             MR. SOBOL:  I'm sorry, page?

19             THE WITNESS:  Oh, sorry.

20        Page 47.  Sorry.

21        A.    We have the stock of promotion

22   that is the continuous series that we saw

23   plotted in that other figure, and then in

24   Model C, I interact that with the dummy

25   variable for the first era.

Highly Confidential - Subject to Further Confidentiality Review

1    And then I also -- I interact

2    that separately with the variable from

3    March 2002.  So those two are essentially

4    separate estimates over those two time

5    periods, but in -- in the third period,

6    because we're looking at an erosion curve,

7    that's just literally what's happening here

8    is opioid prescribing is eroding.  I enter

9    the interaction with that era as a trend, so

10   then that's the sum of the stock of promotion

11   from 2002 and the dummy trend.

12   BY MR. ROTH:

13       Q.    All right.  So you're jumping

14   ahead of me.  I'm going to ask you about the

15   dummy trend.

16       A.    Okay.

17       Q.    But the stock in period 3 is

18   actually overlapping with the stock in period

19   2; is that right?

20       A.    Yes, the stock of promotion --

21   again, because the third period basically is

22   adding on to the second period, they're being

23   estimated -- I mean, the model of course is

24   estimating over the entire period, but the

25   variables are separated such that we have one

1    variable that's the stock of promotion times

2    a dummy variable, so it becomes zero at March

3    of 2002.  That's beta-1.

4             And then beta-2 goes a variable

5    that's zero before 2000- -- that break

6    date -- now I can't remember if March is

7    the -- oh, yeah, it is March of 2002, so

8    Table 1 was always right -- up to 2002, and

9    then it becomes whatever the stock of

10   promotion is, right?

11            And so beta-3 has that same

12   stock of promotion and it has this multiplier

13   effect for the trend.

14        Q.    So what I'm trying to

15   understand is before you put in your trend

16   into period 3, if we recognize that there's a

17   period, according to you, of rapid growth

18   after efforts to market --

19        A.    Yes.

20        Q.    -- followed by a period of

21   decline after growing realization about the

22   dangers, why are those starting from the same

23   baseline and adding a trend as opposed to

24   having some other variable applied to the

25   stock in Era 3?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Yeah, let me try to explain
 2   that.  And just to be clear, I know you know
 3   this, but let me just remind you that the
 4   turning point in the MME trend is not the
 5   turning point that marks off Era 3, right?
 6              Q.     Right.
 7              A.     That starts earlier.
 8                     One thing one could have done
 9   is just say, okay, we're going to split the
10   model at that turning point, and so that is
11   the light switch notion, rather than looking
12   to see where the relationship seems to
13   change.
14                     And we know the relationship is
15   such that it's -- we know conceptually, based
16   on the other evidence, that -- and just from
17   reading the news, that public health
18   authorities are trying to limit opioid
19   prescriptions and they're having some
20   success, and so that we know that we need to
21   put in a trend that will capture when that
22   happens.
23                     There's no way to have
24   something that is an increasing trend go
25   south without giving it the opportunity to
```

 1    have a second coefficient.  And by using a

 2    trend and allowing the break to happen

 3    whenever it happens, I can actually allow the

 4    data to tell me at what pace that erosion

 5    happened.

 6              Otherwise, I would have to sort

 7    of, again, plug it at the top and just

 8    measure the relationship on that second bar.

 9    So this was the most flexible way to use the

10    data to look at what's happening to promotion

11    over time.  It's entirely flexible.  If, in

12    fact, you know, promotion kept going up and

13    it was just not explaining that trend, then

14    the model would have told me that.

15        Q.    Okay.  So now I want to get to

16    the dummy trend.

17        A.    Yeah.

18        Q.    So what support do you have for

19    using the dummy trend only in Era 3 as

20    opposed to before?

21        A.    Yeah, for sure.  So again,

22    because in Era 2 what we're looking at was a

23    growing acceptance of the idea that opioids

24    were safe, that we could have used a trend

25    there.

Highly Confidential - Subject to Further Confidentiality Review

1    A linear shift is the simplest

2    way of capturing that, and essentially, what

3    will happen is then in that case, by using a

4    shift rather than a trend, what we'll get is

5    an average effect as opposed to one that --

6    where we can plot out the changes over time,

7    if there were changes over time, but it would

8    capture that increase either way.

9    When we're looking at the

10   erosion side, however, just picking --

11   putting an additive effect in like the first

12   trend, would require that we fix that really

13   to the peak of the model in order to make any

14   sense of -- of the way the trend reverses,

15   and yet again, we don't -- we don't change

16   the underlying stock of promotion.  That is

17   what it is.

18   If, in fact, that relationship

19   can't be explained by the stock of promotion,

20   then we would -- we would not get a

21   significant coefficient on that.

22   Q.    When you implement the dummy

23   trend incremented by month in the third era,

24   that means the effect of the third period

25   stock is increasing over time still, right?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Well, the effect of the stock

2    is what it is with the negative depreciation

3    rate.  So the effect -- the stock continues

4    to increase, as we discussed earlier, and

5    nonetheless, the productivity of a given unit

6    is decreasing.  So relative to the previous

7    period, the average productivity of a unit of

8    the stock of promotion is lower.

9      Q.      Did you try to run the model

10   using a dummy incremented by months in the

11   first two eras?

12     A.      I don't believe so.  Again, the

13   simplest -- the simplest way to think about

14   that was a slope change, and that's what we

15   did there.  It was really only when we came

16   to trying to figure out how best to let the

17   data tell us about this turning point that a

18   trend seemed like the best approach.

19     Q.      If the effectiveness of

20   promotion is changing in each of the eras,

21   why did you keep the depreciation rate

22   constant the whole time?

23     A.      We used a single depreciation

24   rate because we think that it is something

25   more structural.  As I've talked about, the

1    depreciation rate in my mind reflects the

2    particular context here with an addictive

3    good, so there's no reason for that to change

4    over time.

5             I separate the assumption I

6    make about the depreciation rate, which

7    again, is empirically based, from the

8    assumption about promotional effectiveness,

9    which has something to do again with these

10   environmental factors.  So there are two

11   different things.

12        Q.    I guess where I'm missing you

13   is I get that the effectiveness of promotion

14   changes, right?

15        A.    Uh-huh.

16        Q.    As I understand the

17   depreciation rate, that's measuring how

18   lasting the promotion is into the future, and

19   so what I'm missing is if the effectiveness

20   of promotion as a whole is changing, why

21   isn't the effectiveness of a detail into the

22   future also changing at the same time?

23        A.    Again, I believe that what

24   drives the negative depreciation rate over

25   the whole period is the addictive nature of

Highly Confidential - Subject to Further Confidentiality Review

1    the good, and so, you know, you're using

2    words that are very useful to describe the

3    phenomenon, but they're not a complete

4    explanation because of the fact that we have

5    this addictive good.

6              Even as physicians may have

7    been writing fewer new prescriptions, it is

8    still true that patients who are already on

9    opioids are likely to be refilling those

10   drugs with some likelihood, and so it may

11   well be that we're capturing a lower

12   incremental effectiveness, but still we have

13   the long-lasting effects of the previous

14   patients who were on these drugs.

15   Q.     But if regulations are changing

16   and PDMPs are coming into place and medical

17   standards are changing, all of which are

18   driving prescriptions and MMEs lower, why

19   does that not affect at all the lasting

20   effectiveness of detailing in your model?

21   A.     It does affect sales by

22   reducing the incremental effectiveness of

23   promotion.  That is the way that it affects

24   it.

25              There's no reason particularly

Highly Confidential - Subject to Further Confidentiality Review

1    that it should be captured through the

2    depreciation rate.  The depreciation rate,

3    again, I estimate as a single variable over

4    time, I think that's appropriate because it

5    captures the underlying nature of this

6    marketplace.

7         Q.    Did you run the model

8    estimating different depreciation rates

9    during each of the three eras?

10        A.    During -- no.  During each of

11   the three eras, no, I did not.

12        Q.    Did you consider modeling more

13   than three periods?

14        A.    I did not.  As we've talked

15   about, while I allow the data to tell me the

16   turning points, I have a conceptual idea

17   about why these two general points in time

18   are important; that one is sort of the

19   acceleration of opioid prescribing, and the

20   other is the reversal.

21        Q.    Did you consider modeling two

22   or one period instead of having -- well, one

23   I guess we talked about.  You did that.

24             So -- but did you consider

25   modeling just two periods?

1       A.    It's very clear that there is

2   at least this important change at the end.

3   It's -- it is possible that -- that the

4   effect of the first period to the second

5   period is small enough that we could have

6   just used the one change, but nonetheless,

7   it's statistically significant, that effect.

8       Q.    And then if you look back at

9   paragraph 70, you say for Model A, which is

10   the one that doesn't have these eras or the

11   events, which we'll get to -- for Model A on

12   page 48, it does not capture well either the

13   initial growth in opioid sales or the change

14   that occurred in 2011.

15       In short, estimating Model A

16   teaches us that there's likely a changing,

17   not constant, relationship between detailing

18   and sales over this long 1993 to 2018 time

19   period that should be explored to more

20   accurately describe the relationship.

21       Do you see that?

22       A.    Yes.

23       Q.    And the way you explored it

24   was, as we talked about, by running the model

25   1100-plus times and calculating the Wald

Highly Confidential - Subject to Further Confidentiality Review

```
 1    statistic?

 2         A.     That's correct.

 3              MR. ROTH:  I'm ready to move to

 4         Model C, but how are you doing?  Do

 5         you want a quick break?

 6              THE WITNESS:  Maybe a quick

 7         one.  That would be great, thanks.

 8              THE VIDEOGRAPHER:  The time is

 9         2:12 p.m., we are now off the record.

10              (Recess taken, 2:12 p.m. to

11         2:27 p.m.)

12              THE VIDEOGRAPHER:  The time is

13         2:27 p.m.  We're back on the record.

14    BY MR. ROTH:

15         Q.     Professor Rosenthal, have you

16    studied the addictiveness of opioids?

17         A.     Personally, no.  Again, I have

18    reviewed various articles and reports on

19    this, but I'm not a clinical expert.

20         Q.     What articles and reports are

21    you thinking of?

22              THE WITNESS:  I'm getting sound

23         from the phone.

24         A.     Well, there are some articles

25    that I believe I cite in my report, but a
```

1    number of articles, particularly in the

2    economics literature, that talk about

3    addiction and death and its connection to

4    other economic phenomena, and they, of

5    course, cite a fair amount of public health

6    information.

7              I have read information from

8    the CDC website about the opioid epidemic and

9    the addictive nature of these products in the

10   CDC guidelines.

11   BY MR. ROTH:

12        Q.    Beyond the CDC information and

13   the economic literature cited in your report,

14   are there any other sources you've reviewed

15   for information about the addictiveness of

16   opioids?

17        A.    There are a number of other

18   guidelines that I cite, one from the American

19   Academy of Emergency Medicine.  I'm happy to

20   look in my report, but there are a number

21   that I cite in the introduction, but more so

22   in Section X.

23        Q.    We'll get there.

24              Before we do, have you reviewed

25   any study of the rate of addiction for

Highly Confidential - Subject to Further Confidentiality Review

1    specific opioid drugs?

2         A.      No, I have not.

3         Q.      Have you reviewed any study on

4    the rate of the need to increase prescription

5    for any individual opioid drug?

6         A.      Can you explain a little bit

7    more what you mean by that?

8         Q.      Yeah.  Sorry.  Sorry.

9                 Have you reviewed any study on

10   increasing the dosage for a patient on opioid

11   drugs specific to any opioid drugs?

12        A.      Like I can't recall any

13   specifically right now.  I -- there's a paper

14   that I cite in Section X that pertains to the

15   treatment of cancer patients, for example,

16   and it talks about dosing.  It may talk about

17   specific drugs, but I can't say for sure.

18        Q.      Are you aware of the phenomenon

19   that certain patients may have their dosage

20   of opioids increased because they become

21   tolerant at the lower dose?

22        A.      Yes, I believe I described that

23   phenomenon as well, and the allegations that

24   the conversation around increasing dosages

25   was some of what was manipulated by the

1    defendants.

2        Q.    Do you know what the rate of

3    opioid addiction is in either Summit or

4    Cuyahoga County?

5        A.    As I sit here, no.

6        Q.    Okay.  I'd like to look at

7    Appendix D, page D5.  So we talked about the

8    first paragraph on the Wald statistic.  In

9    the second paragraph, you say:  Separate from

10   marketing efforts, there are other factors

11   that could potentially influence the sales of

12   opioids.

13            Do you see that?

14       A.    Yes.

15       Q.    And I think we talked about

16   some of those factors this morning.

17       A.    We did.

18       Q.    And you say:  While marketing

19   to physicians is one important explanation

20   for changes in sales, and the use of dummy

21   variables captures broad factors that

22   influence the market for opioids, there could

23   still be factors that influence physicians to

24   write prescriptions and consumers in their

25   willingness to fill prescriptions for

1    opioids.

2             Do you see that?

3        A.    Yes.

4        Q.    And so you list five events

5    that you included in Model C to test as

6    turning points.

7        A.    Yes.

8        Q.    And you say --

9        A.    Oh, sorry.  Just to be clear.

10   You said turning points and I agreed, but

11   these are not exactly turning points.  They

12   would be shifts.

13       Q.    Events.

14       A.    Yes.

15       Q.    That's a good clarification.

16   You've got two turning points and five

17   events.

18       A.    Right.

19       Q.    Okay.  And I want to look back

20   at Table 1 in a minute, but before we do

21   that, you say underneath this:  My a priori

22   expectation is that the first three events --

23   meaning the consensus statement, the

24   Federation of State Medical Board Guidelines

25   and the JCAHO pain standards -- would have a

1    positive impact on the quantity of MMEs

2    prescribed per month.

3              Do you see that?

4    A.    Yes.

5    Q.    And then you say:  The

6    reformulation of OxyContin could have an

7    ambiguous impact on MME sales.

8              Do you see that?

9    A.    I do.

10   Q.    Okay.  So why did you select

11   just these five events as opposed to others

12   we saw depicted on Figure 5 in your report?

13   A.    I selected events.  I was

14   looking to pick some from the early period

15   and some from the later period, and

16   particularly from -- well, in both periods,

17   around the time that we see acceleration or

18   deceleration in MMEs.  So they were selected

19   really based on timing.

20   Q.    Did you model any of the other

21   events listed in Figure 5?

22   A.    I did not.

23   Q.    Are there other milestones not

24   depicted in Figure 5 you could test as events

25   in your model?

1        A.      I included in Figure 5 the

2    major milestones that I was aware of, so I

3    don't know that there are others that are not

4    there.

5        Q.      Did you try to model the five

6    events you used in Model C against the

7    Model A curve to see what that would look

8    like?

9        A.      No, I did not.  The decision to

10   do the turning points really relates to the

11   estimated relationship between promotion and

12   sales, and so that was the foundational

13   model.

14       Q.      Okay.  So let's turn to

15   Table 1, which is on page 47.

16       A.      47, you said?

17       Q.      Yeah, page 47.

18       A.      Okay.  All right.

19       Q.      And Table 1 is the output of

20   your model, the three different models that

21   you ran, correct?

22       A.      That's correct.

23       Q.      Okay.  So -- and actually, you

24   also can see in Table 1 some of the input

25   variables at the top?

1      A.     I'm sorry.  What do you mean by

2    that?

3      Q.     Sorry.  The output -- well, I

4    guess, describe what the constant and stock

5    of promotion, those are the explanatory --

6    the constant is a constant, but the stock of

7    promotion, those are the explanatory

8    variables in your model, correct?

9      A.     That's correct.  Everything on

10    the left-hand side is effectively an

11    explanatory variable.

12      Q.     Okay.  I guess first, why is

13    the constant for Model A basically twice as

14    high as Model B or Model C?

15      A.     Well, it's capturing sort of

16    the unexplained average in effect, the

17    intercept, and there's more in Model B and

18    Model C to explain the underlying data.

19      Q.     Okay.  And then Model A

20    actually is the one model where you have a

21    depreciation rate that's essentially zero.

22    It's a small positive depreciation rate.

23      A.     They're all small, so -- but

24    yes, it's a small positive.

25      Q.     And then B and C both have the

Highly Confidential - Subject to Further Confidentiality Review

1    negative depreciation rate that we discussed

2    earlier?

3            A.     That's correct.

4            Q.     So looking at the results from

5    Model C, the consensus statement from AAPM

6    and APS, what do you understand that

7    statement was?

8            A.     It's discussed at greater

9    length in Dr. Perri's report, but the

10   American Academy of Pain Management and the

11   American Pain Society had a consensus

12   statement related to the undertreatment of

13   pain and the need for more attention to the

14   treatment of pain and the effective use of

15   opioids for such treatment.

16                 (Whereupon, Deposition Exhibit

17          Rosenthal-11, The Use of Opioids for

18          the Treatment of Chronic Pain

19          Consensus Statement, was marked for

20          identification.)

21   BY MR. ROTH:

22           Q.     I'm going to mark as Exhibit 11

23   the consensus statement from the American

24   Academy of Pain Medicine and the American

25   Pain Society.

Highly Confidential - Subject to Further Confidentiality Review

1               Do you have that document?

2       A.      I do.

3       Q.      And is this the consensus

4   statement you're referring to?

5       A.      I believe so.  I'm just looking

6   for a date on it.  Oh, of '96.  So the --

7   what I have is dated 1998 in my model, so I'm

8   not sure this is exactly the same one.

9       Q.      Yeah, I was going to ask you

10  about that.  I mean, is there another

11  statement from 1998 you recall looking at?

12      A.      We should look at my documents

13  relied on.

14      Q.      All right.  So let's look at

15  Attachment B.  And as I see this, under Other

16  Documents, four down on page B3?

17      A.      Okay.

18      Q.      You list the American Academy

19  of Pain Medicine and the American Pain

20  Society, "The use of opiates for the

21  treatment of chronic pain," and it has got

22  the same title as this document; is that

23  right?

24      A.      Yes, it does.

25      Q.      And it looks like it was

Highly Confidential - Subject to Further Confidentiality Review

1    published in the Journal of Pain in 1997; is

2    that right?

3          A.    Yes.  Yes.

4          Q.    And you can see from the

5    document I just handed you that this

6    actually approved sometime in 1996; is that

7    right?

8          A.    That's right.

9          Q.    So do you know why this was

10   used or estimated in the model in

11   January '98, if that's the case?

12         A.    I'm not sure as I sit here

13   whether there was another -- as when I was

14   describing these events in the first

15   instance, I was saying that there are

16   different dates that pertain to, for example,

17   when they're published in the Journal of

18   Pain, in this case, versus disseminated, so

19   I'm not sure what the 1998 date is as I sit

20   here.  I'd have to check.

21         Q.    And if we flip back to

22   Figure 5 --

23         A.    Because it appears that way in

24   Figure 5, doesn't it?

25         Q.    That's what I was just going to

Highly Confidential - Subject to Further Confidentiality Review

1    ask you.

2           A.      Let's have a look.  It does.

3    It appears -- oh, no.

4           Q.      Well, there's two.  It looks

5    like it's actually in '97.

6           A.      That does look like it's '97,

7    which would be the date of the -- of the

8    article that I cite.

9           Q.      Yeah.  So is this something

10   that just didn't get picked up by the errata

11   or was the data actually run in '98 or

12   sitting here, you just don't know?

13          A.      Sitting here, I don't know.

14          Q.      Okay.  Regardless, whenever you

15   ran the model to account for this statement,

16   it estimated negative ███████ MMEs; I

17   assume that's the unit for that, right?

18          A.      Yes, that's correct.

19          Q.      And we can both agree that that

20   is directionally not what you would have

21   expected based on the theory that this would

22   have inspired more doctors to write

23   prescriptions for opioids?

24          A.      Yes, I think I say exactly that

25   in my text, do I not?

1    Q.    You do.  You say it did not

2    conform to your expectations, I think.

3    A.    Yes.

4    Q.    Let me find exactly what you

5    say.

6    A.    Actually, I need to -- now I

7    need to go back and remind myself.

8         So it's -- that one was not

9    statistically significant, so I don't say

10   anything about it because it's effectively

11   zero.  I mean, as, by the way, the positive

12   depreciation rate in Model A is effectively

13   zero.  So anything that doesn't have

14   asterisks next to it should be treated as

15   zero.

16   Q.    Got it, yeah.  So I'm

17   looking --

18   A.    I don't interpret it.  It's

19   standard practice to not interpret

20   insignificant coefficients.

21   Q.    Yeah.  So I'm looking at

22   paragraph 73.  So you discuss only --

23   A.    Yeah.

24   Q.    -- the '99 federal, state

25   medical board guidelines and then the

1    hydrocodone rescheduling.  You don't discuss

2    the consensus statement form.

3         A.    That's right, because it wasn't

4    significant.  So what I was recalling is it's

5    the hydrocodone rescheduling that is

6    counterintuitive and significant, yeah.

7         Q.    Yeah.  Although you did say in

8    Attachment D at D5 that your a priori

9    expectation was that this event would have a

10   positive impact on the quantity of MMEs.

11        A.    Did I?

12        Q.    You did.

13        A.    The two reformulation, then I

14   have an errata to my errata.  The two

15   reformulation variables, as you can see in

16   the figure, they come at a time -- regardless

17   of whether the rescheduling itself caused a

18   reduction in MMEs, they come at a time where

19   the steps taken to reschedule hydrocodone are

20   consistent with DEA and others putting the

21   brakes on opioids.

22             So it should have said -- my

23   priors -- because my priors are captured more

24   or less in the color of Figure 5.

25        Q.    Okay.  I think I inadvertently

1   confused you.  To be clear, you say in

2   Attachment D that the consensus statement

3   would have a positive effect.  You said

4   actually nothing about what the hydrocodone

5   rescheduling would do -- oh, no, you do.  You

6   do.  You say:  The impact of rescheduling

7   hydrocodone from Class III to Class II could

8   result in a reduction of MME sales.

9        A.    Did I -- I'm sorry, I should

10  just catch up and read it.

11       Q.    Yeah.  Let's go to D5 so we're

12  all on the same page.

13       A.    I think I say that some of them

14  are more ambiguous than others.

15       Q.    You do say that about

16  OxyContin.

17       A.    Uh-huh.

18       Q.    And then at the bottom of the

19  penultimate paragraph, you say:  The impact

20  of rescheduling hydrocodone from Class III to

21  Class II could result in a reduction of MME

22  sales.

23       A.    Right.

24       Q.    And then if you go back to

25  Table 1, in fact, it actually increases MME

Highly Confidential - Subject to Further Confidentiality Review

1    sales.

2         A.    Increases them, yes.

3         Q.    And it looks like it does so in

4    a statistically significant way because

5    you've got asterisks there.

6         A.    That's correct.  So that is the

7    one where we can now see what I said about

8    that one.

9         Q.    So you said about that one --

10        A.    Yes, counterintuitively

11   suggests an increase, yes.

12        Q.    And you expected it to have the

13   impact of decreasing MMEs?

14        A.    I did.

15        Q.    And what does the fact that

16   your model showed it was a statistically

17   significant impact mean for the validity of

18   Model C?

19        A.    Well, as you know, I preferred

20   Model B in part because this suggests that

21   there's some problem, at least with

22   interpreting that coefficient, and it's my

23   broader belief that, you know, we can think

24   about the list of events that are in my

25   Figure 5, and others, and there are many

1    discrete events, all of which are picking up

2    on broader phenomena, either a loosening of

3    restrictions around opioids or a tightening

4    of restrictions, and just conceptually,

5    trying to pin any one of them to have begun

6    at a discrete point in time seems

7    problematic; and likely, the reason that I

8    get a counterintuitive result is that there

9    are other correlated -- for example, putting

10   both the OxyContin reformulation and the

11   hydrocodone rescheduling may have caused some

12   interaction between the two.

13              And so that's also why I didn't

14   then just try to keep adding events with the

15   notion that this was not the right modeling

16   approach for what was going on in this

17   market.

18        Q.    Okay.  And then if you look

19   back at Table 1, you mention the OxyContin

20   reformulation, which does not look like it

21   was statistically significant, but also

22   resulted in estimating ███████ additional

23   MMEs?

24        A.    That's correct.  It's zero, but

25   positive.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Are you aware that Professors

2    Cutler and Gruber opined that the 2010

3    OxyContin reformulation led to an abrupt

4    market shift that thickened the market for

5    illicit heroin?

6              MR. SOBOL:  Objection to the

7         form.

8      A.     I am aware of their general

9    opinions.  I could not have quoted them.  But

10   I'm aware that it's more broadly understood

11   that the reformulation of OxyContin caused a

12   number of opioid users to switch to illicit

13   opioids.  I believe that's been shown in

14   other literature.

15   BY MR. ROTH:

16     Q.     So how do you reconcile your

17   model showing that there's actually no effect

18   on MMEs from the reformulation of OxyContin

19   with their opinion that it led to some

20   massive shift of opioid users to illegal

21   drugs like heroin?

22             MR. SOBOL:  Objection.

23     A.     Well, a couple of things.

24   First, I believe the model that I put forward

25   in Model B, which captures the environment,

1    the environment I've generally been thinking

2    about in the third era is one in which public

3    health restrictions are tamping down on

4    opioid use.

5              That's already being captured

6    in that dummy trend that we talked about

7    earlier, so some of that is getting picked

8    up, as opposed to being able to pull it out

9    separately just at that moment in time when

10   the OxyContin reformulation occurred.  So my

11   model is already picking that up.

12             You know, I think the other

13   thing is, of course, I'm looking at the

14   opioid market as a whole, not just OxyContin

15   on its own, and so there are -- there are

16   other factors happening for other opioids.

17   BY MR. ROTH:

18        Q.    But your model suggests that

19   there was still a supply of opioids and

20   prescribing driven by promotion whereas

21   they're suggesting that the supply was drying

22   up to the extent that users evaded the legal

23   prescription market and turned to illegal

24   drugs.

25        A.    I don't believe you're correct

1    in that statement.  These models are looking

2    at two very different things.  I'm not

3    looking at the use of illicit opioids.  The

4    data show decreasing use of legal opioids.

5    That's -- that's just the underlying MMEs, so

6    that is happening.

7              My model is looking at the

8    portion of that that's explained by

9    promotion, so there's no way that this is

10   disproving people had left OxyContin.

11        Q.    But it is showing that

12   according to your model, the OxyContin

13   reformulation did not have a statistically

14   significant impact on the MMEs prescribed?

15        A.    Once you control for the

16   variables that I've controlled for, including

17   price, including promotion, and accounting

18   for the change in promotional effectiveness,

19   I don't separately find an effect here.  That

20   is not the same as saying that OxyContin

21   reformulation had no effect.

22        Q.    Okay.  So now I want to go back

23   to Appendix D, and I want to start with

24   Table D.1.

25        A.    Okay.

1          Q.     All right.  So Table D.1 --

2          A.     Oh.  I'm on page D1.

3          Q.     Yeah, you've got to go past

4    that.

5          A.     Keep going.

6          Q.     Talk about your charts and

7    graphs.

8          A.     It's okay.  Excellent.

9                 MR. SOBOL:  This one?

10                THE WITNESS:  All right.

11                MR. ROTH:  Yeah, the table.

12   BY MR. ROTH:

13         Q.     So first the chart, okay.  So

14   Table D.1 is a chart that I think explains

15   Model A; is that right?

16         A.     That's correct.

17         Q.     And maybe just explain to me

18   what is on here, because if I try to ask you

19   a question, I'm not going do as good of a job

20   as if you just tell me what this is showing.

21                MR. SOBOL:  If you just ask a

22         direct question.

23         A.     Sure.  These are SAS output

24   made slightly prettier, and so at the top --

25   the top box there is describing the model

1    overall, degrees of freedom, the total error,

2    the sum of squared errors you see there, the

3    mean squared error.  After that, the square

4    root of the mean squared error.  These are

5    all sort of talking about the variability in

6    the data and the explanatory power of what's

7    included.  The R-squared and the adjusted

8    R-squared are -- the adjusted R-squared

9    accounts for the degrees of freedom, the

10   number of covariants.

11   BY MR. ROTH:

12        Q.    And what is in the bottom chart

13   titled Nonlinear OLS Parameter Estimates?

14        A.    Yes, so those the coefficient

15   standard error, t statistic, p values.  Those

16   are reported way back in Table 1.  They've

17   just cleaned up a little bit.

18             So the coefficient estimate is

19   the one that we're interested in, and then

20   we'll mostly just focus on the p value.

21        Q.    Okay.  So if we flip to Figure

22   D.1 --

23        A.    Yeah.

24        Q.    -- which is the line graph

25   that's an output, I was perplexed when I saw

Highly Confidential - Subject to Further Confidentiality Review

1    this because the green line is predicted

2    but-for; is that right?

3         A.    That's correct.

4         Q.    So you're showing negative

5    but-for in the early '90s and again starting

6    around 2012.

7              Do you see that?

8         A.    Yes, that's correct.

9         Q.    So what does that mean, that,

10   you know, people were returning opioids?  I

11   don't even understand how that conceptually

12   works.

13        A.    Yes.  Well, remember how I said

14   that Model A uses a single promotional

15   effectiveness and it doesn't fit the data

16   very well?  So it's an average that's

17   smoothing over this long period and doesn't

18   fit the data well, so that's what these

19   predictions tell you.  It's the same thing,

20   in effect, as looking at the adjusted

21   R-squared.  This is just what it looks like

22   in predicted values.

23        Q.    So for this reason, Model A is

24   not your preferred approach?

25        A.    This is not my preferred model,

Highly Confidential - Subject to Further Confidentiality Review

1    that's correct.

2         Q.     Yeah.  I mean, conceptually,

3    having a negative but-for doesn't actually

4    make sense, right?

5         A.     Conceptually, it's unappealing.

6         Q.     How would you even calculate

7    the difference with a negative but-for?

8         A.     The same way.  It's -- the

9    difference would be just the space between

10   the two lines.  I have not done that here.

11        Q.     Okay.  So now if you flip the

12   page to Table D.2, you'll see another set of

13   charts.

14              And I think this correlates to

15   your Model B; is that right?

16        A.     That's correct.

17        Q.     And I assume your description

18   of what Table D.1 is would describe D.2,

19   although this second chart has additional

20   labels for the stock of promotion trends that

21   we talked about earlier?

22        A.     That's correct.

23        Q.     Why is the stock of promotion

24   dummy trend from August 2010 a negative

25   number?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Again, it's an erosion rate

2    over the promotional effectiveness in b2, and

3    so the promotional effectiveness is b2 plus

4    the number of months from -- from that time

5    break, August 2010, times b3.  So it

6    increments.  You see what I'm saying?

7          Q.      Yeah.

8          A.      So every month, it's like b2 is

9    reduced by 8.

10          Q.      Right.  And this is your time

11    trend essentially that we talked about

12    before?

13          A.      It's sort of an erosion trend,

14    yes.

15          Q.      Okay.  And why is it -- how did

16    you come up with that number, like how do we

17    get negative 7.97362?

18          A.      It comes out of the regression

19    model.  It's estimated like all the other

20    coefficients using OLS.

21          Q.      And what is it doing?  It's not

22    like a Wald statistic?  Or is it -- how does

23    it mechanically estimate that coefficient?

24          A.      Well, technically through

25    matrix algebra.  I mean, it's essentially

Highly Confidential - Subject to Further Confidentiality Review

1    picking up the association between, in this

2    case, the stock of promotion times the dummy

3    trend and sales.  Like all the other

4    coefficient estimates, the tests relate to

5    the statistical properties of those

6    estimates, but the coefficients really come

7    from the correlations.

8        Q.    All right.  And then if we turn

9    the page to D.2, this is the line graph from

10   your Model B, which maps almost perfectly

11   onto the blue flow of the data.

12       A.    Yes.

13             MR. SOBOL:  A thing of beauty.

14             MR. ROTH:  Almost as if it

15       fitted like a glove.  All right.

16   BY MR. ROTH:

17       Q.    Let's look at Table D.3.

18       A.    Uh-huh.

19       Q.    The last one of these.  So this

20   is -- well, it's not the last one of these,

21   we'll ask about that in a second, but this

22   is, I think, Model C.

23       A.    That's right.

24       Q.    Okay.  So the same concept as

25   D.1 and D.2 we just walked through?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      And then if you look at the

3  second page, it looks like this one has

4  something that says Type, Wald Test -- Test

5  and Test0.  What is that?

6      A.      That's the joint test of

7  significance of those events.

8      Q.      Got it.  Okay.

9          So when you say in your report

10  jointly they're not statistically

11  significant, it's based on this output?

12      A.      Yes, except that that was in

13  the errata, that that should have said they

14  were significant.

15      Q.      I saw that.  That was the one

16  errata where it changed like a no to a yes

17  and there was --

18      A.      Yes.  It does not change my

19  conclusions, but yes, you can see here the p

20  value is .0176.

21      Q.      Okay.  So just to be clear,

22  your opinion is that jointly the five events

23  are actually statistically significant?

24      A.      That's correct.

25      Q.      Okay.  And then if we look at

1    D.3, Figure D.3, this is what your curve

2    looks like in Model C?

3         A.    Yes.

4         Q.    Okay.

5         A.    Not very different from

6    Model B.

7         Q.    Which makes sense because the

8    baseline is Model B; you're just inserting

9    five events and measuring those?

10        A.    Yes.  If they had had some

11   effect, it might have looked different.

12        Q.    Okay.  You can -- looking at

13   your report again, so we talked about this

14   earlier, but you cited Datta and Dave, and we

15   talked about that article this morning.

16              Do you remember that?

17        A.    I do.

18        Q.    So let's pull it out one more

19   time.  Probably the last one.

20        A.    Let me make sure that I get the

21   right...

22        Q.    It's Exhibit...

23        A.    5.  Got it.

24        Q.    5.

25              So if you look with me at

1    page 452 again, we're now going to get to

2    talk about endogeneity.

3         A.    Excellent.

4         Q.    You knew it was coming.

5         A.    I did.

6         Q.    So at the top of the page, they

7    say: A key empirical concern in this

8    literature relates to potential targeting

9    bias, which physicians who already have a

10   history of prescribing a particular drug or

11   who have a higher unobserved likelihood of

12   prescribing the drug (for instance, due to

13   their patient population or practice type)

14   more likely to be targeted by detailers.

15              Do you see that?

16        A.    I do.

17        Q.    And is that an empirical

18   concern that you as an econometrician or

19   economist would have?

20        A.    If I were doing a

21   physician-level study, yes.

22        Q.    And one could describe this

23   issue as something called endogeneity?

24        A.    Yes.

25        Q.    And can you define endogeneity

Highly Confidential - Subject to Further Confidentiality Review

1    for us?

2         A.     Well, in effect, what they're

3    talking about here, I described earlier this

4    morning the endogeneity they're concerned

5    about is of the type that physicians who are

6    more likely to be detailed are already more

7    likely to be open to prescribing or are, in

8    fact, high prescribers already.

9         Q.     And it's called endogeneity

10   because that's an endogenous problem?

11        A.     Yes.  The level of detailing is

12   endogenously determined with the level of

13   prescribing.

14        Q.     So continuing on their paper,

15   they say "Addressing such endogeneity is a

16   vital issue in identifying plausibly causal

17   effects of advertising, which would otherwise

18   lead to overestimates of the advertising

19   response.

20              Do you see that?

21        A.     I do see that.

22        Q.     And --

23        A.     And as I said before, it's

24   because they're talking about physician-level

25   data.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Which you didn't look at?

2                  MR. SOBOL:  Objection, asked

3          and answered.

4          A.      It was not relevant to my

5    report because I have been asked to conduct

6    an aggregate analysis.

7    BY MR. ROTH:

8          Q.      And then they say:  Studies

9    that address this endogeneity in most cases

10   have done so through an instrumental

11   variables-based methodology, although as

12   Bronnenberg caution, many of the instruments

13   employed have limited variation and may not

14   fully satisfy the validity requirements.

15   This caveat notwithstanding, these studies

16   generally find a smaller marginal effect of

17   detailing relative to those that do not

18   account for endogeneity.

19                  Do you see that?

20         A.      I do.

21         Q.      Now, what about having an

22   aggregate macro analysis means that

23   endogeneity is no issue for you?

24                  MR. SOBOL:  Objection.

25         A.      Well, endogeneity is something

Highly Confidential - Subject to Further Confidentiality Review

1    different in every context, so what they're

2    describing specifically here, I mean, I think

3    they say that they're talking about targeting

4    bias, so that's the physician-level concern.

5                    It simply doesn't exist in my

6    data because I'm not looking at

7    physician-level data.  I cannot mistake the

8    fact that Doctor A has high prescriptions

9    compared to Doctor B, not because she's been

10   detailed before, but she's been detailed

11   before because she has high prescriptions.

12   Because I'm only looking at the aggregate.

13   So the only kind of endogeneity there, it

14   can't be related to targeting.  It has to be

15   related to something else.

16                    In other instances people have

17   looked at endogeneity when it comes to a

18   specific product.  They said, well, you know,

19   we knew that this product was going to be a

20   blockbuster so we put our detailing on

21   product A versus product B, and so that's the

22   nature of the endogeneity.  But again, I

23   don't have that here because I'm aggregating

24   across products.

25                    ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ROTH:
 2         Q.     It's a convenient answer to
 3    everything, but I want to dissect that.
 4              The data you're looking at --
 5              MR. SOBOL:  Well, objection to
 6         that.
 7    BY MR. ROTH:
 8         Q.     The data you're looking at from
 9    IQVIA is an aggregation of detailing contacts
10    to doctors, correct?
11         A.     The details were made to
12    doctors, yes.
13         Q.     Or healthcare providers.
14    Actually, could have been nurse
15    practitioners, as we talked about earlier?
16         A.     Yes.
17         Q.     Why is it that adding up a
18    whole suite of contacts to doctors is any
19    less susceptible to the fact that certain
20    doctors are more likely to be detailed in the
21    first place than looking at it on a
22    disaggregated individualized basis?
23         A.     You're making me feel like I'm
24    failing as a teacher.  Let me try again.
25              MR. SOBOL:  Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

1         A.      It's the fact of measuring,

2    detailing and prescribing at the doctor level

3    and trying to examine that specific

4    relationship that's causing the endogeneity

5    problem.

6                So imagine that -- I'm trying

7    to give a work example for you, but I mean,

8    the concern again is that the patterns of

9    high prescribing that we're observing between

10   doctors are really causing detailing and not

11   the other way around.

12               But if I am ignoring those

13   patterns, the only thing that I'm looking at

14   is increases over time.  Those -- the forces

15   that say which doctors get detailed are just

16   not -- they're not in my data.

17               So it's like doing an

18   intent-to-treat analysis, if that means

19   anything to you.  We have clinical studies

20   where we know that some patients will be

21   compliant and some won't, and if we only look

22   at the effect of the drug on the compliant

23   patients, we're going to misstate its

24   population effect, so we look at all

25   patients.

Highly Confidential - Subject to Further Confidentiality Review

1           That's basically what I'm doing

2    is it may well be that targeting is happening

3    here.  If that is true, then the aggregate

4    effect will be small.  In the extreme, where

5    promotion doesn't work at all, it just --

6    detailing -- we just, you know, detail the

7    doctors we know are going to prescribe, then

8    I would find no effect in the aggregate.

9    Even though you would find an effect in the

10   cross-section, you won't find it in the

11   aggregate.

12   BY MR. ROTH:

13       Q.    We may have to agree to

14   disagree on this one for now.  I can't

15   promise we won't come back.

16           Do you agree that when

17   endogeneity is an issue, it's typically

18   handled through instrumental variables?

19       A.    Yes, that is a classic

20   approach.  In effect, the instrumental

21   variables are trying to step back from --

22   from that targeting to get to something that

23   is, in fact, exogenous.

24       Q.    Are there other options for

25   addressing endogeneity?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Well, generally, there's sort

2  of broader research design, so ultimately,

3  endogeneity concerns some kind of unmeasured

4  third variable.  I mean, there's simultaneity

5  that has to do with sort of a different

6  interpretation of endogeneity, but what we're

7  talking about here is something else that

8  we're not measuring.  So endogeneity can be

9  addressed by measuring whatever that thing

10  is.  So in the case of Datta and Dave, it

11  could be historic prescribing.

12       Q.     Did you take any effort to test

13  for endogeneity issues or address endogeneity

14  issues in your regression analyses?

15       A.     Again, conceptually, I don't

16  believe this is an issue looking at the

17  overall opioid market over time, so I did not

18  address endogeneity in my model.

19       Q.     Do you know if anyone on your

20  team did?

21       A.     I do not.

22       Q.     You've used the instrumental

23  variables methodology to correct for

24  endogeneity in other models you've developed

25  for litigation, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      In looking at a single drug,
 2   yes.  As I mentioned, there's another version
 3   of the endogeneity story that makes sense for
 4   a single drug.
 5          Q.      So in Zyprexa, I think, for
 6   example, you used instrumental variables?
 7          A.      I'm afraid that was a long time
 8   ago.  I didn't review that report for that.
 9          Q.      I can mark it just so we have
10   it in the record.
11                  (Whereupon, Deposition Exhibit
12          Rosenthal-12, Rosenthal Declaration
13          re: Zyprexa, was marked for
14          identification.)
15   BY MR. ROTH:
16          Q.      Exhibit 12 is your --
17          A.      Wow.
18          Q.      -- declaration from Zyprexa,
19   Analysis of Class-Wide Impact and Estimation
20   of Damages.
21                  MR. SOBOL:  Oh, wow.  Memories.
22          A.      I'm trying to -- do you know
23   what the date on this is?
24   BY MR. ROTH:
25          Q.      It is February 2007.
```

1      A.      Wow.

2      Q.      12 years ago.

3      A.      That is a really long time ago.

4    Yes.

5      Q.      Okay.  And if you look at your

6    Zyprexa declaration -- and I will stipulate

7    this is an excerpt, we didn't print the whole

8    thing, but at paragraph 35 you talk about the

9    fact that you developed a regression model,

10   and then the equations in paragraph 37.

11           Do you see that?

12     A.      Yeah, I was just looking at --

13   I was trying to remember whether this is a

14   panel data model or not, but --

15           MR. SOBOL:  Well, take your

16        time then to refresh your recollection

17        of your model from 12 years ago.

18           THE WITNESS:  I will.  Yes.

19     A.      Yes, this is a panel data model

20   for the atypical antipsychotic class.

21   BY MR. ROTH:

22     Q.      And if you were to try to

23   assess the effect of any individual

24   defendants' promotion in this case, would you

25   put together a panel data model similar to

1    the one you used in Zyprexa to do that?

2        A.    I have not thought about doing

3    defendant-by-defendant analysis in this case.

4    It was not part of my assignment.  I'm not

5    sure if that would be appropriate, again,

6    because the interest here, even if we're

7    looking at individual defendants, is on the

8    overall -- on the market expansion aspect of

9    their marketing.

10          Whereas in Zyprexa, we were

11    very interested in the -- I'm trying to

12    remember what words we used this morning --

13    business dealing is the way economists

14    usually describe it.  Marketers describe it

15    something differently, but the market share

16    shifts, those were relevant in Zyprexa

17    because the question was not so much that

18    Zyprexa was trying to grow the market,

19    although there was some of that.  It was

20    about trying to encourage doctors to

21    substitute Zyprexa in place of

22    first-generation antipsychotics.

23        Q.    For a manufacturer that was not

24    part of the market before it grew and came

25    into the market after it had been expanded,

Highly Confidential - Subject to Further Confidentiality Review

1  why is it the case in your model that that

2  manufacturer is part of the aggregate

3  analysis and not subject to some other type

4  of causation allocation?

5        MR. SOBOL:  Objection, asked

6     and answered.

7     A.    Nowhere in my assignment was I

8  asked to look at liability for individual

9  manufacturers.  I'm only trying to quantify

10  aggregate impact.  To the extent that I

11  subtract individual defendants, it's really

12  only to get to a different whole, it's not to

13  assign liability to an individual defendant.

14  BY MR. ROTH:

15     Q.    So looking at the Zyprexa

16  declaration, paragraph 42, you say:  For

17  purposes of the regression, the promotional

18  variables for Zyprexa and its competitors

19  were entered as discounted stocks following

20  the tendency of the published literature and

21  in accordance with the theory that promotions

22  to physicians is habit building.

23        Do you see that?

24     A.    I do.

25     Q.    So you used a stock of

1    promotion with a depreciation rate similar to

2    here?

3         A.    At least I'm consistent, yes.

4         Q.    No doubt.

5               And then you also used a Fisher

6    Ideal Price Index in that case too?

7         A.    I did.

8         Q.    But you weren't consistent

9    next, because then you say:  In addition, the

10   estimation deals with two important issues,

11   serial correlation in the error terms and the

12   endogeneity of price and promotion.  Serial

13   correlation in the error terms require the

14   use of time series methods to produce

15   reliable estimates.  The endogeneity of price

16   and promotion was handled using the standard

17   instrumental variables approach.

18               Did I read that correctly?

19        A.    Yes, you did.

20        Q.    And if endogeneity is an issue

21   for you -- I understand you don't think it

22   is -- but if it is an issue for you, your

23   regression may lead to overestimating the

24   response to promotion?

25               MR. SOBOL:  Well, then,

1     objection.

2         A.     I do not believe endogeneity is

3     an issue in my model for the reasons that

4     I've described.  But in particular, what

5     we're looking at is an aggregate phenomenon,

6     and so the theory of endogeneity that we

7     would have to have requires this reverse

8     causation on a month-by-month basis for the

9     market as a whole, and I do not believe

10    that's a plausible notion.

11    BY MR. ROTH:

12        Q.     Okay.  Don't fight the

13    hypothetical, though.

14             Assume endogeneity is an issue

15    with your model.  What impact would it have?

16             MR. SOBOL:  Objection, asked

17        and answered.

18        A.     I cannot imagine a form of

19    endogeneity that would make sense in this

20    case.  I cannot understand how it could be

21    that one month's sales could have caused the

22    next month's detailing to change in the way

23    that endogeneity requires.  It's simply not a

24    plausible set of ideas in this context.

25             ///

```
 1    BY MR. ROTH:

 2         Q.     And why is that again?

 3         A.     Because we're looking at the

 4    market as a whole, and not individual

 5    manufacturers or individual drugs, where

 6    those decisions are made.

 7         Q.     I guess I'm confused, because

 8    earlier you talked about us as this

 9    manufacturing ecosystem that all kind of acts

10    together, but now for purposes of

11    endogeneity, you're saying there are no

12    issues because we're not looking at it on an

13    individualized basis, and I can't square

14    those two things.  Maybe you can help.

15         A.     Sure.

16                MR. SOBOL:  I'll object to the

17         form, but go for it.

18         A.     Sure.  I think where you're

19    confused is the ecosystem is causing

20    prescribing in a way that may be concerted,

21    but I -- I don't believe anywhere I have said

22    that the defendants are aligning, explicitly,

23    their marketing efforts.

24    BY MR. ROTH:

25         Q.     Okay.  Do you remember if you
```

```
 1    used an instrumental variables approach to

 2    address endogeneity in Neurontin?

 3         A.    All not quite 12 years ago, 17,

 4    however many, but I believe the answer is

 5    yes, in the circumstance of -- thank you, can

 6    you remind me -- the circumstance is very

 7    similar to the Zyprexa matter.

 8         Q.    Yes, so we can do this one

 9    quickly.

10         A.    Yes.

11         Q.    But Exhibit 13 is your

12    Neurontin declaration, excerpted.

13              (Whereupon, Deposition Exhibit

14         Rosenthal-13, Rosenthal Declaration

15         re: Neurontin, was marked for

16         identification.)

17         A.    It's in Calibri too.

18    BY MR. ROTH:

19         Q.    It must be the Greylock

20    computers.  Did Greylock McKinnon assist you

21    there?

22         A.    Yes.

23         Q.    August 2008.

24              So looking at your Neurontin

25    declaration, you were addressing alleged
```

Highly Confidential - Subject to Further Confidentiality Review

 1    fraudulent promotion on behalf of the class

 2    plaintiffs; is that right?

 3              MR. SOBOL:  Actually, may I

 4         just interrupt one second?  Sorry.

 5              So is this pulled online or --

 6         it indicates confidential in the

 7         bottom left-hand corner.

 8              MS. VENTURA:  It's available

 9         online.

10              MR. ROTH:  Yeah, we got it

11         online.

12              MR. SOBOL:  Okay, go ahead.

13              THE WITNESS:  Zyprexa too?

14              MR. ROTH:  I think so.  I did

15         ask that question.

16              MR. SOBOL:  Zyprexa had at the

17         top an ECF thing.  This one didn't.

18         That's why I asked.  I'm sorry.  Go

19         ahead.

20    BY MR. ROTH:

21         Q.    So in Neurontin, you offered

22    opinions on behalf of the class plaintiffs

23    related to the defendants' promotion; is that

24    right?

25         A.    And coordinated plaintiffs -- I

Highly Confidential - Subject to Further Confidentiality Review

1   was just trying to see -- yes, that's right.

2        Q.     And then your regression is in

3   paragraph 34.

4        A.     Yes.

5        Q.     And then in paragraph 40, under

6   Prices, there's a sentence toward the end

7   that says:  The endogeneity of price and

8   promotion was handled using the standard

9   instrumental variables approach.

10        A.     Yes, that's correct.

11        Q.     And that's actually a different

12   endogeneity than what Datta and Dave were

13   describing.

14        A.     That's correct.

15        Q.     And is that endogeneity an

16   issue for you here?

17        A.     I think again, because we're

18   looking at a market average set of prices,

19   that that is not the same as thinking about

20   the simultaneity of price and quantities for

21   an individual manufacturer.

22        Q.     Okay.  I've got one more source

23   for you.  We're just taking the time machine

24   into the farther back.

25        A.     Oh my gosh, is there farther

1    back?  Yes.

2                    (Whereupon, Deposition Exhibit

3           Rosenthal-14, 2003 Kaiser Family

4           Foundation Report, was marked for

5           identification.)

6    BY MR. ROTH:

7           Q.    Exhibit 14, Demand Effects of

8    Recent Changes in Prescription Drug

9    Promotion, the Kaiser Family Foundation, and

10   you are one of the authors.

11                  Do you see that?

12          A.    I do.

13          Q.    And Professor Berndt is a

14   co-author of yours.

15          A.    That is correct.

16          Q.    And in this article, it looks

17   like you're analyzing whether increases in

18   direct-to-consumer advertising increased the

19   market share of an entire therapeutic class,

20   right?

21          A.    Yes.  So maybe just briefly,

22   this analysis is a panel data study.  We have

23   a couple of years of data, I think three

24   years of data, for five different classes of

25   drugs.  And we do the analysis both at the

1    class level and then at the individual

2    product level.

3         Q.    But at least a part of this was

4    aggregated, correct?

5         A.    At the class level, yes.

6         Q.    Okay.  Let's look at page 14.

7              MR. SOBOL:  What about page 1?

8         It's got a quote from Kessler on it.

9              MR. ROTH:  Look at that,

10        David A. Kessler, along with laureates

11        Thomas Jefferson and F. Scott

12        Fitzgerald.

13             THE WITNESS:  It would not be

14        appropriate to comment on the

15        quotations in this paper.

16    BY MR. ROTH:

17        Q.    So page 14 --

18             MR. ROTH:  Hold on.

19             (Comments off the stenographic

20        record.)

21    BY MR. ROTH:

22        Q.    Hold on, Professor.  I am on

23    the wrong page, I think.

24        A.    Okay.

25        Q.    Or hopefully not on the wrong

1    article, but it could be.

2              (Document review.)

3    BY MR. ROTH:

4         Q.    Okay.  It's actually page 12.

5         A.    Okay.

6         Q.    I was looking for a sigma,

7    which was a dead giveaway that I was on the

8    wrong page.

9         A.    Okay.  Excellent.

10        Q.    Okay.  And I think it's because

11   this is probably a reprint from the journal,

12   so I'm looking at a snapshot of the journal

13   in my outline.

14        A.    I see.

15        Q.    Okay.  But now we're on the

16   same page, the section that says Basic

17   Models.

18        A.    Okay.

19        Q.    Do you see that?

20        A.    I do.

21        Q.    It says:  We now set out the

22   basic estimation models used in the analysis.

23   As noted above, the Cobb-Douglas formulation

24   is used for both the class level demand model

25   as well as the individual product demand

Highly Confidential - Subject to Further Confidentiality Review

```
1    model.
2                   Do you see that?
3         A.    I do.
4         Q.    So it's both class and
5    individual, and then you've got your equation
6    below it.
7                   Do you see that?
8         A.    I do.
9         Q.    And can you say it in words?
10   Because you did such a nice job earlier and I
11   don't read algebraic.
12        A.    Sure.  Well, that Cobb-Douglas
13   specification has natural logs on both sides,
14   and so it has the log of quantity sales is a
15   function of alpha, beta-1 times the log of
16   direct-to-consumer advertising plus beta-2
17   times the log of detailing plus the other
18   coefficients at times their values.
19        Q.    So I'll take a detour because I
20   had another question about this for you
21   later.
22        A.    Okay.
23        Q.    So by "log," you mean
24   logarithmics, right?
25        A.    That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And there's a difference

2    between using logarithmics or some

3    non-logarithmic variable in a regression

4    model?

5    A.    Yes.  You make logarithmic

6    sound so poetic, but yes, it is -- generally

7    when we use logs, we're trying to collapse

8    across the orders of magnitude, and it

9    frequently permits interpretation of results

10   in terms of proportions.

11             These log-log models have this

12   specific Cobb-Douglas production function

13   under them, which is just something that is

14   frequently used in economics.

15   Q.    Got it.

16             So it says -- and then you have

17   this general specification of a modified AIDS

18   model.

19   A.    That's correct.

20   Q.    And below that, it says after

21   explaining that model:  Finally, we use the

22   same right hand side variable in estimating

23   model specifications where the dependent

24   variable is specified as the logit of

25   quantity squares for the individual drug

1    products.

2                Do you see that?

3         A.     Yeah.  That's the logit.

4         Q.     Legit, sorry.

5         A.     It's all right.  Logit.

6         Q.     With an O, not an E.

7         A.     It's a transformation.

8         Q.     All right.  So now if you look

9    at page 14, it says:  We take account of the

10   possibility that spending on DTCA and

11   physician promotion and product sales are

12   jointly determined by estimating

13   instrumentable -- instrumental variables, IV,

14   models where all three variables are assumed

15   to be endogenous.

16               Do you see that?

17        A.     Yes.

18        Q.     And that's solving for an

19   endogeneity issue?

20        A.     That's correct.  This, again,

21   is at the product level.

22        Q.     And if you had done an analysis

23   at the drug- or geography-specific level,

24   this is an approach you might have had to

25   take?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      I did not do such an analysis

2    for -- based on my assignment, and so I

3    really haven't sat and thought about it.

4               But this model I believe is

5    appropriate for a product-level model, again

6    notwithstanding the challenges in estimating

7    instrumental variables in general.

8          Q.      So even if you're right, that

9    selection isn't an issue because it's an

10   aggregate model at the prescriber level,

11   aggregate promotion across all manufacturers

12   could still be determined at least in part by

13   sales in the aggregate, right?

14              MR. SOBOL:  Objection.

15         A.      Well, again, conceptually, and

16   ultimately endogeneity is a conceptual issue

17   about how we understand the market to be

18   working.

19              Conceptually, it makes no sense

20   to me to think about an aggregate price being

21   set by anyone because it is looking across a

22   wide range of companies and products, and so

23   in terms of the price endogeneity, that is

24   literally about strategic decisions of

25   individual firms and I don't think it
```

Highly Confidential - Subject to Further Confidentiality Review

1    translates into the aggregate level.

2              Likewise, when it comes to

3    detailing, we're assigning the detailing to

4    the class as a whole and it's not the class

5    as a whole that's deciding a detailing

6    budget.  That's for an individual

7    manufacturer at the product level.

8              So conceptually, I think

9    they're disconnected.

10   BY MR. ROTH:

11       Q.    Okay.  But if we assume that

12   pharmaceutical companies are economically

13   rational actors, it would make sense for them

14   to consider recent sales performance when

15   setting promotional budgets?

16       A.    I again -- I guess I can just

17   say it again, that pharmaceutical

18   manufacturers, the concern is that they're

19   looking -- they're anticipating their own

20   sales growth and setting detailing based on

21   that.

22              While that may make sense for

23   an individual manufacturer, I -- even though

24   those decisions are rolled up in my

25   aggregate, the aggregate then is one step

1    removed from the timing of those decisions

2    and so the concern that the factors that

3    determined the level of detailing for the --

4    for the market as a whole in that month are

5    the same as determined as sales, to me that

6    makes no sense.

7        Q.    Okay.  If you were to use an

8    instrumental variables approach, instruments

9    for promotion would need to be correlated to

10   promotion; is that right?

11       A.    In general, in an instrumental

12   variable approach, you need instruments that

13   predict the endogenous variable and only

14   affect the variable of interest through the

15   endogenous variable and not on their own.

16       Q.    Okay.

17            (Whereupon, Deposition Exhibit

18       Rosenthal-15, Regression Instruments

19       Spreadsheet, was marked for

20       identification.)

21   BY MR. ROTH:

22       Q.    I'm going to mark as Exhibit 15

23   a document that was produced along with your

24   backup materials, and it says Regression

25   Instruments, Checked on July 24th, 2018.

1        A.       Yes.

2        Q.       Do you see this?

3        A.       I do.

4        Q.       So that's in part why I asked

5    you before if you knew about this.

6        A.       This is not part of my

7    analysis.  So as you may know, I was retained

8    in the middle of the summer, so this was not

9    part of the analysis that you see in my

10   report.

11       Q.       So who would have performed

12   this regression instruments analysis on your

13   models, if not you?

14       A.       Presumably the staff began

15   gathering these data.

16       Q.       So at least someone on the

17   staff thought that endogeneity might be an

18   issue if they determined to run this analysis

19   in July 2018?

20               MR. SOBOL:  Objection.

21       A.       Like you, they may have been

22   operating on my past analyses and started to

23   collect the data on that basis.

24   BY MR. ROTH:

25       Q.       And I know your position is

Highly Confidential - Subject to Further Confidentiality Review

1    that this didn't need to be done, but if you

2    look at the nine variables on Exhibit 15,

3    some of these look familiar from your

4    Neurontin report, but others are not ones I

5    recognize.

6              Can you comment on that?

7              MR. SOBOL:  Objection.

8         A.   Well, I haven't seen this.

9    Again, like you, I can imagine my staff would

10   have gone back to my last report, maybe not

11   quite as old as these, and looked at the

12   instruments that were gathered for those

13   reports.

14             Generally speaking, these look

15   similar in that they are consumer price and

16   producer price indexes, indices, and wage

17   index.  They look familiar to the ones that

18   we've used in the drug-level studies.

19   BY MR. ROTH:

20        Q.   So you didn't do this or see

21   this before just now?

22        A.   I -- I did not see this, no.

23        Q.   Okay.  And your view is you

24   have no endogeneity issues because you've

25   done an aggregate model, and pricing is not

1    an issue either, so we don't need to use

2    instrumental variables on your model.

3            MR. SOBOL:  Objection, asked

4        and answered.

5        A.    As I sought to address my

6    assignment, it was my belief that we should

7    use an aggregate model and that in doing so,

8    the endogeneity issues around the timing of

9    and extent of detailing for specific drugs

10   would not be pertinent.

11   BY MR. ROTH:

12       Q.    Did you conduct any study or

13   analysis to evaluate whether the

14   manufacturers' detailing targeted physicians

15   with a history of prescribing their drugs?

16       A.    I'm sorry, could you repeat

17   that?  That was a long sentence.

18       Q.    Did you conduct any study or

19   analysis to evaluate whether the

20   manufacturers' detailing targeted physicians

21   with a history of prescribing their drugs?

22       A.    Not specific analysis.  I would

23   have to review my report carefully to see if

24   I don't cite documents.  It is -- in the

25   course of my work on pharmaceutical matters,

Highly Confidential - Subject to Further Confidentiality Review

1    I have been aware that manufacturers do, in

2    fact, target high prescribers.

3           Q.     And I think we've seen

4    throughout today you've relied on Dr. Perri.

5           A.     Dr. Perri, of course, is a

6    pharmaceutical marketing expert, and I

7    certainly cite him on those matters.

8                  I have my own general working

9    knowledge, having seen many documents in the

10   course of discovery about targeting efforts.

11                 (Whereupon, Deposition Exhibit

12          Rosenthal-16, 3/25/19 Perri Expert

13          Report, was marked for

14          identification.)

15   BY MR. ROTH:

16          Q.     I'm going to hand you

17   Exhibit 16, which is an excerpt of

18   Dr. Perri's report.  And if you look at page

19   42 -- sorry, paragraph 42, which is at

20   page 23.  Do you see that?

21          A.     Yes.

22          Q.     He says:  Marketers frequently

23   target prescribers who are most likely to

24   prescribe their drug.  Marketers identify

25   prescribers using commercially available

1    data, which groups prescribers, for example,

2    into deciles reflecting lower versus higher

3    levels of prescribing.

4              Do you see that?

5         A.    I do.

6         Q.    And then it says:  Marketers

7    use this information to select prescribers,

8    or groups of prescribers, as target

9    customers.  Targeting high-decile (more

10   frequent prescribing) prescribers is

11   consistent with marketing principles because

12   it effectively targets customers with

13   potential to generate sales.  Defendants used

14   deciles to identify the best physicians for

15   their PSRs to use in sales plan -- sales call

16   planning.

17             Do you see that?

18        A.    I do.  I think that's exactly

19   what I have said.

20        Q.    And you agree with that.  Your

21   point is just when you aggregate everything,

22   you don't need to account for the targeting

23   issue?

24             MR. SOBOL:  Objection.

25        A.    If I -- if I were looking at

1    individual physician data, it would be

2    important to account for this.  I am not, and

3    therefore this concern does not pertain to my

4    analysis.

5    BY MR. ROTH:

6        Q.    Okay.  Did you consider any

7    methods to test causation that are not

8    included in your report?

9            MR. SOBOL:  Well, other than

10           drafts, right?  How do we even

11           navigate that?

12   BY MR. ROTH:

13       Q.    I mean, I guess what -- the

14   only -- I'll ask it this way.

15           The only tests for causation of

16   your model are contained in your report?  Let

17   me strike that.  That's a bad question.  I'll

18   just -- I don't need to get drafts.  I'm not

19   trying to get at that.

20           Did you consider whether you

21   could leverage any natural experiments to

22   determine whether MMEs were impacted by

23   promotion?

24       A.    Because my assignment related

25   to the whole of this period of interest --

Highly Confidential - Subject to Further Confidentiality Review

1    well, the logical research design to examine

2    the effect of 20-some-odd years of promotion

3    is the one I have done.

4              I was going to say in some

5    sense the indirect analysis and my Section X,

6    which I assume will be a Sunday afternoon

7    activity, is like a natural experiment,

8    right?  It's saying what would have happened

9    absent promotion.

10             Now, how would all other

11   factors have driven this forward?  Those are,

12   in effect, event studies.

13        Q.   It's a thought experiment, but

14   it's not like a regression analysis or event

15   study.

16             MR. SOBOL:  Objection.

17        A.   Well, the -- of course the

18   indirect model uses a regression to establish

19   which factors seem cross-sectionally

20   associated and then trends that forward, so

21   the causal part is in the cross-section.

22             It's hard to imagine an event

23   study of another kind that would be

24   appropriate to capture the effect of the

25   alleged misconduct from 1995 through 2018, so

1    I don't think I considered it.

2    BY MR. ROTH:

3         Q.    Did you consider a

4    difference-in-differences approach?

5         A.    Again, because the alleged

6    misconduct in this matter pertains to all

7    marketing from 1995 to 2018, there wasn't an

8    obvious difference-in-difference approach

9    that I thought would make sense here.

10        Q.    Did you run your model

11   switching the dependent and independent

12   variables to see if MMEs predict detailing?

13        A.    No, I did not.

14        Q.    And that would be a test for

15   reverse causation; is that right?

16        A.    I'm not sure that would be the

17   best test for a reverse causation, but it

18   certainly is literally a reverse model.

19        Q.    Did you run a model including a

20   lead of detailing contacts from the next

21   month as an independent variable to see if

22   future detailing predicted current MMEs?

23        A.    I did not, no.

24        Q.    Did you do any test of reverse

25   causation?

1       A.      I did not.

2       Q.      And what would it mean if there

3   was a significant positive relationship

4   between future detailing and current MMEs?

5               MR. SOBOL:  Objection.

6       A.      Well, again, I proceed on this

7   question of endogeneity from a conceptual

8   basis.  I struggle a bit with thinking about

9   exactly what it would mean.  On the -- at the

10  individual drug level, I think there's a

11  clear story.  At the aggregate level, it's a

12  lot less clear to me.

13  BY MR. ROTH:

14      Q.      Okay.  If there comes a point

15  in time when, for whatever reason, certain

16  defendants are not part of the trial, is it

17  your intention to use your aggregate model

18  along with Table 3 to identify causation

19  percentages for the remaining defendants, or

20  do you have some other approach in mind?

21              MR. SOBOL:  Objection.

22      A.      Well, the reason that I

23  undertook the analysis for Table 3 was that I

24  was asked by counsel if it was possible to

25  remove one of the defendants or any group of

1    the defendants from the measure of impact

2    that I use, and so I did that by removing

3    their marketing from the calculation, which

4    is, in effect, leaving it in the but-for

5    scenario.

6            And so do I know for sure that

7    that's the way the court will ultimately want

8    to remove a defendant?  I don't know for

9    sure, but that was what -- I was asked if I

10   could do that by counsel in order to

11   demonstrate one way that the model could be

12   adapted for fewer defendants.

13   BY MR. ROTH:

14       Q.    I'm going to switch gears and

15   talk about your price index for just a few

16   minutes.

17       A.    Okay.  Sure.

18       Q.    Do you know whether the price

19   index you calculated is increasing or

20   decreasing over time?  And feel free to refer

21   to the --

22       A.    Yes, it doesn't change much.

23   It does increase slightly over time.

24       Q.    How does that square with the

25   fact that the share of generics relative to

1     branded drugs was also increasing over the

2     same period of time?

3          A.    Oh, sure.  Well, you're asking

4     me about my favorite subject, which is drug

5     pricing.  So even though the share of

6     generics may be increasing, the price of

7     those generics is also increasing; and

8     there's a bolus of people who are already on

9     generics, so as the price of generics

10    increases, the price index increases.  And

11    then, of course, there are new drugs and line

12    extensions, and those are priced higher and

13    higher.

14               So all of those forces together

15    are getting us to -- it's a very low rate of

16    increase, but it is slightly positive.

17         Q.    And did that index measure the

18    actual prices, or was that derived through

19    some equation, the Fisher Ideal Price Index

20    you use in your model?

21         A.    The Fisher Price -- Fisher

22    Ideal Price Index, sorry, not Fisher Price.

23    It's late --

24         Q.    That's where our heads should

25    be on Saturday, but we're all hanging out

Highly Confidential - Subject to Further Confidentiality Review

1    here.

2         A.     Yes, right.  Exactly.

3         Q.     Let me ask a clean question.

4         A.     Okay.

5         Q.     Did the Fishiarial [phonetic]

6    Pricing -- Ideal Price Index used in your

7    model look at actual opioid prices, or was it

8    derived through some equation?

9         A.     It looks at actual transaction

10    prices for opioids.

11         Q.     Okay.  What is the unit of

12    measure you used in calculating the price

13    index?

14         A.     The price index is weighted on

15    MMEs.

16         Q.     It's not weighted on extended

17    units?

18         A.     Well, I should check, but -- I

19    should not do anything by memory.  Let me

20    look in my report.  I apologize.

21         Q.     It would be logical if it were

22    weighted by MMEs, but I think it might be

23    weighted by extended units, so you should

24    check.

25         A.     Let me check.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   (Document review.)
 2        A.      It's weighted by extended
 3   units.  Yes.
 4   BY MR. ROTH:
 5        Q.      Would it not be more logical to
 6   weight it by MMEs, given that that's your
 7   dependent variable?
 8        A.      Well, given that MMEs and
 9   extended units track almost perfectly, I
10   think it would make no difference.  And I of
11   course run the model both with MMEs and with
12   extended units, so it happens to be using
13   extended units.
14        Q.      But you haven't run your price
15   index with MMEs to see what that would look
16   like?
17        A.      I haven't seen that, no.
18        Q.      And we talked about the
19   potential endogeneity issues with pricing.  I
20   take it you have not run instruments on your
21   pricing index?
22        A.      Again, because I'm using an
23   aggregate model and, in fact, the total
24   quantity and total prices are not
25   simultaneously determined in the market as a
```

Highly Confidential - Subject to Further Confidentiality Review

 1    whole, I do not believe it is necessary.

 2                   MR. ROTH:  I think we should

 3         take another five-minute break.

 4                   THE WITNESS:  Okay.

 5                   THE VIDEOGRAPHER:  The time is

 6         3:35 p.m.  We're now off the record.

 7                   (Recess taken, 3:35 p.m. to

 8         3:50 p.m.)

 9                   THE VIDEOGRAPHER:  The time is

10         3:50 p.m.  We're back on the record.

11    BY MR. ROTH:

12         Q.    So we started the day with a

13    long discussion of factors that influenced

14    doctors' prescribing decisions.  Do you

15    remember that?

16         A.    I do.

17         Q.    All right.  I want to take it a

18    step broader.

19                   What are the factors that drive

20    sales of prescription opioids?

21         A.    Well, the factors that I

22    account for in my direct model are price and

23    promotion; and promotion, of course, is the

24    most important driver of overall sales.

25         Q.    But there are other drivers

1    apart from price and promotion for opioid

2    sales; is that right?

3          A.    I think when we talk about

4    drivers, I think it's important to be careful

5    to distinguish between things that may

6    determine whether a particular patient or

7    doctor receives or prescribes an opioid

8    versus what increases the size of the market

9    over time.  And when it comes to the latter,

10   I think promotion is really the dominant

11   factor.

12         Q.    Would opioid sales still occur

13   if they were never promoted?

14         A.    Do you mean never from the

15   beginning of time?  Perhaps at some level.

16   But when we are talking about this class that

17   has been promoted for many years, I think

18   just stopping it at a point in time wouldn't

19   result in those sales being eliminated.

20         Q.    You have a but-for world that

21   eliminates promotion from the world, then you

22   still find there are opioid sales, right?

23         A.    I have a but-for world that

24   eliminates promotion for the defendants, for

25   that period of time, although I start my

Highly Confidential - Subject to Further Confidentiality Review

1    analysis earlier so the stock of promotion

2    has a chance to build up somewhat.

3              So yes, I don't -- I clearly

4    don't drive sales to zero with that

5    reduction.

6         Q.     And you said, I think, your

7    direct model includes only promotion and

8    prices as the two variables.

9         A.     As the two explicitly covered

10   variables, yes.

11        Q.     Do socioeconomic factors

12   influence sales of opioids?

13        A.     When it comes to the trends, if

14   they have any effect, it's very small.  And

15   that's really captured in the indirect model

16   when we look at that.  It's a little easier

17   to have that conversation when we have those

18   data in front of us.

19              But I think they do very little

20   to explain the expansion of the market over

21   time, as opposed to they do explain some of

22   the cross-sectional variation in opioid use.

23        Q.     Do demographic factors impact

24   the sale of opioids?

25        A.     Demographic factors, like

1  socioeconomic factors, may well explain some

2  cross-sectional variation.  Older populations

3  maybe have a higher incidence of cancer and

4  therefore more opioids.

5           But over time, even though

6  people do worry about the aging of the

7  population, it's an extremely slow

8  phenomenon; and again, in the indirect model,

9  those age variables do very little to

10  increase the sales of opioids.

11       Q.    Do healthcare factors impact

12  the sale of opioids?

13           MR. SOBOL:  Objection to form.

14       A.    Health -- healthcare factors

15  such as -- perhaps do you mean insurance,

16  health insurance?  We talked a little bit

17  about that this morning.

18           Again, there will be

19  cross-sectional differences between people's

20  coverage, and that will surely determine

21  whether some patients ever go to the

22  physician and therefore get a prescription.

23  So as a cross-sectional matter, those may

24  have some explanatory variable.

25           In the indirect analysis, we

1    see that driving very little of the change.

2    BY MR. ROTH:

3         Q.    And as you pointed out, you

4    modeled socioeconomic, demographic and

5    healthcare factors in your indirect model.

6         A.    Yes, because I'm able to use

7    that approach to exploit the cross-sectional

8    variation to capture those effects reliably,

9    whereas because they change so little on the

10   aggregate year over year, it would be very

11   hard if not impossible to do that in the time

12   series.

13              Nonetheless, using trends in

14   those underlying demographic, socioeconomic

15   and healthcare variables, I find that there's

16   very little of the growth in opioids that's

17   associated with those factors.

18        Q.    Did you attempt to run your

19   direct regression with demographic,

20   socioeconomic, and healthcare factors as

21   variables?

22              MR. SOBOL:  Objection.

23        A.    I did not, no.

24   BY MR. ROTH:

25        Q.    And why not?

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  Bless you.

2              MR. SOBOL:  For the sneeze, not

3         the question.

4              THE WITNESS:  Yes.

5         A.    For the question, those -- at

6    the national level, as you know in my model,

7    those variables show very little variation

8    over time.  If one were to try to put them in

9    a model, they would predict very little of

10   the sales.  And you can see from the

11   literature that we've reviewed today, none of

12   these studies enter variables such as these.

13   BY MR. ROTH:

14        Q.    All right.  If we can go back

15   to the G?n?l study, Exhibit 10.  Did we not

16   use that one yet?  We did, I think, yeah.

17        A.    No, I don't remember looking at

18   it.

19        Q.    Yeah, it's Exhibit 10.  We

20   looked at it quickly.

21        A.    I'm afraid mine are out of

22   order.

23             MR. SOBOL:  This one here.

24             THE WITNESS:  Thank you.  It's

25        just probably at the bottom.  Thank

1    you.

2   BY MR. ROTH:

3        Q.    Page 80.

4        A.    Yes.

5        Q.    So bear with me.  You know

6   what, let's do this.  Let's first go to the

7   Mizik and Jacobson study.

8        A.    Okay.

9        Q.    Which is Exhibit 9.

10       A.    And what page would you like me

11   to look at?

12       Q.    1707.

13       A.    Okay.

14       Q.    And actually it starts on 1706,

15   so I'm sorry about that.

16       A.    Okay.  That's fine.

17       Q.    So they're talking about the

18   G?n?l study.  Do you see that at the bottom

19   of the right column?

20       A.    Yes, I see that -- sort of

21   right midway down the page, they start

22   talking about it.

23       Q.    Yeah.  And they say at the

24   bottom of the page -- well, yeah.  So midway

25   down the page they say they use data

Highly Confidential - Subject to Further Confidentiality Review

1    involving 1,785 patient visits to estimate a

2    multinomial logit model assessing factors

3    influencing physician prescribing behavior.

4              Do you see that?

5    A.    I do.

6    Q.    And then the next paragraph

7    says:  A concern, which G?n?l et al

8    explicitly acknowledge, is over the role of

9    physician-specific effects that can induce a

10   bias in the estimated coefficients.  They

11   state "prescription behavior patterns might

12   be strongly influenced by factors other than

13   the explanatory variables we include in our

14   model.  Examples are physicians' unobservable

15   personal characteristics.  Ignoring these

16   factors might bias the coefficients of the

17   included explanatory variables."

18             Do you see that?

19   A.    Yes.  This is the subject that

20   we've been discussing a great deal this

21   afternoon about these -- it's the same as the

22   endogeneity concern, which is fundamentally

23   about an omitted variable at the physician

24   level.  So the concern is about

25   cross-sectional variation, not about time

Highly Confidential - Subject to Further Confidentiality Review

 1   series variation.

 2         Q.    Okay.

 3               (Whereupon, Deposition Exhibit

 4         Rosenthal-17, 2007 Steinman et al

 5         Publication, was marked for

 6         identification.)

 7   BY MR. ROTH:

 8         Q.    And then let me mark as

 9   Exhibit 17 the Steinman study,

10   Characteristics and Impact of Drug Detailing

11   for Gabapentin.

12               Do you have that document in

13   front of you?

14         A.    I do.

15         Q.    And is this a document you

16   reviewed and quoted and relied upon in your

17   report?

18         A.    It is.

19         Q.    So it looks like from the cover

20   page, for this study this evaluated off-label

21   promotions for gabapentin by analyzing forms

22   on specific detail visits to specific doctors

23   between 1995 and 1999.

24               Do you see that?

25         A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And at page 748, in the right

2   paragraph -- I'll wait until you get there.

3      A.     748, right paragraph.

4      Q.     Do you see "Our study has

5   several limitations"?

6      A.     Yes.

7      Q.     And in that paragraph, they

8   say:  Third, the self-reported intention to

9   increase future prescribing or recommending

10  of gabapentin might have been affected by

11  factors other than the detail.  Thus, we

12  cannot prove a causal relationship between

13  the detail and self-reported behavior change.

14         Do you see that?

15     A.     Yes.  Again, this is a

16  cross-sectional analysis.

17     Q.     And is it your testimony that

18  no aggregate time series regressions ever run

19  instrumental variable tests to account for

20  endogeneity?

21     A.     No, that was not my testimony.

22  It depends a little bit on what you mean by

23  aggregate.  The analyses that I know of,

24  including my own, that have used instrumental

25  variables have been product-level analyses.

1    Even though the Kaiser Family Foundation

2    report we looked at does some class-level

3    analysis, all the instrumental variables are

4    at the product level.

5            Q.    Got it.

6            A.    I can't say for sure that

7    there's no model that aggregates above that

8    level that uses instrumental variables.  I

9    haven't seen one, but...

10           Q.    So you raise a good point.  I

11   mean, all of the peer-reviewed published

12   studies we've looked at today have related to

13   cross-sectional drug-specific models of

14   marketing.

15           A.    The panel, so some of them have

16   time series.  This one doesn't have any time

17   series variation, but some of them have both

18   cross-sectional and time series variation,

19   but they all at least have some product level

20   variation in them.

21           Q.    And as we talked about, your

22   model does not do that?

23           A.    My assignment --

24           MR. SOBOL:  Objection, asked

25       and answered.

Highly Confidential - Subject to Further Confidentiality Review

1        A.      -- is about an aggregate

2    phenomenon, which I appropriately

3    characterize with an aggregate model.

4    BY MR. ROTH:

5        Q.      Okay.  In your direct model,

6    did you consider adding a variable for lagged

7    sales?

8        A.      I did not.

9        Q.      Did you consider adding a

10   variable in your aggregate model for

11   nonmarketing misconduct?

12       A.      Well, I did add those event

13   variables that I considered to be associated

14   with nonmarketing misconduct.

15       Q.      That's a good clarification.

16   Beyond the five events in Model C, there's no

17   variable for nonmarketing misconduct in your

18   direct model?

19       A.      There is not, no.

20       Q.      And just to confirm, Model C is

21   the same as Model B with the addition of the

22   five events?

23       A.      That's correct.

24       Q.      Did you consider adding a

25   variable to your direct model for illegal

1    prescribing?

2         A.    I'm sorry, can you explain

3    what -- what that would look like?

4         Q.    You're the economist.  You

5    probably have a better idea of how to put

6    that into a study.  But is that something you

7    considered doing?

8         A.    What is --

9              MR. SOBOL:  Objection to the

10        form.

11              You're the lawyer.  What's

12        illegal?

13              THE WITNESS:  Yes, sorry,

14        that's my question.

15              MR. ROTH:  I asked both of you.

16        A.    Well, as I understand this

17    case, it is not about illegal prescribing but

18    illegal promotion, and those are two

19    different things.

20    BY MR. ROTH:

21        Q.    Right.  But you understand that

22    there are doctors who have been criminally

23    convicted for illegally prescribing opioid

24    products?

25        A.    I -- yes, I do know there have

Highly Confidential - Subject to Further Confidentiality Review

 1    been some prosecutions.

 2         Q.    And you don't have any variable

 3    in your model to account for that?

 4         A.    I do not account for that in my

 5    model, no.

 6         Q.    You don't have any variable in

 7    your model to account for diversion of

 8    lawfully prescribed drugs to someone other

 9    than the intended user?

10              MR. SOBOL:  Objection to the

11         form.

12         A.    Just to be clear, when -- when

13    thinking about what to put in a model, one

14    reason we might do it is we want to say this

15    is something separate from the variable of

16    interest.

17              But if, in fact, the allegedly

18    unlawful marketing caused diversion, then it

19    would not be appropriate to pull it out from

20    the model.

21    BY MR. ROTH:

22         Q.    Right.  But you could conceive

23    of a set of facts where diversion occurs in

24    the setting of perfectly lawful marketing and

25    prescribing?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Well, my model is currently

2    agnostic as to whether the prescriptions

3    caused by the unlawful conduct were diverted

4    or not.  It seems to me that it's a legal

5    question about, you know, whether it would be

6    appropriate to separately identify those.

7              As we started out our

8    conversation today, it makes sense to me as

9    an economist that what -- whatever happened

10   with those prescriptions after they left the

11   pharmacy, the fact that they generated

12   profits for the defendants is a reasonable

13   basis for recovery, again, on the notion that

14   recovery is intended to deter this kind of

15   conduct in the future.

16      Q.      Does your direct model have any

17   variable for formulary placement status?

18      A.      It does not.

19      Q.      Your direct model does not have

20   any variable for prescription drug coverage?

21      A.      As we discussed earlier, these

22   are not factors that I would expect to be

23   changing over time in a way that would

24   predict the sales of opiates as a class, so

25   if there are formulary changes, that may

1    result in more generics, more of the

2    preferred brand versus the nonpreferred

3    brand.  I don't believe that those are

4    appropriately captured in a model like this.

5         Q.    Okay.  Why do you prefer

6    Model B to Model C?

7         A.    In part, because of that

8    counterintuitive effect that we talked about

9    before, with -- now I can't remember if it

10   was oxycodone or hydrocodone.

11        Q.    I think it was the hydrocodone

12   rescheduling.

13        A.    I think it was hydrocodone,

14   yes.

15             So that suggests to me that

16   that's -- whatever it's doing, it's not

17   picking up what I think it's supposed to be

18   doing.

19             It makes almost no difference

20        in the predictions, we looked at those

21        charts before, and you can see in the

22        adjusted R-squared there's almost no

23        difference, but it's -- to me it looks

24        like it's not the right way to capture

25        the effect of these events.

Highly Confidential - Subject to Further Confidentiality Review

1   BY MR. ROTH:

2       Q.    And, actually, I think Model C

3   has a slightly higher adjusted R-squared than

4   Model B.

5       A.    Yeah, just to be clear, it's

6   one ten-thousandth of a point.

7       Q.    But it is higher.

8       A.    It is technically higher.

9       Q.    If you were to put more of the

10  events from Figure 5 into what is Model C,

11  would that not be a fairly robust test of the

12  predictiveness of Model B since Model C is

13  really just Model B with the events added?

14      A.    I guess I don't understand your

15  question.  If I were to put more events in

16  Model C, would that be another test of

17  Model B?

18      Q.    Right.

19      A.    I think the fact that -- that

20  adding a subset of events that were, you

21  know, displaced over time doesn't change

22  ultimately the predictions in Model B,

23  suggests to me that it's not going to be

24  worthwhile.

25          And again, the counterintuitive

Highly Confidential - Subject to Further Confidentiality Review

1   coefficient on the hydrocodone rescheduling

2   suggest to me also, as we continue to add

3   more events, we'll get a certain amount of

4   gobbledygook.  I mean, that's just going to

5   be true in a time series model.

6              In any econometric model, the

7   goal is to include the important factors but

8   be as parsimonious as possible.  Adding all

9   these events would not be parsimonious.

10      Q.     I think I heard you a minute

11  ago say that you rejected Model C in favor of

12  Model B in part because of the hydrocodone

13  rescheduling.  Is there anything else that

14  led you to make the decision that Model B was

15  preferred?

16      A.     It adds almost nothing.

17      Q.     So it's really a function of

18  almost essentially the same R-squared and you

19  get this wonky result with hydrocodone's

20  rescheduling that leads you to prefer

21  Model B?

22             MR. SOBOL:  Objection, asked

23      and answered.

24      A.     That's -- yes, that is in

25  effect correct.  I look at the two models, I

Highly Confidential - Subject to Further Confidentiality Review

 1    see that they give almost the same

 2    predictions, the same actual predicted and

 3    but-for predicted, and it seems to me that

 4    Model C is not well specified in those five

 5    events, that they don't seem to work in the

 6    way that they're specified there, which is

 7    that they start happening at a point in time.

 8    BY MR. ROTH:

 9         Q.    And yet, your breaks also occur

10    at a point in time?

11              MR. SOBOL:  Objection.

12         A.    The breaks are doing something

13    entirely different because they're

14    interacting with promotion.  They're saying,

15    you know, we've estimated this underlying

16    effectiveness of promotion and does that

17    relationship shift at a point in time.

18    BY MR. ROTH:

19         Q.    Okay.  Model B suggests an

20    R-squared of 99.36%.

21         A.    Yes.

22         Q.    So your model explains more

23    than 99% of the variation in MMEs with

24    promotion?

25         A.    That's correct, and price.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So less than 1% of opioid MMEs

2    are explained by anything but price and

3    promotion?

4    A.    That's correct.

5    Q.    And you conclude that the

6    predictive power of Model B is shown to be

7    quite good?

8    A.    Yes.

9    Q.    Have you tried running your

10   model removing promotion and just having

11   price in the model?

12   A.    I have not.

13   Q.    If it showed negative MMEs,

14   what would that mean for your model?

15   A.    If we're removing promotion

16   and -- I mean, I guess as we talked about in

17   looking at Model A, it would suggest that

18   there was something that's missing from the

19   model.  When we looked at the but-for MMEs as

20   negative, that clearly it is not doing a good

21   job of predicting the real world in which

22   there were positive MMEs.

23   Q.    What is overfitting?

24   A.    Overfitting is when you include

25   factors in the model such that you perfectly

Highly Confidential - Subject to Further Confidentiality Review

1  predict the dependent variable, that you've

2  saturated the model, which is why I don't add

3  more events to this model, where it's already

4  high.  Having an adjusted R-squared as high

5  as we do in this case in a time series model

6  is quite common.

7      Q.    How do you tell to see if a

8  model is overfit?

9      A.    I don't actually, as I sit

10  here, recall the specific test for

11  overfitting, but usually it's about

12  predicting out of sample and looking at how

13  well the model forecasts.

14      Q.    How does the R-squared of your

15  model in this case compare to R-squareds you

16  have from other models you've done of

17  promotion against sales?

18      A.    I don't recall specifically,

19  but I think we probably have a few in front

20  of us that we could look at.

21      Q.    Yeah.  I mean, does 99.36

22  strike you as one of the higher R-squareds

23  you've had or are all of your models perfect

24  in their predictions --

25      A.    Model A has an R-squared of

Highly Confidential - Subject to Further Confidentiality Review

```
1    88 -- well, 87.99, the adjusted R-squared.

2    So we have a range here.  Again, time series

3    models do typically have very high

4    R-squareds.  I don't know what they've been

5    in other models.

6             As we talked about before, this

7    is unlike the model, for example, that we did

8    in the Kaiser Family Foundation report where

9    we're looking at a couple of years for about

10   25 drugs and exploiting both time series and

11   cross-sectional variation.

12        Q.    You understand from the

13   literature that a very high R-squared in the

14   presence of substantial unmodeled

15   autocorrelation can be an issue?

16        A.    I think we've already talked

17   about the error structure here, and my

18   understanding is that my team looked at that

19   early on and concluded that it was not a

20   problem here.

21        Q.    Who from your team did that

22   work?

23        A.    That would be Forrest McCluer.

24        Q.    And what specifically did

25   Mr. McCluer do to test for autocorrelation?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Well, as we were talking

2     before, he was looking at the correlation

3     over time of the errors in the model.

4          Q.      And did you see the results of

5     his work?

6          A.      I did not see the results

7     specifically, no.

8          Q.      Is your direct model a linear

9     model or a nonlinear model?

10         A.      Well, it's nonlinear because of

11    the depreciation rate.  It is effectively run

12    using ordinary linear -- ordinary least

13    squares, but it's nonlinear because of the

14    interaction of the depreciation rate.

15         Q.      Is R-squared an appropriate

16    measure for nonlinear models in econometrics?

17         A.      The adjusted R-squared that we

18    report here is appropriate for this model.

19         Q.      Okay.  Let me mark as

20    Exhibit 18 an article from Spiess and

21    Neumeyer, An evaluation of R-squared as an

22    inadequate measure for nonlinear models in

23    pharmacological and biochemical research.

24              (Whereupon, Deposition Exhibit

25         Rosenthal-18, 2010 Spiess and Neumeyer

```
 1              Publication, was marked for

 2              identification.)

 3    BY MR. ROTH:

 4         Q.     Do you see that?

 5         A.     I do.

 6         Q.     The title sounds pretty

 7    relevant.

 8                Were you aware of this paper?

 9         A.     Not specifically.

10         Q.     Okay.  So this is a 2010 paper

11    in BMC Pharmacology.  It looks like Spiess

12    and -- is from the Department of Andrology at

13    the University Hospital Hamburg-Eppendorf in

14    Germany.

15                Do you see that?

16         A.     I don't actually see where the

17    authors --

18         Q.     I'm looking at the footnote.

19         A.     Uh-huh, yeah.

20         Q.     Okay.  So at page 1, at the

21    very bottom of the first column under

22    Background, it says:  Although it is known

23    now for some time that R-squared is an

24    inadequate measure for nonlinear regression,

25    many scientifics and also reviewers insist on
```

1       it being supplied in papers dealing with

2       nonlinear data analysis.

3                       Do you see that?

4           A.      Yes.

5           Q.      And then if you flip to page 8,

6       under their plotted diagrams in Figure 3, I'm

7       in the left column.

8           A.      Left column, and the notes

9       under --

10          Q.      Under the chart.

11          A.      Yep.

12          Q.      The end of the first paragraph

13      says:  Consequently, and based on the

14      analysis of a sigmoidal nonlinear setup as

15      described here, we feel compelled to give the

16      following summary:  1, The use of highly

17      inferior nonlinear models is reflected only

18      in the third or fourth decimal place of

19      R-squared, and thus the description of single

20      models when using R-squared is not

21      meaningful, as this measure tends to be

22      uniformly high when a set of models is

23      inspected.

24                      Do you see that?

25          A.      I do.

Highly Confidential - Subject to Further Confidentiality Review

 1           Q.     And the authors say:  This has

 2      also been noted by others, and they have a

 3      note 20.

 4                  Do you see that?  And there's a

 5      Zeng study from 2008 that they cite?

 6           A.     Yes.

 7           Q.     And are you familiar with that

 8      study?

 9           A.     No, I'm not familiar with that

10      study.  Ultimately, the -- whether you rely

11      on the R-squared statistic or not, and I -- I

12      don't know honestly if this applies to the

13      particular nonlinear model that I'm using.

14      These are obviously full-time statisticians.

15                  But in my experience, the

16      adjusted R-squared is very frequently used

17      for these kinds of models, but ultimately,

18      you looked at the data; you can see the

19      predictions versus the underlying data, and

20      we have a very good sense of how well the

21      model actually fits the data.

22           Q.     And what measure do you have of

23      how well the model fits the data other than

24      the R-squared statistic?

25           A.     I imagine, so they are talking

Highly Confidential - Subject to Further Confidentiality Review

1    about using other criterion, the AIC and

2    other criteria, that those model criteria,

3    AIC and BIC, which are other model criteria

4    that are frequently output by these kinds of

5    programs.  I imagine that they would likely

6    agree.

7              I can't say for sure.  I

8    haven't calculated them or looked at them

9    myself, but I think the fact that they

10   believe the R-squared statistic itself is not

11   meaningful does not suggest that there's no

12   information from the model fit data that I've

13   looked at.

14        Q.    And there's no AIC or BIC

15   statistic in your report.

16        A.    I don't think it's in the

17   output, no.  It wasn't in what we looked at,

18   was it?

19        Q.    No.  I just looked at the

20   tables and didn't see it.

21        A.    Yeah.

22        Q.    Okay.  Turning to Table 2 of

23   your report, which is on page 51.

24        A.    Yes.

25        Q.    So this table is your

Highly Confidential - Subject to Further Confidentiality Review

```
 1    calculation of MMEs attributable to

 2    defendants' promotion from Model B; is that

 3    right?

 4         A.     That's correct.

 5         Q.     And so between 1995 and 2018,

 6    you calculate a percentage of MMEs that were

 7    attributed to defendants' promotion in each

 8    year, right?

 9         A.     I do.

10         Q.     And it starts with only ██████ in

11    1995.

12                Do you see that?

13         A.     Yes.

14                MR. SOBOL:  Objection to form.

15         A.     Yes, the number is ██████ in

16    1995.

17    BY MR. ROTH:

18         Q.     And then it increases

19    consistently, with the exception, I think, of

20    2005 and 2006 in every year after that.

21         A.     That is correct.

22         Q.     And in 2005-2006, for the

23    record, it's █████████████, so it stays

24    relatively flat in those years.

25         A.     Yes, that's correct.
```

1    Q.    So despite the volume of MMEs

2    going down, your model reflects that the MMEs

3    attributable to defendants' promotion

4    increases over time?

5    A.    Just to be clear, what this is

6    saying is the share of MMEs, and so that

7    makes perfect sense, that as the volume is

8    going down over time, that the share could

9    well be increasing.

10    Q.    To what do you attribute the

11    increasing percentage attributable to

12    defendants' promotion over time?

13            MR. SOBOL:  Objection.

14    A.    I think it would make sense to

15    interpret that.  Of course, it is the result

16    of the analysis, but if we think about the

17    notion that defendants' detailing and other

18    conduct cumulatively affected prescribing

19    patterns, that would suggest that it would be

20    increasing.

21    BY MR. ROTH:

22    Q.    It's the depreciation rate

23    that's driving it up, in part?

24            MR. SOBOL:  Objection, form.

25    A.    No, it's the model results that

 1    are driving it up.  Again, the fact that the

 2    stock of promotion is increasing because of

 3    the negative depreciation rate in Model B

 4    doesn't mean necessarily that the effect has

 5    to be increasing in that first part of -- of

 6    before we allow the promotional effectiveness

 7    to deteriorate.  That would be true because

 8    there's a positive coefficient on promotion,

 9    and so it's simply true over time that that

10    promotion is having a larger and larger

11    effect.

12    BY MR. ROTH:

13         Q.    Have you run Model B with the

14    same period interval breaks with a positive

15    depreciation rate to see how that would

16    affect things?

17              MR. SOBOL:  Objection, asked

18         and answered.

19         A.    I believe you asked me that

20    earlier, and I said no.

21    BY MR. ROTH:

22         Q.    I asked a lot of questions.  I

23    can't remember all of them.  I'm sorry.

24              Let's turn to paragraph 76 of

25    your report, and I want to talk about your

```
 1    sensitivity with respect to specific

 2    defendants.

 3         A.     Okay.

 4         Q.     You started talking about this

 5    this morning, this is Attachment C.

 6         A.     That's right.

 7         Q.     And eventually it outputs into

 8    Table 3, which is on the page.

 9         A.     Yes.

10         Q.     So in paragraph 76, you say:

11    As noted in my assignment, I have examined

12    the sensitivity of my calculations of impact

13    to the inclusion or exclusion of

14    particularly -- start over.  Strike that.

15              As noted in my assignment, I

16    have examined the sensitivity of my

17    calculations of impact to the inclusion or

18    exclusion of particular defendants'

19    promotional efforts in the construction of my

20    but-for scenario.

21              Do you say that in

22    paragraph 76?

23         A.     I do.

24         Q.     And then you say:  In the first

25    row of Table 3, I show that impact of
```

1    manufacturer misconduct on MMEs from 1995 to

2    2018 with a but-for scenario that assumes

3    none of the defendants' marketing was lawful.

4              Do you see that?

5         A.    I do.  I was just thinking,

6    because this is in the errata, if we talk

7    about specific numbers, can we remember to

8    bring that up?

9         Q.    I was going to go there next.

10   So you actually --

11        A.    Okay.  I was trying to find it.

12        Q.    You gave us the errata on

13   Thursday.

14        A.    Yes.

15        Q.    One of your errata was actually

16   saying that something you previously said was

17   not statistically significant is

18   statistically significant.

19        A.    That's right.

20        Q.    And another errata is changing

21   the percentages in Table 3.

22        A.    Yes.

23        Q.    Those are fairly immaterial

24   errata.

25              MR. SOBOL:  Objection.

```
1              A.      I would disagree, although I
2      don't want to use the word "material" because
3      that may mean something different to you and
4      to me, but the first one relates to the joint
5      significance of those five events.
6              It doesn't change my opinion
7      about the counterintuitive effect of that
8      hydrocodone event and my general sense that
9      they're not picking up something in the data
10     that's important because they don't really
11     change the results.
12             So that doesn't change my
13     opinion, so that doesn't change my
14     conclusions.
15             This was a miscalculation.
16     Table 3 was inadvertently calculated
17     including 1993 and 1994 in which the actual
18     and but-for worlds are exactly the same, and
19     so those zeros basically were averaged in
20     there.
21             So the underlying data, they're
22     exactly the same as they were originally
23     submitted, it's just the Table 3 summary is
24     updated.
25                     ///
```

1   BY MR. ROTH:

2        Q.      And when you updated the

3   Table 3 summary, the defendants' share in

4   your model actually increased?

5        A.      Yes, again, because it takes

6   those two years that are not in question out

7   of the analysis.

8        Q.      Why were those two years in

9   there to begin with?  Had you modeled it

10  going back to '93 instead of '95?

11       A.      In all of our models we go back

12  to '93.  As I mentioned earlier, to estimate

13  the model as accurately as possible, we used

14  all the data that we could, and so again, we

15  allow for -- we look at the promotion that

16  was happening before the alleged misconduct.

17       Q.      And you decided to estimate the

18  harms from '95 forward at the instruction of

19  counsel, correct?

20       A.      That's because I understand, as

21  we talked about, again, earlier this morning,

22  that counsel intend to prove that the

23  misconduct began in 1995.

24       Q.      Okay.  So the difference

25  between each manufacturer's percentage in

Highly Confidential - Subject to Further Confidentiality Review

1    Table 3 and the baseline is the percent of

2    MMEs you attribute to that manufacturer; is

3    that right?

4          A.     To their promotion.

5          Q.     And let's just take a step

6    back.

7                 How was that done?  How did you

8    attribute promotion to a particular

9    manufacturer defendant?

10         A.     So in the IMS data, we can see

11   who's promoting for what product, so that's

12   the sort of complex nature of the tables in

13   the back.  So we can see when, for example,

14   there were other manufacturers promoting for

15   one of the defendants, and we can make those

16   cross-walks.

17         Q.     And the IMS data doesn't always

18   consistently put drugs in the same

19   manufacturer's bucket; is that right?

20                MR. SOBOL:  Objection.

21         A.     I'm not sure what you mean by

22   that.  Would you explain?

23   BY MR. ROTH:

24         Q.     We can look at something that

25   explains it.

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Sure.

2       Q.      But so I understand

3    mechanically how Table 3 works, the baseline

4    is when you take all MMEs that you claim are

5    attributable to defendants collectively.

6    That's the baseline?

7       A.      Yes.  So that was where I

8    realized that there was a mistake in the

9    table is that that baseline number is the

10   same as the summary number in Table 2.

11      Q.      So it's ██████

12      A.      That's correct.

13      Q.      Okay.  And then each line item

14   is essentially calculating the baseline

15   percentage against the percent that you

16   attribute to that specific manufacturer?

17              MR. SOBOL:  Objection.

18      A.      I'm not sure, but you may be

19   right, but I wouldn't have said it that way.

20   BY MR. ROTH:

21      Q.      How would you say it?  Just

22   explain what each line is.

23      A.      Each line item has a particular

24   defendant named in it, and in the number

25   calculated to the right of that, I rerun the

1    but-for scenario, but I allow that defendant

2    their promotion to stay in the but-for world,

3    so that's by way of saying, no, that things

4    would not have been different for this

5    defendant.  That is exactly -- it was

6    appropriate.  It was not -- not shown to be

7    unlawful, whatever.

8         Q.    Right.  So you assumed that a

9    particular defendant's promotion is lawful,

10   and then rerun your but-for world?

11            MR. SOBOL:  Objection.

12        A.    That is certainly the way I

13   framed it, but presumed that for whatever

14   reason, we are not going to recover related

15   to that promotion, and so it stays in the

16   but-for world instead of being backed out

17   like the others.

18   BY MR. ROTH:

19        Q.    So in order to allocate MMEs

20   among the individual defendants and

21   non-defendants, you said you looked at IMS

22   data.  Can you be more specific about which

23   specific IMS data?  Was it the NPA data or

24   the IPS data or both?

25        A.    I -- I don't think I said what

1    you said I said.  But just to be clear, for

2    this analysis, what we're backing out is

3    promotion, detailing, not MMEs.  We're

4    backing out the detailing, and then whatever

5    MMEs flow from that, that comes out in the

6    analysis.

7         Q.    Okay.  So what is the data

8    source for the detailing?

9         A.    The Integrated Promotional

10   Services.

11        Q.    So the IPS?

12        A.    The IPS.

13        Q.    So you did not consider the NPA

14   for that allocation?

15        A.    No, because that was not the

16   purpose of the analysis.  The purpose of the

17   analysis was to change what we're considering

18   to be the challenged conduct, and then the

19   model tells us how many MMEs flowed from

20   that.

21        Q.    Did anyone check whether the

22   IPS data was corroborated by the NPA data

23   with respect to how it allocated drugs?

24             MR. SOBOL:  Objection.

25        A.    Well, I think that notion

1    doesn't make a lot of sense.  There are drugs

2    that are sold and not promoted.  So

3    there's -- there's not a one-to-one

4    relationship.

5    BY MR. ROTH:

6         Q.    Even though 99.6% of the world

7    is explained by promotion and price, drugs

8    get sold without being promoted?

9              MR. SOBOL:  Objection.

10        A.    Those two things are not at all

11   in contradiction.  Again, remember, we're

12   looking at an aggregate market here and we're

13   talking about the aggregate market growth.

14   And so there are explicitly spillover effects

15   anticipated here.

16   BY MR. ROTH:

17        Q.    Are you aware of for which

18   drugs specifically plaintiffs have alleged

19   unlawful marketing?

20        A.    Yes.  I mean, could I sit here

21   and rattle them off?  No.  They're -- but I'm

22   happy to go through Table C with you.

23        Q.    Well, let me ask you that.

24              Did you go through every drug

25   on Table C to make sure that there was an

1    allegation that with respect to that drug,

2    something unlawful occurred?

3                    MR. SOBOL:  Objection.

4         A.    I received my instructions from

5    counsel about what promotion to consider

6    unlawful, and that was designated by

7    defendant rather than by drug.  And so I

8    confirmed with counsel all of the lists in

9    Table C.  So that's my understanding, that

10   these are the correct -- the correct drugs

11   and defendants to be including in my

12   analysis.

13   BY MR. ROTH:

14        Q.    So there could be drugs on

15   Table C for which counsel will present no

16   evidence of unlawful marketing?

17                    MR. SOBOL:  Objection.

18        A.    I guess I don't know one way or

19   the other.

20   BY MR. ROTH:

21        Q.    If it were the case that there

22   are drugs on Table C for which no evidence of

23   unlawful marketing is presented, you would

24   agree that you should then shift that drug to

25   the but-for side of the equation?

1          MR. SOBOL:  Objection.

2     A.     Well, I'm not a lawyer, so I

3  really don't -- I don't know how that

4  liability will work, if it's drug by drug or

5  defendant by defendant.  I do not honestly

6  know.

7          As we talked about before and

8  as you can see here, I have the ability to

9  back out drugs as well as defendants, but

10  I -- I haven't anticipated that.

11  BY MR. ROTH:

12     Q.     Okay.  And I think we spoke

13  about this a little earlier, but you know

14  there's a difference between Schedule II and

15  Schedule III drugs under the Controlled

16  Substances Act?

17     A.     I do.

18     Q.     And you are aware that the DEA

19  has changed the classification of certain

20  drugs over time because we'd talked about, I

21  think, hydrocodone?

22     A.     Yes.  Yes, I'm aware of that.

23     Q.     And I think you said this, but

24  just to confirm, you didn't consider that

25  issue in determining how to allocate

1    detailing contacts for drugs that later

2    became Schedule II but previously were

3    Schedule III at the time of detailing?

4         A.    Well, I would say I did

5    consider it, and in consultation with

6    counsel, I left -- I treated those drugs as

7    if they were Schedule II for the entire time

8    period.  That was an explicit assumption.

9         Q.    Okay.  And what was that

10   assumption based on?

11        A.    Instruction from counsel.

12        Q.    Are you aware that Dr. Perri

13   opines on specific promotional efforts

14   employed by the manufacturer defendants that

15   he claims were unlawful?

16        A.    I have read Dr. Perri's report.

17   I'm aware that he opines on some specific

18   kinds of activities, yes.

19        Q.    Have you read Dr. Egilman's

20   report?

21        A.    I have not.

22              MR. SOBOL:  Who has?

23   BY MR. ROTH:

24        Q.    Who prepared the tables in

25   Appendix C that assigned the particular drugs

1    to particular defendants?

2         A.    Forrest McCluer.

3         Q.    Do you know how he determined

4    in the first instance who was a defendant and

5    who was a non-defendant?

6         A.    In consultation with counsel.

7         Q.    Based on instruction from

8    counsel?

9         A.    I guess that's right.  I mean,

10   certainly it wasn't his opinion about who was

11   a defendant.  There were some questions

12   related to changes in ownership that required

13   some digging, and Forrest may have

14   contributed to the conversation, but

15   ultimately, counsel determined who was a

16   defendant and a non-defendant.

17        Q.    Were you involved in those

18   decisions?

19        A.    Not explicitly, no.

20        Q.    How did Mr. McCluer conclude

21   whether an entity that is not a named

22   defendant in the lawsuit was affiliated with

23   a defendant for the purposes of your report?

24        A.    In this conversation with

25   counsel, he asked counsel to instruct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     How did you allocate

2   prescriptions among the named defendants once

3   those defendants were established?  Was it

4   based on the IPS data?  We're mixing things,

5   so let me back up a step.

6      A.     Yes.

7          MR. SOBOL:  Yeah, you are.

8   BY MR. ROTH:

9      Q.     Did you allocate prescriptions

10  among the named defendants, or is it your

11  testimony your model only allocates the

12  detailing contacts among the named

13  defendants?

14          MR. SOBOL:  Objection.  You

15       mean promotions, I think.

16          MR. ROTH:  Detailing and

17       promotion are the same thing in her

18       report.  But let me reask the question

19       so we have a clean record.

20          MR. SOBOL:  Sorry.

21  BY MR. ROTH:

22      Q.     Did you allocate prescriptions

23  among the named defendants or does your model

24  only allocate the detailing contacts among

25  the named defendants?

1        A.      Well, if you look at Table C.2,

2    I do characterize by defendant and by drug,

3    MMEs and extended units.  So I don't know

4    exactly what you mean by allocate.  Because

5    my model is aggregate, I don't have to

6    allocate MMEs.  I am summing up detailing for

7    the defendants versus non-defendants, but

8    these tables summarize the data from the NPA

9    which give you extended units, which we then

10   convert to MMEs.

11       Q.      Okay.  So I misunderstood you

12   before.

13       A.      Yeah.

14       Q.      You allocated the detailing

15   contacts using the IPS data, but then you did

16   take from the NPA data the extended units and

17   the MMEs for the drugs?

18              MR. SOBOL:  Objection.

19       A.      Yes.  I'm sorry if you were

20   confused about that.  The NPA is the sales

21   data, the left-hand side variable.  The IPS

22   is the promotional data, the right-hand side

23   variable.

24   BY MR. ROTH:

25       Q.      Okay.  So for the sales data

1    for the MMEs, are you saying you didn't have

2    to allocate because you just put the same

3    MMEs for the whole class in every line, or

4    how -- how do the MMEs, for example, for

5    Abstral, the first drug on the list, compare

6    to the MMEs for other products in that class?

7         A.    Well, you can see right here --

8    I've lost the first page, but to the right --

9    if you wanted to go to the beginning, to

10   Table C.1, which is a little bit easier to

11   read.

12        Q.    I'm there.

13        A.    You can see MMEs and extended

14   units for Abstral.

15        Q.    So this is just taken straight

16   from the data.  This is the way the NPA data

17   is, it's by drug and it contains the MMEs and

18   the prescriptions?

19              MR. SOBOL:  Objection.

20        A.    No.  The NPA data contain the

21   extended units and prescriptions.  The MMEs

22   are calculated using the multipliers we

23   talked about from the CDC.

24   BY MR. ROTH:

25        Q.    Got it.  That's a good

1    clarification.

2              So the NPA contains the

3    extended units by drug?

4         A.    Yes.  I believe it's actually

5    by NDC, and we rolled them up to drug.

6         Q.    Okay.  And you rolled them up

7    to drug.  Then in C.2 you associate the drugs

8    with defendant or non-defendant?

9         A.    I do.

10        Q.    So how was that determination

11   made?

12        A.    In consultation with counsel

13   and in the IMS data, so the IMS data

14   automatically say who the manufacturer is,

15   but the IMS data have no memory, so if

16   Actavis bought a company yesterday, it's

17   considered an Actavis drug going back in

18   time.

19             And so considerable work was

20   undertaken to examine the -- as we might call

21   it, the genealogy of these drugs.

22        Q.    And who undertook the work to

23   examine the genealogy of the drugs?

24        A.    Well, Forrest provided the data

25   that we have, as I mentioned earlier, and

1    worked with counsel.

2         Q.    And what did you do to verify

3    that Mr. McCluer and counsel's allocation of

4    the genealogy of the drugs was construct?

5         A.    I understand the process they

6    went through, for example, using public

7    documents about acquisitions.  I did not

8    independently verify those allocations.

9         Q.    Okay.  We'll do a couple with

10   public documents and see how you do.

11        A.    Okay.  Good.

12        Q.    Hopefully you had them do a

13   sample or two for you, no?

14        A.    I certainly looked at what

15   their process was.  There are a lot of moving

16   parts.

17             (Whereupon, Deposition Exhibit

18        Rosenthal-19, Kadian

19        Defendant/Non-Defendant Spreadsheet,

20        was marked for identification.)

21   BY MR. ROTH:

22        Q.    Okay.  So I want to hand you

23   what I'll mark as Exhibit 19, which I will

24   represent to you is your backup data

25   distilled down for the drug Kadian.

```
 1              A.      Excellent.

 2              Q.      And do you recognize this data

 3     or Excel format or did you not review these

 4     sorts of documents with the team?

 5              A.      Well, I recognize the general

 6     structure of this file.  I couldn't tell you

 7     one way or another if I've seen this exact

 8     file.

 9              Q.      Okay.  So there's a column that

10     says def_status.  Do you see that?

11              A.      I do.

12              Q.      And it says Non or Def.

13              A.      Yep.

14              Q.      And we can presume what that

15     means, but have you --

16              A.      It means non-defendant or

17     defendant.

18              Q.      And are you speculating as to

19     that or did Forrest tell you that?  I mean,

20     how do you know that?

21              A.      Again --

22              MR. SOBOL:  Objection.  Just no

23         communications with counsel.

24              But go ahead.

25              A.      Again, I've -- I know Forrest's
```

```
1    language around this.

2    BY MR. ROTH:

3         Q.    Okay.  And then there's a

4    column for drug.

5                Do you see that?

6         A.    Yes.

7         Q.    And then a second column for

8    defendant, but this one will say either

9    non-defendant or it looks like a company

10   name.

11               Do you see that?

12        A.    Yes.

13        Q.    Then there's a column for

14   marketer.  Do you see that?

15        A.    Yes.

16        Q.    And do you know what that is?

17        A.    Yes.  As I noted earlier this

18   morning, I'm aware that there are marketing

19   arrangements whereby a third party may market

20   for a particular drug, as AbbVie did for

21   Purdue in the case of OxyContin.

22        Q.    And then the last columns say

23   date, def_contacts and def_cost_of_contacts.

24               Do you see that?

25        A.    Yes.  Those are directly from
```

1    the IPS.

2        Q.     And what are those columns,

3    def_contacts and def_cost_of_contacts

4    representing?

5        A.     The date is the month.  It says

6    1 January, but it is the month of January.

7    Def_contacts is the number of contacts, and

8    then cost_of_contacts is a dollar value that

9    IMS assigns to it.

10   BY MR. ROTH:

11       Q.     So you had dollar values in the

12   IPS data but you chose not to model that?

13       A.     That's correct.

14       Q.     So if you look at the

15   def_contacts, is this just taken directly

16   from the IPS data without any modification by

17   Mr. McCluer?

18       A.     That's correct.

19       Q.     How do you know that?

20       A.     Well, you put a piece of paper

21   in front of me, I can't a hundred percent

22   guarantee it, but it's my belief that these

23   are exactly the form that the data come from

24   the IPS, so I believe that they are

25   unmodified.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sticking with this sheet for

2    Kadian, the first couple of entries are

3    labeled non-defendant.

4          Do you see that?

5    A.    Yes.

6    Q.    And Alpharma and Faulding are

7    both listed as non-defendant.

8          Do you see that?

9    A.    Yes.

10   Q.    And then if you go about seven

11   lines down, do you see there's a marketer

12   labeled Purepac.

13         Do you see that?

14   A.    Yes.

15   Q.    And that's affiliated with

16   defendant Actavis.

17         Do you see that?

18   A.    I do.

19   Q.    Any idea why Purepac was

20   assigned to Actavis by Mr. McCluer?

21   A.    Again, I was not involved in

22   the individual decisions, so I do not know.

23         (Whereupon, Deposition Exhibit

24         Rosenthal-20, Alpharma Form 8-K, was

25         marked for identification.)

Highly Confidential - Subject to Further Confideneiality Review

```
 1    BY MR. ROTH:
 2          Q.     Okay.  I'm going to hand you
 3    what I'll mark as Exhibit 20, which is a
 4    Form 8-K SEC filing from December 12th, 2001
 5    by Alpharma, Inc.
 6                 Do you have --
 7          A.     I do.  December 12th, 2001.
 8    Yes.
 9          Q.     And I assume this is the kind
10    of document Mr. McCluer would have been
11    looking at to construct the genealogy of the
12    drugs?
13                 MR. SOBOL:  Objection, instruct
14          her not to answer.
15                 MR. ROTH:  On what basis?
16                 MR. SOBOL:  Because now you're
17          asking about the communications
18          between Mr. McCluer --
19                 MR. ROTH:  No, I'm asking what
20          Mr. McCluer looked at.
21                 MR. SOBOL:  Let me finish.  Let
22          me finish.
23                 MR. ROTH:  All right.
24                 MR. SOBOL:  You're asking about
25          the communications between Mr. McCluer
```

1          and the lawyers.

2                    MR. ROTH:  I'm asking if this

3          is the kind of document Mr. McCluer

4          looked at to make the determination as

5          to whether Kadian should be attributed

6          to Actavis and to do the genealogy

7          work.

8                    MR. SOBOL:  Well, then I object

9          because that assumes a fact not in

10         evidence.

11                   MR. ROTH:  All right.  Let me

12         reask the question so we get a clean Q

13         and A.

14    BY MR. ROTH:

15         Q.    Is this the kind of document

16    Mr. McCluer would have looked at to

17    reconstruct the genealogy of the drugs in

18    your Table 3?

19                   MR. SOBOL:  Objection.

20         A.    Well, first, I just want to be

21    clear that I've characterized what happened.

22    Mr. McCluer was absolutely involved because

23    he had these data and could bring them to

24    counsel.

25                   So I was not suggesting that

Highly Confidential - Subject to Further Confidentiality Review

1    Mr. McCluer was making a determination, so

2    I -- I understand that public documents were

3    a part of what Mr. McCluer had dug out.  I

4    don't know what exactly was used to make the

5    determination.

6    BY MR. ROTH:

7        Q.    You don't know whether

8    Mr. McCluer or counsel made the determination

9    or how it was made?

10       A.    It was made with counsel.  That

11   is what I know.

12       Q.    Okay.  So let's look at

13   Exhibit 20.  So this is a 2001 8-K from

14   Alpharma, Inc.

15             Do you see that?

16       A.    I do.

17       Q.    And then at the bottom it says

18   Item 2, Acquisition or Disposition of Assets.

19             Do you see that?

20       A.    Yes.

21       Q.    On December 12th, 2001,

22   Alpharma, Inc. acquired through its wholly

23   owned subsidiary, Oral Pharmaceuticals

24   Acquisition Corp., all of the capital stock

25   of US Oral Pharmaceuticals Pty Limited, which

1    owns through subsidiaries the generic oral

2    solid dose pharmaceutical businesses of

3    FH Faulding & Company Limited (Faulding) from

4    Mayne Nickless Limited for $660 million.

5              Do you see that?

6         A.    Yes.

7         Q.    And then in the next paragraph

8    down, it says Alpharma's acquisition of the

9    Oral Pharmaceuticals Business includes the

10   operations of Purepac Pharmaceuticals and

11   Faulding Laboratories in the United States.

12             Do you see that?

13        A.    Yes.

14        Q.    So going back to Exhibit 19,

15   for some reason or another, the decision was

16   made that Alpharma and Faulding were

17   non-defendants, but the other acquired

18   subsidiary, Purepac, is attributed to

19   Actavis.

20        A.    I -- this is the first that

21   I've dug into a specific issue like this, so

22   I can't say as I'm sitting here that there's

23   some other piece of information that's

24   relevant.  I really don't know.

25        Q.    And you don't know whether

1    there are other issues like this with your

2    Table 3?

3                    MR. SOBOL:  Objection.

4         A.    Again, I rely on counsel for

5    the identification of the appropriate

6    entities to be included in the defendant

7    group.

8    BY MR. ROTH:

9         Q.    And if counsel was wrong in

10   allocating entities to defendant groups, then

11   your Table 3 would reflect that wrong input

12   from counsel in allocating causation to the

13   manufacturer defendants?

14                   MR. SOBOL:  Objection.

15        A.    If there were a misallocation,

16   it could certainly be corrected and Table 3

17   rerun.  Table 3 is just a product.  It's a

18   simulation to show the capabilities.  If

19   there's an underlying issue -- and again, I

20   don't know that there is one -- it could be

21   altered and changed.

22                   (Whereupon, Deposition Exhibit

23             Rosenthal-21, Bloomberg Company

24             Overview of Purepac Pharmaceutical

25             Holdings Inc., was marked for

1          identification.)

2     BY MR. ROTH:

3          Q.     Okay.  Let me mark as

4     Exhibit 21 information from Bloomberg on

5     Purepac.  Do you have that?

6          A.     Yes, let's see.

7          Q.     It says:  Purepac

8     Pharmaceutical Holdings operates as a

9     subsidiary of Pfizer Inc.

10          A.     Yes, I'm trying to figure out

11     what date.  I see the date on -- this just

12     might be when it was printed, though, so

13     what's the date of this fact?

14          Q.     This was printed off on

15     April 14th, 2019 from Bloomberg, so two weeks

16     old.

17          A.     Right, right, I understand.  I

18     just wasn't sure what time period you were

19     going to ask me be about since -- this may be

20     current, but I don't -- again, because things

21     change, I don't know.

22          Q.     Well, that's a great point.  So

23     what matters for Table 3?  Are you looking at

24     current affiliation or past affiliation or

25     affiliation at the time of detailing?  What

1    did Mr. McCluer do?

2        A.    Again, on instructions from

3    counsel, as when a company acquires -- when a

4    defendant acquires a drug that was marketed

5    by another defendant earlier, those -- that

6    detailing carries forward to the acquiring --

7    the assumption there is that the acquiring

8    entity acquires liability for those effects.

9            Again, that's something that's

10   been explicit and so those kinds of changes

11   work that way.

12       Q.    And that was an instruction

13   from counsel as opposed to an analysis of the

14   asset purchase agreement or some other

15   mechanism?

16       A.    This was all on instruction

17   from counsel.

18       Q.    Back to your tables for a

19   minute.  If you look at Table C.6 -- I guess

20   one question:  Do you know why C.5 and C.6

21   have privileged and confidential stamps at

22   the bottom?

23       A.    I don't know.  Not being a

24   lawyer, I think we might put it on

25   everything.

```
 1          Q.     Well, did counsel draft this on
 2     their computer or was this something that
 3     McCluer did?
 4          A.     This is something that we did.
 5          Q.     Okay.
 6                 MR. SOBOL:  It might be because
 7          of ARCOS.
 8     BY MR. ROTH:
 9          Q.     So if you look at --
10          A.     I love that you think counsel
11     know how to use a spreadsheet.
12          Q.     I do actually.  We'll have fun
13     if we get to trial.
14          A.     Okay.  Good.
15          Q.     So if you look at Table C.6,
16     the first page starts with Actavis, and tell
17     me when you're there.
18          A.     Yes.
19          Q.     They're not numbered so it's a
20     little hard.
21          A.     I know.  Yes, I see Actavis.
22          Q.     Just pivoting back to a
23     conversation we were having earlier.  So, for
24     example, oxycodone, it looks like there's ■
25     contacts that are attributed to Actavis.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.     Yes.

3     Q.     Which is zero percent of the

4  contacts because it's obviously lower than

5  one-hundredth of a decimal place of the

6  contacts?

7     A.     Yes.

8     Q.     And still there's ████████

9  MMEs that are associated with oxycodone.

10         Do you see that?

11    A.     Yes.  It's --

12    Q.     Go ahead.

13         MR. SOBOL:  There's no question

14    before you.

15    A.     Yes.

16 BY MR. ROTH:

17    Q.     Well, and then we can see like

18 in Kadian, you've got █████ contacts which

19 is ████, and that's associated with

20 ████████████ MMEs, right?

21    A.     Yes.

22    Q.     And you're not drawing any

23 conclusion about the effect of this extremely

24 small percentage of promotion and the number

25 of MMEs prescribed for those drugs, are you?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      I think I've been extremely
 2     clear that my analysis is an aggregate
 3     analysis of the entire opioid class.
 4              Q.      So where it says ██████████
 5     MMEs for oxycodone, what is that number?  Is
 6     that all generic oxycodone from 1993 to 2018?
 7              A.      Sold by Actavis.
 8              Q.      Okay.  So all oxycodone sold by
 9     Actavis based on counsel and Mr. McCluer's
10     assignment of drugs is in the MME column, and
11     there's ██ promotional contacts in the data?
12                      MR. SOBOL:  Objection.
13              A.      Well, again, instruction from
14     counsel identified the defendants.  You can
15     see here that oxycodone is -- the
16     manufacturer is just Actavis.  It seems
17     uncontroversial to me.  But yes, there are
18     ██████████ MMEs of oxycodone that Actavis
19     sold between 1993 and 2018.
20     BY MR. ROTH:
21              Q.      So can you tell without digging
22     into the guts of the model what share Actavis
23     is being allocated for its ██ oxycodone
24     contacts in your model?
25                      MR. SOBOL:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Objection.

2          A.     Well, you can see it rounded

3    here to two decimal places.  The share of

4    contacts is obviously de minimis.

5    BY MR. ROTH:

6          Q.     But in terms of the way the

7    shares work in your Table 3, are you looking

8    at percent contacts to come up with that

9    number?  You're not; you're doing a revised

10   but-for analysis.

11               MR. SOBOL:  Objection.

12         A.     Yes, but the two things are not

13   disconnected.  So the way I construct

14   Table 3, as I mentioned before, is not

15   allocating on the basis of MMEs.  It's about

16   rerunning the but-for model and altering the

17   inputs in terms of detailing.

18               So the ███contacts for Actavis

19   are backed out when I back Actavis out of the

20   model in Table 3, so that all of the contacts

21   that you see here associated with Actavis,

22   that is what gets backed out of the model.

23   BY MR. ROTH:

24         Q.     So the ██████ of promotional

25   contacts?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.        █████ , yes.

 2        Q.     So how is that resulting in an

 3   overall allocation in Table 3 of ██?

 4             MR. SOBOL:  Objection.

 5        A.     ████ -- well, I'm sorry.  I'm

 6   afraid you misunderstand Table 3.  So let me

 7   go back and explain Table 3 again.

 8             So Table 3 starts out with the

 9   same aggregate impact measure that I

10   calculate in Table 2, right, so that's the --

11   if all defendant promotion did not occur,

12   here's what percent of units would not have

13   been sold.

14             And then in Table 3, then I

15   say, okay, well, what if, in fact, the █████

16   of detailing that Actavis was responsible for

17   according to my analysis -- what if that's

18   actually -- that doesn't get affected.  That

19   stays in the model.  Then I run another

20   prediction.  These are econometric

21   predictions based on Model B, and so the ██

22   whatever percent, █████, now that's the

23   aggregate percent of all MMEs if Actavis'

24   conduct is no longer subject to recovery.

25                  ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ROTH:
 2        Q.    So to figure out what
 3    percentage of causation each manufacturer's
 4    having, you actually have to subtract the
 5    percentage that you come up with from that
 6    analysis from the baseline?
 7            MR. SOBOL:  Objection,
 8        mischaracterizes the testimony.
 9        A.    If you wanted to know how
10    much -- how many MMEs Actavis' conduct
11    specifically caused in the market overall,
12    you would subtract those two numbers.
13    BY MR. ROTH:
14        Q.    So you would get ▮▮▮, which is
15    close to the ▮▮▮ of promotional contacts?
16            MR. SOBOL:  Objection.
17        A.    That's correct.
18    BY MR. ROTH:
19        Q.    So essentially -- and we can do
20    this defendant by defendant, but it looks
21    like your allocations are just mirroring how
22    much each of these defendants promoted?
23            MR. SOBOL:  Objection.
24        A.    Well, they are not, but -- but
25    it should be obvious that because the
```

1    challenged conduct is promotion, that if we

2    look at taking defendants out of the impact

3    analysis, that the results would be

4    proportional to promotion, because that's the

5    thing that's being challenged.

6    BY MR. ROTH:

7        Q.    So whoever has the most

8    detailing contacts in the IPS data is going

9    to get the highest share under your Table 3?

10              MR. SOBOL:  Objection.

11       A.    Well, again, Table 3 is not

12   framed or interpreted as telling you how to

13   allocate damages.  It is intended for the

14   court to see, A, that it's possible to move

15   defendants in and out of the analysis, and,

16   B, what those effects would be.

17              Whether or not damages are

18   allocated on the same basis, that is

19   something about which I know nothing.

20   BY MR. ROTH:

21       Q.    Okay.  So we talked about

22   allocating the detailing contacts, and I

23   assume the questions I asked you about the

24   process for doing that would be true whether

25   we're talking about between defendants or

Highly Confidential - Subject to Further Confidentiality Review

1    between defendants or non-defendants, it was

2    Mr. McCluer with instruction from counsel

3    reviewing the sort of documents we just

4    reviewed here today?

5              MR. SOBOL:  Objection.  What's

6         the question?

7         A.    The --

8              MR. SOBOL:  No, I don't know

9         what the question is.  Is there a

10        question?  Or you want to just say

11        "correct" at the end?

12             MR. ROTH:  I mean, come on.

13        All right.

14   BY MR. ROTH:

15        Q.    I asked you questions about how

16   detailing contacts were allocated.  Is the

17   process you described the same whether we're

18   talking about allocating among the defendants

19   or between the defendants and non-defendants?

20        A.    The process of identifying

21   what -- in effect, what contacts should be

22   assigned to defendants was with counsel, and

23   it was ultimately counsel's advice.

24   Mr. McCluer assisted because he had the

25   granular data, but ultimately, the

1    identification -- I mean, I'm not sure why

2    it's different to say the identification of

3    what pieces of -- what products belong with

4    what defendants and what products belong to

5    non-defendants.  That's all one process.

6        Q.    Okay.  How does your model

7    allocate generic drugs?

8              MR. SOBOL:  Objection.

9    BY MR. ROTH:

10       Q.    The same way as we just

11   discussed?

12             MR. SOBOL:  Objection.

13       A.    I don't know what you mean by

14   allocate.  My model measures the aggregate

15   impact of the challenged --

16   BY MR. ROTH:

17       Q.    I should say it differently.

18   How does Table C identify and associate

19   generic drugs with manufacturers?

20             MR. SOBOL:  Objection.

21       A.    Table C, I mean, the process

22   for identifying the manufacturers and the

23   drugs is the same for generics as it is for

24   brand name drugs.  Those generic

25   manufacturers are identified in the IPS --

1    sorry, in both the IPS and the NPA data.

2    BY MR. ROTH:

3         Q.    And then looking back on

4    Exhibit 19, you reference that the marketers

5    were associated with entities pursuant to

6    marketing arrangements.  What did you review

7    on that score?

8         A.    I relied on counsel for that

9    information.

10              MR. ROTH:  I tell you what, why

11         don't we take five more minutes,

12         because I think it would benefit for

13         streamlining.

14              THE WITNESS:  Okay.

15              THE VIDEOGRAPHER:  The time is

16         4:57 p.m.  We're now off the record.

17              (Recess taken, 4:57 p.m. to

18         5:15 p.m.)

19              THE VIDEOGRAPHER:  The time is

20         5:15 p.m.  We're back on the record.

21    BY MR. ROTH:

22         Q.    To close the loop on this,

23    Professor Rosenthal, Table 3 is the output of

24    Appendix C and the way that promotional

25    visits and MMEs are affiliated with the

1    defendants or non-defendants; is that right?

2                MR. SOBOL:  Objection.

3         A.    I guess I wouldn't say that

4    exactly.  Table C reflects the underlying

5    data structure that allows us to parse

6    defendants individually and collectively from

7    non-defendants in the promotional data.

8                Table 3 then relies on that

9    structure to produce alternative but-for

10   percentages.

11   BY MR. ROTH:

12        Q.    The purpose of putting Table C

13   together was to create Table 3?

14                MR. SOBOL:  Objection.

15        A.    I'm not sure that was its sole

16   purpose.  It was to be transparent about how

17   we are allocating drugs and their associated

18   promotion to defendants.

19   BY MR. ROTH:

20        Q.    Table 3 does not allow for a

21   defendant-specific breakdown of the effect of

22   that defendant's promotion, correct?

23                MR. SOBOL:  Objection.

24        A.    Table 3 provides an aggregate

25   measure of impact associated with defendants'

1  promotion; it does not disaggregate that

2  across sales.

3  BY MR. ROTH:

4      Q.    And I think you said earlier,

5  for that you would have to do a disaggregated

6  model, and that's not something you were

7  asked to do, nor something you did?

8          MR. SOBOL:  Objection, form,

9      mischaracterizes the prior testimony.

10          MR. ROTH:  Okay.  Let me try it

11      again.

12  BY MR. ROTH:

13      Q.    In order to analyze the effect

14  of a specific defendant's promotion, you

15  would need to look at a defendant-specific

16  model to correlate its promotion to MMEs?

17          MR. SOBOL:  Objection,

18      mischaracterizes prior testimony.

19      A.    Well, I don't think so.  What I

20  have done, as you know, in the aggregate is

21  to look at all promotion and the extent to

22  which it impacted all sales.

23          And then in Table 3, the only

24  thing I'm trying to do is to identify if we

25  moved some set of promotion from the okay

1    column -- from the not okay column back into

2    the okay column, how that would affect my

3    aggregate impact.

4              So I am looking discretely at

5    defendants' promotion.  But because I'm

6    interested in impact, whether or not it was

7    increasing my sales or increasing your sales,

8    I have, appropriate to my assignment,

9    included both of those things in that impact

10   analysis.  I have not been asked anywhere to

11   calculate the effect only on own sales.

12   BY MR. ROTH:

13        Q.    Table 3 allows you to assess

14   the impact of an individual defendant's

15   promotional contacts on the aggregate

16   promotion and aggregate MMEs?

17              MR. SOBOL:  Objection, asked

18        and answered.

19        A.    Yes, that's correct.  And just

20   to be clear, as we talked about before, the

21   purpose of Table 3 is not to allocate to

22   defendants.  I don't know how damages

23   ultimately will be allocated, but to

24   demonstrate that I could remove the conduct

25   of one of the defendants and still calculate

Highly Confidential - Subject to Further Confidentiality Review

1    aggregate impact.

2    BY MR. ROTH:

3         Q.    And, in fact, Table 3 does not

4    even allow you to isolate the impact of an

5    individual defendant's promotion alone on the

6    aggregate; it simply shows you the proportion

7    of that individual defendant's promotion to

8    the aggregate?

9              MR. SOBOL:  Objection, form,

10        asked and answered.

11        A.    I don't think that's correct.

12   As we talked about before, this is not the

13   purpose of the table.  But if you were to

14   look at the but-for percentage including

15   Purdue versus the but-for percentage

16   excluding Purdue, you would see the increment

17   that is due to Purdue's conduct.

18   BY MR. ROTH:

19        Q.    And that's essentially based on

20   Purdue's share of the promotional contacts in

21   the data?

22             MR. SOBOL:  Objection, asked

23        and answered.

24        A.    That is the way the aggregate

25   model works, yes.  It looks at all detailing

1    and their effect on all sales.

2    BY MR. ROTH:

3         Q.    It's akin to a market share

4    analysis on the promotional data and the

5    number of contacts a given defendant has?

6              MR. SOBOL:  Objection, form,

7         asked and answered.

8         A.    Well, it's not strictly

9    speaking because the model has this time

10   series structure that marketing that occurs

11   at one point in time is not the same as

12   marketing that occurs at a different point in

13   time.  So it's not, strictly speaking,

14   proportional.

15   BY MR. ROTH:

16        Q.    But it is essentially a market

17   share analysis of each defendant's share of

18   contacts as modified by the time series

19   structure that you've imposed that we talked

20   about earlier today?

21             MR. SOBOL:  Objection.

22        A.    I just can't agree with that

23   statement.  It's not a market share analysis.

24   It is the result, the output of a time series

25   analysis of the effect of marketing on sales,

1    and -- and then I alter a set of underlying

2    assumptions about what is in and what is out.

3            But it comes out of -- out of

4    this econometric model.  It doesn't -- it's

5    not simply a market share analysis.

6    BY MR. ROTH:

7        Q.    If you took all of the

8    defendants out of the model except for one,

9    what would the result of your table be?

10           MR. SOBOL:  Objection.

11       A.    Another number.  I haven't done

12   that.

13   BY MR. ROTH:

14       Q.    I mean, would that defendant

15   not just get the entire ███, or would there

16   be some other...

17       A.    No, that's not the way the

18   model works.

19           MR. SOBOL:  Objection.

20   BY MR. ROTH:

21       Q.    Okay.  But it wouldn't be --

22   that would not be a defendant-specific model;

23   that would just be isolating how your

24   aggregate model works when you just consider

25   one defendant's promotion?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Well, again, the aggregate

2  model would be the same, and if we said that

3  all the defendants were no longer going to be

4  subject to recovery except one, then we would

5  be left with the -- whatever the effect of

6  that defendant's promotion on sales was.

7    Q.    Have you compared the results

8  of altering your aggregate model using

9  Table 3 on a defendant-by-defendant basis

10  with each defendant's share of promotional

11  contacts in the data?

12    MR. SOBOL:  Objection, asked

13    and answered.

14    A.    Well, I think when you and I

15  were talking before the break, you made some

16  observation, but I have not, no.

17  BY MR. ROTH:

18    Q.    Okay.  When were you retained

19  by the plaintiffs in this case?

20    A.    In the summer.  I'm not sure

21  the date on the letter, but in the summer of

22  2018, sorry, to be clear.

23    Q.    Who was it that retained you?

24    A.    I was retained by co-counsel.

25  There are two Pauls and Joe Rice, and one of

1    them is a Hanly, but I can't remember all

2    their names.

3        Q.    Okay.  Did you personally draft

4    your expert report?

5        A.    I did.

6        Q.    And did anyone else assist you

7    in the drafting of the report?

8        A.    I had some assistance from my

9    staff, yes.

10        Q.    And you've mentioned your

11    staff.  We said that was Greylock.  Can you

12    just give us the names of all the people who

13    were on your staff?

14        A.    Sure.  Yes, of course.  Forrest

15    McCluer, who is the senior economist they

16    mentioned earlier, particularly around the

17    technical aspects of the report.  I believe I

18    would have had some assistance, for example,

19    in summarizing the complaint from Renee

20    Rushnawitz.

21        Q.    Can you spell that?

22        A.    Yes, R -- well, Renee, is

23    R-E-N-E-E, and then Rushnawitz,

24    R-U-S-H-N-A-W-I-T-Z.

25        Q.    Okay.  Anyone else?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Not that I know of, but there

2    are -- there are junior staff, for example,

3    who work with Forrest and Renee, so I think

4    if you looked, you might see that there were

5    junior staff pulling articles, doing that

6    kind of thing, but not involved in drafting.

7      Q.      So I understand from earlier

8    today and attending their depositions that

9    there was some amount of coordination you did

10   with Professors Cutler, Gruber and McGuire

11   filing these reports; is that right?

12     A.      Yes.

13     Q.      Did you meet with each of the

14   three other professors about your reports in

15   person before March 25th?

16     A.      Yes, we had meetings with

17   counsel.

18     Q.      Do you recall how many meetings

19   you had with one or more of the Professor

20   Cutler group or McGuire try up frustrate

21   prior to March 25th with or without counsel

22   present?

23     A.      I believe there were perhaps

24   four face-to-face meetings from the time I

25   was retained to the filing of the report.  It

1    may have been five.

2         Q.    And in addition to the four to

3    five face-to-face meetings, did you speak

4    with Professors Cutler, Gruber or McGuire

5    about either your work or their work on this

6    case?

7         A.    We had conference calls with

8    that group and with counsel for a period that

9    were weekly.

10        Q.    And do you recall how long the

11   in-person meetings were?

12        A.    Those in-person meetings I

13   think were -- they were largely half day

14   meetings.

15        Q.    And during those meetings, did

16   you present your analyses to each other on

17   slides or were they just conversations?  How

18   did those meetings work?

19             MR. SOBOL:  Just generally,

20        without the content.

21        A.    Generally there were high-level

22   presentations and discussions.

23   BY MR. ROTH:

24        Q.    And did you discuss with them

25   in general terms the analyses that ultimately

1  became the output of your expert report?

2      A.    Yes.

3      Q.    And the models you would run

4  and the approaches you would take?

5      A.    Yes.

6      Q.    And I assume they shared their

7  approaches and models and general report

8  structures with you too?

9      A.    Yes.

10     Q.    Did you review drafts of any of

11 their reports and did they review drafts of

12 your reports?

13     A.    I -- what was the question.

14          MR. SOBOL:  With or without

15     counsel?

16     A.    Review drafts with or without

17 counsel?

18          MR. SOBOL:  Well --

19 BY MR. ROTH:

20     Q.    Were there drafts reviewed?  I

21 know I'm not going to get the drafts.  I just

22 want to know if you reviewed each other's

23 drafts?

24          MR. SOBOL:  Sure.

25          MR. ROTH:  And did the realtime

Highly Confidential - Subject to Further Confidentiality Review

1    drop off?

2         DEFENSE COUNSEL:  Ours is

3    working.

4         MR. ROTH:  Never mind.  Go

5    ahead.

6    A.    So I did see drafts of at least

7    Cutler and part of McGuire.

8    BY MR. ROTH:

9    Q.    And did you discuss the

10   regression model approaches that you would

11   each take with each other?

12   A.    We discussed it, our analysis

13   in general, yes.

14   Q.    Do you believe the regression

15   models you used in this case would be

16   publishable?

17   A.    Yes, I do.

18   Q.    What about Professor Cutler's

19   methodology?  Do you believe that would be

20   publishable?

21   A.    Yes, I do.  It's very similar

22   to other work he has published.

23   Q.    Do you believe that professor

24   Gruber's methodologies would be publishable?

25   A.    Yes, obviously professor

1    Gruber's methodology -- it's multiple

2    methodologies it's not one thing, but yes, I

3    believe it would be.

4         Q.    And same question for professor

5    McGuire?

6         A.    Yes, I believe it would be.

7         Q.    I noticed you're charging $825

8    an hour for your time?

9         A.    Yes, that's correct.

10        Q.    How many hours have you spent

11   to data personally working on this matter?

12        A.    I believe the number is about

13   300.

14        Q.    And what about your team at

15   Greylock McKinnon?  Do you have any sense to

16   as how many hours they've spent?

17        A.    I have not looked at their

18   hours.

19        Q.    I imagine it's been more or

20   less a full-time job for them since July?

21        A.    I think that that is pretty

22   close to true.

23        Q.    And have you or Greylock issued

24   any invoices?

25        A.    Greylock submits those

1    invoices.  I don't know for sure.  I assume

2    that they have submitted invoices.

3         Q.    Do you have any sense as to the

4    overall quantum of how much you have Greylock

5    have charged in fees?

6         A.    No, I do not.

7         Q.    And I assume your work is not

8    contingency fee based in any way?

9         A.    It is not in any way.

10        Q.    Did the plaintiffs replace any

11   reconstructions on cost or the scope of work

12   that you or Greylock was allowed to do?

13        A.    Not to my knowledge, nothing --

14   nothing in my retention that suggested that,

15   no.

16        Q.    Okay.  So we spoke earlier

17   today about a couple of things you're relying

18   on counsel for.  One was the assumption that

19   they'll prove all marketing since 1995 is

20   unlawful, correct?

21        A.    Yes.

22        Q.    Another one the construction of

23   table C that allocated promotional contacts

24   from the IPS data to defendants, right?

25              MR. SOBOL:  Objection.

1        A.      Right, to the extent there's

2    uncertain city there, it's not just the way

3    the data arrive, so yes, that genealogy.

4    BY MR. ROTH:

5        Q.      Right.  So we've got those two

6    things.  As sit here right now, is there any

7    other assumption that was given to you by

8    counsel that we haven't talked about yet?

9        A.      Hmm.

10              MR. SOBOL:  On the direct or --

11          I can't think of anything, but you

12          haven't really --

13              MR. ROTH:  We haven't gone past

14          the direct model yet, that's true.

15       A.      Yeah, it's helpful for me to

16    see my summary.

17    BY MR. ROTH:

18       Q.      Okay.

19              MR. SOBOL:  She was given the

20          assignment.  I'm not trying to coach

21          her.

22       A.      Not that I can think of, as I

23    sit here.

24    BY MR. ROTH:

25       Q.      Okay.  Look at Attachment A

1    with me, please, for a minute.  And that's

2    the CV that you filed with your report in

3    this case?

4        A.    Yes.

5        Q.    And I assume that is still

6    accurate as of today?

7        A.    It's the most updated one I

8    have.  It may -- what is it May there may

9    have been a paper or two that's been

10   published since the CV was finalized.

11       Q.    Okay.  Have you published any

12   economic papers related to opioids?

13       A.    I have not.

14       Q.    Have you published any academic

15   papers related to addiction?

16       A.    I have not.

17       Q.    And you've never testified

18   previously on either opioids or addiction,

19   true?

20       A.    I believe that that is true.

21   I'm just trying to think of cases that

22   involved multiple drugs, but I --

23            Oh, yes, although actually I

24   have to check to see if it's -- if I actually

25   testified in this case.  I just want to look

Highly Confidential - Subject to Further Confidentiality Review

1    at that part of my CV.  Let's see.  Or I
2    could look at the report --
3          Q.     Yeah.  Take your time.
4          A.     -- testimony.  Yeah, one sec.
5                 (Document review.)
6          A.     This case was a number of years
7    ago, and I just honestly cannot remember if I
8    was ever deposed in it, so I can confirm that
9    offline, but there was another ways that I
10   was retained in that related to an opioid.
11   BY MR. ROTH:
12         Q.     I tell you what, we can start
13   there tomorrow.
14         A.     Okay.
15         Q.     Have you ever had your opinions
16   excluded or limited by a court?
17         A.     In one case an opinion I
18   offered on ascertainability in a case
19   involving a drug called Wellbutrin XL, my
20   opinion on -- on damages was accepted, by my
21   opinion as it related to ascertainability was
22   deemed to have included some inappropriate
23   legal assumptions, as I understand the
24   judge's opinion in that matter.  So yes.
25         Q.     And is that the only one were a

Highly Confidential - Subject to Further Confidentiality Review

1    court limited or excluded your opinions?

2         A.    Yes.

3         Q.    You're not aware of any others

4    as you sit here right now?

5         A.    I'm not aware of any others.

6         Q.    What happened in Celexa and

7    Lexapro?

8              MR. SOBOL:  Objection to form.

9         A.    Again I'm not a lawyer, but I

10   don't think my opinion was excluded.

11   BY MR. ROTH:

12        Q.    Okay.  Is Attachment B to your

13   report a complete list of all of the

14   materials on which you relies to form your

15   opinions in this case?

16        A.    It is.

17        Q.    Did you review any materials

18   that you didn't rely on that aren't included

19   in Attachment B?

20        A.    I may have.  It would be hard

21   for me to cross-walk to see things that I

22   reviewed and didn't rely on.  My staff

23   certainly reviewed other documents.

24        Q.    How were the depositions that

25   you reviewed -- I think there are seven in

Highly Confidential - Subject to Further Confidentiality Review

```
 1    total -- selected?
 2         A.    Yes.  I specifically asked
 3    counsel -- because as you know in my
 4    assignment I was asked to undertake this
 5    analysis nationally, I specifically asked
 6    counsel to find in their record any testimony
 7    relative to the national nature of marketing.
 8    It's not something that's easy to find in
 9    documents, otherwise.
10         Q.    Got it.
11               So you received those seven
12    with -- in response to your very specific
13    requests?
14         A.    Yes.
15         Q.    And beyond that, you didn't
16    review any depositions in this case?
17         A.    I don't believe I cite
18    depositions for any other purpose in this
19    case, no.
20         Q.    You list three other expert
21    reports, Schumacher, Perri and Parran.
22               Do you see that?
23         A.    I do.
24         Q.    Are those the only expert
25    reports that you reviewed before issuing
```

1    yourself.  I think you mentioned you might

2    have seen drafts of Cutler, McGuire and

3    Gruber?

4         A.    Yes, but I don't cite to them

5    my report or use them.

6         Q.    Yeah, count rely on them?

7         A.    No.

8         Q.    How did you select the Bates

9    numbered documents that are listed in

10   Attachment B?

11        A.    The Bates number documents were

12   the product of searches that I asked my staff

13   to undertake specifically looking for

14   information on marketing tactics.

15             One big set of documents that I

16   asked them to find was related to promotional

17   effectiveness, and those documents that talk

18   about the return on investment for marketing

19   expenditures.

20             So these were basically the

21   result of specific requests I made to my

22   staff and they searched the database

23   themselves.

24        Q.    And did you review all of the

25   documents related on in your Attachment B, or

Highly Confidential - Subject to Further Confidentiality Review

1    did you rely on your staff to do some of that

2    review for you?

3         A.    I reviewed the key segments of

4    all of these documents.  Some of the

5    documents are quite long, and I relied on my

6    staff to review the whole documents.

7         Q.    I'd be shocked if you read

8    every one of these in 300 hours?

9         A.    Yes, as I said, some of these

10   documents are very long, and you see that I

11   cite to specific parts of them.

12        Q.    Okay.  Look at B8 please which

13   lists the electronic data you relied on.

14        A.    Okay.

15        Q.    So we've talked a lot today

16   about the NPA and the NSP data from IQVIA?

17        A.    Yes.

18        Q.    Sorry.

19        A.    The IPS --

20        Q.    And the NPA and the IPS data.

21        A.    Yes.

22        Q.    But have we not talked about

23   the NSP data.  So what is the National Sales

24   Perspective data and how you are relying on

25   that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I'm trying to think if we

2     actually use the NSP.  I know we cite it in

3     our tables.  We show it in Table C in order

4     to be able to show wholesale quantities as

5     well.  But we actually use the NPA data

6     themselves, you know, essentially they track

7     the same -- the same products at different

8     stages of the supply chain and so I can't

9     recall.

10          I'd have to actual look

11     carefully through the tables to see if

12     there's any reason that we used the wholesale

13     data.  Those are wholesale data.

14          Q.     So the NPA data is the retail

15     data.

16          A.     That's correct.

17          Q.     And the NSP data is the

18     wholesale data?

19          A.     Correct.

20          Q.     Do you know if you did any data

21     cross-walking or review of the two data

22     sources to see how they related to each

23     other?

24          A.     I believe we may have.  I don't

25     know -- I don't know if there's -- that's

Highly Confidential - Subject to Further Confidentiality Review

 1    what I was trying to remember, if there's

 2    anything in my report to that effect.  We

 3    have used those two datasets very frequently,

 4    and they typically are extremely highly

 5    correlated.  One lags the other, obviously.

 6              MR. SOBOL:  Do you mind if I

 7         coach him on an irrelevancy right now?

 8         No seriously, this might just help you

 9         to clean something up.

10              Do you use NSP for prices?

11              THE WITNESS:  No, I use the NPA

12         for prices.

13              MR. SOBOL:  Okay.

14              MR. ROTH:  Okay.

15    BY MR. ROTH:

16         Q.    So on the electronic data

17    section, what is this agency for healthcare

18    research quality healthcare cost and

19    utilization project and how do you use that?

20         A.    Sure.  That's part of our

21    conversation for tomorrow, I hope.  Those

22    data are discharge data that we use to look

23    at the surgical admissions.

24         Q.    In the indirect model?

25         A.    Yeah, in Section X.

1    Q.    And then the bureau of labor

2    statistics that's also used in the indirect

3    model?

4    A.    Yes.

5    Q.    The ARCOS data is in the

6    indirect model.  What is this health

7    resources services administration Area Health

8    Resource File?

9    A.    The Area Health Resource File

10   is sort of a metadata file.  It includes data

11   from other sources to describe various

12   dimensions of county-level health systems,

13   health measures.  So we also used that in the

14   indirect model, and I actually have to look

15   to see if we used in the Section X.

16   Q.    And then what about the CDC

17   surveillance epidemiology and end result

18   dataset?

19   A.    Those data track cancer, cancer

20   epidemiology.

21   Q.    How did you get access to the

22   electronic data that you list in

23   Attachment B?

24   A.    Attachment B includes some

25   publicly available data that anyone can

 1    obtain through the Internet, so that would

 2    cover the ARC data, the ASEC data, the SEER

 3    results, because we're not getting the SEER

 4    microdata; they're aggregated.  And certainly

 5    the morphine milligram equivalence from the

 6    CDC is publicly available data, the Area

 7    Health Resource File is publicly available

 8    data.

 9            The ARCOS data we obtained

10    through compass lexicon, the IQVIA data

11    counsel purchased on our behalf.  They won't

12    sell it to us directly for litigation

13    purposes.  They will sell to counsel.

14        Q.    And the --

15        A.    And the INCB are public.

16        Q.    And did you discuss with

17    counsel purchasing any additional IQVIA data

18    than the three set that you analyzed, IPS,

19    NPA or NSP?

20            MR. SOBOL:  I instruct her not

21        to answer.

22            MR. ROTH:  I asked her if she

23        talked about it.

24            MR. SOBOL:  Well, it would

25        carry the implication of the content

1          of the conversation.

2     BY MR. ROTH:

3          Q.     Are you aware that you've sells

4     data beyond those three datasets that were

5     purchased?

6          A.     Yes.  I am aware they sell

7     other datasets.

8          Q.     Okay.  Did you sign any

9     protective orders to get access to the ARCOS

10    data?

11         A.     I did not, no.

12         Q.     And have you signed any data

13    use agreements related to any of the data you

14    looked at?

15         A.     No, but I don't know to what

16    extent, for example, the people who actually

17    have the data have signed those data use

18    agreements so I don't touch the data.

19         Q.     I didn't see any depositions

20    from any of the Cuyahoga or Summit County

21    witnesses on Attachment B, so I assume you

22    didn't review those?

23         A.     I did not.

24         Q.     Did you interview any of the

25    employees with other Summit or Cuyahoga

Highly Confidential - Subject to Further Confidentiality Review

 1   County?

 2       A.     My analysis is a national

 3   analysis of the effect of detailing on sales,

 4   so interviewing people in the bellwether

 5   counties would if the really not make sense

 6   as part of what I'm trying to do.

 7       Q.     And you didn't rely beyond the

 8   seven depositions you list any other

 9   depositions in this case related to

10   defendants' marketing efforts?

11       A.     Again, I -- I don't find those

12   to be relevant to the main affect the here,

13   which is a quantitative analysis, and as I

14   noted in my report, economists generally

15   proceed using data to tell what people have

16   done in response to a stimulus rather than by

17   asking them to talk about it.

18       Q.     What did you do to prepare for

19   your deposition today?

20       A.     I reviewed my report, the

21   documents I rely on, including the articles,

22   basically everything in this Attachment B,

23   and I had conversations with counsel.

24       Q.     Okay.  Turning back to page 10

25   of your report, which is the handy summary

1    chart?

2         A.    Yes.

3         Q.    Do you do this for every

4    report?

5         A.    I -- it's -- I like a handy

6    summary table.  It's something that is --

7    that we do often in writing federal grants.

8         Q.    I will tell you this is

9    excellent and I'm going to start forcing some

10   of the experts that we have to start doing

11   this?

12             MR. SOBOL:  It's the only thing

13        I understand in the whole report.

14             MR. ROTH:  It's nice, it's a

15        one-pager.

16   BY MR. ROTH:

17        Q.    So recognizing there's a lot of

18   nuance here, and we've already been through

19   your direct model fairly exhaustively and

20   we'll do the same for the indirect and the

21   Section X analysis tomorrow?

22        A.    Yes.

23        Q.    I want to touch briefly on

24   Section VII for a minute?

25        A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So Section VII, you

2    reviewed literature on the marketing of

3    opioids and shared examples from discovery

4    that corroborate the economic theory and

5    evidence on pharmaceutical marketing.  That's

6    what you said, right?

7    A.    Yes.

8    Q.    And we've talked about some of

9    that literature here today?

10    A.    We have.  We haven't gone into

11    detail on the transfers of value literature

12    related to opioids, but we can.

13    Q.    It's a tomorrow topic, unless

14    you want to stay late?

15    A.    No, that's fine.

16    Q.    But then on the discovery

17    materials, you know, you said you had very

18    specific requests for what you looked at.

19        Are those the documents you

20    looked at to come to the conclusions you do

21    in Section VII of your report?

22    A.    Yes.  The documents that I cite

23    in Section VII -- and again can you tell that

24    my quantification of the effect of promotion

25    on sales doesn't rely on some measure from

1    this analysis, but this serves to give some

2    justification for the theory that I'm

3    pursuing that promotion affects sales and

4    that there are multiple mechanisms involved.

5              So I review them, I would say

6    in Section VII with that purpose in mind, not

7    with the purpose of being exhaustive.

8         Q.    Yeah.  And I think you said

9    earlier you're not marketing expert, right?

10             MR. SOBOL:  Objection.

11        A.    I am not here to offer an

12   expert opinion on marketing.  I think

13   Dr. Perri does that.

14   BY MR. ROTH:

15        Q.    Okay.  And to the extent that

16   you're offering comments in Section VII.B of

17   your report from paragraphs 43 to 48 related

18   to defendants' marketing documents, that's

19   really did you know with an eye toward

20   corroborating what the economic literature

21   shows in -- as you analyze in Section VI

22   about the relationship between promotion and

23   sales?

24        A.    Again, this was not intended to

25   be an exhaustive analysis, but to show that

1    the documents provide examples both of the

2    economic idea that promotion is intended to

3    grow sales and of the multiple marketing

4    mechanisms that defendants use, so it

5    corroborates other -- other ways that I have

6    described the mechanism of interest here.

7         Q.    Beyond reading the documents

8    themselves, what other analytical approach

9    did you take to assessing defendants'

10   materials regarding the effects of promotion?

11        A.    Well, as I just said, I don't

12   use this analysis as an input in a

13   quantitative way to my subsequent analysis.

14   It is relate intended as you would see in any

15   economic paper as a review of the

16   institutional landscape that justifies the

17   particular model and sets up the empirical

18   analysis in a more qualitative way.

19        Q.    It's not really a separate

20   opinion as you bulleted it out.  It's more

21   context for the opinions that follow; is that

22   fair?

23             MR. SOBOL:  Objection.

24        A.    Again, I think an institutional

25   analysis is a part of most -- most reports

1    that I have done looking at impact is

2    describing the environment in the way they

3    describe the broader environment for

4    prescription drugs in the U.S., I think it's

5    important to set that context.

6    BY MR. ROTH:

7         Q.    But when you're talking about

8    describing the environment, you're limiting

9    yourself to, you know, a subset of documents

10   that you received from discovery.  You're not

11   doing any exhaustive review of each defendant

12   east marketing budgets; is that correct?

13        A.    That is correct.  That is not

14   any assignment.  It's not -- my goal here was

15   not to do an exhaustive analysis of what each

16   defendant was ding.  Doing.

17        Q.    In fact, there may be some

18   defendants you don't look at any documents

19   for in Section VII.B?

20             MR. SOBOL:  Objection.

21        A.    Again, I'm hot sure, it was not

22   intended to be exhaustive.

23   BY MR. ROTH:

24        Q.    Okay.  What is confirmation

25   bias?

1          A.     Confirmation bias is a

2     psychological phenomenon, in essence that you

3     find what you expect to find.

4          Q.     And does that exist in

5     economics?

6          A.     It's a known psychological

7     bias.  I imagine that economists are humans

8     too.

9               MR. ROTH:  Okay.  Why don't we

10          pause on that, take --

11               THE WITNESS:  You're going to

12          end the day there?

13               MR. ROTH:  I might.  So let's

14          stop.  Give us five to caucus, and

15          that might be a really nice place to

16          end the day.

17               THE VIDEOGRAPHER:  The time is

18          5:48 p.m.  We're off the record.

19               (Proceedings recessed at

20          5:48 p.m.)

21                    --o0o--

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CERTIFICATE
 2            I, MICHAEL E. MILLER, Fellow of
      the Academy of Professional Reporters,
 3    Registered Diplomate Reporter, Certified
      Realtime Reporter, Certified Court Reporter
 4    and Notary Public, do hereby certify that
      prior to the commencement of the examination,
 5    MEREDITH B. ROSENTHAL, Ph.D. was duly sworn
      by me to testify to the truth, the whole
 6    truth and nothing but the truth.
 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      not requested by the witness or other party
12    before the conclusion of the deposition.
13            I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18
19    _____
      MICHAEL E. MILLER, FAPR, RDR, CRR
20    Fellow of the Academy of Professional Reporters
      NCRA Registered Diplomate Reporter
21    NCRA Certified Realtime Reporter
      Certified Court Reporter
22
      Notary Public
23    My Commission Expires:  7/9/2020
24    Dated: May 6, 2019
25
```

```
 1                 INSTRUCTIONS TO WITNESS

 2

 3             Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8             After doing so, please sign the

 9    errata sheet and date it.

10             You are signing same subject to

11    the changes you have noted on the errata

12    sheet, which will be attached to your

13    deposition.

14             It is imperative that you return

15    the original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          ERRATA

 2      PAGE   LINE   CHANGE

 3      _____  _____  _____

 4             REASON: _____

 5      _____  _____  _____

 6             REASON: _____

 7      _____  _____  _____

 8             REASON: _____

 9      _____  _____  _____

10             REASON: _____

11      _____  _____  _____

12             REASON: _____

13      _____  _____  _____

14             REASON: _____

15      _____  _____  _____

16             REASON: _____

17      _____  _____  _____

18             REASON: _____

19      _____  _____  _____

20             REASON: _____

21      _____  _____  _____

22             REASON: _____

23      _____  _____  _____

24             REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4         I, MEREDITH B. ROSENTHAL, Ph.D.,
      do hereby certify that I have read the
 5    foregoing pages and that the same is a
      correct transcription of the answers given by
 6    me to the questions therein propounded,
      except for the corrections or changes in form
 7    or substance, if any, noted in the attached
      Errata Sheet.

 8

 9

10

11

12    _____

      MEREDITH B. ROSENTHAL, Ph.D.        DATE
13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    _____

20    Notary Public

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                              LAWYER'S NOTES

2

3        PAGE        LINE

4        _____       _____        _____

5        _____       _____        _____

6        _____       _____        _____

7        _____       _____        _____

8        _____       _____        _____

9        _____       _____        _____

10       _____       _____        _____

11       _____       _____        _____

12       _____       _____        _____

13       _____       _____        _____

14       _____       _____        _____

15       _____       _____        _____

16       _____       _____        _____

17       _____       _____        _____

18       _____       _____        _____

19       _____       _____        _____

20       _____       _____        _____

21       _____       _____        _____

22       _____       _____        _____

23       _____       _____        _____

24       _____       _____        _____

25