```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL          )   MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION               )   Case No.
                              )   1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6   ALL CASES                )   Polster
                              )
 7
 8
 9                     __ __ __
10             Sunday, May 5, 2019

                       __ __ __
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
                       __ __ __
13
14
15
16        Videotaped Deposition of MEREDITH B.
     ROSENTHAL, Ph.D., VOLUME 2, held at Robins
17   Kaplan LLP, 800 Boylston Street, Suite 2500,
     Boston, Massachusetts, commencing at
18   8:04 a.m., on the above date, before
     Michael E. Miller, Fellow of the Academy of
19   Professional Reporters, Registered Diplomate
     Reporter, Certified Realtime Reporter and
20   Notary Public.
21
22
23                     __ __ __
24          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25                deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:

 2        HAGENS BERMAN SOBOL SHAPIRO LLP
          BY:  THOMAS M. SOBOL, ESQUIRE
 3             tom@hbsslaw.com
          55 Cambridge Parkway
 4        Suite 301
          Cambridge, Massachusetts 02142
 5        (617) 482-3700
          Counsel for MDL Plaintiffs

 6

 7

          BRANSTETTER STRANCH & JENNINGS PLLC
 8        BY:  ANTHONY ORLANDI, ESQUIRE
               aorlandi@bsjfirm.com
 9             (via teleconference)
               TRICIA HERZFELD, ESQUIRE
10             triciah@bsjfirm.com
               (via teleconference)
11        223 Rosa L. Parks Boulevard
          Suite 200
12        Nashville, Tennessee 37203
          (615) 254-8801
13        Counsel for Tennessee Plaintiffs

14

15        KIRKLAND & ELLIS LLP
          BY:  MARTIN L. ROTH, ESQUIRE
16             martin.roth@kirkland.com
          300 North LaSalle
17        Chicago, Illinois 60654
          (312) 862-2000
18        Counsel for Allergan Finance LLC

19

20        KIRKLAND & ELLIS LLP
          BY:  CATIE VENTURA, ESQUIRE
21             catie.ventura@kirkland.com
          1301 Pennsylvania Avenue N.W.
22        Washington, D.C. 20004
          (202) 879-5000
23        Counsel for Allergan Finance LLC

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         O'MELVENY & MYERS LLP
           BY:  CHARLES C. LIFLAND, ESQUIRE
 3              clifland@omm.com
                MATTHEW KAISER, ESQUIRE
 4              mkaiser@omm.com
           400 South Hope Street
 5         18th Floor
           Los Angeles, California 90071
 6         (213) 430-6000
           Counsel for Janssen Pharmaceuticals Inc.
 7
 8         COVINGTON & BURLING LLP
           BY:  RONALD G. DOVE, JR., ESQUIRE
 9              rdove@cov.com
           850 Tenth Street, NW
10         Washington, D.C. 20001
           (202) 662-5575
11         Counsel for McKesson Corporation
12
13         ROPES & GRAY LLP
           BY:  NICHOLAS BRADLEY, ESQUIRE
14              nick.bradley@ropesgray.com
           1211 Avenue of the Americas
15         New York, New York 10036
           (212) 256-9000
16         Counsel for Mallinckrodt
           Pharmaceuticals
17
18
           BARTLIT BECK LLP
19         BY:  PETER B. BENSINGER, JR., ESQUIRE
                peter.bensinger@bartlit-beck.com
20         54 West Hubbard Street
           Suite 300
21         Chicago, Illinois 60654
           (312) 494-4400
22         Counsel for Walgreens Company
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A P P E A R A N C E S:
 2         JONES DAY
           BY:  STEVEN N. GEISE, ESQUIRE
 3             sngeise@jonesday.com
           4655 Executive Drive
 4         Suite 1500
           San Diego, California 92121
 5         (858) 314-1200
           Counsel for Walmart Corporation
 6
 7         DECHERT LLP
           BY:  WILL W. SACHSE, ESQUIRE
 8             will.sachse@dechert.com
           Cira Centre
 9         2929 Arch Street
           Philadelphia, Pennsylvania 19104
10         (215) 994-4000
           Counsel for Purdue Pharma
11
12         ARNOLD & PORTER KAYE SCHOLER LLP
           BY:  SAMUEL N. LONERGAN, ESQUIRE
13             samuel.lonergan@arnoldporter.com
           250 West 55th Street
14         New York, New York 10019
           (212) 836-8000
15         Counsel for Endo Health Solutions
           Inc., Endo Pharmaceuticals Inc., Par
16         Pharmaceutical, Inc. and Par
           Pharmaceutical Companies, Inc.
17
18         MORGAN LEWIS & BOCKIUS LLP
           BY:  WENDY WEST FEINSTEIN, ESQUIRE
19             wendy.feinstein@morganlewis.com
           One Oxford Center
20         Thirty-Second Floor
           Pittsburgh, Pennsylvania 15219
21         (412) 560-3300
           Counsel for Teva Pharmaceuticals
22         USA Inc., Cephalon Inc., Watson
           Laboratories Inc., Actavis LLC, and
23         Actavis Pharma Inc. f/k/a Watson
           Pharma Inc.
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:
 2         REED SMITH LLP
           BY:  LOUIS W. SCHACK, ESQUIRE
 3             lschack@reedsmith.com
           1717 Arch Street
 4         Suite 3100
           Philadelphia, Pennsylvania 19103
 5         (215) 851-8100
           Counsel for AmerisourceBergen Drug
 6         Corporation
 7
 8         WILLIAMS & CONNOLLY LLP
           BY:  CARL R. METZ, ESQUIRE
 9             cmetz@wc.com
           725 Twelfth Street, N.W.
10         Washington, D.C. 20005
           (202) 434-5000
11         Counsel for Cardinal Health Inc.
12
           MORGAN LEWIS & BOCKIUS LLP
13         BY:  AJANI BROWN, ESQUIRE
               ajani.brown@morganlewis.com
14             (via teleconference)
           1000 Louisiana Street
15         Suite 4000
           Houston, Texas 77002
16         (713) 890-5000
           Counsel for Rite Aid
17
18         LOCKE LORD LLP
           BY:  MADELEINE E. BRUNNER, ESQUIRE
19             maddie.brunner@lockelord.com
               (via teleconference)
20         2200 Ross Avenue
           Suite 2200
21         Dallas, Texas 75201
           (214) 740-8000
22         Counsel for Henry Schein, Inc. and
           Henry Schein Medical Systems, Inc.
23
24
25
```

```
 1   A P P E A R A N C E S:
 2       MARCUS & SHAPIRA LLP
         BY:  RICHARD I. HALPERN, ESQUIRE
 3            halpern@marcus-shapira.com
              (via teleconference)
 4       One Oxford Centre
         35th Floor
 5       Pittsburgh, Pennsylvania 15219
         (412) 471-3490
 6       Counsel for HBC Services
 7
 8       FOLEY & LARDNER LLP
         BY:  KRISTINA J. MATIC, ESQUIRE
 9            kmatic@foley.com
              (via teleconference)
10       777 East Wisconsin Avenue
         Milwaukee, Wisconsin 53202
11       (414) 271-2400
         Counsel for Anda Inc.
12
13   ALSO PRESENT:
14       FORREST MCCLUER, Ph.D.
         Greylock McKinnon Associates
15       (via teleconference)
16

     VIDEOGRAPHER:
17
            VINCENT ROSICA,
18          Golkow Litigation Technologies
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

INDEX

APPEARANCES                                              478

PROCEEDINGS                                              485


EXAMINATION OF MEREDITH B. ROSENTHAL, Ph.D.:

        BY MR. METZ                                     746

        BY MR. GEISE                                    843

        BY MR. SOBOL                                    845


CERTIFICATE                                             847

ERRATA                                                  849

ACKNOWLEDGMENT OF DEPONENT                              850

LAWYER'S NOTES                                          851

```
 1                     DEPOSITION EXHIBITS
                     MEREDITH B. ROSENTHAL,
 2                            Ph.D.
                          May 5, 2019
 3
       NUMBER              DESCRIPTION            PAGE
 4
       Rosenthal-22   Data Appendix               553
 5
       Rosenthal-23   Case and Deaton             599
 6                    Publication
 7     Rosenthal-24   CDC Guideline for           650
                      Prescribing Opioids for
 8                    Chronic Pain, United
                      States, 2016
 9
       Rosenthal-25   2017 Haider et al           689
10                    Publication
11     Rosenthal-26   AAEM White Paper on         703
                      Acute Pain Management in
12                    the Emergency Department
13     Rosenthal-27   MD Anderson Cancer          710
                      Center Postoperative
14                    Pain Management
                      Guidelines
15
       Rosenthal-28   Kadian Instructions for     726
16                    Use
17     Rosenthal-29   Joint Statement,            809
                      Promoting Pain Relief
18                    and Preventing Abuse of
                      Pain Medications: A
19                    Critical Balancing Act
20     Rosenthal-30   State of Ohio House Bill    825
                      No. 187
21
       Rosenthal-31   Ohio Prescription Drug      834
22                    Abuse Task Force Final
                      Report
23
24
25
```

```
 1                   PROCEEDINGS

 2             (May 5, 2019 at 8:04 a.m.)

 3             THE VIDEOGRAPHER:  We're now on

 4       record.  My name is Vince Rosica.  I'm

 5       a videographer for Golkow Litigation

 6       Services.  Today's date is May 5th,

 7       2019, and the time is 8:04 a.m.

 8             This video deposition is being

 9       held in Boston, Massachusetts in the

10       matter of National Prescription Opiate

11       Litigation, MDL No. 2804 for the

12       Northern District of Ohio, Eastern

13       Division Court.

14             The deponent is Meredith

15       Rosenthal.

16             Counsel will be noted on the

17       stenographic report.

18             The court reporter is Mike

19       Miller and will now swear in the

20       witness.

21             (Witness sworn.)

22             MR. SOBOL:  Before you begin, I

23       think the professor had one quick

24       update.

25             THE WITNESS:  Yes.  Remember
```

```
1              yesterday you were asking me about if

2              I had testified in other litigation

3              related to opioids, and I knew that I

4              had been retained in a case, and I

5              could not remember whether I had

6              actually testified.  So I looked that

7              up, and indeed, sometime around five

8              years ago, not recently enough to

9              appear in the case captions that I

10             list at the back of my CV, I testified

11             in a matter related to Actiq, the

12             Cephalon drug.

13                  MR. ROTH:  You anticipated my

14             very first question.

15                  THE WITNESS:  Excellent.

16              MEREDITH B. ROSENTHAL, Ph.D.,

17         having been previously duly sworn,

18              testified as follows:

19     BY MR. ROTH:

20         Q.    What was the nature of your

21     expert opinion in that case?

22         A.    I did a damages analysis for

23     class certification proceedings.

24         Q.    And was it limited to a single

25     manufacturer?
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Yes, it was a single drug,

2   single manufacturer.  I can't recall the

3   details.  I didn't go all the way back to the

4   complaint, but it was an off-label marketing

5   case.

6     Q.     And do you recall whether you

7   used a regression analysis in that case?

8     A.     I did not.

9     Q.     Okay.  May have more questions,

10  but that's good for now.

11          Professor Rosenthal, you

12  mentioned a couple of times yesterday that

13  you excluded injectables from your analysis?

14    A.     Yes, that's right.

15    Q.     Why did you do that?

16    A.     That was in consultation with

17  counsel.  So I understood they were not to be

18  considered in the matter, and I understand

19  from clinical experts that the uses of the

20  injectables are somewhat different than the

21  orals.

22    Q.     Do you know anything about

23  whether the marketing for injectables differs

24  from the marketing for the oral opioids?

25    A.     I do not.

1    Q.    Your model does not attribute

2  any causality to manufacturers based on

3  alleged deficiencies in the suspicious order

4  monitoring regime?

5    A.    My assignment was to examine

6  the impact of the allegations with regard to

7  marketing, and so I have not specifically

8  looked at the impact of any

9  monitoring-related allegations.

10    Q.    And that would be true also for

11  the distributors and the pharmacies; because

12  your allegations relate to marketing, you

13  have not included them in any of your

14  analyses in your reports?

15        MR. SOBOL:  Objection.

16    A.    Again, my assignment was to

17  examine the impact of the alleged unlawful

18  marketing.  I have not considered other

19  conduct in my analysis.

20  BY MR. ROTH:

21    Q.    We spoke yesterday about

22  endogeneity, and I think I marked as

23  Exhibit 14 an article you wrote for the

24  Kaiser Family Foundation, if you could pull

25  that up, please.

1        A.      Let me see if Mike organized my

2    documents.  Yes.  Go ahead.

3        Q.      You testified yesterday that

4    endogeneity did not need to be controlled for

5    in your model because it's an aggregate

6    model.

7        A.      Yes.

8        Q.      Are you aware of any economic

9    literature that does control for endogeneity

10   in an aggregate model measuring the impact of

11   promotion on sales?

12       A.      An industrywide aggregate model

13   like mine, I'm not aware of one.

14       Q.      And is there a difference in

15   your mind between industrywide versus

16   classwide?

17       A.      Yes, there is.  Again, if the

18   notion is that whatever causes the

19   endogeneity has to be either some kind of

20   simultaneous decision-making around price and

21   quantity, for example, or a feedback loop,

22   and at the level of the industry, that's

23   simply not plausible, that the industry is

24   coordinating its marketing in that way.

25       Q.      Your model in this case though

1    is not actually an industrywide model, is it?

2         A.    Again, industrywide for the

3    opioid industry?

4         Q.    Well, except you take out all

5    of the non-defendants from your model?

6         A.    Well, that's not true.  The

7    model is all of the -- all of the opioids.

8    The but-for scenario takes -- leaves the

9    non-defendants as they were, but the model

10   concludes all of them.

11        Q.    Right.  So in the but-for

12   scenario where you take out the

13   non-defendants, what did you do to compare

14   their promotional activities to the

15   defendants' promotional activities?

16             MR. SOBOL:  Objection.

17        A.    Well, such a comparison is not

18   part of the overall analysis.  Again, we've

19   talked about the Table C, which presents the

20   marketing by defendants and non-defendants,

21   so the data are in there.

22             The model itself includes

23   marketing for all opioids, and the but-for

24   scenario simply disaggregates and identifies

25   as a part of that process the marketing of

1    non-defendants, but it does so only to

2    generate different predictions of what sales

3    would have been, so there -- I did not make a

4    statistical comparison between non-defendant

5    and defendant promotion.

6    BY MR. ROTH:

7        Q.    When you removed the

8    non-defendants, what did you do to confirm

9    that that did not take out, for example, the

10   non-rivalrous marketing and leave you with a

11   set of just the rivalrous marketing?

12            MR. SOBOL:  Objection.

13       A.    What I'm examining in my

14   aggregate model is the net effect, rivalrous

15   market expanding of promotion, and so the

16   model calculates that average market

17   expansion effect and essentially all of the

18   rivalrous marketing, it nets out by

19   definition because to the extent that we're

20   talking about rivalrous marketing as defined

21   as moving market shares from one drug to the

22   other, which is basically the definition of

23   rivalrous marketing, all the pluses have to

24   net out with the minuses.

25            And so that -- that does not

1    appear in the output of my model because it's

2    not relevant to my assignment.  So by taking

3    out all of the -- actually, technically, it's

4    sort of a double negative.  I actually leave

5    in all of the non-defendant promotion in the

6    but-for scenario because it would have

7    happened regardless of whether the

8    allegations are true or not.

9              By leaving that in, if it has

10   rivalrous components to it, if it has market

11   expanding components to it, whatever that is

12   will show up in my predictions.

13   BY MR. ROTH:

14        Q.    Yeah.  What I'm trying to

15   understand is I think we agree that when you

16   look at an individual manufacturer there

17   could be endogeneity issues in the form of

18   price or in the form of detailing physicians

19   who are predisposed to prescribe their

20   product?

21        A.    If we were looking at an

22   individual manufacturer, we could have some

23   of those endogeneity concerns, but I do not

24   look at an individual manufacturer.

25        Q.    I understand that.

1            Even if we look at a group of

2    manufacturers, we would still have

3    endogeneity concerns to a degree?

4            MR. SOBOL:  Objection.  Excuse

5       me.  Asked and answered.

6       A.    It's my opinion that in this --

7    when we're looking at the level of the entire

8    opioid industry, that the conceptual basis

9    for such endogeneity concerns is really not

10   there, and even -- even if at the second

11   stage of my analysis I parse out some subset

12   of defendant, of manufacturers, sorry,

13   non-defendants, in particular, that in and of

14   itself doesn't raise a new endogeneity

15   concern.  The model is estimated on the

16   marketwide effects.

17   BY MR. ROTH:

18      Q.    I'm trying to figure out where

19   the line is though.  So like how many

20   manufacturers need to be included for all of

21   the endogeneity and rivalrous marketing

22   issues to just net out and show market

23   expansion as opposed to the effects of just

24   the subset you're looking at?

25            MR. SOBOL:  Objection to the

1          form.

2                    You can answer.

3          A.      The rivalrous marketing will

4    always net out.  Again, it's just

5    mathematically true that by definition,

6    marketing that only moves market share, it

7    has to net out.  So that's just an identity.

8                    That will always be true when

9    we look at any subgroup of products that

10   we -- that the rivalrous piece will net out.

11   It just has to.

12   BY MR. ROTH:

13         Q.      What about endogeneity?

14         A.      The endogeneity issue in my

15   opinion is where we have the entire opioid

16   class in the analysis.  It does not make

17   sense to think about this month-to-month

18   reverse causality for marketing as a whole

19   for the industry, relative to sales as a

20   whole for the industry.  It's not how

21   individual companies set their marketing

22   budgets.

23                    It just doesn't make economic

24   sense to me, so for the analysis at hand,

25   looking at the entire opioid industry, I do

Highly Confidential - Subject to Further Confidentiality Review

1    not believe that there's a conceptual basis

2    for the same endogeneity concerns that we

3    might have with an individual drug or an

4    individual company.

5         Q.    Your analysis compares your

6    industrywide but-for scenario against a

7    scenario with just the defendant

8    manufacturers, correct?

9              MR. SOBOL:  Objection.

10        A.    So my analysis ultimately

11   compares the predicted -- the actual

12   predicted sales, so that's leaving everything

13   the same with a world in which we pull out

14   some subset of the marketing.

15   BY MR. ROTH:

16        Q.    So what I'm trying to

17   understand is I understand your position on

18   the big but-for scenario with the whole

19   industry, but why is endogeneity not a

20   concern for the pulled-out set of

21   manufacturers?

22             MR. SOBOL:  Objection.

23        A.    There's no estimation that's

24   going on there, so endogeneity is a concern

25   when we're estimating parameters using a

1    regression model.  It is not -- the second

2    stage of my analysis is simply employing

3    those parameters to predict a different

4    scenario, and so endogeneity, it's -- it's

5    not a relevant construct for that prediction

6    piece.

7    BY MR. ROTH:

8         Q.    If you look at Exhibit 14, this

9    was the article you prepared for the Kaiser

10   Family Foundation in 2003, and if you look at

11   page 2, the last paragraph on the page, you

12   say:  In this paper, we examine the effects

13   of two types of promotional spending for

14   brands in five therapeutic classes of drugs,

15   using monthly aggregate data from August 1996

16   through December 1999.

17             Do you see that?

18        A.    I do.

19        Q.    So you actually looked at five

20   different classes of drugs.  Do you recall

21   what drugs they were?

22        A.      Antidepressants, nasal sprays,

23   nonsedating antihistamines, PPI's, which are

24   proton pump inhibitors, and number 5, let me

25   just look at -- there are some tables that

1    are probably the easiest place.  I'm blanking

2    on the fifth one.  Cholesterol,

3    anticholesterol drugs.

4         Q.     Turn to page 14, please.

5         A.     Okay.

6         Q.     And on page 14 you say:  We

7    take account of the possibility that spending

8    on direct-to-consumer advertising and

9    physician promotion and product sales are

10   jointly determined by estimating instrumental

11   variables, IV, models where all three

12   variables are assumed to be endogenous.

13          Do you see that?

14        A.     Yes.

15        Q.     And I think you said yesterday

16   this article only solved for endogeneity at

17   the product level?

18        A.     I believe so, yes.

19        Q.     Okay.  And if you look at the

20   bottom of page 9, in the last paragraph it

21   says:  At the top level of the tree, which

22   represents the therapeutic class of drugs, we

23   estimate the impact of DTCA spending and

24   detailing in the context of a Cobb-Douglas

25   demand specification, double logarithmic.  In

1    the analysis of competition at the individual

2    product level within each class we specify

3    and estimate three alternative models:  1, an

4    AIDS-type specification; 2, a logit model

5    with log of quantity share divided by, one

6    minus quantity share, on the left-hand side,

7    and prices and promotional spending on the

8    right-hand side; and 3, a Cobb-Douglas model

9    in log levels.

10             Do you see that?

11        A.    Yes, I do.

12        Q.    And then on page 15, under

13   Econometric Results, it says:  We begin by

14   presenting results in Table 3 for the top of

15   the tree structure in Figure 2, the class

16   level quantity equations.

17             Do you see that?

18        A.    I do.

19        Q.    And then if you look at

20   Table 3, which is on page 25, the top two

21   lines say:  Class DTC and Class Detail, and

22   they have an asterisk that says Endogenous,

23   IV Estimated.

24             Do you see that?

25        A.    Yes, I do.  Actually, I can

```
 1    keep reading, but I think essentially the
 2    class level estimates are the sum of the
 3    individual product level estimates.  So
 4    again, the instrumentation was at a product
 5    level.
 6         Q.    And then applied to the class
 7    level through aggregation?
 8         A.    That's right.
 9         Q.    Okay.  And if you had
10    disaggregated individual drugs or
11    manufacturers in this case, you could have
12    applied an instrumental variables method to
13    each and aggregated them similarly here?
14              MR. SOBOL:  This case, the
15         opioids case, not this?
16              MR. ROTH:  Correct, so let me
17         reask it.
18              MR. SOBOL:  Yeah.
19    BY MR. ROTH:
20         Q.    If you had used disaggregated
21    individual drugs or manufacturers in the
22    opioids case we're talking about now, you
23    could have applied an instrumental variables
24    model to each individual drug and then
25    aggregated them as you did in this article?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Unlike the research question in

2     this paper, my assignment asks me to compute

3     the impact of the alleged misconduct at the

4     level of the class, the industry, opioid

5     industry as a whole.  And so it was not

6     appropriate for me to look at individual drug

7     level analyses.

8                I maintain that at that class

9     level, industry level, these endogeneity

10    questions do not pertain.

11         Q.      Did you test that hypothesis by

12    looking at an individual defendant or two to

13    see how the issues there compare to how your

14    model handles endogeneity?

15         A.      Since my assignment was an

16    aggregate assignment, I have conducted my

17    analysis at the aggregate level.  I have not

18    conducted my analysis at the level of an

19    individual defendant.

20         Q.      And, in fact, to confirm,

21    you've not reviewed any individual

22    defendant's marketing materials for any drug

23    at issue in this case?

24                MR. SOBOL:  Objection, asked

25         and answered.

1          A.      I'm not sure what you mean by

2     that exactly.  I reviewed the documents that

3     you see I relied on in my report.  I would

4     consider those to be marketing materials.

5     BY MR. ROTH:

6          Q.      You've not reviewed any

7     manufacturer's marketing plan for any drug at

8     issue in this case?

9               MR. SOBOL:  Objection.

10         A.      Again, I'm not sure that that's

11    entirely correct.  I do cite to what I would

12    consider to be marketing plans.

13    BY MR. ROTH:

14         Q.      Okay.  Aside from the documents

15    reflected in Attachment B or cited in your

16    report, you've not reviewed any marketing

17    materials for any drugs at issue in this

18    case?

19         A.      Aside from materials cited in

20    my report, I've certainly not relied on any

21    of those marketing materials.

22         Q.      And aside from the depositions

23    reflected in Attachment B, you've not

24    reviewed any depositions from any

25    manufacturer's sales representatives?

Highly Confidential - Subject to Further Confidentiality Review

1           A.      Aside from the depositions that

2    I cite in my report, I'm not relying on any

3    other deposition testimony, no.

4           Q.      You've not reviewed any

5    testimony or other direct evidence from

6    doctors about how they were affected by a

7    given manufacturer's promotion?

8                   MR. SOBOL:  Objection.

9           A.      As I note in my report, as an

10   economist, asked to examine the impact of the

11   alleged marketing misconduct, interviewing

12   physicians would not be a scientifically

13   appropriate methodology to ascertain impact.

14                  We know that self-report is

15   unreliable, particularly when it comes to

16   behavior that may be socially unacceptable.

17   BY MR. ROTH:

18          Q.      So if doctors from Summit or

19   Cuyahoga County testified at trial that they

20   were detailed but it didn't affect them, as

21   an economist, you would dismiss that

22   testimony?

23                  MR. SOBOL:  Objection.

24          A.      As an economist, I would rely

25   on the evidence about what people do and not

Highly Confidential - Subject to Further Confidentiality Review

1   what people say.  It's been demonstrated in

2   the literature, literature that I cite in my

3   report, that again, that self-report is not a

4   reliable basis for ascertaining impact, so I

5   would not rely on physician self-report.

6   BY MR. ROTH:

7       Q.     If defendants presented

8   testimony from 15 doctors at trial who all

9   said their prescribing practices were

10  unaffected by opioids promotion, would your

11  position be different?

12      A.     I do not believe that numeracy

13  overcomes bias.  There's no scientific basis

14  for such a conclusion, so no, I do not

15  believe that physician self-report is

16  reliable, even if there are 15 physicians.

17      Q.     So in your view as an

18  economist, the testimony of any number of

19  doctors regarding how they viewed the effect

20  of defendants' promotion has no relevance?

21      A.     I would not draw any conclusion

22  from such testimony for the purposes that my

23  report has been set forth.

24      Q.     You did not review any

25  manufacturer's disaggregated marketing data

1    for the purpose of your analysis?

2              MR. SOBOL:  Objection, form.

3         A.    Again, in my report I cite

4    certain documents that have data in them

5    related to marketing.  I do not use those

6    data in my calculations.

7    BY MR. ROTH:

8         Q.    And I think you said yesterday,

9    you made a very specific request to look for

10   such data.  Do you remember that?

11        A.    I did, yes.

12        Q.    And why did you ask for that?

13        A.    When I started my work, I

14   wanted to know about what all the possible

15   data sources that would be available were.

16        Q.    And if you had a more robust

17   source of disaggregated marketing data across

18   defendants, would you have used that to model

19   promotion instead of the IQVIA data that you

20   used?

21             MR. SOBOL:  Objection.

22        A.    I can't say for sure, but I

23   wanted to find all the data that I could

24   from -- from discovery.

25             ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ROTH:

 2         Q.     You did not review any

 3    manufacturer's detailing call notes?

 4         A.     I did not review any detailing

 5    call notes, no.

 6         Q.     And I think you said this

 7    yesterday, but just to confirm, you did not

 8    comprehensively review all of any given

 9    manufacturer's marketing budgets for a

10    specific drug in this case?

11              MR. SOBOL:  Objection, asked

12         and answered.

13         A.     I did not systematically review

14    those marketing budgets, no.

15    BY MR. ROTH:

16         Q.     And so when you calculate the

17    percentages in Table 3 of your report, as we

18    discussed, that's just a comparison of

19    removing each defendant's promotional

20    contacts in the data from the aggregate

21    model?

22              MR. SOBOL:  Objection, asked

23         and answered.

24         A.     Table 3 presents alternative

25    simulations of but-for scenarios in effect,
```

1    in which individual defendants are -- their

2    marketing efforts are deemed to be not

3    subject to recovery of any kind, and so that

4    those marketing efforts are left in the

5    but-for scenario.

6            So it is a -- it's a product of

7    the regression -- my direct regression model.

8    BY MR. ROTH:

9        Q.    I want to work with you on a

10   hypothetical.  So let's assume that no opioid

11   marketing occurred beginning in 1993.

12       A.    No opiate -- opioid marketing

13   at all?

14       Q.    Correct, no promotion, no IQVIA

15   contacts.

16       A.    Okay.

17       Q.    So in your model --

18            MR. SOBOL:  I'm sorry, just so

19       it's clear, do you mean that or the

20       broader --

21            MR. ROTH:  Well, let's start

22       with -- that's fair.

23            MR. SOBOL:  You know what I

24       mean?

25            MR. ROTH:  That's fair.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ROTH:

2        Q.    So let's start with no

3    promotion at all, no marketing, no detailing,

4    no articles, nothing, a world without

5    promotion, okay?

6        A.    Okay.

7              MR. SOBOL:  Sounds wonderful.

8    BY MR. ROTH:

9        Q.    All right.  So if promotion

10   hadn't occurred since 1993, the only thing

11   your model would use would be price and the

12   constant terms.

13             MR. SOBOL:  Objection.

14             But you can answer.

15   BY MR. ROTH:

16       Q.    Correct?

17       A.    You're sort of suggesting that

18   the underlying data would be totally

19   different, but yes, the -- if the stock of

20   promotion is always zero, then it wouldn't

21   enter into the estimation, so it would be

22   price and the constant term, yes.

23       Q.    What does your model say the

24   level of sales would be if the stock of

25   promotion is always set to zero?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Well, again, you're
 2   constructing a hypothetical that's outside of
 3   the world in which I'm actually putting this
 4   model together, but it would depend on the
 5   level of sales.
 6               Essentially, as you can see in
 7   my indirect model, price would cause a small
 8   decline in sales over the time period.
 9          Q.      So would it show any sales?
10          A.      Well, your hypothetical is --
11   you didn't tell me what the baseline level of
12   sales was.
13          Q.      Okay.  So assume a small
14   baseline level of sales.  It would start
15   there and decline over time?  Is that what
16   you're saying?
17          A.      Yes.
18          Q.      Okay.  So -- and the reason for
19   that is because all of the sales in your
20   model are explained by marketing as
21   counterbalanced by price?
22          A.      Well, again, you have to take
23   into account the specifics of the
24   specification I used.  So the sales are
25   explained by marketing in combination with
```

1    the depreciation rate in combination with the

2    specific functional form I use.

3              Your hypothetical is not one

4    that makes any sense to me as a health

5    economist, and it's generally good practice

6    in applied economic analysis to not

7    extrapolate too far outside of the world

8    you're analyzing.  So we don't want to

9    forecast 50 years out from this model.

10             Likewise, to apply it to a

11   world in which there's no marketing when that

12   is so different from the world that we're in,

13   is -- it's a stretch that doesn't make a lot

14   of sense to me as a hypothetical.

15        Q.    But in order to test whether

16   your model allows for anything but marketing

17   to cause sales, does it not make sense to set

18   marketing at zero?

19        A.    It does not make sense to me to

20   set marketing at zero.  That's not something

21   I would do in a model like this.

22        Q.    All right.  If we do set

23   marketing to zero, however, it shows that no

24   other factors are driving an increase in

25   sales in your model?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      In the model, if -- if

2  promotion were at zero, Model C might look

3  different.  In fact, promotion is the

4  dominant factor driving sales, so what you're

5  asking is a hypothetical that essentially

6  assumes away what we know the fundamental

7  sales driver is in this industry, and so it's

8  a nonsensical hypothetical to me.

9      Q.      And when you say you know the

10 fundamental sales driver for opioids is

11 marketing, how do you know that?

12     A.      Look at Dr. Perri's report.

13 Look at any of the articles that we've talked

14 about.  Promotion is critically important in

15 the pharmaceutical industry.

16     Q.      That's an assumption you're

17 making based on Dr. Perri, not something that

18 you've studied specifically in the opioid

19 industry before, correct?

20             MR. SOBOL:  Objection.

21     Objection, asked and answered.

22     A.      That's -- it's based on

23 economic theory.  It's based on economic and

24 marketing analysis.  It's not an assumption

25 that I'm just taking from Dr. Perri.

1    BY MR. ROTH:

2    Q.    So in your view, a model that

3    allows for nothing but promotion to predict

4    positive sales is reasonable because you

5    believe promotion is what drives marketing

6    for opioids?

7         MR. SOBOL:  Objection.

8         MR. ROTH:  Sorry, that was a

9         bad question.  Let me rephrase it.

10   BY MR. ROTH:

11   Q.    In your view, a model that

12   allows for nothing but promotion to predict

13   positive sales is reasonable because you

14   believe promotion is what drives sales for

15   opioids?

16        MR. SOBOL:  Objection.

17   A.    I think there are many issues I

18   would have with that statement.  So, first of

19   all, my model is looking at the extent to

20   which promotion is driving increases in

21   sales.

22        As we talked about at length

23   yesterday, there may be things that affect

24   whether a particular patient or a particular

25   physician uses a specific medicine.  What I'm

1    trying to explain is growth over time, so

2    that's not the same as what might explain

3    levels.

4              Second, I would say that the

5    model demonstrates that promotion causes

6    sales.  It is not an inherent assumption.

7    The basic structure of my model is the same

8    as the models in the published papers that we

9    looked at that use aggregate time series data

10   because in time series, we're looking at the

11   factors that drive changes over time, and

12   prices and promotion are those factors.

13   BY MR. ROTH:

14        Q.    In your view, your model proves

15   the hypothesis that promotion of opioids

16   drives increased sales of opioids?

17        A.    Yes, that is the conclusion I

18   reach in my report.

19        Q.    And before you put your

20   regression model together, you believed that

21   promotion of opioids drove sales of opioids?

22        A.    As a health economist and as

23   someone who's done work in this area before,

24   my priors were that promotion is an important

25   factor in causing sales increases, yes.

1      Q.     And, in fact, nothing aside

2   from promotion in your model would allow for

3   an increase in the sales of opioids?

4           MR. SOBOL:  Objection.

5      A.     In setting up the model, before

6   doing the analysis, while I expected prices

7   to have the relationship with sales that they

8   did, I did not know whether the prices, as we

9   discussed yesterday, would be rising or

10  falling.

11          So as a matter of specifying

12  the model, the effect of prices could have

13  been either to accelerate or decelerate

14  growth.

15  BY MR. ROTH:

16     Q.     That was a good answer, but I

17  don't think it directly responded to my

18  question.

19          In your model --

20          MR. SOBOL:  That's a

21      contradiction.

22  BY MR. ROTH:

23     Q.     In your model, there is nothing

24  aside from increased promotion that causes an

25  increase in the sale of opioids?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. SOBOL:  Objection, asked
 2        and answered.
 3        A.      Again, in the model as
 4   specified, prices could have had either a
 5   positive or negative effect, not because the
 6   coefficient could have been positive or
 7   negative, but because the trend could have
 8   been positive or negative.
 9              In practice, when I estimated
10   the model, the underlying data suggested that
11   prices were, in fact, increasing, and thus
12   decreasing sales, and so promotion is the
13   single variable in Model B that is causing
14   increases in sales.
15              In Model C, as we talked about
16   yesterday, one of the dummy variables appears
17   positive in a way that is counterintuitive;
18   nonetheless, it accounts for some of that
19   sales growth.
20   BY MR. ROTH:
21        Q.      You included no other variables
22   in your direct regression model beyond price
23   and promotion; is that right?
24        A.      In Model B, I include price,
25   promotion, the constant, and I estimate the
```

Highly Confidential - Subject to Further Confidentiality Review

1    depreciation rate.

2                    In Model C, I include those

3    five event dummies.

4         Q.     What did you do to measure the

5    impact of non-defendant promotion on market

6    expansion?

7                    MR. SOBOL:  Objection, asked

8         and answered.

9         A.     My model is an aggregate model

10   and the estimation includes defendants and

11   non-defendants, and so the coefficient

12   estimated on promotion in the model pertains

13   to the impact of both defendants and

14   non-defendants.

15   BY MR. ROTH:

16        Q.     Your but-for world in your

17   model excludes defendant promotion?

18        A.     The but-for scenario excludes

19   defendant promotion, yes.

20        Q.     What is the result if the

21   but-for world excludes all promotion and

22   keeps all else equal?

23        A.     I have not been asked to look

24   at a but-for scenario.  As we were talking

25   before about the idea of zero promotion,

1     that's not a scenario I've looked at.

2          Q.     You spoke a minute ago about

3     Model C.  I want to come back to that for a

4     minute.

5               If you turn to Table 1.

6          A.     47.

7          Q.     Thank you.

8          A.     Mine is getting well leafed.

9          Q.     And actually, that's not the

10    one I want.  I'm sorry.  I went the wrong

11    way.  I actually want Attachment D, the table

12    that shows your coefficients for Model C.

13         A.     Okay.

14         Q.     So I think it's D.8.

15         A.     No.

16         Q.     No, D.8.  Table D.8.

17         A.     Oh, Table D.8, sorry.

18         Q.     Yeah.  You numbered the tables

19    the same way as the pages.  It makes it

20    confusing.

21         A.     Very confusing, okay.

22         Q.     So in Table D.8, the stock of

23    promotion with the trend for the period

24    starting in August 10 is negative; is that

25    right?

1    A.    That's right.

2    Q.    And you maintain the negative

3    depreciation rate, which means sort of

4    growing stock of promotion even in that

5    period?

6    A.    Right.

7    Q.    And we spoke about that a

8    little bit yesterday, but can you just

9    explain for me why it is that the

10    effectiveness of promotion as a whole is

11    declining but the stock of promotion

12    continues to grow in the third period of your

13    model?

14          MR. SOBOL:  Asked and answered.

15          You can answer.

16    A.    Yes.  The depreciation rate, I

17    estimate a single depreciation rate over the

18    entire time period, and it's my belief that

19    the negative depreciation rate reflects the

20    addictive nature of opioids.

21          That does not change in the

22    latter part of the period, so despite the

23    fact that the marginal productivity of

24    promotion is declining over that period, the

25    idea that the stock of promotion continues to

Highly Confidential - Subject to Further Confidentiality Review

1    grow is not conceptually inconsistent.

2    BY MR. ROTH:

3         Q.    We agree that all detailing is

4    not equally effective?

5              MR. SOBOL:  Objection.

6         A.    I -- here I am trying to

7    estimate -- I am estimating the average

8    effect of detailing.  There may be some

9    variation in that effect, but I'm interested

10   in the aggregate impact.

11             And so the fact that my

12   analysis averages across some -- some

13   variation is not mathematically a problem.

14   It will still lead me to the right answer in

15   terms of the aggregate impact.

16   BY MR. ROTH:

17        Q.    I assume you agree based on the

18   way you've constructed Model B that the

19   effectiveness of detailing changes over time?

20        A.    That is what Model B captures.

21        Q.    Right.  Detailing that may have

22   been effective earlier in time may become

23   less effective over time as new information

24   comes to light?

25        A.    Well, I think the premise

Highly Confidential - Subject to Further Confidentiality Review

1    you're suggesting there is, again, it ignores

2    the addictive nature of the product, so once

3    a patient is using opioids and has increasing

4    needs for higher doses; whether or not the

5    specific messages are still in the mind of

6    their physician, they are nonetheless

7    addicted to the product or tolerant of the

8    product and requiring higher and higher doses

9    which will show up in my data as higher and

10   higher MMEs.

11           So I can't quite agree with the

12   premise and its relevance to the analysis.

13       Q.    Based on your last answer, I

14   assume you'd agree that when a patient

15   receives higher doses of opioids, that may be

16   a sign of tolerance as opposed to addiction?

17       A.    Yes, higher doses may be

18   tolerance and not necessarily addiction.

19   Again, I'm not a clinical expert, so I want

20   to be careful not to go too far with that.

21       Q.    In fact, a patient who is being

22   successfully treated with opioids for chronic

23   pain may become tolerant and need a higher

24   dose to achieve the same pain deterrent

25   effect?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I think we're getting a little

2     too far out of my expertise and into clinical

3     questions.

4          Q.      Do you believe that promotion

5     has a greater impact on the very first

6     prescription a physician writes for a therapy

7     like opioids or for subsequent prescriptions

8     the physician may write for the same drug?

9               MR. SOBOL:  Objection.

10         A.      I'm not sure it makes

11     conceptual sense to distinguish that.  I

12     think that there is a -- there is an inherent

13     connection that happens when someone starts

14     on a medicine.  They have a higher

15     probability of being on that medicine next

16     month than someone who didn't start, right,

17     so that -- that would be a natural underlying

18     connection between the two things.

19               It may be that promotion also

20     has a reminder effect, and so that would be

21     an increment in addition to the fact of that

22     patients once on a drug may be likely to stay

23     on a drug.

24               I have not tried to distinguish

25     those factors.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ROTH:

2        Q.      Is that an issue that you have

3    studied or seen economic literature on,

4    whether promotion is more effective at

5    getting doctors to initiate a therapy versus

6    maintain a therapy they've already used in

7    the past?

8        A.      Again, for the purposes of my

9    analysis, I had no need or wish to

10   distinguish between those things.  I can't

11   point to a paper right now, but I believe

12   that maybe someone has done that.

13       Q.      I assume you're aware there are

14   different classes of opioids, correct?

15       A.      There are different molecules,

16   like oxycodone and hydrocodone, is that what

17   you're referring to when you say classes?

18       Q.      Well, there are different

19   molecules, that's one thing.

20       A.      Yes.

21       Q.      There are different

22   formulations, right?

23       A.      Yes.

24       Q.      There are different methods of

25   administration?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      There's a patch, right?

3       A.      Yes.

4       Q.      There's that sublingual spray?

5       A.      Yes.

6       Q.      And then there's pills and

7   injectables, for example?

8       A.      Yes.

9               MR. SOBOL:  Film.

10  BY MR. ROTH:

11      Q.      Film?

12      A.      Yes, I'm aware that there are

13  different formulations.

14      Q.      And there's also

15  immediate-release opioids and

16  extended-release opioids, correct?

17      A.      Yes, that's correct.

18      Q.      And for the purpose of your

19  models, apart from the injectables, all of

20  those various forms of opioids are included?

21      A.      Yes, that's correct.

22      Q.      Did the manufacturers'

23  marketing budgets that you reviewed show

24  increased marketing spending over time?

25      A.      As I sit here, I don't recall.

1    Q.    Would you agree that if the

2  depreciation rate augments the stock of

3  detailing over time, it would be irrational

4  to keep spending money on promotion?

5              MR. SOBOL:  Objection.

6    A.    No, I don't think that that

7  would be a conclusion that I would agree

8  with.

9  BY MR. ROTH:

10    Q.    And why not?

11    A.    The more effective your

12  marketing is, the more you want to spend on

13  it.

14              MR. SOBOL:  An answer I

15        understood.

16  BY MR. ROTH:

17    Q.    We spoke briefly about your

18  errata yesterday.  Can you just tell me how

19  did that errata come about?

20    A.    That came about from review

21  partly, my very careful review as I was

22  preparing for this deposition, and the staff

23  doing the same.

24    Q.    Got it.

25              And then why did it come in the

1    form of a memo from Mr. McCluer to you and

2    Mr. Sobol?

3         A.    I'm not sure I can answer that

4    question.

5         Q.    But it sounds like the errors

6    were identified some by you and some by the

7    staff?

8         A.    Yes, that's correct.

9         Q.    Do you know who caught the

10   Table 3 error?

11        A.    That was me.

12        Q.    I feel bad for the staff on

13   that one.  And what about the --

14        A.    I'm not the yelling type.

15        Q.    And what about the statistical

16   significance error, was that you or the

17   staff?

18        A.    That was the staff.

19        Q.    Let's turn to your indirect

20   model.

21        A.    Okay.

22        Q.    So you talk about your indirect

23   model beginning at paragraph 78 of your

24   report.

25             And I guess just taking a step

1    back before we get into specifics:  Do you

2    have a preference for your direct over your

3    indirect model in this case?

4         A.     I believe they have strengths.

5    Each of them has strengths, so in my

6    opinions, I have not favored one over the

7    other.

8         Q.     In general when you perform

9    regression analysis, do you have any

10   preference for a direct approach versus an

11   indirect approach?

12        A.     No preference.  I think these

13   kinds of models are really context specific.

14        Q.     And if you look at page 53,

15   paragraph 78, you start by saying:  As noted

16   earlier, the direct method of estimation is

17   limited in part by the extent to which we can

18   measure and include in the models all of the

19   tactics allegedly employed by defendants,

20   including manipulation of various

21   professional societies and accrediting

22   bodies.

23             Did I read that correctly?

24        A.     Yes, you did.

25        Q.     And that's based on the

1    allegations that you reviewed?

2         A.    That's correct.

3         Q.    Would you agree that if a

4    defendant did not engage in promotion other

5    than the detailing measured by the IPS data,

6    the direct model would be a more appropriate

7    measure of that particular defendant's impact

8    on the aggregate MMEs?

9         A.    My assignment was to calculate

10   aggregate impact, so I have not considered

11   how to calculate impact for a single

12   defendant.

13             As we talked about yesterday, I

14   think there are some complicated questions

15   about how to deal with the spillover effect,

16   so I have not undertaken to do that.

17        Q.    As we've discussed fairly

18   exhaustively, your direct Model B explains

19   over 99% of the variation in MME sales based

20   on the detailing data in IQVIA.

21        A.    Yes, it does.

22        Q.    Does that not suggest that the

23   effect of all of these other types of

24   promotion is negligible at best?

25        A.    It may well be the case that

Highly Confidential - Subject to Further Confidentiality Review

1    the amount of variation that is picked up by

2    a broader measure of promotion would not be

3    so much more.  The indirect model is

4    conceptually quite different, however.

5         Q.    So if you compare Table 5,

6    which is on page 61 -- let's take a step

7    back, lay some foundation.

8         A.    Sure.

9         Q.    So Table 5 on page 61 is the

10   output of your indirect model, correct?

11        A.    It is.

12        Q.    Okay.  We talked yesterday

13   about Table 2, which is the output of your

14   direct model and appears on page --

15        A.    Should I bend the corner so we

16   can go back and forth?

17        Q.    Yes, good idea.

18             So I want to compare the direct

19   output in Table 5 on page 61 -- sorry, strike

20   that.

21             I want to compare the indirect

22   model output in Table 5 on page 61 with the

23   direct model output in Table 2 on page 51.

24        A.    Okay.

25             MR. SOBOL:  Do we have a graph

Highly Confidential - Subject to Further Confidentiality Review

```
1           of this somewhere?

2                 THE WITNESS:  Not in my report.

3                 MR. ROTH:  Just for you.  I

4           don't think we've seen that.  I would

5           love to see it.

6   BY MR. ROTH:

7           Q.    So looking at the two tables

8   next to each other, I guess just first taking

9   the bottom line, in Table 2, the direct Model

10  B estimates that      of MMEs are

11  attributable to defendants' detailing.

12                Do you see that?

13          A.    Yes.

14          Q.    And in Table 5, the indirect

15  method suggests that     of MME shipments are

16  attributable to defendants' detailing; is

17  that right?

18          A.    That's correct.

19          Q.    So that's a     delta -- well,

20  that's a bad question because that's not how

21  math works.

22                MR. SOBOL:  Right.

23  BY MR. ROTH:

24          Q.     It's     higher -- well, the

25  numbers are what they are, but it's
```

1    and ██ -- it's actually ██ higher, I think,

2    if I'm doing the math right.

3         A.      It is ██ percentage points or

4    about ██ higher than the direct estimate.

5         Q.      You said it better than I

6    could.

7               How is that possible given that

8    you had a 99% R-squared in the direct model

9    that your indirect model could estimate twice

10   as much impact by defendants' promotion?

11        A.      As I mentioned, they are

12   conceptually very different kinds of

13   analyses, so whether or not detailing

14   explains the vast majority of the variation

15   in sales, it does not account for -- it

16   accounts for a smaller percentage of total

17   sales, so the magnitude of effect is not the

18   same thing as the amount of variation

19   explained, right?

20               And the indirect model takes

21   the position that there are these long run

22   factors that may -- that we can see are

23   relevant to demand in -- across areas, and if

24   we extend those forward, looking at the

25   growth in MMEs only as a result of those

Highly Confidential - Subject to Further Confidentiality Review

1    factors, that's another version of what the

2    world would have been like.

3              It assumes, again, that the

4    drivers of the massive growth we saw were

5    only related to defendant promotion, and so

6    it allows defendant promotion to affect sales

7    in a broader way than the direct model does.

8        Q.    In the direct model, I believe

9    you went through 2018; is that right?

10       A.    Yes.  There were differences in

11   data availability, so yes.

12       Q.    Right.  So that was what I was

13   going to ask you.

14             Direct goes through 2018,

15   indirect only goes through 2016?

16       A.    Yes.  And as I'm sure we'll get

17   to also, because the ARCOS data start in

18   1997, I do, I backcast for '95 and '96, but

19   really I'm starting in 1997.

20       Q.    Got it.  So direct, you go '95

21   to 2018; indirect, you go from '97 to 2016.

22       A.    That's correct.

23       Q.    Okay.  And that's just because

24   of just data limitations?

25       A.    That's correct.

1    Q.    If you had the other years, you

2  would use them in the indirect model?

3    A.    That's correct.

4    Q.    If you look at paragraph 82 of

5  your report, you describe your indirect model

6  as a form of residual analysis.

7        Do you see that?

8    A.    Yes.

9    Q.    And can you explain what a

10  residual analysis is?

11    A.    Well, a residual is the

12  leftover part, and so a residual analysis is

13  an analysis that draws inferences not from

14  something included, but something excluded.

15    Q.    Sort of like in accounting,

16  when you depreciate something, what's left

17  after you've depreciated it is the residual?

18    A.    Is it?  Yeah, perhaps.

19    Q.    Except if the depreciation

20  somehow appreciates, but we won't go there

21  again.

22        What is the baseline of your

23  indirect model?

24    A.    The baseline for the indirect

25  model as I just mentioned is the 1997 level

Highly Confidential - Subject to Further Confidentiality Review

1    of MMEs.

2         Q.     And you chose that because that
3    was the earliest year available in ARCOS?

4         A.     Yes, that's correct.

5         Q.     How did you construct the
6    explanatory variables you used in the
7    indirect model?

8         A.     The explanatory variables come
9    from a variety of sources that I think we
10   reviewed at a very high level yesterday.
11   They're county level -- we haven't exactly
12   talked about.  So this is a county level
13   cross-sectional analysis and we bring in data
14   from a variety of government economic sources
15   and other sources to capture county-level
16   information.

17        Q.     And we spoke about this a
18   little yesterday with respect to Professor
19   Cutler.

20        A.     Yes.

21        Q.     But the same question for you:
22   Why did you decide to use national data and
23   do a national model for direct regression,
24   but then do your indirect regression analysis
25   based on county-level data?

Highly Confidential - Subject to Further Confidentiality Review

1                MR. SOBOL:  Objection, asked

2       and answered.

3       A.     Sure.  The time series analysis

4    that I did is appropriately done at the

5    national level.  We're trying to calculate

6    national aggregate impact and the factors

7    that drive sales over time make sense to do

8    in -- at a national level there.  We don't

9    have promotional data at a county level, so

10   it would not be possible to do a direct model

11   at this level.

12               On the other hand, and this is

13   why the indirect model complements the direct

14   model, we can look cross-sectionally at

15   variation in these socioeconomic and

16   demographic variables because there's a fair

17   amount of cross-sectional variation, and get

18   reasonably precise estimates of the effect of

19   those factors on MMEs.

20               And so the cross-sectional

21   model works at the county level, and then

22   rather than having to estimate the effects of

23   those variables over time, we can trend them

24   forward based on the cross-sectional

25   analysis.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ROTH:

 2         Q.    If you look at paragraph 79,

 3    which is on page 53, you say:  The indirect

 4    model begins with a regression analysis of

 5    the relationship between opioid sales and the

 6    demographic, economic and healthcare

 7    characteristics of an area ideally during the

 8    period prior to the misconduct.

 9              Do you see that?

10         A.    Yes, I do.

11         Q.    So what do you mean when you

12    say ideally it would be from the period prior

13    to the misconduct?

14         A.    Well, to the extent the

15    misconduct is affecting the relationships

16    between the right-hand side variables, those

17    are the demographic, socioeconomic and

18    healthcare variables that we include,

19    estimation during this period could -- could

20    affect the results.

21              And again, the level of MMEs in

22    1997, if the allegations are true, are

23    already affected by the misconduct, but I

24    believe this makes my analysis conservative

25    by starting two years into the damage
```

1    period -- or not the damage period, but the

2    period of alleged misconduct.

3          Q.     So you're taking data from the

4    period of alleged misconduct in 1997 because

5    your assumption is the period of alleged

6    misconduct will be proven back to 1995?

7          A.     That's correct.

8          Q.     And you say this makes it

9    conservative because the factors may have

10   already been influenced and thus there would

11   be a higher likelihood to see prescriptions

12   from the demographic factors which have some

13   effect of the misconduct already?

14         A.     Potentially.

15         Q.     Okay.  And what would be your

16   basis to think that the demographic, economic

17   and healthcare characteristics in Summit or

18   Cuyahoga Counties were already seeing the

19   effects of opioids in 1997?

20         A.     Wait, so just to be clear,

21   actually, the -- what you just said doesn't

22   quite make sense, so let me just -- I

23   probably should have provided a much longer

24   answer to the last question.

25               So what the two things that

Highly Confidential - Subject to Further Confidentiality Review

1    starting the analysis in 1997 do.  One is I

2    start already with a level of MMEs that if

3    the allegations are true, they're inflated.

4                   And, two, what I was trying to

5    say is it's not that the socioeconomic status

6    of the counties is affected, although that

7    can certainly happen in the long run, but

8    instead that the relationship between

9    socioeconomic status and MMEs may have

10   already been affected by the promotion.

11                  So, you know, if, for example,

12   the marketing is differentially affecting

13   certain groups, then that could show up in

14   the cross-sectional analysis, and so that's

15   what I meant.

16       Q.    And the reason you say it's

17   conservative is because directionally you

18   would think that the marketing would cause

19   those factors to predict more MMEs than they

20   would absent the marketing having already

21   occurred?

22       A.    Yes.  And again, the first

23   part, the fact that the levels directionally,

24   again, under the assumption that the alleged

25   misconduct had been occurring for two years,

1  the levels would certainly be inflated

2  relative to a but-for scenario in which there

3  was no misconduct.

4       Q.     Do you agree that for an

5  indirect regression you should include any

6  variable that might impact opioid sales?

7       A.     For the indirect regression, I

8  am including all the variables that should be

9  cross-sectionally associated with that, so

10  they -- just to be clear, that these are

11  variables that can be measured at a county

12  level, so not individual patient level, but

13  at a county level will vary across counties

14  and will predict use.

15       Q.     And if there are variables that

16  are cross-sectionally related to sales that

17  are omitted, that could cause issues with

18  overestimating the amount of sales impacted

19  by promotion?

20       A.     In any regression model, an

21  applied economist will have to consider the

22  possibility of omitted variables.  It is also

23  in tension with the idea that if you throw in

24  hundreds of variables, you get nonsense soup

25  out of it, and so there's always going to be

1    some tension there, but certainly one

2    considers important omitted variables.

3         Q.    Yeah, I mean, if I understand

4    it, the point of an indirect regression is to

5    essentially solve for a variable by including

6    everything but that variable that explains or

7    could explain the outcome?

8         A.    Yes.  I just want to be clear

9    that the word "everything" makes it seem like

10   you could actually estimate a regression with

11   hundreds of variables.  There are degrees of

12   freedom.  There can be problems from trying

13   to put everything in.

14              So in principle, you're right.

15   We're trying to make sure that we include the

16   important factors, and I believe I have done

17   so here.

18        Q.    Okay.  So I want to talk a

19   little bit about the mechanics first.

20              So you look at opioid shipments

21   by county, correct?

22        A.    That's correct.

23        Q.    And why did you use shipments

24   in your indirect model as opposed to

25   prescriptions?

1          A.      These are words that describe

2     the same thing in effect.  So these are the

3     ARCOS data.  They use the terminology

4     shipments.  They don't track prescriptions.

5     They track controlled substances that move

6     from one set of hands to another.  And so

7     these are using their nomenclature.

8               At the end of the day, I --

9     these are MMEs, just like my MMEs in the

10    direct model.  They correspond.  And, in

11    fact, if you graph the two sets of data,

12    they're very close.

13         Q.      Can the IQVIA NPA data be

14    disaggregated to a county level?

15         A.      It cannot.  Actually, I'm not a

16    hundred percent sure as I sit here.  Again,

17    as we talked about yesterday, it's the

18    detailing data that definitely can't be

19    disaggregated.  I can't remember whether the

20    NPA can be disaggregated too.

21         Q.      So as you sit here, you're

22    not --

23               MR. SOBOL:  You mean on its own

24         as opposed to using other tools?

25               MR. ROTH:  No, I just mean

Highly Confidential - Subject to Further Confidentiality Review

1      generally.

2  BY MR. ROTH:

3      Q.    My question, just asking it

4  more broadly, is -- and it sounds like you

5  don't know the answer, so let me strike that

6  and start with a clean question.

7           You don't know whether you

8  could have used the same IQVIA data for MMEs

9  used in your direct model in your indirect

10  model at a county level?

11     A.    I don't.  I think the NPA is

12  just a national-level dataset.  I did compare

13  MMEs in total in the ARCOS data to the IQVIA

14  data, and I found them to be almost

15  identical.

16          I note one place where the

17  ARCOS data are not detailed enough to allow

18  me to omit certain Schedule III codeines and

19  hydrocodones, I think.  Yeah.

20     Q.    And that was going to be my

21  next question.

22     A.    Sure.

23     Q.    So if you had used IQVIA data,

24  you could have taken out the Schedule IIIs,

25  but because you used ARCOS data, you had to

Highly Confidential - Subject to Further Confidentiality Review

1    leave certain Schedule IIIs in your analysis?

2         A.    That's correct.  They're not --

3    you can't identify them because the data

4    aren't granular enough.

5              And I note in my report that

6    that affects about 2?%.  Just to be clear, I

7    realized it's not an error, but it's not a

8    hundred percent clear that that 2?% is really

9    of those classes, of those molecules that

10   have both Schedule II and Schedule III drugs,

11   it's less than 1% of the total.

12             So again, when I compared the

13   ARCOS MMEs and the IQVIA MMEs, they look

14   almost identical.

15             (Interruption by the reporter.)

16             MR. ROTH:  I think we need a

17        quick break.

18             THE VIDEOGRAPHER:  The time is

19        9:04 a.m.  We're off the record.

20             (Recess taken, 9:04 a.m. to

21        9:16 a.m.)

22             THE VIDEOGRAPHER:  The time is

23        9:16 a.m.  We're back on the record.

24   BY MR. ROTH:

25        Q.    Just to go back to something we

Highly Confidential - Subject to Further Confidentiality Review

1    were talking about before the break, so your

2    testimony is that picking '97 is conservative

3    because the unlawful conduct based on your

4    assumptions started in '95, correct?

5         A.    Yes.

6         Q.    You are aware that many of the

7    drugs at issue in this case were not on the

8    market in 1997?

9         A.    I'm aware that certainly some

10   of the drugs enter later, yes.

11        Q.    So for manufacturers who did

12   not have any drug on the market in '97 or

13   even '98 or '99 or until later, you actually

14   did choose a pre-misconduct period for those

15   manufacturers?

16        A.    Well, again, I have been asked

17   to characterize the aggregate impact of

18   marketing on sales here, so I haven't -- and

19   I'm certainly not a lawyer, but I haven't

20   given a thought to allocating liability

21   across defendants in any way.  I would

22   acknowledge that some defendants entered

23   later than that with some drugs.

24        Q.    Right.  And because you looked

25   at an aggregate, if a single manufacturer had

1    a product on the market, the remaining

2    manufacturers would all be subject to

3    whatever the aggregate model shows as the

4    impact from that one product even though it

5    wasn't theirs?

6              MR. SOBOL:  Objection.

7         A.    Well, I think that you

8    misunderstood the cross-sectional analysis.

9    So again, the cross-sectional analysis is

10   really capturing the effect of things like

11   the age distribution and employment and the

12   like.  So that's not a question of something

13   to which liability is being attached.

14             So it's really just trying to

15   get a precise measure of those effects, and

16   yes, that's the basis for projecting forward,

17   but the projections forward, they don't

18   assign any liability to those early

19   relationships.

20   BY MR. ROTH:

21        Q.    And just so we're perfectly

22   clear, none of the models or the work you've

23   done to date allows you to allocate liability

24   to an individual defendant in this case,

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. SOBOL:  Objection.
 2       A.     I don't know the answer to that
 3   question because I don't know how liability
 4   would be allocated.  The models calculate
 5   aggregate impact, and as I've shown in
 6   Table 3, we can change that aggregate.
 7              It is possible -- again, I
 8   haven't been asked to do this, but it is
 9   possible to use a similar approach to
10   construct one kind of liability allocation,
11   which would be to look at the levels of
12   detailing across defendants and use that in
13   Table 3 in a different way.
14   BY MR. ROTH:
15       Q.     None of the work or models
16   you've done in this case allow you to
17   allocate liability to a specific defendant
18   based on only that defendant's alleged
19   promotion?
20              MR. SOBOL:  Objection, asked
21         and answered.
22       A.     Well, again, I'm not a lawyer,
23   but it seems to me that one method of
24   allocating liability is in proportion to
25   one's detailing efforts, and I have an
```

1    aggregate impact that can be allocated in

2    proportion to detailing using a similar

3    approach to the way Table 3 assesses

4    aggregate impact for different combinations

5    of defendants.

6    BY MR. ROTH:

7        Q.    So I understand that your

8    Table 3 allows you to allocate to defendants

9    their share of the promotional contacts in

10   the data, correct?

11           MR. SOBOL:  Objection, asked

12        and answered.

13       A.    It is not based just on their

14   share of the promotional contacts, but it's

15   based on the difference in aggregate

16   prescribing that would occur with and without

17   their marketing happening.

18           So it's not -- as we talked

19   about yesterday, it's not strictly -- it goes

20   through the model.

21   BY MR. ROTH:

22       Q.    Okay.  Your assignment was to

23   develop an aggregate model of the impact of

24   detailing on MMEs, correct?

25           MR. SOBOL:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Just to be crystal clear, my

2    assignment was to estimate aggregate impact

3    using the best available methods.

4    BY MR. ROTH:

5        Q.     Right.  And you've said

6    numerous times throughout the last two days

7    that your assignment was not to determine

8    liability, correct?

9        A.     Yes.  I am -- I am not going

10   to -- my opinions relate to the effect of

11   marketing, and how that relates to liability

12   and recovery is not part of my assignment.

13       Q.     Okay.  So unless the court

14   allows the plaintiffs to prove liability

15   based on each individual defendant's share of

16   aggregate marketing, you have no mechanism to

17   allocate liability on an individual defendant

18   basis?

19            MR. SOBOL:  Objection, asked

20        and answered.

21       A.     I think you're asking me for a

22   legal opinion.  I don't know.  It seems that

23   the court could -- could allow plaintiffs to

24   allocate liability in a number of different

25   ways.  I don't know how that would work.

```
 1    BY MR. ROTH:

 2         Q.      I understand that.  I'm not

 3    asking you for a legal opinion.  I just want

 4    to understand what you're going to do at

 5    trial, okay?  Okay?

 6              MR. SOBOL:  The buzzword is --

 7         when you're using the word "liability"

 8         in the question, that's the buzzword

 9         that's sending her down that road.  So

10         if you -- I'm coaching you now.

11              MR. ROTH:  Well, I understand

12         that, but I'm also trying to -- I know

13         you guys want ultimate flexibility on

14         your side but you shouldn't have it on

15         this point, so I want to make sure the

16         record is clear, okay?

17    BY MR. ROTH:

18         Q.      Professor Rosenthal, your

19    regression models that you have done to date

20    do not allow you to allocate causation to

21    individual defendants in any way other than

22    as a ratio of those defendants' detailing

23    contacts against the market aggregate

24    detailing contacts?

25              MR. SOBOL:  Objection to form,
```

Highly Confidential - Subject to Further Confidentiality Review

1    asked and answered.

2         But you may answer.

3    A.    You have used the terminology

4    as a ratio, and that is not what happens in

5    Table 3.

6         So again, I don't know what the

7    court will want, but what I can do with my

8    aggregate model is I can use the econometric

9    results and create different but-for

10   scenarios, one set of which would be to focus

11   on individual defendants isolated from

12   others.

13        That's similar to what I've

14   done in Table 3, but that's not allocating

15   based on a ratio.  It's rerunning the but-for

16   scenario, the predictions using a defendant's

17   detailing, and that detailing is not just a

18   single number.  It's a time series.

19   BY MR. ROTH:

20   Q.    Let me try this again.

21        Your regression models that you

22   have done do not allow you to allocate

23   causation to individual defendants in any way

24   other than separating out those defendants'

25   detailing contacts from the market aggregate

```
 1    detailing contacts?

 2               MR. SOBOL:  Objection to form,

 3          asked and answered.

 4          A.     My analysis allows me to

 5    predict but-for prescriptions based on any

 6    level of detailing, including the assumption

 7    that only a single defendant's detailing was

 8    unlawful, and there may be other ways of

 9    using the aggregate model to estimate

10    liability, except that I'm not a liability

11    expert.  There may be other ways that I just

12    don't know of.

13               I can identify MMEs.  I can

14    identify detailing for each defendant.  That

15    information may be used in other ways that I

16    haven't thought of because I don't know what

17    the court will need.

18    BY MR. ROTH:

19          Q.     How do your models allow you to

20    predict but-for detailing assuming only a

21    single defendant's detailing was unlawful

22    without running afoul of the endogeneity

23    issues that we've discussed?

24               MR. SOBOL:  Objection.

25               You can answer.
```

1    A.    Because again, the endogeneity

2    issues are in the estimation of the

3    parameters.  The but-for scenarios take the

4    estimates that are created at the aggregate

5    level, and they feed into it an alternative

6    set of detailing information.  So they're

7    post-estimation.

8         Endogeneity is pre-estimation,

9    and all I'm doing is changing the simulation

10   of the but-for scenario.

11   BY MR. ROTH:

12   Q.    Let's go back to the indirect

13   model for a bit.

14        Based on your assertion that

15   opioid pharmaceutical efforts are national in

16   scope and that marketing messages are

17   developed as a whole, would you expect a

18   single detail in one county to have the same

19   effect as a single detail in another county?

20        MR. SOBOL:  Objection.

21        You can answer.

22   A.    I don't know what the

23   variability and the effect of detailing is

24   per se.  I expect that there would be some

25   variation in the effectiveness of detailing

1    from situation to situation.

2                And my model and my assumptions

3    in the indirect model, since I don't model

4    promotion directly, is that what I'm aiming

5    to calculate is the average effect, and

6    therefore, calculate the aggregate impact

7    from that average.

8    BY MR. ROTH:

9        Q.    Is it possible that shipments

10   to a county could understate or overstate

11   consumption of opioids in that county?

12       A.    Yes, it is possible that

13   shipments to a county -- so once we get to

14   the county level, there are -- there are

15   issues related to diversion.

16       Q.    And I think Professor Gruber

17   describes that as a transshipment problem in

18   his report?

19       A.    I think he does.  There's a

20   fancy name for the Florida transshipments, I

21   can't remember what it was called, but yes.

22       Q.    Did you consider using

23   geographic designations that account for

24   commuting patterns?

25       A.    No, I did not.  The

1  county-level data I think are the most

2  appropriate level of analysis.  Any

3  geographic unit will have some people moving

4  in and out, but the county level, I think is

5  an appropriate level of analysis.

6              The economic and

7  sociodemographic -- demographic and

8  socioeconomic variables are measured at the

9  county level, and we think about these sort

10 of economic issues as being approximately

11 captured at the county level.

12      Q.    Did you consider core-based

13 statistical areas instead of counties?

14      A.    I did not.

15      Q.    For the same reason that you

16 just gave?

17      A.    Yes.  There are -- the ARCOS

18 data are at the county level, and again, most

19 economic data are tracked at the county

20 level.  There are some data that are focused

21 on urban cores, but not the kind of

22 comprehensive data that I used here.

23      Q.    Did you consider using

24 metropolitan statistical areas?

25      A.    The same answer.  I did not.

Highly Confidential - Subject to Further Confidentiality Review

1    That would be aggregating up.  MSAs also

2    split certain counties.  It doesn't make

3    sense to me to move up a level.  The county

4    level is more granular than the MSA level.

5          Q.     In certain places, though, the

6    county level may actually be larger than the

7    MSA, right?

8          A.     That is true in urban areas.

9    In rural areas, MSAs include multiple

10   counties.  They're not precisely overlapping,

11   I know from having done some matching at some

12   point, they're not easy to cross-walk.

13         Q.     Okay.  So back to paragraph 83

14   of your report.  So you say as you just said

15   that you used county-level ARCOS data on

16   shipments of prescription opioids between

17   1997 and 2016, correct?

18         A.     Yes.

19         Q.     But ARCOS actually doesn't have

20   county-level data, does it?

21         A.     The -- I believe the data are

22   mapped to counties.

23                (Whereupon, Deposition Exhibit

24         Rosenthal-22, Data Appendix, was

25         marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. ROTH:

 2         Q.     That's right.  So let's look at

 3    Exhibit 22, which is the data appendix that I

 4    believe you shared with Professors Cutler and

 5    Gruber?

 6         A.     That's right.  As I mentioned,

 7    the ARCOS data for me come through Compass

 8    Lexecon.

 9         Q.     Okay.  So we spoke yesterday

10    about who helped you with your report, and it

11    was Greylock McKinnon.  Other than giving you

12    the ARCOS data, did Compass Lexecon have any

13    role in the preparation of your expert

14    report?

15         A.     No role in the preparation of

16    my expert report, no.

17         Q.     And did you speak with anyone

18    from Compass Lexecon directly?

19         A.     Yes, we talked about those

20    meetings, and perhaps some of the calls,

21    there were people from Compass Lexecon on

22    those.

23         Q.     But in terms of your regression

24    analyses and running the Wald statistical

25    tests, that was all Greylock and yourself;

Highly Confidential - Subject to Further Confidentiality Review

1    that was not Compass Lexecon?

2         A.    Yes, that's correct, my staff

3    ran these.

4         Q.    Okay.  So if we look at

5    Exhibit 22, turn to page 11, and it's a

6    section on the ARCOS prescription shipment

7    data.

8              Do you see that?

9         A.    Yes.

10        Q.    Do you know who prepared this

11   document?

12        A.    I do not, no.

13        Q.    It was not you or your staff as

14   far as you know?

15        A.    It was not me or my -- it

16   certainly was not me.  I do not believe it

17   was my staff.

18        Q.    So on the top of page 12, it

19   says:  The Drug Enforcement Agency, DEA,

20   provides data on shipments of prescription

21   opioids over time and across geographies.

22   This appendix describes the source of these

23   data and the steps taken to process and set

24   up the data for analysis.

25              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.      Yes.

 2          Q.      Then also on page 12, we'll get

 3   to this later, but it shows the DEA drug

 4   codes and names in the ARCOS data which are

 5   at the molecule level.

 6          A.      That's right.

 7          Q.      And that was why you couldn't

 8   separate out the Schedule IIIs, as we

 9   discussed?

10          A.      That's correct.

11          Q.      And then if you turn to

12   page 13, the next page.

13          A.      Yeah.

14          Q.      Sorry, it's actually on

15   page 14.  That's my errata.

16                  Do you see the section mapping

17   shipments from three-digit ZIP codes to

18   counties?

19          A.      Yes, I do.

20          Q.      It says:  As noted above, the

21   most detailed geographic area reported in the

22   public ARCOS reports is the three-digit ZIP

23   code.  Three-digit ZIP codes are based on the

24   first three digits of standard U.S. postal

25   ZIP codes.  These areas typically, but not

1    exclusively, span across more than one county

2    and thus are not directly comparable to the

3    county level of data available for mortality,

4    crime and geographic -- I'm sorry, crime and

5    demographic and economic statistics.

6                Do you see that?

7        A.    I do.

8        Q.    And were you aware of that

9    issue?

10       A.    I was at one level.  I had

11   forgotten that there was a cross-walk from

12   three-digit ZIPs, which themselves, again,

13   are geographic areas that vary in terms of

14   how big they are.

15       Q.    Do you know how Cuyahoga County

16   compares to the three-digit ZIPs that are

17   reflected in the ARCOS data for that area?

18       A.    I'm sorry, I do not.

19       Q.    Do you know how Summit County

20   compares to the three-digit ZIPs for that

21   part of Ohio?

22       A.    No, I did not.

23       Q.    And if you look at page 15, it

24   says:  In order to link the ARCOS shipments

25   data to the other county data, we have

Highly Confidential - Subject to Further Confidentiality Review

1    allocated shipments based on the weighted

2    average population of census block centroids,

3    center points that fall within each county

4    that a three-digit ZIP code crosses.  And

5    then this means that when a three-digit ZIP

6    code crosses county boundaries, we use the

7    population at the census block level to

8    estimate the share of population across

9    counties for the three-digit ZIP.

10              Do you see that?

11       A.    I do.

12       Q.    An underlying assumption to

13  this approach is that the shipments per

14  capita within a three-digit ZIP code are the

15  same across census blocks.

16              Do you see that?

17       A.    Yes.

18       Q.    And when it says "we have

19  allocated," do you know who did that work?

20       A.    Compass Lexecon, but I don't

21  know who in particular.

22       Q.    And did you do anything to test

23  Compass Lexecon or whomever's underlying

24  assumption that shipments per capita within a

25  three-digit ZIP code are the same across

Highly Confidential - Subject to Further Confidentiality Review

 1    census blocks?

 2         A.    I did not, no.  I don't think

 3    it's possible to do that with these data

 4    because there aren't census block level data

 5    in ARCOS.

 6         Q.    And then they explain their

 7    methodology below with the mathematical

 8    formula of how they allocated ARCOS drug

 9    shipment totals to the counties based on

10    population share?

11         A.    That's right.

12         Q.    And that's not an analysis

13    you've seen before?

14         A.    I'm sorry, what do you mean?

15    I've seen this data appendix.

16         Q.    Have you seen the analysis for

17    how Compass Lexecon allocated ARCOS shipments

18    to the counties?

19         A.    I guess I don't know what you

20    mean by "seen."  I understand that they

21    allocated based on population using this

22    formula, so have I seen the individual

23    calculations, is that what you're asking?

24         Q.    Correct.

25         A.    No, I have not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And you would agree that

2    just because a product is shipped to certain

3    counties does not mean it's consumed there?

4              MR. SOBOL:  Objection, asked

5         and answered.

6    A.    I think as explained in -- in

7    the Cutler report, and Gruber may have said

8    it also, to the extent that shipments are

9    moving from one county to another, this

10   regression methodology will -- it will just

11   contribute to noise essentially in the

12   regression.

13             So it's -- that -- the fact

14   that there may be understatement of shipments

15   in Ohio -- I think that's the premise here --

16   because there's overstatement somewhere else

17   because they moved from one place to another,

18   that itself won't bias this analysis.  It may

19   create some noise.

20   BY MR. ROTH:

21   Q.    What is your basis for thinking

22   there's an understatement of shipments to

23   Ohio in the ARCOS data?

24   A.    Well, again, it's really

25   reading Cutler and Gruber's reports and the

Highly Confidential - Subject to Further Confidentiality Review

1    notion of the -- I guess it was the

2    Oxy Express, so the shipments go to Florida,

3    but they ultimately end up in Ohio and

4    Kentucky and places like that.

5         Q.    And have you done any analysis

6    as to how the Oxy Express influenced

7    consumption of prescription opioids in Ohio?

8         A.    No, I have not.

9         Q.    Do you agree that the census

10   data on population is not necessarily

11   connected to where opioids are consumed?

12        A.    Allocating shipments based on

13   population is a reasonable approach, and I

14   think, you know, as they say in footnote 24,

15   this is -- it's very common that we make such

16   geographic cross-walks just because the way

17   data are presented.  It's a reasonable basis

18   for allocating shipments in my opinion.

19        Q.    I understand you think it's a

20   reasonable basis.  I'm not asking that.

21             I'm just asking the factual

22   question.  Where the population is shown in

23   the census data is not necessarily correlated

24   to where the shipments are consumed?

25             MR. SOBOL:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Well, it almost --

2                  MR. SOBOL:  Asked and answered.

3          A.      It almost certainly is

4    correlated because you need peoples -- people

5    to have consumption, but exactly what the

6    relationship is, I can't say for sure.  But

7    again, it almost surely is a major factor in

8    determining where the consumption is.  It may

9    not be perfectly correlated.

10   BY MR. ROTH:

11         Q.      And people don't necessarily

12   consume prescription opioids in their homes,

13   right?

14                 MR. SOBOL:  Objection.

15         A.      Well, I don't think that that's

16   the -- that's the relevant question for my

17   analysis.  Again, I'm really looking at what

18   factors predict shipments here, so wherever

19   people consume them.

20   BY MR. ROTH:

21         Q.      But you understand that your

22   analysis is feeding into Professor Cutler's

23   analysis and Professor McGuire's analysis who

24   are trying to compute harms and damages

25   occurring within Summit and Cuyahoga County?

```
 1            A.      It's true, but the way my

 2    indirect analysis feeds into Professor

 3    Cutler's analysis is in the aggregate.

 4            Q.      If you turn to paragraph 84,

 5    that lists, I believe, all the variables you

 6    include in the indirect model; is that

 7    correct?

 8            A.      Yes.

 9            Q.      So you've got three categories,

10    demographic, economic and healthcare

11    variables.

12            A.      That's right.

13            Q.      Let's take those one at a time.

14            So the demographic variables

15    you include are essentially gender, male

16    versus female?

17            A.      Yes.

18            Q.      The percent in different age

19    groups set out in your report as to how you

20    divided them, it looks like into five

21    different age -- six different age group --

22    five different age groups?

23            A.      Sure.  Sorry, these are just

24    standard census categories.

25            Q.      Okay.  Another demographic
```

```
 1    factor you included is the percent of the

 2    population that is white, black and

 3    Hispanic --

 4         A.    Yes.

 5         Q.    -- so race.

 6               And then the share of the

 7    population in four different education

 8    groups, correct?

 9         A.    Yes.

10         Q.    And the percent of the county

11    identified as urban, correct?

12         A.    That's right.

13         Q.    And are all of those census

14    categories?

15         A.    I believe so, yes.  I think

16    they all come from the ASEC that we talked

17    about.

18         Q.    Okay.  And then in the second

19    category, economic variables, you included

20    the unemployment rate?

21         A.    Yes.

22         Q.    You included

23    employment-to-population ratio?

24         A.    Yes.

25         Q.    You included the distribution
```

Highly Confidential - Subject to Further Confidentiality Review

1     of employment by major industry sector?

2          A.     Yes.

3          Q.     You included median household

4     income?

5          A.     Yes.

6          Q.     You included the poverty rate?

7          A.     Yes.

8          Q.     And you included the county's

9     population?

10         A.     Yes.

11         Q.     And then for healthcare, you

12    only included two variables, correct?

13                MR. SOBOL:  Objection.

14                You can answer.

15         A.     Yes, I included two healthcare

16    variables.

17    BY MR. ROTH:

18         Q.     And one was the percentage of

19    the population without insurance, correct?

20         A.     That's correct.

21         Q.     And the second variable is the

22    number of cancer deaths, correct?

23         A.     That's correct.

24         Q.     Why did you include a variable

25    to account for the percentage of the

1    population without insurance?

2        A.    I included that variable

3    because I thought that there might be

4    relatively widespread coverage differences

5    across counties and that that might explain,

6    as I think we talked a little bit about

7    yesterday, the extent to which people go to

8    the doctor and therefore get a prescription,

9    and also, their likelihood of filling a

10   prescription.

11       Q.    Insurance coverage, though, is

12   not a variable you included in your direct

13   model?

14       A.    That's correct.  And I'm sure

15   we'll continue to come back to this, but the

16   cross-sectional variation, insurance coverage

17   is a lot more substantial across counties

18   than it is over time.

19       Q.    In your -- what I'll call

20   thought experiment, which we'll talk about in

21   a minute, you include as potentially

22   medically allowable prescriptions, surgery

23   and trauma; is that right?

24       A.    Yes.  I guess we'll discuss the

25   right words to describe that, but yes, so as

1    the potentially appropriate uses, something

2    like that I think is what I say, that

3    surgical and trauma conditions, yes.

4         Q.    But in your indirect model you

5    don't have any variables for either surgery

6    or trauma?

7         A.    I do not, no.

8         Q.    And why is that?

9         A.    Well, the data from the

10   healthcare utilization project that we

11   will -- we'll talk about later, those cannot

12   be disaggregated.  There are some state-level

13   data, but they're considered to not be

14   reliable for that purpose, so those are

15   national data only.

16             And ultimately, the trends in

17   those -- sorry, wrong question, I was

18   answering the direct model.

19             And ultimately, those factors,

20   the numbers there, I don't believe that we

21   have reliable estimates across counties over

22   the entire time period.

23        Q.    I'm a little confused because

24   you just said the surgery and trauma

25   figures --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yeah.

2    Q.    -- cannot be disaggregated, but

3    I thought in your last section you have a

4    disaggregation of potentially appropriate

5    MMEs for Summit and Cuyahoga that includes

6    trauma and surgery.

7    A.    Yeah, the HCUP data, those data

8    are not at the county level.  The other data

9    are at the county level, the Area Health

10   Resources File.  So I was distinguishing

11   between those two.

12            And in general, you can see,

13   when we get to the appropriate uses, that

14   the -- those trend downwards, and so even if

15   we were to include those in the model and

16   they had a cross-sectional relationship, it

17   would not cause the indirect estimate to be

18   increasing.

19   Q.    But you didn't actually include

20   those in the model?

21   A.    I didn't, no.

22   Q.    Did you consider any other

23   variables to include in any of the three

24   categories, demographic, economic or

25   healthcare, in your indirect model, aside

1    from the ones we've discussed?

2        A.    No, these are the variables --

3    these variables are based on previous

4    literature, all of those demographic and

5    socioeconomic variables come from an

6    assessment of what has been shown to be

7    associated with opioid use.

8        Q.    And what literature assessing

9    the variables associated with opioid use are

10   you relying on?

11       A.    Well, I don't think I have a

12   citation in here, so I don't know a specific

13   paper as I sit here.  Again, these are --

14   these are variables that economists studying

15   opioid use have used from the census data.

16            This is the source of data that

17   have been used by researchers.  I think most

18   of that literature is cited in Professor

19   Cutler's report.

20       Q.    Okay.  And is -- was the list

21   of variables you would use in your indirect

22   model a subject of discussion between

23   yourself and Professor Cutler?

24       A.    I can answer that if counsel

25   were present?

```
 1                  MR. SOBOL:  Well, yes or no.

 2          A.      Yes.

 3  BY MR. ROTH:

 4          Q.      So if you look --

 5                  MR. SOBOL:  You got so used to

 6          just running on that you forgot you

 7          could answer yes or no.

 8  BY MR. ROTH:

 9          Q.      If you look at page 25 of

10  Exhibit 22.

11          A.      Okay.  This is the data

12  appendix?

13          Q.      Yes.

14          A.      Yeah.  The Table 2?

15          Q.      Yes.

16                  So this is a table that

17  reflects economic and demographic variables

18  with data sources and years reported.

19          A.      Uh-huh.

20          Q.      And this is the shared

21  appendix, but I assume these are the

22  variables we've been discussing that you used

23  in your indirect regression?

24          A.      Yes, they are.

25          Q.      Okay.  So if you look at
```

Highly Confidential - Subject to Further Confidentiality Review

1    several of the rows, there's a shaded gray

2    bar that says Interpolated.

3              Do you see that?

4        A.    Yes, that's right.

5        Q.    And what does that mean?

6        A.    Well, some of the variables

7    come only from the decennial census, so we

8    have them for every ten years, so a linear

9    interpolation was used between those ten-year

10   points.

11       Q.    And how do you know it was a

12   linear interpolation?

13       A.    Well, I should read more

14   closely.  I believe it is a linear

15   interpretation, but my memory is not to be

16   trusted.

17       Q.    You know what, you're right.

18   Actually, it says that at the bottom of the

19   chart.  Interpolated values are a linear

20   interpolation between the preceding and

21   following measured value.

22       A.    Someone should do something

23   about that font size.

24       Q.    Who performed the linear

25   interpolation on the census data for the

Highly Confidential - Subject to Further Confidentiality Review

1    variables that were interpolated?

2         A.    I do not know the specific

3    individual.  These were constructed by

4    Compass Lexecon.

5         Q.    Did you consider picking a year

6    where you did not need to do interpolation,

7    such as the year 2000, as your baseline?

8         A.    No, I did not consider that.

9         Q.    Are you using interpolated

10   values for these variables in your 1997

11   baseline?

12        A.    Yes, I am.

13        Q.    Is it possible the interpolated

14   variables affect the baseline estimated

15   relationship between the explanatory

16   variables and shipments per capita per day?

17             MR. SOBOL:  Objection to form.

18        A.    These socioeconomic and

19   demographic variables change very slowly, and

20   I believe the linear interpolation method is

21   entirely appropriate.

22             I do not believe that they are

23   likely to cause any impact on my analysis,

24   but if any, they would be a source of

25   mismeasurement, which would dampen -- which

1    would basically cause noise, but not bias.

2    BY MR. ROTH:

3        Q.    Have you studied the linear

4    interpolation that was done and how it might

5    impact your analysis?

6        A.    Well, I'm not exactly sure how

7    one would study such a thing.  Again, we

8    undertake the interpolation because those

9    data were not captured in those years, so

10   there's not a gold standard to compare the

11   linear interpolation to.

12       Q.    But what you could do is pick a

13   year where no interpolation were needed and

14   compare the results from that year, say 2000,

15   against '97 with the interpolation?

16           MR. SOBOL:  Objection.

17       A.    Well, as we discussed earlier,

18   my effort was to undertake the

19   cross-sectional analysis in a year that was

20   unaffected by the alleged misconduct, and

21   1997, while imperfect, is a bit closer to

22   that.

23           2000 would be a time period in

24   which the alleged misconduct was well under

25   way, so I did not consider such an analysis.

1  BY MR. ROTH:

2      Q.    And when you say the alleged

3  misconduct was well under way in 2000, that's

4  based on your assumption that it started in

5  1995 as opposed to a review of actual

6  promotion that occurred between '95 and 2000?

7              MR. SOBOL:  Objection.

8      A.    Well, again, I am assuming that

9  plaintiffs' counsel will prove their case.

10  As you know, there's quite a bit of evidence

11  that I can't evaluate from a legal

12  perspective that I can see as a layperson

13  that suggests marketing messages related to

14  opioids were, in fact, dampening the sense of

15  the addictive properties of these drugs.

16              Whether or not that's unlawful

17  I can't say, but I can certainly see that

18  what the allegations describe was happening

19  during this period.

20  BY MR. ROTH:

21      Q.    Do you understand -- well,

22  strike that.  Let me ask it a different way.

23              Does your model assume that

24  unlawful detailing occurred even if that

25  detailing were solely based on FDA-approved

1    labels or marketing materials?

2              MR. SOBOL:  Objection, asked

3         and answered.

4         A.    Well, you're asking me to

5    assume a hypothetical in that case, I think,

6    that all marketing was based on FDA-approved

7    labels.

8    BY MR. ROTH:

9         Q.    I don't think so.  I think what

10   I'm asking is your model treats all of

11   defendants' promotion as unlawful based on

12   the assumption that you made based on the

13   instruction of counsel, correct?

14             MR. SOBOL:  Objection, asked

15        and answered.

16        A.    Yes.  I have been asked to

17   assume that plaintiffs will prove that in

18   sum, defendants' marketing was unlawful.

19   BY MR. ROTH:

20        Q.    Okay.  And if, in fact, a

21   defendant or subset of defendants only

22   promoted using FDA-approved labeling and/or

23   FDA-approved marketing materials, how does

24   your model address that?

25             MR. SOBOL:  Objection, asked

Highly Confidential - Subject to Further Confidentiality Review

1       and answered.

2       A.      I think you're asking me a

3  legal question, so I do not know whether such

4  a hypothetical would have -- would exclude

5  the possibility that the conduct was unlawful

6  in some other way.  I don't know.

7  BY MR. ROTH:

8       Q.      Just assume my hypothetical is

9  so, okay?  Don't fight the hypothetical.

10              If for a given defendant it is

11 proven that all promotion was solely based on

12 FDA-approved labeling and FDA-approved

13 marketing materials, your model still

14 includes those promotional contacts in

15 calculating the aggregate impact, correct?

16              MR. SOBOL:  Objection, asked

17       and answered.

18       A.      I guess I'm trying to

19 understand.  We've been talking about my

20 indirect model, which does not include a

21 measure --

22 BY MR. ROTH:

23       Q.      Yeah.  I'm back to the direct

24 for this question.  I'm back to direct for

25 this question.

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Going back to --

2          Q.      Let me reask it because we're

3     talking over each other.

4                  If for a given defendant it is

5     proven that all promotion was solely based on

6     FDA-approved labeling and FDA-approved

7     marketing materials, your direct model still

8     includes that defendant's promotional

9     contacts in calculating the aggregate impact,

10    correct?

11                 MR. SOBOL:  Objection, asked

12          and answered, misstates prior

13          testimony.

14         A.      I do not know whether a

15    hypothetical in which the marketing were

16    based solely on FDA-approved materials is in

17    any way in contradiction to the assumption

18    that that marketing can be proven unlawful.

19    That is a legal question, the answer to which

20    I do not know.

21    BY MR. ROTH:

22         Q.      Now if you turn to paragraph 81

23    of your report, and now we're back to the

24    indirect model.

25                 In paragraph 81, you say:

1    Based on these estimates of the relationship

2    between the economic, demographic and

3    healthcare characteristics of counties and

4    opioid sales before the opioid epidemic took

5    hold, the model can be used to predict opioid

6    sales using only changes in the X-i variables

7    over time.

8              Do you see that?

9    A.    I do.

10   Q.    And then you say:  A modified

11   version of this approach incorporates an

12   estimated secular trend also using data from

13   the pre-misconduct period.

14             Do you see that?

15   A.    I do.

16   Q.    So what is a secular trend?

17   A.    Secular trend here, it's

18   literally a linear trend that I calculate

19   using sort of a long series of pre-alleged

20   misconduct data.

21   Q.    That's based on the growth rate

22   in opioid sales from 1980 to 1995?

23   A.    That's correct.

24   Q.    And that trend would include

25   obviously only the molecules that were

1    approved and sold at that time, correct?

2         A.    By definition, yes.

3         Q.    And I think that would mean it

4    would include morphine, pethidine, oxycodone,

5    fentanyl and hydromorphone.

6              Does that sound right?

7              MR. SOBOL:  Objection.

8         A.    I am not a hundred percent sure

9    so I would have to actually look at the INCB

10   data.

11   BY MR. ROTH:

12        Q.    So do you know which molecules

13   are included in the secular trend and which

14   are not?

15        A.    The data from the INCB are like

16   the ARCOS data, they're at the molecule

17   level.  I just -- as I sit here, I can't

18   remember, but the analysis was done to

19   include the analogous products, recognizing

20   that there are new entrants that happen after

21   1995.

22        Q.    Do you know whether or not the

23   INCB data from 1980 to 1995 includes

24   hydrocodone?

25        A.    I do not as I sit here.

1        Q.      Do you know whether the INCB

2    data from 1980 to 1995 includes propoxyphene?

3        A.      I -- as I sit here, I do not.

4    I'm trying to remember if it's actually in my

5    Appendix D.

6        Q.      If it is, I'm happy to look at

7    it.  I don't --

8        A.      Yeah.

9        Q.      -- know if it is or not.  It

10   may also be in that data appendix I gave you.

11            But so we don't get bogged down

12   on it --

13       A.      Sure.

14       Q.      -- it's fair to say, whatever

15   drugs are listed in the INCB data from 1980

16   to 1995 are included in the secular trend,

17   correct?

18       A.      I believe so, yes.

19       Q.      And any drugs that are not

20   listed in that data are not included in the

21   secular trend?

22       A.      I think that's right, yes.

23       Q.      And if any of the opioids not

24   included in the secular trend grew at a

25   faster rate than those included, your

1    indirect model would not fully account for

2    the intended market-expanding effects of

3    promotion for those molecules?

4              MR. SOBOL:  Objection.

5         A.    Again, adding the secular trend

6    in my opinion is very conservative here to

7    begin with.  My intent was to capture all the

8    relevant molecules, basically those that map

9    to the market that I'm looking at post 1995,

10   recognizing that there are changes over time.

11             And so this secular trend in my

12   indirect model is intending to capture

13   defendant -- non-defendant, sorry,

14   promotion -- that's an important verbal

15   errata.

16             So as already, because some of

17   the defendants may be involved in that early

18   data, they may be picking up some of the

19   alleged misconduct, if some of it occurs

20   before 1995, I think I'm not as concerned

21   about underestimating that trend.

22   BY MR. ROTH:

23        Q.    But just so I understand, if

24   the opioids omitted from the secular trend

25   grew at a faster rate than the included

Highly Confidential - Subject to Further Confidentiality Review

1    molecules, your indirect model would fail to

2    account for the intended market-expanding

3    effects of non-defendant promotion?

4                MR. SOBOL:  Objection, asked

5         and answered.

6         A.      Again, I believe that I

7    included the molecules that were appropriate

8    for inclusion.  I don't know that there are

9    any that should have been included that

10   weren't.

11               My intention was to capture the

12   set of molecules that -- that were similar --

13   were basically the available alternatives

14   over that period to -- as opioid analgesics.

15   And if there -- I guess if there were any

16   that are omitted, I could identify those and

17   adjust the trend if need be.

18   BY MR. ROTH:

19        Q.      Before your post-estimation

20   secular trend and aggregate price

21   adjustments, are your predicted values of

22   shipments per capita per day influenced only

23   by changes in the demographic, economic and

24   healthcare explanatory variables?

25        A.      I don't know what you mean by

Highly Confidential - Subject to Further Confidentiality Review

1    "only," but the -- as you can see in Table 4,

2    there are a number of significant

3    relationships across those demographic,

4    socioeconomic and healthcare variables, and

5    there are about 20 variables included there

6    in total.

7        Q.      And since you've directed me to

8    Table 4, what does it mean, "no obs," is that

9    number of observations, 404?

10       A.      Yes, I'm sorry.  We're not very

11   generous with our shorthand, are we?  Yes,

12   that's the number of observations.

13       Q.      What does that mean exactly?

14       A.      That's the number of counties

15   in the sample.

16       Q.      Okay.  And the R-squared of the

17   indirect model is 33%?

18       A.      That's correct.

19       Q.      Which is not 99.6%.

20       A.      As I note in the chapter,

21   cross-sectional regressions never have the

22   same R-squared as time series analysis.

23       Q.      Did you consider the prediction

24   intervals for your predicted shipments per

25   capita per day?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      What do you mean by the

2    prediction intervals?

3      Q.      Yeah.  Did you consider upper

4    and lower bounds for your predictions?

5      A.      You mean by setting the

6    independent variables to extreme levels?  I'm

7    still not sure what you're talking about.

8      Q.      Yeah, I think that's right.

9      A.      I did not look at trying to

10   predict out of sample.  I'm interested in

11   using these variables to be able to then take

12   the trends in the underlying demographic,

13   socioeconomic and healthcare factors and

14   predict forward in the ranges that those

15   variables hold.  So I did not look at extreme

16   values.

17     Q.      Okay.  If you look at

18   paragraph 88, you talk about how you adjusted

19   for price impact in the indirect model?

20     A.      Yes.

21     Q.      And then you say:  There's

22   little county-level variation in opioid

23   prices so this variable does not appear in

24   the cross-sectional model, despite the fact

25   that my direct model shows a small but

1    significant negative effect of price on sales

2    over time.

3              Do you see that?

4    A.    I do.

5    Q.    And what is your basis for the

6    statement that there's little county-level

7    variation in opioid prices?

8    A.    That's based on my knowledge

9    and experience as a health economist who has

10   done a lot of work on pharmaceutical pricing.

11   As you may know, pharmaceutical manufacturers

12   report list prices, and those list prices are

13   the basis for retail transaction prices.

14   Q.    AWP?

15   A.    AWP.

16   Q.    Have you done any analysis

17   specific to opioid products and potential

18   price variation across counties?

19   A.    I have not calculated that

20   variation in this matter, no.

21   Q.    And in your direct model you

22   acknowledge there is a small but significant

23   downward effect of price on sales over time?

24   A.    Yes, which is why I adjust for

25   it here.

1    Q.    And how do you adjust for it?

2    That's how you described it in paragraph 88,

3    by changing the estimated coefficient on the

4    drug price index?

5    A.    So I used the estimated

6    coefficient from the direct model and then

7    the trend in prices in order to project that

8    price effect.

9    Q.    So you use your direct model's

10   output for the price coefficient, and then as

11   you say, adjust for the trend in prices?

12   A.    That's correct.

13   Q.    Okay.  Can we agree generally

14   that omitted variables can cause bias in

15   regression analyses?

16   A.    The concern about omitted

17   variables is a ubiquitous one in any

18   econometric analysis.  I believe that I have

19   appropriately captured the most important

20   variables in my analysis.

21   Q.    And do you agree that to the

22   extent that other factors not modeled in the

23   baseline regression contributed to increases

24   in opioid shipments, the indirect approach

25   has the potential to overstate the impact of

Highly Confidential - Subject to Further Confidentiality Review

1    promotion on shipments?

2              MR. SOBOL:  Objection, asked

3         and answered.

4         A.    I'm not aware of any variables

5    that should be in the model that would make a

6    substantial effect here.  If such a variable

7    existed, it could affect the calculations in

8    the way that you suggest.

9    BY MR. ROTH:

10        Q.    Okay.  You did not include a

11   variable reflecting the number of military

12   veterans in the counties, did you?

13        A.    No, I did not.

14        Q.    Do you agree the number of

15   veterans in a county could increase the

16   amount of MMEs sold?

17        A.    I don't know as I sit here

18   whether that's a reasonable thing to posit.

19        Q.    You've not looked at any

20   literature as to whether veterans require

21   more opioids than other citizens?

22        A.    I have not, and you have to

23   keep in mind that there are a number of other

24   variables in the model that will be

25   correlated with the number of military

Highly Confidential - Subject to Further Confidentiality Review

1   veterans or any other sociodemographic group,

2   if that's appropriate to call military

3   veterans a sociodemographic group, such as

4   the educational distribution, ages, those

5   things may well pick up some effects, if any

6   exist.

7           Q.      Okay.  But you didn't include

8   veterans specifically?

9           A.      I did not.

10          Q.      You did not include a variable

11  reflecting the number of doctors in the

12  county, correct?

13          A.      I did not include a variable

14  reflecting the number of doctors in the

15  county.

16          Q.      Can we agree that the number of

17  doctors in a county can affect the amount of

18  MMEs prescribed and sold in that county?

19          A.      It's possible, but again, the

20  variables that are included in my model I

21  believe would be correlated with the number

22  of doctors in a county, so rurality, for

23  example, will be correlated with the number

24  of doctors, the percent uninsured will be

25  correlated with the number of doctors, and I

Highly Confidential - Subject to Further Confidentiality Review

1    believe the included variables in my model

2    are sufficient to pick up those effects.

3        Q.    Okay.  You did not include a

4    variable reflecting the number of hospitals

5    in a county?

6        A.    I did not include a variable

7    reflecting the number of hospitals in the

8    county, and again, I believe the demographic

9    and socioeconomic variables in my model will

10   be correlated with the presence of hospitals,

11   and therefore I am not concerned about the

12   bias from that exclusion.

13       Q.    Would you agree the number of

14   hospitals in a county could influence the

15   amount of MMEs prescribed and sold in that

16   county?

17       A.    I believe as a factor it could

18   have some effect, and that the variables that

19   I include in my model will be sufficiently

20   correlated with that, that the omission of

21   the number of hospitals will not bias my

22   results.

23       Q.    You did not include a variable

24   reflecting the number of pharmacies in a

25   county?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I did not include a variable

2    reflecting the number of pharmacies, and like

3    any other measure of economic activity, I

4    believe that will be strongly correlated with

5    the socioeconomic variables that I do include

6    in my model.

7    Q.    Would you agree that the number

8    of pharmacies in a county may increase the

9    amount of MMEs shipped to that county?

10    A.    Ignoring the fact that the

11    other factors that I include may well account

12    for that effect as an independent matter, the

13    number of pharmacies may affect the number of

14    shipments in a county.

15    Q.    Did you include a variable on

16    the incidence of cancer in a county?

17    A.    I included cancer deaths rather

18    than cancer incidence.

19    Q.    And is it your view that cancer

20    deaths is a sufficient proxy for the

21    incidence of cancer?

22    A.    Well, of course, cancer deaths

23    will be substantially correlated with cancer

24    incidence, and I included cancer deaths on

25    the premise that opioids are indicated for

Highly Confidential - Subject to Further Confidentiality Review

1    end-of-life cancer treatment.

2         Q.    Do you understand that opioids

3    may be indicated for cancer pain even if it's

4    not at end of life?

5         A.    I understand that according to

6    clinical experts there are certain cases

7    where opioids may be indicated for cancer

8    pain.

9         Q.    Do you agree that cancer

10   incidence may increase the amount of MMEs

11   shipped to a county?

12        A.    Actually, I was -- it is

13   possible that cancer incidence does correlate

14   with the number of MMEs per county, but very

15   unlikely to me that adding cancer incidence

16   to a model that has cancer deaths would

17   contribute anything to explaining the

18   variation in county-level shipments.

19        Q.    You did not include a variable

20   reflecting the number of individuals eligible

21   for a pharmacy benefit through their insurer

22   in a county?

23        A.    I did not include a variable

24   reflecting the number of individuals eligible

25   for a pharmacy benefit in the county.  Again,

Highly Confidential - Subject to Further Confidentiality Review

 1    I believe that in particular, the percent

 2    uninsured will summarize the accessibility to

 3    coverage and that adding the pharmacy benefit

 4    piece will contribute very little given the

 5    more than 90%, I think more than 95% of

 6    people who have insurance also have a

 7    pharmacy benefit.

 8         Q.    But as we spoke about

 9    yesterday, the parameters of insurance

10    coverage including a pharmacy benefit can

11    influence the prescription and utilization of

12    opioids?

13              MR. SOBOL:  Objection.

14         A.    While it may be true for an

15    individual patient, you can see that my

16    percent uninsured variable, is not

17    statistically significant in this model, so

18    again, accounting already for the population

19    characteristics, the socioeconomic

20    characteristics of the county, percent

21    uninsured, which is clearly the first order

22    measure, does not add any -- anything to this

23    model in terms of explanatory value, and so

24    getting even more granular than that I

25    believe would not change the model.

1    BY MR. ROTH:

2        Q.    You did not include a variable

3    reflecting the existence or number of pill

4    mills in a county.

5        A.    I did not include a variable

6    reflecting the existence of pill mills.  I

7    think to control for that does not make a lot

8    of sense to me, given that I believe it's --

9    that those may have been caused by the

10   alleged misconduct.

11             Moreover, as with other

12   variables not included of that supply side

13   nature, I believe the socioeconomic variables

14   are likely to explain a great deal of the

15   variation in the existence of pill mills.

16       Q.    So is it your position that the

17   manufacturers' promotion created the

18   diversion of prescription opioids through

19   pill mills?

20             MR. SOBOL:  Objection to the

21        form.

22       A.    I have not offered that

23   opinion, but you asked me as to whether I

24   would consider -- well, you asked me whether

25   I included pill mills and my first reaction

Highly Confidential - Subject to Further Confidentiality Review

1    is that I would not consider that to be an

2    appropriate variable to control for because

3    it would essentially say, oh, yeah, this

4    is -- this is expected.  These pill mills are

5    expected, and only changes in opioid

6    prescribing outside of the pill mills would

7    be subject to recovery.

8              As I understand the

9    allegations, I would be very surprised if

10   that would be an appropriate assumption.

11        Q.    So in your view, you think the

12   manufacturers should be responsible for the

13   illegal prescription of opioids through pill

14   mills?

15             MR. SOBOL:  Objection.

16        A.    I think you've gone a little

17   too far, but in my view, I wouldn't just

18   include such a variable like that without

19   better understanding exactly what plaintiffs

20   intend to prove.

21   BY MR. ROTH:

22        Q.    Do you agree that the existence

23   of pill mills can increase the amount of MMEs

24   shipped and utilized in a county?

25        A.    I believe that that is the

Highly Confidential - Subject to Further Confidentiality Review

1    concern with pill mills.  Perhaps by their

2    derogatory name, that is my presumption, that

3    they do, in fact, make opioids more available

4    than they otherwise would be.

5         Q.    And more broadly, you did not

6    include any variable reflecting the existence

7    or volume of illegal prescribing in the

8    county?

9              MR. SOBOL:  Objection.

10        A.    I do not have a variable on

11   illegal prescribing in the county, no, I do

12   not.  And I would have the same concern about

13   the extent to which that is to be considered

14   an independent factor.

15   BY MR. ROTH:

16        Q.    You don't have a variable for

17   formulary placement of opioids in the

18   indirect model?

19        A.    Did we not cover that?

20        Q.    We covered pharmacy benefits.

21        A.    Oh, I'm sorry.  I have not

22   included a formulary measure and I'm not

23   sure -- entirely sure what you mean by that.

24   But I would say again, given that the percent

25   uninsured, which is the first order measure

Highly Confidential - Subject to Further Confidentiality Review

1    of coverage and accessibility is not

2    statistically significant in my model, I

3    would not anticipate a more nuanced measure

4    of the nature of coverage to affect my

5    results.

6          Q.    You did not include a variable

7    to account for the introduction of Medicare

8    Part D in your model?

9          A.    Well, the indirect model is a

10   cross-sectional model of 1997, which is a

11   number of years in advance of Medicare

12   Part D.  And again, given that the percent

13   uninsured seems to have no relationship in

14   the cross-section to opioid use, then

15   Medicare Part D would not play a role in the

16   model.

17         Q.    You did not include a variable

18   for promotion by non-defendants in the model,

19   correct?

20         A.    My time trend, as I describe

21   it, was intended to proxy for that, but --

22         Q.    Right.  So you have a separate

23   secular trend.

24         A.    Yes.

25         Q.    You don't have it as a separate

Highly Confidential - Subject to Further Confidentiality Review

1   variable.

2       A.      That's right, it's not a

3   separate variable, and that's why I include

4   the time trend.

5       Q.      Are you aware that

6   non-defendant promotion accounts for

7   approximately 32% of the promotional contacts

8   in the IPS data, on a national level?

9       A.      I'm hoping somewhere that's in

10  my report.  I'm willing to believe you.  We

11  certainly calculated that figure.

12      Q.      Okay.

13      A.      I just don't want to go back to

14  the dreaded Table C.

15      Q.      Yeah, we may later, but we'll

16  stop for now on there.

17      A.      Okay.

18      Q.      All of the variables we just

19  discussed that you excluded from your

20  indirect model are likewise excluded from

21  your direct model?

22          MR. SOBOL:  Objection.

23      A.      The variables that we discussed

24  do not appear in my direct model, and the

25  direct model as an aggregate time series

Highly Confidential - Subject to Further Confidentiality Review

1    model has different considerations in terms

2    of what variables are appropriate to include.

3    BY MR. ROTH:

4         Q.     And because you did not include

5    any of the excluded variables just discussed

6    in your indirect model, you did not expressly

7    measure the impact of those variables on the

8    sales of opioids in Cuyahoga or Summit

9    Counties?

10             MR. SOBOL:  Objection, asked

11        and answered.

12        A.     While that is tautologically

13   true, it is the case, as I started when we

14   were talking about omitted variable bias,

15   that it's always possible to add more

16   variable to a model, and that is not -- that

17   is not good without limit.

18   BY MR. ROTH:

19        Q.     Well, I understand you don't

20   want to add variables forever, but at what

21   point does the number of variables in an

22   indirect regression render the regression

23   unstable?

24        A.     Well, it would depend on the

25   correlation among those variables.

Highly Confidential - Subject to Further Confidentiality Review

 1                    (Whereupon, Deposition Exhibit

 2              Rosenthal-23, Case and Deaton

 3              Publication, was marked for

 4              identification.)

 5     BY MR. ROTH:

 6          Q.    Okay.  Let me mark as

 7     Exhibit 23 an article by Case and Deaton

 8     entitled Mortality and Morbidity in the 21st

 9     Century.

10                    MR. ROTH:  We're finding one

11              for you.

12                    (Comments off the stenographic

13              record.)

14                    MR. SOBOL:  Sounds like a

15              fairly narrow topic for a paper.

16                    MR. ROTH:  Why don't we take a

17              quick break.  We'll look for the copy.

18                    THE WITNESS:  Okay.

19                    THE VIDEOGRAPHER:  The time is

20              10:16 a.m., we're now off the record.

21                    (Discussion off the record.)

22                    THE VIDEOGRAPHER:  The time is

23              10:16 a.m.  We're back on the record.

24     BY MR. ROTH:

25          Q.    That's pretty efficient.

Highly Confidential - Subject to Further Confidentiality Review

1        A.      That was very efficient.

2        Q.      So do you have the Case and

3    Deaton article in front of you?

4        A.      I do.

5        Q.      And if you look at page 444.

6        A.      These economics articles are

7    very long.

8        Q.      I think you cite this article

9    in your report, do you not?

10       A.      I think I do, yes.

11       Q.      Okay.  Page 444, there's a

12   comment from a friend.

13               Do you see that?

14       A.      I do.

15       Q.      And that's Professor Cutler,

16   who is a co-expert with you and your

17   colleague at Harvard?

18       A.      Yes, that's correct.

19       Q.      And so if you look at his

20   comments on the next page, 445, starting in

21   the middle of the page where he's talking

22   about the article, he says:  Their overall

23   suggestion is very much in the tradition of

24   ?mile Durkheim:  People despair when their

25   material and social circumstances are below

Highly Confidential - Subject to Further Confidentiality Review

1   what they had expected.  This despair leads

2   people to act in ways that significantly harm

3   their health.  This may have a direct impact

4   on death through suicide or an indirect

5   impact through heavy drinking, smoking, drug

6   abuse, or not taking preventative medications

7   for conditions such as heart disease.  At

8   root is economic and social breakdown.  This

9   explanation is certainly correct.

10              Do you see that?

11      A.      I do.

12      Q.      And what variables in your

13  indirect model address the despair points

14  that Professor Cutler is talking about?

15      A.      Professor Cutler and Case and

16  Deaton, they're talking about mortality.

17  They're not talking about the use of opioids.

18      Q.      Well, except that he says that

19  despair can lead people to abuse drugs.

20      A.      Yes, but it's quite a bit

21  different.  So they're talking about the

22  mortality effects, which go beyond the use of

23  drugs.

24              As we've discussed somewhat

25  over the last day and a half, the use of

 1    opioids in and of itself doesn't lead

 2    everyone to die from an overdose.  There's

 3    tolerance and addiction, and all along that

 4    chain, there are different factors that may

 5    contribute to who actually dies of an

 6    overdose.  So this -- this paper is really

 7    trying to get at the mortality results.

 8              And moreover, the socioeconomic

 9    variables included in my model have much to

10    do with this idea of the expected material

11    and social circumstances, has to do with

12    employment, whether people are in the labor

13    force.  All of those socioeconomic variables

14    capture those factors.

15         Q.    But you don't include any

16    variable, for example, on the incidence of

17    depression in the counties?

18              MR. SOBOL:  Objection.

19         A.    I do not include a variable on

20    the incidence of depression.  I have no

21    reason to believe that that would predict

22    opioid use.

23    BY MR. ROTH:

24         Q.    You don't include any variable

25    on the incidence of alcoholism in the

Highly Confidential - Subject to Further Confidentiality Review

1  counties?

2       A.     I do not include a variable on

3  the incidence of alcoholism, nor would I

4  expect it to predict opioid use.

5       Q.     You don't think that alcohol

6  use is correlated with opioid use?

7       A.     Whether individuals who are

8  likely to use opioids have some of the same

9  personal characteristics as those

10 individuals, that may well be true.  But my

11 demographic and socioeconomic factors are

12 also capturing those underlying issues that

13 may be, according to this notion, that the

14 economic status of people is really what's

15 driving the addiction tendencies, and those

16 are the variables that I include in my model.

17      Q.     And similarly, you don't

18 include any variable in your -- either of

19 your regression models related to drug abuse

20 in the counties?

21           MR. SOBOL:  Objection.

22      A.     If you think about my indirect

23 model, predicting shipments to have drug

24 abuse on the right-hand side would make very

25 little sense if the shipments caused the drug

Highly Confidential - Subject to Further Confidentiality Review

1    abuse.

2    BY MR. ROTH:

3         Q.    Well, there are drugs other

4    than opioids in the world that are abused,

5    right?

6         A.    That may be true.  Again, as a

7    broader matter, the demographic and

8    socioeconomic variables that I do capture in

9    my model are essentially the way Case and

10   Deaton look at this as well as these being

11   the predictors of ultimately what contributes

12   to mortality.

13              MR. ROTH:  Okay.  Why don't we

14        take another quick break.

15              THE WITNESS:  Okay.

16              THE VIDEOGRAPHER:  The time is

17        10:21 a.m.  We're now off the record.

18              (Recess taken, 10:21 a.m. to

19        10:34 a.m.)

20              THE VIDEOGRAPHER:  The time is

21        10:35 a.m., and we're back on the

22        record.

23   BY MR. ROTH:

24        Q.    So sticking with your indirect

25   model.

1     A.     Okay.

2     Q.     So we talked about a couple of

3  times now how because the ARCOS data is at

4  the molecule level, you couldn't back out the

5  Schedule III opioids; is that right?

6     A.     That's right.  In those two

7  molecules that have a mix, right?

8     Q.     And your report says you don't

9  believe this impacts the model because it

10 affects only less than 2?% of shipments, and

11 then you further clarified actually that it's

12 less than 1%.

13          Did I hear that right?

14    A.     Right.  So it's less than 2?%

15 of shipments in those molecules -- I'm

16 actually trying to look for the text.  Do you

17 have that paragraph?

18    Q.     It's paragraph 83.

19    A.     Okay, great.  Thank you.  Less

20 than 2?% of the shipments in those molecules

21 that have a mix of Schedule II and Schedule

22 III, and that's hydrocodone and codeine, I

23 believe, are the two molecules that are

24 relevant.

25    Q.     And did you test how removing

Highly Confidential - Subject to Further Confidentiality Review

 1    all of the Schedule III opioids from the
 2    ARCOS data would impact your model?
 3         A.    I don't believe so, no.  I
 4    mean, I assume what you mean is overremoving
 5    since in the ARCOS data I couldn't
 6    distinguish, but removing the molecules that
 7    have any Schedule III, is that what you're
 8    asking?
 9         Q.    Right?
10         A.    Yeah.  That, I did not test.
11         Q.    And we established you used
12    1997 as your baseline, right?
13         A.    That's correct.
14         Q.    So I assume your assumption is
15    that the relationship between demographic,
16    economic and healthcare variables for 1997
17    holds for all future years?
18         A.    That is the basic assumption of
19    the indirect model in general, is that the
20    cross-sectional relationships are stable, and
21    just the variation in those variables changes
22    over time.
23         Q.    Do you know what the
24    rescheduled Schedule III opioids were as a
25    percentage of sales in 1997?

1    A.    When you say rescheduled,

2    you're just talking about hydrocodone?

3    Q.    Well, let me reask the

4    question.

5    A.    Sure.

6    Q.    Do you know what the percentage

7    of sales Schedule III opioids were in 1997?

8    A.    If -- I'm sorry.  I don't know

9    that I understand the question because I know

10   the answer to a version of that question,

11   which I think is the relevant one.

12        The percentage of the included

13   molecules that are Schedule III that I can't

14   pull out is 2?%.

15   Q.    In 1997?

16   A.    In 1997, yes.

17   Q.    Okay.  What about the rest of

18   the Schedule III, that later became Schedule

19   II on the rescheduling, what was their

20   percentage of sales in 1997?

21   A.    So now we're talking about

22   hydrocodone rescheduling?

23   Q.    Correct.

24   A.    I have not assessed that.

25   Again, as we talked about yesterday, I've

Highly Confidential - Subject to Further Confidentiality Review

1    been asked to assume that hydrocodone should

2    be included in my measure of impact for the

3    whole period.

4         Q.    And how would it affect the

5    results of your indirect regression if the

6    percentage of Schedule III molecules in the

7    sales data changes over time?

8         A.    I don't think it would affect

9    the results.  I mean, I think, again, to the

10    extent that it has an effect, it's a -- it's

11    a level effect.

12             For such a small quantum that's

13    in my analysis, the Schedule III drugs, it's

14    just next to impossible that it has any

15    effect on the coefficients.  It overstates

16    the set of molecules, the number of MMEs, and

17    that effect I know also is small.  It's less

18    than 1% of MMEs.

19             In terms of the rescheduling of

20    hydrocodone, I haven't quantified that, so as

21    I sit here, I can't tell you.  Again, I

22    believe if it has an effect and if it's

23    deemed, for example, that hydrocodone should

24    only be included when it was Schedule II and

25    not when it was Schedule III, then those MMEs

Highly Confidential - Subject to Further Confidentiality Review

1    would just be backed out of the levels.

2         Q.    Okay.  If we look back at

3    Table 5 on page 61.

4         A.    Yes.

5         Q.    How does the volume of MMEs

6    that you derive from your indirect regression

7    compare to the volume of MMEs you derived in

8    your direct regression?

9         A.    The total volume, because I'm

10   looking at the large counties here, they're

11   about two-thirds of the national total, so it

12   essentially should be about two-thirds.

13   Again, these are annual numbers and I use

14   monthly numbers as inputs into my direct

15   analysis.

16        Q.    And when you say you're looking

17   at the large counties, can you explain that?

18        A.    Sure.  The ARCOS data that I

19   used for the indirect model is the large

20   county sample, so these are counties with

21   populations of 100,000 or more.

22        Q.    So it's not limited to Cuyahoga

23   and Summit specifically?

24        A.    That's correct.

25        Q.    How do the peaks in the MMEs

1    compare between the indirect regression and

2    the direct regression?

3         A.    Do you mean in the but-for or

4    in the actual?

5         Q.    Well, in the -- looking just --

6    I'll be more clear.

7                In looking at Table 5, it looks

8    like the highest volume of total MMEs is

9    actually in 2011.

10               Do you see that?

11        A.    Yes, I mean, 2010 and 2011 are

12   very similar, but it is slightly higher.

13        Q.    Right.  And I'm just trying to

14   square that with your direct regression which

15   found that there was this era turning point

16   in 2010 that resulted in a decline after

17   that.

18        A.    Well, let's have a look at when

19   the peak MMEs are as opposed to when I

20   estimate the erosion begins to happen.

21               So I'm just looking at

22   Figure 2.  So the absolute peak is in 2011,

23   but if you look at 2010, again, it's just a

24   bit below 2011.  There's sort of a flat spot

25   at the top of the curve there, so...

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Okay.  So in both regressions,
 2   the peak is actually in 2011?
 3        A.    Yeah, I think the peak is in
 4   2011.
 5        Q.    And you agree, based on the
 6   results of your direct regression, that
 7   defendants' promotion for opioids had less
 8   effect after 2010?
 9        A.    According to my model, the
10   incremental effect of promotion began
11   declining in late 2010, yes.
12        Q.    Is it the case that the
13   majority of the conduct influencing the
14   but-for number in your direct model occurred
15   before 2010?
16        A.    I'm just trying to think about
17   what's the right way to answer that question.
18   You're talking -- we're talking about the
19   direct model now?
20        Q.    Correct.  Well, here's my sort
21   of question.  So you've got conduct over
22   time, right?
23        A.    Yes.
24        Q.    Starting in '95, right?  And
25   we've got a growing stock of promotion.
```

1    We've been around all those issues.

2              So is it fair to say that given

3    the parameters of your direct regression,

4    your but-for model is being more heavily

5    influenced by the 1995 to 2009 details than

6    later details?

7         A.    It is true based on Model B

8    that those earlier detailing will -- I mean,

9    it has a longer time to compound effectively.

10             What the level of detailing is,

11   as you know, it's sort of up and down, so

12   it's not a strictly monotonic thing, given

13   that there were periods where the level of

14   detailing was lower.

15             But in general, the model

16   suggests that earlier detailing, because it

17   has longer time to contribute to sales, for a

18   given unit will have a bigger effect on the

19   total.

20        Q.    And you have not run any

21   regression model that attempts to show the

22   effect of defendants' promotion beginning in

23   2009 on prescriptions of opioids after that

24   time?

25        A.    Well, my model incorporates the

1    entire time period.  I haven't separately run

2    a model from 2009 forward.  I don't think it

3    would be appropriate to run a separate model.

4    One could use my model to run a but-for

5    scenario in the post-estimation sense.

6         Q.    But the issue there, though, is

7    that you still have all these details

8    from '95 to 2009 in your model, which have

9    continuing -- continuing impact after 2009?

10        A.    Well, just to be clear, I'm not

11   sure what your hypothetical is, but if I

12   wanted to know for some reason only what

13   impact detailing from 2009 or any other year

14   was from the present, I'd use the same model,

15   but I would say that actual and but-for

16   promotion are equal up until 2009, so not

17   attributing impact to those earlier details.

18              And then from that point on,

19   then I would reduce the promotional stock by

20   the amount of detailing that happened after

21   that time, so that would be the right way, if

22   for some reason one wanted to look at a

23   shorter time period.

24        Q.    And that's not an analysis

25   you've done so far?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      It's not, although I mention in

2   Table 3 that I could limit my analysis to

3   different time periods like that.

4       Q.      Okay.  Table 5 is measuring

5   annual estimates based on your indirect

6   method on an aggregate basis, correct?

7       A.      As per my assignment, I'm

8   looking at aggregate impact in this model as

9   I do in the direct model.

10      Q.      And it does not measure the

11  impact of any specific manufacturer's

12  promotion, the indirect model?

13      A.      Again, I have been asked to

14  calculate the aggregate impact, and because

15  there are spillover effects across

16  manufacturers, I believe here, as I did in

17  the direct model, that it is appropriate to

18  look not one defendant at a time, but to look

19  overall at the underlying issues.

20      Q.      You don't have any Table 3 or

21  related methodology for your indirect

22  regression, correct?

23      A.      I don't have a Table 3 for the

24  indirect method because, of course, it's

25  indirect, and Table 3, as we have talked

Highly Confidential - Subject to Further Confidentiality Review

1    about at length, generates a different set of

2    but-for assumptions by treating promotion

3    differently for the subset of defendants.

4         Q.    And you don't have any

5    IQVIA/IPS-type data for the indirect

6    regression that you could use to generate an

7    allocation the way you have for the direct

8    regression?

9         A.    Again, here, the promotion is

10   not directly measured by nature, so that

11   doesn't map to defendants in the way it did

12   in the direct model.  In -- and so I have not

13   thought about -- again, because it was not

14   part of my assignment, I have not thought

15   about allocating this to defendants.  I think

16   the logical way to do so might be based on

17   MMEs.

18        Q.    But you can't actually allocate

19   by MMEs in your indirect model either because

20   the ARCOS data is at a molecular level, not

21   at an NDC level?

22        A.    While that is true, I have the

23   IQVIA data for the same years that would

24   allow me to say within a molecule what share

25   is Purdue, et cetera.

1    Q.    So you'd have to use a

2   different dataset mapped onto your indirect

3   regression if you were to try to allocate the

4   indirect regression across and between

5   defendants?

6    A.    If such allocation were

7   necessary for whatever reason, I think that

8   would be the best way to do it.

9    Q.    But as we sit here today, you

10   have not done that work and you have no

11   opinion as to what that allocation would be

12   in your indirect regression?

13    A.    I have not offered an opinion

14   on that matter as you can see in my report.

15    Q.    Does your indirect regression

16   exclude opioid shipments by the

17   non-defendants?

18    A.    No, the indirect method is the

19   aggregate market, so it includes

20   non-defendants, and hence, the reason to

21   include that secular trend.

22    Q.    So when we look at these excess

23   shares, that's not just for defendants'

24   promotion, but it's for all promotion?

25    A.    These excess shares are

Highly Confidential - Subject to Further Confidentiality Review

1   analogous to the excess shares that are in

2   Table 2, which is they are the excess share

3   of opioid prescribing overall that is

4   associated with the misconduct, and again,

5   that's the relevant parameter that I need to

6   pass on to Professor Cutler.

7        Q.    And Professor Cutler didn't

8   actually use your indirect regression in the

9   body of his report; is that correct?

10       A.    I think in the body of his

11  report he uses the direct, and then he

12  replicates with the indirect in the -- one of

13  his attachments.

14       Q.    And did you have any

15  conversations with Professor Cutler about

16  that decision to use the direct in his main

17  analysis and address the indirect in an

18  attachment?

19       A.    No.

20       Q.    Do you know whether Professor

21  McGuire uses your indirect regression as an

22  input to his analysis?

23       A.    I do not.

24       Q.    Did you have any direct

25  conversations with Professor McGuire about

1   your analysis and how it would translate into

2   his analysis?

3        A.    Yes, at some point.

4        Q.    Okay.  And you understand that

5   there's an intermediate step between you and

6   Professor McGuire that is Professor Cutler's

7   analysis?

8        A.    Yes.  As a general matter, yes,

9   I understand how these fit together.

10       Q.    Okay.  Let's turn to Section X

11  on page 62.

12             So in Section X, the question

13  you pose in the heading is Does a Theory of

14  Undertreated Pain Explain the Growth in

15  Opiate Prescribing.

16             Do you see that?

17       A.    Yes.

18       Q.    And you say in paragraph 90:

19  As an alternative to the defendants'

20  marketing as being the explanation for much

21  of the rise in opioid prescribing in the

22  United States, I understand that some have

23  argued an alternative explanation that pain

24  was previously undertreated and that the

25  growth in opioid shipments is due either to

Highly Confidential - Subject to Further Confidentiality Review

1    the amount of pain in the United States

2    increasing over time, or more likely to the

3    amount of the opioids used to properly treat

4    pain increasing over time.

5              Do you see that?

6    A.    I do.

7    Q.    And then you say in

8    paragraph 91:  To test this hypothesis, I

9    note there is empirical research on the

10   prevalence of uncontrolled pain among cancer

11   patients and other patient groups that could

12   help us understand how much of the growth in

13   opioid shipments could, as a theoretical

14   matter, even possibly be attributed to using

15   more opioids to treat pain consistent with

16   medical evidence.

17             Do you see that?

18   A.    I do.

19   Q.    Then you've got a footnote that

20   cites to a few medical articles by

21   Dr. Portenoy, Dr. Cleeland, Dr. Donovan, a

22   Marks and Sachar article, and then I won't

23   even attempt to say the name of the last

24   author.

25             Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      I do.

2      Q.      And is there any other

3  empirical research on uncontrolled pain that

4  you reviewed in connection with your report

5  that supports the statement in paragraph 91 I

6  just read?

7      A.      Obviously these are the

8  articles that I rely on.  My point here is

9  simply to say that prior to the period of the

10  alleged misconduct, people were writing about

11  the concerns about uncontrolled pain for

12  these particular areas, and I'm simply -- I'm

13  not trying to be exhaustive about it; I'm

14  just simply showing that there is

15  documentation in the academic literature of

16  these concerns.

17      Q.      And academic literature, by

18  that you're talking primarily about medical

19  articles, correct?

20      A.      Well, undertreated pain

21  presumably is a medical issue.

22      Q.      Right.  And then in

23  paragraph 91 you say, after the sentence I

24  read:  In this section I use epidemiologic

25  data and a simple simulation approach to

 1    approximate the portion of the increased

 2    prescribing caused by the allegedly unlawful

 3    promotion could possibly be associated with

 4    using opioids to address ostensibly

 5    undertreated pain.

 6         A.    It seems like I'm missing a

 7    word there.

 8         Q.    Yeah, I think there's a typo,

 9    but I read that correctly?

10         A.    Yes, you did.

11         Q.    Okay.  So in paragraph 91 you

12    describe the simple simulation approach,

13    which in paragraph 92 you describe as a

14    thought experiment.

15              Do you see that?

16         A.    Yes.

17         Q.    How would the economic

18    literature describe the type of analysis

19    you're conducting in paragraph 10 of your --

20    Section X of your report?

21         A.    Generally, simulation is the

22    word that economists would use to describe

23    it.

24         Q.    And is simulation a

25    peer-reviewed methodology?

1      A.      Sure.

2      Q.      And what papers would I read to

3    describe how to conduct a proper simulation

4    in economics?

5              MR. SOBOL:  This one.

6      A.      Simulations are used in a whole

7    variety of settings.  In general, the

8    cost-effectiveness literature uses simulation

9    as a primary methodology.

10   BY MR. ROTH:

11     Q.      Okay.  As you sit here now, can

12   you think of a specific economics

13   peer-reviewed paper that uses a simulation

14   approach akin to the approach you take in

15   Section X of your expert report?

16     A.      As I sit here, I couldn't come

17   up with a citation for you.  My -- my recall

18   for article names is not that good, but this

19   is -- this is a pretty common approach,

20   particularly when it comes to looking at the

21   effects of policies, proposed policies.

22     Q.      Have you published any research

23   yourself that utilizes the same type of

24   simulation approach that you outlined in

25   Section X of your expert report?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     I have a recent paper that

2  simulates a policy proposal that would, in

3  effect, tax companies that raise their

4  prescription drug prices above either the CPI

5  or some other particular threshold, so that

6  uses a simulation approach.

7     Q.     And if we look at Attachment A,

8  which is your CV, can you show me which paper

9  you're talking about?

10    A.     Yeah, let me just see.  It was

11  just published this year, but I think it

12  should be on there.  Sorry, that's my other

13  documents.

14           It's article 119.

15    Q.     Article 119.  Generic

16  prescription drug price increases, which

17  products will be affected by proposed

18  anti-gouging legislation?

19    A.     That's correct.

20    Q.     Beyond that article in -- 119

21  that you just identified, can you think of

22  any other peer-reviewed publications you've

23  authored that utilize the same type of

24  approach you outline in Section X of your

25  report?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.     There is another one.  Let me

 2   see if -- I just need to figure out what year

 3   it was.

 4               Article 34.

 5         Q.     It's helpful that you number

 6   things, by the way.

 7               So that's State and Federal

 8   approaches to health reform:  What works for

 9   the working poor?

10         A.     That's correct.

11         Q.     Okay.  Anything beyond those

12   two?

13         A.     I think that -- well, actually,

14   I mention cost-effective analysis, and the

15   article 115 is a cost-effectiveness analysis

16   that uses a microsimulation model.

17         Q.     Cost-effectiveness of Financial

18   Incentives for Patients and Physicians to

19   Manage Low-Density Lipoprotein Cholesterol

20   Levels?

21         A.     That's correct.

22         Q.     Okay.  So now we have three.

23   Any others?

24         A.     As far as I know, those are the

25   relevant articles on my CV.  Again, a
```

1    simulation is commonly used as either a whole

2    analysis or as part of an analysis.

3    Sometimes researchers will take parameters

4    that they estimate and then use them to

5    simulate a policy change.

6         Q.    And you've said a couple of

7    times now, it's used to simulate a policy

8    change.

9              Can you explain what you mean

10   by that?

11        A.    Well, in the case of the last

12   article that we just talked about that we

13   undertook a randomized control trial of

14   financial incentives for doctors and patients

15   to control cholesterol better, and we took

16   what we learned in that randomized control

17   trial and said what would happen basically if

18   employers were to adopt this widely or if

19   health insurance companies were to adopt this

20   widely, what would happen to cholesterol

21   control and downstream healthcare

22   expenditures that would result.

23        Q.    And to do that, you used a

24   simulation similar to the one you used in

25   Section X of your report?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes, it's based on the same
 2    premise.  We have some epidemiologic data and
 3    then some information about the relevant
 4    behaviors, and in this case, the treatment
 5    patterns for the patients.
 6          Q.      And you call this analysis a
 7    simulation study or is there some other term
 8    I should be using?
 9          A.      I call it a simulation, and as
10    you can see, I then call it a thought
11    experiment.
12          Q.      Yeah.  And it's simple
13    simulation and a thought experiment, so I
14    wasn't sure which is best.  We may use both
15    interchangeably, if that's okay.
16          A.      Sure.
17          Q.      What is the appropriate
18    methodology in economics for conducting a
19    simulation study such as the one that you
20    have in paragraph 10 of your report?
21          A.      Well, again, as I mentioned, a
22    simulation generally involves some relevant
23    population and then some behavioral
24    parameters.  And, I mean, the context will
25    vary.
```

1    In other contexts, we're

2  looking at patients and their health

3  behaviors.  Simulations are frequently done

4  around tax policy, so the relevant behaviors

5  have to do with labor supply, for example.

6    And I do call this a simple

7  simulation here because the only parameters

8  I'm looking at are treatment patterns.

9    Q.    If I wanted to find some

10  peer-reviewed treatise or article that told

11  me what the appropriate methodology is for a

12  simple simulation such as the one you conduct

13  in Section X of your report, where would I

14  look?

15    A.    I am not sure that there would

16  be a single treatise.  I think to the extent

17  that there are methodological frameworks, I

18  think they're likely context specific.

19    Q.    So to figure out what the

20  appropriate generally accepted economic

21  methodology is for a simulation, I would have

22  to review a bunch of articles that run

23  simulations and determine the best approach

24  myself?

25    A.    I don't know if there's a

1    single methodological paper that would apply

2    here.

3         Q.    Okay.  So back to

4    paragraph 91 --

5         A.    Okay.

6         Q.    -- you say at the end of the

7    paragraph:  In this section, I use

8    epidemiological data and a simple simulation

9    approach.

10              We talked about that.

11              And then the rest of the

12   sentence says:  To approximate the portion of

13   the increased prescribing caused by the

14   allegedly unlawful promotion -- I think you

15   meant "that could possibly be associated."

16        A.    Yes.

17        Q.    Okay.  So when you say

18   promotion that could possibly be associated

19   with using opioids, as we discussed, you're

20   not a medical doctor, right?

21        A.    That's correct.

22        Q.    So you're relying on

23   plaintiffs' medical experts to tell you what

24   those parameters should be?

25        A.    That's correct, in part, yes.

1        Q.      You did not make any

2    independent assumptions about the type of

3    patients that could have benefited medically

4    from using opioids?

5               MR. SOBOL:  Objection.

6        A.      I -- as you can see and will

7    note I talk about, I cite to a number of

8    guidelines and articles, and I rely on

9    plaintiffs' clinical experts to validate my

10   assumptions.

11   BY MR. ROTH:

12        Q.      Right, but since you're not a

13   doctor, when you read the guidelines and

14   articles, I take it you took direction from

15   either a doctor or from counsel about what to

16   take out of those articles?

17               MR. SOBOL:  Objection.

18        A.      Yes, that's correct.

19   BY MR. ROTH:

20        Q.      Okay.  And you don't have any

21   medical expertise that you would need to make

22   your own independent assumptions about the

23   type of patients that could benefit from

24   using opioids?

25        A.      I am not a medical expert.

1    Q.    I want to look at paragraph 94.

2    So towards the bottom of that paragraph, you

3    say:  Note that because I am not documenting

4    the diagnoses and dosing associated with

5    actual uses of opioids, I am not able to

6    calculate how much of the increased use of

7    opioids during the period in which the

8    alleged misconduct occurred was in fact for

9    clinically appropriate indications, dosages

10   and durations.

11         Did I read that correctly?

12   A.    You did.

13   Q.    And that's similar to what we

14   discussed yesterday.  None of your analyses

15   attempt to parse out whether the excess MMEs

16   you identified were for medically appropriate

17   uses?

18   A.    Yes.  Again, here I'm trying to

19   calculate this maximum, just say let's just

20   assume that, in fact, some portion of this

21   growth is driven by better treating cancer

22   patients, how much could that possibly be?

23   But I have not been -- I do not have

24   diagnosis codes that would allow me to

25   precisely capture that in the data.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     Do you know whether data with

2  diagnosis codes for Cuyahoga and Summit

3  County exists that you could use to do an

4  actual analysis?

5     A.     I don't know about whether data

6  are available for Cuyahoga and Summit

7  Counties specifically, no.

8     Q.     And I read the sentence that I

9  just took from paragraph 94 which you have

10 emphasized a few times with italics as a

11 limitation on your analysis, correct?

12    A.     It's a kind of a limitation.

13 It's just a really important clarification

14 because I would not want someone reading my

15 report to interpret the numbers that I've

16 simulated to be actually representative of

17 how prescriptions were -- you know, according

18 to what diagnoses prescriptions were written.

19          So it's not really a

20 limitation.  The purpose of my analysis is to

21 do something different, but it should not be

22 interpreted as showing how much was actually

23 used to address cancer pain.

24    Q.     Your simulation is a

25 hypothetical analysis based on assumptions

1    you made from plaintiffs' experts'

2    explanation of appropriate uses as opposed to

3    a factual assessment of which prescriptions

4    were medically necessary?

5        A.     Yes.  I mean, it is based on a

6    set of facts, but it does not compute the

7    share of prescriptions that were actually

8    used for these indications.

9        Q.     So let's look at kind of the

10   foundational assumptions you've got in

11   paragraph 92.

12       A.     Okay.

13       Q.     You say first:  I conduct a

14   thought experiment that allows me to

15   calculate, in scare quotes, upper bound of

16   how much of the growth in MMEs could be

17   attributable to more intensive pain

18   management for patient groups that according

19   to plaintiffs' experts could have benefit

20   from treatment of -- with opioids.

21             Do you see that?

22       A.     Yes.

23       Q.     And then you say:  All of the

24   underlying assumptions in this section have

25   been developed in reference to the opinions

Highly Confidential - Subject to Further Confidentiality Review

1    of the plaintiffs' clinical experts,

2    including Dr. Schumacher and Dr. Parran.

3              Do you see that?

4        A.    Yes.

5        Q.    Are there any plaintiffs'

6    clinical experts who you rely on that are not

7    Dr. Schumacher and Dr. Parran?

8        A.    Not specifically that I rely

9    on, no.

10       Q.    Okay.  I just was confused,

11   because you say including, but you only named

12   two of them, so I didn't know if there was

13   someone else that's missing here.

14       A.    I understand that there are

15   other clinical experts.  These are the

16   clinical experts that I rely on.

17       Q.    Did you review or rely on

18   Dr. Ballantyne's report?

19       A.    I did not, no.

20       Q.    Are you aware that plaintiffs

21   have withdrawn Dr. Parran's expert report?

22       A.    I was not aware of that, no.

23       Q.    Do you know which of the

24   assumptions you made based on Dr. Parran's

25   report in this section of yours?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I don't believe any of the

2     assumptions were solely based on Dr. Parran.

3               MR. ROTH:  And so the record is

4          clear for the reporter, we're actually

5          talking about Parran, P-A-R-R-A-N, who

6          is actually different than Perri,

7          P-E-R-R-I.  And Schumacher is

8          S-C-H-U-M-A-C-H-E-R.

9     BY MR. ROTH:

10         Q.     Okay.  So based on the opinions

11    of Dr. Schumacher and Dr. Parran, you next

12    set forth the assumptions you make about what

13    could possibly have been an appropriate

14    medical use in paragraph 92?

15              MR. SOBOL:  Objection.

16         A.     Yes, I put forth those three

17    categories of conditions that I understand

18    have clear benefit from opioids.

19    BY MR. ROTH:

20         Q.     Okay.  So the first category is

21    short-term treatment of severe acute pain,

22    e.g., trauma or postsurgical pain,

23    end-of-life pain/hospice care and cancer pain

24    from active malignant disease.

25         A.     That's right.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      The second category you list

2   based on Dr. Parran and Dr. Schumacher is

3   actually sort of a noncategory, right?

4      A.      Yes.

5      Q.      Which --

6      A.      Again, I'm sorry to interrupt

7   you.  Please finish.

8      Q.      What you say in (ii) is:

9   Chronic opioid therapy is not recommended for

10  most common chronic pain conditions, defined

11  as moderate to severe pain lasting beyond 60

12  to 90 days, including low back pain,

13  centralized pain such as fibromyalgia and

14  headache pain.

15              Do you see that?

16     A.      I do.

17     Q.      And we'll talk about this in a

18  minute, but you actually exclude that from

19  your thought experiment?

20     A.      That's correct.

21     Q.      And then the third category

22  which is included is less common chronic pain

23  conditions such as pain from advanced

24  multiple sclerosis, sickle cell disease, pain

25  following spinal cord injury and paraplegia

Highly Confidential - Subject to Further Confidentiality Review

 1    or post-herpetic neuralgia, which comprise a

 2    small percentage of chronic pain patients and

 3    for which opioids may be considered a

 4    third-line therapy?

 5              Do you see that?

 6         A.    I do.

 7         Q.    And actually, really, the only

 8    ones you include in your thought experiment

 9    are Romanette (i), which are trauma or

10    postsurgical pain and cancer pain?

11         A.    Yes, just -- I was going to

12    just clarify.  In this section in

13    paragraph 92, I'm summarizing what I

14    understand the opinions of the clinical

15    experts have put forward in terms of

16    appropriate uses broadly, and you're correct

17    that when I go to implement my analysis, I'm

18    focusing really on section (i), and I try to

19    explain why.

20         Q.    Okay.  And we'll get there.

21         A.    Yeah.

22         Q.    So when you read plaintiffs'

23    medical experts' reports, what you gleaned

24    from those reports was that the only

25    conditions they believed opioids are

1    indicated properly to treat are those

2    conditions listed in paragraph 92?

3              MR. SOBOL:  Objection.

4         A.    When I read those reports, I

5    gleaned everything that I said in that -- in

6    that extremely long sentence, which is a

7    little more nuanced than I think what you

8    just said.

9    BY MR. ROTH:

10        Q.    Do you know whether plaintiffs'

11   medical experts' positions regarding the

12   proper indication of opioids today were the

13   prevailing medical guidelines for use of

14   opioids from 1995 to the present?

15             MR. SOBOL:  Objection.

16        A.    I am probably not the person to

17   best characterize that, but I have looked at

18   some of those guidelines, and I also have

19   read the complaint, and I know that

20   plaintiffs intend to prove that part of the

21   misconduct influenced guidelines that were

22   broader than these opinions.

23             So I believe by extension it

24   must be true that there are guidelines from

25   that period that suggest that it is safe to

1    use opioids for things like chronic pain.

2    BY MR. ROTH:

3         Q.     And you also understand that

4    medical guidelines are not static, correct?

5         A.     I understand that medical

6    guidelines are not static.

7         Q.     I mean, as a healthcare

8    economist, I'm sure you've studied lots of

9    drugs where indications and warnings and

10   appropriate uses change over time?

11        A.     Well, more specifically, I know

12   in this case that there were updated

13   guidelines issued.

14        Q.     But in your thought experiment,

15   you're imposing plaintiffs' experts' 2019

16   framework on opioid use from the entire

17   period from 1995 to the present?

18        A.     I think you mistake the purpose

19   of my thought experiment.  It is not to say

20   what would happen if we imposed 2019 beliefs

21   by these clinical experts, but rather to say

22   in a world in which there was no misconduct,

23   to what extent might the appropriate -- sort

24   of appropriate efforts to address

25   undertreated pain have led to similar

Highly Confidential - Subject to Further Confidentiality Review

1    patterns.

2        Q.    So if I understand you then,

3    your simulation is predicated on plaintiffs

4    proving that the existing medical guidelines

5    between 1995 and today were wrong as a result

6    of defendants' misconduct?

7        A.    Well, I think that you're

8    giving a legal interpretation to my analysis

9    that I'm not really in a good position to

10   judge.

11           What -- the purpose of my

12   analysis is to examine whether there might

13   have been legitimate clinical drivers of the

14   increase in opioids that could have explained

15   a similar pattern of growth.

16           Again, as I understand it,

17   defendants in related matters have said, you

18   know, physicians began using opioids more

19   heavily in the 1990s because of the

20   recognition that pain was undertreated, so

21   I'm simply examining that premise.

22       Q.    But if your premise is to try

23   to understand whether there were legitimate

24   clinical drivers, why would you not use the

25   clinical standards in existence at the time

1    of prescription?

2              MR. SOBOL:  Objection, asked

3         and answered.

4         A.     Those clinical standards are

5    influenced by the misconduct.

6    BY MR. ROTH:

7         Q.     So that goes back to my

8    question.

9              An underlying assumption of

10   Section X, your simulation analysis, is that

11   plaintiffs can prove that defendants'

12   misconduct influenced the extant clinical

13   standards from 1995 until the present?

14             MR. SOBOL:  Objection, asked

15        and answered.

16        A.     Again, I think that you're --

17   you're putting a sort of liability

18   interpretation on this that -- that -- this

19   is not a but-for analysis.  You sound like

20   you're describing it as a but-for analysis.

21             It's a thought experiment that

22   says what if we use opioids to perfectly

23   treat the patients that we know can be safely

24   and effectively treated, what would that look

25   like in comparison to the growth that we

1    actually saw.

2    BY MR. ROTH:

3         Q.    It's a thought experiment that

4    says if the plaintiffs' experts are right

5    about what opioids can be used for, then this

6    shows how prescriptions compare to what they

7    say opioids should be used for?

8              MR. SOBOL:  Objection.

9         A.    The thought experiment does

10   depend on the assumptions about which groups

11   could be appropriately treated.  That is

12   correct.

13   BY MR. ROTH:

14        Q.    Put another way, your thought

15   experiment does not measure opioid usage

16   against the existing clinical standards in

17   place at any point in time?

18             MR. SOBOL:  Objection.

19        A.    The thought experiment measures

20   the level of opioid use that would have

21   occurred -- sort of the highest level of

22   opioid use that would have occurred according

23   to what I believe plaintiffs' experts intend

24   to prove is appropriate.

25             It is not based on any

Highly Confidential - Subject to Further Confidentiality Review

 1    individual set of guidelines.  As I

 2    mentioned, I am relying on clinical experts'

 3    opinions in order to identify these groups,

 4    and so it's not based on a set of guidelines.

 5              The treatments -- the treatment

 6    patterns do come from some guidelines that

 7    I'm sure we will talk about, but again,

 8    there -- I do -- I do some sensitivity

 9    analysis, but naturally, the specific

10    parameters I choose, including the patient

11    groups, do affect the analysis.

12              And the reason why I call it a

13    thought experiment is this is not intended to

14    say this is -- there's only one version of

15    this, but instead, to say, well, look, I've

16    picked these three important groups, and I've

17    assumed that absolutely everyone gets

18    treated, and -- and look how little of the

19    growth in opioids that explains.  If you want

20    to add another 50%, it still explains very

21    little.

22    BY MR. ROTH:

23         Q.    And what would the basis be for

24    adding 50%?  Just rough justice?

25         A.    If you thought for example that

1    I was missing a group of patients or that

2    my -- that dosing, in fact, could safely be

3    50% higher or that duration could be 50%

4    higher.

5          Q.     I forgot to ask you earlier

6    when we were talking about your methodology.

7    Have you utilized a simulation approach

8    similar to the one in Section X of your

9    report in other expert work that you've done?

10   And feel free to take a drink.

11         A.     I'm sorry, now I have the

12   reverse problem.

13         Q.     Let me reask the question

14   because the transcript is not clear.

15               Have you utilized a simulation

16   approach like the one in Section X of your

17   report in other expert work that you've done?

18         A.     In effect, any but-for analysis

19   is a simulation.  I usually call those

20   simulations because they abstract from the

21   actual world by changing some set of facts.

22   Those are simulations.

23               There have also been

24   simulations in my expert work, for example,

25   in the AWP matter, the damages are basically

Highly Confidential - Subject to Further Confidentiality Review

1    calculated by simulation, assuming that

2    instead of whatever markup was actually

3    charged, that there would have been only a

4    30% markup, for example, on drugs.

5            So simulation is very commonly

6    used as a damage analysis.  Although that's

7    not what I'm using it here for.

8        Q.    Have you used a simulation

9    outside of damages analysis in other cases as

10   you do in Section X of your report?

11       A.    I'm not sure whether I have.

12       Q.    So because Section X is based

13   on plaintiffs' medical experts' assumptions

14   about appropriate use of pain, you do not

15   calculate MMEs associated with treatments

16   beyond what they include in your analysis?

17            MR. SOBOL:  Objection.

18       A.    Oh, I'm sorry.  I'm not totally

19   sure what you're talking about.

20   BY MR. ROTH:

21       Q.    So we can go through paragraph

22   by paragraph and see exactly what types of

23   pain -- what types of opioid uses you permit

24   based on their opinions.

25       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      And we'll do that.  But my

2   question is a little different.

3              My question is because you

4   limit yourself to what you glean from

5   Dr. Schumacher and Dr. Parran are appropriate

6   uses of opioids, you do not include other

7   uses of opioids that might be appropriate

8   under medical guidelines in your simulation

9   of MMEs?

10     A.      I think it's fair to say that I

11  include the three categories of patients in

12  my analysis, and by extension, I do not

13  include others.

14     Q.      And looking back at

15  paragraph 92, you took from Dr. Schumacher

16  and Dr. Parran that chronic opioid therapy is

17  not recommended for most common chronic pain

18  indications, correct?

19     A.      That's what I understood, yes.

20     Q.      You understand that opioids are

21  indicated for and labeled for those uses?

22             MR. SOBOL:  Objection.

23     A.      I do know that in some cases

24  they are labeled for chronic pain.

25             ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ROTH:

2         Q.     So your simulation depends not

3    only on showing that the medical standards in

4    place at the time were wrong, but also that

5    the FDA should not have approved opioid use

6    for chronic pain?

7              MR. SOBOL:  Objection, in part

8         asked and answered, misstates her

9         prior testimony.

10             Go ahead.

11        A.     I would not agree that it

12   depends on that.  My analysis conducts this

13   thought experiment on this group for which it

14   is clear that -- to clinical experts, as I

15   understand it, that opioids are appropriately

16   used.

17             For chronic pain patients, I

18   understand that the clinical opinions that

19   are being offered by plaintiff experts are of

20   this mixed form, as I show here, and so I do

21   not include those patients in my analysis.

22             I don't believe that means the

23   analysis has no utility if, in fact, there's

24   some subgroup of patients for whom they are

25   appropriate.  But that's, in fact, captured

Highly Confidential - Subject to Further Confidentiality Review

1    in these opinions, and we'll go on to talk

2    about what the implications are.

3                I think my results can be

4    viewed in the context of the idea that there

5    may be this small group of chronic pain

6    patients who benefit from opioids.

7    BY MR. ROTH:

8        Q.    And if you were to include any

9    number of chronic pain patients for whom

10   opioid use is appropriate in your simulation,

11   that would increase the number of potentially

12   appropriate MMEs and thus, decrease the gap

13   between actual MMEs prescribed and your

14   potentially appropriate number?

15               MR. SOBOL:  Objection.

16       A.    If you were to add to the

17   number of patients and the number of MMEs,

18   that would increase the total, yes.

19   BY MR. ROTH:

20       Q.    Have you done any study or

21   analysis as to what number of chronic pain

22   patients might be an appropriate quantum to

23   add to your potentially appropriate group?

24       A.    So I don't believe that there's

25   a single number that I've seen when I look at

Highly Confidential - Subject to Further Confidentiality Review

1    the clinical opinions, as I've summarized

2    them here.  They're more qualitative.

3              And when they refer to

4    third-line treatment, I think that is a

5    concept that would require understanding what

6    percentage of chronic pain patients have

7    tried and failed to use other therapies.

8         Q.    So we saw yesterday morning,

9    which feels like a long time ago, that

10   Excellus Blue Cross Blue Shield in its

11   guidelines still approves of the use of

12   opioids for pain in some circumstances.

13        A.    In its formulary, yes, I think

14   that's right.

15        Q.    Okay.  And are you aware the

16   CDC guidelines also approve opioid use for

17   chronic pain in some instances?

18              MR. SOBOL:  Objection.

19        A.    I do believe the CDC

20   guidelines -- and I'm not sure that I've seen

21   the most recent ones, but the CDC guidelines

22   do mention chronic pain as a use for opioids.

23   BY MR. ROTH:

24        Q.    And in fact, Dr. Parran himself

25   agrees that chronic pain may be clinically

Highly Confidential - Subject to Further Confidentiality Review

1    appropriate for some subset of patients?

2              MR. SOBOL:  Objection.

3         A.    I believe those opinions again

4    which are nuanced here summarize that same

5    conclusion that you've drawn, that for some

6    small group of patients, opioids may be

7    appropriate.

8    BY MR. ROTH:

9         Q.    Yeah.  And I can mark this, but

10   I don't know if you just remember.  I mean, I

11   think he says in his report chronic opioid

12   therapy for persons with chronic pain

13   conditions is at most indicated in less than

14   10% of patients with chronic pain, and likely

15   significantly fewer.

16             Do you recall reading that?

17        A.    That sounds familiar.

18        Q.    Okay.

19        A.    Obviously that's -- less than

20   10% is a hard number to plug into a

21   simulation.

22        Q.    It's some nonzero number, and

23   he's saying it's somewhere between zero and

24   ten without really saying what it is, so I

25   would agree with you.

Highly Confidential - Subject to Further Confidentiality Review

1    But you recall seeing that he

2    didn't say it was totally impermissible?

3         MR. SOBOL:  Objection.

4         A.    He did not -- and I'll slow

5    down.  And again, I reflect that nuance in my

6    description here.

7    BY MR. ROTH:

8         Q.    You reflect it in your

9    description, but you don't reflect any number

10   of chronic pain patients in your simulation.

11        A.    That's correct, I explicitly

12   exclude them.

13             (Whereupon, Deposition Exhibit

14             Rosenthal-24, CDC Guideline for

15             Prescribing Opioids for Chronic Pain,

16             United States, 2016, was marked for

17             identification.)

18   BY MR. ROTH:

19        Q.    All right.  I'm going to show

20   you what I'll mark as Exhibit -- no, I don't

21   want this one.  Sorry.  She's been so good.

22        A.    I know.  She has a hard job

23   reading your mind.

24        Q.    I'm going to mark as Exhibit 24

25   the CDC guidelines for prescribing opioids

Highly Confidential - Subject to Further Confidentiality Review

1    for chronic pain from 2016.  And are these

2    the guidelines you recall reviewing?

3         A.    Yes, I have reviewed the 2016

4    guidelines.

5         Q.    And are there more recent

6    guidelines than 2016?

7         A.    I'm not sure.  That's -- I was

8    just allowing for the possibility because I

9    think there are older guidelines.

10         Q.    Right.  And the older

11    guidelines it's fair to say are likely more

12    generous in terms of what they suggest is

13    appropriate usage for opioids with respect to

14    chronic pain than the more recent guidelines?

15              MR. SOBOL:  Objection.

16         A.    I don't recall.

17    BY MR. ROTH:

18         Q.    Would you not expect that,

19    given the information in medical journals,

20    et cetera, about an increased sensitivity

21    frankly just to addiction issues and opioids?

22         A.    I guess it depends on what

23    we're comparing it to.  If we had guidelines

24    from 1990 or 1985, I would expect them to be

25    even more cautionary.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And have you reviewed the
 2   guidelines from 1980 or 1985?
 3          A.     I have not.
 4          Q.     Okay.  So you don't know that
 5   for sure; you're speculating.
 6          A.     That's correct.
 7          MR. SOBOL:  You asked her to
 8          speculate to begin with.
 9          MR. ROTH:  I know, but now I
10          need to make clear on the record that
11          that's what she's doing.
12   BY MR. ROTH:
13          Q.     Okay.  So these are published
14   in 2016, which is well into period three of
15   your preferred direct regression, correct?
16          A.     That's correct.
17          Q.     And if you look at the summary
18   on the first page, it says:  This guideline
19   provides recommendations for primary care
20   clinicians who are prescribing opioids for
21   chronic pain outside of active cancer
22   treatment, palliative care and end-of-life
23   care.
24                 Do you see that?
25          A.     I do.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do Dr. Parran or

2    Dr. Schumacher include any appropriate use of

3    opioids for palliative care?

4        A.    Again, as I summarized their

5    statements, they include -- they include

6    virtually the same terms, and many of those

7    palliative care patients of course are also

8    cancer patients.

9        Q.    And they include cancer

10   patients who are not just in hospice in their

11   description, correct?

12       A.    That's correct.  Cancer

13   patients may be in hospice or not in hospice

14   but at the end of life.

15       Q.    And do you know how the

16   journals define end of life?

17       A.    Well, I think there are

18   different ways of looking at end of life, and

19   they vary by analysis.  I think frequently

20   the last 90 days of life are considered end

21   of life, but I'm -- I don't know that that's

22   a single way of thinking about it.

23       Q.    And of course, a doctor who's

24   an oncologist with a patient may not actually

25   know at the time they're prescribing how

Highly Confidential - Subject to Further Confidentiality Review

1    close they are to the end of life to know

2    whether they're within that definition,

3    right?

4         A.    I'd be really impressed if they

5    did know.

6         Q.    Yeah.  I mean, we all have

7    stories of relatives or friends who were

8    given a month to live and magically lived

9    three or four years with cancer.

10             MR. SOBOL:  Objection.

11   BY MR. ROTH:

12        Q.    Do you know people like that?

13        A.    I don't, but I'm glad that you

14   do.

15             The idea of end of life as you

16   know in my analysis, I use the actual end of

17   life for my simulation, but it may well be

18   that some of those people died without

19   getting an opioid treatment because their

20   doctors were not ready to decide that they

21   were at the end of life.

22        Q.    And there may also be people

23   who the doctor thinks is at the end of life

24   that they give an opioid to who actually live

25   longer than the 90-day window in the

Highly Confidential - Subject to Further Confidentiality Review

1    definition?

2         A.    Yes.  I think that that is less

3    often the case, given doctors' general

4    reluctance.  It's sort of a well-known fact

5    in health policy that doctors are reluctant

6    to acknowledge that the end of life has

7    arrived.

8         Q.    But doctors may decide to treat

9    a cancer patient with an opioid even if they

10   don't believe that patient is near the end of

11   life to treat their pain from the malignancy.

12        A.    That may well be true, but

13   again, in my simulation, I'm looking at

14   patients who are actually at the end of life.

15        Q.    Okay.  And by looking at only

16   patients who are actually at the end of life,

17   you're undercounting cancer patients who may

18   be appropriately treated with an opioid to

19   address malignant cancer pain but are not yet

20   at the end of life?

21        A.    I will not be including those

22   patients who are not at the end of life, and

23   we can go back to paragraph 92 to see that,

24   like chronic pain, my understanding of

25   clinical experts' opinions about patients who

Highly Confidential - Subject to Further Confidentiality Review

1    are not at the end of life who are

2    experiencing cancer pain is -- that the same

3    challenges pertain to opioid prescribing in

4    terms of tradeoffs between possible addiction

5    risks.

6         Q.    So looking back at the summary,

7    it then says, after the first sentence:  The

8    guideline addresses, 1, when to initiate or

9    continue opioids for chronic pain; 2, opioid

10   selection, dosage, duration, follow-up and

11   discontinuation; and 3, assessing risk and

12   addressing harms of opioid use.

13             Do you see that?

14        A.    I do.

15        Q.    And these guidelines were

16   developed by the CDC, correct?

17        A.    Yes.

18        Q.    The Centers for Disease

19   Control.

20        A.    That's right.

21        Q.    And they were developed in

22   2016, well into sensitivity around opioid

23   use, addiction and mortality?

24             MR. SOBOL:  Objection, scope.

25        A.    It is certainly true at that

```
 1    time period that the opioid epidemic had been

 2    recognized.

 3    BY MR. ROTH:

 4         Q.     And then if you look at the

 5    introduction in the background section, the

 6    first sentence says:  Opioids are commonly

 7    prescribed for pain.

 8               Do you see that?

 9         A.     Yes.

10         Q.     An estimated 20% of patients

11    presenting to physician offices with

12    noncancer pain symptoms or pain-related

13    diagnoses, including acute and chronic pain,

14    received an opioid prescription.

15               Do you see that?

16         A.     Yes.  And I'm certainly

17    familiar with that fact.

18         Q.     So if 20% of patients are

19    receiving opioids for pain, that's a fairly

20    large population of people.  Would you agree

21    with that?

22               MR. SOBOL:  Objection.

23         A.     Well, yes.  I mean, you're

24    familiar with the litigation that we're all

25    involved in, and that is the subject of this
```

1    litigation.

2            So even in 2016, as prescribing

3    rates have begun to fall, they are well above

4    the levels that are -- were observed 20 years

5    ago.  So this is precisely the issue that

6    we're talking about is that opioids are

7    overused, according to clinical experts.

8    BY MR. ROTH:

9        Q.    Well, they're well above the

10   level of 20 years ago, but there have been a

11   number of new drugs and generics that have

12   entered the market over the last 20 years,

13   correct?

14            MR. SOBOL:  Objection.

15       A.    Well, the fact that there are

16   new drugs and generics does not mean that

17   increased use is appropriate.

18   BY MR. ROTH:

19       Q.    And the mere fact that use has

20   increased over what it was 20 years ago in

21   and of itself does not mean that all of that

22   increase is inappropriate either.

23            MR. SOBOL:  Objection, scope.

24       A.    In my analysis, as I noted

25   earlier, I'm not parsing the actual uses.

 1    And because that is not possible to do in the

 2    data, I instead come from the other

 3    direction, which is to say, okay, let's look

 4    at those uses which are not contested.  How

 5    much of the growth could they possibly

 6    explain.

 7              So if the allegations are true,

 8    my direct analysis shows a large percentage

 9    of prescriptions were caused by the unlawful

10    conduct, and then from this other direction,

11    it appears that the uses that the clinical

12    experts in this matter for plaintiffs

13    consider to be the most appropriate uses only

14    account for a very small percentage of the

15    total.

16              So the statements that you've

17    made are sweeping statements.  Mine are much

18    more precise.

19    BY MR. ROTH:

20         Q.    Put another way, if Dr. Parran

21    and Dr. Schumacher and plaintiffs' opinions

22    about the appropriate use of opioids were the

23    prevailing medical standard, there would be

24    an extremely small percentage of patients who

25    currently receive opioids in our world that

Highly Confidential - Subject to Further Confidentiality Review

```
1     would receive them?

2                MR. SOBOL:  Objection, scope.

3          A.     Of course it depends on what

4     you mean, if there's a certain path

5     dependence, as I'm sure you're well aware.

6     If we come in today and try to unwind

7     prescribing, there are patients who are

8     already addicted to opioids.

9                But if a world happened in

10    which only the uses described by the clinical

11    experts, plaintiffs' clinical experts were

12    those that for which opioids were used,

13    you're right, that we would see a dramatic

14    reduction in opioid use.  That is the entire

15    purpose and conclusion of my analysis.

16    BY MR. ROTH:

17         Q.     And if you look at paragraph 1

18    under the background section in this

19    article -- in the guidelines, the last

20    sentence says:  Rates of opioid prescribing

21    vary greatly across states in ways that

22    cannot be explained by the lack -- sorry, let

23    me start over.

24                The CDC guidelines say:  Rates

25    of opioid prescribing vary greatly across
```

1    states in ways that cannot be explained by

2    the underlying health status of the

3    population, highlighting the lack of

4    consensus among clinicians on how to use

5    opioid pain medication.

6              Do you see that?

7         A.    I do.

8         Q.    So if marketing is national,

9    and all physicians are equally affected by

10   marketing, what explains the geographic

11   variation in prescribing the CDC is

12   highlighting?

13             MR. SOBOL:  Objection, scope.

14        A.    Well, as we talked about

15   before, and as you can see in the indirect

16   analysis, there are county-level factors that

17   explain variation in shipments.

18   BY MR. ROTH:

19        Q.    My question was a little

20   different.

21             This article is talking about

22   variation in prescribing, and what I'm trying

23   to understand is if marketing is national and

24   all doctors are affected, how could it be

25   that there is variation in prescribing on a

1    geographic basis?

2                    MR. SOBOL:  Objection, scope.

3           A.      There -- prescribing and

4    shipments are not different things.  They're

5    the same thing.  The shipments result from

6    prescriptions.  And there are different

7    baselines in different geographic areas,

8    different baselines in terms of the level of

9    use, in terms of all of those socioeconomic

10   and demographic factors.

11                   THE WITNESS:  I hope you can't

12          hear that on the tape.

13          A.      So that variation exists, and

14   then if a national promotional campaign will

15   have different effects based on the

16   underlying area characteristics.

17   BY MR. ROTH:

18          Q.      And the CDC highlights that

19   there's a lack of consensus among clinicians

20   on how to use opioid medication.

21                   Do you see that?

22          A.      I do see that.

23          Q.      And again, that means that

24   promotion alone is not driving some consensus

25   view as to the efficacy and safety of

Highly Confidential - Subject to Further Confidentiality Review

1    opioids?

2                    MR. SOBOL:  Objection, scope.

3        A.      Well, I'm not sure how you

4    derive anything from this about promotion.

5    The fact that there's a lack of consensus

6    among clinicians does not mean that promotion

7    hasn't driven this increase in the aggregate.

8    There may well be variation among clinicians

9    in the extent to which they've responded to

10   that promotion, but again, in the aggregate,

11   that's really what my analysis is about, is

12   what is the total.

13                   There may be variation across

14   areas and across physicians, and still the

15   question is sort of what has happened to the

16   overall growth over this time period.

17       Q.      How much aggregation do you

18   need to do to show that promotion has an

19   overall growth effect?

20       A.      I'm not sure I understand your

21   question.

22       Q.      Well, we seem to be agreeing

23   that at a physician level there could be

24   variation in the effect of promotion, right?

25       A.      There can be variation at a

1    physician level.  That doesn't mean -- my

2    point was that physicians may start in

3    different places, they may be -- they may

4    have a bigger effect because they have more

5    patients of a particular type, but -- but

6    still, there's a total effect.

7              And again, in this matter as I

8    understand it, the court needs to know what

9    the whole effect is, and the fact that it may

10   be smaller for one physician and larger for

11   another is -- does not seem relevant as I

12   understand it to the task of proving impact.

13       Q.    Understood.  But even when

14   aggregated up to a geographic level, the CDC

15   is highlighting a lack of consensus among

16   clinicians, and I agree that marketing may

17   not affect all doctors equally, but your

18   model seems to suggest that everyone is

19   equally affected by marketing.

20             MR. SOBOL:  Objection, asked

21        and answered.

22       A.    You misunderstand the nature of

23   an aggregate model.  Again, I calculate an

24   average effect.  I do not assume that there's

25   no variation in that average.

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. ROTH:

 2         Q.    Right.  So that gets back to

 3    the question I asked three questions ago.

 4              How much do you need to

 5    average?  How far up the chain do you need to

 6    go?  It's not at the doctor level, it's not

 7    at the geographic level.  Where do you start

 8    seeing the aggregative effects overcome

 9    variation in the effect of promotion?

10         A.    I'm sorry, I don't mean to

11    laugh, but that is just a very strange idea.

12              So anything you average over

13    has variation.  So at any level the average

14    captures variation.  And again, what I'm

15    interested in here is the aggregate effect,

16    and so I have looked at that effect.  If one

17    were interested in ascertaining something

18    about variability, then you would

19    disaggregate the data.

20              But the -- every average

21    contains some kind of variation unless it's

22    not a very interesting average of things that

23    are exactly alike.

24         Q.    Let's look at page 3, the top

25    paragraph on the left side says:

1    Professional organizations, states and

2    federal agencies, e.g., the American Pain

3    Society/American Academy of Pain Medicine,

4    the Washington Agency Medical Directors Group

5    and the U.S. Department of Veteran

6    Affairs/Department of Defense have developed

7    guidelines for opioid prescribing.

8            Do you see that?

9    A.    I do.

10   Q.    And why do you think the

11   Department of Veteran Affairs and Department

12   of Defense has their own guidelines for

13   opioid prescribing?

14           MR. SOBOL:  Objection, scope.

15   A.    Because they provide medical

16   care or reimburse medical care for active

17   duty -- what is the general word -- military,

18   active duty military as well as veterans.

19   BY MR. ROTH:

20   Q.    And then it says:  Existing

21   guidelines share some common elements,

22   including dosing thresholds, cautious

23   titration and risk mitigation strategies such

24   as using risk assessment tools, treatment

25   agreements and urine drug testing.  However,

Highly Confidential - Subject to Further Confidentiality Review

1    there is considerable variability in the

2    specific recommendations, e.g., range of

3    dosing thresholds of 90 morphine milligram

4    equivalents a day to 200 morphine milligram

5    equivalents a day, audience, e.g., primary

6    care physicians versus specialists, use of

7    evidence, e.g., systematic review, grading of

8    evidence and recommendations and role of

9    expert opinion, and rigor of methods for

10   addressing conflict of interest.

11            Do you see that?

12       A.    I do.

13       Q.    And then it says:  Most

14   guidelines, especially those that are not

15   based on evidence from scientific studies

16   published in 2010 or later, also do not

17   reflect the most recent scientific evidence

18   about risks related to opioid dosage.

19            So not only is there regional

20   variation, but actually in the medical

21   community, there's variation in prescribing

22   standards for opioids?

23            MR. SOBOL:  Objection, scope.

24   BY MR. ROTH:

25       Q.    Do you agree that's what the

1    CDC is saying?

2              MR. SOBOL:  Objection, scope.

3         A.      I think what the CDC is saying

4    is that both across professional

5    organizations -- I think it's a little

6    broader than the medical community, since

7    we're talking about agencies, that guidelines

8    vary.

9    BY MR. ROTH:

10        Q.      And I assume, based on your

11   testimony throughout the last two days and

12   this sort of contagion effect that Dr. Perri

13   coined, your view would be that those medical

14   associations are influenced by the effect of

15   manufacturers' promotion as well?

16        A.      I believe that plaintiffs

17   specifically point to those influences in the

18   complaint, and so, of course, that is --

19   between that and Dr. Perri's report is where

20   I get my information.  I have not made an

21   individual assessment of this.

22        Q.      Again I ask, if promotion is

23   this unifying thing that influences all

24   physicians equally, why is there a

25   variability in the guidelines that

1   professional organizations come out with for

2   the prescription and use of opioids?

3            MR. SOBOL:  Objection,

4       mischaracterizes prior testimony.

5       A.    As I noted earlier, promotion

6   will have effects that are different for

7   different physicians, no doubt different

8   professional organizations.

9            Because it has the same

10  direction of effect doesn't mean they all

11  start in the same place or end in the same

12  place, and so guidelines vary across a number

13  of seemingly well-accepted clinical areas.

14  BY MR. ROTH:

15      Q.    And the effect that promotion

16  has, if any, on those guidelines will also

17  vary?

18      A.    The effect of promotion on

19  those guidelines may also vary.

20      Q.    And neither your direct nor

21  indirect regression models do anything to

22  measure the effect of medical guidelines on

23  the prescription and use of opioids?

24            MR. SOBOL:  Objection, asked

25       and answered, mischaracterizes prior

1      testimony.

2           A.      The direct model, Model C,

3      includes events for guideline dissemination,

4      and -- and the guidelines are not included in

5      the indirect model.

6      BY MR. ROTH:

7           Q.      In Model C you've got the five

8      events -- I don't remember all of them from

9      memory.  I probably will soon.  I think one

10     was the joint consensus statement, which was

11     a guideline; is that right?

12          A.      Yes, that's correct.

13          Q.      Were any of the others

14     guidelines?

15          A.      The JCAHO standards are similar

16     to guidelines in they set expectations for

17     hospitals.

18          Q.      Okay.  And beyond those two, I

19     don't think the other three events were

20     guideline related.

21          A.      Federation of State Medical

22     Boards, those, I believe, are focused really

23     on liability issues.

24          Q.      Did you consider using, for

25     example, the CDC guidelines or other

Highly Confidential - Subject to Further Confidentiality Review

1    guidelines to test how your model would

2    respond in Model C?

3                    MR. SOBOL:  Objection.

4         A.      The CDC guidelines come out in

5    2016, which is at the tail end of my data,

6    and as we talked about before, it was

7    apparent to me when I included five events

8    that simply adding more effects was not going

9    to improve the performance of the model.

10   BY MR. ROTH:

11        Q.      It wouldn't improve the

12   performance of the model, but it might show

13   that the performance of the model didn't

14   stand up once you added multiple events?

15                    MR. SOBOL:  Objection, asked

16        and answered.

17        A.      Well, the fact that a model

18   with more events did not look good doesn't

19   mean the model that I chose with no events

20   was unreliable.

21   BY MR. ROTH:

22        Q.      If you look at page 17 of the

23   CDC guidelines --

24        A.      Incidentally by the way, I

25   didn't try that model, so I don't know what

Highly Confidential - Subject to Further Confidentiality Review

```
 1    it looks like.

 2          Q.     Good clarification.

 3                 So page 17 is the start of a

 4    long discussion of 12 bolded points that

 5    clinicians should consider when prescribing

 6    opioids for chronic pain.

 7                 Do you see that?

 8          A.     I see -- let's see.

 9          Q.     There are headings in

10    between --

11          A.     Yes.

12          Q.     -- so it's hard to track,

13    but --

14          A.     I see 12, yes.

15          Q.     Okay.  And again, this is not

16    consistent with the view that no patients

17    should ever receive opioid for chronic pain;

18    it just highlights thing clinicians should

19    consider before prescribing opioids for

20    chronic pain?

21                 MR. SOBOL:  Objection, scope.

22          A.     I don't believe anywhere in my

23    report I summarize a clinician's opinion that

24    no patients should receive opioids for

25    chronic pain.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BY MR. ROTH:

 2          Q.      I don't want to go through all

 3      12, but I do want to ask about a couple.

 4          A.      Okay.

 5          Q.      So if you look at page 21.

 6          A.      Sure.

 7          Q.      Number 4 in the section Opioid

 8      Selection, Dosage, Duration, Follow-Up and

 9      Discontinuation.

10              Do you see that?

11          A.      I do.

12          Q.      It says:  When starting opioid

13      therapy for chronic pain, clinicians should

14      prescribe immediate-release opioids instead

15      of extended-release/long-acting, ER/LA,

16      opioids, recommendation category A, evidence

17      type, 4.

18              Do you see that?

19          A.      I do.

20          Q.      So the CDC is making some

21      distinction between immediate-release and

22      extended-release long-acting opioids.

23              Do you agree with that?

24          A.      Yes, this recommendation

25      specifically applies to immediate-release
```

1   opioids, yes.

2       Q.    And your models don't

3   distinguish between immediate-release or

4   extended-release opioids or any other

5   distinguishing characteristics of opioids

6   other than calibrating them based on MMEs?

7           MR. SOBOL:  Objection.

8       A.    In order to accurately capture

9   the impact of the alleged misconduct, I

10   include all forms of opioids, including

11   short- and long-acting.

12           My model is intended to capture

13   any spillover effects, and to the extent that

14   marketing of one product affects use of

15   another, it appropriately captures those

16   spillover effects.

17           To the extent that marketing

18   does not have spillover effects, they won't

19   be detected inappropriately.

20   BY MR. ROTH:

21       Q.    Number 5 says -- it's on

22   page 22 -- when opioids are started,

23   clinicians should prescribe the lowest

24   effective dosage.  Clinicians should use

25   caution when prescribing opioids of any

Highly Confidential - Subject to Further Confidentiality Review

1   dosage, should carefully reassess evidence of

2   individual benefits and risks when

3   considering increasing dosage to greater than

4   or equal to 50 MME per day, and should avoid

5   increasing dosage to greater than or equal to

6   90 MME per day, or carefully justify a

7   decision to titrate dosage to greater than or

8   equal to 90 MME per day.

9           Do you see that?

10  A.      I do.

11  Q.      So the CDC seems to be making a

12  distinction in terms of potency with respect

13  to the clinical guidelines.

14          MR. SOBOL:  Objection.

15  A.      Okay.

16          MR. SOBOL:  Scope.

17  A.      So they're talking about

18  effective dosing.

19  BY MR. ROTH:

20  Q.      And again, that's not something

21  you control for in your regression models?

22  A.      That doesn't make any sense as

23  something to control for.  Again, I

24  appropriately used the number of MMEs as the

25  dependent variable, so that is recognizing

Highly Confidential - Subject to Further Confidentiality Review

1    that the number of MMEs is what is clinically

2    relevant when it comes to ultimately the

3    harms that Professor Cutler looks at.

4                And so I do, in fact, capture

5    MMEs in my model.

6        Q.    Okay.  So we had an extended

7    conversation yesterday about the depreciation

8    factor, and you said it was justified because

9    opioids are addictive and patients need to

10   titrate up.

11               Do you remember that?

12       A.    Yes.

13       Q.    How does that assumption hold

14   in light of the CDC's clinical guidelines

15   suggesting that physicians should maintain

16   patients on lower doses?

17               MR. SOBOL:  Objection, form.

18               You can answer.

19       A.    Are you suggesting that because

20   the 2016 guidelines warn physicians on not

21   increasing doses that none of that happened

22   during the period of my analysis, 1995 to

23   2018?

24   BY MR. ROTH:

25       Q.    Well, I'm asking the questions,

Highly Confidential - Subject to Further Confidentiality Review

1    but I'm just suggesting that you didn't

2    account for it in your analysis, including

3    after 2016 when these guidelines were

4    published.

5              MR. SOBOL:  Objection.

6              You can answer.

7         A.    I would respectfully disagree

8    with that characterization.  My analysis

9    incorporates exactly that, and yesterday we

10   had a brief conversation about a chart that

11   shows the increasing MMEs per prescription

12   that demonstrate that doctors were clearly

13   not following this guideline.

14             This is precisely the concern

15   with the opioid epidemic is that dosing has

16   continued to ramp up, and, you know, whether

17   or not this guideline has influenced

18   physicians to date, there's certainly plenty

19   of evidence that there were increased dosing

20   patterns over time for patients who were on

21   opioids.

22             MR. ROTH:  Okay.  Why don't we

23        stop for a minute.  I don't know if

24        lunch is here, but this would not be a

25        bad time to break since it's around

Highly Confidential - Subject to Further Confidentiality Review

1        noon.

2                THE WITNESS:  Sure, that's

3        great.

4                THE VIDEOGRAPHER:  The time is

5        11:54 a.m.  We're now off the record.

6                (Recess taken, 11:54 a.m. to

7        12:30 p.m.)

8                THE VIDEOGRAPHER:  The time is

9        12:30 p.m.  We're back on the record.

10   BY MR. ROTH:

11        Q.    All right.  So I'd like to go

12   kind of component by component through your

13   simulation on appropriate use, if that's

14   okay.

15        A.    Okay.  Great.  I'll just get to

16   the right section.

17        Q.    Paragraph 95 is the start of

18   the cancer pain section.

19                Are you there?

20        A.    Yes.

21        Q.    So you say:  The first group of

22   patients with potentially undertreated pain

23   includes cancer patients at the end of life/

24   in hospice.  I use epidemiologic data on

25   cancer deaths in each year to identify the

Highly Confidential - Subject to Further Confidentiality Review

 1    size of this population.

 2                 And that's consistent with what

 3    you said earlier, you just looked at

 4    end-of-life cancer patients, correct?

 5         A.     That's correct.

 6         Q.     Why just limit to end-of-life

 7    cancer patients as opposed to patients with

 8    other malignancy associated with cancer?

 9         A.     Sure.  As I understand clinical

10    experts' opinions and just some of the basic

11    risks of opioids, that, of course, people at

12    the end of life, the -- any concern about

13    addiction is attenuated because of the fact

14    that their timeline is short.

15                 And so those patients are

16    distinct from patients who may have continued

17    use and continued life beyond -- beyond the

18    point of malignant cancer pain.

19         Q.     So -- but in paragraph 92 when

20    you summarize Dr. Schumacher and Dr. Parran,

21    you separately refer to end-of-life pain,

22    hospice care and cancer pain from active

23    malignant disease.

24                 Do you see that?

25         A.     Yes, that's correct.  So again,

Highly Confidential - Subject to Further Confidentiality Review

1    in footnote 121, I explain a bit there.  I

2    say I do not attempt to separately identify

3    these patients for lack of complete data and

4    because I understand there's more clinical

5    nuance, so again, that doctors will need to

6    trade off addiction risks in those patients

7    as I understand the clinical opinions.

8         Q.    Okay.  So your thought analysis

9    just includes end-of-life cancer patients,

10   not other cancer parents with malignant

11   disease for the reasons you say in

12   footnote 121?

13        A.    Yes, that's correct.

14        Q.    Why do you not include other

15   patients in hospice beyond cancer patients?

16        A.    Yes, again, a two-part -- and

17   I'm trying to see exactly what I say in

18   footnote 121.  But many patients in hospice

19   are in fact cancer patients.  Cancer patients

20   are really the group of patients for whom

21   hospice was originally designed, and while it

22   has spread to other reasons that people are

23   facing the end of life, cancer patients are,

24   particularly in the early years, I believe,

25   based on the -- my general knowledge of

Highly Confidential - Subject to Further Confidentiality Review

1    hospice, the majority of those patients.

2          Q.     Have you studied a breakdown of

3    the demographics of hospice by diagnosis to

4    know that that's true?

5          A.     I know just from my knowledge

6    of the area that cancer has been the

7    condition around which hospice -- both

8    hospice and really palliative care have been

9    focused in the beginning, and it's a general

10   health policy debate, the need to expand

11   hospice and palliative care to other groups,

12   so I understand that cancer is a dominant

13   condition for those groups.

14         Q.     You are aware that patients

15   with other medical diagnoses than cancer may

16   wind up in hospice?

17         A.     Yes, I'm aware of that.

18         Q.     Congestive heart failure

19   patients could be in hospice, correct?

20         A.     Yes.

21         Q.     Or ALS patients, correct?

22         A.     Yes.

23         Q.     And we can play this game --

24         A.     I am aware of that.

25         Q.     -- with many conditions that

Highly Confidential - Subject to Further Confidentiality Review

1    are unfortunately terminal, but no matter,

2    you only include the cancer hospice patients

3    in your thought analysis.

4        A.    Well, I include cancer patients

5    at the end of life.

6        Q.    Right.  You make no attempt to

7    capture other noncancer-diagnosed hospice

8    patients at the end of life?

9        A.    I do not.  And again, as I note

10   in footnote 121, I believe, my sensitivity

11   analysis will likely capture those groups.

12       Q.    Well, in footnote 121, you're

13   actually just talking about -- yeah, okay.  I

14   see, patients dying from other conditions.

15   Okay.

16           And then in order to calculate

17   the amount of -- well, let me backtrack

18   because I can't let this go.

19           So when you say your

20   sensitivity analysis, that's truly just

21   modeling a 50% increase in your parameters?

22           MR. SOBOL:  Objection.

23       A.    The sensitivity analysis is

24   modeling a 50% increase, so that could

25   pertain to a 50% increase in the populations

Highly Confidential - Subject to Further Confidentiality Review

1    treated.

2    BY MR. ROTH:

3         Q.     And where did you come up with

4    50%?

5         A.     In simulation analysis, people

6    frequently use estimates to get at possible

7    measurement error, which are inherently

8    speculative.  So this was to me a very

9    generous speculation about how big the error

10   could be.

11        Q.     It's a statistical choice, it's

12   not a choice based on any analysis of medical

13   data?

14        A.     It is a modeling choice, yes.

15        Q.     Okay.  And then in paragraph 96

16   you say:  For my simulation I take a

17   conservative approach and assume that 100% of

18   cancer patients at the end of life need and

19   want a high dose of oral extended-release

20   opioids.

21             Do you see that?

22        A.     I do, except you corrected my

23   order.

24        Q.     I transposed -- I think your

25   order is fine, I just transposed it for some

1   reason.

2              Then you say:  This assumption

3   is extremely conservative in light of

4   plaintiffs' clinical expert, Dr. Parran's,

5   opinion.

6              Do you see that?

7       A.    Yes.

8       Q.    And Parran's been withdrawn.

9   Do you have any other basis for saying that

10  it's extremely conservative to assume that

11  all cancer patients at the end of life need

12  and want a high dose of opioids?

13             MR. SOBOL:  Objection.

14      A.    Well, I think it's -- I'm not a

15  clinician, so I -- I think it's unreasonable

16  to assume that a hundred percent of patients

17  want anything, particularly given the side

18  effects of opioids unrelated to addiction,

19  increased risk of death from respiratory

20  issues, et cetera.

21             So I would say that a hundred

22  percent must be conservative.

23  BY MR. ROTH:

24      Q.    And then you say:  For dosing,

25  my baseline assumption is 80 MMEs per day,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    which is consistent with average dosing in

 2    cancer patients reported in public studies.

 3              Do you see that?

 4    A.    I do.

 5    Q.    Then you cite the Haider

 6    Journal of Oncology article?

 7    A.    Yes, that's correct.

 8    Q.    Are there any other published

 9    studies you're relying on, or is that the one

10    you're relying on?

11    A.    That's the one I rely on, and

12    as noted, those choices were reviewed by

13    Dr. Schumacher and Parran.

14    Q.    And I assume, since you're not

15    a doctor, the Haider study was something that

16    either Dr. Schumacher, Dr. Parran or counsel

17    directed you to?

18    A.    I believe that I identified

19    that article.

20    Q.    Okay.  Spending time on PubMed?

21    A.    I spend a lot of time on

22    PubMed.  As you know, the clinical literature

23    and the health services research literature

24    are quite overlapping.  If you've looked at

25    my CVs, I have -- have I published in an
```

1    oncology journal?  I believe I have.

2         Q.    So we talked about dosing,

3    which we'll talk about again in a minute, but

4    then you say for duration, that you use the

5    average duration of treatment reported for

6    cancer palliative care as your baseline,

7    which is roughly 64 days.

8         A.    That's correct.

9         Q.    And where -- that is based on

10   the Carlson study, it looks like?

11        A.    Yes, it is.

12        Q.    Okay.  And so in your thought

13   experiment, if a cancer patient lives a year

14   in excruciating pain, there would be no

15   medically appropriate use for opioids for

16   that patient?

17             MR. SOBOL:  Objection.

18        A.    Well, I'm not offering a

19   clinical opinion here.  I'm conducting an

20   economic simulation based on clinical

21   parameters that are identified from the

22   literature and plaintiffs' clinical experts.

23             So I'm not saying one way or

24   another whether someone who lives beyond

25   those expectations should or shouldn't get an

Highly Confidential - Subject to Further Confidentiality Review

1    opioid.

2    BY MR. ROTH:

3         Q.    So you're not making a medical

4    judgment or a qualitative judgment, but

5    you're still deciding not to include that

6    patient in your potentially acceptable

7    population?

8              MR. SOBOL:  Objection.  Excuse

9         me.  Objection.

10        A.    The simulation again, it

11   assumes that every single patient gets some

12   opioid, and then assigns a typical payment

13   based on the sources that I've cited.  The

14   length of stay there is an average, so

15   unfortunately, we know that many patients do

16   not actually know that they're dying more

17   than a week or two before they die.  As we

18   talked about before, physicians tend to be

19   reluctant to address those issues.

20              So I would imagine there are

21   many patients who in fact would get this kind

22   of opioid treatment for much less than the

23   64 days, and there may well be some that get

24   it for more.  But if the duration on average

25   captures that, my simulation will reflect it.

1    BY MR. ROTH:

2         Q.     It's like with your other

3    model, it's an average.  So there are going

4    to be people above and below the average with

5    respect to treatment time?

6         A.     And nonetheless, the aggregate

7    will still be representative.

8         Q.     You can average anything,

9    right?

10                MR. SOBOL:  Objection.

11        A.     Well, if I'm trying to

12   calculate a total, which is what I'm trying

13   to do here, then the average is a sufficient

14   statistic for that total, and so that's --

15   that's why I use it here.

16   BY MR. ROTH:

17        Q.     Just so I understand it,

18   though, obviously there's sample size issues

19   when you average something, correct?

20        A.     Sample size issues pertain to

21   standard deviations, not to the mean, and

22   here again, I'm using this simulation

23   approach to show an average and not to

24   characterize the variance around that.

25                (Whereupon, Deposition Exhibit

```
 1              Rosenthal-25, 2017 Haider et al

 2              Publication, was marked for

 3              identification.)

 4    BY MR. ROTH:

 5         Q.    I'm going to mark as Exhibit 25

 6    an article entitled Opioid Prescription

 7    Trends Among Patients with Cancer Referred to

 8    Outpatient Palliative Care Over a 6-Year

 9    Period.

10              Is this the Haider study that

11    you cite in footnote 124 of your report?

12         A.    It is.

13         Q.    And that's the study you relied

14    on to come up with the baseline assumption of

15    80 MMEs per day?

16         A.    That's right.

17         Q.    Okay.  So if you look on the

18    cover page, under Material and Methods, the

19    last sentence says:  Data collected included

20    demographics, cancer type and stage, symptom

21    assessment, performance status, opioid type

22    and opioid dose defined as the morphine

23    equivalent daily dose.

24              Do you see that?

25         A.    I do.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then in Results, it says:

2    In 2010, median morphine equivalent daily

3    dose before referral was 78 milligrams per

4    day.  However, by 2015, the morphine

5    equivalent daily dose had progressively

6    decreased to 40 milligrams per day.

7    A.    I see that.

8    Q.    And this study looks at the

9    number of MMEs prescribed to 750 patients who

10   were seen as new consultations at MD Anderson

11   Cancer Center between January 1st and

12   April 30th each year from 2010 and 2015?

13   A.    That's correct.

14   Q.    And this is the only article

15   you rely on for your conclusion that the

16   appropriate treatment is 80 morphine

17   milligram equivalents per day?

18   A.    Again, yes, this is the article

19   where I found that dosing and referred it to

20   the clinical experts for their input.

21   Q.    And this dosing, again, is for

22   patients who were at the cancer center's

23   outpatient palliative care clinic, correct?

24   A.    That's correct.

25   Q.    It's not at a hospice facility?

1          A.      It was not.

2          Q.      So you don't have any articles

3   that you relied on to evaluate the

4   appropriate dosage in MMEs given to

5   end-of-life cancer patients at hospice?

6          A.      This high dose estimate was the

7   estimate that I found that was closest to

8   what I was looking for.  I think some of

9   these patients may be at the end of life and

10  some are not.

11         Q.      And if patients are not yet at

12  the end of life, would you expect their

13  opioid dosing to be higher or lower than

14  patients in hospice?

15         A.      It may be, again, that this 80

16  number is lower.  I don't know for sure.

17  Again, why I do the sensitivity analysis by

18  saying what if it were 50% higher, so not 80,

19  but 120.

20         Q.      And again, you're not a medical

21  doctor, so beyond the Haider article, do you

22  have any basis to say what an appropriate

23  opioid dosage is in MMEs for a hospice

24  patient?

25                 MR. SOBOL:  Objection.

1      A.      Again, I refer these

2  assumptions to the clinical experts for them

3  to validate or contradict them.

4  BY MR. ROTH:

5      Q.      And did one of the clinical

6  experts review this part of your report and

7  give you feedback?

8      A.      That review was done through

9  counsel.

10      Q.      Do you know which clinical

11  expert reviewed your report and endorsed the

12  80 milligrams morphine equivalent for the

13  daily dose for hospice patients?

14      A.      I believe that both

15  Dr. Schumacher and Dr. Parran reviewed this

16  section of my report, specifically to look at

17  the assumptions.

18      Q.      If you look at e977 of the same

19  article.

20      A.      Sorry, you're still on there.

21      Q.      We're still on Haider.

22      A.      Sure.

23      Q.      So on the second column, last

24  paragraph, it says:  Despite a robust

25  dataset, there are several limitations to

Highly Confidential - Subject to Further Confidentiality Review

1    this study.  First, patients were treated at

2    a comprehensive cancer center where dedicated

3    palliative care services  are available.

4    Hence, data from this single institution

5    cannot be generalized to other clinical

6    settings such as community-based programs.

7            Do you see that limitation?

8        A.    I do.

9        Q.    And is that something you

10   considered when deciding this was the study

11   to rely on?

12       A.    Well, again, because I was

13   seeking an estimate associated with

14   palliative care, end-of-life care in

15   particular, I don't think that limitation

16   would pertain to my use of dosing from this

17   study.  I, of course, can't know what's in

18   the authors' minds, but I think what they're

19   talking about is about treatment patterns,

20   and a cancer center may be different than

21   less well organized cancer treatment.

22       Q.    So you think when the authors

23   say data from the single institution cannot

24   be generalized to other clinical settings,

25   they mean data from the single institution

Highly Confidential - Subject to Further Confidentiality Review

1    can be generalized to hospice patients?

2              MR. SOBOL:  Objection.

3         A.     That is not what I said, but,

4    for example, they are looking at prescribing

5    patterns across molecules and not just

6    dosages, and so it may well be that the kind

7    of prescribing over time that patients get in

8    a cancer center is different.

9              The -- it's not immediately

10   obvious to me why dosing in a cancer center

11   would be different than dosing in -- outside

12   of it.  There may be some difference.  It's

13   always true that any article relies on a

14   particular dataset, and they will all say

15   that you can't generalize outside of that

16   dataset.

17   BY MR. ROTH:

18        Q.     And we've been over this, but

19   you're not an oncologist, correct?

20        A.     I'm not an oncologist.

21        Q.     So to ascertain the differences

22   between treatment in a cancer center versus

23   hospice, you would just be speculating as to

24   what that might be?

25             MR. SOBOL:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.     Well, I am a health economist
 2    who has worked on cancer treatment as the
 3    subject of some of my research, so -- so yes,
 4    I don't know exactly what differences the
 5    authors had in mind, but I can make an
 6    informed speculation.
 7    BY MR. ROTH:
 8           Q.     Informed speculation.  That's a
 9    good one.
10           A.     Yes.
11           Q.     Is that more admissible than
12    normal speculation?
13                  MR. SOBOL:  Sounds like to me.
14                  THE WITNESS:  Absolutely.
15           Speculation with a Ph.D.
16                  MR. SOBOL:  Shouldn't have
17           asked that.
18    BY MR. ROTH:
19           Q.     So then if we look at
20    paragraph 96, we talked about the duration,
21    you said 64 days.
22           A.     Yes.
23           Q.     And you say you chose 64 days
24    because it's just below the average number of
25    days spent in hospice, which is 70.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Well, I chose 64 days from

2    another article.  I didn't choose 64 as

3    arbitrarily just below 70 days.  I'm sorry if

4    you read that sentence that way.

5          Q.     Yeah.  I mean, it says 64,

6    which is just below the average number of

7    days.  I was trying to figure out why you

8    didn't pick 69 or 68 or 70 itself.

9          A.     I apologize for the lack of

10   clarity.  If you go back to footnote 125, the

11   second article by Wachterman, et al.

12         Q.     That one has 64 days?

13         A.     That's the length of stay

14   article, yes.

15         Q.     And what did the Carlson

16   article or the website you cite report as the

17   average length of stay?

18         A.     Right.  So the 64 days comes

19   from the Wachterman article.  The 70 comes

20   from the website.

21         Q.     And why did you choose to

22   credit Wachterman's article over the average

23   from the National Hospice and Palliative Care

24   Organization website -- or research, I should

25   say.
```

```
 1              A.      Sure.  Because not every

 2     patient at the end of life is in hospice, so

 3     the -- the data in the Wachterman article

 4     are -- they -- sorry.

 5                      What I mean is not every

 6     patient in the second set of statistics has

 7     cancer, whereas the Wachterman article has a

 8     cancer subpopulation in it, so it's just more

 9     precise.  They're very similar.  The

10     difference would be about a 10% difference.

11              Q.      And I assume you'll tell me

12     that that's captured in your 50% sensitivity

13     analysis.

14              A.      Well, that I can tell you, 10%

15     is definitely less than 50%.

16              Q.      And what did the Carlson

17     article say the average length of stay was?

18              A.      I actually don't recall looking

19     at the length of stay in the Carlson article.

20              Q.      Okay.

21              A.      We can look at it.

22              Q.      So now we're going to do math,

23     which is a little dangerous for me, but we're

24     going to try it.

25                      So for one patient receiving
```

Highly Confidential - Subject to Further Confidentiality Review

1  end-of-life cancer pain, your two assumptions

2  of 64 and 80 MMEs would get you to 5,120

3  MMEs?

4       A.    Okay.  I also can't do math

5  without at least a pen.

6       Q.    We have an iPhone, so let's try

7  it.

8       A.    Let's try it.

9       Q.    This is the best deposition

10  tool I've found.  So 64 times 80 is 5,120.

11      A.    Great.

12      Q.    And so to calculate the total

13  number of --

14            MR. SOBOL:  How does she know

15       you just didn't type in 5,120?

16            MR. ROTH:  She can do it if she

17       wants.

18            THE WITNESS:  He has an honest

19       face.

20            MR. SOBOL:  Go ahead.  Sorry.

21  BY MR. ROTH:

22      Q.    To calculate the total number

23  of MMEs associated with end-of-life cancer

24  patients and hospice care for cancer

25  patients, you multiplied the number of cancer

Highly Confidential - Subject to Further Confidentiality Review

1  deaths each year by 5,120 MMEs?

2      A.    Yes.  And just to be clear, you

3  added "and hospice," but I'm very clear that

4  I'm calculating treatment for end-of-life

5  cancer patients.

6      Q.    Right.  Right.  And you're not

7  calculating at all for other hospice

8  patients, which is the conversation we just

9  had.

10     A.    That's correct.

11     Q.    And then where do you get the

12 number of cancer deaths from, which of the

13 datasets is that?

14     A.    So that comes, excuse me, from

15 the SEER data.

16     Q.    Okay.  So then the next

17 category you calculate potentially acceptable

18 MMEs for are patients with acute pain.

19     A.    Uh-huh.

20     Q.    And on page 66, and that's

21 subdivided into trauma patients and surgical

22 patients.

23     A.    Correct.

24     Q.    You don't consider any other

25 type of acute pain?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      That's correct.

2      Q.      So acute pain related to labor

3  and childbirth would not be something that

4  opioids are appropriate for?

5      A.      Well, I'm not a clinical expert

6  but I have actually not heard of people using

7  opioids for labor pain.

8      Q.      What about for pain associated

9  with a cesarean section?

10     A.      I'm not a clinician, so I think

11  we shouldn't go there.

12     Q.      What about for nontraumatic

13  injuries causing acute pain?  Those aren't

14  captured by your analysis, correct?

15     A.      Well, the -- we can go through

16  in the technical appendix exactly which

17  diagnosis codes are captured, so I'm not sure

18  what you're referring to as nontraumatic

19  injuries, but I think we should probably look

20  at Attachment D.

21     Q.      Okay.  Let's do that.  So where

22  in Attachment D should we go?

23     A.      Okay.  Let's -- I'm starting on

24  page -- as opposed to table -- D8 and working

25  my way over, so for the clinical

Highly Confidential - Subject to Further Confidentiality Review

1    classification codes, we include our external

2    causes of injury except for poisoning,

3    overexertion, suffocation, adverse effects of

4    medical care and drugs and other or

5    unspecified causes.

6          Q.    So let me pause there.

7                I assume you -- well, maybe I

8    shouldn't assume.  Let me just ask.

9                Why do you take out the

10   categories of poisoning, overexertion,

11   suffocation, adverse effects of medical

12   care/drugs and other or unspecified causes?

13         A.    Yes.  I -- from what my

14   understanding of the definition of

15   appropriate uses under acute pain from the

16   guidelines, these would not fit that

17   category.  And again, the underlying

18   assumptions were shared with clinicians.

19         Q.    This does lead me to a question

20   I meant to ask you earlier.

21               Do your models, direct or

22   indirect, include any opioid used to treat

23   opioid use disorder, like naloxone or

24   Suboxone, or were those taken out?

25         A.    Those were taken out.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.  So in this analysis, you

2   include all of the IDC-9 trauma codes except

3   for the one specified on page D9?

4      A.      That's correct.

5      Q.      And apart from what you told me

6   that the clinicians stated these would not be

7   appropriate uses of opioids, you did not have

8   any other basis for excluding them from your

9   trauma numbers?

10      A.      Well, I'm not a clinical

11   expert, but I would say, on the face of it,

12   the notion that opioids would be appropriate

13   for adverse effects of medical care or drugs

14   or poisoning is not something I would expect

15   to be true, but I'm not a clinical expert, so

16   I certainly use my judgment as a starting

17   point.

18      Q.      And certain opioids like

19   Suboxone or naloxone might be, but are those

20   taken out of this simulation as well?

21      A.      They are not in my analysis.

22      Q.      Okay.  So back to paragraph 98.

23      A.      Yeah, way back.

24      Q.      So essentially, to measure the

25   incidence of trauma, you use the data with

Highly Confidential - Subject to Further Confidentiality Review

1   the codes removed as specified in

2   Attachment D?

3           A.      That's correct.

4           Q.      And you assume that a hundred

5   percent of those patients are treated with

6   opioids?

7           A.      That's correct.

8           Q.      And then you assume, according

9   to paragraph 98, that each of these patients

10  is treated with 30 MMEs of immediate-release

11  opioids for three to seven days?

12          A.      Correct.

13          Q.      And for that statement, it

14  looks like you are relying on a white paper

15  from the American Academy of Emergency

16  Medicine, and then the CDC guidelines that we

17  reviewed earlier.  Or is it just from the

18  AAEM white paper?

19          A.      I think they agree on these

20  points.

21          Q.      Okay.  So let's look at the

22  AAEM white paper, which I'll mark as

23  Exhibit 26.

24                  (Whereupon, Deposition Exhibit

25          Rosenthal-26, AAEM White Paper on

Highly Confidential - Subject to Further Confidentiality Review

1           Acute Pain Management in the Emergency

2           Department, was marked for

3           identification.)

4    BY MR. ROTH:

5           Q.    And this is the white paper you

6    rely on as support for using 30 milligrams

7    for three to seven days for trauma patients.

8           A.    You've printed it very small,

9    so --

10          Q.    I did not, but someone did, and

11   I apologize.

12          A.    That's okay.

13          Q.    Do we need a magnifying glass?

14          A.    I'm not bothering your glasses.

15   I'm going to hold it two feet in front of me.

16          Q.    Well, then my next question is

17   going to be particularly hard for you to

18   answer.

19               MR. SOBOL:  Is there a footnote

20          on this?

21   BY MR. ROTH:

22          Q.    I was going to ask where you

23   see the 30 milligrams of an immediate-release

24   opioid such as hydrocodone, because I didn't,

25   but you may not be able to see even the text,

Highly Confidential - Subject to Further Confidentiality Review

1    so that might be a bigger problem.

2         A.    Yeah, I'm -- I believe the

3    guidelines -- some of the guidelines say

4    start at the lowest possible dose.  I'm not

5    sure the 30 milligrams is in this guideline.

6              I believe that they all say use

7    immediate release.  Here, the second bullet

8    under Upon Discharge From the ED:  Emergency

9    medicine clinicians should prescribe only

10   immediate-release formulations at the lowest

11   effective dose and for the shortest course,

12   generally two to three days' supply.

13             I think the CDC guidelines say

14   three to seven.

15   BY MR. ROTH:

16        Q.    And is the 30 also in the CDC

17   guidelines or is that somewhere else?

18        A.    I don't think it actually is,

19   and when I referred clinicians to this

20   language, around the lowest effective dose, I

21   believe that the 30 milligrams comes from

22   getting a translation from clinical experts

23   of what that lowest effective dose is.

24        Q.    Okay.  So that's clear now.

25             So now as I understand it, your

Highly Confidential - Subject to Further Confidentiality Review

1    assumption for 30 morphine milligram

2    equivalents for trauma patients comes from

3    Dr. Parran and Dr. Schumacher telling you

4    that's what you should use?

5              MR. SOBOL:  Objection.

6         A.    There's some other guidelines

7    that we'll get to around surgery that have

8    some more specific doses, where I had those

9    numbers to say, you know, should I use one of

10   these.  But they're not in this document.

11   We'll get to them in the next section.

12   BY MR. ROTH:

13        Q.    So for trauma, your dosage

14   assumption comes from plaintiffs' experts?

15        A.    It is -- yes.  The -- the

16   assumption, again, I did -- I used the

17   guidelines to have that qualitative

18   assumption, and I required assistance from

19   clinical experts to make sure that I

20   understood how to translate that.

21              But there were other guidelines

22   that had some quantitative starting points,

23   but not in these ones.

24        Q.    And when you say clinical

25   experts, that's Drs. Schumacher and Parran?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      That's correct.

 2              Q.      So for one patient receiving

 3     treatment for trauma in an emergency room

 4     setting, you assume 210 MMEs, which is 30

 5     times the 7?

 6              A.      And which we do without a

 7     calculator, yes.

 8              Q.      That's true.

 9                      And so to calculate the total

10     number of MMEs for all patients who visited

11     an emergency room for trauma, you multiplied

12     the patients in the data times 210?

13              A.      The patients in the data times

14     210, yes.

15              Q.      With the patients in the data

16     being the page D9 description of which

17     patients you looked at for trauma?

18              A.      That's correct.

19              Q.      Okay.  So now let's talk about

20     surgery, which is paragraph 99.  So to

21     identify patients treated with opioids

22     related to surgery, you say the universe is

23     patients who underwent surgery on either an

24     inpatient or an outpatient basis.

25              A.      That's correct.
```

1        Q.      And according to studies

2    published around the time of the alleged

3    misconduct, 41% -- sorry.  Let me reread

4    that.

5             According to studies published

6    around the time the alleged misconduct began,

7    41% of postsurgical inpatients experienced

8    moderate to severe pain.

9             Did I read that correctly?

10       A.      Yes, you did.

11       Q.      What do you mean by the time

12   the alleged misconduct began?

13       A.      Again, where I reference

14   literature on undertreatment -- well, it's

15   upset, so now I have to go back.  I was

16   looking for literature that predated the

17   alleged misconduct, so that -- I just have to

18   see where I first cite the Marks and Sachar

19   paper in that footnote 117.  So those are the

20   studies that we talked about at the very

21   beginning of this analysis.

22       Q.      Is there any allegation that

23   you're aware of that the alleged misconduct

24   influenced the prescribing of opioids for

25   surgical patients?

```
 1                MR. SOBOL:  Objection.

 2        A.     I -- as I understand the

 3   misconduct, the misinformation would affect

 4   the treatment of patients being discharged

 5   from surgery like any other patients, yes.

 6   BY MR. ROTH:

 7        Q.     So in your view, discharging

 8   patients from surgery with opioid

 9   prescriptions beyond those prescriptions that

10   you classify as potentially acceptable would

11   be something that plaintiffs are trying to

12   recover for?

13                MR. SOBOL:  Objection.

14        A.     Well, it sounds like there's

15   both a clinical and nonclinical opinion

16   there, but again, remember this analysis is

17   not decomposing actual use but trying to

18   build up to a set of uses that according to

19   clinical experts could have reasonably

20   consumed opioid quantities over this period.

21                So again, we're not -- we're

22   not sort of looking at what was done and

23   parsing between appropriate and

24   inappropriate.  Just say, okay, well, there's

25   going to be a set of people with surgery, and
```

Highly Confidential - Subject to Further Confidentiality Review

1    those people surely will have opioid use for

2    some period of time.  What would it look like

3    if they all got treated.

4    BY MR. ROTH:

5         Q.    So in paragraph 99, you again

6    come up with 30 MMEs and seven days for

7    surgery.

8         A.    Yes, that's correct.

9         Q.    So same as trauma?

10        A.    Yes, the guidelines are quite

11   similar.

12        Q.    And for that conclusion that 30

13   MMEs each day is appropriate, you cite the

14   MD Anderson Cancer Center Postoperative Pain

15   Management Guidelines.

16        A.    That's right.  So that's the --

17   the document that I mentioned did have some

18   quantitative benchmarks in it.

19               (Whereupon, Deposition Exhibit

20         Rosenthal-27, MD Anderson Cancer

21         Center Postoperative Pain Management

22         Guidelines, was marked for

23         identification.)

24   BY MR. ROTH:

25        Q.    So let me mark as Exhibit 27

Highly Confidential - Subject to Further Confidentiality Review

1    the MD Anderson Cancer Center Postoperative

2    Pain Management Guidelines.

3              And is this the document you

4    were citing in your report?

5         A.    It is.

6         Q.    So it looks like this was

7    approved, if you look at the bottom of the

8    page, on October 30th, 2018.

9         A.    Yes, that's correct.

10        Q.    And are you aware that the

11   algorithm used by MD Anderson to evaluate

12   doses of pain management is what was used to

13   come up with the dosage number?  Strike that.

14   That's not a good question.  Let's just turn

15   to page 3.

16        A.    Okay.  At some point, I would

17   direct you to page 10, but we can go to

18   page 3 first.

19        Q.    Okay.  We will get to page 10,

20   I promise.  It's in here.

21        A.    Okay.  Good.

22        Q.    So it looks like they have sort

23   of like a decision tree flow as to how

24   they're going to come up with dosing for

25   surgical patients, based on pain score.

Highly Confidential - Subject to Further Confidentiality Review

1       A.      That's right.

2       Q.      And it identifies different

3    types of pain and the recommended treatment

4    options.

5       A.      Yes.

6       Q.      So if you look at page 5,

7    Appendix A describes the pain score, and it

8    may or may not have highlighting on it.

9       A.      It does.  I appreciate the

10   highlighting.

11      Q.      Now you can see where we're

12   going.

13      A.      That's great.

14      Q.      So if you look at page 5 in

15   Appendix A, it says no pain is zero, mild is

16   1 to 3, moderate is 4 to 6 and severe is 7 to

17   10.

18              Do you see that?

19      A.      I do.

20      Q.      And then if you go back to

21   page 3.

22      A.      To page 3, okay.

23      Q.      So for patients with a pain

24   score of less than 3 who are not currently

25   taking opioids, they recommend using

Highly Confidential - Subject to Further Confidentiality Review

1    nonopioids or weak opioids.

2              Do you see that?

3    A.     Yes.

4    Q.     And then for opioid treatment

5    they refer to Appendix E, which is page 10,

6    which we'll talk about in a minute.

7    A.     Okay.

8    Q.     Correct?

9    A.     Yep.

10   Q.     For patients with a pain score

11   less than 3 who are currently taking opioids,

12   MD Anderson recommends continuing the use of

13   opioids and again refers to Appendix E.

14   A.     Yes.

15   Q.     For patients with a pain score

16   greater to or equal than 4 and who are not

17   taking opioids, MD Anderson recommends

18   short-acting opioids.

19             Do you see that?

20   A.     I do.

21   Q.     And again refers to Appendix E,

22   correct?

23   A.     Yes.

24   Q.     And then for patients with a

25   pain score greater than or equal to 4 who are

Highly Confidential - Subject to Further Confidentiality Review

1    currently taking -- who are not currently

2    taking opioids, MD Anderson recommends

3    short-acting opioids -- we just did that one.

4    Okay.  Strike that.  I'm getting tired.

5              For patients with a pain score

6    greater than or equal to 4 who are currently

7    taking opioids, MD Anderson recommends

8    increasing the scheduled opioid dose.

9         A.    Yes.

10        Q.    All right.  So now let's go to

11   Appendix E on page 10.  And we've

12   conveniently highlighted this for you.

13             So if you look at

14   hydrocodone --

15        A.    Yes.

16        Q.    -- it recommends 30 milligrams

17   a day, right, 5 to 10 milligrams every six

18   hours?

19        A.    Yes.  So 5 would be 20, right?

20        Q.    Sorry, let me back up the

21   truck.  Okay.  This is wrong.

22        A.    Yes.

23        Q.    So first we need to look at

24   codeine, which is on the top of the page.  So

25   for codeine, it recommends 30 to

1    60 milligrams.

2              Do you see that?

3        A.    Yes.  I did not consider

4    codeine in the simulation per se, but go

5    ahead.

6        Q.    Okay.  And now if we look at

7    hydrocodone, it says for short-acting

8    opioids, it's 5 to 10 milligrams every six

9    hours.

10       A.    Correct.

11       Q.    Which if we do the math on that

12   would be between 20 to 40 a day.

13       A.    Yes.  And 30 is right in the

14   middle.

15       Q.    Okay.  And for long-acting

16   opioids, 20 milligrams a day of Hysingla or

17   10 milligrams every ten hours.

18       A.    I think in the flowchart we

19   just looked at -- and again, according to

20   clinical experts in this case, long-acting

21   opioids are not recommended.

22       Q.    Right.  So it's 20 to 40 for

23   immediate-release hydrocodone?

24       A.    That's right, and 30 is in the

25   middle of that.

1      Q.     It's the average.

2      A.     It's the midpoint, it's the

3   average.  Yes.

4      Q.     But then if you look at

5   morphine, which is on the next page, that's

6   also a short-acting opioid?

7      A.     Yes.

8      Q.     And it's 5 to 10 milligrams

9   every four hours, which by math would get you

10  30 to 60.

11     A.     Yes.

12     Q.     So I guess what I'm trying to

13  understand is how you get to 30 when one

14  range is 20 to 40 and the other range is

15  all -- is 30 to 60.

16     A.     Sure.  Again, that's why --

17  because the guidelines don't give one number,

18  I referred this question to the clinical

19  experts through counsel, and -- and was

20  advised to focus on hydrocodone and was told

21  that 30 milligrams was a reasonable baseline.

22             Again, assuming that there's

23  some patients who will only get 20, some

24  patients who will get more.

25     Q.     So again, like with trauma for

Highly Confidential - Subject to Further Confidentiality Review

1    surgical pain, your decision to take 30

2    morphine milligram equivalents per day was

3    driven by plaintiffs' experts' advice?

4         A.    And it's grounded in these

5    guidelines.  And again, while the other

6    guidelines that we looked at are qualitative

7    in nature, as I understand the notion of

8    starting with the lowest dose, that seems

9    quite consistent with choosing 30.

10         Q.    And so like with trauma, 30

11   times seven is 210, and then you multiply 210

12   for surgery with the number of surgical

13   patients in the data?

14         A.    That's correct.

15         Q.    And then we should maybe just

16   close the loop on this.  So if we go back to

17   the Attachment D.

18         A.    Sure.

19         Q.    Just to understand what data

20   you're looking at for surgery.

21         A.    Yeah.

22         Q.    So it looks like page D10.

23         A.    Oh, you're in -- it's page D14.

24   I think we're on the same page.  Aren't we?

25         Q.    Page D10 talks about surgery.

```
1            A.      Oh.

2            Q.      Page D14 is surgery in Cuyahoga

3    and Summit.

4            A.      I see.  I was ahead of you.

5    We'll get to that, I'm sure.

6            Q.      Yes.

7            A.      Yes.  Yes.  So Table D(b),

8    which is also terrible labeling.

9            Q.      Yes, so Table D(b) explains how

10   you identified surgical procedures, and it

11   says they're identified from the Area Health

12   Resource File and the Health Resources &

13   Services Administration data.

14                   Do you see that?

15           A.      Yes, that's correct.

16           Q.      But then data was only

17   available for 2005, 2010 and 2014?

18           A.      That's correct.

19           Q.      And so you had to linearly

20   interpolate all the other values.

21           A.      Yes, and as you can see, they

22   barely change.

23           Q.      But in any event, you only had

24   data for three years, and so the rest of it

25   was interpolated with the data that you had?
```

```
 1            A.      I did interpolate.

 2            Q.      Okay.  And so if you go back to

 3     the body of your report, Table 6, which is at

 4     page 70, essentially presents the math

 5     exercise we've been talking about, correct?

 6            A.      That's correct.

 7            Q.      It has kind of the cancer,

 8     trauma and surgical MMEs by year from 1995 to

 9     2018 based on the inputs and assumptions

10     we've been discussing.

11            A.      Yes.

12            Q.      And so according to Table 6,

13     just looking at 1995, for example, there were

14     ████████████     MMEs potentially clinically

15     justifiable?

16            A.      Yes.

17            Q.      And then the next column is

18     your sensitivity where you just multiply that

19     number by 50%?

20            A.      Correct.

21            Q.      And so for 1995, your

22     sensitivity shows ██████ -- sorry,

23     ██████████ -- start over.

24                    For 1995, your sensitivity

25     shows ████████████ MMEs were potentially
```

Highly Confidential - Subject to Further Confidentiality Review

1    clinically justifiable with the 50% increase?

2         A.    Yes.

3         Q.    And that's actually higher than

4    the actual MMEs sold in that year?

5         A.    That's correct.  So that first

6    number should be a negative.

7         Q.    The first number should be a

8    negative?  I'm not sure I follow.

9         A.    Well, of the total plus 50%, I

10   guess the first -- the percentage there is of

11   the -- of the unadjusted one, so it's

12   correct, but --

13        Q.    Yeah, it's correct.  And

14   what --

15        A.    It actually would be negative

16   if you did the plus 50%.

17        Q.    Right.  Okay.  Thank you for

18   that clarification.

19        A.    It shows up in the chart more

20   clearly.

21        Q.    And actually, if we just look

22   at '95 alone, even under your methodology,

23   75% of the actual MMEs sold -- or nearly 75%,

24   would be potentially clinically justifiable?

25        A.    Could have been accounted for

Highly Confidential - Subject to Further Confidentiality Review

1   justifiable use by -- by justifiable uses,

2   right?  So again, just to be clear that I'm

3   not saying that 75% of actual uses were --

4   were delivered in that way, but they could

5   have been.

6              The level of use was reasonably

7   explained by this measure of need, if you

8   would allow me to use that shorthand.

9        Q.    And so if you use your

10  potentially justifiable use methodology,

11  including your 50% sensitivity analysis, it's

12  not until 1997 that you start seeing more

13  than a small departure from the actual MMEs

14  sold?

15       A.    Right.  So in 1997, the actual

16  is about ▮▮▮▮ higher than the -- those

17  justified by need.

18       Q.    And then where is this actual

19  MMEs sold number coming from?  The IQVIA data

20  it looks like?  It says:  Actual MMEs

21  nationally from IQVIA, NPA, ARCOS, CDC.

22              (Clarification requested by the

23  reporter.)

24              MR. ROTH:  Okay.  Sorry.

25  BY MR. ROTH:

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.      The note on this chart is

 2    confusing to me because it says:  Actual MMEs

 3    nationally from IQVIA, NPA, ARCOS and CDC.

 4            A.      The actual MMEs comes from

 5    IQVIA.  The CDC part relates to the MME

 6    translation.  As I sit here, I cannot think

 7    of a reason that the ARCOS data are used in

 8    the actual MMEs sold.

 9                 MR. SOBOL:  Choice of drugs.

10    BY MR. ROTH:

11            Q.      We may have found another

12    errata.

13            A.      No, it's more likely that I

14    just can't remember that detail as I sit

15    here.

16            Q.      Okay.  And then if you look

17    at -- so you've got the chart, and then the

18    next few paragraphs -- or the next paragraph,

19    102 on page 71, says --

20            A.      Yes.

21            Q.      -- The analysis described above

22    can be applied at the county level.  Table 7

23    shows comparable results for the bellwether

24    counties.

25                 Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And so then you've got a

3  Table 7 with the counties.

4          How was the translation of the

5  national analysis to the counties done?

6    A.    So beginning with the number of

7  patients in each category, there are

8  county-level data available both on cancer

9  deaths and from the Area Health Resource

10  File, where the surgical cases come from, for

11  the trauma patients they're allocated

12  according to population.

13    Q.    And who did that translation?

14    A.    That would be my staff at GMA.

15    Q.    Would you agree that opioids

16  that plaintiffs' experts believe were

17  clinically justifiable are less likely to

18  cause overdose deaths?

19          MR. SOBOL:  Objection.

20    A.    I do not know the answer to

21  that question, and again, this is a

22  simulation about what might have been a

23  clinically reasonable increase in opioid use.

24          It is not an assessment of

25  whether, in fact, in these counties or in the

1    nation as a whole these uses were present in

2    the way that I simulate them.

3    BY MR. ROTH:

4         Q.    And I think we did talk about

5    this earlier during the course of the last

6    two days, but you don't have any mechanism

7    for translating your calculation of

8    potentially justifiable MMEs in your thought

9    analysis to either of your regression models?

10        A.    Well, maybe I'm getting tired,

11   but I'm not sure I understand that statement

12   in the form of a question or question in the

13   form of a statement.  So how would I

14   translate this to my regression model?

15        Q.    Your regression models don't

16   remove from the impact of defendants'

17   promotion the clinically justifiable MMEs you

18   calculate in your last opinion?

19        A.    Again, I simulate them.  I'm

20   not identifying them as actually having

21   occurred.  And the purpose of my direct and

22   indirect analysis is to quantify the impact

23   of alleged misconduct, whether it resulted in

24   a clinically justifiable use or otherwise.

25        Q.    Okay.  Did you review or rely

Highly Confidential - Subject to Further Confidentiality Review

1    on Dr. Kessler's report in this case?

2         A.    I did not review or rely on it

3    prior to filing my report.

4         Q.    Do you know who Dr. Kessler is?

5         A.    I do.

6         Q.    Have you seen him testify in

7    other cases you've been involved in?

8         A.    I think he has testified in

9    other cases I'm involved with.  I want to say

10   that one of the -- one of my old reports that

11   you put in front of me somehow mentioned him.

12              But I certainly know who he is,

13   and I believe he has testified in other cases

14   I've been on, but I've not seen him testify.

15        Q.    I'm trying to streamline

16   simultaneously.

17        A.    That's fine.  Take your time.

18        Q.    Do you agree with the statement

19   that it is not a drug by itself that is

20   regulated or that receives approval from the

21   FDA; it is a drug for an intended use that is

22   reviewed and approved by the FDA?

23        A.    Well, again, as a layperson,

24   not an FDA expert, I do understand that drugs

25   are approved for specific uses.

```
 1          Q.     All right.  And we talked a
 2    little bit at the beginning of your
 3    deposition and a couple of other times about
 4    drug labels, so I just want to show you one
 5    for now.
 6          A.     Sure.
 7                 (Whereupon, Deposition Exhibit
 8          Rosenthal-28, Kadian Instructions for
 9          Use, was marked for identification.)
10    BY MR. ROTH:
11          Q.     And refresh me.  I think you
12    said you did not review any -- I think that's
13    wrong.  I think you said you'd seen maybe the
14    hydrocodone and OxyContin drug labels?
15          A.     I specifically remember seeing
16    those, reviewing those at some point during
17    my analysis.
18          Q.     But you did not do a
19    comprehensive review of all the drug labels
20    for all of the opioids at issue in this case?
21                 MR. SOBOL:  Objection, asked
22          and answered.
23          A.     I did not systemically analyze
24    the drug labels.
25                 ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. ROTH:

 2          Q.     All right.  I'm going to mark

 3    as Exhibit 28 the drug label for Kadian.

 4          A.     I really am going to have to

 5    get glasses.

 6          Q.     I apologize, these are printed

 7    so small.

 8                 Do you know what Kadian is?

 9          A.     I'm aware that it's in this

10    case.  I have -- I think I cite to some

11    documents involving Kadian in my report.
```

21          Q.     So if you look at the top of

22    the first page, Kadian is a morphine sulfate

23    extended-release capsule.

24                 Do you see that?

25          A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.      And there's a big black box on

2    the left side of the front page.

3                Do you see that?

4        A.      I see the black box.

5        Q.      And in all capital letters at

6    the top of the box it says:  Warning:

7    Addiction, abuse, and misuse; risk evaluation

8    and mitigation strategy, REMS;

9    life-threatening respiratory depression;

10   accidental ingestion; neonatal opioid

11   withdrawal syndrome; interaction with

12   alcohol; and risks from concomitant use with

13   benzodiazapines or other CNS depressants.

14               Do you see that?

15       A.      I see that.

16       Q.      And that's in all capital

17   letters.

18       A.      It is.

19       Q.      And then there are seven

20   bullets in all bold that follow underneath in

21   that same black box.

22               Do you see that?

23       A.      I do.

24       Q.      And have you read a black box

25   warning like this one before?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      I have.

2        Q.      In what context?

3        A.      Well, when we were talking --

4    I'm -- I may have seen black box warnings in

5    this case.  When we were talking about this

6    yesterday, I mentioned that black box

7    warnings were a part of the factual base for

8    the Zyprexa in other antipsychotic litigation

9    I was involved in.

10       Q.      Have you done, or are you aware

11   of any research trying to ascertain whether

12   marketing convinces doctors to ignore black

13   box warnings such as the one in front of you?

14              MR. SOBOL:  Objection.

15       A.      As I mentioned yesterday, I am

16   aware of research about black box warnings

17   and the instances in which they have not been

18   effective, and therefore, ignored by

19   prescribing physicians.

20              And in the antipsychotic

21   litigation I was involved in, I did some

22   analysis that showed that while there was a

23   short-run response to the black box warning,

24   that prescribing returned to its original

25   trend.

```
 1    BY MR. ROTH:

 2         Q.    Which antipsychotic drug were

 3    you involved in?

 4         A.    Well, you know about Zyprexa --

 5         Q.    Right.

 6         A.    -- from the case you put in

 7    front of me.  I was an expert in several

 8    Risperdal cases as well, and the black box

 9    warning for atypical antipsychotics is common

10    to all the second-generation drugs.

11         Q.    Okay.  If you look at the

12    section is labeled Indications and Usage on

13    the same page below the black box warning?

14         A.    Yes.

15         Q.    It says:  Kadian is an opioid

16    agonist indicated for the management of pain

17    severe enough to require daily

18    around-the-clock long-term opioid treatment,

19    and for which alternative treatment options

20    are inadequate.

21              Do you see that?

22         A.    I do.

23         Q.    And that's the FDA-approved

24    indication and usage?

25              MR. SOBOL:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Again, as I understand the FDA

2      label, it contains information on the

3      approved usage.  I'm not -- neither a

4      clinician nor an FDA expert.  That is my

5      layperson's understanding.

6      BY MR. ROTH:

7      Q.      Okay.  And do you have any

8      reason to doubt that when the FDA approved

9      the label for Kadian or any other opioid

10     involved in this case, that it underwent the

11     regulatory process required by federal

12     regulations, including receiving studies of

13     efficacy and safety?

14            MR. SOBOL:  Objection, scope.

15     A.      I could not say one way or

16     another.  I don't have the information to

17     evaluate such a proposition.

18     BY MR. ROTH:

19     Q.      Okay.  Let's look at your

20     report, paragraph 11, which was the summary

21     of your opinions.

22     A.      Yes.  Not the table, just the

23     paragraph?

24     Q.      We can look at both.

25     A.      Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      I think we've made it through

2   all of them now.

3      A.      Impressive.

4      Q.      There may be one we didn't, so

5   that's what I want to talk about.

6      A.      Okay.  Good.

7      Q.      If you look back at

8   paragraph 11, the second bullet in your

9   summary says -- well, the first bullet,

10  Promotion of pharmaceuticals increase their

11  sales.

12             We talked about that I think a

13  lot yesterday.

14     A.      I think so.

15     Q.      The second bullet.  The alleged

16  unlawful promotion of opioids, if proven,

17  resulted in increased sales of opioids.

18             We talked about that some as

19  well.

20             And then if you look at the

21  table, I think those opinions are captured by

22  Section VI of your report; is that right?

23     A.      Section VI and VII generally go

24  to the first bullet point, which is, you

25  know, at a high level, promotion increases

Highly Confidential - Subject to Further Confidentiality Review

 1    sales.

 2         Q.     I guess what I'm getting at is

 3    your econometric models are not cited as a

 4    basis for your opinions that either promotion

 5    increases sales or that the unlawful

 6    promotion, if proven, resulted in an increase

 7    in sales.

 8         A.     Yes.  So the econometric models

 9    clearly show that the alleged unlawful

10    promotion of opioids caused sales.  I don't

11    specifically cite to the econometric models

12    there, but when I reach my conclusions from

13    the models, we can go to that text, I do

14    conclude that the model shows a causal

15    relationship.

16              So even though I don't mention

17    the econometric model specifically until I

18    get to the next bullet point, the fact that

19    I'm identifying the extent there is also

20    premised on the existence of an effect.

21         Q.     Okay.  I understand now.

22              So if you look at the second

23    bullet point, the last sentence says:  As a

24    result, I am of the opinion that the combined

25    effect of the defendant manufacturers'

1    promotion of prescription opioids since 1995

2    was a substantial contributing factor to the

3    increase in the use of prescription opioids

4    in the bellwether communities.

5                    Did I read that correctly?

6          A.      You did.

7          Q.      And that is based largely on

8    the econometric models?

9          A.      It's based on all the

10   foregoing.

11         Q.      Okay.  And I noticed the way

12   you worded that sentence was that the

13   promotion was a substantial contributing

14   factor; is that right?

15         A.      That's right.

16         Q.      Not that the unlawful promotion

17   was a substantial contributing factor,

18   because as we've discussed, you have no

19   opinion on whether defendants' promotion was

20   unlawful or not; you're relying on counsel's

21   assumption.

22                    MR. SOBOL:  Objection, asked

23          and answered.

24         A.      Again, I -- perhaps I should

25   have repeated the unlawful promotion, if

Highly Confidential - Subject to Further Confidentiality Review

1    proven.  So as you say, I demonstrate that

2    promotion caused sales, and I assume that

3    plaintiffs will prove that all promotion was

4    unlawful.

5                    MR. SOBOL:  By the defendants.

6          A.    All promotion by the defendants

7    was unlawful.

8    BY MR. ROTH:

9          Q.    And because you assumed that

10   all promotion by the defendants was unlawful,

11   that assumption would include promotion even

12   if a sales representative only dropped off

13   peer-reviewed literature at a doctor's

14   office?

15                   MR. SOBOL:  Objection, asked

16         and answered.

17         A.    My analysis includes all

18   promotion by defendants.  When I calculate

19   the but-for scenario, I remove that

20   regardless if some of that promotion used

21   materials that were FDA approved.

22   BY MR. ROTH:

23         Q.    Your analysis also includes

24   promotion by defendants even if the sales

25   representative had no interaction with the

1    prescriber?

2              MR. SOBOL:  Objection, asked

3         and answered.

4         A.    I think what you're suggesting

5    is that detailing may involve an interaction

6    with someone else in the office?  Is that

7    what you're referring to?

8              And, yes, as I understand the

9    matter at hand, that the entire promotional

10   enterprise is what is at issue here, and so I

11   have appropriately captured all detailing in

12   my econometric model.

13   BY MR. ROTH:

14        Q.    Your analysis includes all

15   promotion by defendants even if that

16   promotion did not result in any change in the

17   prescriber's behavior after they were

18   detailed?

19        A.    Well --

20             MR. SOBOL:  Objection.

21        A.    -- actually, I would

22   respectfully disagree with that.  My analysis

23   only attributes impact where promotion

24   resulted in an increase in sales.

25             ///

1    BY MR. ROTH:

2         Q.      But you include in your

3    analysis details that may have had no effect

4    on the particular prescriber's behavior?

5                  MR. SOBOL:  Objection, asked

6           and answered.

7         A.      And if that is the case, then

8    it reduces the incremental effectiveness of

9    promotion that I observe, and therefore, the

10   calculated impact.  The possibility that some

11   details did not produce change is

12   incorporated into the estimates.

13   BY MR. ROTH:

14        Q.      You include in your analysis

15   detailing where the prescriber's rate of

16   prescription may have actually decreased

17   after the detail?

18                  MR. SOBOL:  Objection, asked

19          and answered.

20        A.      My analysis will incorporate

21   the effects, negative or positive.  Obviously

22   on average they're positive.  If there are

23   some negative changes after a detail for some

24   reason, those again will reduce the measure

25   of impact.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. ROTH:

2         Q.    You include in your analysis

3    detailing even if the prescriber never

4    prescribed the medicine he or she was

5    detailed on?

6              MR. SOBOL:  Objection.

7         A.    Yes.  Again, just like the --

8    any detailing that has no effect or a lower

9    effect, I guess that would be a version of no

10   effect, if the individual detailed never

11   prescribed.  And again, that will reduce the

12   impact of detailing in my model.

13   BY MR. ROTH:

14        Q.    You include in your analysis

15   detailing to prescribers who were already the

16   lead authors of journal articles on the

17   addiction risk of opioids at the time they

18   were detailed?

19             MR. SOBOL:  Objection.

20        A.    If there is such detailing in

21   my data, again, my estimates will

22   appropriately reflect a reduced effectiveness

23   of promotion for those details.

24   BY MR. ROTH:

25        Q.    Your analysis includes

Highly Confidential - Subject to Further Confidentiality Review

1    detailing to oncologists prescribing for

2    end-of-life cancer pain?

3        A.      Again, to the extent that my

4    analysis does not grow the size -- sorry, to

5    the extent that promotion does not grow the

6    size of the market by expanding the use of

7    opioids, detailing, for example, to

8    oncologists who may already have been

9    prescribing opioids will not result in

10   impact.

11       Q.      Your analysis includes

12   detailing to prescribers who are hospice

13   specialists for end-of-life pain.

14       A.      To the extent that there is

15   detailing to hospice providers in my data and

16   those uses would have occurred regardless of

17   the promotion, my analysis will appropriately

18   capture those effects.

19       Q.      Your analysis includes

20   detailing to prescribers who may be

21   performing surgery or trauma intervention in

22   the emergency room?

23       A.      Again, to the extent that

24   those -- my analysis will calculate the uses

25   that occurred in this market as a result of

Highly Confidential - Subject to Further Confidentiality Review

1    the alleged misconduct.  Regardless of how

2    those opioid prescriptions were used in

3    practice, as I understand, is appropriate to

4    my assignment.

5         Q.     Stated differently, your

6    analysis includes any detailing in the data

7    regardless of to whom it was -- let me start

8    over.

9              Stated differently, your

10   analysis -- can we just get a clean question

11   and answer.  Say something.

12        A.     Yes.  What was the question?  I

13   don't know what the question is.

14        Q.     Stated differently, your

15   analysis includes any detail in the data,

16   regardless of who was detailed, what was said

17   or what behavior changed or did not after the

18   detail?

19        A.     So my analysis is consistent

20   with my assignment in that I examine and

21   quantify the aggregate market expansion that

22   occurred as a result of defendants' promotion

23   during the period from 1995 to the end of my

24   data in 2018.  I do not disentangle the types

25   of detailing; however, to the extent there

Highly Confidential - Subject to Further Confidentiality Review

1    are differential effects of detailing across

2    groups, those will be incorporated into the

3    estimates.

4              MR. ROTH:  Our time may be

5         done.  Let's take a quick break.  And

6         I may have more questions or someone

7         else may.

8              THE WITNESS:  Okay.

9              THE VIDEOGRAPHER:  The time is

10        1:35 p.m.  We're now off the record.

11             (Recess taken, 1:35 p.m. to

12        1:51 p.m.)

13             THE VIDEOGRAPHER:  The time is

14        1:51 p.m.  We're back on the record.

15   BY MR. ROTH:

16        Q.    Professor Rosenthal, in Table 2

17   you calculate the total percent of MMEs

18   attributable to defendants' promotion to be

19   ████ of MMEs; is that right?

20        A.    That's right.

21        Q.    To what do we owe the other

22   ████ of MMEs?

23        A.    The other ██ -- excuse me -- ██

24   percent of MMEs are owed to the promotion

25   that is not excluded in the but-for scenario,

Highly Confidential - Subject to Further Confidentiality Review

1    so again, because I start my data as early as

2    I can in '93, there's a stock of promotion

3    that builds up, and then there's

4    non-defendant promotion.  So all those things

5    are left in the model.

6         Q.    So it's promotion prior to '95

7    by anyone and non-defendant promotion

8    thereafter?

9         A.    That's correct.

10        Q.    And that explains ████ of the

11   MMEs with the remainder being explained by

12   defendants' promotion from 1995 to 2018?

13        A.    That's generally correct.  You

14   know, there's a constant in the model, which

15   I think we could go to Table 1 and in

16   Model B, so there's a baseline level of

17   ████████████ MMEs.

18        Q.    Okay.

19        A.    So that's in there as well.

20        Q.    And then the same question for

21   the indirect model, you calculate ███ of MMEs

22   due to excess shipments, so is it fair to say

23   based on your approach that the other ███ is

24   due to the demographic and socioeconomic and

25   other factors you model for?

```
 1              MR. SOBOL:  Objection.

 2       A.     That would be due to the

 3  changes in all of those factors.  Again,

 4  price actually has a negative effect, but the

 5  trend which is intended to proxy for

 6  non-defendant promotion and those other

 7  demographic, socioeconomic and healthcare

 8  variables.

 9  BY MR. ROTH:

10       Q.     Okay.  And then if you look

11  back at page 19 of your report, Figure 1.

12       A.     Sorry, excuse me.  I should

13  just say again, in the indirect model as in

14  the direct model there's also a baseline,

15  right, so we're projecting growth from '95

16  forward.  So there's a baseline level.

17       Q.     Got it.

18              So if you look on Figure 1 on

19  page 19, we haven't actually talked about

20  this diagram yet.

21       A.     Okay.  Page 19.  Yes.

22       Q.     And is this a diagram you've

23  used in other expert reports before?

24       A.     I tailored this one

25  specifically for this report, but I have used
```

1    similar kinds of diagrams.

2         Q.    And if we look at your diagram,

3    you have the ecosystem of promotion in all of

4    the lines between the various constituencies,

5    and in the box in the middle, there's

6    detailing, professional journals, samples,

7    and meetings and events.

8              Do you see that?

9         A.    Yes.

10        Q.    And as we discussed, your model

11   only accounts for detailing promotion, not

12   for any of the other items in the box or any

13   of the other boxes on Figure 1?

14             MR. SOBOL:  Objection,

15        mischaracterizes the testimony, asked

16        and answered.

17        A.    The direct model includes the

18   measure of detailing only.  The indirect

19   model is intended to capture all of these

20   kinds of marketing tools.

21   BY MR. ROTH:

22        Q.    And then Table 3, which we've

23   been round and around on, to the extent that

24   you used Table 3 to assess the delta between

25   a defendant's promotion percentage and the

1    baseline percentage, that delta is capturing

2    how that defendant's promotion relates to the

3    aggregate average; is that right?

4              MR. SOBOL:  Objection, asked

5         and answered.

6         A.    As we discussed earlier, I

7    don't use the table in that way.  I'm using

8    it to narrow the aggregate by excluding

9    individual defendants.

10              And when I do that, for

11    example, to exclude Aventis, just as an

12    alphabetically first choice, I am excluding

13    ultimately the effect that I observe in the

14    econometric model of Aventis' marketing,

15    whether that generates sales for its product

16    or someone else's product.

17              MR. ROTH:  Okay.  I think with

18         that I am done for the time being.

19         It's been a pleasure.  I believe

20         Mr. Metz has some questions, so I will

21         be passing the microphone to him.  And

22         I can't promise I won't come back,

23         depending on what else happens, but

24         thank you so much.

25              THE WITNESS:  Okay.  Thank you.

```
 1                   THE VIDEOGRAPHER:  The time is
 2        1:56 p.m.  We're now off record.
 3                   (Recess taken, 1:56 p.m. to
 4        1:58 p.m.)
 5                   THE VIDEOGRAPHER:  The time is
 6        1:58 p.m.  We're back on the record.
 7                   EXAMINATION
 8   BY MR. METZ:
 9        Q.    Good afternoon, Professor
10   Rosenthal.
11        A.    Good afternoon.
12        Q.    My name is Carl Metz.  I
13   represent Cardinal Health, which is one of
14   the distributor defendants in this case.
15        A.    I apologize for forgetting the
16   name of your employer as it were.
17        Q.    That's all right.  You're
18   referring to testimony yesterday where you
19   were asked about the distributor defendants,
20   you named two companies, and the third name,
21   Cardinal, eluded you.  Yes?
22        A.    Exactly, yes.
23        Q.    Okay.  At various places in
24   your report, you refer to marketing
25   defendants, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes, I do.

 2              Q.      And then in other places, and

 3     I'm sure this is not by design, you refer to

 4     the word "defendants" without

 5     differentiation.

 6                      MR. SOBOL:  Objection to the

 7              form.

 8                      You can answer.

 9              A.      Yes, I believe I use that term.

10     We could look to see how I use it.

11     BY MR. METZ:

12              Q.      For example, in paragraph 64,

13     which you're welcome to look at, and I'll

14     quote this just partially.  You say, quote:

15     A causal relationship between the

16     defendants', possessive, promotion and

17     prescriptions of opioids.

18                      Do you see that?

19              A.      Yes.

20              Q.      And do I understand based on

21     your testimony over the last two days that

22     despite using the singular term "defendants,"

23     we should not read that as referring to all

24     defendants, correct?

25                      MR. SOBOL:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.    In this paragraph in

2    particular, I'm talking about the defendants

3    who have detailing that I'm measuring in my

4    data, so those would be the marketing

5    defendants.

6    BY MR. METZ:

7         Q.    Okay.  And by marketing

8    defendants, you're not including any of the

9    distributor defendants, correct?

10         A.    I don't believe that they have

11   marketing data in my data, so there may be

12   places in my report where I refer to

13   defendants where it's appropriate to talk

14   about them more generally, for example, when

15   I'm summarizing the complaint, but here I

16   intend to describe the defendants who have

17   detailing that is measured in the IQVIA data.

18         Q.    Okay.  So just to be clear,

19   not -- as you believe it, not -- that does

20   not include the distributor defendants,

21   correct?

22              MR. SOBOL:  Objection, asked

23        and answered.

24         A.    I believe that is true.

25              ///
```

```
 1    BY MR. METZ:
 2        Q.      Okay.  And it also does not
 3    include the pharmacy defendants, correct?
 4                MR. SOBOL:  Objection, asked
 5        and answered.
 6        A.      Yes, that is correct.
 7    BY MR. METZ:
 8        Q.      So we take another example,
 9    paragraph 78, where you say, quote:  An
10    alternative method of identifying the impact
11    of the defendants', possessive, misconduct,
12    is to use an indirect method.
13                Do you see that?
14        A.      Yes.
15        Q.      And there again, you're using
16    the term "defendants," but how we should
17    understand that is the marketing defendants,
18    correct?
19        A.      Well, the -- in -- excuse me,
20    the indirect approach -- it is getting to be
21    late -- is, as you know, a residual approach,
22    so it inherently is looking at all of these
23    demographic, socioeconomic and healthcare
24    factors that could have driven higher opioid
25    use and attributes that which is left to the
```

1    misconduct.

2              I think it's a little bit less

3    clear about how that analysis might be used

4    to assess liability for distributors.  I have

5    not been asked to do that, but the indirect

6    analysis, because it's not measuring the

7    conduct of a specific group, could be open to

8    a broader interpretation.

9        Q.    Have you disclosed any opinions

10   that, based upon your indirect model, you

11   draw conclusions about distributor

12   defendants' conduct?

13       A.    I have not.  I have not drawn

14   those conclusions.

15       Q.    And you mentioned the detailing

16   data, but just to be clear, you did not

17   include in your direct model any data series

18   that you understood were measuring the

19   conduct of the distributor defendants; is

20   that correct?

21             MR. SOBOL:  Objection, asked

22        and answered.

23       A.    I have not measured the conduct

24   of the distributors or included that in my

25   model.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. METZ:

2         Q.    And the same would be true of

3    the pharmacy defendants, correct?

4              MR. SOBOL:  Objection, asked

5         and answered.

6         A.    I have not measured the conduct

7    of the pharmacies and included that in my

8    models.

9              MR. METZ:  Just so it's not

10        recurring, I'm five questions in.

11        What have I asked and answered?  Or

12        what have I asked previously?

13             MR. SOBOL:  All of this was

14        covered by Mr. Roth this morning and

15        yesterday.

16             MR. METZ:  Okay.  I disagree.

17   BY MR. METZ:

18        Q.    You testified at several points

19   that the design of your model is intended to

20   capture an aggregate effect on MMEs sold,

21   correct?

22        A.    That's correct.

23        Q.    And in part what that means is

24   you've not reported your results in a way

25   that allows you to identify any particular

1    set of prescriptions that combine to make up

2    the additional MMEs you've identified in your

3    analysis, correct?

4         A.    The way my analysis works is to

5    analyze the actual data and identify a

6    quantity of prescriptions in aggregate that

7    would not have been filled absent the

8    promotional misconduct.

9              As I noted yesterday, because

10   the but-for scenario did not occur, we cannot

11   explicitly observe which individual

12   prescriptions would not have been filled.  So

13   there's a conceptual impossibility to the

14   statement that you're describing.

15        Q.    Okay.  So just to be clear,

16   your answer is yes, but for the reason that

17   it would be impossible?

18             MR. SOBOL:  Objection, asked

19        and answered.

20        A.    Yes, and my analysis -- as you

21   know, my assignment was to estimate the

22   impact of the alleged misconduct and to

23   quantify that in aggregate.

24   BY MR. METZ:

25        Q.    I understand.  The alleged

Highly Confidential - Subject to Further Confidentiality Review

1    marketing misconduct, correct?

2         A.    The alleged marketing

3    misconduct.

4         Q.    And am I correct that the data

5    that you use in your calculation does not

6    contain identifying information for

7    individual prescriptions, correct?

8         A.    My data do not contain

9    individual prescription identifiers.  I

10   assume by that you mean something like a

11   member identifier.

12        Q.    Anything that would enable you

13   to identify a specific prescription that's

14   within the sum of your conclusions?

15        A.    No.  Again, because of -- for

16   privacy reasons, my data are deidentified.

17        Q.    Okay.  Now, you testified

18   yesterday that you have not formed any

19   opinions about the separate role of doctors

20   in causing an increase in the MMEs that you

21   measured.

22              Do you recall that testimony?

23        A.    I believe I described the fact

24   that of course doctors are in the causal

25   chain, they're the ones writing the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prescriptions.
 2         Q.      Right.  You testified that
 3    the conduct you're attempting to measure
 4    flows through doctors, but you're not forming
 5    a separate opinion about their independent
 6    role in the causal chain, what influence they
 7    exerted in the causal chain, correct?
 8                 MR. SOBOL:  Objection.
 9         A.      I have not separately examined,
10    I guess, doctor behavior.  Again, because
11    it's tautologically true that every
12    prescription is written by a physician, I
13    struggle with that concept.
14    BY MR. METZ:
15         Q.      I understand.
16                 Now, you also testified
17    yesterday that you've not formed any opinions
18    about whether any quantity of the increase in
19    MMEs identified in your opinions was
20    medically necessary or unnecessary, correct?
21                 MR. SOBOL:  Objection.  On the
22         direct model, you mean?
23    BY MR. METZ:
24         Q.      On the direct model, do you
25    recall that testimony?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.  In the direct and

2   indirect models, I do not differentiate

3   between medically necessary and unnecessary

4   prescriptions.

5      Q.    Okay.  And in part what that

6   means is you have not endeavored to identify

7   any subset of your total measured MME

8   increase that consists of prescriptions that

9   do not meet an appropriate standard of

10  medical care; is that correct?

11            MR. SOBOL:  Objection, asked

12        and answered.

13      A.    I have not evaluated the -- nor

14  am I a clinical expert, just to be clear --

15  the medical necessity of any of the

16  prescriptions that I find were caused by the

17  alleged misconduct.

18  BY MR. METZ:

19      Q.    Right.  You've not done that at

20  the level of individual prescriptions in the

21  first instance, correct?

22            MR. SOBOL:  Objection, asked

23        and answered.

24      A.    I have not done analysis at the

25  level of individual prescriptions at all.

Highly Confidential - Subject to Further Confidentiality Review

 1    BY MR. METZ:

 2         Q.    Okay.  And you've not done that

 3    for an aggregate sum of prescriptions either,

 4    correct?

 5              MR. SOBOL:  Objection, asked

 6         and answered.

 7         A.    I have not evaluated medical

 8    necessity of any prescriptions.

 9    BY MR. METZ:

10         Q.    All right.  Am I correct that

11    you've also not undertaken to identify any

12    subset of your total MME increase that

13    consists of prescriptions a pharmacist should

14    have refused to fill for whatever reason

15    after it was presented by a patient?

16              MR. SOBOL:  Objection.

17         A.    I have not been asked to

18    examine the decisions of pharmacists or the

19    conduct of pharmacists as it relates to this

20    matter.

21    BY MR. METZ:

22         Q.    Okay.  So you've not done that

23    for the reason you just stated?

24              MR. SOBOL:  Objection, asked

25         and answered.

```
 1           A.      I have not examined the conduct

 2      of pharmacists.

 3      BY MR. METZ:

 4           Q.      Okay.  And you're not an expert

 5      in what constitutes responsible conduct of

 6      pharmacists, correct?

 7           A.      I'm not an expert in what

 8      constitutes responsible conduct for

 9      pharmacists.

10           Q.      Based on your role as a

11      healthcare economist, are you, though,

12      generally aware that pharmacists have certain

13      obligations relating to the dispensing of

14      pharmaceuticals?

15           A.      I am aware generally where

16      pharmacists fit in the supply chain.  I am

17      not familiar with the specifics of their

18      professional guidelines.

19           Q.      Okay.  And recognizing that

20      you've already told me you do not have the

21      expertise to do this, it was not your

22      assignment, and you do not have the

23      visibility at the prescription level -- I

24      just want to confirm for the record -- you

25      have not evaluated whether individual
```

Highly Confidential - Subject to Further Confidentiality Review

1    prescriptions that are somehow within your

2    total MME calculation were properly filled

3    from the perspective of a pharmacist?

4             MR. SOBOL:  Objection.

5         Objection, asked and answered.

6         A.    I have not evaluated -- I guess

7    it sounds to me like you're just saying that

8    there's a notion of medical necessity that

9    applies to pharmacists, but I have not

10   evaluated the medical circumstances around a

11   particular prescription, whether it pertains

12   to the doctor's decisions or the pharmacist's

13   decisions.

14   BY MR. METZ:

15        Q.    Thank you for that.  And just

16   to be clear, because that's not what I was,

17   in fact, suggesting, I'm just trying to

18   confirm what is not done within the contours

19   of your opinions, not necessarily the reasons

20   for them or suggesting that you should have

21   done these things.

22            MR. SOBOL:  Well, she's going

23        to give complete answers to the

24        questions.

25            MR. METZ:  I don't mind her

Highly Confidential - Subject to Further Confidentiality Review

```
1              giving complete answers.
2                   MR. SOBOL:  Okay.
3    BY MR. METZ:
4         Q.     You similarly have not -- it
5    follows, I think, by not having done that
6    analysis at the level of individual
7    prescriptions, you've also not evaluated
8    whether individual pharmacists improperly
9    dispensed in response to prescriptions they
10   were presented with, correct?
11                  MR. SOBOL:  Objection, asked
12         and answered.
13        A.     I have not evaluated the
14   conduct of individual pharmacists in my
15   analysis.
16   BY MR. METZ:
17        Q.     Okay.  And you've not
18   undertaken such an evaluation at the level of
19   pharmacies as a whole, correct?
20                  MR. SOBOL:  Objection, asked
21         and answered.
22        A.     I have not evaluated the
23   contribution of pharmacies to these
24   prescriptions.
25                  ///
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. METZ:

 2         Q.    And you've not evaluated that

 3    at the level of chains of pharmacies,

 4    correct?

 5              MR. SOBOL:  Objection, asked

 6         and answered.

 7         A.    I have not evaluated the

 8    conduct of pharmaceutical chains or pharmacy

 9    chains to the opioid prescriptions.

10    BY MR. METZ:

11         Q.    Now, in Table 2 of your report,

12    you disclose some information on a percentage

13    basis under a heading that it is the percent

14    of MMEs attributable to challenged promotion,

15    correct?

16         A.    I think that's right.  I'm

17    sorry, just let me get the table.  Percent of

18    MMEs attributable to challenged promotion,

19    yes.

20         Q.    Okay.  Now, would I be correct

21    in surmising that for all the reasons we've

22    been discussing, it would not be correct to

23    characterize the results reflected in Table 2

24    as reflecting a percentage of MMEs prescribed

25    in excess of legitimate medical need?
```

Highly Confidential - Subject to Further Confidentiality Review

1          MR. SOBOL:  Objection, asked

2      and answered.

3      A.      It is -- I do not describe my

4      calculations that way, and as we discussed

5      earlier, I have not evaluated the medical

6      necessity of any prescriptions.

7      BY MR. METZ:

8      Q.      Okay.  My question was close to

9      that, but it's not that.

10              They're not described that way,

11     and it would be incorrect to describe them

12     that way based on the analysis you conducted,

13     correct?

14          MR. SOBOL:  Objection, form,

15      asked and answered.

16     A.      I did not analyze medical

17     necessity.  My results do not pertain to

18     medical necessity and, like anything, they

19     are not, it would be incorrect to label them

20     medical necessity or anything else that they

21     are not.

22     BY MR. METZ:

23     Q.      Thank you.

24              You would also agree with me

25     that again, for the same reasons we've been

Highly Confidential - Subject to Further Confidentiality Review

1    discussing, it would not be correct to

2    characterize Table 2 as reflecting a percent

3    of MMEs dispensed by pharmacies or

4    pharmacists in excess of legitimate

5    prescriptions?

6              MR. SOBOL:  Objection, asked

7        and answered.

8        A.    I am not sure whether --

9    because I have not analyzed the conduct of

10   pharmacists or pharmacies -- whether another

11   expert might deem these same units that I

12   calculate are caused by promotion to have

13   been in excess from the point of view of the

14   conduct of pharmacists or pharmacies.

15             I have not done that analysis.

16   So you're asking me a question about how

17   these -- these analyses might be used by

18   others, as far as I'm concerned.

19   BY MR. METZ:

20       Q.    I'm asking the author of the

21   analysis the proper interpretation of the

22   analysis, and as the author of the analysis,

23   it would not be a proper interpretation that

24   what this reflects is a quantity of opioid

25   pharmaceuticals dispensed in excess of

Highly Confidential - Subject to Further Confidentiality Review

1  legitimate prescriptions, correct?

2            MR. SOBOL:  Objection, asked

3       and answered, mischaracterizes prior

4       testimony.

5       A.      When you use the word

6  "legitimate," to me that sounds like it -- I

7  mean, literally it's a legal term, and so

8  what I've calculated here, which I have

9  labeled absolutely clearly, is the percent of

10  MMEs attributable to allegedly unlawful -- I

11  say challenged -- unlawful promotion.

12            So that is illegitimate in a

13  sense, in the sense that I understand

14  plaintiffs' counsel intend to prove that the

15  defendants' promotion from 1995 through 2018

16  was unlawful.

17  BY MR. METZ:

18       Q.      Okay.  Let me ask it in a

19  different way.

20            The information compiled in

21  Table 2 could not be correctly characterized

22  as having been compiled so that it would show

23  an amount of opioid prescriptions that were

24  dispensed based on prescriptions a pharmacist

25  should have refused?

```
 1                    MR. SOBOL:  Objection.

 2   BY MR. METZ:

 3        Q.    That's not the basis on which

 4   Table 2 is compiled, correct, as its author?

 5                    MR. SOBOL:  Objection, asked

 6            and answered several times now.

 7        A.    I have not in my analysis

 8   analyzed the behavior of pharmacies or

 9   pharmacists, and so I cannot describe these

10   data as reflecting the behavior of pharmacies

11   or pharmacists.

12                    Because of this issue around

13   the causal chain that pharmacies, in fact,

14   dispense prescriptions, I don't know if

15   someone else would attribute this -- these

16   same excess units to pharmacies.  I haven't

17   done that analysis.

18                    I am not attributing these to

19   pharmacists' behavior, but they are in the

20   causal chain.  So I'm saying I have described

21   these as those units that are caused by the

22   allegedly unlawful promotion.  That's what

23   they are.

24                    Whether or not the pharmacists'

25   or pharmacies' conduct is fully overlapping
```

Highly Confidential - Subject to Further Confidentiality Review

1    with the marketing manufacturers here, I

2    don't know.  I haven't been asked to look at

3    that question.

4    BY MR. METZ:

5         Q.    In running the analyses that

6    resulted in the numbers in Table 2, it was

7    never at any point your intention to compile

8    a table from which one would interpret that

9    as a volume of opioid prescriptions that were

10   dispensed in excess of legitimate --

11   prescriptions that a pharmacist should have

12   fulfilled after being presented with such

13   prescriptions.

14             MR. SOBOL:  Objection, asked

15        and answered, mischaracterizes prior

16        testimony.

17   BY MR. METZ:

18        Q.    Isn't that correct?

19             MR. SOBOL:  Well, objection.

20        Answer -- asked and answered,

21        mischaracterizes prior testimony.

22             If you want to give the same

23        answer or whatever, go ahead.

24        A.    I'm not sure.  In my analysis,

25   I did not consider whether a pharmacist or

1    pharmacy should have done one thing or

2    another.  Again, they're in the causal chain.

3    They must have been involved in filling these

4    prescriptions, but I have not separately

5    analyzed the conduct of those pharmacists or

6    pharmacies; and moreover, when you use the

7    word "should," that sounds like there's

8    either a professional judgment or a legal

9    judgment, and I have not analyzed that kind

10   of judgment.

11   BY MR. METZ:

12        Q.    Okay.  I think I asked a

13   complicated question, more so than I intended

14   to be.  Mine is just very simple.

15             As the person who compiled the

16   information in that table, it was not done

17   for the purpose of making the sort of claim

18   that I just -- just stated in my previous

19   question, correct?  That was not the purpose

20   of compiling the information in that table.

21             MR. SOBOL:  Objection, asked

22        and answered.

23        A.    The purpose of Table 2 was to

24   fulfill the part of my assignment where I was

25   asked to quantify the impact of allegedly

Highly Confidential - Subject to Further Confidentiality Review

1    unlawful promotion on MMEs.  That was the

2    purpose of Table 2.

3    BY MR. METZ:

4         Q.    Okay.  Now, you testified this

5    morning that you've not conducted any

6    analyses relating to suspicious order

7    monitoring for any defendant.

8              Do you recall that?

9              MR. SOBOL:  Objection, asked

10        and answered.

11        A.    Yes.

12   BY MR. METZ:

13        Q.    To take that one step further,

14   you conducted no analysis seeking to identify

15   any subset of your total MMEs increase that

16   consists of opioid medications that were part

17   of any order that plaintiffs or their experts

18   have alleged to be suspicious.  You've not

19   conducted that analysis, correct?

20        A.    I have not conducted an

21   analysis of suspicious orders in -- within

22   the context of my analysis and any suspicious

23   order analysis.

24        Q.    And as we discussed a few

25   minutes ago, because your results are based

Highly Confidential - Subject to Further Confidentiality Review

1    on aggregate data for total MMEs, they do not

2    contain the identifying information that

3    would allow you to trace them back to

4    individual prescriptions, correct?

5              MR. SOBOL:  Objection, asked

6         and answered.

7         A.    The data I have from the

8    National Prescription Audit do not have

9    identifiers, so in these data, I cannot trace

10   them back to individuals.

11   BY MR. METZ:

12        Q.    Okay.  And therefore, those

13   MMEs are also not traceable back to

14   individual pharmacies, correct?

15             MR. SOBOL:  Objection, asked

16        and answered.

17        A.    Again, in the aggregate data I

18   have, that is correct.

19   BY MR. METZ:

20        Q.    And you've not attempted to

21   trace them, correct?

22             MR. SOBOL:  Objection, asked

23        and answered.

24        A.    I would have to get a different

25   dataset for that.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. METZ:

2         Q.    Okay.  And therefore, those

3    MMEs are also not traceable back to

4    individual orders that pharmacies placed with

5    their wholesale distributors, correct?

6              MR. SOBOL:  Objection, asked

7         and answered.

8         A.    My data are not at the right

9    level of disaggregation to track orders to or

10   from pharmacies.

11   BY MR. METZ:

12        Q.    And for that reason or other

13   reasons, you've not attempted to make any

14   such linkage, correct?

15             MR. SOBOL:  Objection, asked

16        and answered.

17        A.    I have not been asked to make

18   any such linkage, and so, therefore, I have

19   not acquired the data or undertaken that

20   assignment.

21   BY MR. METZ:

22        Q.    And for that reason, if not

23   others, would you agree with me that it would

24   not be correct to characterize Table 2 as

25   reflecting a percentage of MMEs distributed

Highly Confidential - Subject to Further Confidentiality Review

1   as a result of suspicious orders?

2            MR. SOBOL:  Objection.

3        A.      These are -- oh, as a result of

4   suspicious orders, sorry.  It is -- these are

5   a percentage of MMEs that were distributed as

6   it were.  They reached patients at a pharmacy

7   as a result of promotional misconduct.  I

8   have not analyzed suspicious orders.  I do

9   not know how those two things would

10  intersect.  These percentages reflect

11  promotional impact.

12           MR. METZ:  Thank you.  Whoever

13       is on the phone, if you would hit

14       mute, please.  We're hearing some

15       background.  Thank you.

16  BY MR. METZ:

17       Q.      Would you agree with me that as

18  a general proposition, in a regression

19  analysis, causality cannot be inferred by

20  data analysis alone, rather, one must infer

21  that the causal relationship exists on the

22  basis of an underlying causal theory that

23  explains the relationship between the two

24  variables?

25       A.      It sounds like you're reading

1    from a textbook.  Generally, causation begins

2    with an economic theory.  I would agree with

3    the general premise of that statement.

4         Q.     And would you also agree that

5    as a general proposition in regression

6    analysis, even when an appropriate theory has

7    been identified, causality can never be

8    inferred directly; one must also look for

9    empirical evidence that there is a causal

10   relationship?

11             MR. SOBOL:  Objection, asked

12        and answered.

13        A.     I would agree that in general,

14   economists use both theory and empirical

15   evidence to make causal inferences, yes.

16   BY MR. METZ:

17        Q.     And consistent with those

18   principles for your work in this matter, you

19   have not posited a causal theory of how your

20   calculation of the increase in total MMEs

21   might be causally related to any alleged

22   suspicious order by distributor defendants,

23   correct?

24        A.     I have not posited a theory

25   related to suspicious orders.  I have not

Highly Confidential - Subject to Further Confidentiality Review

1    been asked to examine that question in any

2    way in my analysis.

3        Q.    And it follows you've also not

4    looked for empirical evidence of any such

5    causal relationship, correct?

6              MR. SOBOL:  Objection, asked

7         and answered.

8        A.    Yes, I have not -- I have not

9    undertaken an analysis of suspicious orders.

10   BY MR. METZ:

11       Q.    Okay.  New topic.

12             In paragraph 56 of your report,

13   you -- and I'm reading a truncated version of

14   the quote, but, quote:  While documents

15   produced in discovery show many --

16             MR. SOBOL:  Wait one second,

17        please, if it's going to be truncated.

18             MR. METZ:  Please.

19       A.    56?  Yeah.

20             MR. SOBOL:  Where are you?

21             THE WITNESS:  At the bottom of

22        page 38?

23             MR. METZ:  I believe so.

24             THE WITNESS:  Yes.

25             ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. METZ:

2        Q.    You state:  While documents

3    produced in discovery show many examples of

4    such promotional efforts beyond detailing,

5    for the purposes of my econometric analysis,

6    I rely on detailing contacts to measure

7    promotion for several reasons.

8              Do you see that?

9        A.    I do.

10       Q.    Okay.  Now, you testified about

11   this yesterday, but I have a few follow-up

12   questions.

13       A.    Sure.

14       Q.    As I understand your testimony

15   and your report, one reason you rely upon

16   detailing is that it's a form of marketing

17   for which you have enough data to enable you

18   to perform a time series regression; is that

19   correct?

20             MR. SOBOL:  Objection.

21       A.    That is one of the reasons that

22   I state in this paragraph, in addition and

23   first and foremost, to it being a very

24   important form of marketing, if not the

25   dominant form of marketing.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. METZ:

2         Q.     Okay.  So some of the other

3    forms of marketing are not systematically

4    tracked in data in the same way that the

5    detailing is, correct?

6         A.     Yes, that's correct.

7         Q.     And you also believe, do you

8    not, that -- this is a quote:  From an

9    econometric standpoint, detailing is a good

10   proxy for total promotional effort,

11   including -- and closed quote -- including

12   those other forms of marketing for which

13   there's not systematic data, correct?

14        A.     Yes, that's correct.

15        Q.     All right.  Now, in the

16   following paragraph, paragraph 57, and then

17   in Figure 5, you identify a series of what

18   are labeled key events that would have

19   affected the receptiveness of prescribers and

20   patients to promotional messages about the

21   safety and effectiveness of opioids.

22               Do you see that?

23        A.     I do.

24        Q.     Okay.  And your understanding

25   is plaintiffs allege that manufacturer

1    defendants were responsible for those key

2    events?

3         A.    As you can see, looking at

4    Figure 5, the events in red include many

5    policy/regulatory events, so the events in

6    green are ones that are described in

7    Dr. Perri's report, among other places.

8         Q.    Okay.  So the answer to my

9    question would be yes, for the green-flagged

10   key events?

11        A.    Yes.

12        Q.    How did you --

13             MR. SOBOL:  Or the answer she

14        gave.

15   BY MR. METZ:

16        Q.    How did you identify this list

17   of key events?

18        A.    The list comes from -- there's

19   an FDA timeline that's available on their

20   website that is included in my documents

21   relied upon; the complaint, Dr. Perri's

22   report.  It's an aggregation of all those

23   places.

24        Q.    Okay.  Did you include every

25   event that's listed in those sources?

1    A.    No, I did not.

2    Q.    With reference to the events

3 flagged in green, what were your criteria for

4 inclusion from among the various events that

5 were candidates based on those sources?

6    A.    Sure.  Again, as I said earlier

7 yesterday, I believe, I sought to describe

8 some of the key events that were going on at

9 different stages of the analysis during the

10 time frame, so I was looking to identify

11 events over time.

12         In some cases there might be

13 other events that coincide with these same

14 events.  I focused in terms of the events in

15 green in particular ones that are highlighted

16 in the complaint and in Dr. Perri's report.

17    Q.    Now, in your testimony

18 yesterday, you were asked about one of these

19 events.  It was the consensus statement of

20 the American Academy of Pain Management and

21 the American Pain Society.

22    A.    Yes.

23    Q.    Do you recall that?

24    A.    I do.

25    Q.    And I want to ask a little

Highly Confidential - Subject to Further Confidentiality Review

1    follow-up about your testimony which, based

2    on the rough transcript, was in part that

3    that consensus statement related to the

4    undertreatment of pain and the need for more

5    attention to the treatment of pain and the

6    effective use of opioids for such treatment.

7                Do you recall that?

8        A.      Yes, that was my summary of it.

9        Q.      And why would that make that

10   event significant?

11       A.      I don't know what you mean by

12   why would that summary make it significant.

13   Again, it's an event that's talked about in

14   Dr. Perri's report and talked about in the

15   complaint.

16       Q.      This is a -- this is an event

17   that, based on the information referred to in

18   those places, you were hypothesizing could

19   have had a causal relationship with the sales

20   of MMEs, correct?

21       A.      That's right.  I understand

22   that Dr. Perri's opinion and plaintiffs

23   intend to prove that these kinds of

24   professional society recommendations were

25   manipulated by defendants.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And one of the reasons

2    why that statement as you described it

3    yesterday would be hypothesized to have a

4    causal influence is it referred to the notion

5    that there's an undertreatment of pain,

6    correct?

7    A.    Yes.

8    Q.    And another of the reasons was

9    because it referred to the notion that

10   opioids could be effective treatment for such

11   pain, correct?

12   A.    That's correct.

13   Q.    Does the reputation of these

14   two bodies play a role in its being

15   considered a key event?

16   A.    Again, for my purposes, it's a

17   notable event because it is featured in

18   Dr. Perri's analysis and others, and I'm

19   using Figure 5 to talk about particularly the

20   nonmarketing mechanisms that were allegedly

21   part of the overall effort to grow the market

22   for opioids.

23        So the reputation of the

24   professional societies is likely a reason for

25   which the marketing defendants allegedly

Highly Confidential - Subject to Further Confidentiality Review

1    influenced those -- that consensus statement

2    and those guidelines because that is an

3    effective way of delivering their message.

4         Q.    Now, looking again at Figure 5,

5    I see you have it in front of you, another of

6    the key events that's flagged reads capital

7    V, cap A, "Pain as 5th Vital Sign."

8              Do you see that?

9         A.    I do.

10        Q.    Do you have an understanding of

11   what that's referring to?

12        A.    It was a VA statement, again,

13   around the need to more closely monitor and

14   treat pain.

15        Q.    And the VA that you're

16   referencing there is the U.S. Department of

17   Veteran Affairs?

18        A.    It is.

19        Q.    And why would that be

20   significant?

21        A.    Again, this is something that

22   is described in Dr. Perri's report and is

23   another example of the way defendants'

24   message was legitimized through the

25   activities of other stakeholder groups,

1    including the VA.

2         Q.     Okay.  And as you say

3    "defendants" in that testimony, you mean

4    marketing defendants?

5         A.     Yes, marketing defendants.

6         Q.     Do you recall anything else

7    about the VA's message other than it was

8    around a need to more closely monitor and

9    treat pain?

10        A.     I don't recall all the details

11   of it.  I believe it's cited in my documents,

12   so we could pull it up.

13        Q.     Okay.  But it is, as you recall

14   it, thematically consistent with the previous

15   document in that it identified a need to have

16   more expansive treatment of pain and

17   identified opioids as one way of doing that?

18        A.     Yes.  And I think what it

19   became known for was this notion of the fifth

20   vital sign.

21        Q.     That pain is the fifth vital

22   sign?

23        A.     That's correct.

24        Q.     Okay.  And again, in the

25   language we were referring to a few minutes

1     before, you had a causal theory that a

2     publication like that by an organization like

3     the VA could have been causally related to

4     the sale of opioids, correct?

5           A.    Yes.  I believe that's what I

6     describe in my report, that all of these

7     events collectively created an environment in

8     which physicians were more receptive to

9     pharmaceutical marketing.

10          Q.    And because it's flagged in

11    green, the causal theory is that it would be

12    positively correlated with sales, correct?

13          A.    That was my causal theory, yes.

14          Q.    And so can we look at Table 1

15    in your report, which is the --

16          A.    Regression results.

17          Q.    Well, it's the output from your

18    direct regression.

19          A.    Yes.

20                MR. SOBOL:  Do you have a page?

21                MR. METZ:  I do.

22                THE WITNESS:  47.

23                MR. SOBOL:  Thank you.

24    BY MR. METZ:

25          Q.    And you testified about this

1    yesterday and over the course of today, and

2    I'm just going to reference a couple of

3    things to orient us and then I have some

4    follow-up questions.

5              In your Model B, as you've

6    testified, you do not include a variable for

7    marketing conduct other than -- other than

8    detailing; isn't that correct?

9         A.    The variable that I included in

10   my model is detailing, the stock of

11   detailing, yes.

12        Q.    Okay.  And your findings based

13   on that model purport to explain more than

14   99% of the variation in total MMEs, correct?

15        A.    Based on this model, which also

16   includes the price index, yes.

17        Q.    Okay.  And that 99% is based on

18   the R-squared statistic, correct?

19        A.    Yes.

20        Q.    And then in your Model C, you

21   include five additional dummy variables to

22   test for whether specific events from your

23   Figure 5 are having an influence on total

24   MMEs, correct?

25        A.    That's correct.

1    Q.    And you talk about that a

2  little in paragraph 73 of your report?

3    A.    Yes.

4    Q.    And in -- as you disclose

5  there, in your -- and as reflected, I think,

6  in Table 1, when you ran the model, including

7  those five dummy variables, you found that

8  two of them were statistically significant at

9  the 5% level, correct?

10    A.    That's correct.

11    Q.    One is what you've titled the

12  1999 Federation of State Medical Boards Model

13  Guidelines dummy variable, correct?

14    A.    Yes.

15    Q.    And the other is the

16  rescheduling of hydrocodone, correct?

17    A.    That's correct.

18    Q.    Now, you've assigned names to

19  these dummy variables, but wouldn't you agree

20  that by definition, a dummy variable is not

21  actually testing for the influence of the

22  specific event described in its name?

23        MR. SOBOL:  Objection.

24    A.    Well, I'm not sure I would

25  agree with that.  They're intended to capture

1    an event based on their timing.  They are

2    not -- they don't reflect a quantum, other

3    than existence, and so hence, the name dummy

4    variable.

5    BY MR. METZ:

6        Q.    Okay.

7        A.    But they are still intended to

8    capture some kind of timing.

9        Q.    They're intended to capture

10   the -- an effect that's occurring with that

11   time and an effect that may be correlated

12   with the variable of interest, correct?

13       A.    Yes, an effect on the variable

14   of interest.

15       Q.    Okay.  And so it's in contrast

16   with, for example, your detailing data, which

17   is populated by data that changes month to

18   month.  A dummy variable, especially as

19   you've used it, has two settings, correct?

20       A.    A dummy variable, as anyone

21   would use it, as it's defined, is either a

22   one or a zero.  They're very commonly used in

23   regression analysis, as you may know.

24       Q.    I know.

25            And so -- and you described

Highly Confidential - Subject to Further Confidentiality Review

1    this in paragraph 73.  In your model you have

2    a series of months where the dummy variable's

3    value or the value of the data associated

4    with it is zero, correct?

5        A.    That's correct.

6        Q.    And at a point in time that you

7    determine for purposes of trying to capture

8    the effects of some event of interest, you

9    changed that value from zero to one, correct?

10       A.    That's correct.

11       Q.    And in your model you leave it

12   turned on as it were --

13       A.    Yes.

14       Q.    -- from then to the end of your

15   data series, correct?

16       A.    True.

17       Q.    And that's not an automatic

18   design feature one could turn a dummy

19   variable on and off, correct?

20       A.    You can do whatever you like,

21   of course, but for the most part, when we

22   think about something that is released, that

23   it's on and that it stays on.  Unless, for

24   example, there was a policy that was then

25   reversed and then it would make sense to turn

Highly Confidential - Subject to Further Confidentiality Review

1    it off.

2         Q.    Right.  So I understand that

3    you selected the timing of these dummy

4    variables based on their proximity to the

5    events after which they're named, correct?

6         A.    Yes.

7         Q.    But to be precise, regardless

8    of the names, what they're capturing are

9    changes in the dependent variable, which in

10   this case are the total MMEs, that are

11   correlated with influences existing at the

12   time the dummy variable is turned on,

13   correct?

14             MR. SOBOL:  Objection, form.

15        A.    Yes, they are capturing any

16   shift that occurred around that time.

17   BY MR. METZ:

18        Q.    And if there are multiple

19   events around that same time that are

20   correlated with the explanatory variable in a

21   similar way, the dummy variable will pick up

22   their collective influence, correct?

23        A.    Yes.  I believe I said the same

24   thing when I explained why ultimately I do

25   not use Model C.

1      Q.     And you originally created

2    Model C as a robustness test, correct?

3      A.     It is a check on Model B to

4    see, well, we had these events, if we picked

5    the ones that we think are important, do we

6    see any shift around that time period.

7           So it's a check in that sense,

8    and it seems to me based on the results that

9    it's not a sensible direction to go.

10     Q.     Well, maybe my question is

11   meant to be -- I meant it to be a little bit

12   simpler.

13          You designed Model C as a test

14   of the robustness of Model B, rather than

15   running that as a fully formed model.  Isn't

16   that what you say in your report?

17          MR. SOBOL:  Objection, asked

18      and answered.

19     A.     I describe it in that way as

20   well, and in doing so, I look at Model C on

21   its own merits as well.

22   BY MR. METZ:

23     Q.     Okay.  And the purpose -- so

24   leaving aside your valuation of the merits of

25   Model C on its own, I want to focus on the

Highly Confidential - Subject to Further Confidentiality Review

1    robustness test purpose.

2              The purpose of a robustness

3    test is to see the extent to which the

4    results of a regression model are sensitive

5    to changes in the underlying assumptions of

6    that model; is that correct?

7        A.    Yes.

8        Q.    And you agree that robustness

9    is important to the validity of a regression

10   model and its interpreted results?

11             MR. SOBOL:  Objection, form.

12       A.    It's one way that we look at

13   the validity of the model.

14   BY MR. METZ:

15       Q.    And so specifically here, to

16   the extent your purpose was a robustness

17   test, you were testing the assumption -- and

18   I'm quoting again from paragraph 73 -- the

19   validity of the assumption that, quote,

20   Model B implicitly accounts for non-detailing

21   events and policies, closed quote, correct?

22       A.    Yes.

23       Q.    And you tested that by

24   examining whether indicators of specific

25   events and policies should be explicitly

1    included in the model, correct?

2         A.    Yes.

3         Q.    Now, when you originally

4    disclosed your report, you concluded that

5    jointly all five events are not statistically

6    different from zero, correct?

7              MR. SOBOL:  Objection.

8         A.    Yes, that was -- it was -- the

9    wrong test was referenced when the write-up

10   was, although the right test was included in

11   the results, but I was looking at the wrong

12   test when I summarized that.

13   BY MR. METZ:

14        Q.    Okay.  And so just to hone in

15   on the particular language that's used in

16   your report, when you say jointly, all five

17   events are not statistically different from

18   zero, based on the discussion we had a minute

19   ago, you mean the five dummy variables named

20   after events as listed in Table 1 were not

21   statistically different from zero as stated

22   in your report originally?

23             MR. SOBOL:  Objection.  Well,

24        you want her to testify on the basis

25        before the errata?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. METZ:  I'd like her to

2          answer my question.  But she's doing a

3          fine job.  If you don't understand my

4          question, I'm happy to clarify.

5     A.     No, I think you just said

6  something that would be -- I understand is

7  accessible, but it would be a strange way to

8  describe the results.

9          So I say that the dummies are

10  or aren't significant, so I'm inferring from

11  the dummy variables what I can learn about

12  modeling those events in that on/off way.

13  BY MR. METZ:

14     Q.     Well, if I -- if we took the

15  sentence that's in your report that I quoted,

16  the one beginning "jointly," and replaced the

17  word "events" with "dummies," would it cease

18  to be accurate?

19     A.     It would not.  I'm just saying

20  it would not be unusual for someone to

21  describe their statistical results using

22  dummy variables based on what the dummy

23  variables are intended to represent.

24     Q.     Okay.  And one of the reasons

25  you've given for rejecting Model C was you

1    found a counterintuitive result for your

2    hydrocodone event, correct?

3              MR. SOBOL:  Objection.

4         A.    I gave that reason in addition

5    to the fact that it does not fundamentally

6    change my results.

7    BY MR. METZ:

8         Q.    Okay.  But that was one of your

9    reasons?

10         A.    That's correct.

11         Q.    And because it's a dummy

12    variable, that result may not be

13    counterintuitive.  It may be capturing an

14    effect other than hydrocodone, correct?

15              MR. SOBOL:  Objection.

16         A.    Again, it's counterintuitive

17    based on the event I put the dummy variable

18    in to model, and like you, I wonder if it's

19    capturing something else.

20    BY MR. METZ:

21         Q.    Okay.  It would be contrary to

22    your expectations for why you put a dummy

23    there in the first place and why you named it

24    the way you did.  But that doesn't rule out

25    that it's accurately measuring some event

Highly Confidential - Subject to Further Confidentiality Review

1   that's actually going on at that place, just

2   not one that you had hypothesized?

3          MR. SOBOL:  Objection, form,

4      asked and answered.

5      A.    Yes, it is possible that it is

6   appropriately capturing something.

7   BY MR. METZ:

8      Q.    Okay.  And that was one of two

9   events that you found that individually was

10  statistically significant at the 5% level,

11  correct?

12     A.    That's correct.

13     Q.    And you also, as you now

14  disclosed in your errata, you also found that

15  jointly, all five events are statistically

16  different from zero, correct?

17     A.    That's correct.

18     Q.    Okay.  And returning to the

19  robustness test purpose of creating Model C

20  in the first place, that shows, does it not,

21  that your Model B is sensitive to some events

22  outside the construct of Model B that are

23  being captured by those dummy variables?

24         MR. SOBOL:  Objection.

25     A.    I would disagree.  If you

Highly Confidential - Subject to Further Confidentiality Review

1    look -- if we go to look at the charts and

2    you look at the extent to which my

3    predictions changed, they hardly change at

4    all.  The coefficients on the variables of

5    interest, they hardly change at all.

6    BY MR. METZ:

7         Q.    Well --

8         A.    The results are virtually the

9    same.

10        Q.    Your coefficient for -- you

11   have three time period coefficients for the

12   detailing variable, correct?

13        A.    That's correct.

14        Q.    And as you've discussed, you

15   also construct the detailing variable

16   differently in the different periods,

17   correct?

18        A.    We discussed that.  We can go

19   over it again, but yes.

20        Q.    I'm just referencing that.

21        A.    Yes, let's reference that.

22        Q.    All right.  The first time

23   period detailing variable changes from

24   Model B to Model C, does it not?

25        A.    It changes a small bit, but

Highly Confidential - Subject to Further Confidentiality Review

1    again, if you look at the predictions of

2    actual versus but-for, the differences are

3    minute.

4         Q.    I'll get to that in a second.

5               It changes, yes?

6               MR. SOBOL:  Well, no,

7         objection.  She answered the question.

8               MR. METZ:  Fair enough.

9               THE WITNESS:  In my opinion --

10   BY MR. METZ:

11        Q.    I'll ask a different question.

12        A.    Okay.

13        Q.    Specifically, it changed by

14   reporting a lower value in Model C for that

15   coefficient as compared to Model B.

16               MR. SOBOL:  Objection, asked

17         and answered.

18        A.    The coefficient is lower, yes.

19   BY MR. METZ:

20        Q.    And the interpretation of that

21   is that in that Model C, when you include

22   these dummy variables, some amount of the --

23   what had previously been reported as the

24   influence of the detailing is now being no

25   longer reported as the influence of the

1    detailing, and it is being ascribed to one or

2    more of the dummy variables.  Yes?

3              MR. SOBOL:  Objection.

4         A.    There is some quantum.  It is a

5    very small difference.  In my view, given the

6    limitations of Model C and given the fact the

7    results are different by such a small amount,

8    Model B is preferred.

9    BY MR. METZ:

10        Q.    Okay.  And you have a second

11   period in which you report the detailing

12   variable, and the coefficient on that

13   variable also changes from Model B to

14   Model C, correct?

15        A.    Yes, they do.  The point

16   estimates are different.

17        Q.    Okay.  And they change in the

18   same direction in that, again, the detailing

19   is credited with less of an influence, and --

20        A.    I'd actually have to look.

21        Q.    -- some of that influence is

22   credited instead to the dummy variables,

23   correct?

24        A.    There's -- you're right.  There

25   is a small decrease in the second coefficient

1    and the third coefficient is the same.

2         Q.    Now, you've said many times

3    that it is a small decrease, but a couple of

4    follow-ups about that.

5              Is it standard practice in

6    econometrics to actually make qualitative

7    judgments about the differences between

8    coefficients based solely on their numeric

9    values?

10              MR. SOBOL:  Objection.

11         A.    I do not include a conclusion

12    about the quantitative difference between

13    these coefficients.  I explain my reasons for

14    selecting Model B, and we've talked about

15    them.  In terms of the results of Model C,

16    not based on the magnitude of that

17    difference.

18              Had there been a larger

19    magnitude of difference, I might have

20    considered the challenges with Model C

21    differently.

22    BY MR. METZ:

23         Q.    I'm asking a simpler question,

24    which is:  To an econometrician, do the --

25    what I'll call the real numbers -- so not

1    their weighted or contextualized or --

2    versions, but just the pure number, comparing

3    coefficients, coefficient A to coefficient B,

4    based solely on the number associated with

5    them, is that a comparison that

6    econometricians would typically make when

7    evaluating the significance of a change?

8              MR. SOBOL:  Objection, asked

9         and answered, form.

10   A.     I -- economists,

11   econometricians, almost always make

12   qualitative judgments about models because of

13   course there's part of it that is based on

14   theory as we've described.

15             So might an econometrician make

16   a quantitative analysis?  Maybe.  She might

17   also make qualitative judgments about which

18   model is preferred.  Not everything can be

19   described quantitatively.

20             If I wanted to know exactly how

21   different these models are, I could make that

22   quantitative comparison.  I was not

23   attempting to do that here.

24   BY MR. METZ:

25   Q.     I'm just referring back to

Highly Confidential - Subject to Further Confidentiality Review

1    where in response to my questions you kept

2    saying the difference was small.

3              And so as further explanation

4    on that, in comparing coefficients, don't you

5    also need to know the scale against which

6    they're being measured?

7              MR. SOBOL:  Objection, asked

8         and answered.

9    BY MR. METZ:

10        Q.    If you're comparing just the

11   real numbers, you need to know the scale to

12   which those correspond, correct?

13             MR. SOBOL:  Objection, asked

14        and answered, mischaracterizes prior

15        testimony.

16        A.    Yes, and the scale is evident

17   here, and again, if we go to the predicted

18   values, the scale is evident there as well.

19   BY MR. METZ:

20        Q.    Did you not testify repeatedly

21   yesterday that the reason it doesn't matter

22   that you have an inflationary depreciation

23   rate is because all that that does is it gets

24   caught up in muting the impact of the

25   coefficients on the particular variables at

1    the particular times that they're measured?

2                MR. SOBOL:  Objection, asked

3          and answered.

4    BY MR. METZ:

5          Q.    Didn't you testify to that?

6                MR. SOBOL:  Objection, form,

7          asked and answered.

8          A.    I don't believe that I stated

9    that in the way that you have.  All I said is

10   that the fact that promotional stock inflates

11   doesn't necessarily mean that the effect has

12   to inflate in the same way because the

13   measured promotional effectiveness, as we see

14   in both of these models, I find it decreasing

15   over time, and that counteracts.

16               I didn't say it doesn't -- it

17   doesn't have any effect.  I'm just saying

18   that the effect of the misconduct is a

19   function both of the magnitude of the stock

20   and of the promotional effectiveness.

21   BY MR. METZ:

22         Q.    And also in reference to your

23   answers to me that these changes don't matter

24   because the effect was small, it's also the

25   case that those changes, as you characterized

Highly Confidential - Subject to Further Confidentiality Review

1   as small, are the result of five dummy

2   variables you included as a singular

3   robustness test, not a comprehensively

4   designed model attempting to comprehensively

5   control for these kinds of external events,

6   correct?

7           MR. SOBOL:  Objection, form,

8       asked and answered, mischaracterizes

9       prior testimony.

10  A.      As I described yesterday, and I

11  would restate now, given the performance of

12  these selected dummy variables, given the

13  adjusted R-squared of the model, the notion

14  that adding all of the events would improve

15  the performance of the model makes little

16  sense to me.  And that is why I did not run a

17  model with every dummy variable in it.

18  BY MR. METZ:

19  Q.      Well, after running a model

20  with dummy variables, two of which

21  individually were statistically significant,

22  and the five of which were collectively

23  statistically significant, you did not

24  attempt to construct a further model with

25  more dummy variables to see whether or not

1    that had a greater impact on your measure of

2    the relationship between detailing and MMEs,

3    did you?

4              MR. SOBOL:  Objection.

5         A.      Having run Model C and

6    comparing the results to Model B, I deemed

7    that it would not be fruitful to add further

8    dummy variables and run a more expansive

9    version of Model C.

10   BY MR. METZ:

11        Q.      Do you agree that as a general

12   matter in regression analysis failure to

13   include a major explanatory variable that is

14   correlated with the variable of interest in

15   the regression model may cause an included

16   variable to be credited within an effect that

17   actually is caused by the excluded variable?

18        A.      As we discussed earlier today,

19   that notion which you just describe of

20   omitted variable bias is a factor in any

21   analysis, and there are constraints on how

22   many variables one can include in an

23   analysis.

24              So while it's always going to

25   be true that there is a possibility of

Highly Confidential - Subject to Further Confidentiality Review

1    omitted variable bias, it's my opinion that

2    including more of these event variables in

3    the model would not improve the performance

4    of the model.

5         Q.    You mentioned the word

6    "constraint" in that answer.  And in previous

7    testimony you've mentioned a term called

8    "degrees of freedom."

9         A.    Yes.

10        Q.    Can you explain what degrees of

11   freedom are as related to a constraint on the

12   number of variables that can be included in a

13   model?

14        A.    It has to do with the number of

15   observations and the number of included

16   variables.  It also has to do with the

17   correlation in these data, so as we add more

18   and more dummy variables, the chances that we

19   get colinearity are higher.

20        Q.    And degree of freedom refers in

21   part to a point beyond which there's

22   insufficient data to account for the number

23   of permutations that more and more variables

24   will introduce into the model; is that fair?

25        A.    In effect, it makes it

1    impossible to estimate the model.

2         Q.    Okay.  Did you have adequate

3    data to add additional dummy variables beyond

4    the five you included without running into

5    the limit imposed by however many degrees of

6    freedom you had?

7              MR. SOBOL:  Objection, assumes

8         a fact not in evidence.

9         A.    I have adequate data in terms

10   of degrees of freedom.  In terms of concerns

11   about adding more dummy variables and having

12   them be correlated with one another to the

13   point where I'm getting results like the ones

14   I can see in Model C, where the coefficients

15   are clearly picking up something different,

16   that is the concern.

17   BY MR. METZ:

18        Q.    So if I understand, your

19   concern is that had you inquired further, you

20   might have found nonsensical results?

21             MR. SOBOL:  Objection,

22        mischaracterizes the testimony.

23        A.    My concern is that adding dummy

24   variables would likely just make the other

25   dummy variables nonsensical, whereas Model B

Highly Confidential - Subject to Further Confidentiality Review

1    compared to Model C, again, has qualitatively

2    similar promotional effects that adding

3    further dummy variables would simply

4    interfere with the meaning of the dummy

5    variables that are already in them.  They

6    would be impossible to differentiate.

7    BY MR. METZ:

8        Q.    What's the basis for your

9    statement that would likely be the

10   consequence of adding additional dummy

11   variables?

12       A.    Just we talked before that

13   these dummy variables are zero until they

14   turn on and one after, and if we add one

15   every six months, then we have a whole lot of

16   vectors that are zero.  You know, sort of in

17   a staggered way, they're going to be highly

18   correlated.

19       Q.    And nonetheless, you did not

20   test whether that would be the outcome of

21   adding additional dummy variables or other

22   explanatory variables, correct?

23       A.    I did not consider adding other

24   dummy variables.

25       Q.    Okay.  And there are

1    conceivably other variables that are not

2    dummy variables that one could add to test

3    for the presence of additional factors,

4    correct?

5            MR. SOBOL:  Objection.

6        A.    I include the standard factors

7    that are included in an aggregate time series

8    analysis of pharmaceutical promotion, which

9    are -- I'm sorry, of pharmaceutical sales,

10   which are promotion and price.

11   BY MR. METZ:

12       Q.    Okay.  But there are -- in any

13   regression, one of the tasks is to

14   hypothesize as to other conduct that could

15   affect the variable of interest, and where

16   available, to include data that would capture

17   that conduct, correct?

18           MR. SOBOL:  Objection, asked

19       and answered.

20       A.    Starting with the theory of

21   demand for pharmaceuticals, I've constructed

22   this model, including the most important

23   variables, and again, one does not -- a

24   well-constructed model focuses on the most

25   important variables.

1      This model using price and

2   promotion is the same as models that I have

3   used in similar instances, and it's very

4   similar to the models in Berndt, except that

5   those are at product level, but they also

6   focus on price and promotion.

7      So in a time series context,

8   there aren't a lot of other variables that

9   you could even imagine would be included, and

10   in my opinion, price and promotion are the

11   key variables here.

12   BY MR. METZ:

13      Q.   Did you spend any significant

14   time in contemplative thought trying to

15   imagine additional variables to include in

16   your model beyond the ones you included?

17      MR. SOBOL:  Objection, asked

18      and answered.

19      A.   I've spent 300 hours in

20   developing the analyses that are in my

21   report.  I spent considerable time thinking

22   about this model, and it wasn't the first

23   time that I had thought about such analyses,

24   as you know.

25      ///

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. METZ:

 2         Q.    Now, did you -- within those

 3    300 hours, did you spend any significant time

 4    seeking to identify the key events that

 5    should be attempted to be replicated with the

 6    dummy variables you ended up using?

 7              MR. SOBOL:  Objection, asked

 8         and answered.

 9         A.    Yes, you can see in my report

10    that I culled those events again from various

11    sources.

12    BY MR. METZ:

13         Q.    Yes, and when I asked you about

14    it, the answer you gave to me was that you

15    looked at the expert report of Dr. Perri.

16         A.    Yes.

17         Q.    You looked at the plaintiffs'

18    complaint.

19         A.    Yes.

20         Q.    And you looked at one timeline

21    on the website, I believe of the FDA?

22         A.    The FDA timeline.  Those are

23    the primary sources, yes.

24         Q.    Okay.  Now, did you see

25    Dr. Perri's report significantly before your
```

1    own report was finalized?

2        A.    I don't know what you mean by

3    significantly.

4        Q.    Well, in time to adequately

5    evaluate whether the events described there

6    were the key events you should be attempting

7    to model for?

8        A.    Yes, I did.

9        Q.    How many days in advance?

10           MR. SOBOL:  Objection.

11       A.    I can't say.  I can't say for

12   sure when I saw that, but I obtained the

13   information from Dr. Perri's report as I was

14   putting together my model.

15   BY MR. METZ:

16       Q.    Okay.  Was it time adequate

17   that when you ran your Model C and two of the

18   dummy variables came back individually

19   significant and the five collectively came

20   back significant, did you then have time to

21   consider and design and implement and still

22   disclose on time another model with better

23   dummy variables?

24       A.    The --

25           MR. SOBOL:  Objection to

1      "better."

2      A.     Time was not the issue here.  I

3   decided not to run a model with more dummy

4   variables.

5   BY MR. METZ:

6      Q.     Okay.  I'm going to hand you

7   what we're marking as Exhibit 29.

8              (Whereupon, Deposition Exhibit

9          Rosenthal-29, Joint Statement,

10         Promoting Pain Relief and Preventing

11         Abuse of Pain Medications: A Critical

12         Balancing Act, was marked for

13         identification.)

14   BY MR. METZ:

15      Q.     Have you seen Exhibit 29

16   previously?

17      A.     I believe so, yes.

18      Q.     What is it?

19      A.     I'm actually looking for the

20   date on it.  Does it have a date?

21      Q.     Well, I can represent to you

22   that the particular version you're holding

23   was pulled from an Internet archive that

24   dates it as of a date that it was on the

25   Internet, which may not be the first date it

Highly Confidential - Subject to Further Confidentiality Review

1    was on the Internet.

2          A.     I see.

3          Q.     And in the top right corner it

4    dates it as November 27, 2001.

5          A.     I think is the -- it's the

6    joint statement on promoting pain relief and

7    preventing abuse of pain medications, but,

8    sorry, what date did you think it was

9    actually from?

10         Q.     Well, the date that this

11   particular copy is from --

12         A.     Right.

13         Q.     -- is November of 2001.

14         A.     So it came out sometime before

15   that.

16         Q.     The date it was pulled on the

17   Internet.  I can't represent to you what date

18   exactly it was, although I believe it to be a

19   somewhat consistent time to what's reflected

20   here, but I can't represent that to you.

21         A.     Yes, I'm not sure if I have

22   seen this specific document.

23         Q.     Okay.  And do you believe in

24   looking at your Figure 5 that this is one of

25   the event -- the key events dated on your

1    timeline?

2         A.     I'd have to look.

3                MR. SOBOL:  Objection.

4         A.     I just need to go back and

5    find --

6    BY MR. METZ:

7         Q.     I think Figure 5 is on page 41.

8         A.     Thank you.  I must have blown

9    past it.

10               I don't believe that this is

11   part of it.  I was thinking of the consensus

12   statement.  But I think this joint statement

13   is something different, but --

14        Q.     Okay.

15        A.     It's certainly labeled

16   something different.

17        Q.     So to your knowledge, you have

18   not seen this previously; is that correct?

19        A.     To my knowledge, no.

20        Q.     All right.  It's titled A Joint

21   Statement from 21 Health Organizations and

22   the Drug Enforcement Administration.

23               Do you see that?

24        A.     I do.

25        Q.     And the title beneath that is

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Promoting Pain Relief and Preventing Abuse of
 2    Pain Medications: A Critical Balancing Act.
 3               Do you see that?
 4    A.     I do.
 5    Q.     Okay.  And since you've not
 6    seen this before, I just want to read some of
 7    the included terms.  It begins:  As
 8    representatives of the healthcare community
 9    and law enforcement, we're working together
10    to prevent abuse of prescription pain
11    medications while ensuring that they remain
12    available for patients in need.
13               Do you see that?
14    A.     Yes.
15    Q.     And then skipping over a
16    paragraph, the next one down, it says:
17    Preventing drug abuse is an important
18    societal goal, but there is consensus by law
19    enforcement agencies, healthcare
20    practitioners and patient advocates alike
21    that it should not hinder patients' ability
22    to receive the care they need and deserve.
23               Do you see that?
24    A.     I do.
25    Q.     And then it says:  This
```

```
 1    consensus statement is necessary based on the
 2    following facts.
 3                   First bullet:  Undertreatment
 4    of pain is a serious problem in the United
 5    States, including pain among patients with
 6    chronic conditions and those who are
 7    critically ill or near death.  Effective pain
 8    management is an integral and important
 9    aspect of quality medical care and pain
10    should be treated aggressively.
11                   Do you see that?
12        A.    I do.
13        Q.    And then the next bullet says:
14    For many patients, opioid analgesics, when
15    used as recommended by established pain
16    management guidelines, are the most effective
17    way to treat their pain and often the only
18    treatment option that provides significant
19    relief.
20                   Do you see that?
21        A.    I do.
22        Q.    And would you agree with me
23    that shares some of the characteristics of
24    the statement you testified about earlier as
25    well as yesterday, the joint statement?
```

Highly Confidential - Subject to Further Confidentiality Review

 1                    MR. SOBOL:  Objection, beyond

 2          the scope.

 3          A.      Are you referring to --

 4                    MR. METZ:  Beyond the scope of

 5          what?

 6                    MR. SOBOL:  Beyond the scope of

 7          her opinions.  You've got a document.

 8                    MR. METZ:  That's the point.

 9                    MR. SOBOL:  You've got a

10          document before her that she says she

11          hasn't seen before.

12                    MR. METZ:  Okay.  Thank you.

13                    MR. SOBOL:  And you're asking

14          her then to, so far, just read it with

15          you, and now you've asked her to

16          compare a document that she hasn't

17          seen to a document that is referenced

18          in her report, right?  So that's

19          beyond the scope of her opinion.

20   BY MR. METZ:

21          Q.      Would you agree with me that

22   this document and the portions I just read in

23   particular share some of the characteristics

24   that you identified about the joint statement

25   that you testified about earlier today in

Highly Confidential - Subject to Further Confidentiality Review

1      answer to my questions as well as yesterday?

2                  MR. SOBOL:  Objection, form and

3          beyond the scope.

4          A.      Yesterday and today we talked

5      about the American Academy of Pain Management

6      and American Pain Society consensus

7      statement, and how it describes pain as being

8      undertreated and the utility of opioid

9      treatment.

10                 So in that sense, I can read

11     here that this statement also describes pain

12     as undertreated and opioid analgesics as an

13     effective treatment.

14     BY MR. METZ:

15         Q.      And we discussed as well the --

16     at least the potential that the reputations

17     of the bodies making those statements would

18     be part of what made that -- a statement like

19     that significant.

20                 Do you recall discussing that

21     with me?

22                 MR. SOBOL:  Objection.  Is the

23         question -- no --

24                 MR. METZ:  The question is if

25         she recalls the testimony.

```
1                    MR. SOBOL:  Okay.  So

2            objection, mischaracterizes her prior

3            testimony, and form.

4        A.    I recall the discussion where I

5    said that I believed one of the reasons that

6    pharmaceutical manufacturers might seek to

7    influence such statements is because the

8    reputation of professional societies may

9    legitimize their activity.

10   BY MR. METZ:

11       Q.    Okay.  And you would agree with

12   that the -- as a general matter, the Drug

13   Enforcement Administration is a reputable

14   organization on matters pertaining to the

15   legitimate use of controlled substances?

16                    MR. SOBOL:  Objection, scope of

17           her opinion.

18       A.    I understand that the Drug

19   Enforcement Administration is the federal

20   agency responsible for enforcing laws that

21   pertain to controlled substances.  I don't

22   know -- I guess I don't know "reputable."

23   I'm not an expert on the DEA.  I don't really

24   know its reputation.  I certainly know what

25   its function is.
```

```
1    BY MR. METZ:

2         Q.    You think the DEA might be

3    disreputable on the subject of legitimate

4    uses of controlled substances?

5              MR. SOBOL:  Objection, scope,

6         form.

7         A.    I'm just saying I don't know

8    the DEA's reputation.  I know its purpose is

9    to regulate controlled substances.

10   BY MR. METZ:

11        Q.    As an economist forming

12   hypotheses --

13             MR. SOBOL:  Wait a second.  Are

14        you done with this exhibit?

15             MR. METZ:  I haven't marked a

16        new one.  Is there a reason for

17        interrupting me?

18             MR. SOBOL:  Yes.  I want to

19        know if you were done with this

20        exhibit.

21             MR. METZ:  For what purpose?

22        If you want -- I've set mine aside.

23        If you'd like to set yours aside, set

24        it aside, but I don't see the purpose

25        for interrupting me.
```

```
 1                  MR. SOBOL:  Okay.  You've asked

 2            to set it aside.  I move to strike all

 3            the questions regarding the exhibit

 4            because they do not relate to the

 5            report and she has not seen the

 6            exhibit before.

 7                  MR. METZ:  Well --

 8                  MR. SOBOL:  Go ahead.

 9                  MR. METZ:  -- that's the point

10            in cross-examining an expert on the

11            sufficiency of her inquiry is to test

12            her on things that she might not have

13            inquired about or seen, perhaps

14            because Dr. Perri didn't flag them for

15            her.

16      BY MR. METZ:

17            Q.    The question I was going to ask

18      you is:  An economist, hypothesizing the key

19      events that might be causally related to the

20      sale of MMEs, and bearing in mind that you

21      previously said a statement like this from a

22      private organization would be sufficient to

23      at least form a hypothesis, would you not

24      hypothesize that the DEA among 28 other

25      health organizations recognizing the
```

1   undertreatment of pain and the potential for

2   opioids to treat, not just pain generally but

3   also chronic pain, could potentially have had

4   an impact on MME sales?

5          MR. SOBOL:  Objection.

6   BY MR. METZ:

7      Q.     Is that a reasonable hypothesis

8   for an economist in your position undertaking

9   a study like this?

10         MR. SOBOL:  Objection, form,

11     compound.

12      A.     A statement like this, like the

13   statements I do cite in my report, may have

14   had an effect on sales, and because there

15   were many such statements happening, I use

16   the differential promotional effectiveness

17   over time to capture these broader effects

18   across a larger number of factors.

19         I believe something like this,

20   if it were widely disseminated -- I don't

21   really know how widely disseminated this

22   was -- may have had an effect, and therefore,

23   that would be captured in my promotional

24   effectiveness.

25        ///

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. METZ:
2         Q.    Well, that's the hypothesis
3    described in paragraph 73 that Model C was
4    intended to test, correct?
5              MR. SOBOL:  Objection,
6         misrepresent -- mischaracterizes the
7         testimony.
8         A.    My hypothesis is that these
9    events early and late affected promotional
10   effectiveness.  Model C is a particular way
11   of testing them, which has the limitations of
12   involving a large number of dummy variables.
13             I conclude that those dummy
14   variables do not qualitatively affect my
15   results, and we can go back to that
16   discussion if you want, but that was my
17   conclusion.
18   BY MR. METZ:
19        Q.    Yeah.
20        A.    And that, in fact, the
21   differential promotional effectiveness over
22   time is picking up the influence of these
23   environmental factors.
24        Q.    Okay.  Only because I'm short
25   on time I'll ask it this way.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              You described in paragraph 73
 2      of your report a hypothesis about the need to
 3      explicitly include control for these kinds of
 4      events as being the purpose of the robustness
 5      test in paragraph 73.
 6              That's what you -- or the
 7      robustness test in Model C, excuse me.
 8      That's what you say in paragraph 73, correct?
 9              MR. SOBOL:  Objection.
10          Objection to the form.
11          A.      In paragraph 73, I say, in the
12      middle of the first sentence:  I tested the
13      robustness of Model B by examining whether
14      indicators of specific events and policies
15      should be explicitly included in my model.
16      BY MR. METZ:
17          Q.      Thank you.
18              And in Model C, where you
19      included dummy variables, you included three
20      dummy variables that turned on --
21          A.      Yes.
22          Q.      -- prior to -- prior to
23      November of 2001, correct?
24          A.      That's correct.
25          Q.      And the most proximate in time
```

Highly Confidential - Subject to Further Confidentiality Review

1   of those turned on -- was it in January of

2   2001 or does it turn on in February?  I

3   wasn't clear from the way you described in

4   your model.

5        A.    I need to look in the errata,

6   because I think what was stated in the report

7   was different in two different places.

8        Q.    Okay.

9        A.    So let me just take a quick

10  look.

11       Q.    For purposes of my question

12  this will be sufficient.

13       A.    Okay.

14       Q.    It's either/or January or

15  February, correct?  If the dummy variable is

16  dated January 2001.

17       A.    I believe that that is true.  I

18  just didn't want to misstate it.  You're

19  talking about the JCAHO pain standards.

20       Q.    Yes.

21       A.    Yes.

22       Q.    Okay.  And then if this

23  statement, in fact, was released in November

24  of 2001, that is ten months after your dummy

25  variable had already turned on, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      That's correct.

2        Q.      And then you do not have

3   another dummy variable that you include until

4   August of 2010, which is close to nine years

5   later.

6        A.      Yes.  And because the dummy

7   variable stays on, it will pick up any level

8   shift over time after that, controlling for

9   other factors, right.

10       Q.      Any level shift that in the

11  calculation shows up is correlated with the

12  dummy variable from nine months earlier,

13  correct?

14       A.      Yes, but again, the dummy

15  variable stays on over the period when this

16  would have been released.

17       Q.      Does not the distance from the

18  dummy variable have a bearing upon the

19  significance that that variable will attach

20  to events later in time?

21       A.      Well, again, it is literally

22  picking up an average shift before compared

23  to after.

24       Q.      Okay.  And if there are other

25  unexplained events going on, you might

1    attribute those to dummy variables that are

2    years apart from when you first turned them

3    on, correct?

4             MR. SOBOL:  Objection.

5        A.    This is why I conclude that

6    Model B is the more appropriate approach

7    here, to not try to disentangle those things.

8    BY MR. METZ:

9        Q.    Okay.  But in the ideal design

10   of your model, as you told me before, you

11   picked the timing of the dummy variable to

12   coincide with the key events, not to have

13   them be months prior so that they'll just

14   sweep them up eventually, correct?

15            MR. SOBOL:  Objection, form.

16       A.    The dummy variables are

17   intended to reflect the timing of these key

18   events?  Yes.

19   BY MR. METZ:

20       Q.    The -- any dummy variable, the

21   timing for when you turn it on, is intended

22   to be timing that makes sense in light of the

23   key events you're testing for, right?

24       A.    It does.  I'm just saying that

25   just mathematically, the case that while that

Highly Confidential - Subject to Further Confidentiality Review

1    timing is important, it's important because

2    it differentiates pre from post.  It

3    doesn't -- it's not instantaneous.

4         Q.    Okay.  And nonetheless, you put

5    your variable in January 2001 in order to

6    attempt to simulate for an event occurring in

7    or around January 2001, correct?

8              MR. SOBOL:  Objection, asked

9         and answered.

10   A.    Yes.

11             (Whereupon, Deposition Exhibit

12        Rosenthal-30, State of Ohio House Bill

13        No. 187, was marked for

14        identification.)

15   BY MR. METZ:

16        Q.    I'm going to hand you an

17   exhibit we've marked Exhibit 30.  I'd like

18   you to take a look at that and tell me if

19   you've seen it before.

20        A.    I just want to check my

21   documents relied upon.  My memory is not

22   always reliable.

23             (Document review.)

24        A.    I don't think that I've seen

25   this document before.

1    BY MR. METZ:

2         Q.    Well, in that case, Exhibit 30

3    is a printout from a legal -- well, from a

4    book of Ohio session laws, and it's entitled

5    H.B. No. 187, and in the title it says

6    Treatment of Intractable Pain.

7              Do you see that?

8         A.    I do see that.

9         Q.    Okay.  It's described as an act

10   regarding the authority of physicians to

11   prescribe, dispense and administer dangerous

12   drugs for management of intractable pain.

13             Do you see that?

14        A.    I see that.

15        Q.    And under the first -- when you

16   look into the body of the bill, next to

17   number 2 it defines intractable pain.

18             Do you see that?

19        A.    Yes.

20        Q.    And it means a state of pain

21   that is determined, after reasonable medical

22   efforts have been made to relieve the pain or

23   cure its cause, to have a cause for which no

24   treatment or cure is possible or for which

25   none has been found.

1          Do you see that?

2     A.    Yes.

3     Q.    And then if you skip down

4  to (C), the bill states that when a physician

5  diagnoses an individual as having intractable

6  pain, the physician may treat the pain by

7  managing it with dangerous drugs in amounts

8  or combinations that may not be appropriate

9  when treating other medical conditions.

10          Do you see that?

11     A.    I do.

12     Q.    Do you understand intractable

13  pain as so described here to have a similar

14  meaning to chronic pain?

15          MR. SOBOL:  Objection, scope.

16     A.    I do not, no.

17  BY MR. METZ:

18     Q.    Okay.  Do you understand it to

19  be describing pain for which -- pain that

20  will endure over a longer period because

21  there is no -- no other means of curing it?

22          MR. SOBOL:  Objection, scope.

23     A.    Well, I'm not a clinical

24  expert.  It seems to define it as having no

25  treatment or cure.  It does not say anything

Highly Confidential - Subject to Further Confidentiality Review

1    about the longevity of the pain.

2    BY MR. METZ:

3         Q.    Okay.  And then if you flip

4    ahead to subpart (D), which is on the second

5    page, it states that a physician who treats

6    intractable pain by managing it with

7    dangerous drugs is not subject to

8    disciplinary action by the board under

9    Section 4731.22 of the revised code, solely

10   because the physician treated the intractable

11   pain with dangerous drugs.

12             The physician is subject to

13   disciplinary action only if the dangerous

14   drugs are not prescribed, administered or

15   dispensed in accordance with this section and

16   the rules adopted under it.

17             Do you see that?

18        A.    I do.

19        Q.    And were you aware prior to

20   this moment of a law that was passed in Ohio

21   in the late 1990s that provided doctors with

22   legal protection for -- against circumstances

23   in which they treated patients with pain

24   using dangerous drugs?  Were you aware of

25   such a law being passed?

Highly Confidential - Subject to Further Confidentiality Review

 1                    MR. SOBOL:  Objection, form.

 2         A.      I couldn't have told you when

 3   such a law was passed in Ohio.

 4                 I was aware from the complaint

 5   and from Dr. Perri's report that the

 6   influence -- the industry allegedly

 7   influenced such guidelines, including, as I

 8   include in my timeline, the model guidelines

 9   supplied by the Federation of State Medical

10   Boards, and I take this to be an example of

11   one that was implemented in Ohio.

12   BY MR. METZ:

13         Q.      So is it your understanding

14   that a state medical board guideline and a

15   Ohio statute passed by the legislature of

16   Ohio to be functionally equivalent?  Is that

17   what your answer was?

18                    MR. SOBOL:  Objection,

19         mischaracterizes her testimony.

20                    MR. METZ:  That's why I'm

21         asking for clarification.

22         A.      I'm not a lawyer or a state

23   regulatory expert.  These guidelines that I'm

24   seeing for the first time reading them, they

25   are consistent with what I understand the

Highly Confidential - Subject to Further Confidentiality Review

1    goal of the Federation for State Medical

2    Board Model Guidelines were, this protection

3    from liability.

4    BY MR. METZ:

5        Q.    They're consistent in their

6    goals; they're inconsistent that -- in the

7    sense that in this instance, pertaining to

8    Ohio, it's being adopted by the 122nd Elected

9    General Assembly of the State of Ohio.

10            Do you see that?

11            MR. SOBOL:  Objection.  Oh,

12        just do you see that?  That's fine.

13       A.    I do.

14   BY MR. METZ:

15       Q.    Okay.  And do you agree with me

16   that there is a difference between a private

17   or a standard-setting unelected body creating

18   some rule or regulation and the elected

19   assembly of a state like Ohio enacting a law?

20            MR. SOBOL:  Objection to the

21       scope.

22   BY MR. METZ:

23       Q.    Do you see a difference between

24   those two things?

25            MR. SOBOL:  Objection to scope.

1      A.      I'm not a legal or regulatory

2    expert, so I don't have an opinion about the

3    different effects of those two things.

4    BY MR. METZ:

5      Q.      Okay.  To be clear, I wasn't

6    asking about effects.  I was asking about the

7    nature of the body adopting them.

8             Do you see a difference in the

9    nature of the body adopting what you've

10   described as guidelines versus the Assembly

11   of Ohio adopting a law?

12             MR. SOBOL:  Objection, asked

13        and answered.

14      A.      I understand that -- again, I

15   understand that this is a law, and I believe

16   the model guidelines were intended to

17   influence regulations.  I understand the

18   difference between those two things.

19   BY MR. METZ:

20      Q.      Okay.  Thank you.

21             Now, this also does not appear

22   on your timeline of key events, correct?

23      A.      It does not.

24      Q.      Okay.  And you did not design a

25   dummy variable with the specific intention of

Highly Confidential - Subject to Further Confidentiality Review

1    trying to capture any effects from this law,

2    correct?

3              A.    I did not.

4              Q.    Okay.  And, in fact, although

5    your testimony is being used solely for

6    purposes of this case, within two counties in

7    Ohio, your aggregate analysis is done on a

8    national level, correct?

9                    MR. SOBOL:  Objection, asked

10              and answered.

11             A.    My analysis is a national

12   aggregate analysis.

13   BY MR. METZ:

14             Q.    And one consequence of doing a

15   national aggregate analysis is that if a law

16   like this had an impact within the state of

17   Ohio, that effect might be muted in your

18   national analysis because there's 49 other

19   states, right?

20                   MR. SOBOL:  Objection, form.

21             A.    The national analysis will be

22   affected by the extent of such laws across

23   the country, not on just one state.

24   BY MR. METZ:

25             Q.    And if Ohio was

Highly Confidential - Subject to Further Confidentiality Review

1    disproportionately affected by a law such as

2    this, that effect might be different from the

3    average that's reflected in your national

4    aggregate analysis, correct?

5            MR. SOBOL:  Objection, form.

6        A.      That may be the case.  As I

7    understand this law, it seems to be that it

8    would cause even more prescribing than I

9    estimate on average, if other states lag

10   Ohio.

11   BY MR. METZ:

12       Q.      Okay.  Even more within Ohio is

13   what you're saying?

14       A.      Even more than I attribute to

15   Ohio, yes.

16       Q.      Okay.  Now, that law was not

17   identified for you by Dr. Perri as one of the

18   key events as it related to your opinions for

19   Cuyahoga and Summit Counties, correct?

20       A.      Just to be clear, Dr. Perri

21   wasn't identifying for me.  I understand the

22   events that he described in his reports, that

23   he identifies as part of his report as being

24   important.

25       Q.      And in part because this was

Highly Confidential - Subject to Further Confidentiality Review

1    not described in that report and because it

2    is not reflected in plaintiffs' complaint,

3    it's not one of the key events that you put

4    into your Figure 5, correct?

5              MR. SOBOL:  Objection,

6         mischaracterizes the testimony.

7         A.    I do not believe it appears in

8    the sources that I used to put together

9    Figure 5.

10   BY MR. METZ:

11        Q.    Okay.

12        A.    So I did not rely on it.

13        Q.    In the inquiry you

14   independently undertook to identify what key

15   events should be accounted for in your model,

16   did you come across any information

17   indicating that, in fact, this law had had an

18   influence on MMEs within the state of Ohio

19   such that it should be accounted for?

20        A.    I am not aware of anything, no.

21   I did not come across that.

22              (Whereupon, Deposition Exhibit

23         Rosenthal-31, Ohio Prescription Drug

24         Abuse Task Force Final Report, was

25         marked for identification.)

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. METZ:
2         Q.    I'm going to hand you an
3    exhibit marked Exhibit 31.
4               MR. SOBOL:  Where are we on the
5         time?
6               MR. METZ:  I think I have about
7         15 minutes.
8               THE VIDEOGRAPHER:  19.
9               MR. SOBOL:  Thanks.
10              THE WITNESS:  Go ahead.
11   BY MR. METZ:
12        Q.    Have you seen this document
13   before?
14        A.    I don't think so.  I should
15   check again my documents cited.
16              (Document review.)
17        A.    I assume it would be under O
18   for Ohio.
19   BY MR. METZ:
20        Q.    I haven't checked.  It could
21   also be under 2010.  I don't know.
22        A.    I don't think so.
23        Q.    Okay.  You don't recognize it
24   as you sit here?
25        A.    I don't.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Okay.  I will represent to you

2    that Exhibit 31 is a final report and task

3    force recommendations from a body known as

4    the Ohio Prescription Drug Abuse Task Force.

5                Do you see that?

6          A.     Yes.

7          Q.     And in your inquiry and

8    research into finding the key factors that

9    you try to be accounted for in your model,

10   did you at any point come to learn that Ohio

11   had commissioned a drug abuse task force

12   relating to the subject of prescription

13   drugs?

14         A.     I believe that I was aware that

15   there had been activity in Ohio related to

16   combatting the opioid epidemic.

17         Q.     Okay.  But you don't recall

18   seeing any report or other information about

19   that, do you?

20         A.     I don't recall.

21         Q.     Okay.  Now, I want you to turn

22   first to page 21, just so I can orient you to

23   the section in which a later page appears.

24         A.     Okay.

25         Q.     Do you see that there's a
```

1    heading there that says How Did This Become

2    an Epidemic?

3         A.    Yes, I do.

4         Q.    And there's some information

5    there followed by a chart, okay?

6         A.    Yes.

7         Q.    If you turn to the next page,

8    the next -- the section at the top of page 22

9    talks about the law that we just considered,

10   that we just looked at, and I'll just read it

11   into the record.

12             Under the heading Changes in

13   Clinical Pain Management, the document

14   states:  Growing recognition by professionals

15   of the undertreatment of pain in the late

16   1990s prompted needed changes in clinical

17   pain management guidelines at the national

18   level, as well as changes in Ohio's law

19   regarding the treatment of intractable pain.

20   As defined in Ohio law, intractable pain

21   means a state of pain that is determined,

22   after reasonable medical efforts have been

23   made to relieve the pain or cure its cause,

24   to have a cause for which no treatment or

25   cure is possible or for which none has been

1    found.

2              Do you see that?

3    A.     Yes.

4    Q.     And you recall that's the

5    definition we read from the statute a moment

6    ago, correct?

7    A.     It looks like it's verbatim.

8    Q.     Okay.  So the next paragraph

9    says:  To address the perception that

10   prescribing adequate amounts of controlled

11   substances would result in unnecessary

12   scrutiny by regulatory authorities, Ohio's

13   Intractable Pain Act provided that physicians

14   treating intractable pain are not subject to

15   disciplinary action when practicing in

16   accordance with accepted and prevailing

17   standards of care and rules adopted by the

18   medical board delineating those standards.

19              Do you see that?

20   A.     Yes.  And I guess now I see how

21   the law connects to the state medical board

22   standards.  They're clearly interlocking.

23   Q.     And then it says:  Such

24   fundamental changes in the recognition and

25   treatment of pain contributed to increased

Highly Confidential - Subject to Further Confidentiality Review

1    prescribing and concomitant availability of

2    and exposure to potent opioid analgesics,

3    pain medications.

4              Do you see that?

5        A.    I do.

6        Q.    Okay.  So prior to now, were

7    you aware that an appointed task force

8    appointed by the government of the State of

9    Ohio had, in a report, concluded that the law

10   we looked at a moment ago from 1997 had

11   contributed to the levels of prescription

12   opioids dispensed in Ohio during the period

13   covered by your study?

14             MR. SOBOL:  Objection, form,

15        asked and answered.

16       A.     I wasn't aware of this specific

17   report.  Again, going back to the context of

18   Dr. Perri's report and what I understand the

19   allegations are in this matter, it does not

20   come as a surprise to me that this was found.

21   And again, this explicitly references those

22   state medical board guidelines.

23             Those, as I understand it,

24   plaintiffs intend to prove were a vehicle for

25   increasing -- basically opening the flood

Highly Confidential - Subject to Further Confidentiality Review

1    gates for opioid prescribing.  So this simply

2    confirms that the State of Ohio has found

3    that to be true.

4    BY MR. METZ:

5         Q.    And you did not include in your

6    model a variable intended to capture, for

7    sales within Ohio, the influences of the

8    statute, correct?

9              MR. SOBOL:  Objection, asked

10        and answered.

11             MR. METZ:  It's really a

12        yes-or-no question.

13             MR. SOBOL:  Well, you can

14        answer it however you think you need

15        to.

16        A.    I included in my model national

17   variables.  And as I've noted, I believe

18   factors such as these are why promotion was

19   so effective in that early part of the period

20   that I analyze.

21             In my view, it would not be

22   appropriate to try to pull out this effect

23   when it is all part of how promotion caused

24   sales.

25             ///

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. METZ:

2        Q.    Well, in your view in -- as

3    expressed in paragraph 73, it was necessary

4    as a robustness test to test the very

5    assumption you just stated to me as to

6    whether these events, events like this, had a

7    sufficiently strong influence to render

8    Model B inaccurate.

9            MR. SOBOL:  Objection.

10    BY MR. METZ:

11        Q.    Isn't that what you said in

12    your report?

13            MR. SOBOL:  Objection, asked

14        and answered already.

15        A.    As I said in my report, I'm

16    testing the form of the model.  I do not -- I

17    do not use Model C in calculating damages,

18    but it is not my belief that those variables

19    necessarily would occur in a but-for

20    scenario.

21            And so Model C, the robustness

22    check is around the specification, and while

23    I understand that you respectfully disagree,

24    I conclude that, in fact, Model C supports

25    the use of Model B.  But even if there were a

1    significant dummy variable in Model C, it

2    wouldn't necessarily be the case that that

3    variable would exist in the but-for world.

4    BY MR. METZ:

5         Q.    Okay.  So to -- if I could

6    strip that down to a more relatable

7    statement.

8              You're postulating a but-for

9    world in which the State of Ohio's General

10   Assembly does not enact the statute that we

11   just looked at?

12             MR. SOBOL:  Objection,

13        mischaracterizes her testimony.

14        A.    I don't know about the specific

15   law, but many of those events, including the

16   state medical board guidelines, which appear

17   to interact with the law, are posited by

18   plaintiffs to have been caused by the conduct

19   of defendants.

20             MR. METZ:  Why don't we go off

21        the record.

22             THE VIDEOGRAPHER:  The time is

23        3:26 p.m.  We're now off the record.

24             (Recess taken, 3:26 p.m. to

25        3:33 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

1              THE VIDEOGRAPHER:  The time is

2       3:33 p.m.  We're back on the record.

3                   EXAMINATION

4    BY MR. GEISE:

5       Q.    Professor Rosenthal, my name is

6    Steve Geise.  I represent Walmart in this

7    case.  We had a chance to meet off the record

8    and I just have a very few questions for you

9    today because our time is running to a close.

10              In response to questions from

11   Mr. Metz, you indicated you had not analyzed

12   pharmacy conduct at all for purposes of your

13   opinions; is that correct?

14              MR. SOBOL:  Objection, asked

15        and answered.

16       A.    Yes, I do not analyze pharmacy

17   conduct in my analysis.

18   BY MR. GEISE:

19       Q.    Yesterday in response to a

20   question, you testified that distributors'

21   conduct was outside the scope of your report.

22   Is it true that retail pharmacy conduct is

23   also outside the scope of your report?

24              MR. SOBOL:  Objection.

25       A.    My analysis does not include

Highly Confidential - Subject to Further Confidentiality Review

1    retail pharmacy conduct.

2    BY MR. GEISE:

3        Q.    The assignment that you were

4    given by plaintiffs' counsel did not include

5    considering any conduct by a retail pharmacy

6    defendant, correct?

7        A.    My assignment pertains to the

8    marketing conduct and not to the conduct of

9    retail pharmacies.

10        Q.    If you look at Exhibit 1 to

11    your deposition, which is your expert report,

12    in particular, your Figure 1 on page 19, this

13    is your promotion ecosystem, correct?

14        A.    Yes.

15        Q.    You would agree that retail

16    pharmacy defendants are not part of that

17    promotion ecosystem at all, correct?

18        A.    Retail pharmacies are not part

19    of the promotion ecosystem that I describe

20    here.

21            MR. GEISE:  Thank you.  Those

22        are my questions.

23            THE VIDEOGRAPHER:  The time is

24        3:34 p.m.  We're off the record.

25            (Recess taken, 3:34 p.m. to

```
 1              3:35 p.m.)

 2              THE VIDEOGRAPHER:  The time is

 3       3:35 p.m.  We're back on the record.

 4                   EXAMINATION

 5  BY MR. SOBOL:

 6       Q.      You were asked some questions

 7  yesterday and today about the assignment that

 8  you were given.  The assignment you were

 9  given was with respect to modeling the

10  combined effect of certain manufacturer

11  defendants' marketing, correct?

12       A.      Yes, that's correct.

13       Q.      The lawyers, though, didn't

14  tell you what type of model you should use,

15  correct?

16       A.      That's correct.

17       Q.      You chose the aggregate model,

18  correct?

19       A.      I chose the aggregate model to

20  estimate aggregate impact, as I have

21  described over the last day and a half,

22  because the aggregate model allows me to

23  capture spillover effects and is the most

24  efficient way to estimate the combined effect

25  of defendants' alleged marketing misconduct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. SOBOL:  Nothing further.

 2                    MR. ROTH:  No follow-up here.

 3                    THE VIDEOGRAPHER:  That

 4           concludes the deposition of Meredith

 5           Rosenthal.  The time is 3:36 p.m., and

 6           we're now off the record.

 7                    (Proceedings recessed at

 8           3:36 p.m.)

 9                        --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        CERTIFICATE
 2             I, MICHAEL E. MILLER, Fellow of
      the Academy of Professional Reporters,
 3    Registered Diplomate Reporter, Certified
      Realtime Reporter, Certified Court Reporter
 4    and Notary Public, do hereby certify that
      prior to the commencement of the examination,
 5    MEREDITH B. ROSENTHAL, Ph.D. was duly sworn
      by me to testify to the truth, the whole
 6    truth and nothing but the truth.
 7             I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
               I DO FURTHER CERTIFY that pursuant
11    to FRCP Rule 30, signature of the witness was
      not requested by the witness or other party
12    before the conclusion of the deposition.
13             I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
14    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
15    employee of such attorney or counsel, and
      that I am not financially interested in the
16    action.
17
18    _____
      MICHAEL E. MILLER, FAPR, RDR, CRR
19    Fellow of the Academy of Professional Reporters
      NCRA Registered Diplomate Reporter
20    NCRA Certified Realtime Reporter
      Certified Court Reporter
21
      Notary Public
22    My Commission Expires:  7/9/2020
23    Dated: May 6, 2019
24
25
```

```
 1                INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8           After doing so, please sign the

 9    errata sheet and date it.

10           You are signing same subject to

11    the changes you have noted on the errata

12    sheet, which will be attached to your

13    deposition.

14           It is imperative that you return

15    the original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         ERRATA

 2     PAGE   LINE   CHANGE

 3     _____  _____  _____

 4            REASON: _____

 5     _____  _____  _____

 6            REASON: _____

 7     _____  _____  _____

 8            REASON: _____

 9     _____  _____  _____

10            REASON: _____

11     _____  _____  _____

12            REASON: _____

13     _____  _____  _____

14            REASON: _____

15     _____  _____  _____

16            REASON: _____

17     _____  _____  _____

18            REASON: _____

19     _____  _____  _____

20            REASON: _____

21     _____  _____  _____

22            REASON: _____

23     _____  _____  _____

24            REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I, MEREDITH B. ROSENTHAL, Ph.D.,
       do hereby certify that I have read the
 5     foregoing pages and that the same is a
       correct transcription of the answers given by
 6     me to the questions therein propounded,
       except for the corrections or changes in form
 7     or substance, if any, noted in the attached
       Errata Sheet.

 8

 9

10

11

12     _____

        MEREDITH B. ROSENTHAL, Ph.D.        DATE

13

14

15     Subscribed and sworn to before me this

16     _____ day of _____, 20 _____.

17     My commission expires: _____

18

19     _____

20     Notary Public

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      LAWYER'S NOTES

 2

 3     PAGE      LINE

 4     _____     _____     _____

 5     _____     _____     _____

 6     _____     _____     _____

 7     _____     _____     _____

 8     _____     _____     _____

 9     _____     _____     _____

10     _____     _____     _____

11     _____     _____     _____

12     _____     _____     _____

13     _____     _____     _____

14     _____     _____     _____

15     _____     _____     _____

16     _____     _____     _____

17     _____     _____     _____

18     _____     _____     _____

19     _____     _____     _____

20     _____     _____     _____

21     _____     _____     _____

22     _____     _____     _____

23     _____     _____     _____

24     _____     _____     _____

25
```