```
 1            UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                 EASTERN DIVISION

 3
     IN RE: NATIONAL         )
 4   PRESCRIPTION            )   MDL No. 2804
     OPIATE LITIGATION       )
 5   _____     )   Case No.
                             )   1:17-MD-2804
 6                           )
     THIS DOCUMENT RELATES   )   Hon. Dan A.
 7   TO ALL CASES            )   Polster
 8
                MONDAY, APRIL 1, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10             CONFIDENTIALITY REVIEW
11                   - - -
12           Videotaped deposition of Kathe A.
13   Sackler, M.D., held at the offices of DEBEVOISE
14   & PLIMPTON LLP, 919 Third Avenue, New York,
15   New York, commencing at 11:02 a.m., on the
16   above date, before Carrie A. Campbell,
17   Registered Diplomate Reporter, Certified
18   and Realtime Reporter.
19
20
21                   - - -
22

              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
25
```

A P P E A R A N C E S :

SIMMONS HANLY CONROY, LLC
BY:  PAUL HANLY
     phanly@simmonsfirm.com
     JAYNE CONROY
     jconroy@simmonsfirm.com
     SANFORD SMOKLER
     ssmokler@simmonsfirm.com
     LAURA S. FITZPATRICK
     lfitzpatrick@simmonsfirm.com
     ELLYN HURD
     ehurd@simmonsfirm.com
       (VIA REALTIME STREAM)
112 Madison Avenue
New York, New York  10016-7416
(212) 784-6400

MOTLEY RICE LLC
BY:  LINDA SINGER
     lsinger@motleyrice.com
     KAITLYN EEKHOFF
     keekhoff@motleyrice.com
       (VIA REALTIME STREAM)
     AMANDA UNTERREINER
     aunterreiner@motleyrice.com
       (VIA REALTIME STREAM)
401 Ninth Street NW, Suite 1001
Washington, DC 20004
(202) 232-5504

LANIER LAW FIRM, P.C.
BY:  MILDRED CONROY
     mildred.conroy@lanierlawfirm.com
126 East 56th Street, Sixth Floor
New York, New York 10022
(212) 421-2800

SIMMONS HANLY CONROY, LLC
BY:  JO ANNA POLLOCK
     jpollock@simmonsfirm.com
       (VIA REALTIME STREAM)
One Court Street
Alton, Illinois 62002
(618) 259-2222

MCHUGH FULLER LAW GROUP
BY:  MICHAEL J. FULLER, JR.
     mike@mchughfuller.com
       (VIA TELECONFERENCE)
     AJ ELKINS
       (VIA TELECONFERENCE)
97 Elias Whiddon Road
Hattiesburg, Mississippi 39402
(601) 261-2220

SPANGENBERG SHIBLEY & LIBER LLP
BY:  PETER WEINBERGER
     pweinberger@spanglaw.com
       (VIA TELECONFERENCE)
1001 Lakeside Avenue East
Cleveland, Ohio 44114
(216) 600-0114

BARON & BUDD, P.C.
BY:  WILLIAM POWERS
     wpowers@baronbudd.com
       (VIA REALTIME STREAM)
600 New Hampshire Avenue NW
Washington, DC  20037
(202) 333-4562
Counsel for Plaintiffs

BRANSTETTER STRANCH & JENNINGS, PLLC
BY:  MICHAEL G. STEWART
     mstewart@bsjfirm.com
     JOE P. LENISKI, JR.
     joeyl@bsjfirm.com
       (VIA REALTIME STREAM)
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee  37203
(615) 254-8801
Counsel for the Tennessee Action

WASHINGTON ATTORNEY GENERAL'S OFFICE
BY:  LAURA CLINTON
     laura.clinton@atg.wa.gov
       (VIA TELECONFERENCE)
1125 Washington Street SE
Olympia, Washington  98504
(360) 753-6200
Counsel for the State of Washington

DEBEVOISE & PLIMPTON LLP
BY:  MAURA KATHLEEN MONAGHAN
     mkmonaghan@debevoise.com
     MARY JO WHITE
     mjwhite@debevoise.com
     HAROLD WILLIFORD
     hwwillif@debevoise.com
     NORA NIEDZIELSKI-EICHNER
     nniedzie@debevoise.com
     JOSHUA N. COHEN
     jncohen@debevoise.com
919 Third Avenue
New York, New York 10022
(212) 909-6000
Counsel for the Witness

DECHERT LLP
BY:  MARK S. CHEFFO
     mark.cheffo@dechert.com
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500
Counsel for Purdue Pharma

WILLIAMS & CONNOLLY LLP
BY:  JYOTI JINDAL
     jjindal@wc.com
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5331
Counsel for Cardinal Health, Inc.

MARCUS & SHAPIRA LLP
BY:  ROBERT BARNES
     rbarnes@marcus-shapira.com
301 Grant Street, 35th Floor
Pittsburgh, Pennsylvania 15219-6401
(412) 338-4690
Counsel for HBC

COVINGTON & BURLING LLP
BY:  ALEXANDRA WIDAS
     awidas@cov.com
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
Counsel for McKesson Corporation

BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
BY:  KASPAR STOFFELMAYR
     kaspar.stoffelmayr@bartlit-beck.com
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
(312) 494-4400
Counsel for Walgreens

REED SMITH LLP
BY:  M. PATRICK YINGLING
     Mpyingling@reedsmith.com
       (VIA TELECONFERENCE)
10 South Wacker Drive, 40th Floor
Chicago, Illinois 60606-7507
(312) 207-1000
Counsel for AmerisourceBergen

JONES DAY
BY:  EDWARD M. CARTER
     emcarter@jonesday.com
       (VIA TELECONFERENCE)
325 John H. McConnell Boulevard,
Suite 600
Columbus, Ohio 43125-2673
(614) 469-3939
Counsel for Walmart

## Page 6

1 ROPES & GRAY LLP
2 BY: GREGORY MALLOY
    gregory.malloy@ropesgray.com
3 800 Boylston Street
  Boston, Massachusetts 02199-3600
4 (617) 951-7000
  Counsel for Mallinckrodt
5
6 ARNOLD & PORTER KAYE SCHOLER LLP
7 BY: JOSHUA DAVIS
    joshua.davis@arnoldporter.com
    (VIA TELECONFERENCE)
8 601 Massachusetts Avenue, NW
  Washington, DC 20001-3743
9 (202) 942-5000
  Counsel for Endo Pharmaceuticals
10 Inc., and Endo Health Solutions Inc.
11
12 TUCKER ELLIS LLP
  BY: JEFFREY M. WHITESELL
13    jwhitesell@tuckerellis.com
      (VIA TELECONFERENCE)
14 950 Main Avenue, Suite 1100
  Cleveland, Ohio 44113
15 (216) 592-5000
  Counsel for Janssen Pharmaceuticals
16 and Johnson & Johnson, Inc.
17 VENABLE LLP
  BY: MICHAEL B. MACWILLIAMS
18    mbmacwilliams@Venable.com
      (VIA TELECONFERENCE)
19 750 East Pratt Street, Suite 900
  Baltimore, Maryland 21202
20 (410) 244-7400
  Counsel for Abbott Laboratories
21
22
23 VIDEOGRAPHER:
  HENRY MARTE,
24   Golkow Litigation Services
25          – – –

## Page 7

1          INDEX
2              PAGE
3 APPEARANCES.................................. 2
4 EXAMINATIONS
5   BY MR. HANLY.............................. 12
6
7          EXHIBITS
8 No.      Description          Page
9 Purdue    Kathe Sackler, The New York    19
  Sackler 1   Academy of Sciences, Board of
10            Governors
11 Purdue    Memo from Dr. Kathe A. Sackler    28
  Sackler 2   to Dr. Ronald B. Miller,
12            PDD9316700900
13 Purdue    E-mail(s),                30
  Sackler 3   PDD9316716146 - PDD9316716148
14
  Purdue    E-mail(s),                40
15 Sackler 4   PPLPC062000001559 -
            PPLPC062000001560
16
  Purdue    Confidential fax from Richard    53
17 Sackler 5   S. Sackler, MD, November 30,
            1991,
18          PDD9316701014 - PDD9316701015
19 Purdue    Facsimile from Kathe A.        59
  Sackler 6   Sackler, MD, January 2, 1992,
20          PDD1706192327 - PDD1706192329
21 Purdue    Usage and Perceptions of Oral    64
  Sackler 7   Morphine Among Orthopaedic
22            Surgeons, July 9, 1992,
            PDD9316724162 - PDD9316724177
23
24
25

## Page 8

1 Purdue    Memo from Dr. Kathe A. Sackler    78
  Sackler 8   to Sackler, Friedman,
2            Goldenheim and Udell, January
            6, 1993,
3          PDD1701812859
4 Purdue    Interoffice Memorandum, May    83
  Sackler 9   17, 1995, to Mortimer D.
5            Sackler, MD, from Kathe A.
            Sackler, MD,
6          PPLPC063000002490 -
            PPLPC063000002492
7
  Purdue    E-mail(s),                93
8 Sackler 10  PPLPC042000000089 -
            PPLPC042000000091
9
  Purdue    E-mail(s),               102
10 Sackler 11  PPLPC013000015471 -
            PPLPC013000015472
11
  Purdue    Interoffice Memorandum, August  108
12 Sackler 12  8, 1995, to Paul Goldenheim
            from Kathe A. Sackler, MD,
13          PDD1706192312
14 Purdue    Application Summary "Reder     111
  Sackler 13  Version,
15          PDD1501103337 - PDD1501103361
16 Purdue    August 16, 1995 letter to     136
  Sackler 14  Robert Bedford, MD, from Lee
17            Ann Storey, RN, MPH,
            PDD8003007024 - PDD8003007050
18
19 Purdue    Interoffice Memorandum, August  145
  Sackler 15  28, 1995, to Michael Friedman
20            from Kathe A. Sackler, MD,
            PDD1701815258 - PDD1701815259
21 Purdue    Interoffice Memorandum       152
  Sackler 16  September 26, 1995, to Michael
22            Friedman from Kathe A.
            Sackler, MD,
23          PDD9316703912
24
25

## Page 9

1 Purdue    Interoffice Memorandum, August  155
  Sackler 17  28, 1995, to Stuart D. Baker,
2            from Kathe A. Sackler, MD,
            PPLPC063000002482 -
3          PPLPC063000002485
4 Purdue    Interoffice Memorandum,       164
  Sackler 18  February 15, 1996, to Mortimer
5            D. Sackler, MD, from Kathe A.
            Sackler, MD,
6          PDD9316707060
7 Purdue    E-mail(s),               169
  Sackler 19  PDD1706142047 - PDD1706142050
8
  Purdue    E-mail(s),               182
9 Sackler 20  PDD9316706668
10 Purdue    E-mail(s),               189
  Sackler 21  PDD8801118262
11
  Purdue    October 15, 1998 memorandum to  190
12 Sackler 22  distribution, from Mark
            Alfonso,
13          PDD9316703931
14 Purdue    E-mail(s),               196
  Sackler 23  PPLPC063000022175 -
15          PPLPC063000022177
16 Purdue    E-mail(s),               207
  Sackler 24  PDD9316716369
17
  Purdue    Purdue Pharma facsimiles and    211
18 Sackler 25  documents,
            PPLPC063000015803 -
19          PPLPC063000015814
20 Purdue    E-mail(s),               217
  Sackler 26  PPLPC063000002464 -
21          PPLPC063000002465
22 Purdue    Purdue Pharma promotional pen   241
  Sackler 27
23



Purdue E-mail(s), 241
Sackler 29 PDD931600629 - PDD931600635



VIDEOGRAPHER: We are now on the record.

My name is Henry Marte. I'm a videographer with Golkow Litigation Services.

Today's date is April 1, 2019, and the time is 11:02 a.m.

This videotaped deposition is being at 919 Third Avenue, New York, New York, in the matter of National Prescription Opiate Litigation.

The deponent today is Kathe Sackler.

All appearances are noted on the stenographic record.

Will the court reporter please administer the oath to the witness.

KATHE A. SACKLER, M.D.,

of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Plaintiffs, as follows:

VIDEOGRAPHER: You may begin.



DIRECT EXAMINATION

QUESTIONS BY MR. HANLY:

Q. You are Kathe Sackler?
A. I am.

A. That's an office which is --



was my father and my uncle's offices originally, and it also houses the Sackler School of Medicine for Tel Aviv University. They're tenants there. And it also has other tenants there, including several foundations, family offices.

A. Oh, I was describing the two buildings because they're connected. They function as one --
Q. All right.
A. -- structure.

A. Yes. She has a foundation which is a center for child development.
Q. All right.
A. Which is, I think, about 30 years old now. It's been a long time.



Page 14

1

2

3

4

5

6

7

8

9     Q.     What is the [ ]
10    Foundation?
11         A.     That's a private foundation
12    which [ ] and I created in -- I don't
13    remember -- about -- I'm trying to think what
14    year.  It's about -- I guess it's about
15    11 years or so, 12 years.  I don't remember
16    the exact year, but about 11, 12 years ago I
17    created, or thereabouts, a private foundation
18    to use, to establish, to do philanthropic
19    donations through.  And I thought also to
20    organize -- I thought it would be a nice
21    thing to establish a private foundation that
22    would be intergenerational that my children
23    would learn about supporting nonprofit causes
24    and doing community service, which they did
25    in school, always, and even out of school.

Page 15

1          I've always been very
2     community-service- oriented.  So it was very
3     natural for me to create a foundation and
4     for -- to introduce my children, [ ] and my
5     children, to that concept.
6          I guess I grew up also with my
7     parents having foundations that they
8     contributed through to different social
9     causes and community service causes.
10         Q.     What are the causes that the
11    [ ] Foundation has contributed to?
12         A.     Oh, that's a long list.
13         Q.     Well, just give us some
14    examples.
15         A.     Sure.
16              Save the Children is one
17    organization that the foundation has
18    supported.
19              Doctors Without Borders is
20    another foundation.
21              The YMCA summer camp program
22    in -- in Connecticut near where we live is
23    another recipient.
24              The children -- I don't have
25    the title exactly, but it's an organization

Page 16

1     for children in crisis in Connecticut's --
2     Fairfield County, Connecticut, that area,
3     including Bridgeport and -- I think it goes
4     up to about New Haven.  We've supported that
5     organization for a number of years.
6          There's an organization that
7     supports -- helps with homelessness.  That's
8     another organization we support in
9     Connecticut where we live.
10         There's another organization
11    that -- I'm trying to think of the -- also
12    some academic institutions.  We've supported
13    Brown University, Brown University in Rhode
14    Island, that's one.  NYU here in New York.
15    Silver Hill Hospital, which is a very
16    interesting inpatient/outpatient research and
17    clinical facility.  Most of their patient
18    population are adolescents.
19         Q.     Let me interrupt you, if I may.
20              Silver Hill, that's an
21    addiction treatment center in Connecticut --
22         A.     Yes.
23         Q.     -- is it not?
24         A.     It does.  It focuses on
25    addiction treatment and other -- and other

Page 17

1     diagnoses as well.
2          Q.     And did you ever sit on the
3     board of Silver Hill Hospital?
4          A.     No.  No.
5          Q.     You graduated from NYU
6     undergraduate in 1980, true?
7          A.     Correct.
8          Q.     And from the NYU medical
9     school --
10         A.     Yes.
11         Q.     -- in 1984?
12         A.     Yes.
13         Q.     You then engaged in a surgical
14    residency for approximately one year, true?
15         A.     Two years, yeah.
16         Q.     Two years?
17         A.     Yeah.
18         Q.     All right.
19         A.     I think it was about two years.
20         Q.     And after that, you went to
21    work -- withdrawn.
22              Your activities after that
23    related to what was then called the Purdue
24    Frederick Company, true?
25              MS. MONAGHAN:  Object to the



Page 18

1 form.
2
10 QUESTIONS BY MR. HANLY:
11 Q. And then you went to work or
12 began to be involved with the Purdue
13 Frederick Company, as it was then known; is
14 that true?
15 MS. MONAGHAN: Object to the
16 form.
17 THE WITNESS: I actually --
18 it's not the total picture. It's part
19 of the truth.
20 I actually worked for the
21 Purdue Frederick Company, but I also
22 worked for several other companies as
23 well.
24 QUESTIONS BY MR. HANLY:
25 Q. Other companies owned by the

Page 19

1 Sackler family?
2 A. Yes. Yes.
3 MS. MONAGHAN: I'm going to
4 register a belated objection to form
5 to that one. I didn't get to speak
6 fast enough. Sorry.
7 (Purdue-Sackler Exhibit 1
8 marked for identification.)
9 MR. HANLY: Place before the
10 witness Exhibit 1 to the deposition.
11 Ms. Monaghan, if you could
12 slide that to her. Thank you.
13 QUESTIONS BY MR. HANLY:
14 Q. Ms. Sackler, we've placed
15 Exhibit 1 before you, which comes from the
16 website of the New York Academy of Sciences,
17 and it purports to set forth a partial
18 biography of you.
19 Do you see that, sir -- ma'am?
20 A. Yes.
21 Q. All right. Are you presently
22 on the board of governors of the New York
23 Academy of Sciences?
24 A. Yes.
25 Q. What is the New York Academy of

Page 20

1 Sciences?
2 A. It's a very interesting
3 institution. It's been around for a long
4 time. It's one of the oldest medical
5 organizations in the country, I think.
6 But it is a -- it's a nonprofit
7 organization which works to provide
8 educational -- it convenes meetings and
9 symposiums and conferences for physicians and
10 other people who work in -- not only
11 physicians, but scientists, physicians,
12 people who work in health care, people who
13 work in related areas. But it -- it also
14 includes people who are involved in medical,
15 public health policy. It includes people who
16 work -- who work in corporate organizations
17 that are focused on one of the science or
18 medical issues that they are involved with.
19 And they also have a number of
20 initiatives that convey -- that offer
21 research grants in a couple of different
22 areas that they're focused on right now.
23 That's -- it's -- it's a
24 very -- it's a very thoughtful and
25 well-intentioned organization that I think

Page 21

1 really does do some good, some significant
2 contri --
3 Q. Contributions?
4 A. Yeah, they're...
5 Q. Have you finished your answer?
6 A. Yeah, sure.
7 Q. Thanks.
8 Did you prepare this bio for
9 the New York Academy of Sciences?
10 A. I don't know exactly because,
11 you know, I -- we're asked to submit
12 something and then they choose what they want
13 to publish. So I'm not certain it's what I
14 prepared, but it's close.
15 Q. Well, if you look at -- sorry.
16 If you look at the center of
17 highlighted section Philanthropy and
18 Foundation Work.
19 Do you see that?
20 A. Yeah.
21 Q. And it actually lists the
22 various entities that you have some
23 association with in that section of the bio;
24 isn't that true?
25 A. Yes. Sure.

Page 22

1    Q.    And it has the names of those
2  entities, correct?
3    A.    Correct.
4    Q.    But under Professional Work, it
5  doesn't reference by name any particular
6  company or institution, does it?
7        MS. MONAGHAN:  Object to the
8    form.
9        THE WITNESS:  No.
10  QUESTIONS BY MR. HANLY:
11    Q.    And what that section,
12  Professional Work, does refer to, however, is
13  your work for the various Purdue entities,
14  correct?
15        MS. MONAGHAN:  Object to the
16    form.
17        THE WITNESS:  No.
18  QUESTIONS BY MR. HANLY:
19    Q.    What is -- withdrawn.
20        The International Group of
21  Independent Associated Pharmaceutical
22  Companies includes the Purdue entities; does
23  it not?
24    A.    Yes.
25    Q.    It includes --

Page 23

1    A.    Other entities that are
2  separate, independent, legal entities
3  unrelated to Purdue.
4    Q.    Well --
5    A.    They're -- well, they're
6  described as it's described here:
7  independent associated companies.
8    Q.    And that -- those would --
9    A.    Yes.
10    Q.    Those would include
11  Mundipharma; is that right?
12    A.    There are a lot of
13  Mundipharmas.  I'm not sure which Mundipharma
14  you're referring to.
15    Q.    Well, it would refer all --
16    A.    There are a number -- it
17  wouldn't include every Mundipharma.  It would
18  include some of the companies carrying the
19  name Mundipharma.
20    Q.    And it would include Purdue --
21  entities with the name Purdue in the title?
22    A.    Not all of them.  Only -- not
23  all of them.
24    Q.    Does the International Group of
25  Independent Associated Pharmaceutical

Page 24

1  Companies include any companies not owned
2  directly or indirectly by the Sackler family?
3    A.    Yes, some of them are
4  partnerships.  Some of them are jointly owned
5  by the Sackler family and other persons who
6  are not Sacklers.
7    Q.    All of the entities within the
8  International Group of Independent Associated
9  Pharmaceutical Companies are in whole or in
10  part owned by the Sackler family?
11    A.    Yes.
12        MS. MONAGHAN:  Objection.
13  QUESTIONS BY MR. HANLY:
14
15
16
17
18
19
20
21
22
23
24
25    Q.    And is that your residence?

Page 25

1    A.    No, not currently.  It was my
2  residence at one time.
3    Q.    All right.  And you also had
4  some sort of an office there; isn't that
5  true?
6    A.    No.
7    Q.    You never had an office there?
8    A.    No.
9        I'm not sure what you mean by
10  "an office," but not a proper office, no.
11

Page 26

1

2

3

4      MS. MONAGHAN:  Special Master,
5  could I ask whether there's going to
6  be some relevance to these questions?
7      I didn't want to object
8  unnecessarily, but I'm not sure I
9  quite understand what the purpose of
10  these questions is.
11      SPECIAL MASTER COHEN:  Well,
12  I'm not going to rule on relevance
13  objections at this time unless they go
14  completely afield.  I assume that
15  Mr. Farrell will tie it in, and of
16  course right now this has nothing to
17  do with admissibility, so that's when
18  that would get raised.
19      MS. MONAGHAN:  Okay.
20      MR. HANLY:  Special Master, I
21  think you misspoke.  I'm Hanly.
22      SPECIAL MASTER COHEN:  Oh, I'm
23  sorry.  What did I say?  Farrell?
24      MR. HANLY:  Farrell.
25      SPECIAL MASTER COHEN:  I

Page 27

1  apologize for the insult.
2      MR. HANLY:  It's not -- I
3  didn't take it that way.
4      MS. MONAGHAN:  I was going to
5  object to every question thereafter on
6  the grounds that there was an error on
7  the questioner name.
8  QUESTIONS BY MR. HANLY:
9      Q.   Dr. Sackler?
10      A.   Yes, sir.
11      Q.   Is          an employee of any
12  of the Purdue companies at the present time?
13      A.   No, not at the present time.
14      Q.   She was at one time; is that
15  true?
16      A.   She for a -- at one time I
17  think she was a consultant for a very short
18  time.  In a very minor way.
19      Q.   Now, sometime after 1985 you
20  began to do work for the Purdue Frederick
21  Company; is that correct?
22      MS. MONAGHAN:  Object to the
23  form.
24      THE WITNESS:  I answer --
25

Page 28

1  QUESTIONS BY MR. HANLY:
2      Q.   Do you understand the question?
3      A.   Yeah.  Yeah.  I'm not sure
4  whether -- okay.
5      Q.   When she --
6      A.   When there's an objection, I
7  just wait and then answer?
8      Q.   Yes.  If she instructs you not
9  to answer, then you won't answer.
10      A.   Okay.
11      Q.   Otherwise, you can answer my
12  question.
13      A.   Yes.
14      (Purdue-Sackler Exhibit 2
15  marked for identification.)
16  QUESTIONS BY MR. HANLY:
17      Q.   All right.  Marked as Exhibit 2
18  a memorandum from Dr. Kathe Sackler to a
19  Dr. Ronald Miller dated January 26, 1987.
20      Will you have a look at that?
21      MS. MONAGHAN:  Do you have
22  copies for counsel?
23      THE WITNESS:  (Witness
24  complies.)
25

Page 29

1  QUESTIONS BY MR. HANLY:
2      Q.   Is that a memorandum that you
3  prepared and sent to a Dr. Ronald Miller?
4      A.   I can't remember doing that,
5  but it has my name on it.
6      Q.   And --
7      A.   So it's possible.
8      Q.   And it reads, does it not, "We
9  have" -- "Dear Ron, we have just completed at
10  Purdue Frederick the final drafting of the
11  MS-Contin tablet's dosing protocol which I am
12  herein enclosing."
13      Do you see that?
14      A.   Yes.
15      Q.   All right.  So is it true that
16  you were involved in January of 1987 with
17  drafting the MS-Contin tablet's dosing
18  protocol?
19      MR. CHEFFO:  Objection.  Form.
20      THE WITNESS:  I don't think so.
21      I think it's the colloquial
22  "we."  It's the -- meaning the
23  organization, not meaning me as an
24  author.
25      But I can tell you that I -- I

Page 30

1  don't -- this is 32 years ago you're
2  asking about.  I don't think I would
3  have been -- I mean, even -- it's -- I
4  don't think I was the person who would
5  write the protocol, no.
6  QUESTIONS BY MR. HANLY:
7      Q.    Well, you didn't have any
8  training as of January of 1987 in writing --
9      A.    I wouldn't even write it today.
10      Q.    But you transmitted the
11  protocol to a Dr. Miller, right?
12          MS. MONAGHAN:  Object to form.
13          THE WITNESS:  Yeah.
14          MS. MONAGHAN:  She said she
15  didn't recall.
16          THE WITNESS:  I guess I sent
17  him -- it says I sent him a copy of
18  the protocol, yes.
19          You know, I don't think I was
20  the only one who --
21          MS. MONAGHAN:  The way it works
22  is you wait for a question.
23          THE WITNESS:  Oh, okay.
24          (Purdue-Sackler Exhibit 3
25  marked for identification.)

Page 31

1  QUESTIONS BY MR. HANLY:
2      Q.    Mark as Exhibit 3 -- I'm
3  finished with that, Doctor.  You can put that
4  aside.
5      A.    You don't want to know who Ron
6  Miller is?
7      Q.    I don't.
8      A.    Okay.
9      Q.    I've placed Exhibit 3 before
10  you, which appears to be an e-mail exchange
11  between you and Dr. Richard Sackler.
12          Do you see that at the top?
13      A.    Yeah.  Yes, I see it's from me
14  to Richard --
15      Q.    Richard is --
16      A.    -- copying a lot of people.
17      Q.    Richard is a cousin of yours?
18      A.    Yes.
19      Q.    He's the son of Raymond
20  Sackler?
21      A.    Correct.
22      Q.    He was the -- in 1999, he was
23  the president, was he not, of the Purdue
24  Frederick Company?
25      A.    I guess you've probably figured

Page 32

1  out by now I'm not very good at dates, okay,
2  so I apologize if I don't know which date he
3  was the president.
4          But since preparing for this
5  deposition, I've seen that date associated
6  with his being the president, so I accept
7  that.
8      Q.    Did you -- in preparing for
9  this deposition, did you have opportunity to
10  review this specific document?
11      A.    No, I don't remember seeing
12  this specific document.
13      Q.    Okay.  Well, it -- the re: line
14  in the e-mail from you to Dr. Richard
15  Sackler, copying a number of other people --
16  I'm not going to list them here -- has a
17  subject:  Alternative routes of analgesic
18  delivery.
19          Do you see that?
20      A.    Yes.
21      Q.    And so this was an exchange
22  that you were having with Dr. Richard Sackler
23  concerning a possible product with an
24  alternative delivery system for analgesia; is
25  that right?

Page 33

1      A.    I don't know.  I'd have to read
2  it to answer you.
3          Should I take a minute and try
4  to read it?
5      Q.    Sure.
6      A.    It's a long memo.
7      Q.    I'm really only going to be
8  interested --
9      A.    Which part do you want me to
10  look at?
11      Q.    Well, I'd like you to look at
12  the third paragraph on the first page.
13      A.    Okay.
14      Q.    Just indicate when you've
15  reviewed that paragraph for me, please,
16  Doctor.
17      A.    Okay.
18



Page 34

Page 36

QUESTIONS BY MR. HANLY:

Q.   The fourth sentence of that paragraph, it's the sentence that begins, "If I may digress."

Do you see that?

A.   Uh-huh.

Q.   All right.  And it reads, "If I may digress further for a moment, I would remind you" -- that's you're reminding cousin Richard; is that right?

That's who you're reminding; is that right?

A.   I would think so.  It's addressed to Richard, yeah.

Q.   Right.

A.   Although it's copied to a lot of people, so -- which is surprising.

Q.   But the sole addressee --

A.   Yeah.

Q.   -- is Richard?

A.   Okay.  I mean --

Q.   So it reads, "If I may digress further for a moment, I would remind you of an earlier conversation we had, which you may remember, occurred a couple of years after I

Page 37

returned to work at PF" --

That's Purdue Frederick, right?

A.   Uh-huh.

Q.   That's a yes?

A.   Yes.  Yes.

Q.   -- "in 1985 following my residency in general surgery.  We were undergoing some changes within the ranks of the R&D function again.  I have since thought many times of this conversation, which we had over dinner in Greenwich, during which you asked me, quote, 'What is the one thing you would do if you were directing the R&D function,' unquote.  I suppose it was a very good question, since you were not long thereafter, upon TA's departure, directing the R&D function for a period of a few years before Paul's role was expanded from medical to R&D and medical.  Also, the question may have been prompted by our discussion at the time of your father's suggestion that I work with TA in the regulatory area, to which I expressed to you my preference for participation in new product research and development work.  My answer to your question

Page 38

1  was that I would develop a CR" --
2      That's controlled-release,
3  right?
4      A.   Uh-huh.
5      Q.   Yes?
6      A.   Yes.
7      Q.   -- "a CR oxycodone tablet.  You
8  went on to ask me what oxycodone is.
9  Apparently you were unaware of Percodan and
10 Percocet at that time."
11     Did I read that correctly?
12     A.   You did.
13     Q.   Now, CR --
14     A.   Eloquently.
15     Q.   I'm sorry?
16     A.   Eloquently.
17     Q.   CR -- withdrawn.
18         OxyContin is a CR oxycodone
19 tablet, true?
20     A.   Yes.
21     Q.   So --
22     A.   But I didn't develop it.
23     Q.   Well, but it was your idea,
24 wasn't it?
25     A.   It -- no.  It's interesting

Page 39

1  because -- you may find another memo or not,
2  but when I revisited this with Richard at a
3  later point, I don't know when -- which year
4  it was, but -- and I asked him if -- you
5  know, I referenced this conversation that I
6  had with him.  And I remember when I had that
7  conversation with him we were having -- we
8  were having dinner together, I believe.  And
9  he said he didn't remember it at all.  He,
10 like -- he didn't remember it.
11     Q.   Did you have occasion --
12     A.   Which I thought was very odd,
13 actually.
14     Q.   Did you have occasion to read
15 cousin Richard's deposition transcript --
16     A.   No.
17     Q.   -- which was taken a few weeks
18 ago?
19     A.   No.
20         MR. CHEFFO:  Object to form.
21         THE WITNESS:  No, I didn't.
22         MS. MONAGHAN:  I also object to
23 form.
24         MR. CHEFFO:  It's Dr. Sackler.
25         THE WITNESS:  No.

Page 40

1      (Purdue-Sackler Exhibit 4
2  marked for identification.)
3  QUESTIONS BY MR. HANLY:
4      Q.   Mark as Exhibit 5 --
5         MS. CONROY:  4.
6         MS. MONAGHAN:  I think we're
7  only up to 4.
8         MR. HANLY:  4.  I'm sorry.
9  Thank you for the correction.  Oh, I'm
10 sorry.
11         I'm finished with that, Doctor.
12         THE WITNESS:  Okay.  It was a
13 good idea.
14 QUESTIONS BY MR. HANLY:
15     Q.   I'm --
16     A.   It's a very good medicine, and
17 it's a very effective and safe medicine.
18     Q.   -- placing before you --
19         MR. HANLY:  Move to strike the
20 comments which were not in response to
21 a question.
22 QUESTIONS BY MR. HANLY:
23     Q.   Place before you Exhibit 4,
24 Doctor.
25     A.   Yes.

Page 41

1      Q.   And do you see that about a
2  third of the way down the page it indicates
3  that this is an exchange from you to
4  Dr. Mortimer Sackler, right?
5      A.   Yes, my father.
6      Q.   That was your father?
7      A.   Yes.
8      Q.   And this regards a 50 an -- a
9  50-year anniversary booklet.
10         Do you see that in the re:
11 line?
12     A.   50-year anniversary booklet,
13 yes.
14     Q.   All right.  Because the Purdue
15 Frederick Company was acquired by your father
16 and Arthur Sackler in the year 1952?
17     A.   No, my father and Raymond
18 Sackler.
19     Q.   And Raymond Sackler in 1952?
20     A.   Yeah.
21     Q.   Right?
22     A.   Yeah.
23     Q.   So this --
24     A.   And Arthur, I think -- Arthur
25 was a partner, but he wasn't active in -- or

Page 42

1 at least in my -- my recollection, he wasn't
2 a full -- fully active. My father and
3 Raymond were the active partners in that
4 business.
5     Q.    This e-mail from you to your
6 father, Dr. Mortimer Sackler, discusses this
7 planned booklet, right?
8     A.    I don't remember the booklet.
9 I'm sorry.
10     Q.    All right. Well, let's look at
11 the bottom of the e-mail.
12         Do you see where you -- where
13 you signed it K?
14     A.    Yes.
15     Q.    All right. And then below that
16 you wrote, did you not, "PS, I will
17 strenuously protest approval of any document
18 that suggests or implies, as this draft does,
19 that Richard Sackler was responsible for the
20 idea of developing a controlled-release
21 oxycodone product. As you know, when I told
22 Richard of my idea in the mid-'80s, he asked
23 me what oxycodone was."
24         Did I read that correctly?
25     A.    I didn't write that.

Page 43

1     Q.    You did not write this PS?
2     A.    I don't remember writing that
3 ever, and I don't remember -- I also don't
4 remember -- I mean, it's very
5 uncharacteristic that I would copy like 12
6 people if I was just writing something to
7 Richard. It's weird, too.
8     Q.    So --
9     A.    I don't know.
10     Q.    -- do you have any basis to
11 testify, Dr. Sackler --
12     A.    No, I don't know.
13     Q.    -- that either Exhibit 3 or
14 Exhibit 4 are fraudulent documents or weren't
15 actually written by you?
16         MS. MONAGHAN:  Object to the
17     form.
18         She said she didn't remember
19     writing them.
20         MR. CHEFFO:  Object to form.
21         THE WITNESS:  I don't
22     remember and it's -- I don't remember
23     writing either of these, to tell
24     you -- I mean, if you want my honest
25     memory, I don't remember writing these

Page 44

1 memos.
2         I'm kind of accepting what
3     you're showing me because my name is
4     in the "to" line, but -- I mean, in
5     the "from" line and -- but it's -- I
6     mean, that's so -- I can't identify
7     that as something that I would write.
8     But, you know --
9 QUESTIONS BY MR. HANLY:
10     Q.    Doctor, let me ask you --
11     A.    -- it's so long ago, I don't
12 know. I can't swear one way or the other,
13 you know.
14     Q.    Let me ask you this:  You do
15 understand, do you not, Doctor, that
16 Exhibit 4 in front of you --
17     A.    Right.
18     Q.    -- as well as Exhibit 3 that we
19 were looking at a few moments ago, that both
20 of those documents were provided to us by
21 your company?
22         MS. MONAGHAN:  Object to the
23     form.
24 QUESTIONS BY MR. HANLY:
25     Q.    Do you understand that?

Page 45

1     A.    If you say so, yes. I mean, I
2 assume they were part of your discovery work.
3     Q.    And an objective reader of
4 these two documents would conclude, would she
5 not, that you were stating that the idea of a
6 controlled-release oxycodone product was
7 initially yours, right?
8         That's what these two documents
9 purport to say; isn't that true, Doctor?
10     A.    But it wasn't -- my idea was an
11 idea expressed to my cousin over dinner, and
12 that's where it ended. Because that was -- I
13 was not involved in -- it was what year? I
14 wish I could remember what year that dinner
15 was because, you know, this is years later
16 that OxyContin was developed. It wasn't at
17 that time.
18         And if Richard -- you know, the
19 only -- if you ask Richard -- I mean, my
20 impression from what was understood at the
21 company at the time that OxyContin was
22 developed was that it was proposed -- that it
23 was Bob Kaiko's idea. That's what people
24 said.
25         And -- but that was years

Page 46

1 later, and he could have had the same idea.
2 You know, ideas in science and in research
3 and in pharmacology, very often people come
4 up with the same idea at different times and
5 different places. So it -- I didn't -- I
6 kind of said, okay, well, it was developed
7 after Bob came up with that idea. And that's
8 how it was attributed to his -- that it was
9 his idea.
10      So I didn't -- but it is true
11 that I said to Richard over dinner one
12 evening when he was running R&D, or when we
13 were talking about what I would do if I was
14 involved in R&D, and I thought that was a
15 very good idea, to develop an oxy -- a
16 controlled-release OxyContin product, yeah.
17      Q.   But Exhibit 4 states at the
18 bottom, this PS, "I will strenuously protest
19 approval of any document that suggests or
20 implies, as this draft does, that Richard
21 Sackler was responsible for the idea."
22      Then it goes on to say, "As you
23 know, when I told Richard of my idea in the
24 mid-'80s, he asked me what oxycodone was."
25      A.   Yeah.

Page 47

1      Q.   So looking at this document, an
2 objective reader would conclude, would she
3 not, that you were taking credit for the
4 invention of OxyContin?
5      MS. MONAGHAN: Objection.
6      THE WITNESS: Not for the
7 actual invention; just for the idea.
8 QUESTIONS BY MR. HANLY:
9      Q.   Thank you.
10      A.   And the idea was not in the
11 time frame of the invention. It was just
12 something I said to Richard years before.
13      That dinner -- what's the date
14 of this? '99. No, it's not '99. That's
15 not --
16      Q.   The document states that the
17 dinner --
18      A.   The dinner was in 1985 or
19 something, right?
20      Q.   That's what it states.
21      A.   So if I said to Richard over
22 dinner, as I think I did, that I thought it
23 was a good idea to develop a control-release
24 oxycodone product, that's fine. And that's
25 what I said.

Page 48

1      But that doesn't mean that that
2 was -- this -- the -- that that then went
3 forward, that the company then went forward
4 and developed OxyContin, because it didn't.
5 Years passed. People changed. You know,
6 life went on.
7      And then when -- when Purdue
8 began to -- or whenever they were working on
9 developing an oxycodone control-release
10 product, it was not related to what I had
11 said. Because when I asked Richard, he
12 didn't even remember I had ever said that to
13 him.
14      So...
15      Q.   We can agree, can we not,
16 Doctor --
17      A.   Yeah. Sure.
18      Q.   -- that OxyContin is a
19 controlled-release, oxycodone-based product?
20      A.   Yes. It's an FDA-approved
21 and -- control-release oxycodone product,
22 which is a very effective analgesic and which
23 has been -- you know, even with -- with --
24 you know, it's -- unfortunately, it's been
25 caught up in this terrible, terrible public

Page 49

1 health crisis that we're having in our
2 country, which is just distressing and
3 complex and multi-faceted. And it's not --
4 it's not due to one pharmaceutical, and it's
5 not due to one company, and it's not due to
6 one problem. It's due to a very complex
7 situation that our country is living through
8 right now, which is both economic, social,
9 medical and pharmaceutical. And the war on
10 drugs plays a big part in it, the drugs being
11 allowed to come into the country, which are
12 killing people, seriously killing people.
13      And it will take -- I think it
14 will take -- you know, the government has to
15 really take some responsibility to make a
16 difference, and I hope you all will help that
17 happen because this is too big for any one
18 organization or one party to solve. It
19 really will require the federal government as
20 well as the state governments to cooperate to
21 change and to provide medical access to
22 people who were struggling with addiction.
23      And, you know, substance abuse
24 has been a problem in this country for a
25 hundred years, more than a hundred years, 200

Page 50

1 years, but we don't have to suffer the way we
2 do. If you look at other countries, they're
3 able to provide access to medical treatment,
4 and that saves lives. It makes the
5 difference. And I hope we can do that.
6     Q.    You mentioned the federal
7 government, Dr. Sackler.
8         You are aware, are you not,
9 that your company pleaded guilty to the
10 felony of criminal -- criminal misbranding of
11 OxyContin in 2007?
12     A.    Yes, I'm aware of that.
13         There were mistakes made, and
14 there were -- there was behavior that should
15 not have happened but happened that -- where
16 the drug was -- the sale -- there was -- and
17 I don't know who or how many or what level
18 exactly in the organization, but I do know
19 that somewhere in the sales and marketing
20 organization that there were individuals who
21 spoke outside of the label of OxyContin,
22 beyond what was -- what they were required to
23 follow in their communications with doctors.
24 And three executives, senior executives, took
25 responsibility for that also.

Page 51

1         And the company had a plea; I'm
2 aware of the plea. And -- and then there was
3 a -- you know, a CIA, I think it's called,
4 which lasted for a number of years.
5     Q.    And you were --
6     A.    Four or five years, yeah.
7     Q.    You were a director at the time
8 the plea agreement was reached, true?
9         MS. MONAGHAN:  Object to the
10 form.
11         THE WITNESS:  Which year was
12 that?  That was --
13 QUESTIONS BY MR. HANLY:
14     Q.    2007.
15     A.    -- 2007, yeah.
16     Q.    Yes.
17     A.    Yes.
18     Q.    Right.
19         And long prior to 2007 --
20     A.    Right.
21     Q.    -- you were involved on a
22 regular basis with the development of
23 OxyContin; isn't that true?
24     A.    No.
25         MS. MONAGHAN:  Object to the

Page 52

1 form.
2         THE WITNESS:  Not -- I
3 wasn't -- that was not my area of
4 interest or activity, actually.
5         I was there in the company, so
6 I -- and I was copied on almost
7 everything because of the practice
8 within this family business that the
9 directors were copied on a lot of
10 material.
11         And this was -- the governance
12 has changed over the years. It was a
13 much smaller company originally. It
14 was a small family business. And my
15 father and my uncle were very
16 entrepreneurial, you know, type
17 businessmen, and they -- you know,
18 they -- they weren't as -- I suppose
19 in smaller businesses people don't
20 behave as formally with governances
21 or -- but -- you know, but they
22 were copied on a lot of material that
23 as the business grew, the directors
24 would not be copied on because it --
25 you know, it was much more of a

Page 53

1 separation between management and the
2 board of directors, which is
3 appropriate.
4         So...
5         (Purdue-Sackler Exhibit 5
6 marked for identification.)
7 QUESTIONS BY MR. HANLY:
8     Q.    Let me place before you,
9 Doctor, Exhibit 5 to this deposition, for the
10 record, is a memorandum dated November
11 the 30th, 1991, and it's to you, among
12 others.
13         Do you see that, Doctor?
14     A.    It's to --
15     Q.    You're the fourth person down.
16     A.    -- 12 people, including me.
17     Q.    Including you?
18     A.    Uh-huh.
19     Q.    And it reads, starting with the
20 first paragraph, "Until last week" -- well,
21 let me start again.
22         The subject is oxycodone
23 AcroContin tablets.
24         Do you see that?
25     A.    Who's it from?  I can't see --

Page 54

1    Q.   It appears to be from Richard
2  Sackler.
3          Do you see at the very top,
4  "fax from Richard Sackler"?
5    A.   Oh.
6    Q.   And the subject is oxycodone
7  AcroContin trademark tablets.
8          Do you see that?
9    A.   Yes.
10   Q.   AcroContin was a potential --
11   A.   Oxycodone AcroContin tablets,
12 yeah.
13   Q.   Yeah.
14         AcroContin was a potential name
15 that the company was thinking about affixing
16 to this controlled-release oxycodone that was
17 being developed?
18   A.   No.  AcroContin was the name of
19 the technology of the delivery system --
20   Q.   Okay.
21   A.   -- that it was formulated in.
22   Q.   Okay.  The memo reads, "Until
23 last week, our belief that oxycodone in high
24 dose might be a satisfactory alternate to
25 high-dose morphine was a supposition.  As

Page 55

1  recent as this past July, Dr. Kathleen Foley
2  told me that the, quote -- quote, 'The idea
3  is very promising, but whether one can use
4  oxycodone in high doses for cancer pain is
5  not known because nobody has ever used it,'"
6  emphasis added.
7          It goes on, "Dr. Foley told us
8  in her lecture that recently she has been
9  using oxycodone liquid, sold by Roxanne, in
10 high doses and that it has performed
11 excellently.  She has not only had no
12 unexpected side effects, but the product
13 seems to cause less sedation and confusion in
14 elderly patients than morphine, which she
15 finds frequently displays this serious side
16 effect in the elderly.  She has used
17 oxycodone in doses up to 1,000 milligrams per
18 day" --
19   A.   Shoo?
20   Q.   -- "and she believes that that
21 is not a practical limit."
22         It goes on.  The memo goes on.
23 "This new information is excellent and
24 important, as it confirms one of our hopes
25 for CR," controlled-release, "oxycodone."

Page 56

1          Do you see that?
2          Do you see those words, Doctor?
3    A.   Yeah.  That's pretty shocking,
4  a thousand milligrams.  My God, that's an
5  enormous dosage.
6    Q.   And the -- Dr. Richard
7  Sackler's statement that "this new
8  information is excellent and important, as it
9  confirms one of our hopes for CR oxycodone,"
10 this was written at the time that a
11 control-release oxycodone was being developed
12 in your company, right?
13   A.   But that -- I mean, this
14 would -- that was not my understanding of the
15 purpose of developing OxyContin, ever, to be
16 able to dose a thousand milligrams, I mean,
17 or more.
18   Q.   Well, it doesn't say that, does
19 it, Doctor?
20         It doesn't say that that's the
21 purpose?
22   A.   No, but I don't think Richard's
23 the last word on what the company is doing,
24 necessarily, or the first.
25         I mean, he's -- it's his

Page 57

1  perspective, perhaps, I don't know.  But it
2  certainly wasn't -- I mean, this is one
3  person's reaction to what he learned about
4  this -- about Dr. Foley's work.  I don't
5  know.
6    Q.   You have --
7    A.   What's your question to me?
8    Q.   You have no recollection of
9  having written anything in response that
10 disputed anything that Dr. Richard --
11   A.   I don't even remember reading
12 this or seeing this.
13   Q.   All right.  But you have no
14 basis to believe you did not receive it;
15 isn't that true?
16   A.   I have no basis either way,
17 and, you know, I may have been just as
18 stunned by this -- these comments then as I
19 am now, and I might have spoken to people
20 about it and not remembered it since 1991.
21 All of that's possible.  I'm just --
22   Q.   Can we --
23   A.   You know, what's more
24 consistent -- what I can answer you from --
25 you know, more -- I'm trying to answer your

Page 58

1  questions as carefully and accurately as I
2  can, but -- you know, even though you can't
3  remember something, I think you have an
4  understanding of your own ideas and reactions
5  and sensibilities and values and thinking
6  and, you know, I don't -- you know, you're
7  showing me some things that -- or you're
8  suggesting -- you're interpreting the papers
9  that you're showing me in a way that is not
10  consistent...
11        MR. HANLY:  Objection.  Move to
12    strike.  Nonresponsive.
13  QUESTIONS BY MR. HANLY:
14    Q.   Dr. Sackler --
15    A.   I'm sorry, I got a little lost
16  from your question.  If you could start it
17  again.
18    Q.   -- if you'd be kind enough to
19  listen carefully to my questions.
20    A.   Sure.
21    Q.   They all call for only a yes or
22  no answer.  If you can't answer yes or no,
23  your counsel will object.
24        MR. CHEFFO:  Objection.  That's
25    an improper direction.

Page 59

1        MS. MONAGHAN:  Objection.
2        MR. CHEFFO:  And you know that.
3        MS. MONAGHAN:  Actually, I
4    think we're going on about an hour
5    now.  Is this a good time to take a
6    break?
7        MR. HANLY:  That's fine with
8    me.
9        VIDEOGRAPHER:  Okay.  Please
10    remove your microphones.  One second.
11    The time is 11:59 a.m.  Off the
12    record.
13    (Off the record at 11:59 a.m.)
14        VIDEOGRAPHER:  We are back on
15    the record.  The time is 12:13 p.m.
16  QUESTIONS BY MR. HANLY:
17    Q.   Dr. Sackler, you were involved
18  in discussions concerning the potential name
19  of the controlled-release oxycodone that your
20  company was developing, true?
21    A.   I don't remember that.
22        (Purdue-Sackler Exhibit 6
23    marked for identification.)
24  QUESTIONS BY MR. HANLY:
25    Q.   Let me show you Exhibit 6,

Page 60

1  please.
2    A.   Yes.
3    Q.   And I don't mean to throw it at
4  you, Doctor.
5    A.   That's okay.  You can throw it.
6  It's fine.  You have to throw it or it won't
7  get here.
8    Q.   You can ignore the fax cover
9  sheets --
10    A.   Okay.
11    Q.   -- and just look at the last
12  page.  And it appears to be a memo from you
13  to a number of people.  Subject trademark for
14  oxycodone continus.
15    A.   Continus.
16    Q.   Continus?
17    A.   Yes.
18    Q.   And it reads, "Over lunch one
19  day during the international budget meetings,
20  a number of possible trademarks for oxycodone
21  continus were discussed, several of which
22  might be worthy of further consideration and
23  are recorded below."
24        And then there's some names
25  that are recorded below, right?

Page 61

1    A.   Uh-huh.
2    Q.   And you sent this to that group
3  of addressees?
4    A.   You see none of them -- none of
5  them were selected.  Yes.
6        But, okay, I mean, I don't
7  remember, you know.  I can't remember an
8  e-mail -- I mean, a memo I wrote in 1991.
9  It's very difficult.  I mean --
10    Q.   All right.
11    A.   -- I just don't remember this.
12        But it was usual to -- for --
13  it was -- at that time it was not unusual for
14  my father and Raymond and these senior-level
15  executives and myself, because I worked
16  closely with my father, to discuss trademarks
17  and possible names.
18    Q.   All right.  So you don't
19  specifically recall this document.  But would
20  you agree that it suggests that were
21  participating in those discussions?
22        MS. MONAGHAN:  Object to the
23    form.
24  QUESTIONS BY MR. HANLY:
25    Q.   Would you agree with that?

Page 62

1    A.    I'm not sure what you mean by
2  "those discussions."
3    Q.    Well, this memo references
4  apparent -- yes, discussions.  It says, over
5  lunch one day, et cetera, a number of
6  possible trademarks for oxycodone, et cetera,
7  were discussed, right?
8    A.    Well, this was at a budget
9  meeting, so I was participating in the budget
10 meeting.  That I can confirm because I did
11 participate in budget meetings.
12   Q.    Okay.
13   A.    And I can also confirm that
14 from time to time different conversations,
15 whether it was at lunch or not at lunch,
16 would come to the question of trademarks
17 and/or names for -- if there's a new product
18 being developed.  But that's back in those
19 days.
20        As the company grew and
21 became -- you know, had a larger management
22 team and was more removed from the board --
23 the directors of the company, there was more
24 separation than way back in the early days.
25        At that time the directors and

Page 63

1  the -- and the family members did not
2  participate.  I mean, in recent times, the
3  directors and the family members were not
4  part of the process of researching and
5  developing a brand name for -- a brand name
6  for new product.
7        But back then, you know, in the
8  '70s, '80s, early '90s, there was still
9  discussion of brand names, of trademarks.
10   Q.    And you testified just a few
11 moments ago that you worked closely with your
12 father.
13   A.    Yeah.
14   Q.    Let me ask you this question:
15 You worked closely with your father on the
16 business of the Purdue companies; is that
17 true?
18        MR. CHEFFO:  Object to the
19    form.
20        MS. MONAGHAN:  Object to the
21    form.
22        THE WITNESS:  I worked closely
23    with my father -- I worked closely
24    with my father really across a number
25    of the businesses, not only Purdue.

Page 64

1        (Purdue-Sackler Exhibit 7
2    marked for identification.)
3  QUESTIONS BY MR. HANLY:
4    Q.    Okay.  Let me show you
5  exhibit -- I'm finished with that document.
6    A.    And in philanthropy as well.
7    Q.    Let me show you -- you can
8  place that aside.  Thank you, Doctor.
9        Let me show you what we've
10 marked as Exhibit 7 to your deposition, which
11 appears to be a report of some sort entitled
12 "Usage and Perceptions of Oral Morphine Among
13 Orthopaedic Surgeons."  It bears a date at
14 the top of July 9, 1992.
15   A.    When you see MR at the top
16 here --
17   Q.    Yes.
18   A.    -- that's from market research.
19   Q.    All right.
20   A.    So this came, I guess, from
21 department --
22   Q.    Came from market research?
23   A.    I guess.
24   Q.    All right.  Thank you for that
25 clarification, Doctor.

Page 65

1        It does appear to have gone to
2  you, or at least you're listed on the
3  distribution list, correct?
4    A.    Amongst 23 other people.
5    Q.    Yes, that's right.
6    A.    Okay.  Yep.
7    Q.    Now, if you --
8    A.    Almost everything came to me.
9    Q.    If --
10   A.    It was a lot of paper.
11   Q.    If you would turn to the -- the
12 pages bear what seem to be original numbers
13 on them.  If you would turn to the page
14 that's numbered 2, and it's entitled
15 "Executive Summary."
16        I think that's it, Doctor.
17   A.    Yep.
18   Q.    Do you have that?
19   A.    Uh-huh.
20   Q.    And I'm interested in the
21 middle paragraph.  I'm going to just read a
22 portion of that to you.  "ORS" -- that means
23 orthopedic surgeons, right?
24   A.    I don't know what that means.
25   Q.    Okay.  In any case, "ORS appear

Page 66

1 to operate under many false beliefs about
2 morphine. They seem, quote, scared, unquote,
3 or, quote, intimidated, unquote, by the name
4 morphine. It signals, quote, serious
5 drug/dying patient/addiction, unquote, all at
6 once."
7 　　　Do you see that?
8 　　A.　Yes, I see the words, yeah.
9 　　Q.　All right. And then the last
10 paragraph reads, "Respondents did respond
11 very favorably to the idea of a long-acting
12 oral preparation, non-morphine, for their
13 severe pain patients. The primary advantage
14 would be convenience and compliance during
15 the first few days of severe pain following
16 surgery or a fracture. With 12 hours of
17 relief, the patient could sleep through the
18 night, a most important benefit versus
19 current Q4H medication."
20 　　A.　Uh-huh.
21 　　Q.　Do you see that?
22 　　A.　Uh-huh.
23 　　Q.　Yes? That's a yes?
24 　　A.　Yes. I beg your pardon. Yes.
25 　　Q.　So just looking at this as an

Page 67

1 objective reader, it suggests that this
2 survey company was telling the various
3 persons on the distribution list that
4 orthopedic surgeons might be very interested
5 in a non-morphine, 12-hour drug, right?
6 　　　MR. CHEFFO: Objection. Form.
7 Foundation.
8 　　　MS. MONAGHAN: Object to the
9 form.
10 QUESTIONS BY MR. HANLY:
11 　　Q.　Isn't that what it seems to be
12 saying in the last paragraph of the page
13 numbered 2?
14 　　　MR. CHEFFO: Same objections.
15 　　　MS. MONAGHAN: Yes.
16 　　　THE WITNESS: I'm still trying
17 to figure out what the document is.
18 Can I look at it for a moment?
19 QUESTIONS BY MR. HANLY:
20 　　Q.　Of course.
21 　　A.　Because it's like -- it's a
22 large document, but it has a cover on it as
23 if it came from the market research
24 department.
25 　　Q.　Yes. If you have regard to

Page 68

1 the second -- just turn --
2 　　A.　And the distribution is on the
3 front page, and then on the back it's
4 copied -- maybe it's the way it was copied.
5 But I guess it's the Glickman Research
6 Associates.
7 　　　Are we saying that the report
8 is from the Glickman Research Associates --
9 　　Q.　That --
10 　　A.　-- or is it from the market
11 research department?
12 　　Q.　It appears to be from Glickman,
13 forwarded to you and others by the marketing
14 department.
15 　　　Okay?
16 　　A.　So then -- and then it goes --
17 and what is the -- what does it have in the
18 report?
19 　　Q.　Well, I was only looking at the
20 executive summary, Doctor, which is page
21 number 2 of the report. And I was simply
22 asking you if you agreed --
23 　　A.　Oh, here it is. "Purpose. The
24 primary objective of this research was to
25 study the usage habits and perceptions of

Page 69

1 orthopedic surgeons with regard to oral
2 morphine. Essentially, Purdue Frederick has
3 amassed a significant level of understanding
4 of how oncologists think when confronted with
5 the need to treat pain, but relatively little
6 is known about how surgeons feel about
7 analgesic therapy."
8 　　　Okay.
9 　　Q.　Right.
10 　　　And at that time, 1992, Purdue
11 was manufacturing, marketing and selling a
12 product called MS-Contin, right?
13 　　A.　Correct.
14 　　Q.　And that stands for morphine
15 sulfate continuous, right?
16 　　A.　Continus.
17 　　Q.　Continus?
18 　　A.　You're getting there. Continus
19 was the technology, the actual patented
20 technology, that allowed the formulation
21 scientists who invented the product to -- to
22 formulate a 12-hour, slow-release-over-time
23 medication that had a -- particular
24 pharmacokinetic properties that were
25 desirable.

Page 70

1     Q.     And MS-Contin was an oral drug,
2   right?
3     A.     Yes.  A tablet.
4     Q.     It is?
5     A.     It's a tablet, as is OxyContin.
6   It's a tablet.
7     Q.     Right.
8     A.     And MS-Contin was, I think, the
9   first control-release analgesic, I think.
10    Q.     And --
11    A.     It was 1980 -- '85, '86, it was
12  marketed, I think.
13    Q.     And ultimately, a few years
14  after July of 1992, OxyContin was approved by
15  the FDA, correct?
16    A.     No.  1995.  December 1995.
17    Q.     Yes, I said a few years
18  after --
19    A.     Oh.  That's a long time.
20    Q.     Okay.
21    A.     Yeah.
22    Q.     Let's see if we can agree.
23    A.     Sure.
24    Q.     OxyContin was approved by the
25  FDA on December the 12th, 1995?

Page 71

1     A.     Well, you know more than I
2   know.  Yes.  I know it's December '95.  I
3   didn't know the date.
4     Q.     Okay.  And OxyContin was
5   marketed in part as a Q12H drug, meaning
6   every four hours -- to be administered every
7   12 hours?
8     A.     Yes, two -- two tablets a day.
9     Q.     Okay.  And page 2 of this
10  executive summary that I directed your --
11    A.     You know, MS-Contin -- yeah.  I
12  mean, MS-Contin was really -- it really was
13  an incredible medicine because it allowed
14  cancer patients, particularly, not to have to
15  be hospitalized to have their pain treated.
16  Before that, patients had to -- were in and
17  out of hospital to be treated for their pain
18  in this country.  In England, they used
19  hospices so patients could be -- have their
20  pain treatment there.
21         But what -- what -- and even at
22  the time when I went to medical school, it
23  was -- it was -- you know, it had always been
24  thought that because of the first pass effect
25  of the liver that you couldn't deliver an

Page 72

1   opioid in a tablet, in an oral form.  And
2   it's really -- it was -- the continus,
3   control-release technology, changed that.
4   That was the first technology that changed
5   that.
6         MR. HANLY:  Special Master
7   Cohen, I'm going to ask the Court
8   direct the witness to answer the
9   questions that I ask.
10        I asked a question about
11  OxyContin, and the witness gave me a
12  long answer about MS-Contin.  And this
13  has been the pattern since the
14  beginning of the deposition.  The
15  witness resorts to making a number of
16  self-serving statements, and it's --
17  it's obviously burning up my time.
18        And I would ask for direction
19  to the witness by the Court.
20        MS. MONAGHAN:  I'm just going
21  to say that the witness is doing her
22  best to answer the questions.
23  Mr. Hanly gave her a document that
24  purports to be about MS-Contin and
25  then asked her questions in the middle

Page 73

1   about OxyContin, and so it was natural
2   for her to revert to MS-Contin.
3         I think everybody agrees that
4   we're here to do questions and
5   answers, and the witness is doing her
6   best to answer the questions.
7         SPECIAL MASTER COHEN:
8   Ms. Sackler, I appreciate you're doing
9   your best.  I know this is an unusual
10  circumstance.  It's a very formalized
11  way to have a conversation.  If we
12  were in a conversation, there would be
13  different social rules.
14        Because this is so formal, I'm
15  going to suggest to you that it will
16  probably make this shorter and easier
17  for everybody if, when you are asked a
18  question, you try and answer only what
19  is asked.  I think that'll make it
20  quicker and shorter for you, and
21  easier for you, ultimately.
22        THE WITNESS:  Okay.
23        SPECIAL MASTER COHEN:  Okay.
24  It's hard to do.
25        THE WITNESS:  I'd like to

Page 74

1 apologize to Mr. Hanly.  I thought you
2 were interested in the information I
3 offered.
4      MR. HANLY:  No apology is
5 necessary.
6 QUESTIONS BY MR. HANLY:
7      Q.   Could you have a look -- I
8 believe you're on the page.  I just want to
9 ask you one more question.
10      MS. MONAGHAN:  Just to clarify
11      the record, the page with the
12      executive summary on it?
13      MR. HANLY:  Yes.  Yes,
14      page number 2 of the document.
15 QUESTIONS BY MR. HANLY:
16      Q.   The last paragraph suggests,
17 does it not, that oral surgeons would be
18 interested in a drug that was not
19 morphine-based and had a 12-hour duration?
20      MS. MONAGHAN:  Object to the
21      form.
22 QUESTIONS BY MR. HANLY:
23      Q.   Is that a fair reading
24 objectively of this paragraph?
25      MS. MONAGHAN:  Object to the

Page 75

1 form and lack of foundation.
2      THE WITNESS:  May I read it
3 once again?
4 QUESTIONS BY MR. HANLY:
5      Q.   Please.
6      A.   What I would take from this is
7 that the respondents liked the idea of the
8 long-acting oral preparation for their severe
9 pain patients, that's one thing, and that the
10 primary advantage they saw was convenience
11 and compliance.
12      And probably the most important
13 benefit -- in fact, they say most important
14 benefit -- is that it allowed patients to
15 sleep through the night.  Because the Q4H
16 immediate release analgesics, you have to
17 wake up every four to six hours to take and
18 wake up in pain to take.  So...
19      Q.   This paragraph references a
20 non-morphine-based analgesic, true?  Second
21 line of the paragraph?  "Long-acting oral
22 prep" --
23      A.   In parentheses, yeah.
24      Q.   Non-morphine.
25      And it further references

Page 76

1 12 hours.
2      Do you see that in the last
3 sentence?
4      A.   Yes.
5      Q.   Okay.  And both of those
6 characteristics --
7      A.   I don't see 12 hours.  Q4H is
8 not 12 hours.  Q4H is every four to six
9 hours.
10      Q.   The beginning -- I'm sorry,
11 Doctor.
12      A.   Oh, beg your pardon.  With
13 12 hours.  Right.  Okay.
14      Q.   And OxyContin, which was
15 approved three years later than this memo,
16 was a non-morphine-based drug to be
17 administered every 12 hours.  That's all I'm
18 getting at.
19      Can we agree on that?
20      MS. MONAGHAN:  Object to the
21      form.
22      THE WITNESS:  But so is
23      MS-Contin.
24 QUESTIONS BY MR. HANLY:
25      Q.   So is the answer to my question

Page 77

1 yes?
2      A.   Can you tell me the question
3 again?
4      Q.   Yeah, I'll read it.
5      A.   I'm sorry.
6      Q.   I'll read it back.
7      "And OxyContin, which was
8 approved three years later than this memo,
9 was a non-morphine-based drug to be
10 administered every 12 hours.  That's all I am
11 getting at."
12      A.   Oh, okay.
13      Q.   Is the answer yes?
14      A.   What is the question?
15      Q.   The question with reference --
16      A.   You're reading me a statement.
17 I'm trying to understand what the question
18 is --
19      Q.   Right.
20      A.   -- so I can say yes or no.
21      Q.   I was directing your attention
22 to the last paragraph on page number 2 of
23 the -- which is the executive summary --
24      A.   Okay.
25      Q.   -- and referencing the fact

Page 78

1 that that paragraph references two
2 characteristics: One, non-morphine; two,
3 12 hours of relief.
4         And I would like you to agree
5 with me, if you can, that those two
6 characteristics were characteristics of
7 OxyContin.
8         A.    Yes.
9             MS. MONAGHAN: Object to the
10 form.
11            MR. HANLY: Thank you.
12            (Purdue-Sackler Exhibit 8
13 marked for identification.)
14 QUESTIONS BY MR. HANLY:
15         Q.    I'm finished with that, Doctor.
16         A.    Okay.
17         Q.    I'm placing before you
18 Exhibit 8 to the deposition. This is --
19 appears to be a memo from you to Dr. Richard
20 Sackler and others dated January 6, 1993.
21         Do you see that?
22         A.    Yes.
23         Q.    And it's titled, "PF" --
24         That's a reference to Purdue
25 Frederick, correct?

Page 79

1         A.    Yes.
2         Q.    -- "oxycodone CR."
3         That's controlled release?
4         A.    Yeah.
5         Q.    That's tablets, right?
6         A.    Yep, right.
7         Q.    And you wrote to those
8 individuals, "Do we now have agreement on a
9 trademark for Purdue Frederick oxycodone
10 control-release tablets?" And then below
11 that, "OxyContin and pro-OxyContin."
12         Do you see that?
13         A.    Yes.
14         Q.    Does this suggest to you -- do
15 you recall this memo?
16         A.    I don't. I'm sorry.
17         Q.    All right. Would you agree
18 that it suggests that at that time you had
19 some involvement in the decision as to what
20 to call the oxycodone control-release product
21 that was being developed and which was
22 approved approximately two years later?
23            MS. MONAGHAN: Object to the
24 form and lack of foundation.
25            THE WITNESS: Or I'm asking the

Page 80

1 individuals if they've decided what
2 the trademark should be.
3 QUESTIONS BY MR. HANLY:
4         Q.    And that would suggest that you
5 had some involvement in those discussions,
6 would it not?
7             MS. MONAGHAN: Object to the
8 form and lack of foundation.
9             THE WITNESS: If I was asking
10 these four individuals -- you know,
11 that's Michael Friedman, Goldenheim,
12 Udell, these are the three most senior
13 management executives. If I'm asking
14 them and Richard, who at this time
15 was, I think -- I'm not sure, 1993,
16 what his position was.
17         But if I'm -- if I'm asking
18 those four individuals, do we now have
19 agreement on trademark -- on a
20 trademark, I'm asking -- they're four
21 people; I'm one person. I don't know
22 what my -- it doesn't say anything
23 about my role.
24         It says -- it says that I'm --
25 I'm obviously in the conversation, but

Page 81

1 it doesn't say -- you know, I can tell
2 you I did not name OxyContin. I don't
3 know who did. I can't recall.
4 QUESTIONS BY MR. HANLY:
5         Q.    Okay. But you -- you did just
6 tell me that looking at this now it suggests
7 that you were in the conversation?
8         A.    About the name, yeah.
9         Q.    Okay.
10         A.    Yeah, I said that before also.
11         Q.    Okay.
12         A.    Yeah.
13         Q.    And those three individuals
14 below Dr. Sackler --
15         A.    Uh-huh. Dr. Richard Sackler?
16         Q.    I'm sorry, Dr. Richard Sackler.
17         A.    Uh-huh.
18         Q.    Mr. Friedman and Dr. Goldenheim
19 and Mr. Udell, those were the three
20 individuals who pleaded guilty to criminal
21 misbranding of OxyContin, true?
22         A.    Those are the three most senior
23 executives in management and -- who took the
24 responsibility for whatever the mismarketing
25 behavior was, and took the responsibility on

Page 82

1 themselves and pleaded guilty to a
2 misdemeanor, I believe it was.
3      Q.    A misdemeanor on the part of
4 the three individuals --
5      A.    Yes.
6      Q.    -- and a felony on the part of
7 the corporation?
8      A.    No, they wouldn't have been the
9 ones to plea -- I don't -- I don't know.  I'm
10 not -- I don't think they would have been the
11 ones to make the plea for the corporation.  I
12 think -- but maybe.  I'm not sure how that
13 worked.  You would know better than I.
14           But they certainly would be the
15 ones to weigh in on what the trademark --
16 what the brand name should be and what the
17 trademark would be.
18      Q.    Do you have any recollection of
19 a survey commissioned by Purdue in the year
20 1995 concerning the attitudes of physicians
21 about a controlled-release, oxycodone-based
22 product?
23           MS. MONAGHAN:  Object to the
24      form and lack of foundation.
25

Page 83

1 QUESTIONS BY MR. HANLY:
2      Q.    My question is just do you have
3 any recollection?
4      A.    I don't recall.  I don't
5 recall.
6      Q.    Okay.  Do you have any
7 recollection of reviewing the report of that
8 survey?
9      A.    No, I don't remember --
10           MS. MONAGHAN:  Object to the
11      form and foundation.
12           THE WITNESS:  -- that.
13 QUESTIONS BY MR. HANLY:
14      Q.    Do you know the saying in the
15 pharmaceutical world, if it's not in the
16 label, it's not in the launch?
17           Is that a familiar phrase?
18      A.    I've never heard that before.
19      Q.    How about, if it ain't in the
20 label, it ain't in the launch?
21      A.    I never heard that either.
22      Q.    All right.
23      A.    It sounds like it may be from
24 another part of the country.
25           (Purdue-Sackler Exhibit 9

Page 84

1      marked for identification.)
2 QUESTIONS BY MR. HANLY:
3      Q.    I place before you Exhibit --
4 I'm sorry.
5      A.    Sorry, my wire is messing up
6 your toss.
7      Q.    Exhibit 9, Dr. Sackler --
8      A.    Yeah.
9      Q.    -- a memo from you --
10 apparently from you to Dr. Mortimer D.
11 Sackler.
12           Mortimer --
13      A.    My father.
14      Q.    -- D. Sackler is your father?
15      A.    Yes.
16      Q.    And just for clarify, the other
17 Mortimer Sackler is Mortimer D.A. Sackler?
18      A.    That's my brother, yeah.
19      Q.    That's your --
20      A.    My brother.
21      Q.    -- your brother whose mother is
22 not the same mother as you; is that correct?
23      A.    He's still my brother.
24      Q.    Right.  But --
25      A.    We call each other and live our

Page 85

1 lives as brothers and sisters --
2      Q.    Okay.
3      A.    -- even though we have
4 different mothers, and that's fine.
5      Q.    All right.
6      A.    He's my brother.
7      Q.    So he is usually referred --
8      A.    We're all very close.
9      Q.    He is usually referred to as
10 Mortimer D.A. Sackler; is that true?
11      A.    Yes.
12      Q.    All right.  So this is a memo
13 to your father dated May 17, 1995, and it's
14 regarding an agenda for a meeting with
15 Michael Friedman.
16           Do you see that?
17      A.    Yes.
18      Q.    And you write to your father,
19 "Attached please find my draft agenda for
20 items to cover with Mike.  However, since he
21 will be tied up in court and unable to meet
22 with us Friday, I suggest we hold this agenda
23 for the next meeting opportunity.  In the
24 meanwhile, I will be meeting with him one day
25 next week."

Page 86

1    Is that what you wrote?
2    A.    Yes.
3    Q.    All right. And then attached
4  is the proposed agenda, correct?
5    A.    Yes.
6    Q.    And Item 1.3 of the agenda of
7  the meeting that was to take place between
8  you and Mortimer D. Sackler and Michael
9  Friedman is entitled -- 1.3 is entitled "1995
10 OxyContin Launch Program."
11    Do you see that?
12    A.    Uh-huh.
13    Q.    Yes?
14    A.    Yes.
15    Q.    All right. And that suggests,
16 does it not, that you and your father and
17 Michael Friedman were going to be discussing
18 the launch program for OxyContin?
19    MS. MONAGHAN: Object to the
20    lack of foundation and to the form.
21    THE WITNESS: Maybe I can -- I
22    have to stick to yes or no, so I can't
23    help --
24 QUESTIONS BY MR. HANLY:
25    Q.    If you can answer yes or no.

Page 87

1  If you can't, you can tell me, "I can't
2  answer that yes or no."
3    My question is simply: Doesn't
4  this suggest that you, your father and
5  Michael Friedman going to be discussing
6  the launch program for OxyContin?
7    A.    Yes, to bring my father up to
8  speed because he was not in this country. He
9  lived and worked in Europe, and so he would
10 come in for meetings. And Michael or Paul or
11 whoever he was meeting with would bring him
12 up to speed. And I helped organize those
13 meetings and participate in them.
14    Q.    Right.
15    Because you were -- you were at
16 this time up to speed concerning the issues
17 in the agenda, right?
18    MS. MONAGHAN: Objection. Lack
19    of form and foundation.
20    THE WITNESS: No, that's not
21    what it means.
22    What it means is that -- he was
23    far away, and it also gave me an
24    opportunity to share my thoughts with
25    him as well.

Page 88

1    But this -- you know, that's --
2  this is just a way of organizing
3  communications.
4  QUESTIONS BY MR. HANLY:
5    Q.    And --
6    A.    And that's...
7    Q.    And what I'm asking you,
8  Doctor, is does it not suggest that you
9  participated in some discussions concerning
10 the launch program for OxyContin?
11    A.    Or I sat there and listened.
12    MS. MONAGHAN: Object to the
13    form.
14    THE WITNESS: I don't know what
15    I did.
16 QUESTIONS BY MR. HANLY:
17    Q.    Okay. But --
18    A.    It doesn't suggest anything
19 about my behavior. It suggests that there
20 was a meeting set up for my father with
21 Michael Friedman to discuss this agenda and
22 that I facilitated that for my father.
23    Q.    Yes.
24    A.    That's what it suggests.
25    Q.    And if you look at the first

Page 89

1  page, does it not suggest that you were
2  participating in the meeting, because it
3  says, "However, since he will be tied up in
4  court and unable to meet with us Friday, I
5  suggest," et cetera?
6    Doesn't that suggest that you
7  were a participant in the meeting?
8    MS. MONAGHAN: I'm going to
9    object to the question and point out
10    that it -- that the part that counsel
11    skipped over says, "I suggest we hold
12    this agenda for the next meeting
13    opportunity."
14    THE WITNESS: Right.
15 QUESTIONS BY MR. HANLY:
16    Q.    Okay.
17    A.    It just meant that I was going
18 to meet with Mike the next day so that he
19 knew that I would meet with -- it didn't mean
20 that we were going to have this meeting
21 without him. That's not what it meant.
22    You know, I have to just
23 explain something that, you know, I -- I said
24 I worked closely with my father. I did.
25    I didn't work as closely with

Page 90

1 Richard and Michael and Howard and Paul.
2 Because the way that that happened is they --
3 you know, there was a kind of informal way of
4 meeting where they met over lunch every day
5 with Dr. Raymond, my uncle, and John Sackler
6 as well when he was there, and I was not
7 invited to those lunches.
8        So to the extent that they had
9 to include me because we're 50/50 partners
10 and I was there, they did, but not beyond
11 that. So when -- because I -- I see that
12 you're trying to understand what my role was
13 or how involved I was or what I did or what I
14 didn't do or what I participated in. So I
15 think it's important that I tell you that so
16 you understand that dynamic that went on.
17 Q.    The 50/50 --
18 A.    It wasn't easy.
19 Q.    The 50/50 partnership that you
20 referenced --
21 A.    Uh-huh.
22 Q.    -- is the relationship between
23 the Mortimer D. Sackler family and the
24 Raymond Sackler family, true?
25 A.    Yes. Correct.

Page 91

1 Q.    All right. And that 50/50
2 partnership, to use your word, exists today
3 between those two families; isn't that true?
4 A.    Yes.
5 Q.    Do you know a man named Stuart
6 Baker?
7 A.    Yes.
8 Q.    He was, for many years, counsel
9 to the Sackler family; is that true?
10 A.    He was -- he was counsel to the
11 board of directors of Purdue. He had a
12 number of roles.
13 Q.    Did he advise the Sackler
14 family from time to time?
15 A.    I think he advised -- I don't
16 know. I think he advised individual Sackler
17 family members from time to time, and maybe
18 he also advised the whole family in some --
19 as relates to the business, perhaps. I don't
20 know that he did -- yeah.
21 Q.    All right.
22 A.    I think that's how I would
23 describe it.
24 Q.    And did he advise from time to
25 time concerning marketing issues?

Page 92

1 A.    No.
2 Q.    He was --
3 A.    Marketing? No. I don't think
4 so.
5 Q.    He was a partner at a law firm
6 that at one time was called Chadbourne Parke.
7 A.    Yes.
8 Q.    Is that true?
9 A.    Yes.
10 Q.    Do you know whether Mr. Baker
11 was paid by Purdue individually or was his
12 law firm paid? Do you know one way or the
13 other?
14        MS. MONAGHAN: Objection.
15        MR. CHEFFO: I'm just going
16 to -- I'm just going to note an
17 objection on behalf of Purdue, just --
18 and a request for the witness and for
19 Mr. Hanly.
20        I actually don't -- I'm -- it's
21 not specific to that question. But it
22 seems like some of these questions are
23 getting at the tip of what could be
24 attorney-client privilege in terms of
25 roles and advice. So I would just ask

Page 93

1 you to be sensitive to that issue in
2 framing your question so that we don't
3 have any issues of privilege or work
4 product.
5 QUESTIONS BY MR. HANLY:
6 Q.    My question is -- is simply
7 whether you know, and perhaps you have no
8 idea, whether Mr. Baker was paid individually
9 as opposed to paying his law firm for the
10 services he provided to the family and to the
11 Purdue group of companies.
12        Do you know one way or the
13 other?
14        MS. MONAGHAN: Object to the
15 question. Form and foundation.
16        THE WITNESS: I think he was
17 probably paid both ways.
18 QUESTIONS BY MR. HANLY:
19 Q.    All right. I place before
20 you -- Doctor, I'm finished with that one, if
21 you care to set it aside.
22        (Purdue-Sackler Exhibit 10
23 marked for identification.)
24 QUESTIONS BY MR. HANLY:
25 Q.    I place before you Exhibit 10

Page 94

1 to your deposition, which is -- appears to be
2 an e-mail chain, various replies. And at the
3 top it appears to indicate that the chain was
4 sent to a variety of people, including you.
5 And the subject -- and for the record, the
6 date is July the 12th, 1995. The subject is
7 press release.
8         Do you see that at the very
9 top?
10     A.    Yes.
11     Q.    All right. So I think the way
12 to read these coherently is to -- is to start
13 with the e-mail on -- on the second page of
14 the document at the bottom. Again, the re:
15 line is press release. The author is
16 Dr. Richard Sackler.
17         And I would note for the record
18 that it appears that these e-mails all were
19 sent in June, July or October.
20     A.    September.
21     Q.    September?
22     A.    The one on the bottom.
23     Q.    Well, let me ask you this,
24 because there is some confusion, I believe.
25         Richard Sackler's e-mails

Page 95

1 appear to use the English way of setting
2 forth a date.
3         So do you know, in fact,
4 whether this e-mail from Richard Sackler was
5 in September versus June? Because it says
6 09/06/95.
7         Let me withdraw that question.
8         Do you see the e-mail just --
9 well, look at the Richard Sackler date. It's
10 9/6/95, correct?
11     A.    Yes.
12     Q.    All right. Look at the e-mail
13 just above that.
14     A.    All right.
15     Q.    That appears to be 6/9/95.
16         Do you see that?
17     A.    Yes.
18     Q.    Does that suggest to you that
19 Richard Sackler's e-mail was actually a
20 June 9, '95, e-mail?
21     A.    May I say more than yes or no?
22     Q.    Sure.
23     A.    Okay. I'm not sure --
24 Elizabeth Starling is writing from Napp UK.
25 So I would think that if the computer that

Page 96

1 she's working on would use the UK tradition
2 of having the day, then the month, then the
3 year, then I would say that this is June 9,
4 '95, in England.
5         And if I look at Richard's, if
6 he was here in the United States -- you know,
7 because, your -- I think your -- your -- I
8 think Outlook changes when you're writing --
9 when you're in England, let's say, and you
10 send a memo, it might use the UK tradition of
11 dating. And when you're here -- so it may
12 depend on where the people are.
13     Q.    All right.
14     A.    It's one possibility.
15     Q.    All right. Well, let's --
16 let's do it this way.
17     A.    But I'm certain that Elizabeth
18 Starling was in the UK, but what I'm not
19 certain about is whether the date is in the
20 English tradition that you asked.
21     Q.    All right. Well, let's look at
22 the bottommost e-mail on the second page,
23 which is the one from Richard. Whether it's
24 September or June, we'll leave for the
25 moment. The re: line is press release.

Page 97

1         Do you see that?
2     A.    Uh-huh.
3     Q.    That's a yes?
4     A.    Oh, yes. Sorry.
5     Q.    And the first line reads, "Paul
6 M" -- that's a reference to Paul Manners;
7 isn't that true?
8     A.    I would assume. I would guess
9 that, yeah.
10     Q.    And it says, "I have now
11 located the press release. It was with KAS.
12 Somehow it was never was passed to you for
13 action."
14         Do you believe you are KAS?
15         That is the way you were often
16 referred to.
17     A.    This is very -- it would be
18 very strange for him to say that about me.
19     Q.    So you have no recollection of
20 having a press release or a draft press
21 release around this time?
22     A.    No, I don't. I have no
23 recollection of this at all.
24     Q.    Okay. Well, let's turn over to
25 the previous -- to the first page of the

Page 98

1  document, if you would.
2      A.    All right.
3      Q.    Okay.  On the bottom of the
4  first page of the document appears to be
5  another Richard Sackler e-mail, right?
6      A.    Yes.
7      Q.    Okay.  And the one, two, three,
8  fourth paragraph down it states, does it not,
9  "SDB" --
10         Now, you understand that to be
11  Stuart Baker, right?
12     A.    I would think so.
13     Q.    Okay.
14         -- "remarked that since we are
15  private, we haven't a fair disclosure
16  requirement and can choose and select what we
17  want to publish.  This would seem to be a
18  definite advantage to our private status that
19  we have not taken advantage of."
20         Did I read that correctly?
21     A.    Yes.
22     Q.    All right.  And then on the
23  second page, the e-mail just below the one
24  that I just read, appears to be from Jonathan
25  Sackler.

Page 99

1         Jonathan Sackler is your -- is
2  another cousin of yours, correct?
3      A.    Richard's brother.
4      Q.    Richard's brother?
5      A.    Yeah.
6      Q.    All right.  And is Jonathan
7  Sackler a physician as well?
8      A.    No.
9      Q.    All right.  And Jonathan
10  Sackler -- Jonathan Sackler, in 1995, was a
11  member of the board, like you, right?
12     A.    Yes.
13     Q.    Okay.  And Jonathan Sackler
14  writes, "This press release doesn't have to
15  be perfect or even entirely accurate, for
16  that matter.  We just want to get into the
17  record that Mundipharma Germany is
18  introducing its own OAD" -- that means once a
19  day -- "product and that Purdue in the US and
20  Napp in UK have once-a-day formulations in
21  advanced stages of development."
22         Do you see that?
23     A.    Yeah.
24         You notice I'm not copied on
25  these other e-mails we're reading.

Page 100

1      Q.    Well --
2      A.    I'm only copied on the one.
3         Which one was I copied on?  I
4  don't see me copied -- oh, the top one.
5  Yeah.  Okay.
6      Q.    Well, you --
7      A.    One -- so this is a string of
8  e-mails, right?
9      Q.    That's correct.
10     A.    All right.  I don't know.  I
11  mean, I would never -- I mean, it's not how I
12  would express myself, or it does not reflect
13  my thinking.
14     Q.    Okay.
15     A.    But I guess it reflects their
16  thinking.
17     Q.    Let's go back to the first page
18  and look at another e-mail from Dr. Richard
19  Sackler.  This is the second e-mail on the
20  page.
21         Again, it's on the same
22  subject, press release, and it states, does
23  it not, "I would like to suggest that we make
24  more of OxyContin, paren, see the
25  nonconfidential disclosure which could be

Page 101

1  quite easily turned into a press release,
2  close paren."
3         Did I read that correctly?
4      A.    Yes.
5      Q.    And -- withdrawn.
6         By the way, a once-a-day
7  oxycodone product was never developed by
8  Purdue; is that true?
9         MS. MONAGHAN:  Object to the
10     form.
11         THE WITNESS:  Yes.
12  QUESTIONS BY MR. HANLY:
13     Q.    Do you remember a man named
14  Curtis Wright?
15     A.    Yes.
16     Q.    Curtis Wright was the FDA
17  reviewer who had oversight over the new drug
18  application for OxyContin, true?
19     A.    The way I remembered him was he
20  was the research scientist who worked at
21  Purdue research laboratories in Ardsley.
22     Q.    Do you not recollect that prior
23  to the introduction of the approval of
24  OxyContin on December the 12th, 1995, that
25  Curtis Wright worked for the FDA?

Page 102

1     A.    No, I didn't recall that.
2          (Purdue-Sackler Exhibit 11
3     marked for identification.)
4  QUESTIONS BY MR. HANLY:
5     Q.    Let me show you Exhibit
6  Number 11 to your deposition, Doctor.
7          It's an e-mail which appears to
8  be at -- the top of the e-mail appears to be
9  from Dr. Richard Sackler to a number of
10 people, and you are shown as a copyee.
11         Do you see that?
12    A.    Yes.
13    Q.    Okay.  And the subject is TC --
14 you would understand that to mean telephone
15 conference, right, telephone call?  TC?
16         MR. CHEFFO:  Objection.
17         THE WITNESS:  I'm not sure what
18    that means.
19 QUESTIONS BY MR. HANLY:
20    Q.    All right.
21    A.    I've never seen that before,
22 actually, TC.
23    Q.    Okay.  Well, it says TC with
24 Dr. Wright.
25         And then Dr. Richard Sackler

Page 103

1  writes, appears to write, "This conversation
2  with Curtis Wright shows again how far we
3  have come in building a positive relationship
4  with the Agency."
5          Do you see that?
6     A.    Yes.
7     Q.    Okay.  Then if you drop down to
8  the third e-mail on the page, the subject is
9  the same subject, TC with Dr. Wright.  And
10 this appears to be from Dr. Robert Reder.
11         Do you see that?
12    A.    Yes.
13    Q.    And do you remember Dr. Reder?
14    A.    I do.
15    Q.    All right.  And he was
16 involved --
17    A.    I think he was a cardiologist.
18    Q.    But he worked for Purdue?
19    A.    Yes.
20    Q.    Right.
21         And was involved -- was
22 involved with the introduction and approval
23 of OxyContin, right?
24         MS. MONAGHAN:  Objection.
25         THE WITNESS:  You know, I

Page 104

1  really can't recall each person's role
2  because I wasn't -- I didn't -- I
3  wasn't that involved to be able to --
4  and maybe also because it's such a
5  long time.
6          But I don't recall what his
7  role was.  But he was certainly at
8  Purdue, and he was a cardiologist by
9  training.
10         I don't remember what his
11 position was, I'm sorry.  If I did, I
12 would tell you.
13 QUESTIONS BY MR. HANLY:
14    Q.    All right.  Well, in any case,
15 Dr. Reder's e-mail there at the bottom of the
16 page of the exhibit references that he -- it
17 says, "I called to update him on the
18 OxyContin NDA."
19         And further on it reads, "PF
20 will meet internally on the package insert
21 August 9th and have the next version mailed
22 to FDA by the end of that week."
23         Do you see that?
24    A.    Yeah.
25         I'm also not copied on these

Page 105

1  e-mails.
2     Q.    Do you have a recollection of
3  participating in meetings in August of 1995
4  concerning the package insert for the
5  OxyContin product?
6          MS. MONAGHAN:  Objection.
7  QUESTIONS BY MR. HANLY:
8     Q.    Do you recall one way or the
9  other?
10    A.    I don't recall.
11    Q.    All right.
12    A.    I'm sorry.
13         MR. CHEFFO:  Paul, before we do
14    this, I think just to make the record
15    clear, I've been told, which I
16    appreciate, that the actual copy
17    that's going to be used as an exhibit
18    doesn't have highlighting on it.
19         MR. HANLY:  That's right.
20         MR. CHEFFO:  Our copies do, and
21    I think the one that Jayne was using
22    did.  So just --
23         MS. CONROY:  I highlighted it.
24         MR. HANLY:  Right.  But the
25    actual exhibit does not.

Page 106

1    MR. CHEFFO:  Okay.  But the one
2  that was used up on the screen does.
3    MR. HANLY:  Sure.
4    MR. CHEFFO:  That's not the
5  actual exhibit?
6    MR. HANLY:  No.  The exhibit
7  itself does not have any highlighting.
8  It shouldn't, anyway.
9    MS. MONAGHAN:  This one
10 actually does have highlighting,
11 though.  It has, like, in gray,
12 preexisting highlighting.
13   MR. CHEFFO:  That's what I'm
14 talking about.  And even the one that
15 was used on the screen --
16   THE WITNESS:  Low lights.
17   MR. CHEFFO:  -- actually has --
18   MR. HANLY:  Can I see the --
19   MS. CONROY:  The actual --
20   MR. HANLY:  No, the one that
21 the witness --
22   MS. CONROY:  The actual
23 exhibit.
24   MR. HANLY:  I'm sorry, Maura,
25 this doesn't appear to have any.

Page 107

1    MR. CHEFFO:  It doesn't.  But
2  the one that was up on the screen that
3  was being highlighted did.
4    MR. HANLY:  Right.  And we --
5  just so it's clear, we have -- we've
6  been highlighting throughout, but not
7  on the actual exhibit.
8    MR. CHEFFO:  But you see my
9  point.  It's got shading and --
10   MS. MONAGHAN:  It's got
11 preexisting shading.  See?
12   MR. CHEFFO:  Look at the names
13 and look at the text.
14   MR. HANLY:  Okay.  But not on
15 the one --
16   MR. CHEFFO:  I understand.
17   MR. HANLY:  -- that the witness
18 has.
19   MR. CHEFFO:  You put something
20 up on the screen.  I'm just noting it.
21   MR. HANLY:  Okay.  So --
22   MR. CHEFFO:  If that ever gets
23 used at some point, it's not going to
24 be an exact replica, is my only point.
25   MR. HANLY:  Okay.  And we can

Page 108

1  argue that at trial or whatever.
2    MR. CHEFFO:  I'm not looking to
3  argue.
4    (Purdue-Sackler Exhibit 12
5  marked for identification.)
6  QUESTIONS BY MR. HANLY:
7    Q.   Oh, I'm finished with that one.
8  Thank you.
9        Doctor, I'm going to place
10 before you Exhibit 12 to this deposition.
11       For the record, it appears to
12 be a memo from you dated August the 8th,
13 1995, to Paul Goldenheim regarding OxyContin
14 tablets package insert.
15       Do you see that?
16   A.   Uh-huh.
17   Q.   Yes?
18   A.   Uh-huh.
19   Q.   Yes?
20   A.   Oh, yes.  Sorry.
21   Q.   You have to answer yes --
22   A.   I'm sorry, I keep forgetting.
23   Q.   The court reporter, as talented
24 as she is, can't take down --
25   A.   Yes.  I realize -- I beg your

Page 109

1  pardon.  I'll say yes.  Yes.
2    Q.   Thank you.
3        And this reads, does it not,
4  "Just a reminder re:" -- regarding -- "my
5  request for a copy of latest draft of the
6  package insert for OxyContin tablets.  Thank
7  you, regards."
8        Do you see that?
9    A.   Yes.
10   Q.   So would you agree with me it
11 appears, anyway, that in August of 1995 you
12 actually were interested in having the latest
13 draft of what became the package insert?
14   A.   I wanted to read the package
15 insert, and it wasn't finished, and so I
16 asked for the latest draft.  And I didn't see
17 the package insert, I had to ask for it,
18 which reminds me that I was not involved in
19 the process.  And that was typical of a lot
20 of things that happened back then.
21   Q.   But the -- you understand that
22 this memorandum that we're looking at dated
23 August the 8th is some four months prior to
24 the actual approval, right, for OxyContin?
25       MS. MONAGHAN:  Object to the

Page 110

1 form.
2       THE WITNESS:  And therefore?
3 QUESTIONS BY MR. HANLY:
4       Q.   It's just a question.
5       A.   Well, I see the date.
6       Q.   Yes.
7            And you -- you've already
8 testified that you were interested in seeing
9 the package insert --
10      A.   Of course I'd be interested in
11 seeing the package insert.
12      Q.   Okay.  And you ultimately --
13      A.   And not to have seen it by this
14 late date, four months before the launch of
15 the product, I was particularly eager to see
16 the package insert.  It was about to be
17 launched.
18      Q.   And you did ultimately receive
19 the latest draft of the package insert?
20      MS. MONAGHAN:  Object to the
21 form.  Lack of foundation.
22 QUESTIONS BY MR. HANLY:
23      Q.   Did you or did you not?
24      A.   I don't recall.
25      Q.   Okay.

Page 111

1      A.   I hope I -- I hope I did.
2      Q.   Okay.
3      A.   That was typical, having to
4 chase things.
5           (Purdue-Sackler Exhibit 13
6           marked for identification.)
7 QUESTIONS BY MR. HANLY:
8      Q.   I'm placing before you
9 Exhibit 13 to your deposition.  And I tell
10 you, Doctor, I'm only going to be looking at
11 one small portion of this document, which
12 purports to be annotated package insert,
13 including patient instructions, for
14 OxyContin.  And it states below that, "Draft
15 package insert."
16           Do you see that on the front
17 page?
18      A.   Yes.
19      Q.   All right.  And someone has
20 written in hand at the top "Reder version."
21           Do you see that?
22      A.   Yes.
23      Q.   "Reder" apparently referencing
24 Dr. Robert Reder, right?  Yes?
25      A.   It's a good guess.

Page 112

1      Q.   Okay.  And if you sort of flip
2 through it, you see that this document --
3 somebody has made a lot of comments and
4 changes and such to -- to the -- to the
5 printed text.
6           Do you see all that?
7      MR. CHEFFO:  Objection.  Form.
8      THE WITNESS:  Yes.
9 QUESTIONS BY MR. HANLY:
10      Q.   Okay.  And if you turn to --
11 now, I'm going to ask you to look -- you see
12 in the lower right-hand corner of each page
13 there's a very long number?
14      A.   Yes.
15      Q.   Okay.  Could you turn to the
16 page that ends in 354?
17      A.   Yes.  354?
18      Q.   Yes, 354.
19      A.   354.
20      Q.   I think you might have passed
21 it, but perhaps not.
22      MS. MONAGHAN:  Do you mind if I
23 help her find it?
24      MR. HANLY:  I don't.  I'd be
25 grateful.

Page 113

1      MS. MONAGHAN:  This is it.
2      THE WITNESS:  3354.
3 QUESTIONS BY MR. HANLY:
4      Q.   Yes, 3354.
5      A.   Got it.
6      Q.   You have that?
7      A.   Uh-huh.
8      Q.   That's a yes?
9      A.   Yes.
10      Q.   Okay.
11      A.   I didn't realize it was such a
12 habit.  Sorry.
13      Q.   Now --
14      MS. MONAGHAN:  I'm just going
15 to ask a question.  The legibility of
16 this exhibit is not great.
17      MR. HANLY:  Agreed.
18      MS. MONAGHAN:  Is it -- is it
19 legible enough for you to review,
20 Kathe?
21      THE WITNESS:  I can't read
22 this.  Is that what you mean?
23      MS. MONAGHAN:  Okay.  So just
24 note for the record the witness can't
25 read the notes.

Page 114

1 Can you read the --
2 THE WITNESS: The handwritten.
3 MS. MONAGHAN: -- portion --
4 MR. HANLY: Well, that wasn't
5 what she testified. She referenced
6 what's up at the top, which I agree --
7 THE WITNESS: I --
8 MR. HANLY: -- I don't think
9 anyone could read that.
10 THE WITNESS: I can't read
11 what's on the right-hand side either.
12 I can't read these comments --
13 MR. HANLY: Well --
14 THE WITNESS: -- except for
15 that one word, which I think might be
16 "replace."
17 QUESTIONS BY MR. HANLY:
18 Q. Well, let me ask the questions
19 and see --
20 A. Yeah.
21 Q. -- and see whether you can --
22 A. Can you read that?
23 Q. I'm going to try.
24 A. Okay.
25 Q. Okay?

Page 115

1 So, first of all, let's look at
2 that -- the text, the printed text, at
3 Section 580: drug abuse and drug dependence,
4 addiction, and the word "drug" is crossed
5 out.
6 Do you see that? Do you see
7 where we are?
8 A. Yes.
9 Q. Okay. And the sentence I have
10 an interest in is just below that heading,
11 and let's see if we can agree as to what the
12 printed section reads.
13 Does it -- withdrawn.
14 It appears to read, "OxyContin
15 is a mu-agonist opioid with an abuse
16 liability similar to morphine and is a
17 Schedule II controlled substance. Oxycodone
18 products are common targets for both drug
19 abusers and drug addicts."
20 Did I read that text correctly
21 so far as you can tell?
22 A. Yes.
23 Q. Okay. Now, that handwriting
24 over there on the right, I'm going to read
25 what I think it says, and you can tell me "I

Page 116

1 don't see that" or "I don't agree," or you
2 can --
3 MS. MONAGHAN: Or "I can't read
4 it."
5 MR. HANLY: Or "I can't read
6 it."
7 QUESTIONS BY MR. HANLY:
8 Q. But let's try. Okay?
9 Does it appear to say, "Delayed
10 mu-opioid activity as provided by OxyContin
11 tablets is believed to reduce the abuse
12 liability" -- I think it says "of a drug,"
13 but I recognize those last characters are
14 quite faint.
15 Can you agree with any of my
16 reading of that handwritten note?
17 MR. CHEFFO: Objection. Form.
18 MS. MONAGHAN: Object to the
19 form.
20 THE WITNESS: I can agree with
21 "delayed."
22 QUESTIONS BY MR. HANLY:
23 Q. Okay. That's as far as you
24 agree in terms of what you can --
25 A. I can agree with "opioid." I

Page 117

1 think it's "opioid." Looks like "opioid."
2 Can't get the next three, four
3 words. It looks like "OxyContin" in the
4 middle there.
5 Q. Tablets?
6 A. Tablets, I see.
7 Q. How about the next line?
8 A. Can't read the next line, but
9 then I can read "the abuse." But that's it
10 for that line.
11 Q. Okay. All right.
12 A. Do you have a better copy?
13 Q. If you have a look at the
14 screen in front of you, do you see where that
15 handwriting is highlighted?
16 Does that help you read the
17 handwriting?
18 A. I have to get closer. I'm
19 sorry.
20 MS. CONROY: You can move it.
21 QUESTIONS BY MR. HANLY:
22 Q. As highlighted, does it make it
23 easier for you to read it?
24 A. A little bit.
25 Q. So what --

Page 118

1    A.    I think "activity" may be --
2    you can see "activity."
3    Q.    Can you see before the word
4    "opioid" mu, m-u?
5    A.    Can't really make out the U.
6    Q.    Okay.  What else can you
7    read --
8    A.    It could be mu.  I mean, that
9    would be correct if it was mu.  We could
10   assume it was mu.
11   Q.    All right.
12   A.    The "to" is clear.  Is that a
13   t-o, to?
14   Q.    Yes.
15   A.    And the "abuse" is clear.
16   Q.    Okay.  How about the word
17   "liability" after "abuse"?
18   A.    I'd be guessing, but I could
19   see how that could work, yeah.
20   Q.    All right.  Thank you for
21   assisting, Doctor.
22         MS. MONAGHAN:  I just want to
23   note one thing.  As Mr. Hanly was
24   starting this line of questioning,
25   there was a beep on the phone, which

Page 119

1    seemed to signal somebody either
2    joining or dropping off.
3         Do we know if that happened
4    and, if so, who it was?
5         SPECIAL MASTER COHEN:  That's
6    happened a few times during the course
7    of the deposition, and I don't know
8    what it means.
9         MS. MONAGHAN:  Do we have a
10   record of who is on the phone?
11        We do not.
12        Who arranged for the conference
13   number?
14        I'm sorry, does anyone on the
15   plaintiff side know who's on the phone
16   or --
17        MR. HANLY:  I know that Pete
18   Weinberger, who's liaison counsel, was
19   supposed to be on, but I don't know
20   beyond that.
21        MS. MONAGHAN:  If we don't
22   know, then I think we should
23   disconnect the line.
24        MR. WEINBERGER:  Yes, I am on.
25        MR. CHEFFO:  We typically do a

Page 120

1    rollcall.  Doesn't the court reporter
2    typically find out who's on the
3    call --
4         MS. MONAGHAN:  Yes.
5         MR. CHEFFO:  -- or something
6    like that?
7         Maybe we should just do that on
8    the record.  That's usually what
9    happens in a deposition.
10        MR. HANLY:  That's fine, but
11   this time should not be -- come out of
12   my examination.
13        SPECIAL MASTER COHEN:  Correct.
14        MR. CHEFFO:  Well, that's with
15   every single deposition, I think, in
16   this litigation.  People say who's on
17   the record.
18        But I -- Special Master Cohen,
19   you can decide.
20        SPECIAL MASTER COHEN:  All
21   right.  Let's -- first of all, is this
22   a good time to break?  I mean, it
23   might be a good time to break.
24        MR. HANLY:  Sure.
25        MS. MONAGHAN:  Yes, I think it

Page 121

1    is a good time to break.
2         SPECIAL MASTER COHEN:  So let's
3    break the deposition but continue with
4    this question --
5         MS. MONAGHAN:  Okay.
6         SPECIAL MASTER COHEN:  -- which
7    is, who is on the phone.
8         And let me begin by asking,
9    given that we're two hours in, what
10   your concern is.
11        MS. MONAGHAN:  Well, just
12   hearing beeps that people are coming
13   in and out, I think it should be a
14   more controlled environment than that
15   so we know who is participating in the
16   deposition telephonically.
17        SPECIAL MASTER COHEN:  If there
18   had been no beeps, we would still not
19   know who was participating.
20        MS. MONAGHAN:  I thought -- I
21   misunderstood at the beginning of the
22   deposition.  The court reporter said
23   that the appearances had all been
24   noted for the record, and I took that
25   to mean that a survey had been done of

Page 122

1  who was on the telephone and did not
2  understand that it hadn't.
3      SPECIAL MASTER COHEN:  Does --
4      MS. MONAGHAN:  So I apologize
5  for not catching on sooner, but it
6  wasn't until the beeps that I realized
7  that.
8      SPECIAL MASTER COHEN:  Does
9  anybody know who created this telecon
10  call-in number?
11      MS. FITZPATRICK:  Special
12  Master, I believe this telephone
13  conference number was created by
14  Golkow Technologies and is available
15  only to individuals who have signed
16  the protective order in this case and
17  should have access to the number.
18  It's not anything that's circulated
19  beyond anyone who specifically
20  requested from Golkow to receive the
21  number.
22      SPECIAL MASTER COHEN:  All
23  right.  Do you want to --
24      VIDEOGRAPHER:  We're still on
25  the record, so --

Page 123

1      SPECIAL MASTER COHEN:  Yes,
2  that's fine.
3      VIDEOGRAPHER:  Do you guys want
4  to go off the record?
5      SPECIAL MASTER COHEN:  No, I'd
6  like someone to do a rollcall.
7      Is that your job?
8      COURT REPORTER:  So we --
9  people are to e-mail in their
10  appearances, how they are going to
11  appear, whether in person or on the
12  phone, the day before the deposition.
13  I have a list of them, but I do not
14  know if that is who is actually on the
15  phone; just who has e-mailed and said
16  they are going to participate and in
17  which way they are.
18      SPECIAL MASTER COHEN:  All
19  right.  So do you remain concerned
20  enough that you want to do a rollcall?
21      MS. MONAGHAN:  I do want to do
22  a rollcall, please.
23      SPECIAL MASTER COHEN:  Someone
24  else can do that.
25      MS. FITZPATRICK:  Hi.  For

Page 124

1  everyone who's on the phone, would you
2  please identify yourself and which
3  party you're representing?
4      Is that sufficient?
5      MS. MONAGHAN:  That's fine.
6      MR. WEINBERGER:  This is Pete
7  Weinberger on behalf of the plaintiff.
8      MR. YINGLING:  This is Patrick
9  Yingling with Reed Smith for
10  AmerisourceBergen.
11      MR. MALLOY:  This is Greg
12  Malloy on behalf of Mallinckrodt.
13      MR. CARTER:  Ed Carter on
14  behalf of Walmart.
15      MR. DAVIS:  Josh Davis of
16  Arnold & Porter on behalf of Endo and
17  Par.
18      MR. WHITESELL:  This is Jeff
19  Whitesell from Tucker Ellis on behalf
20  of Johnson & Johnson and Janssen.
21      MR. FULLER:  Mike Fuller on
22  behalf of the PEC.
23      MS. CLINTON:  This is Laura
24  Clinton from the Washington Attorney
25  General's Office on behalf of the

Page 125

1  State of Washington.
2      MR. WEINBERGER:  Pete
3  Weinberger, liaison counsel for the
4  PEC.
5      MR. MacWILLIAMS:  Michael
6  MacWilliams, Venable, on behalf of
7  Abbott Labs.
8      MR. CHEFFO:  Anyone else?
9      MS. MONAGHAN:  Okay.
10      MR. STEWART:  As long as we're
11  addressing administrative matters, I
12  just want to remind everybody, Mike
13  Stewart, representing the Tennessee
14  plaintiffs in state-related cases.
15      We have a notice down for this
16  witness for today for three hours.
17  I'm certainly open to other
18  arrangements, but right now we will be
19  beginning our deposition immediately
20  after the MDL today.
21      MR. CHEFFO:  Yeah, we've
22  objected to that, I think, as you
23  know, and I don't believe that that
24  was going to happen today, but we can
25  talk off the record and try to resolve

Page 126

1  that.
2       MR. STEWART: Certainly.
3       SPECIAL MASTER COHEN:
4  Everybody done? We can take a lunch
5  break?
6       MS. MONAGHAN: I think so.
7       VIDEOGRAPHER: Okay. The time
8  is 1:20 p.m. Going off the record.
9   (Off the record at 1:20 p.m.)
10      VIDEOGRAPHER: We are back on
11 the record. The time is 2:03 p.m.
12      And will all appearances -- all
13 present, please introduce themselves
14 for the record, please.
15      MR. HANLY: Paul Hanly, Simmons
16 Hanly Conroy, for plaintiffs.
17      MS. CONROY: Jayne Conroy,
18 Simmons Hanly Conroy, for plaintiffs.
19      MS. FITZPATRICK: Laura
20 Fitzpatrick, Simmons Hanly Conroy, for
21 plaintiffs.
22      MR. SMOKLER: Sanford Smokler,
23 Simmons Hanly Conroy, for plaintiffs.
24      MS. SINGER: Linda Singer,
25 Motley Rice, for the plaintiffs.

Page 127

1       MS. CONROY: Mildred Conroy,
2  the Lanier Law Firm, for the
3  plaintiffs.
4       MR. STEWART: Mike Stewart,
5  Branstetter, Stranch & Jennings, for
6  the Tennessee plaintiffs.
7       MS. JINDAL: Jyoti Jindal,
8  Williams & Connolly, for Cardinal
9  Health.
10      MR. BARNES: Robert Barnes,
11 Marcus & Shapira, defendant HBC
12 Service Company.
13      MR. STOFFELMAYR: Kaspar
14 Stoffelmayr, Bartlit Beck, for
15 Walgreens.
16      MR. WIDAS: Alexandra Widas,
17 Covington & Burling, for McKesson.
18      MR. WILLIFORD: Harold
19 Williford, Debevoise & Plimpton, for
20 Kathe Sackler.
21      MR. CHEFFO: Mark Cheffo for
22 Purdue.
23      MS. WHITE: Mary Jo White,
24 Debevoise & Plimpton, for Dr. Sackler.
25      MS. MONAGHAN: Maura Monaghan,

Page 128

1  also from Debevoise & Plimpton, also
2  for Dr. Kathe Sackler.
3       SPECIAL MASTER COHEN: And
4  Special Master David Cohen.
5       MS. NIEDZIELSKI-EICHNER: Nora
6  Niedzielski-Eichner, Debevoise &
7  Plimpton, for Kathe Sackler.
8       MR. COHEN: Joshua Cohen from
9  Debevoise & Plimpton, Kathe Sackler.
10 QUESTIONS BY MR. HANLY:
11      Q.   Dr. Sackler, you are aware, are
12 you not, that in connection with this
13 litigation your attorneys gathered documents
14 from what lawyers call a custodial file and
15 made those documents available to us?
16      A.   Yes.
17      Q.   You are aware of that?
18      A.   Yes.
19      Q.   Did you assist your attorneys
20 in the gathering together of documents from
21 your so-called custodial file?
22      MS. MONAGHAN: I'm just going
23 to say, you can -- I don't think that
24 question treads on attorney-client
25 privilege, but we're getting close to

Page 129

1  an area that does. So if any question
2  seems to you to call for you to
3  disclose discussions that you had with
4  your attorney, let me know, and I'll
5  tell you whether or not you can answer
6  the question.
7       Okay?
8       THE WITNESS: Okay.
9       I'm sorry, can you repeat the
10 question? I lost track of it.
11 QUESTIONS BY MR. HANLY:
12      Q.   Sure.
13      Did you assist your attorneys
14 in the gathering together of documents from
15 your so-called custodial file?
16      A.   I was -- I was with several of
17 my attorneys or people from my attorneys'
18 office who were gathering my custodial files
19 in -- at the same time that they were at the
20 office in Stamford, yeah.
21      Q.   Do you understand that your
22 attorneys provided to us thousands of pages
23 of documents that supposedly come from your
24 custodial file?
25      A.   Okay.

Page 130

1    Q.    You accept that?
2    A.    If that's -- yes.  Sure.
3    Q.    Okay.  Is there any document
4  that you're aware of that's been provided to
5  the plaintiffs that contains within it any
6  expression by you of remorse, concern,
7  empathy or sympathy for any of the victims of
8  the opioid crisis?
9         MR. CHEFFO:  Objection.  Form.
10  No foundation.  Harassing.
11        MS. MONAGHAN:  Objection on all
12  those grounds.
13        THE WITNESS:  That's not where
14  I would choose to express my empathy,
15  sympathy, and deep compassion for the
16  people who have suffered from opioid
17  abuse or misuse or addiction or...
18        It's -- I mentioned it earlier
19  today.  It's a horrific situation,
20  what's going on in our country with
21  drug abuse and misuse.  And whether
22  it's accidental or whether it's
23  recreational or whether it's
24  iatrogenic or what it is, you know,
25  it's all of the above and it's

Page 131

1  terrible.  It's terrible and it's
2  shocking and it's painful.
3  QUESTIONS BY MR. HANLY:
4    Q.    And so the answer to my
5  question is you're not familiar with any such
6  document in the documents turned over to us?
7        MS. MONAGHAN:  Objection.
8  Form.
9        MR. CHEFFO:  Objection.  Form.
10        THE WITNESS:  I really don't
11  know -- I can't say because there are
12  thousands and thousands of documents.
13  I don't know.  I haven't gone back and
14  read them all.  I can't attest to
15  what's in them in that regard.
16        It's possible there's something
17  in there to that effect.  It's
18  possible it's not.
19        It doesn't strike me as the
20  place where I would express those
21  feelings in a very profound, deep-felt
22  reaction to what's happening.
23  QUESTIONS BY MR. HANLY:
24    Q.    You referenced in your answer
25  just a moment ago iatrogenic addiction,

Page 132

1  right?
2    A.    I --
3    Q.    You used those words?
4    A.    Yeah, I spoke -- iatrogenic --
5  I didn't say addiction, but it's one possible
6  source of -- of substance misuse or
7  consequences from -- you know, I just -- to
8  be inclusive I was -- yes, it is a possible
9  source of addiction also.
10    Q.    And iatrogenic means arising
11  out of a doctor's care?
12    A.    Yeah.
13    Q.    Right?
14    A.    Uh-huh.
15    Q.    And so do you accept that
16  iatrogenic addiction to your company's
17  medication, OxyContin, has occurred?
18    A.    I think that OxyContin, like
19  all Class II narcotics, has a high risk of
20  abuse, has a high risk of diversion, I guess,
21  and has a high risk of addiction, I think.
22  That's a fact.  It's in a big black box on
23  the label.  It's something that I think we've
24  all become more and more and more focused on
25  because of the problems of what's happened

Page 133

1  to -- in the world.
2         And also, I think maybe we
3  understand addiction a little bit better
4  today than we did 25 years ago, but still not
5  great.  We still need a lot of research and a
6  lot more knowledge about -- about, you
7  know -- well, I'm saying too much.  I'm
8  supposed to stick to your question.
9    Q.    Oxycodone was invented in
10  Germany in 1913; isn't that true?
11    A.    I don't know.  I'm sorry.
12    Q.    Oxycodone was around in the
13  medical world for decades before the
14  introduction of OxyContin; is that true?
15    A.    I'm aware that in this country
16  from -- I mean, I don't -- I've never
17  searched -- I really don't know what the
18  first date oxycodone -- you know, I suppose
19  you could look in the pharmacopeia and see
20  when it was listed as an active molecule in
21  the pharmacopeia.
22         I know it wasn't in Europe for
23  many years.  It was here in the United States
24  before it was listed over there as a -- as an
25  active ingredient for medicines in humans.

Page 134

1    Q.   One of the earliest brand names
2 for oxycodone containing analgesia in the
3 United States was Percodan, true?
4    A.   Uh-huh.
5    Q.   Yes?
6    A.   Well, as far as I know, yes.
7    Q.   All right.
8    A.   I'm not an expert on this, so
9 it's hard for me to --
10    Q.   And Percodan has been known for
11 decades to have a high risk of abuse
12 liability, true?
13    MR. CHEFFO:  Objection.
14    THE WITNESS:  The risk
15    liability of a narcotic doesn't change
16    with time.  It is what it is.  It's a
17    molecule that is -- has a high risk of
18    addiction.  That's what it's always
19    been.  That's what it probably always
20    will be.
21 QUESTIONS BY MR. HANLY:
22    Q.   Irrespective of whether that
23 molecule or the active pharmaceutical
24 ingredient is combined, for example, with
25 acetaminophen, true, the risk remains the

Page 135

1 same?
2    MS. MONAGHAN:  Objection.
3    THE WITNESS:  The risk remains
4    the same?
5    You know, you're asking me to
6    answer definitively questions that
7    I'm -- I don't feel knowledgeable
8    enough -- I'm not an expert in
9    pharmacology and I'm not an expert in
10    products or in addiction, and so I
11    have to be a little careful about how
12    I answer you.
13    I don't want to -- but as I
14    think everyone -- certainly every
15    doctor knows, and anyone who has read
16    a package label of any narcotic knows,
17    that Class II -- Class II narcotic --
18    Class II pharmaceutical drugs are
19    Class II because they have a
20    significant risk of abuse, misuse,
21    addiction, overdose and potentially
22    death.  And that's why they're
23    called -- why they're classified as
24    Class II.
25    But -- and I think that's a DEA

Page 136

1 and a regulatory classification, not a
2 pharmaceutical classification.
3    But, you know, the label says
4    it very clearly.  The OxyContin label
5    is absolutely explicit.
6 QUESTIONS BY MR. HANLY:
7    Q.   Well, speaking of the label,
8 let's have a look at another version.  And if
9 you would hold on to Exhibit 13, perhaps your
10 counsel could put that back in front of you.
11    A.   Sorry.
12    Q.   And if you would first just
13 turn back to the page we were looking at,
14 which is 3354 with that handwriting on the
15 right.
16    Are you there, Doctor?
17    A.   3354.
18    Q.   Yes.
19    A.   Yep.
20    (Purdue-Sackler Exhibit 14
21    marked for identification.)
22 QUESTIONS BY MR. HANLY:
23    Q.   Okay.  And now I'm going to
24 place before you Exhibit Number 14, and we're
25 going to look at a similar section.

Page 137

1    By the way, you did testify
2 before the lunch break that you reviewed the
3 OxyContin package insert at some point before
4 the drug was approved, right?
5    MS. MONAGHAN:  Objection.
6    MR. CHEFFO:  Objection.
7    THE WITNESS:  No, I didn't.
8    What I said was I was -- in
9    that memo that you showed me, that was
10    a request to receive a copy of it
11    because I hadn't received a copy of
12    it.
13 QUESTIONS BY MR. HANLY:
14    Q.   All right.
15    A.   So is that the one you're
16 talking about?  Yeah.
17    Q.   Yes.
18    A.   Okay.
19    Q.   Let me ask you this question:
20 Did you ever review the OxyContin package
21 insert, whether in draft form or final form?
22    A.   I actually can't recall, but I
23 would like to think I did.
24    Q.   All right.  So with regard to
25 Exhibit 14 that's in front of you, could you

Page 138

1 turn within that exhibit to page 7041?
2     A.    Okay.
3     Q.    Let me ask you first, actually.
4 This appears to be a version of the package
5 insert.
6         Do you know whether you've ever
7 seen this document before?
8     A.    I'd have to look at it closely
9 to know the answer to that.  I just turned
10 from the front to the end.
11         Do you want me to look at it
12 carefully or...
13     Q.    Why don't you just flip through
14 the pages and see if looking at any of those
15 pages refreshes your recollection as to
16 whether indeed you did or did not see this
17 document before.
18         MR. CHEFFO:  This also has
19     shading, Paul.  Is that not in the
20     original?
21         MS. FITZPATRICK:  Right.
22         MS. CONROY:  It's not in the
23     original.
24 QUESTIONS BY MR. HANLY:
25     Q.    Any recollection of seeing that

Page 139

1 before?
2     A.    I don't think I have, but I
3 really can't fully recall.
4     Q.    All right.
5     A.    It's such a long time ago.  But
6 I don't believe so.  I don't -- one of the
7 things -- one of the reasons I don't -- I
8 mean, this -- this looks like something that
9 someone marked up.
10     Q.    Well, if you take a look at the
11 first page, the second paragraph states,
12 "Attached please find the revised draft
13 package insert."
14     A.    Yeah.
15     Q.    Signed by --
16     A.    I don't think I ever saw this
17 or read this, but I don't recognize it.
18     Q.    All right.  Could you turn --
19 could you just hold -- no, could you hold
20 that there --
21     A.    Okay.
22     Q.    -- and then could you turn to
23 7041 on Exhibit 14?
24     A.    Okay.
25     Q.    And down -- three-quarters of

Page 140

1 the way down the page, do you have there in
2 front of you in Exhibit 14 a section Drug
3 Abuse and Drug Dependence Addiction with the
4 "drug" having a cross-out through it?
5     A.    The same as on this one.
6     Q.    Yes.
7     A.    Yeah.
8     Q.    Can you confirm, however, that
9 in Exhibit 14, which is the one under your
10 right hand --
11     A.    Yeah.
12     Q.    -- that there's an additional
13 sentence in the first paragraph that does not
14 appear in the text of Exhibit 13?
15         Do you see that?  Do you see
16 that sentence that's underlined in 14?
17         MS. MONAGHAN:  I'm going to
18     object that she testified that she
19     couldn't read Exhibit 13 when we went
20     over this section before, and so
21     there's no foundation for these
22     questions.
23         MR. HANLY:  Well, she testified
24     she couldn't read the handwriting in
25     Exhibit 13, not the text.  I'm asking

Page 141

1     her about the text.
2 QUESTIONS BY MR. HANLY:
3     Q.    Can you confirm that there's an
4 additional sentence in the document under
5 your right hand that does not appear in the
6 text of the document under your left hand?
7         And that sentence begins,
8 "Delayed mu-opioid activity."
9     A.    Can you tell me again which
10 one?
11     Q.    Yes.
12         Okay.  Do you see under -- in
13 14, which is under your right hand --
14     A.    Right.  Uh-huh.
15     Q.    -- do you see in that first
16 paragraph under Drug Abuse there's an
17 underlined sentence that begins -- that reads
18 "delayed mu-opioid activity as provided by
19 OxyContin tablets is believed to reduce the
20 abuse liability of a drug"?
21         Do you see that sentence under
22 your right hand?
23     A.    Yes.
24     Q.    Okay.  And can you confirm that
25 sentence is not in the text under your left

Page 142

1  hand?
2      MS. MONAGHAN:  Object to the
3  form.
4  QUESTIONS BY MR. HANLY:
5      Q.   Exhibit 13?
6      A.   Yes, I see what you're pointing
7  to.
8      Q.   Okay.  And the sentence in
9  Exhibit 14 -- let me ask you this.  Well,
10 I'll read it first.  "Delayed mu-opioid
11 activity as provided by OxyContin tablets is
12 believed to reduce the abuse liability of a
13 drug."
14      Do you see that language?
15     A.   I do.
16     Q.   Okay.  Are you aware of any
17 studies that Purdue conducted concerning the
18 abuse liability of a controlled-release
19 oxycodone product?
20     MS. MONAGHAN:  Objection.
21 QUESTIONS BY MR. HANLY:
22     Q.   Did Purdue conduct any such
23 studies?
24     MR. CHEFFO:  Objection.
25     THE WITNESS:  Or did anyone

Page 143

1  else conduct any studies?
2  QUESTIONS BY MR. HANLY:
3      Q.   Yeah.
4      Are you aware of any studies
5  whatsoever in which the abuse liability of a
6  controlled-release or delayed mu-opioid
7  activity drug was studied?
8      MS. MONAGHAN:  Objection.
9      THE WITNESS:  I really don't
10 know.
11 QUESTIONS BY MR. HANLY:
12     Q.   Okay.  Thank you.  I'm finished
13 with that document.
14     A.   Okay.
15     Q.   Did you review, prior to the
16 approval on December the 12th, 1995, of
17 OxyContin by the FDA, any of the proposed
18 marketing plans that Purdue had created for
19 OxyContin?
20     So prior to the approval, did
21 you review any marketing plans?
22     A.   Not that I can recall.  But if
23 there were plans presented to the board at
24 that time, then I might have seen them in the
25 presentation to the board, but I can't

Page 144

1  recall.
2      Q.   Okay.  Is the marketing plans
3  for OxyContin something you would have been
4  interested in at the time?
5      MS. MONAGHAN:  Objection.
6  QUESTIONS BY MR. HANLY:
7      Q.   In your role as a member of the
8  board?
9      MS. MONAGHAN:  Objection.
10     THE WITNESS:  It depends what
11 you mean by marketing plans.
12 QUESTIONS BY MR. HANLY:
13     Q.   Well, what do you mean by
14 marketing plan?
15     A.   I was --
16     MS. MONAGHAN:  Objection.
17     THE WITNESS:  -- referring to
18 the language in the paper you showed
19 me.
20     Oh, no, I wasn't referring to
21 the language in the paper you showed
22 me.  I made a mistake.  I'm sorry.
23 QUESTIONS BY MR. HANLY:
24     Q.   That's all right.
25     All right.  Let's do it --

Page 145

1  let's do it this way.
2      A.   I think I got confused by the
3  two questions.
4      Q.   I can be very confusing.  I'm
5  sorry, Doctor.
6      A.   No, it's not -- I wasn't
7  suggesting that.
8      (Purdue-Sackler Exhibit 15
9  marked for identification.)
10 QUESTIONS BY MR. HANLY:
11     Q.   Exhibit 15.
12     A.   It's very gracious for you to
13 say that.
14     Q.   I think that's actually a
15 double-sided, so I think the second page --
16 would you just confirm for me, Doctor,
17 there's something on the reverse so I make
18 sure that you have --
19     A.   Yes.
20     Q.   Yes.  Okay.
21     So this appears to be --
22 Exhibit 15 appears to be a memo dated
23 August 28, 1995 --
24     A.   Uh-huh.
25     Q.   -- from you to Michael

1 Friedman, who -- well, was he the CEO in
2 1995, if you recall?
3     A.    You know, dates are not my
4 thing --
5     Q.    All right.
6     A.    -- but he -- he was the head
7 of -- he was the head of marketing and sales
8 before he became the CEO.
9     Q.    Right.
10    A.    So he might have been in one
11 position or the other.  I don't know the
12 exact date of the transition.
13    Q.    Okay.  And in this memorandum
14 referencing just -- referencing the last
15 paragraph, though you're free to look at any
16 of it you wish, you write to Mr. Friedman,
17 "As we now are approaching close to launch,
18 would you please provide your proposed
19 marketing plan suggesting pricing position
20 and most current P&L, profit and loss, pro
21 forma for the years 1-5 post launch."
22         Do you see that?
23    A.    Uh-huh.  Yep.
24    Q.    So you were asking to see these
25 documents that related, among other things,

1 to marketing and pricing, correct?
2     A.    Yes.
3     Q.    Okay.
4     A.    Of a new product, yeah, for
5 sure.
6     Q.    And the marketing --
7     A.    That would be presented to the
8 board.
9     Q.    Of which you were a member?
10    A.    Yeah.
11    Q.    All right.  And the
12 marketing -- any marketing plan for a
13 prescription medication has got to be
14 consistent with the package insert; isn't
15 that true?
16    A.    Absolutely.  As far as I know.
17 I mean, now that you raised the question, the
18 question just ran through my mind.  I think
19 that any communications that the company,
20 through their sales representatives or their
21 officers or anyone who works in the company,
22 any communications that are made in any --
23 whether it's marketing or detailing or, you
24 know, other kinds of presentations about --
25 about a product, I think it always has to be

1 consistent with the FDA-approved label.
2     Q.    Okay.  You are aware, are you
3 not, that the label -- or the package insert
4 for OxyContin was revised in July of 2001?
5         MS. MONAGHAN:  Object to the
6     form.
7         THE WITNESS:  I'm not aware of
8     a date of a revision, but I'm aware
9     that the label has been revised a
10    number of times over the life of the
11    product by -- you know, with the FDA's
12    full involvement.
13        And I think, you know, it's a
14    good thing that labels can be revised
15    and that they can change with the
16    science and the knowledge as things
17    progress, so forth.
18        So that's --
19 QUESTIONS BY MR. HANLY:
20    Q.    And the -- well, without regard
21 specifically to the date --
22    A.    Yeah.
23    Q.    -- you are aware, because I
24 believe you referenced it earlier today, that
25 at some point there was a so-called black box

1 warning affixed or inserted into the label or
2 package insert for OxyContin, true?
3     A.    Yes, and there have been some
4 revisions on that as well over the years.
5     Q.    All right.  But the black box
6 warning was in the label prior to the date on
7 which Purdue Pharma pleaded guilty to
8 criminal misbranding; isn't that true?
9         MS. MONAGHAN:  Object to the
10    form.
11        THE WITNESS:  I don't remember
12    when the black box label was brought
13    into the label -- I mean, the black
14    box was brought into the label.
15        Do you have the date?  I don't
16    remember the date --
17 QUESTIONS BY MR. HANLY:
18    Q.    If I suggested to you that it
19 was July 18, 2001, would that help you at
20 all?
21        MS. MONAGHAN:  Objection.
22        THE WITNESS:  Not really.
23 QUESTIONS BY MR. HANLY:
24    Q.    All right.
25

Page 150

1    A.    2001.
2    Q.    Do you -- do you --
3    A.    I don't know.
4    Q.    Can you place the --
5    A.    I mean, there are other people
6  who know these facts factually and who can
7  confirm these facts for you. I'm sorry, I
8  don't -- I can't recall when the label
9  changed. It's had a black box for a very,
10 very long time, but I don't know when that
11 first occurred.
12   Q.    So without regard to the
13 specific date, July or August or 2001 or 1999
14 or whatever, can you confirm -- and if you
15 can't, you just need to say so -- that the
16 black box warning was in the label prior to
17 the date on which Purdue Pharma pleaded
18 guilty to criminal misbranding?
19        MS. MONAGHAN: Objection.
20        THE WITNESS: I don't know the
21 answer to that. I'm sorry.
22 QUESTIONS BY MR. HANLY:
23   Q.    Okay. Thank you.
24   A.    Okay.
25   Q.    So Exhibit 15, Doctor, which is

Page 151

1  on top of the pile. Exhibit 15.
2    A.    Oh, this one?
3    Q.    Yes.
4          Can you confirm that you wrote
5  that memorandum, or it appears that you wrote that
6  memorandum, in August of 1995?
7        MS. MONAGHAN: Objection.
8        THE WITNESS: I didn't read it
9  before.
10        Can I read it now?
11 QUESTIONS BY MR. HANLY:
12   Q.    Please.
13   A.    Okay.
14   Q.    Okay. And that was in --
15 dated --
16   A.    I don't remember the memo, but
17 I'll accept that I may have written it for
18 sure.
19   Q.    And it bears a date of August
20 the 28th?
21   A.    Yes.
22   Q.    1995?
23   A.    Yeah.
24   Q.    Yes?
25   A.    Yes.

Page 152

1        (Purdue-Sackler Exhibit 16
2  marked for identification.)
3  QUESTIONS BY MR. HANLY:
4    Q.    All right. So let me show you
5  Exhibit 16, please.
6    A.    Yep.
7    Q.    And Exhibit 16 is another
8  memorandum, also to Mr. Friedman from you,
9  regarding the OxyContin marketing plan, and
10 this is approximately a month later.
11        Do you see that?
12   A.    Uh-huh.
13   Q.    September 26?
14   A.    I guess I didn't get it.
15   Q.    Apparently not, because you
16 write, "Did I miss the OxyContin marketing
17 plan? Remember, you told me it was about to
18 be issued. May I please have a copy, if
19 possible, before we sit down with
20 Dr. Mortimer tomorrow?"
21   A.    Uh-huh.
22   Q.    Do you see that?
23   A.    Yes.
24   Q.    So this --
25   A.    Sure.

Page 153

1    Q.    -- indicates, did it not --
2  does it not, that you were, as of September
3  1995, desirous of receiving a copy of the
4  marketing plan, which by this date
5  Mr. Friedman had not favored you with a copy?
6    A.    So this is an example of what I
7  was referring to before of my having to chase
8  for things because I didn't receive them.
9  And even after I asked, sometimes I didn't
10 receive them.
11   Q.    Right.
12        You had to chase things that
13 you were interested in your role as a
14 board member of the company?
15        MS. MONAGHAN: Objection.
16        THE WITNESS: I was interested
17 in the normal range of matters that a
18 director should be interested in.
19        So that's a very -- that covers
20 a lot of material. I mean, it covers
21 a wide range. It's not specific
22 individual interests because I am --
23 have a focus on something. It's that
24 I felt a responsibility as a director
25 to inform myself, to be informed about

Page 154

1    what -- important events in the
2    company.  And the launch of a new
3    product is a very important event for
4    any pharmaceutical company.
5    QUESTIONS BY MR. HANLY:
6        Q.    And important --
7        A.    So --
8        Q.    -- to the owners of the
9    pharmaceutical company, right?
10           MS. MONAGHAN:  Objection.
11           THE WITNESS:  Important to
12   everyone.
13   QUESTIONS BY MR. HANLY:
14       Q.    Including the owners?
15           MS. MONAGHAN:  Objection.
16           THE WITNESS:  Important to
17   everyone in their appropriate roles.
18   QUESTIONS BY MR. HANLY:
19       Q.    Did you, in the role that you
20   played at Purdue, provide agenda items for
21   board of directors meetings?
22       A.    No.
23           MS. MONAGHAN:  Objection.  Form
24   and foundation.
25           THE WITNESS:  Not typically,

Page 155

1    no.  You may find an example that I
2    did.  I don't know.  You have
3    information I don't have.  But, no, I
4    don't remember that being my role.
5        That was Stuart Baker's role
6    and management's role.  Stuart was
7    liaison with management, so that would
8    happen, you know, from management to
9    Stuart to board agenda.
10       (Purdue-Sackler Exhibit 17
11   marked for identification.)
12   QUESTIONS BY MR. HANLY:
13       Q.    Well, let me show you a memo
14   dated August 28 --
15       A.    It doesn't mean I couldn't
16   suggest something.
17       Q.    -- August 28, 1995, Exhibit
18   Number 17, which is a memorandum from you to
19   the very same Stuart Baker.
20           Do you see that?
21       A.    Uh-huh.
22       Q.    Yes?  Is that a yes, ma'am?
23       A.    Yes.  Sorry, yes.
24       Q.    And this -- the re: line of
25   this is board of directors meeting,

Page 156

1    September 20 --
2        A.    No.  But you look at the first
3    words, "following discussion with
4    Dr. Mortimer."  This is Dr. Mortimer's
5    suggestion of agenda items that I'm conveying
6    to Stuart on his behalf.  It says so.
7        "Following discussion with
8    Dr. Mortimer, I am writing to ask that the
9    following items be added to the agenda for
10   the next board meeting."
11       Q.    Well, it doesn't say that it's
12   only Dr. Mortimer, does it?  It doesn't say
13   that?
14       A.    Sorry?
15           MS. MONAGHAN:  Object to the
16   form.  The document speaks for itself.
17           THE WITNESS:  But that was my
18   role.  I didn't make this up.
19   QUESTIONS BY MR. HANLY:
20       Q.    You provided to Mr. Baker -- by
21   the way, what was Mr. Baker's role with
22   respect to a board of directors meeting?
23       A.    He was the secretariat of the
24   board.
25       Q.    All right.

Page 157

1        A.    And the liaison between the
2    directors and management.
3        Q.    Okay.  And in this document you
4    set forth a number of items, 11 in all, that
5    you were informing Mr. Baker would be on the
6    agenda for this meeting; is that true?
7        A.    No.
8            MS. MONAGHAN:  Objection to the
9    form.
10           THE WITNESS:  I was informing
11   Mr. Baker of the items that my father
12   wished to have on the agenda.  That's
13   what this says, as far as I can
14   recall.
15   QUESTIONS BY MR. HANLY:
16       Q.    And were any -- were any of
17   these agenda items yours, your ideas?
18           MS. MONAGHAN:  Objection.
19           THE WITNESS:  Should I read it?
20   Because I can't answer that.  I
21   haven't read it yet.
22   QUESTIONS BY MR. HANLY:
23       Q.    Right.  So why don't you --
24       A.    Totally.
25       Q.    You can read what --

Page 158

1  A.  I mean, I skimmed it, but I'll
2  read it.
3  Q.  You can read whatever you want,
4  but I draw your attention to Item Number 4.
5  A.  Item 4?
6  Q.  Yes.
7  A.  Okay.
8  Yes, I see that.
9  Q.  Right.
10  This reflects, does it not,
11  that you were -- you had some sort of a
12  proposal regarding an opportunity with
13  respect to an entity called Immunogen?
14  A.  No.  What this represents is --
15  this represents my desire for the board to
16  conduct a postmortem of an opportunity called
17  Immunogen and to -- in that analysis and
18  discussion to establish better guidelines --
19  or to establish guidelines for due diligence
20  workup of development -- of product
21  development opportunities and how they're
22  presented to the board.  I had some thoughts
23  about that.
24  Q.  Right.
25  So, well, this reflects you had

Page 159

1  a proposal actually for the -- for these
2  guidelines for staging of due diligence work,
3  right?  That's what it says?
4  A.  You know, I see the word
5  "proposal," but I don't know that I
6  actually -- whether it was a written proposal
7  or whether it was more a -- ideas to share
8  with the other directors and engage in a
9  collegial discussion about how we could stage
10  due diligence in a way that would bring
11  opportunities for -- that were studied in a
12  more -- subjected to critical analysis and
13  that that analysis could be shared with the
14  board rather than -- when product
15  opportunities come to the board very often,
16  they would be more in the form of having
17  already been worked through and the business
18  development team wanting to seek an approval
19  of the board.
20  Q.  The word "proposal" --
21  A.  Yeah.
22  Q.  -- that appears here --
23  A.  Uh-huh.
24  Q.  -- this is your writing, right?
25  MS. MONAGHAN:  Objection.

Page 160

1  QUESTIONS BY MR. HANLY:
2  Q.  I mean, you chose the word
3  "proposal"?
4  A.  There's nothing wrong with the
5  word "proposal."
6  Q.  That wasn't my question.
7  You chose the word "proposal,"
8  right?
9  I mean, you did compose this
10  document, did you not?
11  MS. MONAGHAN:  Objection.
12  THE WITNESS:  I don't remember.
13  I can't say I did or didn't, but I --
14  I might have.
15  QUESTIONS BY MR. HANLY:
16  Q.  Well, you certainly --
17  A.  I don't remember the document.
18  I've been told that I should only -- that I
19  should honestly answer your questions to the
20  best of my recollection, so I'm trying to do
21  that, okay, if you would be a little patient
22  with me.
23  Q.  You did remember this Immunogen
24  opportunity, though?
25  A.  I don't remember the

Page 161

1  opportunity, actually.
2  Q.  All right.  You remember the
3  postmortem?
4  A.  Well, I...
5  Q.  And if you don't --
6  A.  Not in content.  I remember it
7  conceptually that this was an issue -- that a
8  number of directors were concerned that --
9  that -- were concerned to try to raise the
10  standard of practice of how due diligence was
11  developed and how product opportunities were
12  presented to the board.  That's what this
13  attempted to do.
14  So my proposal was to -- for
15  the board to engage in that task together to
16  do that.  I don't know if it was written or
17  verbal, but I cannot recall that part.
18  Q.  You recall -- I'm finished with
19  that, Doctor.
20  A.  Okay.
21  MS. MONAGHAN:  I'm just going
22  to note, for the record, that it was
23  an incomplete examination of the
24  document in question and that it
25  should be considered in its entirety.

Page 162

1 QUESTIONS BY MR. HANLY:
2    Q.   Doctor, do you recall that
3 there was at one time a joint venture
4 agreement between Purdue and Abbott
5 Laboratories with respect to OxyContin?
6    A.   Yes.
7         MS. MONAGHAN: Objection.
8 QUESTIONS BY MR. HANLY:
9    Q.   And do you recall that that
10 agreement -- that the essence of that joint
11 venture was that Abbott would promote and
12 attempt to sell OxyContin to hospitals?
13        MR. CHEFFO: Objection.
14        THE WITNESS: Yes. That was an
15    agreement that Michael Friedman
16    established when he was running
17    marketing and sales, I believe.
18 QUESTIONS BY MR. HANLY:
19    Q.   Okay. And was that agreement
20 referred to as a co-promotion agreement, if
21 you recall?
22        MS. MONAGHAN: Objection.
23        THE WITNESS: Now you're
24    getting into a little of detail --
25        MS. MONAGHAN: Form.

Page 163

1        THE WITNESS: -- I can't speak
2 to, but I -- I'm not even sure that
3    that -- whether that came to the board
4    or didn't come to the board. It might
5    have come to the board or it might
6    have just been a management initiative
7    and decision, because it was -- I
8    think they were restricted in the
9    agreement to only selling in
10    hospitals.
11 QUESTIONS BY MR. HANLY:
12    Q.   Did you --
13    A.   Yeah.
14    Q.   Did you as -- as -- withdrawn.
15        Did you have -- did you review
16 the co-promotion agreement or the joint
17 venture agreement between Purdue and Abbott?
18        MS. MONAGHAN: Object to the
19    form.
20        THE WITNESS: I don't remember
21    if I ever read the documents or if it
22    was before it was agreed or after it
23    was agreed or if I only learned about
24    it at a board meeting.
25        I knew -- I know about it. I

Page 164

1 remember it. Not in great detail, it
2 was a long time ago, but -- but I'm
3 not sure -- I don't remember if I ever
4 saw the actual contract, which is what
5 you're asking me, right?
6 QUESTIONS BY MR. HANLY:
7    Q.   Yes.
8    A.   I don't recall.
9        (Purdue-Sackler Exhibit 18
10    marked for identification.)
11 QUESTIONS BY MR. HANLY:
12    Q.   Let me show you Exhibit 18.
13    A.   Sure.
14    Q.   Thank you.
15        This is -- appears to be a memo
16 from you to your father, Dr. Mortimer
17 Sackler, February 15, 1996. The subject is
18 Abbott co-promotion OxyContin.
19        Do you see that?
20    A.   Yes.
21    Q.   And it's says -- the first
22 sentence says, "The agreement with Abbott
23 calls for Abbott to commence promotion effort
24 within 60 days of execution, January 25,
25 1996, but no later than March 1, 1996."

Page 165

1        Do you see that?
2    A.   Yes.
3    Q.   Does this suggest to you that
4 you had familiarity with that agreement?
5        MS. MONAGHAN: Objection.
6    Form.
7        THE WITNESS: Well, I said I
8    had familiarity.
9 QUESTIONS BY MR. HANLY:
10    Q.   Okay.
11    A.   I just said I didn't -- I don't
12 know if I actually read the contract. I'm
13 sorry, maybe I'm being too literal in some of
14 your questions.
15    Q.   How long did that agreement
16 last, to your knowledge, if you know?
17        MS. MONAGHAN: Object to the
18    form.
19        THE WITNESS: I don't remember.
20    I mean, I think more than a year but
21    maybe less than three, something in
22    that ballpark. I don't know exactly.
23        You know, Abbott was very
24    well-known for their -- they're a very
25    good company. Gone now.

Page 166

1 QUESTIONS BY MR. HANLY:
2     Q.    Do you recall steps taken in
3 the late 1990s attempting to have OxyContin
4 approved for sale in Germany?
5         MS. MONAGHAN:  Object to the
6 form.
7         THE WITNESS:  Late 1990s?
8 QUESTIONS BY MR. HANLY:
9     Q.    Yeah, around 1997.
10     A.    I know it was approved in
11 Germany, but I don't remember the dating of
12 when that was.
13     Q.    All right.  Do you recall
14 whether it was scheduled in Germany as a
15 narcotic?
16         MS. MONAGHAN:  Object to the
17 form.
18 QUESTIONS BY MR. HANLY:
19     Q.    The equivalent of a C-II in the
20 United States?
21     A.    Yeah.
22         MS. MONAGHAN:  Objection.
23         THE WITNESS:  My
24 understanding -- my recollection --
25 this is foggy, it's a long time, but

Page 167

1 my recollection is that -- my
2 recollection in Germany is that there
3 were -- I don't know if they had a
4 class the way we have, you know,
5 Class II.  I don't know if they had
6 class designations for different
7 pharmaceuticals, but I know they had
8 very -- very clear regulations as to
9 how opioids could be prescribed in
10 terms of prescription guidelines or
11 regulations.  But I don't know what
12 they called them, and I don't know if
13 there was any overall classification
14 of opioids.  I don't recall that, I'm
15 sorry.
16 QUESTIONS BY MR. HANLY:
17     Q.    Do you recall any efforts on
18 the part of your company, Purdue, to have
19 OxyContin uncontrolled in Germany, meaning
20 scheduled as a non-narcotic drug?
21         MS. MONAGHAN:  Objection.
22 QUESTIONS BY MR. HANLY:
23     Q.    Do you recall any such efforts?
24     A.    So it was a nar -- it was
25 scheduled and you're asking if we did

Page 168

1 anything to get it unscheduled?
2     Q.    I'm asking you whether the
3 company took -- in connection with the
4 process of getting OxyContin approved in
5 Germany, whether the company took any steps
6 to attempt to have it classified as a
7 non-narcotic.
8         MS. MONAGHAN:  Objection.
9         THE WITNESS:  I don't recall
10 ever hearing about that.
11         One thing I heard about was
12 that I heard, as I was saying, that
13 there was a very limited number of
14 tablets, like two or three or
15 something, and that there was a
16 review -- it was so vague, I don't
17 know if this is helpful.
18         But when it was -- the BfArM,
19 which is like our FDA, in Germany it
20 is called the BfArM.  When they
21 reviewed this -- and this is just
22 hearsay to me because I was not
23 directly involved in this.  But I
24 think at some time, I don't know if it
25 was before the launch, during the

Page 169

1 launch, a number of years after the
2 launch, but at some point they decided
3 to change the number of tablets that a
4 doctor could write for it because it
5 was so restrictive that patients were
6 going back and forth and back and
7 forth to their doctor all the time
8 beyond what was in -- I guess in their
9 view reasonable.
10         But that's the only thing I
11 heard of in Germany that was a change
12 in -- that was in prescription
13 regulation, not in classification.
14         (Purdue-Sackler Exhibit 19
15 marked for identification.)
16 QUESTIONS BY MR. HANLY:
17     Q.    I'm going to show you
18 Exhibit 19, Doctor.  This is a couple of
19 e-mail chain -- a couple of e-mails in a
20 chain.
21         And I'd like you to look first
22 at the second page of the document, the
23 message that begins, "Dear Bob," the author
24 apparently someone named Walter Wimmer.
25     A.    Am I on the --

Page 170

1  Q.   The second page, please.
2  A.   Can I just orient myself,
3  please?
4  Q.   Of course.
5       MS. MONAGHAN:  Oh, the second
6  page?  Because it's --
7  QUESTIONS BY MR. HANLY:
8  Q.   Oh, I'm sorry, the third page.
9  I didn't realize it was a two-sided copy.
10      Page number 3 at the bottom.
11 A.   Okay.
12 Q.   So if you look at page
13 number 3 --
14 A.   Yes.
15 Q.   -- of the document, I'm going
16 to ask you some questions about the Walter
17 Wimmer e-mail.
18 A.   Okay.
19 Q.   Okay?  First of all, do you
20 know Walter Wimmer, or did you know him?
21 A.   Yes.  He was the general
22 manager of Mundipharma Germany.
23 Q.   Okay.  And he says in this
24 e-mail that apparently, if you look at the
25 very first page, was to Dr. Robert Kaiko and

Page 171

1  others...
2       Mr. -- is it Mr. Wimmer or
3  Dr. Wimmer?
4  A.   Mister.
5  Q.   Mr. Wimmer says, "Dear Bob, I'm
6  referring" --
7       MS. MONAGHAN:  Objection to the
8  characterization of the document.
9       Go ahead.
10 QUESTIONS BY MR. HANLY:
11 Q.   The last e-mail on the document
12 says, "Dear Bob, I'm referring to the telecon
13 that you had with our registration officer,
14 Matthias Görich, to prepare the meeting with
15 the BfArM on March 7, 1997."
16      The BfArM is the -- I think you
17 said --
18 A.   BfArM.
19 Q.   -- is -- BfArM is the German
20 equivalent of the FDA?
21 A.   Yes.
22 Q.   All right.  And the second
23 paragraph, Mr. Wimmer writes, "In the course
24 of this conversation, he explained to you
25 that due to his discussions with the BfArM,

Page 172

1  he does see a 50 percent chance to get
2  OxyContin off the narcotic drug status
3  provided you could give some information on
4  the very low abuse potential of our CR,"
5  control release, "formulation."
6       Do you see that?
7  A.   I don't think that ever
8  happened.
9  Q.   Well, did I read that sentence
10 correctly?
11 A.   Yeah.
12 Q.   Okay.  And then in the next
13 paragraph he continues, "The non-narcotic
14 status of OxyContin would mean a vast
15 increase of the market potential in Germany
16 because we could then, like PF in the USA,
17 broaden the use of OxyContin to nonmalignant,
18 especially arthritic pain."
19      Do you see that?
20 A.   Yes.
21 Q.   Okay.  Now, if you turn back to
22 the page number 2, there's an e-mail from
23 Dr. Robert Kaiko at the -- at the bottom of
24 that page.
25      Do you see that one?

Page 173

1  A.   Yes.
2  Q.   Also regarding OxyContin.
3       And Dr. Kaiko says, "While my
4  thinking is still developing, frankly, I am
5  very concerned, and I would have to recommend
6  against the uncontrolled/but monitored
7  proposal at this time, perhaps if only to
8  make sure the risks are appreciated and
9  accepted before we proceed as proposed."
10      And then if you go down to
11 item --
12 A.   So -- yeah.
13 Q.   If you go down to item B,
14 Dr. Kaiko says, "I don't believe we have a
15 sufficiently strong case to argue that
16 OxyContin has minimal/or no abuse liability.
17 In the US, oxycodone-containing products were
18 once less controlled than now; abuse resulted
19 in greater controls.  Oxycodone-containing
20 products are still among the most abused
21 opioids in the US."
22 A.   So that's the scientist
23 speaking as opposed to the corporate,
24 market-oriented, general manager speaking.
25 Q.   Right.

Page 174

1  So you would agree that at this
2  time Purdue had no studies showing that
3  OxyContin or any controlled-release oxycodone
4  had a reduced abuse liability, right?
5      MR. CHEFFO:  Objection to form.
6      MS. MONAGHAN:  Object to the
7  form.
8      THE WITNESS:  I couldn't say.
9  I don't know.
10  QUESTIONS BY MR. HANLY:
11     Q.   You would say that Dr. Kaiko
12  was one of those medical experts, right?
13     A.   Are you asking me a question?
14     Q.   Yes.
15     A.   What is your question?
16     Q.   My question is:  Was Dr. Kaiko
17  a medical expert?
18     A.   Dr. Kaiko is a medical expert.
19     Q.   Thank you.
20         How about Dr. Goldenheim?  Is
21  he a medical expert; do you think?
22     A.   No.  I don't think he's -- I
23  don't consider him a medical expert.  He's a
24  physician who has a good number of years'
25  experience at this point, certainly, in

Page 175

1  pharmaceuticals, but when he came to work for
2  us, he came directly from his clinical work
3  at Harvard, at Beth Israel in Boston.  He was
4  a pulmonologist.  He ran the pulmonary
5  clinic.
6      Q.   But during his tenure at
7  Purdue, Dr. Kaiko -- Dr. Goldenheim became
8  very familiar with the characteristics of the
9  drug OxyContin, right?
10     MR. CHEFFO:  Objection.
11     MS. MONAGHAN:  Object to
12  form.
13     THE WITNESS:  I don't know what
14  his state of knowledge was about
15  OxyContin, but I know that Bob Kaiko
16  was both a research scientist and an
17  academician with a history of having
18  worked at Sloan Kettering and places
19  of that stature, taking care of
20  patients and doing research.  And I
21  considered him a very scientifically
22  oriented person, a deep knowledge in
23  science.
24  QUESTIONS BY MR. HANLY:
25     Q.   After the approval of the NDA

Page 176

1  for OxyContin on December the 12th, 1995, and
2  before the black box warning in the -- in the
3  label, did Purdue take any steps to have the
4  label revised in order to reflect that the
5  company had no abuse liability studies?
6      MS. MONAGHAN:  Objection.
7      MR. CHEFFO:  Objection.  Form.
8  QUESTIONS BY MR. HANLY:
9      Q.   You may answer.
10     MS. MONAGHAN:  I'm not
11  instructing you not to answer.
12     THE WITNESS:  Oh, okay.
13     MS. MONAGHAN:  So if you
14  know the answer and you're not --
15     THE WITNESS:  Can you repeat
16  the question?
17  QUESTIONS BY MR. HANLY:
18     Q.   Yes, of course.
19         After approval of the NDA for
20  OxyContin on December 12, 1995, and before
21  the black box warning in the label, did
22  Purdue take any steps --
23     A.   Do you know when the date is of
24  that second event?
25     Q.   July 18, 2001.

Page 177

1      A.   July 18, 2001.
2      Q.   Right.
3      A.   Okay.
4      Q.   So the question is between --
5      A.   Between '95 and 2001.
6      Q.   -- '95 and 2001, whether Purdue
7  took any steps to have the label for
8  OxyContin changed to reflect that the company
9  had no abuse liability studies and was aware
10  of no abuse liability studies?
11     MR. CHEFFO:  Objection.  Form.
12  Foundation.
13     MS. MONAGHAN:  Objection.  Lack
14  of foundation.
15     MR. CHEFFO:  Asked and
16  answered.
17     THE WITNESS:  I don't even -- I
18  think at that very early date, I mean,
19  I don't know that -- that the
20  knowledge or the experience with the
21  medicine was at a point that that even
22  came up in the minds of the FDA or the
23  company or anyone else.
24     I think it's -- as abuse became
25  recognized as a problem for -- you

Page 178

1   know, that OxyContin was being abused
2   and -- it was through that then that
3   led to -- then there was a label
4   revision and there was a black box
5   added and there was other -- there was
6   other language changes also. I don't
7   know exactly what they were.
8   QUESTIONS BY MR. HANLY:
9       Q.   Okay.
10      A.   But I think it's been an
11  evolving picture over all these years.
12      Q.   Right.
13          So before OxyContin was
14  approved in 1995, am I correct that the
15  essence of what you're telling us is that the
16  company didn't do any studies to determine
17  whether OxyContin would have a diminished
18  abuse liability?
19          MR. CHEFFO: Objection. Form.
20  Foundation. Asked and answered.
21          MS. MONAGHAN: Objection.
22  Asked and answered.
23          MR. CHEFFO: Five times now.
24          THE WITNESS: I wouldn't say
25  that because I have no knowledge to

Page 179

1   say that from.
2   QUESTIONS BY MR. HANLY:
3       Q.   Okay. So you don't know one
4   way or the other?
5       A.   I don't.
6       Q.   Okay.
7       A.   But at the same time, I mean,
8   it's -- I think that -- you're trying to
9   understand -- I think it was -- I think
10  everyone understands. I think everyone
11  understands that there's abuse liability with
12  a narcotic product. I think that's true of
13  all narcotic products.
14      Q.   Well, isn't --
15      A.   So I'm not sure what it is
16  you're reaching for.
17      Q.   Do you understand that Purdue
18  marketed OxyContin as having a lesser abuse
19  liability than other narcotic drugs --
20          MS. MONAGHAN: Objection.
21          MR. CHEFFO: Objection.
22  QUESTIONS BY MR. HANLY:
23      Q.   -- as a consequence of the
24  control release feature?
25      A.   No, I'm not aware -- no, I

Page 180

1   don't understand that.
2       Q.   You don't?
3       A.   No.
4           MS. MONAGHAN: I'm just going
5   to note we've been going a little over
6   an hour and ask if now is a good time
7   for a break.
8           MR. HANLY: That's fine.
9           VIDEOGRAPHER: Okay. Remove
10  your microphones. The time is
11  3:05 p.m. Going off the record.
12   (Off the record at 3:05 p.m.)
13          VIDEOGRAPHER: Okay. We are
14  back on the record. The time is
15  3:22 p.m.
16          MR. STEWART: You guys, I want
17  to make an announcement for the record
18  based on our conversations on the
19  break. This is Mike Stewart,
20  Tennessee plaintiff's counsel.
21          I spoke with counsel for
22  Dr. Sackler during the break and was
23  told that despite being properly
24  noticed by a Tennessee notice of
25  deposition, Dr. Sackler is refusing to

Page 181

1   stay for her deposition today.
2           Defense counsel has also
3   refused my offer of putting forward an
4   alternative date by agreement.
5           Counsel for Dr. Sackler did not
6   meet and confer appropriately to alter
7   this date, did not seek a protective
8   order from the Tennessee court as
9   counsel for Dr. Sackler could have.
10          This conduct is sanctionable
11  under Tennessee law. We will seek to
12  enforce our rights with the Court.
13          And in the spirit of
14  cooperation, we had proposed only to
15  take three hours of Dr. Sackler of
16  testimony today. Obviously that's
17  withdrawn, and we'll just pursue all
18  of our rights under the Tennessee
19  Rules of Civil Procedure.
20          MS. MONAGHAN: And for the
21  record, this is Maura Monaghan on
22  behalf of Dr. Sackler. We properly
23  objected to the cross-notice. The
24  Tennessee court has no jurisdiction
25  over Dr. Sackler. And our objection

Page 182

1     was properly communicated to counsel
2     for Tennessee by the plaintiff's {sic}
3     counsel, and we reserve all of our
4     rights.
5 QUESTIONS BY MR. HANLY:
6     Q.   Dr. Sackler, do you agree that
7 the analgesic relationship between morphine
8 and oxycodone is a 2 to 1 relationship, such
9 that oxycodone is twice as powerful as
10 morphine?
11     A.   That's my understanding.
12     MS. MONAGHAN: Objection to
13 form.
14     THE WITNESS: Yes.
15 QUESTIONS BY MR. HANLY:
16     Q.   Are you aware of an effort by
17 Purdue to avoid correcting a misapprehension
18 among physicians concerning that 2 to 1
19 relationship?
20     MR. CHEFFO: Objection.
21     MS. MONAGHAN: Objection.
22     THE WITNESS: No.
23     (Purdue-Sackler Exhibit 20
24     marked for identification.)
25

Page 183

1 QUESTIONS BY MR. HANLY:
2     Q.   All right. I'll place before
3 you Exhibit 20 to your deposition, which is
4 a -- appears to be an e-mail from a Michael
5 Cullen, June 2, 1997, to a number of people,
6 including Dr. Kathe Sackler. Subject is
7 OxyContin team meeting minutes.
8     Do you see that --
9     A.   Yes.
10     Q.   -- at the top?
11     Okay. So I'm going to read
12 portions of this into the record and ask you
13 a couple of questions.
14     It begins, "In recent team
15 meetings, we have discussed the issue that
16 OxyContin is perceived by some physicians,
17 particularly oncologists, as not being as
18 strong as MS-Contin."
19     Let me pause there.
20     MS-Contin, again, is morphine
21 sulfate?
22     A.   Correct.
23     Q.   Continuing. "Although this
24 perception has had some effect with
25 physicians switching to MS-Contin with more

Page 184

1 severe cancer pain patients, it has actually
2 had a positive effect with physicians' use in
3 noncancer pain.
4     "Since oxycodone is perceived
5 as being a quote, weaker, opioid than
6 morphine, it has resulted in OxyContin being
7 used much earlier for noncancer pain.
8 Physicians are positioning this product where
9 Percocet, hydrocodone and Tylenol with
10 codeine have been traditionally used.
11     "Since the noncancer pain
12 market is much greater than the cancer pain
13 market, it is important that we allow this
14 product to be positioned where it currently
15 is in the physician's mind."
16     Did I appear to read all that
17 correctly?
18     A.   Yes, word for word.
19     Q.   Okay. And what's being
20 reflected here is that Mr. Cullen is
21 conveying that there is an incorrect
22 perception among physicians with respect to
23 this 2 to 1 ratio, right?
24     MS. MONAGHAN: Object to the
25 form.

Page 185

1 QUESTIONS BY MR. HANLY:
2     Q.   If you look at the second
3 paragraph I read, he says, "Since oxycodone
4 is perceived as being a weaker opioid than
5 morphine" -- let me just focus on that.
6     You just told me that that's
7 not true, that it's a 2 to 1 in the other
8 direction, right?
9     MS. MONAGHAN: Objection.
10     THE WITNESS: I think there's
11 confusion here. I think there's
12 confusion here because -- well, for
13 me, weaker, stronger, has to do with
14 dose, and I think what you're
15 suggesting is that -- I guess what
16 seems to be confused is the question
17 of potency versus the question of
18 dose -- dosage, for one.
19     Because you can have a more
20 potent opioid in a lower dose or you
21 can have a weaker opioid in a higher
22 dose, and the ultimate strength of
23 that medicine will depend not only on
24 potency but also on dose. You can't
25 separate them, really, as I understand

Page 186

1 it.
2 QUESTIONS BY MR. HANLY:
3    Q.    But it is the case --
4    A.    But I hear what you're saying.
5    Q.    Well, it is the case, though,
6 Doctor, taking 10 milligrams of morphine
7 sulfate has the analgesic potency of 5
8 milligrams of oxycodone?
9    A.    Correct. It's equally
10 analgesic to 5 milligrams. That's the term
11 you would use, yeah.
12    Q.    Yes. Okay. Thank you.
13    A.    Okay.
14    Q.    And at the bottom of this
15 e-mail it states -- and I'll read this into
16 the record -- "It is important that we be
17 careful not to change the perception of
18 physicians towards oxycodone when developing
19 promotional pieces, symposia, review
20 articles, studies, et cetera."
21        Did I read that correctly?
22    A.    Yes. But, I mean, are you
23 suggest -- okay. I won't. I'll wait for the
24 next question. Sorry.
25    Q.    Okay. Well, you were -- you

Page 187

1 were -- you were copied on this. Actually,
2 it's to you and a bunch of other people.
3        Do you see that?
4    A.    20 other people.
5    Q.    Right?
6    A.    Yeah.
7    Q.    Including Dr. Goldenheim?
8    A.    And you see how I'm -- I'm one
9 of the last copies.
10    Q.    Well, but you're before
11 Dr. Richard.
12    A.    It's probably a mistake.
13        MS. MONAGHAN: Just going to
14    say, I think it's in alphabetical
15    order.
16        THE WITNESS: Oh, there you go.
17    Is it? Wow. No, not really.
18        MS. MONAGHAN: It's A, C, D, H.
19        THE WITNESS: Maybe it is.
20 QUESTIONS BY MR. HANLY:
21    Q.    Now, do you see -- do you see
22 that the date of this is -- do you see the
23 date of this is June 2, 1997?
24    A.    Yes.
25    Q.    All right. And by the way, the

Page 188

1 OxyContin team meeting, the OxyContin team is
2 the team engaged in marketing, right?
3    A.    I don't know what that means.
4 I don't recognize that.
5    Q.    Okay. Do you recognize the
6 phrase "OxyContin phase IV team"?
7    A.    Phase IV? Yeah. Phase IV
8 studies are studies that are done for a
9 product after it's been launched. And they
10 can be either studies that are agreed with
11 the FDA as part of the FDA approval and
12 oversight, or they can be studies initiated
13 by the company without the FDA.
14    Q.    All right. Do you agree
15 that -- withdrawn.
16        Do you recall actually taking
17 steps to save this e-mail in your own files
18 as opposed to just receiving it via e-mail?
19        Do you recall taking steps to
20 actually save it somewhere?
21        MS. MONAGHAN: Objection.
22        THE WITNESS: I don't even
23    recall seeing this e-mail or reading
24    this e-mail. I'm sorry.
25

Page 189

1 QUESTIONS BY MR. HANLY:
2    Q.    Okay.
3    A.    1997. It was a Monday,
4 June 2nd. I don't recall.
5        (Purdue-Sackler Exhibit 21
6    marked for identification.)
7 QUESTIONS BY MR. HANLY:
8    Q.    Okay. Let me show you
9 Exhibit 21 to your deposition, Doctor.
10    A.    Yeah.
11    Q.    You can keep that one side by
12 side.
13    A.    Yeah.
14    Q.    Am I correct that Exhibit 21 is
15 an e-mail you sent to yourself in August
16 of 1997 which pasted, if you will, the entire
17 e-mail in Exhibit -- the text of the e-mail
18 in Exhibit 20?
19        Do you see that those two
20 groups of paragraphs are identical?
21    A.    I do, but I don't understand
22 why I have an e-mail to myself.
23    Q.    Do you maintain -- did you
24 maintain at Purdue a personal chrono file of
25 e-mails?

Page 190

1 A. Back in 1997?
2 Q. Yes.
3 A. I don't even remember which
4 operating system we were using in 1997. I'm
5 sorry, that's a long time ago.
6 Q. Okay.
7 A. I can't recall that, but --
8 Q. All right.
9 A. I mean, I guess what you're
10 suggesting is that I sent this to myself to
11 retain it.
12 That's the idea, right?
13 Q. Well, I can't answer your
14 questions.
15 A. Sorry. Okay.
16 I don't recall the e-mail also.
17 Q. Okay. Do you remember a video
18 created by the marketing department at Purdue
19 called "I Got My Life Back"?
20 MS. MONAGHAN: Object to the
21 form.
22 THE WITNESS: "I Got My Life
23 Back"? No.
24 (Purdue-Sackler Exhibit 22
25 marked for identification.)

Page 191

1 QUESTIONS BY MR. HANLY:
2 Q. Do you recall ever reviewing
3 any marketing videos that may have been
4 created during your years --
5 A. I didn't have a role of
6 reviewing for marketing or reviewing for any
7 of the management departments. That really
8 wasn't my role.
9 I may have seen things that
10 they produced and looked at marketing
11 material at different times or -- if it was
12 brought to the board. And once in a while
13 videos were shown at board meetings, if that
14 was part of the presentation of management.
15 So I may have seen a video, but I don't
16 recall.
17 Q. Do you have -- okay. Let me
18 show you Exhibit 22, please.
19 A. Yep.
20 Q. This is a memorandum from a
21 Mark Alfonso to a number of people,
22 October 15, 1998, entitled "OxyContin
23 Promotional Materials."
24 A. Yes.
25 Q. And it indicates, does it not,

Page 192

1 that Mr. Alfonso was sending on to the
2 various people, among other things, a video
3 entitled "I Got My Life Back."
4 Do you see that?
5 A. Yes.
6 Q. You have no recollection of
7 such a video?
8 A. No.
9 Q. Were you ever given the
10 opportunity to review videos before they
11 actually went into circulation within the
12 marketing department --
13 MS. MONAGHAN: Objection.
14 Outside --
15 QUESTIONS BY MR. HANLY:
16 Q. -- so as to either give your
17 seal of approval or reject the -- the
18 particular video?
19 MS. MONAGHAN: Objection.
20 THE WITNESS: That wasn't my
21 role, to critique or to review or to
22 reject or to accept marketing
23 materials.
24 QUESTIONS BY MR. HANLY:
25 Q. But you recognize on this

Page 193

1 particular document, which references "I Got
2 My Life Back," that the various distributees
3 are all members of the Sackler family, with
4 the exception of Mr. Friedman?
5 MS. MONAGHAN: Objection.
6 THE WITNESS: They were all
7 directors.
8 MR. CHEFFO: Objection. Form.
9 THE WITNESS: They're being
10 copied as -- they're being included in
11 the distribution list as directors,
12 not as family members.
13 This isn't a family function.
14 This is a business with a board of
15 directors.
16 MS. MONAGHAN: And I'll also
17 note that Mr. Baker's name is on the
18 distributee list as well.
19 THE WITNESS: Well, he's the
20 secretariat of the board.
21 And Mr. Friedman is the person
22 that Mark Alfonso reported to.
23 Marketing, right?
24 QUESTIONS BY MR. HANLY:
25 Q. You have no recollection of

Page 194

1 actually receiving or not receiving this
2 particular video?
3     A.    I don't remember. I really
4 don't remember.
5     Q.    And you also --
6     A.    If I saw it again, I would
7 remember, perhaps. I don't know. I mean, it
8 might jog my memory if I saw it, but just by
9 its title, I don't recall it or remember it.
10     Q.    Did you ever make a trip to
11 Silver Hill Hospital?
12     A.    Silver Hill Hospital? I
13 visited them once a very long time ago at the
14 invitation of the director at that time. I
15 can't remember what year it was, but it was a
16 very long time ago, yes.
17     Q.    And did you make that visit
18 with Dr. Reder?
19     A.    Sounds like -- it sounds like
20 you see something that suggests that I did.
21 I didn't remember if I did. I could have.
22 It's possible.
23     Q.    And just to -- you mentioned
24 Silver Hill this morning, but just --
25     A.    Yeah.

Page 195

1     Q.    -- for the benefit of the jury,
2 Silver Hill is a facility located in
3 Fairfield County, Connecticut, which --
4     A.    New Canaan.
5     Q.    That's in Fairfield County --
6     A.    That's the town that they're
7 in, New Canaan.
8     Q.    Yes.
9     A.    Yeah.
10     Q.    Is that Fairfield County?
11     A.    Yes, definitely Fairfield
12 County, correct.
13     Q.    Thank you.
14         And it's actually a rather old
15 institution. Goes back to the 1930s, true?
16     A.    That, I don't know.
17     Q.    And it specializes -- indeed,
18 its only medical role is as a rehabilitation,
19 alcohol, drug abuse treatment center, right?
20         MS. MONAGHAN: Object to the
21 form.
22         THE WITNESS: I didn't know
23 that. I thought they also treat
24 adolescents who have other
25 psychological disruptions in their

Page 196

1 lives and need support and need an
2 inpatient or outpatient therapeutic
3 environment.
4         (Purdue-Sackler Exhibit 23
5 marked for identification.)
6 QUESTIONS BY MR. HANLY:
7     Q.    Okay. So let me show you
8 Exhibit 23. And if you could start at the
9 back of the document, which I think will
10 be -- will be the earliest of the e-mails.
11         At the -- the very last
12 document is from Mr. Reder to a number of
13 people, including you.
14         Actually you're copied, right?
15     A.    Yes, because it's talking about
16 me.
17     Q.    Right.
18         And the subject is Silver Hill
19 Hospital. And it reads, "All, Dr. Kathe and
20 I visited with Dr. Richard J. Frances
21 yesterday at Silver Hill Hospital.
22 Dr. Frances is president and medical director
23 of the facility. We discussed a number of
24 issues, one of which I wanted to bring to
25 your attention. Dr. Frances would be

Page 197

1 interested in having one of the Purdue staff
2 participate on the board of trustees of
3 Silver Hill. Is there any interest?"
4 Signed, "Robert."
5         Do you see that?
6     A.    Yes.
7     Q.    Turn to the middle page of the
8 document. I think you're on it.
9         Are you on a page that -- at
10 the bottom is from Michael Friedman to
11 Dr. Reder and others?
12     A.    I was looking at the bottom one
13 of Michael Friedman to Robert Reder.
14     Q.    Yes.
15     A.    "While I think it is a
16 wonderful institution, I have a pretty full
17 plate right now."
18     Q.    Right.
19     A.    So I guess he was asked first.
20     Q.    Okay. And then apparently --
21     A.    Okay.
22     Q.    -- other recipients of this
23 e-mail that's at the last page of the exhibit
24 appear to have responded. Michael Friedman
25 responded. One up is Howard Udell, who was,

Page 198

1  by the way, the general counsel of your
2  company at the time.
3      A.    Yes.
4      Q.    And Mr. Udell states, "While I
5  think it's a wonderful institution, I have a
6  pretty full plate right now.
7  Dr. Goldenheim" --
8      A.    It's funny it's verbatim the
9  same message that Michael sent.
10     Q.    Yes.  I guess he just cut and
11 pasted.
12     A.    All right.
13     Q.    Above that, Dr. Goldenheim
14 says, "Ditto."  Presumably ditto to what
15 Udell and Friedman said, but we don't know
16 that.
17         Above that, Reder writes to you
18 and says, "Kathe, do you want someone from
19 Purdue on the board at Silver Hill?"
20         To which you responded,
21 "Robert, only if it would helpful to our
22 business.  As I believe we mentioned to each
23 other the other day, there is no need to move
24 in this direction now unless someone had a
25 strong desire to do so, which does not seem

Page 199

1  to be the case.  Thanks for asking, Kathe."
2         That's --
3      A.    A decisive no.
4      Q.    You -- you did write this,
5  correct?
6      A.    I don't know.  I don't recall.
7      Q.    Well, you don't have -- you
8  don't have any reason to believe that what I
9  showed you is a fraudulent document, do you?
10         MR. CHEFFO:  Objection.
11         MS. MONAGHAN:  Objection.
12         THE WITNESS:  I probably
13     wouldn't choose those words today
14     because -- you know.  But on the other
15     hand, you know, this is --
16 QUESTIONS BY MR. HANLY:
17     Q.    This was during the --
18     A.    -- 2000.
19     Q.    By the way, do you recall that
20 the sales of OxyContin in the year 2000
21 exceeded $1 billion?
22         MS. MONAGHAN:  Object to the
23     form.
24         THE WITNESS:  No, I didn't
25     recall that.

Page 200

1         But it is a good organization.
2     It does good work.
3  QUESTIONS BY MR. HANLY:
4      Q.    Did you know that Purdue
5  obtained a patent on something called a
6  self-destructing document and e-mail
7  messaging system?
8         MS. MONAGHAN:  Object to the
9     form.
10         THE WITNESS:  I heard something
11     about that, and I also heard it later
12     failed.  It didn't really work.
13 QUESTIONS BY MR. HANLY:
14     Q.    Who did you hear about that
15 from?
16     A.    Stuart Baker.
17     Q.    Mr. Baker was, in fact, one of
18 the inventors of that --
19     A.    I'm aware of that.
20     Q.    You're aware of that?
21     A.    Yes.
22     Q.    All right.  When was the last
23 time you had any conversa -- withdrawn.
24         Does Mr. Baker still function
25 either as a counsel to Purdue or to any

Page 201

1  member of the Sackler family?
2      A.    I don't know.
3      Q.    When was the last time you had
4  any communication with Mr. Baker?
5      A.    A couple weeks ago.
6      Q.    And for what purpose did you --
7         MR. CHEFFO:  Finish your
8     question.  Just note my objection.
9  QUESTIONS BY MR. HANLY:
10     Q.    -- have such communication?
11         MR. CHEFFO:  Before you
12     answer -- I mean, come on, Paul, do
13     you want to rephrase that?
14         She asked you whether --
15     whether she knows if he's even working
16     as counsel, doesn't know it or not,
17     and you're asking her if there's a
18     relationship to divulge the subject
19     matter of what she talked about.
20 QUESTIONS BY MR. HANLY:
21     Q.    Did your communication with
22 Mr. Baker have anything to do with this
23 deposition?
24         MS. MONAGHAN:  Objection.
25         MR. CHEFFO:  Tell her --

Page 202

1       MS. MONAGHAN:  Yeah, I think
2   I'm going to -- can we go off the
3   record for a minute?  Because I just
4   want to check if there's any
5   attorney-client information contained
6   in the potential answer.
7       MR. HANLY:  Okay.
8       VIDEOGRAPHER:  Off the record.
9   Okay.  The time is 3:49 p.m.  Off the
10  record.
11       (Off the record at 3:49 p.m.)
12       VIDEOGRAPHER:  Okay.  We are
13  back on the record.  The time is
14  3:53 p.m.
15       MS. MONAGHAN:  Following
16  consultation, it's my understanding
17  that the answer to the last question
18  posed would call for the revelation of
19  attorney-client advice, and for that
20  reason I'm instructing the witness not
21  to answer the question.
22  QUESTIONS BY MR. HANLY:
23       Q.    So does Stuart Baker still act
24  as counsel to you?
25       A.    In some -- regarding some

Page 203

1   matters, yes.
2       Q.    Do you know if he's still with
3   the firm that is no longer Chadbourne but is
4   some other name?
5       MS. MONAGHAN:  Object to the
6   form.
7       THE WITNESS:  I believe he is.
8   QUESTIONS BY MR. HANLY:
9       Q.    Did you know that he was a
10  defendant in certain of the litigations
11  involving OxyContin?
12       A.    I heard that.
13       Q.    Yes, you heard that?
14       A.    I actually read it in the
15  complaints.
16       Q.    Did you receive a copy of, if
17  you recall, of the self-destructing e-mail
18  messaging system patent?
19       A.    No.  I don't -- oh, the patent?
20       Q.    Yes.
21       A.    I've never actually seen it
22  work.  I thought you were going to ask me did
23  I ever see it operate.
24       Q.    Did you see it operate?
25       A.    No, I didn't.  I wanted to, but

Page 204

1   I didn't -- it didn't happen.
2       Q.    And do you recall who you heard
3   about that device -- that patent from?  From
4   whom you heard about the patent?
5       A.    I think Stuart told me about
6   it.
7       Q.    All right.
8       A.    Is my recollection.
9       Q.    Do you remember a woman named
10  Maureen Sara?
11       A.    No.
12       Q.    Do you recall the name of
13  Howard Udell's secretary at any time --
14       A.    Phyllis Tuckman.
15       Q.    Do you recall the name of
16  Howard Udell's legal assistant at any time?
17       A.    He had a number of legal
18  assistants, I believe, over the years.  No
19  one comes to mind.
20       Q.    All right.  If I told you that
21  Maureen Sara testified many years ago that
22  she sent to you and other members of the
23  Sackler family a memorandum concerning abuse
24  of OxyContin in the year 1999, would any of
25  that be familiar to you?

Page 205

1       Is that something that you know
2   anything about?
3       MR. CHEFFO:  Objection.  Form.
4       MS. MONAGHAN:  Objection.
5   QUESTIONS BY MR. HANLY:
6       Q.    You can answer.
7       A.    I don't remember her.  I don't
8   remember what you're suggesting.
9       Do you know when it was?
10       Q.    Her testimony was -- her
11  testimony was given in the period around
12  2004, but her testimony concerned the year
13  1999.  And the essence was she prepared this
14  certain memorandum, sent it to various
15  people, and you are one of the people who she
16  referenced as having been sent the
17  memorandum.
18       MS. MONAGHAN:  I'm just going
19  to object to this whole question.
20       THE WITNESS:  It's very vague,
21  which I can't quite grasp what
22  you're -- you know, maybe if I knew
23  what the memorandum said I might
24  remember, but I don't remember her or
25  communication from her offhand.

Page 206

QUESTIONS BY MR. HANLY:
Q.    In the year 1999, did you regularly go to the headquarters in Stamford, headquarters of Purdue?
MS. MONAGHAN:  Objection.
THE WITNESS:  We weren't in Stamford in '99.
QUESTIONS BY MR. HANLY:
Q.    Where were you?
A.    Norwalk.
Q.    Okay.  Did you go to the headquarters regularly in Norwalk?
MS. MONAGHAN:  Objection.
THE WITNESS:  '99.  Reasonably regularly.
QUESTIONS BY MR. HANLY:

(Purdue-Sackler Exhibit 24 marked for identification.)
QUESTIONS BY MR. HANLY:
Q.    Let me show you Exhibit 24 to your deposition, Doctor.
This is a -- appears to be an e-mail from 1999, June 22, 1999, from yourself to Dr. Mortimer Sackler, Dr. Richard, Jonathan --
A.    My brother.
Q.    Mortimer Sackler, Junior, is he a physician?
A.    No.
Q.    Alfonso, Mark Alfonso, and Stuart Baker, right?
A.    Okay.
Q.    And the subject is price modifications.  And you're replying to a -- apparently to an e-mail from Dr. Mortimer, your father, to Michael Friedman, copies to

Page 208

various people, talking about price -- price modifications, right?
A.    What was big buck scenario?
Q.    Well, that was going to be my question to you.
A.    Yeah, it's a good question.
Q.    So you referred in this memorandum --
A.    Sounds --
Q.    -- to the MS-Contin and OxyContin, quote, big bucks, unquote, scenario.
Do you see that?
A.    Yeah.
Q.    And are you aware -- do you recall, do you know, that in the year 1999 the sales -- company sales exceeded $1 billion?
MS. MONAGHAN:  Objection.
THE WITNESS:  No, this was --
MS. MONAGHAN:  Asked and answered.
THE WITNESS:  It -- huh-uh.
QUESTIONS BY MR. HANLY:
Q.    You don't have any recollection

Page 209

of this?
A.    No, I don't.
Q.    All right.
A.    I'd like to know, though.  It's -- it's disturbing because it sounds frivolous and it sounds -- it sounds so out of character, and it's -- but I don't know what it refers to.  It could mean -- I don't know.  It could refer to something else, but I don't know what.
Q.    Can we agree that the subject of OxyContin is not a frivolous matter?
A.    Absolutely not.  Absolutely -- that's why this is -- you know, it doesn't -- it's --
Q.    You don't know what you meant --
A.    It doesn't seem appropriate.
Q.    All right.
A.    And I don't -- and I don't know why I would write that.  It must have meant something that I can't recall now that -- so I would like to know what it meant.
Q.    Did you --
A.    It says MS-Contin and

Page 210

1 OxyContin, so it's not just OxyContin.
2     Q.   Thank you, I --
3     A.   I'm sorry. I'm just very
4 surprised by this and am curious. I mean,
5 I'm more than curious. I'm trying to find
6 out what this means.
7     Q.   Do you -- in the late 1990s did
8 you, from time to time, spend time in East
9 Hampton, New York?
10     A.   East Hampton?
11     Q.   Yes.
12     A.   No.
13     Q.   No?
14     A.   Not that I recall.
15     Q.   Any of your family members have
16 homes in that area of Long Island?
17     A.   In the area, but not in East
18 Hampton.
19     Q.   Okay. Amagansett?
20     A.   I don't know. Can you get more
21 specific?
22     Q.   Well, why don't you tell me
23 where -- withdrawn.
24     Did you visit -- as best you
25 recall, in the summer of 1997, did you have

Page 211

1 occasion to visit either friends or family in
2 the East Hampton, New York, area?
3     A.   I don't recall.
4     Q.   All right. Do you recall a
5 Dr. Phillip Robbins, a doctor of orthopedic
6 surgery?
7     A.   Yes, he's a very close family
8 friend.
9     Q.   Okay.
10     A.   This...
11     Q.   Do you recall a dinner with
12 Dr. Robbins in East Hampton?
13     A.   Yeah.
14     MS. MONAGHAN: Objection.
15     THE WITNESS: See, the reason I
16 couldn't answer that the way you
17 phrased it is because he doesn't have
18 a house in East Hampton, so I couldn't
19 place a visit to East Hampton.
20     MR. HANLY: Okay.
21     THE WITNESS: Okay.
22     (Purdue-Sackler Exhibit 25
23 marked for identification.)
24 QUESTIONS BY MR. HANLY:
25     Q.   Well, let me show you

Page 212

1 Exhibit 25, please. The exhibit actually has
2 a lot of irrelevant pages. I'm only
3 interested in the letter to you from
4 Dr. Robbins, which is the third page in.
5     A.   Uh-huh.
6     Q.   Do you see that letter?
7     Does this --
8     A.   Yeah, there are a couple of
9 copies of it here.
10     Q.   It's all the same.
11     A.   Yeah, okay.
12     Q.   The letter suggests that you
13 had a dinner -- you and Dr. Robbins had a
14 dinner in August in East Hampton.
15     Do you see that in the first
16 sentence?
17     A.   Yes.
18     Q.   Okay. And Dr. Robbins writes,
19 "It was my first opportunity to learn about
20 the drug OxyContin which you manufacture. I
21 anticipate that it will have usefulness in my
22 practice of orthopedic surgery. I was
23 surprised by the fact that no sales
24 representative of your company ever came to
25 my office to discuss this medication. I

Page 213

1 would appreciate it if you can have a sales
2 representative contact me. Thank you again
3 for dinner."
4     Do you see that?
5     A.   Uh-huh.
6     Q.   And do you now recollect having
7 a dinner meeting with Dr. Robbins?
8     A.   Yes, of course.
9     Q.   Yes?
10     A.   Phillip Robbins is one of my
11 closest friends.
12     Q.   All right.
13     A.   His father and my father went
14 to medical school together. We've known each
15 other all our lives. And the reason it
16 didn't click is because I visited with him on
17 his boat in East Hampton, and so I didn't,
18 you know, connect with visiting someone in a
19 house.
20     But the way this letter -- can
21 I just tell you about the letter or not?
22     Q.   Well, I'd rather --
23     A.   Okay.
24     Q.   -- ask you some questions
25 and if you can answer the questions.

Page 214

1    A.    Okay.
2    Q.    Up on the -- up on the
3 right-hand corner of the letter it indicates
4 Dr. Robbins' practice includes sports
5 medicine and surgery and pediatric
6 orthopedics.
7        Do you see that?
8    A.    Yep.
9        MS. MONAGHAN:  Objection.
10 QUESTIONS BY MR. HANLY:
11   Q.    Were those disciplines that
12 Purdue -- to whom Purdue -- to which Purdue
13 marketed OxyContin?
14       MS. MONAGHAN:  I'm just going
15    to object that that's an incomplete
16    list of the disciplines listed on the
17    letterhead.
18       MR. HANLY:  But a complete list
19    of what's in the upper right.
20       THE WITNESS:  Orthopedic and
21    trauma surgery, reconstructive joint
22    surgery.
23 QUESTIONS BY MR. HANLY:
24   Q.    Right.
25   A.    Yeah.

Page 215

1    Q.    That's on the left.
2    A.    Okay.  I think it's --
3    Q.    On the right are the sports
4 medicine and surgery and pediatric
5 orthopedics, right?
6    A.    Right.
7    Q.    So my question is:  Did Purdue
8 market to the disciplines of sports medicine
9 and surgery and/or pediatric orthopedics?
10       MS. MONAGHAN:  Object to form.
11 QUESTIONS BY MR. HANLY:
12   Q.    If you know.
13   A.    Trauma surgery is -- orthopedic
14 and trauma surgery, I mean, I think -- I
15 don't know if -- to what extent Purdue
16 directed their marketing to these specific
17 areas of clinical care, but I would
18 imagine -- I would think that Dr. Robbins
19 might have...
20   Q.    My question --
21   A.    It sounds like he was
22 interested in learning about this product.
23   Q.    And my question was not whether
24 he was interested.  My question was:  Did
25 Purdue market to the disciplines of sports

Page 216

1 medicine and surgery --
2    A.    I don't know.
3    Q.    Let me finish my question,
4 please.
5    A.    Oh, sorry.
6    Q.    Did Purdue market to the
7 disciplines of sports medicine and surgery
8 and/or pediatric orthopedics?
9        And your answer is you don't
10 know?
11   A.    What about reconstructive joint
12 surgery or orthopedic and trauma surgery?
13 They may have --
14   Q.    Okay.
15   A.    They may be more appropriate.
16   Q.    Can you answer the question I
17 asked you?
18   A.    I said I don't know.
19   Q.    You were very involved during
20 the 1990s and into the 2000s with respect to
21 the sales figures for the Purdue companies,
22 right?
23       MS. MONAGHAN:  Objection.
24       MR. CHEFFO:  Objection.
25       THE WITNESS:  No, I wouldn't

Page 217

1 describe myself as very involved.
2       MR. HANLY:  Okay.
3       THE WITNESS:  I tried to be
4    knowledgeable about the affairs of the
5    business because I was a director and
6    sat on the board and had
7    responsibilities to be informed.
8        (Purdue-Sackler Exhibit 26
9    marked for identification.)
10 QUESTIONS BY MR. HANLY:
11   Q.    Okay.  Let me show you
12 Exhibit 26, please, Doctor.
13       Oh, sorry.  This is an e-mail,
14 apparently, from you to -- to your father,
15 Dr. Mortimer Sackler, and to your brother,
16 Mortimer Sackler, Junior, regarding 1998 US
17 sales.  And it states, "Importance, high."
18       Do you see that?
19       And then the e-mail that you --
20 that appears to have been created by you goes
21 on to talk about the sales targets and
22 actuals for -- sales targets for 1999, which
23 was the year upcoming after the date of this,
24 right?
25   A.    I don't see sales targets.

Page 218

1  Q.    Well, it says --
2  A.    Where do you see --
3  Q.    The first sentence says, "I
4  believe we will make the 590 target."
5  A.    Oh, I thought you were looking
6  at the -- okay.  I was looking at the
7  numerical listing.
8  Q.    Okay.  And then down below
9  there's -- in bold, there's a list of
10 apparently year-to-date and month-to-date
11 sales figures for apparently the year 1998,
12 right?
13     MS. MONAGHAN:  Objection.
14     THE WITNESS:  I don't -- I
15 don't know if this is for the year.
16 QUESTIONS BY MR. HANLY:
17 Q.    Okay.  Well, let me --
18 A.    This is year-to-date.  Net
19 sales year-to-date, right?  So it's net sales
20 year-to-date.  And it's December, so it's
21 almost a year.
22 Q.    Right.
23     My question is --
24 A.    506,000.
25 Q.    These are detailed figures

Page 219

1  about sales, targets and actuals, right?
2  A.    Yes.
3     MS. MONAGHAN:  Object to the
4  form.
5  QUESTIONS BY MR. HANLY:
6  Q.    Okay.  And then -- by the way,
7  you see this handwriting on the first page?
8  Is that your handwriting?
9     For example, at the bottom it
10 says, "Buy in sales, shipped MS-Contin, oxy 3
11 million."
12    Is that your handwriting?
13 A.    That's MS-Contin 3 million, and
14 oxy doesn't have a number next to it.
15 Q.    Okay.  Is that your
16 handwriting?
17 A.    It looks like it is, but my
18 handwriting and my father's handwriting are
19 very, very similar, so sometimes I have to
20 look carefully.
21 Q.    Okay.
22 A.    Like if you look at the top, if
23 you look at the top of the page on the right,
24 I'm not sure who wrote that --
25 Q.    Okay.

Page 220

1  A.    -- if it was me or my father,
2  because it's so similar.
3  Q.    All right.  Well, how about
4  the --
5  A.    But --
6  Q.    -- reverse side of that
7  exhibit?  You see all of those
8  calculations --
9  A.    Yeah.
10 Q.    -- and numbers?
11 A.    Yeah.
12 Q.    Is that in your handwriting?
13 A.    Looks like it.  Does look like
14 it, yeah.
15 Q.    And these are very detailed
16 calculations, are they not?
17 A.    Of course.  Sales figures are
18 very detailed.
19 Q.    And the -- and it actually
20 looks like you computed various totals by
21 hand.
22    Do you see, for example, down
23 in the right-hand corner there's the 57504,
24 5834, 17891, and then below that it looks
25 like you were carrying the 1s?

Page 221

1     Do you see that?
2  A.    Yes, this is arithmetic.
3  Q.    Right.
4     So you were -- you were doing
5  arithmetic by hand, without a calculator,
6  concerning these various figures, sales
7  figures, right?
8  A.    Should I have used a
9  calculator?
10 Q.    Well, I don't know.  We'll have
11 to figure that out, I suppose, at some point.
12    But you were --
13 A.    It looks like I was trying to
14 understand some sales figures and breaking it
15 down or building it up.  I don't know where
16 was the information coming from.
17 Q.    Right.
18    But these are computations that
19 you did by hand with respect to the matters
20 referenced on the e-mail, which is 1998 US
21 sales, right?
22    MS. MONAGHAN:  Objection.
23    THE WITNESS:  I don't know.  I
24 guess.  I don't know.  Forecast, 590.
25 So there's the 590, what you called

Page 222

1 target. Here it's called forecast.
2 You know, if I studied it for a
3 little while, maybe I could try to
4 figure out what it was I was trying to
5 figure out or what it was I was
6 analyzing, but -- what it was I was
7 computing --
8 QUESTIONS BY MR. HANLY:
9 Q. Well, my question really --
10 A. -- or calculating. But
11 what's --
12 Q. -- is --
13 A. What's the difference? I was
14 learning about the sales, and these are the
15 notes.
16 Q. And you set forth very detailed
17 notes concerning the sales, right?
18 MS. MONAGHAN: Objection.
19 THE WITNESS: I do everything
20 in detail, great detail. Okay? So...
21 QUESTIONS BY MR. HANLY:
22 Q. By the way, did --
23 A. Detail, yes.
24 Q. -- Purdue distribute
25 calculators as part of its marketing plan?

Page 223

1 MS. MONAGHAN: Objection.
2 MR. CHEFFO: Objection.
3 Is that a serious question?
4 THE WITNESS: I guess I didn't
5 get one.
6 QUESTIONS BY MR. HANLY:
7 Q. Well, that's my question.
8 A. I know.
9 Q. But actually, then, I don't
10 have an answer to the actual question.
11 Did Purdue, as part of its
12 marketing activities, distribute to
13 physicians calculators?
14 A. I don't know. I don't recall.
15 Q. Purdue distributed to
16 physicians as part of its marketing other
17 kinds of products, right?
18 MS. MONAGHAN: Objection.
19 QUESTIONS BY MR. HANLY:
20 Q. Other kinds of items. Not
21 drugs, but things like pens and plush toys.
22 Is that true, if you know?
23 I'm finished with that
24 document, by the way, Doctor.
25 A. I think -- I wonder if there

Page 224

1 was someone in the room with me when I was
2 doing these calculations or if I was on the
3 phone with someone and jotting all this down
4 and discussing something.
5 Q. Doctor, thank you for that, but
6 I've moved beyond that --
7 A. All right. I'll let it go.
8 Q. -- and so I asked you a
9 different question.
10 A. That's fine.
11 Q. Did Purdue --
12 A. Yes.
13 Q. -- as part of its marketing --
14 A. Yeah.
15 Q. -- distribute other kinds of
16 items, things like pens and plush toys, in
17 connection with the marketing of --
18 A. I don't remember seeing a lot
19 of toys or pens or -- they may have. I
20 don't...
21 Q. OxyContin was marketed as a
22 12-hour -- Q12 medication, right?
23 A. Yeah.
24 Q. But in fact --
25 A. Well, with the -- I mean, yeah,

Page 225

1 the label for OxyContin is the -- the dosing
2 instructions on the label instructs that it
3 be given twice a day, yes.
4 But there's also provision in
5 the language, I believe, you know, to -- I
6 forgot what -- to -- because there was
7 variability in patients is the way I was
8 told, explained to me, the way I understood
9 this. There's a certain amount of
10 variability in patients, it's true with most
11 medicines, that -- that there -- some --
12 that -- I think it's in the label, but I
13 can't pull up the language right now.
14 I think the -- there's --
15 sorry, I can't recall this part of the
16 labeling. I'm trying to remember.
17 Q. Well, I'm asking you about the
18 marketing.
19 A. It speaks about titration. It
20 speaks about -- okay.
21 Q. All right.
22 A. Go to marketing.
23 Q. The drug was marketed as a
24 12-hour analgesic; isn't that true?
25 MS. MONAGHAN: Objection.

Page 226

1　　　THE WITNESS: It was
2　marketed -- it was dosed BID.
3　That's -- I think that's how it's --
4　QUESTIONS BY MR. HANLY:
5　　Q.　Or Q12?
6　　A.　Or Q12, yeah.
7　　Q.　Right.
8　　A.　Sure. Yeah.
9　　Q.　Okay. But in fact, many
10　patients needed immediate-release opioids
11　during the course of that 12-hour period
12　because the analgesia -- the Q12 drug had
13　worn off; isn't that true?
14　　　MS. MONAGHAN: Objection.
15　　　THE WITNESS: There's a certain
16　variability in patients, from patient
17　to patient, that's not uncommon with
18　analgesics across the board. It's not
19　only OxyContin. Other -- and it's --
20　you know, it's true of other -- other
21　medications as well.
22　　　So it's not...
23　QUESTIONS BY MR. HANLY:
24　　Q.　So the answer to my question is
25　with respect to certain patients, the drug

Page 227

1　didn't work --
2　　A.　Yes, with respect to certain
3　patients -- it's not that the drug didn't
4　work; it's that individuals metabolize drugs
5　with variability. It's not the same in every
6　human body. So you can't have 100 percent
7　the same duration of efficacy in every
8　person.
9　　　So in some patients, physicians
10　would use immediate-release opioids to -- but
11　it was -- I think it's described in the
12　label, but I don't know why I can't remember
13　that part of the label right now. I think
14　I'm getting a little tired.
15　　　MS. MONAGHAN: All right. I
16　think, if possible, now would probably
17　be a good time for a break, which I
18　think will be the last one, probably.
19　　　MR. HANLY: That's fine.
20　　　MS. MONAGHAN: Okay.
21　　　THE WITNESS: Okay.
22　　　VIDEOGRAPHER: Okay. Remove
23　your microphones, please. Doctor,
24　your microphone.
25　　　The time is 4:22 p.m. Off the

Page 228

1　record.
2　　(Off the record at 4:22 p.m.)
3　　　VIDEOGRAPHER: We are back on
4　the record. The time is 4:33 p.m.
5　QUESTIONS BY MR. HANLY:
6　　Q.　Dr. Sackler, does Purdue bear
7　any responsibility for the opioid crisis
8　facing us in America today?
9　　　MR. CHEFFO: Objection.
10　　　MS. MONAGHAN: Objection.
11　　　THE WITNESS: I don't believe
12　Purdue has a legal responsibility, but
13　I think that Purdue, as well as all
14　other stakeholders in health care and
15　in medicine and in pharmaceuticals and
16　law enforcement and the FDA, the DEA,
17　everyone has a responsibility,
18　clearly.
19　　　And Purdue has a
20　responsibility, clearly, to do
21　everything it can to find and
22　participate and contribute to whatever
23　we can hopefully build as solutions so
24　that no one has to suffer this kind of
25　tragedy again. Or at least we can...

Page 229

1　QUESTIONS BY MR. HANLY:
2　　Q.　My question, however, is
3　whether Purdue's conduct was a cause of the
4　opioid epidemic in America today.
5　　　MR. CHEFFO: Objection.
6　　　MS. MONAGHAN: Objection.
7　　　MR. CHEFFO: Form and
8　foundation.
9　　　THE WITNESS: I think it's a
10　very complex set of factors and
11　confluence of different circumstances
12　and societal issues and problems and
13　medical issues and regulatory gaps in
14　different states across the country,
15　without any national system that would
16　correct those gaps. And, I mean, it's
17　very, very, very complex, and I think
18　that all of that has brought this
19　about.
20　　　I don't see that one
21　pharmaceutical company or one product
22　has a causative relationship to the
23　opioid epidemic that we're suffering
24　now.
25

Page 230

1  QUESTIONS BY MR. HANLY:
2      Q.   There was no opioid --
3      A.   Everyone has to be responsible.
4      Q.   There was no opioid epidemic of
5  the current proportions prior to the
6  invention of OxyContin; isn't that true?
7          MS. MONAGHAN:  Objection.
8          MR. CHEFFO:  Objection.
9          THE WITNESS:  No, I don't -- I
10         don't think that's correct.  I think I
11         remember in my lifetime there was a
12         heroin epidemic not that long ago.
13 QUESTIONS BY MR. HANLY:
14     Q.   And do you know the numbers of
15 victims of heroin at whatever period of time
16 that was?
17     A.   Well, it seemed horrific then,
18 too, you know.  So I'm not sure that the
19 numbers are the same, but I -- I don't think
20 we should satisfy -- be satisfied with that
21 either.  I mean, I think -- and, you know,
22 the numbers -- are we talking about numbers
23 of addiction, or are we talking about numbers
24 of overdose and death?
25         Because I am shocked by the

Page 231

1  overdose and death situation that has just
2  exploded in the last five, seven years,
3  something like that.  It's been extraordinary
4  from -- and I'm just seeing it from -- you
5  know, I'm not involved in it professionally,
6  but I see it, I read about it, I hear about
7  it.  I have friends, relatives.  I mean, I
8  know people, individual people, who have
9  suffered and who have died.  And it touches
10 everyone's life.  It's terrible.
11         But that's different.  That's a
12 different epidemic, I think, than what we
13 had -- you know, than -- than the
14 prescription opioid epidemic or crisis or
15 whatever, which has more to do, I think, with
16 failure -- with too much product being out
17 there beyond the needs of the patients it's
18 prescribed for, and also the -- the lack of
19 access to treatment.  People can't access
20 treatment once they -- you know.
21         So it's very complex.  It's
22 hard to answer that question simply or at
23 all.
24     Q.   Do you recognize that hundreds
25 of thousands of Americans have become

Page 232

1  addicted to OxyContin?
2          MS. MONAGHAN:  Objection.
3          MR. CHEFFO:  Objection.
4  QUESTIONS BY MR. HANLY:
5      Q.   Do you recognize that or not?
6  Simple question, yes or no?
7      A.   I don't know --
8          MR. CHEFFO:  Objection.
9          THE WITNESS:  I don't know the
10         answer to that.
11         MR. CHEFFO:  Excuse me.  I'd
12         like the special master's ruling.
13         You know, we can't ask
14         open-ended questions and then instruct
15         a witness only to say yes or no.  It's
16         just not fair.
17         SPECIAL MASTER COHEN:  I think
18         it was a yes or no question.
19         MR. HANLY:  It was a yes or no
20         question.
21         MR. CHEFFO:  Note my objection
22         to the form and the foundation.
23 QUESTIONS BY MR. HANLY:
24     Q.   As the owners of Purdue, the
25 Sackler family could have directed changes in

Page 233

1  the way that OxyContin was marketed; isn't
2  that correct?
3          MS. MONAGHAN:  Objection.
4          THE WITNESS:  Actually, there
5          have been many changes over the years
6          and huge resources spent to bring
7          about those changes.
8  QUESTIONS BY MR. HANLY:
9      Q.   I asked you about marketing
10 materials or giveaways.
11         Have you ever seen one of these
12 OxyContin pens with a pull-down?
13     A.   No.
14     Q.   All right.  I'd like you to
15 take a look at it.  And we can make
16 photocopies of it or whatever, but I --
17         MS. MONAGHAN:  You want to just
18         mark it as an exhibit?  You can stick
19         a sticker on it.
20         MS. CONROY:  I'll put it on the
21         screen.
22         MR. HANLY:  These are of
23         limited distribution.
24         MS. MONAGHAN:  Well, then how
25         are we going to have a clear record of

Page 234

1   what pen was shown to her?
2       MR. HANLY:  It's going to go on
3   the video.
4       MS. MONAGHAN:  Okay.
5   QUESTIONS BY MR. HANLY:
6       Q.   Now, I want to make sure you've
7   got the right side.
8       MR. CHEFFO:  Is this something
9   that was produced to you?
10      MR. HANLY:  No.
11      MR. CHEFFO:  Then have you
12  produced it in response to the
13  discovery requests?
14      MR. HANLY:  This is something
15  that I acquired within the last two
16  weeks of my own accord, not from you.
17  It's work product.
18      MR. CHEFFO:  Well, it's
19  responsive to -- well, if it's work
20  product, then you're waiving it by
21  showing it today?
22      MR. HANLY:  The acquisition is
23  work product.
24      MR. CHEFFO:  Okay.  But I
25  didn't ask that.  If it's ongoing

Page 235

1   discovery, and you have things that
2   are responsive to discovery and you
3   show them to a witness, they should be
4   produced in advance of the deposition.
5       MR. HANLY:  Well, let me
6   continue with the examination, and you
7   can make any application that's
8   appropriate.
9       MR. CHEFFO:  I am going to
10  object to the question of showing --
11  you know, the whole point of discovery
12  here is -- when we've produced 50
13  million pages is to not have exactly
14  this type of surprise.
15      And I don't recall all the
16  discovery requests, but my guess is it
17  probably covers this pen.  But just
18  note my objection.
19      MS. MONAGHAN:  I'm also just
20  going to record my ongoing objection
21  to not marking the pen itself as an
22  exhibit.  I don't think that putting
23  it on the video is sufficient to
24  ensure that we know exactly what pen.
25      I don't know if there were more

Page 236

1   than one version of this.  I don't
2   know how similar they look.  I think
3   we should mark the actual aide as an
4   exhibit.
5       MR. CHEFFO:  It's not even
6   authenticated.
7       MR. HANLY:  Well, that's fine.
8   We can mark -- we can actually mark
9   the one that the witness has.
10      MS. MONAGHAN:  And she said
11  she's never seen it before, so
12  obviously she's not authenticating it.
13      THE WITNESS:  Well, it's
14  interesting.
15  QUESTIONS BY MR. HANLY:
16      Q.   So do you see on one side
17  there's a dosing conversion guide?
18      A.   Yes, it looks like the 2 to 1
19  that we spoke of.
20      Q.   Right.
21      And also to the -- to the right
22  of the middle column there's a column of Oxy
23  IR?
24      A.   Uh-huh.
25      Q.   That's oxycodone immediate

Page 237

1   release?
2       A.   Okay.
3       Q.   Do you agree with that?
4       MS. MONAGHAN:  Objection.
5       THE WITNESS:  Yes, I think it
6   is.
7   QUESTIONS BY MR. HANLY:
8       Q.   All right.  And what is
9   reflected then is that there's a conversion
10  dose.  If you're using another so-called
11  combination opioid and you wished to convert
12  to OxyContin, it shows you that.
13      And then the far right column
14  is the breakthrough dose to be used with
15  OxyContin Q12; is that correct?
16      MS. MONAGHAN:  Objection.
17      THE WITNESS:  I don't know what
18  the -- there are no instructions how
19  to read this, so I don't know if
20  that's the way it's intended or not.
21  But...
22  QUESTIONS BY MR. HANLY:
23      Q.   But you've never --
24      A.   You know, and the -- the...
25      Q.   If you can't read the chart or

| | |
|---|---|
| Page 238 | Page 240 |

Page 238

1 don't understand the chart, you just need to
2 indicate that.
3     A.    I can read it, but I don't know
4 what the -- what it means or what the
5 intention is because it doesn't say -- say
6 how to -- what to make of it.
7     Q.    Okay.
8     A.    You know, it doesn't say this
9 is immediate-release oxycodone to be dosed
10 concurrent with this OxyContin.
11     Q.    Yeah.
12     A.    But maybe.
13     Q.    Is Oxy IR a -- a Purdue
14 product?
15         You see it has a little
16 trademark sign.  So my question is, is the
17 Oxy IR product a product manufactured and
18 distributed by Purdue?
19     A.    I think it is.  I think -- I
20 think it was or it is.
21     Q.    Okay.
22     A.    I think it is.
23     Q.    If you --
24     A.    And I think there are other
25 oxy -- oxycodone immediate-release products

Page 239

1 also.
2     Q.    Yes.
3     A.    Available.
4     Q.    But Oxy IR is a Purdue product.
5 That's all I'm trying to establish.
6     A.    Yeah, I think so.  I think
7 that's right.
8     Q.    All right.  If you hand that
9 back to me, we'll put a sticker on it.
10     A.    Okay.
11         MR. CHEFFO:  Note my objection.
12 I move to strike this entire line of
13 questioning.
14         THE WITNESS:  What does it say?
15         MS. MONAGHAN:  I can't give you
16 advice on the record.  I think counsel
17 has asked for it back so they can put
18 a sticker on it.
19         THE WITNESS:  Okay.
20 QUESTIONS BY MR. HANLY:
21     Q.    Let me just --
22     A.    Do you know -- do you know the
23 date of this?
24     Q.    I can't answer your questions,
25 Doctor.

Page 240

1     A.    I'm sorry.  I'd be very
2 interested to know when they did that.
3         MR. HANLY:  I want to note for
4 the record also that Purdue did not,
5 to my knowledge, produce a single
6 marketing item.
7         MR. CHEFFO:  Okay.  And I
8 haven't heard about it, so if you
9 asked for them, then you should raise
10 them.
11         THE WITNESS:  You mean someone
12 else produced that?  Not Purdue?
13         MR. HANLY:  No.  No.  No.
14 I believe that Purdue had this
15 manufactured, but --
16         THE WITNESS:  Do you know that
17 for a fact?
18         MR. HANLY:  No.
19         THE WITNESS:  Okay.  I'm
20 just --
21         MR. CHEFFO:  That's my point.
22         THE WITNESS:  I thought that's
23 what you were saying.  Maybe they
24 didn't.
25         SPECIAL MASTER COHEN:  Did you

Page 241

1 go to law school?
2         THE WITNESS:  No.  I went to
3 medical school.
4         SPECIAL MASTER COHEN:  That was
5 a good question.
6         THE WITNESS:  Now I'm going to
7 law school.
8         (Purdue-Sackler Exhibit 27
9 marked for identification.)
10 QUESTIONS BY MR. HANLY:
11     Q.    Are you familiar with a company
12 called Purdue Pharma, Inc., as opposed to
13 Purdue Pharma LP?
14     A.    Yes.  Yes.  I think it's the
15 general partner of Purdue Pharma LP.
16     Q.    And --
17     A.    I'll help you out.
18     Q.    -- you were a member of the
19 board of directors of Purdue Pharma, Inc.,
20 correct?
21     A.    Yes.
22         Purdue Pharma LP, doesn't have
23 a board of directors.  It's an LP.  It's a
24 partnership.
25         (Purdue-Sackler Exhibit 29

Page 242

1  marked for identification.)
2  QUESTIONS BY MR. HANLY:
3    Q.   Okay.  Let me show you a
4  document we've marked as Exhibit 29, which is
5  the -- the cover page --
6        MS. MONAGHAN:  Are we up to 29?
7        MS. CONROY:  No, I have 28.
8  You'll be getting it in a minute.
9        MS. MONAGHAN:  Was there a 27?
10       MS. CONROY:  Yes, the pen.
11       MS. MONAGHAN:  Oh, the pen is
12  the 27.  Got it.  Perfect.
13       So this that you're handing is
14  29?
15       MS. CONROY:  You'll be getting
16  28 in a minute.
17       MS. MONAGHAN:  Okay.
18  QUESTIONS BY MR. HANLY:
19    Q.   So 29, Doctor, is -- the cover
20  appears to be an e-mail from Dr. Richard to
21  you and other members of your family.
22       Do you see that?
23       MS. MONAGHAN:  Objection.
24  QUESTIONS BY MR. HANLY:
25    Q.   It's an e-mail from Dr. Richard

Page 243

1  Sackler to various people, including you,
2  right?
3        MS. MONAGHAN:  Objection.
4  QUESTIONS BY MR. HANLY:
5    Q.   The first page, Doctor.
6    A.   Yeah.  Yes.
7    Q.   Okay.
8    A.   Can I look at it?
9    Q.   Yes.  Please.
10       I'm going to ask you a question
11  about the first page of the -- of the -- the
12  first page following the e-mail, which is
13  entitled "CEO Considerations."
14       Okay?
15    A.   This is all Richard's e-mail?
16  This is one e-mail?
17    Q.   Well, if you look at the front,
18  Doctor, it indicates, does it not, that
19  there's attachments -- an attachment called
20  "CEO Considerations," apparently volume 4 or
21  version 4A.doc.
22       Do you see that?
23    A.   Yeah.
24    Q.   Okay.  And the very next
25  numbered page of the document is something

Page 244

1  called CEO Considerations.  And I want to ask
2  you about the first -- that first textual
3  page.
4    A.   This is 2008.
5    Q.   Yes, 2008.
6        And you -- the company was
7  looking for a --
8    A.   CEO.
9    Q.   -- CEO --
10   A.   Yes.
11   Q.   -- because Mr. Friedman was
12  gone from the company, correct?
13   A.   Yes.
14   Q.   After his conviction in 2007?
15   A.   He was -- he was -- I don't
16  know the term for it, when you're not allowed
17  to practice -- to work in the industry
18  anymore.  I don't --
19   Q.   Well, was part of the plea
20  agreement that Mr. Friedman was not to be
21  involved in certain business matters, right?
22   A.   Any business matters with
23  Purdue.
24   Q.   Okay.
25   A.   Or in the industry.  He

Page 245

1  couldn't work in the industry.
2    Q.   So at the time, 2000 --
3    A.   He was excommunicated.
4    Q.   -- 2008, the company was trying
5  to figure out how to go about acquiring a new
6  CEO, right?
7        MS. MONAGHAN:  Objection.
8        THE WITNESS:  I mean -- okay.
9  QUESTIONS BY MR. HANLY:
10   Q.   Okay.  On the first page it
11  references at the very top --
12   A.   I wouldn't take this as an
13  expression of the company because this
14  letter -- this e-mail is only to family
15  members.  This is a shareholder e-mail.  This
16  is not a director's e-mail, and it's not a --
17  and it's certainly not a company e-mail in
18  the sense of management or the board of
19  directors.
20       So --
21   Q.   Well --
22   A.   -- this is Richard speaking to
23  other family members, I think.
24   Q.   About the considerations that
25  needed to be -- or that he thought should

Page 246

1  be --
2       A.    I guess.
3       Q.    -- considered.
4       A.    If he wrote it.  But I'll read
5  it.
6       Q.    Do you know who Peter Boer is,
7  B-o-e-r?
8       A.    Yes.
9       Q.    Who's that?
10      A.    Peter Boer is a director.
11           Is he on here?
12      Q.    Look at the very last page.
13      A.    He's not on the -- he's not on
14  the "to's."
15      Q.    No, he's not, but look at the
16  very last page of the document, please.
17      A.    Okay.
18      Q.    Do you see it says Richard
19  Sackler and Peter --
20      A.    Oh, yeah, uh-huh.
21      Q.    And so he -- was he a Purdue
22  employee at the time?
23           MS. MONAGHAN:  Objection.
24           THE WITNESS:  A director.  A
25       Purdue --

Page 247

1  QUESTIONS BY MR. HANLY:
2       Q.    Yes.
3       A.    -- director.
4       Q.    Okay.  All right.
5       A.    Is he still?  Yes, I think he
6  still is a director.
7       Q.    Okay.  Now, back to the first
8  page of the CEO Considerations.  At the top,
9  the second paragraph -- first paragraph is
10  just a few words long.  The second paragraph
11  reads, "Our central assumption is that Purdue
12  must be managed for long-term success.  While
13  it is very possible that the company can be
14  recapitalized using debt or sold to a
15  strategic buyer, the perception of a sound,
16  long-term plan and effective management will
17  translate into maximizing value for the
18  present owners."
19           Did I read that correctly?
20      A.    Uh-huh.
21      Q.    Yes?
22      A.    Yes.
23      Q.    Then two paragraphs down, do
24  you see the paragraph that begins "In the
25  event that"?

Page 248

1       A.    Uh-huh.
2       Q.    Yes?
3       A.    Yes.
4       Q.    It reads, "In the event that a
5  favorable deal cannot be structured during
6  2008, the most certain way for the owners to
7  diversify their risk is to distribute more
8  free cash flow so they can purchase
9  diversifying assets."
10           Did I read that correctly?
11      A.    Yes.
12      Q.    And you understand that the
13  owners referenced in that sentence are
14  Sackler family members, right?
15           MS. MONAGHAN:  Objection.
16           THE WITNESS:  Actually, the
17       Sackler family members aren't the
18       owners, but I guess if you say
19       beneficial owners, that might be more
20       accurate.
21  QUESTIONS BY MR. HANLY:
22      Q.    Indirect owners, right?
23      A.    Well, beneficial.  They're not
24  really the owners.  I mean, legally they're
25  not the owners.

Page 249

1       Q.    Right.
2           But indirectly they're the --
3  they're the owners?
4       A.    What does that mean?
5           MS. MONAGHAN:  Objection.
6       Asked and answered.
7           THE WITNESS:  I don't know what
8       that means.
9           MS. MONAGHAN:  She said no.
10          THE WITNESS:  I'm not sure what
11      indirect owner means.  Is that a legal
12      owner?
13  QUESTIONS BY MR. HANLY:
14      Q.    Is -- that's fine.
15









15    Q.    And as you sit here today, you
16  can't tell us who owns PLP Associates
17  Holdings LP?
18         MS. MONAGHAN:  Objection.
19    Asked and answered.
20         THE WITNESS:  I'm not sure who
21    owns it.
22  QUESTIONS BY MR. HANLY:
23    Q.    Do you believe PLP Associates
24  Holdings LP is owned beneficially by the
25  Sackler family?

Page 265

1         MS. MONAGHAN:  Objection.
2         THE WITNESS:  I think it's
3    probably owned by trusts.
4  QUESTIONS BY MR. HANLY:
5    Q.    The Mortimer and Raymond
6  Sackler trusts?
7         MS. MONAGHAN:  Objection.
8         THE WITNESS:  There's no such
9    trust.  I mean, I don't know the names
10   of the trusts, but my guess is it's
11   owned by trusts.  I mean, I would
12   think it's owned by trusts.
13  QUESTIONS BY MR. HANLY:
14    Q.    Okay.  Do you understand that
15  the Mortimer Sackler trusts own 50 percent
16  indirectly of the Purdue Pharma entities?
17         MS. MONAGHAN:  Objection.
18         THE WITNESS:  I think it's a
19    little more complicated than that,
20    but...
21  QUESTIONS BY MR. HANLY:
22    Q.    Let me ask this question.
23    A.    Yeah.
24    Q.    Do you -- as you sit here
25  today, do you know where these distributions

Page 266

1 ended up?
2       Did they stay with this entity
3 called Holdings, or were they retransmitted,
4 redistributed, to other entities?
5       MS. MONAGHAN: Objection.
6       THE WITNESS: Well, if you read
7    this paper you put in front of me, it
8    says -- doesn't it say anything about
9    where they went next? If they went
10    somewhere?
11 QUESTIONS BY MR. HANLY:
12    Q.    Well, do you know whether any
13 of these sums distributed between 2008 and
14 2011 made their way into any bank account
15 over which you had control?
16       MS. MONAGHAN: Objection.
17       THE WITNESS: I hope so. I
18    think so.
19 QUESTIONS BY MR. HANLY:
20



Page 268

1       THE WITNESS: Okay.
2 QUESTIONS BY MR. HANLY:
3    Q.    Ms. Sackler, if you could
4 answer my question, please. It's quite
5 simple.
6       When you referenced the two
7 family partners -- that's the term you
8 used -- please let me ask my question --
9 you're referencing the Mortimer Sackler
10 family and the descendants of Mortimer
11 Sackler --
12    A.    Yeah, I was referencing trusts
13 of the two -- the distributions are
14 distributed to trusts.
15    Q.    Yes.
16    A.    And so -- and -- is this
17 PPLP --
18    Q.    Ms. Sackler --
19       MR. CHEFFO: Dr. Sackler.
20 QUESTIONS BY MR. HANLY:
21    Q.    Dr. Sackler, please listen to
22 my question. It's quite simple.
23       When you used the term -- I'm
24 finished with the document, Doctor.
25       Dr. Sackler? When you use the

Page 269

1 term "the two family partners" -- my
2 question's very simple -- you're referencing
3 the Mortimer Sackler family and the Raymond
4 Sackler family; isn't that so?
5    A.    When I'm talking about the
6 family partners, I'm talking about the
7 Raymond family and the Mortimer family.
8    Q.    Thank you.
9    A.    When I'm talking about the
10 shareholders of Purdue -- of Purdue, I'm
11 talking about the trusts.
12    Q.    Okay.
13    A.    It's different.
14    Q.    Thank you --
15    A.    I was just trying to be
16 precise.
17    Q.    Thank you for that answer.
18    A.    Okay.
19       (Purdue-Sackler Exhibit 30
20    marked for identification.)
21 QUESTIONS BY MR. HANLY:
22

9 QUESTIONS BY MR. HANLY:
10    Q.    And just --
11    A.    And -- sorry.
12    Q.    Just to be clear, the two
13 family partners, to use your term, are the
14 Mortimer Sackler family and the Raymond
15 Sackler family; is that -- is that right?
16    A.    What -- I think you have
17 information right here as to --
18       MS. MONAGHAN: Do you know what
19    page you're on?
20       THE WITNESS: Yeah, I'm on --
21    like on page -- I don't have page
22    numbers.
23       MS. MONAGHAN: Look at the
24    bottom right-hand corner. There's a
25    number.



Page 270

Page 272

1  Q.   Okay.  So you don't know that
2  that's the law firm that my partner and I are
3  members of?
4  A.   Oh, I'm terribly sorry.  No, I
5  didn't.
6  Q.   That's quite all right.
7  A.   I thought you were partners of
8  Hanly --
9  Q.   Simmons Hanly Conroy.
10  A.   Simmons Hanly Conroy.  Oh,
11  that's the same law firm.
12  But not Cooper.  Where's
13  Cooper?  What happened to Cooper?
14  Q.   Now, Dr. Sackler, this amount,
15  $75 million --
16  A.   Yes.
17  Q.   -- that's the same amount that
18  the Sackler family contributed to the
19  Oklahoma settlement last week, right?
20  MS. MONAGHAN:  Object to the
21  form.
22  THE WITNESS:  Is there some
23  meaning in that?
24  QUESTIONS BY MR. HANLY:
25  Q.   Well, I'm going to ask you.

Page 273

1  Am I correct that that's the
2  amount that the Sackler family --
3  A.   You can probably find ten other
4  things that cost $75 million as well.  I
5  never -- okay.  Yes, 75 is 75, wherever it
6  is.
7  Q.   And is 75 million sort of what
8  we call walking around money for the
9  Sacklers?
10  MS. MONAGHAN:  Objection.
11  THE WITNESS:  You're being
12  funny now, right?
13  QUESTIONS BY MR. HANLY:
14  Q.   No.  Is it a sum that you
15  regard as --
16  A.   That's a huge amount of money,
17  an enormous amount of money.
18

21  Q.   You don't know what this
22  Simmons Cooper --
23  A.   No.
24  Q.   -- law firm is?
25  A.   No.

24  Q.   All right.
25  A.   I can't see the meaning of

Page 274

1  that, but...
2      Q.   Are you familiar with --
3      A.   You know --
4      Q.   Let me ask you a question.
5  There's no question pending, Doctor.
6      A.   Okay.  Sorry.  It's a really
7  funny one, though.
8      Q.   Are you familiar with -- with
9  something called Project Tango?
10     A.   I wasn't and couldn't remember,
11  didn't remember what it was until I was
12  preparing for this deposition.
13     Q.   Okay.
14     A.   Now I'm familiar with it.
15     Q.   And without discussing with me
16  what you discussed with your lawyers --
17     A.   Right.
18     Q.   -- do you understand that
19  Project Tango involves the development of a
20  buprenorphine sublingual wafer designed to be
21  administered --
22     A.   It's a film, yeah.
23     Q.   -- to be administered with
24  respect to the treatment of addiction
25  disorders?

Page 275

1          MS. MONAGHAN:  Objection.
2          THE WITNESS:  Well, what's
3      important, I think, is that it's a --
4      I'll wait for your question.
5  QUESTIONS BY MR. HANLY:
6      Q.   Well, I don't think you
7  answered my question.
8          Project Tango involves the
9  development of a buprenorphine sublingual
10  film designed to be administered with respect
11  to the treatment of addiction disorders.
12         MS. MONAGHAN:  Objection.
13  QUESTIONS BY MR. HANLY:
14     Q.   Isn't that so?
15     A.   Yes.
16     Q.   All right.  And the patent for
17  that invention is -- is is -- withdrawn.
18         The inventor of that is
19  Dr. Richard Sackler, right?
20         MS. MONAGHAN:  Objection.
21         THE WITNESS:  No.
22  QUESTIONS BY MR. HANLY:
23     Q.   Does Dr. Sackler -- did
24  Dr. Sackler --
25     A.   I didn't know that.

Page 276

1          Is that right?
2      Q.   Did Dr. Sackler apply for a
3  patent for this invention?
4          MS. MONAGHAN:  Objection.
5      Form.
6          THE WITNESS:  Are we talking
7      about Project Tango?
8  QUESTIONS BY MR. HANLY:
9      Q.   Yes.
10     A.   I thought Project Tango was a
11  product development deal the business
12  development management folks brought to the
13  board.  I think it came to us from a venture
14  capital group, and they wanted us to develop
15  it and market it, Purdue to develop it and
16  market it.  And --
17         Are we on the same page?
18     Q.   I don't think so, Doctor.
19     A.   Am I confused?
20     Q.   Do you -- do you know -- do you
21  know who owns the invention of this
22  buprenorphine sublingual wafer?
23         Do you know who owns it?
24     A.   No.
25     Q.   Okay.  Rhodes Pharmaceutical,

Page 277

1  LP, is a company that's owned by the Sackler
2  family, right?
3          MS. MONAGHAN:  Objection.
4          THE WITNESS:  No, it's owned by
5      trusts.
6  QUESTIONS BY MR. HANLY:
7      Q.   Trusts benefitting Sackler
8  family members, right?
9      A.   Yes, that's okay.
10     Q.   Okay.  And you've never seen a
11  patent application for this invention?
12     A.   No.
13         MS. MONAGHAN:  Objection.
14         What invention?
15         THE WITNESS:  What invention?
16  QUESTIONS BY MR. HANLY:
17     Q.   For this buprenorphine wafer
18  for drug substitution therapy?
19         MS. MONAGHAN:  Objection.
20         And is it -- are you
21     representing to her that that is the
22     product underlying Tango, or are you
23     now asking a separate set of questions
24     from Tango?
25         MR. HANLY:  I'm asking the

Page 278

1   questions that I'm asking.
2        THE WITNESS:  I'm quite -- what
3   you're saying is very confusing
4   because that was not my understanding
5   of what Tango was, or is.  So I'm
6   confused.
7   QUESTIONS BY MR. HANLY:
8        Q.    Okay.
9        A.    No, I didn't know anything
10  about Richard's association with that
11  product, if that's true.
12       Q.    Howard Udell is deceased; is
13  that correct?
14       A.    Yes.
15       Q.    But prior to his death, did he
16  not receive a departure bonus upon retiring
17  from the Purdue companies?
18       MR. CHEFFO:  Objection.
19       MS. MONAGHAN:  Objection.
20       THE WITNESS:  I know that he
21       received indemnification money to pay
22       the fine that he was fined.
23  QUESTIONS BY MR. HANLY:
24       Q.    So he was reimbursed in some
25  fashion for the fine that was part of the

Page 279

1   plea agreement?
2        A.    That was contractual, that the
3   company would provide indemnification --
4   provide indemnification.
5        Q.    In addition to the
6   indemnification, are you aware -- do you know
7   one way or the other whether Mr. Udell
8   received a $5 million bonus upon the occasion
9   of his retirement?
10       A.    I don't recall, no.
11       Q.    Do you know what Mr. Friedman
12  received, if anything, upon his departure
13  from the employment of Purdue?
14       MS. MONAGHAN:  Objection.
15       THE WITNESS:  Also
16       indemnification.  The indemnification
17       for the senior executives at Purdue
18       was contractual, and it went to the
19       three individuals who were fined, who
20       took the responsibility and were fined
21       and -- but who hadn't, in and of
22       themselves, committed any wrongdoing.
23       They were taking
24       responsibility, is the way I
25       understood it, for the company,

Page 280

1   because within the company there were
2   behaviors and communications and some
3   marketing that was outside of the
4   label and was not correct and should
5   not have occurred.
6   QUESTIONS BY MR. HANLY:
7        Q.    But you understand that
8   Mr. Friedman, Dr. Goldenheim and Mr. Udell
9   all pleaded guilty to the federal crime of
10  misbranding?
11       MS. MONAGHAN:  Object to the
12       form.
13       THE WITNESS:  I think it was a
14       misdemeanor, right?  Is that right?
15  QUESTIONS BY MR. HANLY:
16       Q.    Well, wasn't the crime
17  misbranding?
18       MS. MONAGHAN:  Objection.
19       THE WITNESS:  I think the --
20       MS. MONAGHAN:  The crime to
21       which the three individuals pled; is
22       that your question?
23       MR. HANLY:  Yes.
24  QUESTIONS BY MR. HANLY:
25       Q.    You can answer.

Page 281

1        A.    The crime to which the three
2   individuals pled, I was told it was a
3   misdemeanor, which is a felony.  Kind of a --
4   which is a felony, so it is a crime.  And
5   that they -- that that was -- that's how they
6   took responsibility for the wrongdoing,
7   mistakes of the company.
8        Q.    In addition to the indemnity
9   amounts that you testified to, did
10  Mr. Friedman receive a bonus of $2 million
11  for the year 2006?
12       MS. MONAGHAN:  Objection.
13       Form.
14       THE WITNESS:  I don't know.  I
15       don't recall.
16       MR. HANLY:  Dr. Sackler, until
17       we meet again.
18       THE WITNESS:  That's it?  I'm
19       released?
20       MR. HANLY:  That's all I have.
21  That's all I'm entitled to.
22       THE WITNESS:  Yeah.
23       MR. CHEFFO:  Thank you.
24       MS. MONAGHAN:  Thank you.
25       THE WITNESS:  We all have to

Page 282

1  live by the rules.

2  VIDEOGRAPHER: Are we done?

3  Should I go off the record?

4  MS. MONAGHAN: Yes, we're going

5  off the record.

6  VIDEOGRAPHER: Okay. This

7  marks the end of today's deposition.

8  The time is 5:32 p.m.

9  (Deposition concluded at 5:32 p.m.)

10  – – – – – –

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 283

1  CERTIFICATE

2

3  I, CARRIE A. CAMPBELL, Registered

   Diplomate Reporter, Certified Realtime

4  Reporter and Certified Shorthand Reporter, do

   hereby certify that prior to the commencement

5  of the examination, Kathe A. Sackler, M.D., was

   duly sworn by me to testify to the truth, the

6  whole truth and nothing but the truth.

7  I DO FURTHER CERTIFY that the

   foregoing is a verbatim transcript of the

8  testimony as taken stenographically by and

   before me at the time, place and on the date

9  hereinbefore set forth, to the best of my

   ability.

10

   I DO FURTHER CERTIFY that I am

11  neither a relative nor employee nor attorney

   nor counsel of any of the parties to this

12  action, and that I am neither a relative nor

   employee of such attorney or counsel, and

13  that I am not financially interested in the

   action.

14

15

16

17  CARRIE A. CAMPBELL,

   NCRA Registered Diplomate Reporter

18  Certified Realtime Reporter

   Notary Public

19  Dated: April 4, 2019

20

21

22

23

24

25

Page 284

INSTRUCTIONS TO WITNESS

1

2

3  Please read your deposition over

4  carefully and make any necessary corrections.

5  You should state the reason in the

6  appropriate space on the errata sheet for any

7  corrections that are made.

8  After doing so, please sign the

9  errata sheet and date it. You are signing

10  same subject to the changes you have noted on

11  the errata sheet, which will be attached to

12  your deposition.

13  It is imperative that you return

14  the original errata sheet to the deposing

15  attorney within thirty (30) days of receipt

16  of the deposition transcript by you. If you

17  fail to do so, the deposition transcript may

18  be deemed to be accurate and may be used in

19  court.

20

21

22

23

24

25

Page 285

ACKNOWLEDGMENT OF DEPONENT

1

2

3

4  I,_____, do

   hereby certify that I have read the foregoing

5  pages and that the same is a correct

   transcription of the answers given by me to

6  the questions therein propounded, except for

   the corrections or changes in form or

7  substance, if any, noted in the attached

   Errata Sheet.

8

9

10

11

12

   _____

   Kathe A. Sackler, M.D.          DATE

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25

Page 286

```
1        _ _ _ _ _ _ _
             ERRATA
2        _ _ _ _ _ _ _
3   PAGE   LINE  CHANGE/REASON
4   ____   ____  _____
5   ____   ____  _____
6   ____   ____  _____
7   ____   ____  _____
8   ____   ____  _____
9   ____   ____  _____
10  ____   ____  _____
11  ____   ____  _____
12  ____   ____  _____
13  ____   ____  _____
14  ____   ____  _____
15  ____   ____  _____
16  ____   ____  _____
17  ____   ____  _____
18  ____   ____  _____
19  ____   ____  _____
20  ____   ____  _____
21  ____   ____  _____
22  ____   ____  _____
23  ____   ____  _____
24  ____   ____  _____
25
```

Page 287

```
1        _ _ _ _ _ _ _
          LAWYER'S NOTES
2        _ _ _ _ _ _ _
3   PAGE   LINE
4   ____   ____  _____
5   ____   ____  _____
6   ____   ____  _____
7   ____   ____  _____
8   ____   ____  _____
9   ____   ____  _____
10  ____   ____  _____
11  ____   ____  _____
12  ____   ____  _____
13  ____   ____  _____
14  ____   ____  _____
15  ____   ____  _____
16  ____   ____  _____
17  ____   ____  _____
18  ____   ____  _____
19  ____   ____  _____
20  ____   ____  _____
21  ____   ____  _____
22  ____   ____  _____
23  ____   ____  _____
24  ____   ____  _____
25
```