Highly Confidential - Subject to Further Confidentiality Review

0   01

2

IN THE UNITED STATES DISTRICT COURT

3 FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

4

IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804

5 OPIATE LITIGATION

Case No. 17-md-2804

6 This document relates to: Judge Dan Aaron Polster

7

All Cases

8 _____/

9   HIGHLY CONFIDENTIAL

10  SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12 The videotaped deposition of JOEL R. SAPER, M.D.,

13 Taken at 3120 Professional Drive,

14 Ann Arbor, Michigan,

15 Commencing at 1:41 p.m.,

16 Friday, January 11, 2019,

17 Before Cheryl McDowell, CSR-2662, RPR.

18

19

20

21

22

23

24

25

```
 1      APPEARANCES:

 2      MR. EVAN M. JANUSH

 3      MR. IAN S. MILLICAN

 4      The Lanier Law Firm

 5      126 East 56th Street, 6th Floor

 6      New York, New York  10022

 7      (212) 421-2800

 8      evan.janush@lanierlawfirm.com

 9      ian.millican@lanierlawfirm.com

10          Appearing on behalf of the Plaintiffs.

11

12      MS. RUTH HARTMAN

13      Baker Hostetler

14      127 Public Square, Suite 2000

15      Cleveland, Ohio  44114

16      (216) 861-7309

17      rhartman@bakerlaw.com

18          Appearing on behalf of the Defendant Endo

19          Pharmaceuticals.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        APPEARANCES, CONTINUED:

 2        MR. LOUIS P. GABEL

 3        Jones Day

 4        150 West Jefferson Avenue, Suite 2100

 5        Detroit, Michigan  48226

 6        (313) 733-3939

 7        lpgabel@jonesday.com

 8            Appearing on behalf of the Defendant Walmart.

 9

10        MS. MARY M. BALASTER

11        Reed Smith, LLP

12        811 Main Street, Suite 1700

13        Houston, Texas  77002

14        (713) 469-3842

15        mbalaster@reedsmith.com

16            Appearing telephonically on behalf of the

17            Defendant AmerisourceBergen Drug.

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        APPEARANCES, CONTINUED:

 2        MR. SEAN B. KENNEDY

 3        Ropes & Gray LLP

 4        800 Boylston Street

 5        Boston, Massachusetts  02199

 6        (617) 951-7000

 7        sean.kennedy@ropesgray.com

 8            Appearing telephonically on behalf of the

 9            Defendant Mallinckrodt.

10

11        MR. PRATIK K. GHOSH

12        Kirkland & Ellis LLP

13        300 North LaSalle

14        Chicago, Illinois  60654

15        (312) 862-3689

16        pratik.ghosh@kirkland.com

17            Appearing telephonically on behalf of the

18            Defendant Allergan Finance.

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES, CONTINUED:

 2         MS. ANGELA R. VICARI

 3         Arnold & Porter Kaye Scholer, LLP

 4         250 West 55th Street

 5         New York, New York  10019

 6         (212) 836-8000

 7         angela.vicari@arnoldporter.com

 8              Appearing telephonically on behalf of the

 9              Defendant Endo Pharmaceuticals and Parr.

10

11         MS. MARY H. KIM

12         Dechert LLP

13         One Bush Street, Suite 1600

14         San Francisco, California  94104

15         (415) 262-4517

16         mary.kim@dechert.com

17              Appearing on behalf of the Defendant Purdue.

18

           ALSO PRESENT:  MR. MARC MYERS, VIDEOGRAPHER

19                         MR. NEAL ROGERS, VIDEOGRAPHER

20

21

22

23

24

25
```

```
1                    TABLE OF CONTENTS

2       Witness                              Page

3       JOEL R. SAPER, M.D.

4       EXAMINATION BY MR. JANUSH:              8

5       EXAMINATION BY MS. HARTMAN:           118

6       EXAMINATION BY MR. GABEL:             148

7

8                       EXHIBITS

9       Exhibit                              Page

10      SAPER EXHIBIT NO. 1                     9

11      Curriculum Vitae

12      SAPER EXHIBIT NO. 2                    13

13      Correspondence dated January 2, 2008

14      SAPER EXHIBIT NO. 3                    31

15      Correspondence dated July 1, 2008

16      SAPER EXHIBIT NO. 4                    57

17      Opioid Treatment Guidelines

18      SAPER EXHIBIT NO. 5                   127

19      New Migraine Study

20      SAPER EXHIBIT NO. 6                    75

21      The Influence of Pharma and Device

        Manufacturers on APS and Other PMA'S

22

        SAPER EXHIBIT NO. 7                    76

23

        More on The Pain Debate dated March 24, 2010

24

25              (Exhibits attached to transcript.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Ann Arbor, Michigan

 2        Friday, January 11, 2019

 3        About 1:41 p.m.

 4              THE VIDEOGRAPHER:  We are now on the

 5        record.  My name is Marc Myers.  I'm the

 6        videographer for Golkow Litigation Services.

 7              Today's date is January 11th, 2019.  The

 8        time is now 1:41 p.m.  This video deposition is

 9        being held in Ann Arbor, Michigan, in the matter of

10        in regards to the National Prescription Opiate

11        Litigation pending in the United States District

12        Court for the Northern District of Ohio, Eastern

13        Division.  The deponent is Doctor Joel Saper.

14              And at this time will the attorneys

15        please introduce themselves for the record and the

16        court reporter, Cheryl McDowell, please swear in the

17        witness.

18              MR. JANUSH:  Evan Janush, Lanier Law

19        Firm, on behalf of the plaintiffs.

20              MR. MILLICAN:  Ian Millican, Lanier Law

21        Firm, on behalf of plaintiffs.

22              MS. HARTMAN:  Ruth Hartman, Baker

23        Hostetler, on behalf of the Endo defendants.

24              MR. GABEL:  Louie Gabel from Jones Day on

25        behalf of Walmart.
```

```
 1                        - - -

 2                   JOEL R. SAPER, M.D.,

 3          having first been duly sworn, was examined and testified

 4          on his oath as follows:

 5                   MS. HARTMAN:  Do you want to get the

 6          people on the phone?

 7                   MR. JANUSH:  People on the phone, can you

 8          announce yourselves for the record as well?

 9                   MS. BALASTER:  This is Mary Balaster

10          representing Amerisource Bergen.

11                   MR. KENNEDY:  Sean Kennedy, Ropes & Gray,

12          representing Mallinckrodt.

13                   MR. GHOSH:  Pratik Ghosh,

14          Kirkland & Ellis, representing Allergan Finance.

15                   MS. VICARI:  Angela Vicari,

16          Arnold & Porter, representing the Endo defendants.

17                   MS. KIM:  Mary Kim from Dechert on behalf

18          of the Purdue defendants.

19                   MR. JANUSH:  Okay.  With that, we'll

20          begin.

21     EXAMINATION BY MR. JANUSH:

22     Q.   Doctor, hello again.

23     A.   Hi there.

24     Q.   It's nice to have met you a little bit before this

25          deposition began.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And just for the record, you and I have

 2            never met before today, is that right?

 3    A.    That's correct.

 4    Q.    Never spoken before today, is that right?

 5    A.    That's right.

 6                    (Saper Exhibit No. 1 marked and

 7                    attached.)

 8    BY MR. JANUSH:

 9    Q.    Okay.  Doctor, your office provided us with a CV

10            just before this deposition began.  I've marked it

11            as Saper Exhibit 1 and put it before you.  I've

12            placed it on the Elmo, and I believe counsel all

13            have a copy that are present in this room.

14                    So I just want to start quickly by going

15            through your education and training, your experience

16            as a physician, and your experience treating pain in

17            that order, okay?

18                    So let's start with your education.

19    A.    I went to the University of Wisconsin in Madison and

20            received a degree, Bachelor's degree, in history.  I

21            then went to the University of Illinois Medical

22            College in Chicago and received my M.D. degree in

23            1969, did my internship at Michael Reese Hospital in

24            Chicago, and then came to the University of Michigan

25            in Ann Arbor to study neurology from 1970 to 1973.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    In 1973 I was asked to join the faculty
 2          of the University of Michigan -- excuse me -- stayed
 3          on the faculty until 1978, at which point I resigned
 4          to develop the Michigan Head Pain & Neurological
 5          Institute which is where we are and received a
 6          clinical appointment as a clinical professor of
 7          neurology by MSU.
 8      Q.  Let's go through your experience as a treating
 9          physician now.
10      A.  Received my license in 1969 when I graduated my
11          internship and then became a resident at the
12          University of Michigan and began treating patients
13          and then continued that throughout my stay at the
14          University of Michigan and then have been in this
15          practice, this year marks the fortieth year.  So
16          I've been a treating physician for approximately
17          fifty years.
18      Q.  And throughout that fifty-year experience, how many
19          years of experience do you have treating pain?
20      A.  My interest in treating pain began while I was a
21          resident, so that was between '70 and '73, and
22          increased by the time that I left the university
23          which was in 1978.  So probably best estimate would
24          be forty-five years.
25      Q.  Okay.  And would you consider yourself an expert in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           issues concerning pain management?

 2      A.   Well, I consider myself experienced.  Expert

 3           designation is for others to determine.

 4      Q.   Okay.  When I turn to page two of your CV, I see

 5           current, past, current and past key national or

 6           state leadership positions.

 7                Can you discuss those current or past

 8           leadership positions?

 9      A.   Well, briefly, I was president of the American

10           Headache Society from '90 to '92, president of the

11           American Council for Headache Education from '92 to

12           '94, national chair of the Pain Care Coalition

13           from -- what does it say -- 1988 to 2000 and 2004 to

14           2010, chair, Medical Advisory Board of the Migraine

15           Research Foundation from 2006 to current, and chair,

16           Head and Facial Pain Section, American Academy of

17           Neurology, from '09 to oh '11.

18      Q.   Okay.  And the national chair of the Pain Care

19           Coalition, can you describe what that role was?

20      A.   The three major pain societies at the time, American

21           Headache Society -- excuse me -- American Headache

22           Society, American Pain Society, and American Academy

23           of Pain Medicine, joined together to work with

24           legislators and advocacy lawyers during those years,

25           and I was elected to be the chairman of that group,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              and that group was called the Pain Care Coalition.

 2      Q.    And what did that group do?

 3      A.    Well, that group met as frequently as we could and

 4              met with a legislative attorney in D.C.  During

 5              those years I wrote together with Congressman Mike

 6              Rogers at the time what became the Pain Care Policy

 7              Act signed eventually by -- passed by Congress and

 8              signed by I think it was President Clinton.  And so

 9              we attempted to influence legislation that was to

10              increase access and care of patients in pain.

11                   Let me correct myself.  I think it was

12              President Obama that signed that Pain Care Policy

13              Act.

14      Q.    Did there come a point in time when you were asked

15              to be part of a joint American Pain Society, an

16              American Academy of Pain Medicine committee

17              dedicated to drafting new treatment guidelines on

18              the use of opioid products?

19      A.    Yes.

20                   MS. HARTMAN:  Objection, form.

21      BY MR. JANUSH:

22      Q.    And when was that?

23      A.    Well, I don't remember exactly when I was asked to

24              be a member of that committee.  It was somewhere

25              around 2008, 2009.  It could have been a little
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          earlier.  I'm not sure.

 2                    (Saper Exhibit No. 2 marked and

 3                    attached.)

 4     BY MR. JANUSH:

 5     Q.   Okay.  I'm going to present to you a document that

 6          is marked as Saper Exhibit 2.

 7                    MR. JANUSH:  Handing copies to opposing

 8          counsel.

 9                    MR. GABEL:  Thank you.

10     BY MR. JANUSH:

11     Q.   And I'm representing that this is one of the

12          documents that you produced in response to a

13          subpoena.

14                    Does this look familiar to you?

15     A.   Yes, it does.

16     Q.   Okay.  What is this document?

17     A.   This document is a letter that I wrote to Doctor

18          Roger Chou who was the administrative chair of the

19          Guideline Committee expressing my concerns at the

20          time.

21     Q.   Okay.  Let's take a step back and have you describe

22          for the court what exactly this Guideline Committee

23          was established to do.

24     A.   Well, it was a group of I think ten, fifteen -- I

25          don't remember the exact number -- of well-,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            well-known and accomplished health professionals in

 2            the pain world, and our charge was to develop

 3            guidelines that would help guide the administration

 4            and monitoring of patients who were on -- who were

 5            placed on opioids for chronic pain.

 6    Q.      Was this -- were the guidelines to address patients

 7            who had chronic pain generally or more specifically

 8            for to address the treatment of non-cancer pain?

 9                    MS. HARTMAN:  Objection.

10                    THE WITNESS:  Well, it was non-cancer

11            chronic pain to be sure.

12    BY MR. JANUSH:

13    Q.      Do you remember how it was that you got asked to be

14            a member of this joint APS/AAPM committee?

15    A.      I don't recall how that all happened.  I imagine

16            that the three presidents of the three contributing

17            organizations, APS, AAPM, and the Headache Society,

18            that one or more of the presidents designated me to

19            be on that committee.

20    Q.      And we began by addressing Exhibit 2, and you

21            noted that this is a letter from you to Doctor Roger

22            Chou.

23                    Tell us more about this letter.  Why did

24            you write this letter?

25    A.      Well, the letter is somewhat self-explanatory.  I
```

```
 1              was expressing concern that certain important

 2              aspects of what I think should have been -- what I

 3              thought should have been included in the guidelines

 4              were not being seriously considered by the committee

 5              and that I felt they were critical, and I laid out

 6              my essential understanding of what our charge was

 7              and why those issues were important.

 8      Q.      What were the certain essential concerns that you

 9              were seeking to address?

10      A.      Well, there were a lot of good things that the

11              committee attempted to do, but my initial concerns,

12              my concerns at this point that I recall without

13              rereading this entire letter again is was that I

14              felt that physicians who were going to prescribe

15              opioids needed to have certain credentials in not

16              only the treatment of pain but also in the

17              pharmacology, risks and benefits of opioid treatment

18              and that the guideline -- at least the draft

19              guidelines -- did not have much in that

20              credentialing domain.

21                      The other part I felt was essential that

22              patients had been tried when reasonable -- and

23              that's most of the time -- on alternate treatment

24              before jumping to opioids, and I didn't feel that

25              those two areas were covered very well.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Q.   You spoke a moment ago about risk/benefit

 2         assessment.

 3                   Can you explain more what that means and

 4         what your concern was regarding a risk/benefit

 5         assessment?

 6    A.   Well, we all know that opioids are not like other

 7         drugs.  They have higher risks.  They have, of

 8         course, the drug dependency potential and interact

 9         with other medicines, and so they are high-risk

10         drugs, and there are many of them, different types

11         of opioids, and one has to judge whether the risks

12         of placing a person on opioids balances against the

13         degree of pain and impairment that a person

14         experiences or reports.

15                   Pain is different than other illnesses,

16         than many other illnesses.  We can't prove that a

17         person's in pain.  We can't prove that a person is

18         not in pain.

19                   And, therefore, the judgment of a

20         physician should be an experienced judgment based

21         upon experience in the field and credentialing

22         perhaps, and those were the issues that were on my

23         mind at the time.

24    Q.   So I'm going to read a specific paragraph and

25         perhaps more than one in this letter and thereafter
```

```
 1              ask you a couple of questions regarding the

 2              statements that you wrote, okay?

 3     A.       That's fine, sure.

 4     Q.       Turning to page two, the second paragraph begins:

 5              Moreover, in my experience and I trust others',

 6              many, if not most, primary care physicians who

 7              initially administer chronic opioid therapy -- is

 8              that what COT stands for?

 9     A.       Yes.

10     Q.       Are not able to discontinue the drugs even when the

11              circumstances warrant discontinuation.  Even in the

12              hands of experts, patients are often resistant to

13              discontinuing the drugs despite failure to meet

14              goals of pain control or function.  Some bolt to

15              find another willing prescriber or use Internet

16              sources or others when the issue is raised.

17              Considering this and the well-known as well as the

18              not so well-known short- and long-term risks of

19              opioid therapy, I feel we are compelled to develop

20              criteria for initial administration that reflects

21              the realistic risks, dilemmas, and knowledge

22              deficiencies associated with chronic opioid therapy.

23              Failure to do so is giving license to practitioners

24              who are at the very lowest level of understanding of

25              these conditions and the use of this treatment,
```

Highly Confidential - Subject to Further Confidentiality Review

 1          ending the quote there.

 2                    I want to focus on that paragraph and ask

 3          what is it that you were seeking to convey.

 4                    MS. HARTMAN:  Objection.

 5     BY MR. JANUSH:

 6     Q.   If you can explain more -- if you can explain and

 7          expand on it for The Court.

 8                    MS. HARTMAN:  Objection.

 9                    THE WITNESS:  Opioids as I said carries

10          risks, carry risk, and we had to recognize that the

11          prescriber needed to have training and experience in

12          the field and knowledge of the drugs themselves and

13          that we should not open up the criteria to allow --

14          we should not write the criteria to allow any

15          physician, any licensed physician, to prescribe

16          these drugs without certain conditions being laid

17          down as criteria.

18                    That's essentially what I was trying to

19          point out given the fact that opioids carry a lot of

20          risks but also have benefits and that the average

21          primary care physician without any special training

22          in pain management or opioid administration should

23          not be given the license to -- with these

24          guidelines, by these guidelines, to administer the

25          drugs.

Highly Confidential - Subject to Further Confidentiality Review

```
 1     BY MR. JANUSH:

 2     Q.    And when you speak about the notion that opioids

 3           carry a lot of risks, what are the risks that you're

 4           speaking to?

 5     A.    Well, I mean, the risks are many from cognitive

 6           impairment to respiratory suppression, and it's not

 7           simply the opioid itself.  It's the opioid in

 8           conjunction with other drugs that can add to the

 9           sedative effect, the cognitive effect, the

10           respiratory effect, and there's many other bodily

11           effects, but those are the more important ones, and

12           those are the ones where the greater risk for fatal

13           outcome is likely.

14     Q.    Were you -- how, if at all, were you concerned when

15           writing this paragraph about the abuse potential

16           associated with opioid products?

17                     MS. HARTMAN:  Objection.

18                     THE WITNESS:  Well, abuse was well known.

19           Years ago a physician that prescribed opioids to a

20           patient without very serious and justifiable cause

21           would likely lose their license.  Medical boards

22           around the country would come down on that

23           physician.

24                     I was concerned that the opening of that

25           door and giving license to physicians based upon
```

```
 1              very little specific criteria would increase the

 2              potential for them to be misused, whether it be for

 3              their hallucinatory effects or the sedative effects

 4              that many people sought.

 5                     We think that some people take opioids

 6              not because they have pain, want opioids not because

 7              they have pain but because they're quite sedating,

 8              quite tranquilizing, and so we had to be sure, and

 9              the doctors that were prescribing these drugs had to

10              be trained to be able to discern those distinctions.

11              That was what was on my mind.

12      BY MR. JANUSH:

13      Q.   How, if at all, were you concerned about the

14              addiction potential related to opioid products when

15              you wrote this paragraph?

16                     MS. HARTMAN:  Objection, form.

17                     THE WITNESS:  Well, the problem, of

18              course, is that opioids are dependency producing,

19              and that means that the more one takes these drugs,

20              the more one will depend on them and need them, and

21              the dose often is required to escalate to achieve

22              the same effect as the lower dose over time.

23                     And so it was almost that I didn't have

24              to say that to this group of doctors that I was

25              writing to through Doctor Chou.  So my concerns in
```

```
 1            terms of that paragraph were addressing what I

 2            thought I needed to establish with Doctor Chou, and

 3            we all understood the addiction potential and

 4            dependency potential for the drugs.

 5     BY MR. JANUSH:

 6     Q.     When you say we all understood, who is the we that

 7            you're speaking to?

 8     A.     I'm speaking of the members of that committee.

 9     Q.     Moving to the next, very next paragraph, the third

10            paragraph, you wrote, quote:  We all appreciate the

11            devastating impact of chronic pain but must be

12            reminded that the urgency of chronic opioid therapy

13            is much less than the urgency of acute pain.  It is

14            my view that it is more prudent to take into account

15            many important clinical variables prior to the use

16            of chronic opioid therapy and that it is our

17            responsibility to delineate these and other

18            requirements as part of this project.  For example,

19            should prescribing physicians have requisite

20            experience not only with the drugs that are being

21            prescribed, in paren, since they can be fatal,

22            closed paren, but with that particular patient

23            before initiating therapy?  Do we really believe

24            that it is appropriate for a primary care physician

25            to administer chronic opioid therapy on a first
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              visit with a painful patient?  Our current work

 2              product and guidelines would support that practice.

 3              I do not.  End quote.

 4                      How was that statement received by Doctor

 5              Roger Chou?

 6      A.      Well, I'm not sure that I know exactly how Roger

 7              received that communication.  I know that I

 8              believe -- I don't have a calendar of my activities.

 9              I believe that after he received this, he shared the

10              letter with others on the committee, and what

11              resulted from that is a Saturday morning conference

12              call that I and several other members of the

13              committee were on -- I think Roger was on it as

14              well -- for us to discuss these various issues.

15                      So I don't specifically know what

16              Doctor Chou's -- Doctor Chou actually played a more

17              administrative role than a clinical directive role.

18              So I think he just passed this on to the committee.

19      Q.      Okay.  Before we get to that Saturday call and

20              discuss that a bit, I'd like to go on to the next

21              paragraph.  You wrote, quote:  That all patients do

22              not have access to specialists or centers should not

23              in and of itself deter us from developing

24              appropriate guidelines for the many who do.

25              Exceptions will obviously have to be made, but our
```

```
 1            standard criteria must be responsible and

 2            appropriate, rigorous, and we must presume that they

 3            will apply to the weakest prescribing links in the

 4            clinical chain.  Many of us presume that they will

 5            apply to the weakest -- many of us have seen --

 6            excuse me -- the consequences when chronic opioid

 7            therapy is inappropriately and unwisely administered

 8            or when unacceptably sustained availability occurs

 9            in the individual who should not have been

10            administered the drugs in the first place, quote.

11                    What were you conveying here?

12                    MS. HARTMAN:  Objection.

13                    THE WITNESS:  Well, one of the arguments

14            against my requests was that not all patients have

15            access to specialists or advanced-trained

16            individuals in the treatment of pain such as those

17            perhaps in rural areas of the country.

18                    So I was acknowledging that, yes, we may

19            have to make some exceptions in some cases but that

20            the general set of guidelines should not be watered

21            down so to speak to accommodate that piece rather

22            than setting up the high bar for protection of the

23            patient.  So that's what I meant by that part of it.

24                    And then the latter part of it of that

25            paragraph was essentially to state that we had to be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              concerned because when people are maintained on

 2              these drugs for very long periods of time, it

 3              becomes very difficult to take them off of it, and

 4              we all know what the consequences of that is or are.

 5       BY MR. JANUSH:

 6       Q.   And what are the consequences of that --

 7                      MR. GABEL:  Objection, form.

 8       BY MR. JANUSH:

 9       Q.   -- that you are referring to when people are on the

10              drug for long periods of time and it becomes

11              difficult to take them off of the drug?

12       A.   Well, even if the reason that their pain improves

13              independent of the drugs or even if it hasn't

14              improved but if the physician knows or feels that

15              it's time for the patient to come off or if the

16              patient is multisourcing and not taking the drugs as

17              prescribed, then there are consequences to that, and

18              the physician may well change their mind.

19                      But then with drugs such as these, the

20              patient can't just be called in and say, okay, John,

21              we're going to take away your Percocet or your

22              oxycodone because it's not that simple with opioids.

23              It's not like an antidepressant.  It's not like a

24              beta blocker or some of the other drugs that we have

25              access to.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And so we have to be very careful in

 2            establishing criteria for usage that embodies the

 3            recognition that this is much more complicated than

 4            just prescribing a drug to an individual, having the

 5            person come back and say, okay, let's do something

 6            else.  It's not that simple.

 7     Q.     When you say that an opioid product is not like a

 8            beta blocker as an example, what is it that you are

 9            referring to?

10     A.     Well, I'm referring to the dependency development.

11            Let's use the word addiction, although addiction has

12            other implications, but, so the dependency or

13            addiction potential, the reduction of respiratory

14            and sometimes cardiovascular function, and the

15            interaction, sedative interaction with many other

16            drugs that a patient in pain might be administered

17            at the very same time.  Rarely is a patient solely

18            placed on an opioid.

19                    But I want to just caveat and say there

20            is a place for opioids in the treatment of pain, and

21            I was specifically addressing how should we write

22            criteria to protect the patient from these

23            medications and yet be available to those who really

24            needed it and be monitored carefully when they were

25            taking it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Q.    In the last paragraph on this page, this second page

 2          of Exhibit 2, you wrote, quote:  My views may not be

 3          shared by other members of the committee, but

 4          increasing numbers of physicians in this country are

 5          coming to believe that the opioid door has been

 6          opened too widely.  Some are arguing to return to an

 7          earlier time when restrictions were unreasonable and

 8          unfounded.  I do not share the view that we should

 9          return to those days.  However, considering

10          regulatory and clinical realities, I do believe that

11          we are compelled to develop responsible guidelines

12          for both initial administration and continuing

13          treatment.  This is both our opportunity and

14          responsibility, quote.

15                    The first sentence of that quote

16          addressed that your views may not be shared by other

17          members of the committee.

18                    Can you describe what you were feeling at

19          the time or observing at the time with respect to

20          whether you were an outlier within this committee?

21    A.    Well, I knew that I was.  I had been at the last

22          meeting that we had had.  I can't remember where it

23          was held, but there were probably fifteen people

24          there on the committee and Doctor Chou, and as we

25          discussed these issues, it became clear to me that I
```

```
 1              was in the minority, stark minority, and so that's

 2              the basis of me saying the views may not be shared

 3              by other people on the committee.

 4                     You know, I could -- at this point in the

 5              saga of these events, I was simply trying to point

 6              out to Doctor Chou and the other members of the

 7              committee that we had a responsibility.  If we

 8              wanted to protect the ability of patients to receive

 9              opioids, when appropriate, then we had to establish

10              rigorous guidelines for that protection to be

11              sustained.

12                     And that was, that was the whole ballgame

13              for me, setting up appropriate criteria for who

14              should administer rather than just anybody, any

15              doctor with a license, and that we had ways of

16              watching and monitoring and setting criteria for the

17              clinical course of that patient before opioids were

18              established.

19         Q.   You ended your letter by stating, quote:  I deeply

20              regret that my lengthy letter comes so late in the

21              game, but it is not too late.  I equally regret and

22              apologize to all of the members of the committee for

23              my unavailability at several of the meetings or

24              conferences, quote.

25                     What did you mean when you wrote that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              regretted that your lengthy letter comes so late in

 2              the game but it is not too late?

 3    A.        Well, I don't remember exactly what prevented me

 4              from attending some of the other meetings.  Some

 5              were conference calls.  I was very professionally

 6              busy at that particular time in my life, and I was

 7              still holding various positions in organizations and

 8              teaching quite a bit.

 9                   So I couldn't attend all the meetings,

10              and I would read the minutes, I'd read what was sent

11              to me, and so that was just acknowledging that I had

12              not been able to be present at all the meetings.

13    Q.        And so when you were writing but it is not too late,

14              were you referring to not too late with respect to

15              the opioid issues in America, or were you referring

16              to it's not too late with respect to the time line

17              of the committee's work?

18    A.        Time line of --

19                        MS. HARTMAN:  Objection.

20                        THE WITNESS:  I'm sorry.

21                        MS. HARTMAN:  You can answer.

22                        THE WITNESS:  Time line of the

23              committee's work.

24    BY MR. JANUSH:

25    Q.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A.    I don't think that at that point the guidelines

 2          had been completed.  They had not been published

 3          for sure, and so that's what I was referring to.

 4    Q.    Okay.  And earlier you had testified about the fact

 5          that there was a Saturday morning call-in, a

 6          conference call meeting over your letter after

 7          Doctor Chou sent it around to other committee

 8          members, is that right?

 9    A.    I'm assuming that that was the basis of that, that

10          meeting.  Certainly we discussed my views at that

11          meeting, but I'm not sure that it was prompted

12          solely by my letter.  Maybe it was.  I don't know

13          that.

14    Q.    Do you remember any of the participants that were on

15          the call at that meeting?

16    A.    I think -- I certainly don't have full recollection.

17          I think that Perry Fine was on the phone at the

18          time, but, honestly, I don't, I don't remember.

19          There was about four or five people on the call.

20          That's all, four or five people.

21    Q.    And do you have any specific recollections of the

22          content of the discussion of that Saturday

23          conference call?

24    A.    Just in general.  They didn't agree with me.  They

25          tried to -- politely and respectfully to dissuade me
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              from my views.  They felt that if we put too high a

 2              bar for opioid treatment, either professional

 3              training or credentialing or too big of a step that

 4              a patient would have to take before opioids could be

 5              administered meaning where along the algorithm of

 6              treatment do opioids belong that it would prevent

 7              some people who needed opioids from getting opioids,

 8              and that was their view, that that was their concern

 9              as expressed to me.

10                   I'm vaguely remembering this, so I don't

11              want to misquote anybody.

12    Q.    Following your transmission of this letter on

13              January 2nd in 2008 and in between or, stated

14              differently, in between January 2nd, 2008, and July

15              1, 2008, do you recall what work you -- what

16              involvement you had with this committee?

17    A.    I don't recall that I had much involvement with the

18              committee at all which is not to say that I might

19              not have talked to some people.  Maybe I even talked

20              to Roger Chou.

21                   I know I had a conversation at one point

22              with Doctor Jane Ballantyne who is a member of that

23              committee and at least to my recollection was the

24              one other member whose sentiments closely

25              parallelled mine, although not necessarily as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              strongly as I felt about those issues, and I do

 2              remember a brief discussion I had with her at a

 3              medical meeting that we both attended.

 4                      But I honestly don't recall much work

 5              with the committee between that time and my

 6              resignation letter.

 7    Q.   Were drafts of the policy guidelines sent around to

 8         you as a committee member between January 2nd, 2008,

 9         and July 1, 2008?

10    A.   I believe that they were.  I don't remember that

11         specifically, but I think that it was the absence of

12         any change at that point fundamentally in the

13         guidelines that prompted me to write my letter.

14    Q.   Okay.

15    A.   My next letter.

16                  (Saper Exhibit No. 3 marked and

17                   attached.)

18    BY MR. JANUSH:

19    Q.   Now we're going to get into that next letter.  I'm

20         going to hand to you what's been marked as Saper

21         Exhibit 3.

22                  MR. JANUSH:  Handing a copy to opposing

23         counsel.

24                  MS. HARTMAN:  Thank you.

25                  MR. JANUSH:  Okay.  I'll put it up on the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Elmo to the best that I can.

 2     BY MR. JANUSH:

 3     Q.   Is this the resignation letter that has been marked

 4          as Exhibit 3 that you have just testified about?

 5     A.   Yes.

 6     Q.   Okay.  And looking at the top of Exhibit 3, it's

 7          addressed to a Judith Paise, Ph.D., R.N., president

 8          of APS.

 9                  Is that president of American Pain

10          Society?

11     A.   Yes.

12     Q.   And it's also addressed to Doctor B. Todd Sitzman,

13          the president of the AAPM.

14                  And that's the president of the American

15          Academy of Pain Medicine?

16     A.   Correct.

17     Q.   Okay.  And why did you send this letter on July 1,

18          2008?

19     A.   Well, they were the president, the current

20          presidents of the two organizations that had

21          sponsored the meetings, and one or both of them had

22          something to do with my appointment to the

23          committee, although I think Doctor Sitzman had just

24          been elected president, so it might have been the

25          previous president.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  But they were the current presidents of

 2          the organizations, and I felt that I needed to let

 3          them know how I felt and sort of publicly state the

 4          reasons why I wanted to resign from the committee.

 5    Q.    Okay.  So we'll start with this quote in the middle

 6          of the first paragraph.  You write:  Nonetheless, I

 7          feel compelled to separate myself from the committee

 8          and express my concerns to you.  It would not take

 9          such a -- forgive me.  I would not take such an

10          unconventional step were it not that I consider this

11          issue of significant importance and a matter of

12          public safety.

13                  What was the issue that you considered of

14          significant importance and a matter of public

15          safety?

16    A.    Well, it was the issues we've already discussed, the

17          concern that we needed to establish a credentialing

18          pathway for doctors to be able to prescribe COT.

19                  I do want to just emphasize if I may that

20          we were talking about chronic administration of

21          opioids.  We are not talking about the use of

22          opioids for a broken bone or postoperative treatment

23          of opioids.  These were cases where we were going to

24          put people on opioids for weeks, months, or years,

25          and that was the issue I was addressing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I was not, I was not bothered by the

 2             ability of a primary care or any other physician,

 3             licensed physician, who would give a short-term

 4             course of opioids for acute pain.  So I wanted to

 5             make that point.

 6                    And so I was quite concerned that without

 7             credentialed and criteria for experience with

 8             chronic pain, nonmalignant chronic pain, and in the

 9             safety and pharmacology of opioids that those would

10             lead to serious public safety issues.

11      Q.    And moving on to the last paragraph on the page with

12             subparts A, B, we skip C and go to D.

13      A.    Yeah.

14      Q.    Typo, right?

15      A.    I noticed that as I was preparing for this

16             deposition.

17      Q.    Okay.

18      A.    So I embarrassingly apologize --

19      Q.    No.

20      A.    -- for leaving out C.

21      Q.    I'm just being accurate so that I'm quoting it

22             correctly.

23                    These issues here, A, B, and D, do these

24             issues concerning, A, physician competence to

25             evaluate chronic pain and determine the appropriate
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              treatment and physician knowledge to prescribe

 2              opioids safely, is that one of the issues that

 3              you've previously been testifying about?

 4      A.      Yes, it is.

 5      Q.      Okay.  And then moving to B or the second issue, you

 6              wrote the importance of effective and responsible

 7              monitoring of usage and treatment efficacy, making

 8              certain that the treatment goals are achieved.

 9                      That's something that you were concerned

10              about with respect to the drafting of these

11              guidelines, is that right?

12      A.      Yes, it is.

13      Q.      Okay.  And then the third issue you wrote:

14              Physician willingness to discontinue opioids when

15              appropriate, is that right?

16      A.      Yes.

17      Q.      And was that something that also you were concerned

18              about related to the drafting of the chronic opioid

19              guidelines by the APS and AAPM Joint Committee?

20      A.      You know, it's a long time ago, and I don't remember

21              where in the guideline development some of these

22              issues were.

23                      But I did not feel that there was enough

24              attention paid to how to discontinue, how a doctor

25              would prescribe opioids but then were not -- was not
```

```
 1              trained, prepared, or taught even informally how to

 2              go about taking a person off those drugs.  That's

 3              what the third, the D was.

 4                        Probably instead of the word willingness,

 5              I probably should have used willingness or ability

 6              to discontinue the opioids, but there was a general

 7              assumption at the time that we would -- that

 8              patients would be put on opioids, and then if they

 9              had to come off, that generally wasn't going to be

10              your average primary care doctor who the guidelines

11              were giving license to giving opioids chronically,

12              again, distinguishing that from acutely, and he

13              would have to be sent -- the patient would have to

14              be sent to a substance program or to a substance

15              abuse treating physician.

16                        So that was different than any other

17              medicine that a doctor would give which is if you're

18              not doing well or you have a side effect, then the

19              doctor takes you off the drug, gives you something

20              else.  So I was -- these concerns were embodied in

21              all those considerations.

22      Q.      Okay.  I'm going to move to the second page of your

23              letter, and you start at the top by saying:  In

24              short, a well-founded concept of risk management

25              must be integrated into the guidelines.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      What were you referring to when you

 2              talked about a well-founded concept of risk

 3              management or wrote about?

 4       A.     When people were on these drugs, we had to make

 5              certain that, one, they were cognitively functioning

 6              with clinical issues, cognitively functioning well,

 7              that we were aware of all the other drugs that might

 8              be administered by any other doctor in their world,

 9              you know, for some other problem that would have to

10              be -- that would interact with the opioids.  So that

11              was the clinical risk issues.

12                      Then there were the issues of abuse,

13              multisourcing, personal dose adjustments by the

14              patient, and we needed to develop concepts of

15              urinary drug screening and other ways to monitor the

16              patient and that we needed to establish contracts

17              for mutual agreement on how that patient was going

18              to be monitored and their responsibility, how often

19              were they going to see the doctor, how frequently

20              were urinary drug screens going to be or any drug

21              screens going to be done, that one pharmacy would be

22              the administering pharmacy rather than anywhere in

23              town, ways to protect against what we had learned

24              from experience or those of us who had learned from

25              experience were aware of what the risks were in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        administering opioids.
 2   Q.   When you speak about one pharmacy being the
 3        administering pharmacy rather than a patient perhaps
 4        filling multiple prescriptions around town, are you
 5        referring to the concept of doctor shopping or
 6        pharmacy shopping?
 7                 MS. HARTMAN:  Objection.
 8                 THE WITNESS:  Yes.  We didn't have the
 9        monitoring programs that we have today at that time.
10        They were in the early phases.  There was talk.  In
11        fact, the Pain Care Coalition that we talked about
12        earlier, we were talking about, you know, the
13        various pharmacy-monitoring programs.
14                 So one way to protect a patient and keep
15        an eye on what was happening, recognizing reality, I
16        guess I would emphasize what we all knew as reality
17        with opioids was to one prescribing doctor, one
18        dispensing pharmacy, and that patients would agree
19        to that, and that was a way to protect.
20   BY MR. JANUSH:
21   Q.   I'm going to move forward just a little bit into the
22        third paragraph.  It's actually the second
23        paragraph, but it begins with with some minor
24        exception, and it states in the second sentence:
25        The guidelines in their current form principally
```

```
 1              focus on and emphasize the post-prescribing period

 2              and not the pretreatment period.  And you wrote:  By

 3              failing to establish pretreatment competence

 4              expectations, the guidelines either assume

 5              competence or reflect the view that no special

 6              knowledge or experience is required to effectively

 7              and safely carry out the assessment and treatment of

 8              chronic pain patients, quote.

 9                  I'm actually going to not end it there.

10              I'm going to read one more sentence.  You wrote:  I

11              believe that most reasonable authorities would find

12              this -- find that indefensible.

13                  Is this the concern you were speaking to

14              in your earlier letter of January 2nd, 2008, where

15              you were also addressing competence expectations?

16      A.      Yes.

17      Q.      And you continued by saying:  In any case, it is a

18              cause of serious concern for me and others.  The

19              U.S. has a serious prescription drug and abuse

20              problem.  In many instances there appears to be a

21              direct linkage between easy to excessive

22              availability, ineffective assessment, unsafe

23              prescribing patterns, and/or ineffective monitoring.

24              The guidelines do address monitoring, but not the

25              pretreatment willingness or capability of physicians
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          to undertake monitoring.

 2                    Can you expand on that to explain the

 3          concern about the guidelines not addressing the

 4          pretreatment willingness or capability of physicians

 5          to undertake monitoring?

 6     A.   Yes.  One of my principal concerns was that in

 7          addition to lacking any credential criteria for who

 8          should and could prescribe opioids chronically,

 9          again, emphasizing we're not talking about acute

10          treatment but chronically, there was also a failure

11          at that time to delineate the monitoring

12          responsibility of that physician and that that

13          physician had to take upon him- or herself the

14          responsibility of monitoring which is not quite the

15          same as monitoring for a dose of antihistamine that

16          you prescribe or a beta blocker or an antidepressant

17          even.

18                    There's a much more rigorous requirement

19          with opioids.  There should have been.  There

20          wasn't.  So that's what I'm stressing --

21     Q.   And in the --

22     A.   -- at that time.

23                    Now, I should add that when the published

24          criteria, when the published guidelines came out, I

25          was pleased to see that there was a little bit more
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            in that direction in several of these issues -- not

 2            all of them -- that I was raising.  But at the time,

 3            they weren't there.

 4     Q.     And we'll get there in a bit.

 5                    You next wrote:  Despite my efforts

 6            during the development process to influence these

 7            guidelines through the committee structure, my

 8            efforts were rejected.

 9                    Earlier we were talking about that call

10            you had after the January 2nd, 2008, letter that you

11            sent, and you indicated that you were in the

12            minority.

13                    Do you remember that?

14     A.     Yes.

15     Q.     How, if at all, did committee members or committee

16            leaders express to you that your efforts to

17            influence the guidelines were rejected?

18     A.     I don't think anybody ever except for that meeting

19            where I clearly hadn't changed anybody's opinion

20            that I was aware of, nor mine, I don't remember

21            anybody at some point coming up to me and to say,

22            well, we're rejecting your thing.  There was just

23            basically nothing said.

24                    I think at some point I must have seen

25            the next rendition of the guidelines, and then I
```

```
 1         understood that those ideas had not been adopted.

 2   Q.    And moving on to the very next paragraph, you wrote:

 3         The liberalization of opioid use for chronic

 4         non-cancer pain has brought both good and bad.

 5         There are many patients today who are living lives

 6         that have been salvaged and made more comfortable,

 7         if not productive and joyful, because of the

 8         availability and proper administration of opioids

 9         for what several years ago would have been

10         considered a prohibited use.  But it must also be

11         acknowledged that liberalization has brought

12         considerable harm, also, and it is to this point

13         that my strong feelings are directed, quote.

14              What is the considerable harm that

15         liberalization of opioid drugs has brought as of

16         writing this letter on July 1, 2008?

17   A.    Well, sorry.  I think we were beginning to see the

18         deaths that were occurring that we believed were

19         attributed to the opioids.  We certainly saw drug

20         misuse, multisourcing.  We saw some violence and

21         burglaries to obtain drugs.

22              And so I remember saying at one of the

23         lectures I gave, I don't remember anybody ever

24         breaking into a drug store to get a beta blocker,

25         you know.  I mean, it created a behavior that we had
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              not seen before but we're beginning to see in all

 2              this, and so the death risks, the criminal behavior,

 3              the substance abuse issues, all of these things we

 4              were beginning to see.

 5     Q.       Okay.  And I'm going to turn the page to page three

 6              of your letter.  I'm going to begin at the paragraph

 7              starting with finally right here.  And you wrote:

 8              Finally, I must point out another important concern.

 9              It is reasonable to assume that the guidelines

10              project has either directly or indirectly been

11              supported by the opioid industry.  The sponsoring

12              organizations have received a large amount of

13              funding from the opioid manufacturers over the past

14              decade.  Many members of the committee have

15              personally received sizable funding from the opioid

16              industry as well.  Congress currently is intently

17              interested in both the prescription drug problem and

18              how physicians and professional organizations are

19              influenced by the flow of dollars to them from the

20              pharmaceutical industry and how this influences

21              treatment policy, guidelines development, and

22              teaching, quote.

23                   Can you elaborate on what you were

24              writing in July of 2008 concerning the sponsoring

25              organizations having received a large amount of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              funding from the opioid manufacturers over the past

 2              decade?

 3       A.     Well, it was my -- I had been on the board of APS

 4              and AAPM.  At one time I was -- they tried to

 5              recruit me to become a president of AAPM, but I

 6              couldn't handle it with all the other stuff I was

 7              doing.

 8                        And so I was aware that these

 9              organizations, like most medical organizations, were

10              being supported by companies that had an interest in

11              the products that that group of doctors would use,

12              would prescribe.  And when we put the -- when the

13              committee was put together, the Guideline Committee,

14              it became apparent -- I can't remember the moment I

15              heard this -- that grants had been received by APS

16              and AAPM from the opioid manufacturers, Pharma, for

17              this committee.

18                        In fact, and I must say that was not a

19              lot different than most medical organizations would

20              handle things.  In other words, they would go to

21              industry or industry would go to them and say how

22              would -- we'd like to support a particular project

23              and ask for a grant, and then the grants were

24              granted very often, not always I know.

25                        But, so that was what I was referring to,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              that this was a committee established, that people

 2              on this committee were known to work closely with

 3              these drug companies and give talks, what was common

 4              practice in medicine, still is, and that the

 5              companies were heavily investing in the programs and

 6              projects of these organizations.

 7      Q.      Were you concerned when writing this paragraph about

 8              the potential for the pharmaceutical industry or the

 9              pharmaceutical manufacturers that produce opioid

10              products to influence treatment policy?

11                      MS. HARTMAN:  Objection.

12                      THE WITNESS:  Yes, I was, because I will

13              say again, opioids are different, and opioids are

14              not like some of the other drugs which have a whole

15              different profile and safety margin.

16                      Not that it makes it better one way or

17              the other, but the risk is that advocacy for those

18              drugs has to be based on medical common sense

19              independent of the financial flow of dollars, and it

20              was my growing fear that that was not the case in

21              the case of these guidelines and programming within

22              the various organizations.

23      BY MR. JANUSH:

24      Q.      You had also addressed as you spoke to moments ago

25              that many members of the committee had also received
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              funding from the opioid industry as well, did you

 2              not?

 3       A.     I did.

 4       Q.     And, actually, in your letter you wrote:  Many

 5              members of the committee have personally received

 6              sizable funding from the opioid industry as well.

 7                       As you sit here today, do you recall any

 8              specific examples of members of the committee who

 9              received funding from opioid industry?

10                       MR. GABEL:  Objection, form.

11                       THE WITNESS:  I think only that it was

12              known amongst us that several of the people were

13              very strong advocates for these opioids and were on

14              the lecture circuits advocating for these opioids.

15              Those are paid responsibilities.  They were on

16              advisory boards.

17                       Again, I will say that that is not

18              different than it is in the non-opioid domain of

19              medical education.  The drug companies tend to do

20              most of the supporting of medical education.  That's

21              true.

22                       I felt -- still do -- that with opioids,

23              they were penetrated in a much more intense way and

24              that we were dealing with a much more potentially

25              dangerous product that needed to be handled much
```

Highly Confidential - Subject to Further Confidentiality Review

1          more independently of people with a vested

2          commercial interest.

3      BY MR. JANUSH:

4      Q.   And in addition to addressing the specific people

5          that served on the committee and whether they

6          individually received funding, did some of these

7          people that served on the committee work for

8          universities that you know received funding or

9          grants from opioid manufacturers while working on

10         this committee?

11              MS. HARTMAN:  Objection, form.

12              THE WITNESS:  I can only assume that that

13         was the case, but I don't know that.  At this point

14         I don't recall those specifics.

15     BY MR. JANUSH:

16     Q.   Do you recall one way or the other whether the

17         University of Wisconsin Pain and Policy Study Group

18         was receiving grants from opioid manufacturers while

19         working on this joint APS and AAPM committee?

20              MS. HARTMAN:  Objection.

21              THE WITNESS:  I'll tell you what I do

22         recall, but I'll give you what I remember.  There

23         were, there were two professionals at the University

24         of Wisconsin that I remember.  One was June Dahl,

25         D-A-H-L, and another one David Jorensen.  To my

Highly Confidential - Subject to Further Confidentiality Review

```
 1            recollection they were both in the School of Social

 2            Work, they were clinical people, and that they had a

 3            project supported it's my understanding because as I

 4            think back, and I have to qualify that by saying I'm

 5            not one hundred percent certain, but it's my

 6            understanding as I recall it that that was support,

 7            that their project which was to go to the medical

 8            boards around the country and attempt to change the

 9            board's position on doctors that prescribe opioids,

10            and that was an initiative that was my understanding

11            as I recall it was supported by some of the opioid

12            industry.

13                      I don't want to lump everybody together.

14            I don't know if it was one company or ten companies.

15            I just -- that was the common knowledge at the time.

16   BY MR. JANUSH:

17   Q.  And when you say that June Dahl and Mr. Jorensen

18            were going around the country to various medical

19            boards, what were they seeking precisely to do as

20            you understand it?

21   A.  The project that they had was to advocate a more

22            liberal attitude towards -- toward doctors who

23            prescribed opioids to their patients with pain and

24            that they were trying to present data that would

25            change the nature of things which was to be quite
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              restrictive, boards to be very restrictive in

 2              allowing physicians to treat nonmalignant pain with

 3              opioids at that time.

 4     Q.       That flows into what my next question concerns which

 5              is the paragraph in the middle of the page three of

 6              your July 1, 2008, letter where you state:  The zeal

 7              to aggressively treat pain may have placed our

 8              responsibility to, quote, first do no harm, quote,

 9              in second position.  In my view the guidelines have

10              set the bar so low for initial administration by any

11              physician who has a medical license and DEA number

12              that the guidelines will, in fact, encourage use by

13              those who are unprepared to carry out the task

14              responsibly and safely, period, quote.

15                       Is this, again, referring to the notion

16              that any doctor would be in a position to prescribe

17              opioids and that is unsafe?

18                       MS. HARTMAN:  Objection.

19                       THE WITNESS:  Well, potentially unsafe,

20              yeah.  I mean, it was referring to essentially the

21              fact that we have -- we took upon ourselves to

22              advocate for the need to more aggressively treat

23              pain.  I support that.  I supported it then, support

24              it now.  And one of the means of treating pain was

25              the use of opioids.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And I felt that in the case of opioids

 2            that there was such strong and often one-sided

 3            advocacy for prompting the use of opioids through

 4            teaching and through courses and through guidelines

 5            that we were forgetting that while treating pain is

 6            our responsibility, not doing any harm is our first

 7            responsibility, and that was the point I was trying

 8            to make.

 9     BY MR. JANUSH:

10     Q.   And in the following paragraph which you -- is

11            really only one sentence that's bolded by you, you

12            wrote:  Such guidelines developed with the support

13            of industry and by many who have been personally

14            paid large sums of -- large sums by industry create

15            a nexus that will not be ignored.

16                    What is the nexus that will not be

17            ignored that you were referring to here?

18     A.   Well, the entire initiative to use opioids in an

19            aggressive way to treat pain and that the teachers

20            and the instructors who are giving courses on how to

21            do that at major pain meetings were people that were

22            also being paid for various other tasks by the drug

23            industry.  It was a conflict, and that's what I --

24            the nexus was a conflict.

25     Q.   Okay.  And in the following paragraph you address:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              In short, the absence of pretreatment competence

 2              expectations from this scholarly group of physicians

 3              and other professionals suggests that nothing

 4              special is necessary.  I believe this is a dangerous

 5              position given the current circumstances.  We should

 6              know better.  Chronic pain does not compel an

 7              emergency response as might be argued, might be

 8              argued by the case of acute pain.  Diligent training

 9              and competence should not be prerequisite --

10     A.   Should be.

11     Q.   Sorry.  Should be -- thank you -- prerequisites to

12          the chronic administration of opioid therapy.  These

13          guidelines do not advance this principle.

14              Can you elaborate on this paragraph

15          further and explain the core of what you were

16          addressing regarding the notion that chronic pain

17          does not compel an emergency response?

18     A.   Again, distinguishing that acute pain, one has to

19          respond quickly, and like any other emergency

20          situation or urgent situation in health care, you

21          know, you sometimes have to bridge the guidelines,

22          bridge the behavior to get to the urgent problem.

23          But we didn't have that urgency in chronic pain.

24          There needed to be time taken to learn about the

25          patient.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              For example, one of the things that I

 2      didn't think that I said somewhere along the line

 3      was that one shouldn't be giving opioids to the

 4      patient who they just met because we don't know that

 5      patient yet.  We haven't had a chance, haven't had a

 6      chance to read all of the background material or

 7      past medical records of the patients who come to see

 8      us, and we don't have a sense of that patient's

 9      accuracy or honesty.

10              Forget we don't have an x-ray to put up

11      on the screen to say, oh, look at that fractured

12      bone.  We don't have an anatomical correlate that

13      can validate the presence of severe pain.

14              So we have to use good judgment and

15      experienced judgment to determine what should be

16      given to whom, and I didn't think that that was

17      being addressed in these guidelines and that

18      diligent training and competence should be

19      prerequisites.  There wasn't a rush to prescribe

20      today when you see a patient.

21  Q.  And you concluded your letter by writing, quote:

22      Deaths and harms have come to many patients

23      prescribed opioids.  The media knows it.  Government

24      and regulatory agencies know it.  Our guidelines

25      must do a better job of addressing it, exclamation
```

1          point.

2                    How did people who received this

3          resignation letter respond to this paragraph, if at

4          all?

5                    MS. HARTMAN:  Objection.

6                    THE WITNESS:  I don't remember much of a

7          response to this letter.  Actually, I think Todd

8          Sitzman, the new president of APS, did come up to me

9          and thanked me for sending the letter.  We didn't

10         have much of a conversation, but he didn't have to

11         have.  He looked me in the eyes and he said thank

12         you for the letter.  So I knew that that was a

13         meaningful connection.

14                   I don't remember receiving much else from

15         anybody that I was interacting with.  Now, it may

16         have occurred.  I just don't remember it.

17    BY MR. JANUSH:

18    Q.   After getting -- after you transmitted this

19         resignation letter on July 1, 2008, who, if any,

20         contacted you to talk you out of your resignation

21         from the committee?

22    A.   Nobody.

23    Q.   Did you ever speak to anybody about that fact,

24         anybody on the committee about that fact?

25    A.   That nobody tried to talk me out of it?

Highly Confidential - Subject to Further Confidentiality Review

```
 1     Q.    Yeah.

 2     A.    I don't recall talking to anybody about changing my

 3           views or going back on the committee.

 4     Q.    One can have a dissenting view as a member of a

 5           committee and theoretically still stay on the

 6           committee and express their dissenting view, is that

 7           right?

 8     A.    Yes.

 9     Q.    In this case, however, when you left the committee,

10           the outcome of that was unanimity on the committee,

11           wasn't it?

12                 MS. HARTMAN:  Objection.

13                 THE WITNESS:  Well, nobody -- I'm sorry.

14           Nobody asked me to leave.  I mean, I wasn't asked to

15           leave the committee.

16     BY MR. JANUSH:

17     Q.    I'm not addressing that.  I'm not addressing that.

18                 I'm addressing the notion that did any

19           potential exist for you to stay on the committee,

20           express your views, and ask for a dissenting note

21           within the guidelines?

22                 MS. HARTMAN:  Objection.

23                 THE WITNESS:  No, no, I didn't ask for

24           that.  I didn't want my name associated with those

25           guidelines, and that's what prompted me to write
```

Highly Confidential - Subject to Further Confidentiality Review

1           this letter.

2                    Nobody asked me to leave, nor did anyone

3           ask me to stay, and I don't actually know how many

4           members of the committee saw this letter.  I sent

5           this to the two presidents.  I didn't send it to

6           everybody on the committee.

7                    And so I don't know whether there might

8           have been a different response if everybody had

9           received the letter.  I thought it was my duty to

10          write it to the two presidents.

11  BY MR. JANUSH:

12  Q.   Let's see if turning the page refreshes your

13       recollection on that.  I see a last --

14  A.   Oh, I did send it to other people.  I'm sorry.

15  Q.   I see that it was sent to Rollin Gallagher, a

16       doctor, Catherine Underwood, the executive director

17       of APS, a doctor named Philipp Lippe from San Jose,

18       California, Phil Saigh, the executive director of

19       AAPM, Richard Rosenquist, M.D., Roger Chou who we

20       spoke about earlier, Doctor Jane Ballantyne,

21       Doctor Fred Sheftell, and Doctor David Dodick from

22       the Mayo Clinic.

23                    I don't see more than that on the CC

24       list, and it certainly looks like there were ten

25       other pages once potentially attached to this letter

Highly Confidential - Subject to Further Confidentiality Review

```
 1            by virtue of the five of fifteen at the top of the

 2            paper.

 3                      Do you see that?

 4     A.     I do, and I'm very embarrassed that I didn't realize

 5            that I must have sent this letter to many more

 6            people.  These are all members of the various

 7            organizations.  Some are presidents, like

 8            Doctor Sheftell was the president of the Headache

 9            Society at the time.  Doctor Dodick was the

10            incoming president of the Headache Society.

11            Doctor Rosenquist was the head of the American

12            Anesthesiological Society.  Everybody else, their

13            title is pretty evident.

14                      So I guess I have to correct myself and

15            say, yes, I sent this letter on to other people and

16            that I don't recall anybody attempting to change my

17            mind which was your initial question on this regard.

18     Q.     And by change your mind, I'm not speaking to change

19            your mind on your belief system.  I'm talking about

20            change your mind on resigning from the committee.

21     A.     That is correct.  I don't recall.  I mean, there

22            might have been somebody that asked me to

23            reconsider, but I do not remember that.

24     Q.     Okay.  That would have been a pretty poignant thing

25            to remember, wouldn't it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. HARTMAN:  Objection.

 2                    THE WITNESS:  Yes.

 3                    MS. VICARI:  Objection to form.

 4    BY MR. JANUSH:

 5    Q.   Would that have been a poignant thing to remember?

 6    A.   If somebody would have asked me to stay?

 7    Q.   Yes.

 8    A.   I think I probably would have remembered it, but,

 9         you know, it's a long time ago.

10                    (Saper Exhibit No. 4 marked and

11                    attached.)

12    BY MR. JANUSH:

13    Q.   I'm going to move on to another exhibit that we've

14         marked Saper Exhibit 4.  This is the Opioid

15         Treatment Guidelines that we've been speaking about.

16                    MR. JANUSH:  Counsel, here are copies.

17    BY MR. JANUSH:

18    Q.   Now, you in your production only produced a portion

19         of the total treatment guidelines, so we found this

20         from within the American Pain Society's third-party

21         production, but it's also available publicly on the

22         worldwide web, and I could have easily printed that

23         out just the same.

24                    But I just wanted to make it clear to you

25         as the witness that this is not the copy you gave,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              you provided in response to the subpoena.

 2    A.    If I may respond to that, the copy that I provided

 3          you is the copy that we had in the file.

 4    Q.    Right.  Understood.

 5    A.    And I think on the Internet, the first several pages

 6          were there, and then you had to go to another

 7          something to get the rest of it, and I think that

 8          for the file, we didn't have that.

 9    Q.    Understood.  Not faulting you in any way.  Just

10          wanted for the record it to be clear why you have

11          the complete set before you --

12    A.    Sure.

13    Q.    -- or what I believe to be the complete set.

14    A.    Right.

15    Q.    Let's see.  The first question, is this the Opioid

16          Treatment Guidelines reflective of the committee

17          that you originally served on before resigning?

18    A.    Yes, it is.

19    Q.    Okay.  And do you recognize the names at the top of

20          the page?  Why don't you read them into the record

21          and then tell us if all of these folks were people

22          who served with you on that committee before you

23          resigned.

24    A.    Well, I don't remember everybody.

25    Q.    Okay.
```

```
1    A.   But I do remember many.  So Roger Chou I do, Gilbert

2         Fanciullo I do, Perry Fine, Jeremy Adler.  I'm not

3         so sure I remember that.  Jane Ballantyne, yes.

4         Pamela Davies, no.  Marilee Donovan, yes.  David

5         Fishbain, yes.  Kathy Foley, I don't think she was

6         at the meetings, but, yes, I remember.  She might

7         have been, but, yes.  I know her.  Jeffrey Fudin,

8         no.  Aaron Gilson, I don't recall that name, nor

9         Alexander Kelter.  Alexander Mauskop, yes.  Patrick

10        O'Connor, I don't remember.  David Passik, Steven

11        Passik, yes.  Gavril Paternak, yes.  Russell

12        Portnoy, yes.  Ben Rich, I don't recall that.

13               Hold on one second.  Let me just try to

14        refresh myself.

15               No, I don't remember that person.

16        Richard Roberts, I don't remember that person.  Knox

17        Todd, I'm not sure I remember that.  Christine

18        Miaskowski, yes.

19   Q.   Okay.  And turning to the --

20   A.   Excuse me one second.  If I can correct myself, I do

21        remember I think Ben Rich, and he was from the

22        University of -- no, wait a minute.  University of

23        Wisconsin was nineteen -- Richard Roberts, I do

24        remember Richard Roberts.

25   Q.   And I'm going to turn to the second page, and I'm
```

```
1              going to address, follow my highlighting if you will

2              right here at the American Pain Society.

3       A.     Okay.

4       Q.     And the second column, it says:  The American Pain

5              Society, APS, in partnership with the American

6              Academy of Pain Medicine, AAPM, commissioned a

7              multidisciplinary panel to develop evidence-based

8              guidelines on chronic opioid therapy for adults with

9              CNCP.

10                    Does that stand for chronic non-cancer

11             pain?

12      A.     Yes.

13      Q.     These recommendations are based on a systematic

14             evidence review, also commissioned by the APS and

15             AAPM.

16                    Do you see that?

17      A.     Yes.

18      Q.     And what was to your knowledge, if you recall, what

19             the systematic evidence review was?

20      A.     Well, it wasn't as rigorous as I would have wanted

21             it to be.  There wasn't a lot of data on some of the

22             key issues.  There was an attempt made I believe to

23             make this as rigorous as they could make it.  I

24             think that Roger Chou who was sort of in charge of

25             all this, I do think he was erudite and scholarly
```

```
 1            in his attempt to put together a defensible

 2            document.

 3                      So that's what that means, that they

 4            attempted to do a well-documented and evidence-based

 5            issue, but there's not evidence for everything that

 6            the guidelines address.  There just isn't evidence.

 7    Q.   And when we speak to evidence based, was it

 8            literature that was being reviewed, scientific

 9            literature or published medical literature that was

10            being reviewed and assessed by the committee and

11            scored based on whether the literature -- how the

12            literature ranked in terms of unreliable at the

13            bottom, moderate in the middle, and highly reliable

14            at the top?

15    A.   Well, evidence is --

16                      MS. HARTMAN:  Objection.

17                      THE WITNESS:  I'm sorry.  Evidence is

18            ranked in general when we do evidence review, and it

19            is ranked according to the rigor of the study that

20            developed that evidence.  If it was a double-blind

21            controlled, placebo-controlled, double-blind,

22            placebo-controlled study, a randomized trial, if it

23            was an open label, if it was just case reports,

24            letters to the editor, things that are in the

25            literature.
```

```
 1                    So those are ranked in terms of their

 2            scholarly intensity and validity.  I was not part of

 3            the process for that literature review, and so I

 4            can't really speak in detail.

 5     BY MR. JANUSH:

 6     Q.     So let me focus your attention to page three of

 7            this.  Actually, we'll start with funding and

 8            conflicts of interest.  At funding and conflicts of

 9            interest, it states:  Funding for the guideline was

10            provided by the APS, period.

11                    Are you aware of whether there was ever

12            any disclosure as to who funded the APS itself for

13            the creation of this guideline?

14                    MS. HARTMAN:  Objection.

15                    THE WITNESS:  Well, it certainly doesn't

16            acknowledge it, but it was my understanding at the

17            time that that funding was coming from various of

18            the manufacturers of opioids.

19     BY MR. JANUSH:

20     Q.     Okay.  And initially I addressed --

21     A.     And that might have been a grant to the

22            organization.  I'm not suggesting that there was a

23            direct funding to the committee.  It was coming from

24            APS or AAPM, and I'm assuming that it was through a

25            grant from the manufacturers to the organization.
```

```
 1    Q.   Okay.  Earlier I addressed moments ago the concept

 2         of the evidence review, and here we have a section

 3         called evidence review, and it states that:

 4         Literature searches were conducted through November

 5         2007.  Investigators reviewed eight thousand

 6         thirty-four abstracts from searches for systematic

 7         reviews and primary studies from multiple electronic

 8         databases, reference lists of relevant articles, and

 9         suggestions from expert reviewers, a total of

10         fourteen systematic reviews and fifty-seven primary

11         studies, not included in previously published

12         systematic reviews, were included in the evidence

13         report.

14              Do you see that?

15    A.   Yes.

16    Q.   Do you recall how many recommendations were

17         ultimately made following the review of this

18         so-called evidence?

19              MS. HARTMAN:  Objection, form.

20              THE WITNESS:  I don't remember much of

21         this at all.

22    BY MR. JANUSH:

23    Q.   Okay.

24    A.   I regret that which, again, is not to say that it

25         didn't occur the way it's described.  But I don't
```

```
 1            recall being subjected to that data, nor reviewing

 2            it in any way.  At least I don't recall.

 3                      MR. JANUSH:  Off the record for a moment.

 4                      THE VIDEOGRAPHER:  Going off the record

 5            at 3:09 p.m.

 6                      (Off the record at 3:09 p.m.)

 7                      (Back on the record at 3:19 p.m.)

 8                      THE VIDEOGRAPHER:  We're back on the

 9            record at 3:19 p.m.

10      BY MR. JANUSH:

11      Q.    Earlier I was speaking about the quality of

12            evidence, so I'm going to have you flip to the page

13            that is marked in the bottom right corner APS-MDL,

14            at least four or five zeros, and then it's 162, and

15            it's Appendix 2.

16                      Do you see that?

17      A.    Yes.

18      Q.    All right.  This is the grading evidence and

19            recommendations concerning the grading methods that

20            are -- were utilized that I was referring to earlier

21            in evaluating all of the literature and evidence

22            that was looked at for this policy guidelines that

23            was implemented.

24                      Do you see that?

25      A.    Yes, I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Q.    Okay.  And there are three different ranks.

 2          High-quality evidence, and that states that it's

 3          evidence includes consistent results from

 4          well-designed, well-controlled, well-conducted

 5          studies in representative populations that directly

 6          assess effects on health outcomes, at least two

 7          consistent higher-quality randomized controlled

 8          trials, or multiple, consistent observational

 9          studies with no significant methodological flaws

10          showing large effects.

11                Do you see that?

12    A.    Yes.

13    Q.    And then there's moderate quality as the middle

14          intermediary.  Evidence is sufficient to determine

15          effects on health outcomes, but the strength of the

16          evidence is limited by the number, quality, size, or

17          consistency of included studies, generalizability to

18          routine practice or indirect nature of the evidence

19          on health outcomes, at least one higher-quality

20          trial with less than one hundred subjects, two or

21          more higher-quality trials with some inconsistency,

22          at least two consistent lower-quality trials or

23          multiple consist observational studies with no

24          significant methodological flaws showing at least

25          moderate effects.
```

```
 1                        Do you see that?

 2      A.   Yes.

 3      Q.   And then the last is low quality.  Evidence is

 4           insufficient to assess effects on health outcomes

 5           because of limited number or power of studies, large

 6           and unexplained inconsistency between higher-quality

 7           studies, important flaws in study design or conduct,

 8           gaps in the chain of evidence or lack of information

 9           on important health outcomes.

10                        Do you see that?

11      A.   Yes.

12      Q.   Now I'd like to go through as briefly, as quickly as

13           I can the Opioid Treatment Guidelines and have you

14           tell The Court for each guideline whether high-,

15           moderate-, or low-quality evidence was deemed by the

16           committee to exist, okay?

17      A.   Okay.

18                        MS. HARTMAN:  Objection.

19                        How is he going to do that without an

20           intense review of the evidence?

21                        MR. JANUSH:  Because I'm going -- you

22           don't need to review the evidence if you've read the

23           document.  There's actually a conclusion at the end

24           of every point addressing what the outcome of the

25           committee was.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BY MR. JANUSH:

 2      Q.   So let's look at recommendations, one, patient

 3           selection and risk stratification, page 115.

 4                     MR. GABEL:  I'd just object on foundation

 5           for this line of questioning, just standing

 6           objection.

 7                     MR. JANUSH:  Fair enough.

 8      BY MR. JANUSH:

 9      Q.   Recommendations, number one, 1.1:  Before initiating

10           chronic opioid therapy, clinicians should conduct a

11           history, physical examination, and appropriate

12           testing, including an assessment of risk of

13           substance abuse, misuse or addiction, and, in paren,

14           the committee notes strong recommendation, comma,

15           low-quality evidence.

16                     Do you see that?

17      A.   Yes.

18      Q.   That's the -- am I correct that this is the

19           committee publishing in parentheses what supports

20           this recommendation, is that right?

21      A.   That's correct.

22      Q.   Okay.  And in 1.2:  Clinicians may consider a trial

23           of COT as an option if CNCP is moderate or severe,

24           pain is having an adverse impact on function or

25           quality of life, and potential therapeutic benefits
```

```
 1            outweigh or likely to outweigh potential harms.

 2            And, again, committee strong recommendation, low

 3            quality of evidence, low-quality evidence, is that

 4            right?

 5    A.   Yes.

 6    Q.   And 1.3:  A benefit-to-harm evaluation, including a

 7            history, physical examination, and appropriate

 8            diagnostic testing, should be performed and

 9            documented before and on an ongoing basis during

10            chronic opioid therapy, strong recommendation,

11            low-quality evidence.

12                     Do you see that?

13    A.   Yes.

14    Q.   Okay.  Now, let's focus for a moment before moving

15            forward on the subject of prescribing opioids to

16            patients generally before having a rule or a mandate

17            or a precept that patients should first try and fail

18            other traditional sources of pain relief --

19    A.   Okay.

20    Q.   -- that are non-opioid.

21                     MS. HARTMAN:  Form objection.

22    BY MR. JANUSH:

23    Q.   Am I correct that what I just stated, this notion

24            that patients should first have to try a non-opioid

25            pain relief therapy and fail it before being put on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            an opioid, is something that -- is a concern that

 2            you had?

 3      A.    Yes.

 4      Q.    Okay.  And --

 5      A.    Although there would be exceptions, but that as a

 6            general rule that I would not want to take -- I did

 7            not think it was appropriate to take a patient with

 8            very little trial, very few trials with other

 9            treatments other than opioids and initially put them

10            on opioids early in the course of their treatment.

11      Q.    So when the -- earlier you said that the committee

12            moved away from where it was in the draft somewhat

13            in its final publication.

14                  Did it move to where you wanted the

15            committee to be on this topic of prescribing opioids

16            as a second-line therapy or a later, a future

17            therapy after a patient fails an initial pain --

18      A.    I think --

19      Q.    I'm not done with my question.

20                  After a patient fails an initial

21            treatment plan of non-opioid products?

22      A.    I don't think they moved to where I thought they

23            should be.  I think they moved in that direction,

24            but there were qualifying words that, I mean, I feel

25            they could have been stronger about the jumping to
```

```
 1            opioids so soon and, also, that the patient needed

 2            to have experience with that doctor, the doctor

 3            needed to have experience with that patient.  It's

 4            part of the same thing actually.

 5                      And so, no, I think they moved somewhat

 6            in that direction, but I don't think they got to

 7            where I thought they should be.

 8    Q.      And moving to number two, additional recommendations

 9            that the committee arrived at concerning informed

10            consent and opioid management plans, here, too, with

11            both of the recommendations, and rather than go

12            through all of the recommendations, I'm just going

13            to look at the evidence that was reviewed was deemed

14            to be low quality of evidence for recommendation

15            2.1, is that right?

16    A.      Correct.

17    Q.      And the evidence that was reviewed for

18            recommendation 2.2 was deemed by the committee to be

19            low-quality evidence as well, is that right?

20    A.      Correct.

21    Q.      And moving to three, initiation and titration of

22            chronologic opioid therapy, at recommendation 3.1,

23            there, too, the committee deemed that there was

24            low-quality evidence to support the recommendation,

25            is that right?
```

```
 1    A.   Correct.

 2    Q.   And moving to 3.2, opioid selection, initial dosing,

 3         and titration should be individualized, and it goes

 4         on.

 5              Here, too, the committee found a strong

 6         recommendation but low-quality evidence in the

 7         literature to support this, is that right?

 8    A.   That is correct.

 9    Q.   And moving to number four, methadone, at 4.1, this

10         is an area where the committee found a strong

11         recommendation and a moderate -- moderate-quality

12         evidence.

13              Do you see that?

14    A.   I do.

15    Q.   Okay.  And at number five, monitoring, here we have

16         at 5.1 concerning clinicians reassessing patients on

17         chronic opioid therapy periodically and as warranted

18         by changing circumstances, and there's more language

19         that follows.  We have a strong recommendation by

20         the committee with, again, a note of low-quality

21         evidence.

22              Do you see that?

23    A.   Yes, I do.

24    Q.   And in 5.2:  In patients on chronic opioid therapy

25         who are at high risk or have engaged in aberrant
```

```
 1              drug-related behaviors, here, too, we have strong

 2              recommendation, low quality of evidence.

 3                      Do you see that?

 4    A.   Yes.

 5    Q.   And 5.3, the committee notes, again, a weak

 6              recommendation for 5.3 and low-quality evidence.

 7                      Do you see that?

 8    A.   Yes.

 9    Q.   And going to recommendations at six concerning

10              high-risk patients, the committee assesses that it

11              evaluated low-quality evidence at 6.1 and

12              low-quality evidence at 6.2.

13                      Do you see that?

14    A.   I do.

15    Q.   And the same exists at recommendation 7.1, 7.2, 7.3,

16              and 7.4, all of which the committee cited low

17              quality of evidence in making its recommendations.

18                      Do you see that?

19    A.   Yes.

20    Q.   And at 8.1, opioid-related adverse effects, the

21              recommendation is that clinicians should anticipate,

22              identify, and treat common opioid-associated adverse

23              effects, strong recommendation with moderate-quality

24              evidence.

25                      Do you see that?
```

```
 1    A.   Yes.

 2    Q.   Okay.  And at 9.1, use of psychotherapeutic

 3         cointerventions, 9.1, strong recommendation,

 4         moderate-quality evidence.

 5              Do you see that?

 6    A.   Yes, I do.

 7    Q.   And then at 10.1, the recommendation regarding

 8         driving and work safety, low-quality evidence is

 9         cited, is that right?

10    A.   Yes.

11    Q.   And at 11.1, recommendations concerning identifying

12         a medical home and when to obtain consultation,

13         low-quality evidence.

14              Do you see that?

15    A.   Yes.

16    Q.   And at 11.2, there is a note from moderate-quality

17         evidence concerning clinician should pursue

18         consultation, including interdisciplinary pain

19         management, when patients with chronic non-cancer

20         pain may benefit from additional skills or resources

21         that they cannot provide, and here there's an

22         increased quality of evidence to moderate quality of

23         evidence.

24              Do you see that?

25    A.   I do, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Q.   And at breakthrough pain, recommendation 12.1:  In

 2         patients on around-the-clock chronic opioid therapy

 3         with breakthrough pain, clinicians may consider

 4         as-needed opioids based upon an initial and ongoing

 5         analysis of therapeutic benefit versus risk, and

 6         here we have a weak recommendation and a low-quality

 7         evidence.

 8              Do you see that?

 9    A.   Yes, I do.

10    Q.   And then at number thirteen, opioids in pregnancy,

11         13.1, recommendation, once again, a low quality of

12         evidence is cited.

13              Do you see that?

14    A.   Yes.

15    Q.   And at fourteen on opioid policies:  Clinicians

16         should be aware of current federal and state laws,

17         regulatory guidelines, and policy statements that

18         govern the medical use of chronic opioid therapy for

19         chronic non-cancer patients, and here, too, there's

20         a low quality of evidence cited.

21              Do you see that?

22    A.   Yes.

23    Q.   And in total, I counted twenty-one recommendations

24         associated with a low quality of evidence, zero

25         recommendations associated with high-quality
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            evidence, and four recommendations associated with

 2            moderate evidence.

 3                    I'm not asking for you to commit that all

 4            to memory, but does that, does that seem right that

 5            there were about four that were elevated to the

 6            moderate standard?

 7       A.   I do.

 8       Q.   Okay.

 9                    (Saper Exhibit No. 6 marked and

10                    attached.)

11       BY MR. JANUSH:

12       Q.   I've marked as Saper Exhibit 6 a document that you

13            produced in response to the subpoena served on you

14            in this case, and it is entitled The Influence of

15            Pharma and Device Manufacturers on APS and other

16            PMA'S, A War Within a War, and you're listed as the

17            author.

18                    Before we get into the substance of this

19            document, can you tell me what this document

20            reflects?

21       A.   This was a, I think it was a draft -- it may have

22            been my final draft -- of my lecture or speech in a

23            debate that I had with -- I don't recall whether

24            this was in the APS domain or whether this was a

25            debate with Doctor Haddox, but it was in that period
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            of time when all of this stuff was playing out, and

 2            I was asked to represent my side of the concerns.

 3            This was dated 10-12-11, so within a year of some of

 4            this happening, and I gave a presentation, and this

 5            was my presentation.

 6                        I had a debate, it was listed as a debate

 7            with Doctor Haddox at Mass General, requested by

 8            members of the pain group at Harvard, and then I had

 9            a debate with -- I can't remember with whom -- at an

10            APS meeting.  So somewhere in that domain, this was

11            the body of my presentation.

12    Q.     Okay.  So since this is 2011, we'll put it aside for

13            the moment and take in time chronologically the

14            document you produced dated March 24, 2010, titled

15            More on the Pain Debate.  We'll mark that as

16            Exhibit 7, and then we'll come back to Exhibit 6 in

17            a moment.

18                        (Saper Exhibit No. 7 marked and

19                        attached.)

20    BY MR. JANUSH:

21    Q.     Do you recognize this document?

22    A.     Yeah.  Now, this is a different debate.

23    Q.     Okay.

24    A.     So this was a debate chaired by Doctor Schacktiman,

25            and I think this was at AAPM, so the other one must
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              have been either sponsored -- well, it was at

 2              Harvard.  It was Mass General.  So it was probably

 3              the team at Harvard that put that debate together.

 4                     So this is a different debate because

 5              these are ten minutes, and this talk is much longer

 6              than ten minutes.

 7     Q.   Okay.  Let's get into this debate titled More on the

 8              Pain Debate, March 24, 2010.

 9                     Where was this again?

10     A.   I don't remember, but it was at one of the AAPM

11              gatherings.  It probably was an annual meeting.

12     Q.   Okay.  And the title of the debate is The Influence

13              of Industry in APS.

14                     Is that the title of the debate, or is

15              that the title of your presentation within the

16              debate?

17     A.   I don't remember.  I don't remember.

18     Q.   Okay.  Why don't you take a moment to look through

19              this document and then help explain what your

20              position was within this debate if you can tell from

21              this document.

22     A.   Okay.

23     Q.   Does a review of this document refresh your

24              recollection as to what this debate concerned?

25     A.   Well, yeah.  I think that it was, it was -- I regret
```

```
 1           that I don't have any more details on this, but I

 2           think that I was putting down thoughts to

 3           myself, thoughts that had been expressed by

 4           Doctor Schacktiman and related to the topics, not

 5           the guidelines specifically but just the events that

 6           were taking place within the different pain

 7           organizations with respect to medical education,

 8           funding, choice of programming, various other things

 9           that I address here, and so I was putting ideas down

10           for myself for what I eventually was going to talk

11           about in one forum or another.

12      Q.   Can you elaborate on the words that you wrote as

13           follows, quote:  Doctor Schacktiman gave an example

14           of how programming was biased and influenced by fear

15           that industry would impose repercussions and

16           consequences for negative programming for their

17           product.  A program on opioids has been dinged, not

18           too dissimilar from all the positive programs at

19           AAPM which I protested or the heavily weighted

20           committee for guidelines.  Evidence-based is not

21           always the Holy Grail.  Common sense and logic must

22           influence policy.  Patients die of opioids; drug

23           problems exist, quote.

24                     Can you elaborate on what you were

25           conveying in taking down these notes in preparation
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              for your debate?

 2    A.   Yes.  I don't think I expressed a couple of those

 3         points very well, so I will explain.

 4                   Doctor Schacktiman had been giving some

 5         examples of what he considered to be as I said

 6         biased programming that were influenced by the fear

 7         that there would be financial consequences if there

 8         was a lot of negative programming on the opioid or

 9         the products.

10                   I had been -- I was criticizing

11         programming at I think it was the American -- at

12         AAPM because there was a strong advocacy list of

13         programs, and none this one year that I was involved

14         in it, none that helped young doctors see a

15         different side of the opioid administration or be

16         taught how to take people off the opioids once they

17         started.

18                   And so that was part of the dialogue, and

19         I was just throwing some thoughts out as I was

20         thinking about my presentations.  So that's

21         essentially what I said dissimilar from all the

22         positive programs.  By positive I meant advocacy for

23         opioids, and so I didn't say that very clearly, but

24         that's what was going on.

25    Q.   And the fear that industry would impose
```

```
 1            repercussions and consequences for negative

 2            programming for their product, what was that

 3            concerning?  Was that concerning negative

 4            repercussions in the sense of reduced funding for

 5            your organization?

 6       A.   Yeah.

 7                      MS. HARTMAN:  Objection.

 8                      THE WITNESS:  I was interpreting his

 9            remarks, I shared those views, but that's what I was

10            trying to say that there would be somehow or other

11            if they were investigating, they certainly didn't

12            want their product to be disadvantaged.  That was

13            the fear and that there would be perhaps some

14            withholding in funding.

15       BY MR. JANUSH:

16       Q.   In the next paragraph you address within your notes

17            for this debate:  Among the solutions, colon, all

18            committees must be balanced in education, et cetera.

19            There must be firewalls that are mutually respected

20            and the identification of safe harbors where the

21            value of industry can be felt in the development of

22            programs and projects.

23                      What did you mean by this?

24       A.   Well, by balancing committees that such as the

25            Opioid Committee that there would have been a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           reasonable balance by people who shared my views and

 2           concerns about opioids and guidelines and those that

 3           had a more liberal or advocacy role, that the

 4           committees would be balanced.

 5                    The same thing Education Committee where

 6           programs are chosen for presentation at the major

 7           pain meetings at the major pain meetings, so the

 8           programs weren't all in one direction and not in the

 9           other.

10                    And then the firewall is, again, that we

11           create a mutually respected attitude so that they

12           did not interfere, industry would not interfere in

13           our ability to come up with appropriate guidelines

14           or programs, educational topics, things of that

15           sort.

16      Q.   And you concluded your notes with the following

17           paragraph.  The problem has existed for years.

18                    Let me pause there for a moment.  The

19           problem that has existed for years is referring to

20           what, what problem?

21      A.   This, this influence of education and funding and

22           programming and projects and committees, everything

23           we've been talking about.

24      Q.   And when you say this influence, you're talking

25           about the corporate influence by opioid product
```

```
 1           manufacturers?

 2                     MS. HARTMAN:  Objection.

 3                     THE WITNESS:  Not just opioid.  I think

 4           it's across the board between Pharma and medical

 5           education because medical education is essentially

 6           funded by Pharma.

 7      BY MR. JANUSH:

 8      Q.   So to ask the question differently, when you say the

 9           problem has existed for years, who or what is at the

10           source of the problem?

11      A.   The source of the problem is how do medical

12           societies fund their programs, how do they, how do

13           they keep their members at reasonable dues levels

14           but put on broad educational programs, and that's

15           the same for all the societies, all the medical

16           societies, and traditionally the, you know, the drug

17           companies have been generous in supporting programs.

18                     And I want to make sure I emphasize that

19           a lot of the doctors would not, would not influence

20           the content of their presentations, nor their

21           decisions at committee meetings based upon any

22           funding.  But when the influence of money as in

23           politics is there, there are opportunities for

24           problems, and I was addressing that issue.

25      Q.   Thank you for that clarification.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    So now to read the complete paragraph, it

 2         states:  The problem has existed for years, but it

 3         was the spiraling increase in opioid advocacy that

 4         crystallized the glaring recognition of this

 5         revolutionary initiative that transformed a

 6         reluctant body of conscientious doctors to the

 7         national epidemic of overuse that we see.  The

 8         programming from the major pain organizations,

 9         including APS, and the involvement of industry

10         executives on boards, committees, and influencing

11         their friends could not be ignored.  Even the

12         presentation at a professional meeting in which

13         Doctor Haddox tried to dissuade the audience from

14         believing the coroner's report as to the cause of

15         death from those linked to OxyContin overdose.  And

16         you end with:  It would also help to have

17         statistics.

18                    Can you explain what you're speaking to

19         here with respect to the programming from the major

20         pain organizations and the involvement of industry

21         executives that could not be ignored?

22    A.   Yes, and I'm glad you're asking me to explain it

23         because I want to make sure that it isn't

24         overreaching.

25                    In terms of industry executives on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          committees, the only example that I am aware of was

 2          with Doctor Haddox.  Doctor Haddox is a friend of

 3          mine.  He was a friend.  I still consider him a

 4          friend, although we strongly disagree as you can

 5          hear.

 6                  And I objected to the fact that he --

 7          after he became an industry executive, he remained

 8          influential in the American Academy of Pain

 9          Medicine, a society which he at one point was

10          president of, of which he was president of and had

11          friends and knew how decisions were made and so

12          forth.  He was also helpful in funding the society

13          obviously as an executive of a major-involved

14          pharmaceutical house.

15     Q.   Which pharmaceutical house is that?

16     A.   Purdue Pharma.

17     Q.   Okay.

18     A.   And I was -- and I shared this with him -- troubled

19          by the fact that he was -- the last sentence

20          speaking to the fact that he was asked to give or

21          given an opportunity to give a lecture at one of the

22          meetings, big meetings, from the podium that

23          challenged the autopsies of the OxyContin causes of

24          death as determined by the medical examiners.

25                  So the autopsies concluded death due to
```

```
 1            OxyContin, and Doctor Haddox was going down the list

 2            of patients in which he refuted the validity of that

 3            diagnosis by the medical examiners, and I was

 4            troubled by that because I didn't find his argument

 5            compelling and I didn't think it was appropriate at

 6            that meeting, and I told him so.  I told the people

 7            at AAPM the same thing.

 8    Q.    And when Doctor Haddox was refuting the causes of

 9            death on death certificates as having been listed as

10            OxyContin related, he was doing so in what capacity?

11            In other words, who was he employed by?

12                     MS. HARTMAN:  Objection.

13                     MS. VICARI:  Objection, form.

14                     THE WITNESS:  He was, he was at the time

15            an executive of Purdue Pharma, and he was obviously

16            asked or he asked -- I don't know -- but he was

17            given a lecture slot to do so.

18    BY MR. JANUSH:

19    Q.    Given that Doctor Haddox is your friend and you

20            expressed that you let him know your feelings, how

21            did he react to your expression of being unsettled

22            by his conduct?

23                     MS. HARTMAN:  Objection.

24                     THE WITNESS:  He disagreed with me.  He

25            felt it was important for him to be able to express
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            himself.  We had several conversations over time in

 2            which I expressed my views which you've heard and he

 3            expressed his views which he disagreed with my

 4            views, but throughout that time we remained friendly

 5            and we interacted.

 6    BY MR. JANUSH:

 7    Q.   Okay.  I'm going to --

 8    A.   And it's not, you know, you know this I think.  I

 9            hope you know that I'm not entirely comfortable with

10            the conversation about a friend of mine who I know

11            that I'm, you know, raising certain concerns, but

12            you've subpoenaed me to this deposition and I'm

13            sworn to be honest, and so I'm being honest.

14    Q.   Thank you for that.

15                I'm going to turn back to I believe I

16            marked it as Exhibit 6, and it's the longer debate

17            notes I believe that are dated 9-27-10 and then

18            10-12.  Sorry.  There we are on the screen, and then

19            10-12-11.

20                Is it that these notes were written in

21            between this time period, or were there two

22            versions?

23    A.   No.  I probably just edited it.

24    Q.   Got it.

25    A.   And those were the two different revisions.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Okay.  So Exhibit 6 is titled The Influence of

 2            Pharma and Device Manufacturers on APS and Other

 3            PMA'S, A War Within a War.

 4                      First of all, what are PMAs?

 5      A.    Professional medical associations.

 6      Q.    So PMAs would include American Pain Society and

 7            American Academy of Pain Medicine in your

 8            nomenclature?

 9      A.    Yes.

10      Q.    Is that right?

11      A.    Right.

12      Q.    What was this document written for, if you can

13            recall?

14      A.    Well, I had these several debates or presentations

15            that I was asked to give my opinion on these

16            matters, and I constructed a document that contained

17            many of my thoughts.

18                      I think this was not a final document

19            from the way I think some of the extra pages

20            reflect, but I don't recall specifically.  My typist

21            at the time has retired and is not reachable, so I

22            can't go back.  But I was sharing my thoughts and

23            perspectives that reflected more of what I've

24            already testified to.

25      Q.    Okay.  I'd like to go through this document with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            you.

 2                      Is that okay?

 3       A.   Sure.

 4       Q.   All right.  All right.  Okay.  Let's see.  Let's

 5            start with page one.  Second paragraph, you address

 6            that you practice neurological pain care principally

 7            in headache for forty years in both academic and

 8            private institutions, and you next state:  I have

 9            served on the boards of APS and AAPM, and I'm a past

10            president of the Headache Society.  I have been its

11            ethics chair for nearly a decade.

12                      Let me pause there.  What do you do in a

13            role as being an ethics chair for the Headache

14            Society?

15       A.   Well, we would try to establish ethical guidelines

16            that would involve physician behavior related to

17            those members who we had, and if there were

18            behaviors that were brought up that were troubling

19            that the committee would judge those behaviors and

20            try to develop a report to the board.

21       Q.   The next note states that this presentation reflects

22            elements and arguments that I first presented during

23            a program of APS in Baltimore in 2009.  Doctor David

24            Haddox, a prominent former practicing physician, a

25            past president of AAPM, and now vice president of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Purdue Pharma and I just faced off.

 2                   This looks like --

 3      A.    I might have meant -- if I can interrupt you.  I'm

 4            sorry.  I might have meant Boston and not Baltimore.

 5      Q.    Okay.

 6      A.    That would seem more appropriate because that might

 7            have been the Harvard --

 8      Q.    Okay.

 9      A.    -- talk that I was referring to.

10      Q.    So even if these notes were in draft form for an

11            expected presentation, is it fair to say that these

12            notes reflect elements and arguments that you had

13            already presented in 2009?

14      A.    Yes.

15      Q.    Okay.  And at page two, you're addressing that these

16            organizations, and by these organizations, I believe

17            you're referring to the PMAs?

18      A.    Yes.

19      Q.    Both heavily supported by commercial sources,

20            particularly the opioid industry, had acted

21            unethically by failing their expected role to

22            provide balanced and evidence-based educational

23            programming.

24                   Can you elaborate on that?

25      A.    Well, it's another statement similar to what I said
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            in that balanced programming is that you don't just

 2            present one side of an academic argument, clinical

 3            or otherwise, and I did not feel that those

 4            organizations were presenting balanced educational

 5            programming with respect to opioid matters.

 6     Q.     And next you get into funding at the bottom of page

 7            two and address that.  CMEs, continuing medical

 8            education, which are generally sponsored by the PMAs

 9            are a two billion dollar a year undertaking.

10            Approximately one half of the cost of these major

11            educational programs comes from physician

12            participants and their organizations.  Industry

13            spends more than one billion annually to cover these

14            costs, and I see a parenthetical to reference.

15                       When you wrote this, did you, did you

16            look to resource information or reference

17            information to come up with your dollar estimates

18            here?

19     A.     Well, I had to, but I don't remember.  I mean, I

20            could not have come up with those numbers without

21            some framework, and so somewhere along the line, I

22            saw those numbers and felt they were reliable, and I

23            simply was noting to myself that I wanted to put

24            down that reference at some later date.

25     Q.     Okay.  And so somewhere might there exist a final
```

```
1           draft version that may have that?

2     A.    I haven't found it.

3     Q.    Okay.

4     A.    I will look.  I will continue to look.

5     Q.    And at the bottom of page three, I'm going to jump

6           down as it stays with the same theme I believe, you

7           wrote:  But in my personal experience -- let me get

8           it into the Elmo.

9                 Actually, I'm going to go above to the

10          paragraph above to make a point here.  You were

11          writing about on page three generally continuing

12          your discussion about -- let's see, I'll highlight

13          it -- meetings are subsidized, booths are purchased,

14          physician attendance is underwritten along with

15          meals, honoraria, and social activities.  Mailing

16          lists are purchased, satellite symposia developed,

17          and funds for the development of practice guidelines

18          and other doctrines that influence physician

19          professional behavior are granted.  Friendships and

20          relationships between physicians, administrators,

21          and corporate representatives are widespread.

22                 Did I read that right?

23    A.    Correct.

24    Q.    And then you say, you go on to say:  In my view,

25          none of this is evil or necessarily unethical.  Were
```

```
 1          it carried out appropriately, these relationships

 2          can be beneficial to all parties, particularly

 3          patients, right?

 4    A.    Right.

 5    Q.    Does the next paragraph confirm for you that perhaps

 6          it was not carried out appropriately?

 7                    MS. HARTMAN:  Objection.

 8    BY MR. JANUSH:

 9    Q.    I'd like you to read your next paragraph and give me

10          that answer.

11                    MS. HARTMAN:  Objection.

12                    THE WITNESS:  But in my personal

13          experience, the educational programs of AAPM and

14          APS, particularly as they involve opioid advocacy,

15          were greatly influenced by commercial largess.  In

16          my opinion commercial dynamics indeed influenced, if

17          not steered, the selection of abstracts, course

18          topics, and faculty to commercially friendly

19          participants as it involved opioid advocacy, largely

20          ignoring those imposing or exhorting caution

21          against the growing advocacy for opioids for chronic

22          nonmalignant pain.

23    BY MR. JANUSH:

24    Q.    So having read what you wrote in that paragraph,

25          were you taking the position that this was not
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          carried out appropriately as per the above

2          paragraph?

3     A.   That was my opinion.

4                MR. GABEL:  Objection, form.  I'm sorry.

5          I didn't get a chance to get that in.

6     BY MR. JANUSH:

7     Q.   Okay.  Just to be clear, the preceding paragraph

8          addressed:  In my view, none of this is evil or

9          necessarily unethical.  Were it carried out

10         appropriately, these relationships can be beneficial

11         to all parties, particularly patients.

12               And then I asked you to read the ensuing

13         paragraph, right?

14    A.   Right.

15    Q.   And your conclusion as to whether educational

16         programs of AAPM and APS as they involve opioid

17         advocacy was carried out appropriately or

18         inappropriately, and your answer is?

19    A.   I felt it was inappropriate.

20               MS. HARTMAN:  Objection, form.

21    BY MR. JANUSH:

22    Q.   Thank you.

23               Now I'd like to address at page five the

24         middle paragraph.  Can you read that middle

25         paragraph for the record?
```

```
 1    A.    APS and AAPM are fine organizations, directed and

 2          managed historically by good people with honorable

 3          goals.  These organizations and their boards, I have

 4          sat on both, have made enormous contributions to the

 5          welfare of patients in pain, pain research, and to

 6          better treatment of pain worldwide.  In my opinion,

 7          however, the organizations have failed to live up to

 8          obvious ethical expectations.  And the best example

 9          involves the nexus between APS and AAPM, their

10          foundations, and what I call narcopharma, the

11          pharmaceutical manufacturers that produce opioids.

12    Q.    Okay.  So as someone who has experience as an

13          ethical director of a -- is it the neurology --

14    A.    The Headache Society.

15    Q.    The Headache Society.  Can you explain how, how APS

16          and AAPM failed in your estimation to live up to

17          obvious ethical expectations?

18    A.    Well, I think I've already spoken to those.  I'll

19          review them.  I think that in the development of

20          guidelines and the balance of programming choices

21          that were made and related educational and

22          activities that there was I felt too close a

23          relationship in some instances.

24                I don't, I don't know about all the other

25          opioid manufacturers and what their influence was or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          how close they were to the decision-makers.  I only

 2          know selectively and I've testified to that, and I

 3          felt that that was just too close and that the

 4          programming influenced, it was influenced and biased

 5          in a direction that I think was inappropriate.

 6     Q.   So just now for clarification, you said I don't know

 7          as to all of the manufacturers, but when you said

 8          you testified selectively, were you referring to

 9          Doctor Haddox and Purdue Pharma?

10     A.   Yes, I was.

11               MS. HARTMAN:  Objection.

12               THE WITNESS:  I'm sorry.  Yes, I was.

13          That's the one example that I had personal

14          involvement in meaning knew about it.

15     BY MR. JANUSH:

16     Q.   Okay.

17     A.   So, yes, that's what I meant.

18     Q.   And if hypothetically you were presented with a

19          sheet showing the Excel spreadsheet of all of the

20          donations made around the time that this committee

21          made before, during, and after the committee you

22          once served on was formed for the APS and AAPM and

23          it showed all of the various manufacturers that made

24          opioid products, how would that, if at all, impact

25          your determination as to whether the -- whether it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              reached beyond Purdue, this ethical issue --

 2                   MS. HARTMAN:  Objection, form.

 3         BY MR. JANUSH:

 4         Q.   -- that you have testified to?

 5                   MR. GABEL:  Objection, form.

 6                   THE WITNESS:  It's not the amount of

 7              money, but as the amount of these grants grow, there

 8              is a far greater burden placed on the organization

 9              to have these firewalls, to have -- to go out of

10              their way to establish balance in their choice of

11              programming so that they're not advocating in one

12              direction more than others.

13                   And my feeling was at the time that they

14              were and that there was a greater burden that wasn't

15              being fulfilled, and it had potentially dire

16              consequences because of the type of product we were

17              dealing with, meaning the opioids.

18                   I would have felt uncomfortable but far

19              less concerned were we advocating for an NSAID or a

20              beta blocker just to give you two examples.  It

21              wouldn't have been appropriate behavior, but it

22              wouldn't have been as dire in my view.

23         BY MR. JANUSH:

24         Q.   How, if at all, does the next paragraph addressing

25              the:  Twenty years ago opioids were shamelessly
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            underprescribed for acute, malignant, and

 2            end-of-life pain, and today the overadministration

 3            of these agents for what many, including me, believe

 4            to be inappropriate cases of reported pain has

 5            produced a drug crisis in the U.S., and your

 6            paragraph goes on.

 7                     How, if at all, does this paragraph

 8            relate to your prior testimony?

 9                     MR. GABEL:  Objection, form.

10    BY MR. JANUSH:

11    Q.     Stated differently, let me strike that and ask this

12           differently.  In this paragraph at the end of page

13           five and going into page six, you address that there

14           was an overadministration of opioid products, is

15           that right?

16    A.     Yes.

17    Q.     And you address that this overadministration in

18           inappropriate cases of reported pain has produced a

19           drug crisis in the U.S., is that right?

20    A.     Yes.

21    Q.     And you address that this is an epidemic that in the

22           view of many was bad enough that the government has

23           predictably stepped in to regulate the practice of

24           medicine as it relates to the prescribing of

25           opioids.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        Do you see that?

 2      A.    Yes.

 3      Q.    How did the government predictably step in to

 4            regulate the practice of medicine as it relates to

 5            the prescribing of opioids?

 6      A.    Well, the DEA and the FDA have established various

 7            remedial -- attempts at remedial action.  The state

 8            boards of medicine in various states have developed

 9            guidelines for doctors to give opioids which at some

10            point at times are reasonable, at times are

11            unreasonable.

12                        And I'm old enough to remember the

13            Valium parallel.  In the late '70s, Valium was

14            overprescribed to anyone who the doctor felt needed

15            a tranquilizer, and there were books written and

16            people went on TV to talk about what Valium had

17            done, and it then became almost criminal to write

18            prescriptions, for doctors to write prescriptions

19            for Valium, and eventually there was regulation and

20            control.  We see it today with the benzodiazepines.

21                        The medical profession should not want

22            government to step in and tie our hands and good

23            judgment when we make reasonable judgments about the

24            care of patients which is complex, but if the

25            medical professionals don't control themselves or
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              medical organizations don't act to control the very

 2              things we're talking about, then government is

 3              forced eventually to protect society, and they step

 4              in, and that in my view is ultimately a bad thing

 5              for good medical care.

 6    Q.        But in this case, government didn't -- did

 7              government step in and limit the ability to

 8              prescribe opioid products in any meaningful way?

 9                      MS. HARTMAN:  Objection, form.

10                      THE WITNESS:  Well, there are regulations

11              now that require -- these are mandated by government

12              that may or may not be appropriate in all settings

13              in which opioids may be used.

14                      There's also in my view an overconcern

15              for some of the other drugs that can be somewhat

16              sedating, though not dependency producing such as

17              opioids, that were giving -- the government warns

18              doctors this patient -- government or various

19              agencies warn doctors don't use those drugs

20              together, this is -- you're on a list, you're going

21              to be -- your prescribing patterns are going to be

22              monitored.

23                      That may be a bit of an overstatement,

24              but that stuff is all happening right now, and I

25              think I know a lot of doctors that are afraid to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              prescribe opioids at this point because of the

 2              overreach and the fear that is being established

 3              that has come from all of this happening, and I

 4              don't think government had a choice, but that's the

 5              predictable, as I said, the predictable involvement

 6              of government when doctors themselves don't police

 7              the ongoing issues and crises that we encounter with

 8              certain medicines.

 9                   I myself prescribed opioids for headache

10              patients for a very short time preventively.

11              Eventually I wrote a paper that showed that very few

12              people actually benefited from that, and I pulled

13              way back and don't do that anymore.  But there are

14              people being harmed right now because they've been

15              on opiates for a very long time, opioids for a very

16              long time, and the doctors are afraid to prescribe

17              it and for the very reasons that we're talking.

18      BY MR. JANUSH:

19      Q.   Because of the magnitude of the crisis?

20      A.   One, the fear that they will harm somebody and/or

21              the fear that they will violate principles of care

22              that are being established now, that they will

23              violate government limits, monitoring.

24                   Doctors should voluntarily set elements

25              within our guidelines and the things we've talked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              about and not have to have government step in and

 2              tell us how to practice.  That's not a good thing.

 3       Q.     And then moving, I'd like to move on to the next

 4              paragraph that addresses:  Opioids are indispensable

 5              for acute, malignant, and end-of-life pain.

 6                      Do you see that?

 7       A.     Yes.

 8       Q.     Okay.  And you address:  Gaining regulatory

 9              acceptance was an essential and honorable

10              undertaking, but widespread administration for

11              chronic non-cancer pain is another matter.

12                      What are you referring to there?

13       A.     Well, there is a place for opioids in the treatment

14              of pain for patients.  Certainly not everybody with

15              acute pain needs to be placed on opiates but some

16              do, and postoperatively, for example, there may be a

17              need for opioids.  But not every painful event

18              should require opioids.

19                      But when you get into chronic non-cancer

20              pain, you're talking about leg pain, back pain,

21              shoulder pain, headache, neck pain, arm pain, finger

22              pain, et cetera.  That's a different matter.

23                      Now, some are very severe, life limiting,

24              disabling, and so forth, and there may be a need in

25              some of those cases for chronic opioid therapy, but
```

```
 1              it has to be, has to be very carefully administered,

 2              and it needs to be administered by people who

 3              understand the risks and can monitor for the risks.

 4     Q.    And does your -- do your next two sentences address

 5              the rationale for why you've taken that position

 6              that you just expressed because opioids are

 7              different than other drugs and for the reasons you

 8              wrote at the bottom of page six?

 9                    MS. HARTMAN:  Objection, form.

10                    THE WITNESS:  Let me just --

11     BY MR. JANUSH:

12     Q.    Please feel free to read it out loud into the record

13              starting with --

14     A.    And despite?

15     Q.    Yeah.

16     A.    And despite arguments to the contrary, opioids are

17              indeed different than other drugs.  They produce

18              dependency, craving, euphoria, major endocrine

19              disturbances and tranquilization, and are more

20              likely to be fatal and harmful than most other

21              day-to-day treatments.

22     Q.    So my question was is that why you take the position

23              that widespread administration for chronic

24              non-cancer pain is another matter?

25     A.    Yeah, yes, it is.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Okay.  I'd like to move to page seven.

 2      A.    I should not write such long speeches.

 3      Q.    I'd like to move to page seven where you address --

 4            why don't you read it in your own words, the second

 5            paragraph.

 6      A.    It was a masterful achievement and in the public

 7            good that efforts by members of APS achieved a

 8            lessening of regulatory burdens in the use of

 9            opioids for the treatment of acute, cancer, and

10            end-of-life pain.  But in their zeal and with the

11            financial backing from narcopharma, the initiative

12            evolved from its initial goals to incite an

13            avalanche of opioid prescriptions and widespread

14            availability.  Opioids were advocated and became

15            available not just to patients reporting convincing,

16            severe pain, but to almost anyone who reported pain,

17            whether that pain was convincingly severe or in some

18            cases believable at all, whether other remedies were

19            a better choice, whether the patient was trustworthy

20            and compliant, whether the physician knew the

21            patient at all.

22      Q.    Do you believe these words today?

23      A.    Yes.

24      Q.    And then you -- why don't you continue with the next

25            paragraph.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A.    It is reasonable to ask the question:  Was this an

 2          accidental outcome derived from a well-intended

 3          effort by well-meaning professionals, or did this

 4          epidemic begin as a result of a creative and

 5          brilliant, though stealth marketing strategy,

 6          energized through financial incentives to

 7          cash-starved organizations with the help of willing

 8          professionals?  I think both.

 9    Q.    Do you believe those words today just as when you

10          wrote this?

11    A.    Yes.

12    Q.    Let's move on to the final paragraph on this page.

13    A.    In my opinion APS, AAPM, and its leaders along with

14          narcopharma coalesced for three reasons in the

15          initiation of the opioid strategy:  Because it was

16          necessary to improve our treatment of acute pain, to

17          financially support PMAs and perhaps physician

18          advocates, and in the case of Pharma, to increase

19          market share and profit through corporate duty,

20          their profit, dash, their corporate duty.

21    Q.    And do you believe all of these words just as you

22          wrote them in 2011?

23    A.    Yes, I believe different dynamics.  I'm not sure

24          all, all of the businesses, all of the opioid

25          companies, producing companies, were of equal
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            involvement in various of these activities.  I just

 2            don't know enough about one from another except the

 3            limited experience that I do have, and I've shared

 4            that.

 5     Q.     Would it be a correct statement that as a general

 6            matter in the case of Pharma as you wrote, you

 7            believe that, that APS, AAPM, its leaders, along

 8            with the pharmaceutical manufacturers worked

 9            together to financially support the PMAs and

10            physician advocates to increase market share?

11                    MS. HARTMAN:  Objection form.

12                    THE WITNESS:  You know, I think that's

13            probably true, but I can't say that with absolute

14            certainty.  I think it's logical.

15     BY MR. JANUSH:

16     Q.     Okay.  And you address at the top of page nine that

17            the APS and its foundation led an early brigade.

18            Professors June Dahl and David Jorensen of the

19            University of Wisconsin were funded to undertake an

20            initiative to visit boards of medicine in state

21            after state to argue the importance of lessening the

22            regulation of doctors who prescribe opioids for

23            cancer, acute, and end-of-life pain.  They

24            succeeded.  Their initiative was funded from perhaps

25            several sources, but certainly APS, which in turn
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              was heavily supported by narcopharma.  The

 2              advocates' university has received grants on their

 3              behalf from narcopharma.  Their success is a matter

 4              of record.

 5                      Do you see that?

 6    A.   Yes.

 7    Q.   And you were speaking -- are these the folks you

 8              were speaking about before that traveled the country

 9              around to visit boards of medicine in different

10              states?

11    A.   I believe that was the program, yes.

12    Q.   Okay.  And when you wrote this, did you have

13              specific information that their initiative was

14              funded from APS?

15    A.   I can't remember exactly.  I think I did.  I

16              certainly wouldn't have just assumed that.

17    Q.   Okay.

18    A.   But I think that there -- I mean, I've had

19              discussions way back with David and with June Dahl,

20              and I think that we knew that that was a funded

21              initiative.  I can't say with certainty.

22                      There was another funding agency called

23              the Mayday Foundation in those days.  I don't know

24              if it's still available, if it's still in existence,

25              but I know they funded programs on advocacy for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              opioid usage.

 2    Q.   And you also address:  The advocates' university has

 3         received grants on their behalf from narcopharma.

 4              And you're referring to the University of

 5         Wisconsin, is that right?

 6    A.   You know, I would not have made -- I'm a graduate of

 7         the University of Wisconsin.  I would not have made

 8         that statement had I not known something factual,

 9         but, or heard something that I believed to be

10         factual, but I cannot recall where I would have got

11         that information from.

12    Q.   Okay.  And you next move into the Joint Commission

13         initiative which you wrote was also supported by APS

14         and employed an important new concept, the fifth

15         vital sign, a welcomed and well-intended initiative

16         conceived by Doctor James Campbell, a highly

17         regarded and influential neurosurgeon from a

18         prestigious medical center, then president of APS

19         and later chair of its foundation.

20              Do you see that?

21    A.   Yes.

22    Q.   When you wrote this, did you, did you know that the

23         Joint Commission initiative concerning the fifth

24         vital sign was indeed supported by APS?

25              MS. HARTMAN:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Well, I must have if I said

 2           that.  I mean, as I say, I didn't just make that

 3           stuff up.  It's a long time ago as you know, and I

 4           don't recall all of the sources of my information at

 5           this point.

 6      BY MR. JANUSH:

 7      Q.   Would the fact that I skipped or didn't read the

 8           fact that Doctor James Campbell was noted to -- by

 9           you to be a friend in the ensuing sentence that I

10           didn't read.

11                    Do you recall having discussions with

12           Doctor James Campbell about the Joint Commission

13           initiative regarding the fifth vital sign and

14           support by the APS?

15      A.   I remember a board meeting that I was at where

16           Doctor Campbell talked about the concept of a fifth

17           vital sign initiative to put pain on the map so to

18           speak -- that's my phrase -- and that to make the

19           treatment of pain in a hospital setting more

20           efficient because there was, in fact, a widespread

21           concern -- and I think it was valid -- that pain was

22           not well attended to in the hospital by people

23           postoperatively and in other ways.

24                    And so this was an attempt, an honest

25           attempt in order to put criteria for hospitals
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              through the Joint Commission in order to better

 2              attend to the pain of the patients, to ask them just

 3              like we would do blood pressure and pulse readings.

 4                      So it was the fifth vital sign,

 5              respiration, blood pressure, pulse, and -- what did

 6              I forget?  And, of course, pain.  Respiration,

 7              pulse.  I'm forgetting one of them.  How do I do

 8              that?  At any rate, that was the basis of it.

 9    Q.   Okay.  And you started --

10    A.   Temperature.  That was the other fifth.

11    Q.   You said that this began as an honest effort, and

12              I'm going to turn your attention to reading the top

13              of page ten, of the paragraph at the top of page

14              ten, and after you're done I'm going to ask you a

15              question.

16    A.   Do you want me to read?

17    Q.   Sure.

18    A.   Where, where do you want me to start?

19    Q.   It was directed at acute pain.

20    A.   It was directed at acute pain, which was laudable.

21              It has morphed into something else.  The guidelines,

22              well meaning as they might have been, suffer greatly

23              from lack of perspective and wisdom, the most

24              glaring of which is failure to distinguish acute

25              pain from chronic pain by treaters who would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              otherwise not have a clear sense of this

 2              distinction, and by the absence of when enough is

 3              enough.  This program revolutionized hospital care

 4              through accreditation criteria.  Development of

 5              these guidelines within the Joint Commission was

 6              with the assistance of key aggressive opioid

 7              advocates.

 8    Q.        What are you referring to when you write the

 9              development of these guidelines within the Joint

10              Commission with the assistance of key aggressive

11              opioid advocates?

12    A.        Well, I don't remember all the details at this

13              point, but it's my vague sense and recollection that

14              there were discussions amongst all of us, how did

15              the Joint Commission, and people would say, well,

16              they visited the joint college, they visited the

17              Joint Commission and made this pitch to them and

18              convinced them to write guidelines or to establish

19              guidelines on the use of pain control measures

20              within hospitalized patients.

21    Q.        I'm going to take you to page -- I'm going to skip

22              forward in the interest of time and since we've

23              covered some other material that's similar earlier

24              to paragraph fourteen on page fourteen -- excuse

25              me -- where you're addressing the most odious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            example of what you believe to be biased influence

 2            over practice.

 3                    Can you read that paragraph and talk to

 4            us about what this means?

 5      A.    I must also say if I can --

 6      Q.    Sure.

 7      A.    -- take the liberty that these comments were to be

 8            given to my colleagues in the various debates.

 9            These were not for public distribution if you know

10            what I'm trying to say here, and some things would

11            have been said differently had I been putting these

12            comments together for more public debate, more

13            public distribution.

14                    Perhaps the most odious example of what I

15            believe to be biased influence over practice was

16            reflected in personal experience while on the

17            APS/AAPM committee to develop opioid guidelines.  It

18            was a project funded through the organizations, who

19            received grants and commercial support from

20            narcopharma.  Almost every member of the twelve to

21            fifteen member committee, except for perhaps two of

22            us, was a well-known aggressive advocate of

23            unrestricted opioid therapy for chronic nonmalignant

24            pain.  At the very least it was not a balanced group

25            of advocates and cautionaries.  The committee's
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              organizational leaders and research assistants were

 2              honorable and scholarly in their approach, but the

 3              decision-making and ultimate guidelines were the

 4              result of committee member decisions.  At a critical

 5              point in the process, I recommended that the

 6              guidelines required a minimal standard for

 7              competency for prescribing physicians.  I also

 8              recommended that pretreatment criteria be

 9              established so that opioid initiation would require

10              more than simply the complaint of pain.  The

11              committee would have nothing of either competence

12              training -- it should have been nor pretreatment

13              criteria.  My recommendations were soundly rejected.

14              I appealed but failed.  There would be no barriers

15              to prescribing or standards, even self-assessment of

16              competence.  In the committee's view, any licensed

17              physician of any skill and learning with any level

18              of experience in the treatment of pain or knowledge

19              of opioid pharmacokinetics who had a DEA number

20              could prescribe opioid to any patient without

21              limiting criteria, restrictions, or background

22              considerations.

23         Q.   Let me pause you there.  So far what you've read, do

24              you agree with that language as you sit here today?

25         A.   Yeah.  It's a bit harsh, but I don't disagree with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            the sentiment behind it.

 2   Q.   Okay.  And earlier when you said, you know, you were

 3            writing for your peers and not for public

 4            consumption, was that intended to mean that you were

 5            writing in a way that's most honest before your core

 6            group of people that you work with in the same

 7            field?

 8   A.   That's what I meant.

 9   Q.   Okay.

10   A.   Is there a question on the table?

11   Q.   Yeah.  Well, first I asked you if these words mean,

12            you know, the same today as they did when you wrote

13            them.

14   A.   Right.

15   Q.   And now I want to have you read at the top of page

16            sixteen where you were headed before I interjected

17            with that question.  Go ahead.

18   A.   I would not allow my name to be associated with the

19            documents, and I publicly resigned.  In the end

20            after I had departed, some small steps were taken in

21            the direction of my recommendations, but by the time

22            it was well -- but by that time it was well beyond

23            the point at which I could comfortably participate.

24            I do not know with certainty, but I cannot avoid

25            believing that undisclosed commercial conflicts of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            interest were influential.  My recommendations were

              modest and relevant, and resistance to them was

 3            intense and absolute.

 4    Q.      Do you stand by these words today?

 5    A.      Yes.

 6    Q.      And in the ensuing paragraph, you write about a

 7            committee member who spoke with you following your

 8            departure.

 9                  Can you read that?

10    A.      Following my departure, one other committee member

11            who chose not to resign said to me they're mad.  By

12            that she meant that they are out of their minds.

13    Q.      Are you willing to disclose who that committee

14            member was?

15    A.      I don't know if that's fair to that person without

16            perhaps me talking to her first.

17    Q.      Now I want to get into what you viewed to be the

18            consequence, consequences to this decade-long

19            undertaking.

20                  First, what is the decade-long

21            undertaking what you're addressing?

22    A.      The aggressive opioid advocacy --

23    Q.      Okay.

24    A.      -- and liberalization.

25    Q.      And what are the consequences that you are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         addressing?

 2    A.   Well, again, these are data that I found somewhere

 3         in the literature online.  Failed poisonings

 4         quadrupled in seven years.  The number of deaths

 5         involving methadone increased sevenfold between '99

 6         and 2006.  The retail distribution of oxycodone

 7         increased by six hundred and sixty percent between

 8         '97 and 2003.  Ninety percent of all drug deaths are

 9         now due to opioids with the majority due to

10         hydrocodone, methadone, and OxyContin.  One life is

11         lost every fourteen minutes due to prescription

12         drugs, largely opioids.

13    Q.   And, again, in order for you to write this, did you

14         do research to find factual underpinnings?

15    A.   I had to.  There would be no way to come up with

16         those numbers.

17    Q.   And rather than take you through the entire

18         document, I'm going to end with this.  At the bottom

19         of page eighteen, can you read from in our

20         eagerness?

21    A.   In our eagerness to address a glaring and troubling

22         problem of undertreated acute cancer and end-of-life

23         pain, a colossal public health crisis has evolved.

24         APS and AAPM and its members have participated, if

25         not promoted, this crisis by failing to assure the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            presentation of unbiased, balanced educational

 2            programs and guideline development, thereby

 3            protecting the public from the commercial influence

 4            through undisclosed support from the opioid

 5            industry.  In failing to do so, the organizations

 6            failed to protect patients.  The government has now

 7            stepped in to solve a problem that should have been

 8            solved by professionals and their organizations.

 9    Q.      And do you believe these words as you wrote them

10            back in 2011?

11    A.      I do.

12    Q.      How would you describe the nature of the opioid

13            crisis as you've termed it in the present, at the

14            present time?

15    A.      Well, there's a bit of a boomerang effect or maybe a

16            pendulum effect and you hit the wall, and now

17            doctors are fearful to use opioids, and there are

18            harms coming from -- in some ways from people who

19            need and have to be maintained on opioids at this

20            point anyway, and there are many doctors that are

21            fearful because of government issues and regulatory

22            and state issues, licensing issues, and perhaps

23            malpractice issues.

24                      On the other hand, I think that it is

25            better that we're now restricting our use of opioids
```

```
 1            as compared to the way it was in the past.

 2            Unfortunately, this is the same pattern as we saw

 3            with other drugs that were misused or

 4            overprescribed, and then there's the they hit the

 5            wall and overreaction in the other direction

 6            sometimes.

 7      Q.    As you sit here today so many years after voicing

 8            your concerns, do you feel vindicated?

 9      A.    I don't feel good about anything here including

10            talking about this that involves my friends who I

11            respect.  I don't know if they would call me their

12            friends any longer, but I think that this is -- this

13            whole dilemma should have been, should have been

14            prevented I think by reasonable efforts, and if we

15            saw there was harm happening, we should have taken

16            steps ourselves to police what we were doing and

17            stopped it, and those of us that are teachers should

18            have been teaching a different perspective, a

19            moderate perspective.

20                  And so I don't feel good about anything.

21            I don't feel vindicated actually.  I feel troubled

22            by the fact that I'm torn between loyalty to my

23            profession and my friends and doing what I think is

24            in the public good by revealing what I know.  But I

25            don't feel good about it at all.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    Q.   I don't have any further questions at this time.

2         Thank you, Doctor, for your testimony today.

3    A.   You're welcome.

4              MS. HARTMAN:  Defendants will have

5         questions, but we're going to maybe take a

6         five-minute restroom break.

7              THE WITNESS:  Sure.

8              THE VIDEOGRAPHER:  Going off the record

9         at 4:44 p.m.

10             (Off the record at 4:44 p.m.)

11             (Back on the record at 4:56 p.m.)

12             THE VIDEOGRAPHER:  We're back on the

13        record at 4:56 p.m.

14   EXAMINATION BY MS. HARTMAN:

15   Q.   Greetings, Doctor Saper.  My name is Ruth Hartman,

16        and I'm here on behalf of Endo Pharmaceuticals and

17        the manufacturing defendants.

18             Based on your testimony so far, would it

19        be fair to say that you advocate the use of opioids

20        for the treatment of acute pain?

21   A.   When it's, when it's appropriate, yes.

22   Q.   Okay.  And is it fair to say that you also believe

23        general practitioners can prescribe opioids for

24        acute pain?

25   A.   If they're acknowledgeable about the opioids and how
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            to prescribe them, I think that that's a necessary

2            responsibility for primary care physicians.

3    Q.      Could you give me some examples of situations where

4            general practitioners may prescribe opioids for

5            acute pain?

6    A.      Well, treatment of a fracture, treatment of perhaps

7            acute injury of some sort, broken bone, a severe

8            sprain, not necessarily as a first-line drug, but

9            certainly along the course of treatment, I would

10           think that a primary care physician.

11                   But I want to say, qualify, again, that I

12           believe that opioids even in the acute form need to

13           be given by people who understand the implications

14           of opioids and how they can affect everything from

15           heart rate and the EKG changes that can occur with

16           some of them.  So we have to assume not all

17           doctors -- whether they're primary care or

18           neurologists or whatever -- are equally

19           knowledgeable about everything.

20                   So first they have to be knowledgeable,

21           and then the patient has to be -- it has to be

22           suitable in that patient.

23   Q.      Could we talk a little bit about Exhibit 6 which was

24           your address?  It was about eighteen pages long.  I

25           just have one question.  You said if this were to be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              given to a public audience, it might read

 2              differently.

 3                        What do you mean by that?

 4     A.    Sure.  I think I was a bit harsh.  I don't retract

 5              the words or the sentiments, but I think that I was

 6              lecturing to my colleagues and with a sentiment that

 7              we needed to do better as a profession and we let

 8              this get out of hand and speaking to the -- my

 9              colleagues in the pain world, pain treatment world.

10                        If I were to say this in a more public

11              forum, I wouldn't be as specifically critical, but I

12              would not hold back on my concerns for what's

13              happened here.

14                        And I was asked by the former questioner

15              as to whether I felt vindicated.  You know, a lot of

16              people have died, a lot of families have been

17              altered, and there's no way to feel good about any

18              of this, and I understand the basis of his question.

19              I don't mean any disrespect on that point, but this

20              is, this is just I think a crisis, and if we

21              understand how it happened, we may be able to

22              prevent it from happening again.  I think that's how

23              I feel.

24     Q.    Okay.  Well, you said you were a little harsh.

25                        I mean, you were trying to convince
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          people of your position?

 2                    MR. JANUSH:  Move to strike, move to

 3          strike.  Objection.

 4                    THE WITNESS:  Well, it's hard to explain.

 5          I mean, you can soften words and express the same

 6          sentiments.

 7     BY MS. HARTMAN:

 8     Q.   Okay.

 9     A.   I don't know how you folks talk to each other as

10          attorneys, and I think if you were talking to a body

11          of attorneys on some of the things that attorneys do

12          or don't do, you know, I think that your choice of

13          words might be different than if you were talking on

14          ABC News or Fox News about the legal profession.

15     Q.   Sure.

16     A.   You might say it a little differently.

17     Q.   Yes.

18                    Do you support the aggressive treatment

19          of pain?

20     A.   Yes.

21     Q.   And what does that mean?

22     A.   Well, first you listen to the patient and you take

23          the patient's symptoms seriously.  That doesn't mean

24          that you believe everything that is said.  We all,

25          just like you as an attorney, you have to take
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              things and interpret them.

 2                      But pain needs to be treated.  Chronic

 3              and acute pain need to be treated, but we have

 4              enormous ways, an enormous number of ways of

 5              treating pain, and so one can be very aggressive

 6              without prescribing opioids.

 7    Q.   But you could prescribe opioids to treat a chronic

 8              pain if you have the requisite knowledge in your

 9              view?

10                      MR. JANUSH:  Objection.

11                      THE WITNESS:  If one has the requisite

12              knowledge, requisite knowledge, and if the patient

13              is an appropriate candidate for chronic use.

14    BY MS. HARTMAN:

15    Q.   Okay.  All right.  You talked a lot about CMEs and

16              industry groups, correct?

17    A.   Uh-huh.

18    Q.   And I think, and correct me if I'm wrong.

19    A.   PMAs.

20    Q.   PMAs.  But also PMAs offer CMEs, is that correct?

21    A.   Yeah.

22    Q.   Okay.  And you say PMAs rely a lot on pharmaceutical

23              companies for their funding, is that correct?

24    A.   Yes.

25    Q.   Are there other alternative sources of funding
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              besides pharmaceutical companies for the PMAs?

 2                       MR. JANUSH:  Objection.

 3                       THE WITNESS:  Well, there are dues, and

 4              there are -- not all is from the pharmaceutical

 5              company.  I mean, there's device manufacturers.

 6              There are sometimes government grants for various

 7              projects that would be done within that society.

 8                       But a large amount of money, like,

 9              percentage of money, does come from the

10              pharmaceutical industry.

11        BY MS. HARTMAN:

12        Q.   And if the pharmaceutical industry stopped funding

13              the PMAs, what would happen to them?

14                       MR. JANUSH:  Objection, calls for

15              speculation.

16                       THE WITNESS:  Some could not survive.

17        BY MS. HARTMAN:

18        Q.   But don't the PMAs offer an important source of

19              CMEs?

20        A.   Of course, yes.

21        Q.   Okay.  So CMEs would be affected?

22        A.   Yes, they would be.

23        Q.   You've conducted clinical research before, correct?

24        A.   Correct.

25        Q.   Has any of your research been funded by medical
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            device companies or pharmaceutical companies?
 2                      MR. JANUSH:  Objection.
 3                      THE WITNESS:  Yes.
 4    BY MS. HARTMAN:
 5    Q.   Could you name a few?
 6    A.   Sure.  Amgen, Alexzo, Doctor Reddy.
 7                  You know what that is?
 8    Q.   No.
 9    A.   It's an Indian company that does a lot of -- they do
10         a lot of studies in the United States.
11                  Gosh, I think twenty or thirty different,
12         all the major companies I think over the years.  My
13         first, my first study was in 1975, and I've been
14         doing them ever since.
15    Q.   Okay.  Would you say what percentage of your
16         research is funded by medical device companies or
17         pharmaceutical companies?
18    A.   Probably, because we're not doing basic research,
19         we're essentially doing drug studies and device
20         studies, so probably ninety-five percent.
21    Q.   Okay.  But despite this funding, are you still able
22         to be objective in your research?
23    A.   Yes.
24    Q.   Okay.  And you're not the only doctor who can
25         conduct research objectively after receiving funds
```

```
 1            from a medical device or a pharmaceutical company,

 2            correct?

 3      A.    That's correct.

 4      Q.    Great.

 5                  And despite the funding, you're still

 6            able to conduct your research with scientific

 7            integrity, correct?

 8      A.    Well, it's not only conducting research.  I mean,

 9            the research is essentially guided by FDA-approved

10            formats for those research projects.

11                  If you ask the question differently about

12            interpreting research, interpreting research or

13            prescribing those drugs after they've been approved,

14            yes, I do, and I use ethical standards to do it, and

15            so do most doctors I believe.

16      Q.    So you're not saying here today that accepting

17            funding from a pharmaceutical company means someone

18            is unable to be objective?

19      A.    That is correct.

20      Q.    Okay.

21      A.    I'm not.

22      Q.    And you're not saying that accepting funding means

23            someone is unable to act with scientific integrity,

24            are you?

25      A.    That is correct, I'm not saying that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.  And you've also provided consulting services

 2           for medical device and pharmaceutical companies, is

 3           that correct?

 4      A.   Yes, I have.

 5      Q.   Approximately how many companies?

 6      A.   Well, over the years, probably thirty, thirty-five

 7           over the years, maybe even more.

 8      Q.   Okay.  And were you able to be objective in your

 9           opinions?

10      A.   I believe I was.

11      Q.   And were you compensated for your services?

12      A.   Do you mean, like, lectures you're talking about?

13      Q.   Yeah.

14      A.   Yeah, I would always be compensated in one way or

15           the other.  Now, some lectures were not compensated

16           for, but mostly, yes.

17      Q.   So you can be objective even though you're receiving

18           compensation?

19      A.   I believe I can be, and I believe most of my

20           colleagues can be.

21      Q.   Okay.  Do you agree that it's important for

22           pharmaceutical companies to consult with top experts

23           in their particular fields?

24      A.   Yes.

25      Q.   Why is that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A.   Well, because pharmaceutical companies need

 2         guidance.  They often need to hear what we feel are

 3         appropriate needs in terms of drug development,

 4         clinical, clinical drug's development, and I think

 5         and I must say I have a good relationship with most

 6         of the companies in terms of the advisory boards

 7         that I've sat on over the years.  So I think it is

 8         an important dialogue back and forth.

 9    Q.   Okay.  In fact, it would be a problem or it could be

10         detrimental to patients if pharmaceutical companies

11         did not consult with experts in their fields?

12    A.   I believe that to be true.

13                   (Saper Exhibit No. 5 marked and

14                    attached.)

15   BY MS. HARTMAN:

16    Q.   Okay.  I want to introduce Exhibit 5.  I took this

17         off a website, your website.

18                   Do you recognize this study referenced in

19         the website?

20    A.   Do you mean Allergan?

21    Q.   Yeah.

22    A.   Yes, of course.

23    Q.   So are you running a migraine study sponsored by

24         Allergan?

25    A.   Currently, yes, we are.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     Q.    Okay.  What's involved in that study?

 2     A.    Well, it's a drug.  It's a -- we have a bunch of

 3           studies, and I don't want to misspeak here.  I think

 4           it's a CGRP antagonist that we're studying.  I think

 5           it is.  I don't keep which drug from which study

 6           always or which company, I don't keep it always

 7           straight because we have many, but it's a headache

 8           drug that we give, and we've done several studies

 9           for Allergan over the years.

10     Q.    Okay.  But does Allergan have any ability to

11           influence the outcome of your study?

12     A.    The outcome of the studies.

13     Q.    Uh-huh.

14     A.    Well, the studies are approved by the FDA.

15     Q.    Okay.

16     A.    And the data is collected by the drug company such

17           as Allergan.

18     Q.    Right.

19     A.    And they usually will interpret the data, and then

20           those people who they ask to write abstracts, in

21           other words, people like myself or others or write a

22           paper, we will look, we should look at that data,

23           you know, and if we're principally or primarily if

24           we're first authors, and so, yeah, there's a

25           process.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Now, can there be mischief along the

 2            line?  Yeah, of course.  Of course there can be

 3            mischief.  There has been mischief over the years.

 4     Q.     But that's more of an exception than the rule, is

 5            that correct?

 6     A.     I believe that to be the case, yes.

 7     Q.     And you don't conduct your studies that way.

 8            There's no mischief when you get funding from the

 9            companies?

10     A.     Not that I'm aware of.

11     Q.     Okay.  You tend to disclose any funding that you

12            receive in your articles, is that correct?

13     A.     Say that again.

14     Q.     When you write an article, do you disclose any

15            outside funding that you receive?

16     A.     Yes.

17     Q.     Okay.  And why do you do that?

18     A.     Well, it's required now.

19     Q.     Okay.

20     A.     Yeah, it's for the last several years.  You probably

21            are familiar with what's referred to as the Sunshine

22            Laws, and every dollar directed at a physician,

23            whether it's for research or for a fountain pen that

24            somebody would drop off, ballpoint pen, you know,

25            everything has to be reported.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And so the answer is yes, you are

 2          obligated and the journals require it as a condition

 3          of publishing the paper and giving a talk.  Before

 4          you give a talk, you have to.  I think that's a good

 5          thing.

 6     Q.   Okay.  Why is that?

 7     A.   Because I believe that it's important for the

 8          audience to know where that doctor has received

 9          funding, and it helps I think promote better

10          interaction between audience and doctor.

11                    I don't participate, for example, in

12          drug-funded, current drug-funded talks and which are

13          essentially marketing talks by doctors.  I don't do

14          those.

15     Q.   But you do do studies?

16     A.   I do studies.

17     Q.   Yeah.  That's correct.

18                    And do you know for the guidelines, let's

19          go back to Exhibit 4.  Do you know whether the

20          authors of the studies disclose any money that they

21          received from outside sources from companies in this

22          document?

23     A.   Isn't there a place where --

24     Q.   Yeah, I'd like to --

25     A.   There is a place back there, and I think that from
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              the last time I looked at it, I think some of the

 2              disclosures had a monetary amount and others did

 3              not.

 4    Q.   Okay.  And you mentioned Jane Ballantyne as someone

 5              on the committee, is that correct?

 6    A.   I did.

 7    Q.   And she supported some of your views, is that

 8              correct?

 9    A.   Yes, she did.

10    Q.   Okay.  I'd like to call your attention to the

11              Exhibit 4 with the Bates number ending 158.

12    A.   Hold on a second.  158?

13    Q.   That's what we were just looking at.

14    A.   Got it.

15    Q.   Yeah.  If you look down at her name at the bottom of

16              the page, do you see that?

17    A.   Uh-huh, yes, I do.

18    Q.   She received funding from Endo Pharmaceuticals,

19              correct, or she served on an advisory panel

20              involving --

21    A.   Yes, yes, she says that, yes.

22    Q.   And yet she still shares some of your views,

23              correct?

24    A.   Yes.

25    Q.   So that suggests you can receive funding and be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        independent?

 2    A.   Yes, you can.

 3    Q.   And did the final guidelines adapt any of your

 4         recommendations because when I looked through it, it

 5         seemed as if it wasn't -- it did sort of include

 6         some of your recommendations, like, if you look on

 7         page 142.

 8    A.   Uh-huh.

 9    Q.   That's topic one, patient selection and risk

10         stratification.  And then if you look on the next

11         page --

12              MR. JANUSH:  Objection.

13              Is there a question?

14              MS. HARTMAN:  Yeah, there is.

15    BY MS. HARTMAN:

16    Q.   It says, the first full paragraph says:  A thorough

17         history and physical examination, including an

18         assessment of psychosocial factors and family

19         history, is essential for adequate risk

20         stratification.

21              That was something you were advocating

22         for, right?

23    A.   Right.

24    Q.   I mean, one thing you said was I don't want a doctor

25         just to prescribe a drug without knowing this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            patient's history.

 2    A.      Uh-huh.  No, I agree.  I've acknowledged in my

 3            direct testimony that there was a movement in the

 4            direction of some of the things, and I'm not sure

 5            that I'm the only one that wanted these things in

 6            there.  I'm not suggesting that.

 7    Q.      Right.

 8    A.      But, yes, I've acknowledged that they did move in

 9            the direction.  I don't think they moved as far as

10            they should have gone.

11                    And I think one point I made about we

12            probably, because of the nature of opioids and the

13            risk issues, we probably shouldn't prescribe opioids

14            the first time or maybe even the second time we see

15            a patient except under maybe the most extraordinary

16            conditions because we will not have even had a

17            time -- people come into our offices with boxes of

18            records.  Wouldn't it be reasonable to read those

19            records in detail before we prescribe so we know

20            what's gone on before, you know.  I'm sure it's

21            parallel to you as an attorney having to read

22            records and the data.

23    Q.      Right.  Okay.  Well, could I ask you to turn to the

24            next page on topic two?

25    A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Q.   And then that's informed consent and opioid

 2         management plans.

 3                   Do you see that?

 4    A.   Yes.

 5    Q.   And then the next page, the first full paragraph, it

 6         says:  It's important for clinicians to discuss a

 7         COT management plan before initiating a course of

 8         treatment and on an ongoing basis while patients are

 9         on therapy.  The COT management plan includes goals

10         of therapy, how opioids will be prescribed and

11         taken, expectations for clinical follow-up and

12         monitoring.  See section five.  Alternatives to COT,

13         expectations regarding the use of concomitant

14         therapies, and potential indications for tapering or

15         discontinuing COT which may include failure to make

16         progress towards therapeutical goals, intolerable

17         adverse effects, or repeated or serious aberrant

18         drug-related behaviors.

19                   So this seems to suggest a plan should be

20         put in place before a patient is prescribed an

21         opioid.

22    A.   Correct.

23    Q.   And you agree with that, don't you?

24    A.   I do agree with that.

25    Q.   So it seems as if you might have had an influence on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          the ultimate guidelines that were enacted in 2009,

 2          would that be correct?

 3                    MR. JANUSH:  Objection.

 4                    THE WITNESS:  I think that there are

 5          areas -- and you pointed to a few of them --

 6          where -- and I don't want to take credit for all of

 7          this or any of these changes.  They may have well

 8          been promoted by other people.

 9                    But the fact is that as I've

10          acknowledged, what prompted my resignation was that

11          these weren't a part of anything that I saw, some of

12          these things, and I still don't see a credentialing

13          of physicians criteria for knowledge about opioids

14          and a reference to a methodological steppage toward

15          opioids by trying other things first.

16                    And so it's not all there, but certainly

17          they made progress in my view.

18     BY MS. HARTMAN:

19     Q.   Okay.  And isn't it true you said you were

20          professionally busy during the time these guidelines

21          were written?

22     A.   Yeah.  I'm trying to remember my lifestyle at that

23          point, but I was busy, and I couldn't attend all the

24          meetings.

25     Q.   Were the meetings via telephone?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    A.    Some were, some were.  Again, I don't remember all

2          of the details.  I remember one meeting, maybe two

3          meetings, but I apologized to them as you saw.  So I

4          acknowledged that I couldn't attend all the

5          meetings.

6    Q.    Do you think had you attended more meetings, you

7          would have been able to persuade more people of your

8          views?

9    A.    That's possible.  I know I knew a lot of people

10         around the table, not all of them, but I knew a lot

11         of people around the table.

12               My views were pretty clear in my letter

13         to Doctor Chou and then the other people that I --

14         well, the letter to Doctor Chou is just to

15         Doctor Chou.  It wasn't sent around the table.  But

16         I think he did send them to other people.

17               So I think my views were both expressed

18         personally by me and publicly and in my letter to

19         Doctor Chou.

20   Q.    But you've mentioned before that you think

21         Doctor Chou is a serious fellow.

22   A.    I do.

23   Q.    Yeah.  And that he took these guidelines seriously?

24   A.    I do.

25   Q.    Do you think anyone else on the committee didn't
```

```
 1          take this seriously?

 2     A.   I don't know if I would use those words.  I think

 3          that there were people that might have had

 4          preconceived notions on how they were going to

 5          respond to any restrictions that might be advocated

 6          by some of us.  But I'm not able to read their

 7          minds.

 8     Q.   You talked a little bit about -- well, let's look at

 9          the first letter you sent to Doctor Chou.  That is

10          Exhibit 2.

11     A.   Okay.

12     Q.   Okay.  This letter talks about criteria for

13          initial administration of opioids, is that correct?

14          You want doctors prescribing for chronic pain to

15          have some sort of criteria for initial

16          administration?

17     A.   Yeah.  Yes.  I'll answer it simply yes.

18     Q.   Yes.  Okay.  And you want the physicians to have

19          proper training, is that correct?

20     A.   Proper knowledge, proper training, yes.

21     Q.   But that's more specifically geared for chronic pain

22          as opposed to acute pain, is that correct?

23                    MR. JANUSH:  Objection.

24                    THE WITNESS:  Let me try to explain it in

25          a different way.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      BY MS. HARTMAN:

 2      Q.   Okay.

 3      A.   I don't want to interrupt your train of thinking or

 4           your line of questioning.

 5                     A doctor has to understand pain

 6           disorders.  Pain is a specialty and pain care is a

 7           board certified specialty, and knowing what could be

 8           tried other than opioids and what has failed are two

 9           of the things that you need to find out about, and

10           what illnesses that that patient has may contribute

11           to pain.

12                     I mean, it would -- you have a parallel

13           in the law.  I mean, if you're a specialist in a

14           certain area, you know a lot more about that problem

15           than you do if you're not a specialist in that area.

16                     The same thing in medicine.  I'm not

17           trying to make business for specialists.  I'm simply

18           saying we're dealing with serious issues here, and

19           so if you come to me and you say it hurts here and I

20           can't work because I can't concentrate, I can't

21           think clearly, I'd better know how to diagnose that.

22           I'd better know how to prescribe for that in a

23           variety of ways, what tests to order, what's

24           available that might work for you, rather than just

25           reach for an opioid prescription pad.  That's what
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I'm getting at.

 2     Q.    Right.  And it sounds as if to some extent the

 3            guidelines addressed your concern by trying to

 4            develop background of the patient's history and

 5            medical condition?

 6     A.    Some of that, yes, some of it did.

 7                    How about, how about the issue of

 8            whether -- I don't know enough about the different

 9            categories of law, but, you know, let's say, let's

10            say a person does contracts and is a business

11            contract lawyer, and someone comes to him or her

12            with a complicated IRS issue, you know.  Are you

13            going to sit there and prescribe a legal remedy for

14            that person or are you going to say, no, I think you

15            need to go and talk to my colleague who specializes

16            in taxes.

17     Q.    Right.  So you think that doctors just need to

18            educate themselves or --

19     A.    If not themselves, to be educated properly and what

20            are the risks here.  You know, I'll bet you that if

21            you were in your work here to defend the company,

22            and I respect that, were to ask some practicing

23            attorneys, some practicing physicians what are the

24            cardiac implications of methadone, what do you have

25            to worry about with methadone, I'll bet you a lot of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              physicians -- experts in certain areas -- wouldn't

 2              know the first way to answer that question because

 3              that's not their area.

 4      Q.      Right.

 5      A.      Wouldn't you want it to be their area if they're

 6              going to prescribe that drug?

 7      Q.      Sure.

 8                       But there are resources that a doctor can

 9              use, is that correct, he or she can look into a

10              prescribing book --

11      A.      Could.

12      Q.      -- or some sort of medical --

13                       MR. JANUSH:  Objection.

14      BY MS. HARTMAN:

15      Q.      I'm just asking what could a doctor do in that

16              situation?

17      A.      Well, the doctor can obtain certain pieces of

18              information, but that, did you ever hear the -- is

19              it all right to ask you a question?  Let me just say

20              there's a phrase out there to referencing opioids,

21              it takes five minutes to say yes and thirty minutes

22              to say no.

23                       That's part of the dilemma.  Doctors are

24              pressured for time, patients are saying I hurt, I

25              hurt, do something, Doctor.  If you say, okay, I'm
```

```
 1              going to give you some Percocet or oxycodone or

 2              something, they're happy.  They feel they'll get

 3              relief right away, and to find something else, to

 4              look things up takes time.  Time is a premium.

 5              That's reality, and so we want that doctor educated

 6              before that patient walks in the room.

 7    Q.   Okay.  Are you still associated with AAPM?

 8    A.   I think I'm still a member.  I don't have any

 9              leadership or teaching responsibilities.  I do think

10              I pay my dues.

11    Q.   Do you still --

12    A.   My office pays my dues.

13    Q.   Do you believe that AAPM is a worthwhile

14              organization?

15    A.   Absolutely.

16    Q.   Okay.  Have you ever served on any committees or

17              subcommittees?

18    A.   Oh, yes, over the years, many.

19    Q.   Could you tell me a few?

20    A.   Oh, geez.  You know, specifically I can't tell you.

21              I was on the board.  I've been on a lot

22              committees --

23    Q.   Okay.

24    A.   -- in a lot of different societies, and I'm not sure

25              without thinking about it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.    Do you know what year?

 2      A.    What's that?

 3      Q.    What years?

 4      A.    The years, yeah.  The years would have been the late

 5            '80s, early up to mid '90s I think when I was most

 6            active.  Actually, I think I was pretty active up

 7            until into the 2010 area.  I used to give the

 8            headache talk at some of the annual meetings.

 9      Q.    Do you still attend their conferences?

10      A.    I haven't for several years now.

11      Q.    Okay.

12      A.    I'm doing less general pain work, and so I don't

13            belong to that organization.

14      Q.    Okay.  What about APS?

15      A.    I think it's about the same.  I think I still belong

16            to the organization.  I still get the Pain journal.

17            So you get it as part of the thing, but I haven't

18            attended.

19      Q.    You're a board certified neurologist, is that

20            correct?

21      A.    Correct.

22      Q.    And you're also a board certified pain medicine

23            specialist, is that correct?

24      A.    Well, yes, I was board certified pain management

25            specialist, but when I stopped seeing a lot of pain
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            patients, I let that special -- that certification

 2            lapse.  I didn't want to take the board

 3            certification again because I'm not seeing general

 4            pain.

 5                     I'm board certified in neurology, and I'm

 6            board certified in headache which is a separate

 7            board.

 8    Q.    Okay.  And to maintain your medical license, you

 9            need to take continuing medical education, is that

10            correct?

11    A.    Correct.

12    Q.    Or the CAMs that we talked about before?

13    A.    CMEs.

14    Q.    CMEs, correct.

15                     So, and there are standards in place to

16            govern the relationship between CME providers and

17            commercial interests?

18    A.    Yes.

19    Q.    Okay.  Are you familiar with the Accreditation

20            Council for Continuing Medical Education?

21    A.    Yes.

22    Q.    And they set forth certain standards, don't they,

23            for CMEs --

24    A.    Right.

25    Q.    -- and commercial interests?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes, they do.

 2      Q.   Is that an appropriate way in which the medical

 3           profession can be governed to guard against

 4           commercial overinfluence?

 5      A.   Well, govern how?  They basically give -- the ACCME

 6           group gives the CME credits, and they generally work

 7           through organizations by setting up standards for

 8           what you have to do to give a talk, I think also to

 9           write a paper, to publish it in their journal, and

10           you have to show the companies that you have

11           conflicts of interest with.

12                     And there's all kinds of guidelines that

13           are now out there.  The last couple of years have

14           become increasingly intense in terms of ethical

15           guidelines.

16      Q.   Okay.  I have a question.  I know plaintiffs'

17           counsel referenced that you spoke today.

18                     Have you met with plaintiffs' counsel

19           before today?

20      A.   No.

21      Q.   Did you speak to plaintiffs' counsel on the phone?

22      A.   I was called -- I was subpoenaed, and I placed a

23           call to -- was it your office that I called?  I

24           don't know.  We needed to get some of the details in

25           terms of what this meant in terms of timing, and the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          initial location was different than this.  So.

 2                  My secretary did most of that calling.  I

 3          had one call, not with either -- I didn't speak --

 4          did I speak to you?

 5                  MR. MILLICAN:  It was with me.

 6                  THE WITNESS:  Okay.  One time, but it

 7          wasn't about content.  It was about location,

 8          whether the room would be big enough, whether we'd

 9          have other rooms available.  That's all.

10   BY MS. HARTMAN:

11   Q.    And you spoke to plaintiffs' counsel today, though?

12   A.    I did.

13   Q.    And was that substantive?

14   A.    Not really.  I mean, we talked about -- the

15          discussion centered around the kinds of things that

16          he wanted to cover and it was going to be the stuff

17          that I sent him, and that was about the extent of

18          that discussion.

19   Q.    Did you send those documents in response to a

20          document subpoena?

21   A.    Yeah.  I mean, the subpoena said please forward all

22          relevant documents, and so we started to search for

23          as many as we could find.

24   Q.    Do you know if you have any other documents in your

25          possession about the 2009 Opioid Treatment
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Guidelines in addition to what you already produced?

 2    A.     Not about the -- no.  As a matter of fact, the

 3           opioid guideline document that I have is -- doesn't

 4           have all the pages attached to it.

 5    Q.     Right.

 6    A.     So I don't have anything else that we can find.

 7    Q.     Okay.  Did you have any notes about those

 8           guidelines?

 9    A.     I don't think so.  I mean, I read, I read the

10           guidelines when they first came out, I think I read

11           them in the journal, and I had a copy which was not

12           the appendix.  I had a copy of the first earlier

13           pages, first set of earlier pages.

14                  And I haven't even reviewed them up until

15           I did go over them in anticipation of this

16           deposition.

17    Q.     Okay.  How much time did you spend preparing for

18           this deposition?

19    A.     I think about two hours of reading the material,

20           maybe an hour and a half.  I don't know.  My

21           secretary spent more time trying to find everything

22           than I did.

23    Q.     Do you know if you have any other documents in your

24           possession about the AAPM?

25    A.     Well, I did not look in our files about if we have a
```

```
 1            file on my -- either organization in terms of when I

 2            was on their boards and that stuff.  I did not look

 3            for that.  That didn't seem relevant to the focus of

 4            the deposition.

 5       Q.   Okay.  And did you look through any of your old

 6            emails?

 7       A.   This was before a lot of emails.  I mean, we're

 8            talking '04, '05, '06, '07.

 9                     Did we have emails then?

10       Q.   We did.

11       A.   Okay.  Maybe I didn't have emails then.

12       Q.   Yeah, yeah.  Okay.

13       A.   No, I did not.

14       Q.   Okay.

15       A.   Okay.

16       Q.   All right.  So it seems as if there might be more

17            documents in your possession, but you didn't conduct

18            an exhaustive search?

19                     MR. JANUSH:  Objection.

20                     THE WITNESS:  Well, I searched for what I

21            thought I was being asked to search for which was

22            what I have said about the industry, what I've said

23            about the criteria, the guidelines, and so forth.

24                     I didn't see any kind of request for

25            documents for my many years of participation in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            those organizations.

 2      BY MS. HARTMAN:

 3      Q.   Okay.  And do you know anything about the lawsuit at

 4           issue in this case?

 5      A.   I know very little about the lawsuit.  I know

 6           about -- I know a little bit about it.  I don't even

 7           know if we're talking about the same lawsuit that

 8           was covered by 60 Minutes a couple weeks ago.  And

 9           so all I know is that there is a lawsuit.  I know

10           essentially what it's about, but I don't know a lot

11           of those details.

12                    And, honestly, with all due respect to

13           the plaintiffs' counsel, I'm not even sure I know

14           where that -- they fit in the bigger picture of what

15           I know is a national lawsuit.  I mean, it's not

16           something that I'm going to attend to.

17      Q.   All right.  Well, thank you for your time today,

18           Doctor.

19      A.   That's all right.

20      EXAMINATION BY MR. GABEL:

21      Q.   You're not finished, though.  I just have a few

22           questions.

23      A.   That's all right.

24      Q.   It will be brief and to the point.

25                    The attempts to lessen the regulation
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            around prescriptions of opioids that was it

 2            Doctor -- well, Professor June Dahl and David

 3            Jorensen did at the University of Wisconsin, do you

 4            remember about what time that was, what year?  And a

 5            general --

 6                      MS. VICARI:  Objection to form.

 7       BY MR. GABEL:

 8       Q.   A general ballpark is fine.

 9       A.   I'm going to say somewhere before 2010 and maybe

10            between 2005 and 2010.  I'm guessing a bit because

11            this stuff was going on for years.  There was a lot

12            of early work.

13                      There was a lot of advocacy that I

14            supported in terms of, I mean, when Doctor Portnoy

15            and others, Kathy Foley took the position that we

16            should be more humane about end-of-life and cancer

17            pain, I was right there.  I was a pain doctor.  I

18            believed in that.  It was when things got out of

19            hand in my view that I shifted positions and so

20            forth.

21                      So I think that it was after -- it was

22            around 2004, 2005.  I think it spanned several years

23            actually.

24       Q.   Okay.  At one point you characterized that twenty

25            years ago, opioids were shamefully underprescribed?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A.   Maybe longer now because years have passed.

 2     Q.   Okay.

 3     A.   I wrote this in 2010.  So maybe it's thirty years

 4          ago, so --

 5     Q.   Okay.

 6     A.   Not now because we're sitting here now.

 7     Q.   At one point they were underprescribed in your

 8          viewpoint?

 9     A.   I certainly think that in many cases they were

10          underprescribed.

11     Q.   Okay.  And you were not in favor of those overly

12          restrictive impediments, is that right?

13               MR. JANUSH:  Objection.

14               THE WITNESS:  Ask that again.

15     BY MR. GABEL:

16     Q.   You weren't in favor of those overly restrictive

17          measures that caused them to be shamefully

18          underprescribed?

19               MR. JANUSH:  Objection.

20               THE WITNESS:  Well, there are two --

21               MR. KENNEDY:  Object to form.

22               THE WITNESS:  There are two dynamics.

23          One dynamic was fail to respect the devastating

24          impact of pain, and parallelling that was that a

25          doctor would be at risk if they chose to prescribe
```

```
 1           opioids.

 2                      To some extent that's good unless that

 3           doctor is very well informed, if it's a very special

 4           need patient, in which case that would be

 5           appropriate care given all the other qualifiers that

 6           I put into the testimony today.

 7                      So I don't particularly like too many

 8           restrictions, but there has to be proper education

 9           and there has to be proper credentialing.

10    BY MR. GABEL:

11    Q.   At the end of the day do you believe it's the

12           physician's responsibility to get it right when it

13           comes to opioid prescription for patients?

14                      MR. JANUSH:  Objection.

15                      THE WITNESS:  Unless the physician or the

16           physician groups have demonstrated that they can't

17           be trusted with that decision.

18                      I believe that they need to be educated

19           properly and that education has to be balanced, and

20           then I would like to leave it up to the physicians

21           for the most part.  Some regulation is good in

22           everything, but there's a limit in my view.

23    BY MR. GABEL:

24    Q.   But the front lines would be the physicians?

25                      MR. JANUSH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     THE WITNESS:  When you say front lines,

 2            would you explain that?

 3     BY MR. GABEL:

 4     Q.   Of prescribing opioids.  In your speech that you

 5            gave, the debate that you gave with the lengthy

 6            eighteen-page summary, it says, quote:  Whether to

 7            prescribe and what and how should depend upon

 8            physician judgment and experience.

 9     A.   Yes.

10     Q.   Do you agree with that statement?

11     A.   I do agree with that with the qualifier that there

12            has to be credentialing and knowledge by that

13            physician.  It can't be any -- listen, there are

14            things in medicine that I don't know anything about,

15            and I've been a physician for fifty years.  So you

16            wouldn't want to trust me with something like that,

17            you know, if I don't know anything about it.

18                     That was the whole point.  And it wasn't

19            inditing every primary care doctor, but the

20            generalization that I was reacting to was that any

21            doctor at any time and place with any level of

22            education could prescribe to any patient who said I

23            hurt, and that was an attitude in my view.

24     Q.   Do you believe that physicians have to police

25            themselves?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.

 2      Q.    And if a physician does decide that it's appropriate

 3            to prescribe opioids and they give a prescription to

 4            their patient, would you expect a pharmacy to fill

 5            that prescription?

 6                  MR. JANUSH:  Objection.

 7                  THE WITNESS:  Yes, unless there is a dire

 8            reason why not.  I mean, every doctor can make a

 9            mistake, even the best of us, and sometimes second

10            brain thinking about it comes up with something that

11            would alter.

12                  And what I would hope is the pharmacy

13            would call that doctor up and respectfully, you

14            know, say, Doctor, did you realize that this patient

15            is getting this drug from someone else or do you

16            realize the person is on this drug from another

17            doctor and that would be a bad -- that would be

18            contraindicated.  That's a good way to help safe,

19            safeguard people, patients.  So I believe that.

20      BY MR. GABEL:

21      Q.    Would a pharmacist have more or less information

22            than a physician?  Is it true that typically a

23            physician would have more information about the

24            patient, their history?

25                  MR. JANUSH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  That's a very complicated

 2           question because the information may be different.

 3           The pharmacist would not have the clinical

 4           experience and judgment about this patient's needs

 5           and the full history of that patient, but what the

 6           pharmacist would have would be a much more

 7           encyclopedic set of lists on that drug and the drug

 8           interactions with other drugs which get very

 9           complicated.

10                    I've spoken to major conventions of

11           pharmacists, and the best and safest care is when

12           cooperating pharmacists and cooperating physicians

13           work together to protect patients.  So it's not that

14           they have the same set of knowledge.  They know

15           different things.

16      BY MR. GABEL:

17      Q.   Have you ever had a pharmacist deny a prescription

18           that you have written?

19      A.   Yes.

20      Q.   Okay.  And what was the reason for that?

21                    MR. JANUSH:  Objection.

22                    THE WITNESS:  Well, I can only remember

23           one or two, and in both cases, they did not

24           understand some of the reasons why you give certain

25           drugs.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    One was a very esoteric drug called

2          phenelzine or Nardil which is a very complicated

3          antidepressant that is a very excellent drug for

4          very advanced headache cases but has a lot of bad

5          interactions with other drugs.  So patients have to

6          be educated.

7                    And when this pharmacy saw the word

8          Nardil, the pharmacist freaked out and said I'm not

9          filling that prescription, this drug could kill you.

10         Well, yeah, yeah, maybe, if you took it with all the

11         other wrong medicines.  So that's the kind of

12         interaction I've had.

13                   Most of the pharmacy -- right now what's

14         happening is the pharmacists are looking at computer

15         lists and/or lists from the insurance companies, and

16         their, their decision-making is sometimes altered by

17         that.

18    BY MR. GABEL:

19    Q.   If a pharmacist refuses to fill a script from a

20         doctor, could it have an adverse impact on the

21         patient?

22                   MR. JANUSH:  Objection.

23                   THE WITNESS:  Yeah, it could, and I think

24         that both -- I think the medical profession needs to

25         be very tolerant of a respectful call from a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            pharmacist that has a constructive dialogue over the

 2            issues, and I think that's good care, and I think

 3            both sides are faulted, can be faulted for not

 4            having good dialogue.

 5      BY MR. GABEL:

 6      Q.    We talked about the opioid industry funding some of

 7            these societies, funding studies, whatever it may

 8            be, and I want to make sure.  I represent Walmart.

 9            So I just want to make sure we're not --

10      A.    Walmart?

11      Q.    Walmart, yeah.

12      A.    Yes, I've heard of Walmart.

13      Q.    The chain retailer.  You've heard of them.  And I

14            want to make sure we're not painting with too broad

15            of a brushstroke.

16                      Are you aware of Walmart ever funding APS

17            or AAPM?

18      A.    No.

19      Q.    Are you aware of them funding any society, any

20            medical society whatsoever?

21      A.    No, none.

22      Q.    Are you aware of them having anything to do with the

23            2009 Opioid Treatment Guidelines?

24      A.    No.

25      Q.    Are you aware of them having anything to do with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              advocacy undertaken by the professors from the

 2              University of Wisconsin?

 3      A.      No.

 4      Q.      Are you aware of any attempts by Walmart or anyone

 5              at Walmart to have any influence over the medical

 6              profession?

 7      A.      No.  I can't even remember a discussion with a

 8              Walmart pharmacist.  So, no, I don't.

 9      Q.      Any awareness of any controls that Walmart employs

10              in its dispensing of pharmaceuticals, in particular

11              opioids?

12      A.      No, because we prescribe so few of them now here at

13              this center that I don't -- I'm not aware, I may not

14              be aware of all the interactions we have with

15              pharmacists, but I'm not aware of any personally.

16      Q.      In your 2008 letter, let me see, it's Exhibit 2 or

17              3.  Let me check.  It's Exhibit 3.  At the end you

18              say:  With respect to the risks associated with

19              opioids, you say the media knows it.  Government and

20              regulatory agencies know it.

21                   What's your basis for the government --

22              the statement that the government knows it?

23      A.      Which letter was that?

24      Q.      It's Exhibit 3.  It's the one that you wrote on July

25              1st, 2008, to the --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A.   Yes, the resignation letter.

 2    Q.   Correct.

 3    A.   Well, I was -- as I mentioned to you and we spoke

 4         earlier about my Pain Care Coalition responsibility,

 5         I was chair of that coalition, and as a result of

 6         that, that was a Washington-based coalition, and we

 7         personally met with the different -- with various

 8         different, in fact, I testified in front of Congress

 9         at one point.

10              And so I know that some of the

11         congresspeople were aware of the issue, and I had a

12         personal relationship, I should say personal

13         professional relationship with Doctor or with

14         Congressman Rogers, and I know that he was acutely

15         aware of this problem.  So that was my reference

16         point.

17    Q.   You mentioned you testified before Congress?

18    A.   I did at some point.

19    Q.   Which committee was it, do you remember?

20    A.   I think it was energy, and what's the other, energy,

21         and I can't remember the last name in the title.

22         Energy, it was the one that was writing -- at that

23         point writing the pain, the Pain Care Law.

24    Q.   Okay.  The one that you helped author?

25    A.   Yes, I did.  I wrote the first draft with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Congressman Rogers.

 2    Q.   Okay.  And did that have anything to do with opioids

 3         at the time?

 4    A.   We didn't really get into the opioid issues in that

 5         piece of legislation.  It was meant to establish the

 6         legitimacy of the pain problem and to give credence,

 7         congressional credence, to this public health

 8         problem called pain.

 9              I mean, there may have been something in

10         there.  I don't remember.  There were so many

11         iterations of that law before it got passed by the

12         House, then the Senate, even then signed into law.

13         So --

14    Q.   How many times have you been deposed before today?

15    A.   Never this long.  You know, I should count up.  I've

16         been being deposed as an expert witness or a

17         treating physician for head injury, I do head

18         injury.

19    Q.   Sure.

20    A.   I'm an expert witness in malpractice claims, mostly

21         on the defense side.  Some, some when I think it's

22         an egregious act on the plaintiff's side.

23              In answer to your question, thirty-five,

24         forty times, maybe more.  I've got a long career, so

25         I've got to be careful when you ask that kind of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          question.

 2    Q.    Been around a lot of lawyers, probably more than you

 3          like.

 4    A.    I've been around a long time, I've been around a

 5          long time.

 6    Q.    Any time that you were deposed, did it have to do

 7          with the subject of opioids?

 8    A.    I don't recall that.  That's an interesting

 9          question.  I don't, I don't recall that it ever had

10          anything to do with opioids.  If you know otherwise,

11          tell me, because I can't remember.  Okay.  I'm just

12          saying I don't remember it.

13    Q.    Okay.  Okay.  That is all I have.  Thank you for

14          your time.

15    A.    You're welcome.

16                MR. JANUSH:  Plaintiffs do not have any

17          further questions.

18                THE WITNESS:  Okay.

19                MS. HARTMAN:  Thank you for your time.

20                THE VIDEOGRAPHER:  This concludes the

21          deposition, and we're going off the record at 5:47

22          p.m.

23

24                (Deposition concluded at 5:47 p.m.)

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    STATE OF MICHIGAN    )

                           )SS.

 2    COUNTY OF LIVINGSTON )

 3              CERTIFICATE OF NOTARY PUBLIC

 4                    I certify that this transcript

 5    is a complete, true, and correct record of the

 6    testimony of the deponent to the best of my ability

 7    taken on Friday, January 11, 2019.

 8                    I also certify that prior to

 9    taking this deposition, the witness was duly sworn

10    by me to tell the truth.

11                    I also certify that I am not a

12    relative or employee of a party, or a relative or

13    employee of an attorney for a party, have a contract

14    with a party, or am financially interested in the

15    action.

16

17

18

19

20

      _____

21

      Cheryl McDowell, CSR-2662, RPR

22    Notary Public, Livingston County

      State of Michigan

23    Commission Expires September 13, 2019

24

25
```