UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

\- - -

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : | MDL No. 2804 |
| ___________________________ | : | Case No. 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO ALL CASES | : | Hon. Dan A. Polster |

\- - -

Wednesday, February 27, 2019

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

\- - -

Videotaped deposition of JAMES T. SCHOEN, held at the Hilton Garden Inn, Perrysburg, Ohio, commencing at 12:59 p.m., on the above date, before Carol A. Kirk, Registered Merit Reporter and Notary Public.

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

A P P E A R A N C E S:

On behalf of the Plaintiffs:
MCHUGH FULLER LAW GROUP
BY: LANCE REINS, ESQUIRE
lance@mchughfuller com
ALLAN (A J ) L ELKINS, ESQUIRE
allan@mchughfuller com
(via teleconference)
97 Elias Whiddon Road
Hattiesburg, Mississippi 39402
601-261-2220

On behalf of AmerisourceBergen Corporation (via teleconference and text/video streaming):
JACKSON KELLY PLLC
BY: SANDRA K ZERRUSEN, ESQUIRE
skzerrusen@jacksonkelly com
50 South Main Street, Suite 201
Akron, Ohio 44308
330-252-9060

On behalf of HBC (via teleconference and text/video streaming):
MARCUS & SHAPIRA LLP
BY: ELLY HELLER-TOIG, ESQUIRE
ehtoig@marcus-shapira com
One Oxford Center, 35th Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219-6401
412-338-3345

On behalf of Walmart (via teleconference and text/video streaming):
JONES DAY
BY: PATRICIA OCHMAN, ESQUIRE
pochman@jonesday com
901 Lakeside Avenue East
Cleveland, Ohio 44114
216-586-3939

On behalf of Prescription Supply, Inc
FOX ROTHSCHILD LLP
BY: JAMES C CLARK, ESQUIRE
jclark@foxrothschild com
STEPHAN A CORNELL, ESQUIRE
scornell@foxrothschild com
(via teleconference and text/video streaming)
2700 Kelly Road, Suite 300
Warrington, Pennsylvania 18976-3624
215-345-7500

On behalf of Johnson & Johnson and Janssen Pharmaceuticals:
TUCKER ELLIS LLP
BY: JEFFREY M WHITESELL, ESQUIRE
jeffrey whitesell@tuckerellis com
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113
216-592-5000

On behalf of McKesson (via teleconference and text/video streaming):
COVINGTON & BURLING LLP
BY: MARY YANG, ESQUIRE
myang@cov com
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202-662-5110

On behalf of HBC:
MARCUS & SHAPIRA LLP
BY: MOIRA CAIN-MANNIX, ESQUIRE
cain-mannix@marcus-shapira com
One Oxford Center, 35th Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219-6401
412-338-3345

ALSO PRESENT:
Michael Newell, Videographer
Zachary Hone, Trial Technician

- - -

VIDEOTAPED DEPOSITION OF JAMES T SCHOEN

INDEX TO EXAMINATION

| WITNESS | PAGE |
| --- | --- |
| JAMES T SCHOEN | |
| CROSS-EXAMINATION BY MR REINS: | 9 |
| REDIRECT EXAMINATION BY MR CLARK | 143 |
| RECROSS-EXAMINATION BY MR REINS: | 144 |

VIDEOTAPED DEPOSITION OF JAMES T. SCHOEN

INDEX TO EXHIBITS

| PSI - J. SCHOEN | DESCRIPTION | PAGE |
|---|---|---|
| PSI - J. Schoen 1 | DEA Notice of Inspection of Controlled Substances, Bates-stamped PSI-0000077 | 124 |
| PSI - J. Schoen 2 | State of Ohio Board of Pharmacy, Written Responses for Prescription Supply, Inc., Wholesaler/ Manufacturer, Category Three, Wholesale Distributor Inspection, October 25, 2017, Bates-stamped PSI0000007 through 83 | 142 |

- - -

P R O C E E D I N G S

- - -

THE VIDEOGRAPHER: We are now on the record. My name is Michael Newell and I'm a videographer for Golkow Litigation Services.

Today's date is February 27th, 2019, and the time is 12:59 p.m.

This video deposition is being held in Perrysburg, Ohio, in the Matter of National Prescription Opiate Litigation for the Northern District of Ohio, Eastern Division.

The deponent today is James Schoen.

Will counsel please identify themselves.

MR. REINS: Lance Reins with McHugh Fuller Law Group on behalf of the Plaintiff.

MR. CLARK: Jim Clark with Fox Rothschild on behalf of

Prescription Supply.

MR. WHITESELL: Jeff Whitesell of Tucker Ellis on behalf of Johnson & Johnson and Janssen.

MS. OCHMAN: Patricia Ochman, Jones Day, for Walmart.

MS. HELLER-TOIG: Elly Heller-Toig for HBC Services Company from Marcus & Shapira.

MS. YANG: Mary Yang with Covington Burling for McKesson.

MR. ELKINS: A.J. Elkins, McHugh Fuller Law Group, Plaintiffs.

MR. CORNELL: Stephan Cornell, Fox Rothschild, for Prescription Supply.

MS. ZERRUSEN: Sandy Zerrusen from Jackson Kelly for AmerisourceBergen.

THE VIDEOGRAPHER: The court reporter today is Carol Kirk and will now swear in the witness.

- - -

JAMES T. SCHOEN

being by me first duly sworn, as hereinafter certified, deposes and says as follows:

EXAMINATION

BY MR. REINS:

Q. Good afternoon.

A. Hi.

Q. Could you please tell us your name.

A. James T. Schoen.

Q. And have you been through a deposition before?

A. Years ago with an auto accident. I think I was maybe 18.

Q. Got it. The reason I ask is I'm just going to go over some of the ground rules for depositions. Your counsel has probably advised you, but better safe than sorry.

So, obviously, I'm going to be taking down -- I'm going to be asking the questions here today. We have a court reporter who types everything that we say. Because of that, if you could please verbalize all your answers, no huh-uhs, um-hmms, or head nods

because those can't be taken down, okay?
A. Okay.
Q. If you do so, I may say "Is that a yes or is that a no," because I'm looking for a verbal response. All right?
A. Okay.
Q. Please let me finish my question before you begin answering. Let me add a caveat to that.
Your counsel is going to object to some my questions. So after I finish my question, if you could just wait a moment, allow him to object, and then you can respond. That way we're not talking over one another, okay?
A. Okay.
Q. Lastly, if you answer my question, I'm going to assume that you are doing two things. One, you understand the question, and, two, most importantly, you're telling the truth; is that fair?
A. Yes.
Q. If you don't know something or you don't understand my question, just let me know and I'll rephrase.

A. Okay.
Q. If you need a break for any reason, just let me know. It's not a marathon. We'll take a break when you need to, okay?
A. Fine.
Q. Can you please tell me what you do for a living.
A. I work at Prescription Supply. I'm presently the controlled substance manager.
Q. And what is Prescription Supply, Inc. in the business of doing?
A. We're a pharmaceutical wholesaler.
Q. And you distribute or provide medications to what type of customers?
A. Mostly independent pharmacies, some doctors, and some outpatient pharmacies that are in hospitals.
Q. And how long have you worked with the company?
A. Since like 1986.
Q. Was your grandfather the founder?
A. Yes.
Q. What was his name?
A. Clarence J. Schoen.

Q. Do you know what year he started the company?
A. 1955.
Q. Your dad is now the president?
A. Yes.
Q. His name is?
A. Thomas G. Schoen.
Q. And he runs the company along with his sister?
A. Yes.
Q. And what's her name?
A. Jacquelyn Harbauer.
Q. Do you know what her position is?
A. Secretary.
Q. How long have you held the position as controlled substance manager?
A. Around 20 years.

Q. PSI deals in the business of distributing narcotics; is that correct?
A. That's some of our business, correct.
Q. Are you aware of the risks and dangers associated with narcotics in our society?
MR. CLARK: Objection to form.
A. Can you repeat?
Q. Sure.
Are you aware that there are certain narcotics that you're distributing that are highly addictive?
MR. CLARK: Objection. Form.
A. I've heard that.

Q. What have you heard?
MR. CLARK: Objection to form.
A. That on some of the labels, it says they can be addictive.
Q. Which ones?
MR. CLARK: Objection to form.
A. I think OxyContin was one and maybe hydrocodone.
Q. And your company distributes both of those?
MR. CLARK: Objection to form.
A. Yes.

Q. Would you agree with me, though,

that we are in the middle of an opioid epidemic and/or crisis right now?
MR. CLARK: Objection to form.
A. I -- I see that in the news. I've never been affected, but I don't know anybody that has, you know, a problem with addiction.
Q. I think -- is Candace your aunt?
A. My cousin.
Q. Cousin. I'm sorry. She said she's seen it on the news.
Have you seen it on the news, that it's a problem?
MR. CLARK: Objection to form.
A. Have I seen -- yes, I've seen stuff on the news regarding opioids.
Q. Have you ever attended any seminars, lectures, or meetings outside of your company regarding the addictive nature of oxycodone?
A. No.
Q. Have you ever read any of the congressional hearings or reports regarding the

addictive nature of oxycodone?
MR. CLARK: Objection to form.
A. No.
Q. Other than the news, have you educated yourself as to the risks and dangers of oxycodone?
MR. CLARK: Objection to form.
A. Have I --
Q. Educated yourself on what the risks and/or dangers might be.
MR. CLARK: Same objection.
A. No.
MR. REINS: Did you get the answer "I don't know"?
THE COURT REPORTER: Yes.
BY MR. REINS:
Q. All right. Sir, based on the fact that your company does distribute narcotics which have been certified or identified by the government, are you aware that there's federal regulations governing the distribution of the products that you sell?

A. Yes.
Q. Okay. So, for instance, you're aware of the Controlled Substances Act, I would presume?
A. I'm aware of it, yes.
Q. Okay. Specifically -- specifically, are you aware that distributors of controlled substances and Schedule I or II, the Attorney General shall register an applicant to distribute a controlled substance in Schedule I or II unless he determines that the issuance of such registration is inconsistent with the public interest.
In determining the public interest, the following factors shall be considered: Maintenance of effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels.
Do you agree that PSI has the duty to maintain effective controls against diversion?
MR. CLARK: Objection. Form.
A. No. The DEA issues us a license.

Q. Yes, sir, and that's fair. But do you agree that your company is responsible for coming up with effective plans to prevent drug diversions of the products that you distribute?

MR. CLARK: Objection to form.

A. That's what the law is.

Q. Yes, sir. And the law is also that any suspicious orders, pursuant to the federal regulations, include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency shall be reported, correct?

MR. CLARK: Objection to form.

A. That's what the law says.

Q. Yes, sir. And I believe I asked your dad about this. This is going to be in his deposition when he was taken specifically as the 30(b), which means a corporate representative of PSI speaking on behalf of the company.

And this is going to be on page 59 of that deposition, specifically line 11.

Your father was asked, as the

president -- let me restate that -- as the 30(b) representative of PSI:

"What is your understanding of the shipping requirement? And, quite honestly, it shouldn't be the shipping requirement. It should be the anti-shipping requirement, right?"

"Answer: That's correct."

"Okay. And is it your understanding that the shipping requirement means that if we have a suspicious order, we need not to ship it?"

"Answer: Yes."

"And that has been the obligation not just upon PSI, but all the distributors, to your understanding, since 1971 when this regulation was passed?"

Answer on the next page at line 2, "Yes."

You understand as -- you understand that that not only is the law but has been the law since 1971, correct?

MR. CLARK: Objection to form.

Q. And I can show you the regulations

when these were passed in 1970 and '71, respectively.

MR. CLARK: Same objection.

Q. Did your father testify honestly and truthfully?

MR. CLARK: Objection to form. There's a question pending. I don't think he answered the prior

Page 22

A. Okay. I go about that by -- a lot of things determine that. How many orders they do per day, how many scripts they fill. They fill out my questionnaire and I go off of that, okay?

So I read the questionnaire, okay? And that's basically the basis point of how I determine what they -- you know, what they receive.

Q. Okay.

A. Okay. And I also, you know, check -- I can check the population around them, you know. They have to be a customer for a

Page 23

little while before they get controls.

Q. All right. Take that one at a time, if you don't mind. Let's start with the questionnaire.

Did you come up with the questionnaire?

A. I helped.

MR. CLARK: Objection to form.

Go ahead.

A. I helped with it, yes.

Q. Okay. And this questionnaire is going to be asking what types of questions?

A. It asks pharmacy information, if they're affiliated with any other pharmacies, how long they've been in business, what are their store hours and what days are they open a week, what is the percentage of controls to non-controls they plan on purchasing, also what they dispense, the amount of cash for controlled substance prescriptions compared to credit cards, insurance, Medicaid.

It asks certain questions about certain items, all right? If they plan on

Page 24

dispensing more than a certain number of -- phentermine is one of them, hydrocodone, oxycodone. Fentanyl is on there, prometh with codeine. Tramadol is on there. Carisoprodol is on there.

Q. And you have them fill out this questionnaire when you first start doing business with them?

A. It's before we do business -- when they fill out their application, that is filled out if they want -- if they expect to get

Q. Okay.

A. So not everybody fills one out. In order to get controls, it must be filled out and completed.

Q. Will the questionnaire also have -- will it ask them kind of their -- well, let me just ask it this way: You maintain all these questionnaires for your customers?

MR. CLARK: Objection to form.

Q. You keep them?

Page 25

Page 26

Page 28

Q. Why not just have unlimited opioids flowing into society? Why have a limit?
MR. CLARK: Objection to form.
A. That's not the right thing to do.
Q. Why?

Page 29

MR. CLARK: Same objection.
A. Because they have to be prescribed for a legitimate purpose and it's -- you know.
Q. Let me show you what -- your father's words. This is going to be on page 28 of his deposition as a 30(b) rep, line 4.
"Tell us, tell the jury why we want to prevent diversion of controlled substances."
"Well, as it states, we -- it can be dangerous. People can die. People can have bad effects and they can be abused. None of that is something that we want to happen. We want the good effects, not the bad effects."
Do you agree?
MR. CLARK: Objection to form.
A. I agree that's his opinion.
Q. Not yours?
MR. CLARK: Same objection.
A. I agree it could be dangerous, yes.
Q. People can die, right?
MR. CLARK: Same objection.

Page 30

A. It's a possibility.

Q. But you do know that the law puts the duty on your shoulders as the distributor to ensure that there aren't unusual amounts or frequency of amounts into society, right?

MR. CLARK: Objection to form.

Page 31

A. That's what the law says, yes.

Q. And you're required to abide by the law, right?

MR. CLARK: Objection to form.

A. Yes.

Page 32

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 10 of 40. PageID #: 251127

Highly Confidential - Subject to Further Confidentiality Review

Page 34

[redacted]

Page 36

[redacted]

10 (Pages 34 to 37)

Golkow Litigation Services - 877.370.DEPS



form.

A. There could be many things. A pharmacy in the area could have closed.

Q. Okay.

A. There may be new doctors in that particular area. Population growth. Maybe they're getting more patients now.

There's a lot of reasons that come into play that --

Q. Any others that you can think of? And I know you're not doing an exhaustive list, but any others you can think of?

MR. CLARK: Objection to form.

A. Sometimes the pharmacy will call and let me know that if a pharmacist is going to be off, okay, if the main pharmacist or the pharmacist in charge is going to be off and somebody else is there who has not the capability to buy -- purchase controls, they'll ask me, okay, if I can raise it for them for

that time so that they can put an order in, because they'll be on vacation for a week or so, just so they have the stock.

Q. All right. I want to show you a document. So this is going to be PSI 30(b)-301-001.

You're looking at a letter that was issued to Cardinal September 27th, 2006, and I'll tell you that it's basically been stipulated that all the distributors got a letter such as this, similar to this, and I think your dad and your cousin, Candace, has already testified to that.

Do you remember seeing this letter? Not this letter, but obviously a similar letter.

MR. CLARK: Objection to form.

Q. And you can take a moment to look it over. I'm not trying to rush you.

You don't have to read the whole thing.

A. I don't recall. I don't recall it, no.

Q. Fair enough.

So I do want to talk to you a little bit about kind of some of the things that are brought up in this letter, see if these are concepts that you recall. So we'll talk about the first paragraph, if you don't mind.

It says, "This letter is being sent to every commercial entity in the United States registered with the Drug Enforcement Administration to distribute controlled substances."

That would certainly be PSI, correct?

A. Yes.

Q. "The purpose of this letter is to reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."

Under "Background," it says, "As each of you is undoubtedly aware, the abuse, non-medical use, of controlled prescription drugs is a serious and growing health problem in this country. DEA has an obligation to combat

this problem as one of the agency's core functions is to prevent the diversion of controlled substances into illicit channels."

You're aware that that's one of their duties and responsibilities, the DEA?

A. Yes.

Q. "Congress assigned DEA to carry out this function through enforcement of the Controlled Substance Act and DEA regulations that implement the Act."

Specifically, on the second page, middle part there, I want to talk to you about where it says, "The DEA regulations require all distributors to report suspicious orders of controlled substances." Specifically, the regulations state in 21 C.F.R. 1301.74(b), "The registrant shall design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Field Division Office of the Administration in this area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern,

and orders of unusual frequency."

Are you aware that your company, PSI, specifically submitted reports in writing every month from approximately 1997 to 2013?

MR. CLARK: Objection to form.

A. There was a variance report, yes. I did look at that too.

Q. Okay. And you're aware that the law requires a suspicious order report be submitted?

A. Yes.

MR. CLARK: Objection. Form.

Q. And that qualified, pursuant to PSI, as meeting your responsibilities under the federal law, specifically the one that you're looking at right here in that regard; fair to say?

MR. CLARK: Objection to form.

A. No, I don't agree with that. That didn't meet suspicious order monitoring.

Q. Okay. You had a different monitoring system?

A. That wouldn't meet -- if there was a suspicious order, I would have sent them information separate from this.

Q. Separate from that?

A. That's right, yes. That's correct.

Q. We'll talk about the report specifically, but why don't you tell me what type of information you would send to the DEA before 2008, when you initiated the -- specifically, the threshold system.

MR. CLARK: Objection to form.

Q. What did you send?

A. Okay. Can you repeat that?

Q. Sure. Yeah. Your -- Kirk, do you know who Kirk is?

A. Yes, I do.

Q. He testified here today he was the IT guy and he would do these reports pursuant to these rules and submit those reports every month.

A. Yes.

Q. Okay. As part of the suspicious

order monitoring requirement under the federal regulations, but you're saying no --

MR. CLARK: Objection to form. Misstates prior testimony.

Q. You're saying no, he wasn't doing it pursuant to the regulations; is that right?

MR. CLARK: Same objection.

A. No. No. These were sent, but this didn't -- just because this was sent doesn't constitute those as suspicious orders. There could have been a suspicious order that wouldn't show up on that report.

Q. That wouldn't have shown up?

A. Yeah. It's possible, yes.

Q. For example?

MR. CLARK: Objection to form.

A. I -- I -- I never had one, but, you know, it would be possible. This report was a variance report which just said, you know, if somebody bought more than what the average was we sold per month.

Q. All right. So you did not -- your testimony here today is that report was not in

fulfillment of the duties and responsibilities of the Code of Federal Regulations, correct?
MR. CLARK: Objection to form.
A. I can't answer that. I don't know -- I mean, it requires more than that.
MR. CLARK: Objection. Calls for legal conclusion.
Q. You said, "We sent" -- "I sent other reports." What other reports did you send?
MR. CLARK: Objection. Misstates his testimony.
A. Yeah. I didn't say I sent reports.
Q. All right. What did your company do, PSI, in regards to -- well, first of all, let's get on the same page. What's a suspicious order? How do you define a suspicious order?
A. How do I define -- a suspicious order to me is if I contact the customer after an order goes on hold that I'm curious about, an order of interest, and I don't get an answer that I believe I can be comfortable with, then

that is a suspicious order.

Q. Yeah, what defines as a -- well, let me say this: Can you and I agree that the law defines what a suspicious order is, right?
MR. CLARK: Objection to form.
A. That's what the law is, yes.
Q. Unusual size, orders deviating substantially from a normal pattern, an order of unusual frequency. That is a suspicious order, correct?
MR. CLARK: Objection to form.

A. According to the law, correct.
Q. According to the law?
A. Yes.
Q. Do you have a different understanding in PSI?
A. No. I go -- do I have a different understanding? No.



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 14 of 40. PageID #: 251131

Highly Confidential - Subject to Further Confidentiality Review

Page 50

Page 52

Q. Okay. Let's go beyond Kirk. Let's go beyond his testimony. Let's talk about the company's policies and procedures.

Are you aware there's policies and procedures?

MR. CLARK: Objection to form.

A. Yes.

14 (Pages 50 to 53)

Golkow Litigation Services - 877.370.DEPS

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 15 of 40. PageID #: 251132

Highly Confidential - Subject to Further Confidentiality Review

Page 54

[redacted]

Page 56

[redacted]

15 (Pages 54 to 57)

Golkow Litigation Services - 877.370.DEPS



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 16 of 40. PageID #: 251133

Highly Confidential - Subject to Further Confidentiality Review

Page 58

Page 60

[redacted]

16 (Pages 58 to 61)

Golkow Litigation Services - 877.370.DEPS



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 17 of 40. PageID #: 251134

Highly Confidential - Subject to Further Confidentiality Review

Page 62

Page 63

Q. That's okay. I'll ask it differently.

Look at page 3, if you don't mind, on the DEA letter.

A. Okay.

Page 64

17 (Pages 62 to 65)

Golkow Litigation Services - 877.370.DEPS

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 18 of 40. PageID #: 251135

Highly Confidential - Subject to Further Confidentiality Review

Page 66

Page 68

[redacted]

18 (Pages 66 to 69)

Golkow Litigation Services - 877.370.DEPS



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 19 of 40. PageID #: 251136
Highly Confidential - Subject to Further Confidentiality Review

Page 70

Page 72

[redacted]

19 (Pages 70 to 73)
Golkow Litigation Services - 877.370.DEPS



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 20 of 40. PageID #: 251137

Highly Confidential - Subject to Further Confidentiality Review

Page 74

Page 76

[redacted]

20 (Pages 74 to 77)

Golkow Litigation Services - 877.370.DEPS



THE VIDEOGRAPHER: We're going off the record at 2:03.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 2:11.

BY MR. REINS:

Q. You discussed with us today about the setting of the threshold limits and then the elevating or raising of those limits.

Are there any policies and procedures within PSI which provides some guidance or parameters for doing either of those tasks?

MR. CLARK: Objection to form.

Q. That you've seen.

A. No.

Q. So not to oversimplify it, it really comes down to your discretion, right?

MR. CLARK: Objection to form.

A. Yes.

Q. Based on the things you've already talked to us about?

MR. CLARK: Same objection.

Q. The criteria you said?

A. And my experience.

Q. Yeah.

I'm going to now show you a chart, and this is a summary which we have created from PSI600, which is transactional data that PSI has produced to us. So we're going to look at that real quick.

MR. REINS: I have an extra copy for you, but I'm going to have to use it from the last deposition, which I believe it was Number 6. So the witness can have one.

BY MR. REINS:

Q. All right. So I tell you where it comes from so that you understand where it comes from, okay? So what we've done is we've isolated some transactions in certain periods of time. And if you zoom in to the top left there column, there's a pharmacy.

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 22 of 40. PageID #: 251139

Highly Confidential - Subject to Further Confidentiality Review

Page 82

Are you familiar with this pharmacy?

A. Yes.

Q. And you can see the screen in front of you it may be helpful because this is small.

A. Yes.

Page 84

22 (Pages 82 to 85)

Golkow Litigation Services - 877.370.DEPS

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 23 of 40. PageID #: 251140

Highly Confidential - Subject to Further Confidentiality Review

Page 86

Page 88

[redacted]

23 (Pages 86 to 89)

Golkow Litigation Services - 877.370.DEPS



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 24 of 40. PageID #: 251141

Highly Confidential - Subject to Further Confidentiality Review

Page 90

Page 92

[redacted]

24 (Pages 90 to 93)

Golkow Litigation Services - 877.370.DEPS



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 25 of 40. PageID #: 251142

Highly Confidential - Subject to Further Confidentiality Review

Page 94

Page 96

25 (Pages 94 to 97)

Golkow Litigation Services - 877.370.DEPS

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 26 of 40. PageID #: 251143

Highly Confidential - Subject to Further Confidentiality Review

Page 98

Page 100

[redacted]

26 (Pages 98 to 101)

Golkow Litigation Services - 877.370.DEPS



Page 102

Page 103

Q. Okay.
A. I know I went to the store to talk to him, spoke to him on the phone a few times.
Q. All right. Moving along. Let's go back to the policy dealing with inventory controls.

Page 104

Well, before we do that, you understand we talked in the very beginning of this deposition about you don't want to ship a suspicious order.

Q. Let me --
MR. CLARK: Were you done answering?
MR. REINS: I think he was done.
THE WITNESS: Yes.
BY MR. REINS
Q. Let's look at this one, and this may be what you're talking about. Again, I'm not here to trick you or anything.

Page 105

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 28 of 40. PageID #: 251145
Highly Confidential - Subject to Further Confidentiality Review

Page 106

Page 108

28 (Pages 106 to 109)
Golkow Litigation Services - 877.370.DEPS

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 29 of 40. PageID #: 251146

Highly Confidential - Subject to Further Confidentiality Review

Page 110

[redacted]

[redacted]

[redacted]

[redacted]

29 (Pages 110 to 113)

Golkow Litigation Services - 877.370.DEPS



Q. All right. Sitting here today, can you testify under oath that you recall how many times you refused to raise a threshold since 2008?

MR. CLARK: Objection to form.

Q. If you know.

A. I have no idea.

Q. Got it.

Can you tell me -- now, let's say you do that analysis, okay, and then you go -- well, let's just say this: You do that analysis. When if ever -- because after 2013 you all stopped sending those forms monthly.

So when, if ever, after 2013, when those forms stopped, would you report a quote/unquote "suspicious order"? Since then, how many times?

MR. CLARK: Objection to form.

A. Zero.

Q. Zero. All right.

Q. Sure. All right. We're going to talk about another DEA letter.

All right. And this is after the other one. This is going to be PSI 30(b)-301-001. This is dated December 27th, 2007. Again, this letter was sent to all the distributors.

It says, "This letter is being sent to every entity in the United States registered with the Drug Enforcement Administration, DEA, to manufacture or distribute controlled substances.

"The purpose of this letter is to reiterate the responsibilities of the controlled substance manufacturers and distributors to inform DEA of suspicious orders in accordance with 21 C.F.R. 1301.74(b).

"In addition to and not in lieu of the general requirement of 21 USC 23 that managers and distributors maintain effective controls against diversion, DEA regulations require all manufacturers and distributors to report suspicious orders of controlled

substances.

"The regulation also requires that the registrant inform the local DEA division office of suspicious orders when discovered by the registrant."

Is that what you understand the rules to include?

MR. CLARK: Objection to form.

Q. That when you get a suspicious order, you should let them know when you receive it, correct?

MR. CLARK: Objection to form.

A. I've heard different things with that from DEA.

Q. You have?

A. Yes.

Q. What else have you heard?

A. I went to a wholesaler -- DEA wholesaler meeting -- I believe it was in Indianapolis -- where the DEA has representatives there and they talk to the wholesalers and keep us updated on the laws and

regulations.

One of the attorneys that works for DEA had said that do our due diligence first and then, you know, make that judgment. So she was an attorney that worked for DEA.

Q. "Make that judgment," meaning what?

A. On if it's a suspicious order or not.

Q. Okay. And if you think it's a suspicious order, you should report it immediately, correct?

A. Yes.

MR. CLARK: Objection to form.

Q. Okay. All right.

"Filing a monthly report of completed transactions ergo excessive purchase report or high unit purchases does not meet the regulatory requirement to report suspicious orders."

Sitting here today, you're aware that the reporting you guys did from 2000 -- I'm sorry -- from 1997 to 2013, that that monthly

report that Kirk did, that was after those had all been shipped; you're aware of that, right?

MR. CLARK: Objection to form.

A. Yes, on the report, correct.

Q. "Registrants are reminded that their responsibility does not end merely with the filing of a suspicious order report. Registrants must conduct an independent analysis of suspicious orders prior to completing a sale to determine whether the controlled substances are likely to be diverted from legitimate channels."

Q. Okay. All right. I'll take that back from you.

I've got a document here, and I'm sorry, I don't have extra copies. I just don't know what it is. We'll make it Plaintiffs' Exhibit Number 1, I guess. I haven't been marking a bunch because we've used the same documents.

So I'll show it to your attorney first, if you don't mind, and then I'm just going to have you identify what that is.

A. It's a DEA inspection.

Q. Okay. And you're signing off that you're aware that there's an inspection, I guess, in the building? Strike that.

What is the purpose of this form, if you know?

MR. CLARK: Objection to form.

Q. Just that you acknowledge that they're there?

MR. CLARK: Same objection.

A. They always give me this form and I always sign it, okay, when they come in, all right.

Q. Okay.

A. You know, I have no reason not to sign it. They're there for an inspection. I'm fine with that.

Q. Okay.

A. I'm not sure why they give you this paper. I'm not with DEA.

Q. Fair enough. Can I see it back if you don't mind. We'll just mark that.

- - -

(PSI - J. Schoen Exhibit 1 marked.)

- - -

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 33 of 40. PageID #: 251150

Highly Confidential - Subject to Further Confidentiality Review

Page 126

Page 128

[redacted]

33 (Pages 126 to 129)

Golkow Litigation Services - 877.370.DEPS



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 34 of 40. PageID #: 251151

Highly Confidential - Subject to Further Confidentiality Review

Page 130

Page 132

[redacted]

34 (Pages 130 to 133)

Golkow Litigation Services - 877.370.DEPS



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 35 of 40. PageID #: 251152

Highly Confidential - Subject to Further Confidentiality Review

Page 134

Page 136

[redacted]

35 (Pages 134 to 137)

Golkow Litigation Services - 877.370.DEPS



Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 36 of 40. PageID #: 251153
Highly Confidential - Subject to Further Confidentiality Review

Page 138

Page 140

[redacted]

36 (Pages 138 to 141)
Golkow Litigation Services - 877.370.DEPS



MR. REINS: Mark that as Plaintiffs' Exhibit Number 2.

- - -

(PSI - J. Schoen Exhibit 2 marked.)

- - -

MR. CLARK: Are we continuing from Kirk or are these new?

MR. REINS: They're new, but I'll tell you what I've done here. I've gotten really revolutionary. I've identified a number of the documents that have been exhibits in other depos by Bates numbers so we know what they are, but I haven't attached them all again because, frankly, I have one copy left.

MR. CLARK: That's fine.

MR. REINS: Okay.

THE WITNESS: Are we done with this, then?

MR. REINS: Yes, sir, we are. And honestly, we're going to take a quick break because I may be done.

THE VIDEOGRAPHER: We're going off the record at 3:04.

(Recess taken.)

THE VIDEOGRAPHER: We're back on the record at 3:14.

MR. REINS: I have no more questions.

- - -

REDIRECT EXAMINATION

BY MR. CLARK:

Case: 1:17-md-02804-DAP Doc #: 1984-9 Filed: 07/24/19 38 of 40. PageID #: 251155

Highly Confidential - Subject to Further Confidentiality Review

Page 146

Page 148

[redacted]

38 (Pages 146 to 149)

Golkow Litigation Services - 877.370.DEPS



MR. REINS: Gotcha.
I have no more questions.
Thanks for your time.
MR. CLARK: Nothing further.

THE VIDEOGRAPHER: We're going off the record at 3:20 p m.
(Signature not waived.)
- - -
Thereupon, at 3:20 p m., on Wednesday, February 27, 2019, the deposition was concluded.
- - -

CERTIFICATE

STATE OF OHIO :
SS:
COUNTY OF _________:

I, JAMES T. SCHOEN, do hereby certify that I have read the foregoing transcript of my cross-examination given on February 27, 2019; that together with the correction page attached hereto noting changes in form or substance, if any, it is true and correct.

____________________________
JAMES T. SCHOEN

I do hereby certify that the foregoing transcript of the cross-examination of JAMES T. SCHOEN was submitted to the witness for reading and signing; that after he had stated to the undersigned Notary Public that he had read and examined his cross-examination, he signed the same in my presence on the _______ day of ________________________, 2019.

____________________________
NOTARY PUBLIC - STATE OF OHIO

My Commission Expires:
________________, ______.

CERTIFICATE

STATE OF OHIO :
SS:
COUNTY OF FRANKLIN :

I, Carol A Kirk, a Registered Merit Reporter and Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within-named JAMES T SCHOEN was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the deposition then given by him was by me reduced to stenotype in the presence of said witness; that the foregoing is a true and correct transcript of the deposition so given by him; that the deposition was taken at the time and place in the caption specified and was completed without adjournment; and that I am in no way related to or employed by any attorney or party hereto or financially interested in the action; and I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D)

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio on this 4th day of March 2019

____________________________
CAROL A KIRK, RMR
NOTARY PUBLIC - STATE OF OHIO
My Commission Expires: April 9, 2022
- - -

DEPOSITION ERRATA SHEET

I, JAMES T SCHOEN, have read the transcript of my deposition taken on the 27th day of February 2019, or the same has been read to me I request that the following changes be entered upon the record for the reasons so indicated I have signed the signature page and authorize you to attach the same to the original transcript

Page Line Correction or Change and Reason:

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

___ ____ _______________________________________

Date _____________ Signature ______________________