Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

IN RE:  NATIONAL              )
PRESCRIPTION                  )   MDL No. 2804
OPIATE LITIGATION             )
_____ )   Case No.
                              )   1:17-MD-2804
THIS DOCUMENT RELATES         )
TO ALL CASES                  )   Hon. Dan A. Polster

- - -

VIDEOTAPED DEPOSITION OF THOMAS G. SCHOEN

Wednesday, September 5, 2018

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of THOMAS G. SCHOEN, held
at the Hilton Inn Garden Toledo, 6165 Levis Commons
Boulevard, Perrysburg, Ohio, commencing at 9:03 a.m., on
the above date, before Carol A. Kirk, Registered Merit
Reporter and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

```
 1        A P P E A R A N C E S:
 2   On behalf of the Plaintiffs:
          MCHUGH FULLER LAW GROUP
 3        BY:  MICHAEL J FULLER, JR , ESQUIRE
          mike@mchughfuller.com
 4        AMY J  QUEZON, ESQUIRE
          amy@mchughfuller.com
 5        97 Elias Whiddon Road
          Hattiesburg, Mississippi  39402
 6        601-261-2220
 7   On behalf of the Cardinal Health, Inc :
          WILLIAMS & CONNOLLY LLP
 8        BY:  JOSEPH S  BUSHUR, ESQUIRE
          jbushur@wc com
 9        725 Twelfth Street, N W
          Washington, DC  20005
10        202-434-5420
11   On behalf of the AmerisourceBergen:
          REED SMITH LLP
12        BY:  JAMES A  PETKUN, ESQUIRE
          jpetkun@reedsmith com
13        Three Logan Square
          1717 Arch Street, Suite 3100
14        Philadelphia, Pennsylvania  19103
          215-851-8100
15
     On behalf of HBC:
16        MARCUS & SHAPIRA LLP
          BY:  JOSHUA A  KOBRIN, ESQUIRE
17        kobrin@marcus-shapira com
          (VIA TELECONFERENCE)
18        One Oxford Center, 35th Floor
          301 Grant Street
19        Pittsburgh, Pennsylvania  15219-6401
          412-338-5208
20
21
22
23
24
```

## Page 3

```
 1   On behalf of Walmart:
          JONES DAY
 2        BY:  KRISTIN S M  MORRISON, ESQUIRE
          kmorrison@jonesday.com
 3        901 Lakeside Avenue East
          Cleveland, Ohio  44114
 4        216-586-7375
 5   On behalf of Prescription Supply, Inc :
          PELINI, CAMPBELL & WILLIAMS LLC
 6        BY:  PAUL B  RICARD, ESQUIRE
          pbricard@pelini-law com
 7        CRAIG G  PELINI, ESQUIRE
          cgp@pelini-law com
 8        SAMANTHA VOLEK, ESQUIRE
          svolek@pelini-law com
 9        8040 Cleveland Avenue NW, Suite 400
          North Canton, Ohio  44720
10        330-305-6400
11   On behalf of Miami-Luken:
          JACKSON KELLY PLLC
12        BY:  WILLIAM J  AUBEL, ESQUIRE
          william j aubel@jacksonkelly com
13        (VIA TELECONFERENCE)
          500 Lee Street East, Suite 1600
14        Charleston, West Virginia  25301
          304-340-1092
15
     On behalf of McKesson:
16        COVINGTON & BURLING LLP
          BY:  MEGHAN E  MONAGHAN, ESQUIRE
17        mmonaghan@cov com
          One CityCenter
18        850 Tenth Street, NW
          Washington, DC  20001
19        202-662-5531
20   On behalf of Endo Pharmaceuticals, Inc  and
     Endo Health Solutions Inc :
21        ARNOLD & PORTER KAYE SCHOLER, LLP
          BY:  ANGEL TANG NAKAMURA, ESQUIRE
22        angel nakamura@apks com
          (VIA TELECONFERENCE)
23        777 S  Figueroa Street, Suite 4400
          Los Angeles, California  90017
24        213-243-4000
```

## Page 4

```
 1   On behalf of Teva Pharmaceuticals USA, Inc., Cephalon,
     Inc., Watson Laboratories, Inc., Actavis LLC, Actavis
 2   Pharma, Inc., f/k/a Watson Pharma, Inc.:
          MORGAN, LEWIS & BOCKIUS LLP
 3        BY:  ELLIOTT E. BROWN, ESQUIRE
          elliott.brown@morganlewis.com
 4        (VIA TELECONFERENCE)
          1111 Pennsylvania Avenue, NW
 5        Washington, DC  20004
          202-739-5833
 6
     On behalf of the Allergan Defendants:
 7        BARNES & THORNBURG LLP
          BY:  WILLIAM E. PADGETT, ESQUIRE
 8        wpadgett@btlaw.com
          (VIA TELECONFERENCE)
 9        11 South Meridian Street
          Indianapolis, Indiana  46204
10        317-236-1313
11
12   ALSO PRESENT:
13        A.J. Elkins, McHugh Fuller
          Darnell Brown, Videographer
14        Gina Veldman, Trial Technician
15
16                   ---
17
18
19
20
21
22
23
24
```

## Page 5

```
 1        VIDEOTAPED DEPOSITION OF THOMAS G. SCHOEN
 2             INDEX TO EXAMINATION
 3   WITNESS                              PAGE
 4   THOMAS G. SCHOEN
 5        EXAMINATION BY MR. FULLER:          12
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential – Subject to Further Confidentiality Review

## Page 6

VIDEOTAPED DEPOSITION OF THOMAS G SCHOEN
INDEX TO EXHIBITS

PSI-SCHOEN   DESCRIPTION                                      PAGE
Exhibit 1    Second Amended First Notice of      14
             Deposition Pursuant to Rule
             30(b)(6) and Document Request
             Pursuant to Rule 30(b)(2) and
             Rule 34 to Defendant
             Prescription Supply, Inc

Exhibit 2    Second Amended Second Notice of     15
             Deposition Pursuant to Rule
             30(b)(6) and Document Request
             Pursuant to Rule 30(b)(2) and
             Rule 34 to Defendant
             Prescription Supply, Inc

Exhibit 3    Prescription Supply, Inc's          15
             Objections and Responses to
             First and Second Notice of
             Deposition to Rule 30(b)(6)

Exhibit 4    Document titled "United States      18
             Code Annotated; Title 21  Food
             and Drugs; Chapter 13  Drug
             Abuse Prevention and Control;
             Subchapter I  Control and
             Enforcement; Parts A through C

Exhibit 5    Legislative findings and            30
             history of the Controlled
             Substances Act, 101 pages

Exhibit 6    21 C F R  1301 74                   39
Exhibit 7    Document titled HathiTrust          47
Exhibit 8    861 Federal Reporter, 3d            54
             Series, Bates-stamped PSI
             30b_ 106-001 through 025
Exhibit 9    Document titled "Ohio               61
             Administrative Code - 2002,"
             Bates-stamped PSI 30b_ 112 -
             001 through 004

## Page 7

VIDEOTAPED DEPOSITION OF THOMAS G SCHOEN
INDEX TO EXHIBITS (CONT'D)

PSI-SCHOEN   DESCRIPTION                                      PAGE
Exhibit 10   Document titled "United States      73
             General Accounting Office GAO
             Report to the Subcommittee on
             Oversight and Investigations,
             Committee on Energy and
             Commerce, House of
             Representatives, May 2002,
             Prescription Drugs, State
             Monitoring Programs Provide
             Useful Tool to Reduce
             Diversion"

Exhibit 11   Document titled "HathiTrust,        77
             OxyContin: Its Use and Abuse"

Exhibit 12   The National Center on             88
             Addiction and Substance Abuse
             at Columbia University, "Under
             the Counter:  The Diversion and
             Abuse of Controlled
             Prescription Drugs in the U S "

Exhibit 13   Letter to Cardinal Health from      95
             Mr  Rannazzisi, dated 9/27/06,
             Bates-stamped PSI 30b_ 301 -
             001 through 004

Exhibit 14   Diagram prepared by Attorney       106
             Fuller

Exhibit 15   PowerPoint presentation titled     113
             "Drug Enforcement
             Administration Pharmaceutical
             Industry Conference, Wholesale
             Distribution Diversion Control
             Program, September 11, 2007,"
             Bates-stamped PSI 30b_ 601 -
             001 through 044

## Page 8

VIDEOTAPED DEPOSITION OF THOMAS G SCHOEN
INDEX TO EXHIBITS (CONT'D)

PSI-SCHOEN   DESCRIPTION                                      PAGE
Exhibit 16   Memorandum for Asa Hutchinson      118
             from Mr  Fine, Bates-stamped
             PSI 30b_ 204 - 001 through 039
Exhibit 17   Letter to Cardinal Health from     127
             Mr  Rannazzisi, dated 12/27/07,
             Bates-stamped PSI 30b_ 303 -
             001 through 002

Exhibit 18   Document titled "HDMA Industry     134
             Compliance Guidelines:
             Reporting Suspicious Orders and
             Preventing Diversion of
             Controlled Substances,"
             Bates-stamped PSI 30b_ 305 -
             001 through 015

Exhibit 19   PSI policies and procedures,       153
             Bates-stamped PSI 30b_ 404 -
             001 through 005

Exhibit 20   Document titled "Maximum           190
             Monthly Quantity," 10/2/08,
             Bates-stamped PSI0000280
             through 285
Exhibit 21   Document titled "Prescription      190
             Supply Maximum Monthly Units
             for OLS Systems," 10/2/2008,
             Bates-stamped PSI0000274
             through 279
Exhibit 22   State of Ohio Board of Pharmacy    193
             Written Response, October 25,
             2017, Bates-stamped PSI0000007
             through 83

Exhibit 23   Thumbdrive containing macro        206
             spreadsheet

## Page 9

VIDEOTAPED DEPOSITION OF THOMAS G. SCHOEN
INDEX TO EXHIBITS (CONT'D)

PSI-SCHOEN   DESCRIPTION                                      PAGE
Exhibit 24   E-mail to Mr. J. Schoen from       218
             Mr. Thomas Schoen, dated May 2,
             2018, Bates-stamped PSI0003024
Exhibit 25   Spreadsheet,                       221
Exhibit 26   Total Monthly                      221
             Oxycodone Sales, January 2008 -
             April 2009
Exhibit 27   Total Monthly                      221
             Oxycodone Sales January 2013 -
             November 2014
Exhibit 28   Letter to          from the        234
             State of Ohio Board of
             Pharmacy, dated 10/6/15,
             Bates-stamped PSI0003419
             through 3421
Exhibit 29   HDMA Boards of Directors           241
             newsletter

Exhibit 30   Amicus Curiae Brief of             243
             Healthcare Distribution
             Management Association in
             Support of Appellant Cardinal
             Health, Inc.

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
 1              ---
 2        P R O C E E D I N G S
 3              ---
 4        THE VIDEOGRAPHER:  Good morning.  We are
 5  now on the record.  My name is Darnell Brown, and
 6  I am a videographer with Golkow Litigation
 7  Services.  Today's date is September 5, 2018, and
 8  the time is 9:03 a.m.
 9        This video deposition is being held in
10  Perrysburg, Ohio, in the matter of In Re:  Opioid Deps
11  for the United States District Court for the Northern
12  District of Ohio.  The deponent is Thomas Schoen.
13        Counsel will be noted on the stenographic
14  record.  The court reporter is Carol Kirk who will now
15  swear in the witness.
16        (Witness sworn.)
17        THE VIDEOGRAPHER:  You may begin.
18        MR. FULLER:  Aren't we supposed to all
19  introduce ourselves?
20        THE VIDEOGRAPHER:  Yeah.
21        MR. FULLER:  All right.  Mike Fuller on
22  behalf of the Plaintiff.
23        MR. ELKINS:  AJ Elkins on behalf of the
24  Plaintiff.
```

Page 11

```
 1        MS. QUEZON:  Amy Quezon on behalf of the
 2  Plaintiff.
 3        MS. VELDMAN:  Gina Veldman on behalf of
 4  the Plaintiff.
 5        MR. PELINI:  Craig Pelini.  I represent
 6  PSI.
 7        MR. BUSHUR:  Joseph Bushur on behalf of
 8  Cardinal Health.
 9        MR. PETKUN:  James Petkun for
10  AmerisourceBergen Corporation.
11        MS. MONAGHAN:  Meghan Monaghan on behalf
12  of McKesson.
13        MS. MORRISON:  Kristin Morrison on
14  behalf of Walmart.
15        MS. VOLEK:  Samantha Volek on behalf of
16  PSI.
17        MR. RICARD:  Paul Ricard, PSI.
18        MR. FULLER:  And anybody on the phone?
19  Can you note your appearance for the record.
20        MR. PADGETT:  Bill Padgett on behalf of
21  HD Smith.
22        MR. BROWN:  Elliott Brown on behalf of
23  Teva.
24        MR. KOBRIN:  Joshua Kobrin on behalf of
```

Page 12

```
 1  HBC.
 2        MS. NAKAMURA:  Angel Nakamura on behalf
 3  of the Endo and Par Pharmaceutical Defendants.
 4        MR. AUBEL:  Bill Aubel on behalf of
 5  Miami-Luken, Inc.
 6        MR. FULLER:  I'm assuming that's
 7  everybody.
 8              ---
 9        THOMAS G. SCHOEN
10  being by me first duly sworn, as hereinafter certified,
11  deposes and says as follows:
12        EXAMINATION
13  BY MR. FULLER:
14        Q.  Mr. Schoen, please state your name,
15  spelling your last name for the record.
16        A.  My name is Thomas G. Schoen.  Last name
17  Schoen, S-c-h-o-e-n.
18        Q.  And, Mr. Schoen, are you the owner and
19  operator of a company called Prescription Supply,
20  Inc.?
21        A.  I am an owner.  There are more than one.
22  And I'm president of Prescription Supply,
23  Incorporated.
24        Q.  Who are the other owners?
```

Page 13

```
 1        A.  All family members.
 2        Q.  Okay.  Your family, I'm assuming?
 3        A.  My family and my sister's family.
 4        Q.  Fair enough.
 5        And your company has been around since,
 6  I think, about 1955; is that correct?
 7        A.  That's correct.
 8        Q.  And has it always been family owned --
 9        A.  It has.
10        Q.  -- and operated?
11        A.  Yes, it has.
12        Q.  Okay.  And you're aware that -- and tell
13  me if it's okay -- but I heard counsel do it, so
14  I'm assuming it is -- referring to Prescription
15  Supply, Inc., as PSI.
16        A.  That's acceptable.
17        Q.  Okay.  And you're aware that PSI has
18  been sued in this litigation involving the opioid
19  epidemic, correct?
20        A.  I'm aware.
21        Q.  You were also -- well, let me just
22  attach the exhibits.  We're going to attach as
23  Plaintiff's 1 a copy of the notice.  And this is
24  more housekeeping for counsel and I.  It's the
```

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    second amended first notice will be Exhibit 1.
2        Here.  Let me just give you all the copies and
3    you can pass them out.
4                     ---
5        (PSI-Schoen Exhibit 1 marked.)
6                     ---
7    BY MR. FULLER:
8        Q.  Mr. Schoen, just so you know, the first
9    little bit here, we're going to just -- sort of
10   going to be like housekeeping, just some notices
11   and objections and things like that that I'll make
12   sure as we get as part of the record of this
13   deposition.  Okay?
14       Now, I'm going to assume -- and correct
15   me if I am wrong -- that you have seen this notice
16   prior to today; is that correct?  Take a minute
17   and flip through it.
18       A.  Actually, I don't know that I've seen
19   this notice.  But, yes, I've seen perhaps the
20   first notice.
21       Q.  Fair enough.  And particularly starting
22   on page 5, I believe it is, the areas of inquiry.
23   Do you see those listed there?  And it goes on to
24   page 6.

Page 15

1        A.  Yes.
2        Q.  And have you had an opportunity to
3    review those before today?
4        A.  I have.
5                     ---
6        (PSI-Schoen Exhibit 2 marked.)
7                     ---
8        Q.  Okay.  The second exhibit is going to be
9    the second amended notice for the second 30(b).
10       Mr. Schoen, it also starts on page 5,
11   certain topic areas.  And, again, I'd just ask if
12   you have had an opportunity to make yourself
13   familiar with those areas of inquiry prior to
14   today?
15       A.  I have.
16                    ---
17       (PSI-Schoen Exhibit 3 marked.)
18                    ---
19       Q.  Okay.  And the third exhibit is going to
20   be the Defendants' objections to our notice.
21       We're just making those part of the
22   record.  I don't know if you've reviewed them or
23   not, and it really doesn't matter to me, so don't
24   worry about it.

Page 16

1        A.  Actually, I have not reviewed this one.
2        Q.  Fair enough.
3        Now, today -- and I'm sure you've been
4    told -- you've been designated as a 30(b) witness,
5    okay?  And what that means is that you're here
6    today to speak on behalf of a company; in this
7    particular case, PSI.
8        Are you aware of that?
9        A.  Yes.
10       Q.  So it's going to be a little awkward
11   probably at times because I'm going to be asking
12   you for information that PSI knows, not just
13   Thomas Schoen; is that fair?
14       A.  Fair.
15       Q.  And for purposes of the 30(b), we're
16   going to be limited to the subject matters set
17   out, with one exception.  Your counsel and I have
18   talked over the past couple of weeks and reached
19   certain agreements with certain topics set out in
20   the notices.
21       MR. FULLER:  And, Counsel, you can
22   correct me if I am wrong, but I'm going to read
23   from my e-mail as to what we, I think, agreed to.
24   And the first 30(b) notice, Subject Matter O, will

Page 17

1    be subject to a written response.  And the second
2    30(b) notice is going to be numbers 1, 2, 3, 4, 5,
3    9, 10, 11, and 18.
4        Here you go, Counsel.  Here's a copy of that
5    e-mail that I sent you.
6        MR. RICARD:  That's correct.
7        MR. FULLER:  Okay.
8    BY MR. FULLER:
9        Q.  So, Mr. Schoen, what your counsel and I
10   did for you is hopefully shortened the amount of
11   time that you have to sit here today.
12       A.  Thank you.
13       Q.  You're more than welcome.  And, again, I
14   appreciate you coming and being here for us.
15       Now, you mentioned that you don't really
16   operate.  What is your role currently with PSI?
17   What do you do on a day-to-day basis?
18       A.  I'm the president.  I do pretty much
19   everything.  I -- okay.
20       Q.  Give me, if you will, just a thumbnail
21   sketch of what your average day is these days.
22       A.  We're going through constant changes in
23   our software, so I'm reviewing and giving some
24   ideas on software changes.  I'm hiring people

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1   because we need them at this time of year. I
2   don't know. It just -- I don't have any more
3   fixed responsibilities, as far as I do whatever
4   has to be done when it has to be done.
5       Q. Fair enough. Fair enough. I get that.
6   I get that.
7       Now, Prescription Supply is a registrant
8   with the DEA related to controlled substances,
9   correct?
10      A. Yes.
11      Q. And as such, you take on certain
12  statutory and regulatory obligations; is that
13  correct?
14      A. Yes.
15      Q. And we're going to mark as Plaintiff's
16  Exhibit Number 4 --
17      MR. FULLER: It's going to be 101, Gina.
18          ---
19      (PSI-Schoen Exhibit 4 marked.)
20          ---
21  BY MR. FULLER:
22      Q. Now, I'm going to assume that you are
23  somewhat familiar, Mr. Schoen, with the Controlled
24  Substances Act; is that correct?

Page 19

1       A. Yes, in general.
2       THE VIDEOGRAPHER: Could the person on
3   the phone -- could you guys please put your phone
4   on mute, because we can now hear you in the
5   background. Please.
6       MR. FULLER: I'm sorry. I wasn't paying
7   attention to it.
8   BY MR. FULLER:
9       Q. And what you have -- and you have a hard
10  copy, which has been marked as an exhibit. You
11  should also have a digital copy in that screen
12  right in front of you. And then there's a big
13  screen up to your right as well. And you can look
14  at any or all of them, okay?
15      And what's going to happen is, as I go
16  through some of this document, the one in front of
17  you on the digital copy, Mr. Schoen, is going to
18  be highlighted as to wherever I'm referring to to
19  help direct you to certain areas. Okay?
20      A. Yes.
21      Q. Okay.
22      MR. RICARD: Before you start on this,
23  can we, notwithstanding any form objections, agree
24  to a standing objection to any -- to the extent

Page 20

1   that this seeks any legal conclusions?
2       MR. FULLER: Sure.
3   BY MR. FULLER:
4       Q. And you'll see up there to the upper
5   left, Mr. Schoen, that -- the seal of the United
6   States Congress, correct?
7       A. I do.
8       Q. And this is part of the United States
9   Code, which is the statutes promulgated by the
10  federal government. And you'll see this is
11  Chapter 13. Drug Abuse, Prevention, and Control.
12      Do you see that? If you look on the
13  screen right in front of you, it's highlighted.
14      A. Okay. Yes.
15      Q. Okay. The screen is sort of like your
16  cheat sheet.
17      A. All right.
18      Q. It will help get you right where I'm
19  looking, too, okay? And you're aware that that is
20  part of the Controlled Substances Act?
21      A. Yes.
22      Q. Okay. And this is Section 801, and it
23  says the Congressional findings and declarations
24  related to controlled substances. "The Congress

Page 21

1   makes the following findings and declarations."
2       Could you read, in all fairness, the
3   first declaration that they made to us,
4   Mr. Schoen.
5       A. "Many of the drugs included within this
6   subchapter have a useful and legitimate medical
7   purpose and are necessary to maintain the health
8   and general welfare of the American people."
9       Q. And does PSI accept that declaration by
10  U.S. Congress as being true?
11      A. Yes.
12      Q. And many of the drugs that you deliver,
13  Schedules II through Vs, do have legitimate
14  medical purposes --
15      A. Yes.
16      Q. -- is that correct?
17      And another thing, Mr. Schoen, is we
18  go -- if you will let me finish my question
19  completely before you answer -- in normal
20  conversation when you know what I'm going to ask,
21  we usually start answering each other, but because
22  of Madam Court Reporter and we want to make sure
23  the record is clear, you let me finish.
24      Your counsel may object from time to

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    time. Let him get out his objection. And then
2    you can answer. And I'll certainly try to let you
3    finish your answer before I ask another question.
4    Okay?
5        A.   Yes.
6        Q.   Now, if you will, read the second
7    declaration to us, please.
8        A.   "The illegal importation, manufacture,
9    distribution, and possession and improper use of
10   controlled substances has a substantial and
11   detrimental effect on the health and general
12   welfare of the American people."
13       Q.   And does PSI as a registrant agree and
14   accept that declaration by the U.S. Congress?
15           MR. RICARD: Objection to form.
16       Q.   That's him stating his objection for the
17   record, but you can go ahead and answer the
18   question.
19       A.   Yes.
20       Q.   Now, with one caveat. The only time you
21   wouldn't answer is if he tells you "Hey,
22   Mr. Schoen, don't answer that question." Okay?
23       A.   I'm afraid I didn't understand that.
24       Q.   I'm sorry. The only time you wouldn't

Page 23

1    answer the question is if counsel tells you not to
2    answer.
3        A.   Oh, okay.
4        Q.   Fair enough?
5        A.   Fair enough.
6        Q.   Okay. Now, PSI -- you sitting here as
7    PSI are a distributor, correct?
8        A.   That's correct.
9        Q.   And Section 2 here refers to the --
10   amongst other things, the illegal distribution?
11       A.   Yes.
12       Q.   And you would agree as PSI that the
13   illegal distribution of controlled substances have
14   a substantial and detrimental effect on the health
15   and general welfare of the American people,
16   correct?
17           MR. RICARD: Objection to form.
18       A.   Yes.
19       Q.   Okay. If you'll turn to the next page,
20   you'll see again the -- on the upper left, a
21   symbol of the great U.S. Congress, correct?
22       A.   Yes.
23       Q.   And it's still Chapter 13, but this is
24   Section 812, and it deals with schedules of

Page 24

1    controlled substances.
2        Do you see that there?
3        A.   Yes.
4        Q.   And PSI is aware that there are several
5    different schedules for controlled substances
6    depending on certain factors that relate to that
7    particular medication, correct?
8        A.   Yes.
9        Q.   Now, I'm going to tell you that most of
10   today we're going to be talking about what is
11   called Schedule IIs. And you know what those are;
12   is that right?
13       A.   Yes.
14       Q.   PSI is also a distributor of Schedule
15   IIs; are they not?
16       A.   Yes.
17       Q.   Tell us what -- under Schedule II, what
18   the three factors are, and start with factor A, if
19   you would.
20       A.   "The drug or other substance has a high
21   potential of abuse.
22       "(B) The drug or other substance has a
23   currently accepted medical use in treatment in the
24   United States or is currently accepted medical use

Page 25

1    for severe -- with severe restrictions.
2        "Abuse of the drug or other substance
3    may lead to severe psychological or physical
4    dependency."
5        Q.   And PSI accepts those as all the
6    requirements for Schedule II drugs, correct?
7            MR. RICARD: Object to form.
8        A.   Yes.
9        Q.   Now -- and let's talk about it just for
10   a second. The reason we have these different
11   schedules, as PSI is well aware, is because there
12   are some medications out there that have -- while
13   legitimate purposes, if they go unchecked, can be
14   very dangerous, correct?
15           MR. RICARD: Objection to form.
16       A.   Yes.
17       Q.   And one of the things that we want to
18   ensure -- and I say "we." One of the things that
19   PSI wants to ensure is that we're dealing with
20   these dangerous drugs in the right way, that we're
21   preventing them from getting into the illicit
22   market?
23           MR. RICARD: Objection to form.
24       Q.   Correct?

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1   A.  Yes.
2   Q.  Okay.  If you'll turn to the next page,
3   and you see this is Section 821 of Chapter 13.
4       Do you see that?
5   A.  I do.
6   Q.  Okay.  And this deals with rules and
7   regulations, and it says, "The Attorney General is
8   authorized to promulgate rules and regulations and
9   to charge reasonable fees related to the
10  registration and control of the manufacture,
11  distribution, and dispensing of controlled
12  substances and listed chemicals."
13      Does PSI accept that the Attorney
14  General is the one with the authority to regulate
15  its industry?
16  A.  Yes.
17      MR. RICARD:  Objection to form.
18  Q.  And if you'll turn to the final page, I
19  think, of this exhibit.  We're at Section 823,
20  registration requirements.
21      Do you see that there?
22  A.  I do.
23  Q.  And then -- and, again -- and I may not
24  have stated this in the beginning.  These are

Page 27

1   portions of the regs -- or excuse me -- portions
2   of the code that I've pulled out, so it doesn't
3   have the whole code.  I only pulled out what I
4   needed for the purposes of this deposition, okay,
5   Mr. Schoen?  I just want you to understand it's
6   not every section, and that's why this section
7   starts with (b).  Fair enough?
8   A.  Yes.
9   Q.  Okay.  It says, "In determining the
10  public interest, the following factors should be
11  considered:  The maintenance of effective controls
12  against diversion of particular controlled
13  substances into other than legitimate medical,
14  scientific, and industrial channels."
15      Do you see that there?
16  A.  Yes.
17  Q.  And PSI agrees that it has an obligation
18  to maintain effective controls against diversion
19  when it comes to controlled substances, correct?
20      MR. RICARD:  Objection to form.
21  A.  Yes.
22  Q.  Now -- and I'm asking you as PSI.  When
23  we see effective controls against diversion, that
24  means the systems in place and controls to prevent

Page 28

1   diversion; is that correct?
2       MR. RICARD:  Objection to form.
3   A.  Yes.
4   Q.  Tell us, tell the jury, why we want to
5   prevent diversion of controlled substances.
6   A.  Well, as it states, we -- it can be
7   dangerous.  People can die.  People can have bad
8   effects, and they can be abused.  None of that is
9   something that we want to happen.  We want the
10  good effects, not the bad effects.
11  Q.  Right.  And we're talking about
12  diversion.  Just so we're on the same page, we're
13  talking about diversion, the non-proper medical
14  use, correct?
15  A.  Correct.
16  Q.  And when we have increased diversion,
17  we're likely to have increased abuse and addiction
18  as you mentioned, right?
19      MR. RICARD:  Objection to form.
20  A.  Yes.
21  Q.  And when we're talking about that, we're
22  talking about the general public at large, our
23  children and our communities, correct?
24  A.  Yes.

Page 29

1   Q.  And you understand that the Controlled
2   Substances Act that was enacted back in October of
3   1970 was Congress' attempt to try to keep our
4   children and our community safe from these
5   controlled substances?
6       MR. RICARD:  Objection to form.
7   A.  Yes.
8   Q.  Okay.  Now, Mr. Schoen, your family has
9   been in the business a very long time.  When did
10  you first start working in the industry?  Probably
11  as a little kid, huh?
12  A.  I'm afraid that's true, yes.  1958.  As
13  an eighth grader, I tore down some shelving.
14  Q.  Wow.
15  A.  Yes.  I've been active somewhat most of
16  my life.
17  Q.  So you literally started at the bottom
18  and worked your way up, huh?
19  A.  I certainly have.  I've worked roughly
20  every position.
21  Q.  Holy cow.  Well, good for you.
22      I'm going to now -- and that was
23  actually even before the Controlled Substances Act
24  was enacted, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1     A.  Well, yes.  I was in the Army '68 to
2  '69.
3     Q.  Okay.  And when you got out of the Army,
4  did you come back home to the family business, or
5  did you go somewhere else first?
6     A.  I was in graduate school for a short
7  time.
8     Q.  Where at?
9     A.  University of Minnesota.
10    Q.  Okay.  As long as it wasn't OSU.  Me and
11 Mr. Craig, at the end of the table, have some
12 issues with OSU.
13          MR. PELINI:  We'll stipulate to that,
14 Mr. Fuller.
15          MR. FULLER:  Thank you.  Thank you,
16 Counsel.
17 BY MR. FULLER:
18    Q.  Now, Mr. Schoen, you're not an OSU fan,
19 are you?
20    A.  Is that really a --
21    Q.  No, no.  You can plead the Fifth on that
22 one.
23               ---
24      (PSI-Schoen Exhibit 5 marked.)

Page 31

1               ---
2     Q.  What I have marked as Exhibit
3  Number 5 -- and you have in front of you -- is the
4  legislative findings and history of the Controlled
5  Substances Act.
6     A.  All right.
7     Q.  And I'm going to ask that you read all
8  211 pages.  No.  I'm kidding.  I'm kidding.
9          And you're welcome to follow along in
10 the document.  But, again, in front of you,
11 Mr. Schoen, is a digital copy.
12    A.  To be honest, I can't read the digital
13 copy.
14    Q.  Oh.  Well, now, the parts I read from do
15 blow up.
16    A.  Okay.
17    Q.  So that may help, okay?
18    A.  Yes.
19          MR. RICARD:  Mike, before you start --
20          MR. FULLER:  Yes, sir.
21          MR. RICARD:  -- I'd just like to note a
22 standing objection to any questions pertaining to
23 this document, as it calls for a legal conclusion.
24          MR. FULLER:  Fair enough.

Page 32

1          MR. FULLER:  Gina, if you could go to
2  page -- you're already there.  Page 5.
3          THE WITNESS:  I can't read that either.
4     Q.  Well, see if this helps.  How about now?
5     A.  That helps, yeah.
6     Q.  It helps me, too.  I'm getting to that
7  age where my eyesight is going as well.
8          So, Mr. Schoen, this is the legislative
9  history and findings related to the Controlled
10 Substances Act, the things Congress did when it
11 was passing the act and some of the reasoning
12 behind it, and we're not going to go through the
13 whole thing.  We're going to go through certain
14 portions of it, if that's okay.  All right?
15    A.  Yes.
16    Q.  All right.  And this says, "Title 2:
17 Control and Enforcement."  It says, "This bill
18 provides for the control by the Justice Department
19 of problems related to drug abuse through
20 registration of manufacturers, wholesalers,
21 retailers, and all others in the legitimate
22 chain -- excuse me -- legitimate distribution
23 chain that makes transactions outside the
24 legitimate distribution chain illegal."

Page 33

1          Does PSI concur that that is the goal
2  behind the Controlled Substances Act?
3          MR. RICARD:  Objection to form.
4          MR. FULLER:  I'm sorry.
5     A.  Yes.
6     Q.  Okay.  And PSI understands that the way
7  the Controlled Substances Act works is that
8  everybody in that chain of distribution starting
9  from the manufacturer all the way down to the
10 pharmacy has to be registered with the Department
11 of Justice via the DEA?
12    A.  Yes.
13    Q.  And, again, as we mentioned earlier, PSI
14 is one of those registrants?
15    A.  Yes.
16    Q.  Does PSI also agree that transactions
17 outside of this legitimate chain or a
18 noncompliance with the Controlled Substances Act
19 would be illegal, meaning breaking the law?
20          MR. RICARD:  Objection to form.
21    A.  Yes.
22    Q.  If you go to page 8.
23          MR. RICARD:  For the record, we're
24 looking at the Bates number 89, not the Westlaw?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    MR. FULLER: I'm sorry. Yes, sir.
2    Upper right-hand corner of the page.
3    BY MR. FULLER:
4    Q.  Mr. Schoen, not the page number on the
5    bottom. I apologize. It's the one on the upper
6    right-hand side --
7    A.  Okay.
8    Q.  -- which looks like they're one page off
9    from each other. Sorry. It can be confusing. I
10   apologize.
11   On page 8, it says, "This bill is
12   designed to improve the administration and
13   regulation of the manufacturing, distribution, and
14   dispensing of controlled substances by providing
15   for a closed system of drug distribution for
16   legitimate handlers of such drugs."
17   Do you have an understanding,
18   Mr. Schoen, of what it means by "closed system"?
19   A.  I believe so.
20   Q.  And that is that there are limited
21   participants, right?
22   A.  Yes.
23   Q.  Not just anybody can do what PSI does?
24   A.  Yes.

Page 35

1    Q.  You have a special ticket or
2    registration to be a manufacturer, distributor, or
3    a pharmacy, correct?
4    MR. RICARD: Objection to form.
5    A.  We're a distributor, yes.
6    Q.  Right. It goes on to say that "Such a
7    closed system should significantly reduce the
8    widespread diversion of these drugs out of
9    legitimate channels into the illicit market, while
10   at the same time providing the legitimate drug
11   industry with a unified approach to narcotic and
12   dangerous drug control."
13   Does PSI understand and agree that this
14   closed system is probably one of the best ways to
15   try to prevent diversion?
16   A.  Yes.
17   Q.  And that what Congress has done here is
18   it's basically done away with, to some degree,
19   capitalism. It says not anybody can participate
20   in this market. For example, Paul, your counsel,
21   and myself, we can't go out today and start buying
22   and selling controlled substances, at least not
23   legally, correct?
24   MR. RICARD: Objection to form.

Page 36

1    A.  Correct.
2    Q.  It's given certain -- it's given certain
3    persons a specific right to do that, for example,
4    PSI, and you agree with that, correct?
5    A.  Yes.
6    Q.  Now, if you go to page 11 as numbered in
7    the upper right-hand corner. It says, "The price
8    for participation in this traffic should be
9    prohibitive. It should be made too dangerous to
10   be attractive."
11   And there this code section or this code
12   of this Congressional history is talking about the
13   illegal traffic. And PSI agrees that what
14   Congress is trying to do is trying to make
15   penalties for the illegal market so significant
16   that people won't want to take part in the illicit
17   market, correct?
18   A.  Yes.
19   MR. RICARD: Objection to form.
20   A.  Yes.
21   MR. RICARD: Tom, give me a second to
22   object if I need to.
23   THE WITNESS: Yes.
24   MR. RICARD: Thanks.

Page 37

1    BY MR. FULLER:
2    Q.  And you have seen that over the history
3    of your operation in this industry, correct?
4    A.  Yes.
5    Q.  Not only with illegal doctors getting
6    arrested and fined and put in prison, but also
7    with other wholesale distributors, correct?
8    MR. RICARD: Objection to form.
9    A.  Yes.
10   Q.  For example, you know that Cardinal and
11   McKesson both had agreements with the federal
12   government to pay certain fines, and those fines
13   have gotten larger over time, correct?
14   MR. RICARD: Objection to form.
15   MS. MONAGHAN: Objection.
16   A.  I'm aware that they've been fined, yes.
17   Q.  Okay. And are you aware that those
18   fines have increased over time?
19   A.  Yes.
20   MR. BUSHUR: Objection; form.
21   Q.  And does PSI agree that as it relates to
22   the illegal traffic, that the fines should be high
23   so we can try to be prevent any potential
24   diversion from occurring?

10 (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1          MR. RICARD:  Objection to form.
2          A.  Yes.
3          Q.  If you go to page 34, Mr. Schoen.  And
4    if you can -- and, again, if you can see it,
5    Mr. Schoen, can you read that out loud to us?
6          A.  "The illegal importation, manufacture,
7    distribution, and possession and improper use of
8    controlled substances has a substantial
9    detrimental effect on the public health and
10   general welfare."
11         Q.  And does PSI agree and accept that
12   Congressional finding as well?
13         A.  Yes.
14         Q.  And does PSI in its operations strive to
15   prevent any illegal distribution of controlled
16   substances?
17         A.  Yes.
18         Q.  And when we're talking about the general
19   effect on the public's health and welfare, we're
20   talking about the impact it can have on our
21   children and our communities, correct?
22         A.  Among others, yes.
23         Q.  Because what you do is you distribute
24   these controlled substances into different

Page 39

1    pharmacies and doctors' offices and drugstores;
2    and for your company, mainly in the Ohio area,
3    correct?
4          MR. RICARD:  Objection to form.
5          A.  We distribute in a number of states.
6          Q.  Sure.
7          A.  Okay.  But, yes, in general, yes, that's
8    correct.
9          Q.  And we'll get into actually where and
10   all that detail down the road.
11         A.  Okay.
12         Q.  So, Mr. Schoen, what we're going to do
13   is mark next as Plaintiff's Exhibit 6 part of the
14   Code of Federal Regulations.
15         MR. RICARD:  Same objection to legal
16   conclusions, Mike.
17         MR. FULLER:  Sure.
18               - - -
19         (PSI-Schoen Exhibit 6 marked.)
20               - - -
21   BY MR. FULLER:
22         Q.  It's 21 C.F.R. 1301.74.
23         Do you see that, Mr. Schoen?
24         A.  I see it.

Page 40

1          Q.  Now, up in the upper left and upper
2    right respectfully we now have the seals of the
3    Department of Justice who you testified earlier is
4    the ones that regulate this industry that you
5    operate in, correct?
6          A.  Yes.
7          Q.  And on the right, we have United States
8    Justice Department, Drug Enforcement
9    Administration, or the DEA, who carries out that
10   function on behalf of the Department of Justice,
11   correct?
12         A.  Yes.
13         Q.  And that's who you're registered with;
14   is that right?
15         A.  Yes.
16         Q.  And you see it's Chapter 2, Part 1301,
17   and it deals with security requirements.
18         Do you see that there?
19         A.  Oh, yes.  Yes.
20         Q.  And it says under Section 1301.74,
21   "Other security controls for non-practitioners,
22   narcotic treatment programs, and compounders for
23   narcotic treatment programs."
24         And you see letter b down there?

Page 41

1          A.  Yes.
2          Q.  Where it says, "The registrant shall
3    design and operate a system to disclose to the
4    registrant suspicious orders of controlled
5    substances.  The registrant shall inform the Field
6    Division Office of the Administration in his area
7    of suspicious orders when discovered by the
8    registrant.  Suspicious orders include orders of
9    unusual size, orders deviating substantially from
10   a normal pattern, and orders of unusual
11   frequency."
12         You are familiar with this regulation as
13   it pertains to suspicious orders, correct?
14         A.  Yes.
15         Q.  And PSI is aware that it has to comply
16   with this regulation as it relates to suspicious
17   orders?
18         A.  Yes.
19         Q.  When we say "suspicious orders," it's
20   PSI's understanding that we're talking about
21   orders that may be suspicious for potential
22   diversion, correct?
23         MR. RICARD:  Objection to form.
24         A.  Yes.  It may be, yes.

                              11  (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    Q.  And it's not that PSI has to know for
2    sure they're being diverted.  You just have to
3    have a suspicion, correct?
4         MR. RICARD:  Objection to form.
5    A.  I would guess that's true, yeah.
6    Q.  Well --
7    A.  I mean, we -- you know, we -- go ahead.
8    Q.  Sure.  And I don't want you to guess,
9    okay?  That's what I don't want you to do here
10   today.  I want to know what you know.  And if you
11   don't know, I want you to tell us that, okay?
12        When we're talking about suspicious
13   orders, we have to know -- as a registrant, as
14   PSI, we have to know suspicious of what, correct?
15   A.  Correct.
16   Q.  And we know it's suspicious of diversion
17   or illicit activity, correct?
18   A.  Yes.
19        MR. RICARD:  Objection to form.
20   Q.  And we know as PSI that the DEA has told
21   us that we can look for orders of unusual size,
22   orders deviating substantially from a normal
23   pattern, and orders of unusual frequency as some
24   of the factors to look to, correct?

Page 43

1         MR. RICARD:  Objection to form.
2    A.  Yes.
3    Q.  And, again, when we're talking about
4    suspicious, it's suspicious of diversion or some
5    sort of illicit activity because that is what
6    you're trying to prevent as a wholesale
7    distributor?
8         MR. RICARD:  Same objection.
9    A.  Yes.
10   Q.  Okay.  Now, let's go back to that part
11   where we had that little hiccup a moment ago.
12        There's nothing in this regulation that
13   says PSI has to determine that they're actually
14   being diverted, does it?
15   A.  No.
16   Q.  It's the mere suspicion of diversion
17   that should be reported, correct?
18        MR. RICARD:  Objection to form.
19   A.  Yes.
20   Q.  And there's a reason for that, right?
21   And the reason is because we want to get those
22   involved, the DEA, if there's even the potential
23   for diversion so that they can do their
24   investigation to determine whether a pharmacy or a

Page 44

1    doctor or somebody else in the distribution chain
2    needs to be shut down, right?
3         MR. RICARD:  Objection to form.
4    A.  Yes.
5    Q.  And unless we're telling them and
6    providing them that information as a registrant,
7    it makes it much harder on them to do their jobs,
8    correct?
9    A.  Yes.
10   Q.  So one of the ways that we're trying to
11   keep our -- again, our communities and our
12   children safe is by putting upon the registrant,
13   such as PSI, the obligation to report suspicious
14   orders --
15        MR. RICARD:  Objection to form.
16   Q.  -- correct?
17   A.  Yes.
18   Q.  Okay.  Now, we're going to talk about it
19   in more detail later, but you're aware that there
20   is a know your customer requirement, due diligence
21   that has to be done, when you're dealing with
22   suspicious orders and controlled substances as
23   well, correct?
24   A.  Yes.

Page 45

1    Q.  And you may find this interesting.  So I
2    will fully admit I'm a little bit of a book nerd,
3    okay?  And if you -- in studying history in
4    college, if you look back -- well, strike that.
5    Let me start with another premise.
6         You would agree that we are in the
7    middle of an opioid epidemic in this country,
8    correct?
9    A.  Yes.
10   Q.  Okay.  And if you go back and look
11   through history, it's not the first time that
12   we've had opioid issues in this world.  If you
13   think back, back at the late 18th century, early
14   19th, you had the opium wars going on --
15   A.  Yes.
16   Q.  -- on the other side of the world.
17   A.  In China, yes.
18   Q.  And then I don't know if you're familiar
19   with the Harrison Act that was passed in the early
20   1900s.
21   A.  I'm not.
22   Q.  So I went and pulled the Congressional
23   Record from the Harrison Act, and this is going to
24   be -- let me grab it.  And I told you I'm a little

12  (Pages 42 to 45)

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    bit of a book nerd.  I really mean I'm a little
2    bit of a book nerd.
3         So -- and tell me -- and, again, not to
4    pick on you at all, but have you ever heard that
5    history tends to repeat itself?
6    A.  Yes.
7    Q.  And if we look back through time, it
8    seems to be true, doesn't it?
9    A.  Yes.
10   Q.  Now, the Harrison Act, that was
11   legislation that was passed back in the early
12   1900s, and this is a legislative history and
13   another tidbit -- I'm not really going to go into
14   with you, but Donald McKesson actually spoke at
15   this legislative hearing.
16        Do you know who Donald McKesson is?
17   A.  I certainly know what McKesson is, yes.
18   Q.  He is one of the founders of that
19   company that now exists still today.
20   A.  Yes.
21   Q.  The Harrison Act was being considered
22   back during the early 1900s because we were having
23   a problem with opium dens in the United States,
24   and there wasn't a way to control it.  And the

Page 47

1    Harrison Act is actually a tax-based act, because
2    way back then, the great U.S. Congress didn't have
3    the expansive powers of the commerce clause to do
4    anything they wanted to.  They could only do
5    things they were specifically given power, and one
6    was tax.  So this is the Congressional history
7    related to that.
8              ---
9         (PSI-Schoen Exhibit 7 marked.)
10             ---
11   Q.  And we're just going to touch on a
12   couple sections.  Page 25 -- and before I actually
13   start reading that with you, Mr. Schoen, are you
14   aware that the U.S. uses over 95 percent of the
15   opium produced in the entire world?
16   A.  No, I'm not aware of that.
17   Q.  Okay.  Would it surprise you to know
18   that the U.S. uses over 95 percent of the opium
19   produced in the entire world?
20   A.  It does surprise me that 95 percent,
21   yes.
22   Q.  And, remember, history repeats itself.
23   So let's take a look.  And this is a Mr. Wright
24   speaking to our United States Congress.  And he

Page 48

1    says, "I would like to point out, as is shown by
2    my report, that this country -- that in this
3    country, we are importing over 400,000 pounds of
4    opium and using it.  Over 75 percent of that
5    opium, gentlemen, is manufactured into morphine."
6         And, Mr. Schoen, you know what morphine
7    is, correct?
8    A.  I do.
9    Q.  And it's another type of pain
10   medication?
11   A.  Yes.
12   Q.  Okay.  "And I have reliable information
13   that 75 percent to 90 percent of that morphine is
14   used outside of legitimate medical channels,"
15   which would be the equivalent to our illicit
16   market today, correct?
17        MR. RICARD:  Objection to form.
18   A.  Apparently, yes.
19   Q.  And in the next section, "In Germany, as
20   I have pointed out in my report, with a population
21   nearly equal to that of the United States, they
22   have a net consumption of 16,000 pounds of opium
23   against 400,000 pounds in this country."
24        Seems shocking, doesn't it, Mr. Schoen?

Page 49

1    A.  Yes.  I mean, it's --
2    Q.  Now, let's go to page 29.  And many of
3    these people speaking during this Congressional
4    hearing, Mr. Schoen, were members of the industry,
5    for example, Mr. McKesson.
6         And here on 29, again, the highlighted
7    area, it says, "Gentlemen, it is the manufacturers
8    and wholesalers, the people higher up, that sell
9    these drugs promiscuously that we want to reach
10   and must reach if we ever hope to break up this
11   traffic.  Scotch the snake at its lair."
12        Have you ever heard that saying before,
13   "Scotch the snake at its lair"?
14   A.  Never.
15   Q.  I looked it up.  It's a quote from
16   Macbeth.  It means go to the home of the snake and
17   kill it.  Okay?
18        Now, here it's talking about
19   manufacturers and wholesalers selling drugs
20   promiscuously.  And you have an understanding of
21   what that means, correct?
22   A.  Outside the appropriate channels, I
23   think.
24   Q.  Sure.  And you are aware that -- I'm

13 (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  going to exclude PSI from this.
2      You are aware that other distributors
3  have sold drugs outside of the legitimate
4  channels --
5      MR. RICARD:  Objection to form.
6  Q.  -- correct?
7  A.  I really -- I really don't know that
8  they have, no.  I mean, it's just because I don't
9  know.
10  Q.  Sure.  I will tell you with the second
11  memorandum of agreements that both McKesson and
12  Cardinal entered with the United States
13  government, that they admitted to breaking the
14  law.
15      MR. RICARD:  Objection to form.
16  Objection to scope.
17  Q.  If that is the case, then you could
18  agree then that others have acted promiscuously in
19  this industry, correct?
20      MR. RICARD:  Same objection.
21  A.  Apparently, yes.
22  Q.  Let's go on.  "The poor unfortunate
23  'dope fiend' is more sinned against than sinning.
24  Had the law provided sufficient safeguards around

Page 51

1  the sale and distribution of these drugs, he would
2  never have acquired such a habit."
3      Do you see that there, Mr. Schoen?
4  A.  I see it.
5  Q.  And does PSI agree that the system as
6  set up with the Controlled Substances Act is
7  designed with safeguards to protect people from
8  becoming addicts, or at least to try to?
9  A.  Yes.
10  Q.  And that's part of the purpose behind
11  it, correct?
12  A.  Yes.
13  Q.  It says, "Had the manufacturers who sell
14  these drugs any conscious, he would make his
15  business to know who to he sold them in unusual
16  quantities."
17      Now, think about that for one second,
18  and let me ask you, does that sound like the know
19  your customer requirement?
20  A.  Yes.
21      MR. RICARD:  Objection to form.
22  Q.  You have to know who you're selling to
23  before you just selling to them?
24  A.  Yes.

Page 52

1  Q.  And this is way back from 1910.  It's
2  pretty impressive how history repeats itself,
3  isn't it?
4  A.  Yes.
5  Q.  It goes on to say, "Since he won't do it
6  on moral grounds, it becomes the duty of the
7  government to compel him to do it by law."
8      Do you see that?
9  A.  I see that.
10  Q.  And it's the same thing with the
11  enactment of the Controlled Substances Act, right?
12      MR. RICARD:  Objection to form.
13  Q.  We needed governmental safeguards out
14  there to ensure that the people in the supply
15  chain were doing the right thing, correct?
16  A.  Yes.
17  Q.  The next section reads, "Throw on the
18  limelight of publicity such as this act provides.
19  Make every man that handles these drugs
20  responsible for his actions so that we have a
21  record of the transactions from the time of
22  manufacture until it reaches the consumer."
23      And, again, that is why the Controlled
24  Substances Act is created, correct?

Page 53

1  A.  That's their attempt, yes.
2  Q.  And even in 1910, it's sort of crazy how
3  people saw that being part of the solution on how
4  to get control of these controlled substances,
5  correct?
6  A.  Yes.
7  Q.  And PSI recognizes that if we don't have
8  these safeguards, these what we call them safety
9  rules, that it becomes dangerous for the American
10  public?
11  A.  Yeah.
12      MR. RICARD:  Objection to form.
13  Q.  Now, as an operator and, again, one who
14  is a registrant, you have a special
15  responsibility, do you not, when you're dealing
16  with controlled substances?
17  A.  Yes.
18  Q.  And that responsibility is to act in a
19  manner which tries to make the safest decisions
20  for the American public, correct?
21      MR. RICARD:  Objection to form.
22  A.  Yes.
23  Q.  And that includes complying with these
24  safety rules that we've already been discussing?

Page 54

```
 1        A.  Yes.
 2        MR. FULLER:  Okay.  And then next is
 3  Exhibit 8, which, Gina, is 108 -- or, no, it's
 4  not.
 5        MS. VELDMAN:  It's good.  I've got it.
 6        MR. RICARD:  Same objection on legal
 7  conclusions, Mike.
 8        MR. FULLER:  Sure.
 9        Gina, it's 106.
10        ---
11        (PSI-Schoen Exhibit 8 marked.)
12        ---
13  BY MR. FULLER:
14        Q.  Now, Mr. Schoen, I know you are not a
15  lawyer.
16        A.  Correct.
17        Q.  I completely understand that.  So I'm
18  going to make this brief.
19        Now, I believe you probably have been
20  given a copy of this case, am I correct, Masters
21  Pharmaceutical?
22        A.  I've seen a copy of it.  I haven't read
23  it.  Yes.
24        Q.  Well, where did you get your copy?
```

Page 55

```
 1  These guys?
 2        A.  Yes.
 3        Q.  Okay.  Now, I would assume that that may
 4  have been more recently when you were getting
 5  ready for this deposition, correct?
 6        A.  Correct.
 7        Q.  Okay.  Now, this decision came out in
 8  June of last year.  Were you made aware -- did
 9  anybody talk to you about the ramifications of
10  this case back in June of last year when the
11  opinion was rendered by the DC Circuit Court of
12  Appeals?
13        A.  No.
14        Q.  And before -- well, up until the point
15  where you were preparing for your deposition, had
16  you ever heard of this case or its implications?
17        A.  No.  I'd heard -- I heard Masters got in
18  trouble, but that's it.
19        Q.  Well, they did.  Whoever told you that
20  was right.  They got in trouble.
21        Let me ask you -- and I'll ask you to
22  turn to page 7.  Now, you can either turn or look
23  at the electronic copy, because the print on that
24  printout is small as well.
```

Page 56

```
 1        MR. FULLER:  And, Gina, if you'll
 2  highlight or enlarge that highlighted section for
 3  me.
 4  BY MR. FULLER:
 5        Q.  Now, do you see that there?  This is
 6  just a portion of the opinion that I'm just going
 7  to focus on for a brief moment, okay, Mr. Schoen?
 8  And it talks about -- you see "The security
 9  requirement" in quotes there?
10        A.  Yes.
11        Q.  Now, that has significance, because if
12  we go back to the earlier exhibit that was 21
13  C.F.R. 1301.74, that suspicious order regulation,
14  it was entitled the security requirements section,
15  wasn't it?
16        MR. RICARD:  Objection to form.
17        A.  Yes.
18        Q.  Okay.  It says -- and this opinion
19  reads, "The security requirement at the heart of
20  the case mandates that distributors design and
21  operate a system to identify suspicious orders of
22  controlled substances and report those orders to
23  the DEA."  And then in parentheses, it has "the
24  Reporting Requirement."
```

Page 57

```
 1        Have you ever heard, Mr. Schoen, of "the
 2  Reporting Requirement"?
 3        A.  Yes.
 4        Q.  Okay.  And that was that regulation we
 5  looked at earlier, correct?
 6        A.  Correct.
 7        Q.  And PSI agrees that it has had a
 8  reporting requirement since that regulation was
 9  enacted in 1971, correct?
10        MR. RICARD:  Objection to form.
11        A.  Yes.
12        Q.  And that reporting requirement by law
13  requires PSI or any distributor to report
14  suspicious orders that it receives to the DEA,
15  correct?
16        MR. RICARD:  Objection to form.
17        A.  Yes.
18        Q.  And that if it doesn't report suspicious
19  orders to the DEA, then that distributor is
20  breaking the law, correct?
21        A.  Yes.
22        MR. RICARD:  Objection to form.
23        Q.  Okay.  Now, it goes on to say that "The
24  reporting requirement is a relatively modest one.
```

15 (Pages 54 to 57)

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1   It requires only that a distributor provide basic
2   information about certain orders to DEA so that
3   DEA investigators in the field can aggregate
4   reports from every point along the legally
5   regulated supply chain and use the information to
6   ferret out potential illegal activity."
7          Did I read that correctly?
8       A.  I wasn't following it, but I'm sure you
9   have, yes.
10      Q.  You're too trusting, Mr. Schoen.  I'm
11  kidding.
12         What I read to you exemplifies what we
13  talked about earlier; does it not?
14      A.  Yes.
15      Q.  And that the design of the system is
16  such that distributors have to provide information
17  to the DEA for the DEA to be able to do their job
18  effectively to prevent diversion?
19         MR. RICARD:  Objection to form.
20      A.  Yes.
21      Q.  And PSI agrees with that, understands
22  that, and lives up to that obligation, correct?
23         MR. RICARD:  Objection to form.
24      A.  Yes.

Page 59

1       Q.  Okay.  Next it goes on -- it says, "Once
2   a distributor has reported a suspicious order, it
3   must make one of two choices:  Decline to ship the
4   order or conduct due diligence."
5          Do you see that there?
6       A.  I see it.
7       Q.  This is ultimately referred to as "the
8   shipping requirement."
9          Have you ever heard of that term?
10      A.  I've heard the term.
11      Q.  What is your understanding of the
12  shipping requirement?  And, quite honestly, it
13  shouldn't be the shipping requirement.  It should
14  be the anti-shipping requirement, right?
15      A.  That's correct.
16      Q.  Okay.  And is it your understanding that
17  the shipping requirement means that if we have a
18  suspicious order, we need not to ship it?
19         MR. RICARD:  Objection to form.
20      A.  Yes.
21      Q.  And that that has been the obligation
22  not just upon PSI but upon all distributors, to
23  your understanding, since 1971 when this
24  regulation was passed?

Page 60

1          MR. RICARD:  Objection to form.
2       A.  Yes.
3       Q.  Okay.  Now, let's talk about it and why
4   that makes sense, okay?
5          If you get a suspicious order -- strike
6   that.
7          Not you.  Somebody at your business.  If
8   PSI gets a suspicious order, we understand that
9   that means it's suspicious for potential
10  diversion, correct?
11      A.  There's something about it brought our
12  attention to it, yes.
13      Q.  And something is wrong with it, correct?
14      A.  Potentially, yes.
15      Q.  We don't want to then -- if we think
16  there's a potential of it being diverted, we don't
17  want to send that order off, do we?
18      A.  No.
19      Q.  Because --
20      A.  If we think it's going to be diverted,
21  we won't send it off.
22      Q.  And that's because that's part of your
23  obligation under the regulations, to maintain an
24  effective system to prevent diversion, correct?

Page 61

1       A.  Yes.
2       Q.  Okay.  All right.  We're done with that.
3   No more legal cases.  I can't say that for sure.
4   There may be another one, now that I think about
5   it.
6          All right.
7          MR. RICARD:  Are you doing okay?
8          THE WITNESS:  Fine.
9          MR. FULLER:  Okay.  This is going to be
10  112, Gina.
11             ---
12         (PSI-Schoen Exhibit 9 marked.)
13             ---
14  BY MR. FULLER:
15      Q.  So what I'm going to pass you next is
16  Plaintiff's Exhibit Number 9, and I'll explain it
17  to you first, Mr. Schoen.  It is a State of Ohio
18  Administrative Code 202 -- or 2002.  And I'll
19  represent to you that it is the current code.  As
20  you can see from the bottom of the enlarged area,
21  current through December 31, 2002.
22         Do you see that there?
23      A.  I see it.
24      Q.  Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1           MR. RICARD:  Real quick, same objection
2    as to legal conclusion.
3           MR. FULLER:  Absolutely.
4    BY MR. FULLER:
5        Q.  And it's Ohio Administrative Code
6    Section 4729-9-16.
7           Have you ever seen this before,
8    Mr. Schoen?
9        A.  Not that I recall.
10       Q.  Okay.  Fair enough that you may have
11   seen it; you just don't recall it?
12       A.  That's true.
13       Q.  Okay.  And it says it's Baldwin's Ohio
14   Administrative Code, Board of Pharmacy, relating
15   to dangerous drugs.
16          Do you see that there?
17       A.  Okay.  Yes.
18       Q.  And I'm not going to do much with this.
19   I just wanted to get your attention to --
20          MR. FULLER:  Gina, I think it's page 6.
21       A.  Page 6?
22          MR. RICARD:  We only have four pages.
23          MS. VELDMAN:  I don't have a page 6.
24          MR. FULLER:  It's actually page 6.

Page 63

1           Do you not have a page 6?
2           MR. RICARD:  It has four pages.
3           MR. FULLER:  Hold on.  Maybe I've got
4    the wrong one.
5    BY MR. FULLER:
6        Q.  Mr. Schoen, that's what happens when you
7    don't copy stuff yourself.
8        A.  That happens.
9        Q.  See, you know.  You've been there, huh?
10          MR. RICARD:  Could I look at that real
11   quick?
12          MR. FULLER:  Yeah.  It's just the State
13   code on suspicious orders.
14          Will it focus?
15   BY MR. FULLER:
16       Q.  Okay.  Not that that is real clear --
17   and I apologize for that, Mr. Schoen, but I'm
18   going to read it to you this time.  And this deals
19   with the Ohio State Board of Pharmacy Code.
20   You're aware there is a Board of Pharmacy Code,
21   correct?
22       A.  Yes.
23       Q.  Okay.  And this says, "A system shall be
24   designed and operate to disclose orders for

Page 64

1    controlled substances and other dangerous drugs
2    subject to abuse."
3           And Section i says that -- did we lock
4    someone out of this room?
5           MR. PELINI:  Locked the old man out.
6           MR. FULLER:  Dude, you can't take a
7    hint?
8           MR. PELINI:  I can now.
9           MR. FULLER:  You leave again, we're not
10   letting you back in.
11          MR. PELINI:  I understand.
12          MR. FULLER:  That bladder, huh?
13   Kidding.
14   BY MR. FULLER:
15       Q.  It says under Section i, "The wholesaler
16   shall inform the State Board of Pharmacy of
17   suspicious orders for drugs when discovered.
18   Suspicious orders are those which, in relation to
19   the wholesaler's record as a whole, are of unusual
20   size, unusual frequency, or deviates substantially
21   from established buying patterns."
22          Correct?
23          MR. RICARD:  Objection to form.
24   Objection to scope.

Page 65

1        A.  Yes.
2        Q.  Okay.  And PSI as a distributor here in
3    Ohio has to comply with that regulation as well?
4           MR. RICARD:  Same objections.
5        A.  Yes.
6        Q.  Okay.  So let's take a minute and recap
7    what we just went over, okay, so I can make sure
8    it's clear and that you and I are on the same
9    page.
10          Prescription Supply, Inc., agrees that
11   it must comply with the Controlled Substances Act
12   as enacted in 1970 by the U.S. Congress, correct?
13       A.  Yes.
14       Q.  Prescription Supply also agrees that as
15   a licensed entity to distribute controlled
16   substances, it has an obligation to try to make
17   the safest choices to keep our children and
18   communities safe related to those drugs?
19       A.  Yes.
20          MR. RICARD:  Objection to form.
21       Q.  Prescription Supply agrees and accepts
22   that from 1971 forward, that there is a suspicious
23   order reporting requirement requiring
24   suspicious -- or excuse me -- requiring

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Prescription Supply to report any suspicious
2    orders that it receives from any of its potential
3    customers?
4         MR. RICARD: Objection to form.
5         A. Yes.
6         Q. And that the reason and basis for
7    reporting suspicious orders is to enable the DEA
8    to do its job in enforcement of the law in
9    preventing diversion?
10        A. Yes.
11        Q. That Prescription Supply also agrees and
12   accepts that since 1971, there has been a shipping
13   requirement, meaning that it cannot ship orders
14   that are in any way suspicious?
15        MR. RICARD: Objection to form.
16        A. Yes.
17        Q. And that the reason we don't ship
18   suspicious orders is because we don't want to
19   contribute to potential diversion of controlled
20   substances?
21        A. Yes.
22        Q. And that, as we've seen through history,
23   Congress not just once, but now twice, has put
24   into place a regulatory scheme, we'll call them

Page 67

1    safety rules, to try to keep the communities, our
2    children, safe from these dangerous drugs?
3         MR. RICARD: Objection to form.
4    Objection to scope.
5         A. Yes.
6         Q. And that as a link in the chain of
7    distribution, wholesalers have an obligation to
8    make the safest choices when distributing these
9    dangerous drugs to protect our children and our
10   families and our communities?
11        MR. RICARD: Objection to form.
12        A. Yes.
13        Q. And Prescription Supply, Inc., would
14   agree that in distributing these controlled
15   substances, every distributor needs to comply with
16   the public safety rules and make the safest
17   choices related to the distribution of these
18   controlled substances?
19        MR. RICARD: Objection to form.
20        A. Yes.
21        Q. Now -- and I'll be upfront. I've seen
22   it in the documents that have been provided by
23   your counsel that Prescription Supply has on
24   occasion declined to do business with potential

Page 68

1    customers because they look sketchy, correct?
2         A. That's correct.
3         Q. Because of one factor or another. Maybe
4    they were off in a far different state. Maybe
5    there were other indicators. But Prescription
6    Supply has declined to do business with people who
7    it felt may be involved in some sort of diversion?
8         A. Many.
9         Q. Making those type of choices has a
10   financial impact on the company's operation; does
11   it not?
12        A. It does.
13        Q. It can actually hamper a company's
14   operations financially, correct?
15        A. Yes. So can not making those choices.
16        Q. Absolutely. But Prescription Supply
17   would agree that a less safe choice should not be
18   made just for financial gain?
19        A. Yes.
20        Q. The financial gain should not weigh in
21   when trying to decide whether to report a
22   suspicious order or to halt orders?
23        A. Yes.
24        Q. And that if it does, it's not good for

Page 69

1    the American public?
2         A. Yes.
3         MR. FULLER: Okay. Guys, we've been
4    going a little over an hour. Do you want to take
5    a break?
6         MR. RICARD: Sure.
7         THE VIDEOGRAPHER: The time is now
8    10:13. Going off the record.
9         (Recess taken.)
10        THE VIDEOGRAPHER: The time is now
11   10:27. Back on the record.
12   BY MR. FULLER:
13        Q. And, Mr. Schoen, I'm sorry because I
14   didn't tell you this at the beginning. If you
15   need a break at any time for anything, use the
16   restroom, take a phone call, whatever it may be,
17   just let us know. This isn't meant to be
18   unbearable, uncomfortable. I know it's not
19   necessarily pleasurable being here.
20        A. It's not meant to be, yes.
21        Q. But we'll try to do everything we can,
22   including keeping you with some Diet Coke, if
23   necessary.
24        A. Thank you.

18 (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1   Q.  Now, you put cream in tea?
2   A.  I'd rather put milk in it, but -- that's
3  the way I was brought up.  You know, it's a
4  very --
5   Q.  English thing?
6   A.  Yes.
7   Q.  I was going to say.
8   A.  My mother-in-law, who has passed away,
9  was a war bride.
10   Q.  Oh, really?
11   A.  And she -- but she was there during the
12  war, and during the depression, which didn't hit
13  England as hard.
14   Q.  Sure.
15   A.  So she never used milk in her tea.
16   Q.  No?
17   A.  She never used it in her tea because
18  they couldn't afford it.
19   Q.  Not because she didn't want it?
20   A.  It's the world, you know.
21   Q.  Not because she didn't want it?
22   A.  Well, perhaps.  What she doesn't know --
23  what she didn't know, she didn't --
24   Q.  You don't miss, right?

Page 71

1   A.  That's right.
2   Q.  What I always tell everybody, growing up
3  we didn't have air-conditioning until I was in
4  high school, which wasn't necessarily back in the
5  depression.  I mean, this is in the --
6   A.  Where were you --
7   Q.  I was born and raised in Plant City,
8  Florida.  It's a strawberry farming town outside
9  of Tampa.
10      MS. QUEZON:  You need air conditioning.
11   Q.  So it's the south.
12      All right.  And, Mr. Schoen,
13  Prescription Supply, Inc., does recognize that we
14  are currently in an opioid crisis, correct?
15   A.  Yes.
16   Q.  And that currently -- I think the last
17  number was somewhere around 120 people are dying
18  of prescription-related overdoses every day in
19  this country?
20   A.  I wasn't aware of that, but I'll accept
21  it.
22   Q.  Assuming that that figure is correct, is
23  that shocking to you?
24   A.  Certainly anybody dying is shocking.

Page 72

1   Q.  But 120 people a day?
2   A.  It was shocking to me that Limbaugh got
3  hooked on it.
4   Q.  And let me ask, unlike a lot of the
5  other Defendants here, you've been in the industry
6  personally yourself for a very long time.  Did you
7  ever think you would see an epidemic develop like
8  has developed in this country?
9   A.  There -- I was in college just before
10  the -- I'm going to say the drug revolution at
11  least hit in my area.  I wasn't -- I graduated
12  St. Thomas in Saint Paul, Minnesota.
13   Q.  Yes, sir.
14   A.  We didn't know about -- I mean, we knew
15  marijuana, but we didn't use it.  I never knew
16  anybody that used it.  We knew that at the
17  university, some people were experimenting with
18  LSD, but I didn't know anybody personally.
19      I went into the Army, came back, went
20  into graduate school.  I graduated in '67, went in
21  the Army '68, '69, came back, went to graduate
22  school, and the world was a different place.
23      And to that extent, I'm not surprised
24  that addiction is a problem in this country.  And

Page 73

1  people that claim that marijuana is not a problem
2  are wrong as far as I'm concerned.
3   Q.  Well, I appreciate that.  I do.  Now
4  we're facing an opioid epidemic on top of
5  everything else, which Prescription Supply
6  recognizes, correct?
7   A.  I do.
8   Q.  And we're going to talk a little bit now
9  about that crisis and how long it's been going and
10  developing.
11      MR. FULLER:  Hey, AJ, give me 201.
12  Thanks.
13      ---
14      (PSI-Schoen Exhibit 10 marked.)
15      ---
16  BY MR. FULLER:
17   Q.  Mr. Schoen, have you ever heard of the
18  United States General Accounting Office or
19  sometimes referred to as the GAO?
20   A.  Probably I've heard of it.  I don't know
21  anything about it.
22   Q.  So it is a federal body that does
23  accountability, integrity, and reliability related
24  to different issues going on in our country, as

19 (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    well as within our federal government.  So there
2    has been a GAO looking into the DEA.  This one is
3    looking into, as you can see, prescription drugs.
4    And as you can see, it's entitled "United States
5    General Accounting Office, GAO Report to
6    Subcommittee on Oversight and Investigations,
7    Committee on Energy and Commerce, House of
8    Representatives."
9          And you understand that that is one of
10   the investigative bodies within our United States
11   House of Representatives, correct?
12         MR. RICARD:  Objection to form.
13   Objection to scope.
14         A.  I do.
15         Q.  And that the title of this -- and it's
16   dated May of 2002.  So we're going back about 16
17   years, correct --
18         A.  Apparently.
19         Q.  -- if I did my math right?
20         A.  Yes.
21         Q.  And it says, "Prescription Drugs, State
22   Monitoring Programs Provide Useful Tool to Reduce
23   Diversion."
24         And you know what state monitoring

Page 75

1    programs are, correct?
2          A.  I do.
3          Q.  Okay.  And if you turn -- and I'll tell
4    you, I didn't provide you the whole document, I
5    don't think.  I think I just provided you the
6    relevant page.  So if you'll turn to the second
7    page where it talks to the background, and it
8    says, "The diversion and abuse of prescription
9    drugs are associated with incalculable costs to
10   society in terms of addiction, overdose, death,
11   and related criminal activities."
12         Does Prescription Supply agree that
13   diversion -- it's foreseeable that diversion would
14   cause all those issues; addiction, overdose,
15   death, and criminal related activities?
16         MR. RICARD:  Objection to form.
17   Objection to scope.
18         A.  Yes.
19         Q.  It goes on to say the "DEA has stated
20   that the diversion and abuse of legitimately
21   produced controlled pharmaceuticals constitutes a
22   multibillion-dollar illicit market nationwide."
23         Does Prescription Supply recognize that
24   the controlled substances that you deal in has a

Page 76

1    substantial value on the black market?
2          MR. RICARD:  Objection to form.
3    Objection to scope.
4          A.  I do.
5          Q.  And that's part of the problem, because
6    that incentivizes people to participate in the
7    illicit market when you're dealing with controlled
8    substances, correct?
9          A.  Yes.
10         Q.  And that takes us back to what we looked
11   at earlier on the Congressional history from 1970,
12   is we basically got to make sure the punishment or
13   potential punishment significantly outweighs
14   whatever potential gains are there in order for
15   the system to be effective, correct?
16         A.  Yes.
17         Q.  PSI recognizes that and suggests that
18   that's part of the way we can get control of this
19   epidemic, correct?
20         MR. RICARD:  Objection to form.
21         A.  Yes.
22         Q.  They go on to state, "A single
23   40-milligram OxyContin tablet legally selling for
24   about $4 is worth about $40 on the illicit

Page 77

1    market."
2          Does that coincide with what you've
3    heard as Prescription Supply, Inc.?  Not to
4    suggest that you've been out buying pills
5    illegally.
6          A.  Yes.
7          Q.  Okay.  Now, keep in mind -- and this is
8    in 2002.  So we're going back well over a decade,
9    16 years.
10         MR. FULLER:  202.  Well, I've got one
11   copy of 202.  It's this whole folder.  There we
12   go.
13   BY MR. FULLER:
14         Q.  I put my sticker on my copy.  I do that.
15   I get like -- multitasking, not my strong suit.
16         A.  Which is why you let other people do
17   your copying.
18         Q.  Yeah, and then see what happens.
19                    ---
20         (PSI-Schoen Exhibit 11 marked.)
21                    ---
22         Q.  All right.  This is going to be
23   Plaintiff's Exhibit Number 11.  And we've seen
24   this once before, I think, Mr. Schoen.  Do you see

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    this? And I'm holding it up. The HathiTrust?
2        A.  Yes.
3        Q.  You've probably never heard of it, have
4    you?
5        A.  I have not, no.
6        Q.  It is a non-profit that collects -- and
7    I didn't learn about it until this litigation --
8    collects old documents or older documents. That's
9    how I gained access to that 1910 Congressional
10   Record, because otherwise you would have to go to
11   the Congress archives in DC and try to dig it out.
12   So a lot of this stuff, fortunately, is online
13   now.
14           So if you'll turn to page 2. This is
15   another United States Congressional hearing. The
16   title of it is, "OxyContin:  Its Use and Abuse."
17           Now, you are aware of what OxyContin is,
18   correct, Mr. Schoen?
19       A.  I'm not a pharmacologist, but yes. I'm
20   basically aware that it is a pain drug.
21       Q.  And you're aware that it's an
22   opioid-based pain medication?
23       A.  I am aware.
24       Q.  And I'll tell you, if you're aware or

Page 79

1    not, that it was launched in approximately 1996.
2            Does that seem to coincide with your
3    recollection?
4        A.  Yes.
5        Q.  And are you aware that -- it was created
6    by Purdue Pharma, which you know who they are,
7    correct?
8        A.  (Indicates affirmatively.)
9            MR. RICARD:  You have to say yes or no.
10       A.  Yes. I'm sorry.
11       Q.  That's all right.  Again, we get into
12   that conversational tone and we forget sometimes.
13   I apologize.
14           Are you aware that the -- that multiple
15   entities have been very critical of Purdue Pharma
16   for the way it marketed OxyContin to doctors and
17   patients?
18           MR. RICARD:  Objection to form.
19       Q.  And if you're not aware --
20       A.  I'm really -- in particular, no, I'm not
21   aware of it.
22       Q.  Are you aware that they got in trouble
23   with the DEA for the way they market their
24   product?

Page 80

1            MR. RICARD:  Objection to form.
2        A.  To be -- I mean, I've heard something
3    about it. That's --
4        Q.  But you don't know the details?
5        A.  I certainly don't.
6        Q.  Fair enough.  And, again, if you don't,
7    just tell me that.
8        A.  Okay.
9        Q.  That is a legitimate answer as long as
10   it's a truthful answer, okay?
11       A.  All right.
12       Q.  So this hearing is before the
13   Subcommittee on Oversight and Investigations of
14   the Committee on Energy and Commerce, House of
15   Representatives, One Hundred Seventh Congress,
16   first session, August 28, 2001.
17           So here going back a year prior to the
18   last document that we looked at, which was a GAO
19   report, this is going back to 2001, and it's the
20   abuse -- the use and abuse of OxyContin.
21           And if you will turn to page 6.  It
22   says, "The use and abuse of OxyContin provides
23   quite a dilemma for us in the U.S. Congress" --
24   excuse me -- "for us in Congress and for the

Page 81

1    American public.  For some, OxyContin is the angel
2    of mercy; and for others, it's the angel of
3    death."
4            Does Prescription Supply agree that if
5    used appropriately, OxyContin has its place and
6    can be a, for lack of a better analogy, angel of
7    mercy; and if used illicitly, can also bring about
8    death?
9            MR. RICARD:  Objection to form.
10       A.  Yes.
11       Q.  It says, "Today, we will hear from law
12   enforcement officials who argue that OxyContin is
13   quickly becoming the abuser's drug of choice,
14   surpassing heroin and cocaine in some
15   jurisdictions."
16           Does Prescription Supply agree and
17   recognize that as early as 2001, we were seeing
18   the opioid epidemic blossom and bloom?
19       A.  To be honest, in 2001, I don't believe I
20   was aware of it.
21       Q.  Whether you were --
22       A.  I'm aware of it now.
23       Q.  Sure.  Let's go on, and then I'll ask
24   the next question.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    If you'll turn to page 8. It says,
2 "These actions, though commendable, also appear
3 long overdue. According to DEA, the number of
4 oxycodone-related deaths has increased 400 percent
5 since 1996, the same time period in which the
6 annual number of prescriptions for OxyContin has
7 risen from approximately 300,000 to almost
8 6 million."
9    We're looking at the time frame,
10 Mr. Schoen, of 1996 to 2001. Prescription Supply
11 would agree that that is an unusual increase in
12 the prescriptions for any drug going from 300,000
13 to 6 million?
14    MR. RICARD: Objection to form.
15    Q. Do you know how many times that is
16 increased --
17    A. No.
18    Q. -- or what percentage?
19    A. No.
20    Q. So I had to do the math on the
21 calculator.
22    A. Okay.
23    Q. That's a 2,000 percent increase in five
24 years.

Page 83

1    A. Mm-hmm.
2    Q. Does that cause you any concern as
3 someone in the industry knowing that this is a
4 Schedule II controlled substance?
5    A. It depends on what it's being used for,
6 doesn't it?
7    Q. Right.
8    A. When my wife broke her leg --
9    Q. Yes, sir.
10    A. -- okay, she got a prescription, okay,
11 and at that time I asked a nurse, who happened to
12 have been a neighbor of ours at one time, that was
13 there, "Why this? Why that drug?"
14    And she said, "Because there's nothing
15 else available," which could explain the rise in
16 this. I mean, it used to be when I was in the
17 Army and had my teeth pulled, they gave me Darvon
18 Compound or something.
19    Q. Sure.
20    A. And that's gone. A lot of the drugs
21 that were out there have disappeared, and that
22 would allow them to gain a certain market share.
23 I'm not defending. I'm just saying that that's --
24    Q. Sure. And you're not -- well, let me

Page 84

1 ask you.
2    You're not saying that there weren't
3 other opioid-based pain medications, because we
4 know morphine --
5    A. Yes.
6    Q. -- was around?
7    A. Yes.
8    Q. We know Lortab was around. Vicodin was
9 around.
10    A. Yeah.
11    Q. Those are all other pain medications,
12 right?
13    A. Well, yeah, there are. When I think of
14 morphine, I think of even worse than, you know ...
15    Q. It would shock you that that's not the
16 case, huh?
17    A. I am shocked that that's not the case,
18 yes. I did not know that.
19    Q. So take that increase, that
20 2,000 percent increase --
21    A. Yes.
22    Q. -- in light of the earlier sentence, a
23 400 percent increase in oxycodone-related deaths
24 during the same time frame. That's not right, is

Page 85

1 it? People shouldn't be dying from prescription
2 medication, should they?
3    MR. RICARD: Objection to form.
4    A. No.
5    Q. Okay.
6    A. But people do die from taking
7 prescription medication. Very few hopefully.
8    Q. You wouldn't expect --
9    A. But I wouldn't expect 400 percent, no.
10    Q. Right. Now, if during this time frame
11 we are mismarketing medications, during this time
12 frame if we are -- and I say "we." People in the
13 supply chain -- and I'm not picking on PSI -- are
14 shipping and not reporting suspicious orders, this
15 type of thing could be a foreseeable outcome,
16 correct?
17    MR. RICARD: Objection to form.
18    A. Yes. But these are -- you're talking
19 about 6 million prescriptions.
20    Q. That's a lot.
21    A. That's a lot.
22    Q. I mean, particularly when five years ago
23 it was only 300,000 --
24    A. Correct.

22  (Pages 82 to 85)

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.  -- a 2,000 percent increase?
2    A.  Mm-hmm.
3    Q.  Now, I agree with you there's plenty of
4    blame to go around.  Doctors had to write those
5    scripts, right?
6    A.  That's right.
7    Q.  But we know there's bad doctors out
8    there, too, don't we?
9    A.  That's right.
10   Q.  Now, we also are not -- as being a
11   member of the supply chain, Prescription Supply,
12   we're not going to condone any manufacturers who
13   may be mismarketing their drugs either?
14   A.  No.
15   Q.  That's absolutely inappropriate,
16   correct?
17   A.  Correct.
18   Q.  It's absolutely detrimental to the
19   American public, correct?
20   A.  Yes.
21   Q.  Without question?
22   A.  Without question.
23   Q.  We're not going to condone any other
24   wholesale distributors who may be shrugging their

Page 87

1    duties to report and stop suspicious orders
2    either, are we?
3    A.  No.
4    Q.  I'm not saying you or picking on anybody
5    else here, but if it's happening, Prescription
6    Supply isn't going to stand for it?
7    A.  Prescription Supply isn't going to do it
8    for sure.
9    Q.  For sure.  And doesn't think anybody
10   else should be able to get away with it?
11   A.  That's correct.
12   Q.  Okay.
13        MR. FULLER:  I need 206.
14   BY MR. FULLER:
15   Q.  It's another big book, but at least my
16   boxes are going to be a lot lighter going home.
17   A.  I'm happy for you and the airlines.
18   Q.  And you don't have to take this with
19   you?
20   A.  I'm happy for you and the airlines.
21   Q.  All right.  This is going to be
22   Plaintiff's Exhibit Number 12.
23        ---
24        (PSI-Schoen Exhibit 12 marked.)

Page 88

1        ---
2    Q.  Now, Mr. Schoen, this is the National
3    Center On Addiction and Substance Abuse, Cornell
4    University.  You know of Cornell University, heard
5    of it at least, correct?
6    A.  Yes.
7    Q.  A very prestigious entity -- university?
8    A.  Yes.
9    Q.  And it's funded by -- well, excuse me.
10   It's "Under the Counter:  The Diversion and Abuse
11   of Controlled Prescription Drugs in the U.S.," and
12   it's dated -- what date do you see there,
13   Mr. Schoen?
14   A.  July '05.
15   Q.  So a couple years after those other
16   documents we looked at, right?
17   A.  Correct.
18   Q.  And it's funded by an unrestricted grant
19   from who?
20   A.  From Purdue apparently.
21   Q.  Purdue Pharma LP?
22   A.  Okay.
23   Q.  The maker of OxyContin, right?
24   A.  Yes.

Page 89

1    Q.  And there's only one area I want to
2    touch on.  If you go to page 9, again, Bates
3    number in the upper right-hand corner.
4    A.  It happens to agree with the lower page.
5    Okay.
6    Q.  Sir?
7    A.  It happens to agree with the lower.
8    Q.  Oh, it does.  You're right.  You're
9    right.
10       It says, "The bottom line:  Our nation
11   is in the throws of an epidemic of controlled
12   prescription drug abuse and addiction.  Today
13   15.1 million people admit abusing prescription
14   drugs, more than the combined number who admit
15   abusing cocaine, hallucinogens, and heroin
16   combined."  Oh, and inhalants as well.
17       Do you see that there?
18   A.  I see it.
19   Q.  And, again, you may not have ever been
20   provided this report or seen this report, but PSI
21   has no reason to disagree with this report that in
22   the early 2000s, we were in the throws of a
23   prescription drug abuse and addiction epidemic,
24   correct?

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1         MR. RICARD:  Objection to form.
2    Objection to scope.
3         A.  I assume that this is accurate then,
4    yes.
5         Q.  And then here's what was most shocking
6    to me at least, and you tell me.  "Children are
7    especially at risk."
8         Do you see that?
9         A.  I see that.
10        Q.  "In 2003" -- so about that time frame
11   you were just talking about -- "2.3 million teens
12   between the ages of 12 and 17 admit abusing
13   prescription drugs in the past year.  83 percent
14   of them admitted abusing opioids."
15        Now, understanding that that was going
16   on back 15 years ago, that causes Prescription
17   Supply great concern, doesn't it?
18        A.  It does.
19        Q.  Because these are our kids, right?
20        A.  Right.
21        Q.  These are part of the people that we
22   are -- and I say "we."  Prescription Supply is
23   trying to keep safe by abiding by the Controlled
24   Substances Act?

Page 91

1         A.  Yes.
2         Q.  We shouldn't have -- would Prescription
3    Supply agree that we shouldn't have 2.3 million
4    teens, kids between the ages of 12 and 17, abusing
5    opioids in this country?
6         A.  Yes.
7         Q.  And this would be an indication that we
8    are in an epidemic even in the early 2000s,
9    correct?
10        MR. RICARD:  Objection to form.
11        A.  Yes.
12        Q.  Now, Prescription Supply is aware that
13   when you're talking about oxycodone or hydrocodone
14   or any of the other derivatives, you're dealing
15   with opioids, right?
16        A.  Yes.
17        Q.  Hydrocodone was -- I say recently.
18   What?  2014, I think rescheduled from a III to a
19   II?
20        A.  Yes.
21        Q.  That's because of the dangerous
22   propensities with that medication as well, right?
23        MR. RICARD:  Objection to form.
24        A.  Yes.

Page 92

1         Q.  Prescription Supply also recognizes
2    that -- strike that.
3         So with that information that I showed
4    you provided by the GAO, the Congressional
5    hearings, and now Cornell University, while you
6    may not have known it at the time, Prescription
7    Supply agrees that the evidence indicates that we
8    were in an opioid epidemic even in the early
9    2000s?
10        MR. RICARD:  Objection to form.
11   Objection to scope.
12        A.  Yes, based on what you've shown me.
13        Q.  And assuming that it's true?
14        A.  Assuming.
15        Q.  Because you haven't done anything to
16   independently verify this stuff?
17        A.  I have not.
18        Q.  All right.  Mr. Schoen, we're going to
19   talk now a little bit about interaction and
20   communication with the DEA.  So here's what my
21   hope is -- and counsel probably picked up on this
22   already.
23        We're flowing through a bunch of
24   different topics, subjects, most of which are set

Page 93

1    out in the 30(b) notices, the Exhibits 1 and 2
2    that we looked at earlier.  Through the
3    progression through these subject areas, we're
4    going to cover -- at least my goal is -- most of
5    the subjects set out in the 30(b).
6         There may be some that we need to go
7    back and -- that I didn't ask about that we'll
8    clean up at the end, just to get the information
9    out, but I'm just trying to do this in sort of
10   organic conversation type instead of running
11   through one after the other, which, trust me,
12   would be even more boring than this already is for
13   you.  Okay?
14        A.  Yes.
15        Q.  All right.  Now, my understanding is
16   that -- strike that.
17        PSI has had interaction with the DEA in
18   the past, correct?
19        A.  Yes.
20        Q.  As of -- shoot.  I think I saw a --
21        A.  The DEA is a regulatory body --
22        MR. RICARD:  There's no question
23   pending.
24        Q.  If you want to go ahead and start

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 talking, we all -- I'm kidding.  I'm kidding.
2 Listen to the advice of your counsel.
3        Now, as recent as April, I think, of
4 '16, PSI had a meeting and a presentation done by
5 the DEA.  Does that sound correct?
6    A.  Yes.
7    Q.  Okay.  But you're correct, the
8 regulatory body, at least at the federal level, is
9 the DEA; is that right?
10    A.  Yes.
11    Q.  Prescription Supply also recognizes that
12 they have to comply with the board of pharmacies
13 in the respective states that they do business in,
14 particularly the state we're sitting in, the State
15 of Ohio --
16    A.  Correct.
17    Q.  -- correct?
18        And they may have slightly different
19 rules and regulations, some of which we saw
20 earlier today?
21    A.  Yes.
22    Q.  But it doesn't change the fact that
23 Prescription Supply is obligated to comply with
24 those regulations?

Page 95

1    A.  Yes.
2    Q.  Okay.
3        MR. FULLER:  301.
4        And, Counsel, this is the Dear Registrant
5 letter from 2006.  In the production, I didn't get one
6 that was specifically to Prescription Supply --
7        MR. RICARD:  Right.
8        MR. FULLER:  -- so I just grabbed
9 Cardinal's, so I'm assuming that he will testify
10 that they got one.
11        MR. RICARD:  Yeah.  You can ask him.
12        ---
13        (PSI-Schoen Exhibit 13 marked.)
14        ---
15 BY MR. FULLER:
16    Q.  So, Mr. Schoen, this letter is what we
17 refer to as a Dear Registrant letter.  And if you
18 look at the very beginning, it says, "This letter
19 is being sent to every commercial entity in the
20 United States registered with the DEA to
21 distribute controlled substances."
22        And certainly we've established that
23 Prescription Supply would fall into that category,
24 correct?

Page 96

1    A.  Correct.
2    Q.  Okay.  This particular letter, however,
3 is to Cardinal Health, right?
4    A.  Yes.
5    Q.  Not Prescription Supply?
6    A.  That's correct.
7    Q.  Now, I'll tell you -- and it may be
8 because it wasn't saved or it wasn't kept -- I
9 never got in discovery one that was sent to
10 Prescription Supply.  I'm not faulting anybody.
11 It's just I didn't get it.
12        Do you know whether Prescription Supply
13 ever got such a letter from the DEA?
14    A.  I don't know that we got it.  I assume
15 we got it, but I don't know that we have it.
16    Q.  So let me ask you a different question.
17        Assuming that the DEA sent one to every
18 registrant in the country in September of 2006,
19 presumptively the same letter would have been sent
20 to Prescription Supply because it was a registrant
21 as well, correct?
22    A.  Correct.
23    Q.  Okay.  But sitting here today, you have
24 no independent recollection of actually getting

Page 97

1 this letter?
2    A.  No, I don't.
3    Q.  Okay.  And that's fair enough, all
4 right?  Like I told you before, if you don't know
5 or you don't remember, just tell me, and I don't
6 have any problem with that, okay?
7    A.  Yes.
8    Q.  All right.  Now, we're going to go
9 through some areas of this letter and just talk
10 about them briefly.
11        So it says -- after that first sentence,
12 it says, "The purpose of this letter is to
13 reiterate the responsibilities of controlled
14 substance distribution in view of the prescription
15 drug abuse problem our nation currently faces."
16        Do you see that?
17    A.  I see it.
18    Q.  If we roll down to the -- under the
19 Background section --
20        MR. FULLER:  Yeah.  How did you know I
21 was going there?  Is that highlighted on yours?
22        MS. VELDMAN:  No.  I was just cheating
23 looking --
24        MR. FULLER:  She's good.

25  (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review

Page 98

```
1    BY MR. FULLER:
2       Q.  All right.  If you go down to the
3    paragraph -- well, you have it highlighted, so I
4    don't need to specify, but the highlighted section
5    there says, "Distributors are, of course, one of
6    the key components of the distribution chain.  If
7    the closed system is to function properly as
8    Congress envisioned, distributors must be vigilant
9    in deciding whether a proposed customer can be
10   trusted to deliver controlled substances only for
11   lawful purposes."
12       PSI agrees and accepts that
13   responsibility as set out by the DEA in this
14   letter, correct?
15       MR. RICARD:  Objection to form.
16       A.  Yes.
17       Q.  PSI also agrees that that has been the
18   obligation since 1971, right?
19       A.  Yes.
20       Q.  That PSI, along with the other
21   registered distributors, is a key component in the
22   distribution chain and must be, as it says here,
23   vigilant in deciding whether to ship controlled
24   substances, correct?
```

Page 99

```
1       A.  Yes.
2       Q.  And PSI takes extreme caution in
3    ensuring that the persons that it is shipping to
4    are the type that are not going to divert, as we
5    discussed earlier?  You even declined to take on
6    new customers because of that concern, correct?
7       A.  Yes.
8       Q.  It says, "This responsibility is
9    critical, as Congress has expressly declared that
10   the illegal distribution of controlled substances
11   has a substantial and detrimental effect on the
12   health and general welfare of the American
13   people."
14       Again, Prescription Supply accepts and
15   agrees with that statement?
16       A.  Yes.
17       Q.  We've already seen that written several
18   other times in the Congressional history, as well
19   as the Controlled Substances Act, correct?
20       A.  Yes.
21       Q.  That shouldn't come as a surprise to
22   anybody?
23       A.  No.
24       Q.  At least nobody in your line of
```

Page 100

```
1    business, correct?
2       A.  Correct.
3       Q.  Okay.  If you go to the next page,
4    Mr. Schoen.
5       A.  Yes.
6       Q.  It says, "The statutory factors DEA must
7    consider in deciding whether to revoke a
8    distributor's registration are set forth in 21
9    U.S.C. 823(e).  Listed first among these factors
10   is the duty of the distributors to maintain
11   effective controls against diversion of controlled
12   substances into other than legitimate medical,
13   scientific, and industrial channels."
14       Prescription Supply agrees and accepts
15   that duty and responsibility to maintain effective
16   controls against diversion, correct?
17       MR. RICARD:  Objection to form.
18       A.  It does.
19       Q.  Okay.  And then it goes down, and it
20   says, "The DEA regulations require" -- do you see
21   that section?
22       A.  No.
23       Q.  Hold on.  She'll get there.  Yeah,
24   that's it.
```

Page 101

```
1       A.  All right.
2       Q.  And this recites 21 C.F.R. 1301.74(b),
3    and that's the suspicious order obligation that we
4    talked about earlier, right?
5       A.  Yes.
6       Q.  And Prescription Supply still accepts
7    and recognizes that that has been in place since
8    1971, correct?
9       MR. RICARD:  Objection to form.
10       A.  Yes.
11       Q.  Then here's where it gets interesting,
12   and here's where I want to make sure that you and
13   I, Mr. Schoen, are on the same page.
14       It next says, "It bears emphasis that
15   the foregoing reporting requirement is in addition
16   to, and not in lieu of, the general requirement
17   under 21 U.S.C. 823(e) that a distributor maintain
18   effective controls against diversion."
19       MR. RICARD:  Hang on.
20       MS. MONAGHAN:  Objection to form.
21       MR. RICARD:  Do you see where --
22       THE WITNESS:  I see that, yes.
23       MR. FULLER:  There we go.
24       THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1	MR. RICARD:  Take a look at it.
2	BY MR. FULLER:
3	Q.  And I'll read it again, Mr. Schoen.  "It
4	bears emphasis that the foregoing reporting
5	requirement is in addition to, and not in lieu of,
6	the general requirement under 21 U.S.C. 823(e)
7	that a distributor maintain effective controls
8	against diversion."
9	And let's talk about that for one
10	second, Mr. Schoen.  What the DEA is pointing out
11	is the two separate code sections we looked at
12	earlier.  We know, and Prescription Supply agrees,
13	that it has a statutory obligation to maintain
14	effective controls against diversion, correct?
15	MR. RICARD:  Objection to form.
16	Q.  And that means put systems and practices
17	and policies in place to try to prevent diversion.
18	Does PSI agree?
19	MR. RICARD:  Same objection.
20	A.  Yes.
21	Q.  And that code section has been in full
22	force and effect since 1970 when the Controlled
23	Substances Act was passed, correct?
24	MR. RICARD:  Objection to form.

Page 103

1	A.  Yes.
2	Q.  Separate from that, separate and
3	distinct, on this side, we have the suspicious
4	order reporting requirement, which is different,
5	right?
6	A.  Yes.
7	Q.  It is a mechanism in which the wholesale
8	distributor, in this case PSI -- I'm sorry.
9	A.  Go ahead.
10	Q.  You seemed bothered there for a second.
11	A.  Well, I'm just trying to make sure that
12	I'm not misunderstanding.
13	Q.  No.  And I'm going to try to make it as
14	simple as I can because this is how --
15	A.  That's good because I need it to be
16	simple.
17	Q.  This is how I know how to do it.
18	21 C.F.R. -- so when we say "C.F.R.," we're
19	referring to the Code of Federal Regulation.
20	A.  Yes.
21	Q.  And that's a rule promulgated by the
22	DEA.
23	A.  Okay.
24	Q.  That's different than U.S.C., which is

Page 104

1	the United States Code that's actually passed by
2	the U.S. Congress.
3	A.  Okay.
4	Q.  Okay?
5	A.  Okay.
6	Q.  So we're dealing with two different
7	statutory schemes.  And, again -- and I'm doing
8	this, Mr. Schoen, so that you and I -- like I
9	mentioned earlier, we can make sure we're on the
10	same page because I want to make sure you
11	understand what you're answering so I know that
12	I'm getting -- I'm understanding what you're --
13	the answer I'm getting as well.
14	Okay.  Now, I'm just going to hold it
15	up.
16	A.  Okay.
17	Q.  So we have -- I hope you don't mind, but
18	I like changing colors for emphasis.  And you see
19	if this makes sense and whether you agree, okay?
20	So, number one, we have the U.S. code section --
21	or excuse me.  And I got that backwards.  I can't
22	write it right much less explain it right.  Jeez.
23	So, number one, the first thing we
24	looked at this morning was the U.S. code section?

Page 105

1	A.  Okay.
2	Q.  And Prescription Supply recognizes that
3	U.S. -- 21, U.S. Code 823(e) requires effective
4	controls against diversion, correct?
5	MR. RICARD:  Objection to form.
6	A.  Yes.
7	Q.  And that regulatory -- or excuse me.
8	That statutory obligation has been in place in
9	full effect since 1970 when the CSA was passed?
10	MR. RICARD:  Same objection.
11	A.  Yes.
12	Q.  In addition to that, what we saw was
13	passed in 1971 was the Code of Federal Regulation,
14	21 C.F.R. 1301.74(b), which is the suspicious
15	order reporting requirement, correct?
16	MR. RICARD:  Objection to form.
17	A.  Mm-hmm.
18	Q.  Is that a yes?
19	A.  Yes.
20	Q.  And Prescription Supply agrees that it
21	also in addition to effective controls against
22	diversion has a suspicious order reporting
23	requirement since 1971?
24	MR. RICARD:  Same objection.

27 (Pages 102 to 105)

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.  Correct?
2    A.  Yes.
3    Q.  Okay.  And when I say there's two
4  distinct -- and when Mr. Rannazzisi is explaining
5  in his letter, he's saying there's two distinct
6  obligations; one, you have to maintain effective
7  control to try to prevent diversion yourself.
8       And you agree with that, correct?
9       MR. RICARD:  Objection to form.
10   A.  Yes.
11   Q.  You also have a suspicious order
12  reporting requirement in addition to that you have
13  to report suspicious orders to the DEA, correct?
14       MR. RICARD:  Objection to form.
15   A.  Yes.
16   Q.  Okay.  And if anybody wants to, I'll --
17       MS. MONAGHAN:  Can we mark that as an
18  exhibit?
19       MR. FULLER:  Yeah.  My artwork, that
20  will be Plaintiff's 14.
21            - - -
22       (PSI-Schoen Exhibit 14 marked.)
23            - - -
24

Page 107

1  BY MR. FULLER:
2    Q.  And that's where Mr. Rannazzisi who
3  was -- I forget what his actual title was.  Let's
4  see if he puts it on his letter.  Joseph
5  Rannazzisi who did this letter was the Deputy
6  Assistant Administrator, Office of Diversion
7  Control, in 1996.
8    A.  Mm-hmm.
9       MR. RICARD:  You need to respond yes or
10  no.
11   A.  I'm sorry.  I don't know what the -- I
12  didn't hear a question there.
13   Q.  No, there wasn't.  I was just stating
14  who -- what his title was.
15       So let me state it differently.  If you
16  go to page 4 of the document, this document
17  indicates that it was -- it is signed off on by
18  Joseph Rannazzisi, correct?
19   A.  Yes.
20   Q.  And it indicates that his position is
21  Deputy Assistant Administrator of the Office of
22  Diversion Control, correct?
23   A.  Yes.
24   Q.  Now, you don't know whether that's right

Page 108

1  or not.  That's just what it indicates on the
2  letter.
3    A.  Yes.
4    Q.  Now, in all fairness, you don't have any
5  reason to dispute that, do you?
6    A.  No.
7    Q.  Okay.  Now, going back to page 2 of the
8  document.  That's what Mr. Rannazzisi is saying
9  when he says, "It bears emphasis that the
10  foregoing reporting requirement is in addition to,
11  and not lieu of, the general requirement under 21
12  U.S.C. 823(e) that a distributor maintain
13  effective controls against diversion"?
14       MR. RICARD:  Objection to form.
15   Q.  And PSI agrees and accepts those
16  responsibilities, correct?
17   A.  We do.
18       MR. RICARD:  Same objection.
19   Q.  Okay.  Now, he goes on to explain it
20  more, and we're going to read through that just
21  for the fun of it, I guess.
22       He says, "Thus, in addition to reporting
23  all suspicious orders, a distributor has a
24  statutory responsibility to exercise due diligence

Page 109

1  to avoid filling suspicious orders that might" --
2  might -- "be diverted into other than legitimate
3  medical, scientific, and industrial channels.
4  Failure to exercise such due diligence could, as
5  circumstances warrant, provide a statutory basis
6  for revocation or suspension of a distributor's
7  registration."
8       And PSI recognizes and accepts that
9  responsibility and obligation, correct?
10       MR. RICARD:  Objection to form.
11   A.  Yes.
12   Q.  Okay.  He goes on to say, "In a similar
13  vein, given the requirement under Section
14  823(e)" --
15       MR. RICARD:  Can you wait until it's up?
16       MR. FULLER:  Yeah.  Sorry.
17  BY MR. FULLER:
18   Q.  All right.  "In a similar vein, given
19  the requirement under Section 823(e) that a
20  distributor maintain effective controls against
21  diversion, a distributor may not simply rely on
22  the fact that the person placing the suspicious
23  order is a DEA registrant and turn a blind eye to
24  the suspicious circumstances."

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1      Prescription Supply agrees that that is
2  the status of the law and has been since 1971,
3  correct?
4          MR. RICARD:  Objection to form.
5      A.  Yes.
6      Q.  That just because the person you're
7  sending to is a registrant doesn't mean that you
8  can turn a blind eye when it's suspicious?
9          MR. RICARD:  Same objection.
10     A.  That's correct.
11     Q.  That's the same thing that you guys did
12 at PSI repeatedly when those registrants wanted to
13 become a new customer and there was something
14 fishy going on, or at least you suspected
15 something, and you turned them down, right?
16     A.  Yes.  That's -- there was some reason
17 why we turned them down, yes.
18     Q.  Sure.  And, listen, I went through the
19 applications because they were provided by your
20 counsel, and a lot of the times it's like, "Look,
21 this just doesn't smell right."
22     A.  That's right.
23     Q.  For whatever reason --
24     A.  We didn't take them off.

Page 111

1      Q.  And you didn't take them off?
2      A.  At least as controlled substance
3  receivers.
4      Q.  And fair enough.  You would agree to
5  ship other things to them?
6      A.  But not controlled substances.
7      Q.  But that's not what they wanted,
8  usually?
9      A.  Generally, yes.
10     Q.  And the reason you were doing that is
11 because you knew of the heightened obligation you
12 had and the potential for abuse and the fact that
13 these drugs are dangerous if not handled
14 correctly?
15         MR. RICARD:  Objection to form.
16     A.  Yes.
17     Q.  And Prescription Supply took that
18 obligation very, very serious?
19     A.  Yes.
20         MR. FULLER:  So now I'm going -- 601.
21 BY MR. FULLER:
22     Q.  So Prescription Supply is also a member
23 of the H -- or what was the HDMA, correct?
24     A.  Yes.

Page 112

1      Q.  Which was --
2      A.  NDWA a long time ago.
3      Q.  Right.
4         (Reporter clarification.)
5      A.  NDWA, National Drug Wholesalers
6  Association.
7      Q.  And HDMA has changed its name to HDA, I
8  think, now?
9      A.  Yes.
10     Q.  Okay.  And not only is Prescription
11 Supply a member, but at different times -- and
12 maybe the entire time -- I'm not sure -- had
13 directors or had a director on the board.
14     A.  Recently, as the number of wholesalers
15 has decreased, and it's been decreasing pretty
16 fast.
17     Q.  So you made your way up the totem pole?
18     A.  Yeah.  Now anybody -- any member,
19 wholesaler member, has a board member.
20     Q.  Oh, currently?
21     A.  Currently.  Now, some big wholesalers
22 have more than one board member.
23     Q.  Sure, sure.
24     A.  But everybody has a board member.

Page 113

1      Q.  Oh, really?  I didn't realize that.
2      A.  Yeah, mm-hmm.
3      Q.  Huh.  Okay.  Well, we're going to look
4  at some of that.
5              - - -
6         (PSI-Schoen Exhibit 15 marked.)
7              - - -
8      Q.  Plaintiff's Exhibit 15.  So there's a
9  lot of stuff on here that's irrelevant I'm not
10 going to ask you about.  We'll wade through it.
11     And I'm going to go to page 12 right off
12 the bat.  So page 12 is an e-mail.
13         MR. FULLER:  Can you blow that up for
14 me?
15         MS. VELDMAN:  Yes.
16 BY MR. FULLER:
17     Q.  So if you look on the screen, there is a
18 J -- it's a Harbauer?
19     A.  That's Harbauer.
20     Q.  Harbauer?
21     A.  Mm-hmm.
22     Q.  And I'm assuming you know who that it
23 is?
24     A.  My sister.

29  (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    Q.  Okay.  Well, there you go.  Let's hope
2  you know who she is.
3    A.  She's 89.
4    Q.  Bless her heart.
5    So this is an e-mail coming from
6  Brian -- or no.  This is from Robert
7  G-i-a-c-a-l-o-n-e.
8    Do you know how to pronounce that?
9    A.  No.
10    Q.  Okay.  Well, we'll go with Robert G.
11  And he is forwarding an e-mail -- I say that -- if
12  you read down, the subject matter is "Summary of
13  September 7th Meeting with DEA and Attachments."
14    Do you see that?
15    A.  All right.  Yes.
16    Q.  We're blowing it up for you.
17    A.  Mm-hmm.
18    Q.  And the attachments include a Final
19  Summary of DEA Meeting 9-7-07.  There's another
20  attachment -- there's a total of three
21  attachments.  At least that's what it says.
22    Do you see that there?
23    A.  Yes.  I see it says three attachments,
24  yes, I do.

Page 115

1    Q.  And then it says, "Attention RAC
2  Members."
3    Do you know what it means, RAC members?
4    A.  No.
5    Q.  Okay.  Either do I.  It wasn't a trick
6  question.
7    But then it reads, "HDMA met with the
8  DEA officials last Friday to discuss the Agency's
9  current policy position on suspicious orders.  A
10  summary highlighting the key points made during
11  the meeting are attached above for your review.
12  Three additional attachments containing a DEA
13  slide presentation on suspicious orders and the
14  DEA's Office of Diversion Control are also
15  enclosed.  Please contact me if you have any
16  questions regarding the attached materials."
17    So this e-mail was apparently forwarded
18  to your sister back on September 10th of 2007; is
19  that correct?
20    A.  That's what it seems to show, yes.
21    Q.  Now, have you had an opportunity to see
22  this before today?
23    A.  Not that I recall.
24    Q.  Okay.  That's fair enough.  And, again,

Page 116

1  I told you there may be some things that don't
2  look familiar.  And what I want to go to is the
3  summary, and that's on page 32 of the document, I
4  believe.
5    MS. VELDMAN:  31.
6    MR. FULLER:  One more, page 31.  There
7  you go.  We'll start with the title though, Gina.
8  BY MR. FULLER:
9    Q.  All right.  You see page 31 there,
10  Mr. Schoen?
11    A.  I do.
12    Q.  It says "Summary of the DEA-HDMA Meeting
13  on Suspicious Orders.  Meeting Date:  September 7,
14  2007."  Right?
15    A.  Yes.
16    Q.  And if we go to the key takeaways from
17  the meeting, we can see what the highlights sort
18  of were.  It says, "The DEA's policy was to expect
19  more than just reporting 'suspicious orders.'  If
20  there was a suspicious order, the distributor
21  should either stop the delivery or should evaluate
22  the customer further before delivering it."
23    Does PSI agree that that has been the
24  obligation as it understood it since 1971?

Page 117

1    MR. RICARD:  Objection to form.
2    A.  Yes.
3    Q.  Without question, correct?
4    MS. MONAGHAN:  Objection; form.
5    A.  Yes.
6    Q.  Okay.  This says, "Simply complying with
7  the suspicious orders regulatory requirement does
8  not mean, in the agency's view, that the
9  registrant is maintaining effective programs to
10  detect and prevent diversion."
11    That's what we talked about, the two
12  separate requirements, correct?
13    A.  Yes.
14    Q.  And PSI agrees that simply reporting
15  suspicious orders and following the regulation
16  doesn't mean you're still following and complying
17  with the U.S. code, correct?
18    MR. RICARD:  Objection to form.
19    A.  Yes.
20    Q.  Then the next key takeaway is, "DEA
21  indicated they did not have the resources to
22  inspect every pharmacy; therefore it was important
23  for the distributor to know their customers."
24    A.  Yes.

30  (Pages 114 to 117)

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    Q.  Does PSI agree simply with the notion
2  that it's important for the distributor to know
3  their customers?
4    A.  Yes.
5    Q.  PSI also recognizes that -- strike that.
6      MR. FULLER:  204, Gina.
7         - - -
8      (PSI-Schoen Exhibit 16 marked.)
9         - - -
10  BY MR. FULLER:
11    Q.  And we're going to flip-flop back and
12  forth between two exhibits for a moment, only
13  because I think it's important for complete
14  understanding.
15    What counsel is going to hand you is a
16  memorandum, and it's from the U.S. Inspector
17  General, Glenn Fine.  And the subject matter is
18  "Review of Drug Enforcement Administration's
19  Investigations of the Diversion of Controlled
20  Pharmaceuticals."
21    This was done in 2002, so about five
22  years before this meeting that we were just
23  looking at, okay?
24    A.  All right.

Page 119

1    Q.  And if you'll turn to page 12. Gina is
2  going to blow up the highlighted section for us
3  there.  And this is talking about -- and so you
4  know, Mr. Schoen, in looking at the resources that
5  the DEA had and the resources that were being
6  allocated for diversion control purposes.
7    Now, this document reads that "Diversion
8  investigators represent 10 percent, or 523, of the
9  DEA's 5,124 authorized investigator positions in
10  fiscal year 2001.  The authorized diversion
11  investigator positions were assigned as follows:
12  55 at headquarters, 455 at domestic field offices,
13  and the remaining 13 at overseas offices."
14    So out in the field around the country
15  during this time, we had 455 diversion officers.
16  That's to police all the wholesale distributors
17  and all the shipments and all the pharmacies
18  around this entire country.
19    A.  Mm-hmm.
20    Q.  You and I can agree there's no way 455
21  guys are going to be able to get that done for the
22  entire country, correct?
23      MR. RICARD:  Objection to form.
24  Objection to scope.

Page 120

1    A.  It would be very difficult to do it
2  perfectly.
3    Q.  It's like having police officers out
4  there trying to maintain and catch people
5  speeding.  If you and I are in the State of Ohio
6  and we're told there's only ten cops in the entire
7  State of Ohio that are going to police speeding,
8  we know they're not going to do a very good job,
9  right?
10      MR. RICARD:  Same objection.
11    A.  They'll only catch a certain number of
12  speeders.
13    Q.  Because they can't.
14    A.  Correct.
15    Q.  It's not possible.  Well, the point is
16  the same thing with the DEA back during this time
17  frame.  They didn't have enough field diversion
18  officers to police every pharmacy.  They're even
19  admitting that to the HDMA in 2007, right?
20      MR. RICARD:  Same objection.
21    A.  Yes.
22    Q.  That's what they say.  They said the DEA
23  indicated they did not have the resources to
24  inspect every pharmacy; therefore, it was

Page 121

1  important for the distributors --
2    A.  To know their customers.
3    Q.  Exactly.  A statutory obligation that
4  they should be doing anyway, right?
5      MR. RICARD:  Objection to form.
6    A.  Yes.
7    Q.  Certainly what PSI has done from the
8  very beginning?
9    A.  We've tried.
10    Q.  Best you can, correct?
11    A.  That's correct.
12    Q.  Not to say people don't make mistakes,
13  right?
14    A.  Hopefully not.
15    Q.  Fair enough.  Let's go to the --
16      MR. FULLER:  Gina, back to 60- whatever,
17  601, page 32 now.
18      MS. VELDMAN:  Okay.
19      THE WITNESS:  This one?
20      MR. RICARD:  This one.
21      THE WITNESS:  On page 32 now?
22      MR. RICARD:  You said 32, Mike?
23      MR. FULLER:  Yes, sir.
24

31  (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review



Page 122

BY MR. FULLER:

13     members about the impact of these expectations."
14     For example, in an indented bullet point, "Are
15     members capable of inspecting their pharmacy
16     customers?"
17         Do you see that there?
18     A.  I see it.
19     Q.  Prescription Supply would agree that all
20     distributors should be investigating or inspecting
21     their pharmacy customers anyway, right?
22         MR. RICARD:  Objection to form.
23     A.  I agree, but --
24     Q.  Now, you don't know what the others are

Page 123

5     three thousand customers of which maybe 150 or so
6     are buying controlled substances on a regular
7     basis.
8         It is easier for us to control our 150
9     in some way.  And we're not perfect, but it's
10     easier for us to control 150 than it is for
11     perhaps some of the bigger operations to
12     control -- how many, I have no idea.
13     Q.  Oh, sure.  Now, let's talk about that
14     just for a second.  We're going to push back from
15     the document for a minute.
16     A.  Okay.
17     Q.  No one forces anybody to get into this
18     line of business, do they?
19     A.  That's correct.
20     Q.  People choose to get into this line of
21     business as an entity in this controlled substance
22     supply chain, right?
23     A.  That's correct.
24     Q.  And if you're going to take on that

Page 124

1     duty --
2     A.  Yes.
3     Q.  -- take on that obligation, with great
4     power also comes great responsibility, correct?
5     A.  Mm-hmm.
6         MS. MONAGHAN:  Objection; form.
7     Q.  Is that a yes?
8     A.  Yes.
9     Q.  And whether others -- no matter how
10     large or small they want to be or choose to be,
11     they still need to comply with the law?
12         MR. RICARD:  Objection to form.
13     Q.  Right?
14     A.  Yes.
15     Q.  And if they don't, whoever they may be,
16     they need to be held accountable for not complying
17     with the law --
18         MR. RICARD:  Same objection.
19     Q.  -- right?
20     A.  Yes.

Page 125

1     smaller than a lot of other people, right?
2     A.  That's correct.
3     Q.  And you have how many employees?
4     A.  Seventy some.
5     Q.  Others have tens of thousands of
6     employees.
7     A.  That's correct.
8     Q.  They should be able to train those
9     people, just like you train your people, to
10     conduct these investigations?  You would agree
11     with that, correct?
12         MR. BUSHUR:  Objection; form.
13     A.  I certainly try.
14     Q.  Fair enough.  Fair enough.
15         And my only point is, just because
16     others chose to grow larger doesn't exempt them
17     from the requirement to know their customer --
18         MR. RICARD:  Objection to form.
19     Q.  -- right?
20     A.  That's correct.
21     Q.  Okay.  Let's go down to the fourth
22     bullet point, which I think is a great question.
23     It says, "Do we have recommendations for the DEA
24     as to how to approach this problem in a way that

32 (Pages 122 to 125)

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    simplifies things for the wholesale distributor?"
2         Do you see that?
3         A. I see it.
4         Q. And wouldn't it make sense that the
5    trade organization and the distributors, that if
6    they could come up with a better system, that they
7    maybe propose that to the DEA?
8         A. Yes, yes.
9         Q. I mean, listen, DEA doesn't have -- or
10   the Department of Justice doesn't have the lock,
11   stock, and barrel on good ideas, right?
12        A. Correct.
13        Q. I mean, you guys are operating in the
14   industry. Maybe there are ideas that can come
15   from the industry to help deal with this situation
16   of controlled substances?
17        A. Yes.
18        Q. Do you know if that's ever been done?
19        MR. RICARD: Objection to form.
20   Objection to scope.
21        A. Do I know? I don't know that that's
22   been done. I'm sure it has been done, but I don't
23   know that it's been done.
24        Q. Right. You don't know one way or

Page 127

1    another?
2         A. I don't from personal knowledge have --
3         MR. FULLER: Now, we're going to go 303.
4    This will be Plaintiff's Exhibit 17.
5         MR. PELINI: 17, Mike?
6         MR. FULLER: Yes, sir.
7              - - -
8         (PSI-Schoen Exhibit 17 marked.)
9              - - -
10        Q. Mr. Schoen, I'm going to represent to
11   you this is going to look a little familiar
12   because it's another letter from the DEA. And if
13   you look on the second page, I think the same
14   gentleman signed it, Joe Rannazzisi, Deputy
15   Assistant Administrator, Office of Diversion
16   Control.
17        Do you see that?
18        A. I see it.
19        Q. Seems to be the same guy as last time,
20   right?
21        A. It appears.
22        Q. But this letter is dated December 27th
23   of 2007, so about a year and three or four months
24   after the first letter in September of 2006,

Page 128

1    correct?
2         A. Correct.
3         Q. Okay. Now, I'm going to go through the
4    same sort of qualifiers. This has the same
5    introduction that is being sent to every
6    registrant, manufacturer, or distributor of
7    controlled substances, which during this time
8    frame, Prescription Supply, Inc., was one of
9    those, right?
10        A. That's correct.
11        Q. And assuming that Mr. Rannazzisi is
12   correct and he sent this letter out to everybody,
13   presumptively Prescription Supply would have
14   gotten that, correct?
15        A. Yes.
16        Q. Now, however, sitting here today, I'm
17   assuming that you have not seen this letter and
18   don't ever recall receiving it?
19        A. I don't recall seeing it.
20        Q. Fair enough.
21        A. We may have received it. I don't --
22        Q. Sure. And, listen, that may have been
23   issues that you delegated to someone else within
24   the business, and that's absolutely fine, okay?

Page 129

1         So the letter starts off after that
2    introductory sentence that "The purpose of this
3    letter is to reiterate the responsibilities of
4    controlled substance manufacturers and
5    distributors to inform the DEA of suspicious
6    orders in accordance with 21 C.F.R. 1301.74(b).
7         Do you see that there?
8         A. I see it, yes.
9         Q. And he, again, is reiterating what he
10   talked about, it appears, in the September of '06
11   letter, right?
12        MR. RICARD: Objection to form.
13        A. Mm-hmm.
14        Q. We saw that the HDMA met with him in
15   April of 2007 and had a summary of those
16   conversations related to these same issues,
17   correct?
18        A. Correct.
19        Q. All right. So let's see if they have
20   anything new or different to say now. He starts
21   off with, "In addition to, and not lieu of" --
22   hold on. Give her a second to get that
23   highlighted for you.
24        "In addition to, and not in lieu of, the

33 (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review

Page 130

```
 1   general requirement under 21 U.S.C. 823, that
 2   manufacturers and distributors maintain effective
 3   controls against diversion, DEA regulations
 4   require all manufacturers and distributors to
 5   report suspicious orders of controlled
 6   substances."
 7        And I know we've been talking about this
 8   ad litem, but you would agree that Prescription
 9   Supply recognizes that duty and obligation,
10   correct?
11        MR. RICARD:  Objection to form.
12        A.  Yes.
13        Q.  That Prescription Supply recognizes that
14   that's been the duty and obligation as a
15   registrant since 1971?
16        MR. RICARD:  Same objection.
17        A.  Yes.
18        Q.  Okay.  Now, if we go down -- yep.
19        The next paragraph starts off "The
20   regulation also requires that the registrant
21   inform local DEA Division Office of suspicious
22   orders when discovered by the registrant."
23        Does Prescription Supply agree and
24   recognize that it has an obligation to report
```

Page 132

```
 1   clear to the industry what they expect from its
 2   registrants, correct?
 3        MR. RICARD:  Objection to form.
 4        A.  Yes.
 5        Q.  Prescription Supply agrees that there is
 6   no question what the DEA expects in fulfilling the
 7   statutory and the regulatory requirement that
 8   we've looked at today?
 9        A.  Yes.
10        MR. RICARD:  Same objection.
11        MR. FULLER:  It's 11:44.  We've been
12   going over an hour.  Do you want to stop now for
13   lunch?  Do you want to push till noon?
14        Mr. Schoen, what's your druthers?
15        THE WITNESS:  You know, I just want to
16   get it over with.
17        MR. FULLER:  I've never heard that
18   before.
19        MR. RICARD:  If now is a good spot to
20   take a break, then we could do lunch now.
21        MR. FULLER:  Yeah.  I was going to jump
22   into the policies and procedures next, but that's
23   going to take a bit, so why don't we go ahead
24   and --
```

Page 131

```
 1   suspicious orders when they're first discovered?
 2        MR. RICARD:  Objection to form.
 3        A.  Yes.
 4        Q.  And we'll skip down a little bit to
 5   "Registrants are."  There you go, right there.
 6        "Registrants are reminded that their
 7   responsibility does not end merely with filing a
 8   suspicious order report.  Registrants must conduct
 9   an independent analysis of suspicious orders prior
10   to completing a sale to determine whether the
11   controlled substances are likely to be diverted
12   from legitimate channels.  Reporting an order as
13   suspicious will not absolve the registrant of
14   responsibility if the registrant knew or should
15   have known that the controlled substances were
16   being diverted."
17        Prescription Supply again agrees with
18   that obligation, correct?
19        MR. RICARD:  Objection to form.
20        A.  Yes.
21        Q.  Now, at least by the end of 2007, we've
22   known we've had the Controlled Substances Act and
23   the regulation since 1970 and '71, but at least by
24   the end of 2007, the DEA has made it abundantly
```

Page 133

```
 1        MR. RICARD:  Sure.
 2        THE VIDEOGRAPHER:  The time now is
 3   11:43.  Going off the record.
 4             - - -
 5        Thereupon, at 11:43 a m. a lunch
 6        recess was taken until 12:49 p m.
 7             - - -
```

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Wednesday Afternoon Session
            September 5, 2018
2            12:59 p.m.
3            - - -
4        THE VIDEOGRAPHER:  The time is now
5    12:59.  Back on the record.
6            - - -
7        (PSI-Schoen Exhibit 18 marked.)
8            - - -
9    BY MR. FULLER:
10       Q.  Mr. Schoen, we're going to pass to your
11   counsel Plaintiff's Exhibit 18.  I'm going to have
12   him take a look at it first and then pass you a
13   copy.
14           And so what you'll be looking at,
15   Mr. Schoen, is this is a document from the HDMA,
16   Healthcare Distribution Management Association.
17   We talked a little bit about them earlier, right?
18       A.  Yes.
19       Q.  And PSI is a member of that
20   organization; is that correct?
21       A.  That's correct.
22       Q.  And if you look at the title of the
23   document you have in front of you -- it's also on
24   the screen.  It's "Healthcare Distribution

Page 135

1    Management Association (HDMA) Industry Compliance
2    Guidelines."  What this appears to be -- and
3    correct me if I am wrong -- is it's guidelines put
4    out by the HDMA for its industry, which is the
5    wholesale distribution industry, right?
6        A.  That's correct.
7        Q.  All right.  And it says, "Reporting
8    Suspicious Orders and Preventing Diversion of
9    Controlled Substances."
10           Correct?
11       A.  Yes.
12       Q.  And Prescription Supply, Inc., would
13   agree that part of how we prevent diversion is by
14   reporting suspicious orders, correct?
15       A.  Yes.
16       Q.  Now, these are, for lack of a better
17   term -- we looked at the federal regulations and
18   the federal code.  These are the industry's own
19   safety rules, if you will, that the industry came
20   up with themselves, correct?
21       MR. RICARD:  Objection to form.
22       A.  Yes.
23       Q.  In regulating how they're going to deal
24   with controlled substances?

Page 136

1        MR. RICARD:  Same objection.
2        A.  Yes.
3        Q.  And you have an understanding, just like
4    with the HDMA, that in order for the guidelines to
5    come out, all the members of the HDMA have to
6    approve it, correct?
7        A.  I suppose, yeah.
8        Q.  Okay.  And then -- so in the
9    introduction -- and I'm going to skip the first
10   sentence and go to the next sentence that begins
11   with "Manufacturers."
12           It says, "Manufacturers, distributors,
13   pharmacies, and healthcare practitioners share a
14   mission and responsibility to continuously
15   monitor, protect, and enhance the safety and
16   security of this system to combat the increasing
17   sophisticated criminals who attempt to breach the
18   security of the legitimate supply chain."
19           And I'm sure PSI would agree that that
20   is the goal of the industry.
21       MR. RICARD:  Object to form.
22       A.  Yes.
23       Q.  All right.  If you go down to the third
24   paragraph on the page.  It says, "At the center of

Page 137

1    a sophisticated supply chain, distributors are
2    uniquely situated to perform due diligence in
3    order to help support the security of the
4    controlled substances they deliver to their
5    customers."
6            Does Prescription Supply, Inc., agree
7    and accept that responsibility?
8        MR. RICARD:  Object to form.
9        A.  Yes.
10       Q.  And it talks about due diligence.  That
11   would be what we were referring to earlier when we
12   talked about knowing your customers and
13   investigating potential suspicious orders and
14   things of that nature, correct?
15       A.  Yes.
16       Q.  And is that what Prescription Supply
17   does when it's operating in this realm?
18       A.  Yes.
19       Q.  It says, "Due diligence can provide a
20   greater level of assurance that those who purchase
21   controlled substances from distributors intend to
22   dispense them for legally acceptable purposes."
23           And, again, that's part of the goal of
24   having the system in place and doing due

35  (Pages 134 to 137)

Page 138

1  diligence, is to ensure that it's only being used
2  for legitimate means, correct?
3      MR. RICARD: Object to form.
4      A. Yes.
5      Q. "Such due diligence can reduce the
6  possibility that controlled substances within the
7  supply chain will reach locations they are not
8  intended."
9      Does Prescription Supply agree with
10 that, that doing the due diligence can help
11 prevent diversion?
12     A. Yes.
13     MR. RICARD: Object to form.
14     Q. Does Prescription Supply agree with the
15 reverse, that not doing due diligence can
16 potentially lead to diversion?
17     MR. RICARD: Object to form.
18     A. Yeah, I suppose.
19     Q. So, for example, with Prescription
20 Supply, if you had taken -- or Prescription Supply
21 had taken on some of those shady customers that we
22 had talked about who --
23     A. Customers that we didn't take on, yes.
24     Q. You don't want to call them shady. I

Page 139

1  get that. But I've read some of what they've said
2  and didn't say, and clearly they were shady. I'll
3  rephrase it.
4      A. There were reasons why we didn't take
5  them on, yes.
6      Q. I'll rephrase it. If Prescription
7  Supply had taken on those customers they didn't
8  deem desirable for whatever reason, maybe
9  documented in the file, there's a greater chance
10 that diversion would have occurred with those
11 entities?
12     A. Yes.
13     Q. And that's the reason that you declined
14 to accept those new customers?
15     A. Yes.
16     Q. Okay.
17     Go to page 4. "Know Your Customer Due
18 Diligence."
19     And this industry guideline, these safety
20 rules that the HDMA put out, addresses each one of these
21 issues, or at least some of them, that we've talked
22 about, Mr. Schoen, in order. So number I -- or I there
23 at the beginning of the page is "Know Your Customer Due
24 Diligence."

Page 140

1      Do you see that?
2      A. Yes.
3      Q. And under the introduction, it says,
4  "Before opening an account for a new customer, the
5  distributor should (i) obtain background
6  information on the customer and the customer's
7  business; (ii) review that information carefully
8  and, where appropriate, verify the information,
9  and; (iii) independently investigate the potential
10 customer."
11     Would you agree that that is the type of
12 due diligence that needs to be done before opening
13 a new customer account?
14     MR. RICARD: Objection to form.
15     A. Yes.
16     Q. Okay. B on that page deals with
17 information gathering. And we're going to skip
18 sort of down to the bullet points. Do you see
19 "The information gathering step would include"?
20 And it provides a whole laundry list there.
21     Do you see that?
22     A. I see it.
23     Q. Including credit application, background
24 questionnaires, business background, number of

Page 141

1  prescriptions filled each day, so forth and so on.
2      Are those the type of things that
3  Prescription Supply undertakes in reviewing and
4  obtaining prior to opening a new customer account?
5      A. Yes.
6      Q. Is that the type of, to your
7  knowledge -- strike that.
8      Now, let's go to page 7.
9      And, Mr. Schoen, let's talk just a
10 second. So we have this due diligence, know your
11 customer requirement which we've talked about
12 some, and we also have something that's referred
13 to as thresholds.
14     Have you ever heard of the term
15 "threshold" before?
16     A. Yes.
17     Q. So now we're going to talk a little bit
18 about that under this auspice of monitoring for
19 suspicious orders, okay? And it says "Identifying
20 Product and Customer Characteristics."
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Page 142

Page 144

Q.   "Separate the controlled substances, or
CS, the distributor sells into groups or families

Page 143

Page 145

of drugs, i.e., all controlled items containing
codeine.  The following information may be useful
for identifying the families of drugs."
        And then it give us a long laundry list
of ways of characterizing them.
        If you turn to the next page, here's
where it talks about the "Develop Thresholds to
Identify Orders of Interest."
        Do you see that there?
    A.   Yes.
    Q.   And it gives several that could be
considered in developing thresholds.  It says,
"Patterns of ordering, such as comparing the
present order to:  Past orders from the same
consumer."
        Do you see that?
    A.   Yes.
    Q.   "Orders from extraordinary quantities
outside of normal purchasing patterns typically
followed by the customer or the customers within
the same class of trade and geographical areas,"
so forth and so on.
        And then it goes on to say that
"Distributors are also encouraged to consider the

Page 146

1  following when developing thresholds:  Quantities
2  of product the dispenser initially indicated
3  during the 'Know Your Customer Due Diligence'
4  phase that is expected to be purchased -- that it
5  expected to purchase"?
6       A.  Mm-hmm.
7       Q.  "A minimum of six months sales history
8  and a maximum of 24 months sales history are
9  recommended."
10          And when it "sales history," it means
11  from the potential customer, correct?
12       A.  It does.
13       Q.  And you can ask the pharmacies to
14  provide you with their -- I think it's been
15  referred to as different things, but their dosage
16  history --
17       A.  That's correct.
18       Q.  -- or sales history, right?
19       A.  We can and do.
20       Q.  And are the pharmacies -- if they want
21  your business or they want you to sell to them,
22  are they usually willing to provide you with that
23  information?
24       A.  Yes.

Page 147

1       Q.  Now, if they don't, would that send up a
2  red flag?
3       A.  Yes.
4       Q.  And why is that?
5       A.  Well, I mean, if they don't want to tell
6  us what they're going to buy or what their usage
7  is, it -- I mean, I probably wouldn't be doing --
8  well, I probably -- it certainly would send up a
9  red flag.
10       Q.  Okay.  And because it causes you concern
11  because that's part of the due diligence you have
12  to do --
13       A.  That's right.
14       Q.  -- as a distributor to know your
15  customer?
16       A.  That's right.
17       Q.  And without that, you can't complete
18  your tasks, right?
19       A.  That's true.
20       Q.  Sort of like failing to report
21  suspicious orders doesn't give the DEA the
22  information they need to do their job, right?
23       A.  Right.
24          MR. RICARD:  Object to form.

Page 148

1       Q.  And Prescription Supply agrees with
2  these safety guidelines put out by the HDMA --
3       A.  Yes.
4       Q.  -- that this is what should be done?
5          MR. RICARD:  Object to form.
6       A.  Yes.
7       Q.  All right.  We're going to jump to page
8  11.  There's a section there on documentation.
9  Mr. Schoen, Prescription -- PSI would agree that
10  documentation in this area is very important,
11  correct?
12          MR. RICARD:  Object to form.
13       A.  Yes.
14       Q.  Because we need to be able to look back
15  and see and know what has transpired in the course
16  of dealing with customers.  We need to
17  substantiate the Know Your Customer investigation
18  we've done, so forth and so on, correct?
19          MR. RICARD:  Same objection.
20       A.  Yes.
21       Q.  And it says here, "All investigation
22  should be fully documented, and all records of the
23  investigation should be retained in the
24  appropriate location within the firm."

Page 149

1          Within parentheses it says "such as with
2  other records relating to the particular
3  customer."
4          Does Prescription Supply agree with
5  that --
6          MR. RICARD:  Object to form.
7       Q.  -- safety rule as stated by the HDMA?
8       A.  Yes.  We probably haven't always done it
9  properly, but yes.
10       Q.  But that's the best practice; that's the
11  safest practice?
12       A.  That would be the safest practice.
13       Q.  "At a minimum, documentation should
14  include the name, title, and other relevant
15  identification of the representative of the
16  customer contacted, dates of contact, and a full
17  description of the questions asked and requests
18  for information made by the distributor and of
19  information provided by the customer."
20          The document should -- "the
21  documentation should include a clear statement of
22  the final conclusion of the investigation,
23  including why the order investigated was or was
24  not determined to be suspicious."

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1        Do you see that there?
2     A.  Okay.  All right.
3     Q.  And do you agree with that, that is
4  the proper standard to conduct yourself as a
5  registrant?
6        MR. RICARD:  Objection to form.
7     A.  Yes.  But I don't think we've always
8  done it.  We've always asked the questions, but I
9  don't know if we've always appropriately noted
10  them.
11     Q.  Right.  And I've looked at the discovery
12  that has been provided, and we're going to just
13  sort of put out there that 8,000-pound gorilla
14  that may be standing over my shoulder.
15        Prescription Supply did not report any
16  suspicious orders, did they?
17     A.  That's correct.
18     Q.  Okay.  But -- and let's continue with
19  that.  You believe that they did do the best job
20  they could investigating new clients, new
21  customers?
22     A.  Yes.
23     Q.  And as I mentioned to you earlier,
24  there's documentation throughout the files of the

Page 151

1  discovery of Prescription Supply even declining
2  potential customers --
3     A.  Yes.
4     Q.  -- because of we'll call them red flags?
5     A.  Yes.  But I don't know if we actually
6  put down why we declined them.
7     Q.  I will --
8     A.  It became obvious, but ...
9     Q.  Right.  I will represent to you that
10  there were issues of concern in some of the
11  documents I reviewed.
12     A.  Yes.
13     Q.  And it said "Ask Tom."
14     A.  Mm-hmm.
15     Q.  And then there would be a handwritten
16  note that "Tom says tell them no."
17        So I think on some of them, it was
18  abundantly clear what the issues were based on the
19  investigation.
20     A.  I hope so, yes.  But we didn't -- I
21  don't think we put down any specific reason.
22     Q.  And you recognize that you probably
23  should have?
24     A.  It was abundantly clear that there were

Page 152

1  questions.  I was not in a position to say there
2  was something wrong with this customer.  I just
3  didn't want to do business with them because I was
4  concerned.
5     Q.  Right.  Of potential issues dealing with
6  controlled substances?
7     A.  Potential issues.
8     Q.  With controlled substances, correct?
9     A.  Among other things, yeah.
10     Q.  Sure.
11        Now, we're not going to spend the rest
12  of the time going over all the -- I don't know how
13  many pages are in this document total, 15 -- 14,
14  15.  But Prescription Supply would agree, would it
15  not, with the HDMA safety rules that were
16  previously provided to it?
17     A.  Yes.
18        MR. RICARD:  Object to form.
19        MR. FULLER:  So next is going to be 404.
20  BY MR. FULLER:
21     Q.  So next, Mr. Schoen, I think we're going
22  to go to something that you probably have seen
23  before, some of your policies and procedures that
24  you guys had at PSI.

Page 153

1              - - -
2        (PSI-Schoen Exhibit 19 marked.)
3              - - -
4     Q.  And I'll be honest with you.  Some of
5  them I completely understood and got it.  Some I
6  didn't.  And there's some issues that I want to
7  hit real briefly and go over with you.
8        So what has been marked for -- or I
9  guess attached as Plaintiff's Exhibit 19, which
10  you have there, is a Prescription Supply, Inc.,
11  document; is that right?
12     A.  It is.
13     Q.  Okay.  And I think this is the first one
14  where we have a Bates number for this case, which
15  is PSI0000648, and is this document named
16  "Inventory Controls."
17     A.  Yes.
18     Q.  Okay.  And this is one of your policies
19  and procedures at Prescription Supply; is that
20  correct?
21     A.  It is.
22     Q.  Okay.  Now, it has an effective date of
23  what?
24     A.  7/30/09 apparently.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    Q.  No.  Look right above that.
2    A.  I'm sorry.  I keep reading it back.
3    Well, from 12/08 to --
4    Q.  Look a little bit above that.
5    A.  Oh, I see.  June 2000.  Okay.
6    Q.  I'm telling you, use the screen as kind
7    of like your little cheat sheet.  That's exactly
8    where I'm at.
9        So this document at least indicates that
10   it was effective as of June of 2000, correct?
11   A.  Well, it's been revised, yes.
12   Q.  And it's been revised, and we have the
13   revision dates there?
14   A.  Yes.
15   Q.  And do you believe those to be accurate?
16   A.  Yes.
17   Q.  To the best of your knowledge?
18   A.  Yes.
19   Q.  Do you believe this to be an accurate
20   copy of a document that's kept in the normal
21   course of business for Prescription Supply?
22   A.  Yes.
23   Q.  Okay.  And I'll tell you, I'm going to
24   sort of go through that with each document, and

Page 156

1    same last name as your sister, I'm assuming she is
2    related.
3    A.  Her daughter, yes.
4    Q.  Okay.
5    A.  She's my niece.
6    Q.  Got it.  Got it.
7    A.  There's a lot of family in the business.
8    Q.  I saw the org chart.  I agree with you.
9    A.  Yes, and a lot that you don't even
10   recognize.
11   Q.  Probably so.  Probably so.  It's truly a
12   family business.  No, I get that.
13   A.  Yes.
14   Q.  Is Candy still employed with the
15   company?
16   A.  She is.
17   Q.  Okay.  Great.  And she would probably be
18   the best one to check with; is that right?
19   A.  Yes.



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 162

Page 164

Page 163

2    Q.   Okay.  Now, let's break that down before
3  we move on.
4    A.   Okay.
5    Q.   The suspicious order requirement under
6  the C.F.R., the Code of Federal Regulation, does
7  not require you to have shipped it before you
8  reported it, right?
9       MR. RICARD:  Object to form.
10    A.   In fact, I believe you're not supposed
11  to ship it.

19    Q.   Okay.  Now, let's take that -- let's go
20  another way.  We also looked at the Ohio
21  Administrative Code, and that also requires
22  certain types of orders to be reported; is that
23  right?
24    A.   Yes.



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 174    Page 176



Highly Confidential - Subject to Further Confidentiality Review



Page 178

11    Q.  Take, for example, a new pharmacy -- a
12  pharmacy down the road closed.
13    A.  That's a reason.
14    Q.  That may be a reason?
15    A.  Um-hmm.
16    Q.  You may need to look to see and see who
17  that pharmacy was providing for in servicing and
18  we still need to do our other due diligence and
19  verification, correct?
20    A.  Correct.
21    Q.  You know, maybe increasing thresholds by
22  20, 30 percent because it's St. Patrick's Day may
23  not be such a legitimate reason?
24    A.  That's correct.

Page 179

1    MS. MONAGHAN:  Objection to form.
2  BY MR. FULLER:
3    Q.  I knew they would object.
4    So there are legitimate reasons and
5  illegitimate reasons that people try to seek
6  increases in thresholds, right?
7    A.  Yes.
8    Q.  Now, the obligation on the distributor,
9  the registrant, is to sort out the legitimate from
10  the illegitimate requests doing the due diligence
11  that we talked about; is that fair?
12    A.  That's right.
13    Q.  Okay.  And that's what the regulations
14  and code require, correct?
15    MR. RICARD:  Objection to form.
16    A.  That's correct.
17    Q.  Okay.  Going to page 2 of that policy
18  and procedure.
19    MR. FULLER:  The first paragraph on that
20  page, Gina.
21  BY MR. FULLER:

Page 180

Highly Confidential - Subject to Further Confidentiality Review

Page 182

6     THE WITNESS:  Okay.
7   BY MR. FULLER:
8     Q.  So we talked about this policy a bit.
9   And it talks about reporting suspicious orders.
10     A.  Yes.
11     Q.  And we know Prescription Supply has
12   never reported a suspicious order.  And is it
13   Prescription Supply's position that's because they
14   never got a suspicious order?
15     A.  We certainly never shipped a suspicious
16   order.
17     Q.  Well -- and I understand that.  You've
18   made that abundantly clear.  But my question is a
19   little different.  Is that because Prescription
20   Supply has never received --
21     A.  It depends on how you define a --
22     Q.  Suspicious order?
23     A.  -- suspicious order.  If you define it
24   the way it is in the code, we've received them,

Page 183

1   okay?
2     Q.  Yes, sir.
3     A.  If you define them the way the HDMA --
4   where they say "orders of interest," okay, and you
5   call those orders of interest and not suspicious
6   orders, then yes, we've never reported a
7   suspicious order because we've never gotten one,
8   okay?
9     Q.  That's just because we renamed them,
10   right?
11     A.  That's because we renamed them.  But I'm
12   telling you that, you know, the -- they want to
13   know when we find something that is truly
14   suspicious.  If we find that Joe Smith Pharmacy
15   placed an order on the 27th that would put them
16   over the threshold by a few hundred tablets, the
17   DEA doesn't want to know that.  They don't need to
18   know it because it's not -- they're not going to
19   use that.
20     Q.  And I get what you're saying.  Now,
21   let's back up and digest what you've just given
22   us.
23     PSI agrees that if we're looking at the
24   regs and the statute and the code, that there have

Page 184

1   been suspicious orders which they failed to report
2   in the past, correct?
3     A.  Yes.
4     Q.  Okay.  If we look at HDMA guidelines
5   now -- let's transfer.  They talk about, you're
6   right, orders of interest, right?
7     A.  Mm-hmm.
8     Q.  Is that a yes?
9     A.  Yes.
10     Q.  Orders of interest are nowhere mentioned
11   in our regulatory requirements, are they?
12     A.  That's correct.
13     Q.  Basically what HDMA has done is tried to
14   reclassify or rename suspicious orders as orders
15   of interest?
16     MR. RICARD:  Object to form.
17     A.  Correct.
18     Q.  Okay.  But just because --
19     A.  They did it.  Okay.  Go ahead.
20     Q.  Right.  If we call a duck a dog, it
21   doesn't change the fact that it's still a duck,
22   right?
23     MR. RICARD:  Object to form.
24     A.  Correct.

Page 185

1     Q.  Okay.  Let's go back to thresholds for a
2   moment.
3     A.  Okay.
4     Q.  Now, we've talked a little bit about how
5   thresholds are set initially.  And I've seen some
6   forms, particularly with that Board of Pharmacy
7   investigation, related to threshold changes or
8   change requests.
9     Is it assuming a -- strike that.
10     When we know our customer, we should be
11   able to set a threshold and have that threshold
12   maintained, correct?
13     A.  Yes.
14     Q.  Now, there may be things in the real
15   world and in changes in the business that cause us
16   to have to adjust that threshold, correct?
17     A.  Correct.
18     Q.  But that should be the exception instead
19   of the rule, meaning that we should be able to set
20   a threshold that maintains over a period of time?
21     A.  Mm-hmm.
22     Q.  We shouldn't see two, three, five, six,
23   seven threshold changes within one month?
24     MR. RICARD:  Object to form.

47  (Pages 182 to 185)

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    A.  For one pharmacy?
2    Q.  For one pharmacy.  Correct?
3    A.  I would think not.
4    Q.  Because then either -- something is
5  wrong.  Either we didn't set our threshold right
6  at the very beginning, or maybe there's a red flag
7  or something going on, correct?
8         MR. RICARD:  Object to form.
9    A.  Mm-hmm.
10   Q.  Do you agree?
11   A.  Yes.
12   Q.  Okay.  And --
13
14
15
16
17
18
19
20
21
22
23
24

Page 188

1    A.  It is.
2    Q.  All right.  We've been going --
3    A.  And the same thing applies --
4         MR. RICARD:  There's --
5         THE WITNESS:  Okay.
6         MR. RICARD:  -- no question --
7         MR. FULLER:  We've been going another
8  hour.  Let's take a break.
9         MR. RICARD:  Sure.
10        THE VIDEOGRAPHER:  The time is now 2:02.
11  We're going off the record.
12        (Recess taken.)
13        THE VIDEOGRAPHER:  The time is now 2:19.
14  Back on the record.
15  BY MR. FULLER:
16
17
18
19
20
21
22
23
24

Page 189

1         MR. RICARD:  Wait for a question, Tom.
2         THE WITNESS:  Okay.
3  BY MR. FULLER:
4    Q.  Well, I think you were trying to
5  clarify, because I think you said earlier that you
6  didn't use a multiplier anymore, but you think you
7  might?
8    A.  I don't know.
9    Q.  Okay.  Who would know that?
10   A.  The IT people.
11   Q.  Kirk?
12   A.  Kirk.
13        MR. FULLER:  So we're going to mark for
14  identification purposes Exhibits 21 and 22 [sic].
15        Gina, it's 407 and 408.
16        MS. VELDMAN:  What was the number?
17        MR. FULLER:  407 and 408.
18        And for the record, it's PSI0000280 and
19  PSI0000274.
20        MS. VELDMAN:  Are you going to do one at
21  a time?
22        MR. FULLER:  Oh, no.  We're going to do
23  three at a time.  Are you kidding me?  We're
24  getting done.  No.  I'm kidding.

48  (Pages 186 to 189)

Highly Confidential - Subject to Further Confidentiality Review



Page 190

1        - - -
2      (PSI-Schoen Exhibits 20 and 21 marked.)
3        - - -
4    BY MR. FULLER:
5       Q.  So we have two more exhibits there in
6    front of you, Mr. Schoen.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 192

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

7       Q.  Okay.
8       A.  Yes.
9            MR. FULLER:  Next is 503.
10   BY MR. FULLER:
11      Q.  Mr. Schoen, we're going to look next at
12   the -- yeah, this is going to be Plaintiff's
13   Exhibit Number 22.
14            - - -
15      (PSI-Schoen Exhibit 22 marked.)
16            - - -
17   BY MR. FULLER:
18      Q.  And have you seen --
19            MR. RICARD:  Can I just state for the
20   record that although not marked as confidential,
21   it was our intention to mark these as confidential
22   documents not to be distributed outside the scope
23   of this deposition.
24            MR. FULLER:  And we won't let the

Highly Confidential – Subject to Further Confidentiality Review

| Page 194 | Page 196 |
|---|---|
| 1    witness keep them. I'm kidding. | 1 |
| 2    BY MR. FULLER: | 2 |
| 3         Q.   All right.  Have you seen this document | 3 |
| 4    before? | 4 |
| 5         A.   Well, yes. | 5 |

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 202

Page 204

17    Q.  Okay.  All right.  So --
18        MR. FULLER:  Gina, can you pull up the
19    macro spreadsheet.
20        And, AJ, I need just -- oh, actually, hold on.
21    I think I -- I think we have it in the -- bring me up
22    904.
23        MS. VELDMAN:  Are you talking to me?
24        MR. FULLER:  Yes, ma'am.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1        MS. VELDMAN:  What did you say, 94?
2        MR. FULLER:  904.  And for the record, I
3   don't know that I'm going to use it right now, but
4   I'm going to be using a macro spreadsheet in a
5   bit, and I'll attach the thumb drive as Exhibit
6   23.
7        And, Counsel, here's a copy of that for y'all.
8        - - -
9        (PSI-Schoen Exhibit 23 marked.)
10       - - -
11  BY MR. FULLER:
12      Q.  All right.  So let me tell you what I've
13  been provided and what I've done, is, Mr. Schoen,
14  I've been provided, as I mentioned to you earlier,
15  the transactional data, as well as all the
16  threshold events that your company received from
17  2008 to present, okay?
18       And what I've done and went through is
19  sort of separate them out, because they were all
20  in chronological order.  And as you know from
21  running the business, that's a whole bunch of
22  lines with a whole bunch of different pharmacies
23  with a whole bunch of different drugs.
24

Page 207



Page 208

53  (Pages 206 to 209)

Highly Confidential - Subject to Further Confidentiality Review



Page 210

Page 212

```
22        MR. FULLER:  Okay.  Now, let's go to --
23    we're going to need to go to the macro.
24        And, AJ, help her get to where the -- all the
```

Page 213

```
1    threshold events, and then bring it up for [        ]
2    [        ], please, unless I have it.
3        Actually, 905 I think does it.  Sorry.  I
4    should have known that.
5    BY MR. FULLER:
```

Highly Confidential - Subject to Further Confidentiality Review



Page 214

Page 216

```
18    Q.  Well, and understand, you don't need to
19  write anything down.  I know you were reaching for
20  your pen, but counsel is going to have all this
21  information.  And if he needs anything from me, I
22  can point him to where it was or what we were
23  looking at, and he can get with you, okay?
24    A.  Mm-hmm.  Um --
```

Page 217

```
1     MR. RICARD:  There's no question
2  pending.
3     MR. FULLER:  Go to 506, Gina.
4  BY MR. FULLER:
```

```
21    Q.  Okay.  And I know you want to explain,
22  but I would just suggest listen to your advice of
23  counsel and just answer the questions being asked.
24    MR. FULLER: All right.  506.  And if
```

Highly Confidential - Subject to Further Confidentiality Review



| Page 218 |
| --- |

1  you can blow up this area here (indicating).  This
2  is going to be Plaintiff's Exhibit Number 24.
3          - - -
4          (PSI-Schoen Exhibit 24 marked.)
5          - - -
6  BY MR. FULLER:
7      Q.  Now, Mr. Schoen, I think this was
8  actually an e-mail that was actually sent to you.
9      A.  Mm-hmm.
10      Q.  Is that a yes?
11      A.  Yes.
12          MR. RICARD:  You need to respond out
13  loud.
14
15
16
17
18
19
20
21
22
23
24

| Page 220 |
| --- |

1
2
3
4
5
6
7          MR. FULLER:  All right.  Gina, if you
8  would bring up 905A for me.
9          Here, let me do a couple housekeeping things
10  real quick here.  So I'm going to do 25.  Plaintiff's
11  Exhibit 25 is going to be that spreadsheet that I showed
12  him.
13          MR. RICARD:  You already saw that one.
14          MR. FULLER:  Yeah.  It's just too hard
15  to see on the printout.  Although, we'll have a
16  printout for the record.  Here's a copy of 905A.
17          - - -
18          (PSI-Schoen Exhibits 25 through 27 marked.)
19          - - -
20  BY MR. FULLER:
21
22
23
24

56  (Pages 218 to 221)

Highly Confidential - Subject to Further Confidentiality Review

| Page 222 | Page 224 |
|----------|----------|



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 230

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 232

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13          MR. PELINI:  Mike, I'm real sensitive
14   about the use of the term "old man."
15          MR. FULLER:  Hey, hey, hey.  This isn't
16   a litigation to be in if you don't get your
17   feelings hurt down there.  Toughen up --
18          MR. PELINI:  All right.  I'm sorry.
19          MR. FULLER:  -- Mr. OSU.
20          MR. PELINI:  Now we have a problem.
21          MR. FULLER:  All right.  So this is
22   going to be Plaintiff's Exhibit 28.
23          And that's where I'm going, Gina.
24                  - - -
```

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    (PSI-Schoen Deposition Exhibit 28 marked.)
2                  - - -
3    BY MR. FULLER:
4        Q.  So Plaintiff's Exhibit 28 is a document
5    from the State of Ohio Board of Pharmacy.
6          Do you see that?
7        A.  I see it.
8        Q.  And it's the Summary Suspension/Notice
9    of Opportunity for Hearing, correct?
10       A.  Yes.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 236



Highly Confidential - Subject to Further Confidentiality Review

Page 238

18  MR. FULLER: Fair enough.  We'll take a
19  quick break.
20       THE VIDEOGRAPHER:  The time is now 3:25.
21  Going off the record.
22       (Recess taken.)
23       THE VIDEOGRAPHER:  Okay.  The time is
24  now 3:39.  Back on the record.

Page 239

1  BY MR. FULLER:

Page 240

11       Q.  All right.  I'm going to run us through
12  two more documents real quick, and then we'll turn
13  it over to your counsel in case he has any
14  questions, okay?
15       A.  Mm-hmm.
16            - - -
17       (PSI-Schoen Deposition Exhibit 29 marked.)
18            - - -
19       Q.  This is going to be Plaintiff's Exhibit
20  Number 29.
21       So I don't know if you know, Mr. Schoen,
22  but there is a thing called the Wayback Machine.
23       Have you ever heard of the Wayback
24  Machine?

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1     A.  No.
2     Q.  You can go way, way back.
3     A.  Way, way back.
4     Q.  At least on the Internet, and you can
5  pull up older websites.  What I've done is I've
6  pulled up the HDMA website for this -- you know
7  what?  I think I gave you my copy, guys.
8     A.  Do you want it back?
9     Q.  Yeah.
10        MR. RICARD:  The one with the circles on
11  it?
12        MR. FULLER:  It doesn't matter.  The
13  other one just doesn't have circles.  It will help
14  you get to it faster.
15  BY MR. FULLER:
16     Q.  So the Wayback Machine tells me that
17  from '04 to 2014, if you look at the second page,
18  Christopher Schoen --
19     A.  Has been on the board.
20     Q.  Is one of the board members, Vice
21  President - Sales, Prescription Supply, Inc.
22        And what relation is Christopher to you?
23     A.  Son.
24     Q.  Okay.  Does he still work at the

Page 243

1  business?
2     A.  Yes.
3     Q.  Is he still in sales?
4     A.  Yes.
5     Q.  Is he still a board member of the HDMA?
6     A.  Yes, mm-hmm.
7     Q.  Fair enough.
8     A.  You understand that we have -- all
9  right.
10     Q.  You see, what makes him really nervous
11  is he's not exactly sure what you're fixing to
12  say.  That makes all of us nervous when our
13  clients are going to say something we're not sure
14  what they're going to say.
15        ---
16        (PSI-Schoen Deposition Exhibit 30 marked.)
17        ---
18     Q.  All right.  Plaintiff's Exhibit 30.  So
19  you understand what this is -- because I told you
20  there wouldn't be any more legal documents, but
21  then I took that back, and I said there may be
22  one.  This is my one, okay?
23     A.  Yes.
24     Q.  So what this is, is it relates to the

Page 244

1  Cardinal versus the Department of Justice matter.
2        MR. FULLER:  It is 108.  Oh, excuse me.
3  107.
4  BY MR. FULLER:
5     Q.  This is part of the pleadings from that
6  matter.  And in the legal world, there is issues
7  of significant importance being considered by a
8  court.  Different organizations can ask to file
9  what's called and amicus curiae brief --
10     A.  Okay.
11     Q.  -- meaning of public interest.  And the
12  HDMA, your trade organization, did that on behalf
13  of Cardinal and related to its action involving
14  the DOJ.
15     A.  Okay.
16     Q.  I'll tell you they also did the same
17  related to that Masters Pharmaceuticals case that
18  we looked at at the beginning this morning.  I
19  didn't show you that document, but they did.
20     A.  Okay.
21     Q.  It's a service they provide, or
22  something that they do related to some legal
23  matters.  This is that document, and there's a few
24  sections that I want to show you.  I think I know

Page 245

1  what your answer is going to be, but I want to
2  take care of it for the record, okay?
3        MR. RICARD:  Mike, before you get
4  started, can I just note an objection to the
5  extent you're going to seek a legal conclusion?
6        MR. FULLER:  Sure.  Objection noted for
7  the record.
8  BY MR. FULLER:
9     Q.  And the first part I want to ask you
10  about is on the bottom of page 1 onto page 2.
11  Actually, just the bottom of page 1.
12        MR. FULLER:  Just give me the bottom of
13  page 1, Gina.
14  BY MR. FULLER:
15     Q.  And there it says -- and it's in front
16  of you on the electronic screen, Mr. Schoen.
17        It says, "HDMA's members" -- which
18  Prescription Supply is one of, correct?
19     A.  Correct.
20     Q.  -- "have not only statutory and
21  regulatory responsibilities to detect and prevent
22  diversion of controlled prescription drugs, but
23  undertake such efforts as responsible members of
24  society."

62  (Pages 242 to 245)

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    Does Prescription Supply agree with that
2    statement?
3        MR. RICARD: Objection to form.
4        A.  Yes.
5        Q.  "The public health dangers associated
6    with the diversion and abuse of controlled
7    prescription drugs have been well-recognized over
8    the years by Congress, DEA, HDMA, and its members,
9    and public health authorities."
10       PSI also agrees and accepts that
11   statement, correct?
12       MR. RICARD: Objection to form.
13       A.  Yes.
14       Q.  PSI also agrees that it has not only a
15   regulatory and statutory duty as mentioned there,
16   but also a duty as a good public actor to protect
17   the public from these dangerous controlled
18   substances, correct?
19       MR. RICARD:  Same objection.
20       A.  Yes.
21       Q.  Basically a common law duty, if you
22   will, correct?
23       MR. RICARD:  Same objection.
24       A.  Yes.

Page 247

1        Q.  Okay.  Page 7.  Here the HDMA says, "The
2    societal costs of prescription drugs are" -- it's
3    in front of you on the electric screen, too,
4    Mr. Schoen.
5        A.  Okay.
6        Q.  So the HDMA says the societal costs of
7    prescription drugs are what?
8        A.  Huge.
9        Q.  Huge.  "The development and
10   implementation of practices and procedures to
11   detect and prevent diversion are burdens that HDMA
12   members willingly bear."
13       You agree with that, correct?
14       MR. RICARD:  Objection to form.
15       A.  Yes.
16       Q.  And if members of the HDMA do not
17   develop and implement practices and procedures to
18   detect and prevent diversion, they should be held
19   responsible for their fair share of these huge
20   societal costs, correct?
21       MR. RICARD:  Objection to form.
22       A.  Yes.
23       MR. FULLER:  I don't have anything
24   further.

Page 248

1        THE VIDEOGRAPHER:  The time is now 3:49.
2    Going off the record.
3        (Recess taken.)
4        THE VIDEOGRAPHER:  Okay.  The time is
5    now 3:58.  Back on the record.
6        MR. RICARD:  I do not have any questions
7    for Mr. Schoen.  We would just request that the
8    transcript be marked as highly confidential
9    pursuant to the protective order that governs this
10   case.
11       MR. FULLER:  Why are you all looking at
12   me?  I'm already finished.
13       Does any other defense counsel have any
14   questions?
15       MR. PELINI:  It's out of respect we're
16   looking at you.
17       THE VIDEOGRAPHER:  The time is now 3:58.
18   This concludes the deposition.  Going off the
19   record.
20       (Signature not waived.)
21       - - -
22       Thereupon, at 3:58 p.m., on Wednesday,
23   September 5, 2018, the deposition was concluded.
24       - - -

Page 249

1            CERTIFICATE
2    STATE OF OHIO       :
                             SS:
3    COUNTY OF _____:
4
5        I, THOMAS G. SCHOEN, do hereby certify that I
6    have read the foregoing transcript of my
7    cross-examination given on September 5, 2018; that
8    together with the correction page attached hereto noting
9    changes in form or substance, if any, it is true and
10   correct.
11       _____
             THOMAS G. SCHOEN
12
13       I do hereby certify that the foregoing
14   transcript of the cross-examination of THOMAS G. SCHOEN
15   was submitted to the witness for reading and signing;
16   that after he had stated to the undersigned Notary
17   Public that he had read and examined his
18   cross-examination, he signed the same in my presence on
19   the _____ day of _____, 2018.
20
21       _____
             NOTARY PUBLIC - STATE OF OHIO
22
23   My Commission Expires:
24   _____, _____.

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1          CERTIFICATE
2   STATE OF OHIO        :
                   SS:
3   COUNTY OF FRANKLIN :
4        I, Carol A  Kirk, a Registered Merit Reporter
    and Notary Public in and for the State of Ohio, duly
5   commissioned and qualified, do hereby certify that the
    within-named THOMAS G  SCHOEN was by me first duly sworn
6   to testify to the truth, the whole truth, and nothing
    but the truth in the cause aforesaid; that the
7   deposition then given by him was by me reduced to
    stenotype in the presence of said witness; that the
8   foregoing is a true and correct transcript of the
    deposition so given by him; that the deposition was
9   taken at the time and place in the caption specified and
    was completed without adjournment; and that I am in no
10  way related to or employed by any attorney or party
    hereto or financially interested in the action; and I am
11  not, nor is the court reporting firm with which I am
    affiliated, under a contract as defined in Civil Rule
12  28(D)
13       IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office at Columbus, Ohio on
14  this 10th day of September 2018
15
16
17
18       _____
            CAROL A  KIRK, RMR
19         NOTARY PUBLIC - STATE OF OHIO
20  My Commission Expires:  April 9, 2022
21       - - -
22
23
24

Page 251

1          DEPOSITION ERRATA SHEET
2   I, THOMAS G  SCHOEN, have read the transcript
    of my deposition taken on the 5th day of September 2018,
3   or the same has been read to me   I request that the
    following changes be entered upon the record for the
4   reasons so indicated  I have signed the signature page
    and authorize you to attach the same to the original
5   transcript
6   Page  Line  Correction or Change and Reason Therefor:
7   ___ ____ _____
8   ___ ____ _____
9   ___ ____ _____
10  ___ ____ _____
11  ___ ____ _____
12  ___ ____ _____
13  ___ ____ _____
14  ___ ____ _____
15  ___ ____ _____
16  ___ ____ _____
17  ___ ____ _____
18  ___ ____ _____
19  ___ ____ _____
20  ___ ____ _____
21  ___ ____ _____
22  ___ ____ _____
23  ___ ____ _____
24  Date _____ Signature _____