```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3
      IN RE: NATIONAL         )
 4    PRESCRIPTION            )  MDL No. 2804
      OPIATE LITIGATION       )
 5    _____ )  Case No.
                              )  1:17-MD-2804
 6                            )
      THIS DOCUMENT RELATES )  Hon. Dan A.
 7    TO ALL CASES            )  Polster
 8
                 TUESDAY, APRIL 23, 2019
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10             CONFIDENTIALITY REVIEW
11                     - - -
12             Videotaped deposition of Mark A.
13    Schumacher, M.D., Ph.D., held at the offices of
14    Morgan, Lewis & Bockius LLP, One Market,
15    Spear Street Tower, San Francisco,
16    California, commencing at 9:35 a.m., on the
17    above date, before Carrie A. Campbell,
18    Registered Diplomate Reporter and Certified
19    Realtime Reporter.
20
21
22                     - - -
23
              GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S :
 2
 3       KELLER ROHRBACK LLP
         BY:  DEREK W. LOESER
 4            dloeser@kellerrohrback.com
              ALISON S. GAFFNEY
 5            agaffney@kellerrohrback.com
              DEAN KAWAMOTO
 6            dkawamoto@kellerrohrback.com
         1201 Third Avenue, Suite 3200
 7       Seattle, Washington 98101
         (206) 623-1900
 8
 9
         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
10       BY:  ABBY R. WOLF
              awolf@lchb.com
11       275 Battery Street, 29th Floor
         San Francisco, California  94111
12       (415) 956-1000
         Counsel for Plaintiffs
13
14
15       WILLIAMS & CONNOLLY LLP
         BY:  MATTHEW P. MOONEY
16            mmooney@wc.com
         725 Twelfth Street, N.W.
17       Washington, DC 20005
         (202) 434-5331
18       Counsel for Cardinal Health, Inc.
19
20
         SHOOK, HARDY & BACON, LLP
21       BY:  MICHELLE M. FUJIMOTO
              mfujimoto@shb.com
22       5 Park Plaza, Suite 1600
         Irvine, California  92614
23       (949) 475-1500
         Counsel for McKesson Corporation
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        REED SMITH LLP
          BY:  MICHAEL J. SALIMBENE, PharmD
 2             msalimbene@reedsmith.com
          Three Logan Square
 3        1717 Arch Street, Suite 3100
          Philadelphia, Pennsylvania 19103
 4        (215) 851-8100
          Counsel for AmerisourceBergen
 5

 6

 7        BARTLIT BECK HERMAN PALENCHAR &
          SCOTT LLP
 8        BY:  MATTHEW BREWER
               matthew.brewer@bartlit-beck.com
 9        54 West Hubbard Street, Suite 300
          Chicago, Illinois  60654
10        (312) 494-4400
          Counsel for Walgreens
11

12

13        JONES DAY
          BY:  LAURA JANE DURFEE
14             ldurfee@jonesday.com
          2727 North Harwood Street, Suite 500
15        Dallas, Texas  75201
          (214) 969-5150
16        Counsel for Walmart
17

18

          ROPES & GRAY LLP
19        BY:  WILLIAM DAVISON
               william.davison@ropesgray.com
20        800 Boylston Street
          Boston, Massachusetts 02199-3600
21        (617) 951-7000
          Counsel for Mallinckrodt
22

23

24

25
```

```
 1          ARNOLD & PORTER KAYE SCHOLER LLP
            BY:   AARON H. LEVINE
 2               aaron.levine@arnoldporter.com
            250 West 55th Street
 3          New York, New York  10019
            (212) 836-7568
 4          Counsel for Endo Pharmaceuticals
            Inc., and Endo Health Solutions Inc.
 5

 6

 7          MORGAN, LEWIS & BOCKIUS LLP
            BY:   BRIAN M. ERCOLE
 8               brian.ercole@morganlewis.com
            200 South Biscayne Boulevard, Suite 5300
 9          Miami, Florida  33131-2339
            (305) 415-3000
10          Counsel for Teva Pharmaceuticals
            USA, Inc., Cephalon, Inc., Watson
11          Laboratories, Inc., Actavis LLC,
            Actavis Pharma, Inc., f/k/a Watson
12          Pharma, Inc.

13

14
            MORGAN, LEWIS & BOCKIUS LLP
15          BY:   JOHN P. LAVELLE, JR.
                 john.lavelle@morganlewis.com
16          1701 Market Street
            Philadelphia, Pennsylvania 19103-2921
17          (215) 963-5000
            Counsel for Rite Aid
18

19

20          LOCKE LORD LLP
            BY:   ANNA K. FINGER
21               anna.finger@lockelord.com
                 (VIA TELECONFERENCE)
22          2200 Ross Avenue, Suite 2800
            Dallas, Texas 75201
23          (214) 740-8445
            Counsel for Henry Schein, Inc., and
24          Henry Schein Medical Systems, Inc.

25
```

```
 1        KIRKLAND & ELLIS LLP
          BY:  KARL STAMPFL
 2            karl.stampfl@kirkland.com
          300 North Lasalle
 3        Chicago, Illinois  60654
          (312) 862-2595
 4        Counsel for Allergan Finance, LLC
 5

 6

          O'MELVENY & MYERS LLP
 7        BY:  HOUMAN EHSAN, M.D.
              hehsan@omm.com
 8            DANIEL LEIGH
              dleigh@omm.com
 9        400 South Hope Street, 18th Floor
          Los Angeles, California 90071
10        (213) 430-6326
          Counsel for Janssen
11

12

          DECHERT LLP
13        BY:  JONATHAN S. TAM
              jonathan.tam@dechert.com
14        One Bush Street, Suite 1600
          San Francisco, California  94104
15        (415) 262-4500
          Counsel for Purdue Pharma
16

17

     VIDEOGRAPHER:
18        DAVID KIM,
          Golkow Litigation Services
19
20                      - - -
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      INDEX

 2

 3                                          PAGE

 4    APPEARANCES.................................   2

 5    EXAMINATIONS

 6      BY MR. ERCOLE............................  11

 7      BY MR. MOONEY........................... 182

 8      BY MR. LAVELLE.......................... 199

 9      BY MR. EHSAN............................ 210

10      BY MR. STAMPFL.......................... 282

11      BY MR. DAVISON.......................... 308

12      BY MR. LEVINE........................... 325

13      BY MR. TAM.............................. 354

14

15                    EXHIBITS

16      No.        Description               Page

17    Schumacher 1   Binder of documents brought   14
                     by the witness

18

      Schumacher 2   Curriculum vitae of Mark A.   16
19                   Schumacher, Ph.D., M.D.

20    Schumacher 3   Appendix 2 - T. Schumacher -  67
                     Materials Considered

21

      Schumacher 4   April 15, 2019 letter from    70
22                   Derek W. Loeser to All
                     Defense Counsel with
23                   attachments

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Schumacher 5    "The Prescription Opioid      147
                      Epidemic:  Challenges and
 2                    Opportunities for California
                      Pain Physicians," Schumacher,
 3                    et al.
 4    Schumacher 6    "Title:  Surveying Ohio        175
                      physicians on opiate
 5                    prescribing behaviors,"
                      SUMMIT_000839795 -
 6                    SUMMIT_000839813
 7    Schumacher 7    2005 Duragesic package insert  227
 8    Schumacher 8    "Basic & Clinical              247
                      Pharmacology," Katzung
 9
10       (Exhibits attached to the deposition.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              VIDEOGRAPHER:  We are now on
2       the record.
3              My name is David Kim.  I'm a
4       videographer for Golkow Litigation
5       Services.
6              Today's date is April 23, 2019,
7       and the time is 9:35 a.m.
8              This video deposition is being
9       held in San Francisco, California, in
10      the matter of National Prescription
11      Opiate Litigation, MDL 2804, for the
12      US District Court for the Northern
13      District of Ohio, Eastern Division.
14             The deponent is Mark A.
15      Schumacher.
16             Will counsel please identify
17      themselves for the record.
18             MR. ERCOLE:  Brian Ercole from
19      Morgan Lewis on behalf of the acquired
20      Actavis and Teva defendants.
21             MR. EHSAN:  Houman Ehsan of
22      O'Melveny & Myers on behalf of the
23      Janssen defendants.
24             MR. TAM:  Jonathan Tam from
25      Dechert for Purdue.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. LEVINE:  Aaron Levine from

 2         Arnold & Porter on behalf of Endo and

 3         Par.

 4              MS. DURFEE:  Laura Jane Durfee

 5         from Jones Day on behalf of Walmart.

 6              MR. LAVELLE:  John Lavelle from

 7         Morgan Lewis on behalf of Rite Aid.

 8              MR. SALIMBENE:  Mike Salimbene

 9         from Reed Smith for AmerisourceBergen

10         Drug Corporation.

11              MR. BREWER:  Matt Brewer from

12         Bartlit Beck on behalf of Walgreens.

13              MR. DAVISON:  William Davison

14         from Ropes & Gray on behalf of

15         Mallinckrodt, LLC, and SpecGx, LLC.

16              MR. KAWAMOTO:  Dean Kawamoto,

17         Keller Rohrback, on behalf of

18         plaintiffs.

19              MS. GAFFNEY:  Alison Gaffney,

20         Keller Rohrback, on behalf of the

21         plaintiffs.

22              MR. LOESER:  Derek Loeser from

23         Keller Rohrback on behalf of the

24         plaintiffs.

25              MR. STAMPFL:  Karl Stampfl from
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Kirkland & Ellis on behalf of Allergan

 2            defendants.

 3                 MR. LEIGH:  Daniel Leigh,

 4            O'Melveny & Myers, on behalf of the

 5            Janssen defendants.

 6                 MS. FUJIMOTO:  Michelle

 7            Fujimoto of Shook, Hardy & Bacon on

 8            behalf of McKesson Corporation.

 9                 MR. MOONEY:  Matt Mooney of

10            Williams & Connolly for Cardinal

11            Health.

12                 MR. ERCOLE:  How about the

13            folks on the phone?

14                 MS. FINGER:  Yeah, this is Anna

15            Finger at Locke Lord for the Henry

16            Schein defendants.

17                 MR. ERCOLE:  Anyone else on the

18            phone?

19                 VIDEOGRAPHER:  The court

20            reporter is Carrie Campbell and will

21            now swear in the witness.

22

23             MARK A. SCHUMACHER, M.D., Ph.D.,

24       of lawful age, having been first duly sworn

25       to tell the truth, the whole truth and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    nothing but the truth, deposes and says on

 2    behalf of the Defendants, as follows:

 3

 4                 DIRECT EXAMINATION

 5    QUESTIONS BY MR. ERCOLE:

 6         Q.    Good afternoon, Dr. Schumacher.

 7               You've provided -- you've been

 8    submitted as an expert in this case; is that

 9    correct?

10         A.    That is correct.

11         Q.    Okay.  And are you prepared to

12    give testimony today?

13         A.    I am prepared.

14         Q.    Okay.  And have you had your

15    deposition taken before?

16         A.    I've not in an expert case, no.

17         Q.    Okay.  Have you had it taken

18    before in another type of case?

19         A.    In a -- yes, in a medical

20    malpractice for UCSF.

21         Q.    You were not an expert in that

22    case?

23         A.    No.

24         Q.    Have you had your deposition

25    taken in other situations?
```

```
 1          A.     No.

 2          Q.     So let me just walk through a

 3    couple of rules, if that works for you.

 4                 It's important to verbally

 5    respond to the questions that I ask because

 6    the court reporter needs to take down your

 7    oral testimony.  So head nods or some type of

 8    gesture will not be picked up by the court

 9    reporter.

10                 Do you understand that?

11          A.     Yes, I do.

12          Q.     Okay.  And another sort of rule

13    for the deposition is unless there is --

14    there are many instances where your counsel

15    may object to a question, and even if there

16    is an objection, unless your counsel tells

17    you not to answer -- instructs you not to

18    answer it -- unless you follow that

19    instruction, you'll have to answer the

20    question.

21                 Do you understand that?

22          A.     I understand.

23          Q.     Another important rule is if I

24    ask a question that you do not understand,

25    please let me know, and I'll do my best to
```

Highly Confidential - Subject to Further Confidentiality Review

 1    rephrase it or reask it.  But if I ask a

 2    question and you respond, I'm going to

 3    presume that you understood the content of

 4    the question.

 5              Do you understand that?

 6         A.    I understand your explanation,

 7    yeah.  Thank you.

 8         Q.    Do you understand that you are

 9    under oath and that your testimony has the

10    same force and effect as if you were

11    testifying in court?

12         A.    Yes, I understand that.

13         Q.    Have you taken any medication

14    or anything else that would impact your

15    ability to testify truthfully and accurately

16    here today?

17         A.    No, I have not.

18         Q.    Okay.  Anything that would

19    prevent you from testifying truthfully and

20    accurate here?

21         A.    Not that I'm aware of.

22         Q.    Sir, you have a -- looks like a

23    binder of materials in front of you?

24         A.    That's correct.

25         Q.    Is that correct?

```
 1                    And is that a binder of

 2     materials that you brought into this

 3     deposition?

 4          A.     That's correct.

 5                 MR. ERCOLE:  I'd actually like

 6          to mark that as Exhibit 1 if we can,

 7          and then I'd like to make a copy of

 8          that over the break.

 9                 THE WITNESS:  That's fine.

10                 (Schumacher Exhibit 1 marked

11          for identification.)

12     QUESTIONS BY MR. ERCOLE:

13          Q.     And, sir, I know your counsel

14     just articulated, but I need to ask you:

15     What is Exhibit 1, to the best of your

16     recollection?

17          A.     Sure.  It contains my draft

18     report -- or the expert report.  It also

19     includes exhibits provided by counsel as well

20     as materials considered, and finally a copy

21     of my curriculum vitae.

22          Q.     Okay.

23          A.     I believe -- yeah.

24          Q.     And you referred to a draft

25     report.
```

 1                     What did you mean by that?

 2          A.     I misspoke.  It is my expert

 3    report.

 4          Q.     I believe from the initial set

 5    of questions you have never been deposed as

 6    an expert before; is that correct?

 7          A.     That is correct.

 8          Q.     Have you ever been proffered as

 9    an expert in any case before?

10          A.     What do you mean by that?

11          Q.     Sure.

12                 Have you ever attempted to

13    serve as an expert before in any type of

14    litigation?

15          A.     No.  No.

16          Q.     So it stands to reason you've

17    never given, in any type of litigation, case

18    or proceeding, any type of expert opinion

19    before; is that correct?

20          A.     That is correct.

21                 It's unusual in that -- in that

22    regards, but this is a very important area of

23    concern of mine.

24          Q.     So just to check off the box,

25    you've never given any expert opinion with

Highly Confidential - Subject to Further Confidentiality Review

```
1    respect to pharmaceutical marketing before,

2    correct?

3         A.    That's correct.

4         Q.    Never given any expert opinion

5    with respect to pain management before,

6    correct?

7              MR. LOESER:  Objection to form.

8    QUESTIONS BY MR. ERCOLE:

9         Q.    You can answer the question.

10        A.    I've been asked for my expert

11   opinion about pain management multiple times

12   as part of my role as medical director of

13   pain management at UCSF Medical Center, as

14   well as chief of the division of pain

15   medicine since 2010.

16        Q.    You've never given any type of

17   expert opinion in any type of litigation case

18   with respect to pain management, correct?

19        A.    That is correct.

20        Q.    And you've never given any type

21   of expert opinion in any litigation case

22   concerning addiction, correct?

23        A.    That is correct.

24              (Schumacher Exhibit 2 marked

25        for identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.     Okay.  Let's mark this as

 3    Exhibit 2.

 4              Dr. Schumacher, is that -- make

 5    sure I'm pronouncing it right.

 6         A.     Yes, thank you.  Yes, that is

 7    correct, Schumacher, yes.

 8         Q.     I have -- my last name is

 9    Italian, so people frequently mispronounce

10    it, so I just wanted to make sure I was not

11    doing that with you.

12              Sir, is this a copy of your

13    curriculum vitae, or CV?

14         A.     Yes, it is.

15         Q.     Okay.  And for your

16    undergraduate education, you attended the

17    University of California; is that correct?

18         A.     Yeah, at San Diego.  University

19    of California at San Diego, that's correct.

20         Q.     Let me ask this:  With respect

21    to that CV, is there anything in there that

22    is inaccurate or that at this point in time

23    you need to change?

24              And I'll represent that's the

25    CV that was produced in connection with your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    expert report in this case.
 2         A.     As far as my own personal
 3    knowledge, there's potentially a
 4    typographical error, but content-wise, as far
 5    as I'm aware.
 6         Q.     And for -- and what was your
 7    major as an undergraduate?
 8         A.     Biology with a concentration in
 9    physiology.
10         Q.     You did not major in marketing,
11    correct?
12         A.     That is correct.
13         Q.     And for graduate education,
14    where did you -- where did you go for your
15    graduate education?
16         A.     I first completed a Ph.D. in
17    physiology and pharmacology at the University
18    of California-San Diego.
19         Q.     And you say you first did that.
20                What did you do afterward?
21         A.     Well, I continued and became
22    sort of a combined -- I joined the school of
23    medicine at UC-San Diego and completed my
24    doctorate in medicine after that.
25         Q.     Do you recall when that was?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I believe it's 1990.

 2          Q.      You did not -- you do not have

 3    a Ph.D. in marketing, correct?

 4          A.      That's correct.

 5          Q.      And you do not have a Ph.D. in

 6    economics, correct?

 7          A.      That is correct.

 8          Q.      With respect to -- after you

 9    graduated from medical school, where did you

10    do your residency and postgraduate training?

11          A.      Sure.

12                  And I'm getting over a cold, so

13    sometimes I have to clear my throat here.

14    Excuse me.

15                  I did a one-tier -- pardon me,

16    a one-year internship at Cedar Sinai Medical

17    Center in internal medicine, and that was

18    followed by a residency in anesthesia at

19    University of California-San Francisco.

20          Q.      Any other residency or

21    postgraduate training that you did?

22          A.      I did some additional sort of

23    combined postgraduate fellowship work in

24    mainly research areas in pain throughout, and

25    became a clinical instructor and then
```

```
 1    assistant professor soon after completing my

 2    residency.

 3         Q.      And where did you become a

 4    assistant professor?

 5         A.      That was at the same

 6    institution, the University of California at

 7    San Francisco.

 8         Q.      Do you recall when that was?

 9         A.      Excuse me, just to make sure I

10    don't fumble the numbers.

11               I was -- I became a clinical

12    instructor from 1994 to 1995 and became on

13    faculty as an assistant professor in

14    residence in 1995 forward.

15         Q.      And the residency that you did

16    was in anesthesia; is that correct?

17         A.      Anesthesiology, that's correct.

18         Q.      What did you do -- well, are

19    you still an assistant professor at this

20    point in time?

21         A.      I'm a professor, full

22    professor, and chief of the division of pain

23    medicine at the University of California-San

24    Francisco in the department of anesthesia and

25    perioperative care.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what does perioperative

2    care mean?

3    A.    It entails a range of subareas

4    for anesthesiology that includes pain

5    medicine, critical care, perioperative

6    evaluations that encompass the sort of total

7    care around a patient.

8    Q.    Does perioperative care involve

9    care associated with surgical procedures?

10   A.    That is correct.

11   Q.    And so when you say "total care

12   around a patient," is it fair to say you're

13   talking about total care around a patient

14   immediately before and immediately after a

15   surgery?

16   A.    So the mission of

17   anesthesiology encompasses the management of

18   pain.  Certain departments of anesthesia have

19   descriptions that include and pain

20   management.

21          Our particular department is --

22   was originally just called the department of

23   anesthesia, and then it broadened its title

24   to anesthesia and perioperative care to

25   project a broader term to include the

Highly Confidential - Subject to Further Confidentiality Review

1    responsibilities of anesthesiologists before,

2    during and after their operation.

3         Q.    And with respect to the duties

4    of anesthesiologists after an operation, do

5    anesthesiologists continue to see patients

6    over long term after a particular surgery

7    takes place?

8         A.    Typically an anesthesiologist

9    would have a follow-up visit after their

10   operation while they're still in the

11   hospital.

12        Q.    You said "typically."

13             Is that one -- there's

14   typically a follow-up visit; is that correct?

15        A.    That's the standard of care,

16   that there's a follow-up visit, that's

17   correct.

18        Q.    And do you treat -- strike

19   that.

20             Do you treat chronic pain

21   patients in an outpatient setting?

22        A.    No, I do not; however, I have

23   managed and taken care of patients with

24   chronic pain, or what we call acute on

25   chronic pain, for 20 years on the inpatient

Highly Confidential - Subject to Further Confidentiality Review

1   side within the hospital.

2        Q.    You said -- was it acute

3   chronic pain?  Is that what you --

4        A.    I said chronic pain, and what

5   we term acute on chronic.  That is a patient

6   who has a chronic painful condition who has

7   come into the hospital for some other acute

8   problem.  For example, they may have had --

9   require an operation on their colon or their

10  gallbladder, but they have a chronic painful

11  condition like back pain, for example.

12       Q.    And so just so my notes are

13  clear, you do not treat those patients in an

14  outpatient setting; is that correct?

15       A.    As chief of the division of

16  pain medicine, I oversee all aspects of our

17  division, and I have recruited and have a

18  medical director for outpatient pain

19  management center.

20       Q.    Okay.  So let me -- maybe my

21  question wasn't clear.

22       A.    Sure.

23       Q.    With respect to you, do you

24  treat -- just my notes are clear --

25       A.    Sure.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.        -- you do not treat patients in

 2     an outpatient setting; is that correct?

 3            A.        That's correct.   That's

 4     correct.

 5            Q.        Okay.   Are you board certified

 6     in pain medicine?

 7            A.        No, I am not.

 8            Q.        Are you board certified in

 9     addiction?

10            A.        No, I'm not.

11            Q.        What are you board certified

12     in?

13            A.        In anesthesiology.

14            Q.        With respect to -- you talked

15     about how, for anesthesiologists, the

16     standard of care is after a surgery, there is

17     typically a follow-up visit.

18                      Do you recall that?

19            A.        That's correct.

20            Q.        Okay.   Typically are there

21     multiple follow-up visits?

22            A.        Well, I guess I would want to

23     know what the context of that is; that is,

24     under what circumstance are you describing.

25            Q.        Sure.   I'm just getting a sense
```

```
 1    of with respect to anesthesiologists.

 2         A.      Uh-huh.

 3         Q.      After a surgery takes place,

 4    how long -- and that patient is discharged

 5    from the hospital, how long will an

 6    anesthesiologist typically follow up with or

 7    treat a patient?

 8              MR. LOESER:  Objection.  Form.

 9              THE WITNESS:  Again, the

10         standard for follow-up is that an

11         anesthesiologist, or anesthesia part

12         of the team, sees that patient

13         postoperatively at least once and --

14         yeah.

15    QUESTIONS BY MR. ERCOLE:

16         Q.      So the standard of care then is

17    for the anesthesiology team or doctors to

18    then see a patient at least once after a

19    surgery takes place.

20              Is that what your testimony is?

21         A.      All right.  Based on the

22    context.  If there are other factors

23    involved, the complexity of the case that

24    requires additional follow-up, there could be

25    additional visits by the anesthesiologist.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And would you agree that
 2   anesthesiologists see patients once in the
 3   hospital before discharge?
 4               MR. LOESER:  Objection.  Form.
 5               THE WITNESS:  Physicians that
 6        have been trained as anesthesiologists
 7        have a variety of roles.  If they have
 8        a role that's just assigned to the
 9        operating room, then what we just
10        described is a good depiction.
11             There are other
12        anesthesiologists like myself that
13        participate in pain management care on
14        a consult service, and as
15        anesthesiologists and pain medicine
16        physicians, we see patients daily and
17        follow-up visits as well.
18   QUESTIONS BY MR. ERCOLE:
19          Q.     And that's in a hospital
20   setting, correct?
21          A.     Yeah, in my case it is.
22          Q.     Okay.
23          A.     In other cases, those
24   anesthesiologists that will see patients in
25   the outpatient setting.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Okay.  And with respect to you,

2   have you -- strike that.

3               Do anesthesiologists see

4   patients on monthly bases over periods of

5   years?

6               Is that their responsibility?

7               MR. LOESER:  Objection.  Form.

8               THE WITNESS:  Anesthesiologists

9       that are pain management physicians

10      working in the outpatient clinic do

11      see patients on a regular basis,

12      potentially monthly.

13  QUESTIONS BY MR. ERCOLE:

14      Q.      You do not, correct?

15      A.      That is correct.

16      Q.      Okay.  Do you have any formal

17  education in marketing?

18      A.      My education in marketing

19  represents reading and review of literature

20  that was included in review of the literature

21  for the National Academy of Sciences, the

22  consensus report from that, as well as some

23  materials that were also included and

24  reviewed for this report I prepared.

25      Q.      Anything else?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     No.

2          Q.     So you have no formal training

3    in marketing, correct?

4          A.     That's correct.

5          Q.     Have you ever -- and is it fair

6    to say you don't have any specialized

7    knowledge with respect to sales or marketing

8    analyses generally, correct?

9                 MR. LOESER:  Objection.  Form.

10                THE WITNESS:  Is there another

11         way to ask that question?  I'm not

12         quite sure what the question is.

13   QUESTIONS BY MR. ERCOLE:

14         Q.     Sure.

15                I'm just asking in terms of

16   your -- in terms of your background and

17   specialization here, let me ask this:  When

18   was the national -- what is the National

19   Academy of Sciences consensus report that you

20   referenced?

21         A.     Right.

22                So I was invited to serve as a

23   committee member on an analysis to

24   characterize and provide recommendations to

25   the national opiate epidemic, to serve on the

Highly Confidential - Subject to Further Confidentiality Review

1    National Academy of Sciences Engineering and

2    Medicine.  And this was requested in order to

3    understand -- not so much appoint blame, but

4    to understand, characterize and to provide

5    recommendations.

6              Within that body of work, there

7    was, by the committee, the realization that

8    opiate manufacturing, marketing, was a key

9    cause and driver for increased prescribing

10   opioids and also a key driving force for the

11   opioid epidemic.

12        Q.    And we'll get into those

13   issues, but when was that consensus report

14   published?

15        A.     It was published in, I

16   believe -- let me just double-check, but I

17   believe it's -- just one minute.

18              In 2017.

19        Q.    Okay.  And so before 2017, you

20   had no education or specialized experience

21   with respect to marketing; is that fair to

22   say?

23              MR. LOESER:  Objection.  Form.

24        Mischaracterizes his testimony.

25              THE WITNESS:  I think that --

```
 1          maybe could you say your question one

 2          more time, please --

 3     QUESTIONS BY MR. ERCOLE:

 4          Q.     Sure.

 5          A.     -- because I got a little bit

 6     mixed up with what you're asking.

 7          Q.     No problem.  Let's do it this

 8     way.

 9                 You don't teach courses in

10     marketing, correct?

11          A.     That is correct.

12          Q.     You don't -- you haven't

13     published articles regarding marketing,

14     correct?

15                 MR. LOESER:  Objection.

16          Mischaracterizes his testimony.

17                 THE WITNESS:  Within my

18          publication list, I have no

19          publications in marketing.

20     QUESTIONS BY MR. ERCOLE:

21          Q.     And you have no background --

22     strike that.

23                 You have no degree in anything

24     concerning marketing, correct?

25          A.     That is correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      And you don't hold yourself out

2     as an expert in marketing, do you?

3                  MR. LOESER:  Objection.  Form.

4                  THE WITNESS:  I have not stated

5          I've ever been an expert in marketing.

6     QUESTIONS BY MR. ERCOLE:

7          Q.      Have you ever consulted for a

8     pharmaceutical company?

9          A.      I have, as part of my academic

10    career, had a collaboration with, I

11    believe -- and I'll just double-check

12    possibly two companies.

13         Q.      And as you're double-checking,

14    can you let me know what you're referring to

15    there in your CV?

16         A.      Sure.  Sure.  Just a minute.

17                 And again, I'm not sure it

18    follows the definition that you provided.

19                 I was invited to give a talk at

20    one company called Anesiva some years ago,

21    and on another I gave a talk in Italy, Zambon

22    Pharmaceuticals.

23         Q.      Were you paid to give those

24    talks?

25         A.      No.  No.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I was -- my travel expenses
 2    were reimbursed, as I recall.
 3          Q.     So just so I understand -- let
 4    me ask this:  Other than those talks that
 5    you've given at -- are they -- how would you
 6    define it?
 7                    Were they talks given for the
 8    pharmaceutical companies?
 9          A.     I don't quite understand the
10    meaning of that question.
11          Q.     Yeah.
12                    So what were the talks about?
13          A.     Sure.  Okay.
14                    Well, one had to do with
15    Anesiva.  It related to my research on the
16    capsaicin receptor, which has been a
17    direction of my research.  It's a hot chili
18    pepper receptor that is a potential target
19    for analgesic therapy, for chronic pain
20    therapy.  And it discussed the structure and
21    function of that receptor in the peripheral
22    nervous system.
23                    The other talk, the Zambon
24    talk, was -- followed in a similar light.  It
25    talked about the structure and what we call
```

Highly Confidential - Subject to Further Confidentiality Review

1    splice variants, sort of cousins of this

2    receptor and how there may be some potential

3    for therapeutic development in targeting that

4    receptor.

5         Q.    Any other speeches that you've

6    done or given for pharmaceutical companies?

7         A.    If you take -- just let me just

8    go through them --

9         Q.    Sure.

10        A.    -- to be as accurate as

11   possible.

12             One other thing I came across

13   that may be relevant, in 2010 I was invited

14   to give a talk about unmet needs of analgesia

15   for a venture innovation program as part of

16   UCSF, and that's where a number of, I think,

17   representatives from pharmaceutical companies

18   or startups were present.  That's where I was

19   introduced to a representative from the

20   Zambon, for example.

21             Let me just continue.  I think

22   that's right, yeah.

23        Q.    Have you ever served as a

24   speaker regarding opioids for any

25   pharmaceutical company?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.       No, not that I recall.

 2          Q.       Have you ever received any

 3   grants from pharmaceutical -- strike that.

 4                   Have you ever received a grant

 5   from a pharmaceutical company for a study

 6   that you've done?

 7          A.       Not that I'm aware of, no.

 8          Q.       Best of your recollection, have

 9   you ever received any payments, whether in

10   the form of consulting fees or honorariums or

11   anything, from pharmaceutical companies?

12          A.       Not that I recall.

13          Q.       We talked a little bit about

14   your clinical practice currently.

15                   Well, let me ask this:

16   Currently, what is the name of the hospital

17   where you will see patients?

18          A.       The Moffitt-Long Hospitals at

19   UCSF Medical Center.  I also --

20          Q.       Sorry.  I apologize.  And just

21   tell me to shut up if I'm talking over you,

22   or your counsel can tell me to shut up,

23   that's fine.  I apologize.

24                   MR. LOESER:  Really?  We can do

25          that?
```

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  I also see

2     patients at the Mission Bay Hospital

3     campus.

4   QUESTIONS BY MR. ERCOLE:

5          Q.    So with respect to the

6   Moffitt-Long Hospital, how often do you see

7   patients there?

8          A.    I see chronic pain patients as

9   well as acute on chronic patients

10   approximately two days every week.

11          Q.    And how about with respect to

12   the Mission Long {sic}?

13          A.    It varies based on need.  There

14   I would fill in for patients -- for

15   attendings that may be unable, so that's much

16   less often.  I don't know how to describe

17   that, but that's less common.

18          Q.    Okay.  I mean, would you say

19   once a month maybe?

20          A.    I think that's fair.

21          I also co-round with a

22   pediatric pain team as well, so on average,

23   maybe once a month there.

24          Q.    Have you ever treated chronic

25   pain patients in a outpatient setting?

```
 1                  MR. LOESER:  Objection.  Form.

 2                  THE WITNESS:  So -- although

 3           that's a question you asked before, I

 4           would just amend that in my training

 5           and rotations in the residency program

 6           in anesthesiology, I was a trainee

 7           evaluating and providing treatment

 8           plans in the outpatient setting during

 9           that time.

10     QUESTIONS BY MR. ERCOLE:

11           Q.    And when was that?

12           A.    During my anesthesia residency,

13     which was -- just a minute.

14                  Essentially 1991 through 1994.

15           Q.    And since then, you have not

16     treated any chronic pain patients in an

17     outpatient setting, correct?

18                  MR. LOESER:  Objection.  Form.

19                  THE WITNESS:  Well, I

20           participate at the pain management

21           center on occasion with our

22           multidisciplinary panel reviews of

23           patients, and so I will participate in

24           that regards.  I will sit in with a

25           review of patient cases and provide
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              recommendations when appropriate.
 2      QUESTIONS BY MR. ERCOLE:
 3              Q.      Do you meet with the patients
 4      there?
 5              A.      That is -- is the question do
 6      we meet with the patients while we're
 7      discussing?
 8              Q.      Well, I mean --
 9              A.      Sorry.
10              Q.      Yeah, sure.
11                      My question is a little bit
12      different.
13                      Do you meet with -- strike
14      that.  Let me go back.
15                      How often do you do that?
16                      MR. LOESER:  Objection.  Form.
17                      THE WITNESS:  Right.
18                      On average, probably once a
19          month.  Yeah, that's about right.
20                      And I -- as part of that --
21          sorry, just to -- I'll discuss cases
22          with the chronic pain faculty there or
23          medical director at least once a
24          month, that's correct.
25
```

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. ERCOLE:

2         Q.    And when you say you will --

3    you "review patient cases and discuss with

4    faculty there," do you actually meet with --

5    you, individually, meet with patients in that

6    circumstance?

7         A.    I typically do not meet with

8    the patients myself.

9         Q.    Okay.  Dr. Schumacher, I just

10   want to ask you a couple of questions

11   about -- to understand your expertise here.

12              You are not an expert in

13   economics, correct?

14              MR. LOESER:  Objection.  Form.

15              THE WITNESS:  I have not gained

16        an expertise in economics.

17   QUESTIONS BY MR. ERCOLE:

18        Q.    And you're not a legal expert,

19   correct?

20              MR. LOESER:  Objection.  Form.

21              THE WITNESS:  I have not

22        described myself as a legal expert.

23   QUESTIONS BY MR. ERCOLE:

24        Q.    And you are not an expert in

25   epidemiology; is that fair to say?

```
 1                    MR. LOESER:  Objection.  Form.

 2                    THE WITNESS:  As part of my

 3            role, I've become more familiar with

 4            the results of epidemiologic studies,

 5            especially in preparation for the

 6            National Academy of Sciences' report

 7            as well as preparing reports --

 8            preparing this particular report.

 9     QUESTIONS BY MR. ERCOLE:

10            Q.     Other than --

11            A.     Other than that, I have no

12     additional expertise.

13            Q.     And you're not an expert in

14     mathematics; is that fair to say?

15                    MR. LOESER:  Objection.  Form.

16                    THE WITNESS:  I do not have an

17            advanced degree in mathematics.

18     QUESTIONS BY MR. ERCOLE:

19            Q.     And you wouldn't call yourself

20     an expert in mathematics, correct?

21                    MR. LOESER:  Objection.  Form.

22                    THE WITNESS:  I wouldn't

23            describe myself having expertise in

24            mathematics.

25
```

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.      And you wouldn't describe

 3    yourself as having expertise in statistics;

 4    is that fair to say?

 5              MR. LOESER:  Objection.  Form.

 6              THE WITNESS:  I would describe

 7         myself as having a functional

 8         knowledge of statistics as it relates

 9         to outcomes data, my research

10         programs.

11    QUESTIONS BY MR. ERCOLE:

12         Q.      Do you have any specialized

13    training with respect to regression analyses?

14              MR. LOESER:  Objection.  Form.

15              THE WITNESS:  Upon my graduate

16         work and my -- from medicine to my

17         Ph.D. work to my research, I've

18         been -- it's been necessary to review

19         papers that have used regression

20         analysis in different ways, and so

21         I've done some independent reading in

22         those areas.

23    QUESTIONS BY MR. ERCOLE:

24         Q.      Other than some independent

25    reading, have any expertise with respect to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    regression analyses?

 2              MR. LOESER:  Objection.  Form.

 3              THE WITNESS:  I think that

 4        describes my experience.

 5    QUESTIONS BY MR. ERCOLE:

 6        Q.    Have you ever conducted a

 7    regression analysis?

 8        A.    Ever?

 9        Q.    Yeah.

10        A.    I have conducted a regression

11    analysis as part of my educational process

12    and statistical coursework in the past.

13        Q.    And what is a regression

14    analysis?

15        A.    It's an attempt to make a

16    correlation.

17              So, for example, if you want to

18    make a relationship between like how much you

19    eat and how much you weigh, there's a formula

20    to try to calculate how tightly that

21    relationship is.

22        Q.    Have you conducted any

23    regression analysis with respect to the

24    opinions that you are giving in this case?

25              MR. LOESER:  Object to the
```

1        form, and also note that the topic of

2        regression analysis is far outside the

3        scope of the opinions that

4        Dr. Schumacher is providing.

5                MR. ERCOLE:  Well, fair enough.

6        We may disagree on that, but --

7                THE WITNESS:  I didn't

8        understand your question.

9    QUESTIONS BY MR. ERCOLE:

10       Q.     Sure.  I'll repeat it for you.

11              In connection with the -- I'll

12   repeat it exactly.

13              Have you conducted any

14   regression analyses with respect to the

15   opinions that you're giving in this case?

16              MR. LOESER:  Same objection.

17              THE WITNESS:  I'm aware that

18       there are certain reviews that contain

19       regression analysis, but I have no

20       opinion on the particular details of

21       those regression analyses.

22   QUESTIONS BY MR. ERCOLE:

23       Q.     Fair enough.

24              And let me -- and my question

25   may be even just a little bit easier than

 1    that, too, which is:  Have you, in connection

 2    with any opinions you're giving here today,

 3    run a regression analysis?

 4                    MR. LOESER:  Objection.  Form.

 5                    THE WITNESS:  I have not

 6          personally run a regression analysis

 7          on the information provided as part of

 8          the report.

 9    QUESTIONS BY MR. ERCOLE:

10          Q.     You've referenced the work you

11    did in connection with the committee on pain

12    management and regulatory strategies.

13                    Do you recall that?

14          A.     I am -- I was a member of that

15    committee and also was a coauthor of that

16    report.

17          Q.     What can we come up -- what

18    acronym can we come up so that --

19          A.     How about NASEM?

20          Q.     NASEM?

21          A.     Do you mind?

22          Q.     Okay.

23          A.     N-A-S-E-M, NASEM.

24          Q.     N-A-S-E-M, okay.

25                    So when I refer to the NASEM

Highly Confidential - Subject to Further Confidentiality Review

```
 1    report, I'm going to be referring to that
 2    document, or the NASEM committee, I'll be
 3    referring to that committee.
 4         A.    Perfect.
 5         Q.    Does that work?
 6         A.    That works for me.  Thank you.
 7         Q.    In connection with your work
 8    there, did you run any regression analyses?
 9              MR. LOESER:  Objection.  Form.
10              THE WITNESS:  That -- although
11         I did not myself, I know that other
12         committee members had that expertise
13         and focused on that area.
14    QUESTIONS BY MR. ERCOLE:
15         Q.    You are not giving an opinion
16    one way or the other on the validity of any
17    regression analyses that were run with
18    respect to the NASEM report, are you?
19              MR. LOESER:  Objection to form.
20              THE WITNESS:  My role as a
21         member of that committee included
22         reviewing the results and conclusions
23         of that report and -- yeah.
24              Maybe you should repeat the
25         question again.
```

```
 1      QUESTIONS BY MR. ERCOLE:

 2           Q.     Yeah, sure.

 3           A.     Sorry.  I didn't answer it,

 4      apparently.

 5           Q.     Yeah, no problem.

 6                  So my question is:  Sitting

 7      here today, you're not giving an opinion one

 8      way or the other on the validity of any

 9      regression analyses that were run with

10      respect to the NASEM report, correct?

11                  MR. LOESER:  Objection.  Form.

12                  THE WITNESS:  I'm here to give

13           validity to the conclusions of the

14           NASEM report.

15      QUESTIONS BY MR. ERCOLE:

16           Q.     Right.

17           A.     And if they're based on

18      regression analysis that were provided in

19      reference material in that report, then I

20      would support that conclusion.

21           Q.     Did you independently review

22      any regression analyses that were done in the

23      NASEM report?

24           A.     No, I did not.

25           Q.     And you didn't conduct any of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    those regression analyses, did you?

 2         A.     I did not --

 3                MR. LOESER:  Objection.  Form.

 4                THE WITNESS:  -- conduct.

 5    QUESTIONS BY MR. ERCOLE:

 6         Q.     And there were no regression

 7    analyses in the NASEM report pertaining to

 8    the impact, if any, of pharmaceutical

 9    marketing, were there?

10         A.     That's outside the scope of my

11    opinion.

12         Q.     Sitting here today, you can't

13    recall any regression analyses performed on

14    pharmaceutical marketing in connection with

15    the NASEM report?

16                MR. LOESER:  Counsel, do you

17           want him to review the report and see

18           if there's any opinions on regression

19           in the NASEM report?

20                It's about -- I don't know how

21           many pages.

22                THE WITNESS:  It's hundreds of

23           pages.  I would -- if that's

24           important, then I would take some time

25           to review the report.
```

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.     Okay.  My question is a little

 3    bit different, which is, sitting here today,

 4    do you recall any regression analyses done on

 5    pharmaceutical marketing in connection with

 6    the NASEM report?

 7              MR. LOESER:  Counsel, object to

 8         the form of the question --

 9              MR. ERCOLE:  Sure.

10              MR. LOESER:  -- and again ask

11         if you want him to answer questions

12         about what's in the breadth of the

13         NASEM report, you should put the

14         report in front of you him.

15              MR. ERCOLE:  You can object all

16         you want; I'm going to ask my

17         question.

18              THE WITNESS:  Yeah, that's

19         outside the scope of my opinion.

20    QUESTIONS BY MR. ERCOLE:

21         Q.     So is the answer to that

22    question, sitting here today you can't recall

23    one way or the other whether there was any

24    regression analyses done on pharmaceutical

25    marketing in connection with the NASEM
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    report?
 2               MR. LOESER:  Objection.  Form,
 3         mischaracterizes his testimony, and
 4         again asks him for opinion on the
 5         breadth of a report that's not in
 6         front of him.
 7               THE WITNESS:  That's outside of
 8         my opinion and the scope of my report.
 9    QUESTIONS BY MR. ERCOLE:
10         Q.    You're not giving an opinion on
11    that, correct?
12         A.    That's correct.
13         Q.    Okay.  You are not -- would you
14    agree you're not an expert in local
15    government administration?
16               MR. LOESER:  Objection.  Form.
17               THE WITNESS:  I'll try not to
18         laugh.
19               What do you mean by "local
20         government" structure?
21    QUESTIONS BY MR. ERCOLE:
22         Q.    Sure.
23               Do you believe you're -- well,
24    how about this:  How about local government?
25    Do you believe that you are an expert on the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    topic of how local government operates, for

 2    instance?

 3                    MR. LOESER:  Objection.  Form.

 4                    THE WITNESS:  The scope of my

 5         report did not include investigation

 6         into local government structures, if

 7         that's what you're asking.

 8    QUESTIONS BY MR. ERCOLE:

 9         Q.    Sure.

10               I mean, do you consider

11    yourself an expert on that topic?

12                    MR. LOESER:  Objection.  Form.

13                    Again, we're straying far

14         outside the scope of his opinions.

15                    THE WITNESS:  Yeah, I have no

16         opinion on that.

17    QUESTIONS BY MR. ERCOLE:

18         Q.    Okay.  Have you ever -- do you

19    know what a -- strike that.

20               Have you ever reviewed the

21    complaint that was filed in this case?

22                    MR. LOESER:  Which compliant,

23         Counsel?

24                    THE WITNESS:  I'm not sure I

25         understand the question --
```

1    QUESTIONS BY MR. ERCOLE:

2        Q.      Sure.

3        A.       -- what that means.

4        Q.      Do you know what a complaint is

5    in civil litigation?

6        A.      I have a -- my, perhaps, basic

7    would be that a county entity would form a

8    complaint to some other party because of

9    liability of costs or something like that.

10   That's -- I do not have a detailed

11   understanding.

12       Q.      Do you recall ever reviewing

13   anything in this case or these cases that had

14   the title "complaint" on it with a number of

15   allegations in there?

16       A.      The extent of my review of such

17   materials was to understand what a

18   multidistrict litigation process is to a

19   degree, but I did not spend significant time

20   reviewing those materials.

21       Q.      Okay.  So let me -- my question

22   is just a little bit different, which is,

23   sitting here today, do you recall ever

24   reviewing a document with the title

25   "complaint" on it in this particular case or

Highly Confidential - Subject to Further Confidentiality Review

```
 1    cases?
 2              MR. LOESER:  Objection.  Form.
 3              THE WITNESS:  I may have been
 4         provided with such a document by
 5         counsel, but I don't recall reviewing
 6         it in detail where I can recollect the
 7         details.
 8    QUESTIONS BY MR. ERCOLE:
 9         Q.    Sure.
10              And is it fair to say that all
11    of the documents that you considered in
12    connection with your opinions in this case
13    are documented in the materials that you have
14    as Exhibit 1?
15         A.    If you give me a moment, let me
16    just review.  Thank you.
17              MR. LOESER:  Counsel, we're
18         coming up on an hour, so when it's a
19         good time to take a break, I'd like to
20         do so.  Perhaps when he's finished
21         answering this question.
22              THE WITNESS:  Yeah, well, let
23         me just -- there's -- I have an
24         appendix to a list of -- or sources
25         of -- that were considered, and I just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          want to be as accurate as possible

 2          to...

 3              Thank you.  Yeah, I don't see

 4          anything like that as...

 5     QUESTIONS BY MR. ERCOLE:

 6          Q.     Okay.  So let me --

 7          A.     Sorry, yeah, let's regroup.

 8          Q.     Let me just finish a couple of

 9     questions on this topic and then we'll take a

10     break.

11          A.     What was the question you just

12     asked, please?

13          Q.     Yeah.  So you just -- and let

14     me rephrase.

15              You just referred to Appendix 2

16     of your report, correct?

17          A.     Uh-huh, that's correct.

18          Q.     And that -- what is the title

19     of that appendix?

20          A.     Well, it's supposed to say M.

21     Schumacher.  It says, "T. Schumacher,

22     Materials Considered," yeah.

23          Q.     Okay.  And is that a complete

24     list of the materials that you considered in

25     formulating your opinion in this case?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     As far as I recall, yes.

 2                     MR. LOESER:  Counsel, I think

 3         there also is a supplement which --

 4                     THE WITNESS:  Oh, I'm sorry,

 5         yes.

 6    QUESTIONS BY MR. ERCOLE:

 7              Q.     And we'll show you that.

 8                     Is there a supplement that you

 9    have in front of you in Exhibit 1?

10              A.     Not that I'm aware of.

11              Q.     Okay.

12              A.     It has -- as I mentioned

13    before, has my report and Exhibits A, B and

14    C, the list of materials, Appendix 2, and my

15    CV.

16              Q.     Okay.  I just -- I want to make

17    sure that the record is clear on this.

18                     So your counsel referred to a

19    supplement of materials considered.

20                     Do you recall that?

21              A.     That's correct.

22              Q.     And you're aware that there was

23    a supplement of materials considered that was

24    provided in this case; is that fair to say?

25              A.     That's right, I'm aware of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that.

 2         Q.     Okay.  And between the

 3    supplement that was provided --

 4         A.     Yes.

 5         Q.     -- and what's referred to as

 6    Appendix 2 to your report, which is materials

 7    considered, is that the entire and complete

 8    list of the materials that you considered in

 9    connection with formulating your opinions in

10    this case?

11         A.     Within this binder of

12    Exhibit 1, that's correct.

13         Q.     So let me -- I just want to

14    make sure we're absolutely --

15         A.     Yeah.

16         Q.     -- absolutely clear on this.

17         A.     Yeah.

18         Q.     I'm asking you -- step outside.

19    With respect to your opinions in this case --

20         A.     Yes.

21         Q.     -- the materials that -- is it

22    fair to say the materials you considered in

23    formulating those opinions are listed in

24    exhibit -- or excuse me, Appendix 2 and the

25    supplement to Appendix 2?
```

```
 1          A.      Right.

 2                  As well as, just to be

 3      complete, the references in my report which

 4      are embedded in Appendix 2, correct.

 5          Q.      Fair enough.

 6                  No other documents, correct?

 7          A.      Okay.  Not that I'm aware of.

 8                  MR. ERCOLE:  Okay.  Good time

 9          to take a break.

10                  VIDEOGRAPHER:  Okay.  We are

11          now going off the record, and the time

12          is 10:28 a.m.

13           (Off the record at 10:28 a.m.)

14                  VIDEOGRAPHER:  We are now going

15          back on the record, and the time is

16          10:47 a.m.

17      QUESTIONS BY MR. ERCOLE:

18          Q.      Dr. Schumacher, can you turn to

19      Appendix 2 in your binder of materials?

20                  Actually, so let me take one

21      step back.

22                  Have you, sir, ever -- since

23      becoming an attending and after your, I

24      guess, your residency, have you ever written

25      an outpatient prescription for any pain
```

```
 1    management medicine?

 2              MR. LOESER:  Objection.  Form.

 3              THE WITNESS:  Initially when I

 4         joined the pain management service,

 5         the consult service on the inpatient

 6         side, there were requests to write

 7         prescriptions on occasion for some

 8         patients being discharged, that's

 9         correct.

10    QUESTIONS BY MR. ERCOLE:

11         Q.    So when you say you "joined the

12    pain management service," what are you

13    referring to there?

14         A.    In 1999, that was a clinical

15    consult service called the pain management

16    service.

17         Q.    And how long -- and you said

18    when you joined that service, there were

19    requests to write prescriptions on occasion

20    for some patients being discharged; is that

21    fair to say?

22         A.    That's correct.

23         Q.    And how long did you work in

24    connection with that pain management service?

25         A.    I've been serving on the
```

```
 1     inpatient pain management service for

 2     20 years.

 3            Q.     Okay.  And can you -- do you

 4     have a sense of how many outpatient

 5     prescriptions for pain management that you've

 6     written?

 7                   MR. LOESER:  Objection.  Form.

 8                   THE WITNESS:  The principal

 9            responsibility for writing

10            prescriptions for discharge patients

11            fell to the primary services, as we

12            were a consult service.  So it was

13            infrequent.

14                   So, for example, at that

15            time if -- for -- attending for the

16            week, seven days, it might represent

17            one, you know, or two prescriptions

18            for that week coverage, given that all

19            the standard prescriptions would be

20            written by the admitting service.

21     QUESTIONS BY MR. ERCOLE:

22            Q.     How many weeks, to the best of

23     your recollection, per year were you

24     associated with that service?

25            A.     I've attended on the pain
```

Highly Confidential - Subject to Further Confidentiality Review

1    management service eight days -- at a

2    minimum, eight days a month for the last

3    20 years.  That's a minimum estimate.

4         Q.    And other than in that

5    particular context that you just described

6    with respect to that pain management service,

7    have you written any outpatient prescriptions

8    for pain medicines?

9         A.    I can't recall outside that

10   scope of those patients.

11        Q.    And when was the last time that

12   you wrote an outpatient prescription for a

13   pain medicine?

14        A.    So as part of prescribing

15   practices, as part of the consult service,

16   pardon me, our plan is written out to provide

17   recommendations to the primary service.  So

18   either myself or the residents are not

19   writing the actual prescriptions, but we're

20   providing the recommendations for the primary

21   service in terms of the discharge

22   prescriptions.

23        Q.    So with respect to your work at

24   the pain management service, you haven't

25   actually written those outpatient

Highly Confidential - Subject to Further Confidentiality Review

1      prescriptions; is that fair to say?  Instead

2      you've provided --

3            A.      That is fair to say that I have

4      not physically or electronically, but I have

5      provided the input for the recommendations

6      for other physicians, that's right.

7            Q.      And so just so that my notes

8      are clear, is it fair to say that since

9      you've been an attending doctor and since

10     your residency that you have not physically

11     written any outpatient prescription for pain

12     medicine?

13                  MR. LOESER:  Object to the

14            form.

15                  THE WITNESS:  I would not

16            describe it that way at all.

17                  As I mentioned before, that

18            upon my initial participation on the

19            inpatient pain management service,

20            there were on occasion times to

21            require to write for controlled

22            substances for pain management.

23     QUESTIONS BY MR. ERCOLE:

24            Q.      Those were the infrequent times

25     that you discussed before, right?

1          MR. LOESER:  Objection.  Form.

2          THE WITNESS:  Yeah, I'm not

3     sure we actually quantitated exactly,

4     but as I mentioned before, the best of

5     my recollection, there may be -- while

6     I was on service for that week, the

7     best I can recall, there would be

8     maybe one or two prescriptions

9     written.

10   QUESTIONS BY MR. ERCOLE:

11        Q.    Okay.

12        A.    In that -- in that time.

13        Q.    Sir, do you know who the

14   plaintiffs are in the case or cases where

15   you've been asked to provide an opinion?

16          MR. LOESER:  Objection.  Form.

17          Are you asking for the

18     bellwether plaintiffs or just all the

19     plaintiffs in the case?

20          THE WITNESS:  As part of -- in

21     preparation of my report -- just a

22     minute.  I don't want to be inaccurate

23     here.

24   QUESTIONS BY MR. ERCOLE:

25        Q.    Do you need to look at the

```
 1    report in order to answer the question?

 2         A.    I don't want to miss --

 3    misspeak.

 4               On the bottom of page 6 of my

 5    report, defendants herein -- to defendant

 6    manufacturers branded and generic opioid

 7    products in the action brought by plaintiffs

 8    in Cuyahoga County and Summit County, Purdue

 9    Pharma, Endo, Janssen, Teva, Cephalon,

10    Mallinckrodt, Actavis and Allergan.

11               Those are what I understand are

12    the defendants in this -- for -- in

13    relationship to my report.

14         Q.    And is your understanding --

15    well, let me take one step back.

16               So my question was different

17    than that.

18         A.    Oh, okay.

19         Q.    My question was -- and I'll

20    repeat it.

21               Do you know who the plaintiffs

22    are in the case or cases where you've been

23    asked to provide an opinion?

24               MR. LOESER:  Objection.  Form.

25               THE WITNESS:  Plaintiffs as in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          the counties in Ohio, for example?  Is
 2          that what you're asking?
 3     QUESTIONS BY MR. ERCOLE:
 4          Q.     What is your understanding
 5     of -- do you have any understanding what a
 6     plaintiff is?
 7          A.     My understanding of plaintiffs
 8     are the representatives of the communities or
 9     counties that have been harmed by a
10     particular product or methods.
11          Q.     And do you know who those
12     counties are in Ohio that you referenced?
13          A.     I'm not sure I understand what
14     level of detail you're asking for.
15          Q.     Okay.  I think you referred to
16     counties in Ohio, right?
17                 And I'm asking you:  Do you
18     know on which counties in Ohio you're
19     providing an opinion here today in this case?
20                 MR. LOESER:  And again, I'll
21          ask if you're asking about bellwether
22          plaintiffs, you should do so.  If
23          you're asking about every plaintiff in
24          the case, you might want to make that
25          clear to him.
```

```
 1                  MR. ERCOLE:  Well, I mean, to

 2           be honest with you, I think -- I'm

 3           going to -- I'm going to ask the

 4           question.  You can state your

 5           objection.

 6                  MR. LOESER:  Objection.  Form.

 7                  MR. ERCOLE:  Fair enough.

 8                  THE WITNESS:  My understanding

 9           is that this case is linked to a

10           multidistrict litigation process.  And

11           in particular, this report and this

12           starting process is focused on

13           representatives from this Cuyahoga

14           County and Summit County.

15     QUESTIONS BY MR. ERCOLE:

16           Q.     Have you ever been to Cuyahoga

17     County?

18           A.     No.

19           Q.     Have you ever been to Summit

20     County?

21           A.     No.

22           Q.     Do you know where they're

23     located in Ohio?

24           A.     No.

25           Q.     You referenced before -- I
```

1    think you read from a footnote on the first

2    page of your report with respect to

3    defendants; is that correct?

4        A.    That's correct.

5        Q.    And does your understanding of

6    who the defendants are in this case come from

7    information that counsel provided you?

8        A.    That's correct.

9        Q.    Do you know how many -- well,

10   and you've listed your -- are you aware of

11   whether or not -- whether there are any other

12   defendants in the case or cases where you've

13   been asked to provide that opinion?

14            MR. LOESER:  Objection.  Form.

15            THE WITNESS:  Well, I'm aware

16        that there's potential defendants

17        based on our introductions around this

18        table.

19   QUESTIONS BY MR. ERCOLE:

20       Q.    Other than those introductions,

21   do you have any knowledge of any other

22   defendants in these cases?

23       A.    Again, cursory, that's been in

24   the media, yeah.

25       Q.    So other than cursory, what's

```
 1    been in the media and the introductions

 2    today, do you have any knowledge of any other

 3    defendants that are in these cases?

 4         A.    No, I don't.

 5         Q.    Okay.  And you're not giving an

 6    opinion regarding the conduct of any

 7    distributors of opioid medicines, correct?

 8              MR. LOESER:  Objection.  Form.

 9              THE WITNESS:  Well, my opinion

10         is -- pardon me -- has been focused on

11         the opioid industry.  I don't believe

12         my opinion has excluded others, but I

13         have focused on the opioid industry in

14         the report.

15    QUESTIONS BY MR. ERCOLE:

16         Q.    Okay.  So my question is a

17    little bit different.

18         A.    Okay.  Sorry.

19         Q.    You've defined what you

20    understand to be defendants in your report;

21    is that correct?

22         A.    That's correct.

23         Q.    And those defendants, as you've

24    defined in your report, do not include any

25    distributors; is that fair to say?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      As I understand, I'm not

 2    certain if any of these companies also

 3    distribute medications.  I don't know that

 4    knowledge.

 5          Q.      And as defined in your report,

 6    the defendants do not include any pharmacies;

 7    is that fair to say?

 8          A.      I have no opinion on this, as

 9    that -- it's outside the scope of -- my focus

10    of my report was the determination of whether

11    pharmacies were -- are included.

12          Q.      And fair to say that it's

13    outside the scope of your report as to

14    whether or not any distributors were included

15    as opposed to actual manufacturers of

16    opioids?

17               MR. LOESER:  Objection.  Form.

18               Might be helpful to define

19          distributors.

20               THE WITNESS:  I guess my

21          opinion is limited, not knowing

22          whether a particular defendant or

23          opioid company also controls -- has

24          controlling interest in pharmacies, so

25          that's why I'm having a hard time with
```

1          this.

2     QUESTIONS BY MR. ERCOLE:

3          Q.     Let me take one step back then.

4          A.     Okay.

5          Q.     With respect to your opinion,

6     your opinion -- strike that.

7                 MR. ERCOLE:  Why don't you mark

8          this as Exhibit 3.

9                 (Schumacher Exhibit 3 marked

10         for identification.)

11    QUESTIONS BY MR. ERCOLE:

12         Q.     Sir, this document is -- do you

13    understand this document to be Appendix 2 to

14    your report, which we've --

15         A.     That's correct.

16         Q.     And this is the document that

17    we referred to that includes the materials

18    considered?

19         A.     That's correct.

20         Q.     Okay.  If you turn to page 25

21    of this document.

22                Do you see that?

23         A.     Page 25, that's correct.

24         Q.     It says "Bates-stamped

25    documents"?

```
 1          A.      Yes, that's right.

 2          Q.      Okay.  And it looks like

 3    there's about -- a little over a hundred

 4    documents that are there.

 5                  Do you see that?

 6                  MR. LOESER:  Objection.  Form.

 7    QUESTIONS BY MR. ERCOLE:

 8          Q.      That are listed there?

 9          A.      Oh, wait a minute.  Let's see.

10    Oh, I see.

11                  Are you talking about 301

12    through 416?

13          Q.      Yes.

14          A.      Okay.

15          Q.      Did your counsel provide these

16    documents to you?

17          A.      Yes, they did.

18          Q.      Did you ask to see additional

19    documents?

20                  MR. LOESER:  Objection.  Form.

21                  And we're not going to get into

22          questions and conversations between

23          this witness and counsel.

24                  THE WITNESS:  Counsel provided

25          these documents.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.    Did you have any say in --

 3    strike that.

 4               Is it fair to say that -- let

 5    me ask an additional question.

 6               Do you know whether -- and do

 7    you know what these Bate-stamped documents

 8    refer to?

 9               Are these company-specific

10    documents?

11         A.    It's my understanding that most

12    of these are company-specific documents.

13    They have -- pardon me -- abbreviations that

14    indicate they're related to a particular

15    pharmaceutical company.  That's my

16    understanding.

17         Q.    Do you know why you only

18    reviewed these documents and not other

19    documents?

20               MR. LOESER:  Objection.

21               And again, answer the question,

22         if you can, without divulging any

23         communication between counsel and

24         yourself.

25               THE WITNESS:  Yeah, these are
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           the documents I was provided by

 2           counsel.

 3                   MR. ERCOLE:  Mark this as

 4           Exhibit 4.

 5                   (Schumacher Exhibit 4 marked

 6           for identification.)

 7    QUESTIONS BY MR. ERCOLE:

 8           Q.    And with respect to the

 9    company-specific documents that are reflected

10    in Exhibit 3 from Bates -- the Bates-stamped

11    documents 301 to 416, at least as of the time

12    that you authored your opinion, correct,

13    these were the list of Bates-stamped

14    documents that you reviewed in formulating

15    your opinions in this case, correct?

16                   MR. LOESER:  Objection.  Form.

17                   THE WITNESS:  So you're asking

18           me whether my report as written is

19           solely based on drawing from

20           Appendix 2, without the supplement?

21           Is that the question?

22    QUESTIONS BY MR. ERCOLE:

23           Q.    Yeah.

24                   So if you take a look -- why

25    don't we look at Exhibit 4.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Exhibit 4.  Okay.

 2          Q.      Okay.

 3          A.      Sure.

 4          Q.      And do you see on the first

 5    page it's -- you understand that to be a

 6    letter from your counsel?

 7          A.      Yes, that's correct.

 8          Q.      Okay.  And it identifies

 9    supplemental materials considered.

10                  Do you see that?

11          A.      Yes, I do.  Yes.

12          Q.      And it talks about supplemental

13    materials reviewed after March 25, 2019?

14    Number 1?

15          A.      Yes, I see that.

16          Q.      Okay.

17          A.      Thank you.

18          Q.      And then number 2 lists

19    "Supplemental materials considered,

20    inadvertently omitted from the March 25, 2019

21    list."

22                  Do you see that?

23          A.      Yes, I do.

24          Q.      And March 25, 2019, was the

25    date of your expert report?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     That's correct.

 2          Q.     Okay.

 3          A.     Yeah.

 4          Q.     So and if you look at

 5   Appendix 2 in Exhibit 4, do you see that?

 6          A.     Oh, yes.

 7          Q.     Okay.  And it says,

 8   "Supplemental materials considered,

 9   inadvertently omitted from the March 25, 2019

10   list."

11                 And it's an article, correct?

12          A.     That is correct.

13          Q.     Okay.  There are no

14   Bates-stamped, company-specific documents

15   that are referenced in that appendix,

16   correct?

17                 MR. LOESER:  In Appendix 2?

18   QUESTIONS BY MR. ERCOLE:

19          Q.     In Appendix 2.

20          A.     I see no --

21          Q.     Okay.

22          A.     -- yeah, company-related,

23   Bates-stamped documents, that's correct.

24          Q.     So with --

25                 MR. LOESER:  And, Counsel, just
```

```
 1            for the record, the whole thing is

 2            Appendix 2, including the Bates

 3            stamped.  So if you could just clarify

 4            that you're talking about the --

 5                 MR. ERCOLE:  Yeah, fair enough.

 6   QUESTIONS BY MR. ERCOLE:

 7       Q.    So with respect to documents

 8   that were omitted from your March 25, 2019

 9   list, the only document that is referenced is

10   an article, correct?  No Bates stamp numbers?

11       A.    That's what I understand,

12   that's correct.

13       Q.    Okay.  And so with that as

14   background, let me go back and ask my

15   question.

16            With respect to the opinions

17   you reached in your March 25, 2019 report,

18   those opinions would have been based

19   exclusively, at least with respect to

20   company-specific documents, on the documents

21   that are reflected in Exhibit 3 at numbers

22   301 through 416; is that fair to say?

23                 MR. LOESER:  Objection.  Form.

24                 THE WITNESS:  I would say

25            that's fair to say unless, again,
```

1        there was -- there was something

2        missed.

3               But as I understand this, this

4        was defined as inadvertent versus

5        supplemental, so I believe that's --

6        one second, sorry.

7               As best as I can tell, yes.

8    QUESTIONS BY MR. ERCOLE:

9        Q.    Okay.  And then after you

10   issued your opinion on March 25, 2019, you

11   considered some additional Bates-stamped

12   materials as reflected on page 2 of

13   Exhibit 4; is that correct?

14       A.    Those additional materials were

15   provided by counsel.

16       Q.    Right.

17               And you reviewed them -- it

18   says on the top, "Reviewed after March 25,

19   2019," right?

20       A.    That's correct.

21       Q.    And that would have been after

22   you formulated your opinions in this case,

23   right?

24       A.    Well, I believe that, if I

25   remember correctly, that there is -- although

```
 1    I prepared the report and submitted it, there

 2    is a clause where additional supplemental

 3    information if -- in the meantime, if that

 4    was provided, that would supplement my

 5    opinion.

 6         Q.    And the documents reflected on

 7    page 2 of Exhibit 4 are documents that your

 8    counsel selected and chose for you to review,

 9    correct?

10              MR. LOESER:  Objection.  Form.

11              THE WITNESS:  Are we talking

12         about the inadvertent omission or the

13         supplemental materials considered or

14         both?

15    QUESTIONS BY MR. ERCOLE:

16         Q.    The supplemental materials

17    considered, page 2 of Exhibit 4, those are

18    documents that your counsel selected and

19    chose for you to review, correct?

20              MR. LOESER:  Objection.  Form.

21              THE WITNESS:  To the best of my

22         recollection.

23    QUESTIONS BY MR. ERCOLE:

24         Q.    Okay.  And so,

25    Dr. Schumacher -- and I don't mean this to
```

1    be -- to sound funny, but let me just ask it

2    anyway.

3              You are not giving an opinion

4    in this case about any marketing materials

5    that you haven't reviewed; is that fair to

6    say?

7              MR. LOESER:  Objection to form.

8              THE WITNESS:  My opinion about

9         marketing materials is based on the

10        materials that we just discussed in

11        Appendix 2, I believe, then also

12        examples of which are included in my

13        report.

14   QUESTIONS BY MR. ERCOLE:

15        Q.    Fair enough.

16              And if there are no marketing

17   materials from a particular company in

18   Appendix 2 or that are referenced in your

19   report, then you're not giving an opinion

20   about the marketing of that company; is that

21   fair to say?

22              MR. LOESER:  Objection.  Form.

23              THE WITNESS:  Within the body

24        of my report and in preparation, I

25        reviewed a number of articles that --

```
 1              several that particularly focused on

 2              marketing.  One was authored by

 3              Van Zee, for example.

 4                   And so within those reports,

 5              there was discussion about marketing.

 6              So I would say that inclusive in my

 7              opinion would be articles that were

 8              referenced that would also discuss

 9              marketing and opioids.

10    QUESTIONS BY MR. ERCOLE:

11         Q.    Okay.  My question's a little

12    bit different.

13         A.    Oh, I'm sorry.

14         Q.    I'll ask it, and I'll just

15    try to be --

16         A.    Okay.

17         Q.    -- as simplistic as possible,

18    which is:  You can only give an opinion on

19    marketing materials that you've actually

20    looked at, right?

21              MR. LOESER:  Objection.  Form.

22              THE WITNESS:  Well, I think

23              part of forming an opinion has to do

24              with reviewing the literature of what

25              I would consider other educated
```

Highly Confidential - Subject to Further Confidentiality Review

1           opinions on marketing or the review of

2           the impact of that marketing on the

3           pharmaceutical industry.  And I

4           believe that's what I'm trying to

5           describe as a relationship to the

6           report --

7      QUESTIONS BY MR. ERCOLE:

8           Q.      Okay.

9           A.      -- and marketing.

10          Maybe I made that confusing for

11     you.

12          Q.      No, no, that's fair.  So I'll

13     ask even a more basic question.

14          If there are no -- if there are

15     no marketing documents, no company-specific

16     documents listed in Appendix 2, whether the

17     supplement or the original one from a

18     particular company, that would mean that you

19     never reviewed any of the marketing materials

20     of that company?

21          A.      That's true.

22          Q.      Okay.

23          A.      Yeah.

24          Q.      And so if you -- let me give

25     you an example.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Have you ever heard of the

 2     company Watson Laboratories?

 3          A.    I'm not familiar with that

 4     name.

 5          Q.    Okay.  Are you aware of any

 6     marketing that they've engaged in?

 7              MR. LOESER:  Objection to form.

 8              THE WITNESS:  In the process of

 9          reviewing these many hundreds and

10          hundreds of documents, it's difficult

11          to recall the name of a particular

12          company.

13              As I recall, various

14          pharmaceutical companies named in this

15          had subsidiaries, had other companies

16          or -- which had various names that

17          prepared marketing material on their

18          behalf.  And it's beyond the scope for

19          my opinion or report to remember or

20          recall those without seeing other

21          documents directly.

22     QUESTIONS BY MR. ERCOLE:

23          Q.    So I'll reference to you that

24     there are no documents -- I'll represent

25     there are no documents pertaining to Watson
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     Laboratories that are referenced in
2     Appendix 2 of your -- whether the supplement
3     or the original --
4          A.    I see.
5          Q.    -- of your report.
6                Assuming that that's accurate,
7     fair to say then you're not giving an opinion
8     about the marketing of that particular
9     company, given that you haven't reviewed any
10    of its materials?
11               MR. LOESER:  Objection.  Form,
12          and mischaracterizes his testimony.
13               THE WITNESS:  Relative in
14          preparation for my report, I don't
15          recall reviewing documents specific to
16          Watson Laboratories -- is that what
17          you said? -- or Watson -- what was the
18          name?
19    QUESTIONS BY MR. ERCOLE:
20          Q.    Watson Laboratories.
21          A.    Watson Laboratories.
22          Q.    And are you -- in the list of
23    defendants that you identify, that you've
24    identified here -- and your report -- it's
25    fair to say your report is limited to the
```

```
 1    defendants that are listed in footnote 1 of

 2    your report?

 3              MR. LOESER:  Objection.  Form.

 4              The witness indicated he wasn't

 5         familiar with subsidiaries of various

 6         of these companies.

 7              THE WITNESS:  My opinion on the

 8         report is focused broadly on the

 9         opioid pharmaceutical industry.  Based

10         on evidence provided by counsel,

11         there's been a focus on particular

12         defendants that were listed in

13         footnote 1.

14    QUESTIONS BY MR. ERCOLE:

15         Q.    And one of those defendants is

16    Cephalon; do you recall that?

17         A.    That's correct.

18         Q.    I'll represent to you there are

19    no marketing documents listed on your

20    appendix pertaining to Cephalon.

21              MR. LOESER:  Objection to form.

22         And again, indicating the witness

23         indicated he was not familiar with

24         subsidiaries or affiliates of listed

25         defendants.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. ERCOLE:  You can state your

 2          objection.

 3                    MR. LOESER:  Or you could

 4          clarify --

 5                    MR. ERCOLE:  And there's no

 6          clarification needed.  It says

 7          defendants include Cephalon.

 8   QUESTIONS BY MR. ERCOLE:

 9          Q.    And my question to you is:  Do

10   you know that there are no documents listed

11   in your appendix pertaining to Cephalon?

12                    MR. LOESER:  Objection to form,

13          and again noting the witness has

14          indicated he's not familiar with

15          subsidiaries or affiliates of the

16          listed defendants.

17                    THE WITNESS:  In my preparation

18          of the report and selection of

19          examples for marketing claims that

20          were blatantly false, in my opinion,

21          or misleading, I selected a number of

22          examples to be included.  It was not

23          intended to be an exhaustive list, and

24          it was drawn from the materials that

25          were provided by counsel.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MR. ERCOLE:

 2          Q.    Fair enough.

 3                Are you familiar with any

 4     marketing document pertaining to Cephalon?

 5                MR. LOESER:  Same objection as

 6          I made before, which is that the

 7          witness has indicated his lack of

 8          familiarity with the subsidiaries and

 9          affiliates of the listed defendants.

10                If you want to ask him and

11          clarify the relationship, you might

12          get more information.

13                MR. ERCOLE:  Counsel, you

14          should probably take a look at

15          footnote 1.

16     QUESTIONS BY MR. ERCOLE:

17          Q.    But you can answer the

18     question, sir.

19          A.    Fair enough.

20                I'm not aware of any marketing

21     materials that I reviewed that were available

22     to be reviewed that were the basis of the

23     report.  Again, my intent was to draw

24     examples.

25          Q.    Fair enough.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      I'll also represent to you that
 2      there are no documents referenced in either
 3      your report or appendix pertaining to Teva
 4      Pharmaceuticals.
 5                      MR. LOESER:  Objection.  Form.
 6      QUESTIONS BY MR. ERCOLE:
 7          Q.    So my question to you is:  Are
 8      you familiar with any marketing document
 9      pertaining to Teva USA or Teva?
10                      MR. LOESER:  Objection.  Form.
11                      THE WITNESS:  In the
12              preparation of my report, I did not
13              review any marketing materials from
14              Teva.
15      QUESTIONS BY MR. ERCOLE:
16          Q.    I'll represent to you that with
17      respect to two entities, Actavis Pharma and
18      Actavis, LLC, there are no documents
19      reflected in your appendix that have been
20      produced or come from those companies.
21                      Is it fair to say that you
22      haven't reviewed any of those marketing
23      materials, too?
24                      MR. LOESER:  Objection.  Form.
25                      THE WITNESS:  I just need a
```

Highly Confidential - Subject to Further Confidentiality Review

1           moment to consider that.

2                   Well, within the document

3           page 25 within the appendix, the Bate

4           stamp, I believe, 301, 302, shows

5           Actavis as part of that.

6    QUESTIONS BY MR. ERCOLE:

7           Q.    Do you know whether those

8    documents pertain to Actavis Pharma or

9    Actavis LLC in any way, shape or form?

10                  MR. LOESER:  Objection.  Form.

11                  THE WITNESS:  It's my

12          understanding that that is the acronym

13          for Actavis.

14   QUESTIONS BY MR. ERCOLE:

15          Q.    And I'll represent to you, sir,

16   that those are not documents that either

17   Actavis Pharma or Actavis LLC produced or

18   that relate to them.

19                  So other than those two

20   documents, can you -- sitting here today, can

21   you recall any marketing that you reviewed

22   pertaining to or from Actavis Pharma or

23   Actavis LLC?

24                  MR. LOESER:  Objection.  Form.

25                  I also object to your

 1          representations --

 2                  MR. ERCOLE:  Okay.

 3                  MR. LOESER:  -- with respect to

 4          relationship to subsidiaries which

 5          you're not explaining to the witness.

 6                  THE WITNESS:  Under the review

 7          of so many documents, it's difficult

 8          for me to recall specifically in this

 9          case.

10      QUESTIONS BY MR. ERCOLE:

11          Q.    Do you recall -- did you review

12      any Ohio-specific documents?

13                  MR. LOESER:  Objection.  Form.

14                  THE WITNESS:  Yes.

15                  I remember reviewing

16          Ohio-specific documents, which I

17          believe some of which I included in my

18          report.

19      QUESTIONS BY MR. ERCOLE:

20          Q.    Okay.  Did you review any

21      documents produced by Summit County in this

22      case?

23                  MR. LOESER:  Objection.  Form.

24                  THE WITNESS:  If you'd give me

25          a moment, let me just check one part

```
 1              of my report.  Thank you.

 2                   I can't recall any specific

 3         about Summit County.

 4    QUESTIONS BY MR. ERCOLE:

 5         Q.    Any specific documents produced

 6    by Cuyahoga County that you've reviewed?

 7                   MR. LOESER:  Objection.  Form.

 8                   THE WITNESS:  So can you

 9         describe -- any document?  Anything

10         with Cuyahoga County's name on it?  Is

11         that what you're asking?

12    QUESTIONS BY MR. ERCOLE:

13         Q.    Yeah, how about we'll go from

14    there.  Anything pertaining to Cuyahoga

15    County.

16         A.    I can't recall.

17         Q.    Review any deposition testimony

18    that has been taken in this case or any other

19    case?

20         A.    Sorry, that's --

21         Q.    Sure.  Do you --

22         A.    In what context?

23         Q.    Do you know what a deposition

24    is?

25         A.    Yes.  We're in a deposition.
```

```
 1         Q.     Exactly.

 2                So are you aware that -- are

 3    you aware of whether any depositions have

 4    been taken in the MDL cases?

 5         A.     I was informed by counsel that

 6    this may be one of the first depositions as

 7    part of this process.

 8         Q.     So is it your understanding

 9    that this is the first deposition taken in

10    any of the multidistrict litigation cases for

11    any purpose?

12                MR. LOESER:  Objection.  Form.

13                There may be some confusion

14         about whether this type of deposition

15         was the same as the others.

16                THE WITNESS:  Yeah, I was not

17         clear on the order or the relationship

18         of depositions.

19    QUESTIONS BY MR. ERCOLE:

20         Q.     So you don't know one way or

21    the other?

22         A.     That's correct.

23         Q.     Okay.  So fair to say since you

24    don't know, you haven't reviewed any

25    deposition testimony of any of the defendants
```

1    or any of the plaintiffs or anyone else in

2    connection with this case?

3          A.    I can't recall reviewing any

4    deposition.

5          Q.    And if you would -- if you

6    would you have reviewed it, you would have

7    listed it as one of the materials --

8          A.    Yeah, I'm not aware of that.

9          Q.    Did you review any declarations

10   by any of the defendants or plaintiffs or any

11   third parties in this case in formulating

12   your opinions?

13               MR. LOESER:  Objection to form.

14               THE WITNESS:  The only

15         materials relative to the defendants

16         would be a few cursory items I've seen

17         in the press that have been quoted.

18   QUESTIONS BY MR. ERCOLE:

19         Q.    Okay.  Do you know what -- sir,

20   do you know what a declaration is?

21         A.    I'm unfamiliar with a

22   declaration.

23         Q.    So since you don't know what it

24   is, you probably -- it would be unfair to ask

25   whether or not you've reviewed any of those,

1    right?

2                    MR. LOESER:  Objection.  Form.

3                    THE WITNESS:  I don't recall

4         reviewing any declarations.

5    QUESTIONS BY MR. ERCOLE:

6         Q.    Okay.  Have you received any

7    summaries of any analyses or information from

8    counsel that you've relied upon in

9    formulating your reports?

10                   MR. LOESER:  Objection.  Form.

11                   And again, we're -- answer to

12             the extent you can without divulging

13             any actual communications between

14             yourself and counsel.

15                   THE WITNESS:  I drafted the

16             report.  I shared it with counsel, who

17             provided organizational assistance.

18   QUESTIONS BY MR. ERCOLE:

19        Q.    Okay.  So my question is a

20   little bit different, which is:  In terms of

21   formulating your opinions in this case, did

22   you receive any summaries of facts or

23   information from counsel that formed the

24   basis for your opinions in this case?

25                   MR. LOESER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And again, I think we have a --
 2           so everyone understands the protocol,
 3           the witness will not be answering any
 4           questions that require him to divulge
 5           communications with counsel.
 6                    MR. ERCOLE:  Okay.  Well --
 7                    MR. LOESER:  If you're asking
 8           him for facts and opinions he relied
 9           on, those are identified in his
10           report.
11                    MR. ERCOLE:  Well, I'm asking
12           whether he's been provided any
13           summaries that he's -- he's been
14           relied upon by counsel.
15                    MR. LOESER:  And the witness is
16           not going to answer any question about
17           communications with counsel except for
18           those on which he relied in forming
19           his opinions.
20                    MR. LEVINE:  For the record,
21           it's "considered," not "relied upon."
22      QUESTIONS BY MR. ERCOLE:
23           Q.    Yeah.  I mean, that's my
24      question.
25                    Did you receive any summaries
```

Highly Confidential - Subject to Further Confidentiality Review

1    from counsel that you considered or relied

2    upon in formulating your opinions?

3         A.    My report is based on my

4    research built from my career in the area of

5    pain medicine.  It was built from my

6    knowledge of chronic pain and the difficult

7    treatment of chronic pain.

8              It relies on review of

9    literature that form the foundation of the

10   NASEM report, and it is built on the review

11   of the literature that came from establishing

12   this report.

13             Counsel's provided

14   organizational support in this report.

15        Q.    So, sir, do you remember my

16   question?

17        A.    So, no.

18        Q.    Okay.  Dr. Schumacher, you do

19   not practice medicine in Ohio, correct?

20        A.    That is correct.

21        Q.    You're not licensed to practice

22   medicine in Ohio?

23        A.    That's correct.

24        Q.    You don't treat patients in

25   Ohio?

1         A.      Treat patients physically in

2    Ohio?

3         Q.      Sure.

4         A.      I've certainly treated patients

5    from Ohio.

6         Q.      How many patients have you

7    treated from Ohio?

8         A.      It's hard to recall.

9         Q.      Okay.  Have you ever spoken

10   with any -- strike that.

11             Did you speak with any Ohio

12   doctors in any field of medicine for purposes

13   of forming the opinions that you're giving in

14   this case?

15        A.      Not that I'm aware.

16        Q.      Did you ever conduct any survey

17   or study of Ohio doctors for purposes of

18   formulating your opinions in this case?

19             MR. LOESER:  Objection.  Form.

20             THE WITNESS:  I have not

21        personally prepared surveys of -- I'm

22        sorry, I lost the last part of that

23        question.

24   QUESTIONS BY MR. ERCOLE:

25        Q.      Sure, I'll repeat it.

1              Did you ever conduct any survey

2     or study of Ohio doctors for purposes of

3     formulating your opinions in this case?

4          A.     No, I did not.

5              MR. LOESER:  Objection.

6     QUESTIONS BY MR. ERCOLE:

7          Q.     And so you've never spoken with

8     any Ohio doctors to ask them, for instance,

9     why they may have written an opioid

10    prescription for patients; fair to say?

11             MR. LOESER:  Objection.  Form.

12             THE WITNESS:  My exposure to

13         Ohio doctors would be represented by

14         statements they made in the call notes

15         that were part of the report as

16         examples of misstatements from the

17         pharmaceutical sales reps to such

18         doctors.

19    QUESTIONS BY MR. ERCOLE:

20         Q.     And that's the extent of your

21    exposure to Ohio doctors?

22             MR. LOESER:  Objection.  Form.

23             THE WITNESS:  Relative to this

24         report.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.     Sure.

 3                Relative to the opinions --

 4         A.     Yeah.

 5         Q.     -- you're giving in this case,

 6    right?

 7         A.     That's correct.

 8         Q.     Have you conducted any survey

 9    or study of Ohio patients to understand

10    whether they've benefitted from opioids that

11    they've been prescribed?

12                MR. LOESER:  Objection.  Form.

13                THE WITNESS:  Relative to

14         developing my own survey or analysis

15         of opioid use for people in -- taking

16         opioids in Ohio, there may be overlap

17         in some of the reference material that

18         I used that if there were surveys done

19         in those papers, but I've not done

20         myself.

21    QUESTIONS BY MR. ERCOLE:

22         Q.     Are you familiar with any

23    survey that you can -- that you can recall

24    today that evaluates whether patients in Ohio

25    have benefitted from opioids that they've
```

```
 1    been prescribed?

 2              MR. LOESER:  Objection.  Form.

 3              THE WITNESS:  I can't recall.

 4    QUESTIONS BY MR. ERCOLE:

 5         Q.    How about this:  Did you ever

 6    speak with any patient in Ohio who received

 7    an opioid prescription in formulating any of

 8    your opinions in this case?

 9         A.    Not that I'm aware of.

10         Q.    Sitting here today, can you

11    identify any Ohio prescriber who wrote an

12    opioid prescription because of a statement

13    that you contend was false that an opioid

14    manufacturer made?

15         A.    Well, I would refer to some of

16    the exhibits that I put in the report as

17    potential examples where following a

18    misstating -- a misleading statement made by

19    a pharmaceutical representative, that the

20    sales representative then states that they

21    have gotten assurance from that doctor that

22    they would now write for a higher-dose,

23    long-acting opioid, for example.

24              Those are some of the examples

25    that I included in the report.
```

```
1          Q.     So what exhibit are you

2    referring to?

3          A.     If you give me a moment,

4    please.

5          Q.     Actually, for clarity of the

6    record, you are looking in Exhibit 1,

7    correct?

8          A.     Yes, that's correct.

9          Q.     Okay.  And what exhibit in

10   Exhibit 1 are you referring to?

11              Not in the sense of the Bates

12   number, in the sense of the -- if you look at

13   the first page, there should be an exhibit.

14              MR. LOESER:  It's his report.

15              THE WITNESS:  It's within my

16        report, yeah, sorry.

17              So, for example, on page 36 of

18        my report there's a note, July 6, 2000

19        note, from Ohio, quote:  "Spoke with

20        MD who expressed concern re: one

21        patient receiving 120 milligrams every

22        12 hours for back pain.  Discussed

23        with the provider that there was no

24        ceiling dose with oxy like

25        short-acting.  He seemed to think that
```

Highly Confidential - Subject to Further Confidentiality Review

 1          this patient was abusing the product.

 2          He needs reaffirmation."

 3                  And thus the sales rep said

 4          then:  "The decreased ability of oxy

 5          to be abused in decreasing number of

 6          tablets."

 7                  And again, that was a call note

 8          from a Purdue sales representative in

 9          Ohio.

10                  Another that says:  "Doc said

11          he had been using oxy for a while and

12          that he uses high doses.  I reminded

13          the doc there's no ceiling and that he

14          should not worry about how high he

15          needs to go."

16     QUESTIONS BY MR. ERCOLE:

17          Q.     Do you know --

18          A.     So those are what I have used

19     as examples in this report and -- reports

20     that suggest that these representatives were

21     influencing physician practices even in the

22     face of concerns that they showed.

23          Q.     Right.

24                  And so you're using the word

25     "suggest," right?

Highly Confidential - Subject to Further Confidentiality Review

```
1                 You never spoke with those two

2    doctors, correct?

3         A.    No, I did not talk to those two

4    doctors.

5         Q.    And do you know whether those

6    two doctors ended up writing prescriptions

7    after those -- let me just finish.

8                 Do you know -- and I'll do -- I

9    don't mean to cut you off.  I'll try to do

10   the same.  So again, if I'm talking --

11        A.    Sorry, I didn't mean to

12   interrupt you.

13        Q.    Not at all.

14                Do you know whether those two

15   doctors that are sort of, I guess, implicitly

16   referenced in the call notes you actually

17   identified wrote any prescriptions after that

18   particular interaction?

19        A.    I do not have that evidence.

20        Q.    And do you know whether or not

21   any of those doctors were actually influenced

22   by those interactions to write any opioid

23   prescriptions?

24                MR. LOESER:  Objection.  Form.

25                THE WITNESS:  Well, that being
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          one example, there are other examples
 2          of these call notes that I reviewed
 3          that stated, based on the report of
 4          the sales representative, that
 5          physicians at that moment told the rep
 6          that they were now going to be writing
 7          prescriptions at either higher doses
 8          or switching from combined forms of
 9          opioids to the sustained forms of, for
10          example, OxyContin.
11   QUESTIONS BY MR. ERCOLE:
12          Q.     And do you know whether or not
13   any of those physicians actually did write
14   prescriptions --
15          MR. LOESER:  Objection.  Form.
16   QUESTIONS BY MR. ERCOLE:
17          Q.     -- after those interactions you
18   just identified?
19          MR. LOESER:  Objection.  Form.
20          THE WITNESS:  Although I do not
21          have evidence that those specific
22          physicians wrote, based on my review
23          of the literature and the presence of
24          the opioid epidemic, it's been
25          concluded that this has been one of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          the driving forces behind

 2          overprescription of potent, high-dose

 3          opioids.

 4   QUESTIONS BY MR. ERCOLE:

 5          Q.    Okay.  And when you refer to

 6   other call notes, what are you referring to?

 7              Is there a list of those call

 8   notes?

 9          A.    Just hang in there one minute.

10              So in Exhibit B, that's

11   within -- that's been submitted.  For

12   example, on Exhibit B, number 5, and I state:

13   "Doctor has a ton of Vico," Vicodin,

14   "patients, a lot of low back pain, leery of

15   Class IIs.  Used product information to sell

16   low abuse, Q12.  And doctor agreed to use for

17   all his low back" -- patients, presumably --

18   "instead of Vicodin.  Keep on this guy.  This

19   is easy money."

20              So there are other examples in

21   Exhibit B.

22          Q.    Right.

23              So Exhibit B, does this reflect

24   the call notes that you've reviewed in this

25   case?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      It's an example of the call

 2    notes.

 3          Q.      Well --

 4          A.      There were thousands and

 5    thousands of call notes that were provided by

 6    counsel.

 7          Q.      Okay.  Well, Exhibit B, at

 8    least, are the call notes that --

 9          A.      Are --

10          Q.      Let me just finish.

11                  Exhibit B reflects the call

12    notes that you've considered in connection

13    with this case; is that correct?

14          A.      That is correct.

15          Q.      Okay.  Sitting here today, can

16    you identify for me any false statements that

17    were made by Cephalon or a Cephalon sales

18    representative to any prescriber in Ohio?

19                  MR. LOESER:  Objection to form.

20                  THE WITNESS:  I'm not aware of

21          any.

22                  MR. LOESER:  Counsel, we've

23          been going about another hour.  So if

24          you finish up this line --

25                  MR. ERCOLE:  Sure.
```

1              MR. LOESER:  And again, we

2          should talk about whether we want to

3          take lunch now or come back and

4          take --

5    QUESTIONS BY MR. ERCOLE:

6          Q.     Okay.  Sitting here today, can

7    you identify for me any false statements that

8    were made by Teva or Teva USA or a Teva USA

9    sales representative to any prescriber in

10   Ohio?

11             MR. LOESER:  Objection.  Form.

12             THE WITNESS:  No, I have no

13         information to support that.

14   QUESTIONS BY MR. ERCOLE:

15         Q.     Sitting here today, can you

16   identify for me any false statements that

17   were made by Watson Laboratories or Watson

18   Laboratories sales representative to any

19   prescriber in Ohio?

20             MR. LOESER:  Objection.  Form.

21             And again, the issue of

22         subsidiaries and whether you want to

23         explain the relationship.

24             THE WITNESS:  I don't know.

25

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. ERCOLE:

2         Q.    Sitting here today, can you

3    identify for me any false statements that

4    were made by Actavis Pharma or any sales

5    representative of Actavis Pharma to any

6    prescriber in Ohio?

7              MR. LOESER:  Objection.  Form.

8              THE WITNESS:  I don't know.

9    QUESTIONS BY MR. ERCOLE:

10        Q.    Sitting here today, can you

11   identify for me any false statements that

12   were made by Actavis LLC or any sales

13   representative of Actavis LLC to any

14   prescriber in Ohio?

15             MR. LOESER:  Objection.  Form.

16             Same objection about

17        subsidiaries and what information you

18        would like the witness to evaluate

19        when answering your questions.

20             THE WITNESS:  I don't know.

21   QUESTIONS BY MR. ERCOLE:

22        Q.    How about sitting here today --

23   putting aside "to prescribers in Ohio."

24             Sitting here today, can you

25   identify any false statement that any of
```

1    those entities I just identified, Cephalon,

2    Watson Labs, Teva USA, Actavis Pharma or

3    Actavis LLC have made in any context?

4                    MR. LOESER:  Objection.  Form.

5                    THE WITNESS:  Given the

6          materials that I've reviewed, I -- and

7          focused on the report, which is not

8          intended to be an exhaustive review of

9          the -- of all manufacturers, I do not

10         have evidence for those listed

11         companies.

12                   MR. LOESER:  Is now a good time

13         for a break?

14                   MR. ERCOLE:  Sure, if you want

15         to take a break.

16                   THE WITNESS:  Yeah, I think

17         that would be good.

18                   MR. LOESER:  And do you want to

19         just break for lunch, or do you want

20         to come back and then go another --

21                   MR. ERCOLE:  How about we go

22         off the record and then talk about

23         that?

24                   VIDEOGRAPHER:  Okay.  We are

25         now going off the record, and the time

```
 1              is 11:46 a.m.

 2               (Off the record at 11:46 a.m.)

 3                    VIDEOGRAPHER:  We are now going

 4              back on the record, and the time is

 5              12:39 p.m.

 6      QUESTIONS BY MR. ERCOLE:

 7              Q.     Good afternoon, Dr. Schumacher.

 8              A.     Good afternoon.

 9              Q.     Sir, have you -- in your

10      capacity as a treating physician, have you

11      ever been visited or detailed by sales

12      representatives from pharmaceutical

13      companies?

14              A.     Yes.

15              Q.     Okay.  And how many -- is that

16      a frequent occurrence?

17              A.      Not recently.  The university

18      had instituted a number of rules that further

19      and further restrict pharmaceutical reps to

20      have direct access to physicians and training

21      physicians.

22              Q.     When were you detailed by

23      pharmaceutical representatives?

24                     Do you have an approximate

25      period of time?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Well, I recall through -- as a
 2   medical student attending lunches that were
 3   sponsored by companies as well as through
 4   internship and residency program.  I think it
 5   seems to taper off around 2000.  Maybe
 6   before.  It's hard to recall.
 7          Q.      Okay.  So and I'm not holding
 8   you to that time period.  But your best
 9   recollection is that after 2000 you did not
10   receive visits as a physician from
11   pharmaceutical representatives?
12          A.      Well, so I guess the question
13   is the context of which type of
14   pharmaceutical representative had I been
15   approached by.
16               I believe beyond that time I
17   specifically was approached by a
18   pharmaceutical representative marketing
19   buprenorphine.
20          Q.      How about since 2000 with
21   respect to have you been visited or detailed
22   by any pharmaceutical representative -- sales
23   representatives concerning opioid medicines
24   other than buprenorphine?
25          A.      I can't recall.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     So before 2000, do you recall

 2    being detailed then by pharmaceutical

 3    representatives concerning opioid medicines?

 4          A.     There was a range of

 5    pharmaceutical representatives, some that

 6    represented like anesthetic-based drugs, for

 7    example, muscle relaxants and things like

 8    that.

 9                 And I just remember, again,

10    some sponsorship talks and things like that.

11    That's -- I don't have a very clear

12    recollection, to be honest.

13          Q.     Okay.  Sitting here today, with

14    respect to any of the visits that you had by

15    pharmaceutical representatives concerning

16    opioid products prior to 2000, can you recall

17    any specific statements that were made by

18    pharmaceutical representatives to you prior

19    to 2000 during those visits?

20                 MR. LOESER:  Objection.  Form.

21                 THE WITNESS:  Not -- I

22          remember -- what I do remember is

23          statements from mentors that were

24          passed along by their recollection or

25          by their experience to me about --
```

Highly Confidential - Subject to Further Confidentiality Review

1          specifically about OxyContin and its

2          safety around older patient

3          populations.

4                  But I don't recall any direct

5          contact with representatives, sales

6          representatives.

7    QUESTIONS BY MR. ERCOLE:

8          Q.      So at least for you

9    specifically, with respect to the instances

10   in which you've been detailed by sales

11   representatives for opioid products, you

12   don't recall any specific instances where

13   someone would have said something that you

14   believed was false or misleading regarding

15   those products; is that fair to say?

16                 MR. LOESER:  Objection to form.

17                 THE WITNESS:  I can't recall.

18   QUESTIONS BY MR. ERCOLE:

19         Q.      Are you -- Dr. Schumacher, are

20   you a member of the American Pain Society?

21         A.      I have been a member of the

22   American Pain Society for a number of years.

23                 I believe their renewal notice

24   is still sitting on my desk, but I think I'm

25   still for this year subscribed.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.      And if you look at page 3 of
 2   your --
 3           A.      Yeah.
 4           Q.      -- résumé?
 5           A.      Yes, that's right.
 6           Q.      It says 2000 to the present?
 7           A.      Yes, that's right.
 8           Q.      And have you given talks at
 9   American Pain Society conferences before?
10           A.      I'd have to look closely.
11                   I know that I presented
12   scientific poster presentations at the
13   meetings.  In terms of the engagement of
14   giving talks, I would have to review my list
15   of talks to not miss something.
16           Q.      Sure.
17           A.      Do you want me to do that?
18           Q.      No, fair enough.  That's your
19   recollection.
20           A.      Okay.
21           Q.      So fair to say that you would
22   not have remained a member of the American
23   Pain Society if you thought that that
24   association was somehow a shill for
25   pharmaceutical manufacturers?
```

```
 1              MR. LOESER:  Objection.  Form.

 2              THE WITNESS:  Yeah, I wouldn't

 3       use those words.

 4              I think that it's important for

 5       anyone in the field of pain to have a

 6       range of resources to look at, both

 7       going to the meetings -- the APS is

 8       known to be a -- kind of a clinically

 9       focused meeting.  And in that regards,

10       it's a venue to present a wide range

11       of approaches to pain management.

12              It's also considered by those

13       that are just in the basic sciences an

14       opportunity for them to come and see

15       what's going on in clinical pain.

16              In terms of what is presented

17       at APS, really each talk or -- you

18       know, really has to stand on its own

19       in terms of its scientific integrity.

20  QUESTIONS BY MR. ERCOLE:

21       Q.     With respect to the American

22  Pain Society, do you think there's been

23  valuable educational materials that have been

24  presented at the conferences where you've

25  participated for the American Pain Society?
```

Case: 1:17-md-02804-DAP Doc #: 1984-11 Filed: 07/24/19 112 of 397. PageID #: 251333


MR. LOESER: Objection. Form.

THE WITNESS: The value of attending American Pain Society meetings is a range. First and foremost is actually the networking that occurs or can occur.

And in particular, the decision to go to a particular meeting typically is driven by a particular speaker that might be present. That influences probably why attending a particular meeting in one year or another.

QUESTIONS BY MR. ERCOLE:

Q. With respect to the instances in which you were detailed by -- strike that. Let me go back.

We talked about instances where prior to 2000 you were detailed by pharmaceutical sales representatives.

Do you recall that?

A. As best I can recall.

Q. Yeah.

Did any of those -- sitting here today, did you ever write an

1    inappropriate or unnecessary prescription as

2    a result of one of those detailing visits?

3                    MR. LOESER:  Objection.  Form.

4                    THE WITNESS:  Right.

5                    The influence of prescribing

6            practices at that time had a lot to do

7            with the mentorship I had received,

8            some of which, I believe, was

9            influenced by marketing, as I

10           mentioned before, especially around

11           the use of the OxyContin and the

12           elderly.

13                   And at that time, if I can try

14           to think back at that moment, the idea

15           of writing prescription for OxyContin

16           for someone that was older seemed like

17           the right thing to do because I was

18           reassured by that information from a

19           mentor at the time.

20                   I can't recall a specific

21           instance where I was detailed and that

22           resulted precisely into a single

23           prescription.

24                   However, I have to say that at

25           that time I was quite aware of the

Highly Confidential - Subject to Further Confidentiality Review

 1          increasing number of patients coming

 2          into the hospital with chronic pain on

 3          these various medications, and as part

 4          of our role was to assess their --

 5          their value for -- of such patients

 6          and potentially to continue them.

 7                So it became obvious that many,

 8          many patients were not -- their pain

 9          was still not well-managed despite

10          that.

11                Those are the -- my

12          recollections at that time.

13   QUESTIONS BY MR. ERCOLE:

14          Q.    Sir, do you agree that chronic

15   pain is a serious medical condition?

16                MR. LOESER:  Objection.  Form.

17                THE WITNESS:  Chronic pain is a

18          complex process and one that is

19          associated with a great deal of

20          disability for the country and serious

21          enough to -- for me to want to pursue

22          a career in this area and identify new

23          mechanisms and new therapeutic targets

24          to relieve pain and suffering.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.    Do you agree that -- I'm going

 3    to ask you a series of questions and hope --

 4         A.    Okay.

 5         Q.    -- hopefully we can reach

 6    agreement on these issues.

 7              Do you agree that every patient

 8    must be treated individually by their

 9    doctors?

10              MR. LOESER:  Objection.  Form.

11              THE WITNESS:  The process of

12         medicine and how we apply our

13         knowledge is -- should be in an

14         evidence-based manner, and having each

15         patient encounter arbitrarily left to

16         a physician's decision, independent of

17         a body of scientific knowledge that

18         supports that practice, I do not

19         believe is correct practice of

20         medicine, per se.

21              And so there are -- the

22         development, especially on population

23         basis, the proper, appropriate way to

24         manage things like chest pain, for

25         instance, or something like that, or
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            diabetes, for example, there tends to
2            be a consensus around these.
3                    And then there's the context of
4            the patient in which the individual
5            physician would then consider those
6            treatment options.
7    QUESTIONS BY MR. ERCOLE:
8            Q.      So with respect to the context
9    of the patient, is it fair to say that the
10   treatment options must be individualized and
11   tailored to the specific patient at issue?
12                   MR. LOESER:  Objection.  Form.
13                   THE WITNESS:  I would say that
14           they need to be individualized based
15           on the evidence of medicine that
16           they're appropriate.
17   QUESTIONS BY MR. ERCOLE:
18           Q.      And would you agree that it's
19   important for physicians to have a variety of
20   treatment options to choose from when they
21   treat a particular medical condition?
22                   MR. LOESER:  Objection.  Form.
23                   THE WITNESS:  Well, depending
24           on the medical condition, there may be
25           very few options or a single option
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              available.

 2                   The presumption is that that

 3              option or options, there is strong

 4              scientific evidence to support them;

 5              in addition, that the risk of harms do

 6              not outweigh the benefits of applying

 7              those particular treatment options.

 8     QUESTIONS BY MR. ERCOLE:

 9         Q.     Sure.

10                   And that risk/benefit analysis

11     needs to be conducted for each particular

12     patient when figuring out what the treatment

13     for that patient should be, correct?

14                   MR. LOESER:  Objection.  Form.

15                   THE WITNESS:  I believe most

16              physicians do not want to harm their

17              patients, and for that reason, most

18              physicians are very cautious in their

19              clinical decisions, especially if

20              they're recommending or initiating

21              therapy that could potentially produce

22              harm.

23     QUESTIONS BY MR. ERCOLE:

24         Q.     So let me reask my question,

25     because I just want to make sure we're still
```

```
 1    on the same --

 2          A.      I'm sorry, I missed that then.

 3          Q.      Sure.

 4                  The risk/benefit analysis you

 5    talked about needs to be conducted for each

 6    particular patient by a prescriber when

 7    figuring out what the proper treatment is for

 8    that particular patient; is that fair to say?

 9                  MR. LOESER:  Objection.  Form.

10                  THE WITNESS:  I would hope that

11          each physician weighs both the risk

12          and benefit in their decision, that's

13          correct.

14    QUESTIONS BY MR. ERCOLE:

15          Q.      And that with respect to that

16    decision, you're referring to the decision to

17    treat a particular patient, correct?

18                  MR. LOESER:  Objection.  Form.

19                  THE WITNESS:  I guess I would

20          need the context of that a little bit

21          to better answer your question.

22    QUESTIONS BY MR. ERCOLE:

23          Q.      I mean, you testified that you

24    would hope that each physician weighs both

25    the risk and benefit in their decision.
```

Highly Confidential - Subject to Further Confidentiality Review

 1                    Do you recall that?  You just

 2     said it.

 3          A.     Right.  And so if we're talking

 4     about analgesic therapy or all therapy.

 5          Q.     Sure.

 6                  How about with respect to

 7     analgesic therapy?

 8          A.     Sure.

 9          Q.     You agree that you would expect

10     the physician to weigh the risk and benefit

11     of prescribing an opioid to a particular

12     patient?

13          A.     Yes.

14          Q.     And would you agree that a

15     medication is appropriately prescribed if the

16     physician writes a prescription after

17     properly weighing its risks and benefits?

18                    MR. LOESER:  Objection to form.

19                    THE WITNESS:  Right.

20                    MR. LOESER:  Speculation.

21                    THE WITNESS:  So, again, it's a

22          bit of a hypothetical.

23                    I think that it, again, depends

24          on the particular clinical situation

25          for that decision.  In some cases

Highly Confidential - Subject to Further Confidentiality Review

```
 1              weighing risk and benefit, again,
 2              needs to have a foundation of the
 3              scientific integrity of those choices.
 4    QUESTIONS BY MR. ERCOLE:
 5         Q.    Would you agree that doctors
 6    are obligated to make an independent medical
 7    determination of whether to prescribe opioids
 8    to patients?
 9              MR. LOESER:  Objection.  Form.
10              THE WITNESS:  It is their job
11              to make medical decisions on behalf of
12              the benefit of the patient.
13    QUESTIONS BY MR. ERCOLE:
14         Q.    And in fact, it's an ethical
15    responsibility, right?
16         A.    And it is an ethical
17    responsibility to make that decision.  It's
18    also an ethical responsibility to not make
19    decisions that would overtly harm a patient
20    or are known to harm a patient.
21         Q.    Would you agree that doctors
22    must be familiar with the labels of the
23    medicines they prescribe before writing a
24    prescription for such medicines?
25              MR. LOESER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  In terms of how
 2          physicians manage their patients and
 3          the information they rely on, most
 4          physicians have been trained and are
 5          able to read into the medications that
 6          they're using.
 7              They also attend continuing
 8          medication -- pardon me, medical
 9          education programs to attempt to stay
10          on top of the new medications that are
11          coming out.
12     QUESTIONS BY MR. ERCOLE:
13          Q.    All right.  So let me just ask
14     my question because I think it was perhaps a
15     little bit more simpler than that.
16              My question was:  Would you
17     agree that doctors must be familiar with the
18     labels of the medicines they prescribe before
19     writing a prescription for those medicines?
20                   MR. LOESER:  Objection.  Form.
21                   THE WITNESS:  I believe they
22          should be familiar with the
23          information that's in that label,
24          that's correct.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.    Fair enough.

 3               And if they're not familiar

 4    with the information in that label, would you

 5    agree that their conduct or behavior falls

 6    below the proper standard of care?

 7               MR. LOESER:  Objection.  Form.

 8               THE WITNESS:  Yeah, my scope of

 9         my opinion is not intended to have an

10         opinion about a particular physician's

11         behavior in this case.

12               It is about whether a certain

13         physician has relied on the scientific

14         evidence in making that decision.

15    QUESTIONS BY MR. ERCOLE:

16         Q.    Okay.  I'm going to -- because

17    I'm -- our deposition here, I mean, I'm going

18    to ask the questions, and I appreciate your

19    response about what your opinion is and

20    isn't.

21               But with respect to this

22    particular question, which is, if a physician

23    writes a prescription for an opioid medicine

24    without being familiar with the information

25    in the label of that medicine, would you
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    agree that that conduct falls below the
2    proper standard of care for a physician?
3              MR. LOESER:  Objection.  Form.
4         It's outside the scope of his opinion,
5         and it's asked and answered.
6              THE WITNESS:  I would say in
7         addition to my prior response that the
8         physician has responsibility to get as
9         much information about that medication
10        as possible that potentially exceeds
11        what is in the label.
12   QUESTIONS BY MR. ERCOLE:
13        Q.    Okay.  Again, with all due
14   respect, sir, I'm not sure you're answering
15   my question, which is, if a doctor is not
16   familiar with the information in the label of
17   a medicine he or she prescribes, would you
18   agree that that conduct, that decision, falls
19   below the standard of care for doctors?
20              MR. LOESER:  Objection.  Form.
21        You're asking a question that's
22        outside the scope of his testimony,
23        and it's asked and answered.
24              THE WITNESS:  Yeah, I have no
25        other comment on that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      QUESTIONS BY MR. ERCOLE:
2           Q.     You can't answer that question?
3           A.     I've answered the question.
4           Q.     Do you know what a box warning
5      is for an opioid medicine?
6           A.     Yes, I do.  Excuse me.
7           Q.     Should doctors be familiar with
8      box warnings before they prescribed -- before
9      they prescribe opioid medicines?
10          A.     Yes, they should.
11          Q.     Would you agree that doctors
12     must be familiar with the approved
13     indications of opioid medicines before they
14     write a prescription?
15              MR. LOESER:  Objection.  Form.
16              THE WITNESS:  I believe
17          physicians should know indicated
18          positions of -- and indications for
19          the medications; however, they should
20          also be up to date at an emerging
21          information about the effects and
22          harms of such medications.
23     QUESTIONS BY MR. ERCOLE:
24          Q.     Would you agree that the risks
25     associated with opioids have been well-known
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    for at least a century?
2                MR. LOESER:  Objection.  Form.
3                THE WITNESS:  Which risk are
4         you -- I'm not supposed the questions,
5         sorry.  I'm unclear about the
6         question.
7    QUESTIONS BY MR. ERCOLE:
8         Q.    Sure.
9               Would you agree that the risk
10   of addiction associated with opioids has been
11   known for at least a century?
12                MR. LOESER:  Objection.  Form.
13                THE WITNESS:  The knowledge of
14        opioid-induced addiction has been
15        known, certainly in this country, for
16        a long time.  Certainly there's
17        examples from the Civil War times with
18        morphine, that's correct.
19   QUESTIONS BY MR. ERCOLE:
20        Q.    And would you agree students in
21   medical school learn that opioids are
22   addictive medicines?
23                MR. LOESER:  Objection.  Form.
24                THE WITNESS:  I believe medical
25        students learn a full range of the
```

```
 1           actions of opioids that include the

 2           risk of addiction.

 3    QUESTIONS BY MR. ERCOLE:

 4           Q.     And medical students are taught

 5    that opioids are Schedule II controlled

 6    substances?

 7                  MR. LOESER:  Objection.  Form.

 8                  THE WITNESS:  I guess the

 9           context of which opioids are being

10           considered, there are Schedule II

11           opioids and there's Schedule III and

12           IV.

13    QUESTIONS BY MR. ERCOLE:

14           Q.     Sure.

15                  But would you agree that

16    medical students are taught that Schedule II

17    controlled substances include substances that

18    have a high potential for abuse and

19    addiction?

20                  MR. LOESER:  Objection.  Form.

21                  THE WITNESS:  I'm not sure I

22           can account for all medical schools

23           and -- in their curriculum that all

24           medical students are aware that potent

25           opioids are Schedule II medications,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              but in general, the relationship

2              between potency and potential for

3              addiction is taught.

4      QUESTIONS BY MR. ERCOLE:

5              Q.     Would you agree that there are

6      different types of opioid medicines?

7              A.     Yes.

8              Q.     Some are short-acting opioids;

9      fair to say?

10             A.     Or might call it immediate

11     release formulations.

12             Q.     Others are long-acting opioids?

13             A.     There are various products that

14     are proposed to be sustained release or

15     long-acting.

16             Q.     Different delivery systems

17     between opioid medicines?

18             A.     It's my understanding that

19     different manufacturers have proposed that

20     they have different formulations of their

21     medications that can influence their release

22     properties, that's correct.

23             Q.     Different FDA-approved

24     indications for opioid medicines; would you

25     agree with that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I believe that opioid

 2    medications do have different FDA approval

 3    for use.

 4                  In addition, it should be noted

 5    that the number of opioid that are used and

 6    their indications are much smaller than the

 7    actual clinical use of opioids in practice.

 8    So-called off-label use.

 9          Q.      Is there -- and doctors are

10    free to prescribe opioid medicines off label,

11    correct?

12                  MR. LOESER:  Objection.  Form.

13                  THE WITNESS:  Again, based on

14          the weight of evidence as they might

15          use them for indications that are

16          thought of as, again, back to the risk

17          and benefit in these areas of pain

18          control.

19                  So, for example, in the

20          treatment of cancer pain, for example.

21    QUESTIONS BY MR. ERCOLE:

22          Q.      But doctors have the

23    independent ability to decide whether to

24    prescribe an opioid medicine for an on-label

25    purpose or an off-label purpose, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LOESER:  Objection.  Form.
 2                    THE WITNESS:  Well, it is a
 3           practice of physicians to not restrict
 4           the use of a particular medication
 5           given that there is scientific
 6           evidence for its use following the
 7           approval of its use.
 8      QUESTIONS BY MR. ERCOLE:
 9           Q.    Would you agree that the
10      scientific data regarding opioid medications
11      has changed over time?
12                    MR. LOESER:  Objection.  Form.
13                    THE WITNESS:  I agree that it
14           has -- the scientific evidence
15           develops, as does clinical evidence.
16      QUESTIONS BY MR. ERCOLE:
17           Q.    Fair to say it's continuing to
18      evolve to this day?
19                    MR. LOESER:  Objection.  Form.
20                    THE WITNESS:  It's true that it
21           continues to evolve to this day,
22           that's correct.
23      QUESTIONS BY MR. ERCOLE:
24           Q.    Would you agree that in some
25      patients opioids may be an effective
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    treatment for chronic noncancer pain?
 2                MR. LOESER:  Objection.  Form.
 3                THE WITNESS:  The overwhelming
 4          evidence is that continuous or chronic
 5          opioid use for chronic noncancer pain
 6          is essentially unproven.
 7                It's my opinion that the vast
 8          majority of chronic noncancer pain,
 9          like pain from chronic back pain,
10          headache, centralized pain syndromes
11          like fibromyalgia, there's no
12          significant, strong evidence that
13          they're effective under those
14          conditions.
15                In addition, there's great
16          amount of evidence that there's been
17          great harm with the use of these
18          chronic opioids in those conditions.
19    QUESTIONS BY MR. ERCOLE:
20          Q.    And so my question was a little
21    different.  I think your answer talked about
22    the vast majority of patients --
23          A.    Uh-huh.
24          Q.    -- and my question was
25    different.  It was:  In some patients, would
```

Highly Confidential - Subject to Further Confidentiality Review

1   you agree that opioids may be an effective

2   treatment for chronic noncancer pain?

3                   MR. LOESER:  Objection.  Form,

4           and asked and answered.

5                   THE WITNESS:  My opinion is

6           that there's very few chronic

7           noncancer pain conditions that would

8           be effectively and safely managed by

9           opioids.

10                  In my experience clinically, I

11          estimate that maybe to be about

12          5 percent.

13  QUESTIONS BY MR. ERCOLE:

14          Q.    And that's based upon your

15  clinical experience?

16          A.    It's based not only on my

17  clinical experience, it's the weight of

18  evidence, of knowing that the vast majority

19  of pain, chronic painful conditions, are

20  noncancer, such as back pain, as I mentioned

21  before.  Headache, very common.  Centralized

22  pain syndromes are essentially unresponsive

23  and -- or the risk versus benefit is not

24  there.

25                  There's -- these smaller

Highly Confidential - Subject to Further Confidentiality Review

1    percentages, you know, these are conditions

2    that are well-known.  They're chronic,

3    painful conditions.  But again, opioids would

4    not be the first line of therapy for them.

5              Chronic opioids would possibly

6    be considered as -- in these candidate areas

7    maybe as third-tier therapies, again, because

8    of limited data to support their use and also

9    the risk of harm that may come from their

10   continuous use.

11        Q.    What are those candidate areas?

12        A.    I'll just refer to my report

13   here.  Just a minute.

14              They -- it involves such thing

15   as pain from multiple sclerosis, sickle cell

16   disease, postherpetic neuralgia, pain from

17   spinal cord injury, for example.  Those are

18   some examples.  It's not intended to be a

19   complete list but examples.

20        Q.    Sitting here today, could you

21   give me a complete list?

22        A.    Those are the most common ones

23   that come to my mind that I've certainly

24   encountered in my practice and that are in

25   the literature.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Okay.  So again, let me ask my

2   question.

3              Sitting here today, can you

4   give me a complete list?

5              MR. LOESER:  Objection.  Asked

6         and answered.

7              THE WITNESS:  What I've

8         provided is probably my best --

9         provides the best examples of that

10        list, and I don't think I would go

11        beyond that.

12   QUESTIONS BY MR. ERCOLE:

13       Q.      So would you agree that -- are

14   you familiar with the concept of breakthrough

15   pain?

16       A.      The concept of breakthrough

17   pain, as I understand it, was introduced in

18   the management of cancer pain, and there's

19   been some knowledge and clinical experience

20   around that where breakthrough pain in cancer

21   patients have been managed with

22   immediate-release formulations of opioids or

23   other medications, that's correct.

24       Q.      Would you agree that as a

25   result of -- strike that.

Highly Confidential - Subject to Further Confidentiality Review

1        Would you agree that opioids

2    can be an effective treatment option for

3    acute pain?

4        A.    Yeah, absolutely.

5            I think opioids -- you know,

6    again, in their indication we use them

7    frequently in the hospital.  They may not be

8    the only best therapy, and there may be

9    nonopioid therapies that are better, but

10   opioids remain one of our most potent tools

11   to treat acute pain and end-of-life and

12   cancer pain.

13       Q.    And opioids -- fair to say,

14   opioids may be an appropriate treatment for

15   postsurgical pain?

16       A.    They're common -- opioids are

17   used commonly in postsurgical pain; however,

18   part of my own career path and evidence has

19   been to introduce nonopioid therapy,

20   so-called multimodal therapies, to reduce the

21   requirements of opioids and improve, frankly,

22   the outcome of patients postsurgically.

23       Q.    And I appreciate that that's

24   your career path, but my question was a

25   little bit different, which is that fair to

```
 1     say that opioids may be an appropriate or

 2     effective treatment for postsurgical pain in

 3     some patients?

 4               MR. LOESER:  Objection.  Asked

 5          and answered.

 6               THE WITNESS:  Yeah.

 7               Again, I have the same --

 8          opioids are potent analgesics that

 9          have been used effectively to treat

10          postsurgical pain.

11     QUESTIONS BY MR. ERCOLE:

12          Q.    So fair to say that at least

13     with respect to your opinion, you would

14     agree -- strike that.

15               Would you agree that addiction

16     is not something that's specific to opioids,

17     that it can occur with other medications?

18               MR. LOESER:  Objection.  Form.

19          Outside the scope of his opinion.

20               THE WITNESS:  Sorry, could you

21          restate that question?  Sorry about

22          that.

23     QUESTIONS BY MR. ERCOLE:

24          Q.    Sure.

25               Do you agree that addiction can
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    occur with other medications?

 2              MR. LOESER:  Same objection.

 3    QUESTIONS BY MR. ERCOLE:

 4         Q.    Strike that.  I'll re -- that

 5    was a bad question.

 6              Would you agree that addiction

 7    can occur with medications other than

 8    opioids?

 9              MR. LOESER:  Same objection.

10              THE WITNESS:  I'm aware that

11         addiction and sometimes now called

12         substance use disorders are associated

13         with a number of nonopioid compounds.

14    QUESTIONS BY MR. ERCOLE:

15         Q.    Are you an addiction

16    specialist, sir?

17              MR. LOESER:  Objection.  Form.

18              THE WITNESS:  As part of my --

19         my clinical responsibilities and work

20         over the years, I've needed to be able

21         to obtain additional education and

22         consultation in addiction medicine to

23         safely manage many of our patients

24         that we see.  We also then collaborate

25         with addiction specialists when
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              needed.

2                    That said, I wouldn't

3              characterize myself as an addiction

4              specialist.

5    QUESTIONS BY MR. ERCOLE:

6              Q.     Thank you.

7              A.     I might add that my scope of

8    testimony and focus is -- does not cover the

9    topics like addiction where I believe there

10   will be other testimony specifically around

11   addiction.

12             Q.     Would you agree that doctors

13   consider many factors when determining

14   whether to write an opioid prescription?

15                   MR. LOESER:  Objection.  Form.

16             Calls for speculation.

17                   THE WITNESS:  Yeah.

18                   I would say that physicians,

19             again, need to weigh the evidence that

20             their decision around opioid

21             prescribing for pain is supported by

22             the scientific literature and then,

23             again, weighed between the risks

24             versus potential benefits for that

25             patient.
```

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.     Well, how about this:  You've

 3    written prescriptions, opioid prescriptions,

 4    before, correct?

 5         A.     That is correct.

 6         Q.     Okay.  When determining whether

 7    to write those prescriptions, did you

 8    consider the risks of the medicine?

 9         A.     You're talking about opioids?

10         Q.     Yes.

11         A.     Okay.  Absolutely.

12         Q.     The medical history of the

13    patient, consider that?

14         A.     So in consideration of writing

15    a prescription, the question is, to myself or

16    other physicians, is whether this will

17    benefit the patient.

18               In the setting of my clinical

19    context, in the inpatient setting, we're

20    often focused on decisions of a patient

21    coming in with high-dose opioids and needing

22    to continue or provide other medications to

23    avoid opioid withdrawal.  And it's in that

24    context that I -- we often have the biggest

25    challenge.
```

 1          Q.     Do you recall my question, sir?

 2          A.     You asked whether I -- maybe

 3    you should repeat it.  Thank you.

 4          Q.     Fair enough.

 5                 In writing a prescription --

 6          A.     Yes.

 7          Q.     -- for opioids for a patient,

 8    do you consider the patient's medical

 9    history?

10          A.     Absolutely.

11          Q.     Do you consider the patient's

12    age?

13          A.     Yes.

14          Q.     Do you consider the patient's

15    level of pain?

16          A.     Yes.

17          Q.     Do you consider the medical

18    literature available at the time?

19          A.     Of course.

20          Q.     Do you consider any genetic

21    predispositions that -- or issues the patient

22    may have?

23          A.     Well, specific to genetic

24    predis -- pardon me, predispositions,

25    currently we do not have the capacity to

1    screen patients, at least in our medical

2    center, for variations in drug metabolism and

3    what impact that -- so in that regards, no.

4         Q.    How about do you consider

5    whether or not the prescription will be

6    reimbursed by the patient's insurance

7    company?

8              MR. LOESER:  Objection.  Form.

9         And obviously we're well outside the

10         scope of his report in this case.

11             THE WITNESS:  Yeah, I don't --

12         I don't know about that.

13   QUESTIONS BY MR. ERCOLE:

14        Q.    I'm asking you, sir, whether

15   you, in writing a prescription for opioid

16   medicines, do you consider the -- whether or

17   not the prescription may be reimbursed by an

18   insurance company?

19             MR. LOESER:  Same objection.

20             THE WITNESS:  We -- part of our

21         consult service, we'll make

22         recommendations independent of what

23         financial impact or reimbursement

24         impact that has within the

25         institution, per se.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    But this is, again, wholly

 2          outside the scope of my report at this

 3          point.

 4     QUESTIONS BY MR. ERCOLE:

 5          Q.    Well, with all due respect,

 6     we'll disagree on that.

 7                    The --

 8                    MR. LOESER:  Actually, it is

 9          outside the scope --

10                    MR. ERCOLE:  Okay.

11                    MR. LOESER:  -- of the report.

12                    MR. ERCOLE:  Again, we'll

13          disagree on that.

14     QUESTIONS BY MR. ERCOLE:

15          Q.    Have you -- when determining

16     whether to write a prescription for opioids,

17     do you consider the patient's ability to pay?

18                    MR. LOESER:  Same objections,

19          and has nothing to do with the scope

20          of his report.

21                    THE WITNESS:  I do not consider

22          a patient's ability to pay in making

23          decisions about analgesic care for

24          patients.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. ERCOLE:

2         Q.     You have -- I think you

3    testified you have prescribed opioids for

4    patients with chronic pain, correct?

5         A.     That is correct.

6         Q.     And can you give me examples of

7    the types of conditions that those patients

8    had that -- for which you prescribed opioids?

9         A.     Sure.

10               Prescribing opioids in the

11   inpatient setting, typically patients will --

12   for instance, a cancer patient who is failing

13   outpatient management, we'll review their

14   medication list and determine what their

15   medication history is, including any

16   analgesic therapies, as well as any other

17   techniques or interventions that they may

18   be -- have received in the past.

19               So we received the medical

20   record.  We speak with them, examine them,

21   look at their pharmacy.

22               We also review the CURES

23   report, the prescription medication reporting

24   system, to understand whether what they have

25   prescribed is in alignment with what they're
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    actually registered to receive.

 2              Based on those decisions, we

 3    would initially consider that they continue

 4    to take their medications -- that may include

 5    opioids and immediate-release or

 6    sustained-release formulations -- initially

 7    as we attempt to make their assessment for

 8    pain management.

 9              There's -- at times we've had

10    patients that have been on extremely high

11    doses, and so we go back and talk to them

12    about how they ended up there.  If there's

13    other physicians that have been involved in

14    prescribing, we would try to contact them.

15              Does that -- I'm sorry.

16    Q.      Have you prescribed opioids for

17    chronic noncancer pain?

18              MR. LOESER:  Objection.  Asked

19         and answered.  At some length.

20              THE WITNESS:  Again, over the

21         total assessment of managing such

22         patients that come into the hospital,

23         for instance, that have failed

24         outpatient management with -- and are

25         on high dose or even modest dose
```

1          around-the-clock opioid therapy, our

2          initial step is to prevent the patient

3          from withdrawing and/or use other

4          adjuncts to blunt that.

5                It's been my experience that

6          patients who have been on

7          around-the-clock opioids that have

8          been asked to taper off of them have

9          failed, and often they may come into

10         the hospital in withdrawal, and we're

11         attempting to manage that.

12    QUESTIONS BY MR. ERCOLE:

13         Q.     Have you prescribed opioids for

14    patients with chronic neck pain?

15         A.     Again, there's been patients

16    that have been admitted to the hospital

17    already being prescribed opioids for their

18    chronic neck pain in which we've continued

19    those medications until we can have a full

20    assessment of their pain management plan.

21         Q.     How about patients with -- same

22    with patients with chronic back pain as well?

23         A.     Includes, yeah, patients with

24    chronic back pain.

25         Q.     Would you agree that doctors

Highly Confidential - Subject to Further Confidentiality Review

```
 1    can take steps to minimize risk associated

 2    with opioids and better ensure that opioids

 3    are having their desired effect?

 4                MR. LOESER:  Objection.  Form.

 5                THE WITNESS:  So, sorry, could

 6         you repeat that?  I didn't catch --

 7    QUESTIONS BY MR. ERCOLE:

 8         Q.    Sure.

 9                Would you agree that doctors

10    can take steps to minimize risk associated

11    with opioids and better ensure that opioids

12    are having their desired effect?

13                MR. LOESER:  Objection.  Form.

14         Assumes facts not in evidence.

15                THE WITNESS:  I think the

16         decision to make -- to prescribe

17         opioids or continue opioids involves a

18         series of decisions, again, of whether

19         the prior prescription of opioids was

20         satisfying the goals for that

21         particular patient.

22                In the patients that we're

23         caring for, we often see that a

24         patient's pain is not being

25         well-managed, and so we're left with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            the task to consider other options,

 2            other nonopioid options, for such

 3            patients.

 4                  And so in that regards,

 5            optimizing opioid therapy for

 6            patients, from our perspective, often

 7            involves reducing the dose -- or

 8            strategies to reduce the dose for

 9            their chronic management.

10                  I'd like to take a break at

11            this point.

12                  MR. LOESER:  Sure.

13                  THE WITNESS:  Could I take a

14            break at this point?

15                  MR. ERCOLE:  Sure.

16                  THE WITNESS:  I'd appreciate

17            it.  Thank you.

18                  VIDEOGRAPHER:  We are now going

19            off the record, and the time is

20            1:25 p.m.

21             (Off the record at 1:25 p.m.)

22                  VIDEOGRAPHER:  We are now going

23            back on the record, and the time is

24            1:35 p.m.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.    Dr. Schumacher, would you agree

 3    that the ceiling of opioids is high compared

 4    to other analgesics?

 5              MR. LOESER:  Objection.  Form.

 6              THE WITNESS:  A ceiling effect

 7         of opioid action on patients is

 8         relative to that particular patient's

 9         context.

10              So I don't believe there's a

11         way to safely or accurately describe a

12         milligram-to-milligram comparison of

13         opioid versus nonopioid medications,

14         if that was your question.

15              (Schumacher Exhibit 5 marked

16         for identification.)

17    QUESTIONS BY MR. ERCOLE:

18         Q.    Sure.  Why don't we mark this

19    as Exhibit 5, I think.

20              Sir, this document is titled

21    "The Prescription Opioid Epidemic:

22    Challenges and Opportunities for California

23    Pain Physicians."

24              Do you see that?

25         A.    Yes, I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Did you author this document?
2          A.     I coauthored it with Dr. Ramana
3     Naidu.
4          Q.     And that was in September 20,
5     2016?
6          A.     That's correct.
7          Q.     If you turn to the third page.
8                 MR. LOESER:  Take your time to
9          review the document.
10    QUESTIONS BY MR. ERCOLE:
11         Q.     Do you see on the third page --
12    I'm just trying to use your words -- where
13    it's the second to the last sentence of that
14    page.  It says, "While the ceiling of opioids
15    is high compared to other common analgesics,
16    there is a ceiling."
17                Do you see that?
18         A.     Yes, I do.
19         Q.     So would you agree with me that
20    the ceiling of opioids is high compared to
21    other common analgesics?
22                MR. LOESER:  Objection.  Form.
23                THE WITNESS:  Right.
24                So the context of that
25         paragraph, of course -- it starts with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              "Despite extremely high doses of
 2         opioids in individuals, there appears
 3         to -- not to be a proportionate
 4         increase in benefit.  With the
 5         increasing number of opioid-tolerant
 6         patients that come in for surgery, it
 7         is a daily occurrence to see a patient
 8         taking over a thousand oral morphine
 9         equivalents continue to have severe
10         pain."
11              So in the context of a patient
12         with a -- developing opioid tolerance,
13         somehow they've managed to survive to
14         that point, and so we're then faced to
15         manage those patients.
16              And in this case, this
17         particular example, this particular
18         patient with a thousand morphine
19         equivalents, while that particular
20         patient's ceiling apparently is high
21         and allows them to stay alive, if you
22         take that same dose with someone else,
23         they may not survive.
24    QUESTIONS BY MR. ERCOLE:
25         Q.    Sir, are the words you used in
```

```
 1    this article "the ceilings" -- "the ceiling

 2    of opioids is high compared to other common

 3    analgesics," are those words accurate?

 4              MR. LOESER:  Objection.  Form.

 5         And you read part it and not all the

 6         sentence.

 7              THE WITNESS:  You're reading

 8         the words accurately, although the

 9         context of the authors has a meaning

10         relative to this example of a patient

11         coming in with a thousand milligrams a

12         day.

13    QUESTIONS BY MR. ERCOLE:

14         Q.    Fair enough.

15              You have to understand the

16    context of that statement to under -- to

17    truly interpret and understand the statement

18    itself, right?

19         A.    That's my point.

20         Q.    Okay.  Are you giving an

21    opinion in this case as to what caused an

22    opioid abuse epidemic, an opioid misuse

23    epidemic, an opioid -- whatever you want to

24    call it.

25              Are you giving any opinion in
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    this case as to what caused an opioid
2    epidemic or opioid-related problems in Ohio?
3                MR. LOESER:  Objection.  Form.
4                You're asking the witness to
5          conduct what sounds like a legal
6          analysis.
7                MR. ERCOLE:  I'm asking for his
8          opinion, so I think he can answer that
9          question.
10               THE WITNESS:  The base --
11               MR. LOESER:  But on a medical,
12         factual or legal question?
13               MR. ERCOLE:  If you can't
14         answer the question, you can say you
15         can't answer the question.  So I'll
16         repeat the question.
17   QUESTIONS BY MR. ERCOLE:
18         Q.    Are you giving an opinion in
19   this case as to what caused an opioid
20   epidemic or opioid-related problems in Ohio?
21               MR. LOESER:  Same objection.
22               THE WITNESS:  My understanding
23         of the factors that are involved with
24         the opioid epidemic have commonalities
25         across the United States, including
```

```
1              Ohio, and the key driver was the

2              misrepresentation of the safety and

3              efficacy of opioids for chronic

4              noncancer pain.

5                   This is a key conclusion that

6              the NASEM committee concluded as well

7              as based on my opinion on this report.

8              I also share that opinion.

9       QUESTIONS BY MR. ERCOLE:

10             Q.    So with respect to my question,

11      are you -- I'm just asking:  Are you giving

12      an opinion in this case as to what caused an

13      opioid epidemic or opioid-related problems in

14      Ohio?

15                  MR. LOESER:  Objection.

16             Asked --

17      QUESTIONS BY MR. ERCOLE:

18             Q.    I think it's a yes/no response.

19                  MR. LOESER:  Objection.  Asked

20             and answered.

21                  THE WITNESS:  Relative to

22             Ohio's -- so sorry.  Could you repeat

23             it one more time for me, please?

24      QUESTIONS BY MR. ERCOLE:

25             Q.    With respect to my question,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I'm just asking:  Are you giving an opinion

 2    in this case as to what caused an opioid

 3    epidemic or opioid-related problems in Ohio;

 4    yes or no?

 5              MR. LOESER:  Objection.  Same

 6         objection.  Asked and answered.

 7              THE WITNESS:  My opinion is

 8         broader and encompasses the factors

 9         and -- driving factors that affect the

10         opioid epidemic, which includes the

11         state of Ohio.

12    QUESTIONS BY MR. ERCOLE:

13         Q.    Have you looked exhaustively at

14    all the possible factors that may have caused

15    the opioid epidemic in Ohio?

16              MR. LOESER:  Objection.  Form.

17              THE WITNESS:  We've examined

18         so-called factors, possible causes

19         of -- more broadly across the United

20         States, including Ohio.  And it's my

21         opinion that although these factors,

22         some of which have been involved like

23         with poverty, other social factors,

24         these have existed for years in the

25         United States without an evidence of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          an opioid epidemic.
 2               We believe that the driving
 3          force has been this promotion of
 4          opioids for noncancer chronic pain.
 5   QUESTIONS BY MR. ERCOLE:
 6      Q.    Right.
 7               I understand that's your -- so
 8   why don't you -- what are the other factors
 9   that you believe contributed to the opioid
10   epidemic in Ohio?
11               MR. LOESER:  Objection.  Form.
12          Misstates his prior testimony.
13   QUESTIONS BY MR. ERCOLE:
14      Q.    Well, let me ask this:  Are
15   there other factors that you believe
16   contributed to the opioid epidemic in Ohio?
17               MR. LOESER:  Objection.  Form.
18               THE WITNESS:  I believe that
19          factors that are in existence that
20          could make the opioid epidemic worse
21          were in existence in Ohio as well as
22          other states, and these have to do
23          with the misinformation that
24          physicians had at the time about the
25          safety and efficacy of opioids for the
```

```
 1              treatment of chronic pain.

 2    QUESTIONS BY MR. ERCOLE:

 3         Q.    Do you recall my question, sir?

 4              MR. LOESER:  Objection.  Form.

 5              THE WITNESS:  I do recall your

 6         question, and my response and my scope

 7         of my opinion represents a broad

 8         analysis -- a broad opinion that would

 9         cover across the United States,

10         including Ohio.

11    QUESTIONS BY MR. ERCOLE:

12         Q.    What was my question?

13              MR. LOESER:  Objection.  Form.

14              Counsel, if you want to repeat

15         your question, go ahead.

16    QUESTIONS BY MR. ERCOLE:

17         Q.    I'm happy to repeat it; that's

18    why I asked the question.  But I don't think

19    you understand my question.

20         A.    Maybe I misunderstood your

21    question.

22         Q.    So are there -- I know you've

23    identified marketing.

24              Are there factors other than

25    marketing that you believe contributed to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opioid epidemic in Ohio?

 2                MR. LOESER:  Objection.

 3          Mischaracterizes his prior testimony.

 4                THE WITNESS:  I suspect that --

 5          well, suspect, scratch that.

 6                There's been a number of

 7          conditions that have been identified

 8          across the country which I believe

 9          also apply to Ohio's case, which

10          includes a lower -- let's see how to

11          say this -- that includes difficult

12          economic circumstances that may limit

13          the access to advanced medical care,

14          may limit access to advanced

15          approaches or even historical

16          approaches that have been approved and

17          successful, such as multidisciplinary

18          pain management programs for the

19          treatment of noncancer chronic pain.

20                Those are the two that come to

21          my mind as the top.

22    QUESTIONS BY MR. ERCOLE:

23          Q.    Any other factors?

24                MR. LOESER:  Objection.  Form.

25                THE WITNESS:  Yeah.  That's all
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           I have to say with that.
 2    QUESTIONS BY MR. ERCOLE:
 3           Q.     Okay.  Why don't you take a
 4    look at the document that I've shown you,
 5    Exhibit 5.
 6           A.     Yes.
 7           Q.     So if you turn to the second to
 8    last page.
 9           A.     Second to last page.
10           Q.     Sure.
11           A.     Yep.  Okay.  Got it.
12           Q.     So these are -- this is a
13    document that you coauthored, right?
14           A.     That's correct.
15           Q.     And it says, "So finally" --
16    tell me if I'm reading this correctly --
17    "where did the opioid epidemic come from?"
18                  Do you see that?
19           A.     Yes, I see that.
20           Q.     And it says, "To put it
21    succinctly, from the following."
22                  Do you see that?
23           A.     Exactly.
24           Q.     And that --
25           A.     But I can read -- if you'd like
```

1    me to, I can read each of those points.

2        Q.    Okay.  Well, I mean, I'm

3    happy -- I'm going to walk through them with

4    you.

5        A.    Sure, go ahead.

6        Q.    So the first one is a society

7    disproportionately fearful of suffering.

8             Am I reading that correctly?

9        A.    That's correct.

10       Q.    So you would agree that that

11   was a factor in contributing to or causing

12   the opioid epidemic, correct?

13       A.    It is a condition in which a

14   driving force in some ways took advantage of,

15   I think, the society.

16       Q.    Okay.  And the next bullet is

17   patient satisfaction surveys.

18             Do you see that?

19       A.    That's right.

20       Q.    That would be another

21   circumstance from which the opioid epidemic

22   sprung, correct?

23       A.    Under the condition that

24   patient satisfaction scores were driving the

25   prescribing behavior of physicians or in

Highly Confidential - Subject to Further Confidentiality Review

1    institutions, with the idea that responding

2    to patient's request for pain was only being

3    responded to with the use of an opioid rather

4    than other medications, for example.

5         Q.    Reckless prescribing, you list

6    that next as a factor that could cause --

7         A.    Right.

8         Q.    -- or contributed to the opioid

9    epidemic, right?

10        A.    And again, I would put that in

11   the category that reckless relative to

12   physicians that were misdirected by the

13   pharmaceutical industry that it was safe and

14   effective to write higher and higher opioid

15   dosing for patients with chronic noncancer

16   pain.  I would characterize that as reckless

17   prescribing.

18        Q.    And is it your belief then that

19   physicians played no role with respect to --

20   strike that.

21             Is it your belief that

22   physicians bear no responsibility for

23   contributing to the opioid epidemic in this

24   country?

25             MR. LOESER:  Objection.  Form.

 1          Misstates his prior testimony.

 2                  THE WITNESS:  The scope of my

 3          report was not to focus on an opinion

 4          of a particular physician's behavior.

 5   QUESTIONS BY MR. ERCOLE:

 6          Q.     Fair enough.

 7                  And I understand that you don't

 8   address that in your report, but you are

 9   purporting to give an opinion regarding the

10   cause of the opioid epidemic, right?

11                  MR. LOESER:  Objection.  Form.

12          Misstates the opinions that he's

13          provided in his report.

14                  THE WITNESS:  My opinion is

15          that the driving force for this opioid

16          epidemic was the misrepresentation of

17          the use of chronic opioids in chronic

18          noncancer pain, which drove -- through

19          the misrepresentation drove physicians

20          who otherwise had great concern about

21          addiction for their patients to

22          believing that these new agents, for

23          example, the OxyContin formulation

24          from Purdue, was safe and effective,

25          with a low-degree risk of addiction

```
 1              and other difficulties.

 2    QUESTIONS BY MR. ERCOLE:

 3         Q.      And when you say "driving

 4    force," what do you mean by that?

 5         A.      Well, if you look at most of

 6    these, a society disproportionately fearful,

 7    or patient satisfaction surveys, or lack of

 8    formal education on pain, none of these

 9    independently would, in my opinion, have

10    generated an opioid epidemic without the

11    introduction and promotion, aggressive

12    promotion, of opioid analgesics in the use of

13    chronic noncancer pain.

14         Q.      So the next factor that you

15    identify as causing or contributing to the

16    opioid epidemic is the fragmenting American

17    patient/doctor relationship.

18              Do you see that?

19              MR. LOESER:  Objection.  Form.

20              THE WITNESS:  Yes.

21              Sorry.  That's read correctly.

22    QUESTIONS BY MR. ERCOLE:

23         Q.      Okay.  The next factor that you

24    identify is lack of formal education on pain

25    and opioids; is that correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      I see that.  You've read it
 2    correctly.
 3            Q.      You wrote that, right?
 4            A.      It was -- again, this was a
 5    collaborative effort with Dr. Ramana Naidu
 6    and myself.
 7            Q.      The next bullet is lack of
 8    formal research on the risks and benefits of
 9    chronic opioid use.
10                    Do you see that?
11            A.      That's read correctly.
12            Q.      That's another factor that you
13    identified as causing or contributing to the
14    opioid epidemic in this article?
15                    MR. LOESER:  Objection.  Form.
16                    THE WITNESS:  Again, I wouldn't
17            phrase it in the way you've said it,
18            that if we go back to the start of
19            this, it was meant to be a provocative
20            statement as where did opioid epidemic
21            come from.
22                    And as you see as we work our
23            way down, we land on pharmaceutical
24            direct-to-consumer marketing,
25            direct-to-prescriber marketing.
```

```
 1                    Again, it's my opinion that
 2           that represents the driving force for
 3           the opioid epidemic.
 4    QUESTIONS BY MR. ERCOLE:
 5           Q.      So the -- I believe you -- the
 6    pain management and regulatory strategies
 7    report that you've mentioned --
 8           A.      Yes.
 9           Q.      -- that was published in 2017,
10    correct?
11           A.      That's correct, yes.
12           Q.      And so this document was
13    published in -- or authored in September
14    of 2016, correct?  If you look at the first
15    page.
16                   MR. LOESER:  Objection.  Form.
17                   THE WITNESS:  September, yes.
18    QUESTIONS BY MR. ERCOLE:
19           Q.      Right.
20           A.      That's correct, yes.
21           Q.      So fair to say that you were
22    including -- well, had you reviewed any
23    marketing materials by any company when you
24    authored this document, Exhibit 5?
25                   MR. LOESER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.    I'll rephrase the question.

 3              When you authored this

 4    document, Exhibit 5, in September of 20 --

 5    2016, had you reviewed any marketing

 6    materials from any pharmaceutical company?

 7              MR. LOESER:  Objection.  Form.

 8              THE WITNESS:  I can't recall.

 9    QUESTIONS BY MR. ERCOLE:

10         Q.    So sitting here today, you

11    can't identify a single marketing material or

12    document that you would have reviewed in

13    publishing an article on the Internet in

14    September of 2016 saying that pharmaceutical

15    marketing is a cause of the opioid epidemic?

16              MR. LOESER:  Objection.  Form.

17              THE WITNESS:  Again, my

18         statement in this article poses the

19         question and lists potential factors.

20         It -- that's what I have to say.

21    QUESTIONS BY MR. ERCOLE:

22         Q.    And have you done any -- well,

23    let me ask this:  How about the FDA -- strike

24    that.

25              How about FDA policy?  Was that
```

Highly Confidential - Subject to Further Confidentiality Review

1    a factor in causing or contributing to the

2    opioid epidemic in Ohio?

3                MR. LOESER:  Objection.  Form,

4          and outside the scope of his report.

5                THE WITNESS:  My report was --

6          and scope does not involve making

7          opinion about the FDA's process for

8          drug approval.

9    QUESTIONS BY MR. ERCOLE:

10         Q.    Did you consider that?

11               MR. LOESER:  Objection.  Form.

12               THE WITNESS:  In what way?

13   QUESTIONS BY MR. ERCOLE:

14         Q.    Did you consider that in

15   authoring the opinions that you're giving,

16   that -- you just said it was outside the

17   scope of your opinion.  So is it fair to say

18   that you're not giving an opinion on that

19   issue?

20         A.    My opinion is based on the lack

21   of scientific integrity that underpinned the

22   claims made by the pharmaceutical industry

23   that opioids, chronic opioids, were safe and

24   effective for the treatment of chronic pain.

25               I'm not making an opinion on

Highly Confidential - Subject to Further Confidentiality Review

1    the process of the FDA.

2         Q.    Are you giving -- did you

3    consider whether DEA policy caused or

4    contributed to the opioid epidemic in Ohio?

5              MR. LOESER:  Objection.  Form.

6         Outside the scope of his report.

7    QUESTIONS BY MR. ERCOLE:

8         Q.    Let me ask this:  Is it outside

9    the scope of your report as to whether or not

10   you considered whether DEA policy caused or

11   contributed to the opioid epidemic in Ohio?

12             MR. LOESER:  Objection.  Form.

13             THE WITNESS:  That was outside

14        the scope of my report.

15   QUESTIONS BY MR. ERCOLE:

16        Q.    Fair enough.

17             And is it outside the scope of

18   your report as to whether or not you

19   considered whether FDA policy caused or

20   contributed to the opioid epidemic in Ohio?

21             MR. LOESER:  Objection.  Form.

22             THE WITNESS:  Again, it was

23        outside the --

24             MR. LOESER:  Compound.

25             THE WITNESS:  -- scope of my

Highly Confidential - Subject to Further Confidentiality Review

```
 1          report.
 2     QUESTIONS BY MR. ERCOLE:
 3          Q.     And is it fair to say -- is it
 4     outside the scope of your report as to
 5     whether or not you considered whether managed
 6     care or reimbursement policies by managed
 7     care entities caused or contributed to the
 8     opioid epidemic in Ohio?
 9               MR. LOESER:  Objection.  Form.
10          It's outside the scope of his report.
11               THE WITNESS:  Yeah, I -- that
12          was outside the scope of my report.
13     QUESTIONS BY MR. ERCOLE:
14          Q.     Is it outside the scope of your
15     report as to whether or not you considered
16     whether pill mills caused or contributed to
17     the opioid epidemic in Ohio?
18               MR. LOESER:  Objection.  Form.
19          Outside the scope of his report.
20               THE WITNESS:  Yeah.  I do not
21          consider that.  That was outside the
22          scope of my report.
23     QUESTIONS BY MR. ERCOLE:
24          Q.     Was it outside the scope of
25     your report as to whether or not actions or
```

Highly Confidential - Subject to Further Confidentiality Review

1    inactions taken by local government caused or

2    contributed to the opioid epidemic in Ohio?

3                    MR. LOESER:  Objection.  Form.

4                    THE WITNESS:  Within my

5            opinion, there was evidence within the

6            literature of the influence of

7            pharmaceutical industries to try to

8            change certain rules at the state

9            level having to do with the approval

10           and prescribing practices of opioids.

11                   But otherwise, the rest is --

12           otherwise, your question is outside

13           the scope of my report.

14   QUESTIONS BY MR. ERCOLE:

15           Q.    Did you consider whether Summit

16   or Cuyahoga -- excuse me.

17                   Did you consider whether Summit

18   or Cuyahoga Counties -- strike that.

19                   Did you consider whether Ohio's

20   decision when or when not to implement a PDMP

21   caused or contributed to the opioid epidemic

22   in Ohio?

23                   MR. LOESER:  Objection.  Form.

24           Outside the scope of his report.

25           Assumes facts not in evidence.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   THE WITNESS:  As part of the
 2           NASEM report, there was a section in
 3           which we examined the pattern of the
 4           institution of these prescription
 5           medication reporting systems, and so
 6           broadly we examined different states'
 7           record of that and whether there was a
 8           relationship between the institution
 9           of those tools for physicians and
10           potential rates of opioid abuse or
11           harm.
12                   I do reference the NASEM report
13           in my core opinion, but that is as far
14           as I have.  I don't have anything
15           specific for Ohio.
16     QUESTIONS BY MR. ERCOLE:
17           Q.    So you don't know one way or
18     the other --
19           A.    I can't recall.
20           Q.    Let me just -- let me just
21     finish.
22                   You don't know sitting here
23     today, one way or another, whether Ohio
24     implemented a PDMP or not?
25                   MR. LOESER:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Outside the scope of his report.
2                THE WITNESS:  It's outside the
3           scope for the -- your question.
4    QUESTIONS BY MR. ERCOLE:
5           Q.    And fair to say you didn't
6    consider the timing of -- strike that.
7                Fair to say you didn't consider
8    whether Ohio implemented a PDMP and, if so,
9    the timing of it in determining whether that
10   contributed or caused the opioid epidemic in
11   Ohio?
12               MR. LOESER:  Same objection.
13               THE WITNESS:  The context of
14          the prescription medication reporting
15          system has been, in my practice, a
16          tool to try to identify warning signs
17          of patients if they're prescribed
18          something and taking something else.
19               Again, the overall impact of
20          the record is a tool, but I can't
21          recall the details at this time that
22          relate the starting of the -- of that
23          recording program in the state of
24          Ohio.
25
```

```
 1    QUESTIONS BY MR. ERCOLE:

 2         Q.    Did you consider whether the

 3    misuse by -- strike that.

 4              Did you consider whether the

 5    misuse of opioids by patients in Ohio caused

 6    or contributed to the opioid epidemic there?

 7              MR. LOESER:  Objection.  Form.

 8         Outside the scope of his report.

 9              THE WITNESS:  Again, the core

10         of the opinion was based on a review

11         of the literature that -- pulled from

12         various studies that had been done

13         across the country.  I can't recall

14         which of those studies specifically

15         included cohorts from the state of

16         Ohio.

17    QUESTIONS BY MR. ERCOLE:

18         Q.    Sir, I'm just trying to

19    understand what you considered and didn't

20    consider --

21         A.    Sure.

22         Q.    -- in forming the opinions that

23    you're purporting to give in this case.

24         A.    Uh-huh.

25         Q.    And you agree this case is a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     serious case, right?

 2           A.     That's why I'm here.

 3           Q.     Right.

 4                  So did you consider, in giving

 5     your opinions as to what caused or didn't

 6     cause the opioid epidemic, the misuse of

 7     opioids by patients in Ohio?

 8                  MR. LOESER:  Objection.

 9           Assumes facts not in evidence.  It's

10           outside the scope of his report.

11                  THE WITNESS:  My consideration

12           weighed on the effect of opioids on

13           the entire population of the United

14           States, at least that represented by

15           different study groups as represented

16           in the literature.

17     QUESTIONS BY MR. ERCOLE:

18           Q.     Did you consider the factor of

19     misuse of opioids by patients in determining

20     what caused or didn't cause the opioid

21     epidemic in Ohio?

22                  And with all due respect, I

23     don't think you've answered that question.

24                  MR. LOESER:  Objection.  Form.

25           Asked and answered several times.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Again, my opinion
 2           is that the factors that are driving
 3           the opioid epidemic, as we've
 4           discussed, and the powerful force
 5           behind the epidemic was driven by the
 6           pharmaceutical industry, and those
 7           factors and conditions existed across
 8           the country and would not be
 9           necessarily unique to Ohio.
10               That's my opinion.
11               MR. ERCOLE:  Okay.  I'll move
12           to strike that response as
13           nonresponsive.
14               MR. LOESER:  I object.  I
15           believe that answer was responsive and
16           shouldn't be stricken.
17      QUESTIONS BY MR. ERCOLE:
18           Q.    Okay.  Sir, have you done any
19      quantitative analysis to try to apportion
20      responsibility -- strike that.
21               We talked about -- well, you
22      identify in your September 20, 2016 article a
23      number of factors that, according to this
24      article, you say the opioid epidemic came
25      from, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      Actually, the phrasing is
2    "Where did the opioid epidemic come from?"
3           Q.      Right.
4           A.      "Did it come from the
5    following?"
6                   And so it was posed as a
7    question.  "To put it succinctly, from the
8    following."
9                   Yeah.  "So finally, where did
10   the opioid epidemic come from," question
11   mark?
12                  "To put it succinctly, from the
13   following."
14                  Right.
15          Q.      Right.
16          A.      So it is intended to engage the
17   reader to consider these conditions, that's
18   correct.
19          Q.      Okay.  Did you do anything to
20   try to apportion responsibility for the
21   opioid crisis in Ohio according to any of
22   these conditions or factors?
23                  MR. LOESER:  Objection.
24          Mischaracterizes his prior testimony,
25          and form.
```

```
 1                     THE WITNESS:  I have not

 2          personally conducted an analysis to

 3          apportion responsibility amongst these

 4          various factors.

 5                     (Schumacher Exhibit 6 marked

 6          for identification.)

 7     QUESTIONS BY MR. ERCOLE:

 8          Q.     Sir, last document I'm going to

 9     show you.  Let's mark this as Exhibit 6.

10                     MR. LOESER:  Take your time.

11     QUESTIONS BY MR. ERCOLE:

12          Q.     Sir, we talked before.  You

13     have not conducted any survey of

14     physicians -- strike that.

15                     You haven't -- sorry.

16                     I talked to you before.  You

17     have not conducted any survey of prescribers

18     in Ohio to figure out whether they received

19     any misleading marketing by defendants and,

20     if so, whether they relied upon that

21     marketing, correct?

22                     MR. LOESER:  Objection.  Form.

23          Mischaracterizes his testimony.

24                     THE WITNESS:  What I have

25          testified at this deposition is the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            evidence provided by counsel that
2            there were call note reports that were
3            describing efforts by the
4            pharmaceutical industry to influence
5            physician prescribing behavior
6            specifically about the use of higher
7            doses of chronic opioids.
8                    Given that, I have not
9            conducted any other survey or
10           analysis.
11      QUESTIONS BY MR. ERCOLE:
12           Q.    Right.
13                 You didn't survey Ohio -- you
14      didn't actually survey -- conduct and
15      initiate and oversee a survey of Ohio
16      prescribers to figure out whether they
17      received any misleading marketing and, if so,
18      whether that influenced their
19      decision-making, right?
20                 MR. LOESER:  Objection.  Form,
21           and asked and answered.
22                 THE WITNESS:  As best of my
23           knowledge, I have not conducted a
24           survey for -- in the Ohio area to
25           survey physicians in that regards.
```

```
 1     QUESTIONS BY MR. ERCOLE:

 2          Q.     So the title of this document

 3     is "Surveying Ohio Physicians on Opioid

 4     Prescribing Behaviors."

 5                 Do you see that?

 6          A.     I do.

 7          Q.     Have you ever seen this

 8     document before?

 9          A.     I don't recall seeing this

10     document.

11                 When was this -- I can't answer

12     the question, sorry.

13                 Can I ask a question:  When was

14     this published?

15          Q.     Yeah.

16                 So, unfortunately, we're here

17     to -- for me to ask questions.

18          A.     No, that's okay.

19          Q.     And I'm just asking whether

20     you've seen it.

21          A.     Okay.  I can't recall seeing

22     this.

23          Q.     You don't recall your counsel

24     ever giving you this document?

25                 MR. LOESER:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    We're not going to talk about

 2           anything that may or may not have been

 3           provided to him that's not considered

 4           or relied on in his report.

 5                    THE WITNESS:  I don't --

 6                    MR. LOESER:  You can ask him

 7           all you want about the document.

 8           You're just not going to ask him

 9           about --

10                    MR. ERCOLE:  You can -- just

11           make your objection, and then we'll go

12           from there.

13                    MR. LOESER:  Well, it's more

14           than making an objection.  It's an

15           instruction not to answer questions

16           about communications with counsel.

17                    MR. ERCOLE:  Then just instruct

18           him not to answer.  If that's your --

19           if that's your -- what you're going to

20           argue.

21                    MR. LOESER:  I'm instructing

22           the witness not to answer.  However,

23           you can ask whatever question you want

24           about the document; just don't ask

25           anything that I or my colleagues may
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          have said to the witness about the

 2          document.

 3    QUESTIONS BY MR. ERCOLE:

 4          Q.    So you just don't recall seeing

 5    this document before?

 6          A.    That's correct, yeah.

 7          Q.    Okay.  And it's not something

 8    you relied on or considered in your report,

 9    right?

10          A.    I don't recall relying on this

11    document.

12          Q.    Can you turn to the -- I just

13    have one or two questions, and then we'll

14    take a break.

15                Can you turn to the page marked

16    SUMMIT_000839799?

17          A.    Okay.

18          Q.    And -- one second.

19                Do you see where in the summary

20    section on the second sentence it says,

21    "Certain factors such as employer

22    reimbursement policies and pharmaceutical

23    marketing did not overtly change opiate

24    prescribing habits"?

25                Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      I see that you've --

2          Q.      I read that right.

3          A.      -- correctly read that.

4          Q.      Yeah.  Okay.

5                  And if this was a survey

6   conducted by the State of Ohio regarding

7   opioid prescribing behavior and what

8   prescriptions rely upon when prescribing

9   opioids in Ohio, would you have want to have

10  seen this document before issuing your

11  opinions here today?

12                 MR. LOESER:  Objection.  Form.

13          The exhibit lacks foundation, and this

14          is outside the scope of his report.

15                 THE WITNESS:  Well, before

16          rendering an opinion about two

17          sentences from the summary, I would

18          need to understand the sponsor of this

19          survey.  I would need an opportunity

20          to review the survey's methodologies

21          and look at their results prior to

22          stating an opinion.

23  QUESTIONS BY MR. ERCOLE:

24          Q.      Fair enough.

25                  And at least -- and I'm not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    asking you to do that now.  I'm just saying
 2    fair enough.
 3              But you have not -- in
 4    connection with your opinions in this case
 5    that are contained in Exhibit 1, you did not
 6    do that, right?
 7              MR. LOESER:  Objection.  Form.
 8              THE WITNESS:  I don't recall
 9         ever reviewing this document before.
10              MR. ERCOLE:  Thank you.  So can
11         we take a three-minute break?
12              MR. LOESER:  Three?
13              MR. ERCOLE:  We can take a very
14         short break, if that's okay.
15              THE WITNESS:  Yeah, sure.
16              VIDEOGRAPHER:  We are now going
17         off the record, and the time is
18         2:13 p.m.
19         (Off the record at 2:13 p.m.)
20              VIDEOGRAPHER:  We are now going
21         back on the record, and the time is
22         2:25 p.m.
23              MR. ERCOLE:  Dr. Schumacher,
24         thank you for your time with me, at
25         least.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    That being said, I'm going to

 2          pass the witness to one of the

 3          codefendants here and reserve the

 4          right to ask additional questions as

 5          appropriate based upon further

 6          developments in the deposition.

 7          Thanks.

 8                    CROSS-EXAMINATION

 9     QUESTIONS BY MR. MOONEY:

10          Q.    Good afternoon, Dr. Schumacher.

11          A.    Good afternoon.

12          Q.    My name is Matt Mooney.  I'm an

13     attorney with the law firm of Williams &

14     Connolly, and I represent Cardinal Health,

15     one of the defendants in this case.

16                    Excuse me.  I have a couple of

17     questions just right off the bat.

18                    On page 6 of your report, in

19     footnote 1 -- are you there?

20          A.    Yes.

21          Q.    You write, "'Defendants' as

22     used herein refers to the defendant

23     manufacturers of branded and generic opioid

24     products in the actions brought by plaintiffs

25     Cuyahoga County and Summit County, Purdue
```

1    Pharma, Endo, Janssen, Teva, Cephalon,

2    Mallinckrodt, Actavis and Allergan."

3              Did I read that correctly?

4    A.      You read that correctly.

5    Q.      Okay.  Are the opinions in your

6    report and that you will offer in this

7    litigation limited to the defendant

8    manufacturers that you list in footnote 1 of

9    your report?

10   A.      My opinions that are listed in

11   the report are intended to be a broad-based

12   opinion to the effect of pharmaceutical

13   industry and industry in general that's it's

14   promoted the use of opioids for chronic

15   noncancer pain without scientific evidence.

16   Q.      Okay.  So is the answer to my

17   question, "no," the opinions in your report

18   and that you intend to offer in this

19   litigation extend to defendants beyond the

20   ones that you list in footnote 1 of your

21   report?

22   A.      I have no opinion about that.

23   Q.      You don't have an opinion about

24   whether or not your opinion applies to

25   defendants beyond the ones you've listed in

Highly Confidential - Subject to Further Confidentiality Review

1    your report as defendants; is that true?

2         A.    I have not included -- is it

3    Cardinal?

4         Q.    It is Cardinal, but I'm asking

5    more -- I'm asking more specifically.

6         A.    Uh-huh.

7         Q.    Do you have an opinion about

8    any of the other defendants that have been

9    named in this litigation that you intend to

10   offer at trial beyond the ones that you have

11   listed as defendants in footnote 1?

12        A.    My opinion is -- for this

13   report is listed here as the defendants in

14   footnote 1.

15        Q.    Okay.  You don't have a

16   specific opinion about the actions of

17   Cardinal Health as it relates to this

18   litigation, correct?

19        A.    I have not -- in my report, I

20   have not provided a focused opinion about

21   Cardinal Health.

22        Q.    And you're not going to offer

23   an opinion at trial about Cardinal Health

24   specifically, correct?

25        A.    It's my understanding that my

Highly Confidential - Subject to Further Confidentiality Review

1    testimony is -- within scope relates to this

2    report.

3              Q.    Okay.  And --

4              MR. LOESER:  Counsel, just so

5         the record's clear on these defendants

6         listed here, there's been no effort to

7         identify the affiliates and

8         subsidiaries.

9              So provided you're talking

10        about, you know, within that family

11        the companies, that's what that is

12        intended --

13   QUESTIONS BY MR. MOONEY:

14             Q.    When you used the word "Purdue

15   Pharma" in this report, are you referring to

16   Purdue Pharmaceuticals and its affiliates?

17             A.    That's correct.

18             Q.    Okay.  I'm working with that

19   same definition then.

20             A.    Okay.

21             Q.    To the extent that any of these

22   seven -- eight entities listed have

23   affiliates or subsidiaries that have been

24   listed as defendants, you may offer opinions

25   about them, but not outside of those

Highly Confidential - Subject to Further Confidentiality Review

1    family --

2           A.      I understand.  That's correct.

3           Q.      That's correct?

4           A.      Yes.

5           Q.      Okay.  So you don't have a

6    specific opinion about the actions of

7    McKesson Corporation that you intend to offer

8    at trial in this litigation?

9           A.      Yeah, I -- my scope of opinion

10   is restricted to -- or encompasses the list

11   of defendants shown in footnote 1.

12          Q.      Okay.  I'm going to run through

13   the rest of the distributors all at once --

14          A.      Oh, I see.

15          Q.      -- and that way we'll tie it

16   up.

17          A.      Okay.

18          Q.      So AmerisourceBergen Drug

19   Corporation, Prescription Supply,

20   Incorporated, Miami-Luken and Henry Schein,

21   you do not intend to offer an opinion at

22   trial about any of those defendants in

23   connection with this litigation, correct?

24          A.      That is correct.

25          Q.      And exhibit -- Deposition

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit 3 and 4, which were the Appendix 2

2    and supplemental appendix to your report.

3              Do you have both of those in

4    front of you?

5         A.    Exhibit 3 and 4?

6         Q.    Exhibit -- I believe those were

7    the two appendix and supplemental appendix.

8              Is that correct?

9         A.    That's -- sorry.  So what's the

10   question?

11        Q.    Just you have them in front of

12   you?

13        A.    Yes, I do.

14        Q.    Okay.  And there is a list of

15   Bates-stamped documents that I understand

16   your counsel provided you in connection --

17   that you considered in connection with your

18   report; is that right?

19        A.    That's correct.

20        Q.    And if a document is not listed

21   in Appendix 2 and the supplemental appendix,

22   you did not consider it in arriving at your

23   opinion that's reflected in your report,

24   correct?

25              MR. LOESER:  And, Counsel, you

1        mean discovery documents?

2                MR. MOONEY:  Yes.

3                THE WITNESS:  That's what I

4        understand, correct.

5     QUESTIONS BY MR. MOONEY:

6        Q.    Okay.  One of the opinions in

7     your report is that the medical standard of

8     care for the treatment of chronic and acute

9     pain was changed; is that correct?

10       A.    That is -- that is correct.

11    That is in the report.

12       Q.    And is that -- that's your

13    opinion, that the standard of care for the

14    treatment of chronic and acute pain changed?

15       A.    That is a key point in my

16    report.

17       Q.    And --

18       A.    And that is my opinion.

19       Q.    Okay.  And I'm at page third --

20       A.    Where are you?

21       Q.    Sorry, I'm at page 30 of your

22    report, paragraph 60.

23       A.    Oh, okay.

24       Q.    Sort of middle of the page --

25    or the paragraph you say, quote, "Physicians

Highly Confidential - Subject to Further Confidentiality Review

1    were influenced by these efforts, and a

2    cautious and conservative approach to the use

3    of opioids for the treatment of pain was

4    replaced with a much more liberal

5    prescribing -- or was replaced with much more

6    liberal prescribing practices."

7                Is it your opinion that the

8    medical standard of care for the treatment of

9    chronic and acute pain changed, such that a

10   cautious and conservative approach to the use

11   of opioids for the treatment of pain was

12   replaced with a much more liberal -- or with

13   a more liberal prescribing practice?

14        A.    It's my opinion that the -- for

15   many physicians influenced by the message

16   that chronic opioids for chronic noncancer

17   pain was safe and effective, I believe that

18   for those physicians their practice changed.

19                And that is also supported by

20   some of the sales rep notes that were -- that

21   I previously stated.

22        Q.    And my question is:  Is it your

23   opinion that the standard of care change that

24   you believe occurred was a change from a

25   cautious and conservative approach to opioid

Highly Confidential - Subject to Further Confidentiality Review

1    prescribing to a more liberal prescribing

2    practice?

3         A.    Yes.

4         Q.    And when did that change occur?

5         A.    Sorry, are you asking about

6    when did that -- my opinion change or --

7         Q.    When did the standard of care

8    change?

9         A.    I see.

10              Based on my report and in my

11   review of the literature, there was a direct

12   relationship, in my opinion, as to the

13   marketing and increased information out for

14   new formulations of sustained-release opioids

15   such as OxyContin starting in 1996 through

16   forward.

17              There appeared to be a dramatic

18   increase -- there was a dramatic increase in

19   prescriptions written for opioids for chronic

20   noncancer pain that in the past had not been

21   realized.

22        Q.    And so the standard of care

23   changed starting in 1996 through forward; is

24   that right?

25        A.    The standard of care in this

Highly Confidential - Subject to Further Confidentiality Review

```
 1    context.

 2         Q.    This context being the

 3    treatment of chronic and acute pain?

 4         A.    Chronic and -- chronic

 5    noncancer pain.

 6         Q.    Okay.  Is it also your opinion

 7    that under the changed standard of care

 8    doctors would prescribe 30-to-60-day supplies

 9    of opioids for acute injuries and

10    postoperative recoveries?

11              That's page 9, bullet 15, in

12    case you're --

13         A.    Sorry.  What was --

14         Q.    Page 9, bullet 15.

15         A.    Page 9.

16              MR. LOESER:  Paragraph 15?

17              MR. MOONEY:  15, yes.

18    QUESTIONS BY MR. MOONEY:

19         Q.    You write, "Many in the medical

20    community, including myself, were persuaded

21    at the time that opioids were safe and

22    effective for long-term use.  There was less

23    concern about providing 30- or even 60-day

24    supplies for acute injury, postoperative

25    recoveries."
```

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.     Yes, I do.  You read that

3  correctly.

4     Q.     And is it your opinion that the

5  prescription -- prescribing 30-to-60-day or

6  even 60-day supplies of opioids for acute

7  injuries and postoperative recoveries was

8  consistent with the standard of care as it

9  existed when it changed?

10          MR. LOESER:  Objection.  Form.

11      Mischaracterizes his testimony.

12          THE WITNESS:  I included those

13      comments in the report to reflect on

14      what I recalled as a change in

15      practice, if not just what was the

16      state of practice in many instances

17      for the inpatient management of

18      chronic noncancer pain.  But in

19      addition, that would extend to

20      potentially postoperative management

21      of pain as well, that's correct.

22  QUESTIONS BY MR. MOONEY:

23     Q.     Understood.

24          And is it your opinion that

25  that general practice was consistent with the

Highly Confidential - Subject to Further Confidentiality Review

 1    standard of care for the practice of medicine

 2    that you say changed?

 3              MR. LOESER:  Objection.

 4        Mischaracterizes his testimony.

 5              THE WITNESS:  The

 6        characterization of this section in my

 7        report is not intended to represent an

 8        acceptable or evidence-based

 9        acknowledgement of a change in

10        practice but rather reflecting on the

11        practice at the time that was emerging

12        with the use of long-term opioids for

13        certain postoperative, surgical

14        recovery.

15    QUESTIONS BY MR. MOONEY:

16        Q.    So you're not offering an

17    opinion about whether providing 30- or 60-day

18    supplies of opioids for acute injuries and

19    postoperative recoveries is or is not within

20    the acceptable medical standard of care; is

21    that right?

22        A.    My opinion in terms of offering

23    a precise recommendation about the amount or

24    length of a prescription, of course, relates

25    to the context of the clinical situation.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Currently, we have worked hard,
 2    and I have been a leader in this area, to
 3    introduce multimodal analgesic practices that
 4    limit the prescription of opioids under these
 5    conditions.  And it was really the
 6    recognition of these patients being exposed
 7    to increasing doses of opiates and not doing
 8    well that motivated me and others to work to
 9    change that.
10         Q.    Okay.  Once the medical
11    standard of care for the treatment of chronic
12    and acute pain had changed, was that change
13    in the standard of care communicated to
14    medical practitioners?
15              MR. LOESER:  Objection.  Form.
16         Mischaracterizes his testimony.
17              THE WITNESS:  I believe that,
18         as I mentioned before, that changing
19         in practice at the time was --
20         misrepresented that such practices
21         would achieve more efficacious
22         analgesic care for the patients and
23         also be safe.  Subsequent we've found
24         that's not to be the case.
25              And so I don't believe that
```

```
 1            your wording of an establishment of

 2            change of -- or an acceptable change

 3            in the practice of care is best

 4            represented with the idea that

 5            physicians in general accepted that

 6            all patients could receive -- should

 7            be receiving high doses and lengthy

 8            doses of opioids.

 9                 Sorry.

10    QUESTIONS BY MR. MOONEY:

11            Q.    Okay.  So I understand that

12    it's your opinion that now, today, or at some

13    point in the more recent past, physicians

14    have determined that maybe opioids are not as

15    safe and effective for certain uses as they

16    once believed.

17                 Is that fair?  That's the gist

18    of what your --

19            A.    Our current, yes.

20            Q.    Has changed.

21                 I'm sorry, I just interrupted

22    you.  Your current.  I didn't mean to

23    interrupt.

24            A.    When I entered the pain

25    management services, again, around 1999,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    2000, I was seeing an increased number of

2    patients that came in on these medications

3    who continued to have chronic, painful

4    complaints who were no better.  And so I

5    believe at the time there was a recognition

6    by myself and others that nonopioid

7    strategies were important to help manage

8    these painful conditions.

9              So just as the time that there

10   was a pressure to change practices, that is,

11   as you characterize that the practice had

12   changed, there were also ongoing efforts to

13   recognize that and potentially reverse to a

14   safer strategy for pain management.

15   Q.    Understood.

16              I want to be clear.  You said

17   that I characterized it as a change.

18              Doesn't your report say the

19   medical standard of care for treating both

20   chronic and acute pain was changed on

21   page 27?

22              Isn't that your opinion?

23   A.    And I would say the context of

24   that is -- well, if you don't mind, let me

25   just have a quick look at it again.
```

1          Page 27?

2     Q.     Page 27.

3     A.     Thank you.

4     Q.     And I understand that you have

5  an opinion about why the standard of care

6  changed.  My question is simply:  It changed,

7  correct?

8     A.     And I would add that it changed

9  due to the misdirection and misinformation

10  provided by the pharmaceutical industry

11  influence of studies and product information

12  and sales representation.

13     Q.     But it did change; yes or no?

14     A.     Again, it's a change relative

15  to -- in proportionate to the understanding

16  of -- that chronic opiate use in higher doses

17  was safe and effective.

18     Q.     Your report describes marketing

19  claims and sales detailing that you opine

20  promoted misconceptions concerning opioids,

21  correct?

22     A.     My report's opinion is that

23  there were numerous examples of opioid

24  product information that was incorrect and

25  not substantiated by the scientific

Highly Confidential - Subject to Further Confidentiality Review

```
 1    literature that's also been -- also supported
 2    by subsequent reviews and systematic reviews
 3    to that effect.
 4         Q.    Do you have any basis to opine
 5    that any of the distributor defendants that
 6    we talked about at the beginning of my
 7    questioning of you were aware that any
 8    marketing claims or sales detailing
 9    concerning opioids contained misleading or
10    false information?
11         A.    That was outside the scope of
12    my report, and I did not offer an opinion.
13         Q.    So you don't have a basis to
14    opine on that?
15              MR. LOESER:  Objection.
16         Mischaracterizes his testimony.
17              THE WITNESS:  I do not have an
18         opinion on that based on my report.
19              MR. MOONEY:  Okay.  I have no
20         more questions, so if you don't mind,
21         we'll just go off the record real
22         quick so John and I can switch seats.
23              THE WITNESS:  Sure.  Sure.
24              VIDEOGRAPHER:  Okay.  We are
25         now going off record, and the time is
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            2:44 p.m.
2             (Off the record at 2:44 p.m.)
3                 VIDEOGRAPHER:  We are now going
4            back on the record, and the time is
5            2:45 p.m.
6                 CROSS-EXAMINATION
7    QUESTIONS BY MR. LAVELLE:
8            Q.    Good afternoon, Dr. Schumacher.
9    My name is John Lavelle.  I'm an attorney at
10   Morgan Lewis, and I am representing Rite Aid
11   Pharmacy Company.
12                Are you aware that Rite Aid is
13   a defendant in this litigation that you are
14   an expert in?
15           A.    I was -- I am now aware that
16   you're at the table, but as part of my
17   preparation of my report and opinion, I was
18   not aware that Rite Aid was connected in this
19   process.
20           Q.    So as we're sitting here today,
21   we're here for your deposition on April 23,
22   2019, correct?
23           A.    That's correct.
24           Q.    You're aware today -- because I
25   introduced myself earlier during this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    deposition and who I represent, you're now

 2    aware --

 3           A.      Yes.

 4           Q.      -- that Rite Aid is a

 5    defendant; is that right?

 6           A.      That's correct.

 7           Q.      Prior to today, prior to

 8    April 23rd, you were not aware of that; is

 9    that correct?

10           A.      That's correct.

11                   My only information had come

12    from, frankly, the media that distributors

13    were also being examined for liability in the

14    opioid epidemic.

15           Q.      Well, focusing specifically on

16    your report --

17           A.      Yes.

18           Q.      -- which was authored March 25,

19    2019 --

20           A.      That's correct.

21           Q.      -- when you completed your

22    report, were you aware at that time that Rite

23    Aid was a defendant in this litigation?

24           A.      I had no opinion about Rite

25    Aid's role in my report, and I gave no
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    opinion.

2         Q.    Okay.  You're jumping ahead to

3    the next question I may ask.

4         A.    Okay.

5         Q.    I want to ask you about the

6    question I asked --

7         A.    Okay.

8         Q.    -- which was:  Were you aware,

9    when you prepared and completed this report

10   on March 25, 2019, that Rite Aid was a

11   defendant in the litigation?

12        A.    No, I was not.

13        Q.    I'm going to ask you about some

14   of the other retail chain pharmacies.

15              Were you aware, when you

16   completed your report on March 25, 2019, that

17   CVS was also a defendant in this litigation?

18        A.    No, I was not.

19        Q.    Were you aware, when you

20   prepared your report on March 25, 2019, that

21   Walgreen Company was a defendant in this

22   litigation?

23        A.    No, I was not.

24        Q.    When you completed your report

25   on March 25, 2019, were you aware that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Walmart was a defendant in this litigation?

 2         A.     I was not aware.

 3         Q.     Were you aware on March 25,

 4    2019, when you completed your report that

 5    Giant Eagle stores was a defendant in this

 6    litigation?

 7         A.     I was not aware.

 8              MR. LOESER:  Were you aware

 9         that there was such a thing as Giant

10         Eagle stores?

11    QUESTIONS BY MR. LAVELLE:

12         Q.     Yes.  Well, counsel asked a

13    good question; I'm going to ask the same one.

14              You never heard of Giant Eagle

15    stores?

16         A.     That was the top of my mind,

17    actually.  I'd never heard of that before.

18    Fair enough, yeah.

19         Q.     All right.  Fair enough.

20         A.     Yeah.

21         Q.     So you looked earlier in the

22    deposition at your report, which you have in

23    front of you, right?

24         A.     Yes, I do.

25         Q.     And you've got on page 6 a
```

Highly Confidential - Subject to Further Confidentiality Review

1    footnote, footnote 1, that refers to

2    defendants and defines defendants; is that

3    right?

4         A.    That is correct.

5         Q.    And your definition of

6    defendants excludes all of the pharmacies

7    that we just mentioned; is that right?

8              MR. LOESER:  Objection.  Form.

9              THE WITNESS:  Those pharmacies

10        do not appear as this footnote.

11   QUESTIONS BY MR. LAVELLE:

12        Q.    So throughout your report, when

13   you referred to defendants, you are not

14   referring to any of the chain pharmacies; is

15   that right?

16        A.    Within the report I have used

17   wording that is broad and refers to the

18   pharmaceutical industry.  In that regards,

19   that's the breadth of that.

20             However, the defendants as

21   listed do not include the companies you just

22   mentioned.

23        Q.    So just to be clear, Doctor,

24   when you refer in your March 25, 2019 expert

25   report to defendants --

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Uh-huh.
 2          Q.      -- you are not referring to any
 3     of the retail chain pharmacies; is that
 4     right?
 5          A.      The retail chain pharmacies
 6     were outside the scope of preparation of my
 7     report.
 8          Q.      So the answer to my question
 9     is, yes, you are not referring to them; is
10     that right?
11          A.      I have not referred to those
12     companies in my report.  They're outside the
13     scope of my report preparation.
14          Q.      Are you aware of the basis on
15     which plaintiffs have asserted claims against
16     any of the retail chain pharmacies?
17          A.      Only relative to my own reading
18     in the media.  But I have not discussed
19     such -- well, I can't reveal discussions with
20     counsel, but, again -- I'm sorry, could you
21     repeat your question?
22          Q.      Sure.
23                  And I understand you may be
24     getting confused here.  I'm not asking for
25     communications you had with your counsel.
```

Highly Confidential - Subject to Further Confidentiality Review

 1    I'm just asking what your understanding is.

 2                    As you sit here today on

 3    April 23, 2019, do you have an understanding

 4    of why plaintiffs have asserted claims or

 5    what the claims are that the plaintiffs have

 6    asserted against the retail chain pharmacies?

 7         A.    That's outside the scope of my

 8    report.  I have no opinion in that matter.

 9         Q.    But do you have an

10    understanding of what the claims are against

11    them?

12         A.    No, I do not.

13         Q.    Do you have an understanding

14    today as to whether they have been sued for

15    dispensing as opposed to distribution?

16         A.    I don't know.

17         Q.    Do you know whether any of the

18    pharmacies I've mentioned earlier, Rite Aid,

19    CVS, Walmart, Walgreens, Giant Eagle, whether

20    they, in fact, distribute opioids or have

21    distributed opioids?

22         A.    Within the -- preparing for

23    this report, I have no evidence other than

24    just from personal knowledge of being a

25    physician and knowing that certain pharmacies

```
 1    dispense opioids to patients.

 2         Q.     And what is that understanding?

 3         A.     That -- for example, I'm aware

 4    that CVS Pharmacy dispenses opioids.

 5         Q.     Do you know whether they

 6    distribute opioids?

 7         A.     I do not know.

 8         Q.     Any of the other retail chain

 9    pharmacies, do you have an understanding of

10    whether they distribute opioids?

11              MR. LOESER:  Objection.  Form.

12              THE WITNESS:  I do not know.

13    QUESTIONS BY MR. LAVELLE:

14         Q.     Do you have an understanding as

15    we sit here today on April 23, 2019, as to

16    whether any of those retail chain pharmacies

17    conducted any marketing activities with

18    respect to opioids?

19         A.     I do not know.

20         Q.     Would you agree with me that

21    the documents --

22              MR. LAVELLE:  I'm sorry to say

23         that we've -- this is John Lavelle,

24         representing Rite Aid.  We've been

25         speaking for quite a while here with
```

```
 1           apparently the mute on, so I'll

 2           apologize, although I'm not sure when

 3           the phone was muted.

 4                VIDEOGRAPHER:  It's eight

 5           minutes.

 6                MR. LOESER:  I could give a

 7           very quick summary, if you'd like.

 8   QUESTIONS BY MR. LAVELLE:

 9      Q.    Okay.  So let me just look at

10   the realtime here to see where we were.

11           Doctor, would you agree with me

12   that documents that you have identified in

13   Appendix 2 to your report, which are the

14   documents that you reviewed in order to

15   prepare your opinions, do not include any

16   marketing materials from any of the retail

17   chain pharmacies, that is, no marketing

18   materials from Rite Aid, CVS, Walmart,

19   Walgreens or Giant Eagle?

20      A.    Upon my review, I see -- I do

21   not identify any of those materials in this

22   exhibit, which is Exhibit 3, apparently.

23      Q.    Did you request any materials

24   or information relating to the retail chain

25   pharmacies that you did not have an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opportunity to review prior to finalizing

 2    your report?

 3                MR. LOESER:  I'm going to

 4          object and instruct the witness not to

 5          answer any question about

 6          communications and conversations with

 7          counsel.

 8                So instruct you not to answer

 9          that question.

10    QUESTIONS BY MR. LAVELLE:

11          Q.    Do you have any plans in the

12    future to offer opinions concerning any of

13    the retail chain pharmacies?

14          A.    As I understand the process, my

15    expert opinion and report as submitted on the

16    25th of March allows me to further develop my

17    opinion based on additional information in

18    the process.

19                I'll tell you honestly, I don't

20    know if that extends through the whole

21    process or was just the process until we're

22    here at the deposition.

23          Q.    So do you have any plans in the

24    future to offer opinions concerning any of

25    the retail chain pharmacies?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Thus far, my testimony is based

 2     on the report given and the list of the

 3     defendants that we've reviewed that are

 4     listed in footnote 1.

 5          Q.      Doctor, I understand your

 6     testimony earlier, and I think you've been

 7     clear that you have not offered any opinions

 8     concerning any of the retail chain

 9     pharmacies, and I appreciate your explaining

10     that to us.

11              My question is a different one.

12     My question is:  Do you have any plans in the

13     future to offer opinions concerning any of

14     the retail chain pharmacies, that is,

15     opinions that you have not yet committed to

16     writing?

17              MR. LOESER:  And, Counsel, I

18          think part of the confusion is if

19          you're talking about the Summit and

20          Cuyahoga bellwether cases or

21          subsequent cases, so maybe if you can

22          clarify that, that can be helpful.

23              THE WITNESS:  I'm struggling

24          with the process here to answer your

25          question as clearly as I can.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I don't have an answer for that

 2         given the information I have

 3         currently.

 4    QUESTIONS BY MR. LAVELLE:

 5         Q.    You haven't been given any

 6    information about the retail chain

 7    pharmacies, correct?

 8         A.    That's correct.

 9         Q.    So you would have no basis on

10    which to offer opinions at this stage, right?

11         A.    I have no basis to offer an

12    opinion today.

13                    MR. LAVELLE:  That's all I

14         have.  Thank you, Doctor.

15                    THE WITNESS:  Thank you.

16                    VIDEOGRAPHER:  We are now going

17         off the record, and the time is

18         2:57 p.m.

19          (Off the record at 2:57 p.m.)

20                    VIDEOGRAPHER:  We are now going

21         back on the record, and the time is

22         3 p.m.

23                    CROSS-EXAMINATION

24    QUESTIONS BY MR. EHSAN:

25         Q.    Good afternoon, Dr. Schumacher.
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Good afternoon.

2    Q.    My name is Houman Ehsan, and I

3    represent Janssen in this litigation.

4          Doctor, do you know what opioid

5    medications, if any, Janssen manufactures or

6    manufactured in the past?

7    A.    I'm most familiar with the

8    Duragesic product, the transdermal.

9    Q.    Do you know when the Duragesic

10   transdermal system was first approved for

11   market in the United States?

12   A.    I do not.

13   Q.    If I told you it was 1990,

14   would you have any reason to disbelieve me?

15   A.    No.

16   Q.    Did you prescribe at any point,

17   whether in your training or as an attending

18   physician, a Duragesic transdermal patch for

19   any of your patients?

20   A.    Yes.  This would be -- sorry,

21   in -- principally in the hospital setting,

22   yeah.

23   Q.    Have you had any occasion to

24   prescribe the Duragesic transdermal patch

25   system for a patient in an outpatient

1    setting?

2         A.    No, I have not.

3         Q.    Do you have a sense of how

4    often in a particular year you would

5    prescribe a Duragesic transdermal patch for

6    inpatients that were under your care?

7              MR. LOESER:  Objection.  Form.

8              THE WITNESS:  So the structure

9         of our medication management for

10        inpatients essentially requires a

11        review and confirmation of the

12        medications they're on, and

13        essentially physicians, the primary

14        admitting physicians, would rewrite

15        that order.

16             If for some reason that was

17        missed, at least in their process, and

18        we were consulted, we would initially

19        rewrite that order, or the resident

20        would rewrite it, until we understood

21        the overall medical history and

22        history of analgesic use for that

23        patient.

24   QUESTIONS BY MR. EHSAN:

25        Q.    If I understand your testimony,

Highly Confidential - Subject to Further Confidentiality Review

1    Doctor, correctly, that as a consult

2    physician in the hospital, you just make

3    recommendations to the primary care team, and

4    unless something is missed, you or your team

5    wouldn't be the ones writing prescriptions

6    for patients in an inpatient setting; is that

7    correct?

8              MR. LOESER:  Objection.  Form.

9              THE WITNESS:  That is not

10         correct.  There are a number of --

11         sorry, a number of situations where

12         the pain management services would be

13         primary prescribers.  It depends on

14         the context of the admission and the

15         difficulty to manage a particular

16         patient.

17              If there's a pain crisis

18         evolving or if there's other

19         interventions required to manage that

20         patient's pain, we work -- that there

21         would only be a single, essentially,

22         prescriber so there -- avoid confusion

23         of conflicting orders.

24    QUESTIONS BY MR. EHSAN:

25         Q.    How many patients in a given

Highly Confidential - Subject to Further Confidentiality Review

```
1     month are you the primary treating physician

2     for in a hospital?

3                    MR. LOESER:  Objection.  Form.

4                    THE WITNESS:  So I -- pardon

5          me -- attend two days a week, and our

6          census usually is about 20 patients a

7          day I see.  And so on average I'll

8          see -- half of those patients, at

9          least, are chronic pain patients or

10         acute on chronic.

11                   I may have lost track of your

12         question.  Sorry about that.

13    QUESTIONS BY MR. EHSAN:

14         Q.    What percentage of those

15    patients are you the primary responsible

16    physician for?

17                   MR. LOESER:  Objection.  Form.

18                   THE WITNESS:  I'm not sure I

19         understand the question.

20                   Do you mean the admitting

21         physician or the consult pain

22         physician?

23    QUESTIONS BY MR. EHSAN:

24         Q.    My question is straightforward.

25                   You said that you, on occasion,
```

1    would write prescriptions for opioids in an

2    inpatient setting.

3              My question is:  What

4    percentage of the patients you see in a

5    hospital are you or your team the primary

6    managing physician for?

7              MR. LOESER:  Objection.  Form.

8              THE WITNESS:  If I understand

9         your question, that when we are

10        consulted by the primary service, we

11        are either writing the opioid or

12        analgesic orders or we're providing

13        recommendations.

14             The interpretation of what a

15        primary physician is -- I'm a little

16        bit confused of what you mean by that.

17   QUESTIONS BY MR. EHSAN:

18        Q.    Let me ask you this way:  What

19   percentage are you making -- for what

20   percentage of patients are you making a

21   recommendation for an opioid versus for what

22   percentage of patients are you actually

23   writing the opioid prescription for?

24             MR. LOESER:  Objection.  Form.

25             Assumes facts not in evidence.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I would say that
 2          on average we're actually writing for
 3          probably at least 60 percent of these
 4          patients.  Something in that range.
 5          It varies.
 6   QUESTIONS BY MR. EHSAN:
 7          Q.    Dr. Schumacher, you said that
 8   the standard of care related to opioid
 9   prescribing changed in 1996.
10                    Do you recall that testimony?
11                    MR. LOESER:  Objection.
12          Mischaracterizes his testimony.
13                    THE WITNESS:  That was the
14          words that one of the attorneys, I
15          believe, used.
16                    My wording is that due to
17          intense marketing by pharmaceutical
18          industry, there was an increase in
19          prescribing of opioids by physicians
20          that had the understanding that doing
21          so was safe and effective for their
22          patients.
23   QUESTIONS BY MR. EHSAN:
24          Q.    So in your report, you don't
25   mention that the standard of care was changed
```

Highly Confidential - Subject to Further Confidentiality Review

1    by the pharmaceutical industry?

2         A.    No, I remember we reviewed

3    that.

4         Q.    And what -- when did that

5    happen?

6              MR. LOESER:  Objection.  Form.

7              THE WITNESS:  Again, I -- my

8         opinion is that beginning in 1996 or

9         thereabouts, due to the forces of the

10        pharmaceutical industry to promote

11        opioids, that many physicians'

12        practices changed in ways to utilize

13        chronic opioids in high dose and

14        potency opioids for their chronic

15        noncancer patients.

16   QUESTIONS BY MR. EHSAN:

17        Q.    Dr. Schumacher, were you ever

18   visited by a pharmaceutical representative

19   that detailed you on the Duragesic patch?

20             MR. LOESER:  Objection.  Form.

21             THE WITNESS:  I can't recall.

22   QUESTIONS BY MR. EHSAN:

23        Q.    Do you believe you may have

24   been visited by a pharmaceutical rep to

25   discuss the Duragesic patch?

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      I can't recall.
2           Q.      You said you were -- in the
3    past have interacted with pharmaceutical
4    representatives related to other analgesic
5    medications, correct, Doctor?
6           A.      I did say that, that's correct.
7           Q.      Were there instances -- sitting
8    here today, do you recall any instance in
9    which a pharmaceutical rep told you a
10   misleading or false information related to
11   the medications that they were discussing
12   with you?
13                  MR. LOESER:  Objection.  Form.
14                  THE WITNESS:  I don't recall.
15   QUESTIONS BY MR. EHSAN:
16          Q.      Would it be fair to say that
17   it's possible for a pharmaceutical
18   representative to visit a doctor, discuss a
19   medication and not make any false or
20   misleading statements to that doctor?
21                  MR. LOESER:  Objection.  Form,
22          and calls for speculation.
23                  THE WITNESS:  Although that is
24          a possible outcome, based on my review
25          of the evidence and exhibits provided,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            I was astonished by the number of

2            misstatements and misleading

3            statements that were offered around

4            the use of chronic opioids for chronic

5            noncancer pain.

6    QUESTIONS BY MR. EHSAN:

7            Q.      How many call notes did you

8    review in preparation for your expert report?

9            A.      I surveyed hundreds of them.

10           Q.      Do you know how many

11   physician/pharmaceutical rep interactions

12   there were in the Cuyahoga County and Summit

13   Counties between 1996 and 2015?

14           A.      I do not.

15           Q.      Would you suspect that it would

16   be a lot more than hundreds?

17                   MR. LOESER:  Objection.  Calls

18           for speculation.

19                   THE WITNESS:  I do not know.

20   QUESTIONS BY MR. EHSAN:

21           Q.      How did you -- did you select

22   the hundreds of particular call notes you

23   reviewed, or were they provided to you?

24           A.      I was provided by counsel with

25   what is listed as exhibits in Appendix 2, and
```

Highly Confidential - Subject to Further Confidentiality Review

1    I reviewed -- sampled as many as I could and

2    selected certain of them as examples.

3         Q.    Did you consider it a context

4    in which the pharmaceutical reps -- well, let

5    me back up a second.

6              You understand that the call

7    notes are a summary of an interaction between

8    a -- well, let me back up and ask the

9    question.

10              What is your understanding of

11   what the call notes represent?

12        A.    As I understand them, my

13   interpretation is that they're a report back

14   to the corporation and to their leadership or

15   supervisors monitoring their ability to

16   market a particular opioid product.

17        Q.    Are they all written in full

18   sentences?

19        A.    It appears there is a mixture

20   of abbreviations and full sentences, is what

21   I have reviewed.

22        Q.    Did you review the regulations,

23   if any, related to what a sales

24   representative or a pharmaceutical

25   representative needs to include or not

1    include in his or her call notes?

2         A.    I don't recall.

3         Q.    Did you review any standard

4    operating procedures from any of the

5    defendants related to how and the manner in

6    which a -- pharmaceutical representatives

7    would keep track of their interactions with

8    physicians via call notes?

9              MR. LOESER:  Objection to form.

10             THE WITNESS:  Just give me a

11        moment.  I'd like to just review a

12        portion of my exhibits.

13   QUESTIONS BY MR. EHSAN:

14        Q.    Sure.

15        A.    I can't recall the details of

16   specific instructions to sales

17   representatives on a protocol for their call

18   notes.

19        Q.    Is it your opinion, Doctor,

20   that you had adequately understood the

21   context of those call notes before you made a

22   decision whether or not they were evidence of

23   a misrepresentation by the pharmaceutical

24   representative to the physician?

25             MR. LOESER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Calls for a legal conclusion.
 2                THE WITNESS:  With my review of
 3          these sales representative notes, it
 4          struck me hard, frankly, that there
 5          was such misrepresentation of the use
 6          of high-dose opioids under various
 7          clinical situations.
 8                Again, in Exhibit B -- and I'll
 9          quote:  "Doctor has a ton of Vicodin
10          patients.  A lot of low back pain.
11          Leery of Class II.  Use product
12          information to sell low-abuse,
13          Q12-hour."
14                And "Doctor agreed to use for
15          all of his low back instead of
16          Vicodin.  Keep on this guy.  He's easy
17          money."
18                My interpretation is I don't
19          particularly believe I need additional
20          direction to interpret that as -- that
21          the promotion of these opioids were
22          not based on a description of the
23          scientific evidence to that particular
24          physician and provided a variety of
25          misstatements and misdirection for
```

1       that physician that might influence

2       their prescribing practices.

3    QUESTIONS BY MR. EHSAN:

4       Q.    So sitting here looking at that

5    language you read, you feel comfortable

6    opining on whether the pharmaceutical

7    representative intended to deceive the doctor

8    and whether or not that doctor was, in fact,

9    deceived by that and whether the doctor

10   actually wrote prescriptions that were

11   inappropriate for his patients or her

12   patients?

13          MR. LOESER:  Objection.  Form.

14       Mischaracterizes his prior testimony.

15          THE WITNESS:  This particular

16       example -- there were multiple other

17       examples that I came across that

18       appeared to misrepresent the intent of

19       providing physicians with details

20       about -- to safely manage their

21       patient without harm.

22   QUESTIONS BY MR. EHSAN:

23       Q.    So you were able to understand

24   the intent of the pharmaceutical

25   representatives based on the call notes you

Highly Confidential - Subject to Further Confidentiality Review

```
1    have in front of you; is that correct?
2              MR. LOESER:  Objection to --
3              THE WITNESS:  My --
4              MR. LOESER:  -- form, and it
5         mischaracterizes his prior testimony.
6              THE WITNESS:  Yeah, my opinion
7         does not focus on the --
8         characterizing an individual's, sales
9         rep's, intent, short of misdirecting a
10        physician, because they're using
11        information that's not supported by
12        the scientific evidence.
13   QUESTIONS BY MR. EHSAN:
14        Q.    Likewise, Doctor, are you aware
15   of whether or not any of those doctors that
16   are the subject of those call notes --
17        A.    Uh-huh.
18        Q.    -- made a improper -- wrote an
19   improper prescription for any opioids as a
20   result of the interaction with the
21   pharmaceutical reps?
22              MR. LOESER:  Objection.  Form,
23        and outside the scope of his opinions.
24              THE WITNESS:  I do not know.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. EHSAN:
 2         Q.    Dr. Schumacher, are you aware
 3    of any physician in the state of Ohio who
 4    wrote an improper prescription for opioids as
 5    a result of false or misleading statements
 6    made to him or her by a pharmaceutical
 7    representative?
 8              MR. LOESER:  Objection.  Form.
 9         Outside the scope of the report.
10         Asked and answered in prior
11         questioning.
12              THE WITNESS:  I do not have
13         direct references that link these
14         reports to an individual physician
15         writing a prescription.
16              However, what I do know, based
17         on the research in this report, is
18         that as there was aggressive marketing
19         to physicians to prescribe high-dose
20         opioids, as illustrated in these
21         examples, there was an increase across
22         the country of prescribing opioids and
23         stronger doses of opioids that
24         paralleled an increase in harm to the
25         population.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. EHSAN:

 2         Q.    So that would be a temporal

 3    association or temporal correlation?

 4              MR. LOESER:  Objection.  Form.

 5              THE WITNESS:  Could you explain

 6         your question, please?

 7    QUESTIONS BY MR. EHSAN:

 8         Q.    Let me back up and ask a

 9    slightly different question.

10              Doctor, how many of those call

11    notes you have in front of you are from

12    Summit or Cuyahoga County?

13              MR. LOESER:  Objection.  Form.

14              THE WITNESS:  I do not know.

15         The extent of the description for

16         several of these indicates they're

17         from Ohio.  That's the level of detail

18         that's provided.

19    QUESTIONS BY MR. EHSAN,

20         Q.    Did you make any efforts to try

21    to limit your analysis to call notes that

22    were -- that reflected interactions with

23    doctors or prescribers in Summit and Cuyahoga

24    County?

25         A.    If I understood your question,
```

1    I made no effort to restrict to those

2    counties.

3         Q.    Doctor, to the extent that you

4    had interactions with pharmaceutical

5    representatives for any purpose in your

6    career, have you had occasion to be left the

7    package insert or prescribing information for

8    the medication that was the subject of the

9    discussion?

10        A.    That has occurred in the past,

11   yes.

12             (Schumacher Exhibit 7 marked

13        for identification.)

14   QUESTIONS BY MR. EHSAN:

15        Q.    And I'm going to mark as the

16   next exhibit...

17             Doctor, I've handed you what's

18   been -- or you've been handed what's been

19   marked as Exhibit 7.  I'll represent to you

20   this is the package insert for the Duragesic

21   transdermal system for 2005.

22             If you would like to confirm,

23   if you can go to the last page, you'll see

24   it's electronically signed by Bob Rappaport,

25   who I'll represent to you is from the FDA, on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    February 4th of 2005.

 2                Doctor, have you ever seen the

 3    package insert for Duragesic?

 4                MR. LOESER:  And I'll caution

 5         the witness to review the document

 6         before indicating whether he's seen it

 7         or not previously.

 8                MR. EHSAN:  I'm not talking

 9         about this particular document.

10    QUESTIONS BY MR. EHSAN:

11         Q.    I'm talking about have you ever

12    seen a package insert for Duragesic at any

13    point in time?

14         A.    Yes, I have.

15         Q.    Were you aware that it

16    contained a box warning?

17         A.    The black box warning, that's

18    correct.

19         Q.    And do you see the first page,

20    and actually continuing on to the second page

21    of this document, contained some bolded

22    language that is surrounded by a box,

23    correct?

24         A.    That's correct.

25         Q.    And that is what is
```

1    colloquially referred to as the box warning,

2    correct?

3         A.    That's correct.

4         Q.    And do you have an

5    understanding of whether or not the box

6    warning is the highest level of warning a

7    prescription medication can carry within the

8    United States?

9         A.    That's my understanding.

10             MR. ERCOLE:  Counsel, before

11        you ask more questions about this

12        document, can you just clarify that --

13        I believe you're asking questions

14        generally about this package insert,

15        or are you asking if he's seen this

16        one and is knowledgeable about this

17        package insert?

18             MR. EHSAN:  I asked him if he's

19        ever seen any package insert for

20        Duragesic, and then the questions

21        about a boxed warning is just generic

22        about boxed warnings.

23    QUESTIONS BY MR. EHSAN:

24        Q.    Focusing your attention on this

25    document, which has been marked as Exhibit 7,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Doctor, would you mind reading aloud the

 2    first paragraph that's in the box?

 3          A.      "Duragesic contains a high

 4    concentration of a potent Schedule II opioid

 5    agonist fentanyl.  Schedule II opioid

 6    substance which include fentanyl,

 7    hydromorphone, methadone, morphine, oxycodone

 8    and oxymorphone have the highest potential

 9    for abuse and associated risk of fatal

10    overdose due to respiratory depression.

11    Fentanyl can be abused and is subject to

12    criminal diversion.  The high content of

13    fentanyl in the patches, Duragesic, may be a

14    particular target for abuse and diversion."

15          Q.      You can stop there.  Thank you,

16    Doctor.

17                  Anything you would consider

18    false or misleading about the paragraph you

19    just read?

20          A.      No.

21          Q.      Is it true that this paragraph,

22    even though it's from 2005, still even today

23    adequately reflects the risk associated with

24    Schedule II opioids in terms of addiction,

25    diversion or respiratory depression?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. LOESER:  Objection.  Form.

 2              THE WITNESS:  It represents a

 3         part of the description.  I would

 4         agree with that.

 5    QUESTIONS BY MR. EHSAN:

 6         Q.     And if you go to the next

 7    section, it states that:  "Duragesic is

 8    indicated for the management of persistent,

 9    underlined, moderate to severe chronic pain,

10    that, colon, requires continuous

11    around-the-clock opioid administration for an

12    extended period of time, comma," and, next

13    bullet, "cannot be managed by other means

14    such as nonsteroidal analgesics, opioid

15    combination products or immediate-release

16    opioids."

17              Did I read that correctly,

18    Doctor?

19         A.     You did read that correctly.

20         Q.     Would it be fair to say then,

21    Doctor, that the Duragesic patch is not a

22    first-line opioid medication?

23              MR. LOESER:  Objection.  Form.

24              THE WITNESS:  As reflected in

25         this 2005 document.
```

```
 1              However, I do recall that prior

 2         releases of Duragesic did not have all

 3         of the same wording here.

 4    QUESTIONS BY MR. EHSAN:

 5         Q.    At least as of the 2005

 6    label -- and I will represent to you that

 7    this language continues going forward -- that

 8    this medication was intended for patients who

 9    were already receiving opioids, correct?

10         A.    That is correct.

11              Given the difficulties of

12    having introduced this system previously to

13    nonopioid patients, there were a number of

14    incidents of disastrous respiratory failure

15    and death associated with the use of this

16    system in so-called nonopioid-tolerant

17    patients.

18         Q.    And not only does this

19    medication require a patient to be

20    opioid-tolerant, but it also required that

21    patients couldn't have been managed by other

22    means such as nonsteroidal analgesic opioid

23    combination products and immediate-release

24    opioids.

25              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LOESER:  Objection.  Form.
 2      QUESTIONS BY MR. EHSAN:
 3           Q.     That's the second bullet point.
 4           A.     I'm aware that what you've read
 5      is included in this description.
 6           Q.     In evaluating a patient --
 7                  MR. LOESER:  Counsel, I think
 8           he was --
 9                  MR. EHSAN:  I'm sorry, were
10           you --
11                  THE WITNESS:  No, that's fine.
12           I'll stop.
13      QUESTIONS BY MR. EHSAN:
14           Q.     You sure?
15                  I apologize if I interrupt.
16           A.     No problem.
17           Q.     Would it be fair to say,
18      Doctor, that whether or not a patient had
19      failed other nonopioid therapeutic or
20      analgesic interventions would be relevant in
21      making a medical decision on whether or not
22      to prescribe that patient an opioid?
23                  MR. LOESER:  Objection.  Form.
24                  THE WITNESS:  So their decision
25           to prescribe a long-acting or
```

1    around-the-clock opioid for noncancer

2    chronic pain really depends on the

3    context for that particular patient,

4    as I mentioned before.

5         And given that there's

6    essentially no strong evidence that

7    chronic opioid therapy for noncancer

8    chronic pain has not been shown to be

9    effective and can be associated with

10   great harm, I would want to put this

11   sentence, this point, into the context

12   of that decision and may very well

13   fall into these very low -- very low

14   percentage of patients that might

15   actually represent a candidate for

16   such therapy.

17   QUESTIONS BY MR. EHSAN:

18        Q.    Doctor, has there been strong

19   evidence to show efficacy of opioids for

20   cancer pain treatment?

21        A.    There has been, yes.

22        Q.    Is your opinion that -- let me

23   back up and ask one other question.

24             Has there been evidence in your

25   mind that is strong on the efficacy of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opioids in long-term treatment of cancer
 2    pain?
 3         A.     There is also good evidence,
 4    strong evidence, for that.
 5         Q.     But you believe that there is
 6    not good evidence or strong evidence for the
 7    treatment of chronic noncancer pain with
 8    opioids; is that correct?
 9         A.     That is my opinion, yes.
10         Q.     Can you tell me which
11    nociceptor in the body -- well, let me back
12    up.
13             Do you know what a nociceptor
14    is, Doctor?
15         A.     Yes.  A nociceptor has been
16    described to be a -- sensory neurons our
17    primary afferent nociceptor was principally
18    discussed that is either an unmyelinated or
19    slightly myelinated primary afferent
20    nociceptor neuron.  So it detects
21    both noxious chemical, mechanical and thermal
22    stimuli signals, impending or actual tissue
23    damage to the central nervous system.
24         Q.     Do you know of any
25    cancer-specific nociceptor in the body,
```

Highly Confidential - Subject to Further Confidentiality Review

1   Doctor?

2        A.    A nociceptor is only activated

3   in the -- under the condition of cancer.

4        Q.    That's correct.

5        A.    I'm not aware that the

6   mechanism works that way.

7        Q.    Are you aware of anyone being

8   able to assess -- let me back that up.  Let

9   me back up and ask this question slightly

10  different.

11            These primary afferent neurons

12  have targets in the thalamus, correct?

13       A.    That is one -- after they

14  connect through the spinal cord, there's

15  ascending pathways that pass through the

16  thalamus and other structures, that's

17  correct.

18       Q.    I will get to the other

19  structures.

20       A.    Oh.

21       Q.    Anywhere -- is there a

22  cancer-specific portion of the thalamus where

23  cancer pain registers where other cancer

24  pains don't?

25       A.    I'm not aware of, no.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How about the rostral ventral

2    medulla?

3    A.    Not as a specific center for

4    cancer pain.

5    Q.    How about the periaqueductal

6    gray matter?

7    A.    No.

8    Q.    So, Doctor, can you tell me

9    what, from a neurobiology or neuroanatomy, is

10   there any unique aspect of cancer pain that

11   maps differently than noncancer pain in the

12   human brain?

13   A.    So the distinguishing features

14   of cancer pain may reflect not just tissue

15   trauma but a particular cancer may be

16   releasing factors that produce plasticity

17   changes in the nervous system that are

18   potentially different than, say, a traumatic

19   injury or postsurgical pain or osteoarthritis

20   pain or back pain.

21   And so there is evidence that

22   certain types of cancer pain, again, release

23   factors that are unique, that are not in all

24   other pain syndromes.

25   Q.    And that's true for all cancers

1    or just some cancers?

2        A.    I don't believe all cancers

3    have been studied relative to their

4    potential, but I'm familiar with certain

5    cancers that involve -- for instance,

6    squamous cell carcinomas have been studied in

7    some detail.  Or the effect of, for instance,

8    pancreatic cancer, and because of its

9    location, the degree of inflammation that can

10   be generated from a cancer there is unique

11   compared to other sites of cancers, for

12   instance, lung cancer.

13       Q.    Is it your understanding that

14   the strong evidence on the efficacy of

15   opioids for cancer pain is restricted to

16   cancers that release certain factors, or is

17   it more general to all cancers?

18       A.    I believe as we practice,

19   it's -- despite those potential differences,

20   it has been broadly applied to the treatment

21   of cancer pain.

22       Q.    Generally; is that correct?

23       A.    Generally, that's right, yeah.

24       Q.    So sitting here today, can

25   you -- do you have an opinion about what it

Highly Confidential - Subject to Further Confidentiality Review

1    is about cancer pain that allows opioids to

2    be effective long-term that doesn't exist in

3    chronic noncancer pain?

4         A.    I believe the literature that

5    supports the use of opioids in -- high

6    potency opioids in cancer pain has grown --

7    has developed over time relative to, frankly,

8    the survivorship of cancer patients.  And the

9    idea is that the compassionate use of opioids

10   in the setting of advancing active cancer as

11   well as end-of-life care is in balance with

12   the potential risks.

13            However, not all cancer pain is

14   necessarily responsive to opioids alone.  And

15   as a pain physician, when presented with

16   these patients, we look at all potential

17   modalities to help manage such patients,

18   especially given that as survivorship has

19   improved with these patients, we're now

20   realizing that the chronic opioid therapy

21   that they were receiving, in fact, is

22   impairing their quality of life after

23   survivorship with the same risk and harms

24   that we've seen in chronic noncancer pain

25   patients using these opioids chronically.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Doctor, my question was

2  actually very specific --

3    A.    Oh, I'm sorry.

4    Q.    -- about the efficacy, not the

5  risk profile.  So I want to back up a second.

6    A.    Sure.  Sure.

7    Q.    If the opioids didn't relieve

8  long-term pain in cancer, irrespective of

9  whether or not the risk mattered to the

10  patient given his or her life expectancy, you

11  still wouldn't prescribe an opioid, correct?

12          MR. LOESER:  Objection.  Form.

13      Mischaracterizes his testimony.

14          THE WITNESS:  Yeah.  So from my

15      perspective and my opinion is the

16      difficulty here is what constitutes

17      long-term efficacy.  And many of the

18      studies that have been done both on

19      the chronic noncancer pain as well as,

20      to a degree, the cancer pain

21      literature have relied on relatively

22      short-term initial studies where we're

23      facing patients, both chronic

24      noncancer as well as cancer patients,

25      that are on these medications for

Highly Confidential - Subject to Further Confidentiality Review

```
1          years.  And we don't have, actually,

2          evidence that they continue to provide

3          the analgesic effects that initially

4          were intended.

5                  I don't know if that helps

6          answer that.

7   QUESTIONS BY MR. EHSAN:

8          Q.     If you look at Exhibit 7, which

9   is the Duragesic label that's in front of

10  you, Doctor --

11         A.     Yes.

12         Q.     -- there is no -- under the

13  second paragraph there -- an indicated --

14         A.     Sorry, first page, still?

15         Q.     First page.

16         A.     Okay.

17         Q.     Second full paragraph.

18         A.     Uh-huh.

19         Q.     It talks about Duragesic is

20  indicated for the management of persistent,

21  moderate to severe chronic pain.

22                 Do you recall reading that

23  prior?

24         A.     Yes, I do.

25         Q.     There's no limitations there to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    cancer; is that correct?

 2         A.     That's correct.

 3         Q.     Do you have an opinion whether

 4    that's an inappropriate indication for

 5    Duragesic, that it not be limited just to

 6    cancer pain patients?

 7              MR. LOESER:  Objection.  Form.

 8         Also, it's outside the scope of his

 9         opinion in this case.

10              THE WITNESS:  Again, my opinion

11         is that there's very few indications

12         for the use of around-the-clock

13         chronic opioid therapy in chronic

14         noncancer pain.

15              And -- as there is no evidence

16         for its utility versus its risks of

17         harm.

18    QUESTIONS BY MR. EHSAN:

19         Q.     Doctor, are you familiar with

20    the drug tapentadol?

21         A.     I am familiar with it.  It's --

22    yes, I am familiar with it.

23         Q.     Do you know what the brand name

24    for tapentadol is?

25         A.     I believe it's Nucynta.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you had any occasion to

2    prescribe Nucynta to any of your patients?

3    A.    On the inpatient services,

4    Nucynta is not on our formulary, and so a

5    patient who comes in with that medication,

6    honestly, it's a bit of a challenge to

7    continue them on that medication for that

8    reason.

9    Q.    Have you found in your clinical

10   practice that whether or not a specific

11   medication is on a formulary can impact

12   whether or not you can prescribe it to a

13   patient?

14   A.    Well, within the University of

15   California-San Francisco, whether or not a

16   medication is on a formulary absolutely

17   impacts its use in the hospital.

18   Q.    Have you ever had occasion to

19   have any interaction with a pharmaceutical

20   representative related to Nucynta?

21   A.    I don't believe so.

22   Q.    Do you have an understanding of

23   Nucynta's mechanism of action?

24   A.    I do have some understanding of

25   its mechanism.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      You understand that Nucynta has
 2      nonopioid receptor function?
 3              A.      My understanding is that it
 4      carries both serotonin and norepinephrine
 5      reuptake inhibition, but it also is combined
 6      with a stronger opioid effect, which --
 7              Q.      Do you have an understanding
 8      one way or another about the abuse profile of
 9      Nucynta versus other opioids?
10              A.      I do not know.
11              Q.      You understand, Doctor, that
12      both the Duragesic transdermal system and
13      Nucynta ER are long-acting opioids?
14              A.      Yes.  I mean, the transdermal
15      system is a continuous release formulation,
16      that's right.
17              Q.      And just for clarity sake,
18      methadone is an actually long-acting opioid
19      by virtue of its half-life, correct?
20              A.      That's correct.
21              Q.      But putting methadone aside,
22      you can generate a long-acting medication
23      with a short half-life compound by virtue of
24      its delivery mechanism, correct?
25              A.      I believe that the -- well,
```

Highly Confidential - Subject to Further Confidentiality Review

1    again, you brought up the point about

2    methadone.  Aside -- you know, each of these

3    opioids have unique properties of binding and

4    their half-lives once they bind.

5              So that is a factor relative to

6    how they are delivered over time in these

7    systems.

8        Q.    I just want to be clear that

9    fentanyl itself is not a long-acting opioid.

10   But given the fact that the transdermal

11   system delivers small quantities over a

12   period of three days, it acts as if it was a

13   long-acting delivery system, right?

14             MR. LOESER:  Objection.  Form.

15             THE WITNESS:  Fentanyl patch,

16        as I understand it, provides a depot

17        of the fentanyl into the underlying

18        skin and fat and tissues, and from

19        there it is slowly -- enters the

20        system that way.

21   QUESTIONS BY MR. EHSAN:

22        Q.    So it's not a function of the

23   medication's chemical half-life but rather

24   the delivery system that allows it to be a

25   long-acting agent, correct?

```
 1          A.      And also its property of

 2    lipophilicity, its -- how it interacts with

 3    membranes and -- that can be also a factor

 4    independent of -- sorry, independent of its

 5    binding to a receptor.

 6          Q.      Likewise, there are certain

 7    long-acting versions of other opioids that

 8    are -- that are in pill form that have a

 9    slow-release mechanism within the GI tract,

10    correct?

11          A.      That's what is proposed, that's

12    correct.

13          Q.      Do you have an opinion one way

14    or another about whether or not this slow

15    delivery or extended-release delivery has any

16    advantages for the treatment of chronic pain?

17          A.      My opinion is that the

18    continuous administration of opioids for

19    conditions most commonly like back pain and

20    centralized pain syndromes and headaches,

21    which make up the vast majority of chronic

22    pain complaints, are not -- there's not

23    evidence to support the long and chronic use

24    of opioids to effectively manage that pain,

25    as well as there is increased risk of abuse
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      and harm under those circumstances.

 2                  Again, it's a very small

 3      fraction of such patients that may be

 4      candidates and have -- demonstrate long-term

 5      benefit over time.

 6          Q.     I may have been inartful in my

 7      question, so let me mark this as the next

 8      exhibit, which I think is 8.

 9                  (Schumacher Exhibit 8 marked

10          for identification.)

11      QUESTIONS BY MR. EHSAN:

12          Q.     Doctor, what you've been handed

13      is an excerpt exhibit.  The first page is the

14      cover page of a textbook --

15          A.     That's fine.

16          Q.     -- by Dr. Katzung called "Basic

17      & Clinical Pharmacology" --

18          A.     Yes.

19          Q.     -- copyrighted 2001, and then

20      inside is Chapter 31, which carries as its

21      last author a Mark A. Schumacher.

22                  Do you see that?

23          A.     Yes, I do.

24          Q.     And you are that Mark A.

25      Schumacher; is that right?
```

1      A.      That's correct, yes.

2      Q.      Do you recall writing this

3   chapter with your coauthors?

4      A.      I remember joining these

5   coauthors in this chapter and participating

6   in the authorship.

7      Q.      So I want to focus your

8   attention on a couple of sections in here.

9              On page 523 as paginated in

10   here -- and the page numbers are on the top.

11   Just let me know when you're there.

12      A.      Yes.

13      Q.      There is a Section F titled

14   "Alternative Routes of Administration."

15              Do you see that?

16      A.      Yes, I do.

17      Q.      And it talks about, first,

18   rectal suppositories, and we'll skip that.

19              It goes on to state, "Another

20   example is the transdermal patch for systemic

21   effects that provide stable blood levels of a

22   drug and better pain control while avoiding

23   the need for repeated parenteral injections,

24   period."

25              Next sentence, "Fentanyl has

Highly Confidential - Subject to Further Confidentiality Review

1    been the most successful opioid in

2    transdermal application and finds great use

3    in pain relief for patients experiencing

4    chronic pain, period."

5              Did I read that correctly,

6    Doctor?

7        A.    You did.

8        Q.    Would you agree that at least

9    as of 2001 that those two sentences were

10   accurate?

11             MR. LOESER:  Objection.  Form.

12             THE WITNESS:  I would agree

13        that as I read this that that depicts

14        the words that were used.

15             It's not my current opinion,

16        and I don't know if you have a copy of

17        the recent edition, but I can't recall

18        how that wording has changed over

19        time.

20   QUESTIONS BY MR. EHSAN:

21        Q.    I appreciate that, Doctor.

22   That's why my question was very specific.

23             As of 2001 when this was

24   published, would you agree with me that those

25   two sentences were accurate?

```
 1                    MR. LOESER:  Objection.  Form.

 2                    THE WITNESS:  Again, much like

 3          my other testimony, taking a specific

 4          sentence or two, it must, as a

 5          clinician, be applied to a particular

 6          context for patients and what is the

 7          indications for their management of

 8          their pain.

 9     QUESTIONS BY MR. EHSAN:

10          Q.     So, Doctor, this chapter is

11     about opioid analgesics and antagonists,

12     correct?

13          A.     That's correct, yes.

14          Q.     And you have a section in there

15     about alternative routes of administration,

16     correct?

17          A.     That is correct, yes.

18          Q.     That's not caveated by anything

19     that is in the language of the document

20     because it goes from applications of

21     anesthesia, which is Section E, to Section F,

22     Alternative Routes of Administration,

23     correct?

24          A.     That's correct, yes.

25          Q.     And the first section is rectal
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    suppositories.  And I'm going to assume, and
2    you correct me if I am wrong, that rectal
3    suppositories don't relate to transdermal
4    patches, do they?
5         A.    No, but they're intended to
6    provide an example of more continuous
7    administration of opioids.
8         Q.    And I suspect reading this, and
9    again, I could be wrong, that these are --
10   these are some examples of nonoral,
11   nonparenteral injection -- administration of
12   opioids that you wanted to discuss, correct?
13        A.    That's right.  We wanted to
14   make sure the readers were aware of the
15   various formulations and delivery systems,
16   that's correct.
17        Q.    And you discuss rectal
18   suppositories, transdermal mechanisms,
19   intranasal and buccal, transmucosal, correct?
20        A.    That is correct, yes.
21        Q.    And all of these techniques
22   have been or at some point have been
23   available to doctors in the delivery of
24   opioids to patients, correct?
25        A.    That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.      And in the transdermal section,
2     you note that as an example transdermal
3     patches can provide stable blood levels of
4     drug.
5              Do you agree that that's
6     accurate, or was accurate at least as of
7     2001?
8              MR. LOESER:  Objection.  Form.
9              THE WITNESS:  Well, the context
10        within here is relative to parenteral
11        injections; presumably intravenous
12        injections, I think, was the intent of
13        that.
14    QUESTIONS BY MR. EHSAN:
15            Q.     Understood.
16             And I think one can appreciate
17    that because you state -- go on to say,
18    "Better control while avoiding the need for
19    repeated parenteral injections."
20             I think the comparator here was
21    parenteral injections versus transdermal
22    delivery, correct?
23            A.     That's correct.  There is times
24    where we've taken care of very difficult
25    patients with -- again, with cancer who there
```

1   was -- the oral route or the intravenous

2   route was not really suitable for that

3   clinical case, and so we would turn to a

4   transdermal system to try to provide relief.

5          Q.     And that better -- relatively

6   better blood levels would be true regardless

7   of the genesis of the pain the patient is

8   suffering from, correct?

9          A.     When we make a comparison

10  between intravenous administration and the

11  transdermal system?

12         Q.     That's correct.

13         A.     I think that's accurate, yeah.

14         Q.     And now, of course, there will

15  be some patients who, for example, are unable

16  to swallow, in which a transdermal system may

17  be preferred because of patient-specific

18  factors, correct?

19         A.     That's what I just mentioned in

20  the case of a cancer patient, for example.

21         Q.     And you don't have to

22  necessarily have cancer in order to be unable

23  to swallow, correct?

24         A.     Again, there's -- from my own

25  clinical experience there's been, again, very

Highly Confidential - Subject to Further Confidentiality Review

1    rare conditions where we've been faced with

2    that decision, a patient with, for instance,

3    small gut syndrome that they're unable to

4    absorb oral medication, so --

5         Q.    Okay.  If you had a patient who

6    was NPO for an extended period of time

7    because they were postop, acute pancreatitis,

8    we can come up with lots of hypotheticals,

9    but that patient would not be able to swallow

10   anything by virtue of the NPO status,

11   correct?

12             MR. LOESER:  Objection.  Form.

13             THE WITNESS:  Well, again, in

14        the context of caring for such

15        patients in the setting of a hospital

16        setting, we would not typically think

17        in terms of initiating transdermal

18        system under those conditions.  We

19        would typically consider, if

20        necessary, all means to manage their

21        pain, nonopioid, and potentially

22        continuous intravenous or intermittent

23        administration of opioids to better

24        titrate to their needs.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. EHSAN:

 2         Q.    But in an outpatient setting,

 3    you may have a bed-bound patient for a

 4    multitude of reasons for whom getting up and

 5    getting to a pill container may be

 6    problematic, or he or she may lack the

 7    ability to adequately swallow for risk of

 8    aspiration, correct?

 9              MR. LOESER:  Objection.  Calls

10         for speculation.

11              THE WITNESS:  Again, just

12         falling back on my clinical experience

13         and those of my colleagues and the

14         literature that the most common

15         application in this setting is -- in

16         my experience has been in the cancer

17         literature and cancer pain patients

18         with advancing cancer, which affects

19         their ability to swallow or absorb.

20    QUESTIONS BY MR. EHSAN:

21         Q.    I understand that your clinical

22    experience is with cancer patients.  It's

23    certainly -- there's nothing in the

24    indications that would preclude you from

25    prescribing Duragesic to a cancerous patient.
```

But you would agree with me, Doctor, that there are doctors who do prescribe a Duragesic patch for noncancer indication in outpatient settings, correct?

MR. LOESER: Objection. Form. Calls for speculation.

THE WITNESS: I'm certainly aware of patients that have been prescribed transdermal fentanyl for a range of conditions; however, it's been my experience and understanding that many of these patients, the transdermal fentanyl therapy, although it may be initially providing some relief, in the long term rarely continues to have the quality of pain control that they initially reported when it was first applied to them.

QUESTIONS BY MR. EHSAN:

Q. So assuming a patient had good improvements in his or her pain levels initially with transdermal fentanyl, does that make the prescription somehow inappropriate for that patient?

MR. LOESER: Objection. Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Well, again, it
 2        depends on the clinical context of the
 3        particular patient we're discussing,
 4        and I'll just leave it at that, yeah.
 5   QUESTIONS BY MR. EHSAN:
 6        Q.    The clinical context would
 7   matter, correct?
 8        A.    Absolutely.
 9        Q.    Now, if I could have you turn
10   to page 522, which is the prior page.
11        A.    Sorry, 5 --
12        Q.    22.
13        A.    Okay.
14        Q.    And we're looking at the first
15   full paragraph on the right-hand column.
16   Starts with "the pain associated."
17                Do you see that?  Right-hand
18   column on 522?
19        A.    Oh, the box.
20        Q.    First -- no, below the box, the
21   first full paragraph starts, "The pain
22   associated with cancer."
23                Do you see that?
24        A.    Yes, I do.
25        Q.    There's a discussion here, and
```

1    let me get -- focus you specifically on the

2    language.

3              It says -- halfway in that

4    paragraph starts the word "research."

5    "Research by workers."

6              Do you see that?

7         A.    Yes, I do.  Thank you.

8         Q.    "Researcher by workers in the

9    hospice movement has demonstrated that fixed

10   interval administration of opioid

11   medications, parentheses, i.e., regular dose

12   at regular time, close paren, is more

13   effective in achieving pain relief than

14   dosing on demand, period."

15             Do you see that?

16        A.    I do see that.

17        Q.    Are you familiar with that

18   research?

19        A.    I'm familiar with those

20   findings, yes.

21             MR. LOESER:  And to be clear,

22        you're talking about a 2001 chapter of

23        this book.

24             MR. EHSAN:  Understood.

25             MR. LOESER:  So you're asking

1          about the research as of that time

2          frame?

3     QUESTIONS BY MR. EHSAN:

4          Q.     The research you refer to in

5     this particular section we read, which is

6     from a 2001 chapter, are you familiar with

7     that research?

8          A.     Within this edition of this

9     chapter.

10         Q.     So would that -- would it be

11    fair to say, Doctor, that in 2001 there was

12    some evidence to suggest that a continuous

13    standing exposure to an opioid may offer some

14    pain control advantages over a PRN or

15    on-demand pain management schedule?

16              MR. LOESER:  Objection.  Form.

17              THE WITNESS:  It is my opinion

18         that in the treatment of end-of-life

19         hospice or cancer patients that have

20         advancing cancer pain, that fixed

21         interval or continuous administration

22         of analgesics or analgesic care is

23         critical, and I acknowledge that the

24         transdermal system or the

25         sustained-release formulations of

Highly Confidential - Subject to Further Confidentiality Review

```
 1              morphine provided that ability.
 2    QUESTIONS BY MR. EHSAN:
 3         Q.    So there were some implicit
 4    reasons, or some reason, to believe that a
 5    long-acting formulation may offer advantages
 6    for these patients, correct?
 7              MR. LOESER:  Objection.  Form.
 8         Mischaracterizes his testimony.
 9              THE WITNESS:  The
10         characterization of these compounds,
11         of course, are relative to this
12         chapter dedicated to opioids.
13              What is not provided here is
14         relative to what and to the context of
15         what is being treated, as there
16         certainly is other treatment
17         modalities in addition to opioids for
18         some of these patients.
19    QUESTIONS BY MR. EHSAN:
20         Q.    Right, Doctor.
21              And I think you mentioned
22    somewhere in your report, for almost all
23    conditions opioids are not -- all chronic
24    noncancer pain conditions, opioids aren't
25    considered first-line therapies, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              That was something you said in
 2    your report, correct?
 3         A.    That's what I recall, yes.
 4         Q.    And likewise, as we read in the
 5    Duragesic label, Duragesic, at least under
 6    the discussion we had of the 2005 label,
 7    wasn't indicated for patients who weren't
 8    already opioid-tolerant, correct?
 9              MR. LOESER:  Objection.  Form.
10              THE WITNESS:  We did discuss
11         the black box warning and also noted
12         that the 2005 indicated that the
13         patient should provide some so-called
14         evidence of opioid tolerance, which
15         has been defined by 60 OMEs a day for
16         a week, that's correct.
17    QUESTIONS BY MR. EHSAN:
18         Q.    So it is, at least putting all
19    this together, unlikely that a patient would
20    get a prescription for Duragesic as a
21    first-line, never tried any other analgesic
22    medication, never tried an opioid before,
23    correct?
24              MR. LOESER:  Objection.  Form.
25         Assumes facts not in evidence.
```

```
 1                    THE WITNESS:  Honestly, I'm
 2         unclear when Duragesic added the
 3         additional information related to
 4         opioid tolerance development as a
 5         requirement for starting this
 6         medication relative to the time this
 7         article was written.
 8  QUESTIONS BY MR. EHSAN:
 9         Q.    So the article was -- or the
10  chapter was in 2001, but we'll just focus on
11  2005, so it's a four-year gap.  And I'm sorry
12  these labels don't match up exactly with the
13  chapter here.
14                But at least as of 2005, it is
15  unlikely someone would have received an
16  opioid prescription for Duragesic without
17  ever having at least tried and failed some
18  other medications, at least if the doctor
19  prescribed it as indicated, correct?
20                MR. LOESER:  Objection.  Calls
21         for speculation.
22                THE WITNESS:  I don't know.  I
23         don't know the literature that's
24         tracked these -- the prescription to
25         such patients.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. EHSAN:

 2         Q.    Well, let's just be a little

 3    bit more specific.

 4              If you look at Exhibit 7, under

 5    the middle of that column and then going back

 6    to the indications, it says, "As indicated,

 7    when the -- for chronic pain that cannot be

 8    managed by other means," and it provides some

 9    examples.

10              So would you agree with me,

11    Doctor, that if a physician prescribed

12    Duragesic in a patient that had not been

13    attempted to be managed by other means, that

14    this would be an off-label prescription, at

15    least as of 2005?

16              MR. LOESER:  Objection.

17         Outside the scope of his report.

18              THE WITNESS:  That's outside

19         the scope of my report to comment.

20    QUESTIONS BY MR. EHSAN:

21         Q.    Doctor, do you understand what

22    an off-label prescription is?

23         A.    I believe it's the use of a

24    drug that goes beyond the initial FDA

25    approval process.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Do you have occasion to

 2    prescribe medications off-label in your

 3    clinical practice?

 4            A.     There's a majority, frankly, of

 5    medications used clinically that have been

 6    used in different off-label manners, for

 7    example, in the treatment of -- well, I'll

 8    just stop there.

 9            Q.     So is it your opinion, Doctor,

10    that it is commonplace for physicians to

11    prescribe medications off-label?

12                   MR. LOESER:  Objection to form.

13                   THE WITNESS:  I would say that

14           it is a practice of physicians.  I

15           can't characterize it as common.

16    QUESTIONS BY MR. EHSAN:

17            Q.     And to the extent that

18    medication is being prescribed off-label,

19    that means that at least the manufacturer

20    didn't submit to the Food and Drug

21    Administration sufficient information to

22    justify a label change for that medication

23    for that indication, correct?

24                   MR. LOESER:  Objection as to

25           form.  It's outside the scope of his
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        report.
2                  THE WITNESS:  That's outside
3        the scope of my opinion.
4   QUESTIONS BY MR. EHSAN:
5        Q.    You don't understand how an
6   indication gets on a label for a medication,
7   Doctor?
8                  MR. LOESER:  Same objection.
9                  THE WITNESS:  I would say that
10       the practice of medicine relative to a
11       physician's decision to use something
12       off-label would need to be supported
13       by the scientific evidence that
14       there's efficacy and its risk of harm
15       is low.
16                 MR. LOESER:  We've been going
17       about an hour, so when you have a --
18                 MR. EHSAN:  Sure.
19                 THE WITNESS:  Yeah, actually
20       that would be good.  Could we take a
21       break?  That would be --
22                 MR. EHSAN:  Yeah, sure.
23                 THE WITNESS:  I appreciate
24       that.
25                 VIDEOGRAPHER:  Okay.  We are
```

Highly Confidential - Subject to Further Confidentiality Review

1          now going off the record, and the time

2          is 3:0 -- 4:01 p.m.

3           (Off the record at 4:01 p.m.)

4                   VIDEOGRAPHER:  We are now going

5          back on the record, and the time is

6          4:17 p.m.

7     QUESTIONS BY MR. EHSAN:

8          Q.     Dr. Schumacher, focusing your

9     attention back on Exhibit 8, if you could

10    look at page 525 as paginated.

11                 I think this is towards --

12    well, kind of close to the end, but not

13    really.  Let me know when you're there.

14         A.     Yes, 525.

15         Q.     Yes.

16                 And you see in the left column

17    there is -- the first full paragraph, there's

18    some language that is in italics.

19                 Do you see that?

20         A.     Yes, I do.

21         Q.     Let me just start from the

22    beginning of that paragraph so I can read the

23    complete thing.

24                 But it starts with, "Obviously,

25    the risk of causing dependence is an

Highly Confidential - Subject to Further Confidentiality Review

1    important consideration in the therapeutic

2    use of these drugs, period."

3              Did I read that correctly?

4         A.    That's correct, you did read

5    this correctly.

6         Q.    And "these drugs" is referring

7    to opioids; is that correct?

8         A.    Say it --

9         Q.    "These drugs" is making

10   reference to opioid medicines, correct?

11        A.    Yes.

12        Q.    And it goes on to say -- and

13   this is the part that's italicized:  "Despite

14   that risk, under no circumstances should

15   adequate pain relief ever be withheld simply

16   because an opioid exhibits potential for

17   abuse or because legislative controls

18   complicate the process of prescribing

19   narcotics, period."

20              Did I read that correctly?

21        A.    You did, yes.

22        Q.    And it goes on to say,

23   "However, certain principles can be observed

24   by clinician -- by the clinician to minimize

25   problems presented by tolerance and

Highly Confidential - Subject to Further Confidentiality Review

1    dependence when using opioid analgesics,

2    colon."

3            Did I read that correctly,

4    Doctor?

5        A.    That's correct.

6        Q.    At the time you wrote this, did

7    you believe that despite the risk of

8    dependence and addiction, under no

9    circumstances should adequate pain relief

10   ever be withheld simply because an opioid

11   exhibits potential for abuse or because

12   legislative controls complicate the process

13   of prescribing narcotics?

14           MR. LOESER:  Objection.  Form.

15           THE WITNESS:  The context of

16       this chapter was in the acute pain --

17       acute management -- management of

18       acute pain, principally, as the lead

19       author was an anesthesiologist whose

20       primary focus had been perioperative.

21           Nevertheless, we would never

22       restrict the use of an opioid simply

23       because a patient has a risk of

24       addiction or has known addiction when

25       treating acute pain or cancer pain or

Highly Confidential - Subject to Further Confidentiality Review

1          end-of-life care.  Certainly have been

2          in numerous, you know, clinical

3          situations like that.

4     QUESTIONS BY MR. EHSAN:

5          Q.    Would there be a situation in

6     which case you would let a patient suffer

7     from pain because of the risk of addiction

8     from opioids?

9               MR. LOESER:  Objection.  Form.

10              THE WITNESS:  I would -- as a

11         physician and a pain physician, I do

12         everything possible to manage

13         someone's pain with all valuable and

14         available resources that include

15         opioids and may include nonopioid

16         strategies in that setting.

17    QUESTIONS BY MR. EHSAN:

18         Q.    And then you go on after to

19    highlight -- or to italicize a section to

20    discuss that there are certain principles

21    that a physician can observe, or clinician

22    can observe, to minimize problems of

23    tolerance and dependence, correct?

24         A.    For this chapter, that's

25    correct, yes.

1      Q.      And you list those A through D,

2    correct?

3      A.      My coauthors as well, yes,

4    listed those as steps to take as part of the

5    management of an opioid or an analgesic.

6      Q.      And when you and your coauthors

7    wrote this chapter, did you believe that

8    those principles enumerated in A through D

9    were effective in potentially reducing the

10   risk of tolerance and dependence in opioid

11   users?

12            MR. LOESER:  Objection.  Form.

13            THE WITNESS:  If you give me a

14       moment just to reread through them

15       again.

16   QUESTIONS BY MR. EHSAN:

17     Q.      Sure.

18     A.      It's been a while.  Thank you.

19            Sorry, would you mind repeating

20   the question, please?

21     Q.      Sure.

22            I was going to say items

23   enumerated in A through D in this -- on this

24   page were factors that you believed at the

25   time would be effective, or potentially

Highly Confidential - Subject to Further Confidentiality Review

```
 1      effective, in minimizing the tolerance and

 2      dependence on opioids in patients needing

 3      to -- opioid therapy for pain, correct?

 4              MR. LOESER:  Objection.  Form.

 5              THE WITNESS:  Well, I believe

 6          that many of these points are -- have

 7          clinical validation and are important

 8          features in the management of pain,

 9          whether it's opioids or other

10          nonopioid therapies.

11              The est -- pardon me -- the

12          establishment of therapeutic goals

13          before starting opioid therapy is, in

14          fact, a tenet within the current CDC

15          guidelines; however, as you know CDC

16          guidelines do not promote opioids as a

17          first-line therapy for chronic

18          noncancer pain.

19              At this time the idea and the

20          use of the word "dependence" I believe

21          at that time implied addiction or

22          abuse as well rather than purely

23          physical dependence limited to

24          withdrawal symptoms.

25              Nonetheless, the way this is
```

Highly Confidential - Subject to Further Confidentiality Review

1           written, of course, does not

2           acknowledge that the fact that a

3           patient will likely develop opioid

4           tolerance and the effectiveness of the

5           initial therapy will likely lose

6           efficacy over time, and so at many

7           points have changed since these items

8           have been inserted in this particular

9           part.

10     QUESTIONS BY MR. EHSAN:

11          Q.     Let me back up and ask the

12     question slightly differently, Doctor.

13               As of 2001, did you believe

14     that items enumerated A through D were valid

15     considerations in trying to minimize

16     tolerance and dependence, meaning opioid use

17     disorder, by today's standards in connection

18     with opioid therapy in patients?

19               MR. LOESER:  Objection.  Form.

20               THE WITNESS:  I believe they

21          were valuable points to make to the

22          reader for the overall management of

23          analgesic care and opioid therapy.

24               And in particular, although we

25          did not prioritize, of course, we --

Highly Confidential - Subject to Further Confidentiality Review

```
1          in C we said instead of opiate
2          analgesic, especially in chronic
3          management, consider using other types
4          of analgesics or compounds exhibiting
5          less pronounced withdrawal symptoms on
6          discontinuation.
7                 So even at this earlier version
8          of this chapter, there was an
9          acknowledgement for chronic management
10         was going to be likely different and
11         require a different treatment plan
12         approach.
13    QUESTIONS BY MR. EHSAN:
14         Q.    So let me back up, because I
15    don't think you answered my question exactly.
16                Would you agree that you
17    believed at the time that you wrote these,
18    these were effective strategies in attempting
19    to limit tolerance and dependence in patients
20    exposed to opioid therapy?
21                MR. LOESER:  Objection.  Form.
22                THE WITNESS:  Well, I wouldn't
23         use that language.  I think, again,
24         going back to the chapter itself, you
25         know, certain principles can be
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              observed by the clinicians to

 2              minimize -- minimize problems

 3              presented by tolerance and dependence

 4              when using opioid analgesics.  So it

 5              was providing some guidance to

 6              minimize.  It did not say eliminate.

 7     QUESTIONS BY MR. EHSAN:

 8         Q.    And I think I said mitigate.  I

 9     apologize.  I'll use the word "minimize" from

10     now on.

11         A.    Okay.

12         Q.    But you stand by the language,

13     though, that it would minimize the problems

14     presented by tolerance and dependence,

15     correct?

16              MR. LOESER:  Objection.  Form.

17              THE WITNESS:  I guess, again,

18              the context of this is relative to

19              what?  And this is always the

20              difficulty in taking something sort of

21              in a textbook into a broad clinical

22              application to all patients that might

23              have pain or chronic pain.

24              And again, I think these are

25              guideposts for physicians to consider
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              when they are prescribing opioids.
 2    QUESTIONS BY MR. EHSAN:
 3         Q.      These guideposts, were these
 4    guideposts that a primary care physician or a
 5    non-pain specialist could understand and
 6    implement in his or her own practice?
 7                   MR. LOESER:  Objection.  Form.
 8                   THE WITNESS:  The target
 9              audience for this chapter is
10              principally medical students and
11              potentially -- well, it's principally
12              medical students in undergrad medical
13              education with the understanding that
14              such training physicians begin to
15              appreciate that there is complexities
16              to opioid prescribing and alert them
17              that problems of tolerance and
18              dependence need to be addressed.
19    QUESTIONS BY MR. EHSAN:
20         Q.      And in Item C, which you, I
21    think, referenced in one of your prior
22    answers, you talk about that, the potential
23    use of other nonopioids in chronic management
24    of pain.
25                   Do you see that language there?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes, I do.  Yeah.

2      Q.      It doesn't say, though, that

3  you should not use opioids in chronic

4  noncancer pain, period, right?

5           MR. LOESER:  Objection.  Form.

6           THE WITNESS:  It -- as you

7      stated, it does not say that.

8  QUESTIONS BY MR. EHSAN:

9      Q.      It says consider using other

10  medications, correct?

11     A.      Well, C starts with "instead of

12  opioid analgesics, especially in chronic

13  management."  I believe the context there is

14  that chronic pain management is a unique

15  subset, as I recall, and the intent of this

16  writing.

17     Q.      And it goes on to say,

18  "Consider using other types of analgesic --

19  analgesics or compounds," correct?

20     A.      That's correct.

21     Q.      Now, if I turn your attention

22  to page 522, same document still.  Let me

23  know when you're there.

24     A.      Yes.  Thank you.

25     Q.      So we're looking at the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    left-hand column.

 2         A.      Uh-huh.

 3         Q.      The last full paragraph before

 4    the section that has the title "Clinical Use

 5    of Opioid Analgesics."

 6         A.      Okay.

 7         Q.      So that paragraph starts with

 8    Table 31-1.

 9               Do you see that?

10               The wording on that paragraph

11    starts with Table 31-1, shows the range.

12               Do you see that?

13         A.      Wait, I may not be on the --

14         Q.      Sure.  Page --

15         A.      There's a 31-4 table.

16         Q.      No.  No.  So page 522.

17         A.      Yep.

18         Q.      The left-hand column.

19         A.      Uh-huh.  Oh, in the text.

20         Q.      The paragraph in the text of

21    the paragraph.  So I'm not referring to the

22    table.

23         A.      Oh, I see it now.  Yeah.

24    Sorry.  Got it.

25         Q.      The sentence that says 31.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      Yeah.  Got it.

2          Q.      So that paragraph there.

3                  If you go halfway down the

4    paragraph, a little bit more perhaps, the

5    sentence that starts "the most common error."

6                  Do you see that?

7          A.      Oh, yes, sure.

8          Q.      It states, "The most common

9    error made by physicians in using opioid

10   analgesics is a failure to provide sufficient

11   dose to achieve optimal relief, period."

12                 And it goes on to say,

13   "Patients vary widely in their response, so

14   dosing must be individualized for each,

15   period."

16                 Did I read that correctly,

17   Doctor?

18         A.      That's -- you did, thank you.

19         Q.      And at the time you wrote this

20   in 2001, did you understand what you state to

21   be accurate?

22                 MR. LOESER:  Objection.  Form.

23                 THE WITNESS:  Again, the

24         context here was in the context of

25         treating acute pain and cancer pain.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            That was the drivers for, as I recall

 2            for this section; that is, acute pain

 3            management being undertreated with, in

 4            this example, with opioids.

 5   QUESTIONS BY MR. EHSAN:

 6       Q.     My question was slightly

 7   different, Doctor.

 8            My question was:  When you

 9   wrote that statement, was that an accurate

10   statement based on your understanding of the

11   state of science?

12            MR. LOESER:  Objection.  Form.

13       Asked and answered.

14            THE WITNESS:  Again, the

15       accuracy of that statement and my

16       support of it is in the context that

17       the -- this chapter and that section

18       was intended to be principally

19       understood in the setting of the

20       treatment of acute and cancer pain.

21   QUESTIONS BY MR. EHSAN:

22       Q.     If you go back to the prior

23   page, 521, the section heading --

24       A.     Uh-huh.

25       Q.     -- is "Clinical Pharmacology of
```

```
 1    Opioid Analgesics"; is that correct?

 2         A.     That is correct, yes.

 3         Q.     And the first sentence there

 4    is, "The management of pain is essential to

 5    good clinical practice and requires careful

 6    consideration of the proper dose, type of

 7    drug and the disease being treated," correct?

 8         A.     That's correct, yes.

 9         Q.     Is there -- and you are -- is

10    it your opinion, Doctor, that this section

11    was meant by that language to be restricted

12    to cancer or acute inpatient care of pain?

13              MR. LOESER:  Objection.  Form.

14              THE WITNESS:  So sorry.  Could

15         you repeat that?

16    QUESTIONS BY MR. EHSAN:

17         Q.     Sure.

18              Is it your opinion, Doctor,

19    that the language in the chapter that -- or

20    on page 522 that we read was meant to be

21    restricted to acute inpatient care -- pain

22    management or cancer pain management by

23    virtue of the heading of "Clinical

24    Pharmacology of the Opioid Analgesics"?

25              MR. LOESER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Well, the
 2           statement, of course, is very general,
 3           and I would again have to fall back to
 4           the concept that the safe practice of
 5           analgesic care depends on the clinical
 6           context for a particular patient and
 7           their disease process, whether it's
 8           acute or chronic.  And I'm afraid
 9           these -- this chapter and some of the
10           readings do not make that distinction.
11  QUESTIONS BY MR. EHSAN:
12           Q.    Doctor, when you wrote this
13  chapter in 2001, were you -- did you receive
14  any payment for your work?
15                    MR. LOESER:  Objection.  Form.
16                    THE WITNESS:  Right.  So when I
17           joined this paragraph with the other
18           senior professors, I believe there was
19           a shared royalty that was based on its
20           distribution and sales.  That's
21           correct.
22  QUESTIONS BY MR. EHSAN:
23           Q.    Were you -- did you receive any
24  remuneration that you understand came from
25  any pharmaceutical company?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I don't know.
 2          Q.      Do you believe if a
 3    pharmaceutical company relied on this
 4    textbook or excerpted language from this
 5    textbook in any of their promotional material
 6    that they would be misleading or otherwise
 7    providing false information to prescribers or
 8    patients?
 9                  MR. LOESER:  Objection.  Calls
10          for speculation.
11                  THE WITNESS:  I don't know.
12                  MR. EHSAN:  Doctor, I think
13          that is all I have, so we can take a
14          break and do another round of musical
15          chairs.
16                  THE WITNESS:  Okay.
17                  VIDEOGRAPHER:  We are now going
18          off the record, and the time is
19          4:34 p.m.
20           (Off the record at 4:34 p.m.)
21                  VIDEOGRAPHER:  We are now going
22          back on the record, and the time is
23          4:41 p.m.
24                  CROSS-EXAMINATION
25    QUESTIONS BY MR. STAMPFL:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      Good afternoon, sir, Karl
2    Stampfl.  I represent the Allergan
3    defendants.
4                  Do you have your report which I
5    believe is part of Exhibit 1 in front of you?
6          A.      That's right.
7          Q.      Could you look at page 6,
8    footnote 1?  We've looked at a couple times
9    today.
10                 Do you see there that you refer
11   to Allergan and Actavis as among the
12   defendants in this case?
13         A.      That's correct.
14         Q.      Sitting here today, can you
15   think of any other reference to Allergan or
16   Actavis within the body of your report?
17         A.      Can you give me a moment just
18   to reflect on --
19         Q.      Well, let me cut through it a
20   little bit.
21                 Recognizing that you won't have
22   a chance to look through every paragraph or
23   everything, can you think of any other
24   references to Allergan or Actavis in your
25   report?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LOESER:  Objection.  Form.
 2   QUESTIONS BY MR. STAMPFL:
 3        Q.    Sir, I'm not asking you to look
 4   through every page of your report.  I'm just
 5   asking:  Without looking through every page
 6   of your report, can you think of any, off the
 7   top of your head, references to Allergan or
 8   Actavis in the body of your report?
 9                    MR. LOESER:  So you're asking
10        if he can remember something in the
11        report, not whether it's actually in
12        the report?
13                    MR. STAMPFL:  That's right,
14        though I think it might be indicative
15        of whether it's in the report.
16                    MR. LOESER:  Well --
17                    THE WITNESS:  Well, I would
18        need, again, to check within the
19        exhibits.
20
21   QUESTIONS BY MR. STAMPFL:
22        Q.    Putting side the exhibits, just
23   within the body of your report --
24        A.    Not in the exhibits, but in the
25   report itself --
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      In the report, yeah.

2       A.      -- I don't recall any reference

3   to --

4       Q.      Allergan or Actavis?

5       A.      Allergan, yes.

6       Q.      Did you know that Allergan sold

7   opioids prior to your involvement in this

8   case?

9               MR. LOESER:  Objection.  Form.

10              THE WITNESS:  I was unaware.

11  QUESTIONS BY MR. STAMPFL:

12      Q.      What opioids or opioid does

13  Allergan sell?

14      A.      I believe it sells Kadian.

15      Q.      Can you identify any others?

16      A.      That's the prominent one I'm

17  familiar with.

18      Q.      You can't think of any others

19  sitting here today, right?

20              MR. LOESER:  Objection.  Asked

21          and answered.

22              THE WITNESS:  Again, Kadian is

23          what's on the top of the list that I'm

24          familiar with.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. STAMPFL:

 2        Q.    You said earlier during your

 3   testimony that the driving force of the

 4   opioid epidemic has been the promotion for

 5   chronic noncancer pain.

 6             Can you point --

 7             MR. LOESER:  Objection.  Form.

 8   QUESTIONS BY MR. STAMPFL:

 9        Q.    Do you recall that testimony?

10        A.    The promotion of opioids for

11   chronic noncancer pain, that's correct.

12        Q.    That's right.

13             Can you point to any statements

14   that Allergan or Actavis made at any time

15   where they promoted opioids for chronic

16   noncancer pain?

17             MR. LOESER:  Are you asking if

18        he can point to something in his

19        report?

20             MR. STAMPFL:  I'm asking

21        whether he can point to any statements

22        by Allergan or Actavis, sitting here

23        today, where they promoted opioids for

24        chronic noncancer pain.

25             THE WITNESS:  Just give me a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          moment.  I'll have a quick look here.
 2     QUESTIONS BY MR. STAMPFL:
 3          Q.     Okay.
 4          A.     Within Exhibit A, Sales
 5     Training and Promotional Materials, 1.6,
 6     "Kadian patients experience sustained
 7     morphine release with less fluctuations
 8     versus morphine sulfate.  Kadian patients
 9     report improved management of pain versus
10     morphine sulfate.  Kadian patients require
11     less rescue medications versus morphine
12     sulfate."
13               And then the 1.7, "Kadian
14     provides steady blood levels of morphine
15     sulfate with few peaks and valleys."
16          Q.     Yes, sir.
17               So my question was about
18     chronic noncancer pain.  And you'd agree that
19     the phrase "chronic noncancer pain" doesn't
20     appear in either 1.6 or 1.7 of your
21     Exhibit A, correct?
22          A.     That is true, it does not
23     appear there.
24          Q.     So sitting here today, can you
25     identify any statements by Allergan or
```

1    Actavis promoting opioids for the use -- for

2    the treatment of chronic noncancer pain?

3            MR. LOESER:  Objection.  Form.

4        The witness is reviewing the

5        materials.

6            THE WITNESS:  I would still

7        like to review a little bit more,

8        please.

9    QUESTIONS BY MR. STAMPFL:

10       Q.    Go ahead.

11           Sir, we just don't have time

12   for you to go through every page in your

13   report, so I'm just asking you:  Without

14   going through every page -- we understand

15   that will be part of the record -- are you

16   able to point to any such statements by

17   Allergan or Actavis?

18           MR. LOESER:  And I'll just note

19       for the record that you've stopped the

20       witness from continuing to review

21       where he can identify other references

22       to your client.

23           MR. STAMPFL:  Yes, sir, I

24       thought that was clear from my

25       question.

1    QUESTIONS BY MR. STAMPFL:

2         Q.    Could you go ahead and answer,

3    please?

4              MR. LOESER:  Well, I'm making

5         clear from the question that there

6         actually are other references, but

7         you've stopped him from finding them.

8              THE WITNESS:  The other

9         references that are at 1.32 and 1.33

10        concerning Allergan focus on the

11        product relative to its risk of

12        addiction, but I do not see any of the

13        words that you mention about chronic

14        noncancer pain.

15   QUESTIONS BY MR. STAMPFL:

16        Q.    Okay.  And could you look at

17   paragraph 56 of your report -- excuse me, 59

18   of your report?

19        A.    Sorry, again, where do you want

20   me to go?

21        Q.    Paragraph 59 of your report.

22        A.    Paragraph 59.  Okay.

23             Yes, I have it in front of me.

24        Q.    Thank you.

25             Do you see that you write,

1    "Purdue and other defendants utilized a

2    number of approaches to encourage physicians

3    to prescribe opioids broadly for the

4    treatment of chronic pain.  They engaged in

5    direct-to-consumer marketing."

6              Do you see that?

7         A.    Yes, I do.

8         Q.    Can you identify any

9    direct-to-consumer marketing performed by

10   Allergan or Actavis?

11             MR. LOESER:  Do you want him to

12        review the report?

13             MR. STAMPFL:  His entire

14        report?

15   QUESTIONS BY MR. STAMPFL:

16        Q.    Well, sir, are you familiar

17   with what's in your report?

18        A.    I am familiar with what's in my

19   report in terms of certain details.

20   Sometimes I need to go back to refresh my

21   memory.

22        Q.    Without looking through your

23   entire report, can you point to any

24   direct-to-consumer marketing that Allergan or

25   Actavis engaged in?

```
 1            A.      I have not included any

 2    examples of marketing efforts within the

 3    report from Allergan or Actavis.

 4                 MR. LOESER:  And to be clear,

 5            again, you're asking about the report

 6            and not the attached exhibits?

 7                 MR. STAMPFL:  I'm asking him

 8            whether he can identify that.

 9                 MR. LOESER:  Well, you're

10            asking him, but you've also stopped

11            him from reviewing the report to find

12            the references.

13                 So if you want -- if you want

14            to ask him a question that requires

15            him to tell you what's in his report

16            but you won't let him look through the

17            references, then you're denying him

18            the ability to answer your question.

19                 MR. STAMPFL:  Sir, I disagree.

20            I said "without looking through the

21            report."

22                 But in any case, you can

23            object, but we're going to move on.

24    QUESTIONS BY MR. STAMPFL:

25            Q.      You continue here on page 59,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      "They funded" -- are you with me, sir?

 2           A.      Paragraph 59?

 3           Q.      Yes, thank you.

 4           A.      Okay.

 5           Q.      "They funded research,

 6      pain-related medical societies and continuing

 7      medical education, lobbied medical boards and

 8      agencies responsible for pain-related

 9      treatment guidelines, and lobbied state and

10      local government to remove barriers to

11      broader use of opioids for the treatment of

12      pain."

13                   Do you see that?

14           A.      Yes, I do.

15           Q.      Can you think of any

16      inappropriate research that Allergan or

17      Actavis funded with respect to opioids?

18                   MR. LOESER:  I have the same

19           objection.

20                   THE WITNESS:  I'm not aware.

21      QUESTIONS BY MR. STAMPFL:

22           Q.      Can you think of any

23      pain-related medical societies that Allergan

24      or Actavis funded?

25           A.      I'm aware that multiple drug
```

Highly Confidential - Subject to Further Confidentiality Review

1  companies were reviewed and included in the

2  Senate subcommittee report on the influence

3  of pharmaceutical companies influencing

4  medical societies and education.

5            I can't recall the detail that

6  Actavis or Allergan was amongst those.

7       Q.    So sitting here today, can you

8  identify any pain-related medical societies

9  that Allergan or Actavis funded?

10            MR. LOESER:  Objection.  Form.

11            THE WITNESS:  I don't know.

12            MR. LOESER:  Mischaracterizes

13       his testimony.

14  QUESTIONS BY MR. STAMPFL:

15       Q.    Can you identify any continuing

16  medical education that Allergan or Actavis

17  funded?

18            MR. LOESER:  Same objection.

19            THE WITNESS:  I don't know.

20  QUESTIONS BY MR. STAMPFL:

21       Q.    Can you identify even one

22  prescriber in Cuyahoga or Summit Counties who

23  received any misstatements from Allergan or

24  Actavis?

25            MR. LOESER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  If you'll allow

2      me to look.

3           I do not have any documentation

4      to support that.

5  QUESTIONS BY MR. STAMPFL:

6      Q.     Can you identify any -- a

7  single prescription that was written in

8  Cuyahoga or Summit Counties as a result of

9  anything that Allergan or Actavis did?

10     A.     That's beyond the scope of my

11 report.  I have no opinion on that.

12     Q.     So the answer is, no, you can't

13 identify any such prescription?

14          MR. LOESER:  Objection.  Asked

15     and answered.

16          THE WITNESS:  It was beyond the

17     scope of my report.  I have no opinion

18     on that.

19 QUESTIONS BY MR. STAMPFL:

20     Q.     Can you identify one or not?

21          MR. LOESER:  Objection.  Asked

22     and answered.

23          THE WITNESS:  I've answered

24     your question.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. STAMPFL:

 2         Q.    Respectfully, sir, I think I'm

 3    entitled to a direct answer to that question.

 4              Putting aside whether you

 5    believe it's within the scope of your report,

 6    my question is:  Can you, sitting here today,

 7    identify a single prescription in Cuyahoga or

 8    Summit Counties that was written as a result

 9    of anything Allergan or Actavis did?

10              MR. LOESER:  Objection.  Asked

11         and answered.

12              THE WITNESS:  Relative to my

13         preparation, I have not identified

14         such a prescription as you stated.

15    QUESTIONS BY MR. STAMPFL:

16         Q.    Can you take out Exhibits 3 and

17    4 to the deposition here today, which are

18    your list of materials considered and then I

19    believe the supplemental list that you

20    submitted later?

21         A.    Exhibits 3 and 4?

22         Q.    Yes, please.

23         A.    Okay.  All right.  I have those

24    in front of me.

25         Q.    And do you see that if you look
```

1    on, I believe, it's page 25 of Exhibit 3,

2    there's your list of Bates-stamped documents.

3            A.      That's correct.

4            Q.      And that's the list of

5    documents produced by defendants and others

6    that you considered in forming your opinions,

7    correct?

8            A.      These are materials that were

9    provided by counsel for my review, yes.

10            Q.      And this list includes six

11    documents produced by Allergan or Actavis,

12    correct?

13                  MR. LOESER:  Objection.  Form.

14                  THE WITNESS:  That's right,

15            yes.  Pardon me, sorry.  Yes, that's

16            correct, yeah.

17    QUESTIONS BY MR. STAMPFL:

18            Q.      Okay.  Thank you.

19                  You didn't consider any other

20    Allergan or Actavis-produced documents beyond

21    those six, correct?

22            A.      As part of the preparation of

23    this report, these were the documents I

24    reviewed, that's correct.

25            Q.      Are you aware that Allergan and

```
 1    Actavis produced hundreds of thousands, if

 2    not millions, of documents in this case?

 3              MR. LOESER:  Objection to form.

 4              THE WITNESS:  I'm a little

 5         confused.  I'm not sure what documents

 6         you're trying to describe.

 7    QUESTIONS BY MR. STAMPFL:

 8         Q.    Yeah, right.  Okay.

 9              So I'm asking:  Are you aware

10    that Allergan and Actavis produced not just

11    six documents in this case but rather

12    hundreds of thousands of documents?

13         A.    I wasn't aware of the number of

14    documents that Actavis and Allergan had

15    produced.

16         Q.    You know it's more than six,

17    right?

18              MR. LOESER:  Objection.  Form.

19         Assumes facts not in evidence.

20              THE WITNESS:  I am now informed

21         based on what you told me.

22    QUESTIONS BY MR. STAMPFL:

23         Q.    Did you ever ask counsel for

24    any additional documents produced by Allergan

25    or Actavis, or do you think maybe these were
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      the only six?
 2                  MR. LOESER:  Objection.
 3                  And I'm instructing the witness
 4          not to answer any question about what
 5          you asked us or what we told you.
 6                  So don't answer the question.
 7      QUESTIONS BY MR. STAMPFL:
 8          Q.      Are you accepting your
 9      counsel's instruction?
10          A.      Yes.
11          Q.      So all of the six documents
12      that you considered that were produced by
13      Allergan or Actavis were provided by the
14      lawyers for the plaintiffs, right?
15          A.      They were provided by counsel,
16      that's correct.
17          Q.      Did you take any steps to
18      determine whether plaintiffs' lawyers were
19      giving you a representative sample of
20      Allergan or Actavis documents?
21                  MR. LOESER:  Objection.  Form.
22                  THE WITNESS:  Sorry, could you
23          repeat the question, please?
24      QUESTIONS BY MR. STAMPFL:
25          Q.      Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Did you take any steps to
 2      determine whether plaintiffs' counsel was
 3      giving you a representative sample of
 4      Allergan or Actavis documents?
 5                   MR. LOESER:  Objection.  Form.
 6                   THE WITNESS:  I made no such
 7           request for additional Allergan or
 8           Actavis documents.
 9      QUESTIONS BY MR. STAMPFL:
10           Q.    You know, in your testimony
11      here today, you've referred to the importance
12      of the context of prior statements, right?
13                   MR. LOESER:  Objection.  Form.
14           Mischaracterizes his testimony.
15                   THE WITNESS:  I have
16           occasionally raised the point of a
17           clinical context to better clarify a
18           particular phrase that was buried in a
19           paragraph.
20      QUESTIONS BY MR. STAMPFL:
21           Q.    Do you think that defendants'
22      statements, too, should be considered in
23      their full and proper context?
24                   MR. LOESER:  Objection.  Form.
25           Mischaracterizes his testimony.
```

```
 1                    THE WITNESS:  I don't know.

 2          That is outside the scope of my

 3          opinion, and I'm not sure how to

 4          respond to that.

 5                    The context, clinical context,

 6          of some of these, the meaning of some

 7          of these paragraphs and the meanings

 8          of their effects on clinical care,

 9          it's difficult for me to form a

10          relationship of that to your question

11          about companies and their

12          decision-making.

13  QUESTIONS BY MR. STAMPFL:

14      Q.    Okay.  Well, let me take it

15  outside of the context of your -- excuse me,

16  the context of your prior testimony.

17                    Do you think it's important

18  when you're considering defendants' marketing

19  statements to consider them in their full and

20  proper context?

21                    MR. LOESER:  Objection.  Form.

22                    THE WITNESS:  I would have to

23          say it depends on what the statement

24          is.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. STAMPFL:

 2         Q.    So you think there's some

 3    occasions where you could look at a marketing

 4    material or a sentence from a marketing

 5    material and you wouldn't need to consider

 6    the context of it?  Is that your testimony,

 7    sir?

 8              MR. LOESER:  Objection.  Form,

 9         and it mischaracterizes his testimony.

10              THE WITNESS:  I would say that

11         there's certain examples of, like,

12         sales call reps that I've previously

13         mentioned that to me stand on their

14         own.  They don't need particular

15         context to provide a message.

16              Again, back to -- in Exhibit B,

17         "Doctor has a ton of Vicodin patients.

18         A lot of low back pain.  Leery of

19         Class II.  Use PI, product

20         information.  Sell low abuse and Q12.

21         Doctor agreed to use for all his low

22         back pain instead of Vicodin.  Keep on

23         this guy.  This is easy money."

24              To me, I don't -- it's hard for

25         me as a physician, as a human being,
```

1          to understand what other context there

2          would be for that phrase, other than

3          promoting a product for its financial

4          value over the impact or the health of

5          the patient it's going to.

6     QUESTIONS BY MR. STAMPFL:

7          Q.     So you referred to Exhibit B in

8     your answer just now, and this is -- this has

9     what you characterize as examples of

10    defendants' salespeople call notes reflecting

11    efforts to trivialize the risk of addiction

12    and exaggerate the benefits of chronic opioid

13    use, correct?

14         A.     That's correct.

15         Q.     So this is where you set out

16    the call notes that you considered and you

17    wanted to point out as examples, right?

18         A.     As examples, that's correct,

19    sure.

20         Q.     Okay.  But this exhibit doesn't

21    contain any Allergan or Actavis call note?

22         A.     That's correct.

23         Q.     Can you identify, sitting here

24    today, any Allergan or Actavis call notes

25    that reflected efforts, as you put it, to

Highly Confidential - Subject to Further Confidentiality Review

 1   trivialize the risk of addiction?

 2       A.     If you'll give me one moment,

 3   please.

 4              No, I do not have an example of

 5   that.  Thank you.

 6       Q.     Can you identify any Allergan

 7   or Actavis call notes that exaggerate the

 8   benefits of chronic opioid use, as you put in

 9   your report?

10              MR. LOESER:  Objection.  Form.

11              THE WITNESS:  I don't recall if

12          there's any inclusions of that

13          specific language in there, as

14          examples in the report.

15   QUESTIONS BY MR. STAMPFL:

16       Q.     And there are no call notes by

17   Allergan or Actavis at all in Exhibit B to

18   your report?

19       A.     That's what I see as well, yes.

20       Q.     So can you, sitting here today,

21   identify any Allergan or Actavis call notes

22   that exaggerate the benefits of chronic

23   opioid use?

24       A.     Not within this report.

25       Q.     Anywhere?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Not within my exhibits.

 2              Q.      Anywhere in the world, can you

 3      point to any example of any Allergan or

 4      Actavis call notes that exaggerates the

 5      benefits of chronic opioid use?

 6                      MR. LOESER:  Object to the form

 7              of the question, and it exceeds the

 8              scope of his report.

 9                      If you're asking him to review

10              the millions of pages you referenced,

11              I suppose he could do that.

12                      MR. STAMPFL:  Well, I would

13              have expected him to do that before

14              you put in your opinions about

15              Allergan and Actavis.

16      QUESTIONS BY MR. STAMPFL:

17              Q.      Did you do that, sir?

18              A.      Within the scope of my report

19      and preparation, I did not review all

20      potential call notes and reports from

21      Allergan or Actavis.

22              Q.      Did you review any call notes

23      from Allergan or Actavis?

24              A.      I can't recall.

25              Q.      You don't recall doing that
```

 1   sitting here today, right?

 2              MR. LOESER:  Objection.  Asked

 3         and answered.

 4              THE WITNESS:  Again, I can't

 5         recall.  I looked at a lot of notes,

 6         hundreds of notes, but I can't recall

 7         the specific manufacturer or their

 8         abbreviation as it related to a

 9         particular comment.

10   QUESTIONS BY MR. STAMPFL:

11         Q.    Okay.  Could you look at

12   Exhibit A to your report?  That's --

13         A.    Exhibit A?

14         Q.    Yes, please, sir.

15              And Exhibit A purports to set

16   out examples of promotional statements or

17   materials used by defendants in which the

18   risk of addiction is downplayed and the

19   benefits to patients exaggerated, correct?

20         A.    Sure, yes.

21         Q.    Okay.  Besides anything that

22   you set out in Exhibit A, can you think of

23   any other promotional statements or materials

24   used by Allergan or Actavis in which the risk

25   of addiction is downplayed?

```
 1            A.      Excluding those that are

 2    already listed in Exhibit A?

 3            Q.      Yes, sir, to the extent there

 4    are any.

 5            A.      Again, I've previously noted

 6    1.6 and 1.7.  Beyond -- sorry.  There's

 7    also -- within 1.32 and 1.33, there's also

 8    examples of that.

 9                    But you're asking if there's

10    something beyond in -- within this exhibit.

11            Q.      Yes, sir.

12            A.      Not that I recall.

13            Q.      Are you aware that three of the

14    six documents that had Allergan or Actavis

15    Bates numbers that you cited in Exhibit A

16    were not Allergan or Actavis marketing

17    materials at all but rather were for an

18    unaffiliated company known as Alpharma?

19                    MR. LOESER:  Objection.  Form.

20                    THE WITNESS:  I did not have

21        any previous knowledge of that.

22    QUESTIONS BY MR. STAMPFL:

23            Q.      Have you ever heard of

24    Alpharma?

25            A.      Not prior to this -- reviewing
```

1   these documents.

2        Q.    So were you aware that an

3   entity that at the time had Actavis in its

4   name acquired Kadian from Alpharma in

5   December 2008?

6        A.    Sorry, could you repeat that,

7   please?

8        Q.    Did you know that Actavis or an

9   affiliate entity acquired Kadian from

10  Alpharma in December 2008?

11       A.    I was not aware of those --

12  that transaction at that date.

13       Q.    Would you agree that you have

14  no basis to hold Actavis or Allergan

15  responsible for anything that an unaffiliated

16  entity did?

17            MR. LOESER:  Objection to form.

18       Calls for a legal conclusion, among

19       other problems, and is outside the

20       scope of his report.

21            THE WITNESS:  I'm unaware of

22       the relationship of Alpharma with

23       Actavis or Allergan.

24  QUESTIONS BY MR. STAMPFL:

25       Q.    So you didn't take any steps to

Highly Confidential - Subject to Further Confidentiality Review

1    investigate the relationship between those

2    two entities, correct?

3         A.    With the preparation of the

4    report, I did not take any steps to clarify,

5    given that I was unaware that there -- those

6    entities were not connected.

7               MR. STAMPFL:  Okay.  I will

8         pass the witness.  Thank you, sir.

9               THE WITNESS:  Okay.  Thank you.

10              VIDEOGRAPHER:  We are now going

11        off the record, and the time is

12        5:08 p.m.

13         (Off the record at 5:08 p.m.)

14              VIDEOGRAPHER:  We are now going

15        back on the record, and the time is

16        5:14 p.m.

17              CROSS-EXAMINATION

18   QUESTIONS BY MR. DAVISON:

19        Q.    Dr. Schumacher, my name is

20   William Davison, and I represent Mallinckrodt

21   in this matter.

22              Are you familiar with

23   Mallinckrodt?

24        A.    I'm familiar that it's a

25   pharmaceutical company.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And are you offering an opinion

 2    regarding the truthfulness and accuracy of

 3    Mallinckrodt promotional materials regarding

 4    its opioid products in this case?

 5                 MR. LOESER:  Objection.  Form.

 6                 THE WITNESS:  I believe I've

 7          included some examples of materials,

 8          you know, through sales training

 9          materials, for example, as well as --

10          thank you.  I just want to be

11          accurate.

12    QUESTIONS BY MR. DAVISON:

13          Q.     Well, if you've included

14    examples, my question is a little bit

15    different.

16                 Are you offering an opinion on

17    the truthfulness and accuracy of those

18    materials in this litigation?

19          A.     Is the question of whether I'm

20    attempting to validate that they're accurate?

21          Q.     Yeah, I'm --

22          A.     They're inaccurate -- like what

23    I read is actually what happened?  Is that

24    the question?

25          Q.     No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      I'm asking whether you think

 2      the materials that you cite -- in other

 3      words, are you claiming in this litigation

 4      that Mallinckrodt promoted its products using

 5      false statements?

 6           A.     I believe that Mallinckrodt,

 7      amongst other pharmaceutical companies,

 8      misstated certain information in the

 9      promotion or the training for the promotion

10      of their products, and I've included some

11      examples of that.

12           Q.     So your opinion in this matter

13      is that Mallinckrodt misstated certain

14      information in the promotion of its opioid

15      products; is that correct?

16           A.     That's correct.

17           Q.     And that is based on the

18      Mallinckrodt materials that are cited in your

19      report, correct?

20           A.     That is correct.

21           Q.     Okay.  And in looking at the

22      materials in your report, if you turn to

23      Exhibit A of your report?

24           A.     Yes.

25           Q.     If you go to 1.19?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.      Yes.

2          Q.      Is that one of the Mallinckrodt

3    documents that you relied upon to reach your

4    opinion in this matter?

5          A.      One of the important

6    Mallinckrodt documents to reach that --

7          Q.      And, sir, this document, you

8    state here, is training for sales

9    representatives, correct?

10         A.      Just a minute.  Let me just

11   make I've got all of this organized for

12   myself here.

13         Q.      So, sir, I'm asking you about

14   1.19 of Exhibit A of your report.

15         A.      Right.  So let's -- we can

16   start with that.

17         Q.      And it states there that it's a

18   training for sales representatives, correct?

19         A.      That's correct.

20         Q.      Do you have any reason to

21   believe that that document was ever shown to

22   a physician?

23         A.      I have no evidence that it's

24   been shown to a physician.

25                 I understood that the material
```

Highly Confidential - Subject to Further Confidentiality Review

1    was -- the educational materials brought --

2    sorry, passed along or provided to the sales

3    representatives.

4         Q.    Okay.  And did you review that

5    entire document?

6         A.    I reviewed a lot of documents.

7    I can't recall this particular phrase out of

8    a larger document.  It's likely, but I can't

9    recall.

10        Q.    And, sir, I'd like to turn your

11   attention to 1.35 of Exhibit A.

12             Are you there?

13        A.    Yes, I am.  1.35, yes.

14        Q.    And again, this says, "Training

15   bulletin, number 21."

16             Is that correct?

17        A.    That's correct, that's what I

18   have in front of me.

19        Q.    Do you have any reason to

20   believe that the information in this document

21   was ever shown to a physician?

22             MR. LOESER:  You mean a

23        treating physician or --

24             MR. DAVISON:  A physician.

25             MR. LOESER:  At Mallinckrodt or

Highly Confidential - Subject to Further Confidentiality Review

```
 1          not at Mallinckrodt?

 2                  MR. DAVISON:  You can object,

 3          if you want.

 4                  MR. LOESER:  All right.  I

 5          object.  Form.  The question is

 6          confusing.

 7                  THE WITNESS:  I have no

 8          evidence that this was shown to a

 9          physician or a prescribing physician.

10   QUESTIONS BY MR. DAVISON:

11          Q.    If I can turn your attention to

12   Exhibit B of your report.  And if you look at

13   number 20 on Exhibit B.

14          A.    Yes, I have it in front of me.

15          Q.    Is this another Mallinckrodt

16   document that you reviewed?

17          A.    My interpretation with MNK was

18   that it would be Mallinckrodt.

19          Q.    Okay.  So looking at this

20   document, it says, "E-mail re: sales message

21   for Exalgo," and then it has a quote from the

22   document.

23                  Is that accurate?

24          A.    That's correct, that's what I

25   see.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Is there anything in that quote

 2      that relates to the potential for abuse of

 3      opioid products?

 4              A.      If you just give me a minute,

 5      I'll have a look at it.  Thank you.

 6                      Sorry, what was your question

 7      one more time, please?

 8              Q.      Is there anything in that

 9      e-mail that discusses the potential for abuse

10      for opioids?

11                      MR. LOESER:  Objection.  Form.

12                      THE WITNESS:  I do not see

13          anything -- any content that

14          specifically discusses abuse or risk

15          of abuse.

16      QUESTIONS BY MR. DAVISON:

17              Q.      And you testified earlier, sir,

18      that every document that you reviewed in

19      preparation for your report you've included

20      in either the exhibits, the materials relied

21      upon or the supplemental document --

22      supplemental material relied upon that were

23      provided to us; is that correct?

24                      MR. LOESER:  And the

25          references.
```

 1              MR. DAVISON:  Yeah, sorry, the

 2         materials -- I think I said materials.

 3         If I did not, I meant to include that.

 4              THE WITNESS:  So the question

 5         is, does this constitute a list of the

 6         reviewed materials that went into the

 7         report?

 8              MR. DAVISON:  Yes, that's the

 9         question, sir.

10              THE WITNESS:  That's correct.

11    QUESTIONS BY MR. DAVISON:

12         Q.    Okay.  So it's fair to say that

13    for your opinion regarding Mallinckrodt's

14    marketing, if these are the only three

15    documents that are included in your list, it

16    is based solely on those three documents; is

17    that accurate?

18              MR. LOESER:  Objection.

19         Mischaracterizes his testimony.

20              THE WITNESS:  In addition,

21         the -- sorry, one more time with the

22         question, please?  Thank you.

23    QUESTIONS BY MR. DAVISON:

24         Q.    So if these are the only three

25    documents -- excuse me.  Strike that.

```
 1                    If these are the only three

 2    Mallinckrodt documents listed in your report,

 3    it's fair to say that your expert opinion on

 4    the truthfulness of Mallinckrodt's marketing

 5    is based solely on those three documents?

 6                    MR. LOESER:  Objection.

 7           Mischaracterizes his testimony.

 8                    THE WITNESS:  Based on what I

 9           have reviewed in terms of the

10           materials provided for the composition

11           of this report, I'm only aware of

12           those documents we just discussed.

13    QUESTIONS BY MR. DAVISON:

14           Q.    All right.  And two of the

15    documents that we just discussed were

16    internal training documents, correct?

17           A.    These examples, that's right.

18           Q.    But as we stated -- you say

19    examples -- this is the totality of the

20    documents you reviewed for your report?

21                    MR. LOESER:  Objection.

22           Mischaracterizes his testimony.

23                    THE WITNESS:  In terms of what

24           I was -- the resources I was able to

25           review and include in this preparation
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           of the report as shown here, again, is
 2           limited to these -- or includes these
 3           three documents -- sorry, these three
 4           training statements from Mallinckrodt.
 5      QUESTIONS BY MR. DAVISON:
 6           Q.    So your opinion regarding the
 7      truthfulness of Mallinckrodt's marketing to
 8      physicians is based solely on internal
 9      training documents; is that correct?
10               MR. LOESER:  Objection.
11           Mischaracterizes his testimony.
12               THE WITNESS:  Based on those
13           examples of -- that part of my
14           opinion -- my opinion is based on the
15           various examples that were pulled from
16           a larger body of examples to -- strike
17           that.
18               These three examples constitute
19           my review of -- for the report of
20           training materials for Mallinckrodt,
21           and I'm not aware within these
22           materials that other Mallinckrodt
23           examples exist.
24      QUESTIONS BY MR. DAVISON:
25           Q.    And so if you were to provide
```

Highly Confidential - Subject to Further Confidentiality Review

1    an expert opinion in this litigation that

2    Mallinckrodt made false or misleading

3    statements to physicians regarding opioids,

4    that would be based solely on the review of

5    three documents that were internal training

6    documents; is that right?

7            MR. LOESER:  Objection.

8        Mischaracterizes his testimony.

9            THE WITNESS:  These three

10       documents are -- represent the

11       information that I had to review and

12       support my argument.

13   QUESTIONS BY MR. DAVISON:

14       Q.    And did you ever consider

15   asking counsel for additional documents to

16   support your statements?

17           MR. LOESER:  Objection.  Form.

18           THE WITNESS:  I did not ask

19       counsel for additional resources

20       within Mallinckrodt.

21   QUESTIONS BY MR. DAVISON:

22       Q.    And within your field, do you

23   think it's sufficient to base an opinion on

24   just three documents?

25           MR. LOESER:  Objection.  Form.

1       Lacks foundation.

2              THE WITNESS:  If additional

3       examples exist in the review, I can't

4       recall.

5   QUESTIONS BY MR. DAVISON:

6       Q.     But they would be in the report

7   and the exhibits we talked about, correct?

8       A.     That's correct.

9       Q.     Okay.  After talking through

10  those three documents, do you think that is

11  sufficient for you to make a determination as

12  to whether Mallinckrodt's marketing

13  statements to physicians were false or

14  misleading?

15             MR. LOESER:  Objection.  Form.

16             THE WITNESS:  Well, I am

17      concerned that with those examples

18      representing what the intent of the

19      training for their product, I would be

20      concerned there would be additional

21      such examples.  And even in the face

22      of two or three of these examples for

23      me, it sends up a red flag that there

24      would be other representations.  That

25      would be my opinion.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. DAVISON:

 2         Q.    Sir, would it have been helpful

 3    for you to actually review what Mallinckrodt

 4    said to physicians when it was marketing its

 5    products?

 6              MR. LOESER:  Objection.  Form.

 7         Calls for speculation.

 8              THE WITNESS:  I believe the --

 9         that reviewing all of the available

10         materials that apply to Mallinckrodt

11         in this instance was beyond the scope

12         of the time available for me to

13         prepare this report, and as such, I

14         attempted to obtain from the materials

15         provided by counsel some examples that

16         seemed to me to represent

17         misstatements or exaggerations.

18    QUESTIONS BY MR. DAVISON:

19         Q.    So is it fair to say that what

20    Mallinckrodt actually said to physicians in

21    its detailing is outside the scope of your

22    report?

23              MR. LOESER:  Object to the form

24         of the question.  I also object to the

25         notion that there are call notes from
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Mallinckrodt that he was able to
 2          review or --
 3               MR. DAVISON:  You can limit
 4          your objection to objection to form.
 5          That's the appropriate objection in
 6          this case.
 7               MR. LOESER:  Object to the
 8          form.  I think the question is
 9          confusing, misleading and assumes
10          facts not in evidence.
11               THE WITNESS:  So understanding
12          the -- well, strike that.
13               I was unaware of the existence
14          of call notes by Mallinckrodt to
15          review.  I can't recall having
16          reviewed any specific example that I
17          could provide, nor did I include that
18          in this report, dossier.
19     QUESTIONS BY MR. DAVISON:
20          Q.    So is it fair to say that what
21     Mallinckrodt actually said to physicians
22     through either call notes or through
23     detailing sale aid is outside the scope of
24     your report?
25               MR. LOESER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            THE WITNESS:  I have no

 2       evidence either way, and based on

 3       that, I put it outside the scope of my

 4       report.

 5            MR. DAVISON:  Okay.  Thank you.

 6       I have nothing further.

 7            VIDEOGRAPHER:  We are now going

 8       off the record, and the time is

 9       5:31 p.m.

10        (Off the record at 5:31 p.m.)

11            VIDEOGRAPHER:  We are now going

12       back on the record, and the time is

13       5:4 -- 34 p.m.

14            MR. LOESER:  Actually, I'd just

15       take a quick minute to note two

16       corrections or objections for the

17       record.

18            The first is that Allergan's

19       counsel referred to six documents,

20       some of which he described as and

21       characterized as not relating to

22       chronic pain.  And I would just note

23       our objection to the

24       mischaracterization of those

25       documents.  The witness was not shown
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          the documents; however, the documents
 2          are not as described by counsel.
 3                 Second, I would object to
 4          Mallinckrodt's counsel referring to
 5          call notes and suggesting or implying
 6          to the witness that such notes exist.
 7          We are not aware of any call notes
 8          produced by Mallinckrodt, however; if
 9          they exist, we'd ask that they be
10          produced immediately.
11                 MR. STAMPFL:  And I'd like to
12          make a statement in response to that
13          belated objection, which is that I
14          disagree that there were any
15          mischaracterizations at all, and if
16          counsel would allow me half an hour or
17          an hour additional time with the
18          witness, I could demonstrate that by
19          going through each of the documents he
20          cites.
21                 So will you allow me to do
22          that, Counsel?
23                 MR. LOESER:  Counsel, your time
24          and what you get is subject to the
25          agreement of your colleagues, so good
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            luck.
2                 MR. STAMPFL:  Beyond the seven
3            hours.  Will you allow me an hour
4            beyond the seven hours?
5                 MR. LOESER:  No, I will not.
6                 MR. STAMPFL:  Okay.  So we have
7            no opportunity to test the statement
8            that you just put on the record?
9                 MR. LOESER:  Counsel, you have
10           the opportunity to divide up your time
11           however you see fit, and you chose the
12           way you chose, and that's life.  So we
13           should move on.
14                MR. STAMPFL:  Well, I object
15           because I don't think there's been
16           enough time to test that statement
17           that you just made, which was
18           inaccurate.
19                MR. LEVINE:  All I'll note is
20           that the last three minutes did not
21           count towards this deposition.
22                MR. LOESER:  At least a minute
23           and a half of it, anyway.
24                CROSS-EXAMINATION
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     QUESTIONS BY MR. LEVINE:

 2          Q.     Good afternoon, Dr. Schumacher.

 3          A.     Good afternoon.

 4          Q.     My name is Aaron Levine, and I

 5     represent Endo and Par in this case.

 6                 One of my co-counsel asked you

 7     about a book chapter from 2001.

 8          A.     That's correct.

 9          Q.     Do you recall?

10                 That was Exhibit 8, which you

11     said was used to educate medical students,

12     correct?

13          A.     Principally, yes.

14          Q.     Did you contribute to the

15     opioid crisis?

16                 MR. LOESER:  Objection.  Form.

17                 THE WITNESS:  I believe that

18          all physicians that were misled by

19          promotional and misleading statements

20          by pharmaceuticals may have

21          participated in the overprescribing of

22          high-dose or chronic opioid

23          prescribing for noncancer patients.

24     QUESTIONS BY MR. LEVINE:

25          Q.     With respect to the chapter
```

```
 1    that you wrote, was that based on any

 2    statements that you received from

 3    pharmaceutical companies, or was that based

 4    on independent research?

 5              MR. LOESER:  Objection.  Form.

 6              THE WITNESS:  Sorry, which

 7         statement are you talking about?

 8    QUESTIONS BY MR. LEVINE:

 9         Q.    With respect to the chapter

10    that was discussed as Exhibit 8, your book

11    chapter.

12         A.    Are you talking about the

13    entire chapter?

14         Q.    Yes.

15              Did you base any of that

16    chapter on any statements that you received

17    from pharmaceutical companies?

18              MR. LOESER:  Objection.  Form.

19              THE WITNESS:  I see.  The

20         chapter was based on the literature as

21         it existed at that time.

22    QUESTIONS BY MR. LEVINE:

23         Q.    And so once again I ask:  Did

24    the information that you conveyed in that

25    chapter contribute to the opioid crisis?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LOESER:  Objection.  Form.

 2                    THE WITNESS:  I'm not aware

 3           that -- that that chapter contributed

 4           to the opioid crisis.

 5      QUESTIONS BY MR. LEVINE:

 6           Q.     Might have; might not have?

 7                    MR. LOESER:  Objection.  Form.

 8           Calls for speculation.

 9                    THE WITNESS:  I'm not aware.

10      QUESTIONS BY MR. LEVINE:

11           Q.     You're not offering any

12      marketing opinions as to Par Pharmaceuticals,

13      correct?

14                    I'll represent to you that

15      there's no mention of Par in your report or

16      in any exhibit.

17                    MR. LOESER:  Counsel, just an

18           objection as before.  The footnote

19           that we keep reading does not refer to

20           subsidiaries or affiliates of the

21           listed defendants.

22                    So if you want to clarify the

23           relationship of Par to a listed

24           defendant, you might get a different

25           answer.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LEVINE:

 2         Q.    Par is associated with Endo,

 3    but you are not offering any opinions that

 4    are specific to Par, correct?

 5         A.    Frankly, I don't know what the

 6    relationship is between Par and Endo to make

 7    an opinion in that regards.

 8         Q.    Okay.  You don't cite any

 9    marketing materials that reference Par in

10    your report, correct?

11         A.    As far as --

12              MR. LOESER:  Go ahead.

13              THE WITNESS:  As far as my

14         understanding in preparing for this

15         report, I had not associated Par with

16         Endo and recognized Par as a separate

17         entity to identify as marketing

18         materials.

19    QUESTIONS BY MR. LEVINE:

20         Q.    Do you know which products Endo

21    markets?

22         A.    I'm aware that Endo markets

23    oxymorphone.

24         Q.    What is the brand name of those

25    products?
```

```
 1          A.      In terms of brand naming, I
 2   tend to use the generic names.
 3          Q.      So I'm confused.
 4                  You've said the marketing
 5   materials you reviewed have an effect on
 6   physicians, correct?
 7          A.      Uh-huh, that's --
 8          Q.      But yet in all of your review
 9   of the marketing materials, you cannot
10   remember the brand name of the product?
11                  MR. LOESER:  Objection to form.
12                  THE WITNESS:  If you give me a
13          moment just to review my materials.
14   QUESTIONS BY MR. LEVINE:
15          Q.      Do physicians review their
16   marketing materials before they prescribe?
17                  MR. LOESER:  Objection.  Form.
18                  The witness has asked for a
19          moment to review his report in order
20          to answer --
21                  MR. LEVINE:  There's nothing
22          I've asked that he needs to review.
23          I'm actually not asking about any
24          document.
25                  MR. LOESER:  But you've asked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            him if he remembers the drug name --

 2                  MR. LEVINE:  Right.

 3                  MR. LOESER:  -- and the report

 4            indicates the drug name, so he's

 5            looking --

 6                  MR. LEVINE:  Right.  I'll tell

 7            him the drug name.  I'm not trying to

 8            hide it.

 9                  MR. LOESER:  Well, then speed

10            it up and tell him.

11                  MR. LEVINE:  I'm just asking if

12            he can remember the drug name because

13            he's talking about the effect of

14            marketing materials.

15                  MR. LOESER:  Okay.  Well, tell

16            him the drug name if you want it to go

17            faster.

18      QUESTIONS BY MR. LEVINE:

19            Q.    Without looking at your report,

20      you do not remember the drug name of Endo's

21      product, correct?

22                  MR. LOESER:  Objection.  Form.

23      QUESTIONS BY MR. LEVINE:

24            Q.    Dr. Schumacher?

25      Dr. Schumacher?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     I'm having sort of a very tired

2    moment at the -- at the moment.

3               MR. LOESER:  Do you want to --

4    QUESTIONS BY MR. LEVINE:

5          Q.     Do you need a break?

6          A.     I do, actually.  Do you mind?

7    Sorry about that, yeah.

8          Q.     Well, there is one question

9    pending, which is, without looking at your

10   report, you cannot remember the name of

11   Endo's products in this report, correct?

12         A.     Right now I feel too fatigued

13   to respond.

14         Q.     As fatigued or not, you can't

15   remember the name of the product right now?

16               And we'll continue after --

17   we'll take a break.  I just don't want to

18   break with a question pending.

19         A.     Again, I can't recall right now

20   because I'm fatigued and --

21               MR. LEVINE:  Okay.  Let's take

22         a break.

23               VIDEOGRAPHER:  Okay.  We are

24         now going off the record, and the time

25         is 5:41 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Off the record at 5:41 p.m.)

 2              VIDEOGRAPHER:  We are now going

 3         back on the record, and the time is

 4         5:59 p.m.

 5    QUESTIONS BY MR. LEVINE:

 6         Q.    Hi, Dr. Schumacher.

 7               Are you feeling better?

 8         A.    I am.

 9         Q.    You're able to continue?

10         A.    Yes, I am.

11         Q.    Okay.  I imagine you probably

12    know the name of the Endo product.

13         A.    As soon as I got half of the

14    soda in me...

15               Opana, of course, because it's

16    not on our formulary, and I know that comes

17    up occasionally.

18         Q.    Okay.  For the record, are you

19    also offering opinions regarding Percocet?

20         A.    I believe that within my report

21    there's been discussion of combination of --

22    opioid and acetaminophen combinations, so

23    within the report, those combinations have

24    been mentioned in various aspects of the

25    report.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Do you know whether you're

 2    offering opinions regarding Percocet?

 3                 MR. LOESER:  Objection.  Form.

 4                 MR. LEVINE:  Excuse me, let me

 5          rephrase that.

 6                 THE WITNESS:  Yes.

 7    QUESTIONS BY MR. LEVINE:

 8          Q.     Do you know whether you're

 9    offering opinions regarding the marketing of

10    Percocet?

11                 MR. LOESER:  Objection.  Form.

12                 THE WITNESS:  I'm not aware

13          that -- I'll say this:  The focus of

14          my review of the materials was not

15          focused on Percocet.

16    QUESTIONS BY MR. LEVINE:

17          Q.     Okay.  You testified earlier,

18    and correct me if I misstate this, that

19    you're relying on statements and call notes

20    that show that sales representatives have

21    gotten assurances that they would now -- that

22    doctors would now write prescriptions for

23    higher doses; is that correct?

24                 MR. LOESER:  Objection to form.

25          Mischaracterizes his testimony.
```

```
 1                   THE WITNESS:  My testimony is

 2           upon review of call notes from sales

 3           representatives, I had great concern,

 4           based on review of a few of those

 5           examples, that -- that they were

 6           influencing the decision of

 7           prescribers based on statements that

 8           were not supported by the scientific

 9           literature.

10     QUESTIONS BY MR. LEVINE:

11           Q.    You can't cite any Endo call

12     notes in -- let's start with Summit or

13     Cuyahoga County -- indicating that any doctor

14     changed his or her prescribing in any way due

15     to detailing or marketing, can you?

16                   MR. LOESER:  Objection.  Form.

17                   THE WITNESS:  In my -- as I

18           recall in my previous testimony, I did

19           not have examples of call notes that

20           came from -- that was identified as

21           other than Ohio, and I don't believe I

22           have any details that was related to a

23           county.

24     QUESTIONS BY MR. LEVINE:

25           Q.    You can't cite any Endo call
```

Highly Confidential - Subject to Further Confidentiality Review

1    notes in the United States that indicate that

2    any doctor changed his or her prescribing

3    habits in any way due to detailing or

4    marketing, can you?

5           MR. LOESER:  Objection to form.

6           THE WITNESS:  I do not have

7       documentation that links a particular

8       call note to a particular

9       prescriber -- prescribing event for an

10      opioid.

11   QUESTIONS BY MR. LEVINE:

12      Q.    And that's for any opioid, Endo

13   or not?

14      A.    Well, specifically you asked

15   about Endo.

16      Q.    Okay.  I was just clarifying

17   based on your answer.

18           Is your answer specific to Endo

19   or all defendants?

20      A.    That was your question, and so

21   I'll answer it specific to Endo.

22      Q.    Would the same be true for all

23   defendants?

24           MR. LOESER:  Objection.  Form.

25           THE WITNESS:  Could you restate

Highly Confidential - Subject to Further Confidentiality Review

```
 1            the question, please?

 2   QUESTIONS BY MR. LEVINE:

 3            Q.     Sure.

 4                   Can you cite any call notes in

 5   the United States indicating that any doctor

 6   changed his or her prescribing in any way due

 7   to detailing or marketing?

 8                   MR. LOESER:  Objection.  Form.

 9                   THE WITNESS:  Again, the

10            relationship of those call notes in

11            forming my opinion, the promotional

12            efforts and the misstatements by call

13            representatives as documented in those

14            notes, supported the notion, the

15            thesis, that aggressive marketing of

16            opiates for chronic noncancer pain

17            resulted in the overprescribing of

18            opiates throughout the United States

19            and the opioid epidemic; however, I

20            don't have a link that -- one to one

21            that relates a particular call note

22            for a particular physician to a change

23            in their prescribing practice.

24   QUESTIONS BY MR. LEVINE:

25            Q.     Okay.  You can't say the opioid
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    crisis in Summit and Cuyahoga Counties would
 2    look any different if Endo did not market and
 3    sell opioids, could you?
 4                 MR. LOESER:  Objection.  Form.
 5                 THE WITNESS:  That's beyond the
 6          scope of my report.  I did not
 7          specifically look at an individual --
 8          well, that's beyond the scope of my
 9          report.
10    QUESTIONS BY MR. LEVINE:
11          Q.    The scope of your report does
12    attribute what's driving the opioid crisis,
13    correct?
14          A.    That's correct.
15          Q.    So you cannot say that the
16    opioid crisis would look any different --
17    again, now, let's make it broader -- in the
18    United States if Endo did not market or sell
19    opioids?
20                 MR. LOESER:  Objection.  Form.
21          Calls for speculation about a universe
22          that doesn't exist.
23                 THE WITNESS:  Based on my
24          review of a number of opioid
25          manufacturers, the promotion of
```

Highly Confidential - Subject to Further Confidentiality Review

1           opioids in the treatment of chronic

2           noncancer pain where there's no strong

3           literature that supports its use in

4           things like back pain, centralized

5           pain syndromes or headache, in my

6           opinion, underpin the driving force of

7           the opioid epidemic.

8      QUESTIONS BY MR. LEVINE:

9           Q.    So let me be more specific.

10               Can you say that any patient

11     who was prescribed an Endo product would not

12     have otherwise been prescribed a different

13     opioid had Endo not marketed and sold their

14     products?

15               MR. LOESER:  Objection.  Form.

16          Calls for speculation.

17               THE WITNESS:  I don't know.

18     QUESTIONS BY MR. LEVINE:

19          Q.    Have you ever been detailed by

20     any Endo sales representative or marketing

21     person?

22          A.    I can't recall.

23          Q.    Do you recall ever telling any

24     Endo sales representative or marketing person

25     whether their marketing was too aggressive,

Highly Confidential - Subject to Further Confidentiality Review

1    improper or misleading?

2          A.     I don't recall ever doing that.

3          Q.     You never told anyone at Endo

4    that their promotion of opioids was improper,

5    did you?

6                 MR. LOESER:  Objection.  Form.

7                 THE WITNESS:  I don't recall

8          doing that.

9    QUESTIONS BY MR. LEVINE:

10         Q.     Did you ever tell your

11   colleagues at UCSF that Endo's marketing was

12   improper?

13                MR. LOESER:  Objection.  Form.

14         Outside the scope of his report.

15                THE WITNESS:  I don't recall.

16   QUESTIONS BY MR. LEVINE:

17         Q.     Did you ever present at a

18   medical conference to tell your colleagues

19   that they were being misled by Endo's

20   marketing?

21                MR. LOESER:  Objection.  Form.

22                THE WITNESS:  No, I don't

23         recall ever doing that.

24   QUESTIONS BY MR. LEVINE:

25         Q.     Ever present at a medical

Highly Confidential - Subject to Further Confidentiality Review

```
 1    conference to tell your colleagues that they

 2    were being misled by other people's

 3    marketing?

 4         A.    I have made presentations that

 5    have been based on the work of the NASEM

 6    report that -- which the key thesis or the

 7    key cause, conclusion, was the aggressive

 8    promotion of opiates for noncancer chronic

 9    pain.  And within presentations, I have made

10    that reference to our study's conclusion.

11         Q.    Have you ever prescribed Opana

12    or Opana ER?

13         A.    No, I have not.  It's not

14    within our formulary at UCSF.

15         Q.    Have you ever prescribed

16    Percocet?

17         A.    As part of our consult service,

18    we have prescribed Percocet to patients,

19    that's correct.

20         Q.    Do you continue to prescribe

21    Percocet?

22         A.    Based on the patient's history.

23    Often patients may come in with a history of

24    already taking Percocets, and depending on

25    the clinical situation, we -- and discussions
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    with them, we may continue that medication.

2    So we would either give a recommendation or

3    if the prescribing pattern is under our

4    control, we would write for that

5    prescription.

6         Q.    Have you ever prescribed

7    Percocet based on marketing?

8              MR. LOESER:  Objection.  Form.

9              THE WITNESS:  The decision to

10        prescribe Percocet has been -- within

11        the inpatient services has typically

12        been driven by a patient's particular

13        history of analgesic use and in

14        certain circumstances their ability to

15        tolerate different opioids, including

16        Percocet.

17   QUESTIONS BY MR. LEVINE:

18        Q.    Sorry, I don't believe you

19   answered my question.

20        A.    I'm sorry, could you repeat

21   that?

22        Q.    Have you ever prescribed

23   Percocet based on marketing?

24              MR. LOESER:  Objection.  Asked

25        and answered.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    THE WITNESS:  I have not based
2          a decision to use Percocet based on
3          marketing materials that I'm aware of.
4    QUESTIONS BY MR. LEVINE:
5          Q.    What methodology did you use to
6    determine that Endo's marketing influenced
7    the way opioids were prescribed?
8                    MR. LOESER:  Objection.  Form.
9                    THE WITNESS:  Well, principally
10         I was given the records as described
11         throughout this testimony of either
12         training materials or call notes or
13         internal documents, and upon those --
14         with review, I have included some
15         examples within my report.  And it is
16         on that basis that I've included those
17         in my opinion.
18   QUESTIONS BY MR. LEVINE:
19         Q.    So you've reviewed a document
20   and concluded that it influenced the way that
21   opioids were prescribed.
22                 Is there any method in between
23   your review of the document and your
24   conclusion that I'm unaware of?
25                    MR. LOESER:  Objection.  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 THE WITNESS:  My opinion was

 2           formed by the review of the documents

 3           provided and -- yeah.

 4    QUESTIONS BY MR. LEVINE:

 5           Q.    No other method?

 6           A.    Relative to the review of the

 7    literature, there's been a relationship of

 8    how, again, the influence of -- strike that.

 9                 I'll just stop there.  No other

10    influence.

11           Q.    No other influence -- you mean

12    no other method, right?

13           A.    No other method beyond the

14    review of the literature that is -- went into

15    the report development and also the materials

16    that were provided for review.

17                 That said, I am understanding

18    that this is largely providing examples, and

19    there will be other expert testimony that

20    will focus on -- specifically around

21    marketing.

22           Q.    Do you know if any of the

23    marketing materials you reviewed were used in

24    Summit or Cuyahoga Counties?

25           A.    Specifically, I do not have
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    documents that would tie those materials to

2    those counties.

3         Q.    Do you know if any of the

4    physicians -- if any physicians were

5    influenced to prescribe -- strike that.

6              Do you know if any physicians

7    were influenced to prescribe Endo's opioids

8    based on their marketing?

9              MR. LOESER:  Objection.  Form.

10             THE WITNESS:  Sorry, did you

11        say any physicians?  Where?  Could you

12        repeat that?

13   QUESTIONS BY MR. LEVINE:

14        Q.    Do you know if any physicians

15   were influenced to prescribed Endo's opioids

16   based on their marketing?

17             MR. LOESER:  Objection.  Form.

18             THE WITNESS:  My review of the

19        materials grew from the idea that

20        aggressive marketing in a number of

21        aspects of detailing and -- could be

22        generalized to influence physician

23        decision-making, and to that extent, I

24        do not have a specific link of a

25        particular physician to a particular
```

Highly Confidential - Subject to Further Confidentiality Review

1        Endo marketing.

2   QUESTIONS BY MR. LEVINE:

3        Q.    So the answer to my question

4   is, no, you do not know if any physicians

5   were influenced to prescribe Endo's opioids

6   based on their marketing?

7             MR. LOESER:  Objection.

8   QUESTIONS BY MR. LEVINE:

9        Q.    Correct?

10            MR. LOESER:  Asked and

11       answered.

12            THE WITNESS:  Beyond the

13       example I gave in terms of a general

14       effect of marketing of opioids for

15       chronic noncancer pain when there's

16       limited or no scientific evidence.

17  QUESTIONS BY MR. LEVINE:

18       Q.    You don't have any data

19  indicating what percentage of patients taking

20  opioids were exposed to marketing, do you?

21            MR. LOESER:  Objection.  Form.

22       Outside the scope of the report.

23            THE WITNESS:  Within the

24       preparation of the report, I did not

25       focus on evaluating that -- any

Highly Confidential - Subject to Further Confidentiality Review

1           specific relationship or, I should

2           say, percentage of marketing materials

3           to patients.  I don't know.

4       QUESTIONS BY MR. LEVINE:

5           Q.     So I'm going to -- I'm trying

6       to move through this as quickly as I can to

7       allow my colleague to have time.

8           A.     Sure.  Sure.

9           Q.     You cite on -- in Exhibit B of

10      your report, you cite two sales training

11      reports in paragraphs 16 and 17.

12          A.     Okay.

13          Q.     Now, this section of your

14      report refers to efforts to trivialize

15      addiction.

16               At the beginning of Exhibit B,

17      you say these are examples of efforts to

18      trivialize addiction, correct?

19          A.     That's correct, yes.

20          Q.     Okay.  You don't cite any

21      statements in these -- from these documents

22      that trivialize addiction, do you?

23               MR. LOESER:  Objection.  Form.

24               THE WITNESS:  If you can just

25          give me a moment, I'll review these

Highly Confidential - Subject to Further Confidentiality Review

```
 1              two quick statements.  Thank you.

 2                   Well, again, going back to the

 3              beginning of Exhibit B, examples,

 4              notes reflecting efforts to trivialize

 5              the risk of addiction and exaggerate

 6              the benefits of chronic opioid use.

 7      QUESTIONS BY MR. LEVINE:

 8              Q.    Do you cite any examples of

 9      exaggerating the benefits there either?

10                   MR. LOESER:  And I'll note for

11              the record there are other examples

12              that cover those topics.

13                   MR. LEVINE:  Right, but

14              these --

15                   MR. LOESER:  Not in this

16              section.  I'm not saying in general.

17                   MR. LEVINE:  First of all, you

18              don't need to note anything for the

19              record.  I'm asking about these two

20              examples.

21                   MR. LOESER:  Right.  But to the

22              extent you're suggesting these are the

23              only --

24                   MR. LEVINE:  Please don't abuse

25              my time.
```

```
 1                    MR. LOESER:  -- Endo examples.

 2          There are other --

 3                    MR. LEVINE:  I'm not suggesting

 4          anything of the sort.

 5                    MR. LOESER:  Okay.  Well, then

 6          we've clarified that.

 7                    THE WITNESS:  Well, again,

 8          reading number 17, "I'd like you to

 9          turn up the passion some with Opana,"

10          "staying ahead of the pain," "being

11          released from the grip of pain," are

12          tag lines that stand out and should be

13          used along -- these type of

14          statements, again, trying to

15          understand, again, the context in

16          which these were made is limiting.

17                    So I would agree that there's

18          no specific inference that these

19          agents -- I would say this, that the

20          focus is on the success of pain

21          control with Opana, without any

22          mention of potential harms or risks to

23          addiction.  I think that's --

24     QUESTIONS BY MR. LEVINE:

25          Q.    Sorry, just to be clear --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.
 2          Q.      -- you think these documents
 3    don't mention potential harms or risks?
 4          A.      I'm talking about these two
 5    points, 16 and 17.
 6          Q.      Right.
 7                  You think those documents don't
 8    mention -- the documents you're referencing
 9    there don't mention potential harms or risks?
10                  MR. LOESER:  Objection.  And
11          asked and answered.
12    QUESTIONS BY MR. LEVINE:
13          Q.      Or is it just the statement you
14    pull out of the document that doesn't mention
15    it?
16          A.      It's just the statement I'm
17    referring to.
18          Q.      Okay.  Do you agree that the
19    majority of opioid analgesics are thought to
20    drive -- strike that.
21                  Do you agree that the majority
22    of opioid analgesics that are thought to
23    drive the catastrophic figures regarding
24    increased deaths and opioid-induced side
25    effects overwhelmingly comes from
```

1    prescription painkillers shared by friend or

2    relative for free and often prescribed

3    originally for postoperative pain?

4                  MR. LOESER:  Objection.  Form.

5                  THE WITNESS:  Based on evidence

6            that I reviewed, as well as evidence,

7            frankly, that has been stated by the

8            CDC, I believe patients that are using

9            now illicit forms of opioids resulting

10           in increasing opioid-related deaths

11           had their initial -- the initiated

12           exposure to opioids were through

13           prescription opioids.

14                  And in particular, the sources

15           of those opioids, as I understand it,

16           have come from a wide range of

17           indications.

18                  I do agree that in addition to

19           the trajectory of the opioid epidemic,

20           there's been a shift from patients

21           that are having overdose or harm from

22           the primary prescribed opioids to then

23           transitioning to other opioids that

24           resulted in their death.

25

```
 1    QUESTIONS BY MR. LEVINE:

 2          Q.     So yes or no, do you disagree

 3    with my -- with the statement I asked you

 4    about?

 5                 MR. LOESER:  Objection.  Form,

 6          and asked and answered.

 7                 THE WITNESS:  The --

 8                 MR. LEVINE:  I'll withdraw it.

 9          I'm running out of time.

10                 THE WITNESS:  Okay.

11    QUESTIONS BY MR. LEVINE:

12          Q.     So in Exhibit A on paragraph --

13    in paragraph 134 of your report, you cite a

14    Revopan --

15                 MR. LOESER:  Sorry, Counsel,

16          where are you?

17                 MR. LEVINE:  Exhibit A,

18          paragraph 1.34 of the report.  Sorry.

19                 THE WITNESS:  1.34?

20    QUESTIONS BY MR. LEVINE:

21          Q.     Yeah, page 8 of the exhibit.

22          A.     1.3 --

23                 MR. LOESER:  1.34 on A.

24                 THE WITNESS:  Sorry.

25                 MR. LOESER:  Is that B?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  This is -- I

 2           thought we were on -- this is

 3           Exhibit A.

 4      QUESTIONS BY MR. LEVINE:

 5           Q.    Yeah, 1.34.

 6           A.    Oh, it's back here.  Sorry.

 7           Q.    Do you see that?

 8           A.    Yes, I'm there.

 9           Q.    You cite a Revopan scientific

10      training module?

11           A.    Yes.

12           Q.    Do you know what Revopan is?

13           A.    I can't recall.

14           Q.    Do you know whether any drug

15      was ever marketed as Revopan?

16           A.    I can't recall.

17           Q.    Is this document a draft or a

18      final?

19                 It says it in your report, it's

20      a draft.

21                 Do you see that?

22           A.    Draft, yes, I see that.

23           Q.    Okay.  Did you ask to see the

24      final?

25           A.    No, I did not.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     You don't have any reason to
2    think this document was ever used based on
3    the fact that it's a draft and not a final,
4    correct?
5               MR. LOESER:  Objection.  Form.
6          Calls for speculation.
7               THE WITNESS:  I have no
8          evidence either way whether it was
9          made into a final form.
10              MR. LEVINE:  Okay.  I think I'm
11         out of --
12              MR. TAM:  Go ahead.
13   QUESTIONS BY MR. LEVINE:
14         Q.     Maybe two more questions.
15              You're not saying opioids
16   should be off the market, are you?
17              MR. LOESER:  Objection.  Form.
18              THE WITNESS:  I think opioids
19         are an important part of analgesic
20         care for patients, in particular for
21         acute pain management, cancer pain and
22         end-of-life care and, under very small
23         circumstances, other conditions we
24         discussed previously.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. LEVINE:
2         Q.    So you're not saying opioids
3    should be off the market, correct?
4              MR. LOESER:  Objection.  Asked
5         and answered.
6              THE WITNESS:  If you're asking
7         me all opioids should be taken off the
8         market, I believe there's many opioids
9         that are -- provide useful therapeutic
10        options for physicians.
11             MR. LEVINE:  Thank you.  Let's
12        go off the record.
13             VIDEOGRAPHER:  We are now going
14        off the record, and the time is
15        6:23 p.m.
16         (Off the record at 6:23 p.m.)
17             VIDEOGRAPHER:  We are now going
18        back on the record, and the time is
19        6:32 p.m.
20             CROSS-EXAMINATION
21    QUESTIONS BY MR. TAM:
22         Q.    Dr. Schumacher, my name is
23    Jonathan Tam, and I represent Purdue.
24             Have you ever prescribed
25    OxyContin?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Within the setting of our

2     consult service in the hospital, yes.

3          Q.      When was the last time you

4     prescribed OxyContin?

5          A.      Relative to patients that we

6     have managed in terms of the continuation of

7     their care, many patients have come in on

8     OxyContin, so it could have been within a few

9     weeks ago.

10         Q.      In your career, how many

11    OxyContin prescriptions have you written?

12              MR. LOESER:  Objection.  Form.

13              THE WITNESS:  I don't know.

14    QUESTIONS BY MR. TAM:

15         Q.      Don't have a ballpark?

16         A.      I really don't know.

17         Q.      And have any of those

18    prescriptions been for chronic pain?

19              MR. LOESER:  Objection.  Form.

20              THE WITNESS:  Again, those

21          prescriptions have included patients

22          that have come into the hospital,

23          typically for chronic or acute on

24          chronic indications, and within the

25          evaluation of those patients, we've

1        deemed, if appropriate, to continue

2        their OxyContin principally out of the

3        fear of opioid withdrawal.

4    QUESTIONS BY MR. TAM:

5        Q.    So some of the prescriptions

6    have been for chronic pain, correct?

7            MR. LOESER:  Objection.  Form.

8            THE WITNESS:  Various forms of

9        chronic pain, that's correct.

10   QUESTIONS BY MR. TAM:

11       Q.    Have you ever been detailed by

12   a Purdue sales representative about

13   OxyContin?

14       A.    I don't recall.

15       Q.    Earlier today you mentioned

16   that you had mentors that may have interacted

17   with sales representatives about OxyContin;

18   is that correct?

19       A.    That's correct, I did testify

20   to that.

21       Q.    What are the names of your

22   mentors?

23       A.    At the time it was Warren McKay

24   and Pamela Pierce Palmer.  That's what I

25   recall.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.      And are those doctors -- were
2      they practicing in California?
3              A.      That's correct.
4              Q.      Did they ever practice in Ohio?
5              A.      Not that I'm aware of.
6              Q.      Have you conducted any research
7      or analysis to determine how many
8      prescriptions -- strike that.
9                      In your report, you say that
10     Purdue's marketing drove the prescription of
11     OxyContin at higher doses; is that correct?
12                     MR. LOESER:  Objection.  Form.
13                     THE WITNESS:  That's correct, I
14           did that -- include that in the
15           report.
16     QUESTIONS BY MR. TAM:
17             Q.      Have you conducted any research
18     or analysis to determine how many
19     prescriptions of OxyContin were written at
20     higher doses because of Purdue's marketing?
21                     MR. LOESER:  Objection.  Form.
22                     THE WITNESS:  That was beyond
23           the scope of my preparation of the
24           report.
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. TAM:

 2         Q.     So that's not --

 3         A.     I have not prepared such a

 4    report myself.

 5         Q.     So that's not something you can

 6    quantify, can you?

 7         A.     I'm unclear whether you can

 8    quantify it or not, but given the materials I

 9    had, I was unable -- I did not quantify it

10    for this report.

11         Q.     Have you conducted any research

12    or analysis to determine how many

13    prescriptions of OxyContin were written for a

14    longer duration because of Purdue's

15    marketing?

16         A.     I have not conducted any

17    studies that would attempt to answer that

18    question.

19         Q.     So that's not something you can

20    quantify, can you?

21              MR. LOESER:  Objection.  Form.

22         Mischaracterizes his testimony.

23              THE WITNESS:  I know that there

24         will be expert testimony by other

25         experts focused on marketing.  It's
```

Highly Confidential - Subject to Further Confidentiality Review

1          possible they have the methodology and

2          means to make such a determination,

3          but that was outside the scope for my

4          report --

5    QUESTIONS BY MR. TAM:

6          Q.     I apologize.

7          A.     No, that was it.

8          Q.     Have you conducted any research

9    or analysis to determine how many

10   prescriptions of OxyContin were written for

11   any particular condition because of Purdue's

12   marketing?

13              MR. LOESER:  Objection.  Form.

14              THE WITNESS:  I have not

15         performed any study or calculation to

16         make that relationship.

17   QUESTIONS BY MR. TAM:

18         Q.     And no research or analysis on

19   that, correct?

20              MR. LOESER:  Objection to form.

21              THE WITNESS:  The extent of my

22         research was the review of the

23         literature that linked aggressive

24         marketing to increased prescribing.  I

25         think that's summarized by Van Zee in

```
 1              my report and references.

 2     QUESTIONS BY MR. TAM:

 3              Q.    But you can't quantify the

 4     increase in OxyContin prescriptions that were

 5     written because of Purdue's marketing, can

 6     you?

 7                   MR. LOESER:  Objection.  Form.

 8                   THE WITNESS:  Again, I --

 9              that's -- the quantification of that

10              difference was beyond the scope of my

11              preparation for this report.

12     QUESTIONS BY MR. TAM:

13              Q.    So it's not something you did

14     in preparing your opinions, correct?

15              A.    Again, I relied on review of

16     the materials given to me as well as the

17     referenced literature in which to help

18     support my opinion, as well as the evidence

19     that in my practice that patients on

20     chronic -- advancing doses of opioids were

21     doing little for their chronic noncancer pain

22     problems.

23                   MR. TAM:  Doctor, I know it's

24              been a long day, but I'm going to move

25              to strike that as nonresponsive.  But
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              I'll go ahead and move on.

2    QUESTIONS BY MR. TAM:

3         Q.     If you turn to Exhibit B in

4    your report, this is where you cite to the

5    Purdue call notes that you discuss in your

6    report, right?

7         A.     That's correct.

8         Q.     And you cite to, it looks like,

9    15 call notes from Purdue?

10        A.     That looks correct, yes.  Thank

11   you.

12        Q.     Did you have access to all the

13   call notes that Purdue produced in this

14   litigation?

15             MR. LOESER:  Objection.  Calls

16        for speculation.

17             THE WITNESS:  I am uncertain

18        that I had access to all the -- I

19        don't know either way.

20   QUESTIONS BY MR. TAM:

21        Q.     How many Purdue call notes were

22   you provided with?

23        A.     Based on review, there appear

24   to be hundreds, if not thousands, of call

25   notes.  And I -- based on the time available,
```

Highly Confidential - Subject to Further Confidentiality Review

1    I did my best to grab a few as -- basically

2    as examples to support my report.

3         Q.    Sir, you were provided a subset

4    of the Purdue call notes; is that fair?

5              MR. LOESER:  Objection.  Calls

6         for speculation.

7              THE WITNESS:  Again, I don't

8         know what the representative sample,

9         in fact, was.  I just was provided

10        hundreds, if not thousands, of call

11        notes.

12   QUESTIONS BY MR. TAM:

13        Q.    Did you review all of the

14   hundreds or thousands of call notes that were

15   provided to you?

16        A.    I reviewed samples of those

17   call notes.

18        Q.    Was it -- sorry, go ahead.

19        A.    In one case, since these were

20   on an Excel spreadsheet, I searched just a

21   term of "OxyContin," for example, and then

22   every tenth one I would have a look at.  So I

23   had to have some methodology to try to

24   generate an overview of what the call notes

25   looked like.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.     Would you be surprised to learn
 2    that there were over 400,000 call notes
 3    produced by Purdue?
 4                  MR. LOESER:  Objection.  Form.
 5                  THE WITNESS:  That's a lot of
 6         call notes.
 7                  Was I surprised?  I don't know,
 8         but...
 9    QUESTIONS BY MR. TAM:
10           Q.     When you say you received call
11    notes in the thousands, can you ballpark that
12    better?
13                  MR. LOESER:  Objection.
14         Mischaracterizes his testimony.
15                  THE WITNESS:  I did not
16         quantitate the total number of call
17         notes.  Again, it was in the
18         thousands.
19    QUESTIONS BY MR. TAM:
20           Q.     Like 10,000?  Hundred thousand?
21           A.     I think that it was -- again,
22    if I -- thinking about -- in my process in
23    looking to the left column, I believe it
24    exceeded 10,000, so it -- at least it was in
25    the hundred thousands, but I don't know
```

1    precisely how many were there.

2         Q.    What time period did those --

3    strike that.  Let me ask that.

4              For the Purdue call notes that

5    you reviewed, what time period did they

6    cover?

7              MR. LOESER:  What time period

8         did the calls occur?  That's what

9         you're asking?

10             THE WITNESS:  Well, within the

11        examples here, they represent

12        somewhere between '97 and 2000, is

13        what I recall, but I would have to go

14        back through all my examples to see if

15        that --

16   QUESTIONS BY MR. TAM:

17        Q.    Okay.  So in fairness to you,

18   Doctor, there is a call note from 2001, but

19   all the call notes that you cite for Purdue

20   are from 2001 and earlier; is that correct?

21        A.    For the sake of time, if that's

22   what you've identified, but let me just

23   quickly look here real quick.

24             In 2001 you said; is that

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.      Yes.

2        A.      That appears correct, yes.

3        Q.      Doctor, how many hours did you

4   spend preparing your report in this case?

5        A.      I can't -- I haven't actually

6   considered tallying up all those hours.

7        Q.      You haven't billed your time to

8   plaintiffs' counsel?

9        A.      I have been, but I -- I'm not

10  sure I have an accurate tally, to be honest

11  with you.

12       Q.      What's your best estimate as to

13  the number of hours you've billed -- or let

14  me ask that again.

15              What's your best estimate as to

16  the amount of hours you've spent on your

17  report?

18              MR. LOESER:  Don't guess, if

19      you don't know.

20              THE WITNESS:  I don't know.

21  QUESTIONS BY MR. TAM:

22       Q.      Have you submitted bills to

23  plaintiffs' counsel?

24       A.      Yes, that's correct.

25       Q.      How many bills have you
```

```
 1    submitted?

 2         A.     Two.

 3         Q.     When did you start working on

 4    your report?

 5         A.     Somewhere mid or late February.

 6         Q.     And when did you finish your

 7    report?

 8         A.     March 25th.

 9         Q.     And when you say you started in

10    mid-February, you're talking about

11    February 2019?

12         A.     That's correct.

13         Q.     Doctor, for the Purdue call

14    notes that you cite, some of these are from

15    outside of Ohio; is that fair?

16         A.     There's -- I see one.

17    Number 10 is Kentucky.  Number 11's Kentucky.

18    It looks like the bulk of them are from Ohio.

19         Q.     Number 8 is from West Virginia?

20         A.     You're right, yes, that's

21    correct.

22         Q.     And for the Ohio call notes,

23    you didn't determine whether any of these

24    call notes are from either Cuyahoga County or

25    Summit County?
```

```
 1              A.      That's correct.

 2              Q.      Would you be surprised to learn

 3       that only one of the call notes is from

 4       Cuyahoga County?

 5                    MR. LOESER:  Objection.  Form.

 6              Assumes facts not in evidence.

 7                    THE WITNESS:  That's new

 8              information at this setting.

 9       QUESTIONS BY MR. TAM:

10              Q.      Are you aware that the call

11       notes provide the city for the doctor?

12              A.      I'm sorry, could you repeat

13       that?

14                    MR. LOESER:  Objection.  Form.

15                    THE WITNESS:  I wasn't quite

16              sure I understood that.  Sorry.

17       QUESTIONS BY MR. TAM:

18              Q.      Are you aware that the call

19       notes identify the city for where the doctor

20       is located?

21                    MR. LOESER:  Objection.  Form.

22                    THE WITNESS:  I remember

23              reviewing aspects of it, but I was

24              unaware that the call notes had that

25              level of detail.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. TAM:

 2         Q.    Did you do any research into

 3    the prescribing practices of any of the

 4    doctors corresponding to the call notes you

 5    cite in your report?

 6         A.    No, I have not.

 7         Q.    So it's fair to say you don't

 8    know what the patient outcomes are for any of

 9    the patients that were prescribed an opioid

10    medication by any of the doctors called upon

11    in the call notes you cited, correct?

12              MR. LOESER:  Objection.  Form.

13              THE WITNESS:  As I mentioned

14         before, I did not have any of the data

15         that linked any of these particular

16         patients to their -- sorry, any of

17         these comments to particular

18         physicians, nor their patient or

19         patient outcome, that's correct.

20    QUESTIONS BY MR. TAM:

21         Q.    So you can't identify any

22    specific prescription for a Purdue opioid

23    medication that a doctor in Cuyahoga County

24    or Summit County wrote because of anything

25    Purdue said or did, can you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LOESER:  Objection.  Form.
 2                    THE WITNESS:  My opinion was,
 3            again, built on a broader view that
 4            misleading statements by Purdue sales
 5            representatives to influence
 6            prescribing practices of physicians
 7            throughout the United States,
 8            including Ohio, was a driving force in
 9            the overprescription of opioids,
10            leading to harm.
11    QUESTIONS BY MR. TAM:
12            Q.    Doctor, if you could please
13    focus on my question.
14                    You can't identify any specific
15    prescription for a Purdue opioid medication
16    that a doctor in Cuyahoga or Summit County
17    wrote because of anything Purdue said or did,
18    an you?
19                    MR. LOESER:  Objection.  Asked
20            and answered.
21                    THE WITNESS:  Again, I do not
22            have the data that linked a specific
23            comment, a physician, to a particular
24            prescription or outcome.
25                    Was that your question?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. TAM:

2         Q.    So the answer to my question

3    is, no, you can't identify any specific

4    prescription for a Purdue opioid medication

5    that a doctor in Cuyahoga or Summit County

6    wrote because of anything Purdue said or did?

7              MR. LOESER:  Objection.  Asked

8         and answered.

9    QUESTIONS BY MR. TAM:

10        Q.    Right?

11             MR. LOESER:  Same objection.

12             THE WITNESS:  It's the same

13        answer.  No, I do not have the data

14        that links those circumstances.

15   QUESTIONS BY MR. TAM:

16        Q.    And you can't identify a doctor

17   in Cuyahoga or Summit County who relied on

18   any of Purdue's marketing materials when

19   prescribing a Purdue opioid medication to his

20   or her patients, can you?

21             MR. LOESER:  Objection.  It's

22        outside the scope of his report.

23             THE WITNESS:  Yeah, I have no

24        such data to link those events.

25
```

```
1    QUESTIONS BY MR. TAM:

2         Q.    So you can't identify any such

3    doctor, correct?

4              MR. LOESER:  Same objection.

5              THE WITNESS:  I cannot identify

6         a particular doctor beyond the concern

7         that they're being influenced based on

8         a lack of scientific evidence.

9    QUESTIONS BY MR. TAM:

10        Q.    But again, you can't identify

11   any specific doctor in Cuyahoga or Summit

12   County?

13        A.    That's correct.

14             MR. LOESER:  Same objection.

15   QUESTIONS BY MR. TAM:

16        Q.    Are you aware that Purdue has

17   never done direct-to-consumer advertising for

18   OxyContin?

19        A.    My understanding of product

20   information that I reviewed for the report

21   included medications for the treatment of

22   chronic noncancer pain that appeared to me to

23   be directed at patients -- directly at

24   patients.

25        Q.    Can you cite to a specific
```

Highly Confidential - Subject to Further Confidentiality Review

1    OxyContin promotional material that you think

2    was directed to consumers?

3         A.    As I recall -- if you can just

4    give me a moment -- that there was a number

5    of marketing materials, but one stands out is

6    the so-called Spanos video, Spanos video.

7    And I believe, as I recall, that that video

8    was targeted to -- directly to patients, as I

9    recall.

10        Q.    Do you know whether any doctor

11   in Cuya -- let me strike that.

12              Do you know whether anyone in

13   Cuyahoga County or Summit County ever saw

14   those videos that you're referring to?

15        A.    Again, that was not within the

16   scope or the depth of marketing review.  I'm

17   not aware of -- I cannot confirm that any

18   people viewed that video in Cuyahoga County.

19        Q.    Do you have any evidence that

20   the use of those videos led to any instances

21   of abuse of opioids in Cuyahoga or Summit

22   County?

23              MR. LOESER:  Objection.

24        Outside the scope of his report.

25              THE WITNESS:  I have no

Highly Confidential - Subject to Further Confidentiality Review

1           evidence that directly links that

2           county to that particular marketing

3           material.

4    QUESTIONS BY MR. TAM:

5           Q.      And you don't know whether any

6    doctor in Cuyahoga or Summit County relied on

7    those videos when prescribing a Purdue opioid

8    medication to his or her patients, do you?

9               MR. LOESER:  Objection.

10          Outside the scope of his report.

11              THE WITNESS:  Again, I have no

12          evidence that would support that.

13              I'm sorry, I lost track of your

14          statement or question.

15   QUESTIONS BY MR. TAM:

16          Q.      You don't know whether any

17   doctor in Cuyahoga or Summit County relied on

18   anything in those videos when prescribing a

19   Purdue opioid medication to his or her

20   patients, do you?

21              MR. LOESER:  Same objection.

22              THE WITNESS:  I do not.

23   QUESTIONS BY MR. TAM:

24          Q.      And are you aware that those

25   videos were no longer distributed as of July

```
 1    2001?

 2                 MR. LOESER:  Objection.  Calls

 3         for speculation.

 4                 THE WITNESS:  I did not know.

 5    QUESTIONS BY MR. TAM:

 6         Q.    You cite to the 2003 GAO report

 7    in your report, right?

 8         A.    That has been referenced in

 9    various ways in the report.

10         Q.    If you turn to page -- sorry,

11    paragraph 76 of your report?

12         A.    76?

13         Q.    Yes.

14         A.    Okay.

15         Q.    So in paragraph 76, one of the

16    advertisements you single out for Purdue is

17    this ad that says in part, "There Can Be Life

18    with Relief."

19                 Do you see that?

20                 You'll have to turn the page,

21    actually.  Paragraph --

22         A.    Oh, okay.

23         Q.    Do you see that?

24         A.    Yes, I do.

25         Q.    If you turn back to the prior
```

1    page, you say that this is a 2006 ad?

2         A.     That is what's written here in

3    the document.

4         Q.     What is your basis for that

5    assertion?

6         A.     As I recall, review of the many

7    documents included brochures, and there was,

8    again, an attempt to pull out examples that

9    linked -- pardon me -- particular phrases

10   with an image.  That's my recollection.

11        Q.     What's your basis for saying

12   that this is an ad from 2006?

13             MR. LOESER:  Objection.  Asked

14        and answered.

15             THE WITNESS:  I don't recall

16        the details, other than I, at the

17        time -- well, I can only speculate

18        that somewhere in this review there

19        was a link of that date with that

20        image in some of the reviewed

21        materials.

22   QUESTIONS BY MR. TAM:

23        Q.     Are you aware that this ad was

24   withdrawn in December 2002?

25             MR. LOESER:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I was not aware

 2        of that.

 3   QUESTIONS BY MR. TAM:

 4        Q.    Were you aware that the FDA

 5   sent Purdue a warning letter about this

 6   advertisement in 2002?

 7                    MR. LOESER:  Objection.  Form.

 8                    THE WITNESS:  I was aware that

 9        the FDA sent warning letters to Purdue

10        about misstatements in their marketing

11        materials.  The chronology of that, I

12        can't recall.

13   QUESTIONS BY MR. TAM:

14        Q.    Are you aware that in response

15   to that warning letter Purdue took corrective

16   actions?

17                    MR. LOESER:  Objection.  Form.

18                    THE WITNESS:  I understand that

19        in response to the letter that Purdue

20        made certain changes in their

21        marketing and withdrew certain

22        materials.

23   QUESTIONS BY MR. TAM:

24        Q.    Are you aware that Purdue

25   issued a corrective promotional piece in
```

Highly Confidential - Subject to Further Confidentiality Review

1    response to the FDA's warning letter?

2         A.    I'm aware that Purdue responded

3    to the request to withdraw certain marketing

4    materials and claims.

5         Q.    But you're not aware of any

6    corrective advertisements?

7         A.    I'm not aware of that.

8         Q.    Since 2002 are you aware of any

9    warning letter that Purdue -- let me ask that

10   again.  Strike that.

11             Since 2002, are you aware of

12   any other warning letter that the FDA sent to

13   Purdue about its marketing of OxyContin?

14             MR. LOESER:  Objection.  It's

15        outside the scope of his report.

16             THE WITNESS:  Yeah, that's

17        beyond the scope of my report.  I have

18        no recollection of review of a

19        document that would support that.

20   QUESTIONS BY MR. TAM:

21        Q.    But you said you're aware of

22   letters from the FDA to Purdue, right?

23        A.    Broadly.  The principal -- I'm

24   aware of a letter that requested Purdue to

25   make -- or defend certain marketing claims.

Highly Confidential - Subject to Further Confidentiality Review

1    That's what I'm aware of.  And then you --

2    sorry, so that's --

3         Q.    You understand that marketing

4    materials from a pharmaceutical company get

5    submitted to the FDA, right?

6              MR. LOESER:  Objection.  It's

7         outside the scope of his report.

8              THE WITNESS:  I believe that

9         within the scope of my report, the

10        utility of reviewing these various

11        materials was an intent to provide

12        examples.  A more in-depth review of

13        marketing materials and their impact,

14        I believe, is left for other experts

15        in this area.

16   QUESTIONS BY MR. TAM:

17        Q.    Do you have an understanding as

18   to whether the FDA has oversight over

19   pharmaceutical marketing?

20             MR. LOESER:  Objection.  Form.

21             THE WITNESS:  I am aware that

22        the FDA has some oversight over

23        marketing materials; however, I also

24        know, based on my review of the

25        literature, that they have a

Highly Confidential - Subject to Further Confidentiality Review

1           monumental job where the amount of

2           materials submitted dwarf the staff to

3           adequately review them, as I believe

4           mentioned in the Van Zee paper.

5    QUESTIONS BY MR. TAM:

6           Q.     You agree that OxyContin has

7    always been and is currently FDA approved for

8    12-hour dosing, right?

9                  MR. LOESER:  Objection.  Form.

10                 THE WITNESS:  I understand

11          that's the approval, that's correct.

12   QUESTIONS BY MR. TAM:

13          Q.     You refer to the Purdue 2007

14   guilty plea in your report, right?

15          A.     That's correct.

16          Q.     And you refer to the Agreed

17   Statement of Facts?

18          A.     What page are you on?

19          Q.     I'm just asking generally.  I'm

20   not asking about a specific statement.

21          A.     Well, without me --

22          Q.     Let me ask this --

23          A.     -- finding that document, it's

24   hard for me to encompass broadly the intent

25   of your question.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.      Do you recall whether you

2    reviewed the Agreed Statement of Facts?

3          A.      I do remember reviewing at

4    least part of the Statement of Facts.  I --

5    at this moment I'm not sure I recall I

6    reviewed the entire document or I was given

7    the entire document.

8          Q.      You don't know whether any

9    doctor in Cuyahoga or Summit County was

10   called upon by any of the managers or sales

11   reps at issue in the guilty plea, do you?

12              MR. LOESER:  Objection to form.

13         Outside the scope of his report.

14              THE WITNESS:  I -- again, I do

15         not have data or elements that would

16         link specifically the Purdue

17         statements with Cuyahoga County or

18         Summit County.

19   QUESTIONS BY MR. TAM:

20         Q.      Are you aware that in 2007

21   Purdue entered into a corporate integrity

22   agreement?

23         A.      I'm not aware of that.

24         Q.      You don't know what the

25   corporate integrity agreement required of
```

 1    Purdue?

 2          A.     I have not read about a

 3    corporate integrity agreement from Purdue.

 4          Q.     So it's not something you

 5    considered in forming your opinions in this

 6    case, right?

 7          A.     That's correct.

 8          Q.     If you turn to Exhibit C in

 9    your report.

10          A.     Okay.

11          Q.     All the documents you cite in

12    Exhibit C are from 2001 or earlier, right?

13          A.     So sorry, I was distracted.

14                 What were the dates you said?

15          Q.     2001 or earlier.

16          A.     That's what -- yes, that's what

17    it looks like.

18          Q.     And these were all internal

19    Purdue documents and e-mails, correct?

20          A.     That's my understanding.

21          Q.     Do you know of any affirmative

22    misstatements by Purdue related to the

23    relevant potencies of OxyContin and morphine

24    that went to a physician in Summit or

25    Cuyahoga County?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LOESER:  Objection.  Form.

 2          Outside the scope of his report.

 3                    THE WITNESS:  Sorry, is the

 4          quest -- I guess -- sorry, could you

 5          repeat the question one more time,

 6          please?

 7     QUESTIONS BY MR. TAM:

 8          Q.     Yeah.

 9                 Do you know of any affirmative

10     misstatements by Purdue related to the

11     relative potencies of OxyContin and morphine

12     that went to a doctor in Summit or Cuyahoga

13     County?

14                    MR. LOESER:  Same objection.

15                    THE WITNESS:  I do not, again,

16          have data that would link such

17          statements directly to a particular

18          physician in those counties.

19     QUESTIONS BY MR. TAM:

20          Q.     You've read the OxyContin

21     label, right?

22                    MR. LOESER:  Objection.  Form.

23                    THE WITNESS:  I have reviewed

24          the OxyContin label -- labeling, yes.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. TAM:

 2         Q.    Do you recall reviewing the

 3    2001 OxyContin label which had a box warning?

 4         A.    I'm aware that OxyContin is

 5    label -- has a box warning.  I can't recall

 6    in terms of how that box warning may have

 7    changed over time or how the 2001 versus any

 8    current box warning may look.

 9         Q.    Are you familiar with the group

10    known as Physicians for Responsible Opioid

11    Prescribing?

12         A.    I am aware that they exist.

13    I've not had any direct interactions with

14    them.

15         Q.    Are you aware that in 2012 they

16    petitioned the FDA to change the labeling for

17    opioid medications?

18         A.    I was not aware of that.

19         Q.    And so you wouldn't have been

20    aware of the FDA's response to that petition

21    in 2013?

22              MR. LOESER:  Objection.  Form.

23              THE WITNESS:  I don't recall.

24    QUESTIONS BY MR. TAM:

25         Q.    Do you know what OxyContin's
```

Highly Confidential - Subject to Further Confidentiality Review

1    market share of the overall prescription

2    opioid market is?

3         A.    What percentage it is in the

4    overall market, I don't know.  I don't want

5    to guess, but I don't know what it is.

6         Q.    Do you know what Purdue's

7    marketing budget for OxyContin was from year

8    to year?

9         A.    What I do know is that early on

10   in the release of -- promotion of OxyContin

11   within the report, there was evidence that

12   within initial -- approximately five or six

13   years there was something in the range of

14   $200 million focused on promotional

15   materials.

16        Q.    Did you compare Purdue's

17   marketing budget for OxyContin for the

18   marketing budgets -- strike that.  Let me ask

19   it again.

20            Did you compare Purdue's

21   marketing budget for OxyContin with the

22   marketing budgets of other similar

23   medications?

24        A.    I have not.

25        Q.    Have you done any research to

Highly Confidential - Subject to Further Confidentiality Review

1    determine whether Purdue's marketing

2    expenditures increased the market share of

3    OxyContin?

4              MR. LOESER:  Objection.  Form.

5              THE WITNESS:  I'm just aware

6         that with the introduction, of course,

7         of OxyContin and its marketing

8         campaign that there was a dramatic

9         increase in the prescribing for

10        OxyContin after 1996.

11   QUESTIONS BY MR. TAM:

12        Q.    1996 is when OxyContin was

13   first introduced, right?

14        A.    That's correct, yeah.

15        Q.    Have you done any research to

16   determine from year to year whether Purdue's

17   marketing expenditures increased the market

18   share of OxyContin?

19             MR. LOESER:  Objection.  Form

20        and outside the scope of his report.

21             THE WITNESS:  Yeah, again, that

22        was outside the scope of my report.  I

23        have not conducted such a study.

24             MR. LOESER:  Counsel, I think

25        you're down to about five minutes,

Highly Confidential - Subject to Further Confidentiality Review

1          just in case you're not tracking every

2          second.

3     QUESTIONS BY MR. TAM:

4          Q.     One of your opinions is that

5     Purdue funded pain-related medical societies,

6     right?

7          A.     Just a minute.  I'll -- right.

8     I believe that was supported by reference to

9     the McCaskill report, the influence of

10    opioid -- pharmaceuticals, including Purdue,

11    to fund various medical education and

12    societies for -- yes, that's correct.

13         Q.     Beyond evidence of funding,

14    have you seen any evidence that Purdue

15    controlled or dictated the content of any

16    statement or publication by a pain-related

17    medical society?

18              MR. LOESER:  Objection.  Form.

19              THE WITNESS:  I have not -- in

20         my review of the documents, I've not

21         had any documents that particularly

22         make a link that -- well, I would just

23         say this:  that I don't know.  I have

24         not had the documents that may have

25         the depth and breadth of all the

Highly Confidential - Subject to Further Confidentiality Review

```
 1              various medical societies or
 2              foundations that provided -- were
 3              provided with funding.
 4     QUESTIONS BY MR. TAM:
 5          Q.    I'm only asking about the
 6     evidence you've seen.
 7              So have you seen any evidence
 8     that Purdue controlled or dictated the
 9     content of any statement or publication by a
10     pain-related medical society?
11              MR. LOESER:  Objection.  Asked
12          and answered.
13              THE WITNESS:  I've not reviewed
14          any such evidence in the preparation
15          of my report.
16     QUESTIONS BY MR. TAM:
17          Q.    You've not seen such evidence,
18     correct?
19          A.    I have not seen such evidence.
20          Q.    Have you seen any evidence that
21     Purdue controlled or dictated the content of
22     any statement or publication by a so-called
23     key opinion leader?
24              MR. LOESER:  Objection.  Form.
25              THE WITNESS:  Again, although
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            I've not seen any data, I'm aware of

 2            literature that has linked the

 3            influence of funding by pharmaceutical

 4            industry to the changing of key

 5            opinion leaders' opinions on opioids,

 6            but I do not have any evidence that

 7            I've reviewed in that regards.

 8   QUESTIONS BY MR. TAM:

 9       Q.     Sorry, I didn't mean to step

10   over you, so just to clarify.

11       A.     Sure.

12       Q.     You have not seen any evidence

13   that Purdue controlled or dictated the

14   content of any statement or publication by a

15   key opinion leader, have you?

16            MR. LOESER:  Objection.  Form.

17            THE WITNESS:  I have not seen

18       any evidence that substantiates that

19       statement.

20   QUESTIONS BY MR. TAM:

21       Q.     Have you seen any evidence that

22   Purdue controlled or dictated the content of

23   any CME it sponsored?

24            MR. LOESER:  Objection.  Form.

25            THE WITNESS:  Again, based on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        the literature review, there's been
 2        strong associations, if not direct
 3        relationship, of industry influence on
 4        medical decision-making based on
 5        influence of money, funding for these
 6        or other -- providing other support to
 7        their target audience, including down
 8        to a piece of pizza.
 9   QUESTIONS BY MR. TAM:
10        Q.    But, Doctor, you have not seen
11   any evidence that Purdue controlled or
12   dictated the content of any CME it sponsored,
13   have you?
14        A.    I have not seen such --
15             MR. LOESER:  Objection.
16             THE WITNESS:  I have not seen
17        such evidence.
18   QUESTIONS BY MR. TAM:
19        Q.    Have you looked at any
20   agreements between Purdue and any entity or
21   organization that put on a CME?
22        A.    I have not reviewed such
23   documents.
24        Q.    Have you seen any evidence that
25   Purdue controlled or dictated the results or
```

```
 1    publication of any research that Purdue

 2    funded?

 3              MR. LOESER:  Same objection.

 4        Form.

 5              THE WITNESS:  I don't recall.

 6              MR. LOESER:  Counsel, we're at

 7        seven hours.

 8              MR. TAM:  How are we on time?

 9              VIDEOGRAPHER:  You just did

10        40 minutes.

11              MR. TAM:  So I'll note that

12        there were a lot of speaking

13        objections today.

14              Are you going to cut me off

15        right now?

16              MR. LOESER:  If you want to ask

17        one more minute of questions, that's

18        fine, but it's not because there's any

19        speaking objections.  It's because

20        you've asked.

21    QUESTIONS BY MR. TAM:

22        Q.    Are you aware that Purdue

23    submitted promotional statements and labeling

24    to the FDA that said OxyContin did not have a

25    ceiling dose?
```

```
1                    MR. LOESER:  Objection.  Form.

2                    THE WITNESS:  Again, the scope

3         of my investigation and review of the

4         literature did not reveal any

5         documents that Purdue submitted for

6         approval with that wording about the

7         ceiling dose.

8                    MR. LOESER:  Counsel, one more

9         question and I think we're done.

10                   THE WITNESS:  I'm sorry, what?

11   QUESTIONS BY MR. TAM:

12        Q.    But you have seen documents, as

13   part of your review and preparation of your

14   report in this case, where Purdue submitted

15   marketing -- its marketing materials to the

16   FDA, right?

17        A.    I'm aware that they submitted

18   marketing documents.  I can't recall whether

19   it included -- whether or not ceiling doses

20   was part of that; however, I certainly know

21   that within the call notes that Purdue

22   representatives repeatedly claimed there was

23   no ceiling dose for OxyContin.

24                   MR. LOESER:  Okay.  I think

25        we're done.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. TAM:  You cutting me off?

 2                    MR. LOESER:  Your time is up.

 3                    MR. TAM:  Anyone else have

 4        questions?

 5                    MR. EHSAN:  Are you going to

 6        question the witness?

 7                    MR. LOESER:  I'm not going to

 8        question the witness.

 9                    VIDEOGRAPHER:  Should we

10        conclude?

11                    MR. TAM:  Well, I'll just note

12        for the record that I think our time

13        was very limited today, but we are at

14        the seven-hour mark, but reserve our

15        rights to seek additional time.

16                    MR. LOESER:  Noted.

17                    VIDEOGRAPHER:  Okay.  This

18        concludes the video deposition of Mark

19        Schumacher.  We are now going off the

20        record, and the time is 7:14 p.m.

21        (Deposition concluded at 7:14 p.m.)

22                    - - - - - - -

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   CERTIFICATE
 2
 3           I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 4   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 5   of the examination, Mark A. Schumacher, M.D.,
     Ph.D. was duly sworn by me to testify to the
 6   truth, the whole truth and nothing but the
     truth.
 7
             I DO FURTHER CERTIFY that the
 8   foregoing is a verbatim transcript of the
     testimony as taken stenographically by and
 9   before me at the time, place and on the date
     hereinbefore set forth, to the best of my
10   ability.
11           I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
12   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
13   employee of such attorney or counsel, and
     that I am not financially interested in the
14   action.
15
16
17   _____
     CARRIE A. CAMPBELL,
18   NCRA Registered Diplomate Reporter
     Certified Realtime Reporter
19   Notary Public
     Dated:  April 26, 2019
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13              It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4         I,_____, do

      hereby certify that I have read the foregoing

 5    pages and that the same is a correct

      transcription of the answers given by me to

 6    the questions therein propounded, except for

      the corrections or changes in form or

 7    substance, if any, noted in the attached

      Errata Sheet.

 8

 9

10

11

12    _____

      Mark A. Schumacher, M.D., Ph.D.    DATE

13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  - - - - - - -

                      ERRATA

 2                  - - - - - - -

 3    PAGE    LINE    CHANGE/REASON

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   - - - - - - -

                 LAWYER'S NOTES

 2                   - - - - - - -

 3      PAGE   LINE

 4      _____  _____  _____

 5      _____  _____  _____

 6      _____  _____  _____

 7      _____  _____  _____

 8      _____  _____  _____

 9      _____  _____  _____

10      _____  _____  _____

11      _____  _____  _____

12      _____  _____  _____

13      _____  _____  _____

14      _____  _____  _____

15      _____  _____  _____

16      _____  _____  _____

17      _____  _____  _____

18      _____  _____  _____

19      _____  _____  _____

20      _____  _____  _____

21      _____  _____  _____

22      _____  _____  _____

23      _____  _____  _____

24      _____  _____  _____

25
```