Highly Confidential - Subject to Further Confidentiality Review

```
 1                 UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF OHIO

 3                       EASTERN DIVISION

 4

 5   ----------------------------) MDL No. 2804

 6   IN RE NATIONAL PRESCRIPTION  )

 7   OPIATE LITIGATION            ) Case No. 17-md-2804

 8                                )

 9   This document relates to:    ) Hon. Dan A. Polster

10   All Cases                    )

11   ----------------------------) VOLUME I

12

13                    HIGHLY CONFIDENTIAL

14        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16            The videotaped deposition of STEPHEN SEID,

17   called for examination, taken pursuant to the Federal

18   Rules of Civil Procedure of the United States District

19   Courts pertaining to the taking of depositions, taken

20   before JULIANA F. ZAJICEK, a Registered Professional

21   Reporter and a Certified Shorthand Reporter, at the

22   offices of Dechert LLP, Suite 3400, 35 West Wacker

23   Drive, Chicago, Illinois, on December 12, 2018, at

24   1:43 p.m.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         SIMMONS HANLY CONROY LLC
           112 Madison Avenue, 7th floor
 4         New York, NY 10016
           212-784-6400
 5         BY:  JAYNE CONROY, ESQ.
                jconroy@simmonsfirm.com;
 6              LAURA FITZPATRICK, ESQ.
                lfitzpatrick@simmonsfirm.com
 7              ELLYN HURD, ESQ. (Telephonically)
                ehurd@simmonsfirm.com
 8
 9    ON BEHALF OF THE STATE OF TENNESSEE PLAINTIFFS:
10         BRANSTETTER, STRANCH & JENNINGS, PLLC
           The Freedom Center
11         223 Rosa L. Parks Avenue, Suite 200
           Nashville, Tennessee 37203
12         615-254-8801
           BY:  MICHAEL G. STEWART, ESQ.
13              mstewart@bsjfirm.com
14
      ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
15    AMERISOURCEBERGEN DRUG CORPORATION:
16         JACKSON KELLY PLLC
           150 Clay Street, Suite 500
17         Morgantown, West Virginia 26501
           304-284-4138
18         BY:  SYLVIA WINSTON NICHOLS, ESQ.
                (Telephonically)
19              sylvia.winston@JacksonKelly.com
20
      ON BEHALF OF MALLINCKRODT LLC and SPECGX LLC:
21         ROPES & GRAY LLP
           Prudential Tower
22         800 Boylston Street
           Boston, Massachusetts 02199-3600
23         617-951-7910
           BY:  LUKE D. RILEY, ESQ. (Telephonically)
24              luke.riley@ropesgray.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES: (Continued)
 2
      ON BEHALF OF CARDINAL HEALTH, INC.:
 3
            WILLIAMS & CONNOLLY LLP
 4          725 Twelfth Street, N.W.
            Washington, D.C. 20005
 5          202-434-5000
            BY:  KATELYN ADAMS, ESQ. (Telephonically)
 6              kadams@wc.com
 7
      ON BEHALF OF McKESSON CORPORATION:
 8
            COVINGTON & BURLING, LLP
 9          One City Center
            850 Tenth Street, NW
10          Washington, D.C. 20001
            202-662-5531
11          BY:  AMBER CHARLES, ESQ. (Telephonically)
                acharles@cov.com
12
13          TABET DIVITO & ROTHSTEIN LLC
            209 South LaSalle Street, 7th Floor
14          Chicago, Illinois 60604
            312-762-9461
15          BY:  DANIEL L. STANNER, ESQ.
                dstanner@tdrlawfirm.com
16
17    ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
      PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
18    INC.:
19          ARNOLD & PORTER KAYE SCHOLER LLP
            70 West Madison Street, Suite 4200
20          Chicago, Illinois 60602-4231
            312-583-2435
21          BY:  MICHAEL S. BULLERMAN, ESQ.
                michael.bullerman@arnoldporter.com
22
23
24
```

```
 1   APPEARANCES:  (Continued)
 2
     ON BEHALF OF WALMART INC.:
 3
         JONES DAY
 4       77 West Wacker Drive
         Chicago, Illinois 60601-1692
 5       312-269-4164
         BY:  MARK W. DeMONTE, ESQ.
 6            mdemonte@jonesday.com
 7
     ON BEHALF OF PURDUE PHARMA, L.P., PURDUE PHARMA, INC.
 8   and THE PURDUE FREDERICK COMPANY, INC.:
 9       DECHERT LLP
         35 West Wacker Drive, Suite 3400
10       Chicago, Illinois 60601
         312-646-5800
11       BY:  NATHAN HOFFMAN, ESQ.
              nathan.hoffman@dechert.com;
12            MELANIE MACKAY, ESQ.
              melanie.mackay@dechert.com
13
14   ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC. IN
     NON-MDL CASES PENDING IN ARKANSAS AND PENNSYLVANIA:
15
         CLARK MICHIE LLP
16       220 Alexander Street
         Princeton, NJ 08540
17       609-423-2143
         BY:  CHRISTOPHER J. MICHIE, ESQ.
18            (Telephonically)
              chris.michie@clarkmichie.com
19
20   ON BEHALF OF DEFENDANT ROCHESTER DRUG COOPERATIVE:
         ALLEGAERT BERGER & VOGEL, LLP
21       111 Broadway, 20th Floor
         New York, New York 10006
22       212-571-0550
         BY:  LOUIS CRACO, ESQ. (Telephonically)
23            lcraco@abv.com;
              LUCY ONYEFORO, ESQ. (Telephonically)
24            lonyeforo@abv.com
```

```
 1    APPEARANCES: (Continued)

 2

      ON BEHALF OF THE DEPONENT:

 3

              SALVATORE PRESCOTT & PORTER

 4            1010 Davis Street

              Evanston, Illinois 60201

 5            312-283-5711

              BY:  JULIE B. PORTER, ESQ.

 6                 porter@spplawyers.com

 7

 8

 9

10    THE VIDEOGRAPHER:

11            MR. BEN STANSON,

              Golkow Litigation Services.

12

13

14

15

16

17

18

19

20    REPORTED BY:   JULIANA F. ZAJICEK, RPR, CSR 84-2604.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     I N D E X
 2   WITNESS:                                PAGE:
 3    STEPHEN SEID
 4        EXAM BY MS. CONROY................... 10
 5
 6                      *****
 7                 E X H I B I T S
 8   PURDUE-SEID EXHIBIT            MARKED FOR ID
 9    No. 001   Second Amended Notice of        10
               Deposition
10
      No. 002   Press release from had, dated   12
11             3/10/2015
12    No. 003   Pamphlet from Partners Against   57
               Pain; PDD1501720706 - 714
13
      No. 004   National Accounts Memorandum,   104
14             5/21/97, From Lang To Green;
               PKY181715440 - 443
15
      No. 005   PowerPoint presentation titled  110
16             "Living Our Vision";
               PPLPC008000018733
17
      No. 006   E-mail chain, top one from Stephen  123
18             Seid to Janet Koch, 12/13/06,
               Subject: FW: Phase I Presentation
19             Slides with attachment,
               NEWHIRE2006REV3.PPT;
20             PPLPC004000092270 - 271
21    No. 007   E-mail chain, top one from Stephen  140
               Seid to Janet Koch, among others,
22             8/20/10, Subject: FW: August 11th
               Level 150 Slide Decks from Steve
23             Seid, with attachment
               NEWHIRE2008LEV150Aug11.ppt;
24             PPLPC004000247116 - 118
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S (Continued)
 2    PURDUE-SEID EXHIBIT                      MARKED FOR ID
 3      No. 008   E-mail from Steven Projansky to      147
                  Stephen Seid, 11/29/2012, Subject:
 4                Managers' Meeting Presentation,
                  with attachment Manager Meeting -
 5                National Accounts - 12-05-12.pptx;
                  PPLPC004000341299 - 300
 6
        No. 009   Draft document titled "Channel        156
 7                Operations Standard Operating
                  Procedures"; PPLPC032000374808 -
 8                823
 9      No. 010   E-mail from Gregory Bogdan to        158
                  Steven Projansky, Stephen Seid,
10                1/14/13, Subject: Fee For Service
                  SOP,w/attachment FFS SOP - DRAFT
11                1.14.doc; PPLPC004000344799 - 818
12      No. 011   E-mail from Nurudin Veerjee to       176
                  Steve Projansky, Stephen Seid,
13                Tina Mosley, 9/9/2013, Subject:
                  Purdue-McKesson Authorized
14                Distribution Agreement
                  w/attachment Purdue-McKesson
15                Authorized Distributor Agreement
                  (ADA) Clean 09-08-13.doc;
16                PPLPC004000371161 - 205
17      No. 012   E-mail from Cheryl Siciliano to      185
                  Stephen Seid, 6/27/06, Subject:
18                Shelton's Memor with attachment
                  062606 Shelton Benson.doc;
19                PPLPC004000073279 - 281
20      No. 013   E-mail chain, top one from Shelton   194
                  Benson to Stephen Seid, Cheryl
21                Siciliano, 9/13/10, Subject: FW:
                  McKesson Connect, re: OxyContin
22                DirectRx Ad Report 8-16-10;
                  PPLPC004000249167 - 169
23
24
```

```
 1                    E X H I B I T S (Continued)

 2   PURDUE-SEID EXHIBIT                    MARKED FOR ID

 3    No. 014   E-mail chain, top one from Stephen    204
                Seid to Shelton Benson, 8/4/2010,
 4              Subject: RE: McKesson Connect
                program; PPLPC004000245298 - 299
 5

      No. 015   E-mail chain, top one from Stephen    204
 6              Seid to Shelton Benson, 8/5/10,
                Subject: Re: McKesson Connect
 7              program; PPLPC004000245474 - 475

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1        THE VIDEOGRAPHER:  We are now on the record.  My

 2   name is Ben Stanson.  I am a videographer for Golkow

 3   Litigation Services.  Today's date is December 12th,

 4   2018, and the time is 1:43 p.m.

 5            This video deposition is being held in

 6   Chicago, Illinois In the Matter of National

 7   Prescription Opioid Litigation, MDL No. 2804, pending

 8   in the US District Court, Northern District of Ohio,

 9   Eastern Division.

10            The deponent is Stephen Seid.

11            Counsel will be noted on the stenographic

12   record.

13            The court reporter is Juliana Zajicek.

14   Will you please swear in the witness.

15                (WHEREUPON, the witness was duly

16                 sworn.)

17     MS. CONROY:  Nathan, did you want to talk about

18   the protective order?

19     MR. HOFFMAN:  Oh, yeah.  I'm sorry.

20            Just again, I'll just put on the record

21   that all who are present here in person or attending

22   by phone have agreed to be bound by applicable terms

23   of confidentiality orders in place in the MDL and

24   state cases unless you state otherwise.
```

1          We hear nothing, so all are bound.  Thank

2  you.

3      MS. CONROY:  Thank you.

4              (WHEREUPON, a certain document was

5               marked Purdue-Seid Deposition Exhibit

6               No. 001, for identification, as of

7               12/12/2018.)

8              STEPHEN SEID,

9  called as a witness herein, having been first duly

10  sworn, was examined and testified as follows:

11                  EXAMINATION

12  BY MS. CONROY:

13      Q.    Good afternoon, Mr. Seid.

14      A.    Good afternoon.

15      Q.    We met this morning, had the opportunity

16  to have -- for me to learn a little bit about you.

17          Let me show you what I've marked as

18  Exhibit 1.  There are also some copies attached there.

19      A.    Okay.

20      Q.    Have you seen -- Exhibit 1 is the second

21  Amended Notice of Deposition of yourself, Stephen

22  Seid, a former employee of Purdue Pharma.

23          Have you seen this document before?

24      A.    Yes.

Highly Confidential -- Subject to Further Confidentiality Review

```
1       Q.    And I know we spoke earlier today about

2   you had met with counsel in preparation for your

3   30(b)(6) deposition.

4             Do you recall that?

5       A.    Yes.

6       Q.    Was there any distinction made with

7   respect to preparing for the 30(b)(6) deposition and

8   preparing for this deposition?

9       A.    No.

10      Q.    And your counsel, your personal counsel

11  today is Julie Porter?

12      A.    Yes, she is.

13      Q.    And Purdue's counsel Nathan Hoffman is

14  here as well?

15      A.    Yes.

16      Q.    And were both present during your prep --

17  preparation sessions?

18      A.    That's correct.

19      Q.    Did you bring any documents with you today

20  with respect to your deposition this afternoon?

21      A.    No, I did not.

22      Q.    You can put that one away.

23                 (WHEREUPON, a certain document was

24                  marked Purdue-Seid Deposition Exhibit
```

```
 1                     No. 002, for identification, as of

 2                     12/12/2018.)

 3     BY MS. CONROY:

 4          Q.    Let me show you what we have marked as

 5     Exhibit 2.

 6                     Exhibit 2 is a document entitled "News"

 7     from HDA, and it says it is a press release.

 8                     "HDMA recognizes former Purdue Pharma

 9     executive Stephen Seid with Distribution Management

10     Award for Industry Leadership," dated March 10th of

11     2015.

12                     Do you see that?

13          A.    Yes.

14          Q.    Have you seen this document before?

15          A.    Yes, I saw the press release.

16          Q.    Okay.  And is H -- you see up at the top

17     it says "HDA"?

18          A.    Yes.

19          Q.    Is that -- is that the same as HDMA, do

20     you know?

21          A.    It is the same.  They rebranded.

22          Q.    Okay.  So HDA is the updated brand?

23          A.    Right.

24          Q.    Okay.  Were you present to receive this
```

```
 1    industry leadership award?

 2         A.    Yes, I was.

 3         Q.    And I -- it looks like it might be helpful

 4    to go through this document because it explains, and

 5    we can take a look at it, some of your background.

 6         A.    Okay.

 7         Q.    Okay.  And if you look toward the --

 8    toward the bottom of Exhibit 2, it has that you have a

 9    career -- had a career with Purdue for 35 years.

10               Does that sound right?

11         A.    It is 38-and-a-half actually.

12         Q.    Ah, okay.

13               And you started, as it says here -- is

14    this correct, you began as a sales representative?

15         A.    That is correct.

16         Q.    What were your responsibilities as a sales

17    representative?

18         A.    The promotion of Purdue products to

19    retailers -- to physicians, pharmacies and to

20    wholesalers at that time.

21         Q.    Physicians, pharmacies and wholesalers?

22         A.    Yes.

23         Q.    And what was your -- did you have a

24    territory?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.  My territory was primarily in

    New Jersey with beautiful north New Jersey as the

 3    centerpiece.

 4        Q.    Okay.  And for how long were you a sales

 5    representative?

 6        A.    Five years.

 7        Q.    And what were your products that --

 8    what -- what were the years, do you remember?

 9        A.    December 8th, 1975, until November 1st,

10    1980.

11        Q.    What was your --

12        A.    I remember that.

13        Q.    -- educational background before you went

14    to work for Purdue?

15        A.    I had a bachelor's degree from Rutgers

16    University and I did -- had done some graduate work

17    also at Rutgers in education.

18        Q.    What was your major at Rutgers?

19        A.    Political science.  I wanted to be

20    governor.

21        Q.    There is still time.

22        A.    I'm not interested now.

23        Q.    Did you -- you graduated with a -- a BA?

24        A.    Yes.
```

```
 1          Q.     And that was what year?

 2          A.     1971.

 3          Q.     And then did some graduate work.  Did --

 4    have you received a master's?

 5          A.     No, I didn't.  I was two credits short,

 6    actually.

 7          Q.     Do you have -- do you hold a Ph.D.?

 8          A.     No.

 9          Q.     And you -- and you are not a medical

10    doctor?

11          A.     No.

12          Q.     And what did you do after you graduated

13    from Rutgers?

14          A.     After grad -- I graduated from Rut- --

15    Rutgers I taught for a couple of years and I then went

16    to work for a company I had worked summer jobs in

17    college, which was a construction materials testing

18    firm, and I wound up getting my sales experience with

19    them.

20          Q.     Okay.  And who did you sell to with -- at

21    the construction firm?

22          A.     Contractors, architects, engineers,

23    municipalities.

24          Q.     Was there a product involved or were
```

```
 1   you --

 2         A.    Service.

 3         Q.    Service, okay.

 4               And then did you -- how did you hear about

 5   Purdue?

 6         A.    I got a little brochure at the Rutgers

 7   Postgraduate Resource Center that said, "Would you

 8   like to be a pharmaceutical rep?"  And I sent a -- a

 9   resume, a blind resume.

10         Q.    And were you interviewed for the position?

11         A.    Yes, I was.

12         Q.    And I take it you received a job offer

13   shortly thereafter?

14         A.    I did.

15         Q.    And then you began to work on December 8th

16   in 1975?

17         A.    Yes, I did.

18         Q.    And were you -- did you receive any

19   training as a sales representative?

20         A.    Yes.  I received training -- both

21   corporate training and training from my then district

22   manager.

23         Q.    What did the corporate training look like?

24         A.    I actually got extra corporate -- because
```

1    of the time of the year, I actually got extra

2    corporate training, and that was a week in corporate,

3    and then I came back after six months and got an --

4    received another week of corporate training.

5         Q.    And what is corporate training?

6         A.    It was training with other new sales

7    representatives and it was being -- disease state

8    training, product training, some sales training.

9         Q.    Do you recall what disease states you were

10   trained on?

11        A.    Well, primarily we were selling

12   antiseptics and laxatives at the time, so it was

13   selling against infection, mostly topical infection,

14   and then any disease states where constipation was the

15   main issue.

16        Q.    And what were the products at that time?

17        A.    I sold Betadine antiseptics, Senokot

18   laxatives, a product called Cerumenex for the removal

19   of ear wax, X-Prep, which was a bowel evacuant prior

20   to colonoscopy.  Needless to say, I was not the person

21   who was a hit at a cocktail party with those topics to

22   talk about my job.

23        Q.    I don't know.  It is kind of unusual

24   stuff.

```
 1              I know you had some -- you talked about

 2    sales training.  Is that sort of just how to sell

 3    to --

 4         A.    How to present the products, yeah.

 5         Q.    And you would speak with physicians, is

 6    that correct?

 7         A.    Yes, primarily physicians, that was...

 8         Q.    And was Betadine a product that was

 9    prescribed by a physician?

10         A.    It was recommended.  It was over --

11    over-the-counter.  So it was used for various

12    conditions, for topical use.  There was skin wash,

13    feminine hygiene line, a -- we'd -- we'd also sell to

14    hospitals because it was used preoperatively.

15         Q.    At the time that you started and the

16    products were the antiseptics and laxatives, were any

17    of them prescription products?

18         A.    The only prescription product was

19    Cerumenex and that was the ceruminolytic.

20         Q.    That was the ear wax removal?

21         A.    Yes.

22         Q.    That was a -- that was a prescription

23    product?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And what type -- what types of physicians

2    did you call on?

3    A.    We called on almost all types.  General

4    practice was a big focus, but we'd call on surgeons a

5    lot, orthopedics, internal medicine.

6    Q.    And you had a particular territory?

7    A.    I had a particular territory.

8    Q.    And you reported to a district manager?

9    A.    I reported to a district manager.

10   Q.    And for how long -- you remained -- were

11   you a sales representative in that northern New Jersey

12   territory until 1975?

13   A.    Yeah, I was pretty much the same territory

14   for all five years.

15   Q.    Did the products remain the same?

16   A.    There were some additions after that.

17   There was a product for arthritis that we began

18   selling called Arthropan.  There was a product for

19   arrhythmia called Cardioquin.  There was another --

20   and there was a bronchodilator called Phyllocontin.

21   Q.    Were those prescription drugs?

22   A.    And also a product called Trilisate, which

23   is an -- for arthritic pain.  And those -- those were

24   prescription.

Highly Confidential -- Subject to Further Confidentiality Review

```
 1        Q.    And did you receive any additional
 2   training with respect to those disease states, such as
 3   arthritis or cardiac issues?
 4        A.    Yes, there was extensive training,
 5   extent -- extensive classroom training, meeting
 6   training, home -- home schooling.
 7        Q.    And what about the -- would that have been
 8   considered corporate training or was that something
 9   else?
10        A.    There was a combination of corporate, self
11   training, meeting modules that were prepared by the
12   training department.
13        Q.    And did you have the same district manager
14   for those additional prescription drugs?
15        A.    No.  My -- they changed.  My district
16   manager changed from my original to more -- so there
17   were three people over the five years.
18        Q.    Did -- did you receive a commission on
19   these products?
20        A.    I received a bonus.
21        Q.    Okay.  And did you receive the bonus at
22   the end of every year or was it based on sales over a
23   particular period of time?
24        A.    It was based on sales quarterly and for
```

```
 1    those years it was based on -- it was a team bonus.

 2    So I had a team of five other people, four or five.

 3           Q.    Trilisate was the arthritic pain drug?

 4           A.    Yes.

 5           Q.    And what kind of a -- was it -- what kind

 6    of a drug?  Was it an opioid or...?

 7           A.    It was a salicylate.

 8           Q.    And what is a salicylate?

 9           A.    Simple way to put it is like aspirin,

10    except this was an aspirin that wouldn't burn holes in

11    your stomach --

12           Q.    And a --

13           A.    -- due to the formulation.

14           Q.    And was that a -- did Purdue hold a patent

15    on that drug, if you know?

16           A.    I believe they did, yeah.

17           Q.    And what was it indicated for?

18           A.    For the treatment of arthritis pain,

19    rheumatoid or osteo.

20           Q.    What happened in 1975?  Did you change

21    responsibilities or did you get promoted?

22           A.    '75 is when I started.

23           Q.    Oh, I'm sorry.  1980.  November 1st of

24    1980 --
```

```
 1        A.     I became a district manager.

 2        MS. PORTER:  Be sure to let her finish her

 3   question.

 4        THE WITNESS:  Okay.

 5   BY MS. CONROY:

 6        Q.     And that was a promotion?

 7        A.     Yes.

 8        Q.     And what was your territory?

 9        A.     At that time it was most of New York,

10   New Jersey, most of New York State, Vermont and about

11   a third of Pennsylvania.

12        Q.     And did you -- were you promoted into the

13   position that the district manager that you had during

14   your -- when you were a sales rep, is that the

15   position that you took?

16        A.     I replaced that person, yes.

17        Q.     Who did you replace?

18        A.     A guy named Vern Walker.

19        Q.     And did he -- was he likewise promoted or

20   did he leave the company?

21        A.     No, he went -- he went to work for a

22   company that is long defunct called Cooper.

23        Q.     And did -- at the time that you became a

24   district manager in November of 1980, did the products
```

1   that you described for me remain the same?

2       A.    Well, we added products, additional

3   products.

4       Q.    After 1980?

5       A.    And after 1980 we were promoting Uniphyl,

6   a product called Prioderm for the treatment of head

7   lice, and in '85 we launched MS Contin.  We had a

8   product for a short period of time prior to that

9   called DHC Plus, which was a pain medication.

10      Q.    What kind of a pain medication was that?

11      A.    It was dihydrocodeine.  Dihydrocodeine, a

12  combination product with caffeine, and I'm trying to

13  remember the third portion.

14      Q.    Is that a prescription product?

15      A.    It was prescription also.

16      Q.    Did Purdue hold a patent on that product?

17      A.    I don't believe so.

18      Q.    What was Uniphyl?

19      A.    Uniphyl was a bronchodilator for the

20  treatment of asthma, COPD.

21      Q.    And then MS Contin in 1985?

22      A.    Um-hum.

23      Q.    And for how long did you remain a district

24  manager?

```
 1        A.    Until November of 1990.

 2        Q.    So for ten years?

 3        A.    Um-hum, I think that's right.

 4              I'm sorry.  It was November of 1989.  It

 5   was nine years.

 6        Q.    1989?

 7        A.    Um-hum.

 8        Q.    Okay.  And did your territory remain the

 9   same?

10        A.    As a district manager, no, that -- I -- I

11   was primarily on the East Coast but I had various

12   districts that ran from Baltimore to Maine.

13        Q.    And that would somewhat change over the

14   nine years?

15        A.    It would change, yeah, periodically over

16   those as we added sales reps and districts, it would

17   be realigned.

18        Q.    Did you report to a regional manager?

19        A.    I reported to a regional manager, yes.

20        Q.    And was it the same regional manager

21   throughout the nine years?

22        A.    Yes, it was.

23        Q.    Who was that?

24        A.    Jim Lang.
```

1     Q.    Did you know Russell Gasdia at that time?

2     A.    I knew Russell when he got hired, yeah.

3     Q.    And how -- what was he hired as?

4     A.    Hospital rep, I believe.

5     Q.    Okay.  And did you -- was he -- did you

6  work with him?

7     A.    Not directly, not at -- not at that time.

8  When he became a district manager, we worked together,

9  but not before that.

10     Q.    For how long -- what happened after

11  November of 1989?

12     A.    I was promoted to regional manager.

13     Q.    Was Mr. Lang promoted at the same time?

14     A.    He was promoted at the same time.

15     Q.    And what was your territory or how would

16  you describe your territory?

17     A.    I was the eastern regional manager.  The

18  responsibility at that time was from Maine to

19  Baltimore and west to Pittsburgh -- no -- yeah, west

20  to Pittsburgh, but the -- Pittsburgh lasted just a

21  short period of time.  I lost that fairly quickly.  I

22  got it back.  The region changed also over the

23  11 years I did that job.

24     Q.    So you were a regional manager for the

```
 1    eastern region and there may have been some changes in

 2    that?

 3         A.    Yes.

 4         Q.    For 11 years?

 5         A.    Yes, until 1990.  I mean, until 2000.

 6         Q.    Until 2000, okay.

 7         A.    I'm sorry.

 8         Q.    So from November of 1989?

 9         A.    Until October of 1990 -- until --

10         Q.    Of 2000?

11         A.    Until 2000.  Sorry.

12         Q.    You were the regional manager?

13         A.    Yes.

14         Q.    And it was the Eastern Division or

15    something like that?

16         A.    Something like that.

17         Q.    And you had district managers that

18    reported to you?

19         A.    I had district managers reporting to me.

20         Q.    And the district managers had sales reps

21    that reported to them?

22         A.    Correct.

23         Q.    Who did you report to during the time that

24    you were a regional manager?
```

```
 1       A.     Initially Jim Lang, then to a gentleman

 2  named Mark Alphonso, and then to Russ Gasdia.

 3       Q.     Was Jim Lang promoted -- what -- what was

 4  Jim Lang's title when you were reporting to him when

 5  you were a regional manager?

 6       A.     He was national sales manager and then --

 7       Q.     And when he -- he was -- he was promoted

 8  from that job?

 9       A.     He became VP of sales and then eventually

10  VP of sales and marketing.

11       Q.     Was Mark Alphonso, then, national sales

12  manager?

13       A.     He was the national sales manager, yeah.

14       Q.     Okay.  Was he promoted past that?

15       A.     He became the vice president of marketing.

16       Q.     And was he promoted beyond that?

17       A.     No, not that I'm --

18       Q.     And --

19       A.     -- aware of, no.

20       Q.     Okay.  And Russ Gasdia then became

21  national sales manager?

22       A.     Correct.

23       Q.     And?

24       A.     Eventually VP of sales and eventually
```

Highly Confidential – Subject to Further Confidentiality Review

1   beyond that VP of sales and marketing.

2        Q.    The same trajectory as Mr. Lang, correct?

3        A.    Yeah, pretty much.

4        Q.    When did Mr. Lang leave the company, if

5   you recall?

6        A.    2004.

7        Q.    And is that when Mr. Gasdia became vice

8   president of sales and marketing?

9        A.    I'm -- he had become a vice president

10  before Jim left of VP of fee -- sales -- field sales.

11  I don't remember exactly when he got the -- I guess he

12  got the title of marketing when Jim retired.

13       Q.    Okay.

14             And as regional manager, you were still

15  responsible for prescription products, correct?

16       A.    Correct.  Prescription and OTC.

17       Q.    Okay.  Did it still include laxatives?

18       A.    Yep.

19       Q.    Prioderm?

20       A.    That was gone at that point.

21       Q.    Betadine or Betadine?

22       A.    Betadine a little bit.  Yeah, that was

23  still -- it was still in the -- in the book.  Uniphyl,

24  MS Contin, Trilisate.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did OxyContin come on the market during

 2   this period?

 3        A.    1995, December.

 4        Q.    And you were likewise responsible for that

 5   product?

 6        A.    Yes.

 7        Q.    Did you have anything to do with the

 8   development of OxyContin?

 9        A.    No.

10        Q.    Did you have anything to do with the

11   development of MS -- of MS Contin?

12        A.    No.

13        Q.    Did you have anything to do with the

14   development of the sales training modules with respect

15   to MS Contin?

16        A.    No.

17        Q.    Same question for OxyContin?

18        A.    No.

19        Q.    Did you yourself in a position as regional

20   manager educate district managers about the products?

21        A.    I would say I supplemented their education

22   or, what's the word I'm looking for, reinforced their

23   education.

24        Q.    And how would you -- by the time, for
```

1    example, OxyContin comes on the market in December

2    of 1995, you are already a regional manager.

3              How do you -- do you learn about that

4    product?

5         A.    Well, the product -- the product training

6    at Purdue was always extensive and it always usually

7    started with disease state training where a product

8    would be utilized.

9              You know, we had built some of that base

10   with MS Contin.  So it was a more extended training on

11   pain states once we learned about OxyContin.  And then

12   there was extensive training on the product itself,

13   which always started with the package insert.  We were

14   expected, no matter what product it was, to know the

15   package insert chapter and verse.

16        Q.    The pain states, however, would not be

17   something that you could learn from just reading the

18   package insert, correct?

19        A.    No, no, absolutely not.  You'd have to be

20   trained on it.

21        Q.    So how would you be trained on pain

22   states?

23        A.    Well, it depended on the time period,

24   because it got more sophisticated as time went on.  As

Highly Confidential - Subject to Further Confidentiality Review

1    there was more access to electronic training, there

2    was a lot of home study, hard copy training, if you

3    will, on a product like OxyContin early on.  Later in

4    its -- later in the '90s when there was more access to

5    electronic learning, there was a lot of that as well.

6              We had a lot of prelaunch training and

7    then there would be -- the representatives and

8    managers would be tested on it.  And if you did not

9    reach a certain grade level, which was generally the

10   low end was around 90 percent, you were not certified

11   to sell the product.  So there were representatives,

12   not many, that had to go for remedial training before

13   they were allowed to go to the field and go out and

14   sell the product.

15        Q.    Even as a regional manager, did you need

16   to become certified to sell OxyContin?

17        A.    No, I didn't -- I didn't -- yeah, we had

18   to take the test.  I don't remember if it was actual

19   certification, but we had to take the test.

20        Q.    Did you have to score above whatever the

21   threshold was?

22        A.    I really don't remember.

23        Q.    And you would have had to do the same for

24   MS Contin, you would have had to -- you would have had

1  to at least --

2       A.    MS Contin, I don't remember if there was

3  testing for that.  There was -- there were quizzes,

4  but I don't know if there was certification for MS

5  Contin.  That was our first foray into opioids.  It

6  was a relatively, frankly, my -- minor product in

7  those years.

8       Q.    And so you learned about pain states with

9  electronic modules, is that correct?

10      A.    I would say later on.  I don't know if --

11 and I can't remember in the beginning if it was

12 electronic, but I know there was significant --

13 significant hard copy training with that.

14      Q.    And what do you recall about the types of

15 pain that OxyContin could be prescribed for?

16      MR. HOFFMAN:  Object to form.

17 BY THE WITNESS:

18      A.    Let me think.  Certainly for pain related

19 to cancer, for those patients who were in Hospice

20 often as related to cancer, intractable pain in

21 general, severe back injury, that type of

22 orthopedic-related severe injury, but in general the

23 pain states were from moderate to severe pain that was

24 long -- of long duration.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. CONROY:

 2        Q.    What other -- you mentioned severe back

 3    injury and severe orthopedic injury.  What other --

 4    what other diseases or injuries or conditions would

 5    OxyContin be used for?

 6        MR. HOFFMAN:  Object to form.

 7    BY THE WITNESS:

 8        A.    I'm trying to remember specifics.  I -- I

 9    really can't -- I'm thinking of more that it was for

10    intractable pain, but I can't really remember

11    specifics off the top of my head as far as -- I know

12    back pain, pain from severe injury, severe orthopedic

13    pain.  I guess in some cases late stage arthritic

14    pain.  I'm really not -- that's about what I can

15    remember off the top of my head.

16    BY MS. CONROY:

17        Q.    I know it was a long time ago.

18        A.    Yeah.

19        Q.    What do you -- what do you mean by "late

20    stage arthritic pain"?  What do you mean by the "late

21    stage" part of that?

22        A.    Well, people who have been through every

23    other mode of treatment and there was really nothing

24    left that they had tried.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Would it be fair to say that you would
 2   have considered that for anyone to be prescribed
 3   OxyContin that they would have tried everything else
 4   first?
 5        A.    I would think that they would -- I don't
 6   know if they would have tried everything else first,
 7   but that they would generally have tried other things
 8   first.
 9        Q.    Other non-opioid pain relief?
10        A.    Other non-o -- opioid or other opioids
11   that were short acting.
12        Q.    OxyContin was a long-acting opioid?
13        A.    Yes, it was.
14        Q.    When you spoke about severe, did you have
15   any -- severe pain, any type of a definition of what
16   that would mean?
17        MR. HOFFMAN:  Object to form.
18   BY THE WITNESS:
19        A.    Well, it was -- it was definitely not
20   indicated for acute pain, so pain of a short duration.
21   It was anything that was chronic and required
22   long-term treatment.  And it was moderate to sev- --
23   in the nature of moderate to severe pain.
24   BY MS. CONROY:
```

```
 1        Q.      What do you recall about the risks of

 2   OxyContin?

 3        A.      The risks of Ox -- OxyContin was a Class 2

 4   opioid that carried with it all of the warnings that

 5   are commensurate with any Class 2 opioid and that...

 6        Q.      Okay.  What would those be?

 7        A.      Abuse, the potential for abuse, potential

 8   for addiction, severe constipation.

 9        Q.      And what do you -- how would you define

10   abuse?

11        MR. HOFFMAN:  Object to form.

12   BY THE WITNESS:

13        A.      How would I define abuse?

14   BY MS. CONROY:

15        Q.      Well, you were -- you were the regional

16   manager, so I assume you had some understanding of

17   what abuse meant in the context of --

18        A.      Well, the --

19        Q.      -- OxyContin.

20        A.      We would pretty much lump abuse and

21   diversion together, and it would be people who were

22   using -- or would seek to use the product

23   inappropriately or illegally --

24        Q.      And --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    -- or divert it to a party other than

 2   themselves.

 3      Q.    And how would you use the product

 4   inappropriately?

 5      MR. HOFFMAN:  Object to form.

 6   BY THE WITNESS:

 7      A.    Well, not that we spelled out what was

 8   inappropriate, but inappropriate use is if you used it

 9   recreationally or used it for a purpose other than

10   what it was indicated for.

11   BY MS. CONROY:

12      Q.    Was OxyContin prescribed or understood to

13   be prescribed every 12 hours?

14      A.    Yes.

15      Q.    If a -- if a patient took it 11-and-a-half

16   hours after the first pill, would that be

17   inappropriate?

18      MR. HOFFMAN:  Object to form.

19   BY THE WITNESS:

20      A.    To me that's kind of splitting hairs.  I

21   don't think it would be.  If it's indicated for use

22   every 12 hours, if somebody took it at 11-and-a-half

23   or 12-and-a-half, I don't think that would be an

24   extreme variation from how the product was supposed to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   be used.

 2   BY MS. CONROY:

 3        Q.    Okay.  What about if a -- if a patient

 4   took it every -- the 12-hour OxyContin every six

 5   hours, would you consider that to be abuse?

 6        MR. HOFFMAN:  Object to form.

 7   BY THE WITNESS:

 8        A.    We'd consider it to be abuse, we'd

 9   consider it to be using it inappropriately and not as

10   per prod -- package insert.

11   BY MS. CONROY:

12        Q.    And so you would -- you would call that

13   abuse as part of the abuse and diversion?

14        A.    No, I wouldn't necessarily call it part of

15   the abuse and diversion.  If a patient was taking it

16   every six hours, what -- if I was talking to a

17   physician, I would say, Doctor, this -- according to

18   the package insert, this is a every-12-hour drug and

19   should not be dosed more frequently, which it said in

20   the package insert.

21        Q.    Would you have suggested to a physician

22   that the dosage should be increased if a patient

23   was -- found it necessary to take it more often than

24   every 12 hours?
```

```
 1      A.   Based on the physician's assessment, if

 2  they felt that the patient needed a higher dose, we

 3  would recommend a higher dose rather than an increase

 4  in the frequency.

 5      Q.   Did you tell physicians at that time that

 6  if a -- if a patient was taking the drug more

 7  frequently than 12 hours that the patient was abusing

 8  the drug?

 9      MR. HOFFMAN:  Object to form.

10          What -- what is the timeframe?  I'm not

11  sure we are clear.

12      MS. CONROY:  When -- when Mr. Seid was selling

13  OxyContin.

14  BY THE WITNESS:

15      A.   We would tell the physician that, as we

16  were trained, that they should use the product

17  according to package insert.

18  BY MS. CONROY:

19      Q.   And if the physician asked you at that

20  time, Is my patient abusing the product if he or she

21  takes it more often than every 12 hours, what would

22  your answer be?

23      MR. HOFFMAN:  Object to form and it assumes

24  facts not in evidence.
```

1    BY THE WITNESS:

2         A.    I don't -- I don't know if I ever got that

3    question, so that's kind of a -- I can't -- I can't

4    answer a question that I don't remember -- remember

5    getting from a physician.

6    BY MS. CONROY:

7         Q.    Okay.  How would you have described abuse

8    to one of the sales reps that was -- that you

9    supervised?

10        A.    If a physician was giving -- if he was --

11   if the representative observed something in practice

12   including a physician's prescribing pat -- practices

13   that appeared to be inappropriate or not as per

14   indicated in the package insert, that there was a

15   potential that there could be abuse going on in that

16   office.

17        Q.    Okay.  And what would you do about that?

18        A.    I myself, I myself told district managers

19   who reported to me that no representative should

20   continue to call on a physician they feel

21   uncomfortable with.

22        Q.    And would you have advised --

23        A.    And I would advise my supervisor that I --

24   I did that, whether they were considered a top

Highly Confidential — Subject to Further Confidentiality Review

```
 1    prescriber or not, and if the representative or the

 2    district manager was uncomfortable, I said, Don't go

 3    there.

 4         Q.    Would you have been uncomfortable calling

 5    on a physician who told you that they prescribed

 6    OxyContin every ten hours?

 7         MR. HOFFMAN:  Object to form.

 8    BY THE WITNESS:

 9         A.    I would ask -- my first question would be:

10    Why were you doing that?

11    BY MS. CONROY:

12         Q.    Would that have been a reason for you to

13    not call on that physician any longer?

14         MR. HOFFMAN:  Object to form.

15    BY THE WITNESS:

16         A.    Not necessarily.

17    BY MS. CONROY:

18         Q.    What answers could that physician give you

19    that would satisfy you that you could continue to call

20    on that physician?

21         MR. HOFFMAN:  Object to form, assumes facts not

22    in evidence.

23    BY THE WITNESS:

24         A.    Well, that would be an interesting
```

1    physician, because if it was every -- most physicians

2    prescribed any medication in a systematic method to

3    get compliance by the patient.

4           So if you were going to take a product

5    every ten hours, and often a patient, for example, if

6    you take something twice a day or three times a day or

7    even four times a day, you tie it to an event so you

8    can remember to take it at appropriate intervals.

9           So ten hours would be one that would leave

10   me scratching my head because how could you ever judge

11   when a patient was taking it every ten hours.  And why

12   would you prescribe that, because at some point they

13   would be taking it one day at 3:00 in the morning and

14   the next day at 4:00 in the afternoon.  So that would

15   be -- that particular example would be very

16   problematic to deal with.

17   BY MS. CONROY:

18      Q.    What about every -- what about every eight

19   hours?

20      MR. HOFFMAN:  Object to form.

21   BY THE WITNESS:

22      A.    There was -- there was -- there were

23   physicians who would do it every eight hours because

24   for a particular reason they did not want to increase

1    the dose but increase the frequency because they felt

2    it wasn't lasting for that particular patient.

3           My district managers and my

4    representatives were to try to educate the physician

5    that it was more appropriate, according to the PI it

6    should be given every 12 hours, and if there is not --

7    if there is not sufficient relief, rather than

8    increase the frequency, to increase the dose.

9           If they weren't going to increase the

10   dose, there was certainly significant documentation to

11   physicians recommending how to -- to prescribe what

12   was known as rescue doses, so a short-acting in

13   between.

14   BY MS. CONROY:

15       Q.   And did --

16       A.   We'd always try to get them back, at least

17   under my watch, to doing appropriate 12-hour dosing.

18       Q.   And you would suggest that -- that in

19   order to get to the 12-hour dosing with a patient that

20   was not getting adequate pain relief for the full

21   12 hours that they increased the dose?

22       A.   Um-hum.

23       Q.   You -- you have to --

24       A.   Yes.

1    Q.    And if the physician wanted to keep his or

2  her patients at eight hours and not increase the dose,

3  would you have reported that physician as potentially

4  abusing or prescribing it to patients who were abusing

5  the drug?

6    MR. HOFFMAN:  Object to form.

7  BY THE WITNESS:

8    A.    I think that would be on an individual

9  basis.  That was not an unusual way, certainly early

10  on, the period of when I was in the field with that

11  product of physicians doing it at eight-hour intervals

12  because that's what they were more comfortable with.

13  BY MS. CONROY:

14    Q.    And you had access to IMS data at that

15  time, correct?

16    A.    Yes.

17    Q.    Would you have been able to actually see

18  how many pills a physician was prescribing?

19    A.    I don't think so at that time.  I don't

20  think it was as sophisticated when I was in the field.

21    Q.    Could you tell which physicians were

22  prescribing?

23    MR. HOFFMAN:  Object to form, overly broad.

24  BY THE WITNESS:

```
 1        A.      Maybe towards the end of the time I was in

 2    the field.  I don't know if we had data early on that

 3    was that granular.

 4    BY MS. CONROY:

 5        Q.      Would -- might it have been by zip code?

 6        A.      It might have been by zip code at that

 7    point.

 8        Q.      And -- and not by physician name?

 9        A.      Yeah.  And you've got, as you can imagine,

10    as the IMS data became more sophisticated and they

11    were able to cut it in more ways, they could get more

12    granular data -- data.  Certainly right around the

13    time I went inside.  And I -- as I -- as I remember

14    it.

15        Q.      Did you have occasion to report any

16    physicians while the time -- during the time you were

17    a regional manager with respect to their prescribing

18    practices with OxyContin?

19        A.      I don't remember specifically.  I remember

20    reporting a couple of doctors, at least to my

21    superior, that said that I'm -- the rep is not

22    comfortable calling on this physician and he -- she or

23    he thinks it's inappropriate, so I directed them not

24    to call on that physician anymore.
```

```
 1        Q.     And did you do anything else at that time,

 2    did you report it to the company or was there a

 3    protocol to follow?

 4        A.     I don't believe in '95 -- in '95, '96

 5    there was a prot -- protocol.

 6        Q.     And how about by 2000 when you left that

 7    job?

 8        A.     I think there were -- I think there were

 9    reports of concern at that time.

10        Q.     And there would have been some protocol to

11    follow --

12        A.     Right.

13        Q.     -- if you were directing or if you -- if

14    you heard there was some problem with the physician

15    and you directed someone under you not to call on that

16    physician anymore, there would have been some

17    reporting?

18        A.     So there was a formal, but I don't

19    remember the specific process.

20        Q.     We talked about abuse and diversion, you

21    also mentioned addiction as a risk of a controlled

22    substance, correct?

23        A.     Um-hum.

24        Q.     You have to give an answer.
```

```
 1        A.    Yes, I did.

 2        Q.    And was -- was addiction a risk of

 3   OxyContin?

 4        A.    Yes.  It was a Class 2 opioid.

 5        Q.    And is it a risk --

 6        A.    Excuse me.

 7        Q.    -- if a patient is taking OxyContin

 8   exactly as prescribed and according to the package

 9   insert --

10        MR. HOFFMAN:  Object to --

11   BY MS. CONROY:

12        Q.    -- can they still become addicted?

13        MR. HOFFMAN:  Sorry.

14             Object to form.

15   BY THE WITNESS:

16        A.    I imagine they could.  I -- I'm not --

17   I --

18   BY MS. CONROY:

19        Q.    What -- what did your training tell you?

20        MR. HOFFMAN:  Object to form, foundation.

21   BY THE WITNESS:

22        A.    Our train -- training indicated that based

23   on the information that was available at that time was

24   that patients who required opioids for chronic
```

```
 1   intractable pain would become dependent on the opioid

 2   but that the majority of patients, the vast majority

 3   of patients would be able to be weaned off the drug

 4   if -- in the event that the chronic intractable pain

 5   improved or was sim -- somehow relieved.

 6   BY MS. CONROY:

 7        Q.    So they wouldn't be -- they wouldn't be

 8   addicted, they would be dependent?

 9        MR. HOFFMAN:  Object to form.

10   BY THE WITNESS:

11        A.    Yes.

12   BY MS. CONROY:

13        Q.    And you said the vast majority.

14              What kind of -- what kind of percentages

15   are you thinking about?

16        MR. HOFFMAN:  Object to form, foundation.

17   BY THE WITNESS:

18        A.    I can't give you an exact number.

19   BY MS. CONROY:

20        Q.    What makes you think the vast majority

21   would not become addicted?

22        A.    The data that was available at the time

23   for us when we first began promoting the product

24   indicated that that was what the -- the situation
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would be is that people in severe pain would be

 2    dependent, but that most would not become addicted.

 3         Q.    You've -- I'm just trying to -- you've --

 4    you've said "most," you've said "majority," you've

 5    said "vast majority".

 6              Any -- do you -- do you recall what the

 7    studies --

 8         A.    I don't --

 9         Q.    -- were or what the --

10         A.    I don't --

11         Q.    -- data was?

12         MS. PORTER:  I'm sorry.  Let her finish her

13    whole question before you answer.

14         THE WITNESS:  I'm sorry.

15         MS. PORTER:  Go ahead.

16    BY THE WITNESS:

17         A.    I don't recall.

18    BY MS. CONROY:

19         Q.    Do you recall if there were studies about

20    that?

21         A.    I recall there was data provided on that,

22    yeah, yes.

23         Q.    Data provided to -- to the sales force

24    about that?
```

```
 1        A.     Yes.

 2        Q.     That you would then be able to speak about

 3    with the physician?

 4        A.     Yes.

 5        Q.     Did you -- did that data change over time,

 6    do you know, was it different, for example, in 1995

 7    than it was in 2000?

 8        MR. HOFFMAN:  Object to form, foundation.

 9    BY THE WITNESS:

10        A.     I don't -- I don't know for sure.

11    BY MS. CONROY:

12        Q.     Okay.  Do you know today -- or let's -- by

13    the time you retired in 2014, do you know if anything

14    had changed with respect to the risk of addiction to a

15    patient appropriately taking OxyContin?

16        MR. HOFFMAN:  Object to form, foundation, and

17    overly broad.

18    BY THE WITNESS:

19        A.     I know that we were telling our

20    representatives, and I was telling my staff, even

21    though they were business people as opposed to calling

22    on physicians, that we had a product with a Black Box

23    warning and that it was important even for my folks

24    that when they were talking to customers, as opposed
```

1   to physicians, that they were clear as to what was in

2   the product labeling about the potential for abuse,

3   aver- -- diversion and addiction of the product, and

4   that they needed to stick with the PI.

5   BY MS. CONROY:

6       Q.    Okay.  I'm asking you a little bit more

7   specifically.

8           Did you continue to hold the understanding

9   that the risk of addiction to a pain patient taking

10  OxyContin as prescribed was the vast majority would

11  not or most would not become addicted?

12      MR. HOFFMAN:  Object to form, foundation.

13  BY THE WITNESS:

14      A.    I -- I don't know if I could speak to

15  that.  I -- again, what I told my people was to make

16  sure that people knew what was in the -- in the PI,

17  that OxyContin should be prescribed to patients that

18  were identified as appropriate for the product and --

19  and dosed appropriately.

20  BY MS. CONROY:

21      Q.    My question is somewhat different than

22  that.

23      A.    No, I understand what the question is, I

24  don't --

1    Q.    Is there anything that changed your mind

2  about the way you felt in 2000 about the risk of

3  addiction in a patient who took the product

4  appropriately?

5    MR. HOFFMAN:  Object to the form.

6  BY THE WITNESS:

7    A.    Changed my mind or --

8  BY MS. CONROY:

9    Q.    Right, changed your mind.

10    A.    I felt that if patients, appropriately

11  dosed, and patients that were particularly monitored

12  by a physician, if the product was given correctly and

13  was given for an appropriate condition, that the

14  product could be effective and I would think that

15  perhaps addiction was a possibility, but that

16  appropriate use for a patient in need would be

17  something that the physician would have to weigh.

18    Q.    What would be your understanding of the

19  likelihood of addiction?

20    MR. HOFFMAN:  Object to form, foundation.

21  BY MS. CONROY:

22    Q.    In that patient that you just described to

23  me.

24    A.    I don't -- I -- I don't know if I could

1    tell the likelihood.

2        Q.    Well, you've told me that --

3        A.    But if -- if -- if there was a likelihood

4    for addiction in every patient prescribed OxyContin,

5    then OxyContin should not be prescribed.  I didn't

6    feel that way.

7        Q.    You didn't feel what way, that there --

8        A.    That it shouldn't be prescribed.

9        Q.    Okay.  Did you believe that there was a

10   likelihood that every patient prescribed OxyContin

11   could become addicted?

12       MR. HOFFMAN:  Object to form.

13   BY THE WITNESS:

14       A.    The package insert said that the product

15   was a Class 2 opioid and there was a potential for

16   addiction, and that's what -- if I was in front of a

17   customer and if at that time I was in front of a

18   doctor, I would say, Doctor, there is a potential for

19   addiction.

20   BY MS. CONROY:

21       Q.    Right.  But you also told me that you

22   would tell someone that the vast majority of patients

23   would not get addicted?

24       A.    Early --

```
 1        MS. PORTER:  I object to the form of the

 2   question.

 3        MR. HOFFMAN:  Object to the form.

 4        MR. STANNER:  It misstates the --

 5        MR. HOFFMAN:  It misstates the testimony.

 6        MS. PORTER:  You can go ahead.

 7   BY MS. CONROY:

 8        Q.    You can answer it.

 9        A.    What I said early on was initially we felt

10   and the information we were using at the time

11   indicated that physician and patients on opioids could

12   become dependent on it, for want of a better example,

13   like a -- a patient on insulin who is dependent on the

14   insulin to control their glucose blood levels, that a

15   pain patient could become dependent on the product to

16   relieve their pain.  And without that pain medication,

17   they exhibit cravings because they were in increasing

18   pain.

19             As I said over -- over time as the PI

20   became changed and indicated, I or my team would, if

21   in front of a customer, say that there was a potential

22   of addiction for this product.  So what I said before,

23   what was early on when you asked when I first was as

24   regional manager and then as time went on and the PI
```

1   changed, it got more specific and it said potential

2   for addiction.

3        Q.    I see.  That's what was confusing me when

4   you were talking about initially.

5             So you were then following the package

6   insert in your answers that there would be a potential

7   for addition?

8        A.    Yes.

9        Q.    Okay.  Is it still the case that you

10  understand that dependence was physical dependence as

11  opposed to psychological dependence on the drug?

12       A.    At that time, yes, more physical

13  dependence.

14       Q.    And did that change, your understanding of

15  whether it was physical versus psychological damage --

16  dependence over time?

17       A.    I'm not a physician --

18       MR. HOFFMAN:  Object to form.

19  BY THE WITNESS:

20       A.    -- but from what I know of pain

21  management, there are some patients who are physically

22  dependent on it and there are some who are

23  psychologically dependent on it.

24  BY MS. CONROY:

1      Q.    And are there some patients who are

2   psychologically dependent even though they take the --

3   the drug appropriately?

4      MR. HOFFMAN:  Object to form.

5   BY THE WITNESS:

6      A.    I don't know that.

7   BY MS. CONROY:

8      Q.    When -- when did you become aware of the

9   possibility of psychological dependence on OxyContin?

10     MR. HOFFMAN:  Object to form.

11  BY MS. CONROY:

12     Q.    As opposed to physical dependence?

13     A.    OxyContin -- Contin is a Class 2 opioid,

14  so somebody or somebodies could be psychologically

15  dependent on it.

16     Q.    So you --

17     A.    So I was aware of that from day one.

18     Q.    And it was your understanding that that

19  rate was low or the vast majority would not become

20  psychologically dependent?

21     MR. HOFFMAN:  Object to form.

22  BY THE WITNESS:

23     A.    It was my feeling at that time based on

24  the training I received that, first of all, that you

Highly Confidential - Subject to Further Confidentiality Review

1    were to be very clear with the healthcare provider on

2    what was in the package insert, but that if given

3    appropriately that the patient may become dependent on

4    the product based on their need for more pain

5    medication, but that it was a Class 2 opioid and there

6    was a potential for addiction.

7              That evolved over time as far as the

8    package insert goes and it became much stronger in the

9    fact that the -- the product may become -- could be

10   addictive, period.

11   BY MS. CONROY:

12        Q.    And -- and that -- that became stronger

13   after you were no longer regional manager?

14        A.    It was right -- almost right at the cusp.

15        MS. PORTER:  If we get to a stopping point, I

16   just need a bathroom break, at a -- at a good stopping

17   point for you.

18        MS. CONROY:  We can stop now.  That's fine.

19   We'll take a break.

20        THE VIDEOGRAPHER:  We are off the record at

21   2:39 p.m.

22              (WHEREUPON, a recess was had

23              from 2:39 to 2:47 p.m.)

24        THE VIDEOGRAPHER:  We are back on the record at

Highly Confidential - Subject to Further Confidentiality Review

```
 1   2:47 p.m.

 2                    (WHEREUPON, a certain document was

 3                     marked Purdue-Seid Deposition Exhibit

 4                     No. 003, for identification, as of

 5                     12/12/2018.)

 6   BY MS. CONROY:

 7        Q.   Mr. Seid, let me show you what I've marked

 8   as Exhibit 3.  Exhibit 3 is a pamphlet from Partners

 9   Against Pain, PDD1501720706 through 714.

10             Are you familiar with Partners Against

11   Pain?

12        A.   Yes, I am.

13        Q.   And what do you -- what do you know about

14   it?

15        A.   It was a support material that was

16   separately branded that was non-product which talked

17   to things like counseling pain -- patients and their

18   families about pain, bad, how to appropriately take

19   it, appropriately store it, that kind of thing.

20        Q.   Okay.  And when you said it was separately

21   branded, it was -- it was not -- would you call this

22   unbranded?

23        A.   Unbranded.

24        Q.   So it didn't actually mention a particular
```

```
 1   product, correct?

 2        A.    Right.   It was a branded as Partners

 3   Against Pain I guess is what I meant to say.

 4        Q.    Do you know if unbranded materials could

 5   actually list the drug OxyContin, could they mention

 6   the drug OxyContin?

 7        A.    I don't --

 8        MR. HOFFMAN:   Object to form.

 9   BY THE WITNESS:

10        A.    I don't remember, actually.

11   BY MS. CONROY:

12        Q.    Have you ever seen this document before,

13   does it ring -- ring any bells?

14        A.    I've seen Partners Against Pain material.

15   I don't remember this one specifically.

16        Q.    Do you re -- I know this began to be used

17   in 1997, so is it -- would it be -- you can see that

18   from the very last page.  It was copyrighted in 1997

19   in Norwalk, Connecticut by Purdue.

20        A.    Um-hum.

21        Q.    Do you know or do you recall seeing this

22   when you were a regional manager?

23        A.    I recall seeing Partners Against Pain

24   material.  I don't specifically remember seeing this
```

1    one.

2        Q.    Okay.  Is there any reason why you

3    wouldn't have seen this?

4        MR. HOFFMAN:  Object to form.

5    BY THE WITNESS:

6        A.    I don't know if there is any reason I

7    wouldn't have seen it.  I just don't remember seeing

8    it.

9    BY MS. CONROY:

10       Q.    Okay.  I mean, there was nothing -- you --

11   you would -- anything that was used or developed by

12   Purdue Pharma with respect to analgesics or pain,

13   you -- you would have had access to it, correct?

14       MR. HOFFMAN:  Object to form.

15   BY THE WITNESS:

16       A.    I would have had access to it.

17   BY MS. CONROY:

18       Q.    If you would turn to Page 10.  And there

19   is a section of questions and answers.  And the

20   question is:  "Won't I (or my family member) become

21   addicted to opioids and lose control?"

22            Do you see that?

23       A.    Yes.

24       Q.    And that's one of the questions that sales

1    representatives were trained on, correct?

2         MR. HOFFMAN:  Object to form, foundation.

3    BY THE WITNESS:

4         A.    Yes, I believe so.

5    BY MS. CONROY:

6         Q.    That was a -- that was a concern of

7    physicians at the time, wasn't it?

8         MR. HOFFMAN:  Object to form.

9    BY THE WITNESS:

10        A.    It could have been, yeah.

11   BY MS. CONROY:

12        Q.    Do you re -- do you recall that that was

13   one of the obstacles to the sale of OxyContin when it

14   first came out, that physicians were concerned about

15   addiction?

16        MR. HOFFMAN:  Object to form.

17   BY THE WITNESS:

18        A.    I don't know that -- could you repeat that

19   question again?  I'm not...

20   BY MS. CONROY:

21        Q.    Do you have any recollection of, at the

22   time that OxyContin went on the market, December

23   of 1995, that there were concerns about whether it

24   would -- how well it would do in the market because

1    physicians were concerned about addiction and

2    particularly with -- in particular with patients with

3    non-cancer pain?

4         MR. HOFFMAN:  Object to form.

5    BY MS. CONROY:

6         Q.   Do you -- do you remember that issue?

7         A.   I don't remember specifically in -- in

8    1995.  Many of the physicians we were going to at that

9    time had already been presented MS Contin or were

10   prescribing MS Contin.

11        Q.   Were you seeing non-cancer physicians for

12   MS Contin at that time?

13        A.   In some cases.

14        Q.   So that's not something -- you wouldn't --

15   you were not aware of that concern by physicians?

16        MR. HOFFMAN:  Object to form.  Assumes facts not

17   in evidence.

18   BY THE WITNESS:

19        A.   I imagine it could be a concern of

20   physicians.  I -- it is a Class 2 opioid.

21   BY MS. CONROY:

22        Q.   Correct.

23             But you don't con -- you don't recall what

24   was called at the time an obstacle to the sales force

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with respect to physicians who were concerned about

 2    addiction in patients with non-cancer pain?

 3         MR. HOFFMAN:  Object --

 4    BY MS. CONROY:

 5         Q.    You don't recall that?

 6         A.    I don't re --

 7         MR. HOFFMAN:  Object to form, foundation.

 8    BY THE WITNESS:

 9         A.    I re -- I remember the term "obstacles,"

10    but I don't remember this as specifically being one,

11    so...

12    BY MS. CONROY:

13         Q.    Okay.  Do you see where it says in the

14    italics -- well, let's look right above it.  It says:

15              "In fact, a survey of more than 11,000

16    opioid-using patients, taken over several years, found

17    only four cases of documented addition."

18              Do you see that?

19         A.    I do see that.

20         Q.    Do you recall -- do you recall that study

21    or knowing about that study?

22         A.    I recall only seeing it here.

23         Q.    What does that mean, that it -- that's

24    remind -- it reminded you --
```

```
1        A.    I remember that --

2        Q.    -- you said it refreshed about it.

3        A.    Yeah, but I -- if you asked me what the

4   specifics of that bullet was, before I saw it here, I

5   couldn't give you the specifics.

6        Q.    I won't ask you that.

7              I -- but do you remember that there was,

8   in fact, some study with -- around that number of

9   people that had a conclusion that addiction was rare?

10       A.    I don't re -- I don't remember the number.

11  As I mentioned before, there was data available that

12  said that it was rare, so this is apparently the data.

13  And now I see it and I remember the number, but

14  that's -- not before that.

15       Q.    And -- and you rely on -- if -- if you see

16  this, you believe it to be true because it was created

17  by Purdue Pharma, correct?

18       MR. HOFFMAN:  Object to form.

19  BY THE WITNESS:

20       A.    Yes, I would accept it as being correct.

21  BY MS. CONROY:

22       Q.    And is there any reason why you would not

23  accept it as correct today?

24       MR. HOFFMAN:  Object to form.
```

1    BY THE WITNESS:

2        A.    Based on this one bullet point in this one

3    study, I don't -- I don't know if I could question the

4    correctness or not question the correctness of the

5    study.

6    BY MS. CONROY:

7        Q.    Okay.  Would it be fair to say for as long

8    as this pamphlet was used that you would have believed

9    that Purdue Pharma would not have circulated it to

10   physicians or patients unless they believed it to be

11   true?

12       A.    I would expect that they believed it to be

13   true.

14       Q.    And as a consequence, you believed it, at

15   least for as long as it was circulated, you believed

16   it to be true?

17       A.    If it was an approved piece of promotional

18   material, I would use it.

19       Q.    When you say "approved piece of

20   promotional material," what do you mean by that?

21       A.    That it had gone through full

22   legal/regulatory review, legal, medical and regulatory

23   review, it had been approved, had been submitted as

24   all documents had to be submitted, and it was approved

1    for use in the field.

2         Q.    Would this document have been submitted to

3    the FDA?

4         A.    I don't know.

5         Q.    Okay.  Did --

6         A.    I can only assume.

7         Q.    You assumed that it was?

8         A.    I said I can only assume.  It was not my

9    responsibility as to whether it was or wasn't.

10        Q.    Okay.  If it --

11        A.    But I was directed to use only approved

12   material.

13        Q.    Okay.  This was copyrighted by Purdue

14   Pharma in 1997 and it was on the Purdue Pharma website

15   www.partnersagainstpain.com.

16              Would that suggest to you that it was --

17   it -- that it at least went through legal and

18   regulatory and any other departments that it needed to

19   at Purdue Pharma?

20        A.    I would assume.

21        Q.    So if you -- if you saw that this was on

22   www.partnersagainstpain.com, you would assume it was

23   okay to use?

24        A.    I would assume that.

 1       Q.    If you'd take a look again on Page 10 and

 2   11, which is on the same page, it says:

 3            "To illustrate just how rare addiction is

 4   among pain patients taking opioids" -- that doesn't

 5   talk anything about appropriate patients, correct,

 6   that's just among pain patients taking opioids?

 7            Do you see that?

 8       MR. HOFFMAN:  Object to form.

 9   BY THE WITNESS:

10       A.    Yes.

11   BY MS. CONROY:

12       Q.    -- "administer the visual quiz on the next

13   two pages.  Many patients, and family members, will be

14   surprised to discover that fewer than 1 percent of

15   opioid-using patients become addicted."

16            Do you see that?

17       A.    Yes, I do.

18       Q.    And was that your understanding at least

19   until you left your role as regional manager?

20       A.    If this was an approved piece and this

21   question came up with a physician, I would think it

22   was appropriate to use.

23       Q.    You're confusing me when you say "if this

24   was an approved piece."

```
1        A.    I mean, this was an approved piece.

2        Q.    What -- what else do we need to know about

3    this piece?

4        A.    No, if it's an approved piece, then I

5    would use it.

6        Q.    And if you -- if you turn the page:

7              "Among patients who regularly take opioids

8    for pain, and have no history of substance abuse,

9    which percentage represents the proportion who become

10   addicted?"

11             Do you see that?

12       A.    Yes.

13       Q.    And that's the 1 percent, correct?

14       A.    Correct.

15       Q.    What does that mean, "have no history of

16   substance abuse"?

17       MR. HOFFMAN:  Object to form.

18   BY THE WITNESS:

19       A.    I would assume, since I didn't write the

20   piece, that it meant a patient has not abused opioids

21   or other substances in the past.

22   BY MS. CONROY:

23       Q.    Did you ever advise physicians that they

24   should ask their patients about the abuse of opioids
```

1    in the past before they prescribed OxyContin?

2         MR. HOFFMAN:  Object to form.

3    BY THE WITNESS:

4         A.    I believe there were pieces available that

5    were available for reps to use that had it -- that as

6    part of the questions they asked patients.

7    BY MS. CONROY:

8         Q.    But not them, but the -- the doctors?

9         A.    That the doctors could ask patients or

10   their -- their nursing staff.

11        Q.    And what would it mean to have abused

12   opioids in the past, what would -- what kind of

13   examples would you be looking at?

14        MR. HOFFMAN:  Object to form.

15   BY THE WITNESS:

16        A.    Would I be looking at?

17   BY MS. CONROY:

18        Q.    Or as a regional manager and you are

19   supervising and you have all of these district

20   managers and sales representatives under you, what

21   would you tell them it meant to abuse an opioid prior

22   to being prescribed OxyContin?

23        MR. HOFFMAN:  Object to form, foundation.

24   BY THE WITNESS:

```
 1         A.    I don't know that I would tell them that.

 2    The -- the point here says, and this is a piece that a

 3    physician is using with their patients, and it states

 4    here:  "Among patients who regularly take opioids for

 5    pain and have no history of substance abuse," and

 6    these are the percentages.

 7              If I was using this piece, unless I was

 8    trained otherwise as to a litany of what substance

 9    abuse would be, I would not direct a rep to -- to

10    decide on their own what that list would look like

11    because that would not be using the piece as directed.

12         Q.    Okay.  Would you have a memory of whether

13    or not you would have considered tobacco smoking to be

14    substance abuse?

15         MR. HOFFMAN:  Object to form.

16    BY THE WITNESS:

17         A.    I don't know if that would be part of this

18    and I don't have any memory of where that was

19    discussed.

20    BY MS. CONROY:

21         Q.    Do you recall a discussion about alcohol

22    abuse?

23         MR. HOFFMAN:  Object to form.

24    BY THE WITNESS:
```

```
1        A.    I don't remember that either.  I know it

2   was talked about, but I don't know if it was something

3   you would, again, direct a rep to -- to say in using

4   this piece.

5   BY MS. CONROY:

6        Q.    Do you have any memory of an ar -- of --

7   of a study or an article called "Porter and Jick"?

8              Have you ever heard that before?

9        A.    No.  If I did, I don't remember it.

10       Q.    Do you have a definition for moderate

11  pain, what that means?

12       A.    I don't have one myself, no.

13       Q.    Okay.  Do you know if the company had one?

14       MR. HOFFMAN:  Object to form.

15  BY THE WITNESS:

16       A.    I don't remember, if they did, what it

17  was.

18  BY MS. CONROY:

19       Q.    Do you ever remember whether there was any

20  discussion in -- in training or in any of the meetings

21  that you would have held with district managers or

22  with sales representatives about the types of disease

23  states that would be appropriate for OxyContin, such

24  as tennis elbow or migraine headaches or things like
```

1   that?

2        MR. HOFFMAN:  Object to form, foundation.

3   BY THE WITNESS:

4        A.    I remember various -- certainly at

5   meetings various conditions would come up because

6   often they were -- or at times they were brought up by

7   a healthcare provider.

8   BY MS. CONROY:

9        Q.    Do you remember any conditions that were

10  not appropriate for OxyContin?

11       MR. HOFFMAN:  Object to form.

12  BY THE WITNESS:

13       A.    Postsurgical use, dental use, acute use in

14  general.

15  BY MS. CONROY:

16       Q.    So it would -- it would -- as far as you

17  understood, it would not be appropriate to use

18  OxyContin after -- just after surgery?

19       A.    Depended --

20       MR. HOFFMAN:  Object to the form.

21  BY THE WITNESS:

22       A.    It would depend on the surgery, but, you

23  know, minor surgery certainly would not be something

24  that it should be used for.

```
 1   BY MS. CONROY:

 2        Q.    And --

 3        A.    Maybe at that time a total hip, which was

 4   much different than what a total hip looks like today.

 5        Q.    What do you mean by dental?

 6        A.    Extractions, oral surgery, that kind of

 7   thing.

 8        Q.    It's -- it's your understanding that

 9   OxyContin would not be appropriate for those -- for

10   pain from dental surgery, extractions or oral surgery?

11        A.    Right.

12        MR. HOFFMAN:  Object to form and the timeframe.

13   BY MS. CONROY:

14        Q.    Do you have -- is there a period of time

15   that you think that that would no longer be true?

16        A.    No longer be true?

17        Q.    Right.

18        A.    I don't know.

19        Q.    Did you ever come to understand that at

20   one point it was inappropriate for dental extractions

21   or oral dental -- oral surgery and then at a

22   particular date it was appropriate for that?

23        A.    I don't remember it ever being appropriate

24   for that.  I'm sure there were dentists out there who
```

1    prescribed, but I --

2         Q.    And if they --

3         A.    -- I wouldn't go to that dentist.

4         Q.    If -- if dentists were prescribing, that

5    would show up in the IMS data, correct?

6         A.    I guess eventually.  I'm not sure.

7         Q.    Oh, and I don't -- I -- I -- I don't mean

8    to -- I understand it may not have shown up early in

9    the data.  Let's say by 2008 or 2010, would --

10        A.    Yeah, if it did, I didn't see it.  I

11   wouldn't be exposed to it, so I don't know.

12        Q.    Yeah, that's a -- that's really not --

13   sorry.  I'm not being very clear.

14             At -- at some point the IMS data became

15   granule enough to identify a physician's office,

16   correct, an actual physician?

17        A.    I believe so, yeah.

18        Q.    And do you understand that it could also

19   identify a -- a dentist?

20        MR. HOFFMAN:  Object to form.

21   BY THE WITNESS:

22        A.    I would imagine it could, yes.

23   BY MS. CONROY:

24        Q.    If -- if they were writing a prescription?

```
1       A.    I imagine it could, yes.

2       Q.    Okay.  While you were a regional manager

3   and OxyContin was one of your products, do you recall

4   sales reps ever calling on dentists?

5       A.    Not that I knew of.  If I knew of it, it

6   would have stopped.

7       Q.    Anything else, dental use, acute use and

8   after surgery, anything else you can think of that it

9   would be inappropriate to use OxyContin?

10      MR. HOFFMAN:  Object to form.

11  BY THE WITNESS:

12      A.    I can't think of anything else other than

13  if a short acting would do the job, there is no reason

14  to use a long acting.

15  BY MS. CONROY:

16      Q.    Now, after October of 2000 you left being

17  a regional manager, and what was your next position?

18      A.    Senior director of national accounts and

19  trade relations.

20      Q.    And can you just explain to me, how did

21  you go from the sales representative part of the

22  company into what really looks like data part of the

23  company?

24      A.    No, that wasn't data.  It was the
```

1    commercial part of the company.  It was under the

2    sales department.

3         Q.    Okay.

4         A.    I had had experience -- I had been there

5    for a long time and I had had experience, very

6    successful experience calling on wholesalers and

7    chains throughout my career prior to that.  So it was

8    something that my then superior Jim Lang thought I

9    would be good at and he had never steered me wrong

10   before and when I got there I threw myself into it so

11   that I knew it and understood it and I think I made a

12   relatively successful switch.

13        Q.    So that was beginning in November of 2000?

14        A.    October officially.  I didn't move up

15   there until November.  Or I was going back and forth

16   between the regional job and national accounts.

17        Q.    And then that was in through -- I know you

18   became executive director, but you basically stayed in

19   that --

20        A.    Same --

21        Q.    -- division?

22        A.    Same division, same job.

23        Q.    Until May of 2014?

24        A.    Yes, May 30, 2014.

1    Q.    And what kind of experience did you have

2  going into the job with wholesalers and chains?

3    A.    I had had some experience as a sales rep

4  and district manager and to some degree as a regional

5  manager calling on those accounts, dealing with those

6  accounts, actually supporting the national accounts

7  groups -- group with a couple of accounts.

8    Q.    And why would you have been calling on

9  wholesalers as a -- when you were in the regional

10 manager position?

11   A.    Because the national accounts group at

12 that time was heavily focused, although they had

13 responsibility for the products going into wholesalers

14 and chains, that they didn't have as much day-to-day

15 responsibilities for prescription products.  So to

16 support them to a -- to some degree we would call on

17 some of those accounts.

18   Q.    And did that change over time that the

19 wholesalers began to have more responsibility for

20 prescription products or to increase their

21 responsibility with respect to prescription products?

22   A.    The department had more responsibility,

23 not the wholesalers.

24   Q.    I see.  The -- the department at Purdue?

```
1       A.    Yes.

2       Q.    So initially the department at Purdue was

3   involved with wholesalers and chains with respect to

4   over-the-counter products?

5       A.    With over-the-counters primarily they had

6   responsibility for the Rx products, but they just

7   didn't spend a lot of time with them.

8       Q.    And was that beginning to change before

9   you became --

10      A.    It was beginning to change some, but it

11  changed dramatically when I took the position.

12      Q.    And -- and why did it change dramatically,

13  apart from you taking it over, but what did -- what

14  did you do to change it?

15      A.    I felt that -- the first thing I did was I

16  upped the education of my team on both business and --

17  and products and marketplace to make them more of

18  business and marketplace experts so that they could be

19  a greater resource for their accounts.  I got them

20  engaged with the products from product knowledge-wise

21  even though they didn't have to spend as much time,

22  they didn't call on healthcare professionals, because

23  I felt that it was important that they knew it better

24  than they did, and I upped their level of engagement.
```

1      Q.     Would it be fair to say that you had

2  your -- your people undergo some of the same types of

3  training about the products that the sales

4  representatives would have?

5      A.     Yes.

6      Q.     And how did you do that?  Did they take

7  the sales training modules?

8      A.     Yes, they did.

9      Q.     And who was it that you had do that on

10  your team?  What -- what -- how many were on your team

11  when you -- when you went in as the senior director of

12  national accounts?

13      A.     There were four national account reps.

14      Q.     And those national account reps had not

15  had that training previously?

16      A.     They had some of it.  They just didn't

17  have it to the frequency and depth they did

18  afterwards.

19      Q.     Okay.  And did you have those four

20  national account representatives undergo the sales

21  representative training with respect to the products

22  that they would be responsible for?

23      A.     They went to similar training, not

24  necessarily the exact training, but similar training.

1    Q.    And how did you do that?

2    A.    Either by formal training through the

3    training department or online training modules or

4    training we would do at meetings.

5    Q.    Did they have to take any quizzes or

6    become certified?

7    A.    Yeah, they had to take quizzes.

8    Q.    And did you -- did you grade them?

9    A.    No.

10    Q.    Did you know what they got on them?

11    A.    Yes.

12    Q.    Did everybody do okay?

13    A.    Yeah, some better than others as in any

14    group, but they did -- they did fine.

15    Q.    And MS Contin and OxyContin, both

16    continual release as well as immediate release were

17    part of that training?

18    MR. HOFFMAN:  Object to form.

19    BY THE WITNESS:

20    A.    Any product that Purdue was distributing

21    was part of the training, and if there was a new

22    product, when Butrans came out or whatever product

23    came out, Intermezzo, they were trained on it.

24    BY MS. CONROY:

```
1        Q.    Okay.  And you believe that prepared them

2   to have better interaction with their customers who

3   were the wholesalers?

4        A.    Yes, I did.

5        Q.    And did you have any metrics on that?

6   Could you -- could you tell whether it work -- whether

7   your idea worked?

8        A.    Certainly by observation of the frequency

9   and the levels of the organizations they dealt with,

10  it looked to have impact.

11       Q.    And it -- it looked to have impact because

12  they sold a lot more product to the wholesalers,

13  correct?

14       A.    No, they weren't -- it wasn't about

15  selling more product, it was to be -- have a better

16  understanding of why the wholesaler carried what

17  inventory they -- they carried and how they

18  distributed it.  And particularly as it related to the

19  issues related to the safe, secure distribution of the

20  product, it enabled them to get into different and

21  higher levels of the organization to the point where

22  they were a useful resource to the people in the

23  supply chain and customer service.  They did things

24  that -- it was great exposure for them also.  They
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    didn't just go to an office.  They went to -- into
 2    vaults and saw how the product was stored and how it
 3    was received.
 4         Q.    Having them do that didn't decrease sales
 5    for Purdue, did it?
 6         MR. HOFFMAN:  Object to form.
 7    BY THE WITNESS:
 8         A.    No.
 9    BY MS. CONROY:
10         Q.    And was management supportive of this?
11         A.    Yeah, yes, they were.
12         Q.    And how did they -- how did management
13    learn about that?  Did you -- were you reporting to
14    somebody at that time?
15         A.    Yeah.  Jim Lang, Russ Gasdia, Mark
16    Alphonso at various times.
17         Q.    And were they supportive of you increasing
18    the training of -- of your national account
19    representatives and having them out in the field?
20         A.    Yes.
21         Q.    And at this time are you also taking a
22    look at what data is available to you?
23         A.    I looked at -- my responsibility at that
24    time when I first came in was a commercial
```

1    responsibility.  So sales numbers, inventory numbers,

2    inventory levels, returns, out-of-date goods, that --

3    those type of things.  So the data I looked at related

4    to the business.

5         Q.    Had you had any familiarity with inventory

6    numbers and levels as a regional manager?

7         A.    Not much.

8         Q.    So this was new for you?

9         A.    Yeah, to a great degree it was new.

10        Q.    And how did you acquaint yourself with

11   what was available and what you would need in order

12   to -- in order to know what the inventory numbers were

13   and to understand what the returns were, how did --

14   how did you familiarize yourself with that?

15        A.    I did something that my predecessor failed

16   to do and that was to reach out to every department

17   that my folks touched and that touched my department.

18   And I spent time with -- with logistics and customer

19   service and finance and medical and regulatory and

20   anybody who touched the product and to help it get out

21   into the marketplace.

22             And the other thing I did was pack my bag

23   and go out and see my customers, because the best way

24   to find out what a customer needs and who they are is

1    to look them in the eye.

2         Q.    Okay.  Let's start first with reaching out

3    to the departments at Purdue.

4               And you mentioned that you went to

5    logistics.  That's at Purdue?

6         A.    Yes.

7         Q.    That's an internal department?

8         A.    Yes.

9         Q.    And what could logistics tell you?

10        A.    Logistics, we talked about how the product

11   was shipped, how inventory levels were developed, what

12   quotas looked like, what issues may be affected by

13   quota.  Certainly as we got towards the end of the

14   year, which helped me manage inventory, how we could

15   interface with logistics and help them be more

16   efficient in shipping the product so that it was more

17   efficiently and securely received, how to help avoid

18   anything from damages to returns.  So that was big

19   with logistics.

20        Q.    Did logistics have a -- data or a

21   database?

22        A.    I'm sure they did.

23        Q.    Is that something that you were interested

24   in to -- or were you -- or did you already have that

```
 1    data at national accounts?

 2         A.    I had, yeah, pretty much the data I

 3    needed.

 4         Q.    So you didn't need to build your data, you

 5    just needed to understand what was behind the data

 6    that you already had access to?

 7         A.    Yes.

 8         Q.    And one way you did that was by -- by

 9    going and learning about all of the items you just

10    told me about --

11         A.    Yes, correct.

12         Q.    -- with the logistics department?

13         A.    Um-hum.

14         Q.    Okay.  You mentioned customer service.

15               What did you want to talk to them about?

16         A.    I wanted customer service to realize that

17    national accounts wasn't their enemy and that they

18    actually could talk to us and talk to my people and

19    they could do so in a normal tone of voice.  So that

20    was step one.  And then how they could more

21    efficiently service our customers and how we could

22    help them do so.

23         Q.    Who was -- give me the dynamic, who is

24    usually angry on this --
```

1      A.    I didn't -- I -- well, to be honest with

2   you, I couldn't understand why anybody was angry with

3   anybody.  It was -- it was literally open warfare.

4      Q.    Okay.

5      A.    Which I couldn't understand from the

6   minute I walked in.

7      Q.    And what was -- what were they fighting

8   about?

9      A.    Customer service didn't want national

10  accounts to tell them what to do and customer

11  service -- and national accounts didn't want customer

12  service to tell them what to do, and they were

13  communicating mostly in writing because they couldn't

14  be in the same room.

15     Q.    Were they in the same physical building?

16     A.    Yes.

17     Q.    And what was customer service responsible

18  for?

19     A.    They were responsible for getting orders

20  and making sure they get out and dealing with customer

21  issues, dealing with returns to a -- a great degree.

22     Q.    And were they dealing with -- was customer

23  service dealing with opioids at that point?

24     A.    They were dealing with all products.

```
1       Q.    Okay.  And so customer service would

2    receive an order for OxyContin from a particular

3    wholesaler, is that a possibility?

4       A.    Yes.

5       Q.    And you were trying to communicate with --

6    your national account representatives wanted to be --

7    you wanted them to be able to communicate with

8    customer service so they would understand if there

9    were issues with either the orders or the returns or

10   any other kind of issues that might come up?

11      A.    Yeah, up until about 2010, 2009,

12   because in an electronic ordering world, Class 2s were

13   paper driven on NCR paper, probably the only place

14   left in the country that still used the NCR paper.

15   And since it was all -- everything traveled by mail,

16   efficiency in getting it done could mean out of stock

17   or in stock, so working together we facilitated making

18   that a more smooth running operation.

19      Q.    Okay.  And -- and you -- that was

20   something that you facilitated?

21      A.    I -- I had a good partner in the director

22   of customer service.

23      Q.    And who was that?

24      A.    Laura Watson.
```

```
 1          Q.     I'm sorry?

 2          A.     Laura Watson.

 3          Q.     Oh, when we saw her name, she was one of

 4   the names that you mentioned in your list that you

 5   showed me this morning, correct?

 6          A.     Right.

 7          Q.     And who headed up logistics, if you

 8   recall?

 9          A.     Jeff Zerillo, Z-e-r-i-l-l-o.

10          Q.     When you were talking earlier, and we'll

11   get into this in more detail, but when you were

12   talking earlier today about red flags or alerts with

13   respect to particular shipments of opioids or whether

14   a shipment was larger than the -- than the month or

15   six months prior to that, would that data be flagged

16   by customer service or --

17          A.     The system would flag it.

18          Q.     And whose -- whose system was it?

19          A.     It was the -- you mentioned ValueCentric

20   early on.

21          Q.     Um-hum.

22          A.     It was the data feed that we were getting

23   from them that was put through our order system.

24          Q.     And would that be available to both
```

1   customer service as well as national accounts?

2        A.    Yes.

3        Q.    And so you would -- you would both see

4   that?

5        A.    Yes.

6        Q.    Would logistics see it?

7        A.    No.

8        Q.    Any other departments see it?

9        A.    No.   Just customer service and myself and

10  national accounts.

11       Q.    When you say you saw it, you mean national

12  accounts?

13       A.    Yes.

14       Q.    You mentioned finance.   Why did you want

15  to communicate more with finance?

16       A.    Because finance, of -- of course, not only

17  collects the money, but they -- they give accounts

18  limits.   There might be issues as it relates to past

19  due bills.   It was more -- on the finance side more on

20  the OTC business, which was a little bit -- there were

21  more customers on OTC -- on the OTC side and it tended

22  to be, you know, with promotions and you had -- you're

23  dealing with big customers, not just wholesalers, you

24  are dealing with Walmart, Walgreens, so it was real

```
 1   important to be on the same page with that.

 2        Q.    Okay.  And I saw some communications

 3   concerning some of the alerts that would come up on

 4   the suspicious order monitoring reports that dealt

 5   with whether -- dealt with credit issues?

 6        A.    Credit issues.

 7        Q.    With some of the customers?

 8        A.    That's true.

 9        Q.    Would credit be part of finance?

10        A.    Credit would be part of it also, that's --

11        Q.    But --

12        A.    -- a good observation.

13        Q.    But finance wouldn't get those alerts,

14   customer service and national accounts would get the

15   alerts and then you would reach out to who you needed

16   to speak to?

17        A.    That's correct.

18        Q.    You mentioned regulatory.  Why did you

19   need to communicate with regulatory?

20        A.    Well, if there were materials that I

21   needed specifically for the use of my folks, it had

22   previously -- much of it was done with marketing or

23   through marketing.  And it seemed to me that, not that

24   the marketing folks couldn't handle it, but why
```

1  translate what I was trying to say to a third party,

2  so I asked if I could participate, and that was one

3  area.

4          The other thing, unfortunately, I had to

5  get involved with regulatory and know them well and

6  what they were thinking was -- when it came to

7  recalls.

8      Q.   I don't think I understood.  Leaving aside

9  recalls, but I didn't really understand why you would

10  need to communicate with regulatory with respect to --

11  or versus marketing, what -- what did you mean by

12  that?

13      A.   Well, if I -- if I needed a -- a

14  promotional piece that was specific to national

15  accounts or that would pre -- predominantly be used by

16  national accounts, it would require legal, medical and

17  regulatory review, and if I was -- it was just being

18  done through marketing and it would come back to me

19  and I would say, Well, Julie, you should have said

20  this, this and this to them, and I realized after

21  doing that five -- five or six times, I might as well

22  reach out to these folks and say, Let me explain what

23  we are looking for here.

24      Q.   And is that because marketing was

```
 1    primarily set up to be dealing with healthcare

 2    providers and potentially patients?

 3         A.    Right.

 4         Q.    And you were trying to deal with

 5    wholesalers and --

 6         A.    Pharmacies.

 7         Q.    -- chain pharmacies?

 8         A.    Right.

 9         Q.    And so if you wanted to develop particular

10    promotional pieces, it was more efficient for you just

11    to go directly to regulatory because you knew what --

12    who your audience was, that audience was different

13    than marketing, is that correct?

14         A.    Correct, correct.

15         Q.    Or that audience was different than the

16    audience marketing was working with?

17         A.    Correct.  That is correct.

18         Q.    And some of those promotional pieces for

19    the wholesalers and the chain pharmacies would concern

20    opioids, correct?

21         A.    That is correct.

22         Q.    And that would be OxyContin, Butrans and

23    MS Contin?

24         A.    And Intermezzo.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    What was Intermezzo?

 2        A.    It was a sleep aid, Class 4.

 3        Q.    And so you would work on promotional

 4  pieces with regulatory so that your national accounts

 5  representatives could use those in the field?

 6        A.    Yes.

 7        Q.    And did you use them in the field as well?

 8        A.    When I was with them, yes.

 9        Q.    Medical?

10        A.    Same, same issues.

11        Q.    Recalls?

12        A.    No.  As far as promotional pieces, yeah.

13        Q.    Okay.

14        A.    And recalls, recall team was about 17

15  different departments.

16        Q.    Who would you speak to at medical, if you

17  can recall?

18        A.    Particular people I can't remember off the

19  top of my head.  Often it was the -- more often than

20  not it was the pharmacists in the department because

21  they had a better under -- understanding, of course,

22  of pharmacy material and what would work for a

23  pharmacist or be beneficial for a pharmacist.

24        Q.    Why would a promotional piece be useful
```

1  for a pharmacist in -- in your position as national

2  accounts?

3      MR. HOFFMAN:  Object to the form.

4  BY THE WITNESS:

5      A.    A -- in general in the industry, most

6  pieces are written with a physician in mind, which

7  makes sense, and then given to people like national

8  accounts or other departments and say, Use these as

9  you will.

10         A pharmacist doesn't necessarily want to

11  see what a physician wants to see.  So we developed

12  some pieces which were called Pharmacist Guides and

13  would talk about what's used in opioid, for example,

14  is -- not only include indications and the usual stuff

15  you would see in a physician piece, you know, with all

16  of the disclaimers in it, et cetera, but how to safely

17  store it, how to safely dispense it, how to look

18  for -- for bad actors, if you will, all of the things

19  that would be ben -- and what third party cover --

20  covers, because those are the things that a pharmacist

21  is interested in as well as the therapeutic aspect of

22  the product.

23  BY MS. CONROY:

24      Q.    And did you find that providing that type

1    of targeted promotional information -- and by

2    targeted, I mean targeted to a pharmacist as opposed

3    to a physician, increased the number of accounts that

4    you would -- that you would have?

5        A.    No.

6        Q.    What -- did it keep the accounts longer,

7    you hoped?

8        A.    No.  It -- it was the right thing to do

9    and it was better relations with the account.  I don't

10   want you to just dispense my product.  I want you to

11   do it the right way.

12       Q.    And did you find that that was effective?

13       A.    It was embraced.

14       Q.    Anyone -- anyone you can think of other

15   than pharmacists that you -- well, you used the word

16   "targeted," that's what you used before, that you

17   would target for the same reason to kind of enhance

18   your communication from national accounts?

19       A.    No.  We would not only use it at the

20   street level, we would use it at the corporate level

21   also.  Usually it started at the corporate level,

22   because you needed -- generally needed permission to

23   provide material and some accounts would actually put

24   an electronic version on their resource section of

Highly Confidential – Subject to Further Confidentiality Review

```
1    their pharmacies so that the pharmacist could use it.

2         Q.    And that would be something like Walgreens

3    or some -- that had --

4         A.    Walgreens, Walmart, CVS, Kroger, Jewel

5    Osco, et cetera.

6         Q.    And so you would start at the corporate

7    level and then work --

8         A.    Work down.

9         Q.    -- down?

10        A.    With independers, the wholesalers would

11   use that because they felt it was a service they could

12   provide for their customers and our reps would use it

13   with pharmacists as well.

14        Q.    And you mean the sales reps would use it?

15        A.    Yes, the sales reps.  I'm sorry.

16        Q.    And so once -- once these were developed,

17   that would also be available to the sales field

18   representatives to use?

19        A.    Generally, yes.

20        Q.    Anything missing here, logistics, customer

21   service, finance, regulatory and medical?

22        A.    Manufacturing.

23        Q.    Okay.  And why manufacturing?

24        A.    Well, man -- manufacturing and logistics
```

Highly Confidential - Subject to Further Confidentiality Review

1    are very closely tied, so we would work with them on

2    supply issues or anything along those lines.

3         Q.    Manufacturing is where the -- the product

4    was made, correct?

5         A.    Right, North Carolina.

6         Q.    And that's in North Carolina?

7         A.    Um-hum.

8         Q.    I take it you've been there?

9         A.    Yes.

10        Q.    Are there -- how many -- how many plants

11   are there?

12        A.    I think there is two.  There was only one

13   there when I was working there.

14        Q.    Are you familiar with any plant or

15   facility in Rhode Island?

16        A.    I know of Rhodes, but I didn't deal with

17   Rhodes.

18        Q.    Have you ever visited Rhodes?

19        A.    No, I haven't.

20        Q.    Do you know what -- do you know why you

21   didn't deal with them?

22        A.    Because it was a generic company --

23        Q.    That was --

24        A.    -- separate -- separate company.

1    Q.    Okay.

2    A.    I mean, I knew the folks, but...

3    Q.    Did you have anything to do -- did

4  national accounts have anything to do with generics,

5  even if they were licensed to be sold by Purdue?

6    A.    Not under my watch.  There was one

7  co-marketing agreement that I was on that the -- the

8  joint marketing team that I really didn't have a big

9  involvement with it.  Somebody thought it was a good

10  idea.  I was there, but it probably didn't matter.

11    Q.    Okay.

12          Who was your -- do you remember who that

13  co-marketing agreement was with?

14    A.    It was Par, I think.

15    Q.    And were they licensed to sell generic

16  OxyContin, do you know?

17    MR. STANNER:  Object to form.

18  BY THE WITNESS:

19    A.    Any generic --

20    MR. HOFFMAN:  Objection to form.

21  BY THE WITNESS:

22    A.    I was not part of any generic OxyContin

23  deal.  This was a non-OxyContin product.

24  BY MS. CONROY:

Highly Confidential — Subject to Further Confidentiality Review

```
 1          Q.    Do you remember what the product was?

 2          A.    I think it was a dronabinol-type product,

 3    but I'm not sure.

 4          Q.    What's a dronabinol?

 5          A.    It's a -- it's not cannabis.  It is --

 6    what's the active -- a THC product.

 7          Q.    Is it a -- is it an analgesic?

 8          A.    I don't remember what it was for.

 9          Q.    Okay.  Let's just take another look at

10    Exhibit 2, because I think we have sort of filled in

11    what you were -- it says here:

12                "At Purdue, Seid led initiatives in the

13    areas of track and trace and supply chain security."

14                Track and trace is the -- the SKU on the

15    bottle?

16          A.    Yes.

17          Q.    "Supply chain security," we talked about

18    that a bit, we'll probably talk some more about that,

19    things like vault and -- vault and security measures

20    that can be taken?

21          A.    Right.

22          Q.    "Educated retail pharmacy networks and

23    distributors on minimizing drug diversion and opioid

24    abuse, among other safety issues."
```

```
 1              That's what we just talked about, talking

 2    to pharmacists and at the corporate level as well?

 3        A.    Talking to pharmacists at the corporate

 4    level.  I -- part of it, also, and I believe they were

 5    referencing here, is my work with the law enforcement

 6    liaisons to set up programs for pharmacists.

 7        Q.    And what kind of programs were they?

 8        A.    They were --

 9        THE WITNESS:  Somebody is off mute.

10        MS. CONROY:  Yeah.

11              Can -- can someone go on mute, please,

12    whoever is on the phone, can everyone go on mute.

13    BY THE WITNESS:

14        A.    The -- there was a series of programs that

15    the law enforcement liaisons who also engaged with law

16    enforcement would do that they would do for

17    pharmacists, they would talk about -- one that was

18    very popular was how to harden their pharmacy against

19    robbery.  And another one that was popular was looking

20    for what an abuser looks like, that kind of thing.

21    And they were often done at wholesaler meetings and

22    mostly for independents because one of the things that

23    we did was strengthen our relationship with the

24    independent pharmacy group.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. CONROY:

2        Q.    What does an abuser look like?

3        MR. HOFFMAN:  Object to form.

4    BY THE WITNESS:

5        A.    Well, the guys who were all former cops

6    would be the better person to ask than me.

7    BY MS. CONROY:

8        Q.    What do you remember them --

9        A.    Well, they would talk about what a washed

10   prescription looks like, what an alter -- altered

11   prescription pad looked like, how somebody was paying

12   for it, what kind of -- what kind of identification

13   they were presenting, you know, all of those kinds of

14   things that law enforcement would look for.

15       Q.    Where it says "minimizing drug diversion

16   and opioid abuse," is that what you are talking about,

17   that law enforcement piece, are you talking about

18   those two issues?

19       A.    Well, that was among that, but just as the

20   piece I indicated that was for pharmacists about what

21   pharmacists need to know about product X, we would

22   talk about what to look for, we had other brochures

23   that we provided in quantity or electronically for

24   distribution.

1    Q.    And -- and those might be distributed

2  either from I'll call it the corporate level, you'd

3  be -- they'd be given to Walgreens and then Walgreens

4  could send them wherever they wanted or you might go

5  to a particular independent pharmacy and --

6    A.    Give it to them.

7    Q.    -- give them.  Okay.

8         It says:  "Among other awards," you were

9  "twice recognized with the AmerisourceBergen's

10  Manufacturer Award."

11        Do you remember receiving that twice?

12    A.    Yes, um-hum.

13    Q.    What is the -- by manufacturer, are they

14  just talking about manufacturer like Purdue as opposed

15  to a distributor or a wholesaler?

16    A.    No.  They are talking about manufacturer

17  as opposed to another manufacturer.

18    Q.    Okay.  And do you -- what was -- was the

19  criteria for the award, if you know?

20    A.    They had significant internal things that

21  they would look at.  Mostly it was policies,

22  procedures, relationships, shipping efficiency, return

23  handling, dozens of things.

24    Q.    "Finalist for H.D. Smith's Trading Partner

1    of the Year (2007 and 2014)."

2              H.D. Smith is a wholesaler?

3    A.    Yes.  They were.

4    Q.    And what does trading partner -- do you --

5    do you have any idea what the criteria was for Trading

6    Partner of the Year?

7    A.    Same as AmerisourceBergen.  Almost every

8    wholesaler had some kind of an award like that.

9    Q.    "And Contract Partner of the Year."  Was

10   that Contract Partner of the Year for H.D. Smith?

11   A.    Yes.

12   Q.    And that was in 2008?

13   A.    Yes.

14   Q.    And you won these personally, it wasn't a

15   Purdue Pharma, these were --

16   A.    This -- this award they are mentioning

17   here is personally.  The rest of that was a team

18   effort.

19   Q.    Okay.  "Seid also was honored with the

20   Supplier Quality Award from Cardinal Health for seven

21   years (from 2007 to 2014)."

22              Who -- who is the supplier in that award?

23   A.    We are.  Purdue is.

24   Q.    Okay.  And do you know the criteria for

1    Cardinal Health's determination?

2        A.    Again, they had a whole gamut of different

3    areas that they give you points -- literally gave you

4    points for, kind of a quarterly report card.

5        Q.    What kind of awards did you get, what did

6    they look like?

7        A.    They looked like nice cut glass things

8    that were etched.

9        Q.    Some things to put in your office?

10       A.    Well, most of them stayed at Purdue.

11       Q.    Okay.  Does Purdue have a trophy case?

12       A.    I guess.  I don't know.  I left a whole

13   bunch in my office when I left.

14       MR. HOFFMAN:  It's full, it's full of those

15   kinds of stuff.

16   BY THE WITNESS:

17       A.    I just took the two personal ones home.

18   BY MS. CONROY:

19       Q.    Okay.  And it says you were "an active

20   participant in HDMA" and you "served on the REMS

21   Advisory Committee."

22            What's REMS?

23       A.    It is risk management.  There is a -- a

24   class risk management for Class 2s and rather than

1    have 17 or 18 different risk management programs for

2    the class, it was the objective of the FDA,

3    manufacturing and HDMA to have one that everybody

4    could live with, and I helped facilitate that as a

5    member of the committee.

6                There were other folks from Purdue who I

7    don't remember off the top of my head, but -- who

8    probably did much more work in that.  They probably

9    deserve the recognition more than I did, really.

10        Q.    Did you -- did you serve on any REM

11   committee at Purdue, or have any involvement in the

12   creation of the REMs?

13        A.    Not really.  No, not really at Purdue.

14   There were people -- some of the same people involved

15   at -- on -- working on this committee were doing the

16   same thing at Purdue, like David Haddox.

17        Q.    Did you work with Dr. Moskovitz from

18   Janssen, do you recall that name?

19        A.    No, I don't.

20                (WHEREUPON, a certain document was

21                 marked Purdue-Seid Deposition Exhibit

22                 No. 004, for identification, as of

23                 12/12/2018.)

24   BY MS. CONROY:

1       Q.    I'll show you what I have marked as

2    Exhibit 4.

3       A.    Thank you.

4       Q.    And Exhibit 4 is PKY181715440 through 443.

5    This is a National Accounts Memorandum.  You are not

6    on this.  It was sent to Mr. Lang from Mr. Green and

7    it is dated May 21st of 1997.

8             This is prior to you joining national

9    accounts, correct?

10      A.    Correct.

11      Q.    And what I'd like to -- to show to you is,

12   if you turn the page to the -- to the last page of the

13   document, and under Strategic Direction, do you see

14   that?

15      A.    Yes, I see it.

16      Q.    It says:  "Over 80 percent of the current

17   drug wholesaler market is controlled by four players.

18   McKesson, Bergen, Cardinal, and AmeriSource."

19            Do you see that?

20      A.    Yes.

21      Q.    During your tenure, that 80 -- well,

22   AmeriSource and Bergen joined, correct?

23      A.    Correct.

24      Q.    And would you agree with me that during

1    your tenure in national accounts that 80 percent grew,

2    became higher?

3         A.    Yes, yeah.

4         Q.    And I think we'll look at some documents,

5    but it -- it was over 90 percent --

6         A.    Yeah.

7         Q.    -- correct?

8         A.    It was well into the 90s, yes.

9         Q.    It says:  "It is my suggestion that we

10   should participate in programs that are relevant to

11   these four customers."

12              Do you see that?

13        A.    Yes.

14        Q.    And you agreed with that and you carried

15   that out when you became the senior director, correct,

16   and then the executive director?

17        A.    I -- this is the first time I've seen this

18   document, but, yeah, yes, I did do that.

19        Q.    Then if you --

20        A.    Well, I -- I shouldn't -- well, let me

21   rephrase, reframe that.

22              I don't know what he means here by

23   "programs," so I can't say I did that.

24        Q.    Okay.  That's -- that's fair.

1          We skip a sentence, it says:  "Our

2    wholesaler trading partners are moving away from

3    simply performing a distribution function.  More and

4    more they are becoming information vendors.  They have

5    captured information in terms of compliance,

6    substitution, and patient demographics, that they wish

7    to sell to us."

8          Do you see that?

9      A.    Yes.

10     Q.    And that's -- that's correct, right?

11     MR. STANNER:  Objection; form and foundation.

12     MR. HOFFMAN:  Same.

13          (Reporter clarification.)

14     MS. CONROY:  I don't know that it matters,

15   but...

16     MS. PORTER:  She just wants to write down who it

17   is.

18     MS. CONROY:  No, I know.  Do you care -- do

19   you --

20     MR. STANNER:  It is Stanner from McKesson.

21   BY MS. CONROY:

22     Q.    You can answer.

23     A.    I don't know what Jim was looking for

24   here.  It's kind of a broad sentence.  There is

Highly Confidential - Subject to Further Confidentiality Review

1    information, but other than -- and he is right that

2    the large wholesalers have other aspects of their

3    business which mines data or provides data, but I

4    can't say I know exactly what -- I can't say I know

5    exactly what he was looking for here.

6        Q.    Let me ask you this --

7        A.    It seems -- seems very general to me.  I

8    would assume there was some discussion related to this

9    that gave this some -- some depth, but not with me.

10       Q.    Okay.  That's true.

11             Would you agree that when you went into

12   national accounts, would you agree that Purdue's

13   wholesale trading partners captured information that

14   dealt with compliance?

15       A.    Compliance in the sense of -- comp --

16   comp -- compliance can mean patient compliance as well

17   as compliance as far as regulatory compliance.  So I

18   don't know which of these he was talking about.

19       Q.    What was your experience, did they capture

20   information with respect to patient compliance when

21   you were head of national accounts?

22       A.    If they did, I didn't seek to buy it.

23       Q.    Okay.  Do you know if they did?

24       A.    I -- it's nothing I explored.

1    Q.    Okay.  What about patient demographics

2   generally, did you buy that?

3    A.    Not from them.  I mean, the company did,

4   but I had nothing to do with that.

5    Q.    Purdue purchased patient demographics but

6   you did not purchase patient demographics as a

7   component of national accounts from wholesalers?

8    A.    I don't know -- I don't know if Purdue

9   purchased patient demographic information from

10  wholesalers.

11   Q.    Oh, I'm sorry.  I misunderstood what you

12  said.

13   A.    I know I certainly didn't, but I don't

14  know if Purdue did in general.

15   Q.    Do you know if the vendor chargeback

16  policy of recouping the 2 percent, do you see that's

17  in the next sentence there, was in effect when you

18  came into national accounts?

19   A.    No, I don't know.  I don't know what he

20  was after here.

21   Q.    Does that ring any -- does it ring any

22  bells with you?

23   A.    Well, this issue with vendor chargeback,

24  they were basically held by -- handled by other

1    departments than national accounts.

2         Q.    Okay.  You can put that document away.

3                   (WHEREUPON, a certain document was

4                    marked Purdue-Seid Deposition Exhibit

5                    No. 005, for identification, as of

6                    12/12/2018.)

7    BY MS. CONROY:

8         Q.    I'll show you what I have marked as

9    Exhibit 5.

10        A.    Thank you.

11        Q.    Which is produced natively

12   PPLPC008000018733, and this document is "Living Our

13   Vision," and your name is here, "Steve Seid, Senior

14   Director Trade Relations and National Accounts."

15             Do you see that?

16        A.    Yes.

17        Q.    And do you know what this would have been?

18        A.    We're in training class presentation.

19        Q.    Okay.  And who would a training class

20   presentation be given to?

21        A.    It would be given to -- I think this was

22   for new hires.  So the objective was to get the -- as

23   part of the reps' training to give them exposure to

24   other departments in the -- in the company.

```
 1        Q.    Okay.  And would you give this

 2   presentation yourself?

 3        A.    I would do it myself.

 4        Q.    I believe the date of this, although it's

 5   not easy to find it, and we may see it in here, is

 6   2001.

 7              Is that --

 8        A.    It probably -- it looks very early.

 9        Q.    Okay.  And this training would assist in

10   just what you say here:  "What do we do in national

11   accounts?  We call on national accounts, really big

12   accounts."

13              Do you see that?

14        A.    Um-hum.

15        Q.    And:  "Serviced by four national account

16   managers."

17              That's not their picture though, right?

18        A.    That was based on my New Jersey roots.

19        Q.    You -- you had the -- who were the four

20   national account managers at this time, do you

21   remember?

22              You know, they may have their -- let me --

23   I don't mean to give you a memory quiz -- question.

24   They may actually -- you may list their names -- you
```

1    do list their names.  We'll keep going along.

2            And you have the learning objectives.  You

3    are going to explain what national accounts and trade

4    relations does, correct?

5        A.    Um-hum, um-hum.

6        Q.    "How we work with you to try to drive

7    sales"?

8        A.    Um-hum.

9        Q.    An "industry overview," do you see that?

10       A.    Um-hum.

11       Q.    Would that be an industry overview of the

12   wholesaler business, the --

13       A.    Right.  How it --

14       Q.    The pharmacy business?

15       A.    Right, how it -- how a product gets from

16   Point A to Point B.

17       Q.    Okay.  "Synergy on value-added programs."

18            Do you remember what that is?

19       A.    Things like doing educational programs for

20   pharmacies.

21       Q.    "Working retail," what does that mean?

22       A.    Working the retail pharmacy.

23       Q.    And then you list the responsibilities,

24   which is the:  "Distribution of all of the current

1    products"?

2         A.    Um-hum.

3         Q.    "New product distribution and promotion of

4    all of our products."

5               Do you see that?

6         A.    Um-hum.

7         Q.    And then:  "Trade relations, building

8    bridges with our major customers."

9               What did -- do you recall what you meant

10   by that?

11        A.    We talked about some before is that it was

12   the prime objective to improve the relationship with

13   all of our major customers so that -- that we could

14   work more effectively together and that that needed

15   work.

16        Q.    Okay.  If you skip a few pages and you'll

17   come to an organizational chart.

18        A.    Um-hum.

19        Q.    And you're here?

20        A.    Um-hum.  Yes.

21        Q.    Cheryl Reuss, that's who you would go to,

22   for example, we spoke this morning, to get a --

23        A.    Yes.

24        Q.    -- a standard operating protocol or

1    whatever?

2         A.    Right.  Her title actually was senior

3    coordinator, I believe.

4         Q.    Okay.  And then you had Maria Gallagher

5    was an analyst and Donna Primarano was a senior

6    analyst?

7         A.    That's correct.

8         Q.    What did they analyze?

9         A.    Both of them pretty much analyzed -- or

10   worked on material related to -- to the OTC products.

11        Q.    Okay.

12        A.    Ad claims, things like that.

13        Q.    And then here are the four national

14   account representatives?

15        A.    Right.

16        Q.    And NAM, is that national account manager?

17        A.    Manager, correct.

18        Q.    And they were assigned -- they had

19   assigned, would you call these customers?

20        A.    Customers, yes.

21        Q.    Okay.  And -- okay.

22              Keep going on the slides to the one where

23   you see the MS Contin bottle.

24        A.    Um-hum.

1      Q.    And you say:  "National Accounts.

2   Providing support and generating demand for Rx

3   products."

4            And then it says:  "MS Contin 7 percent

5   promotion January 15 to February 16 of 2001,

6   339,820 units, $79,391,912," and the original forecast

7   for 2001 is below at $57,515 -- I'm sorry --

8   57 million from 79 million.

9            What is the meaning of this slide, what

10  were you -- what were you teaching the sales force and

11  others?

12     A.    I was showing them that there was a

13  promotion, MS Contin was highly genericized at that

14  point, so at our full cost it was not -- not

15  beneficial for many of the retailers to dispense that

16  product, so we gave them a discount for 30 days to try

17  to displace some of the generic product.

18     Q.    And I take it that was successful?

19     A.    It was successful.

20     Q.    Because you -- you sold 20 million more?

21     A.    Than forecast.

22     Q.    You -- than forecasted.

23     A.    It was a declining product at that time.

24     Q.    And was the -- was the idea of this

1    promotion with the discount, did that originate with

2    national accounts?

3         A.    Yes, it did.

4         Q.    Then if you turn the page, you talk about

5    a 10 percent Uniphyl rebate.

6              Is that something similar, that was a way

7    of generating more business in a product using either

8    a rebate or at least for the MS Contin some sort of a

9    discount?

10        A.    Yes.

11        Q.    And that would be to your customers who

12   were either the wholesalers or the --

13        A.    The Uniphyl --

14        Q.    -- pharmacy, the retail -- independent

15   pharmacies?

16        A.    The Uniphyl re -- rebate was to the -- to

17   the -- to the retailer.

18        Q.    To the retail pharmacies?

19        A.    Yes.  They had to mail in proof of

20   purchase and -- to get the rebate.

21        Q.    And so the pharmacy itself would mail --

22   this wasn't a patient that would mail in the rebate,

23   this was the --

24        A.    Pharmacy that would mail in --

1      Q.     -- pharmacy that would mail in the rebate?

2      A.     Um-hum.

3      Q.     And the MS Contin discount, was that --

4      A.     Through the wholesaler.

5      Q.     Through the wholesaler, so that the -- the

6   purchase of the product, there would be a 10 percent

7   discount on the -- whatever the --

8      A.     Seven percent.

9      Q.     I'm sorry.  Seven percent discount on

10  whatever the -- it's not bulk, but on the -- on the

11  entire --

12     A.     Right.

13     Q.     -- inventory?

14     A.     For a period of time.

15     Q.     Then if you go almost to the end of this

16  slide show, you'll see something with CVS Pharmacy --

17  a letter with CVS Pharmacy on the top.

18          And this is a letter on -- from June --

19  oh, here is the -- well, this helps us a little bit

20  more with the date.

21          "CVS/pharmacy" and "Partners Against

22  Pain," do you see that?

23     A.     Um-hum.

24     Q.     And Purdue's logo is down at the bottom of

Highly Confidential - Subject to Further Confidentiality Review

```
 1   the letter.

 2              Do you see that?

 3      A.     Yes.  Yes.

 4      Q.     And this is a letter that went to CVS

 5   pharmacists.  Do you see that?

 6      A.     Yes.

 7      Q.     So would this have been something that

 8   would have gone out from corporate in CVS and would

 9   have been approved to go to all of the CVS

10   pharmacists?

11      A.     That is correct.

12      Q.     Okay.  And then it says:

13              "CVS is proud to participate in Partners

14   Against Pain, a therapeutic alliance of pharmacists,

15   physicians, nurses and pain experts sponsored by

16   Purdue Pharma."

17              Do you see that?

18      A.     Yes.

19      Q.     And that would -- and if you go a little

20   bit further down, it says:

21              "Along with hundreds of educational

22   programs and brochures, Partners Against Pain sponsors

23   the award-winning website www.partnersagainstpain.com,

24   which provides pain information, assessment tools
```

1    and" -- "assessment tools and support, 24 hours a day.

2    We hope you and your customers will visit this site

3    and that the enclosed brochure will help you in your

4    efforts to serve your customers and protect your

5    pharmacy from drug diversion."

6              Do you see that?

7         A.   Um-hum.

8         Q.   Would this --

9         A.   Yes, I do.

10        Q.   Would this have been something that you

11   would have helped to put together with CVS?

12        A.   Yes.

13        Q.   And how would -- how would this assist you

14   with the individual pharmacists, what would it -- what

15   would it do for you at national accounts?

16        MR. HOFFMAN:  Object to the form.

17   BY THE WITNESS:

18        A.   What it would do for us at national

19   accounts.  First of all, as I remember, the letter was

20   prepared -- they agreed to do this, but the letter was

21   prepared by them.  It got reviewed, but it was their

22   letter since it was on their letterhead.

23              And the objective, as mentioned

24   previously, was the initial focus was on the brochure,

Highly Confidential - Subject to Further Confidentiality Review

1    how to stop drug diversion and protect your pharmacy,

2    which was a brochure as to, again, what to look for

3    and a prop -- an appropriate script, things to do

4    to -- to harden the pharmacy against theft.

5              So the goal was to build a better

6    relationship with CVS, No. 1, and No. 2, and probably

7    more importantly, was to get information out to some

8    seven or 8,000 pharmacies and another --

9    pharmacists -- no, it was probably more than that.  It

10   was probably about 12,000 pharmacists and about 18,000

11   pharmacy techs.

12   BY MS. CONROY:

13        Q.    And that would be information about drug

14   diversion, how to stop drug diversion and protect your

15   pharmacy?

16        A.    Right.

17        Q.    Which is listed here.  And also at the

18   last sentence here:  "Provide the right patients with

19   the right pain medication at the right dosage under

20   the right supervision."

21              Do you see that?

22        A.    Um-hum.

23        Q.    And so --

24        A.    I do.

1    Q.    -- those would be two of the -- at least

2  two of the objectives?

3    A.    Right.

4    Q.    And also to identify for them the website

5  where they could get additional information?

6    A.    As a resource.

7    Q.    Okay.  And that would have included what

8  we looked at, Exhibit 3 or 4, which is the pamphlet

9  Partners Against Pain, correct?

10    A.    Yes.

11    Q.    And then if you --

12    MR. HOFFMAN:  I'm sorry.  Late objection to form

13  and to timeframe as this is 2001 and the brochure is

14  1997.

15  BY MS. CONROY:

16    Q.    You don't know whether -- what was on the

17  website or what came off the website in any particular

18  time, do you?

19    A.    No.

20    Q.    Because that -- you weren't overseeing the

21  website, correct?

22    A.    No, I was not.

23    Q.    But you did tell your customers that the

24  website was available for them, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Correct.

 2        Q.    And then if you turn the page, there is

 3   something similar.  I didn't go by it word for word,

 4   but it looks like it is almost the identical letter

 5   from June of 2001 that went out to the Walgreen -- the

 6   Walgreens' pharmacists.

 7        A.    Yes.

 8        Q.    Do you see that?

 9        A.    Yes.

10        Q.    You had an estimate for the CVS

11   pharmacists, what do you think, about 12,000?

12        A.    About the same probably.

13        Q.    About the same for Walgreens?

14        A.    I might be underestimating, but it sounds

15   right.

16        Q.    Okay.

17        A.    A lot of pharmacists.

18        Q.    You can put that one away.

19        A.    You don't want me to go over the Senokot

20   promotions here?

21        Q.    No.  I want to hear about the ear wax.

22        MR. HOFFMAN:  If you are moving on to something

23   else, is it okay if we take a brief break?

24        MS. CONROY:  Oh, yeah.  Sure.
```

```
 1        THE VIDEOGRAPHER:  We are off the record at

 2   4:12 p.m.

 3                    (WHEREUPON, a recess was had

 4                     from 4:12 to 4:25 p.m.)

 5        THE VIDEOGRAPHER:  We are back on the record at

 6   4:25 p.m.

 7                    (WHEREUPON, a certain document was

 8                     marked Purdue-Seid Deposition Exhibit

 9                     No. 006, for identification, as of

10                     12/12/2018.)

11   BY MS. CONROY:

12        Q.    Mr. Seid, I'm going to pass to you

13   Exhibit 6.  We don't have as many copies of this

14   document, but we are not going to go into it as much,

15   except for one page.  It is PPLPC004000092270.

16              And, Mr. Seid, this is -- this -- the

17   cover letter shows that this is dated at the end of

18   2006, December 13th, 2006, and it's a Phase 1

19   presentation slide from you to Janet Koch.

20              Do you see that?

21        A.    Yes.

22        Q.    And then it looks like the name of it is

23   "New Hire 2006."

24              Do you see that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Is this a similar -- if you take a look at

 3   the first page --

 4        A.    Yes.

 5        Q.    -- is this also a training slide deck?

 6        A.    Yes.

 7        Q.    And this is something that you would have

 8   presented?

 9        A.    Yes.  It's a Phase 1.

10        Q.    Okay.

11              And what does -- what does Phase 1 mean?

12        A.    New hires.

13        Q.    Okay.

14              One of the pages in this slide deck looks

15   like this, if you could find that one.

16        MS. PORTER:  Beginning, middle, end?

17        MS. CONROY:  Let me see if I can --

18   BY THE WITNESS:

19        A.    I should have numbered my pages.

20   BY MS. CONROY:

21        Q.    It is not near the end.  It is closer to

22   the beginning.  Yeah, it's -- it's after the DEA form.

23   You found it.

24              Did you create this chart?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Okay.  And it was -- it was helpful to me,

 3   so I wanted to make sure that I understood what's

 4   happening here.  Okay.

 5              This is Purdue right here in the light

 6   blue?

 7        A.    That's Purdue corporate, yes.

 8        Q.    Purdue corporate, okay.

 9              And that's where you are located, is that

10   correct?

11        A.    Correct.

12        Q.    And over on the left-hand side is

13   Walgreens and on the right-hand side is RiteAid?

14        A.    Yes.

15        Q.    And are those -- is that RiteAid corporate

16   and Walgreens corporate or are those drugstores?

17        A.    The two on top would be RiteAid corporate.

18   I mean the corporate RiteAid and Walgreens corporate.

19        Q.    Okay.  And then if you look down where it

20   says "Purdue Pharmaceuticals," what is that intended

21   to represent?

22        A.    North Carolina.

23        Q.    The manufacturing plant?

24        A.    Yes.
```

```
 1        Q.    Let's see if I can get rid of this glare.

 2              That's where the -- the OxyContin is made?

 3        A.    Yes.

 4        Q.    And the But -- Butrans?

 5        A.    I don't -- I don't believe Butrans was

 6    made there.

 7        Q.    Where do you think Butrans was made?

 8        A.    I'm not really sure.

 9        Q.    Was it made by Purdue Pharmaceuticals?

10        A.    I'm not sure where that was made.  It was

11    originally made in Germany.

12        Q.    Who was it made by?

13        A.    I -- I don't remember.

14        Q.    Was it Mundipharma?

15        A.    I'm not sure.

16        Q.    Does -- is that familiar to you,

17    Mundipharma?

18        A.    Yes.

19        Q.    Okay.  But you don't know whether Butrans

20    was manufactured by Mundipharma?

21        A.    I don't remember.

22        Q.    Was it manufactured, do you recall, by

23    some entity unrelated to Purdue Pharma or Mundipharma?

24        A.    I really -- it wasn't -- I don't believe
```

Highly Confidential - Subject to Further Confidentiality Review

1    it was manufactured in North Carolina.

2         Q.    Okay.  Did you have some responsibility at

3    national accounts for the distribution of Butrans?

4         A.    Yes, I did.

5         Q.    And where did you get the supply from, do

6    you know, or did you ever know?

7         A.    I think the supply came out of North

8    Carolina, but I don't think they made it there.

9         Q.    I see.

10             So -- so it -- if you were looking at what

11   sort of inventory you had within Purdue for Butrans,

12   that would have been a North Carolina question, you

13   are just not sure where they actually made the pills?

14        A.    That's correct.

15        Q.    Was MS Contin manufactured at Purdue

16   Pharmaceuticals?

17        A.    I believe so.

18        Q.    And how about Intermezzo?

19        A.    I'm not sure about Intermezzo.

20        Q.    Now, I see, for example, on the left-hand

21   side from Walgreens corporate there is a CII order

22   that comes into Purdue corporate.

23             Do you see that?

24        A.    Yes.

 1      Q.    Now, is that -- is that Walgreens ordering

 2   as a wholesaler, for example, OxyContin from Purdue?

 3      A.    That would be in the event Walgreens

 4   ordered directly from Purdue.

 5      Q.    And does -- and -- and did they on

 6   occasion?

 7      A.    2006, yeah, it was still on occasion that

 8   they would.

 9      Q.    And that's what this chart is representing

10   to the -- to whoever you are training, the sales

11   force, that there are instances where Walgreens

12   corporate is directly ordering a -- a CII product from

13   Purdue corporate, correct?

14      A.    Yes.

15      Q.    And if you go by the green arrows, when

16   that order comes into Purdue corporate, then that is

17   transmitted, that order request is transmitted to

18   Purdue Pharmaceuticals, correct?

19      A.    Yes.

20      Q.    And who does -- what department does that

21   in Purdue corporate?

22      A.    Customer service.

23      Q.    And so customer service tells the

24   manufacturing arm, this is what we -- this is what the

```
1    order looks like, this is what we need to fill?

2         A.    Yes.

3         Q.    And then if you follow the green arrow, it

4    goes over to the left here where it says "Walgreens

5    DC".

6               Do you see that?

7         A.    Yes.

8         Q.    And what does DC stand for?

9         A.    Distribution center.

10        Q.    Okay.  And that means that the order is

11   placed in corporate, it's transmitted to

12   manufacturing, manufacturing makes the product or the

13   pills, and then those are shipped to the distribution

14   center for Walgreens?

15        A.    Yes.

16        Q.    Okay.  And does it matter that it is

17   Walgreens?  Is that sort of the process that would

18   take place with respect to a CII order coming directly

19   into Purdue corporate?

20        A.    This -- what that would demonstrate is

21   that if there was a chain that had a warehouse with a

22   vault that they could order that way.

23        Q.    And the warehouse with the vault would be

24   the distribution center?
```

```
1      A.    Yes.

2      Q.    And so in order to -- to put an order

3   directly into Purdue corporate, there had to be some

4   showing that there was a distribution center with a

5   vault?

6      A.    Correct.

7      Q.    And is that something you would audit, you

8   would know at national accounts?

9      A.    Yes.

10      Q.    And would customer service know that as

11   well in order to take the order or would you know

12   about the order when it came in as well?

13      A.    Customer service would know that it was

14   listed as a customer.

15      Q.    And that they had a vault?

16            Okay.

17            And then from the Walgreens distribution

18   center there are green arrows and I take it that means

19   that the product or OxyContin, the controlled, the CII

20   drug would be then distributed out to individual

21   Walgreens?

22      A.    That is correct.

23      Q.    Then if you look on the right-hand side,

24   the RiteAid corporate offices, this works a little bit
```

```
1   differently if you follow the orange arrow.  There is

2   a CII order that goes down to this building down here

3   in the center.

4            What -- what is that building?

5       A.    It's probably missing a label.  But it

6   would be a wholesaler.

7       Q.    Okay.  And that would be a wholesaler like

8   Cardinal or McKesson or AmerisourceBergen?

9       A.    Um-hum.  Mc -- it would be McKesson.

10      Q.    Okay.  And -- and you know -- why -- why

11  do you know it would be McKesson?

12      A.    Because RiteAid was a customer of

13  McKesson.

14      Q.    Got it.  Okay.

15           And so the order would be placed by

16  RiteAid corporate to McKesson, then McKesson would

17  place an order with Purdue corporate, correct?

18      A.    That is correct.

19      Q.    And then Purdue corporate, a department at

20  Purdue corporate -- would it also be customer service?

21      A.    Yes.

22      Q.    -- would then relay that order to Purdue

23  Pharmaceuticals for the manufacture of that order to

24  take place or to -- or to fill that order?
```

```
 1        A.    That is correct.

 2        Q.    And then from there it goes back to the

 3   wholesaler, the actual product goes to the wholesaler,

 4   correct?

 5        A.    Correct.

 6        Q.    And then from McKesson, the wholesaler, it

 7   goes to RiteAid's distribution center, correct?

 8        A.    That's probably a -- a bad arrow.  It

 9   would go from -- it would go from the McKesson DC to

10   the RiteAid stores, not to the dis -- distribution

11   center.

12        Q.    Is there -- is there any reason for

13   RiteAid to have a distribution center in this chain?

14        A.    Yeah.  This was -- this was not the

15   finished copy.  As you noted, it had to go through

16   compliance first, so this was just a draft copy.  It

17   doesn't say draft on it, but --

18        Q.    So you think this -- so you think this

19   changed.

20              So the way you would -- looking at this

21   right now, the way you would change this is this whole

22   distribution center would be gone and --

23        A.    Right.

24        Q.    -- the -- the drug would just go out to
```

1    the retailer.  So it would just look -- it would get

2    rid of this arrow here?

3         A.    Yeah.

4         Q.    Okay.

5         A.    Yes.

6         Q.    Now, let's talk about in this chart where

7    the money is going.

8               The Walgreens Corp. -- corporate orders

9    directly to Purdue corporate.  Who gets billed for

10   that order?  Who pays for that?

11        A.    If that was the case, Walgreens would get

12   billed.

13        Q.    And would it be Walgreens corporate that

14   would be billed?

15        A.    Correct.

16        Q.    And so this -- the -- the money would go

17   this way?

18               Oh, you can't see it at all.  So the -- so

19   Walgreens -- so the bill would go from Purdue

20   corporate to Walgreens corporate, Walgreens corporate

21   would then pay the bill back to Purdue corporate?

22        A.    Yes.

23        Q.    Okay.  When the order comes from McKesson,

24   who do you send the bill to?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    McKesson.

2        Q.    And then McKesson sends the money back to

3    corporate?

4        A.    Correct.

5        Q.    Is that correct?

6              Now, the data issues that we spoke about

7    this morning and a little bit this afternoon, you, in

8    national accounts, you are receiving daily -- I know

9    sometimes it's weekly, but you had -- you would like

10   daily information with respect to the product that

11   goes out as well as -- the product that's left the

12   wholesaler or the distribution center, as well as how

13   much product went in, that's coming to you at national

14   accounts?

15       A.    Yes.

16       Q.    And where is that coming from?

17             Are you getting that data from Walgreens

18   corporate or do you get the data from the Walgreens

19   distribution center?

20       A.    In this scenario we would not be getting

21   data from Walgreens.  The data only comes from the

22   wholesaler.

23       Q.    I didn't hear the last thing.

24             Only from the wholesaler, so only from --
```

1   you would not get any data from Walgreens?

2         A.    Right.

3         Q.    And that's because of what you told me

4   they had the -- the blinded policy or blocked policy?

5         A.    No, we would not be getting it at the

6   store level in this case because Walgreens ordered

7   direct.  They stopped ordering direct altogether

8   after -- shortly after this slide was produced.

9         Q.    Okay.  If they -- when they stopped

10  ordering direct, were they then going through a

11  wholesaler --

12        A.    Yes.

13        Q.    -- like McKesson?

14        A.    Yes.

15        Q.    Which -- which wholesaler did they use?

16        MR. STANNER:  Objection to form.

17  BY THE WITNESS:

18        A.    AmerisourceBergen.

19  BY MS. CONROY:

20        Q.    And would that mean that after -- after

21  they stopped ordering directly to corporate and they

22  were using AmerisourceBergen, would you in national

23  accounts be receiving that daily data from Ameri --

24  about the Wal -- about Walgreens from

1    AmerisourceBergen?

2         A.    This was 20-- -- 2006.  I don't believe we

3    were getting the data at that time.

4         Q.    When do you think it started that you got

5    the data?

6              Let -- let me ask it this way.  We talked

7    earlier about the suspicious order monitoring and that

8    seemed to be at the very beginning of 2007.

9              Were you getting it by 2007?

10        A.    I believe it was later than that, but I

11   don't have the exact date off the top of my head.  It

12   was later than that.  I don't have the exact date.

13        Q.    Did you have any other way of getting

14   individual store data in 2007 other than from a

15   wholesaler?

16        A.    The only way we got sell out data was

17   through a wholesaler if we had an agreement in place.

18        Q.    What about from IMS, did you ever use IMS

19   for this -- for some ability to see what was happening

20   at the retail level?

21        A.    I did not use IMS for that.

22        Q.    Up until the wholesalers were involved and

23   that data was available, did you not have -- did you

24   not have data with respect to what was being held and

```
 1    sold out of the distribution centers?

 2         MR. HOFFMAN:  Object to form.

 3    BY THE WITNESS:

 4         A.    Could you rephrase that?  I'm not sure.

 5    BY MS. CONROY:

 6         Q.    Sure.

 7         A.    You --

 8         Q.    I -- you -- when you first spoke to me

 9    about this, we talked -- you talked about there being

10    paper forms back and forth and a lot of difficulty in

11    evaluating what -- what inventories were with the

12    wholesalers.

13              Do you recall that testimony?

14         A.    I believe I indicated that it was

15    difficult to know what was sold out.  We always knew

16    what was sold in.

17         Q.    Okay.  So you -- you always knew what you

18    sent to the wholesaler?

19         A.    Correct.

20         Q.    Is that correct?

21              And you always knew what you sent to

22    Walgreens or anyone else that had a direct contract,

23    correct?

24         A.    Correct.
```

```
 1        Q.     What it was then difficult to determine

 2   was how much went out from the wholesaler?

 3        A.     How much was sold.

 4        Q.     Okay.  And at some point you had some

 5   ability to collect that data?

 6        A.     Yes, once we had agreements in place.

 7        Q.     And those were the fee-for-service

 8   agreements?

 9        A.     That is correct.

10        Q.     And you did not have that data until you

11   entered into the fee-for-service agreements?

12        A.     That is correct.

13        Q.     And you did not use IMS for that purpose?

14        A.     No.

15        Q.     And once you had the fee-for-service

16   agreements in place, were you using -- were you using

17   ValueCentric at that point or was there some other

18   data company that you were using?

19        A.     We were using a -- a different vendor who

20   was -- I will -- I don't remember.

21        Q.     Did it have "Edge" in the name?

22        A.     Oh, Edge Dynamics, thank you for that.

23        Q.     Edge.  Okay.  So it was -- it was -- how

24   long was it Edge Dynamics?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.      I'm thinking about three years.

2       Q.      Okay.  And then it went to ValueCentric?

3       A.      ValueCentric.

4       Q.      Is there a difference between ValueCentric

5    and ValueTrak, or is one of them the name of the

6    product?

7       A.      ValueTrak is the product.

8       Q.      Do you recall when you started to use

9    ValueCentric or when you started to use Edge Dynamics,

10   so can you put any kind of a -- any kind of years on

11   it?

12      A.      It is just an estimate, I think Edge was

13   2003 to 2006 and after that it was ValueCentric would

14   be my estimate.

15      Q.      And it was ValueCentric until May of 2014

16   at least?

17      A.      At least.

18      Q.      Do you know if -- if Purdue still uses

19   ValueCentric?

20      A.      I don't know.

21      Q.      Let's just -- don't put that too far away

22   because I'll probably have some more questions about

23   it, but -- so, do you want a Post-It note to keep that

24   page?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MS. PORTER:   Thank you.

 2   BY MS. CONROY:

 3        Q.    Did you have any fee-for-service

 4   agreements in place during the time that you were

 5   using Edge Dynamics?

 6        A.    Yes.

 7        Q.    Do you recall who you had those in place

 8   with?

 9        A.    I don't recall all of the accounts, but

10   certainly the may -- three major wholesalers.

11                  (WHEREUPON, a certain document was

12                   marked Purdue-Seid Deposition Exhibit

13                   No. 007, for identification, as of

14                   12/12/2018.)

15   BY MS. CONROY:

16        Q.    I'll show you what I'm marking as

17   Exhibit 7.  PPLPC004000247116 and 118 is the native

18   production of a "2010 National Accounts," this says

19   "Level 150."

20                  Is that also a training --

21        A.    Yes.

22        Q.    -- training deck?

23                  What's Level 150?

24        A.    I think it's the second phase of new
```

1    hires, they were probably out in the field for a while

2    and come back.

3        Q.    And this is a -- you've sent this to Janet

4    Koch on Friday, August 20th, 2010.

5            Do you see that?  And then you have

6    attached the slide deck?

7        A.    Um-hum.  Yes.

8        Q.    Okay.  And this looks pretty familiar from

9    what we looked at before, we got a little bit

10   better -- the New Jersey guys are a little bit better

11   dressed this time around.

12           Then if you would turn to, there is

13   another diagram in here -- or let's -- before we do

14   that, let's look.  These are numbered.  Let's go to

15   Page 16.  And this is 2010.

16           Is Ms. Reuss -- has she moved or is she

17   just not on this chart?

18       A.    She got remarried.

19       Q.    Oh, okay.  So what's her last name?

20       A.    Sicillano.

21       Q.    Got it.  Okay.

22           And now you have one analyst, is that

23   correct, instead of two?

24       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And then here are your four

2    national account managers?

3    A.    Yes.

4    Q.    And the -- and their responsibilities?

5    A.    That's correct.

6    Q.    And then if you turn to the first diagram,

7    which is:  "The Purdue chain drug supply chain

8    warehousing (with vault)."

9          Do you see that?

10   A.    Yes.

11   Q.    So this is a picture of, here in the

12   center, this is Purdue in Stanford, Connecticut,

13   correct?

14   A.    Yes.

15   Q.    That's the company headquarters?

16   A.    Yes.

17   Q.    And then take a look at the orange arrows.

18   There is an orange arrow out that says "Walgreen 222."

19          What does that mean?

20   A.    That if there is a Walgreen-specific order

21   that is designated not for their warehouse but to be

22   distributed through Cardinal, it would be -- well,

23   that's really not the case.

24          What this is showing is that -- an account

1    like Walgreens that has a vault can order direct or

2    they can get product through the wholesaler.

3         Q.    I -- oh, I see.  Okay.

4               So on the left-hand side we have Walgreens

5    and the green arrow is a -- is a direct order?

6         A.    Right.

7         Q.    And on the right-hand side it's a

8    wholesaler order?

9         A.    Correct.

10        Q.    And then when it's a direct order, Purdue

11   is sending that order down to Purdue Pharmaceuticals

12   in Wilson, North Carolina, we've got a picture of that

13   manufacturing plant, and then the product goes out to

14   the Walgreens distribution center that has the vault,

15   correct?

16        A.    Correct.

17        Q.    And then it goes out to the individual

18   stores.

19              And in a direct order, would Purdue

20   national accounts in 2010 see any of the data with

21   respect to Walgreens if they had a fee-for-service

22   with Walgreens?

23        A.    We would not have a fee-for-service with

24   Walgreens.

1     Q.    And so you would not see -- you would not

2  see the data?

3     A.    They would not see the store-level data.

4     Q.    And then if we take a look on the

5  right-hand side, Cardinal Health places an order on

6  behalf of Walgreens, is that correct?

7     A.    Correct.

8     Q.    And then Purdue sends that order to

9  Wilson, North Carolina, the product is then sent back

10  to Cardinal Health, the distribution center that has a

11  vault, correct?

12     A.    Correct.

13     Q.    And then that is delivered in this big

14  arrow to the Walgreens distribution center with a

15  vault or can it go to the individual Walgreens?

16     A.    Either they had -- they would do on

17  occasion overlapping.

18     Q.    So --

19     A.    Ultimately it was Cardinal to the stores.

20     Q.    Okay.  So -- so at some point you would --

21  it would go directly to the stores from Cardinal and

22  that sort of data you could see, correct?

23     A.    Probably not until a couple of years after

24  this.

1    Q.    And why is that?

2    A.    Because we made an arrangement with

3  Walgreens.

4    Q.    So could -- if it was going through

5  Cardinal as the wholesaler and if you had a

6  fee-for-service agreement with -- with Cardinal, could

7  you see data concerning shipments to Walgreens?

8    A.    On occasion we could pick up a couple of

9  stores, but usually it was blocked.

10    Q.    Okay.  And then it wasn't until a few

11  years later you believe that you actually had an

12  agreement to be able to see the data from Walgreens?

13    A.    Right.

14    MR. HOFFMAN:  Object to form.

15  BY MS. CONROY:

16    Q.    And would that create -- when that -- when

17  that agreement took place, did you have the ability to

18  see what was going out and what was being sold at

19  Walgreens all of the way down to the retail level?

20    A.    Yeah, we were able to see store level

21  data.

22    Q.    And would that agreement have been a

23  fee-for-service with Walgreens or something else?

24    A.    There was a fee for the data, but we had

```
 1    made an agreement -- we had an agreement with

 2    Walgreens, and I don't remember if it was after I

 3    left, to test receiving the data and ultimately there

 4    would be a fee.

 5         Q.   Did the -- in some of the fee-for-service

 6    agreements, the data, it was sort of a combination,

 7    we'll supply the drug and you supply the data back and

 8    there would be a credit arrangement, correct, to pay

 9    for the data?

10         A.   Yes.

11         Q.   And that was different with Walgreens, it

12    wasn't -- there was just a separate data contract?

13         A.   This was a sep- -- a separate agreement.

14         Q.   What about promotion with respect to

15    Walgreens, was there a separate agreement for that?

16    For example, promotion through the pharmacists, being

17    able to send letters to the pharmacists or e-mails or

18    rebate information or anything like that?

19         A.   If they would agree to do it, it would be

20    directly with them.

21         Q.   And would there be a charge for that,

22    would Walgreens charge to be able to do any sort of

23    promotion?

24         A.   Not usually.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    But they did charge for their data?

2     A.    Yes.

3     Q.    Okay.  You can put that one away.

4     THE WITNESS:  It is a good organization,

5     AmeriCares.

6               (WHEREUPON, a certain document was

7                marked Purdue-Seid Deposition Exhibit

8                No. 008, for identification, as of

9                12/12/2018.)

10    MS. CONROY:  I may have some more.  I can't

11    tell.  I may have some more copies of that.

12    BY MS. CONROY:

13    Q.    Exhibit 8 is PPLPC004000341299 and it

14    attaches "Channel Operations," by Steven Projansky.

15    And this document is dated Thursday, November 29th,

16    2012, and it's from Steve Projansky.

17              He is one of the account -- the national

18    account managers, correct?

19    A.    No.  Steven Projansky is -- I don't

20    remember if he was associate or assistant, but he was

21    a director in national accounts reporting to me.  He

22    was a corporate person.

23    Q.    Was he part of national accounts and trade

24    relations?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.

 2      Q.    And what was his title?

 3      A.    Either associate or assistant director of

 4  national accounts.

 5      Q.    Was he superior to the national account

 6  managers?

 7      A.    Not really.

 8      Q.    What were his responsibilities?

 9      A.    His responsibilities were to deal with the

10  data on a daily basis, deal with ValueCentric, deal

11  with internal customers as it relates to the data

12  dissemination, and assist me where -- where needed.

13      Q.    What's an internal customer?

14      A.    Internal customer?

15      Q.    Yes.

16      A.    The sales reps were internal customers.

17      Q.    Okay.  Of the data.  So he would assist

18  the sales reps?

19      A.    Oh, I'm -- I'm sorry.  I misunderstood.

20            Does it say internal customer here?

21      Q.    You -- you said it.  That's what you said.

22  "He assisted me" -- you said:  "His responsibilities

23  were to deal" -- "deal with data on a daily basis,

24  deal with ValueCentric, with internal customers as it
```

1   relates to the dissemination and assist me where

2   needed."

3       A.    Internal customers from my perspective?

4       Q.    I'm just -- whatever you meant when you

5   answered that question.

6       A.    What I meant was that I considered people

7   that we work with internal customers.  I mean, we did

8   it that way so that we would treat them as somebody

9   that needed to be worked with rather than a task that

10  needed to be done.

11      Q.    Oh.

12      A.    So that's why I called them internal

13  customers.

14      Q.    Okay.

15            And so sales or marketing could be an

16  internal customer?

17      A.    Sales, marketing, sales reps, you name it.

18      MS. CONROY:  Can you see how to get that back

19  again?  Thanks.

20  BY MS. CONROY:

21      Q.    Mr. Projansky says: "This is my

22  presentation so far.  I didn't add the ValueCentric

23  slides yet."  And then he says he'll send you an

24  updated session.  So we know that this is not quite

1    finished, but let's just take a look.

2              What is a channel operation, which is the

3    first slide?  Or what -- what does -- what does

4    channel mean?

5        A.    Some folks refer to the supply chain as

6    the supply channel.  So it would be channel operations

7    as opposed to supply chain.

8        Q.    Then if you take a look at the second

9    page, which is actually -- yeah, the second page --

10   the Distribution Performance Program (DPP)?

11       A.    Um-hum.  Yes.

12       Q.    What was that?

13       A.    Distribute -- the wholesalers were, as

14   part of the agreements, were required to perform and

15   we were pretty strict on the measurement of that

16   performance.  So that parameters were set for their

17   performance in a scorecard fashion and looked at

18   monthly and score carded quarterly.

19       Q.    And so there was a scorecard created for

20   each wholesaler that you did business with?

21       A.    Yes.

22       Q.    And what were you measuring in -- with the

23   scorecards?

24       A.    There were numerous parameters, such as

1   days on hand, reporting, data reconciliation, various

2   things like that.

3       Q.    And there is a -- an SOP with respect to

4   this, correct?

5       A.    I believe so, yes.

6       Q.    Okay.  I think we'll have it so I won't

7   make you go through what you might remember as part of

8   it.

9              What is "alternative distribution

10  channel"?

11      A.    I don't know what he meant by that.

12      Q.    Okay.  Then he has "ValueTrak" at the

13  bottom there, and if you turn the page, this is a

14  pretty simplified distribution channel.  It goes from

15  Purdue to the wholesaler to the pharmacy to the

16  patient.

17             Do you see that?

18      A.    Yep.

19      Q.    And then he has the -- the Distribution

20  Performance Program here between Purdue and the

21  wholesaler, and so this is where those metrics are

22  developed between the wholesaler and Purdue for the

23  scorecard?

24      A.    Correct.

1    Q.    It -- it does not -- does the scorecard

2    include any end pharmacies or where the product is

3    going?

4    A.    It's part of the measurements in -- in the

5    data.

6    Q.    Okay.

7          Then if you take a look at the DPP

8    structure, there is a central distribution services

9    agreement that says it -- to pay for unique service.

10          What kind of service, if you can give me

11    an example of what that would be?

12    A.    Central distribution services agreement,

13    Cardinal, McKesson, and I don't know if AmeriSource,

14    they were headed in that direction, had a central

15    distribution center.  We used to ship to all of their

16    distribution centers.

17          So let's say on a given Monday, 26 trucks

18    would go out.  With a central distribution services

19    agreement, one truck goes to a central location and

20    they distribute the product to 26 locations.

21    Q.    Okay.

22    A.    So there is efficiencies there.  Also,

23    although it's a large order, there is safety and

24    security benefits to sending it to one location, so we

```
 1    would execute those agreements if they were available.

 2         Q.    Okay.

 3               The distribution performance agreement

 4    that provided an incentive for account to enhance

 5    performance and value to Purdue, what would -- what

 6    would that be?

 7               Is that --

 8         A.    That's the --

 9         Q.    -- how is that formulated --

10         A.    -- same thing as the previous page.  We

11    talked about that.

12         Q.    Okay.  That's the DPP?

13         A.    Correct.

14         Q.    Okay.  And then an authorized distributor

15    agreement, this -- that's just the base agreement?

16         A.    Yes.

17         Q.    And could that be a fee-for-service?

18         A.    No.  It is just if you wanted to do

19    business with Purdue, these are the conditions you

20    needed to adhere to.

21         Q.    Okay.

22               And then if you could turn the page,

23    the -- that baseline, that's what this is talking

24    about and you have a list of the fully executed
```

1    distribution agreements --

2        A.    Um-hum.

3        Q.    -- on the left-hand side and the ones that

4    were pending on the right?

5        A.    Um-hum, yes.

6        Q.    If you could turn to Page 8, please.

7              Is that true of DPPs, they were three-year

8    agreements?

9        A.    Most were.

10       Q.    And then if you look at the fourth bullet

11   point where it says:  "Inventory and Sales Reports Due

12   Daily," the 852s and the 867s, that's what you were

13   talking about, the data that you would -- some was

14   provided weekly but you hoped for it to be provided

15   daily?

16       A.    That is correct.

17       Q.    And do you think by 2010 you had everybody

18   daily?

19       A.    Pretty close.  It certainly was sliced

20   daily.

21       Q.    And then the DPA fee here, and you have

22   different percentages for the different companies.

23             Are they -- are those negotiated

24   percentages?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And would they be in effect for the entire

 3   three years of the contract?

 4        A.    Yes, they would.

 5        Q.    And who would negotiate those percentages,

 6   who would be the individuals responsible for that?

 7        A.    I would have the team that negotiated

 8   those percentages.  Steve Projansky would assist me, a

 9   guy from procurement, actually, would also be on the

10   team, a guy named Abe Boms.  And both Russ Gasdia and

11   the CFO would oversee us on the -- but the -- the

12   face-to-face negotiation was me.

13        Q.    Okay.  And then the partial clawback,

14   the tri -- the -- the length of time that Cardinal,

15   McKesson, ABC would keep their inventory for

16   appreciation purposes, would those days, 36 days,

17   26 days, were they negotiated?

18        A.    Yes.

19        Q.    And if you could turn to Page 11.

20              This talks about the -- the scorecard?

21        A.    Yes.

22        Q.    Wholesaler performance issues, OxyContin,

23   Cesar Castillo.

24              Who is -- is he a -- is that a Purdue
```

1    employee?

2         A.    No.  That's a wholesaler.

3         Q.    Is that a company name?

4         A.    Yes, company name.

5         Q.    Do you know what this slide means:  "So

6    why is this wholesaler listed for OxyContin?"

7         A.    I don't know what -- I don't know -- I

8    don't know what he is getting to here.

9         Q.    Okay.  You don't know if there was a

10   particular performance issue with respect to OxyContin

11   with that wholesaler?

12        A.    Yeah, I don't know.  I don't know what he

13   was pointing out here.  I'm sure he was going to speak

14   to each of these points, but --

15        Q.    Okay.

16        A.    -- I don't know what he was after.

17        Q.    You can put this document away.

18                  (WHEREUPON, a certain document was

19                  marked Purdue-Seid Deposition Exhibit

20                  No. 009, for identification, as of

21                  12/12/2018.)

22   BY MS. CONROY:

23        Q.    I'll show you what I have marked as

24   Exhibit 9, which is PPLPC032000374808 through 823.

1    This is clearly a draft and it says:  "Channel

2    Operations Standard Operating Procedures," and it

3    starts with a glossary.

4            Does this document look familiar to you?

5    A.    No.

6    Q.    Do you recall there being a standard

7    operating procedure for channel operations?

8    A.    I don't recall this one.

9    Q.    Would you have been involved in drafting

10   something like this?

11   A.    Not this one.

12   Q.    Who -- if it wasn't you, who might it have

13   been?

14   A.    I don't know.  This was after I retired.

15   Q.    Oh, is there a date -- where do you see

16   that?  Help me out.

17   A.    Well, it says the director of pharmacy

18   distribution sales, it is Robert Palma.

19   MS. PORTER:  It is on the last page.

20   MR. HOFFMAN:  The last page.

21   MS. CONROY:  The last page, oh.  Great.  Okay.

22   BY THE WITNESS:

23   A.    Which is, I guess, the name for national

24   accounts now.

```
 1    BY MS. CONROY:

 2         Q.    I see.  Okay.  Thank you.  You can put

 3    that away then.

 4                    (WHEREUPON, a certain document was

 5                     marked Purdue-Seid Deposition Exhibit

 6                     No. 010, for identification, as of

 7                     12/12/2018.)

 8    BY MS. CONROY:

 9         Q.    I show you Exhibit 10.

10         A.    Thank you.

11         Q.    Exhibit 10 is PPLPC004000344799 through

12    818.  And this is a document from Gregory Bogdan dated

13    January 14th, 2013, to Steven Projansky and yourself

14    and the re line is:  "Fee-for-service SOP."

15              Does this standard operating procedure for

16    fee-for-service quarterly credit process look familiar

17    to you?

18         A.    Yes.

19         Q.    Did you help to draft this?

20         A.    This was drafted by finance.

21         Q.    And would you have overseen it?

22         A.    I would have approved it.

23         Q.    And it's quite detailed.  For example, if

24    you look on Page 3 where it talks at the very top
```

```
 1    about:  "Basis points are earned by wholesalers'

 2    ability to adhere to four metrics:  Raw service level

 3    unit fill rate, effective inventory level, purchase

 4    variability and EDI 352 and EDI 867" -- I'm sorry --

 5    "852 and 867 data reconciliation."

 6              Do you see those?

 7       A.    Yes.

 8       Q.    Who would keep track of those four

 9    metrics, what department?

10       A.    National accounts.

11       Q.    Was this SOP intended to cover the entire

12    process of track -- of tracking the data and

13    overseeing the supply to the wholesalers that had a --

14    that had a fee-for-service contract?

15       A.    I think it says it right on the front

16    page.  It says:  "Our fee-for-service SOP."  So this

17    was generated by finance for their use.

18       Q.    Where are you reading?

19       A.    On the front page.

20       Q.    Where it says:  "Hi Steve and Steve"?

21       A.    Yes.

22       Q.    "Can you take a look at our

23    fee-for-service SOP, add any additional information

24    you deem necessary and/or provide feedback"?
```

1      A.     Correct.

2      Q.     Okay.

3             And then if you look at Page 2:  "The

4      purpose of this SOP is to document the quarterly

5      fee-for-service (FFS) credit process"?

6      A.     Correct.

7      Q.     Do you see that?

8             And that credit process is a credit that

9      goes back to the wholesaler that had signed the

10     fee-for-service?

11     A.     Correct.

12     Q.     Do you know if this SOP became final?

13     A.     I don't know.

14     Q.     If it did, would it -- how would it work?

15     Would it get a number, like I've seen SOP 7.7,

16     SOP 1.7.1?

17     A.     I don't know how -- it says on the front

18     there is a document number.

19     Q.     I -- I see where it says Draft 1.14.  Is

20     that what you are talking about?

21     A.     Under SOP number, title, effective date,

22     version number and supersedes document number.

23     Q.     So this looks like:  Version No. 1,

24     supersedes document number," and then it has an "NA"

1    there.

2         A.    Correct.

3         Q.    So you don't know one way or the other

4    whether it ever received an SOP number?

5         A.    This was the finance SOP.

6         Q.    Okay.  And I think you told me earlier if

7    you needed to review a standard operating procedure

8    you wouldn't have it, you would ask your assistant for

9    it?

10        A.    I probably would have gotten this directly

11   since she wasn't copied.

12        Q.    But this is a draft, correct?

13        A.    This is a draft, yeah.

14        Q.    So wouldn't -- wouldn't an SOP have to be

15   approved by others at the company?

16        A.    Yeah.  I'm on there for approval.

17        Q.    I see that you are on there and you were

18   asked if there was any additional information you

19   wanted to add or any feedback.

20             Do you know if you did?

21        A.    I don't remember.

22        Q.    If you didn't, would this just

23   automatically become final?

24        A.    It would still require me to -- to sign

1    off.

2         Q.    Okay.  So there would likely be some

3    formal SOP if this was ever finalized?

4         A.    If this was finalized, you'd see a final

5    copy.

6         Q.    Okay.  So I would need to ask Purdue to

7    see a final copy of the SOP that dealt with quarterly

8    fee-for-service credit process?

9         A.    I guess.

10        MR. HOFFMAN:  Object to form.

11   BY MS. CONROY:

12        Q.    Do you ever recall referring to a formal

13   SOP for fee-for-service credit process while you were

14   at Purdue?

15        A.    I don't remember.

16        Q.    Did you know it so well that you wouldn't

17   have to look at an SOP?

18        A.    This is a finance department document for

19   their use.

20        Q.    So this isn't anything you would ever use?

21        A.    This -- this is the way they handle the

22   credit.  This is an SOP for the way finance handles

23   the credit.

24        Q.    So it doesn't affect you at national

1   accounts?

2       A.    Not the way they handle their credit, no.

3       Q.    Okay.  Would you be required in

4   negotiations to have any conversations about the way

5   credit was to be handled or would someone from finance

6   handle that section of the negotiation with the

7   wholesaler?

8       A.    The negotiation with the wholesaler would

9   be the areas on the scorecard and the credit would be

10  based on how well they did on the scorecard.

11      Q.    And that is on Page 3 at the very top,

12  those are the four metrics that are listed?

13      A.    Those are the four metrics.

14            Yeah, yeah, yes.

15      Q.    Are those the scorecard metrics?

16      A.    Yes.

17      Q.    And so is that -- are they -- are these

18  always the scorecard metrics regardless of the

19  negotiation, regardless of who signs the

20  fee-for-service contract?

21      A.    They were the scorecard metrics as of

22  1/14/2013.

23      Q.    Do you recall any other metrics that were

24  used for the scorecards --

 1        A.    The --

 2        Q.    -- during your tenure at Purdue?

 3        A.    -- earlier versions of the scorecard had

 4   more metrics.  This was a refinement.

 5        Q.    Okay.  If you'd look at Page 10 of the

 6   document.

 7        A.    Oh, I'm sorry.  We are still on it.

 8        Q.    There is an annex?

 9        A.    Um-hum, yes.

10        Q.    And it says:  "Wholesalers under

11   fee-for-service agreements"?

12        A.    Yes.

13        Q.    And we see a little bit of what we had

14   looked at before on the far right.

15              The effective inventory days, those differ

16   among the wholesalers, correct?

17        A.    Yes.

18        Q.    As well as the fee?

19        A.    Yes.

20        Q.    Was there an attempt -- I see the

21   effective date of July 1st, 2012, and the ending date

22   of June 30th, 2015.

23              Was there an effort to have all of the

24   wholesalers under fee-for-service agreements in

```
 1    this -- in the same contract period?

 2         A.    We, yes, tried to.

 3         Q.    Then if you turn the page, there is a

 4    sample SAP report.

 5               What does "SAP" stand for?

 6         A.    Our operating system.

 7         Q.    Would this be something for finance or is

 8    this anything that your national account department

 9    would have used?

10         A.    This would be finance.

11         Q.    Would you ever have had occasion to look

12    at this type of data?

13         A.    I would not have occasion to look at this.

14         Q.    Then, if you go to Page 13, which is a

15    sample ValueTrak report, is that anything that you

16    would have taken a look at?

17         A.    Yes.

18         Q.    And you would have had this on your -- on

19    your desktop?

20         A.    Yes.

21         Q.    Do you see at the bottom on No. 2, it

22    says:  "Enter the following parameters" and it gives

23    "timeframe," "start date," "to date" and then the last

24    one is "select build report."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Did you create reports yourself or is that
 2    something you would have asked someone to do?
 3        A.    I did sometimes, or I'd -- but I'd often
 4    ask someone to do it.
 5        Q.    And the purpose of this SOP is to
 6    basically give instructions or step-by-step
 7    instructions as to how to do these different
 8    processes?
 9        MR. STANNER:  I'll just object to the form.  It
10    is a draft SOP.
11    BY THE WITNESS:
12        A.    The objective of this is for the finance
13    department to have an SOP in place as to how they
14    handle the fee-for-service quarterly credit.
15    BY MS. CONROY:
16        Q.    Did your department have SOPs with respect
17    to any of your processes?
18        A.    I believe there is an SOP in place.
19        Q.    And what would it have been -- what would
20    it have been called or what would it have covered?
21        A.    I'm -- I'm not sure.
22        Q.    But you believe you had one?
23        A.    I -- I think we had one.  I'm not sure.
24        Q.    Page 17 is the sample scorecard and then
```

1    it shows McKesson Corporation.

2              Do you see that?

3         A.    Yes.

4         Q.    Would you ever have occasion to look at

5    the scorecards or is that all finance?

6         A.    No.  Scorecards would be generated in

7    national accounts.

8         Q.    And so this is something you would -- you

9    would look at?

10        A.    Yes.

11        Q.    And what would -- what would be the

12   purpose of you reviewing a scorecard?

13        A.    I would review the scorecard against the

14   metrics, ask any pertinent questions as it relates to

15   what I see, because Steve Projansky would do the nuts

16   and bolts of this, and if I felt that there were no

17   issues, I would sign off.

18        Q.    Would you -- when you say "sign off,"

19   would you be signing off on scorecards on some regular

20   basis?

21        A.    Quarterly.

22        Q.    And so if you've got a scorecard, for

23   example, for McKesson, I see here it says at the top

24   "Third Quarter 2012," this is something you would see

```
 1    and then sign off on?

 2         A.    Correct.

 3         Q.    For example.

 4               And would it be more than a page or is --

 5    would it look like this?

 6         A.    It would gen -- generally be a page.

 7         Q.    And if we just take a look at it, it says:

 8    "Gross invoice" -- "invoiced purchases for July,

 9    August and September" and it tells you -- it breaks it

10    down by drug.  So you see Butrans 3.6 million in July,

11    6.6 million in August, 2.6 million in September and

12    then a total for the quarter.

13               Do you see that?

14         A.    Yes.

15         Q.    Is -- what would be -- why would that

16    information be of interest to you in national

17    accounts?

18         A.    On this scorecard?

19         Q.    Correct.

20         A.    Because to execute the scorecard, you

21    would need to input the sales data.

22         Q.    And this would tell you how much McKesson

23    purchased during that quarter?

24         A.    It would have all communications,
```

```
 1    prescription drug purchases for the quarter.

 2         Q.    And the scorecard is only for prescription

 3    drug purchases?

 4         A.    Designated, yes, prescription drugs.

 5         Q.    Is there anything -- if -- if you take a

 6    look at OxyContin, which in July was 67.6 million,

 7    August 85.1 million, September 63.6 million to a total

 8    of 216.5 million for the third quarter in 2012, what

 9    would -- what would those numbers be telling you for

10    this scorecard?

11         A.    How much gross -- how much in gross

12    purchases they've made each month.

13         Q.    And why would that be important to you?

14         A.    Because you can't calculate the scorecard

15    performance without the gross purchase information.

16         Q.    Okay.  And then the gross purchase

17    information is used for what calculation?

18         A.    Basically all of them.

19         Q.    Okay.  So if we go to the next box where

20    it says "adjusted" and there is a service level?

21         A.    Yes.

22         Q.    And then on the far right an earned fee.

23               Who is earning that fee?

24         A.    McKesson.
```

1      Q.    And is that fee calculated off of the

2   gross invoice purchases in the box above?

3      A.    Yes.

4      Q.    And that's done -- the -- there is a

5   computer program that's doing that for you, correct?

6      A.    That is correct.

7      Q.    And then if you look next at the

8   "effective inventory level" box and then there is a

9   fee earned on the far right-hand side.

10            Is that also a fee earned by McKesson?

11      A.    Yes.

12      Q.    If you go dex -- down next to the

13   "purchase variability" and there is a fee earned on

14   the right-hand side.

15            Is that fee earned by McKesson?

16      A.    Yes.

17      Q.    And then there is the EDI 352/867 [sic]

18   reconciliation.

19            Do you recall what "EDI" stands for?

20      A.    Electronic data interface.

21      Q.    Okay.  And the 852 is what went out or

22   what -- what was sent out and the 867 is what was then

23   sent out from McKesson?

24      A.    Correct.

1    Q.    And it says, "actual fee."

2          Is that a fee that's charged or a fee that

3    Purdue is paying or what is that -- who -- whose --

4    A.    That is a fee that Purdue was paying or

5    crediting.

6    Q.    So this is a credit to McKesson?

7    A.    Correct.

8    Q.    And it's a credit to McKesson for the data

9    that has been provided to Purdue for the EDI 852 and

10   867 reconciliations?

11   A.    That one portion of the fee is what it's

12   for, yes.

13   Q.    The -- the portion that's in this box?

14   A.    Correct.

15   Q.    So McKesson receives a credit of

16   $433,001.20 for the data that it provided to Purdue

17   with respect to the sale of its sale of OxyContin in

18   the third quarter of 2012, correct?

19   A.    That's correct.

20   Q.    And the same, you look at that, they

21   received a credit of $25,798.37 for Butrans in the

22   third quarter of --

23   A.    Correct.

24   Q.    -- 2012?

```
 1        A.    Correct.

 2        Q.    And then look to the next box, it says:

 3   "Data reporting fee" and -- and there is something

 4   under it that says:  "Occurrences, missing products,

 5   missing DCs, late transmission, missing elements,

 6   duplicates," all zeroes.

 7              Are those -- do those reference the 852s

 8   and the 867s?

 9        A.    Yes.

10        Q.    And that's -- that means that there were

11   no issues with the data that was provided to Purdue

12   from McKesson with respect to what they received and

13   what went out?

14        A.    For that quarter.

15        Q.    Okay.  Then there is the box:  "Gross

16   invoiced, excess invoiced and adjust excess invoice

17   appreciation and adjusted payment base."

18              Do you see that?

19        A.    Yes.

20        Q.    What -- what is -- what is this box

21   capturing for the third quarter of 2012?

22        A.    It's capturing the aggregate of all of the

23   fees above and providing a gross payment base, and if

24   there is excess inventory, that's a clawback on our
```

1   part, so we get back $4,928.47 for a price increase

2   related to Dilaudid.

3        Q.    Okay.  So this is taking the gross

4   invoiced purchases of Butrans, which is 12.8 million,

5   that comes from -- that comes from up here, the gross

6   invoice purchases total for the three months, correct?

7        A.    Correct.

8        Q.    And then there is a fee earned on that of

9   2.03 percent and that comes out to an adjusted payment

10  base of $261,853.47.

11             Is that money that is credited to McKesson

12  or paid to McKesson?

13        A.    Credited.

14        Q.    And so when we look at the adjusted

15  payment base, which is 4.7 million there at the bottom

16  for all of the products?

17        A.    Yes.

18        Q.    Is that credit to McKesson 4.7 million?

19        A.    That's what it appears.

20        Q.    Okay.

21             And then there is a DPA payment box here

22  and it looks like zero data reporting fees, zero

23  unauthorized deductions.  So the DPA payment to

24  McKesson is 4.7 million?

```
 1        A.    That's correct.

 2        Q.    And would that be a check that would be

 3   written to McKesson or -- or a credit on their

 4   account?

 5        A.    It's a credit.

 6        Q.    And how would you determine the amount of

 7   money that Purdue was paid by McKesson during this

 8   quarter for these five products?

 9        MR. HOFFMAN:  Object to form, foundation.

10   BY THE WITNESS:

11        A.    How would --

12   BY MS. CONROY:

13        Q.    Well, I see that on the gross invoiced

14   purchases in the first box.  Do you see that?

15        A.    Yes.

16        Q.    Where it talks about, for example,

17   OxyContin, the total for the third quarter was

18   216 million?

19        A.    Yes.

20        Q.    Would that be money paid to Purdue?

21        A.    Yes.

22        Q.    Okay.  And then there would be a credit,

23   there would be some amount of that 216 million that

24   would be credited back to McKesson?
```

Highly Confidential - Subject to Further Confidentiality Review

     1        A.     That is correct.

     2        Q.     And if you add -- if you -- if you were to

     3   add all of the gross invoiced purchases for the five

     4   drugs for the third quarter, which is here in this

     5   box, if you added those together, that money would

     6   have been paid to Purdue and of that total 4.7 million

     7   would have been credited back to McKesson?

     8        A.     Right.

     9        Q.     Is that correct?

    10        A.     Yes.

    11        Q.     So this would be the total would go to

    12   Purdue minus the DPA payment of 4,720,903.87, correct?

    13        A.     Correct.

    14        Q.     And did it generally work this way --

    15   what -- when did the scorecard come into effect, if

    16   you can recall?

    17        A.     This is the '13 -- let's see.

    18        Q.     This is dated 2013.

    19        A.     2010 or is it 2007?  No.  It first came

    20   into effect 2004 or '5.

    21        Q.     Okay.  And it may not have been exactly

    22   the same, but it would work something like this from

    23   2005 onward?

    24        MR. STANNER:  Objection to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY THE WITNESS:

 2       A.   Something like this, yeah.

 3       MR. STANNER:  Form, foundation.

 4   BY MS. CONROY:

 5       Q.   And from 2004 onward, would you have

 6   reviewed and signed off on the scorecards each

 7   quarter?

 8       A.   Yes.

 9       Q.   Okay.  You can put that away.

10       MS. PORTER:  Are you okay?

11       THE WITNESS:  Yeah.

12            (WHEREUPON, a certain document was

13             marked Purdue-Seid Deposition Exhibit

14             No. 011, for identification, as of

15             12/12/2018.)

16   BY MS. CONROY:

17       Q.   I'll show you Exhibit 11.  11 is

18   PPLPC004000371161 through 1205.  And this is dated

19   September 9th of 2013, and it's to Steve Projansky

20   from Nurudin Veerjee and you are one of the CC's, and

21   this is the Purdue-McKesson Authorized Distribution

22   Agreement.

23            Do you see that?

24       A.   Yes.
```

1    Q.    And is this -- we've been talking about

2    distributor agreements.

3              Is this what one looks like?

4    A.    This is an authorized distributor of

5    record agreement.

6    Q.    And what do you understand that to be?

7    A.    A document that any authorized distributor

8    that wants to distribute Purdue products has to be

9    approved as an authorized distributor of record.  So

10   they have to sign an A -- an authorized distributor

11   agreement.

12   Q.    And until they would sign something like

13   this, they -- you would not ship product to them,

14   correct?

15   A.    No.  There was a previous agreement in

16   place, so this was an updated agreement, so we'd be

17   still shipping them under the old agreement.

18   Q.    Yeah, I -- I didn't mean they didn't have

19   one before, but, I mean, you would -- in -- in the

20   first instance until --

21   A.    If --

22   Q.    -- until there was some agreement with a

23   wholesaler, you, Purdue, would not ship?

24   A.    Correct.

```
 1        Q.    Would you have been involved in the

 2   negotiation of this agreement?

 3        A.    I certainly would have reviewed it.

 4        Q.    Was there an effort to have the authorized

 5   distributor agreements similar in terms with respect

 6   to all of the wholesalers that signed these

 7   agreements?

 8        A.    Yes.

 9        Q.    And why is that?

10        A.    We would have specific criteria of what we

11   felt an authorized -- a distributor should accept as

12   performance obligations to distribute our products.

13   So we would send out a similar base agreement to every

14   authorized distributor or every distributor that we

15   wanted to get on our authorized distributor list.

16        Q.    Okay.

17              If you take a look at Page 6, it talks

18   about promotional allowances.  And there were

19   promotional allowances on over-the-counter products,

20   correct?

21        A.    Correct.

22        Q.    And that would -- that might be different

23   sales or discounts or coupons or things that would be

24   offered for over-the-counter products?
```

```
 1      A.     Correct.

 2      Q.     And then there were also, if you look at

 3   (b):  "Purdue may offer promotional support such as

 4   distribution allowances that will be paid to the

 5   wholesaler for these additional services."

 6            Was that also -- I've seen some documents,

 7   and we can look at them, that talked about payments

 8   for e-mail blasts or fax blasts or that type of thing

 9   about prescription products.

10            Do you recall that?

11      A.     Yes.

12      Q.     And so this is covering that type of

13   allowance or payments that would be made to McKesson

14   or any other distributor that signed this agreement

15   when they fulfilled those promotional activities for

16   Purdue?

17      MR. STANNER:  Just objection; form and

18   foundation since you are talking about a draft

19   unsigned agreement.

20      MR. HOFFMAN:  Same objections.

21   BY THE WITNESS:

22      A.     It would -- it would be based on -- yes,

23   they would be paid a fee based on performance.

24   BY MS. CONROY:
```

1    Q.    This agreement has a -- is not signed,

2  correct?  Or we don't -- I don't see a signature on

3  this.

4         Do you see that?

5    A.    This is not signed yet.

6    Q.    Do you have any reason to believe that

7  McKesson in 2013 did not have an active distribution

8  agreement with Purdue?

9    A.    I have no reason to believe that.

10   Q.    Any reason to believe they would not have

11  had a promotional allowance as a -- as a part of that

12  agreement?

13    MR. STANNER:  Objection.

14    MR. HOFFMAN:  Object to form, foundation.

15  BY THE WITNESS:

16    A.    I don't know what was -- it -- I'm looking

17  at the one from 2013.  I don't know -- don't know what

18  was in the other one.

19  BY MS. CONROY:

20    Q.    Okay.  But if you did, if we see some

21  documents and you -- and Purdue paid for e-mail blasts

22  or fax blasts or any of those types of items, would it

23  be fair to say that there would be some method for

24  McKesson to be paid for doing that?

```
 1        A.    It -- I can't suppose that, so I don't --

 2   I don't know.  I'd have to see the document.

 3        Q.    Okay.

 4              Were the promotional allowances a fairly

 5   typical inclusion in the distributor agreement -- in

 6   the distribute -- distribution agreements?

 7        MR. HOFFMAN:  Object to form, timeframe.

 8   BY THE WITNESS:

 9        A.    For this one dated 9/9/2013?

10   BY MS. CONROY:

11        Q.    No.  Just generally.

12        A.    Well...

13        Q.    Well, I mean, during your tenure, you were

14   the person who would be --

15        A.    I would --

16        Q.    -- involved, correct?

17        A.    This -- for that -- this time period,

18   2013?

19        Q.    No.  I'm asking you generally when you

20   would be involved in distribution agreements?

21        A.    This is not a distribution agreement.

22   This is an authorized distributor agreement.

23        Q.    You are calling it a what?

24        A.    It is an authorized distributor
```

1    distribution agreement, but he put the wrong subject.

2         Q.    I'm sorry.  I was reading distribution

3    agreement.

4              So it's -- what -- what is it, is it a

5    distribution agreement or a distributor agreement?

6         A.    Top of Page 1, "Authorized Distributor

7    Agreement."

8         Q.    Okay.  And so that's the correct title?

9         A.    That is the correct title.

10        Q.    Okay.  So this is not correct on the

11   e-mail, it's not an authorized distribution agreement?

12        A.    Correct.

13        Q.    Okay.  It's this.

14             As the head of national sales and trade

15   relations, were you familiar with authorized

16   distributor agreements?

17        A.    Yes.

18        Q.    And were you involved in at least

19   overseeing the terms on those agreements and approving

20   them?

21        A.    Yes.

22        Q.    And where did you keep the signed

23   authorized distributor agreements?

24        A.    In a file in my office.

```
 1        Q.     In your office.

 2        A.     Well, not my office.  In my --

 3        Q.     It -- well --

 4        A.     -- section.

 5        Q.     In the -- in national --

 6        A.     Accounts.

 7        Q.     In national accounts?

 8        A.     Yes.

 9        Q.     And so at any given time if someone had

10   wanted to see who were the authorized distributors

11   that had signed agreements, they could go and look in

12   your office?

13        A.     Yes.

14        Q.     And they could see what the terms were?

15        A.     Yes.

16        Q.     Were -- were agreements kept from year to

17   year?

18        A.     These were generally done -- this was done

19   three -- this was along with the three-year

20   fee-for-service agreement.

21        Q.     Would it be done at the same time as the

22   fee-for-service agreement?

23        A.     We tried to -- we tried to do them at the

24   same time.
```

```
 1      Q.    And when a new agreement came into effect,

 2  this says -- this is a little bit confusing.  Maybe

 3  you can -- maybe you can help.  The e-mail, it says --

 4  is dated September 9th of 2013.

 5      A.    Um-hum.

 6      Q.    And it attaches an authorized distributor

 7  agreement that's effective as of July 1st, 2012.

 8            Do you see that, with McKesson?

 9      A.    Yes.

10      Q.    Do you -- do you have any explanation, did

11  you just -- was there an assumption that this would be

12  in effect starting in 2012 or was there something new

13  that was signed and it was changed to a different

14  date?

15      MR. STANNER:  Object.

16      MR. HOFFMAN:  Object to form, foundation.

17  BY THE WITNESS:

18      A.    This -- this went through negotiation on

19  language between Purdue and McKesson, and that's why

20  there was the delay.  But Veerjee is sending to Steve,

21  as it says here, "as the new language has been

22  approved."

23            So this was over a period of time.

24  BY MS. CONROY:
```

1    Q.    So the language was negotiated from

2  July 1st of 2012 until September 9th of 2013?

3    A.    I'm not sure about that.  I don't -- since

4  this is a draft, I don't know what document was

5  originally attached and how many iterations this went

6  through.

7    Q.    Is it fair to say that something was in

8  effect if Purdue was shipping to McKesson in the years

9  2012 and 2013?

10    A.    As I had stated before is that this was a

11  revised ADA and that there was an ADA that they were

12  shipping under prior -- prior to that.

13    Q.    Okay.  And that ADA that they were sh --

14  that Purdue was shipping under would have -- that

15  signed copy would have been in your --

16    A.    Right.

17    Q.    -- national accounts offices?

18    A.    And that even if it was, yes, just the

19  letter that was with us, yeah.

20              (WHEREUPON, a certain document was

21               marked Purdue-Seid Deposition Exhibit

22               No. 012, for identification, as of

23               12/12/2018.)

24  BY MS. CONROY:

1    Q.    I show you the next exhibit.

2    A.    Thank you.

3    Q.    Exhibit 12 is an e-mail from Char --

4    Cheryl Siciliano, that's Cheryl Reuss --

5    A.    Yes.

6    Q.    -- to you dated June 27th of 2006, and the

7    subject is "Shelton's memo."

8          Do you see that?

9    A.    Um-hum.

10   Q.    And Benson -- Shelton Benson was one of

11   your national account managers?

12   A.    Correct.

13   Q.    And this is a memo that you drafted dated

14   June 26th of 2006 to Shelton concerning a meeting on

15   June 15th, 2006?

16   A.    Yes.

17   Q.    If you look down here at "Rx Promotion,"

18   and you say:  "McKesson targets 6,000 to 7,000 stores

19   in their First Script Program."

20         Do you see that?

21   A.    Correct.

22   Q.    And then you say:

23         "They have numerous vehicles.  I am not

24   keen on the return on investment of things such as fax

1  blast programs unless they can show a prove in

2  return."

3          Do you see that?

4      A.     Yes.

5      Q.     When you say "they have numerous

6  vehicles," what are you talking about?

7      A.     They have numerous marketing vehicle --

8  vehicles.

9      Q.     And one of those marketing vehicles is a

10 fax blast program?

11     A.     Yes.

12     Q.     And this is marketing for OxyContin, among

13 other products, correct?

14     A.     Correct.

15     Q.     What's a fax blast program?

16     A.     A fax blast program can vary from

17 wholesaler to wholesaler, but generally they'll send

18 out information on a product or a new product or a new

19 strength or a new whatever.

20     Q.     And they would send it out?

21     A.     To their pharmacies.

22     Q.     And it would come across to the pharmacies

23 on a fax machine?

24     A.     Right.

1       Q.      Since this was 2006?

2       A.      '6, yeah.

3       Q.      And would they -- would the information on

4   the fax blast program come from Purdue?

5       A.      It would be an agreed upon information to

6   be sent.

7       Q.      So Purdue and McKesson would agree on the

8   information that would be sent --

9       A.      Right.

10      Q.      -- in the fax blast?

11      A.      Correct.

12      Q.      Is it correct that Purdue and McKesson

13  would agree on any marketing that would Mc -- that

14  McKesson would send out to any of its customers?

15      MR. STANNER:  Objection; form, foundation and

16  vague, compound.

17  BY THE WITNESS:

18      A.      Are you talking about with Purdue, with

19  everybody, with any kind of program?  That...

20  BY MS. CONROY:

21      Q.      No.  I'm talking about the programs we are

22  talking about, McKesson has numerous vehicles, you

23  told me that was marketing, correct?

24      A.      Yeah, correct.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    And then you told me that the fax blast

2   program, those -- the information that would be

3   relayed in the flax -- the Fax Blast program would be

4   something that Purdue and McKesson got together and

5   agreed upon, correct?

6        A.    Correct.

7        MR. STANNER:  Object to form, foundation.

8   BY MS. CONROY:

9        Q.    So my question is for any other marketing

10  vehicles concerning Purdue products, would Purdue and

11  McKesson work together to develop the information that

12  would be sent out to McKesson's customers?

13       MR. STANNER:  Same objection.

14       MR. HOFFMAN:  Object to form, foundation.

15  BY THE WITNESS:

16       A.    McKesson would have the vehicle.  In this

17  case we would be the customer, because we are paying

18  for it.  We would expect certain things to go out if

19  we were going to engage them in a program.  And they

20  would then tell us what they were capable of doing for

21  that program.

22  BY MS. CONROY:

23       Q.    With respect to the content of the

24  information that would be sent out, where would that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   come from?

 2        A.    It would --

 3        MR. STANNER:  Objection; form, foundation, vague

 4   and compound.

 5   BY THE WITNESS:

 6        A.    It depends --

 7        MS. PORTER:  Now, now you can answer.

 8   BY THE WITNESS:

 9        A.    It depends on what type of product

10   promotion it would be.

11   BY MS. CONROY:

12        Q.    Let's say it's promotion with respect to

13   OxyContin.

14        A.    We wouldn't -- we would --

15        MR. STANNER:  Objection; form, foundation.

16   BY THE WITNESS:

17        A.    It would be highly unlikely that we would

18   send a fax blast on OxyContin.

19   BY MS. CONROY:

20        Q.    That's not my question.

21        A.    If they were sending out something on an

22   Rx product they could not adulterate any of our

23   material.

24        Q.    So you -- so Purdue would provide the
```

1   material to McKesson?

2       A.   Or if they put a cover on it, like a cover

3   letter, we'd have to approve that.

4       Q.   And where is that protocol?  How -- was

5   there some sort of an agreement that that would be the

6   way it would work?

7       A.   An agreement with who?

8       Q.   With McKesson.

9       A.   There was no agreement with McKesson,

10  because if they wouldn't agree with it, we wouldn't do

11  it.

12      Q.   So you would ask McKesson to market

13  OxyContin in a particular way?

14      MR. STANNER:  Objection; form, foundation.

15      MR. HOFFMAN:  Object to form.

16  BY THE WITNESS:

17      A.   We -- if -- if for some reason we would do

18  OxyContin, which, again, would be highly unlikely, is

19  they would have -- they couldn't change a comma on

20  what was being sent out.

21  BY MS. CONROY:

22      Q.   And you would pay them for that service?

23      A.   Yes.

24      Q.   And that would be true of Butrans?

1      A.     Yes.

2      Q.     And/or Intermezzo?

3      A.     Yes.

4      Q.     Or MS Contin?

5      A.     Yes.

6      Q.     What about over-the-counter products,

7   could they change a comma in a product that you were

8   paying them to promote that was over-the-counter?

9      MR. HOFFMAN:  Object to form.

10   BY THE WITNESS:

11      A.     We would still like them to adhere to what

12   our promotional material says.

13   BY MS. CONROY:

14      Q.     When it says here:  "They will need to get

15   creative with OxyContin Tablets programs," the "they"

16   means McKesson, correct?

17      A.     Right.

18      Q.     And what was the OxyContin Tablets

19   programs?

20      A.     I can't tell you from 12 years ago what

21   that was specific to.

22      Q.     If they got creative with an OxyContin

23   tablets program, is that something they would do on

24   their own?

```
 1          MR. HOFFMAN:  Object to form.

 2          MR. STANNER:  Objection; vague, form,

 3     foundation.

 4     BY THE WITNESS:

 5          A.   I can't tell you from 12 years ago what

 6     that was about.

 7     BY MS. CONROY:

 8          Q.   You can put that one away.

 9          MS. PORTER:  Are you okay?

10          THE WITNESS:  I'm good.

11          MS. PORTER:  About another 30 minutes, folks, is

12     that okay?

13          MS. CONROY:  We'll do this next document.

14          MS. PORTER:  I was saying about another

15     30 minutes, does that sound okay?

16          MS. CONROY:  Oh, 30.  I thought you said three

17     minutes.

18          MS. PORTER:  That would be pretty specific.

19              The witness is okay for another

20     30 minutes.

21          MS. CONROY:  Okay.

22          MS. PORTER:  As am I.

23          MS. CONROY:  That's fine.

24          MS. PORTER:  If everyone else is okay, too.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        MS. CONROY:  Thank you, Mr. Seid.

2                  (WHEREUPON, a certain document was

3                   marked Purdue-Seid Deposition Exhibit

4                   No. 013, for identification, as of

5                   12/12/2018.)

6   BY MS. CONROY:

7        Q.    I show you what I have marked as

8   Exhibit 13, PPLPC004000249167 through 69.  This is an

9   e-mail dated Monday, September 9th of 2010.  To you

10  from Shelton Benson concerning OxyContin DirectRx ad

11  report dated 8/16/10.  And...

12       MS. CONROY:  Actually, this -- oh, here it is.

13  Does everybody have an attachment like this?

14       MR. HOFFMAN:  No.

15  BY THE WITNESS:

16       A.    No.

17       MS. CONROY:  Let me see.  Maybe it's -- what?

18            Oh, that's right.  Yep.  Let me just make

19  sure that I don't show anything that I'm not supposed

20  to show.

21  BY MS. CONROY:

22       Q.    Okay.  If we go to the beginning of this

23  e-mail, there is an e-mail from May Chow at McKesson

24  to Shelton Benson on August 4th of 2010 and Shelton
```

1    asked some questions about McKesson Connect.

2            Do you see that?  The subject line is

3    "McKesson Connect."

4        A.    Yes.

5        Q.    And then May responds on August 5th to

6    Shelton and says:

7            "Please see attached.  DirectRx

8    advertising places an ad with links to your

9    educational materials and ordering page on McKesson

10   Connect, our customer portal.  Hope this answers your

11   questions.  Let me know if you need anything else."

12           Do you see that?

13       A.    Yes.

14       Q.    Have you ever had occasion to go to

15   McKesson Connect?

16       A.    Have -- have I had --

17       Q.    To go to the McKesson Connect ordering

18   page, which is the customer portal for McKesson, is

19   that anything you've ever looked at?

20       A.    I may have been shown it by the marketing

21   folks at McKesson, but I would not go to it directly

22   myself.

23       Q.    Okay.  And then if you go to the next

24   e-mail, Shelton asked May:  "How many customers does

```
1    McKesson Connect reach?"

2            Do you see that?

3    A.    Yes.

4    Q.    And then she responds to him and says:

5    "Reaches about 38,000 customer accounts (on average,

6    one account represents 2 to 3 users).  This includes

7    all customer segments."

8            Do you have an understanding of what

9    "customer segment" means?

10   A.    I don't from this.

11   Q.    Okay.

12           "We can target ads to specific segments.

13   For example, we would not show ads for retail products

14   to hospitals and hospital items to retail pharmacies."

15           Do you see that?

16   A.    Yes.

17   Q.    Was that your understanding of the way

18   McKesson ads could be targeted?

19   MR. HOFFMAN:  Object to form.

20   MR. STANNER:  Object.  Yeah, object to the --

21   BY THE WITNESS:

22   A.    According to this --

23   MS. PORTER:  Hold on.  Let him finish talking.

24   MR. STANNER:  Form and foundation.
```

```
 1        MS. PORTER:  Now go.  Now you can answer.

 2   BY THE WITNESS:

 3        A.    According to this, it says they can

 4   separate hospital from retail and vice versa.

 5   BY MS. CONROY:

 6        Q.    Would you -- it has been a while.  Is that

 7   something you would have known at the time?

 8        A.    I don't know.

 9        Q.    And then up at the top, which is a Shelton

10   Benson e-mail from Friday, August 6th, to May Chow,

11   Shelton says:

12             "The McKesson Connect program is a go.

13   Turn on the hospital group as well.  Let me know if

14   you need anything else."

15             Do you see that?

16        A.    Yes.

17        Q.    So that means Shelton is telling McKesson

18   they can go ahead with the advertisement, correct?

19        A.    Correct.

20        MR. STANNER:  Object to form and foundation.

21   BY MS. CONROY:

22        Q.    And then May responds:  "Thanks, Shelton.

23   I'll have this set up to go on 8/16."

24             And then May on September 13th attaches
```

1    the statistics for the OxyContin DirectRx ad program

2    that are attached.

3             Do you see that reference?

4         A.    Yes.

5         MR. STANNER:  Can I just -- I'm sorry.  Can I

6    ask, does the exhibit have the attachment, because the

7    one I have doesn't have an attachment?

8         MS. PORTER:  It -- it does not.

9         MS. CONROY:  It has --

10        MS. PORTER:  The witness says it does not have

11   an attachment.

12        MS. CONROY:  You don't have this on --

13        THE WITNESS:  No.

14        MS. FITZPATRICK:  He should.

15        MS. CONROY:  Oh, it should.  I don't know --

16   I'll put it up on the screen so he can see it.

17             The Bates is PPLPC004000249170.  It should

18   be the next -- I don't know -- let's make sure it's

19   not stuck on some other.  We can get copies of it.

20   BY MS. CONROY:

21        Q.    But you can see it up there.  This is the

22   DirectRx advertising program results from McKesson.

23             Have you ever seen something like this

24   before?

```
 1        A.    Yes.

 2        Q.    And it has the date of the online ad was

 3   August 16th, the duration of the ad, it was on for one

 4   week and it has the dates.

 5              Do you see that?

 6        A.    Yes.

 7        Q.    "Number of ad impressions, 174,209."

 8              Do you see that?

 9        A.    Yes.

10        Q.    Do you know what that means, "ad

11   impressions"?

12        A.    I believe it was the number of views.  I'm

13   not sure.

14        Q.    Number of?  I'm sorry.

15        A.    Number of views.

16        Q.    Okay.

17        A.    It was done electronically.

18        Q.    And then the number of clicks to order

19   system is 127?

20        A.    Um-hum.

21        Q.    Is that how many people clicked and

22   actually ordered the product?

23        MR. STANNER:  Objection; foundation.

24   BY THE WITNESS:
```

```
 1        A.    I don't know.  I would assume.

 2   BY MS. CONROY:

 3        Q.    Okay.  And then it says:  "Number of file

 4   downloads, OxyContin reformulation FAQ fax sheet PDF

 5   187."

 6              Do you see that?

 7        A.    Yes.

 8        Q.    And then it says:  "Overall product lift."

 9              What does that mean?

10        MR. STANNER:  Objection; foundation.

11   BY THE WITNESS:

12        A.    I'm not sure what they mean by that

13   because that just looks like products that they

14   ordered for those weeks.

15   BY MS. CONROY:

16        Q.    So when you say "products that they

17   ordered," McKesson in the week 8/16 to 8/22, there

18   were 15,000 units sold.

19              Do you see that?

20        A.    Yes.

21        Q.    So does that mean that they -- they

22   certainly ordered 15,000 in that week or maybe more

23   but they sold 15,000?

24        MR. HOFFMAN:  Objection to form, foundation.
```

```
 1       MR. STANNER:  Objection to form, foundation.

 2   BY THE WITNESS:

 3       A.    I -- again, I'm not sure what they mean by

 4   that because -- I'm just not sure what they mean by

 5   that.

 6   BY MS. CONROY:

 7       Q.    If you'd look back at what -- if you'd

 8   look back at the e-mail, Shelton sends the results of

 9   the McKesson ad that was run, which is this

10   attachment, to you, correct?

11       A.    Um-hum.

12       Q.    And why would he have sent that to you?

13   Was that typical that he would send results of an ad

14   that was run?

15       A.    Yes.  He reported to me.

16       Q.    Where would I go to determine what was the

17   price for running this ad?

18       A.    I have no rec -- recollection of that, so

19   I don't know where you'd go.

20       Q.    Well, I -- I'm not expecting you to

21   remember what it was.  I just mean where would I -- if

22   I wanted to know what Purdue paid for this DirectRx

23   advertising for OxyContin during the week 8/16 to

24   8/22, where would that kind of information be at
```

1    Purdue?

2         A.    I don't know.

3         Q.    Would it have been -- it would be recorded

4    somewhere, correct?

5         A.    Yes, it would.

6         Q.    Would that come out of a national accounts

7    budget or marketing budget or --

8         A.    It would come out of a marketing budget.

9         Q.    Would Shelton Benson have had to get

10   permission from marketing to spend that money with

11   McKesson?

12        A.    Well, I'd have to get permission to get

13   that.

14        Q.    That would be something you would do?

15        A.    Right.

16        Q.    Would you -- if you can recall, would you

17   have passed on the results of this advertising to

18   marketing?

19        A.    I believe I would.

20        Q.    So it's -- it -- in some fashion this

21   information from McKesson, the program results would

22   have made their way to marketing?

23        A.    I believe so.

24        Q.    You can put that away.

```
 1        MS. PORTER:  Do you want me to take that

 2   page and put it with the witness' exhibit?

 3        MS. CONROY:  I think -- I do.  I'm perfectly

 4   happy to have it, but we can make copies of it.  So

 5   why don't I give it to the person who --

 6        MR. HOFFMAN:  We can -- we can add it tomorrow.

 7        MS. CONROY:  Oh, that's fine.  I just -- let's

 8   just --

 9        MS. PORTER:  Do you have a paperclip?

10        MS. CONROY:  I do.

11        MS. PORTER:  There are not many office supplies

12   you guys don't have over there somewhere, so...

13        MR. STANNER:  When you attach it, can we do one

14   that's not highlighted?

15        MS. CONROY:  Yeah, I'm -- I'm going to look --

16   we can -- somewhere we had these copies made.

17   Somewhere there's a --

18        MR. STANNER:  We may copy the highlighting and

19   it will not show anyway.

20        MS. CONROY:  Yeah.  We can straighten that -- we

21   can straighten that out or get a -- or we -- we can

22   run it out of Relativity again.

23        MS. PORTER:  I'm just going to put a Post-it on

24   there with a note so that we remember to fix that
```

1    tomorrow.

2          MS. CONROY:  I'm going to mark as 14 and 15 a

3    little bit more information about this.

4                    (WHEREUPON, certain documents were

5                     marked Purdue-Seid Deposition Exhibit

6                     No. 014 and No. 015, for

7                     identification, as of 12/12/2018.)

8          MS. CONROY:  That's 15 -- no.  That's 14.

9    I'll -- I'll read them out as we go.

10   BY MS. CONROY:

11         Q.    14 and 15.

12               Exhibit 14 is an e-mail, top, it's

13   PPLPC004000245298 through 299 and Exhibit 15 is

14   PPLPC004000245474 through 75.

15               If you'd take a look first at Exhibit 14,

16   there is an e-mail from Shelton Benson to you on

17   August 4th and he says:  "Just wanted to get your

18   okay.  Is it okay for me to let May" -- that's

19   May Chow from McKesson, correct?

20         A.    Correct.

21         Q.    -- "know that it's okay to go ahead with

22   the program to run 8/16 through the 22nd?"  And then

23   you ask him:  "How much?"  And Shelton says:  "I'm not

24   asking for your okay on the program cost.  We already

1    discussed it.  This is the program we decided to go

2    with rather than the fax blast programs."

3            Do you see that?  It's on the last page.

4            Do you see that e-mail?

5    A.    Yes.

6    Q.    Okay.

7            And then he says:  "I gets," but I think

8    it should be "it gets," "prime exposure for one week

9    and then goes on the website permanently."

10           Do you see that?

11   A.    Yes.

12   Q.    That means it goes on the McKesson Connect

13   website, correct?

14   A.    Yes.

15   Q.    "I was asking for your okay with the ad

16   that they will be using that will drive the customer

17   to the order page with the reformulated OxyContin and

18   will include the FAQ sheet that we sent them."

19           Do you see that?

20   A.    Yes.

21   Q.    And so the FAQ sheet is the sheet that

22   Purdue, Shelton, sent to McKesson, correct?

23   A.    Um-hum.  Yes.

24   Q.    "The cost is $4500 compared to 7,000 for

```
 1    the other programs that did not get as much exposure."

 2             Do you see that?

 3        A.   Yes.

 4        Q.   And you have a question at the bottom of

 5    the first page.  You thought it was $3,500.

 6             Do you see that?

 7        A.   Yes.

 8        Q.   And then Shelton says:  "The original

 9    program we discussed were 6500 to 7,000.  When we met

10    with Martha and May we decided that McKesson Connect

11    for $4500 had more reach and was better bang for our

12    buck."

13             Do you see that?

14        A.   Yes.

15        Q.   And then you asked him what the reach is.

16             Do you see that?

17        A.   Yes.

18        Q.   And he says that the information is at

19    home and that the fax blast was -- "would only go out

20    to 2600, limited to two pages, which would not work

21    with FPI."

22             Do you see that?

23        A.   Yes.

24        Q.   Do you know what FPI is?
```

1      A.    Full package insert.

2      Q.    Okay.  And then if you look at Exhibit 15,

3  and Shelton, it is just a little bit convoluted with

4  the e-mail chain, but Shelton responds to you when you

5  asked what the reach is, and he says:

6            "With the McKesson Connect the

7  reformulated OxyContin will reach 38,000 customers two

8  to three times in all COTs."

9            Do you see that?

10     A.    Um-hum.

11     Q.    What's is a COT?

12     A.    Class of trade.

13     Q.    Class of trade?

14     A.    Yes.

15     Q.    What does that mean?

16     A.    Hospitals, retail pharmacies.

17     Q.    So these are groups that would order

18  OxyContin?

19     A.    That may have ordered the reformulated

20  OxyContin.

21     Q.    Okay.  So this -- this is reaching

22  customers who would potentially order the reformulated

23  OxyContin from McKesson?

24     A.    Correct.

1      Q.     And then he goes on, he says:

2             "We get the primary spot for one week

3      (August 16th through the 22nd), after that it will be

4      on the McKesson Connect website indefinitely.  The

5      cost is $4500 compared to the original programs that

6      we discussed, Fax Blast and RxBulletin, that would be

7      a total of $8500.  We talked about that we may want to

8      do RxBulletin $3,500 in November as a follow-up.  That

9      pro" -- "program is more of a HealthMart program."

10            Do you see that?

11     A.     Yes.

12     Q.     Do you know what that means, a program is

13     more of a HealthMart program?

14     A.     HealthMart is their branding for

15     independent pharmacies under their -- it's a McKesson

16     program.

17     Q.     And so if there were advertisements for

18     the reformulated OxyContin that were run through the

19     HealthMart program, that would only reach the

20     independent pharmacies?

21     MR. STANNER:  Objection; foundation.

22     BY THE WITNESS:

23     A.     I can't give specifics based on just this

24     one sentence, but HealthMart is an independent

Highly Confidential - Subject to Further Confidentiality Review

```
 1   pharmacy program that McKesson has.

 2        MS. PORTER:  Is it a good time to call it a day?

 3        MS. CONROY:  Sure.  That's fine.

 4             Thank you, Mr. Seid.

 5        THE WITNESS:  Thank you.

 6        MR. STANNER:  Are we off the record?

 7        THE VIDEOGRAPHER:  We are off the record at

 8   6:27 p.m.

 9                  (WHEREUPON, the deposition was

10                   adjourned until 9:00 a.m., Thursday,

11                   December 13, 2018.)

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    REPORTER'S CERTIFICATE

 2

 3           I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4    a Certified Shorthand Reporter, do hereby certify:

 5           That previous to the commencement of the

 6    examination of the witness herein, the witness was

 7    duly sworn to testify the whole truth concerning the

 8    matters herein;

 9           That the foregoing deposition transcript

10    was reported stenographically by me, was thereafter

11    reduced to typewriting under my personal direction and

12    constitutes a true record of the testimony given and

13    the proceedings had;

14           That the said deposition was taken before

15    me at the time and place specified;

16           That I am not a relative or employee or

17    attorney or counsel, nor a relative or employee of

18    such attorney or counsel for any of the parties

19    hereto, nor interested directly or indirectly in the

20    outcome of this action.

21           IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 17th day of December, 2018.

23

24           JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                DEPOSITION ERRATA SHEET

 2

 3   Assignment No. 200039

 4   Case Caption:  In Re: National Prescription

 5                  Opiate Litigation

 6

 7        DECLARATION UNDER PENALTY OF PERJURY

 8

 9        I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                              STEPHEN SEID

19

20   SUBSCRIBED AND SWORN TO

21   before me this       day

22   of               , A.D. 20__.

23

24           Notary Public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                       STEPHEN SEID
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                       STEPHEN SEID
```