```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4

 5   ----------------------------) MDL No. 2804

 6   IN RE NATIONAL PRESCRIPTION  )

 7   OPIATE LITIGATION            ) Case No. 17-md-2804

 8                                )

 9   This document relates to:    ) Hon. Dan A. Polster

10   All Cases                    )

11   ----------------------------) VOLUME II

12

13                   HIGHLY CONFIDENTIAL

14        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

15

16              The resumed videotaped deposition of

17   STEPHEN SEID, called for examination, taken pursuant

18   to the Federal Rules of Civil Procedure of the United

19   States District Courts pertaining to the taking of

20   depositions, taken before JULIANA F. ZAJICEK, a

21   Registered Professional Reporter and a Certified

22   Shorthand Reporter, at the offices of Dechert LLP,

23   Suite 3400, 35 West Wacker Drive, Chicago, Illinois,

24   on December 13, 2018, at 9:00 a.m.
```

```
 1    APPEARANCES:
 2    ON BEHALF OF THE PLAINTIFFS:
 3         SIMMONS HANLY CONROY LLC
           112 Madison Avenue, 7th floor
 4         New York, NY 10016
           212-784-6400
 5         BY:  JAYNE CONROY, ESQ.
                jconroy@simmonsfirm.com;
 6              LAURA FITZPATRICK, ESQ.
                lfitzpatrick@simmonsfirm.com
 7              ELLYN HURD, ESQ. (Telephonically)
                ehurd@simmonsfirm.com
 8
      ON BEHALF OF THE STATE OF TENNESSEE PLAINTIFFS:
 9
           BRANSTETTER, STRANCH & JENNINGS, PLLC
10         The Freedom Center
           223 Rosa L. Parks Avenue, Suite 200
11         Nashville, Tennessee 37203
           615-254-8801
12         BY:  MICHAEL G. STEWART, ESQ.
                mstewart@bsjfirm.com
13
      ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
14    AMERISOURCEBERGEN DRUG CORPORATION:
15         JACKSON KELLY PLLC
           150 Clay Street, Suite 500
16         Morgantown, West Virginia 26501
           304-284-4138
17         BY:  SYLVIA WINSTON NICHOLS, ESQ.
                (Telephonically)
18              sylvia.winston@JacksonKelly.com
19    ON BEHALF OF MALLINCKRODT LLC and SPECGX LLC:
20         ROPES & GRAY LLP
           Prudential Tower
21         800 Boylston Street
           Boston, Massachusetts 02199-3600
22         617-951-7910
           BY:  LUKE D. RILEY, ESQ. (Telephonically)
23              luke.riley@ropesgray.com;
                GREGORY F. MALLOY, ESQ. (Telephonically)
24              gregory.malloy@ropesgray.com
```

```
 1    APPEARANCES: (Continued)

 2

      ON BEHALF OF CARDINAL HEALTH, INC.:

 3

             WILLIAMS & CONNOLLY LLP
 4           725 Twelfth Street, N.W.
             Washington, D.C. 20005
 5           202-434-5000
             BY:  KATELYN ADAMS, ESQ. (Telephonically)
 6               kadams@wc.com

 7

      ON BEHALF OF McKESSON CORPORATION:

 8

             COVINGTON & BURLING, LLP
 9           One City Center
             850 Tenth Street, NW
10           Washington, D.C. 20001
             202-662-5531
11           BY:  AMBER CHARLES, ESQ. (Telephonically)
                 acharles@cov.com

12

13           TABET DIVITO & ROTHSTEIN LLC
             209 South LaSalle Street, 7th Floor
14           Chicago, Illinois 60604
             312-762-9461
15           BY:  DANIEL L. STANNER, ESQ.
                 dstanner@tdrlawfirm.com

16

17    ON BEHALF OF ENDO HEALTH SOLUTIONS INC., ENDO
      PHARMACEUTICALS INC., PAR PHARMACEUTICAL COMPANIES,
18    INC.:
19           ARNOLD & PORTER KAYE SCHOLER LLP
             70 West Madison Street, Suite 4200
20           Chicago, Illinois 60602-4231
             312-583-2435
21           BY:  MICHAEL S. BULLERMAN, ESQ.
                 michael.bullerman@arnoldporter.com

22

23

24
```

```
 1    APPEARANCES:  (Continued)

 2

      ON BEHALF OF WALMART INC.:

 3

          JONES DAY
 4        77 West Wacker Drive
          Chicago, Illinois 60601-1692
 5        312-269-4164
          BY:  SCOTT D. QUELLHORST, ESQ.
 6            squellhorst@jonesday.com

 7

      ON BEHALF OF PURDUE PHARMA, L.P., PURDUE PHARMA, INC.
 8    and THE PURDUE FREDERICK COMPANY, INC.:

 9        DECHERT LLP
          35 West Wacker Drive, Suite 3400
10        Chicago, Illinois 60601
          312-646-5800
11        BY:  NATHAN HOFFMAN, ESQ.
              nathan.hoffman@dechert.com;
12            MELANIE MACKAY, ESQ.
              melanie.mackay@dechert.com

13

14    ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC. IN
      NON-MDL CASES PENDING IN ARKANSAS AND PENNSYLVANIA:

15

          CLARK MICHIE LLP
16        220 Alexander Street
          Princeton, NJ 08540
17        609-423-2143
          BY:  CHRISTOPHER J. MICHIE, ESQ.
18            (Telephonically)
              chris.michie@clarkmichie.com

19

20    ON BEHALF OF DEFENDANT ROCHESTER DRUG COOPERATIVE:

21        ALLEGAERT BERGER & VOGEL, LLP
          111 Broadway, 20th Floor
22        New York, New York 10006
          212-571-0550
23        BY:  LOUIS CRACO, ESQ. (Telephonically)
              lcraco@abv.com

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES: (Continued)
 2
      ON BEHALF OF VALIDUS PHARMACEUTICALS:
 3
           FOX ROTHSCHILD LLP
 4         1301 Atlantic Avenue
           Midtown Building, Suite 400
 5         Atlantic City, New Jersey 08401-7212
           609-572-2236
 6         BY:  JACOB S. PERSKIE, ESQ.
                jperskie@foxrothschild.com
 7              CIERA LOGAN, ESQ.
                clogan@foxrothschild.com
 8
 9    ON BEHALF OF THE DEPONENT:
10         SALVATORE PRESCOTT & PORTER
           1010 Davis Street
11         Evanston, Illinois 60201
           312-283-5711
12         BY:  JULIE B. PORTER, ESQ.
                porter@spplawyers.com
13
14
      ALSO PRESENT:
15
           MS. GRETCHEN KEARNEY, Paralegal,
16         Baron & Budd, P.C.
17
18    THE VIDEOGRAPHER:
19         MR. BEN STANSON,
           Golkow Litigation Services.
20
21
22
23
24    REPORTED BY:   JULIANA F. ZAJICEK, RPR, CSR 84-2604.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         I N D E X

 2

 3   WITNESS:                                    PAGE:

 4    STEPHEN SEID

 5        EXAM BY MS. CONROY...................  226

 6        EXAM BY MR. STEWART..................  337

 7        EXAM BY MR. STANNER..................  441

 8        EXAM BY MR. HOFFMAN..................  451

 9        FURTHER EXAM BY MS. CONROY...........  489

10        FURTHER EXAM BY MR. STEWART..........  522

11        FURTHER EXAM BY MR. STANNER..........  538

12        FURTHER EXAM BY MR. HOFFMAN..........  545

13        FURTHER EXAM BY MS. CONROY...........  547

14

15                          *****

16

17                     E X H I B I T S

18   PURDUE-SEID EXHIBIT                 MARKED FOR ID

19    No. 016    E-mail chain, top one from Dan      226
                 Colucci to Howard Udell, among

20               others, 6/6/07, Subject: SOP 7.7
                 System to disclose suspicious

21               orders of controlled substances
                 SOP.pdf; PPLPC004000119319 - 320

22               and PPLPC004000119321_001 -
                 321_003

23

24
```

```
 1                   E X H I B I T S (Continued)
 2    PURDUE-SEID EXHIBIT                    MARKED FOR ID
 3      No. 017  E-mail chain, top one from Aaron      248
                 Graham to Charles Forsaith and Dan
 4               Colucci, 6/6/2007, Subject: RE:
                 Sop 7.7 System to disclose
 5               suspicious orders of controlled
                 substances; PPLPC016000001102 -
 6               104
 7      No. 018  E-mail chain, top one from Thomas     250
                 Roepke to Charles Forsaith,
 8               6/7/2007, Subject: Re: SOP 7.7
                 System to disclose suspicious
 9               orders of controlled substances;
                 PPLPC018000152012 - 015
10
        No. 019  E-mail chain, top one from Jack       261
11               Crowley to Dan Colucci, among
                 others, 10/3/07, Subject: RE:
12               Follow-up on Suspicious Order
                 Reporting; PPLPC004000132946 - 954
13
        No. 020  E-mail from Gina Limer to Jack        277
14               Crowley, 2/6/08, Subject: RE:
                 Suspicious Orders Meeting with
15               attachment, Suspicious Order
                 Monitoring and Reporting Meeting
16               020608.doc; PPLPC026000037881 -
                 883
17
        No. 021  E-mail from William Mallin to         288
18               Robin Abrams, among others,
                 5/30/12, Subject: May 2012 Updated
19               Purdue Committee Charters,with
                 attachment Purdue Committees
20               Binder May 2012.ppt;
                 PPLPC012000378036 - 037
21
        No. 022  "OMS report May 5th, 2011, Kabs       293
22               Pharmacy No. 5";
                 PPLPC004000279670 - 671
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S (Continued)
 2    PURDUE-SEID EXHIBIT                        MARKED FOR ID
 3     No. 023   E-mail chain, top one from Mark      297
                 Geraci to Nancy Bentley, 1/28/10,
 4               Subject: FW: OMS Meeting 10:00am,
                 with attachments OMS Monthly
 5               Meeting 12162009Minutes.doxk, OMS
                 Quarterly Meeting Agenda January
 6               28, 2010.doc;
                 PPLPC034000360255 - 266
 7
       No. 024   E-mail chain, top one from Stephen   314
 8               Seid to
                 ValueTrak@valuecentric.com,
 9               7/13/2009, Subject: RE: Item
                 Exceeds Average;
10               PPLPC004000207529 - 530
11     No. 025   E-mail chain, top one from Stephen   320
                 Seid to
12               valuetrak@valuecentric.com,
                 7/13/2009, Subject: RE: Item
13               Exceeds Average;
                 PPLPC004000207523 - 524
14
       No. 026   E-mail chain, top one from Stephen   321
15               Seid to Dawn Wargo, among others,
                 7/20/2009, Subject: FW: Item
16               Exceeds Average;
                 PPLPC004000208240 - 241
17
       No. 027   E-mail chain, top one from Stephen   323
18               Seid to FFSOrderMngt, 9/9/2009,
                 Subject: RE: Item On Order Exceeds
19               Average Exception;
                 PPLPC004000213649 - 650
20
       No. 028   E-mail chain, top e-mail from        324
21               Stephen Seid to FFSOrderMngt,
                 9/24/2009, Subject: RE: Item On
22               Order Exceeds Average Exception;
                 PPLPC004000214875 - 876
23
24
```

```
 1                  E X H I B I T S (Continued)
 2    PURDUE-SEID EXHIBIT                     MARKED FOR ID
 3    No. 029   E-mail chain, top one from Stephen   325
                Seid to FFSOrderMngt, 10/27/2009,
 4              Subject: FW: Item On Order Exceeds
                Average Exception;
 5              PPLPC004000218107 - 108
 6    No. 030   E-mail chain, top one from Stephen   327
                Seid to FFSOrderMngt, 10/1/2009,
 7              Subject: FW: Item On Order Exceeds
                Average Exception;
 8              PPLPC004000215590 - 591
 9    No. 031   Training document titled:            329
                "Institutional Contracts, Level
10              150," by Christine Ostrowski,
                Senior Director Managed Markets
11              Contracting & Operations;
                PPLP003553723 - 754
12
      No. 032   E-mail chain, top one from Stephen   329
13              Seid to Steve Bishop, Cheryl
                Siciliano, 11/10/10, Subject: FW:
14              Butrans; PPLPC004000256865 - 866
15    No. 033   E-mail from Giselle Issa to Robin    329
                Abrams, among others, 4/16/14,
16              Subject: Final Agenda and
                Presentation, with attachment
17              Overview of Purdue's OMS Program
                for ABC Meeting April 17 2014.ppt,
18              Purdue Meeting with ABC April 17
                2014.docx; PPLPC004000399334 - 337
19
      No. 034   Personnel File - Stephen Seid;       336
20              PPLP004418217 - 400
21    No. 035   JC Elmo Notes                        337
22    No. 036   PowerPoint dated 3/13/12 by Robin    339
                Abrams, "Order Monitoring System
23              (OMS): A Manufacturer's
                Perspective"; PPLPC004000317962
24
```

```
 1                    E X H I B I T S (Continued)
 2    PURDUE-SEID EXHIBIT                     MARKED FOR ID
 3     No. 037   E-mail from Giselle Issa to Mark      378
                 Geraci, among others, 6/7/12,
 4               Subject: Updated Agenda and the 3
                 Outstanding Reports for OMS
 5               Meeting, with attachments;
                 PPLPC004000325578 - 607
 6
       No. 038   Field Research Results Summary -      403
 7               Update, 12/5/06;
                 PP_TN_Staubus000202716 - 724
 8
       No. 039   E-mail from Aileen Barcia to         404
 9               Russem Johnson, among others,
                 10/05/07, Subject: Frank and Janet
10               McNeil; PP_TN_Staubus000003441
11     No. 040   AE/PC Data Collection Form,          406
                 8/22/08;
12               PP_TN_Staubus000186585 - 592
13     No. 041   E-mail chain, top one from          410
                 Steve Bishop to Stephen Seid,
14               Cheryl Siciliano, 9/22/2008,
                 Subject: FW: Community Awareness
15               Knox County;
                 PPLPC004000175719 - 720
16
       No. 042   CSA Compliance Accounts as of        420
17               6/1/10; PPLP004381168 - 170
18     No. 043   Referral to DEA re: Frank McNeil;    421
                 PTN000045572
19
       No. 044   E-mail from Giselle Issa to Mark     422
20               Geraci, among others, 7/16/13,
                 Subject: Reports for the OMS
21               Meeting; PPLPC004000363663
22     No. 045   E-mail from Joan Zooper to Lori      423
                 Stewart, among others, 4/7/11,
23               Subject:  Drs. Janet and Frank
                 McNiel from TN;
24               PP_TN_Staubus000002663
```

```
 1            E X H I B I T S  (Continued)
 2   PURDUE-SEID EXHIBIT              MARKED FOR ID
 3   No. 046   E-mail from Brenda Dawson to      426
               ADD-Legal, among others, 4/19/12,
 4             Subject: FW: QE/PC/ROC/ADD(SOP
               1.7.1) Details for
 5             1025310000005888 PFT-000167144;
               PP_TN_Staubus00003387 - 388
 6
     No. 047   E-mail chain, top one from Jack   427
 7             Crowley to Stephen Seid, Giselle
               Issa, 9/13/12, Subject: OMS
 8             Accounts; PPLPC004000334743 - 744
 9   No. 048   OMS Summary Report, 9/10/12, Drug 430
               Park Inc.; PPLP004380246 - 269
10
     No. 049   OMS Report, Updated 7/18/13,      430
11             Original 6/7/12, Food City
               Pharmacy #674;
12             PPLPC004000363824 - 841
13   No. 050   OMS Meeting Minutes, 7/18/13;     435
               PPLP004372147 - 149
14
     No. 051   McKesson Manufacturer Marketing   447
15             Product Promotional Agreement,
               7/25/10; MCKMDL00353305 - 306
16
     No. 052   Banner Ad OxyContin Reformulation; 448
17             MCKMDL00353284
18   No. 053   GC-SOP-0007, 3/23/09;             471
               PPLPC031001491482 - 487
19
     No. 054   RxPATROL; PPLP003318459 - 460     473
20
     No. 055   E-mail chain, top one from Michael 485
21             Cullen to Bob Breetz, among
               others, 9/12/10, Subject: RE:
22             OxyContin Question, with
               attachment;
23             PPLPC004000248927 - 948
24   No. 056   OMS Customer Details;             491
```

```
 1                    E X H I B I T S (Continued)
 2    PURDUE-SEID EXHIBIT                        MARKED FOR ID
 3     No. 057    Screen shot of the suspicious       495
                  order monitoring database;
 4                PPLPC033000006038 - 039
 5     No. 058    McKesson Manufacturer Marketing,    505
                  8/20/12, Prepared for Purdue
 6                Pharma L.P. - RxPATROL;
                  MCKMDL00353316 - 319
 7
       No. 059    Screen shot McKesson Connect;       509
 8                MCKMDL00353308
 9     No. 060    McKesson Manufacturer Marketing -   512
                  Custom Solutions for Driving Brand
10                Performance;
                  CAH_MDL2804_02100389 - 396
11
       No. 061    E-mail from Jack Crowley to Robin   523
12                Abrams, among others, 11/23/09,
                  Subject: South Florida;
13                PPLPC004000220392 - 394
14     No. 062    PowerPoint presentation: Purdue     528
                  OxyContin Trends;
15                PPLPC004000396762 - 780
16     No. 063    E-mail from Jack Crowley to         532
                  Stephen Seid, among others,
17                4/6/2009, Subject: RE: OMS;
                  PPLPC004000198309 - 316
18
       No. 064    E-mail from Jack Crowley to         535
19                Stephen Seid, 2/17/12, Subject:
                  Meeting; PPLPC004000312845 - 847
20
       No. 065    LinkedIn profile - Barbara          547
21                Boockholdt
22
23
24
```

```
 1        THE VIDEOGRAPHER:  We are back on the record on

 2   December 13th, 2018.  The time is 9:20 a.m.  This is

 3   the continuation of the deposition of Mr. Seid.  The

 4   witness is still under oath.

 5           Counsel, you may proceed.

 6               (WHEREUPON, a certain document was

 7                marked Purdue-Seid Deposition Exhibit

 8                No. 016, for identification, as of

 9                12/13/2018.)

10               STEPHEN SEID,

11   called as a witness herein, having been previously

12   duly sworn, was examined and testified further as

13   follows:

14               EXAMINATION (Resumed)

15   BY MS. CONROY:

16       Q.    Good morning, Mr. Seid.

17       A.    Good morning.

18       Q.    Let me pass to you what I've marked as

19   Exhibit 16.

20       A.    Thank you.

21       Q.    Exhibit 16 is PPLPC004000119319 through

22   321, and it is an e-mail that is dated Wednesday,

23   the 6th of June, 2007, that's the top one, from Dan

24   Colucci.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1                   Who is Dan Colucci?

 2        A.    Dan Colucci is in finance.

 3        Q.    Okay.  And you are on the list of

 4   recipients.

 5              Do you see that up at the top, all of

 6   those names?

 7        A.    Yes.  Yeah, I see myself.

 8        Q.    Okay.  And the subject is:  "Standard

 9   Operating Procedure 7.7 System to Disclose Suspicious

10   Orders of Controlled Substances."

11              Do you see that?

12        A.    Yes.

13        Q.    And are you fam -- I think you told me

14   yesterday you were not familiar with 7.7.

15              Does this refresh at all seeing it in

16   print?

17        A.    No, I'm not familiar with it.

18        Q.    Okay.  And if you take a look at the

19   second page of the e-mail, there is a reference from

20   an Anthony DiCocco?

21        A.    Yes.

22        Q.    About Watson's Anda division.

23              Do you see that, about some orders?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And then there is a -- up at the top there
 2   is a reference to -- for you to call him.
 3              Do you see that?  "Steve, when you can,
 4   please call me."
 5        A.    It looks like something is cut off here.
 6   Oh, from back here.
 7              Yes, I see that.
 8        MS. FITZPATRICK:  Do you have the attachment?
 9        MS. CONROY:  The attachment is not -- I think
10   it's --
11              Does yours have it or no?
12        MS. PORTER:  No, it does not, neither does the
13   witness's.
14        MS. CONROY:  All right.  Let's -- let's go off
15   the record.
16        THE VIDEOGRAPHER:  We are off the record at
17   9:23 a.m.
18                   (WHEREUPON, discussion was had
19                    off the record.)
20        THE VIDEOGRAPHER:  We are back on the record at
21   9:26 a.m.
22   BY MS. CONROY:
23        Q.    Mr. Seid, we took a -- a brief moment to
24   replace your exhibit.  Now you have the attachment
```

1    that was meant to be a part of Exhibit 16.  And

2    Exhibit 16, I'll just read it so I make sure I get the

3    whole thing, PPLPC004000119319 through 003, and it

4    includes the SOP 7.7 in those numbers, which I think

5    are different -- actually, I'm just going to read.

6    7.7 has three separate numbers.  PPLPC004000119321-001

7    through 003.

8            If you take a look at the attachment, 7.7

9    that's attached to your e-mail thread, Mr. Seid, is it

10   familiar to you?

11       A.   No.

12       Q.   If you received it from Mr. Udell back on

13   Wednesday, June 6th of 2-7 -- 2007, is that something

14   you would have opened?

15           Would you have opened the attachment?

16       A.   I don't see that on here.

17       Q.   You -- you don't see what?

18       A.   I don't -- if I had received this from

19   How -- Howard Udell?

20       Q.   Correct.

21       A.   Which is --

22       Q.   What I'm looking at is on the front page,

23   there is -- I'm sorry.  From Dan Colucci, there was an

24   e-mail from Dan -- Dan Colucci to Howard Udell, many

```
1    other Purdue recipients, yourself included.

2            Do you see that?

3    A.    Um-hum.

4    Q.    And the SOP 7.7, System to Disclose

5    Suspicious Orders of Controlled Substances, was

6    attached.

7            Do you see that SOP.pdf?

8    A.    Yes.

9    Q.    If you had received it from Mr. Colucci,

10   would you have opened the attachment?

11   A.    I can't tell you whether I would have

12   opened the attachment or not.

13   Q.    Is there a reason -- as you were on the

14   suspicious order monitoring committee, correct?

15   A.    Yes.

16   Q.    Is there a reason you would not have seen

17   or been familiar with SOP 7.7?

18   A.    This is a finance and accounting standard

19   operating procedures manual.  I norm --

20   Q.    Is that -- so is that why you would not

21   have been aware of it, because it was a -- a finance

22   and accounting SOP?

23   A.    That's why I was not familiar with it.

24   Q.    So it would be -- it would not be
```

Highly Confidential -- Subject to Further Confidentiality Review

```
 1    something that you would follow?

 2        MR. HOFFMAN:  Object to form.

 3    BY THE WITNESS:

 4        A.    I don't -- it's just -- it's an SOP I'm

 5    not aware of.  It's a finance and -- and accounting

 6    department procedures manual and it's about their

 7    procedures and what they follow, so it...

 8    BY MS. CONROY:

 9        Q.    Is there a representative of finance on

10    the suspicious order monitoring committee?

11        A.    No.

12        Q.    Is there a reason there is no

13    representative from finance on the suspicious order

14    monitoring committee?

15        MR. HOFFMAN:  Object to form.

16    BY THE WITNESS:

17        A.    I would say you would need to ask the

18    chair of the suspicious order monitoring committee as

19    to the decision as to who should be members.

20    BY MS. CONROY:

21        Q.    And that would be Robin Abrams?

22        A.    Correct.

23        Q.    She -- she made the decisions about who

24    would be on the committee?
```

1     A.     She was the chair.

2     Q.     And did she make the decisions as far as

3   you know about who -- who should be a member of the

4   committee?

5     A.     I know that she made a decision that I

6   should be on the committee.  I don't know how she made

7   decisions otherwise as to who should be on the

8   committee.

9     Q.     Did you have occasion to consult with the

10  finance and -- and -- the finance department when you

11  had questions about a customer or one of the

12  wholesalers' customers?

13    A.     It appears that the question here was

14  probably -- it appears that the question -- the

15  concern here was credit limits.  And whether it was an

16  order for a gross of Senokot laxatives or prescription

17  medication, if an account was banging up against their

18  credit limit, finance would reach out to me and we

19  would discuss that.  So the -- it appears the key

20  issue here for Dan Colucci was the line of credit.

21    Q.     If you'd take a look at the second page of

22  the document, the e-mail from Dan Colucci to you and

23  others on June 5th of 2007, he says:  "Steves,"

24  because there are -- there are two Stephens, I guess,

```
 1    Steve Bishop and Stephen Seid?

 2         A.    Correct.

 3         Q.    "Steves, is it possible they would need

 4    another 2 million in product?"

 5               Do you see that?

 6         A.    Yes.

 7         Q.    You -- it's your understanding that he is

 8    asking whether there is a -- whether they have a

 9    credit issue?

10         A.    Well, ultimately it relates to the orders

11    that they received from Anda and that they operated

12    successfully with an 800 line of -- 800,000 line of

13    credit.  "Last week they placed an order for 1.682 for

14    their Ohio location."

15               And he goes on to say:  "This was approved

16    with input from sales and then credit approved

17    following our approval SOP."  And then he goes on in

18    the next paragraph talking about that Anda is

19    financially okay, so...

20               It appears that what triggered this was

21    his concern with the line of credit.

22         Q.    So you believe that what was suspicious

23    about this order was whether or not they could pay for

24    the order?
```

```
 1        A.    I don't know if that was suspicious, but

 2   it seems that -- I'm not aware of this.  Again, an SOP

 3   is that it indicates to me that he was concerned about

 4   the size of the order because it was banging against

 5   the credit limit and was looking for a clarification,

 6   which it appears we gave him.

 7        Q.    I also see here that it says in the

 8   very -- on the front page:

 9             "In the last week we have received very

10   significant orders from Anda Pharmaceutical, a unit of

11   Watson Pharmaceutical, Inc.  For the past two years

12   they've operated successfully with an $800,000 line of

13   credit in similar exposures.  Last week they placed an

14   order for 1.6 million for their Ohio location.

15   Virtually all of it was for OxyContin 40 and

16   80-milligram strengths."

17             Why would it matter what the item was if

18   this was just a credit issue?

19        A.    I'd have to look at their SOP, if that had

20   anything to do with it.

21        Q.    Would that matter to you?  You were on the

22   suspicious order monitoring committee?

23        A.    Yes, it would matter to me.

24        Q.    What -- what would -- what would matter
```

1    about it?

2        A.    Well, I -- as it indicates here,

3    Steve Bishop, who was responsible for the account, and

4    myself contacted Anda, asked them about the reasons

5    for the order, although I can't -- since this was from

6    11 years ago, I can't recall that conversation, and we

7    would try to ascertain the reason for the increase and

8    if it appeared to be due to account change or

9    distribution, a real -- a distribution reallocation,

10   because they had multiple location, if appropriate we

11   would let the -- if we felt it was appropriate, we'd

12   let the order proceed.

13       MR. HOFFMAN:  Jayne, can I make a suggestion.  I

14   don't think the witness has read the SOP yet.  Maybe

15   if we give him two minutes to read it you guys could

16   get on the same page.

17       MS. CONROY:  Absolutely not.  He has never read

18   it.  There is no reason for him to read it now.  My

19   questions have nothing to do with something that he

20   has never had any involvement with.

21       MR. HOFFMAN:  You -- you are not asking him how

22   the e-mail relates to the SOP?

23       MS. CONROY:  I don't believe I am.

24       MR. HOFFMAN:  Okay.

```
 1    BY MS. CONROY:

 2        Q.    It sounds to me like you did evaluate at

 3    some point in 2007 whether or not the orders were

 4    suspicious, regardless of the credit issue, because

 5    you weren't involved with the credit issue, correct?

 6        A.    I was involved with the credit issue in

 7    the sense that before the order was released, the

 8    credit line had to be increased.

 9        Q.    But that's not what you did, you didn't

10    have anything to do with that, right?

11        A.    I had nothing to do with the credit.

12        Q.    Right.  What you did was you looked at the

13    reasons for the order, you contacted -- that's --

14    that's what you just told me, that you looked into it

15    and you contacted someone to find out why there was a

16    rise in demand at the Ohio facility, correct?

17        A.    That would be what I expect I would have

18    done, yes.

19        Q.    Well, doesn't it -- doesn't it infer that

20    you did that?  It says here:

21              "Today, Stephens" -- "Steve Seid spoke

22    with Anda's buying group and they outlined their

23    reasons for the increased purchases below."

24              You wouldn't be talking to them about
```

```
 1   their finances, you'd be talking about them --

 2       A.    Right.

 3       Q.    -- for the reasons --

 4       A.    Yes.

 5       Q.    -- for the order --

 6       A.    Yes.

 7       Q.    -- correct?

 8       A.    Correct.

 9       Q.    And so you were looking into whether or

10   not this was a suspicious order with respect to the

11   amount and the dose of the product that was -- that

12   was ordered, correct?

13       A.    Correct.

14       Q.    That didn't have anything to do with, as

15   far as you know, SOP 7.7?

16       A.    I was looking into the reason for the

17   order based on Dan Colucci's request.

18       Q.    And how did you interpret Dan Colucci's

19   request?

20       A.    It appears the way I interpreted it is

21   that I contacted Anda's buying group and found out the

22   reasons for the increased purchases.

23       Q.    And based on what you heard from Anda,

24   you -- you approved it, at least from your standpoint?
```

```
 1        A.    Correct.

 2        Q.    And then it was up to someone in finance

 3   to approve it from the credit standpoint, correct?

 4        A.    I -- it appears that is correct.

 5        Q.    And would there have been any record in

 6   the suspicious order monitoring database, any notes or

 7   anything with respect to your contact with the Anda

 8   buying group about this purchase and, you know, the

 9   investigation that you did?

10        A.    Other than this documation --

11   documentation, I don't know.

12        Q.    Would it have been your practice at the

13   time to go into the suspicious order monitoring

14   database and enter anything about this particular

15   suspicious order investigation?

16        A.    That database is specific to pharmacies,

17   so documentation would be this type of com --

18   correspondence.

19        Q.    So you would?

20        A.    The documenta -- tation in the suspicious

21   order monitoring system relates to pharmacies.  So

22   this document would be the kind of documentation we

23   would have on -- on file.

24        Q.    So I'm -- I'm just not totally
```

Highly Confidential - Subject to Further Confidentiality Review

1    understanding what you are saying to me.

2              So you would have put something about this

3    in the suspicious order monitoring database?

4         A.    Not in -- we would keep a record of this

5    information via e-mail that the order was released,

6    but on the suspicious order monitoring system, that is

7    specific to pharmacies.  And this would -- there would

8    not be -- we would not put this in that pharmacy

9    system.

10        Q.    So the suspicious order monitoring

11   database is only -- is only about individual

12   pharmacies?

13        A.    Right.  We kept any record of questions of

14   orders to -- from wholesalers, that would be

15   documentation that was kept via correspondence and

16   retained.

17        Q.    Correspondence like these e-mails?

18        A.    Yes.

19        Q.    And where would that be kept?

20        A.    It would be kept electronically.

21        Q.    Where?

22        A.    In Purdue's -- on my laptop on -- in

23   the -- it would be archived in the Purdue system.

24        Q.    Was it archived in any particular way,

```
 1   were -- were there -- was there a file that was kept

 2   for suspicious orders with respect to -- what would

 3   you call this, a susp -- suspicious order with respect

 4   to a wholesaler?

 5        A.    Yes.

 6        Q.    And did you have a particular place where

 7   you kept all of the e-mail correspondence --

 8        A.    I don't --

 9        Q.    Let me finish.

10              -- concerning investigations --

11        A.    Sorry.

12        Q.    -- of suspicious orders?

13        A.    I don't remember where it was kept.

14        Q.    Is it possible that it was not kept in a

15   segregated fashion?

16        MR. HOFFMAN:  Object to form.

17   BY THE WITNESS:

18        A.    I can't -- I can't -- I can't speak to

19   that.  I don't remember.

20   BY MS. CONROY:

21        Q.    So just so that I understand, you don't

22   remember whether or not if you had this type of an

23   investigation with respect to a suspicious order from

24   a wholesaler, you don't recall if there was any
```

1   particular place where such correspondence was kept?

2        A.   I don't remember.

3        Q.   And that means that if two or three years

4   later another issue came up with Anda's buying in

5   Ohio, there would be no record that you could easily

6   refer back to to take a look to see if you would have

7   already investigated them about that?

8        MR. HOFFMAN:  Object to form, foundation.

9   BY THE WITNESS:

10       A.   We had no problem, at least as I remember,

11  going back and get -- getting previous document --

12  correspondence if it was needed.

13  BY MS. CONROY:

14       Q.   But you had to use your memory to remember

15  about that, right?

16       A.   No, not necessarily.  You can certainly do

17  searches and -- and get the information because it was

18  primarily electronically.

19       Q.   So who would -- what would you search?

20       A.   I wouldn't do it.  I'd ask somebody else

21  to do it.

22       Q.   Who would you ask?

23       A.   Either Steve Projansky or -- or my admin.

24       Q.   Or who?

Highly Confidential – Subject to Further Confidentiality Review

```
 1        A.    Or my admin, Cheryl.

 2        Q.    And did Steve Projansky have access to all

 3   of your e-mails?

 4        A.    Although this was 2007, so it would be

 5   Cheryl.  She had access to all of my e-mails.

 6        Q.    And you would ask Cheryl to do a search?

 7        A.    Right, or a file search.  We'd print out a

 8   copy.  It would be -- we had files for each of the

 9   wholesalers, so there was data in there.

10        Q.    Hard copy files?

11        A.    Hard copy files.

12        Q.    Would something like this have been

13   printed out and put in a hard copy file for Anda?

14        A.    I don't know for sure, but it's possible.

15        Q.    Were there any procedures in your

16   department that would lay out what Cheryl should do

17   with things like this?

18        A.    I don't remember.  I'd' have to speculate,

19   and I don't remember.

20        Q.    And where is Cheryl now?

21        A.    She is retired.

22        Q.    Where does she live?

23        A.    Connecticut.

24        Q.    Do you know if someone took her position?
```

```
 1        A.    I don't.

 2        Q.    This e-mail concerns a distribution center

 3   in Ohio?

 4        A.    Yes.

 5        Q.    Had you -- have you ever been to that

 6   distribution center?

 7        A.    No, I haven't.

 8        Q.    Do you know where in Ohio it's located?

 9        A.    Not off the top of my head.

10        Q.    Do you recall whether you had any

11   visibility at Purdue with respect to the customers of

12   Anda?

13        A.    We had a fee-for-service agreement with

14   them, we're getting data from them.

15        Q.    So you would be able to look at their

16   retail customs [sic]?

17        A.    Yes.

18        Q.    So if you wanted to, you could investigate

19   where the OxyContin 40 and 80-milligram strengths,

20   what retail outlets they went to?

21        A.    Yes.

22        Q.    Do you know if you ever did that?

23        A.    As part of the system we did, yes.

24        Q.    You mean just routinely you would know?
```

```
 1        A.     Right, routinely, yes.

 2        Q.     You don't know if you ever separately went

 3   and looked at that?

 4        A.     I can't recall from 2007 -- '7 whether I

 5   did that with this.

 6        Q.     And that data would be in the suspicious

 7   order monitoring database, correct?

 8        A.     Correct.

 9        Q.     Would there be a reference to the fact

10   that those pharmacies were related to Anda?

11        A.     There would be.

12        Q.     But you would not be able to, for example,

13   see this -- this order placed by Anda in the

14   suspicious order monitoring database?

15        A.     No.

16        Q.     Only by retail pharmacy with a reference

17   to who the wholesaler was?

18        A.     That's correct.

19        Q.     Could you run a report on the suspicious

20   order monitoring database that would identify for you

21   just the Anda orders and their pharmacies?

22        A.     Yes.

23        Q.     And so that would -- that would give you

24   visibility as to what Anda was ordering, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    That's correct.

 2      Q.    And you would also know what -- not only

 3   what Anda was ordering but what they were selling?

 4      A.    What they were selling, correct, and to

 5   whom.

 6      Q.    And that data was available in 2007 if, in

 7   fact, there was a fee-for-service agreement with Anda,

 8   correct?

 9      A.    Correct.

10      Q.    Is a fee-for-service agreement a separate

11   document from a distribution agreement?

12      A.    It depends on, how can I put this, it's a

13   manner of nomenclature.  Some pharmaceutical companies

14   call fee-for-service agreement dist -- distribution

15   management agreement.

16           We had three types of agreements.  I think

17   we discussed this some yesterday.  We had an

18   authorized distributor agreement, a fee-for-service

19   agreement, and a central dist -- distribution

20   agreement in the event that a wholesaler had a central

21   distribution center.

22           THE WITNESS:  Excuse me.

23   BY MS. CONROY:

24      Q.    So these are the three types of contracts
```

1    that I would find or I could find in the documents at

2    Purdue, correct?

3          A.    Correct.  The authorized distributor of

4    record is more an agreement than a contract, but...

5          Q.    Why do you say that?

6          A.    Well, it's -- it was produced stipulating

7    the basics of what a distributor needs to do to be a

8    distributor.

9          Q.    Did you -- you referred to that as sort of

10   the baseline?

11         A.    Right.  That was entry into the door.

12         Q.    Okay.  And then after that, if there was

13   already an authorized distribution agreement, the next

14   step would be a fee-for-service agreement?

15         A.    Generally, yes.

16         Q.    And that would be a separate written

17   signed document?

18         A.    That is correct.

19         Q.    And then tell me what the central

20   distribution agreement is.

21         A.    Accounts such as McKesson had a large,

22   efficient, central distribution center.  So rather

23   than send their orders to 26 different locations, we

24   would send it to the -- what was known as the RDC, the

```
 1   Regional Distribution Center, and they would then

 2   break it out to their individual distribution centers.

 3        Q.    And so that required --

 4        A.    Yes.

 5        Q.    -- you talked to me about that yesterday

 6   as being more secure for you and other things,

 7   correct?

 8        A.    That's one shipment on the road as opposed

 9   to 26 trucks with product.

10        Q.    And that would also be a written agreement

11   with, for example, McKesson?

12        A.    That would be an agreement, that would be

13   a contract, that would be a written agreement.

14        Q.    Okay.

15              Would -- would you have been involved in

16   the negotiation or approving the negotiated -- the

17   negotiated terms on all three?

18        A.    Yes, I would.

19        Q.    And would I find all three contracts if

20   they existed in documents held at national accounts

21   and trade relations?

22        A.    You should, yes.

23        Q.    I was puzzled because I haven't seen any

24   fee-for-service -- fee-for-service agreements.  I have
```

```
 1    seen authorized distributor agreements and maybe even

 2    a central distribution agreement, but I have not

 3    actually seen a fee-for-service agreement.

 4         A.    I think you showed me --

 5         MS. PORTER:  Well --

 6    BY MS. CONROY:

 7         Q.    Did I show you one?

 8         A.    Yes.

 9         MS. PORTER:  Oh, go ahead.  I'm sorry.

10    BY MS. CONROY:

11         Q.    Let me look back and -- at the exhibits.

12               All right.  You can put that away.

13                    (WHEREUPON, a certain document was

14                     marked Purdue-Seid Deposition Exhibit

15                     No. 017, for identification, as of

16                     12/13/2018.)

17    BY MS. CONROY:

18         Q.    Let me show you what I've marked as

19    Exhibit 17.

20               17 is PPLPC016000001102 through 04.  It

21    actually appears this is more about the Anda situation

22    with the top e-mail from the 6th of June 2007, but I

23    think we've actually already seen the e-mails.

24               You send -- we've already seen this
```

1    e-mail.  This is just part of the thread where you

2    explained the rise in demand at the Ohio facility and

3    call that the order be released.

4            Do you see that?

5        A.    Yes.

6        Q.    And was that typically how you would

7    memorialize the release of an order, in an e-mail?

8        A.    Yes.

9        Q.    And remind me who Charles Forsaith is?

10       A.    Chuck Forsaith is the corporate director

11   of supply chain security.

12       Q.    Did he sit on the suspicious order

13   monitoring committee?

14       A.    No, he did not.

15       Q.    Did anyone from supply chain security sit

16   on the committee?

17       A.    Well, this is just at the beginning of --

18   I think this is before the committee was actually

19   fully operational because the gentleman who replaced

20   Aaron, Mark Geraci, was on the committee, so Charles

21   Forsaith's boss was on the committee.  The person

22   who --

23       Q.    Mark Geraci?

24       A.    Mark Geraci.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.     And he was in security?

2        A.     He was the VP of corporate security and

3   Chuck, Charles Forsaith reported to him.

4        Q.     Okay.  You can put that away.

5                      (WHEREUPON, a certain document was

6                       marked Purdue-Seid Deposition Exhibit

7                       No. 018, for identification, as of

8                       12/13/2018.)

9   BY MS. CONROY:

10       Q.     I'm going to look at Exhibit 18.

11       A.     Thank you.

12       Q.     This is a little bit more on this story.

13  It is PPLP 018000152012 through 15.

14              This is -- some of the e-mails will be

15  familiar to you at the beginning and the thread

16  continues.  And if you look on the page that's stamped

17  013, there is an e-mail from Aaron Graham, also on

18  June 6th, to you and others, and he says:

19              "At the risk of stating the obvious, two

20  observations come to mind:  40-milligram and

21  8-milligram [sic] strengths are the most diverted,

22  misused and abused."

23              Do you agree with that statement?  Do you

24  see it?
```

```
 1        A.    I'm sorry.

 2        Q.    Look on --

 3        A.    One more time.

 4        Q.    -- Bates No. 013 on the bottom right-hand

 5   side of the page.

 6        A.    Yes.

 7        Q.    And then at the -- the bottom e-mail from

 8   Aaron Graham at 5:11 p.m. on June 6th.

 9        A.    Um-hum, yes.

10        Q.    Then he says:  "At the risk of stating the

11   obvious, 40-milligram and 80-milligram strengths are

12   the most diverted, misused and abused."

13              Do you see that?

14        A.    Yes.

15        Q.    Do you agree with that statement?

16        A.    Do I agree with Point 1?

17        Q.    Correct.

18        A.    There was abuse of 40 and 80.

19        Q.    Do you agree that -- do you agree with

20   Mr. Graham that they are the most diverted, misused

21   and abused, those doses?

22        A.    That's his area of expertise being the VP

23   of corporate securities, so that would be his

24   observation.
```

Highly Confidential – Subject to Further Confidentiality Review

1    Q.    Do you have a different observation?

2    A.    It was significantly abused and -- not

3    significantly, but it was abused -- 40 and 80 were

4    misused and abused.

5    Q.    Correct.  I'm asking you if you agreed

6    with the vice president and chief security officer

7    that the 40-milligram and 80-milligram strengths are

8    the most diverted, misused and abused?

9    A.    I don't know if, as compared to the other

10   strengths, if I could quantify that.  They were

11   certainly attractive for their strengths to those who

12   would abuse, but I -- I can't say for sure that is the

13   case.  Aaron would be the expert there, if he felt

14   that way.

15   Q.    Would you rely on Aaron's expertise with

16   respect to what was the most abused, diverted and

17   misused strengths of OxyContin?

18   A.    I would trust his judgment in most cases.

19   Q.    So is there a reason you wouldn't agree

20   with that statement?

21   MR. HOFFMAN:  Object to form.

22   BY THE WITNESS:

23   A.    I -- I didn't make it, so it's -- it's

24   hard for me to agree to it, but -- based on what he

1    says here, but I certainly would agree that there were

2    issues with the 40 and 80-milligrams that related to

3    diversion, misuse and abuse.

4    BY MS. CONROY:

5        Q.    Yes, I understand that.  I'm trying to

6    understand if you had facts or other information that

7    would be contrary to what Mr. Graham believed were the

8    strengths that were most --

9        A.    I --

10       Q.    -- diverted, misused or abused?

11       A.    I didn't have specific facts.  And

12   certainly when we looked at abuse and diversion in

13   the -- in the SOMS system we focused heavily on 40 and

14   80 because they were the higher strengths.

15       Q.    Did you find when you focused on those in

16   the -- in the SOMs that they were the most diverted,

17   misused and abused, those 40 and 80-milligram

18   strengths?

19       A.    They were often an indication of issues as

20   it related to abuse and diversion.

21       Q.    I understand that, but I'm asking if you

22   found that they were the most related to issues of

23   abuse and diversion?

24       A.    I don't know if I -- I can say that, based

1    on that, I can say the most.  They were certainly a

2    significant indicator, but I'd have to go back and

3    look at all of the data, but it was certainly an

4    ind- -- a significant indicator of the potential for

5    abuse and diversion.

6         Q.    Do you have in your mind some different

7    strength that was more abused or misused?

8         A.    I don't have my -- in my mind a -- a

9    different strength.

10        Q.    But for you to have a -- but for you to

11   hold a belief as to which was the most diverted, you'd

12   have to go back and look at the data?

13        A.    I would have to look specifically.  He is

14   talking about Ohio and -- and the data and I'd have to

15   look at what was available.

16        Q.    Well, I don't -- I don't know that he is

17   talking about Ohio there.  You believe he is

18   talking -- that in Ohio the 40 and the 80s are most

19   diverted, misused and abused?

20        A.    I don't know what he is talking -- he is

21   talking about.  He mentioned Ohio as the highest rate

22   of pharmacy burglaries.  I don't know if he is talking

23   about Ohio there.

24        Q.    Do you agree that Ohio at the time had the

1  highest rate of pharmacy burglaries in the country?

2      A.    I don't -- I don't know the statistics on

3  that.

4      Q.    Would you have had any reason to doubt him

5  in June of 2007?

6      A.    I would have had no reason to doubt him,

7  although I thought there were other areas that had

8  higher, but...

9      Q.    What other areas did you believe were

10  higher?

11      A.    I thought Massachusetts might be higher,

12  but he was the security -- security guy, so, and he

13  had his finger on that pulse.

14      Q.    Then you received an e-mail from Howard

15  Udell about a half an hour later asking if you found

16  "Anda's explanation satisfactory?  If so, do you think

17  that we need to ask them for some evidence to support

18  the explanation?"

19          Do you see that?

20      A.    Yes.

21      Q.    Was that typical to hear -- to have

22  questions like this from Howard Udell?

23      A.    It was not usual for me to get those

24  questions from Howard, no.

```
 1       Q.    Did Mr. Udell have any involvement with

 2  suspicious order monitoring that you were familiar

 3  with at this time or was it Robin Abrams in your mind?

 4       A.    I don't know if he had delegated it to

 5  Robin at that time or not.  She doesn't appear to be

 6  copied on this.

 7       Q.    Was she a part of the legal -- legal

 8  office at that time?

 9       A.    Yes, she was.

10       Q.    Then if you go to the front, you send an

11  e-mail at 6:00 p.m. on June 6th and you tell Mr. Udell

12  and others that you're "comfortable with Anda's demand

13  needs and explanation."

14             Do you see that?

15       A.    Yes.

16       Q.    And you say that:  "They are an authorized

17  distributor of record."

18             That means they've signed a distribution

19  agreement?

20       A.    Yes.

21       Q.    Or -- or distributor agreement?

22       A.    They have signed a distributor agreement.

23       Q.    And then if you turn the page, you say:

24  "Let us not forget that Ohio is also a significant
```

```
 1    market for appropriate patients."

 2               Do you see that?

 3        A.    Correct.

 4        Q.    What -- how did you come to that

 5    conclusion that Ohio was a significant market for

 6    appropriate patients?

 7        A.    It was to my knowledge that there were

 8    many patients who were taking OxyContin in Ohio that

 9    would appear to be appropriate.

10        Q.    And -- and how did you reach that

11    conclusion?

12        A.    I don't remember how I reached that

13    conclusion.

14        Q.    How would you have?

15        A.    I would have looked -- from what I was

16    responsible for at that point was based on what the

17    ordering patterns of accounts were doing, the

18    wholesalers as it related to inventory in a specific

19    area, and that inventory management was based on the

20    concept that it was meeting the needs and the demand

21    for patients at the pharmacy level.

22               And it's also noted in there, and it says

23    that Ohio has lifted its Medicaid prior authorization

24    on OxyContin, which would -- would increase the
```

Highly Confidential - Subject to Further Confidentiality Review

1    demand, and the reduction in the generic

2    reimbursement, and what the chain in the State of Ohio

3    that I had visited indicated to me that they would

4    fill Medicaid prescriptions with brand.

5            And based on those -- that information, I

6    felt that it was -- apparently I felt that it was

7    appropriate to release that order.

8        Q.    Right.  That was with respect to an

9    increased demand for the branded product OxyContin,

10   correct?

11       A.    Correct.

12       Q.    I'm asking how -- what information you

13   would use to determine that Ohio is also a significant

14   market for appropriate patients.

15           Appropriate patients, you mean patients

16   who need opioid for pain, correct?

17       A.    For pain, correct.

18       Q.    And so it wouldn't matter whether that was

19   generic or brand, correct?

20       A.    Correct.

21       Q.    So what information, other than the

22   ordering patterns of the accounts, would you look at

23   to determine that those patients who are taking

24   opioids in Ohio are appropriate?

```
1       A.    I could not tell if the individual

2  patients were appropriate.

3       Q.    You're just looking at it generally by the

4  ordering patterns?

5       A.    I would look at it generally.

6       Q.    And would you be looking at it generally

7  by the ordering patterns of the wholesalers?

8       A.    I would be looking at it generally not

9  only by the ordering patterns of an individual

10  wholesaler, but as it relates to the overall market.

11       Q.    And what do you mean by that?

12       A.    I knew it is fairly easy to ascertain,

13  particularly since four large wholesalers -- three

14  large wholesalers were responsible for the bulk of the

15  business.  And based on product used in general, I had

16  a good idea of the percentage that each account had,

17  there weren't that many accounts, of the volume of any

18  of our products by -- by brand and by strength, so I

19  could ascertain to a fairly strong degree what

20  percentage of the market a particular wholesaler

21  should have.  It didn't vary too significantly.

22       Q.    So would it be fair to say if the -- if a

23  wholesaler's volume was steady by brand and by

24  strength, you would then determine that the patients
```

```
 1    they were serving were appropriate?

 2         A.    I would assume that it was appropriate,

 3    they were ordering the appropriate amount of products

 4    that -- their orders, and if for some reason their

 5    market or their customers changed, we would factor

 6    that in -- or I would factor that in.

 7         Q.    Okay.

 8               If you'd look at the first page of this,

 9    Chuck Forsaith forwards your -- this e-mail chain on

10    to Thomas Roepke, R-o-e-p-k-e, who is the manager of

11    corporate security at Watson Laboratories.

12               Do you see that?

13         A.    Yes.

14         Q.    Do you know who he is?

15         A.    No.

16         Q.    And he -- this was the next -- the next

17    day in the morning of June 7th and Chuck Forsaith

18    says:

19               "Doesn't sit well with me.  I hope we

20    don't find ourselves up" with an asterisk "creek with

21    no paddle in sight."

22               Do you see that?

23         A.    I --

24         MR. HOFFMAN:  Object to the form.  It is not
```

```
 1   Forsaith who is saying that.  It is the gentleman from

 2   Watson.

 3        MS. CONROY:  Oh, I'm sorry.  It's -- it is.

 4   BY MS. CONROY:

 5        Q.   It is the manager of corporate security

 6   sending it to Charles Forsaith at Purdue.

 7             Had you ever heard any comments like that

 8   from Watson Laboratories or Anda?

 9        A.   I did not hear that.

10        Q.   And you don't recall Mr. Forsaith telling

11   you that?

12        A.   I don't recall.

13        Q.   You can put that one away.

14             (WHEREUPON, a certain document was

15              marked Purdue-Seid Deposition Exhibit

16              No. 019, for identification, as of

17              12/13/2018.)

18   BY THE WITNESS:

19        A.   Thank you.

20   BY MS. CONROY:

21        Q.   Exhibit 19 is an e-mail chain from --

22   beginning on the top from Jack Crowley dated

23   October 3rd, 2007, PPLPC004000132946 through 953.

24             Who is Jack Crowley?
```

```
1        A.    Jack Crowley is the executive director of

2    CSA compliance.

3        Q.    Executive director of controlled substance

4    compliance?

5        A.    Yes.

6        Q.    And was he a retired DEA agent?

7        A.    Yes.

8        Q.    And then this is a -- a -- a long e-mail

9    chain that you can take a look at, but you may -- you

10   may remember some of this, which is a lot of back and

11   forth about the executive audit committee and then

12   about suspicious orders.

13            Do you have any recollection of the

14   conversations that were taking place about suspicious

15   orders in the fall of 2007?

16       A.    I don't have a recollection of this.

17       Q.    Okay.  If you take a look at your e-mail,

18   which is on Bates Page 950, and this was an e-mail

19   from you to Jack Crowley and others on September 25th

20   of 2007.

21            Do you see that?

22       A.    I do.

23       Q.    Okay.  And you say:

24            "Let's make sure we take a step back and
```

1    look at the entire picture.  Our goal is to assure

2    availability to appropriate patients while do our best

3    due diligence to assure appropriate channels of

4    distribution."

5              Do you see that?

6        A.    Correct.

7        Q.    And you have described to me just a few

8    minutes ago how you fulfilled that function, correct?

9        A.    Correct.

10       Q.    And then you say down a little bit

11   further:

12             "If the issue here is credit limits, that

13   is a different story.  Then we hold due to that, not

14   based on suspicious orders."

15             Do you see that?

16       A.    I don't.

17       Q.    Look down a few paragraphs further in your

18   e-mail.

19       A.    "If the issue here is credit limits that

20   is a different story.  Then we hold due to that not

21   based on..."

22             Yes, I see that.

23       Q.    And that would -- that would be something

24   that finance would determine, not you, correct?

1    A.    Right.

2    Q.    And then if you look at the e-mail that's

3 a response to yours from Dan Colucci, it starts on the

4 prior -- on the Page 949, Dan Colucci responds to you

5 on September 25th, and he says:

6         "Steve, Laura and I are not always

7 100 percent comfortable with the process from our

8 side.  As Jack points out, the responsibility for this

9 process lies with finance.  Based on the comments from

10 the conference that you may need to know your

11 customers' customers, Laura and I thought it best to

12 sit with Jack.  We also both thought it was best as a

13 courtesy to invite you in case (a) Jack said we were

14 doing something wrong and you could hear and reply to

15 the ramifications, and (b) so you could bring your

16 expertise to the meeting as you did below."

17         Do you see that?

18    A.    Yes.

19    Q.    Do you have a recollection of being asked

20 to join with Jack Crowley to talk about becoming more

21 comfortable with the process?

22    A.    I'm -- I don't recall this meeting.

23    Q.    Okay.  And then if you look at the first

24 page of the document, Exhibit 19, there is an e-mail

1    to everyone from Jack Crowley, which is a very long

2    e-mail, where he explains his position with respect to

3    suspicious orders?

4         A.    Okay.

5         Q.    Have you ever -- have you ever heard

6    Mr. Crowley give his -- his position with respect to

7    suspicious order reporting?

8         A.    Have I ever heard Jack Crowley...?

9         Q.    Give his opinions with respect to

10   suspicious order monitoring?

11        A.    I don't know.

12        Q.    Did -- did Mr. Crowley sit on the

13   suspicious order monitoring committee?

14        A.    Yes.

15        Q.    And did he ever talk about his views on

16   the way a company needed to act in conformance with

17   the Controlled Substances Act?

18        A.    Jack reported to Robin Abrams and he

19   provided advice to her.  I can't say I remember a

20   particular situation where Jack said, This is the way

21   we should do things.  He may have, but I can't say I

22   remember him doing that.

23        Q.    Okay.  So you don't have any memory as you

24   sit here today of having any discussions with

1    Mr. Crowley about the way to -- about the processes

2    involved with suspicious order monitoring?

3        A.    I'm sure over the years we discussed what

4    was going on, but if I -- I would be less than -- less

5    than able to tell you on a specific time, year, date

6    or occasion.

7        Q.    Do you recall having a difference of

8    opinion with Mr. Crowley with respect to the reporting

9    and the timing of reporting suspicious orders?

10       A.    I don't remember that, ever having a

11   difference with Jack.

12       Q.    Did you ever have a difference of opinion

13   with anyone on the committee with respect to how

14   suspicious orders should be reported and the timing

15   and how to interpret the Controlled Substances Act?

16       A.    I don't remember having any disagreement.

17   And I think, actually, it was very beneficial that

18   there wasn't a more significant commercial presence on

19   the committee because if there was ever an event where

20   I said, I think this is a great account, I was one

21   vote out of five or six and easily overruled.

22            So I think the way the committee was

23   established, that a purely commercial decision, a

24   disagreement from me from a commerce -- commercial

1    standpoint would be -- would be easily overruled.

2         Q.    By --

3         A.    And I would -- and I would accept that.

4         Q.    By "commercial decision," you are talking

5    about if you took into consideration the business that

6    a particular order was bringing in to Purdue?

7         A.    Well, when I say "commercial decision" --

8    "decision," I mean I was a commercial representative.

9    So I would just say an indi -- individual resent --

10   representing the commercial side of the business,

11   not...

12        Q.    As opposed to corporate security?

13        A.    As opposed to non-commercial.

14        Q.    And even though you were on the commercial

15   side, you would investigate and report to the

16   committee things like whether or not patients were

17   appropriate for opioid therapy, correct?

18        A.    More what I would report to committee were

19   my concerns.

20        Q.    Or lack of concern?

21        A.    Or if I thought that there was no issue

22   with the order.

23        Q.    Right.  A lack of concern about the order?

24        A.    Or a lack of concern.

```
 1        Q.    Do you see where Mr. Crowley at the bottom

 2   of the first page says:  "The requirement is to report

 3   suspicious orders, not suspicious sales after the

 4   fact."

 5              Do you see that?  The very first page,

 6   with the -- the one with the sticker on it.

 7              And right at the bottom of the page, and

 8   it's bolded, it says:  "The requirement is to report

 9   suspicious orders, not suspicious sales after the

10   fact."

11              Do you see that?

12        A.    I see that line, yes.

13        Q.    Do you agree with that statement?

14        A.    I agree that that's the intention, yes.

15        Q.    And do you agree that that is what Purdue,

16   that they reported suspicious orders to the DEA and

17   not sales after the fact?

18        A.    Which suspicious orders are you talking

19   about?

20        Q.    Any, just in general was that -- was that

21   your procedure to immediately report to the DEA any

22   suspicious orders that were flagged by the company

23   versus waiting, investigating, and then reporting to

24   the DEA after the sales had gone through?
```

```
1        MR. HOFFMAN:  Object to form.

2   BY THE WITNESS:

3        A.    The decision to report a suspicious order

4   was done by the committee.  I was not the individual

5   and nor I -- did I work with any specific individual

6   to actually report to the DEA.  I was not DEA facing,

7   if you will.

8             And since in that system with pharmacies

9   we don't see the orders before they are sales, so it

10  required to see the shipment from the wholesaler to

11  the retailer before we could do any type of

12  investigation.

13  BY MS. CONROY:

14       Q.    Would you report to the DEA that a

15  wholesaler had shipped a suspicious order?

16       A.    We would report to the DEA based on

17  previous testimony after investigation, analysis,

18  research, contact with our wholesale partners, orders

19  that we felt were -- or accounts, basically, who had

20  orders that we felt were suspicious, and based on

21  Robin's PowerPoint presentations, which we shared and

22  reviewed yesterday, that between I believe the dates

23  were 2008 and 2011 that 290 accounts were such

24  referred to the DEA.
```

```
 1        Q.    Yes.  Out of 50,000 retail pharmacies,

 2   correct?

 3        A.    Yes.

 4        Q.    And that was 390 instances -- or 290

 5   instances, correct, where you identified?

 6        A.    290 accounts that were reported.

 7        Q.    That were reported to the DEA.

 8              My question is a little bit different.

 9   What I'm asking is:  As I understand it, you have

10   suspicious sales that are flagged by your suspicious

11   order monitoring database, correct, with the

12   algorithms you talked to me about yesterday?

13        A.    That's correct.

14        Q.    At that point someone has determined that

15   those sales are suspicious?

16        MR. HOFFMAN:  Object to form.

17   BY THE WITNESS:

18        A.    So --

19   BY MS. CONROY:

20        Q.    I'm -- well, let me -- let me clarify

21   that.

22        A.    Please.

23        Q.    I know you are going to investigate them,

24   but you have flagged them as suspicious, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        MR. HOFFMAN:  Object to form.

 2   BY THE WITNESS:

 3        A.    The orders in the suspicious order

 4   monitoring system are deemed of concern based on the

 5   algorithm.  So in that sense the algorithm flags

 6   certain pharmacies as pharmacies that need to be

 7   investigated with the poten -- potential that there

 8   was -- the orders were of a suspicious nature.

 9             But, again, we don't see the orders before

10   they are shipped.  We can't -- if we -- the goal was

11   to take an educated, intensive investigation to make

12   sure those accounts that we referred to the DEA, which

13   is a serious action, and certainly can have and should

14   have ramifications on an individual or an entity if

15   they are a bad actor, then it would be referred to the

16   DEA.

17             But as I used -- and as an example

18   yesterday, that if we immediately sent to the DEA a

19   referral on a pharmacy across the street from H --

20   Memorial Sloan Kettering or MD Anderson or Boswell

21   Cancer Center in Buffalo, New York without doing our

22   due diligence to see if that may be appropriate

23   ordering, I don't think it would be fair to the

24   individual or the account.  So we did not
```

```
 1    automatically, without investigation, send the --

 2    refer the orders to the DEA.

 3    BY MS. CONROY:

 4        Q.    Correct.  So when you identified

 5    suspicious sales in this suspicious order monitoring

 6    database, you did not report to the DEA at that time?

 7        MR. HOFFMAN:  Object to form.

 8    BY THE WITNESS:

 9        A.    We did not immediately report.

10    BY MS. CONROY:

11        Q.    Then you would investigate?

12        A.    Correct.

13        Q.    Did you contact the wholesaler when you

14    investigated?

15        A.    Yes, we did.

16        Q.    Did you determine at any point whether the

17    wholesaler was reporting to the DEA those pharmacies

18    that were -- that you had tagged as suspicious?

19        A.    I would not be the one to do that, so I

20    can't say that -- whether that was done or not.

21        Q.    Who would be the one to do that?

22        A.    Jack usually was the one or Luis Bauza

23    would reach out to people on the wholesaler side.

24        Q.    Is that B-o-u-z-a?
```

```
 1        A.    B-a-u-s-z-a?  I don't know if he is on

 2   here.

 3        Q.    I saw him somewhere, but we'll find it

 4   later.

 5              Or Jack Crowley?

 6        A.    Or Jack Crowley.

 7        Q.    Was there any method that -- that Purdue

 8   had to determine whether or not the wholesaler was

 9   doing its due diligence of the suspicious orders and

10   sales that you had identified at Purdue?

11        A.    We, as I mentioned yesterday, tried to

12   work collaboratively to -- to help identify pharmacies

13   that may be an issue and we would provide any insight

14   or ideas or support that was appropriate to our

15   wholesaler partners, but I don't think, at least from

16   my perspective, we did an assessment of what the

17   wholesalers were doing or deemed what they were doing

18   appropriate -- as appropriate or inappropriate.

19        Q.    Would you say you worked

20   collaboratively -- collaboratively with the

21   wholesalers to identify pharmacies that were

22   suspicious?

23        A.    That was the goal of the collaboration

24   with the wholesaler.
```

```
1        Q.    Okay.  And did you work with all of the

2   wholesalers that were -- that had signed distributor

3   agreements with Purdue?

4        A.    We tried -- we tried to work with all

5   wholesalers.

6        Q.    And did they all work with you?

7        A.    Yeah, I'd say pretty much.

8        Q.    And so you would share the information you

9   had that -- of concern about particular pharmacies?

10       A.    We would share the information of concern.

11  We wouldn't share any proprietary information that

12  might be approp -- inappropriate.

13       Q.    Would you share enough information that --

14  that the wholesaler could identify the pharmacy?

15       A.    I believe we would certainly share enough

16  information to help them identify an issue.

17       Q.    Now, in the -- in the -- with respect to

18  the data that you were receiving from the wholesalers,

19  the data that Purdue had was the same data that the

20  wholesaler had, correct, with respect to the sales in

21  and out of the pharmacy?

22       A.    No, that's not correct.

23       MR. HOFFMAN:  Object to form, foundation.

24  BY MS. CONROY:
```

```
 1        Q.     What would they -- what would they have

 2   that was not equal to what Purdue had?

 3        A.     They had only their sales to the pharmacy.

 4   We had everybody's sales to the pharmacy.

 5        Q.     Would you share everyone's sales to the

 6   pharmacy to an individual wholesaler?

 7        A.     We would not share -- since that is

 8   proprietary information, as part of our agreements, we

 9   would not share exact information, but we would say to

10   Wholesaler X that, although your shipments appear

11   appropriate and are meeting your parameters, which is

12   good, you are keeping an eye on the shop, the problem

13   is, is they are receiving product strength or product

14   brand or strengths from Wholesaler Y and Wholesaler Z

15   and they are receive -- receiving -- I'm obviously

16   making this up, this particular case -- is that they

17   are receiving orders three days a week from these

18   other wholesalers.

19              That would be a very important information

20   for our wholesaler partner because from their

21   standpoint they may believe that they are doing

22   exactly the right thing without the knowledge that we

23   were able to share with them.

24        Q.     And when you would share that knowledge
```

```
 1    with them, it would be their decision then whether to

 2    suspend sales to that pharmacy based on the

 3    information that they learned from Purdue about more

 4    product going to that pharmacy from other wholesalers?

 5        A.    I can't ascertain what --

 6        MR. HOFFMAN:  Objection.

 7    BY THE WITNESS:

 8        A.    I can't ascertain what the decisions of

 9    other wholesalers or -- or a wholesaler would do,

10    whether they chose to suspend or restrict, but I know

11    they welcomed the input and support.

12    BY MS. CONROY:

13        Q.    Right.  I -- I -- that was my question.

14              You shared the information and as far as

15    you understood they welcomed receiving that

16    information?

17        A.    As far as I'm --

18        Q.    What -- what they did with it was not

19    something you could see?

20        A.    Well, we could see if ship -- shipments

21    decreased, but --

22        Q.    But you wouldn't know the reason?

23        A.    We wouldn't know the reason, unless

24    they -- they may have told Jack or Luis, but...
```

1    Q.    Would there be a record in the suspicious

2  order monitoring database if Jack or Luis was actually

3  having conversations with a wholesaler just about what

4  they would have said and when they had those

5  conversations to share particular information?

6    A.    I believe we saw that yesterday in

7  previous testimony.

8    Q.    That they put it in the database?

9    A.    Correct.

10    Q.    Okay.  You can put that one away.

11                (WHEREUPON, a certain document was

12                marked Purdue-Seid Deposition Exhibit

13                No. 020, for identification, as of

14                12/13/2018.)

15  BY MS. CONROY:

16    Q.    I'll show you what I've marked as

17  Exhibit 20.

18                Exhibit 20, PPLPC026000037881 through 883.

19  This is an -- the front sheet is a suspicious orders

20  meeting and then there are attached meeting minutes

21  from February 6th of 2008.  And if you turn the page,

22  these are meeting minutes from a suspicious order

23  monitoring and reported -- reporting meeting, dated

24  February 6th, 2008.

1          Would this have been one of the quarterly

2   meetings you talked about?

3       MR. HOFFMAN:  I'm sorry.  I'll just object to

4   form because it indicates it is a rough draft, not the

5   final minutes, but go ahead.

6   BY THE WITNESS:

7       A.    Yeah, this is a rough draft and I don't

8   see that I was cc'd on this.

9   BY MS. CONROY:

10      Q.    Yes.  I'm ask --

11      MS. CONROY:  I object to any coaching the

12  witness with your objections.  Just please give a

13  speaking objection -- don't give a speaking objection.

14      MR. HOFFMAN:  I'm not coaching the witness.  I

15  was just clarifying for the record what it was because

16  you said it was the minutes and it's not, it's the

17  rough draft.

18      MS. CONROY:  I read what it was.

19  BY MS. CONROY:

20      Q.    If you turn the page, I'm -- I'm going to

21  ask you if you were present at the meeting, not

22  whether you received the draft minutes.

23      A.    It says I was present at the meeting.  I

24  can't say I remember this meeting.

1      Q.     Would this have been one of the quarterly

2  meetings you talked about?

3      A.     This does not appear to be a quarterly

4  meeting.

5      Q.     What kind of a --

6      A.     It could have been.

7      Q.     What kind of a meeting would this have

8  been, if you can tell?

9      A.     I can't tell, but let's see.  If I look at

10  it...

11             Jack calls it a suspicious order

12  monitoring reporting meeting.  I don't know if this

13  was a group that got together just for a discussion on

14  suspicious order monitoring or it was a quarterly

15  meeting based on what's -- I haven't read the whole

16  thing, but based on what's indicated here, the only

17  thing I can say is it was a suspicious order

18  monitoring reporting meeting.

19      Q.     Okay.  And take a look at the attendees.

20      A.     Um-hum.  Yes.

21      Q.     Are those typically the members of the

22  suspicious order monitoring committee?

23      A.     Dan Colucci is not usually involved.

24  Jason Barnes, I'm trying to remember who Jason Barnes

```
1    was.  Jason Barnes, Jason Barnes.  I don't re -- I

2    remember the name.  I don't remember what his function

3    was.  Laura Watson wasn't typically a member of the

4    committee either, Chuck wasn't typically a member of

5    the committee or Aaron -- well, Aaron would be and

6    then his subsequent replacement Mark Geraci would be.

7         Q.    Who was Laura Watson again?

8         A.    She was director of customer service.

9         Q.    She was not typically a member?

10        A.    Not typically a member.

11        Q.    Customer service would also hear

12   complaints from the field about suspicious pharmacies,

13   et cetera?

14        A.    I don't know.  That's an interesting

15   question.  I don't know.

16        Q.    It says the:  "Objective of the Meeting:

17   To help our distributors to develop a program that we

18   can share data for our customers/customers relating to

19   suspicious orders."

20              Do you see that?

21        A.    Yes.

22        Q.    Do you have any recollection of ever

23   discussing developing that sort of a program?

24        A.    We developed a program.  And, again, I
```

1    don't know where Jack was coming from here and if in a

2    revision he may have said something like develop a

3    program, that we could develop a program that we can

4    share data with customers, but I'm not sure what --

5    I'm not sure what he meant by that objective, whether

6    it was an existing program or development of a

7    program.  It would be purely supposition on my part.

8         Q.   So you don't recall in February of 2008 if

9    you had a program that would help distributors that

10   you could share data for our customers' customers

11   relating to suspicious orders?

12        A.   I don't remember how row -- robust it was

13   at that point.

14        Q.   Do you know if you had one at all?

15        A.   I don't remember.

16        Q.   Didn't you tell me yesterday that as soon

17   as you had fee-for-service agreements signed that you

18   began to collect data that could --

19        A.   We were able to see data, yes.

20        Q.   And that would give you data with respect

21   to your customers' --

22        A.   Right.

23        Q.   -- customers?

24        A.   Right.  We gave -- but we -- as I

Highly Confidential — Subject to Further Confidentiality Review

```
 1   discussed yesterday, we utilized that data to form a

 2   specific committee and build algorithms.

 3         MS. CONROY:  You need a break?

 4         MR. STANNER:  Yes.

 5         MS. CONROY:  Yeah, of course.  Yep.  Yep.

 6         THE VIDEOGRAPHER:  We are off the record at

 7   10:41 a.m.

 8                  (WHEREUPON, a recess was had

 9                   from 10:41 to 10:56 a.m.)

10         THE VIDEOGRAPHER:  We are back on the record at

11   10:56 a.m.

12   BY MS. CONROY:

13         Q.    Just before we broke I was asking you

14   about the suspicious order monitoring committee, and

15   we were talking about fee-for-service agreements and

16   using that data to create algorithms to identify

17   suspicious orders.

18               Do you recall that?

19         A.    I do recall that.

20         Q.    And I think you told me yesterday that

21   there were some individuals who helped develop the

22   algorithm to flag suspicious orders in the

23   fee-for-service data?

24         A.    Correct.
```

```
1        Q.     And who are those individuals?

2        A.     The individuals were in the IT department.

3        Q.     So you don't need to -- so they would --

4   they were IT guys that were --

5        A.     Who -- who crunched the numbers.

6        Q.     Okay.  And did you -- did you give them

7   the -- did you give them the parameters of what you

8   were looking for or was that someone else that would

9   help them to develop the algorithm?

10       A.     We as a group would give them parameters.

11       Q.     And do you recall what the parameters

12  were?

13       A.     Things like volume, number of wholesalers

14  used, strengths versus other strengths, whether they

15  bought all Purdue products.  I'm trying to think what

16  else in the data.  Those are the -- all that come to

17  mind right now.

18       Q.     And you would -- there'd be some threshold

19  level, and if it went over that level with that

20  criteria that was being put in, it would create a flag

21  on the -- on the file?

22       A.     It would ping the system, yeah.

23       Q.     And did you -- when the system was pinged,

24  did you just see a report that would come back and it
```

1    would identify them or did you get some sort of an

2    e-mail that actually said, Here is a specific pharmacy

3    that has just pinged the data, that has -- that has

4    just crossed over or flagged?

5        A.    The chair of the committee would take the

6    report, identify pharmacies for -- I shouldn't say the

7    chair of the committee.  The director of OMS, either

8    Betsy originally or Giselle as her replacement, would

9    see the data based on the report of what pharmacies

10   may have exceeded all criteria, some criteria, two

11   criteria, and create a list of those pharmacies for us

12   to review.

13          We would -- some of us would review them

14   before the meeting, certainly at the meeting, and then

15   establish what actions we were going to take.

16       Q.    When that list of pharmacies that would be

17   prepared by the -- by either Betsy or Giselle, would

18   you conduct any investigation of your own before you

19   went to the meeting or would you wait, go to the -- go

20   to the suspicious order monitoring meeting and then

21   come up with a plan of action for each of those?

22       A.    So you are asking if I was prepared for

23   the meeting?

24       Q.    No.  I'm -- I'm -- I'm really -- no.  I'm

```
 1    saying did you -- was -- was -- when you got that

 2    list, did that mean you had to do something or did you

 3    wait and go to the meeting and then make decisions

 4    about what to do with that list?

 5         A.    I -- I tried to prepare before I went to

 6    the meeting.

 7         Q.    So you would -- you would look up those

 8    pharmacies that --

 9         A.    True.

10         Q.    -- were on the list?

11         A.    Right.

12         Q.    If you'd turn the page from the draft

13    minutes.

14         A.    30?

15         Q.    There are some bullet items.  It says,

16    "Approximately 30 authorized distributors."

17               Does that sound about right to you?

18         A.    No.

19         Q.    How many do you think there were?

20         A.    12, 13, 14.

21         Q.    And those were 12 to 14 that had signed

22    distributor agreements?

23         A.    Who were -- agreements or ADR letters.

24         Q.    Would you agree that the top three
```

```
 1   distributors at this time were Cardinal, McKesson and

 2   AmeriSource?

 3       A.    I would agree to that, even though two of

 4   the three are spelled wrong, but still the top three.

 5       Q.    Okay.  "Required to know our customer's

 6   customer."

 7             Do you see that?

 8       A.    Yes.

 9       Q.    Did you believe that there was a

10   requirement to know your customer's customer, that

11   would be the wholesaler's customers?

12       A.    Correct.

13       Q.    And did you agree that that was -- that

14   was required?

15       MR. HOFFMAN:  Object to form.

16   BY THE WITNESS:

17       A.    Based on the two letters which I believe

18   Jack references in this document and based on what was

19   in the literature of the time and meetings we

20   attended, that's the way we, and I think most of the

21   industry, expected or was -- we felt was the

22   expectation of the DEA.

23   BY MS. CONROY:

24       Q.    Okay.  And in order to know your
```

1    customer's customer, that's the next bullet point:

2    "How do we want to collect the information through

3    fee-for-service data?"

4         A.    Yes.

5         Q.    And it says:  "Analysis of suspicious

6    orders 'do we have an obligation to report back to our

7    customers.'"

8              And that, I believe, is what you told me a

9    few minutes ago, that you would reach out to your

10   customers and share the information but without

11   identifying -- without identifying any proprietary

12   information?

13        A.    That is correct.

14        Q.    Down toward the bottom, it says:

15   "Steve/Robin will meet and follow up with a system

16   (policy) in place."  And then there is another bullet

17   that says:  "Develop a policy on a case-by-case

18   basis."

19              Do you see that?

20              Do you recall coming up with "a system

21   (policy) in place" with Robin?

22        A.    I don't know where Jack was going on that.

23        Q.    Okay.

24              Where it says:  "Are able to obtain

```
 1   approximately 97.5 percent data," is that a reference

 2   to the data that could be seen as of 2008 through the

 3   fee-for-service data?

 4        A.    I don't know where Jack was going there.

 5   You'd have to ask him.

 6        Q.    Okay.  The action item that says:

 7   "Develop a order/policy to report 'suspicious orders'

 8   to the DEA by e-mail or by phone," do you know if that

 9   was ever created?

10             I know you were not the person that did

11   it, but do you know if that was ever created?

12        A.    I do not.

13        Q.    Okay.  You can put that exhibit away.

14             (WHEREUPON, a certain document was

15             marked Purdue-Seid Deposition Exhibit

16             No. 021, for identification, as of

17             12/13/2018.)

18   BY MS. CONROY:

19        Q.    I show you what's marked as Exhibit 21.

20   It looks like I don't have -- I don't have as many

21   copies of this, but I'll show it up on the screen.

22   Exhibit 21, PPLPC012000378036 through 037, and then

23   the rest of it is a native file.

24             And these are -- this is a May 30th, 2012
```

1    e-mail that is updating the Purdue committee charters

2    and it's attaching the committee charters.  And if you

3    look to Page 45, there is a committee, "The Order

4    Monitoring System Committee."

5          Do you see that?

6    A.    Yes.

7    Q.    And it has a charter that:  "Ensures a

8    comprehensive interdisciplinary effort to comply with

9    the Drug Enforcement Administration's (DEA) rules and

10   regulations and enhance our systems, review and

11   vigilance in the area of suspicious order monitoring."

12         Do you see that?

13   A.    Yes.

14   Q.    Do you agree that that's part of the

15   charter of the committee that you were on?

16   A.    I had nothing to do with this charter.

17   Actually, this is the first time I've seen it, I

18   believe.

19   Q.    Does it sound -- well, read -- read the

20   charter to yourself, and does it sound like what you

21   understand -- understood the order monitoring system

22   committee to be organized to do?

23   A.    I think it's -- reflects -- ensures a

24   comprehensive --

1            I think it somewhat reflects what it was.

2        Q.    Okay.  And the members, does that look

3    right to you?

4        A.    I'm surprised they left out Giselle.

5    Joan -- Joan was there, but she didn't -- she was more

6    a support person.

7        Q.    This was -- if you look at the bottom, it

8    says "March 2009".  It doesn't look like they

9    changed -- you know, it was -- they were attaching

10   everything in 2012, but is it possible Giselle became

11   more involved after March of 2009?

12       A.    In actually 2009 it probably would have

13   been Betsy Adams, so I don't know if this -- it said

14   something in here about changes will be made as

15   needed, if this was one of those things where changes

16   needed to be made, there was a subsequent document,

17   but that was not necessarily all of the people who

18   attended the meeting.

19       Q.    If you take a look at "Decision Rights,"

20   "Decides which accounts need further due diligence

21   analysis, which accounts to discuss with our

22   authorized distributors, when to conduct" -- "when to

23   conduct order monitoring system site visits and when

24   to report a particular account or order to the DEA as

 1    suspicious."

 2              Would you agree that your committee had

 3    the right to do all of those?

 4        MR. HOFFMAN:  Object to form.

 5    BY THE WITNESS:

 6        A.    I would -- the simplistic description of

 7    it, but, yeah, I guess that would be.

 8    BY MS. CONROY:

 9        Q.    It would be?

10        A.    The -- the decision rights, for this

11    document it seemed to be an appropriate way to

12    describe it.

13        Q.    Okay.  And then the final sentence of

14    Decision Rights says:  "The committee has the

15    authority to stop shipments to both wholesale and

16    retail accounts."

17              Do you see that?

18        A.    I do see that.

19        Q.    Do you agree that the committee had the

20    right to do that?

21        A.    They may have the -- the right to do it.

22    It would be -- again, this is kind of a simplistic

23    description.  I don't know what the goal of this

24    document was, other than to outline committees.

```
 1    Again, I would -- if it was me I would phrase it

 2    differently.

 3         Q.    Did the order monitoring system committee

 4    have the authority to stop shipments to both wholesale

 5    and retail accounts?

 6         A.    Well, we could stop wholesale shipments.

 7    We couldn't stop retail shipments.

 8         Q.    Okay.

 9         A.    Since we didn't know about retail

10    shipments until after the fact.

11         Q.    Could you have stopped continued retail

12    shipments?

13         MR. HOFFMAN:  Object to form.

14    BY THE WITNESS:

15         A.    We could have -- we could have recommended

16    to the wholesaler to stop shipping.

17    BY MS. CONROY:

18         Q.    Did you ever do that?

19         A.    We would make those recommendations where

20    appropriate.

21         Q.    And the meetings, it says:  "Meetings are

22    convened quarterly and as required."

23              Does that sound right?

24         A.    Perhaps when he wrote this document, but
```

```
 1    we would meet more often as needed.

 2        Q.    Well, it says that.  "Con" -- "convene

 3    quarterly and as required"?

 4        A.    Right.

 5        Q.    So that would cover that?

 6        A.    I don't know.  Maybe when they were

 7    establishing charters that quarterly was the way to

 8    go.  I don't know if that was ever the thought of this

 9    committee initially, but that's what's in here.

10        Q.    Because the committee met more often than

11    quarterly, is that --

12        A.    Certainly.

13        Q.    -- the case?

14              We can put that one away.

15                  (WHEREUPON, a certain document was

16                   marked Purdue-Seid Deposition Exhibit

17                   No. 022, for identification, as of

18                   12/13/2018.)

19    BY MS. CONROY:

20        Q.    I'll show you mark -- what I've marked as

21    Exhibit 22.

22        A.    Thank you.

23        Q.    Exhibit 22, PPLPC004000279670 through 71.

24              And, actually, I'm not going to ask you
```

```
 1    about the substance of this, but this says:  "Order

 2    Monitoring" -- "OMS Report, May 5th, 2011, Kabs

 3    Pharmacy #5."

 4               Do you see that?

 5    A.    Yes.

 6    Q.    This looks like a template to me.

 7               Was this some sort of a template that

 8    would be filled in with information about a particular

 9    pharmacy that had triggered the suspicious order

10    algorithm?

11    A.    Yes, it looks like a typical report.

12    Q.    And who -- would you receive these reports

13    electronically or would you get a hard copy?

14    A.    Sometimes both.

15    Q.    And where would these reports be kept at

16    Purdue?

17    A.    They would be kept in legal.

18    Q.    At the -- in the legal department?

19    A.    Yes.

20    Q.    Would you receive these reports at the

21    time that you would receive the list of pharmacies

22    that had triggered the suspicious order algorithm or

23    is this something you would receive later?

24    A.    They would generally come together.
```

1    Q.    Okay.  Would there be a report for each of

2    the listed pharmacies that triggered the algorithm?

3    A.    There would be some type of report, even

4    if it was a template to get it going.

5    Q.    Okay.  And then if you look down,

6    Roman Numeral III, "OMS Investigation Activity," would

7    this inform -- would this information be filled in as

8    the investigation proceeded?

9    A.    Yes.

10   Q.    So national accounts input, that's what

11   you would -- you would add to this report with your

12   investigation?

13   A.    I would add to this report.

14   Q.    And that -- and that's where you would do

15   it where it says "National Accounts Input"?

16   A.    Yes.

17   Q.    And then --

18   A.    Or -- or I would do it verbally and they

19   would put it in for me.

20   Q.    Giselle would put it in for you?  You have

21   to answer.

22   A.    Yes.

23   Q.    And that would be potentially at a

24   committee meeting?

1        A.      Yes.

2        Q.      At the bottom it says:  "Prescriber

3    Information - Savings Card Data."

4                What is that about?

5        A.      Well, it certainly points to the fact that

6    I forgot some things, but savings card data, for want

7    of a better term, or another term that's very common

8    is co-pay relief cards.  You know, you see them in

9    those TV advertising as pay $5 a month for your

10   whatever medication.  Those are cards that take some

11   of the co-pay burden off of patients.

12               We had co-pay cards for our products and

13   this was a -- an added criteria that we added in

14   because we thought it was a good idea to see if a

15   particular pharmacy was utilizing or claiming payment

16   for these cards at an unusual level.

17       Q.      Higher would be more suspicious than lower

18   use?

19       A.      Higher use would be --

20       Q.      And --

21       A.      -- more suspicious.

22       Q.      -- where does the -- where does the

23   savings card data come from?  Is that in the

24   fee-for-service data?

 1       A.    No.  That's from sales operations.

 2       Q.    Does that come from IMS data or some

 3   version of IMS data?

 4       A.    You would have to ask the sales ops folks

 5   how it was received and aggregated because generally

 6   they came through a third-party vendor.

 7       Q.    Okay.  You would see it in some sort of a

 8   report at the committee level?

 9       A.    I did, yes.

10       Q.    And savings cards or co-pay relief cards

11   were used for OxyContin, Butrans, Intermezzo, any of

12   the opioid products?

13       A.    That is correct.

14       Q.    You can put that document away.

15             (WHEREUPON, a certain document was

16             marked Purdue-Seid Deposition Exhibit

17             No. 023, for identification, as of

18             12/13/2018.)

19   BY MS. CONROY:

20       Q.    Exhibit 23.

21       A.    Thank you.

22       Q.    PPLPC034000360255 through 266.

23             This is what appears to be meeting minutes

24   from the order monitoring system monthly meeting and

1    the OMS quarterly meeting agenda also attached.  They

2    are minutes for -- from the December 16th, 2009

3    meeting and the final page is the agenda for the

4    upcoming January 28th, 2010 meeting.  And you are a

5    recipient on January 28th of the meeting minutes and

6    the agenda from Jack Crowley.

7            Do you see that?

8    A.    I see that.

9    Q.    And if you turn the page, you have the OMS

10   monthly meeting, December 16th, 2009, 11:00 a.m.

11           Would that meeting have taken place in

12   Stanford at that time at the Purdue headquarters?

13   A.    Yes, it would.

14   Q.    And it lists the individuals there.

15           Robin Abrams, was she the director of the

16   meeting?

17   A.    She was the chair.  She was the -- in

18   charge of the meeting.

19   Q.    Okay.  Luis Bauza, Jack Crowley, Mark

20   Geraci, Gina Limer, yourself and Joan Zooper.

21           Do you see that?

22   A.    Correct.

23   Q.    And then it says here:  "Robin provided

24   opening comments and asked the question:  'Are we

1   adequately managing this process?'"

2           She is talking about the order -- the

3   suspicious order monitoring process, correct?

4       A.   Yes.

5       Q.   "She challenged the committee to consider

6   whether or not we had the right expertise, were we

7   making timely decisions (since this process is handled

8   mainly as a collateral duty)."

9           Do you see that?

10      A.   I see that.

11      Q.   And by "collateral duty," she means that

12  everyone else on the committee has other corporate

13  duties as well, correct?

14      A.   I would expect that this is Jack's

15  interpretation of what Robin said.

16      Q.   You were at the meeting.  Do you have any

17  reason to dispute that that's what she meant?

18      MR. HOFFMAN:  Object to form.

19  BY THE WITNESS:

20      A.   I don't remember this specific meeting.

21  I'm -- so I can only tell you what I know.

22  BY MS. CONROY:

23      Q.   Any reason to doubt that the minutes are

24  correct?

1       A.      There is no reason to doubt that.  I'm

2   just telling you what I remember --

3       Q.      Okay.

4       A.      -- or don't remember.

5       Q.      "Robin mentioned that we need to think

6   strategically and properly manage our data.  Our

7   strengths are also our weaknesses.  There don't seem

8   to be any updates, who's tracking what?  Who owns it?

9   Robin mentioned that Ed Mahony felt the owner should

10  be Robin herself."

11              Do you see that?

12      A.      Yes.

13      Q.      Do you -- do you recall a discussion about

14  who is tracking what and who should be responsible?

15      A.      Do I recall a discussion at this meeting

16  of that?

17      Q.      Right.  Or at -- maybe not at this meeting

18  in particular, but do you recall a discussion about

19  someone needed to own this issue?

20      A.      I don't specifically remember a discussion

21  on who should own it.

22      Q.      It says:  "The Purdue owner will chair the

23  OMS committee meetings."

24              Do you see that?

```
 1        A.    Yes.

 2        Q.    Do you know what that means?

 3        A.    No.

 4        Q.    "Robin discussed with the committee a

 5   meeting that was held with Ed Mahony, Russ Gasdia and

 6   yourself regarding adding a FTE/Contractor to the

 7   committee."

 8              Do you see that?

 9        A.    Yes.

10        Q.    Do you have any memory of that?

11        A.    No.

12        Q.    "In the meantime, we need someone to

13   manage the order monitoring system and be accountable.

14   It was suggested that Michael Car" -- "Carraturo

15   (senior manager, field incentives) would be a good

16   candidate.  The key role for Michael would be," and

17   then he lists a number of things:  "Tracking the

18   system; establish a paper trail (files in order);

19   number crunching and analysis; monitor - sales; work

20   with Joan on the SharePoint system; and marrying up

21   all of the data."

22              Do you see that?

23        A.    I do see that.

24        Q.    Do you recall this being an issue that
```

 1    they -- you needed someone in to help to marry up all

 2    of the data, track the system, all of those items?

 3        MR. HOFFMAN:  Object to form.

 4    BY THE WITNESS:

 5        A.    This is the -- appears to me to be between

 6    the time that Betsy Adams was supporting the committee

 7    and Giselle Issa took the full-time role.  I'm not

 8    sure how much time Michael Carraturo, if any, spent

 9    with this.

10    BY MS. CONROY:

11        Q.    Do you know if anyone ever spent any time

12    with that?

13        MR. HOFFMAN:  Object to form.

14    BY THE WITNESS:

15        A.    Well, I was going to finish and say that

16    in that paragraph above the numbered bullets that it

17    is suggesting a full-time equivalent and/or a slash

18    contractor and that was, I guess, why they were

19    considering Michael, but ultimately it became Giselle

20    Issa who became the full-time equivalent.

21    BY MS. CONROY:

22        Q.    So it was Giselle Issa that ended up

23    dealing with the six numbered items there?

24        A.    Among other things.

```
1       Q.      And where it says at the bottom there:

2   "We want to create a more disciplined schedule for

3   review and decision making.  Everyone agreed that we

4   definitely need someone to own the system."

5           That would be Giselle?

6       A.      My speculation, knowing Jack Crowley's

7   verbiage, would be what he meant by "own" there was

8   somebody who would be in charge of gathering the data

9   and putting it together and coordinating everything.

10      Q.      Would that be Giselle Issa?

11      A.      Ultimately it would have been Giselle

12  since that was her title, OMS director.

13      Q.      Okay.

14      A.      Or something along those lines.

15      Q.      If you turn the page:  "Mark stated that

16  we need to 'paper the world,' document the files

17  concerning interactions with wholesalers, and reports

18  and interactions with DEA where appropriate."

19          Do you see that?

20      A.      Yes, I do.

21      Q.      And those would be the files that were

22  kept in the legal department?

23      A.      Perhaps.  I'm not sure what Jack was

24  getting to there, but perhaps that would be the files
```

```
 1    kept in the legal department.

 2        Q.    Well, the files that concerned

 3    interactions with the wholesalers, reports and

 4    interactions with DEA, would those types -- would that

 5    type of information, if it was put in a file, be in

 6    the legal department?

 7        A.    I would suspect it would be, yes.

 8        Q.    Anywhere else it would be?

 9        A.    I'm not sure.  I don't -- not sure if some

10    of it would be -- since he is quoting Mark Geraci, I

11    don't know if some of that is in the corporate

12    security department or that it might be in the

13    corporate security department, or both.

14        Q.    Okay.  So the two places to look would be

15    the legal department and the corporate security

16    department?

17        A.    I would -- I would think so.

18        Q.    Okay.  If you look next:

19              "Robin expressed one other idea.  We need

20    to ensure that our files are in order, so that SOP and

21    procedures documents are up-to-date, so that we can

22    survive an inspection challenge by the government

23    (i.e. the Drug Enforcement Administration)."

24              Do you see that?
```

1     A.    Yes.

2     Q.    Are you -- do you know if there ever was

3     an inspection or challenge by the DEA?

4     A.    Not that I'm aware of.

5     Q.    Do you know if there was an attempt to get

6     your files up-to-date for that purpose?

7     A.    For that purpose?

8     Q.    In case there was a -- in case there was

9     an inspection or a challenge?

10    A.    I can't say for that purpose.  I can say

11    that the -- one of the reasons of getting a

12    coordinator was that everything was in order,

13    recorded, documented and kept up-to-date.  I don't

14    know specifically it was -- the intention was for a

15    DEA inspection.

16    Q.    Okay.  And then Robin also advanced two

17    more agenda items:

18          "We will reach out to all other authorized

19    distributors that we have not had a face-to-face

20    meeting via teleconference and follow that up with a

21    letter."

22          Do you see that?

23    A.    Yes.

24    Q.    And it looked like you were -- you were

1    assigned that task.

2           Do you agree?

3       A.    I agree it says I was assigned that task,

4    and I assume if I was assigned that task I did my best

5    to accomplish it.

6       Q.    Do you know if you had an opportunity to

7    talk to all of the authorized distributors about

8    keeping up-to-date with suspicious order monitoring?

9       A.    I know -- unrelated to this or just in

10   general?

11      Q.    Just in general.

12      A.    There was not a distributor we had that

13   supply chain security and suspicious order monitoring

14   was not discussed.

15      Q.    Okay.  So there was no one that -- that --

16      A.    There was --

17      Q.    -- did not have that dis --

18      A.    There was --

19      Q.    -- none of your other --

20      A.    There was no one that was missed.

21      Q.    And then it says -- she says:

22           "We need to amend our wholesaler contracts

23   to require that they have a comprehensive suspicious

24   order monitoring program and limiting their ability to

```
 1    sell our products to other secondary distributors."

 2              Do you see that?

 3        A.    Yes.

 4        Q.    Was that ever accomplished, to have a

 5    contract that could lim -- that could limit their

 6    ability to sell Purdue products to other secondary

 7    distributors?

 8        A.    I haven't looked at those contracts in

 9    five, five-and-a-half years, so I can't tell you

10    specifically if they are in there.  I believe, but I'm

11    not positive, but I believe that limiting their

12    ability to sell to secondary distributors is part of

13    the authorized distributor agreement, and not being --

14    and I'm not -- since I can't guarantee it, because

15    I -- it's been a long time since I read it, but I

16    would be surprised if those two items weren't added.

17    The language may be different in some of the

18    contracts, but it would be the same concept.

19        Q.    And those two items would be an authorized

20    distributor would need to have a comprehensive

21    suspicious order monitoring program and limit their

22    ability to sell Purdue products to other secondary

23    distributors, those are the two items?

24        A.    Those -- that is correct.
```

1      Q.    The comprehensive suspicious order

2  monitoring program, is that something that you would

3  have your eyes on, a wholesaler's suspicious order

4  monitoring program?

5      A.    My eyes?

6      Q.    Correct.

7      A.    I would not have it on -- I would not

8  personally have it on their program.

9      Q.    Could you, pursuant to the distributor

10  contract, could you audit their suspicious order

11  monitoring program?

12      A.    As per previous testimony, we would meet

13  with our trading area partners -- I mean our

14  wholesaler partners and discuss policies and

15  procedures as related to suspicious order monitoring.

16      Q.    Did you ever audit their suspicious order

17  monitor files?

18      A.    I did not do it personally.

19      Q.    Did someone --

20      A.    So I -- if it was done, it would be from

21  another department.  I would check with legal or

22  corporate security.

23      Q.    Was there -- did Purdue have the right to

24  audit the suspicious order monitoring programs of its

1    authorized distributors?

2        A.    Unless I had the opportunity to read

3    through a contract, I couldn't tell you.

4        Q.    Do you have a -- do you have an -- I'm not

5    asking you about a specific authorized distributor.

6              Do you recall if there were any that there

7    were auditing rights by Purdue?

8        A.    I don't remember.

9        Q.    You do remember, though, that if there

10   were, it would be a different department that would do

11   that?

12       A.    I don't remember that, but since much of

13   the interaction with the nuts and bolts of a

14   wholesaler's suspicious order monitoring system or

15   discussions about accounts was done by either Jack or

16   Lou Bauza, I would assume, but certainly cannot

17   guarantee, that it was -- since Jack reported through

18   legal and Lou reported through corporate security that

19   it would be one of those departments.

20       Q.    And if there was an audit ability, that

21   would be in the distributor agreement, not the

22   fee-for-service agreement?

23       A.    If there was something about auditing --

24   well, there is -- there -- to my recollection,

1    anything about auditing would probably be in the

2    fee-for-service because there was other things we

3    audited like chargebacks -- audited like chargebacks,

4    so I'm not -- I'm not sure where it would be.  My

5    assumption was the fee-for-service is a good place to

6    look, but I'm not sure.

7         Q.    And you negotiated the fee-for-service

8    contracts?

9         A.    Yes, I did.

10        Q.    But you don't recall if they had an -- an

11   audit ability?

12        A.    I don't recall because many folks had

13   their eyes and contributed to the language in the

14   fee-for-service agreement.

15        Q.    Was it something -- and so are you -- are

16   you telling me that it's something you would have put

17   in there but someone else may have taken it out down

18   the -- down the line?

19        A.    That's not what I'm telling you.

20        Q.    Okay.  What -- what are you telling me?

21        A.    I'm telling you that -- that the folks who

22   reviewed the document before it was submitted to the

23   account, and then subsequent to the submission,

24   because the accounts, rightly so, had the opportunity

1    to review the language in the document, adjust,

2    contest, add what they felt was appropriate in the

3    document.  We would receive the document back and

4    counter, accept, revise.  There were numerous people

5    in areas of expertise which I did not have which were

6    included in the fee-for-service contract that would --

7    would adjust that language all under legal review, of

8    course.  And if they felt -- if they believed that

9    that area of expertise, which may have been audit, I'm

10   not sure, then I would negotiate and say this is what

11   we stand by.

12       Q.   So is an audit function -- function

13   something that you as a committee member of the

14   suspicious order monitoring committee would have

15   wanted in a fee-for-service contract, whether or not

16   you got it or not?

17       A.   I --

18       MR. HOFFMAN:  Object to form.

19   BY THE WITNESS:

20       A.   I don't -- I don't remember discussing

21   audits.

22   BY MS. CONROY:

23       Q.   With a --

24       A.   From -- from myself.  Not that it was a

1  bad idea, but if you are asking me if I said that, I

2  don't remember saying it.

3       Q.    Well, let me ask it this way then.

4            So -- so having the ability -- you having

5  the ability to audit a wholesale -- a -- an authorized

6  distributor, a wholesaler's suspicious order

7  monitoring program was not significant to you?

8       A.    That's not what I said.

9       Q.    Okay.  Was it --

10      A.    As --

11      Q.    Let me -- let me ask you this, then.

12           Was -- was it significant to you to have

13  the ability to audit a wholesaler's suspicious order

14  monitoring program?

15      A.    I don't remember if I discussed auditing

16  at that time.  I knew it was important to me that we

17  engaged our wholesalers and discussed policies and

18  procedures where we could work together.  If that is

19  an audit, then that would -- you -- you could call

20  that an audit, but that specific word I don't remember

21  saying.

22      Q.    Okay.  For clarity, I would not call that

23  an audit.  I'm talking about an ability of Purdue to

24  go in and actually see the suspicious mon -- order

1    monitoring program in place at a wholesaler and -- and

2    see how the data was collected and -- and make some

3    assessment of the -- the quality of that data and of

4    that program.

5             Is that anything that you were ever aware

6    that Purdue was able to do with any of its authorized

7    wholesalers?

8        A.    I don't know if it was done or not.

9        Q.    Have you ever heard anything about that in

10   existence at all?  Do you know anything about that?

11       A.    I know that there was engagement with the

12   wholesalers from our staff with their staff and I

13   don't know if it was on an audit basis.

14       Q.    So you don't know if Purdue's staff may,

15   in fact, have been able to audit some or all of the

16   wholesalers' suspicious order monitoring programs?

17       A.    I do not know if it was -- they were

18   audited.

19       Q.    No, my question is a little different.

20   Not whether they were audited.  You don't know if

21   Purdue had the ability to audit?

22       A.    I don't know that as a fact, no, that they

23   had the ability to audit.

24       Q.    And where would I look to determine if

```
 1    Purdue had the ability to audit a particular

 2    wholesaler?  Where would -- where would that -- where

 3    would that information be?

 4         A.    Let's just say that Robin advanced this as

 5    an agenda item.  If, in fact, she required it, it

 6    would have been added to the fee-for-service

 7    agreements, so you -- you would look there.  Again,

 8    perhaps there was audit information in the corporate

 9    security files that were specific -- specific audits,

10    but those are the places I can think of.

11         Q.    Okay.  So those would be the two places,

12    the legal department and corporate security?

13         A.    That I would recommend, yes.

14         Q.    You can put that document away.

15                   (WHEREUPON, a certain document was

16                    marked Purdue-Seid Deposition Exhibit

17                    No. 024, for identification, as of

18                    12/13/2018.)

19    BY MS. CONROY:

20         Q.    Let me show you what I've marked as

21    Exhibit 24.  So I guess all of the copies are in that

22    packet there.

23                   Exhibit 24, PPLPC004000207529 through 30.

24    This is an e-mail from you to ValueTrak?
```

 1      A.   Yes.

 2      Q.   July 13th, 2009.

 3      A.   Yes.

 4      Q.   Do you see this?

 5      A.   Correct.

 6      Q.   And this starts with an e-mail from

 7   ValueTrak, Monday, July 13th, at 1:42 p.m., 2009, to

 8   you, and it says:  "Item exceeds average."

 9           Do you see that?

10      A.   Yes.

11      Q.   Is this an alert concerning something that

12   triggered a suspicious order over the algorithm at

13   Purdue?

14      A.   Yes.

15      Q.   And this would come directly to you from

16   ValueTrak as an e-mail?

17      A.   Yes.

18      Q.   And is this -- did it typically follow

19   this, the way this looks, it says:  "The following

20   exception was generated based on an order number."

21           Do you see that?

22      A.   Yes.

23      Q.   And then it says:  "Item on order exceeds

24   average order size."  And then the trigger is an Item

```
 1    Total of $166,000, which is 162 units, on order and

 2    then the order number exceeded the six-week average by

 3    22.73 percent.

 4              Do you see that?

 5        A.    Yes.

 6        Q.    So that -- that basically means that

 7    whatever algorithm is in the -- is in the database, it

 8    triggered it 22.73 percent over what was the average

 9    in the database?

10        A.    That's correct.

11        Q.    And the trading partner is Smith Drug?

12        A.    Correct.

13        Q.    That's a pharmacy?

14        A.    No.  That's a wholesaler.

15        Q.    So the trading partner is Smith Drug and

16    they are located in Valdosta?

17        A.    I believe that was their -- a distribution

18    center.

19        Q.    Okay.  And it involved OxyContin

20    80-milligram tablets?

21        A.    Yes.

22        Q.    And where it says:  "Average exceeded by

23    20 percent, order handling hold order," what does that

24    mean?
```

1      A.     The trigger for the order alert was then

2  at the average exceeded 20 percent.

3      Q.     And what does that mean "hold order"?

4      A.     The hold order, the order had to be held

5  before -- until it was reviewed.

6      Q.     And that review was you?

7      A.     It was me at that time, yes.

8      Q.     Okay.  And then we see this came in at

9  1:41, 1:42 in the afternoon, and then you approved the

10  order just around five o'clock that afternoon,

11  correct?

12      A.     Correct.

13      Q.     Is that typical?

14      A.     Is that typical for what?

15      Q.     For the way you would operate, you

16  would -- you would get an e-mail like this and then do

17  whatever you do and then approve or not approve by

18  e-mail?

19      A.     Yes.  Correct.

20      Q.     What would you have done in the interim

21  between quarter to 2:00 to 5:00 p.m. to -- to reach

22  your decision?

23      A.     To reach my decision, I would look at

24  their ordering patterns, I would go beyond the

Highly Confidential - Subject to Further Confidentiality Review

1    six-week average, I would look at the overall sales

2    for the account, I would look at if there are spikes

3    for various reasons, if it was a particular concern, I

4    would have the individual responsible for the account

5    contact the account and find out if there was any

6    business reason, meaning new account or anything that

7    would, you know, change in Medicaid to the area,

8    whatever, that would impact the ordering pattern.

9          Q.    And I -- I take it at least in this

10   instance based on this -- based on your e-mail, you

11   were satisfied that the 22.73 percent increase was not

12   suspicious?

13         A.    I was satisfied --

14         Q.    And you --

15         A.    -- apparently.

16         Q.    Anyone else have to approve to release the

17   hold?

18         A.    Not at that time.

19         Q.    And by "that time," you mean in 2009?

20         A.    Right.

21         Q.    Did that change?

22         A.    We added -- once I added Steven Projansky

23   to my team, he did a lot of the releases.

24         Q.    Did anyone else have -- so could Steve

1  Projansky approve an order or did he have to get your

2  approval to let the order go through?

3      A.    As I remember, once he was on board for a

4  while, he was allowed to approve.

5      Q.    And so he could take some of the burden

6  from you?

7      A.    I guess -- I don't consider it is a

8  burden, but, yes, he could take some of the

9  responsibility from me.

10     Q.    Okay.  There was no one -- you didn't have

11 to go to Robin Abrams or anyone else?

12     A.    No, not in that situation.

13     Q.    Okay.  When you say "not in that

14 situation," what does that mean?

15     A.    Because the procedure at that time was

16 that I was allowed to approve and release the order on

17 my own.

18     Q.    Okay.  And that's in July of 2009?

19     A.    Yes.

20     Q.    And did that change at any time up until

21 you retired?

22     A.    The only major change, again, was the

23 addition of Steve, who was doing it --

24     Q.    So --

```
 1        A.    -- basically full time.

 2        Q.    So either you or then ultimately Steve --

 3        A.    Right.

 4        Q.    -- had the final say with respect --

 5        A.    Correct.

 6        Q.    -- to whether an order would be

 7   approved --

 8        A.    Correct.

 9        Q.    -- or not?

10              If the order was not approved, would it

11   go -- what would happen?  Would it go through the

12   order monitoring committee?

13        A.    Well, it depends on -- it was situational.

14   If, for whatever reason, there was something very

15   unusual, the account would be contacted.  If it got --

16   if there was not a satisfactory answer from the

17   national accounts manager who was responsible for the

18   account, I would call the account myself.  And then

19   there was occasion where I would say to the account,

20   we -- it is our intention to cut the order by

21   36 units, 24 units, and then we would release it.

22                    (WHEREUPON, a certain document was

23                     marked Purdue-Seid Deposition Exhibit

24                     No. 025, for identification, as of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    12/13/2018.)

 2   BY MS. CONROY:

 3       Q.    Let me show you what I have marked as

 4   Exhibit 25.

 5       A.    Thank you.

 6       Q.    PPLPC004000207523 to 524.

 7             This is another one, it looks very

 8   similar.  This one, the trigger -- this is dated

 9   Monday, July 13th.  This comes in at 11:35 in the

10   morning.  The trigger is an H.D. Smith that exceeds by

11   63.64 percent for OxyContin 30-milligram controlled

12   release tablets.

13             Do you see that?

14       A.    Yes.

15       Q.    And about a little under an hour later you

16   approved that?

17       A.    Yes.

18                   (WHEREUPON, a certain document was

19                    marked Purdue-Seid Deposition Exhibit

20                    No. 026, for identification, as of

21                    12/13/2018.)

22   BY MS. CONROY:

23       Q.    Take a look at Exhibit 26.

24       A.    Thank you.
```

1      Q.      PPLPC004000208240 to 241.

2              Monday, July 20th, 2009.

3              Would you get these sort of triggers every

4    day?

5      A.      Some days I would get several, other days

6    I would get none.

7      Q.      Would a week ever go by that you would not

8    get any triggers?

9      A.      I don't -- I'm not sure, but my

10   expectation is that there would be at least one a

11   week.  These -- this one and the one before is a small

12   number of units and OxyContin is packaged -- was

13   packaged all strengths in cases of 12 -- or multiples

14   of six, so this was -- they were -- it's a small

15   account that used to exist here in Chicago that was

16   ordering a small amount.  The percentage seems high,

17   but basically it was to send them a full case because

18   we didn't sell individual units, or we tried not to

19   sell individual units.

20     Q.      So would this -- something like this,

21   Exhibit 20 -- is this 25?

22     A.      26.

23     Q.      26.  Something like Exhibit 26, you could

24   make a decision pretty quickly on something like this?

```
 1      A.     Something like that.

 2      Q.     Okay.  And, in fact, you did.  It took you

 3  under two hours to make that decision, correct?

 4      A.     Correct.

 5             (WHEREUPON, a certain document was

 6              marked Purdue-Seid Deposition Exhibit

 7              No. 027, for identification, as of

 8              12/13/2018.)

 9  BY MS. CONROY:

10      Q.     Exhibit 27, PPLPC00400213649 to 650.

11             This is September 9th of 2009 and this

12  was, again, an e-mail from ValueTrak to you.  This is

13  a trigger on what looks like a much larger order,

14  $442,063, 408 units, and it was up about

15  146.26 percent for OxyContin 80-milligram controlled

16  release tablets.

17             Do you see that?

18      A.     Yes.

19      Q.     And this was, again, Smith Drug and this

20  was a quick approval in about 30 minutes.

21             Did you do any investigation to approve

22  this suspicious order?

23      MR. HOFFMAN:  Object to form.

24  BY THE WITNESS:
```

1    A.    I don't know.  I assume I did, but I don't

2  know.

3  BY MS. CONROY:

4    Q.    But whatever you did, you did it within

5  about a half an hour?

6    A.    That's what it appears, yeah.

7    Q.    And that's 146.26 percent on a large

8  order, that's not like the one we just looked at,

9  correct?

10    A.    Correct.

11    Q.    Which was just concerning a case?

12    MR. HOFFMAN:  Object to form.

13  BY MS. CONROY:

14    Q.    You have to answer verbally.

15    A.    Correct.

16    Q.    And this was a large order, correct?

17    A.    Correct.

18            (WHEREUPON, a certain document was

19             marked Purdue-Seid Deposition Exhibit

20             No. 028, for identification, as of

21             12/13/2018.)

22  BY MS. CONROY:

23    Q.    Exhibit 28, PPLPC004000214875.  This was

24  H.D. Smith dated September 24th of 2009.  This was an

1    order of 144 units oxy 80-milligram controlled release

2    and the trigger was -- trigger average was up by

3    133.41 percent.

4              Do you see that?

5    A.    Yes.

6    Q.    And this was approved in about ten

7    minutes, correct?

8    A.    Correct.

9    Q.    Do you have any understanding or memory of

10   what sort of investigation you would have done to

11   release this order?

12   A.    I don't.

13   Q.    Do you consider this a large order?

14   A.    I'll -- for that account that was a pretty

15   large order, not exceptionally large, but a large

16   order.  I mean a large order relatively, but...

17              (WHEREUPON, a certain document was

18              marked Purdue-Seid Deposition Exhibit

19              No. 029, for identification, as of

20              12/13/2018.)

21   BY MS. CONROY:

22   Q.    Let me show you Exhibit 29,

23   PPLPC00400218107 through 108.

24              Exhibit 29 is a -- an order trigger on

```
1    October 27th of 2009 and the wholesaler is Cardinal

2    Health and this is a -- an order of OxyContin

3    15-milligram tablets controlled release that was up by

4    almost 95 percent over the average and this took you

5    about a minute to approve?

6         A.    Um-hum.

7         Q.    Two minutes.

8               You couldn't do any investigation in two

9    minutes, correct?

10        MR. HOFFMAN:  Object to form.

11   BY THE WITNESS:

12        A.    Other than what I knew of the account, no.

13   BY MS. CONROY:

14        Q.    And what did you know of the account?

15        A.    That this was the National Logistics

16   Center, this was products for all of their DCs, that

17   there was variability as to the orders that would go

18   to the NLC -- NLC because they were distributing to

19   24, 26 locations, so I would release this order.  This

20   was the lowest strength of OxyContin.

21        Q.    Did that make a difference to you, the

22   fact that it was the lowest strength of OxyContin?

23        A.    Well, it was lowest strength and -- I

24   don't know other -- what other issues may have been --
```

```
 1    I may have been looking at at the time.  There could

 2    have been an -- have out-of-stock situation previously

 3    or -- I don't know off the top of my head.

 4                    (WHEREUPON, a certain document was

 5                     marked Purdue-Seid Deposition Exhibit

 6                     No. 030, for identification, as of

 7                     12/13/2018.)

 8    BY MS. CONROY:

 9        Q.    I'm going to mark as Exhibit 30

10    PPLPC00400215590.

11                This is dated October 1st of 2009.  This

12    is a McKesson RDC.  Is that one of those --

13        A.    Regional distribution centers, yes.

14        Q.    Okay.  And this is very large,

15    $4.6 million, 14,256 units of OxyContin 20-milligrams.

16                Do you see that?

17        A.    Yes, I do.

18        Q.    And over by 76.1 percent.  And you

19    approved this one in under an hour.

20                Would that be because it is an RDC?

21        A.    One of the key factors, yes, it would be

22    an RDC.

23        Q.    Is there a reason why you did not attempt

24    to change the algorithm in some way to -- to account
```

1    for RDCs and those issues?

2        MR. HOFFMAN:  Object to form, foundation.

3    BY THE WITNESS:

4        A.    As I recollect, I'm not sure why we didn't

5    change it, but I remember saying to the folks -- no, I

6    shouldn't say I remember saying to the folks in

7    customer service, but that's certainly one of the

8    things I thought about was I'd rather have the

9    responsibility of looking at the order rather than

10   changing the algorithm just so it would pass my eyes

11   one more time, there would be one set -- more set of

12   eyes on it before it was released rather than just

13   upping the algorithm.

14       Q.    And -- and that's because even though it

15   was an RDC or for some other reason, it may still be

16   suspicious to you, correct?

17       A.    Right, so I wanted the opportunity to put

18   one more set of eyes on it.

19       Q.    The issue of chargebacks, are they -- is

20   that something that would be in the fee-for-service

21   agreement or in the distributor agreement or both?

22       A.    Would you be more specific on chargebacks?

23       Q.    Sure.  Let me -- I -- I think you need to

24   explain to me, I'm going to mark as the next

```
 1    exhibit 31.

 2                    (WHEREUPON, a certain document was

 3                     marked Purdue-Seid Deposition Exhibit

 4                     No. 031, for identification, as of

 5                     12/13/2018.)

 6    BY MS. CONROY:

 7        Q.    This is something that you are not on

 8    but --

 9        A.    Then since it may take a -- a minute for

10    me to look at, can we take a break?

11        Q.    Sure.

12        A.    Okay.  Thanks.

13        THE VIDEOGRAPHER:  We are off the record at

14    12:03 p.m.

15                    (WHEREUPON, a recess was had

16                     from 12:03 to 12:13 p.m.)

17                    (WHEREUPON, certain documents were

18                     marked Purdue-Seid Deposition Exhibit

19                     No. 032 and No. 033, for

20                     identification, as of 12/13/2018.)

21        THE VIDEOGRAPHER:  We are back on the record at

22    12:13 p.m.

23    BY MS. CONROY:

24        Q.    Mr. Seid, while you were employed by
```

```
 1    Purdue, did you ever communicate using a personal

 2    e-mail and not your corporate e-mail?

 3         A.    I didn't have a personal e-mail until I

 4    retired.

 5         Q.    Okay.  That makes it easy.

 6               Have you ever been convicted of a crime

 7    yourself?

 8         A.    No.

 9         Q.    If you would take a look at Exhibit 32,

10    this is an e-mail dated November 10th of 2010, and

11    it's talking about, if you look at the bottom, it's

12    Steve Bishop from Michael Kody about Butrans and then

13    it goes up to you, but it's talking about a

14    one-page Word version of the information that you

15    would like to include in the fax blast:

16               "We will send the document to

17    approximately 7,000 customers and bill Purdue $8,400."

18               Do you see that?

19         A.    Yes.

20         Q.    And this is an example of the type of

21    promotion that would be carried out by

22    AmerisourceBergen on behalf of Purdue and then

23    Purdue -- then AmerisourceBergen would bill Purdue for

24    that, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MR. HOFFMAN:  Object to form.

 2   BY THE WITNESS:

 3     A.    So this was starting with Kody to Steve.

 4   And there is no attachment with this, it talks about a

 5   list that was attached.

 6   BY MS. CONROY:

 7     Q.    I don't have the attachment, but what I'm

 8   asking is do you see Michael Kody is at

 9   AmerisourceBergen?

10     A.    Yes.  You know, I just want to get the

11   full understanding of what was -- this is about.

12           Yes, this looks like an approved document

13   that was distributed under a marketing program by

14   AmerisourceBergen that we paid for.

15     Q.    Thank you.  You can put that away.

16           Take a look at Exhibit 33, which I'm just

17   going to ask you -- it looks pretty thick, but I'm

18   just going to ask you about it.  I see that it is

19   dated April 16th of 2014 and there is a -- a Purdue

20   meeting scheduled with AmerisourceBergen the next day?

21     A.    Yes.

22     Q.    That's up on the subject line.

23           And would this -- would this be the type

24   of meeting that was -- or an example of a presentation
```

1    that would be given to a wholesaler concerning the

2    suspicious order monitoring program?

3                 If you take a look on Page 3 of the slide

4    deck, that might help you.

5         A.    Yes, this looks like a -- one of a series

6    of meetings shortly before I retired.  And it does say

7    on the -- Points of Discussion, Collaboration, Purdue

8    OMS Update, et cetera.

9         Q.    And then on Page 3 it says:

10   "Collaboration Efforts.  Supporting authorized

11   distributors with their order monitoring" --

12        A.    Um-hum.

13        Q.    -- "system programs in an effort to limit

14   diversion while ensuring access for appropriate

15   patients."

16                Do you see that on the slide itself on

17   Page 3?

18        A.    I just want to see, those look like

19   speaker notes to me.

20        Q.    Right.  And do you just see on Page 3 it

21   has the Slide No. 3?

22        A.    Yes, I see that.

23        Q.    Do you see the language there:

24   "Collaboration Efforts.  Supporting authorized

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributors with their OMS programs in an effort to

 2    limit diversion while ensuring access for appropriate

 3    patients."

 4              Do you see that?

 5       A.    Yes, I see that.

 6       Q.    And this would have been part of the

 7    presentation that you would have given to

 8    AmerisourceBergen the next day?

 9       A.    It would be part of a presentation that I

10    attended with AmerisourceBergen.

11       Q.    And would --

12       A.    I -- I'm not necessarily the speaker.

13       Q.    Okay.  And then if you take -- is it -- is

14    it fair to say that these presentations would have

15    been conducted with other wholesaler distrib --

16    distributors as well --

17       A.    They would --

18       Q.    -- this sort of -- of presentation?

19       A.    This sort of presentation would be done

20    with other wholesalers.

21       Q.    And you would have been present?

22       A.    I would have been present.

23       Q.    Okay.  You can put that away.

24              The Exhibit 31 looks to me like a
```

 1    teaching -- a teaching Level 150 on institutional

 2    contracts that was conducted by Christine Ostrowski.

 3              Do you see that?

 4        A.    Yes, I see that.

 5        Q.    And I have a question about -- the best

 6    way to get to it is if you look at the Bates at the

 7    bottom, 744 is what I would like to look at.

 8        A.    744.

 9        Q.    Actually, we can even go to 7 -- 743

10    first.  It has a -- it has a -- has a diagram.

11              Do you see that?

12        A.    Yeah.

13        Q.    Are you familiar with this process?  Is

14    that something you would have understood as head of

15    national accounts and trade relations?

16        A.    I was certainly familiar with it.

17        Q.    Would you have been aware of the pricing

18    differences and the chargebacks between wholesalers

19    and Purdue or would that be a different department?

20        A.    That would be a different department.

21        Q.    So the scorecard that you would look at

22    with respect to a wholesaler, that would not -- would

23    that have chargebacks on it?

24        A.    No.

1      Q.    And what about managed care rebates or

2   Medicaid or Medicare rebates, would that be anything

3   you would deal with in national accounts?

4      A.    That was not me.  That was not national

5   accounts.  I'm sorry.

6      Q.    Okay.  Was this anything -- would the --

7   was the kind of information concerning a GPO contract

8   that may have op -- been in operation at Purdue,

9   versus distributor pricing, anything to do with your

10  suspicious order monitoring tracking system?  Would

11  it -- would -- would the GPO contract be of any

12  interest to you in determining whether or not an order

13  was suspicious?

14     A.    Well, if a product was on a GPO contract

15  or a wholesaler was awarded an additional GPO

16  contract, it might be a factor in whether the -- or if

17  it lost the GPO contract, it might be a factor as to

18  what the order should look like.

19     Q.    Would you -- would you be able to see

20  whether or not there was a GPO contract in effect or

21  is that something you would learn through

22  investigation -- internal investigation at Purdue?

23     A.    I -- that department was operated

24  separately and very efficiently.  If there was an

1    issue with one of my wholesalers or one of our

2    wholesalers, the folks at -- involved with the

3    contracts and rebates would reach out to me.

4        MS. CONROY:  Thank you.  I have no further

5    questions at this time.

6            Oh, maybe I do?

7            Oh, I do.  I'm sorry.

8            (WHEREUPON, a certain document was

9            marked Purdue-Seid Deposition Exhibit

10           No. 034, for identification, as of

11           12/13/2018.)

12   BY MS. CONROY:

13       Q.    I gave you -- I just want to put on the

14   record, I gave you exhibit -- what is that exhibit in

15   front of you?

16       A.    34.

17       Q.    34 is the -- is your personnel file that

18   was provided to us.  I don't have more copies.  I

19   think there is one copy of that.  So that's marked and

20   on the record.

21           And just for the record, I'm going to mark

22   as exhibit -- I'll put them in a folder, Exhibit 35,

23   my Elmo notes so we have them for the record.

24       A.    I assure you I don't want to read this.

1    Q.    Yeah, it's very solid.

2              (WHEREUPON, a certain document was

3               marked Purdue-Seid Deposition Exhibit

4               No. 035, for identification, as of

5               12/13/2018.)

6    MS. CONROY:  Thank you, Mr. Seid.

7    THE WITNESS:  Thank you.

8    MS. CONROY:  I'm just going to put a clip on

9    these.

10   THE VIDEOGRAPHER:  We'll go off the record at

11   12:23 p.m.

12              (WHEREUPON, a recess was had

13               from 12:23 to 1:33 p.m.)

14   THE VIDEOGRAPHER:  We are back on the record at

15   1:33 p.m.

16                    EXAMINATION

17   BY MR. STEWART:

18       Q.    Mr. Seid, I am Mike Stewart and I

19   represent some Plaintiffs in Tennessee.

20              A question, you had talked -- do you

21   recall during this -- your testimony that you have

22   talked periodically about Purdue's order monitoring

23   system?

24       A.    Yes, I have.

1      Q.    And that's a system that covers order

2  monitoring across the United States?

3      A.    Yes.

4      Q.    Is your testimony regarding the order

5  monitoring system applicable to how it works in all of

6  the states?

7      A.    I'm not sure I understand.

8      Q.    I guess my question is, you know, I'm

9  representing people in Tennessee, and I'll assume from

10  the way you've described the order monitoring system

11  that it generally applies to Tennessee in the same way

12  it applies to every other state?

13      A.    It would be applied, yes, the same across

14  the board.

15      Q.    Generally speaking, when you've been

16  talking about Purdue's national policies in your

17  deposition testimony, have you been talking about

18  policies that apply across the board, across the

19  United States?

20      A.    Policies were consistent.

21      Q.    So it's -- you don't have policies that

22  treat Tennessee differently from other states?

23      A.    No.  We wouldn't do that.

24              (WHEREUPON, a certain document was

```
 1                    marked Purdue-Seid Deposition Exhibit

 2                    No. 036, for identification, as of

 3                    12/13/2018.)

 4    BY MR. STEWART:

 5         Q.    I'd like to start out with an exhibit.

 6    I'll hand the witness a document which we've already

 7    seen, which is --

 8         MR. HOFFMAN:  Is that from yesterday's?

 9         MR. STEWART:  Yes.  It is from the 30(b)(6)

10    deposition.

11    BY MR. STEWART:

12         Q.    Do you recognize that document?

13         A.    Yes, from yesterday.

14         Q.    And can you read the exhibit sticker, what

15    exhibit is it?

16         A.    Seid 36.

17         Q.    Yes.

18               And what is Exhibit Seid 36?

19         A.    It looks to be a slide presentation.

20         Q.    And what -- what is -- what is the

21    presentation of?

22         A.    The title of the presentation is:  "Order

23    Monitoring System (OMS):  A Manufacturer's

24    Perspective."
```

1    Q.    And I think you testified this

2    presentation that you are looking at is one that you

3    actually attended, fair?

4    A.    Yes.

5    Q.    And remind us who Robin Abrams is?

6    A.    Robin Abrams -- Abrams -- Robert --

7    Robin -- sorry.

8         Robin Abrams is the vice president and

9    associate general counsel at Purdue.

10   Q.    And what was her relationship to the order

11   monitoring system?

12   A.    She was the chair of the order monitoring

13   system group.

14   Q.    That put her essentially, is it fair to

15   say, in charge of the order monitoring system at

16   Purdue?

17   A.    I would say that's fair.

18   Q.    And can you turn to the -- they are not

19   page numbers, but can you turn to the next page of the

20   PowerPoint presentation that you are looking at?

21   A.    Yep.

22   MR. STANNER:  Do you have a screen or put it up

23   on the Elmo?

24   MR. STEWART:  We have so many versions.

```
 1        MR. HOFFMAN:  You know what, Mike, I think we

 2   might have a problem because yours is double sided and

 3   it looks like ours are single sided and every other

 4   page is skipped.  Because I have 3, 5, 7, 9.

 5        THE WITNESS:  I was just going to say the same

 6   thing.

 7        MR. STEWART:  Well, first of all, you all have

 8   copies, theoretically, but let's go off the record for

 9   a moment and just fix that right now.

10        THE VIDEOGRAPHER:  We are off the record at

11   1:36 p.m.

12                  (WHEREUPON, a recess was had

13                   from 1:36 to 1:45 p.m.)

14        THE VIDEOGRAPHER:  We are back on the record at

15   1:45 p.m.

16   BY MR. STEWART:

17        Q.    Mr. Seid, we are back on the record.  And

18   just to keep things clear, can you look on the

19   document you've got and confirm that you've got

20   Exhibit 36 in front of you?

21        A.    That's what I have.

22        Q.    Okay.  Can you turn to the second page of

23   this PowerPoint presentation?

24        A.    I am there.
```

1      Q.     And this is the Robin Abrams PowerPoint

2  presentation you've already testified about today?

3      A.     Correct.

4      Q.     And do you see a -- this slide is entitled

5  "Mission of the Purdue OMS Program"?

6      A.     Yes.

7      Q.     What does "OMS" stand for?

8      A.     Order monitoring system.

9      Q.     If we talk about an OMS program, can we

10  agree today that we are talking about the order

11  monitoring system?

12      A.     Yes.

13      Q.     And do you see that at the bottom of this

14  slide there is a statement:  "Reporting of suspicious

15  ordering to DEA, other law enforcement, or state

16  licensing boards, as appropriate."

17            Do you see that?

18      A.     Yes.

19      Q.     That is listed as a mission of the Purdue

20  order monitoring system -- OMS program?

21      A.     That's what it says on the slide.

22      Q.     Okay.

23            Question:  Can you explain when, per the

24  OMS program, a suspicious order would be reported to

```
 1    law enforcement as opposed to the DEA?

 2         A.    I really don't know the distinction there.

 3         Q.    Okay.  You've got the DEA.

 4               Do you know what the DEA is?

 5         A.    Yeah, I understand that.  I don't

 6    understand -- I know that there were individuals who

 7    were in contact with local law enforcement and I know

 8    that Robin put this in the slide and I am not sure why

 9    she put it with reporting of suspicious order

10    monitoring.

11         Q.    With regard to the OMS program, were you

12    on the OMS committee?

13         A.    Yes, I was.

14         Q.    And Robin Abrams was the chairwoman of

15    that committee, correct?

16         A.    Correct.

17         Q.    And the OMS committee would make the

18    decisions about referrals to the DEA?

19         A.    DEA.

20         Q.    Is that right?

21         A.    Yes.

22         Q.    And if we talk about the DEA today, we are

23    talking about the US Drug Enforcement Administration,

24    is that fair?
```

1        A.      Yes.

2        Q.      So, to be clear, did -- did -- do you

3    recall the OMS committee ever referring a pharmacist

4    to law enforcement other than the Drug Enforcement

5    Administration?

6        A.      I don't recall it.  I can't say it wasn't

7    done or it was done or not -- it was done or not done,

8    but I don't recall it.

9        Q.      You are on the OMS committee from its

10   inception to -- until the time you retired, is that

11   fair?

12       A.      That's fair.

13       Q.      You retired in when?

14       A.      May 2014.

15       Q.      Okay.  So when we are talking about what

16   you remember, you can certainly speak with regard to

17   the OMS program for the period that you were on the

18   OMS committee, is that fair?

19       A.      That's correct.

20       Q.      Do you recall the OMS committee ever

21   referring a pharmacist or medical provider or anybody

22   else to a state licensing board?

23       A.      I don't.

24       Q.      Direct your attention to the next page of

1    this PowerPoint presentation that is Exhibit 36.

2             Do you see that this is a PowerPoint slide

3    that is entitled "The History of the Purdue OMS

4    Program"?

5        A.    Yes, I see that.

6        Q.    And was the OMS program instituted after

7    the DEA demanded that manufacturers start conducting

8    independent analysis and exercise due diligence to

9    confirm the legitimacy of orders and to scrutinize

10   suspicious circumstances?

11       MR. HOFFMAN:  Object to form.

12   BY THE WITNESS:

13       A.    Yes.

14   BY MR. STEWART:

15       Q.    Now, if you could move two pages forward,

16   I'd like to move to a page entitled "OMS Information

17   Sources."

18             Do you see that?

19       A.    I do see that.

20       Q.    Okay.  What is this slide telling the

21   viewer?

22       A.    It's telling the viewer that there were

23   various sources of information utilized by the OMS.

24       Q.    Was there any legal limit on the sources

1    that the OMS committee could review in its discretion?

2        MR. HOFFMAN:  Object to form.

3    BY THE WITNESS:

4        A.    Was there any legal limit?

5    BY MR. STEWART:

6        Q.    I'll tell you what.  Strike that.  Let me

7    rephrase it.

8            The -- the DEA directed that Purdue use

9    due diligence to try to ferret out diversion, fair?

10        MR. HOFFMAN:  Object to form.

11   BY THE WITNESS:

12       A.    The DEA -- if you read the letters of

13   September 2016 or December 2017, what the letters

14   specifically say, and I'm doing this from memory,

15   is -- I shouldn't say specifically then.  I'm doing

16   this from memory.

17            But what the letters say is that

18   distributors of opioid products are required under

19   Sections USC 823 and more specifically under

20   1301.74(b) to develop and implement a suspicious order

21   monitoring system.

22            In one of those two letters, and I forget

23   which, perhaps in both, it says the -- something along

24   the lines of the type and form of that committee,

Highly Confidential - Subject to Further Confidentiality Review

1    there will be no specific recommendations by the DEA

2    as to the form and type of that committee and it is

3    the obligation of the -- the manufacturer or

4    distributor, as they called it, to develop that.

5         MR. HOFFMAN:  I'm sorry.  Mike, can I -- go

6    ahead.  Go ahead.

7         MS. PORTER:  I was just going to pause.

8             You said 2016 and 2017.  I just wanted

9    to --

10        THE WITNESS:  Sorry.

11        MS. PORTER:  -- check with you on the -- on the

12   years.

13        THE WITNESS:  Sorry about that.

14        MS. PORTER:  Before we get too far down the

15   road.

16        THE WITNESS:  Yes, I did.  I'm sorry.

17   BY THE WITNESS:

18        A.    It was 2006 and 2007.

19   BY MR. STEWART:

20        Q.    And --

21        A.    Sorry about that.

22        Q.    Your -- your counsel answered my next

23   question.

24            So -- so the point is what the DEA -- the

1    DEA didn't -- didn't send out a precise framework,

2    they assigned a duty to Purdue and then Purdue's order

3    monitoring system was developed to fulfill that duty

4    to use due diligence and care to try to ferret out

5    diversion, fair?

6        A.    Fair that it's not just Purdue but anybody

7    who is a distributor was required to do that.

8        Q.    And -- and so when you are talking about

9    the information that -- information sources that

10   Purdue would use as part of its OMS system, those are

11   information sources that are not -- that are simply

12   information available to Purdue that it can use to

13   fulfill this mission, they are not req -- in other

14   words -- strike that.

15             Purdue, I take it, and the OMS committee

16   specifically, will use whatever information is at hand

17   to fulfill the mission of using due diligence to find

18   diversion, fair?

19       MR. HOFFMAN:  Object to form.

20   BY THE WITNESS:

21       A.    Purdue would use whatever information was

22   available and seek other resources as we refined the

23   activities of the -- the committee.

24   BY MR. STEWART:

```
 1        Q.    And are the items listed on the slide

 2   that's part of Exhibit 36, the slide you are looking

 3   at right now --

 4        A.    Yes.

 5        Q.    -- entitled "OMS Information Sources"?

 6        A.    Yes.

 7        Q.    Are those all types of information that,

 8   in fact, the OMS committee felt it could look at?

 9        MS. PORTER:  I think you are on the wrong page.

10             Here.

11   BY THE WITNESS:

12        A.    I think, since this was not my

13   presentation and I'm going to give my assumption here,

14   is that these points were fleshed out and that there

15   were probably sub points underneath these would --

16   that would uncover more granularity as to various

17   aspects of the sources.

18             For example, when it's talking about the

19   second bullet of "IMS outlook prescriber data and

20   sales ops outlier analysis," there would be other

21   things underneath that, I would assume, that would be

22   presented, so that this is a broader overview.

23   BY MR. STEWART:

24        Q.    But I take it the board -- or the OMS
```

1    committee within Purdue recognized that

2    fee-for-service data was a good source of information?

3        A.    Yes, they did.

4        Q.    And if we talk today about FFS data, can

5    we agree we are talking about fee-for-service data?

6        A.    Yes.

7        Q.    And I think you testified, tell me if I'm

8    wrong, that that's the data that you would purchase

9    from distributors to gain insight into what Purdue

10   products were being sold to particular pharmacies?

11       A.    Only as far as clarification goes, and I

12   guess you could call it purchased, the fee-for-service

13   data was a -- a byproduct of agreements we signed with

14   the wholesalers and we were paying them a fee for

15   certain activities, and one of them was providing the

16   data.

17       Q.    And the fee-for-service data allowed you

18   to determine what Purdue products, take, for example,

19   OxyContin, were sold by what pharmacy in the

20   United States, fair?

21       MR. HOFFMAN:  Object to form.  Overly broad.

22   BY THE WITNESS:

23       A.    I'm sorry.  Could you do that one more

24   time?

```
 1   BY MR. STEWART:

 2        Q.    Sure.

 3              I take it the fee-for-service data that

 4   Purdue used would allow the OMS committee to look at

 5   how much of a given product, Purdue product was sold

 6   at a given pharmacy or other outlet in the

 7   United States, fair?

 8        MR. HOFFMAN:  Object -- object to form, overly

 9   broad.

10   BY THE WITNESS:

11        A.    Yes.

12   BY MR. STEWART:

13        Q.    And what about IMS outlet/prescriber data

14   and sales ops outlier analysis, is that also a source

15   of data that was available to the OMS committee?

16        A.    Yes.

17        Q.    And is this the IMS data that would show

18   prescribers prescribing habits with respect to Purdue

19   Pharmaceuticals and other pharmaceuticals?

20        A.    That was not -- I was more familiar with

21   the data we were providing, but, I mean, my department

22   was providing the fee-for-service, but that would be

23   included in that data.

24        Q.    And then you've got sales force reports of
```

Highly Confidential - Subject to Further Confidentiality Review

1    concern.

2              Was that another area of information that

3    the OMS committee could draw upon?

4         A.    Yes.

5         Q.    And these were reports from the Purdue

6    sales force of potential diversion and other

7    concerning activities, is that fair?

8         A.    Yes.

9         Q.    And what about prescriber program

10   information, can you tell me what -- what that means

11   in the context of Ms. Abrams' presentation?

12        A.    I'm not sure what she meant by that.

13        Q.    Do you have a hunch?

14        A.    No.

15        Q.    We'd have to ask Ms. Abrams, I take it?

16        A.    Yes.

17        Q.    What about government agencies/law

18   enforcement, how would you normally draw information

19   from government agencies and law enforcement?

20        A.    Well, that was basically done through the

21   legal department and state government -- state

22   government affairs -- and corporate security based on

23   contacts they had.

24              As previously testified, we had an

1    executive director of CSA compliance and we also had a

2    very extensive corporate security department that

3    include investigators.  They had developed over time

4    relationships in particular with local law enforcement

5    in some areas that they would utilize.  They are our

6    contact.

7           State licensing boards generally was from

8    public information and doing research.  Legislative

9    contacts, you would have to -- I don't know what Robin

10   meant in there and I didn't have any personal

11   legislative contacts, so I couldn't tell you.

12        Q.   Did -- did the OMS committee receive

13   information from government agencies, law enforcement

14   on a case-by-case basis?

15        A.   I don't know how they received it.

16        Q.   Well, when you were on the OMS committee,

17   did you receive a report every month or periodically

18   outlining law enforcement events that were germane to

19   the OMS mission?

20        A.   There would be an individual from,

21   generally, corporate security, the responsibility of

22   Mark Geraci and Lou -- Lou Bauza, who was also on the

23   committee, and if there was pertinent law enforcement

24   information, they would provide it.

1    Q.    When you say "pertinent law enforcement

2    information," are you saying pertinent to a

3    particular -- a particular file or a case that came

4    before the OMS committee?

5    A.    Yes.

6    Q.    I guess my question is a little different.

7         Did you OS -- did the OMS committee

8    receive reports that purported to describe law

9    enforcement activities related to drug diversion

10   across the United States?

11   A.    I can't answer that.

12   Q.    Can you answer whether you received it

13   when you were on the committee?

14   A.    What I saw was law enforcement reports

15   pertinent to a particular customer we were reviewing.

16   Q.    Do you know whether Purdue in any of its

17   departments systematically reviewed records of arrests

18   relating to drug diversion?

19   A.    The only thing that I was aware of that

20   would somewhat relate to that was a service that

21   Purdue provided to the pharmacy community called

22   RxPATROL.

23   Q.    What was RxPATROL?

24   A.    RxPATROL was a information resource to

1    pharmacies and law enforcement, primarily focused on

2    thefts and robberies in a particular area.  That was

3    provided to -- or the access was provided to licensed

4    pharmacists and law enforcement.

5        Q.    Do you know if Purdue in any of its -- any

6    of its departments systematically reviewed arrests of

7    pharmacists for misuse of pharmaceuticals, drug

8    diversion and the like?

9        A.    I know that certainly in related --

10   relation to the activities of the OMS committee that

11   the -- not only the arrests, but complaints to

12   pharmacy boards were reviewed.

13       Q.    So the OMS committee would re -- would

14   review arrests, but I think I heard you say that would

15   be in the context of a specific case, is that fair?

16       A.    Generally a specific case.

17       Q.    And when you were reviewing state

18   licensing board action, that would, again, at the OMS

19   committee level be with respect to a specific case you

20   are looking at?

21       MR. HOFFMAN:  Object to form.

22   BY THE WITNESS:

23       A.    Yes.

24   BY MR. STEWART:

1    Q.    Do you know whether Purdue systematically

2    reviewed arrests of pharmacists in the United States

3    to determine whether they related to drug diversion?

4    A.    I don't know if they did or they didn't.

5    Q.    Do you know if Purdue systematically

6    reviewed arrests of physicians, nurse practitioners

7    and other prescribers to determine whether or not

8    those arrests were related to drug diversion?

9    A.    I don't know if they did or they didn't.

10   Q.    Do you know if Purdue ever reviewed

11   systematically records of state licensing boards for

12   pharmacists, physicians, nurse practitioners, and

13   other healthcare providers?

14   A.    I don't know if they did or they didn't.

15   Q.    You have the FFS data on the slide we are

16   looking at.  Could it be used to determine what

17   prescribers were acquire -- were prescribing, the

18   pharmaceuticals that a pharmacy was -- was selling?

19   A.    The FS -- FFS data in itself?

20   Q.    Yes.

21   A.    Could not.

22   Q.    Do you know of data that could show that,

23   that could link the prescriber to the pharmacy?

24   A.    The prescriber data that was listed in

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Point 2.

 2        Q.   You'd look at the IMS data to figure out,

 3   okay, at this particular pharmacy, this is the doctor

 4   that's ordering this amount of OxyContin,

 5   80-milligram, fair?

 6        A.   Fair.

 7        Q.   And that would be true not just for

 8   80-milligram OxyContin but for all Purdue prescription

 9   products, fair?

10        A.   Yeah, that's correct.

11        Q.   I'd like to turn your attention to the

12   next page, and do you see it's entitled, and this is

13   still the Robin Abrams PowerPoint that's Exhibit 36,

14   do you see the next page is entitled "Prescriber

15   Versus Dispenser"?

16        A.   Yes, I do.

17        Q.   And do you see it says:  "Prescriber

18   program:  Focus is on the prescriber and Rx

19   history/patterns."

20             Do you see that?

21        A.   Yes, I do.

22        Q.   What is the prescriber program that is

23   referred to by Ms. Abrams here on this slide?

24        A.   I believe -- I believe what she refers to
```

1    here is a focus on the individual prescriber, their Rx

2    history as it relates to that product and the patterns

3    that develop from that history.

4         Q.    And here we are talking about IMS data

5    that provides that, fair?

6         A.    It looks to be IMS data.

7         Q.    And then it says -- she says:  "OMS:

8    Focus is on dispenser/pharmacist and ordering

9    history/patterns," right?

10        A.    Yes.

11        Q.    And what she says for -- and OMS, here we

12   are talking about the use of -- of the data that you

13   purchase that I think we have been referring to as FFS

14   data, fair?

15        A.    That's correct.

16        Q.    And do you see that Ms. Abrams in her

17   PowerPoint says:  "Sharing of signal detection

18   information between OMS and prescriber programs," she

19   talks about that?

20        A.    Yes.

21        Q.    She says that that sharing of signal

22   detection information between OMS and prescriber

23   programs "enables us to consider prescriber and

24   pharmacy issues within particular geographic area."

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Do you see that?

 2        A.    I do see that bullet point.

 3        Q.    Do you see Ms. Abrams also says:  "Sharing

 4   of signal detection information between OMS and

 5   prescriber programs results in more robust information

 6   shared with internal (e.g., risk management) and

 7   external (e.g., authorized distributors) partners."

 8                   Do you see that?

 9        A.    I do see that bullet point.

10        Q.    Now, can you tell me, having been on the

11   OMS committee from its inception until you left Purdue

12   in 2014, how did this sharing process work?

13        A.    So, you are referring to the second bullet

14   point under the third main bullet, correct?

15        Q.    I'm referring to the third main bullet and

16   the subparts, I'm referring to the sharing of signal

17   detection information between OMS and prescriber

18   programs.

19                   How did that work in the OMS committee?

20        A.    I am -- I believe what she is talking

21   about here as it relates to our authorized distributor

22   partners is that we have information that is

23   individual -- we have -- Purdue had individual --

24   information at a time that was related to individual
```

Highly Confidential - Subject to Further Confidentiality Review

1    prescribers in a given geographic area that could be

2    beneficial to one of our -- or a particular wholesaler

3    partner as it relates -- related to a potential issue

4    that resulted in prescriptions that impacted pharmacy

5    or pharmacies of concern.

6        Q.    Is what you are saying that you could look

7    at IMS data to find prescribing practices that seemed

8    to suggest diversion and that might be used to ferret

9    out diversion at the pharmacy level?

10       A.    It could be -- it could be beneficial in

11   helping to understand what was going on at the

12   pharmacy.

13       Q.    Did -- did you see in your experience on

14   the OMS committee situations where pharmacies and pill

15   mills would be linked?

16       MR. HOFFMAN:  Object to form.

17   BY THE WITNESS:

18       A.    We saw situations where there were

19   particular prescribers that were influencing

20   particular pharmacies.

21   BY MR. STEWART:

22       Q.    And -- and when you talk about particular

23   subscribers influencing particular pharmacists, I take

24   it given we are talking about the OMS committee that

1   you are saying influencing them in the context of drug

2   diversion?

3       MR. HOFFMAN:  Did you mean prescribers, Mike,

4   just so we are clear?

5   BY MR. STEWART:

6       Q.   I'll tell you what, I'll strike that

7   question.

8          Did -- did you mean with your previous

9   testimony to talk about prescribers influencing

10   pharmacists with respect to drug diversion?

11      A.   There -- yes, there may be particular

12   prescribers that may be of concern that were sending

13   significant prescriptions to a particular pharmacy.

14      Q.   When -- when you would review a case

15   involving a pharmacist to determine whether to report

16   the pharmacist to the DEA for diversion, would you

17   also on the OS -- MS committee look at the prescribers

18   in the geographic area around that pharmacist to see

19   whether they were also engaged in diversion?

20      A.   We would look -- first of all, let me

21   correct you if I may.  That we didn't refer

22   pharmacists, we referred pharmacies.  I'm sure the

23   byproduct of the referral, once the DEA got it, was

24   the pharmacist was involved or the owner or both.

1        But we would look at whatever factors we

2    needed or we felt was beneficial to ascertain whether

3    that particular pharmacist -- pharmacist was doing

4    something that was untoward.

5        Q.   Well, was there a standard procedure,

6    though, that established that once a pharmacist was

7    referred to the DEA that there would be an

8    investigation of prescribing patterns in the area

9    where that pharmacist had functioned?

10       MR. HOFFMAN:  Object to form.

11   BY THE WITNESS:

12       A.   I don't -- I am -- don't know and cannot

13   testify to what additional actions would have been

14   done after that.  The focus of the OMS and the focus

15   of that committee was to uncover suspicious orders.

16       As previously testified to, we utilized

17   data such as prescriber data at -- that we had

18   available, but to answer your question, I am -- I am

19   not the person to ask if that was then done

20   afterwards.

21   BY MR. STEWART:

22       Q.   You are not the person to ask because you

23   don't know?

24       A.   Well, I'd guess, I don't know, that's why

1    I'm not the person to ask.

2         Q.    Are you familiar with the -- with the term

3    "region zero"?

4         A.    Yes, I am aware of region zero.

5         Q.    What's region zero with respect to

6    Purdue's business operations?

7         A.    I will give you what I know about it, but,

8    again, I will give the caveat that there are others

9    who have much more experience than I have and

10   knowledge, so they would be better resources.

11         But region zero, as I understand it, are

12   physicians that our reps were prohibited from calling

13   on, were not -- I don't believe they were compensated

14   for.  I'm pretty confident they weren't compensated

15   for, and because of the fact that they were considered

16   to be potential div -- diverters.

17         Q.    Did Purdue ever analyze region zero

18   providers to see whether they used particular

19   pharmacies?

20         MR. HOFFMAN:  Object to form, foundation.

21   BY THE WITNESS:

22         A.    I don't know if they did that

23   independently of the OMS, but certainly if we were

24   looking at a particular account and a specific area

1  and there was a region zero doctor or doctors in that

2  area, it would influence our decision on the pharmacy.

3  BY MR. STEWART:

4     Q.    But I guess my question is when you were

5  on the OMS committee, did you ever see a report at

6  Purdue that reflected a study using algorithms or some

7  other method to -- to use the existence of region zero

8  prescribers in an area to find pharmacies engaged in

9  diversion?

10    A.    I recollect a study that was done, and I

11  think may even -- shared, that looked at various

12  datas -- data to areas of the country that might be

13  areas of concern.

14    Q.    What study was that?

15    A.    I don't know the exact name of the study.

16    Q.    Tell me how -- everything you know that

17  can help me identify the study.

18    A.    I was aware that that study was discussed.

19  I don't know if that was part of what was called

20  "radars."  It might have been.  But it was

21  epidemiological study of the areas and I'm not sure

22  who -- whose or what department is responsible for it.

23    Q.    And you are not sure whether that focused

24  on region zero doctors or not, fair?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    Fair.  I'm not sure.  I would assume that

 2   that information would have been included, but I'm not

 3   sure.

 4         Q.    Maybe I put -- I take it from your

 5   testimony that it wasn't a standard practice when

 6   materials were being assembled for the OMS committee

 7   to put in the materials an analysis that would

 8   evaluate region zero doctors in the area.

 9         MR. HOFFMAN:  Object to form.

10   BY MR. STEWART:

11         Q.    Is that correct?

12         MR. HOFFMAN:  Object to form.

13   BY THE WITNESS:

14         A.    I think we have to go back to the purpose

15   of the OMS committee.

16              The OMS committee was designed to monitor

17   and look for suspicious orders and the data used of

18   all types were focused on those accounts.  So I don't

19   remember a particular case where, and it may have

20   happened, but I don't remember it, that somebody came

21   in and said, Well, in this area of Chicago in the

22   Wicker Park/Bucktown area there are 17 pharmacies and

23   11 doctors that are relate -- related to a region

24   zero.  I don't remember it.
```

1    BY MR. STEWART:

2         Q.    Do you think that's something you would

3    remember if it had happened?

4         A.    That's an interesting question.  I

5    don't -- I don't know if it's something I would

6    remember.

7         MR. STEWART:  And I'll tell you I'm going to ask

8    him in a moment about Exhibit 19, you may want to pull

9    that out, but for now I'd like to turn to the next

10   page of the PowerPoint.

11   BY MR. STEWART:

12        Q.    Do you see there is a page entitled "OMS

13   Process"?

14        A.    Yes.

15        Q.    And do you see that it lists a series of

16   bullet points and it -- it says:  "Outlets with orders

17   outside the normal range based on algorithm"?

18        A.    Yes.

19        Q.    And do I remember correctly that the first

20   pass of -- of information that would bring pharmacies

21   to the OMS committee's attention would be study of FFS

22   data using algorithms, is that fair?

23        MR. HOFFMAN:  Object to the form.

24   BY THE WITNESS:

1     A.    The first thing that would bring a

2   pharmacy to the attention of the committee would be

3   based on this series of algorithm -- algorithms, this

4   is what you are asking?

5   BY MR. STEWART:

6     Q.    Yes.

7     A.    Okay.

8     Q.    Is that fair?

9     A.    That's fair.

10    Q.    And is an outlet the same as a pharmacy

11   when we are talking about the OMS process?

12    A.    Yes, an outlet is a pharmacy.

13    Q.    And do each of these bullet points

14   starting with "Total volume of Purdue product orders"

15   reflect a potential indicator of diversion?

16    A.    Does each one or in the aggregate?

17    Q.    You tell me.

18    A.    Generally it was a series of factors.  Any

19   one could trigger an alert, but generally it was a

20   combination of -- of factors that would create an

21   alert.

22    Q.    And the point is all of these factors from

23   total volume of Purdue product orders to percentage of

24   OxyContin/non-OxyContin orders to percentage of orders

1    of higher doses of OxyContin, these were all

2    indicators of diversion that then would be weighed and

3    considered within the algorithms, is that correct?

4        MR. HOFFMAN:  Object to form.

5    BY THE WITNESS:

6        A.    These parameters were indication of

7    potential diversion, not of diversion.

8    BY MR. STEWART:

9        Q.    Do you see that at the bottom of the

10   page it says:  "Based on the algorithm, 500 to 600

11   outlets met the criteria."

12            Do you see that?

13       A.    I do see that.

14       Q.    And that would be in '09-'10 according to

15   the PowerPoint slide?

16       A.    Yes.

17       Q.    And remind me who you said would select

18   from among the 500 to 600 outlets the ones that would

19   receive a review by the OMS committee?

20       A.    Generally the director would, but first of

21   all as point of clarification, and I don't know if it

22   was two years here or the end of '09 to the beginning

23   of '10, so it would be hard for me to tell, but just

24   as a point of clarification, it wasn't as if 500 or

Highly Confidential - Subject to Further Confidentiality Review

1    600 popped up at one time.  This is over a period of

2    time.  And we were meeting monthly at that time,

3    three -- sometimes every three weeks.

4              So for those monthly meetings for those

5    that popped up at that time, the director of OMS at

6    that time, the full-time person whose job it was to

7    monitor would create a list.

8         Q.    And I guess my question is:  Would the

9    list include every single pharmacy that had been spit

10   out of the com -- computer using algorithms or would

11   it be a -- a selection from that list?

12        A.    I'm not sure.

13        Q.    You would receive a list of suspect

14   pharmacies?

15        A.    I would receive a -- a list and an initial

16   report of suspect pharmacies.

17        Q.    And typically how many would you consider

18   at a meeting?

19        A.    When I was doing it, it seemed like there

20   was a hundred at every meeting, but I'm sure it was

21   not that.  It was probably anywhere from 8 to 15.

22        Q.    And I believe you've said you would not

23   get the underlying report generated by the algorithm,

24   you would just get the recommendation from --

1    A.    No.  I would get -- I'd get certainly the

2  data report.

3    Q.    Let me make -- you said the -- the

4  director of OMS would come to you with the list of

5  suspect pharmacies, fair?

6    A.    It would -- it would be on the agenda, but

7  if there was information on them available, she would

8  attach it to the agenda.

9    Q.    But you would not be able to look behind

10  that list to figure out whether that list was a

11  complete list of every pharmacy that had been -- that

12  had met the criterion of the algorithm or whether

13  there was a subset selected, is that fair?

14    A.    I'm not sure.

15    Q.    I take it the -- the -- your starting

16  point for investigation as a member of the OMS

17  committee was that list that was provided?

18    A.    Yes.

19    Q.    Is that correct?

20          And who was the human being that was

21  providing that list?

22    A.    The director of OM -- of OMS.

23    Q.    And it was always the director of OMS?

24    A.    Yes.

```
 1       Q.    I think that was two people held that
 2   position, is that correct?
 3       A.    Yes.
 4       Q.    And who were they?
 5       A.    Betsy Adams and Giselle Issa.
 6       Q.    And I'd like you to turn to the next page.
 7             Do you see it's another page entitled "OMS
 8   Process (continued)"?
 9       A.    Yes.
10       Q.    And is this -- is this -- when it -- you
11   see it, there is a title that says:  "Outlets
12   identified by other signals"?
13       A.    Yes.
14       Q.    And what does that involve?
15       A.    It involves apparently what is listed
16   there.
17       Q.    Turn to the next page.  Do you see it
18   says:  "OMS process continues"?
19       A.    Yes.
20       Q.    And it talks about "outlier pharmacies
21   selected for review"?
22       A.    Yes.
23       Q.    And it says:  "Total FFS data outliers (as
24   ranked by sales ops)"?
```

```
 1       A.     Yes.

 2       Q.     Okay.  What is that process?  Is that the

 3  one you just described where the head of OMS would

 4  provide you a list?

 5       A.     Yeah, yes, the -- in the system -- the

 6  system with its algorithms was designed to rank the

 7  pharmacies.

 8       Q.     But you wouldn't actually get the raw data

 9  showing the ranking, I take it?

10       A.     I could certainly look at it.

11       Q.     I'm hearing you.  Did you ever look at it?

12       A.     Yeah, I would look at it.

13       Q.     Well, I guess what I'm saying is would you

14  ever look at the data to show why these particular

15  pharmacies were selected?

16       A.     Before I would go to the meeting I would

17  look at why the pharmacies were selected.

18       Q.     The ones that had been given to you on the

19  list?

20       A.     Right.

21       Q.     You just don't know how many were

22  excluded, if any, that met the algorithm requirements?

23       A.     I don't know if any were excluded.

24       Q.     You don't know one way or the other, is
```

1    that fair?

2         A.    Yeah.

3         Q.    What does this mean:  "Input from national

4    accounts"?

5              Was there another way to get on the list

6    for consideration by the OMS committee?

7         A.    If there was anything that national

8    accounts knew from our dealings in the -- in the field

9    that would -- that would come to our attention and,

10   therefore, as outlined by Robin here, would require a

11   need for further follow-up.

12        Q.    Now, we -- we talked about Purdue looking

13   at things systematically.

14             Do you know if Purdue systematically

15   reviewed media reports of diversion at pharmacies?

16        A.    I think somewhere in here she -- Robin

17   points to looking at media reports.  I think on the

18   previous page, as a matter of fact.

19        Q.    But do you know yourself whether or not

20   Purdue looks at media reports on a daily basis to gain

21   information about where pharmacies might be engaged in

22   diversion?

23        A.    I know that there were people reviewing

24   material every day, both digit -- mostly digitally.

```
 1        Q.    Okay.  How do you know that?

 2        A.    Because when we got reports of something,

 3   it was because somebody had done a media review.

 4        Q.    When you got reports on the OMS committee,

 5   was that related to a particular case?

 6        A.    When we got reports on the OMS committee,

 7   reports of what?

 8        Q.    When you got reports of news -- news

 9   articles and so forth relating to pharmacists and

10   diversion, were those news articles assembled for you

11   because these pharmacists were before the --

12   pharmacies were before the OMS committee for analysis?

13        A.    Yes, that's what we're there for.

14        Q.    The point is, you didn't get lists of

15   inform -- of -- of news reports from across the

16   country indicating diversion by pharmacists, fair?

17        MR. HOFFMAN:  Object to form.

18   BY THE WITNESS:

19        A.    The purpose of the OMS committee was to

20   review individual pharmacies.  If there was a report

21   going somewhere else, it would not come before that

22   committee to analyze one pharmacy.

23   BY MR. STEWART:

24        Q.    And in your time at Purdue, you didn't see
```

```
1    such a report, is that fair?

2         A.    I was not on that distribution list.

3         Q.    Do you see that the next page of this

4    document is entitled "OMS Process (continued), DEA

5    Compliance:  Collaboration With Authorized

6    Distributors"?

7         A.    Yes.

8         Q.    And do you see it talks about following up

9    with respect to individual outlets, which may include

10   surveillance, reduction or cut off of supply, and I'm

11   paraphrasing, or reporting to the licensing board,

12   DEA, et cetera?

13        A.    Yes.

14        Q.    Okay.  Is this follow-up that would occur

15   after you had reported somebody to the DEA, is that

16   what this is describing?

17        A.    That's prior to reporting.

18        Q.    Okay.  So what is it follow-up to?

19        A.    I believe it is prior to reporting, I

20   should --

21        Q.    What sort of follow-up is Ms. Abrams

22   referring to then in this context?

23        A.    Well, to put it into context, I believe

24   what she is saying here, and, again, you'd have to ask
```

```
 1   Ms. Abrams to do that herself, but the context here

 2   from the way I read it is that if there was -- if

 3   there were or was an outlet of concern, we would work

 4   with our wholesale partners to try to gather

 5   additional or share information not limited to but

 6   including, when it says surveillance or site -- site

 7   visit it means literally going out ourselves or -- or

 8   going with a representative from the wholesaler to

 9   observe a -- a particular outlet, for want of a better

10   term, to do a stakeout which -- or they would do a

11   site visit and confront the pharmacy or owner or both,

12   pharmacist, owner -- owner, both, about specifically

13   what was going on in the pharmacy.

14        Q.    So --

15        A.    Go ahead.

16        Q.    No.  Go ahead and continue if you'd like.

17        A.    I'm finished.

18        Q.    So it sounds like the way the OMS

19   committee would work is data would be used, the FFS

20   data would be analyzed to come up with a potential

21   suspect diverters and then the OMS committee would

22   respond at times by sending out investigators to

23   figure out, Okay, in the field are these signals of

24   diversion true or -- or are they not true, is that
```

1    fair?

2        A.    What they would do was use all of the

3    information that was available to them, including

4    data, to ascertain as to whether some -- a particular

5    outlet was suspected of being a diverter or abuser of

6    controlled substances.

7        Q.    But the starting point that got the OMS

8    committee on the trail was an analysis of FFS data,

9    fair?

10       A.    No, I don't think that's --

11       MR. HOFFMAN:  Object to form.

12   BY THE WITNESS:

13       A.    -- necessarily fair because if you go back

14   earlier in the reports, earlier in the slide deck, the

15   problem refers to other sources.

16   BY MR. STEWART:

17       Q.    But -- but I would a say --

18       A.    I would say the FFS was the driver, but

19   other sources.

20       Q.    So when you say "the driver," in a --

21   in -- in a situation involving FFS, what would happen

22   is FFS data would be analyzed using algorithms and

23   that would indicate suspect pharmacies and then the

24   OMS committee would investigate them using

1    investigators or other means, fair?

2        A.    True.

3        Q.    Turn to the next page.  It's entitled

4    "OMS" -- or it's two pages.  "OMS Report and Committee

5    Decision."

6        A.    Excuse me.

7        Q.    Do you see that?

8        A.    Yes, I do.

9               (WHEREUPON, a certain document was

10              marked Purdue-Seid Deposition Exhibit

11              No. 037, for identification, as of

12              12/13/2018.)

13   BY MR. STEWART:

14       Q.    I'm going to hand you -- I can't use that

15   one -- I'm going to hand you Exhibit 37.

16       A.    Thank you.

17       Q.    And ask you, is Exhibit 37 an example --

18   there is an e-mail in front and it seems to attach an

19   OMS report, and I'm wondering if that's an example of

20   a written report for OMS committee review?

21       A.    Yes.

22       Q.    Okay.  You can set that exhibit aside.

23              Turn to the next page --

24       MR. STANNER:  Can you pass down 37?

```
 1                 Thanks.
 2    BY MR. STEWART:
 3        Q.    Do you see this slide entitled "OMS
 4    Process:  Post Reformulation"?
 5        A.    Yes.
 6        Q.    Do you remember what this involves?
 7        A.    This was based if the -- in August of 2010
 8    the reformulated Ox -- OxyContin was released.  And
 9    based on that, ob -- observing the ordering --
10    ordering patterns of the reformulated product and how
11    it impacted the FFS system, the algorithms were
12    adjusted to see if -- where there may have been a
13    reduction in dispensing of a pharmacy after the launch
14    of the abuse deterrent formulation in August of 2010.
15        Q.    Do you see there is a line, it's the
16    fourth bullet down, it says:
17                 "Percentage of OxyContin decline post
18    reformulation versus contemporaneous increase in other
19    opioids"?
20        A.    Yes.
21        Q.    Is that one thing that the study was
22    measuring?
23        A.    It was one of the points that she
24    indicates here.
```

1    Q.    Was trying to determine whether or not,

2    after they reformulated OxyContin to the abuse

3    deterrent-type, that some pharmacies would have a

4    dramatic decline in -- in selling that OxyContin, is

5    that correct?

6    A.    That is correct.

7          Are you referring to the fourth bullet

8    after the main bullet in yellow?

9    Q.    That's correct.

10   A.    You -- I will note that it also includes

11   the contemporaneous increase in other opioids.

12   Q.    And was the theory -- was the theory

13   behind the study that if you had a pharmacy that saw a

14   dramatic decline post formulation in sales of

15   OxyContin, that probably that reflected the fact that

16   that pharmacy had been serving the illegal drug market

17   for diverted OxyContin?

18   MR. HOFFMAN:  So object to form.  I think your

19   question might be a little unclear.  You said "post

20   formulation in sales of OxyContin."

21   BY MR. STEWART:

22   Q.    Um, I'll -- I'll rephrase.

23         Do you -- do you -- is the theory

24   underlying this study that if you have a pharmacy that

1    showed a significant decline in sales of OxyContin

2    after the reformulation, that that suggested that the

3    pharmacy had been involved in the market for diverted

4    drugs?

5        A.    There was a potential that there -- that

6    that pharmacy may have been involved in a situation

7    where abuse and diversion may have been prevalent.

8        Q.    The theory being that proper users of

9    OxyContin didn't have a problem with the reformulated

10   drug because they weren't planning to crush it?

11       A.    Most didn't, right.

12       Q.    Do you see that the bullet says:

13   "Evaluate whether geographically" -- "geographically

14   located near prescribers of concern"?

15       A.    I do see that bullet.

16       Q.    What did that involve?

17       A.    Well, that goes back to even -- it goes

18   back to pre reformulation.

19             As mentioned several times over the last

20   couple of days is that one of the things -- one of the

21   criteria -- criteria and data that was looked at was

22   prescriber data as it related to that particular

23   pharmacy.

24       Q.    So as part of this report what they did is

Highly Confidential - Subject to Further Confidentiality Review

1    they looked at pharmacies and they said, Is the

2    pharmacy located near prescribers of concern that

3    we've already identified, fair?

4        A.    But this is -- first of all, this is an

5    algorithm and not a report.  So this wasn't creating a

6    report.  It was creating an algorithm.

7        Q.    So -- so was the algorithm structured such

8    that it could also incorporate information about the

9    location of prescribers of concern?

10       A.    It used prescribers of concern as a factor

11   in looking at the data.

12       Q.    Do you know whether, other than with

13   respect to this report, Purdue systematically used its

14   algorithms to evaluate the relationship of prescribers

15   of concern to pharmacies involved in -- in diversion?

16       MR. HOFFMAN:  Object to form.

17   BY THE WITNESS:

18       A.    You have to give me that one more time.

19   BY MR. STEWART:

20       Q.    Sure.

21            Here you're -- you just testified, right,

22   that -- that one aspect of this algorithm was it would

23   evaluate whether a pharmacy potentially engaged in

24   diversion was located near prescribers of concern,

```
 1   right?

 2       A.    Correct.

 3       Q.    Prescribers of concern, a lot of them

 4   would end up in region zero, fair?

 5       A.    I don't know that for a fact since I was

 6   not on that side of the business at the time, but I'm

 7   sure some of them did.

 8       Q.    And -- and I guess the question is:

 9   Did -- here they made this -- this algorithm evaluate

10   prescribers of concern as related to pharmacies.

11             Did Purdue that -- do that systematically

12   as a business practice?

13       A.    I can't tell you if they did or they

14   didn't.

15       Q.    Who could tell us about this algorithm

16   that's referred to on this particular slide entitled

17   "OMS Process:  Post Reformulation"?

18       A.    Well, I can tell you about the algorithm

19   because I was part of the team who did it, but what

20   more would you be looking for?

21       Q.    I guess I'd like to know if there is -- is

22   there a broader report that explains how this

23   algorithm precisely worked?

24       A.    I don't know if there is a broader report.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.     As part of the team that did it, did you

2   find a lot of situations where these problem

3   pharmacies were identified as located near prescribers

4   of concern?

5      A.     Again, you have to give me that one more

6   time.  I'm not --

7      Q.     Sure.

8      A.     -- sure where you are going.

9      Q.     Did you, in fact, since you were part of

10  the team that developed this algorithm, did you find a

11  lot of pharmacies that were geographically located

12  near prescribers of concern?

13     A.     What I was looking at as part of the team

14  as related to this algorithm was the pharmacies and

15  the amount of product they dispensed because that was

16  my area of expertise.  And as part of the

17  decision-making and being on part of the team, a

18  source that was brought in was the prescriber

19  information.  So somebody who was responsible for that

20  dealt with all of that information.

21     Q.     Do you remember who that team member was

22  with respect to this particular study?

23     A.     Well, they -- they received it from --

24  from sales operations.  There was not a sales
```

```
 1   operations member, as I remember, on the OMS

 2   committee.  I would imagine -- I shouldn't say I would

 3   imagine.  I would guess that there was somebody

 4   feeding Giselle that data or Robin or both.

 5        Q.   You don't know who the human being was in

 6   the sales operation that did that?

 7        A.   That's a -- I don't know who it was

 8   because there were some changes over that department,

 9   certainly in the last few years that I was there there

10   were several changes, so I'm not sure.

11        Q.   So we'd have to ask Robin or Giselle?

12        A.   Yeah, I would think they would be a better

13   source.

14        Q.   It says, though, do you see:  "Based on

15   the new algorithm, 100 to 200 outlets met the

16   criteria."

17             Do you see that?

18        A.   Yes.

19        Q.   And so those were now outlets, pharmacies

20   that were suspected as being involved in diversion?

21        A.   We were concerned, yes.

22        Q.   Where could I get a list of those

23   pharmacies that were identified as the 100 to 200

24   outlets that met the criteria?
```

1    A.    I'm not sure who the person is for -- for

2    that.

3    Q.    Certainly probably Robin Abrams would be

4    one person, right?

5    A.    Well, she is no longer with the company,

6    so she is probably not the right person.

7    Q.    But somewhere there must be some record of

8    those particular people?

9    A.    I'm sure there is some record somewhere.

10   Q.    And turn over to the next slide.

11         Do you see you've got a slide "Meetings

12   with the DEA"?

13   A.    Yes.

14   Q.    And did you have to turn over these 100 to

15   200 prescribers to the DEA, did you do that?

16   A.    I have no idea.

17   Q.    Okay.  Was there any follow-up done with

18   the 100 to 200 prescribers identified in the study

19   that you have been describing or the algorithm related

20   to the reformulation?

21   MR. HOFFMAN:  Object to form.  I'm sorry.  I

22   think you are saying "prescribers" now, which I don't

23   know if that's what you intend.

24   BY THE WITNESS:

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Do you mean pharmacies?

2  BY MR. STEWART:

3     Q.     That's right.  Thank you.

4            You talked about -- well, outlets, we'll

5  use the word used in the materials.

6     A.     Outlets, yes.

7     Q.     "Based on the new algorithm, 100 to 200

8  outlets met criteria."

9            And I'm wondering, was there any follow-up

10 with respect to those outlets that you know of?

11    A.     I know the data was shared with the DEA.

12 I don't know if -- how and in what format, but we

13 were -- not we, because I was not the individual who

14 did it.  The people involved were pretty open and

15 transparent with the DEA on the findings we had.

16    Q.     Do you know if they identified the

17 pharmacies or the outlets by name to the DEA?

18    A.     I don't know that.

19    Q.     What human being was responsible for

20 interfacing with the DEA with respect to those outlets

21 that were identified in the post -- in the

22 reformulation study?

23    A.     I do not know specifically who went to

24 those -- these meetings.  It certainly was not

```
 1    national accounts.  And it certainly was nobody from

 2    the sales department.  So if I was to guess, they were

 3    from either corporate security or the general

 4    counsel's office.

 5         Q.    So what human being do you think would

 6    have gone?

 7         A.    A guess would be Robin Abrams.

 8         Q.    Okay.  Would Jack Crowley have gone to

 9    such a meeting with the DEA?

10         A.    Possibly.  Possibly Mark Geraci.

11         Q.    Can you pull out Exhibit 19 for just one

12    moment, sir.

13         A.    Thank you.

14         Q.    And I would like to turn your attention --

15    do you recall specifically you testified about it

16    earlier today?

17         A.    Yes.

18         Q.    Do you see it's an e-mail from Jack

19    Crowley to you, among other people?

20         A.    Yes.

21         Q.    Okay.  And can you flip to the second

22    page.

23               And do you see that Mr. Crowley says, and

24    this is the final full paragraph:
```

```
1                    "Steve, system orders to one account in

2       Florida where orders appear to have increased

3       substantially, I have spoke to Robin about this retail

4       pharmacy account last Thursday.  I soon realized this

5       account was related to a physician who I had reported

6       to the DEA last October at Robin's direction due to

7       IMS data that Robin monitors."

8                    Do you see that?

9            A.    Yes, I do.

10           Q.    In this correspondence, isn't Mr. Crowley

11      talking about what you have referred to, which is

12      this, the fact that to get the full picture of

13      diversion, you have to look at both the OMS data with

14      respect to the pharmacies and the I -- the IMS data

15      with respect to the prescribers, is that fair?

16           A.    So let me rephrase, if -- if I may, to

17      make sure I understand.

18           Q.    Sure, um-hum.

19           A.    And is that to -- for the OMS to be

20      effective, you need to look at the prescriber data to

21      assure that the pharmacy data was correct?

22           Q.    I guess Crowley, Mr. Crowley in this

23      letter, you tell me, seems to be telling people, you

24      know, here we looked at pharmacists -- we -- we -- we
```

```
 1    were looking at a pharmacy, okay, a retail pharmacy

 2    account, and then I soon realized, he says, that this

 3    was related to a physician I reported to the DEA based

 4    on IMS data.

 5              Do you see that, that's the paragraph that

 6    we read?

 7         A.    Yes.

 8         Q.    And then you might want to read it, do you

 9    see Mr. Crowley goes on to talk about the fact that

10    you have to put two and two together to really develop

11    the pattern of diversion here.

12              Do you see that?

13         A.    I do see that.

14         Q.    When he is talking about putting two and

15    two together, isn't he talking about the fact that

16    sometimes the best evidence of diversion comes from

17    the FFS data with respect to what the pharmacies are

18    selling and sometimes it comes from the IMS data with

19    respect to what the physicians and nurse practitioners

20    are prescribing, fair?

21         MR. HOFFMAN:  Object to form.

22    BY THE WITNESS:

23         A.    I think what Jack is saying here is that,

24    being the good retired DEA agent that he is, that he
```

1    looked at more than one aspect of the crime to get the

2    impact.

3              Again, the OMS -- the -- how can I put

4    it -- the charge of 1301.74(b) is to know your

5    customer's customer.  The wholesaler is our customer.

6    Their customer is the pharmacy.  It appears to me that

7    Jack did a good job of going beyond what was

8    prescribed by the DEA to be more effective.

9    BY MR. STEWART:

10        Q.    To figure out the true pattern of

11   diversion, fair?

12        A.    Yep.

13        Q.    Can you turn to --

14        MS. PORTER:   Are you done with Exhibit 19?

15        MR. STEWART:  Yes, take away Exhibit 19.   Thank

16   you.

17   BY MR. STEWART:

18        Q.    And can you turn back to the PowerPoint

19   and turn to the page entitled "Summary of OMS Program

20   Activity"?

21        A.    Yes.

22        Q.    And do you see that you've got a summary

23   of outlets reviewed and referred between -- between

24   the years of '08 and '11?

```
 1        A.      Yes.

 2        Q.      Okay.  Do you see that it seems to rank

 3   outlets by state?

 4        A.      Yes.

 5        Q.      And do you see that they are ranked in

 6   order of the number of -- of outlets that are

 7   investigated?

 8        A.      Yes.

 9        Q.      And the fifth on the -- the sixth on the

10   list is Tennessee, fair?

11        A.      That's what I see.

12        Q.      So it looks like Tennessee had the sixth

13   most number of outlets that were investigated by the

14   OMS committee, fair?

15        A.      That's what it looks like.

16        Q.      And any reason to think that's not the

17   case?

18        A.      I have no reason to think it's not the

19   case.

20        Q.      Do you remember any of these particular

21   Tennessee cases as we sit here?

22        A.      No, I don't.

23        Q.      Do you know how many of them were referred

24   to the DEA after an investigation by the OMS
```

```
1    committee?

2        A.    No, I don't.

3        Q.    Well, what this is showing us here, this

4    slide is showing us, that Tennessee had 14 outlets

5    that were sufficiently suspected of diversion that

6    they were given an investigation by the OMS committee?

7        A.    That is correct.

8        Q.    Once -- once Purdue refers somebody to the

9    DEA, refers an outlet to the DEA, does Purdue continue

10   to supply pharmaceuticals to that outlet?

11       A.    We don't supply pharmaceuticals to

12   outlets.

13       Q.    Fair enough.  Let me rephrase.

14             When Purdue decides to refer an outlet to

15   the DEA, such as the outlets listed on the

16   exhibit here on this slide entitled "Summary of OMS

17   Probe" -- "Program Activity," does anything happen to

18   Purdue's relationship to that outlet?

19       A.    We keep our -- certainly keep our

20   representatives out of that outlet, that's for sure.

21   We advise our -- or urge our trading area partners not

22   to supply product to that outlet or restrict flow to

23   that off -- outlet, and we continue to monitor the

24   outlet, because I'm sure, as you are well aware, that
```

1    the wheels of law enforcement sometimes grind slowly

2    and we continue to monitor because the DEA may not

3    take action for a period of time --

4         Q.    So --

5         A.    -- after we report.

6         Q.    So while the DEA's wheels are grinding,

7    Purdue is basically monitoring the situation with the

8    di -- diverting pharmacy, fair?

9         A.    Sure.  We want to make sure that nobody is

10   going to pick up the volume.

11        Q.    But during that period the pharmacy that's

12   been referred to the DEA remains in business unless

13   some other factor intervenes, fair?

14        A.    Well, if I -- unless some kind of

15   adjudicating agency takes the lighted -- license away.

16        Q.    Let's turn now to Exhibit 37.  I think

17   you've got it, sir.

18             Can you tell me what this exhibit is?

19        A.    It is a letter -- e-mail from Giselle Issa

20   to, it looks like members of the OMS committee with

21   copies to several other people with an attached agenda

22   and one additional topic to be discussed by Steve Seid

23   and the remaining three outstanding reports.

24        Q.    Let me ask you, okay, so if you turn to

1    the next page, and I'll tell you the next page has a

2    Bates number that ends in the numbers 5580.

3              Do you see that?

4        A.    Yes, I do.

5        Q.    Is this the first page of an OMS report

6    that the committee is supposed to analyze?

7        A.    It looks to be one.

8        Q.    What information would you always expect

9    to be in these reports for your review?

10       A.    The data -- the data that's listed there.

11   There is more granular -- granular data on the second

12   page, yeah, the second page, background and reason for

13   the OMS review, of course, is initial.  There is

14   additional data obtained by sales operation.  I --

15   those charts are hard to read and I have no -- I don't

16   know what they are.

17            MS. PORTER:  Are you referring to Page 5583?

18            THE WITNESS:  5583.

19   BY THE WITNESS:

20       A.    On 5584 there is no national accounts

21   input which needs to be in there.  Luis Bauza did a

22   records search.  Field sales force input.  There was

23   some attachment there.  And then it's missing

24   wholesaler input and recommendation.

```
 1        MR. HOFFMAN:  Mike, real quick, I'm sorry for

 2   the record, it looks like the -- we are missing one

 3   page in order, which is 79, Bates 79.  I'm not

 4   suggesting we need it, but it looks like the agenda

 5   for whatever reason wasn't included in the exhibit.

 6   BY MR. STEWART:

 7        Q.    Sir, do you -- turn your attention to

 8   Page 5592.

 9        A.    92.

10        Q.    Now, do you see that that's a news report?

11        A.    Yes.

12        Q.    Okay.

13              Is that the sort of thing you would expect

14   to see in the packets, the reports that are provided

15   to you on the OMS committee?

16        A.    I would expect to see data that was

17   pertinent to the particular account, yes.

18        Q.    And if there is a news report about

19   diversion at this particular pharmacy, would you

20   expect that?

21        A.    Yes.

22        Q.    Turn to Page 5594.

23        A.    Okay.

24        Q.    And do you see that it's a second report
```

1    about a second pharmacy?

2        A.    Yes.

3        Q.    And this is the Food City Pharmacy?

4        A.    Yes.

5        Q.    It's in Knoxville, Tennessee?

6        A.    Yes.

7        Q.    On Hardin Valley, it is 11501 Hardin

8    Valley ROA?

9        A.    Yes.

10       Q.    So, now, this is the second pharmacy in

11   this package that is in Tennessee and before your

12   committee as suspected of diversion, fair?

13       MR. HOFFMAN:  Object to form.

14   BY THE WITNESS:

15       A.    It's suspect if it's a reason for review,

16   yes.

17   BY MR. STEWART:

18       Q.    And let me ask you, if we wanted to look

19   at every report that has ever been filed of the sort

20   that is included in Exhibit 37, would Purdue have

21   these reports on file?

22       A.    I would suspect they do.

23       Q.    We ought to be able to go into Purdue's

24   records and figure out how many pharmacies in

```
 1    Tennessee, for example, have been subject to OMS

 2    review, fair?

 3         MR. HOFFMAN:  Object to form, foundation.

 4    BY THE WITNESS:

 5         A.    I would expect you would be able to find

 6    those pharmacies anywhere that have been reviewed.

 7    BY MR. STEWART:

 8         Q.    Turn to Page 5599, sir.

 9         A.    5599.  Yes.

10         Q.    Do you see it's a narrative?

11         A.    Yes.

12         Q.    Do you see there is a section that's

13    entitled "Wholesaler Input"?

14         A.    Yes.

15         Q.    And tell me what you have here in this

16    narrative.

17               Why -- why is this included in this

18    report?

19               I mean, do you always have these sorts of

20    narratives in these reports?

21         A.    There is usually wholesaler input.

22    It's -- some is more significant than others or longer

23    than others or multiple accounts.

24         Q.    But if there is investigations, if there
```

1    are investigations that have been done, you would

2    expect that these reports would be included so that

3    you could review them on the OMS committee, is that

4    fair?

5         A.    If the -- if we were able to get input

6    from our wholesaler partners, we would do so.

7         Q.    Do you see that it says, "Jack and

8    Giselle," it is the very first line under Wholesaler

9    Input --

10        A.    Yes.

11        Q.    -- "contacted Ed Hazewski from ABC on

12   May 24th, 2012."

13              Do you see that?

14        A.    Yes, I do.

15        Q.    Who do you think Jack is?  Is that Jack

16   Crowley?

17        A.    That's Jack Crowley.

18        Q.    And who is Gis -- Giselle?

19        A.    Giselle Issa.

20        Q.    And do you see that -- that it says that:

21              "Ed stated that his comments are

22   applicable to the three Food City Pharmacies.  Ed

23   stated that a year ago ABC started forcing Food City's

24   volume down.  Ed stated that their volume is mainly

1   driven by Bearden Clinic (managed by Drs. Frank and

2   Janet McNeil) both region zero doctors."

3              Do you see that?

4        A.    I do see that.

5        Q.    And then do you see it says down, I've

6   underlined it:

7              "Ed stated that there are three Food City

8   Pharmacies in Knoxville and they all fill

9   prescriptions for the Bearden Clinic."

10             Do you see that?

11       A.    Yes.

12       Q.    And -- and do you know what -- what was

13  done to follow up on this report?

14       A.    This specific report?

15       Q.    Yeah, um-hum.

16       A.    I don't know.

17       Q.    Okay.  Can you turn to Page 5600.

18             Do you see that there is a recommendation

19  made?

20       A.    Yes.

21       Q.    And what's the recommendation?

22       A.    The recommendation is:

23             "We recommend that Purdue" -- "Purdue

24  assist in the site visit of this Food City account.

 1    In particular, we are interested in confirming whether

 2    the account is complying with state reporting

 3    requirements under the Prescription Drug Monitoring

 4    Program, and attempt to learn more about the

 5    prescribers whose patients they are servicing.  If we

 6    participate in a visit with ABC, this account will

 7    qualify for MOEs 1 and 2.  The sales reps may continue

 8    to call, and will be requested to notify the General

 9    Counsel's Office if further derogatory information is

10    obtained."

11         Q.   So what happened was the OMS committee was

12    presented with a report with a pharmacy and there is a

13    report involving large amounts of -- of OxyContin, for

14    example, prescribed and the recommendation is that you

15    send some field representatives, go down to look at

16    it, is that fair?

17         MR. HOFFMAN:  Object to form.

18    BY THE WITNESS:

19         A.   The last line is a field representative,

20    the Purdue assisted in the site visit would be with

21    the executive director of CSA, I assume, or -- and/or

22    Luis Bauza, director of investigations.

23    BY MR. STEWART:

24         Q.   So the point is at this point the

1    recommendation, and this is taking place in June 2012,

2    the recommendation is don't take any action with

3    regard to referring this pharmacy to the DEA, but

4    conduct further investigation, is that correct?

5        A.    I am not sure, because I forget right now,

6    MOEs stand for recommendation actions, and I don't

7    remember what each MOE number was and meant.  So I can

8    tell you -- I can't tell you what specific

9    Recommendations 1 and 2 are.

10       Q.    We'd have to look at the MOEs to figure

11   that out?

12       A.    Yeah.

13       Q.    But what we do know is that there is a

14   recommendation that there be a site visit of the Food

15   City account?

16       A.    Yes.

17       Q.    Fair?

18             Do you know if that ever happened?

19       A.    I don't.

20       Q.    Okay.

21       A.    I'm --

22       MR. HOFFMAN:  Hey, Mike, is it a good time to

23   take --

24       MR. STEWART:  Sure.

```
 1          MR. HOFFMAN:  -- just a quick break?

 2          MR. STEWART:  Absolutely.  Let's take five.

 3          THE VIDEOGRAPHER:  We are off the record at

 4   3:04 p.m.

 5               (WHEREUPON, a recess was had

 6                from 3:04 to 3:18 p.m.)

 7          THE VIDEOGRAPHER:  We are back on the record at

 8   3:18 p.m.

 9                  (WHEREUPON, a certain document was

10                   marked Purdue-Seid Deposition Exhibit

11                   No. 038, for identification, as of

12                   12/13/2018.)

13   BY MR. STEWART:

14     Q.    I'm going to hand the exhibit -- the

15   witness Exhibit 38.

16          Sir, do you recognize that document?

17     A.    I do not.

18     Q.    Do you recognize the type of document, a

19   Field Research Result Summary?

20     A.    Who -- who authored this?

21     Q.    I don't know.

22          Do you -- do you know what it is?

23     A.    I do not know what it is.

24     Q.    Okay.  You -- you -- you haven't seen or
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you are not familiar with the document that has a

2    Bates number P_TN_000055997?

3         A.    No.

4         Q.    And --

5         A.    I'm trying to figure out what, even, prism

6    map is here.

7         Q.    It doesn't sound like it is a document

8    that you recall using on the OMS committee?

9         A.    I don't recall this document, no.

10                    (WHEREUPON, a certain document was

11                     marked Purdue-Seid Deposition Exhibit

12                     No. 039, for identification, as of

13                     12/13/2018.)

14   BY MR. STEWART:

15        Q.    I hand you Exhibit 39.

16        A.    Thank you.

17        Q.    And --

18        MR. STEWART:  Oh.  Here, let me take one back.

19   BY MR. STEWART:

20        Q.    Do you recognize Exhibit 39?

21        A.    I rec -- do I recognize that this is

22   Exhibit 39?

23        Q.    Yeah.

24        A.    Yes, this is Exhibit 39.
```

1    Q.    Do you recognize what sort of document it

2    is?

3    A.    This is a document from a rep to I believe

4    Russell Johnson was a DM -- no, Clyde Williams I think

5    was a DM and Phil Cramer was an RN, and Mark

6    Carraturo, Windell Fisher, Paul Rusu, Joan Zooper were

7    all copied, but I would not have seen this document.

8    I don't believe.

9    Q.    And do you -- are you familiar with

10   documents in which Purdue will decide whether or not

11   doctors can -- can be detailed by Purdue salespeople?

12   A.    2007, I was in corporate and it had been

13   better than seven years that I was in the sales field,

14   so I am not familiar with this type of document.

15   Q.    Okay.  So you are not familiar with this

16   document here that says:  "Purdue has decided that

17   sales representatives may call on Dr. Frank and Janet

18   McNeil."

19         Do you see that?

20   A.    Yes, I saw it.  I read it.  And I'm not

21   familiar --

22   Q.    And -- and you are not -- you are just not

23   familiar with --

24   A.    This type of document?

```
 1        Q.     -- that type of document?

 2        A.     Oh.  And I said Alieen -- Aileen was a

 3   rep.  She was still a paralegal at Purdue at that

 4   time.  She went from being a paralegal to a rep.

 5        Q.     Do you recognize --

 6        A.     Too much information.

 7        Q.     Do you recognize that the McNeils are the

 8   doctors that were mentioned in the OMS -- in the OMS

 9   report that we looked at that's Exhibit 37?

10        A.     I do remember seeing those names.

11               (WHEREUPON, a certain document was

12                marked Purdue-Seid Deposition Exhibit

13                No. 040, for identification, as of

14                12/13/2018.)

15   BY MR. STEWART:

16        Q.     I'm going to hand you Exhibit 40.

17        A.     Thank you.

18        Q.     And ask you if you recognize that?

19               Do you recognize that document?

20        A.     No.

21        Q.     Do you recognize -- do you know what an

22   ROC is?

23        A.     Yes, it is a report of concern.

24        Q.     And is that the sort of document -- well,
```

```
 1    first, tell me what a report of concern is within

 2    Purdue?

 3         A.    Report of concern is a report that -- I

 4    believe it is anybody in the organization.  I don't

 5    know if that's still in -- the case, but I believe

 6    it's anybody in the organization who sees or hears

 7    something that may be a report of concern as it

 8    relates to one of our products, in particular as to

 9    the inappropriate use of a product, that they are

10    expected, not that they can, they are expected to --

11    to document that with an ROC, as it was called.

12         Q.    And -- and what is the date of the report

13    of concern that's Exhibit 40 to your deposition?

14         A.    The date, it's date stamped August 25,

15    2008.

16         Q.    Okay.  And do you see that -- what the

17    report of concern said is that:

18              "Purdue sales rep called to report in the

19    Metro Pulse (21 August 2008, Volume 18), he read an

20    article called Drug Zone.  There were statements about

21    OxyContin, Food City Pharmacy and the Vearden Heart

22    Associates Clinic."

23              Do you see that?

24         A.    Yes.
```

```
1        Q.    Okay.  Do you see, if you turn to

2   Page 6589 in the Bates numbering, that there is a

3   newspaper article called "Drug Zone"?

4        A.    Yes.

5        Q.    Do you see that the "Drug Zone" article,

6   and you can look up on the screen, it talks about Food

7   City, the Food City, and it talks about the McNeils?

8              I'll turn it this way for you.

9              Do you see that?

10       A.    Yeah, it's a bit hard to read either in

11  the copy here or on the screen.

12       Q.    Do you see it talks about Bearden

13  Healthcare Associates as operated by Drs. Frank and

14  Janet McNeil?

15       A.    Yes.

16       Q.    Do you see it talks about the Food City

17  parking lot?

18       A.    Where is that?

19       Q.    It is highlighted.  It is up on the

20  screen.

21       A.    I can't see that.

22       Q.    Well, do you see the headline is "Drug

23  Zone Westwood Residents Allege Irresponsible" --

24  "Allege Irresponsible Prescription Practices At
```

1    Neighborhood Food City and Nearby Clinic"?

2        A.    Yes.

3        Q.    Okay.  Now, before we looked at an

4    Exhibit 37, which was a June 2012 report on a Food

5    City Pharmacy in the Knoxville area.

6              Do you see -- do you remember that?

7        A.    I do remember that.

8        Q.    Okay.  And you remember that report

9    contained investigator comments regarding Drs. Frank

10   and Janet McNeil?

11       A.    I remember they were in that report.

12       Q.    Now here we have a newspaper article

13   addressing those same doctors, fair?

14       A.    I -- the same names are in this article,

15   yes.

16       Q.    Right.  The -- Exhibit 40 has got the same

17   names of the doctors, it has got Food City, and it is

18   a Food City in Knoxville, fair?

19       A.    Okay.  It is a Food City in Knoxville.

20       Q.    And my question is:  Do you know why this

21   newspaper article is not included in the package of

22   materials that you were given to review on the OMS

23   committee?

24       A.    I do not know.

```
 1                      (WHEREUPON, a certain document was

 2                       marked Purdue-Seid Deposition Exhibit

 3                       No. 041, for identification, as of

 4                       12/13/2018.)

 5   BY MR. STEWART:

 6        Q.    I'm going to hand you Exhibit 41.

 7        A.    Thank you.

 8        MR. STEWART:  If you can share, I would

 9   appreciate it.

10   BY MR. STEWART:

11        Q.    Do you see here you have an e-mail from

12   Steve Bishop to you?

13        A.    Yes.

14        Q.    Do you see he says:

15             "I'm looking at my calendar and I will try

16   to plan a trip to see Food City headquarters and then

17   drive to the Knoxville area the last week of October"?

18             Do you see that?

19        A.    Yes.

20        Q.    Okay.  And do you see forwarded is a

21   report, if you go down to the bottom of the page, from

22   Russell Johnson and he reports that:

23             "Approximately a year ago there was a news

24   report on TV that discussed Food City Pharmacy in
```

Highly Confidential - Subject to Further Confidentiality Review

1    Knoxville, Tennessee as being the largest distributor

2    of opioids in Tennessee.  They then insinuated the

3    prescriptions were coming from Bearden Healthcare.

4    The report did not condemn the pharmacy or the

5    clinic."

6             Do you see that?

7        A.    Yes.

8        Q.    And then below that there is a paragraph

9    talking about the Metro Pulse article "Drug Zone"?

10       A.    Yes.

11       Q.    That's the article we just looked at?

12       A.    Yes.

13       Q.    Okay.  And what -- what was your reaction,

14   do you remember this?

15       A.    I don't.

16       Q.    I take it you've now -- with this 2 --

17   September 2008 correspondence you've been put on

18   notice personally of these reports about the Food City

19   Pharmacy in Knoxville and the McNeils, fair?

20       MR. HOFFMAN:  Object to form.

21   BY THE WITNESS:

22       A.    I think -- I've been put on notice because

23   I've read these here or --

24   BY MS. CONROY:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Right.  Someone has now sent an e-mail to

 2   you --

 3        A.    Oh, I see -- I see what you are asking.

 4        Q.    -- telling you about the "Drug Zone"

 5   article and the television report, fair?

 6        A.    I was copied on this.

 7        Q.    Well, you were sent an e-mail from

 8   Steve Bishop, right?

 9        A.    Yes.

10        Q.    And why would Steve Bishop send you an

11   e-mail about this?

12        A.    Because he reported to me.

13        Q.    Why would this be something that would

14   come to your attention within Purdue?

15        A.    Because Food City was a retail account --

16   was a -- was a distributor, was a retailer, a chain

17   retailer and geographically it was Steve Bishop's

18   responsibility.

19        Q.    So this didn't come to you, this document

20   that we are looking at now did not come to you in the

21   context of your work for the OMS committee, it came to

22   you through business channels?

23        A.    It appears so.

24        Q.    And you're being handed document -- the
```

1  document that's Exhibit 41 or you were sent the e-mail

2  in that document to alert you that one of the

3  customers that you were ultimately responsible for

4  managing had been mentioned as potentially involved in

5  diversion?

6       A.    That's what it -- the article said.

7       Q.    What steps did you take?

8       A.    I don't remember.

9       Q.    What -- what would normally be your

10  reaction to receiving such an article?

11       A.    I don't know who else was copied -- well,

12  I do see who was copied from Eric, but I don't know

13  where else it was forwarded, so I don't know if this

14  wound up in legal or more senior management, sales

15  management, because I do not see -- a regional manager

16  was copied and I don't know what she -- if she would

17  have forwarded this on, so I don't know -- I don't

18  know what was done with this e-mail.

19       Q.    What should have been done with the e-mail

20  that's Exhibit 41?  What should have that -- what

21  should that have prompted?

22       MR. HOFFMAN:  Object to form.

23  BY THE WITNESS:

24       A.    I -- what it should have prompted, and I

```
 1   did see 2008 reports of concern were in place, it

 2   should have prompted a ROC, which would have been

 3   triaged through legal and then -- and perhaps there

 4   was action decided on this -- then action would be

 5   decided.  Steve Bishop, perhaps, provided additional

 6   information because he scheduled to get down there in

 7   October.

 8   BY MR. STEWART:

 9       Q.    What should you have done receiving a

10   report that described diversion, you yourself within

11   the organization?

12       MR. HOFFMAN:  Object to form.

13   BY THE WITNESS:

14       A.    Well, I don't know what I -- I can't tell

15   you what I -- I would have done with this.  It was --

16   these were articles.  It appears they were going to,

17   like, government affairs, they -- public affairs, the

18   areas that would review these kind of articles, and I

19   don't know what action -- my action would have been to

20   support Steve Bishop to go down there and get some

21   more information before I did something.

22   BY MR. STEWART:

23       Q.    And -- and once again, we've got now this

24   article describing the problems at Food City and also
```

1    describing Bearden Healthcare and the McNeils, fair?

2       MR. HOFFMAN:  Object to form.

3    BY THE WITNESS:

4       A.    It was the previous article you showed me,

5    right, the Westwood Homeowners --

6    BY MR. STEWART:

7       Q.    Right.

8       A.    Yeah.

9       Q.    You can read the e-mail from Russell

10   Johnson that's forwarded to you and it says, do you

11   see in the paragraph, the second paragraph --

12      A.    Uh-huh.

13      Q.    "The article discussed the Westwood

14   Homeowners Association's newsletter that accused Food

15   City Pharmacy and Bearden Healthcare and Associates of

16   conspiring to run a pill mill.  They accused Food City

17   of filling the highest volume of opioids in the State

18   of Tennessee.  The community news article went on to

19   say that the physicians at Bearden Healthcare are the

20   biggest problem in the state when it comes to

21   overprescribing."

22          Do you see that?

23      A.    I see that.

24      Q.    Okay.  So here once again this is a report

1   of this article warning of Food City and Bearden

2   Healthcare run by the McNeils, correct?

3        MR. HOFFMAN:  Object to form.

4   BY MR. STEWART:

5        Q.    Is that fair?

6        A.    It mentions them, yes.

7        Q.    Well, and my question is:  How come this

8   article is not in the materials in Exhibit 37 that

9   were provided to you on the OMS committee when you

10  were provided a -- a report about a Food City?

11       A.    Let me --

12       MR. HOFFMAN:  Object to form, timeframe.

13  BY THE WITNESS:

14       A.    -- let me just check, because I want to

15  just see the date of the other report.

16            So I'm not sure that there weren't -- and

17  it goes back to an earlier question of yours as to

18  whether an account was reviewed and if it was --

19  continued to be reviewed.  I'm not sure that Food City

20  was not reviewed by the OMS committee before 2012, as

21  this --

22  BY MR. STEWART:

23       Q.    If not, would you expect the article to be

24  included in the packet for you to review on the OMS

Highly Confidential - Subject to Further Confidentiality Review

1    committee, the article --

2         A.    I would have ex --

3         Q.    -- about the "Drug Zone"?

4         MR. HOFFMAN:  Object to form, timeframe.

5    BY THE WITNESS:

6         A.    I would have expected that if that had

7    happened in 2008 and if it hit the algorithm, which it

8    seems it would have, that in that 2008 report if there

9    was media information available that it should have

10   been included in that report.

11   BY MR. STEWART:

12        Q.    Would -- would you have expected that

13   Russell Johnson's e-mail recounting the concerns about

14   Food City and the Bearden health clinic and the

15   McNeils, would -- would you have expected that that

16   would be included in the packet for the OMS

17   committee's review?

18        MR. HOFFMAN:  Object to form.

19   BY THE WITNESS:

20        A.    Not necessarily in the 2012, but as -- do

21   you have that 2012 on you?  Okay.

22             If there had been one in 2000 -- in and

23   around 2008, just like in this one where Lee Sparks,

24   who was a Tennessee rep, made a fee -- field sales

1  report, it would be in here.  It would be in here.

2  BY MR. STEWART:

3      Q.    Right.  It sounds like you would have

4  expected Russell Johnson's report to appear before the

5  OMS committee in some report depending on -- you know,

6  timed at some point, fair?

7      MR. HOFFMAN:  Objection to form, foundation.

8  BY THE WITNESS:

9      A.    I would expect a field sales report to

10  appear, not necessarily the Russell Johnson letter.

11  There have been times in certain instances where we

12  send a manager to -- to do an onsite or go in with the

13  rep to -- or ascertain the information to get a -- a

14  more senior review, if you will.

15          But if there -- since this is dated 2008,

16  if there was re -- review before the committee in

17  2008, and I don't know if there was or there wasn't,

18  but it would be surprising if it wasn't -- if -- if it

19  hit the algorithm, that there would be field sales

20  input in the document.

21  BY MR. STEWART:

22      Q.    I mean, you would expect as a member of

23  the OMS committee that at some point the committee

24  would be apprised of any negative field report

```
 1   describing diversion or suggesting diversion?

 2        A.   We certainly would not --

 3        MR. HOFFMAN:  Sorry.  Object to form.

 4   BY THE WITNESS:

 5        A.   We certainly would ignore -- not nor --

 6   ignore a field report.

 7   BY MR. STEWART:

 8        Q.   Now, you talk about, Well, perhaps.

 9             Do you recall saying, Well, it may be

10   there was a prior report about Food City and the

11   McNeils, fair?

12        A.   I would say, yes, perhaps there was.

13        Q.   Wouldn't you expect any prior report to be

14   mentioned in Exhibit 37, the 2012 report?

15        A.   I --

16        MR. HOFFMAN:  Object to form, foundation.

17   BY THE WITNESS:

18        A.   -- am not sure.  I would...

19   BY MR. STEWART:

20        Q.   As -- as a matter of general policy,

21   wouldn't the committee want to know --

22        A.   It certainly would be possible.

23        Q.   Go ahead.

24        A.   Sorry.
```

```
 1        Q.     Pardon me.

 2        A.     It certainly would be possible.

 3               (WHEREUPON, a certain document was

 4                marked Purdue-Seid Deposition Exhibit

 5                No. 042, for identification, as of

 6                12/13/2018.)

 7   BY MR. STEWART:

 8        Q.     Do you recognize the document that you see

 9   up on the screen, and it's Exhibit 42?

10        A.     "CSA Compliance Accounts, Redacted For

11   Privilege."

12               This looks like -- I don't know what this

13   is.  This looks like a type of -- it's titled "CS

14   Compliance Accounts," so it looks like a CSA

15   compliance report.

16        Q.     What is a CSA compliance report?

17        A.     I don't know what it is.

18        Q.     It is not a document that you are familiar

19   with --

20        A.     It is not a document --

21        Q.     -- within Purdue?

22        A.     It may have been a precursor to

23   information for the OMS, but it's not a -- I would not

24   see this document.  This -- it mentions Luis, which is
```

1    Luis Bauza, so it appears that it related to

2    investigation and that would be through CSA compliance

3    or the legal department or maybe corporate security.

4    CS compliance reports to legal, so it would be legal

5    or corporate compliance.

6                    (WHEREUPON, a certain document was

7                     marked Purdue-Seid Deposition Exhibit

8                     No. 043, for identification, as of

9                     12/13/2018.)

10   BY MR. STEWART:

11        Q.    Do you recognize the document that is

12   Exhibit 43?

13        A.    No.

14        Q.    You -- you don't, you have not seen a

15   document like that before?

16        A.    Referral to DEA, no.

17        Q.    Right.  Do you know what document is used

18   to refer a doctor to DEA, to the DEA?

19        A.    No, I don't.

20        Q.    Is there a similar document used to refer

21   pharmacists to the DEA by the OMS committee?

22        A.    The OMS usually contacts -- it's mentioned

23   in that report you were showed, Robin Abrams' deck, it

24   said that referral was done by phone or by visit for

Highly Confidential - Subject to Further Confidentiality Review

1   the pharmacy.

2               (WHEREUPON, a certain document was

3               marked Purdue-Seid Deposition Exhibit

4               No. 044, for identification, as of

5               12/13/2018.)

6       MS. PORTER:   I'm just going to -- do you want

7   this Post-it on the exhibit?

8       MR. STEWART:  You can take it off.

9   BY MR. STEWART:

10      Q.   Do you recognize the exhibit that is 44?

11      MS. PORTER:  Do you have a copy, Counsel?

12  BY THE WITNESS:

13      A.   I recognize it was -- a copy was sent to

14  me.

15  BY MR. STEWART:

16      Q.   Do you see it says:  "Reports for OMS

17  meeting," that's the subject?

18      A.   Yes.

19      Q.   Okay.  Do you see the second report from

20  the bottom of that list is "Food City Pharmacy updated

21  report for July 2013"?

22      A.   I see that.

23      Q.   Okay.  And do you know -- do you know what

24  happened with respect to Food City in 2013?

1          A.     I don't.

2          Q.     But you were once again looking at a

3    report with regard to Food City Pharmacy?

4          A.     Apparently.

5                 (WHEREUPON, a certain document was

6                 marked Purdue-Seid Deposition Exhibit

7                 No. 045, for identification, as of

8                 12/13/2018.)

9    BY MR. STEWART:

10         Q.     I'm going to hand you Exhibit 55.

11         A.     Thank you.

12         Q.     Do you recognize that document?

13         MR. HOFFMAN:  Did you say 55?

14         MR. STEWART:  Oh, 45.  Pardon me.

15   BY MR. STEWART:

16         Q.     Is that a document you recognize?

17         A.     No.

18         Q.     Okay.

19                Do you see it says:  "Sales

20   representatives should not call on Drs. Janet and

21   Frank McNeil"?

22         A.     I see that.

23         Q.     Okay.  Is the reason you don't recognize

24   this because it's not a document that would come from

1  within the OMS system?

2      A.    Sales reps call on doctors.

3      Q.    Right.

4      A.    And report up through the sales

5  department.  Although I was under the umbrella of the

6  sales department, my team called only on trade

7  accounts, so I would not be familiar with this.

8      Q.    But here is a question.

9            You remember that Dr. Frank McNeil and

10 Janet McNeil --

11     A.    Yes, I do.

12     Q.    -- remember they were referred to -- in a

13 field report which was contained in Exhibit 37 which

14 was this OMS report that you had?

15     A.    Yes.

16     Q.    Fair?

17           Wouldn't a Purdue document stating that

18 the doctors referred to had been put on the "do not

19 call" list, shouldn't that report be included in the

20 materials given to the OMS committee?

21     MR. HOFFMAN:  Object --

22 BY THE WITNESS:

23     A.    I believe it was.

24     MR. HOFFMAN:  Object to form.

1    BY THE WITNESS:

2        A.    I believe it was, because, as I remember,

3    it said they were in region zero, so if they were in

4    region zero, that is the code name for don't call on

5    the doc.

6    BY MR. STEWART:

7        Q.    The point is you wouldn't -- you -- you

8    don't think you would have to include this document

9    with the actual history, fair, that's your thinking?

10       A.    I would think it would be a duplication.

11       Q.    Normally would you include sales documents

12   that would talk about prescribers that are discussed

13   in the OMS materials?

14       A.    What do you mean by "sales documents"?

15       Q.    Well, is there any rule that says, you

16   know, we are not going to put sales documents in an

17   OMS committee report as backup?

18       A.    Not that I'm aware of.

19       Q.    I mean, in fact, I think you have said

20   sales documents, reports from salespeople of potential

21   diversion should go in the OMS materials that you

22   would rec -- review, fair?

23       A.    They are in -- they are in those reports.

24   There is a section that says sales -- field sales

Highly Confidential - Subject to Further Confidentiality Review

```
 1    input or something along those lines.

 2                 (WHEREUPON, a certain document was

 3                  marked Purdue-Seid Deposition Exhibit

 4                  No. 046, for identification, as of

 5                  12/13/2018.)

 6    BY MR. STEWART:

 7         Q.    I hand you Exhibit 46.

 8         A.    Thank you.

 9         Q.    Do you recognize this document?

10         A.    No.

11         Q.    You do not?

12         A.    This is an Adverse Event/Product

13    Complaint/ROC.  This is a form that a Purdue employee

14    is required to do for adverse events, product

15    complaints, reports of concern, ADD.  I don't think

16    it's attention deficit disorder.  I don't know what

17    ADD is.

18                But this is a form that -- I didn't see

19    this particular one, but this is a form that anyone in

20    the company is supposed to do to deal with any of

21    those issues.

22         Q.    And do you see that the -- if you look at

23    the top of -- of the second page, it says:

24                "Chad said they do not fill prescriptions
```

```
 1   for Drs. Frank McNeil's clinic.  Chad said that he has

 2   had some patients come in and tell him that

 3   Dr. Meal" -- "McNeil has told patients that the DEA

 4   has told Dr. McNeil he has got to cut back on his

 5   prescribing."

 6            Do you see that?

 7       A.   Yes.

 8       Q.   Do you know why this document wouldn't be

 9   included in your materials that the -- that the OMS

10   committee reviewed when evaluating Food City and its

11   prescribers, related prescribers, the McNeils?

12       MR. HOFFMAN:  Object to form, foundation.

13   BY THE WITNESS:

14       A.   I don't know if there is any policy as to

15   why it would or it wouldn't.

16                  (WHEREUPON, a certain document was

17                   marked Purdue-Seid Deposition Exhibit

18                   No. 047, for identification, as of

19                   12/13/2018.)

20   BY MR. STEWART:

21       Q.   I hand you exhibit marked 30 -- 47.

22            Do you recognize that document?

23       A.   It's to me from Jack.  I don't remember

24   the specific document, but it was to me.
```

1    Q.    Okay.  And -- and is this a document that

2    relates to your work on the OMS committee?

3    A.    This appears to be Jack just asking me

4    about three specific accounts.

5    Q.    Do you see he is asking you about the Food

6    City account in Knoxville?

7    A.    Yes.

8    Q.    Okay.  And he is asking you about a large

9    order of OxyContin 80 milligrams?

10   A.    Yes.

11   Q.    Okay.  And why is he -- why -- why is he

12   talking to you about this?  I mean, why would Jack

13   contact you about this?

14         Is this a specific -- a suspicious order?

15   A.    He asked me if we notified customers of

16   this sales increase.

17   Q.    What was he -- what was the point of that?

18   A.    I'd venture to say you'd have to ask Jack

19   what the point of it was, but he did ask me about the

20   notification of the customers.

21   Q.    I guess my question is if Jack Crowley is

22   contacting you, is it about diversion?  I mean, that's

23   his area, right?

24   A.    He is concerned about the size of the

1    order.

2         Q.    He is concerned about the size of the

3    order that Food City Pharmacy is looking at, right?

4         A.    That's correct.

5         Q.    Or is making, fair?

6         A.    Correct.

7         Q.    And -- and -- and the reason that this

8    e-mail is not in the materials that the OMS committee

9    reviewed is because it postdates it, fair?

10        A.    I guess it postdates it.

11        Q.    Yeah, if you look at Exhibit 37, the

12   report that you were looking at, Exhibit 37 is dated

13   June 2012, fair?

14        A.    Yes.

15        Q.    And Jack Crowley is rec -- is noting that

16   Food City in Knoxville is now ordering a large number

17   of OxyContin 80 milligrams, fair?

18        A.    That's what it says.

19        Q.    And he is concerned about that order?

20        MR. HOFFMAN:  Object to form.

21   BY MR. STEWART:

22        Q.    Is that --

23        A.    It -- it appears he is concerned.

24              (WHEREUPON, a certain document was

```
 1                    marked Purdue-Seid Deposition Exhibit

 2                    No. 048 and No. 049, for

 3                    identification, as of 12/13/2018.)

 4  BY MR. STEWART:

 5       Q.   I'm going to hand you Exhibit 48.

 6            Yeah, I take it you've gathered from Jack

 7  Crowley's e-mail that at that point at least one Food

 8  City in Knoxville is still going strong ordering

 9  Oxy-80s, right?

10       MR. HOFFMAN:  Object to form.

11  BY THE WITNESS:

12       A.   I saw that there was a large order at that

13  Food City in Knoxville.

14  BY MR. STEWART:

15       Q.   And do you remember in the report reviewed

16  by OMS in June, what was reported to you is that there

17  were actually three Food Cities and the Bearden clinic

18  used all three of them to sell its pills, fair?

19       A.   That's what it said.

20       Q.   Okay.

21       MR. HOFFMAN:  Object to the form.

22  BY MR. STEWART:

23       Q.   So we know at least one of them is --

24  at -- at the point that Jack Crowley sent that e-mail
```

1    is -- is ordering OxyContin-180s [sic] to sell --

2    strike that.

3              We know that at least one Knoxville Food

4    City is ordering OxyContin 80-milligram tablets to

5    sell?

6         A.   It appears that's the case.

7         MR. HOFFMAN:  Mike, for your planning purposes,

8    you have about five minutes.

9    BY MR. STEWART:

10        Q.   You have in front of you another exhibit.

11             Do you see that?

12        A.   48?

13        Q.   Exhibit 48?

14        A.   Yes.

15        Q.   Okay.  And what's Exhibit 48?

16        A.   OMS report, September 12th, for Drug Park

17   Inc.

18        Q.   And what -- what is this?  Is this a

19   follow-on report?  And I'll turn your attention to

20   Page 0258.

21        A.   I don't know whose report this is.  There

22   is -- this is not an OMS report.  This -- it looks

23   like it is some kind of follow-up report.

24        Q.   Well, do you see on the front cover, okay,

```
1    do you see on the front cover of Exhibit 48 it says:

2    "OMS Summary Report"?

3         A.    Yes.  But --

4         Q.    What do you think the word "OMS" -- or the

5    acronym "OMS" stands for?

6         A.    Order monitoring system.

7         Q.    Okay.

8         A.    But that doesn't mean it is an order

9    monitoring system committee report.

10        Q.    Okay.  What do you think it is?

11        A.    Because it doesn't look like one.

12        Q.    Okay.  Why don't you turn to Page 0258.

13        A.    Okay.

14        Q.    Do you see that here it's -- the -- the --

15   the -- the headline says -- we are looking at Food

16   City Pharmacy 674 in Kingston Pike?

17        A.    Yes.

18        Q.    Okay.  And do you see that there is a

19   discussion about an on-site visit?

20        A.    Yes.

21        Q.    And now that you are looking at this

22   document, do you see -- do you see -- do you recognize

23   it as a document that the OMS would have considered,

24   the OMS committee?
```

1     A.     We would consider the information in it.

2   If you remember the format of the OMS reports, there

3   is a section for wholesaler input, and I don't know if

4   Giselle would cut and paste this or put a summary of

5   this in that section.

6     Q.     And so you think this is a wholesaler

7   pitching in to tell you about -- to tell you about the

8   Food City and Bearden?

9     A.     I don't know what it is unless I read it.

10    Q.     Okay.  Well, take a look at it.

11    A.     Oh, yes, I know this guy.

12    Q.     Do you recognize the report?

13    A.     I don't recognize the report.  I recognize

14  some of the names in the report, but not the report.

15    Q.     Well, I'll turn your attention to Page 14

16  because we have to move quickly here.

17           Sir, do you see Page 14, Bates Stamp 0259?

18    A.     Yes.

19    Q.     Okay.  Do you see that it talks about a

20  Mr. Murphy who reveals that he and an associate had

21  interviewed Frank McNeil at length over two hours

22  perhaps a year ago, and it says:

23           "Matt felt that Dr. McNeil was afraid that

24  Food City would cut off his patients the same way that

Highly Confidential - Subject to Further Confidentiality Review

1    CVS, Walgreens and Walmart had cut them off, therefore

2    he had agreed to an interview."

3           Do you see that?

4       A.    I do see that.

5       Q.    Okay.  What do you think this is, this is

6    a report from a wholesaler about Dr. McNeil and Food

7    City again?

8       MR. HOFFMAN:  Object to form.

9    BY THE WITNESS:

10      A.    I don't know for sure.  Matt Murphy is the

11   vice president of pharm -- Pharma Compliance Group.

12   So that's an outside agency.  There is further

13   information where it says "contact with wholesaler"

14   later on.  There is further contact where --

15   BY MR. STEWART:

16      Q.    Well, here --

17      A.    -- Jack and Lou met with sales rep.

18      Q.    Sir, I'll tell you, I'm going to hand you

19   another exhibit.

20      A.    Okay.

21      Q.    Tell me if you recognize that as an

22   official OMS report?

23      A.    This looks like an OMS report.

24      Q.    And it is, in fact, one about the Food

```
 1   City Pharmacy?

 2        A.    Yes.

 3        Q.    Okay.  And now I'm going to hand you

 4   Exhibit 51 [sic].  Okay.

 5               (WHEREUPON, a certain document was

 6                marked Purdue-Seid Deposition Exhibit

 7                No. 050, for identification, as of

 8                12/13/2018.)

 9   BY MR. STEWART:

10        Q.    And we just had exhibit --

11        MS. PORTER:  This will be 50.

12        MR. STEWART:  Okay.  Exhibit 50.

13        MS. PORTER:   I believe you are at two hours,

14   but if you want to go ahead and ask the witness --

15        MR. STEWART:  I'm going to put -- okay.  Thank

16   you.

17   BY MR. STEWART:

18        Q.    Here, I'll hand you Exhibit 50.

19        A.    Thank you.

20        MR. STEWART:  And your copies.

21   BY MR. STEWART:

22        Q.    And do you recognize that document?

23        A.    As meeting minutes?

24        Q.    Yeah, Exhibit 50.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I recognize it is a type of OMS minutes we

2    would receive.

3      Q.    And can you turn to the second page,

4    Page 2148.

5      A.    2148.  You gave me two here.

6      Q.    Do you see there in the center of the

7    page there is a statement:

8            "Food City Pharmacy, Knoxville, Tennessee.

9    Decision closed, suspended by McKesson"?

10     A.    Yes.

11     Q.    What does that mean?

12     A.    That the investigation was closed and

13   McKesson stopped shipping, from what it sounds like.

14     Q.    So at that point do you know whether Food

15   City is still -- is still prescribing -- or is still

16   selling OxyContin, can you tell from the meeting

17   minutes?

18     A.    Oh, these are -- not from this copy of the

19   minutes for sure.

20     Q.    And from those minutes you can't tell

21   whether Food City is still -- it may well be that Food

22   City even then is still prescribing, fair?

23     A.    I don't know that.

24     Q.    And you can't tell whether or not the OMS

```
 1   committee ever reported Food City to the DEA or not,

 2   fair --

 3        A.   It doesn't --

 4        Q.   -- from any of the documents you've seen?

 5        A.   It doesn't say that here, no.

 6        Q.   Okay.

 7             Let me ask you:  Do you recall that you

 8   had an e-mail talking about this Food -- the -- the

 9   problem of Food City and the McNeils, it was dated

10   September 2008?

11        MR. HOFFMAN:  Object to form.

12   BY THE WITNESS:

13        A.   I don't remember that document.

14   BY MR. STEWART:

15        Q.   So, I mean, is it fair to say that --

16   well, I can refer your attention to it.  I believe

17   it's --

18        A.   Oh, do you mean in a previous e-mail?

19        Q.   That's right, that's right.

20        A.   Yes.

21        Q.   You looked at an e-mail.

22        A.   Yep.

23        Q.   And -- and my point is:  Do you -- do you

24   see that now over five years have elapsed since this
```

Highly Confidential - Subject to Further Confidentiality Review

1    Food City was first brought to your personal

2    attention, and even then the record seems to suggest

3    that after all of these discussions, all of these

4    newspaper articles, it's still prescribing, it's still

5    selling OxyContin?

6          MR. HOFFMAN:  Object to form.

7    BY THE WITNESS:

8          A.    Is that -- is that a question?

9    BY MR. STEWART:

10         Q.    It is.

11         A.    It -- if it's still open and they are

12   getting OxyContin from somebody, they are selling

13   OxyContin.

14         Q.    Here it seems like McKesson has stopped

15   supplying that pharmacy in 2013, fair?

16         A.    Correct.

17         Q.    Okay.  So up to that point, McKesson up to

18   the point referenced in the minute meetings, McKesson

19   was supplying Purdue pharmaceuticals and other

20   pharmaceuticals, fair?

21         MR. HOFFMAN:  Objection to form, foundation.

22         MR. STANNER:  Objection to form.

23   BY MR. STEWART:

24         Q.    Correct?

1          Well, we know up until this July 18th,

2     2013 minutes closed the report and say that McKesson

3     has stopped supplying, fair?

4          A.    These minutes, I don't know if these are

5     the full minutes.  I see that some of it is redacted,

6     so I don't know if there is any other comments in

7     here.

8          MR. HOFFMAN:  Mike, you are at about 2:05.

9     BY MR. STEWART:

10         Q.    I understand, but the point is -- and I'll

11    stop.

12         But the point is, what we know is that,

13    and you heard about this pharmacy in 2008 and we've

14    seen all of these documents, all of these news

15    reports, but it looks like Jack Crowley is still

16    concerned about the pharmacy ordering more Oxy-80s on

17    up until 2012, fair?

18         A.    It a --

19         MR. HOFFMAN:  Object to form, argumentative.

20    BY THE WITNESS:

21         A.    It appears he was asking about that.

22    BY MR. STEWART:

23         Q.    How -- how does the process, the OMS

24    process, ever result in anything actually happening

1    that matters in terms of stopping the flow of drugs

2    into our communities?

3         MR. HOFFMAN:  Object to form, argumentative,

4    speech.

5    BY THE WITNESS:

6         A.    According to the information that has been

7    provided, on the activities and procedures of the OMS

8    committee, that a minimum of 290 pharmacies were

9    reported to the DEA.  I suspect the number is higher.

10   For example, those 100 to 200 by the new algorithm.

11            The DEA has taken action on some of those

12   accounts and some of those pharmacies, so that

13   restricts the flow.  Even in the discussion of Food

14   City here there was notes that in discussions with ABC

15   and McKesson that the flow was restricted.

16            So there -- I -- I believe that to paint

17   the entire OMS procedure with a broad brush and say it

18   doesn't work based on what you showed me about Food

19   City is not accurate.

20        MR. STEWART:  Thank you.

21        MS. PORTER:  Thank you very much.

22        MR. STEWART:  And -- and thank you for letting

23   me complete that line of questions.

24        MR. HOFFMAN:  Let's go off the record briefly,

Highly Confidential - Subject to Further Confidentiality Review

1    please.

2         THE VIDEOGRAPHER:  We are off the record at

3    4:01 p.m.

4                   (WHEREUPON, a recess was had

5                    from 4:01 to 4:06 p.m.)

6         THE VIDEOGRAPHER:  We are back on the record at

7    4:06 p.m.

8                              EXAMINATION

9    BY MR. STANNER:

10        Q.    Mr. Seid, I have what will hopefully be

11   just a few questions for you.

12        A.    Okay.

13        Q.    Thanks for your patience over the last

14   couple of days.  My name is Dan Stanner, I represent

15   McKesson.

16             I want to just go back and -- and clarify

17   a couple of points on -- in particular relating to the

18   banner ad that we talked about yesterday.

19             Do you recall that?

20        A.    Yeah, I recall that ad.

21        Q.    Okay.  And you recall that that was a

22   banner ad that was put on McKesson Connect, correct?

23        A.    Correct.

24        Q.    Let me ask you first, you talked about

Highly Confidential - Subject to Further Confidentiality Review

1    this a little bit last time, but I want to make sure I

2    understand your understanding of McKesson Connect.

3              McKesson Connect is a system that allows

4    for bulk orders of products, right?

5         A.    Um-hum.

6         MS. CONROY:  Objection.

7    BY MR. STANNER:

8         Q.    Is that right?

9         A.    Yes.

10        Q.    Okay.

11        A.    I believe so, let's put it that way.

12        Q.    It's --

13        MS. CONROY:  Sorry.  I didn't hear that.

14        THE WITNESS:  I said I believe so.

15   BY MR. STANNER:

16        Q.    It's a system that allows McKesson

17   customers to place orders for their inventory?

18        A.    Correct.

19        Q.    So a pharmacy can stock up to be prepared

20   when prescribers ultimately issue prescriptions for

21   certain types of medication?

22        A.    That's correct.

23        Q.    The McKesson Connect system was not a

24   system that was designed to go out to individual

```
 1    doctors so they could do single orders for their

 2    patients, correct?

 3         A.    No.  It was a pharmacy system.

 4         Q.    Okay.  The -- and, therefore, placement of

 5    that banner ad was not designed to drive up individual

 6    prescriptions, correct?

 7         MS. CONROY:  Objection.

 8    BY THE WITNESS:

 9         A.    No, that was not -- that -- going back to

10    the specifics, it was -- at the time when the

11    reformulated abuse-deterrent OxyContin formulation was

12    in -- introduced to the market and the -- obviously

13    the objective was to replace the original Ox --

14    OxyContin and tremendous logistical effort was to do

15    that very quickly and working with people like Chris

16    Alverson from the McKesson on warehouse orders and

17    that kind of thing.

18              But we anticipated that the medical

19    community, particularly pharmacists, would have

20    questions about the new product.  What was created and

21    approved over a long period of time was a document

22    called the FAQs about reformulated OxyContin.  And it

23    was approved by our medical, legal and regulatory, of

24    course, to be factual and it came with the PI.
```

Highly Confidential - Subject to Further Confidentiality Review

1           As much as it was to get out to McKesson

2    customers to stock the reformulated OxyContin, one of

3    the most important aspects, and if you saw the numbers

4    on the sheet that was attached as far as contacts go,

5    was to get eyes on that sheet to educate the

6    pharmacists.

7        Q.    Okay.  It was not -- was never designed to

8    go out to individual prescribers?

9        A.    Never.  We didn't -- we didn't go to

10   McKesson to go to the pre -- we didn't create

11   marketing programs with any wholesaler to go to

12   prescribers.

13       Q.    Okay.  And you said that the materials

14   that were made available to pharmacists through the

15   program were things that were developed over a long

16   period of time at Purdue?

17       MS. CONROY:  Objection to form.

18   BY THE WITNESS:

19       A.    It took a -- it took, you know, they have

20   to go through the medical, legal and regulatory review

21   process.

22   BY MR. STANNER:

23       Q.    So at least three different departments?

24       A.    Which is laborious for us who were not in

```
 1    those three different departments.

 2         Q.    And each of them went through their own

 3    protocols --

 4         A.    Protocols, that's right.

 5         Q.    -- to make sure --

 6         A.    That's right.

 7         Q.    -- it was appropriate?

 8         MS. CONROY:  Objection.

 9    BY THE WITNESS:

10         A.    Yes, and revised it 50 times.

11         MS. PORTER:  Yeah.  Let him finish.

12         MS. CONROY:  Could you just give me a chance to

13    object.   So just --

14         THE WITNESS:  I'm sorry.

15         MS. CONROY:  That's all right.

16         MS. PORTER:  Let him finish.

17         THE WITNESS:  It is late and we are getting --

18         MS. CONROY:  I know, but we're dis --

19         THE WITNESS:  I'm sorry.

20         MS. CONROY:  There is no way --

21         THE WITNESS:  I know that.  I'm sorry.

22         MS. CONROY:  -- this is going to get sped up --

23         THE WITNESS:  I know.  I understand.

24         MS. CONROY:  -- no matter how fast we talk.
```

```
 1   BY MR. STANNER:

 2        Q.    And we talked yesterday about how on this

 3   fax blast program McKesson wasn't able to change a

 4   comma --

 5        A.    Right.

 6        Q.    -- on those materials.

 7              Do you recall that?

 8        A.    I recall that.

 9        Q.    Same with this banner ad, right, McKesson

10   couldn't change a comma on these things?

11        MS. CONROY:  Object.

12   BY THE WITNESS:

13        A.    I recalled that.

14   BY MR. STANNER:

15        Q.    I'm asking you now, did that also apply

16   for the banner ads?

17        MS. CONROY:  Objection.

18   BY THE WITNESS:

19        A.    Yes.

20   BY MR. STANNER:

21        Q.    And that's because Purdue had gone through

22   all of these internal checks to make sure it said

23   exactly what Purdue wanted it to say?

24        A.    That is correct.
```

```
 1                    (WHEREUPON, a certain document was

 2                    marked Purdue-Seid Deposition Exhibit

 3                    No. 051, for identification, as of

 4                    12/13/2018.)

 5    BY MR. STANNER:

 6         Q.    And I'll hand you what we've marked as

 7    Exhibit 51.  Exhibit 51 is a document entitled a

 8    "Product Promotional Agreement."

 9              Do you see that?

10         A.    I see that.

11         Q.    Are you familiar with this document?

12         A.    I'm familiar with a document like this,

13    yes.

14         Q.    Okay.  And you see that it talks about the

15    OxyContin promotion that would run in August 2010 and

16    run for one week.

17              Do you see that?

18         A.    That's correct.

19         Q.    And that's the banner ad that we were

20    talking about yesterday?

21         A.    That's correct.

22         Q.    Okay.  And you see underneath where it

23    says Ox -- OxyContin in the middle of the page, it

24    says:
```

1          "The contect" -- "The content of any

2    graphical ad is the sole responsibility of the

3    Perfer" -- "Purdue Pharma L.P."?

4         A.    That's correct.

5         Q.    And you agree that it was solely Purdue

6    Pharma who was responsible for putting that together?

7         A.    That is correct.

8         MS. CONROY:  Objection.

9    BY MR. STANNER:

10        Q.    And that McKesson couldn't have any --

11   couldn't change it at all, had to post it as provided?

12        MS. CONROY:  Objection.

13   BY THE WITNESS:

14        A.    That was -- that was the agreement we made

15   to go forward is that they could not adulterate it in

16   any way.

17              (WHEREUPON, a certain document was

18              marked Purdue-Seid Deposition Exhibit

19              No. 052, for identification, as of

20              12/13/2018.)

21   BY MR. STANNER:

22        Q.    Okay.  And I'll hand you what we've marked

23   as Exhibit 52.

24              I guess I'll need one copy.

```
 1      MS. PORTER:   That's okay.  I can see it.

 2   BY THE WITNESS:

 3      A.    Yes.

 4   BY MR. STANNER:

 5      Q.    Do you recognize that to be the banner ad?

 6      A.    I don't remember it, but it looks like

 7   what it would look like.

 8      Q.    Okay.  Do you have any reason to question

 9   whether this is actually the banner ad that you

10   purchased for one week?

11      A.    I have no reason --

12      MS. CONROY:  Objection.

13   BY THE WITNESS:

14      A.    I have no reason to question.  It is from

15   2010.  I would expect this is --

16   BY MR. STANNER:

17      Q.    Okay.

18      A.    -- the banner ad.

19      Q.    And we talked yesterday when the issue was

20   brought up that you had one ad that ran as a banner

21   for one week.

22            Do you recall that?

23      A.    I recall that.

24      Q.    Do you recall any other banner ads for
```

```
1    OxyContin?

2        A.    I don't recall any others.

3        Q.    Okay.

4        A.    No.

5        Q.    And there was some talk about how -- well,

6    actually, the contract shows you paid $4,500 to have

7    it on the --

8        A.    I think it was 4250.

9        Q.    4250 to have it on for a week?

10       A.    Um-hum.

11       Q.    Are you familiar with Purdue's marketing

12   budget?

13       MS. CONROY:  Objection.  Misstates the evidence.

14       MR. HOFFMAN:  Objection to form, foundation.

15   BY MR. STANNER:

16       Q.    Are you -- are you familiar with it or is

17   it outside of your area?

18       A.    My -- what I needed to do was to go to

19   marketing and request budget for -- so I don't know

20   what their marketing budget was.

21       Q.    Okay.  We'll ask somebody else about that.

22       MR. STANNER:  Okay.  Thank you.

23       MR. HOFFMAN:  Go off the record again real

24   quick.
```

```
1        THE VIDEOGRAPHER:  We are off the record at

2   4:14 p.m.

3                  (WHEREUPON, a recess was had

4                   from 4:14 to 4:28 p.m.)

5        THE VIDEOGRAPHER:  We are back on the record at

6   4:28 p.m.

7                        EXAMINATION

8   BY MR. HOFFMAN:

9        Q.    Good afternoon, Mr. Seid.

10       A.    Good afternoon.

11       Q.    I guess it is early evening by now.

12  Thanks again for being patient.

13            Again, for the record, my name is Nathan

14  Hoffman.  I represent Purdue and now it is my chance

15  to ask you some questions, okay?

16       A.    Yes.

17       Q.    I've placed in front of you a stack of

18  exhibits --

19       A.    Yes.

20       Q.    -- that I'd like to go through based upon

21  the previous questioning, both by Tennessee counsel as

22  well as Plaintiffs' MDL counsel.

23            And the first document I'd like for you to

24  look at is Exhibit 40.  Do you that in front of you?
```

```
 1        A.     Yes, I have Exhibit 40.

 2        Q.     And, again, for the record, Exhibit 40 is

 3   the report of concern dated August 22nd, 2008, that

 4   you were shown by Tennessee counsel, is that right?

 5        A.     That's correct.

 6        Q.     And a report of concern like this, it

 7   would be sent to -- to whom at Purdue?

 8        A.     Drug safety and pharmacovigilance.

 9        Q.     Okay.  And would the legal department or

10   Robin Abrams also get reports of concern sent to them?

11        A.     I'm not sure how these were triaged, but I

12   would imagine that they would go to her at some point.

13        Q.     Okay.  And then looking at the actual --

14   so -- so just to get our bearings here again, this is

15   from a Purdue sales rep and the Purdue sales rep just

16   happened to be reading something called the Metro

17   Pulse.  He read the article in a section called "Drug

18   Zone," right?

19               Do you see that?

20        A.     Yes.

21        Q.     And just based upon his reading of this

22   local publication, the sales rep sent in this report

23   of concern, is that fair?

24        MS. CONROY:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY THE WITNESS:

 2        A.    That appears to be what happened.

 3    BY MR. HOFFMAN:

 4        Q.    Okay.  Now, and if we go to the actual

 5    publication, which might be a little hard to read, but

 6    I'm going to try to go through it a little bit and see

 7    exactly what it -- what it says.

 8             On -- are you with me there, Bates ending

 9    89?

10        A.    Yes.

11        Q.    It might be -- it might be easier if you

12    read it up on the screen.  I'm going to try to blow it

13    up a little bit.

14             So the article is entitled:  "Drug Zone?

15    Westwood residents allege irresponsible prescription

16    practices at neighborhood" -- "neighborhood Food City

17    and nearby clinic."

18             Do you see that?

19        A.    I see that.

20        Q.    And this is based upon a -- a newsletter

21    by a -- by a -- the home association.

22             Do you recall that?

23        A.    I guess, yeah.

24        Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    And here, in fact, it says:  "The" -- "The

 3   newsletter goes on to raise concerns about a nearby

 4   clinic," it mentions the clinic, "Drs. Frank and Janet

 5   McNeil," it says, "who did not return repeated

 6   requests for comment on this story."

 7              Do you see that?

 8        A.    I see that.

 9        Q.    Going down a little bit further, it says

10   that:  "The allegation supposedly was reported by an

11   unnamed DEA agent."

12              Do you see that?

13        A.    I see that.

14        Q.    And it goes on to say:  "These very

15   serious charges from the Drug Enforcement Agency's

16   Knoxville field office and unnamed 'experts' in the

17   Knoxville Police Department."

18              Do you see that?

19        A.    I see that.

20        Q.    It goes on to say -- there is a gentleman

21   here, "Neil Morgenstern, head of the DEA's Knoxville

22   field office, says he is not aware of anyone in his

23   office having made such a claim and cannot confirm

24   that there is an ongoing investigation into the
```

1    clinic, the pharmacy, or any connection between the

2    two.  He does say that making these concerns in public

3    was a less than responsible thing for the organization

4    to do."

5              Do you see that?

6         MR. STEWART:  Object to form.

7    BY THE WITNESS:

8         A.    I see that.

9    BY MR. HOFFMAN:

10        Q.    So what we know, based on this local

11   publication, is that there was -- supposedly it was

12   being reported that a DEA agent had made the -- the

13   initial report, is that right?  Or he had a concern?

14        A.    Are you talking about the ROC or are you

15   talking about the letter?

16        Q.    No.  According to this --

17        A.    Yes, yeah.

18        Q.    -- there is a mention of a DEA agent,

19   there is a mention of the Knoxville police department.

20             Do you see that?

21        A.    I see that.

22        Q.    And then, in fact, the head of the DEA's

23   Knoxville field office is reviewed for the article and

24   he comments on the article.

1          Do you see that?

2      A.    I do see that.

3      Q.    So we know that at least the Knoxville,

4  the head of the Knoxville DEA field office was aware

5  of this report at this time, is that fair?

6      A.    It appears so.

7      Q.    And then down at the bottom there is a

8  quote from an attorney.  It says:  "I think there is a

9  potential liability issue for defamation there."

10         Do you see that?

11     A.    I see that.

12     Q.    And do you have an understanding that if a

13  claim is being made by [sic] a doctor that is not

14  substantiated there could be this potential liability

15  issue?

16     MS. CONROY:  Objection.

17  BY THE WITNESS:

18     A.    I'm -- I'm not a -- an attorney, so I

19  don't know what the liability issues would be.

20  BY MR. HOFFMAN:

21     Q.    Oh, all right.  Got it.

22         But we do know that the -- the DEA was

23  aware of this publication because the DEA was

24  interviewed in correspondence with it, is that right?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    That's what it says.

2       Q.    Okay.

3       A.    Excuse me.

4       Q.    So this report of concern, just to get our

5  timeline correct, is August 22, 2008, is that right?

6       A.    Yeah, it looks like it is date -- date

7  stamped the 25th, though.

8       Q.    Okay.

9             And then you were shown an e-mail which is

10  in September, September 22nd, so a month later where a

11  summary of that very same article was forwarded to

12  you, is that right?

13      A.    It appears so, yes.

14      MS. PORTER:  We are on Exhibit 41?

15      MR. HOFFMAN:  I'm sorry.  We are on Exhibit 41,

16  yes.

17  BY THE WITNESS:

18      A.    Yes, it appears so.

19  BY MR. HOFFMAN:

20      Q.    And Tennessee counsel referred to multiple

21  news articles, I believe is what he said, but does

22  this appear to be the same article that was already

23  submitted as a report of concern or at least a summary

24  of it?
```

1       A.      It appears to be a summary of the same

2   article in a different periodical.

3       Q.      Well, it says the -- "Drug Zone," that's

4   what we looked at, right?

5       A.      Yeah.   The Metro Pulse, the free magazine,

6   printed an article called "Drug Zone" and it discussed

7   the list with owners.

8       Q.      And so that's what we had just looked at a

9   moment ago right here, "Drug" -- you can look up on

10  the screen, Mr. Seid, so this one here, "Drug Zone"?

11      A.      That's correct.

12      Q.      So same -- a summary of the same article

13  and you are receiving it through another means about a

14  month later, is that right?

15      A.      That's correct.

16      Q.      And going to Exhibit 45.

17      A.      Thank you.

18      Q.      Plaintiffs' counsel showed you that at

19  some later point in time, in fact, Drs. Janet and

20  Frank McNeil were placed into what is referred to as

21  "region zero" at the company, meaning that sales

22  representatives were not to call on those physicians

23  any longer?

24      A.      That's what region zero means, yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    And then Exhibit 43 -- and by the way,
2  that -- the e-mail for region zero is dated April 7,
3  2011, that we just looked at, is that right?
4       A.    Yes.
5       Q.    Okay.  And then it looks like, and I --
6  this is really small, but I'm going to do my best.
7             And then there is a -- a -- a readout from
8  referral to DEA Frank McNeil and it looks like it's
9  April 12, 2011, and it says:
10            "The prescriber is one of 82 prescribers
11  referred to the DEA during a meeting between Purdue
12  and DEA on April 12, 2011."
13            Do you kind of see that?
14       A.    It's making these cheap readers work very
15  hard, but I do see it here, actually, better on the
16  sheet.
17       Q.    Okay.
18            So -- so as of April 12, 2011, what this
19  refers to is that Frank McNeil was one of 82
20  prescribers that Purdue was referring to DEA at that
21  time, is that right?
22       A.    That's what it says.
23       Q.    Okay.  So when you were shown the OMS
24  committee report, which I think is where we started on
```

1    this issue with Tennessee counsel, that's now dated

2    June of 2012, it's Exhibit 37?

3         A.    Yes.

4         Q.    Do you have that in front of you?

5               So that's dated June 7th, 2012, is that

6    right?

7         A.    June 7th, 2012.

8         Q.    So that would be more than a year after

9    Dr. Mc -- Dr. McNeil had been referred to DEA by

10   Purdue, is that fair?

11        A.    That's what it appears.

12        Q.    Okay.

13              So when there is a discussion about the

14   site visit, this is over on page Bates ending 599, so

15   when there is a discussion about a -- a site visit on

16   May 24, 2012, and it talks about how the wholesaler

17   started forcing Food City's volume down, do you see

18   that?

19        A.    I see that.

20        Q.    And when it also refers to these

21   Drs. Frank and Janet McNeil, both region zero doctors,

22   do you see that?

23        A.    Yes.

24        Q.    So all of this is occurring about a year

1  after Purdue had already referred these physicians to

2  the DEA, correct?

3      A.    Correct.

4      Q.    Tennessee counsel also asked you about --

5      MR. STEWART:  I object to the form of that.

6  BY MR. HOFFMAN:

7      Q.    -- in -- in the context of Ms. Abrams'

8  PowerPoint presentation, Tennessee counsel asked you

9  about the algorithm being adjusted after the

10 reformulation.

11          Do you recall that generally?

12     A.    Yes.

13     Q.    Okay.  Now, and he -- and he asked whether

14 or not Purdue had referred those pharmacies at that

15 time to DEA.

16          Do you recall that?

17     A.    I recall that.

18     Q.    Okay.  Now, if you actually go into your

19 30(b)(6) materials right over there from -- from

20 yesterday, do we have them?

21          And if you look at Exhibit 3, Folder 3.

22     A.    Exhibit 3, I've got it.

23     Q.    And if you go to the -- the last two

24 documents in that folder for Topic 5 that you

1    testified about yesterday.  I just want to -- so for

2    the record, that was Exhibit 3 to Mr. Seid's 30(b)(6)

3    deposition, Bates PPLPD004687363 is the initial

4    e-mail.

5        A.    I have that.

6        Q.    You have that one in front of you.

7              Dated October 7, 2011, and then it

8    attaches a spreadsheet with Bates PPLPD004687385.

9              Do you have that in front of you as well?

10       A.    I have that in front of me.

11       Q.    So this is an e-mail from Jack Crowley who

12   we've heard referred to many times during your

13   deposition, executive director, CSA compliance, to a

14   chief at -- it looks like at -- at the -- is that the

15   DEA, usdoj.gov?

16       A.    I -- I don't know if that's DEA or

17   Department of Justice or --

18       Q.    Okay.  So it says:

19             "Thank you very much for" -- "for the time

20   you and Supervisory Investigators Levin and Arnold

21   spent with Robin and me on Tuesday.  The list was

22   compiled by our colleague Giselle Issa, who is the

23   director of our order monitoring system program.

24   Attached please find the list that we have labeled

1    Slow Pharmacies with the new criteria - retail

2    pharmacies that have sales greater than 350,000 and

3    declined in units greater than or equal to

4    50 percent."

5              Do you see that?

6         A.    Yes.

7         Q.    It says:  "The total of pharmacies that

8    met this criteria" -- "criteria is 285.  I believe

9    that you will be able to sort them by state."

10             Do you see that?

11        A.    I do see that.

12        Q.    And, in fact, if we look at the

13   spreadsheet, which is the attachment, it lists the

14   criteria at the top.

15             Do you see that?

16        A.    Yes, I do see that.

17        Q.    And then it lists -- or it refers 285

18   pharmacies in the spreadsheet which goes on for -- for

19   multiple pages, is that right?

20        A.    Yes, I see that.

21        Q.    And, in fact, if we look through the

22   spreadsheet, we'll see that there are pharmacies

23   listed, and if -- you can follow along on the screen

24   because I've highlighted it.

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     Okay.

2        Q.     You can see that there are pharmacies

3    listed from Ohio and Tennessee on Page 1.  Going on to

4    Page 2, we also have Tennessee Pharmacy No. 63 and

5    Ohio Pharmacy No. 85.

6               Do you see that?

7        A.     Yes, I see that.

8        Q.     It goes onto the next page, and there are

9    a few more -- a couple of more Ohio pharmacies and a

10   Tennessee pharmacy?

11              Do you see that?

12       A.     I see that.

13       Q.     And we can go on from there.  I'll just

14   show you that it goes on and lists some additional

15   pharmacies, and I've just highlighted the Tennessee

16   and Ohio pharmacies because this case -- you

17   understand this case that you are testifying about, it

18   involves cases in Ohio and Tennessee, is that right?

19       A.     I understand.

20       Q.     Okay.  So based upon these documents, does

21   it appear that in response to the new algorithm after

22   the reformulation, that Purdue, in fact, referred it

23   looks like 285 pharmacies to DOJ?

24       A.     That --
```

```
 1      MS. CONROY:  Objection.

 2  BY THE WITNESS:

 3      A.    That's what it looks like.

 4  BY MR. HOFFMAN:

 5      Q.    Do you have Exhibit 19 in front of you?

 6      A.    I do.

 7      Q.    I'd like to go now to some of Ms. Conroy's

 8  questioning of you yesterday -- or maybe it was today.

 9  I'm sorry.  It was today, Exhibit 19.

10          I want to go back and look at -- and for

11  the record, Exhibit 19 is a October 3, 2007 e-mail.

12  This is the e-mail from Jack Crowley.  It is a fairly

13  long e-mail, but it is discussing some of the aspects

14  of the SOM system at that time, is that right?

15      A.    Yes.

16      Q.    Okay.  I just want to call your attention

17  to this highlighted paragraph, which is  I guess, the

18  fourth paragraph in his e-mail.

19          He says -- and, again, this is in October

20  of 2007, he says:

21          "Our system is described in finance and

22  accounting SOP 7.7, System to Disclose Suspicious

23  Orders of Controlled Substances.  I feel that this is

24  a cross-functional responsibility, however-and it
```

1    involves the participants in the meeting and Robin's

2    office as well."

3            Do you see that?

4        A.    I see that.

5        Q.    And then do you recall that you were shown

6    Exhibit 16, which I think you also have in front of

7    you.

8        A.    I have it in front of me.

9        Q.    Which was an e-mail that attached SOP 7.7

10   in June of 2007.  I'm just turning over to that SOP.

11   Just confirm that this is, in fact, SOP No. 7.7 and it

12   has a revision date of March 12, 2003.

13       A.    I see that.

14       Q.    So would this have been the SOP system to

15   disclose suspicious orders of controlled substances

16   that would have been in place in or around mid 2007?

17       MS. CONROY:  Objection.

18   BY THE WITNESS:

19       A.    I -- what that is is a finance department

20   SOP for suspicious orders of controlled substances.

21   BY MR. HOFFMAN:

22       Q.    Okay.  And, in fact, the SOP recites the

23   DEA regulations, some of which we talked about earlier

24   today, 21 CFR 1301.74?

```
 1        A.     Correct.

 2        Q.     But it appears from this SOP that at this

 3   time it says:

 4               "Procedure for customer service.  It says:

 5   "They review each order for unusual quantities or any

 6   other deviation from the customer's regular order

 7   pattern."

 8               Do you see that?

 9        MS. CONROY:  Objection.

10   BY THE WITNESS:

11        A.     Yes.

12   BY MR. HOFFMAN:

13        Q.     So this -- that wouldn't be you at this

14   time, that would be a function of the customer service

15   department?

16        A.     That is what it says, yes.

17        Q.     It goes on to say:

18               "If any deviations are found, the CSR will

19   submit the customer's purchase order to the senior

20   management of customer service or the senior director

21   of finance operations for further review as outlined

22   in Section 6."

23               Do you see that as well?

24        A.     Yes, I do see that.
```

1    Q.    And finally down here at the bottom, it

2    says:

3          "Communication of spesh" -- "suspicious

4    orders.  The director of credit will provide the

5    associate general counsel with all of the information

6    gathered from credit services, customer service,

7    national sales and Purdue's security group and make an

8    order recommendation.  The law department will

9    determine if further investigative steps are required

10   and if the findings should be reported to the field

11   office of the DEA."

12          Do you see that?

13   A.    I see that.

14   Q.    So at least from the exhibit that

15   Plaintiffs' counsel showed you, which is Exhibit 16

16   back in mid 2007, which at least was sent to you at

17   that time, it does appear that a suspicious order

18   monitoring system was in place but it was being

19   handled by different departments and reported up at

20   least differently at that time, is that fair?

21   A.    That --

22   MS. CONROY:  Objection.

23   BY THE WITNESS:

24   A.    What it appears.

1    BY MR. HOFFMAN:

2        Q.    It just concludes, it says:

3            "In the event the order needs to be

4    reported to the DEA field office, Purdue's president

5    and chief executive officer will be notified."

6            Do you see that?

7        A.    I see that.

8        Q.    Now, going back to 19 real quick, 19 also

9    references that around this time in October of 2007,

10   and I'll refer you to the fifth paragraph on the

11   second page, which is Bates ending 2947, it talks

12   about how at this time you were getting involved with

13   the fee-for-service data and it says:

14           "Steve is now analyzing that data and

15   discussing orders that appear to be suspicious,

16   analyzing patterns of ordering and looking for

17   patterns that are out of the ordinary."

18           Do you see that?

19       A.    I do see that.

20       Q.    And that -- and in -- at this time that's

21   what, in fact, you were -- you were doing in 2007 was

22   looking at these data and trying to analyze it in that

23   fashion, is that right?

24       A.    Yes.

1      Q.    Okay.  It talks about your system alerted

2   the group to a -- an account in Florida.

3            Do you recall discussing that with

4   Tennessee counsel earlier?

5      A.    Yes.

6      Q.    And then Crowley's e-mail concludes by

7   saying:

8            "We will always consider improving the

9   process and further developing best practices."

10           Do you see that?

11     A.    Yes.

12     Q.    And can you tell us whether or not that

13  was the general attitude of the group, would be to

14  always consider improvements and developing best

15  practices?

16     MS. CONROY:  Objection.

17  BY THE WITNESS:

18     A.    What the group tried to do, as we thought

19  about it and experienced working with it, was that if

20  there were other sources we could tap into that would

21  be beneficial in our review, we would do so.

22  BY MR. HOFFMAN:

23     Q.    Okay.  And then Ms. Conroy showed you

24  Exhibit 20.

1          Do you have that in front of you?

2      A.    Yes, I do.

3      Q.    Exhibit 20 is -- these are the rough draft

4  of minutes from a little -- it looks like it is now

5  February of 2008 and part of what's being considered

6  at that time, it says a couple of things at the end of

7  the minutes:

8          "Finance SOP 7.7 may need to be updated"

9  and then the action item is:  "Update SOP 7.7."

10          Is that right?

11      A.    Yes.

12      Q.    And, in fact, did -- did that occur?

13      A.    I don't know --

14      MS. CONROY:  Objection.

15  BY THE WITNESS:

16      A.    I don't know if 7.7 was updated, but we

17  did develop a -- an OMS subsequently to that meeting.

18  BY MR. HOFFMAN:

19      Q.    Okay.

20      A.    A different OMS, I guess, from 7.7.

21              (WHEREUPON, a certain document was

22              marked Purdue-Seid Deposition Exhibit

23              No. 053, for identification, as of

24              12/13/2018.)

1    BY MR. HOFFMAN:

2        Q.    So I'll just mark for the record as Seid

3    Exhibit 53 --

4        A.    Thank you.

5        Q.    You just mentioned a -- a subsequent SOP

6    on the OMS system, and can you just confirm for the

7    record that this SOP dated March 23, 2009 is that SOP

8    that you just referred to?

9        A.    Yes.

10        Q.    So we know that as of this date the SOP

11    had moved from finance over into a -- a different

12    group that included the general counsel, national

13    accounts, corporate security and CSA compliance, is

14    that right?

15        MS. CONROY:  Objection.

16    BY THE WITNESS:

17        A.    The only thing I don't know is whether

18    this 7.7 still existed in some format revised or

19    otherwise.

20    BY MR. HOFFMAN:

21        Q.    Okay.

22        A.    I -- this is the one I focused on.

23        Q.    In response to some questions by Tennessee

24    counsel you mentioned something called RxPATROL?

1      A.    Yes, I did.

2      Q.    And is that something that you were

3  familiar with during your time at Purdue?

4      A.    Yes, it was.

5      Q.    There has been some discussion in other

6  depositions about RxPATROL.  But I want to ask you

7  about it and see if it is something that you were

8  involved with.

9              (WHEREUPON, a certain document was

10              marked Purdue-Seid Deposition Exhibit

11              No. 054, for identification, as of

12              12/13/2018.)

13  BY MR. HOFFMAN:

14      Q.    So I'll hand you Seid Exhibit 54.

15      A.    Yes.

16      Q.    And for the record, Exhibit 54 appears to

17  be something from the www.rxpatrol.org website that

18  discusses the RxPATROL program, is that right?

19      A.    Yes.

20      Q.    And it looks like it is dated, I don't

21  know if I can -- it looks like it is dated 2008.

22          Do you see that?

23      A.    I think --

24      Q.    It is hard to see it on the...?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yeah, it's hard to see and...

 2        Q.    Okay.  I don't know if that's any better.

 3              But anyway, I believe you described

 4    earlier generally what -- what RxPATROL was when you

 5    were being questioned by Tennessee counsel, but I just

 6    want to go through a couple of these points with you.

 7        A.    Okay.

 8        Q.    It mentions that R -- strike that.  Let me

 9    back up.

10              Do you recall when -- when Purdue first

11    started this particular program, RxPATROL?

12        A.    I am -- my recollection is, and I use Jim

13    Lang's retirement as a benchmark for the time there,

14    because it was before his retirement, it was either

15    late 2002 or early 2003.

16        Q.    Okay.  And were you involved in some form

17    or fashion with RxPATROL since its in -- its

18    inception?

19        A.    Yes, I was.

20        Q.    And in what -- what way were you involved?

21        A.    Pharmacy robbery and pharmacy theft, which

22    one of the things I learned from the place that I was

23    working, the people I was working with, are two

24    different things, were prevalent for opioids,
```

1    including Purdue's opioids in the early 2000s.

2              One area that was particularly hit hard

3    was Massachusetts.  There was an outcry from our

4    retail customers at corporate and at the store level

5    is somebody needs to do something.  And they looked to

6    us because we sold opioids.

7              In discussion with my supervisor at that

8    time, who was James Lang, and a newly hired VP of

9    corporate security, Aaron Graham, we decided to

10   schedule a meeting in Boston, I believe it was at the

11   Parker house, for about two-thirds of the day,

12   inviting all of the chains and representative from the

13   National Community of Pharmacists Association, which

14   represents independent pharmacists, to come to the

15   meeting.  There was, I'm guessing, about, as I

16   remember, maybe 25 people invited, 25 different

17   organizations and maybe 35 people invited.

18             And quite frankly, we, at the time said we

19   will be standing in an empty room or we'll have a

20   packed house.  We had no idea.  But it was a hot topic

21   and the room was full, representatives from CVS,

22   Walgreens -- I believe Walgreens was there -- the

23   chains up in that area, NCPA was represented.

24             And what the big issue was was that these

```
1    pharmacies -- robberies were taking place, that there

2    was no database available, that different

3    jurisdictions were not speaking to each other, and

4    particularly in Massachusetts, being a commonwealth,

5    there were dozens of sheriffs' offices and that kind

6    of thing.

7              So what was proposed, and actually Aaron

8    came up with the idea, is that you need a database so

9    that you can start talking to each other, help

10   apprehend these people.  And it became a very

11   productive meeting which did last the entire time we

12   had booked the room for.

13             Long story short, we went back and

14   created, "we" being Purdue, created that, under the

15   guidance and our own grants department, a repository

16   for this information, we hired an outside source to

17   analyze it, because we wanted active law enforcement,

18   so it was an active Stanford police captain.

19             And RxPATROL was born and where my group

20   got involved was recruiting pharmaceuticals to

21   participate, because the more information we had, the

22   more eyes on it, the better.

23        Q.   Okay.

24        A.   It became a very robust and very popular
```

1    website.  I don't know the exact numbers, but they had

2    data to show that it had -- this information from

3    this -- and it also was for law enforcement, that

4    information from this website resulted in numerous

5    arrests.

6              So you see on the back, not only was it

7    endorsed by the pharmacy community, but it was

8    endorsed by the National Association of Drug Diversion

9    Investigators, LEEDA also supported it, which is the

10   Laud -- the Law Enforcement Executive Development

11   Association of the FBI.  So it was something that we

12   provided as a service to the pharmacy community.

13        Q.    Okay.  So you referred to LEEDA, and

14   that's -- that's a -- a branch of -- of the FBI, is

15   that what you said?

16        A.    That's a -- an Executive Development

17   Association --

18        Q.    Okay.

19        A.    -- of the FBI.

20        Q.    And so, in part what this is referring to

21   is that FBI Law Enforcement Executive Development

22   Association was joining in endorsing the RxPATROL --

23   RxPATROL that was being initiated by Purdue at that

24   time, is that right?

1      A.     Um-hum, yes.

2      Q.     And then you mentioned NADDI, that's the

3  National Association of Drug Diversion Investigators?

4      A.     National Association of Drug Diversion

5  Investigators.

6      Q.     Okay.  And it looks like it actually

7  launched, it looks like, in mid 2000 and -- and '3, is

8  that right?

9      A.     Yes.  It launched very quickly after that

10  meeting.

11      Q.     Okay.  And then if we just go back just to

12  confirm, it mentions that the RxPATROL system, and

13  RxPATROL stands for Rx Pattern Analysis Tracking --

14  Tracking Robberies and Other Losses.

15          Do you see that?

16      A.     Correct.

17      Q.     It says it collects, analyzes and shares

18  information to do three things, among other things,

19  help protect pharmacists, guard against potential

20  robberies and burglars, and then assist law

21  enforcement to apprehend and successfully prosecute

22  those engaged in pharmacy theft of controlled

23  substances.

24          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.     That is correct.

2        Q.     And is that generally -- based upon your

3    experience, is that generally correct that those were

4    some of the functions of RxPATROL?

5        A.     Those were some of the functions.

6        Q.     It also talks about it uses state of the

7    art computer program to collate, analyze and

8    disseminate information to the law enforcement

9    community, analyzing patterns to create profiles of

10   vulnerable pharmacies and of effective security

11   systems for deterring burglars and robbers.

12              Based upon your experience, are those some

13   of the other functions that it served --

14       A.     Yes.

15       Q.     -- the RxPATROL system?

16       A.     It was.

17       Q.     Okay.  And you mentioned the -- the

18   RxPATROL website just a -- a minute ago?

19       A.     Yes.

20       Q.     I noticed that, if we go to Exhibit 7,

21   which I think you have in front of you.

22       A.     I do.

23       Q.     I noticed that in one of the PowerPoint

24   presentations that was shown -- shown to you by
```

1    Ms. Conroy, there was a fairly detailed discussion of

2    RxPATROL.

3             It's -- there are no Bates numbers on this

4    portion of Exhibit 7, but if you go in quite a ways,

5    the page that I want to ask you about looks like this.

6        A.    "Keeping your pharmacy safe and secure."

7             Well, it has got to be around here

8    somewhere.

9        Q.    Yeah, yeah, it's just -- there it is.

10       A.    Yeah.

11       Q.    Okay.  So was this a -- is this at least a

12   snapshot of what the RxPATROL --

13       A.    Yes.

14       Q.    -- website --

15       A.    Yes.

16       Q.    -- would have looked like?

17            It say -- it says as of January 7, 2010.

18            Do you see that?

19       A.    Right.

20       Q.    It looks like, among other things it -- it

21   talks about collaborating with crime stoppers and

22   providing -- in fact, providing awards for referrals

23   that led to arrests.

24            Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    Yes.

2       Q.    It mentions, among other things, a

3    pharmacy security checklist.

4             Do you see that referenced over here --

5       A.    Yes.

6       Q.    -- on the left?

7             It mentions training videos.

8             Do you see that as well?

9       A.    Yes.

10      Q.    And then if we go in and look at some of

11   the additional pages here, I've got a page with at

12   least some of the training videos that were available

13   at that time, is that right?

14      A.    Yes.  But that -- that screen shot that's

15   there -- oh, I'm sorry.  I'm looking further on.  Yes.

16   There is just some of the training and videos.

17      Q.    So this would be some of the training

18   videos, including videos on pharmacy safety among

19   other things.

20            Do you see that?

21      A.    Yes.

22      Q.    The website also had what's referred to as

23   a pharmacy sec -- security checklist --

24      A.    Yes.
```

1      Q.     -- is that right?

2      A.     Yes, they did.

3      Q.     And then is -- is this, in fact, the

4    checklist that was provided to pharmacies to help them

5    ensure that their pharmacies were as safe and secure

6    as possible?

7      A.     Yes, it was.

8      Q.     And who came -- who came up with the

9    checklist?  I see NADDI referenced up there.  I don't

10   know if that --

11     A.     They may have been involved, but it was --

12   all -- all of the material for this was developed by

13   the -- the folks in corporate security.

14     Q.     Okay.  Then if you turn to the next page,

15   it looks like it's a document with some facts

16   regarding RxPATROL.  Don't worry, I'm not going to go

17   through all of this.

18            But at least here it says as of August of

19   2008, it says:  "To date, RxPATROL is credited with 56

20   arrests for pharmacy crimes."

21            Do you see that?

22     A.     Yes.

23     Q.     And it talks about some of the individuals

24   involved.  It says:

```
 1              "RxPATROL was created and is funded by

 2   Purdue Pharma L.P.  The program is operated by Captain

 3   Richard Conklin, a 27-year veteran of the Stanford,

 4   Connecticut Police Department.  Captain Conklin is a

 5   graduate of the FBI National Academy and is a

 6   nationally-recognized law enforcement consultant.

 7   RxPATROL was conceived by Aaron Graham" --

 8              Is that who you mentioned a moment ago?

 9       A.    Yes.

10       Q.    -- "vice president and chief security

11   officer for Purdue Pharma.  Mr. Graham is a former

12   special agent with Drug Enforcement Administration and

13   the Food and Drug Administration's Office of Criminal

14   Investigations."

15              Do you see that?

16       A.    Yes.

17       Q.    Now, is RxPATROL something that was

18   required by any regulator or law enforcement body

19   for -- for Purdue to come up with and to -- to

20   organize or -- or to do?

21       A.    No.  Nobody asked us to do that.  That

22   was...

23       Q.    And is RxPATROL still in existence as far

24   as you know?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    I don't know.

2        Q.    Okay.  When you left the company in May

3   of 2014, was it still in --

4        A.    It was still in existence.

5        Q.    Finally, do you have Exhibit 13 in front

6   of you?

7        A.    I do.

8        Q.    Exhibit 13 was a document shown to you by

9   Ms. Conroy, it may have been yesterday, it may have

10  been today, I don't recall, but it's dated

11  September 13th, 2010, and it refers to a -- it refers

12  to some materials that were being provided through the

13  McKesson website.

14              Do you recall that?

15       A.    That's correct.

16       Q.    And it mentions specifically the OxyContin

17  reformulation FAQ --

18       A.    Yes.

19       Q.    -- fact sheet.

20              Do you see that?

21       A.    Yes.

22       Q.    Is that what you referred to earlier in

23  your testimony in response to McKesson counsel's

24  questions referred to FAQ --
```

```
 1        A.    Yes.

 2        Q.    -- fact sheet on the reformulation?

 3        A.    Yes.

 4        Q.    Is it -- okay.

 5              So let me hand to you, it's Exhibit 55.

 6                   (WHEREUPON, a certain document was

 7                    marked Purdue-Seid Deposition Exhibit

 8                    No. 055, for identification, as of

 9                    12/13/2018.)

10  BY THE WITNESS:

11        A.    Thank you.

12  BY MR. HOFFMAN:

13        Q.    It is --

14        A.    Hard reads.

15        Q.    It is an e-mail also dated in September

16  of 2010.

17        A.    Correct.

18        Q.    And it attaches "Oxy ORF FAQ fact

19  sheet.pdf."

20              Do you see that?

21        A.    Yes.

22        Q.    And for the record, this is

23  PPLPC004000248927.

24              And can you just confirm for me that this
```

```
 1    is, in fact, the -- the OxyContin FAQ fact sheet on

 2    the reformulation?

 3         A.    Yes, it is.

 4         Q.    And actually, if we -- if we look at the

 5    first page, you refer to a box warning I think earlier

 6    in your testimony?

 7         A.    Yes.

 8         Q.    And the very first page of this FAQ fact

 9    sheet includes the box warning on the importance of

10    proper patient selection and potential for abuse, is

11    that right?

12         A.    Yes.

13         Q.    Okay.  We won't go through all of it, but

14    it also advises the reader to read the accompanying

15    full prescribing information.

16               Do you see that?

17         A.    That is correct.

18         Q.    And -- and then it goes through a series

19    of -- of questions.

20               And so what -- what would be the -- the

21    purpose of providing this type of document through a

22    wholesaler?

23         MS. CONROY:  Objection.

24    BY THE WITNESS:
```

```
 1        A.     This was provided through Kroger, which is

 2     a retailer.

 3     BY MR. HOFFMAN:

 4        Q.     Okay.

 5        A.     But the reason to provide it, and it's

 6     interesting because there is a copy of -- there is an

 7     e-mail chain here which I don't remember, but I see it

 8     now, is that Bob Breetz, who I think is retired, and

 9     they got their product through Cardinal, Cardinal is

10     also addressed here, it appears to be a request from a

11     Kroger employee to Bob and Card -- and Cardinal Health

12     about the transition from old OxyContin to new

13     OxyContin.  And it -- this is great to -- great to see

14     we had a solution to their question:  "Do either or

15     you have any information from the manufacturer about

16     the change?"  And that's what this was -- we

17     anticipated that would be a concern, so we prepared

18     this FAQ sheet.

19             And the reason we asked our retailers and

20     wholesalers to distribute it was an opportunity for

21     education, because not only did it contain answers to

22     frequently asked questions, but it contained the new

23     and most recent FPI.

24             And as we noted in the McKesson situation,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I testified to that a couple of times, is that we

 2    required that our information went out as approved and

 3    with the full patient insert -- full patient insert --

 4         Q.    Okay.  But --

 5         A.    -- full package insert.

 6         Q.    But just to be clear, what -- what I've

 7    shown here, I know it's in a separate e-mail, but

 8    this -- this would be the same FAQ?

 9         A.    The same FAQ that went out with the --

10         Q.    It went -- went out through McKesson?

11         A.    McKesson, yes.

12         Q.    Okay.  And you mentioned it had a number

13    of frequently asked questions.  I won't go through all

14    of them, but the very first question is:  "The ref" --

15    "Is the reformulated OxyContin harder to abuse?"

16              Do you see that one?

17         A.    Yes, that was...

18         Q.    And there was a response to that, as well

19    as:  "Is this a tamper-resistant formulation of

20    OxyContin?"

21              And it goes through a whole series of

22    questions that a pharmacist, for example, may have, is

23    that right, or may get?

24         A.    A pharmacist or their patients may have.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Okay.  All right.  Got it.

2        MR. HOFFMAN:  Okay.  Mr. Seid, those are all of

3   the questions I have at this time.  Thank you.

4        THE WITNESS:  Thank you.

5        THE VIDEOGRAPHER:  We are off the record at

6   5:09 p.m.

7                  (WHEREUPON, a recess was had

8                   from 5:09 to 5:20 p.m.)

9        THE VIDEOGRAPHER:  We are back on the record at

10   5:20 p.m.

11                  FURTHER EXAMINATION

12   BY MS. CONROY:

13        Q.    Mr. Seid, you were shown Exhibit 53, which

14   I think we also looked at yesterday or the day before,

15   which is the general counsel SOP double -- 0007.

16             Do you see that?

17        A.    I see that.

18        Q.    And you talked about this coming into

19   effect in March of 2009, correct?

20        A.    That's what it's dated.

21        Q.    Okay.  And so that's what -- that would be

22   when it became effective?

23        A.    That's when the SOP is effective.

24        Q.    Okay.  You don't know one way or the other
```

1    whether SOP 7.7 for the finance department was still

2    in effect at this time, do you?

3         A.   I believe I -- I noted that previous

4    testimony that I did not know.

5         Q.   So for all you know, 7.7 is still in

6    effect?

7         A.   I don't know that.  I have no idea about

8    that.

9         Q.   Right.  You don't -- you don't know one

10   way or the other?

11        A.   Right, yeah.

12        Q.   Okay.  So it's -- you --

13        A.   That's safe to say.

14        Q.   Thank you.

15             Exhibit 43 that you were shown, is this a

16   screen shot from the suspicious order monitoring

17   database?

18        A.   No.  I don't -- no.  This is a referral

19   document.

20        Q.   Do you know what -- you don't think this

21   is part of a -- of a database?

22        A.   This -- this has got physicians, not

23   pharmacies.

24        Q.   Cor -- correct.

1          Do you know what this document comes from?

2    Is this coming from a computer screen?  Do you have

3    any idea?

4        A.    I have no idea.  This is nothing to do

5    with the O -- the OMS that I was involved in.

6        Q.    Okay.  Let me show you this document here

7    which appears to be a screen shot.  It's

8    PPLPC004000245483 through 86.  I'll mark it as

9    Exhibit 56.

10              (WHEREUPON, a certain document was

11               marked Purdue-Seid Deposition Exhibit

12               No. 056, for identification, as of

13               12/13/2018.)

14   BY MS. CONROY:

15       Q.    Does that look familiar to you at all?

16       A.    The type of document is familiar to me,

17   yes.

18       Q.    Would this have been something you would

19   see on a -- is -- is this a screen shot of the

20   suspicious order monitoring database?

21       A.    I --

22       Q.    Do you want to look at it?  Here, let me

23   pass --

24       A.    Yeah, that would certainly help.

1      Q.      That's how I received it in hard copy like

2   that, but it looks to me like it's a screen shot?

3      A.      Yeah, that -- that is a screen shot.

4      Q.      So do you see down at the bottom there are

5   some very -- very fine print under Notes?

6      A.      Yes.

7      Q.      Are those the -- are those the sorts of

8   notes that would have been input by different

9   individuals into the database as information was

10  collected on various topics?

11     A.      That's what it looks like, yes.

12     Q.      And this -- they would then become part of

13  the suspicious order monitoring database?

14     A.      Yes, they were included in the database.

15     Q.      And would they have been available --

16  would -- would the information on the database been

17  available to you on the OMS committee?

18     A.      Yes, this information would be OMS

19  available data.

20     Q.      Can I take a look at it?

21             And do you see up in the right-hand corner

22  there are different tabs you could -- is that

23  something that you could click on with your mouse?

24     A.      Yes.

1    Q.    And then this would also tell you the name

2    of the -- if you -- if you take a look at the first

3    page, it looks like it's isolating the customer Izz

4    and Sons, do you see that, doing business as Roberts

5    Drugstore in Miami?

6    A.    Yes.

7    Q.    And then if you turn the page, there is a

8    status box, and it looks like it says:  "Complete

9    referred."

10    Do you see that?

11    A.    I can't see that from here.

12    Q.    Oh, I -- it is kind of -- yeah, I can --

13    I'll pass it back to you again, but if it says

14    "complete referred," does that mean it was referred to

15    the DEA?

16    A.    Yes.

17    Q.    Okay.  And then here it has the rep

18    information.  Those are --

19    A.    Yep.

20    Q.    -- the sales reps?

21    A.    That's correct.

22    Q.    And where does that come from, who puts

23    that information into the database?

24    A.    Not being a -- a systems expert, my

```
 1    supposition is, is that there is a zip to territory

 2    overlay.

 3          Q.    Oh, I see.  So it would sort of -- it

 4    would automatically populate?

 5          A.    It would populate it.

 6          Q.    I see.

 7                And do you see here on the notes where you

 8    see "CROWLEY J" in -- capitalized, and then --

 9          A.    Yeah.

10          Q.    -- the text?

11                If you entered a note, would it have

12    "SEID" capitalized?

13          A.    Yes.

14          Q.    That -- that happens automatically?

15          A.    Yes.

16                There -- noted there the special agent

17    that Jack had made a referral to.

18          Q.    That's Special Agent Griffith?

19          A.    Um-hum.

20          Q.    And he made that ref -- referral in

21    August, August 13th of 2008?

22          A.    Yes.  That's what it appears, but it notes

23    it.

24          Q.    And then -- okay.
```

1           Oh, actually, we'll lose this if I do

2    that.  Let me give this back -- let me put that over

3    to you so we don't lose it.

4         A.    Okay.  It goes in this pile.

5         Q.    This is PPLPC033000006038.  I'll mark it

6    as Exhibit 57.

7                (WHEREUPON, a certain document was

8                 marked Purdue-Seid Deposition Exhibit

9                 No. 057, for identification, as of

10                12/13/2018.)

11   BY MS. CONROY:

12        Q.    If you can take a look there, and I'll be

13   happy to pass it over to you, and what I'm going to

14   ask you about this, does this likewise look to be a

15   screen shot of the suspicious order monitoring

16   database?

17        A.    I'm not sure what this is.  It may be.  It

18   looks it -- to be a different format.

19                Is there a date on here?

20        Q.    That's the way it was produced to me, so I

21   don't know anything more about it.

22        A.    (Witness reading to himself.)

23                This looks like -- I don't know if this is

24   an early version or some kind of a summary report, but

Highly Confidential - Subject to Further Confidentiality Review

1    what you showed me previously looked like the more

2    typical report that would go -- that we would use.

3        Q.    Okay.

4        A.    But this one also was in reference to a

5    referral, I see.

6        Q.    It was a reference to a DEA referral?

7        A.    Yeah.

8        Q.    And you can tell that because it says up

9    here --

10       A.    "Complete referred."

11       Q.    -- it's a "complete referred."

12             Does it mean anything to you up here at

13   the top it says "Purdue OMS," does that mean anything

14   to you?

15       A.    It may have been a -- one of the types of

16   screen shots and it may be an earlier version.  I'm

17   more familiar with the first one you showed me.

18       Q.    Exhibit 56 that I showed you?

19       A.    And the more we used it the more

20   sophisticated it got and the more sophisticated it

21   looked.

22       Q.    So you think Exhibit 57 may be a --

23       A.    An earlier version.

24       Q.    -- an earlier version of the suspicious

1    order monitoring database?

2         A.    Yes.

3         Q.    Okay.  I'll give you that.

4               You were shown this document by

5    Mr. Hoffman.  You also produced it as part of the

6    30(b)(6) deposition.

7               What is meant by the term, it says:

8    "Attached please find the list that we have labeled

9    Slow Pharmacies."

10              What does -- what did -- what does that

11   mean, "slow pharmacies"?

12        MS. CONROY:  Do you have the exhibit number

13   there?

14        MS. PORTER:   I think it's a -- this is a

15   page from Exhibit 3 to the 30(b)(6) deposition which

16   would be in the manila folder.

17        THE WITNESS:  It's right -- it is right here.

18        MS. PORTER:  Great.

19        THE WITNESS:  I kept it handy.  It is easier for

20   me to read.

21   BY THE WITNESS:

22        A.    Okay.  This was dated 2011?

23   BY MS. CONROY:

24        Q.    Correct, October 7th, 2011 --

```
 1        A.    Now this --

 2        Q.    -- from Jack Crowley.

 3        MS. PORTER:   Just to be clear, we are talking

 4   about this is the one with 7363 at the bottom?

 5        MS. CONROY:  Yes.

 6   BY THE WITNESS:

 7        A.    This is the one that -- this would have

 8   referenced those pharmacies, it appears, that showed a

 9   decrease, I guess that's why Jack is calling them

10   "slow," a decrease from prior levels after the

11   formulation changed and these -- was a list of 285

12   pharmacies referred to the DEA.

13   BY MS. CONROY:

14        Q.    Whose per -- when you say referred to the

15   DEA, what do you mean by that?

16        A.    He provided -- well, I shouldn't say

17   referred.  Well, maybe -- I don't know if referred is

18   the right word, but this was a list provided after

19   this meeting with the investigators, Robin and Jack

20   and I believe it was at the DEA and they provided the

21   entire list of 285 pharmacies.  This is the

22   attachment.

23        Q.    And those are pharmacies that Mr. Crowley

24   called "slow pharmacies" because their prescribing of
```

```
 1    OxyContin decreased after the reformulation?

 2         A.    Decreased dramatically, yes, after the --

 3         Q.    You don't know if the pharmacies that are

 4    listed here were referred to the DEA as -- as

 5    suspicious?

 6         MR. HOFFMAN:  Object to the form.

 7    BY THE WITNESS:

 8         A.    I was not privy to their discussion.

 9    BY MS. CONROY:

10         Q.    So you don't know?

11         A.    I'm sure they -- well, I shouldn't say I'm

12    sure, but it doesn't appear that they would be

13    referred for any other reason than that they were

14    pharmacies of concern.

15         Q.    So you think -- so this was the same sort

16    of referral as what we saw come out of the OMS

17    committee --

18         A.    Yeah --

19         Q.    -- when the DEA -- when we saw in those --

20    in those other documents where it says "complete

21    referred"?

22         A.    Right.

23         Q.    There were -- there were referrals to the

24    DEA and the DEA number assigned for every one of these
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Crowley-called slow pharmacies?

 2       A.    The DEA assigned, I'm -- I'm not sure what

 3   you mean.

 4       Q.    Well, let me ask it again then.

 5             We looked at some documents today that

 6   ref -- that referenced a referral to the DEA?

 7       A.    Correct.

 8       Q.    Because it was a decision made by the

 9   legal -- by Robin Abrams and the committee that the

10   pharmacy should be reported to the DEA, correct?

11       A.    Correct.

12       Q.    And we -- you referred to those as being

13   referred to the DEA?

14       A.    Correct.

15       Q.    Is this the same thing, were all of these

16   pharmacies in the same manner discussed at the

17   committee and referred to the DEA?

18       MR. HOFFMAN:  Object to form.

19   BY MS. CONROY:

20       Q.    Or is this something different?

21       A.    I don't know if they were all discussed.

22   This list was discussed.  And based on this meeting

23   that was referenced, they were provided to the DEA.

24       Q.    And do you know if this list was likewise
```

```
 1    provided to the supplier of -- the -- whoever was

 2    supplying these pharmacies?

 3         A.    I don't know that.

 4         Q.    Who would know that?

 5         A.    Perhaps Jack, perhaps Robin.

 6         Q.    And are the -- DEA is DOJ, same e-mail

 7    address?

 8         A.    I -- I'm -- I -- I suppose that's DEA.  I

 9    don't know.  I don't know who else they would be

10    meeting in the Department of Justice, but...

11         Q.    Well, do you know if -- if Barbara

12    Boockholdt is with the Department of Justice or with

13    the DEA?

14         A.    I -- I don't know that.

15         Q.    What about Leonard Levin who has a DOJ

16    e-mail address?

17         A.    He is a -- he and James Arnold are

18    supervisory inspectors, investigators.

19         Q.    For the DEA?

20         A.    I don't know.

21         Q.    You just -- you know they are supervisory

22    investigators because you are -- you are taking a look

23    at the e-mail, correct?

24         A.    Correct.
```

 1      Q.    But you don't know -- you don't know who

 2   they work for?

 3      A.    I don't know who they work for.

 4      Q.    Okay.  Is there anything on this document

 5   that would lead you to believe that this was a

 6   communication with the DEA?

 7      A.    I can't say for sure it was the DEA.  It

 8   was some -- it was a -- apparently some type of law

 9   enforcement in the Department of Justice which could

10   be the DEA.

11      Q.    But you don't know?

12      A.    I don't know.

13      Q.    And does that mean that you don't know

14   whether this list of slow pharmacies was actually

15   supplied to the DEA or to the DOJ?

16      A.    I don't know exactly who it was referred

17   to.

18      Q.    You -- you don't know, it's not just

19   exactly, you don't know at all, right?

20      A.    I -- no.  I only know by this document.

21      Q.    Right.

22      A.    That this information was provided to a

23   Chief Boockhart -- Boockholdt in the Department of

24   Justice.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And -- and that's all we can tell from

 2   this, right?

 3        A.    Yes.  I wasn't at the -- this meeting.

 4        Q.    And -- and you weren't a part -- you don't

 5   know whether -- whether these pharmacies were referred

 6   to the DEA or not?

 7        A.    I don't know what was done with them

 8   afterwards, but I'm assuming the list was provided to

 9   whoever this law enforcement official was because they

10   were pharmacies of concern.

11        Q.    So you consider the DOJ and the DEA the

12   same thing?

13        A.    No, I don't.  I'm just saying they were

14   referred to a -- some law enforcement agency.

15        Q.    And -- and that's what I'm trying to

16   clarify.

17              What you understand reading this document,

18   you weren't a part of it, is the best you can tell,

19   the list of pharmacies was referred to the DOJ,

20   correct?

21        A.    That's what it looks like.

22        Q.    You have no idea if it was referred to the

23   DEA?

24        A.    I don't know it was --
```

```
 1        MR. HOFFMAN:  Object to the --

 2   BY THE WITNESS:

 3        A.    -- if it was referred to the DEA.

 4        MR. HOFFMAN:  Sorry.

 5             Object to form.

 6   BY MS. CONROY:

 7        Q.    You were very proud of RxPATROL, correct?

 8        A.    Yes, I am.

 9        Q.    And you were proud enough you -- it was

10   something that you hoped to increase the visibility

11   of, correct?

12        A.    Yes.

13        Q.    And it was something that you hoped all of

14   your customers would use and take advantage of,

15   correct?

16        A.    Correct.

17        Q.    And is that the reason, do you know, that

18   it was also provided to McKesson to circulate with all

19   of its customers?

20        A.    We provided it to wholesalers to circulate

21   to their customers, yes.

22        Q.    And that was to increase the visibility,

23   correct?

24        A.    The visibility, yes.
```

```
 1        Q.    Do you know if that was something that you

 2   did without getting paid or did you -- did you -- did

 3   you --

 4        A.    I don't --

 5        Q.    -- pay for McKesson to circulate it, do

 6   you know?

 7        A.    I don't think so, but I don't know.  I

 8   don't remember.

 9        Q.    But in any event, you believed that would

10   increase the possibility that it would be read if it

11   was, in fact, circulated through the wholesalers?

12        A.    Yes.

13        Q.    I'm going to show you what -- I'll show it

14   up on the screen.  I'll mark it Exhibit 58,

15   MCKMDL00353316.

16                    (WHEREUPON, a certain document was

17                     marked Purdue-Seid Deposition Exhibit

18                     No. 058, for identification, as of

19                     12/13/2018.)

20   BY MS. CONROY:

21        Q.    This is a McKesson Manufacturing --

22   Manufacturer Marketing prepared for Purdue Pharma,

23   August 20th of 2012, concerning RxPATROL.

24                    Do you see that?
```

```
 1        A.    I see that.

 2        Q.    And it says here the:

 3              "Objective:  "McKesson offers the

 4    following awareness and education programs which can

 5    be utilized by Purdue Pharma L.P. to educate and

 6    generate awareness to pharmacists regarding the x" --

 7    "RxPATROL initiative and the valuable resources on

 8    pharmacy security available from RxPATROL."

 9              Do you see that?

10        A.    I see that.

11        Q.    And then if you go a little bit further

12    down, it talks about McKesson Connect and how many --

13    how many customers that can -- that can hit a day.

14              Do you see that?

15        A.    I see that.

16        Q.    Do you also see here at the bottom it

17    says:

18              "Content for each program listed above

19    must be provided by Purdue Pharma L.P." -- you agree

20    with that, right?

21        A.    Yes.

22        Q.    -- "and approved by McKesson clinical and

23    legal teams."

24              Do you see at that?
```

```
1        A.    I see that.

2        Q.    So not only did Purdue Pharma have to

3   approve of every comma, as you spoke about before, but

4   McKesson's clinical and legal teams had to approve the

5   documents as well, correct?

6        MR. STANNER:  Objection; form, foundation.

7   BY THE WITNESS:

8        A.    That's what it says there.

9   BY MS. CONROY:

10       Q.    And if you take a look, it says:

11             "Create awareness as well as educate

12  pharmacists about RxPATROL.  The marketing services

13  detailed above could be utilized by Purdue Pharma L.P.

14  to educate and create pharmacist awareness of RxPATROL

15  among pharmacies served by McKesson distribution."

16             Do you see that?

17       A.    I see that.

18       Q.    And -- and you understood that was the way

19  it worked when, for example, there was the OxyContin

20  bottle shown that was used for that week in August?

21       MR. STANNER:  Objection.

22  BY MS. CONROY:

23       Q.    That website?

24       MR. STANNER:  Objection, form.
```

```
 1    BY MS. CONROY:

 2         Q.    Do you remember you looked at that picture

 3    of the OxyContin bottle just about an hour ago?

 4         A.    Yes.

 5         Q.    That's what -- that's what we are talking

 6    about here?

 7         MR. STANNER:  Objection, form, foundation.

 8         MR. HOFFMAN:  Same objection.

 9    BY THE WITNESS:

10         A.    This is a general statement.  The thing

11    that -- the item that we saw before was specific to

12    Direct Connect and the information related to the

13    reformulation of OxyContin.

14    BY MS. CONROY:

15         Q.    Okay.  But it was the same -- McKesson

16    Connect was the vehicle to circulate RxPATROL as well

17    as what we saw with -- with that one-week primary spot

18    for the reformulated OxyContin, correct?

19         MR. STANNER:  Objection, form, foundation.

20    BY THE WITNESS:

21         A.    I don't know if it was -- I don't remember

22    if it was done through Rx Connect.

23    BY MS. CONROY:

24         Q.    You -- you don't remember which one?
```

```
 1          A.     RxPATROL.

 2          Q.     If Rx -- you don't remember if RxPATROL --

 3          A.     Was done.

 4          Q.     -- was available through McKesson Connect?

 5          A.     Connect.

 6          Q.     Okay.

 7          A.     Who is that addressed to?

 8          Q.     It was -- it's just an available McKesson

 9    document.

10          A.     I am wondering if that was done with the

11    RxPATROL folks.  It doesn't indicate to who that was

12    sent.

13          Q.     You can -- you can keep that.

14          A.     Okay.

15          Q.     I don't have to who it was sent.

16          A.     Okay.

17          Q.     Do you remember being shown Exhibit 52

18    which was the screen shot of what appeared on McKesson

19    Connect?

20          A.     Yes.

21                 (WHEREUPON, a certain document was

22                  marked Purdue-Seid Deposition Exhibit

23                  No. 059, for identification, as of

24                  12/13/2018.)
```

1   BY MS. CONROY:

2        Q.    Okay.  Let me show you what I'll mark as

3   Exhibit 59, which is an actual screen shot of McKesson

4   Connect.

5              And do you see over here on the right-hand

6   side?

7        A.    Yes.

8        Q.    And that's what was -- that's what had a

9   primary spot for that week in August?

10       MR. STANNER:  Objection to form and foundation.

11  BY MS. CONROY:

12       Q.    You would see that that entire week when

13  you went to McKesson Connect?

14       A.    I assume so, yes.

15       Q.    Okay.  And what we looked at in Exhibit 52

16  was just the picture, do you see, with the "order now"

17  button?

18       A.    Right.

19       Q.    Okay.  But you also -- but you see that

20  the actual web page had this reference "click here for

21  more information" and that's where the fact pamphlet

22  was available, correct?

23       A.    The FAQs, yes.

24       Q.    And so anyone coming onto McKesson Connect

```
 1    not only would see this banner ad but they would

 2    also -- and they would be able to click and order from

 3    this banner, they would also be able to click and

 4    receive the multi-page FAQs, correct?

 5         A.    They would be able to click on that and

 6    view the multi-page FAQs and the revised full product

 7    information.

 8         Q.    Right.  That whole -- that whole pamphlet

 9    with the label that we saw?

10         A.    Yes.

11         Q.    And they could download it as well, right?

12         A.    I don't know how their system -- I don't

13    know if that's cape -- the capability of their system.

14    I would assume they could download it.

15         Q.    Okay.  When McKesson sells Purdue

16    products, McKesson makes money, right?

17         A.    When Pur -- when McKesson sells Purdue's

18    products?

19         Q.    It makes -- it makes money, right?

20         A.    I would assume they would make money.

21         Q.    When -- when Purdue sells products using a

22    wholesaler like McKesson, Purdue makes money on its

23    own products, right?

24         A.    Well, we make money on the sales to the
```

```
 1    wholesaler.

 2        Q.    Right.

 3              And the wholesaler makes money on some

 4    percentage of what gets sold, right?

 5        MR. STANNER:  Objection, form, foundation.

 6    BY THE WITNESS:

 7        A.    What -- how McKesson does their business,

 8    obviously you would need to talk to them, but my

 9    assumption is that they make money on what they sell.

10    BY MS. CONROY:

11        Q.    They -- they don't do it for free?

12        A.    Right.

13        Q.    Let me just show you what I'll mark as

14    Exhibit 60.

15              (WHEREUPON, a certain document was

16               marked Purdue-Seid Deposition Exhibit

17               No. 060, for identification, as of

18               12/13/2018.)

19    BY MS. CONROY:

20        Q.    Which is "Custom Solutions For Driving

21    Brand Performance by McKesson Manufacturer Marketing."

22    And I'll pass this to you so you can take a look if

23    you want.

24              And it says:  "McKesson Manufacturer
```

1    Marketing partners with pharmaceutical manufacturers

2    to define and execute customized strategic solutions

3    targeting key awareness, distribution, sale" -- "sales

4    and adherence goals at all stages of the product

5    lifecycle."

6              Do you see that?

7         A.    I see that.

8         Q.    If we turn the page.

9         MR. STANNER:  Do we have copies of this

10   document?

11        MS. CONROY:  I don't have copies of it.

12   BY MS. CONROY:

13        Q.    And then it says:  "Created from a

14   portfolio of proven and innovative programs from

15   multiple McKesson business units.  McKesson

16   Manufacturer Marketing strategic solutions deliver the

17   resources and expertise to help your brand."

18             Do you see that?

19        A.    I see that.

20        Q.    And one of those is McKesson Connect,

21   correct?

22        MR. STANNER:  Objection; form, foundation.

23   BY THE WITNESS:

24        A.    Does it list it on this piece?

```
 1   BY MS. CONROY:

 2       Q.   I'm going to find it.  I'm going to find

 3   that.  It lists Health Mart.

 4            Remember we talked about that yesterday?

 5       A.   Yeah.

 6       Q.   And that's -- that's something that Purdue

 7   Pharma has used in the past, correct?

 8       A.   I don't know if we've used.  We have

 9   explored Health Mart.  But I'm not sure what we used

10   it for.  It might have been for our OTC brands if we

11   did.

12       Q.   Okay.

13            You used Direct Rx.  It says:  "Feature

14   your brand's ads in screen messages on McKesson

15   Connect."

16            That's what we just looked at, right?

17       A.   Yeah, we used, yes.

18       Q.   Okay.  So:  "The McKesson Manufacturer

19   Marketing strategic solutions deliver the resources

20   and expertise to help your brand," some of those

21   resources, as we just saw, are McKesson Connect,

22   correct?

23       MR. STANNER:  Objection; form and foundation.

24   BY THE WITNESS:
```

```
 1        A.     And one of the resources listed was

 2   McKesson Connect, yes.

 3   BY MS. CONROY:

 4        Q.     Okay.

 5               And it says here:  "Increased product

 6   distribution to retail pharmacies through targeted

 7   product launch, distribution and packaging solutions."

 8               Would you agree that McKesson provides

 9   that service to Purdue?

10        MR. STANNER:  Objection; form, foundation,

11   timeframe.

12   BY THE WITNESS:

13        A.     They would -- can offer that solution, I

14   guess, to Purdue.

15   BY MS. CONROY:

16        Q.     Okay.  Well, McKesson has helped at

17   product launch, correct?

18        MR. STANNER:  Objection; form, vague.

19   BY THE WITNESS:

20        A.     We've worked with them on product

21   launches, yes.

22   BY MS. CONROY:

23        Q.     They certainly work on distribution,

24   correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Correct.

2        Q.    And what about packaging solutions, have

3   you ever used --

4        A.    No.

5        Q.    -- McKesson for packaging solutions?

6        A.    Years and years before we used -- there

7   was an Rx Pack, which is a McKesson repacker, but we

8   didn't use that at this time.

9        Q.    So that the more relevant issues would be

10  targeted product launch and distribution?

11       A.    Correct.

12       MR. STANNER:  Objection; form.

13  BY MS. CONROY:

14       Q.    Then if you see here at the bottom it

15  says:

16            "Delivering an unmatched combination of

17  communication, distribution, packaging and pharmacist

18  coaching options, plus targeted analytics of exclusive

19  data.  McKesson Manufacturer Marketing is designed to

20  enable brands to set strategic solutions that

21  prioritize opportunities, optimize resources and

22  improve profitability."

23            Do you see that?

24       A.    I see that.

1    Q.    Now, you're familiar with some of the

2  pharmacist coaching options, correct, you've heard

3  about -- you've heard about that?

4    MR. HOFFMAN:  Object to form.

5    MR. STANNER:  Objection.

6  BY THE WITNESS:

7    A.    I don't -- I don't know where you are

8  going.

9  BY MS. CONROY:

10    Q.    You don't -- you are not familiar with

11  pharmacist coaching?

12    A.    I -- you'd have to be specific.  I don't

13  know what those would be.

14    Q.    Okay.  "Targeted analytics of exclusive

15  data," that's the data that you receive in the

16  fee-for-service contracts, correct?

17    A.    This is different than the fee-for-service

18  contracts.

19    Q.    It is -- the targeted analytics would be

20  different?

21    A.    That has nothing to do with

22  fee-for-service contracts.

23    Q.    Okay.  Do you know what the targeted

24  analytics of exclusive data is referring to?

```
 1        A.    I don't.

 2        Q.    But you know it is different than the data

 3   that you received from McKesson on the Purdue

 4   products?

 5        A.    This is under their marketing umbrella.

 6   When I'm -- the fee-for-services agreement relates to

 7   distribution.

 8        Q.    Okay.  So that would be here,

 9   distribution?

10        MR. STANNER:  Objection; form.

11   BY THE WITNESS:

12        A.    The fee-for-service agreement is based on

13   the distribution of Purdue's products.  It has nothing

14   to do with a marketing program, zero.

15   BY MS. CONROY:

16        Q.    Okay.

17              Do you see this where it says:  "Build

18   patient awareness through retail merchandising,

19   promotions and advertising"?

20              Do you see that?

21        A.    Yes.

22        Q.    At least would there be any reason

23   RxPATROL documents would not be seen by a patient?

24        MR. HOFFMAN:  Object to form.
```

1    BY THE WITNESS:

2        A.    RxPATROL would not go to a patient.  A

3    patient has no -- no relation to RxPATROL at all.

4    BY MS. CONROY:

5        Q.    That's not quite my question, but if -- if

6    a patient was interested in sharing information to

7    help protect pharmacists, would there be any reason a

8    pharmacist could not inform customers coming into the

9    pharmacy about RxPATROL?

10       MR. STANNER:  Objection, form, foundation, calls

11   for speculation.

12   BY THE WITNESS:

13       A.    How would I know that?

14       MR. HOFFMAN:  Object to form.

15   BY MS. CONROY:

16       Q.    I'm asking you if you would have any

17   reason to believe it could not be done?

18       MR. HOFFMAN:  Object to form.

19   BY THE WITNESS:

20       A.    I'd have no reason to believe it could be

21   done.

22   BY MS. CONROY:

23       Q.    Okay.

24             And what about the fact sheet about the

Highly Confidential — Subject to Further Confidentiality Review

```
 1   reformulated OxyContin that was available on McKesson
 2   Connect, would that be something that a patient could
 3   talk to a pharmacist about?
 4        MR. HOFFMAN:  Object to form.
 5   BY THE WITNESS:
 6        A.    It would be something that a pharmacist
 7   could talk to a patient about.  It was not designed
 8   for patient ute -- utilization.
 9   BY MS. CONROY:
10        Q.    I saw -- fee-for-service contracts, they
11   are going to say that in the title, it will say
12   "fee-for-service contract"?
13        A.    I think it says -- that's what we titled
14   it.
15        Q.    Okay.  I'll -- I'll tell you that I've --
16   I have located some drug distribution agreements that
17   have -- that reference fee-for-service --
18        A.    Then that --
19        Q.    -- data --
20        A.    Yeah.
21        Q.    -- in 52 --
22        A.    Try drug distribution agreements.
23        Q.    So it might be called a drug distribution
24   agreement?
```

```
 1        A.     It might be, yes.

 2        Q.     Okay.  So you don't have a -- you don't

 3   have a strong memory that it's actually called -- that

 4   all of these agreements that are -- that contain the

 5   fee-for-service data are called fee-for-service --

 6        A.     Fee-for-service.

 7        Q.     -- agreements.

 8        A.     No, I don't have a strong memory.  I'm --

 9   as a -- an old timer, I use the old term, which was

10   fee-for-service, but it may have been, when it was

11   done, a distribution management agreement.

12        Q.     Okay.  So when I -- when I see some of

13   that "fee-for-service" language --

14        A.     Right.

15        Q.     -- I can be comfortable that what I'm

16   looking at is actually the fee-for-service agreement?

17        A.     It probably is, yeah.

18        Q.     You've just cleared up a lot of confusion

19   that I had.

20        A.     Okay.

21        Q.     Thank you.

22        A.     Sorry about that.

23        Q.     No, that's -- that's quite all right.

24        MS. CONROY:  I have no further questions.  Thank
```

1   you.

2       THE WITNESS:  Thank you.

3               (WHEREUPON, discussion was had

4                off the stenographic record.)

5       MR. STEWART:  Okay.  Let's go back on the

6   record.

7       THE VIDEOGRAPHER:  We are back on the record at

8   6:01 p.m.

9                   FURTHER EXAMINATION

10  BY MR. STEWART:

11      Q.   Mr. McNeil, you remember that your

12  attorney in his examination brought this document out

13  and suggested that it -- it represented a DA -- a DEA

14  referral?

15      MS. PORTER:  Objection.  I am Mr. Seid's

16  attorney and that was --

17      MR. STEWART:  Oh, pardon me.

18  BY MR. STEWART:

19      Q.   Do you remember that Purdue's attorney

20  used this in his examination of you and just suggested

21  that it was evidence of a DEA referral?

22      MR. HOFFMAN:  Object to form.  I was just using

23  your exhibit.

24  BY THE WITNESS:

```
 1        A.     He did use that and pointed out there was

 2    a referral in there.

 3    BY MR. STEWART:

 4        Q.     Okay.  But just to be clear, you -- you've

 5    said you don't know anything about this document, is

 6    that right?

 7        A.     I don't know -- I don't -- did not deal

 8    with -- with referrals of physicians.

 9        Q.     It's not -- it is not a document you even

10    recognized when we were talking before, fair?

11        A.     That's true.

12        Q.     Okay.

13               (WHEREUPON, a certain document was

14                marked Purdue-Seid Deposition Exhibit

15                No. 061, for identification, as of

16                12/13/2018.)

17    BY MR. STEWART:

18        Q.     I will hand you Exhibit 61.

19               And very quickly, do you see that this is

20    a -- a e-mail from a Jack Crowley to you?

21        A.     This is an e-mail from Jack Crowley to --

22        Q.     And I've got it highlighted if you want to

23    look at -- you're -- you're on --

24        A.     It looks like members of the OMS
```

1    committee.

2         Q.    Okay.  And if you'd turn over to the next

3    page, do you see I've highlighted a section where he

4    says:  "The traffic" -- trafficking case," and it

5    describes this article, "began as a probe by the Palm

6    Beach County Sheriff's Office but quickly expanded

7    into a collaborative effort with the US Drug

8    Enforcement Administration."

9              Do you see that?

10        A.    I see that.

11        Q.    Do you see that then on the first page,

12   Jack says:

13             "This is one of the problems, this

14   investigation went on from January of 2006 through

15   2" -- "October of 2009, meanwhile, the oxycodone was

16   hitting the streets."

17             Do you see that?

18        A.    I see that.

19        Q.    Do you remember talking to Jack about this

20   article?

21        A.    I don't remember talking to Jack about

22   this article.

23        Q.    Do you remember him having this view that,

24   you know, the DEA is a hardworking government

 1    organization but the fact is, given their workload,

 2    you're going to have delays like this, fair?

 3         MR. HOFFMAN:  Ob -- object to form and it is

 4    beyond the scope of my examination.

 5    BY THE WITNESS:

 6         A.    Yeah, that's -- can you rephrase the

 7    question?

 8    BY MR. STEWART:

 9         Q.    Yeah.  I'm just -- had -- had you and

10    Mr. Crowley, do you recall him alerting you to the

11    fact that the DEA involvement even in this case

12    involved a three-year process?

13              Do you remember that?

14         A.    Well, he -- he informed me via this

15    document, yes.

16         Q.    That's correct.

17              Can you turn to Exhibit 48, I believe,

18    which is an OMS summary report in front of you?

19         A.    Yes.

20         Q.    Now that you are looking at it, and I'd

21    refer you to the page marked 0267.  And do you see

22    that it -- it contains a recommendation?

23         A.    Yes.

24         Q.    Before, I think -- you know, we looked at

1    this document and you were questioning whether you --

2    whether it was an OMS committee report or document.

3           Now that you look at it, it is -- it is a

4    report from your committee, fair?

5       A.   I'm -- this looks to be some kind of

6    summary report that Jack prepared.  That's what it

7    looks like to me.  It doesn't look like an OMS report.

8       Q.   Okay.  Do you see that there is a -- do

9    you see that there is a -- if you look at Page 0266,

10   there is a recommendation decision for OMS committee

11   9/19/2012.

12          Do you see that?

13      A.   Yes.

14      Q.   Okay.  And do you see that the questions

15   are:  "May Daryl Rose resume calling on the Food City

16   Pharmacies in Knoxville?"

17      A.   That's what it says.

18      Q.   And there is another question:  "May Daryl

19   Rose resume calling on Janet McNeil M.D.?"  And then

20   it lists her DEA number.

21          Do you see that?

22      A.   Yes.

23      Q.   Okay.  And then do you see the notice that

24   the -- the recommendation is on the next page that:

Highly Confidential - Subject to Further Confidentiality Review

```
 1              "The sales representative may continue to

 2    call, and will be requested to notify the General

 3    Counsel's Office if further derogatory information is

 4    obtained."

 5              Do you see that?

 6    A.     Yes.

 7    Q.     So the point is, it may be, you know,

 8    counsel for Purdue suggested that perhaps there had

 9    been some referral for Frank McNeil, but here the

10    committee that you sit on gave Purdue salespeople the

11    green light to call on his wife Janet McNeil, fair?

12         MR. HOFFMAN:  Object to form.

13    BY MR. STEWART:

14    Q.     Is that fair?

15    A.     I'm -- what's the question?

16    Q.     The point is, the committee here is --

17    is -- is saying that -- that Purdue salespeople can

18    call on Janet McNeil?

19    A.     According to what this document says.

20    Q.     And what's the date on that document, the

21    date on the front?

22    A.     September 19, 2012, although there is a

23    bunch of different dates throughout this document.

24    Q.     What's the date of the decision that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were just referring to, just so we're clear?

 2              Here, and I'll guide you.

 3              Do you see you've got on Bates No. 0266

 4    you've got the decision for the committee and it says

 5    September 19th, 2012?

 6         A.   Yes, I see that.

 7         Q.   Okay.  And then you've got the decision on

 8    the next page.

 9              So that's a September 2012 decision --

10         A.   Okay.

11         Q.   -- fair?

12         A.   That's what it says.

13                   (WHEREUPON, a certain document was

14                    marked Purdue-Seid Deposition Exhibit

15                    No. 062, for identification, as of

16                    12/13/2018.)

17    BY MR. STEWART:

18         Q.   I hand you Exhibit -- I'll tell you what,

19    I hand you Exhibit 62.

20              Do you recognize it?

21         A.   No.

22         Q.   You've never seen that document before?

23         A.   No.

24         Q.   I'll tell you what, turn to --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Is there a date as to when this was

 2   produced and who produced it?

 3        Q.    Well, here, I'll -- I'll -- I'll try to

 4   answer your question.

 5              Do you see on the second page marked 6763

 6   with the Bates stamp, do you see that page?

 7        A.    Yes.

 8        Q.    Do you see that the last date on this

 9   graph is 16 March '14?

10        A.    I see that.

11        Q.    Okay.  So this -- this document may

12   reflect that period.

13              Why don't we turn to the page marked 6779.

14        A.    Okay.

15        Q.    Do you see there is a highlighted -- a

16   highlighted entry, and this is a chart that identifies

17   "Top 50 OxyContin outlets last 18 months"?

18        A.    Yes.

19        Q.    And do you see that on this list is K-VA-T

20   Food Stores Inc. at 5941 Kingston Pike, Bearden, in

21   Knoxville?

22        A.    I see it on this document.

23        Q.    Okay.  And you flip to the other side for

24   clarity on the next page, 6780.
```

Highly Confidential - Subject to Further Confidentiality Review

1           And do you see that listed among monthly

2    OxyContin purchasing trends by chain is Food City

3    K-VA-T Food Stores Inc., it's in the last -- last

4    chamber of this presentation?

5        A.    Yes.

6        Q.    Do you see that?

7           So -- so it looks like the Food City on

8    Kingston Pike had made the -- the top 50 OxyContin

9    outlet list, at least as of the production of this

10   document, fair?

11       MR. HOFFMAN:  Object to form, misstates the

12   document.

13   BY THE WITNESS:

14       A.    I don't know what this document is for or

15   what it's about --

16   BY MR. STEWART:

17       Q.    Okay.

18       A.    -- but on one page it shows 4.8 million in

19   sales and then it shows negative sales, so I don't

20   know what this document is about.

21       Q.    All we can say, you can confirm for me

22   that if you look at the document, K-VA, and you're

23   looking at Page 6779, you can see that on -- on a

24   sheet that identifies top 50 OxyContin outlets, K-VA

```
 1   Food Stores Inc. at 5941 Kingston Pike, Bearden is

 2   listed, fair?

 3        A.   I can see on a document that doesn't give

 4   a specific timeframe here --

 5        Q.   And --

 6        A.   -- but it is listed.

 7        Q.   -- can you turn to the front page of the

 8   document that you are looking at?

 9        A.   Yes.

10        Q.   What is the biggest word that appears on

11   that page?

12        A.   "Purdue."

13        Q.   Is that an indicator it might be a Purdue

14   document?

15        MS. MACKAY:  Objection.

16   BY MR. STEWART:

17        Q.   We talked -- you talked earlier you were

18   examined by Purdue's counsel about an e-mail that Jack

19   Crowley had sent you talking about the interplay

20   between pharmacies and doctors.

21             Do you remember that?

22        A.   I remember him presenting a document, yes.

23        Q.   Do you remember that he was talking about

24   pharmacies in Florida that were supplying people?
```

```
 1                    (WHEREUPON, a certain document was

 2                     marked Purdue-Seid Deposition Exhibit

 3                     No. 063, for identification, as of

 4                     12/13/2018.)

 5   BY MR. STEWART:

 6        Q.    I'll give you Exhibit 63.

 7        A.    Is this the same document?

 8        Q.    It's not.

 9        A.    Then I'd have to look at the previous

10   document to refresh my memory.

11        MS. PORTER:   Which one?

12        MR. STEWART:  It's the -- it was used in his --

13   in Purdue's direct.  No.  It was -- it's the

14   document -- it's an e-mail by Crowley.  It is probably

15   Exhibit 20 something.

16             I'm -- I'm looking at Purdue's counsel

17   because he just used it.  It is probably in that pile

18   right there.

19        MS. MACKAY:  Oh, it's exhibit -- I think it is

20   the -- one of the docs that was in Exhibit 3 of the

21   30(b)(6).

22        MR. HOFFMAN:  19 -- 19?

23        MR. STEWART:  19, Exhibit 19.

24        THE WITNESS:  Thank you.
```

```
 1        MS. PORTER:   You're welcome.

 2   BY MR. STEWART:

 3        Q.    Okay.  So in Exhibit 19, do you have that

 4   in front of you?

 5        A.    I do have it in front of me.

 6        Q.    And do you -- do you remember that

 7   Mr. Crowley was talking to you about -- about

 8   suspicious pharmacies and physicians in the Florida

 9   area?

10        A.    This, to be specific, is a memo from Jack

11   Crowley to many people, and so he wasn't speaking to

12   me.  And one of the things that did come up --

13   sorry -- one of the things that did come up was ABC

14   Orlando in this document.

15        Q.    And that was one of the suppliers that was

16   engaged in diversion?

17        MR. HOFFMAN:  Object to form.

18   BY THE WITNESS:

19        A.    I don't believe that that's what this

20   says.

21   BY MR. STEWART:

22        Q.    Well, do you recall that in that document,

23   Exhibit 19, Jack Crowley talks about discovering a

24   pharmacy with suspicious orders and then discovering
```

1    doctors with suspicious orders?

2        A.    He indicates a particular pharmacy that I

3    alerted him to and he associated it with a doctor, I

4    had given testimony to that before.

5        Q.    And that all occurred in Florida?

6        A.    That's what it says here.

7        Q.    Okay.  And -- and I take it you recall,

8    and this is the exhibit that you've got in front of

9    you now, Exhibit 63, Mr. Crowley had alerted you as

10   well that that diversion in Florida resulted in the

11   transfer of drugs, not the particular diversion

12   described in the previous exhibit, but that in general

13   there was a pipeline of pills coming from Florida up

14   into the Appalachian states, fair?

15       MR. HOFFMAN:  Object to form, foundation.

16   BY THE WITNESS:

17       A.    He sent a e-mail to, again, a list of

18   people and it was a -- an article.  I don't see any

19   comment from Jack on here.  It is a series of

20   articles.

21   BY MR. STEWART:

22       Q.    But he has alerted you to this article

23   about "Pills From South Florida Flood Appalachian

24   States," fair?

```
1        A.     That's what the title says.

2        Q.     And it was sent to you by Jack Crowley?

3        A.     I was copied on an e-mail that Jack

4    Crowley sent.

5                (WHEREUPON, a certain document was

6                 marked Purdue-Seid Deposition Exhibit

7                 No. 064, for identification, as of

8                 12/13/2018.)

9    BY MR. STEWART:

10       Q.     Okay.  And this is the last document and

11   probably the last two minutes of this deposition.  I'm

12   going to give you another exhibit, Exhibit 64.

13              And is this another one of Jack Crowley's

14   e-mails to you, this one to you only?

15              Do you see that?

16       A.     I see that.

17       Q.     And he is identifying some -- some

18   pharmacies for you to look at?

19       A.     Yes.

20       Q.     And he is -- one of them is Pardue's

21   Pharmacy at 1900 Patterson Street in Nashville,

22   Tennessee?

23       A.     Yes.

24       Q.     And do you see he points out on the next
```

1    page as part of his discussion:

2              "Based on the 584 percent increase in

3    branded Dilaudid, the continuous monitoring of the

4    wholesaler because of the increase in Oxycodone IR and

5    because Tennessee is becoming a hot spot, we believe

6    that the OMS committee should consider referring this

7    account to DEA in collaboration with the wholesalers."

8              Do you see that?

9        A.    Yes.

10       Q.    Okay.  And do you recall Mr. Crowley

11   talking to you about Tennessee being a hot spot,

12   emerging as a hot spot?

13       A.    I don't recall him discussing it.  I see

14   it here in this document.

15       Q.    Okay.  When you all in Purdue would call a

16   state like Tennessee a hot spot in this context, what

17   would you mean?

18       MR. HOFFMAN:  Object to form, foundation.

19   BY THE WITNESS:

20       A.    Jack called it a hot spot.

21   BY MR. STEWART:

22       Q.    What do you think he meant by a hot spot?

23       A.    I don't know what his thinking was.

24       Q.    Okay.  Is that a term that you've heard in

```
 1   Purdue?

 2        A.    I've heard people use the word "hot spot."

 3        Q.    And have they ref -- used it in connection

 4   with diversion?

 5        MR. HOFFMAN:  Object to form.

 6   BY THE WITNESS:

 7        A.    I'm not sure what they used it in

 8   connection with, and what they were identifying.

 9        MR. STEWART:  Okay.  Thank you, Mr. Seid.

10   That's all of the questions I have.  We appreciate it.

11        MR. HOFFMAN:  We can -- we can stay on.  I just

12   have to mark one document and then we'll be done.

13        MR. STANNER:  You are not going to let me ask

14   questions about the three new documents that have been

15   marked?

16        MS. PORTER:   I think there is more -- I mean,

17   his seven hours are done and everyone has asked him

18   questions.  There has been redirect.

19        MR. STANNER:  There hasn't been, though, on

20   the -- the three new McKesson documents that were just

21   introduced.  It is going to take two minutes.

22        MS. PORTER:  Okay.

23        MS. CONROY:  And it is not a seven hours.  It is

24   seven hours plus -- I mean, that's what the court
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    order is and that's what the coordination agreement is

 2    all about so that we are on --

 3        MS. PORTER:   I just -- I just told him okay.

 4        MS. CONROY:  Well, I'm just letting you know

 5    that even -- because we have more depositions coming

 6    up and it's not -- it is seven hours plus we get to

 7    continue to question based on how much direct is done.

 8                    (WHEREUPON, discussion was had

 9                     off the stenographic record.)

10                    FURTHER EXAMINATION

11   BY MR. STANNER:

12        Q.   Mr. Seid, just a few questions about some

13   documents that were recently handed to you.

14             Do you recall seeing Exhibit 60?

15        A.   Yes.

16        Q.   Is that a document that you received

17   during the course of your work at Purdue?

18             Do you recall receiving that?

19        A.   I don't recall receiving it.

20        Q.   Okay.  And you don't know whether it was

21   actually sent to anybody at Purdue, true?

22        A.   I don't know if it was or it wasn't.

23        Q.   Okay.  That's all I had on that.  You can

24   set that aside.
```

```
 1              You also were shown this new document,

 2   Exhibit 59, which is a banner ad with the click

 3   through?

 4        A.   Yes.

 5        Q.   For information?

 6              And you were also shown Exhibit 55, which

 7   are the frequently asked questions regarding the

 8   reformulated --

 9        A.   Yes.

10        Q.   -- OxyContin, right?

11        A.   Yes.

12        Q.   Is it your understanding that if somebody

13   clicked on -- on that link that they would be taken to

14   those frequently asked questions?

15        A.   Yes.

16        Q.   And as we talked about before, those

17   frequently asked questions were drafted entirely by

18   Purdue?

19        MS. CONROY:   Objection.

20   BY THE WITNESS:

21        A.   Yes.

22   BY MR. STANNER:

23        Q.   And McKesson was not allowed to change a

24   comma on that document?
```

```
 1        MS. CONROY:  Objection.

 2   BY THE WITNESS:

 3        A.    That's correct.

 4   BY MR. STANNER:

 5        Q.    And you told us how that document went

 6   through 50 revisions, right?

 7        A.    No, I don't know if it was 50, but it went

 8   through a lot of revisions.

 9        Q.    Right.  And that -- it is a lengthy

10   document?

11        A.    It is a lengthy document.

12        Q.    Purdue put a lot of time and effort into

13   it and didn't want anybody changing anything on it?

14        MS. CONROY:  Objection.

15        MR. HOFFMAN:  Object to the form.

16   BY MR. STANNER:

17        Q.    Isn't that correct?

18        A.    Right.  We could not -- if -- it had to be

19   use -- used as approved.

20        Q.    Okay.  And we already looked at the

21   contract, Exhibit 51, that's for this one-week banner

22   ad was in August -- the contract was in July of 2010.

23            Do you recall that?

24        A.    Yes, I remember seeing that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Now, you were also shown this exhibit,

 2   No. 58.  I'll just hand it to you to refresh your

 3   memory.

 4        A.    Yes.

 5        Q.    I might need it back.

 6              Do you recall ever receiving that ad at

 7   Purdue?

 8        A.    I don't recall this particular document --

 9        Q.    Okay.

10        A.    -- with the Rx feature.

11        Q.    And do you know whether anybody at Purdue

12   received that document?

13        A.    I --

14        MS. CONROY:  Objection.

15   BY THE WITNESS:

16        A.    I don't know who received this document.

17   BY MR. STANNER:

18        Q.    Do you know if anybody ever did one way or

19   the other?

20        MS. CONROY:  Objection.

21   BY THE WITNESS:

22        A.    I -- I don't know.  It is a R -- Purdue

23   Pharma R -- L.P. RxPATROL.

24   BY MR. STANNER:
```

1      Q.    Okay.

2      A.    So -- I'm sorry.

3      Q.    Whether it was a draft or it went to

4  Purdue, you don't know?

5      A.    I have no idea.

6      Q.    Okay.

7      MS. PORTER:   Do you need it back?

8      MR. STANNER:  Yeah.

9  BY MR. STANNER:

10     Q.    Well, I guess I might have to show you

11  again, but do you see that document is dated 2012?

12     A.    Yes.

13     Q.    And this document related only to this

14  RxPATROL program, right?

15     A.    Well, I don't know, because I --

16     Q.    Do you see in the title there it talks

17  only about --

18     A.    It says -- it shows it on RxPATROL, but as

19  I said, I'm -- don't remember receiving this document

20  or seeing this document.

21     Q.    In any event, if it relates to RxPATROL,

22  it has got nothing to do with the OxyContin banner ad?

23     A.    It had to do with RxPATROL.

24     Q.    Yeah.  And RxPATROL is about pharmacy

Highly Confidential - Subject to Further Confidentiality Review

```
 1    security?

 2         A.    And safety.

 3         Q.    And safety.

 4               And, again, the materials prepared on that

 5    by Purdue were materials that you wouldn't want

 6    modified or changed by anybody, right?

 7         A.    No.

 8         MS. CONROY:  Object.

 9    BY THE WITNESS:

10         A.    They would have to be used as designed.

11    BY MR. STANNER:

12         Q.    Okay.  So just like the faxes and just

13    like the banner ads, if McKesson got it they couldn't

14    change a comma on there?

15         MS. CONROY:  Objection.

16    BY MR. STANNER:

17         A.    That would be my understanding.  Again, I

18    didn't deal with this, but even if it was another

19    department that was policy that...

20    BY MR. STANNER:

21         Q.    Okay.

22         A.    It's used as approved.

23         Q.    And this document here dated 2012, that's

24    two years after the OxyContin banner ad?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    Yes.

2       MR. STANNER:  Okay.  That's all I have.  Thanks.

3   BY THE WITNESS:

4       A.    To be used into the reformulation.

5       THE WITNESS:  Do you want that back?

6       MR. STANNER:  I do -- I do want to just say one

7   thing for the record.

8            We have got some original deposition

9   exhibits that now have highlighting and marking on it

10  and to the extent we are going to be admitting any of

11  these things at trial, I don't think it should be done

12  with -- I would object to doing it with highlighting

13  and marking.  That's it.

14      MS. CONROY:  I'm happy to swap them out.

15      MS. PORTER:  This one is 58, this guy.

16      MS. CONROY:  That's all I have.  I don't have

17  another one.

18      MS. PORTER:   No, I'm just letting you know

19  which one he is talking about.

20      MS. CONROY:  Thank you.  We'll have to work it

21  out.

22      MS. PORTER:  Maybe -- maybe also 59.

23      THE WITNESS:  60.  I'm sorry.

24      MS. PORTER:  And 60.
```

```
 1                    FURTHER EXAMINATION

 2   BY MR. HOFFMAN:

 3        Q.    Hello again, Mr. Seid.

 4        A.    Hello.

 5        Q.    I -- I will be very brief.

 6              Plaintiffs counsel for the MDL,

 7   Ms. Conroy, remember she asked you about this

 8   correspondence to Chief Boockholdt?

 9        A.    Chief Boockholdt, yes.

10        Q.    Do you remember that from Jack Crowley

11   with the 285 pharmacies that were being sent over to

12   Chief Barbara Boockholdt.

13              Do you recall that?

14        A.    I remember that.

15        Q.    And just to clear up any potential

16   confusion, while Ms. Conroy was asking you questions,

17   we just went on LinkedIn.

18              Do you see Barbara Boockholdt there?

19        A.    Yes.

20        Q.    Do you see it says under Experience, "Drug

21   Enforcement Administration, 36 years."

22              Do you see that?

23        A.    Okay.  So she was DEA.

24        Q.    And, in fact, if we look at the time
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   period that is referenced in the e-mail, which is

 2   October 7, 2011 --

 3        A.    Um-hum.

 4        Q.    -- and we compare that to her LinkedIn

 5   profile --

 6        MR. STEWART:  Object to the form.

 7   BY MR. HOFFMAN:

 8        Q.    You will see that she was Chief Regulatory

 9   Section, Drug Enforcement Administration at that time?

10             Is that right?

11        MS. CONROY:  Objection.

12   BY THE WITNESS:

13        A.    I see that.

14   BY MR. HOFFMAN:

15        Q.    So having looked at this, is -- is there

16   any doubt in your mind that this e-mail and the

17   referral of these pharmacies was going to the DEA?

18        MR. STEWART:  Objection.

19   BY THE WITNESS:

20        A.    It appears that it was going to the DEA.

21        MR. HOFFMAN:  Okay.  Thanks.  That's all of the

22   questions that I have.

23        MS. CONROY:  I have a couple of questions.

24        MS. MACKAY:  Nathan, did you want to mark that?
```

```
 1        MR. HOFFMAN:  Oh, I'm sorry.  We didn't mark it.

 2   We'll mark it as 60 -- is it 65?

 3        MS. CONROY:  Yes.

 4        MR. HOFFMAN:  Okay.

 5                  (WHEREUPON, a certain document was

 6                   marked Purdue-Seid Deposition Exhibit

 7                   No. 065, for identification, as of

 8                   12/13/2018.)

 9                   FURTHER EXAMINATION

10   BY MS. CONROY:

11        Q.   Mr. Seid, in response to Mr. --

12        MS. CONROY:  I'm sorry, what's your --

13        MR. STANNER:  Stanner.

14   BY MS. CONROY:

15        Q.   -- Stanner's questions about McKesson, you

16   saw one of the exhibits said that McKesson as well as

17   Purdue had the ability to review whatever would be

18   posted in the McKesson site, do you recall that?

19        A.   I saw that on the RxPATROL document.

20        Q.   Right.

21             Where it said that both Purdue Pharma and

22   McKesson clinical and legal would approve the

23   document?

24        A.   I saw that on the RxPATROL document.
```

1    Q.    Okay.  So you don't know -- you don't know

2  one way or the other whether McKesson could actually

3  refuse to put something on McKesson Connect regardless

4  of whether Purdue wanted it there, correct?

5    MR. STANNER:  Object to form and foundation.

6    MR. HOFFMAN:  Objection.

7  BY THE WITNESS:

8    A.    I don't understand the question.

9  BY MS. CONROY:

10    Q.    Okay.  The ad that was up there, there

11  were some questions that you were asked about whether

12  or not it could be changed by McKesson.

13        Do you recall that?

14    A.    The OxyContin ad?

15    Q.    Any ad at all, but, sure, the OxyContin

16  ad.

17    A.    I was shown the OxyContin contract and as

18  I remember when I looked at it, it didn't say anything

19  about McKesson review.

20    Q.    Do you know if --

21    A.    On that document it is for RxPATROL and I

22  don't know if -- who that document was produced for.

23    Q.    Okay.  So is it your understanding, then,

24  that the RxPATROL document, McKesson would be able to

1   review that document before it posted it on its

2   website?

3       MR. STANNER:  Objection; form, foundation.

4       MR. HOFFMAN:  Object to the form.

5   BY THE WITNESS:

6       A.    As proud as I am of RxPATROL, I am not

7   responsible for that.  So if that -- any kind of

8   marketing pro -- program was proceeded with or we

9   would proceed with a marketing program, anything that

10   would be done with that document would go back to the

11   generating department.  So nothing would be done to

12   any of those documents unless it was signed off by

13   corporate security.

14   BY MS. CONROY:

15       Q.    I agree.

16       Purdue would need to sign off on the

17   document before it gave it to McKesson to post on --

18       A.    No.  I'm talking about even after -- if it

19   went through McKesson review.

20       Q.    It would still have to go through Purdue

21   review is what you are saying?

22       A.    It would have to go back to Purdue.  And

23   if it was coming back to Purdue, if it -- if it was

24   out of my shop, I would probably say we are not going

1    to do the program because I know we are not going to

2    change it in our house.

3        Q.    And do you know one way or the other

4    whether McKesson could say the same thing, if you

5    don't accept our changes --

6        A.    I don't know.  I don't know.  It appears

7    it didn't happen with the one ad we did that I'm aware

8    of.  But I don't know McKesson's operating procedures.

9        Q.    Right.

10        So you don't know one way or the other

11   whether McKesson could refuse to run it if they didn't

12   get the changes that they wanted to the document?

13       MR. STANNER:  Objection; misstates the evidence,

14   assumes facts not in evidence.

15   BY MS. CONROY:

16       Q.    You don't know?

17       A.    My -- my issue here is that the document

18   that we are talking about was two years after the

19   document that my department was involved in and I

20   don't remember if my department was involved in that

21   RxPATROL piece.  I don't know if McKesson's policies

22   were different from when we did our piece, so that's

23   not -- I don't know who that went to.  I don't know

24   who was asking or what -- where it proceeded.  So I

1    really can't say what would happen with that document.

2             I'm not trying to -- I just don't know.

3    It was a -- a different period of time and a different

4    document.

5        Q.    It's your testimony that Purdue would not

6    want any of its documents changed that were going to

7    be given to a wholesaler for promotional purposes,

8    correct?

9        A.    Yes.  And that was in reference to the

10   2010 document.

11       Q.    Right.  Well, I'm talking about at all.

12       A.    That was -- would be my understanding.

13       Q.    Okay.  And you also don't know whether a

14   wholesaler at any time being given a promotional

15   document from Purdue could tell Purdue, unless they

16   changed something they wouldn't run it, you don't know

17   one way or the other?

18       MR. HOFFMAN:  Objection to form.

19       MR. STANNER:  Objection to form, vague,

20   incomplete hypothetical.

21       MR. HOFFMAN:  Assumes facts not in evidence.

22   BY THE WITNESS:

23       A.    I don't know one way or the other which

24   way that -- I -- I don't know about that document.

```
 1   BY MS. CONROY:

 2        Q.    That's not -- it's not your area, right?

 3        A.    It's not my area.  I mean, market -- if it

 4   would have come from my area, I would know that we

 5   were involved in it, but I don't remember doing that

 6   program.

 7        Q.    Okay.  The inspector, Barbara Boockholdt,

 8   I think her name was --

 9        MR. HOFFMAN:  It is chief.

10   BY MS. CONROY:

11        Q.    Chief, thank you, Chief Boockholdt, when

12   you were answering questions that Mr. Hoffman was

13   asking you about that e-mail, you didn't know whether

14   she was DEA or DOJ, did you?

15        A.    No.  I knew she was some kind of law

16   official in the Federal Government.

17        Q.    Okay.  But thanks to LinkedIn now we know,

18   right?

19        A.    Now we know.

20        MS. CONROY:  Okay.  Thank you.

21        THE WITNESS:  Who is next?

22        MR. HOFFMAN:  We are off -- we are off the

23   record.

24        THE VIDEOGRAPHER:  We are off the record at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   6:34 p.m.

 2              (Time Noted:  6:34 p.m.)

 3         FURTHER DEPONENT SAITH NAUGHT.

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 4    a Certified Shorthand Reporter, do hereby certify:

 5            That previous to the commencement of the

 6    examination of the witness herein, the witness was

 7    duly sworn to testify the whole truth concerning the

 8    matters herein;

 9            That the foregoing deposition transcript

10    was reported stenographically by me, was thereafter

11    reduced to typewriting under my personal direction and

12    constitutes a true record of the testimony given and

13    the proceedings had;

14            That the said deposition was taken before

15    me at the time and place specified;

16            That I am not a relative or employee or

17    attorney or counsel, nor a relative or employee of

18    such attorney or counsel for any of the parties

19    hereto, nor interested directly or indirectly in the

20    outcome of this action.

21            IN WITNESS WHEREOF, I do hereunto set my

22    hand on this 17th day of December, 2018.

23

24            JULIANA F. ZAJICEK, Certified Reporter
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                DEPOSITION ERRATA SHEET

 2

 3   Assignment No. 200041

 4   Case Caption:  In Re: National Prescription

 5                  Opiate Litigation

 6

 7        DECLARATION UNDER PENALTY OF PERJURY

 8

 9        I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                              STEPHEN SEID

19

20   SUBSCRIBED AND SWORN TO

21   before me this        day

22   of                 , A.D. 20__.

23

24           Notary Public
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24                       STEPHEN SEID
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change:_____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change:_____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change:_____

23    SIGNATURE:_____DATE:_____

24                   STEPHEN SEID
```