1          IN THE UNITED STATES COURT

2            NORTHERN DISTRICT OF OHIO

3               EASTERN DIVISION

4

5          ~~~~~~~~~~~~~~~~~~~~~

6    IN RE:  NATIONAL PRESCRIPTION

7    OPIATE LITIGATION          MDL No. 2804

8                               Case No.

9                               17-mdl-2804

10                              Judge Dan Polster

11

12   This document relates to:

13   The County of Cuyahoga, Ohio, et al., v.

14   Purdue Pharma L.P., et al.,

15   Case No. 1:17-OP-45004 (N.D. Ohio)

16

17          ~~~~~~~~~~~~~~~~~~~~~

18        30(b)(6) videotaped deposition of

19              HUGH SHANNON

20            January 15, 2019

21               9:05 a.m.

22               Taken at:

     Climaco, Wilcox, Peca & Garofoli Co., L.P.A.

           55 Public Square, Suite 1950

23            Cleveland, Ohio

24         Wendy L. Klauss, RPR

25

Page 2

```
 1  APPEARANCES:
 2
 3      On behalf of Cuyahoga County:
          Napoli Shkolnik PLLC
 3        JOSEPH L. CIACCIO, ESQ.
 4        SALVATORE C. BADALA, ESQ.
          400 Broadhollow Road, Suite 305
 5        Melville, NY  11747
          (631) 224-1133
 6        Jciaccio@napolilaw.com
          Sbadala@napolilaw.com
 7          -AND-
          Plevin & Gallucci
 8        FRANK L. GALLUCCI, III, ESQ.
          55 Public Square
 9        Suite 2222
          Cleveland, OH  44113-1901
10        (216) 861-0804
          Fgallucci@pglawyer.com
11
          On behalf of the City of Cleveland:
12        Zashin & Rich
          CHRISTOPHER D. CASPARY, ESQ.
13        950 Main Avenue, 4th Floor
          Cleveland, OH  44113
14        (216) 696-4441
          CDC@zrlaw.com
15
          On behalf of Distributor
16        AmerisourceBergen Drug Corporation,
          Co-Liaison Counsel for the Distributor
17        Defendants:
          Reed Smith LLP
18        STEVEN J. BORANIAN, ESQ.
          LUKE PORTER, ESQ.
19        101 Second Street
          Suite 1800
20        San Francisco, CA  94105
          (415) 543-8700
21        Sboranian@reedsmith.com
          Lporter@reedsmith.com
22          -AND-
          Jackson Kelly PLLC
23        SANDRA K. ZERRUSEN, ESQ.
          50 South Main Street, Suite 201
24        Akron, OH  44308
          (330) 252-9060
25        Skzerrusen@jacksonkelly.com
```

Page 3

```
 1  APPEARANCES, Continued:
 2      On behalf of Purdue Pharma L.P., Purdue
          Pharma, Inc., and The Purdue Frederick
 3      Company:
          Dechert LLP
 4        SARA B. ROITMAN, ESQ.
          35 West Wacker Drive, Suite 3400
 5        Chicago, IL  60601-1634
          (312) 646-5800
 6        Sara.roitman@dechert.com
 7      On behalf of Walmart Inc. F/K/A Wal-Mart
        Stores, Inc.
 8        Jones Day
          EDWARD M. CARTER, ESQ.
 9        325 John H. McConnell Blvd.
          Suite 600
10        Columbus, OH  43215-2673
          (614) 469-3939
11        Emcarter@jonesday.com
12      On behalf of Cardinal Health, Inc.:
          Williams & Connolly LLP
13        J. ANDREW KEYES, ESQ.
          725 Twelfth Street, N.W.
14        Washington, DC  20005
          (202) 434-5000
15        Akeyes@wc.com
16      On behalf of the Endo Defendants:
          Baker Hostetler
17        RUTH E. HARTMAN, ESQ.
          127 Public Square
18        Suite 2000
          Cleveland, OH  44114
19        (216) 621-0200
          Rhartman@bakerlaw.com
20
          On behalf of the Distributor Defendant
21        McKesson Corporation:
          Covington & Burling LLP
22        ASEEM P. PADUKONE, ESQ.
          One Front Street
23        San Francisco, CA  94111-5356
          (415) 591-6000
24        Apadukone@cov.com
25
```

Page 4

```
 1  APPEARANCES, Continued:
 2      On behalf of Johnson & Johnson and
        Janssen Pharmaceuticals, Inc.:
 3        Tucker Ellis, LLP
          ERICA M. JAMES, ESQ.
 4        950 Main Avenue, Suite 1100
          Cleveland, OH  44113-7213
 5        (216) 592-5000
          Erica.james@tuckerellis.com
 6
          On behalf of HD Smith:
 7        Barnes & Thornburg LLP
          MONIQUE HANNAM, ESQ.
 8        11 South Meridan Street
          Indianapolis, IN  46204
 9        (313) 236-1313
          Monique.hannam@btlaw.com
10      ~ ~ ~ ~ ~
11  ALSO PRESENT:
12        Joseph VanDetta, Videographer
13      ~ ~ ~ ~ ~
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          TRANSCRIPT INDEX
 2  APPEARANCES:............................  2
 3  INDEX OF EXHIBITS .....................  6
 4  EXAMINATION OF HUGH SHANNON
      By Mr. Boranian..........................  11
 5    By Mr. Carter............................  68
      By Ms. Roitman...........................  110
 6
      REPORTER'S CERTIFICATE...................  149
 7
      EXHIBIT CUSTODY
 8  EXHIBITS RETAINED BY COURT REPORTER
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

1          INDEX OF EXHIBITS
        NUMBER      DESCRIPTION      MARKED
2
    Exhibit 1    Amended Notice of Videotaped .  12
3          30(b)(6) Deposition of the
        County of Cuyahoga
4
    Exhibit 2    Black Binder Containing Tabs .  17
5          1 Through 5
6  Exhibit 3    Plaintiff the County of ......  24
        Cuyahoga, Ohio and the State
7        of Ohio Ex Rel. Prosecuting
        Attorney of Cuyahoga County,
8        Michel C. O'Malley's Second
        Supplemental Responses and
9        Objections to Distributor
        Defendants' Interrogatory
10        No. 18 Pursuant to the
        Court's November 21, 2018
11        Order
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1    objection................................    77
2    objection................................    79
3    objection................................    80
4    objection................................    81
5    objection................................    82
6    objection................................    82
7    objection................................    83
8    objection................................    88
9    object..................................    89
10    objection................................    89
11    objection................................    90
12    objection................................    91
13    objection................................    92
14    objection................................    92
15    objection................................    103
16    objection................................    104
17    objection................................    105
18    objection................................    105
19    objection................................    105
20    objection................................    106
21    objection................................    115
22    objection................................    116
23    objection................................    116
24    objection................................    117
25    objection................................    117

Page 7

1        INDEX OF VIDEO OBJECTION
2    OBJECT                  PAGE
3    object..................................    25
4    objection................................    29
5    objection................................    29
6    objection................................    29
7    objection................................    31
8    object..................................    32
9    objection................................    38
10    objection................................    40
11    objection................................    46
12    objection................................    52
13    objection................................    55
14    object..................................    55
15    objection................................    69
16    objection................................    70
17    objection................................    73
18    objection................................    73
19    objection................................    74
20    objection................................    74
21    objection................................    75
22    objection................................    75
23    objection................................    76
24    objection................................    76
25    objection................................    77

Page 9

1    objection................................    119
2    objection................................    120
3    objection................................    135
4    objection................................    136
5    objection................................    137
6    objection................................    138
7    objection................................    139
8    objection................................    142
9    objection................................    142
10    objection................................    144
11    objection................................    145
12    objection................................    146
13    objection................................    147
14
15
16
17
18
19
20
21
22
23
24
25

Page 10

1    THE VIDEOGRAPHER:  We are now on
2  the record.  The date is January 15, 2019.  The
3  time 9:05 a.m.  The caption of this case is In
4  Re National Prescription Opiate Litigation.
5  The name of the witness is Hugh Shannon.
6    At this time the attorneys present
7  and those attending remotely will identify
8  themselves and the parties they represent.
9    MR. CIACCIO:  I'll start.  Joseph
10  Ciaccio, Napoli Shkolnic, Cuyahoga County.
11    MR. GALLUCCI:  Frank Gallucci,
12  Plevin & Gallucci, Cuyahoga County.
13    MR. CASPARY:  Chris Caspary, Zashin
14  & Rich, City of Cleveland.
15    MS. JAMES:  Erica James, Tucker
16  Ellis, Janssen Pharmaceuticals and Johnson &
17  Johnson.
18    MR. PADUKONE:  Assem Padukone,
19  Covington & Burling, on behalf of McKesson
20  Corporation.
21    MS. HARTMAN:  Ruth Hartman, Baker
22  Hostetler, on behalf of the Endo defendants.
23    MR. KEYES:  Andrew Keyes, Williams
24  & Connolly, on behalf of Cardinal Health.
25    MS. ROITMAN:  Sara Roitman, from

Page 11

1  Dechert, on behalf of Purdue.
2    MR. CARTER:  Ed Carter, Jones Day,
3  for Walmart.
4    MS. ZERRUSEN:  Sandy Zerrusen, from
5  Jackson Kelly, on behalf of AmeriSourceBergan.
6    MR. BORANIAN:  Steven Boranian,
7  from Reed Smith, for defendant
8  AmeriSourceBergan.
9    THE VIDEOGRAPHER:  People on the
10  phone?
11    MR. PORTER:  Luke Porter, with Reed
12  Smith, on behalf of AmerisourceBergen.
13    MS. HANNAM:  Monique Hannam, from
14  Barnes & Thornburg, on behalf of HD Smith.
15    MR. BADALA:  Salvatore Badala, on
16  behalf of plaintiff, Cuyahoga County.
17    THE VIDEOGRAPHER:  Will the court
18  reporter please swear in the witness.
19    HUGH SHANNON, of lawful age, called
20  for examination, as provided by the Statute,
21  being by me first duly sworn, as hereinafter
22  certified, deposed and said as follows:
23    EXAMINATION OF HUGH SHANNON
24  BY MR. BORANIAN:
25    Q.  Good morning, Mr. Shannon.  How are

Page 12

1  you today?
2    A.  Good morning.  I'm well, thank you.
3    Q.  Do you understand that you are here
4  today to testify as a representative of
5  Cuyahoga County under Federal Rule of Civil
6  Procedure 30(b)(6)?
7    A.  I do.
8    - - - - -
9    (Thereupon, Deposition Exhibit 1,
10    Amended Notice of Videotaped
11    30(b)(6) Deposition of the County of
12    Cuyahoga, was marked for purposes of
13    identification.)
14    - - - - -
15    Q.  Take a look at what we have marked
16  as Exhibit 1.  This is the notice for today's
17  deposition.  Can you take a look at the topics
18  that are listed on pages 2 and 3 of Exhibit 1,
19  and when you are done with that, just look up
20  at me.
21    So, Mr. Shannon, the notice lists
22  topics 10, 12, 17, 23, 24, 25 and 31.  Are
23  those the topics that you understand that you
24  are here to testify about today?
25    A.  Yes.

Page 13

1    Q.  And have you prepared to testify
2  about those topics today?
3    A.  I have.
4    Q.  What have you done to prepare for
5  today's deposition?
6    A.  A lot of review of materials,
7  mainly from past years; materials from other
8  county agencies that I'm not a part of but work
9  with, to familiarize myself more with these
10  topics and how they may have affected the
11  operations of those agencies; discussions with
12  some of those directors.
13    I have had discussions with members
14  of the task forces that are in effect right now
15  to deal with the opioid crisis in our
16  community.
17    Q.  How did you select the documents
18  and materials that you reviewed for today?
19    A.  Most of it was just a general
20  re-review of, you know, information that our
21  office has produced and shared and provided to
22  members of the community and the task forces
23  over the years.
24    Most of, you know, the discussions
25  with the attorneys about these specific topics,

4 (Pages 10 - 13)

Page 14

1 once we have had those discussions, maybe start
2 to zero in on specific documents that we may
3 have created out of our office or out of other
4 agencies of the county.
5     Q.   Did you make a list of the
6 documents or, otherwise, take notes --
7     A.   No. The --
8     Q.   I wasn't --
9         MR. CIACCIO: Make sure you --
10     Q.   I didn't go through the standard
11 instructions, but have you been deposed before,
12 Mr. Shannon?
13     A.   No.
14     Q.   Okay. The person sitting to your
15 left is taking down everything that we say, so
16 it is more that we not talk at the same time.
17 I promise to not cut you off if you promise to
18 not cut me off, and that goes for all of the
19 attorneys here in the room.
20     A.   I apologize.
21     Q.   If you need a break at any time,
22 just let us know. If we have -- if you don't
23 understand any question that I've asked you,
24 please let me know and I will do my best to ask
25 you a better question, okay? Are those

Page 15

1 instructions clear?
2     A.   Yes.
3     Q.   Okay. Thank you. So we were
4 talking about the documents. I think my
5 question was did you keep any list or tally of
6 the documents that you reviewed for today's
7 deposition?
8     A.   I did not.
9     Q.   Okay. Did you take any notes, when
10 you were preparing for today's deposition?
11     A.   I did not.
12     Q.   Did counsel provide any materials
13 for you to review?
14     A.   Just what's in this binder in front
15 of me.
16         MR. BORANIAN: Do you have a copy
17 of the binder for us?
18         MR. CIACCIO: Sure.
19     Q.   Do you have that binder in front of
20 you right now, Mr. Shannon?
21     A.   I do.
22     Q.   So tell me what's in the binder.
23     A.   So tab 1, I believe tab 1 deals
24 with what they call -- what they have named
25 interrogatory number 18, which deals

Page 16

1 specifically with the categories of injury and
2 our attorneys' response.
3         Tab 2 is titled the Second Amended
4 Corrected Complaint.
5     Q.   It looks like there are excerpts of
6 that complaint in tab 2, correct?
7     A.   I didn't write this document, so
8 I'm not sure, specifically, if it's an amended
9 version or a condensed version.
10     Q.   Okay. For the record, it's not all
11 there, but that's fine. What's the next tab?
12     A.   Tab 3, this is the Medical
13 Examiner's of Cuyahoga County report on updated
14 fentanyl, heroin and cocaine deaths, related
15 deaths in Cuyahoga County from June 1 of 2018.
16         Tab 4 is titled the Amended Notice
17 of Videotaped 30(b)(6) Deposition of Cuyahoga
18 County.
19         And tab 5 looks like the
20 organizational chart of Cuyahoga County.
21     Q.   Okay. Did you take any handwritten
22 notes on any of those documents?
23     A.   I did not.
24     Q.   Okay. We will mark that as Exhibit
25 2. If you can just hand it over to me, or you

Page 17

1 can just put the sticker on yourself.
2             - - - - -
3         (Thereupon, Deposition Exhibit 2,
4         Black Binder Containing Tabs 1
5         Through 5, was marked for purposes
6         of identification.)
7             - - - - -
8         MR. GALLUCCI: I think we did it on
9 the outside yesterday.
10         MR. CIACCIO: We did.
11     Q.   Now, other than the documents in
12 that binder, Exhibit Number 2, are there any
13 other documents that you reviewed that you
14 physically have that you collected in a file or
15 anywhere else?
16     A.   Most of our files we put online,
17 because it's information that we are sharing
18 with the community. I do have files on my hard
19 drive that I've collected over the years, which
20 were turned over during discovery.
21     Q.   Okay. So specifically. So
22 preparation for today's deposition, do you have
23 a file or a box of documents or anything in
24 physical or hard copy?
25     A.   No. I try not to waste paper. I

5 (Pages 14 - 17)

Page 18

1  just reviewed what I was looking for in my
2  files and on the website, just to refamiliarize
3  myself.
4      Q.   Who did you speak with to prepare
5  for today's deposition?
6      A.   Well, obviously Dr. Gilson and I
7  have spoken at length.  I'm his administrator
8  at the medical examiner's office.  So during
9  the course of the day, we are always talking.
10 Occasionally, what we are doing during the day
11 also crosses over into preparation of what we
12 are doing for this action.
13     Q.   Did you talk to Dr. Gilson between
14 his deposition yesterday and this morning?
15     A.   Yes.
16     Q.   Okay.  And what did you discuss
17 with him?
18     A.   Well, he was here late yesterday,
19 and I was his ride, so I took him back to the
20 office, and we were basically talking about
21 what had happened at the office while we were
22 gone, and that he needed to get home and have
23 dinner and see his kids.
24     Q.   And did you discuss his deposition
25 or the case during that conversation?

Page 19

1      A.   Only to the extent that it lasted
2  longer than he thought it would.
3      Q.   Who else did you talk to for
4  today's deposition?
5      A.   We have had a number of discussions
6  by phone with other directors.  The HHS
7  director, David Merriman, talked to us a little
8  bit about the impacts on child and family
9  services.  Vince Caraffi, at the board of
10 health, he ran the Opiate Task Force for the
11 board of health.  Dr. Joan Papp, at
12 MetroHealth, we had a brief conversation,
13 updates about the Dawn program.
14         It's hard to really say I talked
15 specifically to this person about this specific
16 topic, because my work with the medical
17 examiner's office, as well as with the various
18 task forces that we participate in, kind of,
19 brings me into contact with these folks about
20 the general topic of the opioid crisis on a
21 daily basis.
22         So I wouldn't seek people out
23 necessarily to prepare but, as we were talking
24 during the normal course of business, things
25 that I learned from them getting regular

Page 20

1  updates, like I normally would, actually helped
2  me in preparation as well.
3      Q.   When did you learn that you would
4  be a representative of the county for
5  deposition?
6      A.   I think there was a general
7  understanding that there was going to be a
8  deposition at some point.  I don't believe I
9  could pick a specific date.
10     Q.   Well, when did you learn that you
11 would testify on these specific topics?
12     A.   For the 30(b)(6) deposition, I
13 think that might have been more recent, maybe
14 two months.
15     Q.   Okay.  So I understand that you
16 deal with these folks in the regular course of
17 business.
18     A.   Sure.
19     Q.   But I just want to complete getting
20 a description of how you prepared for the
21 deposition.
22         So since you learned that you would
23 testify on these enumerated topics, who else
24 have you spoken to, for the purpose of
25 educating yourself and preparing yourself to

Page 21

1  testify for the county on these topics.  We
2  have Dr. Gilson, Mr. Merriman, Mr. Caraffi, Dr.
3  Papp.  Who else?
4      A.   I would say -- I would say members
5  of law enforcement: Commander Gingell from the
6  City of Cleveland, he runs the HIDI task force,
7  among other things, for the City of Cleveland;
8  agent Martin from the DEA, I had a brief
9  conversation; Derek Siegle, he's the director
10 at the High Intensity Drug Trafficking Agency.
11     Q.   You mentioned you spoke to some
12 task force members.  Does that jog your memory
13 at all?
14     A.   Judge Synenberg and Judge Matia,
15 they were on the drug and recovery courts.  As
16 I said, it is difficult to differentiate
17 between my normal course of business.
18     Q.   If anyone else comes to mind, just
19 let us know.
20     A.   Sure.
21     Q.   Did you meet with attorneys to
22 prepare for today's deposition?
23     A.   I did.
24     Q.   And how many times?
25     A.   It would be hard for me to put a

6 (Pages 18 - 21)

Page 22

1  number on it.  It's been a busy two months.
2      Q.   Is it more than once?
3      A.   Yes.
4      Q.   Is it more than five times?
5      A.   I would say, yes.
6      Q.   Is it more than ten times?
7      A.   Very likely.
8      Q.   So you have met with attorneys.  Is
9  it more than 15 times?
10     A.   As I said, we have met in person,
11 we have talked on the phone.  It's been a busy
12 two months.  I would say dozens of times, yes,
13 at least.
14     Q.   Okay.  So if you can, how many
15 times did you meet with attorneys for the
16 purpose of preparing for today's deposition to
17 testify on these enumerated topics?
18     A.   It's probably a dozen -- dozens of
19 times, yeah, right.
20     Q.   How many hours total do you think?
21     A.   Like I said, over the course of my
22 normal business, I'm constantly dealing with
23 these issues, so it's hundreds of hours, I
24 would think.  Specifically saying, let's start
25 with the 30(b)(6) topics, at least 100 and

Page 23

1  maybe more.
2      Q.   When was the last time you met with
3  attorneys to prepare for today's deposition?
4      A.   You mean besides this morning?
5      Q.   Was this morning the last time?
6      A.   Yes.
7      Q.   Then before this morning, when was
8  the last time you met with attorneys?
9      A.   Yesterday.
10     Q.   And how long did that meeting take
11 place?
12     A.   Several hours.
13     Q.   More than four?
14     A.   About four maybe.
15     Q.   And who was there?
16     A.   The gentleman seated to the right
17 of me.
18     Q.   Mr. Ciaccio?
19     A.   Mr. Ciaccio and Mr. Gallucci.
20 There were other attorneys coming in and out.
21     Q.   Okay.  Let me ask you about topic
22 10, Mr. Shannon.  Topic 10 is the harm that
23 plaintiff has incurred from the promotion,
24 marketing, distribution, dispensing and/or
25 diversion of prescription opioids.

Page 24

1      Mr. Shannon, does the county -- got
2  it?
3      Mr. Shannon, does the county
4  contend that it has incurred harm resulting
5  from the promotion, marketing, distribution
6  and/or diversion of prescription opioids?
7      A.   Yes, it does.
8      Q.   Let me show you Exhibit 3.  This
9  might speed things along a little bit.
10          - - - - -
11     (Thereupon, Deposition Exhibit 3,
12     Plaintiff the County of Cuyahoga,
13     Ohio and the State of Ohio Ex Rel.
14     Prosecuting Attorney of Cuyahoga
15     County, Michel C. O'Malley's Second
16     Supplemental Responses and
17     Objections to Distributor
18     Defendants' Interrogatory No. 18
19     Pursuant to the Court's November 21,
20     2018 Order, was marked for purposes
21     of identification.)
22          - - - - -
23     Q.   Mr. Shannon, Exhibit 3 is
24 Plaintiff, The County of Cuyahoga, the second
25 supplemental responses and objections to

Page 25

1  distributor defendants' interrogatory number 18
2  pursuant to the Court's order of November 21,
3  2018.
4      This was in the binder that we
5  marked as Exhibit 2, correct?
6      A.   Yes.
7      Q.   And this is an interrogatory
8  response that deals with the damages that the
9  county is claiming in this lawsuit, true?
10     A.   Yes.
11     Q.   So let's go to Exhibit 2 within
12 Exhibit 3, this response.  It's a chart that
13 looks like this.  Okay.
14     So Mr. Shannon, does the county
15 contend that it has incurred harm that has had
16 an impact on the ADAMHS Board?
17     MR. CIACCIO:  Object to the form.
18     A.   Yes, it does.
19     Q.   What does ADAMHS Board stand for?
20     A.   The ADAMHS Board is the Alcohol
21 Drug and Mental Health Services Board.
22     Q.   And what harm does the county
23 contend was incurred that had an impact on the
24 ADAMHS Board?
25     A.   So in responding to the opioid

7 (Pages 22 - 25)

Page 26

1  crisis, Cuyahoga County and individual agencies
2  within it had been doing work on their own.
3  ADAMHS Board is obviously a frontline agency in
4  dealing with the treatment of people who are
5  addicted to alcohol and drugs.
6        When it became clear that we had a
7  real problem, that some of the services at
8  agencies across the county were being
9  overwhelmed, we needed to really get together
10  to talk about, you know, ways to respond in a
11  more vigorous way.
12        When the Cuyahoga County Medical
13  Examiner's Office was talking about the crisis,
14  we had seen a rise in heroin deaths, and so we
15  called the ADAMHS Board to find out, had they
16  been seeing the same thing.  We called the
17  board of health, we talked to the U.S.
18  Attorney's Office, Steve Dettelbach and Carole
19  Rendon and other people, saying, are you seeing
20  the same things that we are seeing, do we need
21  to sit down and talk about the response.
22        So that was really the creation of
23  the U.S. Attorney's Task Force at that point.
24     Q.  I didn't ask you about the U.S.
25  Attorney's Task Force, Mr. Shannon.

Page 27

1        My question is:  What harm did the
2  county incur that had an impact on the
3  operations of the ADAMHS Board --
4     A.  Understood.
5     Q.  -- that's the question.
6     A.  Understood.  Unfortunately, it's
7  really all tied together.  ADAMHS Board
8  response, the board of health's response, the
9  medical examiner's response, law enforcement's
10  response, we decided that we needed to be
11  working more closely together.
12        So in order to do that, and to your
13  question, everybody suffered harms because of
14  the resources that needed to be expended,
15  because everybody's caseloads were going up,
16  there were, you know, more people needing to
17  get into treatment, the hospitals were starting
18  to get overwhelmed, their emergency rooms, our
19  office was being stressed, the medical
20  examiner's office, and carried down the line.
21  There was a ripple effect.
22        So in enumerating what damages go
23  to what specific agency, I think that will be
24  worked out by their experts that the
25  representation here is working with, but I can

Page 28

1  tell you that in our conversations, when the
2  task force was formed, ADAMHS was there.
3        They were stressed.  They required
4  more resources to respond, same as all the rest
5  of the agencies of the county that are listed
6  here, more people going through the Court
7  system, more people going into the jail.  All
8  of these things, stemming from the opioid
9  crisis, created stresses on local government
10  that required more vigorous response and more
11  resources.
12     Q.  So this chart attached to the
13  interrogatory response purports to list
14  damages.  It is divided into each of these
15  categories, and it is listed out from 2006
16  through 2017.
17        What I want to understand, and
18  there is somebody else designated to testify
19  about the Cuyahoga County's damages, okay?
20  Topic 10 is the harm, the harm resulting in the
21  damages.  We don't need to get into the
22  numbers, all right, we don't have time for that
23  today anyway.
24        What I want to know is, what
25  happened that impacted the ADAMHS Board that

Page 29

1  resulted in the claimed damages of, for
2  example, 6 million dollars in 2006; what is the
3  harm --
4        MR. CIACCIO:  Objection.
5     Q.  -- that that money was incurred to
6  address?
7        MR. CIACCIO:  Objection to the
8  form.
9     Q.  If there is a better way to
10  organize this, I'm open to that, but this is
11  the way that the county set this out for us.
12  This is how we are going to start doing this.
13        You know, what is the harm that
14  occurred to the ADAMHS Board that resulted in
15  these numbers?
16        MR. CIACCIO:  Objection to form.
17     A.  If I understood you, you said you
18  didn't want to talk about the specific numbers,
19  so I'm not sure that I could speak to what you
20  specifically asked, 6 million dollars in this
21  year for that agency.
22     Q.  Well, some harm happened to form
23  the basis for these damages.  Something
24  happened to the ADAMHS Board that was harmful;
25  what was it?

8 (Pages 26 - 29)

Page 30

1    A.   Right.  So that's what I was trying
2  to explain, and maybe I wasn't doing a good
3  job, and I apologize.
4    Q.   Well, I heard greater caseloads, I
5  heard more people in jails, more patients
6  coming through the medical examiner's office,
7  but the county has disclosed numbers in
8  connection with the ADAMHS Board, as well as
9  the medical examiner and others.  What's the
10  harm, what's the harm to the ADAMHS Board?
11    A.   So the harm is that more resources
12  are needed when there are more people seeking
13  treatment.
14    Q.   So greater treatment caseloads?
15    A.   Absolutely.
16    Q.   Anything else to the ADAMHS Board?
17    A.   So in familiarizing myself with all
18  of these other agencies and working with them
19  on the task force, all the discussions have
20  really amounted to the same types of things.
21        There are more people who are
22  becoming addicted, there are more people who
23  are dying, there are more people who are
24  seeking treatment, there are more people
25  getting caught up in the justice system because

Page 31

1  of their activities surrounding the opioid
2  crisis, and in order to respond to that, as a
3  local government, it requires additional
4  resources.
5        I am not sure that I can speak to
6  the individual numbers, as you are asking.
7    Q.   I'm not asking for numbers.  I'm
8  asking for the harm.  I'm asking for what
9  happened to harm the county, starting in 2006
10  and extending until today?
11        For ADAMHS we have established
12  that, you know, greater caseloads for
13  treatment.  Let's move on to Children and
14  Family Services, what harm has been incurred by
15  the county that has had an impact on Children
16  and Family Services?
17        MR. CIACCIO:  Objection to the
18  form.
19    A.   So the Department of Children and
20  Family Services is, you know, tasked with
21  protecting the children in this community.
22  They have seen a massive upswing of cases due
23  to the fact that people who are caregivers of
24  these children are either being incarcerated,
25  going into treatment or dying because of the

Page 32

1  opioid crisis, and that means more caseloads
2  for caseworkers to go out and do
3  investigations, additional placements in foster
4  care.  The costs of these services are not
5  cheap.
6        I mean, often times there are
7  babies that are being born who are already
8  addicted to opiates.  So not only are you
9  looking to try to get treatment for parents,
10  but if they die or they lose custody of their
11  children, now we are trying to get treatment
12  for babies who are addicted, born addicted to
13  opiates, and then get them placed in foster
14  care or through the adoption system.  So all of
15  these are additional stresses on DCFS.
16    Q.   Are there greater or fewer numbers
17  of placements through DCSF since 2006?
18    A.   Far more.
19    Q.   And who told you that?
20    A.   Director Merriman.
21    Q.   I'm going to take these next few
22  together, Mr. Shannon.  First of all, have you
23  identified the harm incurred that has impacted
24  DCSF?
25        MR. CIACCIO:  Object to the form.

Page 33

1    Q.   Are you done with that?
2    A.   There may be others.  This is what
3  I have been able -- that's the major topic that
4  we discussed with Director Merriman.
5    Q.   You understand you are here to
6  testify about topic 10, harm incurred, true?
7    A.   I do.
8    Q.   Is there anything else you can tell
9  us about DCSF, other than what we have already
10  said?
11    A.   Not at the moment, no.
12    Q.   So let's talk about the prosecutor,
13  the public defender, court of common pleas and
14  juvenile court.  Has the county incurred harm
15  that has had an impact on those institutions?
16    A.   It has.
17    Q.   And what is the harm?
18    A.   So again, greater caseloads all the
19  way around, more people going through the
20  justice system.  There are more arrests, there
21  is obviously more people going into the jail,
22  both juveniles and adults.  This crisis has not
23  spared anybody, based on age, demographics or
24  where they live.
25        So more prosecutions means more

9 (Pages 30 - 33)

Page 34

1  cases for prosecutors, more cases for
2  defenders, busier dockets for the Court.
3        We have special dockets, drug court
4  and recovery court.  Recovery court was created
5  in response to this crisis.  We had already had
6  an operating drug court.  I think there is talk
7  about trying to add another to keep up with
8  caseloads.
9        And those deal specifically with
10  trying to get people out of the jail and into
11  treatment.  They have criteria that they have
12  to meet, and it is a rigorous program, but they
13  see very good results.  But those are also not
14  inexpensive.  So more people going through drug
15  courts, getting into treatment, means more
16  resources.
17     Q.   Has the county incurred harm that
18  has had an impact on the sheriff's office?
19     A.   Yes.
20     Q.   And what would that be?
21     A.   So the sheriff's office, while it
22  is the main law enforcement agency for the
23  county, which means it's doing more
24  investigations based on the opioid crisis, but
25  it also runs the county jail.

Page 35

1        The county jail is now
2  overcrowded -- more overcrowded, it has also
3  become one of, if not the largest drug
4  treatment center in Cuyahoga County.  Research
5  done of local cases by the medical examiner's
6  office, I believe, showed that we had somewhere
7  in the 40 to 50 percent range of folks who were
8  dying of an opioid overdose had had some jail
9  time in the previous two years.
10        So as those numbers go up, you are
11  talking about more and more people going into
12  the jail.  Probably one of the most expensive
13  things that Cuyahoga County does is run that
14  jail.
15     Q.   Has the county incurred harm that
16  had an impact on the medical examiner's office?
17     A.   It has.
18     Q.   And what is that harm?
19     A.   So we have, in identifying this
20  crisis, the medical examiner's office has
21  started to collect and produce reports, collect
22  data, produce reports to get out into the
23  community.  We felt that that was a very
24  important thing to do, that everybody had a
25  common baseline of knowledge about what was

Page 36

1  happening.
2        In order to deal with our increased
3  caseloads, unfortunately, as fatalities were
4  rising faster than we could almost adapt to, we
5  needed to bring on more forensic pathologists
6  to do autopsies, we needed more forensic
7  scientists in the laboratory to do toxicology
8  testing and drug chemistry work.
9        As the investigations grew more
10  elaborate for drug cases than they had in the
11  past, it required additional training.  There
12  were protocols designed with law enforcement,
13  with the prosecutor's office, to instruct
14  people who were going to be on these scenes how
15  to properly collect evidence that they would
16  want to submit for forensic testing.
17        Generally, in a drug case, you
18  wouldn't see a lot of forensic testing done,
19  but these cases now became -- there was a shift
20  in policy both at the prosecutor's and at the
21  U.S. Attorney's Office to be more rigorous with
22  the prosecutions, charging people with
23  manslaughter, death specification cases.  So it
24  required more evidence collected at the scene.
25        So when packaging is found at the

Page 37

1  scene by law enforcement, maybe they want
2  fingerprints done, maybe they want DNA testing
3  done.  Well, you can't just throw a baggy in --
4  or throw packaging, drug packaging into a
5  plastic baggy and seal it up if you want DNA
6  testing.  It ruins it or it has a potential to
7  regrade it.
8        So we had to just kind of brief who
9  would be on scene, these narcotic agents, these
10  detectives, how to properly collect it if they
11  wanted evidence from our office.  So more
12  scientists, more doctors.
13        Obviously, with more case work, we
14  got busier.  We needed to buy more supplies,
15  equipment started to fail, we needed to
16  replenish equipment.  There was a new
17  technology that helps us identify the new
18  strains and analogs of fentanyl that were
19  emerging, help us identify them and identify
20  them quicker.  Over the course of --
21     Q.   I thought you were done.
22     A.   No.  I'm sorry.
23        Over the course of, I would say,
24  the last three years, we've asked for and
25  received an additional 3 million dollars to our

Page 38

1 budget to deal specifically with the opioid
2 crisis, for equipment, supplies and personnel.
3 Fortunately, I am familiar with those specific
4 numbers.
5      Q.   Has the county incurred any harm
6 that we haven't already discussed?
7      A.   For sure.
8      Q.   What else?
9      A.   Well, I would start with the 3,000
10 people that have died in the last dozen years
11 or so from an opioid-related drug.
12      Q.   Which is a great loss to their
13 friends and family, true?
14      A.   Correct.
15      Q.   I'm asking about harm to the
16 county.  What other harm has the county
17 incurred because of the promotion, marketing,
18 distribution and/or diversion of opioids?
19      MR. CIACCIO:  Objection to form.
20 Just let him finish the answer before you start
21 interrupting.
22      A.   So as I was saying, there is great
23 harm to the county, because those families who
24 were left behind, our doctors have to talk to
25 those families, Dr. Gilson has to talk to

Page 39

1 parents who have lost children.
2      It's not an easy thing to have to
3 deal with.  You can, you know, only say so much
4 for someone who has lost a child, and there are
5 other ripple effects.
6      We talked about what was to DCSF.
7 People are also caregiving for their parents,
8 for their grandparents.  When they lose a
9 caregiver, those people have to be taken care
10 of.  It goes directly to the harms that ripple
11 out throughout all of the service systems.
12      The county is the last safety net
13 for a lot of people, and so taking 3,000
14 people, often times people who are -- you know,
15 this is not what we remember, you know, from
16 old TV shows.  These are people who are working
17 every day, these are people who are
18 contributing to the tax base, they are working,
19 they are taking care of their parents, they're
20 taking care of their families.  It has a ripple
21 effect.  It is a direct effect on harms to the
22 county.
23      Q.   Mr. Shannon, there is not a person
24 in this room who is not sympathetic to the
25 plight that you have just described.

Page 40

1      Our task today is to identify the
2 harms so we can learn with particularity what
3 we're dealing with here.
4      So is there any harm to the county
5 that we haven't already covered that you are
6 claiming in this lawsuit?
7      MR. CIACCIO:  Objection to form.
8 Just objection.  Outside the scope.
9      MR. BORANIAN:  How could that
10 possibly be outside the scope?
11      MR. CIACCIO:  Well, when you are
12 clarify it with that you are claiming in this
13 lawsuit, I think it starts to go into damages.
14 So I think that is outside the scope.
15      If you are going to ask him the
16 damages -- by claiming, you are saying damages.
17 So that's the part that I think is outside the
18 scope.
19      MR. BORANIAN:  We have your
20 objection.
21      Q.   So, Mr. Shannon?
22      A.   So we have talked about the
23 expansion of treatment both in the jail and
24 other areas.  One of the things that we did
25 early on, the county supported MetroHealth,

Page 41

1 which is the county hospital, in instituting
2 the Dawn Program.
3      Dawn is the Deaths Avoided With
4 Naloxone Program, and getting that up and
5 running required an investment of resources
6 from the county to get started.  It has since
7 expanded to include increased availability for
8 needle exchange, they have instituted now a
9 fentanyl strip program, which they distribute
10 with the kits and with the needles, so folks
11 can use those to identify if their drugs have
12 fentanyl in them.
13      Not everybody who is seeking drugs
14 is looking for fentanyl.  Often times, you
15 know, there is no quality control of it.  So
16 that was an important addition, to help harm
17 reduction.
18      There have been expanded
19 interventions for hep C and HIV.  Obviously,
20 people who are using needles, that's a danger.
21      Q.   Are you talking now about measures
22 the county has taken to address the opioid
23 problem?
24      A.   Well, you were asking about the
25 harm.

11 (Pages 38 - 41)

1    Q.    Right.
2    A.    And so when we expend resources --
3    Q.    Let me just cut you off there.  The
4  only reason I asked is because the next topic
5  is topic 12, which is mitigation of harm, which
6  would address what the county does to address
7  the opioid issues.  So we're going to get to
8  that, I promise.
9    A.    I understand.
10    Q.    I want to focus on and finish with
11  identifying the harm that has been incurred by
12  the county because of the marketing, promotion,
13  distribution and diversion of opioids.
14          We have gone through each of the
15  agencies that are listed in the interrogatory
16  response, we have discussed MetroHealth and the
17  Dawn Program.  Is there any other harm that you
18  can identify that the county has incurred
19  because of the promotion, marketing,
20  distribution or diversion of prescription
21  opioids?
22    A.    So I understand what you are saying
23  that we will get to number 12, but when you are
24  asking about harms, all of these interventions
25  required resources --

1    Q.    Very well.
2    A.    -- to start.  So if you are asking
3  me, you know, how this is all getting put
4  together, that's going to be part of it.
5    Q.    That's fine.  That's fine.
6          Is there any other harm to the
7  county you want to describe, other than what we
8  have already talked about?
9    A.    So the county, both the ADAMHS
10  Board and the county itself, embarked on a
11  number of media campaigns, billboards, videos,
12  things like that, to do prevention messaging
13  into the community about the dangers of opioid
14  prescriptions and the opioid crisis.
15          So there was a lot of time, effort,
16  and resources put into those programs to be
17  able to try to stem the tide, make sure that
18  people understood the dangers of prescribed
19  opioids, to understand that they had the power
20  to say to their doctor that they didn't need an
21  opioid prescription, if they didn't want one.
22  This also led to a lot of school-based
23  prevention messaging and programs, again all
24  requiring additional resources.
25          There is a laundry list, I'm sure,

1  of the law enforcement resources that are
2  required and needed for expanded
3  investigations.
4    Q.    We have covered law enforcement and
5  the sheriff's office and the courts and the
6  prosecutor and the public defender.  Anything
7  else?
8    A.    Currently trying to put together a,
9  kind of an integrated data system.  There is a
10  lot of information that's out there about both
11  prescription opioids and the ensuing heroin and
12  fentanyl crisis, and they are all on different
13  systems, they all come in different formats,
14  and they are all owned by different agencies.
15          Being able to pull a lot of that
16  information together in one place to be able to
17  use it to inform law enforcement
18  investigations, treatment interventions,
19  prevention, it's not an easy task.  We are not
20  even sure yet what all is out there, but to be
21  able to bring a lot of different data platforms
22  together under one umbrella is going to be a
23  resource-intensive undertaking, and so we are
24  fortunate to get a Department of Justice grant
25  to start things, but it's really just to get us

1  to the point where we know everything we need
2  to know to start designing that system.  And
3  that will be expensive, so...
4    Q.    Has the county incurred any harm
5  because of the marketing, promotion,
6  distribution, or dispensing of prescription
7  opioids that we haven't already covered?
8    A.    I'm sure there are others.  It's a
9  lot, it's a lot of information to try to absorb
10  and take in.  I have been doing it for seven
11  years, and I'm sure there are things I really
12  don't know well enough.
13    Q.    Well, you understand that you have
14  been designated to testify --
15    A.    I do understand that.
16    Q.    -- on this topic for the county?
17          Have you given us all the
18  information that you currently have on behalf
19  of the county about the harm that has been
20  incurred?
21    A.    I would say that we have gone into
22  discussions with the various hospitals and the
23  medical schools about trying to put together
24  new training programs, new education standards
25  for existing physicians, as well as medical

12 (Pages 42 - 45)

Page 46

1  students.
2  We see a lot of medical students
3  come through our office, we try to do some of
4  that, but to coordinate with those teaching
5  hospitals, with those medical schools, it takes
6  resources to be able to come up with those new
7  standards, how to prescribe appropriately and
8  responsively.  We have had, you know, many
9  discussions, the medical examiner's office
10  specifically.
11  Q.  Anything else, Mr. Shannon, or can
12  we move on?
13  A.  I'm sure there are more.
14  Q.  Well, now is your chance.  Let me
15  ask you this: When did the county first
16  experience harm resulting from the promotion,
17  marketing, distribution, dispensing or
18  diversion of prescription opioids?
19  MR. CIACCIO:  Objection to form.
20  A.  Well, that's complicated.  When we
21  had our first discussion about heroin, we
22  didn't have all of the information, I think, we
23  needed to be fully informed, like we are today.
24  Seven years ago, when we saw
25  heroin, we saw it spiking, that was a problem.

Page 47

1  What we didn't realize and what was kind of,
2  you know, hidden from view was that, you know,
3  most of these people started with a prescribed
4  opiate.
5  Q.  The question, Mr. Shannon, is, when
6  did you first incur the harm?
7  MR. CIACCIO:  I think he's
8  answering that question.
9  MR. BORANIAN:  No, I don't think he
10  is.  He is answering -- he's talking about what
11  he understood and what he is learning.
12  Q.  The question is:  When did you
13  first experience the harm?
14  MR. CIACCIO:  If he finishes the
15  question, then you will know whether or not he
16  answered it and you can follow back up.  But,
17  again, I'm going to ask you not to cut him off
18  just because you don't like the answer.
19  A.  So we didn't fully understand, kind
20  of, these underlying issues.  Part of it was
21  that we required more information than we were
22  entitled to at that time legally.
23  Once the medical examiner himself
24  started having conversations with the board of
25  pharmacy to get access to the drug prescription

Page 48

1  monitoring system, OARRS, and that took some
2  time and personal lobbying to get, we were able
3  to do -- start doing lookbacks on people we
4  knew were dying from overdoses.  We set up a
5  poison death review committee.
6  Q.  Mr. Shannon, when did the county
7  incur the harm?  When did it first incur the
8  harm?
9  MR. CIACCIO:  I think he is trying
10  to explain that to you.  He said it is a
11  complicated answer.
12  MR. BORANIAN:  We have a time limit
13  here.
14  MR. CIACCIO:  I understand that.
15  MR. BORANIAN:  You can't
16  filibuster.
17  Q.  The question is, when did the
18  county first experience the harm that you've
19  just described here for the last 45 minutes?
20  MR. CIACCIO:  And I think you are
21  using up time by making him restart his answer
22  every time.
23  Q.  So when?
24  A.  As I said, it's a complicated
25  issue.

Page 49

1  Q.  I don't think it is.  You listed in
2  your discovery response as early as 2006.  So
3  you're testifying for the county here, not as
4  the medical examiner's administrator.
5  MR. CIACCIO:  Outside.
6  Q.  The response starts in 2006.  The
7  question is, when did you first incur the harm
8  for which you are claiming damages in this
9  lawsuit?
10  MR. CIACCIO:  Outside the scope,
11  obviously.
12  MR. BORANIAN:  It is completely
13  within the scope.
14  MR. CIACCIO:  No.  You are using
15  the date the damages started as a date.  You
16  are confusing the two topics, and we didn't
17  write them but their -- but I can understand
18  why you are, but again, and I would ask, if you
19  just let him get the answer out, we probably
20  would have been moved on by now.
21  A.  So when we were able to get this
22  information and be able to look at the people
23  who were dying, look at their histories of
24  prescriptions, we started to find that about 75
25  percent of them had had prescribed opioids

13 (Pages 46 - 49)

Page 50

1  prior to their death.
2        There were discussions about this
3  in medical literature as well starting to come
4  out.  The work that the medical examiner's
5  office did was one of the first concrete
6  studies of linking heroin deaths to previous
7  prescribed opioids.  That helped inform the
8  work that we were doing in Cuyahoga County.
9        So while we knew that there were
10  issues, we knew that there were concerns that
11  we had about people dying from heroin
12  overdoses, now we were starting to see, kind
13  of, the genesis of the evolution of the crisis
14  that we were facing.  If you don't know all of
15  the factors, you may be trying to, you know,
16  stop one avenue and leave another one wide
17  open.
18        So then, I would say, 2016 is when
19  it became acute.  It was then obvious to us,
20  with all the other data we had, there was a
21  starting point to this that -- and the numbers
22  continued to hold up year after year.
23  Three-quarters of the people, roughly, give or
24  take percentage there, had prescription opiates
25  in their OARRS histories.

Page 51

1        So that is a big step in helping us
2  to try to design interventions.  When we met in
3  2013, we didn't have that information.  So the
4  things that we were designing didn't fully
5  address the full scope of the crisis.
6     Q.  Mr. Shannon, I didn't ask you when
7  you understood something, I didn't ask you
8  about your review of OARRS data.  If you don't
9  answer the question, we can ask for more time,
10  we can come back and do this again.  I would
11  rather not do that.
12        The question is, regardless of what
13  the county understood at the time, when did it
14  first incur harm resulting from the promotion,
15  marketing, distribution, dispensing, or
16  diversion of prescription opioids; when did the
17  harm first occur, based on what you know today,
18  as a representative of the county?
19     A.  Like I said, it's difficult to say
20  with any specificity.  I can only tell you when
21  we had access to information, that we were able
22  to connect those dots, that's when, you know,
23  we put things into motion to act, based on that
24  information.  I would say --
25     Q.  So would the county's -- the

Page 52

1  county's -- I'm sorry.  I thought you were
2  finished.
3     A.  That's all right.  I would just
4  say, my best guess is by 2016, we had had an
5  analysis of data that we had not previously had
6  to be able to make those links back to
7  prescription opioids and heroin use, and heroin
8  use became fentanyl use, and fentanyl use
9  became carfentanil use.
10     Q.  Is the county willing to stipulate
11  that it's not claiming damages for any harm
12  incurred before 2016?
13        MR. CIACCIO:  Objection.  Outside
14  the scope.  He's not going to answer that.
15  That's clearly topic 11.  Plus topic 10 is when
16  plaintiff became aware it was incurring the
17  harm.  So you are outside of the scope in
18  reframing topic 10, so he has been answering
19  the question.
20        The topic, I didn't write it, it
21  says, "Became aware it was incurring that
22  harm."  So you saying when did it suffer the
23  harm is a question that's not being asked in
24  10.
25        MR. BORANIAN:  Topic 10 is the harm

Page 53

1  that plaintiff has incurred.
2        MR. CIACCIO:  Sure.
3        MR. BORANIAN:  That's what I'm
4  asking about, including when it started.
5        MR. CIACCIO:  Then you say when
6  plaintiff became aware it was incurring that
7  harm.
8        MR. BORANIAN:  That's one thing
9  that we are asking about.  I want to know when
10  the harm started.
11        MR. CIACCIO:  That's not in the --
12        MR. BORANIAN:  We may have to come
13  back and ask him again.
14        MR. CIACCIO:  That's not part of
15  topic 10.  It doesn't say the harm incurred and
16  when that harm took place.  It just says the
17  harm, and then you specify when plaintiff
18  became aware it was incurring that harm.  He
19  still answered the question.  Either way, he's
20  answered his answer.  I'm just putting that on
21  the record that he is answering the question.
22        MR. BORANIAN:  The description is
23  illustrative.  It doesn't mean that I can't ask
24  him when the harm occurred, in addition to what
25  the harm is.

14 (Pages 50 - 53)

1     MR. CIACCIO:  Okay.
2     Q.   Mr. Shannon, is it the county's
3  position that the harm you described has been
4  incurred exclusively because of the marketing,
5  promotion, distribution, dispensing or
6  diversion of prescription opioids?
7     A.   That is the position of the county.
8     Q.   So it is your position
9  that -- well, the county had a sheriff's
10  department before there was a problem with
11  prescription opioids, right?
12     A.   Yes.
13     Q.   And the county had jails, right?
14     A.   Yes.
15     Q.   And the county had drug treatment
16  programs, right?
17     A.   Yes, they did.
18     Q.   And there were placements into
19  foster care and adoption before the current
20  problem, true?
21     A.   That's true.
22     Q.   Are you willing to say, is it your
23  position that none, zero percent of the
24  increased caseloads that you have described are
25  attributable to factors other than prescription

1  opioids?
2     MR. CIACCIO:  Objection to the
3  form.
4     A.   The harms that we have seen and the
5  actions that have needed to be taken are a
6  direct result from the overprescribing, the
7  overmanufacturing, the overmarketing, the
8  aggressive marketing tactics used that are
9  outlined of prescription opioids.  It created
10  the market that we now see that is now being
11  filled with illicit drugs as well.
12     Q.   The increase in caseloads that you
13  have described as the harm incurred by the
14  county, is 100 percent of that increase
15  attributable exclusively to prescription
16  opioids, the distribution, manufacturing,
17  dispensing, promotion, diversion, whatever the
18  topic says, of opioids, 100 percent?
19     MR. CIACCIO:  Object to the form.
20     Q.   Is that your position?
21     A.   That is the contention of the
22  county.
23     Q.   We have already bled over into
24  topic 12 a little bit, but let me ask you, Mr.
25  Shannon, what has the county done to address

1  the harm that you have just described, and you
2  don't need to repeat, it is not so rigid, you
3  don't need to repeat what we have already
4  covered.
5     For example the DAWN Program, the
6  messaging campaign you described, the
7  integrated data system, all the stuff that you
8  have already described, you don't need to go
9  over it again, but what else has the county
10  done to address the harm that you have just
11  described?
12     A.   So there are several task forces
13  that have been set up, the Opiate Task Force
14  and the board of health.  There are programs
15  run out of the ADAMHS Board.  We talked about
16  the treatment.
17     There are also housing issues.
18  ADAMHS Board works with people who are in
19  treatment to get them stable housing.  That is
20  important in the recovery process, to stabilize
21  that person's life.  Having, you know, housing
22  is an important piece of that.  We talked
23  about, I think, DAWN and all of the ancillaries
24  that have been added to it.
25     One of the other things that we do

1  with Metro's opioid safety office though is do
2  reviews of the fatalities, because they use
3  that to inform their medical staff about
4  prescriptions they may have been writing to
5  people who then subsequently have passed away
6  due to a drug overdose.
7     Again, the data is something that
8  we are -- that we think is very important.
9  It's why our website is filled with reports and
10  research.  Providing the community with a solid
11  foundation of information is important, all the
12  way down to the family level, to be able to
13  have them take more control, empower those
14  families to help those whose loved ones they
15  may have that are addicted.
16     The prevention messaging outside of
17  the media campaigns, I think we have had, like
18  I said, hundreds of volunteers go out and do
19  community forums, talks in schools.  We also
20  attend conferences, conferences both here in
21  the state, law enforcement, attorney general's
22  office, medical groups, but also we have been
23  invited outside of the state.  I believe that
24  the medical examiner was invited to El Paso to
25  talk at a training of their -- all their DEA

Page 58

1  agents.
2      People will think that they have an
3  understanding of what is going on.  They have
4  an understanding of what their piece is, but
5  how that piece fits into the larger picture is
6  something that we stress from the beginning,
7  the creation of the task force, that we were
8  not going to be able to do this as individuals,
9  that it was going to require a community
10  effort.
11      And being able to sit next to a
12  doctor and an officer and have a discussion and
13  hear the same information and have that
14  discussion take place better informs law
15  enforcement about the needs of the medical
16  community and vice versa.
17      So any opportunity to address in
18  public and inform is something that they have
19  done, I think, rather well and rather
20  aggressively.  We talked about the jail --
21      Q.  I'm sorry.  You paused.  I thought
22  you were finished.
23      But the question was going to be:
24  Is there anything else that the county has done
25  to address or reduce the harm that you have

Page 59

1  described?
2      A.  So we developed special protocols
3  for investigations.  That was done mainly with
4  law enforcement in mind, but as we went further
5  into it, it also helped inform us about how to
6  deal on the scenes with families.
7      A lot of times when families find a
8  loved one who has passed away, you know, their
9  first instincts aren't always the best, and
10  being able to get in there and talk to them
11  while it is still relatively, you know, at the
12  forefront of their minds about warning signs,
13  getting other people who in the family may be
14  in trouble, getting them into treatment, that's
15  important.
16      So a lot of the departments has now
17  also instituted programs like PAARI or quick
18  response teams where, when police are
19  responding to a scene of an overdose, either
20  fatal or nonfatal, especially if it is a
21  nonfatal, they are able to call and they will
22  get, you know, a specialist to come out with
23  EMS and talk to people about maybe the problems
24  that they are having with their addiction, do
25  they want treatment, do they need help.

Page 60

1      Often times they are able to place
2  them directly into an inpatient facility close
3  by.  We are now, kind of, trying to partition
4  off beds specifically for this program, so that
5  you don't have to wait.
6      A lot of times if you give somebody
7  a pamphlet and say, you know, call us if you
8  need help or, you know, it's Friday night, they
9  are open on Monday morning, this person could
10  be using again the next morning and be dead by
11  Monday morning.
12      So having access to treatment beds
13  is critically important for a program like
14  this.  They are able to get them off the
15  street, out of that environmental, that using
16  environment, and put them right into treatment.
17      That is still at its, kind of,
18  nascent stages, but it has been fairly popular
19  and successful to this point, and we are hoping
20  to be able to expand it.
21      Q.  What's the name of that program?
22      A.  There are a number of them.
23  Basically the quick response teams is what the
24  county specifically funded with the ADAMHS
25  Board, working with the Cleveland Police

Page 61

1  Department, to be able to put together those
2  teams of people who would respond and try to
3  get people into treatment.
4      Q.  So would people from the ADAMHS
5  Board and from the Cleveland Police Department
6  know more about those programs?
7      A.  They'll know specifics and details
8  of it, yes.
9      Q.  You mentioned a few minutes ago
10  ADAMHS programs, but you weren't specific.  You
11  mentioned maybe a housing program, but let's go
12  back to that.
13      Which ADAMHS programs were you
14  referring to when you said that ADAMHS programs
15  have been implemented to address or reduce the
16  harm?
17      A.  So the ADAMHS Board gets county
18  funding.  They also get funding through grants
19  and the federal government.  They will -- they
20  have a variety of treatment options for people,
21  medical-assisted treatments, inpatient and
22  outpatient, getting people placed in sober
23  housing for full detox.
24      It's case dependent, and I'm not a
25  specialist, so I couldn't give you what those

16 (Pages 58 - 61)

Page 62

1 criteria are.  They deal with that, but there
2 are a variety of treatment options that ADAMHS
3 provides.
4       MR. CIACCIO:  If you're done, we
5 are a little bit over an hour, so if we could
6 just take a couple minutes.
7       MR. BORANIAN:  Yeah.  Let me just
8 ask him another.  I'm going to wrap up in a
9 couple minutes, so...
10     Q.   What else has the county done, if
11 anything, to address or reduce the harm that
12 you have described, Mr. Shannon?
13     A.   As I said, there is a lot of people
14 doing a lot of work and...
15     Q.   You've described quite a lot, so I
16 just want to know if there is anything else?
17     A.   It is certainly not an exclusive
18 list at this point.
19     Q.   Well, you are here to testify on
20 this topic --
21     A.   I understand.
22     Q.   -- so I kind of need to know, out
23 of fairness, what we're dealing with.
24       So what other measures has the
25 county taken, if anything, to address or reduce

Page 63

1 the harm that you have described?
2     A.   There were extensive lobbying
3 efforts, both at state and federal levels, to
4 help craft legislation that would help address
5 the opioid crisis, to provide additional
6 dollars for treatment, to make the availability
7 of naloxone more widespread.
8       That required a lot of travel, a
9 lot of testimony, to be able to get proper
10 prescribing limits -- or guidelines.  There
11 were discussions with, again, CDC at the
12 federal level, as well as at the state level,
13 the department of health.  Those are ongoing
14 efforts.
15     Q.   I think we discussed the
16 prescription guidelines.
17       MR. CIACCIO:  We're going -- I'm
18 going to go take a break.  I gave you a couple
19 more, but we are well over an hour now, so we
20 are going to take a break.
21       MR. BORANIAN:  No, I'm taking the
22 deposition.  We'll take a break in about a
23 minute, okay?
24       MR. CIACCIO:  Are you forbidding a
25 break?

Page 64

1       MR. BORANIAN:  No.  I want to
2 finish the question I'm in the middle of
3 asking.
4       MR. CIACCIO:  I gave you a chance
5 to finish the question.  We are going to take a
6 break.  I don't really know what else to tell
7 you.  We're going to take a break.
8       MR. BORANIAN:  That's how you want
9 to play this, really, Joe?
10       MR. CIACCIO:  I'm just -- I'm just
11 asking for a break.  I don't usually ever tell
12 people no when they say -- especially over an
13 hour.
14       You don't have a question pending,
15 I allowed you to forbid the break a few
16 questions ago, now I want to take a break.
17       MR. BORANIAN:  Go ahead.  Take a
18 break.
19       MR. CIACCIO:  Thank you.
20       THE VIDEOGRAPHER:  Off the record,
21 10:13.
22       (Recess taken.)
23       THE VIDEOGRAPHER:  On the record,
24 10:25.
25     Q.   Mr. Shannon, has the county done

Page 65

1 anything else to address or reduce the harm we
2 have discussed, other than what we have already
3 talked about?
4     A.   So for several years, I believe
5 that the county has participated in Operation
6 Medicine Cabinet.  That's in conjunction with
7 the DEA.
8       They set up collection centers in
9 the county twice a year generally, to have
10 people go through their medicine cabinets, find
11 any of the unused prescriptions that they may
12 have and properly dispose them.
13       That kind of led to another program
14 that the sheriff's office and Judge Matia at
15 drug court instituted of drug drop boxes.
16 Basically, it looks like a big mailbox, but it
17 is for collecting drugs, and they have started
18 to place those in nearly all of the police
19 stations throughout Cuyahoga County and all the
20 communities, so you don't have to wait for a
21 drop-off day.  Any time that you have got them,
22 you can go to a safe place, a police station,
23 drop off your unused, unwanted drugs.
24     Q.   Anything else?
25     A.   It's so woven into the fabric of

17 (Pages 62 - 65)

Page 66

1 everyday life now, that almost everything that
2 we do, every time we get a case in.  You know,
3 we started alerts, so when somebody dies in
4 Cuyahoga County, the death management system
5 that Cuyahoga County Medical Examiner's Office
6 runs will create alerts, so the medical
7 examiner, myself, the investigators will know
8 that there is a fatality.
9       We are able now to specify those,
10 when there is evidence of opioid abuse, drug
11 abuse.  We have opened those alerts up to law
12 enforcement, prosecutor's office, other
13 investigators.  So now in realtime, they are
14 able to respond to drug scenes and start their
15 investigations earlier.
16       That was important, because they
17 would -- normally they would have to wait.  We
18 would get a body, we would do the toxicology.
19 Three, five weeks later, oh, it came back
20 positive for opiates.  Oh, well, we better do
21 an investigation.  Now, they are on the scene
22 when we know, starting their investigation.
23       Time is everything in the
24 investigation of these cases.  So it was a
25 great timesaver for their investigations.

Page 67

1       Q.    Are those alerts available online?
2       A.    No.  Those are, you know, part of
3 the confidential law enforcement investigatory
4 records.
5       Q.    Is there a log of those alerts
6 anywhere?
7       A.    There is.
8       Q.    And when did those alerts start?
9       A.    I believe we started in 2013.  I'm
10 not sure exactly what month.  I think it was
11 later in the year.
12       Q.    Okay.  Have we covered everything,
13 Mr. Shannon?
14       A.    Probably not.  I'm struggling to
15 try to find other things to tell you.  I want
16 to be thorough.  I know you are looking for as
17 much as I can remember, so...
18       Q.    Well, like I have said a few times,
19 you are designated on this topic, so this is
20 our chance to learn what it is that is at
21 stake.  If there is nothing else, doctor, I
22 will pass the microphone to a colleague of
23 mine.
24       A.    I'm not a doctor.  I don't even
25 play one on TV.

Page 68

1       Q.    That was a slip of the tongue.
2             Mr. Shannon, is there anything
3 else?
4       A.    Like I said, it's pretty much
5 normal, day-to-day, everything we do now is in
6 some way some kind of a response.
7       Q.    And we have covered all of that,
8 right?
9       A.    A lot of it, yes.
10             MR. BORANIAN:  Thank you for your
11 time.  We are going to switch seats.  I think
12 we will stay on the record and just switch
13 seats, if that's okay with you?
14             MR. CIACCIO:  Yeah, sure.
15             EXAMINATION OF HUGH SHANNON
16 BY MR. CARTER:
17       Q.    Good morning, Mr. Shannon.
18             My name is Ed Carter.  I have some
19 questions for you.
20       A.    Sure.
21       Q.    You are the county's designee to
22 testify on topics 23, 24 and 25, correct?
23       A.    That is correct.
24       Q.    Other than what you already
25 identified this morning, did you do anything

Page 69

1 specifically to prepare for those three topics?
2       A.    Not other than what I previously
3 talked about.
4       Q.    I want to talk about topic 24
5 first.  When did the county first warn the
6 public about the dangers of prescription opioid
7 abuse?
8             MR. CIACCIO:  Objection to form.
9       A.    So our communications, the county,
10 with members of the community about opioid
11 abuse.
12             Like I said, we had a summit in
13 2013, where we started to discuss, kind of, the
14 tactics and responses that we needed to make as
15 a community.  There had been some individual
16 agencies who had been working, you know, for
17 years talking about drug addiction and things
18 like that, but as it became more acute, the
19 problem became more acute, and especially when
20 we got access to OARRS and we were able to,
21 kind of, trace it all the way back about what
22 maybe the foundational issues were, we started
23 scheduling people to go out into the community
24 to talk to schools, to talk to community
25 groups.

Page 70

1    I would say that that, after the
2  summit in late 2013, that effort began in
3  earnest the next year, but it's been an ongoing
4  process, an ongoing discussion with the
5  community.  We often got asked by council
6  members in municipalities or the mayor or
7  police chief, any number of sources will
8  request somebody to come out and talk to them
9  about the dangers of prescription opioid use
10  and how it leads to other problems, like heroin
11  and fentanyl.
12    Q.   I appreciate that, and hopefully
13  that will streamline some of my other
14  questions, but if you can do your best to
15  concentrate on my question, which the first one
16  was simply when, and I think you told me 2013,
17  your best estimate of when the county first
18  warned the public about the first dangers of
19  opioid abuse?
20    MR. CIACCIO:  Objection to form.
21    A.   The opioid task force and the board
22  of health had met previous to that.
23    Q.   When?
24    A.   I think they had been in existence
25  since 2010, but that was mainly people who were

Page 71

1  working within, kind of, the treatment
2  communities, talking directly with each other.
3  I believe they did have a summit similar in
4  2012 that preceded the one that I was talking
5  about.
6    So there is a difference.  The
7  Opiate Task Force is run out of the county
8  board of health.  The U.S. Attorney's Office
9  task force was created, like, the next year,
10  but I would say 2014 is a good starting point,
11  as far as, kind of, that regular community
12  dialogue.
13    Q.   So regular community dialogue,
14  2014, is your best estimate.
15    Is 2010 the first year that any
16  county official or county organization alarmed
17  the public about the risks of opioid abuse?
18    A.   I'm not aware that there was a
19  specific warning given to the community before
20  that.
21    Q.   Before 2010?
22    A.   Before the summit in 2013.
23    Q.   Okay.  So in terms of actually
24  communicating with the public, the first time
25  you are aware of that is the summit in 2013?

Page 72

1    A.   Correct.
2    Q.   Okay.
3    A.   And to be clear -- I'm sorry.
4    So again, that summit was focused
5  on heroin abuse, which is an opiate.  We didn't
6  make the connection about prescription opioids
7  until we had access to OARRS a few years later.
8    Q.   And that's a good point.  Opioid is
9  a broad term that includes illegal substances
10  and prescription substances, correct?
11    A.   It can be used that way, yes.
12    Q.   So your answer to the broad
13  category of opioids generally is what you
14  previously stated, and that first summit you
15  just clarified, 2013, was focused on illicit
16  heroin, correct?
17    A.   Correct.
18    Q.   So if we focus on the subset,
19  prescription opioids, legal prescription
20  opioids, when was the first time the county
21  communicated with the public about the risks of
22  prescription opioid abuse?
23    A.   As I said, I believe that the
24  county board of health's Opiate Task Force had
25  a summit the year previous.  I'm not sure of

Page 73

1  the exact date, but it was sometime in 2012.
2    Q.   And anything prior to that focused
3  on prescription opioids, in terms of the county
4  communicating those dangers to the public?
5    A.   Not that I'm aware of.
6    MR. CIACCIO:  Objection to the
7  form.
8    Q.   In 2006, did the county have
9  overdose death data that indicated the causes
10  of deaths?
11    A.   The medical examiner's office and
12  the coroner's office at the time had causes of
13  death, yes.
14    Q.   And they shared that, as a county
15  organization, they shared that with the county,
16  that wasn't segregated or limited to the
17  medical examiner, right, they shared that with
18  the county?
19    MR. CIACCIO:  Objection to form.
20    A.   So the coroner's office produces a
21  statistical report every year, and that data is
22  contained within that report.
23    Q.   So in 2006, the county knew the
24  number of deaths that had been certified by the
25  coroner as caused by prescription opioids,

19 (Pages 70 - 73)

Page 74

1  correct?
2      A.   I believe so, yes.
3      Q.   And did the county sound the alarm
4  regarding those prescription opioid deaths that
5  the medical examiner had certified in 2006?
6          MR. CIACCIO:  Objection to form.
7      A.   I'm not sure I understand what you
8  are looking for.  Would you repeat the
9  question.
10     Q.   Sure.  At the end of 2006, when the
11  coroner had processed all the overdose death
12  cases for that year and they saw whatever the
13  number was for the category of prescription
14  opioids --
15     A.   Sure.
16     Q.   -- did anyone at the coroner's
17  office or the county sound the alarm, based on
18  those number of deaths that they had identified
19  for 2006?
20         MR. CIACCIO:  Objection to form.
21     A.   I guess my question is, you know,
22  "Sound the alarm."
23     Q.   Okay.  Did they notify the public,
24  did they warn the public, did they identify a
25  problem that needed corrective action?

Page 75

1          MR. CIACCIO:  Objection to form.
2  Compound.
3      A.   At that time, I don't believe that
4  there was any action taken outside of the
5  reporting that we have done throughout the
6  years in our statistical reports.
7      Q.   Did the coroner's office and the
8  county treat the number of overdose deaths that
9  they certified in 2006 attributable to
10  prescription opioids as a number that was
11  not -- that did not justify a community
12  notification?
13         MR. CIACCIO:  Objection to form.
14     A.   I would have to go back and look at
15  previous years' data to see if it had made any,
16  you know, statistical jumps.  It had been
17  pretty steady, if I'm -- at least for the data
18  that I'm familiar with, it had been a steady
19  number for many years.  So I don't think
20  anything from a statistical standpoint stood
21  out.
22         Obviously the work that the
23  coroner's office, now the medical examiner's
24  office does, in any of these cases, these kind
25  of deaths that we know are avoidable, it is

Page 76

1  unfortunate, but I don't think anything stood
2  out about that particular number, that
3  particular year.
4      Q.   So there was nothing about that
5  particular number in 2006 that stood out as
6  outside the norm or that was putting a
7  particular stress on the medical examiner's
8  office or the county; is that fair?
9          MR. CIACCIO:  Objection to form.
10  Outside the scope.  You are saying this is
11  under topic 24, communications between
12  plaintiff?
13         MR. CARTER:  Yes.
14         MR. CIACCIO:  Whether data in 2006
15  stood out to the medical examiner's office --
16         MR. CARTER:  Absolutely.
17         MR. CIACCIO:  -- is under
18  communications between the plaintiff?
19         MR. CARTER:  Absolutely.
20         MR. CIACCIO:  Okay.  Objection,
21  outside of the scope.  Objection to form.
22     A.   I'm not aware that any additional
23  action was taken, therefore, I can only assume
24  that they didn't see a need at that time.
25     Q.   Now, the county, if the county had

Page 77

1  noticed a stress on the systems or an increase
2  in burden or some kind of statistical outlier
3  in those number of deaths, would the county
4  have sounded the alarm and notified the public?
5          MR. CIACCIO:  Objection to form.
6  Objection, Compound.  Objection, outside the
7  scope.
8      A.   I'm not sure I can answer that.  I
9  know I'm supposed to be talking about this
10  topic, but in 2006, I wasn't there.  It was a
11  different time.  They didn't do it.
12         I can't speculate as to what they
13  may or may not have done with other
14  information, other data.
15     Q.   So the bottom line is, in 2006, as
16  a representative of the county, no
17  communication identifying a specific issue with
18  respect to prescription opioids, true?
19         MR. CIACCIO:  Objection to the
20  form.
21     A.   So now that's changed.  Any issue?
22     Q.   I don't intend to change it, so let
23  me reask it a different way.
24         2006, no communications sent to the
25  public by the county, based on the number of

20 (Pages 74 - 77)

1  prescription opioid deaths that they had
2  identified in that year?
3      A.   Not that I'm aware of, no.
4      Q.   And same answer for 2007?
5      A.   Again, not that I'm aware of, no.
6      Q.   Same for 2008?
7      A.   I don't have any record of specific
8  special communications that were done at the
9  office of the coroner at that time.
10     Q.   And just to be clear, my question
11 is the county as a whole.
12     A.   Right.
13     Q.   So is your answer different, did
14 the county have any communications, specific to
15 prescription opioid deaths, in 2006, 2007,
16 2008?
17     A.   Not that I'm aware of, no.
18     Q.   Did they have any of those
19 communications prior to the time period you
20 estimated for me earlier, in terms of that
21 first task force that was focussed on
22 prescription opioids in 2012?
23     A.   Any communications?
24     Q.   Yes.  Identifying for the public --
25     A.   Or communications for the public,

1  okay.
2      Q.   Communications for the public.
3      A.   I have not been made aware of any,
4  no.
5      Q.   Now, as a responsible county, if
6  the county was aware of a problem, is that
7  something they would have shared with its
8  citizens?
9           MR. CIACCIO:  Objection to form.
10     A.   So I'm sorry.  It's confusing me a
11 little bit.  So you keep jumping back between
12 awareness and alert and alarm.
13     Q.   Right.
14     A.   So certainly the forensic
15 scientists and the forensic pathologists within
16 that office, at that time, were certainly aware
17 that there were issues with prescription
18 opiates and opioids, and that they were
19 contributing to fatalities that were coming to
20 that office.
21          Whether that awareness had reached
22 critical mass that it was necessary or deemed
23 necessary to alert or alarm, raise the alarm,
24 as you were saying before, raise the alarm with
25 the public, is a different question.  So that's

1  why I keep going back to that --
2      Q.   Let me ask --
3      A.   -- to make sure I'm answering your
4  question properly.
5      Q.   Let me ask it this way:  The county
6  had the data available to it that it did, and
7  the county leadership, in analyzing the data
8  that was available in 2006, 2007, 2008, 2009
9  and 2010 and 2011, in looking at what they saw
10 in the community and in their data, did the
11 county leadership make the policy decisions at
12 any point that they needed to communicate with
13 the public regarding the specific harms of
14 prescription opioids?
15          MR. CIACCIO:  Objection to form.
16     A.   So at the outset of your datasets,
17 2006 to 2010, I'm not aware of any.  I know
18 that by 2010, the state had started to take
19 action, had issued reports, which is the
20 foundation for the creation of the county board
21 of health's Opiate Task Force.
22          So as I said, the difference
23 between the awareness of a problem and it
24 reaching the point where they had to raise the
25 alarm are different, but they hadn't done it, I

1  don't believe, at that point.  I don't have any
2  information that says that they did.
3      Q.   Okay.  Now, I want to focus back to
4  the other aspect of the opioid category that we
5  described earlier.  I want to talk about
6  illicit opioids now, and I want to start with
7  heroin.
8           Over the last seven years, going
9  back to 2011, is it true there have been more
10 cases where heroin was listed as the official
11 cause of death than any prescription opioid?
12          MR. CIACCIO:  Objection.  Outside
13 the scope.  Again, you are saying this falls
14 under topic 24?
15          MR. CARTER:  It does, and if you
16 would keep your objections to within the
17 deposition protocol.  Scope is not a form
18 objection, so don't make it.
19          MR. CIACCIO:  In a 30(b)(6)
20 deposition you can object to outside the scope.
21 I don't care --
22          MR. CARTER:  It doesn't mean
23 anything because it's a deposition designation
24 argument.
25          MR. CIACCIO:  Okay.

21 (Pages 78 - 81)

Page 82

1     MR. CARTER:  Let me ask my
2 question, or we're going to ask for more time,
3 I'm asking --
4     MR. CIACCIO:  I can ask you what
5 topic you are asking about.
6     MR. CARTER:  And I'm asking in 24,
7 and if you let me go, you will see I'm asking a
8 factual predicate for my next question.
9     MR. CIACCIO:  Okay.
10    Q.   Over the last seven years, has the
11 county had more deaths certified for heroin
12 than prescription opioids?
13    MR. CIACCIO:  Objection to form.
14    A.   Are you asking over that entire
15 span?
16    Q.   Yes.
17    A.   Because there are individual years
18 where it wasn't, but I would say yes, that is
19 right, if you are taking it in aggregate.
20    Q.   And based on those seven years, has
21 the county communicated with the public that
22 they are facing a heroin crisis?
23    MR. CIACCIO:  Objection to form.
24    A.   Yes, we have.
25    Q.   And when was the first time that

Page 83

1 you communicated to the public that there was a
2 heroin crisis; was that that 2013 task force?
3    A.   No.
4    Q.   When was it?
5    A.   The medical examiner talked to the
6 county executive over the summer of 2012, late
7 summer, as we were starting to assemble data,
8 and I believe they had a press conference in
9 September of 2012.
10    Q.   Okay.  And what was the response
11 from the community to the county leadership?
12    A.   The response?
13    Q.   Yes.  How did they respond to the
14 county's announcement?
15    MR. CIACCIO:  Objection to form,
16 and objection, outside the scope.
17    A.   I'm not sure I was in a position to
18 assess the response.  I'm sure there were
19 responses.  Obviously, at that time, the county
20 ADAMHS Board was seeing more cases, board of
21 health was, you know, referring people to
22 treatment.  Obviously, you know, crime was
23 increasing, jails were getting full.  So there
24 were touches, but I wouldn't say that there
25 was, like, a formal community response.

Page 84

1    Q.   You mentioned earlier today, and I
2 wrote it down, correct me if I've missed any,
3 you said that the county and the ADAMHS Board
4 embarked on a number of media campaigns, you
5 also identified billboards, videos, things like
6 that, school-based prevention and messaging,
7 right?
8    A.   Yes.
9    Q.   So with that large bucket, then I
10 will follow up on individuals, when was the
11 first time that one of those media campaigns, a
12 billboard, a video or a school-based prevention
13 messaging, was rolled out with respect to
14 heroin?
15    A.   I think it was right after the
16 summit, maybe early 2014.
17    Q.   What topics related to opioid abuse
18 has the county taken out a billboard for?
19    A.   I'm not sure that that got that
20 specific.  There were, you know, general
21 messaging about the dangers of prescription
22 opioids, the dangers of using drugs.
23    Q.   Do you recall any specific
24 billboard messages on the topic of opioid
25 abuse?

Page 85

1    A.   Well, the Know Your Rx campaign
2 that the county did, I think, in 2016, there
3 was -- it was more visual.  Somebody inside a
4 large prescription pill bottle, and that
5 campaign was designed, Know Your Rx, know what
6 your doctor is prescribing you, know, you know,
7 that you can say no, what are patients' rights,
8 those kind of things, were the general themes.
9 I don't know if I could point to any specific
10 billboard.  The visual, for sure, stands out.
11    Q.   How many different ad executions in
12 the billboard format did the county take out
13 regarding opioid abuse?
14    A.   That information, I don't have
15 specific numbers for you.
16    Q.   Do you know the locations of any
17 billboard that the county put out regarding
18 opioid abuse?
19    A.   The specific locations, I'm sure we
20 can track that down.  I do not have those for
21 you at the moment.
22    Q.   Do you know who designed or came up
23 with the idea for the billboard communications?
24    A.   The Know Your Rx campaign was, kind
25 of, a joint effort, and then I believe they got

22 (Pages 82 - 85)

Page 86

1  some pro bono work from ad agencies.  I know
2  some other efforts, we had asked, you know, the
3  local media stations, sometimes they, kind of,
4  put their own together.  They do a PSA on their
5  own.
6       The billboard campaign for ADAMHS
7  Board that was done last year, I don't know the
8  name of the ad agency that they used.
9     Q.  With respect to other forms of
10  media, let's stick with print, so in
11  newspapers, magazines, fliers, any kind of
12  print media, what was the first time when there
13  was a media, a print media campaign related to
14  opioid abuse?
15     A.  So again, I think when we reached
16  out to local media, like Cleveland.com would
17  tell us what they were willing to be able to
18  put in.  I don't know that we were spending a
19  whole lot of money to purchase ad space.  So I
20  believe some of that was done in 2014, the Know
21  Your Rx they were participating in.  That was,
22  I believe, in 2016.
23       The ADAMHS Board has done it over
24  the years, again, general messaging about their
25  programs for getting people into addiction

Page 87

1  treatment.
2     Q.  Let me ask a broad question to see
3  if it will streamline.  With respect to all of
4  these types, we have been talking about
5  billboards, printed media, you mentioned
6  online.  I want to incorporate school-based
7  prevention and any TV ads, which we haven't
8  talked about.  Did any of those media efforts
9  go into effect prior to approximately 2014?
10     A.  I don't believe so.  ADAMHS Board,
11  like I said, they have always advertised, in
12  some form or fashion, access to treatment.  I
13  think it just intensified after that time
14  period.
15     Q.  All right.  I want to talk about
16  TV.  Has the county run TV spots, communicating
17  regarding opioid abuse?
18     A.  I believe that was part of the Know
19  Your Rx campaign.
20     Q.  Any other TV campaigns that you can
21  identify?
22     A.  Not that the county initiated.  I
23  believe, you know, ADAMHS had done radio in the
24  past, and they also did bus signs, but nothing,
25  I don't believe, on TV.

Page 88

1       When we reached out to local media,
2  again, a lot of them did their own PSAs.  The
3  one that sticks out in my mind is WKYC, Monica
4  Robbins, their health reporter did a piece.
5  She was very involved.  So they did a special,
6  you know, and I believe they actually edited it
7  and cut it down to be able to distribute to
8  schools.
9     Q.  So the only one that you are aware
10  of that the county is responsible for was that
11  Know Your Rx campaign?
12     A.  I believe so.
13       MR. CIACCIO:  Objection to form.
14     Q.  And that's on the TV?
15     A.  Correct.  I believe so, yes.
16     Q.  It was also on billboards, as you
17  indicated.
18       With respect to the ADAMHS Board,
19  they also had radio spots?  Is that a yes?
20     A.  Yes.
21     Q.  Was that related to Know Your Rx,
22  or were there additional radio campaigns?
23     A.  No.  That was previous.
24     Q.  When did the radio spots from
25  ADAMHS Board start?

Page 89

1     A.  I believe they have been using
2  those for several years.  I'm pretty sure that
3  it predated that 2014 date we were talking
4  about.
5     Q.  Sitting here, as the representative
6  of the county, can you be any more specific
7  with your estimate, or is that the best you can
8  do?
9     A.  At this point, I think that's the
10  best I can do.
11       MR. CIACCIO:  Object to the form.
12     Q.  In terms of the county's media
13  efforts, put them all together, radio, TV,
14  internet, billboard, all of the things you have
15  discussed, as well as the school intervention
16  program, have those media efforts been
17  effective?
18       MR. CIACCIO:  Objection to form.
19     A.  I guess I would need to know more
20  about what we consider to be effective.
21     Q.  And that's what I'm trying to
22  figure out.  So does the county do anything to
23  audit or evaluate the efficacy of its
24  communications to the public regarding opioid
25  abuse?

23 (Pages 86 - 89)

Page 90

1        MR. CIACCIO:  Objection to form.
2      A.   I don't believe so, no.
3      Q.   So you're not aware of any county
4   communication where there has been data or any
5   kind of metric to evaluate quantitatively
6   whether it has been effective?
7      A.   I know that they do track social
8   media, so when there is an event, a public
9   event, they will try to track that, and they're
10  pretty good about keeping stats on social
11  media.
12        As far as, you know, radio, TV,
13  billboards, not that I'm aware of, that we do
14  anything like that.
15     Q.   So social media, similar to any
16  other advertising, you know, a TV station can
17  provide viewership estimates, a radio broadcast
18  can say this is how many listeners we have and,
19  I guess, on social media you can see page views
20  or likes or people that, you know, forward
21  something.
22        Other than just tracking eyes or
23  ears on a particular media message, anything to
24  actually measure whether it's resulting in a
25  positive impact?

Page 91

1      A.   Is that a question?
2      Q.   Is there anything the county does
3   to figure out not just viewership or exposure,
4   but whether it's actually having an impact in
5   its messaging?
6      A.   I'm not aware of, no.
7      Q.   Do you think that that would be a
8   good thing that the county should do, is
9   measure the efficacy of its communications so
10  that it can be as effective as possible with
11  its communications regarding opioid abuse?
12        MR. CIACCIO:  Objection.  This is a
13  30(b)(6) deposition.  You're asking him his
14  personal opinion about what the county should
15  be doing.
16     Q.   Okay.  I want to be clear on this.
17  I don't want your personal opinion.  I want --
18        MR. CIACCIO:  So you're asking does
19  the county think it's a good idea to do
20  something?
21     Q.   Yeah.  I want the county's policy.
22  Does the county have a policy, is the
23  county -- how does the county intend to ensure
24  that it uses its opportunities to communicate
25  as effectively and as impactfully as possible?

Page 92

1        MR. CIACCIO:  Objection to form.
2      A.   I would have to have further
3   discussion with the communications director
4   about that.
5      Q.   Did you have communications with
6   the communications director in preparation for
7   the deposition?
8      A.   I did not.
9      Q.   All right.
10        MR. CIACCIO:  Sorry.  I had a
11  objection that didn't show up.  I don't know if
12  it matters.
13        MR. BORANIAN:  You can have a late
14  one.  That's fine.
15     Q.   From 2011 to 2018, has the county
16  had more deaths attributed to illicit fentanyl
17  than prescription opioids?
18     A.   Undoubtedly.
19     Q.   And has the county had
20  communications to the public regarding the
21  abuse of illicit fentanyl?
22     A.   Yes.
23     Q.   Do those start in the same general
24  timeframe that we talked about with respect to
25  heroin, that after the summit --

Page 93

1      A.   No, it doesn't.  The fentanyl
2   supply in the local drug supply didn't show up
3   until a few years later.
4        The evolution of the crisis, we saw
5   at the end of 2014, it became a little more
6   regular in 2015.  2016 it basically flooded the
7   market.  That's when overall drug deaths
8   doubled countywide, and that's when, really,
9   almost every single outlet at any agency that
10  was addressing this got overwhelmed.
11     Q.   So what media did the county use,
12  billboards, radio, TV, school interventions,
13  the internet, what did the county utilize to
14  get out the message regarding fentanyl abuse?
15     A.   Well, there are a number of -- the
16  Know Your Rx was obviously going on at the same
17  time that this was happening.  The medical
18  examiner's office would often put out alerts
19  when there were specific dangers known to the
20  public.
21        A number of times there were law
22  enforcement interventions that interdicted
23  pills that looked like prescription opiates
24  that actually ended up being fentanyl.  I felt
25  that that was a clear and present danger to the

24 (Pages 90 - 93)

Page 94

1  public health and safety, that we would do
2  alerts at that time, or press conferences,
3  something to make sure that the community was
4  aware.
5        We also embarked again, all ongoing
6  were these visits to schools, to community
7  groups.  That never stopped, it intensified,
8  but that was an ongoing communication.
9        Q.  What -- sorry?
10       A.  Sorry.
11       Q.  Go ahead.
12       A.  We did reach out into schools and
13  ask them to identify student leadership.  They
14  came, and we did intensive work with students
15  to go back to their schools, to take messaging
16  back to their peers to talk about the dangers
17  of opioids and illicit drugs.  That was, I
18  believe, also in 2016.
19       Q.  Does that complete your answer?
20       A.  No, there's more.  And we talked
21  about the ADAMHS Board.  The billboard campaign
22  was last year.
23       Q.  And that was the Know Your Rx?
24       A.  No.  That was separate from Know
25  Your Rx.  They had their own billboard

Page 95

1  campaign.
2        Q.   And what was the messaging on that?
3        A.   Again, more general treatment.  It
4  was actually a little -- it grew as it went,
5  the general options for treatment, but it also
6  was trying to inject more positive messaging
7  about treatment works, recovery is possible.
8  You know, that was the general theme for last
9  year's.
10       Q.   In its communications regarding
11  opioid abuse, has the county ever given the
12  community the message that addictions can't be
13  broken or that treatment will not be effective?
14       A.   No, that I'm aware of.
15       Q.   Did they send the opposite message?
16       A.   I believe we always try to tell
17  people that treatment is your best option and
18  that it's possible.  When we do speaking
19  engagements, we often employ people who have
20  recovered, especially young people, to show
21  them, you know, that it's possible, that there
22  is hope.
23       Q.   With respect to the school
24  interventions that you described a moment ago,
25  in the context of illicit fentanyl, did that

Page 96

1  programming to the schools focus on illicit
2  drugs, or did it describe prescription drugs?
3        A.   They talked about -- both are
4  talked about, in conjunction.
5        Q.   Are there pamphlets or, you know,
6  written literature or video presentations that
7  were utilized in those school interventions?
8  In other words, is there kind of like a
9  standard programming set of material that the
10  county uses?
11       A.   I don't think there is a standard.
12  It depends on who the speaker is.  I know, you
13  know, you will get one message from a judge,
14  you will get a different one from the medical
15  examiner.  Like I said, we had hundreds of
16  volunteers literally going out dozens of times
17  a week to talk to thousands of people.
18        So the bottom line messages are
19  always, you know, don't start, if you have
20  started, do what you can to stop, we can help
21  you get into treatment, here are the signs.
22        If you are going to continue to
23  use, you know, you have to be safe, get
24  naloxone, get fentanyl test strips, don't use
25  by yourself.  You know, there are general

Page 97

1  messages.  I don't know that there is a
2  standard package.
3        Q.   You mentioned medical examiner's
4  office alerts.  What's the audience of those?
5        A.   Which alerts are you talking about?
6        Q.   The ones that would have been sent
7  in the 2016 and forward timeframe related to
8  illicit fentanyl.
9        A.   They go into the general media.
10       Q.   Print media?
11       A.   They are included, yes.
12       Q.   Do they make it onto broadcast
13  media?
14       A.   Often times, yes.
15       Q.   With respect to all of these, the
16  county campaigns via broadcast, the billboards,
17  the school interventions, does the county incur
18  any costs in making those media messages?
19       A.   I'm sure they do.  I mean, the
20  staff time alone is a cost, but...
21       Q.   Let me --
22       A.   I'm not sure there a is a specific,
23  you know, charge for broadcast.  There is some
24  of that.  ADAMHS Board certainly pays for their
25  billboard placements.

25 (Pages 94 - 97)

1    Q.   Do you know the costs of any media
2  space that the county has incurred in its
3  messaging regarding opioid abuse?
4    A.   I don't have any specific numbers,
5  no.
6    Q.   Over the last seven years, have
7  there been -- well, not seven years.
8        Since 2016, has there been the
9  arrival and a number of overdose deaths
10  attributable to carfentanil?
11   A.   Yes.
12   Q.   Has the county messaged to the
13  community regarding carfentanil?
14   A.   Yes.
15   Q.   Anything different about the
16  carfentanil messaging than what you just
17  described related to illicit fentanyl
18  generally?
19   A.   They are both extremely dangerous,
20  but carfentanil is much more powerful.  So our
21  sense of urgency, I think, at those times, when
22  we know that it's present in the supply, the
23  sense of urgency is greater, I think.
24   Q.   Okay.
25   A.   I don't think there is a specific

1  different message, other than to identify when
2  we know carfentanil is in play.
3    Q.   All right.  And just to be clear,
4  with respect to illicit fentanyl messaging,
5  carfentanil messaging, the school intervention,
6  the medical examiner alerts, for any of those,
7  does the county do anything to audit or
8  evaluate those communications, from a data
9  standpoint, to measure the efficacy of those
10  interventions and media campaigns?
11   A.   I'm not sure.  I did not prepare
12  for that particular question, no.
13   Q.   All right.  On topic 23, I want to
14  focus on a subportion of that, because you have
15  already discussed some of those other aspects.
16  I want to focus on task force, program, working
17  groups, committees or other organizations
18  dealing with opioid prescribing first.
19       So can you identify any such
20  organization that the county has been involved
21  in related to opioid prescribing?
22   A.   Well, as I said, the Cuyahoga
23  County Board of Health's Opioid Task Force that
24  was created did talk extensively about opioid
25  prescribing issues.

1        When the U.S. Attorney's Task Force
2  was created, leading up to that summit in 2013,
3  there were extensive discussions about opioid
4  prescribing guidelines, whether what had
5  currently existed in the OAC, the Ohio
6  Administrative Code, was sufficient.
7        Mainly the medical people in the
8  room were talking about whether or not -- how
9  to balance between putting more strict
10  guidelines on prescribing and whether it would
11  affect how they are treating their patients.
12  They talked about the complications with the
13  pain management guidelines that they were
14  working under, the H-CAP scores, because it had
15  been several years where, you know, identifying
16  pain as the fifth vital sign was, kind of,
17  common practice, and that was always part of
18  the discussion about the prescribing
19  guidelines.
20   Q.   All right.  Are there any other --
21  I'm sorry.
22   A.   I'm sorry.
23   Q.   I was just focused on the names of
24  any groups or organizations, other than what
25  you just mentioned, any other task force

1  committee program, working group, that was
2  organized to address opioid prescribing
3  specifically?
4    A.   So the U.S. Attorney's Task Force,
5  as we were preparing for that summit, they
6  decided to break down into working groups.  So
7  there was one for health policy and data, and
8  so health policy, kind of, encompassed, in more
9  detail, and a lot of the medical people who
10  were involved with the task force, kind of,
11  aggregated to that, that working group, to talk
12  it out in more detail.
13   Q.   Other than that, is there any other
14  separate group, outside that group or the task
15  forces, any other separate entity focused on
16  opioid prescribing?
17   A.   Well, there has always been, you
18  know, law enforcement task forces for various
19  issues that would pop up.
20       And so there were obviously
21  investigations for people who were prescribing
22  opioids, if they were not following guidelines,
23  if they were outside of the medical practice,
24  normal medical practice.
25       So I would probably include some of

1  those task forces, those law enforcement task
2  forces that were investigating prescribing.
3     Q.   Anything else you can identify
4  focused on prescribing?
5     A.   So often times, a lot of this, kind
6  of, runs together.  We didn't really pull it
7  apart.  When they were addressing the opioid
8  crisis, we talked about all of these things in
9  conjunction.
10     Q.   All right.  Any group in topic 13
11  that not -- you know, as part of general
12  discussions, but that was specifically charged
13  and focused on the promotion and marketing of
14  prescription opioids?
15         MR. CIACCIO:  You said 13.  You
16  mean 23, right?
17     Q.   If I said 13, I meant 23.  So I'll
18  reask the question.
19         Any group in topic 23 that's
20  focused on promotion or marketing of
21  prescription opioids?
22     A.   At the county level?
23     Q.   Yes.
24     A.   I don't believe anybody at the
25  county level would be charged with that.

1     Q.   Topic 25, can you provide me with
2  the names of all the doctors that the county
3  officials reported to board of medicine, board
4  of pharmacy, local law enforcement or the DEA?
5         MR. CIACCIO:  Objection to form.
6  Objection, outside the scope.
7     A.   I can't give you specific names,
8  no.
9     Q.   Did the county report any
10  physicians to the board of medicine?
11     A.   There were a few, at least, that I
12  can recall that that took place, yes.
13     Q.   Can you give me the approximate
14  number?
15     A.   Again, there are investigations
16  that the county does that I'm not involved in
17  personally, and in preparation, we had brief
18  discussions over general topics, not specifics.
19         So the ones that I'm personally
20  aware of in my role at the medical examiner's
21  office would not be a complete rendering of --
22     Q.   All right.
23     A.   -- of that question.
24     Q.   So your best testimony for the
25  county, sitting here today, is that there were

1  a few, I think is what you said, a few that
2  were reported to the board of medicine, but you
3  can't give me a more specific estimate or
4  identify any names, sitting here today; is that
5  fair?
6         MR. CIACCIO:  Objection to form.
7     A.   That's fair to say at this time,
8  yes.
9     Q.   Board of pharmacy, did the county
10  ever report a physician to the board of
11  pharmacy?
12     A.   No.
13     Q.   Did the county ever report a
14  physician to local law enforcement related to
15  prescription writing for opioids?
16     A.   Again, as the county is local law
17  enforcement, I'm not fully informed about what
18  investigations were or are taking place.
19     Q.   Okay.  So sitting here today as the
20  county's representative, in terms of the number
21  of physicians investigated, how they were
22  referred within the county system to the local
23  law enforcement, the identity of any of those
24  individuals who were investigated, that's not
25  something you are able to give me with

1  specificity?
2         MR. CIACCIO:  Objection to form.
3  Outside the scope.
4     A.   Yeah, not with any specificity, no.
5     Q.   Can you identify -- well, strike
6  that.
7         Did the county refer any physicians
8  to the DEA related to their prescribing
9  practices for opioids?
10         MR. CIACCIO:  Objection to form and
11  outside the scope.
12     A.   Again, the answer is the same.
13     Q.   Well, there have been a couple
14  different ones.
15         Were there any reported, or is it
16  something you aren't prepared to discuss today?
17         MR. CIACCIO:  Objection to form and
18  outside the scope.
19     A.   So you are asking me if the county
20  reported any physicians.  We would often get
21  inquiries from local law enforcement about
22  physicians.  We would respond as we could.
23         We have certain restrictions on us,
24  at the medical examiner's office, about what we
25  can and can't use OARRS for.  OARRS has its own

Page 106

1   set of guidelines.  What we would tell law
2   enforcement, who was making inquiries about
3   specific physicians, is give us a list of
4   patients, and we can cross-reference them with
5   any of the people who have died, that we've
6   identified had died from an opioid or a heroin
7   or fentanyl overdose.
8         That was the more common
9   communication.  Otherwise, I would say I'm
10  not -- I'm not fully aware of all law
11  enforcement investigations that were taking
12  place.
13      Q.   Okay.  And so without getting
14  further into the why, just on the simple
15  question of did the county report officials and
16  refer them to the DEA related to opioid
17  prescribing practices, what is your practice?
18      MR. CIACCIO:  Objection.  Your
19  question says officials.  That's not part of
20  the --
21      Q.   We will get rid of the word
22  officials.  The county, however they want to
23  define it, did the county refer any physicians
24  to the DEA for their prescribing practices?
25      A.   I can't speak to that.

Page 107

1       Q.   Okay.  When you mentioned that
2   there were some referred to the board of
3   medicine, when was the first year that the
4   county reported any physician to the board of
5   medicine related to opioid prescribing?
6       A.   I couldn't say with any
7   specificity.  It has been going on for years.
8       Q.   Okay.  Does the county have any
9   coordination agreements, any formal
10  relationships with other jurisdictions, in
11  terms of addressing the opioid abuse issue?
12      A.   Other jurisdictions?
13      Q.   Other counties, other states, do
14  you have any partners outside of Cuyahoga
15  County, in terms of geographic jurisdictions
16  that you partner with on a regular basis?
17      A.   But informal agreements?
18      Q.   We will start with any agreements,
19  and then I will ask you whether they are formal
20  or informal.
21      A.   All right.  Yes.  So first off, the
22  medical examiner's office's does autopsies for
23  about a dozen of the surrounding counties.
24  That work is under contract.  That's a formal
25  agreement.

Page 108

1       That has also doubled over the past
2   seven years, mainly due to the opioid crisis,
3   to the point where we actually had to tell
4   counties that we were unable to take more of
5   their cases.
6       Q.   And because there are follow-up
7   questions, if it helps focus your answer, I
8   just want you to identify the jurisdictions
9   where you have those agreements, and then we
10  can get into the why and what and when.
11      A.   So all of the surrounding counties,
12  Lake, Geauga, Medina, Ashtabula, we also do
13  work for Mahoning at times, Trumbull County,
14  Ashland County, Stark County at times.
15      I believe we also do Erie,
16  Pennsylvania, because they contract with
17  Mahoning, and when Mahoning can't do their's,
18  they route them to us.  Columbiana.  I may be
19  missing one or two.
20      There are agreements.  They were in
21  the files that we produced, so they should be
22  there.
23      Q.   Other than medical examiner autopsy
24  formal agreements, are there any other formal
25  agreements in any other area of dealing with

Page 109

1   the opioid issues that Cuyahoga County has with
2   its surrounding counties?
3       A.   So there are regional task forces
4   that law enforcement is part of that involves
5   law enforcement from other jurisdictions.
6       Q.   Can you just give me the names of
7   those task forces that you are aware of?
8       A.   I'm not going to get the names
9   right either.  Northern border, the gang task
10  force mainly focused in Cuyahoga County, but I
11  know that they do work with Lorain and Lake at
12  times.
13      I'm not sure if violent crime is
14  outside the county or not, but they certainly
15  work with all the jurisdictions within Cuyahoga
16  County, all of the different law enforcement
17  agencies within Cuyahoga County.
18      Q.   Other than what you mentioned, any
19  other formal cooperation agreements between
20  Cuyahoga County and another county addressing
21  opioid issues?
22      A.   No formal agreements that come to
23  mind, no.
24      Q.   Okay.  My last question, then I'm
25  going to hand it off to another counsel, has

28 (Pages 106 - 109)

Page 110

1 the county ever had communications with an
2 outside governmental entity regarding the
3 marketing of opioids?
4     A.   I can't say that I know of any.
5         MR. CARTER:  Thank you for your
6 time.  We can go off the record briefly.
7         THE VIDEOGRAPHER:  Off the record,
8 11:19.
9         (Recess taken.)
10        THE VIDEOGRAPHER:  On the record,
11 11:36.
12        EXAMINATION OF HUGH SHANNON
13 BY MS. ROITMAN:
14    Q.   Mr. Shannon, are you all set?
15    A.   I am.
16    Q.   My name is Sara Roitman.  I
17 represent Purdue.  We met earlier.
18    A.   Yes.  Good morning.
19    Q.   I am going to do things a little
20 unusual, in the sense I am going to try to get
21 you out of here as quickly as possible, which I
22 know is what every witness, really the only
23 thing you want to hear.
24        In exchange for that, I would just
25 kindly ask that you really focus on listening

Page 111

1 to my question and answering just my question,
2 and we should be able to kind of move things
3 along.  I've tried to streamline things a
4 little bit.
5         To orient you, we are going to
6 start with topic 31, which is the consideration
7 by plaintiff of limiting the prescribing,
8 distribution or dispensing of prescription
9 opioids; are you familiar with that topic?
10    A.   Okay.  Yes.
11    Q.   So generally speaking, did Cuyahoga
12 consider limiting the prescribing of opioids in
13 any way?
14    A.   The county itself is not a -- you
15 know, it doesn't have authority over
16 prescribing, but, as I discussed earlier, there
17 were several task forces that were up and
18 running that did have specific discussions
19 about prescribing guidelines, and that the
20 current, at the time, current OAC guidelines
21 may not be sufficient, and that they may need
22 to be relooked at and altered in some way.
23        Part of that effort at the U.S.
24 Attorney's Task Force was a discussion about
25 lobbying state government for legislative

Page 112

1 changes that might be needed.
2     Q.   Okay.
3     A.   I think that was really the extent
4 of our involvement, as far as discussion of
5 limiting prescribing.
6     Q.   I want to make sure you are done.
7         So you said that the county doesn't
8 have authority to limit it, and so am I correct
9 that that has to happen at the state level or
10 at the federal level?
11    A.   I believe at least at the state
12 level it would be a requirement.
13    Q.   And but the county was involved in
14 some efforts concerning different opioid
15 prescribing guidelines; is that correct?
16    A.   Yes.
17    Q.   And were those communications with
18 the state?
19    A.   So there was communication with the
20 state.  There were, at the time, there was
21 quite a bit of opioid-related legislation that
22 was moving through both state and federal
23 government legislatures, and so there were
24 times where testimony was being requested, they
25 would participate, people from the county,

Page 113

1 various parts of the county with various
2 agencies.
3         Again, the discussion that we had
4 internally at the U.S. Attorney's Task Force
5 was in preparation for that first summit in
6 2013, discussions about what the actual MED
7 limit should be, what exceptions might be
8 needed.  That's all I can recall about those
9 specific discussions.
10    Q.   And MED limit, what does that stand
11 for?
12    A.   Morphine equivalent dose.
13    Q.   So we sometimes referred to that
14 previously as MME use, the dosing, would that
15 be the same?
16    A.   I have not heard that, but that
17 sounds about the same.
18    Q.   So in any of the communications
19 that Cuyahoga was having with -- let's focus
20 first on the state regarding different
21 prescribing guidelines.  Did the county ever
22 recommend that there be a complete ban on
23 opioid prescriptions?
24    A.   No.  I don't believe that was ever
25 an option that was brought up.

29 (Pages 110 - 113)

Page 114

1    Q.   Did the county ever discuss with
2  the state limiting prescription opioids to
3  certain medical conditions?
4    A.   I don't believe it said -- I don't
5  believe the position was to limit it only for
6  medical conditions, but that certain conditions
7  would be excluded from any kind of guideline or
8  limitation.
9    Q.   And so explain that to me.  So it
10  is something where you were saying that there
11  were certain medical conditions that the
12  guidelines did not touch upon?
13    A.   I believe that for pain associated
14  with cancer, or cancer treatment, that I don't
15  recall any of the medical people or anybody
16  else involved in these discussions saying that
17  they should have any kind of limitations placed
18  on them, that the physician would be best
19  suited to make that call.
20    Q.   And why, in your view, was the
21  physician best suited to make that call?
22      MR. CIACCIO:  By "you," you mean
23  the county?
24      MS. ROITMAN:  Yeah.  I'm using Mr.
25  Shannon's words.

Page 115

1    Q.   On behalf of the county --
2    A.   Right.  On behalf of the county, I
3  don't recall that we had any position, one way
4  or the other.  It was just we were part of the
5  discussion that was taking place.
6    Q.   Well, as part of -- I apologize.
7    A.   I'm sorry.
8      So I couldn't say that we said,
9  yeah, that's a good idea or that's a bad idea
10  or maybe we should leave it up to the
11  physicians.  I think that was just the
12  discussion that was taking place at the time.
13    Q.   And does the county have a position
14  on that, with respect to limiting opioid
15  prescriptions, about whether or not,
16  ultimately, it should be left up to the
17  physician?
18    A.   I don't believe we have a position,
19  no.
20    Q.   That wasn't something that was
21  considered in all these different opioid
22  prescribing guidelines, about the significance
23  and the importance of respecting physicians'
24  clinical judgment?
25      MR. CIACCIO:  Objection to form.

Page 116

1    A.   It was certainly part of the
2  discussion.
3    Q.   Is it fair to say that that was
4  included in certain of the guidelines, that
5  kind of overarching principle regarding
6  physicians' independent medical judgment?
7      MR. CIACCIO:  Objection to form.
8    A.   I don't recall that that was what
9  ended up coming out of it.  I believe there was
10  some general -- a general agreement, after all
11  those discussions, that cancer patients should
12  be left outside of any kind of restrictions.
13    Q.   And I think my question was a
14  little bit more broad.
15      If you are not familiar with those
16  specific guidelines, then that's just the
17  answer, and it could be.  I'm trying to figure
18  out if the county had a position, when they
19  were trying to figure out all these different
20  ways to potentially limit opioid prescribing,
21  whether there was some consideration about the
22  value of physicians' independent medical
23  judgment?
24      MR. CIACCIO:  Objection to form.
25    A.   There was always consideration of

Page 117

1  it.  I don't know if we, as the county, staked
2  out a hard position, yes, leave it up to the
3  physicians, or no, don't ever leave it up to
4  the physicians.
5    Q.   So you don't know the county's
6  position on that, one way or another?
7      MR. CIACCIO:  Objection to form.
8    A.   So I know that we were focused on
9  MED limits and the lengths of times that
10  prescriptions were provided, that the focus was
11  on reducing the MED limit and reducing the
12  number of -- the number of doses provided per
13  patient.
14      Again, consideration of medical
15  judgment versus legislation was always
16  discussed.  I don't think anybody took up a
17  hard position one way or the other.
18    Q.   If there are points about that in
19  the prescribing guidelines issued by the state,
20  is that something that we can take that the
21  county generally agreed with?
22      MR. CIACCIO:  Objection to form.
23    A.   What ended up in any of the
24  forwarded amended guidelines, I don't believe
25  we took a position objecting to them.

30 (Pages 114 - 117)

Page 118

1    Q.   Thank you.  Let's turn to focusing
2   on the MED limits, the term that you are using.
3        What efforts did the county take to
4   limit the dosage of opioids in any way, the
5   per-day dosage of opioids in any way?
6    A.   So again, I don't believe the
7   county has jurisdiction.  So the discussion, I
8   believe the OAC at the time had set guidelines
9   at 100 MEDs, and the discussion was there is
10  additional research, should we lower it to 90
11  or even 80.
12       That was handled more by medical
13  professionals, who were familiar with medical
14  journals and the research that may have been
15  coming out at the time.
16       The county certainly participated
17  in those conversations, but I think we had a
18  general understanding that there were too high
19  of doses and too many doses, and how do we best
20  reduce those without endangering patient care,
21  was the general tone of those conversations.
22   Q.   When you say -- is it fair to say
23  that the county or the state, those involved in
24  these discussions, were trying to strike a
25  balance between the risk that they saw relating

Page 119

1   to certain dosages of opioids with, in your
2   words, how best not to reduce and endanger
3   patient care?
4        MR. CIACCIO:  Objection to form,
5   and objection, outside of the scope, asking him
6   to testify about the state.  He is not here as
7   a witness on behalf of the state.
8    A.   I'm sorry.  Can you ask the
9   question again.
10   Q.   I'm just really following up on
11  something you said.
12   A.   Sure.
13   Q.   I'm trying to understand.  You said
14  that in the county's discussions with the state
15  about different prescribing limits, that there
16  was some -- sounds like there was some
17  discussion about setting guidelines regarding
18  maximum daily dosage of opioids and what in the
19  county's view they felt were appropriate dosing
20  ranges, but at the same time, you said that you
21  were trying to balance this with not, I think
22  you said, endangering patient care.
23       I'm trying to understand what you
24  mean by the patient care aspect of your
25  response?

Page 120

1        MR. CIACCIO:  Objection to the
2   form.
3    A.   Yeah.  It's a little difficult for
4   me, I'm not a physician, but I was present at
5   those discussions, and I've talked to people
6   who were in those discussions.  That was a
7   running theme throughout, that we recognized
8   that there was too high a dose, too many doses,
9   but there wasn't a -- necessarily a blanket
10  that you could throw over everything and cover
11  everything appropriately, and that there had to
12  be exceptions made.  Again, cancer patients,
13  the pain that is involved there.
14       So it wasn't a blanket, you know,
15  this is the line, don't cross it.  There was
16  always trying to strike balance, yes.
17   Q.   You also talked about limiting
18  doses.  Is that -- am I fair to assume that
19  that relates to, kind of, limiting the amount
20  of pills that can be dispensed or --
21   A.   At a time, correct.  At a time that
22  they were concerned that -- again, we had been
23  running Operation Medicine Cabinet and the drug
24  drop boxes for a few years at that -- well, the
25  drug drop boxes were just starting at that

Page 121

1   time, but we had done Operation Medicine
2   Cabinet.  So we knew that that was one of the
3   avenues that people could use, perhaps, to
4   start down that path of opioid abuse.
5        And so the discussion was then, how
6   do we -- we can always get rid of them after
7   the fact, but how do we prevent them from
8   getting into the medicine cabinet to start, how
9   do we reduce the dosage, and that was really
10  later on in the conversation.
11       Once we had done the first summit
12  and then got access to OARRS and was able to
13  start connecting these dots, you know, the next
14  time the next Operation Medicine Cabinet came
15  around, what are we doing, well, you know,
16  maybe we should address this in another way, or
17  maybe we should attack it from both ends,
18  supply and, you know, demand.
19   Q.   In any of the discussions that the
20  county was having with the state about
21  different prescribing guidelines, did the
22  county ever recommend that there be a
23  prohibition on using opioids for chronic pain
24  treatment?
25   A.   I don't believe they asked for a

31 (Pages 118 - 121)

Page 122

1  prohibition. I think there was discussion
2  about research or lack thereof, saying that
3  prescription opioids were effective for chronic
4  pain.
5      Q.   And in all -- in those discussions,
6  however, they did not lead to the county
7  endorsing a position or recommending to the
8  state that opioids for chronic pain be
9  prohibited entirely?
10     A.   No.
11     Q.   So with the guidelines that -- the
12  different prescribing guidelines that the state
13  has been issuing, what efforts did Cuyahoga do
14  to disseminate those guidelines, if any, any
15  efforts to prescribers in Cuyahoga?
16     A.   We would not have a lot of touches
17  on that. That would be individual physicians,
18  hospitals, things like that, that would have to
19  put those in place.
20         I can think that we certainly
21  promoted it, board of health, you know,
22  especially -- the CDC came out with their set
23  of guidelines, the state came out with theirs,
24  they matched up fairly closely, I believe. So
25  it was disseminated.

Page 123

1          It was, again, the task force would
2  discuss as each new piece of legislation came
3  through and how to implement it. A lot of
4  that -- again the discussion took place within
5  the county at the table, but most of the
6  implementation took place outside of, you know,
7  what the county actually controlled.
8          The county, you know, everybody
9  calls Metro the county hospital. We do give
10 them a large chunk of money. Metro had
11 implemented their own guidelines, I think, even
12 before that, outside out of the emergency room,
13 how to dispense prescription opioids out of the
14 emergency room and no more than, you know,
15 three days' worth, but I can't think of
16 anything that we proactively were able to do,
17 other than to continue that discussion and
18 distribute whatever information we had,
19 legislative updates and so forth.
20     Q.   So to use your words, I'm trying to
21 figure out what proactive steps the county took
22 to make sure that prescribers in its community
23 were aware of these prescribing guidelines.
24         I realize that the county doesn't
25 set them, but they were involved in those

Page 124

1  discussions. Certainly the county has the
2  ability to communicate with different area
3  hospitals in Cuyahoga, correct?
4      A.   Yes.
5      Q.   And did it, through those
6  communications, make sure that those hospitals
7  had the prescribing guidelines?
8      A.   So there were representatives from
9  all the hospitals at the task force in the
10 room, usually leading the discussions about the
11 prescribing guidelines. It was pretty evident
12 that they were fully aware of what was
13 happening.
14         I believe the government affairs
15 officers for The Cleveland Clinic were the ones
16 that were actually driving a lot of the
17 lobbying that was taking place, so -- or at
18 least they were the ones providing us with a
19 lot of the legislative updates.
20         So I don't think that there was
21 anything that the county, on top of the efforts
22 of setting that discussion in motion and
23 participating, needed to do to make them any
24 more aware.
25     Q.   So just to be clear. The county

Page 125

1  didn't take any additional steps to disseminate
2  or make sure the guidelines were disseminated
3  to the area Cuyahoga hospitals?
4      A.   I don't recall that there was any
5  proactive effort, no.
6      Q.   Did the county make any proactive
7  efforts to, kind of, follow up with those
8  hospitals to see how the guidelines were
9  working in realtime?
10     A.   Over the course of time, through
11 the task force, which was our main
12 communication with everybody on this effort,
13 there were discussions. The healthcare policy
14 subcommittee, the head led a lot of those
15 efforts, we would give updates.
16         Metro, in particular, like I said,
17 they had already set guidelines for their
18 emergency room, they started doing training
19 modules for their medical staff, physicians and
20 nurse practitioners, things like that, and so
21 they would always bring, kind of, their updates
22 about what they were doing and share that with
23 the others in the room.
24         Other than that kind of constant
25 update and discussion through the task force, I

32 (Pages 122 - 125)

Page 126

1  don't think that there was anything further
2  that the county itself did.
3      Q.   Nothing further that the county
4  did, in terms of working to disseminate the
5  guidelines or making sure they were being
6  followed?
7      A.   Again, to make sure that they were
8  followed sounds like an enforcement issue,
9  which is outside of the jurisdiction of the
10  county, but we did have those ongoing
11  discussions at the task force about how people
12  were implementing them, how hospitals were
13  implementing, and how they were generally
14  working out.  I don't recall anything specific
15  about how this worked, this didn't, but...
16      Q.   Did the county ever conduct any
17  studies with its healthcare providers in
18  Cuyahoga to be able to have evidence-based data
19  to show that the prescribing guidelines were
20  having an effect?
21      A.   I don't think, I'm not aware, and
22  have not been made aware of any studies that
23  the county sponsored, no.
24      Q.   Did the county recommend that the
25  state conduct any studies?

Page 127

1      A.   I don't think we recommended a
2  study.  What we did ask for, and what was
3  actually already in motion when they did --
4  when we got access to OARRS, the county medical
5  examiner's office got access to OARRS, they
6  started making reports, and they were showing
7  that, you know, when things were -- these
8  guidelines were beginning to be implemented,
9  you know, year after year, how many doses were
10  being distributed statewide, how many -- you
11  know, the amount.  There is a calculation, MED
12  times, you know, number of doses equals.
13          And that that had consistently gone
14  down year after year after year, when those
15  guidelines were put in place.  So there was
16  something tracking of it.  I don't think there
17  was a specific request for any study.
18      Q.   I next want to turn to talking
19  about diversion, briefly.
20          What steps, if any, has the county
21  taken to reduce illegal diversion relating to
22  prescription opioids?
23      A.   So again, it participated in
24  Operation Medicine Cabinet and the drug drop
25  box, to get any of those pills out of people's

Page 128

1  homes and medicine cabinets, so that they
2  weren't diverted.
3          Again, there are a variety of local
4  law enforcement and law enforcement task forces
5  that are -- that investigate specific diversion
6  cases.  Occasionally, they will, again, call
7  the medical examiner's office for follow-up on
8  specific patients or doctors, and we will work
9  with them on that.
10          I'm not thinking of a whole lot of
11  other activity that the county runs that would
12  fall under that.
13      Q.   Are you familiar with what the
14  ARCOS data is?
15      A.   I know of it now, yes.
16      Q.   And what is your understanding of
17  what it is?
18      A.   It is a federal database, you know,
19  drugs that are being dispensed or distributed.
20      Q.   And is it your understanding that
21  it can potentially help identify incidence of
22  diversion?
23      A.   I do now, yes.
24      Q.   Do you know if the county has
25  access to OARRS -- excuse me -- access to the

Page 129

1  ARCOS data?
2      A.   We do not.
3      Q.   Is that something that the county
4  would like to have access to?
5      A.   I think that there are uses for it,
6  that a variety of county agencies would like to
7  see, yes.
8      Q.   Can you talk to me about any steps,
9  if any, the county has taken to limit the
10  dispensing of opioids, kind of, at the pharmacy
11  level?
12      A.   I can't think of anything that the
13  county has done to talk about the actual
14  dispensing of the drugs.  I know that there
15  have been a variety of conversations with local
16  pharmacies, especially when we were trying to
17  distribute naloxone, but I don't have any
18  recollection of anything we talked specifically
19  in those meetings about how to somehow alter
20  the dispensing of drugs out of a local
21  pharmacy.
22      Q.   And I think we probably all agree
23  that the issue regarding naloxone is obviously
24  important, but that is different from, kind of,
25  limiting the dispensing of prescription

33 (Pages 126 - 129)

Page 130

1  opioids?
2      A.    The only thing I could think of is,
3  again, getting into OARRS, one of the things
4  that we started looking for were people who may
5  have been doctor shopping.  So anybody who was
6  seeking prescriptions for more than five
7  doctors within a calendar year, would, I guess,
8  is kind of like the qualifying conditions for
9  what they call doctor shopping.
10          There is also a thing called
11  pharmacy shopping, where they would, instead of
12  taking the same, you know, prescriptions from
13  different doctors to the same pharmacy, they
14  would split it up.  They would go to a pharmacy
15  near their home, they would go to a pharmacy
16  near their work, across the street from their
17  favorite bar, whatever, so it was kind of
18  splitting it up, and having access to OARRS,
19  and making that mandatory, was another one of
20  those lobbying pushes that we were making, and
21  I think at some point, either, I think, 2015,
22  it became mandatory for both doctors and
23  pharmacists to check OARRS prior to prescribing
24  or dispensing.
25      Q.    Thank you for that.  We will unpack

Page 131

1  a fair amount of that.
2          But to closeout my question, so
3  besides OARRS and, kind of, the policies that
4  we talk about with OARRS, there is no other
5  policies or steps that you can think of, as the
6  county representative, that the county took to
7  try to limit the dispensing of opioids at the
8  pharmacy level?
9      A.    No, I don't believe so.
10      Q.    Let's turn to OARRS, since you
11  brought it up.
12          And you had mentioned that it
13  currently is mandatory for physicians to review
14  OARRS before prescribing an opioid
15  prescription, but it wasn't always mandatory --
16      A.    Yes.
17      Q.    -- is that fair?
18      A.    Correct.
19      Q.    It became mandatory in 2015,
20  correct?
21      A.    I believe so.
22      Q.    Before it became mandatory, I
23  understand that the -- well, I should say this:
24  Before it became mandatory in 2015, was it the
25  county's position that they could have made it

Page 132

1  mandatory for physicians in Cuyahoga?
2      A.    The county didn't have that
3  authority.  The state did.
4      Q.    But did Cuyahoga make any
5  recommendations to physicians in its community,
6  before 2015, that even though checking OARRS
7  wasn't mandatory before writing a prescription,
8  that it was a good idea and that they should be
9  doing it?
10      A.    It was certainly a topic of
11  discussion at the first summit at the end of
12  2013, and we continued to push it in our
13  efforts when we were discussing it with the
14  state.
15      Q.    And when did you -- when did the
16  county first start those discussions with
17  prescribers in Cuyahoga that they really should
18  be utilizing OARRS, even if it wasn't
19  mandatory?
20      A.    Again, it would have been between
21  the period of time when we first discussed it
22  at the summit and when the legislation was
23  actually passed.
24          I believe -- I believe throughout
25  2014, again, there were a number of legislative

Page 133

1  initiatives that were going through the state
2  legislature that we were, you know, trying to
3  champion and trying to help the state with
4  getting passed, access to naloxone, and the
5  Good Samaritan bill, the OARRS expansion.
6          I think a lot of it was predicated
7  on the state's resources and being able to
8  expand OARRS, and that took some, I think,
9  technical changes as well.
10      Q.    Obviously, the county, as a local
11  government, is still able to issue any type of
12  recommendations that it wants to its citizens?
13      A.    It was in the recommendations in
14  our report to the community.
15      Q.    And what was the date of that?
16      A.    Well, the task force summit was on
17  November 21, 2013, and then there was a
18  follow-up report a year later.  So November of
19  2014.
20      Q.    Thank you.  So you have talked
21  about monitoring OARRS a lot.  Does the county
22  have any policies or procedures for, kind of,
23  proactively monitoring OARRS, to see if they
24  can identify incidence of where someone is
25  either doctor shopping or pharmacy shopping?

34 (Pages 130 - 133)

Page 134

1    A.   We do now, yes.
2    Q.   When did that start?
3    A.   So we started our poison death
4  review in 2013, but we did not get immediate
5  access to OARRS until 2014, and even then it
6  was limited.  I know that the medical examiner
7  had to have more than one discussion about the
8  access levels within OARRS and what was
9  appropriate for a medical examiner to have.
10         Technically, he's not a prescribing
11  doctor, does he go there, he is not technically
12  law enforcement, so there was a lot of back and
13  forth.
14         Once we had full access to OARRS,
15  we were able, again, to go back two years.  So
16  we started with cases from 2012, but with a
17  two-year lookback, we only got a small snippet.
18  The 2013 cases became more clear, and then, as
19  we went forward, we were asked to see more and
20  more.
21         So in 2013, cases that came from
22  deaths that occurred in 2013, we were getting
23  the data in 2014, and then we were able to
24  start counting, you know, MEDs, we were able to
25  start looking at prescribers, the pharmacies

Page 135

1  that were filling them.  So I believe that the
2  2013 deaths, we were able to report on doctor
3  shopping in 2014, and then in 2015, we started
4  reporting on pharmacy shoppers as well.
5    Q.   And is all of that analysis and
6  review done within the medical examiner's
7  office, or does law enforcement also run its
8  own queries --
9    A.   Law enforcement -- sorry.
10    Q.   -- to potentially identify
11  instances of doctor shopping or pharmacy
12  shopping?
13    A.   Yes.  Sorry.  Yes.  Law enforcement
14  does have an access level within OARRS that
15  they are able to utilize.
16    Q.   And do you know if they have an
17  official policy of running those reports and
18  conducting that analysis proactively, to try to
19  identify instances of diversion of doctor
20  shopping?
21         MR. CIACCIO:  Objection to form.
22    A.   It is my understanding that the
23  guidelines that regulate OARRS use does not
24  allow for that.
25    Q.   Even from a law enforcement

Page 136

1  standpoint?
2    A.   I believe so.  But they have to
3  have an active investigation before they can
4  enter OARRS and start downloading that data.
5    Q.   Well, certainly there is some
6  analysis that can be done of OARRS from a
7  research or scientific perspective.  Dr. Gilson
8  testified the medical examiner's office did
9  that --
10    A.   Correct.
11    Q.   -- yesterday.
12         MR. CIACCIO:  Objection to form.
13  Just since you brought that up, we are, kind
14  of, deep into another topic that he's not
15  assigned to.  So I will put a standing
16  objection.  I understand how you started on
17  OARRS and how it is semi-related, but now we
18  are getting into a deep dive into the policies
19  and guidelines and how OARRS works and who has
20  access, and I think you already got that
21  testimony from Dr. Gilson yesterday.
22         MS. ROITMAN:  Joe, I have been
23  incredibly patient with you about these
24  speaking objections.  We are under a very --
25         MR. CIACCIO:  Can you identify what

Page 137

1  other speaking objections --
2         MS. ROITMAN:  -- tight timeframe.
3         MR. CIACCIO:  I don't think I've
4  said to you objection to form -- anything but
5  objection to form.
6         MS. ROITMAN:  I'm not going to
7  quibble with you on the record.  This relates
8  to topic 17.
9    Q.   Mr. Shannon, regarding -- so let's
10  talk about when someone -- when someone
11  overdoses from an opioid.
12         Part of -- my understanding is part
13  of the medical examiner's process is to review
14  OARRS to see if that person had had a history
15  of receiving opioid prescription?
16    A.   If they died.
17    Q.   An overdose death, correct?
18    A.   Right.
19    Q.   Does the county have any policies
20  or procedures about what they do if they
21  identify a concern that someone was engaging in
22  illegal either doctor shopping or pharmacy
23  shopping, in terms of reporting that either
24  doctor or that person to law enforcement?
25         MR. CIACCIO:  Objection to form.

35 (Pages 134 - 137)

Page 138

1    A.   When you say a concern, whose
2  concern?
3    Q.   Well, you have testified a fair
4  amount today that OARRS, one of the values and
5  utilities of OARRS is being able to potentially
6  identify instances of doctor shopping.  It
7  sounds like either the county or the medical
8  examiner has a definition of what that means,
9  and I'm trying to figure out, once you -- let's
10  play it out.
11      Someone overdoses on fentanyl, the
12  medical examiner's office runs a report to see
13  if they have an OARRS profile, they see that
14  this person has visited six doctors in the last
15  year.  By your definition, that would qualify
16  as someone who is potentially engaging in
17  doctor shopping.
18      Doctor shopping is illegal,
19  correct?
20    A.   I believe so, yes.
21      MR. CIACCIO:  Objection to form.
22    Q.   So what I'm asking, is there any
23  policies in place that what happens after there
24  has been an identification that there had been
25  suspected doctor shopping, whether that's

Page 139

1  reported to law enforcement, either the patient
2  or, if there is some suspicion that there is a
3  doctor who is engaging in improper opioid
4  prescribing, if that's been reported?
5      MR. CIACCIO:  Objection to form.
6    A.   So just for the record, so you keep
7  saying overdose, but it's overdose death.  You
8  can overdose and not die.
9    Q.   Fair enough.  Thank you for that
10  clarification.
11    A.   That's how I hear it in my head
12  now.  Sorry.
13      But, so, yes, we will run, as part
14  of the reviews, the OARRS report on any
15  fatality.  We do identify a number of people
16  who have doctor shopping in their history, as
17  well as pharmacy shopping.  While it may be
18  illegal to doctor shop, there is nobody left to
19  prosecute for doctor shopping.
20      Now, that may have changed somewhat
21  once it became mandatary for doctors to check
22  OARRS before prescribing, or pharmacists to
23  check OARRS before they dispense to catch those
24  things, and then self-report to, you know,
25  their respective boards.

Page 140

1      What the medical examiner's office
2  did as a -- it's actually in state that we
3  share overdose data with whatever agency at the
4  state level we feel is appropriate, but we do,
5  when we see specific cases where, especially
6  the MED limits are not only above what the
7  prescribing guidelines show, but in excessive
8  amounts.  And that's a discussion that we have
9  directly with the medical examiner for
10  his -- his review.
11      So there were cases where you would
12  get somebody who was getting progressively
13  more, 120, then 240, then 360.  So 360 MEDs per
14  day, that was almost something that it was
15  automatic, unless there was an underlying
16  medical condition, and that's why it went to
17  the medical examiner, so he could review the
18  full case file to see what the patient history
19  was there.
20      Then and only then would that
21  particular doctor's name be forwarded to the
22  respective boards, medical board mostly.
23      A lot of times we would get
24  requests from law enforcement, DEA, the
25  sheriff's office, a variety of other agencies,

Page 141

1  "Do you have this doctor on your list?"
2      We don't keep a list of doctors.
3  We have access to OARRS, but only through the
4  patients, the case files that we are
5  investigating their deaths, and I can work
6  backwards from there.
7      So I always tell law enforcement, I
8  need a name of a patient that you are
9  investigating, and I can see if we have that
10  patient, but we don't -- generally aren't able
11  to take a doctor's name and say, yeah, we've
12  got X amount of patients.
13    Q.   Do you know, as the county
14  representative, whether law enforcement does
15  any checks about when they see drug overdose,
16  whether it's fatal or nonfatal, whether they
17  also look at OARRS from a law enforcement
18  standpoint, to see if they can be detecting any
19  instances -- or whether that overdose could
20  potentially be attributable to a doctor who is,
21  perhaps, improperly prescribing illegally?
22    A.   I believe that's how a lot of their
23  investigations start, yes.
24    Q.   Do you know if the county has any
25  policies and procedures, probably at the law

36 (Pages 138 - 141)

Page 142

1  enforcement level, regarding prosecuting or
2  investigating doctors relating to improper
3  opioid prescribing, and if you could, I would
4  just like, kind of, a direct answer to that
5  question, if you know if there is any policies
6  or procedures?
7       MR. CIACCIO: Objection to form.
8       A.  There are procedures, but it's a
9  legal matter.  So I'm sure there is state law
10  that they were following when they start
11  investigating and prosecuting.
12      Q.  Part of your research that you were
13  doing and education as a 30(b)(6) witness was,
14  it sounded like, you went and talked to
15  Commander Gingell?
16      A.  Gingell, right.
17      Q.  You know, did you find out from him
18  whether the Cuyahoga sheriff or I guess the
19  Cleveland has any policies and procedures
20  relating to how they investigate and prosecute
21  doctors who are suspected of opioid
22  misprescribing, illegally prescribing opioids?
23      MR. CIACCIO: Objection to form.
24      A.  I'm not sure that there are
25  specific procedures outside of normal

Page 143

1  investigative procedures.  Once we develop the
2  HIDI protocols, the heroin involved death
3  investigation protocols with CPD and the
4  sheriff's office and the prosecutor's office, I
5  don't know if any of those specific policies in
6  that protocol assist them when they find that
7  they are investigating a doctor, but it may.
8       Q.  So the short answer is that you are
9  not aware of any specific procedures relating
10  to opioid prescribing?
11      A.  Not specific, no.
12      Q.  What about opioid diversions,
13  illegal opioid diversions, and I apologize, I'm
14  shortening the questions.  I shouldn't.
15      If you understand, is it your
16  understanding that the county has any specific
17  policies or procedures relating to how law
18  enforcement investigates or prosecutes
19  instances of illegal diversion?
20      A.  I don't believe that there is any
21  special, specific to diversion, no.
22      Q.  And the same question would apply
23  to improper dispensing at the pharmacy level?
24      A.  Correct.
25      Q.  As part of Cuyahoga County's

Page 144

1  efforts to address the opioid epidemic, did the
2  county ever open a criminal investigation into
3  any of the defendants named in the county's
4  lawsuit?
5       A.  I'm not aware of any, no.
6       Q.  And you didn't ask Commander
7  Gingell or any of the people -- no one told you
8  about it through your investigation and
9  education as a 30(b)(6) witness?
10      A.  No.
11      Q.  Other than this litigation, as part
12  of the county's efforts to address the opioid
13  epidemic, did the county ever open a civil
14  investigation into any of the defendants named
15  in the county's lawsuit?
16      A.  Not that I'm aware of, no.
17      Q.  Now, I don't want you to tell me
18  anything about what was discussed with lawyers.
19  I'm really just looking for a date, a fact
20  date.
21      When did the county begin the
22  investigation that led to the filing of its
23  current lawsuit against these defendants?
24      MR. CIACCIO: Objection to form and
25  outside the scope.  Go ahead.

Page 145

1       A.  Would you explain what you mean by
2  "investigation"?
3       Q.  At some point -- and again, I want
4  to try carefully, because I'm really not asking
5  you to reveal any sort of confidential
6  attorney-client communications or work product.
7       A.  Sure.
8       Q.  But just from a factual standpoint,
9  at some point, obviously, the county developed
10  concerns that particular entities and companies
11  may be responsible for the harm that they
12  alleged occurred.
13      I don't want to get into any of the
14  harm stuff, we talked about that at length.
15  I'm really just looking for when the county
16  first decided that it was going to investigate
17  or -- and pursue legal action against certain
18  entities?
19      MR. CIACCIO: Objection to form.
20  Outside the scope.
21      Q.  Which -- this is addressing which
22  topic?
23      Q.  Topic 2.
24      MR. CIACCIO: He's not topic 2.
25      MS. ROITMAN: Mitigation of

37 (Pages 142 - 145)

Page 146

1 damages, whatever topic that is. We talked
2 about it at length this morning.
3     A.   Gotcha. 2016 changed everything.
4 We went -- you know, we doubled the number of
5 deaths, and fentanyl had flooded the market. I
6 wouldn't be able to give you an exact date,
7 because, again, it wasn't within my normal
8 preparation for this, but after 2016, it was
9 clear that we weren't able to control and
10 contain what was happening.
11     Q.   So is it the county's position, as
12 the 30(b)(6) representative, that in, roughly,
13 sometime in 2016 was when the county first
14 considered initiating litigation against
15 particular entities?
16         MR. CIACCIO:  Objection to form.
17     A.   It was certainly sometime after the
18 summer of 2016 or before the spring of 2017,
19 but I couldn't be more specific.
20         MS. ROITMAN:  I have no further
21 questions right now.  If you would just give us
22 ten minutes to regroup.  I think we should be
23 able to get you out of here pretty soon.
24         MR. CIACCIO:  Okay.  Can we just
25 put on the record whatever time we have, when

Page 147

1 you can figure it out?
2         THE VIDEOGRAPHER:  When we come
3 back.
4         MR. CIACCIO:  That's fine.
5         THE VIDEOGRAPHER:  Off the record
6 at 12:20.
7         (Recess taken.)
8         THE VIDEOGRAPHER:  We are now on
9 the record.  It is 12:23 p.m.  We are at two
10 hours and 46 minutes of depo time with this
11 witness.
12         MR. CIACCIO:  And I don't have any
13 questions.  We just, Cuyahoga County has a
14 standing objection to Baker Hostetler's
15 involvement in any of these depositions,
16 specifically through Carole Rendon, but other
17 than that, I don't have anything else.
18         MS. HARTMAN:  Just for the record,
19 Endo wants its counsel to be here, and we think
20 your objection is baseless.
21         MR. CIACCIO:  I think my objection
22 is not baseless.
23         THE VIDEOGRAPHER:  Off the record.
24 12:23.
25         (Deposition concluded at 12:23 p.m.)

Page 148

1 Whereupon, counsel was requested to give
2 instruction regarding the witness's review of
3 the transcript pursuant to the Civil Rules.
4
5         SIGNATURE:
6 Transcript review was requested pursuant to the
7 applicable Rules of Civil Procedure.
8
9         TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 149

1         REPORTER'S CERTIFICATE
2 The State of Ohio,   )
3                     SS:
4 County of Cuyahoga.  )
5
6     I, Wendy L. Klauss, a Notary Public
7 within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, HUGH SHANNON,
10 was by me first duly sworn to testify the
11 truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotype in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19     I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

38 (Pages 146 - 149)

Page 150

1    I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5    IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 18th day of
8  January, 2019.
9
10
11
12
13  *Wendy L. Klauss*
14    Wendy L. Klauss, Notary Public
15    within and for the State of Ohio
16
17  My commission expires July 13, 2019.
18
19
20
21
22
23
24
25

Page 152

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

2
ASSIGNMENT REFERENCE NO: 3191952
3  CASE NAME: In Re: National Prescription Opiate Litigation
   DATE OF DEPOSITION: 1/15/2019
4  WITNESS' NAME: Hugh Shannon
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date            Hugh Shannon
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13    They signed the foregoing Sworn
   Statement; and
14    Their execution of this Statement is of
   their free act and deed.
15
   I have affixed my name and official seal
16
   this _____ day of _____, 20____.
17
18    Notary Public
19
   Commission Expiration Date
20
21
22
23
24
25

Page 151

1    Veritext Legal Solutions
   1100 Superior Ave
2    Suite 1820
   Cleveland, Ohio 44114
3    Phone: 216-523-1313
4
   January 18, 2019
5
   To: Joseph L. Ciaccio, Esq.
6
   Case Name: In Re: National Prescription Opiate Litigation
7
   Veritext Reference Number: 3191952
8
   Witness:  Hugh Shannon      Deposition Date:  1/15/2019
9
10  Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 153

1    DEPOSITION REVIEW
   CERTIFICATION OF WITNESS
2
ASSIGNMENT REFERENCE NO: 3191952
3  CASE NAME: In Re: National Prescription Opiate Litigation
   DATE OF DEPOSITION: 1/15/2019
4  WITNESS' NAME: Hugh Shannon
5    In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7    I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9    I request that these changes be entered
   as part of the record of my testimony.
10
   I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
   Date            Hugh Shannon
14
   Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17    They have read the transcript;
   They have listed all of their corrections
18  in the appended Errata Sheet;
   They signed the foregoing Sworn
19  Statement; and
   Their execution of this Statement is of
20  their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of _____, 20____.
23
   Notary Public
24
   Commission Expiration Date
25

39 (Pages 150 - 153)

Page 154

1       ERRATA SHEET

      VERITEXT LEGAL SOLUTIONS MIDWEST

2      ASSIGNMENT NO: 1/15/2019

3  PAGE/LINE(S) /     CHANGE    /REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19

  _____   _____

20  Date      Hugh Shannon

21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22  DAY OF _____, 20_____ .

23  _____

      Notary Public

24

      _____

25      Commission Expiration Date

Veritext Legal Solutions

www.veritext.com          888-391-3376

**[& - 4]**                                                                       Page 1

| **&** |
| --- |
| **&**   1:22 2:7,12 3:12 |
| 3:21 4:2,7 10:12 |
| 10:14,16,19,24 |
| 11:14 |

| **1** |
| --- |
| **1**   6:2,5 12:9,16,18 |
| 15:23,23 16:15 |
| 17:4 |
| **1/15/2019**   151:8 |
| 152:3 153:3 154:2 |
| **10**   12:22 23:22,22 |
| 28:20 33:6 52:15 |
| 52:18,24,25 53:15 |
| **100**   22:25 55:14,18 |
| 118:9 |
| **101**   2:19 |
| **103**   8:15 |
| **104**   8:16 |
| **105**   8:17,18,19 |
| **106**   8:20 |
| **10:13**   64:21 |
| **10:25**   64:24 |
| **11**   4:8 5:4 52:15 |
| **110**   5:5 |
| **1100**   4:4 151:1 |
| **115**   8:21 |
| **116**   8:22,23 |
| **117**   8:24,25 |
| **11747**   2:5 |
| **119**   9:1 |
| **11:19**   110:8 |
| **11:36**   110:11 |
| **12**   6:2 12:22 42:5 |
| 42:23 55:24 |
| **120**   9:2 140:13 |
| **127**   3:17 |
| **12:20**   147:6 |
| **12:23**   147:9,24,25 |

| **13**   102:10,15,17 |
| --- |
| 150:17 |
| **135**   9:3 |
| **136**   9:4 |
| **137**   9:5 |
| **138**   9:6 |
| **139**   9:7 |
| **142**   9:8,9 |
| **144**   9:10 |
| **145**   9:11 |
| **146**   9:12 |
| **147**   9:13 |
| **149**   5:6 |
| **15**   1:20 10:2 22:9 |
| **17**   1:9 6:4 12:22 |
| 137:8 |
| **18**   6:10 15:25 |
| 24:18 25:1 151:4 |
| **1800**   2:19 |
| **1820**   151:2 |
| **18th**   150:7 |
| **1950**   1:22 |
| **1:17**   1:15 |

| **2** |
| --- |
| **2**   5:2 6:4 12:18 |
| 16:3,6,25 17:3,12 |
| 25:5,11 145:23,24 |
| **20**   152:16 153:22 |
| 154:22 |
| **2000**   3:18 |
| **20005**   3:14 |
| **2006**   28:15 29:2 |
| 31:9 32:17 49:2,6 |
| 73:8,23 74:5,10,19 |
| 75:9 76:5,14 |
| 77:10,15,24 78:15 |
| 80:8,17 |
| **2007**   78:4,15 80:8 |
| **2008**   78:6,16 80:8 |
| **2009**   80:8 |

| **201**   2:23 |
| --- |
| **2010**   70:25 71:15 |
| 71:21 80:9,17,18 |
| **2011**   80:9 81:9 |
| 92:15 |
| **2012**   71:4 73:1 |
| 78:22 83:6,9 |
| 134:16 |
| **2013**   51:3 67:9 |
| 69:13 70:2,16 |
| 71:22,25 72:15 |
| 83:2 100:2 113:6 |
| 132:12 133:17 |
| 134:4,18,21,22 |
| 135:2 |
| **2014**   71:10,14 |
| 84:16 86:20 87:9 |
| 89:3 93:5 132:25 |
| 133:19 134:5,23 |
| 135:3 |
| **2015**   93:6 130:21 |
| 131:19,24 132:6 |
| 135:3 |
| **2016**   50:18 52:4,12 |
| 85:2 86:22 93:6 |
| 94:18 97:7 98:8 |
| 146:3,8,13,18 |
| **2017**   28:16 146:18 |
| **2018**   6:10 16:15 |
| 24:20 25:3 92:15 |
| **2019**   1:20 10:2 |
| 150:8,17 151:4 |
| **202**   3:14 |
| **21**   6:10 24:19 25:2 |
| 133:17 |
| **216**   2:10,14 3:19 |
| 4:5 |
| **216-523-1313** |
| 151:3 |
| **2222**   2:9 150:13 |

| **224-1133**   2:5 |
| --- |
| **23**   12:22 68:22 |
| 99:13 102:16,17 |
| 102:19 |
| **236-1313**   4:9 |
| **24**   6:6 12:22 68:22 |
| 69:4 76:11 81:14 |
| 82:6 |
| **240**   140:13 |
| **25**   7:3 12:22 68:22 |
| 103:1 |
| **252-9060**   2:24 |
| **2804**   1:7,9 |
| **29**   7:4,5,6 |

| **3** |
| --- |
| **3**   6:6 12:18 16:12 |
| 24:8,11,23 25:12 |
| 37:25 |
| **3,000**   38:9 39:13 |
| **30**   1:18 6:3 12:6 |
| 12:11 16:17 20:12 |
| 22:25 81:19 91:13 |
| 142:13 144:9 |
| 146:12 |
| **305**   2:4 |
| **31**   7:7 12:22 111:6 |
| **312**   3:5 |
| **313**   4:9 |
| **3191952**   151:7 |
| 152:2 153:2 |
| **32**   7:8 |
| **325**   3:9 |
| **330**   2:24 |
| **3400**   3:4 |
| **35**   3:4 |
| **360**   140:13,13 |
| **38**   7:9 |

| **4** |
| --- |
| **4**   16:16 |

[40 - administrative]                                                        Page 2

**40**  7:10 35:7
**400**  2:4
**415**  2:20 3:23
**43215-2673**  3:10
**434-5000**  3:14
**44113**  2:13
**44113-1901**  2:9
**44113-7213**  4:4
**44114**  3:18 151:2
**44308**  2:24
**45**  48:19
**45004**  1:15
**46**  7:11 147:10
**46204**  4:8
**469-3939**  3:10
**4th**  2:13

**5**

**5**  6:5 16:19 17:5
**50**  2:23 35:7
**52**  7:12
**543-8700**  2:20
**55**  1:22 2:8 7:13
  7:14
**591-6000**  3:23
**592-5000**  4:5

**6**

**6**  1:18 5:3 6:3 12:6
  12:11 16:17 20:12
  22:25 29:2,20
  81:19 91:13
  142:13 144:9
  146:12
**600**  3:9
**60601-1634**  3:5
**614**  3:10
**621-0200**  3:19
**631**  2:5
**646-5800**  3:5
**68**  5:5

**69**  7:15
**696-4441**  2:14

**7**

**70**  7:16
**725**  3:13
**73**  7:17,18
**74**  7:19,20
**75**  7:21,22 49:24
**76**  7:23,24
**77**  7:25 8:1
**79**  8:2

**8**

**80**  8:3 118:11
**81**  8:4
**82**  8:5,6
**83**  8:7
**861-0804**  2:10
**88**  8:8
**89**  8:9,10

**9**

**90**  8:11 118:10
**91**  8:12
**92**  8:13,14
**94105**  2:20
**94111-5356**  3:23
**950**  2:13 4:4
**9:05**  1:20 10:3

**a**

**a.m.**  1:20 10:3
**ability**  124:2
**able**  33:3 43:17
  44:15,16,21 46:6
  48:2 49:21,22
  51:21 52:6 57:12
  58:8,11 59:10,21
  60:1,14,20 61:1
  63:9 66:9,14
  69:20 86:17 88:7
  104:25 111:2

121:12 123:16
126:18 133:7,11
134:15,23,24
135:2,15 138:5
141:10 146:6,9,23
**absolutely**  30:15
  76:16,19
**absorb**  45:9
**abuse**  66:10,11
  69:7,11 70:19
  71:17 72:5,22
  84:17,25 85:13,18
  86:14 87:17 89:25
  91:11 92:21 93:14
  95:11 98:3 107:11
  121:4
**access**  47:25 51:21
  60:12 69:20 72:7
  87:12 121:12
  127:4,5 128:25,25
  129:4 130:18
  133:4 134:5,8,14
  135:14 136:20
  141:3
**acknowledge**
  152:11 153:16
**act**  51:23 152:14
  153:20
**action**  18:12 74:25
  75:4 76:23 80:19
  145:17 150:4
**actions**  55:5
**active**  136:3
**activities**  31:1
**activity**  128:11
**actual**  113:6
  129:13
**acute**  50:19 69:18
  69:19
**ad**  85:11 86:1,8,19

**adamhs**  25:16,19
  25:20,24 26:3,15
  27:3,7 28:2,25
  29:14,24 30:8,10
  30:16 31:11 43:9
  56:15,18 60:24
  61:4,10,13,14,17
  62:2 83:20 84:3
  86:6,23 87:10,23
  88:18,25 94:21
  97:24
**adapt**  36:4
**add**  34:7
**added**  56:24
**addicted**  26:5
  30:22 32:8,12,12
  57:15
**addiction**  59:24
  69:17 86:25
**addictions**  95:12
**addition**  41:16
  53:24
**additional**  31:3
  32:3,15 36:11
  37:25 43:24 63:5
  76:22 88:22
  118:10 125:1
**address**  29:6
  41:22 42:6,6 51:5
  55:25 56:10 58:17
  58:25 61:15 62:11
  62:25 63:4 65:1
  101:2 121:16
  144:1,12 151:15
**addressing**  93:10
  102:7 107:11
  109:20 145:21
**adjournment**
  149:22
**administrative**
  100:6

**administrator**
18:7 49:4
**adoption** 32:14
54:19
**ads** 87:7
**adults** 33:22
**advertised** 87:11
**advertising** 90:16
**affairs** 124:14
**affect** 100:11
**affixed** 150:6
152:15 153:21
**aforesaid** 149:12
**age** 11:19 33:23
**agencies** 13:8,11
14:4 26:1,8 28:5
30:18 42:15 44:14
69:16 86:1 109:17
113:2 129:6
140:25
**agency** 21:10 26:3
27:23 29:21 34:22
86:8 93:9 140:3
**agent** 21:8
**agents** 37:9 58:1
**aggregate** 82:19
**aggregated** 101:11
**aggressive** 55:8
**aggressively** 58:20
**ago** 46:24 61:9
64:16 95:24
**agree** 129:22
**agreed** 117:21
**agreement** 107:25
116:10
**agreements** 107:9
107:17,18 108:9
108:20,24,25
109:19,22
**ahead** 64:17 94:11
144:25

**akeyes** 3:15
**akron** 2:24
**al** 1:13,14
**alarm** 74:3,17,22
77:4 79:12,23,23
79:24 80:25
**alarmed** 71:16
**alcohol** 25:20 26:5
**alert** 79:12,23
**alerts** 66:3,6,11
67:1,5,8 93:18
94:2 97:4,5 99:6
**alleged** 145:12
**allow** 135:24
**allowed** 64:15
**alter** 129:19
**altered** 111:22
**amended** 6:2
12:10 16:3,8,16
117:24
**amerisourceberg...**
11:5,8
**amerisourceberg...**
2:16 11:12
**amount** 120:19
127:11 131:1
138:4 141:12
**amounted** 30:20
**amounts** 140:8
**analogs** 37:18
**analysis** 52:5
135:5,18 136:6
**analyzing** 80:7
**ancillaries** 56:23
**andrew** 3:13 10:23
**announcement**
83:14
**answer** 38:20
47:18 48:11,21
49:19 51:9 52:14
53:20 72:12 77:8

78:4,13 94:19
105:12 108:7
116:17 142:4
143:8
**answered** 47:16
53:19,20
**answering** 47:8,10
52:18 53:21 80:3
111:1
**anybody** 33:23
102:24 114:15
117:16 130:5
**anyway** 28:23
**apadukone** 3:24
**apart** 102:7
**apologize** 14:20
30:3 115:6 143:13
**appear** 152:11
153:15
**appearances** 2:1
3:1 4:1 5:2
**appended** 153:11
153:18
**applicable** 148:7
**apply** 143:22
**appreciate** 70:12
**appropriate**
119:19 134:9
140:4
**appropriately**
46:7 120:11
**approximate**
103:13
**approximately**
87:9
**arcos** 128:14
129:1
**area** 108:25 124:2
125:3
**areas** 40:24

**argument** 81:24
**arrests** 33:20
**arrival** 98:9
**aseem** 3:22
**ashland** 108:14
**ashtabula** 108:12
**asked** 14:23 29:20
37:24 42:4 52:23
70:5 86:2 121:25
134:19
**asking** 31:6,7,8,8
38:15 41:24 42:24
43:2 53:4,9 64:3
64:11 82:3,5,6,7
82:14 91:13,18
105:19 119:5
138:22 145:4
**aspect** 81:4 119:24
**aspects** 99:15
**assem** 10:18
**assemble** 83:7
**assess** 83:18
**assigned** 136:15
**assignment** 152:2
153:2 154:2
**assist** 143:6
**assisted** 61:21
**associated** 114:13
**assume** 76:23
120:18
**attached** 28:12
153:7
**attack** 121:17
**attend** 57:20
**attending** 10:7
**attorney** 6:7 24:14
57:21 145:6 150:2
**attorney's** 26:18
26:23,25 36:21
71:8 100:1 101:4
111:24 113:4

**attorneys** 10:6
13:25 14:19 16:2
21:21 22:8,15
23:3,8,20
**attributable** 54:25
55:15 75:9 98:10
141:20
**attributed** 92:16
**audience** 97:4
**audit** 89:23 99:7
**authority** 111:15
112:8 132:3
**authorize** 153:11
**automatic** 140:15
**autopsies** 36:6
107:22
**autopsy** 108:23
**availability** 41:7
63:6
**available** 67:1
80:6,8
**ave** 151:1
**avenue** 2:13 4:4
50:16
**avenues** 121:3
**avoidable** 75:25
**avoided** 41:3
**aware** 52:16,21
53:6,18 71:18,25
73:5 76:22 78:3,5
78:17 79:3,6,16
80:17 88:9 90:3
90:13 91:6 94:4
95:14 103:20
106:10 109:7
123:23 124:12,24
126:21,22 143:9
144:5,16
**awareness** 79:12
79:21 80:23

**b**

**b** 1:18 3:4 6:3 12:6
12:11 16:17 20:12
22:25 81:19 91:13
142:13 144:9
146:12
**babies** 32:7,12
**back** 18:19 47:16
51:10 52:6 53:13
61:12 66:19 69:21
75:14 79:11 80:1
81:3,9 94:15,16
134:12,15 147:3
151:15
**backwards** 141:6
**bad** 115:9
**badala** 2:4 11:15
11:15
**baggy** 37:3,5
**baker** 3:16 10:21
147:14
**bakerlaw.com**
3:19
**balance** 100:9
118:25 119:21
120:16
**ban** 113:22
**bar** 130:17
**barnes** 4:7 11:14
**base** 39:18
**based** 33:23 34:24
43:22 51:17,23
74:17 77:25 82:20
84:6,12 87:6
126:18
**baseless** 147:20,22
**baseline** 35:25
**basically** 18:20
60:23 65:16 93:6
**basis** 19:21 29:23
107:16

**becoming** 30:22
**beds** 60:4,12
**began** 70:2
**beginning** 58:6
127:8
**behalf** 2:2,11,15
3:2,7,12,16,20 4:2
4:6 10:19,22,24
11:1,5,12,14,16
45:18 115:1,2
119:7
**believe** 15:23 20:8
35:6 57:23 65:4
67:9 71:3 72:23
74:2 75:3 81:1
83:8 85:25 86:20
86:22 87:10,18,23
87:25 88:6,12,15
89:1 90:2 94:18
95:16 102:24
108:15 112:11
113:24 114:4,5,13
115:18 116:9
117:24 118:6,8
121:25 122:24
124:14 131:9,21
132:24,24 135:1
136:2 138:20
141:22 143:20
**best** 14:24 52:4
59:9 70:14,17
71:14 89:7,10
95:17 103:24
114:18,21 118:19
119:2
**better** 14:25 29:9
58:14 66:20
**big** 51:1 65:16
**bill** 133:5
**billboard** 84:12,18
84:24 85:10,12,17

85:23 86:6 89:14
94:21,25 97:25
**billboards** 43:11
84:5 87:5 88:16
90:13 93:12 97:16
**binder** 6:4 15:14
15:17,19,22 17:4
17:12 25:4
**bit** 19:8 24:9 55:24
62:5 79:11 111:4
112:21 116:14
**black** 6:4 17:4
**blanket** 120:9,14
**bled** 55:23
**blvd** 3:9
**board** 19:9,11
25:16,19,20,21,24
26:3,15,17 27:3,7
27:8 28:25 29:14
29:24 30:8,10,16
43:10 47:24 56:14
56:15,18 60:25
61:5,17 70:21
71:8 72:24 80:20
83:20,20 84:3
86:7,23 87:10
88:18,25 94:21
97:24 99:23 103:3
103:3,10 104:2,9
104:10 107:2,4
122:21 140:22
**boards** 139:25
140:22
**body** 66:18
**bono** 86:1
**boranian** 2:18 5:4
11:6,6,24 15:16
40:9,19 47:9
48:12,15 49:12
52:25 53:3,8,12,22
62:7 63:21 64:1,8

64:17 68:10 92:13
**border** 109:9
**born** 32:7,12
**bottle** 85:4
**bottom** 77:15
 96:18
**box** 17:23 127:25
**boxes** 65:15
 120:24,25
**break** 14:21 63:18
 63:20,22,25 64:6,7
 64:11,15,16,18
 101:6
**brief** 19:12 21:8
 37:8 103:17
**briefly** 110:6
 127:19
**bring** 36:5 44:21
 125:21
**brings** 19:19
**broad** 72:9,12
 87:2 116:14
**broadcast** 90:17
 97:12,16,23
**broadhollow** 2:4
**broken** 95:13
**brought** 113:25
 131:11 136:13
**btlaw.com** 4:9
**bucket** 84:9
**budget** 38:1
**burden** 77:2
**burling** 3:21 10:19
**bus** 87:24
**busier** 34:2 37:14
**business** 19:24
 20:17 21:17 22:22
**busy** 22:1,11
**buy** 37:14

**c**

**c** 2:4 6:8 24:15
 41:19
**ca** 2:20 3:23
 151:25
**cabinet** 65:6
 120:23 121:2,8,14
 127:24
**cabinets** 65:10
 128:1
**calculation** 127:11
**calendar** 130:7
**call** 15:24 59:21
 60:7 114:19,21
 128:6 130:9
**called** 11:19 26:15
 26:16 130:10
**calls** 123:9
**campaign** 56:6
 85:1,5,24 86:6,13
 87:19 88:11 94:21
 95:1
**campaigns** 43:11
 57:17 84:4,11
 87:20 88:22 97:16
 99:10
**cancer** 114:14,14
 116:11 120:12
**cap** 100:14
**caption** 10:3
 149:21
**caraffi** 19:9 21:2
**cardinal** 3:12
 10:24
**care** 32:4,14 39:9
 39:19,20 54:19
 81:21 118:20
 119:3,22,24
**carefully** 145:4
**caregiver** 39:9

**caregivers** 31:23
**caregiving** 39:7
**carfentanil** 52:9
 98:10,13,16,20
 99:2,5
**carole** 26:18
 147:16
**carried** 27:20
**carter** 3:8 5:5 11:2
 11:2 68:16,18
 76:13,16,19 81:15
 81:22 82:1,6
 110:5
**case** 1:8,15 10:3
 18:25 36:17 37:13
 61:24 66:2 140:18
 141:4 151:6 152:3
 153:3
**caseloads** 27:15
 30:4,14 31:12
 32:1 33:18 34:8
 36:3 54:24 55:12
**cases** 31:22 34:1,1
 35:5 36:10,19,23
 66:24 74:12 75:24
 81:10 83:20 108:5
 128:6 134:16,18
 134:21 140:5,11
**caseworkers** 32:2
**caspary** 2:12
 10:13,13
**catch** 139:23
**categories** 16:1
 28:15
**category** 72:13
 74:13 81:4
**caught** 30:25
**cause** 81:11
 149:12
**caused** 73:25

**causes** 73:9,12
**cdc** 2:14 63:11
 122:22
**center** 35:4
**centers** 65:8
**certain** 105:23
 114:3,6,11 116:4
 119:1 145:17
**certainly** 62:17
 79:14,16 97:24
 109:14 116:1
 118:16 122:20
 124:1 132:10
 136:5 146:17
**certificate** 5:6
 149:1 153:11
**certification** 152:1
 153:1
**certified** 11:22
 73:24 74:5 75:9
 82:11
**certify** 149:8,19
 150:1
**champion** 133:3
**chance** 46:14 64:4
 67:20
**change** 77:22
 151:13,14 153:8
 154:3
**changed** 77:21
 139:20 146:3
**changes** 112:1
 133:9 151:12
 152:7 153:7,9
**charge** 97:23
**charged** 102:12,25
**charging** 36:22
**chart** 16:20 25:12
 28:12
**cheap** 32:5

[check - complications]

check  130:23
139:21,23
checking  132:6
checks  141:15
chemistry  36:8
chicago  3:5
chief  70:7
child  19:8 39:4
children  31:13,15
31:19,21,24 32:11
39:1
chris  10:13
christopher  2:12
chronic  121:23
122:3,8
chunk  123:10
ciaccio  2:3 10:9,10
14:9 15:18 17:10
23:18,19 25:17
29:4,7,16 31:17
32:25 38:19 40:7
40:11 46:19 47:7
47:14 48:9,14,20
49:5,10,14 52:13
53:2,5,11,14 54:1
55:2,19 62:4
63:17,24 64:4,10
64:19 68:14 69:8
70:20 73:6,19
74:6,20 75:1,13
76:9,14,17,20 77:5
77:19 79:9 80:15
81:12,19,25 82:4,9
82:13,23 83:15
88:13 89:11,18
90:1 91:12,18
92:1,10 102:15
103:5 104:6 105:2
105:10,17 106:18
114:22 115:25
116:7,24 117:7,22

119:4 120:1
135:21 136:12,25
137:3,25 138:21
139:5 142:7,23
144:24 145:19,24
146:16,24 147:4
147:12,21 151:5
citizens  79:8
133:12
city  2:11 10:14
21:6,7
civil  12:5 144:13
148:3,7 152:5
153:5
claimed  29:1
claiming  25:9 40:6
40:12,16 49:8
52:11
clarification
139:10
clarified  72:15
clarify  40:12
clear  15:1 26:6
72:3 78:10 91:16
93:25 99:3 124:25
134:18 146:9
clearly  52:15
cleveland  1:23 2:9
2:11,13 3:18 4:4
10:14 21:6,7
60:25 61:5 124:15
142:19 150:7
151:2
cleveland.com
86:16
client  145:6
climaco  1:22
clinic  124:15
clinical  115:24
close  60:2

closely  27:11
122:24
closeout  131:2
cocaine  16:14
code  100:6
colleague  67:22
collect  35:21,21
36:15 37:10
collected  17:14,19
36:24
collecting  65:17
collection  65:8
columbiana
108:18
columbus  3:10
come  44:13 46:3,6
50:3 51:10 53:12
59:22 70:8 109:22
147:2
comes  21:18
coming  23:20 30:6
79:19 116:9
118:15
commander  21:5
142:15 144:6
commission
150:17 152:19
153:25 154:25
commissioned
149:8
committee  48:5
101:1
committees  99:17
common  33:13
35:25 100:17
106:8
communicate
80:12 91:24 124:2
communicated
72:21 82:21 83:1

communicating
71:24 73:4 87:16
communication
77:17 90:4 94:8
106:9 112:19
125:12
communications
69:9 76:11,18
77:24 78:8,14,19
78:23,25 79:2
85:23 89:24 91:9
91:11 92:3,5,6,20
95:10 99:8 110:1
112:17 113:18
124:6 145:6
communities
65:20 71:2
community  13:16
13:22 17:18 31:21
35:23 43:13 57:10
57:19 58:9,16
69:10,15,23,24
70:5 71:11,13,19
75:11 80:10 83:11
83:25 94:3,6
95:12 98:13
123:22 132:5
133:14
companies  145:10
company  3:3
complaint  16:4,6
complete  20:19
94:19 103:21
113:22
completed  149:22
151:15
completely  49:12
complicated  46:20
48:11,24
complications
100:12

**compound** 75:2
77:6
**concentrate** 70:15
**concern** 137:21
138:1,2
**concerned** 120:22
**concerning** 112:14
**concerns** 50:10
145:10
**concluded** 147:25
**concrete** 50:5
**condensed** 16:9
**condition** 140:16
**conditions** 114:3,6
114:6,11 130:8
**conduct** 126:16,25
**conducting** 135:18
**conference** 83:8
**conferences** 57:20
57:20 94:2
**confidential** 67:3
145:5
**confusing** 49:16
79:10
**conjunction** 65:6
96:4 102:9
**connect** 51:22
**connecting** 121:13
**connection** 30:8
72:6
**connolly** 3:12
10:24
**consider** 89:20
111:12
**consideration**
111:6 116:21,25
117:14
**considered** 115:21
146:14
**consistently**
127:13

**constant** 125:24
**constantly** 22:22
**contact** 19:19
**contain** 146:10
**contained** 73:22
**containing** 6:4
17:4
**contend** 24:4
25:15,23
**contention** 55:21
**context** 95:25
**continue** 96:22
123:17
**continued** 3:1 4:1
50:22 132:12
**contract** 107:24
108:16
**contributing**
39:18 79:19
**control** 41:15
57:13 146:9
**controlled** 123:7
**conversation**
18:25 19:12 21:9
121:10
**conversations**
28:1 47:24 118:17
118:21 129:15
**cooperation**
109:19
**coordinate** 46:4
**coordination**
107:9
**copy** 15:16 17:24
**coroner** 73:25
74:11 78:9
**coroner's** 73:12,20
74:16 75:7,23
**corporation** 2:16
3:21 10:20

**correct** 16:6 25:5
38:14 68:22,23
72:1,10,16,17 74:1
84:2 88:15 112:8
112:15 120:21
124:3 131:18,20
136:10 137:17
138:19 143:24
149:17
**corrected** 16:4
**corrections** 151:12
153:17
**corrective** 74:25
**cost** 97:20
**costs** 32:4 97:18
98:1
**council** 70:5
**counsel** 2:16 15:12
109:25 147:19
148:1,10 150:2
**counties** 107:13,23
108:4,11 109:2
**counting** 134:24
**county** 1:13 2:2
6:3,6,7 10:10,12
11:16 12:5,11
13:8 14:4 16:13
16:15,18,20 20:4
21:1 24:1,3,12,15
24:24 25:9,14,22
26:1,8,12 27:2
28:5 29:11 30:7
31:9,15 33:14
34:17,23,25 35:1,4
35:13,15 38:5,16
38:16,23 39:12,22
40:4,25 41:1,6,22
42:6,12,18 43:7,9
43:10 45:4,16,19
46:15 48:6,18
49:3 50:8 51:13

51:18 52:10 54:7
54:9,13,15 55:14
55:22,25 56:9
58:24 60:24 61:17
62:10,25 64:25
65:5,9,19 66:4,5
69:5,9 70:17 71:7
71:16,16 72:20,24
73:3,8,14,15,18,23
74:3,17 75:8 76:8
76:25,25 77:3,16
77:25 78:11,14
79:5,6 80:5,7,11
80:20 82:11,21
83:6,11,19 84:3,18
85:2,12,17 87:16
87:22 88:10 89:6
89:22 90:3 91:2,8
91:14,19,22,23,23
92:15,19 93:11,13
95:11 96:10 97:16
97:17 98:2,12
99:7,20,23 102:22
102:25 103:2,9,16
103:25 104:9,13
104:16,22 105:7
105:19 106:15,22
106:23 107:4,8,15
108:13,14,14
109:1,10,14,16,17
109:20,20 110:1
111:14 112:7,13
112:25 113:1,21
114:1,23 115:1,2
115:13 116:18
117:1,21 118:3,7
118:16,23 121:20
121:22 122:6
123:5,7,8,9,21,24
124:1,21,25 125:6
126:2,3,10,16,23

126:24 127:4,20
128:11,24 129:3,6
129:9,13 131:6,6
132:2,16 133:10
133:21 137:19
138:7 141:13,24
143:16 144:2,13
144:21 145:9,15
146:13 147:13
149:4 152:10
153:15
**county's** 28:19
51:25 52:1 54:2
68:21 83:14 89:12
91:21 104:20
117:5 119:14,19
131:25 143:25
144:3,12,15
146:11
**countywide** 93:8
**couple** 62:6,9
63:18 105:13
**course** 18:9 19:24
20:16 21:17 22:21
37:20,23 125:10
**court** 1:1 5:8
11:17 28:6 33:13
33:14 34:2,3,4,6
65:15 152:7
**court's** 6:10 24:19
25:2
**courts** 21:15 34:15
44:5
**cov.com** 3:24
**cover** 120:10
**covered** 40:5 44:4
45:7 56:4 67:12
68:7
**covington** 3:21
10:19

**cpd** 143:3
**craft** 63:4
**create** 66:6
**created** 14:3 28:9
34:4 55:9 71:9
99:24 100:2
**creation** 26:22
58:7 80:20
**crime** 83:22
109:13
**criminal** 144:2
**crisis** 13:15 19:20
26:1,13 28:9 31:2
32:1 33:22 34:5
34:24 35:20 38:2
43:14 44:12 50:13
51:5 63:5 82:22
83:2 93:4 102:8
108:2
**criteria** 34:11 62:1
**critical** 79:22
**critically** 60:13
**cross** 106:4 120:15
**crosses** 18:11
**current** 54:19
111:20,20 144:23
**currently** 44:8
45:18 100:5
131:13
**custody** 5:7 32:10
**cut** 14:17,18 42:3
47:17 88:7
**cuyahoga** 1:13 2:2
6:3,6,7 10:10,12
11:16 12:5,12
16:13,15,17,20
24:12,14,24 26:1
26:12 28:19 35:4
35:13 50:8 65:19
66:4,5 99:22
107:14 109:1,10

109:15,17,20
111:11 113:19
122:13,15 124:3
125:3 126:18
132:1,4,17 142:18
143:25 147:13
149:4

**d**

**d** 2:12
**daily** 19:21 119:18
**damages** 25:8
27:22 28:14,19,21
29:1,23 40:13,16
40:16 49:8,15
52:11 146:1
**dan** 1:10
**danger** 41:20
93:25
**dangerous** 98:19
**dangers** 43:13,18
69:6 70:9,18 73:4
84:21,22 93:19
94:16
**data** 35:22 44:9,21
50:20 51:8 52:5
56:7 57:7 73:9,21
75:15,17 76:14
77:14 80:6,7,10
83:7 90:4 99:8
101:7 126:18
128:14 129:1
134:23 136:4
140:3
**database** 128:18
**datasets** 80:16
**date** 10:2 20:9
49:15,15 73:1
89:3 133:15
144:19,20 146:6
148:11 151:8
152:3,9,19 153:3

153:13,25 154:20
154:25
**david** 19:7
**dawn** 19:13 41:2,3
42:17 56:5,23
**day** 3:8 11:2 18:9
18:10 39:17 65:21
68:5,5 118:5
140:14 150:7
152:16 153:22
154:22
**days** 123:15
151:18
**dc** 3:14
**dcfs** 32:15
**dcsf** 32:17,24 33:9
39:6
**dea** 21:8 57:25
65:7 103:4 105:8
106:16,24 140:24
**dead** 60:10
**deal** 13:15 20:16
34:9 36:2 38:1
39:3 59:6 62:1
**dealing** 22:22 26:4
40:3 62:23 99:18
108:25
**deals** 15:23,25
25:8
**dear** 151:10
**death** 36:23 48:5
50:1 66:4 73:9,13
74:11 81:11 134:3
137:17 139:7
143:2
**deaths** 16:14,15
26:14 41:3 50:6
73:10,24 74:4,18
75:8,25 77:3 78:1
78:15 82:11 92:16
93:7 98:9 134:22

135:2 141:5 146:5
**dechert** 3:3 11:1
**dechert.com** 3:6
**decided** 27:10
101:6 145:16
**decisions** 80:11
**deed** 152:14
153:20
**deemed** 79:22
151:19
**deep** 136:14,18
**defendant** 3:20
11:7
**defendants** 2:17
3:16 6:9 10:22
24:18 25:1 144:3
144:14,23
**defender** 33:13
44:6
**defenders** 34:2
**define** 106:23
**definition** 138:8
138:15
**delivery** 148:9,11
**demand** 121:18
**demographics**
33:23
**department** 31:19
44:24 54:10 61:1
61:5 63:13 151:22
**departments**
59:16
**dependent** 61:24
**depends** 96:12
**depo** 147:10
**deposed** 11:22
14:11
**deposition** 1:18
6:3 12:9,11,17
13:5 15:7,10
16:17 17:3,22

18:5,14,24 19:4
20:5,8,12,21 21:22
22:16 23:3 24:11
63:22 81:17,20,23
91:13 92:7 147:25
149:20 151:8,11
152:1,3 153:1,3
**depositions** 147:15
**derek** 21:9
**describe** 43:7 96:2
**described** 39:25
48:19 54:3,24
55:13 56:1,6,8,11
59:1 62:12,15
63:1 81:5 95:24
98:17
**description** 6:1
20:20 53:22
**design** 51:2
**designated** 28:18
45:14 67:19
**designation** 81:23
**designed** 36:12
85:5,22
**designee** 68:21
**designing** 45:2
51:4
**detail** 101:9,12
**details** 61:7
**detecting** 141:18
**detectives** 37:10
**detox** 61:23
**dettelbach** 26:18
**develop** 143:1
**developed** 59:2
145:9
**dialogue** 71:12,13
**die** 32:10 139:8
**died** 38:10 106:5,6
137:16

**dies** 66:3
**difference** 71:6
80:22
**different** 44:12,13
44:14,21 77:11,23
78:13 79:25 80:25
85:11 96:14 98:15
99:1 105:14
109:16 112:14
113:20 115:21
116:19 119:15
121:21 122:12
124:2 129:24
130:13
**differentiate** 21:16
**difficult** 21:16
51:19 120:3
**dinner** 18:23
**direct** 39:21 55:6
142:4
**directly** 39:10
60:2 71:2 140:9
**director** 19:7 21:9
32:20 33:4 92:3,6
**directors** 13:12
19:6
**disclosed** 30:7
**discovery** 17:20
49:2
**discuss** 18:16,24
69:13 105:16
114:1 123:2
**discussed** 33:4
38:6 42:16 63:15
65:2 89:15 99:15
111:16 117:16
132:21 144:18
**discussing** 132:13
**discussion** 46:21
58:12,14 70:4
92:3 100:18

111:24 112:4
113:3 115:5,12
116:2 118:7,9
119:17 121:5
122:1 123:4,17
124:22 125:25
132:11 134:7
140:8
**discussions** 13:11
13:13,24 14:1
19:5 30:19 45:22
46:9 50:2 63:11
100:3 102:12
103:18 111:18
113:6,9 114:16
116:11 118:24
119:14 120:5,6
121:19 122:5
124:1,10 125:13
126:11 132:16
**dispense** 123:13
139:23
**dispensed** 120:20
128:19
**dispensing** 23:24
45:6 46:17 51:15
54:5 55:17 111:8
129:10,14,20,25
130:24 131:7
143:23
**dispose** 65:12
**disseminate**
122:14 125:1
126:4
**disseminated**
122:25 125:2
**distribute** 41:9
88:7 123:18
129:17
**distributed** 127:10
128:19

**distribution** 23:24
24:5 38:18 42:13
42:20 45:6 46:17
51:15 54:5 55:16
111:8
**distributor** 2:15
2:16 3:20 6:9
24:17 25:1
**district** 1:2
**dive** 136:18
**diversion** 23:25
24:6 38:18 42:13
42:20 46:18 51:16
54:6 55:17 127:19
127:21 128:5,22
135:19 143:19,21
**diversions** 143:12
143:13
**diverted** 128:2
**divided** 28:14
**division** 1:3
**dna** 37:2,5
**dockets** 34:2,3
**doctor** 43:20
58:12 67:21,24
85:6 130:5,9
133:25 134:11
135:2,11,19
137:22,24 138:6
138:17,18,25
139:3,16,18,19
141:1,20 143:7
**doctor's** 140:21
141:11
**doctors** 37:12
38:24 103:2 128:8
130:7,13,22
138:14 139:21
141:2 142:2,21
**document** 1:12
16:7

**documents** 13:17
14:2,6 15:4,6
16:22 17:11,13,23
**doing** 18:10,12
26:2 29:12 30:2
34:23 45:10 48:3
50:8 62:14 91:15
121:15 125:18,22
132:9 142:13
**dollars** 29:2,20
37:25 63:6
**dosage** 118:4,5
119:18 121:9
**dosages** 119:1
**dose** 113:12 120:8
**doses** 117:12
118:19,19 120:8
120:18 127:9,12
**dosing** 113:14
119:19
**dots** 51:22 121:13
**doubled** 93:8
108:1 146:4
**downloading**
136:4
**dozen** 22:18 38:10
107:23
**dozens** 22:12,18
96:16
**dr** 18:6,13 19:11
21:2,2 38:25
136:7,21
**drive** 3:4 17:19
**driving** 124:16
**drop** 65:15,21,23
120:24,25 127:24
**drug** 2:16 21:10
21:15 25:21 34:3
34:6,14 35:3 36:8
36:10,17 37:4
38:11 47:25 54:15

57:6 65:15,15
66:10,14 69:17
93:2,7 120:23,25
127:24 141:15
**drugs** 26:5 41:11
41:13 55:11 65:17
65:23 84:22 94:17
96:2,2 128:19
129:14,20
**due** 31:22 57:6
108:2
**duly** 11:21 149:7
149:10
**dying** 30:23 31:25
35:8 48:4 49:23
50:11

### e

**e** 3:17
**earlier** 66:15
78:20 81:5 84:1
110:17 111:16
**early** 40:25 49:2
84:16
**earnest** 70:3
**ears** 90:23
**eastern** 1:3
**easy** 39:2 44:19
**ed** 11:2 68:18
**edited** 88:6
**educating** 20:25
**education** 45:24
142:13 144:9
**edward** 3:8
**effect** 13:14 27:21
39:21,21 87:9
126:20
**effective** 89:17,20
90:6 91:10 95:13
122:3
**effectively** 91:25

**effects** 39:5
**efficacy** 89:23
91:9 99:9
**effort** 43:15 58:10
70:2 85:25 111:23
125:5,12
**efforts** 63:3,14
86:2 87:8 89:13
89:16 112:14
118:3 122:13,15
124:21 125:7,15
132:13 144:1,12
**either** 31:24 53:19
59:19 109:9
130:21 133:25
137:22,23 138:7
139:1 150:2
**el** 57:24
**elaborate** 36:10
**ellis** 4:3 10:16
**email** 151:17
**embarked** 43:10
84:4 94:5
**emcarter** 3:11
**emergency** 27:18
123:12,14 125:18
**emerging** 37:19
**employ** 95:19
**empower** 57:13
**ems** 59:23
**enclosed** 151:11
**encompassed**
101:8
**endanger** 119:2
**endangering**
118:20 119:22
**ended** 93:24 116:9
117:23
**endo** 3:16 10:22
147:19

endorsing 122:7
ends 121:17
enforcement 21:5
  34:22 36:12 37:1
  44:1,4,17 57:21
  58:15 59:4 66:12
  67:3 93:22 101:18
  102:1 103:4
  104:14,17,23
  105:21 106:2,11
  109:4,5,16 126:8
  128:4,4 134:12
  135:7,9,13,25
  137:24 139:1
  140:24 141:7,14
  141:17 142:1
  143:18
enforcement's
  27:9
engagements
  95:19
engaging 137:21
  138:16 139:3
ensuing 44:11
ensure 91:23
enter 136:4
entered 153:9
entire 82:14 152:5
  153:5
entirely 122:9
entities 145:10,18
  146:15
entitled 47:22
entity 101:15
  110:2
enumerated 20:23
  22:17
enumerating
  27:22
environment
  60:16

environmental
  60:15
epidemic 144:1,13
equals 127:12
equipment 37:15
  37:16 38:2
equivalent 113:12
erica 4:3 10:15
erica.james 4:5
erie 108:15
errata 151:13,18
  153:7,10,18 154:1
especially 59:20
  64:12 69:19 95:20
  122:22 129:16
  140:5
esq 2:3,4,8,12,18
  2:18,23 3:4,8,13
  3:17,22 4:3,7
  151:5
established 31:11
estimate 70:17
  71:14 89:7 104:3
estimated 78:20
estimates 90:17
et 1:13,14
evaluate 89:23
  90:5 99:8
event 90:8,9 150:3
everybody 27:13
  35:24 41:13 123:8
  125:12
everybody's 27:15
everyday 66:1
evidence 36:15,24
  37:11 66:10
  126:18
evident 124:11
evolution 50:13
  93:4

ex 6:7 24:13
exact 73:1 146:6
exactly 67:10
examination 5:4
  11:20,23 68:15
  110:12
examiner 30:9
  47:23 57:24 66:7
  73:17 74:5 83:5
  96:15 99:6 108:23
  134:6,9 138:8
  140:9,17
examiner's 16:13
  18:8 19:17 26:13
  27:9,20 30:6 35:5
  35:16,20 46:9
  49:4 50:4 66:5
  73:11 75:23 76:7
  76:15 93:18 97:3
  103:20 105:24
  107:22 127:5
  128:7 135:6 136:8
  137:13 138:12
  140:1
example 29:2 56:5
exceptions 113:7
  120:12
excerpts 16:5
excessive 140:7
exchange 41:8
  110:24
excluded 114:7
exclusive 62:17
exclusively 54:4
  55:15
excuse 128:25
executed 153:10
execution 152:14
  153:19
executions 85:11

executive 83:6
exhibit 5:7 6:2,4,6
  12:9,16,18 16:24
  17:3,12 24:8,11,23
  25:5,11,12
exhibits 5:3,8 6:1
existed 100:5
existence 70:24
existing 45:25
expand 60:20
  133:8
expanded 41:7,18
  44:2
expansion 40:23
  133:5
expend 42:2
expended 27:14
expensive 35:12
  45:3
experience 46:16
  47:13 48:18
experts 27:24
expiration 152:19
  153:25 154:25
expires 150:17
explain 30:2 48:10
  114:9 145:1
exposure 91:3
extending 31:10
extensive 63:2
  100:3
extensively 99:24
extent 19:1 112:3
extremely 98:19
eyes 90:22

**f**

f 3:7
fabric 65:25
facility 60:2
facing 50:14 82:22

fact 31:23 121:7
144:19
factors 50:15
54:25
factual 82:8 145:8
fail 37:15
fair 76:8 104:5,7
116:3 118:22
120:18 131:1,17
138:3 139:9
fairly 60:18
122:24
fairness 62:23
fall 128:12
falls 81:13
familiar 38:3
75:18 111:9
116:15 118:13
128:13
familiarize 13:9
familiarizing
30:17
families 38:23,25
39:20 57:14 59:6
59:7
family 19:8 31:14
31:16,20 38:13
57:12 59:13
far 32:18 71:11
90:12 112:4
fashion 87:12
faster 36:4
fatal 59:20 141:16
fatalities 36:3 57:2
79:19
fatality 66:8
139:15
favorite 130:17
federal 12:5 61:19
63:3,12 112:10,22
128:18

feel 140:4
felt 35:23 93:24
119:19
fentanyl 16:14
37:18 41:9,12,14
44:12 52:8,8
70:11 92:16,21
93:1,14,24 95:25
96:24 97:8 98:17
99:4 106:7 138:11
146:5
fewer 32:16
fgallucci 2:10
fifth 100:16
figure 89:22 91:3
116:17,19 123:21
138:9 147:1
file 17:14,23
140:18
files 17:16,18 18:2
108:21 141:4
filibuster 48:16
filing 144:22
filled 55:11 57:9
filling 135:1
find 26:15 49:24
59:7 65:10 67:15
142:17 143:6
151:11
fine 16:11 43:5,5
92:14 147:4
fingerprints 37:2
finish 38:20 42:10
64:2,5
finished 52:2
58:22
finishes 47:14
first 11:21 32:22
46:15,21 47:6,13
48:7,18 49:7 50:5
51:14,17 59:9

69:5,5 70:15,17,18
71:15,24 72:14,20
78:21 82:25 84:11
86:12 99:18 107:3
107:21 113:5,20
121:11 132:11,16
132:21 145:16
146:13 149:10
fits 58:5
five 22:4 66:19
130:6
fliers 86:11
flooded 93:6 146:5
floor 2:13
focus 42:10 72:18
81:3 96:1 99:14
99:16 108:7
110:25 113:19
117:10
focused 72:4,15
73:2 100:23
101:15 102:4,13
102:20 109:10
117:8
focusing 118:1
focussed 78:21
folks 19:19 20:16
35:7 41:10
follow 47:16 84:10
108:6 125:7 128:7
133:18
followed 126:6,8
following 101:22
119:10 142:10
follows 11:22
forbid 64:15
forbidding 63:24
force 19:10 21:6
21:12 26:23,25
28:2 30:19 56:13
58:7 70:21 71:7,9

72:24 78:21 80:21
83:2 99:16,23
100:1,25 101:4,10
109:10 111:24
113:4 123:1 124:9
125:11,25 126:11
133:16
forces 13:14,22
19:18 56:12
101:15,18 102:1,2
109:3,7 111:17
128:4
forefront 59:12
foregoing 149:16
149:21 152:13
153:18
forensic 36:5,6,16
36:18 79:14,15
form 25:17 29:8
29:16,22 31:18
32:25 38:19 40:7
46:19 55:3,19
69:8 70:20 73:7
73:19 74:6,20
75:1,13 76:9,21
77:5,20 79:9
80:15 81:17 82:13
82:23 83:15 87:12
88:13 89:11,18
90:1 92:1 103:5
104:6 105:2,10,17
115:25 116:7,24
117:7,22 119:4
120:2 135:21
136:12 137:4,5,25
138:21 139:5
142:7,23 144:24
145:19 146:16
formal 83:25
107:9,19,24
108:24,24 109:19

109:22
format 85:12
formats 44:13
formed 28:2
forms 86:9
forth 123:19
134:13
fortunate 44:24
fortunately 38:3
forums 57:19
forward 90:20
97:7 134:19
151:15
forwarded 117:24
140:21
foster 32:3,13
54:19
found 36:25
foundation 57:11
80:20
foundational
69:22
four 23:13,14
francisco 2:20
3:23
frank 2:8 10:11
frederick 3:2
free 152:14 153:20
friday 60:8
friends 38:13
front 3:22 15:14
15:19
frontline 26:3
full 51:5 61:23
83:23 134:14
140:18
fully 46:23 47:19
51:4 104:17
106:10 124:12
funded 60:24

funding 61:18,18
further 59:4 92:2
106:14 126:1,3
146:20 149:19
150:1

**g**

gallucci 2:7,8
10:11,11,12 17:8
23:19
gang 109:9
garofoli 1:22
geauga 108:12
general 13:19
19:20 20:6 84:20
85:8 86:24 92:23
95:3,5,8 96:25
97:9 102:11
103:18 116:10,10
118:18,21
general's 57:21
generally 36:17
65:9 72:13 98:18
111:11 117:21
126:13 141:10
genesis 50:13
gentleman 23:16
geographic 107:15
getting 19:25
20:19 30:25 34:15
41:4 43:3 59:13
59:14 61:22 83:23
86:25 106:13
121:8 130:3 133:4
134:22 136:18
140:12
gilson 18:6,13 21:2
38:25 136:7,21
gingell 21:5
142:15,16 144:7
give 50:23 60:6
61:25 103:7,13

104:3,25 106:3
109:6 123:9
125:15 146:6,21
148:1,10
given 45:17 71:19
95:11 149:13,18
go 14:10 25:11
27:22 32:2 35:10
40:13 56:8 57:18
61:11 63:18 64:17
65:10,22 69:23
75:14 82:7 87:9
94:11,15 97:9
110:6 130:14,15
134:11,15 144:25
goes 14:18 39:10
going 20:7 27:15
28:6,7 29:12
31:25 32:21 33:19
33:21 34:14 35:11
36:14 40:15 42:7
43:4 44:22 47:17
52:14 58:3,8,9,23
62:8 63:17,18,20
64:5,7 68:11 80:1
81:8 82:2 93:16
96:16,22 107:7
109:8,25 110:19
110:20 111:5
133:1 137:6
145:16
good 11:25 12:2
30:2 34:13 68:17
71:10 72:8 90:10
91:8,19 110:18
115:9 132:8 133:5
gotcha 146:3
government 28:9
31:3 61:19 111:25
112:23 124:14
133:11

governmental
110:2
grandparents 39:8
grant 44:24
grants 61:18
great 38:12,22
66:25
greater 30:4,14
31:12 32:16 33:18
98:23
grew 36:9 95:4
group 101:1,11,14
101:14 102:10,19
groups 57:22
69:25 94:7 99:17
100:24 101:6
guess 52:4 74:21
89:19 90:19 130:7
142:18
guideline 114:7
guidelines 63:10
63:16 100:4,10,13
100:19 101:22
106:1 111:19,20
112:15 113:21
114:12 115:22
116:4,16 117:19
117:24 118:8
119:17 121:21
122:11,12,14,23
123:11,23 124:7
124:11 125:2,8,17
126:5,19 127:8,15
135:23 136:19
140:7

**h**

h 3:9 100:14
hand 16:25 109:25
150:6
handled 118:12

[handwritten - implementation]                                              Page 14

handwritten
  16:21
hannam  4:7 11:13
  11:13
happen  112:9
happened  18:21
  28:25 29:22,24
  31:9
happening  36:1
  93:17 124:13
  146:10
happens  138:23
hard  17:18,24
  19:14 21:25 117:2
  117:17
harm  23:22 24:4
  25:15,22 27:1
  28:20,20 29:3,13
  29:22 30:10,10,11
  31:8,9,14 32:23
  33:6,14,17 34:17
  35:15,18 38:5,15
  38:16,23 40:4
  41:16,25 42:5,11
  42:17 43:6 45:4
  45:19 46:16 47:6
  47:13 48:7,8,18
  49:7 51:14,17
  52:11,17,22,23,25
  53:7,10,15,16,17
  53:18,24,25 54:3
  55:13 56:1,10
  58:25 61:16 62:11
  63:1 65:1 145:11
  145:14
harmful  29:24
harms  27:13 39:10
  39:21 40:2 42:24
  55:4 80:13
hartman  3:17
  10:21,21 147:18

hd  4:6 11:14
head  125:14
  139:11
health  3:12 10:24
  19:10,11 25:21
  26:17 56:14 63:13
  70:22 71:8 83:21
  88:4 94:1 101:7,8
  122:21
health's  27:8
  72:24 80:21 99:23
healthcare  125:13
  126:17
hear  58:13 110:23
  139:11
heard  30:4,5
  113:16
help  37:19 41:16
  57:14 59:25 60:8
  63:4,4 96:20
  128:21 133:3
helped  20:1 50:7
  59:5
helping  51:1
helps  37:17 108:7
hep  41:19
hereinafter  11:21
hereunto  150:5
heroin  16:14
  26:14 44:11 46:21
  46:25 50:6,11
  52:7,7 70:10 72:5
  72:16 81:7,10
  82:11,22 83:2
  84:14 92:25 106:6
  143:2
hhs  19:6
hidden  47:2
hidi  21:6 143:2
high  21:10 118:18
  120:8

histories  49:23
  50:25
history  137:14
  139:16 140:18
hiv  41:19
hold  50:22
home  18:22
  130:15
homes  128:1
hope  95:22
hopefully  70:12
hoping  60:19
hospital  41:1
  123:9
hospitals  27:17
  45:22 46:5 122:18
  124:3,6,9 125:3,8
  126:12
hostetler  3:16
  10:22
hostetler's  147:14
hour  62:5 63:19
  64:13
hours  22:20,23
  23:12 147:10
housing  56:17,19
  56:21 61:11,23
hugh  1:19 5:4 10:5
  11:19,23 68:15
  110:12 149:9
  151:8 152:4,9
  153:4,13 154:20
hundreds  22:23
  57:18 96:15

i

idea  85:23 91:19
  115:9,9 132:8
identification
  12:13 17:6 24:21
  138:24

identified  32:23
  68:25 74:18 78:2
  84:5 106:6
identify  10:7
  37:17,19,19 40:1
  41:11 42:18 74:24
  87:21 94:13 99:1
  99:19 102:3 104:4
  105:5 108:8
  128:21 133:24
  135:10,19 136:25
  137:21 138:6
  139:15
identifying  35:19
  42:11 77:17 78:24
  100:15
identity  104:23
iii  2:8
il  3:5
illegal  72:9 127:21
  137:22 138:18
  139:18 143:13,19
illegally  141:21
  142:22
illicit  55:11 72:15
  81:6 92:16,21
  94:17 95:25 96:1
  97:8 98:17 99:4
illustrative  53:23
immediate  134:4
impact  25:16,23
  27:2 31:15 33:15
  34:18 35:16 90:25
  91:4
impacted  28:25
  32:23
impactfully  91:25
impacts  19:8
implement  123:3
implementation
  123:6

**implemented**
61:15 123:11
127:8
**implementing**
126:12,13
**importance**
115:23
**important** 35:24
41:16 56:20,22
57:8,11 59:15
60:13 66:16
129:24
**improper** 139:3
142:2 143:23
**improperly**
141:21
**incarcerated**
31:24
**incidence** 128:21
133:24
**include** 41:7
101:25
**included** 97:11
116:4 151:13
**includes** 72:9
**including** 53:4
**incorporate** 87:6
**incorporated**
153:12
**increase** 55:12,14
77:1
**increased** 36:2
41:7 54:24
**increasing** 83:23
**incredibly** 136:23
**incur** 27:2 47:6
48:7,7 49:7 51:14
97:17
**incurred** 23:23
24:4 25:15,23
29:5 31:14 32:23

33:6,14 34:17
35:15 38:5,17
42:11,18 45:4,20
52:12 53:1,15
54:4 55:13 98:2
**incurring** 52:16
52:21 53:6,18
**independent** 116:6
116:22
**index** 5:1,3 6:1 7:1
**indianapolis** 4:8
**indicated** 73:9
88:17
**indicating** 151:13
**individual** 26:1
31:6 69:15 82:17
122:17
**individuals** 58:8
84:10 104:24
**inexpensive** 34:14
**inform** 44:17 50:7
57:3 58:18 59:5
**informal** 107:17
107:20
**information** 13:20
17:17 44:10,16
45:9,18 46:22
47:21 49:22 51:3
51:21,24 57:11
58:13 77:14 81:2
85:14 123:18
**informed** 46:23
104:17
**informs** 58:14
**initiated** 87:22
**initiating** 146:14
**initiatives** 133:1
**inject** 95:6
**injury** 16:1
**inpatient** 60:2
61:21

**inquiries** 105:21
106:2
**inside** 85:3
**instances** 135:11
135:19 138:6
141:19 143:19
**instincts** 59:9
**instituted** 41:8
59:17 65:15
**instituting** 41:1
**institutions** 33:15
**instruct** 36:13
**instruction** 148:2
148:10
**instructions** 14:11
15:1
**integrated** 44:9
56:7
**intend** 77:22 91:23
**intensified** 87:13
94:7
**intensity** 21:10
**intensive** 44:23
94:14
**interdicted** 93:22
**interested** 150:3
**internally** 113:4
**internet** 89:14
93:13
**interrogatory** 6:9
15:25 24:18 25:1
25:7 28:13 42:15
**interrupting** 38:21
**intervention** 89:15
99:5
**interventions**
41:19 42:24 44:18
51:2 93:12,22
95:24 96:7 97:17
99:10

**investigate** 128:5
142:20 145:16
**investigated**
104:21,24
**investigates**
143:18
**investigating**
102:2 141:5,9
142:2,11 143:7
**investigation**
66:21,22,24 136:3
143:3 144:2,8,14
144:22 145:2
**investigations**
32:3 34:24 36:9
44:3,18 59:3
66:15,25 101:21
103:15 104:18
106:11 141:23
**investigative**
143:1
**investigators** 66:7
66:13
**investigatory** 67:3
**investment** 41:5
**invited** 57:23,24
**involved** 88:5
99:20 101:10
103:16 112:13
114:16 118:23
120:13 123:25
143:2
**involvement** 112:4
147:15
**involves** 109:4
**issue** 48:25 77:17
77:21 107:11
126:8 129:23
133:11
**issued** 80:19
117:19

**issues** 22:23 42:7
47:20 50:10 56:17
69:22 79:17 99:25
101:19 109:1,21
**issuing** 122:13

**j**

**j** 2:18 3:13
**jackson** 2:22 11:5
**jacksonkelly.com**
2:25
**jail** 28:7 33:21
34:10,25 35:1,8,12
35:14 40:23 58:20
**jails** 30:5 54:13
83:23
**james** 4:3 10:15,15
**janssen** 4:2 10:16
**january** 1:20 10:2
150:8 151:4
**jciaccio** 2:6
**joan** 19:11
**job** 30:3
**joe** 64:9 136:22
**jog** 21:12
**john** 3:9
**johnson** 4:2,2
10:16,17
**joint** 85:25
**jones** 3:8 11:2
**jonesday.com**
3:11
**joseph** 2:3 4:11
10:9 151:5
**journals** 118:14
**judge** 1:10 21:14
21:14 65:14 96:13
**judgment** 115:24
116:6,23 117:15
**july** 150:17
**jumping** 79:11

**jumps** 75:16
**june** 16:15
**jurisdiction** 118:7
126:9
**jurisdictions**
107:10,12,15
108:8 109:5,15
**justice** 30:25
33:20 44:24
**justify** 75:11
**juvenile** 33:14
**juveniles** 33:22

**k**

**k** 2:23 3:7
**keep** 15:5 34:7
79:11 80:1 81:16
139:6 141:2
**keeping** 90:10
**kelly** 2:22 11:5
**keyes** 3:13 10:23
10:23
**kids** 18:23
**kind** 19:18 37:8
44:9 47:1,19
50:12 60:3,17
62:22 65:13 68:6
69:13,21 71:1,11
75:24 77:2 85:8
85:24 86:3,11
90:5 96:8 100:16
101:8,10 102:5
111:2 114:7,17
116:5,12 120:19
125:7,21,24
129:10,24 130:8
130:17 131:3
133:22 136:13
142:4
**kindly** 110:25
**kits** 41:10

**klauss** 1:24 149:6
150:14
**knew** 48:4 50:9,10
73:23 121:2
**know** 13:20,24
14:22,24 21:19
26:10 27:16 28:24
29:13 31:12,20
39:3,14,15 41:15
43:3 45:1,2,12
46:8 47:2,2,15
50:14,15 51:17,22
53:9 56:21 59:8
59:11,22 60:7,8
61:6,7 62:16,22
64:6 66:2,7,22
67:2,16 69:16
74:21 75:16,25
77:9 80:17 83:21
83:22 84:20 85:1
85:5,5,6,6,9,16,22
85:24 86:1,2,7,18
86:20 87:18,23
88:6,11,21 89:19
90:7,12,16,20
92:11 93:16 94:23
94:24 95:8,21
96:5,12,13,19,23
96:25 97:1,23
98:1,22 99:2
100:15 101:18
102:11 109:11
110:4,22 111:15
117:1,5,8 120:14
121:13,15,18
122:21 123:6,8,14
127:7,9,11,12
128:15,18,24
129:14 130:12
133:2 134:6,24
135:16 139:24

141:13,24 142:5
142:17 143:5
146:4
**knowledge** 35:25
**known** 93:19

**l**

**l** 1:24 2:3,8 149:6
150:14 151:5
**l.p.** 1:14 3:2
**l.p.a.** 1:22
**laboratory** 36:7
**lack** 122:2
**lake** 108:12
109:11
**large** 84:9 85:4
123:10
**larger** 58:5
**largest** 35:3
**lasted** 19:1
**late** 18:18 70:2
83:6 92:13
**laundry** 43:25
**law** 21:5 27:9
34:22 36:12 37:1
44:1,4,17 57:21
58:14 59:4 66:11
67:3 93:21 101:18
102:1 103:4
104:14,16,23
105:21 106:1,10
109:4,5,16 128:4,4
134:12 135:7,9,13
135:25 137:24
139:1 140:24
141:7,14,17,25
142:9 143:17
**lawful** 11:19
**lawsuit** 25:9 40:6
40:13 49:9 144:4
144:15,23

lawyers  144:18
lead  122:6
leadership  80:7,11
  83:11 94:13
leading  100:2
  124:10
leads  70:10
learn  20:3,10 40:2
  67:20
learned  19:25
  20:22
learning  47:11
leave  50:16 115:10
  117:2,3
led  43:22 65:13
  125:14 144:22
left  14:15 38:24
  115:16 116:12
  139:18
legal  72:19 142:9
  145:17 151:1
  154:1
legally  47:22
legislation  63:4
  112:21 117:15
  123:2 132:22
legislative  111:25
  123:19 124:19
  132:25
legislature  133:2
legislatures
  112:23
length  18:7 145:14
  146:2
lengths  117:9
letter  151:19
level  57:12 63:12
  63:12 102:22,25
  112:9,10,12
  129:11 131:8
  135:14 140:4

142:1 143:23
levels  63:3 134:8
liaison  2:16
life  56:21 66:1
likes  90:20
limit  48:12 112:8
  113:7,10 114:5
  116:20 117:11
  118:4 129:9 131:7
limitation  114:8
limitations  114:17
limited  73:16
  134:6
limiting  111:7,12
  112:5 114:2
  115:14 120:17,19
  129:25
limits  63:10 117:9
  118:2 119:15
  140:6
line  27:20 77:15
  96:18 120:15
  151:13 153:7
  154:3
linking  50:6
links  52:6
list  14:5 15:5
  28:13 43:25 62:18
  106:3 141:1,2
listed  12:18 28:5
  28:15 42:15 49:1
  81:10 153:7,17
listeners  90:18
listening  110:25
listing  153:7
lists  12:21
literally  96:16
literature  50:3
  96:6
litigation  1:7 10:4
  144:11 146:14

151:6 152:3 153:3
little  19:7 24:9
  55:24 62:5 79:11
  93:5 95:4 110:19
  111:4 116:14
  120:3
live  33:24
llp  2:17 3:3,12,21
  4:3,7
lobbying  48:2 63:2
  111:25 124:17
  130:20
local  28:9 31:3
  35:5 86:3,16 88:1
  93:2 103:4 104:14
  104:16,22 105:21
  128:3 129:15,20
  133:10
locations  85:16,19
log  67:5
long  23:10
longer  19:2
look  12:15,17,19
  49:22,23 75:14
  141:17
lookback  134:17
lookbacks  48:3
looked  93:23
looking  18:1 32:9
  41:14 67:16 74:8
  80:9 130:4 134:25
  144:19 145:15
looks  16:5,19
  25:13 65:16
lorain  109:11
lose  32:10 39:8
loss  38:12
lost  39:1,4
lot  13:6 36:18
  39:13 43:15,22
  44:10,15,21 45:9,9

46:2 59:7,16 60:6
  62:13,14,15 63:8,9
  68:9 86:19 88:2
  101:9 102:5
  122:16 123:3
  124:16,19 125:14
  128:10 133:6,21
  134:12 140:23
  141:22
loved  57:14 59:8
lower  118:10
lporter  2:21
luke  2:18 11:11

m

m  3:8 4:3
madam  151:10
magazines  86:11
mahoning  108:13
  108:17,17
mailbox  65:16
main  2:13,23 4:4
  34:22 125:11
major  33:3
making  48:21
  97:18 106:2 126:5
  127:6 130:19,20
management  66:4
  100:13
mandatary  139:21
mandatory  130:19
  130:22 131:13,15
  131:19,22,24
  132:1,7,19
manslaughter
  36:23
manufacturing
  55:16
mark  16:24
marked  6:1 12:12
  12:15 17:5 24:20
  25:5

| | | | |
|---|---|---|---|
| **market** 55:10 93:7 146:5 | 88:1 89:12,16 90:8,11,15,19,23 93:11 97:9,10,13 | 70:6 **memory** 21:12 **mental** 25:21 | **minute** 63:23 **minutes** 48:19 61:9 62:6,9 |
| **marketing** 23:24 24:5 38:17 42:12 42:19 45:5 46:17 51:15 54:4 55:8 102:13,20 110:3 | 97:18 98:1 99:10 **medical** 16:12 18:8 19:16 26:12 27:9,19 30:6,9 35:5,16,20 45:23 | **mentioned** 21:11 61:9,11 84:1 87:5 97:3 100:25 107:1 109:18 131:12 **meridan** 4:8 | 146:22 147:10 **misprescribing** 142:22 **missed** 84:2 **missing** 108:19 |
| **mart** 3:7 **martin** 21:8 **mass** 79:22 | 45:25 46:2,5,9 47:23 49:4 50:3,4 57:3,22,24 58:15 | **merriman** 19:7 21:2 32:20 33:4 **message** 90:23 | **mitigation** 42:5 145:25 **mme** 113:14 **modules** 125:19 |
| **massive** 31:22 **matched** 122:24 **material** 96:9 | 61:21 66:5,6 73:11,17 74:5 75:23 76:7,15 | 93:14 95:12,15 96:13 99:1 **messaged** 98:12 | **moment** 33:11 85:21 95:24 **monday** 60:9,11 |
| **materials** 13:6,7 13:18 15:12 **matia** 21:14 65:14 | 83:5 93:17 96:14 97:3 99:6 100:7 101:9,23,24 | **messages** 84:24 96:18 97:1,18 **messaging** 43:12 | **money** 29:5 86:19 123:10 **monica** 88:3 |
| **matter** 142:9 **matters** 92:12 **maximum** 119:18 | 103:20 105:24 107:22 108:23 114:3,6,11,15 | 43:23 56:6 57:16 84:6,13,21 86:24 91:5 94:15 95:2,6 | **monique** 4:7 11:13 **monique.hannam** 4:9 |
| **mayor** 70:6 **mcconnell** 3:9 **mckesson** 3:21 | 116:6,22 117:14 118:12,13 125:19 127:4 128:7 134:6 | 98:3,16 99:4,5 **met** 22:8,10 23:2,8 51:2 70:22 110:17 | **monitoring** 48:1 133:21,23 **month** 67:10 |
| 10:19 **mdl** 1:7,9 **mean** 23:4 32:6 | 134:9 135:6 136:8 137:13 138:7,12 140:1,9,16,17,22 | **metric** 90:5 **metro** 123:9,10 125:16 | **months** 20:14 22:1 22:12 **morning** 11:25 |
| 53:23 81:22 97:19 102:16 114:22 119:24 145:1 | **medicine** 65:6,10 103:3,10 104:2 107:3,5 120:23 | **metro's** 57:1 **metrohealth** 19:12 40:25 42:16 | 12:2 18:14 23:4,5 23:7 60:9,10,11 68:17,25 110:18 |
| **means** 32:1 33:25 34:15,23 138:8 **meant** 102:17 | 121:1,8,14 127:24 128:1 **medina** 108:12 | **michel** 6:8 24:15 **microphone** 67:22 **middle** 64:2 | 146:2 **morphine** 113:12 **motion** 51:23 |
| **measure** 90:24 91:9 99:9 **measures** 41:21 | **meds** 118:9 134:24 140:13 **meet** 21:21 22:15 | **midwest** 151:17 154:1 **million** 29:2,20 | 124:22 127:3 **move** 31:13 46:12 111:2 |
| 62:24 **med** 113:6,10 117:9,11 118:2 | 34:12 **meeting** 23:10 **meetings** 129:19 | 37:25 **mind** 21:18 59:4 88:3 109:23 | **moved** 49:20 **moving** 112:22 **municipalities** |
| 127:11 140:6 **media** 43:11 57:17 84:4,11 86:3,10,12 86:13,13,16 87:5,8 | **melville** 2:5 **members** 13:13,22 21:4,12 69:10 | **minds** 59:12 **mine** 67:23 | 70:6 |

**[n.d. - obviously]**

**n**

n.d.  1:15
n.w.  3:13
naloxone  41:4
  63:7 96:24 129:17
  129:23 133:4
name  10:5 60:21
  68:18 86:8 110:16
  140:21 141:8,11
  151:6 152:3,4,15
  153:3,4,21
named  15:24
  144:3,14 149:9
names  100:23
  103:2,7 104:4
  109:6,8
napoli  2:3 10:10
napolilaw.com  2:6
  2:6
narcotic  37:9
nascent  60:18
national  1:6 10:4
  151:6 152:3 153:3
near  130:15,16
nearly  65:18
necessarily  19:23
  120:9
necessary  79:22
  79:23
need  14:21 26:20
  28:21 43:20 45:1
  56:2,3,8 59:25
  60:8 62:22 76:24
  89:19 111:21
  141:8
needed  18:22 26:9
  27:10,14 30:12
  36:5,6 37:14,15
  44:2 46:23 55:5
  69:14 74:25 80:12
  112:1 113:8

124:23
needing  27:16
needle  41:8
needles  41:10,20
needs  58:15
net  39:12
never  94:7
new  37:16,17
  45:24,24 46:6
  123:2
newspapers  86:11
night  60:8
nonfatal  59:20,21
  141:16
norm  76:6
normal  19:24
  21:17 22:22 68:5
  101:24 142:25
  146:7
normally  20:1
  66:17
northern  1:2
  109:9
notarized  151:14
notary  149:6
  150:14 151:25
  152:10,18 153:15
  153:23 154:23
note  151:12
notes  14:6 15:9
  16:22
notice  6:2 12:10
  12:16,21 16:16
noticed  77:1
notification  75:12
notified  77:4
notify  74:23
november  6:10
  24:19 25:2 133:17
  133:18

number  6:1 15:25
  17:12 19:5 22:1
  25:1 42:23 43:11
  60:22 70:7 73:24
  74:13,18 75:8,10
  75:19 76:2,5 77:3
  77:25 84:4 93:15
  93:21 98:9 103:14
  104:20 117:12,12
  127:12 132:25
  139:15 146:4
  151:7,13
numbers  28:22
  29:15,18 30:7
  31:6,7 32:16
  35:10 38:4 50:21
  85:15 98:4 153:7
nurse  125:20
ny  2:5

**o**

o'malley's  6:8
  24:15
oac  100:5 111:20
  118:8
oarrs  48:1 50:25
  51:8 69:20 72:7
  105:25,25 121:12
  127:4,5 128:25
  130:3,18,23 131:3
  131:4,10,14 132:6
  132:18 133:5,8,21
  133:23 134:5,8,14
  135:14,23 136:4,6
  136:17,19 137:14
  138:4,5,13 139:14
  139:22,23 141:3
  141:17
object  7:2,3,8,14
  8:9 25:17 32:25
  55:19 81:20 89:11

objecting  117:25
objection  7:1,4,5,6
  7:7,9,10,11,12,13
  7:15,16,17,18,19
  7:20,21,22,23,24
  7:25 8:1,2,3,4,5,6
  8:7,8,10,11,12,13
  8:14,15,16,17,18
  8:19,20,21,22,23
  8:24,25 9:1,2,3,4,5
  9:6,7,8,9,10,11,12
  9:13 29:4,7,16
  31:17 38:19 40:7
  40:8,20 46:19
  52:13 55:2 69:8
  70:20 73:6,19
  74:6,20 75:1,13
  76:9,20,21 77:5,6
  77:6,19 79:9
  80:15 81:12,18
  82:13,23 83:15,16
  88:13 89:18 90:1
  91:12 92:1,11
  103:5,6 104:6
  105:2,10,17
  106:18 115:25
  116:7,24 117:7,22
  119:4,5 120:1
  135:21 136:12,16
  137:4,5,25 138:21
  139:5 142:7,23
  144:24 145:19
  146:16 147:14,20
  147:21
objections  6:9
  24:17,25 81:16
  136:24 137:1
obvious  50:19
obviously  18:6
  26:3 33:21 37:13
  41:19 49:11 75:22

[obviously - outside]                                                                        Page 20

83:19,22 93:16
101:20 129:23
133:10 145:9
**occasionally**  18:10
128:6
**occur**  51:17
**occurred**  29:14
53:24 134:22
145:12
**office**  13:21 14:3
18:8,20,21 19:17
26:13,18 27:19,20
30:6 34:18,21
35:6,16,20 36:13
36:21 37:11 44:5
46:3,9 50:5 57:1
57:22 65:14 66:5
66:12 71:8 73:11
73:12,20 74:17
75:7,23,24 76:8,15
78:9 79:16,20
93:18 97:4 103:21
105:24 127:5
128:7 135:7 136:8
138:12 140:1,25
143:4,4 150:6
**office's**  107:22
**officer**  58:12
**officers**  124:15
**official**  71:16
81:10 135:17
152:15 153:21
**officials**  103:3
106:15,19,22
**oh**  2:9,13,24 3:10
3:18 4:4 66:19,20
**ohio**  1:2,13,15,23
6:6,7 24:13,13
100:5 149:2,7
150:7,15 151:2

**okay**  14:14,25
15:3,9 16:10,21,24
17:21 18:16 20:15
22:14 23:21 25:13
28:19 54:1 63:23
67:12 68:13 71:23
72:2 74:23 76:20
79:1 81:3,25 82:9
83:10 91:16 98:24
104:19 106:13
107:1,8 109:24
111:10 112:2
146:24
**old**  39:16
**once**  14:1 22:2
47:23 121:11
134:14 138:9
139:21 143:1
**ones**  57:14 97:6
103:19 105:14
124:15,18
**ongoing**  63:13
70:3,4 94:5,8
126:10
**online**  17:16 67:1
87:6
**op**  1:15
**open**  29:10 50:17
60:9 144:2,13
**opened**  66:11
**operating**  34:6
**operation**  65:5
120:23 121:1,14
127:24
**operations**  13:11
27:3
**opiate**  1:7 10:4
19:10 47:4 56:13
71:7 72:5,24
80:21 151:6 152:3
153:3

**opiates**  32:8,13
50:24 66:20 79:18
93:23
**opinion**  91:14,17
**opioid**  13:15 19:20
25:25 28:8 31:1
32:1 34:24 35:8
38:1,11 41:22
42:7 43:13,14,21
57:1 63:5 66:10
69:6,10 70:9,19,21
71:17 72:8,22
74:4 78:1,15 81:4
81:11 84:17,24
85:13,18 86:14
87:17 89:24 91:11
95:11 98:3 99:18
99:21,23,24 100:3
101:2,16 102:7
106:6,16 107:5,11
108:2 109:1,21
112:14,21 113:23
115:14,21 116:20
121:4 131:14
137:11,15 139:3
142:3,21 143:10
143:12,13 144:1
144:12
**opioids**  23:25 24:6
38:18 42:13,21
43:19 44:11 45:7
46:18 49:25 50:7
51:16 52:7 54:6
54:11 55:1,9,16,18
72:6,13,19,20 73:3
73:25 74:14 75:10
77:18 78:22 79:18
80:14 81:6 82:12
84:22 92:17 94:17
101:22 102:14,21
104:15 105:9

110:3 111:9,12
114:2 118:4,5
119:1,18 121:23
122:3,8 123:13
127:22 129:10
130:1 131:7
142:22
**opportunities**
91:24
**opportunity**  58:17
**opposite**  95:15
**option**  95:17
113:25
**options**  61:20 62:2
95:5
**order**  6:11 24:20
25:2 27:12 31:2
36:2
**organization**
71:16 73:15 99:20
**organizational**
16:20
**organizations**
99:17 100:24
**organize**  29:10
**organized**  101:2
**orient**  111:5
**outlet**  93:9
**outlier**  77:2
**outlined**  55:9
**outpatient**  61:22
**outset**  80:16
**outside**  17:9 40:8
40:10,14,17 49:5
49:10 52:13,17
57:16,23 75:4
76:6,10,21 77:6
81:12,20 83:16
101:14,23 103:6
105:3,11,18
107:14 109:14

110:2 116:12
119:5 123:6,12
126:9 142:25
144:25 145:20
**overall** 93:7
**overarching** 116:5
**overcrowded** 35:2
35:2
**overdose** 35:8
57:6 59:19 73:9
74:11 75:8 98:9
106:7 137:17
139:7,7,8 140:3
141:15,19
**overdoses** 48:4
50:12 137:11
138:11
**overmanufacturi...**
55:7
**overmarketing**
55:7
**overprescribing**
55:6
**overwhelmed** 26:9
27:18 93:10
**owned** 44:14

**p**

**p** 3:22
**p.m.** 147:9,25
**paari** 59:17
**package** 97:2
**packaging** 36:25
37:4,4
**padukone** 3:22
10:18,18
**page** 7:2 90:19
151:13,15 153:7
154:3
**pages** 12:18
**pain** 100:13,16
114:13 120:13

121:23 122:4,8
**pamphlet** 60:7
**pamphlets** 96:5
**paper** 17:25
**papp** 19:11 21:3
**parents** 32:9 39:1
39:7,19
**part** 13:8 40:17
43:4 47:20 53:14
67:2 87:18 100:17
102:11 106:19
109:4 111:23
115:4,6 116:1
137:12,12 139:13
142:12 143:25
144:11 153:9
**participate** 19:18
112:25
**participated** 65:5
118:16 127:23
**participating**
86:21 124:23
**particular** 76:2,3
76:5,7 90:23
99:12 125:16
140:21 145:10
146:15
**particularity** 40:2
**parties** 10:8
**partition** 60:3
**partner** 107:16
**partners** 107:14
**parts** 113:1
**party** 150:3
**paso** 57:24
**pass** 67:22
**passed** 57:5 59:8
132:23 133:4
**path** 121:4
**pathologists** 36:5
79:15

**patient** 117:13
118:20 119:3,22
119:24 136:23
139:1 140:18
141:8,10
**patients** 30:5 85:7
100:11 106:4
116:11 120:12
128:8 141:4,12
**paused** 58:21
**pays** 97:24
**peca** 1:22
**peers** 94:16
**pending** 64:14
**pennsylvania**
108:16
**people** 11:9 19:22
26:4,19 27:16
28:6,7 30:5,12,21
30:22,23,24 31:23
33:19,21 34:10,14
35:11 36:14,22
38:10 39:7,9,13,14
39:14,16,17 41:20
43:18 47:3 48:3
49:22 50:11,23
56:18 57:5 58:2
59:13,23 61:2,3,4
61:20,22 62:13
64:12 65:10 69:23
70:25 83:21 86:25
90:20 95:17,19,20
96:17 100:7 101:9
101:21 106:5
112:25 114:15
120:5 121:3
126:11 130:4
139:15 144:7
**people's** 127:25
**percent** 35:7 49:25
54:23 55:14,18

**percentage** 50:24
**period** 78:19
87:14 132:21
**person** 14:14
19:15 22:10 39:23
60:9 137:14,24
138:14
**person's** 56:21
**personal** 48:2
91:14,17
**personally** 103:17
103:19 152:11
153:15
**personnel** 38:2
**perspective** 136:7
**pglawyer.com**
2:10
**pharma** 1:14 3:2,2
**pharmaceuticals**
4:2 10:16
**pharmacies**
129:16 134:25
**pharmacists**
130:23 139:22
**pharmacy** 47:25
103:4 104:9,11
129:10,21 130:11
130:13,14,15
131:8 133:25
135:4,11 137:22
139:17 143:23
**phone** 11:10 19:6
22:11 151:3
**physical** 17:24
**physically** 17:14
**physician** 104:10
104:14 107:4
114:18,21 115:17
120:4
**physicians** 45:25
103:10 104:21

105:7,20,22 106:3
106:23 115:11,23
116:6,22 117:3,4
122:17 125:19
131:13 132:1,5
**pick** 20:9
**picture** 58:5
**piece** 56:22 58:4,5
88:4 123:2
**pill** 85:4
**pills** 93:23 120:20
127:25
**place** 23:11 44:16
53:16 58:14 60:1
65:18,22 103:12
104:18 106:12
115:5,12 122:19
123:4,6 124:17
127:15 138:23
149:20
**placed** 32:13
61:22 114:17
**placements** 32:3
32:17 54:18 97:25
**plaintiff** 6:6 11:16
23:23 24:12,24
52:16 53:1,6,17
76:12,18 111:7
**plastic** 37:5
**platforms** 44:21
**play** 64:9 67:25
99:2 138:10
**pleas** 33:13
**please** 11:18 14:24
151:11,11
**plevin** 2:7 10:12
**plight** 39:25
**pllc** 2:3,22
**plus** 52:15
**point** 20:8 26:23
45:1 50:21 60:19

62:18 71:10 72:8
80:12,24 81:1
85:9 89:9 108:3
130:21 145:3,9
**points** 117:18
**poison** 48:5 134:3
**police** 59:18 60:25
61:5 65:18,22
70:7
**policies** 131:3,5
133:22 136:18
137:19 138:23
141:25 142:5,19
143:5,17
**policy** 36:20 80:11
91:21,22 101:7,8
125:13 135:17
**polster** 1:10
**pop** 101:19
**popular** 60:18
**porter** 2:18 11:11
11:11
**position** 54:3,7,8
54:23 55:20 83:17
114:5 115:3,13,18
116:18 117:2,6,17
117:25 122:7
131:25 146:11
**positive** 66:20
90:25 95:6
**possible** 91:10,25
95:7,18,21 110:21
**possibly** 40:10
**potential** 37:6
**potentially** 116:20
128:21 135:10
138:5,16 141:20
**power** 43:19
**powerful** 98:20
**practice** 100:17
101:23,24 106:17

**practices** 105:9
106:17,24
**practitioners**
125:20
**preceded** 71:4
**predated** 89:3
**predicate** 82:8
**predicated** 133:6
**preparation** 17:22
18:11 20:2 92:6
103:17 113:5
146:8
**prepare** 13:4 18:4
19:23 21:22 23:3
69:1 99:11
**prepared** 13:1
20:20 105:16
**preparing** 15:10
20:25 22:16 101:5
**prescribe** 46:7
**prescribed** 43:18
47:3 49:25 50:7
**prescribers**
122:15 123:22
132:17 134:25
**prescribing** 63:10
85:6 99:18,21,25
100:4,10,18 101:2
101:16,21 102:2,4
105:8 106:17,24
107:5 111:7,12,16
111:19 112:5,15
113:21 115:22
116:20 117:19
119:15 121:21
122:12 123:23
124:7,11 126:19
130:23 131:14
134:10 139:4,22
140:7 141:21
142:3,22 143:10

**prescription** 1:6
10:4 23:25 24:6
42:20 43:21 44:11
45:6 46:18 47:25
50:24 51:16 52:7
54:6,11,25 55:9,15
63:16 69:6 70:9
72:6,10,19,19,22
73:3,25 74:4,13
75:10 77:18 78:1
78:15,22 79:17
80:14 81:11 82:12
84:21 85:4 92:17
93:23 96:2 102:14
102:21 104:15
111:8 114:2 122:3
123:13 127:22
129:25 131:15
132:7 137:15
151:6 152:3 153:3
**prescriptions**
43:14 49:24 57:4
65:11 113:23
115:15 117:10
130:6,12
**presence** 149:15
**present** 4:11 10:6
93:25 98:22 120:4
**presentations** 96:6
**press** 83:8 94:2
**pretty** 68:4 75:17
89:2 90:10 124:11
146:23
**prevent** 121:7
**prevention** 43:12
43:23 44:19 57:16
84:6,12 87:7
**previous** 35:9 50:6
70:22 72:25 75:15
88:23

**previously** 52:5
69:2 72:14 113:14
**principle** 116:5
**print** 86:10,12,13
97:10
**printed** 87:5
**prior** 50:1 73:2
78:19 87:9 130:23
**pro** 86:1
**proactive** 123:21
125:5,6
**proactively**
123:16 133:23
135:18
**probably** 22:18
35:12 49:19 67:14
101:25 129:22
141:25
**problem** 26:7
41:23 46:25 54:10
54:20 69:19 74:25
79:6 80:23
**problems** 59:23
70:10
**procedure** 12:6
148:7 152:5 153:5
**procedures** 133:22
137:20 141:25
142:6,8,19,25
143:1,9,17
**process** 56:20 70:4
137:13
**processed** 74:11
**produce** 35:21,22
**produced** 13:21
108:21
**produces** 73:20
**product** 145:6
**production** 151:15
151:17,22

**professionals**
118:13
**profile** 138:13
**program** 19:13
34:12 41:2,4,9
42:17 56:5 60:4
60:13,21 61:11
65:13 89:16 99:16
101:1
**programming**
96:1,9
**programs** 43:16
43:23 45:24 54:16
56:14 59:17 61:6
61:10,13,14 86:25
**progressively**
140:12
**prohibited** 122:9
**prohibition**
121:23 122:1
**promise** 14:17,17
42:8
**promoted** 122:21
**promotion** 23:23
24:5 38:17 42:12
42:19 45:5 46:16
51:14 54:5 55:17
102:13,20
**proper** 63:9
**properly** 36:15
37:10 65:12 80:4
**prosecute** 139:19
142:20
**prosecutes** 143:18
**prosecuting** 6:7
24:14 142:1,11
**prosecutions**
33:25 36:22
**prosecutor** 33:12
44:6

**prosecutor's** 36:13
36:20 66:12 143:4
**prosecutors** 34:1
**protecting** 31:21
**protocol** 81:17
143:6
**protocols** 36:12
59:2 143:2,3
**provide** 15:12
63:5 90:17 103:1
**provided** 11:20
13:21 117:10,12
**providers** 126:17
**provides** 62:3
**providing** 57:10
124:18
**psa** 86:4
**psas** 88:2
**public** 1:22 2:8
3:17 33:13 44:6
58:18 69:6 70:18
71:17,24 72:21
73:4 74:23,24
77:4,25 78:24,25
79:2,25 80:13
82:21 83:1 89:24
90:8 92:20 93:20
94:1 149:6 150:14
152:10,18 153:15
153:23 154:23
**pull** 44:15 102:6
**purchase** 86:19
**purdue** 1:14 3:2,2
3:2 11:1 110:17
**purports** 28:13
**purpose** 20:24
22:16
**purposes** 12:12
17:5 24:20
**pursuant** 6:10
24:19 25:2 148:3

148:6
**pursue** 145:17
**push** 132:12
**pushes** 130:20
**put** 17:1,16 21:25
43:3,16 44:8
45:23 51:23 60:16
61:1 85:17 86:4
86:18 89:13 93:18
122:19 127:15
136:15 146:25
**putting** 53:20 76:6
100:9

## q

**qualified** 149:8
**qualify** 138:15
**qualifying** 130:8
**quality** 41:15
**quantitatively**
90:5
**quarters** 50:23
**queries** 135:8
**question** 14:23,25
15:5 27:1,5,13
47:5,8,12,15 48:17
49:7 51:9,12
52:19,23 53:19,21
58:23 64:2,5,14
70:15 74:9,21
78:10 79:25 80:4
82:2,8 87:2 91:1
99:12 102:18
103:23 106:15,19
109:24 111:1,1
116:13 119:9
131:2 142:5
143:22
**questions** 64:16
68:19 70:14 108:7
143:14 146:21
147:13

**quibble** 137:7
**quick** 59:17 60:23
**quicker** 37:20
**quickly** 110:21
**quite** 62:15 112:21

**r**

**radio** 87:23 88:19
  88:22,24 89:13
  90:12,17 93:12
**raise** 79:23,24
  80:24
**ran** 19:10
**range** 35:7
**ranges** 119:20
**reach** 94:12
**reached** 79:21
  86:15 88:1
**reaching** 80:24
**read** 152:5,6,12
  153:5,6,17
**reading** 151:19
**real** 26:7
**realize** 47:1
  123:24
**really** 19:14 26:9
  26:22 27:7 30:20
  44:25 45:11 64:6
  64:9 93:8 102:6
  110:22,25 112:3
  119:10 121:9
  132:17 144:19
  145:4,15
**realtime** 66:13
  125:9
**reask** 77:23
  102:18
**reason** 42:4
  151:14 153:8
  154:3
**recall** 84:23
  103:12 113:8

114:15 115:3
  116:8 125:4
  126:14
**receipt** 151:18
**received** 37:25
**receiving** 137:15
**recess** 64:22 110:9
  147:7
**recognized** 120:7
**recollection**
  129:18
**recommend**
  113:22 121:22
  126:24
**recommendations**
  132:5 133:12,13
**recommended**
  127:1
**recommending**
  122:7
**record** 10:2 16:10
  53:21 64:20,23
  68:12 78:7 110:6
  110:7,10 137:7
  139:6 146:25
  147:5,9,18,23
  153:9
**records** 67:4
**recovered** 95:20
**recovery** 21:15
  34:4,4 56:20 95:7
**reduce** 58:25
  61:15 62:11,25
  65:1 118:20 119:2
  121:9 127:21
**reduced** 149:14
**reducing** 117:11
  117:11
**reduction** 41:17
**reed** 2:17 11:7,11

**reedsmith.com**
  2:21,21
**refamiliarize** 18:2
**refer** 105:7 106:16
  106:23
**reference** 106:4
  151:7 152:2 153:2
**referenced** 149:13
  149:18 152:11
  153:15
**referred** 104:22
  107:2 113:13
**referring** 61:14
  83:21
**reframing** 52:18
**regarding** 74:4
  80:13 85:13,17
  87:17 89:24 91:11
  92:20 93:14 95:10
  98:3,13 110:2
  113:20 116:5
  119:17 129:23
  137:9 142:1 148:2
  148:11
**regardless** 51:12
**regional** 109:3
**regrade** 37:7
**regroup** 146:22
**regular** 19:25
  20:16 71:11,13
  93:6 107:16
**regulate** 135:23
**rel** 6:7 24:13
**related** 16:14
  38:11 84:17 86:13
  88:21 97:7 98:17
  99:21 104:14
  105:8 106:16
  107:5 112:21
  136:17

**relates** 1:12
  120:19 137:7
**relating** 118:25
  127:21 142:2,20
  143:9,17
**relationships**
  107:10
**relative** 150:2
**relatively** 59:11
**relooked** 111:22
**remember** 39:15
  67:17
**remotely** 10:7
**rendering** 103:21
**rendon** 26:19
  147:16
**repeat** 56:2,3 74:8
**replenish** 37:16
**report** 16:13 73:21
  73:22 103:9
  104:10,13 106:15
  133:14,18 135:2
  138:12 139:14,24
**reported** 103:3
  104:2 105:15,20
  107:4 139:1,4
**reporter** 5:8 11:18
  88:4 152:7
**reporter's** 5:6
  149:1
**reporting** 75:5
  135:4 137:23
**reports** 35:21,22
  57:9 75:6 80:19
  127:6 135:17
**represent** 10:8
  110:17
**representation**
  27:25
**representative**
  12:4 20:4 51:18

77:16 89:5 104:20
131:6 141:14
146:12
**representatives**
124:8
**request** 70:8
127:17 153:9,11
**requested** 112:24
148:1,6,10
**requests** 140:24
**require** 58:9
**required** 28:3,10
36:11,24 41:5
42:25 44:2 47:21
63:8 151:25
**requirement**
112:12
**requires** 31:3
**requiring** 43:24
**research** 35:4
57:10 118:10,14
122:2 136:7
142:12
**resource** 44:23
**resources** 27:14
28:4,11 30:11
31:4 34:16 41:5
42:2,25 43:16,24
44:1 46:6 133:7
**respect** 77:18
84:13 86:9 87:3
88:18 92:24 95:23
97:15 99:4 115:14
**respecting** 115:23
**respective** 139:25
140:22
**respond** 26:10
28:4 31:2 61:2
66:14 83:13
105:22

**responding** 25:25
59:19
**response** 16:2 25:8
25:12 26:21 27:8
27:8,9,10 28:10,13
34:5 42:16 49:2,6
59:18 60:23 68:6
83:10,12,18,25
119:25
**responses** 6:8
24:16,25 69:14
83:19
**responsible** 79:5
88:10 145:11
**responsively** 46:8
**rest** 28:4
**restart** 48:21
**restrictions**
105:23 116:12
**result** 55:6
**resulted** 29:1,14
**resulting** 24:4
28:20 46:16 51:14
90:24
**results** 34:13
**retained** 5:8
**returned** 151:18
**reveal** 145:5
**review** 13:6,20
15:13 48:5 51:8
131:13 134:4
135:6 137:13
140:10,17 148:2,6
151:12 152:1
153:1
**reviewed** 13:18
15:6 17:13 18:1
**reviews** 57:2
139:14
**rhartman** 3:19

**rich** 2:12 10:14
**rid** 106:21 121:6
**ride** 18:19
**right** 13:14 15:20
22:19 23:16 28:22
30:1 42:1 52:3
54:11,13,16 60:16
68:8 73:17 78:12
79:13 82:19 84:7
84:15 87:15 92:9
99:3,13 100:20
102:10,16 103:22
107:21 109:9
115:2 137:18
142:16 146:21
**rights** 85:7
**rigid** 56:2
**rigorous** 34:12
36:21
**ripple** 27:21 39:5
39:10,20
**rise** 26:14
**rising** 36:4
**risk** 118:25
**risks** 71:17 72:21
**road** 2:4
**robbins** 88:4
**roitman** 3:4 5:5
10:25,25 110:13
110:16 114:24
136:22 137:2,6
145:25 146:20
**role** 103:20
**rolled** 84:13
**room** 14:19 39:24
100:8 123:12,14
124:10 125:18,23
**rooms** 27:18
**roughly** 50:23
146:12

**route** 108:18
**rpr** 1:24
**ruins** 37:6
**rule** 12:5
**rules** 148:3,7
152:5 153:5
**run** 35:13 56:15
71:7 87:16 135:7
139:13
**running** 41:5
111:18 120:7,23
135:17
**runs** 21:6 34:25
66:6 102:6 128:11
138:12
**ruth** 3:17 10:21
**rx** 85:1,5,24 86:21
87:19 88:11,21
93:16 94:23,25

**s**

**s** 151:15 153:8,8
154:3
**safe** 65:22 96:23
**safety** 39:12 57:1
94:1
**salvatore** 2:4
11:15
**samaritan** 133:5
**san** 2:20 3:23
**sandra** 2:23
**sandy** 11:4
**sara** 3:4 10:25
110:16
**sara.roitman** 3:6
**saw** 46:24,25
74:12 80:9 93:4
118:25
**saying** 22:24 26:19
38:22 40:16 42:22
52:22 76:10 79:24
81:13 114:10,16

122:2 139:7
**says**  52:21 53:16
  55:18 81:2 106:19
**sbadala**  2:6
**sboranian**  2:21
**scene**  36:24 37:1,9
  59:19 66:21
**scenes**  36:14 59:6
  66:14
**scheduling**  69:23
**school**  43:22 84:6
  84:12 87:6 89:15
  93:12 95:23 96:7
  97:17 99:5
**schools**  45:23 46:5
  57:19 69:24 88:8
  94:6,12,15 96:1
**scientific**  136:7
**scientists**  36:7
  37:12 79:15
**scope**  40:8,10,14
  40:18 49:10,13
  51:5 52:14,17
  76:10,21 77:7
  81:13,17,20 83:16
  103:6 105:3,11,18
  119:5 144:25
  145:20
**scores**  100:14
**seal**  37:5 150:6
  152:15 153:21
**seated**  23:16
**seats**  68:11,13
**second**  2:19 6:8
  16:3 24:15,24
**see**  18:23 34:13
  36:18 46:2 50:12
  55:10 75:15 76:24
  82:7 87:2 90:19
  125:8 129:7
  133:23 134:19

137:14 138:12,13
  140:5,18 141:9,15
  141:18
**seeing**  26:16,19,20
  83:20
**seek**  19:22
**seeking**  30:12,24
  41:13 130:6
**seen**  26:14 31:22
  55:4
**segregated**  73:16
**select**  13:17
**self**  139:24
**semi**  136:17
**send**  95:15
**sense**  98:21,23
  110:20
**sent**  77:24 97:6
**separate**  94:24
  101:14,15
**september**  83:9
**service**  39:11
**services**  19:9
  25:21 26:7 31:14
  31:16,20 32:4
**set**  29:11 48:4
  56:13 65:8 96:9
  106:1 110:14
  118:8 122:22
  123:25 125:17
  150:6
**setting**  119:17
  124:22
**seven**  45:10 46:24
  81:8 82:10,20
  98:6,7 108:2
**shannon**  1:19 5:4
  10:5 11:19,23,25
  12:21 14:12 15:20
  23:22 24:1,3,23
  25:14 26:25 32:22

39:23 40:21 46:11
  47:5 48:6 51:6
  54:2 55:25 62:12
  64:25 67:13 68:2
  68:15,17 110:12
  110:14 137:9
  149:9 151:8 152:4
  152:9 153:4,13
  154:20
**shannon's**  114:25
**share**  125:22
  140:3
**shared**  13:21
  73:14,15,17 79:7
**sharing**  17:17
**sheet**  151:13 153:7
  153:10,18 154:1
**sheriff**  142:18
**sheriff's**  34:18,21
  44:5 54:9 65:14
  140:25 143:4
**shift**  36:19
**shkolnic**  10:10
**shkolnik**  2:3
**shop**  139:18
**shoppers**  135:4
**shopping**  130:5,9
  130:11 133:25,25
  135:3,11,12,20
  137:22,23 138:6
  138:17,18,25
  139:16,17,19
**short**  143:8
**shortening**  143:14
**show**  24:8 92:11
  93:2 95:20 126:19
  140:7
**showed**  35:6
**showing**  127:6
**shown**  151:16

**shows**  39:16
**siegle**  21:9
**sign**  100:16
**signature**  148:5
  150:13 151:14
**signed**  152:13
  153:18
**significance**
  115:22
**signing**  151:19
**signs**  59:12 87:24
  96:21
**similar**  71:3 90:15
**simple**  106:14
**simply**  70:16
**sincerely**  151:21
**single**  93:9
**sir**  151:10
**sit**  26:21 58:11
**sitting**  14:14 89:5
  103:25 104:4,19
**six**  138:14
**skzerrusen**  2:25
**slip**  68:1
**small**  134:17
**smith**  2:17 4:6
  11:7,12,14
**snippet**  134:17
**sober**  61:22
**social**  90:7,10,15
  90:19
**solid**  57:10
**solutions**  151:1
  154:1
**somebody**  28:18
  60:6 66:3 70:8
  85:3 140:12
**somewhat**  139:20
**soon**  146:23
**sorry**  37:22 52:1
  58:21 72:3 79:10

92:10 94:9,10
100:21,22 115:7
119:8 135:9,13
139:12
**sort**   145:5
**sound**   74:3,17,22
**sounded**   77:4
142:14
**sounds**   113:17
119:16 126:8
138:7
**sources**   70:7
**south**   2:23 4:8
**space**   86:19 98:2
**span**   82:15
**spared**   33:23
**speak**   18:4 29:19
31:5 106:25
**speaker**   96:12
**speaking**   95:18
111:11 136:24
137:1
**special**   34:3 59:2
78:8 88:5 143:21
**specialist**   59:22
61:25
**specific**   13:25 14:2
19:15 20:9,11
27:23 29:18 38:3
61:10 71:19 77:17
78:7,14 80:13
84:20,23 85:9,15
85:19 89:6 93:19
97:22 98:4,25
103:7 104:3 106:3
111:18 113:9
116:16 126:14
127:17 128:5,8
140:5 142:25
143:5,9,11,16,21
146:19

**specifically**   16:1,8
17:21 19:15 22:24
29:20 34:9 38:1
46:10 60:4,24
69:1 101:3 102:12
129:18 147:16
**specification**
36:23
**specificity**   51:20
105:1,4 107:7
**specifics**   61:7
103:18
**specified**   149:21
**specify**   53:17 66:9
**speculate**   77:12
**speed**   24:9
**spending**   86:18
**spiking**   46:25
**split**   130:14
**splitting**   130:18
**spoke**   21:11
**spoken**   18:7 20:24
**sponsored**   126:23
**spots**   87:16 88:19
88:24
**spring**   146:18
**square**   1:22 2:8
3:17
**ss**   149:3
**stabilize**   56:20
**stable**   56:19
**staff**   57:3 97:20
125:19
**stages**   60:18
**stake**   67:21
**staked**   117:1
**stand**   25:19
113:10
**standard**   14:10
96:9,11 97:2

**standards**   45:24
46:7
**standing**   136:15
147:14
**standpoint**   75:20
99:9 136:1 141:18
145:8
**stands**   85:10
**stark**   108:14
**start**   10:9 14:1
22:24 29:12 38:9
38:20 43:2 44:25
45:2 48:3 66:14
67:8 81:6 88:25
92:23 96:19
107:18 111:6
121:4,8,13 132:16
134:2,24,25 136:4
141:23 142:10
**started**   35:21
37:15 41:6 47:3
47:24 49:15,24
53:4,10 65:17
66:3 67:9 69:13
69:22 80:18 96:20
125:18 127:6
130:4 134:3,16
135:3 136:16
**starting**   27:17
31:9 50:3,12,21
66:22 71:10 83:7
120:25
**starts**   40:13 49:6
**state**   6:6 24:13
57:21,23 63:3,12
80:18 111:25
112:9,11,18,20,22
113:20 114:2
117:19 118:23
119:6,7,14 121:20
122:8,12,23

126:25 132:3,14
133:1,3 140:2,4
142:9 149:2,7
150:15 152:10
153:15
**state's**   133:7
**stated**   72:14
**statement**   152:13
152:14 153:19,19
**states**   1:1 107:13
**statewide**   127:10
**station**   65:22
90:16
**stations**   65:19
86:3
**statistical**   73:21
75:6,16,20 77:2
**stats**   90:10
**statute**   11:20
**stay**   68:12
**steady**   75:17,18
**stem**   43:17
**stemming**   28:8
**stenotypy**   149:14
**step**   51:1
**steps**   123:21 125:1
127:20 129:8
131:5
**steve**   26:18
**steven**   2:18 11:6
**stick**   86:10
**sticker**   17:1
**sticks**   88:3
**stipulate**   52:10
**stood**   75:20 76:1,5
76:15
**stop**   50:16 96:20
**stopped**   94:7
**stores**   3:7
**strains**   37:18

streamline 70:13
87:3 111:3
street 2:19,23 3:13
3:22 4:8 60:15
130:16
stress 58:6 76:7
77:1
stressed 27:19
28:3
stresses 28:9 32:15
strict 100:9
strike 105:5
118:24 120:16
strip 41:9
strips 96:24
struggling 67:14
student 94:13
students 46:1,2
94:14
studies 50:6
126:17,22,25
study 127:2,17
stuff 56:7 145:14
subcommittee
125:14
submit 36:16
subportion 99:14
subscribed 152:10
153:14 154:21
subsequently 57:5
subset 72:18
substances 72:9
72:10
successful 60:19
suffer 52:22
suffered 27:13
sufficient 100:6
111:21
suite 1:22 2:4,9,19
2:23 3:4,9,18 4:4
151:2

suited 114:19,21
summer 83:6,7
146:18
summit 69:12 70:2
71:3,22,25 72:4,14
72:25 84:16 92:25
100:2 101:5 113:9
121:11 132:11,22
133:16
superior 151:1
supplemental 6:8
24:16,25
supplies 37:14
38:2
supply 93:2,2
98:22 121:18
supported 40:25
supposed 77:9
sure 14:9 15:18
16:8 20:18 21:20
29:19 31:5 38:7
43:17,25 44:20
45:8,11 46:13
53:2 67:10 68:14
68:20 72:25 74:7
74:10,15 77:8
80:3 83:17,18
84:19 85:10,19
89:2 94:3 97:19
97:22 99:11
109:13 112:6
119:12 123:22
124:6 125:2 126:5
126:7 142:9,24
145:7
surrounding 31:1
107:23 108:11
109:2
suspected 138:25
142:21

suspicion 139:2
swear 11:18
switch 68:11,12
sworn 11:21
149:10 152:10,13
153:14,18 154:21
sympathetic 39:24
synenberg 21:14
system 28:7 30:25
32:14 33:20 44:9
45:2 48:1 56:7
66:4 104:22
systems 39:11
44:13 77:1

**t**

tab 15:23,23 16:3
16:6,11,12,16,19
table 123:5
tabs 6:4 17:4
tactics 55:8 69:14
take 12:15,17 14:6
15:9 16:21 23:10
32:21 45:10 50:24
57:13 58:14 62:6
63:18,20,22 64:5,7
64:16,17 80:18
85:12 94:15 108:4
117:20 118:3
125:1 141:11
taken 1:21 39:9
41:22 55:5 62:25
64:22 75:4 76:23
84:18 110:9
127:21 129:9
147:7 149:20
takes 46:5
talk 14:16 18:13
19:3 26:10,21
29:18 33:12 34:6
38:24,25 57:25
59:10,23 69:4,24

69:24 70:8 81:5
87:15 94:16 96:17
99:24 101:11
129:8,13 131:4
137:10
talked 19:7,14
22:11 26:17 39:6
40:22 43:8 56:15
56:22 58:20 65:3
69:3 83:5 87:8
92:24 94:20 96:3
96:4 100:12 102:8
120:5,17 129:18
133:20 142:14
145:14 146:1
talking 15:4 18:9
18:20 19:23 26:13
35:11 41:21 47:10
69:17 71:2,4 77:9
87:4 89:3 97:5
100:8 127:18
talks 57:19
tally 15:5
task 13:14,22
19:10,18 21:6,12
26:23,25 28:2
30:19 40:1 44:19
56:12,13 58:7
70:21 71:7,9
72:24 78:21 80:2
83:2 99:16,23
100:1,25 101:4,10
101:14,18 102:1,1
109:3,7,9 111:17
111:24 113:4
123:1 124:9
125:11,25 126:11
128:4 133:16
tasked 31:20
tax 39:18

teaching 46:4
teams 59:18 60:23
  61:2
technical 133:9
technically 134:10
  134:11
technology 37:17
tell 15:22 28:1
  33:8 51:20 64:6
  64:11 67:15 86:17
  95:16 106:1 108:3
  141:7 144:17
ten 22:6 146:22
term 72:9 118:2
terms 71:23 73:3
  78:20 89:12
  104:20 107:11,15
  126:4 137:23
test 96:24
testified 136:8
  138:3
testify 12:4,24
  13:1 20:11,23
  21:1 22:17 28:18
  33:6 45:14 62:19
  68:22 119:6
  149:10
testifying 49:3
testimony 63:9
  103:24 112:24
  136:21 149:13,17
  152:6,7 153:6,9,12
testing 36:8,16,18
  37:2,6
thank 12:2 15:3
  64:19 68:10 110:5
  118:1 130:25
  133:20 139:9
their's 108:17
theirs 122:23

theme 95:8 120:7
themes 85:8
thereof 122:2
thing 26:16 35:24
  39:2 53:8 91:8
  110:23 130:2,10
things 19:24 21:7
  24:9 26:20 28:8
  30:20 35:13 40:24
  43:12 44:25 45:11
  51:4,23 56:25
  67:15 69:17 84:5
  85:8 89:14 102:8
  110:19 111:2,3
  122:18 125:20
  127:7 130:3
  139:24
think 15:4 17:8
  20:6,13 22:20,24
  27:23 34:6 40:13
  40:14,17 46:22
  47:7,9 48:9,20
  49:1 56:23 57:8
  57:17 58:2,19
  63:15 67:10 68:11
  70:16,24 75:19
  76:1 84:15 85:2
  86:15 87:13 89:9
  91:7,19 96:11
  98:21,23,25 104:1
  112:3 115:11
  116:13 117:16
  118:17 119:21
  122:1,20 123:11
  123:15 124:20
  126:1,21 127:1,16
  129:5,12,22 130:2
  130:21,21 131:5
  133:6,8 136:20
  137:3 146:22
  147:19,21

thinking 128:10
thirty 151:18
thornburg 4:7
  11:14
thorough 67:16
thought 19:2
  37:21 52:1 58:21
thousands 96:17
three 37:24 50:23
  66:19 69:1 123:15
throw 37:3,4
  120:10
tide 43:17
tied 27:7
tight 137:2
time 10:3,6 14:16
  14:21 23:2,5,8
  28:22 35:9 43:15
  47:22 48:2,12,21
  48:22 51:9,13
  65:21 66:2,23
  68:11 71:24 72:20
  73:12 75:3 76:24
  77:11 78:9,19
  79:16 82:2,25
  83:19 84:11 86:12
  87:13 93:17 94:2
  97:20 104:7 110:6
  111:20 112:20
  115:12 118:8,15
  119:20 120:21,21
  121:1,14 125:10
  132:21 146:25
  147:10 149:20
timeframe 92:24
  97:7 137:2
times 21:24 22:4,6
  22:9,12,15,19 32:6
  39:14 41:14 59:7
  60:1,6 67:18
  93:21 96:16 97:14

98:21 102:5
  108:13,14 109:12
  112:24 117:9
  127:12 140:23
timesaver 66:25
titled 16:3,16
today 12:1,4,24
  13:2,18 28:23
  31:10 40:1 46:23
  51:17 84:1 103:25
  104:4,19 105:16
  138:4
today's 12:16 13:5
  15:6,10 17:22
  18:5 19:4 21:22
  22:16 23:3
told 32:19 70:16
  144:7
tone 118:21
tongue 68:1
top 124:21
topic 19:16,20
  23:21,22 28:20
  33:3,6 42:4,5
  45:16 52:15,15,18
  52:20,25 53:15
  55:18,24 62:20
  67:19 69:4 76:11
  77:10 81:14 82:5
  84:24 99:13
  102:10,19 103:1
  111:6,9 132:10
  136:14 137:8
  145:22,23,24
  146:1
topics 12:17,22,23
  13:2,10,25 20:11
  20:23 21:1 22:17
  22:25 49:16 68:22
  69:1 84:17 103:18

| | | | |
|---|---|---|---|
| **total**  22:20 | **trouble**  59:14 | **u** | 124:19 125:15,21 |
| **touch**  114:12 | **true**  25:9 33:6 | | **upswing**  31:22 |
| **touches**  83:24 | 38:13 54:20,21 | **u.s.**  26:17,23,24 | **urgency**  98:21,23 |
| 122:16 | 77:18 81:9 149:16 | 36:21 71:8 100:1 | **use**  41:11 44:17 |
| **toxicology**  36:7 | **trumbull**  108:13 | 101:4 111:23 | 52:7,8,8,8,9 57:2 |
| 66:18 | **truth**  149:11,11,12 | 113:4 | 70:9 93:11 96:23 |
| **trace**  69:21 | **try**  17:25 32:9 | **ultimately**  115:16 | 96:24 105:25 |
| **track**  85:20 90:7,9 | 43:17 45:9 46:3 | **umbrella**  44:22 | 113:14 121:3 |
| **tracking**  90:22 | 51:2 61:2 67:15 | **unable**  108:4 | 123:20 135:23 |
| 127:16 | 90:9 95:16 110:20 | **underlying**  47:20 | **uses**  91:24 96:10 |
| **trafficking**  21:10 | 131:7 135:18 | 140:15 | 129:5 |
| **training**  36:11 | 145:4 | **understand**  12:3 | **usually**  64:11 |
| 45:24 57:25 | **trying**  30:1 32:11 | 12:23 14:23 20:15 | 124:10 |
| 125:18 | 34:7,10 44:8 | 28:17 33:5 42:9 | **utilities**  138:5 |
| **transcribed** | 45:23 48:9 50:15 | 42:22 43:19 45:13 | **utilize**  93:13 |
| 149:16 152:7 | 60:3 89:21 95:6 | 45:15 47:19 48:14 | 135:15 |
| **transcript**  5:1 | 116:17,19 118:24 | 49:17 62:21 74:7 | **utilized**  96:7 |
| 148:3,6,9,11 | 119:13,21,23 | 119:13,23 131:23 | **utilizing**  132:18 |
| 151:11,12 152:5 | 120:16 123:20 | 136:16 143:15 | |
| 152:12 153:5,11 | 129:16 133:2,3 | **understanding** | **v** |
| 153:17 | 138:9 | 20:7 58:3,4 | |
| **transcription** | **tucker**  4:3 10:15 | 118:18 128:16,20 | **v**  1:13 |
| 149:17 | **tuckerellis.com** | 135:22 137:12 | **value**  116:22 |
| **travel**  63:8 | 4:5 | 143:16 | **values**  138:4 |
| **treat**  75:8 | **turn**  118:1 127:18 | **understood**  27:4,6 | **vandetta**  4:11 |
| **treating**  100:11 | 131:10 | 29:17 43:18 47:11 | **variety**  61:20 62:2 |
| **treatment**  26:4 | **turned**  17:20 | 51:7,13 | 128:3 129:6,15 |
| 27:17 30:13,14,24 | **tv**  39:16 67:25 | **undertaking**  44:23 | 140:25 |
| 31:13,25 32:9,11 | 87:7,16,16,20,25 | **undoubtedly** | **various**  19:17 |
| 34:11,15 35:4 | 88:14 89:13 90:12 | 92:18 | 45:22 101:18 |
| 40:23 44:18 54:15 | 90:16 93:12 | **unfortunate**  76:1 | 113:1,1 |
| 56:16,19 59:14,25 | **twelfth**  3:13 | **unfortunately** | **veritext**  151:1,7 |
| 60:12,16 61:3,20 | **twice**  65:9 | 27:6 36:3 | 154:1 |
| 62:2 63:6 71:1 | **two**  20:14 22:1,12 | **united**  1:1 | **veritext.com.** |
| 83:22 87:1,12 | 35:9 49:16 108:19 | **unpack**  130:25 | 151:17 |
| 95:3,5,7,13,17 | 134:15,17 147:9 | **unused**  65:11,23 | **versa**  58:16 |
| 96:21 114:14 | **type**  133:11 | **unusual**  110:20 | **version**  16:9,9 |
| 121:24 | **types**  30:20 87:4 | **unwanted**  65:23 | **versus**  117:15 |
| **treatments**  61:21 | | **update**  125:25 | **vice**  58:16 |
| **tried**  111:3 | | **updated**  16:13 | **video**  7:1 84:12 |
| | | **updates**  19:13 | 96:6 |
| | | 20:1 123:19 | **videographer**  4:11 |
| | | | 10:1 11:9,17 |

64:20,23 110:7,10
147:2,5,8,23
**videos**  43:11 84:5
**videotaped**  1:18
6:2 12:10 16:17
**view**  47:2 114:20
119:19
**viewership**  90:17
91:3
**views**  90:19
**vigorous**  26:11
28:10
**vince**  19:9
**violent**  109:13
**visited**  138:14
**visits**  94:6
**visual**  85:3,10
**vital**  100:16
**volunteers**  57:18
96:16

**w**

**wacker**  3:4
**wait**  60:5 65:20
66:17
**waived**  151:19
**wal**  3:7
**walmart**  3:7 11:3
**want**  20:19 28:17
28:24 29:18 36:16
37:1,2,5 42:10
43:7,21 53:9
59:25 62:16 64:1
64:8,16 67:15
69:4 81:3,5,6 87:6
87:15 91:16,17,17
91:21 99:13,16
106:22 108:8
110:23 112:6
127:18 144:17
145:3,13

**wanted**  37:11
**wants**  133:12
147:19
**warn**  69:5 74:24
**warned**  70:18
**warning**  59:12
71:19
**washington**  3:14
**waste**  17:25
**way**  26:11 29:9,11
33:19 53:19 57:12
68:6 69:21 72:11
77:23 80:5 111:13
111:22 115:3
117:6,17 118:4,5
121:16
**ways**  26:10 116:20
**wc.com**  3:15
**we've**  37:24 106:5
141:11
**website**  18:2 57:9
**week**  96:17
**weeks**  66:19
**wendy**  1:24 149:6
150:14
**went**  59:4 95:4
134:19 140:16
142:14 146:4
**west**  3:4
**whereof**  150:5
**wide**  50:16
**widespread**  63:7
**wilcox**  1:22
**williams**  3:12
10:23
**willing**  52:10
54:22 86:17
**witness**  10:5 11:18
110:22 119:7
142:13 144:9
147:11 149:9,14

149:15,18 150:5
151:8,11 152:1,4
152:11 153:1,4,15
**witness's**  148:2
**witness'**  151:14
**wkyc**  88:3
**word**  106:21
**words**  96:8 114:25
119:2 123:20
**work**  13:8 19:16
26:2 36:8 37:13
50:4,8 62:14
75:22 86:1 94:14
107:24 108:13
109:11,15 128:8
130:16 141:5
145:6
**worked**  27:24
126:15
**working**  27:11,25
30:18 39:16,18
60:25 69:16 71:1
99:16 100:14
101:1,6,11 125:9
126:4,14
**works**  56:18 95:7
136:19
**worth**  123:15
**woven**  65:25
**wrap**  62:8
**write**  16:7 49:17
52:20
**writing**  57:4
104:15 132:7
**written**  96:6
**wrote**  84:2

**x**

**x**  141:12

**y**

**yeah**  22:19 62:7
68:14 91:21 105:4
114:24 115:9
120:3 141:11
**year**  29:21 50:22
50:22 65:9 67:11
70:3 71:9,15
72:25 73:21 74:12
76:3 78:2 86:7
94:22 107:3 127:9
127:9,14,14,14
130:7 133:18
134:17 138:15
**year's**  95:9
**years**  13:7,23
17:19 35:9 37:24
38:10 45:11 46:24
65:4 69:17 72:7
75:6,15,19 81:8
82:10,17,20 86:24
89:2 93:3 98:6,7
100:15 107:7
108:2 120:24
134:15
**yesterday**  17:9
18:14,18 23:9
136:11,21
**young**  95:20

**z**

**zashin**  2:12 10:13
**zero**  14:2 54:23
**zerrusen**  2:23 11:4
11:4
**zrlaw.com**  2:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.