Page 1

1          IN THE UNITED STATES COURT

2           NORTHERN DISTRICT OF OHIO

3               EASTERN DIVISION

4

5          ~~~~~~~~~~~~~~~~~~~~

6   IN RE:  NATIONAL PRESCRIPTION    MDL NO. 2804

7   OPIATE LITIGATION

8                             Case no.

9                             17-mdl-284

10                            Judge Dan Polster

11

12  This document relates to:

13  The County of Summit, Ohio, et al.,

14        V.

15  Purdue Pharma L.P., et al.,

16  Case No. 1:18-OP-45090 (N.D. Ohio)

17

18          ~~~~~~~~~~~~~~~~~~~~

19            Videotaped deposition of

20               DONNA SKODA

21            August 14, 2018

                 9:06 a.m.

22

                 Taken at:

23           Brennan Manna & Diamond

             75 East Market Street

24               Akron, Ohio

25           Wendy L. Klauss, RPR

Page 2

```
1   APPEARANCES:
2
        On behalf of the City of Akron, Summit County,
3   and the Witness:
        Motley Rice LLC
4       ANNE McGINNESS KEARSE, ESQ.
        HANNA S. WERNER, ESQ.
5       JODI FLOWERS, ESQ.
        28 Bridgeside Boulevard
6       Mt. Pleasant, SC   29464
        (843) 216-9140
7       Akearse@motleyrice.com
        Hwerner@motleyrice.com
8       Jflowers@motleyrice.com
                    -AND-
9       FIDELMA L. FITZPATRICK, ESQ.
        55 Cedar Street, Suite 100
10      Providence, RI  02903
        (401) 457-7728
11      Ffitzpatrick@motleyrice.com
12  On behalf of Cuyahoga County:
        Napoli Shkolnik PLLC
13      JOSEPH L. CIACCIO, ESQ.
        400 Broadhollow Road, Suite 305
14      Melville, NY   11747
        (631) 224-1133
15      Jciaccio@napolilaw.com
                    -AND-
16      Plevin & Gallucci
        ROBIN M. WILSON, ESQ.
17      55 Public Square, Suite 2222
        Cleveland, OH   44113-1901
18      (216) 861-0804
        Rwilson@pglawyer.com
19
20  On behalf of Johnson & Johnson and Janssen
    Pharmaceuticals, Inc.:
        Tucker Ellis, LLP
21      TARIQ M. NAEEM, ESQ.
        GIUSEPPE W. PAPPALARDO, ESQ.
22      950 Main Avenue, Suite 1100
        Cleveland, OH   44113
23      (216) 592-5000
        Tariq.naeem@tuckerellis.com
24      Gwp@tuckerellis.com
25
```

Page 3

```
1   APPEARANCES, Continued:
2   On behalf of the Allergan:
        Kirkland & Ellis LLP
3       ZACHARY A. CIULLO, ESQ.
        300 North LaSalle
4       Chicago, IL  60654
        (312) 862-2000
5       Zac.ciullo@kirkland.com
6   On behalf of Distributor AmerisourceBergen Drug
    Corporation
7       Reed Smith, LLP
        MICHAEL J. SALIMBENE, ESQ.
8       Three Logan Square
        1717 Arch Street, Suite 3100
9       Philadelphia, PA  19103
        (215) 851-8100
10      Msalimbene@reedsmith.com
11  On behalf of Rite Aid of Maryland:
        Morgan Lewis
12      JOHN P. LAVELLE, JR.
        1701 Market Street
13      Philadelphia, PA   19103-2921
        (215) 963-4842
14      John.lavelle@morganlewis.com
15  On behalf of Cardinal Health, Inc.:
        Williams & Connolly LLP
16      JOSHUA D. TULLY, ESQ.
        725 Twelfth Street, N.W.
17      Washington, DC   20005
        (202) 434-5000
18      Jtully@wc.com
19  On behalf of Prescription Supply, Inc.:
        Pelini, Campbell & Williams, LLC
20      GIANNA M. CALZOLA-HELMICK, ESQ.
        Bretton Commons
21      8040 Cleveland Avenue NW, Suite 400
        North Canton, OH   44720
22      (330) 305-6400
        Giannac@pelini-law.com
23
24
25
```

Page 4

```
1   APPEARANCES, Continued:
2   On behalf of Endo Health Solutions, Inc, and
    Endo Pharmaceuticals Inc.
3       Arnold & Porter
        ANGEL TANG NAKAMURA, ESQ.
4       777 South Figueroa Street, 44th Floor
        Los Angeles, CA   90017-5844
5       (213) 243-4000
        Angel.nakamura@arnoldporter.com
6
        On behalf of Walmart Inc.:
7       Jones Day
        LISA GATES, ESQ.
8       North Point
        901 Lakeside Avenue East
9       Cleveland, OH   44114-1190
        (216) 586-3939
10      Lgates@jonesday.com
11  On behalf of HBC Service Company:
        Marcus & Shapira, LLP
12      ZACHARY P. FENSTEMAKER, ESQ.
        One Oxford Centre, 35th Floor
13      301 Grant Street
        Pittsburgh, PA   15219-6401
14      (412) 471-3490
        Fenstemaker@marcus-shapira.com
15
        On behalf of Distributor Defendant McKesson
16  Corporation:
        Covington & Burling LLP
17      STEPHEN RAIOLA, ESQ.
        One CityCenter
18      850 Tenth Street, NW
        Washington, DC   20001-4956
19      (202) 662-6000
        Sraiola@cov.com
20
        On behalf of Miami Luken:
21      Jackson Kelly PLLC
        SAMANTHA M. D'ANNA
22      500 Lee Street East, Suite 1600
        P.O. Box 1600
23      Charleston, WV   25301
        (304) 340-1141
24      Samantha.danna@jacksonKelly.com
25
```

Page 5

```
1   APPEARANCES, Continued:
2   On behalf of Insys Therapeutics, Inc.
        Holland & Knight LLP
3       JOE FRANCO, ESQ.
        2300 U.S Bancorp Tower
4       111 S.W. Fifth Avenue
        Portland, Or  97204
5       (503) 517-2941
        Joe.franco@hklaw.com
6
        On behalf of CVS Rx Services, Inc. and CVS
7   Indiana, LLC:
        Zuckerman Spaeder LLP
8       ANTHONY RUIZ, ESQ.
        1800 M Street, NW
9       Suite 1000
        Washington, DC   20036-5802
10      (202) 778-1823
        Aruiz@zuckerman.com
11
        On behalf of Teva Pharmaceutical Industries
12  Ltd.
        Morgan Lewis, LLP
13      ELLIOTT E. BROWN, ESQ,
        1111 Pennsylvania Avenue N.W.
14      Washington, DC   20004
        (202) 739-3000
15      Elliott.brown@morganlewis.com
16  On behalf of Mallinckrodt LLC.
        Ropes & Gray
17      HAYDEN MILLER, ESQ.
        1211 Avenue of the Americas
18      New York, NY   10036
        (212) 596-9451
19      Hayden.miller@ropesgray.com
20  Also Present:
        Joseph Vandetta, Videographer
21              ~ ~ ~ ~ ~
22
23
24
25
```

Page 6

1    TRANSCRIPT INDEX
2
3    APPEARANCES:.............................    2
4
5    INDEX OF EXHIBITS .......................    7
6
7    EXAMINATION OF DONNA SKODA
8    By Mr. Naeem..............................    17
9    By Mr. Lavelle............................  228
10   By Mr. Salimbene........................  285
11   By Ms. Fitzpatrick......................  353
12   By Mr. Naeem............................  371
13
14   REPORTER'S CERTIFICATE...................  388
15
16   EXHIBIT CUSTODY
17   EXHIBITS RETAINED BY COURT REPORTER
18
19
20
21
22
23
24
25

Page 7

1        INDEX OF EXHIBITS
2    NUMBER      DESCRIPTION      MARKED
3    Exhibit 1   Organizational Chart, Dated ..  92
              January 2017, Bates Labeled
4             Summit 155008
5    Exhibit 2   Organizational Chart, Bates ..  92
              Labeled Summit 180563
6
     Exhibit 3   Youth Risk Behavior Survey, .. 159
7             High School Report
8    Exhibit 4   Email Exchange, Beginning .... 171
              with Bates Label Summit
9             154701
10   Exhibit 5   Email with Attachment, ....... 190
              Beginning with Bates Label
11            Summit 264062
12   Exhibit 6   Email, Subject Data for ...... 190
              Narcan, Beginning with Bates
13            Label Summit 263018
14   Exhibit 7   October 26, 2015 Email, ...... 225
              Beginning with Bates Label
15            Summit 178390
16   Exhibit 8   LinkedIn Profile of Donna .... 229
              Skoda
17
     Exhibit 9   Publication of the Ohio ...... 256
18            State Board of Pharmacy
              About the Ohio Automated Rx
19            Reporting System
20   Exhibit 10  OARRS 2017 Annual Report...... 260
21   Exhibit 11  Printout Generated From ...... 269
              OARRS Public Website
22
     Exhibit 12  Email with Attachment, ....... 302
23            Beginning with Bates Label
              Summit 176307
24
     Exhibit 13  Email with Attachment, ....... 313
25            Beginning with Bates Label
              Summit 131869

Page 8

1        ..............................
     Exhibit 14  Email with Attachment, ....... 316
2             Beginning with Bates Label
              Summit 135023
3
     Exhibit 15  2015 Ohio Drug Overdose ...... 321
4             Data: General Findings
5    Exhibit 16  2016 Ohio Drug Overdose ...... 327
              Data: General Findings
6
     Exhibit 17  Email Chain, Bates Label ..... 337
7             Summit 271615
8    Exhibit 18  Printout from the OARRS ...... 340
              Website
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1    INDEX OF VIDEO OBJECTION
2    OBJECT                          PAGE
3    object...................................    22
4    object...................................    25
5    object...................................    35
6    object...................................    71
7    objection................................    80
8    object...................................    81
9    object...................................    83
10   object...................................   100
11   objection................................   120
12   objection................................   134
13   objection................................   146
14   objection................................   164
15   objection................................   166
16   objection................................   167
17   objection................................   167
18   objection................................   167
19   objection. ..............................   171
20   objection................................   175
21   objection................................   177
22   objection................................   178
23   objection................................   178
24   objection................................   179
25   objection................................   181

Page 10

1   objection..............................  197
2   objection..............................  199
3   objection..............................  199
4   objection..............................  199
5   objection..............................  201
6   objection..............................  203
7   objection..............................  203
8   objection..............................  204
9   objection..............................  204
10  objection..............................  206
11  objection..............................  209
12  objection..............................  210
13  objection..............................  213
14  objection..............................  215
15  objection..............................  215
16  objection..............................  216
17  objection..............................  216
18  objection..............................  225
19  objection..............................  227
20  objection..............................  238
21  objection..............................  240
22  objection..............................  245
23  objection..............................  246
24  objection..............................  249
25  objection..............................  253

Page 11

1   objection..............................  254
2   objection. ............................  255
3   object....................  257
4   objection..............................  258
5   objection..............................  258
6   object....................  258
7   object....................  259
8   objection..............................  260
9   objection..............................  261
10  objection..............................  262
11  objection..............................  263
12  objection..............................  263
13  objection..............................  264
14  objection..............................  266
15  objection..............................  267
16  objection..............................  268
17  objection..............................  268
18  objection..............................  269
19  objection..............................  272
20  objection..............................  276
21  objection..............................  278
22  objection..............................  279
23  objection..............................  279
24  objection..............................  280
25  objection..............................  280

Page 12

1   objection..............................  280
2   objection..............................  288
3   objection..............................  290
4   objection..............................  292
5   objection..............................  298
6   objection..............................  299
7   objection..............................  300
8   objection..............................  301
9   objection..............................  308
10  objection..............................  309
11  objection..............................  318
12  objection..............................  320
13  objection..............................  323
14  objection..............................  323
15  objection..............................  327
16  objection..............................  327
17  objection..............................  331
18  objection..............................  334
19  objection..............................  337
20  objection..............................  341
21  objection..............................  341
22  objection..............................  342
23  objection..............................  343
24  objection..............................  344
25  objection..............................  344

Page 13

1   objection..............................  346
2   objection..............................  348
3   objection..............................  349
4   objection..............................  350
5   objection..............................  352
6   objection..............................  353
7   object....................  357
8   objections................  357
9   object....................  360
10  object....................  361
11  object....................  366
12  object....................  367
13  object....................  367
14  object....................  368
15  object....................  368
16  objection..............................  373
17  objection..............................  373
18  objection..............................  373
19  objection..............................  374
20  objection..............................  374
21  objection..............................  375
22  objection..............................  377
23  objection..............................  377
24  objection..............................  378
25  objection..............................  381

Veritext Legal Solutions
www.veritext.com                                     888-391-3376

Page 14

1  objection................................. 382
2  objection................................. 383
3  objection................................. 383
4  objection................................. 384
5  objection................................. 385
6  objection................................. 385
7  objection................................. 386
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 15

1       THE VIDEOGRAPHER:  The date is
2  August 14, 2018.  The time is 9:06 a.m.  The
3  caption of this case is In Re:  National
4  Prescription Opiate Litigation.  The name of
5  the witness is Donna Skoda.
6       At this time the attorneys present
7  and those attending remotely will identify
8  themselves and the parties they represent.
9       MS. KEASE:  Anne Kearse, on behalf
10  of Summit County and Akron.
11       MS. FITZPATRICK:  Fidelma
12  Fitzpatrick, on behalf of Summit County and
13  Akron.
14       MS. WERNER:  Hannah Werner, on
15  behalf of Summit County and Akron.
16       MS. WILSON:  Robin Wilson, of
17  Plevin & Gallucci, on behalf of Cuyahoga
18  County.
19       MR. CIULLO:  Zach Ciullo, for
20  Allergan on behalf of -- from Kirkland Ellis,
21  on behalf of Allergan.
22       MS. NAKAMURA:  Angel Nakamura,
23  Arnold & Porter, on behalf of Defendants Endo
24  Pharmaceuticals and Par.
25       MS. CALZOLA-HELMICK:  Gianna

Page 16

1  Calzola-Helmick, from Pelini, Campbell &
2  Williams, on behalf of Prescription Supply,
3  Inc.
4       MR. FENSTEMAKER:  Zach Fenstemaker,
5  with Marcus & Shapira, on behalf HBC Service
6  Company.
7       MR. TULLY:  Josh Tully, from
8  Williams & Connolly, on behalf of Cardinal
9  Health.
10       MR. LAVELLE:  John Lavelle, from
11  Morgan Lewis, on behalf of Rite Aid of
12  Maryland.
13       MR. SALIMBENE:  Mike Salimbene,
14  from Reed Smith, for AmerisourceBergen Medical
15  Group.
16       MR. PAPPALARDO:  Giuseppe
17  Pappalardo, with Tucker Ellis, on behalf of
18  Johnson & Johnson.
19       MR. NAEEM:  Tariq Naeem, Tucker
20  Ellis, on behalf of Janssen Pharmaceuticals and
21  Johnson & Johnson.
22       Can the people on the phone please
23  identify themselves.
24       MR. RAIOLA:  Stephen Raiola, with
25  Covington & Burling, on behalf of McKesson.

Page 17

1       MR. NAEEM:  Anybody else?  Just a
2  reminder that everybody on the phone,
3  regardless who they are and who they represent,
4  has to represent themselves per the deposition
5  protocol entered by the judge.  So it looks
6  like we have a few more people, please identify
7  yourself.  Okay.
8       THE VIDEOGRAPHER:  Would the court
9  reporter please swear in the witness.
10       DONNA SKODA, of lawful age, called
11  for examination, as provided by the Statute,
12  being by me first duly sworn, as hereinafter
13  certified, deposed and said as follows:
14       EXAMINATION OF DONNA SKODA
15  BY MR. NAEEM:
16   Q.  Good morning.
17   A.  Good morning.
18   Q.  Would you identify yourself please
19  for the record.
20   A.  My name is Donna Skoda, S-K-O-D-A.
21   Q.  Thank you, Ms. Skoda, for being
22  here today.  As we identified ourselves shortly
23  before you were sworn, my name is Tariq Naeem,
24  I'm going to be examining you today.
25       Before we get started, I just want

5 (Pages 14 - 17)

Page 18

1  to lay down a few ground rules to make this
2  easier, primarily for the court reporter.  Let
3  me ask, have you been deposed before?
4      A.   Yes.
5      Q.   In your work capacity?
6      A.   Yes.
7      Q.   When was the last time you were
8  deposed?
9      A.   Probably three years ago.
10     Q.   And I don't want to get into the
11 specifics, but generally what kind of case was
12 it?
13     A.   It was a wrongful termination
14 employment case.
15     Q.   And have you been deposed other
16 than that instance?
17     A.   No.
18     Q.   Did you testify at trial in that
19 case?
20     A.   No.
21     Q.   Well, just briefly, what I want to
22 make sure again, and this is for the court
23 reporter's benefit, is that you verbalize your
24 answers, yeses and nos, or whatever you need to
25 say, but no nods and shrugs or --

Page 19

1      A.   Right.
2      Q.   -- ambiguous language like uh-huh
3  and uh-uh, which makes sense to us here, but
4  won't translate on the record.  I'm going to
5  ask, again because we are used to
6  conversational speak, but again the court
7  reporter has difficulty taking down what we are
8  both saying, if we are talking at the same
9  time, that I would ask if you let me finish my
10 question, and I'll give you the courtesy of
11 finishing your answer before I move on to the
12 next question.
13     A.   Okay.
14     Q.   And then if I ask bad questions,
15 which will be frequent over the course of the
16 day, if it doesn't make sense, let me know, and
17 I'll try to rephrase it.  In my head it makes
18 sense, it doesn't come out the way I want all
19 the time.  So I don't want you trying to
20 interpret what you think I meant, just let me
21 know and I'll rephrase it, okay?
22     A.   Uh-huh.  Thank you.
23     Q.   And if you want to take a break at
24 any point, just let us know, and we will go off
25 the record.

Page 20

1      As we get started, I want to start
2  with your background, but before we do, let me
3  ask, I assume you prepared for your deposition
4  today?
5      A.   Yes.
6      Q.   How many times -- well, let me ask.
7  Did you meet with counsel to prepare for
8  deposition?
9      A.   Yes.
10     Q.   How many times have you met in
11 total to prepare for your deposition today?
12     A.   Twice.
13     Q.   When was the first time you met
14 with counsel to prepare?
15     A.   It was a while ago, maybe a week or
16 two.
17     Q.   How long did you meet to prepare
18 for that -- for the deposition that first time?
19     A.   I think that was maybe four or five
20 hours.
21     Q.   And then there was a second
22 meeting --
23     A.   Correct.
24     Q.   -- to prepare?
25     A.   Yes.

Page 21

1      Q.   When was that?
2      A.   Yesterday.
3      Q.   And how long did you spend
4  preparing for the deposition?
5      A.   Four hours, five.
6      Q.   Now, as I ask my questions here, I
7  don't want you to tell me anything about what
8  you spoke with your attorneys.  That is
9  privileged.  So if it comes out that way, I'm
10 not asking for that information.
11     Did you review documents to prepare
12 for your deposition?
13     A.   Yes, documents that we submitted.
14     Q.   That were produced by Summit
15 County?
16     A.   Uh-huh.
17     Q.   Specifically by Summit County
18 Public Health?
19     A.   Uh-huh.
20     Q.   Let's talk about that a little bit,
21 not the documents you reviewed, but the
22 documents your agency collected, and to be
23 clear, you are the health commissioner for
24 Summit County Public Health, correct?
25     A.   Correct.

6 (Pages 18 - 21)

Page 22

1    Q.   When did you become aware that a
2  lawsuit was going to be filed?
3    A.   Let me think.  There was sort of
4  conversation in the City of Akron.  We merged
5  health districts, and they no longer had their
6  records.  They were asking us for some
7  financial information, probably in mid 17,
8  2017.
9         They were asking us for some
10 financial information, but at that time, we
11 really didn't know what they wanted it for.
12 After that, we were invited to a meeting.
13       MS. KEARSE:  And I'm just going to
14 object to anything that was discussed with
15 counsel in regards to the lawsuit.  That is
16 privileged, and we don't need to talk about
17 that.
18    A.   We were just invited to the meeting
19 about the general lawsuit with the county.
20    Q.   And do you recall when that meeting
21 was?
22    A.   It had to have been in the fall of
23 2017 maybe, or maybe earlier.
24    Q.   And again, as your counsel pointed
25 out, we are not allowed to ask about the

Page 23

1  conversations you had with counsel present, but
2  can I ask, was counsel present for that
3  meeting?
4    A.   There was a representative there,
5  but it was not any of these ladies.
6    Q.   Was it a representative of an
7  outside law firm?
8    A.   Yes.
9    Q.   Was there anybody present from the
10 Summit County Law Department?
11    A.   Yes.  Wait.  Law department, yeah,
12 John Galonski, yes.
13    Q.   And anybody there from the City of
14 Akron Law Department?
15    A.   Yes.
16    Q.   And I understand there were a
17 number of other municipalities --
18    A.   Correct.
19    Q.   -- that were involved early in the
20 lawsuit.  Were they represented at this meeting
21 as well?
22    A.   Yes, but I couldn't tell you if
23 they were all law directors though.
24    Q.   And just to capture what I think I
25 heard from you about the timing of all this,

Page 24

1  was that in mid 2017, Akron had reached out to
2  you or your agency for some financial
3  information?
4    A.   Correct.
5    Q.   And that the meeting with the
6  representatives of the plaintiffs and counsel,
7  outside counsel, was later, it was after that,
8  you think in the fall of 2017?
9    A.   I think, yeah.
10    Q.   Now, prior to mid 2017, had you
11 attempted to collect any documents related to
12 what I'm going to refer to throughout the
13 course of the day today as the opioid crisis,
14 for the purposes of litigations?
15    A.   No, no.
16    Q.   So again, mid 2017 is the first
17 time --
18    A.   I can remember, yeah.
19    Q.   And to be clear, you didn't
20 undertake to -- any document identification or
21 collection activities prior to Akron reaching
22 out to you?
23    A.   Uh-huh.
24       THE NOTARY:  I'm sorry?
25    A.   I said no.  I'm sorry.

Page 25

1    Q.   I want to follow up very quickly
2  on -- you mentioned Akron used to have its own
3  health department --
4    A.   Correct.
5    Q.   -- and then there was a merger?
6    A.   Right.
7    Q.   Give me just a quick background of
8  when that was?
9    A.   Actually, in Summit County, the
10 three health -- there is two city health
11 departments and a county health department.  It
12 would have been in October of 2010 we picked
13 up -- the City of Barberton Health Department
14 joined, and then in January of 2011, we picked
15 up Akron Health Department.  So we became one
16 combined general health district.
17    Q.   And so your testimony earlier was
18 that when you were contacted by Akron in mid
19 2017, can you let me know who it was
20 specifically who contacted you?
21    A.   Yeah, if I could think of his name.
22 One of their attorneys, Isham.
23       MS. KEARSE:  And I'm going to
24 object if this is an attorney communications
25 with that.

7 (Pages 22 - 25)

Page 26

1      MR. NAEEM:  And the identity of the
2  person, can we just ask about the identity of
3  the person?
4      A.   I'd have to think of his name, but
5  I --
6      Q.   That's his first name?
7      A.   I think it was Isham.
8      Q.   But it was somebody from the Akron
9  Law Department --
10      A.   Correct.
11      Q.   -- to your knowledge, that
12  contacted you?
13      A.   Correct.  Well, I should say that
14  was after.  Initially, that request came to our
15  fiscal officer to collect information about
16  costs, and then he followed up with me, to ask
17  if we could do it.
18      Q.   Who is the fiscal officer?
19      A.   Angela Burgess.
20      Q.   Angela Burgess?
21      MS. KEARSE:  Again, if those were
22  communications by a lawyer or counsel, that
23  that is privileged.
24      Q.   And the fiscal officer, Angela
25  Burgess, is that a Summit County position or is

Page 27

1  that a Summit County Public Health position?
2      A.   Summit County Public Health
3  position.
4      Q.   So someone from Akron reaches out
5  to Ms. Burgess, and then is that in mid 2017
6  time frame we are still talking about?
7      A.   Yeah.  I think it was, yeah.
8      Q.   Do you recall when the lawsuit was
9  filed?
10      A.   I want to say November, December of
11  2017, maybe.
12      Q.   And prior to the lawsuit being
13  filed -- well, strike that.  Let me ask it
14  again.
15      Between mid 2017, the first time
16  you were notified about the lawsuit, until that
17  November, December 2017 time frame when the
18  lawsuit was filed, and I have it here, we can
19  show you the date, it's not important at this
20  point, but if you want to look at it, let me
21  know, did you undertake to collect any
22  documents regarding the opioid crisis?
23      A.   No.
24      Q.   When was the -- when was the first
25  time -- well, strike that.

Page 28

1      Were you the -- were you the person
2  at Summit County Public Health that was
3  responsible for ensuring that employees of that
4  agency were maintaining emails for the lawsuit?
5      A.   I'm not sure I understand what you
6  are saying.
7      Q.   Let me --
8      A.   We have a record retention policy.
9      Q.   That's something that has been in
10  effect --
11      A.   Oh, yeah.
12      Q.   -- prior to you?
13      THE NOTARY:  Let him finish the
14  question, please.
15      Q.   How long has that record retention
16  policy, the current version in effect, how long
17  has that been in effect?
18      A.   Since, well, five, six years at
19  least.  The records, I'm trying to -- they did
20  change the rules for record retention in the
21  State of Ohio, having a records commission, and
22  that was probably five or six years ago.
23      Q.   So the change in the State of Ohio
24  policy dictated the current version that's in
25  effect?

Page 29

1      A.   Uh-huh.
2      Q.   And that's dictated to your agency
3  by State of Ohio law?
4      A.   Yes.
5      Q.   Do you recall what that change was
6  five or six years ago?
7      A.   No.
8      Q.   Are you familiar with the record
9  retention policy generally?
10      A.   Yes.
11      Q.   Do you know how long emails are to
12  be maintained?
13      A.   No.
14      Q.   Do you know generally, is there any
15  time requirement with respect to records, any
16  records, are to be maintained?
17      A.   Yes.  It depends on what they are.
18  Some are 50 years, some are until the child
19  turns 21.  They are -- we have a records
20  schedule, and they are all maintained according
21  to that.
22      Q.   Financial records, do you know how
23  long those are to be maintained?
24      A.   Seven years.
25      Q.   And what was Summit County's policy

8 (Pages 26 - 29)

1 prior to this revision with respect to
2 financial records being maintained, do you
3 recall?
4     A.   Yes.  We kept everything.
5     Q.   So, and I'm assuming you use that
6 kind of euphemistically, but basically --
7     A.   We just kept everything and didn't
8 get rid of anything until we were told we were
9 allowed to establish a schedule and start
10 getting rid of.
11    Q.   All right.  And so was that that
12 five or six years ago that now you had that
13 policy that some things would be allowed to be
14 destroyed and some things would continue to
15 have to be maintained pursuant to that
16 schedule?
17    A.   Correct.  We got clarification on
18 what that was.
19    Q.   Did Summit County Public Health
20 maintain those records, and I want to go
21 through the list a little bit, but with respect
22 to financial, for example, were those
23 maintained electronically or in hard copy?
24    A.   Both.
25    Q.   The hard copy, were they maintained

Page 31

1 on site or were they sent out for storage?
2     A.   On site.
3     Q.   Do you know if those records still
4 resist -- I'm sorry, still exist?
5     A.   Some do, others have been
6 destroyed.
7     Q.   And how far back do those records
8 go currently, the existing records?
9     A.   It depends on what record it is.
10 We are required to keep air monitoring records
11 for, I think, a hundred years, so some of them
12 are very old.
13    Q.   So let's just -- let's just right
14 now talk about the financial records, which you
15 told me are now currently required to be
16 maintain for seven years?
17    A.   I believe seven years.
18    Q.   So certainly Summit County Public
19 Health is maintaining seven years of financial
20 records?
21    A.   Yes.
22    Q.   Are you maintaining records that go
23 further back then seven years?
24    A.   I couldn't be sure about that.
25    Q.   Where would those records be if

Page 32

1 they were maintained, if those --
2     A.   1867 West Market Street.
3     Q.   Is that Summit County's
4 headquarters --
5     A.   Our public health.
6     Q.   -- public health headquarters?
7     A.   Yes.
8     Q.   Who would you talk to within your
9 agency to look for and identify those records?
10    A.   Stephen Nemecek.
11    Q.   Can you spell the last name.
12    A.   N-E-M-E-C-E-K.
13    Q.   And what is his title with Summit
14 County Public Health?
15    A.   He is actually a paralegal, and he
16 does our record retention.
17    Q.   So would he be the person you would
18 speak to regarding any category of records with
19 respect to do they exist and where are they?
20    A.   Yes.
21    Q.   How long has he been with Summit
22 County Public Health?
23    A.   Three years, four years maybe.
24    Q.   And was he hired specifically with
25 respect -- strike that.

Page 33

1        At the time he was hired, record
2 retention, was that one of the things that he
3 were responsible for from the date of hire?
4     A.   No, it was not.
5     Q.   Was there somebody else prior to
6 Mr. Nemecek who was responsible for the record
7 retention?
8     A.   It was sort of -- it was
9 administration that handled it, all of the
10 records that were retained, but I don't believe
11 there was a specific person.
12    Q.   And again, administration for
13 Summit County Public Health?
14    A.   Correct.
15    Q.   Which is kind of a group under the
16 umbrella that you are responsible for the
17 administration?
18    A.   Yes.
19    Q.   I want to call it department, but I
20 don't want to use a word that doesn't actually
21 appear --
22    A.   Yes.
23    Q.   -- on an org chart?
24    A.   Administration.
25    Q.   Who would you go to at Summit

9 (Pages 30 - 33)

Page 34

1 County Public Health administration if you had
2 questions regarding records retention that
3 preceded Mr. Nemecek's employment?
4 A. Heather Pierce, P-I-E-R-C-E.
5 Q. Now, when you were advised of the
6 lawsuit in 2017, and when you were ultimately
7 asked to identify and collect documents for the
8 litigation, did you work with Mr. Nemecek and
9 Mr. Pierce for that purpose?
10 A. Yes. Well, it was Stephen, and
11 Heather is the girl, Heather Pierce, and our
12 attorney, and also Brenda Pickle, who is my
13 administrative assistant, and our IT
14 individual, Eddie Mink.
15 Q. Okay. When did you direct
16 Mr. Nemecek, Ms. Pierce, Mr. Mink, Ms. Pickle
17 to begin collecting documents for this
18 litigation?
19 A. When we received the request.
20 THE VIDEOGRAPHER: Off the record?
21 MR. NAEEM: Yes. Let's go off the
22 record.
23 THE VIDEOGRAPHER: Off the record
24 at 9:26.
25 (Pause.)

Page 35

1 THE VIDEOGRAPHER: On the record,
2 9:27.
3 Q. Ms. Skoda, we took a very, very
4 short break off the record, and what we were
5 talking about before we did was Summit County
6 Public Health's collection of records for the
7 lawsuit, and you had identified a number of
8 names of folks who were involved in those
9 efforts from your agency.
10 MS. KEARSE: I'm going to just
11 object. I don't think it was specific to the
12 lawsuit. You were asking general questions
13 about record retention.
14 Q. My question had been, shortly
15 before we went on the break, was when did you
16 have these folks begin collecting records, and
17 you said it was when you got the request.
18 A. Correct, because we --
19 Q. Well, I was going to ask, when was
20 that request?
21 A. I'm not 100 percent sure. I'm
22 going to say early 18.
23 Q. And again, I don't want to know
24 anything about the contents of the
25 communication. I just want to know, was that

Page 36

1 request sent to you by outside counsel?
2 A. After we signed a contract and
3 hired them, yes.
4 Q. And the contract was signed when?
5 A. January, February.
6 Q. And again, just to be clear so the
7 record is clear, that was a contract with your
8 outside counsel to represent Summit County in
9 this lawsuit?
10 A. Summit County Public Health,
11 correct.
12 Q. And which law firm was it you
13 signed the contract with?
14 A. I think there was -- it was a
15 group. I was Motley Rice, with a subsidiary of
16 Brennan Diamond helping locally.
17 Q. So you signed a contract, there is
18 a request to collect documents, and then you
19 meet with some of the names we talked about to
20 go ahead and collect documents, yes?
21 A. Yes.
22 Q. One of the things -- well, strike
23 that. Let me ask it.
24 Did you collect financial records,
25 and when I say you, I mean your agency, or at

Page 37

1 your direction, were financial records
2 collected?
3 A. Yes.
4 Q. And as we sit here today, do you
5 know whether there were records that were --
6 financial records that were collected that are
7 older than seven years old?
8 A. No.
9 Q. You don't know?
10 A. I don't know.
11 Q. Was budget information for Summit
12 County Public Health one of the things you
13 asked for?
14 A. Yes, but let me -- I want to
15 clarify a minute. We were asked for the budget
16 information for the City of Akron. We then
17 collected additional documents that were
18 requested. We dumped all of our emails.
19 Everything we possibly had, we gave up, that we
20 had in our possession, that was of value, I
21 think, to whomever wanted to review it.
22 I cannot be 100 percent sure that
23 we looked at those financial documents again,
24 once we gave that information.
25 Q. Okay. So let me see if I

10 (Pages 34 - 37)

Page 38

1  understand what you just said.  At some point,
2  you get the request, and you and the folks that
3  work for Summit County Public Health go looking
4  for what has been asked for?
5      A.   Correct.
6      Q.   You don't specifically review those
7  documents to see should I or shouldn't I
8  produce it, you just give them whole categories
9  of documents?
10     A.   Correct.
11     Q.   So one of those categories is
12 financial records, but you don't know
13 specifically what is contained in those
14 documents that were produced?
15     A.   Correct.
16     Q.   The financial documents, were they
17 hard copy, were they electronic, were they
18 both?
19     A.   Probably both.
20     Q.   With respect to employees of Summit
21 County Public Health, were there -- were you
22 responsible for identifying people who would
23 have some knowledge about this opioid crisis
24 and collecting their electronic or hard copy
25 documents?

Page 39

1      A.   Jackie Pollard, P-O-L-L-A-R-D, is
2  our assistant director for our alcohol and
3  other drug services.  So Jackie was involved
4  with collecting any information that was,
5  should I say, treatment or programmatically
6  focused.
7      Q.   How long has Jackie, Ms. Pollard,
8  been employed by Summit County Public Health?
9      A.   About a year.
10     Q.   Who was her predecessor?
11     A.   Yvette Edwards.  Common spelling.
12     Q.   And how long was she in that
13 position, Ms. Edwards?
14     A.   Two years, two to three years.
15     Q.   Is she still employed, in any
16 capacity, by any Summit County government
17 entity?
18     A.   No.
19     Q.   Do you know, does she still live in
20 the area?
21     A.   I am not sure, to be quite honest
22 with you.
23     Q.   Have you spoken with her about this
24 lawsuit?
25     A.   No.

Page 40

1      Q.   Do you know who was Ms. Edward's
2  predecessor?
3      A.   Carol Boze, and I believe it is
4  B-O-S-E, or it might be Z.
5      Q.   And how long did Ms. Boze have the
6  position prior to Ms. Edwards?
7      A.   Well, I don't know that, because
8  that's when the merger happened, and she came
9  over with the merger.  So she was probably
10 employed by us for about a year or two, and
11 then she retired.  Prior to service at Akron, I
12 don't know.
13     Q.   If you had to try to get employment
14 records for folks that were with Akron prior to
15 the merger, who would you talk to?
16     A.   City of Akron personnel.
17     Q.   Is there anybody in particular you
18 would call?
19     A.   Unfortunately, they have all
20 retired.  I don't know anyone there now.
21     Q.   So going back to the collection of
22 documents, Ms. Pollard, who is the assistant
23 director of alcohol and other drug services, so
24 if I say AOD --
25     A.   Yes.

Page 41

1      Q.   -- services; is that accurate?
2      A.   Yes.
3      Q.   Ms. Pollard, who is an assistant
4  director of AOD services, you relied on her to
5  identify the people and programs who would have
6  relevant information to this lawsuit?
7      A.   Correct.
8      Q.   And did you supervise her in any
9  way or just tell her, explain it to her and
10 tell her to take responsibility for it?
11     A.   She completed that task.  I did not
12 direct her work.
13     Q.   Did she communicate directly with
14 the lawyers then, with respect to what
15 existed -- and this is to your knowledge, what
16 existed and what needed to be produced?
17     A.   No.  Actually, we compiled
18 everything and then submitted it as one, sort
19 of, pile, big pieces of information.
20     Q.   And that pile you turned over, was
21 some of it electronic and some of it hard copy?
22     A.   I believe so.
23     Q.   In addition to financial records,
24 do you know whether any records, any
25 patient-specific records were collected and

11 (Pages 38 - 41)

Page 42

1  turned over?
2      A.   Not to my knowledge.
3      Q.   Now, Summit County Public Health
4  does provide some services to clients, to
5  patients?  I don't know what word you would be
6  comfortable using but --
7      A.   Yes.
8      Q.   And I want to focus this deposition
9  as much as possible just on substance abuse,
10  generally, and opioids specifically.  So, you
11  know, child services or anything else, that
12  doesn't relate to -- I'm going to try not to
13  ask about that, otherwise, we would be here
14  forever, right?  I know Anne would love to be
15  here forever, but we are going to try to keep
16  it narrow.
17          MS. KEARSE:  I have been here
18  forever.
19          MR. NAEEM:  We're just getting
20  started.
21      Q.   Are there clients or patients that
22  Summit County Public Health provides substance
23  abuse services to?
24      A.   Yes.
25      Q.   And what are those services?

Page 43

1      A.   We have intensive outpatient
2  treatment, we have counseling, we have
3  education classes, services, we also provide
4  naloxone training, needle exchange,
5  medication-assisted treatment, only with
6  Vivitrol.  We don't use Suboxone at all.
7          And we also address some of their
8  social needs, by trying to make sure they have
9  housing and food, we do vaccine, we do
10  communicable disease testing, HIV, hep C.
11      Q.   And with respect to, again,
12  collection of documents, Ms. Pollard would have
13  been the person responsible for identifying
14  what documents, perhaps, in these services
15  should be collected and produced?
16      A.   Correct.
17      Q.   Just following up on a few of the
18  things you mentioned with respect to the
19  patient-specific services, are any of those
20  services contracted out, or are those all
21  performed by Summit County Public Health?
22      A.   They are all provided by us.  The
23  only contract in any of that is we do have a
24  contract nurse practitioner, but she works for
25  Summit County Public Health.

Page 44

1      Q.   That's more of an employment --
2      A.   Correct.  It is it is an employment
3  relationship.
4      Q.   Sure.  You said with respect to the
5  medication-assisted treatment, I noted you said
6  you don't use Suboxone.  How long has that
7  medication-assisted treatment program been in
8  existence with Summit County Public Health?
9      A.   Six months.
10      Q.   And who designed that program?  Is
11  there somebody within Summit County generally,
12  a clinical officer, is it a different
13  department, who is -- who designed that
14  program?
15      A.   We have a medical director.  We
16  follow the practice guidelines that are given
17  to us by the alcohol, drug, mental health
18  board, as well as the Ohio State Mental Health
19  Addiction Services.  So when we designed that
20  program, we did it in respect, I believe the
21  acronym is OMAS, Ohio State -- but it's the
22  group that sets the criteria to provide
23  medication-assisted treatment.
24          So it was done, those protocols
25  were established in relationship to best

Page 45

1  practice with our ADM board.  They employ a
2  psychiatrist, Doug Smith, and Dr. Smith and
3  Jerry Craig were instrumental in helping us
4  establish that program, clinically.
5      Q.   Jerry Craig is also an ADM's board
6  employee?
7      A.   He is their executive director.
8      Q.   Dr. Smith -- and is it Mr. Craig or
9  Dr. Craig?
10      A.   Mr.
11      Q.   Have they been with the ADM board
12  for at least as long as you have been the
13  health commissioner for Summit County --
14      A.   Yes.
15      Q.   -- Public Health?  Okay.
16          Now, with respect to the
17  medical-assisted treatment, you mentioned that
18  there were some state-level criteria that were
19  used to design that program, there was some
20  consultation with the Summit County ADM board?
21      A.   Correct.
22      Q.   And then you mentioned a medical
23  director.  Is that a Summit County Public
24  Health medical director?
25      A.   Yes, our medical director.

12 (Pages 42 - 45)

Page 46

1     Q.    And who is that?
2     A.    Erica Sobolewski,
3   S-O-B-O-L-E-W-S-K-I.  Sobolewski.
4     Q.    How long has had she been with
5   Summit County Public Health?
6     A.    Eight months, nine months.
7     Q.    Who was her predecessor?
8     A.    Margo Erme, E-R-M-E.
9     Q.    Dr. Sobolewski, did I pronounce
10  that correct?
11    A.    Yes.
12    Q.    What is her medical specialty, if
13  you are aware?
14    A.    Family practice.
15    Q.    And Dr. Erme, did I pronounce that
16  correctly?
17    A.    Correct.
18    Q.    What was her medical -- or what is
19  her medical specialty?
20    A.    She was an ER physician.
21    Q.    All right.  So State of Ohio, ADM
22  board, your medical director were responsible
23  for designing this medical-assisted treatment
24  program which has been in existence for about
25  six months, correct?

Page 47

1     A.    Correct.
2     Q.    Why was the decision made not to
3   use Suboxone?
4     A.    We felt, starting out, we needed to
5   start slowly, and start to develop the program,
6   make sure we had good protocols in place, and
7   we were able to be successful with the Vivitrol
8   administration, and then we would move into
9   other medications.
10    Q.    So it's not something that was a
11  refusal --
12    A.    No.
13    Q.    -- to consider Suboxone, it's just
14  part of the normal rollout of this program?
15    A.    Correct.
16    Q.    How many patients, if you are
17  aware, has Summit County Public Health provided
18  services to, medical-assisted treatment
19  services, in the six months the program has
20  been in effect?
21    A.    I believe, in order for us to be
22  certified and to work through the state
23  guidelines, we had to do an initial, sort of,
24  test group of patients, I believe those were
25  somewhere between six and ten, and we completed

Page 48

1   that.
2     Q.    Is there currently, as the program
3   is in effect, is there an outer number of
4   patients that your agency is allowed to provide
5   services to?
6     A.    I'm not sure.  An outer number?
7     Q.    Yeah.  So if we were to put the
8   funding issues aside and you had unlimited
9   resources, could you provide medical-assisted
10  treatment to any patient who came into the
11  agency for those services?
12    A.    Vivitrol, yes.  There are not the
13  restrictions there are on Suboxone.
14    Q.    And Suboxone has the limit on the
15  number of patients that can be treated at one
16  time?
17    A.    Yes.
18    Q.    How many is that for Suboxone?
19    A.    They were talking about raising it
20  in Ohio, but it is not very much.  I don't know
21  the exact number now.
22    Q.    Is it somewhere in the 1 to 20
23  range?
24    A.    Oh, no.  I would say it's somewhere
25  between 50 to a hundred.

Page 49

1     Q.    So each clinic has a limit on the
2   amount of patients they are able to --
3     A.    Initially --
4           THE NOTARY:  Wait a minute, please.
5   Let him finish the question.  "So each clinic
6   has a limit on the number of" --
7     Q.    -- patients that can be treated
8   with Suboxone at any one time?
9     A.    Yes.
10    Q.    But Vivitrol does not have those
11  same restrictions?
12    A.    Correct.
13    Q.    So Summit County Public Health has
14  treated, you said, between six and ten
15  patients?
16    A.    I believe so.
17    Q.    And has -- is there some sort of
18  review before that program can be expanded?
19    A.    No.  I think we had to complete
20  those patients, complete the protocols, and
21  then we now can move on.
22    Q.    Beyond that initial set of six to
23  ten patients, has Summit County Public Health
24  provided any medication-assisted treatment to
25  other patients?

13 (Pages 46 - 49)

Page 50

1     A.    I'm not sure.
2     Q.    Is Dr. Sobolewski in charge of
3   administering the program, specifically
4   providing services to the patients?
5     A.    She is the medical director, so she
6   has oversight on that program.
7     Q.    She works with some of the staff
8   from Summit County Public Health?
9     A.    Yes.  A nurse practitioner as well
10  as public health nurses.
11    Q.    Now, does Summit County Public
12  Health maintain treatment records for the
13  patients that receive medication-assisted
14  treatment?
15    A.    Yes.
16    Q.    So she treats them just as if they
17  were a patient coming into her private practice
18  office?
19    A.    Correct.
20    Q.    And where does -- Dr. Sobolewski,
21  does she work full time for Summit County
22  Public Health?
23    A.    Part time.
24    Q.    Does she provide treatment at her
25  office, or does she provide for agency

Page 51

1   patients -- does she provide the treatment at
2   her office, or does it happen at one of your
3   clinics?
4     A.    It happens at Summit County Public
5   Health, our clinics.
6     Q.    So with respect to those treatment
7   records, would they be maintained in the files
8   of Summit County Public Health?
9     A.    Yes.
10    Q.    One of the programs you also
11  mentioned was needle exchange.
12    A.    Correct.
13    Q.    Is that -- well, strike that.  Let
14  me just ask.
15          How long has Summit County Public
16  Health been administering that program?
17    A.    I'm going to say at least a year,
18  maybe a little longer.  It's when the law
19  changed, and I can't remember exactly when the
20  law changed that allowed public health
21  districts to do syringe exchange programs.
22    Q.    And that is a Summit County Public
23  Health administered program?
24    A.    Yes.
25    Q.    Does Dr. Sobolewski run that

Page 52

1   program?
2     A.    No.
3     Q.    That's done by somebody else at
4   Summit County Public Health?
5     A.    Yes.
6     Q.    Who is responsible for --
7     A.    Jackie Pollard.
8     Q.    And what kind of records does
9   Summit County Public Health maintain regarding
10  that program?
11    A.    Limited.  If you're familiar with
12  syringe exchange programs, they are done
13  anonymously.  Therefore, everybody is given a
14  patient ID number, and the records that are
15  maintained are all tied to a patient record
16  number, but we have no idea as to the identity
17  of that person, unless they would choose to
18  seek treatment with us, then we may know their
19  identity.
20          And then, so there is a sign-in
21  sheet and the number of needles returned and
22  given, and that would -- that's about all that
23  we keep.
24    Q.    Is that something that Summit
25  County Public Health employees are trained to

Page 53

1   do, which is offer treatment services?
2     A.    Oh, yes.
3     Q.    And this needle exchange program
4   has been in effect for, you said, a year --
5     A.    Year and a half maybe.
6     Q.    -- a little more maybe?
7     A.    It may have been 16.  It may have
8   been 16.  They changed the rule.  As soon as
9   they changed the rule, we started with it.
10    Q.    Are those services provided at the
11  clinic or clinics, or are there other sites
12  where the needle exchange is done?
13    A.    It has expanded.  There is such a
14  need, that we had to go to a second site.  So
15  we are now using a second site.
16    Q.    And with respect to the funding for
17  the needle exchange, is that funded entirely
18  through Summit County Public Health revenue or
19  its budget or does it come from outside
20  sources?
21    A.    Both.
22    Q.    Roughly, if you can tell me, what
23  percentage is funded directly by Summit County
24  Public Health and what percentage is funded
25  through outside sources?

14 (Pages 50 - 53)

Page 54

1    A.   I would say probably we have
2  contributed 20 percent, and the rest would be
3  outside sources.
4    Q.   And the outside sources, at least
5  at a general level, I don't need the specifics,
6  if it's a specific foundation or a specific
7  grant name, I don't need to know, but what are
8  the sources of the outside revenue, at a high
9  level?
10    A.   State of Ohio, United Way, as well
11  as the alcohol, drug and mental health board.
12    Q.   Okay.  I'm working backwards from
13  the list you gave me.  So one of the other
14  services that your agency, you said, provides
15  with respect to substance abuse and/or opioid
16  services is naloxone training?
17    A.   And distribution.
18    Q.   Okay, and I was going to ask that,
19  because I either didn't write it down or you
20  didn't say it.  So there are two facets of the
21  naloxone.  There is the training for people,
22  how to use, and then there is the distribution
23  of the kits; is that correct?
24    A.   Correct.
25    Q.   Now same question that I asked with

Page 55

1  respect to the needle exchange, how much of the
2  funding for the entire program, whether it is
3  supplies or training, comes from your agency's
4  budget and how much comes from outside sources?
5    A.   Probably, again, it's a small
6  percentage from our budget.  I would say 10 to
7  15 percent, and the remaining amount would be
8  from outside sources.
9    Q.   And those sources are generally the
10  same as the ones you mentioned for the needle
11  exchange program?
12    A.   With the addition of OMAS, Ohio
13  Mental Health and Addiction Services.  They
14  have purchased most of the Narcan.  They have
15  given the naloxone to us.
16    Q.   How long has the naloxone program,
17  and I want to focus on the distribution of
18  the -- they call them Narcan kits?
19    A.   Yes.
20    Q.   Yeah.  How long has Summit County
21  Public Health been distributing those kits?
22    A.   Probably two years.
23    Q.   Currently, is Ms. Pollard also
24  responsible for that program?
25    A.   Yes.

Page 56

1    Q.   Does Dr. Sobolewski have any
2  oversight or provide any consultation?
3    A.   Yes.  Because it is a prescription
4  medication, she signs the prescriptions.
5    Q.   I assume -- well, strike that.
6        I'm not going to assume anything,
7  and I'm not even going to ask that question.
8        How many, if you know, naloxone
9  kits have been distributed by Summit County
10  Public Health in the two years or so that the
11  program has been in existence?
12    A.   I can take a rough guesstimate.
13  About at least over a thousand to 1500, if you
14  include law enforcement.
15    Q.   Does your agency track how many of
16  those have actually been used?
17    A.   Yes.  If individuals tell us.
18    Q.   And that would -- individuals being
19  the first responders, or would it be the --
20    A.   Well, not first responders, if you
21  are talking about -- we train only the police.
22  We do not train -- paramedics have their own
23  supply they have used for years.
24        We give it to police.  They do
25  not -- they come back and get refills, we can

Page 57

1  give them additional, and we track that.
2        We have community members, family
3  members, that will come back and say they used
4  it.  So we then get replacement kits.  That
5  data we keep.
6    Q.   Is it a situation where you find,
7  and I'm following up, kind of, on the example
8  you gave me, where the same family members are
9  coming in for more kits for the same family
10  member who is abusing opioids?
11    A.   I couldn't honestly say that.
12    Q.   Has there been any situations in
13  the last two years, with respect to the Narcan,
14  that Summit County Public Health has been
15  unable to obtain the amount of kits that it was
16  seeking to distribute?
17    A.   When we first started doing it, it
18  was reasonably priced, and then the price took
19  off.  It got a lot more expensive.  So we had
20  to look for additional resources to be able to
21  keep purchasing it.
22    Q.   Was there a point in time where
23  essentially your agency ran out of kits to
24  distribute?
25    A.   No.

15 (Pages 54 - 57)

Page 58

1    Q.   Moving again up, backwards from the
2  list you gave me, education is another service,
3  substance abuse service provided by your agency
4  that you told me about.  What generally are
5  those services?
6    A.   You are referring to the alcohol
7  other drug?
8    Q.   Any substance abuse, and I don't
9  need to know the specifics, and I'll follow up
10  if I do, but generally, could you give me an
11  overview of the type of education provided by
12  your agency on substance abuse?
13    A.   We provide any number of program
14  areas in relationship to identification, how do
15  we help families be successful in the treatment
16  of addiction, a chronic disease.  We help
17  families and individuals come to terms with the
18  fact that this is a chronic disease and that it
19  will need a lifetime of interventions.
20        We work with individuals on how to
21  be successful in the employment, how to get
22  information to them about training programs.
23  Many of the individuals that we serve have been
24  entangled with the criminal justice system, so
25  they often have some things they have to

Page 59

1  straighten out in order to be successful in
2  treatment, but, for the most part, a lot of our
3  education focuses on understanding the need for
4  long-term solutions to addiction.
5    Q.   Now, the education services you
6  described, is that something that Summit County
7  Public Health has been doing for more than ten
8  years?
9    A.   We haven't, as we didn't have that
10  program until we merged.  So we have only been
11  doing it since we merged, which would have been
12  11.  So we have been doing seven years.
13    Q.   All right.  So let me follow up and
14  try to understand how your agency has changed
15  since the merger.  And essentially, what you
16  are talking about, you mentioned Barberton in
17  2010, but it sounds as if you are really
18  focusing more on the 2011 merger with Akron's
19  health department?
20    A.   That was the largest.  Barberton
21  had a small number of employees that were easy
22  to integrate.  It was a community of about
23  20,000 people.  So it wasn't as difficult to
24  bring them to join with us, and we had had
25  Barberton prior, we have done a lot of work in

Page 60

1  that area, but Akron had -- was much larger,
2  had many buildings we had to assume, fleet
3  cars, there were a lot -- and there were some
4  programs that we didn't do and we had to
5  assume.  So it was a much more difficult
6  merger.
7    Q.   So prior to 2011, based on what you
8  had said about education programs, it sounds
9  like Summit County Public Health wasn't doing
10  substance abuse education programs?
11    A.   No, we were not.  No.
12    Q.   No.
13    A.   Excuse me.
14    Q.   Why was that?  Was it a coordinated
15  division of labor --
16    A.   Yes.
17    Q.   -- between local agencies?
18    A.   Yes.
19    Q.   And Akron was responsible for the
20  substance abuse education?
21    A.   Yes.
22    Q.   What dictated the merger of these
23  health districts in 2010 and 2011?
24    A.   At the state level, there is a push
25  for health districts to merge, to some extent,

Page 61

1  to save resources.
2        The other issue locally was the
3  City of Akron was at a point where they had
4  lost their health director.  Their city charter
5  needed a board certified prevention specialist
6  physician to take that role on, and that was
7  difficult, to find that person to assume the
8  role as a health director.
9        Also they had -- they were looking,
10  the mayor, at that time, was Mayor Plusquellic,
11  and he was looking for cost savings, and he was
12  looking for efficiencies.  So as it was
13  being -- and accreditation was just on the
14  horizon for local public health entities to
15  become credentialed and accredited, so he felt
16  it was a good time to bring it forward.  It had
17  been talked about in previous years, but never
18  had the political will.
19    Q.   Was Akron -- and I'm talking about
20  from an administrative perspective, employees,
21  services, revenue, expenses, was it actually a
22  bigger health district than Summit County
23  Public Health --
24    A.   No.
25    Q.   -- agency?

16 (Pages 58 - 61)

Page 62

1    A.   No.
2    Q.   If you recall, prior to the merger,
3  do you know what Summit County Public Health's,
4  essentially, budget was prior to the merger?
5    A.   I want to say it had to be
6  somewhere between 12 and 15.
7    Q.   And to the best of your
8  recollection, what would Akron's revenue/budget
9  have been around that time?
10    A.   I think it was 6.3 million.  But
11  remember, it's a city department, so that was
12  their departmental budget.
13    Q.   What is the combined, and I
14  actually, I guess, I better ask this to be
15  complete.  At the time of the merger with
16  Barberton, which you said was a much smaller
17  health district --
18    A.   Yes.
19    Q.   -- what was their budget prior to
20  merging into Summit County Public Health?
21    A.   About a million.
22    Q.   And as we sit here, and I don't
23  know whether we are in a 2018 budget or 2019
24  budget.
25    A.   18.

Page 63

1    Q.   Okay.  What is Summit County Public
2  Health's current budget for the 2018 fiscal
3  year?
4    A.   About 24 and a half million.
5    Q.   Has that number been in the same
6  general neighborhood since the 2011 merger?
7    A.   No.
8    Q.   How has it changed since 2011?
9    A.   It's increased.
10    Q.   So if we use -- can we use 2012 as
11  maybe the first full budget year that included
12  Akron and Barberton together?
13    A.   No, because that would be wrong.
14  In that -- the first, when we merged, we, in
15  the contract with the city, had agreed to do a
16  three-year trial period of budget expenses,
17  where we would keep, actually, each two set of
18  books and keep them absolutely separate.  So we
19  would know exactly what it cost to administer
20  that health district, that city department.
21         We felt as though that at 6.2, it
22  was way too high, that it shouldn't cost 6.2
23  million to do that, but we weren't sure.
24         So we did three years of a trial, a
25  trial, sort of, budget period.  When it came

Page 64

1  time to then actually formalize a contract that
2  renews each year for us to be the health
3  department, it actually became -- we were able
4  to get the cost down to about 3 million, about
5  3.3 million, and that's actually what the --
6  actually what the contract is for now.  So
7  after that, so probably the first budget year
8  that would be reliable would be 16.
9    Q.   And so in 2016, incorporating those
10  cost savings --
11    A.   15 might be too.  I'm sorry.
12    Q.   Maybe 2015, you said?
13    A.   Yes.
14    Q.   All right.  I'm just trying to get
15  a big picture from you --
16    A.   Yes.
17    Q.   -- I don't need to the dollar and
18  cent exact.  But in 2015, what was the budget
19  for Summit County Public Health?
20    A.   I want to say it was probably about
21  21 million, 20, 21 million.
22    Q.   And that includes all sources of
23  revenue?
24    A.   Yes.
25    Q.   Outside funding, State of Ohio, for

Page 65

1  example?
2    A.   Yes.
3    Q.   Plus general revenue from levy
4  revenue?
5    A.   We don't have levy.  We have inside
6  millage from property taxes.
7    Q.   2016, if you recall, how did what
8  change?
9    A.   That's probably up by a million,
10  probably.
11    Q.   About 22 million?
12    A.   Yeah.
13    Q.   17?
14    A.   Probably up a lit bit, 23, 24,
15  somewhere in there.
16    Q.   And then you said it's about 24 and
17  a half this year?
18    A.   Uh-huh.  Yes.
19    Q.   Has Summit County Public Health
20  started its 2019 budget process?
21    A.   Yes.
22    Q.   Can you give me a general
23  description of how the budget process works for
24  your agency, within the context of the overall
25  Summit County government budgetary process?

17 (Pages 62 - 65)

Page 66

1    A.   Okay.  In revised code, we are a
2 separate taxing district, therefore, we do our
3 own budget.  So we will look at -- each
4 division head will look at the needs and the
5 cost.
6         We pretty much know what our
7 revenues are going to be, except with some
8 fluctuations, maybe some permitting fees or how
9 much we are actually going to bring in, but we
10 know what the City of Akron contract says, we
11 know what the inside millage is, we know
12 roughly what we receive in permits and
13 contracts that we are required by law to
14 charge, like for birth certificates and well
15 permits and sewage permits, and then the
16 remaining amount of our dollars, the other 12
17 and a half, is soft grant money that we find in
18 order to provide additional services for
19 individuals.
20         So when that budgeting process
21 starts, we know what we are required by law to
22 provide services, and then each division
23 director looks for additional dollars to
24 provide services to the community, based on the
25 community health improvement plan.

Page 67

1    Q.   Does Summit County Public Health
2 have one community health improvement plan --
3    A.   Yes.
4    Q.   -- or goes each division have one?
5    A.   Each division contributes to that,
6 plus the community at large.  We are
7 responsible for the offering of one document.
8    Q.   Is that an annual document or is
9 it --
10    A.   It's now, based on the state, it's
11 an every-three-year document.
12    Q.   Which -- what's the current version
13 in effect, what years does it cover?
14    A.   We are in 16, 17, 18.  It will be
15 redone in 19.
16    Q.   So with respect to the budget, you
17 mentioned there is the permits and contracts,
18 the fees that come in?
19    A.   Correct.
20    Q.   Are those earmarked, do they have
21 to be spent on specific purposes, or are they
22 general revenue to your --
23    A.   Well, we have to -- let's take
24 vital statistics, for example.  We charge $22
25 per birth certificate.  We have to.  We keep

Page 68

1 $3.  The rest is remitted to the state.  So the
2 $3 we keep is earmarked for vital statistics,
3 to keep that operational.
4         Most of our dollars -- we don't
5 make money on anything.  So we're poor.
6    Q.   Property taxes, does that go into a
7 general revenue fund?
8    A.   Yes.
9    Q.   So that would pay for salaries,
10 benefits, for example?
11    A.   Correct.
12    Q.   Does it also pay for services,
13 substance abuse services provided to clients or
14 patients of Summit County Public Health?
15    A.   A little bit.
16    Q.   The grant money, do those pay for
17 salaries and benefits?
18    A.   Sometimes, yes.
19    Q.   Is that the primary source of
20 revenue for, for example, substance abuse
21 services provided to agency clients or
22 patients?
23    A.   Yes.
24    Q.   Currently, I think you said, it's
25 12 and a half million, give or take?

Page 69

1    A.   That's grant money.
2    Q.   Of grant money, yeah.
3         How has that number changed since
4 2015?
5    A.   It increased.  It increased.
6    Q.   So roughly what was it in 2015?
7    A.   I want to say it had to be around
8 maybe 9 or 10 million.
9    Q.   Of the current amount of 12 and a
10 half million, do you know how much of that,
11 roughly, goes towards providing the substance
12 abuse services we were talking about earlier?
13 You can do it by dollar amounts or by
14 percentage.
15    A.   Some of our grants are multiple
16 year grants.  So like we have a 1.5 SAMHSA
17 grant to provide education and outreach, risk
18 behavior, as far as looking at training and any
19 number of things.
20         That grant runs over five years, so
21 if I look at per year, we get about 300 a year
22 on that grant, we get another, I would say,
23 probably close to a million -- well, our
24 contract -- maybe a million and a half.
25    Q.   Goes towards substance abuse

18 (Pages 66 - 69)

Page 70

1  programs?
2      A.   Yeah, a million and a half.  I
3  would say a million and a half to probably
4  1.75.
5      Q.   And does your agency track -- I'm
6  sure it tracks -- strike that.  Let me start
7  all over.
8          Does your agency track how much of
9  that 1 and a half to 1.75 million is actually
10 used for opioid-related services?
11     A.   Only in those programs that are
12 specific, like Narcan, naloxone or -- yeah,
13 that would be it probably, those that are
14 specific, MAT.
15     Q.   So other than going grant by grant
16 and knowing what the purpose of the grant is,
17 there isn't any sort of other accounting being
18 done in your department to carve out this is
19 going toward opioids, this is going to meth,
20 this is going to go to --
21     A.   It could be.  This is probably a
22 lot more information, but the State of Ohio
23 started something call deliverable-based grant
24 reimbursements.  So if your grant is for
25 $300,00, completing OARRS training and

Page 71

1  education with physicians, if you did 50
2  physicians, that maybe bring in $50,000.
3          So if it's a deliverable-based
4  grant, we would know the specific objective
5  that had to be met in order to receive that
6  money, and we would know if it was grant or
7  not, if it was opioid related.
8      Q.   But again, that would require us to
9  go on a grant-by-grant basis --
10     A.   Correct.
11     Q.   -- and know what the grant is for
12 and do that math, but if it's just a top-line
13 budget or revenue analysis, there isn't a
14 category that says opioid-related expenses?
15         MS. KEARSE:  Object to form.  You
16 can answer.  I just objected to the form of the
17 question.
18     A.   No.
19     Q.   And then, so just to tie that off,
20 as we sit here today, if I started in 2015 and
21 worked up to 2018, could you give me a number
22 or a percentage of that substance abuse
23 expenditure that is related solely to
24 opioid-related programs?
25     A.   50 percent.

Page 72

1      Q.   And is there somebody, if you had
2  to go and pinpoint that number to the best of
3  your agency's abilities, is there somebody
4  within your agency you would go to ask for that
5  analysis?
6      A.   Yes.
7      Q.   Who is that?
8      A.   Jackie Pollard.
9      Q.   By the way, I had asked how long
10 she had been assistant director of AOD
11 services.  I did not ask how long she has been
12 employed by Summit County Public Health.  Do
13 you know?
14     A.   The same.  She has been there about
15 a year.
16     Q.   So she was new to the agency --
17     A.   Correct.
18     Q.   -- when she took the current
19 position?
20     A.   Correct.
21     Q.   All right.  There were two more
22 service categories that we haven't talked about
23 yet that you gave me earlier in the deposition.
24 We have been talking about education.  The next
25 one on the list was counseling.

Page 73

1      A.   Yes.
2      Q.   Can you give me -- well, first of
3  all, is Jackie Pollard responsible, kind of the
4  supervisor of that program as well?
5      A.   We actually have an additional
6  supervisor in there.
7      Q.   Who is the supervisor for
8  counseling service?
9      A.   Griffin Brown.  It's G-R-I-F-F-I-N,
10 Griffin Brown.
11     Q.   And that's a Mr. Brown?
12     A.   Yes.
13     Q.   How long has he been that assistant
14 director?
15     A.   He's a supervisor.
16     Q.   I'm sorry.  A supervisor.
17     A.   Probably four months.  We just
18 hired him.
19     Q.   Was he hired into a new position or
20 was he hired to replace somebody?
21     A.   He was hired in to replace somebody
22 who had left.
23     Q.   And who was that previous person?
24     A.   It would have been Victoria.  Yeah.
25 Her name is Victoria.

19 (Pages 70 - 73)

Page 74

1    Q.   Is she like Cher, one name,
2  Victoria?
3    A.   Yeah.  Victoria.  I'm trying to
4  think, Victoria.  I don't remember her last
5  name though.
6    Q.   How long was she in that position?
7    A.   Probably a couple years.
8    Q.   And do you recall who would have
9  had that position before her?
10    A.   Yvette Edwards.
11    Q.   What is the -- what is the role of
12  a counseling supervisor?
13    A.   They oversee practice standards and
14  make sure that the counselors are meeting their
15  productivity standards, and that they are
16  actually providing quality counselling and
17  review, and do supervision with each of them,
18  and try to make sure that the service delivery
19  is on par with best practice standards in what
20  they are doing.
21    Q.   How many counselors does, and we
22  are just talking about substance abuse,
23  although if you can't answer that, then we can
24  dive into it deeper, but how many counselors
25  are there at Summit County Public Health that

Page 75

1  provide substance abuse counseling?
2    A.   I believe there are eight.
3    Q.   Has that number been roughly the
4  same since you have been the health
5  commissioner?
6    A.   Yes.  Seven, eight, somewhere in
7  there.
8    Q.   And within that group of
9  counselors, are there some that have -- are
10  they generalists or are they specialists, if
11  you know?
12    A.   Most of them are LPC, licensed
13  personal counselors, and they all have
14  substance abuse certifications.  Some are
15  LISWs, licensed social workers, some of them
16  have independent status.
17    Q.   What does that mean, "independent
18  status"?
19    A.   It's like you actually become a
20  social worker, and then you become an LISW,
21  which is independent, and then you complete a
22  two-year supervision period, and you are
23  allowed to supervise other social workers.
24    Q.   Okay.  So of the seven to eight
25  that -- counselors that have been with Summit

Page 76

1  County Public Health in the last few years, has
2  there -- strike that.
3    Are there some counselors that deal
4  with certain substances, or do they just see
5  whoever comes?
6    A.   Yes.  No, they do an assessment
7  that points them towards what the problems
8  might be, what the addictions, and they handle
9  it.
10    Q.   All right.  So if you have a client
11  who comes in and they are dealing with opioid
12  addiction, is there one or more specific
13  counselors they are directed to, or could any
14  of them actually take that case?
15    A.   Any of them can do that.
16    Q.   Who is the longest tenured
17  counselor in the group currently employed by
18  Summit County Public Health?
19    A.   Myron Lewis, I believe.
20    Q.   How long, to your knowledge, has he
21  been a counselor for your agency?
22    A.   Again, we merged in 11, so he has
23  only been with us seven years.  Prior to that,
24  he was with Akron.
25    Q.   How many of those seven or eight

Page 77

1  have been with the agency since that merger
2  seven years ago?
3    A.   I'm going to say two to three.
4    Q.   Who were the other one or two,
5  other than Myron?
6    A.   Victoria and Deonna, but I'm not
7  100 percent sure Deonna came with the merger.
8    Q.   What is Deonna's last name?
9    A.   I don't know.
10    Q.   And so Victoria, when we were
11  talking about counseling supervisors, you
12  couldn't remember her last name, she is still
13  with the agency, but is no longer a supervisor,
14  is that --
15    A.   Correct.
16    Q.   If you had a question about opioid
17  addiction, who would be the person you would
18  speak to, whether it's a counselor or a
19  supervisor or an assistant director, anybody
20  within Summit County Public Health, who is the
21  person you would go ask that question to?
22    A.   Jackie Pollard.
23    Q.   What is her background, if you
24  could give me a --
25    A.   She is a social worker, spent a lot

20 (Pages 74 - 77)

1  of years in Stark County Mental Health,
2  alcohol, drug other counseling, she worked for
3  the ADM board down there for many, many years.
4  She has a history, a long history of counseling
5  services.  She is very well versed.
6      Q.    Of the three counselors that, to
7  the best of your recollection, have been with
8  your agency for about -- since the merger
9  roughly --
10     A.    Yes.
11     Q.    -- which of those would you speak
12 to if you wanted to know something about opioid
13 addiction in Summit County?
14     A.    Probably Myron.
15     Q.    With respect to the counseling
16 services that these folks are providing to
17 Summit County residents, how many, roughly,
18 clients or patients does the agency see in a
19 given year, substance abuse?
20     A.    I think it's about 800 to a
21 thousand.
22     Q.    And are those walk-in-type
23 services, or are they regularly scheduled, or
24 does it vary?
25     A.    It varies.

1      Q.    Can someone just walk into the
2  clinic?
3      A.    Yes.
4      Q.    And they are seen the same day?
5      A.    Yes, if they choose to be.
6      Q.    With respect to the 800 to 1,000
7  clients that are provided substance abuse
8  services, has that number been roughly the same
9  since you have been health commissioner, if
10 not, how that has it changed?
11     A.    It's increased.
12     Q.    From roughly what, to the 800 to a
13 thousand?
14     A.    Around 500, 600.
15     Q.    And that's in 2015?
16     A.    15, 16, yes.
17     Q.    What has driven the change from
18 500, 600 to 800 to a thousand?
19     A.    Quite honestly, a lot of our
20 clients come via court referral.  So when
21 somebody finds themselves in trouble, and as
22 part of their probation or part of that, they
23 end up seeking counseling through us.  And
24 because we have seen such an increase in the
25 use, all the agencies in town have seen an

1  increase in the numbers.
2      Q.    Okay.  And you said, "An increase
3  in the use."  Do you mean the use of
4  substance --
5      A.    Substance abuse --
6      Q.    -- illegal substances generally?
7      A.    I'm sorry.
8      Q.    Do you mean generally all
9  substances or do --
10     A.    All substances.
11     Q.    One, and we will, I'm sure, talk
12 about it a little bit later, one substance
13 would, of course, be heroin?
14     A.    Yes.
15     Q.    Fentanyl, perhaps?
16     A.    Yes.
17     Q.    I'm going to, throughout the course
18 of the day, and if we need to clarify as we go,
19 I'm happy to do it, but when I refer to illicit
20 opioids, would you understand that to include
21 heroin and fentanyl?
22        MS. KEARSE:  Objection.
23     A.    Yes.
24     Q.    And then there are, of course,
25 prescription opioids?

1      A.    Correct.
2      Q.    Which can be used illegally too, if
3  they are, for example, stolen from a family
4  member; would you agree?
5        MS. KEARSE:  Object to form.
6      A.    Yes.
7      Q.    But they are legal -- legally
8  approved FDA products; is that your
9  understanding?
10     A.    Yes.
11     Q.    How many of the 800 to a thousand
12 patients, roughly, if you know, are seeking
13 counseling services based on use of illicit
14 opioids?
15     A.    I don't know that.
16     Q.    If you know, how many, in number or
17 percentage, of that 800 to a thousand are
18 seeking counseling services for opioids versus
19 any other substance?
20     A.    I couldn't answer that.  That's
21 personal health information that's contained in
22 the assessment.
23     Q.    Okay.  And the assessment is
24 something that is done by the counselor when he
25 meets with -- he or she meets with the patient?

21 (Pages 78 - 81)

Page 82

1    A.   Correct.
2    Q.   Are those records that are
3  maintained by Summit County Public Health?
4    A.   Yes.
5    Q.   And where would those be
6  maintained?
7    A.   1867 West Market.
8    Q.   And each client has a personal
9  file, sort of like a medical record?
10    A.   Yes.
11    Q.   How long are those medical records
12  required to be maintained pursuant to that
13  retention policy?
14    A.   I am not sure.
15    Q.   Would we talk to Mr. Nemecek --
16    A.   Yes.
17    Q.   -- or Ms. Pierce about that?
18    A.   Either.
19    Q.   Either.  And are those
20  maintained -- does Summit County Public Health
21  have an electronic medical record system, or
22  are those hard copies?
23    A.   Hard copies.
24    Q.   I had asked you, you know, roughly,
25  if you knew, and you didn't, to be fair, what

Page 83

1  the general breakdown was of the 800 to a
2  thousand patients regarding what substance that
3  they were abusing.
4        If we were to go back in time to
5  that 2015, 16 time frame when that is 5 to 600,
6  would you be able to answer those questions?
7    A.   No.
8    Q.   I have seen documents that, and I
9  probably have one, and we can talk about it
10  later, but it describes various -- well, it
11  describes opioids being the number 2 reason why
12  patients come in for counseling services for
13  men.  I don't know if you have seen anything
14  like that, in your work at Summit County Public
15  Health?
16    A.   I'm sorry.  I didn't hear that last
17  word you said, for met?
18    Q.   Yeah.  For men, men, versus women.
19    A.   Oh, for men.  I'm sorry.  I thought
20  you said for met.
21    Q.   Yeah.  Sorry.  It's the number two
22  cause for men coming in seeking substance abuse
23  counseling.  Do you know what the number one
24  substance is that they are coming in?
25        MS. KEARSE:  Object to form.

Page 84

1    A.   No, I don't.
2    Q.   Is it alcohol perhaps --
3    A.   It could be.
4    Q.   -- does that refresh your
5  recollection?
6    A.   It could be.
7    Q.   In any event though, you would want
8  to ask one of your counselors, or maybe one of
9  your assistant directors, if we were going to
10  break down the number of clients and what
11  specific substances were the most abused?
12    A.   Yes.  For accuracy, I would.
13    Q.   The counseling, just to tie off, to
14  tie off these last two categories, the
15  counseling, substance abuse counseling, the
16  revenue or -- how much of the expenditures for
17  substance abuse counseling services come from
18  your agency's budget versus other sources?
19    A.   A small percentage.
20    Q.   Somewhere in that 10 to 20 percent
21  range maybe --
22    A.   Probably.
23    Q.   -- that we used --
24    A.   Probably.
25    Q.   -- for other categories?

Page 85

1    A.   Yes.
2    Q.   And the other -- the remainder,
3  whatever it is, would be outside sources?
4    A.   Correct.
5    Q.   And then outpatient treatment
6  would --
7    A.   Intensive outpatient.
8    Q.   Intensive outpatient treatment?
9    A.   IOP.
10    Q.   I don't know what that means, could
11  you --
12    A.   Those are programs that are set up,
13  when it is determined that someone doesn't have
14  to go to a facility or be inpatient, that they
15  can be in an intensive outpatient program,
16  which means they show up every day for a
17  required number of hours, they run through any
18  number of activities, and then they get to go
19  home.
20    Q.   Are there individualized treatment
21  plans?
22    A.   Yes.
23    Q.   So one person might be in there for
24  six months, one person might be 12 months?
25    A.   Correct.

22 (Pages 82 - 85)

Page 86
1    Q.    How many -- did you say IOP or IOT?
2    A.    IOP, P as in Paul.
3    Q.    Okay.  How many clients or patients
4  does your agency provide IOP treatment to?
5    A.    I am not sure.
6    Q.    Is it in the dozens or is it in the
7  hundreds?
8    A.    It would be hundreds.
9    Q.    And the expenses associated with
10  that program, what percentage is from your
11  agency's budget versus outside sources?
12    A.    Maybe 10 percent.
13    Q.    The intensive outpatient treatment,
14  does it perhaps also incorporates the
15  medication-assisted treatment, or are those
16  completely separate programs?
17    A.    They are separate.
18    Q.    So is this counseling just on
19  another level than --
20    A.    Yes.
21    Q.    And with respect to the assistant
22  director, Jackie Pollard, and some of the
23  counselors we talked about briefly over the
24  last 20, 30 minutes, are they the same people
25  who are administering this program?

Page 87
1    A.    Yes.
2    Q.    And if I were to ask the breakdown
3  of patients and whether they are using opioids
4  or some other substance, would you know that
5  data?
6    A.    I would not.
7    Q.    And same question with respect to
8  the maintenance of patient records, would your
9  answers be the same as to where they are stored
10  and what is stored and it's hard copy versus
11  electronic?
12    A.    For intensive outpatient?
13    Q.    Yeah.
14    A.    It's the same, yes.  I know where
15  they are at, yes.
16    Q.    And what was the -- what did you
17  call the initial assessment form that's done,
18  did you just say it is an assessment?
19    A.    An assessment, an AOD assessment.
20    Q.    Is that an actual preprinted form?
21    A.    Oh, yes.  It's a tool.
22    Q.    And so that's done with the
23  counseling patients and that's done with the
24  IOP clients or patients?
25    A.    Yes, on intake.

Page 88
1    Q.    And does Dr. Sobolewski oversee
2  either one of these last two programs we have
3  been talking about, the IOP or the counseling
4  services?
5    A.    No.
6    Q.    How about the ADM board, anybody
7  from the ADM board of Summit County, whether it
8  is Dr. Smith or Mr. Craig, that assist your
9  department in providing those counseling or IOP
10  services?
11    A.    Yes.
12    Q.    How does that work, what is the
13  interaction there?
14    A.    Alcohol, drug, mental health boards
15  in Ohio are not allowed to provide direct
16  services.  Therefore, they contract with
17  everybody for services that they want to see
18  happen.  They contract with us.
19        They are responsible for indigent
20  care, so out of those 800 to 1,000 individuals,
21  some of those patients we will seek
22  reimbursement, either through private insurance
23  or Medicaid, but then there is another group
24  that are deemed indigent.
25        The ADM board, alcohol, drug and

Page 89
1  mental health, will then reimburse us for those
2  individuals that we see.  And they do that with
3  about -- I think they have about 30
4  subcontractors around town.
5    Q.    Is Summit County Public Health the
6  only political subdivision or government entity
7  to which they have that contract?  And that's a
8  terrible question.  Can I ask it a different
9  way --
10    A.    Yes.
11    Q.    -- if you don't you mind?
12    A.    Yes, please.
13    Q.    Are the other -- other than Summit
14  County Public Health, are the other entities
15  with which ADM contracts private entities?
16    A.    Some are, some aren't.  I would say
17  like the jail, Summit County jail, Oriana
18  House, those are quasi political.  Perhaps they
19  may do some work with -- they do work with
20  different groups.  So I couldn't say for sure
21  they were all not for profit or private.
22    Q.    With respect to how ADM reimburses
23  your agency, is it a per-patient reimbursement
24  or is it a -- do they just give you a certain
25  budget per year to provide services?

23 (Pages 86 - 89)

Page 90

1     A.   Our contract is for $700,00, about
2  6 to $700,00.  And so we are allowed to spend
3  up to that much, but we see as many people as
4  we can.  So we try to seek as much outside
5  reimbursement so we don't have to use those
6  dollars.
7     Q.   And just so we are clear, to tie
8  this off, this 6 to 700,000 per year is to
9  provide substance abuse services to indigent
10 residents of Summit County?
11    A.   And/or those with -- you can have
12 insurance, you can have private insurance.  You
13 don't have to necessarily be indigent.  There
14 is just a pay or mechanism if you are indigent.
15    Q.   Okay.  Gotcha.
16         MR. NAEEM:  Anne, do you want to
17 take a few minute break?
18         MS. KEARSE:  We have been
19 going -- how long have we he been going?  We
20 can take a break.
21         THE VIDEOGRAPHER:  Almost an hour
22 and a half.
23         MS. KEARSE:  Ten minutes?
24         MR. NAEEM:  Yeah.
25         THE VIDEOGRAPHER:  Off the record

Page 91

1  at 10:32.
2         (Recess taken.)
3         THE VIDEOGRAPHER:  On the record,
4  10:51.
5         MR. NAEEM:  Before we continue with
6  the deposition, would the folks on the phone go
7  ahead and identify themselves for the record.
8         MR. MILLER:  Hello.  Yes.  Hayden
9  Miller, of Ropes & Gray, for defendant
10 Mallinckrodt LLC.
11        MR. FRANCO:  Joe Franco, with
12 Holland & Knight, on behalf of Insys
13 Therapeutics, Inc.
14        MS. D'ANNA:  Samantha D'Anna, from
15 Jackson Kelly, on behalf of Miami Luken.
16        MR. BROWN:  Elliott Brown, from
17 Morgan Lewis, on behalf of Teva.
18        MS. GATES:  And here in person --
19        MR. RUIZ:  Anthony Ruiz, from
20 Zuckerman Spaeder, on behalf of CVS Rx
21 Services, Inc. and CVS Indiana, LLC.
22        MR. NAEEM:  Anybody else on the
23 phone?
24        MR. RAIOLA:  Yes.  Stephen Raiola,
25 with Covington Burling, on behalf of McKesson.

Page 92

1         MS. GATES:  In person, Lisa Gates,
2  Jones Day, for Walmart.
3         - - - - -
4         (Thereupon, Deposition Exhibit 1,
5         Organizational Chart, Dated January
6         2017, Bates Labeled Summit 155008,
7         was marked for purposes of
8         identification.)
9         - - - - -
10        - - - - -
11        (Thereupon, Deposition Exhibit 2,
12        Organizational Chart, Bates Labeled
13        Summit 180563, was marked for
14        purposes of identification.)
15        - - - - -
16 BY MR. NAEEM:
17    Q.   Ms. Skoda, I have had marked as
18 Exhibit 1 and 2 a couple org charts we found in
19 your custodial documents, and I don't want to
20 spend a lot of time on these, but we have been
21 talking about the services provided by Summit
22 County Public Health, substance abuse services,
23 and some of the folks who provide those
24 services.
25         If we look at Exhibit 1, is that

Page 93

1  representative of the current organizational
2  structure of Summit County Public Health?
3     A.   Yes.
4     Q.   And underneath Citizens of Summit
5  County, there is a district advisory counsel,
6  and below that Summit County Board of Health,
7  and below that is health commissioner, which is
8  you, correct?
9     A.   Correct.
10    Q.   Medical director off, as we are
11 looking at, it to the left, would be Ms.
12 Sobolewski?
13    A.   Sobolewski.
14    Q.   Sobolewski, I apologize, who's been
15 around since roughly the beginning of the year,
16 in that position?
17    A.   November-December of 17.
18    Q.   And Margo Erme -- no.  Yes, Margo
19 Erme, Dr Margo Erme prior.
20         Did she come over with the merger?
21    A.   Yes.
22    Q.   So she was with Akron?
23    A.   Correct.
24    Q.   And she took the medical director
25 position at Summit County Public Health --

24 (Pages 90 - 93)

Page 94

1    A.   Correct.
2    Q.   -- in 2011.  Did Summit have its
3  own medical director at the time, or was that
4  person laid off?
5    A.   Yes.  We had a four-hour a week
6  medical director, and when we merged, Margo
7  came over with the merger.  He had a
8  full-time -- he worked elsewhere full time as
9  an occupational health physician, and he went
10  to work for Akron General Medical Center.
11    Q.   And his name?
12    A.   Ronald Hawes, H-A-W-E-S.
13    Q.   And so at that point in time, at
14  the time of the merger, you said it was roughly
15  four hours a week?
16    A.   Correct.
17    Q.   Okay.  All right.  And then if we
18  go back to Exhibit 1, there are two deputy
19  health commissioners and an assistant health
20  commission year; do you see that?
21    A.   Correct.
22    Q.   Okay.  Jackie Pollard is the person
23  who is the assistant health commissioner?
24    A.   No.  Jackie is an assistant
25  director under community health, which would be

Page 95

1  the second box from the left.
2    Q.   Let's fill in this with a few names
3  then.
4    A.   Okay.
5    Q.   I'm not going to do the whole
6  thing, and we will compare it perhaps maybe to
7  Exhibit 2 in a second, but first of all, who is
8  the assistant health commissioner?
9    A.   Tonya Block.
10    Q.   How long has she been employed by
11  Summit County Public Health?
12    A.   Maybe 13 years, approximately.
13    Q.   And if we are looking at Exhibit 1,
14  there is a direct line between the assistant
15  health commissioner and the director of these
16  various departments?
17    A.   Correct.
18    Q.   There is no direct line from the
19  deputy health commissioner to those
20  departments?
21    A.   Correct.
22    Q.   Is that because they have
23  administrative functions?
24    A.   Yes.
25    Q.   What are, generally, the two -- and

Page 96

1  there are still two?
2    A.   Yes.
3    Q.   All right.  What are their
4  responsibilities?
5    A.   They vary from any number of
6  special projects that they work on.  They look
7  at basically -- we give direction and provide
8  services, they look at any number of programs
9  within the health district, and they look for
10  improvements, but they are all from an
11  administrative perspective.
12        So they have a list of projects
13  that they work on.  Some may be from building
14  facilities to launching new software programs
15  to monitor our strategic plans, to look at
16  outcomes.  They work on any number of special
17  projects.
18    Q.   But neither of those two people
19  would have oversight responsibility for
20  substance abuse programs provided by Summit
21  County Public Health?
22    A.   No.  The only piece that one of the
23  deputy health commissioners, Heather Pierce,
24  would have, she has assisted with behavioral
25  redesign in Ohio.  You may have heard, in July

Page 97

1  of 17, they flipped the switch, and now we are
2  under behavioral redesign, where they are
3  changing the payment and reimbursement
4  structure.  So she has helped with that, at an
5  administrative level.
6    Q.   At an administrative level for the
7  repayment of services provided?
8    A.   Correct.
9    Q.   But not actually the termination of
10  the programs themselves?
11    A.   No.  The state did that.
12    Q.   And the behavioral redesign, that
13  applies to substance abuse or the --
14    A.   The entire State of Ohio.  All
15  mental health, all alcohol, drug mental health
16  services.
17    Q.   And that's essentially how the
18  State of Ohio reimburses local health district
19  for those services?
20    A.   And ADM boards and everybody.
21    Q.   And then if we go back to assistant
22  health commissioner, there is currently, as of
23  January 2007, {sic} when this chart is dated,
24  five director positions for various
25  departments.

Page 98

1      Do any of the five, other than
2  community health, provide substance abuse
3  services to citizens of Summit County?
4      A.   Not direct care, but other than --
5  the MAT program is a blending between clinical
6  services and the community health folks, for
7  the training and the counseling that goes with
8  it.
9      Q.   Okay.
10     A.   Within clinical services, the STD,
11  HIV communicable disease unit, there is a lot
12  of education regarding substance use disorders.
13       And then the personal
14  responsibility education program is a 13-county
15  project that reduces risk behaviors in youth.
16  So they do some education around substance use
17  disorders.
18     Q.   Who then is the director of
19  clinical services?
20     A.   Leanne Beavers.
21     Q.   And how long has she been with
22  Summit County Public Health?
23     A.   Since December -- excuse me,
24  October, whenever they came over in 10.  It was
25  the end of 10.  So I want to say it was like

Page 99

1  October of 10.  Barberton Health Department
2  joined Summit County.
3     Q.   So she was previously with
4  Barberton --
5     A.   Yes.
6     Q.   -- at the time of that merger.
7  Okay.
8       So clinical services does provide
9  some services to substance abuse patients or
10  clients along the lines you just described.  Is
11  it accurate for me to say though that the bulk
12  of services are provided through the community
13  health division?
14     A.   Yes.
15     Q.   And who is the current director of
16  that?
17     A.   Community health?
18     Q.   Yes.
19     A.   Donna Barrett, B-A-R-R-E-T-T.
20     Q.   And how long has she been in that
21  position?
22     A.   Three years, two to three years.
23     Q.   And how long has she been with
24  Summit County Public Health?
25     A.   Two to three years.

Page 100

1     Q.   All right.  And are there any -- as
2  we were talking before we took a break, we had
3  gone through the list of services, substance
4  abuse services generally provided.
5       Is there anything on this list that
6  we didn't talk about that you would want to add
7  regarding the services provided to substance
8  abuse patients or clients?
9       MS. KEARSE:  Object to form.
10     A.   No.  The only thing that we didn't
11  talk about, that I doubt when I see this,
12  within community health, if you look at the
13  STARS programs, S-T-A-R-S, that again was a
14  federal grant.  It was actually a research
15  grant to look at alcohol drug assessment in the
16  home, and that was -- we were in partnership
17  with children's services, Summit County
18  Children Services, and that is in-home
19  assessments, and we did the assessment and
20  provided some of the wraparound social support
21  services.
22       But that actually was in order to
23  help reduce the number of children that were
24  being taken out of homes because of safety
25  issues with the rise in opioid use.

Page 101

1     Q.   Okay.  And some of the answers you
2  just gave, or some of the testimony you just
3  gave sounded in the past tense.  Is that an
4  ongoing program?
5     A.   Well, it was -- it's been -- it was
6  a five-year research grant, so it's over now.
7  We are continuing the program, but it's without
8  that money.
9     Q.   And --
10     A.   And it ends September of 18.  The
11  grant is just ending.
12     Q.   Okay.  After September of 2018, who
13  will provide funding for those programs?
14     A.   Summit County Public Health will
15  provide part of it.  ADM board may be able to
16  provide some of it with peer recovery coaches
17  for families.  They certainly would be able to
18  pay for the in-home assessment under our
19  current contract that we have.
20       But it will just depend on how many
21  people we get and how it -- in the final
22  shakeout, as to what it looks like as it goes
23  forward.
24       We have committed about 65,000 of
25  general revenue dollars to make sure that this

26 (Pages 98 - 101)

Page 102

1 group of individuals can continue to have
2 social support in place.
3    Q.    So that's $65,000 for the year?
4    A.    Yes, starting in September.
5    Q.    But not through the end of this
6 year --
7    A.    Correct.
8    Q.    -- that would be for the 12-month
9 cycle?
10    A.    12-month cycle.
11    Q.    Does children's services provide
12 any revenue for this program after September of
13 2018?
14    A.    I am not sure what they have
15 decided to do with that piece.
16    Q.    Okay.
17    A.    I know we have made a commitment.
18    Q.    And we talked about the counselors
19 that provide substance abuse services to
20 patients or clients of public health.  Are
21 those the same people that do the in-home
22 assessments?
23    A.    Yes.  It is usually just one of
24 them though.
25    Q.    One has responsibility for this

Page 103

1 program?
2    A.    Yes.
3    Q.    Who or which of those counselors is
4 responsible for that?
5    A.    Victoria.
6    Q.    Okay.  If we look at Exhibit 2.
7    A.    Okay.
8    Q.    This looks to be, in my review, an
9 org chart of just the community health division
10 of Summit County Public Health.
11         It's dated obviously, correct, it's
12 not current?
13    A.    Oh, yes.  That's what I was going
14 to say, it is dated, and it's when -- it
15 happened during the time when we were
16 separating clinical services into a very
17 specific unit, and we removed the two darker
18 colored, gray-shaded boxes, we removed those
19 individuals, and actually that became part of
20 population health.
21         So we created a new division of
22 epidemiologist, assessors, those sorts of
23 things, and they became on their own in
24 population health.
25         So then Leanne, at the time, was

Page 104

1 the assistant director before she became the
2 director.  The director would have been Jill
3 Solem, Jillian Solem, S-O-L-E-M.
4    Q.    Of clinical services?
5    A.    Correct.  So this is probably from
6 15 early -- this is early 15 maybe.
7    Q.    Just a couple follow-ups.  So other
8 than the movement of two of these gray-shaded
9 boxes to other divisions, is the breakdown
10 generally the same, even if the people have
11 moved around?
12    A.    No.  It is different.  WIC and all
13 of its clinical supervisors, the longest box on
14 the left under -- that now went to population
15 health as well, because of the need for the
16 extraordinary data collection on all of our WIC
17 clients.  We have about 10,000 moms and babies
18 in that program.
19         And then HIV, STD, DIS, disease
20 investigation component, went under clinical
21 services as well, but that happened after this
22 rendition was published.
23    Q.    If we look at the box for -- well,
24 at the top it says counseling supervisor,
25 Yvette Edwards?

Page 105

1    A.    Right.
2    Q.    And below that are the counselors,
3 and there is seven there currently?
4    A.    Right.
5    Q.    I see Victoria Kaplan, is that --
6    A.    That was her name, yeah, Kaplan.
7 Sorry.  I couldn't think of it.  And Deonna
8 Green.
9    Q.    Okay.
10    A.    It was Diane Smith.  She's no
11 longer there.
12    Q.    Did we talk about the prevention
13 specialist position?
14    A.    Therese Kline?
15    Q.    Yeah.
16    A.    No.  I forgot her.
17    Q.    What are their role?
18    A.    They provide prevention special --
19 in schools.
20    Q.    So they are part of that
21 education --
22    A.    Yes.
23    Q.    -- function?
24    A.    Yes.
25    Q.    And Michael Skoda, is that a --

27 (Pages 102 - 105)

Page 106

1    A.   No.  We have a nepotism policy.  He
2  was not related.
3    Q.   Is he still with --
4    A.   No.  He left after about six weeks.
5    Q.   So if we go through this list of
6  counselors, which ones would I cross off as
7  former employees?
8    A.   Julie Curtis went back to school,
9  Deonna Green is still with us, Myron is still
10  with us, Diane finished her Ph.D., Todd is not
11  with us, nor is a Michael.
12    Q.   And when you say Diane finished her
13  Ph.D., that mean she is no longer with you as
14  well --
15    A.   No.
16    Q.   -- or she is and --
17    A.   No.  She finished and she went on
18  to teach.
19    Q.   So the three that I have left are
20  Victoria, Deonna and Myron?
21    A.   Correct.
22    Q.   Okay.  Good.  We have talked about
23  a lot of things, thank you, so far.
24        What we didn't talk about was your
25  background.  So I want to get some information

Page 107

1  from you.
2    A.   Okay.
3    Q.   I have -- the information I have is
4  that you have a master's degree and you are a
5  registered and licensed dietician; is that
6  correct?
7    A.   Correct.
8    Q.   Would you give me the brief version
9  of where and how you got those various degrees
10  and certifications?
11    A.   You mean all of my college?
12    Q.   Sure.
13    A.   Okay.  First I went to school, I
14  was at Kent State University.  I finished an
15  undergraduate degree in social work and
16  corrections, and then went on to work for six
17  years as a State of Ohio parole officer, went
18  back to school, took classes at night at the
19  University of Akron to finish my requirements
20  to get another degree in dietetics, to be able
21  to get a master's in nutrition and public
22  health at Case Western Reserve.
23    Q.   I read somewhere that prior to
24  coming over to Summit County Public Health, you
25  actually worked in Cuyahoga County?

Page 108

1    A.   Correct.
2    Q.   At the board of health?
3    A.   Yes.
4    Q.   All right.  And what was your --
5  what was your position at the board of health?
6  What did you do?
7    A.   When I first went there, I was
8  employed as the early intervention dietician,
9  provided services, home-based services to
10  children with special healthcare needs and
11  children at risk, and did that for a while.
12        And then I was promoted to a
13  program manager, and then I started writing
14  grants in all sorts of areas, lead prevention,
15  teenage pregnancy prevention, and I ultimately
16  was a supervisor.  Finding money was my job.
17    Q.   Okay.  The early intervention
18  dietician position at Cuyahoga County Board of
19  Health, what years did you have that position,
20  if you recall?
21    A.   Oh, yeah.  It would have to have
22  been -- it was right when I went there, so it
23  had to be 95, 96, somewhere in there, when I
24  left Metro.
25    Q.   And when did you get promoted to

Page 109

1  program manager?
2    A.   A couple years after.
3    Q.   And how long were you at the board
4  of health; what year did you leave?
5    A.   When I went to Akron -- Summit
6  County, so it would have been like 2000, 2001.
7    Q.   And so when you took the position
8  in Summit County Public Health, what was your
9  initial role?
10    A.   I was told that I was going to come
11  and we were going to develop a community health
12  division, much like we did in Cuyahoga County.
13  It was determined that we needed to -- the
14  health commissioner that was in Summit, I used
15  to work for him in Cuyahoga County.  He
16  accepted the position in Summit County and
17  asked me to come work with him there.  I had
18  lived in Summit County, so I went there to
19  work.
20    Q.   And who was that commissioner?
21    A.   Gene Nixon, N-I-X-O-N.
22    Q.   So at the time you came over in
23  roughly 2001, the commissioner for Summit
24  County Public Health was Gene Nixon?
25    A.   Yes.

28 (Pages 106 - 109)

1    Q.    And how long was he commissioner?
2    A.    15 years.
3    Q.    I guess I should have asked a
4 different question.  When did he retire as
5 commissioner?  You took over for him
6 immediately?
7    A.    2015.
8    Q.    So he had come from Cuyahoga to
9 Summit shortly before you did?
10    A.    Correct.
11    Q.    So you said you were told that you
12 were going to be developing a community health
13 division?
14    A.    Right.
15    Q.    And that was to be your first
16 position when you came over?
17    A.    Correct.
18    Q.    What was your title, if you recall?
19    A.    I think I came in as planning for
20 chronic disease prevention, it was something
21 like that, or policy planning.  I can't really
22 remember what I first came as, because I got
23 there and ended up doing a lot of the same
24 functions that I did in Cuyahoga County,
25 regarding grant management, chronic disease

1 prevalence, heart disease, hypertension,
2 obesity, physical inactivity.
3          We had a lot of those grants at the
4 time, and I ended up having to help manage some
5 of those grants and find additional dollars.
6    Q.    And that general function you
7 described, and whatever the title was at the
8 time, how long did you have that position,
9 until what year?
10    A.    Probably three, four years, maybe
11 five.
12    Q.    And were you responsible for
13 securing grants related to substance abuse
14 issues?
15    A.    No.
16    Q.    So after four or five years, you
17 take -- you get a new position or new
18 responsibilities at Summit County Public
19 Health?
20    A.    It was director of planning and
21 policy.  Then I became a director.  I can't
22 remember what that first title was, but then I
23 became director of planning and policy -- or
24 policy and plans, which was really more
25 administrative operations.

1    Q.    And what does that mean?
2    A.    Really, it was more just the
3 organization of the units, trying to determine
4 the structure.
5          We were in the process of trying to
6 figure out really where public health was
7 heading, what sort of new initiatives we should
8 be looking into, what the state was telling us
9 was important in public health.  So we were
10 looking at a lot of local -- at the time, the
11 community health assessment, as well as the
12 community health improvement plan weren't as
13 prevalent in public health.  It wasn't until
14 later.
15          We, though, locally, under the
16 direction of county executive Mr. McCarthy,
17 James McCarthy, in 2003 launched what was known
18 as the quality of life initiative, and I was
19 responsible for maintaining that quality of
20 life initiative, which really looked at the
21 quality of life in Summit County, based on a
22 core set of indicators, or 20 indicators that
23 we tracked over time.
24    Q.    Okay.  I'm sorry.  What year was
25 that initiative?

1    A.    2003 it started.
2    Q.    And that was your responsibility --
3    A.    Yes.
4    Q.    -- as director of planning and
5 policy?
6    A.    Yes.
7    Q.    How long did you hold the position
8 of director of planning and policy?
9    A.    Until -- we had merged, and it was
10 after the merger.  It must have been 2013 and
11 maybe 14, I became one of the assistant health
12 commissioners.
13    Q.    Okay.  And what were your
14 responsibilities in that position?
15    A.    Title change, but not really
16 responsibility change.  Had a lot more of
17 the -- still had the -- I was still finding
18 money and looking at the operations in managing
19 the quality of life project.
20          At that point though, we were
21 starting down the road of accreditation.
22 Health departments had to become accredited, so
23 we were into accreditation, we were doing all
24 sorts of things with the accreditation.  So I
25 was really kind of doing a hodgepodge of

Page 114

1  responsibilities.
2      Q.   As director of planning and policy,
3  prior to 2013, did you have any exposure to or
4  involvement with the substance abuse programs
5  that Summit County Public Health was providing?
6      A.   No.  We weren't providing them
7  until 11, so maybe those few years, but I
8  didn't have anything to do with them.
9      Q.   Okay.  Prior to 2011 then, what
10  were the primary areas that, if not substance
11  abuse, that public health was providing?
12      A.   We were involved with -- you mean,
13  before we merged?
14      Q.   Uh-huh.
15      A.   We were doing chronic disease, life
16  skill behaviors, environmental health, some of
17  the social determinants of health around, you
18  know, socioeconomic housing, education, food
19  insecurities.
20          We also continually, during that
21  time period, before the Affordable Care Act,
22  another one of the programs I was charged with
23  developing and operating was access to care,
24  which was a donated healthcare program.  It's
25  an H-CAP, it's a federal model, and what

Page 115

1  happens in that project is you recruit
2  physicians to donate time.
3          Once a physician donates their
4  time, they see a client, that we refer them a
5  patient.  They then generate a bill, they
6  generate HCFA, they generate -- so you can keep
7  track of what the cost of that donated -- the
8  value of that donated care is.
9          So we recruited about 500
10  physicians and specialists to provide care to a
11  group of individuals that weren't eligible for
12  any kind of health coverage.
13      Q.   Okay.
14      A.   We ran that program until Medicaid
15  expansion in Ohio, which is almost four years
16  ago now.  We still operate a very small
17  access-to-care program, but don't need to do as
18  much of that now, because people have access to
19  healthcare coverage.
20      Q.   So, and you had mentioned this
21  earlier, and I apologize for forgetting we
22  talked about it, but prior to 2011, Summit
23  County Public Health wasn't providing substance
24  abuse services?
25      A.   No.

Page 116

1      Q.   That was being done by Akron?
2      A.   Akron Health Department.
3      Q.   Was Barberton as well providing --
4      A.   No.  Barberton was not doing
5  anything either.
6      Q.   Who was the -- well, let me ask a
7  foundation question first.  Was Akron's public
8  health department late similar to the way
9  Summit County Public Health is now?
10      A.   No.
11      Q.   Did they have a health
12  commissioner?
13      A.   Health director, yes.
14      Q.   Health director.  Who was the
15  health director at the time of the merger?
16      A.   Well, he was gone but -- he had
17  left, that was one of the issues, but his name
18  was Dr. Moser, M-O-S-E-R.
19      Q.   And you may or may not know the
20  answer, but was he -- prior to him leaving, had
21  he been in that position for a number of years?
22      A.   No.  Just a couple.
23      Q.   Do you know who his predecessor
24  might have been?
25      A.   Well, because they have got that

Page 117

1  charter requirement, that you have to have a
2  board certified physician and prevention, they
3  are hard to find.  So Dr. Keck left.  Dr. Bill
4  Keck was the health commissioner.
5          They then had a series of
6  administrators who took care -- who kind of
7  worked as just, sort of, interim.  They had
8  Mike Smiley, we had -- they had a lot of folks
9  who were just kind of interim in that position,
10  and then they found Dr. Moser, and then he took
11  over.
12          So I want to say maybe three to
13  four years maybe, and then he retired.  I think
14  he still works for NEOMED though, the medical
15  school.
16      Q.   And we are talking about Dr. Moser
17  still?
18      A.   Right.
19      Q.   Dr. Keck, is that K-E-C-K?
20      A.   Yes.  Bill Keck, yeah.
21      Q.   Is he still in the area?
22      A.   Bill Keck?
23      Q.   Yes.
24      A.   Oh, yes.
25      Q.   Does he work for any of the local

30 (Pages 114 - 117)

Page 118

1  institutions?
2      A.  He might still have something at
3  NEOMED.  He's in Cuba a lot.  He does a lot of
4  Cuban healthcare.
5      Q.  Now, we talked very briefly, early
6  in the deposition, about how your initial
7  exposure to the litigation was being asked to
8  try to find Akron -- records from this prior
9  organization, Akron's health department.  Do
10  you recall we talked about that?
11      A.  No, they asked costs that we had as
12  the health district, not Akron's.  We don't
13  have Akron's stuff.
14      Q.  Well, and that's what I was about
15  to ask.  So I will ask it anyway.
16      A.  Oh, no.  It was a clean break.
17  When we merged, we said you take you stuff, we
18  take our stuff.
19      Q.  So anything related to substance
20  abuse services provided by Akron is not
21  maintained currently by Summit County Public
22  Health?
23      A.  No, it is not.
24      Q.  Do you know what happened to the
25  records of Akron's health department at the

Page 119

1  time of the merger?
2      A.  Unfortunately, no.
3      Q.  Now, some of the employees -- some
4  of the current public health employees,
5  particularly in the substance abuse arena,
6  seemed to have been prior employees of Akron's
7  health department?
8      A.  Yes.
9      Q.  Do you know, did they bring, for
10  example, client or treatment records with them,
11  when they came, to maintain continuity of care?
12      A.  They may have.  I don't know that
13  for sure.
14      Q.  And just to clarify, what I thought
15  I heard from you about the budget information,
16  you were asked to provide financial information
17  regarding Akron's contribution to public health
18  since 2011, or to find pre-2011 records from
19  Akron's --
20      A.  No.  They had asked us for any
21  costs we had associated with opioids or opiates
22  for, like, 14, 15, and 16, which would have
23  been our years.  That was it.
24      Q.  Okay.  But it was Akron making that
25  request of you and your agency?

Page 120

1      MS. KEARSE:  I'm just going to
2  raise an objection.  I think there was counsel
3  involved in the request.  That would be
4  privileged information.
5      Q.  Did Akron's health department have
6  its own board of health, overseeing its
7  department?
8      A.  Yes.  In the charter, they have a
9  five-member board that looks at directing and
10  advises the mayor on health issues.
11      Q.  So immediately above you, for
12  example, on Exhibit 1, is a board of health?
13      A.  Correct.
14      Q.  And those are appointed?
15      A.  No.
16      Q.  No.
17      A.  Well, kind of.  Not really
18  appointed, in the sense of appointed.
19      Within the structure of a board of
20  health, it is governed by a district advisory
21  council, meaning that every single city, and
22  then political subdivision, can have a member
23  on our board.
24      So our board is large.  It's 18
25  members, unlike many health districts

Page 121

1  surrounding the state that are not that large.
2  But we have the 13 cities, we have four
3  at-large members, so that makes 17.  They
4  represent the townships and the villages.  And
5  then we have one licensing counsel member,
6  because we levy license fees, and they are
7  allowed to weigh in on what the licensing costs
8  are.
9      So our 18-member board is very
10  different.  So when, let's say, the City of
11  Green wants to have a member, the mayor can
12  pick whoever he wants and put on our board.
13      Q.  Okay.
14      A.  Many of our board of health members
15  have served for years.
16      Q.  And so the district advisory
17  counsel are the actual executives of those
18  cities and --
19      A.  Political subdivision, correct.
20      Q.  And so they have the ability to
21  select the member who is going to represent
22  their subdivision on the board of health?
23      A.  Yes.  But they usually ask us, "Do
24  you know anybody?"
25      Q.  What is the role of the board of

31 (Pages 118 - 121)

Page 122

1  health, how do you interact with the board of
2  health?
3      A.   We have a monthly meeting.  The
4  board of health is an administrative -- again,
5  they are required to sign off on all the
6  approvals, travel, they approve all of our
7  vouchers, but they are an administrative board.
8      Q.   Do they approve line-item expenses?
9      A.   In the -- they approve the final
10 budgets, but they do not have to approve
11 expenditures at a line-item level.
12     Q.   So hypothetically, if Summit County
13 Public Health contracts with an outside
14 provider for anything, make something up, that
15 would be done externally, does the board of
16 health have to approve that contract before you
17 enter into it?
18     A.   If it is over $25,000.
19     Q.   Otherwise, you have currently --
20     A.   Right.
21     Q.   -- discretion?
22     A.   And we report that to them and tell
23 them what we do.
24     Q.   So you have quarterly meetings with
25 the board of health?

Page 123

1      A.   We have monthly.
2      Q.   Monthly, I'm sorry.  I actually
3  wrote that down.
4           And to your knowledge, did Akron's
5  health department have a similar structure,
6  even if the numbers were different?
7      A.   No.  They have a five-member board.
8      Q.   And who selected those board
9  members?
10     A.   The mayor.
11     Q.   All right.  And is all of this
12 governed by state law?
13     A.   They are charter.  It's the city
14 charter, but the DAC boards of health is
15 revised code.
16     Q.   Okay.  Gotcha.
17     A.   The board of health still exists
18 within Akron.  They didn't change the charter,
19 when they merged.
20     Q.   So there is a currently
21 operating --
22     A.   We haven't met in seven years.
23     Q.   But it still exists on paper?
24     A.   Yes.
25     Q.   Are people getting paid for it?

Page 124

1      A.   No.  Volunteer.  All volunteer.
2      Q.   We were talking a little bit about
3  the transition from Akron's function with the
4  substance abuse to now Summit County Public
5  Health, and there was some names I wanted to
6  ask you about, one of whom came up.  Gene
7  Nixon, he was your immediate predecessor?
8      A.   Yes.
9      Q.   I think you said he was there from
10 2000 to 2015 roughly?
11     A.   Yes.
12     Q.   When you were directing your staff,
13 your colleagues, to compile records for this
14 litigation, do you know whether Mr. Nixon's
15 records were collected?
16     A.   I can't honestly -- I mean, I
17 really don't know, to be quite frank.  They did
18 just an archive dump.  So I would assume
19 anything in there archived would have come with
20 it.
21     Q.   And "archive dump," what are you --
22     A.   When we had -- all the records are
23 kept electronically.  So we just went in and, I
24 think, literally just took it and loaded it to
25 a jump and gave it, because we were told

Page 125

1  everybody else would go through anything.  So
2  any open records request we get, we give what
3  they ask for.
4      Q.   And to follow up on what you said,
5  were you responsible for dumping your own
6  electronic documents to a flash drive?
7      A.   No.
8      Q.   So somebody came in and did that?
9      A.   Yes.  You don't want me doing that.
10     Q.   Yeah.  So with respect to how you
11 operate on a day-to-day basis, interacting by
12 email or memos and things like that, do you
13 store documents on your hard drive?
14     A.   On the computer?
15     Q.   Yes.
16     A.   We're not allowed.
17     Q.   Okay.  Where do you store them?
18     A.   They all go to our public drives.
19 HSL shared library, and even my H drive, which
20 is on -- so like my space on the big, old
21 server, it's not mine to control.  So when you
22 dump it, I don't -- whatever I have in there is
23 in there.
24     Q.   So you wouldn't be able to go in,
25 for example, and delete something?

32 (Pages 122 - 125)

Page 126

1    A.   No.
2    Q.   And is the process for how those
3  documents are saved automatic, or do you have
4  to move documents over from, for example, your
5  email into one of the H or S or other drives?
6    A.   No.  It's automatic?
7    Q.   When you create a document,
8  hypothetically, if you created a document in
9  Microsoft Word, where would that document save
10  to?
11    A.   H, L or S.  I do have a bad habit
12  of working on my desktop until I get it done
13  and then sending it, and IT sends me hate mail
14  and takes it over to H.
15    Q.   And your emails, do you manually
16  delete them, or do you put everything into
17  archive folders?
18    A.   Archive.  The only thing that we
19  are allowed to delete is like transitional
20  emails.  "Do you want to go to lunch?"  "How is
21  your mother?"  We are not allowed to delete
22  anything with any content.
23    Q.   And do you know what the -- we
24  talked just very briefly about the document
25  retention policy --

Page 127

1    A.   It wouldn't matter if you --
2       THE NOTARY:  Wait a minute.
3    A.   I'm sorry.  Even if you delete
4  them, they are still saved.
5    Q.   But as a practice, you only delete
6  those transition emails or anything else?
7    A.   Yes.
8    Q.   Do you move those into subject
9  matter archives?
10    A.   No.  They are automatically saved.
11    Q.   So if you were to open your
12  computer right now and use your email program,
13  would you see five years' worth of emails?
14    A.   Yeah.
15    Q.   And just to be clear, do you have
16  any subject matter folders in your email system
17  that you save things to?
18    A.   I do sometimes, yes.
19    Q.   Do you have one of those subject
20  matter folders for anything related to
21  substance abuse or opioids?
22    A.   Yes.
23    Q.   How long have you been maintaining
24  that particular folder?
25    A.   Probably a couple years.

Page 128

1    Q.   And did you have any responsibility
2  for making sure that that was something that
3  was collected --
4    A.   No.
5    Q.   -- by -- but somebody just took
6  care of the hard drive, the email system, they
7  just did that document dump that you talked
8  about?
9    A.   Yes.
10    Q.   And then, I'm sorry, going back to
11  Mr. Nixon, you don't know whether someone
12  specifically found and collected his, for
13  example, emails or his former hard drive?
14       MS. KEARSE:  Asked and answered,
15  that question, but --
16    A.   No, I don't.  If it was in those
17  archives, it got dumped.
18    Q.   I saw another name, Rich --
19    A.   Marountas.
20    Q.   Marountas.  All right.  He is an
21  epidemiologist?
22    A.   Yes.
23    Q.   And how long has he worked for
24  Summit County Public Health?
25    A.   Oh, probably for about 12 years.

Page 129

1    Q.   So he was with Summit County prior
2  to the merger, or did he come over with the
3  merger?
4    A.   He was prior.
5    Q.   Were you responsible for
6  communicating to Summit County Public Health
7  employees the requirements of or the
8  circumstances regarding the production of
9  documents for this litigation?
10    A.   We met, and it's handled like any
11  records request.  So when we get a records
12  request and it says dump, or we need all of
13  your sewage files, we don't debate whether we
14  should give them up or not.  We just take the
15  sewage files, load them on whatever.  Sometimes
16  they give us something, and we have had the
17  case where somebody will say, can you print the
18  sewage documents, and that's millions of pages,
19  and we'll say, that's an reasonable request, we
20  will give them to you electronically.
21       But typically we just meet, say
22  this is what they want, what's the best way to
23  give it to them, and then we give it up.  We
24  probably handle 3,000 record requests a year.
25    Q.   And -- strike that.

33 (Pages 126 - 129)

Page 130

1    Going back to your background, we
2  talked about your education, we talked about
3  your employment with Summit County Public
4  Health.
5    Have you had, since you took the
6  position of health commissioner, any further
7  education or training on substance abuse
8  issues?
9    A.  I have attended meetings and
10 trainings, but that would be in continuing
11 education courses.
12   Q.  So you are still required to
13 maintain --
14   A.  Yes.
15   Q.  -- continuing education for your
16 dietician?
17   A.  Correct.
18   Q.  Did you take any of those kind of
19 continuing education courses on substance abuse
20 prior to 2015 when you became health
21 commissioner?
22   A.  No.
23   Q.  So you have done that since?
24   A.  Yes.
25   Q.  And roughly how many programs do

Page 131

1  you think you have taken since 2015 on
2  substance abuse issues?
3    A.  Five or six.
4    Q.  Were any or all of them opioid
5  related?
6    A.  Most were.
7    Q.  Anything else you have done since
8  2015 to educate yourself on opioids or opioid
9  addiction or substance abuse generally?
10   A.  Yes.
11   Q.  What else?
12   A.  I work closely with Doug Smith,
13 general conversations with individuals in the
14 field, talked to Jackie a lot about, you know,
15 protocols.  I have read a tremendous amount
16 about what we can do, as a public health
17 entity, to help keep people alive until they
18 get to treatment and hopefully recover.
19   So I have done a lot of personal
20 training and education.
21   Q.  Other than conversations, does that
22 personal education involve reading medical
23 literature --
24   A.  Yes.
25   Q.  -- or journal articles?

Page 132

1    A.  Oh, yes.  It is all refereed
2  journaled articles that are credible.
3    Q.  And when you engage in that
4  process, is it typically because somebody sent
5  you something, or do you go out and try to
6  educate yourself and see --
7    A.  I educate myself.
8    Q.  And to be clear, did you do any of
9  these things prior to 2015 when you became
10 health commissioner?
11   A.  No.  The only thing I can say that
12 I was trained on prior to that was more in
13 relationship to addiction in general and the
14 relationship to food and all substances.
15 Because there is, in the dietetics world, there
16 is that food addiction.
17   Q.  So the concept of addiction was
18 something that you understood --
19   A.  Correct.
20   Q.  -- and had been educated on, but
21 not, for example, opioid addiction?
22   A.  Correct.
23   Q.  Conversations with, I'm going to
24 say the word, you didn't say it necessarily,
25 but conversations with experts, reviewing

Page 133

1  journal articles, was there anything else you
2  had done since taking the position of health
3  commissioner to educate yourself on substance
4  abuse issues?
5    A.  We participate with the Ohio
6  Association of Health Commissioners, OAHC.
7  It's the association of Ohio health
8  commissioners.
9    Also there is the Ohio Public
10 Health Association, Ohio Public Health, and
11 APHA, the American Public Health Association,
12 and NACCHO, National Association of City and
13 County Health Officials.  We have worked with
14 them and done -- you know, completed surveys,
15 talked about current trends, used their
16 knowledge and information to help us.
17   Q.  Anything else?
18   A.  I think we were on program areas,
19 what should we be doing from a programmatic
20 area.
21   Q.  So consulting on, kind of, best
22 practices for implementing various programs?
23   A.  Yeah, promising strategies.
24   Q.  Anything else, to close the loop,
25 conversations, reviewing journal articles,

34 (Pages 130 - 133)

Page 134

1  consulting with various state or other
2  entities, organizations?
3       A.   Probably not.  Opiate Task Force,
4  we talked a lot, worked with them.
5       Q.   The Opiate Task Force, my
6  understanding, was formed in early 2014; does
7  that sound right?
8       MS. KEARSE:  Objection.
9       Q.   Have you been involved with that
10  since the beginning?
11       A.   Not as much.  My responsibilities
12  were different during 14 and half of 15.  So I
13  really wasn't as involved, until I took over as
14  health commissioner.
15       Q.   Okay.  Were you generally aware in
16  the early 2014 time frame about the
17  circumstances why it was formed?
18       A.   Yes.
19       Q.   What is your understanding, as to
20  how it was formed?
21       A.   How?
22       Q.   Yeah.
23       A.   The ADM board, ADM, wanted to
24  pursue the development of the Opiate Task Force
25  in Summit County, like many other communities

Page 135

1  had done.  So they started to bring together
2  individuals.  At the time, it would have been
3  probably Tonya Block and Yvette Edwards, maybe
4  Donna Barrett, I'm not sure.  But Jackie wasn't
5  with us yet.
6       So they brought together some
7  individuals from public health, from the
8  practitioners, providers, and started the talk
9  about how do they develop this, what does it
10  look like.
11       Within Summit County, there is a
12  few families that have been very active in
13  pushing for the development of an Opiate Task
14  Force.  They lost their children, and so they
15  have been very, very active.
16       And so that helped, sort of, the
17  impetus, and so they brought a bunch of
18  individuals together, decided they were going
19  to start meeting, and I do believe, and I
20  wasn't directly involved until later on, but I
21  do believe they, kind of, hit the ground
22  running with bringing lots of partners to the
23  table.
24       Q.   And just to be clear, when you say
25  "they," you are talking about --

Page 136

1       A.   The alcohol, drug, mental health
2  board, yes.
3       Q.   So as far as the driving force for
4  the initiation of the task force, correct me if
5  I'm wrong, it was ADM?
6       A.   Yes.
7       Q.   And were there -- was there a
8  person or persons primarily, to your
9  understanding, involved in pulling everything
10  together from ADM?
11       A.   I believe at the time it was Jerry
12  Craig, and John Ellis was there.  He was their
13  director of clinical programs.  John Ellis was
14  there at the time.  He has since left, and he
15  works at the University of Akron now.
16       So, yeah, those were the two that I
17  remember.
18       Q.   Was John Ellis still with ADM by
19  the time you became health commissioner, or had
20  he left?
21       A.   I think he probably left
22  pretty -- I can't remember the exact time
23  frame.
24       Q.   And is it your understanding then
25  that when ADM started pulling this task force

Page 137

1  together, they reached out to Summit County
2  Public Health --
3       A.   Yes.
4       Q.   -- for their involvement?
5       A.   Right.
6       Q.   And I assume that there is a
7  relationship between your public health agency
8  and ADM, continuing relationship?
9       A.   Yes.
10       Q.   So did they reach out directly to
11  Mr. --
12       A.   Nixon.
13       Q.   -- Nixon?
14       A.   I don't know.
15       Q.   Did you ever talk to Mr. Nixon
16  about the formation of the task force?
17       A.   No, I did not.
18       Q.   So let me make a statement, and let
19  me know if you agree with it.  Prior to 2015,
20  you were aware of the task force, but you
21  weren't involved, and then you became involved
22  with it after you became health commissioner?
23       A.   True.
24       Q.   Are you aware of the -- I might not
25  get this right, but youth behavioral risk

35 (Pages 134 - 137)

Page 138

```
 1   survey --
 2       A.   Yes.
 3       Q.   -- that was done in 2013?
 4       A.   Yes.
 5       Q.   Was that something you were
 6   involved in planning or executing for Summit
 7   County Public Health?
 8       A.   Finding money to pay for it.
 9   Planning it and finding money and getting the
10   contractor on board, Case Western Reserve
11   University.
12       Q.   So you were part of the planning
13   process?
14       A.   Yes.
15       Q.   Seeking funds?
16       A.   Yes.
17       Q.   Were you actually involved in going
18   out and retaining the outside agency that was
19   going to perform the study?
20       A.   Actually, it was a bid that was put
21   out.  I was familiar with Case Western's work
22   in Cuyahoga County, since we did it when we
23   were there, and they have an ongoing
24   relationship.
25            We weren't necessarily going to pay
```

Page 139

```
 1   for our own youth risk behavior survey, but the
 2   State of Ohio came out and said they were only
 3   going to do 50 children in Summit County, for
 4   the entire county, and that would not have been
 5   a large sample size, and the ADM board and --
 6   or there were are a lot of people from public
 7   health and ADM involved.
 8            And we decided we needed a good
 9   baseline sample.  We did not have a good
10   baseline sample for risk behaviors in children,
11   youngsters, either through middle school,
12   through high school.
13            So we both went back to our
14   respective wherever, found the money, came back
15   together again and said, let's go ahead and do
16   this.
17       Q.   Once Case Western was on board to
18   perform the survey, did you have any continuing
19   involvement in the survey?
20       A.   Actually, we met -- I had two
21   meetings.  We met with the superintendents
22   group to talk about the importance of
23   implementing this in their schools, and that
24   was under my hat, of like the quality of life,
25   you know, the assessment piece we were doing to
```

Page 140

```
 1   try to keep.
 2            And then also we met with -- I met
 3   with the Copley PTA, because they were upset
 4   that the administrators wanted to take all the
 5   sexual behavior questions off, and the parents
 6   did not want the sexual behavior questions
 7   taken off.
 8            So I met with them, those were my
 9   two meetings, other than meeting with Case, to
10   get their bills paid or to get that sort of
11   stuff.  But that was the idea of hiring a
12   contractor, that they would be able then to
13   come do the program for us.
14       Q.   And once Case was on board to
15   perform the survey, did anybody from Summit
16   County Public Health or ADM actually -- was
17   anyone from those organizations actually
18   involved in conducting surveys, reviewing data?
19       A.   Yes.  A lot of us were, in that we
20   looked at the -- I'm trying to remember.  For
21   the first time we did the survey, there may
22   have been some employee volunteers that went to
23   the classrooms, because at first it was paper,
24   and a couple of schools, because they couldn't
25   use the Scantron sheets, so we may have had
```

Page 141

```
 1   some employees volunteer to do that.
 2            And then what was probably more
 3   important was, in order to get it funded, we
 4   had to agree to put some gambling questions on,
 5   because that's where some of the money came
 6   from.  So we did add the gambling questions.
 7            And then the data came out.  We
 8   wanted Case to be the owner of all of the
 9   information and the data, and they were the
10   owner of all that material.  So we then
11   received only aggregate reports from them after
12   that.  So we reviewed the data they provided to
13   us, but it was all aggregate.
14       Q.   And you specifically, at the
15   time -- well, let me take a half step back.
16            When you say, "The aggregate
17   information," are you talking about the report,
18   for example?
19       A.   Yes.
20       Q.   Did you yourself review the report?
21       A.   Yes.
22       Q.   Has there been any updated research
23   done since 2013, when that survey was
24   performed?
25       A.   We are launching it.  It starts
```

36 (Pages 138 - 141)

Page 142

1 September this year again. We do it every five
2 years. It's what we can afford to do. So --
3 and we wanted enough of a time period where
4 some of the interventions that were put in
5 place, maybe we could see some of the behavior
6 changes. So it will start again in September
7 of 18.
8     Q.   Is it going to be the same subject
9 matter areas?
10    A.   The youth risk behavior survey is
11 validated. It is a CDC product. There is
12 only -- you have to have a core set of
13 questions, and then you can change a few, a
14 percentage, but if you change too many, it's no
15 longer comparable to other areas and other
16 regions.
17         So we abide by all the statistical
18 analysis rules, to make sure we are not going
19 to screw up the sample. So Case will decide
20 that. We will tell them areas that we want to
21 question in, but they will make sure that it
22 stays within the validity of the survey.
23    Q.   And you anticipated my next
24 question, which was going to be, is Case
25 performing a study as well?

Page 143

1     A.   Correct. They are about the only
2 ones in town that will do it now, because it is
3 very labor intensive.
4     Q.   Now, you mentioned CDC. Does the
5 CDC also perform these studies on a national
6 basis?
7     A.   Well, they used to do it a little
8 better. They used to get a company, and then
9 they would contract with the states. Well,
10 every three years, the vendor has to turn over,
11 by rule. So they had to get a new vendor.
12         So they got a new vendor, and then
13 each of the states didn't like the new vendor.
14 So some of the states went with that vendor,
15 some didn't, so it is kind of a real hodgepodge
16 out there now, but the CDC does do the risk
17 behavior surveys.
18    Q.   And they had done them, for
19 example, prior to 2013?
20    A.   Oh, yeah.
21    Q.   When you were planning this project
22 on behalf of Summit County, did you review the
23 CDC's prior reports on --
24    A.   Oh, I have always seen them. We
25 don't -- and this isn't meant to be

Page 144

1 derogatorily stated, but we don't pay much
2 attention, because they don't have a big enough
3 sample size.
4         I mean, it's great if you are
5 looking at youth across the country, but it's
6 not if you are trying to figure out what's
7 going on in your own community.
8         And if the sample sizes aren't big
9 enough, and the Ohio Department of Health never
10 had the money to do a big, full scale, so they
11 did these very small samples, and,
12 unfortunately, they couldn't even tell us where
13 the samples were from.
14         So we don't know who we're talking
15 to or what their -- statistically, it's great
16 for the whole state, but it is not drillable.
17 You can't drill down small enough to know if it
18 really applies to your county, if that makes
19 sense to you.
20    Q.   Yeah, it does, and my recollection
21 from that report is, and we can pull it out if
22 we have to, but there were roughly 18,000
23 students that were surveyed?
24    A.   Yes.
25    Q.   So are you telling me that, for

Page 145

1 example, when the State of Ohio did it, they
2 didn't have enough --
3     A.   They were going to do 100 kids.
4     Q.   From who knows where?
5     A.   Yeah.
6     Q.   You mentioned seeking funds for the
7 project. I don't recall if I asked or if you
8 told me already, but where did the funds come
9 from that they --
10    A.   It was grant money.
11    Q.   From the State of Ohio?
12    A.   No, no. It was local funds. It
13 was from the quality of life project, and we
14 had some carryover from the year before, so we
15 used that, which is all local money.
16    Q.   And was 2013 the first time that
17 you are aware of that Summit County performed a
18 survey like this?
19    A.   On our own we did it, yes.
20    Q.   What existed prior to that that
21 wasn't on your own?
22    A.   We just used the state survey.
23    Q.   Which you have some issues --
24    A.   Right.
25    Q.   -- regarding the quality of the

37 (Pages 142 - 145)

Page 146

1  data?
2      A.    Correct.
3      Q.    Okay.  Turning back, a little bit
4  back towards your --
5          THE NOTARY:  She was talking at the
6  same time he was.  Did you object?
7          MS. KEARSE:  Form objection.
8      Q.    We had run through your education,
9  your training on substance abuse issues.  Have
10  you undertaken to educate yourself on FDA
11  regulations?
12      A.    Some.
13      Q.    What FDA regulations have you
14  looked into or educated yourself on?
15      A.    Locally -- well, it's probably more
16  state law than FDA, are the OARRS requirements,
17  and some of the regulation about what should
18  happen when there is a distribution of opioids.
19          And a lot of that came through
20  emergency preparedness, because we are
21  required -- we were looking at just in general
22  for -- we are required to keep a stockpile of
23  antibiotics, and we were debating whether we
24  should do that again, because it was so
25  expensive.

Page 147

1          And like at the time doxycycline
2  and Cipro were so expensive, and we purchased
3  it, and like it was going to go -- it was going
4  to expire, and we couldn't use it.
5          And it was killing me that I knew
6  these free clinics and everybody was
7  struggling, and these drugs would have been so
8  helpful.
9          So we were looking into the FDA
10  regs about, you know, can we use these, is
11  there a longer-than-life expectancy, are they
12  really good still but we -- because we couldn't
13  afford to replace them, with the stockpile.
14          So when we were doing that, we were
15  reviewing other requirements for FDA, and one
16  of the things we came -- I was reading about, I
17  remember reading about is, you know, there are
18  certain rules and regulations about how you
19  distribute opioids and what you do and who you
20  got to call and what you got to tell them when
21  you do these things, these distributions.
22      Q.    And I want to make sure we are
23  talking about the same thing, because I had
24  asked you about FDA regulation, you said yes,
25  but then you said, well, maybe they were state

Page 148

1  and OARRS or --
2      A.    Well, OARRS, I also looked at all
3  the OARRS requirements about reporting.  So
4  that is state rule.
5      Q.    Right.  Okay.  So I just want to
6  make sure we are not talking about two
7  different things.
8      A.    No.  I'm talking about the FDA with
9  the Strategic National Stockpile, and then I
10  was reading about the rules, and OARRS was
11  separate.
12      Q.    So the opioid regulations, you were
13  not referring to FDA regulations, you were
14  referring to the State of Ohio OARRS --
15      A.    OARRS, but no, no.  Then when I said
16  about we were looking at FDA rules around this
17  Strategic National -- that was FDA rules.
18      Q.    Are those opioid related?
19      A.    Well, then I stumbled across it and
20  kept reading about how you were supposed to
21  tell if you download -- if you sent a bunch of
22  drugs to an area, you should tell somebody you
23  were doing that, and all of those rules around
24  who you had to notify and what had to be
25  notified.

Page 149

1      Q.    Okay.  And are those FDA
2  regulations or are they perhaps DEA
3  regulations?
4      A.    They may have been DEA.  Now that
5  you say that, you could be correct.
6      Q.    When, roughly, was this that you
7  were looking into it?
8      A.    It would have been about a year
9  ago, maybe two.  Because those drugs expired,
10  and we only bought enough for the safety
11  forces, to start.
12      Q.    And if I were to ask you questions,
13  and one of my colleagues may later in the day,
14  about what those requirements are for
15  notification, so who has to notify whom, would
16  you be able to talk about those in --
17      A.    No, because I was just reading
18  about it and remembering that when you said
19  that to me.
20      Q.    All right.  Going back to the FDA
21  regs, have you ever read anything regarding the
22  new drug approval process?
23      A.    Yes.
24      Q.    And what have you read about that?
25      A.    Just the process to you get drugs

38 (Pages 146 - 149)

Page 150

1    approved, but it wasn't because of opioids.
2        Q.    Okay.  Would that be something that
3    you would feel comfortable standing up in front
4    of your public health colleagues and lecturing
5    on?
6        A.    No.
7        Q.    Have you reviewed any of the FDA
8    regulations related to approval of generic
9    drugs?
10       A.    No.
11       Q.    How about the process for
12   implementing or changing warnings that come
13   with, for example, opioids?
14       A.    No.  I would have no reason to.
15       Q.    How about any FDA regulations
16   regarding the advertising or promotion of
17   FDA-regulated products?
18       A.    No.  Again, I would have no reason.
19   We don't --
20       Q.    Other than the DEA regs or the
21   regulations that might have been DEA
22   regulations that we talked about just a moment
23   or two ago, anything -- any other DEA
24   regulations you might have read regarding --
25       A.    The only one that comes to mind is

Page 151

1    I did read about dump boxes.  We do the, you
2    know, the drug disposal boxes.
3            We wanted to expand the program,
4    and I was reading the DEA rules around that,
5    they have to be under direct video
6    surveillance, and it has to be a police force,
7    there has to be an actual police force.
8            So we just couldn't put dump boxes
9    all over the community, which is what we wanted
10   to do, and that they had to be tied to either a
11   police department, a real police department,
12   not like a security at the mall, and they had
13   to be under video surveillance.
14       Q.    How many of those dump boxes are
15   there in Summit County?
16       A.    I think we have 15 now.
17       Q.    And so if I'm hearing you right,
18   they all have to be under video surveillance
19   and located at a legitimate police force site?
20       A.    Yes.
21       Q.    Is that program run by Summit
22   County Public Health?
23       A.    Yes.
24       Q.    And who funds the maintenance of
25   those dump boxes?

Page 152

1        A.    We do, out of general revenue.
2        Q.    Is there a number per box that you
3    can cite to us for administration?
4        A.    You mean the cost?
5        Q.    Yeah.
6        A.    Well, the whole program cost us
7    about 40,000.  Most of that is incineration
8    though.  We have to burn, the medications have
9    to be incinerated.
10       Q.    And 40,000 per year?
11       A.    Yes.
12       Q.    And those dump boxes aren't
13   specific to just opioids, correct --
14       A.    Correct.
15       Q.    -- they are any pharmaceuticals?
16       A.    Oh, yes.  Yes.
17       Q.    When did Summit County install or
18   start installing those boxes?
19       A.    2005 maybe, 2006.
20       Q.    So we were talking about DEA regs.
21   There was the distribution, you mentioned, five
22   minutes or so ago, and then the regulations
23   regarding these dump boxes.  Any other DEA
24   regs --
25       A.    No.

Page 153

1        Q.    -- you looked into?
2        A.    No.
3        Q.    I have one -- tie off one last
4    thing, I think, on general background, and we
5    were talking about Summit County Public
6    Health's budget roughly after the merger with
7    Akron and how it had changed.
8            You were able to put a -- you told
9    me that there was about one and a half to 1.7
10   million dollars spent or budgeted in 2018 for
11   substance abuse programs?
12       A.    Yes.
13       Q.    Was that just one -- was that just
14   the portion of grant money that has been
15   received by Summit Count Public Health, or was
16   that the total budget?
17       A.    That was everything in the
18   counseling.  That didn't include the dump
19   program.
20       Q.    So out of the roughly 24 million
21   pot, or revenue, that Summit County Public
22   Health has in 2018, that was the slice
23   available for substance abuse counseling?
24       A.    No, not exactly.
25       Q.    Okay.

39 (Pages 150 - 153)

Page 154

1    A.   Because we only have about 12 and a
2  half million in grants.  The rest of that money
3  is pretty much designated by state rule.  So
4  the 12 and a half we had, about a million and a
5  half went to the substance abuse programs.
6    Q.   And of the roughly 12 million in
7  your agency's revenue that isn't from grants --
8    A.   Right.
9    Q.   -- can you put a number on how much
10  of that goes towards substance abuse programs?
11    A.   Well, I can kind of add up in my
12  head.  We have about 40 in dump, about 65 for
13  the STARS program, that's about 105 that we
14  have committed.  We do buy some naloxone.  I
15  don't know how much that is, maybe 5, 10,000.
16  We do buy fentanyl test strips, that's another
17  5,000.  So maybe 125, is that where I'm at?
18  Something like that.
19    Q.   And the grant money comes from
20  federal, state and/or private sources?
21    A.   Usually federal, state, local.
22    Q.   Okay.
23    A.   But many local foundations don't
24  fund government, because they know we receive
25  subsidies.

Page 155

1    Q.   And there was a program you were
2  describing, I think it was for the -- how ADM
3  reimburses for certain substance abuse services
4  provided to maybe indigent or underinsured
5  patients?
6    A.   Correct.
7    Q.   Where in the budget does that get
8  allocated?  That's not considered a grant, is
9  it?
10    A.   No.  It's a contract.
11    Q.   So again, if you are looking at a
12  pie chart, it would be separate from the 12 and
13  a half million?
14    A.   Yes.  We are mandated to keep every
15  federal project separate, particularly if there
16  are any FDA numbers attached, everything is
17  kept totally separate.
18    Q.   And who would be the person most
19  knowledgeable in your agency regarding the
20  revenues and expenses, sources of revenues and
21  where that money goes for substance abuse
22  programs?
23    A.   Probably Jackie Pollard.  Jackie
24  would have an account clerk assigned to her,
25  that would help her with that, but they

Page 156

1  wouldn't know a lot of the particulars.
2    Q.   Is there -- is there somebody at
3  the administration level that handles the
4  inflows and outflows of expenditures for the
5  agency?
6    A.   Yes.
7    Q.   Who is that person?
8    A.   Well, it's Angela Burgess is the
9  fiscal officer, and then there are six, five or
10  six account clerks.
11    Q.   And they are assigned to subject
12  matter areas?
13    A.   Yes.
14    Q.   Okay.  And that being the different
15  divisions within the department or the -- there
16  would be one assigned to each one of these
17  divisions in Exhibit 1?
18    A.   No.  It depends on the load of the
19  grants.  So it's basically based on the amount
20  of the grants, the cumulative amount of the
21  grants.
22         So if you have like two -- our HUD
23  grant is 2.5 million for lead abatement and
24  housing repair.  So if you had lead and you
25  had, let's say, ADM board, 700,000, that's

Page 157

1  close to 3 million, then everybody would --
2  they would distribute -- so you could have
3  another 3 million over here, but you might have
4  10 grants in that 3 million.  It's really based
5  on more money.
6         MR. NAEEM:  Why don't we go off the
7  record.
8         THE VIDEOGRAPHER:  Off the record,
9  12:09.
10         (Recess taken.)
11         THE VIDEOGRAPHER:  On the record
12  1:00 p.m.
13         MR. NAEEM:  I think that we need to
14  make sure that people on the phone identify
15  themselves, in case some people dropped off and
16  some people joined.
17         So could you please give us a
18  rollcall of who is all present on the phone?
19  Do we have people on the phone?
20         MR. FRANCO:  Joe Franco, with
21  Holland & Knight, for Insys Therapeutics.
22         MR. BROWN:  Elliott Brown, from
23  Morgan Lewis, for Teva.
24         MR. RUIZ:  Anthony Ruiz, Zuckerman
25  Spaeder, for CVS.

40 (Pages 154 - 157)

Page 158

1        MR. RAIOLA:  Stephen Raiola, with
2    Covington Burling, on behalf of McKesson.
3    BY MR. NAEEM:
4        Q.    Ms. Skoda, I'm not sure I remember
5    where we were when we left off.
6        A.    You were going to a new subject.
7        Q.    Yes, I am going to go into a new
8    subject.
9        MS. KEARSE:  And he will ask you
10   the same questions.
11       Q.    We can start at the top, with
12   education and training, but I would like to
13   move on to the opioid crisis and specifically
14   here in Summit County.
15           We talked at length about your
16   agency and your knowledge regarding opioid
17   addiction issues.  When did you become aware
18   in -- or when did you become aware of
19   prescription abuse issues that were occurring
20   in Summit County.
21       A.    During that 14 to 15 time period, I
22   was probably -- or I was, not probably, I was
23   aware that the Opiate Task Force was beginning.
24   The data was starting to tick up.  We were
25   looking at many, many data sources.  We were

Page 159

1    starting to have, you know, the overdoses, the
2    pill mills, those sorts of things.
3            So I was aware of it.  Not my
4    direct responsibility, so I wasn't really that
5    involved.
6        Q.    So you didn't have any
7    responsibility within the agency for handling
8    these issues, but as an employee of the agency,
9    you may have been generally aware; is that
10   fair?
11       A.    Yes.
12              - - - - -
13           (Thereupon, Deposition Exhibit 3,
14           Youth Risk Behavior Survey, High
15           School Report, was marked for
16           purposes of identification.)
17              - - - - -
18       Q.    Ms. Skoda, I'm going to hand you
19   what has been marked as Deposition Exhibit 3.
20       A.    Oh, okay.  Number 3.
21       Q.    Now, can you identify what
22   Deposition Exhibit 3 is?
23       A.    It is the Youth Risk Behavior
24   Survey, High School Report, summary report.
25       Q.    And this is something that we

Page 160

1    talked about earlier that you had some
2    involvement in the planning for?
3        A.    Yes.
4        Q.    And do you recall having received
5    and read this report?
6        A.    Yes.
7        Q.    Do you recall, as we sit here
8    today, and we will look at it, but do you
9    recall what the results of the survey were
10   regarding prescription drug misuse by teens in
11   Summit County was at this time?
12       A.    Yes.  My recollection, in this
13   report, was we were concerned, and when I say
14   "we," I don't mean just me, it was the health
15   department and the Opiate Task Force.
16           There was conversation about the
17   kids needed to have resiliency skills built,
18   and that was in relationship to the suicide --
19   the three areas that I remember clearly, that
20   stick out in my mind, were the suicide, those
21   individuals who felt depressed more days and
22   severely depressed, and those individuals,
23   those youngsters, that had tried suicide was a
24   fairly significant percentage.  The exact
25   percentage escapes me.

Page 161

1            It also talked about youngsters who
2    had used somebody else's pain medication, which
3    again was concerning, because there seemed to
4    be a perceived acceptance that that wasn't
5    harmful, because it was somebody else's
6    legitimate medicine.
7            So the ADM board launched any
8    number of programming, put out some grant
9    moneys in the schools, for zero -- for suicide
10   prevention, as well as -- it's something called
11   the PAX Good Behavior Game, it's P-A-X, all
12   capital letters, and what that is, PAX Good
13   Behavior Game, works with teachers to talk
14   about how to build resiliency in kids, how to
15   have behavior controls, those sorts of things,
16   in the classroom.  And they did that, and
17   school districts took advantage of those grant
18   moneys.
19       Q.    And I want to be clear about what
20   you just said.  Those programs occurred because
21   of the results of the survey?
22       A.    Yes.
23       Q.    Now, prior to the survey -- well,
24   first of all, you had testified earlier that
25   this survey is based on a methodology --

41 (Pages 158 - 161)

Page 162

1      A.   Yes.
2      Q.   -- a validated methodology
3   developed by CDC?
4      A.   Correct.
5      Q.   So was there any analysis done by
6   Summit County during the planning phase to
7   emphasize certain aspects of this survey based
8   on local conditions?
9      A.   No.  We are not allowed.  Like I
10  said, we talked about some of the conditions.
11  We did add gambling questions, but there is a
12  core set of questions you have to ask.  This
13  survey is developed to be from that research.
14     Q.   And was there any discussion in the
15  planning phase about certain issues that were
16  perceived to be ongoing in Summit County that
17  would be interesting to find out what the
18  actual results were in this cohort?
19     A.   Not that I remember.
20     Q.   If you could turn to, and these are
21  numbered a bit weird, but there is a section 6,
22  page 12.
23     A.   Yes.  Okay.  Okay.
24     Q.   Are you there?
25     A.   Yes.

Page 163

1      Q.   Okay.  What does this table
2   represent?
3      A.   Let me take a minute and look at
4   it.  It is comparing, I believe, what was on
5   the other pages in regards to prevalence, to
6   the number -- the percentage of individuals to
7   the now -- the Ohio and the United States
8   numbers.
9      Q.   And what are they specifically
10  looking at, in this table?
11     A.   It looks as though there are one,
12  two, three, four, five -- 13 indicators.
13     Q.   And those are for illegal drug use
14  or substance abuse?
15     A.   Correct, substance use.
16     Q.   Substance use, okay.
17          And was one of the things they
18  looked at prescription drug use?
19     A.   Well, just the one question about
20  have you ever used somebody else's medications.
21     Q.   And --
22     A.   -- without a doctor's prescription.
23     Q.   Right.  So the actual category that
24  was measured, and so this would be a question
25  that was asked of everybody who participated in

Page 164

1   the survey?
2      A.   Yes, providing the school district
3   didn't remove that question, and to my
4   knowledge, none of the questions regarding any
5   sort of substance use were removed.  It was
6   only occasionally sexual risk behaviors that
7   were removed.
8      Q.   We certainly have results here
9   about -- the results, or at least the answers
10  to the question about whether the survey
11  participants, and this is in quotes, "Ever took
12  prescription pain medication without a doctor's
13  prescription," end quote; do you see that?
14     A.   Yes.
15     Q.   And that would be improper to do
16  so, correct, to use prescription pain medicine
17  without a prescription?
18          MS. KEARSE:  Objection.
19     A.   Yes.  You aren't supposed to.
20     Q.   And what was the result of the
21  survey for that particular question?
22     A.   15.6 percent in 2013 alleged they
23  had done that.
24     Q.   So 15.6 percent of the --
25     A.   Participants in the survey.

Page 165

1      Q.   And this is kids of high school age
2   generally?
3      A.   Middle to high school.  This
4   was -- oh, this is the high school report.  I'm
5   sorry.  Yes, it is high school.
6      Q.   But 15.6 percent of kids who took
7   the survey were using opioid medications
8   without a doctor's prescription, correct?
9      A.   The question -- okay.  I'm not sure
10  what you are asking.
11          I think I get what you are saying
12  to me, but if I read this, it's, "Ever took a
13  pain medication without a doctor's
14  prescription," and so the kid either answer, I
15  believe, yes or no.
16     Q.   Okay.  And 15.6 percent of them --
17     A.   Said yes.
18     Q.   -- said yes.
19          And there is a number of other
20  drugs that are listed here, in addition to
21  prescription pain medications being used
22  without a doctor's prescription, yes?
23     A.   I'm sorry.  Could you repeat that?
24     Q.   Yeah.  There are a number of other
25  substances that are being tested in the survey

42 (Pages 162 - 165)

Page 166

1  and measured regarding whether the youth that
2  took the survey were using these substances and
3  how many of them were using them?
4      MS. KEARSE:  Objection.
5      A.   Yes.
6      Q.   And, for example, the results in
7  2013 for Summit County use of marijuana one or
8  more times during your lifetime was 36.6
9  percent?
10     A.   Yes.
11     Q.   Cocaine use was 5.8 percent?
12     A.   Correct, yes.
13     Q.   Heroin use, 4.1 percent?
14     A.   Yes.
15     Q.   Methamphetamines, 5 percent?
16     A.   Yes.
17     Q.   Hallucinogenic drugs, 8.9 percent?
18     A.   Yes.
19     Q.   And those drugs that I just
20 mentioned, those are all illegal substances?
21     A.   Yes.  To my knowledge, yes.
22     Q.   So what does that data tell you
23 about the prevalence of drug use in Summit
24 County, if anything?
25     A.   I'm --

Page 167

1      Q.   Let me ask it a different way.
2      A.   Please.
3      Q.   Would you agree that this data
4  indicates that there is some portion of the
5  population that is going to abuse drugs no
6  matter what the drug is?
7      MS. KEARSE:  Objection.
8      A.   My answer to that would be no, it
9  doesn't tell me that.  What I take from this
10 data is children experiment, youngsters
11 experiment with substances.
12     Q.   And how is that different from what
13 I asked you?
14     A.   Would you say what you said again?
15     Q.   Sure.  What I asked was would you
16 agree that this data shows, or demonstrates,
17 that some proportion of the population is going
18 to use illegal substances, no matter what the
19 substance is?
20     MS. KEARSE:  Objection.
21     A.   I think I have trouble with the
22 words, "Going to use."  I don't know if
23 youngsters start out with the intent.  They are
24 experimenting with drugs.  I don't know if it
25 is, "Going to use."  I don't know if they are

Page 168

1  set on a pathway and a certain group of them
2  are always going to do drugs.
3      Q.   Well, this country has had a long
4  history of substance abuse going back to the
5  late 1800s, at least; would you agree?
6      A.   Yes, I would.
7      Q.   And you have seen articles about
8  heroin and morphine use in the 1800s and
9  addiction issues from articles written in the
10 early 1900s, yes?
11     A.   Correct, yes.
12     Q.   So this isn't a new issue in this
13 country?
14     A.   Yes.
15     Q.   Opioid abuse is not a new issue in
16 this country?
17     A.   I would say in the past, I think it
18 was very different.
19     Q.   How so?
20     A.   Opioids, we never had in the past.
21 Opiate use was mostly -- back when I was a
22 parole officer and back when I was in the inner
23 city of Cleveland, heroin use was used by a
24 very certain group of individuals.
25        What we see now -- and that may

Page 169

1  have been a group of individuals that started
2  out by, you know, being 12 years old, smoking a
3  little bit of pot, ended up going on to a much
4  more serious drug addiction, having a substance
5  abuse disorder.
6        What we see now though is a group
7  of folks who may have innocently started out by
8  taking a pain med, having a surgery, being
9  harmed, and then having this horrific supply in
10 the community, be able to become very addicted
11 very quickly, and have ease of access to those
12 drugs.
13        And it was one of the reasons in 13
14 and 14 that Jerry Craig was so adamant about we
15 need to get a baseline survey, we need to find
16 out just exactly what youngsters are thinking
17 and their risk behaviors, because I think we
18 were worried that there was a changing -- the
19 heroin addict of old, who had a little tattoo
20 right here that told them exactly how much
21 heroin to use so they never overdosed, was
22 gone.  They're different now.
23        So the whole scene was changing,
24 and it was taking -- it was a very hard thing
25 to get your hands around, but it was becoming a

43 (Pages 166 - 169)

Page 170

1 very different user. It was coming across our
2 paths.
3    Q.   Now, what I thought I heard you
4 just say was, in profiling those new users, was
5 that these were people who had been
6 legitimately, perhaps, prescribed opioids and
7 were becoming -- or the prescription opioids
8 and becoming addicted?
9    A.   Could have been.
10    Q.   Could have been?
11    A.   It's one pathway.
12    Q.   Now, have you seen any data
13 regarding -- seen any data that allows you to
14 characterize what percentage of opioid abusers
15 started on that pathway?
16    A.   I can tell you from the Opiate Task
17 Force work, what we have been told is it is
18 four out of five or about 80 percent have
19 reported starting with a prescription pain
20 medication.
21    Q.   Okay. Does that data tell you
22 whether they legitimately had a prescription
23 pain medication?
24    A.   I don't know that.
25    Q.   Okay. You understand the

Page 171

1 distinction I'm trying to make --
2    A.   Oh, yes, I do.
3    Q.   -- because four out of five of
4 those could have stolen them from their
5 family's medicine cabinet and never had a
6 legitimate prescription; would you disagree?
7    MS. KEARSE:  Objection.
8    A.   Yes, I agree with that, but it
9 shouldn't have been in the medicine cabinet to
10 begin with. There was such an oversupply
11 available in the community, it was just
12 anywhere you went. I mean, it was out there.
13         - - - - -
14         (Thereupon, Deposition Exhibit 4,
15         Email Exchange, Beginning with Bates
16         Label Summit 154701, was marked for
17         purposes of identification.)
18         - - - - -
19    Q.   Ms. Skoda, I'm handing you what has
20 been marked as Deposition Exhibit Number 4.
21    A.   Thank you.
22    Q.   Before we turn to this exhibit, let
23 me ask you, you were talking about an
24 oversupply. What's the basis for your
25 testimony that there was an oversupply of

Page 172

1 prescription opioids that was leading to
2 addiction issues?
3    A.   I think it's twofold. One is
4 self-reported from individuals that we have
5 come in contact with, that we have treated,
6 that have said, you know, there was a lot
7 available. I have actually talked to users who
8 thought they were buying legitimate oxy in the
9 street, a little blue pill, and it ended up
10 being fentanyl, and they have subsequently
11 overdosed.
12         But the other part of it is, again,
13 our OARRS data, you know, was indicating, again
14 through the Opiate Task Force, that we were
15 tracking high amongst -- the pills that were
16 dispensed per person in Summit County was just
17 really high, and the State of Ohio was telling
18 us to pay attention, and the programs that we
19 were focusing on needed to get that per-person
20 number down of dispensing.
21         And particularly there was some
22 information, you know, provided in grant
23 projects that we wrote about we want to get the
24 morphine equivalents down. There is too much
25 in the community.

Page 173

1    Q.   Okay. So with respect to the pills
2 dispensed per person, that was a goal that was
3 set by the task force was to reduce?
4    A.   Yes.
5    Q.   And as part of any work you did
6 with the task force or on your own, what was
7 the -- what was leading to the -- what was
8 causing the high amount of pills dispensed per
9 person? Why was it a number that needed to be
10 decreased?
11    A.   I think because the availability
12 was there. It was in the community. Not
13 everybody was taking all of their pills, or
14 those that were taking them were not getting
15 pain relief and taking a higher dose, were
16 either subsequently becoming addicted and
17 taking a higher dose and/or leaving their extra
18 pills just lying around, and it did fall into
19 the wrong hands.
20    Q.   All right. So the situation where
21 people wouldn't have been taking all their
22 pills and would just leave them around where
23 somebody else could pick them up, that would be
24 diversion, right, somebody who took the pill
25 from somebody else?

44 (Pages 170 - 173)

Page 174

1    A.   Yes.
2    Q.   Other than diversion, were there
3 any other reasons why these pills were more
4 available than perhaps they had been in the
5 past?
6    A.   It is my belief, and I know that
7 when pain was starting to be a fifth sign, and
8 all the focus was, you know, directed towards
9 nobody can be in pain, all of the pain meds
10 that were historically used for the end of
11 life, cancer treatment, hospice care were being
12 dispensed for headaches, back pain, because the
13 physicians thought they were doing what they
14 should be doing, based on what their medical
15 societies were telling them, with pain as a
16 fifth sign.
17        So when all of those pills started
18 to flood the market, you know, people were
19 using them, they were out there for any number
20 of conditions, that they typically, in the
21 past, never were for.
22        Like if you had ask me 12 years ago
23 in public health, I would have -- or even a
24 home health nurse would have never known that
25 there were the level of narcotics that were in

Page 175

1 the home that there is now.
2    Q.   Okay.  And are you aware -- you
3 mentioned medical societies in your answer,
4 that physicians were doing essentially what
5 their medical societies had told them, with
6 respect to treating pain.
7        Were there any State of Ohio
8 initiatives that encouraged the use of opioid
9 medications that you are aware of?
10    A.   Not that I'm aware of.
11    Q.   Do you recall Ohio law changing,
12 regarding use of opioids for intractable pain?
13    A.   No.
14    Q.   Were there physicians who were
15 engaging in illegal or immoral conduct in
16 providing opioid medications to their patients?
17        MS. KEARSE:  Objection.
18    A.   I would know of none of those,
19 other than the ones that were in the newspaper
20 that were subsequently arrested and convicted.
21    Q.   And what were the circumstances of
22 those generally, you don't have to recall the
23 specifics, but what was it that doctors were
24 doing?
25    A.   Well, I think disregarding

Page 176

1 protocols.  I think a few were disregarding
2 protocols, not getting appropriate follow-up
3 with patients, following any standard of care,
4 just basically writing prescriptions, is my
5 understanding of the one that I know about.
6    Q.   What are you specifically referring
7 to?
8    A.   That was arrested.
9    Q.   When was that, do you recall?
10    A.   No.  I know he was out of Copley,
11 Ohio, but I don't know when.  It was a while
12 ago.
13    Q.   Yeah.  Have you heard the phrase
14 "pill mill"?
15    A.   Yes.
16    Q.   What does that mean to you?
17    A.   It's a -- it's a group of
18 individuals that are licensed to prescribe in
19 Ohio, whether they are physicians or whatever
20 their specialty might be, that operate under
21 pain management clinics, yet disregard any
22 standard and just continue to dispense pills,
23 without any follow-up or, I think, appropriate
24 treatment guidelines.
25    Q.   And to your knowledge, were

Page 177

1 physicians who operated pill mills, do they
2 contribute to the increase in prescription
3 opioids available for abuse?
4        MS. KEARSE:  Objection.
5    A.   Probably some.  I think anyone who
6 overprescribed was contributing.
7    Q.   Do you have any sense or do you
8 know how many physicians have been prosecuted
9 in Summit County for operating pill mills?
10    A.   No, I do not.
11    Q.   Have you heard of online
12 pharmacies?
13    A.   Yes.
14    Q.   Have you done any research or heard
15 about whether online pharmacies -- the
16 operation of online pharmacies contributed to
17 the opioid prescription use epidemic?
18    A.   No.
19    Q.   Do you know how online pharmacies
20 operated, do you have any information about
21 that?
22    A.   Not for opioids.  I buy dog
23 medicine, but that's not opioids.
24    Q.   No.  So as we sit here today, you
25 don't have any information regarding whether

45 (Pages 174 - 177)

Page 178

1 people were obtaining prescriptions improperly
2 through online pharmacies?
3    A.  I know that anecdotally people have
4 said that, but not that I know for a fact.
5    Q.  Is that something that was
6 discussed at the task force level or --
7    A.  Not that I remember.
8    Q.  You did mention overprescribing,
9 physicians were overprescribing opioids --
10       MS. KEARSE:  Objection.
11    Q.  -- to their patients?
12    A.  Yes.
13    Q.  What about patients, were you --
14 are you aware of any conduct by patients
15 generally, not specific patients, that
16 contributed to the increased availability of
17 pills, opioids, on the street?
18       MS. KEARSE:  Objection.
19    A.  Their behaviors were driven by a
20 brain disease addiction.  So once they became
21 addicted, they continued to seek drugs, and
22 that may have included behavior such as doctor
23 shopping or forging prescriptions or stealing
24 medication, but I believe that's, you know,
25 just an unintended consequence of getting

Page 179

1 addicted to a medication.
2    Q.  And those patients who were forging
3 prescriptions or stealing medications, did they
4 always -- did they always use the medications,
5 or did they perhaps sell them on the street?
6       MS. KEARSE:  Objection.
7    A.  I can't -- I don't know.
8    Q.  That's not something that you have
9 heard discussed?
10    A.  Oh, I've heard that, and I have
11 heard that people sell medications to survive.
12 Just like food stamps have value, pain pills
13 have value.  There is a whole separate economy
14 in the streets.  So, yes, they are used for
15 income, they're cash.
16    Q.  Okay.  And --
17    A.  -- in supporting a habit.
18    Q.  And I had previously marked
19 Deposition Exhibit 4.  Did you get a chance to
20 look at that?
21    A.  Yes.
22    Q.  Who is Terry Albanese?
23    A.  Terry Albanese was assistant to the
24 mayor for education, health and families.  She
25 is no longer there.

Page 180

1    Q.  Is she in -- I'm sorry.  Is she
2 still in the City of Akron government?
3    A.  No.
4    Q.  Is she working for Summit County
5 government?
6    A.  No, not to my knowledge.
7    Q.  And do you recall this email; is
8 this something you recall?
9    A.  Yes.  I remember reading it.
10    Q.  And you were attached -- I'm sorry.
11 You were one of the recipients of this email,
12 correct?
13    A.  Right.
14    Q.  So this email is dated September 7,
15 2016.  Do you see the second paragraph?
16    A.  Correct.  Yes.
17    Q.  And it is referring to Governor
18 Kasich, one of his --
19    A.  Right.
20    Q.  -- responses to the opioid crisis,
21 yes?
22    A.  Well, the first paragraph is.  The
23 second paragraph --
24    Q.  Right.  And so she says, she is
25 talking about people under the age of 18 and

Page 181

1 the percentage of overdoses in that age group?
2    A.  Are small, correct.
3    Q.  Right.  And then she goes on to
4 state, "However, I have yet to see any research
5 on when and how overdose victims got started
6 with substance abuse in the first place.  If
7 any of you have data along those lines, I would
8 be quite interested in the findings."
9       Was there any response to Ms.
10 Albanese that you were copied on?
11    A.  Not that I remember.  And I was
12 trying to remember if I responded to her, and I
13 don't believe so.  I don't know.  I may have
14 sent her the risk behavior, but I don't
15 remember.  There might be.
16    Q.  So you may have responded and you
17 may have sent her the youth survey?
18    A.  Right.
19    Q.  But you don't recall?
20    A.  But I think she probably already
21 had that.
22    Q.  And was there anything else you
23 might have sent her about when and how overdose
24 victims got started with substance abuse?
25       MS. KEARSE:  Objection.

46 (Pages 178 - 181)

Page 182

1    A.    Not that I remember.
2    Q.    Was there anything that you saw
3 sent to her by any of the people who were
4 copied on this email?
5    A.    Not that I remember.  I was looking
6 at the list of names and thinking who might
7 have responded, but, no.
8    Q.    And so you don't recall whether
9 anyone might have sent her anything regarding
10 how people get started on prescription opioid
11 abuse?
12    A.    No.
13    Q.    In talking about prescription
14 opioid or, I'm sorry, opioid abuse -- strike
15 that.
16        Is opioid abuse something that's
17 tracked by Summit County Public Health
18 currently?
19    A.    Yes.  Well, I should say opioid
20 data that we have access to is tracked.
21    Q.    Okay.  And so you made the
22 distinction about data that you have access to.
23    A.    Correct.
24    Q.    What is the data that Summit County
25 Public Health has access to?

Page 183

1    A.    We have access to birth and death
2 data, we also have access to the coroner's data
3 via ADM board, alcohol, drug, mental health.
4 We use some of the ADM data that they give us,
5 and we also have access to something called
6 EpiCenter.
7    Q.    Other than those sources and data,
8 is there any other data that your agency
9 monitors with respect to opioid use or perhaps
10 overdoses?
11    A.    No.  We don't have access to either
12 clinical data, OARRS, or any of that.  We are
13 not allowed to have access, it's public -- it's
14 PHI.
15    Q.    All right.  So nobody at Summit
16 County Public Health has access to OARRS?
17    A.    Our medical director, but only for
18 her patients.
19    Q.    Which does or doesn't include --
20    A.    MAT?
21    Q.    Well, I was going to ask about any
22 Summit County Public Health program, but --
23    A.    No, she does not.
24    Q.    So even with the medical-assisted
25 treatment program participants, she would not

Page 184

1 be able to access OARRS; is that correct?
2    A.    Yes.
3    Q.    So the birth and death data, what
4 about that data would inform you regarding use
5 of -- use, misuse of opioids or overdoses?
6    A.    Cause of death.
7    Q.    So the death certificate will have
8 information regarding what that patient -- or
9 what that person died of?
10    A.    Yes.
11    Q.    And does your department keep
12 statistics of those causes of death?
13    A.    Yes.
14    Q.    Who is responsible for that?
15    A.    Rich Marountas.  And also, I would
16 like to add, the birth certificate also has a
17 part of a birth certificate that is
18 confidential to everyone.  It talks about
19 maternal risk behaviors during pregnancy.  So
20 it does include topics of alcohol and a few
21 other things, so we might be able to know, but
22 my understanding the State of Ohio is doing
23 away with that, so that may have been a thing
24 of the past.
25    Q.    Specifically you are talking about

Page 185

1 the section of the birth certificate --
2    A.    Yes, that was confidential.
3    Q.    How is the death certificate data
4 that you just talked about different from the
5 coroner data you mentioned as additional
6 sources of information?
7    A.    We get all of the data from the
8 State of Ohio.  There is about 6,000 births and
9 6,000 deaths every year.  So every single
10 person who dies in Summit County, we get that
11 information on.
12        The coroner gets a subset of that
13 group, which are those individuals that either
14 died in a police matter, a suspicious
15 death, somewhere where there is an autopsy
16 required.
17        And so within that subset of her
18 data, she is capable, with some difficulty, of
19 collecting, you know, the type of drug, what
20 killed them, that sort of stuff.
21    Q.    Okay.  So essentially the data the
22 medical examiner gets are really only those
23 deaths that are referred to her office for
24 investigation?
25    A.    Correct.  And we receive that data

47 (Pages 182 - 185)

Page 186

1  only deidentified.  As public health, we aren't
2  as interested -- we aren't interested in the
3  one person, the individualized.  We keep those
4  records deidentified.  We are very much
5  interested in the aggregate data and the impact
6  it's having on the community.
7      Q.   Okay.  So then in what format do
8  you get that data from the medical examiner?
9      A.   We get it via the ADM board, the
10  coroner gets it from her.  We get it as
11  aggregate data, 25 overdose deaths, ten heart
12  attacks.
13      Q.   So is it via email?
14      A.   Oh, I'm sorry.
15      Q.   Yeah.
16      A.   It's from an FTP site, a transfer
17  protocol, file transfer protocol, that's
18  secure.
19      Q.   And how periodically do you get
20  that data?
21      A.   Rich probably -- I don't know
22  exactly, because we look more at EpiCenter, he
23  looks at that data, I would say at least once a
24  month.
25      Q.   And you are getting all of the

Page 187

1  death data for that -- not holding you to it
2  being a month, that you get it every month, but
3  are you just asking for drug overdose data, or
4  is it all the death data from the medical
5  examiner that you are receiving?
6      A.   We are asking for a combination,
7  everything.
8      Q.   Have you -- when is the last time
9  you saw that data provided by ADM, based on
10  medical examiner data?
11      A.   I've never directly looked at it.
12  I've only seen it written in reports.
13      Q.   And is there a standard report
14  format that is being prepared, based on that
15  data?
16      A.   Rich -- well, Rich uses that data
17  to validate what we see in EpiCenter.  So
18  EpiCenter is a realtime surveillance system
19  that was established after 9/11, and it was
20  established to allow health departments to do
21  monitoring of emergency room activity, to see
22  if, in fact, there were any upticks in any of
23  the disease conditions for which people present
24  to the ER.
25      So if, for an example, if there are

Page 188

1  25 people at one hospital system going in for
2  diarrhea, and there is 25 at another system,
3  chances are that's a real uptick in what is
4  happening.  There could be a food-borne
5  outbreak, there could be something going on.
6      Move up a few years, we have used
7  that always, and the State of Ohio sends out
8  alerts to let you know that there is this, sort
9  of, uptick in the data.
10      Rich started looking at EpiCenter
11  all the time because there were so many
12  overdoses in there, and we started monitoring
13  it, and then he started putting out every day a
14  daily overdose report, but because that data is
15  preliminary, because nothing has been confirmed
16  by the coroner's office that, in fact, yes,
17  this was a drug overdose, yes, in fact, it was
18  an opioid, yes, in fact, it was carfentanil.
19  Unless it states an 89-year-old man died of
20  insulin, took too much insulin, we would never
21  include that in there.
22      Then Rich uses that data that we
23  get from the coroner's office and ADM board to
24  validate that, yes, in fact, we have the
25  numbers right.

Page 189

1      Q.   So does the EpiCenter reports -- or
2  does the data received from Epicenter tell you
3  whether those overdoses were opioid related or
4  not?
5      A.   Sometimes.
6      Q.   Could they be, if you were looking
7  at an EpiCenter report right now, could you
8  distinguish between those related to cocaine
9  versus those related to an opioid?
10      A.   No, not until toxicology is back.
11      Q.   And that's data from the medical
12  examiner's office?
13      A.   Correct.
14      Q.   Okay.  So if we are just focusing
15  on EpiCenter, would it tell you which
16  substances were -- which opioid substances were
17  involved in that particular overdose?
18      A.   It will -- sometime it will say an
19  opiate, because they'll use Narcan and it will
20  be reversed, and the emergency doctor will feel
21  comfortable saying that.
22      Or a paramedic will say, you know,
23  this was an opiate overdose, we revived him
24  with Narcan, and they will feel comfortable
25  writing overdose/opiate, but we don't know the

Page 190

1 type that is underneath that.  It could have
2 been carfentanil, fentanyl with opiates or
3 cocaine.  We don't know.
4     Q.    And then going back to the medical
5 examiner data.
6         - - - - -
7         (Thereupon, Deposition Exhibit 5,
8         Email with Attachment, Beginning
9         with Bates Label Summit 264062, was
10        marked for purposes of
11        identification.)
12        - - - - -
13    Q.    Handing you what has been marked
14 Deposition Exhibit 5.  Did I give you the right
15 one?  Yes, number 5.
16        MR. NAEEM:  I'm going to mark this
17 one too.
18    Q.    Handing you what has been marked
19 Deposition Exhibit 6.
20        - - - - -
21        (Thereupon, Deposition Exhibit 6,
22        Email, Subject Data for Narcan,
23        Beginning with Bates Label Summit
24        263018, was marked for purposes of
25        identification.)

Page 191

1         - - - - -
2     Q.    I actually marked them out of
3 order.
4         If you could take a look at
5 Deposition Exhibit Number 6.
6     A.    Okay.
7     Q.    This is a June 15, 2016 email from
8 Rich Marountas to you; do you see that?
9     A.    Yes.
10    Q.    Now, those charts that are in his
11 email, do you know how those were generated,
12 from what data source?
13    A.    No, I could not say for sure.
14    Q.    Do these look like the data he
15 sends around in his Epicenter reports?
16    A.    No.  I mean, they are similar.  I'm
17 looking at them again here.  The word that is
18 throwing me is the, "Drug poisoning deaths,"
19 which makes me believe it includes other drug
20 poisoning.
21    Q.    Okay.
22    A.    So I don't know.  I would have to
23 look and check the data source to see what that
24 means.
25    Q.    Well, okay.  Epicenter wouldn't

Page 192

1 tell you which drug -- at a high level, you
2 can't distinguish in Epicenter whether it is an
3 opioid versus cocaine versus anything else
4 involved in the overdose, right?
5     A.    Correct, unless it was specifically
6 stated.
7     Q.    And then if you could look at
8 Exhibit 5.
9     A.    Correct.
10    Q.    This is a June 22, 2018 from Rich
11 Marountas to you?
12    A.    Right.
13    Q.    He's put that data together, and my
14 only question at this point is, would this
15 reflect data from Epicenter, or would this
16 reflect data from the coroner or the medical
17 examiner?
18    A.    Well, what he is saying here,
19 "Deaths for 2017 may differ from other
20 figures," because we have seen -- because I'm
21 going only off of the count of death
22 certificates with drug related.
23        So what he was doing was trying to
24 get verification from the coroner's office,
25 because for a while, they were so backed up on

Page 193

1 the toxicology, it would take six to seven to
2 eight months to actually get a cause of death
3 to finalize the certificate.
4         And so the numbers tend to look
5 like they are all over the place, because we
6 haven't really finished -- I'm sure this was
7 January of 18, we weren't finished with
8 validating with the coroner's office that, yes,
9 in fact, these were correct, and then often we
10 have to correct death certificates.
11    Q.    So of the sources of overdose data
12 we were talking about that you listed, Exhibit
13 5 would represent overdoses based on review of
14 death certificate data?
15    A.    Yes.
16    Q.    And Exhibit 6, at this point, you
17 are not sure whether or not that is Epicenter
18 data?
19    A.    No, I am not sure.
20    Q.    Again going back to the medical
21 examiner data that's received by the FTP site,
22 again you mentioned Rich Marountas is the one
23 who pulls that data down.  He prepares reports
24 based on that data?
25    A.    Yes.

49 (Pages 190 - 193)

Page 194

1    Q.   Do those reports identify the
2  particular substance at issue in those
3  over death -- I'm sorry in those cases, those
4  death cases?
5    A.   If it's been validated by the
6  coroner that, yes, that was the cause of death.
7    Q.   And do you see those reports; does
8  he send them to you?
9    A.   A lot of times they are blended
10  into other documents.  I see the drug report
11  every day, and then, like, if we are creating
12  this for a project or somebody has asked for
13  data, I might look at it, but I'm not his
14  direct supervisor, so I don't usually see
15  everything.
16    Q.   So who is he -- who does he --
17  first of all, why are these reports being
18  prepared?
19    A.   We get requests from the community
20  for information all the time for grant
21  proposals, and individuals will call us up and
22  say, hey, do you have a graph I could stick
23  into this grant, or we provide kind of as a
24  service to community partners, we will give
25  them data that has been crunched so they can

Page 195

1  use it in a grant proposal.
2    Q.   So does he -- does he prepare these
3  reports on an ad hoc basis?
4    A.   It can be.
5    Q.   So this isn't something that is
6  done every month by your directive?
7    A.   No.  He monitors this data.  We
8  do the -- every Friday he does a cumulative
9  report based on what we know, but every day he
10  does the individual drug overdose report.
11    Q.   But those daily and weekly reports
12  are based on EpiCenter, or are they based on
13  this medical examiner data?
14    A.   EpiCenter, until they are
15  confirmed, and that's the caveat on that data.
16  We tell them this is the rough estimates, it's
17  the best we have, until we actually confirm it.
18    Q.   I guess I'm just trying to get a
19  sense of what that confirmed report looks like.
20  What is it that is sent around --
21    A.   Oh --
22    Q.   -- that distinguishes between here
23  are these preliminary EpiCenter cases --
24    A.   Right.
25    Q.   -- and here is the final data

Page 196

1  that's been confirmed through medical examiner
2  data?
3    A.   What would happen is Rich would
4  send an updated EpiCenter report and say, these
5  are the real numbers.  Or when we report out,
6  like when somebody would ask Rich for this,
7  like we had talked about this, he would make
8  sure he either -- either it was confirmed, or
9  he would put the caveat on it that we don't
10  know for sure if this is the real number yet.
11    But typically, when they are -- I
12  know what you are asking.  I'm sorry.  I didn't
13  answer the question.
14    When he gets an update, he corrects
15  the document.
16    Q.   He corrects the EpiCenter
17  report or --
18    A.   The numbers.
19    Q.   -- the weekly report that he sends
20  out?
21    A.   Yes.  And -- yes.
22    Q.   And I think you said, when you were
23  describing these three sources of data, that
24  your agency does not have access to
25  patient-level data?

Page 197

1    A.   No.
2    Q.   So at least as far as Summit County
3  Public Health, in reviewing overdoses and
4  deaths in the community, and if we just limit
5  it to opioid-related deaths, let's assume it
6  has been able to be refined to the point that
7  you know it's an opioid, there is no way for
8  your agency to determine whether or not that
9  patient had prior use of prescription opioids
10  from a legitimate prescription?
11    MS. KEARSE:  Objection.
12    A.   The only way that we know that, the
13  ADM board has access to OARRS, and the Ohio
14  Pharmacy Board puts out reports.  So we are
15  able to use that as that sort of a barometer,
16  that individuals are receiving some of these
17  opioids through legitimate prescriptions.
18    Q.   Okay.  And do you get data from ADM
19  which breaks these overdoses or deaths down
20  into categories of patients who were using
21  illicit substances, who are using prescription
22  opioids, and who were using prescription
23  opioids based on a legitimate prescription?
24    A.   Not to my knowledge.
25    Q.   So at least you, within the agency,

50 (Pages 194 - 197)

Page 198

1  haven't seen it?
2      A.   No.
3      Q.   Have you talked to anybody at
4  Summit County Public Health who has received
5  that data from ADM?
6      A.   Not to my knowledge.
7      Q.   Have you talked to anybody at ADM
8  about their ability to generate that
9  patient-level data?
10     A.   No.
11     Q.   So what is the ADM data that you
12  believe -- oh, I'm sorry.  Strike that.
13          ADM has access to OARRS?
14     A.   Yes.
15     Q.   And so was your answer based on
16  simply the fact that they do have the ability
17  to go look at OARRS?
18     A.   Right, and present to the Opiate
19  Task Force their findings.
20     Q.   Is that something you are aware
21  that they have done?
22     A.   Yes, in their reporting and in
23  their presentations.
24     Q.   Have you attended a task force
25  meeting or subcommittee meeting where ADM has

Page 199

1  presented OARRS data?
2      A.   I could not be sure.  I mean, there
3  is a lot of data presented.  I just don't know
4  the source, without checking.
5      Q.   Would you agree with me that there
6  are some heroin users in Summit County who have
7  never used prescription opioids?
8          MS. KEARSE:  Objection.
9      A.   Would I agree with that statement,
10  or it's more I just don't know?
11     Q.   Either way.
12     A.   I don't know.
13     Q.   Would you agree with me that there
14  are some prescription opioid abusers in Summit
15  County who have never had a legitimate
16  prescription for opioids?
17          MS. KEARSE:  Objection.
18     A.   I'm sorry.  Would you ask it again?
19     Q.   Sure.  Would you agree with me that
20  there are some people in Summit County who are
21  abusing prescription opioids who have never had
22  a legitimate prescription for that medication?
23          MS. KEARSE:  Objection.
24     A.   Again, I don't know.
25     Q.   You are aware, however, based on

Page 200

1  your prior testimony, that there certainly are
2  people abusing opioid prescriptions who have
3  gotten them through improper means?
4      A.   Yes.
5      Q.   Have you done any research -- we
6  talked a little bit earlier about some of the
7  education and some of the programs you have
8  attended regarding substance abuse after you
9  became health commissioner.
10          Within the context of any of those
11  programs, did you read anything or hear
12  anything from anyone about the consequences of
13  untreated chronic pain?
14     A.   Yes.
15     Q.   Okay.  Are you aware that untreated
16  chronic pain can lead to depression?
17     A.   Yes.
18     Q.   Are you aware that untreated
19  chronic pain can lead -- can lead some people
20  to commit suicide or attempt suicide?
21     A.   No, I did not know that.
22     Q.   Do you dispute that fact?
23     A.   I don't know.
24     Q.   Are you aware that untreated
25  chronic pain can lead people to self-medicate?

Page 201

1      A.   Yes.
2      Q.   And that self-medication can lead
3  to substance abuse?
4      A.   Yes.
5      Q.   Is it your position that opioid
6  medications should not be available to people
7  suffering from chronic pain?
8          MS. KEARSE:  Objection.
9      A.   Yes.
10     Q.   Should not be available?
11     A.   Yes.
12     Q.   And what is that based on?
13     A.   From what I've seen, with the
14  devastation and destruction that is cause for
15  conditions that perhaps could have been treated
16  another way and/or been much more successful in
17  the treatment if there had been, perhaps,
18  another approach to pain management, that
19  included those difficult lifestyle behavior
20  changes that individuals can be very resistant
21  to and/or other sorts of pain treatment
22  programs that didn't require a prescription.
23          Certainly there are conditions at
24  the end of life, hospice care, horrific
25  surgeries, where a well-controlled pain is

51 (Pages 198 - 201)

Page 202

1 critical, but for the general use in the
2 community, it has wreaked havoc.
3    Q.    Who decides when opioids are
4 appropriate for treatment of chronic pain?
5    A.    I would hope that a physician
6 would, or a nurse practitioner.
7    Q.    And you raise a good point.  There
8 are different groups authorized under Ohio law
9 to dispense or provide a prescription --
10    A.    Right.
11    Q.    -- for chronic pain.
12         You mentioned physicians, nurse
13 practitioners.  Are you aware of any other
14 medical professionals who are able to
15 prescribe?
16    A.    Dentists.
17    Q.    Anybody else?
18    A.    I'm sure psychiatrists could.  Any
19 licensed physician in Ohio and/or an NP.
20    Q.    Are you aware of whether or not
21 physicians assistants --
22    A.    I'm sorry, PAs.  I forgot about
23 them, yes.
24    Q.    And to be fair, you are not one of
25 those, in one of those categories --

Page 203

1    A.    Correct.
2    Q.    -- of people who can prescribe?
3    A.    Correct.
4    Q.    And are you aware of any state laws
5 or administrative sections regarding chronic
6 pain patients' access to pain medications?
7    A.    No, I am not.
8    Q.    And you initially said you don't
9 believe that opioids should be available for
10 treatment of chronic pain, but you carved out
11 some of the more -- the end-of-life pain and
12 some horrific surgery, I think you said?
13    A.    Correct.
14    Q.    Would you agree that restricting
15 access to prescription opioid medications would
16 result in some chronic pain patients who don't
17 get the treatment they require?
18         MS. KEARSE:  Objection.
19    A.    Perhaps.
20    Q.    Do you suppose that could lead to
21 increases in depression and suicide?
22         MS. KEARSE:  Objection.
23    A.    I don't know.  It's a conclusion
24 that you could draw, but I don't know that.
25    Q.    Could it lead patients to

Page 204

1 self-medicate with illegal opioids --
2         MS. KEARSE:  Objection.
3    Q.    -- like heroin?
4    A.    Perhaps, yes.
5    Q.    Do you believe that -- or do you
6 dispute that chronic pain is a legitimate
7 medical issue?
8         MS. KEARSE:  Objection.
9    A.    No.
10    Q.    Have you seen any analyses at the
11 federal or state level regarding the cost of
12 chronic pain to society?
13    A.    I'm sorry?
14    Q.    Yeah.  I don't know what that was.
15         Have you seen any data published at
16 the federal or state level analyzing the cost
17 of chronic pain to society?
18    A.    No, not that I remember.  I'm sure
19 I've read it, but don't remember it.
20    Q.    Can pharmaceutical companies
21 legally provide opioids directly to patients?
22    A.    No.
23    Q.    Do you know -- you testified about
24 reading some DEA regulations about
25 distribution.  Do you know how prescription

Page 205

1 opioids make it from the manufacturers or
2 pharmaceutical companies to patients, do you
3 have a general understanding of the process?
4    A.    My guess, it would go to a
5 supplier, and then to the physician -- a
6 pharmacy for which the physician would write a
7 prescription, and the patient would fill it.
8    Q.    Those suppliers or distributors, as
9 they are sometimes called, do you know if they
10 can legally provide opioids directly to
11 patients?
12    A.    Not to my knowledge.
13    Q.    Can pharmacies do so?
14    A.    Not without a prescription.
15    Q.    Have you read any warning
16 information published by manufacturers
17 regarding prescription opioids?
18    A.    No, I have not.
19    Q.    Would you agree with me that many
20 substances can lead to addiction issues other
21 than opioids?
22    A.    Yes.
23    Q.    What are some of those substances
24 that are causing addiction issues in Summit
25 County that you are aware of.

52 (Pages 202 - 205)

Page 206

1    A.   Alcohol, marijuana, although there
2  are those that don't believe it is addictive,
3  methamphetamine, crack cocaine, cocaine, any
4  sort of pill, benzodiazapine, any amphetamine,
5  there are any number of drugs.
6    Q.   And other than the general
7  substance abuse programs we have talked about
8  that are provided to clients of Summit County
9  Public Health, are you aware of any task forces
10  or any other initiatives to reduce, for
11  example, the substance -- or addiction issues
12  related to, for example, methamphetamine?
13    A.   I think they are generally treated
14  under just substance use disorders.
15    Q.   So again, the counselors can see
16  patients that have addiction issues, it may be
17  opioids, it may be any other substance?
18    A.   Correct.
19    Q.   And I had asked you earlier about
20  whether -- about data regarding -- strike that.
21  Never mind.
22       Has Summit County, to your
23  knowledge, assessed the link between mental
24  illness and opioid abuse?
25       MS. KEARSE:  Objection.

Page 207

1    A.   I am not sure.
2    Q.   So with respect to any causation or
3  association between mental illness and opioid
4  abuse, you wouldn't be able to characterize,
5  for example, what percentage of substance
6  abusers have mental illness?
7    A.   No, I would not.
8    Q.   Looking at Exhibit 5, is it a fair
9  characterization that, the second page
10  specifically, is it a fair characterization to
11  state that the number of overdose-related
12  deaths have increased year over year since
13  2014?
14    A.   Until we get to 17, there is a
15  pattern of increase.
16    Q.   And what was, if you are aware,
17  what was driving the increase in opioid -- I'm
18  sorry, overdose-related deaths over that time
19  frame?
20    A.   I know that when there was
21  restrictions on the number of prescriptions
22  that started to be dispensed in Ohio, many
23  individuals who had a legitimate source to get
24  drugs, could get prescription pills, could no
25  longer get them.

Page 208

1       Many of them went to other sources
2  to get medications, opioids specifically, to
3  continue their addiction, the brain disease.
4  It's a very powerful addiction that drove
5  individuals to do things that they normally
6  would not have done, if they could have
7  maintained getting those pills.
8       And whether it was from a
9  physician, a pill mill, wherever they were
10  getting them, because there was so much, when
11  that supply was cut off, they went to other
12  sources, or thought they were purchasing
13  OxyContin in the street, and they were not, and
14  they were purchasing fentanyl or carfentanil,
15  or some other derivative.
16    Q.   And so you started your answer by
17  saying, "I know."  What is the basis of that
18  knowledge that you just testified to?
19    A.   The people that I have talked to,
20  the families, the drug treatment counselors.
21       In public health, we tend to -- we
22  look at populations, and that's why we are
23  never quite really interested -- we are looking
24  at a harmful condition to any group of people.
25  We are trying to sort out and figure out what

Page 209

1  the root cause is, so we can prevent death and
2  disability.
3       And so in looking at this, all of a
4  sudden there is so many different people, we
5  don't even know where to target it.  It is
6  individuals of all classes, all socioeconomic
7  status that are now impacted by wanting opioid
8  drugs.
9       And so for us, it was where did
10  that come from.  So we started to look into it,
11  through data sources, research, reading journal
12  articles, talking to folks, talking to EMS,
13  talking to clients that come through the door,
14  talking to their families, talking to the folks
15  who come to our needle exchange program, and we
16  soon realized that when the supply was starting
17  to dry up, the addiction was still there.
18    Q.   Okay.  And so if I can perhaps
19  paraphrase what I think I'm hearing you say, is
20  that the increase in deaths resulted or at
21  least occurred because of patients switching
22  from prescription opioids to illicit opioids?
23       MS. KEARSE:  Objection.
24    A.   I wouldn't say "illicit."  I will
25  say from a source they have never had it

53 (Pages 206 - 209)

Page 210

1 before.  So they might have thought it looked
2 just like a little blue pill, or it was
3 somebody's blue pill, but it was also laced
4 with fentanyl or carfentanil.
5     Q.   Well, fentanyl is an illicit
6 substance?
7     A.   Yes.  Correct.  I'm sorry.  I
8 understand what you are saying now, yes.
9     Q.   And roughly, when did Summit
10 County, at least your agency, begin seeing that
11 transition?
12     A.   Probably it was 15 to 16, but
13 particularly in July of 16 is when, I think, we
14 had enough evidence, and it finally hit home,
15 that we had a weekend of many, many overdoses,
16 and it started to really bring it home that,
17 yes, these individuals were addicted and were
18 going to engage in drug-seeking behavior in
19 order to support their habit.
20     Q.   But to be fair, your agency doesn't
21 have patient-level data that will tell you
22 whether any of those patients ever had a
23 legitimate prescription for prescription
24 opioids?
25         MS. KEARSE:  Objection.

Page 211

1     A.   That is correct.
2     Q.   And the July 2016 spike in overdose
3 deaths was related to carfentanil?
4     A.   And fentanyl.
5     Q.   So fentanyl derivatives --
6     A.   Correct.
7     Q.   -- analogs.  And your agency
8 doesn't have any data at all to suggest that
9 any of those deaths -- any of those patients
10 ever had a prescription for opioid medications?
11     A.   When the assessment is completed,
12 we do ask the question.
13     Q.   Okay.  And --
14     A.   So that would be with our subgroup
15 individuals.
16     Q.   The subgroup being --
17     A.   The folks we are providing
18 treatment services for.
19     Q.   Are you suggesting that the
20 counselors knew these patients who had
21 overdosed?
22     A.   No, no, no, no.  There are two
23 separate groups.  I'm saying that the
24 individuals that we see were seeking treatment.
25 They were saying to us, that, yes, we started

Page 212

1 out with an opiate, I was hurt at work,
2 whatever, got an opiate, took way too much, got
3 addicted.
4         The group over here, we derived
5 from that information and other data sources
6 that, yes, in fact, it was the same thing
7 occurring here, people were going to the
8 streets to get drugs and ended up dying.
9     Q.   Okay.  So let me deal with the
10 information that your agency would be receiving
11 from clients and patients, who are telling you
12 that they got injured, had a legitimate
13 prescription, and transitioned to illegal
14 opioids, either pills or heroin.  Is that the
15 type of information that would be maintained in
16 the counselor's assessments?
17     A.   Yes.
18     Q.   Now, going back to the July 2016
19 deaths, I'm not sure that I quite understand
20 how you are able to conclude that some, none,
21 or all of those involved patients who had
22 previously used prescription opioids?
23     A.   We talked to many of those folks,
24 and knowing the amount of pills that were
25 prescribed and actually even -- we do something

Page 213

1 called quick response teams, where we actually
2 visit the homes of folks that overdose, and we
3 are part of quick response teams in Summit
4 County, so we collect the data.
5         The reason we feel confident in
6 believing that is there was such a supply.
7 There is no other plausible reason that a bunch
8 of people who could legitimately get a
9 prescription, sometimes even paid for by their
10 health insurance, would go to the streets,
11 unless they couldn't get those pills anymore.
12     Q.   Okay.  So it's an educated guess?
13         MS. KEARSE:  Objection.
14     A.   It's more than an educated guess.
15     Q.   So we were talking about six deaths
16 in July of 2016 --
17     A.   Yes.
18     Q.   -- is what you had told me?
19     A.   No.  Was it 26 deaths in July?
20     Q.   I thought you said -- I wrote down
21 26 deaths but --
22     A.   No.  I don't remember how many
23 deaths there were.
24     Q.   All right.  So it might have been
25 me writing down in my notes wrong, but whatever

54 (Pages 210 - 213)

1 that spike was in July of 2016, your testimony
2 is there was follow-up done by your agency to
3 assess the addiction pattern in some or all of
4 those cases?
5      A.   No, no.  We don't look at -- we
6 would never look at 26 people.  We look at a
7 much bigger picture in the community.
8          So those 26 folks, I don't know who
9 they are.  We're saying this comes from many
10 sources, and the assumption would be that, yes,
11 in fact, some or maybe all of those folks
12 started with a prescription med.  If you apply
13 the 80 percent that everybody tells us, then,
14 yeah, it was a good number of them.
15      Q.   Okay.  And how many of those 80
16 percent, based on the interviews and data you
17 have seen from any source, ever actually had a
18 legitimate prescription for opioids?
19      A.   I don't know that.
20      Q.   If you look at Exhibit 6, in the
21 top chart, it shows an uptick in -- well, I'll
22 ask if you agree with me.
23          Do you agree with me that top chart
24 shows an increase in drug poisoning deaths
25 beginning in 2011 or 2012?

1      A.   Yes.  I don't know if it is
2 statistical or not significantly, but it is
3 definitely an uptick.
4      Q.   And we don't know, as we sit here,
5 whether those are opioid-related deaths?
6          MS. KEARSE:  Objection.
7      A.   No, we do not.
8      Q.   Do you believe, based on your
9 experience at Summit County Public Health since
10 2015, that the main driver of that was opioid
11 deaths?
12      A.   Yes.
13      Q.   Would you agree with me that --
14      A.   Or I would agree with you that it
15 was opioid overdoses.
16      Q.   Okay.  And would you agree with me
17 that the primary driver for those increases was
18 use of heroin and fentanyl analogs?
19          MS. KEARSE:  Objection.
20      A.   No.
21      Q.   What is that based on?
22      A.   I don't know that.
23      Q.   You don't know, okay.  So you don't
24 have -- you can't say one way or the other?
25      A.   Based on this, I have no idea

1 what's in those numbers.
2      Q.   All right.  Are you aware of any
3 data or analysis from your time as Summit
4 County's -- the health commissioner for Summit
5 County Public Health, as to the cause of any
6 increase in opioid overdoses since 2011 or 2012
7 is?
8          MS. KEARSE:  Objection.
9      A.   I'm sorry.  Could you repeat that,
10 please?
11      Q.   Yeah.  I'll try.  It was a bad
12 question.
13          We saw in Exhibit 5 that there has
14 been an increase --
15      A.   Right.
16      Q.   -- in opioid-related deaths.
17      A.   Right.
18      Q.   Do you have an opinion, one way or
19 the other, as to whether those increases in
20 deaths are caused by opioids?
21          MS. KEARSE:  Objection.
22      A.   Yes.
23      Q.   Do you have an opinion, one way or
24 the other, whether those increases in opioid
25 deaths were caused primarily by heroin and

1 fentanyl analogs?
2      A.   I don't know that.
3          MR. NAEEM:  I'm surprised I said
4 something that egregiously stupid since we got
5 started, and I'm not excluding the fact that
6 I've said a lot of stupid things since this
7 deposition started.
8      Q.   We have talked about statistics
9 regarding opioid deaths and the data maintained
10 by Summit County Public Health.  We have also
11 talked about ADM and the data they may have or
12 have access to regarding opioid overdoses.
13      A.   Yes.
14      Q.   All right.  So other than Summit
15 County Public Health, other than ADM, are there
16 any Summit County entities that maintain that
17 type of data, overdose -- overdose data that
18 allows you to drill down to whether it was
19 opioid related or not?
20      A.   Within the whole county?
21      Q.   Yeah.
22      A.   Certainly there are medical records
23 that do, but we don't have access to them.
24 Children's Services, Summit County Children's
25 Services may have some data as related to their

Page 218

1 custody cases, that have children that are
2 placed in custody based on overdose.
3         Obviously the coroner, not for
4 profits, the 30 subcontractors that Jerry
5 funds, Jerry Craig from the ADM board, Oriana
6 House, Summit County jail, they perhaps would
7 have information that would speak to the -- the
8 sheriffs, well, police officers as well, EMS,
9 some of their run data, which again we don't
10 have access to.
11     Q.    Okay. Have you seen any -- I think
12 you mentioned that the task force, one of the
13 goals that they set for themselves was a
14 reduction in prescription opioids dispensed?
15     A.    Per person.
16     Q.    Per person. How has that changed
17 since 2014, that number?
18     A.    It's going down.
19     Q.    So the conclusion being that the
20 amount of opioids prescribed in Summit County
21 has gone down since 2014?
22     A.    I'm not sure 14, but 15, 16 maybe,
23 16. Whenever the laws, rules changed.
24     Q.    And I appreciate what you are
25 saying. If we compare 2014 to today,

Page 219

1 regardless of when it started, the number now
2 is lower than it was in 2014?
3     A.    Yes. To my knowledge, yes.
4     Q.    Are you familiar with, and I may
5 not pronounce these correctly, but the Deterra
6 Project?
7     A.    Yes.
8     Q.    Okay. What is that?
9     A.    Deterra is -- there is a local not
10 for profit, Darryl Brake and his group, there
11 is like three people, two or three people.
12 They are a drug prevention organization, and
13 they were able to secure these charcoal-filled
14 bags, and you can dump an opioid in them and
15 seal it up and it disintegrates it. So another
16 way to get drugs out of the community.
17         So he partnered with, like, Acme
18 pharmacies and a few other pharmacies, that
19 handed out -- when they prescribe an opiate,
20 they then also give them Deterra bags. And
21 then we hand out Deterra bags as well, not that
22 we give out opiates but...
23     Q.    Did you suggest that it's a
24 separate entity that handles that program?
25     A.    Yes. He's a 501(c)(3), yes.

Page 220

1     Q.    What was -- the Deterra Project is
2 actually the name of the entity?
3     A.    No, no. Deterra Project is the
4 name of the project. It's with Community
5 Partnership. That's Darryl Brake's group.
6 Darryl Brake, like brake, B-R-A-K-E.
7     Q.    So community project is the name of
8 the --
9     A.    No. That's the name of his
10 501(c)(3).
11     Q.    And that's what I meant. I'm
12 sorry.
13     A.    Yes. And then he runs the Deterra
14 Project. He was able to secure like 40,000 of
15 those bags for Summit County.
16     Q.    Does Summit County Public Health,
17 other than pass out some of these bags, does it
18 provide any funding to that project?
19     A.    Not to my knowledge.
20     Q.    Do you know whether Mr. Brake
21 received any funding or support from any
22 pharmaceutical companies?
23     A.    I believe he did.
24     Q.    And what is your understanding as
25 to that?

Page 221

1     A.    I don't know. I know they came
2 from somewhere. It was not -- he didn't
3 purchase them. I don't remember the name of
4 the company that bought those for him.
5     Q.    Does Mallinckrodt sound familiar?
6     A.    Yeah, that could be it. That may
7 have been it, yes.
8     Q.    And what year did he start that
9 project?
10     A.    15, 16 maybe.
11     Q.    Has -- strike that.
12         Have you read the complaint in this
13 case?
14     A.    No.
15     Q.    Do you have any personal knowledge
16 regarding any of the acts or omissions alleged
17 with respect to the pharmaceutical
18 manufacturers?
19     A.    No. We hired attorneys to do that,
20 quite honestly.
21     Q.    Do you have any personal knowledge
22 about any of the allegations against the
23 distributors or pharmacies in these cases?
24     A.    No, I do not.
25     Q.    If I were to go through the list of

56 (Pages 218 - 221)

Page 222

1  defendants and ask you what products they
2  manufacture, would you know?
3      A.   Maybe, maybe not.  Not every single
4  one of them.
5      Q.   Would you know when those companies
6  first began manufacturing those -- each
7  specific product?
8      A.   No.  I know some of them came on
9  the market in 96, I believe in the 90s, but
10  that's all I would know.  Just very general
11  information.
12      Q.   And again, you have not reviewed
13  any of the warnings or prescribing information
14  or patient information for any of those -- any
15  of the opioid products manufactured by the
16  defendants in these cases?
17      A.   No, I have not.
18      Q.   Have you had any involvement with
19  any of the State of Ohio initiatives to address
20  the opioid crisis?
21      A.   With the attorney general's office?
22      Q.   Any, any of them.
23      A.   Okay.  Oh, yes.  I have, yes.
24      Q.   You mentioned the attorney general?
25      A.   Yes.

Page 223

1      Q.   Have you had any -- and we will get
2  to that in a second, but have you had any
3  involvement with any Ohio Department of Health
4  initiatives to reduce -- or to address the
5  opioid crisis in the State of Ohio?
6      A.   Yes.  We receive grant money.
7      Q.   Other than grant money, have you
8  participated in any of the State of Ohio task
9  forces that are addressing the opioid issue?
10      A.   The only one that is not really
11  purely the Ohio Department of Health, but the
12  Association of Health Commissioners drafted a
13  white paper as to what public health could do
14  to help with the opioid situation.
15      And then I also -- I sat on for
16  like two initial meetings with the health
17  commissioners and individuals that had opioid
18  task forces, and then I assigned it to
19  somebody, but it was really just coming
20  together and sharing ideas.
21      Those were the only two, but they
22  weren't really Ohio Department of Health,
23  although Ohio Department of Health personnel
24  were there.
25      Q.   When were those?

Page 224

1      A.   They were over the last couple of
2  years, maybe a year.
3      Q.   So during your time as health
4  commissioner?
5      A.   Yes.
6      MS. KEARSE:  Are you at a good
7  stopping point?  It's about 2:30.
8      MR. NAEEM:  Yeah.  We can -- just
9  trying to consolidate --
10      MS. KEARSE:  Another two minutes,
11  break at 2:30?
12      MR. NAEEM:  Might as well do it
13  now.  I'm just trying to consolidate what I
14  have left so I can pass it over to these guys.
15      THE VIDEOGRAPHER:  Off the record
16  at 2:31.
17      (Recess taken.)
18      THE VIDEOGRAPHER:  On the record.
19  2:50.
20      Q.   Ms. Skoda, I don't think I have
21  much more before I go ahead and let other
22  counsel here ask their questions, but I wanted
23  to clear up one thing.
24      When, and I'm not sure really
25  whether I asked the question directly, so I'll

Page 225

1  get to it, but when we were talking about
2  heroin and fentanyl and its impact in Summit
3  County, can you put a date on when those
4  substances made their appearance to Summit
5  County, again, contributing to this crisis?
6      MS. KEARSE:  Objection.
7      A.   I was first aware of it in -- end
8  of July -- or end of June, beginning of July of
9  16, 2016.
10      Q.   And prior to becoming health
11  commissioner, is that something that you would
12  have been aware of, if it had, in fact,
13  occurred or started occurring earlier than
14  summer of 16?
15      A.   I don't know.  Maybe, but I don't
16  remember ever hearing about it before then.
17      - - - - -
18      (Thereupon, Deposition Exhibit 7,
19      October 26, 2015 Email, Beginning
20      with Bates Label Summit 178390, was
21      marked for purposes of
22      identification.)
23      - - - - -
24      Q.   Ms. Skoda, handing you what has
25  been marked as Deposition Exhibit 7, can you

57 (Pages 222 - 225)

Page 226

1  please take a look at that.
2      Have you had an opportunity to
3  review that?
4      A.  Oh, yeah.  I know what it is.
5      Q.  This is an email you received in
6  October of 2015; would you agree with me?
7      A.  Yes.
8      Q.  And what's the subject of the
9  email?
10     A.  It is Increase in the Fentanyl Drug
11 Confiscations and Fentanyl-Related Overdose
12 Drug Fatalities.
13     Q.  And who is this email from?
14     A.  These alerts started about 2003.
15 They come from the State of Ohio or CDC wanting
16 to get information out.  They are sent to
17 probably, oh, 25, 30 people in our
18 organization, maybe even more than that, 35, at
19 different levels of reporting.
20     So I may have well received this,
21 yet it didn't apply to me, so I wouldn't have
22 done anything with it.
23     Q.  Okay.  But you did forward it --
24     A.  Yes.
25     Q.  -- from one of your email addresses

Page 227

1  to another one of your email addresses?
2      A.  I may have done that.  Who did it
3  go to?  Oh, my home address, just to make sure
4  I had it, yes.
5      Q.  And the subject of this email is
6  increases in fentanyl -- part of it is
7  fentanyl-related overdose facilities; do you
8  see that?
9      A.  Correct.
10     Q.  So by your testimony about July
11 2016, you weren't saying that fentanyl hadn't
12 caused overdoses in Ohio or Summit County prior
13 to that, you were just saying that's when you
14 became aware of that?
15     MS. KEARSE:  Objection.
16     A.  Yes.
17     MR. NAEEM:  All right.  I don't
18 have anything else.  So it was two minutes,
19 Anne.
20     MS. KEARSE:  Murphy's law, right.
21     MR. NAEEM:  So I'm going to go
22 ahead and turn it over to Mr. Salimbene.
23     THE VIDEOGRAPHER:  Off the record,
24 2:54.
25     (Pause.)

Page 228

1      THE VIDEOGRAPHER:  On the record,
2  2:55.
3      EXAMINATION OF DONNA SKODA
4  BY MR. LAVELLE:
5      Q.  My name is John Lavelle.  I'm an
6  attorney with Morgan Lewis, and I'm
7  representing Rite Aid of Maryland.  So I'm
8  going to ask you some more questions.
9      Is it okay if I call you
10 Commissioner?
11     A.  You can call me Donna.
12     Q.  Okay.  Whatever you are most
13 comfortable with.
14     I wanted to start with the issue of
15 my client being sued in this case.  Are you
16 aware that Rite Aid is a defendant in this
17 case?
18     A.  Yes.
19     Q.  Do you know when they were added as
20 a defendant?
21     A.  No.
22     Q.  Do you know why they were added as
23 a defendant?
24     A.  No.
25     Q.  Do you know whether they were sued

Page 229

1  at the same time as the other defendants?
2      A.  I don't know that.
3      Q.  I want to show you an exhibit.
4      MR. LAVELLE:  Let's mark this,
5  please.
6      - - - - -
7      (Thereupon, Deposition Exhibit 8,
8      LinkedIn Profile of Donna Skoda, was
9      marked for purposes of
10     identification.)
11     - - - - -
12     Q.  Donna, we've marked as Exhibit 8 a
13 LinkedIn profile that, I believe, I found for
14 you.
15     A.  Okay.
16     Q.  Do you recognize that?
17     A.  Actually, no.  I mean, I recognize
18 it, but we only put that up because we needed
19 to have it for a grant we applied for.  I don't
20 do much with it.
21     Q.  Okay.  Well, first of all, do you
22 have a LinkedIn profile?
23     A.  Yes.
24     Q.  Does what we have marked as Exhibit
25 8 look to you like your LinkedIn profile?

58 (Pages 226 - 229)

Page 230

1    A.    Maybe.  I mean, that probably
2  sounds totally crazy, but I don't really ever
3  go here.
4    Q.    Did you have any involvement in
5  putting up the LinkedIn profile --
6    A.    When we needed it for a grant, we
7  did, about, oh, a while ago.
8    Q.    Well, I'll just give you -- I think
9  you got the direction earlier from counsel,
10  it's important that you wait until I finish --
11    A.    Okay.  I'm sorry.  Yeah.
12    Q.    -- the question -- that you wait
13  until I finish asking a question before you
14  answer it, otherwise --
15    A.    Okay.
16    Q.    -- we are talking over one another.
17    A.    Okay.
18      MS. KEARSE:  Counsel didn't give
19  that advice, but go ahead.
20    Q.    Okay.  All right.  Well, I'm going
21  to ask that you try and -- and I'll try and
22  work on finishing my questions before you give
23  an answer.
24      Okay.  So specifically with respect
25  to this document, the reason I put it in front

Page 231

1  of you, I just wanted to have collected in one
2  place what I thought was your professional
3  background here.  Can you tell me whether this
4  is an accurate description of your professional
5  background?
6    A.    It's very -- it's not updated, and
7  it's very -- it's hieroglyphic, at best.
8    Q.    Okay.  Why don't you tell me, under
9  experience, what is incorrect, if anything
10  that's listed there?
11    A.    If you start -- do you want to go
12  up from the bottom?  But if you start at
13  education, where I think is where I started the
14  last time, I originally went to Kent State
15  University and received that degree in social
16  work/corrections, and then I went to the
17  University of Akron to complete the
18  undergraduate coursework that was needed, and
19  then I went to Case Western Reserve University.
20    Q.    So Kent State is not listed here --
21    A.    Correct.
22    Q.    -- in your LinkedIn profile?
23      But other than that, the
24  description of your education is correct?
25    A.    Yes.

Page 232

1    Q.    And you received a Master's from
2  Case Western in nutrition and public health in
3  1990; is that correct?
4    A.    Correct.
5    Q.    Okay.  Now let's turn to the
6  description of your experience.
7    A.    When -- there is some things
8  missing.  I worked at MetroHealth Medical as a
9  dietician in there as well, doing some home
10  visiting for children with special healthcare
11  needs.
12    Q.    What time period was that?
13    A.    It would have been 80 -- I'm sorry,
14  I had to be a dietician.  91 to maybe 93 or 4.
15    Q.    Did that overlap at all with any of
16  the other jobs that are --
17    A.    Cuyahoga County Board of Health,
18  because for a while I was part time at both.  I
19  was part time at MetroHealth Medical and part
20  time at the board of health.
21    Q.    How long a period did you overlap
22  at both of those?
23    A.    A couple years maybe, year and a
24  half, two years.
25    Q.    So this profile lists you as

Page 233

1  starting at Cuyahoga County Board of Health as
2  a supervisor in June of 1993; is that correct?
3    A.    Yes.  It might -- it was
4  supervisor, yes.
5    Q.    And it shows that you were there
6  until July of 2001; is that correct?
7    A.    Correct.
8    Q.    And how about the next entry going
9  up the chart?
10    A.    That's what I was debating earlier.
11  I'm not sure it was called policy or planning,
12  or what the actual title was, director.  And
13  then I became a deputy health commissioner, and
14  then I became the health commissioner.
15    Q.    So your LinkedIn profile says that
16  you were with Summit County Public Health in
17  the position of director of policy and planning
18  from June of 2001 to August 2011.  Did I read
19  that correctly?
20    A.    Yes.
21    Q.    And is that accurate?
22    A.    There was a couple of positions in
23  there, so I really don't remember.
24    Q.    So this period of June 2001 to
25  August 2011, you had some other positions

Page 234

1  as well --
2      A.  Yes.
3      Q.  -- that are not reflected on this?
4      A.  Yes.  Other duties, other
5  positions.
6      Q.  The position of deputy health
7  commission for planning, did you assume that in
8  August of 2011?
9      A.  Yes.
10     Q.  And you held that position through
11  June of 2015; is that correct?
12     A.  Yes.  I actually thought it was
13  August of 2012, but it might have been 2011.
14     Q.  What's your best recollection
15  today?
16     A.  11, we'll say 11.
17     Q.  Okay.  And this LinkedIn profile
18  says that you became the health commissioner in
19  July of 2015.  Is that accurate?
20     A.  Yes.
21     Q.  And you continue to hold that
22  position today?
23     A.  Yes.
24     Q.  In your role as health
25  commissioner, do you have any supervisory

Page 235

1  responsibility for pharmacies?
2      A.  No.
3      Q.  Have you ever, in any of your job
4  positions that we looked at here, had any
5  responsibility for supervising pharmacies?
6      A.  No.
7      Q.  You are not a physician; is that
8  correct?
9      A.  Correct.
10     Q.  You are not a nurse?
11     A.  Correct.
12     Q.  You have never gone to medical
13  school?
14     A.  No.
15     Q.  You're not licensed by the State of
16  Ohio to write prescriptions, are you?
17     A.  Correct.
18     Q.  And you would, therefore, not be
19  licensed to write a prescription for an opioid;
20  is that correct?
21     A.  Correct.
22     Q.  Do you have any interactions
23  currently, as commissioner, with retail
24  pharmacies?
25     A.  The only one I can say we have ever

Page 236

1  really interacted with was the Acme pharmacies,
2  and that's been quite a while.  His name was
3  Joe Lahovich.
4      Q.  I'm sorry.  Was that an acronym
5  that you gave earlier, Acme?
6      A.  Acme.  It's a local grocery chain.
7      Q.  Acme, the grocery store.
8      A.  Yeah.
9      Q.  A-C-M-E?
10     A.  Yes.  It's a local grocery store.
11         They were working with us on some
12  disaster-preparedness events and some
13  activities, and Joe was agreeing to be our
14  Strategic National Stockpile, allowing us to
15  store -- they have large warehouses.  They were
16  going to allow us to store some of the
17  pharmaceuticals we needed for preparedness at
18  their warehouse.
19         So that was really my -- other than
20  personal interaction with a pharmacist for my
21  own prescriptions, that would be it.
22     Q.  Any of that interaction you had
23  with the Acme pharmacist, did that have
24  anything to do with opioids?
25     A.  No.

Page 237

1      Q.  Have you ever had any professional
2  contact with Rite Aid?
3      A.  No.
4      Q.  How about with Walgreens?
5      A.  Professional contact?
6      Q.  Yes --
7      A.  No.
8      Q.  -- in any of the positions that we
9  have looked at as health commissioner or in any
10  other position you have held for Summit or
11  Cuyahoga Counties?
12     A.  No.
13     Q.  How about with respect to CVS, you
14  have had any professional contact with any of
15  them --
16     A.  No.
17     Q.  -- with CVS?
18         How about with Walmart?
19     A.  No.
20     Q.  Any other retail pharmacy that we
21  haven't already mentioned that you have had
22  professional contact with?
23     A.  No.
24     Q.  In your role as commissioner, do
25  you have any responsibility for supervising

60 (Pages 234 - 237)

Page 238

1 distributors of prescription drugs?
2   A.   No.
3   Q.   Do you have any interactions with
4 drug distributors?
5   A.   No.
6   Q.   Do you know who supplies
7 pharmaceutical products to Rite Aid?
8   A.   No.
9   Q.   Do you know who supplies them to
10 Walgreens?
11   A.   No.
12   Q.   Do you know who supplies them to
13 CVS?
14   A.   No.
15   Q.   To Walmart?
16   A.   No.
17   Q.   Would you agree that there are some
18 patients for whom opioids are an appropriate
19 treatment?
20       MS. KEARSE:  Objection.
21   A.   Yes.
22   Q.   How would you define that group?
23   A.   The original intent for end of
24 life, hospice care, surgery, under a very
25 controlled situation.

Page 239

1   Q.   And who gave you the information on
2 which you base that understanding?
3   A.   I think the literature that I have
4 read, and understanding that -- knowing that
5 when you don't have constraints around those
6 drugs, that they can be misused and used and
7 put into the community where there is just
8 too many of them.
9       So I have, over the last three
10 years, developed an opinion and a belief and
11 knowledge that it needs to be in a very
12 controlled substance when those -- or situation
13 when those drugs are used.
14   Q.   We already covered that you
15 yourself can't write prescription --
16   A.   Correct.
17   Q.   -- for opioids, right?
18       Do you know whether your belief is
19 consistent with what federal law provides?
20   A.   I do not know.
21   Q.   Do you know whether your belief is
22 consistent with what Ohio law provides?
23   A.   I do not know.
24   Q.   Would you agree with me that
25 doctors are ultimately responsibile for

Page 240

1 determining whether patients receive
2 prescription drugs?
3       MS. KEARSE:  Objection.
4   A.   I'm sorry.  Could you ask that
5 again?
6   Q.   Sure.  Would you agree with me that
7 doctors are responsible for determining whether
8 patients get prescription drugs?
9   A.   Physicians and anybody who has
10 prescriptive powers can determine whether or
11 not somebody gets a drug.
12   Q.   And I believe you discussed that
13 earlier today, but that would be physicians,
14 nurses who have the ability to write
15 prescriptions?  Is there anybody --
16   A.   Physician assistants.
17   Q.   Physician assistants.
18   A.   Psychiatrists, anyone who has the
19 ability to -- who is licensed in Ohio to write
20 prescriptions.
21   Q.   Right.  Are you familiar with the
22 Controlled Substances Act?
23   A.   Yes.
24   Q.   How did you become familiar with
25 the Controlled Substances Act?

Page 241

1   A.   When I was a parole officer,
2 individuals used to be arrested when they
3 would -- if they were forging prescriptions or
4 trying to get drugs illegally, they would
5 be -- I mean, DEA or whomever was doing the
6 investigation would cite those rules and
7 regulations.
8   Q.   Do you know how prescription
9 opioids are regulated under the Controlled
10 Substances Act?
11   A.   Not specifically.  I just know they
12 are controlled.
13   Q.   Are you aware that there are
14 different levels of -- different schedules --
15   A.   Yes.
16   Q.   -- within the Controlled Substances
17 Act?
18   A.   Yes.
19   Q.   Okay.  Again, I'll ask you to wait
20 until I finish a question before you answer it.
21       So let me just ask the question
22 again.  Are you aware that there are different
23 schedules within the Controlled Substances Act?
24   A.   Yes.
25   Q.   And that there are different levels

61 (Pages 238 - 241)

Page 242

1  of control on particular categories of drugs
2  based on what schedule they fall within?
3      A.  Yes.
4      Q.  Do you know what schedule
5  prescription opioids fall into?
6      A.  No, I do not.
7      Q.  Are you familiar with the duties of
8  distributors under the Controlled Substances
9  Act?
10     A.  No, I am not.
11     Q.  Are you familiar with the Ohio
12  Board of Pharmacy?
13     A.  Yes.
14     Q.  How are you familiar with the Ohio
15  Board of Pharmacy?
16     A.  We have a terminal dispensing
17  license through the Ohio Pharmacy Board that we
18  have to renew in order for our medical director
19  to be able to provide free STD drugs to our
20  patients.
21     Q.  So your department actually
22  dispenses drugs; is that correct?
23     A.  STD drugs would be it.
24     Q.  And that's through a grant of
25  authority from the Ohio Board of Pharmacy; is

Page 243

1  that correct?
2      A.  Correct.
3      Q.  Do you yourself interact with the
4  Ohio Board of Pharmacy in a professional
5  capacity?
6      A.  No, only in that they have attended
7  a few meetings I have been at, but that would
8  be it.
9      Q.  I think you have testified earlier
10  about something called OARRS?
11     A.  Yes.
12     Q.  I think that's an acronym for the
13  Ohio Automated Rx Reporting System; is that
14  correct?
15     A.  Yes.
16     Q.  How are you familiar with OARRS?
17     A.  OARRS data has been presented at
18  the Opiate Task Force and a few other
19  presentations I have been at that talks about
20  the number of pills that have been prescribed
21  per person in Ohio.
22     Q.  What is your understanding of what
23  OARRS is?
24     A.  Oh, OARRS is a program for which --
25  what happens is you -- when somebody gets an

Page 244

1  opiate prescription filled, you put their name
2  and everything in there, and then that allows
3  physicians to monitor and see if they are
4  doctor shopping, or allows pharmacists to look
5  in there to see if, in fact, people are going
6  to one or more places before they fill a
7  prescription, or actually it is used to keep
8  track of where these opiates are going and
9  where they are being prescribed.
10     Q.  Does OARRS provide data to people
11  in the community?
12     A.  Not directly, no.  Only if you're
13  an OARRS user, you have to have a reason to
14  have OARRS licensure -- you have to be -- your
15  patients are in OARRS, and you have been able
16  to get access to your patients in there, and
17  that's it.
18     Q.  Are you aware that OARRS has a
19  public website?
20     A.  Yes.
21     Q.  Are you aware that OARRS issues
22  reports to the general public?
23     A.  Yes.  Aggregate, yes, yes.
24     Q.  Have you ever seen any of those
25  reports?

Page 245

1      A.  Maybe just once.  Rich Marountas,
2  in our office, would pull those off and look at
3  them, if he was interested in looking at them.
4      Q.  Why would Rich look at those
5  records?
6      A.  He's our epidemiologist, and he may
7  just want to track and look and see what is
8  happening.
9      Q.  Now, you described earlier today
10  that there was something that happened in July
11  of -- or late June or July of 2016 that made
12  you realize that there was an issue.
13     MS. KEARSE:  Objection.
14     Q.  Do you remember that testimony
15  earlier today?
16     A.  Yes.
17     Q.  What specifically happened, was
18  there a specific incident that occurred then?
19     A.  It was the weekend that there were
20  many, many overdoses in Summit County, that
21  sent individuals to the ER, and I think as a
22  result of that, when we realized that it was
23  illegal -- most of it was -- the overdoses were
24  caused by fentanyl and carfentanil.
25         But when we realized it was

62 (Pages 242 - 245)

Page 246

1  individuals that were using this as a
2  substitute for either a prescription medication
3  or somehow were hooked on opioids were using
4  this, were going to the streets when the supply
5  was drying up, and I think what happened then,
6  drug manufacturers -- not drug -- I meant not
7  you, not drug manufactures, but illegal drug
8  manufactures brought carfentanil and fentanyl,
9  whether it came from China or Mexico or
10  wherever, brought the drugs into Summit County,
11  because the supply of medication -- or
12  prescription opioids was drying up.
13     Q.   So how many incidents were there
14  that occurred that weekend?
15     A.   I can't remember exactly, but it
16  was a good number.  I mean, I want to say we
17  had an unbelievable number of deaths -- or
18  overdoses that weekend.
19     Q.   I understand you may not be able to
20  give a precise number, but if you can give an
21  approximation, that would be useful.
22         MS. KEARSE:  Objection.
23     A.   I want to say like 20 or 35,
24  somewhere in there, like.
25     Q.   And that to 20 to 35 deaths

Page 247

1  involved --
2     A.   No.  I believe it was just the
3  overdoses peaked, and then we had deaths.
4     Q.   Do you know how many deaths there
5  were among that group?
6     A.   No, I don't.
7     Q.   And how many of those 20 to 35
8  involved fentanyl or carfentanil?
9     A.   Again, I'm sorry, I just don't
10  know.
11     Q.   How many of them were people who
12  had previously been prescribed opioids?
13     A.   I don't know that either.
14     Q.   Do you know whether any of them had
15  been?
16     A.   No.
17     Q.   So really what struck you in July
18  of 2016 was that there was a problem with
19  fentanyl or carfentanil; is that right?
20     A.   There were a number of individuals
21  who had drug-seeking behaviors that caused them
22  to use, thinking -- my personal recollection is
23  that I remember talking to one gentleman who
24  had overdosed and said he thought he was buying
25  an oxy in the street, like he always did, to

Page 248

1  support a habit, but he didn't, he got a
2  carfentanil, because it looked the same, and he
3  thought that's what it was.
4         So to some extent we believe that
5  there was a lot of that behavior when the
6  supply dried up, and there was not as many
7  being dispensed.  As the opiate per capita was
8  going down, the street use was going up.
9     Q.   So in that particular incident that
10  you referred to, that anecdote, that was an
11  individual who thought he was buying one drug
12  illegally and was actually buying another drug
13  illegally; is that correct?
14     A.   Yes.
15     Q.   Do you know whether that individual
16  had ever been prescribed opioids?
17     A.   I do not.
18     Q.   I believe you said that, "The
19  supply was drying up."  Can you explain what
20  you mean by that?
21     A.   What was happening was there was
22  recommendations coming down that no longer
23  should we be prescribing -- or anybody in the
24  medical community be prescribing as many
25  opioids for conditions for which it wasn't

Page 249

1  originally intended.
2         So if it wasn't end of life, it
3  wasn't cancer treatment, there were other ways
4  to address chronic pain, and we should stop
5  giving -- I say "we," collectively the medical
6  community should stop out -- stop giving
7  opioids for headaches or backaches.
8         And so I think when that started to
9  happen and some of the pill mills were shut
10  down and some of the prescribers, I think, were
11  starting to realize that maybe we shouldn't do
12  this, then people started to get other sources,
13  because when you're addicted, you're addicted.
14  You will get the drug, even if it is a
15  really bad decision for your life.
16     Q.   Okay.  So I understand you have a
17  hypothesis here, but do you have any facts, as
18  we sit here, to suggest that any of those 20 to
19  35 people had actually ever been prescribed
20  opioids?
21         MS. KEARSE:  Objection.
22     A.   I would say yes.
23     Q.   Okay.  And what are those facts?
24     A.   That the data sources that we
25  reviewed, and when we talked to the patients

63 (Pages 246 - 249)

Page 250

1 about treatment, about 80 percent of all
2 individuals that now use street drugs or who
3 have turned to the other ways to get their
4 medications, began with an opiate or an opioid
5 prescription from a physician.
6     Q.   Those are statistics that are
7 general?
8     A.   I'm sorry?
9     Q.   Those are general statistics,
10 correct?
11     A.   Yes.
12     Q.   But those are not statistics with
13 respect to this 20 to 35 incidents?
14     A.   Correct.
15     Q.   You do not know as we are sitting
16 here today, on August 14, 2018, what caused any
17 of those people to become addicted to opioids,
18 do you?
19     A.   Correct.
20     Q.   When do you understand that the
21 supply dried up, as you put it?
22     A.   I think we knew that the dispensing
23 per person was going down, and I do believe
24 with police activity and, you know -- because
25 it takes a multifaceted approach to try to get

Page 251

1 street drugs off the street, to get the supply
2 down.  There was a lot of push to start, you
3 know, getting rid of opioids out of your
4 cupboards, you know, don't let it be in -- you
5 know, get rid of it, get rid of all that stuff,
6 start to ask questions.
7     So I would say that probably before
8 that big weekend of a lot of drug use, we
9 started to realize that, yes, the supply was
10 drying up.
11     Q.   And as best you understand it, to
12 what do you attribute that drying up of the
13 supply?
14     A.   I think the rules changed for
15 dispensing.  There was enough education out
16 there to tell people that we needed to -- or
17 physicians, or whomever, that maybe they should
18 rethink prescribing as many opioids as they
19 were.
20     Q.   What rule specifically are you
21 referring to there?
22     A.   I believe the state law change that
23 had said that you couldn't dispense as many.
24     Q.   And when did that law change?
25     A.   I'm not exactly sure.  Because

Page 252

1 there has been another revision to that law,
2 like no more than seven days now, and all that
3 stuff.
4     Q.   When did that occur?
5     A.   Just recently, maybe four or five
6 months ago.
7     Q.   Anything else, other than this law
8 change, whenever that occurred, that you can
9 identify today as a cause for the supply drying
10 up, as you put it?
11     A.   No.
12     Q.   Do you think police work had
13 anything to do with it?
14     A.   Perhaps.  I was thinking there was
15 some, but, you know, the problem started out,
16 you know, there has always been DEA and drug
17 enforcement units that are local, and there has
18 always been individuals that have always tried
19 to curb the availability of drugs in the
20 street, from marijuana to anything, and those
21 agents have always worked.
22     I don't know if they knew what they
23 were going after.  I think in general, I mean,
24 it's so diverse and it's across so many
25 socioeconomic classes, I don't know if they

Page 253

1 knew who they were trying to target to reduce
2 the amount of drugs, other than that illegal
3 trafficker.
4     Q.   When, as you understand it, did the
5 supply dry up?
6     A.   I think beginning maybe four --
7 maybe a couple three months before that event,
8 four months, to my knowledge.
9     Q.   So early 2016?
10     A.   Yes.
11     Q.   Is supply still dried up today?
12     MS. KEARSE:  Objection.
13     A.   I don't believe so.
14     Q.   It's gotten worse since then?
15     A.   No.  I think the dispensing may be
16 down.  I don't know.
17     What makes this so difficult, from
18 a public health perspective, is that, you know,
19 we look at a lot of data sets and we look at a
20 lot of information, we talk to a lot of people,
21 we try to find out, we review the refereed
22 literature to see what we should by doing or
23 what really seems to work, and when we do that,
24 this has been probably the most difficult
25 problem to get our hands around, because there

Page 254

1  is a whole group of people that, you know, that
2  have insurance, who can legitimately maintain
3  an addiction for a long time without ever
4  coming to the surface, and that is the group,
5  to me, that is probably going to be the most
6  difficult for public health to get their hands
7  around.
8         There is another, you know -- there
9  is a group of people that, yes, sure, started
10  out smoking marijuana, ended up, but that group
11  that cuts across all SES, that cuts across
12  white, black, whoever you are, we don't know
13  who those people are to target resources to try
14  to stop this and to get other ways for pain
15  management and whatever it takes to get people
16  off of pills to maintain their pain.  And
17  that's what's made it so tough for us.
18     Q.   Commissioner, do you remember what
19  my question was?
20     A.   No.  I'm sorry.
21         MR. LAVELLE:  Can we read back the
22  question, please, and strike that answer as
23  nonresponsive.
24         MS. KEARSE:  Objection.  Just read
25  the question back.  She answered your question.

Page 255

1         THE NOTARY:  Question: "It's
2  gotten worse since then?"
3         MR. LAVELLE:  And the question
4  before that?
5         MS. KEARSE:  Your question was --
6         THE NOTARY:  Question:  Is supply
7  still dried up today?"
8         "Objection."
9         Answer: "I don't believe so.
10         "Question:  "It's gotten worse
11  since then?"
12     Q.   So can you answer that question,
13  it's got even worse since then?
14     A.   Yes.
15     Q.   How has it gotten worse since 2016?
16         MS. KEARSE:  I'll make an
17  objection.  She did answer your question.
18     A.   I tried to answer that by saying
19  that I don't -- I think it's gotten worse
20  because we really can't get our hands around
21  knowing exactly where the problem is and where
22  it lies in regards to the number of
23  prescriptions that are out there.
24     Q.   Commissioner, when did the OARRS
25  database open?

Page 256

1     A.   I believe it was 2015.  It was
2  mandated in 2015.
3         MR. LAVELLE:  Let's mark this as
4  the next exhibit, please.
5         - - - - -
6         (Thereupon, Deposition Exhibit 9,
7         Publication of the Ohio State Board
8         of Pharmacy About the Ohio Automated
9         Rx Reporting System, was marked for
10         purposes of identification.)
11         - - - - -
12     Q.   Ms. Skoda, I have put in front of
13  you a document that is the publication of the
14  Ohio State Board of Pharmacy, about the Ohio
15  Automated Rx Reporting System, or OARRS --
16     A.   Correct.
17     Q.   -- it is a House Bill 93 report
18  dated November 21, 2011, and I'll represent to
19  you that we found this on the public section of
20  the OARRS website.
21     A.   Right.
22     Q.   Have you ever seen this before?
23     A.   No.
24     Q.   Are you familiar with House Bill
25  93?

Page 257

1     A.   No.
2     Q.   Let's take a look at page 3 of
3  this.
4         MS. KEARSE:  I'll object.  She said
5  she's not familiar with this document, never
6  seen it.
7         MR. LAVELLE:  I understand.
8     Q.   Under Background, would you mind
9  reading the first two sentences?
10         MS. KEARSE:  Again, she has never
11  seen this document before.  So if you're going
12  to ask her to see what it says on there, I
13  don't think it is appropriate to ask her
14  questions about it.
15     Q.   You can go ahead and read it.
16     A.   "In 2004, House Bill 377 was passed
17  by both the Ohio House of Representatives and
18  the Ohio Senate.  It was signed by governor and
19  became law in May of 2005."
20     Q.   And then the next sentence?
21     A.   "It allowed the board of pharmacy
22  to develop and operate a dangerous drug
23  database."
24     Q.   Does looking at this help refresh
25  your recollection that the OARRS database

65 (Pages 254 - 257)

Page 258

1 actually started much earlier than 2015?
2      MS. KEARSE:  Objection.
3      A.   No.
4      Q.   You weren't aware of that until I
5 told that you today?
6      A.   Correct.  I have never seen this.
7 I didn't know this existed.  I think -- what I
8 think, I believe I said, was in 2015, it was
9 mandated.  I don't know when it was developed.
10 I think 2015 is when they told physicians, "You
11 have to report to this."  I don't know when
12 this was originally developed.
13      Q.   As best you understand, as you can
14 sit here today and tell us, do you know when
15 the OARRS database opened up?
16      A.   No.
17      Q.   Was it prior to 2015?
18      MS. KEARSE:  Objection.
19      A.   According to this document that
20 I've just received, it was.
21      Q.   All right.  Let's turn to the next
22 page, please.
23      MS. KEARSE:  Again, the document
24 speaks for itself.  I'm going to object to
25 reading the document.

Page 259

1      Q.   There is a paragraph that starts at
2 the top of that page, starting with, "In May
3 2011"?
4      A.   Right.
5      MS. KEARSE:  What page are you on?
6      MR. LAVELLE:  Page 4.
7      Q.   Would you mind reading the first
8 three sentences there?
9      A.   "In May 2011, House Bill 93 became
10 effective.  This law made sweeping changes to
11 address the epidemic of prescription drug abuse
12 and overdose deaths in Ohio.  The objective was
13 to address those individuals who were
14 masquerading as legitimate medical care
15 providers but, in reality, were drug
16 traffickers."
17      MS. KEARSE:  And I'm going to
18 object to her just reading statements without a
19 pending question, when you're having her read
20 the document.  The document speaks for itself.
21 If you got a question about
22 something, just ask her a question and she can
23 review the document.  I don't think it is
24 appropriate for her to be reading the document.
25      MR. LAVELLE:  Okay.  Your objection

Page 260

1 is on the record.
2      Q.   Commissioner, are you familiar with
3 HB, or House Bill 93?
4      A.   No.
5      Q.   You have never heard of it before?
6      A.   No.
7      Q.   Are you aware of the problem of
8 individuals masquerading as legitimate medical
9 care providers but who in reality were drug
10 traffickers?
11      MS. KEARSE:  Objection.
12      A.   No.  I'm not sure what that
13 sentence means.
14      Q.   You talked about pill mills
15 earlier?
16      A.   If they are referring to that, yes.
17      Q.   Do you know whether there were
18 changes made in the law in Ohio in May of 2011
19 in order to address prescription drug abuse?
20      A.   No, I do not.
21      MR. LAVELLE:  Let's mark this as
22 the next exhibit, please.
23      - - - - -
24      (Thereupon, Deposition Exhibit 10,
25      OARRS 2017 Annual Report, was marked

Page 261

1      for purposes of identification.)
2      - - - - -
3      Q.   Commissioner, we put in front of
4 you the 2017 annual report of OARRS as
5 published on their website.
6      A.   Yes.
7      Q.   Have you ever seen this before?
8      A.   No.
9      Q.   Have you ever looked at any annual
10 reports of the OARRS system?
11      A.   I don't believe so.
12      Q.   Can you turn to page 3, please, of
13 this document.  It has State of Ohio Board of
14 Pharmacy at the top.  It's a letter in the
15 form -- it's in the form of a letter from
16 Steven Schierholt.
17      A.   Okay.
18      Q.   Do you know who Steven Schierholt
19 is?
20      A.   No, I don't.
21      MS. KEARSE:  Again, I'll make an
22 objection.  She just testified she has never
23 seen this document.  To the extent you are
24 going to have her read parts of this document,
25 I think is inappropriate.  You can ask her

66 (Pages 258 - 261)

Page 262

1 questions about it.
2     Q.   In this letter, Mr. Schierholt says
3 to Governor Kasich and members are the Ohio
4 General Assembly, I'm going to read the first
5 bullet point here, that, "The total doses of
6 opioids dispensed to Ohio patients decreased by
7 225 million doses, or 28.4 percent, from 2012
8 to 2017."  Do you see that bullet point I just
9 read?
10    A.   Yes.
11    Q.   Were you aware of that prior to my
12 reading that to you?
13         MS. KEARSE:  Objection.
14    A.   I knew that they were going down,
15 but I didn't know the actual facts, how much
16 they were going down.  And that's all across
17 Ohio.  I'm not sure that's Summit County,
18 correct?  So I wouldn't have looked at anything
19 that wasn't --
20    Q.   I'll try and show you something in
21 a little bit that --
22    A.   Okay.
23    Q.   -- will focus specifically on
24 Summit County, but let's just focus on this
25 bullet point.

Page 263

1         Were you aware, prior to my reading
2 that bullet point to you, that the total doses
3 of opioids dispensed to Ohio patients, during
4 the period 2012 to 2017, had decreased by 28.4
5 percent?
6         MS. KEARSE:  Objection.
7    A.   No, I do not.
8    Q.   Does that surprise you?
9    A.   No.
10    Q.   Do you have an understanding, as
11 you sit here, why that occurred?
12    A.   No.  I would assume they stopped
13 dispensing as much.
14    Q.   The fourth bullet point here in
15 Mr. Schierholt's letter to the governor and the
16 members of the general assembly states, "The
17 number of individuals engaged in doctor
18 shopping behavior decreased from 2,205 in 2011
19 to 273, or 88 percent, in 2017"; do you see
20 that?
21    A.   Yes.
22         MS. KEARSE:  Again note an
23 objection.  The document speaks for itself.
24    Q.   Were you aware of that prior to my
25 reading that to you?

Page 264

1    A.   No.
2    Q.   Do you know what doctor shopping
3 is?
4    A.   Yes.
5    Q.   Can you give us your understanding
6 of what doctor shopping is?
7    A.   My understanding is that it is an
8 individual that would go to multiple providers,
9 trying to secure an opiate prescription, opioid
10 prescription.
11    Q.   Why would someone go to multiple
12 providers?
13    A.   So you can get more of them.
14    Q.   So it's a bad thing; is that right?
15    A.   Yes.
16    Q.   Was it your understanding, prior to
17 my reading that bullet point to you, that
18 doctor shopping behavior had decreased in Ohio?
19    A.   No, but it would make logical
20 sense.  Once you started monitoring it, you
21 would be able to identify those individuals.
22    Q.   Your understanding is that this
23 OARRS database has helped reduce doctor
24 shopping?
25         MS. KEARSE:  Objection.

Page 265

1    A.   Yes.
2    Q.   All right.  I want to take you to
3 the page that's captioned Section 1.  It says
4 Opioids Dispensed to Ohio Patients.
5         Have you ever seen these statistics
6 before?  These are details about the decrease
7 of 28.4 percent in total doses of opioids in
8 Ohio.
9    A.   No, I have not seen them for Ohio.
10 Summit County, yes, but not Ohio.
11    Q.   Were they decreasing for Summit
12 County during this same period of time?
13    A.   Yes.  I don't know where the
14 decrease began, but I have been told they go
15 down.
16    Q.   What is your understanding of why
17 they decreased in Summit County during that
18 time period?
19    A.   Dispensing practices.
20    Q.   Can you be more specific?
21    A.   Any provider that can dispense
22 medications, it was my understanding, they were
23 no longer prescribing as much.
24    Q.   And when did that start in Summit
25 County?

67 (Pages 262 - 265)

Page 266

1     A.   I don't know.
2     Q.   Let's turn to the next page.  You
3  referred earlier in your testimony to MED?
4     A.   Yeah.
5     Q.   Do you remember using that term?
6     A.   Yes, morphine equivalent dose.
7     Q.   There is a definition of morphine
8  equivalent dose here in this document.  Would
9  you mind reading it for us into the record?
10        MS. KEARSE:  Objection.
11    A.   The very first paragraph?
12    Q.   Yes.
13    A.   Okay.  "A morphine equivalent dose,
14  MED, is the total amount of the opioid
15  medications converted to a common unit of
16  milligrams of morphine that a patient currently
17  has access to based on the information reported
18  by prescribers and pharmacies to OARRS."
19    Q.   Can you read the next two --
20    A.   "Morphine is widely regarded as the
21  standard of treatment of moderate to severe
22  pain and is commonly used as a reference point.
23  As MED increases, the likelihood of an adverse
24  event increases, therefore identifying at-risk
25  patients is a crucial first step towards

Page 267

1  improving patients safety."
2     Q.   Do you agree or disagree with this
3  definition of MED, or morphine equivalent dose?
4     A.   It's scientific.  I have no basis
5  to question it.  It's a conversion that's used
6  to see how much you're getting of morphine.
7     Q.   But has this -- has OARRS described
8  accurately, in your view, what morphine
9  equivalent dose is?
10        MS. KEARSE:  Objection.  Asked and
11  answered.
12    A.   Yes.
13    Q.   Can you read for us what the
14  average daily MED per prescription was
15  dispensed to Ohio patients per year in the year
16  2010?
17    A.   Average in Ohio, it would have been
18  64.37.
19    Q.   I believe that's the average
20  quantity per --
21    A.   Oh, I'm sorry.  The MED would be
22  53.35.
23    Q.   And by 2017, what was that number?
24    A.   43.23.
25    Q.   Do you agree with me that's a

Page 268

1  decrease?
2     A.   Yes.
3     Q.   Would you agree with me that that
4  is another measure by which we can see that the
5  prescriptions of opioids to Ohio patients went
6  down during the time period 2010 to 2017?
7     A.   I think it's an average, yes.
8     Q.   Now, I think you described earlier
9  that you wanted to see some specific Summit
10  County statistics.
11        MS. KEARSE:  Objection.
12    Q.   Do you remember that?
13    A.   Yes.  I just said I hadn't seen
14  them so...
15    Q.   So have you ever looked on the
16  OARRS website to see if they make that
17  available to the members of the general public?
18    A.   I don't believe so.
19    Q.   You weren't curious, as
20  commissioner of public health, to see whether
21  OARRS actually makes that data available?
22        MS. KEARSE:  Objection.
23    A.   No.
24        MR. LAVELLE:  Let's mark this as
25  the next exhibit.

Page 269

1        - - - - -
2        (Thereupon, Deposition Exhibit 11,
3        Printout Generated From OARRS Public
4        Website, was marked for purposes of
5        identification.)
6        - - - - -
7     Q.   Commissioner, I have put in front
8  of you what we have marked as Exhibit 11, a
9  printout we generated from the OARRS public
10  website, which compares Summit County to the
11  county average for the different statistical
12  measures that are covered there.
13        Have you ever seen this type of
14  data from OARRS before?
15    A.   No.
16    Q.   And you were not aware, prior to my
17  showing this to you, you could get this
18  information from the public database, were you?
19        MS. KEARSE:  Objection.
20    A.   Correct.
21    Q.   Would you look with me at the
22  second page of this document, the Average Daily
23  MED Per Ohio Patient By County and Quarter, do
24  you see that caption at the top of the chart
25  that is there, Average Daily MED Per Ohio

68 (Pages 266 - 269)

Page 270

1  Patient By County and Quarter?
2      A.  Yes.
3      Q.  Are you familiar with what that
4  means?
5      A.  It would be the amount of MED given
6  to a patient by the quarter -- by a quarter, a
7  three-month period of time.
8      Q.  And in this chart, there are two
9  lines.  There is a line which, according to the
10  legend on the bottom, is blue --
11      A.  Right.
12      Q.  -- which is Summit, and then there
13  is a line which is yellow, which is county
14  average.  Do you agree with me?
15      A.  Yes.
16      Q.  And from left to right, it
17  progresses in time.  So for 2010, quarter 1, to
18  the far left, all the way to 2017, on the far
19  right.
20      A.  Okay.
21      Q.  Would you agree with me that this
22  chart shows that the average daily MED per Ohio
23  patient by county and quarter is going down for
24  Summit over the period of time that's covered
25  here?

Page 271

1      A.  Yes, just looking at it, but it
2  kind of looks like it levels off at the end
3  there.  So I'm not sure what's going on.
4      Q.  In fact, it is above the county
5  average in the early years, but then it comes
6  to be --
7      A.  Correct.
8      Q.  -- about the same as the county
9  average?
10      A.  Correct.
11      Q.  Looking at the next chart, it's
12  captioned Average Day MED Per Capita to Ohio
13  Patients by County and Quarter.  Is that a
14  measure you were familiar with?
15      A.  No.
16      Q.  You never heard of that before?
17      A.  No.
18      Q.  Do you have an understanding of how
19  that would be different than Ohio patient?
20      A.  This is a per capita number?
21      Q.  Yes.
22      A.  Okay.  Divided, okay, over time,
23  yeah.
24      Q.  So what do you understand "per
25  capita" to mean?

Page 272

1      A.  Per every individual.
2      Q.  And you would agree with me that,
3  again, this is a chart that shows a line for
4  Summit, which is in blue; do you agree with me,
5  Commissioner?
6      A.  Yes.  Oh, yeah.
7      Q.  And the line underneath it is the
8  county average?
9      A.  Yes.
10      Q.  And as on the previous one, this
11  progresses through time.  So the far left is
12  the earliest time, 2010 quarter 1, the far
13  right is 2017, the most recent that's covered
14  in the chart; do you agree?
15      A.  Correct.
16      Q.  And this chart shows that, again,
17  Summit is above the county average at the
18  beginning of the chart in 2010 and has
19  descended down below the county average by
20  2017; is that right?
21      A.  Yes.
22      Q.  So that's good news; isn't it?
23      MS. KEARSE:  Objection.
24      A.  Yes.  I'm hopeful.
25      Q.  And the number has gone down quite

Page 273

1  a bit, it has gone down from close to 3 MEDs,
2  in the early years, down to 1.7 in 2017; is
3  that right?
4      A.  Yes.
5      Q.  Assuming that these numbers are
6  correct, would you have an understanding of why
7  that occurred during that time period?
8      A.  Other than prescribing habits, no.
9      Q.  I think you described earlier in
10  your testimony today something called
11  divergent; do you remember being asked about?
12      A.  Diversion, yes.
13      Q.  Yes.  What do you understand
14  diversion to be?
15      A.  Diversion, in the pharmaceutical
16  world, to me is when you have a prescription
17  that is written, and it's taken by somebody
18  else, other than for who it is intended.
19      Q.  Have you been able to find any
20  statistics that helped quantify how much
21  diversion has occurred in Summit County?
22      A.  No.
23      Q.  Are you aware of any attempts to
24  measure that?
25      A.  No.

69 (Pages 270 - 273)

Page 274

1    Q.   Have you ever asked anybody for
2  statistics on diversion?
3    A.   No.
4    Q.   I think you described earlier use
5  of illegal opioids, such as heroin.  Are there
6  statistics available in Summit County for
7  heroin use?
8    A.   There are estimates of use.
9    Q.   And who provides those estimates?
10   A.   Ohio Department of Health.
11   Q.   I'm sorry?
12   A.   Ohio Department of Health and/or
13  the ADM board.
14   Q.   So that is not done by your
15  department?
16   A.   No.
17   Q.   Do you have access to those
18  statistics?
19   A.   Yes.  Aggregate, yes.
20   Q.   Do you have an understanding, as we
21  sit here today, whether heroin use has been
22  increasing, decreasing, or remains the same in
23  Summit County over the past five years?
24   A.   It has been increasing.
25   Q.   Has it increased over the past ten

Page 275

1  years?
2    A.   I am not sure.
3    Q.   How about the use of illegal
4  fentanyl, is that something that is tracked in
5  any type of statistics that you are aware of?
6    A.   No.  Only in the work of the
7  coroner, where she does the tox reports, and I
8  think there is probably some police data
9  somewhere that talks about the availability of
10  fentanyl, but I don't know about the --
11   Q.   You're not familiar with that?
12   A.   No, I'm not familiar.
13   Q.   We talked about fentanyl, we talked
14  about heroin.  Are there any other illegal
15  opioids that you are aware of for which there
16  is any effort going on to try to track
17  statistically usage in Summit County?
18   A.   When you say "opioids," you mean
19  all of the opioids?
20   Q.   Yes.
21   A.   No.
22   Q.   Have you ever asked anybody to try
23  to track that information?
24   A.   No.
25   Q.   Are you familiar with counterfeit

Page 276

1  opioids, have you ever heard of those?
2    A.   No.
3    Q.   I think you described an incident
4  earlier.
5    A.   Okay.  That's what I thought you
6  were referring to.  Yes.  I didn't know that's
7  what they were called.
8    Q.   Can we agree that that would be an
9  instance of a --
10   A.   Yes.
11   Q.   -- counterfeit opioid, where
12  someone thinks they are buying illegally one
13  opioid, it turns out they are buying a
14  different opioid?
15   A.   Yes.
16       MS. KEARSE:  Objection.
17   Q.   Do you know whether there are any
18  statistics available to measure how prevalent
19  that is in Summit County, that is counterfeit
20  opioids?
21   A.   No, I do not know.
22   Q.   Do you know whether that has
23  increased, decreased, or remained the same over
24  time?
25   A.   I do not know.

Page 277

1    Q.   Do you know whether deaths from
2  prescription opioids have gone up, gone down,
3  or remained the same over time?
4    A.   I'm sorry?  Could you ask that
5  again, please?
6    Q.   Yes.  Could you tell me whether
7  deaths attributable to prescription opioids
8  have gone up, gone down, or remained the same
9  in Summit County over time?
10   A.   I cannot, just to one cause, one
11  opioid, no.
12   Q.   How about generally to the category
13  of prescription opioids?
14   A.   Opioids in general, the overdoses
15  and deaths have gone up.  Whether or not it's a
16  prescription, what prescription it was, I don't
17  know.
18   Q.   And you can't distinguish between
19  prescription and nonprescription, that is
20  illegal --
21   A.   Well, the coroner can, but we don't
22  have access to that.
23   Q.   Are you aware of any statistics
24  that are available, as we are sitting here
25  today, that measure whether or not prescription

70 (Pages 274 - 277)

Page 278

1 opioid deaths have gone up, gone down, or
2 remained the same in Summit County?
3     A.   My understanding is they have gone
4 up.
5     Q.   So what statistics are you aware of
6 that mention that?
7     A.   From any of the sources, like CDC
8 or the Ohio Department of Health, that says
9 opioid-related deaths are up and overdoses.
10     Q.   Are those specifically prescription
11 opioids or just opioids?
12     A.   I do not know that.
13     Q.   Okay.  So let me go back to the
14 question I asked earlier.
15     A.   I'm sorry.  Yes.
16     Q.   And I apologize if I'm being
17 confusing here.  I'm trying to be clear.
18         Are you aware of any statistics
19 that measure whether deaths attributable to
20 prescription opioids have gone up, gone down,
21 or remained the same in Summit County?
22         MS. KEARSE:  Objection.
23     A.   No.
24     Q.   Do you know of anyone who has
25 attempted to measure that statistically?

Page 279

1     A.   No.
2     Q.   You talked earlier about pill
3 mills.  Do you have any understanding, as we
4 sit here, about how significant pill mills were
5 contributing to the opioid problem?
6         MS. KEARSE:  Objection.
7     A.   No, I do not.
8     Q.   Is there any measurement that you
9 are aware of, any statistics that help us
10 define how many opioids came from these pill
11 mills?
12     A.   No, I do not.
13     Q.   Do you know who distributed opioids
14 to the pill mills?
15     A.   No, I do not.
16     Q.   Do you know whether pill mills were
17 distributed opioids from Rite Aid of Maryland?
18         MS. KEARSE:  Objection.
19     A.   I don't know that.
20     Q.   How about CVS?
21     A.   I don't know that.
22     Q.   Walgreens?
23     A.   I don't know that.
24     Q.   Walmart?
25     A.   I don't know that.

Page 280

1     Q.   Would it surprise you to learn that
2 Rite Aid of Maryland only distributes
3 medications to Rite Aid pharmacies?
4         MS. KEARSE:  Objection.
5     A.   No.  That makes sense to me.
6     Q.   Would you agree with me that if
7 that's true, that means Rite Aid is not
8 responsible for opioids that came from pill
9 mills?
10         MS. KEARSE:  Objection.
11     A.   I'm sorry.  Again?
12     Q.   Would you agree with me, I told you
13 it was true that Rite Aid of Maryland only
14 distributes to Rite Aid pharmacies, that that
15 means that Rite Aid of Maryland is not
16 responsible for opioids that came from pill
17 mills?
18         MS. KEARSE:  Objection.
19     A.   I can't say that.
20     Q.   Are you familiar with hydrocodone
21 products?
22     A.   Like Vicodin?
23     Q.   That could be one, yes.  Have you
24 ever heard of hydrocodone --
25     A.   Yes.

Page 281

1     Q.   -- combination products?
2         What are they, as you understand
3 them?
4     A.   Synthetic opiates, opioids.
5     Q.   Synthetic opioids?
6     A.   Manufactured.
7     Q.   Are you aware of products where
8 hydrocodone is combined with another
9 nonnarcotic ingredient, such as a cough
10 suppressant or an analgesic, have you ever
11 heard of such a product?
12     A.   Like Tylenol?
13     Q.   Right.
14     A.   Yes.
15     Q.   Do you know whether those type of
16 products have ever been abused in Summit
17 County?
18     A.   Not to my knowledge.  I don't know.
19     Q.   Do you know of any attempt to
20 measure whether hydrocodone-combination
21 products have been part of the opioid crisis,
22 as you have described it?
23     A.   Not that I know of.
24     Q.   Have you ever heard that
25 anecdotally?

71 (Pages 278 - 281)

Page 282

1    A.   No.
2    Q.   Are you aware of any measures taken
3 by pharmacies to try to help decrease opioid
4 diversion and abuse?
5    A.   Well, I think they participate in
6 OARRS.
7    Q.   I'm sorry?
8    A.   They participate in the OARRS
9 program.
10    Q.   Yes.
11    A.   They have handed out the Deterra
12 bags for us.
13    Q.   Can you describe what those are?
14    A.   It's a charcoal-containing, you add
15 water and throw your pills in there, then when
16 you seal it and squish it up, it dissolves the
17 pills so they are inactive.
18    Q.   And why is that helpful?
19    A.   Because what it does is, when they
20 dispense a prescription, then they can also
21 give folks who aren't going to end up using the
22 whole amount of it, to get rid of what is left
23 over.
24    Q.   So it helps reduce the amount of --
25    A.   That's available for diversion,

Page 283

1 yes.
2    Q.   Okay.  How about in distributing
3 Narcan or naloxone?
4    A.   Yes, they have done that as well.
5    Q.   What can you tell us about the
6 pharmacies involved in that program?
7    A.   From what I know is they
8 will -- some, I believe, even have given it
9 away to -- that may have been free or low cost,
10 but they have given away naloxone kits as a
11 community service to help put Narcan in the
12 community for overdose prevention.
13    Q.   And how is that helpful?
14    A.   It's helpful because we are in the
15 prevention business, and if we can prevent a
16 death, what it helps us do is give that person,
17 once they are overdosed, once they are then
18 revived with Narcan, it gives us or whomever an
19 opportunity to seek treatment or help them get
20 into treatment, if we can.  They get a second
21 chance of being able to be successful at
22 fighting addiction.
23    Q.   So that's a good thing?
24    A.   That's a very good thing.
25    MR. LAVELLE:  Can I have one

Page 284

1 minute, please?  Can we go off record for one
2 minute.
3    THE VIDEOGRAPHER:  Off the record
4 at 3:51.
5    (Pause.)
6    THE VIDEOGRAPHER:  On the record,
7 4:05.
8    Q.   Commissioner, thank you.  I have
9 just one final, short area I wanted to cover
10 with you, and then I'm going to pass the baton
11 to counsel for AmerisourceBergen.
12    Did you receive a litigation hold
13 notice in this case?
14    A.   No.
15    Q.   Do you know what one of those is?
16    A.   No.
17    Q.   You described earlier that you went
18 through a process of collecting records and
19 then turning them over to the attorneys; do you
20 remember that?
21    A.   Correct.
22    Q.   Were you ever asked to preserve
23 documents and not discard them, not throw them
24 away?
25    A.   You mean -- no.  We wouldn't

Page 285

1 anyway.  We always have the documents.  We
2 would never throw anything away.
3    Q.   I understand that.  I'm just asking
4 you whether you received a notice telling you
5 to hold onto documents and not dispose of them?
6    A.   Not to my knowledge.
7    MR. LAVELLE:  Very good.  Thank you
8 very much, Commissioner.  I'm going to pass the
9 baton.
10    THE WITNESS:  Thank you.
11    MR. LAVELLE:  I appreciate it.
12    EXAMINATION OF DONNA SKODA
13 BY MR. SALIMBENE:
14    Q.   Ms. Skoda, my name is Michael
15 Salimbene.  I represent AmerisourceBergen,
16 another defendant in this lawsuit.
17    Do you know who or what
18 AmerisourceBergen is?
19    A.   No.
20    Q.   Have you ever heard that name
21 before today?
22    A.   Yes.
23    Q.   In what context?
24    A.   Just as a name.  I don't know
25 anything about them though.

72 (Pages 282 - 285)

Page 286

1    Q.   Okay.  Did you speak at a press
2  conference announcing this lawsuit to the
3  residents of Summit County?
4    A.   Yes, I believe so.
5    Q.   What did you say, if you recall?
6    A.   I don't remember.
7    Q.   Who -- did somebody ask you to
8  speak --
9    A.   Yes.  It was --
10    Q.   -- at the press conference?
11    Who asked you to speak?
12    A.   Ilene Shapiro.
13    Q.   Who is Ilene Shapiro?
14    A.   The county executive.
15    Q.   Did you ask her, or did she tell
16  you why she wanted you to speak?
17    A.   I can't remember.  They just wanted
18  general health information as to why they were
19  doing this.
20    Q.   Did you prepare any written
21  document to assist with your statement?
22    A.   Not that I can remember.
23    Q.   Do you remember roughly when, what
24  month and year, you made the statement?
25    A.   It had to be probably sometime in

Page 287

1  the late 2017, 6, 17 maybe.
2    Q.   Is it fair to say the purpose of
3  you giving a statement was to address, in part,
4  why the county was filing a lawsuit?
5    A.   No.  It wasn't necessarily the
6  county, but why public health was joining.
7    Q.   And if you don't recall what you
8  said then, what is the reason for public health
9  joining?
10    A.   We felt, our board of health felt,
11  we have a board, they felt strongly that we
12  needed to show support, and they were hopeful
13  that there would be some injunctive relief to
14  stop some of the behaviors that were creating
15  some of these situations.
16    Q.   What behaviors in particular?
17    A.   Like overprescribing, the ability
18  of -- not the ability of, but the number of
19  pills that were available in the community, the
20  ability for us to be trying to combat this
21  without really knowing what the problem was.
22    Q.   So one of the purposes was to curb
23  overprescribing, you testified?
24    A.   Yes.
25    Q.   Are you aware that there aren't any

Page 288

1  prescribers named in this lawsuit?
2    A.   Yes.
3    Q.   How is it possible to curb
4  overprescribing, using this lawsuit as a tool,
5  if prescribers are not involved in the case?
6    A.   I think it wasn't necessarily
7  against physicians.  It was all the behaviors
8  that created this environment that allowed
9  everybody to think that opioids were safe.
10    Q.   Okay.  But physicians actually do
11  the prescribing, true?
12    A.   That is true.
13    Q.   And physicians are the individuals
14  who operate so-called pill mills, which have
15  been discussed today, true?
16    MS. KEARSE:  Objection.
17    A.   True, to my knowledge.  I don't
18  know much about pill mills because -- not tons,
19  but...
20    Q.   Does your department of public
21  health have a mission statement or a set of
22  goals, anything like that, a credo, if you
23  will?
24    A.   Yes.
25    Q.   What is that?

Page 289

1    A.   To protect and ensure the safety
2  and health of citizens of Summit County, just
3  kind of summarized.
4    Q.   Is that available on your website,
5  do you know?
6    A.   Yes.
7    Q.   Back to the decision to bring a
8  lawsuit, you said there is a board, board of --
9    A.   Health.
10    Q.   Board of health, okay.  So how did
11  that, how did the process work?  The internal
12  decision, I'm not talking about conversations
13  with counsel, was there a vote, for example?
14    A.   No, we never actually had a formal
15  resolution.  The decision was meant that they
16  talked about it, we talked about it at open
17  board, they then agreed.
18    We talked about it -- first of all,
19  our structure is that personnel in finance
20  would have heard that conversation first.
21  Personnel in finance had discussed that
22  possibility of us joining the lawsuit with the
23  county and other people, and they then agreed
24  to move forward, brought it back to the full
25  board and said, we wanted to support the county

73 (Pages 286 - 289)

Page 290

1   in the efforts, plus, again, the concern was
2   they wanted to help mitigate the opioid crisis.
3       Q.   Are you aware of any individual who
4   was against bringing a lawsuit?
5       A.   On my board?
6       Q.   Just within the county in general.
7       A.   No.
8       Q.   Did anybody on your board express
9   reservations in any way?
10      A.   No.
11      Q.   Do you know which drug distributors
12  your county sued in this case?
13      A.   No.
14      Q.   Do you know how many there are?
15      A.   No.
16      Q.   I talked about AmerisourceBergen.
17  Are you familiar with Cardinal?
18      A.   Yes.
19      Q.   Okay.  And how so?
20      A.   Cardinal actually has a series of
21  grants that they put out, and we wrote for one
22  of those grants and was successful.
23      Q.   So Cardinal has provided funding to
24  your county?
25      MS. KEARSE:  Objection.

Page 291

1       A.   Just recently.
2       Q.   And in what context was the funding
3   provided?
4       A.   They had an open RFP process that
5   was put out, and there were three different
6   categories.  We were in the one for community
7   outreach and education.  So they provided
8   funding to us about -- I think it is close to
9   maybe $80,000.
10          And they have also given us an
11  AmeriCorps volunteer that allows us to do some
12  recovery coach work, some education, some
13  outreach, trying to help reach more clients,
14  naloxone.
15      Q.   Is that helpful to your efforts?
16      A.   Yes.
17      Q.   How about McKesson?
18      A.   Do I know them?
19      Q.   Yes.
20      A.   Yes.
21      Q.   What is context?
22      A.   I think we do buy supplies from
23  McKesson.
24      Q.   Do you know anything about the
25  distributors, AmerisourceBergen, Cardinal, and

Page 292

1   McKesson, do you know anything about their
2   company policies with respect to the
3   distribution of pharmaceutical products?
4       A.   No.
5       Q.   How about with respect to the
6   distribution of opioids?
7       A.   No.
8       Q.   Do you have a general understanding
9   of the pharmaceutical supply chain?
10          And I'll just say, so from the time
11  somebody goes a doctor and is diagnosed with a
12  condition, how it works that they end up with a
13  medication to treat that condition?
14      MS. KEARSE:  Objection.
15      A.   Yes.
16      Q.   Can you describe that for me?
17      A.   Well, my understanding would be
18  that the drug is manufactured somewhere, it
19  would go to a supplier, and then it would go to
20  a drugstore or pharmacy, and then it would come
21  to the patient.
22      Q.   Do you understand or have an
23  understanding what a distributor does within
24  the pharmaceutical supply chain?
25      A.   Not probably clearly.

Page 293

1       Q.   Do you know if distributors play
2   any part in the manufacture of prescription
3   drugs?
4       A.   I am not sure.
5       Q.   Do you know whether distributors
6   promote prescription products to prescribers?
7       A.   I'm sorry.  Could you say that
8   again?
9       Q.   Sure.  Do you know whether
10  distributors promote prescription products to
11  prescribers?
12      A.   Not to my knowledge.  I don't know.
13      Q.   Okay.  Do you have any knowledge
14  about -- excuse me.  Strike that.
15          Do you have any personal knowledge
16  regarding any statements made by a distributor
17  or its representatives in promoting opioid
18  products to prescribers?
19      A.   No.
20      Q.   You mentioned earlier, I think,
21  pain is the fifth vital sign?
22      A.   Correct.
23      Q.   Do you have any knowledge of any
24  distributor defendant taking part in the origin
25  of creating, you know, pain as a fifth vital

74 (Pages 290 - 293)

Page 294

1  sign, as you put it?
2      A.   No, I do not.
3      Q.   Do you know whether distributor
4  defendants, and I'll just limit it to
5  defendants named in this case, if that
6  helpful -- is helpful, draft the warnings that
7  accompany prescription medications?
8      A.   No, I don't know that.
9      Q.   Do you know whether distributor
10  defendants interact in any way with patients in
11  the course of their treatment with the
12  physician?
13      A.   Not to my knowledge.
14      Q.   Do you know whether the distributor
15  defendants in this case fill prescriptions
16  written by physicians?
17      A.   Not to my knowledge.
18      Q.   Okay.  Do you know if distributors
19  named in this suit counsel patients about
20  proper medication use?
21      A.   Not to my knowledge.
22      Q.   Do you know whether distributors
23  named in this suit are licensed to practice
24  medicine in Ohio?
25      A.   I don't know.  No, I don't know.

Page 295

1      Q.   Sorry.
2      A.   I just don't know.
3      Q.   Do you know whether distributor
4  defendants in this case have any role in
5  creating drug formularies?
6      A.   Not to my knowledge.
7      Q.   Do you have any understanding of
8  the way the DEA determines how many opioids are
9  allowed to be manufactured in a given year, a
10  quota process?
11      A.   No.
12      Q.   Do you have any understanding about
13  whether distributor defendants in this case
14  play any role in setting quotas for opioids?
15      A.   No, I don't know that.
16      Q.   I believe you testified in the
17  previous line of questioning that you have had
18  no interaction with distributor defendants; is
19  that fair?
20      A.   Correct.
21      Q.   Fair to say then, you don't have
22  any knowledge about a statement made to you by
23  somebody who was a representative for a
24  distributor defendant in this case?
25      A.   Yeah.  I don't know who it would

Page 296

1  be.
2      Q.   Do you know if a distributor knows
3  the identity of the prescriber who actually
4  writes a prescription for a given patient?
5      A.   Not to my knowledge.  I wouldn't
6  think.
7      Q.   Are you familiar with HIPAA?
8      A.   Yes.
9      Q.   And just in general, fair to say
10  that is a law that's designed to protect
11  confidential health information?
12      A.   Yes.
13      Q.   Do you know if distributor
14  defendants have any information about the
15  reason a medication is prescribed for a
16  particular patient?
17      A.   No.
18      Q.   How about what that patient's
19  diagnosis is?
20      A.   No.
21      Q.   How about how a patient pays for
22  their prescription, in other words, if it's
23  covered by insurance or they go to a pharmacy
24  and pay with cash?
25      A.   No.

Page 297

1      Q.   How about whether a patient has
2  tried and failed more conservative pain
3  medications before getting an opioid, is that
4  something that a distributor defendant would
5  know?
6      A.   Not to my -- I don't know.  Not to
7  my knowledge.  I wouldn't think.
8      Q.   How about whether a patient has a
9  history of addiction?
10      A.   Not to my knowledge, no.
11      Q.   How about whether the defendant --
12  excuse me.  Strike that.
13          Do you know if distributors are
14  regulated?
15      A.   No.
16      Q.   Do you have any understanding of
17  State of Ohio regulations applicable to
18  distributors in this case?
19      A.   No.
20      Q.   Board of pharmacy regulations, any
21  knowledge about those, as they apply to
22  distributors?
23      A.   No.
24      Q.   Do you have an understanding of
25  what a distributor defendant's legal

75 (Pages 294 - 297)

Page 298

1  responsibilities are with respect to controlled
2  substances?
3      A.   No.
4      Q.   Have you ever heard of -- strike
5  that.
6          Have you heard of the phrase,
7  "suspicious order"?
8      A.   No.
9      Q.   You said earlier you read, "A
10 tremendous amount," I think were your quotes?
11     A.   Right.
12     Q.   In that tremendous reading, as you
13 put it, have you ever come across the phrase,
14 "Suspicious order"?
15     A.   No.
16     Q.   Do you have any personal knowledge
17 about anything related to suspicious order
18 reporting by distributor defendants in this
19 case?
20     A.   No.
21     Q.   Do you have any basis to dispute
22 that every opioid medication shipped by a
23 distributor defendant in this case was approved
24 by FDA?
25         MS. KEARSE:  Objection.

Page 299

1      A.   I don't know that.  I would have no
2  way to know that.
3      Q.   Do you agree that access to
4  prescription medications is important for
5  Summit residents?
6      A.   Yes.
7      Q.   I'm going to ask this as well.  Are
8  you aware of any link between a specific order
9  shipped by a distributor defendant into Summit
10 County and an individual who overdosed in this
11 county?
12     A.   No.
13     Q.   Do you agree that if Summit County
14 residents could not access prescription
15 medications, it would be -- represent a problem
16 for the general health for the residents of
17 this county?
18         MS. KEARSE:  Objection.
19     A.   Perhaps, yes.
20     Q.   So you mentioned earlier, I think,
21 that you deal with people who have diabetes and
22 cardiovascular disease, true?
23     A.   Yes.
24     Q.   Those conditions are treated with
25 prescription medications, true?

Page 300

1      A.   Correct.
2      Q.   And if somebody with diabetes
3  didn't have access to prescription medication
4  that a doctor had prescribed them, that could
5  be a problem for that individual, true?
6      A.   Yes.
7      Q.   Do you know who distributes
8  medications into this county for people who
9  suffer from diabetes?
10     A.   No.
11     Q.   Do you know that it is the same
12 distributor defendants who have been sued in
13 this case?
14         MS. KEARSE:  Objection.
15     A.   No, but it makes sense.
16     Q.   Do you agree that your citizens are
17 better off if they can fill prescriptions with
18 the medications prescribed by their doctors?
19     A.   Generally, yes.
20     Q.   As the -- is your title
21 commissioner or director?
22     A.   It's health commissioner.
23     Q.   Health commissioner.  In Cuyahoga,
24 commissioner was underneath the director.
25     A.   Correct.  That's the only one in

Page 301

1  the state.  So don't worry.
2      Q.   I like it better this way.
3          As commissioner of public health,
4  who do believe should make decisions about
5  which medications your citizens receive?
6          MS. KEARSE:  Objection.
7      A.   Who do I believe?
8      Q.   Yes.
9      A.   Personally?
10     Q.   Yes.
11     A.   It should be a partnership between
12 the patient and whoever their provider is.
13     Q.   You mentioned needle exchanges
14 earlier, and I just want to follow up on that.
15         You said there is no patient
16 identifying information; is that true?
17     A.   Correct.
18     Q.   So it's reduced to an identifying
19 number?
20     A.   Yes.
21     Q.   Is there anything done within the
22 county to track overdose rates for individuals
23 who make use of your needle exchange program?
24     A.   No.  We couldn't.  There would be
25 no way.

76 (Pages 298 - 301)

Page 302

1    Q.   So it's fair to say you don't know
2  whether individuals who pick up a syringe from
3  Summit County's needle exchange program have a
4  higher or lower overdose rate?
5    A.   We don't know.  They come back
6  every week, so I don't think they are
7  overdosing, if that makes sense, but really,
8  that's just anecdotal.
9    Q.   Right.  I'm going to show you
10  something.
11      MR. SALIMBENE:  And I have one
12  single-sided copy for the witness, for the
13  exhibit, and then everybody else is going to
14  have to deal with double-sided.  I'm sorry, but
15  I'm not that strong and I had a lot of paper.
16      MS. KEARSE:  What number are we on?
17      MR. SALIMBENE:  12, I think.
18      I'm just going to mark this whole
19  thing as 12.
20         - - - - -
21      (Thereupon, Deposition Exhibit 12,
22      Email with Attachment, Beginning
23      with Bates Label Summit 176307, was
24      marked for purposes of
25      identification.)

Page 303

1         - - - - -
2    Q.   Are you familiar with Summit County
3  Opiate Task Force?
4    A.   Yes.
5    Q.   I think you testified a bit about
6  it earlier today --
7    A.   Yes.
8    Q.   -- true?  And that's one of the
9  perils of going last.  I have to keep up with
10  the whole day.
11      MS. KEARSE:  So does she.
12      MR. SALIMBENE:  No kidding.
13    Q.   When did you first learn about this
14  task force?
15    A.   It would have been 2014, 2015.
16    Q.   And it's true that your department
17  coordinates with this task force as part of
18  your efforts to address opioid addiction; is
19  that true?
20    A.   Yes.
21    Q.   And since when have you coordinated
22  or your department coordinated with Summit
23  County Opiate Task Force?
24    A.   Since the inception.  We were on
25  some of the planning committee meetings.

Page 304

1      MS. KEARSE:  Can I ask a question?
2  I know you handed this to her, but I don't
3  see -- am I missing it?  Is this an email to
4  her?
5      MR. SALIMBENE:  Well, it came
6  through her custodial file.
7      MS. KEARSE:  Okay.
8      MR. SALIMBENE:  So it's from
9  Darlene Migas, and then it is on behalf of her
10  with no lines, so it is probably a BCC to a lot
11  of people, was my assumption, but I was going
12  to ask.
13      MS. KEARSE:  I was going to say, if
14  could you get that on the record.
15      MR. SALIMBENE:  I will.
16  Absolutely.
17    Q.   Just looking at the first cover
18  email to the attachment, and it is Bates number
19  Summit 176307, and this is from Darlene Migas;
20  did I pronounce that correctly?
21    A.   Uh-huh.
22    Q.   Is this an email you would have
23  received?
24    A.   Yes.  Yeah.  If it was in my files,
25  I received it.

Page 305

1    Q.   So now if you look at the
2  attachments, Summit County Opiate Task Force
3  2017 Through 18 Strategic Plan?
4    A.   Yes.
5    Q.   Are you familiar with this
6  document?
7    A.   Yes.
8    Q.   Have you ever seen this document
9  prior to today?
10    A.   Yes.
11    Q.   On page 2, the Strategic Planning
12  Process?
13    A.   Yes.
14    Q.   The first sentence there says,
15  "Summit County Opiate Task Force has made great
16  strides in addressing the opiate crisis in the
17  last few years"; do you see where I read that?
18    A.   Yes.
19    Q.   Do you agree with that statement?
20    A.   Yes.
21    Q.   Can you name the great strides that
22  have been made in addressing the opiate crisis?
23    A.   I think it's just they have just
24  made an attempt to organize the work into
25  categories, and they have been able to put in

77 (Pages 302 - 305)

Page 306

1 place additional funding for recovery, for all
2 of the necessary tools that we need to try to
3 ensure that individuals can get treatment and
4 stay in recovery.
5        So they have been able to address
6 the problem, from a multifaceted approach, in
7 organizing all of these community partners to
8 help us.
9    Q.   And that's a good thing for the
10 residents of Summit County, correct?
11   A.   Yes.  When they say "residents"
12 though, they are residents, but most of these
13 individuals are tied to an organization or
14 agency.  100 Summit County citizens are task
15 force members, but they are individuals that
16 work in the field --
17   Q.   Oh, sure.
18   A.   -- most of them.
19   Q.   I meant to say the task force's
20 great strides are a good thing for the citizens
21 of this county?
22   A.   Yes.  Oh, it's an excellent thing,
23 yes.
24   Q.   So here on page two, it says, third
25 paragraph down, "The second phase of the

Page 307

1 planning process was to conduct an in-person
2 strategic meeting in February of 2017 with key
3 stakeholders to develop actionable items around
4 the priorities identified through this survey
5 process."  Do you see where I read that?
6    A.   Yes.
7    Q.   And I should back up.  This is a
8 survey mentioned in paragraph 2.  It says, "As
9 part of the first phase of planning, various
10 task force documents, including meeting
11 minutes, data reports, and previous survey
12 results were reviewed to formulate a new survey
13 to assess priority issues regarding the opiate
14 crisis for 2017 through 18."  Do you see where
15 I read that?
16   A.   Yes.
17   Q.   Did you ever review that survey?
18   A.   I don't believe so.
19   Q.   Okay.  Do you know how folks were
20 selected to take part in the survey?  It says,
21 "53 individuals provided their input."
22   A.   I think it was just willing, those
23 that would do it.
24   Q.   Were those who would do it task
25 force members?

Page 308

1    A.   Yes.
2    Q.   So then on page 3, it lists survey
3 results.  It says, second paragraph down, "The
4 biggest area of concern from the survey was
5 lack of access to treatment services."
6        Do you agree with that, that -- not
7 that that was the biggest outcome from the
8 survey, but do you agree that the largest area
9 of concern is the lack of access to treatment
10 and services?
11   A.   There weren't enough beds to meet
12 the need that was required for the addiction.
13   Q.   Do you think that insurance
14 companies choosing not to reimburse for
15 addiction services contributed to the opioid
16 crisis that gave rise to the lawsuit here?
17        MS. KEARSE:  Objection.
18   A.   No.  I have not ever heard that.
19 With Medicaid expansion in Ohio, we, in Summit
20 County, dropped to about 30,000 individuals
21 that were uninsured down from about 85,000.  So
22 there was a great number of individuals who
23 picked up services -- or actually picked up
24 insurance to get services, and then if -- let's
25 say you don't have insurance and you need

Page 309

1 treatment, the ADM board will reimburse that
2 facility.  ADM, they pay for indigent care,
3 uninsured.
4    Q.   So if the individuals who had
5 received -- not prescription, but received
6 insurance coverage, was that part of that due
7 to the Affordable Care Act?
8    A.   Medicaid expansion --
9    Q.   Okay.  Medicaid expansion.
10   A.   -- and affordable care for some --
11        THE NOTARY:  Wait a minute.
12        MR. SALIMBENE:  That one was my
13 fault.
14   Q.   So actually, I'll just back up and
15 ask you a new question.
16        Do you know whether insurance
17 companies, some insurance companies who cover
18 residents in this county made the decision to
19 not to cover rehabilitation treatment for
20 people who were addicted to opioids?
21        MS. KEARSE:  Objection.
22   A.   Not to my knowledge.  There is
23 mental health parity in Ohio, so they had --
24 most insurance plans had to cover -- I mean,
25 they all covered mental health treatment.

78 (Pages 306 - 309)

Page 310

1    Q.   Okay.  So the next paragraph down
2  says, "The second most frequently mentioned
3  area of concern was the need for prevention
4  services to get in front of the problem."  Do
5  you see where I read that?
6    A.   Yes.
7    Q.   So, "Respondents mentioned the need
8  for prevention of experimentation by young
9  people, misuse of prescriptions, prevention use
10  of illegal substances and preventing
11  overprescribing."  Do you see where I read
12  that?
13    A.   Yes.
14    Q.   Now, misuse of prescriptions, that
15  is something that takes place on the individual
16  level, true, the individual who is actually
17  misusing the prescription medication?
18    A.   It would be an individual doing it,
19  yes.
20    Q.   Right.  And overprescribing is
21  something done by a physician or an individual
22  who has prescribing power in the State of Ohio,
23  true?
24    A.   Yes.
25    Q.   Do you agree there is nothing

Page 311

1  listed here about any of the conduct of a
2  distributor defendant in this lawsuit?
3    A.   Yes, if I knew exactly what a
4  distributor did.  If you could explain that.
5    Q.   Well, I'm just saying there is
6  nothing listed here --
7    A.   No.
8    Q.   -- to your knowledge that applies
9  to a distributor of pharmaceutical drugs, true?
10    A.   Except maybe preventing the
11  overprescribing if they are being shipped.
12    Q.   But they are not prescribing, true?
13    A.   Yes.  True.
14        MS. KEARSE:  I think the witness
15  asked for clarification for your term
16  "distributor."
17    A.   Yes.
18        MS. KEARSE:  If you want to --
19    Q.   Well, it's a company that
20  distributes pharmaceuticals that were sued in
21  this case?
22    A.   Right.  But you are distributing
23  them to pharmacies and --
24    Q.   Correct.
25    A.   Okay.

Page 312

1    Q.   "Two other," the next paragraph
2  down, sorry.
3        "Two other areas that came out as
4  tying for the third priority, were the number
5  of overdoses and the number of people dying by
6  overdose, and the need of various segments of
7  the public for education.  The topics for
8  education needed were: Addiction as a complex,
9  chronic brain disease; the role of law
10  enforcement in behavioral health; the dangers
11  of experimentation with opiates; how to access
12  help; and that there are things working to make
13  the problems better in the community."  Did you
14  see where I read that?
15    A.   Yes.
16    Q.   And there is nothing in these
17  survey results that mention suspicious order
18  reporting in any way; is that true?
19    A.   Correct.
20    Q.   And if you look at page five of
21  this document, at the top there is a heading
22  Strategic Goals, and then it says, "Following
23  are the goals selected for action planning by
24  the workgroups."  Do you see where I read that?
25    A.   Uh-huh.

Page 313

1    Q.   And it lists 11 items, and I'll
2  give you a chance to look them over but -- and
3  let me know when you have.
4    A.   Okay.
5    Q.   Do you see number 8 says, "Reduce
6  access to heroin/other illegal opioids"?
7    A.   Yes.
8    Q.   Do you agree that this list under
9  strategic goals doesn't say anything about
10  legal prescription opioids?
11    A.   Yes.
12    Q.   Do you agree that this section does
13  not say anything about distributors of
14  prescription opioids?
15    A.   Yes.
16    Q.   Do you agree that this section
17  doesn't say anything about suspicious order
18  reporting?
19    A.   Yes.
20    Q.   And I'm finished with that
21  document.
22        - - - - -
23        (Thereupon, Deposition Exhibit 13,
24        Email with Attachment, Beginning
25        with Bates Label Summit 131869, was

79 (Pages 310 - 313)

Page 314

1     marked for purposes of
2     identification.)
3          - - - - -
4     Q.   Marked here as Exhibit 13 is Summit
5  131869 and an attachment.  It is from Gene
6  Nixon to you, dated October 2014, correct?
7     A.   What date did you say?
8     Q.   October 2014.
9     A.   Oh, yeah, yes, yes.
10    Q.   Maybe I didn't say that but --
11    A.   No, I thought you said April, and I
12  was like, is that April?
13    Q.   Gene Nixon, remind me who that was,
14  the previous health commissioner?
15    A.   Yes.
16    Q.   And the attachment, which is the
17  next page there, By the Numbers, Scope of the
18  Problem.  Do you see where it says that at the
19  top?
20    A.   Yes.
21    Q.   Do you know who drafted this
22  document?
23    A.   It would have been Gene.
24    Q.   Did you -- or let me just ask this.
25  Do you know why he sent it to you?

Page 315

1     A.   I used to proof his work.  So we
2  shared documents back and forth to proof, so
3  I'm sure he sent it to me to read.  He must
4  have been doing something with this.
5     Q.   If you look four paragraphs down,
6  the last sentence -- the previous sentence
7  speaks to, "Prescription opiates, i.e. pain
8  medication," and then it says, "These addictive
9  pain medications are being diverted to street
10  economy in alarming proportions due to
11  overprescribing."  Do you see where I read
12  that?
13    A.   Yes.
14    Q.   And did you -- do you recall ever
15  emailing or speaking with Gene Nixon and
16  disagreeing with that statement?
17    A.   No, because I probably read this,
18  checked it for errors, spelling, and sent it
19  back to him.
20    Q.   Do you agree that in this document
21  from the acting -- or the then health
22  commissioner, there is no mention of suspicious
23  order reporting in any way?
24    A.   Yes.
25    Q.   Is it true that you have given

Page 316

1  presentations on what you termed the opioid --
2  excuse me, the opiate epidemic?
3     A.   Yes.
4     Q.   I'm going to mark this one as
5  Exhibit 14.
6     A.   This one is not marked.  Do you
7  want to mark it?
8     Q.   Oh, it was supposed to be clipped
9  with the previous --
10    A.   Oh, I'm sorry.
11    Q.   No, I'm sorry.
12         - - - - -
13         (Thereupon, Deposition Exhibit 14,
14         Email with Attachment, Beginning
15         with Bates Label Summit 135023, was
16         marked for purposes of
17         identification.)
18         - - - - -
19    Q.   So what is marked as Exhibit 14 is
20  an email from Richard --
21    A.   Marountas.
22    Q.   Marountas, thank you, to you, and
23  the subject is opiate epidemic, and that's
24  Summit 135023; do you see that?
25    A.   Yes.

Page 317

1     Q.   And then if you look at the
2  attachment, the opiate epidemic PowerPoint, I
3  believe?
4     A.   Yes.
5     Q.   And it says, "Presentation to the
6  Child Family Leadership Exchange," and that's
7  your name there, true?
8     A.   Yes.
9     Q.   Do you know if you drafted this
10  PowerPoint presentation?
11    A.   No, I did not.
12    Q.   Did you present the actual
13  presentation?
14    A.   Yes.
15    Q.   Would you have reviewed it to make
16  sure it was accurate?
17    A.   Yes, usually.  It depends on the
18  time, but usually I do.
19    Q.   You wouldn't go and present to the
20  Child Family Leadership Exchange information
21  that you did not believe to be accurate,
22  correct?
23    A.   Correct.
24    Q.   If you look at -- let me ask this.
25  Do you recall, or was it your typical practice,

80 (Pages 314 - 317)

1  I should say, when you have a PowerPoint like
2  this, are there speakers note?  You know how
3  sometimes in PowerPoint you have a little
4  section -- you just wing it?  Good for you.
5          MS. KEARSE:  Objection.
6      Q.   Actually, you know what, strike
7  that.  I didn't mean to be pejorative in that,
8  with saying that.
9          I just meant that you just will
10  work with your slides --
11     A.   Correct.
12     Q.   -- and go from your mind.  I did
13  not mean to make that sound offensive.
14         If you look at -- now, there are no
15  slide numbers, and I don't know who we have to
16  blame for that, but if you look at the section
17  that begins Solutions to the Opiate Epidemic,
18  it is about, I would say, maybe halfway
19  through the presentation -- towards the end of
20  the presentation actually, closer to the end, I
21  believe.
22     A.   I see.
23     Q.   About four pages from the end.
24         And the first slide has to do with
25  naloxone -- the first two slides have to do

1  with naloxone, true?
2      A.   Let me find them.
3      Q.   Sure.  Yes.  And it looks like
4  this.
5      A.   Yeah.  Project DAWN.  Right.  Okay.
6  D-A-W-N.
7      Q.   Well, actually, prior to that
8  slide, I think, there is one before it.
9      A.   Oh, yes.
10     Q.   Okay.  And so the first of the
11  slides for the solutions to the opioid epidemic
12  concern naloxone, true, the first two slides?
13         MS. KEARSE:  There may be a slide
14  before the first one.
15     A.   Yes.
16     Q.   And then there is a slide on
17  Project DAWN, correct?
18     A.   Yes.
19     Q.   And then the last of that type --
20  excuse me.  There is another slide on the DUMP
21  Program; do you see where I read that?
22     A.   DUMP, yes.
23     Q.   And then the last slide has to do
24  with Other County Initiatives; do you see where
25  I read that?

1      A.   Yes.
2      Q.   Do any of the solutions proposed in
3  your PowerPoint here have anything to do with
4  suspicious order reporting done by distributor
5  defendants in this lawsuit?
6      A.   No.  This was mostly geared for
7  public health interventions, so we didn't get
8  into any other solutions that might be
9  possible.
10     Q.   Do you agree that the -- and you
11  can put that aside, thank you -- the number of
12  prescription opioids dispensed is lower today
13  than it was in 2012?
14     A.   Yes.
15     Q.   Do you agree that today there are
16  more overdose deaths in Ohio due to illegal
17  opioids than prescription opioids?
18         MS. KEARSE:  Objection.
19     A.   I don't really know that.
20     Q.   Have you ever reviewed the Ohio
21  drug overdose data statewide?
22     A.   Ohio Department of Health document?
23     Q.   I'll show it to you.
24     A.   Okay.
25     Q.   I don't mean to put you on the

1  spot.
2          - - - - -
3          (Thereupon, Deposition Exhibit 15,
4          2015 Ohio Drug Overdose Data:
5          General Findings, was marked for
6          purposes of identification.)
7          - - - - -
8      Q.   So Exhibit 15 is titled 2015 Ohio
9  Drug Overdose Data: General Findings from the
10  Ohio Department of Health?
11     A.   Yes.
12     Q.   Have you ever seen this document
13  before?
14     A.   I believe so.
15     Q.   Is it something you reviewed as
16  part of your role as health commissioner in
17  Summit County?
18     A.   Probably in 2015 -- it was labeled
19  2015, I don't know when we received it though,
20  so that's what I'm kind of struggling with, to
21  know when we looked at it, but, yes, we
22  probably -- I reviewed it.
23     Q.   Okay.  Do you see, there is a
24  chart, it's figure 4, it's on page 3, at the
25  bottom?

1    A.    Yes.  Yes.
2    Q.    And there is a little blurb to the
3  right that says, "The percentage of
4  prescription opioid overdose deaths decreased
5  in 2015 for the fourth straight year."  Do you
6  see where I read that?
7    A.    Oh, yes, I did, yes.
8    Q.    Okay.  Now, if you look at that
9  figure 4, the deaths from fentanyl and from
10  heroin, which is a green bar for 2015, which is
11  when this was reported, are those higher or
12  lower than the percentage due to prescription
13  opioids?
14    A.    Lower -- or higher.  I'm sorry,
15  higher.
16    Q.    It was your opinion at around this
17  time that the decrease in prescription opioid
18  usage, in terms of pills dispensed, was a good
19  thing, correct?
20    A.    I'm sorry.  Could you say that
21  again.
22    Q.    Sure.  That was terrible.
23        Around this time in 2015, you
24  believed that the decrease in the number of
25  prescription opioids dispensed was a good

1  thing; is that fair to say?
2        MS. KEARSE:  Objection.
3    A.    Yes.
4    Q.    And if you look at the figure 9 on
5  page 7, which says, number of, quote, doctor
6  shoppers, Ohio, 2011 through 2015; do you see
7  where I read that?
8    A.    Yes.
9    Q.    And then a little asterisk says, "A
10  doctor shopper is defined as an individual
11  receiving a prescription from five or more
12  providers in one calendar month."  Do you see
13  where I read that?
14    A.    Yes.
15    Q.    And doctor shoppers, according to
16  this chart, drop every year from 2011 to 2015,
17  correct?
18    A.    Yes.
19    Q.    Do you agree that doctor shoppers
20  bear some responsibility for the opioid crisis
21  that gave rise to this lawsuit?
22        MS. KEARSE:  Objection.
23    A.    No.
24    Q.    And why not?
25    A.    Because I believe once you are

1  addicted and if you have been given a
2  legitimate prescription for which you take, and
3  then people doctor shop because they have to
4  get more because of the addiction.
5        So it's like they are addicted, and
6  so they start to make bad decisions and go to
7  multiple physicians or nurse practitioners or
8  whomever, so that they can continue that habit,
9  because they are addicted.
10        And their own doctor may have said,
11  no, this is all you can have, and then they go
12  out and seek pills from other places, but it's
13  in relationship to that addiction that they
14  have.
15    Q.    You're speaking very generally.
16  Are you basing what your answer was there on
17  any specific facts that you are aware of?
18    A.    Again, it would be conversations
19  with individuals and understanding drug-seeking
20  behavior and having spent 30 years in the --
21  basically in the streets with drug users and
22  individuals who have abused medications.
23    Q.    And there are individuals who sell
24  medications illegally to individuals, correct,
25  including prescription-only opioids?

1    A.    Yes.  But it would be a rare bird,
2  I have never seen one that wasn't a user as
3  well.
4    Q.    Okay.  But do you have any data
5  that says what percentage of these doctor
6  shoppers here are individuals who were using
7  the pills versus individuals who took the pills
8  and sold them on the streets?
9    A.    No, I have no idea.
10    Q.    Okay.  If you look at page 8.
11    A.    Yes.
12    Q.    And it is table 1, Unintentional
13  Drug Overdose Deaths of Ohio Residents
14  Involving Specifics Drugs, as Mentioned on
15  Death Certificate, By Year.  Do you see where I
16  am?
17    A.    Uh-huh.
18    Q.    If you look at some of these
19  categories, let's start with, say,
20  benzodiazepines, from 2003 to 2015, there is an
21  increase from 38 deaths to 504, correct?
22    A.    Yes.
23    Q.    And if you look at cocaine, cocaine
24  is up from 140 in 2003 to 685 in 2015, correct?
25    A.    Correct.

Page 326

1 Q. And alcohol goes from 40 in 2003 up
2 to 380 in 2015 --
3 A. Yes.
4 Q. -- correct?
5 Hallucinogens goes from 7 to 61
6 from 2003 to 2015, correct?
7 A. Yes.
8 Q. Are benzodiazepines, cocaine,
9 alcohol, hallucinogens, are any of those
10 opioids?
11 A. No.
12 Q. Have you ever undertaken an
13 analysis as to why there is an increase in,
14 say, alcohol-related deaths, going from 40 to
15 380, so just about a nine times increase over a
16 12-year period?
17 A. No.
18 Q. Would the same be true with respect
19 to cocaine?
20 A. Yes.
21 Q. And would the same be true with
22 respect to hallucinogens?
23 A. Yes.
24 Q. Would the same be true with respect
25 to benzodiazepines?

Page 327

1 A. Yes.
2 Q. Did you discuss with anybody, aside
3 from counsel in this lawsuit, about bringing a
4 lawsuit related to manufacturers of alcohol
5 products, alcohol-containing products?
6 MS. KEARSE: Objection.
7 A. No.
8 Q. Do you agree that the distributor
9 defendants you sued in this case do not
10 distributor cocaine?
11 MS. KEARSE: Objection.
12 A. Yes. I would assume not.
13 - - - - -
14 (Thereupon, Deposition Exhibit 16,
15 2016 Ohio Drug Overdose Data:
16 General Findings, was marked for
17 purposes of identification.)
18 - - - - -
19 Q. So what the court reporter has
20 marked as Exhibit 16 is the 2016 Ohio Drug
21 Overdose Data: General Findings. Do you recall
22 reviewing this report prior to today?
23 A. No.
24 Q. Is this the same sort of report
25 that we just looked at, but just now for 2016,

Page 328

1 same data set?
2 A. It could be. Yes, I would think.
3 Q. If you look at the last sentence of
4 the first paragraph, it says, "The data also
5 shows some promising progress, the fewest
6 unintentional overdose deaths involving
7 prescription opioids since 2009, excluding
8 deaths involving fentanyl and related drugs."
9 Do you see where I read that?
10 A. Yes.
11 Q. Do you agree that that is promising
12 progress?
13 A. I really don't know. I would have
14 to think about it. I mean, yes, but I don't
15 know where that data comes from though, to be
16 honest. I just don't know.
17 Q. Okay. Well, if you look at figure
18 2, it is the Percentage of Unintentional Drug
19 Overdose Deaths Involving Select Drugs By Year,
20 and at the bottom, it says, Source: Ohio
21 Department of Health, Bureau of Vital
22 Statics --
23 A. Okay. They're tracking, okay.
24 Q. Okay. Is that a reliable source?
25 A. Yes.

Page 329

1 Q. So do you believe that the fact
2 that the Ohio Department of Health, Bureau of
3 Vital Statistics is reporting that the
4 fewest -- reporting the fewest unintentional
5 overdose deaths involving prescription opioids
6 since 2009, do you view that as promising
7 progress?
8 A. It's a good thing, yes.
9 Q. And if you look at page 3, the last
10 paragraph of the page, where it says, "Opioid
11 prescribing in Ohio declined for a fourth
12 consecutive year in 2016, according to the
13 State of Ohio Board of Pharmacy, see figure 6.
14 Between 2012 and 2016, the total number of
15 opioids dispensed to Ohio patients decreased by
16 162 million doses, or 20.4 percent." Do you
17 see where I read that?
18 A. Were you on page 4?
19 Q. I'm on page 3. I'm sorry. Did I
20 say page 4?
21 MS. KEARSE: I don't know. I don't
22 think any of us knew where you were reading.
23 Q. It's the last paragraph on that
24 page.
25 A. Is that a per capita number, or

83 (Pages 326 - 329)

Page 330

1  just a general, in total, number?  Just
2  general, okay.
3      Q.    I don't know.  I'm not going to
4  make any representations, other than what's
5  written there.
6      A.    Yeah.  It's a good thing.
7      Q.    Okay.  Now, if you look at table 1
8  on page 6, which is now the Number of
9  Unintentional Drug Overdose Deaths Involving
10  Specific Drugs As Mentioned on Death
11  Certificate, by year, 2004 through 2016.  So
12  again we are looking at the same table for 2016
13  that we just looked at for 2015, true?
14      A.    Yes.
15      Q.    Okay.  Now, if you look at cocaine,
16  in 2016, according to the Ohio Department of
17  Health, Bureau of Vital Statistics, there are
18  1,109 deaths due to cocaine in 2016 alone; do
19  you see that?
20      A.    Yes.
21      Q.    Is it true that the deaths due to
22  cocaine in 2016 are higher than the deaths due
23  to prescription opioids for any year listed
24  here in this chart for 2004 to 2016?
25      A.    Yes.

Page 331

1      Q.    And it is also true as of 2016, the
2  percentage of deaths attributable to cocaine
3  are about double the percentage of deaths
4  attributable to prescription opioids; is that
5  correct?
6      A.    I'm sorry.  Say that again.
7      Q.    Sure, sure.  Let me just -- so you
8  can see underneath cocaine, it lists
9  prescription opioid deaths?
10      A.    Yes.
11      Q.    It says 564, correct?
12      A.    Yes.
13      Q.    Which is down from the previous
14  year of 667, correct?
15      A.    Correct.
16      Q.    And cocaine in 2016 is 1,109,
17  correct?
18      A.    Correct.
19      Q.    So you would agree with me that the
20  deaths attributable to cocaine were roughly two
21  times the deaths attributable to prescription
22  opioids in 2016?
23          MS. KEARSE:  Objection.
24      A.    Yes.
25      Q.    And cocaine is not an opioid,

Page 332

1  correct?
2      A.    Correct.  But it could have been
3  mixed with an opioid, but I doubt in this
4  chart, but they used all confirmed data so...
5      Q.    Right.  And there are opioids
6  listed on this chart, such as fentanyl and
7  heroin, correct?
8      A.    Uh-huh.
9      Q.    So is there any basis for you to
10  make the assumption that the cocaine deaths
11  listed on this chart may involve another
12  substance?
13      A.    No, because I think -- I'm sure the
14  Ohio Department of Health used the vital
15  statistics, they used the final death record,
16  so hopefully it was defined across the state.
17      Q.    Okay.  And three up from the bottom
18  of this chart, there is a category for multiple
19  drug involvement?
20      A.    Okay.  That would be, yeah, that's
21  probably what was more -- that's what I was
22  looking for, because often they are mixed.
23      Q.    And you testified earlier that you
24  have not conducted any investigation into why
25  cocaine deaths are increasing at the rate they

Page 333

1  are; is that true?
2      A.    Yes.
3      Q.    And if you look at this chart here,
4  alcohol, from 2015 to 2016, we see that metric
5  going from 380 deaths to 539, correct?
6      A.    Yes.
7      Q.    And, again, you testified that you
8  have not conducted any analysis into why
9  alcohol deaths are increasing at the rate they
10  are; is that fair?
11      A.    Yes.
12      Q.    Would the same be true with
13  methamphetamines, and I'll just -- strike that.
14          So methamphetamine is a
15  psychostimulant, it's categorized as here?
16      A.    Right.
17      Q.    It goes from 96 to 233, correct?
18      A.    Correct.
19      Q.    The same is true as of 2016 --
20  actually, strike that.
21          As of -- even to present day, you
22  have not conducted any analysis as to why
23  psychostimulant death rate has increased year
24  over year; is that fair?
25      A.    Yes.

Page 334

1    Q.    Would you agree that based on this
2  chart, table 1, 2016 and the 2016 Ohio drug
3  overdose data, Summit has a growing nonopioid
4  problem?
5         MS. KEARSE:  Objection.
6    A.    Now, where?
7    Q.    Sure.  Well, let me just back up.
8  If you look at, again, 2015 to 2016 --
9    A.    Right.
10   Q.    -- just focusing on that one year.
11   A.    Right.
12   Q.    Cocaine deaths go from 685 --
13   A.    Right.
14   Q.    -- to 1109 --
15   A.    Right.
16   Q.    -- true?
17        And benzodiazepines go from 504 to
18  553, true?
19   A.    Yes.
20   Q.    And alcohol goes from 380 to 539,
21  true?
22   A.    Correct.
23   Q.    Psychostimulants go from to 96 to
24  233, true?
25   A.    True.

Page 335

1    Q.    Hallucinogens go from 61 to 100,
2  correct?
3    A.    Correct.
4    Q.    So that's increases in all those
5  categories, correct?
6    A.    Yes.  Those are raw numbers.  So I
7  don't know if the rates have changed actually.
8    Q.    Okay.  But the year --
9    A.    That's my concern, and probably the
10  bigger concern I have, and why I'm kind of
11  hesitating on this, when it says multiple drug
12  involvement, that's defined somewhere, because
13  what we are seeing now is any sort of an opioid
14  mixed with cocaine, an opioid mixed with
15  methamphetamine, carfentanil mixed with
16  cocaine.
17        So we see these mixtures, so I'm
18  not real sure that -- I get the whole multiple
19  drug involvement, but I'm not real sure, and I
20  want to be accurate.  So I think these are raw
21  numbers, not rates.  So I don't know if they
22  are really increasing.
23   Q.    Okay.  Well, let me --
24   A.    If you get what I'm saying.
25   Q.    I do, and let me rephrase my

Page 336

1  question.
2    A.    Okay.
3    Q.    I'm just now talking about the
4  absolute year-over-year total --
5    A.    Okay.
6    Q.    -- for cocaine, benzodiazepines,
7  alcohol, psychostimulants and hallucinogens --
8    A.    Yes.
9    Q.    -- has increased year or year over
10  from 15 to 2016, correct?
11   A.    Yes.
12   Q.    And the year-over-year total for
13  deaths attributable to prescription opioids has
14  decreased year over year from 2015 to 2016,
15  true?
16   A.    Correct.  The raw numbers have
17  decreased.
18        MS. KEARSE:  Mike, I think meant
19  the growing -- you insinuated for Summit,
20  right?
21        MR. SALIMBENE:  No, I don't think I
22  did.  I think I said Ohio.
23        MS. KEARSE:  The last question you
24  did, so I want to make sure the record is
25  correct.

Page 337

1    Q.    And let me just ask, do you have
2  any basis to say that the trends noted for Ohio
3  at large would be any different within Summit
4  County?
5    A.    The only statement I would make in
6  this response is if you look at Summit County
7  as a separate county from all issues, we
8  probably trend more like the federal-level data
9  than we do the local.
10   Q.    Well, is it fair to say --
11   A.    Ohio.
12   Q.    Is it fair to say you are not aware
13  of any data that suggests Summit County is
14  experiencing trends different from the State of
15  Ohio, with respect to the information in table
16  1?
17   A.    Correct.
18        MS. KEARSE:  Objection.
19        - - - - -
20        (Thereupon, Deposition Exhibit 17,
21        Email Chain, Bates Label Summit
22        271615, was marked for purposes of
23        identification.)
24        - - - - -
25   Q.    So marked as Exhibit 17 is an email

85 (Pages 334 - 337)

Page 338

1 from Donna Skoda to Mmcneely@BathTownship.org;
2 do you see that?
3     A.   Yes.
4     Q.   The first email, I should say.  The
5 chain originates with an email from Michael
6 McNeely to you?
7     A.   Right.  He was the police chief.
8     Q.   And he was asking you -- and this
9 email, I should say, is dated April 6, 2011,
10 correct?
11    A.   Yes.
12    Q.   And he's asking you, "Hi Donna, do
13 you have any statistics on the improper use of
14 prescription medications in Summit County?  I
15 am especially interested in numbers on the teen
16 population."
17        And then the last paragraph says,
18 "I have a media interview on this topic
19 tomorrow afternoon"; do you see that?
20    A.   Yes.
21    Q.   And you forwarded the email to
22 Richard Marountas, correct?
23    A.   Yes.
24    Q.   And Richard replied to you,
25 correct?

Page 339

1     A.   Correct.
2     Q.   And then you replied to
3 Mr. McNeely, at the top of the chain, correct?
4     A.   Correct.
5     Q.   And as part of your email, you
6 wrote, the fourth sentence, "We do know that
7 unused prescriptions are a source of drugs for
8 teens and others.  Also, accidental overdose is
9 on rise from abusing prescription drugs,"
10 correct?
11    A.   Correct.
12    Q.   So unused prescriptions as a source
13 of drugs, that would be diversion, correct?
14    A.   Yes.
15    Q.   And you say you knew, or I should
16 say, it says, "We do know," it says, and one of
17 the things here is, "Accidental overdose is on
18 the rise from abusing prescription drugs,"
19 correct?
20    A.   Correct.
21    Q.   Is it fair to say that as of April
22 2011, you were aware that there was an issue
23 with accidental overdoses rising, secondary to
24 abusing prescription drugs?
25    A.   Yes.  I probably knew about it, but

Page 340

1 it wasn't anything I was responsible for.
2     Q.   I just want to ask you a few more
3 questions about the OARRS database.
4        Do you know what the purpose of the
5 OARRS database is?
6     A.   Yes.
7     Q.   And what is it?
8     A.   It was created as a tracking
9 mechanism for individuals that are prescribed
10 opiates, and then in order to help pharmacists
11 and physicians know if there are any behaviors
12 going on that are like doctor shopping.
13        - - - - -
14        (Thereupon, Deposition Exhibit 18,
15        Printout from the OARRS Website, was
16        marked for purposes of
17        identification.)
18        - - - - -
19    Q.   So I just marked as Exhibit 18 the
20 printout of the web page, if you go to the main
21 OARRS website here, and this statement here,
22 "About."  And then it says, "What is OARRS?"
23    A.   Right.
24    Q.   If you look at the last sentence on
25 the first page, it says, "Drug wholesalers are

Page 341

1 also required to submit information monthly on
2 all controlled substances and gabapentin sold
3 to an Ohio licensed pharmacy or prescriber."
4 Do you see where I read that?
5     A.   Yes.
6     Q.   Were you aware of that requirement
7 prior to today?
8     A.   I knew there were general rules,
9 but I didn't know specifics.
10    Q.   Do you have any basis to dispute
11 that the distributors named as defendants in
12 this case complied with the requirement
13 articulated here?
14        MS. KEARSE:  Objection.
15    A.   I have no idea if they complied.
16    Q.   Do you agree that the majority of
17 people who take prescription opioids do not
18 become addicted?
19        MS. KEARSE:  Objection.
20    A.   No.
21    Q.   So it's your testimony that the
22 majority, that would be over 50 percent of
23 people who receive a legitimate prescription
24 for an opioid become addicted to opioid
25 medications?

86 (Pages 338 - 341)

Page 342

1    A.   I wouldn't know the exact
2  percentage, but I can tell you that it's high,
3  extremely high.
4    Q.   Do you have any basis to support
5  the statement that greater than 50 percent of
6  people who receive a prescription opioid, a
7  valid prescription from a doctor, end up as
8  addicts?
9       MS. KEARSE:  Objection.
10    A.   What is a "valid prescription"?
11    Q.   Well, a prescription from a doctor.
12  So let's just back up.
13       An individual who goes to a doctor
14  and has knee pain, say, and the doctor gives
15  him or her a prescription for oxycodone.  So
16  you get a prescription from a legitimate
17  DEA-licensed doctor, that of those people, the
18  majority of them become opioid addicts?
19    A.   I don't know the percentage, but I
20  would say the risk is great.
21    Q.   Do you know what percentage of
22  individuals who receive a prescription for
23  opioids end up dying from an overdose?
24    A.   No.
25    Q.   Have you ever undertaken that

Page 343

1  analysis?
2    A.   No.
3    Q.   Do you agree that the majority of
4  opioid users never try heroin?
5    A.   I don't know that.
6    Q.   Do you agree that the majority of
7  opioid users never try fentanyl?
8    A.   I don't know that either.
9    Q.   Do you agree that the majority of
10  opioid users never try carfentanil?
11    A.   I don't know.
12    Q.   Does Summit County have in place
13  any program to make sure that patients who are
14  in pain can access prescription opioids if
15  those opioids are lawfully prescribed to them?
16       MS. KEARSE:  Objection.
17    A.   Does Summit County have any
18  programs?
19    Q.   Yes.
20    A.   You mean Summit County Public
21  Health or the government?
22    Q.   Just in general, in the county, any
23  program in the county?
24    A.   Oh, I think that the hospital
25  systems do.

Page 344

1    Q.   Does your department of public
2  health make any effort to ensure that opioids
3  are available to Summit County residents who
4  receive a valid prescription for them?
5    A.   No.
6    Q.   Do you agree with the statement
7  that an individual has responsibility for their
8  health?
9    A.   Yes.
10    Q.   Do you agree that
11  individuals -- let me back up.
12       Do you agree that there is an
13  element of personal responsibility in addiction
14  when you look at the first time an individual
15  chooses to take a prescription opioid without a
16  prescription?
17       MS. KEARSE:  Objection.
18    Q.   So before they become addicted, and
19  they make the decision to go out on the street
20  and buy OxyContin without a valid prescription?
21       MS. KEARSE:  Objection.
22    A.   That's not been my experience with
23  what happens.  So I don't know of anybody who
24  starts out and just goes out and buys an
25  OxyContin on the street.

Page 345

1       If they were given a prescription
2  from a prescriber and they start taking it, it
3  has been my knowledge that within a short
4  while, they continue to like that feeling, that
5  euphoric feeling, and they continue, and then
6  they -- once that happens, it doesn't take a
7  great deal of time to become addicted.
8    Q.   So let's focus on the --
9       MS. KEARSE:  I think you just cut
10  her off.
11    Q.   Did I?
12       MS. KEARSE:  Were you finished?
13    Q.   I thought you were done.  I'm
14  sorry.
15    A.   No -- yeah, that's good.  I'm done.
16    Q.   Okay.  I thought you were.  I'm
17  sorry.
18       So let's look at the teenagers and
19  the young people who divert pills from, say, a
20  relative's medicine cabinet.
21    A.   Yes.
22    Q.   Is it your testimony that the
23  majority of those children who use opioids
24  first had a prescription for opioids?
25    A.   No, but that's a very different

87 (Pages 342 - 345)

Page 346

1 group of individuals with experimentation. And
2 what we know now about brain chemistry is that
3 children, youngsters to about -- boys to about
4 23 or 24, and females, 22, 23, brain growth and
5 development isn't complete, their ability to
6 make good decisions isn't complete, and quite
7 frankly, risky behaviors in youth
8 experimentation is a part of growing up.
9        We don't encourage it, and
10 certainly you hope the resiliency factors are
11 there to teach children to make better
12 decisions, but I don't think that -- that's a
13 very different scenario with kids experimenting
14 than it is with adults.
15    Q.   You testified earlier that data you
16 have seen suggests that four and five heroin
17 users first received a prescription for
18 opioids?
19    A.   Four out of five.
20    Q.   Four out of five, right.
21        So what about the one in five who
22 did not, is there any personal responsibility
23 for that individual who sought out heroin and
24 used heroin?
25        MS. KEARSE:  Objection.

Page 347

1    A.   I'm not sure what you are asking
2 me.  Was there personal responsibility for
3 becoming addicted?  It is a brain disease.
4 It's like blaming a diabetic for becoming a
5 diabetic. It's not because they ate cookies
6 and candy.  It could be because of weight gain,
7 but it is very different.  You can't blame
8 somebody for developing a disease.
9    Q.   I'm talking about before the first
10 time any substance has been used.  There is a
11 first time an individual uses heroin, correct?
12    A.   Only after a long history.
13 Individuals who use heroin don't go to the
14 street and buy heroin today and decide to use
15 it.  It isn't like that at all.  Maybe I'm
16 missing what you're asking me.
17    Q.   No, no.  I'm just trying to make a
18 very basic statement that for every heroin
19 user, there is a first time they inject heroin,
20 correct?
21    A.   Correct.
22    Q.   Okay.  And you said that four out
23 of those five of those individuals have first
24 used a prescription opioid, correct?
25    A.   Yes.

Page 348

1    Q.   So I'm saying, let's focus on the
2 one in five who did not.
3    A.   Right.
4    Q.   Is there any personal
5 responsibility for that individual from making
6 the decision to use heroin that very first time
7 before they were addicted to heroin?
8        MS. KEARSE:  Objection.
9    A.   And I guess what I'm not saying
10 well is, they wouldn't be getting heroin if
11 they weren't addicted.  Heroin is just, for
12 some, a natural progression.
13        So they are getting into -- they
14 couldn't get this drug, they may have used
15 heroin, but once you are addicted, individuals
16 will do unbelievable things to maintain that
17 addiction, including using heroin.  It's a
18 brain disease.  No one chooses to be addicted.
19    Q.   Is it your testimony that
20 individuals within Summit County who engaged in
21 prescription opioid diversion bear no personal
22 responsibility for their decision to divert
23 opioids?
24    A.   Are you talking about the sale of
25 opioids?

Page 349

1    Q.   I'm talking about the individuals
2 who, without a prescription, use opioids in an
3 unlawful manner, be it prescription opioids,
4 for which they had no prescription, heroin,
5 fentanyl or carfentanil.
6    A.   Right.
7    Q.   Is it your testimony the that those
8 individuals have no personal responsibility for
9 that decision?
10        MS. KEARSE:  Objection.
11    A.   No, I'm not saying that.
12    Q.   So is it fair to say they do bear
13 some personal responsibility for those
14 decisions?
15    A.   No.
16    Q.   So I'm confused now.
17    A.   Yeah, because I see it very much in
18 a disease model, and I don't think they would
19 be engaging in those behaviors if they weren't
20 addicted.
21        Now, whether they got addicted via
22 something else and started down that road, or
23 whatever the progression has been, individuals
24 who are addicted with a substance-use disorder
25 use multiple substances, and they end up at a

88 (Pages 346 - 349)

Page 350

1 point where taking that oxycodone out of the
2 medicine cabinet or stealing that drug is no
3 different.
4       Some of them, if you look at some
5 of the literature, they take it because of pain
6 and get addicted accidently.  They may have a
7 legitimate pain and get addicted, they take it
8 for the high maybe, but the bottom line is,
9 that addiction is somewhere in that tale of woe
10 for that individual.
11     Q.  Is there any level of personal
12 responsibility for an individual who chooses to
13 use heroin?
14     MS. KEARSE:  Objection.
15     A.  Only in the act could be -- yes,
16 there is personal responsibility for everything
17 you do.
18       But I think you need to understand
19 that there is a brain disease here.  They
20 can't, in some ways, understand what they are
21 doing.  The brain is powerful.
22       MR. SALIMBENE:  I'm going to move
23 to strike anything towards the end of that,
24 which frankly -- starting with, "But I think
25 you need" --

Page 351

1       MS. KEARSE:  You want to cut off
2 where you just want her to stop, but she
3 answered your question, so...
4       MR. SALIMBENE:  Okay.  Well, you
5 can make whatever -- I'm just going to move to
6 strike that answer as it begins with, "But I
7 think."
8       MS. KEARSE:  And I'll say she was
9 explaining her answer.  She was answering your
10 question, and you are trying to strike the part
11 you didn't like.
12      MR. SALIMBENE:  Okay.  Can we hop
13 off the record just pop out for a minute.
14      THE VIDEOGRAPHER:  Off the record,
15 5:15.
16      (Recess taken.)
17      THE VIDEOGRAPHER:  On the record,
18 5:23.
19     Q.  Commissioner Skoda, can you pull up
20 Exhibit 14, quickly.  It is the PowerPoint
21 presentation that you presented.  It's clipped
22 to the back of an email.
23     A.  Thank you.
24     Q.  And if you flip one of the slides
25 in the middle of the presentation, it's titled

Page 352

1 Facts and Figures, Continued.
2     A.  Yes.
3     Q.  And if you look at the fourth
4 bullet down, it says, "Four in five new heroin
5 users started out misusing prescription
6 painkillers."  Do you see where I read that?
7     A.  Yes.
8     Q.  And the source is an article by an
9 author named Jones, Heroin Use and Heroin Use
10 Risk Behaviors Among Nonmedical Users of
11 Prescription Opioid Pain Relievers.
12     A.  Correct.
13     Q.  Is it correct that you are not able
14 to say today what percentage of those four
15 heroin users started out having received a
16 prescription for opioids?
17       In other words, you are not able to
18 say what percentage purchased opioids
19 illegally, compared to the percentage who first
20 received a legal prescription for opioids?
21      MS. KEARSE:  Objection.
22     A.  Correct.
23     Q.  Is it your testimony that heroin
24 users in Summit County bear no personal
25 responsibility for their decision to use

Page 353

1 heroin?
2       MS. KEARSE:  Objection.
3     A.  Yes.
4       MR. SALIMBENE:  Does anybody else?
5 I'm getting some blank stares.  Nobody looks
6 very enthused.
7     A.  Sorry.
8     Q.  That's a good thing for you.
9       MR. SALIMBENE:  We're good?  Okay.
10 We're finished.  We will pass the witness.
11      MS. KEARSE:  Okay.
12      EXAMINATION OF DONNA SKODA
13 BY MS. FITZPATRICK:
14     Q.  Ms. Skoda, I'm Fidelma Fitzpatrick.
15 We've met a couple of times, and I just want to
16 ask you a few questions at the end of the
17 deposition and, hopefully, this won't take too
18 long to run through.
19     A.  Okay.
20     Q.  You are the Summit County
21 Commissioner of Public Health, correct?
22     A.  Correct.
23     Q.  And how long have you been in that
24 position?
25     A.  Three years.

89 (Pages 350 - 353)

Page 354

1    Q.    Can you tell us what public health
2  is?
3    A.    It is a complex system of public
4  health entities, local boards of health, that
5  work in collaboration with any number of
6  partners in the community to deliver services
7  that reduce risk and harm and prevention in the
8  communities.
9    Q.    And is part of your job as the
10  commissioner of public health to determine
11  whether a particular health situation or a
12  particular situation within Summit County is a
13  public health issue or a public health crisis?
14    A.    Yes, at times it is, it's
15  appropriate, but it's usually, for us to
16  determine a public health nuisance or a public
17  health crisis, it's done in partnership with
18  many of our partner entities, because these
19  issues that are public health concerns are
20  complex in nature.
21    And so we usually begin with a very
22  thorough review of data and information and try
23  to identify who is at most risk within the
24  population.  It is not geared at individuals.
25  It's geared at preventing harm and any

Page 355

1  condition in the entire community.
2    Q.    Is a public health issue different
3  than an individual health issue?
4    A.    Yes.
5    Q.    Can you explain that to me?
6    A.    An individual seeks medical care --
7  or has care one on one.  Public health doesn't
8  look -- that's why the data sources that we
9  collect, much of what we get are deidentified,
10  it's aggregate data, because our concern is
11  what is this problem or potential problem
12  creating in the community.
13    We aren't looking at it from an
14  individual basis, but rather how do we address
15  the needs of all and reduce harm and risk.
16    Q.    And what makes something a public
17  health issue or a public health crisis?
18    A.    Something where, for public health
19  particularly in this network, is we become very
20  concerned when we see rising death rates, when
21  we understand that the situation is now
22  different from the perspective in the
23  community, whether a use perspective or that
24  things are now changing.
25    Another example of that might be

Page 356

1  climate change.  We become concerned when see
2  things that are changing in the community that
3  can have adverse effects on the population.
4    Q.    And earlier today, you were asked
5  about patient-specific records a couple times;
6  do you remember that?
7    A.    Yes.
8    Q.    And when determining whether
9  something is a public health issue for Summit
10  County, do you ever rely on patient-specific
11  records or patient-specific information?
12    A.    No, we do not.
13    Q.    And why not?
14    A.    Because that's not public health.
15  We are into prevention for populations.  We
16  don't identify individuals or what their
17  behaviors are.
18    We, unfortunately, with limited
19  resources, deal with what we see in the
20  community, as best we can, to try to mitigate
21  damages that harm the people, and try to make
22  sure that people can be successful and live and
23  be healthy.
24    Q.    Do you rely on aggregated data when
25  making a determination whether something is a

Page 357

1  public health issue in Summit?
2    A.    Yes.
3    Q.    And you testified earlier today in
4  response to some of the defendants'
5  questioning, that there is an oversupply of
6  opiates into the Summit County community; do
7  you remember that?
8    A.    Yes.
9    Q.    And as the commissioner of public
10  health, and with the experience that you bring
11  to that position, do you believe that the
12  oversupply of prescription opioids in Summit
13  County has created a public health crisis?
14    A.    Yes.
15    MR. NAEEM:  Object to form and
16  foundation.
17    Q.    And why is that?
18    MR. NAEEM:  I objected to form and
19  foundation.
20    Q.    Why do you believe that the
21  oversupply of prescription opioids into Summit
22  County has created a public health crisis?
23    MR. NAEEM:  Same objections.
24    A.    Because any time there are
25  behaviors -- or there is such a trust with the

90 (Pages 354 - 357)

Page 358

1  medical community and with the organizations.
2        So any time there is a potential
3  breach of that trust to the public -- people go
4  to their doctor and believe that what they are
5  doing is right, and when an individual
6  physician prescribes a medication to a person,
7  they trust at all levels that that is what
8  should be happening to them.
9        And I refuse to believe, in my
10  heart of hearts, that physicians don't think
11  they are doing right.  They are doing what they
12  have been told to do.  They were told to
13  evaluate pain as a fifth sign, a vital sign.
14        Their professional organizations
15  were are telling them, it's okay, go ahead and
16  prescribe, and then all of a sudden we have
17  this whole new group of individuals that are
18  using opioids incorrectly and/or become
19  addicted to them, and it has created havoc, and
20  that is a kind word, for the communities.
21    Q.    Is the opioid public health crisis
22  of Summit limited to any particular
23  socioeconomic group?
24    A.    No.
25    Q.    Is it limited to any particular

Page 359

1  gender?
2    A.    No.
3    Q.    Is it limited to any particular age
4  group?
5    A.    No.
6    Q.    Is it limited to any particular
7  ethnicity?
8    A.    No.
9    Q.    Why isn't this just an individual
10  issue for individuals who are dependent on
11  opioids?
12    A.    Because it's impacting community
13  resources, it's creating death and disability
14  for which public health does everything in our
15  power to prevent death and disability with
16  policies, changes, whatever it might take, but
17  it is creating the environment for which there
18  are so many downhill issues between children
19  services, the school systems, the safety
20  forces, EMS, it has cost communities millions
21  to respond.
22        And I know there is this attitude
23  that why would you spend money, why would you
24  not just let them die.  It's because every
25  single human on this earth deserves a second

Page 360

1  chance.  So do we don't let them die.  They are
2  addicted.
3    Q.    And I think you testified earlier
4  that, despite the best efforts, there are
5  individuals who do die --
6    A.    Yes.
7    Q.    -- of prescription opioid overdoses
8  in Summit County, correct?
9    A.    Yes.
10    Q.    And are those overdoses and deaths
11  limited to any particular socioeconomic group?
12    A.    No.
13    Q.    Or limited to any particular
14  gender?
15    A.    No.
16        MR. NAEEM:  Object to form and
17  foundation.
18    Q.    Any particular age?
19    A.    No.
20    Q.    Or any particular ethnicity?
21    A.    No.
22    Q.    And, in fact, this is an issue that
23  I think you testified that you have been deeply
24  involved in as commissioner of public health
25  for Summit County, correct?

Page 361

1    A.    Yes.
2    Q.    And is this part of your job, to
3  study and understand the opioid crisis as it
4  exists in Summit County?
5    A.    Yes.
6    Q.    And to help develop programs and
7  solutions to prevent overdose and death and
8  dependency with opioid users?
9    A.    Yes, with staff assistance.  I
10  don't do it all.  I mean, the staff really are
11  the individuals that work.  It's direction,
12  though, to them.
13    Q.    And you had testified earlier that
14  there are also problems in the community with
15  heroin, fentanyl, and carfentanil, correct?
16    A.    Yes.
17    Q.    And in your experience as the
18  commissioner of public health and the work that
19  you have done on these issues, do you believe
20  that the heroin, fentanyl, and carfentanil
21  problems are related to the prescription opioid
22  public health crisis?
23        MR. NAEEM:  Object to foundation.
24    A.    It would be my understanding that
25  illicit drugs became more available as pill

91 (Pages 358 - 361)

Page 362

1  mills dried up and as prescriptions decreased,
2  so most of the cartels, most of the illicit
3  drug solicitors are business people, and they
4  knew when we created a shortage here and we had
5  all these addicted people that they were going
6  to do all kinds of crazy things to stay
7  addicted, because it is a brain disease.
8        And you don't just wake up one day
9  and say, oh, today I'm going to be a bad
10 parent, and today I'm not going to take care of
11 my kids.  Today I'm going to stop using heroin.
12 It doesn't work like that.  You are addicted.
13 It's a brain disease.
14        And what happens then is, we have
15 seen this over and over and over again, that
16 when the supply dries up and when it decreases,
17 the illicit drugs increase.  And now we are
18 seeing dealers who don't make their product as
19 potent, because we are prosecuting them now,
20 and they don't want to go to jail.  So we are
21 now seeing polydrug use, mixing other drugs,
22 cocaine, methamphetamine.
23        Yes, they are individuals that
24 engage in awful behavior, but the group of
25 people that are giving them the business are

Page 363

1  there because of an -- often a very legitimate
2  injury or prescription -- a prescription that
3  took them down a road where they became
4  addicted.
5     Q.   And speaking of other drugs, you
6  were asked some questions about drug abuse
7  generally in the community; do you recall that
8  earlier today?
9     A.   Yes.
10    Q.   And you were asked some questions
11 about other illegal drugs, including cocaine
12 and methamphetamine, correct?
13    A.   Correct.
14    Q.   And I jotted down here that there
15 is some question about a long history of
16 substance abuse in this country, going back to
17 the 1800s; do you recall that?
18    A.   Oh, yes.
19    Q.   Why are prescription opioids alone
20 public health crisis in Summit County, if there
21 are other drug issues that exist in the
22 community as well?
23    A.   First, I think it has been very
24 difficult for us to get our hands around the
25 scope of the problem, because we aren't really

Page 364

1  sure how many individuals are functional
2  addicts out there.  And that, down the road, is
3  going to create a whole other set of needs,
4  because individuals can maintain an addiction
5  for a long time, many do for years, and then
6  slowly it will start to unravel.
7        And they will be engaging in other
8  behaviors, and their lives will sometimes tank,
9  and often some get treatment at that point,
10 other don't.  But this is different in that it
11 began because people were going to providers,
12 getting pills, and being told take this for
13 your headaches, and it will be okay, when, in
14 fact, they ended up addicted.
15    Q.   And does the fact that people can
16 be addicted to substances other than
17 prescription opioids mean that prescription
18 opioids are not a public health issue in Summit
19 County?
20    A.   No.
21    Q.   Why not?
22    A.   All of those other drugs we know
23 are illegal.  They are illicit, they are
24 illegal, you shouldn't be fooling around with
25 them.  Opioids were a totally different -- they

Page 365

1  have a role in society.
2        I have never taken an opiate, but I
3  can tell you, if I need one and I'm really
4  hurt, I hope I get it.  I mean, if you really
5  need pain relief and pain medication, opiates
6  should be available.  It was just taken to a
7  whole new level.
8     Q.   And is that what you meant by the
9  oversupply --
10    A.   Yes, because physicians thought it
11 was okay to hand them out to people.
12    Q.   And you were asked a series of
13 questions on a decline in the amount of
14 prescription opioids that are dispensed into
15 Summit County; do you recall that?
16    A.   Yes.
17    Q.   Does the fact that there has been a
18 decline in the amount of prescription opioids
19 dispensed into Summit County mean that
20 prescription opioids are not a public health
21 crisis in Summit County today?
22    A.   No.
23    Q.   And why not?
24    A.   Because I have no idea how many
25 individuals are maintaining an addiction right

92 (Pages 362 - 365)

Page 366

1  now with still going to a doctor, still getting
2  overprescribed opiates, still getting them
3  and/or sharing them with each other, whatever
4  the case may be. We have no idea, down the
5  road, how far this goes.
6    Q.  And you had testified that one of
7  the jobs of public health is to engage in
8  prevention, correct?
9    A.  Correct.
10   Q.  Is there any way for public health
11 to identify any particular population or
12 particular subpopulation that is likely to turn
13 up as opioid overdoses or opioid deaths or
14 opioid addictions?
15      MR. NAEEM: Object to form and
16 foundation.
17   A.  No. Not unless I had access to
18 data that told me who -- you know, the
19 communities they lived in or wherever.
20      That's why we take -- all of our
21 programs, we try to be as mobile and as spread
22 out in the community as we possibly can. I
23 mean, we have done education programs with food
24 services workers, we've gone to business
25 leaders. It's all over. We don't

Page 367

1  differentiate where we have to go for this,
2  because we don't know.
3    Q.  And do you believe that
4  prescription opioids continue to create a
5  public health crisis in Summit County today?
6    A.  Yes.
7    Q.  And that public health crisis that
8  we are talking about, is that something caused
9  only by the diversions or illegal sales of
10 prescription pills?
11   A.  No.
12      MR. LAVELLE: Object to the form.
13 Go ahead.
14   Q.  Is that prescription opioid public
15 health crisis, is that something that is an
16 issue only related to criminal conduct?
17   A.  No.
18   Q.  Is the prescription opioid public
19 health crisis in Summit County an issue that's
20 only related to so-called pill mills?
21      MR. LAVELLE: Object to the form of
22 the question.
23   Q.  Is the prescription opioid public
24 health crisis in Summit County caused only by
25 bad doctors?

Page 368

1    A.  No.
2      MR. LAVELLE: Objection to form and
3  foundation.
4    Q.  Is it something that is only caused
5  by bad choices made by addicts.
6      MR. LAVELLE: Object to the form of
7  the question.
8    A.  No.
9    Q.  Has the county -- has your
10 department undertaken any programs to address
11 the opioid crisis within the county?
12   A.  Yes. Prevention.
13   Q.  And what programs are run through
14 the Summit County Public Health Department?
15   A.  We do alcohol and other drug
16 counseling, but again that came over from the
17 Akron Health Department. We also do needle
18 exchange programs, Summit Safe, we have Project
19 DAWN, we distribute naloxone, we also train
20 police officers in supplying naloxone, so they
21 can use it if they are first on the scene for
22 an unconscious human.
23      We do quick response teams, where
24 we supply a counselor to go out and visit the
25 homes of those individuals that have overdosed.

Page 369

1  We do fentanyl test strips. I said MAT,
2  medication-assisted treatment. Those are the
3  programs that we have developed.
4    Q.  And have those programs, in your
5  opinion, been effective in mitigating some of
6  the prescription opioid public health crisis
7  that exists in your community?
8    A.  I am hopeful that that's part of
9  it.
10   Q.  And those programs are paid for by,
11 I think you testified, a combination of
12 taxpayer dollars and grants; is that correct?
13   A.  Correct.
14   Q.  Okay. Do you believe that the
15 programs that you have identified alone are
16 enough to address the prescription opioid
17 public health crisis in Summit County?
18   A.  No.
19   Q.  Why not?
20   A.  Because the need. We need to
21 really have additional -- because addiction is
22 a brain disease, and you don't ever live
23 without it.
24      I had a mother tell me once that
25 when your kid's in recovery and your kid's

93 (Pages 366 - 369)

Page 370

1 sober, that the addiction is out in the parking
2 lot doing pushups, so it can go back even
3 stronger.
4     So because we know it's a disease
5 that's hard to manage, like many chronic
6 diseases, we are going to need a lot of
7 medication-assisted therapy to help individuals
8 remain sober, we're going to need recovery
9 houses, we really need to have sober housing
10 for individuals, because, quite frankly, I have
11 talked to so many parents whose child was sober
12 for three years, four years, five years after
13 an opioid addiction, and then overdosed a died.
14     So prevention isn't just
15 getting -- starting way early and getting
16 resiliency factors and getting kids. It's
17 going to take years to continue this group of
18 caring for, or we're going to continue to have
19 relapse.
20     Q.   If you could describe the opioid
21 epidemic in Summit County in one word, what
22 would it be?
23     A.   Devastating.
24         MS FITZPATRICK.  That's all.  Thank
25 you very much.

Page 371

1         THE WITNESS:  Thank you.
2         EXAMINATION OF DONNA SKODA
3 BY MR. NAEEM:
4     Q.   Ms. Skoda, you were asked -- you
5 were just asked a lot of questions about public
6 health, public health issues generally, and
7 specifically related to use of prescription
8 opioids.
9         To be clear, you have been health
10 commissioner since 2015, correct?
11     A.   Correct.
12     Q.   All right.  And when you were asked
13 questions by the defense side of the table
14 about what happened prior to 2015, you
15 basically said you had no exposure to the
16 opioids as within the health department, or
17 Summit County Public Health, prior to becoming
18 health commissioner in 2015?
19     A.   Well, I knew about them and
20 certainly probably work might have crossed, but
21 it wasn't my direct responsibility.  I didn't
22 manage the programs.
23     Q.   So you were a concerned citizen
24 certainly, but no responsibility for Summit
25 County Public Health's response to the opioid

Page 372

1 crisis prior to 2015?
2     A.   Well, I hesitate to say no, because
3 if there was a grant that was being written, I
4 may have helped with the grant.  If there were
5 some projects, I may have helped with that.  So
6 I might have helped on something or helped work
7 with it, but I wasn't directly focused on that.
8     Q.   Okay.  You were asked a series of
9 questions about how to assess public health and
10 needing to do it from, this is my word, a macro
11 perspective rather than looking at individual
12 health records?
13     A.   Correct.
14     Q.   Okay.  So, in fact, you don't have
15 the ability to individually assess which of
16 those people who are addicted to illicit drugs
17 like heroin and fentanyl started with a
18 prescription opioid or not?
19     A.   Correct.
20     Q.   And you were asked questions about
21 the socioeconomic demographics of patients who
22 were addicted to opioids.  Have you read
23 articles suggesting that the only reason people
24 care about the opioid crisis currently is
25 because it's now affecting primarily white and

Page 373

1 middle or upper class communities?
2     A.   Yes.
3         MS. FITZPATRICK:  Objection.
4     Q.   You've seen those, haven't you?
5     A.   Yes.
6     Q.   You have talking a lot about or --
7 strike that.  I don't want to ask it that way.
8         You were asked about fentanyl,
9 heroin, and carfentanil and its is increasing
10 prevalence in the community, and you testified
11 that drug cartels were moving in to replace the
12 prescription opioids, because those
13 prescription opioids were becoming harder to
14 get, I'm paraphrasing again, but do you
15 remember that testimony?
16     A.   Yes.
17         MS. FITZPATRICK:  Objection, it
18 misstates testimony.
19     Q.   You certainly don't have any
20 understanding regarding what cartels do or
21 think, do you?
22         MS. FITZPATRICK:  Objection.
23     A.   I have not ever been in a cartel.
24     Q.   Have you ever spoken to any of the
25 Mexican cartels about why they are producing

94 (Pages 370 - 373)

Page 374

1  fentanyl or carfentanil?
2      A.   No.
3      Q.   So that was speculation on your
4  part; would you agree?
5          MS. FITZPATRICK:  Objection.
6      A.   No.  I believe it is in the
7  literature.
8      Q.   Okay.  So what literature --
9      A.   And according to the police,
10  police, I would say all of the meetings we have
11  had with Ohio State Patrol or any of those
12  responsible for, I guess, catching them, has
13  made it very clear that those drugs are coming
14  from the Mexican cartel, China is shipping, any
15  number.
16      Q.   Okay.  And I understand and I don't
17  dispute with you where that is coming from, but
18  do you have personal knowledge regarding the
19  intent of cartels when they are producing and
20  shipping illegal substances like fentanyl and
21  heroin?
22          MS. FITZPATRICK:  Objection.
23  Misstated her testimony.
24      A.   No.
25      Q.   So again, that was speculation on

Page 375

1  your part regarding what cartels were doing?
2          MS. FITZPATRICK:  Objection.  Asked
3  and answered.
4      A.   I'm not speculating.
5      Q.   And again, when you were talking
6  about fentanyl and carfentanil, you said that
7  those patients often started with their
8  addiction with a legitimate prescription.
9  Again, you don't have any data to back that up,
10  do you?
11      A.   I only have the Opiate Task Force
12  has presented, that four out of five started
13  with a prescription drug.
14      Q.   Can we -- do you have Exhibit 14 in
15  front of you?
16      A.   Yes.  Okay.
17      Q.   And to be clear, Exhibit 14, this
18  is was a presentation you gave to the Child
19  Family Leadership Exchange, correct?
20      A.   Correct.
21      Q.   That presentation was in September
22  of 2016?
23      A.   Correct.
24      Q.   And the facts and figures page, and
25  again, they are unnumbered, but do you have

Page 376

1  that?  You were directed to it by
2  Mr. Salimbene.
3      A.   Yes.  The fourth bullet?
4      Q.   The fourth bullet point, "Four and
5  five new heroin users," it starts, correct?
6      A.   Yes.
7      Q.   This, again, this is information
8  from your presentation?
9      A.   Yes.
10      Q.   Is this the information you are
11  citing the four out of five start with
12  prescription opioids?
13      A.   Four and five, it was data put in
14  here because of that.  I knew that, yes.
15      Q.   Yeah, and I'm just asking --
16      A.   Yes.
17      Q.   -- there is a citation there, is
18  that --
19      A.   Yes.
20      Q.   -- we talked about four and five a
21  number of times today?
22      A.   Correct.
23      Q.   This is the citation for that,
24  correct?
25      A.   Correct.

Page 377

1      Q.   Now, the name of the article is
2  Heroin Use and Heroin Use Risk Behaviors Among
3  Nonmedical Users of Prescription Opioid Pain
4  Relievers?
5      A.   Yes.
6      Q.   Do you know what nonmedical use
7  means?
8          MS. FITZPATRICK:  Objection.
9      A.   Yeah.
10      Q.   What does it mean?
11      A.   That you take the pills to get
12  high, I would assume.
13      Q.   Right.  So it's not for medical
14  use, so it is illegitimate, not legitimate use,
15  correct?
16          MS. FITZPATRICK:  Objection.
17      A.   I can't take that from the title.
18  Because, to be honest, when that, "Started out
19  misusing prescription drugs," people can get
20  and then start misusing because they were
21  addicted.
22          I believe in my heart that people
23  don't ever try to get addicted, and so I think
24  if they start misusing, it's because they are
25  addicted.

Page 378

1      Q.    And that wasn't my question.  I
2  appreciate your answer.  But you cited this for
3  the proposition that four out of five heroin
4  users started with a legitimate prescription.
5  My point is simply, this article doesn't
6  support that, does it?
7          MS. FITZPATRICK:  Objection.  Hang
8  on.  Can you show her the article?
9          MR. NAEEM:  This is her citation.
10  I can ask her --
11          MS. FITZPATRICK:  Right, but you're
12  asking her based on the title of the article to
13  make an assumption.
14          MR. NAEEM:  Fair.
15          MS. FITZPATRICK:  And you should
16  put the article in front of her.
17          MR. NAEEM:  Speaking objections are
18  not permitted.
19          MS. FITZPATRICK:  Well, then I'll
20  go with asked and answered, because she gave a
21  full answer to this very question.
22          MR. NAEEM:  And her answer prior to
23  my follow-up was that she couldn't say what
24  nonmedical use was.
25          MS. FITZPATRICK:  No.  She said she

Page 379

1  didn't agree with your interpretation.
2      Q.    Let's follow up with some questions
3  here.
4      A.    Okay.
5      Q.    Can you cite any article, other
6  than what's in your presentation, for the
7  proposition that four out of five new heroin
8  users started out with a legitimate
9  prescription for opioids?
10      A.    The Opiate Task Force sites that as
11  well.  Now, whether or not they used this same
12  source, I don't know.
13      Q.    But to be fair, this citation is in
14  your presentation from 2006, correct?
15      A.    Correct.
16      Q.    As we sit here today, can you tell
17  us whether that article supports your
18  proposition that four out of five heroin users
19  started with a legitimate prescription for
20  opioids?
21      A.    I don't understand what you mean by
22  legitimate.  Could you explain that?
23      Q.    Sure.  Legitimate means taken as
24  prescribed by a licensed physician and used
25  according to instructions.

Page 380

1      A.    Okay.  So that's good, but what I
2  think -- I guess where we are just missing on
3  semantical terms, if you start taking that
4  correctly and get addicted, and some people get
5  addicted very quickly, depending on your brain
6  chemistry, how old you are, if you get
7  addicted -- or if you use other substances, but
8  if you get addicted, I think this is saying
9  that you get addicted and start misusing
10  prescription pills.
11          Now, I understand the title, but I
12  don't remember the article at all, but I
13  understand what you are trying to say to me,
14  but I don't know if I agree.
15      Q.    Okay.  Well, I'm asking for your
16  interpretation, right?
17      A.    But my interpretation is that four
18  out of five new heroin users start out misusing
19  prescription pills after they became addicted.
20      Q.    Okay.  And so your citation for
21  that and your interpretation is based on that
22  citation, Jones CM, Heroin Use and Heroin Use
23  Risk Behaviors Among Nonmedical Users of
24  Prescription Opioid Relievers?
25      A.    And to me, that nonmedical means

Page 381

1  it's beyond what you were originally given the
2  prescription for.
3      Q.    All I want to do is, when I leave
4  here today --
5      A.    I'm lost.
6      Q.    -- know what the citations are for
7  your proposition that four out of five heroin
8  users started out with a legitimate
9  prescription, because that was your testimony
10  earlier today.
11      A.    So I would look at Jones, and I
12  would look at the Opiate Task Force stuff.
13      Q.    And anything else, as you sit here
14  today, that you can cite for that very specific
15  testimony you gave earlier?
16      A.    No.
17      Q.    You were asked a series of
18  questions, towards the end of your direct,
19  about whether things like criminal activity was
20  the only cause of the crisis, or bad choices of
21  addicts were the only cause; do you remember
22  that?
23      A.    Yes.
24          MS. FITZPATRICK:  Objection.
25      Q.    Certainly they are causes though of

96 (Pages 378 - 381)

Page 382

1 the crisis?
2     A.   No.
3     Q.   So --
4     A.   Addiction is the cause.
5     Q.   So diversion is not a cause of the
6 crisis?
7     A.   There was a lot of pills that were
8 available, and you're calling it a criminal
9 activity, and it is a criminal activity in law.
10 I mean, people can be charged with taking
11 somebody else's prescription, but people were
12 addicted.
13     Q.   I understand that.  I have a simple
14 question though.  Is diversion a cause of the
15 current crisis?
16         MS. FITZPATRICK: Objection.  Asked
17 and answered.
18     A.   So you are saying someone who has a
19 prescription and gives it to somebody else?
20     Q.   Right.
21     A.   Is a cause of the problem?
22     Q.   Is it a cause of --
23     A.   It could be.
24     Q.   And the operation of pill mills, is
25 it a cause of the current opioid crisis in

Page 383

1 Summit County?
2         MS. FITZPATRICK: Objection.
3     A.   I don't know that, because I don't
4 know how many pill mills were here.
5     Q.   Criminal activity, is that a cause
6 of the current opioid crisis?
7         MS. FITZPATRICK: Objection.
8     A.   What do you mean by, "Criminal
9 activity"?
10     Q.   Well, that was the question you
11 were asked.  I'm assuming it is the provision
12 of heroin and fentanyl --
13     A.   Oh, oh, oh.
14     Q.   -- from outside sources into Summit
15 County.
16     A.   No.
17     Q.   Not at all?  So if there was no
18 heroin and fentanyl in Summit County --
19     A.   I think it brought to light an
20 underlying problem that was just brewing out
21 there.
22     Q.   So to be clear, the manufacturers
23 of illicit heroin and fentanyl bear no
24 responsibility for the current crisis in Summit
25 County?

Page 384

1         MS. FITZPATRICK: Objection.
2     A.   The manufacturers of those, you
3 mean, the street dealers?
4     Q.   Sure.  The people who manufacture
5 fentanyl in China.  They bear no --
6     A.   Yes, they are guilty of
7 manufacturing it, but they would not have been
8 able to sell their wares to anyone if these
9 individuals weren't addicted.
10         And many of them got addicted by
11 other ways that weren't related to going out
12 and finding street heroin.  People just don't
13 just start going out and getting street heroin.
14 There is a long pathway.
15     Q.   And what is your citation for no
16 one does that?
17     A.   It would be -- it's experience.
18 It's personal times I have spent with -- they
19 wouldn't even know.
20         I spent a great deal of time with
21 individuals who are drug users, homeless drug
22 users.  It's a -- and often they are
23 individuals that people don't like, because the
24 brain disease takes over, and they do all kinds
25 of horrible things to support that habit.  But

Page 385

1 really, underneath it all, they are really good
2 people that just need support and help.
3         So I don't really have a formal
4 reference that no one, but in my wildest dream,
5 I could not think of somebody going out for the
6 first time ever using a drug and getting
7 heroin.  It just doesn't happen.
8     Q.   Okay.  Well, so let's clarify then.
9 Did all heroin users start by using
10 prescription opioids?
11         MS. FITZPATRICK: Objection.
12     A.   I don't know that.
13     Q.   Certainly we know that there were
14 prior epidemics of opioid addiction, for
15 example, after the Vietnam War?
16     A.   Yes.
17     Q.   They weren't using prescription
18 opioids, were they?
19     A.   No.
20     Q.   There were opioid addiction crisis
21 in the early 1900s?
22     A.   Yes.
23     Q.   There weren't any prescription
24 opioids back then, was there?
25         MS. FITZPATRICK: Objection.

97 (Pages 382 - 385)

Page 386

```
1     A.   I'm not sure.  I don't know if it
2  was prescription, but they were not the
3  manufactured, but they were given
4  certain -- there was a belief -- they gave it
5  to them because they didn't have anything else,
6  so that was used, yeah.
7     Q.   So even if we just limit our
8  discussion to people who use heroin based on
9  their prior use of other substances, illegal
10 substances, it's not just prescription opioids,
11 it could have been marijuana, it could have
12 been alcohol, it could have been many other
13 substances that led to their use of heroin?
14       MS. FITZPATRICK:  Objection.  Form.
15    A.   It could be.
16       MR. NAEEM:  No further questions.
17       MS. FITZPATRICK:  Nothing further.
18       THE VIDEOGRAPHER:  Off the record
19 6:00 p.m.
20    (Deposition concluded at 6:00 p.m.)
21         - - - - -
22
23
24
25
```

Page 388

```
1         REPORTER'S CERTIFICATE
2  The State of Ohio,   )
3              SS:
4  County of Cuyahoga.  )
5
6      I, Wendy L. Klauss, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, DONNA SKODA, was
10 by me first duly sworn to testify the truth,
11 the whole truth and nothing but the truth in
12 the cause aforesaid; that the testimony then
13 given by the above-referenced witness was by me
14 reduced to stenotypy in the presence of said
15 witness; afterwards transcribed, and that the
16 foregoing is a true and correct transcription
17 of the testimony so given by the
18 above-referenced witness.
19      I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25
```

Page 387

```
1  Whereupon, counsel was requested to give
2  instruction regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5         SIGNATURE:
6  Transcript review was requested pursuant to the
7  applicable Rules of Civil Procedure.
8
9         TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.
```

Page 389

```
1      I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5      IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 17th day of
8  August, 2018.

13      Wendy L. Klauss, Notary Public
14      within and for the State of Ohio

17 My commission expires July 13, 2019.
```

98 (Pages 386 - 389)

Page 390

```
1        Veritext Legal Solutions
            1100 Superior Ave
2             Suite 1820
           Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
   August 17, 2018
5
   To: Anne Kearse
6
   Case Name: In Re: National Prescription Opiate Litigation v.
7
   Veritext Reference Number: 2987504
8
   Witness:  Donna Skoda      Deposition Date:  8/14/2018
9
10 Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA
```

Page 391

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
3  ASSIGNMENT REFERENCE NO: 2987504
   CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 8/14/2018
4  WITNESS' NAME: Donna Skoda
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date _____ Donna Skoda
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed.
15
      I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18    _____
      Notary Public
19
      _____
      Commission Expiration Date
20
21
22
23
24
25
```

Page 392

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
3  ASSIGNMENT REFERENCE NO: 2987504
   CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 8/14/2018
4  WITNESS' NAME: Donna Skoda
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
   Date        Donna Skoda
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17    They have read the transcript;
      They have listed all of their corrections
18    in the appended Errata Sheet;
      They signed the foregoing Sworn
19    Statement; and
      Their execution of this Statement is of
20    their free act and deed.
21 I have affixed my name and official seal
22 this _____ day of_____, 20____.
23 _____
      Notary Public
24
      _____
25    Commission Expiration Date
```

Page 393

```
1     ERRATA SHEET
      VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 8/14/2018
3  PAGE/LINE(S) /     CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 Date        Donna Skoda
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20____ .
23 _____
      Notary Public
24
      _____
25    Commission Expiration Date
```

[& - 20001-4956]

| & |
| --- |
| **&** 1:23 2:16,19 3:2 |
| 3:15,19 4:3,11,16 |
| 5:2,16 15:17,23 |
| 16:1,5,8,18,21,25 |
| 91:9,12 157:21 |

| 0 |
| --- |
| **02903** 2:10 |

| 1 |
| --- |
| **1** 7:3 48:22 70:9 |
| 92:4,18,25 94:18 |
| 95:13 120:12 |
| 156:17 265:3 |
| 270:17 272:12 |
| 325:12 330:7 |
| 334:2 337:16 |
| **1,000** 79:6 88:20 |
| **1,109** 330:18 |
| 331:16 |
| **1.5** 69:16 |
| **1.7** 153:9 273:2 |
| **1.75** 70:9 |
| **1.75.** 70:4 |
| **10** 7:20 55:6 69:8 |
| 84:20 86:12 98:24 |
| 98:25 99:1 157:4 |
| 260:24 |
| **10,000** 104:17 |
| 154:15 |
| **100** 2:9 9:10 35:21 |
| 37:22 77:7 145:3 |
| 306:14 335:1 |
| **1000** 5:9 |
| **10036** 5:18 |
| **105** 154:13 |
| **10:32** 91:1 |
| **10:51** 91:4 |
| **11** 7:21 59:12 |
| 76:22 114:7 |
| 234:16,16 269:2,8 |

313:1
**1100** 2:22 390:1
**1109** 334:14
**111** 5:4
**1111** 5:13
**11747** 2:14
**12** 7:22 62:6 66:16
68:25 69:9 85:24
102:8,10 128:25
154:1,4,6 155:12
162:22 169:2
174:22 302:17,19
302:21 326:16
**120** 9:11
**1211** 5:17
**125** 154:17
**12:09** 157:9
**13** 7:24 95:12
98:14 121:2
163:12 169:13
313:23 314:4
389:17
**131869** 7:25
313:25 314:5
**134** 9:12
**135023** 8:2 316:15
316:24
**14** 1:21 8:1 15:2
113:11 119:22
134:12 158:21
169:14 218:22
250:16 316:5,13
316:19 351:20
375:14,17
**140** 325:24
**146** 9:13
**15** 8:3 55:7 62:6
64:11 79:16 104:6
104:6 110:2
119:22 134:12
151:16 158:21

191:7 210:12
218:22 221:10
321:3,8 336:10
**15.6** 164:22,24
165:6,16
**1500** 56:13
**15219-6401** 4:13
**154701** 7:9 171:16
**155008** 7:4 92:6
**159** 7:6
**16** 8:5 53:7,8 64:8
67:14 79:16 83:5
119:22 210:12,13
218:22,23 221:10
225:9,14 327:14
327:20
**1600** 4:22,22
**162** 329:16
**164** 9:14
**166** 9:15
**167** 9:16,17,18
**17** 1:9 6:8 8:6 22:7
65:13 67:14 93:17
97:1 121:3 207:14
287:1 337:20,25
390:4
**1701** 3:12
**171** 7:8 9:19
**1717** 3:8
**175** 9:20
**176307** 7:23
302:23 304:19
**177** 9:21
**178** 9:22,23
**178390** 7:15
225:20
**179** 9:24
**17th** 389:7
**18** 8:8 35:22 62:25
67:14 101:10
120:24 121:9

142:7 180:25
193:7 305:3
307:14 340:14,19
**18,000** 144:22
**1800** 5:8
**1800s** 168:5,8
363:17
**180563** 7:5 92:13
**181** 9:25
**1820** 390:2
**1867** 32:2 82:7
**19** 67:15
**190** 7:10,12
**1900s** 168:10
385:21
**19103** 3:9
**19103-2921** 3:13
**197** 10:1
**199** 10:2,3,4
**1990** 232:3
**1993** 233:2
**1:00** 157:12
**1:18** 1:16

| 2 |
| --- |
| **2** 6:3 7:5 83:11 |
| 92:11,18 95:7 |
| 103:6 305:11 |
| 307:8 328:18 |
| **2,205** 263:18 |
| **2.5** 156:23 |
| **20** 48:22 54:2 |
| 64:21 84:20 86:24 |
| 112:22 246:23,25 |
| 247:7 249:18 |
| 250:13 391:16 |
| 392:22 393:22 |
| **20,000** 59:23 |
| **20.4** 329:16 |
| **2000** 109:6 124:10 |
| **20001-4956** 4:18 |

**[20004 - 28]**

| | | | |
|---|---|---|---|
| **20004**  5:14 | 303:15 314:6,8 | 287:1 305:3 307:2 | **238**  10:20 |
| **20005**  3:17 | **2015**  7:14 8:3 | 307:14 | **24**  63:4 65:14,16 |
| **2001**  109:6,23 | 64:12,18 69:4,6 | **2018**  1:21 15:2 | 153:20 346:4 |
| 233:6,18,24 | 71:20 79:15 83:5 | 62:23 63:2 71:21 | **240**  10:21 |
| **2003**  112:17 113:1 | 110:7 124:10 | 101:12 102:13 | **243-4000**  4:5 |
| 226:14 325:20,24 | 130:20 131:1,8 | 153:10,22 192:10 | **245**  10:22 |
| 326:1,6 | 132:9 137:19 | 250:16 389:8 | **246**  10:23 |
| **20036-5802**  5:9 | 215:10 225:19 | 390:4 | **249**  10:24 |
| **2004**  257:16 | 226:6 234:11,19 | **2019**  62:23 65:20 | **25**  9:4 186:11 |
| 330:11,24 | 256:1,2 258:1,8,10 | 389:17 | 188:1,2 226:17 |
| **2005**  152:19 | 258:17 303:15 | **202**  3:17 4:19 5:10 | **25,000**  122:18 |
| 257:19 | 321:4,8,18,19 | 5:14 | **253**  10:25 |
| **2006**  152:19 | 322:5,10,23 323:6 | **203**  10:6,7 | **25301**  4:23 |
| 379:14 | 323:16 325:20,24 | **204**  10:8,9 | **254**  11:1 |
| **2007**  97:23 | 326:2,6 330:13 | **206**  10:10 | **255**  11:2 |
| **2009**  328:7 329:6 | 333:4 334:8 | **209**  10:11 | **256**  7:17 |
| **201**  10:5 | 336:14 371:10,14 | **21**  29:19 64:21,21 | **257**  11:3 |
| **2010**  25:12 59:17 | 371:18 372:1 | 256:18 | **258**  11:4,5,6 |
| 60:23 267:16 | **2016**  8:5 64:9 65:7 | **210**  10:12 | **259**  11:7 |
| 268:6 270:17 | 180:15 191:7 | **212**  5:18 | **26**  7:14 213:19,21 |
| 272:12,18 | 211:2 212:18 | **213**  4:5 10:13 | 214:6,8 225:19 |
| **2011**  25:14 59:18 | 213:16 214:1 | **215**  3:9,13 10:14 | **260**  7:20 11:8 |
| 60:7,23 63:6,8 | 225:9 227:11 | 10:15 | **261**  11:9 |
| 94:2 114:9 115:22 | 245:11 247:18 | **216**  2:18,23 4:9 | **262**  11:10 |
| 119:18,18 214:25 | 253:9 255:15 | 10:16,17 | **263**  11:11,12 |
| 216:6 233:18,25 | 327:15,20,25 | **216-523-1313** | **263018**  7:13 |
| 234:8,13 256:18 | 329:12,14 330:11 | 390:3 | 190:24 |
| 259:3,9 260:18 | 330:12,16,18,22 | **216-9140**  2:6 | **264**  11:13 |
| 263:18 323:6,16 | 330:24 331:1,16 | **22**  9:3 65:11 67:24 | **264062**  7:11 190:9 |
| 338:9 339:22 | 331:22 333:4,19 | 192:10 346:4 | **266**  11:14 |
| **2012**  63:10 214:25 | 334:2,2,8 336:10 | **2222**  2:17 389:13 | **267**  11:15 |
| 216:6 234:13 | 336:14 375:22 | **224-1133**  2:14 | **268**  11:16,17 |
| 262:7 263:4 | **2017**  7:3,20 22:8 | **225**  7:14 10:18 | **269**  7:21 11:18 |
| 320:13 329:14 | 22:23 24:1,8,10,16 | 262:7 | **271615**  8:7 337:22 |
| **2013**  113:10 114:3 | 25:19 27:5,11,15 | **227**  10:19 | **272**  11:19 |
| 138:3 141:23 | 27:17 34:6 92:6 | **228**  6:9 | **273**  263:19 |
| 143:19 145:16 | 192:19 260:25 | **229**  7:16 | **276**  11:20 |
| 164:22 166:7 | 261:4 262:8 263:4 | **23**  65:14 346:4,4 | **278**  11:21 |
| **2014**  134:6,16 | 263:19 267:23 | **2300**  5:3 | **279**  11:22,23 |
| 207:13 218:17,21 | 268:6 270:18 | **233**  333:17 334:24 | **28**  2:5 |
| 218:25 219:2 | 272:13,20 273:2 | | |

**28.4** 262:7 263:4 265:7

**280** 11:24,25 12:1

**2804** 1:6

**284** 1:9

**285** 6:10

**288** 12:2

**290** 12:3

**292** 12:4

**29464** 2:6

**298** 12:5

**2987504** 390:7 391:2 392:2

**299** 12:6

**2:30** 224:7,11

**2:31** 224:16

**2:50** 224:19

**2:54** 227:24

**2:55** 228:2

**3**

**3** 7:6 64:4 68:1,2 157:1,3,4 159:13 159:19,20,22 219:25 220:10 257:2 261:12 273:1 308:2 321:24 329:9,19

**3,000** 129:24

**3.3** 64:5

**30** 86:24 89:3 218:4 226:17 324:20

**30,000** 308:20

**300** 3:3 12:7 69:21

**300,00** 70:25

**301** 4:13 12:8

**302** 7:22

**304** 4:23

**305** 2:13

**305-6400** 3:22

**308** 12:9

**309** 12:10

**3100** 3:8

**312** 3:4

**313** 7:24

**316** 8:1

**318** 12:11

**320** 12:12

**321** 8:3

**323** 12:13,14

**327** 8:5 12:15,16

**330** 3:22

**331** 12:17

**334** 12:18

**337** 8:6 12:19

**340** 8:8

**340-1141** 4:23

**341** 12:20,21

**342** 12:22

**343** 12:23

**344** 12:24,25

**346** 13:1

**348** 13:2

**349** 13:3

**35** 9:5 226:18 246:23,25 247:7 249:19 250:13

**350** 13:4

**352** 13:5

**353** 6:11 13:6

**357** 13:7,8

**35th** 4:12

**36.6** 166:8

**360** 13:9

**361** 13:10

**366** 13:11

**367** 13:12,13

**368** 13:14,15

**371** 6:12

**373** 13:16,17,18

**374** 13:19,20

**375** 13:21

**377** 13:22,23 257:16

**378** 13:24

**38** 325:21

**380** 326:2,15 333:5 334:20

**381** 13:25

**382** 14:1

**383** 14:2,3

**384** 14:4

**385** 14:5,6

**386** 14:7

**388** 6:14

**3:51** 284:4

**4**

**4** 7:8 171:14,20 179:19 232:14 259:6 321:24 322:9 329:18,20

**4.1** 166:13

**40** 154:12 326:1,14

**40,000** 152:7,10 220:14

**400** 2:13 3:21

**401** 2:10

**412** 4:14

**43.23.** 267:24

**434-5000** 3:17

**44113** 2:22

**44113-1901** 2:17

**44114** 390:2

**44114-1190** 4:9

**44720** 3:21

**44th** 4:4

**45090** 1:16

**457-7728** 2:10

**471-3490** 4:14

**4:05** 284:7

**5**

**5** 7:10 83:5 154:15 166:15 190:7,14 190:15 192:8 193:13 207:8 216:13

**5,000** 154:17

**5.8** 166:11

**50** 29:18 48:25 71:1,25 139:3 341:22 342:5

**50,000** 71:2

**500** 4:22 79:14,18 115:9

**501** 219:25 220:10

**503** 5:5

**504** 325:21 334:17

**517-2941** 5:5

**53** 307:21

**53.35.** 267:22

**539** 333:5 334:20

**55** 2:9,17

**553** 334:18

**564** 331:11

**586-3939** 4:9

**592-5000** 2:23

**596-9451** 5:18

**5:15** 351:15

**5:23** 351:18

**6**

**6** 7:12 90:2,8 162:21 190:19,21 191:5 193:16 214:20 287:1 329:13 330:8 338:9

**6,000** 185:8,9

**6.2** 63:21,22

**6.3** 62:10

**[600 - accurate]**

**600** 79:14,18 83:5
**60654** 3:4
**61** 326:5 335:1
**631** 2:14
**64.37.** 267:18
**65** 154:12
**65,000** 101:24
102:3
**662-6000** 4:19
**667** 331:14
**685** 325:24 334:12
**6:00** 386:19,20

**7**

**7** 6:5 7:14 180:14
225:18,25 323:5
326:5
**700,00** 90:1,2
**700,000** 90:8
156:25
**71** 9:6
**725** 3:16
**739-3000** 5:14
**75** 1:23
**777** 4:4
**778-1823** 5:10

**8**

**8** 7:16 229:7,12,25
313:5 325:10
**8.9** 166:17
**8/14/2018** 390:8
391:3 392:3 393:2
**80** 9:7 170:18
214:13,15 232:13
250:1
**80,000** 291:9
**800** 78:20 79:6,12
79:18 81:11,17
83:1 88:20
**8040** 3:21

**81** 9:8
**83** 9:9
**843** 2:6
**85,000** 308:21
**850** 4:18
**851-8100** 3:9
**861-0804** 2:18
**862-2000** 3:4
**88** 263:19
**89** 188:19

**9**

**9** 7:17 69:8 256:6
323:4
**9/11** 187:19
**90017-5844** 4:4
**901** 4:8
**90s** 222:9
**91** 232:14
**92** 7:3,5
**93** 232:14 256:17
256:25 259:9
260:3
**95** 108:23
**950** 2:22
**96** 108:23 222:9
333:17 334:23
**963-4842** 3:13
**97204** 5:4
**9:06** 1:21 15:2
**9:26** 34:24
**9:27** 35:2

**a**

**a.m.** 1:21 15:2
**abatement** 156:23
**abide** 142:17
**abilities** 72:3
**ability** 121:20
198:8,16 240:14
240:19 287:17,18
287:20 346:5

372:15
**able** 47:7 49:2
57:20 64:3 83:6
101:15,17 107:20
125:24 140:12
149:16 153:8
169:10 184:1,21
197:6,15 202:14
207:4 212:20
219:13 220:14
242:19 244:15
246:19 264:21
273:19 283:21
305:25 306:5
352:13,17 384:8
**absolute** 336:4
**absolutely** 63:18
304:16
**abuse** 42:9,23
54:15 58:3,8,12
60:10,20 68:13,20
69:12,25 71:22
74:22 75:1,14
78:19 79:7 80:5
83:22 84:15,17
90:9 92:22 96:20
97:13 98:2 99:9
100:4,8 102:19
111:13 114:4,11
115:24 118:20
119:5 124:4
127:21 130:7,19
131:2,9 133:4
146:9 153:11,23
154:5,10 155:3,21
158:19 163:14
167:5 168:4,15
169:5 177:3 181:6
181:24 182:11,14
182:16 200:8
201:3 206:7,24

207:4 259:11
260:19 282:4
363:6,16
**abused** 84:11
281:16 324:22
**abusers** 170:14
199:14 207:6
**abusing** 57:10
83:3 199:21 200:2
339:9,18,24
**acceptance** 161:4
**accepted** 109:16
**access** 114:23
115:17,18 169:11
182:20,22,25
183:1,2,5,11,13,16
184:1 196:24
197:13 198:13
203:6,15 217:12
217:23 218:10
244:16 266:17
274:17 277:22
299:3,14 300:3
308:5,9 312:11
313:6 343:14
366:17
**accidental** 339:8
339:17,23
**accidently** 350:6
**accompany** 294:7
**account** 155:24
156:10
**accounting** 70:17
**accreditation**
61:13 113:21,23
113:24
**accredited** 61:15
113:22
**accuracy** 84:12
**accurate** 41:1
99:11 231:4

233:21 234:19
317:16,21 335:20
**accurately** 267:8
**acknowledge**
391:11 392:16
**acme** 219:17 236:1
236:5,6,7,23
**acronym** 44:21
236:4 243:12
**act** 114:21 240:22
240:25 241:10,17
241:23 242:9
309:7 350:15
391:14 392:20
**acting** 315:21
**action** 312:23
389:4
**actionable** 307:3
**active** 135:12,15
**activities** 24:21
85:18 236:13
**activity** 187:21
250:24 381:19
382:9,9 383:5,9
**acts** 221:16
**actual** 87:20
121:17 151:7
162:18 163:23
233:12 262:15
317:12
**ad** 195:3
**adamant** 169:14
**add** 100:6 141:6
154:11 162:11
184:16 282:14
**added** 228:19,22
**addict** 169:19
**addicted** 169:10
170:8 173:16
178:21 179:1
210:17 212:3

249:13,13 250:17
309:20 324:1,5,9
341:18,24 344:18
345:7 347:3 348:7
348:11,15,18
349:20,21,24
350:6,7 358:19
360:2 362:5,7,12
363:4 364:14,16
372:16,22 377:21
377:23,25 380:4,5
380:7,8,9,19
382:12 384:9,10
**addiction** 44:19
55:13 58:16 59:4
76:12 77:17 78:13
131:9 132:13,16
132:17,21 158:17
168:9 169:4 172:2
178:20 205:20,24
206:11,16 208:3,4
209:17 214:3
254:3 283:22
297:9 303:18
308:12,15 312:8
324:4,13 344:13
348:17 350:9
364:4 365:25
369:21 370:1,13
375:8 382:4
385:14,20
**addictions** 76:8
366:14
**addictive** 206:2
315:8
**addicts** 342:8,18
364:2 368:5
381:21
**addition** 41:23
55:12 165:20

**additional** 37:17
57:1,20 66:18,23
73:5 111:5 185:5
306:1 369:21
**address** 43:7
222:19 223:4
227:3 249:4
259:11,13 260:19
287:3 303:18
306:5 355:14
368:10 369:16
390:15
**addresses** 226:25
227:1
**addressing** 223:9
305:16,22
**adjournment**
388:22
**adm** 45:1,11,20
46:21 78:3 88:6,7
88:25 89:15,22
97:20 101:15
134:23,23 136:5
136:10,18,25
137:8 139:5,7
140:16 155:2
156:25 161:7
183:3,4 186:9
187:9 188:23
197:13,18 198:5,7
198:11,13,25
217:11,15 218:5
274:13 309:1,2
**adm's** 45:5
**administer** 63:19
**administered**
51:23
**administering**
50:3 51:16 86:25
**administration**
33:9,12,17,24 34:1

47:8 152:3 156:3
**administrative**
34:13 61:20 95:23
96:11 97:5,6
111:25 122:4,7
203:5
**administrators**
117:6 140:4
**adults** 346:14
**advantage** 161:17
**adverse** 266:23
356:3
**advertising** 150:16
**advice** 230:19
**advised** 34:5
**advises** 120:10
**advisory** 93:5
120:20 121:16
**affixed** 389:6
391:15 392:21
**afford** 142:2
147:13
**affordable** 114:21
309:7,10
**aforesaid** 388:12
**afternoon** 338:19
**age** 17:10 165:1
180:25 181:1
359:3 360:18
**agencies** 60:17
79:25
**agency** 21:22 24:2
28:4 29:2 32:9
35:9 36:25 48:4
48:11 50:25 54:14
56:15 57:23 58:3
58:12 59:14 61:25
65:24 68:21 70:5
70:8 72:4,16
76:21 77:1,13
78:8,18 86:4

89:23 119:25
137:7 138:18
155:19 156:5
158:16 159:7,8
183:8 196:24
197:8,25 210:10
210:20 211:7
212:10 214:2
306:14
**agency's**  55:3 72:3
84:18 86:11 154:7
**agents**  252:21
**aggregate**  141:11
141:13,14 186:5
186:11 244:23
274:19 355:10
**aggregated**  356:24
**ago**  18:9 20:15
28:22 29:6 30:12
77:2 115:16 149:9
150:23 152:22
174:22 176:12
230:7 252:6
**agree**  81:4 137:19
141:4 167:3,16
168:5 171:8 199:5
199:9,13,19
203:14 205:19
214:22,23 215:13
215:14,16 226:6
238:17 239:24
240:6 267:2,25
268:3 270:14,21
272:2,4,14 276:8
280:6,12 299:3,13
300:16 305:19
308:6,8 310:25
313:8,12,16
315:20 320:10,15
323:19 327:8
328:11 331:19

334:1 341:16
343:3,6,9 344:6,10
344:12 374:4
379:1 380:14
**agreed**  63:15
289:17,23
**agreeing**  236:13
**ahead**  36:20 91:7
139:15 224:21
227:22 230:19
257:15 358:15
367:13
**aid**  3:11 16:11
228:7,16 237:2
238:7 279:17
280:2,3,7,13,14,15
**air**  31:10
**akearse**  2:7
**akron**  1:24 2:2
15:10,13,15 22:4
23:14 24:1,21
25:2,15,18 26:8
27:4 37:16 40:11
40:14,16 60:1,19
61:3,19 63:12
66:10 76:24 93:22
94:10 107:19
109:5 116:1,2
118:8,20 119:24
123:18 136:15
153:7 180:2
231:17 368:17
**akron's**  59:18 62:8
116:7 118:9,12,13
118:25 119:6,17
119:19 120:5
123:4 124:3
**al**  1:13,15
**alarming**  315:10
**albanese**  179:22
179:23 181:10

**alcohol**  39:2 40:23
44:17 54:11 58:6
78:2 84:2 88:14
88:25 97:15
100:15 136:1
183:3 184:20
206:1 326:1,9,14
327:4,5 333:4,9
334:20 336:7
368:15 386:12
**alerts**  188:8
226:14
**alive**  131:17
**allegations**  221:22
**alleged**  164:22
221:16
**allergan**  3:2 15:20
15:21
**allocated**  155:8
**allow**  187:20
236:16
**allowed**  22:25
30:9,13 48:4
51:20 75:23 88:15
90:2 121:7 125:16
126:19,21 162:9
183:13 257:21
288:8 295:9
**allowing**  236:14
**allows**  170:13
217:18 244:2,4
291:11
**ambiguous**  19:2
**american**  133:11
**americas**  5:17
**americorps**
291:11
**amerisourceberg...**
3:6 16:14 284:11
285:15,18 290:16
291:25

**amount**  49:2 55:7
57:15 66:16 69:9
131:15 156:19,20
173:8 212:24
218:20 253:2
266:14 270:5
282:22,24 298:10
365:13,18
**amounts**  69:13
**amphetamine**
206:4
**analgesic**  281:10
**analogs**  211:7
215:18 217:1
**analyses**  204:10
**analysis**  71:13
72:5 142:18 162:5
216:3 326:13
333:8,22 343:1
**analyzing**  204:16
**anecdotal**  302:8
**anecdotally**  178:3
281:25
**anecdote**  248:10
**angel**  4:3 15:22
**angel.nakamura**
4:5
**angela**  26:19,20,24
156:8
**angeles**  4:4
**anne**  2:4 15:9
42:14 90:16
227:19 390:5
**announcing**  286:2
**annual**  7:20 67:8
260:25 261:4,9
**anonymously**
52:13
**answer**  19:11
71:16 74:23 81:20
83:6 116:20

165:14 167:8
175:3 196:13
198:15 208:16
230:14,23 241:20
254:22 255:9,12
255:17,18 324:16
351:6,9 378:2,21
378:22
**answered** 128:14
254:25 267:11
351:3 375:3
378:20 382:17
**answering** 351:9
**answers** 18:24
87:9 101:1 164:9
**anthony** 5:8 91:19
157:24
**antibiotics** 146:23
**anticipated** 142:23
**anybody** 17:1 23:9
23:13 40:17 77:19
88:6 91:22 121:24
140:15 198:3,7
202:17 240:9,15
248:23 274:1
275:22 290:8
327:2 344:23
353:4
**anymore** 213:11
**anyway** 118:15
285:1
**aod** 40:24 41:4
72:10 87:19
**apha** 133:11
**apologize** 93:14
115:21 278:16
**appear** 33:21
391:11 392:15
**appearance** 225:4
**appearances** 2:1
3:1 4:1 5:1 6:3

**appended** 392:11
392:18
**applicable** 297:17
387:7
**applied** 229:19
**applies** 97:13
144:18 311:8
**apply** 214:12
226:21 297:21
**appointed** 120:14
120:18,18
**appreciate** 218:24
285:11 378:2
**approach** 201:18
250:25 306:6
**appropriate** 176:2
176:23 202:4
238:18 257:13
259:24 354:15
**approval** 149:22
150:8
**approvals** 122:6
**approve** 122:6,8,9
122:10,16
**approved** 81:8
150:1 298:23
**approximately**
95:12
**approximation**
246:21
**april** 314:11,12
338:9 339:21
**arch** 3:8
**archive** 124:18,21
126:17,18
**archived** 124:19
**archives** 127:9
128:17
**area** 39:20 60:1
117:21 133:20
148:22 284:9

308:4,8 310:3
**areas** 58:14
108:14 114:10
133:18 142:9,15
142:20 156:12
160:19 312:3
**arena** 119:5
**arnold** 4:3 15:23
**arnoldporter.com**
4:5
**arrested** 175:20
176:8 241:2
**article** 352:8 377:1
378:5,8,12,16
379:5,17 380:12
**articles** 131:25
132:2 133:1,25
168:7,9 209:12
372:23
**articulated** 341:13
**aruiz** 5:10
**aside** 48:8 320:11
327:2
**asked** 34:7 37:13
37:15 38:4 54:25
72:9 82:24 109:17
110:3 118:7,11
119:16,20 128:14
145:7 147:24
163:25 167:13,15
194:12 206:19
224:25 267:10
273:11 274:1
275:22 278:14
284:22 286:11
311:15 356:4
363:6,10 365:12
371:4,5,12 372:8
372:20 373:8
375:2 378:20
381:17 382:16

383:11
**asking** 21:10 22:6
22:9 35:12 165:10
187:3,6 196:12
230:13 285:3
338:8,12 347:1,16
376:15 378:12
380:15
**aspects** 162:7
**assembly** 262:4
263:16
**assess** 214:3
307:13 372:9,15
**assessed** 206:23
**assessment** 76:6
81:22,23 87:17,18
87:19,19 100:15
100:19 101:18
112:11 139:25
211:11
**assessments**
100:19 102:22
212:16
**assessors** 103:22
**assigned** 155:24
156:11,16 223:18
**assignment** 391:2
392:2 393:2
**assist** 88:8 286:21
**assistance** 361:9
**assistant** 34:13
39:2 40:22 41:3
72:10 73:13 77:19
84:9 86:21 94:19
94:23,24 95:8,14
97:21 104:1
113:11 179:23
**assistants** 202:21
240:16,17
**assisted** 43:5 44:5
44:7,23 45:17

[assisted - base]                                                      Page 8

46:23 47:18 48:9
49:24 50:13 86:15
96:24 183:24
369:2 370:7
**associated**  86:9
119:21
**association**  133:6
133:7,10,11,12
207:3 223:12
**assume**  20:3 56:5
56:6 60:2,5 61:7
124:18 137:6
197:5 234:7
263:12 327:12
377:12
**assuming**  30:5
273:5 383:11
**assumption**
214:10 304:11
332:10 378:13
**asterisk**  323:9
**ate**  347:5
**attached**  155:16
180:10 392:7
**attachment**  7:10
7:22,24 8:1 190:8
302:22 304:18
313:24 314:5,16
316:14 317:2
**attachments**  305:2
**attacks**  186:12
**attempt**  200:20
281:19 305:24
**attempted**  24:11
278:25
**attempts**  273:23
**attended**  130:9
198:24 200:8
243:6
**attending**  15:7

**attention**  144:2
172:18
**attitude**  359:22
**attorney**  25:24
34:12 222:21,24
228:6 389:2
**attorneys**  15:6
21:8 25:22 221:19
284:19
**attributable**  277:7
278:19 331:2,4,20
331:21 336:13
**attribute**  251:12
**august**  1:21 15:2
233:18,25 234:8
234:13 250:16
389:8 390:4
**author**  352:9
**authority**  242:25
**authorize**  392:11
**authorized**  202:8
**automated**  7:18
243:13 256:8,15
**automatic**  126:3,6
**automatically**
127:10
**autopsy**  185:15
**availability**
173:11 178:16
252:19 275:9
**available**  153:23
171:11 172:7
174:4 177:3 201:6
201:10 203:9
268:17,21 274:6
276:18 277:24
282:25 287:19
289:4 344:3
361:25 365:6
382:8

**ave**  390:1
**avenue**  2:22 3:21
4:8 5:4,13,17
**average**  267:14,17
267:19 268:7
269:11,22,25
270:14,22 271:5,9
271:12 272:8,17
272:19
**aware**  22:1 46:13
47:17 134:15
137:20,24 145:17
158:17,18,23
159:3,9 175:2,9,10
178:14 198:20
199:25 200:15,18
200:24 202:13,20
203:4 205:25
206:9 207:16
216:2 225:7,12
227:14 228:16
241:13,22 244:18
244:21 258:4
260:7 262:11
263:1,24 269:16
273:23 275:5,15
277:23 278:5,18
279:9 281:7 282:2
287:25 290:3
299:8 324:17
337:12 339:22
341:6
**awful**  362:24

**b**

**b**  40:4 46:3 99:19
220:6
**babies**  104:17
**back**  31:7,23
40:21 56:25 57:3
83:4 94:18 97:21
106:8 107:18

128:10 130:1
139:13,14 141:15
146:3,4 149:20
168:4,21,22
174:12 189:10
190:4 193:20
212:18 254:21,25
278:13 289:7,24
302:5 307:7
309:14 315:2,19
334:7 342:12
344:11 351:22
363:16 370:2
375:9 385:24
390:15
**backaches**  249:7
**backed**  192:25
**background**  20:2
25:7 77:23 106:25
130:1 153:4 231:3
231:5 257:8
**backwards**  54:12
58:1
**bad**  19:14 126:11
216:11 249:15
264:14 324:6
362:9 367:25
368:5 381:20
**bags**  219:14,20,21
220:15,17 282:12
**bancorp**  5:3
**bar**  322:10
**barberton**  25:13
59:16,20,25 62:16
63:12 99:1,4
116:3,4
**barometer**  197:15
**barrett**  99:19
135:4
**base**  239:2

[based - bit]

**based** 60:7 66:24
67:10 70:23 71:3
81:13 108:9
112:21 156:19
157:4 161:25
162:7 174:14
187:9,14 193:13
193:24 195:9,12
195:12 197:23
198:15 199:25
201:12 214:16
215:8,21,25 218:2
242:2 266:17
334:1 378:12
380:21 386:8
**baseline** 139:9,10
169:15
**basic** 347:18
**basically** 30:6 96:7
156:19 176:4
324:21 371:15
**basing** 324:16
**basis** 71:9 125:11
143:6 171:24
195:3 208:17
267:4 298:21
332:9 337:2
341:10 342:4
355:14
**bates** 7:3,5,8,10,12
7:14,23,25 8:2,6
92:6,12 171:15
190:9,23 225:20
302:23 304:18
313:25 316:15
337:21
**bathtownship.org**
338:1
**baton** 284:10
285:9

**bcc** 304:10
**bear** 323:20
348:21 349:12
352:24 383:23
384:5
**beavers** 98:20
**becoming** 169:25
170:7,8 173:16
225:10 347:3,4
371:17 373:13
**beds** 308:11
**began** 222:6 250:4
265:14 364:11
**beginning** 7:8,10
7:12,14,23,25 8:2
93:15 134:10
158:23 171:15
190:8,23 214:25
225:8,19 253:6
272:18 302:22
313:24 316:14
**begins** 318:17
351:6
**behalf** 2:2,12,19
3:2,6,11,15,19 4:2
4:6,11,15,20 5:2,6
5:11,16 15:9,12,15
15:17,20,21,23
16:2,5,8,11,17,20
16:25 91:12,15,17
91:20,25 143:22
158:2 304:9
**behavior** 7:6
69:18 139:1 140:5
140:6 142:5,10
143:17 159:14,23
161:11,13,15
178:22 181:14
201:19 210:18
248:5 263:18
264:18 324:20

362:24
**behavioral** 96:24
97:2,12 137:25
312:10
**behaviors** 98:15
114:16 139:10
164:6 169:17
178:19 184:19
247:21 287:14,16
288:7 340:11
346:7 349:19
352:10 356:17
357:25 364:8
377:2 380:23
**belief** 174:6
239:10,18,21
386:4
**believe** 31:17
33:10 40:3 41:22
44:20 47:21,24
49:16 75:2 76:19
135:19,21 136:11
163:4 165:15
178:24 181:13
191:19 198:12
203:9 204:5 206:2
215:8 220:23
222:9 229:13
240:12 247:2
248:4,18 250:23
251:22 253:13
255:9 256:1 258:8
261:11 267:19
268:18 283:8
286:4 295:16
301:4,7 307:18
317:3,21 318:21
321:14 323:25
329:1 357:11,20
358:4,9 361:19
367:3 369:14

374:6 377:22
**believed** 322:24
**believing** 213:6
**benefit** 18:23
**benefits** 68:10,17
**benzodiazapine**
206:4
**benzodiazepines**
325:20 326:8,25
334:17 336:6
**best** 44:25 62:7
72:2 74:19 78:7
129:22 133:21
195:17 231:7
234:14 251:11
258:13 356:20
360:4
**better** 62:14 143:8
300:17 301:2
312:13 346:11
**beyond** 49:22
381:1
**bid** 138:20
**big** 41:19 64:15
125:20 144:2,8,10
251:8
**bigger** 61:22 214:7
335:10
**biggest** 308:4,7
**bill** 115:5 117:3,20
117:22 256:17,24
257:16 259:9
260:3
**bills** 140:10
**bird** 325:1
**birth** 66:14 67:25
183:1 184:3,16,17
185:1
**births** 185:8
**bit** 21:20 30:21
65:14 68:15 80:12

124:2 146:3
162:21 169:3
200:6 262:21
273:1 303:5
**black** 254:12
**blame** 318:16
347:7
**blaming** 347:4
**blank** 353:5
**blended** 194:9
**blending** 98:5
**block** 95:9 135:3
**blue** 172:9 210:2,3
270:10 272:4
**blurb** 322:2
**board** 7:18 44:18
45:1,5,11,20 46:22
54:11 61:5 78:3
88:6,7,25 93:6
101:15 108:2,5,18
109:3 117:2 120:6
120:9,12,19,23,24
121:9,12,14,22,25
122:1,4,7,15,25
123:7,8,17 134:23
136:2 138:10
139:5,17 140:14
156:25 161:7
183:3 186:9
188:23 197:13,14
218:5 232:17,20
233:1 242:12,15
242:17,25 243:4
256:7,14 257:21
261:13 274:13
287:10,11 289:8,8
289:10,17,25
290:5,8 297:20
309:1 329:13
**boards** 88:14
97:20 123:14

354:4
**books** 63:18
**borne** 188:4
**bottom** 231:12
270:10 321:25
328:20 332:17
350:8
**bought** 149:10
221:4
**boulevard** 2:5
**box** 4:22 95:1
104:13,23 152:2
**boxes** 103:18
104:9 151:1,2,8,14
151:25 152:12,18
152:23
**boys** 346:3
**boze** 40:3,5
**brain** 178:20
208:3 312:9 346:2
346:4 347:3
348:18 350:19,21
362:7,13 369:22
380:5 384:24
**brake** 219:10
220:6,6,20
**brake's** 220:5
**breach** 358:3
**break** 19:23 35:4
35:15 84:10 90:17
90:20 100:2
118:16 224:11
**breakdown** 83:1
87:2 104:9
**breaks** 197:19
**brenda** 34:12
**brennan** 1:23
36:16
**bretton** 3:20
**brewing** 383:20

**bridgeside** 2:5
**brief** 107:8
**briefly** 18:21
86:23 118:5
126:24
**bring** 59:24 61:16
66:9 71:2 119:9
135:1 210:16
289:7 357:10
**bringing** 135:22
290:4 327:3
**broadhollow** 2:13
**brought** 135:6,17
246:8,10 289:24
383:19
**brown** 5:13 73:9
73:10,11 91:16,16
157:22,22
**budget** 37:11,15
53:19 55:4,6 62:4
62:8,12,19,23,24
63:2,11,16,25 64:7
64:18 65:20,23
66:3 67:16 71:13
84:18 86:11 89:25
119:15 153:6,16
155:7
**budgetary** 65:25
**budgeted** 153:10
**budgeting** 66:20
**budgets** 122:10
**build** 161:14
**building** 96:13
**buildings** 60:2
**built** 160:17
**bulk** 99:11
**bullet** 262:5,8,25
263:2,14 264:17
352:4 376:3,4
**bunch** 135:17
148:21 213:7

**bureau** 328:21
329:2 330:17
**burgess** 26:19,20
26:25 27:5 156:8
**burling** 4:16 16:25
91:25 158:2
**burn** 152:8
**business** 283:15
362:3,25 366:24
**buy** 154:14,16
177:22 291:22
344:20 347:14
**buying** 172:8
247:24 248:11,12
276:12,13
**buys** 344:24

**c**

**c** 32:12 34:4 43:10
117:19 219:25
220:10 236:9
**ca** 4:4 390:25
**cabinet** 171:5,9
345:20 350:2
**calendar** 323:12
**call** 33:19 40:18
55:18 70:23 87:17
147:20 194:21
228:9,11
**called** 17:10
161:10 183:5
205:9 213:1
233:11 243:10
273:10 276:7
288:14 367:20
**calling** 382:8
**calzola** 3:20 15:25
16:1
**campbell** 3:19
16:1
**cancer** 174:11
249:3

[candy - changing]

**candy** 347:6
**canton** 3:21
**cap** 114:25
**capable** 185:18
**capacity** 18:5
39:16 243:5
**capita** 248:7
271:12,20,25
329:25
**capital** 161:12
**caption** 15:3
269:24 388:21
**captioned** 265:3
271:1
**capture** 23:24
**cardinal** 3:15 16:8
290:17,20,23
291:25
**cardiovascular**
299:22
**care** 88:20 98:4
114:21,23 115:8
115:10,17 117:6
119:11 128:6
174:11 176:3
201:24 238:24
259:14 260:9
309:2,7,10 355:6,7
362:10 372:24
**carfentanil** 188:18
190:2 208:14
210:4 211:3
245:24 246:8
247:8,19 248:2
335:15 343:10
349:5 361:15,20
373:9 374:1 375:6
**caring** 370:18
**carol** 40:3
**carryover** 145:14

**cars** 60:3
**cartel** 373:23
374:14
**cartels** 362:2
373:11,20,25
374:19 375:1
**carve** 70:18
**carved** 203:10
**case** 1:8,16 15:3
18:11,14,19 76:14
107:22 129:17
138:10,21 139:17
140:9,14 141:8
142:19,24 157:15
221:13 228:15,17
231:19 232:2
284:13 288:5
290:12 294:5,15
295:4,13,24
297:18 298:19,23
300:13 311:21
327:9 341:12
366:4 390:6 391:3
392:3
**cases** 194:3,4
195:23 214:4
218:1 221:23
222:16
**cash** 179:15
296:24
**catching** 374:12
**categories** 38:8,11
72:22 84:14,25
197:20 202:25
242:1 291:6
305:25 325:19
335:5
**categorized**
333:15
**category** 32:18
71:14 163:23

277:12 332:18
**causation** 207:2
**cause** 83:22 184:6
193:2 194:6
201:14 209:1
216:5 252:9
277:10 381:20,21
382:4,5,14,21,22
382:25 383:5
388:12
**caused** 216:20,25
227:12 245:24
247:21 250:16
367:8,24 368:4
**causes** 184:12
381:25
**causing** 173:8
205:24
**caveat** 195:15
196:9
**cdc** 142:11 143:4,5
143:16 162:3
226:15 278:7
**cdc's** 143:23
**cedar** 2:9
**cent** 64:18
**center** 94:10
**centre** 4:12
**certain** 76:4 89:24
147:18 155:3
162:7,15 168:1,24
386:4
**certainly** 31:18
101:17 164:8
200:1 201:23
217:22 346:10
371:20,24 373:19
381:25 385:13
**certificate** 6:14
67:25 184:7,16,17
185:1,3 193:3,14

325:15 330:11
388:1 392:11
**certificates** 66:14
192:22 193:10
**certification** 391:1
392:1
**certifications**
75:14 107:10
**certified** 17:13
47:22 61:5 117:2
**certify** 388:8,19
389:1
**chain** 8:6 236:6
292:9,24 337:21
338:5 339:3
**chance** 179:19
283:21 313:2
360:1
**chances** 188:3
**change** 28:20,23
29:5 65:8 79:17
113:15,16 123:18
142:13,14 251:22
251:24 252:8
356:1 390:13,14
392:8 393:3
**changed** 51:19,20
53:8,9 59:14 63:8
69:3 79:10 153:7
218:16,23 251:14
335:7
**changes** 142:6
201:20 259:10
260:18 359:16
390:12 391:7
392:7,9
**changing** 97:3
150:12 169:18,23
175:11 355:24
356:2

characterization 207:9,10
characterize 170:14 207:4
charcoal 219:13 282:14
charge 50:2 66:14 67:24
charged 114:22 382:10
charleston 4:23
chart 7:3,5 33:23 92:5,12 97:23 103:9 155:12 214:21,23 233:9 269:24 270:8,22 271:11 272:3,14 272:16,18 321:24 323:16 330:24 332:4,6,11,18 333:3 334:2
charter 61:4 117:1 120:8 123:13,14 123:18
charts 92:18 191:10
check 191:23
checked 315:18
checking 199:4
chemistry 346:2 380:6
cher 74:1
chicago 3:4
chief 338:7
child 29:18 42:11 317:6,20 370:11 375:18
children 100:18 100:23 108:10,11 135:14 139:3,10 167:10 218:1

232:10 345:23 346:3,11 359:18
children's 100:17 102:11 217:24,24
china 246:9 374:14 384:5
choices 368:5 381:20
choose 52:17 79:5
chooses 344:15 348:18 350:12
choosing 308:14
chronic 58:16,18 110:20,25 114:15 200:13,16,19,25 201:7 202:4,11 203:5,10,16 204:6 204:12,17 249:4 312:9 370:5
ciaccio 2:13
cipro 147:2
circumstances 129:8 134:17 175:21
citation 376:17,23 378:9 379:13 380:20,22 384:15
citations 381:6
cite 152:3 241:6 379:5 381:14
cited 378:2
cities 121:2,18
citing 376:11
citizen 371:23
citizens 93:4 98:3 289:2 300:16 301:5 306:14,20
city 2:2 22:4 23:13 25:10,13 37:16 40:16 61:3,4 62:11 63:15,20

66:10 120:21 121:10 123:13 133:12 168:23 180:2
citycenter 4:17
ciullo 3:3 15:19,19
civil 387:3,7 391:5 392:5
clarification 30:17 311:15
clarify 37:15 80:18 119:14 385:8
class 373:1
classes 43:3 107:18 209:6 252:25
classroom 161:16
classrooms 140:23
clean 118:16
clear 21:23 24:19 36:6,7 90:7 127:15 132:8 135:24 161:19 224:23 278:17 371:9 374:13 375:17 383:22
clearly 160:19 292:25
clerk 155:24
clerks 156:10
cleveland 2:17,22 3:21 4:9 168:23 389:7 390:2
client 76:10 82:8 115:4 119:10 228:15
clients 42:4,21 68:13,21 78:18 79:7,20 84:10 86:3 87:24 99:10

100:8 102:20 104:17 206:8 209:13 212:11 291:13
climate 356:1
clinic 49:1,5 53:11 79:2
clinical 44:12 98:5 98:10,19 99:8 103:16 104:4,13 104:20 136:13 183:12
clinically 45:4
clinics 51:3,5 53:11 147:6 176:21
clipped 316:8 351:21
close 69:23 133:24 157:1 273:1 291:8
closely 131:12
closer 318:20
cm 380:22
coach 291:12
coaches 101:16
cocaine 166:11 189:8 190:3 192:3 206:3,3 325:23,23 326:8,19 327:10 330:15,18,22 331:2,8,16,20,25 332:10,25 334:12 335:14,16 336:6 362:22 363:11
code 66:1 123:15
cohort 162:18
collaboration 354:5
colleagues 124:13 149:13 150:4

**collect** 24:11 26:15
27:21 34:7 36:18
36:20,24 213:4
355:9
**collected** 21:22
37:2,6,17 41:25
43:15 124:15
128:3,12 231:1
**collecting** 34:17
35:16 38:24 39:4
185:19 284:18
**collection** 24:21
35:6 40:21 43:12
104:16
**collectively** 249:5
**college** 107:11
**colored** 103:18
**combat** 287:20
**combination**
187:6 281:1,20
369:11
**combined** 25:16
62:13 281:8
**come** 19:18 53:19
56:25 57:3 58:17
67:18 79:20 83:12
84:17 93:20
109:10,17 110:8
124:19 129:2
140:13 145:8
150:12 172:5
209:10,13,15
226:15 292:20
298:13 302:5
**comes** 21:9 55:3,4
76:5,11 150:25
154:19 214:9
271:5 328:15
**comfortable** 42:6
150:3 189:21,24
228:13

**coming** 50:17 57:9
83:22,24 107:24
170:1 223:19
248:22 254:4
374:13,17
**commission** 28:21
94:20 234:7
389:17 391:19
392:25 393:25
**commissioned**
388:8
**commissioner**
21:23 45:13 75:5
79:9 93:7 94:23
95:8,15,19 97:22
109:14,20,23
110:1,5 116:12
117:4 130:6,21
132:10 133:3
134:14 136:19
137:22 200:9
216:4 224:4
225:11 228:10
233:13,14 234:18
234:25 235:23
237:9,24 254:18
255:24 260:2
261:3 268:20
269:7 272:5 284:8
285:8 300:21,22
300:23,24 301:3
314:14 315:22
321:16 351:19
353:21 354:10
357:9 360:24
361:18 371:10,18
**commissioners**
94:19 96:23
113:12 133:6,8
223:12,17

**commit** 200:20
**commitment**
102:17
**committed** 101:24
154:14
**committee** 303:25
**common** 39:11
266:15
**commonly** 266:22
**commons** 3:20
**communicable**
43:10 98:11
**communicate**
41:13
**communicating**
129:6
**communication**
35:25
**communications**
25:24 26:22
**communities**
134:25 354:8
358:20 359:20
366:19 373:1
**community** 57:2
59:22 66:24,25
67:2,6 94:25 98:2
98:6 99:12,17
100:12 103:9
109:11 110:12
112:11,12 144:7
151:9 169:10
171:11 172:25
173:12 186:6
194:19,24 197:4
202:2 214:7
219:16 220:4,7
239:7 244:11
248:24 249:6
283:11,12 287:19
291:6 306:7

312:13 354:6
355:1,12,23 356:2
356:20 357:6
358:1 359:12
361:14 363:7,22
366:22 369:7
373:10
**companies** 204:20
205:2 220:22
222:5 308:14
309:17,17
**company** 4:11
16:6 143:8 221:4
292:2 311:19
**comparable**
142:15
**compare** 95:6
218:25
**compared** 352:19
**compares** 269:10
**comparing** 163:4
**compile** 124:13
**compiled** 41:17
**complaint** 221:12
**complete** 49:19,20
62:15 75:21
231:17 346:5,6
**completed** 41:11
47:25 133:14
211:11 388:22
390:15
**completely** 86:16
**completing** 70:25
**complex** 312:8
354:3,20
**complied** 341:12
341:15
**component** 104:20
**computer** 125:14
127:12

concept 132:17
concern 290:1
  308:4,9 310:3
  319:12 335:9,10
  355:10
concerned 160:13
  355:20 356:1
  371:23
concerning 161:3
concerns 354:19
conclude 212:20
concluded 386:20
conclusion 203:23
  218:19
condition 208:24
  292:12,13 355:1
conditions 162:8
  162:10 174:20
  187:23 201:15,23
  248:25 299:24
conduct 175:15
  178:14 307:1
  311:1 367:16
conducted 332:24
  333:8,22
conducting 140:18
conference 286:2
  286:10
confident 213:5
confidential
  184:18 185:2
  296:11
confirm 195:17
confirmed 188:15
  195:15,19 196:1,8
  332:4
confiscations
  226:11
confused 349:16
confusing 278:17

connolly 3:15 16:8
consecutive
  329:12
consequence
  178:25
consequences
  200:12
conservative
  297:2
consider 47:13
considered 155:8
consistent 239:19
  239:22
consolidate 224:9
  224:13
constraints 239:5
consultation 45:20
  56:2
consulting 133:21
  134:1
contact 172:5
  237:2,5,14,22
contacted 25:18
  25:20 26:12
contained 38:13
  81:21
containing 282:14
  327:5
content 126:22
contents 35:24
context 65:24
  200:10 285:23
  291:2,21
continually
  114:20
continue 30:14
  91:5 102:1 176:22
  208:3 234:21
  324:8 345:4,5
  367:4 370:17,18

continued 3:1 4:1
  5:1 178:21 352:1
continuing 101:7
  130:10,15,19
  137:8 139:18
continuity 119:11
contract 36:2,4,7
  36:13,17 43:23,24
  63:15 64:1,6
  66:10 69:24 88:16
  88:18 89:7 90:1
  101:19 122:16
  143:9 155:10
contracted 43:20
contractor 138:10
  140:12
contracts 66:13
  67:17 89:15
  122:13
contribute 177:2
contributed 54:2
  177:16 178:16
  308:15
contributes 67:5
contributing
  177:6 225:5 279:5
contribution
  119:17
control 125:21
  242:1
controlled 201:25
  238:25 239:12
  240:22,25 241:9
  241:12,16,23
  242:8 298:1 341:2
controls 161:15
conversation 22:4
  160:16 289:20
conversational
  19:6

conversations
  23:1 131:13,21
  132:23,25 133:25
  289:12 324:18
conversion 267:5
converted 266:15
convicted 175:20
cookies 347:5
coordinated 60:14
  303:21,22
coordinates
  303:17
copied 181:10
  182:4
copies 82:22,23
copley 140:3
  176:10
copy 30:23,25
  38:17,24 41:21
  87:10 302:12
core 112:22
  142:12 162:12
coroner 185:5,12
  186:10 192:16
  194:6 218:3 275:7
  277:21
coroner's 183:2
  188:16,23 192:24
  193:8
corporation 3:6
  4:16
correct 20:23
  21:24,25 23:18
  24:4 25:4 26:10
  26:13 30:17 33:14
  35:18 36:11 38:5
  38:10,15 41:7
  43:16 44:2 45:21
  46:10,17,25 47:1
  47:15 49:12 50:19
  51:12 54:23,24

**[correct - county]** Page 15

| | | | |
|---|---|---|---|
| 67:19 68:11 71:10 | 326:4,6 331:5,11 | 230:9,18 284:11 | 35:5 36:8,10 |
| 72:17,20 77:15 | 331:14,15,17,18 | 289:13 294:19 | 37:12 38:3,21 |
| 81:1 82:1 85:4,25 | 332:1,2,7 333:5,17 | 327:3 387:1,10 | 39:8,16 42:3,22 |
| 93:8,9,23 94:1,16 | 333:18 334:22 | 389:2 | 43:21,25 44:8,11 |
| 94:21 95:17,21 | 335:2,3,5 336:10 | **counseling** 43:2 | 45:13,20,23 46:5 |
| 97:8 102:7 103:11 | 336:16,25 337:17 | 72:25 73:8 74:12 | 47:17 49:13,23 |
| 104:5 106:21 | 338:10,22,25 | 75:1 77:11 78:2,4 | 50:8,11,21 51:4,8 |
| 107:6,7 108:1 | 339:1,3,4,10,11,13 | 78:15 79:23 81:13 | 51:15,22 52:4,9,25 |
| 110:10,17 120:13 | 339:19,20 347:11 | 81:18 83:12,23 | 53:18,23 55:20 |
| 121:19 130:17 | 347:20,21,24 | 84:13,15,15,17 | 56:9 57:14 59:6 |
| 132:19,22 136:4 | 352:12,13,22 | 86:18 87:23 88:3 | 60:9 61:22 62:3 |
| 143:1 146:2 149:5 | 353:21,22 360:8 | 88:9 98:7 104:24 | 62:20 63:1 64:19 |
| 152:13,14 155:6 | 360:25 361:15 | 153:18,23 368:16 | 65:19,25 67:1 |
| 162:4 163:15 | 363:12,13 366:8,9 | **counselling** 74:16 | 68:14 72:12 74:25 |
| 164:16 165:8 | 369:12,13 371:10 | **counselor** 76:17 | 76:1,18 77:20 |
| 166:12 168:11 | 371:11 372:13,19 | 76:21 77:18 81:24 | 78:1,13,17 82:3,20 |
| 180:12,16 181:2 | 375:19,20,23 | 368:24 | 83:14 88:7 89:5 |
| 182:23 184:1 | 376:5,22,24,25 | **counselor's** 212:16 | 89:14,17 90:10 |
| 185:25 189:13 | 377:15 379:14,15 | **counselors** 74:14 | 92:22 93:2,5,6,25 |
| 192:5,9 193:9,10 | 388:16 | 74:21,24 75:9,13 | 95:11 96:21 98:3 |
| 203:1,3,13 206:18 | **corrections** 107:16 | 75:25 76:3,13 | 98:14,22 99:2,24 |
| 210:7 211:1,6 | 231:16 390:12 | 78:6 84:8 86:23 | 100:17 101:14 |
| 227:9 231:21,24 | 392:17 | 102:18 103:3 | 103:10 107:24,25 |
| 232:3,4 233:2,6,7 | **correctly** 46:16 | 105:2 106:6 | 108:18 109:6,8,12 |
| 234:11 235:8,9,11 | 219:5 233:19 | 206:15 208:20 | 109:15,16,18,24 |
| 235:17,20,21 | 304:20 380:4 | 211:20 | 110:24 111:18 |
| 239:16 242:22 | **corrects** 196:14,16 | **count** 153:15 | 112:16,21 114:5 |
| 243:1,2,14 248:13 | **cost** 61:11 63:19 | 192:21 | 115:23 116:9 |
| 250:10,14,19 | 63:22 64:4,10 | **counterfeit** 275:25 | 118:21 122:12 |
| 256:16 258:6 | 66:5 115:7 152:4 | 276:11,19 | 124:4 128:24 |
| 262:18 269:20 | 152:6 204:11,16 | **counties** 237:11 | 129:1,6 130:3 |
| 271:7,10 272:15 | 283:9 359:20 | **country** 144:5 | 133:13 134:25 |
| 273:6 284:21 | **costs** 26:16 118:11 | 168:3,13,16 | 135:11 137:1 |
| 293:22 295:20 | 119:21 121:7 | 363:16 | 138:7,22 139:3,4 |
| 300:1,25 301:17 | **cough** 281:9 | **county** 1:13 2:2,12 | 140:16 143:22 |
| 306:10 311:24 | **council** 120:21 | 15:10,12,15,18 | 144:18 145:17 |
| 312:19 314:6 | **counsel** 20:7,14 | 21:15,17,24 22:19 | 151:15,22 152:17 |
| 317:22,23 318:11 | 22:15,24 23:1,2 | 23:10 25:9,11 | 153:5,21 158:14 |
| 319:17 322:19 | 24:6,7 26:22 36:1 | 26:25 27:1,2 28:2 | 158:20 160:11 |
| 323:17 324:24 | 36:8 93:5 120:2 | 30:19 31:18 32:14 | 162:6,16 166:7,24 |
| 325:21,24,25 | 121:5,17 224:22 | 32:22 33:13 34:1 | 172:16 177:9 |

180:4 182:17,24
183:16,22 185:10
197:2 198:4 199:6
199:15,20 205:25
206:8,22 210:10
213:4 215:9 216:5
217:10,15,16,20
217:24 218:6,20
220:15,16 225:3,5
227:12 232:17
233:1,16 245:20
246:10 262:17,24
265:10,12,17,25
268:10 269:10,11
269:23 270:1,13
270:23 271:4,8,13
272:8,17,19
273:21 274:6,23
275:17 276:19
277:9 278:2,21
281:17 286:3,14
287:4,6 289:2,23
289:25 290:6,12
290:24 299:10,11
299:13,17 300:8
301:22 303:2,23
305:2,15 306:10
306:14,21 308:20
309:18 319:24
321:17 337:4,6,7
337:13 338:14
343:12,17,20,22
343:23 344:3
348:20 352:24
353:20 354:12
356:10 357:6,13
357:22 360:8,25
361:4 363:20
364:19 365:15,19
365:21 367:5,19
367:24 368:9,11

368:14 369:17
370:21 371:17,25
383:1,15,18,25
388:4 391:10
392:15
**county's** 29:25
32:3 216:4 302:3
**couple** 74:7 92:18
104:7 109:2
116:22 127:25
140:24 224:1
232:23 233:22
253:7 353:15
356:5
**course** 19:15
24:13 80:13,17,24
294:11
**courses** 130:11,19
**coursework**
231:18
**court** 1:1 6:17
17:8 18:2,22 19:6
79:20 327:19
391:7
**courtesy** 19:10
**cov.com** 4:19
**cover** 67:13 284:9
304:17 309:17,19
309:24
**coverage** 115:12
115:19 309:6
**covered** 239:14
269:12 270:24
272:13 296:23
309:25
**covington** 4:16
16:25 91:25 158:2
**crack** 206:3
**craig** 45:3,5,8,9
88:8 136:12
169:14 218:5

**crazy** 230:2 362:6
**create** 126:7 364:3
367:4
**created** 103:21
126:8 288:8 340:8
357:13,22 358:19
362:4
**creating** 194:11
287:14 293:25
295:5 355:12
359:13,17
**credentialed** 61:15
**credible** 132:2
**credo** 288:22
**criminal** 58:24
367:16 381:19
382:8,9 383:5,8
**crisis** 24:13 27:22
38:23 158:13
180:20 222:20
223:5 225:5
281:21 290:2
305:16,22 307:14
308:16 323:20
354:13,17 355:17
357:13,22 358:21
361:3,22 363:20
365:21 367:5,7,15
367:19,24 368:11
369:6,17 372:1,24
381:20 382:1,6,15
382:25 383:6,24
385:20
**criteria** 44:22
45:18
**critical** 202:1
**cross** 106:6
**crossed** 371:20
**crucial** 266:25
**crunched** 194:25

**cuba** 118:3
**cuban** 118:4
**cumulative** 156:20
195:8
**cupboards** 251:4
**curb** 252:19
287:22 288:3
**curious** 268:19
**current** 28:16,24
63:2 67:12 69:9
72:18 93:1 99:15
101:19 103:12
119:4 133:15
382:15,25 383:6
383:24
**currently** 31:8,15
48:2 55:23 68:24
76:17 97:22 105:3
118:21 122:19
123:20 182:18
235:23 266:16
372:24
**curtis** 106:8
**custodial** 92:19
304:6
**custody** 6:16
218:1,2
**cut** 208:11 345:9
351:1
**cuts** 254:11,11
**cuyahoga** 2:12
15:17 107:25
108:18 109:12,15
110:8,24 138:22
232:17 233:1
237:11 300:23
388:4
**cvs** 5:6,6 91:20,21
157:25 237:13,17
238:13 279:20

**cycle** 102:9,10

**d**

**d** 3:16 17:20 39:1
  319:6
**d'anna** 4:21 91:14
  91:14
**dac** 123:14
**daily** 188:14
  195:11 267:14
  269:22,25 270:22
**damages** 356:21
**dan** 1:10
**dangerous** 257:22
**dangers** 312:10
**darker** 103:17
**darlene** 304:9,19
**darryl** 219:10
  220:5,6
**data** 7:12 8:4,5
  57:5 87:5 104:16
  140:18 141:7,9,12
  146:1 158:24,25
  166:22 167:3,10
  167:16 170:12,13
  170:21 172:13
  181:7 182:20,22
  182:24 183:2,2,4,7
  183:8,12 184:3,4
  185:3,5,7,18,21,25
  186:5,8,11,20,23
  187:1,3,4,9,10,15
  187:16 188:9,14
  188:22 189:2,11
  190:5,22 191:12
  191:14,23 192:13
  192:15,16 193:11
  193:14,18,21,23
  193:24 194:13,25
  195:7,13,15,25
  196:2,23,25
  197:18 198:5,9,11

199:1,3 204:15
206:20 209:11
210:21 211:8
212:5 213:4
214:16 216:3
217:9,11,17,17,25
218:9 243:17
244:10 249:24
253:19 268:21
269:14 275:8
307:11 320:21
321:4,9 325:4
327:15,21 328:1,4
328:15 332:4
334:3 337:8,13
346:15 354:22
355:8,10 356:24
366:18 375:9
376:13
**database** 255:25
257:23,25 258:15
264:23 269:18
340:3,5
**date** 15:1 27:19
33:3 225:3 314:7
387:11 390:8
391:3,9,19 392:3
392:13,25 393:20
393:25
**dated** 7:3 92:5
97:23 103:11,14
180:14 256:18
314:6 338:9
**dawn** 319:5,17
368:19
**day** 4:7 19:16
24:13 79:4 80:18
85:16 92:2 125:11
125:11 149:13
188:13 194:11
195:9 271:12

303:10 333:21
362:8 389:7
391:16 392:22
393:22
**days** 160:21 252:2
390:18
**dc** 3:17 4:18 5:9
5:14
**dea** 149:2,4 150:20
150:21,23 151:4
152:20,23 204:24
241:5 252:16
295:8 342:17
**deal** 76:3 212:9
299:21 302:14
345:7 356:19
384:20
**dealers** 362:18
384:3
**dealing** 76:11
**dear** 390:10
**death** 183:1 184:3
184:6,7,12 185:3
185:15 187:1,4
192:21 193:2,10
193:14 194:3,4,6
209:1 283:16
325:15 330:10
332:15 333:23
355:20 359:13,15
361:7
**deaths** 185:9,23
186:11 191:18
192:19 197:4,5,19
207:12,18 209:20
211:3,9 212:19
213:15,19,21,23
214:24 215:5,11
216:16,20,25
217:9 246:17,25
247:3,4 259:12

277:1,7,15 278:1,9
278:19 320:16
322:4,9 325:13,21
326:14 328:6,8,19
329:5 330:9,18,21
330:22 331:2,3,9
331:20,21 332:10
332:25 333:5,9
334:12 336:13
360:10 366:13
**debate** 129:13
**debating** 146:23
233:10
**december** 27:10
27:17 93:17 98:23
**decide** 142:19
347:14
**decided** 102:15
135:18 139:8
**decides** 202:3
**decision** 47:2
249:15 289:7,12
289:15 309:18
344:19 348:6,22
349:9 352:25
**decisions** 301:4
324:6 346:6,12
349:14
**decline** 365:13,18
**declined** 329:11
**decrease** 265:6,14
268:1 282:3
322:17,24
**decreased** 173:10
262:6 263:4,18
264:18 265:17
276:23 322:4
329:15 336:14,17
362:1
**decreases** 362:16

**decreasing** 265:11
274:22
**deed** 391:14
392:20
**deemed** 88:24
390:19
**deeper** 74:24
**deeply** 360:23
**defendant** 4:15
91:9 228:16,20,23
285:16 293:24
295:24 297:4,11
298:23 299:9
311:2
**defendant's**
297:25
**defendants** 15:23
222:1,16 229:1
294:4,5,10,15
295:4,13,18
296:14 298:18
300:12 320:5
327:9 341:11
357:4
**defense** 371:13
**define** 238:22
279:10
**defined** 323:10
332:16 335:12
**definitely** 215:3
**definition** 266:7
267:3
**degree** 107:4,15
107:20 231:15
**degrees** 107:9
**deidentified** 186:1
186:4 355:9
**delete** 125:25
126:16,19,21
127:3,5

**deliver** 354:6
**deliverable** 70:23
71:3
**delivery** 74:18
387:9,11
**demographics**
372:21
**demonstrates**
167:16
**dentists** 202:16
**deonna** 77:6,7
105:7 106:9,20
**deonna's** 77:8
**department** 23:10
23:11,14 25:3,11
25:13,15 26:9
33:19 44:13 59:19
62:11 63:20 64:3
70:18 88:9 99:1
116:2,8 118:9,25
119:7 120:5,7
123:5 144:9
151:11,11 156:15
160:15 184:11
223:3,11,22,23
242:21 274:10,12
274:15 278:8
288:20 303:16,22
320:22 321:10
328:21 329:2
330:16 332:14
344:1 368:10,14
368:17 371:16
390:22
**departmental**
62:12
**departments**
25:11 95:16,20
97:25 113:22
187:20

**depend** 101:20
**dependency** 361:8
**dependent** 359:10
**depending** 380:5
**depends** 29:17
31:9 156:18
317:17
**deposed** 17:13
18:3,8,15
**deposition** 1:19
17:4 20:3,8,11,18
21:4,12 42:8
72:23 91:6 92:4
92:11 118:6
159:13,19,22
171:14,20 179:19
190:7,14,19,21
191:5 217:7
225:18,25 229:7
256:6 260:24
269:2 302:21
313:23 316:13
321:3 327:14
337:20 340:14
353:17 386:20
388:20 390:8,11
391:1,3 392:1,3
**depressed** 160:21
160:22
**depression** 200:16
203:21
**deputy** 94:18
95:19 96:23
233:13 234:6
**derivative** 208:15
**derivatives** 211:5
**derived** 212:4
**derogatorily**
144:1
**descended** 272:19

**describe** 282:13
292:16 370:20
**described** 59:6
99:10 111:7 245:9
267:7 268:8 273:9
274:4 276:3
281:22 284:17
**describes** 83:10,11
**describing** 155:2
196:23
**description** 7:2
65:23 231:4,24
232:6
**deserves** 359:25
**design** 45:19
**designated** 154:3
**designed** 44:10,13
44:19 296:10
**designing** 46:23
**desktop** 126:12
**despite** 360:4
**destroyed** 30:14
31:6
**destruction**
201:14
**details** 265:6
**determinants**
114:17
**determination**
356:25
**determine** 112:3
197:8 240:10
354:10,16
**determined** 85:13
109:13
**determines** 295:8
**determining** 240:1
240:7 356:8
**deterra** 219:5,9,20
219:21 220:1,3,13
282:11

devastating 370:23
devastation 201:14
develop 47:5 109:11 135:9 257:22 307:3 361:6
developed 162:3 162:13 239:10 258:9,12 369:3
developing 110:12 114:23 347:8
development 134:24 135:13 346:5
diabetes 299:21 300:2,9
diabetic 347:4,5
diagnosed 292:11
diagnosis 296:19
diamond 1:23 36:16
diane 105:10 106:10,12
diarrhea 188:2
dictated 28:24 29:2 60:22
die 359:24 360:1,5
died 184:9 185:14 188:19 370:13
dies 185:10
dietetics 107:20 132:15
dietician 107:5 108:8,18 130:16 232:9,14
differ 192:19
different 44:12 89:8,20 104:12 110:4 121:10

123:6 134:12 148:7 156:14 167:1,12 168:18 169:22 170:1 185:4 202:8 209:4 226:19 241:14,14 241:22,25 269:11 271:19 276:14 291:5 337:3,14 345:25 346:13 347:7 350:3 355:2 355:22 364:10,25
differentiate 367:1
difficult 59:23 60:5 61:7 201:19 253:17,24 254:6 363:24
difficulty 19:7 185:18
direct 34:15 41:12 88:15 95:14,18 98:4 151:5 159:4 194:14 371:21 381:18
directed 76:13 174:8 376:1
directing 120:9 124:12
direction 37:1 96:7 112:16 230:9 361:11
directive 195:6
directly 41:13 53:23 135:20 137:10 187:11 204:21 205:10 224:25 244:12 372:7
director 39:2 40:23 41:4 44:15 45:7,23,24,25

46:22 50:5 61:4,8 66:23 72:10 73:14 77:19 86:22 93:10 93:24 94:3,6,25 95:15 97:24 98:18 99:15 104:1,2,2 111:20,21,23 113:4,8 114:2 116:13,14,15 136:13 183:17 233:12,17 242:18 300:21,24
directors 23:23 84:9
dis 104:19
disability 209:2 359:13,15
disagree 171:6 267:2
disagreeing 315:16
disaster 236:12
discard 284:23
discretion 122:21
discuss 327:2
discussed 22:14 178:6 179:9 240:12 288:15 289:21
discussion 162:14 386:8
disease 43:10 58:16,18 98:11 104:19 110:20,25 111:1 114:15 178:20 187:23 208:3 299:22 312:9 347:3,8 348:18 349:18 350:19 362:7,13 369:22 370:4

384:24
diseases 370:6
disintegrates 219:15
disorder 169:5 349:24
disorders 98:12,17 206:14
dispense 176:22 202:9 251:23 265:21 282:20
dispensed 172:16 173:2,8 174:12 207:22 218:14 248:7 262:6 263:3 265:4 267:15 320:12 322:18,25 329:15 365:14,19
dispenses 242:22
dispensing 172:20 242:16 250:22 251:15 253:15 263:13 265:19
disposal 151:2
dispose 285:5
dispute 200:22 204:6 298:21 341:10 374:17
disregard 176:21
disregarding 175:25 176:1
dissolves 282:16
distinction 171:1 182:22
distinguish 189:8 192:2 277:18
distinguishes 195:22
distribute 57:16 57:24 147:19 157:2 368:19

**distributed** 56:9
279:13,17
**distributes** 280:2
280:14 300:7
311:20
**distributing** 55:21
283:2 311:22
**distribution** 54:17
54:22 55:17
146:18 152:21
204:25 292:3,6
**distributions**
147:21
**distributor** 3:6
4:15 292:23
293:16,24 294:3,9
294:14 295:3,13
295:18,24 296:2
296:13 297:4,25
298:18,23 299:9
300:12 311:2,4,9
311:16 320:4
327:8,10
**distributors** 205:8
221:23 238:1,4
242:8 290:11
291:25 293:1,5,10
294:18,22 297:13
297:18,22 313:13
341:11
**district** 1:2 25:16
61:22 62:17 63:20
66:2 93:5 96:9
97:18 118:12
120:20 121:16
164:2
**districts** 22:5
51:21 60:23,25
120:25 161:17
**dive** 74:24

**divergent** 273:11
**diverse** 252:24
**diversion** 173:24
174:2 273:12,14
273:15,21 274:2
282:4,25 339:13
348:21 382:5,14
**diversions** 367:9
**divert** 345:19
348:22
**diverted** 315:9
**divided** 271:22
**division** 1:3 60:15
66:4,22 67:4,5
99:13 103:9,21
109:12 110:13
**divisions** 104:9
156:15,17
**doctor** 178:22
189:20 244:4
263:17 264:2,6,18
264:23 292:11
300:4 323:5,10,15
323:19 324:3,10
325:5 340:12
342:7,11,13,14,17
358:4 366:1
**doctor's** 163:22
164:12 165:8,13
165:22
**doctors** 175:23
239:25 240:7
300:18 367:25
**document** 1:12
24:20 67:7,8,11
126:7,8,9,24 128:7
196:15 230:25
256:13 257:5,11
258:19,23,25
259:20,20,23,24
261:13,23,24

263:23 266:8
269:22 286:21
305:6,8 312:21
313:21 314:22
315:20 320:22
321:12
**documents** 21:11
21:13,21,22 24:11
27:22 34:7,17
36:18,20 37:17,23
38:7,9,14,16,25
40:22 43:12,14
83:8 92:19 125:6
125:13 126:3,4
129:9,18 194:10
284:23 285:1,5
307:10 315:2
**dog** 177:22
**doing** 57:17 59:7
59:11,12 60:9
74:20 110:23
113:23,25 114:15
116:4 125:9
133:19 139:25
147:14 148:23
174:13,14 175:4
175:24 184:22
192:23 232:9
241:5 253:22
286:19 310:18
315:4 350:21
358:5,11,11 370:2
375:1
**dollar** 64:17 69:13
**dollars** 66:16,23
68:4 90:6 101:25
111:5 153:10
369:12
**donate** 115:2
**donated** 114:24
115:7,8

**donates** 115:3
**donna** 1:20 6:7
7:16 15:5 17:10
17:14,20 99:19
135:4 228:3,11
229:8,12 285:12
338:1,12 353:12
371:2 388:9 390:8
391:4,9 392:4,13
393:20
**door** 209:13
**dose** 173:15,17
266:6,8,13 267:3,9
**doses** 262:5,7
263:2 265:7
329:16
**double** 302:14
331:3
**doubt** 100:11
332:3
**doug** 45:2 131:12
**downhill** 359:18
**download** 148:21
**doxycycline** 147:1
**dozens** 86:6
**dr** 45:2,8,9 46:9,15
50:2,20 51:25
56:1 88:1,8 93:19
116:18 117:3,3,10
117:16,19
**draft** 294:6
**drafted** 223:12
314:21 317:9
**draw** 203:24
**dream** 385:4
**dried** 248:6
250:21 253:11
255:7 362:1
**dries** 362:16
**drill** 144:17
217:18

drillable  144:16
drive  125:6,13,19
  128:6,13
driven  79:17
  178:19
driver  215:10,17
drives  125:18
  126:5
driving  136:3
  207:17
drop  323:16
dropped  157:15
  308:20
drove  208:4
drug  3:6 8:3,5
  39:3 40:23 44:17
  54:11 58:7 78:2
  88:14,25 97:15
  100:15 136:1
  149:22 151:2
  160:10 163:13,18
  166:23 167:6
  169:4 183:3
  185:19 187:3
  188:17 191:18,19
  192:1,22 194:10
  195:10 208:20
  210:18 214:24
  219:12 226:10,12
  238:4 240:11
  246:6,6,7,7 247:21
  248:11,12 249:14
  251:8 252:16
  257:22 259:11,15
  260:9,19 290:11
  292:18 295:5
  320:21 321:4,9
  324:19,21 325:13
  327:15,20 328:18
  330:9 332:19
  334:2 335:11,19

340:25 348:14
350:2 362:3 363:6
363:21 368:15
373:11 375:13
384:21,21 385:6
drugs  147:7
  148:22 149:9,25
  150:9 165:20
  166:17,19 167:5
  167:24 168:2
  169:12 178:21
  206:5 207:24
  209:8 212:8
  219:16 238:1
  239:6,13 240:2,8
  241:4 242:1,19,22
  242:23 246:10
  250:2 251:1
  252:19 253:2
  293:3 311:9
  325:14 328:8,19
  330:10 339:7,9,13
  339:18,24 361:25
  362:17,21 363:5
  363:11 364:22
  372:16 374:13
  377:19
drugstore  292:20
dry  209:17 253:5
drying  246:5,12
  248:19 251:10,12
  252:9
due  309:6 315:10
  320:16 322:12
  330:18,21,22
duly  17:12 388:7
  388:10
dump  124:18,21
  125:22 128:7
  129:12 151:1,8,14
  151:25 152:12,23

153:18 154:12
219:14 319:20,22
dumped  37:18
  128:17
dumping  125:5
duties  234:4 242:7
dying  212:8 312:5
  342:23

e

e  5:13 32:12,12,12
  34:4,4 40:4 46:3,8
  46:8 94:12 99:19
  104:3 116:18
  117:19 220:6
  236:9
earlier  22:23
  25:17 69:12 72:23
  115:21 160:1
  161:24 200:6
  206:19 225:13
  230:9 233:10
  236:5 240:13
  243:9 245:9,15
  258:1 260:15
  266:3 268:8 273:9
  274:4 276:4
  278:14 279:2
  284:17 293:20
  298:9 299:20
  301:14 303:6
  332:23 346:15
  356:4 357:3 360:3
  361:13 363:8
  381:10,15
earliest  272:12
early  23:19 35:22
  104:6,6 108:8,17
  118:5 134:6,16
  168:10 253:9
  271:5 273:2
  370:15 385:21

earmarked  67:20
  68:2
earth  359:25
ease  169:11
easier  18:2
east  1:23 4:8,22
eastern  1:3
easy  59:21
economy  179:13
  315:10
eddie  34:14
educate  131:8
  132:6,7 133:3
  146:10
educated  132:20
  146:14 213:12,14
education  43:3
  58:2,11 59:3,5
  60:8,10,20 69:17
  71:1 72:24 98:12
  98:14,16 105:21
  114:18 130:2,7,11
  130:15,19 131:20
  131:22 146:8
  158:12 179:24
  200:7 231:13,24
  251:15 291:7,12
  312:7,8 366:23
edward's  40:1
edwards  39:11,13
  40:6 74:10 104:25
  135:3
effect  28:10,16,17
  28:25 47:20 48:3
  53:4 67:13
effective  259:10
  369:5
effects  356:3
efficiencies  61:12
effort  275:16
  344:2

**efforts** 35:9 290:1
291:15 303:18
360:4
**egregiously** 217:4
**eight** 46:6 75:2,6
75:24 76:25 193:2
**either** 54:19 82:18
82:19 88:2,22
116:5 139:11
151:10 165:14
173:16 183:11
185:13 196:8,8
199:11 212:14
246:2 247:10
343:8 389:2
**electronic** 38:17
38:24 41:21 82:21
87:11 125:6
**electronically**
30:23 124:23
129:20
**element** 344:13
**eligible** 115:11
**elliott** 5:13 91:16
157:22
**elliott.brown** 5:15
**ellis** 2:20 3:2 15:20
16:17,20 136:12
136:13,18
**else's** 161:2,5
163:20 382:11
**email** 7:8,10,12,14
7:22,24 8:1,6
125:12 126:5
127:12,16 128:6
171:15 180:7,11
180:14 182:4
186:13 190:8,22
191:7,11 225:19
226:5,9,13,25
227:1,5 302:22

304:3,18,22
313:24 316:14,20
337:21,25 338:4,5
338:9,21 339:5
351:22 390:17
**emailing** 315:15
**emails** 28:4 29:11
37:18 126:15,20
127:6,13 128:13
**emergency** 146:20
187:21 189:20
**emphasize** 162:7
**employ** 45:1
**employed** 39:8,15
40:10 72:12 76:17
95:10 108:8
**employee** 45:6
140:22 159:8
**employees** 28:3
38:20 52:25 59:21
61:20 106:7 119:3
119:4,6 129:7
141:1
**employment** 18:14
34:3 40:13 44:1,2
58:21 130:3
**ems** 209:12 218:8
359:20
**enclosed** 390:11
**encourage** 346:9
**encouraged** 175:8
**ended** 110:23
111:4 169:3 172:9
212:8 254:10
364:14
**endo** 4:2,2 15:23
**ends** 101:10
**enforcement**
56:14 252:17
312:10

**engage** 132:3
210:18 362:24
366:7
**engaged** 263:17
348:20
**engaging** 175:15
349:19 364:7
**ensure** 289:1
306:3 344:2
**ensuring** 28:3
**entangled** 58:24
**enter** 122:17
**entered** 17:5 392:9
**enthused** 353:6
**entire** 55:2 97:14
139:4 355:1 391:5
392:5
**entirely** 53:17
**entities** 61:14
89:14,15 134:2
217:16 354:4,18
**entity** 39:17 89:6
131:17 219:24
220:2
**entry** 233:8
**environment**
288:8 359:17
**environmental**
114:16
**epicenter** 183:6
186:22 187:17,18
188:10 189:1,2,7
189:15 191:15,25
192:2,15 193:17
195:12,14,23
196:4,16
**epidemic** 177:17
259:11 316:2,23
317:2 318:17
319:11 370:21

**epidemics** 385:14
**epidemiologist**
103:22 128:21
245:6
**equivalent** 266:6,8
266:13 267:3,9
**equivalents**
172:24
**er** 46:20 187:24
245:21
**erica** 46:2
**erme** 46:8,15
93:18,19,19
**errata** 390:13,18
392:7,10,18 393:1
**errors** 315:18
**escapes** 160:25
**especially** 338:15
**esq** 2:4,4,5,9,13,16
2:21,21 3:3,7,16
3:20 4:3,7,12,17
5:3,8,13,17
**essentially** 57:23
59:15 62:4 97:17
175:4 185:21
**establish** 30:9 45:4
**established** 44:25
187:19,20
**estimates** 195:16
274:8,9
**et** 1:13,15
**ethnicity** 359:7
360:20
**euphemistically**
30:6
**euphoric** 345:5
**evaluate** 358:13
**event** 84:7 253:7
266:24 389:3
**events** 236:12

everybody 17:2
52:13 88:17 97:20
125:1 147:6 157:1
163:25 173:13
214:13 288:9
302:13
evidence 210:14
exact 48:21 64:18
136:22 160:24
342:1
exactly 51:19
63:19 153:24
169:16,20 186:22
246:15 251:25
255:21 311:3
examination 6:7
17:11,14 228:3
285:12 353:12
371:2
examiner 185:22
186:8 187:5,10
190:5 192:17
193:21 195:13
196:1
examiner's 189:12
examining 17:24
example 30:22
57:7 65:1 67:24
68:10,20 81:3
119:10 120:12
125:25 126:4
128:13 132:21
141:18 143:19
145:1 150:13
166:6 187:25
206:11,12 207:5
289:13 355:25
385:15
excellent 306:22
exchange 7:8 43:4
51:11,21 52:12

53:3,12,17 55:1,11
171:15 209:15
301:23 302:3
317:6,20 368:18
375:19
exchanges 301:13
excluding 217:5
328:7
excuse 60:13
98:23 293:14
297:12 316:2
319:20
executed 392:10
executing 138:6
execution 391:14
392:19
executive 45:7
112:16 286:14
executives 121:17
exhibit 6:16 7:3,5
7:6,8,10,12,14,16
7:17,20,21,22,24
8:1,3,5,6,8 92:4,11
92:18,25 94:18
95:7,13 103:6
120:12 156:17
159:13,19,22
171:14,20,22
179:19 190:7,14
190:19,21 191:5
192:8 193:12,16
207:8 214:20
216:13 225:18,25
229:3,7,12,24
256:4,6 260:22,24
268:25 269:2,8
302:13,21 313:23
314:4 316:5,13,19
321:3,8 327:14,20
337:20,25 340:14
340:19 351:20

375:14,17
exhibits 6:5,17 7:1
exist 31:4 32:19
363:21
existed 41:15,16
145:20 258:7
existence 44:8
46:24 56:11
existing 31:8
exists 123:17,23
361:4 369:7
expand 151:3
expanded 49:18
53:13
expansion 115:15
308:19 309:8,9
expectancy 147:11
expenditure 71:23
expenditures
84:16 122:11
156:4
expenses 61:21
63:16 71:14 86:9
122:8 155:20
expensive 57:19
146:25 147:2
experience 215:9
231:9 232:6
344:22 357:10
361:17 384:17
experiencing
337:14
experiment
167:10,11
experimentation
310:8 312:11
346:1,8
experimenting
167:24 346:13
experts 132:25

expiration 391:19
392:25 393:25
expire 147:4
expired 149:9
expires 389:17
explain 41:9
248:19 311:4
355:5 379:22
explaining 351:9
exposure 114:3
118:7 371:15
express 290:8
extent 60:25 248:4
261:23
externally 122:15
extra 173:17
extraordinary
104:16
extremely 342:3

f

f 73:9,9
facets 54:20
facilities 96:14
227:7
facility 85:14
309:2
fact 58:18 178:4
187:22 188:16,17
188:18,24 193:9
198:16 200:22
212:6 214:11
217:5 225:12
244:5 271:4 329:1
360:22 364:14,15
365:17 372:14
factors 346:10
370:16
facts 249:17,23
262:15 324:17
352:1 375:24

**failed** 297:2
**fair** 82:25 159:10
  202:24 207:8,10
  210:20 287:2
  295:19,21 296:9
  302:1 323:1
  333:10,24 337:10
  337:12 339:21
  349:12 378:14
  379:13
**fairly** 160:24
**fall** 22:22 24:8
  173:18 242:2,5
**familiar** 29:8
  52:11 138:21
  219:4 221:5
  240:21,24 242:7
  242:11,14 243:16
  256:24 257:5
  260:2 270:3
  271:14 275:11,12
  275:25 280:20
  290:17 296:7
  303:2 305:5
**families** 58:15,17
  101:17 135:12
  179:24 208:20
  209:14
**family** 46:14 57:2
  57:8,9 81:3 317:6
  317:20 375:19
**family's** 171:5
**far** 31:7 69:18
  106:23 136:3
  197:2 270:18,18
  272:11,12 366:5
**fatalities** 226:12
**fault** 309:13
**fda** 81:8 146:10,13
  146:16 147:9,15
  147:24 148:8,13

  148:16,17 149:1
  149:20 150:7,15
  150:17 155:16
  298:24
**february** 36:5
  307:2
**federal** 100:14
  114:25 154:20,21
  155:15 204:11,16
  239:19 337:8
**feel** 150:3 189:20
  189:24 213:5
**feeling** 345:4,5
**fees** 66:8 67:18
  121:6
**felt** 47:4 61:15
  63:21 160:21
  287:10,10,11
**females** 346:4
**fenstemaker** 4:12
  4:14 16:4,4
**fentanyl** 80:15,21
  154:16 172:10
  190:2 208:14
  210:4,5 211:4,5
  215:18 217:1
  225:2 226:10,11
  227:6,7,11 245:24
  246:8 247:8,19
  275:4,10,13 322:9
  328:8 332:6 343:7
  349:5 361:15,20
  369:1 372:17
  373:8 374:1,20
  375:6 383:12,18
  383:23 384:5
**fewest** 328:5 329:4
  329:4
**ffitzpatrick** 2:11
**fidelma** 2:9 15:11
  353:14

**field** 131:14
  306:16
**fifth** 5:4 174:7,16
  293:21,25 358:13
**fighting** 283:22
**figueroa** 4:4
**figure** 112:6 144:6
  208:25 321:24
  322:9 323:4
  328:17 329:13
**figures** 192:20
  352:1 375:24
**file** 82:9 186:17
  304:6
**filed** 22:2 27:9,13
  27:18
**files** 51:7 129:13
  129:15 304:24
**filing** 287:4
**fill** 95:2 205:7
  244:6 294:15
  300:17
**filled** 219:13 244:1
**final** 101:21 122:9
  195:25 284:9
  332:15
**finalize** 193:3
**finally** 210:14
**finance** 289:19,21
**financial** 22:7,10
  24:2 29:22 30:2
  30:22 31:14,19
  36:24 37:1,6,23
  38:12,16 41:23
  119:16
**find** 57:6 61:7
  66:17 111:5 117:3
  118:8 119:18
  162:17 169:15
  253:21 273:19
  319:2 390:11

**finding** 108:16
  113:17 138:8,9
  384:12
**findings** 8:4,5
  181:8 198:19
  321:5,9 327:16,21
**finds** 79:21
**finish** 19:9 28:13
  49:5 107:19
  230:10,13 241:20
**finished** 106:10,12
  106:17 107:14
  193:6,7 313:20
  345:12 353:10
**finishing** 19:11
  230:22
**firm** 23:7 36:12
**first** 17:12 20:13
  20:18 24:16 26:6
  27:15,24 56:19,20
  57:17 63:11,14
  64:7 73:2 95:7
  107:13 108:7
  110:15,22 111:22
  116:7 140:21,23
  145:16 161:24
  180:22 181:6
  194:17 222:6
  225:7 229:21
  257:9 259:7 262:4
  266:11,25 289:18
  289:20 303:13
  304:17 305:14
  307:9 318:24,25
  319:10,12,14
  328:4 338:4
  340:25 344:14
  345:24 346:17
  347:9,11,19,23
  348:6 352:19
  363:23 368:21

385:6 388:10
**fiscal** 26:15,18,24
6:2 156:9
**fitzpatrick** 2:9
6:11 15:11,12
353:13,14 370:24
373:3,17,22 374:5
374:22 375:2
377:8,16 378:7,11
378:15,19,25
381:24 382:16
383:2,7 384:1
385:11,25 386:14
386:17
**five** 20:19 21:5
28:18,22 29:6
30:12 69:20 97:24
98:1 101:6 111:11
111:16 120:9
123:7 127:13
131:3 142:1
152:21 156:9
163:12 170:18
171:3 252:5
274:23 312:20
323:11 346:16,19
346:20,21 347:23
348:2 352:4
370:12 375:12
376:5,11,13,20
378:3 379:7,18
380:18 381:7
**flash** 125:6
**fleet** 60:2
**flip** 351:24
**flipped** 97:1
**flood** 174:18
**floor** 4:4,12
**flowers** 2:5
**fluctuations** 66:8

**focus** 42:8 55:17
174:8 262:23,24
345:8 348:1
**focused** 39:6 372:7
**focuses** 59:3
**focusing** 59:18
172:19 189:14
334:10
**folder** 127:24
**folders** 126:17
127:16,20
**folks** 35:8,16 38:2
40:14 78:16 91:6
92:23 98:6 117:8
169:7 209:12,14
211:17 212:23
213:2 214:8,11
282:21 307:19
**follow** 25:1 44:16
58:9 59:13 104:7
125:4 176:2,23
214:2 301:14
378:23 379:2
**followed** 26:16
**following** 43:17
57:7 176:3 312:22
**follows** 17:13
**food** 43:9 114:18
132:14,16 179:12
188:4 366:23
**fooling** 364:24
**force** 134:3,5,24
135:14 136:3,4,25
137:16,20 151:6,7
151:19 158:23
160:15 170:17
172:14 173:3,6
178:6 198:19,24
218:12 243:18
303:3,14,17,23
305:2,15 306:15

307:10,25 375:11
379:10 381:12
**force's** 306:19
**forces** 149:11
206:9 223:9,18
359:20
**foregoing** 388:16
388:21 391:13
392:18
**forever** 42:14,15
42:18
**forgetting** 115:21
**forging** 178:23
179:2 241:3
**forgot** 105:16
202:22
**form** 71:15,16
81:5 83:25 87:17
87:20 100:9 146:7
261:15,15 357:15
357:18 360:16
366:15 367:12,21
368:2,6 386:14
**formal** 289:14
385:3
**formalize** 64:1
**format** 186:7
187:14
**formation** 137:16
**formed** 134:6,17
134:20
**former** 106:7
128:13
**formularies** 295:5
**formulate** 307:12
**forth** 315:2
**forward** 61:16
101:23 226:23
289:24 390:15
**forwarded** 338:21

**found** 92:18
117:10 128:12
139:14 229:13
256:19
**foundation** 54:6
116:7 357:16,19
360:17 361:23
366:16 368:3
**foundations**
154:23
**four** 20:19 21:5
32:23 73:17 94:5
94:15 111:10,16
115:15 117:13
121:2 163:12
170:18 171:3
252:5 253:6,8
315:5 318:23
346:16,19,20
347:22 352:4,14
370:12 375:12
376:4,11,13,20
378:3 379:7,18
380:17 381:7
**fourth** 263:14
322:5 329:11
339:6 352:3 376:3
376:4
**frame** 27:6,17
83:5 134:16
136:23 207:19
**franco** 5:3 91:11
91:11 157:20,20
**frank** 124:17
**frankly** 346:7
350:24 370:10
**free** 147:6 242:19
283:9 391:14
392:20
**frequent** 19:15

[frequently - goes]

**frequently** 310:2
**friday** 195:8
**front** 150:3 230:25
    256:12 261:3
    269:7 310:4
    375:15 378:16
**ftp** 186:16 193:21
**full** 50:21 63:11
    94:8,8 144:10
    289:24 378:21
**function** 105:23
    111:6 124:3
**functional** 364:1
**functions** 95:23
    110:24
**fund** 68:7 154:24
**funded** 53:17,23
    53:24 141:3
**funding** 48:8
    53:16 55:2 64:25
    101:13 220:18,21
    290:23 291:2,8
    306:1
**funds** 138:15
    145:6,8,12 151:24
    218:5
**further** 31:23
    130:6 386:16,17
    388:19 389:1

**g**

**g** 73:9
**gabapentin** 341:2
**gain** 347:6
**gallucci** 2:16
    15:17
**galonski** 23:12
**gambling** 141:4,6
    162:11
**game** 161:11,13
**gates** 4:7 91:18
    92:1,1

**geared** 320:6
    354:24,25
**gender** 359:1
    360:14
**gene** 109:21,24
    124:6 314:5,13,23
    315:15
**general** 8:4,5
    22:19 25:16 35:12
    54:5 63:6 65:3,22
    67:22 68:7 83:1
    94:10 101:25
    111:6 131:13
    132:13 146:21
    152:1 153:4 202:1
    205:3 206:6
    222:10,24 244:22
    250:7,9 252:23
    262:4 263:16
    268:17 277:14
    286:18 290:6
    292:8 296:9
    299:16 321:5,9
    327:16,21 330:1,2
    341:8 343:22
**general's** 222:21
**generalists** 75:10
**generally** 18:11
    29:9,14 42:10
    44:11 55:9 58:4
    58:10 80:6,8
    95:25 100:4
    104:10 131:9
    134:15 159:9
    165:2 175:22
    178:15 206:13
    277:12 300:19
    324:15 363:7
    371:6
**generate** 115:5,6,6
    198:8

**generated** 7:21
    191:11 269:3,9
**generic** 150:8
**gentleman** 247:23
**getting** 30:10
    42:19 123:25
    138:9 173:14
    176:2 178:25
    186:25 208:7,10
    251:3 267:6 297:3
    348:10,13 353:5
    364:12 366:1,2
    370:15,15,16
    384:13 385:6
**gianna** 3:20 15:25
**giannac** 3:22
**girl** 34:11
**giuseppe** 2:21
    16:16
**give** 19:10 25:7
    38:8 56:24 57:1
    58:10 65:22 68:25
    71:21 73:2 77:24
    89:24 96:7 107:8
    125:2 129:14,16
    129:20,23,23
    157:17 183:4
    190:14 194:24
    219:20,22 230:8
    230:18,22 246:20
    246:20 264:5
    282:21 283:16
    313:2 387:1,10
**given** 44:16 52:13
    52:22 55:15 78:19
    270:5 283:8,10
    291:10 295:9
    296:4 315:25
    324:1 345:1 381:1
    386:3 388:13,17

**gives** 283:18
    342:14 382:19
**giving** 249:5,6
    287:3 362:25
**go** 19:24 30:20
    31:8,22 33:25
    34:21 36:20 38:3
    53:14 68:6 70:20
    71:9 72:2,4 77:21
    80:18 83:4 85:14
    85:18 91:6 94:18
    97:21 106:5 125:1
    125:18,24 126:20
    132:5 139:15
    147:3 157:6 158:7
    198:17 205:4
    213:10 221:25
    224:21 227:3,21
    230:3,19 231:11
    249:14 257:15
    264:8,11 265:14
    278:13 284:1
    292:19,19 296:23
    317:19 318:12
    324:6,11 334:12
    334:17,23 335:1
    340:20 344:19
    347:13 358:3,15
    362:20 367:1,13
    368:24 370:2
    378:20
**goal** 173:2
**goals** 218:13
    288:22 312:22,23
    313:9
**goes** 67:4 69:11,25
    98:7 101:22
    154:10 155:21
    181:3 292:11
    326:1,5 333:17
    334:20 342:13

344:24 366:5
**going** 17:24 19:4
22:2,13 24:12
25:23 35:10,19,22
40:21 42:12,15
51:17 54:18 56:6
56:7 66:7,9 70:15
70:19,19,20 77:3
80:17 84:9 90:19
90:19 95:5 103:13
109:10,11 110:12
120:1 121:21
128:10 130:1
132:23 135:18
138:17,19,25
139:3 142:8,18,24
144:7 145:3 147:3
147:3 149:20
158:6,7 159:18
167:5,17,22,25
168:2,4 169:3
183:21 188:1,5
190:4,16 192:21
193:20 210:18
212:7,18 218:18
227:21 228:8
230:20 233:8
236:16 244:5,8
246:4 248:8,8
250:23 252:23
254:5 257:11
258:24 259:17
261:24 262:4,14
262:16 270:23
271:3 275:16
282:21 284:10
285:8 299:7 302:9
302:13,18 303:9
304:11,13 316:4
326:14 330:3
333:5 340:12

350:22 351:5
362:5,9,10,11
363:16 364:3,11
366:1 370:6,8,17
370:18 384:11,13
385:5
**good** 17:16,17
47:6 61:16 106:22
139:8,9 147:12
161:11,12 202:7
214:14 224:6
246:16 272:22
283:23,24 285:7
306:9,20 318:4
322:18,25 329:8
330:6 345:15
346:6 353:8,9
380:1 385:1
**gotcha** 90:15
123:16
**gotten** 200:3
253:14 255:2,10
255:15,19
**governed** 120:20
123:12
**government** 39:16
65:25 89:6 154:24
180:2,5 343:21
**governor** 180:17
257:18 262:3
263:15
**grant** 4:13 54:7
66:17 68:16 69:1
69:2,17,20,22
70:15,15,16,23,24
71:4,6,9,9,11
100:14,15 101:6
101:11 110:25
145:10 153:14
154:19 155:8
156:23 161:8,17

172:22 194:20,23
195:1 223:6,7
229:19 230:6
242:24 372:3,4
**grants** 69:15,16
108:14 111:3,5,13
154:2,7 156:19,20
156:21 157:4
290:21,22 369:12
**graph** 194:22
**gray** 5:16 91:9
103:18 104:8
**great** 144:4,15
305:15,21 306:20
308:22 342:20
345:7 384:20
**greater** 342:5
**green** 105:8 106:9
121:11 322:10
**griffin** 73:9,10
**grocery** 236:6,7
236:10
**ground** 18:1
135:21
**group** 16:15 33:15
36:15 44:22 47:24
75:8 76:17 88:23
102:1 115:11
139:22 168:1,24
169:1,6 176:17
181:1 185:13
208:24 212:4
219:10 220:5
238:22 247:5
254:1,4,9,10 346:1
358:17,23 359:4
360:11 362:24
370:17
**groups** 89:20
202:8 211:23

**growing** 334:3
336:19 346:8
**growth** 346:4
**guess** 62:14 110:3
195:18 205:4
213:12,14 348:9
374:12 380:2
**guesstimate** 56:12
**guidelines** 44:16
47:23 176:24
**guilty** 384:6
**guys** 224:14
**gwp** 2:24

**h**

**h** 94:12 114:25
125:19 126:5,11
126:14
**habit** 126:11
179:17 210:19
248:1 324:8
384:25
**habits** 273:8
**half** 53:5 63:4
65:17 66:17 68:25
69:10,24 70:2,3,9
90:22 134:12
141:15 153:9
154:2,4,5 155:13
232:24
**halfway** 318:18
**hallucinogenic**
166:17
**hallucinogens**
326:5,9,22 335:1
336:7
**hand** 159:18
219:21 365:11
389:6
**handed** 219:19
282:11 304:2

handing 171:19
190:13,18 225:24
handle 76:8
129:24
handled 33:9
129:10
handles 156:3
219:24
handling 159:7
hands 169:25
173:19 253:25
254:6 255:20
363:24
hang 378:7
hanna 2:4
hannah 15:14
happen 51:2 88:18
146:18 196:3
249:9 385:7
happened 40:8
103:15 104:21
118:24 245:10,17
246:5 371:14
happening 188:4
245:8 248:21
358:8
happens 51:4
115:1 243:25
344:23 345:6
362:14
happy 80:19
hard 30:23,25
38:17,24 41:21
82:22,23 87:10
117:3 125:13
128:6,13 169:24
370:5
harder 373:13
harm 354:7,25
355:15 356:21

harmed 169:9
harmful 161:5
208:24
hat 139:24
hate 126:13
havoc 202:2
358:19
hawes 94:12
hayden 5:17 91:8
hayden.miller
5:19
hb 260:3
hbc 4:11 16:5
hcfa 115:6
head 19:17 66:4
154:12
headaches 174:12
249:7 364:13
heading 112:7
312:21
headquarters 32:4
32:6
health 3:15 4:2
16:9 21:18,23,24
22:5 25:3,10,10,11
25:13,15,16 27:1,2
28:2 30:19 31:19
32:5,6,14,22 33:13
34:1 36:10 37:12
38:3,21 39:8 42:3
42:22 43:21,25
44:8,17,18 45:13
45:15,24 46:5
47:17 49:13,23
50:8,10,12,22 51:5
51:8,16,20,23 52:4
52:9,25 53:18,24
54:11 55:13,21
56:10 57:14 59:7
59:19 60:9,23,25
61:4,8,14,22,23

62:17,20 63:20
64:2,19 65:19
66:25 67:1,2
68:14 72:12 74:25
75:4 76:1,18
77:20 78:1 79:9
81:21 82:3,20
83:15 88:14 89:1
89:5,14 92:22
93:2,6,7,25 94:9
94:19,19,23,25
95:8,11,15,19 96:9
96:21,23 97:15,15
97:18,22 98:2,6,22
99:1,13,17,24
100:12 101:14
102:20 103:9,10
103:20,24 104:15
107:22,24 108:2,5
108:19 109:4,8,11
109:14,24 110:12
111:19 112:6,9,11
112:12,13 113:11
113:22 114:5,11
114:16,17 115:12
115:23 116:2,8,9
116:11,13,14,15
117:4 118:9,12,22
118:25 119:4,7,17
120:5,6,10,12,20
120:25 121:14,22
122:1,2,4,13,16,25
123:5,14,17 124:5
128:24 129:6
130:4,6,20 131:16
132:10 133:2,6,7
133:10,10,11,13
134:14 135:7
136:1,19 137:2,7
137:22 138:7
139:7 140:16

144:9 150:4
151:22 153:15,22
160:14 174:23,24
179:24 182:17,25
183:3,16,22 186:1
187:20 197:3
198:4 200:9 206:9
208:21 213:10
215:9 216:4,5
217:10,15 220:16
223:3,11,12,13,16
223:22,23 224:3
225:10 232:2,17
232:20 233:1,13
233:14,16 234:6
234:18,24 237:9
253:18 254:6
268:20 274:10,12
278:8 286:18
287:6,8,10 288:21
289:2,9,10 296:11
299:16 300:22,23
301:3 309:23,25
312:10 314:14
315:21 320:7,22
321:10,16 328:21
329:2 330:17
332:14 343:21
344:2,8 353:21
354:1,4,4,10,11,13
354:13,16,17,19
355:2,3,7,17,17,18
356:9,14 357:1,10
357:13,22 358:21
359:14 360:24
361:18,22 363:20
364:18 365:20
366:7,10 367:5,7
367:15,19,24
368:14,17 369:6
369:17 371:6,6,9

371:16,17,18
372:9,12
**health's** 35:6 62:3
63:2 153:6 371:25
**healthcare** 108:10
114:24 115:19
118:4 232:10
**healthy** 356:23
**hear** 83:16 200:11
**heard** 23:25 96:25
119:15 170:3
176:13 177:11,14
179:9,10,11 260:5
271:16 276:1
280:24 281:11,24
285:20 289:20
298:4,6 308:18
**hearing** 151:17
209:19 225:16
**heart** 111:1
186:11 358:10
377:22
**hearts** 358:10
**heather** 34:4,11,11
96:23
**held** 234:10
237:10
**hello** 91:8
**helmick** 3:20
15:25 16:1
**help** 58:15,16
100:23 111:4
131:17 133:16
155:25 223:14
257:24 279:9
282:3 283:11,19
290:2 291:13
306:8 312:12
340:10 361:6
370:7 385:2

**helped** 97:4
135:16 264:23
273:20 372:4,5,6,6
**helpful** 147:8
282:18 283:13,14
291:15 294:6,6
**helping** 36:16 45:3
**helps** 282:24
283:16
**hep** 43:10
**hereinafter** 17:12
**hereunto** 389:5
**heroin** 80:13,21
166:13 168:8,23
169:19,21 199:6
204:3 212:14
215:18 216:25
225:2 274:5,7,21
275:14 313:6
322:10 332:7
343:4 346:16,23
346:24 347:11,13
347:14,18,19
348:6,7,10,11,15
348:17 349:4
350:13 352:4,9,9
352:15,23 353:1
361:15,20 362:11
372:17 373:9
374:21 376:5
377:2,2 378:3
379:7,18 380:18
380:22,22 381:7
383:12,18,23
384:12,13 385:7,9
386:8,13
**hesitate** 372:2
**hesitating** 335:11
**hey** 194:22
**hi** 338:12

**hieroglyphic**
231:7
**high** 7:7 54:8
63:22 139:12
159:14,24 165:1,3
165:4,5 172:15,17
173:8 192:1 342:2
342:3 350:8
377:12
**higher** 173:15,17
302:4 322:11,14
322:15 330:22
**hipaa** 296:7
**hire** 33:3
**hired** 32:24 33:1
36:3 73:18,19,20
73:21 221:19
**hiring** 140:11
**historically**
174:10
**history** 78:4,4
168:4 297:9
347:12 363:15
**hit** 135:21 210:14
**hiv** 43:10 98:11
104:19
**hklaw.com** 5:5
**hoc** 195:3
**hodgepodge**
113:25 143:15
**hold** 113:7 234:21
284:12 285:5
**holding** 187:1
**holland** 5:2 91:12
157:21
**home** 85:19
100:16,18 101:18
102:21 108:9
174:24 175:1
210:14,16 227:3
232:9

**homeless** 384:21
**homes** 100:24
213:2 368:25
**honest** 39:21
328:16 377:18
**honestly** 57:11
79:19 124:16
221:20
**hooked** 246:3
**hop** 351:12
**hope** 202:5 346:10
365:4
**hopeful** 272:24
287:12 369:8
**hopefully** 131:18
332:16 353:17
**horizon** 61:14
**horrible** 384:25
**horrific** 169:9
201:24 203:12
**hospice** 174:11
201:24 238:24
**hospital** 188:1
343:24
**hour** 90:21 94:5
**hours** 20:20 21:5
85:17 94:15
**house** 89:18 218:6
256:17,24 257:16
257:17 259:9
260:3
**houses** 370:9
**housing** 43:9
114:18 156:24
370:9
**hsl** 125:19
**hud** 156:22
**huh** 19:2,22 21:16
21:19 24:23 29:1
65:18 114:14
304:21 312:25

325:17 332:8
**human** 359:25
  368:22
**hundred** 31:11
  48:25
**hundreds** 86:7,8
**hurt** 212:1 365:4
**hwerner** 2:7
**hydrocodone**
  280:20,24 281:8
  281:20
**hypertension**
  111:1
**hypothesis** 249:17
**hypothetically**
  122:12 126:8

**i**

**i.e.** 315:7
**idea** 52:16 140:11
  215:25 325:9
  341:15 365:24
  366:4
**ideas** 223:20
**identification**
  24:20 58:14 92:8
  92:14 159:16
  171:17 190:11,25
  225:22 229:10
  256:10 261:1
  269:5 302:25
  314:2 316:17
  321:6 327:17
  337:23 340:17
**identified** 17:22
  35:7 307:4 369:15
**identify** 15:7
  16:23 17:6,18
  32:9 34:7 41:5
  91:7 157:14
  159:21 194:1
  252:9 264:21

354:23 356:16
  366:11
**identifying** 38:22
  43:13 266:24
  301:16,18
**identity** 26:1,2
  52:16,19 296:3
**il** 3:4
**ilene** 286:12,13
**illegal** 80:6 163:13
  166:20 167:18
  175:15 204:1
  212:13 245:23
  246:7 253:2 274:5
  275:3,14 277:20
  310:10 313:6
  320:16 363:11
  364:23,24 367:9
  374:20 386:9
**illegally** 81:2
  241:4 248:12,13
  276:12 324:24
  352:19
**illegitimate** 377:14
**illicit** 80:19 81:13
  197:21 209:22,24
  210:5 361:25
  362:2,17 364:23
  372:16 383:23
**illness** 206:24
  207:3,6
**immediate** 124:7
**immediately** 110:6
  120:11
**immoral** 175:15
**impact** 186:5
  225:2
**impacted** 209:7
**impacting** 359:12
**impetus** 135:17

**implementing**
  133:22 139:23
  150:12
**importance**
  139:22
**important** 27:19
  112:9 141:3
  230:10 299:4
**improper** 164:15
  200:3 338:13
**improperly** 178:1
**improvement**
  66:25 67:2 112:12
**improvements**
  96:10
**improving** 267:1
**inactive** 282:17
**inactivity** 111:2
**inappropriate**
  261:25
**inception** 303:24
**incident** 245:18
  248:9 276:3
**incidents** 246:13
  250:13
**incinerated** 152:9
**incineration** 152:7
**include** 56:14
  80:20 153:18
  183:19 184:20
  188:21
**included** 63:11
  178:22 201:19
  390:13
**includes** 64:22
  191:19
**including** 307:10
  324:25 348:17
  363:11
**income** 179:15

**incorporated**
  392:12
**incorporates**
  86:14
**incorporating**
  64:9
**incorrect** 231:9
**incorrectly** 358:18
**increase** 79:24
  80:1,2 177:2
  207:15,17 209:20
  214:24 216:6,14
  226:10 325:21
  326:13,15 362:17
**increased** 63:9
  69:5,5 79:11
  178:16 207:12
  274:25 276:23
  333:23 336:9
**increases** 203:21
  215:17 216:19,24
  227:6 266:23,24
  335:4
**increasing** 274:22
  274:24 332:25
  333:9 335:22
  373:9
**independent** 75:16
  75:17,21
**index** 6:1,5 7:1 9:1
**indiana** 5:7 91:21
**indicates** 167:4
**indicating** 172:13
  390:13
**indicators** 112:22
  112:22 163:12
**indigent** 88:19,25
  90:9,13,14 155:4
  309:2
**individual** 34:14
  195:10 248:11,15

264:8 272:1 290:3
299:10 300:5
310:15,16,18,21
323:10 342:13
344:7,14 346:23
347:11 348:5
350:10,12 355:3,6
355:14 358:5
359:9 372:11
**individualized**
85:20 186:3
**individually**
372:15
**individuals** 56:17
56:18 58:17,20,23
66:19 88:20 89:2
102:1 103:19
115:11 131:13
135:2,7,18 160:21
160:22 163:6
168:24 169:1
172:4 176:18
185:13 194:21
197:16 201:20
207:23 208:5
209:6 210:17
211:15,24 223:17
241:2 245:21
246:1 247:20
250:2 252:18
259:13 260:8
263:17 264:21
288:13 301:22
302:2 306:3,13,15
307:21 308:20,22
309:4 324:19,22
324:23,24 325:6,7
340:9 342:22
344:11 346:1
347:13,23 348:15
348:20 349:1,8,23

354:24 356:16
358:17 359:10
360:5 361:11
362:23 364:1,4
365:25 368:25
370:7,10 384:9,21
384:23
**industries** 5:11
**inflows** 156:4
**inform** 184:4
**information** 21:10
22:7,10 24:3
26:15 37:11,16,24
39:4 41:6,19
58:22 70:22 81:21
106:25 107:3
119:15,16 120:4
133:16 141:9,17
172:22 177:20,25
184:8 185:6,11
194:20 205:16
212:5,10,15 218:7
222:11,13,14
226:16 239:1
253:20 266:17
269:18 275:23
286:18 296:11,14
301:16 317:20
337:15 341:1
354:22 356:11
376:7,10
**ingredient** 281:9
**initial** 47:23 49:22
87:17 109:9 118:6
223:16
**initially** 26:14
49:3 203:8
**initiation** 136:4
**initiative** 112:18
112:20,25

**initiatives** 112:7
175:8 206:10
222:19 223:4
319:24
**inject** 347:19
**injunctive** 287:13
**injured** 212:12
**injury** 363:2
**inner** 168:22
**innocently** 169:7
**inpatient** 85:14
**input** 307:21
**insecurities**
114:19
**inside** 65:5 66:11
**insinuated** 336:19
**install** 152:17
**installing** 152:18
**instance** 18:16
276:9
**institutions** 118:1
**instruction** 387:2
387:10
**instructions**
379:25
**instrumental** 45:3
**insulin** 188:20,20
**insurance** 88:22
90:12,12 213:10
254:2 296:23
308:13,24,25
309:6,16,17,24
**insys** 5:2 91:12
157:21
**intake** 87:25
**integrate** 59:22
**intended** 249:1
273:18
**intensive** 43:1
85:7,8,15 86:13
87:12 143:3

**intent** 167:23
238:23 374:19
**interact** 122:1
243:3 294:10
**interacted** 236:1
**interacting** 125:11
**interaction** 88:13
236:20,22 295:18
**interactions**
235:22 238:3
**interested** 181:8
186:2,2,5 208:23
245:3 338:15
389:3
**interesting** 162:17
**interim** 117:7,9
**internal** 289:11
**interpret** 19:20
**interpretation**
379:1 380:16,17
380:21
**intervention** 108:8
108:17
**interventions**
58:19 142:4 320:7
**interview** 338:18
**interviews** 214:16
**intractable** 175:12
**investigation**
104:20 185:24
241:6 332:24
**invited** 22:12,18
**involve** 131:22
332:11
**involved** 23:19
35:8 39:3 114:12
120:3 134:9,13
135:20 136:9
137:21,21 138:6
138:17 139:7
140:18 159:5

[involved - kearse]

189:17 192:4
212:21 247:1,8
283:6 288:5
360:24
**involvement** 114:4
137:4 139:19
160:2 222:18
223:3 230:4
332:19 335:12,19
**involving** 325:14
328:6,8,19 329:5
330:9
**iop** 85:9 86:1,2,4
87:24 88:3,9
**iot** 86:1
**isham** 25:22 26:7
**issue** 61:2 168:12
168:15 194:2
204:7 223:9
228:14 245:12
339:22 354:13
355:2,3,17 356:9
357:1 359:10
360:22 364:18
367:16,19
**issues** 48:8 100:25
111:14 116:17
120:10 130:8
131:2 133:4
145:23 146:9
158:17,19 159:8
162:15 168:9
172:2 205:20,24
206:11,16 244:21
307:13 337:7
354:19 359:18
361:19 363:21
371:6
**item** 122:8,11
**items** 307:3 313:1

**j**

**j** 3:7
**jackie** 39:1,3,7
52:7 72:8 73:3
77:22 86:22 94:22
94:24 131:14
135:4 155:23,23
**jackson** 4:21
91:15
**jacksonkelly.com**
4:24
**jail** 89:17,17 218:6
362:20
**james** 112:17
**janssen** 2:19 16:20
**january** 7:3 25:14
36:5 92:5 97:23
193:7
**jciaccio** 2:15
**jerry** 45:3,5
136:11 169:14
218:4,5
**jflowers** 2:8
**jill** 104:2
**jillian** 104:3
**job** 108:16 235:3
354:9 361:2
**jobs** 232:16 366:7
**jodi** 2:5
**joe** 5:3 91:11
157:20 236:3,13
**joe.franco** 5:5
**john** 3:12 16:10
23:12 136:12,13
136:18 228:5
**john.lavelle** 3:14
**johnson** 2:19,19
16:18,18,21,21
**join** 59:24
**joined** 25:14 99:2
157:16

**joining** 287:6,9
289:22
**jones** 4:7 92:2
352:9 380:22
381:11
**jonesday.com**
4:10
**joseph** 2:13 5:20
**josh** 16:7
**joshua** 3:16
**jotted** 363:14
**journal** 131:25
133:1,25 209:11
**journaled** 132:2
**jr** 3:12
**jtully** 3:18
**judge** 1:10 17:5
**julie** 106:8
**july** 96:25 210:13
211:2 212:18
213:16,19 214:1
225:8,8 227:10
233:6 234:19
245:10,11 247:17
389:17
**jump** 124:25
**june** 191:7 192:10
225:8 233:2,18,24
234:11 245:11
**justice** 58:24

**k**

**k** 17:20 32:12 46:3
117:19,19 220:6
**kaplan** 105:5,6
**kasich** 180:18
262:3
**kearse** 2:4 15:9
22:13 25:23 26:21
35:10 42:17 71:15
80:22 81:5 83:25
90:18,23 100:9

120:1 128:14
134:8 146:7 158:9
164:18 166:4
167:7,20 171:7
175:17 177:4
178:10,18 179:6
181:25 197:11
199:8,17,23 201:8
203:18,22 204:2,8
206:25 209:23
210:25 213:13
215:6,19 216:8,21
224:6,10 225:6
227:15,20 230:18
238:20 240:3
245:13 246:22
249:21 253:12
254:24 255:5,16
257:4,10 258:2,18
258:23 259:5,17
260:11 261:21
262:13 263:6,22
264:25 266:10
267:10 268:11,22
269:19 272:23
276:16 278:22
279:6,18 280:4,10
280:18 288:16
290:25 292:14
298:25 299:18
300:14 301:6
302:16 303:11
304:1,7,13 308:17
309:21 311:14,18
318:5 319:13
320:18 323:2,22
327:6,11 329:21
331:23 334:5
336:18,23 337:18
341:14,19 342:9
343:16 344:17,21

345:9,12 346:25
348:8 349:10
350:14 351:1,8
352:21 353:2,11
390:5

**kease** 15:9

**keck** 117:3,4,19,20
117:22

**keep** 31:10 42:15
52:23 57:5,21
63:17,18 67:25
68:2,3 115:6
131:17 140:1
146:22 155:14
184:11 186:3
244:7 303:9

**kelly** 4:21 91:15

**kent** 107:14
231:14,20

**kept** 30:4,7 124:23
148:20 155:17

**key** 307:2

**kid** 165:14

**kid's** 369:25,25

**kidding** 303:12

**kids** 145:3 160:17
161:14 165:1,6
346:13 362:11
370:16

**killed** 185:20

**killing** 147:5

**kind** 18:11 30:6
33:15 52:8 57:7
73:3 113:25
115:12 117:6,9
120:17 130:18
133:21 135:21
143:15 154:11
194:23 271:2
289:3 321:20
335:10 358:20

**kinds** 362:6
384:24

**kirkland** 3:2 15:20

**kirkland.com** 3:5

**kits** 54:23 55:18
55:21 56:9 57:4,9
57:15,23 283:10

**klauss** 1:25 388:6
389:14

**kline** 105:14

**knee** 342:14

**knew** 82:25 147:5
211:20 250:22
252:22 253:1
262:14 311:3
329:22 339:15,25
341:8 362:4
371:19 376:14

**knight** 5:2 91:12
157:21

**know** 19:16,21,24
22:11 25:19 27:21
29:11,14,22 31:3
35:23,25 37:5,9,10
38:12 39:19 40:1
40:7,12,20 41:24
42:5,11,14 48:20
52:18 54:7 56:8
58:9 62:3,23
63:19 66:6,10,11
66:11,21 69:10
71:4,6,11 72:13
75:11 77:9 78:12
81:12,15,16 82:24
83:13,23 85:10
87:4,14 102:17
114:18 116:19,23
118:24 119:9,12
121:24 124:14,17
126:23 128:11
131:14 133:14

137:14,19 139:25
144:14,17 147:10
147:17 151:2
154:15,24 156:1
159:1 167:22,24
167:25 169:2
170:24 172:6,13
172:22 174:6,8,18
175:18 176:5,10
176:11 177:8,19
178:3,4,24 179:7
181:13 184:21
185:19 186:21
188:8 189:22,25
190:3 191:11,22
195:9 196:10,12
197:7,12 199:3,10
199:12,24 200:21
200:23 203:23,24
204:14,23,25
205:9 207:20
208:17 209:5
214:8,19 215:1,4
215:22,23 217:2
220:20 221:1,1
222:2,5,8,10
225:15 226:4
228:19,22,25
229:2 238:6,9,12
239:18,20,21,23
241:8,11 242:4
247:4,10,13,14
248:15 250:15,24
251:3,4,5 252:15
252:16,22,25
253:16,18 254:1,8
254:12 258:7,9,11
258:14 260:17
261:18 262:15
264:2 265:13
266:1 275:10

276:6,17,21,22,25
277:1,17 278:12
278:24 279:13,16
279:19,21,23,25
281:15,18,19,23
283:7 284:15
285:17,24 288:18
289:5 290:11,14
291:18,24 292:1
293:1,5,9,12,25
294:3,8,9,14,18,22
294:25,25 295:2,3
295:15,25 296:2
296:13 297:5,6,13
299:1,2 300:7,11
302:1,5 304:2
307:19 309:16
313:3 314:21,25
317:9 318:2,6,15
320:19 321:19,21
328:13,15,16
329:21 330:3
335:7,21 339:6,16
340:4,11 341:9
342:1,19,21 343:5
343:8,11 344:23
346:2 359:22
364:22 366:18
367:2 370:4 377:6
379:12 380:14
381:6 383:3,4
384:19 385:12,13
386:1

**knowing** 70:16
212:24 239:4
255:21 287:21

**knowledge** 26:11
38:23 41:15 42:2
76:20 123:4
133:16 158:16
164:4 166:21

176:25 180:6
197:24 198:6
205:12 206:23
208:18 219:3
220:19 221:15,21
239:11 253:8
281:18 285:6
288:17 293:12,13
293:15,23 294:13
294:17,21 295:6
295:22 296:5
297:7,10,21
298:16 309:22
311:8 345:3
374:18
**knowledgeable**
155:19
**known** 112:17
174:24
**knows** 145:4 296:2

**l**

**l** 1:25 2:9,13 39:1
39:1 46:3 104:3
126:11 388:6
389:14
**l.p.** 1:15
**label** 7:8,10,13,14
7:23,25 8:2,6
171:16 190:9,23
225:20 302:23
313:25 316:15
337:21
**labeled** 7:3,5 92:6
92:12 321:18
**labor** 60:15 143:3
**laced** 210:3
**lack** 308:5,9
**ladies** 23:5
**lahovich** 236:3
**laid** 94:4

**lakeside** 4:8
**language** 19:2
**large** 67:6 120:24
121:1,3 139:5
236:15 337:3
**larger** 60:1
**largest** 59:20
308:8
**lasalle** 3:3
**late** 168:5 245:11
287:1
**launched** 112:17
161:7
**launching** 96:14
141:25
**lavelle** 3:12 6:9
16:10,10 228:4,5
229:4 254:21
255:3 256:3 257:7
259:6,25 260:21
268:24 283:25
285:7,11 367:12
367:21 368:2,6
**law** 23:7,10,11,14
23:23 26:9 29:3
36:12 51:18,20
56:14 66:13,21
123:12 146:16
175:11 202:8
227:20 239:19,22
251:22,24 252:1,7
257:19 259:10
260:18 296:10
312:9 382:9
**law.com** 3:22
**lawful** 17:10
**lawfully** 343:15
**laws** 203:4 218:23
**lawsuit** 22:2,15,19
23:20 27:8,12,16
27:18 28:4 34:6

35:7,12 36:9
39:24 41:6 285:16
286:2 287:4 288:1
288:4 289:8,22
290:4 308:16
311:2 320:5
323:21 327:3,4
**lawyer** 26:22
**lawyers** 41:14
**lay** 18:1
**lead** 108:14
156:23,24 200:16
200:19,19,25
201:2 203:20,25
205:20
**leaders** 366:25
**leadership** 317:6
317:20 375:19
**leading** 172:1
173:7
**leanne** 98:20
103:25
**learn** 280:1 303:13
**leave** 109:4 173:22
381:3
**leaving** 116:20
173:17
**lecturing** 150:4
**led** 386:13
**lee** 4:22
**left** 73:22 93:11
95:1 104:14 106:4
106:19 108:24
116:17 117:3
136:14,20,21
158:5 224:14
270:16,18 272:11
282:22
**legal** 81:7 297:25
313:10 352:20
390:1 393:1

**legally** 81:7
204:21 205:10
**legend** 270:10
**legitimate** 151:19
161:6 171:6 172:8
197:10,17,23
199:15,22 204:6
207:23 210:23
212:12 214:18
259:14 260:8
324:2 341:23
342:16 350:7
363:1 375:8
377:14 378:4
379:8,19,22,23
381:8
**legitimately** 170:6
170:22 213:8
254:2
**length** 158:15
**letter** 261:14,15
262:2 263:15
390:19
**letters** 161:12
**level** 45:18 54:5,9
60:24 86:19 97:5
97:6 122:11 156:3
174:25 178:6
192:1 196:25
198:9 204:11,16
210:21 310:16
337:8 350:11
365:7
**levels** 226:19
241:14,25 271:2
358:7
**levy** 65:3,5 121:6
**lewis** 3:11 5:12
16:11 76:19 91:17
157:23 228:6

lgates 4:10
library 125:19
license 121:6
242:17
licensed 75:12,15
107:5 176:18
202:19 235:15,19
240:19 294:23
341:3 342:17
379:24
licensing 121:5,7
licensure 244:14
lies 255:22
life 112:18,20,21
113:19 114:15
139:24 145:13
147:11 174:11
201:24 203:11
238:24 249:2,15
lifestyle 201:19
lifetime 58:19
166:8
light 383:19
likelihood 266:23
limit 48:14 49:1,6
197:4 294:4 386:7
limited 52:11
356:18 358:22,25
359:3,6 360:11,13
line 71:12 95:14
95:18 122:8,11
270:9,13 272:3,7
295:17 350:8
390:13 392:7
393:3
lines 99:10 181:7
270:9 304:10
link 206:23 299:8
linkedin 7:16
229:8,13,22,25
230:5 231:22

233:15 234:17
lisa 4:7 92:1
list 30:21 54:13
58:2 72:25 96:12
100:3,5 106:5
182:6 221:25
313:8
listed 165:20
193:12 231:10,20
311:1,6 330:23
332:6,11 392:7,17
listing 392:7
lists 232:25 308:2
313:1 331:8
lisw 75:20
lisws 75:15
lit 65:14
literally 124:24
literature 131:23
239:3 253:22
350:5 374:7,8
litigation 1:7 15:4
34:8,18 118:7
124:14 129:9
284:12 390:6
391:3 392:3
litigations 24:14
little 21:20 30:21
51:18 53:6 68:15
80:12 124:2 143:7
146:3 169:3,19
172:9 200:6 210:2
262:21 318:3
322:2 323:9
live 39:19 356:22
369:22
lived 109:18
366:19
lives 364:8
llc 2:3 3:19 5:7,16
91:10,21

llp 2:20 3:2,7,15
4:11,16 5:2,7,12
load 129:15
156:18
loaded 124:24
local 60:17 61:14
97:18 112:10
117:25 145:12,15
154:21,23 162:8
219:9 236:6,10
252:17 337:9
354:4
locally 36:16 61:2
112:15 146:15
located 151:19
logan 3:8
logical 264:19
long 20:17 21:3
28:15,16 29:11,23
32:21 39:7,12
40:5 44:6 45:12
46:4 51:15 55:16
55:20 59:4 72:9
72:11 73:13 74:6
76:20 78:4 82:11
90:19 95:10 98:21
99:20,23 109:3
110:1 111:8 113:7
127:23 128:23
168:3 232:21
254:3 347:12
353:18,23 363:15
364:5 384:14
longer 22:5 51:18
77:13 105:11
106:13 142:15
147:11 179:25
207:25 248:22
265:23
longest 76:16
104:13

look 27:20 32:9
57:20 66:3,4
69:21 92:25 96:6
96:8,9,15 100:12
100:15 103:6
104:23 135:10
160:8 163:3
179:20 186:22
191:4,14,23 192:7
193:4 194:13
198:17 208:22
209:10 214:5,6,6
214:20 226:1
229:25 244:4
245:2,4,7 253:19
253:19 257:2
269:21 305:1
312:20 313:2
315:5 317:1,24
318:14,16 322:8
323:4 325:10,18
325:23 328:3,17
329:9 330:7,15
333:3 334:8 337:6
340:24 344:14
345:18 350:4
352:3 355:8
381:11,12
looked 37:23
112:20 140:20
146:14 148:2
153:1 163:18
187:11 210:1
235:4 237:9 248:2
261:9 262:18
268:15 321:21
327:25 330:13
looking 38:3 61:9
61:11,12 69:18
93:11 95:13 112:8
112:10 113:18

144:5 146:21
147:9 148:16
149:7 155:11
158:25 163:10
182:5 188:10
189:6 191:17
207:8 208:23
209:3 245:3
257:24 271:1,11
304:17 330:12
332:22 355:13
372:11
**looks**  17:5 66:23
101:22 103:8
120:9 163:11
186:23 195:19
271:2 319:3 353:5
**loop**  133:24
**los**  4:4
**lost**  61:4 135:14
381:5
**lot**  57:19 59:2,25
60:3 70:22 77:25
79:19 92:20 98:11
106:23 110:23
111:3 112:10
113:16 117:8
118:3,3 131:14,19
134:4 139:6
140:19 146:19
156:1 172:6 194:9
199:3 217:6 248:5
251:2,8 253:19,20
253:20 302:15
304:10 370:2,6
371:5 373:6 382:7
**lots**  135:22
**love**  42:14
**low**  283:9
**lower**  219:2 302:4
320:12 322:12,14

**lpc**  75:12
**luken**  4:20 91:15
**lunch**  126:20
**lying**  173:18

**m**

**m**  2:16,21 3:20
4:21 5:8 32:12
46:8 104:3 116:18
236:9
**macro**  372:10
**madam**  390:10
**mail**  126:13
**main**  2:22 215:10
340:20
**maintain**  30:20
31:16 50:12 52:9
119:11 130:13
217:16 254:2,16
348:16 364:4
**maintained**  29:12
29:16,20,23 30:2
30:15,23,25 32:1
51:7 52:15 82:3,6
82:12,20 118:21
208:7 212:15
217:9
**maintaining**  28:4
31:19,22 112:19
127:23 365:25
**maintenance**  87:8
151:24
**majority**  341:16
341:22 342:18
343:3,6,9 345:23
**making**  119:24
128:2 348:5
356:25
**mall**  151:12
**mallinckrodt**  5:16
91:10 221:5

**man**  188:19
**manage**  111:4
370:5 371:22
**management**
110:25 176:21
201:18 254:15
**manager**  108:13
109:1
**managing**  113:18
**mandated**  155:14
256:2 258:9
**manna**  1:23
**manner**  349:3
**manually**  126:15
**manufacture**
222:2 293:2 384:4
**manufactured**
222:15 281:6
292:18 295:9
386:3
**manufacturers**
205:1,16 221:18
246:6 327:4
383:22 384:2
**manufactures**
246:7,8
**manufacturing**
222:6 384:7
**marcus**  4:11,14
16:5
**margo**  46:8 93:18
93:18,19 94:6
**marijuana**  166:7
206:1 252:20
254:10 386:11
**mark**  190:16
229:4 256:3
260:21 268:24
302:18 316:4,7
**marked**  7:2 92:7
92:13,17 159:15

159:19 171:16,20
179:18 190:10,13
190:18,24 191:2
225:21,25 229:9
229:12,24 256:9
260:25 269:4,8
302:24 314:1,4
316:6,16,19 321:5
327:16,20 337:22
337:25 340:16,19
**market**  1:23 3:12
32:2 82:7 174:18
222:9
**marountas**  128:19
128:20 184:15
191:8 192:11
193:22 245:1
316:21,22 338:22
**maryland**  3:11
16:12 228:7
279:17 280:2,13
280:15
**masquerading**
259:14 260:8
**master's**  107:4,21
232:1
**mat**  70:14 98:5
183:20 369:1
**material**  141:10
**maternal**  184:19
**math**  71:12
**matter**  127:1,9,16
127:20 142:9
156:12 167:6,18
185:14
**mayor**  61:10,10
120:10 121:11
123:10 179:24
**mccarthy**  112:16
112:17

[mcginness - merged]

mcginness  2:4
mckesson  4:15
  16:25 91:25 158:2
  291:17,23 292:1
mcneely  338:6
  339:3
mdl  1:6,9
mean  36:25 75:17
  80:3,8 106:13
  107:11 112:1
  114:12 124:16
  144:4 152:4
  160:14 171:12
  176:16 191:16
  199:2 229:17
  230:1 241:5
  246:16 248:20
  252:23 271:25
  275:18 284:25
  309:24 318:7,13
  320:25 328:14
  343:20 361:10
  364:17 365:4,19
  366:23 377:10
  379:21 382:10
  383:8 384:3
meaning  120:21
means  85:10,16
  191:24 200:3
  260:13 270:4
  280:7,15 377:7
  379:23 380:25
meant  19:20
  143:25 220:11
  246:6 289:15
  306:19 318:9
  336:18 365:8
measure  268:4
  271:14 273:24
  276:18 277:25
  278:19,25 281:20

measured  163:24
  166:1
measurement
  279:8
measures  269:12
  282:2
mechanism  90:14
  340:9
med  169:8 214:12
  266:3,14,23 267:3
  267:14,21 269:23
  269:25 270:5,22
  271:12
media  338:18
medicaid  88:23
  115:14 308:19
  309:8,9
medical  16:14
  44:15 45:17,22,24
  45:25 46:12,18,19
  46:22,23 47:18
  48:9 50:5 82:9,11
  82:21 93:10,24
  94:3,6,10 117:14
  131:22 174:14
  175:3,5 183:17,24
  185:22 186:8
  187:4,10 189:11
  190:4 192:16
  193:20 195:13
  196:1 202:14
  204:7 217:22
  232:8,19 235:12
  242:18 248:24
  249:5 259:14
  260:8 355:6 358:1
  377:13
medicate  200:25
  204:1
medication  43:5
  44:5,7,23 49:24

50:13 56:4 86:15
  161:2 164:12
  165:13 170:20,23
  178:24 179:1
  199:22 201:2
  246:2,11 292:13
  294:20 296:15
  298:22 300:3
  310:17 315:8
  358:6 365:5 369:2
  370:7
medications  47:9
  152:8 163:20
  165:7,21 175:9,16
  179:3,4,11 201:6
  203:6,15 208:2
  211:10 250:4
  265:22 266:15
  280:3 294:7 297:3
  299:4,15,25 300:8
  300:18 301:5
  315:9 324:22,24
  338:14 341:25
medicine  161:6
  164:16 171:5,9
  177:23 294:24
  345:20 350:2
meds  174:9 273:1
meet  20:7,17
  36:19 129:21
  308:11
meeting  20:22
  22:12,18,20 23:3
  23:20 24:5 74:14
  122:3 135:19
  140:9 198:25,25
  307:2,10
meetings  122:24
  130:9 139:21
  140:9 223:16
  243:7 303:25

374:10
meets  81:25,25
melville  2:14
member  57:10
  81:4 120:9,22
  121:5,9,11,21
  123:7
members  57:2,3,8
  120:25 121:3,14
  123:9 262:3
  263:16 268:17
  306:15 307:25
memos  125:12
men  83:13,18,18
  83:19,22
mental  44:17,18
  54:11 55:13 78:1
  88:14 89:1 97:15
  97:15 136:1 183:3
  206:23 207:3,6
  309:23,25
mention  178:8
  278:6 312:17
  315:22
mentioned  25:2
  43:18 45:17,22
  51:11 55:10 59:16
  67:17 115:20
  143:4 145:6
  152:1 166:20
  175:3 185:5
  193:22 202:12
  218:12 222:24
  237:21 293:20
  299:20 301:13
  307:8 310:2,7
  325:14 330:10
merge  60:25
merged  22:4 59:10
  59:11 63:14 76:22
  94:6 113:9 114:13

118:17 123:19
merger  25:5 40:8
40:9,15 59:15,18
60:6,22 62:2,4,15
63:6 77:1,7 78:8
93:20 94:7,14
99:6 113:10
116:15 119:1
129:2,3 153:6
merging  62:20
met  20:10,13 71:5
83:17,20 123:22
129:10 139:20,21
140:2,2,8 353:15
meth  70:19
methamphetamine
206:3,12 333:14
335:15 362:22
363:12
methamphetami...
166:15 333:13
methodology
161:25 162:2
metric  333:4
metro  108:24
metrohealth  232:8
232:19
mexican  373:25
374:14
mexico  246:9
miami  4:20 91:15
michael  3:7
105:25 106:11
285:14 338:5
microsoft  126:9
mid  22:7 24:1,10
24:16 25:18 27:5
27:15
middle  139:11
165:3 351:25
373:1

midwest  390:17
393:1
migas  304:9,19
mike  16:13 117:8
336:18
mill  176:14 208:9
millage  65:6 66:11
miller  5:17 91:8,9
milligrams  266:16
million  62:10,21
63:4,23 64:4,5,21
64:21 65:9,11
68:25 69:8,10,23
69:24 70:2,3,9
153:10,20 154:2,4
154:6 155:13
156:23 157:1,3,4
262:7 329:16
millions  129:18
359:20
mills  159:2 177:1
177:9 249:9
260:14 279:3,4,11
279:14,16 280:9
280:17 288:14,18
362:1 367:20
382:24 383:4
mind  89:11 150:25
160:20 206:21
257:8 259:7 266:9
318:12
mine  125:21
mink  34:14,16
minute  37:15 49:4
90:17 127:2 163:3
284:1,2 309:11
351:13
minutes  86:24
90:23 152:22
224:10 227:18
307:11

missing  232:8
304:3 347:16
380:2
mission  288:21
misstated  374:23
misstates  373:18
misuse  160:10
184:5 310:9,14
misused  239:6
misusing  310:17
352:5 377:19,20
377:24 380:9,18
mitigate  290:2
356:20
mitigating  369:5
mixed  332:3,22
335:14,14,15
mixing  362:21
mixtures  335:17
mmcneely  338:1
mobile  366:21
model  114:25
349:18
moderate  266:21
moment  150:22
moms  104:17
money  66:17 68:5
68:16 69:1,2 71:6
101:8 108:16
113:18 138:8,9
139:14 141:5
144:10 145:10,15
153:14 154:2,19
155:21 157:5
223:6,7 359:23
moneys  161:9,18
monitor  96:15
244:3
monitoring  31:10
187:21 188:12
264:20

monitors  183:9
195:7
month  102:8,10
186:24 187:2,2
195:6 270:7
286:24 323:12
monthly  122:3
123:1,2 341:1
months  44:9 46:6
46:6,25 47:19
73:17 85:24,24
193:2 252:6 253:7
253:8
morgan  3:11 5:12
16:11 91:17
157:23 228:6
morganlewis.com
3:14 5:15
morning  17:16,17
morphine  168:8
172:24 266:6,7,13
266:16,20 267:3,6
267:8
moser  116:18
117:10,16
mother  126:21
369:24
motley  2:3 36:15
motleyrice.com
2:7,7,8,11
move  19:11 47:8
49:21 126:4 127:8
158:13 188:6
289:24 350:22
351:5
moved  104:11
movement  104:8
moving  58:1
373:11
msalimbene  3:10

**mt** 2:6
**multifaceted**
  250:25 306:6
**multiple** 69:15
  264:8,11 324:7
  332:18 335:11,18
  349:25
**municipalities**
  23:17
**murphy's** 227:20
**myron** 76:19 77:5
  78:14 106:9,20

**n**

**n** 32:12 73:9
  109:21,21 319:6
**n.d.** 1:16
**n.w.** 3:16 5:13
**naccho** 133:12
**naeem** 2:21 6:8,12
  16:19,19 17:1,15
  17:23 26:1 34:21
  42:19 90:16,24
  91:5,22 92:16
  157:6,13 158:3
  190:16 217:3
  224:8,12 227:17
  227:21 357:15,18
  357:23 360:16
  361:23 366:15
  371:3 378:9,14,17
  378:22 386:16
**nakamura** 4:3
  15:22,22
**naloxone** 43:4
  54:16,21 55:15,16
  56:8 70:12 154:14
  283:3,10 291:14
  318:25 319:1,12
  368:19,20
**name** 15:4 17:20
  17:23 25:21 26:4

26:6 32:11 54:7
73:25 74:1,5 77:8
77:12 94:11 105:6
116:17 128:18
220:2,4,7,9 221:3
228:5 236:2 244:1
285:14,20,24
305:21 317:7
377:1 390:6 391:3
391:4,15 392:3,4
392:21
**named** 288:1
  294:5,19,23
  341:11 352:9
  388:9
**names** 35:8 36:19
  95:2 124:5 182:6
**napoli** 2:12
**napolilaw.com**
  2:15
**narcan** 7:12 55:14
  55:18 57:13 70:12
  189:19,24 190:22
  283:3,11,18
**narcotics** 174:25
**narrow** 42:16
**national** 1:6 15:3
  133:12 143:5
  148:9,17 236:14
  390:6 391:3 392:3
**natural** 348:12
**nature** 354:20
**necessarily** 90:13
  132:24 138:25
  287:5 288:6
**necessary** 306:2
**need** 18:24 22:16
  53:14 54:5,7 58:9
  58:19 59:3 64:17
  80:18 104:15
  115:17 129:12

157:13 169:15,15
306:2 308:12,25
310:3,7 312:6
350:18,25 365:3,5
369:20,20 370:6,8
370:9 385:2
**needed** 41:16 47:4
  61:5 109:13 139:8
  160:17 172:19
  173:9 229:18
  230:6 231:18
  236:17 251:16
  287:12 312:8
**needing** 372:10
**needle** 43:4 51:11
  53:3,12,17 55:1,10
  209:15 301:13,23
  302:3 368:17
**needles** 52:21
**needs** 43:8 66:4
  108:10 232:11
  239:11 355:15
  364:3
**neighborhood**
  63:6
**neither** 96:18
**nemecek** 32:10
  33:6 34:8,16
  82:15
**nemecek's** 34:3
**neomed** 117:14
  118:3
**nepotism** 106:1
**network** 355:19
**never** 61:17 144:9
  168:20 169:21
  171:5 174:21,24
  187:11 188:20
  199:7,15,21
  206:21 208:23
  209:25 214:6

235:12 257:5,10
258:6 260:5
261:22 271:16
285:2 289:14
325:2 343:4,7,10
365:2
**new** 5:18 72:16
  73:19 96:14
  103:21 111:17,17
  112:7 143:11,12
  143:13 149:22
  158:6,7 168:12,15
  170:4 307:12
  309:15 352:4
  358:17 365:7
  376:5 379:7
  380:18
**news** 272:22
**newspaper** 175:19
**night** 107:18
**nine** 46:6 326:15
**nixon** 109:21,24
  124:7 128:11
  137:12,13,15
  314:6,13 315:15
**nixon's** 124:14
**nods** 18:25
**nonmedical**
  352:10 377:3,6
  378:24 380:23,25
**nonnarcotic** 281:9
**nonopioid** 334:3
**nonprescription**
  277:19
**nonresponsive**
  254:23
**normal** 47:14
**normally** 208:5
**north** 3:3,21 4:8
**northern** 1:2

**nos** 18:24
**notarized** 390:14
**notary** 24:24
   28:13 49:4 127:2
   146:5 255:1,6
   309:11 388:6
   389:14 390:25
   391:10,18 392:15
   392:23 393:23
**note** 263:22 318:2
   390:12
**noted** 44:5 337:2
**notes** 213:25
**notice** 284:13
   285:4
**notification**
   149:15
**notified** 27:16
   148:25
**notify** 148:24
   149:15
**november** 27:10
   27:17 93:17
   256:18
**np** 202:19
**nuisance** 354:16
**number** 7:2 23:17
   35:7 48:3,6,15,21
   49:6 52:14,16,21
   58:13 59:21 63:5
   69:3,19 71:21
   72:2 75:3 79:8
   81:16 83:11,21,23
   84:10 85:17,18
   96:5,8,16 100:23
   116:21 152:2
   154:9 159:20
   161:8 163:6
   165:19,24 171:20
   172:20 173:9
   174:19 190:15

191:5 196:10
206:5 207:11,21
214:14 218:17
219:1 243:20
246:16,17,20
247:20 255:22
263:17 267:23
271:20 272:25
287:18 301:19
302:16 304:18
308:22 312:4,5
313:5 320:11
322:24 323:5
329:14,25 330:1,8
354:5 374:15
376:21 390:7,13
**numbered** 162:21
**numbers** 80:1
   123:6 155:16
   163:8 188:25
   193:4 196:5,18
   216:1 273:5
   314:17 318:15
   335:6,21 336:16
   338:15 392:7
**nurse** 43:24 50:9
   174:24 202:6,12
   235:10 324:7
**nurses** 50:10
   240:14
**nutrition** 107:21
   232:2
**nw** 3:21 4:18 5:8
**ny** 2:14 5:18

**o**

**o** 17:20 39:1 40:4
   46:3,3 104:3
   109:21 116:18
**oahc** 133:6
**oarrs** 7:20,21 8:8
   70:25 146:16

148:1,2,3,10,14,15
172:13 183:12,16
184:1 197:13
198:13,17 199:1
243:10,16,17,23
243:24 244:10,13
244:14,15,18,21
255:24 256:15,20
257:25 258:15
260:25 261:4,10
264:23 266:18
267:7 268:16,21
269:3,9,14 282:6,8
340:3,5,15,21,22
**obesity** 111:2
**object** 9:2,3,4,5,6
   9:8,9,10 11:3,6,7
   13:7,9,10,11,12,13
   13:15 22:14 25:24
   35:11 71:15 81:5
   83:25 100:9 146:6
   257:4 258:24
   259:18 357:15
   360:16 361:23
   366:15 367:12,21
   368:6
**objected** 71:16
   357:18
**objection** 9:1,7,11
   9:12,13,14,15,16
   9:17,18,19,20,21
   9:22,23,24,25 10:1
   10:2,3,4,5,6,7,8,9
   10:10,11,12,13,14
   10:15,16,17,18,19
   10:20,21,22,23,24
   10:25 11:1,2,4,5,8
   11:9,10,11,12,13
   11:14,15,16,17,18
   11:19,20,21,22,23
   11:24,25 12:1,2,3

12:4,5,6,7,8,9,10
12:11,12,13,14,15
12:16,17,18,19,20
12:21,22,23,24,25
13:1,2,3,4,5,6,14
13:16,17,18,19,20
13:21,22,23,24,25
14:1,2,3,4,5,6,7
80:22 120:2 134:8
146:7 164:18
166:4 167:7,20
171:7 175:17
177:4 178:10,18
179:6 181:25
197:11 199:8,17
199:23 201:8
203:18,22 204:2,8
206:25 209:23
210:25 213:13
215:6,19 216:8,21
225:6 227:15
238:20 240:3
245:13 246:22
249:21 253:12
254:24 255:8,17
258:2,18 259:25
260:11 261:22
262:13 263:6,23
264:25 266:10
267:10 268:11,22
269:19 272:23
276:16 278:22
279:6,18 280:4,10
280:18 288:16
290:25 292:14
298:25 299:18
300:14 301:6
308:17 309:21
318:5 320:18
323:2,22 327:6,11
331:23 334:5

| | | | |
|---|---|---|---|
| 337:18 341:14,19 | 389:6 | 172:17 175:7,11 | 106:22 107:2,13 |
| 342:9 343:16 | **officer** 26:15,18,24 | 176:11,19 184:22 | 108:17 112:24 |
| 344:17,21 346:25 | 44:12 107:17 | 185:8 188:7 | 113:13 114:9 |
| 348:8 349:10 | 156:9 168:22 | 197:13 202:8,19 | 115:13 119:24 |
| 350:14 352:21 | 241:1 | 207:22 222:19 | 121:13 123:16 |
| 353:2 368:2 373:3 | **officers** 218:8 | 223:3,5,8,11,22,23 | 125:17 134:15 |
| 373:17,22 374:5 | 368:20 | 226:15 227:12 | 146:3 148:5 149:1 |
| 374:22 375:2 | **official** 391:15 | 235:16 239:22 | 150:2 153:25 |
| 377:8,16 378:7 | 392:21 | 240:19 242:11,14 | 154:22 156:14 |
| 381:24 382:16 | **officials** 133:13 | 242:17,25 243:4 | 159:20 162:23,23 |
| 383:2,7 384:1 | **oh** 2:17,22 3:21 | 243:13,21 256:7,8 | 163:1,16 165:9,16 |
| 385:11,25 386:14 | 4:9,11 28:11 | 256:14,14 257:17 | 170:21,25 173:1 |
| **objections** 13:8 | 48:24 53:2 83:19 | 257:18 259:12 | 175:2 179:16 |
| 357:23 378:17 | 87:21 103:13 | 260:18 261:13 | 182:21 185:21 |
| **objective** 71:4 | 108:21 117:24 | 262:3,6,17 263:3 | 186:7 189:14 |
| 259:12 | 118:16 128:25 | 264:18 265:4,8,9 | 191:6,21,25 |
| **obtain** 57:15 | 132:1 143:20,24 | 265:10 267:15,17 | 197:18 200:15 |
| **obtaining** 178:1 | 152:16 159:20 | 268:5 269:23,25 | 209:18 211:13 |
| **obviously** 103:11 | 165:4 171:2 | 270:22 271:12,19 | 212:9 213:12 |
| 218:3 | 179:10 186:14 | 274:10,12 278:8 | 214:15 215:16,23 |
| **occasionally** 164:6 | 195:21 198:12 | 294:24 297:17 | 218:11 219:8 |
| **occupational** 94:9 | 222:23 226:4,17 | 308:19 309:23 | 222:23 226:23 |
| **occur** 252:4 | 227:3 230:7 | 310:22 320:16,20 | 228:9,12 229:15 |
| **occurred** 161:20 | 243:24 267:21 | 320:22 321:4,8,10 | 229:21 230:11,15 |
| 209:21 225:13 | 272:6 306:17,22 | 323:6 325:13 | 230:17,20,24 |
| 245:18 246:14 | 314:9 316:8,10 | 327:15,20 328:20 | 231:8 232:5 |
| 252:8 263:11 | 319:9 322:7 | 329:2,11,13,15 | 234:17 241:19 |
| 273:7,21 | 343:24 362:9 | 330:16 332:14 | 249:16,23 259:25 |
| **occurring** 158:19 | 363:18 383:13,13 | 334:2 336:22 | 261:17 262:22 |
| 212:7 225:13 | 383:13 | 337:2,11,15 341:3 | 266:13 270:20 |
| **october** 7:14 25:12 | **ohio** 1:2,13,16,24 | 374:11 388:2,7 | 271:22,22 276:5 |
| 98:24 99:1 225:19 | 7:17,18 8:3,5 | 389:7,15 390:2 | 278:13 283:2 |
| 226:6 314:6,8 | 28:21,23 29:3 | **okay** 17:7 19:13 | 286:1 288:10 |
| **offensive** 318:13 | 44:18,21 46:21 | 19:21 34:15 37:25 | 289:10 290:19 |
| **offer** 53:1 | 48:20 54:10 55:12 | 45:15 54:12,18 | 293:13 294:18 |
| **offering** 67:7 | 64:25 70:22 88:15 | 63:1 66:1 75:24 | 304:7 307:19 |
| **office** 50:18,25 | 96:25 97:14,18 | 80:2 81:23 86:3 | 309:9 310:1 |
| 51:2 185:23 | 107:17 115:15 | 90:15 94:17,22 | 311:25 313:4 |
| 188:16,23 189:12 | 133:5,7,9,10 139:2 | 95:4 98:9 99:7 | 319:5,10 320:24 |
| 192:24 193:8 | 144:9 145:1,11 | 101:1,12 102:16 | 321:23 322:8 |
| 222:21 245:2 | 148:14 163:7 | 103:6,7 105:9 | 325:4,10 328:17 |

328:23,23,24
330:2,7,15 332:17
332:20 335:8,23
336:2,5 345:16
347:22 351:4,12
353:9,11,19
358:15 364:13
365:11 369:14
372:8,14 374:8,16
375:16 379:4
380:1,15,20 385:8
**old** 31:12 37:7
125:20 169:2,19
188:19 380:6
**older** 37:7
**omas** 44:21 55:12
**omissions** 221:16
**once** 37:24 115:3
139:17 140:14
178:20 186:23
245:1 264:20
283:17,17 323:25
345:6 348:15
369:24
**ones** 55:10 106:6
143:2 175:19
**ongoing** 101:4
138:23 162:16
**online** 177:11,15
177:16,19 178:2
**op** 1:16
**open** 125:2 127:11
255:25 289:16
291:4
**opened** 258:15
**operate** 115:16
125:11 176:20
257:22 288:14
**operated** 177:1,20
**operating** 114:23
123:21 177:9

**operation** 177:16
382:24
**operational** 68:3
**operations** 111:25
113:18
**opiate** 1:7 15:4
134:3,5,24 135:13
158:23 160:15
168:21 170:16
172:14 189:19,23
189:25 198:18
212:1,2 219:19
243:18 244:1
248:7 250:4 264:9
303:3,23 305:2,15
305:16,22 307:13
316:2,23 317:2
318:17 365:2
375:11 379:10
381:12 390:6
391:3 392:3
**opiates** 119:21
190:2 219:22
244:8 281:4
312:11 315:7
340:10 357:6
365:5 366:2
**opinion** 216:18,23
239:10 322:16
369:5
**opioid** 24:13 27:22
38:23 54:15 70:10
71:7,14,24 76:11
77:16 78:12
100:25 131:4,8
132:21 148:12,18
158:13,16 165:7
168:15 170:14
175:8,16 177:17
180:20 182:10,14
182:14,16,19

183:9 188:18
189:3,9,16 192:3
197:5,7 199:14
200:2 201:5
203:15 206:24
207:3,17 209:7
211:10 215:5,10
215:15 216:6,16
216:24 217:9,12
217:19 219:14
222:15,20 223:5,9
223:14,17 235:19
250:4 264:9
266:14 276:11,13
276:14 277:11
278:1,9 279:5
281:21 282:3
290:2 293:17
297:3 298:22
303:18 308:15
316:1 319:11
322:4,17 323:20
329:10 331:9,25
332:3 335:13,14
341:24,24 342:6
342:18 343:4,7,10
344:15 347:24
348:21 352:11
358:21 360:7
361:3,8,21 366:13
366:13,14 367:14
367:18,23 368:11
369:6,16 370:13
370:20 371:25
372:18,24 377:3
380:24 382:25
383:6 385:14,20
**opioids** 42:10
57:10 70:19 80:20
80:25 81:14,18
83:11 87:3 119:21

127:21 131:8
146:18 147:19
150:1,13 152:13
168:20 170:6,7
172:1 175:12
177:3,22,23 178:9
178:17 184:5
197:9,17,22,23
199:7,16,21 202:3
203:9 204:1,21
205:1,10,17,21
206:17 208:2
209:22,22 210:24
212:14,22 214:18
216:20 218:14,20
236:24 238:18
239:17 241:9
242:5 246:3,12
247:12 248:16,25
249:7,20 250:17
251:3,18 262:6
263:3 265:4,7
268:5 274:5
275:15,18,19
276:1,20 277:2,7
277:13,14 278:11
278:11,20 279:10
279:13,17 280:8
280:16 281:4,5
288:9 292:6 295:8
295:14 309:20
313:6,10,14
320:12,17,17
322:13,25 324:25
326:10 328:7
329:5,15 330:23
331:4,22 332:5
336:13 341:17
342:23 343:14,15
344:2 345:23,24
346:18 348:23,25

349:2,3 352:16,18
352:20 357:12,21
358:18 359:11
363:19 364:17,18
364:25 365:14,18
365:20 367:4
371:8,16 372:22
373:12,13 376:12
379:9,20 385:10
385:18,24 386:10
**opportunity**  226:2
283:19
**order**  47:21 59:1
66:18 71:5 100:22
141:3 191:3
210:19 242:18
260:19 298:7,14
298:17 299:8
312:17 313:17
315:23 320:4
340:10
**org**  33:23 92:18
103:9
**organization**
112:3 118:9
219:12 226:18
306:13
**organizational**  7:3
7:5 92:5,12 93:1
**organizations**
134:2 140:17
358:1,14
**organize**  305:24
**organizing**  306:7
**oriana**  89:17
218:5
**origin**  293:24
**original**  238:23
**originally**  231:14
249:1 258:12
381:1

**originates**  338:5
**outbreak**  188:5
**outcome**  308:7
**outcomes**  96:16
**outer**  48:3,6
**outflows**  156:4
**outpatient**  43:1
85:5,7,8,15 86:13
87:12
**outreach**  69:17
291:7,13
**outside**  23:7 24:7
36:1,8 53:19,25
54:3,4,8 55:4,8
64:25 85:3 86:11
90:4 122:13
138:18 383:14
**overall**  65:24
**overdose**  8:3,5
181:5,23 186:11
187:3 188:14,17
189:17,23,25
192:4 193:11
195:10 207:11,18
211:2 213:2
217:17,17 218:2
226:11 227:7
259:12 283:12
301:22 302:4
312:6 320:16,21
321:4,9 322:4
325:13 327:15,21
328:6,19 329:5
330:9 334:3 339:8
339:17 342:23
361:7
**overdosed**  169:21
172:11 211:21
247:24 283:17
299:10 368:25
370:13

**overdoses**  159:1
181:1 183:10
184:5 188:12
189:3 193:13
197:3,19 210:15
215:15 216:6
217:12 227:12
245:20,23 246:18
247:3 277:14
278:9 312:5
339:23 360:7,10
366:13
**overdosing**  302:7
**overlap**  232:15,21
**overprescribed**
177:6 366:2
**overprescribing**
178:8,9 287:17,23
288:4 310:11,20
311:11 315:11
**oversee**  74:13 88:1
**overseeing**  120:6
**oversight**  50:6
56:2 96:19
**oversupply**  171:10
171:24,25 357:5
357:12,21 365:9
**overview**  58:11
**owner**  141:8,10
**oxford**  4:12
**oxy**  172:8 247:25
**oxycodone**  342:15
350:1
**oxycontin**  208:13
344:20,25

**p**

**p**  3:12 4:12 34:4
39:1 86:2 161:11
**p.m.**  157:12
386:19,20

**p.o.**  4:22
**pa**  3:9,13 4:13
**page**  9:2 162:22
207:9 257:2
258:22 259:2,5,6
261:12 265:3
266:2 269:22
305:11 306:24
308:2 312:20
314:17 321:24
323:5 325:10
329:9,10,18,19,20
329:24 330:8
340:20,25 375:24
390:13,15 392:7
393:3
**pages**  129:18
163:5 318:23
**paid**  123:25
140:10 213:9
369:10
**pain**  161:2 164:12
164:16 165:13,21
169:8 170:19,23
173:15 174:7,9,9
174:12,15 175:6
175:12 176:21
179:12 200:13,16
200:19,25 201:7
201:18,21,25
202:4,11 203:6,6
203:10,11,16
204:6,12,17 249:4
254:14,16 266:22
293:21,25 297:2
315:7,9 342:14
343:14 350:5,7
352:11 358:13
365:5,5 377:3
**painkillers**  352:6

[paper - people]                                                                                     Page 44

**paper** 123:23
  140:23 223:13
  302:15
**pappalardo** 2:21
  16:16,17
**par** 15:24 74:19
**paragraph** 180:15
  180:22,23 259:1
  266:11 306:25
  307:8 308:3 310:1
  312:1 328:4
  329:10,23 338:17
**paragraphs** 315:5
**paralegal** 32:15
**paramedic** 189:22
**paramedics** 56:22
**paraphrase**
  209:19
**paraphrasing**
  373:14
**parent** 362:10
**parents** 140:5
  370:11
**parity** 309:23
**parking** 370:1
**parole** 107:17
  168:22 241:1
**part** 47:14 50:23
  59:2 79:22,22
  101:15 103:19
  105:20 138:12
  172:12 173:5
  184:17 213:3
  227:6 232:18,19
  232:19 281:21
  287:3 293:2,24
  303:17 307:9,20
  309:6 321:16
  339:5 346:8
  351:10 354:9
  361:2 369:8 374:4

  375:1 392:9
**participants**
  164:11,25 183:25
**participate** 133:5
  282:5,8
**participated**
  163:25 223:8
**particular** 40:17
  127:24 164:21
  189:17 194:2
  242:1 248:9
  287:16 296:16
  354:11,12 358:22
  358:25 359:3,6
  360:11,13,18,20
  366:11,12
**particularly** 119:5
  155:15 172:21
  210:13 355:19
**particulars** 156:1
**parties** 15:8
**partner** 354:18
**partnered** 219:17
**partners** 135:22
  194:24 306:7
  354:6
**partnership**
  100:16 220:5
  301:11 354:17
**parts** 261:24
**party** 389:3
**pas** 202:22
**pass** 220:17
  224:14 284:10
  285:8 353:10
**passed** 257:16
**paths** 170:2
**pathway** 168:1
  170:11,15 384:14
**patient** 41:25
  43:19 48:10 50:17

  52:14,15 81:25
  87:8 89:23 115:5
  184:8 196:25
  197:9 198:9 205:7
  210:21 222:14
  266:16 269:23
  270:1,6,23 271:19
  292:21 296:4,16
  296:21 297:1,8
  301:12,15 356:5
  356:10,11
**patient's** 296:18
**patients** 42:5,21
  47:16,24 48:4,15
  49:2,7,15,20,23,25
  50:4,13 51:1
  68:14,22 78:18
  81:12 83:2,12
  86:3 87:3,23,24
  88:21 99:9 100:8
  102:20 155:5
  175:16 176:3
  178:11,13,14,15
  179:2 183:18
  197:20 203:6,16
  203:25 204:21
  205:2,11 206:16
  209:21 210:22
  211:9,20 212:11
  212:21 238:18
  240:1,8 242:20
  244:15,16 249:25
  262:6 263:3 265:4
  266:25 267:1,15
  268:5 271:13
  294:10,19 329:15
  343:13 372:21
  375:7
**patrol** 374:11
**pattern** 207:15
  214:3

**paul** 86:2
**pause** 34:25
  227:25 284:5
**pax** 161:11,12
**pay** 68:9,12,16
  90:14 101:18
  138:8,25 144:1
  172:18 296:24
  309:2
**payment** 97:3
**pays** 296:21
**peaked** 247:3
**peer** 101:16
**pejorative** 318:7
**pelini** 3:19,22 16:1
**pending** 259:19
**pennsylvania** 5:13
**people** 16:22 17:6
  38:22 41:5 54:21
  59:23 86:24 90:3
  96:18 101:21
  102:21 104:10
  115:18 123:25
  131:17 139:6
  157:14,15,16,19
  170:5 173:21
  174:18 178:1,3
  179:11 180:25
  182:3,10 187:23
  188:1 199:20
  200:2,19,25 201:6
  203:2 208:19,24
  209:4 212:7 213:8
  214:6 219:11,11
  226:17 244:5,10
  247:11 249:12,19
  250:17 251:16
  253:20 254:1,9,13
  254:15 289:23
  299:21 300:8
  304:11 309:20

310:9 312:5 324:3 341:17,23 342:6 342:17 345:19 356:21,22 358:3 362:3,5,25 364:11 364:15 365:11 372:16,23 377:19 377:22 380:4 382:10,11 384:4 384:12,23 385:2 386:8
**perceived** 161:4 162:16
**percent** 35:21 37:22 54:2 55:7 71:25 77:7 84:20 86:12 164:22,24 165:6,16 166:9,11 166:13,15,17 170:18 214:13,16 250:1 262:7 263:5 263:19 265:7 329:16 341:22 342:5
**percentage** 53:23 53:24 55:6 69:14 71:22 81:17 84:19 86:10 142:14 160:24,25 163:6 170:14 181:1 207:5 322:3,12 325:5 328:18 331:2,3 342:2,19 342:21 352:14,18 352:19
**perform** 138:19 139:18 140:15 143:5
**performed** 43:21 141:24 145:17

**performing** 142:25
**perils** 303:9
**period** 63:16,25 75:22 114:21 142:3 158:21 232:12,21 233:24 263:4 265:12,18 268:6 270:7,24 273:7 326:16
**periodically** 186:19
**permits** 66:12,15 66:15 67:17
**permitted** 378:18
**permitting** 66:8
**person** 26:2,3 28:1 32:17 33:11 43:13 52:17 61:7 73:23 77:17,21 85:23,24 91:18 92:1 94:4 94:22 136:8 155:18 156:7 172:16,19 173:2,9 184:9 185:10 186:3 218:15,16 243:21 250:23 283:16 307:1 358:6
**personal** 75:13 81:21 82:8 98:13 131:19,22 221:15 221:21 236:20 247:22 293:15 298:16 344:13 346:22 347:2 348:4,21 349:8,13 350:11,16 352:24 374:18 384:18
**personally** 301:9 391:11 392:15

**personnel** 40:16 223:23 289:19,21
**persons** 136:8
**perspective** 61:20 96:11 253:18 355:22,23 372:11
**pglawyer.com** 2:18
**ph.d.** 106:10,13
**pharma** 1:15
**pharmaceutical** 5:11 204:20 205:2 220:22 221:17 238:7 273:15 292:3,9,24 311:9
**pharmaceuticals** 2:20 4:2 15:24 16:20 152:15 236:17 311:20
**pharmacies** 177:12,15,16,19 178:2 205:13 219:18,18 221:23 235:1,5,24 236:1 266:18 280:3,14 282:3 283:6 311:23
**pharmacist** 236:20,23
**pharmacists** 244:4 340:10
**pharmacy** 7:18 197:14 205:6 237:20 242:12,15 242:17,25 243:4 256:8,14 257:21 261:14 292:20 296:23 297:20 329:13 341:3
**phase** 162:6,15 306:25 307:9

**phi** 183:14
**philadelphia** 3:9 3:13
**phone** 16:22 17:2 91:6,23 157:14,18 157:19 390:3
**phrase** 176:13 298:6,13
**physical** 111:2
**physician** 46:20 61:6 94:9 115:3 117:2 202:5,19 205:5,6 208:9 235:7 240:16,17 250:5 294:12 310:21 358:6 379:24
**physicians** 71:1,2 115:2,10 174:13 175:4,14 176:19 177:1,8 178:9 202:12,21 240:9 240:13 244:3 251:17 258:10 288:7,10,13 294:16 324:7 340:11 358:10 365:10
**pick** 121:12 173:23 302:2
**picked** 25:12,14 308:23,23
**pickle** 34:12,16
**picture** 64:15 214:7
**pie** 155:12
**piece** 96:22 102:15 139:25
**pieces** 41:19
**pierce** 34:4,9,11 34:16 82:17 96:23

pile 41:19,20
pill 159:2 172:9
    173:24 176:14
    177:1,9 206:4
    208:9 210:2,3
    249:9 260:14
    279:2,4,10,14,16
    280:8,16 288:14
    288:18 361:25
    367:20 382:24
    383:4
pills 172:15 173:1
    173:8,13,18,22
    174:3,17 176:22
    178:17 179:12
    207:24 208:7
    212:14,24 213:11
    243:20 254:16
    282:15,17 287:19
    322:18 324:12
    325:7,7 345:19
    364:12 367:10
    377:11 380:10,19
    382:7
pinpoint 72:2
pittsburgh 4:13
place 47:6 102:2
    142:5 181:6 193:5
    231:2 306:1
    310:15 343:12
    388:20
placed 218:2
places 244:6
    324:12
plaintiffs 24:6
plan 66:25 67:2
    112:12 305:3
planning 110:19
    110:21 111:20,23
    113:4,8 114:2
    138:6,9,12 143:21

160:2 162:6,15
    233:11,17 234:7
    303:25 305:11
    307:1,9 312:23
plans 85:21 96:15
    111:24 309:24
plausible 213:7
play 293:1 295:14
pleasant 2:6
please 16:22 17:6
    17:9,18 28:14
    49:4 89:12 157:17
    167:2 216:10
    226:1 229:5
    254:22 256:4
    258:22 260:22
    261:12 277:5
    284:1 390:11,11
plevin 2:16 15:17
pllc 2:12 4:21
plus 65:3 67:6
    290:1
plusquellic 61:10
point 4:8 19:24
    27:20 38:1 57:22
    61:3 94:13 113:20
    192:14 193:16
    197:6 202:7 224:7
    262:5,8,25 263:2
    263:14 264:17
    266:22 350:1
    364:9 376:4 378:5
pointed 22:24
points 76:7
poisoning 191:18
    191:20 214:24
police 56:21,24
    151:6,7,11,11,19
    185:14 218:8
    250:24 252:12
    275:8 338:7

368:20 374:9,10
policies 292:2
    359:16
policy 28:8,16,24
    29:9,25 30:13
    82:13 106:1
    110:21 111:21,23
    111:24 113:5,8
    114:2 126:25
    233:11,17
political 61:18
    89:6,18 120:22
    121:19
pollard 39:1,7
    40:22 41:3 43:12
    52:7 55:23 72:8
    73:3 77:22 86:22
    94:22 155:23
polster 1:10
polydrug 362:21
poor 68:5
pop 351:13
population 103:20
    103:24 104:14
    167:5,17 338:16
    354:24 356:3
    366:11
populations
    208:22 356:15
porter 4:3 15:23
portion 153:14
    167:4
portland 5:4
position 26:25
    27:1,3 39:13 40:6
    72:19 73:19 74:6
    74:9 93:16,25
    99:21 105:13
    108:5,18,19 109:7
    109:16 110:16
    111:8,17 113:7,14

116:21 117:9
    130:6 133:2 201:5
    233:17 234:6,10
    234:22 237:10
    353:24 357:11
positions 97:24
    233:22,25 234:5
    235:4 237:8
possession 37:20
possibility 289:22
possible 42:9
    288:3 320:9
possibly 37:19
    366:22
pot 153:21 169:3
potent 362:19
potential 355:11
    358:2
power 310:22
    359:15
powerful 208:4
    350:21
powerpoint 317:2
    317:10 318:1,3
    320:3 351:20
powers 240:10
practice 44:16
    45:1 46:14 50:17
    74:13,19 127:5
    294:23 317:25
practices 133:22
    265:19
practitioner 43:24
    50:9 202:6
practitioners
    135:8 202:13
    324:7
pre 119:18
preceded 34:3
precise 246:20

**predecessor** 39:10
40:2 46:7 116:23
124:7
**pregnancy** 108:15
184:19
**preliminary**
188:15 195:23
**prepare** 20:7,11
20:14,17,24 21:11
195:2 286:20
**prepared** 20:3
187:14 194:18
**preparedness**
146:20 236:12,17
**prepares** 193:23
**preparing** 21:4
**preprinted** 87:20
**prescribe** 176:18
202:15 203:2
219:19 358:16
**prescribed** 170:6
212:25 218:20
243:20 244:9
247:12 248:16
249:19 296:15
300:4,18 340:9
343:15 379:24
**prescriber** 296:3
341:3 345:2
**prescribers**
249:10 266:18
288:1,5 293:6,11
293:18
**prescribes** 358:6
**prescribing**
222:13 248:23,24
251:18 265:23
273:8 288:11
310:22 311:12
329:11

**prescription** 1:6
3:19 15:4 16:2
56:3 80:25 158:19
160:10 163:18,22
164:12,13,16,17
165:8,14,21,22
170:7,19,22 171:6
172:1 177:2,17
182:10,13 197:9
197:10,21,22,23
199:7,14,16,21,22
201:22 202:9
203:15 204:25
205:7,14,17
207:24 209:22
210:23,23 211:10
212:13,22 213:9
214:12,18 218:14
235:19 238:1
239:15 240:2,8
241:8 242:5 244:1
244:7 246:2,12
250:5 259:11
260:19 264:9,10
267:14 273:16
277:2,7,13,16,16
277:19,25 278:10
278:20 282:20
293:2,6,10 294:7
296:4,22 299:4,14
299:25 300:3
309:5 310:17
313:10,14 315:7
320:12,17 322:4
322:12,17,25
323:11 324:2,25
328:7 329:5
330:23 331:4,9,21
336:13 338:14
339:9,18,24
341:17,23 342:6,7

342:10,11,15,16
342:22 343:14
344:4,15,16,20
345:1,24 346:17
347:24 348:21
349:2,3,4 352:5,11
352:16,20 357:12
357:21 360:7
361:21 363:2,2,19
364:17,17 365:14
365:18,20 367:4
367:10,14,18,23
369:6,16 371:7
372:18 373:12,13
375:8,13 376:12
377:3,19 378:4
379:9,19 380:10
380:19,24 381:2,9
382:11,19 385:10
385:17,23 386:2
386:10 390:6
391:3 392:3
**prescriptions** 56:4
176:4 178:1,23
179:3 197:17
200:2 207:21
235:16 236:21
240:15,20 241:3
255:23 268:5
294:15 300:17
310:9,14 339:7,12
362:1
**prescriptive**
240:10
**presence** 388:14
**present** 5:20 15:6
23:1,2,9 157:18
187:23 198:18
317:12,19 333:21
**presentation**
317:5,10,13

318:19,20 351:21
351:25 375:18,21
376:8 379:6,14
**presentations**
198:23 243:19
316:1
**presented** 199:1,3
243:17 351:21
375:12
**preserve** 284:22
**press** 286:1,10
**pretty** 66:6 136:22
154:3
**prevalence** 111:1
163:5 166:23
373:10
**prevalent** 112:13
276:18
**prevent** 209:1
283:15 359:15
361:7
**preventing** 310:10
311:10 354:25
**prevention** 61:5
105:12,18 108:14
108:15 110:20
117:2 161:10
219:12 283:12,15
310:3,8,9 354:7
356:15 366:8
368:12 370:14
**previous** 61:17
73:23 272:10
295:17 307:11
314:14 315:6
316:9 331:13
**previously** 99:3
179:18 212:22
247:12
**price** 57:18

**priced**  57:18
**primarily**  18:2
  136:8 216:25
  372:25
**primary**  68:19
  114:10 215:17
**print**  129:17
**printout**  7:21 8:8
  269:3,9 340:15,20
**prior**  24:10,21
  27:12 28:12 30:1
  33:5 40:6,11,14
  59:25 60:7 62:2,4
  62:19 76:23 93:19
  107:23 114:3,9
  115:22 116:20
  118:9 119:6 129:1
  129:4 130:20
  132:9,12 137:19
  143:19,23 145:20
  161:23 197:9
  200:1 225:10
  227:12 258:17
  262:11 263:1,24
  264:16 269:16
  305:9 319:7
  327:22 341:7
  371:14,17 372:1
  378:22 385:14
  386:9
**priorities**  307:4
**priority**  307:13
  312:4
**private**  50:17
  88:22 89:15,21
  90:12 154:20
**privileged**  21:9
  22:16 26:23 120:4
**probably**  18:9
  22:7 28:22 38:19
  40:9 54:1 55:5,22

64:7,20 65:9,10,14
69:23 70:3,13,21
73:17 74:7 78:14
83:9 84:22,24
104:5 111:10
127:25 128:25
129:24 134:3
135:3 136:21
141:2 146:15
155:23 158:22,22
177:5 181:20
186:21 210:12
226:17 230:1
251:7 253:24
254:5 275:8
286:25 292:25
304:10 315:17
321:18,22 332:21
335:9 337:8
339:25 371:20
**probation**  79:22
**problem**  247:18
  252:15 253:25
  255:21 260:7
  279:5 287:21
  299:15 300:5
  306:6 310:4
  314:18 334:4
  355:11,11 363:25
  382:21 383:20
**problems**  76:7
  312:13 361:14,21
**procedure**  387:7
  391:5 392:5
**process**  65:20,23
  65:25 66:20 112:5
  126:2 132:4
  138:13 149:22,25
  150:11 205:3
  284:18 289:11
  291:4 295:10

305:12 307:1,5
**produce**  38:8
**produced**  21:14
  38:14 41:16 43:15
**producing**  373:25
  374:19
**product**  142:11
  222:7 281:11
  362:18
**production**  129:8
  390:15,17,22
**productivity**
  74:15
**products**  81:8
  150:17 222:1,15
  238:7 280:21
  281:1,7,16,21
  292:3 293:6,10,18
  327:5,5
**professional**  231:2
  231:4 237:1,5,14
  237:22 243:4
  358:14
**professionals**
  202:14
**profile**  7:16 229:8
  229:13,22,25
  230:5 231:22
  232:25 233:15
  234:17
**profiling**  170:4
**profit**  89:21
  219:10
**profits**  218:4
**program**  44:7,10
  44:14,20 45:4,19
  46:24 47:5,14,19
  48:2 49:18 50:3,6
  51:16,23 52:1,10
  53:3 55:2,11,16,24
  56:11 58:13 59:10

73:4 85:15 86:10
86:25 98:5,14
101:4,7 102:12
103:1 104:18
108:13 109:1
114:24 115:14,17
127:12 133:18
140:13 151:3,21
152:6 153:19
154:13 155:1
183:22,25 209:15
219:24 243:24
282:9 283:6
301:23 302:3
319:21 343:13,23
**programmatic**
  133:19
**programmatically**
  39:5
**programming**
  161:8
**programs**  41:5
  51:10,21 52:12
  58:22 60:4,8,10
  70:1,11 71:24
  85:12 86:16 88:2
  96:8,14,20 97:10
  100:13 101:13
  114:4,22 130:25
  133:22 136:13
  153:11 154:5,10
  155:22 161:20
  172:18 200:7,11
  201:22 206:7
  343:18 361:6
  366:21,23 368:10
  368:13,18 369:3,4
  369:10,15 371:22
**progress**  328:5,12
  329:7

progresses  270:17
272:11
progression
348:12 349:23
project  98:15
113:19 115:1
143:21 145:7,13
155:15 194:12
219:6 220:1,3,4,7
220:14,18 221:9
319:5,17 368:18
projects  96:6,12
96:17 172:23
372:5
promising  133:23
328:5,11 329:6
promote  293:6,10
promoted  108:12
108:25
promoting  293:17
promotion  150:16
pronounce  46:9
46:15 219:5
304:20
proof  315:1,2
proper  294:20
property  65:6
68:6
proportion  167:17
proportions
315:10
proposal  195:1
proposals  194:21
proposed  320:2
proposition  378:3
379:7,18 381:7
prosecuted  177:8
prosecuting
362:19
protect  289:1
296:10

protocol  17:5
186:17,17
protocols  44:24
47:6 49:20 131:15
176:1,2
provide  42:4 43:3
44:22 48:4,9
50:24,25 51:1
56:2 58:13 66:18
66:22,24 69:17
75:1 86:4 88:15
89:25 90:9 92:23
96:7 98:2 99:8
101:13,15,16
102:11,19 105:18
115:10 119:16
194:23 202:9
204:21 205:10
220:18 242:19
244:10
provided  17:11
43:22 47:17 49:24
53:10 58:3,11
68:13,21 79:7
92:21 96:20 97:7
99:12 100:4,7,20
108:9 118:20
141:12 155:4
172:22 187:9
206:8 290:23
291:3,7 307:21
providence  2:10
provider  122:14
265:21 301:12
providers  135:8
259:15 260:9
264:8,12 323:12
364:11
provides  42:22
54:14 239:19,22
274:9

providing  50:4
69:11 74:16 78:16
88:9 114:5,6,11
115:23 116:3
164:2 175:16
211:17
provision  383:11
psychiatrist  45:2
psychiatrists
202:18 240:18
psychostimulant
333:15,23
psychostimulants
334:23 336:7
pta  140:3
public  2:17 7:21
21:18,24 27:1,2
28:2 30:19 31:18
32:5,6,14,22 33:13
34:1 35:6 36:10
37:12 38:3,21
39:8 42:3,22
43:21,25 44:8
45:15,23 46:5
47:17 49:13,23
50:8,10,11,22 51:4
51:8,15,20,22 52:4
52:9,25 53:18,24
55:21 56:10 57:14
59:7 60:9 61:14
61:23 62:3,20
63:1 64:19 65:19
67:1 68:14 72:12
74:25 76:1,18
77:20 82:3,20
83:14 89:5,14
92:22 93:2,25
95:11 96:21 98:22
99:24 101:14
102:20 103:10
107:21,24 109:8

109:24 111:18
112:6,9,13 114:5
114:11 115:23
116:7,9 118:21
119:4,17 122:13
124:4 125:18
128:24 129:6
130:3 131:16
133:9,10,11 135:7
137:2,7 138:7
139:6 140:16
150:4 151:22
153:5,15,21
174:23 182:17,25
183:13,16,22
186:1 197:3 198:4
206:9 208:21
215:9 216:5
217:10,15 220:16
223:13 232:2
233:16 244:19,22
253:18 254:6
256:19 268:17,20
269:3,9,18 287:6,8
288:20 301:3
312:7 320:7
343:20 344:1
353:21 354:1,3,10
354:13,13,16,16
354:19 355:2,7,16
355:17,18 356:9
356:14 357:1,9,13
357:22 358:3,21
359:14 360:24
361:18,22 363:20
364:18 365:20
366:7,10 367:5,7
367:14,18,23
368:14 369:6,17
371:5,6,17,25
372:9 388:6

389:14 391:10,18
392:15,23 393:23
**publication**  7:17
256:7,13
**published**  104:22
204:15 205:16
261:5
**pull**  144:21 245:2
351:19
**pulling**  136:9,25
**pulls**  193:23
**purchase**  221:3
**purchased**  55:14
147:2 352:18
**purchasing**  57:21
208:12,14
**purdue**  1:15
**purely**  223:11
**purpose**  34:9
70:16 287:2 340:4
**purposes**  24:14
67:21 92:7,14
159:16 171:17
190:10,24 225:21
229:9 256:10
261:1 269:4
287:22 302:24
314:1 316:16
321:6 327:17
337:22 340:16
**pursuant**  30:15
82:12 387:3,6
**pursue**  134:24
**push**  60:24 251:2
**pushing**  135:13
**pushups**  370:2
**put**  48:7 121:12
126:16 138:20
141:4 142:4 151:8
153:8 154:9 161:8
192:13 196:9

225:3 229:18
230:25 239:7
244:1 250:21
252:10 256:12
261:3 269:7
283:11 290:21
291:5 294:1
298:13 305:25
320:11,25 376:13
378:16
**puts**  197:14
**putting**  188:13
230:5

---

**q**

**qualified**  388:8
**quality**  74:16
112:18,19,21
113:19 139:24
145:13,25
**quantify**  273:20
**quantity**  267:20
**quarter**  269:23
270:1,6,6,17,23
271:13 272:12
**quarterly**  122:24
**quasi**  89:18
**question**  19:10,12
28:14 35:14 49:5
54:25 56:7 71:17
77:16,21 87:7
89:8 110:4 116:7
128:15 142:21,24
163:19,24 164:3
164:10,21 165:9
192:14 196:13
211:12 216:12
224:25 230:12,13
241:20,21 254:19
254:22,25,25
255:1,3,5,6,10,12
255:17 259:19,21

259:22 267:5
278:14 304:1
309:15 336:1,23
351:3,10 363:15
367:22 368:7
378:1,21 382:14
383:10
**questioning**
295:17 357:5
**questions**  19:14
21:6 34:2 35:12
83:6 140:5,6
141:4,6 142:13
149:12 158:10
162:11,12 164:4
224:22 228:8
230:22 251:6
257:14 262:1
340:3 353:16
363:6,10 365:13
371:5,13 372:9,20
379:2 381:18
386:16
**quick**  25:7 213:1,3
368:23
**quickly**  25:1
169:11 351:20
380:5
**quite**  39:21 79:19
124:17 181:8
208:23 212:19
221:20 236:2
272:25 346:6
370:10
**quota**  295:10
**quotas**  295:14
**quote**  164:13
323:5
**quotes**  164:11
298:10

---

**r**

**r**  34:4 39:1 46:8
73:9 99:19,19
100:13 116:18
220:6
**raiola**  4:17 16:24
16:24 91:24,24
158:1,1
**raise**  120:2 202:7
**raising**  48:19
**ran**  57:23 115:14
**range**  48:23 84:21
**rare**  325:1
**rate**  302:4 332:25
333:9,23
**rates**  301:22 335:7
335:21 355:20
**raw**  335:6,20
336:16
**reach**  137:10
291:13
**reached**  24:1
137:1
**reaches**  27:4
**reaching**  24:21
**read**  107:23
131:15 149:21,24
150:24 151:1
160:5 165:12
200:11 204:19
205:15 221:12
233:18 239:4
254:21,24 257:15
259:19 261:24
262:4,9 266:19
267:13 298:9
305:17 307:5,15
310:5,11 312:14
312:24 315:3,10
315:17 319:21,25
322:6 323:7,13

[read - referred]

328:9 329:17
341:4 352:6
372:22 391:5,6,12
392:5,6,17
**reading** 131:22
147:16,17 148:10
148:20 149:17
151:4 180:9
204:24 209:11
257:9 258:25
259:7,18,24
262:12 263:1,25
264:17 266:9
298:12 329:22
390:19
**real** 143:15 151:11
188:3 196:5,10
335:18,19
**reality** 259:15
260:9
**realize** 245:12
249:11 251:9
**realized** 209:16
245:22,25
**really** 22:11 59:17
110:21 111:24
112:2,6,20 113:15
113:25 120:17
124:17 134:13
144:18 147:12
157:4 159:4
172:17 185:22
193:6 208:23
210:16 223:10,19
223:22 224:24
230:2 233:23
236:1,19 247:17
249:15 253:23
255:20 287:21
302:7 320:19
328:13 335:22

361:10 363:25
365:3,4 369:21
370:9 385:1,1,3
**realtime** 187:18
**reason** 83:11
150:14,18 213:5,7
230:25 244:13
287:8 296:15
372:23 390:14
392:8 393:3
**reasonable** 129:19
**reasonably** 57:18
**reasons** 169:13
174:3
**recall** 22:20 27:8
29:5 30:3 62:2
65:7 74:8 108:20
110:18 118:10
145:7 160:4,7,9
175:11,22 176:9
180:7,8 181:19
182:8 286:5 287:7
315:14 317:25
327:21 363:7,17
365:15
**receipt** 390:18
**receive** 50:13
66:12 71:5 154:24
185:25 223:6
240:1 284:12
301:5 341:23
342:6,22 344:4
**received** 34:19
141:11 153:15
160:4 189:2
193:21 198:4
220:21 226:5,20
231:15 232:1
258:20 285:4
304:23,25 309:5,5
321:19 346:17

352:15,20
**receiving** 187:5
197:16 212:10
323:11
**recess** 91:2 157:10
224:17 351:16
**recipients** 180:11
**recognize** 229:16
229:17
**recollection** 62:8
78:7 84:5 144:20
160:12 234:14
247:22 257:25
**recommendations**
248:22
**record** 17:19 19:4
19:25 28:8,15,20
29:8 31:9 32:16
33:1,6 34:20,22,23
35:1,4,13 36:7
52:15 82:9,21
90:25 91:3,7
129:24 157:7,8,11
224:15,18 227:23
228:1 260:1 266:9
284:1,3,6 304:14
332:15 336:24
351:13,14,17
386:18 392:9
**records** 22:6 28:19
28:21 29:15,16,19
29:22 30:2,20
31:3,7,8,10,14,20
31:22,25 32:9,18
33:10 34:2 35:6
35:16 36:24 37:1
37:5,6 38:12
40:14 41:23,24,25
50:12 51:7 52:8
52:14 82:2,11
87:8 118:8,25

119:10,18 124:13
124:15,22 125:2
129:11,11 186:4
217:22 245:5
284:18 356:5,11
372:12
**recover** 131:18
**recovery** 101:16
291:12 306:1,4
369:25 370:8
**recruit** 115:1
**recruited** 115:9
**redesign** 96:25
97:2,12
**redone** 67:15
**reduce** 100:23
173:3 206:10
223:4 253:1
264:23 282:24
313:5 354:7
355:15
**reduced** 301:18
388:14
**reduces** 98:15
**reduction** 218:14
**reed** 3:7 16:14
**reedsmith.com**
3:10
**refer** 24:12 80:19
115:4
**refereed** 132:1
253:21
**reference** 266:22
385:4 390:7 391:2
392:2
**referenced** 388:13
388:18 391:11
392:15
**referral** 79:20
**referred** 185:23
248:10 266:3

**referring** 58:6
148:13,14 176:6
180:17 251:21
260:16 276:6
**refills** 56:25
**refined** 197:6
**reflect** 192:15,16
**reflected** 234:3
**refresh** 84:4
257:24
**refusal** 47:11
**refuse** 358:9
**regarded** 266:20
**regarding** 27:22
32:18 34:2 52:9
83:2 98:12 100:7
110:25 119:17
129:8 145:25
149:21 150:16,24
152:23 155:19
158:16 160:10
164:4 166:1
170:13 175:12
177:25 182:9
184:4,8 200:8
203:5 204:11
205:17 206:20
217:9,12 221:16
293:16 307:13
373:20 374:18
375:1 387:2,11
**regardless** 17:3
219:1
**regards** 22:15
163:5 255:22
**regions** 142:16
**registered** 107:5
**regs** 147:10
149:21 150:20
152:20,24

**regularly** 78:23
**regulated** 150:17
241:9 297:14
**regulation** 146:17
147:24
**regulations** 146:11
146:13 147:18
148:12,13 149:2,3
150:8,15,21,22,24
152:22 204:24
241:7 297:17,20
**rehabilitation**
309:19
**reimburse** 89:1
308:14 309:1
**reimbursement**
88:22 89:23 90:5
97:3
**reimbursements**
70:24
**reimburses** 89:22
97:18 155:3
**relapse** 370:19
**relate** 42:12
**related** 24:11
70:10 71:7,14,23
71:24 106:2
111:13 118:19
127:20 131:5
148:18 150:8
189:3,8,9 192:22
197:5 206:12
207:11,18 211:3
215:5 216:16
217:19,25 226:11
227:7 278:9
298:17 326:14
327:4 328:8
361:21 367:16,20
371:7 384:11

**relates** 1:12
**relationship** 44:3
44:25 58:14
132:13,14 137:7,8
138:24 160:18
324:13
**relative** 389:2
**relative's** 345:20
**relevant** 41:6
**reliable** 64:8
328:24
**relied** 41:4
**relief** 173:15
287:13 365:5
**relievers** 352:11
377:4 380:24
**rely** 356:10,24
**remain** 370:8
**remainder** 85:2
**remained** 276:23
277:3,8 278:2,21
**remaining** 55:7
66:16
**remains** 274:22
**remember** 24:18
51:19 62:11 74:4
77:12 110:22
111:22 136:17,22
140:20 147:17
158:4 160:19
162:19 178:7
180:9 181:11,12
181:15 182:1,5
204:18,19 213:22
221:3 225:16
233:23 245:14
246:15 247:23
254:18 266:5
268:12 273:11
284:20 286:6,17
286:22,23 356:6

357:7 373:15
380:12 381:21
**remembering**
149:18
**remind** 314:13
**reminder** 17:2
**remitted** 68:1
**remotely** 15:7
**remove** 164:3
**removed** 103:17
103:18 164:5,7
**rendition** 104:22
**renew** 242:18
**renews** 64:2
**repair** 156:24
**repayment** 97:7
**repeat** 165:23
216:9
**rephrase** 19:17,21
335:25
**replace** 73:20,21
147:13 373:11
**replacement** 57:4
**replied** 338:24
339:2
**report** 7:7,20
122:22 141:17,20
144:21 159:15,24
159:24 160:5,13
165:4 187:13
188:14 189:7
194:10 195:9,10
195:19 196:4,5,17
196:19 256:17
258:11 260:25
261:4 327:22,24
**reported** 170:19
172:4 266:17
322:11
**reporter** 6:17 17:9
18:2 19:7 327:19

391:7
**reporter's** 6:14
18:23 388:1
**reporting** 7:19
148:3 198:22
226:19 243:13
256:9,15 298:18
312:18 313:18
315:23 320:4
329:3,4
**reports** 141:11
143:23 187:12
189:1 191:15
193:23 194:1,7,17
195:3,11 197:14
244:22,25 261:10
275:7 307:11
**represent** 15:8
17:3,4 36:8 121:4
121:21 163:2
193:13 256:18
285:15 299:15
**representations**
330:4
**representative**
23:4,6 93:1
295:23
**representatives**
24:6 257:17
293:17
**represented** 23:20
**representing**
228:7
**request** 26:14
34:19 35:17,20
36:1,18 38:2
119:25 120:3
125:2 129:11,12
129:19 392:9,11
**requested** 37:18
387:1,6,10

**requests** 129:24
194:19
**require** 71:8
201:22 203:17
**required** 31:10,15
66:13,21 82:12
85:17 122:5
130:12 146:21,22
185:16 308:12
341:1 390:25
**requirement**
29:15 117:1 341:6
341:12
**requirements**
107:19 129:7
146:16 147:15
148:3 149:14
**research** 100:14
101:6 141:22
162:13 177:14
181:4 200:5
209:11
**reservations** 290:9
**reserve** 107:22
138:10 231:19
**residents** 78:17
90:10 286:3 299:5
299:14,16 306:10
306:11,12 309:18
325:13 344:3
**resiliency** 160:17
161:14 346:10
370:16
**resist** 31:4
**resistant** 201:20
**resolution** 289:15
**resources** 48:9
57:20 61:1 254:13
356:19 359:13
**respect** 29:15 30:1
30:21 32:19,25

38:20 41:14 43:11
43:18 44:4,20
45:16 51:6 53:16
54:15 55:1 57:13
67:16 78:15 79:6
86:21 87:7 89:22
125:10 173:1
175:6 183:9 207:2
221:17 230:24
237:13 250:13
292:2,5 298:1
326:18,22,24
337:15
**respective** 139:14
**respond** 359:21
**responded** 181:12
181:16 182:7
**respondents** 310:7
**responders** 56:19
56:20
**response** 181:9
213:1,3 337:6
357:4 368:23
371:25
**responses** 180:20
**responsibile**
239:25
**responsibilities**
96:4 111:18
113:14 114:1
134:11 298:1
**responsibility**
41:10 96:19 98:14
102:25 113:2,16
128:1 159:4,7
235:1,5 237:25
323:20 344:7,13
346:22 347:2
348:5,22 349:8,13
350:12,16 352:25
371:21,24 383:24

**responsible** 28:3
33:3,6,16 38:22
43:13 46:22 52:6
55:24 60:19 67:7
73:3 88:19 103:4
111:12 112:19
125:5 129:5
184:14 240:7
280:8,16 340:1
374:12
**rest** 54:2 68:1
154:2
**restricting** 203:14
**restrictions** 48:13
49:11 207:21
**result** 164:20
203:16 245:22
**resulted** 209:20
**results** 160:9
161:21 162:18
164:8,9 166:6
307:12 308:3
312:17
**retail** 235:23
237:20
**retained** 6:17
33:10
**retaining** 138:18
**retention** 28:8,15
28:20 29:9 32:16
33:2,7 34:2 35:13
82:13 126:25
**rethink** 251:18
**retire** 110:4
**retired** 40:11,20
117:13
**returned** 52:21
390:18
**revenue** 53:18
54:8 61:21 62:8
64:23 65:3,4

**[revenue - s]** Page 54

67:22 68:7,20
71:13 84:16
101:25 102:12
152:1 153:21
154:7
**revenues** 66:7
155:20,20
**reversed** 189:20
**review** 21:11
37:21 38:6 49:18
74:17 103:8
141:20 143:22
193:13 226:3
253:21 259:23
307:17 354:22
387:2,6 390:12
391:1 392:1
**reviewed** 21:21
141:12 150:7
222:12 249:25
307:12 317:15
320:20 321:15,22
**reviewing** 132:25
133:25 140:18
147:15 197:3
327:22
**revised** 66:1
123:15
**revision** 30:1
252:1
**revived** 189:23
283:18
**rfp** 291:4
**ri** 2:10
**rice** 2:3 36:15
**rich** 128:18 184:15
186:21 187:16,16
188:10,22 191:8
192:10 193:22
196:3,6 245:1,4

**richard** 316:20
338:22,24
**rid** 30:8,10 251:3
251:5,5 282:22
**right** 19:1 25:6
30:11 31:13 42:14
46:21 59:13 64:14
72:21 76:10 94:17
96:3 100:1 105:1
105:4 108:4,22
110:14 117:18
122:20 123:11
127:12 128:20
134:7 137:5,25
145:24 148:5
149:20 151:17
154:8 163:23
169:20 173:20,24
180:13,19,24
181:3,18 183:15
188:25 189:7
190:14 192:4,12
195:24 198:18
202:10 213:24
216:2,15,17
217:14 227:17,20
230:20 239:17
240:21 247:19
256:21 258:21
259:4 264:14
265:2 270:11,16
270:19 272:13,20
273:3 281:13
298:11 302:9
310:20 311:22
319:5 322:3 332:5
333:16 334:9,11
334:13,15 336:20
338:7 340:23
346:20 348:3
349:6 358:5,11

365:25 371:12
377:13 378:11
380:16 382:20
**rise** 100:25 308:16
323:21 339:9,18
**rising** 339:23
355:20
**risk** 7:6 69:17
98:15 108:11
137:25 139:1,10
142:10 143:16
159:14,23 164:6
169:17 181:14
184:19 266:24
342:20 352:10
354:7,23 355:15
377:2 380:23
**risky** 346:7
**rite** 3:11 16:11
228:7,16 237:2
238:7 279:17
280:2,3,7,13,14,15
**road** 2:13 113:21
349:22 363:3
364:2 366:5
**robin** 2:16 15:16
**role** 61:6,8 74:11
105:17 109:9
121:25 234:24
237:24 295:4,14
312:9 321:16
365:1
**rollcall** 157:18
**rollout** 47:14
**ronald** 94:12
**room** 187:21
**root** 209:1
**ropes** 5:16 91:9
**ropesgray.com**
5:19

**rough** 56:12
195:16
**roughly** 53:22
66:12 69:6,11
75:3 78:9,17 79:8
79:12 81:12 82:24
93:15 94:14
109:23 124:10
130:25 144:22
149:6 153:6,20
154:6 210:9
286:23 331:20
**rpr** 1:25
**ruiz** 5:8 91:19,19
157:24,24
**rule** 53:8,9 143:11
148:4 154:3
251:20
**rules** 18:1 28:20
142:18 147:18
148:10,16,17,23
151:4 218:23
241:6 251:14
341:8 387:3,7
391:5 392:5
**run** 51:25 85:17
146:8 151:21
218:9 353:18
368:13
**running** 135:22
**runs** 69:20 220:13
**rwilson** 2:18
**rx** 5:6 7:18 91:20
243:13 256:9,15

**s**

**s** 2:4 17:20 40:4
46:3,3 94:12
100:13,13 104:3
116:18 126:5,11
390:15 392:8,8
393:3

s.w. 5:4
safe 288:9 368:18
safety 100:24
  149:10 267:1
  289:1 359:19
salaries 68:9,17
sale 348:24
sales 367:9
salimbene 3:7
  6:10 16:13,13
  227:22 285:13,15
  302:11,17 303:12
  304:5,8,15 309:12
  336:21 350:22
  351:4,12 353:4,9
  376:2
samantha 4:21
  91:14
samantha.danna
  4:24
samhsa 69:16
sample 139:5,9,10
  142:19 144:3,8
samples 144:11,13
sat 223:15
save 61:1 126:9
  127:17
saved 126:3 127:4
  127:10
savings 61:11
  64:10
saw 128:18 182:2
  187:9 216:13
saying 19:8 28:6
  165:11 189:21
  192:18 208:17
  210:8 211:23,25
  214:9 218:25
  227:11,13 255:18
  311:5 318:8
  335:24 348:1,9

349:11 380:8
  382:18
says 66:10 71:14
  104:24 129:12
  180:24 233:15
  234:18 257:12
  262:2 265:3 278:8
  305:14 306:24
  307:8,20 308:3
  310:2 312:22
  313:5 314:18
  315:8 317:5 322:3
  323:5,9 325:5
  328:4,20 329:10
  331:11 335:11
  338:17 339:16,16
  340:22,25 352:4
sc 2:6
scale 144:10
scantron 140:25
scenario 346:13
scene 169:23
  368:21
schedule 29:20
  30:9,16 242:2,4
scheduled 78:23
schedules 241:14
  241:23
schierholt 261:16
  261:18 262:2
schierholt's
  263:15
school 7:7 106:8
  107:13,18 117:15
  139:11,12 159:15
  159:24 161:17
  164:2 165:1,3,4,5
  235:13 359:19
schools 105:19
  139:23 140:24
  161:9

scientific 267:4
scope 314:17
  363:25
screw 142:19
seal 219:15 282:16
  389:6 391:15
  392:21
second 20:21
  53:14,15 95:1,7
  180:15,23 207:9
  223:2 269:22
  283:20 306:25
  308:3 310:2
  359:25
secondary 339:23
section 162:21
  185:1 256:19
  265:3 313:12,16
  318:4,16
sections 203:5
secure 186:18
  219:13 220:14
  264:9
securing 111:13
security 151:12
see 37:25 38:7
  76:4 78:18 88:17
  89:2 90:3 94:20
  100:11 105:5
  115:4 127:13
  132:6 142:5
  164:13 168:25
  169:6 180:15
  181:4 187:17,21
  191:8,23 194:7,10
  194:14 206:15
  211:24 227:8
  244:3,5 245:7
  253:22 257:12
  262:8 263:19
  267:6 268:4,9,16

268:20 269:24
  304:3 305:17
  307:5,14 310:5,11
  312:14,24 313:5
  314:18 315:11
  316:24 318:22
  319:21,24 321:23
  322:6 323:6,12
  325:15 328:9
  329:13,17 330:19
  331:8 333:4
  335:17 338:2,19
  341:4 349:17
  352:6 355:20
  356:1,19
seeing 210:10
  335:13 362:18,21
seek 52:18 88:21
  90:4 178:21
  283:19 324:12
seeking 57:16
  79:23 81:12,18
  83:22 138:15
  145:6 210:18
  211:24 247:21
  324:19
seeks 355:6
seen 79:4,24,25
  83:8,13 143:24
  168:7 170:12,13
  187:12 192:20
  198:1 201:13
  204:10,15 214:17
  218:11 244:24
  256:22 257:6,11
  258:6 261:7,23
  265:5,9 268:13
  269:13 305:8
  321:12 325:2
  346:16 362:15
  373:4

**segments** 312:6
**select** 121:21
 328:19
**selected** 123:8
 307:20 312:23
**self** 172:4 200:25
 201:2 204:1
**sell** 179:5,11
 324:23 384:8
**semantical** 380:3
**senate** 257:18
**send** 194:8 196:4
**sending** 126:13
**sends** 126:13
 188:7 191:15
 196:19
**sense** 19:3,16,18
 120:18 144:19
 177:7 195:19
 264:20 280:5
 300:15 302:7
**sent** 31:1 36:1
 132:4 148:21
 181:14,17,23
 182:3,9 195:20
 226:16 245:21
 314:25 315:3,18
**sentence** 257:20
 260:13 305:14
 315:6,6 328:3
 339:6 340:24
**sentences** 257:9
 259:8
**separate** 63:18
 66:2 86:16,17
 148:11 155:12,15
 155:17 179:13
 211:23 219:24
 337:7
**separating** 103:16

**september** 101:10
 101:12 102:4,12
 142:1,6 180:14
 375:21
**series** 117:5
 290:20 365:12
 372:8 381:17
**serious** 169:4
**serve** 58:23
**served** 121:15
**server** 125:21
**service** 4:11 16:5
 40:11 58:2,3
 72:22 73:8 74:18
 194:24 283:11
**services** 5:6 39:3
 40:23 41:1,4 42:4
 42:11,23,25 43:3
 43:14,19,20 44:19
 47:18,19 48:5,11
 50:4 53:1,10
 54:14,16 55:13
 58:5 59:5 61:21
 66:18,22,24 68:12
 68:13,21 69:12
 70:10 72:11 78:5
 78:16,23 79:8
 81:13,18 83:12
 84:17 88:4,10,16
 88:17 89:25 90:9
 91:21 92:21,22,24
 96:8 97:7,16,19
 98:3,6,10,19 99:8
 99:9,12 100:3,4,7
 100:17,18,21
 102:11,19 103:16
 104:4,21 108:9,9
 115:24 118:20
 155:3 211:18
 217:24,25 308:5
 308:10,15,23,24

 310:4 354:6
 359:19 366:24
**ses** 254:11
**set** 49:22 63:17
 85:12 112:22
 116:8 142:12
 162:12 168:1
 173:3 218:13
 288:21 328:1
 364:3 389:6
**sets** 44:22 253:19
**setting** 295:14
**seven** 29:24 31:16
 31:17,19,23 37:7
 59:12 75:6,24
 76:23,25 77:2
 105:3 123:22
 193:1 252:2
**severe** 266:21
**severely** 160:22
**sewage** 66:15
 129:13,15,18
**sexual** 140:5,6
 164:6
**shaded** 103:18
 104:8
**shakeout** 101:22
**shapira** 4:11 16:5
**shapira.com** 4:14
**shapiro** 286:12,13
**shared** 125:19
 315:2
**sharing** 223:20
 366:3
**sheet** 52:21 390:13
 392:7,10,18 393:1
**sheets** 140:25
**sheriffs** 218:8
**shipped** 298:22
 299:9 311:11

**shipping** 374:14
 374:20
**shkolnik** 2:12
**shop** 324:3
**shopper** 323:10
**shoppers** 323:6,15
 323:19 325:6
**shopping** 178:23
 244:4 263:18
 264:2,6,18,24
 340:12
**short** 35:4 284:9
 345:3
**shortage** 362:4
**shortly** 17:22
 35:14 110:9
**show** 27:19 85:16
 229:3 262:20
 287:12 302:9
 320:23 378:8
**showing** 269:17
**shown** 390:16
**shows** 167:16
 214:21,24 233:5
 270:22 272:3,16
 328:5
**shrugs** 18:25
**shut** 249:9
**sic** 97:23
**side** 371:13
**sided** 302:12,14
**sign** 52:20 122:5
 174:7,16 293:21
 294:1 358:13,13
**signature** 387:5
 389:13 390:14
**signed** 36:2,4,13
 36:17 257:18
 391:13 392:18
**significant** 160:24
 279:4

significantly 215:2
signing 390:19
signs 56:4
similar 116:8
  123:5 191:16
simple 382:13
simply 198:16
  378:5
sincerely 390:21
single 120:21
  185:9 222:3
  302:12 359:25
sir 390:10
sit 37:4 62:22
  71:20 160:7
  177:24 215:4
  249:18 258:14
  263:11 274:21
  279:4 379:16
  381:13
site 31:1,2 53:14
  53:15 151:19
  186:16 193:21
sites 53:11 379:10
sitting 250:15
  277:24
situation 57:6
  173:20 223:14
  238:25 239:12
  354:11,12 355:21
situations 57:12
  287:15
six 28:18,22 29:6
  30:12 44:9 46:25
  47:19,25 49:14,22
  85:24 106:4
  107:16 131:3
  156:9,10 193:1
  213:15
size 139:5 144:3

sizes 144:8
skill 114:16
skills 160:17
skoda 1:20 6:7
  7:16 15:5 17:10
  17:14,20,21 35:3
  92:17 105:25
  158:4 159:18
  171:19 224:20
  225:24 228:3
  229:8 256:12
  285:12,14 338:1
  351:19 353:12,14
  371:2,4 388:9
  390:8 391:4,9
  392:4,13 393:20
slice 153:22
slide 318:15,24
  319:8,13,16,20,23
slides 318:10,25
  319:11,12 351:24
slowly 47:5 364:6
small 55:5 59:21
  84:19 115:16
  144:11,17 181:2
smaller 62:16
smiley 117:8
smith 3:7 16:14
  45:2,2,8 88:8
  105:10 131:12
smoking 169:2
  254:10
sober 370:1,8,9,11
sobolewski 46:2,3
  46:9 50:2,20
  51:25 56:1 88:1
  93:12,13,14
social 43:8 75:15
  75:20,23 77:25
  100:20 102:2
  107:15 114:17

231:15
societies 174:15
  175:3,5
society 204:12,17
  365:1
socioeconomic
  114:18 209:6
  252:25 358:23
  360:11 372:21
soft 66:17
software 96:14
sold 325:8 341:2
solely 71:23
solem 104:3,3
solicitors 362:3
solutions 4:2 59:4
  318:17 319:11
  320:2,8 361:7
  390:1 393:1
somebody 26:8
  33:5 44:11 52:3
  72:1,3 73:20,21
  79:21 125:8 128:5
  129:17 132:4
  148:22 156:2
  161:2,5 163:20
  173:23,24,25
  194:12 196:6
  223:19 240:11
  243:25 273:17
  286:7 292:11
  295:23 300:2
  347:8 382:11,19
  385:5
somebody's 210:3
soon 53:8 209:16
sorry 24:24,25
  31:4 64:11 73:16
  80:7 83:16,19,21
  105:7 112:24
  123:2 127:3

128:10 165:5,23
  180:1,10 182:14
  186:14 194:3
  196:12 198:12
  199:18 202:22
  204:13 207:18
  210:7 216:9
  220:12 230:11
  232:13 236:4
  240:4 247:9 250:8
  254:20 267:21
  274:11 277:4
  278:15 280:11
  282:7 293:7 295:1
  302:14 312:2
  316:10,11 322:14
  322:20 329:19
  331:6 345:14,17
  353:7
sort 22:3 33:8
  41:18 47:23 49:17
  63:25 70:17 82:9
  112:7 117:7
  135:16 140:10
  164:5 185:20
  188:8 197:15
  206:4 208:25
  327:24 335:13
sorts 103:22
  108:14 113:24
  159:2 161:15
  201:21
sought 346:23
sound 134:7 221:5
  318:13
sounded 101:3
sounds 59:17 60:8
  230:2
source 68:19
  191:12,23 199:4
  207:23 209:25

| | | | |
|---|---|---|---|
| 214:17 328:20,24 | 76:12 84:11 | **square** 2:17 3:8 | 210:16 211:25 |
| 339:7,12 352:8 | 103:17 152:13 | **squish** 282:16 | 214:12 217:5,7 |
| 379:12 | 178:15 222:7 | **sraiola** 4:19 | 219:1 225:13 |
| **sources** 53:20,25 | 245:18 265:20 | **ss** 388:3 | 226:14 231:13 |
| 54:3,4,8 55:4,8,9 | 268:9 299:8 | **staff** 50:7 124:12 | 249:8,12 251:9 |
| 64:22 84:18 85:3 | 324:17 330:10 | 361:9,10 | 252:15 254:9 |
| 86:11 154:20 | 356:5,10,11 | **stakeholders** | 258:1 264:20 |
| 155:20 158:25 | 381:14 | 307:3 | 349:22 352:5,15 |
| 183:7 185:6 | **specifically** 21:17 | **stamps** 179:12 | 372:17 375:7,12 |
| 193:11 196:23 | 25:20 32:24 38:6 | **standard** 176:3,22 | 377:18 378:4 |
| 208:1,12 209:11 | 38:13 42:10 50:3 | 187:13 266:21 | 379:8,19 381:8 |
| 212:5 214:10 | 128:12 141:14 | **standards** 74:13 | **starting** 47:4 |
| 249:12,24 278:7 | 158:13 163:9 | 74:15,19 | 102:4 113:21 |
| 355:3 383:14 | 176:6 184:25 | **standing** 150:3 | 158:24 159:1 |
| **south** 4:4 | 192:5 207:10 | **stares** 353:5 | 170:19 174:7 |
| **space** 125:20 | 208:2 230:24 | **stark** 78:1 | 209:16 233:1 |
| **spaeder** 5:7 91:20 | 241:11 245:17 | **stars** 100:13 | 249:11 259:2 |
| 157:25 | 251:20 262:23 | 154:13 | 350:24 370:15 |
| **speak** 19:6 32:18 | 278:10 371:7 | **start** 20:1 30:9 | **starts** 66:21 |
| 77:18 78:11 218:7 | **specifics** 18:11 | 47:5,5 70:6 | 141:25 259:1 |
| 286:1,8,11,16 | 54:5 58:9 175:23 | 135:19 142:6 | 344:24 376:5 |
| **speakers** 318:2 | 325:14 341:9 | 149:11 152:18 | **state** 7:18 28:21,23 |
| **speaking** 315:15 | **specified** 388:21 | 158:11 167:23 | 29:3 44:18,21 |
| 324:15 363:5 | **speculating** 375:4 | 221:8 228:14 | 45:18 46:21 47:22 |
| 378:17 | **speculation** 374:3 | 231:11,12 251:2,6 | 54:10 60:24 64:25 |
| **speaks** 258:24 | 374:25 | 265:24 324:6 | 67:10 68:1 70:22 |
| 259:20 263:23 | **spell** 32:11 | 325:19 345:2 | 97:11,14,18 |
| 315:7 | **spelling** 39:11 | 364:6 376:11 | 107:14,17 112:8 |
| **special** 96:6,16 | 315:18 | 377:20,24 380:3,9 | 121:1 123:12 |
| 105:18 108:10 | **spend** 21:3 90:2 | 380:18 384:13 | 134:1 139:2 |
| 232:10 | 92:20 359:23 | 385:9 | 144:16 145:1,11 |
| **specialist** 61:5 | **spent** 67:21 77:25 | **started** 17:25 20:1 | 145:22 146:16 |
| 105:13 | 153:10 324:20 | 42:20 53:9 57:17 | 147:25 148:4,14 |
| **specialists** 75:10 | 384:18,20 | 65:20 70:23 71:20 | 154:3,20,21 |
| 115:10 | **spike** 211:2 214:1 | 108:13 113:1 | 172:17 175:7 |
| **specialty** 46:12,19 | **spoke** 21:8 | 135:1,8 136:25 | 181:4 184:22 |
| 176:20 | **spoken** 39:23 | 169:1,7 170:15 | 185:8 188:7 203:4 |
| **specific** 33:11 | 373:24 | 174:17 181:5,24 | 204:11,16 207:11 |
| 35:11 41:25 43:19 | **spot** 321:1 | 182:10 188:10,12 | 222:19 223:5,8 |
| 54:6,6 67:21 | **spread** 366:21 | 188:13 207:22 | 226:15 231:14,20 |
| 70:12,14 71:4 | | 208:16 209:10 | 235:15 251:22 |

256:7,14 261:13
297:17 301:1
310:22 329:13
332:16 337:14
374:11 388:2,7
389:15 391:10
392:15
stated  144:1 192:6
statement  137:18
199:9 286:21,24
287:3 288:21
295:22 305:19
315:16 337:5
340:21 342:5
344:6 347:18
391:13,14 392:19
392:19
statements  259:18
293:16
states  1:1 143:9,13
143:14 163:7
188:19 263:16
statewide  320:21
statics  328:22
statistical  142:17
215:2 269:11
statistically
144:15 275:17
278:25
statistics  67:24
68:2 184:12 217:8
250:6,9,12 265:5
268:10 273:20
274:2,6,18 275:5
276:18 277:23
278:5,18 279:9
329:3 330:17
332:15 338:13
status  75:16,18
209:7

statute  17:11
stay  306:4 362:6
stays  142:22
std  98:10 104:19
242:19,23
stealing  178:23
179:3 350:2
stenotypy  388:14
step  141:15 266:25
stephen  4:17
16:24 32:10 34:10
91:24 158:1
steven  261:16,18
stick  160:20
194:22
stockpile  146:22
147:13 148:9
236:14
stolen  81:3 171:4
stop  249:4,6,6
254:14 287:14
351:2 362:11
stopped  263:12
stopping  224:7
storage  31:1
store  125:13,17
236:7,10,15,16
stored  87:9,10
straight  322:5
straighten  59:1
strategic  96:15
148:9,17 236:14
305:3,11 307:2
312:22 313:9
strategies  133:23
street  1:23 2:9 3:8
3:12,16 4:4,13,18
4:22 5:8 32:2
172:9 178:17
179:5 208:13
247:25 248:8

250:2 251:1,1
252:20 315:9
344:19,25 347:14
384:3,12,13
streets  179:14
212:8 213:10
246:4 324:21
325:8
strides  305:16,21
306:20
strike  27:13,25
32:25 36:22 51:13
56:5 70:6 76:2
129:25 182:14
198:12 206:20
221:11 254:22
293:14 297:12
298:4 318:6
333:13,20 350:23
351:6,10 373:7
strips  154:16
369:1
strong  302:15
stronger  370:3
strongly  287:11
struck  247:17
structure  93:2
97:4 112:4 120:19
123:5 289:19
struggling  147:7
321:20
students  144:23
studies  143:5
study  138:19
142:25 361:3
stuff  118:13,17,18
140:11 185:20
251:5 252:3
381:12
stumbled  148:19

stupid  217:4,6
subcommittee
198:25
subcontractors
89:4 218:4
subdivision  89:6
120:22 121:19,22
subgroup  211:14
211:16
subject  7:12 127:8
127:16,19 142:8
156:11 158:6,8
190:22 226:8
227:5 316:23
submit  341:1
submitted  21:13
41:18
suboxone  43:6
44:6 47:3,13
48:13,14,18 49:8
subpopulation
366:12
subscribed  391:10
392:14 393:21
subsequently
172:10 173:16
175:20
subset  185:12,17
subsidiary  36:15
subsidies  154:25
substance  42:9,22
54:15 58:3,8,12
60:10,20 68:13,20
69:11,25 71:22
74:22 75:1,14
78:19 79:7 80:4,5
80:12 81:19 83:2
83:22,24 84:15,17
87:4 90:9 92:22
96:20 97:13 98:2
98:12,16 99:9

100:3,7 102:19
111:13 114:4,10
115:23 118:19
119:5 124:4
127:21 130:7,19
131:2,9 133:3
146:9 153:11,23
154:5,10 155:3,21
163:14,15,16
164:5 167:19
168:4 169:4 181:6
181:24 194:2
200:8 201:3 206:7
206:11,14,17
207:5 210:6
239:12 332:12
347:10 349:24
363:16
**substances** 76:4
80:6,9,10 84:11
132:14 165:25
166:2,20 167:11
167:18 189:16,16
197:21 205:20,23
225:4 240:22,25
241:10,16,23
242:8 298:2
310:10 341:2
349:25 364:16
374:20 380:7
386:9,10,13
**substitute** 246:2
**successful** 47:7
58:15,21 59:1
201:16 283:21
290:22 356:22
**sudden** 209:4
358:16
**sued** 228:15,25
290:12 300:12
311:20 327:9

**suffer** 300:9
**suffering** 201:7
**suggest** 211:8
219:23 249:18
**suggesting** 211:19
372:23
**suggests** 337:13
346:16
**suicide** 160:18,20
160:23 161:9
200:20,20 203:21
**suit** 294:19,23
**suite** 2:9,13,17,22
3:8,21 4:22 5:9
390:2
**summarized** 289:3
**summary** 159:24
**summer** 225:14
**summit** 1:13 2:2
7:4,5,8,11,13,15
7:23,25 8:2,7
15:10,12,15 21:14
21:17,24 23:10
25:9 26:25 27:1,2
28:2 29:25 30:19
31:18 32:3,13,21
33:13,25 35:5
36:8,10 37:11
38:3,20 39:8,16
42:3,22 43:21,25
44:8,11 45:13,20
45:23 46:5 47:17
49:13,23 50:8,11
50:21 51:4,8,15,22
52:4,9,24 53:18,23
55:20 56:9 57:14
59:6 60:9 61:22
62:3,20 63:1
64:19 65:19,25
67:1 68:14 72:12
74:25 75:25 76:18

77:20 78:13,17
82:3,20 83:14
88:7 89:5,13,17
90:10 92:6,13,21
93:2,4,6,25 94:2
95:11 96:20 98:3
98:22 99:2,24
100:17 101:14
103:10 107:24
109:5,8,14,16,18
109:23 110:9
111:18 112:21
114:5 115:22
116:9 118:21
122:12 124:4
128:24 129:1,6
130:3 134:25
135:11 137:1
138:6 139:3
140:15 143:22
145:17 151:15,21
152:17 153:5,15
153:21 158:14,20
160:11 162:6,16
166:7,23 171:16
172:16 177:9
180:4 182:17,24
183:15,22 185:10
190:9,23 197:2
198:4 199:6,14,20
205:24 206:8,22
210:9 213:3 215:9
216:3,4 217:10,14
217:16,24 218:6
218:20 220:15,16
225:2,4,20 227:12
233:16 237:10
245:20 246:10
262:17,24 265:10
265:11,17,24
268:9 269:10

270:12,24 272:4
272:17 273:21
274:6,23 275:17
276:19 277:9
278:2,21 281:16
286:3 289:2 299:5
299:9,12 302:3,23
303:2,22 304:19
305:2,15 306:10
306:14 308:19
313:25 314:4
316:15,24 321:17
334:3 336:19
337:3,6,13,21
338:14 343:12,17
343:20 344:3
348:20 352:24
353:20 354:12
356:9 357:1,6,12
357:21 358:22
360:8,25 361:4
363:20 364:18
365:15,19,21
367:5,19,24
368:14,18 369:17
370:21 371:17,24
383:1,14,18,24
**superintendents**
139:21
**superior** 390:1
**supervise** 41:8
75:23
**supervising** 235:5
237:25
**supervision** 74:17
75:22
**supervisor** 73:4,6
73:7,15,16 74:12
77:13,19 104:24
108:16 194:14
233:2,4

**supervisors** 77:11
  104:13
**supervisory**
  234:25
**supplier** 205:5
  292:19
**suppliers** 205:8
**supplies** 55:3
  238:6,9,12 291:22
**supply** 3:19 16:2
  56:23 169:9
  208:11 209:16
  213:6 246:4,11
  248:6,19 250:21
  251:1,9,13 252:9
  253:5,11 255:6
  292:9,24 362:16
  368:24
**supplying** 368:20
**support** 100:20
  102:2 210:19
  220:21 248:1
  287:12 289:25
  342:4 378:6
  384:25 385:2
**supporting** 179:17
**supports** 379:17
**suppose** 203:20
**supposed** 148:20
  164:19 316:8
**suppressant**
  281:10
**sure** 18:22 28:5
  31:24 35:21 37:22
  39:21 43:8 44:4
  47:6 48:6 50:1
  63:23 70:6 74:14
  74:18 77:7 80:11
  82:14 86:5 89:20
  101:25 102:14
  107:12 119:13

128:2 135:4
  142:18,21 147:22
  148:6 157:14
  158:4 165:9
  167:15 191:13
  193:6,17,19 196:8
  196:10 199:2,19
  202:18 204:18
  207:1 212:19
  218:22 224:24
  227:3 233:11
  240:6 251:25
  254:9 260:12
  262:17 271:3
  275:2 293:4,9
  306:17 315:3
  317:16 319:3
  322:22 331:7,7
  332:13 334:7
  335:18,19 336:24
  343:13 347:1
  356:22 364:1
  379:23 384:4
  386:1
**surface** 254:4
**surgeries** 201:25
**surgery** 169:8
  203:12 238:24
**surprise** 263:8
  280:1
**surprised** 217:3
**surrounding**
  121:1
**surveillance** 151:6
  151:13,18 187:18
**survey** 7:6 138:1
  139:1,18,19
  140:15,21 141:23
  142:10,22 145:18
  145:22 159:14,24
  160:9 161:21,23

161:25 162:7,13
  164:1,10,21,25
  165:7,25 166:2
  169:15 181:17
  307:4,8,11,12,17
  307:20 308:2,4,8
  312:17
**surveyed** 144:23
**surveys** 133:14
  140:18 143:17
**survive** 179:11
**suspicious** 185:14
  298:7,14,17
  312:17 313:17
  315:22 320:4
**swear** 17:9
**sweeping** 259:10
**switch** 97:1
**switching** 209:21
**sworn** 17:12,23
  388:10 391:10,13
  392:14,18 393:21
**synthetic** 281:4,5
**syringe** 51:21
  52:12 302:2
**system** 7:19 58:24
  82:21 127:16
  128:6 187:18
  188:1,2 243:13
  256:9,15 261:10
  354:3
**systems** 343:25
  359:19

**t**

**t** 99:19,19 100:13
**table** 135:23 163:1
  163:10 325:12
  330:7,12 334:2
  337:15 371:13
**take** 19:23 41:10
  56:12 61:6 67:23

68:25 76:14 90:17
  90:20 111:17
  118:17,18 129:14
  130:18 140:4
  141:15 163:3
  167:9 191:4 193:1
  226:1 257:2 265:2
  307:20 324:2
  341:17 344:15
  345:6 350:5,7
  353:17 359:16
  362:10 364:12
  366:20 370:17
  377:11,17
**taken** 1:22 91:2
  100:24 131:1
  140:7 157:10
  224:17 273:17
  282:2 351:16
  365:2,6 379:23
  388:20
**takes** 126:14
  250:25 254:15
  310:15 384:24
**tale** 350:9
**talk** 21:20 22:16
  31:14 32:8 40:15
  80:11 82:15 83:9
  100:6,11 105:12
  106:24 135:8
  137:15 139:22
  149:16 161:13
  253:20
**talked** 36:19 61:17
  72:22 86:23
  102:18 106:22
  115:22 118:5,10
  126:24 128:7
  130:2,2 131:14
  133:15 134:4
  150:22 158:15

**[talked - things]** Page 62

160:1 161:1
162:10 172:7
185:4 196:7 198:3
198:7 200:6 206:7
208:19 212:23
217:8,11 249:25
260:14 275:13,13
279:2 289:16,16
289:18 290:16
370:11 376:20
**talking** 19:8 27:6
35:5 48:19 56:21
59:16 61:19 69:12
72:24 74:22 77:11
88:3 92:21 100:2
117:16 124:2
135:25 141:17
144:14 146:5
147:23 148:6,8
152:20 153:5
171:23 180:25
182:13 184:25
193:12 209:12,12
209:13,14,14
213:15 225:1
230:16 247:23
289:12 336:3
347:9 348:24
349:1 367:8 373:6
375:5
**talks** 184:18
243:19 275:9
**tang** 4:3
**tank** 364:8
**target** 209:5 253:1
254:13
**tariq** 2:21 16:19
17:23
**tariq.naeem** 2:23
**task** 41:11 134:3,5
134:24 135:13

136:4,25 137:16
137:20 158:23
160:15 170:16
172:14 173:3,6
178:6 198:19,24
206:9 218:12
223:8,18 243:18
303:3,14,17,23
305:2,15 306:14
306:19 307:10,24
375:11 379:10
381:12
**tattoo** 169:19
**taxes** 65:6 68:6
**taxing** 66:2
**taxpayer** 369:12
**teach** 106:18
346:11
**teachers** 161:13
**teams** 213:1,3
368:23
**teen** 338:15
**teenage** 108:15
**teenagers** 345:18
**teens** 160:10 339:8
**tell** 21:7 23:22
41:9,10 53:22
56:17 122:22
142:20 144:12
147:20 148:21,22
166:22 167:9
170:16,21 189:2
189:15 192:1
195:16 210:21
231:3,8 251:16
258:14 277:6
283:5 286:15
342:2 354:1 365:3
369:24 379:16
**telling** 112:8
144:25 172:17

174:15 212:11
285:4 358:15
**tells** 214:13
**ten** 47:25 49:14,23
59:7 90:23 186:11
274:25
**tend** 193:4 208:21
**tense** 101:3
**tenth** 4:18
**tenured** 76:16
**term** 59:4 266:5
311:15
**termed** 316:1
**terminal** 242:16
**termination** 18:13
97:9
**terms** 58:17
322:18 380:3
**terrible** 89:8
322:22
**terry** 179:22,23
**test** 47:24 154:16
369:1
**tested** 165:25
**testified** 161:24
204:23 208:18
243:9 261:22
287:23 295:16
303:5 332:23
333:7 346:15
357:3 360:3,23
361:13 366:6
369:11 373:10
**testify** 18:18
388:10
**testimony** 25:17
101:2 171:25
200:1 214:1
227:10 245:14
266:3 273:10
341:21 345:22

348:19 349:7
352:23 373:15,18
374:23 381:9,15
388:12,17 391:6,7
392:6,9,12
**testing** 43:10
**teva** 5:11 91:17
157:23
**thank** 17:21 19:22
106:23 171:21
284:8 285:7,10
316:22 320:11
351:23 370:24
371:1
**therapeutics** 5:2
91:13 157:21
**therapy** 370:7
**therese** 105:14
**thing** 95:6 100:10
126:18 132:11
147:23 153:4
169:24 184:23
212:6 224:23
264:14 283:23,24
302:19 306:9,20
306:22 322:19
323:1 329:8 330:6
353:8
**things** 30:13,14
33:2 36:22 37:12
43:18 58:25 69:19
103:23 106:23
113:24 125:12
127:17 132:9
147:16,21 148:7
159:2 161:15
163:17 184:21
208:5 217:6 232:7
312:12 339:17
348:16 355:24
356:2 362:6

381:19 384:25
**think** 19:20 20:19
22:3 23:24 24:8,9
25:21 26:4,7 27:7
31:11 35:11 36:14
37:21 49:19 62:10
68:24 74:4 78:20
89:3 105:7 110:19
117:13 120:2
124:9,24 131:1
133:18 136:21
151:16 153:4
155:2 157:13
165:11 167:21
168:17 169:17
172:3 173:11
175:25 176:1,23
177:5 181:20
196:22 203:12
206:13 209:19
210:13 218:11
224:20 230:8
231:13 239:3
243:9,12 245:21
246:5 249:8,10
250:22 251:14
252:12,23 253:6
253:15 255:19
257:13 258:7,8,10
259:23 261:25
268:7,8 273:9
274:4 275:8 276:3
282:5 288:6,9
291:8,22 293:20
296:6 297:7
298:10 299:20
302:6,17 303:5
305:23 307:22
308:13 311:14
319:8 328:2,14
329:22 332:13

335:20 336:18,21
336:22 343:24
345:9 346:12
349:18 350:18,24
351:7 358:10
360:3,23 363:23
369:11 373:21
377:23 380:2,8
383:19 385:5
**thinking** 169:16
182:6 247:22
252:14
**thinks** 276:12
**third** 306:24 312:4
**thirty** 390:18
**thorough** 354:22
**thought** 83:19
119:14 170:3
172:8 174:13
208:12 210:1
213:20 231:2
234:12 247:24
248:3,11 276:5
314:11 345:13,16
365:10
**thousand** 56:13
78:21 79:13,18
81:11,17 83:2
**three** 3:8 18:9
25:10 32:23 39:14
63:16,24 67:11
77:3 78:6 99:22
99:22,25 106:19
111:10 117:12
143:10 160:19
163:12 196:23
219:11,11 239:9
253:7 259:8 270:7
291:5 332:17
353:25 370:12

**throw** 282:15
284:23 285:2
**throwing** 191:18
**tick** 158:24
**tie** 71:19 84:13,14
90:7 153:3
**tied** 52:15 151:10
306:13
**time** 15:2,6 18:7
19:9,19 20:13,18
22:10 24:17 27:6
27:15,17,25 29:15
33:1 48:16 49:8
50:21,23 57:22
61:10,16 62:9,15
64:1 83:4,5 92:20
94:3,8,8,13,14
99:6 103:15,25
109:22 111:4,8
112:10,23 114:21
115:2,4 116:15
119:1 134:16
135:2 136:11,14
136:19,22 140:21
141:15 142:3
145:16 146:6
147:1 158:21
160:11 187:8
188:11 194:20
207:18 216:3
224:3 229:1
231:14 232:12,18
232:19,20 254:3
265:12,18 268:6
270:7,17,24
271:22 272:11,12
273:7 276:24
277:3,9 292:10
317:18 322:17,23
344:14 345:7
347:10,11,19

348:6 357:24
358:2 364:5
384:20 385:6
388:20
**times** 20:6,10
166:8 194:9
326:15 331:21
353:15 354:14
356:5 376:21
384:18
**timing** 23:25
**title** 32:13 110:18
111:7,22 113:15
233:12 300:20
377:17 378:12
380:11
**titled** 321:8 351:25
**today** 17:22,24
20:4,11 24:13
37:4 71:20 160:8
177:24 218:25
234:15,22 240:13
245:9,15 250:16
252:9 253:11
255:7 258:5,14
273:10 274:21
277:25 285:21
288:15 303:6
305:9 320:12,15
327:22 341:7
347:14 352:14
356:4 357:3 362:9
362:10,11 363:8
365:21 367:5
376:21 379:16
381:4,10,14
**todd** 106:10
**told** 30:8 31:15
58:4 109:10
110:11 124:25
145:8 153:8

169:20 170:17
175:5 213:18
258:5,10 265:14
280:12 358:12,12
364:12 366:18
**tomorrow** 338:19
**tons** 288:18
**tonya** 95:9 135:3
**tool** 87:21 288:4
**tools** 306:2
**top** 71:12 104:24
158:11 214:21,23
259:2 261:14
269:24 312:21
314:19 339:3
**topic** 338:18
**topics** 184:20
312:7
**total** 20:11 153:16
262:5 263:2 265:7
266:14 329:14
330:1 336:4,12
**totally** 155:17
230:2 364:25
**tough** 254:17
**tower** 5:3
**town** 79:25 89:4
143:2
**townships** 121:4
**tox** 275:7
**toxicology** 189:10
193:1
**track** 56:15 57:1
70:5,8 115:7
244:8 245:7
275:16,23 301:22
**tracked** 112:23
182:17,20 275:4
**tracking** 172:15
328:23 340:8

**tracks** 70:6
**trafficker** 253:3
**traffickers** 259:16
260:10
**train** 56:21,22
368:19
**trained** 52:25
132:12
**training** 43:4
54:16,21 55:3
58:22 69:18 70:25
98:7 130:7 131:20
146:9 158:12
**trainings** 130:10
**transcribed**
388:15 391:7
**transcript** 6:1
387:3,6,9,11
390:11,12 391:5
391:12 392:5,11
392:17
**transcription**
388:16
**transfer** 186:16,17
**transition** 124:3
127:6 210:11
**transitional**
126:19
**transitioned**
212:13
**translate** 19:4
**travel** 122:6
**treat** 292:13
**treated** 48:15 49:7
49:14 172:5
201:15 206:13
299:24
**treating** 175:6
**treatment** 39:5
43:2,5 44:5,7,23
45:17 46:23 47:18

48:10 49:24 50:12
50:14,24 51:1,6
52:18 53:1 58:15
59:2 85:5,8,20
86:4,13,15 119:10
131:18 174:11
176:24 183:25
201:17,21 202:4
203:10,17 208:20
211:18,24 238:19
249:3 250:1
266:21 283:19,20
294:11 306:3
308:5,9 309:1,19
309:25 364:9
369:2
**treats** 50:16
**tremendous**
131:15 298:10,12
**trend** 337:8
**trends** 133:15
337:2,14
**trial** 18:18 63:16
63:24,25
**tried** 160:23
252:18 255:18
297:2
**trouble** 79:21
167:21
**true** 137:23 280:7
280:13 288:11,12
288:15,17 299:22
299:25 300:5
301:16 303:8,16
303:19 310:16,23
311:9,12,13
312:18 315:25
317:7 319:1,12
326:18,21,24
330:13,21 331:1
333:1,12,19

334:16,18,21,24
334:25 336:15
388:16
**trust** 357:25 358:3
358:7
**truth** 388:10,11,11
**try** 19:17 40:13
42:12,15 59:14
74:18 90:4 118:8
132:5 140:1
216:11 230:21,21
250:25 253:21
254:13 262:20
275:16,22 282:3
306:2 343:4,7,10
354:22 356:20,21
366:21 377:23
**trying** 19:19 28:19
43:8 64:14 74:3
112:3,5 140:20
144:6 171:1
181:12 192:23
195:18 208:25
224:9,13 241:4
253:1 264:9
278:17 287:20
291:13 347:17
351:10 380:13
**tucker** 2:20 16:17
16:19
**tuckerellis.com**
2:23,24
**tully** 3:16 16:7,7
**turn** 143:10
162:20 171:22
227:22 232:5
258:21 261:12
266:2 366:12
**turned** 41:20 42:1
250:3

**turning** 146:3
284:19
**turns** 29:19
276:13
**twelfth** 3:16
**twice** 20:12
**two** 20:16 25:10
39:14,14 40:10
54:20 55:22 56:10
57:13 63:17 72:21
75:22 77:3,4
83:21 84:14 88:2
94:18 95:25 96:1
96:18 99:22,25
103:17 104:8
136:16 139:20
140:9 148:6 149:9
150:23 156:22
163:12 211:22
219:11 223:16,21
224:10 227:18
232:24 257:9
266:19 270:8
306:24 312:1,3
318:25 319:12
331:20
**twofold** 172:3
**tying** 312:4
**tylenol** 281:12
**type** 58:11 78:22
185:19 190:1
212:15 217:17
269:13 275:5
281:15 319:19
**typical** 317:25
**typically** 129:21
132:4 174:20
196:11

**u**

**u.s** 5:3
**uh** 19:2,3,3,22
21:16,19 24:23
29:1 65:18 114:14
304:21 312:25
325:17 332:8
**ultimately** 34:6
108:15 239:25
**umbrella** 33:16
**unable** 57:15
**unbelievable**
246:17 348:16
**unconscious**
368:22
**undergraduate**
107:15 231:18
**underinsured**
155:4
**underlying** 383:20
**underneath** 93:4
190:1 272:7
300:24 331:8
385:1
**understand** 23:16
28:5 38:1 59:14
80:20 170:25
210:8 212:19
246:19 249:16
250:20 251:11
253:4 257:7
258:13 271:24
273:13 281:2
285:3 292:22
350:18,20 355:21
361:3 374:16
379:21 380:11,13
382:13
**understanding**
59:3 81:9 134:6
134:19 136:9,24

176:5 184:22
205:3 220:24
239:2,4 243:22
263:10 264:5,7,16
264:22 265:16,22
271:18 273:6
274:20 278:3
279:3 292:8,17,23
295:7,12 297:16
297:24 324:19
361:24 373:20
**understood**
132:18
**undertake** 24:20
27:21
**undertaken**
146:10 326:12
342:25 368:10
**unfortunately**
40:19 119:2
144:12 356:18
**uninsured** 308:21
309:3
**unintended**
178:25
**unintentional**
325:12 328:6,18
329:4 330:9
**unit** 98:11 103:17
266:15
**united** 1:1 54:10
163:7
**units** 112:3 252:17
**university** 107:14
107:19 136:15
138:11 231:15,17
231:19
**unlawful** 349:3
**unlimited** 48:8
**unnumbered**
375:25

**unravel** 364:6
**untreated** 200:13
200:15,18,24
**unused** 339:7,12
**update** 196:14
**updated** 141:22
196:4 231:6
**upper** 373:1
**ups** 104:7
**upset** 140:3
**uptick** 188:3,9
214:21 215:3
**upticks** 187:22
**usage** 275:17
322:18
**use** 30:5 33:20
43:6 44:6 47:3
54:22 63:10,10
79:25 80:3,3
81:13 90:5 98:12
98:16 100:25
127:12 140:25
147:4,10 163:13
163:15,16,18
164:5,16 166:7,11
166:13,23 167:18
167:22,25 168:8
168:21,23 169:21
175:8,12 177:17
179:4 183:4,9
184:4,5 189:19
195:1 197:9,15
202:1 206:14
215:18 247:22
248:8 250:2 251:8
274:4,7,8,21 275:3
294:20 301:23
310:9 338:13
345:23 347:13,14
348:6 349:2,24,25
350:13 352:9,9,25

**[use - way]** Page 66

355:23 362:21
368:21 371:7
377:2,2,6,14,14
378:24 380:7,22
380:22 386:8,9,13
**useful** 246:21
**user** 170:1 244:13
325:2 347:19
**users** 170:4 172:7
199:6 324:21
343:4,7,10 346:17
352:5,10,15,24
361:18 376:5 377:3
378:4 379:8,18
380:18,23 381:8
384:21,22 385:9
**uses** 187:16
188:22 347:11
**usually** 102:23
121:23 154:21
194:14 317:17,18
354:15,21

**v**

**v** 1:14 390:6 391:3
392:3
**vaccine** 43:9
**valid** 342:7,10
344:4,20
**validate** 187:17
188:24
**validated** 142:11
162:2 194:5
**validating** 193:8
**validity** 142:22
**value** 37:20 115:8
179:12,13
**vandetta** 5:20
**varies** 78:25
**various** 83:10
95:16 97:24 107:9
133:22 134:1

307:9 312:6
**vary** 78:24 96:5
**vendor** 143:10,11
143:12,13,14
**verbalize** 18:23
**verification**
192:24
**veritext** 390:1,7
393:1
**veritext.com.**
390:17
**versed** 78:5
**version** 28:16,24
67:12 107:8
**versus** 81:18 83:18
84:18 86:11 87:10
189:9 192:3,3
325:7
**vicodin** 280:22
**victims** 181:5,24
**victoria** 73:24,25
74:2,3,4 77:6,10
103:5 105:5
106:20
**video** 9:1 151:5,13
151:18
**videographer** 5:20
15:1 17:8 34:20
34:23 35:1 90:21
90:25 91:3 157:8
157:11 224:15,18
227:23 228:1
284:3,6 351:14,17
386:18
**videotaped** 1:19
**vietnam** 385:15
**view** 267:8 329:6
**villages** 121:4
**visit** 213:2 368:24
**visiting** 232:10

**vital** 67:24 68:2
293:21,25 328:21
329:3 330:17
332:14 358:13
**vivitrol** 43:6 47:7
48:12 49:10
**volunteer** 124:1,1
141:1 291:11
**volunteers** 140:22
**vote** 289:13
**vouchers** 122:7

**w**

**w** 2:21 46:3 94:12
319:6
**wait** 23:11 49:4
127:2 230:10,12
241:19 309:11
**waived** 390:19
**wake** 362:8
**walgreens** 237:4
238:10 279:22
**walk** 78:22 79:1
**walmart** 4:6 92:2
237:18 238:15
279:24
**want** 17:25 18:10
18:21 19:18,19,23
20:1 21:7 25:1
27:10,20 30:20
33:19,20 35:23,25
37:14 42:8 55:17
62:5 64:20 69:7
84:7 88:17 90:16
92:19 98:25 100:6
106:25 117:12
125:9 126:20
129:22 140:6
142:20 147:22
148:5 161:19
172:23 229:3
231:11 245:7

246:16,23 265:2
301:14 311:18
316:7 335:20
336:24 340:2
351:1,2 353:15
362:20 373:7
381:3
**wanted** 22:11
37:21 78:12 124:5
134:23 140:4
141:8 142:3 151:3
151:9 224:22
228:14 231:1
268:9 284:9
286:16,17 289:25
290:2
**wanting** 209:7
226:15
**wants** 121:11,12
**war** 385:15
**warehouse** 236:18
**warehouses**
236:15
**wares** 384:8
**warning** 205:15
**warnings** 150:12
222:13 294:6
**washington** 3:17
4:18 5:9,14
**water** 282:15
**way** 19:18 21:9
41:9 54:10 63:22
72:9 89:9 116:8
129:22 167:1
197:7,12 199:11
201:16 212:2
215:24 216:18,23
219:16 270:18
290:9 294:10
295:8 299:2 301:2
301:25 312:18

**[way - yeah]**

315:23 366:10 370:15 373:7

**ways**  249:3 250:3 254:14 350:20 384:11

**wc.com**  3:18

**we've**  229:12 353:15 366:24

**web**  340:20

**website**  7:21 8:8 244:19 256:20 261:5 268:16 269:4,10 289:4 340:15,21

**week**  20:15 94:5 94:15 302:6

**weekend**  210:15 245:19 246:14,18 251:8

**weekly**  195:11 196:19

**weeks**  106:4

**weigh**  121:7

**weight**  347:6

**weird**  162:21

**wendy**  1:25 388:6 389:14

**went**  35:15 94:9 104:14,20 106:8 106:17 107:13,16 107:17 108:7,22 109:5,18 124:23 139:13 140:22 143:14 154:5 171:12 208:1,11 231:14,16,19 268:5 284:17

**werner**  2:4 15:14 15:14

**west**  32:2 82:7

**western**  107:22 138:10 139:17 231:19 232:2

**western's**  138:21

**whereof**  389:5

**white**  223:13 254:12 372:25

**wholesalers**  340:25

**wic**  104:12,16

**widely**  266:20

**wildest**  385:4

**williams**  3:15,19 16:2,8

**willing**  307:22

**wilson**  2:16 15:16 15:16

**wing**  318:4

**witness**  2:3 15:5 17:9 285:10 302:12 311:14 353:10 371:1 388:9,13,15,18 389:5 390:8,11 391:1,4,11 392:1,4 392:15

**witness's**  387:2

**witness'**  390:14

**woe**  350:9

**women**  83:18

**word**  33:20 42:5 83:17 126:9 132:24 191:17 358:20 370:21 372:10

**words**  167:22 296:22 352:17

**work**  18:5 34:8 38:3 41:12 47:22 50:21 58:20 59:25 83:14 88:12 89:19

89:19 94:10 96:6 96:13,16 107:15 107:16 109:15,17 109:19 117:25 131:12 138:21 170:17 173:5 212:1 230:22 231:16 252:12 253:23 275:6 289:11 291:12 305:24 306:16 315:1 318:10 354:5 361:11,18 362:12 371:20 372:6

**worked**  71:21 78:2 94:8 107:25 117:7 128:23 133:13 134:4 232:8 252:21

**worker**  75:20 77:25

**workers**  75:15,23 366:24

**workgroups**  312:24

**working**  54:12 126:12 180:4 236:11 312:12

**works**  43:24 50:7 65:23 117:14 136:15 161:13 292:12

**world**  132:15 273:16

**worried**  169:18

**worry**  301:1

**worse**  253:14 255:2,10,13,15,19

**worth**  127:13

**wraparound**  100:20

**wreaked**  202:2

**write**  54:19 205:6 235:16,19 239:15 240:14,19

**writes**  296:4

**writing**  108:13 176:4 189:25 213:25

**written**  168:9 187:12 273:17 286:20 294:16 330:5 372:3

**wrong**  63:13 136:5 173:19 213:25

**wrongful**  18:13

**wrote**  123:3 172:23 213:20 290:21 339:6

**wv**  4:23

**x**

**x**  109:21 161:11

**y**

**yeah**  23:11 24:9 24:18 25:21 27:7 27:7 28:11 48:7 55:20 65:12 69:2 70:2,12 73:24 74:3 83:18,21 87:13 90:24 105:6 105:15 108:21 117:20 125:10 127:14 133:23 134:22 136:16 143:20 144:20 145:5 152:5 165:24 176:13 186:15 204:14 214:14 216:11

217:21 221:6
224:8 226:4
230:11 236:8
266:4 271:23
272:6 295:25
304:24 314:9
319:5 330:6
332:20 345:15
349:17 376:15
377:9 386:6
**year** 39:9 40:10
51:17 53:4,5 63:3
63:11,16 64:2,7
65:17 67:11 69:16
69:21,21 72:15
75:22 78:19 89:25
90:8 93:15 94:20
101:6 102:3,6
109:4 111:9
112:24 129:24
142:1 145:14
149:8 152:10
185:9 188:19
207:12,12 221:8
224:2 232:23
267:15,15 286:24
295:9 322:5
323:16 325:15
326:16 328:19
329:12 330:11,23
331:14 333:23,24
334:10 335:8
336:4,4,9,9,12,12
336:14,14
**years** 18:9 28:18
28:22 29:6,18,24
30:12 31:11,16,17
31:19,23 32:23,23
37:7 39:14,14
55:22 56:10,23
57:13 59:8,12

61:17 63:24 67:13
69:20 74:7 76:1
76:23 77:2 78:1,3
95:12 99:22,22,25
107:17 108:19
109:2 110:2
111:10,16 114:7
115:15 116:21
117:13 119:23
121:15 123:22
127:13,25 128:25
142:2 143:10
169:2 174:22
188:6 224:2
232:23,24 239:10
271:5 273:2
274:23 275:1
305:17 324:20
353:25 364:5
370:12,12,12,17
**yellow** 270:13
**yeses** 18:24
**yesterday** 21:2
**york** 5:18
**young** 310:8
345:19
**youngsters** 139:11
160:23 161:1
167:10,23 169:16
346:3
**youth** 7:6 98:15
137:25 139:1
142:10 144:5
159:14,23 166:1
181:17 346:7
**yvette** 39:11 74:10
104:25 135:3

| z |
| --- |

**z** 40:4
**zac.ciullo** 3:5

**zach** 15:19 16:4
**zachary** 3:3 4:12
**zero** 161:9
**zuckerman** 5:7
91:20 157:24
**zuckerman.com**
5:10

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.