Page 1

1              IN THE UNITED STATES COURT

2              NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4

5              ~~~~~~~~~~~~~~~~~~~~~

6   IN RE:  NATIONAL PRESCRIPTION    MDL NO. 2804

7   OPIATE LITIGATION

8                                Case No. 17-mdl-284

9                                Judge Dan Polster

10

11  This document relates to:

12  The County of Summit, Ohio, et al.,

13        V.

14  Purdue Pharma L.P., et al.,

15  Case No. 1:18-OP-45090 (N.D. Ohio)

16

17              ~~~~~~~~~~~~~~~~~~~~~

18           Videotaped deposition of

19         DOUGLAS A. SMITH, M.D., DFAPA

20            November 16, 2018

                 9:08 a.m.

21

                 Taken at:

22            Jackson Kelly PLLC

           50 South Main Street Street

23              Akron, Ohio

24          Wendy L. Klauss, RPR

25

Page 2

```
 1    APPEARANCES:
 2
              On behalf of the City of Akron, Summit
 3            County, and the Witness:
                   Motley Rice LLC
 4                 ANNE McGINNESS KEARSE, ESQ.
                   ANNIE E. KOUBA, ESQ.
 5                 JODI WESTBROOK FLOWERS, ESQ.
                   28 Bridgeside Boulevard
 6                 Mt. Pleasant, SC   29464
                   (843) 216-9140
 7                 Akearse@motleyrice.com
                   Akouba@motleyrice.com
 8                 Jflowers@motleyrice.com
 9        On behalf of Cardinal Health, Inc.,
          Co-Liaison Counsel for the Distributor
10        Defendants:
                   Williams & Connolly LLP
11                 PAUL BOEHM, ESQ.
                   BRAD MASTERS, ESQ.
12                 MELINDA JOHNSON, ESQ.
                   725 Twelfth Street, N.W.
13                 Washington, DC   20005
                   (202) 434-5000
14                 Pboehm@wc.com
                   Bmasters@wc.com
15                 Mkjohnson@wc.com
16        On behalf of Walmart Inc. F/K/A Wal-Mart
          Stores, Inc.
17                 Jones Day
                   EDWARD M. CARTER, ESQ.
18                 325 John H. McConnell Blvd.
                   Suite 600
19                 Columbus, OH   43215-2673
                   (614) 469-3939
20                 Emcarter@jonesday.com
                         -AND-
21                 Jones Day
                   MEREDITH KINCAID, ESQ.
22                 1420 Peachtree Street, N.E.
                   Suite 800
23                 Atlanta, GA   30309-3053
                   (404) 581-3939
24                 Mkincaid@jonesday.com
25
```

```
                                                    Page 3
 1     APPEARANCES, Continued:
 2          On behalf of Teva Pharmaceutical
            Industries Ltd.:
 3                Morgan Lewis, LLP
                  WENDY WEST FEINSTEIN, ESQ.
 4                One Oxford Centre, 32nd Floor
                  301 Grant Street
 5                Pittsburgh, PA   15219-6401
                  (412) 471-3490
 6                Wendy.feinstein@morganlewis.com
 7          On behalf of the Distributor Defendant
            McKesson Corporation:
 8                Covington & Burling LLP
                  BRYANT PULSIPHER, ESQ.
 9                One Front Street
                  San Francisco, CA   94111-5356
10                (415) 591-6000
                  Bpulsipher@cov.com
11
            On behalf of Johnson & Johnson and
12          Janssen Pharmaceuticals, Inc.:
                  Tucker Ellis, LLP
13                TARIQ M. NAEEM, ESQ.
                  RACHEL N. BYRNES, ESQ.
14                950 Main Avenue, Suite 1100
                  Cleveland, OH   44113
15                (216) 592-5000
                  Tariq.naeem@tuckerellis.com
16                Rachel.byrnes@tuckerellis.com
17
            On behalf of the Allergan Finance, LLC:
18                Kirkland & Ellis LLP
                  TUCKER HUNTER, ESQ.
19                300 North LaSalle
                  Chicago, IL   60654
20                (312) 862-2000
                  Tucker.hunter@kirkland.com
21
            On behalf of Teva Pharmaceutical
22          Industries Ltd.:
                  Morgan, Lewis & Bockius
23                ZACHARY A. LAZAR, ESQ.
                  77 West Wacker Drive
24                Chicago, Il   60601-5094
                  (312) 324-0000
25                Zachary.lazar@morganlewis.com
```

Page 4

1    APPEARANCES, Continued:
2         On behalf of Endo Health Solutions, Inc.,
          Endo Pharmaceuticals Inc., Par
3         Pharmaceutical, Inc., and Par
          Pharmaceutical Companies, Inc.,(FKA Par
4         Pharmaceutical Holdings, Inc.)
                  Arnold & Porter
5                 NEDA HAJIAN, ESQ.
                  777 south Figueroa Street
6                 44th Floor
                  Los Angeles, CA   90017-5844
7                 (213) 243-4000
                  Neda.Hajian@arnoldporter.com
8
          On behalf of Distributor
9         AmerisourceBergen Drug Corporation
                  Reed Smith, LLP
10                ANNE ROLLINS, ESQ.
                  Three Logan Square
11                1717 Arch Street, Suite 3100
                  Philadelphia, PA   19103
12                (215) 851-8100
                  Arollins@reedsmith.com
13                    ~   ~   ~   ~   ~
14    ALSO PRESENT:
                  Jim Torok, Videographer
15                    ~   ~   ~   ~   ~
16
17
18
19
20
21
22
23
24
25

1                    TRANSCRIPT INDEX

2     APPEARANCES:...............................    2

3     INDEX OF EXHIBITS .........................    6

4     EXAMINATION OF DOUGLAS A. SMITH, M.D., DFAPA

      By Mr. Boehm...............................   19

5     By Mr. Carter..............................  342

      By Ms. West Feinstein......................  376

6     By Mr. Boehm...............................  385

7     REPORTER'S CERTIFICATE.....................  402

8     EXHIBIT CUSTODY

      EXHIBITS RETAINED BY COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| Exhibit 1 | Curriculum Vitae of Douglas A. Smith, M.D., Beginning with Bates Label SUMMIT 925093 | 28 |
| Exhibit 2 | 2014 Annual Clinical Report for ADM Funded Programs and Services, Beginning with Bates Label SUMMIT 833675 | 58 |
| Exhibit 3 | 2018 Budget For the Summit County ADM Board, Beginning with SUMMIT 897931 | 70 |
| Exhibit 4 | August 14, 2017 Email From Jennifer Peveich, Beginning with Bates Label SUMMIT 902497 | 123 |
| Exhibit 5 | August 14, 2017 Email Exchange, Beginning with Bates Label SUMMIT 902513 | 126 |
| Exhibit 6 | August 18, 2017 Email Exchange, Beginning with Bates Label SUMMIT 902806 | 129 |
| Exhibit 7 | May 8, 2012 Agenda, Ohio's Opiate Summit | 131 |
| Exhibit 8 | Pamphlet Entitled The Role of the Physician in Prescription Drug Abuse, Beginning with Bates Label SUMMIT 930645 | 143 |
| Exhibit 9 | A Document From the Summit County Opiate Task Force, Beginning with Bates Label SUMMIT 821280 | 166 |
| Exhibit 10 | Email Exchange From February 2014, Beginning with Bates Label SUMMIT 105557 | 203 |
| Exhibit 11 | October 2016 Email Exchange Between Smith, Craig, and | 219 |

Page 7

1                  Skoda, Beginning with Bates ..
                   Label SUMMIT 153786
2
    Exhibit 12     October 4, 2016 DEA Press .... 228
3                  Release
4   Exhibit 13     Report of the Ohio .......... 234
                   Compassionate Care Task
5                  Force
6   Exhibit 14     A Slide Deck Entitled Facing . 241
                   the Opiate Epidemic: How We
7                  Got Here and What we Need to
                   do Next, Beginning with
8                  Bates Label SUMMIT 822287
9   Exhibit 15     2010 Final Report From an .... 247
                   Ohio Prescription Drug Abuse
10                 Task Force
11  Exhibit 16     A Document From 2012 from .... 282
                   the Ohio Department of
12                 Alcohol, Drug Addiction
                   Services
13
    Exhibit 17     October 10, 2017 Email From .. 291
14                 Caraffi, with Attachment,
                   Beginning with Bates Label
15                 SUMMIT 906717
16  Exhibit 18     May 2015 Email Exchange, ..... 307
                   Beginning with Bates Label
17                 SUMMIT 834829
18  Exhibit 19     March 2017 Email Exchange, ... 314
                   Beginning with Bates Label
19                 SUMMIT 887987
20  Exhibit 20     September 24, 2015 News ...... 322
                   Release From the Ohio
21                 Department of Health
22  Exhibit 21     2015 Ohio Drug Overdose Data . 332
                   Summary From the Ohio
23                 Department of Health
24  Exhibit 22     2016 Ohio Drug Overdose Data . 338
                   Summary From the Ohio
25                 Department of Health,
                   Beginning with Bates Label

Page 8

1                    SUMMIT 820711..................
2    Exhibit 23    Presentation Given by Dr. .... 367
                    Smith
3
     Exhibit 24    Composite Exhibit, Beginning . 372
4                    with Bates Label SUMMIT
                    880095
5
     Exhibit 25    December 2014 Email ......... 387
6                    Exchange, Beginning with
                    Bates Label SUMMIT 93592
7
     Exhibit 26    Surveying Ohio Physicians on . 391
8                    Opiate Prescribing
                    Behaviors, Beginning with
9                    Bates Label SUMMIT 839795
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 9

1                  INDEX OF VIDEO OBJECTION

2     OBJECT                                        PAGE

3     object...................................   23

4     object...................................   24

5     object...................................   30

6     Object...................................   31

7     object...................................   40

8     object...................................   48

9     object...................................   50

10    object...................................   50

11    object...................................   58

12    object...................................   61

13    Object...................................   62

14    object...................................   62

15    object...................................   62

16    objection................................   63

17    object...................................   64

18    object...................................   65

19    object...................................   87

20    object...................................   88

21    object...................................   92

22    object...................................   97

23    object...................................   98

24    objection................................  100

25    object...................................  102

Page 10

 1    object.......................................  104

 2    object.......................................  106

 3    object.......................................  106

 4    objection....................................  107

 5    object.......................................  112

 6    Object.......................................  113

 7    object.......................................  113

 8    object.......................................  114

 9    object.......................................  117

10    object.......................................  117

11    object.......................................  118

12    object.......................................  118

13    object.......................................  122

14    object.......................................  126

15    object.......................................  127

16    object.......................................  128

17    objection....................................  129

18    object.......................................  130

19    object.......................................  132

20    Object.......................................  137

21    object.......................................  138

22    object.......................................  139

23    object.......................................  139

24    object.......................................  140

25    object.......................................  141

Page 11

1    object.................................... 141

2    Object.................................... 141

3    object.................................... 142

4    object.................................... 143

5    Object.................................... 143

6    Object.................................... 150

7    object.................................... 150

8    Object.................................... 153

9    object.................................... 153

10   object.................................... 153

11   object.................................... 154

12   object.................................... 155

13   object.................................... 157

14   object.................................... 158

15   object.................................... 158

16   Object.................................... 159

17   object.................................... 160

18   object.................................... 161

19   object.................................... 162

20   object.................................... 163

21   Object.................................... 164

22   Object.................................... 164

23   object.................................... 165

24   Object.................................... 166

25   object.................................... 176

Page 12

1     object.................................... 186

2     Object.................................... 186

3     object.................................... 187

4     Object.................................... 188

5     object.................................... 189

6     object.................................... 190

7     object.................................... 191

8     object.................................... 194

9     object.................................... 194

10    object.................................... 195

11    object.................................... 199

12    object.................................... 202

13    object.................................... 203

14    objection................................. 207

15    object.................................... 212

16    object.................................... 213

17    object.................................... 216

18    Object.................................... 221

19    object.................................... 223

20    object.................................... 224

21    object.................................... 227

22    Object.................................... 228

23    Object.................................... 231

24    object.................................... 232

25    Object.................................... 233

Page 13

1    object..................................... 233

2    object..................................... 234

3    object..................................... 236

4    object..................................... 240

5    objection.................................. 242

6    object..................................... 243

7    object..................................... 245

8    object..................................... 248

9    Object..................................... 248

10   object..................................... 249

11   object..................................... 249

12   object..................................... 250

13   object..................................... 250

14   object..................................... 251

15   object..................................... 251

16   object..................................... 251

17   object..................................... 252

18   object..................................... 253

19   object..................................... 253

20   object..................................... 254

21   Object..................................... 257

22   object..................................... 258

23   object..................................... 260

24   object..................................... 261

25   object..................................... 262

Page 14

| 1  | object | 263 |
| 2  | object | 265 |
| 3  | Object | 266 |
| 4  | object | 267 |
| 5  | object | 269 |
| 6  | object | 270 |
| 7  | object | 271 |
| 8  | object | 274 |
| 9  | object | 275 |
| 10 | object | 276 |
| 11 | object | 278 |
| 12 | objection | 279 |
| 13 | objection | 279 |
| 14 | object | 281 |
| 15 | object | 284 |
| 16 | object | 286 |
| 17 | object | 288 |
| 18 | object | 291 |
| 19 | object | 294 |
| 20 | object | 295 |
| 21 | object | 297 |
| 22 | Object | 298 |
| 23 | object | 300 |
| 24 | object | 303 |
| 25 | object | 304 |

Page 15

```
 1    object...................................... 305
 2    Object...................................... 305
 3    Object...................................... 305
 4    object...................................... 306
 5    object...................................... 310
 6    object...................................... 312
 7    Object...................................... 318
 8    object...................................... 319
 9    object...................................... 321
10    object...................................... 322
11    object...................................... 324
12    object...................................... 331
13    object...................................... 341
14    object...................................... 347
15    object...................................... 349
16    objection................................... 350
17    object...................................... 351
18    Object...................................... 353
19    object...................................... 354
20    object...................................... 354
21    Object...................................... 355
22    Object...................................... 356
23    Object...................................... 356
24    object...................................... 357
25    Object...................................... 361
```

Page 16

```
 1     object.................................. 361
 2     object.................................. 362
 3     object.................................. 364
 4     object.................................. 365
 5     objection............................... 375
 6     Object.................................. 379
 7     Object.................................. 383
 8     object.................................. 385
 9     object.................................. 386
10     object.................................. 386
11     object.................................. 393
12     object.................................. 394
13     object.................................. 394
14     Object.................................. 397
15     object.................................. 397
16     Object.................................. 398
17     object.................................. 398
18     object.................................. 398
19     Object.................................. 399
20
21
22
23
24
25
```

Page 17

1           THE VIDEOGRAPHER:  We are on the

2      record.  Today's date is November 16, 2018.

3      The time is approximately 9:08 a.m.

4               We are here to take the videotaped

5      deposition of Doug Smith, in the case of

6      National Prescription Opiate Litigation, case

7      number 17 MD 2804, to be heard in the United

8      States District Court, Northern of District of

9      Ohio, Eastern Division.

10              Would counsel please state their

11     appearances for the record.

12              MS. KEARSE:  Anne Kearse, with

13     Motley Rice, on behalf of the County of Summit

14     and City of Akron.

15              MS. KOUBA:  Annie Kouba, of Motley

16     Rice, on behalf of the County of Summit and the

17     City of Akron.

18              MS. FLOWER:  Jodi Flowers, Motley

19     Rice, on behalf of the County of Summit, the

20     City of Akron, and the witness.

21              MR. CARTER:  Edward Carter,

22     Walmart.

23              MS. KINCAID:  Meredith Kincaid,

24     Walmart.

25              MR. BOEHM:  Paul Boehm, from

```
                                           Page 18
 1    Williams & Connolly, for Cardinal Health, and
 2    I'm joined by Brad Masters and Mindy Smith.
 3                MS. WEST FEINSTEIN:  Wendy West
 4    Feinstein, with Morgan Lewis, on behalf of the
 5    Teva defendants.
 6                THE NOTARY:  On the phone, please.
 7                MR. BOEHM:  I'm sorry.  I said
 8    Mindy Smith, but I meant Mindy Johnson.  I'm so
 9    sorry, Mindy.
10                MR. LAZAR:  Good morning.  This is
11    Zach Lazar, from Morgan Lewis, on behalf of the
12    Teva Defendants.
13                MR. HUNTER:  Tucker Hunter, from
14    Kirtland & Ellis, on behalf of Allergan
15    Finance.
16                MR. NAEEM:  Tariq Naeem, on behalf
17    of Janssen and Johnson & Johnson.
18                MS. HAJIAN:  Neda Hajian, from
19    Arnold & Porter, on behalf of the Endo and Par.
20                MS. ROLLINS:  Anne Rollins, from
21    Reed Smith, on behalf of AmerisourceBergen Drug
22    Corporation.
23                MR. PULSIPHER:  Bryant Pulsipher,
24    Covington & Burling, for McKesson.
25                THE VIDEOGRAPHER:  Please swear the
```

Page 19

1   witness.

2               DOUGLAS A. SMITH, M.D., DFAPA, of

3   lawful age, called for examination, as provided

4   by the Statute, being by me first duly sworn,

5   as hereinafter certified, deposed and said as

6   follows:

7    EXAMINATION OF DOUGLAS A. SMITH, M.D., DFAPA

8   BY MR. BOEHM:

9        Q.    Good morning, Dr. Smith.

10       A.    Good morning.

11       Q.    You and I introduced ourselves off

12  the record, but we will do it formally again on

13  the record.  Thank you for being here this

14  morning.

15             Could you please state and spell

16  your name, just for the record.

17       A.    Sure.  Douglas Smith,

18  D-O-U-G-L-A-S, Smith, S-M-I-T-H.

19       Q.    And what is your address?

20       A.    1867 West Market Street, Akron,

21  Ohio.

22       Q.    What is your understanding as to

23  why you have been asked to give deposition

24  testimony here today?

25       A.    Well, I work with the Summit County

Page 20

 1    Alcohol, Drug Addiction, Mental Health Services

 2    Board, and in my role since May 1 of 2012, part

 3    of that role has involved the -- working with

 4    the opiate epidemic and, as a result of that, I

 5    guess I have certain facts that are important

 6    to the case.

 7         Q.    Have you read the complaint that's

 8    been filed in this case?

 9         A.    No.  I did try to glance at the

10    table of contents, but I actually didn't read

11    the -- I got a sense of how broad it is.

12         Q.    Did you have an opportunity to

13    review the complaint before it was filed?

14         A.    No.

15         Q.    Nobody asked you to look it over?

16         A.    Never.

17         Q.    Do you know who wrote the

18    complaint?

19         A.    I don't think that -- I literally

20    looked at it two days ago, so I don't think I

21    know who wrote it, no.

22         Q.    When did you first learn that this

23    lawsuit was going to be filed?

24         A.    We had a -- so ADM board has a

25    board of directors, and we had a meeting with

Page 21

1    them -- well, actually, I had to leave the room

2    because our director, Jerry Craig, was in the

3    room, but they had -- they went into executive

4    session.

5              This was probably, geez, it might

6    even be early in 2018, not real long ago, and

7    they met to determine whether ADM was

8    officially part of the County of Summit for

9    this purpose, because we are kind of separate,

10   because we have our own board of directors.

11             But anyway, somewhere, it wasn't

12   real, real long ago, it might have been -- it

13   probably was from our board meetings in 18.

14        Q.    So is that meeting sometime in

15   early 2018 the first time you learned about the

16   existence of this lawsuit?

17        A.    Yes.  It was pertaining to us, yes.

18   I had heard, you know, through the media that

19   at some point there might be a lawsuit, but I

20   didn't think about it much and certainly didn't

21   expect we might be first.

22        Q.    You said the purpose of lawsuit --

23   or I'm sorry -- the purpose of that meeting

24   that you recall was to determine whether or not

25   the ADM board was part of Summit County or not?

1    A.    Because of the weird -- and I don't

2  pretend to understand it, I'm not the director,

3  and I don't deal with anything nonclinical, so

4  I think it is just to make sure that we were

5  going to be working with the Count of Summit

6  together, as part of the fact finding.

7    Q.    Is the ADM Board for Summit County

8  a part of county government?

9    A.    We are, but as -- not 100 percent,

10  because our director reports to a board of

11  trustees, as opposed to reporting to our county

12  executive.

13    Q.    When you say, "Not 100 percent,"

14  can you tell us more what you mean by that?

15    A.    I just did.  That's all I know.  So

16  in other words, some departments report

17  directly to the county executive, and ADM does

18  not report directly to the county executive,

19  because we have a structure of 14 board

20  members, appointed by both the county and the

21  state, that sit on the board, and then our

22  director reports to them.  He does not answer

23  to the county executive.

24    Q.    You said that you had to leave the

25  room at that meeting?

1        A.    When they go into executive

2   session, that means it is Jerry Craig, our

3   director, and the board members, and then if

4   they had invited guests, whoever they were.

5              So they have a discussion that's

6   not public.  Otherwise, our meetings are

7   public.

8        Q.    Understood.  So when you talk about

9   the board, you are talking about the board of

10  directors for the Summit County ADM Board?

11       A.    Correct.  It's confusing.  We've

12  used the board twice, but, yes.

13       Q.    And you are not a member of the ADM

14  Board board of directors?

15       A.    Correct.  I'm a staff member.

16       Q.    And do you know what the

17  determination that was -- let me strike that

18  and start over.

19             Do you know what determination was

20  made at that meeting as to the question of

21  whether or not the Summit County ADM Board

22  would be considered part of Summit County for

23  purposes of this lawsuit?

24             MR. KEARSE:  Object to form.

25       A.    I believe the answer was yes,

1    because I'm here today talking to you, so...

2         Q.    Did you have an opinion about that?

3         A.    Not at all.  That's not clinical.

4    Everything I do is clinical.

5         Q.    Has anybody ever asked your opinion

6    about whether or not this lawsuit should be

7    filed?

8         A.    Nobody.

9         Q.    Do you have an opinion about that?

10            MR. KEARSE:  Object to form.

11        A.    I have never really given it

12   thought.  I under -- having grown up in the

13   Baltimore/DC area, I was aware of, like, the

14   big asbestos cases and those kind of things.

15   So I kind of understand a little bit about

16   class action, but I don't have an opinion about

17   the lawsuit, per se.

18        Q.    Do you know whose decision it was,

19   ultimately, to file the lawsuit on behalf of

20   Summit County?

21        A.    I do not.

22        Q.    Have you ever given deposition

23   testimony before today?

24        A.    Yes.

25        Q.    How many times have you given

Page 25

1    deposition testimony?

2          A.    Maybe five or six.

3          Q.    And what are the contexts in which

4    you have been asked to give deposition

5    testimony, prior to today?

6          A.    All of them -- all of them have

7    part -- been due to my private forensic

8    psychiatry practice, and they have been in

9    legal cases that I have been -- in that case,

10   all of them except for one, I was an expert

11   witness.

12          One of them I was a fact witness,

13   but it was because I had been an expert witness

14   for -- they never let me finish the review, but

15   for a capital murder defense, and basically I

16   was a fact witness for a new set of attorneys

17   who were making the argument that the first set

18   of attorneys did not do a good job defending

19   the person against the capital crime.

20          Q.    Understood.  In that instance, you

21   ended up not testifying, did I --

22          A.    I was a fact -- in that case, I was

23   a fact witness, because I actually had never

24   finished my interview, let alone the paper

25   review, to give an opinion.

Page 26

1              They wanted to know that fact, "Oh,
2    so they didn't even let you finish."  That was
3    germane to their case against the lack of
4    defense by the first set of attorneys.
5         Q.    Go it.  You also said you have been
6    retained as an expert witness in matters, and
7    that is what resulted in your deposition?
8         A.    Correct.
9         Q.    And that's happened, did you say,
10   about four or five times?
11        A.    Yeah.  Maybe -- it's probably four,
12   it may be five times ever.
13        Q.    Have you been retained by
14   plaintiffs lawyers, defense lawyers, or both --
15        A.    Both.
16        Q.    -- in your capacity as an expert
17   witness?
18        A.    Both.
19        Q.    When was the last time that you did
20   deposition testimony?
21        A.    I believe earlier this year.
22        Q.    As an expert?
23        A.    Yes.
24        Q.    What did the case involve?
25        A.    Let me think about which one that

                                                  Page 27

1    was.  I believe that was a police case, so I

2    train the crisis intervention team officers in

3    Summit County.  There aren't a lot of

4    psychiatrists in the country that do that.

5              So I am sometimes asked to look at

6    a case of a bad outcome with a police officer

7    or a sheriff's deputy.  So this was a similar

8    kind of situation, where I was asked, and it's

9    not settled yet, so I probably can't officially

10   give you all the details, but basically they

11   asked my opinion about CIT training, could it

12   have prevented the bad outcome, that kind of

13   information.

14        Q.    And were you a retained expert in

15   that case?

16        A.    Yes.

17        Q.    Who retained you?

18        A.    In that case, it was the plaintiff.

19        Q.    Do you get paid by the hour, when

20   you do that work?

21        A.    Yes, I do.

22        Q.    How much do you charge?

23        A.    $400.

24        Q.    Now, we have your CV here, and I'm

25   going to mark that as Exhibit 1, for purposes

Page 28

1    of your deposition.

2                    - - - - -

3               (Thereupon, Deposition Exhibit 1,

4               Curriculum Vitae of Douglas A.

5               Smith, M.D., Beginning with Bates

6               Label SUMMIT 925093, was marked for

7               purposes of identification.)

8                    - - - - -

9         Q.    Dr. Smith, is this a copy of your

10   curriculum vitae?

11        A.    Yes, it is.

12        Q.    And you will see, by the numbers

13   down there in the bottom right-hand corner of

14   the document, that this is something that was

15   produced to us by lawyers for Summit County.

16        A.    Uh-huh.

17        Q.    Is this the most current version of

18   your CV?

19        A.    Yes, it is.

20        Q.    If you would turn to the second to

21   the last page.  In the bottom right-hand

22   corner, it's the page number that ends in 98 --

23        A.    Yes.

24        Q.    -- do you see that?

25        A.    Uh-huh.

1          Q.     You make reference to some

2     presentations that you have given in your

3     professional capacity, correct?

4          A.     Correct.

5          Q.     And you say you have made over 70

6     presentations, yes?

7          A.     Yes.

8          Q.     And you have made those

9     presentations to various audiences on various

10    topics --

11         A.     Yes.

12         Q.     -- right?

13                These are topics, presumably, on

14    which you have some level of training and

15    expertise that you are informing others about?

16         A.     Yes.  Correct.

17         Q.     It looks like most of these, not

18    surprisingly, relate to your work as a

19    psychiatrist?

20         A.     Yes.

21         Q.     At the bottom of the list, the next

22    to the last item that you list is Basics of

23    Court Testimony --

24         A.     Yes.

25         Q.     -- do you see that one?

Page 30

1          A.     Uh-huh.

2          Q.     Can you tell us more about that?

3          A.     Sure.  So for many -- you can see

4     from the CV, for many years I worked at the

5     state psychiatric hospital, most of those years

6     as the medical director.

7                 Many times our psychiatrists have

8     to testify in probate court for civil

9     commitment hearings.  So I would train the

10    psychiatrists on, kind of, how to do that, what

11    to say, how to answer questions, that kind of

12    thing.

13         Q.     Can you give us some examples of

14    the kinds of things that --

15         A.     Sure.  Well, I would --

16                THE NOTARY:  Wait a minute.  You've

17    got to let him finish the question before you

18    start please.

19         "Can you give us some examples of the

20    kinds" --

21         Q.     -- the kinds of advise that you

22    would be giving to your audience, in that type

23    of presentation?

24                MR. KEARSE:  Object to form.

25         A.     So basically, I would give them a

1    little bit a background.  I would talk about

2    the underpinning of civil commitment, Addington

3    versus Texas, Supreme Court case, and so forth,

4    so they had some understanding of what was

5    going on, and then basic talk about just say

6    the facts and make sure you have got the

7    records with you, and that kind of thing.

8         Q.    You said you would kind of give

9    them some advice about how to answer

10   questions --

11              MS. KEARSE:   Object to form.

12        Q.    -- what did you mean by that?

13        A.    Just what -- just that they need to

14   talk about the actual facts of the case so they

15   would -- we have a thing called a pink slip in

16   Ohio.  I would make sure they read the pink

17   slip, so they give the actual information about

18   why the person first came to the hospital.

19              So basically just -- many of them

20   get nervous.  It's really more about helping

21   them not be nervous, when they are testifying,

22   not about always say this or that.  It's not

23   that kind of detail.

24        Q.    Got it.

25        A.    That's why it's basics.

Page 32

1          Q.    And have you testified in court
2     before?
3          A.    Yes.
4          Q.    How many times have you done that?
5          A.    Well, civil commitment, many times.
6     In my private forensic world, three or four.
7     Most of the cases settle long before deposition
8     or even trial.
9          Q.    When was the last time you
10    testified in a court proceeding?
11         A.    It would have been also earlier
12    this year, in Georgia.
13         Q.    In Georgia?
14         A.    Uh-huh.
15         Q.    And that's the case where you were
16    retained by plaintiff's counsel as an expert?
17         A.    Yes.  In that -- yes.  In that --
18    so it was actually the general capital defense
19    group for Georgia itself defending a person
20    against a capital murder of a police officer,
21    and in that case, my testimony actually really
22    only was about CIT.  I didn't actually talk
23    about the defendant at all, because I never got
24    to evaluate him.
25         Q.    Got it.  Let's turn to the front of

Page 33

1     your CV, and if we get through your education

2     and work history, just for a few minutes --

3          A.    Sure.

4          Q.    -- that might be helpful.

5          A.    Uh-huh.

6          Q.    I'm just going to help the court

7     reporter here, and I should have said this at

8     the beginning.  As you notice and you know from

9     your prior experience, the court reporter is

10    here typing up everything each of us says.

11         A.    Yes.

12         Q.    And it's hard for her to do that if

13    one of us is talking while the other is still

14    finishing a thought.  I sometimes make that

15    mistake, you will probably do it, and we will

16    just do our very best to wait until one person

17    is done before the other starts talking.

18              MR. KEARSE:  I may have an

19    objection once in a while as well too, but you

20    will be able to answer, unless I instruct you

21    not to, but sometimes it may be a three way, at

22    times.

23              MR. BOEHM:  I certainly did not

24    mean to cut you out of that, Anne, in any way.

25         Q.    Okay.  So you went to the

Page 34

```
 1    University of Maryland at College Park,

 2    correct?

 3         A.    For undergraduate, yes.

 4         Q.    For undergraduate.  And for medical

 5    school?

 6         A.    Actually the medical school was in

 7    Baltimore.  So they are, I don't know, 40 miles

 8    apart or something.

 9         Q.    And you said you are from the

10    DC/Maryland area --

11         A.    Yes.

12         Q.    -- correct?

13         A.    That's correct.

14         Q.    That's where you grew up?

15         A.    Yes.

16         Q.    You majored in pre-medicine and

17    psychology, correct?

18         A.    Correct.

19         Q.    Why did you select that major?

20         A.    Actually, I started, -- I thought

21    medical school early on, but I started as a

22    chemistry major, until I took an intro

23    psychology class and it -- I don't know, I

24    really liked the content, and that changed the

25    whole path that I took.
```

Page 35

1          Q.    Did you know when you entered

2     medical school that you wanted to go into

3     psychiatry?

4          A.    I did, but I was actually open to

5     other -- liking other things, and I did like

6     other things, but in the end, psychiatry was

7     the winner.

8          Q.    And that's what you did your

9     residency and fellowship in, right?

10         A.    A residency in psychiatry.  I did a

11    forensic fellowship specifically about both

12    civil and criminal evaluations, testimony, and

13    so forth.

14         Q.    And you're board certified in

15    psychiatry and in forensic psychiatry, correct?

16         A.    Correct.

17         Q.    What does it mean, that you are

18    board certified in those areas?

19         A.    It means that you -- it's not

20    required, but some of us choose to do it.  We

21    do some extra -- often extra education, like

22    the forensic fellowship, and then in

23    psychiatry, when I did it, you had to do a

24    written exam, a national examination, pass that

25    examination, then you had to actually do an

Page 36

1   oral examination in front of several other

2   psychiatrists of a -- a randomly assigned

3   patient at a randomly assigned site.  I was in

4   Chicago for that.

5               So you have to make it through

6   that.  That gets you board certified in

7   psychiatry.  Forensic psychiatry is an

8   additional test, national test, all put on by

9   the American Board of Psychiatry and Neurology.

10       Q.    What is forensic psychiatry?

11       A.    Basically any intersection between

12  psychiatry and the law, although forensic

13  actually means public forum, so it really, to

14  me, includes teaching, educating the public and

15  others.

16       Q.    Why did you choose to specialize in

17  forensic psychology -- I'm sorry, forensic

18  psychiatry?

19       A.    Psychiatry.  During medical school

20  I did a rotation at -- I think it's -- was the

21  first, actually, court psychiatric clinic in

22  the country, which happened to be in Baltimore,

23  Maryland.

24               The grandfather of forensic

25  psychiatry, Jonas Rappaport, ran the court, and

Page 37

1    actually he was the one who started the

2    American Academy of Psychiatry and the Law.

3    That's why I refer to him as the grandfather of

4    forensic psychiatry.

5             I got to watch evaluations and --

6    as well as actually tapes of -- when there were

7    no evaluations, tapes of the Jeffrey Dahmer

8    trial and was -- really enjoyed the interaction

9    between them, all the legal issues, as well as

10   the psychiatric issues.

11        Q.    Did you have some professional

12   objective in mind, when you decided to

13   specialize in forensic psychiatry?

14             In other words, did you have some

15   particular type of work you hoped to do with

16   that accreditation?

17        A.    No.   I don't think I thought about

18   that far in advance.   I was fascinated by the

19   topic.   I was still, kind of, in the mindset of

20   getting educated, so I, thankfully, got the

21   fellowship.   There are very few of them in the

22   country.

23             I did the fellowship, which was

24   really a Johns Hopkins/Maryland combination,

25   and after that, I think it has helped me in

1    political work as well as in, obviously, some

2    occasional forensic work.

3           Q.    What percentage of your work, over

4    the course of your career as a psychiatrist,

5    has been in a clinical setting?

6           A.    All of it.

7           Q.    All of it.

8                 Would you characterize the work

9    that you do for the Summit County ADM Board as

10   clinical work?

11          A.    Almost all of it.

12          Q.    You are licensed to practice

13   medicine in the State of Ohio, correct?

14          A.    Correct.

15          Q.    Have you ever been licensed to

16   practice medicine in any state other than Ohio?

17          A.    Maryland, when I was there, and

18   officially made it -- I had to do some

19   paperwork to make it inactive, but I could, if

20   I moved back, I could reactive it.

21          Q.    It is inactive now, but --

22          A.    Correct.

23          Q.    -- you have some kind of status

24   there; is that fair?

25          A.    That's fair.

Page 39

1          Q.     You also have the letters DFAPA

2     next to your name.  Can you tell us what that

3     means?

4          A.     Sure.  So that's a Distinguished

5     Fellow of the American Psychiatric Association.

6     That means that I have done a fair amount of

7     service work on behalf of the -- mostly the

8     Ohio Psychiatric Physicians Association, OPPA,

9     advocacy and chairing committees and things of

10    that nature, and if you do enough of that over

11    the course of time, you're able to get some

12    letters of recommendation from colleagues and

13    then apply for that.

14         Q.     Okay.  Are you licensed to

15    prescribe medications to patients?

16         A.     Yes.

17         Q.     How regularly -- how regularly do

18    you do that?

19         A.     I have a small private practice,

20    half a day a week, where I actually treat

21    patients directly.

22         Q.     Do they come to you in a private

23    office?

24         A.     Yes.

25         Q.     Is that like a therapy setting?

Page 40

1        A.    Well, I -- there is a psychologist

2    who created a large practice around Worker's

3    Compensation cases, and so he -- I don't work

4    for him, but the practice has a lot of offices

5    around the state, and they were looking for

6    psychiatrists.  So I go to one of those offices

7    three afternoons a month and one of the other

8    offices the other afternoon a month, so

9    basically once a week.

10        Q.    And are all of these cases Worker's

11    Comp related cases?

12        A.    Everyone of them.

13        Q.    So tell us more about what you do

14    in relation to what the patients are needing?

15            MR. KEARSE:  Object to form.

16        A.    So it's direct patient care.  So my

17    official role is managing their medications

18    safely.  Most of the patients have an allowed

19    condition, which is the wording they use when

20    they have vetted what there illness is; if it's

21    in the depressive disorder or anxiety disorder

22    range or overlap, occasionally something more

23    severe like schizophrenia, but most of them in

24    that range are in that range, plus PTSD, I do

25    treat some correction officers and other

1    officers that have work injuries that end up on

2    that system.

3         Q.    Does any of your work involve

4    helping a patient make or sustain a claim for

5    Workers' Compensation?

6         A.    None of mine does, no.  There

7    are -- I think the practice has a couple of

8    psychologists who will do reports to either

9    allow -- add an allowed condition or argue to

10   allow a condition, but all of my stuff is

11   direct care, and that's it.

12        Q.    Are you compensated by the practice

13   itself, or how do you get compensated for that

14   work?

15        A.    So I -- the practice has a separate

16   billing company.  So I submit my notes to the

17   billing company, they send them out, the checks

18   all come to me, then I pay an overhead fee to

19   the billing company, basically, each month.

20        Q.    On the second page of your CV,

21   there is a reference to Private Practice in

22   Forensic Psychiatry.

23        A.    Yes.

24        Q.    Is that the category that we are

25   talking about now?

Page 42

1          A.    It would be the one above that,

2     Private Practice in Psychiatry.

3          Q.    I see.  And is this something that

4     you -- is this a business that you own?

5          A.    Yes.  I didn't incorporate it or

6     anything.  It's just Doug Smith M.D.

7          Q.    You don't have any partners working

8     with you in that --

9          A.    No, or staff.

10          Q.    And the private practice in

11     forensic psychiatry that I first looked at,

12     that has to do with your work as an expert

13     consultant; do I understand that correctly?

14          A.    That's correct.

15          Q.    Does it have to do with any work

16     outside of your work as a retained expert in

17     litigation?

18          A.    No.

19          Q.    What medication or medications do

20     you most commonly prescribe to patients in your

21     practice?

22          A.    Sure.  It would be -- it wouldn't

23     be exclusively.  It would be antidepressants,

24     occasionally antianxiety medications,

25     occasionally medications to treat insomnia.

Page 43

1    That's it.

2         Q.    Have you ever prescribed any

3    controlled substance?

4         A.    Benzodiazepines, like Valium,

5    Ativan, yes, that would be -- and I have not

6    prescribed stimulants, I have not prescribed

7    opiates, I have not -- that's it.

8         Q.    All right.  If we turn over to the

9    following pages of your CV, we see a little bit

10   more about your work history, right?

11        A.    Yes.

12        Q.    And if you start at the bottom,

13   because it looks like they are kind of in

14   reverse chronological order here, you started

15   with an entity called Northcoast Behavioral

16   Healthcare, correct?

17        A.    Correct.

18        Q.    Does that mean that was the first

19   job you took when you were completed with --

20   when you completed your fellowship?

21        A.    That's correct.

22        Q.    What is Northcoast Behavioral

23   Healthcare?

24        A.    So the state psychiatric hospitals,

25   which are probably -- were 60 percent then,

1    about 70 percent forensic now, my forensic

2    interest, I sought work in a state psychiatric

3    hospital, for that interest.

4              So this was a campus in Toledo.

5    Northcoast was three of the state psychiatric

6    hospitals in Ohio, and they, because of stigma

7    and so forth, the whole system got rid of the

8    word "psychiatric" and so forth and the names,

9    and in this case we were Northcoast Behavioral

10   Healthcare.

11       Q.   Were you working with patients who

12   were -- who were living at the hospital, or

13   were these people who could come and visit you

14   and then go back home?

15       A.   In Toledo, it was specifically

16   people who were living in the hospital.

17       Q.   And what kind of work did you do

18   there at Northcoast?

19       A.   Mostly direct care of patients on

20   two -- we had four units.  Two of the units

21   were forensic.  I did also some clinical

22   administrative work, because there were no

23   other forensic psychiatrists who actually had

24   the training.  So I revamped the system and set

25   it up so people could actually get out of the

Page 45

1   hospital eventually and help the process.

2          Q.    How did forensic psychiatry come

3   into play in the context of treating

4   psychiatric patients in a psychiatric hospital?

5          A.    So in the state system, the

6   forensic mostly refers to people who have been

7   found not guilty by reason of insanity, using

8   an Ohio term, and/or not competent or possibly

9   not competent to stand trial.

10              So we would treat individuals to

11  help treat their illness, we would work with

12  the courts a lot around the NGRI population,

13  and eventually many of them would be released

14  to the community on an out-patient program

15  called conditional release, which is not what I

16  was doing.  I was doing the inpatient.

17              The competency to stand trial, you

18  know better than I the laws, but we have a

19  right to a fair trial, and it's not fair if you

20  don't understand what's going on or can't work

21  with your attorney.  So we would treat

22  individuals to help restore their capacity to

23  have a fair trial, and then they might go back

24  to jail and then to trial.

25          Q.    Would you sometimes be called upon

1    to render an opinion as to the competency of

2    somebody who might need to stand trial?

3         A.    Yes.

4         Q.    Was that a routine part of your

5    job?

6         A.    Yeah.  That's what we were -- we

7    had to do that, as well as occasionally the

8    opinion about sanity legally.

9         Q.    What do you mean, "Occasionally the

10   opinion about"?  You would offer an opinion in

11   a court of law as to whether or not a criminal

12   defendant was sane?

13        A.    Using the legal term, yes, we

14   would, yes.

15        Q.    Would you be a witness for the

16   state, in that kind of proceeding?

17        A.    That's correct, yeah.  We would be

18   the neutral, working directly for the judge, as

19   opposed to either plaintiff or prosecution.

20        Q.    During your time at Northcoast --

21        A.    Or defendant.  Sorry.

22        Q.    I'm sorry?

23        A.    I meant defendant or prosecution,

24   but, yeah.

25        Q.    Okay.  During your time at

Page 47

1    Northcoast, did you have any oversight or

2    direct responsibility related to the use of

3    opioid medicines?

4         A.    I would say yes to that.  So if you

5    look further up the CV, I eventually became the

6    medical director for all.

7              Three of our psychiatric hospitals,

8    Toledo, downtown Cleveland, and then

9    Northfield, which is the main one at this point

10   for Northcoast, and three outpatient programs.

11             So we did have a group of

12   pharmacists, and ultimately the head pharmacist

13   did report to me.  So I would have had

14   oversight.  Not that we prescribed a lot of

15   opioids there, but yes, I would have had

16   oversight of that, yes.

17        Q.    Did you prescribe some opiates to

18   patients in these psychiatric hospitals?

19        A.    I didn't directly, because by then

20   I was in that medical director role, but it did

21   happen.

22             We had officially 3.7, but 4

23   internal medicine -- sorry -- three internal

24   medicine, one family medicine person, they

25   would do that prescribing.

Page 48

1      Q.    What were the occasions when

2  opiates might be prescribed to a psychiatric

3  patient, under your direction as the medical

4  director for these psychiatric hospitals?

5            MR. KEARSE:   Object to form.

6      A.    Well, patients would come, and we

7  would do a process called medical clearance, to

8  make sure they didn't have a serious physical,

9  medical concern that might compromise their

10  health, because we didn't have cardiac

11  telemetry to monitor their hearts and all that.

12  It was all very -- we didn't do IV fluids.

13            So we needed, basically, physically

14  healthy people, but some of them would come in

15  already prescribed opiates for pain.  We were

16  not the place that started them, but if they

17  came in with a known back injury, and they were

18  going to be in the hospital for days or weeks,

19  forensically, months perhaps, then our doctors

20  would often -- we would send them out to

21  specialty clinics, usually at MetroHealth if

22  Cleveland, or Toledo would be University of

23  Toledo, and then if we got recommendations that

24  they needed ongoing medications, our primary

25  care doctors would continue those.

Page 49

1          Q.    Have you ever prescribed an opiate,

2     over the course of your career?

3          A.    I don't recall ever doing it.  If

4     it happened, it might have been in that Toledo

5     hospital, years ago, direct -- directly caring

6     for patients.

7          Q.    When did you first learn about the

8     class of medications sometimes referred to as

9     opioids?

10         A.    Medical school.

11         Q.    What did you learn about opioids in

12    medical school?

13         A.    Medical school, for me, would have

14    been -- I finished in 1993, so it was a while

15    ago, but basically we learned all the classes

16    of medications, we had psychopharmacology

17    classes and, quite frankly, most of what I

18    learned was they were for pain, they were

19    really mostly for extreme pain, cancer pain,

20    end-of-life pain, and that we should be careful

21    with them, because people could become

22    addicted.

23         Q.    So you learned in medical school

24    that opioids can have addictive properties?

25         A.    Yes.

Page 50

1      Q.     Is that something that you think is
2    commonly taught in medical schools?
3             MR. KEARSE:  Object to form.
4      A.     I don't teach that in medical
5    schools.  I'm assuming they haven't stopped
6    teaching it though.
7      Q.     Did Northcoast Behavioral
8    Healthcare, during the time that you had
9    oversight as the medical director, have any
10   prescribing guidelines in place for the
11   prescribing of opioid medications?
12     A.     I don't believe so.
13     Q.     Is it fair to say that the
14   prescribing of opioid medications was left to
15   the discretion of the primary care physicians
16   who were interfacing directly with patients?
17             MR. KEARSE:  Object to form.
18     A.     I would say mostly.  And the reason
19   is that we did regular reviews of what was
20   being prescribed of all types of medications
21   across our system, and if we saw anything that
22   appeared to be overprescribing or needless
23   prescriptions, then we would have discussions
24   about that.
25     Q.     Did that ever happen, in the

Page 51

1    context of your physicians prescribing opioid
2    medications?
3         A.    One time.  We -- my head pharmacist
4    came to me, and I couldn't tell you the year,
5    but 2006 or something, came to me and
6    said -- let me step back.
7              I had physicians on call admitting
8    patients telling me, "I admitted another person
9    from Lake County," a county up north here, and
10   it was rare that we had anybody on opiates, but
11   what happened was they had several doctors tell
12   me, in the course of a short time, all these
13   patients were from Lake County.
14             So I asked that pharmacist to run a
15   report and tell me, well, what percentage of
16   the opiates we prescribe are coming from Lake
17   County.  The answer was 78 percent, and they
18   were like five of our 260 beds, patient beds.
19             Anyway, so that's the one time I
20   was aware, but it really was not us prescribing
21   them, it was people coming in on them.
22        Q.    So in this instance when your head
23   pharmacist came to you and reported that he
24   was -- he or she was seeing patients from Lake
25   County being prescribed opioids, did you

Page 52

1    investigate?

2          A.    I did.

3          Q.    What did you conclude, based on

4    looking into that?

5          A.    I took it to their director of

6    their ADM Board, Linda Frazier, who is still

7    there, actually, in the role that Jerry Craig

8    is on our ADM Board.  She was able to run not

9    names, because of HIPPA, but zip codes of who

10   was coming to the pain clinics in Painesville,

11   and people were driving from as far as Florida

12   to come to those pain clinics.

13         Q.    Do you know if any action was ever

14   taken by the Ohio Medical Board or any other

15   entity in terms of prescriptions that were

16   being made by pain clinics in Lake County?

17         A.    Yes.  Eventually they passed -- I

18   don't remember the bill, but they called it the

19   pill mill bill in Ohio, to go after the few,

20   but there were some unscrupulous physicians who

21   were just handing out opiates improperly and

22   probably illegally, and they did shut them down

23   eventually.

24         Q.    Are those sometimes referred to as

25   pill mills?

Page 53

1        A.     Yes.

2        Q.     Did you ever see problems with pill

3    mills in Summit County?  Setting aside what you

4    saw in Lake County, did you ever see an issue

5    with so-called pill mills in Summit County?

6        A.     I didn't see the issue, but we

7    saw -- I remember one of our staff bringing us

8    a photo of a hand-painted sign from the side of

9    the road, you know, need opiates, call this

10   number, kind of thing, but as far as actually

11   seeing the pill mill, I did not.

12       Q.     Well, I don't mean necessarily

13   seeing it with your own eyes.  My question

14   really to you, Dr. Smith, is whether or not you

15   were aware of specific instances of pill mills

16   in Summit County?

17       A.     I wasn't fully aware.  Our

18   addiction specialist told me he wondered about

19   a particular practice in Summit County, whether

20   they were giving -- they were overprescribing

21   opiates.

22            I don't believe it got investigated

23   for that at any point, because the main

24   physician there got in separate legal trouble

25   for some other problem.  I don't remember

1    whether it was fraud or something, but it was

2    not about opiates, but eventually got in

3    trouble for -- and then that clinic vanished.

4         Q.    Okay.  So in your work at

5    Northcoast, and up to today, you can't identify

6    any specific instance in Summit County where

7    there was a practice that you would

8    characterize as a pill mill?

9         A.    Well, the definition was they had

10   to -- 50 percent or more of their patients were

11   getting opiates, was, I think, the way the law

12   characterized it, and I was not aware, other

13   than, again, a pain clinic, which is the one

14   where this doctor was at, which may or may not

15   have been legitimate, because I'm not

16   the -- ADM doesn't investigate those things.

17   That's the only one I was even lightly aware

18   of.

19        Q.    So the answer is you're not aware

20   of any specific instance where you determined,

21   within Summit County, that a particular

22   practice was a so-called pill mill; is that --

23        A.    Correct.

24        Q.    -- correct?

25             Are you aware of physicians at

Page 55

1    Northcoast Behavioral Healthcare ever making

2    illegitimate prescriptions of opioids to

3    patients?

4           A.    Never.

5           Q.    Are you aware of any hospitals

6    within Summit County who made illegitimate

7    prescriptions of opioids to patients?

8           A.    No.

9           Q.    Are you aware of any particular

10   medical practices, that you can identify for us

11   within Summit County, who made illegitimate

12   prescriptions of opioids to patients?

13          A.    No.

14          Q.    In May 2012, you became the chief

15   clinical officer for the Summit County ADM

16   Board, correct?

17          A.    Correct.

18          Q.    And then I see in parentheses, it

19   also says medical director.  Is that -- can you

20   explain the difference, if there is one,

21   between chief clinical officer and the medical

22   director?

23          A.    Sure.  There is no difference.  The

24   law defines the chief clinical officer, if you

25   look at the Ohio Revised Code, says the medical

Page 56

1    director of.

2              I did that because, until coming to

3    Ohio, I never heard the phrase "chief clinical

4    officer," and so others looking at my CV might

5    not even know what that was, so on the CV I put

6    both names.

7         Q.   Why did you decide to join the

8    Summit County ADM Board in May 2012?

9         A.   So from my vantage point at the

10   state hospital, all three sites, we saw the ADM

11   Boards from the Indiana border to the

12   Pennsylvania border, and during my many years

13   there, Summit County was always the best.

14             They always had the best array of

15   services, seemed to be the most collaborative.

16   Again, I don't know about the southern part of

17   the state, but northern part of the state, they

18   were the best.

19             So Dr. Munetz, who was in my role

20   prior to me, approached me.  He was in the

21   process of moving fully into NEOMED, the

22   medical school, as their chair of psychiatry,

23   and I thought about it a fair amount and

24   decided that that was a pretty good

25   opportunity, just a change of -- change of

Page 57

1    pace, but to come to the best board I had seen

2    for over a decade, and that was the reason I

3    entertained that.

4         Q.    When you described the Summit

5    County ADM as the best board you've seen, can

6    you just tell us a little bit more about why

7    you think that's true?

8         A.    Certainly.  So most responsive to

9    new areas that need attention for treatment;

10   most responsive to filling gaps in the

11   care -- the continuum of care; leaders, as we

12   still are, in a number of areas, even

13   nationally, like crisis intervention team,

14   training of police officers, assisting in

15   outpatient treatment.

16             So it was an opportunity to, you

17   know, to work with a group that already had a

18   good track record, and then tried to help

19   further that.

20        Q.    Were there particular issues that

21   you were interested in that you thought this

22   new position would give you an opportunity to

23   address, when you made the decision to go from

24   Northcoast over to the Summit County ADM Board?

25        A.    Yes.  Forensically, the -- our

Page 58

1     board was and is known in our area, actually,

2     here in Summit County, for working hard on jail

3     diversion, so forensic-type topics.

4                So we really try hard to have a

5     system where individuals do not end up in jail

6     because of mental illness, disorderly

7     conduct -- I mean, we really try hard to have

8     them go get treatment through our system, and

9     so that, for me, was a big draw, to be able to

10    do that.  That was not something I could deal

11    with from the state hospital vantage point.

12                So to do that in a reasonable-sized

13    county, with a good group of people who were

14    already thinking in the same way, was one of

15    the reasons I thought it was a good place to

16    work.

17         Q.    Okay.  Anything else that stands

18    out in your mind as something you were very

19    interested in and a reason why you wanted to

20    join the Summit County ADM Board?

21                MR. KEARSE:  Object to the form.

22         A.    I think I gave you the big ones.

23                     -  -  -  -  -

24                (Thereupon, Deposition Exhibit 2,

25                2014 Annual Clinical Report for ADM

Page 59

1              Funded Programs and Services,

2              Beginning with Bates Label SUMMIT

3              833675, was marked for purposes of

4              identification.)

5                    -  -  -  -  -

6         Q.    Now, I have set a document in front

7    of you that I've marked as Exhibit 2 for

8    purposes of this deposition, and this is a 2014

9    annual clinical report that has to do with the

10   Summit County ADM Board; do you see this

11   document?

12        A.    Yes, I do.

13        Q.    Is this something that you are

14   familiar with?

15        A.    Yeah.  I haven't seen it in a few

16   years, but, yes, I have certainly seen it.

17        Q.    And it says at the beginning that

18   it has an executive summary that describes the

19   ADM Board as a special purpose government

20   agency; do you see that?

21        A.    Yes.

22        Q.    Do you know what that means?

23        A.    Yes.  So you can see Ohio Revised

24   Code is listed here.

25              The Ohio Revised Code section 340

Page 60

1    defines the legal entities known as ADM Boards.

2    Some places call themselves recovery service

3    boards or ADAMHS boards, but same idea.

4              And so it sets is apart as a

5    separate special government agency to deal

6    with -- and you can see it here -- the

7    planning, funding, monitoring and evaluating

8    treatment of prevention services for all the

9    county residents for alcohol, drug addiction,

10   and mental health services.

11        Q.   What does it mean that the ADM

12   Board is a special purpose government agency?

13        A.   So we are very focused on that

14   relatively -- it cuts across a lot of people,

15   it's a broad thing, but it is a very focused

16   mission purpose, compared to other government

17   agencies.

18        Q.   Are there other entities in Summit

19   County government that are focused on drug

20   abuse, addiction, addiction treatment and the

21   issues that the ADM Board are focused on?

22        A.   Government agencies?

23        Q.   Yes.

24        A.   So the -- originally, no.  I think

25   because of the opioid epidemic, the Summit

Page 61

1    County Health Department, because it became a

2    public health issue, has also been a partner

3    with us and others on this, yes.

4         Q.    When would you say that the public

5    health department for Summit County became, as

6    you put it, a partner to the ADM Board, in

7    terms of addressing opioid abuse?

8              MR. KEARSE:  Object to form.  I

9    think he said "epidemic," but go ahead.

10   Mischaracterizes his testimony.

11        A.    Late 2013, early 2014.

12        Q.    What happened at that time?

13        A.    Two things.  One, we moved our

14   prior location to the same building as public

15   health, so we were co-located, which is very

16   good for integrated medical care in the first

17   place; and then during 2013 is when we first

18   were becoming aware of the numbers of people

19   dying from opioid overdoses, and we started to

20   work on pulling together an opiate task force.

21        Q.    Did you say 2013 was the first time

22   you learned that people were dying from opioid

23   abuse?

24        A.    It's the first time that -- it's

25   when -- not the first time.  It's when the

Page 62

1    people around the county started talking about,

2    wow, we need to do something about this.

3          Q.    So your testimony today is that

4    2013 is the first time people in the county

5    started to talk about the impact of opioid

6    abuse --

7                  MS. KEARSE:  Object to form.

8          Q.    -- within Summit County; is that

9    your testimony?

10                  MR. KEARSE:  Object to form.  I'm

11    sorry.  I apologize.  I thought he was finished

12    with his question.

13          Q.    Go ahead.

14          A.    So 2013 is the first time that I

15    became aware that people were discussing, wow,

16    we have a real issue here.

17          Q.    Okay.  We are going to look at some

18    documents from earlier than that.  Would that

19    surprise you?

20                  MR. KEARSE:  Object to form.

21          A.    No.  I mean, once we learned about

22    it, we ran data for 2012, for example, so we

23    had that information.  Again, I didn't get

24    there until May 1 of 2012, so relatively early

25    in my time, I learned that there was an issue.

 1      Q.   Okay.  So you are saying, today
 2   your testimony is, that it wasn't until you
 3   arrived at the ADM Board in May of 2012 that
 4   you recognized that there was an issue in
 5   Summit County in connection --
 6              MS. KEARSE:  Objection.  Form and
 7   argumentative.
 8              MR. BOEHM:  I'm sorry.  I'm not
 9   even done yet.  Let me finish my question.
10              MR. KEARSE:  Well, you are
11   badgering the witness.  You are being
12   argumentative.
13              So if you have a question or a
14   document you can show him --
15              MR. BOEHM:  If you want to make an
16   objection, Anne, you wait until I'm done with
17   my question, and then make your objection, and
18   it should be to form.  I don't need you
19   stopping me in the middle of my question to
20   make an argument.  I don't want that to happen
21   today, and that's inappropriate.  You shouldn't
22   be doing it.  Please don't do that.
23              If you want to object when I'm
24   done, you have every right to do that, but not
25   in the middle of my question, not appropriate,

Page 64

1    please don't do.

2              MR. KEARSE:  I'm going to ask you

3    not to argue with the witness, and if you have

4    a question, ask the question, if you have a

5    document, show him a document.  We are not here

6    to argue or be rude to the witness.

7              MR. BOEHM:  I'm not being rude to

8    the witness, but you are being rude to me.

9    Let's not waste time, okay?

10             MR. KEARSE:  I'm not the one

11   wasting time.

12        Q.    Dr. Smith, is it your testimony

13   here today that you did not know that there was

14   an opioid abuse problem happening in Summit

15   County, until you arrived at the ADM Board in

16   May of 2012?

17             MR. KEARSE:  Object to form.

18        A.    I don't know that I can answer the

19   question using the phrase "opiate abuse," but I

20   was not aware that there was a great increase

21   in overdose deaths until 2013, that's correct.

22        Q.    Until 2013?

23        A.    Correct.

24        Q.    And what is your understanding as

25   to when you think that increase in deaths took

Page 65

1    place, in relation to opioid abuse?

2            MR. KEARSE:  Object to form.

3        A.    Well, after 2013, as we saw this,

4    we started looking at data.  The department of

5    health created a graph that shows, actually, an

6    upward trend, starting in about 1999, all the

7    way -- well, at that time through 2012 was the

8    data they had, that's most of the graphs, but,

9    unfortunately, that graph kept going up after

10   that.

11       Q.    Okay.  And that's something you

12   didn't know about until 2013?

13       A.    Correct.

14       Q.    Okay.  We are certainly going to

15   come back to that.

16            Just to stay with this document

17   here --

18       A.    Sure.

19       Q.    -- that's marked as Exhibit 2, the

20   executive summary, in describing the ADM Board,

21   refers to alcoholism, drug addiction and mental

22   illness; do you see that?

23       A.    Yes.

24       Q.    Is it fair to say that those are,

25   kind of, the three broad categories that define

Page 66

1    the mission of the Summit County ADM Board?

2         A.    Yes.

3         Q.    The next sentence there says that

4    the board does not provided any direct service,

5    but contracts with local agencies to provide

6    services.  What does that mean?

7         A.    So we are a funding entity.  We

8    bring in -- about 80 percent of our dollars

9    come from a local levy real estate tax, 10

10   percent federal, 10 percent state dollars, and

11   then we, as a team, about 20 of us, we then

12   fund partially or sometimes entirely about 25

13   agencies across the county who are focused on

14   either alcohol, drug addiction or mental health

15   services or both.  Some do both.

16        Q.    So the ADM Board itself doesn't

17   provide the services directly to individuals in

18   the county?

19        A.    That's correct.

20        Q.    So when you said that your work as

21   the medical director for the Summit County ADM

22   Board is a clinical position, tell us what you

23   mean by that, in light of the statement that

24   the ADM Board does not itself provide any

25   services directly to patients?

Page 67

1      A.    Sure.  So the role for myself and

2   another handful of clinicians at the board, is

3   that we help the board determine where dollars

4   might be spent for -- to fill gaps and improve

5   patient care cross the system, and then we also

6   go out and evaluate, to make sure we are

7   getting good clinical outcomes from the money

8   that we are spending on that care.

9           We need to be able to share with

10   the public, it is their dollars after all, that

11   we are getting good bang for the buck --

12      Q.    How do you --

13      A.    -- clinically.

14      Q.    I'm sorry.

15           How do you go about ensuring that

16   you are getting good bang for the buck from the

17   contractors who are actually rendering the

18   services that you are funding?

19      A.    So again, our team does audits on a

20   regular basis, looking through the charts

21   clinically, as well as our fiscal side does

22   fiscal audits of all the claims made, all the

23   billings made, to make sure the patients are

24   getting the care they need.

25      Q.    Are you involved in that auditing

Page 68

1    process?

2         A.    I review the -- some of the audits

3    after the fact.  I'm not the one

4    usually -- I've been to some, but I'm not

5    usually the one sitting there going through the

6    charts.

7         Q.    You go and visit the facilities

8    that are rendering the services?

9         A.    Yes, regularly.

10         Q.    And you survey the level of care

11    that's being provided?

12         A.    Yeah.  I look at the level of care,

13    and then if there are challenging individuals

14    in the system that are touching more than one

15    agency, I can call, which I do regularly,

16    what's called a case conference, and

17    everyone -- kind of like this, the room is

18    usually full, and we walk through the case and

19    figure out where can we give better services to

20    help that particular person.

21         Q.    Has there ever been an occasion

22    where you felt that the services being provided

23    by the contractors but funded by the ADM Board

24    were subpar?

25         A.    There are certainly cases where we

1   are not getting the outcomes that we would

2   like, and then we have meetings and discuss it

3   with -- they get better.

4        Q.   How do you go about addressing

5   those types of problems?

6        A.   A number of ways.  I mean,

7   obviously, we hold the dollars on some of those

8   things, so we are able to say, well, we want to

9   do more with the funding in this area than that

10  area.

11            We have a process by which agencies

12  can request to add a service.  We only really

13  will to do that if it is an evidence-based

14  practice, so there is research behind it that

15  says, if they do it this way, we will get these

16  outcomes, because sometimes outcomes take

17  years, so we're not going to -- it's not like

18  every six months we can say, hey, did you cure

19  X number of people?  So we're looking out.

20            So more of the ways that we can

21  have checks and balances on it, and then help

22  them improve the service they are providing.

23        Q.   I've marked this document as

24  Exhibit 3.

25                   -  -  -  -  -

Page 70

1              (Thereupon, Deposition Exhibit 3,
2              2018 Budget For the Summit County
3              ADM Board, Beginning with SUMMIT
4              897931, was marked for purposes of
5              identification.)
6                          -  -  -  -  -
7         Q.    And you will see that it is a 2018
8    budget for the Summit County ADM Board that was
9    presented to the board of directors on July 15,
10   2017; do you see that?
11        A.    Yes, I do.
12        Q.    I'll direct your attention to page
13   10 of this document, which looks to be an
14   organizational chart for the ADM Board.
15        A.    Yes.
16        Q.    You made reference to a board of
17   directors for the ADM Board, right?
18        A.    Yes.
19        Q.    And that's what we're seeing at the
20   very top of this chart?
21        A.    That's correct.
22        Q.    How many members of the board of
23   directors are there?
24        A.    Fourteen.
25        Q.    And how are they selected?

1      A.    I believe that eight of them have

2  to be approved through the Ohio Department of

3  Mental Health and Addiction Services, and they

4  look for a range of individuals, including

5  people maybe with their own lived experience,

6  with no health or addiction, and the other six

7  are appointed here locally, and I believe they

8  have to be officially approved by the county

9  executive.

10          It gives us both the local and the

11  state picture, gives us the perspective of many

12  people in the community.  We have got a couple

13  of attorneys.  It gives us a broad look at

14  what's going on.

15      Q.    Do you have any medical doctors on

16  the board of directors?

17      A.    Yes, we do.

18      Q.    Who do you have on the board of

19  directors who are --

20      A.    I believe we have --

21      Q.    I'm sorry.  You got to wait until

22  I'm finished, and then you can start.

23          My question was --

24          MR. BOEHM:  I think you got it.

25  Did you get my question?

1         Q.     How many members of the Summit
2    County ADM board of directors are medical
3    doctors?
4         A.     One.
5         Q.     And who is that?
6         A.     Dr. Todd Ivan.
7         Q.     What kind of practice does Dr. Ivan
8    have?
9         A.     He is a consult liaison
10   psychiatrist at Summa.
11        Q.     Is it I-V-A-N?
12        A.     Yes.
13        Q.     What is Summa?
14        A.     One of our two large healthcare
15   systems here.  We have Summa, and then we have
16   Cleveland Clinic/Akron General.
17        Q.     Are any ADM employees or staff also
18   members of the board of directors?
19        A.     No.  That wouldn't be allowed.
20        Q.     What about Mr. Craig, is he a
21   member of the board of directors?
22        A.     So, yeah.  He would be -- he is,
23   but he reports to the board.  So however that
24   works.
25        Q.     He reports to the board, but my

1    question is, is he, in addition to being the

2    executive director for the ADM Board, is he

3    also a member of the board of directors?

4         A.    I don't know if there are subtle

5    distinctions or not about that.  I know that if

6    they go in executive session, he's in there

7    with the board of directors generally.

8         Q.    Do you ever attend board of

9    director meetings?

10        A.    Most of them, yes.

11        Q.    How often do those occur?

12        A.    Eleven times a year.

13        Q.    Okay.  So almost monthly?

14        A.    Yes.

15        Q.    There is one month when it doesn't

16   happen?

17        A.    Yeah.  Because they are at the end

18   of the month, the November one would conflict,

19   as it would next week, with Thanksgiving week.

20   So they have one in early December that covers

21   both November and December.

22        Q.    And you said there is something

23   called an executive session?

24        A.    Yes.

25        Q.    And that's not open to the public?

Page 74

1          A.     Correct.

2          Q.     Are there minutes kept of the

3     executive session?

4          A.     I honestly don't know, because I

5     wouldn't see them, if they did.

6          Q.     Are there minutes kept of the

7     public session of the board of director

8     meetings?

9          A.     I believe, yes, for that.

10          Q.     And do those get circulated to

11     members of the ADM Board?

12          A.     Yes.

13          Q.     Is that something that you see on a

14     regular basis?

15          A.     Yes.

16          Q.     Do those get emailed?

17          A.     I'm sure they must.

18          Q.     Is that how you receive --

19          A.     We don't print very much stuff,

20     yes, so, yes.

21          Q.     What do you understand the board of

22     directors' duties to involve?

23          A.     They are there to ensure the

24     mission of the organization, to make sure the

25     money is being spent wisely, to -- so we use a

Page 75

1    structure called policy governance, and under

2    that structure, they have certain duties, that

3    they then hold Jerry Craig accountable as the

4    director, and then ultimately, of course, he

5    holds the rest of us accountable to him.

6              Under policy governance, they have

7    a global ends, they call it, list of things

8    that we are -- Jerry is supposed to accomplish

9    with his staff, and they review those parts of

10   them each month, so they are all reviewed

11   annually.

12        Q.    Did you ever receive any

13   instruction, in connection with the filing of

14   this lawsuit, to preserve materials that you

15   might have in your possession, whether it be

16   electronic materials on your computer or in

17   hard copy, to preserve those materials, to the

18   extent they relate to issues that are alleged

19   in the complaint?

20        A.    Yes.

21        Q.    Do you remember when you received

22   that?

23        A.    I don't recall.  I think it was,

24   again, maybe early 2018.

25        Q.    Do you ever interact directly with

1     members of the board of directors, in terms of

2     them making a request to you for something?

3          A.    There is a meeting called the

4     assurance committee.

5          Q.    I'm sorry.  Assurance?

6          A.    Assurance, yes.  So the assurance

7     committee will ask -- ask to talk about certain

8     data occurring in the county, most commonly

9     that's deaths by suicide.  It might be other

10    things that have come to their attention, and

11    then generally, both Aimee Wade, you can see on

12    here, she's really my counterpart with the

13    clinical team, and I, we attend that meeting

14    and bring them data and have discussions.

15         Q.    Why is it most commonly death by

16    suicide that the assurance committee is

17    interested in?

18         A.    Important topic, we would like to

19    drive those down.

20         Q.    Are there other examples that you

21    can recall in your time at the Summit County

22    ADM Board where the assurance committee has

23    come to you with a particular request on a

24    subject?

25         A.    I mean, we review, sometimes, other

Page 77

1   types of data in there.  It depends on what --
2   often it's what they have heard in the board
3   meeting, they will then say, hey, we kind of
4   like to hear more about X.
5              It might be administrative
6   discharges from our residential treatment
7   program, for example.  So we have people going
8   in there getting care for alcohol or drug
9   addiction, and then they don't finish their
10  stay, because maybe they were using substances,
11  maybe they were fighting with other people and
12  they get kicked out, basically.  They want to
13  review that and make sure we are not,
14  basically, spending money for nothing.  You
15  don't want to spend the money for somebody to
16  be there for 20 days and then throw it all away
17  because they -- so that kind of stuff we've
18  looked at.
19       Q.    Are there any other examples that
20  you can think of where the assurance committee
21  has come to you requesting specific information
22  about a specific issue?
23       A.    No.  Those are the two main topics.
24       Q.    Now, if you look to the far left of
25  this organizational chart, I think we see your

 1   name, Doug Smith M.D., Chief Clinical Officer;

 2   do you see that?

 3        A.    Yes.

 4        Q.    That's you, right?

 5        A.    That's me.

 6        Q.    And you have the names of three

 7   individuals who appear to report to you; is

 8   that right?

 9        A.    That's correct.

10        Q.    Mr. Aaron Ellington,

11   Mr. Christopher Freeman-Clark, and Ms.

12   Christine Smalley, right?

13        A.    That's who is listed, yes.

14        Q.    Are those the individuals who

15   are -- -- all of those individuals still at the

16   ADM Board?

17        A.    No, they are not.

18        Q.    Who is not there anymore?

19        A.    Christine Smalley is no longer.  We

20   are in the process of filling that position.

21        Q.    So that position is not filled

22   right now --

23        A.    Correct.

24        Q.    -- it's vacant.

25              What about the other two?

Page 79

1          A.     Both are there.

2          Q.     What are the responsibilities of

3     Mr. Ellington and Mr. Freeman-Clark?

4          A.     Okay.  So actually Dr. Ellington --

5          Q.     Oh, sorry about that.

6          A.     -- he's a psychologist.  We, Jerry

7     and I, and maybe others contributed, but we

8     decided that, in order to, again, better verify

9     that we are getting the best outcomes for the

10    money we spent, we decided to hire somebody who

11    could really be focused on evidence-based

12    practice, and we created a position, we went

13    looking, we found Dr. Ellington, he's

14    excellent.

15              So his role is to make sure that we

16    are asking the right questions when we are

17    looking at services our agency is providing,

18    and also then to vet requests from other

19    agencies, saying, "Hey, we would like to

20    add" -- recently we have done a big program on

21    cognitive behavioral therapy, and so his job is

22    to make sure we are structuring it right, that

23    we are doing it faithfully to the model that

24    was -- exactly the way the research was done.

25    So fidelity to the model is the phrase.

 1            And then he follows that, and he

 2    will visit them, he will make sure that things

 3    are happening in the way they are supposed to.

 4            Chris Freeman-Clark is our forensic

 5    monitor and the title coordinator of forensic

 6    services.  What that means is that he's in the

 7    court a lot.  He is there to watch and make

 8    sure things flow smoothly, and really to

 9    educate the judges, who often don't get a lot

10    of education in mental health law, for the

11    individuals in Summit County on conditional

12    release, who have been found previously not

13    guilty by reason of insanity.

14            So he helps that and works closely

15    with community support services, which is the

16    agency that treats all those individuals.

17        Q.    Are either of these individuals

18    particularly focused on the issue of opioid

19    abuse?

20        A.    No.

21        Q.    When you look over the

22    organizational chart overall, are there any

23    individuals that you see who are particularly

24    focused on the issue of opioid abuse?

25        A.    Yes.  Most squarely would be Kim

                                        Page 81

 1    Patton, our addictions prevention and training

 2    coordinator, and because Christine Smalley is

 3    not with us right now, Dr. Ellington has at

 4    least been attending our -- what used to be

 5    called wait-list meeting, that is people

 6    waiting to get into residential treatment

 7    services.

 8              I believe they just told me they

 9    changed the name last week.  I honestly don't

10    remember the name, but something like Access or

11    something, because it is not really a wait

12    list, because most people are not waiting there

13    in jail or something, and we can't exactly say

14    they are waiting, because they can't just come

15    in today, but it's an access issue.

16              Mostly through Kim Patton,

17    some would -- it's touched all of us in the

18    recent years.  Beth Kuckuck, who does the

19    children program, certainly the opiate issue

20    has come up in the adolescent hospitalization.

21              And then Eric Hutzell is our main

22    data person, so he would see all the data,

23    creates the charts and graphs that we put out

24    at our quarterly opiate task meeting and so

25    forth.  So he sees a lot of data on opiates, as

Page 82

1    well as mental health and so forth.

2         Q.    Anybody else on this list focused

3    on opioids?

4         A.    Well, the entire fiscal side is

5    paying a lot of claims for people being treated

6    for opiate use disorder, and obviously then

7    Jerry Craig and the board of directors

8    certainly have been watching that carefully and

9    providing -- and Jerry particularly, providing

10   a lot of leadership for us and for the county

11   around -- and sometimes at state meetings, you

12   know, dealing with the sad deaths from the

13   opiates.

14        Q.    Anybody else?

15        A.    Well, I think I, sort of, covered

16   everybody.

17        Q.    You said that those on the fiscal

18   side are, I think you said, paying a lot of

19   claims?

20        A.    Yes, that's correct.

21        Q.    What do you mean by that?

22        A.    Well, so they are the ones -- so

23   the money, as I said, we are a funder, so a

24   good proportion of our staff are focused on

25   making sure claims get paid.  So as agencies

Page 83

1    bill for services that Medicaid and other

2    insurances don't pay for, then they are

3    processing those claims, and when we have our

4    meetings and talk about it, it's clear they

5    have been processing a lot of claims for opiate

6    use disorders.

7         Q.    And do they calculate what the

8    costs are to the Summit County, related to the

9    issue of opioid abuse?

10        A.    I'm sure they have.

11        Q.    Do you know what those amounts are?

12        A.    I do not.

13        Q.    Who would we talk to at the ADM

14   Board to try and figure that out?

15        A.    I'm sure Jerry Craig is aware;

16   otherwise, Jennifer Peveich is our director of

17   operation.  She is also our chief financial

18   officer.  So she is the expert on that.

19        Q.    You made reference in one of your

20   earlier answers to a state entity, I think it

21   is O-M-A-S, did I get that right?

22        A.    Yeah.  It's the Ohio Department of

23   Mental Health and Addiction Services.  So they

24   often say OHMAS.

25        Q.    OHMAS.  Ohio Department of Mental

Page 84

1    Health and Addiction Services, right?

2           A.    Correct.

3           Q.    What is that?

4           A.    So when I was working at the state

5    hospital, I think the entire time actually, we

6    had two separate departments.  So these are

7    departments who have directors that report

8    directly to the governor.

9                 So the Ohio Department of Mental

10   Health and the Ohio Department of Alcohol/Drug

11   Addiction Services, they merged probably July,

12   I believe, like somewhere around July 1, 2013.

13   Maybe it's a little off on the date.  So they

14   merged into one department, so they could focus

15   on, kind of, everything about the brain and be

16   more efficient.

17          Q.    Is it still called OHMAS?

18          A.    Yes.

19          Q.    Is there some relationship between

20   the Summit County ADM Board and the state

21   agency, the Ohio Department of Mental Health

22   and Addiction Services?

23          A.    There is, in that we frequently

24   have discussions, we sit on committees that

25   they may run, and then about 10 percent, it's

Page 85

1   increased as far as opiate money, I think,

2   because of the Cures Act and other things, but

3   then they receive moneys at the state level,

4   which they then parse out to the counties.

5            So they would also then send us

6   funding for that.  They send us funding for --

7   to help fight deaths by suicide as well.  And

8   so their role is pretty broad, and they -- so

9   then their -- I do talk pretty regularly with

10  the medical director -- well, I should say

11  medical director recently became director of

12  OHMAS, when the prior director left for a

13  different job.  All the cabinet members are

14  looking for jobs, because our governor is going

15  to change, so...

16       Q.    If I understand you correctly, the

17  Summit County ADM Board receives some of its

18  funding, some of its dollars, from this state

19  entity, the Ohio Department of Mental Health

20  and Addiction Services?

21       A.    Correct.

22       Q.    Is it also true that some of the

23  dollars that Summit County receives for the ADM

24  Board come from the federal government?

25       A.    Yes.

Page 86

1              MR. BOEHM:  Okay.  Let's go off the
2    record.
3              THE VIDEOGRAPHER:  Off the record,
4    10:17.
5              (Recess taken.)
6              THE VIDEOGRAPHER:  We are back on
7    the record, 10:34.
8         Q.    Welcome back, Dr. Smith.
9              When you took this role as the
10   chief clinical officer at the Summit County ADM
11   Board in May 2012, how much did you already
12   know about opioid addiction and its impact on
13   Summit County?
14        A.    As of May 1, 2012, not much.
15        Q.    Did you know anything?
16        A.    I wasn't -- again, I came in with
17   forensic experience, which they were looking
18   for, and, no, opiates was not part of my hiring
19   discussion or anything like that.
20        Q.    Did you know that issues related to
21   opioids would be a part of your duties and
22   responsibilities, once you joined the ADM Board
23   as its medical director and chief clinical
24   officer?
25        A.    Sure.  Alcohol, Drug Addiction,

```
 1    Mental Services Board, I was certainly aware
 2    that was part of the scope.
 3           Q.    But there wasn't anything
 4    particular about opioids that you understood
 5    would be a part of your responsibility; is that
 6    fair?
 7           A.    That's fair.
 8           Q.    When you joined the ADM Board in
 9    May 2012, what steps did you take, if any, to
10    ensure that you were fully up to speed on the
11    subject of opioid addiction, including causes
12    of the levels of addiction and impacts on the
13    community?
14           MR. KEARSE:  Object to form.
15           A.    So most of what I did, when I first
16    joined, is I went and met with anybody and
17    everybody at every agency, and the mayor and
18    the county executive, and basically, you know,
19    asked what current issues were, and mostly said
20    I'm here, here's who I am, here's my expertise,
21    if you need me.
22                 There was initially no cause, that
23    I was aware of, to do anything particular about
24    opiates.
25           Q.    You don't recall opioids in
```

Page 88

1    particular coming up in any of your

2    conversations, in your meetings with everybody

3    and anybody?

4              MR. KEARSE:  Object to form.

5         A.    I'm sure it came up, because we

6    would look at, you know, claims data, things of

7    that nature, but I don't recall any specific

8    discussions until 2013.

9         Q.    You indicated that you also met

10   with the county executive when you joined the

11   ADM Board?

12        A.    The former one, yes.

13        Q.    The former one.  Who was that?

14        A.    Russ Pry.

15        Q.    When did Mr. Pry leave his position

16   as the county executive?

17        A.    Unfortunately, he passed away,

18   probably two years ago now.

19        Q.    What is the relationship between

20   the ADM Board in Summit County and the office

21   of the county executive?

22        A.    So, you know, although we -- so I

23   don't want to over -- make it sound that

24   separate.  So we do have a separate board of

25   directors, but we are on the county payroll, we

Page 89

```
 1    use the county Cronos system.
 2                 So we really are county employees.
 3    All my paychecks come from the county and so
 4    forth.  It's that we have some separate
 5    leadership role, separate from the county
 6    executives, so again, because Jerry Craig does
 7    not directly report to the county executive.
 8         Q.    What is the relationship between
 9    the Summit County ADM Board and the Summit
10    County Office of the County Executive?
11         A.    I guess it depends -- I don't know.
12    It's between Jerry and Ilene Shapiro, how they
13    play that.
14         Q.    Does Mr. Craig report in any way to
15    Ms. Shapiro?
16         A.    He does not.  I will say that our
17    budgets do have to be reviewed by the county
18    council.  Everything -- all of our health and
19    human services agencies go through the SSAB
20    review process, and I'm lacking in what that
21    acronym means.
22                 But anyway, that is a Social
23    Services Advisory Board, I think is what it is.
24    So they review it, so I mean, we are very
25    connected to the county, but the county
```

Page 90

1   executive can't directly tell Jerry what he

2   must do.  There is a place where there is a

3   separation.

4        Q.    You said that the council reviews

5   ADM Board budgets, right?

6        A.    Yes.

7        Q.    Do they approve ADM budgets?

8        A.    I believe through them and SSAB,

9   they do approve it, yes.

10       Q.    What is SSAB?

11       A.    Social Services Advisory Board, I

12   believe.

13       Q.    Is that an entity under the county

14   executive?

15       A.    I'm sure it might be.  I don't

16   honestly know.  Again, I do clinical, but, yes,

17   I believe they are all tied to county, and they

18   are all reviewing to make sure that the budget

19   is appropriate.  It is an extra oversight

20   beyond our board of trustees.

21       Q.    Does the office of the county

22   executive also review and approve the ADM Board

23   annual budget?

24       A.    Not directly no.

25       Q.    Who on the county council is most

1   directly involved in the goings on of the

2   Summit County ADM Board?

3          A.     I honestly don't know.

4          Q.     Do you have any interaction with

5   anybody on the Summit County Council, as part

6   of your professional duties?

7          A.     No.  I did go before them once to

8   promote them doing a -- I forget what you even

9   call it, but anyway, to officially decree that

10  we would be a stepping-up county, that is a

11  forensic issue, where we are trying to do,

12  again, jail diversion.  That's a nationwide

13  approach.  Each county, it's hoped, will sign

14  that.  So I'm the one who went before them and

15  presented that, and they did approve it.

16         Q.     Okay.  When did that happen?

17         A.     Probably three and a half years

18  ago.

19         Q.     You indicated that when you took

20  this position on as chief clinical officer and

21  medical director for the ADM Board, you met

22  with everybody and anybody to introduce

23  yourself and to, I take it, to understand their

24  understanding of their needs and how the ADM

25  Board could help; is that a fair summary?

1          MR. KEARSE:  Object to form.

2      A.    It was really more about how they

3  thought I would be able to help.  My phrase to

4  every one of them was, I want to be a value

5  add, so here is who I am, here is my

6  background, reach out to me, if you need

7  something I could help with.

8      Q.    Do you recall, in those

9  conversations, individuals saying, yes, here is

10  something you could very much help us out with?

11      A.    That did not happen much.  I think

12  people were okay, and they had to wait and see

13  who I was and so forth.  Some of them were such

14  politicians that they spent the time trying to

15  figure out what committee they could appoint me

16  to, so...

17      Q.    Did that happen at all, did anybody

18  ever raise a particular issue with you, in

19  those meetings?

20      A.    In one meeting I recall, this is

21  happenstance, I was meeting with Donna Skoda,

22  who is our director of public health, and it

23  happened that she got a phone call during the

24  meeting, there two others in the room, public

25  health, and it had to do with refugees, another

Page 93

1    topic I was unfamiliar with, how we would

2    receive refugees, and then our process to help

3    get them the care they needed and so forth.

4              So that was one time where it

5    happened simply because I was in the room at

6    that time.

7         Q.    Did you meet with specialists in

8    addiction medicine?

9         A.    Sure.

10        Q.    What did you -- what was the

11   purpose of your meetings with addiction

12   specialists?

13        A.    They were part of the everybody

14   that I was meeting.  So I met at the Summa, at

15   St. Thomas, we have Ignatia Hall, which is an

16   inpatient detox unit, so I met with Dr. Labor,

17   who is their -- was, actually, I don't think

18   she's there now, but their addiction

19   specialist.

20             Along the way, I'm sure I met with

21   Dr. Shane, who is also part of that system, Dr.

22   Garry Thrasher who is our out -- not really

23   outpatient, but sub-acute detox program leader.

24        Q.    Did you meet with healthcare

25   providers at Summit-County-affiliated hospitals

1   or practices?

2          A.     Yeah, as I just described.

3          Q.     Did you meet with the service

4   contractors that ADM pays to handle the

5   services it wishes to provides to residents of

6   Summit County?

7          A.     Yes.  I went to many of the

8   agencies.

9          Q.     In any of those conversations, did

10  the issue in particular of opioid abuse, use or

11  any issues surrounding that come up?

12         A.     In 2012, no, not that I recall.

13         Q.     Your view is that it wasn't really

14  on anybody's radar in 2012; is that right?

15         A.     I would say that is an

16  overexaggeration.  I would say it --

17         Q.     How would you describe it?

18         A.     -- didn't come up, as a topic of

19  conversation in the meetings I was in in 2012.

20         Q.     Why do you think it didn't come up?

21         A.     They didn't feel they needed it to

22  be something that I was -- they didn't talk to

23  me about it, I guess.

24         Q.     All right.  Let's turn to the

25  beginning of this exhibit.  It's Exhibit 3.  It

Page 95

1   is the 2018 budget.

2              Does the ADM Board prepare a budget

3   every year?

4         A.    Yes.

5         Q.    Who was responsible for its

6   preparation?

7         A.    That would be our director, Jerry

8   Craig, and our director of operations, also

9   CFO, Jennifer Peveich.

10        Q.    Anybody else involved in the

11  preparation of the budget?

12        A.    I believe that Aimee Wade plays

13  some role in looking at it.  I'm sure I've seen

14  it along the way, but again, I'm clinical, I

15  don't do the money stuff.

16        Q.    Do you review or approve the

17  budget?

18        A.    No.

19        Q.    Now, this 2018 budget, I'll

20  represent, is the most recent one we have been

21  able to find, from the production in the

22  litigation.  It looks like this one was

23  presented to the board of directors on July 25,

24  2017.

25              Do you know if there has been a

1   more recent budget for -- for example, for

2   2019, that has been presented to the board of

3   directors?

4           A.    I believe one is in process, but I

5   don't know that I've seen it, and again, if I

6   do, I mostly just glance at it.  It's not my

7   purview.

8           Q.    Why do you have an understanding

9   that one is in process; have you seen one?

10          A.    I believe that I saw one.  I have

11  to say, just my schedule, I missed a couple of

12  board meetings, so that it might have happened,

13  you know, July or August, and I was not at all

14  the meetings.  So it is possible that it

15  occurred.

16               I believe Aimee Wade and I were

17  talking, and she mentioned something about a

18  budget.

19               I also know that we are in a levy

20  year, meaning that next November we are on the

21  ballot to get our levy renewed, every six

22  years.  So I know there is discussions going on

23  about how to plan for that budgeting.  So I'm

24  certainly aware of that.

25          Q.    Okay.  Is it your understanding

1    that there is a 2019 proposed budget that has

2    been circulated among the members of the ADM

3    Board?

4                   MR. KEARSE:  Object to form.

5          A.    I believe there must have been, but

6    I don't know anything about it.

7          Q.    Would you ever receive that by

8    email?

9          A.    Possibly.

10         Q.    Now, I want you to turn just to the

11   next page of the budget, Exhibit 3.  Does this

12   page reflect the Summit County ADM Board's

13   sources of revenue?

14         A.    Yes.

15         Q.    And it looks like -- well, let me

16   back up.

17                These are the funds that the ADM

18   Board uses to fund its operations; is that

19   right?

20         A.    Yes.

21         Q.    And these are the funds it uses to

22   fund all of its operations; is that right?

23         A.    Almost all of the operations, yes.

24         Q.    Are there sources of funds that are

25   not reflected here?

```
 1                    MR. KEARSE:  I'm going to object to

 2      form.  And I'm just going to have an objection

 3      to going into detail.  You can ask him general

 4      questions about the budget, but he has

 5      already --

 6                    MR. BOEHM:  I don't want any

 7      coaching.

 8                    MR. KEARSE:  I'm just saying, he

 9      has already testified he's not familiar, he

10      doesn't --

11                    MR. BOEHM:  You can object to form.

12      Don't coach the witness.

13                    MR. KEARSE:  I'm putting the

14      objection on the record to going into a

15      document that he has already said he's not

16      familiar with.

17                    MR. BOEHM:  You have done that, and

18      it's not appropriate for you to coach the

19      witness.

20                    MS. KEARSE:  I'm not coaching the

21      witness, counsel.

22                    MR. BOEHM:  Object, and then stop.

23                    MS. KEARSE:  I'm objecting to going

24      in to spend time -- I said, go ahead and answer

25      the question.
```

1              MR.  BOEHM:  He can answer whatever

2    he can answer.  That goes without saying.  You

3    don't need to make a speech about it.

4              MR.  KEARSE:  You don't need to be

5    so rude.

6              MR.  BOEHM:  Object, and then stop,

7    please.

8              Can you go back up to the question

9    that was pending.

10        Q.    My question to you is whether or

11   not there were funds at the disposal of the ADM

12   Board that are not reflected here?

13        A.    So again, these are projected, but

14   we do, on occasion, where we can, we will apply

15   for grants to leverage our money.

16              So in other words, if we can -- if

17   we are going to work on a program, and we know

18   we can get an extra $50,000 from the Bureau of

19   Criminal Justice, for example, to do a forensic

20   project, and we have to match it or something,

21   where we can take our 50 grand and turn it into

22   a hundred, we will do that.

23        Q.    Okay.

24        A.    So that usually happens.  Not huge

25   dollars, but that does add to it.

Page 100

1        Q.    Grants would not be reflected on
2   this summary?
3        A.    Correct.  We wouldn't know about
4   them in advance to project them.
5        Q.    Okay.  It looks like this is broken
6   down into three categories: federal, state and
7   local; is that right?
8        A.    It appears that way, yes.
9        Q.    And the federal and state are
10  funding sources that come from outside of
11  Summit County, right?
12       A.    Correct.
13       Q.    And then the local, those are
14  dollars that are from Summit County; do I
15  understand that correctly?
16       A.    Yes.
17       Q.    And then, of course, grants, those
18  would also be from outside the county, right?
19            MR. KEARSE:  Objection.
20       A.    Correct.
21       Q.    In terms of the funds that are
22  outlined here, are these earmarked for specific
23  purposes, or can the ADM Board use these
24  dollars in whatever way they see fit?
25       A.    I don't know the full answer to

1    that.  There are, again, like 25 agencies, so

2    they certainly have planned their budgets based

3    on us funding certain proportions.  So a

4    certain percentage of this would certainly

5    be -- much of it would already be, at least, in

6    wet concrete, you know, that we are going to

7    spend this on these agencies.  That's the most

8    I can tell you.

9              I don't know, again, I don't know

10   the interworkings of that, but they don't --

11   they can't just suddenly say, we're going to

12   spend $42 million and buy a blimp or something.

13   No, there is definitely -- it's expected it is

14   spent on services to treat drug addiction,

15   alcohol, mental health.

16        Q.    Understood.  Let me be more

17   specific.  That's a fair point.

18              Of course, I wouldn't expect that

19   the moneys would be spent to, you know, have a

20   carnival, but my question really is, within the

21   parameters of the mission of the Summit County

22   ADM Board, when you receive these funds, is it

23   predetermined that they would be earmarked for

24   specific purposes within that mission, or can

25   you use it however you, as the ADM Board,

Page 102

1    believe to be appropriate?

2              MR. KEARSE:  Object to form.

3         Q.    Does that make sense?

4         A.    That makes sense.

5              So I believe many times federal and

6    state dollars come with very specific

7    parameters.  So we may get -- we may get

8    something from the state that says we

9    specifically want you to work on -- use this

10   for the opioid epidemic or suicide prevention,

11   and so forth.

12             The levy dollars, the bulk of our

13   funds that are local tax levy dollars, I think

14   there is more freedom to determine where the

15   need is, but it's a big process, so it would be

16   steering a big ship.  It wouldn't change a lot,

17   from year to year.

18        Q.    Who is involved in the

19   decision-making process of how to actually

20   apportion these dollars to whatever purposes

21   the ADM Board has prioritized?

22        A.    Well, if you use "involved"

23   broadly, lots of people, because the agencies

24   would certainly be discussing it with Jerry

25   Craig and our CFO.  They would talk to the

1    clinical team, to see is there something that

2    we need to be doing more about.  Our ADM Board

3    of directors, of course, then ultimately has to

4    decide, yeah, that makes sense to, if we are

5    going to do a shift, in terms of how we might

6    fund something.

7         Q.    You mentioned to start the agencies

8    might have something to say about that.  What

9    do you mean when you talk about the agencies,

10   which agencies?

11        A.    Any of the 25 that we fund.  In the

12   process, if somebody was talking to Jerry Craig

13   and saying we have an area that we really need

14   to bolster our budget, so they need an extra

15   100,000 for something, then they -- presumably

16   that's going to be reflected in how the moneys

17   get spent.  Obviously, that may mean less money

18   spent in one place, more money spent that

19   place.

20        Q.    Are you referring to Summit County

21   government agencies?

22        A.    Summit County treatment agencies.

23        Q.    That are owned by the county?

24        A.    No.  They are not government

25   entities.  That's why I corrected you.

1      Q.    So what do you mean, when you talk

2    about Summit County treatment agencies, are

3    these private entities that -- are these the

4    contracting agencies?

5      A.    Correct.

6      Q.    Okay.  Let's go to the next page.

7    Does this page reflect actual expenditures?

8           MR. KEARSE:  I'm going to again

9    object to the form of the question and the

10   foundation.

11     A.    I'm not a budget person.  It looks

12   like these are projected expenditures.

13     Q.    It says Budget Expenditure Summary,

14   and just for the record, we are looking at the

15   page of the document that ends with Bates stamp

16   7933; do you see that?

17     A.    Yes.

18     Q.    It says Budgeted Revenue and

19   Expenditures, right?

20     A.    Yes.

21     Q.    And then it has a summary, correct?

22     A.    Correct.

23     Q.    And it's broken into two

24   categories, one is board administration, and

25   the other is contract services; do you see

Page 105

1    that?

2          A.    Yes.

3          Q.    What is the difference between

4    those two categories?

5          A.    So actually, that's something we

6    are quite proud of.  So we attempt to spend as

7    much of the dollars on actual care, that is

8    through the contract agencies, as opposed to on

9    our rent, salaries, utilities and so forth, and

10   we've kept it -- 6 percent is a target, because

11   many organizations spend a lot more than 6

12   percent on noncare.  So 94 percent goes to

13   direct care of patients of Summit County.

14         Q.    Then when you look at the contract

15   services, it appears that most of the ADM

16   Board's actual expenditures are directed to

17   mental health; is that a fair characterization?

18         A.    Well, it looks like it's the

19   majority of it.  It's not a huge difference.

20         Q.    Yeah.  It's more than half, right?

21         A.    Yes.

22         Q.    Has that always been the case,

23   since you have been involved with Summit County

24   ADM Board, that most of the funds are directed

25   toward mental health services?

1          MR. KEARSE:  Object to form.

2      A.    My understanding is that prior to

3    the opioid epidemic, about two-thirds of the

4    dollars actually were spent on mental health,

5    and a third on alcohol and drug addiction

6    treatments, and that because of the epidemic,

7    the number has gotten closer to 50/50.

8      Q.    Closer to 50/50, but even today,

9    more than half of the funds expended by ADM

10   Board are directed toward mental health

11   services, correct?

12          MR. KEARSE:  Object to the form.

13   The document speaks for itself.

14     Q.    Correct?

15     A.    Yes.

16     Q.    And then you have below the mental

17   health services, a line item for alcohol and

18   drug; do you see that?

19     A.    Yes.

20     Q.    And here alcoholism and drug

21   addiction are combined into a single line item,

22   right?

23     A.    It appears that way, yes.

24     Q.    Do you know how this figure would

25   break down if you were to divide it up between

Page 107

1   alcoholism and drug addiction?

2          A.    I do not.

3          Q.    Do you have a rough estimate of

4   that?

5                MS. KEARSE:  Objection.  Asked and

6   answered.

7          A.    I don't.

8                MR. BOEHM:  Actually, it hadn't

9   been asked and answered.

10                MR. KEARSE:  It calls for

11   speculation, too.

12                MR. BOEHM:  Object to form is fine

13   and appropriate, and what has been directed.

14          Q.    Okay.  When you talk about contract

15   services, Dr. Smith, can you describe for us

16   how these contracts are awarded?

17          A.    Again, I don't pretend to

18   understand all the logistics.  I do know that,

19   ultimately, Jerry does present to the board of

20   directors a list, I think, on a monthly basis,

21   of what contracts we plan to -- he plans to

22   award, and then they do have to approve.

23                I'm not sure how they determine

24   exactly the dollars for any given entity at

25   that point, though.

Page 108

1          Q.     These are contracted medical

2     providers, right?

3          A.     Healthcare providers, yes.

4          Q.     Healthcare providers.  And you are

5     the medical director for the Summit County ADM

6     Board?

7          A.     That's correct.

8          Q.     Do you have involvement in the

9     process by which contracts are awarded to the

10    medical providers funded by ADM Board?

11         A.     Minimally.

12         Q.     What is your involvement?

13         A.     We may discuss -- we have periodic

14    meetings, at least a couple times a month,

15    where Jerry Craig and I meet and talk about,

16    kind of, where things are at, but not money.

17              So my influence would be clinical

18    input on where things are at, but as far as,

19    "Gee, therefore, please spend a million here

20    and not here," would not be my role.

21         Q.     Do you have insight into who you

22    think is doing a good job and who is not?

23         A.     Insight, sure, but most of what we

24    do is as data driven as possible, so we can

25    see, based on the audits and everything else,

1    who's doing the -- who seems to be getting the

2    better outcomes.

3           Q.    Who is involved in that process of

4    generating and analyzing the data in connection

5    with the decisionmaking about awarding

6    contracts?

7           A.    Many people on the clinical team,

8    as on the TO you showed me would be doing

9    audits.  Aimee Wade puts those together, and

10   then they get discussed.

11          Q.    And are you part of that process?

12          A.    I'm sure I've seen audit reports,

13   but I'm not, again, making decisions on how

14   much money gets spent one place or the other.

15          Q.    Well, earlier this morning, you

16   talked about how important it was for the

17   Summit County ADM Board to ensure that you were

18   getting the best bang for your buck from these

19   service providers, right?

20          A.    That's correct.

21          Q.    And you talked about the need to

22   audit, and you talked about the need to provide

23   some oversight over these contract providers,

24   right?

25          A.    Correct.

1      Q.    And you said you were involved in

2    that, right?

3      A.    That's correct.

4      Q.    Can you describe for us, in more

5    detail, what that auditing and oversight

6    responsibility involves?

7      A.    I can tell you for myself.  So for

8    me, I do run a quarterly meeting, where I meet

9    with the medical directors for all the agencies

10   that have a medical director, I actually

11   include the two big hospital systems in that,

12   and then the following month, but again

13   quarterly -- I just had this recently -- I run

14   a clinical leaders meeting, because not

15   everybody has got a medical director, a

16   clinical leaders meeting, and so we do

17   discuss -- I leave it open, most of the agenda

18   is open to the agencies to talk about things

19   they are doing, things they see a need for, and

20   so forth.

21          Quite frankly, most of it ends up

22   being me talking and maybe my clinical team

23   talking, but -- so that's one of the ways.

24          I also meet with the main medical

25   directors, one-on-one, once a month to talk

1    about how they see things going, what they

2    think their needs might be and so forth.

3           Q.    Do the service contractors or

4    entities that wish to be service contractors

5    submit a bid to the ADM Board for the scope of

6    work requested?

7           A.    They do prepare a budget.  I

8    believe that our CFO sees their entire budget,

9    and then within the portion they believe, they

10   hope, will come from ADM, and then they do that

11   process.

12          Q.    So they do submit a bid?

13          A.    I don't know if you would call it a

14   bid.  I think they have a negotiation.

15          Q.    Okay.  Is each contract that is

16   awarded defined to a specific scope -- specific

17   scope of work?

18          A.    Well, each of the agencies has,

19   through OHMAS, has certainly certification to

20   do certain types of scope of work.  So

21   certainly they would be held to that, whatever

22   that standard is.

23               Some are certified specifically for

24   mental health, some specifically for addiction,

25   and some actually now, really are required by

Page 112

1    the opioid epidemic, have become dual

2    certified, because there has been so much

3    overlap.

4         Q.    But when the ADM Board says to an

5    entity, here is some money, and we want you to

6    spend it in a certain way, does that get

7    written down in a contract, is there some

8    recordkeeping mechanism so that you can then

9    follow up and provide the oversight that you

10   said was important?

11             MR. KEARSE:  Object to form.  I

12   think it misstates his testimony.

13        A.    There is a contract annually with

14   each entity, yes.

15        Q.    Where is that -- where are those

16   contracts kept, who has those?

17        A.    I'm sure that Jerry Craig and the

18   director of operations have them.

19        Q.    Okay.  Do you have those?

20        A.    I do not.

21        Q.    Going back up to this line item for

22   alcohol and drug, just to be clear, this is a

23   comprehensive figure that reflects Summit

24   County's expenditures for alcoholism and drug

25   addiction relating to all drugs, correct?

1        A.    Correct.

2        Q.    So that involves cocaine, meth,

3    heroin, marijuana, and the list goes on,

4    correct?

5              MS. KEARSE:  Object to form.

6        A.    I believe it is comprehensive of

7    all potentially addictive substances, yes.

8        Q.    Is it possible to break that figure

9    down, in terms of how much is spent on any

10   particular drug?

11       A.    Presumably, the fiscal side could

12   at least say if somebody is being treated for

13   an opiate-use disorder versus an alcohol-use

14   disorder.  That is probably achievable.

15       Q.    If you look at the bottom of this

16   page 7933, do you see the line that says,

17   "Projected revenue over/under expenditures"?

18       A.    Yes.

19       Q.    And for 2018, it is in parentheses,

20   does that mean that the expenditures are

21   greater than the revenue?

22       A.    Yes.

23       Q.    And can you describe what that

24   means?

25             MR. KEARSE:  Object to form.

Page 114

1          A.    Well, mathematically, it means we

2     spent more money than we brought in through

3     those three sources.

4          Q.    And does the ADM Board have, kind

5     of, money in reserve that it can apply to those

6     expenditures?

7          A.    Yes.  We have a fund balance, based

8     on what wasn't spent in other years, and then

9     gradually that often gets spent down pretty

10    low, by the time we have a levy.

11         Q.    So in this case, this figure here

12    in parentheses for 2018, would the ADM Board

13    draw upon existing -- an existing account to

14    cover that expense?

15              MR. KEARSE:  Object to form.

16         A.    That's my understanding, yes.

17         Q.    If you turn to page 11 in the upper

18    right-hand corner of this, it looks like that

19    for many years, the ADM Board had revenue that

20    exceeded its expenditures.  I'm looking here at

21    the projected revenue over/under expenditures

22    line on at the bottom of page 11.

23         A.    Yes.

24         Q.    Do you see that?

25              So for 2009, for example, revenue

                                                    Page 115

1    exceeded expenditures by over 12 million

2    dollars; am I reading that right?

3              A.    Yeah.  That's what it says.

4              Q.    And then in 2010, by 10 and a half

5    million dollars?

6              A.    Yes.

7              Q.    What is your understanding of what

8    that means?

9              A.    The dollars that came in through

10   the levy and perhaps other, you know, federal

11   and state sources exceeded what was spent.

12             Q.    I'll direct your attention to page

13   8 of this same document, Dr. Smith.  It's

14   entitled 2008 Contract Expenditures By Agency;

15   do you see that?

16             A.    Yes.

17             Q.    Does this page reflect the entities

18   which have been awarded service contracts by

19   the Summit County ADM Board in 2008?

20             A.    It appears to.

21             Q.    Okay.  This is again broken down

22   into two categories, mental health, and then

23   alcoholism and drug addiction are combined,

24   right?

25             A.    Yes.

1          Q.    If you look down toward the bottom

2     the page, there are two line items that refer

3     specifically to opiates, one is the 21st

4     Century Cures Act, OMHAS Opiate Grant; do you

5     see that?

6          A.    I see that.

7          Q.    What is that?

8          A.    So I believe under the Obama

9     administration, one of their last legislative

10    actions was to create the 21st Century Cures

11    Act, and so that provided a certain amount of

12    dollars to each state to provide treatment and

13    fight the opiate epidemic, and that was the

14    portion that then filtered through the state,

15    which then means Ohio Department of Health and

16    Addiction Services, down to our county.

17         Q.    Okay.  This is a grant from the

18    federal government that went through some state

19    agency, and ultimately Summit County got some

20    of that money; is that right?

21         A.    That's my understanding, yes.

22         Q.    The one below that, the next one on

23    the list, says Targeted Solutions, dash, Opiate

24    Epidemic; do you see that?

25         A.    Yes.

1          Q.     What is that?

2          A.     By that phrase, I don't know.

3          Q.     You're not sure what this line item

4     refers to?

5                 MR. KEARSE:  Object to the form,

6     and asked and answered.

7          A.     No, I don't, not specifically.

8          Q.     Who would we need to ask to get the

9     answer to that question?

10         A.     Again, either Director Jerry Craig

11    or Jennifer Peveich, our CFO.

12         Q.     You don't recall being involved in

13    any discussion about a targeted solutions line

14    item related to the opiate epidemic?

15         A.     Not by that phrase.  I'm sure it is

16    tied to our Opiate Task Force and all of the

17    many things that have been happening.

18         Q.     Well, whether it's by this phrase

19    or not, do you know what this refers to?

20                MR. KEARSE:  Object to form and

21    asked and answered.

22         A.     Again, it says "solutions," so they

23    have done a lot of things in the county.  I

24    assume it is money that was spent to fund those

25    programs.

Page 118

```
 1        Q.    Okay.  Do you know what programs it
 2   was funding?
 3              MR. KEARSE:  Object to form.  I'm
 4   just going to direct the witness not to guess
 5   as well.  So he has already answered.  He's
 6   told you specifically, to that line budget
 7   item, he does not know what that refers to.
 8              MR. BOEHM:  When the attorney is
 9   done, can you just go back up to my question
10   and read it back, please.
11              THE NOTARY:  Question:  "Do you
12   know what programs it was funding?"
13        A.    So I know what programs ADM, at
14   least some of them, what we fund, but I don't
15   know if that's what this line item is about.
16        Q.    Do you know what the source of
17   funds are for this particular line item?
18              MR. KEARSE:  Object to form.  Asked
19   and answered.
20        A.    I do not.
21        Q.    Which of the services contracts
22   that are reflected here for 2018 relate, in
23   particular, to opioid addiction and
24   opioid-related issues?
25        A.    Again, I can only read what you can
```

1    read.  So 21st Century Cures says opiates;

2    Targeted Solutions - Epidemic Opiates, says

3    opiates.  But opiates have affected so many in

4    our population, that I'm sure there is overlap

5    in virtually every one of them.

6          Q.    Okay.  But you know what these

7    entities are, right, as the medical director

8    for the Summit County --

9          A.    Certainly.

10         Q.    -- ADM Board?

11         A.    Yes.

12         Q.    And you know the services that they

13   have been contracted to render; don't you?

14         A.    At least broadly, yes.

15         Q.    Which of these service contractors

16   and contracts relate, in particular, to opioid

17   addiction?

18         A.    Well, all of the ones in the lower

19   half that says Alcohol/Substance Use Services

20   certainly have worked with individuals with

21   opiate-use disorder.  Ones that are really

22   targeted, that's very, very specifically,

23   UMADAOP for sure; community health center is

24   our largest addiction treatment agency; Edwin

25   Shaw is also a treatment agency for substance

1    use, I'm sure, therefore, opiates; Interval

2    Brotherhood Home is our largest residential

3    treatment program for addiction, they -- we

4    have a lot of discussions with them.  A lot of

5    their people are there for opiate-use disorder

6    treatment.

7             Mature Services, now called Vantage

8    Aging, is what it sounds like, it's older

9    adults.  Again they have a whole section that's

10   on treatment of addiction.  Oriana House is all

11   about addiction.  They work with the criminal

12   justice service for addiction, and then, in

13   particular for us, they run our detox center,

14   which is mostly, in the recent years, has been

15   seeing opiate addiction, as opposed to any

16   other addiction.

17            The Summit County Community

18   Partnership is -- specifically, has been

19   spending their time working on fighting the

20   opiate epidemic, giving out Deterra bags,

21   giving lectures and so forth.

22            Summit County Public Health, again

23   there is a lot of overlap there, because they

24   work with the whole public sphere of health.

25   They do a lot.  They distribute the Dawn kits,

Page 121

1    the naloxone kits to hopefully save lives

2    during an overdose.  The DARE program is the

3    law enforcement approach in schools to prevent

4    individuals from starting to use drugs.

5            Q.    Okay.  Thank you.

6                  Are any of these entities that you

7    have just, kind of, ticked through devoted

8    exclusively to opioid addiction?

9            A.    Not exclusively, no.

10           Q.    Are you able to break down what

11   proportion of the funds that are given to these

12   contracting agencies actually get directed

13   specifically to opioid treatment, as opposed to

14   treatment of other alcohol or substance abuse

15   disorders?

16           A.    Personally, I'm not, no.

17           Q.    Do you have somebody at the ADM

18   Board who could do that?

19           A.    I'm sure, based on the claims data,

20   they could decide what the person was at, say,

21   Interval Brotherhood Home, what addiction are

22   you here for, yes, they could on that.

23           Q.    Who would we ask about that, at the

24   ADM Board board?

25           A.    Again, Jerry Craig is your best

Page 122

1    source.

2         Q.    I saw a reference to Ms. Peveich,

3    and I think you've referenced her before as

4    well?

5         A.    Yeah.  Jen Peveich.  So she's our

6    director of operations/chief financial officer.

7    She is our money person.

8         Q.    So as the chief financial officer,

9    is she also somebody that we could ask about

10   that?

11        A.    Certainly.

12        Q.    What is the total cost to Summit

13   County, in relation to the opioid crisis,

14   during the years that you have been the chief

15   clinical officer and medical director for the

16   Summit County ADM Board?

17             MR. KEARSE:  Object to form.

18        A.    Again, I don't know the dollar

19   figure.  Clinically, it's hundreds of lost

20   lives.

21        Q.    Do you know what the number is?

22        A.    I do not.  I'm sure it's many

23   millions, but other than that, I couldn't -- I

24   can't guess that, no.

25        Q.    Would we have to ask Ms. Peveich?

Page 123

1          A.    Yes.

2                THE VIDEOGRAPHER:  May I change the

3    tape at this point?

4                MR. BOEHM:  You need a break?

5                THE VIDEOGRAPHER:  Yes, to change

6    the tape.

7                MR. BOEHM:  Yes.

8                THE VIDEOGRAPHER:  We are off the

9    record at 11:15.

10               (Pause.)

11               THE VIDEOGRAPHER:  We are back on

12   the record, 11:17.

13                        -   -   -   -   -

14               (Thereupon, Deposition Exhibit 4,

15               August 14, 2017 Email From Jennifer

16               Peveich, Beginning with Bates Label

17               SUMMIT 902497, was marked for

18               purposes of identification.)

19                         -   -   -   -   -

20         Q.    I'm going to hand you the next

21   exhibit to your deposition today.  It's marked

22   as Exhibit 4.

23               This is an August 14, 2017 email

24   from Ms. Jennifer Peveich, and she wrote this

25   email to you, to Mr. Jerry Craig, and to Ms.

Page 124

1    Mary Alice Sonnhalter; do you see that?

2          A.    I do.

3          Q.    Do you know see that the subject of

4    this email is, "Draft opioid cost and

5    demographic information"?

6          A.    I see that.

7          Q.    She writes that she's providing to

8    you a draft of information that was requested

9    by the Summit County Executive's office; do you

10   see that?

11         A.    I see that.

12         Q.    And that the request from the

13   Summit County Executive's office was related to

14   the cost of opiate use to the county for the

15   years 2012, 2013, 14, 15 and 16; do you see

16   that?

17         A.    I see that.

18         Q.    Do you recall seeing this email

19   from August of last year?

20         A.    Yes.  I'm sure I saw it, yes.

21         Q.    Who from the Summit County

22   Executive's office made the request for a

23   calculation of total costs of opiate use to

24   Summit County for the years 2012 to 2016?

25         A.    I think it was actually the county

1  executive.

2      Q.    It was Ms. Shapiro?

3      A.    Yes.

4      Q.    Why -- what is your understanding

5  as to why Ms. Shapiro requested this cost

6  analysis?

7      A.    She was relatively new, and I

8  believe she was working on a, whatever you call

9  it, state of the county speech, and she wanted

10  to be able to talk cogently about the epidemic.

11      Q.    Did you ever speak personally to

12  anyone in county government about this request?

13      A.    I did not.

14      Q.    And this task fell to Ms. Peveich,

15  for the reasons that you have described,

16  correct?

17      A.    Correct.

18      Q.    She is the right person to ask this

19  question of, right?

20      A.    Definitely the right person.

21      Q.    And if you turn to the next page,

22  we can see the attachment to Ms. Peveich's

23  email, right?

24      A.    Correct.

25      Q.    This is where she estimates total

Page 126

1    costs to Summit County related to opiate use

2    from 2012 to 2016, right?

3         A.    Yes.

4         Q.    And if you just take a look through

5    all the numbers, she comes to a grand total of

6    approximately 25 million dollars, total cost to

7    Summit County related to opiate use for the

8    years 2012 to 2016, correct?

9         A.    Yes.

10        Q.    Do you recall seeing this analysis?

11        A.    I recall it.  I wouldn't have

12   remembered the numbers, but, yes, I recall it.

13        Q.    Do you recall having a reaction to

14   this analysis?

15        A.    No.  I knew we were spending tens

16   of millions on it, so, no.

17        Q.    Did this number surprise you?

18             MR. KEARSE:  Object to form.  Asked

19   and answered.

20        A.    No.

21                   -  -  -  -  -

22             (Thereupon, Deposition Exhibit 5,

23             August 14, 2017 Email Exchange,

24             Beginning with Bates Label SUMMIT

25             902513, was marked for purposes of

1              identification.)

2                    - - - - -

3          Q.     Giving you a document that's been

4     marked as Exhibit 5, this is the continuation

5     of your email exchange with Ms. Peveich from

6     August of last year; do you see that?

7          A.     I do.

8          Q.     You wrote back to Ms. Peveich,

9     "Wow, 25 million"; do you see that?

10         A.     Yes, I do.

11         Q.     Why did you write, "Wow, 25

12    million"?

13         A.     I don't recall.  I also wrote,

14    "Looks pretty thorough."  I'm not the numbers

15    person, so...

16         Q.     My question to you is, this is

17    something you wrote, right --

18         A.     It is, yes.

19         Q.     -- "Wow, 25 million"?

20         A.     Uh-huh.

21         Q.     When did you mean when you wrote,

22    "Wow, 25 million"?

23              MR. KEARSE:  Asked and answered.

24    Object to form.

25         A.     I don't recall, but obviously, you

1   tell me you want to give me a check for 25

2   million, I'm going to say, "Wow, that's a lot

3   of money."

4        Q.    So you were said, "Wow, 25

5   million," you were saying that's a lot of

6   money?

7        A.    Right.

8        Q.    Did you expect it to be less?

9        A.    No.  I don't think I had --

10             MR. KEARSE:  Object to form.

11        A.    I don't think I had an expectation,

12   but it's a lot of money.

13        Q.    And then you wrote, as you

14   mentioned, "Looks pretty thorough."  What did

15   you mean by that?

16        A.    That it looks like she had gone

17   through all the possible expenditures and come

18   up with an accurate number.

19        Q.    Do you know if that's the analysis

20   that actually was submitted to the county

21   executive, in response to Ms. Shapiro's

22   request?

23        A.    I honestly don't know.

24        Q.    You don't know of any changes

25   having been made to that analysis, do you?

```
                                                    Page 129
 1                MR. KEARSE:  Objection.  Asked and
 2       answered.  He testified he doesn't know.
 3            A.    Yeah, I don't know.
 4            Q.    The answer is you are not aware of
 5       any --
 6            A.    I'm not.
 7            Q.    -- changes having been made, right?
 8            A.    Correct.
 9                        -   -   -   -   -
10                  (Thereupon, Deposition Exhibit 6,
11                  August 18, 2017 Email Exchange,
12                  Beginning with Bates Label SUMMIT
13                  902806, was marked for purposes of
14                  identification.)
15                        -   -   -   -   -
16            Q.    And here is a document that has
17       been marked as Exhibit 6 for this deposition.
18       This is still from August 2017, and Ms. Peveich
19       here is following up, asking whether anybody
20       else has any comments or suggestions; do you
21       see that?
22            A.    Yes.
23            Q.    And you wrote back to Ms. Peveich
24       saying, "None.  Looks solid as is"; do you see
25       that?
```

Page 130

1          A.     I do.

2          Q.     What did you mean by that?

3          A.     Similar to my "pretty thorough"

4     response, it looked like I couldn't give a

5     reason to think there was something faulty

6     about her calculations.

7          Q.     And, in fact, they looked thorough

8     and looked solid to you, right?

9          A.     Yes.

10         Q.     You indicated earlier that you

11    joined the ADM Board in May 2012, right?

12         A.     Correct.

13         Q.     But you said, I think, earlier, if

14    I heard you right, that you didn't know that

15    there was this opioid, as you put it, epidemic

16    happening until sometime in 2013; did I hear

17    your testimony correctly about that?

18         A.     That's correct.

19         Q.     Do you recall, Dr. Smith, that in

20    reality, you attended an opiate conference in

21    May 2012, the very month that you started at

22    the ADM Board?

23              MR. KEARSE:  Object to form.

24         A.     The only conference I recall

25    attending would have been one that the family

1   medicine put on from NEOMED, and I don't recall

2   if it was opiates or not.

3                        -   -   -   -   -

4                (Thereupon, Deposition Exhibit 7,

5                May 8, 2012 Agenda, Ohio's Opiate

6                Summit, was marked for purposes of

7                identification.)

8                        -   -   -   -   -

9        Q.    This is a document I have marked as

10  Exhibit 7.  It is a May 8, 2012 agenda for

11  something called Ohio's 2012 Opiate Summit,

12  Miles Traveled, Miles Ahead.  Does this look

13  familiar to you?

14       A.    Honestly, it goes not, but...

15       Q.    Do you recall having attended this

16  conference?

17       A.    I don't, actually.  I know many of

18  the presenters, but I don't recall this

19  particular conference.

20       Q.    Do you recall registering for this

21  conference?

22       A.    It's been a lot of years.  No.

23  I've registered for lots of conferences.

24       Q.    I'll represent that the county has

25  produced data to us that shows that you

1    registered for this conference in May of 2012;

2    does that ring a bell for you?

3         A.    I won't refute it, but...

4              MR. KEARSE:  Object to form.  I'm

5    not going to have you ask questions about a

6    conference he doesn't recall going to.  So, you

7    know, if you want to show him that he was

8    actually there.

9              MR. BOEHM:  I'm going to ask

10   whatever questions I want to ask, and you can

11   object to form.  You gave us data that showed

12   that he registered and attended the conference,

13   so...

14             MR. KEARSE:  If he doesn't recall

15   attending the conference.

16             MR. BOEHM:  Then let me ask the

17   question.

18             MR. KEARSE:  I did.  You did ask

19   the question, and he doesn't recall going to

20   the conference.

21             MR. BOEHM:  Okay.  So what are

22   you -- what are you doing right now?  Do you

23   want me to examine you, or can I turn back to

24   the doctor?

25             MR. KEARSE:  I would like to have a

Page 133

1    civil conversation --

2              MR. BOEHM:  I'm just not sure what

3    record you're making right now.

4        Q.   Dr. Smith, do you know what the

5    OACBHA is?

6        A.   Yes.

7        Q.   What is that?

8        A.   I don't remember the acronym, but

9    basically, OACBHA, as we say, is the

10   organization that represents all of the ADM

11   Boards across the state.

12       Q.   Okay.  And my counsel -- my

13   colleague has just reminded me that this

14   conference that is described in the agenda and

15   marked as Exhibit 7 was hosted by the OACBHA

16   and produced data showing that you registered

17   for this conference.

18             MS. KEARSE:  And, counsel, I would

19   like to know the Summit -- the number that

20   shows this was produced by Summit County.

21             MR. BOEHM:  This particular agenda

22   was produced by the OACBHA.

23             MR. KEARSE:  Okay.  So it was not

24   produced by Summit County.  So counsel has not

25   provided you with this information, and I would

Page 134

1    like to correct the record.

2                MR. BOEHM:  I just said that the

3    OACBHA produced this information, pursuant to

4    third-party subpoena.

5                MR. KEARSE:  Right.  Earlier you

6    suggested that counsel provided you with this

7    information --

8                MR. BOEHM:  I just --

9                MS. KEARSE:  -- from the Summit

10   County files.

11               MR. BOEHM:  I just clarified that

12   myself.

13               MR. KEARSE:  Okay.  Because I just

14   asked you to clarify it.

15               MR. BOEHM:  No.  I clarified it

16   before you jumped in.  Regardless --

17               MR. KEARSE:  I wanted -- to the

18   extent you are going to suggest that the

19   witness was at this conference when he just

20   testified he wasn't at the conference or

21   doesn't recall the conference, I'm just going

22   to --

23       Q.   Dr. Smith, did you testify that you

24   did not attend this conference?

25       A.   No.  I just don't recall.

Page 135

1      Q.    And if we have data from the OACBHA

2   reflecting that you registered for this

3   conference, you are not going to refute that,

4   right?

5      A.    Not that I registered, no.

6           MR. KEARSE:  Can I see the

7   document, please?

8           MR. BOEHM:  What document?

9           MR. KEARSE:  The one that you are

10  referencing that suggests he registered there.

11  I just would like to see the document that you

12  have in front of you.

13          MR. BOEHM:  I'm going to conduct

14  this deposition.  If you want to follow up

15  later, you can do that.  But I represented it

16  for the record.

17          MR. KEARSE:  Okay.  Well, you have

18  it right in front of you.  If you could show it

19  to me.

20          MR. BOEHM:  It's a printout from

21  the database that you have access to.  So if

22  you want to go look it up --

23          MR. KEARSE:  What's the Bates --

24          MR. BOEHM:  -- from OACBHA --

25          MS. KEARSE:  Is there a Bates

1  number on it?

2              MR. BOEHM:  We can talk off the

3  record.  I'm not going to waste more of our

4  time here.

5      Q.    You don't recall attending this,

6  Dr. Smith --

7      A.    Being the fifth business day that I

8  was working the ADM board, no, I do not.

9      Q.    Right.  Well, that's why I thought

10  it was interesting as well.  This was just a

11  matter of days after you joined the ADM Board,

12  right?

13      A.    Correct.

14      Q.    Is this something that would have

15  been of interest to you, as the medical

16  director for the Summit County ADM Board?

17      A.    Certainly.  I went to as many

18  clinical, and still do, clinical conferences

19  that I can, so...

20      Q.    And you can see that the subject of

21  this conference is opioid abuse, right?

22      A.    Well, it says, "Opiate Summit."  So

23  it's something about opiates.

24      Q.    Yeah.  If you look at it, Dr.

25  Smith, you can see, for example, Dr. Orman

Page 137

1     Hall; do you know who that is?

2          A.    Not doctor, but, yes, he was the

3     director -- he was the director of ODMHAS.

4     This is, again, before the departments merged.

5          Q.    And he gave a presentation at this

6     conference entitled Driving the AOD System

7     Response to Opiate Abuse in Ohio; do you see

8     that?

9          A.    Yes.

10         Q.    And then Mr. DeWine, now

11    Governor-Elect DeWine, gave a presentation

12    about Detouring Illegal Activity, right?

13         A.    Yes.

14         Q.    And the title of the conference is

15    Ohio's 2012 Opiate Summit.

16         A.    Right.

17         Q.    Fair to say that this was an agenda

18    for a conference on the subject of issues

19    related to opioid addiction and abuse in the

20    state --

21              MS. KEARSE:  Object to form.

22         Q.    -- fair?

23         A.    Yes.

24         Q.    Do you recall attending any

25    conferences related to opiate abuse in 2012?

Page 138

```
1         A.    Again, to place it in exact date
2    and time, no.
3         Q.    Do you recall, as part of your
4    efforts to try to understand the issue of
5    opiate abuse, going back and looking for
6    reports by any task forces or any other
7    entities that were charged with the
8    responsibility of trying to identify causes of
9    opiate abuse; did you do that?
10             MR. KEARSE:  Object to form.
11        A.    Sure.  At the time, not there
12   anymore, Aimee Wade's predecessor, John Ellis,
13   who really was our -- I came in as our forensic
14   expert, he came in as our addictions expert
15   about six months before me, I think.
16             So he was mostly the one collecting
17   information and sharing it with me.  When it
18   became clear that we had a lot of problem with
19   opiate overdose deaths, I actually then,
20   instead of attending the usual conferences I go
21   to in October, I went to a national conference
22   of the American Academy of Addiction
23   Psychiatrists, to try to enhance my education.
24   It would have been December of 13 or 14,
25   something like that, I think.
```

Page 139

1          Q.    In the year 2012, when you came

2     into the position of medical director for the

3     Summit County ADM Board, did you undertake to

4     try to identify and review any task force work

5     product on the subject of opioid abuse?

6               MR. KEARSE:  Object to form.

7          A.    I may have -- so Cuyahoga County

8     did start their Opiate Task Force before ADM,

9     and I don't know if it was in 12, but certainly

10    I went to some of their meetings, as we were

11    planning our Opiate Task Force in Summit

12    County, which we launched in early 14.

13               So I certainly went to

14    their -- those task forces, went to whatever

15    opportunities were offered; therefore, I'm not

16    surprised if I went to this.  I may have gone

17    to this, but do I recall the content, no.

18         Q.    Well, certainly if you went to this

19    conference in May 2012, just days after you

20    started as the medical director at Summit

21    County ADM, you certainly wouldn't say it

22    wasn't until 2013 that you became aware that

23    there were issues related to opiate abuse that

24    merited particular attention?

25               MR. KEARSE:  Object to form.

Page 140

1   Mischaracterizes his testimony.

2        A.    No.  All I'm saying is my

3   recollection was, and probably because we

4   started doing a lot of things in 2013, that it,

5   kind of, hit that high mark in 2013.

6              So perhaps I learned something in

7   12, but 13 is when we started to act on it with

8   various projects.

9        Q.    Okay.  Well, that's an important

10  distinction.  Your testimony is that you really

11  started to act on the opioid epidemic as part

12  of the Summit County ADM Board in 2013, but you

13  were aware of the opioid epidemic before that,

14  fair?

15             MR. KEARSE:  Object to form.

16  Mischaracterizes his testimony.

17       A.    I don't recall being aware, whether

18  I went to this conference or not.

19       Q.    Well, if you went to this

20  conference, that would certainly suggest you

21  were aware, right?

22       A.    Right.

23       Q.    And if you had looked for reports

24  that were produced by opiate-specific task

25  forces that were produced before 2012, that

Page 141

1   also would suggest that you were aware before

2   2013 about the opioid epidemic, correct?

3            MR. KEARSE:  I'm going to object to

4   form.

5            Are you okay?

6            MR. MASTERS:  Yes.  Sorry.

7        A.    Yes.  I mean, there is no doubt

8   that my very nature would be to start working

9   on trying to figure it out and help it as soon

10  as I was aware.

11           I'm just, again, important to you,

12  not important to me, in my mindset.  I would

13  have started acting on it as early as I could

14  have.

15       Q.    You would have wanted to research

16  this issue as quickly as you possibly could

17  have, right?

18           MR. KEARSE:  Object to form.

19       A.    Certainly.

20       Q.    So if, for example, there was a

21  task force report from 2010 that described

22  opioid abuse in Ohio as an epidemic, that's

23  something you would have wanted to identify,

24  read and understand --

25           MS. KEARSE:  Object.

Page 142

1      Q.     -- as part of your responsibilities

2   as the clinical director for Summit County ADM

3   Board; is that fair?

4                MR. KEARSE:  Object to form.

5      A.     Yes.  I would have wanted that even

6   from some other states, sure.

7      Q.     Do you recall undertaking that kind

8   of effort, to identify reports or writings or

9   articles that would help inform your

10  understanding of opioid abuse?

11     A.     I do.  I don't know timeframes, but

12  I certainly did -- I recall doing some

13  in -- learning something about -- I think they

14  had an earlier issue in New England, maybe

15  Maine in particular.  So I was looking for

16  information from what they were doing.

17               Again, I went to a conference I

18  wouldn't have normally -- previously gone to,

19  the American Addiction -- American Academy of

20  Addiction Psychiatrists conference, to be

21  amongst the experts, to learn, multiple

22  lectures and stuff about that.

23               And then once I was up to speed, I

24  started helping put on our own conferences.

25     Q.     So you don't know, sitting here

Page 143

1    today, exactly when you learned about the

2    opioid epidemic in Ohio and specifically in

3    Summit County; is that correct?

4              MR. KEARSE:  Object to form.

5         A.    Correct.  I know it was not while I

6    was at Northcoast, and it was sometime after I

7    joined the ADM board.

8         Q.    And your testimony, if I understand

9    it correctly, is that when you joined the ADM

10   Board, you would have undertaken, as quickly as

11   possible, to try and understand what was

12   happening in Summit County, with respect to

13   opioid abuse; is that fair?

14             MS. KEARSE:  Object to form.

15        A.    Once it was raised as an issue of

16   concern, yes.

17        Q.    And you indicated that at some

18   point, after undertaking that effort, you

19   yourself started to have and host conferences

20   on the subject of opioid abuse in Summit

21   County, right?

22        A.    Yes.

23                   -  -  -  -  -

24             (Thereupon, Deposition Exhibit 8,

25             Pamphlet Entitled The Role of the

Page 144

1              Physician in Prescription Drug

2              Abuse, Beginning with Bates Label

3              SUMMIT 930645, was marked for

4              purposes of identification.)

5                          -  -  -  -  -

6              MS. KEARSE:  A perfectionist.

7              MR. BOEHM:  Can you tell?  I want

8    to put it there so much.  It wasn't happening.

9         Q.    I just marked a document as Exhibit

10   8.  Do you remember this document?  And I'll

11   just say for the record, it is a pamphlet

12   related to a May 31, 2014 conference entitled

13   The Role of the Physician in Prescription Drug

14   Abuse.  Do you recall this?

15        A.    Yes.

16        Q.    What this is?

17        A.    So Dr. Thrasher, who is our

18   addiction expert at our detox center, and I

19   started talking about we need to do something

20   to educate physicians.

21             We did create a healthcare

22   subcommittee for the Opiate Task Force that

23   started in early 2014, but even before that, we

24   started looking at -- in 13, we started looking

25   at we need a way to educate the physicians, and

Page 145

1    not just psychiatrists, we meant primary care

2    and so forth, physicians about prescriptions

3    and the fact that they were leading to

4    addiction.  So that was -- we set forth to

5    create a conference.

6         Q.    Were you responsible for organizing

7    the conference?

8         A.    Both Dr. Thrasher and I, yes.

9         Q.    And you and Dr. Thrasher delivered

10   the opening remarks for this conference, right?

11        A.    That's correct.

12        Q.    Were you the individuals, you and

13   Dr. Thrasher, who were responsible for

14   identifying and inviting the speakers for this

15   conference?

16        A.    Yes.

17        Q.    How did you go about identifying

18   appropriate speakers for this conference?

19        A.    Well, our goal was to move quickly.

20   In this case, we didn't want to wait a long,

21   long time to get the first conference going.

22   So we went with individuals we were both aware

23   of in the Northeast Ohio region who were

24   addiction specialists, as well as Dr. Kohler,

25   who is our -- is and was our Summit County

Page 146

1    Medical Examiner, to give her perspective on

2    what was happening.

3         Q.    In your view, are all the doctors

4    who presented at this conference that you had

5    organized respected in the medical community?

6         A.    Yes.

7         Q.    And they had some expertise with

8    respect to prescription drug abuse that you

9    thought would be helpful for other doctors to

10   hear about, right?

11        A.    Yes.

12        Q.    The first speaker after you and Dr.

13   Thrasher is Dr. Christina Delos Reyes; do you

14   see that?

15        A.    Yes.

16        Q.    Who is that?

17        A.    She is the director of the

18   addiction fellowship program up at Case Western

19   Reserve University.

20        Q.    Was she the keynote speaker?

21        A.    Nobody was a keynote.  They were

22   all very important.

23        Q.    Do you recall if the speakers

24   developed slides and presented slides for this

25   conference?

Page 147

1          A.    At least some of them, I'm sure,

2     did, yes.

3          Q.    Did you receive copies of those

4     slides?

5          A.    I believe we actually posted them,

6     at some point, on our website.

7          Q.    The ADM Board website?

8          A.    Yes.

9          Q.    Do you know if those would still be

10    available there?

11         A.    I don't know if they are still on

12    the website.  I'm sure they are available

13    somewhere.

14         Q.    Where would we go to try and find

15    all of those slides developed for this

16    conference?

17         A.    I actually believe they were part

18    of the large, beyond a flash drive, whatever it

19    was, of stuff that we sent in the discovery

20    process.

21         Q.    You mean to the lawyers --

22         A.    Right.

23         Q.    -- for Summit County?

24         A.    They should be in the whole big

25    database.

Page 148

1        Q.    Okay.  And the next speaker is Dr.

2    Lisa Kohler.

3        A.    Correct.

4        Q.    Who is that?

5        A.    She is then and now is the Summit

6    County Medical Examiner.  She is a trained

7    forensic pathologist.

8        Q.    Right.  And then getting later on

9    in the day, Ms. Ann DiFrangia -- I don't know

10   that I pronounced that correctly -- spoke about

11   the OARRS database; do you see that?

12       A.    I do.

13       Q.    Who is Dr. DiFrangia?

14       A.    She is an addiction specialist at

15   what used to be called Edwin Shaw Rehab

16   Hospital.  They -- when Cleveland Clinic took

17   over, they changed the name to something else

18   at this point, but she is still at that agency

19   here in town as part of the Cleveland Clinic.

20       Q.    What is the OARRS database?

21       A.    So OARRS is the Ohio version -- I

22   always forget the initials, OENDP, or

23   something, program, where basically a physician

24   can go in and ultimately, by law, it became

25   required, it wasn't yet at that point, go in by

Page 149

1   law, and look up a patient's profile of

2   prescriptions, to make sure, basically, they

3   are not doctor shopping.  That was the original

4   purpose.

5           So, like, when I -- if I were to

6   prescribe Ambien for sleep, because, again, I

7   don't prescribe opiates, but as a controlled

8   substance, I would look up John Jones, I have

9   to put a date of birth and a zip code, I think

10  that zip code is anywhere he lived in the last

11  ten years -- actually, it's a pretty thorough

12  database.

13          It will then pull up and show me

14  the physicians, the medications, the dosages,

15  the number of pills, the pharmacy, and then

16  that allows me to make sure he didn't just get

17  some Ambien three days ago from his primary

18  care doctor and so forth.

19      Q.   What does OARRS have to do with the

20  abuse of prescription drugs and, in particular,

21  opioids?

22      A.   Well, again this was a conference

23  by physicians for physicians.  So we wanted to

24  make sure, even though the law had not required

25  it yet, we wanted to make sure physicians knew

Page 150

1    this was a tool to help prevent doctor shopping

2    and, if you will, accidental even,

3    overprescribing.

4              If I prescribe, but he just got

5    some, that would be, kind of, an accidental

6    overprescribing of what the substance was.  So

7    where it was an educational moment for the

8    doctors.

9         Q.   Was the Summit County ADM Board

10   advocating for the passage of requirements in

11   the medical community to use the OARRS database

12   in connection with prescribing opioid

13   medications?

14             MS. KEARSE:  Object to form.

15        A.   We certainly were in favor of it.

16   I don't know whether there was a subcomponent

17   of our task force, because we had a separate --

18   an advocacy and policy component.  They may

19   very well have been advocating.  I don't recall

20   if they officially did.

21        Q.   In what ways did the OARRS

22   database, if at all, relate to accidental

23   overprescribing?

24             MR. KEARSE:  Object to form.

25        A.   So it would help a physician make

1    certain that he or she was not giving some, you

2    know, say, a 30-day of supply of something to a

3    patient that they actually just got from

4    another doctor that, by the way, they didn't

5    happen to tell this doctor that they got.

6              So it would avoid getting more

7    pills than is needed medically.

8         Q.    Okay.  When did it become a

9    requirement in Ohio that physicians use the

10   OARRS database?

11        A.    I believe officially required was

12   something like April 1 of 2015.

13        Q.    All right.  The next speaker is

14   somebody by the name of Gregory Boehm, who must

15   be a distinguished fellow, as he shares my last

16   name.  Tell me about Dr. Boehm.

17        A.    So he is actually somebody Dr.

18   Thrasher knew and recruited, but he works with

19   adolescents and addiction, also through

20   Recovery Resources, which is a treatment agency

21   up in the Cleveland area.  It actually recently

22   merged with MetroHealth.

23        Q.    Okay.  Is he respected in the

24   medical community?

25        A.    That's my understanding, yes.  I

Page 152

1    actually had not met him before or since that

2    day, but I met him that day.

3         Q.    Do you know Dr. Samer Narouze, who

4    is down there at the 1:45 speaking slot on the

5    agenda?

6         A.    Right.  So I met him that day.

7    Another person -- again, a lot of these are

8    addiction people, and if they are not directly

9    at one of our agencies, I wouldn't know them.

10              But, yeah, he came as very highly

11   respected, and came and spoke about chronic

12   pain, because they have a chronic pain

13   specialty at the Western Reserve Hospital,

14   which used to be part of Summa, but is no

15   longer part of Summa.

16        Q.    His presentation was entitled Best

17   Practices in Managing Chronic Pain, right?

18        A.    Correct.

19        Q.    Do you recall what he had to say

20   about that subject?

21        A.    Not in any detail.  His goal was to

22   talk about, okay, if you want to avoid

23   addiction, but you still need to treat pain,

24   here is how he recommended people go about it,

25   but I don't recall exactly what he said in

1    detail.

2          Q.    Do you know if Dr. Narouze

3    prescribes or prescribed opioid medications?

4          A.    I'm certain he does, does or did.

5          Q.    Do you know anything about Dr.

6    Narouze's view on appropriate prescribing

7    guidelines for opioid medications?

8                MS. KEARSE:  Object to form.

9          A.    I don't know specifically what his

10   thoughts are.

11         Q.    You said that you first learned

12   about opioids while you were in medical school,

13   right?

14         A.    Certainly.

15         Q.    And you said that you learned then

16   that opioids have addictive properties?

17         A.    Yes.

18         Q.    Fair to say you would be surprised

19   if there is a doctor out there who doesn't know

20   about that?

21               MR. KEARSE:  Object to form.

22         A.    Yes.

23         Q.    But not everybody who uses an

24   opioid becomes an addict, correct?

25               MR. KEARSE:  Object to form.

Page 154

1           A.     That's correct.

2           Q.     In fact, overwhelmingly, people

3    don't become addicts just because they use an

4    opioid, true?

5           A.     Well, my understanding, there is

6    like a dose frequency response curve, that if

7    you take them long enough, you will certainly

8    develop tolerance, that would happen to

9    anybody's brain, and that that increases the

10   likelihood that somebody will develop an actual

11   addiction.

12          Q.     My question to you is, isn't true

13   that most people who use an opioid do not

14   become an addict?

15                 MR. KEARSE:  Object to form.

16          Q.     Do you agree with that?

17          A.     I'm thinking of whether I have seen

18   statistics, but, I guess, yeah, probably not.

19   It's certainly not 50 percent or more.  So I

20   would say you're correct.

21          Q.     You don't know what the percentage

22   is?

23          A.     I do not.

24          Q.     Why do some individuals who use

25   substances with addictive properties become

Page 155

1    addicted, while most people don't?

2                    MR. KEARSE:  Object to form.

3         A.    So my understanding is that, you

4    know, any of us have -- we all have a reward

5    system in our brain, and for some of us, we're

6    fortunate that reward system is turned on by

7    reading or streaming Netflix or riding a

8    bicycle or what have you, but there are some

9    people whose reward system gets particularly

10   turned on by certain substances.

11                    So that might be an opiate, for

12   some people that might be alcohol, some

13   unfortunate individuals it might be both, and

14   those individuals, once their brain has been

15   rewarded through that pathway, they want more

16   of it, and then they will do things to get more

17   of it.

18        Q.    Why would one person's brain

19   respond differently than another person,

20   exposed to the same substance?  What is the

21   science behind that?

22        A.    Genetic variation amongst brains.

23   Some people have a genetic predisposition, and,

24   again, I think some of that is, you know, maybe

25   there are certain people where their first dose

Page 156

1    turns on the reward system so much, that they

2    are maybe automatically addicted.  They now

3    have that disease.

4              There might be others who had to

5    take it for weeks or months and, within that

6    time period, it turned it on and off, they

7    developed it.

8         Q.    Is it true -- well, let me back up.

9              Are you a specialist in addiction

10   medicine?

11        A.    That depends on how you define

12   that.

13        Q.    Okay.  Well, let's be more

14   specific.  Can somebody become board certified

15   in addiction medicine?

16        A.    Yes, I believe they can now.

17        Q.    Are you board certified in

18   addiction medicine?

19        A.    I am not.

20        Q.    Would you hold yourself out to the

21   medical community as a specialist in addiction

22   medicine?

23        A.    No.

24        Q.    Do you know enough to talk and to

25   express opinions about what are the root causes

Page 157

```
 1   of addiction?  For example, you mentioned
 2   genetic predisposition.
 3         A.    So I can talk about genetic
 4   predisposition and about the brain and the
 5   reward pathway.  I don't know that science has
 6   determined exactly who may or may not get
 7   addicted.  We certainly can't do a blood test
 8   and predict that she would but she wouldn't,
 9   for example.  So I don't think there is anybody
10   who has that expertise.
11         Q.    So it's complicated from a
12   prescriber's perspective, without having a
13   blood test, to know exactly who is going to
14   have the brain that gets turned on, versus who
15   is going to have the brain that doesn't?
16               MR. KEARSE:  Object to form.
17         A.    Correct.  We can go through
18   clinical information.  We expect physicians to
19   ask about family history about addiction,
20   because we do get our genes from our relatives,
21   from our parents, so we would try to screen for
22   it that way.
23               And if somebody has had an
24   addiction to one substance, we would be more
25   careful.  They might be able to become addicted
```

Page 158

1    to another substance.

2         Q.    So if I understand you correctly, a

3    healthcare provider who is looking face-to-face

4    with a patient, trying to render a medical

5    judgment, has the advantage of being able to

6    examine that individual, ask questions of that

7    individual, and better inform their prescribing

8    decision; is that fair?

9              MR. KEARSE:  Object to form.

10        A.    Yeah.  There is a doctor-patient

11   discussion to determine risks.

12        Q.    But that process will not perfectly

13   predict outcomes, correct?

14        A.    Correct.

15        Q.    That's impossible?

16             MR. KEARSE:  Object to form.

17        A.    Yeah.  Medical science doesn't have

18   an exact test yet.

19        Q.    Now, just to go back quickly on the

20   question of addiction science.  You're not

21   board certified in it.  Have you ever received

22   any specific training in addiction medicine?

23        A.    I mean, in residency, I did

24   rotations in addiction.  So certainly I treated

25   many individuals on one particular unit,

1    inpatient unit, and some outpatients for their

2    addiction.

3         Q.    What about outside of your

4    residency?

5         A.    And then what I have learned

6    through my role at ADM, as well as attending

7    the various conferences, including the American

8    Academy of Addiction Psychiatrists.

9         Q.    You described some of these doctors

10   who presented at your May 2014 conference as

11   addiction specialists?

12        A.    Yes.

13        Q.    You said many of them were

14   addiction specialists, right?

15        A.    That's correct.

16        Q.    So what would distinguish a doctor

17   like that, who you would call an addiction

18   specialist, from a doctor like you, who may

19   have some experience with addiction, but it's

20   not your area of specialty?

21             MS. KEARSE:  Object to form.

22        A.    So there is two routes to that.

23   One would be that they would go through an

24   actual fellowship, such as one that Dr. Delos

25   Reyes runs, and they would actually learn all

Page 160

1    about addiction prevention, treatment, and so

2    forth.

3              The other route would be that they

4    ended up in a job where they are spending a lot

5    of time treating people with addiction, and

6    over time they would certainly be seen as

7    experts.

8         Q.    Are there some individuals whose

9    brain is predisposed to be a addict, kind of

10   based on a lot of -- let me start that question

11   over, see if I can explain this idea right to

12   you.

13             Are there some --

14             MS. KEARSE:  A question.

15             MR. BOEHM:  What's that?

16             MR. KEARSE:  Hopefully, there is a

17   question.

18             MR. BOEHM:  Well, I hope not to be

19   able to disappoint you today.

20        Q.    Dr. Smith, are there some people

21   whose brain is, kind of, predisposed to

22   addiction, across a variety of substances?

23             MR. KEARSE:  Object to form.

24        Q.    Does that question make sense to

25   you?

Page 161

1      A.     Yeah.   There are certainly people

2     who seem to become addicted more readily to a

3     wide array of substances, yes.

4      Q.     Is that more common than not, when

5     you are talking about addicts?

6            MR. KEARSE:   Object to form.

7      A.     Many of the people that we've --

8     that I am told about in our system are coming

9     in for one particular addiction, but, yes,

10     there is -- as we expand the availability of

11     marijuana, that's adding to the mix, so you are

12     finding more people.

13            Are they actually addicted?

14     Perhaps not, but there may be polysubstance

15     use, even though the person may actually have

16     the disease of addiction to one of the

17     chemicals.

18      Q.     What do you mean by "polysubstance

19     use"?

20      A.     We use the phrase when somebody

21     comes in for treatment, and we learn that they

22     are using marijuana and cocaine and opiates and

23     what have you.  So they would be using more

24     than one potentially addictive substance, but

25     many times, if they are coming in for

1    treatment, they are really coming in for one

2    particular diagnosable use disorder.

3         Q.    Why is that?  If they are using

4    many different addictive substances, why would

5    it be that they are coming in to treatment for

6    only one of those substances; why wouldn't they

7    be getting treatment for more than one?

8              MR. KEARSE:  Object to form.

9         A.    So a disease of addiction means

10   that you spend your time either using the

11   substance, obtaining the substance, or thinking

12   about obtaining the substance, and then all the

13   behaviors that come from that, such as selling

14   your parents' TV set to get the money to buy

15   the drugs.

16             So that's the disease of addiction,

17   where basically the addicted part of your

18   brain, the animal part of your brain, is

19   fooling the thought -- thinking -- the one we

20   are all using today a lot, the thinking part of

21   our brain, and making it believe that these

22   behaviors are necessary, although not their

23   usual behavior.

24             So that would be addiction.

25   Somebody might use marijuana twice a week, in

Page 163

1    quotes, recreationally, and it doesn't trigger

2    their reward system to lead to the addiction as

3    an illness.  But they might have taken

4    Percocet, and their brain got turned on by

5    that, and they are actually actively addicted,

6    that is, doing all those behaviors.  That would

7    be the difference.

8         Q.    Is it common for addicts to be

9    using multiple addictive substances at the same

10   time?

11              MR. KEARSE:  Object to form.

12        A.    I'd say, yeah.  It's not rare,

13   sure.

14        Q.    And is there some medical

15   explanation for that?

16        A.    A lot of people don't like, you

17   know, how they -- maybe they use a substance,

18   because they are addicted to it, maybe it gives

19   them a side effect they don't like.  They may

20   look for something else to get rid of the side

21   fact, which might, of course, since they are

22   already buying drugs, often illegally, then

23   might be something else they buy on the street.

24   There is lots of theories behind it.

25        Q.    Okay.  From a forensic perspective,

Page 164

1   or a statistical perspective, would you be able

2   to see a list of substances that somebody was

3   using and make a determination as to which

4   substance, in particular, the person was

5   addicted to, or is that something you would

6   need to determine based on a clinical

7   relationship?

8            MS. KEARSE:  Object to form.

9       A.    I would need some sort of data that

10  would lead me to that conclusion, such as

11  multiple admissions for that particular use

12  disorder, or I would need that relationship.  A

13  list alone would not tell me the answer.

14      Q.    Would not tell you what substance

15  was the one that person was addicted to?

16           MS. KEARSE:  Object to form.

17      A.    Correct.  There are some medical

18  record systems where you put in -- whatever you

19  put in first is what they are there for, so you

20  might argue that, but that's not uniform.

21      Q.    Just reviewing the documents, Dr.

22  Smith, it appears to us that one of the things

23  that the Summit County ADM Board has undertaken

24  to do is to identify the root causes of opiate

25  addiction and its impact in Summit County; is

Page 165

1    that fair?

2              MR. KEARSE:  Object to form.

3         A.    What do you mean by "root causes"?

4         Q.    Well, there has been some reference

5    to something called an opioid epidemic, right?

6         A.    Correct.

7         Q.    And that's something -- a term that

8    you've used?

9         A.    Correct.

10        Q.    So when I talk about the ADM

11   Board's efforts to try and understand the root

12   causes, I'm talking about the board's efforts

13   to try and understand what has caused this

14   level of opioid abuse that sometimes gets

15   referred to as an epidemic; does that make

16   sense?

17        A.    Yeah, that's correct.  Epidemic is

18   used as a technical term, because the

19   statistics, as done by epidemiologists, show

20   that it is an epidemic, based on how we define

21   epidemics.  It's not just a word I'm using.  It

22   is actually a technical term, because it

23   reached that level.

24        Q.    Okay.  But my question is slightly

25   different.  I'm just confirming that one of the

Page 166

1   things that the Summit County ADM Board has

2   undertaken to do is to try and identify the

3   causes of this opioid epidemic and its impact

4   specifically here in Summit County; is that

5   correct?

6                   MS. KEARSE:   Object to form.

7        A.     Yes.

8        Q.     And is it fair to say that the ADM

9   Board has summarized those findings and

10  conclusions and presented those findings and

11  conclusions to the community here in Summit

12  County?

13       A.     Yes.

14       Q.     What are we at, 9?

15       A.     Yes.

16                        -   -   -   -   -

17                   (Thereupon, Deposition Exhibit 9, A

18                   Document From the Summit County

19                   Opiate Task Force, Beginning with

20                   Bates Label SUMMIT 821280, was

21                   marked for purposes of

22                   identification.)

23                        -   -   -   -   -

24       Q.     You are looking right now at a

25  document, Dr. Smith, that has been marked as

Page 167

1    Exhibit 9, for purposes of your deposition.  It

2    is a document from the Summit County Opiate

3    Task Force; do you see that?

4            A.    Yes, I do.

5            Q.    What is the Summit County Opiate

6    Task Force?

7            A.    So starting in -- well, we planned

8    it in 2013, but in early 2014, we launched the

9    opiate task force.

10               This was to -- as we determined how

11   difficult it was going to be to, we call it,

12   fight the opioid epidemic, we realized it was

13   going to take a village, as they say or, in

14   this case, a whole county.

15               So we pulled together the task

16   force.  The task force started with four, now

17   has six subcommittees, and the goal of the task

18   force was to work on every possible avenue, to

19   decrease needless deaths from opiate overdoses.

20           Q.    You indicated that -- I think you

21   said "we" set this up.  Did you mean that the

22   ADM Board for Summit County is the entity that

23   set up the Summit County Opiate Task Force?

24           A.    Correct.  We are the ones who

25   initially planned it and launched it, yes.

Page 168

1      Q.     Does the Summit County Opiate Task

2  Force have its own leadership?

3      A.     Our goal was to make it a truly

4  fully community-held entity.  In practice, we

5  tend to -- ADM tends to orchestrate all of the

6  quarterly meetings and, through that mechanism,

7  you could say, provide some leadership, but

8  each of the subcommittees have their own

9  leaders, drawn from community, and, you know,

10  we don't tell them what to do.  So they are

11  their own leadership.

12      Q.     What are the subcommittees for the

13  task force?

14      A.     So we have a -- no surprise -- a

15  healthcare subcommittee.  Dr. Thrasher is

16  actually one of the cochairs of that, along

17  with Dana Nelson, who is at Akron Children's.

18  I will not know all the chairs.  I know that

19  one.

20          We have a criminal justice

21  subcommittee, for law enforcement and judges

22  and so forth, to figure out what angle their

23  branches of government can bring to bear.  We

24  have a policy and advocacy subcommittee.  They

25  work with legislators.  Both state and federal

```
 1    have come to our task force at times.
 2                We have an youth subcommittee.
 3    That was a sad but kind of enlightening thing.
 4    When we started the task force, we use to be at
 5    4:00 in the afternoon, and we suddenly had
 6    these young women showing up.  It turned out
 7    they had lost their brothers to opiate
 8    overdoses, and they wanted to do something
 9    about it.  So we then had to create -- we moved
10    our meetings -- I'm sorry.
11                We used to have it in the morning.
12    We moved to the afternoon so they could come
13    after school.  So the youth subcommittee has
14    been very, very strong.
15                How many did I list?
16         Q.    You said healthcare, criminal
17    justice, policy and advocacy, and youth.  So
18    you have identified four subcommittees.
19         A.    Okay.  I would have to look at a
20    document to remember every single one of them,
21    but...
22         Q.    No others come to mind right now?
23         A.    I do most of my work with criminal
24    justice and healthcare, so...
25                Yeah, I don't recall the other two.
```

1    I'll have to -- I'm sure it will be in a

2    document somewhere.

3         Q.    That's okay.  Do you know who runs

4    the task force?  Who is the head of the task

5    force?

6         A.    So from a leadership perspective,

7    ADM really has taken the leadership.  We have

8    in recent -- in the recent year, I think, we

9    have hired a woman name Chyna Darrington to be

10   our lead of the Opiate Task Force.  So she is

11   now --

12        Q.    What's the name again?

13        A.    Chyna, it's C-H-Y-N-A, Darrington,

14   I think it's D-A-R-R-I-N-G-T-O-N.  So she has

15   been our -- relatively new, but she has come in

16   as the leader, to help coordinate the meetings

17   and so forth.

18        Q.    When was she hired?

19        A.    I believe this year.

20        Q.    Was there somebody who had her

21   responsibility before she was hired?

22        A.    No.  It was Phil and us at ADM.

23        Q.    Who at ADM was leading that charge?

24        A.    Well, when Jerry quit, Craig would

25   be the one who would usually chair the big

1    quarterly meeting.  Either myself or Eric

2    Hutzell would, kind of, go over the data

3    dashboard, kind of, how the metrics were going,

4    and then we would have other people come

5    present from each of the task forces.  So

6    again, they are their own leadership.  No one

7    is telling them what to do.

8         Q.    You mean from each of the

9    subcommittees?

10        A.    Yeah, subcommittees, yes.

11             Yes, so there was no one person who

12   could dedicate his or her time, and that's, we

13   felt, that was important, so...

14        Q.    Okay.  Based on this document that

15   I've marked as Exhibit 9 and that is in front

16   of you now, it appears that one of the things

17   the task force has done in Summit County is to

18   present findings about the opioid epidemic to

19   the broader community; is that fair?

20        A.    Yes.

21        Q.    This one looks like it was done in

22   Barberton?

23        A.    Correct.

24        Q.    Do you remember this particular

25   presentation?

Page 172

1          A.     Well, it's a document, but I don't.

2          Q.     Is this similar, in form and

3    content, to other presentations made by the

4    task force to community members in Summit

5    County?

6          A.     I mean, everybody uses their own.

7    Some use PowerPoint, some are using this.  This

8    looks like it was somebody's script.  It says,

9    "Thank you for the opportunity."  So it looks

10   to me like somebody wrote this out so they

11   could follow along, as they gave a talk.

12         Q.     Is this something that you would

13   have an opportunity to review, before an

14   individual went to make a presentation?

15         A.     No.

16         Q.     I say that, because this is

17   something that was produced to us from your

18   files.  Do you know why a document like this

19   would be in your files?

20         A.     Anything that's come up around

21   opiates, I have tried to collect it and keep it

22   and so forth.  So I've got a lot of stuff in

23   the files.

24         Q.     This document appears to reflect

25   the Summit County Task Force's conclusions in

Page 173

1    it and, therefore, the ADM board's conclusions

2    about how the opioid epidemic happened.  Do you

3    see the first question there, it's, "How did

4    this happen?"

5              A.    Yes.

6              Q.    And is that a fair characterization

7    of what we are looking at here on the first

8    page?

9              A.    Yes.

10             Q.    So the first thing on the list here

11   is marketing; do you see that?

12             A.    Yes.

13             Q.    Could you describe for us why you

14   think this had something to do with opioid

15   abuse in Summit County?

16             A.    Sure.  I mean, there is only two

17   countries in the entire world that allow

18   pharmaceutical companies to market their

19   medications directly to the enduser, us and New

20   Zealand.  I'm sure that's why New Zealand is on

21   there.

22                   And, as a result of that, Americans

23   are much more likely to become aware of the

24   medications, in this case the opiates.

25             Q.    Are you talking about

Page 174

1    direct-to-consumer advertising?

2           A.    Yes.

3           Q.    And in the United States,

4    direct-to-consumer advertising is legal and

5    permitted, under United States law, right?

6           A.    That's correct.  But we are only

7    one of two countries in the world that allows

8    that.

9           Q.    And do you disagree with the laws

10   allowing direct-to-consumer advertising?

11          A.    Well, based on the opiate epidemic,

12   I do now, yes.

13          Q.    That's a decision that's made by

14   legislators, right?

15          A.    That's correct.

16          Q.    Have you yourself ever had direct

17   interaction with a representative of any

18   manufacturer of an opioid medication?

19          A.    That's a good question.  Again, I

20   don't prescribe them, so I don't tend to have

21   those reps.  I certainly do psychiatric meds.

22                I think the only one would be an

23   anti-opiate medication.  I've met with the

24   Alkermes, it's A-L-K-E-R-M-E-S, representative

25   about Vivitrol.

Page 175

1          Q.     You mean, like, an overdose
2     reversal type of medication?
3          A.     Vivitrol is the injectable,
4     Naltrexone, so it actually is one of our
5     medications that we use for medication-assisted
6     treatment.  So it's a blocker.  It's an
7     antagonist.
8          Q.     Okay.  Also under this marketing
9     category there is a reference to a new
10    philosophy of pain management; do you see that?
11         A.     Yes.
12         Q.     What does that refer to?
13         A.     Well, again, I haven't read this,
14    but I believe it goes hand to hand with the
15    physician piece, which is the concept that
16    perhaps pain was undertreated, and pain is a
17    vital sign, like pulse or respirations and,
18    therefore, you know, say prior, I don't know
19    the exact dates, I'll say 1995, because I'm
20    sure that's true, you know, prior to 1995, if
21    somebody sprained their ankle, they get rest,
22    ice, elevation, maybe Ibuprofen, a week later
23    maybe a heating bad.
24              The philosophy changed to where
25    suddenly people were getting particularly

Page 176

1    Percocet and Vicodin, and I would think that

2    was a change in philosophy of pain management.

3           Q.    When you talk about a change in

4    philosophy of pain management, who is adopting

5    this new philosophy; what are you talking about

6    in terms of this mindset?

7                 MR. KEARSE:  Object to form.

8           A.    Well, I didn't write this, but I

9    believe -- I believe --

10          Q.    Let's just pause there.  I'm happy

11   to have you look at this, but I understand this

12   to be from the Opiate Task Force for Summit

13   County, and I understand that entity to be

14   under the direction and control of the ADM

15   Board.

16                So if there is anything in here

17   that you disagree with, in terms of your

18   physicians or you think mischaracterizes it,

19   then I would be happy to pause and let you look

20   at it, and you can let me know if that's the

21   case.  Do you want to do that?

22          A.    No.  The point is if they write a

23   phrase, "A new philosophy," I don't know

24   exactly what the writer meant by that phrase.

25   I can describe to you what I believe has

Page 177

1    happened with that, which is, again, we went

2    from my training, prior to 1995, that we should

3    be very careful about addictive substances of

4    all types that we could prescribe and,

5    therefore, not use them unless it was really

6    extreme.

7             So my training on opiates was

8    end-of-life pain, cancer pain, maybe a kidney

9    stone or childbirth, but it was not ankle

10   sprains, it was not low back pain.

11            And the change seemed to be, and I

12   don't know exactly all the parameters there,

13   but whether that really came from patients or

14   really came from some other forces, was that we

15   would start to give out addictive opiates to a

16   much broader group of people, and the net

17   result of that is you find more of those brains

18   that we never would have found under the old

19   model.

20            You would find more of those brains

21   that have a predisposition for addiction to

22   opiates, and you now end up with a bunch of

23   people addicted to opiates, who never would

24   have, and some of them died.

25        Q.    I think, if I hear you right, you

1    are saying that prescribing practices of

2    healthcare providers shifted to prescribe

3    opioid medications more commonly than they

4    maybe would have sometime earlier; is that

5    right?

6           A.    They shifted under pressure, yes.

7           Q.    When you say "under pressure," what

8    do you mean?

9                 Why do you think that physicians

10   changed the guidelines in terms of -- well, let

11   me actually back up and say it, I hope, better.

12                What do you think accounts for the

13   changing guidelines for increased prescribing

14   of prescription opioid medications?

15          A.    So I believe somewhere around 2001,

16   I'm sure there was pressures from -- not from

17   physicians, prior to this, the Joint Commission

18   adopted, and they are the ones who accredit

19   hospitals and outpatient programs, including

20   the state psychiatric hospital I worked at for

21   years.

22                Joint Commission adapt -- I think

23   they were -- used to JCAH, and now they are

24   just the Joint Commission, they adopted pain as

25   the fifth vital sign, in the sense that they

Page 179

1     incorporated it into standards.

2              So when they would come to survey,

3     including my own hospitals at the time, we were

4     required to do all -- jump through all sorts of

5     hoops, to make sure that a patient's pain was

6     managed, even though nobody was coming to our

7     hospital for pain, we would have to do that.

8              The net result was, there was a lot

9     of pressure, because you had to meet standards,

10    there was pressure on physicians to start

11    handing out Vicodin and Percocet in particular,

12    sometimes OxyContin, when we, otherwise, would

13    have been giving Ibuprofen and Tylenol, and

14    that definitely did not come from the

15    physicians.

16         Q.   Well, you talked about this Joint

17    Commission.  Can you tell us more about what

18    the Joint Commission is?

19         A.   Yes.  So they are a private entity,

20    although they're -- for many years now they

21    have been very connected to Centers for

22    Medicare and Medicaid.  So I'm not sure how

23    private they are anymore.

24              But they go in, and they will

25    survey an outpatient setting or a hospital.

Page 180

1    They have a huge list of standards, everything

2    from using separate cutting boards for your

3    meat and your vegetables, to how you address

4    pain, and everything in between.

5              So we are -- the hospitals -- it's

6    a badge of honor, basically, to be Joint

7    Commission accredited.  No hospital wants to

8    not be Joint Commission accredited, and as a

9    result of that, hospitals work to comply with

10   these standards, even if they disagree with

11   them, even if they are in the background

12   pushing back on them, which I did, actually, at

13   Northcoast, before knowing there was an opioid

14   epidemic.

15             So we -- we were forced, in effect,

16   to start paying a lot of attention to pain and,

17   in effect, forced to start giving Percocet and

18   Vicodin and other things that we certainly

19   would not have been planning to give prior to

20   that.

21        Q.    You talked about how the joint

22   commission adopted pain as a fifth vital sign;

23   did I hear you right?

24        A.    That's correct, and that's in the

25   document.

Page 181

1          Q.    And what does that mean?

2          A.    So they, and I don't know who they

3     was, somebody prior to Joint Commission created

4     this, I don't know who created it.  They

5     brought the idea up, and Joint Commission

6     adopted it.

7               That concept was that it's so

8     important in a hospital to pay attention,

9     obviously, to your life vital signs.  Pain is

10    equally as important, as a vital sign, as your

11    blood pressure.  It is so important that you

12    must address it, just as if you would address

13    their heart rate being too slow or their blood

14    pressure being too low, i.e., really putting it

15    at a really high bar.  This is like really,

16    really important, like, life requirements.

17               Even though physicians didn't agree

18    with that, I've heard many physicians say that,

19    number one, it's not a vital sign; number two,

20    the only way you can even wrap your mind around

21    it is that if you are in pain, you know you are

22    alive.  So that, I guess, is a vital sign.

23    That's what I mean by that.

24         Q.    How did that impact the way in

25    which prescription opioid medications were

Page 182

1    being prescribed by healthcare providers?

2          A.    I think it tremendously increased

3    the prescribing of opiates.  And as you see on

4    the document, led to the United States, even

5    though we are not even 5 percent of the world's

6    population, using 99 percent of the world's

7    Vicodin.  That's not happenstance.  That is

8    clearly there was pressures to lead to that

9    problem.

10         Q.    You indicated there was pressure on

11   physicians to prescribe more pain medications;

12   did I hear you right?

13         A.    Yes.

14         Q.    What did you mean by that?

15         A.    Well, if you are told by the

16   leaders in your hospital or clinic that you

17   have to take pain as seriously as pulse, then

18   you are now going to do more and more and more

19   and more about that, which is what happened.

20              Add to that that some hospital

21   systems were actually then giving at least

22   partial -- partial reimbursement of physician

23   salaries, and I'm saying physicians, eventually

24   it was all prescribers, with nurse

25   practitioners, but partially your salary was

Page 183

1   tied to your patient satisfaction scores.

2           So you have a lot of people coming

3   in with addiction, and you're saying, "No, my

4   clinical judgment is I'm not going to give you

5   any more Percocet," and they say, "Well, then

6   I'm going to downgrade you," suddenly you've

7   just hurt your own salary by doing what

8   clinically you believe is right, and over time,

9   human nature is you're going to just -- fine, I

10  want my money, like anybody else does, and

11  you're going to end up overprescribing, because

12  it's the only illness where patients are

13  basically now allowed to dictate the treatment

14  they get.

15       Q.    Can you tell us more about these

16  patient satisfaction surveys; how did that

17  work?

18       A.    So big ones, like -- even like

19  Press Ganey, basically, I would give, if I

20  treated -- let's say over the course of a

21  month, I treated everybody in this room.  At

22  some point thereafter, you would be given the

23  opportunity to fill out a satisfaction survey.

24           The survey would ask questions

25  about your care, did you feel like you got the

                                        Page 184

1    right treatment, or maybe even the right

2    medications, depending on the survey, and, of

3    course, if this part of your brain is now being

4    tricked by your addicted brain, your illness,

5    well, now you're really pretty dissatisfied

6    that Dr. Smith wouldn't give you -- wouldn't

7    double your dose of Percocet.

8            So now I get a de- -- I get a low

9    report, and I get enough of those from people

10   with addictions, because again more people are

11   getting these drugs, more people are getting

12   addicted, now I get all these surveys saying,

13   "Hey, Dr. Smith's not a very good doctor," and

14   my pay gets cut, because the hospital tied my

15   pay to the survey, and human nature is, you're

16   not going to let that happen.

17           Over time you're going to be like,

18   you know what, all my colleagues seem to be

19   giving out Percocets like this, all the

20   patients are getting it, so I'm just going to

21   start doing it too.

22           And so the pressure was not only on

23   keeping your job, because you had to help the

24   hospitals and the clinics keep their Joint

25   Commission accreditation, it was also on your

Page 185

1    salary.

2              So really for two reasons,

3    physicians were prescribing at a much higher

4    rate than certainly I was ever trained to do.

5         Q.    Who was implementing these patient

6    satisfaction surveys that you referred to?

7         A.    I don't know exactly all of them.

8    Press Ganey is the big one that you hear about.

9    The hospitals --

10        Q.    Who was implementing them?

11        A.    So hospitals do.  Hospitals and

12   clinics, because it's about customer service.

13             So you -- you know, good business

14   practice is let's make sure we are keeping our

15   clients, customers, consumers, whatever you

16   want to use in your business, satisfied.

17             And so they started doing these

18   surveys, and some of them decided to tie part

19   of physicians' salaries, I guess some kind of a

20   weird version of value-based payment, to the

21   patient satisfaction surveys.

22        Q.    Did any government entities or

23   medical organizations, other than the Joint

24   Commission, also adopt these standards designed

25   to address the problem of untreated or

Page 186

1    undertreated pain?

2              MR. KEARSE:  Object to form.

3         A.    I honestly don't know.  I don't

4    know how much the AMA got involved, I don't --

5    so I don't know whether there was another

6    component of this that got involved.

7              I know that the -- all the talk

8    amongst physicians that I was interacting with,

9    again mostly psychiatrists and primary care

10   doctors, was this sense of why is pain a vital

11   sign, why are we being told that we have to

12   make such a big deal about pain, because none

13   of us were trained that way.

14        Q.    Okay.  You're not aware of any

15   other entities in the medical community or

16   regulatory bodies also modifying prescribing

17   standards or guidelines, with an eye toward

18   ensuring that patients who are suffering from

19   debilitating pain received treatment for that

20   pain?

21             MS. KEARSE:  Object to form.

22        Q.    Other than the Joint Commission?

23        A.    As I said, in my mind's eye, the

24   AMA might have done something, but sitting here

25   this moment, I don't recall.

Page 187

1          Q.    What about the VA?

2          A.    I don't work for the VA.

3          Q.    But I'm asking if you are aware of

4     that?  I mean, you have looked into what you

5     understand to be the causes here, you have got

6     this document that describes what you

7     understand the causes to be.  So that's what

8     I'm asking you about.

9          A.    I wouldn't --

10              MR. KEARSE:  Object to form.

11         A.    Again, the VA probably isn't Joint

12    Commission accredited, but I wouldn't doubt

13    that they are having those very discussions.

14              Again CMS, which is also federal

15    government, very much working together with

16    Joint Commission more and more every year, I

17    think.  So I wouldn't be surprised if the VA

18    would have also done some version of pain as a

19    vital sign and said we need to treat pain

20    better.

21         Q.    Were there respected physicians in

22    academia who also were trying at this time to

23    highlight the importance of undertreated or

24    untreated pain?

25         A.    I'm sure that was in the background

Page 188

1    of all of this.  No doubt that there must have

2    been some physicians.  Again, at this point,

3    I'm jaded by all this.  So, you know, some of

4    them probably were paid speakers by Pharma to

5    go around and talk about the wonders of

6    OxyContin, for example.

7               So I don't know how much they could

8    have been -- they usually are really well

9    respected people, and they might have really

10   believed what they were saying, but I think

11   that would also be another pressure on

12   physicians, in general, to say, "Oh, well, if

13   Dr. Jones said that, it must be okay to start

14   using it."

15             So it is another reason we would

16   start giving out more opiates that we otherwise

17   wouldn't have, just using our prior clinical

18   judgment.

19        Q.    You said that at this point you are

20   jaded by this, and I think what you mean, and

21   tell me if I'm wrong, is that at this point you

22   are looking back in time, retrospectively, and

23   assessing statements that were made, in some

24   cases decades ago, about the problem of pain --

25             MS. KEARSE:  Object to form.

Page 189

1      Q.    -- and treatment of pain; is that

2   right?

3      A.    Well, I'm jaded because of so many

4   people that have died needlessly from this, and

5   seeing statistics such, wow, look how many

6   opiates we use in this country compared to any

7   other country, clearly something went wrong.

8      Q.    I understand that.  I'm trying to

9   ask a slightly differently question.

10          You talked about -- I've asked you

11   about medical organizations, regulatory bodies,

12   specific respected physicians in academia and

13   in private practice who were trying to address

14   the issue that they thought was important at

15   the time, undertreatment and untreated pain.

16          And my question for you is, do you

17   think that those people were being dishonest or

18   disingenuous or were throwing away their

19   good-faith medical judgment for pecuniary gain?

20          MR. KEARSE:  Object to form.

21      A.    No.  As I said -- I did say, I

22   don't doubt that they believed what they were

23   saying at the time.  It just clearly was wrong.

24      Q.    In hindsight, you're saying what

25   those people were saying then, you don't

Page 190

1    believe is correct, but you are not suggesting

2    that they had ill will or that they were

3    favoring money over the safety of their

4    patients?

5              MR. KEARSE:  Object to form.

6         Q.    I mean, if you disagree with that,

7    just tell me.  I just want to know what your

8    opinion is.

9         A.    I do think -- I think there has

10   been a big exposé on this in recent years, that

11   there were -- there are some physicians,

12   historically, and it's much harder now, who

13   did, in fact, take a lot of Pharma payments to

14   promote -- help promote certain medications

15   that, yes, they were choosing money over

16   ethics.

17        Q.    Are you aware of any particular

18   doctors who you think -- now, let me give you

19   an example.  You have been paid, right, by

20   lawyers to give testimony in cases, right?

21        A.    That's correct.

22        Q.    Right.  And you are paid $400 a

23   lawyer for that, right?

24        A.    Most recently, yes.

25        Q.    When you do that, do you throw out

Page 191

1   your own independent medical judgment because

2   you're being paid $400 an hour to offer

3   opinions?

4               MR. KEARSE:  Object to form.

5         A.    No.  There is a big difference

6   though.  I'm paid for my time, not my opinions.

7   So I often am retained to review a case, and

8   you know what, my opinion doesn't favor the

9   person that hired me.  They still pay me, and

10  it just doesn't go forward to trial, or what

11  have you, with me.  Sometimes nobody even knows

12  I existed, because of the discovery rules.

13              So that's different than, doctor,

14  go out and lecture, because we're going to

15  watch you do it, and, by the way, we are going

16  to pay you X amount to say great things.  Not

17  only that, we are going to give you the slide

18  set, and you can't deviate from the slide set,

19  because that's what we want you to say, which

20  is what Pharma does.

21              I did one of those lectures, years

22  ago, for Risperidone, a long, long time ago,

23  and I didn't like it at all.  It was canned,

24  and I couldn't go off script, so to speak.

25              Yes, I believe there have been

Page 192

1    physicians, and I think we have seen exposés

2    about that, where they made over $100,000

3    giving talks about something that, it's a

4    little hard to believe, that they all believed

5    everything they said in those canned

6    transcripts.

7         Q.    Are there particular physicians who

8    you want to identify, who you think have -- who

9    have thrown out their clinical judgment for

10   pecuniary gain?

11        A.    No.  I don't know any personally.

12        Q.    You are not aware of any specific

13   instances of that, right?

14        A.    Correct.

15        Q.    You indicated that when you were at

16   Northcoast, did I hear you say that you, kind

17   of, pushed back on the prescribing of opioids?

18        A.    I pushed back on the need for us to

19   emphasize pain for every patient coming into

20   the hospital.  We had myriad discussions, and

21   even talked to Chicago, to the Joint

22   Commission, and CMS actually at one point, to

23   say, can we not do this as part of the

24   standards, that this was a -- my fear, quite

25   frankly, part of the time was addiction.

Page 193

1              And this is not our business.  This
2      is not what we are doing.  We've got primary
3      care doctors, psychiatrists.  We don't have a
4      pain specialist on staff.  Why are we being
5      told -- I mean, we were told, through this
6      process, if they couldn't answer your question
7      about pain, we had to show them little grimace
8      faces and smiley faces, the FLACC scale, and
9      try to get a sense of their pain that way.
10             Just way different than the rest of
11     the kind of care they were trying to provide to
12     people with psychosis and depression and mania.
13     It just didn't make any sense that we were
14     being required to focus on pain.
15         Q.    If I understood your testimony
16     earlier, at Northcoast, the psychiatric
17     hospital, it was very infrequent that people
18     showed up with --
19         A.    It was.
20         Q.    -- with opioid prescriptions,
21     right?
22         A.    Correct.
23         Q.    And, in fact, I thought I heard you
24     testify that in all of those instances, those
25     individuals showed up with already having been

Page 194

1    prescribed opioids; did I understand that

2    correctly?

3            A.    That's correct.

4            Q.    Okay.  So when you talk about

5    pressure at Northcoast on physicians to

6    prescribe opioids, how does that match up with

7    what you testified to earlier?

8                  MR. KEARSE:  Object to form.

9            A.    I didn't say pressure to prescribe

10   opioids.  I said pressure to deal with pain as

11   such a big issue.

12                 So we still did have to ask every

13   patient about pain, give every patient a pain

14   scale on some regular basis, nurses had to be

15   burdened to go check with the patients on a

16   frequent basis about pain.  So it really did

17   add a layer that just didn't -- it took away

18   time for the more important things we were

19   there to treat.

20           Q.    I see.  So when you talk about

21   pushing back, you're talking about the effort

22   to pay attention to patients' pain, maybe more

23   than you otherwise would have, not really the

24   use of prescription opioid medications, right?

25                 MR. KEARSE:  Object to form.

Page 195

1          A.    Correct.

2          Q.    Are you aware --

3                MR. BOEHM:  I'm almost done.  We

4     can go to lunch.

5                MS. KEARSE:  Yeah.  I think the

6     court reporter --

7          Q.    Are you aware of any specific

8     instances in Summit County where healthcare

9     providers, you believe, chose their own salary,

10    some financial benefit over making a decision

11    that was, in their view, at that time,

12    clinically appropriate for the patients that

13    they were treating?

14                MR. KEARSE:  Object to form.

15          A.    I am not, but again, in my role, I

16    wouldn't just stumble -- I wouldn't find that,

17    unless probably it was in the newspaper.  So it

18    wouldn't be something that I would, like,

19    happen upon, you know, in my chart reviews or

20    something.  So, no, I'm not aware.

21          Q.    And in your efforts to try and

22    understand opioid abuse, the level of opioid

23    abuse, the causes of the opioid epidemic in

24    Summit County, you are not aware of any

25    instance where you believe the healthcare

Page 196

1    provider sacrificed, what was in his view, his

2    or her view, what was appropriate for a

3    particular patient, in favor of more money?

4         A.    I'm not.

5              MR. BOEHM:  I think we can take a

6    break and maybe go to lunch.

7              THE VIDEOGRAPHER:  Off the record,

8    12:32.

9              (Recess taken.)

10             THE VIDEOGRAPHER:  We are back on

11   the record, 1:46.

12        Q.    I hope you had a nice lunch, Dr.

13   Smith.

14        A.    Yes, thank you.

15        Q.    Welcome back.

16             When we broke, we were looking at

17   this document that's been marked as Exhibit

18   9 --

19        A.    Yes.

20        Q.    -- from the Opiate Task Force for

21   Summit County, and we were going through some

22   of the information listed here; do you recall

23   that?

24        A.    Yes.

25        Q.    I want to direct your attention to

                                        Page 197

1    the section with the Physicians heading.  It is

2    in the middle of the first page.

3         A.    Okay.

4         Q.    Do you see that?

5              The final bullet point says,

6    "Accrediting bodies have addressed pain relief

7    in their standards, again affecting

8    reimbursement"; what does that mean?

9         A.    So similar, that's probably,

10   mostly, the Joint Commission, as an accrediting

11   body.  So again, if you're not -- if you're not

12   complying with the standard, then whoever is

13   employing the physician is not going to be

14   happy, so your job is potentially on the line,

15   if you don't comply, and that standard really

16   pushes physicians to prescribe more narcotic

17   pain meds.

18        Q.    Okay.  When it talks about

19   accrediting bodies, in the plural, are there

20   other accrediting bodies that you are aware of,

21   other than the Joint Commission, that addressed

22   pain relief in their prescribing guidelines and

23   standards?

24        A.    Well, CS -- so Centers for Medicaid

25   and Medicare, and I may have those two

1   reversed, but anyway, CMS, they do so much with

2   drug commission, they may well have.  I don't

3   know if they are exactly in that -- in their

4   conditions of participation or not, but they

5   may have.

6        Q.   What does it mean here, where it

7   refers to the effect on reimbursement?

8        A.   Well, so if -- the CMS is about

9   money, Joint Commission is not, but if Joint

10  Commission has a negative finding, then they

11  usually report it to CMS, who then comes and

12  reviews, and if you're not meeting standards,

13  then they will pull money, so CMS would

14  literally reimburse less, which means now

15  someone is angry at the doctor.  Again, it's a

16  vicious cycle.

17       Q.   Is the Joint Commission led by

18  individuals with medical and scientific

19  expertise?

20       A.   My understanding is they do have

21  some physicians, I think.  I don't know if he's

22  still there, I think there was a doctor, maybe

23  Mark Chassin, who was the executive director at

24  some point, but they do have -- certainly have

25  physicians, and their surveying team usually

Page 199

1    includes at least one physician, and then

2    nurses and social workers who come out, and

3    environment people, who understand code and so

4    forth, to make sure you have a safe

5    environment.

6         Q.    Do you know anything about the

7    processes by which the Joint Commission

8    establishes prescribing standards and

9    guidelines?

10        A.    I do not.

11        Q.    Do you have any reason to believe

12   that the Joint Commission, in establishing

13   guidelines with respect to opioids and opioid

14   prescribing practices, failed to exercise what,

15   at the time, those individuals believed to be

16   their best clinical judgment about what was

17   appropriate?

18             MR. KEARSE:  Object to form.

19        A.    Can you repeat that, please?

20        Q.    I'm hoping it's good enough just to

21   have the court reporter read back to you, and I

22   can rephrase it if it doesn't make sense after

23   that.

24             THE NOTARY:  Question:  "Do you

25   have any reason to believe that the Joint

Page 200

1    Commission, in establishing guidelines with

2    respect to opioids and opioid prescribing

3    practices, failed to exercise what, at the

4    time, those individuals believed to be their

5    best clinical judgment about what was

6    appropriate?"

7           A.    No.  I have no -- no way of

8    questioning that.

9           Q.    Okay.  You can set that document

10   aside.

11               Actually, before you do that, you

12   don't even need to turn back it to, but you

13   notice that document used the term "epidemic."

14   We talked about that.

15          A.    Yes.

16          Q.    And you had mentioned, in your

17   testimony earlier, that there is an

18   epidemiological definition or standard for the

19   term "epidemic"?

20          A.    Yes.

21          Q.    What were you referring to?

22          A.    So epidemiologists have the role of

23   watching data trends.  If a bunch of people get

24   sick, they go and investigate, and they may

25   discover that was E. coli in Chipotle lettuce,

Page 201

1    for example.  That's how that all works.

2              So with this epidemic, they look at

3    metrics, the math, the numbers of people

4    affected, the deaths, and you can determine --

5    and I don't know the exact cutoff, but they do

6    determine then whether something is officially

7    epidemic.

8              There is a Dr. Li, L-I, at Columbia

9    University, who is very well respected in this,

10   and he looked at this and compared it even to

11   epidemics like the 1918 flu epidemic that

12   killed so many people, and this meets all the

13   metrics, mathematically, that that epidemic

14   met.

15        Q.    Okay.  So your understanding is

16   that the term "epidemic" is, in scientific

17   terms, a statistical matter, it's a statistical

18   question, it's a term of art?

19              I'm going to strike all that.  That

20   was a mess.  I'm going to back up and start

21   over.

22              Is it fair to say that your

23   understanding of the term "epidemic," as used

24   in the scientific community, is that it has to

25   meet a particular defined scientific standard?

1           MR. KEARSE:  Object to form.

2       A.    Yes.  I believe it's based on a

3   mathematical calculation, yes.

4       Q.    Okay.  You are not an

5   epidemiologist, I take it, correct?

6       A.    I am not.

7       Q.    So you yourself have not conducted

8   any kind of analysis to determine whether or

9   not anything, including opioid abuse, is an

10  epidemic; is that fair?

11      A.    Right, I have not.

12      Q.    When you talk about an opioid

13  epidemic, what outcome are you specifically

14  referring to, when you say epidemic?

15      A.    So my understanding is the epidemic

16  is about the number of people dying, as it was

17  in the 1918 flu epidemic.

18           It's about you got X number of

19  people dieing in a certain timeframe by a

20  certain mechanism, and if it reaches a certain

21  mathematical threshold, again, I don't know

22  what that is, it can be defined as --

23  officially as an epidemic.

24      Q.    Do you know in what year the

25  mathematical standards for calling something an

Page 203

1    epidemic was met, in terms of opioid-related

2    deaths?

3            A.    I don't know the exact year.  I do

4    know that the first time I saw it published was

5    by Dr. Li in 2014, because I cringed when I

6    read it, because further, the mathematical

7    model predicted that the epidemic would not

8    peak until 2017, based on his math.

9            Q.    I'm asking you a slightly different

10   question, not when did you read an article

11   about or even when an article was published.

12            My question to you is do you know

13   in what year, based on what mathematical

14   standards would be applied to determine whether

15   or not something meets the definition of an

16   epidemic, that would be the case with respect

17   to opioid-related deaths?

18            MR. KEARSE:  Object to form.

19            A.    I don't know the year.

20            Q.    Okay.  I think we are at Exhibit

21   Number 10.

22                        -   -   -   -   -

23            (Thereupon, Deposition Exhibit 10,

24            Email Exchange From February 2014,

25            Beginning with Bates Label SUMMIT

```
1              105557, was marked for purposes of
2              identification.)
3                   -  -  -  -  -
4       Q.    Which I'm going to give to you now.
5              Exhibit 10, Dr. Smith, is an email
6    exchange from February 2014 that starts with a
7    February 21 email from you; do you see that?
8       A.    Yes.
9       Q.    And it appears that this February
10   2014 email from you is an invitation to
11   individuals to attend the May 31, 2014
12   conference that you organized and that we
13   discussed earlier today; is that correct?
14      A.    That's correct.
15      Q.    And you write, if you look in the
16   middle of the page, "Clearly, the epidemic is
17   the result of many factors"; do you see that?
18      A.    I see that.
19      Q.    "And attempted resolutions will
20   require new laws, new public processes, and
21   changes in the behavior of both patients and
22   clinicians."
23      A.    Yes.
24      Q.    I read that correctly?
25      A.    Yes.
```

Page 205

1          Q.    When you wrote that, "The epidemic

2     is the result of many factors," what epidemic

3     were you referring to in February of 2014?

4          A.    The opioid epidemic.

5          Q.    Referring to the number of

6     opioid-related deaths?

7          A.    Yeah.  You asked what epidemic, I

8     said the opioid epidemic.

9          Q.    Right.  And specifically, you are

10    talking about the number of opioid-related

11    deaths; is that correct?

12         A.    Right.  And I may have very well

13    read that article by then, yes.

14         Q.    You say that that epidemic is the

15    result of many factors.  What did you mean by

16    that?

17         A.    That there is a bunch of reasons

18    that we ended up with an epidemic, including

19    things we've talked about today, the

20    direct-to-consumer marketing, the fact that

21    pain became such a focus that required

22    physicians to prescribe opiates at a much

23    higher rate than they would have previously and

24    so forth.

25              One of the other factors was the, I

Page 206

1    guess, mischaracterization of OxyContin as not

2    being addictive because somehow it was a new

3    form, and, therefore, doctors could use it at

4    will, and that, of course, was false.

5         Q.    When you talk about the

6    mischaracterization about OxyContin, can you be

7    more specific about what you are referring to?

8         A.    Yes.  My understanding is that the

9    makers of the drug were using an article, that

10   wasn't even a study, from, I forget, Dr. Jick,

11   or something like that, who had studied a few

12   of his own patients and decided that, oh, look,

13   very few of them get addicted, and that got

14   taken around the country, but with the

15   pharmaceutical representatives and others, and

16   it was another educational thing for

17   physicians, but it was not true, and it wasn't

18   a study either, and so that's another factor.

19             So now you've got physicians who

20   generally go into the profession to care for

21   people, you know, first do no harm is our big

22   issue.  We really want to help people, and so

23   we believe we are helping people, oh, good,

24   I've got patients in pain, everyone is telling

25   me I've got to treat pain, here is a drug that

Page 207

1    won't cause addiction, so I'm going to use this

2    drug, and it turned out to be just as

3    potentially addictive as other opiates and,

4    sadly, just as deadly.

5         Q.    I am going to ask you to turn back

6    to Exhibit 9 after all, since you, kind of,

7    referred back to it.

8              As we discussed, this document

9    asked the question, "How did this happen?" at

10   the very top of the document; do you see that?

11        A.    Yes.

12        Q.    And then do you see what I take to

13   be the Summit County Opiate Task Force's answer

14   to that question, as laid out in these bullet

15   points; is that fair?

16        A.    Yes.

17             MS. KEARSE:  Objection.  Form.

18        Q.    And you referred to -- we've

19   discussed some of them, and I haven't discussed

20   every detail about each of them, but my

21   question for you right now is whether or not,

22   in reviewing this list, there are other factors

23   that you believe have materially played into

24   the opioid epidemic, in Summit County and

25   beyond Summit County, that are not identified

Page 208

1    and discussed here on the first page of Exhibit

2    9.

3         A.    Let's see.  I have to look at this

4    and see if it is missing some of the ones that

5    we think about.

6         Q.    Sure.  Take your time.

7         A.    Yeah.  There is one here we haven't

8    discussed, which is under Marketing, the last

9    bullet point, "Perceived safety of prescription

10   drugs."

11            You know, so part of the problem is

12   that, if you go back in time again, I just use

13   1995 because it predates all this stuff, you

14   know, most physicians and the public, I expect

15   in general, had a sense that opiates were

16   dangerous.

17            The only thing most of the public

18   knew about opiates was the very different kind

19   of heroin problem that occurred way back in the

20   70s, kind of attributed to like

21   down-in-the-gutter kind of people, a very, very

22   different issue.

23            And now suddenly you are hearing

24   from your friends, your neighbors, your

25   physicians and others, and again

1    direct-to-consumer advertising and so forth,

2    oh, these drugs are fine, they are safe, you

3    have pain, you deserve your pain to be treated,

4    you know, more effectively, and so the

5    perception of the public becomes, oh, then they

6    must be safe, we are hearing about them all the

7    time, and the net result is then even patients

8    coming in with a sprained ankle asking for the

9    opiates now, because they are hearing about

10   these opiates.  They never would have done in

11   that 1995.  They were doing that.  So that's

12   another factor we touched on that definitely

13   has an effect.

14        Q.    Okay.  Do you know of any

15   healthcare providers, who have prescribed

16   prescription opioid medicines, who did not know

17   that they had addictive properties?

18        A.    No.

19        Q.    Okay.  Anything else that you think

20   is a material contributor to the opioid

21   epidemic that is not identified here in Exhibit

22   9?

23        A.    No, not at the moment.  This is

24   pretty comprehensive.

25        Q.    The third category here is about

Page 210

1    Diversion.  Can you explain to us what

2    diversion is?

3           A.    Sure.  So diversion would be that

4    an individual gets their prescription of

5    whatever, in this case opiates, and they either

6    give it or sell it, some of that portion of

7    that, to somebody else who was not officially

8    prescribed that medication.

9           Q.    All right.  Let's go back to

10   Exhibit 10, where we were discussing you having

11   announced this May 2014 conference about opioid

12   abuse that you were organizing, right?

13          A.    Yes.

14          Q.    And a gentleman by the name of Nick

15   Jouriles, -- am I pronouncing that correctly?

16          A.    Yes.

17          Q.    Mr. Jouriles writes back to you

18   saying, "Blame TJC for regulating," quote,

19   "pain, the fifth vital sign and so modifying

20   physician behavior.  Thanks"; do you see that?

21          A.    Yes.

22          Q.    Who is Mr. Jouriles?

23          A.    Actually, Dr. Jouriles, he was the,

24   at the time, the head of the -- all of the

25   emergency departments for the Akron General

 1   Hospital system, now Cleveland Clinic/Akron

 2   General.

 3           Q.    Yeah.  His email address says Akron

 4   General.  Does that mean he practices in Akron?

 5           A.    Oh, yes.

 6           Q.    Is he a well-respected physician in

 7   the community?

 8           A.    Yeah.  He wouldn't be the chair of

 9   the department, if he wasn't.  Yes.

10           Q.    Do you know if Dr. Jouriles

11   prescribed or has prescribes opioid medicines?

12           A.    As an emergency physician, I'm sure

13   he has.

14           Q.    And Akron General Hospital has

15   prescribed and continues to prescribe opioid

16   medications to patients, correct?

17           A.    I'm sure they must.

18           Q.    What did you understand Dr.

19   Jouriles to be saying when he referred to the

20   fifth vital sign from TJC modifying physician

21   behavior?

22           A.    I think it was short for what I

23   have described in more detail, the Joint

24   Commission.  TJC, you know, took this -- I

25   don't think created, but took the fifth vital

                                        Page 212

1    sign and incorporated it into some pretty

2    stringent standards, and then modified

3    physician behavior, forcing us to prescribe

4    more opiates than we otherwise would have,

5    based on our purely unfettered clinical

6    judgment.

7           Q.    When you say the doctors were

8    forced to prescribe more opioids, is that

9    the -- what do you mean by that?

10          Do you think that there were

11   doctors who were compelled or forced to

12   prescribe opioids?

13          MR. KEARSE:  Object to form.

14       A.    Yes.  Certainly.

15       Q.    How so?

16       A.    Again, if you're working in a

17   system that is accredited by the Joint

18   Commission, which also probably means CMS, and

19   you don't follow the standards, and the

20   hospital gets a citation for not meeting the

21   pain standards, then that physician's practice

22   is in danger.  So that's pretty forcing.

23          You are going to lose your job if

24   you don't, you know, go with the flow.  They

25   probably have individuals at these big -- I'm

                                        Page 213

1    sure they do -- individuals in the systems who

2    go around and review charts, match the

3    standards, they look at Dr. Jones' chart, match

4    the standards, they look at Dr. Jones' chart,

5    and they are going to be all over Dr. Jones if

6    Dr. Jones is going to lose them that

7    accreditation.

8            So that's -- I would say the doctor

9    is going to be pretty well forced to either

10   resign or go with the flow.  Well, you know,

11   human nature, doctors are humans as well, you

12   are probably going to try to go with the plan.

13       Q.    Okay.  And let me go back to a

14   question that, I think, we touched on earlier.

15            Are you aware of any specific

16   doctor, who you know of, who prescribed an

17   opioid to a patient against his or her best

18   clinical judgment because of concern about

19   money or concern about hospital administration

20   taking action against that physician?

21            MR. KEARSE:  Object to form.

22       A.    So I can't exactly recall names,

23   but at conferences and other situations, where

24   I was amongst physicians, where the topic of

25   opiate prescribing came up, many physicians

1   were complaining that they felt like they were

2   prescribing a lot more opiates than they would

3   have liked to prescribe, and the Joint

4   Commission, CMS, and patient satisfaction

5   scores were the main reasons they gave.

6        Q.    Are you able to identify any

7   particular instance where, in your judgment or

8   to your knowledge, a specific physician made a

9   specific prescription of an opioid to a patient

10  when that physician believed it was not in that

11  patient's best medical -- in the interests of

12  that patient's best medical care?

13       A.    No, I can't give that detail.

14       Q.    You write in this email, on

15  February 21, 2014, that, "The epidemic is a

16  result of many factors, and its resolution will

17  require new laws, new public processes, and

18  changes in behavior of both patients and

19  clinicians."

20            When you refer to it requiring new

21  laws, what did you have in mind?

22       A.    So there needed to be -- at that

23  point, it was so imbedded with Joint

24  Commission, so we really needed some laws about

25  pushing back on that, thus decrease the number

1    of pills we are giving out, let's decrease the

2    pressure on physicians, let's -- and that also

3    helps the public perception, because when they

4    hear, wait a minute, there is a problem, there

5    is so much of a problem that our government has

6    just made a law that says you are not going to

7    be able to get X amount of pills and that kind

8    of thing, so that's the kind of changes that

9    I'm referring to.

10         Q.    Were there particular laws that you

11   had in mind here when you said that combatting

12   the opioid epidemic would require new

13   legislation?

14         A.    I think I just answered that.

15         Q.    Nothing else, no other particular

16   laws that you had in mind here?

17         A.    Well, again, my purpose of this was

18   by physicians for physicians.  So it was really

19   about helping the physicians get out from under

20   the burden of these kind of pressures.

21              There were -- I'm not sure if they

22   were in evidence yet or they were about to come

23   out, there were some prescribing guidelines

24   that were being -- if not created, had just

25   been created for the emergency room physicians,

Page 216

1    and postings to post for the patients, so the

2    patients understood you're not going to walk

3    into this ER and just get as many pills as you

4    want, because there are new rules for the

5    doctors, as well as the patients.

6             So all of those kind of factors

7    were ways to help protect the -- and decrease

8    the overprescribing.

9        Q.    Are you talking the OARRS database

10   requirements?

11            MR. KEARSE:  Object to form.

12       A.    No.  Separate from that.

13       Q.    Okay.  I'm sorry.  I'm probably

14   just being slow on the take here, but what is

15   the specific legislation that you thought

16   needed to be passed in 2014, that wasn't yet in

17   effect, to help combat the opioid epidemic?

18       A.    So rules that would push back on

19   the vital sign requirements, that would allow

20   physicians to use their clinical judgment

21   without concern for Joint Commission or anybody

22   else making pain an erroneous fifth vital sign,

23   as one example.

24       Q.    Do you have any other examples;

25   anything else that comes to mind?

Page 217

1        A.    I don't remember.  We have had so

2   many laws passed that what wasn't then or what

3   needed to be, I'd be hard pressed to tell you

4   that.

5        Q.    Okay.  You next talk about new

6   public processes.  What did you have in mind

7   with respect to new public processes?

8        A.    A lot of that, that as well as the

9   behavior of patients, was about helping the

10  public understand addiction as an illness and

11  help get rid of stigma, so, like, patient

12  behavior could change, so they'd actually come

13  in to get help.  A lot of people with addiction

14  still don't, even now, come in to get help.

15             Public processes, some of that is

16  because many people in the public, probably

17  less so now with the epidemic, but many people,

18  I suspect even some in this room, don't

19  necessarily understand addiction as a disease,

20  and that's -- that's damaging, because then

21  people are afraid to go get help, they don't

22  want their colleague to know they got help and

23  so forth.  So that would be another change that

24  we would need to eventually -- still, I think,

25  need to accomplish.

Page 218

1      Q.     How do you do that through public
2   processes?
3      A.       Education.  Some laws can open up
4   doors to making it -- if you -- mental health
5   has a stigma.  Addiction has a stigma.  If I
6   said that as part of your -- whatever your
7   health plans are, ours is Med Mutual, that not
8   only is it an option for you to go get an
9   assessment for addiction, it's required, and
10   that became the norm over time, that would get
11   rid of the stigma.  It would be a normal thing
12   to go in, and everybody gets an addiction
13   assessment.
14           You wouldn't be -- she wouldn't be
15   stigmatized to say to me, hey, I had my
16   assessment today, because it would be the norm.
17   So that would be another -- that would be a
18   huge public process, affecting all of
19   healthcare, for example.
20      Q.    And this may lead into the next
21   category that you mentioned in your email,
22   which is, "Changes in both patients" --
23   sorry -- "Changes in the behavior of both
24   patients and clinicians."
25           What did you have in mind when you

Page 219

1   talked about combatting the opioid epidemic

2   through changes in the behavior of both

3   patients and clinicians?

4        A.    Sure.  So the idea for -- I'll

5   start with patients, would be to help decrease

6   the barriers to getting access to care.  One of

7   the biggest is stigma.  And we want to help

8   them -- educate them enough so that people

9   would realize it is worth them changing their

10  behavior, getting in to get help, as opposed to

11  continuing to suffer in silence, many times.

12  Excuse me.

13            The clinicians, again it was more

14  about making sure they were educated so that

15  they could maybe have a better chance of

16  following their own clinical thought process,

17  as opposed to falling prey to a lot of these

18  other factors that were forcing and requiring

19  them to prescribe more opiates than they hoped,

20  than they would have in their own practices.

21                  -   -   -   -   -

22            (Thereupon, Deposition Exhibit 11,

23            October 2016 Email Exchange Between

24            Smith, Craig, and Skoda, Beginning

25            with Bates Label SUMMIT 153786, was

```
 1                 marked for purposes of

 2                 identification.)

 3                      -  -  -  -  -

 4        Q.    I'm going to give you a document

 5    that I've marked as Exhibit 11.  It's an email

 6    exchange that goes back to October of 2016

 7    between you, Mr. Jerry Craig and Dr. Donna

 8    Skoda; do you see that?

 9        A.    Yes.

10        Q.    It appears that Dr. Skoda is

11    forwarding -- I'm sorry.  Is she a doctor?

12    Maybe I'm mis- --

13        A.    No, she's not.

14        Q.    -- misdesignating her.

15              That Ms. Skoda is forwarding to you

16    a link to a DEA press release; do you see that?

17        A.    I see it.

18        Q.    She writes, "See the link below.

19    Amen"; do you see that?

20        A.    I see that.

21        Q.    And then you write back to her

22    saying that you recently told the board, and by

23    our board, you mean the ADM --

24        A.    Yes.

25        Q.    -- board of directors, or do you
```

Page 221

1   mean the whole ADM Board, kind of, staff and
2   employees?
3         A.     In this -- that case, it may have
4   been both, both the staff and the actual board
5   of directors, right.
6         Q.    So when you say, "I recently told
7   our board," in this email you mean you told the
8   employees of the ADM Board for Summit County
9   and the board of directors for the ADM Board --
10                MS. KEARSE:   Object to form.
11        Q.     -- is that right?
12        A.     That's correct.  They asked -- they
13  asked the question.  The board asked -- I gave
14  a presentation about the epidemic, and the
15  board asked, well, what would -- what is the
16  one way we could really resolve this, and I
17  gave them a lot of other answers, as I've given
18  today, but I did say if we could make -- change
19  all the laws, pressures and everything, and
20  roll back the clock to 1995 and treat pain the
21  way we did then, that would do it.
22        Q.    Okay.  You made a presentation to
23  the board of directors about the opioid
24  epidemic --
25        A.    Yes.

1          Q.    -- in 2016?

2          A.    Yes.

3          Q.    Was that at the board of directors'

4    request?

5          A.    Yes.

6          Q.    Did you prepare a slide deck, in

7    connection with that presentation?

8          A.    I'm sure it's pretty much the same

9    one that I use, that you've got, my guess is,

10   20 copies of, but yes.

11         Q.    I'm not sure we do have that.  Is

12   that something that would have been in your --

13         A.    Yes.

14         Q.    -- in your documents?

15         A.    It's part of everything that was

16   given, sure.

17         Q.    Okay.  Do you recall when you made

18   that presentation to the board of directors?

19         A.    Well, since I said recently, that

20   probably means it was in late September of 16,

21   would have been probably two weeks -- a week or

22   two before this.

23         Q.    And you said the board of directors

24   asked you a question, right?

25         A.    Well, in advance, we determine what

Page 223

1    topics.  So most every board meeting, somebody,

2    many times it's other agencies that we contract

3    with, comes and gives a presentation to educate

4    our board, so they understand what's going on

5    in the system, and in this case they asked

6    about the opioid epidemic, because in July of

7    16, unfortunately, we were hit with synthetic

8    carfentanil, which was killing people at a very

9    high clip, and so they really wanted to have a

10   presentation about, all right, we knew it was

11   bad, now what's going on, basically.

12        Q.    And they asked you a question, as I

13   understand it, "What is the thing that would

14   have or could -- would have stopped or could

15   stop the opioid epidemic?"; is that fair?

16              MR. KEARSE:  Object to form.

17        A.    The question was what -- what needs

18   to be done or could be done to stop this.

19              I think one of the -- in my mind's

20   eye, I'm remembering a person saying, "Stop

21   this madness."

22        Q.    Another way of framing that

23   question might be, "What is the thing that has

24   caused that epidemic to have taken place"; is

25   that fair?

Page 224

1              MR. KEARSE:  Object to form.

2         A.    It was sort of the corollary, flip

3    of the question, sure.

4         Q.    And your answer was, "The best way

5    to prevent furthering this epidemic is to

6    return to the way we treated pain in about

7    1995," right?

8         A.    That's correct.

9         Q.    Is that what you told the board of

10   directors?

11        A.    Yes, it is.

12        Q.    And that's what you said in

13   response to Ms. Skoda's email, right?

14        A.    Yes.

15        Q.    What do you -- what did you mean by

16   that?

17        A.    So again, I gave a bigger

18   presentation, but what I mean by that, and I

19   still believe it, is if we went back to only

20   using, whether it's Percocet, Vicodin,

21   prescription fentanyl, whatever, only for real

22   significant pain, extreme pain, cancer pain,

23   kidney stone pain, childbirth and the like,

24   that we would not -- that would be one way to

25   stop continuing furthering this epidemic,

Page 225

1   because the epidemic, even if today we thought

2   we had stopped all those pills, addiction is a

3   chronic illness, so we are going to have years

4   of dealing with these people.

5              We have babies born addicted to

6   opiates, and they got a whole life,

7   potentially, to deal with.  We still don't know

8   how that affects their brain.

9              So we got -- this is a long-term

10  process.  It's not a, oh, it's a onetime event,

11  I'm addicted, I'm detoxed, I'm cured.  This is

12  probably, because the disease of addiction, an

13  ongoing problem.

14             So this would be one way to stop

15  the furthering of the epidemic, and then we

16  would still have to deal with all the

17  aftereffects that will go on for many, many

18  years.

19       Q.   And when you talk about the changes

20  between 1995 and, let's say, 2016, in terms of

21  the way pain was treated, are you talking about

22  the Joint Commission and the pain as the fifth

23  vital sign and those things that we have been

24  discussing today, or did you have something

25  else in mind?

Page 226

1          A.      Yeah.   All of the above.   OxyContin

2    being promoted as though it was not addictive,

3    pain as a fifth vital sign, patient

4    satisfaction, all the things that changed from

5    the time I was trained, be very careful about

6    potential causes of addiction, to don't worry

7    about it, we can just start handing out opiates

8    for all kind of pain.   That was a huge -- many

9    factors, but that was a huge switch.

10          Q.      Are you aware of any actual

11   instance or statement from the manufacturer of

12   OxyContin or the manufacturer of any opioid

13   medication that their opioid does not, in fact,

14   have addictive properties?

15          A.      And they don't -- I don't prescribe

16   opiates, so I wasn't having pharmaceutical reps

17   come to me personally.

18               So my knowledge comes from reading,

19   you know, the various sources, talking to

20   doctors, the, sort of, big exposé, the book

21   Dreamland, from Sam Quinones, you know, that

22   describes how these articles, the Dr. Jick

23   article and so forth, were used to educate but,

24   in effect, convince physicians that, at least,

25   OxyContin was not addictive, and that that was

Page 227

1    part of the upsurge of the use of these

2    medications for things that didn't and don't

3    need that kind of treatment.

4         Q.    Understood.  My question is

5    slightly different than that and more specific.

6              My question to you is whether or

7    not you are aware of any particular statements,

8    actual statements made by a pharmaceutical

9    manufacturer of an FDA-approved prescription

10   medicine, opioid medicine, that their product

11   does not have addictive properties?

12        A.    I have not seen it, like, in the

13   FDA-approved handouts.  I believe there were

14   some quotes in the Dreamland book.

15        Q.    Okay.  So you believe there is

16   something in Dreamland about that, but I'm

17   asking you whether or not, you, Dr. Smith, are

18   aware of any specific instances where the maker

19   of an FDA-approved opioid medication stated to

20   a physician that their product does not have

21   addictive properties?

22             MR. KEARSE:  Object to the form.

23        A.    Not directly, no.

24        Q.    What about indirectly?

25        A.    Again, I think I have read things

1    in articles and Dreamland and other places that

2    do indicate that that was being said by --

3    maybe not in writing, but said by reps,

4    pharmaceutical reps to physicians.  I didn't

5    personally experience that.

6         Q.    Okay.  You're not aware -- you're

7    not personally aware of any such instances?

8              MS. KEARSE:  Object to form.

9         A.    I am not.

10        Q.    Okay.  As we mentioned, this

11   particular email exchange with Ms. Skoda

12   started with a forward of the DAE press

13   release.  So let's look at that press release,

14   if we can, and I'll mark that separately as

15   Exhibit 12.

16                   -   -   -   -   -

17              (Thereupon, Deposition Exhibit 12,

18              October 4, 2016 DEA Press Release,

19              was marked for purposes of

20              identification.)

21                   -   -   -   -   -

22        Q.    Dr. Smith, I have given you the

23   document marked as Exhibit 12.

24              MR. BOEHM:  I'm sorry.

25              MR. KEARSE:  I was going to say.

Page 229

1    I'm not asleep.

2              MR. BOEHM:  You are not, but I'm

3    getting there.

4         Q.    I've marked as Exhibit 12 to your

5    deposition the DEA press release that was

6    referred to and forwarded to you by Ms. Skoda;

7    do you see that?

8         A.    Yes.

9         Q.    And the title is DEA Reduces Amount

10   of Opioid Controlled Substances to be

11   Manufactured in 2017; do you see that?

12        A.    I see that.

13        Q.    And the last line of your email in

14   what has been marked as Exhibit 11, states

15   that, "Maybe the DEA will help with that," and

16   I think "with that," you mean returning to

17   1995; is that right?

18        A.    Yes.

19        Q.    The DEA press release refers to the

20   DEA deciding to lower the aggregate production

21   quota, the APQ, for that year, correct?

22        A.    Yes.

23        Q.    Do you know what the APQ is?

24        A.    I've never heard of it until this

25   document, no.

1     Q.     Do you remember receiving this?

2     A.     I do.

3     Q.     Do you know what it is, as you sit

4  here today, what the APQ is?

5     A.     I think the language speaks for

6  itself.  It is the total number of controlled

7  substances that somebody has decided would be

8  enough to do drug treatments but not

9  overtreatment.

10     Q.     And who is it that makes that

11  decision about the appropriate amount of

12  controlled substances to be manufactured?

13     A.     That I do not know.

14     Q.     You are not sure who does that?

15     A.     No.  I'll answer this.  This may

16  tell us.

17     Q.     I'll direct your attention to the

18  last paragraph.

19          MR. KEARSE:  Allow the witness to

20  take the time --

21     Q.     Of course.  You can look at

22  whatever you want to answer any question, but I

23  think you may find, in particular, looking at

24  the last paragraph of the document, helpful in

25  that regard.

Page 231

1      A.    So it appears it is the DEA
2   themselves.
3      Q.    It says in the final paragraph, "In
4   setting the APQ, DEA considers data from many
5   sources"; do you see that?
6      A.    I see that.
7      Q.    And then in your email again, you,
8   of course, also reference that maybe the DEA is
9   going to help, right?
10      A.    Right.
11      Q.    So you understood, when you wrote
12   this email, that it was the DEA who was setting
13   the AQP, this quota for the year, right?
14           MS. KEARSE:  Object to form.
15      A.    Well, I understood that they were
16   reducing, based on the title alone even, the
17   amount of opioid-controlled substances being
18   manufactured, which would decrease the
19   oversupply of pills.
20      Q.    And you say -- well, backing up a
21   little bit, this paragraph goes on to identify
22   the factors that the DEA takes into account in
23   establishing the APQ each year; do you see
24   that?
25      A.    I see that.

Page 232

1       Q.    It estimates the legitimate medical

2    need, right?

3       A.    I see that.

4       Q.    The amount of consumption, based on

5    dispensed prescriptions?

6       A.    Right.

7       Q.    Manufacturers' data, based on

8    actual production, sales, inventory, exports,

9    product development needs and manufacturing

10   losses?

11      A.    Yes.

12      Q.    And then, of course, DEA's own

13   internal system for tracking controlled

14   substances and transactions, right?

15      A.    Yes.

16      Q.    And DEA took all those factors into

17   account and exercised its regulatory authority

18   to establish what it views as the appropriate

19   amount of prescription opioids to ensure

20   adequate supply for legitimate medical needs,

21   while limiting it to prevent diversion, right?

22           MR. KEARSE:  Object to form.

23      A.    Yeah.  That's what it says they are

24   doing, yes.

25      Q.    Is that your understanding of what

Page 233

1  the DEA does?

2        A.    Again, this was the only time I

3  have ever seen it referenced, but, yes, when I

4  read this, that was what my understanding.

5        Q.    Okay.  Are you critical of the DEA,

6  in terms of opioid abuse, opioid epidemic, in

7  particular as it has impacted Summit County?

8              MS. KEARSE:  Object to form.

9        A.    No.  I've never sat around and

10  thought that, no.

11        Q.    You mentioned this book Dreamland?

12        A.    Yes.

13        Q.    Do you remember that?

14        A.    Huh-uh.

15        Q.    How much of your understanding

16  about the causes of the opioid epidemic comes

17  from you having read that book?

18              MR. KEARSE:  Object to form.

19        A.    I mean, I read the book after I had

20  what is on the slide set already as an

21  understanding.  I do think the book supported a

22  lot of what Summit County together pulled and

23  felt were the causes.

24        Q.    The author of that book, is he a

25  medical doctor?

1          A.    No.  An LA Times reporter, I

2     believe.

3          Q.    LA Times reporter.  Not an

4     epidemiologist?

5          A.    No.

6          Q.    Not a public health specialist?

7          A.    No.

8          Q.    Are you familiar with any specific

9     exposé-style reporting on the opioid epidemic,

10    insofar as it concerns Summit County?

11             MR. KEARSE:  Object to form.

12         A.    Exposé, meaning like a book?

13         Q.    Yeah.  The same style of reporting

14    that we get from the LA Times reporter in

15    Dreamland, but just particular to Summit

16    County?

17         A.    No, not that I recall.

18         Q.    Okay.

19                   -   -   -   -   -

20             (Thereupon, Deposition Exhibit 13,

21             Report of the Ohio Compassionate

22             Care Task Force, was marked for

23             purposes of identification.)

24                   -   -   -   -   -

25             MS. KEARSE:  Once you get it on,

Page 235

1   you can't take it off.

2             MR. BOEHM:  You are making me

3   laugh, pointing out my mental health issues,

4   right here in front of the psychiatrist.

5             THE WITNESS:  I was going to send

6   him my bill later.

7        Q.    Okay.  I think we are at Exhibit

8   13, and I've marked that document for you,

9   which is in front of you now.  It's a document

10  entitled Report of the Ohio Compassionate Care

11  Task Force.  Have you seen that document

12  before?

13        A.    I don't recall seeing it, but that

14  doesn't mean I didn't.

15        Q.    Did you know that the Ohio General

16  Assembly commissioned a task force to look into

17  compassionate care for the State of Ohio?

18        A.    I don't believe I did until now,

19  actually, no.

20             MR. KEARSE:  Is there a date on

21  this document?

22             MR. BOEHM:  Yeah.  I can show it to

23  you.  2004.

24        Q.    And if you want to, kind of, skip

25  head to page 5, you can see there is a

1    reference to the legislative authority,

2    specifically that the Ohio General Assembly

3    enacted House Bill 474 December 2002, creating

4    the Compassionate Care Task Force; do you see

5    that?

6         A.    Yes.

7         Q.    And then if you flip back to the

8    background page, there is an explanation of,

9    kind of, what the task force was trying to do;

10   do you see that?

11        A.    Yes.

12        Q.    And there is a reference right at

13   the top to chronic pain?

14        A.    Yes.

15        Q.    It says, "Chronic pain is among the

16   most disabling and costly afflictions in North

17   America."

18             MR. KEARSE:  I'm going to object to

19   form.  The doctor said he hasn't seen this

20   document before.  The document speaks for

21   itself.

22             MR. BOEHM:  Well, right now I'm

23   just asking him is that what it says here.

24        Q.    Do you see that it says that?

25        A.    I see it.

1          Q.    Again, this is, you know, in the

2     2003, 2004 time range.  Do you agree or

3     disagree with the statement here by the Ohio

4     Compassionate Care Task Force that chronic pain

5     is among the most disabling and costly

6     afflictions in North America?

7          A.    I'm thinking about all the top

8     causes I've seen listed.  It's -- I doubt it's

9     in the top ten, but I won't disagree.  It's an

10    issue.

11         Q.    If you turn to page 6, you will see

12    that there is a list -- actually, it starts on

13    page 5 and carries over to page 6.

14              There is a list provided of the

15    individuals who participated on this task

16    force.

17         A.    Uh-huh.

18         Q.    Do you see that?

19         A.    Yes.

20         Q.    And you can see that it's primarily

21    experts in the medical profession, right?

22         A.    Yes.

23         Q.    And just to point to a few names in

24    particular, do you see the name Ted Parren?

25         A.    I spotted it before you mentioned

Page 238

1    it, yes.

2         Q.    Do you know Dr. Parren?

3         A.    Sure.  He's a well-respected

4    addiction specialist in the Northeast Ohio

5    area, more in the Cleveland than Akron, and

6    actually gave one of our talks at that May 31,

7    conference, 2014, that you've already

8    referenced.

9         Q.    And he participated in the creation

10   of the recommendations that are encompassed in

11   this document, this report of the Ohio

12   Compassionate Care Task Force, right?

13        A.    Yes.

14        Q.    And then in the second column on

15   page 6, there is another name, Sarah Friebert

16   or Friebert?

17        A.    Friebert.

18        Q.    Do you know Dr. Friebert?

19        A.    Yes.  She is part of our healthcare

20   subcommittee for our opiate task force.

21        Q.    She works in Akron?

22        A.    Yes, she does.

23        Q.    She works at the Akron Children's

24   Hospital?

25        A.    Yes.  She is their director of

Page 239

1   palliative care.

2        Q.    What is palliative care?

3        A.    Basically, people who are dying or

4   likely to die, chronic pain, she is an

5   oncologist, so cancer, in this case with kids,

6   and so she treats their pain, as the report

7   says, compassionately.

8        Q.    Would you say that she's an expert

9   in the treatment of pain?

10        A.    For that type of pain, yes.

11        Q.    And it appears that she was

12   appointed to serve on this task force and

13   participated in the creation of this document,

14   correct?

15        A.    Yes.

16        Q.    I want to direct your attention to

17   page 11, where there is a discussion about

18   standards for palliative care or pain

19   management programs.

20             In particular, I'm going to ask you

21   about number 2 here, where it says,

22   "Patient-driven, outcome-based guidelines

23   should be used in providing pain management and

24   palliative care, such as, but not limited to";

25   have I read it correctly so far?

Page 240

1          A.     Yes.

2          Q.     And the first thing it says is

3     chronic pain?

4          A.     Yes.

5          Q.     Do you have a view, one way or

6     another, as to whether or not it is

7     appropriate, or may be appropriate, depending

8     on the discretion of an individual healthcare

9     provider treating an individual patient, to

10    prescribe a prescription opoid medication to a

11    patient for chronic pain?

12              MR. KEARSE:  Object to the form.

13         A.     Well, my opinion is it depends on

14    which chronic pain.  So, sure, if somebody has

15    a chronic pain due to some pervasive illness in

16    their body, and other medications haven't

17    worked, then there would be logic for that.

18              It wouldn't be logical to give --

19    to call an ankle sprain or tennis elbow chronic

20    pain and then treat that.  So I think in this

21    case, chronic pain has got to be pretty serious

22    chronic pain.  It is actually disabling, and

23    not just bothersome.

24         Q.     And here it says, "Chronic pain,"

25    and then it says, "The VA/DoD Clinical Practice

1    Guidelines for the management of opioid therapy

2    for chronic pain," with a reference to the

3    Department of Veteran Affairs, 2003?

4         A.    Yes.

5         Q.    Do you know what practice

6    guidelines are being referred to there?

7         A.    I'm not familiar with them.  I

8    would imagine that veterans come back with

9    serious wounds from battle, and some of them

10   end up with chronic pain and they are helping

11   their prescribers treat that.

12        Q.    And the use of FDA-approved

13   prescription opioid medicines may be

14   appropriate to prescribe to a patient in that

15   situation, fair?

16        A.    Yes.

17        Q.    We are going to set that one aside

18   for just a minute.

19                    -  -  -  -  -

20              (Thereupon, Deposition Exhibit 14, A

21              Slide Deck Entitled Facing the

22              Opiate Epidemic: How We Got Here and

23              What we Need to do Next, Beginning

24              with Bates Label SUMMIT 822287, was

25              marked for purposes of

Page 242

1              identification.)

2                        -  -  -  -  -

3         Q.     Dr. Smith, I have put in front of

4    you a document that I have marked as Exhibit

5    14.  It is a slide deck from Dr. Christina

6    Delos Reyes from the May 31, 2014

7    opioid-related conference that you organized,

8    right?

9         A.     Correct.

10        Q.     And it looks like, from the title

11   of her slide deck, she wants to talk about

12   identifying causes of the increasing opioid

13   abuse.  She asks, "How we got here," right?

14             MR. KEARSE:  Objection to form.

15        Q.     Do you agree with that

16   characterization?

17        A.     Yeah, that's her title.

18        Q.     Yeah.  And one of the things she is

19   trying to do is identify the causes of

20   increasing levels of opioid abuse, right?

21        A.     Well, the opioid epidemic, yes.

22        Q.     The opioid epidemic.

23             Now, her slide deck is not numbered

24   on its own, but, of course, we have these Bates

25   numbers in the bottom right-hand corner, and

Page 243

1   I'm going to ask you to turn in particular to

2   the slide that's on the page with the number

3   that ends 2321.  So I think it is about halfway

4   in.

5            The top of the side, it says,

6   Contributing Factors; do you see that?

7        A.    Yes.

8        Q.    And it references these changes in

9   clinical pain management in the late 1990s that

10  you have been talking about, right?

11       A.    Yes.

12       Q.    And that you have identified as the

13  driver of the opioid epidemic itself, right?

14            MR. KEARSE:  Object to form.

15       A.    One of the contributors, yes.

16       Q.    This slide references a 1998 policy

17  document from the Federation of State Medical

18  Boards of the United States; do you see that?

19       A.    I see that.

20       Q.    And there is a reference to, "Model

21  guidelines for the use of controlled substances

22  for the treatment of pain," right?

23       A.    Yes.

24       Q.    Do you know what that is?

25       A.    I probably only heard about it from

Page 244

```
 1    Dr. Delos Reyes.  So no, again, psychiatrists

 2    don't tend to treat pain, so that would not

 3    have been something that would have been part

 4    of my education.

 5         Q.    Do you know what these model

 6    guidelines from the Federation of State Medical

 7    Boards of the United States said, with respect

 8    to the use of controlled substances to treat

 9    pain?

10         A.    I do not.

11         Q.    In the middle of the page, it says,

12    "Pain relief laws being pushed down to states

13    to address liability concerns among

14    prescribers"; do you see that?

15         A.    Yes.

16         Q.    Do you know what is being referred

17    to here?

18         A.    I do not.

19         Q.    There a reference to Ohio Revised

20    Code 4731.21, Drug Treatment of Intractable

21    Pain; do you see that?

22         A.    I do.

23         Q.    Do you know what that law is?

24         A.    It appears to speak for itself.

25    This is the kind of pain I'm talking about.  It
```

1    looks like they wanted to put something in the

2    law about treating intractable pain, and I

3    suspect it's a law that helps keep physicians

4    who need -- who spend their time trying to help

5    such people in such pain be protected from

6    scrutiny, because the DEA or others would look

7    and go, "My, God, you're giving out way too

8    many pain meds."  So this is probably to allow

9    them, under very refined circumstances, to

10   treat it.

11        Q.    Okay.  So in 1997, the DEA might

12   have said to certain doctors, "Hey, you're

13   prescribing too many opioid medications," and

14   this law would have been designed to provide

15   relief to those physicians, so that they could

16   exercise their independent medical judgment --

17             MR. KEARSE:  Object to form.

18        Q.    -- to prescribe or not prescribe,

19   as appropriate; is that your understanding?

20        A.    Well, for very specific types of

21   terrible chronic pain, right.

22        Q.    Have you read this, this Ohio

23   Revised Code 4731.21 legislation?

24        A.    I don't recall reading it, no.

25        Q.    Do you know why it was included on

Page 246

1   Dr. Delos Reyes' slide deck?

2       A.    Yeah.  Dr. Delos Reyes, as an

3   addiction specialist, she does, in her small

4   private practice, treat people that basically

5   nobody else will treat, that is people who have

6   an addiction to opiates, but also have true

7   pain and needs care, and so she tries to

8   balance these things.

9           Even pain specialists won't treat

10  them, and other people won't treat them, so

11  she -- so I suspect that she would be the

12  one -- in fact, the only one I know in all of

13  Northeast Ohio would treat such individuals.

14      Q.    Would she sometimes treat those

15  individuals by prescribing FDA-approved

16  prescription opioid medicines, even if there

17  were addiction issues?

18      A.    I'm assuming, yes, but I don't

19  know.  I don't know her practice.

20      Q.    You getting buried by paper?

21      A.    I think we're good.  Although this

22  sticker is a little crooked.

23      Q.    Oh, no.  We have to start over.

24  Let's start from the top.  Now you, as a

25  medical doctor, should not be preying on my --

1        A.     Humor is a good thing, so...

2                    -  -  -  -  -

3               (Thereupon, Deposition Exhibit 15,

4               2010 Final Report From an Ohio

5               Prescription Drug Abuse Task Force,

6               was marked for purposes of

7               identification.)

8                    -  -  -  -  -

9        Q.    How did I do on that one?  Does it

10   look okay?

11       A.     It looks pretty good, actually.

12       Q.     The sticker that we have been

13   referring to marks this particular document as

14   Exhibit 15, for purposes of your deposition.

15               Exhibit 15 is a 2010 final report

16   from an Ohio Prescription Drug Abuse Task

17   Force, right?

18       A.     Yes.

19       Q.     Have you read this report before?

20       A.     I believe Dr. Thrasher actually

21   gave it to me at one point to look at.  I don't

22   know that I have read it cover to cover, but I

23   have certainly looked at it.

24       Q.     You said that when you came to the

25   ADM Board in 2012, you hadn't really focused on

Page 248

1    opioids and opioid-addiction-related issues,

2    but when you came to the board, you wanted to

3    do everything you could to try and understand

4    that issue, right?

5                    MR. KEARSE:  Object to form.

6         A.    Certainly.  Anything that would

7    help us understand how ADM and then the Opiate

8    Task Force could help.

9         Q.    Is this report the kind of thing

10   that you would have wanted to look at to make

11   sure that you understood the contours of the

12   opioid epidemic, when you came to the ADM

13   Board?

14                   MS. KEARSE:  Object to form.

15        A.    Yes.  That's why Dr. Thrasher gave

16   it to me, although I don't think I saw it until

17   2014 or something, but, yes.

18        Q.    If you turn to the third page of

19   the document, you can see a letter that's being

20   written to Governor Strickland.  He was the

21   governor of Ohio at that time, right?

22        A.    Yes.

23        Q.    Governor Strickland, in 2010,

24   established a task force to address the opioid

25   epidemic in Ohio, right?

Page 249

1               MR. KEARSE:  Object to form.

2          A.    Yeah.  That's the title of the

3     document, so...

4          Q.    Did you know that before today?

5          A.    I think I knew it like in 2014.  He

6     was a psychologist, the governor.

7          Q.    But sitting here today, you now

8     know that in 2010, Ohio had already identified

9     opioid-related issues as an epidemic?

10              MS. KEARSE:  I want to object to

11     the form.  It mischaracterizes his testimony.

12     He just testified in 2014 he saw this document.

13              MR. BOEHM:  That doesn't in any way

14     mischaracterize --

15              MR. KEARSE:  You just suggested

16     it --

17              MR. BOEHM:  Don't coach the

18     witness.  You can object to form.  The question

19     stands.

20              MR. KEARSE:  And

21     mischaracterization, I can highlight that as

22     well.

23          Q.    Did you keep my question in mind,

24     or did that all fuzzy it up for you?

25          A.    I would say please repeat it.

Page 250

1            MR.  BOEHM:  Let's go back up, if

2      you don't mind.

3            THE NOTARY:  Question:  "But

4      sitting here today, you now know that in 2010,

5      Ohio had already identified opioid-related

6      issues as an epidemic?"

7            MR.  KEARSE:  Object to form.

8      Mischaracterizes his testimony.

9            Q.    You can answer.

10            A.    So, yes, I saw this probably in

11      2014, but was not aware of it when I was still

12      at the state hospital system in 2010.

13            Q.    But my question is, sitting here

14      today, you now know that it had been identified

15      as an epidemic at the latest by 2010, right?

16            MR.  KEARSE:  Object to form.

17            A.    Clearly, something about opiates,

18      they call it drug abuse, had been identified by

19      2010, yes.

20            Q.    And it uses the term "epidemic"

21      right there in the first sentence, right?  It

22      is the last word in the first sentence of the

23      document --

24            A.    Yes.

25            Q.    -- right?

Page 251

1            So you agree, right --

2      A.    Yes.

3      Q.    -- with the way I have asked the

4   question?

5            MR. KEARSE:  Object to form.

6      Q.    Yes?

7      A.    I agree that in 2010, they were

8   aware there was a problem and the governor

9   started to work on it.

10     Q.    And, in fact, by October of 2010,

11  this task force had completed its work and

12  developed 20 policy recommendations to try to

13  curb Ohio's prescription drug abuse, and they

14  used the word "epidemic," right?

15     A.    Yes.

16           MR. KEARSE:  Object to form.

17     Q.    As you sit here today, as the

18  medical director and chief clinical officer of

19  the Summit County opiate -- or I'm sorry -- of

20  the Summit County ADM Board, what is your

21  understanding as to when public officials in

22  Ohio first recognized the issues related to

23  opioid abuse that are now the subject of the

24  lawsuit that Summit County has filed?

25           MR. KEARSE:  Object to form.

1      A.     So Ohio, as a state, I don't know.

2   Summit County I can talk about, and I know that

3   the original discovery, I think, of the

4   epidemic really focused on Southern Ohio, in

5   Scioto County, this may very well reflect that,

6   that Summit County, again, was not something

7   that was being discussed until -- really until

8   2013.

9      Q.     Well, we have already seen that

10   that's not true, haven't we today, by looking

11   at some of the documents in the stack?

12            MR. KEARSE:  Object to form.

13      A.     No.  That was a conference in 2012

14   that was in Columbus.  That was a state thing,

15   not a Summit County conference.

16      Q.     Do you know when Cuyahoga County

17   set up its Opiate Task Force?

18      A.     About a year or two before Summit

19   County, but again, my focus has been Summit

20   County, so...

21      Q.     As part of your responsibilities

22   for trying to understand drug addiction in

23   Summit County, did you ever communicate with

24   public health officials and corresponding ADM

25   Board members in the neighboring county of

Page 253

1    Cuyahoga?

2              MR. KEARSE:  Object to form and to

3    tone.

4         A.    So once -- I've said that already.

5    Once we realized there was an issue, yes, I

6    went to their task force, which was already set

7    up, to gain as much knowledge as possible, but

8    I didn't attempt to gain knowledge until I knew

9    there was a reason to obtain it.

10        Q.    And unfortunately, you, in your

11   search and efforts to try to understand opioid

12   abuse in 2012, just didn't come across this

13   report from the Opiate Task Force that Governor

14   Strickland had set up in 2012?

15             MR. KEARSE:  Object to form.

16   Argumentative.

17        A.    No, that's correct.  New governor,

18   I guess they didn't share it.

19        Q.    "They didn't share it," what do you

20   mean, "They didn't share it"?

21        A.    Meaning, when I was talking to the

22   people at ODMH and then it became ODMHAS, this

23   is not one of the things that they shared.

24        Q.    You know that this is publicly

25   available, right?  You can see that on the --

Page 254

1        A.    True, true.

2        Q.    -- first page of the document?

3        A.    It's government, true.

4        Q.    Publically --

5        A.    It doesn't mean you can magically

6   know it exists.

7        Q.    Well, you don't have to use magic,

8   right?  There is an actual specific reference.

9   I don't need to have gone to Hogwarts to find

10  this document, do I?

11             MR. KEARSE:  Object to form.

12  Condescending.

13       A.    But when you are searching for

14  documents, that doesn't mean they all magically

15  show up.  So if I didn't run across it, I

16  didn't run across it.

17       Q.    What kind of searches did you

18  undertake?

19       A.    Mostly through the addiction

20  specialists at the hospitals.  So Dr. Thrasher,

21  Dr. Shane, Dr. Labor, they were the ones who I

22  relied on as my experts, to provide me the

23  information I needed.  This was not -- not

24  until 2014, when Dr. Thrasher gave it to me.

25       Q.    Have you read it ever; have you

1    ever read this document?

2         A.    I'm sure I did back in 2014.

3         Q.    If you turn to, let's say it is

4    page 21.  Do you see that it says on this page,

5    "How did this become an epidemic"; do you see

6    that?

7         A.    Yes.

8         Q.    So the task force that was

9    assembled by Governor Strickland in 2010

10   reaches conclusions about the causes of what

11   they are calling an opioid epidemic in the

12   State of Ohio, right?

13        A.    Yes.

14        Q.    And there is this graph on the

15   bottom of the page.  I don't know if graph is

16   the right word, some depiction of those causes,

17   right?

18        A.    Yes.

19        Q.    One is aggressive marketing of

20   opioids.  You have already talked about that,

21   right?

22        A.    Yes.

23        Q.    Two is changes in clinical pain

24   management?

25        A.    Yes.

1        Q.    You have already talked about that.

2              Three is growing use of

3    prescription opioids; do you see that?

4        A.    Yes.

5        Q.    I'm not going in any particular

6    order, but four is direct-to-consumer

7    marketing.  You already talked about that?

8        A.    Yes.

9        Q.    Five says self-medicating habits of

10   baby boomers.  I think you at least referenced

11   that earlier today, right?

12       A.    Yes.

13       Q.    And then six, you mentioned

14   diversion, specifically internet, pill mills,

15   deception/scams, theft, friends and family?

16       A.    Yes.

17       Q.    And we already talked about that as

18   well, right?

19       A.    Yes.

20       Q.    Is it fair to say that, based on

21   this document from October 2010, the task force

22   was reaching conclusions about what caused the

23   epidemic related to opioids that are the same

24   conclusions that the Summit County ADM Board

25   reached in whatever subsequent years, when you

1    all started looking at the problem; is that

2    fair?

3         A.    Yes.  In fact, we use a similar

4    graphic in our speakers bureau for the Opiate

5    Task Force about the causes.

6         Q.    In spite of the complexity of the

7    issues that we have been talking about today,

8    do you agree that opioid medications have

9    legitimate medical purposes?

10        A.    Yes.

11        Q.    Do you agree that doctors need to

12   be afforded some discretion in exercising their

13   individual medical judgment about whether a

14   particular patient has a legitimate medical

15   need for a prescription opioid?

16        A.    Yes.  As I have said, I think that

17   needs to be unfettered by outside forces,

18   though, that are either encouraging them to use

19   or not use something, when it is not really a

20   clinical decision at that point.

21        Q.    Okay.  In other words, a

22   prescribing physician is the person who

23   interacts directly with the patient, right?

24             MS. KEARSE:  Object to the form.

25        A.    Yes.

Page 258

1          Q.     As a medical doctor, why is that
2     important?  Why is it important; why does it
3     matter, in terms of making prescribing
4     decisions, that the medical doctor, the person
5     who is there with the patient, has the
6     discretion to exercise their professional
7     medical judgment?
8                   MR. KEARSE:  Object to form.
9          A.     Well, at that point in time, that's
10    the only person who's got the education and
11    experience, and then the data, by talking to
12    the person, as well as hopefully getting other
13    records and so forth, to make a mutual decision
14    with the patient about what is in his or her
15    best interest.
16         Q.     They could take a medical history
17    of that person, right?
18         A.     Certainly.
19         Q.     They can perform an examination?
20         A.     Yes.
21         Q.     They can look the patient in the
22    eye, right?
23         A.     Correct.
24         Q.     Does that matter, in making medical
25    decisions, to be able to be right there with

Page 259

1    the person?

2         A.    Yeah.  In fact, we are not really

3    able to make a diagnosis of somebody we haven't

4    seen.  So that's kind of a requirement.

5         Q.    And then taking all that

6    information into account, that particular

7    healthcare provider can apply medical judgment,

8    right?

9         A.    Correct.

10         Q.    And your view is that medical

11    judgement should not be fettered, one way or

12    another, either in terms of false inflating

13    their likelihood of prescribing an opioid or

14    discouraging the prescription of an opioid,

15    when it might be in that patient's best

16    interest, right?

17         A.    Yeah.  As long as it's, you know, I

18    guess, completely unfettered, but the truth is

19    medical science changes.  So if there is new

20    science that says something is the right

21    treatment, and there is evidence based to it,

22    then obviously, hopefully, the physician will

23    have that at his or her disposal to take into

24    account.

25         Q.    Okay.  Now just to back up for a

1   moment, we have been talking about opioids, but

2   to be clear, there is an important distinction

3   to be made been prescription opioid medications

4   and opiates that are illegal, not approved by

5   the FDA, and not appropriate for any legitimate

6   medical need; is that right?

7           MR. KEARSE:  Object to form.

8       A.   Yes.  So there are medications

9   approved, tested, manufactured to certain

10  specifications, and they definitely differ from

11  what you might buy on the street, not knowing

12  what you are getting.

13      Q.   Sometimes those are all referred to

14  as opiates, but there is a different between

15  FDA-approved prescription opioid medicines and

16  street drugs that also sometimes get referred

17  to as opiates, right?

18      A.   There may be, yes.

19      Q.   Well, what do you mean when you

20  say, "There may be"?

21      A.   Pills get diverted, so you might be

22  selling me OxyContin that you didn't take or

23  you got from your neighbor's medicine cabinet.

24  So that would be a real medication, but

25  diverted to the street.

Page 261

1      Q.      Understood.  But I'm talking about

2    the actual substances.  There is a difference

3    between an FDA-approved prescription opioid

4    medicine and heroin, for example, right?

5      A.      Yes.

6      Q.      What does it mean that a medicine

7    has been approved as safe and effective for its

8    indicated uses by the Food and Drug

9    Administration?

10      A.      Well, so medicines go through a

11    pretty -- I think in this country, the most

12    rigorous of any country process to make sure

13    they are first and foremost not toxic, and then

14    next they have to be proven to serve the

15    purpose for which they are meant.

16              So they have to cause the positive

17    effect, at least a certain percent of

18    individuals compared to placebo generally, and

19    then they get approved, and then they are

20    allowed to be -- physicians can then be

21    educated about them and then prescribe them.

22      Q.      Does the FDA employ subject matter

23    experts, as part of that testing, review and

24    approval process?

25              MR. KEARSE:  Object to form.

Page 262

1          A.     Subject experts on what?

2          Q.     Well, for example, drug safety,

3     epidemiology, toxicology, all the issues that

4     would go into an assessment of whether or not

5     something is safe and effective for its

6     indicated uses.

7                MR. KEARSE:  Object to form.

8          A.     So, yes, they have people that are

9     part of that pipeline, to make sure the

10    research is being done appropriately and

11    outcomes are what they appear to be.

12         Q.     And you said that the United States

13    has the most rigorous drug-testing system in

14    the world, right?

15         A.     That's my understanding, yes.

16         Q.     And what does that mean; what do

17    you mean by that?

18         A.     Other countries may release

19    medications with less rigorous research studies

20    than the U.S., and the big example of that was

21    thalidomide, quite a long time ago.

22                It was brought out as an antinausea

23    drug during pregnancy.  FDA said, "No, not in

24    this country," and other -- in Europe there

25    were a lot of individuals born with missing

Page 263

1    limbs and so forth.  There were some born here.

2    That's because those individuals managed to get

3    thalidomide illegally from the other countries.

4            So that's an example of where the

5    FDA protected a lot of the U.S. citizens by not

6    being so -- not being so -- you know, not being

7    too streamlined, if you will, on the process of

8    approval.

9        Q.    Do you know how long it typically

10   takes between the development of a compound and

11   it's approval as a medicine by the FDA?

12            MR. KEARSE:  Object to form.

13       A.    Years.  I don't know how many

14   years.  I think the total -- there is like a

15   17-year window from compound to end of patent,

16   but I don't know how many years, and that

17   probably varies by drugs, how many years.

18            Certainly there are some drugs that

19   have come out, HIV, cancer, things where the

20   trials are so compelling that they move even

21   faster, and they will get them on the market

22   quickly, because it will save lives, that's

23   certainly a good decision, and there are others

24   that it's not as clear, maybe this

25   antidepressant is new, let's see if it's better

Page 264

1    than the other 15 we have.  That probably goes

2    through the full process, before it comes out.

3           Q.    When the FDA approves a medication

4    as safe and effective for specific uses, it

5    approves it for particular indications, right?

6           A.    Correct.  And that's based on what

7    the research was done for that indication.

8           Q.    And for those who may not be

9    familiar with all the medical terminology, what

10   does it mean when we talk about approval of a

11   medication as safe and effective for the

12   approved indications?

13          A.    Well, so if they studied a

14   particular opiate for use in a particular type

15   of pain, then it would get approved for that

16   particular type of pain, and similar to

17   antidepressants, there are some that have been

18   studied specifically, say, Paxil, for social

19   anxiety.

20                So Paxil comes out, and they have

21   done extra studies that say not only is it an

22   antidepressant, it's also for social anxiety.

23   That would be an evidenced-based indication

24   and, therefore, the FDA would approve it for

25   that indication.

Page 265

1          Q.    And this process that we have been

2     talking about was followed with respect to all

3     of the FDA-approved opioid medications that are

4     on the market in the United States today,

5     correct?

6          A.    Yes.

7          Q.    But when you talk about opiates, as

8     a member of the Summit County ADM Board, you

9     are also talking about substances that have

10    never been approved, have never been even

11    contemplated for use for legitimate medical

12    needs, right?

13               MR. KEARSE:  Object to form.

14         Q.    You are also talking about illicit

15    drugs?

16         A.    Correct.  We want to treat

17    addiction, no matter where the opiate came

18    from.

19         Q.    And these illicit drugs, like

20    heroin, don't get prescribed by doctors, right?

21         A.    No.  They certainly shouldn't, no.

22         Q.    They don't get dispensed by

23    pharmacies?

24         A.    No.

25         Q.    They are not FDA approved?

```
                                        Page 266
 1          A.     No.
 2          Q.     They are illegal street drugs,
 3   right?
 4                 MS. KEARSE:  Object to form.
 5          A.     Correct.
 6          Q.     You mentioned earlier today
 7   something about carfentanil.
 8          A.     Yes.
 9          Q.     And there has been some reference,
10   I think, also to fentanyl, and you know what
11   those drugs are, right?
12          A.     Yes.
13          Q.     And those are -- to the extent
14   those are being abused in Summit County, those
15   are not, at least by and large, prescribed
16   fentanyl or carfentanil, right?
17          A.     Yeah, correct.  Carfentanil is an
18   elephant tranquilizer, only used for very large
19   animals, none of which are even in the Akron
20   zoo, for that matter, so it is not prescribed
21   here anywhere.
22                 And fentanyl, there is a
23   prescription version of that, but what
24   generally is referred to as synthetic fentanyl
25   that is coming, apparently, from China, in the
```

1    U.S. Mail.

2         Q.    And synthetic fentanyl that is

3    showing up in Summit County and other

4    communities, that's not something that is being

5    prescribed by a healthcare provider to

6    residents here in Summit County, right?

7         A.    Right.  No.

8         Q.    I take it you have communicated

9    with law enforcement in various ways, insofar

10   as it concerns the opioid epidemic in Summit

11   County; is that true?

12              MR. KEARSE:  Object to form.

13        A.    Yeah.  Our task force has over 400

14   members of all three branches of government,

15   police chiefs, et cetera.

16        Q.    So based on your understanding from

17   your work on the Summit County ADM Board, and

18   specifically as its medical director, what is

19   your understanding about how addicts typically

20   obtain illicit street opiates, like heroin or

21   fentanyl or carfentanil?

22        A.    So, you know, in fact, we have done

23   programs on this, but basically, as what we

24   have seen is the vast proportion of people who

25   end up with the disease of addiction, opiate

Page 268

1    use disorder, started with pills, many times,

2    again, legitimately, coming from their

3    physicians, and then they, when they can't get

4    them anymore, or at least because, again, we

5    have shut down doctor shopping and we have shut

6    down pill mills and all these various

7    resources, we have got prescribers prescribing

8    more similarly to what they would have years

9    ago, before the epidemic.

10                    They then seek out -- again, they

11    have an addicted brain, and that definition

12    again is that the person either is using,

13    thinking about using, or obtaining the drugs to

14    use by any means possible at that point, and so

15    they then go to the street, looking to find

16    somebody who will sell them heroin, but in

17    today's world, heroin may be tainted with

18    fentanyl or, sadly, with very deadly

19    carfentanil.

20                    And so they seek out drug dealers,

21    because they, number one, they want to continue

22    that addiction, that's what their brain is

23    telling them, and number two, they don't want

24    to go in withdrawal.  So they actually have two

25    motivators to maintain their addiction.  If

Page 269

1    they go into withdrawal, it affects nearly ever

2    system of their body, and it -- basically

3    people with addiction will tell you it feels

4    like a true case of influenza, not that they

5    have sniffles and a cough and they call it the

6    flu, but actual influenza, that is just

7    miserable.

8              So they really have two reasons at

9    that point, from an addicted brain point of

10   view, to seek out any version of opiate they

11   can get, which, sadly, means they end up taking

12   risks, to take things that they know their

13   neighbor just died from, but they think they

14   will be careful, because they are not really

15   thinking.

16        Q.    You mentioned that -- I think

17   earlier you said that some addicts try to get

18   their hands on and abuse prescription opioid

19   medicines, correct?

20              MR. KEARSE:  Object to form.

21   Mischaracterizes his testimony.

22        Q.    Oh, well, if you disagree with

23   that, please do let us know.

24              MR. KEARSE:  Well, I don't think

25   he's called them addicts.  So I think you are

Page 270

1    putting words in his mouth that he hasn't

2    actually stated.  So mischaracterizes his

3    testimony.

4                MR. BOEHM:  Would you just read

5    back my question, and see if it works between

6    me and the doctor.

7                THE NOTARY:  Question:  "You

8    mentioned that -- I think earlier you said that

9    some addicts try to get their hands on and

10   abuse prescription opioid medicines, correct?"

11               MR. KEARSE:  Again, I object to the

12   form.  Mischaracterizes his testimony.

13        A.    Okay.  So I think what I said was

14   people who have an addicted brain, they have

15   the disease of addiction, at that point they

16   were truly driven.  It's not a thought process

17   at that point.  They are really truly driven to

18   find opiates.

19               They no doubt first seek out the

20   pills, whether that is in your medicine cabinet

21   or the neighbor's medicine cabinet or

22   eventually the street, and when they can't find

23   them, they will go to the street looking for --

24        Q.    I'm worried that the exchange

25   between the lawyers made you, kind of, lose

Page 271

1    focus on the question.

2              My question, again, is I think -- I

3    thought you already said this.  I was just

4    trying to confirm something I though I heard

5    you say, so tell me if I'm understanding for

6    sure.

7              MR. KEARSE:  And he has answered

8    your question.

9              MR. BOEHM:  I'm not talking right

10   now, Anne, I'm asking a question.

11        Q.    Some people who are addicted to

12   opiates try to get their hands on and abuse

13   prescription opioid medications; did I

14   understand that correctly?

15        A.    That is correct.  People who are

16   addicted will try to find pills, yes.

17        Q.    How does that most commonly happen?

18   As opposed to going out on the street and

19   buying heroin from a dealer, how do people who

20   are addicted to opiates get their hands on, for

21   purposes of abuse, prescription opioid

22   medicines that have been approved by the FDA

23   for legitimate medical needs?

24             MR. KEARSE:  Object to form.

25        A.    So prior to OARRS and similar

Page 272

1   processes around the country, they would doctor

2   shop.  So I would not know -- pretend I'm a

3   pain specialist.  I wouldn't know that they

4   came in and told me they had pain today, and I

5   gave them Percocet, and then they went to

6   another doctor and got more and so on and so

7   forth.

8           So they would want -- number one,

9   they would doctor shop, trying to obtain these

10  pills.  They would go to emergency departments,

11  often complaining of a toothache, which was

12  kind of genius, because doctors are not

13  dentists, and they will just say, "Oh, my gosh,

14  toothaches hurt, so I better give you some

15  opiates," and they would get opiates that way.

16  So initially they would try to get it that way.

17          When we shut that pathway down,

18  then they start looking in people's medicine

19  cabinets and, eventually, they may even go to

20  the street and ask if they can buy pills,

21  because they don't necessarily want to trust

22  heroin.  So they will ask if they can buy

23  pills.  Those are probably the main ways they

24  seek them out.

25      Q.    When you talk about shutting down

1    doctor shopping, what do you mean by that?

2         A.    So the OARRS report was designed,

3    in the beginning at least, the way it was

4    couched in 14 and then mandatory April 1 of 15,

5    was so that a patient couldn't get away with

6    that.

7              In other words, if they came in to

8    me to get a controlled substance, there is a

9    reason they are controlled, obviously, then I

10   can look it up and make sure they didn't just

11   get that same or a similar substance from

12   another physician or another prescriber.

13             So that would be OARRS preventing

14   doctor shopping.  So that I use it, pharmacies,

15   by the way, are also required to use it, so

16   they also would be aware if you have got a

17   person who has gone down the path of addiction

18   and is trying to get more pills than would be

19   medically necessary.

20        Q.    Okay.  Other than that doctor

21   shopping, how do addicts, who are trying to get

22   their hands on prescription opioid medications

23   for abuse, how do they do that, other than the

24   things you have already mentioned, or did you

25   give me a comprehensive list?

1          MR. KEARSE:  Object to form.

2      A.     There is at least one other way I'm

3   aware of.  They read the obituaries.  They read

4   the obituary, and in the obituary, people will

5   put in, "My grandmother bravely fought off

6   cancer," just to, kind of, give some honor to

7   their loved one, and then in that same

8   obituary, it will tell the drug addict when no

9   one is home.  "Oh, we'll all be at the funeral

10  home or the viewing," and they -- you have lost

11  your loved one, now they break into your home

12  or her home while you are at the funeral, and

13  they take all their pills, because they are

14  pretty sure there is probably a cache of pills,

15  and there probably was, in their medicine

16  cabinet.

17          So that would be another example.

18  They would be -- again, this part of the brain

19  is not completely gone, but it is being

20  deceived by the addicted part of their brain,

21  and so they are able to think things out, they

22  are able to plan, they are able to scheme, they

23  are able to start to sell things, their

24  parents' TV and whatever, to be able to

25  accomplish their goal, because it's a disease.

Page 275

1          Q.    So that would fit into the category

2     of, kind of, theft, right?

3          A.    Yes.

4               MR. BOEHM:  Would now about a good

5     time for a break?  What do you all think?  I

6     could use five minutes to walk around.

7               We will go off the record.

8               THE VIDEOGRAPHER:  Off the record

9     at 3:16.

10              (Recess taken.)

11              THE VIDEOGRAPHER:  We are back on

12    the record, 3:40.

13         Q.    Okay.  We are back from break, Dr.

14    Smith.

15              Before we broke, you were making

16    some references to something that you called

17    doctor shopping; do you remember that?

18              MR. KEARSE:  Object to form.

19         A.    Yeah.  Addicted patients, shopping

20    for more than one doctor, yes.

21         Q.    And as I understand it, when you

22    talk about doctor shopping, you are talking

23    about a situation where an addicted patient

24    goes from one doctor to the next doctor, maybe

25    multiple doctors, trying to get as many

Page 276

1    prescriptions of opioids as that person can; is

2    that right?

3          A.    Correct.  Somebody with an

4    addicted -- the disease of addiction is driven

5    to obtain the medication.

6          Q.    And that, in that situation, the

7    healthcare providers wouldn't know that that's

8    what that particular patient is doing; is that

9    right?

10         A.    Not without some other way of

11   policing them, no.  They come in, you want to

12   treat the person in front of you, you don't

13   know that they just got pills yesterday.

14         Q.    And you're not blaming the doctor

15   in that situation, right?

16               MR. KEARSE:  Object to form.

17         A.    No.  It's the disease of addiction

18   at that point that's at play.

19         Q.    And the doctor is trying to address

20   what he or she perceives to be a legitimate

21   medical need, right, doesn't know that they are

22   the third or fourth doctor in the line for that

23   particular patient, right?

24         A.    Correct.

25         Q.    And for some time in Ohio, doctors

1  wouldn't have had the tools available for them

2  to reliably make a determination as to whether

3  or not that kind of doctor shopping was

4  happening, fair?

5      A.    Correct.

6      Q.    I think you said that OARRS didn't

7  become mandatary until 2016?

8      A.    I believe, mandatory, I believe,

9  April 1 of 2015.  And discussed maybe starting

10  in 14, as it was at our conference.

11      Q.    Do you know why it wasn't until

12  April of 2015 that OARRS reporting became a

13  requirement in Ohio?

14      A.    No.  I don't know why that

15  particular date, as opposed to an earlier date.

16      Q.    Did you or others for the Summit

17  County ADM Board ever advocate for an earlier

18  implementation of mandatory OARRS usage?

19      A.    Again, we have an advocacy policy

20  subcommittee, and they very well may have done

21  that.  I don't -- I don't know everything that

22  each of the six committees is doing, so I don't

23  know.

24      Q.    Did the Summit County ADM Board

25  have a position, prior to April 2015, about

1    whether or not OARRS reporting should be

2    mandatory in Summit County and the State of

3    Ohio?

4              MR. KEARSE:  Object to form.

5         A.    I don't know that we had a

6    position.  It's not really our role to take

7    positions on such things.  So we never would

8    have had a formal position, even if we had that

9    belief.

10        Q.    When you say, it is not your role,

11   the role of the Summit County ADM Board to take

12   positions on that sort of thing, tell me what

13   you mean by that?

14        A.    I mean, we are not designed as an

15   advocacy group.  We don't have a lobbyist, we

16   don't do any of that kind of work.  The Opiate

17   Task Force, because it had the arm that brought

18   in some legislators and so forth, could

19   potentially have taken that role and run.

20        Q.    Do you remember your email in

21   February 2014 announcing the May 2014

22   conference that you were organizing around

23   opiates?

24        A.    Yes.

25        Q.    And in your email, you said the way

1    to address this is, in part, through new

2    legislation; do you remember that?

3          A.    Correct.  Yes.

4          Q.    So you, at least, had some views,

5    either in your official or unofficial capacity

6    as the medical director for Summit County's ADM

7    Board, about what type of legislation or public

8    policy process you should put in place to

9    address the opioid epidemic, right?

10                MR. KEARSE:  Objection to form.

11         A.    Sure.  I mean, I think when you are

12   in the midst of a difficult actuation, you are

13   going to come up with a lot of views and

14   opinions about things that could be helpful.

15         Q.    And that's really the nature of my

16   question, with respect to OARRS.

17                Was it your position, either

18   personally or in your official capacity as the

19   medical director for the Summit County ADM

20   Board, that the required use of OARRS ought to

21   have been put into effect prior to April 2015?

22                MR. KEARSE:  Objection to the form.

23         A.    I honestly doesn't know that I

24   thought about it from a mandatory point of

25   view.  My role was to try to educate physicians

Page 280

1    that it already existed and they, therefore,

2    could and should use it.

3                As far as making it a law, that's

4    not my -- I wouldn't have had an opinion about

5    law, at that point.

6         Q.    Well, if only some doctors are

7    using it and others aren't using it, that takes

8    away the reliability of it; doesn't it?

9         A.    I agree.  Similarly, if -- because

10   pharmacies are also -- have to use it.  If they

11   are not using it, same issue, right.

12        Q.    And when you talk about doctor

13   shopping, that is illegal conduct, right?  It

14   is against the law to engage in doctor

15   shopping?

16        A.    It probably is.  It's certainly

17   unethical.  I don't know whether there is a law

18   against it or not, actually.

19        Q.    Okay.  And so is theft, right, if

20   somebody is stealing somebody else's

21   medication?

22        A.    Yeah.  That is certainly illegal.

23        Q.    That's illegal.  And so is sneaking

24   into your grandma's medicine cabinet and

25   stealing her medication for abuse, that's also

Page 281

1    illegal, right?

2            MR. KEARSE:  Object to form.

3        A.    Yeah.  You are not supposed to use

4    a prescription that's for somebody else, and

5    you use it, and you are not -- if I'm given a

6    prescription, I'm also not supposed to loan her

7    one --

8        Q.    Right.

9        A.    -- either.  So either direction,

10   it's not proper.

11       Q.    If I'm given a prescription for

12   this controlled substance, a prescription

13   opioid medication, it would be unlawful for me

14   to say, "Hey, you use it," or sell it to

15   somebody else, right?

16       A.    Yes.  Both would be illegal, and

17   worse would selling it, sure.

18       Q.    And you talked about the means by

19   which patients addicted to opioids obtained

20   prescription opioids, not the street drugs, but

21   the prescription opioids; we talked about some

22   of the ways, right?

23       A.    Yes.

24       Q.    And I want to show you a document

25   from 2012 from the Ohio Department of Alcohol,

Page 282

1    Drug Addiction Services that addresses that

2    issue.

3                    -   -   -   -   -

4               (Thereupon, Deposition Exhibit 16, A

5               Document From 2012 from the Ohio

6               Department of Alcohol, Drug

7               Addiction Services, was marked for

8               purposes of identification.)

9                    -   -   -   -   -

10        Q.    I'm going to mark this document as

11   number 16.  Do you see at the top it says

12   Ohio's Attack on the Opiate Addiction and

13   Overdose Epidemic; do you see that?

14        A.    Yes.

15        Q.    And this says SFY 2012 Annual

16   Report?

17        A.    Yes, state fiscal year.  Yes.

18        Q.    So this is about the year 2012,

19   right?

20        A.    It is about 2012, but it would have

21   come out in July of 13 or later, because the

22   state fiscal year would be July 1 of 12, right.

23        Q.    It is addressing data from 2012?

24        A.    Yeah.

25        Q.    And if you turn to the back page,

Page 283

1    you can see some graphics.

2              MR. KEARSE:  I would just ask,

3    counsel, does this -- does this have a date?

4              MR. BOEHM:  It says SFY 2012.

5              MR. KEARSE:  Okay.

6              MR. BOEHM:  So that's why I was

7    asking about that.

8         Q.    So if you turn to the back page of

9    the document, you can see some graphics about

10   opiate abuse in Ohio; do you see that?

11        A.    Yes.

12        Q.    And several of these are

13   interesting, but the one I want to direct you

14   to has -- has to do with the subject we were

15   talking about before the break, How

16   Prescription Opiates Are Obtained For Abuse,

17   and do you see that, that's one of the graphics

18   here, about a third of the way down the page,

19   on the right side?

20        A.    Yes.

21        Q.    And it breaks out the different

22   means by which opiate addicts were obtaining

23   prescription opiates for the year 2012 into

24   different percentage categories, right?

25        A.    Yes.

```
 1                    MR. KEARSE:  Object to form, and

 2       that's not what the document says, if you are

 3       reading for the doctor.

 4                    MR. BOEHM:  When I'm done with the

 5       doctor, I'll be happy to ask you some

 6       questions, but I think we got it on the record.

 7                    MR. KEARSE:  You are reading the

 8       document and you weren't reading it correctly.

 9                    MR. BOEHM:  Unfortunately, I think

10       you listened to the lawyer and not the witness,

11       when he said yes to my question.

12                    THE NOTARY:  I was listening to

13       both of you.

14                    MR. BOEHM:  Not me.  I wasn't

15       talking.

16                    THE NOTARY:  Do you want me to ask

17       the question again?

18                    MR. BOEHM:  I think it will be on

19       the recording, but I'll ask you, Anne, not to

20       speak when other people are speaking.  This is

21       an instance where your interruption has caused

22       the court reporter not to have heard,

23       apparently, the answer that the witness gave,

24       and I don't want that to happen.  It is

25       inappropriate.  It shouldn't be happening at
```

Page 285

1   all.

2           MR. KEARSE:  Well, for the record,

3   I'm reading it right now, I said object to the

4   form --

5           MR. BOEHM:  I don't need you to --

6   I don't want to -- I'm not asking you about

7   this document.  I'm talking the matter of

8   procedure and process.

9           MR. KEARSE:  Counsel, before he

10  answers and after you ask the question, I'm

11  allowed to says an objection.

12          MR. BOEHM:  Object to form.

13          MS. KEARSE:  And I did object to

14  the form.

15          And I'll ask the doctor, so if we

16  have time, I'm allowed to object before he

17  answers, the witness, Dr. Smith.

18          THE NOTARY:  Question:  "And it

19  breaks out the different means by which opiate

20  addicts were obtaining prescription opiates for

21  the year 2012 into different percentage

22  categories, right?"

23      A.   So it does, it says how

24  prescription opiates are obtained, and

25  presumably that is by people with opiate

Page 286

1    addiction.

2         Q.    So the answer is yes, right?

3         A.    Yes.

4         Q.    Okay.  And the first and largest

5    category here is 55 percent.  It says, "Free

6    from a friend or relative"; do you see that?

7         A.    Yes.

8         Q.    What do you understand that to

9    include?  That's a situation where the person

10   is receiving the prescription opioid not from a

11   healthcare provider, but from an individual who

12   already had the prescription drug, right?

13             MR. KEARSE:  Object to form.

14        A.    Right.  So a friend or a relative

15   is handing them to the person who is probably

16   got an opiate addiction and has probably

17   figured out a way to ask them for it.

18        Q.    And that's unlawful?

19        A.    Yes.

20        Q.    Okay.  And the next category, it

21   says, "17 percent stolen from a friend or

22   relative"; do you see that?

23        A.    Yes.

24        Q.    And that's also unlawful, right?

25        A.    Yes.

Page 287

1          Q.    And it says, "11 percent bought
2     from a friend or relative"; do you see that?
3          A.    Yes.
4          Q.    And that's also unlawful, right?
5          A.    Correct.
6          Q.    The next category says, "5 percent,
7     doctor prescription"; do you see that?
8          A.    Yes.
9          Q.    So this is saying that, at least
10    for the year 2012, only 5 percent of
11    prescription opioid medicines that were being
12    obtained for abuse were obtained directly
13    through a doctor prescription, right?
14         A.    For abuse, so people with the
15    disease of addiction, yes, they were finding
16    other ways to get them.
17         Q.    Okay.
18         A.    Which is what an addicted person's
19    brain would lead them to do, is to break the
20    law, whatever they have to do to get that
21    substance.
22         Q.    Right.  But the point is here that
23    I'm making, is that only 5 percent of
24    prescription opioid medicines that were being
25    obtained for abuse were obtained directly

Page 288

1    through a doctor prescription, right?

2         A.    According to this, yes.

3         Q.    And do you have any reason to

4    dispute this statistic?

5         A.    No.

6         Q.    Do you know how these percentages

7    changed after 2012?

8         A.    I do not.

9         Q.    Fair to say that -- okay.  Let's

10   see.  The fourth one says, "Drug dealer or

11   stranger, 4 percent"; do you see that?

12        A.    I see that.

13        Q.    That's the last one.

14        A.    Yes.

15        Q.    That's also unlawful, right?

16        A.    Yes.

17        Q.    So at least as of 2012, at least 95

18   percent of the prescription opioid medicines

19   that were being obtained for abuse were

20   obtained through some intervening unlawful

21   conduct on behalf -- on behalf of the -- on the

22   part of the drug seeker, right?

23             MR. KEARSE:  Object to form.

24        A.    That's accurate, but that

25   presupposes then that they had already had

1    prescription opiates, became addicted, and now

2    they needed to find a way to maintain their

3    addiction.

4          Q.    I'm not presupposing anything.  I'm

5    just looking at the statistic here.

6          A.    But that's what the graph is about.

7    It's people who have developed addiction, and

8    we know that the vast majority start with

9    pills, now they are driven to get more pills.

10              So, yes, then in that respect, they

11   now need to seek other ways of getting those

12   pills.

13         Q.    When you say, "The vast majority,"

14   okay, that's a separate topic, and I do want to

15   talk to you about that, but you're not

16   disagreeing with this graphic, right?

17         A.    Correct.

18         Q.    The subject of how people become

19   addicted is a complicated one; isn't it?

20         A.    Not particularly complicated, no.

21         Q.    Okay.  You think addiction science

22   and addiction medicine is pretty simple?

23         A.    I think that we understand enough

24   about how people getting addicted, they have a

25   brain reward system that is set up to like, for

Page 290

1    lack of a better word, the substance more than

2    most.  They try the substance, and they get

3    addicted.

4              I don't think there is a lot of

5    complications to that.  I think that's pretty

6    straightforward.

7         Q.    In fact, in the scientific

8    community, there is a huge amount of

9    complication to that, right?  I mean, there is

10   a whole board certification process for

11   addiction medicine, right?

12        A.    Well, the certification process is

13   about how to treat it.  Treating it is much

14   more complicated, because now the brain is not

15   thinking with this part, it's thinking with

16   your animal brain.  Not really thinking, it's

17   driven now to obtain, use or think about

18   obtaining and using the substance, and that's

19   the complicated part.  Treatment is very

20   complicated.

21        Q.    But the medical literature, doctor,

22   to be fair, to the extent you reviewed it,

23   makes it clear that the factors that play into

24   whether or not somebody is an addict naturally,

25   or is likely to become an addict, depending on

Page 291

1   exposures to various substances, is, indeed, a

2   very complicated scientific question; do you

3   disagree with that?

4                   MR. KEARSE:  Object to form.

5          A.    It is complicated in the sense that

6   we don't have a way yet to predict who may

7   become addicted to a given substance, so that

8   part is complicated.

9                   The actual route to addiction is

10  very simple.  You have to have a predisposition

11  to turn your reward system on more than most

12  people's reward system, and also you have to

13  actually take the substance in order to turn on

14  that reward system, and then you end up with

15  addiction.

16                           -  -  -  -  -

17                   (Thereupon, Deposition Exhibit 17,

18                   October 10, 2017 Email From Caraffi,

19                   with Attachment, Beginning with

20                   Bates Label SUMMIT 906717, was

21                   marked for purposes of

22                   identification.)

23                           -  -  -  -  -

24          Q.    I'm going to show you the next

25  exhibit.  It is marked as 17.  And this is an

                                                    Page 292

1    email -- it is one of these email chains from

2    October of 17, and like most email exchanges,

3    you kind of have to start at the bottom --

4           A.    Right.

5           Q.    -- to go in chronological order.

6                 And the first email appears to be

7    from V. Caraffi on October 10, 2017.

8                 MR. KEARSE:  Counsel, I just -- I

9    suspect Dr. Smith' name is on here somewhere?

10                MR. BOEHM:  Yes.

11                MS. KEARSE:  Okay.

12                MR. BOEHM:  I believe, Brad can

13   tell me if I'm wrong, but I believe this was

14   produced from his custodial file.

15                MR. MASTERS:  Yes.

16                MR. KEARSE:  I mean, it's a Summit

17   County number on it.

18                MR. BOEHM:  There are, indeed,

19   many, many names on here.

20                MR. KEARSE:  I know, and I'm going

21   to take your word for it right now, until I

22   actually look at it.

23                MR. BOEHM:  Okay.

24                MS. KEARSE:  I would assume that

25   you are suggesting that his name is on here?

Page 293

1              MR.  BOEHM:  Yeah.  There it is.  I

2     found it.

3              MS.  KEARSE:  Okay.

4         Q.    You know who V. Caraffi is?

5         A.    Yes.  So he runs the Cuyahoga

6     County Opiate Task Force, or did, at least, at

7     that time, I think he still does, and because I

8     had gone to some of their meetings in the past,

9     he added me to their distribution.  So I do get

10    maybe not all, but certainly some of the emails

11    from their task force.

12        Q.    So he sent you this email on

13    October 10, 17, along with scores of other

14    people?

15        A.    Yes.

16        Q.    And he writes, "Good morning,

17    please review the citation below sent on behalf

18    of Dr. Gilson"; do you see that?

19        A.    Yes.

20        Q.    Who is Dr. Gilson?

21        A.    He is their medical examiner for

22    Cuyahoga County, just like Dr. Kohler is for

23    us.

24        Q.    He reports in this email to you and

25    others, that, "At the April task force meeting,

Page 294

1    Tom" -- is that Dr. Gilson?

2         A.    Yes.

3         Q.    "Tom indicated local data was

4    showing an increasing trend in the number of

5    overdose fatalities from heroin/fentanyl with

6    no history of overprescribing of pain

7    medication"; do you see that?

8         A.    Yes.

9         Q.    Are you familiar with these data?

10        A.    Again, it's not Summit County data,

11   but I do read the emails that they send.

12        Q.    My question is whether you are

13   familiar with these data that are being

14   referred to here in this email?

15        A.    Only because he sent me the email.

16   No, not prior to that, I wouldn't have.  He,

17   again, is for a different county.

18        Q.    Has Summit County undertaken an

19   analysis to determine whether or not the number

20   of overdose fatalities from heroin and fentanyl

21   in Summit County are among individuals with no

22   history of overprescribing of prescription pain

23   medication?

24             MR. KEARSE:  Object to form.

25        A.    I don't know about a formal study.

Page 295

1   When I've talked to Dr. Kohler on numerous

2   occasions along the way, that's never the

3   impression that she's given me; that generally

4   they are able to track backwards and find that

5   there were pills before there was dope.

6        Q.    Okay.  So here is some local data

7   that's saying that's not what's happening,

8   right?

9        A.    From Cuyahoga County, yes.

10       Q.    And you have not undertaken and you

11  are not aware of Summit County having

12  specifically undertaken an analysis to see

13  whether or not the trends in Cuyahoga County

14  are similar to trends in Summit County; did I

15  understand that right?

16            MR. KEARSE:  Object to form.

17       A.    Yeah.  I'm not aware if Dr. Kohler

18  has done that.  It wouldn't be something I

19  could even run.  It's got to be done using the

20  death investigation files, but I don't know if

21  she has done one or not.

22       Q.    You said a couple of times that

23  these people, they get addicted to prescription

24  opioids, and they move to heroin.  That's not

25  always true, right?

Page 296

1      A.    No.   The studies I have seen

2   though, it's 75 to 83 percent, different

3   studies, started with pills, but, yeah, there

4   is a certain small percentage, or smaller

5   percentage, at least, that started with street

6   drugs.

7      Q.    What studies are you referring to

8   that mention the 75 to 83 percent?

9      A.    Most recently, came out two days,

10  in the Journal of American Medical Association,

11  there is an article in there.

12     Q.    Two days ago?

13     A.    Two days ago.

14     Q.    For what period of time is that

15  Journal of the American Medical Association

16  article looking back at to reach whatever

17  statistical figures it has provided?

18     A.    I don't recall.  I think it was an

19  update to an earlier article.  It might have

20  been from 2013, so it may be one that goes all

21  the way back to the original date of 2012, or

22  something like that, but I don't recall.

23     Q.    You don't know what period of time

24  is being referred to?

25     A.    I just saw the highlights of it.  I

1   mean, I have not read the whole article.  I

2   just saw the highlights two days ago, so...

3       Q.    So when you saw these statistics

4   and how likely it is or not that somebody first

5   became addicted to an opiate through

6   prescription, as opposed to heroin or fentanyl,

7   you are not sure what period of time those

8   statistics are based on?

9            MR. KEARSE:  Object to form.

10      A.    Well, so when they -- when they do

11  studies like this one that Dr. Gilson did, then

12  they are looking at their entire lives, because

13  that's what they do in death investigation

14  reports.  So they would know exactly -- they

15  would go back their whole life and try to

16  figure out if they ever had opiate pills, and

17  if that was the trajectory.

18            So in that case, it would be

19  whatever their lifespan was.  It wouldn't be a

20  matter of, "Oh, we started in 2012."  It would

21  be how long was Mr. Jones -- we looked at their

22  whole history, and we said, "Oh, Mr. Jones had

23  sprained his ankle playing soccer, and here is

24  what happened."

25      Q.    But I presume these articles and

Page 298

1  these statistics are not based on anecdotal

2  cases like Mr. Jones's, right?

3          They're based on more

4  population-wide statistical inputs, I would

5  presume; am I wrong?

6      A.    I'm sure they are based on

7  aggregate data, but it may have required them

8  to go back in time and figure out via the

9  people.

10      Q.    And I'm asking you whether or not

11  you know what period of time was looked at, for

12  purposes of generating these statistical

13  outputs?  I mean, surely they adopted some

14  parameters in that regard, and I'm asking you

15  whether or not you know?

16          MS. KEARSE:  Object to form.

17      A.    Right.  And I said the one I'm most

18  familiar with recently is JAMA, and I don't

19  recall what the time frame was.

20      Q.    Do you know the time frame for any

21  of the articles that set forth a statistic

22  purporting to identify whether or not

23  individuals became first addicted to

24  prescription opioids or whether to an illicit

25  street opiate substance?

Page 299

1          A.     Sitting here today, I don't recall.

2          Q.     This JAMA article that you

3    mentioned as having come out a couple of days

4    ago, do you know whether or not it encompassed

5    Summit County data?

6          A.     Again, I only saw the little

7    abstract, so I don't know.

8          Q.     Was it particular to Summit County,

9    Ohio?

10         A.     No.  It was not specifically

11   created for Summit County.

12         Q.     Are you familiar with any

13   peer-reviewed article that provides estimates

14   of how addicted patients first became addicted

15   in Summit County?

16         A.     No.  I don't think so I've seen any

17   publications that are rigorous research, no.

18         Q.     And you mentioned, I think, you

19   have had conversations with people in Summit

20   County about what those percentages might be.

21   Did I hear you right?

22         A.     Not just people, with Dr. Kohler

23   and her office is the one that would make those

24   determinations.

25         Q.     Do you know the specific process or

Page 300

1    procedure or statistical protocol, if any, that

2    Dr. Kohler implemented, in terms of trying to

3    reach conclusions about those statistics?

4         A.    I do not.

5         Q.    Okay.  But here there is, at least,

6    some data suggesting that it is more likely

7    for, at least, some periods of time that an

8    individual became addicted or initiated opiate

9    use through heroin than through prescription

10   opioid medications, right?

11              MR. KEARSE:  Object to form.

12        A.    No.  These are all below 50

13   percent, so it's -- even these articles say it

14   is more likely to be pills.

15        Q.    Well, let's read it together and

16   see if that stands up.  If you look in the

17   Results section here, do you see Results?

18        A.    Yes.

19        Q.    It say, "The use of commonly

20   prescribed opioids, oxycodone and hydrocodone,

21   dropped from 42.4 percent and 42.3 percent of

22   opioid initiators, respectively, to 24.1

23   percent and 27.8 percent in 2015"; do you see

24   that?

25        A.    Yes.

Page 301

1      Q.     "Such that heroin as an initiating

2   opioid was now more frequently endorsed than

3   prescription opioid analgesics"; do you see

4   that?

5      A.     I do.  Okay.

6      Q.     What is your understanding of that?

7      A.     Okay.  So you are right.  So their

8   conclusion is that people started with heroin.

9      Q.     Has the Summit County ADM Board or

10   anybody else in Summit County ever undertaken

11   an evaluation or an analysis to determine

12   whether or not these statistics would be true

13   within Summit County?

14      A.     Let me read the conclusions first.

15             So, no, I don't think we've -- I've

16   not seen statistics in Summit County, but I

17   think the conclusions make a pretty strong

18   statement, which is that because we have

19   decreased the overprescribing of hydrocodone

20   and oxycodone, that it stands to reason that

21   more and more people might start with something

22   other than prescription opiates.  I don't think

23   that's rocket science.

24      Q.     It stands to reason that some

25   people -- they've never even tried a

Page 302

1    prescription opioid, they would go right to

2    heroin; is that what you are saying?

3          A.    That there are some -- there are

4    always going to be some people who are going to

5    try whatever is out there to feel differently,

6    and there obviously are -- this may be

7    representing the people, in fact, it may be a

8    very positive sign that we have pushed back

9    the -- overflooding the market with pills.

10               That, at least, leaves us with the

11   only -- in quotes, the other half in the

12   problem, which is to treat all the people for

13   the next number of decades for their addiction.

14         Q.    When you say there is always going

15   to be some people who are going to try whatever

16   is out there, tell me what you mean by that?

17         A.    Well, psychiatrically, there are

18   people who don't like how they feel, and they

19   will snort, inhale, inject, skin pop, anything

20   they can get their hands on, in order to feel

21   differently, maybe hoping to feel better.

22               Some people do that by jumping off

23   a bridge in a bungee cord or SCUBA diving or

24   some other way of getting their rush.  Others

25   will try substances.

Page 303

1      Q.    And there is a certain segment of

2    the population who is just predisposed to that

3    kind of dangerous behavior; is that what you

4    are saying?

5              MR. KEARSE:  Object to form.

6      A.    Yeah.  There is a small percentage

7    of people who will do that, which, I think,

8    accounted for the original, although far

9    smaller heroin epidemic way back in the 70s.

10   That was just a very small segment that had

11   that path.

12     Q.    There is a follow-up email from

13   somebody named Thomas Tallman.  Do you know

14   who -- by the way, is that a doctor?

15     A.    I honestly don't know who that is.

16     Q.    You don't know who that is.  He is

17   at MetroHealth.  Do you know what MetroHealth

18   is?

19     A.    Yes.

20     Q.    Is that a hospital?

21     A.    That is a hospital in Cleveland.

22     Q.    But you are not familiar with Dr.

23   Tallman.  Okay.

24              He writes, in response to this

25   email from Mr. Caraffi, "I can also add that a

Page 304

1    significant number of inmates I have screened

2    for Vivitrol MAT do not have a history of

3    opioid addiction following a prescription for

4    Percocet, OxyContin, et cetera"; do you see

5    that?

6            A.    I see that.

7            Q.    So he is further substantiating

8    these statistics that suggest that actually

9    people maybe are initiating with

10   nonprescription opiates, street opiates, rather

11   than initiating with FDA-approved prescription

12   opioid medications, designed for legitimate

13   medical use, right?

14           MR. KEARSE:  Object to form.

15           A.    It appears that's what he's saying;

16   although, having worked in the prison setting

17   in the past myself, I would doubt the veracity

18   of many of the people who are giving me the

19   information, and I'm sure he's got no other

20   controls on that, so that saying, "Oh, yeah, I

21   went out one day and snorted heroin, as opposed

22   to doctor so and so gave me."

23           So, you know, yes, he seems to be

24   supporting, but I don't know that I would -- I

25   would put more stock on this study than I would

Page 305

1     on the --

2         Q.    Well, he's saying his experience

3     confirms the findings of the study, right?

4              MR. KEARSE:  Object to form.

5         A.    Yeah.  He seems to be wanting to

6     support it, based on his anecdotal information,

7     yes.

8         Q.    And with respect to the reliability

9     of self-reporting by addicted patients, that's

10    the basis for all of these statistics, isn't

11    it?  They are actually just asking addicted

12    patients how they initiated opiate use?

13             MS. KEARSE:  Object to form.

14        A.    No.  I believe when medical

15    examiners do it, they look back at OARRS, and

16    so forth, to find out if the person actually

17    received prescriptions for opiates.

18        Q.    How would that tell them whether or

19    not they first had heroin, just because it is

20    in OARRS?

21             How do you know, based on looking

22    at OARRS, that somebody got a prescription,

23    they didn't have heroin first --

24             MS. KEARSE:  Object to form.

25        Q.    -- that doesn't answer that

Page 306

1    question, does it?

2        A.    No, I agree.  That wouldn't fully,

3    100 percent, answer the question, but...

4        Q.    So if you are relying on OARRS data

5    alone to try and derive statistics about how

6    somebody initiated opiates, you might be on a

7    mission to nowhere, fair?

8            MR. KEARSE:  Object to form.

9        A.    I think it depends on the patient.

10   If it's a 17-year-old high school hockey player

11   who twisted her ankle and had opiates, it's

12   pretty fair to assume she didn't use heroin

13   when she was 12.

14       Q.    Sure.  Or if it is a 27-year-old,

15   and you see that there is some prescription

16   along the way, you can't determine whether or

17   not that was their initiation to opiate abuse,

18   right?

19       A.    Not 100 percent, no.

20       Q.    Okay.  And, likewise, if you are

21   looking at information that's gleaned from

22   toxicology reports in the medical examiner's

23   office, and you see that there is certain

24   substances present or not present, you can't

25   learn from that information what that

Page 307

1    particular individual initiated, in terms of

2    their opiate use, correct?

3            A.    From one tox screen, no.

4            Q.    All right.  Let's move to the next

5    exhibit, which I'm going to mark as Exhibit 18.

6                        -  -  -  -  -

7                 (Thereupon, Deposition Exhibit 18,

8                 May 2015 Email Exchange, Beginning

9                 with Bates Label SUMMIT 834829, was

10                marked for purposes of

11                identification.)

12                       -  -  -  -  -

13           Q.    This is an email exchange that you

14    were involved in, it goes back to May 2015, and

15    it starts on May 22, 2015.  It was sent by

16    Janet Shaw.

17           A.    Uh-huh.

18           Q.    Is that a physician?

19           A.    No.

20           Q.    Who is Ms. Shaw?

21           A.    She is the administrative director

22    for the Ohio Psychiatric Physicians

23    Association.

24           Q.    Okay.  And she writes to a group of

25    individuals, including you, and says that,

1    "Representative Sprague's office called us

2    today to schedule a meeting to discuss four

3    bills and the," quote, "concept paper for

4    another bill that Representative Sprague is

5    having drafted to specifically address

6    behavioral health"; do you see that?

7           A.    Yes.

8           Q.    And she addresses this to Members

9    of the Public Mental Health Committee and

10   Members of the Government Relations Committee;

11   do you see that?

12          A.    Yes.

13          Q.    Were you a member of one or both of

14   those committees?

15          A.    Public Mental Health Committee,

16   yes.

17          Q.    What is the Public Mental Health

18   Committee?

19          A.    It is a group of psychiatrists who

20   are members of the OPPA, who tend to work in

21   the community or public mental health arena,

22   and are interested in discussing ideas and

23   thoughts.

24          Q.    Are you still on the public

25   health -- I'm sorry, the Public Mental Health

Page 309

1    Committee?

2          A.    Yes, I am.

3          Q.    So she sends this information to

4    you and others who are on these committees,

5    right?

6          A.    Yes.

7          Q.    And then a gentleman by the name of

8    Mark Munetz responds?

9          A.    Yeah.  Dr. Munetz.

10         Q.    Dr. Munetz, okay.  He's at NEOMED?

11         A.    He's the chair of psychiatry at

12   NEOMED, yes.

13         Q.    Is that somebody -- is Mark

14   somebody that you know?

15         A.    Yeah.  He was in my position at ADM

16   for about 20 years, before he shifted.

17         Q.    Okay.  And then on top of Dr.

18   Munetz's email, somebody by the name of Eileen

19   McGee weighs in; do you see that?

20         A.    Yes.

21         Q.    Who is Eileen McGee?

22         A.    She is another psychiatrist that I

23   know by phone, but not in person.

24         Q.    And then Dr. McGee writes, and

25   toward the end of her email she says, with

Page 310

 1    respect to two of the bills, "The other two

 2    seem overly intrusive into the practice of

 3    medicine and very punitive.  If I read the one

 4    correctly, any opioid would require prior

 5    authorization, so if you are going to break a

 6    major bone, you better plan to do it?"; do you

 7    see that?

 8         A.    I see that.

 9         Q.    In other words, she is expressing

10    concern about this draft legislation that would

11    place restrictions on individual healthcare

12    providers' discretion to prescribe an

13    FDA-approved opioid medicine when that doctor

14    believes it is in the best interest of an

15    individual patient, right?

16              MR. KEARSE:  Object to form.

17         A.    Right, and again, without the

18    attachments here, it's a little bit tougher,

19    but, yes, apparently whatever the bill said,

20    the fear was it would be overly restrictive to

21    allow -- getting people to be able to get pain

22    meds when they had legitimate pain, like a

23    broken bone.

24         Q.    And your position here and

25    historically has been you shouldn't -- you

Page 311

1    shouldn't -- you shouldn't create incentives

2    for doctors to overprescribe when it's not in

3    the patient's best interest, nor should you

4    create a situation where doctors feel compelled

5    not to prescribe an opioid medicine when it is

6    in the patient's best interest, right?

7            A.    Correct.

8            Q.    And she's expressing concern about

9    that very same thing, right?

10           A.    Yes.

11           Q.    And you write in, to say, "I agree

12   with the comments from Mark, Eileen and Steve

13   Jewell," and the last sentence of the first

14   paragraph, you write, "I am concerned about

15   Sprague's strong limits on docs for opiate

16   prescribing, and that issue is not part of any

17   of the other discussions"; do you see that?

18           A.    I see that.

19           Q.    Did I read it correctly?

20           A.    Yes.

21           Q.    What were you saying, when you

22   expressed concern about Representative

23   Sprague's strong limits on doctors for opiate

24   prescribing?

25           A.    Without seeing the attachments, I

Page 312

1    can't give you any specifics.

2         Q.    Does this sound familiar to you?

3         A.    Yeah, it certainly sounds familiar.

4    Yeah, it sounds familiar, but it has been over

5    three years, and I would want to see the

6    proposed bill before I can tell you what I

7    fully meant about that.

8         Q.    Okay.  To the extent that any

9    individual representative or committee was

10   advancing legislation that would limit an

11   individual healthcare provider's discretion to

12   prescribe an opioid medicine to a patient when

13   it was, in that doctor's view, in the best

14   interest of that patient, you would not favor

15   that particular policy or legislation; is that

16   fair?

17              MR. KEARSE:  Object to form.

18        A.    So I think I have to put my answer

19   in context.  You know, the problem is that, in

20   effect, the way we were feeling, still are

21   feeling, although it's getting better, even

22   though we know we have got years of treatment

23   of these individuals ahead of us, is that we

24   are in the middle of people dying left and

25   right, and everybody, every branch of

Page 313

1    government, every clinician of many types, is

2    trying to figure out, how do we stop people

3    from dying needlessly from opiate death

4    overdoses.

5              And so what you have got, and

6    here you've got -- we had millions -- not

7    millions -- probably literally, though,

8    hundreds of bills being proposed about what

9    this representative, or that representative, or

10   the governor, or law enforcement, or the

11   attorney general, wanted do to try to solve

12   this.

13             And so our difficulty was, wow, you

14   know, we get it.  People are dying, we

15   got -- let's stop, let's eliminate all opiates.

16   It was, kind of like, well, that doesn't work

17   if you are physician, because we also are doing

18   this to help people.

19             So I think that's the -- so in that

20   context, this is one out of probably many

21   discussions that we have had, you know, because

22   the different bills or different things.

23             We shut down the pill mills, and

24   that was a good thing to do, because we had to

25   stop those, in those case, criminal physicians

Page 314

1    from adding to the problem by putting more

2    pills out there.  On the other hand, those

3    individuals now have addiction, and they are

4    going to go find their pills somewhere.

5             So these are all balances, but we

6    are in the middle of what felt like a war zone,

7    and causes us to have these discussions, and

8    how do you come up with the right answer.

9        Q.    Got it.

10            And there were some proposals that,

11   in the view of you and other doctors, that went

12   too far, in terms of restricting the use of

13   opiates, or at least restricting an individual

14   doctor's discretion to do what was best for a

15   patient in a particular circumstance; is that

16   fair?

17       A.    Fair.  That bill did not go

18   forward, because we don't have that law now,

19   so...

20                    -   -   -   -   -

21            (Thereupon, Deposition Exhibit 19,

22            March 2017 Email Exchange, Beginning

23            with Bates Label SUMMIT 887987, was

24            marked for purposes of

25            identification.)

```
                                            Page 315
 1                   -   -   -   -   -
 2          Q.     This is Exhibit 19.   This is
 3    another email that you were a part of, an email
 4    exchange, I should say, that started in March
 5    2017, and ultimately got forwarded to you a few
 6    days later.
 7                 It starts with an email from Margie
 8    Munn to Carol Baden; do you see that?
 9          A.     I do.
10          Q.     Do you know who Carol Baden is?
11          A.     I do not.
12          Q.     This individual writes about the
13    suffering and the pain that she is
14    experiencing, and she says that she is at the
15    end of her rope; do you see that?
16          A.     Yes.
17          Q.     She says, "My daily activities have
18    diminished even more, and I am barely existing.
19    I am very discouraged.  I have just about given
20    up on ever having a life and would much rather
21    not be here to endure the pain.  Not only is it
22    physically, but it is so mentally exhausting,
23    has affected my relationships with everyone.  I
24    now have become a recluse.  Please hear my
25    desperation and please help"; do you see that?
```

Page 316

1          A.     I see that.

2          Q.     Do you recall this email?

3          A.     I don't specifically recall this

4     one, but...

5          Q.     What do you understand this person

6     to be saying?

7          A.     Well, it appears that she believes

8     she is in extreme physical pain and apparently

9     is not getting the relief she needs.

10          Q.     And Ms. Baden is concerned enough

11     about this woman and what she's experienced

12     that she refers the situation to members of the

13     Summit County ADM Board.  You can look back to

14     see that.

15              First, it goes to Mr. Jerry Craig;

16     do you see that?  If you go to 7989 in the

17     bottom right-hand corner, you can see the

18     continuation of the conversation.

19          A.     Yes.  I see that Jerry Craig sent

20     her an email, okay.

21          Q.     On March 4, Jerry Craig sends this

22     individual an email, learns that she lives in

23     North Benton, they have a conversation, and

24     then, later that night, this individual writes

25     to Mr. Craig; do you see that?

Page 317

1          A.     Yes.

2          Q.     And she describes her experience in

3     more detail.  She says she has had two major

4     surgeries, she has had every injection that she

5     is aware of, physical therapy makes her

6     situation worse, right?

7          A.     Yes.

8          Q.     She writes, "I understand the point

9     of doctors overprescribing and all of the

10    deaths, but there are some of us that need

11    medication to have some sort of quality of

12    life.  There are no more surgeries to help me.

13    My highly qualified surgeon at The Cleveland

14    Clinic said further surgeries will not help me.

15    There are more overdoses because the government

16    thinks they have the right to tell a doctor how

17    to treat patients' pain.  They simply are

18    afraid of losing their licenses, and it is not

19    fair to the doctor or the patient who follows

20    the rules.  I had to sell my home because I

21    couldn't walk up the stairs.  Some days I

22    cannot get out of bed, and just to take a

23    shower is a chore"; do you see all that?

24         A.     Uh-huh.

25         Q.     She writes, "If you have

1   suggestions or ideas, I'm very open to them,

2   but under no circumstances do I want to be

3   labeled as a drug addict or drug seeker,

4   because I am not.  I just want to live the rest

5   of my days at least being able to hold my

6   grandchildren, get up in the morning, and be

7   able to maintain a life without pain"; do you

8   see that?

9           A.    Yes.

10          Q.    Do you think this woman from North

11  Benton is a drug addict?

12          A.    I have no idea.

13          Q.    Do you think that this woman from

14  North Benton who wants to hold her

15  grandchildren and walk up the stairs is a drug

16  seeker, as that term is used in an pejorative

17  sense?

18          MS. KEARSE:  Object to form.

19          A.    Again, not knowing her, it could be

20  either direction.  This could be an addiction

21  talking, and she could have been thwarted at

22  all turns to get further prescription

23  medications to feed her addiction, and now she

24  is reaching to, it looks like, the attorney

25  general, who then referred her back to ADM.

1           If you can sell your parents' TV

2    set or car for drugs, you can write emails that

3    sound like you need help.

4         Q.    Yeah.  And you can also be somebody

5    who wants to hold your grandchildren, but

6    can't, because you are suffering from severe

7    chronic pain that does not respond to anything

8    but opiate medications, right?

9              MR. KEARSE:  Object to form.

10        A.    Yes, that's also possible.

11        Q.    And if you keep going up the chain

12   of the email, Mr. Craig now loops you in; do

13   you see that?

14        A.    Yes.

15        Q.    He says, "I'm trying to find a

16   gentle way to pass this woman along to a

17   resource that offers information about pain

18   management programs."  And Mr. Craig is telling

19   you he's looking for a way to pass this woman,

20   who is from North Benton, to other resources

21   and he wants to bow out, correct?

22        A.    Correct, because we are not in the

23   specialty of treating pain, correct.

24        Q.    And you provide a list of actual

25   pain clinics, right?

```
                                        Page 320
 1          A.     In Mahoning County, right, because
 2     it turns out she is elsewhere.
 3          Q.     And you provide a reference,
 4     though, to some pain clinics?
 5          A.     Correct.
 6          Q.     Were any of those pain clinics, in
 7     your view, pill mills?
 8          A.     No.  These were legitimate ones,
 9     and it happened that my small private practice
10     of Worker's Comp patients, three days a month
11     is Lake County, and one day a month is Mahoning
12     County, so I knew where to find the legitimate
13     pain clinics.
14                 So our goal was to help her, but
15     you can see Mr. Craig says, it turns out it
16     wasn't a mental health issue, it was a pain
17     issue.  Well, we are not experts in treating
18     pain, so we wanted to make sure we gave her the
19     care she needed, and I believe that worked,
20     because I think one of our adult liaisons
21     reached out, and she got what she needed.
22          Q.     She got the pain treatment she
23     needed, it turned out that she was not an
24     addict?
25          A.     I don't know.  She got the
```

Page 321

1    treatment she needed.  I don't know what

2    treatment she got.

3         Q.    You don't know any details about

4    it?

5         A.    I do not.

6         Q.    Jerry writes to you, at the very

7    top of this email chain, saying that, "This is

8    outside your expertise," right?

9         A.    Correct, meaning pain management.

10        Q.    So you are looking at this

11   situation from one side of the equation, from

12   the addiction side of the equation, but your

13   area of expertise is not the pain management

14   side of the equation, right?

15             MR. KEARSE:  Object to form.

16        A.    So I looked at this as a person who

17   neither Jerry or I could see or evaluate, and

18   somebody that, therefore, we would take

19   seriously and try to get her to somebody who

20   could actually see her in person and determine

21   what she need.

22        Q.    And that's terrific, but I'm

23   referring specifically to the language

24   specifically, "Outside of our expertise," and I

25   think you said earlier pain management is

Page 322

1    outside of your expertise --

2              MR. KEARSE:  Object to form.

3         Q.    -- right?

4         A.    Correct.  None of us at ADM are

5    pain experts.

6         Q.    So when you are looking at the

7    situation of the use of opiates and

8    particularly prescription opioid medications,

9    you are coming at it from an addiction

10   perspective, you are not coming it from an

11   expertise in pain management; is that fair?

12        A.    Yes.

13                   -  -  -  -  -

14              (Thereupon, Deposition Exhibit 20,

15              September 24, 2015 News Release From

16              the Ohio Department of Health, was

17              marked for purposes of

18              identification.)

19                   -  -  -  -  -

20        Q.    This is Exhibit 20.  It is a

21   September 24, 2015 news release from the Ohio

22   Department of Health; do you see that?

23        A.    Yes.

24        Q.    This news release reports that Ohio

25   has seen a major increase in drug reports

1   involving fentanyl; do you see that?

2       A.    Yes.

3       Q.    And we talked about fentanyl a

4   little bit earlier, as coming from -- typically

5   coming from China and being used, and it can be

6   very dangerous, right?

7       A.    Very dangerous.

8       Q.    It says about two-thirds down the

9   page, "Since Ohio started to aggressively fight

10  back against opiate abuse, the state has begun

11  seeing some promising progress"; do you see

12  that?

13      A.    Yes.

14      Q.    And then it describes some of the

15  progress that Ohio has seen?

16      A.    Uh-huh.

17      Q.    Now, do you know, when this press

18  release from the Ohio Department of Health

19  refers to the state having begun to fight back

20  aggressively against opiate abuse, do you know

21  what period of time they are referring to?

22      A.    Well, it says beginning in --

23  "Building on efforts that started in 2011," in

24  the paragraph above.

25      Q.    And that would have been just a few

Page 324

1    months after Governor Strickland's Opiate Task

2    Force released its conclusions in October 2010,

3    right?

4              MR. KEARSE:  Object to form.

5         A.    Yeah, it appears that way.  Yes.

6         Q.    The first bullet point says, "The

7    number of opiate prescriptions had decreased by

8    40 minimum doses"; do you see that?

9         A.    Yes.

10         Q.    Why did that number go down?

11         A.    Because there was a lot of

12    discussion about people dieing from overdose

13    deaths, physicians were gradually being

14    educated about it, and it represents that there

15    clearly were way too much pills being dispensed

16    from pharmacies all across the state, and they

17    got -- they started to drop, and they have

18    continued to drop, since that time, actually.

19         Q.    So you mentioned physician

20    education --

21         A.    Uh-huh.

22         Q.    -- as one way that that number went

23    down?

24         A.    Right.

25         Q.    Anything else that you think

Page 325

1    explains why the number of opiate prescriptions

2    decreased?

3          A.    Sure.  OARRS was in use, and then

4    became mandatory.  Lots of -- so there is those

5    kind of pieces.

6              The eduction, the OARRS, somewhere

7    in that time frame, I don't remember the exact

8    dates, they may have shut down the pill mills,

9    so that may have taken some of the pills out of

10   the equation, but a lot of it was about

11   physician education.

12             There were -- I mentioned before,

13   there were guidelines placed in emergency

14   departments, so that the -- any patient coming

15   in, again, even somebody with an addiction

16   would immediately see they are not going to

17   get, which at its peak might have been a 30-day

18   supply, a 90-day supply, when this was really

19   rampant.

20             Now they are going to get maybe

21   zero, maybe a day.  They can't come in and

22   complain they have tooth pain and get two weeks

23   to get to their dentist.  They are going to get

24   two days and a dental referral, and the doctors

25   were given the same guidelines, which is the

Page 326

1   perfect way to do it, because now I can easily

2   say to the patients, "Sorry, you saw the

3   placard, I can't give you more," and there is

4   no battle.

5               "Well, doctor, I heard somebody got

6   seven last week."

7               "Well, no, I'm sorry, they didn't,

8   because that's against the rules."  That's how

9   that plays.

10              So there are a lot of ways that we

11  were pushing, because, again, at that point in

12  time, it was very clear that it was the

13  overabundance of pills out in Ohio that was the

14  root cause of the opiate overdoses.  So we

15  needed to push that number down.

16       Q.   When you say about these guidelines

17  in emergency departments, who was issuing these

18  guidelines?

19       A.   I believe those came through the

20  Ohio Department of Health, so it was a

21  statewide initiative, and I'm sure that ODMHAS

22  had a role in that as well, you know, with

23  their expertise.

24       Q.   Anything else?  In terms of -- you

25  have mentioned physician education, OARRS,

Page 327

1    shutting down pill mills, and prescribing

2    guidelines that were modified.

3         A.    Uh-huh.

4         Q.    Are there other reasons why, in

5    your view, and in the view of the Summit County

6    ADM Board, this number of opiate prescriptions

7    decreased?

8         A.    Well, I mean, part of it, at that

9    point, might have been not only physicians

10   using OARRS, perhaps even the pharmacies

11   started using it more effectively.  So that,

12   therefore, they were able to catch some of

13   that.  Prior to that, I don't think they were

14   using OARRS effectively.

15        Q.    So OARRS can have value both in the

16   clinical setting with the doctor, and in the

17   pharmacy setting with the pharmacist, right?

18        A.    Correct.

19        Q.    Anything else?

20        A.    Not at the moment that I can think

21   of, no.

22        Q.    The second bullet point there

23   refers to doctor shopping.  We have talked

24   about that, and it also references OARRS?

25        A.    Yes.

Page 328

1      Q.    And it says the doctor shopping had

2   decreased significantly, right?

3      A.    Yes.

4      Q.    Why did doctor shopping decrease?

5      A.    Basically, it was very difficult

6   for patients to do it.  As of this point, you

7   are going to get caught, if you go to more than

8   one doctor and that gets flagged on OARRS,

9   again by the physician, by the pharmacy, and, I

10  think by now, my guess is, the numbers dropped

11  to close to zero, because it was really hard to

12  pull off once it went -- once it became

13  mandatory.  On April 1 of 15, that number of

14  960 probably dropped down to very, very few.

15     Q.    Okay.  Anything else that would

16  explain why doctor shopping was reduced?

17     A.    That's the main -- that was the

18  purpose of OARRS, and that was -- it is very

19  effective for that.

20     Q.    The third bullet point refers to

21  higher dosages of prescription opiate medicines

22  being prescribed to patients, and saying that

23  the volume of higher dosage prescriptions had

24  also been reduced; do you see that?

25     A.    Yes.

Page 329

1          Q.     Why did that go down?

2          A.     Well, it says it right here, "When

3     Ohio's opiate prescribing guidelines were

4     announced," so it was a reaction to the

5     guidelines, which again really has a twofold

6     effect, that is, that now physicians are on

7     alert, but it gives the physician a tool to say

8     to the patient, "Hey, you know what, I got this

9     guideline, and I got to follow this, and I'm

10    sorry, I can't give you that dose that you are

11    seeking."

12          And as much as their addiction

13    would probably get them sometimes to get pretty

14    angry about it, at least what is remaining

15    about their thought process, they can get to

16    that easier than just, "Oh, it is just the

17    doctor being mean to me today."

18          No, there is a guideline, and

19    that's the way the rules are, so that's a very

20    effective approach for two reasons, not just

21    one reason.

22          Q.     Okay.  Great.  Then the fourth

23    bullet point, and last one on this page, refers

24    to the percentage of opiate prescribers who are

25    registered to use the OARRS database, and that

Page 330

1    that number had gone up; do you see that?

2         A.    Yes.

3         Q.    Why did that number go up?

4         A.    I believe that -- I don't know

5    when, when it was official.  Again, as a

6    psychiatrist, I wasn't prescribing opiates,

7    which was the real purpose of OARRS, even

8    though it does have all the controlled

9    substances in it.

10             I don't recall the state hospitals

11   even being aware that OARRS existed, even

12   though, you know, it may have.

13             So I think once it got promoted,

14   including my own conference in May, we were now

15   telling doctors, "Hey, this tool exists.  You

16   really ought to sign up for it."

17             I mean, doctors don't want to hurt

18   people.  Doctors want to help people.  So

19   doctors started signing up even without it

20   being mandatory.  "Oh, my gosh, I could have

21   done that.  I'll sign up."  So I don't think it

22   was surprising that we would start to see an

23   increase in enrollment in that.

24        Q.    And that ended up being helpful, in

25   terms of limiting doctor shopping and

1    drug-seeking behavior from addicted

2    individuals, right?

3                    MR. KEARSE:  Object to form.

4          A.    Yeah.  I mean, it stopped as many

5    pills and high doses as -- from flowing, as

6    there were before.

7            Q.    Okay.  I think that was 20, right?

8            A.    Yes.

9            Q.    So we will go to 21.

10                   MR. BOEHM:  I'm sorry.

11                   MR. KEARSE:  My question was at a

12    break, I would love, just for curiosity sake,

13    how long we have on the record.

14                   MR. BOEHM:  Oh, we have so much

15    time.

16                   MR. KEARSE:  I know we do.  I just

17    was curious.  I said, "At break, just for

18    curiosity."

19                   MR. BOEHM:  I'm feeling no

20    constraint whatever right now.

21                   MR. KEARSE:  I'm not asking you to.

22                   MR. BOEHM:  I'm joking.

23                   MR. KEARSE:  I said, "For curiosity

24    sake."

25                            -  -  -  -  -

```
                                            Page 332
 1                  (Thereupon, Deposition Exhibit 21,
 2                  2015 Ohio Drug Overdose Data Summary
 3                  From the Ohio Department of Health,
 4                  was marked for purposes of
 5                  identification.)
 6                           -  -  -  -  -
 7          Q.    Okay.  Dr. Smith, this document has
 8    been marked as Exhibit 21, for purposes of your
 9    deposition, and it is a 2005 Ohio Drug Overdose
10    Data Summary From the Ohio Department of
11    Health; do you see that?
12          A.    2015, yes.
13          Q.    I'm sorry.  Did I misstate that?  I
14    said 2005.  Thank you for the correction.
15                MS. KEARSE:  And I was asleep at
16    the wheel, so thank you.
17                MR. BOEHM:  Hey, this a witness --
18    he's on top of it.  You can?
19                THE WITNESS:  I'm trying.
20                MR. BOEHM:  Yeah.  No need to
21    worry.
22                MR. KEARSE:  I'm not.
23          Q.    Okay.  Is this the kind of document
24    that you would receive, as part of your
25    professional duties as the clinical
```

Page 333

1    director -- the medical director and chief

2    clinical officer for the Summit County ADM

3    Board?

4         A.    Yes.  It is representative of the

5    kind of data we were always trying to get,

6    sure.

7         Q.    Okay.  If you turn to the second

8    page here, at the top, it says that, "Although

9    pharmaceutical fentanyl may be diverted for

10   abuse in the U.S., the majority of fentanyl

11   drug reports and fentanyl reported with other

12   drugs result from illegally produced and

13   tracked fentanyl, not diverted pharmaceutical

14   fentanyl;" do you see that?

15        A.    Yes.

16        Q.    And I think that's consistent with

17   what you were saying earlier, that the

18   overwhelming majority of the fentanyl that's

19   making its way onto the streets for abuse is

20   illegally produced and trafficked, not

21   pharmaceutical, right?

22        A.    Correct.

23        Q.    Do you know what the percentages

24   are, in terms of the illegally produced and

25   trafficked fentanyl, versus the prescription

Page 334

1   fentanyl?

2       A.    I don't know the percentages.  I

3   know the percentage of prescription fentanyl is

4   very low, because when they run -- they looked

5   at like -- because to get prescription fentanyl

6   diverted, it would be diverted from a hospital.

7   They can watch -- they can track that, and they

8   are showing that that's where it's coming from.

9       Q.    And around this time, Ohio was

10  seeing an increase in drug reports involving

11  fentanyl, right?

12      A.    That's correct.

13      Q.    In your view, what accounted for

14  the increased incidence of drug reports

15  involving fentanyl?

16      A.    Well, so as we worked hard to get

17  rid of the pills, and again, but we still have

18  these individuals with addiction to deal with,

19  their brain is going to make them find an

20  opiate, and if that means they have to go to

21  the street, they are going to go to the street,

22  and likely they went to the street, and they

23  think they are getting heroin, but they are

24  getting heroin plus fentanyl, sometimes just

25  fentanyl.

Page 335

1          Q.    And why is fentanyl making its way

2     into heroin that people might purchase on the

3     street?

4          A.    A weird version of drug dealer

5     capitalism, is my thought.

6          Q.    What do you mean by that?

7          A.    So the drug dealers, in this opiate

8     epidemic, unlike the movies, we are not hearing

9     about a bunch of people shooting each other

10    because you're in my territory or they're in

11    somebody else's territory, which is, kind of,

12    how the movies portray it.

13              We have drug dealers who are

14    attempting to make more money by giving better

15    customer service and, in quotes, better

16    product.  To a person with the disease of

17    addiction, the better product is the more

18    potent opioid product.

19              So if I want to outdo you as a drug

20    dealer, I'm going to try to find a friend of a

21    friend of a friend and add a stronger opiate to

22    my heroin and outsell you.

23         Q.    That's what you mean by drug dealer

24    economics?

25         A.    I didn't say that phrase but --

Page 336

1          Q.     I thought you did.  Maybe I misread
2     it.  You said drug dealer something?
3          A.     Capitalism.
4          Q.     Capitalism, drug dealer capitalism.
5              If you turn to the next page of
6     this document that has been marked as Exhibit
7     21, do you see right there in the middle of the
8     page, it says, "Number of heroin overdose
9     deaths increased," and this is for 2015, right?
10         A.     Yes, I see that.
11         Q.     And then just below that, it says,
12    "Prescription opioid overdose deaths declined";
13    do you see that?
14         A.     Yes.
15         Q.     And then there is a figure 4, which
16    is a graph that tries to depict the declining
17    prescription opioid overdose deaths and the
18    increasing overdose with heroin and fentanyl,
19    right?
20         A.     Yes.
21         Q.     And it looks, in fact, like the
22    number of opioid deaths related to prescription
23    opioid use or abuse is steadily dropping since
24    2010, right?
25         A.     Yes.  It looks like it is, yep.

Page 337

1          Q.     And the numbers for heroin and

2     fentanyl are going up, right?

3          A.     Yeah.  Fentanyl in particular.

4     Heroin kind of peaked, yes.

5          Q.     Yeah, heroin kind of peaked, but

6     fentanyl keeps going up, right?

7          A.     Yes.

8          Q.     And, in fact, it looks like, if you

9     look over a few columns to the cocaine

10    category; do you see that?

11         A.     Yes.

12         Q.     The number of overdose deaths

13    related to cocaine and prescription opioids,

14    about the same, right, for 2015?

15         A.     Oh, yes.

16         Q.     Why is cocaine usage going up?

17         A.     You know, historically, if you look

18    at trends across the country, as far as street

19    drugs go, they wax and wane in whatever reason

20    popular.  I don't think it is clear why it is

21    cocaine now or originally heroin back in the

22    70s or crack cocaine during the 80s.  That

23    seems to wax and wane, so it comes and goes,

24    and cocaine may go up when methamphetamine

25    drops, and then they will switch.

Page 338

1      Q.    Is that related to what you were

2  saying earlier, about how there is going to be

3  some segment of the population out there that

4  is just going to use whatever is available?

5      A.    Yes.  There is a certain

6  percentage, if they go down the path of trying

7  a substance or many substances, they are likely

8  to find the one that turns their brain on to

9  addiction.

10     Q.    Okay.

11                -  -  -  -  -

12              (Thereupon, Deposition Exhibit 22,

13              2016 Ohio Drug Overdose Data Summary

14              From the Ohio Department of Health,

15              Beginning with Bates Label SUMMIT

16              820711, was for purposes of

17              identification.)

18                -  -  -  -  -

19     Q.    We are at Exhibit 22, which is now

20  in front of you.  This is a 2016 Ohio Drug

21  Overdose Data Summary From the Ohio Department

22  of Health.  So this is the same version of the

23  document we were looking at for 2015, but now

24  it is for 2016; do you see that?

25     A.    Yes.

Page 339

1          Q.    And it says that in 2016, if you

2     look towards the bottom of that first

3     paragraph, there were the fewest unintentional

4     overdose deaths involving prescription opioids

5     since 2009, when you exclude deaths involving

6     fentanyl and related drugs; do you see that?

7          A.    Yes.

8          Q.    Why do you think that is the case;

9     what accounts for that?

10         A.    We were getting rid of the pills.

11    You know, we dropped off the ability for

12    individuals to get the pills.  We dropped off

13    the ability for new people to get the pills and

14    start their addiction.  We were giving out the

15    Deterra bags, which is the activated charcoal

16    bags, to have people clear out their medicine

17    cabinets, we were promoting the dump boxes in

18    all the police precincts, to please bring in

19    all your pills and your grandparents' pills and

20    dump them, so that nobody can grab them out of

21    your medicine cabinet, whether it's the plumber

22    or the neighbor next door.

23              So we really -- we greatly

24    decreased the -- what had been a smorgasbord of

25    pills available everywhere in the state, to a

Page 340

1    much smaller amount, cut off the added flow

2    between doctor shopping and things with OARRS,

3    and the problem is, we still have these people

4    who are addicted to opiates, and many of whom

5    had started with the original pills out there,

6    and they are going to find, because that's the

7    definition of addiction, they are going to find

8    an alternative, and they go to the street more

9    and more.

10           Q.    Do you know who has been sued in

11   this lawsuit?

12           A.    Generally, yes, not specifically.

13           Q.    What is your understanding about

14   that?

15           A.    I believe it's pharmaceutical

16   companies that manufactured any of the opiates

17   and pharmacy companies that distributed them.

18           Q.    When you say, "Pharmacy companies

19   that distributed them," what do you mean by

20   that?  You mean the pharmacies --

21           A.    The pharmacies, yeah.

22           Q.    -- where people go and have the

23   drug dispensed?

24           A.    Yes.  So CVS, Walmart here at the

25   table, and so forth, yes.

Page 341

1          Q.     Are you familiar with the concept

2     of a wholesale drug distributor in the delivery

3     of healthcare in the United States?

4          A.     Only lightly.

5          Q.     Do you know whether any wholesale

6     distributors have been sued, as part of this

7     lawsuit?

8          A.     I don't recall.  When I glanced at

9     the complaint, and again really truly glanced,

10    it was a lengthy list of individuals on the

11    defense side.  So I would probably assume, yes,

12    but I didn't read it that carefully.

13         Q.     Well, there is a long list, right?

14    But let me ask you a maybe more relevant

15    question.

16              Are you, as the Summit County ADM

17    Board chief clinical officer and medical

18    director, aware of any particular conduct by

19    closed-system wholesale distributors that you

20    believe has materially contributed to the

21    opioid epidemic in Summit County?

22              MR. KEARSE:  Object to form.

23         A.     Not knowing enough about the whole

24    process, I haven't formed an opinion about that

25    either way.

```
                                       Page 342
 1        Q.    Let's just take a break now, if we
 2   could.
 3              THE VIDEOGRAPHER:  Off the record.
 4   4:51.
 5              (Recess taken.)
 6              THE VIDEOGRAPHER:  We are back on
 7   the record, 5:13.
 8    EXAMINATION OF DOUGLAS A. SMITH, M.D., DFAPA
 9   BY MR. CARTER:
10        Q.    Good afternoon, doctor.
11        A.    Good afternoon.
12        Q.    I introduced myself on the record,
13   but we haven't had a chance to meet.  My name
14   is Ed Carter, and I'll be asking you some
15   questions, okay?
16        A.    Okay.
17        Q.    Because you guys have covered so
18   much, I'm going to jump around a little bit.
19   The same rules apply, in terms of if you don't
20   understand one of my questions or if you need
21   clarification, will you let me know?
22        A.    I will.
23        Q.    And as I jump around, if you lose
24   track of where I am, will you let me know, so I
25   can reorient you?
```

Page 343

1          A.     Yes.

2          Q.     Okay.  What is the Diagnostic and

3     Statistical Manual?

4          A.     So the DSM is the book that we use

5     in psychiatry that -- and mental health, that

6     lists the diagnoses that are mostly based on

7     research, and it gives us a basic collection of

8     things that we can use to communicate amongst

9     clinicians effectively, without having to

10    detail all the symptoms.

11               We they can say somebody has X, say

12    a major depressive episode, and that

13    automatically tells that clinician a lot of

14    information about the illness.  So it's our way

15    of giving a diagnosis, just like in medicine,

16    they have other manuals.

17         Q.     And that manual is published by the

18    APA, correct?

19         A.     That's correct.

20         Q.     The American Psychiatric

21    Association?

22         A.     Correct.

23         Q.     And the current edition is the

24    DSM-5, right?

25         A.     That's correct.  Since 2013, yes.

1      Q.    And under the DSM-5, there is an

2    entire section that refers to substance-use

3    disorders, correct?

4      A.    Correct.

5      Q.    And opioid-use disorder is one of

6    the different types of substance-use disorders

7    outlined in the DSM-5, correct?

8      A.    Yes.

9      Q.    Does the DSM-5 use the term

10    "addiction" as a diagnosis?

11      A.    I don't believe it does, no.

12      Q.    It refers to a use disorder,

13    correct?

14      A.    That's correct.

15      Q.    And clinicians, such as yourself,

16    according to the DSM, sometimes use the term

17    addiction to refer to the more severe

18    presentations of a use disorder, correct?

19      A.    Yes.

20      Q.    So if we go to the criteria for an

21    opioid use disorder, there will be the

22    discussion of what you are looking for is a

23    pattern of use that reflects or results in

24    clinically significant impairment or distress,

25    and it is evidenced by two or more of the

Page 345

1    various criteria that are outlined in the DSM,

2    correct?

3         A.    That's correct.

4         Q.    And there is a scale, so that if

5    someone has two or three -- I think it is

6    actually two, four, it's mild, five or six is

7    moderate, and then more than six is severe,

8    correct?

9         A.    That sounds correct, yes.

10        Q.    And in the course of those 11

11   criteria that are outlined for an opioid-use

12   disorder, clinicians, such as yourself,

13   understand you don't use that as a checklist,

14   correct?

15        A.    What do you mean?

16        Q.    You can't -- a layperson can't just

17   go through that and apply it as a checklist.

18   It's something intended to be used with medical

19   and clinical judgment, correct?

20        A.    That's correct.

21        Q.    And that training enables you to

22   apply DSM to a patient that you see in a

23   clinical setting, correct?

24        A.    Yes.

25        Q.    Okay.  Have you ever used DSM to

Page 346

1    diagnose a patient with an opioid-use disorder

2    in a clinical setting?

3          A.    I am certainly capable of it, and

4    I'm sure it happened on occasion in the state

5    hospital.  I have not done that in my job at

6    ADM, since I'm not -- other than challenging

7    cases, I'm not seeing them directly.

8          Q.    And sitting here today, do you have

9    a specific recollection of a case in the

10   clinical setting where you did that?

11         A.    No.

12         Q.    Have you ever applied DSM-5's

13   opioid-use disorder criteria in a forensic

14   setting, since being part of the ADM Board?

15         A.    No, I have not.

16         Q.    So is it fair to say, in your

17   medical practice, you have never diagnosed a

18   resident of Summit County with an opioid-use

19   disorder?

20         A.    Correct.

21         Q.    And likewise, even though it is

22   understood as a severe form of the disorder,

23   you have never diagnosed a resident of Summit

24   County with an addiction to opioids, correct?

25         A.    Correct.

Page 347

1           Q.    And that's either in a clinical or
2    forensic setting, true?
3           A.    True.
4           Q.    Based on your training and
5    experience, would you agree that you could not,
6    as a medical matter, diagnose a patient with an
7    opioid-use disorder simply by knowing that they
8    use the substance; you would need more
9    information to make that diagnosis, correct?
10          A.    Correct.
11          Q.    So you couldn't just say, you know,
12   person X uses hydrocodone, therefore, they have
13   a use disorder.  You would need that full
14   clinical picture to be able to run through DSM,
15   applying your medical and clinical judgment,
16   correct?
17                MR. KEARSE:  Object to form.
18          A.    Yes.  I'd want to make sure they
19   meet official criteria.
20          Q.    And you explained earlier that you
21   don't personally prescribe opioid medications,
22   but you do prescribe medications such as
23   antidepressants, SSRIs, things of that nature,
24   correct?
25          A.    Yes.

1      Q.    And those medications have

2   potential for abuse, correct?

3           A.    Not much with antidepressants, no.

4           Q.    What about withdrawal, if someone

5   doesn't go off those following the physicians'

6   orders, if someone abruptly stops the use of an

7   SSRI, can there be a withdrawal syndrome?

8           A.    Yes.  There is -- well, I'm not

9   sure if they officially call it withdrawal, but

10  there is definitely an effect when the brain

11  suddenly doesn't have what it was getting from

12  a medication, and people do have symptoms of

13  abrupt stopping of medications, like Zoloft,

14  for example.

15          Q.    And one of the potential

16  consequences of someone abruptly stopping one

17  of those medications is there is an increased

18  risk of suicide, correct?

19          A.    Potentially, yes.

20          Q.    But despite the risks associated

21  with the misuse or someone not following

22  doctor's orders with those types of substances,

23  there is still appropriate medical use for

24  those substances, correct?

25          A.    Yes.

Page 349

1          Q.    Now, in terms of individual

2    clinical cases in Summit County, do you know

3    the details of any conversation a patient who

4    is prescribed prescription opioids in Summit

5    County had with their prescribing physician,

6    regarding the risks or the proper use of that

7    substance, do you have any information about

8    what that doctor-patient interaction was, in

9    any specific individual?

10              MR.  KEARSE:   Object to form.

11         A.    No.

12         Q.    Do you know what any treating

13   physician told any member of Summit County, in

14   terms of the warnings that they gave, regarding

15   the properties of their prescription?

16         A.    No.

17         Q.    Do you have any information

18   regarding what any pharmacist may have told the

19   patients at the dispensing level about the

20   risks of using those prescription opioids?

21         A.    No.

22         Q.    In the course of your clinical

23   practice, have you ever made a medical

24   decision, based on something an opioid

25   manufacturer, distributor, or pharmacy ever

Page 350

1    said publicly about prescription opioids?

2                MR. KEARSE:   Objection.

3         A.    As I said, I don't -- haven't -- I

4    don't prescribe opiates, so, no.

5         Q.    Have you ever made any public

6    policy decisions, in your role on the ADM

7    Board, that you based on a statement from one

8    of the defendants in this case?

9         A.    I don't set public policy, so, no.

10        Q.    Have you ever set ADM Board

11   initiatives or figured out how to best use

12   funds, based on something one of the defendants

13   in this case said about prescription opioids?

14        A.    No.

15        Q.    In terms of people that do use

16   prescription opioids, fair to say there are a

17   number of people who use prescription opioids

18   and never go on to use heroin?

19        A.    Yes.

20        Q.    Fair to say there are a number of

21   people who use prescription opioids and never

22   go on to break the law, in trying to obtain

23   opioids?

24        A.    Yes.

25        Q.    And that includes people that would

1    be described as addicted to opioids?  There are

2    people addicted to opioids that never go on to

3    use heroin, correct?

4         A.    Correct, if they find some other

5    source for the opiates.  The definition of

6    addiction, if they can't obtain those

7    substances, they are very highly likely to move

8    on to finding them on the street or moving on

9    to heroin.

10        Q.    And just to be clear, since we have

11   talked about addiction an awful lot today,

12   based on your medical training, the definition

13   that you would use of addiction is what the APA

14   sets forth in terms of a severe form of an

15   opioid-use disorder, or one of the other

16   substance-use disorders as defined in DSM-5; is

17   that correct?

18             MR. KEARSE:  Object to form.

19        Q.    Let me ask you, how would you

20   define addiction?  How did you in your practice

21   understand addiction?

22        A.    So addiction, agreed, that we would

23   use the DSM-5 to give the official diagnosis,

24   as well as mild, moderate, severe, but

25   addiction itself is, again, I've said before,

1    it's the individual who is either using the

2    substance, thinking about using the substance,

3    or actually obtaining the substance, and that's

4    basically what they do, that's how they spend

5    their time, and they do it despite continuing

6    to use and all that, despite the negative

7    consequences that it is causing to them, their

8    family, their finances, their job, et cetera.

9         Q.    And it is true, is it not, that all

10   of those clarifications you just added are just

11   actually within the substance-use disorder

12   category of DSM, correct?

13        A.    Correct.

14        Q.    And one of them, for example, is a

15   significant amount of time using or trying to

16   obtain the substance, that's one of the first

17   criteria, correct?

18        A.    That's correct.

19        Q.    Problematic, you know, people

20   making sacrifices in their social lives or in

21   their work lives or disruption, those are all

22   individual criteria under the substance-use

23   disorder framework, correct?

24        A.    Correct.

25        Q.    Cravings, you mentioned thinking

Page 353

1    about it, cravings for a substance, that's a

2    criteria under DSM as well, correct?

3         A.    Correct.

4         Q.    And used despite known harms,

5    that's another DSM criteria, correct?

6         A.    Correct.

7         Q.    So at the broadest level, there are

8    different aspects of it that you've described,

9    but it all is articulated in that DSM

10   framework, fair?

11        A.    Yes.  It is pretty thorough, yeah.

12        Q.    Now, with addictions generally, you

13   agree that all addictions can be overcome,

14   correct?

15             MS. KEARSE:  Object to form.

16        A.    What do you mean by "overcome"?

17        Q.    Well, people treat addiction,

18   right?

19        A.    Yes.

20        Q.    And when a patient comes in for

21   alcohol addiction, cocaine addiction, or

22   prescription opioid addiction, no patient is

23   ever told, "You might as well give up, there is

24   no hope, it's an addiction, you can never beat

25   it, you know, that's going to be the rest of

Page 354

1    your life," that is something medical
2    professionals never tell someone who comes in
3    for addiction treatment, correct?
4                MR. KEARSE:  Object to form.
5         A.    So we would not tell them there is
6    no hope, but we would, in fact, tell them that
7    it is a chronic illness and that they are going
8    to need treatment, perhaps, the rest of their
9    lives, as opposed to strep throat, where you
10   are going to take ten days of antibiotics and
11   it's gone.  So there is hope, but it is not a
12   onetime and you are done type of an illness.
13        Q.    Right.  You would give them
14   accurate information about the challenges, but
15   you would never say this is a condition that
16   you are not going to be able to deal with or
17   live with or overcome the consequences of, you
18   would never give that message, right?
19                MR. KEARSE:  Object to form.
20        A.    Correct.  We would always maintain
21   hope.
22        Q.    And that's one of the things that
23   the various task forces and organizations that
24   you have been involved in, one of the options
25   treatment of addiction, correct?

Page 355

1      A.    Certainly.

2      Q.    And the use of a substance

3  resulting in addiction, all substance users,

4  even addicted substance users, still maintain

5  the ability to make the decision to try and

6  quit, correct?

7              MS. KEARSE:  Object to form.

8      A.    No, that's not accurate.

9      Q.    What circumstances would addiction

10  deprive a person of the ability to try and

11  quit?

12      A.    Many circumstances, actually.  So

13  the illness, once it has tricked your frontal

14  lobes into believing that you must have the

15  substance to survive, that is literally how

16  your brain interprets it, that you must have

17  it, you need the opiate more than you need

18  water, more than you need food, more than you

19  need sex to survive, it is -- it becomes,

20  number one, as your drive, it is a true drive

21  at that point.

22              Many people go pretty deep into

23  despair, destruction of their lives and all

24  aspects before, often times, somebody, like law

25  enforcement or a judge, says, "You are going to

Page 356

1    get help."

2              So it's not like it's a choice, not

3    that they can just choose to get help.  It is

4    true that if given the right circumstances,

5    which may be coercive circumstances, you know,

6    prison for ten years versus we are going to

7    give you a drug court treatment, coercive, then

8    the person can get help, but I wouldn't

9    characterize it as every person can choose to

10   get well.

11        Q.   With the proper internal motivation

12   and external support, every addicted person can

13   get treatment, correct?

14              MS. KEARSE:  Object to form.

15        A.   Yes.  If they can get to that stage

16   of change, which I will use as your internal

17   motivation, yes.

18        Q.   And even addicted individuals still

19   have to go through the physical and mechanical

20   act of obtaining the substance and, you know,

21   injecting it or putting the pill in their

22   mouth, correct, or smoking a cigarette or

23   drinking a shot of whiskey?

24              MS. KEARSE:  Object to form.

25        A.   Even, you said even the --

1          Q.    Yeah.  Even individuals that are

2     addicted, that is there is still a mechanical

3     behavioral aspect, they have to take the

4     substance, correct?

5          A.    Even implies compared to who?

6          Q.    Get rid of the word even.  All

7     users of a substance are -- to use that

8     substance, they have to mechanically take it,

9     ingest it, in whatever form they are using it,

10    correct?

11         A.    Yes.

12         Q.    And addicted individuals do not

13    become mindless zombies who are compelled,

14    against their free will, to take a substance,

15    correct?

16              MR. KEARSE:  Object to form.

17         A.    I disagree with that.

18         Q.    So the brain changes that you

19    talked about, it is true that changes to the

20    brain receptors, when the substance is gone

21    from the system, those changes to the brain

22    revert back to normal levels, correct?

23         A.    So when somebody is taking a

24    substance, their brain does change, becomes

25    less -- make it simple, less sensitive to the

1    substance.  So they need more and more of the

2    substance to get the same effect, and to

3    maintain the feeling they are trying to get.

4            Again it is driven by the

5    addiction, not by thinking, and to avoid

6    withdrawal, which is the second reason that

7    they maintain the addiction, so they

8    would -- they would have two drivers that would

9    keep them going.

10           There is no -- so they really are

11   being compelled by their illness to obtain,

12   mix, inject, snort the substance.  It is not

13   a -- not really a conscious thought process, in

14   the sense of making a decision about whether to

15   eat pizza or a sandwich today.  It is much more

16   driven by this animal need, this true drive

17   that you must have this substance.

18       Q.    And the animal need you are talking

19   about, it is the pleasure response system of

20   the brain, correct?

21       A.    Correct.

22       Q.    And in terms of the brain

23   chemistry, there are receptors within the brain

24   that various substances bind to and then they

25   release substances -- for example, dopamine is

Page 359

1    released, and that's part of the conditioning

2    that is -- response, as you said, in some

3    individuals can lead on an addiction, correct?

4         A.    Correct.

5         Q.    And in terms of that brain

6    chemistry, the way that the receptors interact

7    with the substance, if you looked at -- you

8    know, you have seen, in the course of your

9    medical research, that people can take PET

10   scans of deceased individuals to scan the

11   brain, correct?

12        A.    Yes.

13        Q.    And psychiatry does that, you have

14   seen studies like that, where they look at the

15   receptor activation in, for example, a deceased

16   smoker's brain, to see the dopamine release;

17   have you seen things like that?

18        A.    Yes.

19        Q.    Okay.  And so if you look at the

20   brain chemistry of someone who has never taken

21   a prescription opioid, and then you look at

22   someone who has been abstinent from a

23   prescription opioid for six months, those brain

24   scans, in terms of the receptor structure and

25   the presence of those chemicals, would look

Page 360

1    identical, correct?

2         A.    So given our current technology,

3    they would look identical, but the person who

4    is in recovery for six months is at much

5    greater risk of relapse, at least over that

6    ensuing year, at least 18 months total,

7    compared to that always-normal brain that never

8    had the addiction.

9         Q.    And so withdrawal from a person who

10   is coming off of opioids, that usually lasts

11   seven to ten days, correct?

12        A.    Yes.  Sometimes less, yes.

13        Q.    And the peak, in the ordinary case,

14   is three to four days, correct?

15        A.    Yes.

16        Q.    And do you know what the half-light

17   is -- excuse me -- the half-life is of the

18   chemicals in opioids; how long after someone's

19   last dose does it take to be out of their

20   system?

21        A.    They all vary.  So fentanyl would

22   be much longer than Percocet, for example.

23        Q.    Do you know the half-life for

24   oxycodone?

25        A.    I don't think it's very long,

1    actually.  Eight or 12 hours, I think.

2        Q.    So within eight or 12 -- assuming

3    that that's correct, within eight or 12 hours

4    after taking the last dose of oxycodone, that

5    chemical would be out of the user's system,

6    correct?

7            MS. KEARSE:  Object to form.

8        A.    Well, half of it would be out of

9    the user's system, then half again the next.

10   That's the definition of half-life.

11       Q.    The half-life is 8 to 12 hours?

12       A.    Yes.

13       Q.    Okay.  I misunderstood.

14            Do you know what the half-life is

15   for hydrocodone?

16       A.    I don't.  It is probably similar.

17       Q.    In the course of your career, have

18   you seen anyone in Summit County who has died,

19   had their death identified as being caused by

20   prescription opioids, and a case where that

21   person was using those prescription opioids, as

22   directed by a physician; have you ever seen a

23   case like that?

24            MR. KEARSE:  Object to form.

25       A.    I've not been -- I should say, I

Page 362

1    don't see the case, so I have not been informed
2    by the medical examiner's office that they have
3    had a case where somebody died on taking
4    exactly the prescribed doses of a prescription
5    opiate, no.
6          Q.    In the course of your work, have
7    you become aware of any specific resident of
8    Summit County who died as a result of
9    prescription opioid pills distributed,
10   manufactured, or dispensed by any of the
11   defendants in this case?
12              MR. KEARSE:  Object to form.
13         A.    I don't know that anybody has ever
14   looked to see where -- you know, which pharmacy
15   or which company they got it from.
16              Certainly Dr. Kohler's office looks
17   to see, tries to figure out whether it was
18   prescription pills versus illicit substance
19   from the street and, to the extent that they
20   are prescription opiates, I'm sure they came
21   from some defendant or defendants in the case.
22         Q.    Now, putting other people aside,
23   you personally, have you made the
24   determinations, are you aware of any specific
25   individual in Summit County whose death was the

1    result of prescription opiate pills linked to

2    one of the defendants; is that something you

3    know?

4         A.    I wouldn't know the link.

5         Q.    Are you aware of any instance where

6    prescription medications were diverted from a

7    retail pharmacy in Summit County?

8         A.    No.

9         Q.    You mentioned, and it is reflected

10   in some of the documents that were marked as

11   exhibits, public perceptions about the safety

12   of prescription opioids; do you recall talking

13   about that generally?

14        A.    Yes.

15        Q.    Now, in terms of the information,

16   the comments describing those public

17   perceptions, are you an expert in the history

18   of public opinions regarding prescription

19   opioids?

20        A.    You would have to define expert, I

21   guess.

22        Q.    Do you hold yourself out as an

23   expert historian?

24        A.    No, sir.

25        Q.    Have you undertaken any systematic

Page 364

1    study of public perceptions in Summit County of

2    the health effects or addictive nature of

3    prescription opioids?

4              MR. KEARSE:  Object to form.

5        A.    No.

6        Q.    Do you consider yourself an expert

7    in risk perception?

8        A.    No.

9        Q.    Do you hold yourself out as an

10   expert in polling or the study of public

11   opinion on various issues?

12       A.    At least one, yes.

13       Q.    What is that issue?

14       A.    Dr. Thrasher and I did a survey

15   of -- attempted a survey, not everybody -- many

16   didn't respond -- of every physician in Ohio

17   about what was encouraging them to prescribe

18   opiates, when they didn't want to, including

19   patient satisfaction surveys and all that.

20             So in that case, we did a pretty

21   thorough poll.  Sadly, with everybody being

22   busy, we didn't get a response rate at a level

23   that we thought, basically, we should publish

24   it.  So we didn't do that, but...

25       Q.    So you mentioned that survey that

1   you and Dr. Thrasher put out.  So you, for that

2   purposed, had a scientific methodology, and you

3   tried to get a fair sample, and you said you

4   designed the survey to try to get accurate

5   information that you thought would withstand

6   scientific methods, fair?

7           A.    Yes.

8           Q.    And in terms of that methodology,

9   have you applied that methodology in any other

10  area related to prescription opioids?

11          A.    No.

12          Q.    So you haven't done any other

13  survey on attitudes or beliefs related to

14  prescription opioids, correct?

15          A.    Correct.

16          Q.    Including what the public

17  perception was, whether they were safe,

18  dangerous or somewhere in between?

19          A.    Correct.

20                MR. KEARSE:  Object to form.

21          Q.    The survey that you and Dr.

22  Thrasher performed, did you submit it for peer

23  review?

24          A.    No.  As I said, we didn't get

25  enough response rate to give the results to

Page 366

1    anybody.

2         Q.    Okay.  So when you saw the response

3    rate, you realized that that was the

4    information you collected, but in terms of

5    formalizing it, that was the end of the road,

6    for that particular survey?

7         A.    Correct.  There weren't enough

8    responses to make it rigorous enough, as far as

9    research.

10         Q.    Was one of the questions that you

11    asked in that survey whether pharmaceutical

12    marketing played a role in the physician's

13    prescribing behavior?

14         A.    I honestly don't recall.

15         Q.    Okay.  We will get copies and come

16    back to that.

17              You mentioned a presentation that

18    you were asked to give in 2016 to the ADM

19    Board, after carfentanil had come on the scene

20    the Fourth of July weekend; do you recall that?

21         A.    Yes.

22         Q.    I would like to mark -- well, I

23    have marked, and I'll hand down to you Exhibit

24    23.

25                        -  -  -  -  -

Page 367

1              (Thereupon, Deposition Exhibit 23,

2              Presentation Given by Dr. Smith, was

3              marked for purposes of

4              identification.)

5                      -  -  -  --

6      Q.    Take a moment to familiarize

7   yourself with Exhibit 23.

8      A.    Sure.

9      Q.    Do you recognize this as a

10   presentation that you have given?

11      A.    Yes, multiple times.

12      Q.    And there are some notes, towards

13   the back.  This has page numbers in the

14   presentation, because it was in native format,

15   and although the page numbers are somewhat

16   sporadic, it would be page 17, there is some

17   notes for slide 63; do you see that?

18      A.    I do.

19      Q.    And then you see some individual's

20   names.  Who is Mary Sonnhalter?

21      A.    So this may be my presentation.  I

22   didn't add any notes.

23              So Mary Alice Sonnhalter was our

24   marketing and promotions person, worked with

25   newspapers and things like that.  It is now

1    Chrissy Gahash.  She retired the end of last

2    year, I guess.

3            Q.    Who is Eric -- I'm sorry.

4            A.    Go ahead.

5            Q.    Who is Eric Hutzell?

6            A.    Eric, as I mentioned earlier, is

7    our data analyst/research person, who really

8    looks at the data and gives us the -- gives us

9    these ending charts and graphs and so forth.

10           Q.    And while the presentation itself

11   is not dated, the comments embedded in the

12   presentation that we just are looking at are

13   indicated September 8, 2016; do you see that

14   date?

15           A.    I do see that, yes.

16           Q.    Is that around the time that it was

17   your best estimate of when you gave the

18   presentation to the ADM Board that they

19   requested after carfentanil hit in July?

20           A.    Yes.  I'm thinking it would have

21   been September 20 something of 16, yes.

22           Q.    If you turn to page 7 -- well, let

23   me ask you a broader question, and it may take

24   you a minute to flip through.

25                 Do you know if this presentation

1    mentions the word "carfentanil" anywhere in it?

2         A.    Well, I can look.

3         Q.    Okay.  Please do.

4         A.    I should say, however, although the

5    notes are old, the slides I keep updating with

6    new data.  So they may not -- they might have

7    said it in September of 16, and they might not

8    say it now, but I'll look.

9              Okay.  So I don't see carfentanil

10   but -- hang on.  I don't see carfentanil, but

11   it actually looks like the printed date is

12   November of 18, but this was actually from

13   September of 16.

14        Q.    And I'll represent to you the

15   printed date is when I printed it off from the

16   production.

17        A.    Okay.

18        Q.    So in any event, at the time -- at

19   this time, September of 2016, had Summit County

20   been able to publish data of what had just

21   happened a couple months earlier, with respect

22   to the arrival of carfentanil in the county?

23        A.    We wouldn't have yet, because we

24   were doing the data quarterly, and so that

25   would have fallen in a quarter later, before

Page 370

1    Eric would have been able to add that to our

2    charts and graphs.

3              Q.    When you gave that presentation

4    that the board requested in September of 2016,

5    do you recall whether you made any updates to

6    what was your standard deck, specifically to

7    address carfentanil?

8              A.    I don't believe that I would have

9    changed a chart or a graph for that.  I would

10   have talked about it, other than I have

11   a -- let me see if it's in here.

12              So I did add -- it's not in this

13   presentation.  I did add a graphic that

14   shows -- looks like a graphic of a pill and

15   shows the relative strength of morphine, the

16   base chemical that our brain deals with, that

17   are brain actually deals with opiate-wise, and

18   then heroin, fentanyl, carfentanil, showing

19   that carfentanil is much more potent, but that

20   graphic was added after that.

21              Q.    I would like to ask you about one

22   slide in this presentation.  If you turn to

23   numbered page 7, on the bottom left, there is a

24   chart with a brain and a bunch of words,

25   correct?

Page 371

1          A.     Yes.

2          Q.     The title of this slide is Pleasure

3     Centers, correct?

4          A.     Yes.

5          Q.     And this is something designed to

6     illustrate the point that the brain -- the

7     brain function that we described earlier, in

8     terms of various things that trigger positive

9     reinforcement in the brain's pleasure reward

10    system, correct?

11         A.     Correct.  I use it to demonstrate

12    that we all have certain things, that everyone

13    is a little different, so that whereas some

14    person may be turned on by Liam Neeson,

15    somebody else might be turned on by Chicago

16    pizza.

17              So I use that to -- and generally

18    to get a little bit of humor from a sad topic,

19    I'll usually tell people that I'm pretty

20    certain all of us would agree on sex with

21    chocolate would be a good one, and that usually

22    gets a laugh.

23         Q.     And what about the failures of

24    others, why is that so prominently displayed on

25    there?

Page 372

1        A.    Oh, I -- you can ask Stivers, who

2    created that.

3        Q.    Okay.

4        A.    Some people are, I guess, more

5    sadistic than others.

6        Q.    I would like to mark as Exhibit 24

7    the following.

8                    -   -   -   -   -

9              (Thereupon, Deposition Exhibit 24,

10             Composite Exhibit, Beginning with

11             Bates Label SUMMIT 880095, was

12             marked for purposes of

13             identification.)

14                   -   -   -   -   -

15       Q.    Now, I'll tell you, this is a

16   longer exhibit than I intend to use, but I want

17   to just orient us to it, nonetheless.

18             This is a composite exhibit that

19   starts with Summit 000880095, and continues

20   sequentially through ending Bates 145.  It

21   starts with a cover sheet that has the minutes

22   from the January 21, 2014 meeting of the ADM

23   Board, correct?

24       A.    Yes.

25       Q.    All right.  And the part that I

Page 373

1   wanted to ask you about is very close to the

2   end.  It starts on ending Bates 140; do you see

3   that?

4        A.    Yes.

5        Q.    Now, the top of the page ending in

6   140 says Summit County ABM Board Fiscal Year

7   2014 Community, Plan Attachment 2; do you see

8   that?

9        A.    Yes.

10        Q.    And what does this depict?

11        A.    So part of our approach was to help

12   instill hope, show that people can, in fact,

13   get back into -- either back or for the first

14   time into recovery, and these are individuals

15   telling their stories of hope, including --

16   yeah, and these are people who are willing to

17   put their faces out there on the -- because

18   they are on our website, so, publically.

19        Q.    So these are actual testimonials,

20   correct?

21        A.    That's correct.

22        Q.    And none of these are, you know,

23   manufactured or made up.  These are real people

24   telling real stories, correct?

25        A.    Correct.

1      Q.    And below the featured story

2    section, there is a little bit of text that

3    says, "Alcoholism, drug addiction, mental

4    illness are real medical conditions that can

5    affect anyone.  People can live rich and

6    fulfilling lives with the right services and

7    supports funded by the ADM Board"; did I read

8    that correctly?

9          A.    That's correct.

10        Q.    And the stories of hope that the

11   ADM Board is offering are hope to people that

12   are struggling with addiction, correct?

13        A.    Yes.

14        Q.    And so the first individual, Jarod,

15   the headline next to his video says, "Today, I

16   am in control of my future," correct?

17        A.    Yes.

18        Q.    So this is someone who was dealing

19   with addiction, but as a result of the

20   treatment that was provided, is able to feel

21   like he's in control of his future, correct?

22        A.    Right.  You can see it says, in

23   micro print, "After multiple attempts in

24   detox," et cetera.  So it also is very

25   real-world, because it demonstrates it is a

Page 375

1    challenging illness to gain full control over

2    and may require repeated attempts to get that

3    treatment.

4         Q.    And so motivation and persistence

5    are important in an individual addressing their

6    substance addictions, correct?

7         A.    Yes, even though many times that

8    motivation is external.

9         Q.    And persistence is necessary?

10        A.    Yes.

11        Q.    No matter how hard you, as a

12   physician, want someone to quit, at the end of

13   the day, you, as a physician, can't make that

14   decision for them, can you?

15        A.    No.

16             MR. KEARSE:  Objection.  Form.

17        A.    Correct, the patient plays,

18   certainly, a role in their own recovery.

19        Q.    And they have to make a decision

20   for themselves that you can't make for them, as

21   a physician?

22        A.    Correct.

23             MR. CARTER:  Okay.  Those are all

24   the questions I have.  Thank you for your time.

25   I'll pass you over to co-counsel.

1              THE VIDEOGRAPHER:  Off the record,
2     5:52.
3              (Pause.)
4              THE VIDEOGRAPHER:  We are back on
5     the record, 6:01.
6      EXAMINATION OF DOUGLAS A. SMITH, M.D., DFAPA
7     BY MS. WEST FEINSTEIN:
8         Q.    Good evening, doctor.  We met
9     briefly before the beginning of today's
10    deposition, way back this morning, but I'll
11    reintroduce myself.  My name is Wendy West
12    Feinstein, I'm with the law firm of Morgan
13    Lewis, and I represent the Teva defendants in
14    this litigation.
15             Were you aware that any claims were
16    brought against the Teva defendants in this
17    litigation?
18        A.    Again, not specifically.  They are
19    probably in the big list I glanced at.
20        Q.    Are you familiar with any of the
21    prescription opioids that are manufactured by
22    any of the Teva defendants?
23        A.    Probably good, in terms of
24    influence by pharmaceutical reps, but I never
25    seem to remember which company makes which

Page 377

1    medication, so, no, I'm not sure which one Teva

2    makes.

3            Q.    And you just mentioned

4    pharmaceutical reps.  Have you been visited by

5    any detail representative from any Teva-related

6    entity?

7            A.    Not that I'm aware of, no.

8            Q.    And you have not been detailed by

9    any pharmaceutical representative regarding

10   opioid, prescription opioid medications, right?

11           A.    Correct.

12           Q.    And you have never, since being in

13   practice, since leaving the hospital, you do

14   not recall prescribing any opioid medications,

15   right?

16           A.    Correct.

17           Q.    We talked a little bit earlier

18   about the FDA approval process for opioids; do

19   you recall that testimony --

20           A.    Yes.

21           Q.    -- with one my colleagues?

22                 And you mentioned that the FDA

23   process is rigorous and thorough, right?

24           A.    Yes.

25           Q.    Are you aware that, as a part of

1    the FDA approval process, that the FDA also

2    approves a package insert or labelling for a

3    product?

4            A.    Yes.

5            Q.    Have you read the FDA-approved

6    labels for any of the prescription opioids?

7            A.    I think I did actually read a

8    couple way back in 13 or 14, as I was gathering

9    all the information, but it's been a while.

10           Q.    Do you recall seeing a black box

11   warning on any of those labels that you

12   reviewed?

13           A.    Sitting here today, I don't recall,

14   because I don't prescribe them, so...

15           Q.    And do you know what I'm talking

16   about when I refer to a black box warnings?

17           A.    Oh, yes.

18           Q.    And can you describe for us what

19   your understanding is of a black box warning?

20           A.    Sure.  It indicates that there is a

21   potential for a serious, adverse event from

22   that medication in -- for example, in

23   antidepressants with younger individuals, there

24   is a black box warning against suicidality

25   increasing.

Page 379

1      Q.    You just mentioned that with

2    prescription opioids, you are not familiar with

3    the black box warning on their labels; is that

4    right?

5      A.    Yeah.  I don't recall what it was.

6      Q.    Do you remember ever being informed

7    that prescription opioids include a black box

8    warning about addiction?

9          MS. KEARSE:  Object to form.

10     A.    No, but I wouldn't be surprised,

11   especially in the current environment.

12     Q.    Do you know the last time, the most

13   recent time that any prescription opioid label

14   has been updated?

15     A.    No.

16     Q.    As part of the FDA's functions with

17   prescription medications in the U.S., are you

18   familiar with its involvement in reviewing

19   advertising for prescription drugs?

20     A.    I'm familiar that maybe a decade

21   ago, at some point, there was a change, and

22   they added the warnings at the end of the

23   pharmaceutical commercials to give you the

24   adverse effects, potentials, as well as -- on

25   top of the positives that were being promoted

Page 380

1    in the advertising.

2              I'm not sure exactly what year that

3    was, but in my mind's eye, it was about a

4    decade ago.

5         Q.    You're not an expert in regulatory

6    affairs, are you?

7         A.    No.

8         Q.    You are not an expert in

9    pharmaceutical marketing, are you?

10        A.    No.

11        Q.    But you are aware that it is

12   permissible and lawful for pharmaceutical

13   manufacturers to advertise their medications,

14   right?

15        A.    Yes.

16        Q.    And that promotion is -- are you

17   aware that that promotion is reviewed and

18   evaluated by FDA at times?

19        A.    Yes.

20        Q.    Have you personally seen any

21   direct-to-consumer marketing related to

22   prescription opioids?

23        A.    I have to think about that.  I

24   don't watch much TV, so that wouldn't be where

25   it would get me.  I have to think about medical

1    journals and stuff.  I don't -- not in any

2    recent time, no.

3         Q.    Have you seen any form of marketing

4    for prescription opioids?

5         A.    Not in recent years.

6         Q.    At any time?

7         A.    I couldn't tell you what I saw a

8    decade ago, but...

9         Q.    Nothing stands out to you --

10        A.    Correct.

11        Q.    -- as you sit here today?

12        A.    No.

13        Q.    Since you took the position at the

14   ADM Board and formed the Opiate Task Force, did

15   you review any prescription opioid marketing

16   materials?

17        A.    No.  I haven't looked into that, as

18   a part of my research, no.

19        Q.    Are you aware of any

20   misrepresentation made by any manufacturer

21   relating to its prescription opioids?

22        A.    Only by -- you know, others have

23   said that they've -- the Dr. Jick article and

24   things that were stated along the way, but not

25   directly to me.

1          Q.     And Dr. Jick isn't a prescription

2     opioid manufacturer, is he?

3          A.     No.

4          Q.     Right.  So are you aware of any

5     statements or misrepresentations made directly

6     by any manufacturer of prescription opioids?

7          A.     No.

8          Q.     Are you aware of any omissions

9     regarding risks, for example, made by any

10    manufacturer of prescription opioids?

11         A.     No.

12         Q.     Are you aware of any physician

13    within Summit County who has been misled by any

14    statements made by any manufacturer of

15    prescription opioids?

16         A.     No.  No one has come forward to

17    tell me that, so...

18         Q.     Are you aware of any prescription

19    that has been written to any patient in Summit

20    County, on the basis of a misrepresentation

21    made by any pharmaceutical manufacturer?

22         A.     No.

23         Q.     Have you seen any information

24    regarding any agreement among pharmaceutical

25    manufacturers related to opioid marketing?

```
                                        Page 383
 1          A.     No.
 2          Q.     Have you seen any information that
 3     ties any pharmaceutical manufacturer who
 4     manufacturers prescription opioids to Dr. Jick?
 5          A.     Can you repeat that, please.
 6          Q.     Have you seen any information that
 7     ties any pharmaceutical manufacturer of a
 8     prescription opioid to Dr. Jick?
 9          A.     I think I've seen reference to that
10     in an article somewhere, as well as in
11     Dreamland.  That's where I would have seen
12     that.
13          Q.     But you personally aren't aware of
14     any data or evidence, other than what you read
15     in Dreamland; is that right?
16               MS. KEARSE:  Object to form.
17          A.     And there was some other article I
18     saw written, maybe it was because of Dreamland,
19     but it was actually in one of the medical
20     journals, but no, not directly in Summit
21     County.
22          Q.     You mentioned that in your
23     research, you didn't come across any marketing
24     information performed by any of the
25     pharmaceutical manufacturers.
```

1          Can you please tell me what

2     research did you do after joining the ADM Board

3     or at any time relating to prescription

4     opioids?

5          A.    I'm sure most of it was talking to

6     the addiction specialists in Summit County,

7     Department of Health, the Department of Mental

8     Health, which then became the Department of

9     Mental Health and Addiction Services, went to

10    the annual meeting of the American Academy of

11    Addiction Psychiatrists, and then through the

12    Opiate Task Force, we have had, kind of, a

13    constant flow of information that comes in,

14    much of which I get to look at, so...

15         Q.    So when you are using the term

16    "research," you are not talking, sort of,

17    scientific research and epidemiological

18    studies; is that right?

19         A.    Correct.  Right.  I'm not running

20    research projects on opiates.  I do see a lot

21    epidemiological data through Summit County

22    Public Health.

23         Q.    Is it fair to say that most of the

24    information that you have regarding the opioid

25    crisis and the opioid epidemic is from other

Page 385

1    sources; it's not information that you have

2    developed on your own?

3              MR. KEARSE:  Object to form.

4         A.    Correct.  We're -- our mission is

5    not to create that information.  It's to use

6    the information to determine where to use our

7    funds to treat people in the county.

8              MS. WEST FEINSTEIN:  Thanks,

9    doctor.  I have the nothing further.

10             MR. KEARSE:  Are you coming back?

11    You passed the witness already.

12     EXAMINATION OF DOUGLAS A. SMITH, M.D., DFAPA

13    BY MR. BOEHM:

14         Q.    Okay.  Dr. Smith, I have just a

15    couple of questions in reference to a point

16    that you made about some kind of survey study

17    that you thought about doing; do you remember

18    that?

19         A.    Yes.

20         Q.    I think you said that, in response

21    to a question about whether you hold yourself

22    out as an expert in certain fields, you kind of

23    suggested that you might hold yourself out as

24    an expert in one particular area, having to do

25    with this survey thing that you did; did I hear

Page 386

1     that right?

2               MR. KEARSE:  Object to form.

3          A.    No.  I said I had experience with

4     doing one particular survey with Dr. Thrasher

5     of all the physicians in Ohio.  The attempted

6     survey, I guess I should say, because we got a

7     very dismal response rate.  So I couldn't use

8     the data to reach any conclusions.

9          Q.    Okay.  Just to be clear then, and

10    make sure we have this very clear on the

11    record, do you consider yourself an expert in

12    survey methodology?

13         A.    No.

14         Q.    Did you have an expert in survey

15    methodology who was working with you and Dr.

16    Thrasher in preparing the questions or in

17    analyzing the survey results?

18               MR. KEARSE:  Object to form.

19         A.    So in that case, Dr. Thrasher --

20    again, I'm not the expert on opiates -- he did

21    vet the questions and so forth through a number

22    of individuals, some of whom may have had that

23    expertise, but I'm not aware of who they were.

24               The data analysis, again, not done

25    by an expert, because we didn't get enough

Page 387

1   results to make it worth actual analysis.

2          Q.    I see.  So the data you received

3   back never even got analyzed by an expert; is

4   that right?

5          A.    That's correct.

6                MR. BOEHM:  Are we at 25?

7                THE NOTARY:  I think so.

8                      -  -  -  -  -

9                (Thereupon, Deposition Exhibit 25,

10               December 2014 Email Exchange,

11               Beginning with Bates Label SUMMIT

12               93592, was marked for purposes of

13               identification.)

14                     -  -  -  -  -

15         Q.    I have marked this document as

16  Exhibit 25, and it is an email Exchange --

17               MS. KEARSE:  Wait.  Can I have one?

18               MR. BOEHM:  Oh, I'm sorry.

19         Q.    This is an email exchange that I

20  think relates to this idea for a survey that

21  you referenced earlier in your testimony; is

22  that correct?

23         A.    Yes, it does.

24         Q.    And there is an email that --

25  actually, you start this email chain, if you

Page 388

1    turn to page 2, right?

2         A.    Yes.

3         Q.    You say, "Dr. Thrasher and I are

4    working with two physicians from NEOMED about a

5    plan to conduct a survey of all" -- and the

6    word all is in all caps, right?

7         A.    Yes.

8         Q.    " All Ohio physicians on factors

9    that contribute to physician prescribing

10   practices for opiates"; did I read that right?

11        A.    Yes.

12        Q.    Who were the two physicians that

13   you and Dr. Thrasher were working with from

14   NEOMED?

15        A.    From NEOMED, it would have been Dr.

16   Mark Munetz, I'm sure, and 2014, I'm not sure

17   who the other doctor would have been.  There

18   was only one -- the battery is low on your

19   phone.

20             MR. BOEHM:  Make sure it is plugged

21   in.

22        A.    From NEOMED, I don't know,

23   actually, at the moment who the other person

24   who have been, since there is only one I can

25   think of at NEOMED right now.

1          Q.      Okay.  And you attached to this

2     email, it looks like, maybe some drafts or

3     proposed questions that might be used for the

4     survey --

5          A.      Yes.

6          Q.      -- do you see that?

7          A.      Yes.

8          Q.      And you solicit feedback from the

9     recipients, right?

10         A.      Correct.

11         Q.      Are any of the individuals who are

12    recipients of this email experts in survey

13    methodology?

14         A.      Survey methodology -- addiction,

15    yes, survey methodology, no.

16         Q.      You do get some feedback from -- is

17    that Dr. Michelle Blanda?

18         A.      Yes.

19         Q.      And she raises the issue of the

20    standards from the JCAHO; is that the Joint

21    Commission?

22         A.      Yes, it is.

23         Q.      She says, "The standards for Joint

24    Commission is that patients have a right to

25    have their pain addressed"; do you see that?

Page 390

1          A.     Yes.

2          Q.     And she says, "I would include some

3     definition of the standards that you are

4     referring to"; do you see that?

5          A.     Yes.

6          Q.     What did you understand Dr. Blanda

7     to mean?

8          A.     I think she was concerned that not

9     all physicians would even be aware that Joint

10    Commission had standards.  Not all physicians

11    work in a setting accredited by Joint

12    Commission.  So she was asking that we

13    enumerate what the standard was, so that all

14    physicians, you know, could respond to it, as

15    opposed to only ones working in a setting,

16    although there are many of them that are

17    accredited by Joint Commission.

18         Q.     What percentage, if you know, of

19    hospitals and private practices are accredited

20    by the Joint Commission, as opposed to those

21    that are not?

22         A.     Sure.  So a private practice, zero

23    percent.

24         Q.     That's not -- a private practice

25    wouldn't be accredited by Joint Commission --

Page 391

1          A.     Correct.

2          Q.     -- is that right?

3          A.     That's correct.

4          Q.     So the Joint Commission would --

5          A.     Like a clinic --

6          Q.     -- accredit hospitals?

7          A.     Sorry.  Yeah.  Hospitals, clinics,

8     larger entities that -- an individual

9     physician, I don't think he or she could comply

10    with the book of Joint Commission standards,

11    because you need a bunch of people to be able

12    to fulfill a lot of the standards, so...

13                     -  -  -  -  -

14               (Thereupon, Deposition Exhibit 26,

15               Surveying Ohio Physicians on Opiate

16               Prescribing Behaviors, Beginning

17               with Bates Label SUMMIT 839795, was

18               marked for purposes of

19               identification.)

20                     -  -  -  -  -

21          Q.    And you all put together a draft

22    article in connection with the results that you

23    received back from your survey, right?

24               This would be -- I just marked

25    Exhibit 26; is that right?

Page 392

1          A.     Yeah.   Dr. Thrasher did actually
2    write that.
3          Q.     Did you help draft this?
4          A.     He wrote it, I'm sure I reviewed
5    it, but he actually wrote i.
6          Q.     And the title is Surveying Ohio
7    Physicians on Opiate Prescribing Behaviors?
8          A.     Yes.
9          Q.     And it says, about a third of the
10   way into the first paragraph there, that, "A
11   survey was created and distributed to Ohio
12   physicians and podiatrists" and skipping just a
13   little bit further, it says, "The response rate
14   was 11.8 percent," right?
15         A.     Yes.
16         Q.     And your view was that response
17   rate is too low for there to be reliable
18   results, is that --
19         A.     Yeah.  It's hard to translate that
20   to all physicians' thoughts when there were
21   something like 47,000 physicians that it went
22   out to and about 900 podiatrists, because they
23   are part of the same board.
24         Q.     The final sentence of the abstract
25   says, "Pharmaceutical marketing and continuing

Page 393

1    medical education were more likely to decrease

2    a physician's opiate prescribing with more

3    years of experience"; did I read that right?

4           A.    Yes.   It means that physicians with

5    more years of experience, they are less likely

6    to be affected by pharmaceutical marketing.

7           Q.    It actually says that it would

8    decrease a physician's opiate prescribing --

9                 MR. KEARSE:   Object to form.

10          Q.    -- right?  In other words, there

11   are two factors here: One variable is

12   pharmaceutical marketing and CMEs, and

13   continuing medical education --

14          A.    Right.

15          Q.    -- and information, training that

16   doctors receive, right?

17          A.    Uh-huh.

18          Q.    But that was associated with a

19   decreased amount of prescribing, in those

20   doctors who were more experienced, right?

21          A.    Yes.

22          Q.    So to the extent you received

23   survey results, that was, at least, one of the

24   findings that you found, right?

25          A.    Right.

1          MR. KEARSE:  Object to form.

2     Q.    I want you to turn, if you could,

3  just a couple of pages in, to the Discussion

4  section.  Let met know when you are there.

5     A.    Okay.  Yep.

6     Q.    This is, for the record, the Bates

7  number that ends 9798.

8     A.    Yes.

9     Q.    And you talk about some limitations

10  of the study, right?

11          I'm directing you to the paragraph

12  that begins, "Limitations to the study."  It's

13  the final paragraph on this page.

14     A.    Yes.

15          MR. KEARSE:  I'm going to object to

16  form, and I think the doctor testified it is

17  not his paper.  It is Dr. Thrasher's, just so

18  the record is clear.

19     Q.    Is it your testimony that this

20  isn't yours?

21     A.    Dr. Thrasher wrote it.  I'm sure

22  that I looked at it, but he wrote it.

23     Q.    I see.  But these were the results

24  from the study that you and Dr. Thrasher

25  attempted to conduct, right?

Page 395

1          A.    Yes.

2          Q.    And it says, "Limitations to this

3    study include the low response rate," and you

4    talked about that, "And the wording of the

5    questions"; do you see that?

6          A.    Yes.

7          Q.    What do you mean by that?

8          A.    That, I think, we had a number of

9    responses on email as a question, like, "What

10   do you mean to this, what do you mean to that,"

11   which again, probably because we didn't have a

12   survey expert, you know, writing the questions,

13   so it was -- so again, another reason to say

14   are the results really of any value.  It's

15   unclear.  If you don't know what the question

16   means, if you answer it anyway, we can try to

17   interpret that as what we meant by the

18   question, but the doctor might not have

19   responded that way.

20         Q.    And then about two-thirds in, do

21   you see the sentence that begins, "Attempting

22   to finish this study"?

23         A.    Yes.

24         Q.    It says, "Attempting to finish this

25   study in the time allotted during academic

Page 396

1  semesters was also a limitation."

2       A.    Uh-huh.

3       Q.    What is that referring to?

4       A.    I think the other person at NEOMED

5  might not have been a physician, but somebody

6  working on a Master's degree, who was helping

7  us, and the name escapes me because, of course,

8  we didn't publish it, so we don't have names on

9  it.

10           So they wanted to get the results

11 back in a short time.  We were told there was a

12 particular technique, and I'm forgetting the

13 name of it, where if you send a survey out and

14 then you continue to send it out at a certain

15 interval, a certain number of times, I think it

16 was like seven times, in theory, under survey

17 expertise, that gets you some really high

18 response rate, by the time we get done with

19 that methodology, and we ended up cutting that

20 short, thereby not following that model, and

21 that may have accounted for our low response

22 rate.

23      Q.    Okay.  And this had to do with the

24 personal circumstances of a Master's degree

25 student?

Page 397

1       A.    Right.  Who actually, quite

2   frankly, may have written this up, and then Dr.

3   Thrasher added to it, and then I basically, as

4   the recipient.

5       Q.    The idea of writing up a draft like

6   this is to consider submitting it to a

7   peer-reviewed medical journal, correct?

8           MS. KEARSE:  Object to form.

9       A.    Well, in this case, the person

10  working the Master's degree had to come up

11  with -- had to do something as a -- to submit

12  to a board to get their Master's, but that does

13  not mean that we said, "Gee, we better submit

14  this to publication," because I don't think --

15  neither I nor Dr. Thrasher thought it would

16  stand up to peer-review scrutiny, because of

17  the limitations.

18      Q.    The bottom line is, you don't

19  believe in the results of this particular

20  survey study that you tried to put together?

21          MR. KEARSE:  Object to form.

22      A.    Yeah.  Correct.  I, quite frankly,

23  soon thereafter kind of discounted it, and we

24  moved on.

25      Q.    Okay.  Did you discount it in part

Page 398

1    because it didn't -- the results that you

2    received, whatever their limitations, didn't

3    match your preconceived hypothesis?

4                   MS. KEARSE:  Object to form.

5         A.    No.  That had nothing to do with

6    it.  Just I was very disappointed that we

7    couldn't get a better response, when we thought

8    we were trying to do something good, that would

9    help us figure out what factors were playing

10   here, and given that, wasn't willing to put my

11   name or ADM's name on it and have it out there.

12        Q.    Do you agree, as general matter,

13   that sometimes perceived factors, things that

14   are taken to be true or perceived to be true,

15   can be undermined by actual data, when studies

16   are actually performed?

17                   MR. KEARSE:  Object to form.

18        A.    Can you repeat that.

19        Q.    Sure.  Do you agree that perceived

20   factors or perceived perceptions about what

21   might be true, even in medical science, can

22   sometimes be disproved by actual data?

23                   MR. KEARSE:  Object to form.

24        A.    Certainly.  Yeah.  Medical science

25   changes all the time, based on new studies that

Page 399

1    come out.

2         Q.    And that's why it is important to

3    have reliable, sound, and, if possible,

4    peer-reviewed science to back up claims that

5    are made, fair?

6              MS. KEARSE:  Object to form.

7         A.    Yes.  That's why we didn't publish

8    this.

9              MR. BOEHM:  Thank you.

10             Anne, do you have any questions?

11             MR. KEARSE:  I don't know.  We will

12    have a break, and I'll let you know.

13             MR. BOEHM:  Sounds good.  Go off

14    the record.

15             THE VIDEOGRAPHER:  Off the record

16    at 6:25.

17             (Recess taken.)

18             THE VIDEOGRAPHER:  Back on the

19    record.  The time is 6:26.

20             MR. KEARSE:  I want that on the

21    record though.

22             MR. BOEHM:  Happy to put that on

23    the record.

24             MR. KEARSE:  The deposition is

25    closed.  Thank you, Dr. Smith, for answering

Page 400

1    questions of counsel today.

2              MR. BOEHM:  Yes, we agree.  Thank

3    you very much for your time today.

4              THE VIDEOGRAPHER:  Off the record,

5    6:26.

6         (Deposition concluded at 6:26 p.m.)

7                   - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 401

1    Whereupon, counsel was requested to give

2    instruction regarding the witness's review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to the

7    applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 402

1              REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                                      SS:

4    County of Cuyahoga.   )

5

6              I, Wendy L. Klauss, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, DOUGLAS A.

10   SMITH, M.D., DFAPA, was by me first duly sworn

11   to testify the truth, the whole truth and

12   nothing but the truth in the cause aforesaid;

13   that the testimony then given by the

14   above-referenced witness was by me reduced to

15   stenotypy in the presence of said witness;

16   afterwards transcribed, and that the foregoing

17   is a true and correct transcription of the

18   testimony so given by the above-referenced

19   witness.

20              I do further certify that this

21   deposition was taken at the time and place in

22   the foregoing caption specified and was

23   completed without adjournment.

24

25

Page 403

1          I do further certify that I am not

2    a relative, counsel or attorney for either

3    party, or otherwise interested in the event of

4    this action.

5          IN WITNESS WHEREOF, I have hereunto

6    set my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 21st day of

8    November, 2018.

9

10

11

12

13                    _Wendy L. Klauss_

14          Wendy L. Klauss, Notary Public

15               within and for the State of Ohio

16

17   My commission expires July 13, 2019.

18

19

20

21

22

23

24

25

```
                                                    Page 404
 1                    Veritext Legal Solutions
                           1100 Superior Ave
 2                             Suite 1820
                         Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4
     November 21, 2018
 5
     To: Anne Kearse
 6
     Case Name: In Re: National Prescription Opiate Litigation v.
 7
     Veritext Reference Number: 3112788
 8
     Witness:  Douglas A. Smith, M.D., DFAPA    Deposition Date:
 9   11/16/2018
10
     Dear Sir/Madam:
11
12   Enclosed please find a deposition transcript.  Please have the witness
13   review the transcript and note any changes or corrections on the
14   included errata sheet, indicating the page, line number, change, and
15   the reason for the change.  Have the witness' signature notarized and
16   forward the completed page(s) back to us at the Production address
     shown
17
     above, or email to production-midwest@veritext.com.
18
19   If the errata is not returned within thirty days of your receipt of
20   this letter, the reading and signing will be deemed waived.
21
     Sincerely,
22
     Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 3112788
 3   CASE NAME: In Re: National Prescription Opiate Litigation v.
     DATE OF DEPOSITION: 11/16/2018
 4   WITNESS' NAME: Douglas A. Smith, M.D., DFAPA
 5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7         I have made no changes to the testimony
     as transcribed by the court reporter.
 8

     _____      _____
 9   Date                  Douglas A. Smith, M.D., DFAPA
10         Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15
           I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20
21
22
23
24
25
```

1                     DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 3112788
3   CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 11/16/2018
4   WITNESS' NAME: Douglas A. Smith, M.D., DFAPA
5         In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7         I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9         I request that these changes be entered
    as part of the record of my testimony.
10

          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____      _____
    Date                  Douglas A. Smith, M.D., DFAPA
14

          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22  this _____ day of_____, 20____.
23        _____
          Notary Public
24

          _____
25        Commission Expiration Date

Page 407

1            ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2             ASSIGNMENT NO: 11/16/2018
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                  Douglas A. Smith, M.D., DFAPA
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24

                      _____
25                    Commission Expiration Date

**[& – 2006]**

| & | |
|---|---|
| **&** 2:10 3:8,11,18 3:22 4:4 18:1,14 18:17,19,24 | |

| 0 | |
|---|---|
| **000880095** 372:19 | |

**1**

**1** 6:2 20:2 27:25 28:3 62:24 84:12 86:14 151:12 273:4 277:9 282:22 328:13
**10** 6:23 7:13 66:9 66:10 70:13 84:25 115:4 203:21,23 204:5 210:10 291:18 292:7 293:13
**100** 9:24 22:9,13 306:3,19
**100,000** 103:15 192:2
**102** 9:25
**104** 10:1
**105557** 6:24 204:1
**106** 10:2,3
**107** 10:4
**10:17** 86:4
**10:34** 86:7
**11** 6:25 114:17,22 219:22 220:5 229:14 239:17 287:1 345:10
**11.8** 392:14
**11/16/2018** 404:9 405:3 406:3 407:2
**1100** 3:14 404:1
**112** 10:5
**113** 10:6,7

**114** 10:8
**117** 10:9,10
**118** 10:11,12
**11:15** 123:9
**11:17** 123:12
**12** 7:2 115:1 139:9 140:7 228:15,17 228:23 229:4 282:22 306:13 361:1,2,3,11
**122** 10:13
**123** 6:9
**126** 6:12 10:14
**127** 10:15
**128** 10:16
**129** 6:14 10:17
**12:32** 196:8
**13** 7:4 138:24 140:7 144:24 234:20 235:8 282:21 378:8 403:17
**130** 10:18
**131** 6:16
**132** 10:19
**137** 10:20
**138** 10:21
**139** 10:22,23
**14** 6:9,12 7:6 22:19 123:15,23 124:15 126:23 138:24 139:12 241:20 242:5 273:4 277:10 378:8
**140** 10:24 373:2,6
**141** 10:25 11:1,2
**142** 11:3
**1420** 2:22
**143** 6:17 11:4,5

**145** 372:20
**15** 7:9 70:9 124:15 247:3,14,15 264:1 273:4 328:13
**150** 11:6,7
**15219-6401** 3:5
**153** 11:8,9,10
**153786** 7:1 219:25
**154** 11:11
**155** 11:12
**157** 11:13
**158** 11:14,15
**159** 11:16
**16** 1:20 7:11 17:2 124:15 222:20 223:7 282:4,11 368:21 369:7,13
**160** 11:17
**161** 11:18
**162** 11:19
**163** 11:20
**164** 11:21,22
**165** 11:23
**166** 6:20 11:24
**17** 1:8 7:13 17:7 263:15 286:21 291:17,25 292:2 293:13 306:10 367:16
**1717** 4:11
**176** 11:25
**18** 6:14 7:16 21:13 129:11 307:5,7 360:6 369:12
**1820** 404:2
**186** 12:1,2
**1867** 19:20
**187** 12:3
**188** 12:4
**189** 12:5

**19** 5:4 7:18 314:21 315:2
**190** 12:6
**191** 12:7
**19103** 4:11
**1918** 201:11 202:17
**194** 12:8,9
**195** 12:10
**199** 12:11
**1990s** 243:9
**1993** 49:14
**1995** 175:19,20 177:2 208:13 209:11 221:20 224:7 225:20 229:17
**1997** 245:11
**1998** 243:16
**1999** 65:6
**1:18** 1:15
**1:45** 152:4
**1:46** 196:11

**2**

**2** 5:2 6:5 58:24 59:7 65:19 239:21 373:7 388:1
**20** 7:20 66:11 77:16 222:10 251:12 309:16 322:14,20 331:7 368:21 405:16 406:22 407:22
**20005** 2:13
**2001** 178:15
**2002** 236:3
**2003** 237:2 241:3
**2004** 235:23 237:2
**2005** 332:9,14
**2006** 51:5

**2008**  115:14,19
**2009**  114:25 339:5
**2010**  7:9 115:4
  141:21 247:4,15
  248:23 249:8
  250:4,12,15,19
  251:7,10 255:9
  256:21 324:2
  336:24
**2011**  323:23
**2012**  6:16 7:11
  20:2 55:14 56:8
  62:22,24 63:3
  64:16 65:7 86:11
  86:14 87:9 94:12
  94:14,19 124:15
  124:24 126:2,8
  130:11,21 131:5
  131:10,11 132:1
  137:15,25 139:1
  139:19 140:25
  247:25 252:13
  253:12,14 281:25
  282:5,15,18,20,23
  283:4,23 285:21
  287:10 288:7,17
  296:21 297:20
**2013**  61:11,17,21
  62:4,14 64:21,22
  65:3,12 84:12
  88:8 124:15
  130:16 139:22
  140:4,5,12 141:2
  167:8 252:8
  296:20 343:25
**2014**  6:5,23 8:5
  58:25 59:8 61:11
  144:12,23 159:10
  167:8 203:5,24
  204:6,10,11 205:3
  210:11 214:15

216:16 238:7
  242:6 248:17
  249:5,12 250:11
  254:24 255:2
  278:21,21 372:22
  373:7 387:10
  388:16
**2015**  7:16,20,22
  151:12 277:9,12
  277:25 279:21
  300:23 307:8,14
  307:15 322:15,21
  332:2,12 336:9
  337:14 338:23
**2016**  6:25 7:2,24
  124:24 126:2,8
  219:23 220:6
  222:1 225:20
  228:18 277:7
  338:13,20,24
  339:1 366:18
  368:13 369:19
  370:4
**2017**  6:9,12,14
  7:13,18 70:10
  95:24 123:15,23
  126:23 129:11,18
  203:8 229:11
  291:18 292:7
  314:22 315:5
**2018**  1:20 6:7 17:2
  21:6,15 70:2,7
  75:24 95:1,19
  113:19 114:12
  118:22 403:8
  404:4
**2019**  96:2 97:1
  403:17
**202**  2:13 12:12
**203**  6:23 12:13

**207**  12:14
**21**  7:22 204:7
  214:15 255:4
  331:9 332:1,8
  336:7 372:22
  404:4
**212**  12:15
**213**  4:7 12:16
**215**  4:12
**216**  3:15 12:17
**216-523-1313**
  404:3
**216-9140**  2:6
**219**  6:25
**21st**  116:3,10
  119:1 403:7
**22**  7:24 307:15
  338:12,19
**221**  12:18
**2222**  403:13
**223**  12:19
**224**  12:20
**227**  12:21
**228**  7:2 12:22
**23**  8:2 9:3 366:24
  367:1,7
**231**  12:23
**232**  12:24
**2321**  243:3
**233**  12:25 13:1
**234**  7:4 13:2
**236**  13:3
**24**  7:20 8:3 9:4
  322:15,21 372:6,9
**24.1**  300:22
**240**  13:4
**241**  7:6
**242**  13:5
**243**  13:6
**243-4000**  4:7

**245**  13:7
**247**  7:9
**248**  13:8,9
**249**  13:10,11
**25**  8:5 66:12 95:23
  101:1 103:11
  126:6 127:9,11,19
  127:22 128:1,4
  387:6,9,16
**250**  13:12,13
**251**  13:14,15,16
**252**  13:17
**253**  13:18,19
**254**  13:20
**257**  13:21
**258**  13:22
**26**  8:7 391:14,25
**260**  13:23 51:18
**261**  13:24
**262**  13:25
**263**  14:1
**265**  14:2
**266**  14:3
**267**  14:4
**269**  14:5
**27**  306:14
**27.8**  300:23
**270**  14:6
**271**  14:7
**274**  14:8
**275**  14:9
**276**  14:10
**278**  14:11
**279**  14:12,13
**28**  2:5 6:2
**2804**  1:6 17:7
**281**  14:14
**282**  7:11
**284**  1:8 14:15
**286**  14:16

**288**  14:17
**291**  7:13 14:18
**294**  14:19
**29464**  2:6
**295**  14:20
**297**  14:21
**298**  14:22

**3**

**3**  6:7 69:24 70:1
94:25 97:11
**3.7**  47:22
**30**  9:5 151:2
325:17
**300**  3:19 14:23
**301**  3:4
**303**  14:24
**30309-3053**  2:23
**304**  14:25
**305**  15:1,2,3
**306**  15:4
**307**  7:16
**31**  9:6 144:12
204:11 238:6
242:6
**310**  15:5
**3100**  4:11
**3112788**  404:7
405:2 406:2
**312**  3:20,24 15:6
**314**  7:18
**318**  15:7
**319**  15:8
**321**  15:9
**322**  7:20 15:10
**324**  15:11
**324-0000**  3:24
**325**  2:18
**32nd**  3:4
**331**  15:12
**332**  7:22

**338**  7:24
**340**  59:25
**341**  15:13
**342**  5:5
**347**  15:14
**349**  15:15
**350**  15:16
**351**  15:17
**353**  15:18
**354**  15:19,20
**355**  15:21
**356**  15:22,23
**357**  15:24
**361**  15:25 16:1
**362**  16:2
**364**  16:3
**365**  16:4
**367**  8:2
**372**  8:3
**375**  16:5
**376**  5:5
**379**  16:6
**383**  16:7
**385**  5:6 16:8
**386**  16:9,10
**387**  8:5
**391**  8:7
**393**  16:11
**394**  16:12,13
**397**  16:14,15
**398**  16:16,17,18
**399**  16:19
**3:16**  275:9
**3:40**  275:12

**4**

**4**  6:9 7:2 47:22
123:14,22 228:18
288:11 316:21
336:15
**40**  9:7 34:7 324:8

**400**  27:23 190:22
191:2 267:13
**402**  5:7
**404**  2:23
**412**  3:5
**415**  3:10
**42**  101:12
**42.3**  300:21
**42.4**  300:21
**43215-2673**  2:19
**434-5000**  2:13
**44113**  3:14
**44114**  404:2
**44th**  4:6
**45090**  1:15
**469-3939**  2:19
**47,000**  392:21
**471-3490**  3:5
**4731.21**  244:20
245:23
**474**  236:3
**48**  9:8
**4:00**  169:5
**4:51**  342:4

**5**

**5**  6:12 126:22
127:4 182:5
235:25 237:13
287:6,10,23
343:24 344:1,7,9
351:16,23
**5's**  346:12
**50**  1:22 9:9,10
54:10 99:21
154:19 300:12
**50,000**  99:18
**50/50**  106:7,8
**55**  286:5
**58**  6:5 9:11
**581-3939**  2:23

**591-6000**  3:10
**592-5000**  3:15
**5:13**  342:7
**5:52**  376:2

**6**

**6**  5:3 6:14 105:10
105:11 129:10,17
237:11,13 238:15
**60**  43:25
**600**  2:18
**60601-5094**  3:24
**60654**  3:19
**61**  9:12
**614**  2:19
**62**  9:13,14,15
**63**  9:16 367:17
**64**  9:17
**65**  9:18
**6:01**  376:5
**6:25**  399:16
**6:26**  399:19 400:5
400:6

**7**

**7**  6:16 131:4,10
133:15 368:22
370:23
**70**  6:7 29:5 44:1
**70s**  208:20 303:9
337:22
**725**  2:12
**75**  296:2,8
**77**  3:23
**777**  4:5
**78**  51:17
**7933**  104:16
113:16
**7989**  316:16

[8 - actual]                                                                 Page 4

**8**

**8** 6:16,17 115:13
  131:5,10 143:24
  144:10 361:11
  368:13
**80** 66:8
**800** 2:22
**80s** 337:22
**820711** 8:1 338:16
**821280** 6:22
  166:20
**822287** 7:8 241:24
**83** 296:2,8
**833675** 6:6 59:3
**834829** 7:17 307:9
**839795** 8:9 391:17
**843** 2:6
**851-8100** 4:12
**862-2000** 3:20
**87** 9:19
**88** 9:20
**880095** 8:4 372:11
**887987** 7:19
  314:23
**897931** 6:8 70:4

**9**

**9** 6:20 166:14,17
  167:1 171:15
  196:18 207:6
  208:2 209:22
**90** 325:18
**900** 392:22
**90017-5844** 4:6
**902497** 6:11
  123:17
**902513** 6:13
  126:25
**902806** 6:15
  129:13

**906717** 7:15
  291:20
**92** 9:21
**925093** 6:4 28:6
**930645** 6:19 144:3
**93592** 8:6 387:12
**94** 105:12
**94111-5356** 3:9
**95** 288:17
**950** 3:14
**960** 328:14
**97** 9:22
**9798** 394:7
**98** 9:23 28:22
**99** 182:6
**9:08** 1:20 17:3

**a**

**a.m.** 1:20 17:3
**aaron** 78:10
**ability** 339:11,13
  355:5,10
**able** 33:20 39:11
  52:8 58:9 67:9
  69:8 92:3 95:21
  121:10 125:10
  157:25 158:5
  160:19 164:1
  214:6 215:7
  258:25 259:3
  274:21,22,22,23
  274:24 295:4
  310:21 318:5,7
  327:12 347:14
  354:16 369:20
  370:1 374:20
  391:11
**abm** 373:6
**abrupt** 348:13
**abruptly** 348:6,16
**abstinent** 359:22

**abstract** 299:7
  392:24
**abuse** 6:18 7:9
  60:20 61:7,23
  62:6 64:14,19
  65:1 80:19,24
  83:9 94:10 121:14
  136:21 137:7,19
  137:25 138:5,9
  139:5,23 141:22
  142:10 143:13,20
  144:2,14 146:8
  149:20 165:14
  173:15 195:22,23
  202:9 210:12
  233:6 242:13,20
  247:5,16 250:18
  251:13,23 253:12
  269:18 270:10
  271:12,21 273:23
  280:25 283:10,16
  287:12,14,25
  288:19 306:17
  323:10,20 333:10
  333:19 336:23
  348:2
**abused** 266:14
**academia** 187:22
  189:12
**academic** 395:25
**academy** 37:2
  138:22 142:19
  159:8 384:10
**access** 81:10,15
  135:21 219:6
**accidental** 150:2,5
  150:22
**accomplish** 75:8
  217:25 274:25
**account** 114:13
  231:22 232:17

  259:6,24
**accountable** 75:3
  75:5
**accounted** 303:8
  334:13 396:21
**accounts** 178:12
  339:9
**accredit** 178:18
  391:6
**accreditation**
  37:16 184:25
  213:7
**accredited** 180:7,8
  187:12 212:17
  390:11,17,19,25
**accrediting** 197:6
  197:10,19,20
**accurate** 128:18
  288:24 354:14
  355:8 365:4
**achievable** 113:14
**acknowledge**
  405:11 406:16
**acronym** 89:21
  133:8
**act** 85:2 116:4,11
  140:7,11 356:20
  405:14 406:20
**acting** 141:13
**action** 24:16 52:13
  213:20 403:4
**actions** 116:10
**activated** 339:15
**activation** 359:15
**actively** 163:5
**activities** 315:17
**activity** 137:12
**actual** 31:14,17
  104:7 105:7,16
  154:10 159:24
  221:4 226:10

227:8 232:8 254:8
261:2 269:6 291:9
319:24 373:19
387:1 398:15,22
**actuation**  279:12
**acute**  93:23
**adamhs**  60:3
**adapt**  178:22
**add**  41:9 69:12
79:20 92:5 99:25
182:20 194:17
303:25 335:21
367:22 370:1,12
370:13
**added**  293:9 340:1
352:10 370:20
379:22 397:3
**addict**  153:24
154:14 160:9
274:8 290:24,25
318:3,11 320:24
**addicted**  49:22
155:1 156:2 157:7
157:25 161:2,13
162:17 163:5,18
164:5,15 177:23
184:4,12 206:13
225:5,11 268:11
269:9 270:14
271:11,16,20
274:20 275:19,23
276:4 281:19
287:18 289:1,19
289:24 290:3
291:7 295:23
297:5 298:23
299:14,14 300:8
305:9,11 331:1
340:4 351:1,2
355:4 356:12,18
357:2,12

**addiction**  7:12
20:1 53:18 60:9
60:20,20 65:21
66:14 71:3,6 77:9
83:23 84:1,11,22
85:20 86:12,25
87:11,12 93:8,11
93:18 101:14
106:5,21 107:1
111:24 112:25
115:23 116:16
118:23 119:17,24
120:3,10,11,12,15
120:16 121:8,21
137:19 138:22
142:19,20 144:18
145:4,24 146:18
148:14 151:19
152:8,23 154:11
156:9,15,18,21
157:1,19,24
158:20,22,24
159:2,8,11,14,17
159:19 160:1,5,22
161:9,16 162:9,16
162:24 163:2
164:25 177:21
183:3 192:25
207:1 217:10,13
217:19 218:5,9,12
225:2,12 226:6
238:4 246:3,6,17
248:1 252:22
254:19 265:17
267:25 268:22,25
269:3 270:15
273:17 276:4,17
282:1,7,12 286:1
286:16 287:15
289:3,7,21,22
290:11 291:9,15

302:13 304:3
314:3 318:20,23
321:12 322:9
325:15 329:12
334:18 335:17
338:9 339:14
340:7 344:10,17
346:24 351:6,11
351:13,20,21,22
351:25 353:17,21
353:21,22,24
354:3,25 355:3,9
358:5,7 359:3
360:8 374:3,12,19
379:8 384:6,9,11
389:14
**addictions**  81:1
138:14 184:10
353:12,13 375:6
**addictive**  49:24
113:7 153:16
154:25 161:24
162:4 163:9 177:3
177:15 206:2
207:3 209:17
226:2,14,25
227:11,21 364:2
**addicts**  154:3
161:5 163:8
267:19 269:17,25
270:9 273:21
283:22 285:20
**adding**  161:11
314:1
**addington**  31:2
**addition**  73:1
**additional**  36:8
**address**  19:19
57:23 180:3
181:12,12 185:25
189:13 211:3

244:13 248:24
276:19 279:1,9
308:5 370:7
404:16
**addressed**  197:6
197:21 389:25
**addresses**  282:1
308:8
**addressing**  61:7
69:4 282:23 375:5
**adequate**  232:20
**adjournment**
402:23
**adm**  6:5,8 20:24
21:7,25 22:7,17
23:10,13,21 38:9
52:6,8 54:16
55:15 56:8,10
57:5,24 58:20,25
59:10,19 60:1,11
60:21 61:6 63:3
64:15 65:20 66:1
66:16,21,24 68:23
70:3,8,14,17 72:2
72:17 73:2 74:11
76:22 78:16 83:13
84:20 85:17,23
86:10,22 87:8
88:11,20 89:9
90:5,7,22 91:2,21
91:24 94:4 95:2
97:2,12,17 99:11
100:23 101:22,25
102:21 103:2
105:15,24 106:9
108:5,10 109:17
111:5,10 112:4
114:4,12,19
115:19 118:13
119:10 121:17,24
122:16 130:11,22

133:10 136:8,11
136:16 139:3,8,21
140:12 142:2
143:7,9 147:7
150:9 159:6
164:23 165:10
166:1,8 167:22
168:5 170:7,22,23
173:1 176:14
220:23 221:1,8,9
247:25 248:7,12
251:20 252:24
256:24 265:8
267:17 277:17,24
278:11 279:6,19
301:9 309:15
316:13 318:25
322:4 327:6 333:2
341:16 346:6,14
350:6,10 366:18
368:18 372:22
374:7,11 381:14
384:2
**adm's** 398:11
**administration**
104:24 116:9
213:19 261:9
**administrative**
44:22 77:5 307:21
**admissions** 164:11
**admitted** 51:8
**admitting** 51:7
**adolescent** 81:20
**adolescents**
151:19
**adopt** 185:24
**adopted** 178:18,24
180:22 181:6
298:13
**adopting** 176:4

**adult** 320:20
**adults** 120:9
**advance** 37:18
100:4 222:25
**advancing** 312:10
**advantage** 158:5
**adverse** 378:21
379:24
**advertise** 380:13
**advertising** 174:1
174:4,10 209:1
379:19 380:1
**advice** 31:9
**advise** 30:21
**advisory** 89:23
90:11
**advocacy** 39:9
150:18 168:24
169:17 277:19
278:15
**advocate** 277:17
**advocating** 150:10
150:19
**affairs** 241:3
380:6
**affect** 374:5
**affiliated** 93:25
**affixed** 403:6
405:15 406:21
**afflictions** 236:16
237:6
**afforded** 257:12
**aforesaid** 402:12
**afraid** 217:21
317:18
**aftereffects** 225:17
**afternoon** 40:8
169:5,12 342:10
342:11
**afternoons** 40:7

**age** 19:3
**agencies** 60:17,22
66:5,13 69:11
79:19 82:25 89:19
94:8 101:1,7
102:23 103:7,9,10
103:21,22 104:2,4
105:8 110:9,18
111:18 121:12
152:9 223:2
**agency** 59:20 60:5
60:12 68:15 79:17
80:16 84:21 87:17
115:14 116:19
119:24,25 148:18
151:20
**agenda** 6:16
110:17 131:5,10
133:14,21 137:17
152:5
**aggregate** 229:20
298:7
**aggressive** 255:19
**aggressively** 323:9
323:20
**aging** 120:8
**ago** 20:20 21:6,12
49:5,15 88:18
91:18 149:17
188:24 191:22,22
262:21 268:9
296:12,13 297:2
299:4 379:21
380:4 381:8
**agree** 154:16
181:17 237:2
242:15 251:1,7
257:8,11 280:9
306:2 311:11
347:5 353:13
371:20 398:12,19

400:2
**agreed** 351:22
**agreement** 382:24
**ahead** 61:9 62:13
98:24 131:12
312:23 368:4
**aimee** 76:11 95:12
96:16 109:9
138:12
**akearse** 2:7
**akouba** 2:7
**akron** 1:23 2:2
17:14,17,20 19:20
72:16 168:17
210:25 211:1,3,4
211:14 238:5,21
238:23 266:19
**al** 1:12,14
**alcohol** 7:12 20:1
60:9 66:14 77:8
84:10 86:25
101:15 106:5,17
112:22 113:13
119:19 121:14
155:12 281:25
282:6 353:21
**alcoholism** 65:21
106:20 107:1
112:24 115:23
374:3
**alert** 329:7
**alice** 124:1 367:23
**alive** 181:22
**alkermes** 174:24
**alleged** 75:18
**allergan** 3:17
18:14
**allotted** 395:25
**allow** 41:9,10
173:17 216:19
230:19 245:8

310:21
allowed 40:18
  41:9 72:19 183:13
  261:20 285:11,16
allowing 174:10
allows 149:16
  174:7
alternative 340:8
ama 186:4,24
ambien 149:6,17
amen 220:19
america 236:17
  237:6
american 36:9
  37:2 39:5 138:22
  142:19,19 159:7
  296:10,15 343:20
  384:10
americans 173:22
amerisourceberg...
  4:9 18:21
amount 39:6
  56:23 116:11
  191:16 215:7
  229:9 230:11
  231:17 232:4,19
  290:8 340:1
  352:15 393:19
amounts 83:11
analgesics 301:3
analysis 125:6
  126:10,14 128:19
  128:25 202:8
  294:19 295:12
  301:11 386:24
  387:1
analyst 368:7
analyzed 387:3
analyzing 109:4
  386:17

anecdotal 298:1
  305:6
angeles 4:6
angle 168:22
angry 198:15
  329:14
animal 162:18
  290:16 358:16,18
animals 266:19
ankle 175:21
  177:9 209:8
  240:19 297:23
  306:11
ann 148:9
anne 2:4 4:10
  17:12 18:20 33:24
  63:16 271:10
  284:19 399:10
  404:5
annie 2:4 17:15
announced 210:11
  329:4
announcing
  278:21
annual 6:5 58:25
  59:9 90:23 282:15
  384:10
annually 75:11
  112:13
answer 22:22
  23:25 30:11 31:9
  33:20 51:17 54:19
  64:18 98:24 99:1
  99:2 100:25 117:9
  129:4 164:13
  193:6 207:13
  224:4 230:15,22
  250:9 284:23
  286:2 305:25
  306:3 312:18
  314:8 395:16

answered 107:6,9
  117:6,21 118:5,19
  126:19 127:23
  129:2 215:14
  271:7
answering 399:25
answers 83:20
  221:17 285:10,17
antagonist 175:7
anti 174:23
antianxiety 42:24
antibiotics 354:10
antidepressant
  263:25 264:22
antidepressants
  42:23 264:17
  347:23 348:3
  378:23
antinausea 262:22
anxiety 40:21
  264:19,22
anybody 24:5
  51:10 82:2,14
  87:16 88:3 91:5
  91:22 92:17 95:10
  129:19 157:9
  183:10 216:21
  301:10 362:13
  366:1
anybody's 94:14
  154:9
anymore 78:18
  138:12 179:23
  268:4
anyway 21:11
  51:19 89:22 91:9
  198:1 395:16
aod 137:6
apa 343:18 351:13
apart 34:8 60:4

apologize 62:11
apparently 266:25
  284:23 310:19
  316:8
appear 78:7
  262:11 405:11
  406:15
appearances 2:1
  3:1 4:1 5:2 17:11
appeared 50:22
appears 100:8
  105:15 106:23
  115:20 164:22
  171:16 172:24
  204:9 220:10
  231:1 239:11
  244:24 292:6
  304:15 316:7
  324:5
appended 406:11
  406:18
applicable 401:7
applied 203:14
  346:12 365:9
apply 39:13 99:14
  114:5 259:7
  342:19 345:17,22
applying 347:15
appoint 92:15
appointed 22:20
  71:7 239:12
apportion 102:20
approach 91:13
  121:3 329:20
  373:11
approached 56:20
appropriate 63:25
  90:19 98:18 102:1
  107:13 145:18
  153:6 195:12
  196:2 199:17

200:6 230:11
232:18 240:7,7
241:14 245:19
260:5 348:23
**appropriately**
262:10
**approval**  261:24
263:8,11 264:10
377:18 378:1
**approve**  90:7,9,22
91:15 95:16
107:22 264:24
**approved**  71:2,8
227:9,13,19
241:12 246:15
260:4,9,15 261:3,7
261:19 264:12,15
265:3,10,25
271:22 304:11
310:13 378:5
**approves**  264:3,5
378:2
**approximately**
17:3 126:6
**apq**  229:21,23
230:4 231:4,23
**april**  151:12 273:4
277:9,12,25
279:21 293:25
328:13
**aqp**  231:13
**arch**  4:11
**area**  24:13 34:10
58:1 69:9,10
103:13 151:21
159:20 238:5
321:13 365:10
385:24
**areas**  35:18 57:9
57:12

**arena**  308:21
**argue**  41:9 64:3,6
164:20
**argument**  25:17
63:20
**argumentative**
63:7,12 253:16
**arm**  278:17
**arnold**  4:4 18:19
**arnoldporter.com**
4:7
**arollins**  4:12
**array**  56:14 161:3
**arrival**  369:22
**arrived**  63:3 64:15
**art**  201:18
**article**  203:10,11
205:13 206:9
226:23 296:11,16
296:19 297:1
299:2,13 381:23
383:10,17 391:22
**articles**  142:9
226:22 228:1
297:25 298:21
300:13
**articulated**  353:9
**asbestos**  24:14
**aside**  53:3 200:10
241:17 362:22
**asked**  19:23 20:15
24:5 25:4 27:5,8
27:11 51:14 87:19
107:5,9 117:6,21
118:18 126:18
127:23 129:1
134:14 189:10
205:7 207:9
221:12,13,13,15
222:24 223:5,12
251:3 366:11,18

**asking**  79:16
129:19 187:3,8
203:9 209:8
227:17 236:23
271:10 283:7
285:6 298:10,14
305:11 331:21
342:14 390:12
**asks**  242:13
**asleep**  229:1
332:15
**aspect**  357:3
**aspects**  353:8
355:24
**assembled**  255:9
**assembly**  235:16
236:2
**assessing**  188:23
**assessment**  218:9
218:13,16 262:4
**assigned**  36:2,3
**assignment**  405:2
406:2 407:2
**assisted**  175:5
**assisting**  57:14
**associated**  348:20
393:18
**association**  39:5,8
296:10,15 307:23
343:21
**assume**  117:24
292:24 306:12
341:11
**assuming**  50:5
246:18 361:2
**assurance**  76:4,5,6
76:6,16,22 77:20
**ativan**  43:5
**atlanta**  2:23
**attached**  389:1
406:7

**attachment**  7:14
125:22 291:19
373:7
**attachments**
310:18 311:25
**attack**  282:12
**attempt**  105:6
253:8
**attempted**  204:19
364:15 386:5
394:25
**attempting**  335:14
395:21,24
**attempts**  374:23
375:2
**attend**  73:8 76:13
134:24 204:11
**attended**  130:20
131:15 132:12
**attending**  81:4
130:25 132:15
136:5 137:24
138:20 159:6
**attention**  57:9
70:12 76:10
115:12 139:24
180:16 181:8
194:22 196:25
230:17 239:16
**attitudes**  365:13
**attorney**  45:21
118:8 313:11
318:24 403:2
**attorneys**  25:16,18
26:4 71:13
**attributed**  208:20
**audience**  30:22
**audiences**  29:9
**audit**  109:12,22
**auditing**  67:25
110:5

**audits** 67:19,22
  68:2 108:25 109:9
**august** 6:9,12,14
  96:13 123:15,23
  124:19 126:23
  127:6 129:11,18
**author** 233:24
**authority** 232:17
  236:1
**authorization**
  310:5
**authorize** 406:11
**automatically**
  156:2 343:13
**availability**
  161:10
**available** 147:10
  147:12 253:25
  277:1 338:4
  339:25
**ave** 404:1
**avenue** 3:14
  167:18
**avoid** 151:6
  152:22 358:5
**award** 107:22
**awarded** 107:16
  108:9 111:16
  115:18
**awarding** 109:5
**aware** 24:13 51:20
  53:15,17 54:12,17
  54:19,25 55:5,9
  61:18 62:15 64:20
  83:15 87:1,23
  96:24 129:4
  139:22 140:13,17
  140:21 141:1,10
  145:22 173:23
  186:14 187:3
  190:17 192:12

195:2,7,20,24
197:20 213:15
226:10 227:7,18
228:6,7 250:11
251:8 273:16
274:3 295:11,17
317:5 330:11
341:18 362:7,24
363:5 376:15
377:7,25 380:11
380:17 381:19
382:4,8,12,18
383:13 386:23
390:9
**awful** 351:11

**b**

**babies** 225:5
**baby** 256:10
**back** 38:20 44:14
  45:23 48:17 51:6
  65:15 86:6,8
  97:16 99:8 112:21
  118:9,10 123:11
  127:8 129:23
  132:23 138:5
  156:8 158:19
  177:10 178:11
  180:12 188:22
  192:17,18 194:21
  196:10,15 199:21
  200:12 201:20
  207:5,7 208:12,19
  210:9,17 213:13
  214:25 216:18
  220:6,21 221:20
  224:19 236:7
  241:8 250:1 255:2
  259:25 270:5
  275:11,13 282:25
  283:8 296:16,21
  297:15 298:8

302:8 303:9
305:15 307:14
316:13 318:25
323:10,19 337:21
342:6 357:22
366:16 367:13
373:13,13 376:4
376:10 378:8
385:10 387:3
391:23 396:11
399:4,18 404:16
**background** 31:1
  92:6 180:11
  187:25 236:8
**backing** 231:20
**backwards** 295:4
**bad** 27:6,12
  175:23 223:11
**baden** 315:8,10
  316:10
**badge** 180:6
**badgering** 63:11
**bags** 120:20
  339:15,16
**balance** 114:7
  246:8
**balances** 69:21
  314:5
**ballot** 96:21
**baltimore** 24:13
  34:7 36:22
**bang** 67:11,16
  109:18
**bar** 181:15
**barberton** 171:22
**barely** 315:18
**barriers** 219:6
**base** 370:16
**based** 52:3 69:13
  79:11 101:2
  108:25 114:7

121:19 160:10
164:6 165:20
171:14 174:11
185:20 202:2
203:8,13 212:5
231:16 232:4,7
239:22 256:20
259:21 264:6,23
267:16 297:8
298:1,3,6 305:6,21
343:6 347:4
349:24 350:7,12
351:12 398:25
**basic** 31:5 343:7
**basically** 25:15
  27:10 30:25 31:19
  36:11 40:9 41:19
  48:13 49:15 77:12
  77:14 87:18 133:9
  148:23 149:2
  162:17 180:6
  183:13,19 223:11
  239:3 246:4
  267:23 269:2
  328:5 352:4
  364:23 397:3
**basics** 29:22 31:25
**basis** 67:20 74:14
  107:20 194:14,16
  305:10 382:20
**bates** 6:3,6,10,13
  6:15,19,21,23 7:1
  7:8,14,16,18,25
  8:4,6,9 28:5 59:2
  104:15 123:16
  126:24 129:12
  135:23,25 144:2
  166:20 203:25
  219:25 241:24
  242:24 291:20
  307:9 314:23

338:15 372:11,20
373:2 387:11
391:17 394:6
**battery** 388:18
**battle** 241:9 326:4
**bear** 168:23
**beat** 353:24
**becoming** 61:18
**bed** 317:22
**beds** 51:18,18
**beginning** 6:3,6,8
6:10,12,14,19,21
6:23 7:1,7,14,16
7:18,25 8:3,6,8
28:5 33:8 59:2,17
70:3 94:25 123:16
126:24 129:12
144:2 166:19
203:25 219:24
241:23 273:3
291:19 307:8
314:22 323:22
338:15 372:10
376:9 387:11
391:16
**begins** 394:12
395:21
**begun** 323:10,19
**behalf** 2:2,9,16 3:2
3:7,11,17,21 4:2,8
17:13,16,19 18:4
18:11,14,16,19,21
24:19 39:7 288:21
288:21 293:17
**behavior** 162:23
204:21 210:20
211:21 212:3
214:18 217:9,12
218:23 219:2,10
303:3 331:1
366:13

**behavioral** 43:15
43:22 44:9 50:7
55:1 79:21 308:6
357:3
**behaviors** 8:8
162:13,22 163:6
391:16 392:7
**belief** 278:9
**beliefs** 365:13
**believe** 23:25
26:21 27:1 50:12
53:22 71:1,7,20
74:9 81:8 84:12
90:8,12,17 95:12
96:4,10,16 97:5
102:1,5 111:8,9
113:6 116:8 125:8
147:5,17 151:11
156:16 162:21
170:19 175:14
176:9,9,25 178:15
183:8 190:1
191:25 192:4
195:9,25 199:11
199:25 202:2
206:23 207:23
224:19 227:13,15
234:2 235:18
247:20 277:8,8
292:12,13 305:14
320:19 326:19
330:4 340:15
341:20 344:11
370:8 397:19
**believed** 188:10
189:22 192:4
199:15 200:4
214:10
**believes** 310:14
316:7

**believing** 355:14
**bell** 132:2
**benefit** 195:10
**benton** 316:23
318:11,14 319:20
**benzodiazepines**
43:4
**best** 33:16 56:13
56:14,18 57:1,5
79:9 109:18
121:25 152:16
199:16 200:5
213:17 214:11,12
224:4 258:15
259:15 310:14
311:3,6 312:13
314:14 350:11
368:17
**beth** 81:18
**better** 45:18 68:19
69:3 79:8 109:2
158:7 178:11
187:20 219:15
263:25 272:14
290:1 302:21
310:6 312:21
335:14,15,17
397:13 398:7
**beyond** 90:20
147:18 207:25
**bicycle** 155:8
**bid** 111:5,12,14
**big** 24:14 58:9,22
79:20 102:15,16
110:11 147:24
170:25 183:18
185:8 186:12
190:10 191:5
194:11 206:21
212:25 226:20
262:20 376:19

**bigger** 224:17
**biggest** 219:7
**bill** 52:18,19 83:1
235:6 236:3 308:4
310:19 312:6
314:17
**billing** 41:16,17,19
**billings** 67:23
**bills** 308:3 310:1
313:8,22
**bind** 358:24
**birth** 149:9
**bit** 24:15 31:1 43:9
57:6 231:21
310:18 323:4
342:18 371:18
374:2 377:17
392:13
**black** 378:10,16
378:19,24 379:3,7
**blame** 210:18
**blaming** 276:14
**blanda** 389:17
390:6
**blimp** 101:12
**blocker** 175:6
**blood** 157:7,13
181:11,13
**blvd** 2:18
**bmasters** 2:14
**board** 6:8 20:2,24
20:25 21:10,13,25
22:7,10,19,21 23:3
23:9,9,10,12,14,14
23:21 35:14,18
36:6,9 38:9 52:6,8
52:14 55:16 56:8
57:1,5,24 58:1,20
59:10,19 60:12,21
61:6 63:3 64:15
65:20 66:1,4,16,22

66:24 67:2,3
68:23 70:3,8,9,14
70:16,17,22 71:16
71:18 72:2,18,21
72:23,25 73:2,3,7
73:8 74:7,11,21
76:1,22 77:2
78:16 82:7 83:14
84:20 85:17,24
86:11,22 87:1,8
88:11,20,24 89:9
89:23 90:5,11,20
90:22 91:2,21,25
95:2,23 96:2,12
97:3,18 99:12
100:23 101:22,25
102:21 103:2
104:24 105:24
106:10 107:19
108:6,10 109:17
111:5 112:4 114:4
114:12,19 115:19
119:10 121:18,24
121:24 122:16
130:11,22 136:8
136:11,16 139:3
140:12 142:3
143:7,10 147:7
150:9 156:14,17
158:21 164:23
166:1,9 167:22
176:15 220:22,23
220:25 221:1,4,7,8
221:9,9,13,15,23
222:3,18,23 223:1
223:4 224:9
247:25 248:2,13
251:20 252:25
256:24 265:8
267:17 277:17,24
278:11 279:7,20

290:10 301:9
316:13 327:6
333:3 341:17
346:14 350:7,10
366:19 368:18
370:4 372:23
373:6 374:7,11
381:14 384:2
392:23 397:12
**board's** 97:12
105:16 165:11,12
173:1
**boards** 56:11 60:1
60:3,3 133:11
180:2 243:18
244:7
**bockius** 3:22
**bodies** 186:16
189:11 197:6,19
197:20
**body** 197:11
240:16 269:2
**boehm** 2:11 5:4,6
17:25,25 18:7
19:8 33:23 63:8
63:15 64:7 71:24
86:1 98:6,11,17,22
99:1,6 107:8,12
118:8 123:4,7
132:9,16,21 133:2
133:21 134:2,8,11
134:15 135:8,13
135:20,24 136:2
144:7 151:14,16
160:15,18 195:3
196:5 228:24
229:2 235:2,22
236:22 249:13,17
250:1 270:4 271:9
275:4 283:4,6
284:4,9,14,18

285:5,12 292:10
292:12,18,23
293:1 331:10,14
331:19,22 332:17
332:20 385:13
387:6,18 388:20
399:9,13,22 400:2
**bolster** 103:14
**bone** 310:6,23
**book** 226:20
227:14 233:11,17
233:19,21,24
234:12 343:4
391:10
**boomers** 256:10
**border** 56:11,12
**born** 225:5 262:25
263:1
**bothersome**
240:23
**bottom** 28:13,21
29:21 43:12
113:15 114:22
116:1 242:25
255:15 292:3
316:17 339:2
370:23 397:18
**bought** 287:1
**boulevard** 2:5
**bow** 319:21
**box** 378:10,16,19
378:24 379:3,7
**boxes** 339:17
**bpulsipher** 3:10
**brad** 2:11 18:2
292:12
**brain** 84:15 154:9
155:5,14,18 157:4
157:14,15 160:9
160:21 162:18,18
162:21 163:4

184:3,4 225:8
268:11,22 269:9
270:14 274:18,20
287:19 289:25
290:14,16 334:19
338:8 348:10
355:16 357:18,20
357:21,24 358:20
358:22,23 359:5
359:11,16,20,23
360:7 370:16,17
370:24 371:6,7
**brain's** 371:9
**brains** 155:22
177:17,20
**branch** 312:25
**branches** 168:23
267:14
**bravely** 274:5
**break** 106:25
113:8 121:10
123:4 196:6
274:11 275:5,13
283:15 287:19
310:5 331:12,17
342:1 350:22
399:12
**breaks** 283:21
285:19
**bridge** 302:23
**bridgeside** 2:5
**briefly** 376:9
**bring** 66:8 76:14
168:23 339:18
**bringing** 53:7
**broad** 20:11 60:15
65:25 71:13 85:8
**broader** 171:19
177:16 368:23
**broadest** 353:7

**broadly** 102:23
119:14
**broke** 196:16
275:15
**broken** 100:5
104:23 115:21
310:23
**brotherhood**
120:2 121:21
**brothers** 169:7
**brought** 114:2
181:5 262:22
278:17 376:16
**bryant** 3:8 18:23
**buck** 67:11,16
109:18
**budget** 6:7 70:2,8
90:18,23 95:1,2,11
95:17,19 96:1,18
97:1,11 98:4
103:14 104:11,13
111:7,8 118:6
**budgeted** 104:18
**budgeting** 96:23
**budgets** 89:17
90:5,7 101:2
**building** 61:14
323:23
**bulk** 102:12
**bullet** 197:5
207:14 208:9
324:6 327:22
328:20 329:23
**bunch** 177:22
200:23 205:17
335:9 370:24
391:11
**bungee** 302:23
**burden** 215:20
**burdened** 194:15

**bureau** 99:18
257:4
**buried** 246:20
**burling** 3:8 18:24
**business** 42:4
136:7 185:13,16
193:1
**busy** 364:22
**buy** 101:12 162:14
163:23 260:11
272:20,22
**buying** 163:22
271:19
**byrnes** 3:13

**c**

**c** 170:13
**ca** 3:9 4:6 404:25
**cabinet** 85:13
260:23 270:20,21
274:16 280:24
339:21
**cabinets** 272:19
339:17
**cache** 274:14
**calculate** 83:7
**calculation** 124:23
202:3
**calculations** 130:6
**call** 51:7 53:9 60:2
68:15 75:7 91:9
92:23 111:13
125:8 159:17
167:11 240:19
250:18 269:5
348:9
**called** 19:3 31:15
43:15 45:15,25
48:7 52:18 53:5
54:22 68:16 73:23
75:1 76:3 81:5
84:17 120:7

131:11 148:15
165:5 269:25
275:16 308:1
**calling** 202:25
255:11
**calls** 107:10
**campus** 44:4
**cancer** 49:19
177:8 224:22
239:5 263:19
274:6
**canned** 191:23
192:5
**capable** 346:3
**capacity** 26:16
29:3 45:22 279:5
279:18
**capital** 25:15,19
32:18,20
**capitalism** 335:5
336:3,4,4
**caps** 388:6
**caption** 402:22
**car** 319:2
**caraffi** 7:14
291:18 292:7
293:4 303:25
**cardiac** 48:10
**cardinal** 2:9 18:1
**care** 7:4 40:16
41:11 44:19 48:25
50:15 57:11,11
61:16 67:5,8,24
68:10,12 77:8
93:3 105:7,13
145:1 149:18
183:25 186:9
193:3,11 206:20
214:12 219:6
234:22 235:10,17
236:4 237:4

238:12 239:1,2,18
239:24 246:7
320:19
**career** 38:4 49:2
361:17
**careful** 49:20
157:25 177:3
226:5 269:14
**carefully** 82:8
341:12
**carfentanil** 223:8
266:7,16,17
267:21 268:19
366:19 368:19
369:1,9,10,22
370:7,18,19
**caring** 49:5
**carnival** 101:20
**carol** 315:8,10
**carries** 237:13
**carter** 2:17 5:5
17:21,21 342:9,14
375:23
**case** 1:8,15 17:5,6
20:6,8 25:9,22
26:3,24 27:1,6,15
27:18 31:3,14
32:15,21 44:9
68:16,18 105:22
114:11 145:20
146:18 167:14
173:24 176:21
191:7 203:16
210:5 221:3 223:5
239:5 240:21
269:4 297:18
313:25 339:8
346:9 350:8,13
360:13 361:20,23
362:1,3,11,21
364:20 386:19

397:9 404:6 405:3
406:3
**cases** 24:14 25:9
32:7 40:3,10,11
68:25 188:24
190:20 298:2
346:7 349:2
**catch** 327:12
**categories** 65:25
100:6 104:24
105:4 115:22
283:24 285:22
**category** 41:24
175:9 209:25
218:21 275:1
286:5,20 287:6
337:10 352:12
**caught** 328:7
**cause** 87:22 207:1
261:16 326:14
402:12
**caused** 165:13
223:24 256:22
284:21 361:19
**causes** 87:11 138:8
156:25 164:24
165:3,12 166:3
187:5,7 195:23
226:6 233:16,23
237:8 242:12,19
255:10,16 257:5
314:7
**causing** 352:7
**center** 119:23
120:13 144:18
**centers** 179:21
197:24 371:3
**centre** 3:4
**century** 116:4,10
119:1

**certain** 20:5 75:2
76:7 101:3,4
111:20 112:6
116:11 151:1
153:4 155:10,25
190:14 202:19,20
202:20 245:12
260:9 261:17
296:4 303:1
306:23 338:5
371:12,20 385:22
396:14,15
**certainly** 21:20
33:23 57:8 59:16
65:14 68:25 81:19
82:8 87:1 96:24
101:2,4 102:24
111:19,21 119:9
119:20 122:11
136:17 139:9,13
139:18,21 140:20
141:19 142:12
150:15 153:14
154:7,19 157:7
158:24 160:6
161:1 174:21
180:18 185:4
198:24 212:14
247:23 248:6
258:18 263:18,23
265:21 280:16,22
293:10 312:3
346:3 355:1
362:16 375:18
398:24
**certificate** 5:7
402:1 406:11
**certification**
111:19 290:10,12
405:1 406:1

**certified** 19:5
35:14,18 36:6
111:23 112:2
156:14,17 158:21
**certify** 402:8,20
403:1
**cetera** 267:15
304:4 352:8
374:24
**cfo** 95:9 102:25
111:8 117:11
**chain** 319:11
321:7 387:25
**chains** 292:1
**chair** 56:22 170:25
211:8 309:11
**chairing** 39:9
**chairs** 168:18
**challenges** 354:14
**challenging** 68:13
346:6 375:1
**chance** 219:15
342:13
**change** 56:25,25
85:15 102:16
123:2,5 176:2,3
177:11 217:12,23
221:18 356:16
357:24 379:21
404:14,15 406:8
407:3
**changed** 34:24
81:9 148:17
175:24 178:10
226:4 288:7 370:9
**changes** 128:24
129:7 204:21
214:18 215:8
218:22,23 219:2
225:19 243:8
255:23 259:19

357:18,19,21
398:25 404:13
405:7 406:7,9
**changing** 178:13
219:9
**characterization**
105:17 173:6
242:16
**characterize** 38:8
54:8 356:9
**characterized**
54:12
**charcoal** 339:15
**charge** 27:22
170:23
**charged** 138:7
**chart** 70:14,20
77:25 80:22
195:19 213:3,4
370:9,24
**charts** 67:20 68:6
81:23 213:2 368:9
370:2
**chassin** 198:23
**check** 128:1
194:15
**checklist** 345:13
345:17
**checks** 41:17
69:21
**chemical** 361:5
370:16
**chemicals** 161:17
359:25 360:18
**chemistry** 34:22
358:23 359:6,20
**chicago** 3:19,24
36:4 192:21
371:15
**chief** 55:14,21,24
56:3 78:1 83:17

86:10,23 91:20
122:6,8,14 251:18
333:1 341:17
chiefs 267:15
childbirth 177:9
224:23
children 81:19
children's 168:17
238:23
china 266:25
323:5
chipotle 200:25
chocolate 371:21
choice 356:2
choose 35:20
36:16 356:3,9
choosing 190:15
chore 317:23
chose 195:9
chris 80:4
chrissy 368:1
christina 146:13
242:5
christine 78:12,19
81:2
christopher 78:11
chronic 152:11,12
152:17 225:3
236:13,15 237:4
239:4 240:3,11,14
240:15,19,21,22
240:24 241:2,10
245:21 319:7
354:7
chronological
43:14 292:5
chyna 170:9,13
cigarette 356:22
circulated 74:10
97:2

circumstance
314:15
circumstances
245:9 318:2 355:9
355:12 356:4,5
396:24
cit 27:11 32:22
citation 212:20
293:17
citizens 263:5
city 2:2 17:14,17
17:20
civil 30:8 31:2
32:5 35:12 133:1
401:3,7 405:5
406:5
claim 41:4
claims 67:22 82:5
82:19,25 83:3,5
88:6 121:19
376:15 399:4
clarification
342:21
clarifications
352:10
clarified 134:11
134:15
clarify 134:14
clark 78:11 79:3
80:4
class 24:16 34:23
49:8
classes 49:15,17
clear 83:4 112:22
138:18 260:2
263:24 290:23
326:12 337:20
339:16 351:10
386:9,10 394:18
clearance 48:7

clearly 182:8
189:7,23 204:16
250:17 324:15
cleveland 3:14
47:8 48:22 72:16
148:16,19 151:21
211:1 238:5
303:21 317:13
403:7 404:2
clients 185:15
clinic 36:21 54:3
54:13 72:16
148:16,19 182:16
211:1 317:14
391:5
clinical 6:5 24:3,4
38:5,10 44:21
55:15,21,24 56:3
58:25 59:9 66:22
67:7 76:13 78:1
86:10,23 90:16
91:20 95:14 103:1
108:17 109:7
110:14,16,22
122:15 136:18,18
142:2 157:18
164:6 183:4
188:17 192:9
199:16 200:5
212:5 213:18
216:20 219:16
240:25 243:9
251:18 255:23
257:20 327:16
332:25 333:2
341:17 345:19,23
346:2,10 347:1,14
347:15 349:2,22
clinically 67:13,21
122:19 183:8
195:12 344:24

clinician 313:1
343:13
clinicians 67:2
204:22 214:19
218:24 219:3,13
343:9 344:15
345:12
clinics 48:21 52:10
52:12,16 184:24
185:12 319:25
320:4,6,13 391:7
clip 223:9
clock 221:20
close 328:11 373:1
closed 341:19
399:25
closely 80:14
closer 106:7,8
cmes 393:12
cms 187:14 192:22
198:1,8,11,13
212:18 214:4
coach 98:12,18
249:17
coaching 98:7,20
cocaine 113:2
161:22 337:9,13
337:16,21,22,24
353:21
cochairs 168:16
code 55:25 59:24
59:25 149:9,10
199:3 244:20
245:23
codes 52:9
coercive 356:5,7
cogently 125:10
cognitive 79:21
coli 200:25
collaborative
56:15

colleague 133:13
217:22
colleagues 39:12
184:18 377:21
collect 172:21
collected 366:4
collecting 138:16
collection 343:7
college 34:1
columbia 201:8
columbus 2:19
252:14
column 238:14
columns 337:9
combat 216:17
combatting
215:11 219:1
combination
37:24
combined 106:21
115:23
come 39:22 41:18
44:13 45:2 48:6
48:14 52:12 57:1
65:15 66:9 76:10
76:23 77:21 81:14
81:20 85:24 89:3
94:11,18,20
100:10 102:6
111:10 128:17
162:13 169:1,12
169:22 170:15
171:4 172:20
179:2,14 199:2
215:22 217:12,14
226:17 241:8
253:12 263:19
276:11 279:13
282:21 299:3
314:8 325:21
366:15,19 382:16

383:23 397:10
399:1
comes 126:5
161:21 198:11
216:25 223:3
226:18 233:16
264:2,20 337:23
353:20 354:2
384:13
coming 51:16,21
52:10 56:2 88:1
161:8,25 162:1,5
179:6 183:2
192:19 209:8
266:25 268:2
322:9,10 323:4,5
325:14 334:8
360:10 385:10
comments 129:20
311:12 363:16
368:11
commercials
379:23
commission
178:17,22,24
179:17,18 180:7,8
180:22 181:3,5
184:25 185:24
186:22 187:12,16
192:22 197:10,21
198:2,9,10,17
199:7,12 200:1
211:24 212:18
214:4,24 216:21
225:22 389:21,24
390:10,12,17,20
390:25 391:4,10
403:17 405:19
406:25 407:25
commissioned
235:16 402:8

commitment 30:9
31:2 32:5
committee 76:4,7
76:16,22 77:20
92:15 308:9,10,15
308:18 309:1
312:9
committees 39:9
84:24 277:22
308:14 309:4
common 161:4
163:8
commonly 42:20
50:2 76:8,15
178:3 271:17
300:19
communicate
252:23 343:8
communicated
267:8
communities
267:4
community 45:14
71:12 80:15 87:13
119:23 120:17
146:5 150:11
151:24 156:21
166:11 168:4,9
171:19 172:4
186:15 201:24
211:7 290:8
308:21 373:7
comp 40:11
320:10
companies 4:3
173:18 340:16,17
340:18
company 41:16,17
41:19 362:15
376:25

compared 60:16
189:6 201:10
261:18 357:5
360:7
compassionate 7:4
234:21 235:10,17
236:4 237:4
238:12
compassionately
239:7
compelled 212:11
311:4 357:13
358:11
compelling 263:20
compensated
41:12,13
compensation
40:3 41:5
competency 45:17
46:1
competent 45:8,9
complain 325:22
complaining 214:1
272:11
complaint 20:7,13
20:18 75:19 341:9
completed 43:19
43:20 251:11
402:23 404:16
completely 259:18
274:19
complexity 257:6
complicated
157:11 289:19,20
290:14,19,20
291:2,5,8
complication
290:9
complications
290:5

comply  180:9
197:15 391:9
complying  197:12
component  150:18
186:6
composite  8:3
372:10,18
compound  263:10
263:15
comprehensive
112:23 113:6
209:24 273:25
compromise  48:9
computer  75:16
concept  175:15
181:7 308:3 341:1
concern  48:9
143:16 213:18,19
216:21 310:10
311:8,22
concerned  311:14
316:10 390:8
concerns  234:10
244:13 267:10
conclude  52:3
concluded  400:6
conclusion  164:10
301:8
conclusions
166:10,11 172:25
173:1 255:10
256:22,24 300:3
301:14,17 324:2
386:8
concrete  101:6
condescending
254:12
condition  40:19
41:9,10 354:15
conditional  45:15
80:11

conditioning
359:1
conditions  198:4
374:4
conduct  58:7
135:13 280:13
288:21 341:18
388:5 394:25
conducted  202:7
conference  68:16
130:20,24 131:16
131:19,21 132:1,6
132:12,15,20
133:14,17 134:19
134:20,21,24
135:3 136:21
137:6,14,18
138:21 139:19
140:18,20 142:17
142:20 144:12
145:5,7,10,15,18
145:21 146:4,25
147:16 149:22
159:10 204:12
210:11 238:7
242:7 252:13,15
277:10 278:22
330:14
conferences
131:23 136:18
137:25 138:20
142:24 143:19
159:7 213:23
confirm  271:4
confirming  165:25
confirms  305:3
conflict  73:18
confusing  23:11
connected  89:25
179:21

connection  63:5
75:13 109:4
150:12 222:7
391:22
connolly  2:10 18:1
conscious  358:13
consequences
348:16 352:7
354:17
consider  364:6
386:11 397:6
considered  23:22
considers  231:4
consistent  333:16
constant  384:13
constraint  331:20
consult  72:9
consultant  42:13
consumer  174:1,4
174:10 205:20
209:1 256:6
380:21
consumers  185:15
consumption
232:4
contemplated
265:11
content  34:24
139:17 172:3
contents  20:10
context  45:3 51:1
312:19 313:20
contexts  25:3
continuation
127:4 316:18
continue  48:25
268:21 396:14
continued  3:1 4:1
324:18
continues  211:15
372:19

continuing  219:11
224:25 352:5
392:25 393:13
continuum  57:11
contours  248:11
contract  104:25
105:8,14 107:14
109:23 111:15
112:7,13 115:14
223:2
contracted  108:1
119:13
contracting  104:4
121:12
contractors  67:17
68:23 94:4 111:3
111:4 119:15
contracts  66:5
107:16,21 108:9
109:6 112:16
115:18 118:21
119:16
contribute  388:9
contributed  79:7
341:20
contributing
243:6
contributor
209:20
contributors
243:15
control  176:14
374:16,21 375:1
controlled  43:3
149:7 229:10
230:6,12 231:17
232:13 243:21
244:8 273:8,9
281:12 330:8
controls  304:20

conversation
94:19 133:1
316:18,23 349:3
conversations
88:2 92:9 94:9
299:19
convince 226:24
coordinate 170:16
coordinator 80:5
81:2
copies 147:3
222:10 366:15
copy 28:9 75:17
cord 302:23
corner 28:13,22
114:18 242:25
316:17
corollary 224:2
corporation 3:7
4:9 18:22
correct 23:11,15
26:8 29:3,4,16
34:2,12,13,17,18
35:15,16 38:13,14
38:22 42:14 43:16
43:17,21 46:17
54:23,24 55:16,17
64:21,23 65:13
66:19 70:21 74:1
78:9,23 82:20
84:2 85:21 100:3
100:12,20 104:5
104:21,22 106:11
106:14 108:7
109:20,25 110:3
112:25 113:1,4
125:16,17,24
126:8 129:8
130:12,18 134:1
136:13 141:2
143:3,5 145:11

148:3 152:18
153:24 154:1,20
157:17 158:13,14
159:15 164:17
165:6,9,17 166:5
167:24 171:23
174:6,15 180:24
190:1,21 192:14
193:22 194:3
195:1 202:5
204:13,14 205:11
211:16 221:12
224:8 229:21
239:14 242:9
253:17 258:23
259:9 264:6 265:5
265:16 266:5,17
269:19 270:10
271:15 276:3,24
277:5 279:3 287:5
289:17 307:2
311:7 319:21,22
319:23 320:5
321:9 322:4
327:18 333:22
334:12 343:18,19
343:22,25 344:3,4
344:7,13,14,18
345:2,3,8,9,14,19
345:20,23 346:20
346:24,25 347:9
347:10,16,24
348:2,18,24 351:3
351:4,17 352:12
352:13,17,18,23
352:24 353:2,3,5,6
353:14 354:3,20
354:25 355:6
356:13,22 357:4
357:10,15,22
358:20,21 359:3,4

359:11 360:1,11
360:14 361:3,6
365:14,15,19
366:7 370:25
371:3,10,11
372:23 373:20,21
373:24,25 374:9
374:12,16,21
375:6,17,22
377:11,16 381:10
384:19 385:4
387:5,22 389:10
391:1,3 397:7,22
402:17
corrected 103:25
correction 40:25
332:14
corrections 404:13
406:17
correctly 42:13
85:16 100:15
130:17 143:9
148:10 158:2
194:2 204:24
210:15 239:25
271:14 284:8
310:4 311:19
374:8
corresponding
252:24
cost 122:12 124:4
124:14 125:5
126:6
costly 236:16
237:5
costs 83:8 124:23
126:1
couched 273:4
cough 269:5
council 89:18 90:4
90:25 91:5

counsel 2:9 17:10
32:16 98:21
133:12,18,24
134:6 283:3 285:9
292:8 375:25
400:1 401:1,10
403:2
count 22:5
counterpart 76:12
counties 85:4
countries 173:17
174:7 262:18
263:3
country 27:4
36:22 37:22 189:6
189:7 206:14
261:11,12 262:24
272:1 337:18
county 1:12 2:3
6:8,21 17:13,16,19
19:25 21:8,25
22:7,8,11,17,18,20
22:23 23:10,21,22
24:20 27:3 28:15
38:9 51:9,9,13,17
51:25 52:16 53:3
53:4,5,16,19 54:6
54:21 55:6,11,15
56:8,13 57:5,24
58:2,13,20 59:10
60:9,19 61:1,5
62:1,4,8 63:5
64:15 66:1,13,18
66:21 70:2,8 71:8
72:2 76:8,21
80:11 82:10 83:8
84:20 85:17,23
86:10,13 87:18
88:10,16,20,21,25
89:1,2,3,5,7,9,10
89:10,17,25,25

90:13,17,21,25
91:2,5,10,13 93:25
94:6 97:12 100:11
100:14,18 101:21
103:20,22,23
104:2 105:13,23
108:5 109:17
115:19 116:16,19
117:23 119:8
120:17,22 122:13
122:16 124:9,13
124:14,21,24,25
125:9,12 126:1,7
128:20 131:24
133:20,24 134:10
136:16 139:3,7,12
139:21 140:12
142:2 143:3,12,21
145:25 147:23
148:6 150:9
164:23,25 166:1,4
166:12,18 167:2,5
167:14,22,23
168:1 171:17
172:5,25 173:15
176:13 195:8,24
196:21 207:13,24
207:25 221:8
233:7,22 234:10
234:16 251:19,20
251:24 252:2,5,6
252:15,16,19,20
252:23,25 256:24
265:8 266:14
267:3,6,11,17
277:17,24 278:2
278:11 279:19
292:17 293:6,22
294:10,17,18,21
295:9,11,13,14
299:5,8,11,15,20

301:9,10,13,16
316:13 320:1,11
320:12 327:5
333:2 341:16,21
346:18,24 349:2,5
349:13 361:18
362:8,25 363:7
364:1 369:19,22
373:6 382:13,20
383:21 384:6,21
385:7 402:4
405:10 406:15
**county's** 112:24
279:6
**couple** 41:7 71:12
96:11 108:14
295:22 299:3
369:21 378:8
385:15 394:3
**course** 38:4 39:11
49:2 51:12 75:4
100:17 101:18
103:3 163:21
183:20 184:3
206:4 230:21
231:8 232:12
242:24 345:10
349:22 359:8
361:17 362:6
396:7
**court** 1:1 5:8 17:8
29:23 30:8 31:3
32:1,10 33:6,9
36:21,25 46:11
80:7 195:6 199:21
284:22 356:7
405:7
**courts** 45:12
**cov.com** 3:10
**cover** 114:14
247:22,22 372:21

**covered** 82:15
342:17
**covers** 73:20
**covington** 3:8
18:24
**crack** 337:22
**craig** 6:25 21:2
23:2 52:7 72:20
75:3 82:7 83:15
89:6,14 95:8
102:25 103:12
108:15 112:17
117:10 121:25
123:25 170:24
219:24 220:7
316:15,19,21,25
319:12,18 320:15
**cravings** 352:25
353:1
**create** 116:10
144:21 145:5
169:9 311:1,4
385:5
**created** 40:2 65:5
79:12 181:3,4
211:25 215:24,25
299:11 372:2
392:11
**creates** 81:23
**creating** 236:3
**creation** 238:9
239:13
**crime** 25:19
**criminal** 35:12
46:11 99:19
120:11 168:20
169:16,23 313:25
**cringed** 203:5
**crisis** 27:2 57:13
122:13 384:25

**criteria** 344:20
345:1,11 346:13
347:19 352:17,22
353:2,5
**critical** 233:5
**cronos** 89:1
**crooked** 246:22
**cross** 67:5
**cs** 197:24
**curb** 251:13
**cure** 69:18
**cured** 225:11
**cures** 85:2 116:4
116:10 119:1
**curiosity** 331:12
331:18,23
**curious** 331:17
**current** 28:17
87:19 343:23
360:2 379:11
**curriculum** 6:2
28:4,10
**curve** 154:6
**custodial** 292:14
**custody** 5:8
**customer** 185:12
335:15
**customers** 185:15
**cut** 33:24 184:14
340:1
**cutoff** 201:5
**cuts** 60:14
**cutting** 180:2
396:19
**cuyahoga** 139:7
252:16 253:1
293:5,22 295:9,13
402:4
**cv** 27:24 28:18
30:4 33:1 41:20
43:9 47:5 56:4,5

**cvs** 340:24
**cycle** 198:16

**d**

**d** 19:18 170:14
**dae** 228:12
**dahmer** 37:7
**daily** 315:17
**damaging** 217:20
**dan** 1:9
**dana** 168:17
**danger** 212:22
**dangerous** 208:16
303:3 323:6,7
365:18
**dare** 121:2
**darrington** 170:9
170:13
**dash** 116:23
**dashboard** 171:3
**data** 7:22,24 62:22
65:4,8 76:8,14
77:1 81:22,22,25
88:6 108:24 109:4
121:19 131:25
132:11 133:16
135:1 164:9 171:2
200:23 231:4
232:7 258:11
282:23 294:3,9,10
294:13 295:6
298:7 299:5 300:6
306:4 332:2,10
333:5 338:13,21
368:7,8 369:6,20
369:24 383:14
384:21 386:8,24
387:2 398:15,22
**database** 135:21
147:25 148:11,20
149:12 150:11,22
151:10 216:9

329:25
**date** 17:2 84:13
138:1 149:9
235:20 277:15,15
283:3 296:21
368:14 369:11,15
401:11 404:8
405:3,9,19 406:3
406:13,25 407:20
407:25
**dated** 368:11
**dates** 175:19 325:8
**dawn** 120:25
**day** 2:17,21 39:20
136:7 148:9 151:2
152:2,2,6 304:21
320:11 325:17,18
325:21 375:13
403:7 405:16
406:22 407:22
**days** 20:20 48:18
77:16 136:11
139:19 149:17
296:9,12,13 297:2
299:3 315:6
317:21 318:5
320:10 325:24
354:10 360:11,14
404:19
**dc** 2:13 24:13
34:10
**de** 184:8
**dea** 7:2 220:16
228:18 229:5,9,15
229:19,20 231:1,4
231:8,12,22
232:16 233:1,5
245:6,11
**dea's** 232:12
**deadly** 207:4
268:18

**deal** 22:3 58:10
60:5 186:12
194:10 225:7,16
334:18 354:16
**dealer** 271:19
288:10 335:4,20
335:23 336:2,4
**dealers** 268:20
335:7,13
**dealing** 82:12
225:4 374:18
**deals** 370:16,17
**dear** 404:10
**death** 76:15
295:20 297:13
313:3 361:19
362:25
**deaths** 64:21,25
76:9 82:12 85:7
138:19 167:19
201:4 203:2,17
205:6,11 317:10
324:13 336:9,12
336:17,22 337:12
339:4,5
**debilitating**
186:19
**decade** 57:2
379:20 380:4
381:8
**decades** 188:24
302:13
**deceased** 359:10
359:15
**deceived** 274:20
**december** 8:5
73:20,21 138:24
236:3 387:10
**deception** 256:15
**decide** 56:7 103:4
121:20

**decided** 37:12
56:24 79:8,10
185:18 206:12
230:7
**deciding** 229:20
**decision** 24:18
57:23 102:19
158:8 174:13
195:10 230:11
257:20 258:13
263:23 349:24
355:5 358:14
375:14,19
**decisionmaking**
109:5
**decisions** 109:13
258:4,25 350:6
**deck** 7:6 222:6
241:21 242:5,11
242:23 246:1
370:6
**declined** 336:12
**declining** 336:16
**decrease** 167:19
214:25 215:1
216:7 219:5
231:18 328:4
393:1,8
**decreased** 301:19
324:7 325:2 327:7
328:2 339:24
393:19
**decree** 91:9
**dedicate** 171:12
**deed** 405:14
406:20
**deemed** 404:20
**deep** 355:22
**defendant** 3:7
32:23 46:12,21,23
362:21

**defendants**  2:10
   18:5,12 350:8,12
   362:11,21 363:2
   376:13,16,22
**defending**  25:18
   32:19
**defense**  25:15 26:4
   26:14 32:18
   341:11
**define**  65:25
   156:11 165:20
   351:20 363:20
**defined**  111:16
   201:25 202:22
   351:16
**defines**  55:24 60:1
**definitely**  101:13
   125:20 179:14
   209:12 260:10
   348:10
**definition**  54:9
   200:18 203:15
   268:11 340:7
   351:5,12 361:10
   390:3
**degree**  396:6,24
   397:10
**delivered**  145:9
**delivery**  341:2
   401:9,11
**delos**  146:13
   159:24 242:6
   244:1 246:1,2
**demographic**
   124:5
**demonstrate**
   371:11
**demonstrates**
   374:25
**dental**  325:24

**dentist**  325:23
**dentists**  272:13
**department**  7:11
   7:21,23,25 61:1,5
   65:4 71:2 83:22
   83:25 84:9,10,14
   84:21 85:19
   116:15 211:9
   241:3 281:25
   282:6 322:16,22
   323:18 326:20
   332:3,10 338:14
   338:21 384:7,7,8
   404:22
**departments**
   22:16 84:6,7
   137:4 210:25
   272:10 325:14
   326:17
**depending**  184:2
   240:7 290:25
**depends**  77:1
   89:11 156:11
   240:13 306:9
**depict**  336:16
   373:10
**depiction**  255:16
**deposed**  19:5
**deposition**  1:18
   17:5 19:23 24:22
   25:1,4 26:7,20
   28:1,3 32:7 58:24
   59:8 70:1 123:14
   123:21 126:22
   129:10,17 131:4
   135:14 143:24
   166:17 167:1
   203:23 219:22
   228:17 229:5
   234:20 241:20
   247:3,14 282:4

291:17 307:7
   314:21 322:14
   332:1,9 338:12
   367:1 372:9
   376:10 387:9
   391:14 399:24
   400:6 402:21
   404:8,12 405:1,3
   406:1,3
**depression**  193:12
**depressive**  40:21
   343:12
**deprive**  355:10
**deputy**  27:7
**derive**  306:5
**describe**  94:17
   107:15 110:4
   113:23 173:13
   176:25 378:18
**described**  57:4
   94:2 125:15
   133:14 141:21
   159:9 211:23
   351:1 353:8 371:7
**describes**  59:18
   187:6 226:22
   317:2 323:14
**describing**  65:20
   363:16
**description**  6:1
**deserve**  209:3
**designed**  185:24
   245:14 273:2
   278:14 304:12
   365:4 371:5
**despair**  355:23
**desperation**
   315:25
**despite**  348:20
   352:5,6 353:4

**destruction**
   355:23
**detail**  31:23 98:3
   110:5 152:21
   153:1 207:20
   211:23 214:13
   317:3 343:10
   377:5
**detailed**  377:8
**details**  27:10
   321:3 349:3
**determination**
   23:17,19 164:3
   277:2
**determinations**
   299:24 362:24
**determine**  21:7,24
   67:3 102:14
   107:23 158:11
   164:6 201:4,6
   202:8 203:14
   222:25 294:19
   301:11 306:16
   321:20 385:6
**determined**  54:20
   157:6 167:10
**deterra**  120:20
   339:15
**detouring**  137:12
**detox**  93:16,23
   120:13 144:18
   374:24
**detoxed**  225:11
**develop**  154:8,10
**developed**  146:24
   147:15 156:7
   251:12 289:7
   385:2
**development**
   232:9 263:10

deviate 191:18
devoted 121:7
dewine 137:10,11
dfapa 1:19 5:4
19:2,7 39:1 342:8
376:6 385:12
402:10 404:8
405:4,9 406:4,13
407:20
diagnosable 162:2
diagnose 346:1
347:6
diagnosed 346:17
346:23
diagnoses 343:6
diagnosis 259:3
343:15 344:10
347:9 351:23
diagnostic 343:2
dictate 183:13
die 239:4
died 177:24 189:4
269:13 361:18
362:3,8
dieing 202:19
324:12
differ 260:10
difference 55:20
55:23 105:3,19
163:7 191:5 261:2
different 85:13
162:4 165:25
191:13 193:10
203:9 208:18,22
227:5 260:14
283:21,24 285:19
285:21 294:17
296:2 313:22,22
344:6 353:8
371:13

differently 155:19
189:9 302:5,21
difficult 167:11
279:12 328:5
difficulty 313:13
difrangia 148:9,13
diminished 315:18
direct 40:16 41:11
44:19 47:2 49:5
66:4 70:12 105:13
115:12 118:4
174:1,4,10,16
196:25 205:20
209:1 230:17
239:16 256:6
283:13 380:21
directed 105:16,24
106:10 107:13
121:12 361:22
directing 394:11
direction 48:3
176:14 281:9
318:20
directly 22:17,18
39:21 46:18 47:19
49:5 50:16 66:17
66:25 75:25 84:8
89:7 90:1,24 91:1
152:8 173:19
227:23 257:23
287:12,25 346:7
381:25 382:5
383:20
director 21:2 22:2
22:10,22 23:3
30:6 47:6,20 48:4
50:9 52:5 55:19
55:22 56:1 66:21
73:2,9 74:7 75:4
83:16 85:10,11,11
85:12 86:23 91:21

92:22 95:7,8
108:5 110:10,15
112:18 117:10
119:7 122:6,15
136:16 137:3,3
139:2,20 142:2
146:17 198:23
238:25 251:18
267:18 279:6,19
307:21 333:1,1
341:18
directors 20:25
21:10 23:10,14
70:9,17,23 71:16
71:19 72:2,18,21
73:3,7 74:22 76:1
82:7 84:7 88:25
95:23 96:3 103:3
107:20 110:9,25
220:25 221:5,9,23
222:3,18,23
224:10
disabling 236:16
237:5 240:22
disagree 174:9
176:17 180:10
190:6 237:3,9
269:22 291:3
357:17
disagreeing
289:16
disappoint 160:19
disappointed
398:6
discharges 77:6
discount 397:25
discounted 397:23
discouraged
315:19
discouraging
259:14

discover 200:25
discovery 147:19
191:12 252:3
discretion 50:15
240:8 257:12
258:6 310:12
312:11 314:14
discuss 69:2
108:13 110:17
308:2
discussed 109:10
204:13 207:8,19
207:19 208:1,8
252:7 277:9
discussing 62:15
102:24 210:10
225:24 308:22
discussion 23:5
86:19 117:13
158:11 239:17
324:12 344:22
394:3
discussions 50:23
76:14 84:24 88:8
96:22 120:4
187:13 192:20
311:17 313:21
314:7
disease 156:3
161:16 162:9,16
217:19 225:12
267:25 270:15
274:25 276:4,17
287:15 335:16
dishonest 189:17
disingenuous
189:18
dismal 386:7
disorder 40:21,21
82:6 113:13,14
119:21 120:5

162:2 164:12
268:1 344:5,12,18
344:21 345:12
346:1,13,19,22
347:7,13 351:15
352:11,23
**disorderly** 58:6
**disorders** 83:6
121:15 344:3,6
351:16
**dispensed** 232:5
265:22 324:15
340:23 362:10
**dispensing** 349:19
**displayed** 371:24
**disposal** 99:11
259:23
**disproved** 398:22
**dispute** 288:4
**disruption** 352:21
**dissatisfied** 184:5
**distinction** 140:10
260:2
**distinctions** 73:5
**distinguish** 159:16
**distinguished** 39:4
151:15
**distress** 344:24
**distribute** 120:25
**distributed** 340:17
340:19 362:9
392:11
**distribution** 293:9
**distributor** 2:9 3:7
4:8 341:2 349:25
**distributors** 341:6
341:19
**district** 1:2 17:8,8
**diversion** 58:3
91:12 210:1,2,3
232:21 256:14

**diverted** 260:21
260:25 333:9,13
334:6,6 363:6
**divide** 106:25
**diving** 302:23
**division** 1:3 17:9
**docs** 311:15
**doctor** 54:14
132:24 137:2
149:3,18 150:1
151:4,5 153:19
158:10 159:16,18
184:13 191:13
198:15,22 213:8
213:16 220:11
233:25 236:19
246:25 258:1,4
268:5 270:6 272:1
272:6,9 273:1,14
273:20 275:17,20
275:22,24,24
276:14,19,22
277:3 280:12,14
284:3,5 285:15
287:7,13 288:1
290:21 303:14
304:22 310:13
317:16,19 326:5
327:16,23 328:1,4
328:8,16 329:17
330:25 340:2
342:10 349:8
376:8 385:9
388:17 394:16
395:18
**doctor's** 312:13
314:14 348:22
**doctors** 48:19,25
51:11 71:15 72:3
146:3,9 150:8
159:9 186:10

190:18 193:3
206:3 212:7,11
213:11 216:5
226:20 245:12
257:11 265:20
272:12 275:25
276:25 280:6
311:2,4,23 314:11
317:9 325:24
330:15,17,18,19
393:16,20
**document** 1:11
6:20 7:11 28:14
59:6,11 63:14
64:5,5 65:16
69:23 70:13 98:15
104:15 106:13
115:13 127:3
129:16 131:9
135:7,8,11 144:9
144:10 166:18,25
167:2 169:20
170:2 171:14
172:1,18,24
180:25 182:4
187:6 196:17
200:9,13 207:8,10
220:4 228:23
229:25 230:24
235:8,9,11,21
236:20,20 238:11
239:13 242:4
243:17 247:13
248:19 249:3,12
250:23 254:2,10
255:1 256:21
281:24 282:5,10
283:9 284:2,8
285:7 332:7,23
336:6 338:23
387:15

**documents** 62:18
164:21 222:14
252:11 254:14
363:10
**dod** 240:25
**doing** 45:16,16
49:3 63:22 79:23
91:8 103:2 108:22
109:1,8 110:19
132:22 140:4
142:12,16 163:6
183:7 184:21
185:17 193:2
209:11 232:24
276:8 277:22
313:17 369:24
385:17 386:4
**dollar** 122:18
**dollars** 66:8,10
67:3,10 69:7
85:18,23 99:25
100:14,24 102:6
102:12,13,20
105:7 106:4
107:24 115:2,5,9
116:12 126:6
**donna** 92:21 220:7
**door** 339:22
**doors** 218:4
**dopamine** 358:25
359:16
**dope** 295:5
**dosage** 328:23
**dosages** 149:14
328:21
**dose** 154:6 155:25
184:7 329:10
360:19 361:4
**doses** 324:8 331:5
362:4

**double** 184:7
**doubt** 141:7
  187:12 188:1
  189:22 237:8
  270:19 304:17
**doug** 17:5 42:6
  78:1
**douglas** 1:19 5:4
  6:2 19:2,7,17 28:4
  342:8 376:6
  385:12 402:9
  404:8 405:4,9
  406:4,13 407:20
**downgrade** 183:6
**downtown** 47:8
**dr** 8:2 19:9 28:9
  53:14 56:19 64:12
  72:6,7 79:4,13
  81:3 86:8 93:16
  93:21,21 107:15
  115:13 130:19
  133:4 134:23
  136:6,24,25
  144:17 145:8,9,13
  145:24 146:12,13
  148:1,13 151:16
  151:17 152:3
  153:2,5 159:24
  160:20 164:21
  166:25 168:15
  184:6,13 188:13
  196:12 201:8
  203:5 204:5
  206:10 210:23
  211:10,18 213:3,4
  213:5,6 220:7,10
  226:22 227:17
  228:22 238:2,18
  242:3,5 244:1
  246:1,2 247:20
  248:15 254:20,21

254:21,24 275:13
285:17 292:9
293:18,20,22
294:1 295:1,17
297:11 299:22
300:2 303:22
309:9,10,17,24
332:7 362:16
364:14 365:1,21
367:2 381:23
382:1 383:4,8
385:14 386:4,15
386:19 388:3,13
388:15 389:17
390:6 392:1
394:17,21,24
397:2,15 399:25
**draft** 124:4,8
  310:10 391:21
  392:3 397:5
**drafted** 308:5
**drafts** 389:2
**draw** 58:9 114:13
**drawn** 168:9
**dreamland** 226:21
  227:14,16 228:1
  233:11 234:15
  383:11,15,18
**drinking** 356:23
**drive** 3:23 76:19
  147:18 355:20,20
  358:16
**driven** 108:24
  239:22 270:16,17
  276:4 289:9
  290:17 358:4,16
**driver** 243:13
**drivers** 358:8
**driving** 52:11
  137:6

**drop** 324:17,18
**dropped** 300:21
  328:10,14 339:11
  339:12
**dropping** 336:23
**drops** 337:25
**drug** 4:9 6:18 7:9
  7:12,22,24 18:21
  20:1 60:9,19
  65:21 66:14 77:8
  84:10 86:25
  101:14 106:5,18
  106:20 107:1
  112:22,24 113:10
  115:23 144:1,13
  146:8 198:2 206:9
  206:25 207:2
  230:8 244:20
  247:5,16 250:18
  251:13 252:22
  261:8 262:2,13,23
  268:20 274:8
  282:1,6 286:12
  288:10,22 318:3,3
  318:11,15 322:25
  331:1 332:2,9
  333:11 334:10,14
  335:4,7,13,19,23
  336:2,4 338:13,20
  340:23 341:2
  356:7 374:3
**drugs** 112:25
  121:4 149:20
  162:15 163:22
  184:11 208:10
  209:2 260:16
  263:17,18 265:15
  265:19 266:2,11
  268:13 281:20
  296:6 319:2
  333:12 337:19

339:6 379:19
**dsm** 343:4,24
  344:1,7,9,16 345:1
  345:22,25 346:12
  347:14 351:16,23
  352:12 353:2,5,9
**dual** 112:1
**due** 25:7 240:15
**duly** 19:4 402:7,10
**dump** 339:17,20
**duties** 74:22 75:2
  86:21 91:6 332:25
**dying** 61:19,22
  202:16 239:3
  312:24 313:3,14

---

e

---

**e** 2:4 174:24,24
  200:25
**earlier** 26:21
  32:11 62:18 83:20
  109:15 130:10,13
  134:5 142:14
  178:4 193:16
  194:7 200:17
  204:13 213:14
  256:11 266:6
  269:17 270:8
  277:15,17 296:19
  321:25 323:4
  333:17 338:2
  347:20 368:6
  369:21 371:7
  377:17 387:21
**early** 21:6,15
  34:21 61:11 62:24
  73:20 75:24
  139:12 141:13
  144:23 167:8
**earmarked** 100:22
  101:23

easier  329:16
easily  326:1
eastern  1:3 17:9
eat  358:15
economics  335:24
ed  342:14
edition  343:23
educate  80:9
  144:20,25 219:8
  223:3 226:23
  279:25
educated  37:20
  219:14 261:21
  324:14
educating  36:14
education  33:1
  35:21 80:10
  138:23 218:3
  244:4 258:10
  324:20 325:11
  326:25 393:1,13
educational  150:7
  206:16
eduction  325:6
edward  2:17 17:21
edwin  119:24
  148:15
effect  163:19
  180:15,17 198:7
  209:13 216:17
  226:24 261:17
  279:21 312:20
  329:6 348:10
  358:2
effective  261:7
  262:5 264:4,11
  328:19 329:20
effectively  209:4
  327:11,14 343:9
effects  364:2
  379:24

efficient  84:16
effort  142:8
  143:18 194:21
efforts  138:4
  165:11,12 195:21
  253:11 323:23
eight  71:1 361:1,2
  361:3
eileen  309:18,21
  311:12
either  41:8 46:19
  66:14 80:17
  117:10 162:10
  171:1 206:18
  210:5 213:9
  257:18 259:12
  268:12 279:5,17
  281:9,9 318:20
  341:25 347:1
  352:1 373:13
  403:2
elbow  240:19
elect  137:11
electronic  75:16
elephant  266:18
elevation  175:22
eleven  73:12
eliminate  313:15
ellington  78:10
  79:3,4,13 81:3
ellis  3:12,18 18:14
  138:12
else's  280:20
  335:11
email  6:9,12,14,23
  6:25 7:13,16,18
  8:5 97:8 123:15
  123:23,25 124:4
  124:18 125:23
  126:23 127:5
  129:11 203:24

204:5,7,10 211:3
214:14 218:21
219:23 220:5
221:7 224:13
228:11 229:13
231:7,12 278:20
278:25 291:18
292:1,1,2,6 293:12
293:24 294:14,15
303:12,25 307:8
307:13 309:18,25
314:22 315:3,3,7
316:2,20,22
319:12 321:7
387:10,16,19,24
387:25 389:2,12
395:9 404:17
emailed  74:16
emails  293:10
  294:11 319:2
embedded  368:11
emcarter  2:20
emergency  210:25
  211:12 215:25
  272:10 325:13
  326:17
emphasize  192:19
employ  261:22
employees  72:17
  89:2 221:2,8
employing  197:13
enables  345:21
enacted  236:3
enclosed  404:12
encompassed
  238:10 299:4
encouraging
  257:18 364:17
ended  25:21 160:4
  205:18 330:24
  396:19

endo  4:2,2 18:19
endorsed  301:2
ends  28:22 75:7
  104:15 110:21
  243:3 394:7
endure  315:21
enduser  173:19
enforcement
  121:3 168:22
  267:9 313:10
  355:25
engage  280:14
england  142:14
enhance  138:23
enjoyed  37:8
enlightening  169:3
enrollment  330:23
ensuing  360:6
ensure  74:23
  87:10 109:17
  232:19
ensuring  67:15
  186:18
entered  35:1 406:9
entertained  57:3
entire  82:4 84:5
  111:8 173:17
  297:12 344:2
  405:5 406:5
entirely  66:12
entities  60:1,18
  103:25 104:3
  111:4 115:17
  119:7 121:6 138:7
  185:22 186:15
  391:8
entitled  6:17 7:6
  115:14 137:6
  143:25 144:12
  152:16 235:10
  241:21

**entity** 43:15 52:15
66:7 83:20 85:19
90:13 107:24
112:5,14 167:22
168:4 176:13
179:19 377:6
**enumerate** 390:13
**environment**
199:3,5 379:11
**epidemic** 7:6 20:4
60:25 61:9 102:10
106:3,6 112:1
116:13,24 117:14
119:2 120:20
125:10 130:15
140:11,13 141:2
141:22 143:2
165:5,15,17,20
166:3 167:12
171:18 173:2
174:11 180:14
195:23 200:13,19
201:2,7,11,13,16
201:23 202:10,13
202:14,15,17,23
203:1,7,16 204:16
205:1,2,4,7,8,14
205:18 207:24
209:21 214:15
215:12 216:17
217:17 219:1
221:14,24 223:6
223:15,24 224:5
224:25 225:1,15
233:6,16 234:9
241:22 242:21,22
243:13 248:12,25
249:9 250:6,15,20
251:14 252:4
255:5,11 256:23
267:10 268:9

279:9 282:13
303:9 335:8
341:21 384:25
**epidemics** 165:21
201:11
**epidemiological**
200:18 384:17,21
**epidemiologist**
202:5 234:4
**epidemiologists**
165:19 200:22
**epidemiology**
262:3
**episode** 343:12
**equally** 181:10
**equation** 321:11
321:12,14 325:10
**er** 216:3
**eric** 81:21 171:1
368:3,5,6 370:1
**errata** 404:14,19
406:7,10,18 407:1
**erroneous** 216:22
**escapes** 396:7
**especially** 379:11
**esq** 2:4,4,5,11,11
2:12,17,21 3:3,8
3:13,13,18,23 4:5
4:10
**establish** 232:18
**established** 248:24
**establishes** 199:8
**establishing**
199:12 200:1
231:23
**estate** 66:9
**estimate** 107:3
368:17
**estimates** 125:25
232:1 299:13

**et** 1:12,14 267:15
304:4 352:8
374:24
**ethics** 190:16
**europe** 262:24
**evaluate** 32:24
67:6 321:17
**evaluated** 380:18
**evaluating** 60:7
**evaluation** 301:11
**evaluations** 35:12
37:5,7
**evening** 376:8
**event** 225:10
369:18 378:21
403:3
**eventually** 45:1,13
47:5 52:17,23
54:2 182:23
217:24 270:22
272:19
**everybody** 82:16
87:17 88:2 91:22
93:13 110:15
153:23 172:6
183:21 218:12
312:25 364:15,21
**evidence** 69:13
79:11 215:22
259:21 383:14
**evidenced** 264:23
344:25
**exact** 138:1 158:18
175:19 201:5
203:3 325:7
**exactly** 79:24
81:13 107:24
143:1 152:25
157:6,13 176:24
177:12 185:7
198:3 213:22

297:14 362:4
380:2
**exam** 35:24
**examination** 5:4
19:3,7 35:24,25
36:1 258:19 342:8
376:6 385:12
**examine** 132:23
158:6
**examiner** 146:1
148:6 293:21
**examiner's** 306:22
362:2
**examiners** 305:15
**example** 62:22
77:7 96:1 99:19
114:25 136:25
141:20 157:1,9
188:6 190:19
201:1 216:23
218:19 261:4
262:2,20 263:4
274:17 348:14
352:14 358:25
359:15 360:22
378:22 382:9
**examples** 30:13,19
76:20 77:19
216:24
**exceeded** 114:20
115:1,11
**excellent** 79:14
**exchange** 6:12,14
6:23,25 7:16,18
8:6 126:23 127:5
129:11 203:24
204:6 219:23
220:6 228:11
270:24 307:8,13
314:22 315:4
387:10,16,19

exchanges 292:2
exclude 339:5
exclusively 42:23
  121:8,9
excuse 219:12
  360:17
executed 406:10
execution 405:14
  406:19
executive 21:3
  22:12,17,18,23
  23:1 59:18 65:20
  71:9 73:2,6,23
  74:3 87:18 88:10
  88:16,21 89:7,10
  90:1,14,22 125:1
  128:21 198:23
executive's 124:9
  124:13,22
executives 89:6
exercise 199:14
  200:3 245:16
  258:6
exercised 232:17
exercising 257:12
exhausting 315:22
exhibit 5:8 6:2,5,7
  6:9,12,14,16,17,20
  6:23,25 7:2,4,6,9
  7:11,13,16,18,20
  7:22,24 8:2,3,3,5,7
  27:25 28:3 58:24
  59:7 65:19 69:24
  70:1 94:25,25
  97:11 123:14,21
  123:22 126:22
  127:4 129:10,17
  131:4,10 133:15
  143:24 144:9
  166:17 167:1
  171:15 196:17

203:20,23 204:5
207:6 208:1
209:21 210:10
219:22 220:5
228:15,17,23
229:4,14 234:20
235:7 241:20
242:4 247:3,14,15
282:4 291:17,25
307:5,5,7 314:21
315:2 322:14,20
332:1,8 336:6
338:12,19 366:23
367:1,7 372:6,9,10
372:16,18 387:9
387:16 391:14,25
exhibits 5:3,8 6:1
  363:11
existed 191:12
  280:1 330:11
existence 21:16
existing 114:13,13
  315:18
exists 254:6
  330:15
expand 161:10
expect 21:21
  101:18 128:8
  157:18 208:14
expectation
  128:11
expected 101:13
expended 106:9
expenditure
  104:13
expenditures
  104:7,12,19
  105:16 112:24
  113:17,20 114:6
  114:20,21 115:1
  115:14 128:17

expense 114:14
experience 33:9
  71:5 86:17 159:19
  228:5 258:11
  305:2 317:2 347:5
  386:3 393:3,5
experienced
  316:11 393:20
experiencing
  315:14
expert 25:10,13
  26:6,16,22 27:14
  32:16 42:12,16
  83:18 138:14,14
  144:18 239:8
  363:17,20,23
  364:6,10 380:5,8
  385:22,24 386:11
  386:14,20,25
  387:3 395:12
expertise 29:15
  87:20 146:7
  157:10 198:19
  321:8,13,24 322:1
  322:11 326:23
  386:23 396:17
experts 142:21
  160:7 237:21
  254:22 261:23
  262:1 320:17
  322:5 389:12
expiration 405:19
  406:25 407:25
expires 403:17
explain 55:20
  160:11 210:1
  328:16
explained 347:20
explains 325:1
explanation
  163:15 236:8

exports 232:8
exposed 155:20
exposures 291:1
exposé 190:10
  226:20 234:9,12
exposés 192:1
express 156:25
expressed 311:22
expressing 310:9
  311:8
extent 75:18
  134:18 266:13
  290:22 312:8
  362:19 393:22
external 356:12
  375:8
extra 35:21,21
  90:19 99:18
  103:14 264:21
extreme 49:19
  177:6 224:22
  316:8
eye 186:17,23
  223:20 258:22
  380:3
eyes 53:13

**f**

f 2:16
face 158:3,3
faces 193:8,8
  373:17
facilities 68:7
facing 7:6 241:21
fact 22:6 25:12,16
  25:22,23 26:1
  68:3 130:7 145:3
  154:2 163:21
  190:13 193:23
  205:20 226:13
  246:12 251:10
  257:3 259:2

267:22 290:7
302:7 336:21
337:8 354:6
373:12
**factor** 206:18
209:12
**factors** 204:17
205:2,15,25
207:22 214:16
216:6 219:18
226:9 231:22
232:16 243:6
290:23 388:8
393:11 398:9,13
398:20
**facts** 20:5 31:6,14
**failed** 199:14
200:3
**failures** 371:23
**fair** 38:24,25 39:6
45:19,19,23 50:13
56:23 65:24 87:6
87:7 91:25 101:17
105:17 137:17,22
140:14 142:3
143:13 153:18
158:8 165:1 166:8
171:19 173:6
201:22 202:10
207:15 223:15,25
241:15 256:20
257:2 277:4 288:9
290:22 306:7,12
312:16 314:16,17
317:19 322:11
346:16 350:16,20
353:10 365:3,6
384:23 399:5
**faith** 189:19
**faithfully** 79:23

**fallen** 369:25
**falling** 219:17
**false** 206:4 259:12
**familiar** 59:14
98:9,16 131:13
234:8 241:7 264:9
294:9,13 298:18
299:12 303:22
312:2,3,4 341:1
376:20 379:2,18
379:20
**familiarize** 367:6
**family** 47:24
130:25 157:19
256:15 352:8
**far** 37:18 52:11
53:10 77:24 85:1
108:18 239:25
280:3 303:8
314:12 337:18
366:8
**fascinated** 37:18
**faster** 263:21
**fatalities** 294:5,20
**faulty** 130:5
**favor** 150:15
191:8 196:3
312:14
**favoring** 190:3
**fda** 227:9,13,19
241:12 246:15
260:5,15 261:3,22
262:23 263:5,11
264:3,24 265:3,25
271:22 304:11
310:13 377:18,22
378:1,1,5 380:18
**fda's** 379:16
**fear** 192:24 310:20
**featured** 374:1

**february** 6:23
203:24 204:6,7,9
205:3 214:15
278:21
**federal** 66:10
85:24 100:6,9
102:5 115:10
116:18 168:25
187:14
**federation** 243:17
244:6
**fee** 41:18
**feed** 318:23
**feedback** 389:8,16
**feel** 94:21 183:25
302:5,18,20,21
311:4 374:20
**feeling** 312:20,21
331:19 358:3
**feels** 269:3
**feinstein** 3:3 5:5
18:3,4 376:7,12
385:8
**fell** 125:14
**fellow** 39:5 151:15
**fellowship** 35:9,11
35:22 37:21,23
43:20 146:18
159:24
**felt** 68:22 171:13
214:1 233:23
314:6
**fentanyl** 224:21
266:10,16,22,24
267:2,21 268:18
294:5,20 297:6
323:1,3 333:9,10
333:11,13,14,18
333:25 334:1,3,5
334:11,15,24,25
335:1 336:18

337:2,3,6 339:6
360:21 370:18
**fettered** 259:11
**fewest** 339:3
**fidelity** 79:25
**fields** 385:22
**fifth** 136:7 178:25
180:22 210:19
211:20,25 216:22
225:22 226:3
**fight** 85:7 116:13
167:12 323:9,19
**fighting** 77:11
120:19
**figueroa** 4:5
**figure** 68:19 83:14
92:15 106:24
112:23 113:8
114:11 122:19
141:9 168:22
297:16 298:8
313:2 336:15
362:17 398:9
**figured** 286:17
350:11
**figures** 296:17
**file** 24:19 292:14
**filed** 20:8,13,23
24:7 251:24
**files** 134:10 172:18
172:19,23 295:20
**filing** 75:13
**fill** 67:4 183:23
**filled** 78:21
**filling** 57:10 78:20
**filtered** 116:14
**final** 7:9 197:5
231:3 247:4,15
392:24 394:13
**finance** 3:17 18:15

finances 352:8
financial 83:17
   122:6,8 195:10
find 95:21 147:14
   177:17,20 195:16
   230:23 254:9
   268:15 270:18,22
   271:16 289:2
   295:4 305:16
   314:4 319:15
   320:12 334:19
   335:20 338:8
   340:6,7 351:4
   404:12
finding 22:6
   161:12 198:10
   287:15 351:8
findings 166:9,10
   171:18 305:3
   393:24
fine 107:12 183:9
   209:2
finish 25:14 26:2
   30:17 63:9 77:9
   395:22,24
finished 25:24
   49:14 62:11 71:22
finishing 33:14
firm 376:12
first 19:4 20:22
   21:15,21 25:17
   26:4 31:18 36:21
   42:11 43:18 49:7
   61:16,17,21,24,25
   62:4,14 87:15
   145:21 146:12
   153:11 155:25
   164:19 173:3,7,10
   197:2 203:4
   206:21 208:1
   240:2 250:21,22

251:22 254:2
   261:13 270:19
   286:4 292:6 297:4
   298:23 299:14
   301:14 305:19,23
   311:13 316:15
   324:6 339:2
   352:16 373:13
   374:14 392:10
   402:10
fiscal 67:21,22
   82:4,17 113:11
   282:17,22 373:6
fit 100:24 275:1
five 25:2 26:10,12
   51:18 256:9 275:6
   345:6
fka 4:3
flacc 193:8
flagged 328:8
flash 147:18
flip 224:2 236:7
   368:24
floor 3:4 4:6
florida 52:11
flow 80:8 212:24
   213:10 340:1
   384:13
flower 17:18
flowers 2:5 17:18
flowing 331:5
flu 201:11 202:17
   269:6
fluids 48:12
focus 84:14 193:14
   205:21 252:19
   271:1
focused 60:13,15
   60:19,21 66:13
   79:11 80:18,24
   82:2,24 247:25

252:4
follow 112:9
   135:14 172:11
   212:19 303:12
   329:9
followed 265:2
following 43:9
   110:12 129:19
   219:16 304:3
   348:5,21 372:7
   396:20
follows 19:6 80:1
   317:19
food 261:8 355:18
fooling 162:19
force 6:21 7:5,10
   61:20 117:16
   139:4,8,11 141:21
   144:22 150:17
   166:19 167:3,6,9
   167:16,16,18,23
   168:2,13 169:1,4
   170:4,5,10 171:17
   172:4 176:12
   196:20 234:22
   235:11,16 236:4,9
   237:4,16 238:12
   238:20 239:12
   247:5,17 248:8,24
   251:11 252:17
   253:6,13 255:8
   256:21 257:5
   267:13 278:17
   293:6,11,25 324:2
   381:14 384:12
force's 172:25
   207:13
forced 180:15,17
   212:8,11 213:9
forces 138:6
   139:14 140:25

171:5 177:14
   257:17 354:23
forcing 212:3,22
   219:18
foregoing 402:16
   402:22 405:13
   406:18
foremost 261:13
forensic 25:7 32:6
   35:11,15,22 36:7
   36:10,12,17,17,24
   37:4,13 38:2
   41:22 42:11 44:1
   44:1,21,23 45:2,6
   58:3 80:4,5 86:17
   91:11 99:19
   138:13 148:7
   163:25 346:13
   347:2
forensically 48:19
   57:25
forget 91:8 148:22
   206:10
forgetting 396:12
form 23:24 24:10
   30:24 31:11 40:15
   48:5 50:3,17
   58:21 61:8 62:7
   62:10,20 63:6,18
   64:17 65:2 87:14
   88:4 92:1 97:4
   98:2,11 102:2
   104:9 106:1,12
   107:12 112:11
   113:5,25 114:15
   117:5,20 118:3,18
   122:17 126:18
   127:24 128:10
   130:23 132:4,11
   137:21 138:10
   139:6,25 140:15

**[form - funding]** Page 29

141:4,18 142:4
143:4,14 150:14
150:24 153:8,21
153:25 154:15
155:2 157:16
158:9,16 159:21
160:23 161:6
162:8 163:11
164:8,16 165:2
166:6 172:2 176:7
186:2,21 187:10
188:25 189:20
190:5 191:4 194:8
194:25 195:14
199:18 202:1
203:18 206:3
207:17 212:13
213:21 216:11
221:10 223:16
224:1 227:22
228:8 231:14
232:22 233:8,18
234:11 236:19
240:12 242:14
243:14 245:17
248:5,14 249:1,11
249:18 250:7,16
251:5,16,25
252:12 253:2,15
254:11 257:24
258:8 260:7
261:25 262:7
263:12 265:13
266:4 267:12
269:20 270:12
271:24 274:1
275:18 276:16
278:4 279:10,22
281:2 284:1 285:4
285:12,14 286:13
288:23 291:4

294:24 295:16
297:9 298:16
300:11 303:5
304:14 305:4,13
305:24 306:8
310:16 312:17
318:18 319:9
321:15 322:2
324:4 331:3
341:22 346:22
347:17 349:10
351:14,18 353:15
354:4,19 355:7
356:14,24 357:9
357:16 361:7,24
362:12 364:4
365:20 375:16
379:9 381:3
383:16 385:3
386:2,18 393:9
394:1,16 397:8,21
398:4,17,23 399:6
**formal** 278:8
294:25
**formalizing** 366:5
**formally** 19:12
**format** 367:14
**formed** 341:24
381:14
**former** 88:12,13
**forth** 31:3 35:13
44:7,8 81:25 82:1
89:4 92:13 93:3
102:11 105:9
110:20 111:2
120:21 145:2,4
149:18 160:2
168:22 170:17
172:22 199:4
205:24 209:1
217:23 226:23

258:13 263:1
272:7 278:18
298:21 305:16
340:25 351:14
368:9 386:21
**fortunate** 155:6
**forum** 36:13
**forward** 191:10
228:12 314:18
382:16 404:16
**forwarded** 229:6
315:5
**forwarding**
220:11,15
**fought** 274:5
**found** 45:7 79:13
80:12 177:18
293:2 393:24
**foundation** 104:10
**four** 26:10,11 32:6
44:20 167:16
169:18 256:6
308:2 345:6
360:14
**fourteen** 70:24
**fourth** 276:22
288:10 329:22
366:20
**frame** 298:19,20
325:7
**framework**
352:23 353:10
**framing** 223:22
**francisco** 3:9
**frankly** 49:17
110:21 192:25
397:2,22
**fraud** 54:1
**frazier** 52:6
**free** 286:5 357:14
405:14 406:20

**freedom** 102:14
**freeman** 78:11
79:3 80:4
**frequency** 154:6
**frequent** 194:16
**frequently** 84:23
301:2
**friebert** 238:15,16
238:17,18
**friend** 286:6,14,21
287:2 335:20,21
335:21
**friends** 208:24
256:15
**front** 3:9 32:25
36:1 59:6 135:12
135:18 171:15
235:4,9 242:3
276:12 338:20
**frontal** 355:13
**fulfill** 391:12
**fulfilling** 374:6
**full** 68:18 100:25
264:2 347:13
375:1
**fully** 53:17 56:21
87:10 168:4 306:2
312:7
**function** 371:7
**functions** 379:16
**fund** 66:12 97:18
97:22 103:6,11
114:7 117:24
118:14
**funded** 6:5 59:1
68:23 108:10
374:7
**funder** 82:23
**funding** 60:7 66:7
67:18 69:9 85:6,6
85:18 100:10

101:3 118:2,12
**funds** 97:17,21,24
99:11 100:21
101:22 102:13
105:24 106:9
118:17 121:11
350:12 385:7
**funeral** 274:9,12
**further** 47:5 57:19
203:6 304:7
317:14 318:22
385:9 392:13
402:20 403:1
**furthering** 224:5
224:25 225:15
**future** 374:16,21
**fuzzy** 249:24

**g**

**g** 19:18 170:14
**ga** 2:23
**gahash** 368:1
**gain** 189:19
192:10 253:7,8
375:1
**ganey** 183:19
185:8
**gaps** 57:10 67:4
**garry** 93:22
**gathering** 378:8
**gee** 108:19 397:13
**geez** 21:5
**general** 32:18
72:16 98:3 188:12
208:15 210:25
211:2,4,14 235:15
236:2 313:11
318:25 398:12
**generally** 73:7
76:11 206:20
261:18 266:24
295:3 340:12

353:12 363:13
371:17
**generating** 109:4
298:12
**genes** 157:20
**genetic** 155:22,23
157:2,3
**genius** 272:12
**gentle** 319:16
**gentleman** 210:14
309:7
**georgia** 32:12,13
32:19
**germane** 26:3
**getting** 37:20
54:11 67:7,11,16
67:24 69:1 77:8
79:9 109:1,18
148:8 151:6 162:7
175:25 184:11,11
184:20 219:6,10
229:3 246:20
258:12 260:12
289:11,24 302:24
310:21 312:21
316:9 334:23,24
339:10 348:11
**gilson** 293:18,20
294:1 297:11
**give** 19:23 25:4,25
27:10 30:13,19,25
31:8,17 57:22
68:19 128:1 130:4
146:1 177:15
180:19 183:4,19
184:6 190:18,20
191:17 194:13
204:4 210:6
214:13 220:4
240:18 272:14
273:25 274:6

312:1 326:3
329:10 351:23
353:23 354:13,18
356:7 365:25
366:18 379:23
401:1,10
**given** 8:2 24:11,22
24:25 29:2 107:24
121:11 183:22
221:17 222:16
228:22 281:5,11
291:7 295:3
315:19 325:25
356:4 360:2 367:2
367:10 398:10
402:13,18
**gives** 71:10,11,13
163:18 223:3
329:7 343:7 368:8
368:8
**giving** 30:22 53:20
120:20,21 127:3
151:1 179:13
180:17 182:21
184:19 188:16
192:3 215:1 245:7
304:18 335:14
339:14 343:15
**glance** 20:9 96:6
**glanced** 341:8,9
376:19
**gleaned** 306:21
**global** 75:7
**go** 23:1 26:5 35:2
40:6 44:14 45:23
52:19 57:23 58:8
61:9 62:13 67:6
67:15 68:7 69:4
73:6 86:1 89:19
91:7 98:24 99:8
104:6 118:9

135:22 138:20
145:17 147:14
148:24,25 152:24
157:17 158:19
159:23 171:2
179:24 188:5
191:10,14,24
194:15 195:4
196:6 200:24
206:20 208:12
210:9 212:24
213:2,10,12,13
217:21 218:8,12
225:17 245:7
250:1 261:10
262:4 268:15,24
269:1 270:23
272:10,19 275:7
292:5 297:15
298:8 302:1 314:4
314:17 316:16
324:10 328:7
329:1 330:3 331:9
334:20,21 337:19
337:24 338:6
340:8,22 344:20
345:17 348:5
350:18,22 351:2
355:22 356:19
368:4 399:13
**goal** 145:19
152:21 167:17
168:3 274:25
320:14
**god** 245:7
**goes** 99:2 105:12
113:3 131:14
175:14 220:6
231:21 264:1
275:24 296:20
307:14 316:15

337:23
**going** 20:23 22:5
  27:25 31:5 33:6
  45:20 48:18 62:17
  64:2 65:9,14 68:5
  69:17 71:14 77:7
  85:14 96:22 98:1
  98:2,3,14,23 99:17
  101:6,11 103:5,16
  104:8 111:1
  112:21 118:4
  123:20 128:2
  132:5,6,9,19
  134:18,21 135:3
  135:13 136:3
  138:5 141:3
  145:21 157:13,15
  167:11,13 171:3
  182:18 183:4,6,9
  183:11 184:16,17
  184:20 191:14,15
  191:17 196:21
  197:13 201:19,20
  204:4 207:1,5
  212:23 213:5,6,9
  213:12 215:6
  216:2 220:4 223:4
  223:11 225:3
  228:25 231:9
  235:5 236:18
  239:20 241:17
  243:1 256:5
  271:18 279:13
  282:10 291:24
  292:20 302:4,4,14
  302:15 307:5
  310:5 314:4
  319:11 325:16,20
  325:23 328:7
  334:19,21 335:20
  337:2,6,16 338:2,4

340:6,7 342:18
  353:25 354:7,10
  354:16 355:25
  356:6 358:9
  394:15
**goings** 91:1
**good** 18:10 19:9
  19:10 25:18 56:24
  57:18 58:13,15
  61:16 67:7,11,16
  82:24 108:22
  174:19 184:13
  185:13 189:19
  199:20 206:23
  246:21 247:1,11
  263:23 275:4
  293:16 313:24
  342:10,11 371:21
  376:8,23 398:8
  399:13
**gosh** 272:13
  330:20
**gotten** 106:7
**governance** 75:1,6
**government** 22:8
  59:19 60:5,12,16
  60:19,22 85:24
  103:21,24 116:18
  125:12 168:23
  185:22 187:15
  215:5 254:3
  267:14 308:10
  313:1 317:15
**governor** 84:8
  85:14 137:11
  248:20,21,23
  249:6 251:8
  253:13,17 255:9
  313:10 324:1
**grab** 339:20

**gradually** 114:9
  324:13
**grand** 99:21 126:5
**grandchildren**
  318:6,15 319:5
**grandfather** 36:24
  37:3
**grandma's** 280:24
**grandmother**
  274:5
**grandparents**
  339:19
**grant** 3:4 116:4,17
**grants** 99:15 100:1
  100:17
**graph** 65:5,9
  255:14,15 289:6
  336:16 370:9
**graphic** 257:4
  289:16 370:13,14
  370:20
**graphics** 283:1,9
  283:17
**graphs** 65:8 81:23
  368:9 370:2
**great** 64:20 191:16
  329:22
**greater** 113:21
  360:5
**greatly** 339:23
**gregory** 151:14
**grew** 34:14
**grimace** 193:7
**group** 32:19 47:11
  57:17 58:13
  177:16 278:15
  307:24 308:19
**growing** 256:2
**grown** 24:12
**guess** 20:5 89:11
  94:23 118:4

122:24 154:18
  181:22 185:19
  206:1 222:9
  253:18 259:18
  328:10 363:21
  368:2 372:4 386:6
**guests** 23:4
**guideline** 329:9,18
**guidelines** 50:10
  153:7 178:10,13
  186:17 197:22
  199:9,13 200:1
  215:23 239:22
  241:1,6 243:21
  244:6 325:13,25
  326:16,18 327:2
  329:3,5
**guilty** 45:7 80:13
**gutter** 208:21
**guys** 342:17

**h**

**h** 2:18 19:18
  170:13
**habits** 256:9
**hajian** 4:5 18:18
  18:18
**half** 39:20 91:17
  105:20 106:9
  115:4 119:19
  302:11 360:16,17
  360:23 361:8,9,10
  361:11,14
**halfway** 243:3
**hall** 93:15 137:1
**hand** 28:13,21
  53:8 114:18
  123:20 175:14,14
  242:25 314:2
  316:17 366:23
  403:6

**handful** 67:2
**handing** 52:21
  179:11 226:7
  286:15
**handle** 94:4
**handouts** 227:13
**hands** 269:18
  270:9 271:12,20
  273:22 302:20
**hang** 369:10
**happen** 47:21
  50:25 63:20 73:16
  91:16 92:11,17
  151:5 154:8 173:4
  184:16 195:19
  207:9 271:17
  284:24
**happened** 26:9
  36:22 49:4 51:11
  61:12 92:23 93:5
  96:12 173:2 177:1
  182:19 297:24
  320:9 346:4
  369:21
**happening** 64:14
  80:3 117:17
  130:16 143:12
  144:8 146:2 277:4
  284:25 295:7
**happens** 99:24
**happenstance**
  92:21 182:7
**happy** 176:10,19
  197:14 284:5
  399:22
**hard** 33:12 58:2,4
  58:7 75:17 192:4
  217:3 328:11
  334:16 375:11
  392:19

**harder** 190:12
**harm** 206:21
**harms** 353:4
**head** 47:12 51:3
  51:22 170:4
  210:24 235:25
**heading** 197:1
**headline** 374:15
**health** 2:9 4:2 7:21
  7:23,25 18:1 20:1
  48:10 60:10 61:1
  61:2,5,15 65:5
  66:14 71:3,6
  80:10 82:1 83:23
  84:1,10,21 85:19
  89:18 92:22,25
  101:15 105:17,25
  106:4,10,17
  111:24 115:22
  116:15 119:23
  120:22,24 218:4,7
  234:6 235:3
  252:24 308:6,9,15
  308:17,21,25,25
  320:16 322:16,22
  323:18 326:20
  332:3,11 338:14
  338:22 343:5
  364:2 384:7,8,9,22
**healthcare** 43:16
  43:23 44:10 50:8
  55:1 72:14 93:24
  108:3,4 144:21
  158:3 168:15
  169:16,24 178:2
  182:1 195:8,25
  209:15 218:19
  238:19 240:8
  259:7 267:5 276:7
  286:11 310:11
  312:11 341:3

**healthy** 48:14
**hear** 77:4 130:16
  146:10 177:25
  180:23 182:12
  185:8 192:16
  215:4 299:21
  315:24 385:25
**heard** 17:7 21:18
  56:3 77:2 130:14
  181:18 193:23
  229:24 243:25
  271:4 284:22
  326:5
**hearing** 208:23
  209:6,9 335:8
**hearings** 30:9
**heart** 181:13
**hearts** 48:11
**heating** 175:23
**held** 111:21 168:4
**help** 33:6 45:1,11
  45:22 57:18 67:3
  68:20 69:21 85:7
  91:25 92:3,7,10
  93:2 141:9 142:9
  150:1,25 170:16
  184:23 190:14
  206:22 216:7,17
  217:11,13,14,21
  217:22 219:5,7,10
  229:15 231:9
  245:4 248:7,8
  313:18 315:25
  317:12,14 319:3
  320:14 330:18
  356:1,3,8 373:11
  392:3 398:9
**helped** 37:25
**helpful** 33:4 146:9
  230:24 279:14
  330:24

**helping** 31:20 41:4
  142:24 206:23
  215:19 217:9
  241:10 396:6
**helps** 80:14 215:3
  245:3
**hereinafter** 19:5
**hereunto** 403:5
**heroin** 113:3
  208:19 261:4
  265:20 267:20
  268:16,17 271:19
  272:22 294:5,20
  295:24 297:6
  300:9 301:1,8
  302:2 303:9
  304:21 305:19,23
  306:12 334:23,24
  335:2,22 336:8,18
  337:1,4,5,21
  350:18 351:3,9
  370:18
**hey** 69:18 77:3
  79:19 184:13
  218:15 245:12
  281:14 329:8
  330:15 332:17
**high** 140:5 181:15
  223:9 306:10
  331:5 396:17
**higher** 185:3
  205:23 328:21,23
**highlight** 187:23
  249:21
**highlights** 296:25
  297:2
**highly** 152:10
  317:13 351:7
**hindsight** 189:24
**hippa** 52:9

hire 79:10
hired 170:9,18,21
  191:9
hiring 86:18
historian 363:23
historically
  190:12 310:25
  337:17
history 33:2 43:10
  157:19 258:16
  294:6,22 297:22
  304:2 363:17
hit 140:5 223:7
  368:19
hiv 263:19
hockey 306:10
hogwarts 254:9
hold 69:7 75:3
  156:20 318:5,14
  319:5 363:22
  364:9 385:21,23
holdings 4:4
holds 75:5
home 44:14 120:2
  121:21 274:9,10
  274:11,12 317:20
honestly 74:4 81:9
  90:16 91:3 128:23
  131:14 186:3
  279:23 303:15
  366:14
honor 180:6 274:6
hoops 179:5
hope 111:10
  160:18 178:11
  196:12 353:24
  354:6,11,21
  373:12,15 374:10
  374:11
hoped 37:15 91:13
  219:19

hopefully 121:1
  160:16 258:12
  259:22
hoping 199:20
  302:21
hopkins 37:24
hospital 30:5
  31:18 44:3,12,16
  45:1,4 48:18 49:5
  56:10 58:11 84:5
  110:11 148:16
  152:13 178:20
  179:7,25 180:7
  181:8 182:16,20
  184:14 192:20
  193:17 211:1,14
  212:20 213:19
  238:24 250:12
  303:20,21 334:6
  346:5 377:13
hospitalization
  81:20
hospitals 43:24
  44:6 47:7,18 48:4
  55:5 93:25 178:19
  179:3 180:5,9
  184:24 185:9,11
  185:11 254:20
  330:10 390:19
  391:6,7
host 143:19
hosted 133:15
hour 27:19 191:2
hours 361:1,3,11
house 120:10
  236:3
huge 99:24 105:19
  180:1 218:18
  226:8,9 290:8
huh 28:16,25 30:1
  32:14 33:5 127:20

233:14 237:17
  307:17 317:24
  323:16 324:21
  327:3 393:17
  396:2
human 89:19
  183:9 184:15
  213:11
humans 213:11
humor 247:1
  371:18
hundred 99:22
hundreds 122:19
  313:8
hunter 3:18 18:13
  18:13
hurt 183:7 272:14
  330:17
hutzell 81:21
  171:2 368:5
hydrocodone
  300:20 301:19
  347:12 361:15
hypothesis 398:3

i

i.e. 181:14
ibuprofen 175:22
  179:13
ice 175:22
idea 60:3 160:11
  181:5 219:4
  318:12 387:20
  397:5
ideas 308:22 318:1
identical 360:1,3
identification 28:7
  59:4 70:5 123:18
  127:1 129:14
  131:7 144:4
  166:22 204:2
  220:2 228:20

234:23 242:1
  247:7 282:8
  291:22 307:11
  314:25 322:18
  332:5 338:17
  367:4 372:13
  387:13 391:19
identified 169:18
  207:25 209:21
  243:12 249:8
  250:5,14,18
  361:19
identify 54:5
  55:10 138:8 139:4
  141:23 142:8
  164:24 166:2
  192:8 214:6
  231:21 242:19
  298:22
identifying 145:14
  145:17 242:12
ignatia 93:15
il 3:19,24
ilene 89:12
illegal 137:12
  260:4 266:2
  280:13,22,23
  281:1,16
illegally 52:22
  163:22 263:3
  333:12,20,24
illegitimate 55:2,6
  55:11
illicit 265:14,19
  267:20 298:24
  362:18
illness 40:20 45:11
  58:6 65:22 163:3
  183:12 184:4
  217:10 225:3
  240:15 343:14

354:7,12 355:13
358:11 374:4
375:1
**illustrate** 371:6
**imagine** 241:8
**imbedded** 214:23
**immediately**
325:16
**impact** 62:5 86:12
164:25 166:3
181:24
**impacted** 233:7
**impacts** 87:12
**impairment**
344:24
**implementation**
277:18
**implemented**
300:2
**implementing**
185:5,10
**implies** 357:5
**importance**
187:23
**important** 20:5
76:18 109:16
112:10 140:9
141:11,12 146:22
171:13 181:8,10
181:11,16 189:14
194:18 258:2,2
260:2 375:5 399:2
**impossible** 158:15
**impression** 295:3
**improperly** 52:21
**improve** 67:4
69:22
**inactive** 38:19,21
**inappropriate**
63:21 284:25

**incentives** 311:1
**incidence** 334:14
**include** 110:11
286:9 379:7 390:2
395:3
**included** 245:25
404:14
**includes** 36:14
199:1 350:25
**including** 71:4
87:11 159:7
178:19 179:3
202:9 205:18
307:25 330:14
364:18 365:16
373:15
**incorporate** 42:5
**incorporated**
179:1 212:1
406:12
**increase** 64:20,25
322:25 330:23
334:10
**increased** 85:1
178:13 182:2
334:14 336:9
348:17
**increases** 154:9
**increasing** 242:12
242:20 294:4
336:18 378:25
**independent** 191:1
245:16
**index** 5:1,3 6:1 9:1
**indiana** 56:11
**indicate** 228:2
**indicated** 88:9
91:19 130:10
143:17 167:20
182:10 192:15
261:8 262:6 294:3

368:13
**indicates** 378:20
**indicating** 404:14
**indication** 264:7
264:23,25
**indications** 264:5
264:12
**indirectly** 227:24
**individual** 158:6,7
172:14 210:4
240:8,9 257:13
286:11 300:8
307:1 310:11,15
312:9,11 314:13
315:12 316:22,24
349:1,9 352:1,22
362:25 374:14
375:5 391:8
**individual's**
367:19
**individuals** 45:10
45:22 58:5 66:17
68:13 71:4 78:7
78:14,15 80:11,16
80:17,23 92:9
119:20 121:4
145:12,22 154:24
155:13,14 158:25
160:8 193:25
198:18 199:15
200:4 204:11
212:25 213:1
237:15 246:13,15
261:18 262:25
263:2 294:21
298:23 307:25
312:23 314:3
331:2 334:18
339:12 341:10
356:18 357:1,12
359:3,10 373:14

378:23 386:22
389:11
**industries** 3:2,22
**inflating** 259:12
**influence** 108:17
376:24
**influenza** 269:4,6
**inform** 142:9
158:7
**information** 27:13
31:17 62:23 77:21
124:5,8 133:25
134:3,7 138:17
142:16 157:18
196:22 254:23
259:6 304:19
305:6 306:21,25
309:3 319:17
343:14 347:9
349:7,17 354:14
363:15 365:5
366:4 378:9
382:23 383:2,6,24
384:13,24 385:1,5
385:6 393:15
**informed** 362:1
379:6
**informing** 29:15
**infrequent** 193:17
**ingest** 357:9
**inhale** 302:19
**initially** 87:22
167:25 272:16
**initials** 148:22
**initiated** 300:8
305:12 306:6
307:1
**initiating** 301:1
304:9,11
**initiation** 306:17

initiative 326:21
initiatives 350:11
initiators 300:22
inject 302:19
  358:12
injectable 175:3
injecting 356:21
injection 317:4
injuries 41:1
injury 48:17
inmates 304:1
inpatient 45:16
  93:16 159:1
input 108:18
inputs 298:4
insanity 45:7
  80:13
insert 378:2
insight 108:21,23
insofar 234:10
  267:9
insomnia 42:25
instance 25:20
  51:22 54:6,20
  195:25 214:7
  226:11 284:21
  363:5
instances 53:15
  192:13 193:24
  195:8 227:18
  228:7
instill 373:12
instruct 33:20
instruction 75:13
  401:2,10
insurances 83:2
integrated 61:16
intend 372:16
intended 345:18
interact 75:25
  359:6

interacting 186:8
interaction 37:8
  91:4 174:17 349:8
interacts 257:23
interest 44:2,3
  136:15 258:15
  259:16 310:14
  311:3,6 312:14
interested 57:21
  58:19 76:17
  308:22 403:3
interesting 136:10
  283:13
interests 214:11
interfacing 50:16
internal 47:23,23
  232:13 356:11,16
internet 256:14
interpret 395:17
interprets 355:16
interruption
  284:21
intersection 36:11
interval 120:1
  121:21 396:15
intervening
  288:20
intervention 27:2
  57:13
interview 25:24
interworkings
  101:10
intractable 244:20
  245:2
intro 34:22
introduce 91:22
introduced 19:11
  342:12
intrusive 310:2
inventory 232:8

investigate 52:1
  54:16 200:24
investigated 53:22
investigation
  295:20 297:13
invitation 204:10
invited 23:4
inviting 145:14
involve 26:24 41:3
  74:22
involved 20:3
  67:25 91:1 95:10
  102:18,22 105:23
  109:3 110:1
  117:12 186:4,6
  307:14 354:24
involvement 108:8
  108:12 379:18
involves 110:6
  113:2
involving 323:1
  334:10,15 339:4,5
issue 53:4,6 61:2
  62:16,25 63:4
  77:22 80:18,24
  81:15,19 83:9
  91:11 92:18 94:10
  138:4 141:16
  142:14 143:15
  189:14 194:11
  206:22 208:22
  237:10 248:4
  253:5 280:11
  282:2 311:16
  320:16,17 364:13
  389:19
issues 37:9,10
  57:20 60:21 75:18
  86:20 87:19 94:11
  118:24 137:18
  139:23 235:3

246:17 248:1
  249:9 250:6
  251:22 257:7
  262:3 364:11
issuing 326:17
item 29:22 106:17
  106:21 112:21
  117:3,14 118:7,15
  118:17
items 116:2
iv 48:12
ivan 72:6,7

**j**

jackson 1:22
jaded 188:3,20
  189:3
jail 45:24 58:2,5
  81:13 91:12
jama 298:18 299:2
janet 307:16
janssen 3:12 18:17
january 372:22
jarod 374:14
jcah 178:23
jcaho 389:20
jeffrey 37:7
jen 122:5
jennifer 6:10
  83:16 95:9 117:11
  123:15,24
jerry 21:2 23:2
  52:7 75:3,8 79:6
  82:7,9 83:15 89:6
  89:12 90:1 95:7
  102:24 103:12
  107:19 108:15
  112:17 117:10
  121:25 123:25
  170:24 220:7
  316:15,19,21
  321:6,17

**jewell** 311:13
**jflowers** 2:8
**jick** 206:10 226:22
  381:23 382:1
  383:4,8
**jim** 4:14
**job** 25:18 43:19
  46:5 79:21 85:13
  108:22 160:4
  184:23 197:14
  212:23 346:5
  352:8
**jobs** 85:14
**jodi** 2:5 17:18
**john** 2:18 138:12
  149:8
**johns** 37:24
**johnson** 2:12 3:11
  3:11 18:8,17,17
**join** 56:7 58:20
**joined** 18:2 86:22
  87:8,16 88:10
  130:11 136:11
  143:7,9
**joining** 384:2
**joint** 178:17,22,24
  179:16,18 180:6,8
  180:21 181:3,5
  184:24 185:23
  186:22 187:11,16
  192:21 197:10,21
  198:9,9,17 199:7
  199:12,25 211:23
  212:17 214:3,23
  216:21 225:22
  389:20,23 390:9
  390:11,17,20,25
  391:4,10
**joking** 331:22
**jonas** 36:25

**jones** 2:17,21
  149:8 188:13
  213:3,4,5,6 297:21
  297:22
**jones's** 298:2
**jonesday.com**
  2:20,24
**jouriles** 210:15,17
  210:22,23 211:10
  211:19
**journal** 296:10,15
  397:7
**journals** 381:1
  383:20
**judge** 1:9 46:18
  355:25
**judgement** 259:11
**judges** 80:9
  168:21
**judgment** 158:5
  183:4 188:18
  189:19 191:1
  192:9 199:16
  200:5 212:6
  213:18 214:7
  216:20 245:16
  257:13 258:7
  259:7 345:19
  347:15
**july** 70:9 84:11,12
  95:23 96:13 223:6
  282:21,22 366:20
  368:19 403:17
**jump** 179:4
  342:18,23
**jumped** 134:16
**jumping** 302:22
**justice** 99:19
  120:12 168:20
  169:17,24

**k**

**k** 2:16 174:24
**kearse** 2:4 17:12
  17:12 23:24 24:10
  30:24 31:11 33:18
  40:15 48:5 50:3
  50:17 58:21 61:8
  62:7,10,20 63:6,10
  64:2,10,17 65:2
  87:14 88:4 92:1
  97:4 98:1,8,13,20
  98:23 99:4 100:19
  102:2 104:8 106:1
  106:12 107:5,10
  112:11 113:5,25
  114:15 117:5,20
  118:3,18 122:17
  126:18 127:23
  128:10 129:1
  130:23 132:4,14
  132:18,25 133:18
  133:23 134:5,9,13
  134:17 135:6,9,17
  135:23,25 137:21
  138:10 139:6,25
  140:15 141:3,18
  141:25 142:4
  143:4,14 144:6
  150:14,24 153:8
  153:21,25 154:15
  155:2 157:16
  158:9,16 159:21
  160:14,16,23
  161:6 162:8
  163:11 164:8,16
  165:2 166:6 176:7
  186:2,21 187:10
  188:25 189:20
  190:5 191:4 194:8
  194:25 195:5,14
  199:18 202:1

203:18 207:17
212:13 213:21
216:11 221:10
223:16 224:1
227:22 228:8,25
230:19 231:14
232:22 233:8,18
234:11,25 235:20
236:18 240:12
242:14 243:14
245:17 248:5,14
249:1,10,15,20
250:7,16 251:5,16
251:25 252:12
253:2,15 254:11
257:24 258:8
260:7 261:25
262:7 263:12
265:13 266:4
267:12 269:20,24
270:11 271:7,24
274:1 275:18
276:16 278:4
279:10,22 281:2
283:2,5 284:1,7
285:2,9,13 286:13
288:23 291:4
292:8,11,16,20,24
293:3 294:24
295:16 297:9
298:16 300:11
303:5 304:14
305:4,13,24 306:8
310:16 312:17
318:18 319:9
321:15 322:2
324:4 331:3,11,16
331:21,23 332:15
332:22 341:22
347:17 349:10
350:2 351:18

353:15 354:4,19
355:7 356:14,24
357:16 361:7,24
362:12 364:4
365:20 375:16
379:9 383:16
385:3,10 386:2,18
387:17 393:9
394:1,15 397:8,21
398:4,17,23 399:6
399:11,20,24
404:5
**keep** 172:21
184:24 245:3
249:23 319:11
358:9 369:5
**keeping** 184:23
185:14
**keeps** 337:6
**kelly** 1:22
**kept** 65:9 74:2,6
105:10 112:16
**keynote** 146:20,21
**kicked** 77:12
**kidney** 177:8
224:23
**kids** 239:5
**killed** 201:12
**killing** 223:8
**kim** 80:25 81:16
**kincaid** 2:21 17:23
17:23
**kind** 21:9 24:14,15
27:8,12 30:10,11
31:7,8,23 37:19
38:23 43:13 44:17
46:16 53:10 65:25
68:17 72:7 77:3
77:17 84:15
108:16 114:4
121:7 140:5 142:7

150:5 160:9,21
169:3 171:2,3
185:19 192:16
193:11 202:8
207:6 208:18,20
208:21 215:7,8,20
216:6 221:1 226:8
227:3 235:24
236:9 244:25
248:9 254:17
259:4 270:25
272:12 274:6
275:2 277:3
278:16 292:3
303:3 313:16
325:5 332:23
333:5 335:11
337:4,5 384:12
385:16,22 397:23
**kinds** 30:14,20,21
**kirkland** 3:18
**kirkland.com** 3:20
**kirtland** 18:14
**kits** 120:25 121:1
**klauss** 1:24 402:6
403:14
**knew** 126:15
149:25 151:18
208:18 223:10
249:5 253:8
320:12
**know** 20:17,21
21:18 22:15 23:16
23:19 24:18 26:1
33:8 34:7,23 35:1
45:18 52:13 53:9
56:5,16 57:17
59:22 64:13,18
65:12 73:4,5 74:4
82:12 83:11 86:12
86:15,20 87:18

88:6,22 89:11
90:16 91:3 95:25
96:5,13,19,22 97:6
99:17 100:3,25
101:6,9,9,19
106:24 107:18
111:13 115:10
117:2,19 118:1,7
118:12,13,15,16
119:6,12 122:18
122:21 124:3
128:19,23,24
129:2,3 130:14
131:17 132:7
133:4,19 137:1
139:9 142:11,25
143:5 147:9,11
148:9 150:16
151:2 152:3,9
153:2,5,9,19
154:21 155:4,24
156:24 157:5,13
163:17 168:9,18
168:18 170:3
172:18 175:18,18
175:20 176:20,23
177:12 181:2,4,21
184:18 185:7,13
186:3,4,5,7 188:3
188:7 190:7 191:8
192:11 195:19
198:3,21 199:6
201:5 202:21,24
203:3,4,12,19
206:21 208:11,14
209:4,14,16
211:10,24 212:24
213:10,16 217:22
225:7 226:19,21
229:23 230:3,13
235:15 237:1

238:2,18 241:5
243:24 244:5,16
244:23 245:25
246:12,19,19
247:22 249:4,8
250:4,14 252:1,2
252:16 253:24
254:6 255:15
259:17 263:6,9,13
263:16 266:10
267:22 269:12,23
272:2,3 276:7,13
276:21 277:11,14
277:21,23 278:5
279:23 280:17
288:6 289:8
292:20 293:4
294:25 295:20
296:23 297:14
298:11,15,20
299:4,7,25 303:13
303:15,16,17
304:23,24 305:21
309:14,23 312:19
312:22 313:14,21
315:10 320:25
321:1,3 323:17,20
326:22 329:8
330:4,12 331:16
333:23 334:2,3
337:17 339:11
340:10 341:5
342:21,24 347:11
349:2,12 352:19
353:25 356:5,20
359:8 360:16,23
361:14 362:13,14
363:3,4 368:25
373:22 378:15
379:12 381:22
388:22 390:14,18

394:4 395:12,15
399:11,12
**knowing** 180:13
260:11 318:19
341:23 347:7
**knowledge** 214:8
226:18 253:7,8
**known** 48:17 58:1
60:1 353:4
**knows** 191:11
**kohler** 145:24
148:2 293:22
295:1,17 299:22
300:2
**kohler's** 362:16
**kouba** 2:4 17:15
17:15
**kuckuck** 81:18

**l**

**l** 1:24 19:18
174:24 201:8
402:6 403:14
**l.p.** 1:14
**la** 234:1,3,14
**label** 6:3,6,10,13
6:15,19,21,24 7:1
7:8,14,16,18,25
8:4,6,9 28:6 59:2
123:16 126:24
129:12 144:2
166:20 203:25
219:25 241:24
291:20 307:9
314:23 338:15
372:11 379:13
387:11 391:17
**labeled** 318:3
**labelling** 378:2
**labels** 378:6,11
379:3

**labor** 93:16
254:21
**lack** 26:3 290:1
**lacking** 89:20
**laid** 207:14
**lake** 51:9,13,16,24
52:16 53:4 320:11
**language** 230:5
321:23
**large** 40:2 72:14
147:18 266:15,18
**larger** 391:8
**largest** 119:24
120:2 286:4
**lasalle** 3:19
**lasts** 360:10
**late** 61:11 222:20
243:9
**latest** 250:15
**laugh** 235:3
371:22
**launched** 139:12
167:8,25
**law** 36:12 37:2
46:11 54:11 55:24
80:10 121:3
148:24 149:1,24
168:21 174:5
215:6 244:23
245:2,3,14 267:9
280:3,5,14,17
287:20 313:10
314:18 350:22
355:24 376:12
**lawful** 19:3 380:12
**laws** 45:18 174:9
204:20 214:17,21
214:24 215:10,16
217:2 218:3
221:19 244:12

**lawsuit** 20:23
21:16,19,22 23:23
24:6,17,19 75:14
251:24 340:11
341:7
**lawyer** 190:23
284:10
**lawyers** 26:14,14
28:15 147:21
190:20 270:25
**layer** 194:17
**layperson** 345:16
**lazar** 3:23 18:10
18:11
**lead** 163:2 164:10
170:10 182:8
218:20 287:19
359:3
**leader** 93:23
170:16
**leaders** 57:11
110:14,16 168:9
182:16
**leadership** 82:10
89:5 168:2,7,11
170:6,7 171:6
**leading** 145:3
170:23
**learn** 20:22 49:7
49:11 142:21
159:25 161:21
306:25
**learned** 21:15
49:15,18,23 61:22
62:21,25 140:6
143:1 153:11,15
159:5
**learning** 142:13
**learns** 316:22
**leave** 21:1 22:24
88:15 110:17

**leaves** 302:10
**leaving** 377:13
**lecture** 191:14
**lectures** 120:21
142:22 191:21
**led** 182:4 198:17
**left** 50:14 77:24
85:12 312:24
370:23
**legal** 25:9 37:9
46:13 53:24 60:1
174:4 404:1 407:1
**legally** 46:8
**legislation** 215:13
216:15 245:23
279:2,7 310:10
312:10,15
**legislative** 116:9
236:1
**legislators** 168:25
174:14 278:18
**legitimate** 54:15
232:1,20 257:9,14
260:5 265:11
271:23 276:20
304:12 310:22
320:8,12
**legitimately** 268:2
**lengthy** 341:10
**letter** 248:19
404:20
**letters** 39:1,12
**lettuce** 200:25
**level** 29:14 68:10
68:12 85:3 165:14
165:23 195:22
349:19 353:7
364:22
**levels** 87:12
242:20 357:22

**leverage** 99:15
**levy** 66:9 96:19,21
  102:12,13 114:10
  115:10
**lewis** 3:3,22 18:4
  18:11 376:13
**li** 201:8 203:5
**liability** 244:13
**liaison** 2:9 72:9
**liaisons** 320:20
**liam** 371:14
**licensed** 38:12,15
  39:14
**licenses** 317:18
**life** 49:20 177:8
  181:9,16 225:6
  297:15 315:20
  317:12 318:7
  354:1 360:17,23
  361:10,11,14
**lifespan** 297:19
**light** 66:23 360:16
**lightly** 54:17 341:4
**liked** 34:24 214:3
**likelihood** 154:10
  259:13
**likewise** 306:20
  346:21
**liking** 35:5
**limbs** 263:1
**limit** 312:10
**limitation** 396:1
**limitations** 394:9
  394:12 395:2
  397:17 398:2
**limited** 239:24
**limiting** 232:21
  330:25
**limits** 311:15,23
**linda** 52:6

**line** 106:17,21
  112:21 113:16
  114:22 116:2
  117:3,13 118:6,15
  118:17 197:14
  229:13 276:22
  397:18 404:14
  406:7 407:3
**link** 220:16,18
  363:4
**linked** 363:1
**lisa** 148:2
**list** 29:21,22 75:7
  81:5,12 82:2
  107:20 113:3
  116:23 164:2,13
  169:15 173:10
  180:1 207:22
  237:12,14 273:25
  319:24 341:10,13
  376:19
**listed** 59:24 78:13
  196:22 237:8
  406:7,17
**listened** 284:10
**listening** 284:12
**listing** 406:7
**lists** 343:6
**literally** 20:19
  198:14 313:7
  355:15
**literature** 290:21
**litigation** 1:7 17:6
  42:17 95:22
  376:14,17 404:6
  405:3 406:3
**little** 24:15 31:1
  43:9 57:6 84:13
  192:4 193:7
  231:21 246:22
  299:6 310:18

**line** 323:4 342:18
  371:13,18 374:2
  377:17 392:13
**live** 318:4 354:17
  374:5
**lived** 71:5 149:10
**lives** 121:1 122:20
  263:22 297:12
  316:22 352:20,21
  354:9 355:23
  374:6
**living** 44:12,16
**llc** 2:3 3:17
**llp** 2:10 3:3,8,12
  3:18 4:9
**loan** 281:6
**lobbyist** 278:15
**lobes** 355:14
**local** 66:5,9 71:10
  100:7,13 102:13
  294:3 295:6
**locally** 71:7
**located** 61:15
**location** 61:14
**logan** 4:10
**logic** 240:17
**logical** 240:18
**logistics** 107:18
**long** 21:6,12 32:7
  145:20,21 154:7
  191:22,22 225:9
  259:17 262:21
  263:9 297:21
  331:13 341:13
  360:18,25
**longer** 78:19
  152:15 360:22
  372:16
**look** 20:15 27:5
  47:5 55:25 62:17
  68:12 71:4,13

**look** 77:24 80:21 88:6
  105:14 113:15
  116:1 126:4
  131:12 135:22
  136:24 149:1,8
  163:20 169:19
  176:11,19 189:5
  201:2 204:15
  206:12 208:3
  213:3,4 228:13
  230:21 235:16
  245:6 247:10,21
  248:10 258:21
  273:10 292:22
  300:16 305:15
  316:13 337:9,17
  339:2 359:14,19
  359:21,25 360:3
  369:2,8 384:14
**looked** 20:20
  42:11 77:18 130:4
  130:7,8 140:23
  187:4 201:10
  247:23 297:21
  298:11 321:16
  334:4 359:7
  362:14 381:17
  394:22
**looking** 40:5 52:4
  56:4 65:4 67:20
  69:19 79:13,17
  85:14 86:17 95:13
  104:14 114:20
  138:5 142:15
  144:24,24 158:3
  166:24 173:7
  188:22 196:16
  230:23 252:10
  257:1 268:15
  270:23 272:18
  289:5 296:16

297:12 305:21
306:21 319:19
321:10 322:6
338:23 344:22
368:12

**looks** 29:17 43:13
70:13 95:22 97:15
100:5 104:11
105:18 114:18
127:14 128:14,16
129:24 171:21
172:8,9 242:10
245:1 247:11
318:24 336:21,25
337:8 362:16
368:8 369:11
370:14 389:2

**loops** 319:12

**los** 4:6

**lose** 212:23 213:6
270:25 342:23

**losing** 317:18

**losses** 232:10

**lost** 122:19 169:7
274:10

**lot** 27:3 40:4 45:12
47:14 60:14 80:7
80:9 81:25 82:5
82:10,18 83:5
102:16 105:11
117:23 120:4,4,23
120:25 128:2,5,12
131:22 138:18
140:4 152:7 160:4
160:10 162:20
163:16 172:22
179:8 180:16
183:2 190:13
214:2 217:8,13
219:17 221:17
233:22 262:25

263:5 279:13
290:4 324:11
325:10 326:10
343:13 351:11
384:20 391:12

**lots** 102:23 131:23
163:24 325:4

**love** 331:12

**loved** 274:7,11

**low** 114:10 177:10
181:14 184:8
334:4 388:18
392:17 395:3
396:21

**lower** 119:18
229:20

**lunch** 195:4 196:6
196:12

---

### m

**m** 2:17 3:13 19:18
83:21 174:24

**m.d.** 1:19 5:4 6:3
19:2,7 28:5 42:6
78:1 342:8 376:6
385:12 402:10
404:8 405:4,9
406:4,13 407:20

**madam** 404:10

**madness** 223:21

**magic** 254:7

**magically** 254:5
254:14

**mahoning** 320:1
320:11

**mail** 267:1

**main** 1:22 3:14
47:9 53:23 77:23
81:21 110:24
214:5 272:23
328:17

**maine** 142:15

**maintain** 268:25
289:2 318:7
354:20 355:4
358:3,7

**major** 34:19,22
310:6 317:3
322:25 343:12

**majored** 34:16

**majority** 105:19
289:8,13 333:10
333:18

**maker** 227:18

**makers** 206:9

**making** 25:17 55:1
76:2 82:25 102:19
109:13 133:3
162:21 195:10
216:22 218:4
219:14 235:2
258:3,24 275:15
280:3 287:23
333:19 335:1
352:20 358:14

**managed** 179:6
263:2

**management**
175:10 176:2,4
239:19,23 241:1
243:9 255:24
319:18 321:9,13
321:25 322:11

**managing** 40:17
152:17

**mandatary** 277:7

**mandatory** 273:4
277:8,18 278:2
279:24 325:4
328:13 330:20

**mania** 193:12

**manual** 343:3,17

**manuals** 343:16

**manufactured**
229:11 230:12
231:18 260:9
340:16 362:10
373:23 376:21

**manufacturer**
174:18 226:11,12
227:9 349:25
381:20 382:2,6,10
382:14,21 383:3,7

**manufacturers**
232:7 380:13
382:25 383:4,25

**manufacturing**
232:9

**march** 7:18
314:22 315:4
316:21

**margie** 315:7

**marijuana** 113:3
161:11,22 162:25

**mark** 27:25 140:5
198:23 228:14
282:10 307:5
309:8,13 311:12
366:22 372:6
388:16

**marked** 6:1 28:6
59:3,7 65:19
69:23 70:4 123:17
123:21 126:25
127:4 129:13,17
131:6,9 133:15
144:3,9 166:21,25
171:15 196:17
204:1 220:1,5
228:19,23 229:4
229:14 234:22
235:8 241:25

242:4 247:6 282:7
291:21,25 307:10
314:24 322:17
332:4,8 336:6
363:10 366:23
367:3 372:12
387:12,15 391:18
391:24
**market** 19:20
173:18 263:21
265:4 302:9
**marketing** 173:11
175:8 205:20
208:8 255:19
256:7 366:12
367:24 380:9,21
381:3,15 382:25
383:23 392:25
393:6,12
**marks** 247:13
**mart** 2:16
**mary** 124:1
367:20,23
**maryland** 34:1,10
36:23 37:24 38:17
**master's** 396:6,24
397:10,12
**masters** 2:11 18:2
141:6 292:15
**mat** 304:2
**match** 99:20 194:6
213:2,3 398:3
**material** 209:20
**materially** 207:23
341:20
**materials** 75:14,16
75:17 381:16
**math** 201:3 203:8
**mathematical**
202:3,21,25 203:6
203:13

**mathematically**
114:1 201:13
**matter** 136:11
201:17 258:3,24
261:22 265:17
266:20 285:7
297:20 347:6
375:11 398:12
**matters** 26:6
**mature** 120:7
**mayor** 87:17
**mcconnell** 2:18
**mcgee** 309:19,21
309:24
**mcginness** 2:4
**mckesson** 3:7
18:24
**md** 17:7
**mdl** 1:6,8
**mean** 22:14 31:12
33:24 35:17 43:18
46:9 53:12 58:7
60:11 62:21 66:6
66:23 69:6 76:25
82:21 89:24 103:9
103:17 104:1
113:20 127:21
128:15 130:2
141:7 147:21
158:23 161:18
165:3 167:21
171:8 172:6
173:16 175:1
178:8 181:1,23
182:14 187:4
188:20 190:6
193:5 197:8 198:6
205:15 211:4
212:9 220:23
221:1,7 224:15,18
229:16 233:19

235:14 253:20
254:5,14 260:19
261:6 262:16,17
264:10 273:1
278:13,14 279:11
290:9 292:16
297:1 298:13
302:16 327:8
329:17 330:17
331:4 335:6,23
340:19,20 345:15
353:16 390:7
395:7,10,10
397:13
**meaning** 96:20
234:12 253:21
321:9
**means** 23:2 35:19
36:13 39:3,6
59:22 80:6 89:21
113:24 114:1
115:8 116:15
162:9 198:14
212:18 222:20
268:14 269:11
281:18 283:22
285:19 334:20
393:4 395:16
**meant** 18:8 46:23
145:1 176:24
261:15 312:7
395:17
**meat** 180:3
**mechanical**
356:19 357:2
**mechanically**
357:8
**mechanism** 112:8
168:6 202:20
**med** 218:7

**media** 21:18
**medicaid** 83:1
179:22 197:24
**medical** 30:6 34:4
34:6,21 35:2
36:19 47:6,20
48:3,7,9 49:10,12
49:13,23 50:2,4,9
52:14 55:10,19,21
55:25 56:22 61:16
66:21 71:15 72:2
85:10,11 86:23
91:21 108:1,5,10
110:9,10,15,24
119:7 122:15
136:15 139:2,20
146:1,5 148:6
150:11 151:24
153:12 156:21
158:4,17 163:14
164:17 185:23
186:15 189:11,19
191:1 198:18
214:11,12 232:1
232:20 233:25
237:21 243:17
244:6 245:16
246:25 251:18
257:9,13,14 258:1
258:4,7,16,24
259:7,10,19 260:6
264:9 265:11
267:18 271:23
276:21 279:6,19
290:21 293:21
296:10,15 304:13
305:14 306:22
333:1 341:17
345:18 346:17
347:6,15 348:23
349:23 351:12

354:1 359:9 362:2
374:4 380:25
383:19 393:1,13
397:7 398:21,24
**medically** 151:7
273:19
**medicare** 179:22
197:25
**medicating** 256:9
**medication** 42:19
174:18,23 175:2,5
210:8 226:13
227:19 240:10
260:24 264:3,11
276:5 280:21,25
281:13 294:7,23
317:11 348:12
377:1 378:22
**medications** 39:15
40:17 42:19,24,25
48:24 49:8,16
50:11,14,20 51:2
149:14 150:13
153:3,7 173:19,24
175:5 178:3,14
181:25 182:11
184:2 190:14
194:24 211:16
227:2 240:16
245:13 257:8
260:3,8 262:19
265:3 271:13
273:22 300:10
304:12 318:23
319:8 322:8
347:21,22 348:1
348:13,17 363:6
377:10,14 379:17
380:13
**medicine** 34:16
38:13,16 47:23,24

47:24 93:8 131:1
156:10,15,18,22
158:22 227:10,10
260:23 261:4,6
263:11 270:20,21
272:18 274:15
280:24 289:22
290:11 310:3,13
311:5 312:12
339:16,21 343:15
**medicines** 47:3
209:16 211:11
241:13 246:16
260:15 261:10
269:19 270:10
271:22 287:11,24
288:18 328:21
**meds** 174:21
197:17 245:8
310:22
**meet** 93:7,24 94:3
108:15 110:8,24
179:9 201:25
342:13 347:19
**meeting** 20:25
21:14,23 22:25
23:20 76:3,13
77:3 81:5,24
92:20,21,24 93:14
110:8,14,16 171:1
198:12 212:20
223:1 293:25
308:2 372:22
384:10
**meetings** 21:13
23:6 69:2 73:9
74:8 82:11 83:4
88:2 92:19 93:11
94:19 96:12,14
108:14 139:10
168:6 169:10

170:16 293:8
**meets** 201:12
203:15
**melinda** 2:12
**member** 23:13,15
72:21 73:3 265:8
308:13 349:13
**members** 22:20
23:7 70:22 72:1
72:18 74:11 76:1
85:13 97:2 172:4
252:25 267:14
308:8,10,20
316:12
**mental** 20:1 58:6
60:10 65:21 66:14
71:3 80:10 82:1
83:23,25 84:9,21
85:19 87:1 101:15
105:17,25 106:4
106:10,16 111:24
115:22 218:4
235:3 308:9,15,17
308:21,25 320:16
343:5 374:3 384:7
384:9
**mentally** 315:22
**mention** 296:8
**mentioned** 96:17
103:7 128:14
157:1 200:16
218:21 228:10
233:11 237:25
256:13 266:6
269:16 270:8
273:24 299:3,18
324:19 325:12
326:25 352:25
363:9 364:25
366:17 368:6
377:3,22 379:1

383:22
**mentions** 369:1
**meredith** 2:21
17:23
**merged** 84:11,14
137:4 151:22
**merited** 139:24
**mess** 201:20
**message** 354:18
**met** 21:7 87:16
88:9 91:21 93:14
93:16,20 152:1,2,6
174:23 201:14
203:1 376:8 394:4
**meth** 113:2
**methamphetamine**
337:24
**methodology**
365:2,8,9 386:12
386:15 389:13,14
389:15 396:19
**methods** 365:6
**metrics** 171:3
201:3,13
**metrohealth** 48:21
151:22 303:17,17
**michelle** 389:17
**micro** 374:23
**middle** 63:19,25
197:2 204:16
244:11 312:24
314:6 336:7
**midst** 279:12
**midwest** 404:17
407:1
**mild** 345:6 351:24
**miles** 34:7 131:12
131:12
**mill** 52:19 53:11
54:8,22

**million** 101:12
108:19 115:1,5
126:6 127:9,12,19
127:22 128:2,5
**millions** 122:23
126:16 313:6,7
**mills** 52:25 53:3,5
53:15 256:14
268:6 313:23
320:7 325:8 327:1
**mind** 37:12 58:18
169:22 181:20
214:21 215:11,16
216:25 217:6
218:25 225:25
249:23 250:2
**mind's** 186:23
223:19 380:3
**mindless** 357:13
**mindset** 37:19
141:12 176:6
**mindy** 18:2,8,8,9
**mine** 41:6
**minimally** 108:11
**minimum** 324:8
**minute** 30:16
215:4 241:18
368:24
**minutes** 33:2 74:2
74:6 275:6 372:21
**mis** 220:12
**mischaracterizat...**
206:1,6 249:21
**mischaracterize**
249:14
**mischaracterizes**
61:10 140:1,16
176:18 249:11
250:8 269:21
270:2,12

**misdesignating**
220:14
**miserable** 269:7
**misled** 382:13
**misread** 336:1
**misrepresentation**
381:20 382:20
**misrepresentatio...**
382:5
**missed** 96:11
**missing** 208:4
262:25
**mission** 60:16 66:1
74:24 101:21,24
306:7 385:4
**misstate** 332:13
**misstates** 112:12
**mistake** 33:15
**misunderstood**
361:13
**misuse** 348:21
**mix** 161:11 358:12
**mkincaid** 2:24
**mkjohnson** 2:15
**model** 79:23,25
177:19 203:7
243:20 244:5
396:20
**moderate** 345:7
351:24
**modified** 212:2
327:2
**modifying** 186:16
210:19 211:20
**moment** 150:7
186:25 209:23
260:1 327:20
367:6 388:23
**money** 67:7 74:25
77:14,15 79:10
82:23 85:1 95:15

99:15 103:17,18
108:16 109:14
112:5 114:2,5
116:20 117:24
122:7 128:3,6,12
162:14 183:10
190:3,15 196:3
198:9,13 213:19
335:14
**moneys** 85:3
101:19 103:16
**monitor** 48:11
80:5
**monitoring** 60:7
**month** 40:7,8
41:19 73:15,18
75:10 108:14
110:12,25 130:21
183:21 320:10,11
**monthly** 73:13
107:20
**months** 48:19
69:18 138:15
156:5 324:1
359:23 360:4,6
369:21
**morgan** 3:3,22
18:4,11 376:12
**morganlewis.com**
3:6,25
**morning** 18:10
19:9,10,14 109:15
169:11 293:16
318:6 376:10
**morphine** 370:15
**motivation** 356:11
356:17 375:4,8
**motivators** 268:25
**motley** 2:3 17:13
17:15,18

**motleyrice.com**
2:7,7,8
**mouth** 270:1
356:22
**move** 145:19
263:20 295:24
307:4 351:7
**moved** 38:20
61:13 169:9,12
397:24
**movies** 335:8,12
**moving** 56:21
351:8
**mt** 2:6
**multiple** 142:21
163:9 164:11
275:25 367:11
374:23
**munetz** 56:19
309:8,9,10 388:16
**munetz's** 309:18
**munn** 315:8
**murder** 25:15
32:20
**mutual** 218:7
258:13
**myriad** 192:20

**n**

**n** 3:13 72:11
170:13,14,14
**n.d.** 1:15
**n.e.** 2:22
**n.w.** 2:12
**naeem** 3:13 18:16
18:16
**naloxone** 121:1
**naltrexone** 175:4
**name** 19:16 39:2
78:1 81:9,10
148:17 151:14,16
170:9,12 210:14

237:24 238:15
292:9,25 309:7,18
342:13 376:11
396:7,13 398:11
398:11 404:6
405:3,4,15 406:3,4
406:21
**named** 303:13
402:9
**names** 44:8 52:9
56:6 78:6 213:22
237:23 292:19
367:20 396:8
**narcotic** 197:16
**narouze** 152:3
153:2
**narouze's** 153:6
**national** 1:6 17:6
35:24 36:8 138:21
404:6 405:3 406:3
**nationally** 57:13
**nationwide** 91:12
**native** 367:14
**naturally** 290:24
**nature** 39:10 88:7
141:8 183:9
184:15 213:11
279:15 347:23
364:2
**nearly** 269:1
**necessarily** 53:12
217:19 272:21
**necessary** 162:22
273:19 375:9
**neda** 4:5 18:18
**neda.hajian** 4:7
**need** 7:7 31:13
46:2 53:9 57:9
62:2 63:18 67:9
67:24 87:21 92:6
99:3,4 102:15

103:2,13,14
109:21,22 110:19
117:8 123:4
144:19,25 152:23
164:6,9,12 187:19
192:18 200:12
217:24,25 227:3
232:2 241:23
245:4 254:9
257:11,15 260:6
276:21 285:5
289:11 317:10
319:3 321:21
332:20 342:20
347:8,13 354:8
355:17,17,18,19
358:1,16,18
391:11
**needed** 48:13,24
93:3 94:21 151:7
214:22,24 216:16
217:3 254:23
289:2 320:19,21
320:23 321:1
326:15
**needing** 40:14
**needless** 50:22
167:19
**needlessly** 189:4
313:3
**needs** 91:24 111:2
223:17 232:9,20
246:7 257:17
265:12 271:23
316:9
**neeson** 371:14
**negative** 198:10
352:6
**negotiation** 111:14
**neighbor** 269:13
339:22

**neighbor's** 260:23
270:21
**neighboring**
252:25
**neighbors** 208:24
**neither** 321:17
397:15
**nelson** 168:17
**neomed** 56:21
131:1 309:10,12
388:4,14,15,22,25
396:4
**nervous** 31:20,21
**net** 177:16 179:8
209:7
**netflix** 155:7
**neurology** 36:9
**neutral** 46:18
**never** 20:16 24:11
25:14,23 32:23
55:4 56:3 177:18
177:23 209:10
229:24 233:9
265:10,10 278:7
295:2 301:25
346:17,23 350:18
350:21 351:2
353:24 354:2,15
354:18 359:20
360:7 376:24
377:12 387:3
**new** 25:16 57:9,22
125:7 142:14
170:15 173:19,20
175:9 176:5,23
204:20,20 206:2
214:17,17,20
215:12 216:4
217:5,7 253:17
259:19 263:25
279:1 339:13

369:6 398:25
**news** 7:20 322:15
322:21,24
**newspaper** 195:17
**newspapers**
367:25
**ngri** 45:12
**nice** 196:12
**nick** 210:14
**night** 316:24
**noncare** 105:12
**nonclinical** 22:3
**nonprescription**
304:10
**norm** 218:10,16
**normal** 218:11
357:22 360:7
**normally** 142:18
**north** 3:19 51:9
236:16 237:6
316:23 318:10,14
319:20
**northcoast** 43:15
43:22 44:5,9,18
46:20 47:1,10
50:7 54:5 55:1
57:24 143:6
180:13 192:16
193:16 194:5
**northeast** 145:23
238:4 246:13
**northern** 1:2 17:8
56:17
**northfield** 47:9
**notarized** 404:15
**notary** 18:6 30:16
118:11 199:24
250:3 270:7
284:12,16 285:18
387:7 402:6
403:14 404:25

405:10,18 406:15
406:23 407:23
**note** 404:13
**notes** 41:16 367:12
367:17,22 369:5
**notice** 33:8 200:13
**november** 1:20
17:2 73:18,21
96:20 369:12
403:8 404:4
**number** 6:1 17:7
28:22 53:10 57:12
69:6,19 106:7
122:21 126:17
128:18 133:19
136:1 149:15
181:19,19 202:16
202:18 203:21
205:5,10 214:25
230:6 239:21
243:2 268:21,23
272:8 282:11
292:17 294:4,19
302:13 304:1
324:7,10,22 325:1
326:15 327:6
328:13 330:1,3
336:8,22 337:12
350:17,20 355:20
386:21 394:7
395:8 396:15
404:7,14
**numbered** 242:23
370:23
**numbers** 28:12
61:18 126:5,12
127:14 201:3
242:25 328:10
337:1 367:13,15
406:7

**numerous** 295:1
**nurse** 182:24
**nurses** 194:14
199:2

**o**

**o** 19:18 83:21
170:14
**oacbha** 133:5,9,15
133:22 134:3
135:1,24
**oarrs** 148:11,20,21
149:19 150:11,21
151:10 216:9
271:25 273:2,13
277:6,12,18 278:1
279:16,20 305:15
305:20,22 306:4
325:3,6 326:25
327:10,14,15,24
328:8,18 329:25
330:7,11 340:2
**obama** 116:8
**obituaries** 274:3
**obituary** 274:4,4,8
**object** 9:2,3,4,5,6
9:7,8,9,10,11,12
9:13,14,15,17,18
9:19,20,21,22,23
9:25 10:1,2,3,5,6,7
10:8,9,10,11,12,13
10:14,15,16,18,19
10:20,21,22,23,24
10:25 11:1,2,3,4,5
11:6,7,8,9,10,11
11:12,13,14,15,16
11:17,18,19,20,21
11:22,23,24,25
12:1,2,3,4,5,6,7,8
12:9,10,11,12,13
12:15,16,17,18,19
12:20,21,22,23,24

12:25 13:1,2,3,4,6
13:7,8,9,10,11,12
13:13,14,15,16,17
13:18,19,20,21,22
13:23,24,25 14:1,2
14:3,4,5,6,7,8,9,10
14:11,14,15,16,17
14:18,19,20,21,22
14:23,24,25 15:1,2
15:3,4,5,6,7,8,9,10
15:11,12,13,14,15
15:17,18,19,20,21
15:22,23,24,25
16:1,2,3,4,6,7,8,9
16:10,11,12,13,14
16:15,16,17,18,19
23:24 24:10 30:24
31:11 40:15 48:5
50:3,17 58:21
61:8 62:7,10,20
63:23 64:17 65:2
87:14 88:4 92:1
97:4 98:1,11,22
99:6 102:2 104:9
106:1,12 107:12
112:11 113:5,25
114:15 117:5,20
118:3,18 122:17
126:18 127:24
128:10 130:23
132:4,11 137:21
138:10 139:6,25
140:15 141:3,18
141:25 142:4
143:4,14 150:14
150:24 153:8,21
153:25 154:15
155:2 157:16
158:9,16 159:21
160:23 161:6
162:8 163:11

164:8,16 165:2
166:6 176:7 186:2
186:21 187:10
188:25 189:20
190:5 191:4 194:8
194:25 195:14
199:18 202:1
203:18 212:13
213:21 216:11
221:10 223:16
224:1 227:22
228:8 231:14
232:22 233:8,18
234:11 236:18
240:12 243:14
245:17 248:5,14
249:1,10,18 250:7
250:16 251:5,16
251:25 252:12
253:2,15 254:11
257:24 258:8
260:7 261:25
262:7 263:12
265:13 266:4
267:12 269:20
270:11 271:24
274:1 275:18
276:16 278:4
281:2 284:1 285:3
285:12,13,16
286:13 288:23
291:4 294:24
295:16 297:9
298:16 300:11
303:5 304:14
305:4,13,24 306:8
310:16 312:17
318:18 319:9
321:15 322:2
324:4 331:3
341:22 347:17

349:10 351:18
353:15 354:4,19
355:7 356:14,24
357:16 361:7,24
362:12 364:4
365:20 379:9
383:16 385:3
386:2,18 393:9
394:1,15 397:8,21
398:4,17,23 399:6
**objecting** 98:23
**objection** 9:1,16
9:24 10:4,17
12:14 13:5 14:12
14:13 15:16 16:5
33:19 63:6,16,17
98:2,14 100:19
107:5 129:1
207:17 242:14
279:10,22 285:11
350:2 375:16
**objective** 37:12
**obtain** 253:9
267:20 272:9
276:5 290:17
350:22 351:6
352:16 358:11
**obtained** 281:19
283:16 285:24
287:12,12,25,25
288:19,20
**obtaining** 162:11
162:12 268:13
283:22 285:20
290:18 352:3
356:20
**obviously** 38:1
69:7 82:6 103:17
127:25 181:9
259:22 273:9
302:6

**occasion** 68:21
99:14 346:4
**occasional** 38:2
**occasionally** 40:22
42:24,25 46:7,9
**occasions** 48:1
295:2
**occur** 73:11
**occurred** 96:15
208:19
**occurring** 76:8
**october** 6:25 7:2
7:13 138:21
219:23 220:6
228:18 251:10
256:21 291:18
292:2,7 293:13
324:2
**odmh** 253:22
**odmhas** 137:3
253:22 326:21
**oendp** 148:22
**offer** 46:10 191:2
**offered** 139:15
**offering** 374:11
**offers** 319:17
**office** 39:23 88:20
89:10 90:21 124:9
124:13,22 299:23
306:23 308:1
362:2,16 403:6
**officer** 27:6 32:20
55:15,21,24 56:4
78:1 83:18 86:10
86:24 91:20 122:6
122:8,15 251:18
333:2 341:17
**officers** 27:2 40:25
41:1 57:14
**offices** 40:4,6,8

**official** 40:17
279:5,18 330:5
347:19 351:23
405:15 406:21
**officially** 21:8 27:9
38:18 47:22 71:8
91:9 150:20
151:11 201:6
202:23 210:7
348:9
**officials** 251:21
252:24
**oh** 2:19 3:14 26:1
79:5 188:12
206:12,23 209:2,5
211:5 225:10
246:23 269:22
272:13 274:9
297:20,22 304:20
329:16 330:20
331:14 337:15
372:1 378:17
387:18
**ohio** 1:2,12,15,23
7:4,9,11,20,22,22
7:24,24 8:7 17:9
19:21 31:16 38:13
38:16 39:8 44:6
45:8 52:14,19
55:25 56:3 59:23
59:25 71:2 83:22
83:25 84:9,10,21
85:19 116:15
137:7 141:22
143:2 145:23
148:21 151:9
234:21 235:10,15
235:17 236:2
237:3 238:4,11
244:19 245:22
246:13 247:4,16

248:21,25 249:8
250:5 251:22
252:1,4 255:12
276:25 277:13
278:3 281:25
282:5 283:10
299:9 307:22
322:16,21,24
323:9,15,18
326:13,20 332:2,3
332:9,10 334:9
338:13,14,20,21
364:16 386:5
388:8 391:15
392:6,11 402:2,7
403:7,15 404:2
**ohio's** 6:16 131:5
131:11 137:15
251:13 282:12
329:3
**ohmas** 83:24,25
84:17 85:12
111:19
**okay** 33:25 39:14
46:25 54:4 58:17
62:17 63:1 64:9
65:11,14 73:13
79:4 86:1 91:16
92:12 96:25 99:23
100:5 104:6
107:14 111:15
112:19 115:21
116:17 118:1
119:6 121:5
132:21 133:12,23
134:13 135:17
140:9 141:5 148:1
151:8,23 152:22
156:13 163:25
165:24 169:19
170:3 171:14

175:8 186:14
188:13 194:4
197:3,18 200:9
201:15 202:4
203:20 209:14,19
213:13 216:13
217:5 221:22
222:17 227:15
228:6,10 233:5
234:18 235:7
245:11 247:10
257:21 259:25
270:13 273:20
275:13 280:19
283:5 286:4,20
287:17 288:9
289:14,21 292:11
292:23 293:3
295:6 300:5 301:5
301:7 303:23
306:20 307:24
309:10,17 312:8
316:20 328:15
329:22 331:7
332:7,23 333:7
338:10 342:15,16
343:2 345:25
359:19 361:13
366:2,15 369:3,9
369:17 372:3
375:23 385:14
386:9 389:1 394:5
396:23 397:25
**old** 177:18 306:10
306:14 369:5
**older** 120:8
**omhas** 116:4
**omissions** 382:8
**once** 33:19 40:9
62:21 86:22 91:7
110:25 142:23

143:15 155:14
234:25 253:4,5
328:12,12 330:13
355:13
**oncologist** 239:5
**ones** 58:22 82:22
119:18,21 167:24
178:18 183:18
208:4 254:21
320:8 390:15
**onetime** 225:10
354:12
**ongoing** 48:24
225:13
**op** 1:15
**open** 35:4 73:25
110:17,18 218:3
318:1
**opening** 145:10
**operation** 83:17
**operations** 95:8
97:18,22,23
112:18 122:6
**opiate** 1:7 6:16,21
7:6 8:8 17:6 20:4
49:1 61:20 64:19
81:19,24 82:6
83:5 85:1 113:13
116:4,13,23
117:14,16 119:21
120:5,15,20
124:14,23 126:1,7
130:20 131:5,11
136:22 137:7,15
137:25 138:5,9,19
139:8,11,23
140:24 144:22
155:11 164:24
166:19 167:2,5,9
167:19,23 168:1
169:7 170:10

174:11,23 176:12
196:20 207:13
213:25 238:20
241:22 248:7
251:19 252:17
253:13 257:4
264:14 265:17
267:25 269:10
278:16 282:12
283:10,22 285:19
285:25 286:16
293:6 297:5,16
298:25 300:8
305:12 306:17
307:2 311:15,23
313:3 319:8
323:10,20 324:1,7
325:1 326:14
327:6 328:21
329:3,24 334:20
335:7,21 355:17
362:5 363:1
370:17 381:14
384:12 391:15
392:7 393:2,8
404:6 405:3 406:3
**opiates** 43:7 47:17
48:2,15 51:10,16
52:21 53:9,21
54:2,11 81:25
82:13 86:18 87:24
116:3 119:1,2,3,3
120:1 131:2
136:23 149:7
161:22 172:21
173:24 177:7,15
177:22,23 182:3
188:16 189:6
205:22 207:3
208:15,18 209:9
209:10 210:5

212:4 214:2
219:19 225:6
226:7,16 246:6
250:17 260:4,14
260:17 265:7
267:20 270:18
271:11,20 272:15
272:15 278:23
283:16,23 285:20
285:24 289:1
301:22 304:10,10
305:17 306:6,11
313:15 314:13
322:7 330:6 340:4
340:16 350:4
351:5 362:20
364:18 384:20
386:20 388:10
**opinion** 24:2,5,9
24:16 25:25 27:11
46:1,8,10,10 190:8
191:8 240:13
280:4 341:24
364:11
**opinions** 156:25
191:3,6 279:14
363:18
**opioid** 47:3 50:11
50:14 51:1 60:25
61:7,19,22 62:5
64:14 65:1 80:18
80:24 83:9 86:12
87:11 94:10
102:10 106:3
112:1 118:23,24
119:16 121:8,13
122:13 124:4
130:15 136:21
137:19 139:5
140:11,13 141:2
141:22 142:10

143:2,13,20
150:12 153:3,7,24
154:4,13 165:5,14
166:3 167:12
171:18 173:2,14
174:18 178:3,14
180:13 181:25
193:20 194:24
195:22,22,23
199:13 200:2
202:9,12 203:1,17
205:4,6,8,10
207:24 209:16,20
210:11 211:11,15
213:17 214:9
215:12 216:17
219:1 221:23
223:6,15 226:12
226:13 227:10,19
229:10 231:17
233:6,6,16 234:9
241:1,13 242:7,12
242:20,21,22
243:13 245:13
246:16 248:1,12
248:24 249:9
250:5 251:23
253:11 255:11
257:8,15 259:13
259:14 260:3,15
261:3 265:3
267:10 269:18
270:10 271:13,21
273:22 279:9
281:13 286:10
287:11,24 288:18
300:10,22 301:2,3
302:1 304:3,12
310:4,13 311:5
312:12 322:8
335:18 336:12,17

336:22,23 341:21
344:5,21 345:11
346:1,13,18 347:7
347:21 349:24
351:15 353:22
359:21,23 362:9
377:10,10,14
379:13 381:15
382:2,25 383:8
384:24,25
**opioids** 47:15 49:9
49:11,24 51:25
55:2,7,12 82:3
86:21 87:4,25
149:21 153:12,16
192:17 194:1,6,10
199:13 200:2
212:8,12 232:19
248:1 255:20
256:3,23 260:1
276:1 281:19,20
281:21 295:24
298:24 300:20
337:13 339:4
346:24 349:4,20
350:1,13,16,17,21
350:23 351:1,2
360:10,18 361:20
361:21 363:12,19
364:3 365:10,14
376:21 377:18
378:6 379:2,7
380:22 381:4,21
382:6,10,15 383:4
384:4
**opioid** 240:10
**oppa** 39:8 308:20
**opportunities**
139:15
**opportunity** 20:12
56:25 57:16,22

172:9,13 183:23
**opposed** 22:11
46:19 105:8
120:15 121:13
219:10,17 271:18
277:15 297:6
304:21 354:9
390:15,20
**option** 218:8
**options** 354:24
**oral** 36:1
**orchestrate** 168:5
**order** 43:14 79:8
256:6 291:13
292:5 302:20
**orders** 348:6,22
**ordinary** 360:13
**organization**
74:24 133:10
**organizational**
70:14 77:25 80:22
**organizations**
105:11 185:23
189:11 354:23
**organized** 146:5
204:12 242:7
**organizing** 145:6
210:12 278:22
**oriana** 120:10
**orient** 372:17
**original** 149:3
252:3 296:21
303:8 340:5
**originally** 60:24
337:21
**orman** 136:25
**ought** 279:20
330:16
**outcome** 27:6,12
202:13 239:22

**outcomes** 67:7
69:1,16,16 79:9
109:2 158:13
262:11
**outdo** 335:19
**outlined** 100:22
344:7 345:1,11
**outpatient** 47:10
57:15 93:23
178:19 179:25
**outpatients** 159:1
**outputs** 298:13
**outsell** 335:22
**outside** 42:16
100:10,18 159:3
257:17 321:8,24
322:1
**overabundance**
326:13
**overall** 80:22
**overcome** 353:13
353:16 354:17
**overdose** 7:22,24
64:21 121:2
138:19 175:1
282:13 294:5,20
324:12 332:2,9
336:8,12,17,18
337:12 338:13,21
339:4
**overdoses** 61:19
167:19 169:8
313:4 317:15
326:14
**overexaggeration**
94:16
**overflooding**
302:9
**overhead** 41:18
**overlap** 40:22
112:3 119:4

120:23
**overly** 310:2,20
**overprescribe**
311:2
**overprescribing**
50:22 53:20 150:3
150:6,23 183:11
216:8 294:6,22
301:19 317:9
**oversight** 47:1,14
47:16 50:9 90:19
109:23 110:5
112:9
**oversupply** 231:19
**overtreatment**
230:9
**overwhelming**
333:18
**overwhelmingly**
154:2
**owned** 103:23
**oxford** 3:4
**oxycodone** 300:20
301:20 360:24
361:4
**oxycontin** 179:12
188:6 206:1,6
226:1,12,25
260:22 304:4

**p**

**p.m.** 400:6
**pa** 3:5 4:11
**pace** 57:1
**package** 378:2
**page** 9:2 28:21,22
41:20 70:12 97:11
97:12 104:6,7,15
113:16 114:17,22
115:12,17 116:2
125:21 173:8
197:2 204:16

208:1 235:25
236:8 237:11,13
237:13 238:15
239:17 243:2
244:11 248:18
254:2 255:4,4,15
282:25 283:8,18
323:9 329:23
333:8 336:5,8
367:13,15,16
368:22 370:23
373:5 388:1
394:13 404:14,16
406:7 407:3
**pages** 43:9 394:3
**paid** 27:19 82:25
188:4 190:19,22
191:2,6
**pain** 48:15 49:18
49:19,19,20 52:10
52:12,16 54:13
152:12,12,17,23
175:10,16,16
176:2,4 177:8,8,10
178:24 179:5,7
180:4,16,22 181:9
181:21 182:11,17
186:1,10,12,19,20
187:18,19,24
188:24 189:1,15
192:19 193:4,7,9
193:14 194:10,13
194:13,16,22
197:6,17,22
205:21 206:24,25
209:3,3 210:19
212:21 216:22
221:20 224:6,22
224:22,22,23
225:21,22 226:3,8
236:13,15 237:4

239:4,6,9,10,18,23
240:3,11,14,15,20
240:21,22,24
241:2,10 243:9,22
244:2,9,12,21,25
245:2,5,8,21 246:7
246:9 255:23
264:15,16 272:3,4
294:6,22 310:21
310:22 315:13,21
316:8 317:17
318:7 319:7,17,23
319:25 320:4,6,13
320:16,18,22
321:9,13,25 322:5
322:11 325:22
389:25
**painesville** 52:10
**painted** 53:8
**palliative** 239:1,2
239:18,24
**pamphlet** 6:17
143:25 144:11
**paper** 25:24
246:20 308:3
394:17
**paperwork** 38:19
**par** 4:2,3,3 18:19
**paragraph** 230:18
230:24 231:3,21
311:14 323:24
339:3 392:10
394:11,13
**parameters**
101:21 102:7
177:12 298:14
**parentheses** 55:18
113:19 114:12
**parents** 157:21
162:14 274:24
319:1

**park** 34:1
**parren** 237:24
238:2
**parse** 85:4
**part** 20:2 21:8,25
22:6,8 23:22 25:7
46:4 56:16,17
86:18,21 87:2,5
91:5 93:13,21
109:11 138:3
140:11 142:1
147:17 148:19
152:14,15 162:17
162:18,20 184:3
185:18 192:23,25
208:11 218:6
222:15 227:1
238:19 244:3
252:21 261:23
262:9 274:18,20
279:1 288:22
290:15,19 291:8
311:16 315:3
327:8 332:24
341:6 346:14
359:1 372:25
373:11 377:25
379:16 381:18
392:23 397:25
406:9
**partial** 182:22,22
**partially** 66:12
182:25
**participated**
237:15 238:9
239:13
**participation**
198:4
**particular** 37:15
53:19 54:21 55:9
57:20 68:20 76:23

87:4,23 88:1
92:18 94:10
113:10 118:17,23
119:16 120:13
131:19 133:21
139:24 142:15
149:20 158:25
161:9 162:2 164:4
164:11 171:24
179:11 190:17
192:7 196:3
201:25 214:7
215:10,15 227:7
228:11 230:23
233:7 234:15
237:24 239:20
243:1 247:13
256:5 257:14
259:6 264:5,14,14
264:16 276:8,23
277:15 299:8
307:1 312:15
314:15 337:3
341:18 366:6
385:24 386:4
396:12 397:19
**particularly** 80:18
  80:23 82:9 155:9
  175:25 289:20
  322:8
**partner** 61:2,6
**partners** 42:7
**partnership**
  120:18
**parts** 75:9
**party** 134:4 403:3
**pass** 35:24 319:16
  319:19 375:25
**passage** 150:10
**passed** 52:17
  88:17 216:16

217:2 385:11
**patent** 263:15
**path** 34:25 273:17
  303:11 338:6
**pathologist** 148:7
**pathway** 155:15
  157:5 272:17
**patient** 36:3 40:16
  41:4 45:14 48:3
  51:18 67:5 151:3
  158:4,10 183:1,16
  185:5,21 192:19
  194:13,13 196:3
  213:17 214:4,9
  217:11 226:3
  239:22 240:9,11
  241:14 257:14,23
  258:5,14,21 273:5
  275:23 276:8,23
  306:9 310:15
  312:12,14 314:15
  317:19 325:14
  329:8 345:22
  346:1 347:6 349:3
  349:8 353:20,22
  364:19 375:17
  382:19
**patient's** 149:1
  179:5 214:11,12
  259:15 311:3,6
**patients** 39:15,21
  40:14,18 42:20
  44:11,19 45:4
  47:18 48:6 49:6
  50:16 51:8,13,24
  54:10 55:3,7,12
  66:25 67:23
  105:13 177:13
  183:12 184:20
  186:18 190:4
  194:15,22 195:12

204:21 206:12,24
209:7 211:16
214:18 216:1,2,5
217:9 218:22,24
219:3,5 275:19
281:19 299:14
305:9,12 317:17
320:10 326:2
328:6,22 349:19
389:24
**pattern** 344:23
**patton** 81:1,16
**paul** 2:11 17:25
**pause** 123:10
  176:10,19 376:3
**paxil** 264:18,20
**pay** 41:18 83:2
  181:8 184:14,15
  191:9,16 194:22
**paychecks** 89:3
**paying** 82:5,18
  180:16
**payment** 185:20
**payments** 190:13
**payroll** 88:25
**pays** 94:4
**pboehm** 2:14
**peachtree** 2:22
**peak** 203:8 325:17
  360:13
**peaked** 337:4,5
**pecuniary** 189:19
  192:10
**peer** 299:13
  365:22 397:7,16
  399:4
**pejorative** 318:16
**pending** 99:9
**pennsylvania**
  56:12

**people** 44:13,16,25
  45:6 48:14 49:21
  51:21 52:11 58:13
  60:14 61:18,22
  62:1,4,15 69:19
  71:5,12 77:7,11
  81:5,12 82:5
  92:12 102:23
  109:7 120:5 152:8
  152:24 154:2,13
  155:1,9,12,23,25
  160:5,20 161:1,7
  161:12 163:16
  171:4 175:25
  177:16,23 183:2
  184:9,10,11 188:9
  189:4,17,25
  193:12,17 199:3
  200:23 201:3,12
  202:16,19 206:21
  206:22,23 208:21
  217:13,16,17,21
  219:8 223:8 225:4
  239:3 245:5 246:4
  246:5,10 253:22
  262:8 267:24
  269:3 270:14
  271:11,15,19
  274:4 284:20
  285:25 287:14
  289:7,18,24
  293:14 295:23
  298:9 299:19,22
  301:8,21,25 302:4
  302:7,12,15,18,22
  303:7 304:9,18
  310:21 312:24
  313:2,14,18
  324:12 330:18,18
  335:2,9 339:13,16
  340:3,22 348:12

[people - physician]

350:15,17,21,25
351:2 352:19
353:17 355:22
359:9 362:22
371:19 372:4
373:12,16,23
374:5,11 385:7
391:11
**people's** 272:18
291:12
**perceived** 208:9
398:13,14,19,20
**perceives** 276:20
**percent** 22:9,13
43:25 44:1 51:17
54:10 66:8,10,10
105:12 154:19
182:5,6 261:17
286:5,21 287:1,6
287:10,23 288:11
288:18 296:2,8
300:13,21,21,23
300:23 306:3,19
390:23 392:14
**percentage** 38:3
51:15 101:4
154:21 283:24
285:21 296:4,5
303:6 329:24
334:3 338:6
390:18
**percentages** 288:6
299:20 333:23
334:2
**perception** 209:5
215:3 364:7
365:17
**perceptions**
363:11,17 364:1
398:20

**percocet** 163:4
176:1 179:11
180:17 183:5
184:7 224:20
272:5 304:4
360:22
**percocets** 184:19
**perfect** 326:1
**perfectionist**
144:6
**perfectly** 158:12
**perform** 258:19
**performed** 365:22
383:24 398:16
**period** 156:6
296:14,23 297:7
298:11 323:21
**periodic** 108:13
**periods** 300:7
**permissible**
380:12
**permitted** 174:5
**persistence** 375:4
375:9
**person** 25:19
31:18 32:19 33:16
47:24 51:8 68:20
81:22 104:11
121:20 122:7
125:18,20 127:15
152:7 155:19
161:15 164:4,15
171:11 191:9
223:20 257:22
258:4,10,12,17
259:1 268:12
273:17 276:1,12
286:9,15 305:16
309:23 316:5
321:16,20 335:16
347:12 355:10

356:8,9,12 360:3,9
361:21 367:24
368:7 371:14
388:23 396:4
397:9
**person's** 155:18
287:18
**personal** 396:24
**personally** 121:16
125:11 192:11
226:17 228:5,7
279:18 347:21
362:23 380:20
383:13 405:11
406:15
**perspective** 71:11
146:1 157:12
163:25 164:1
170:6 322:10
**pertaining** 21:17
**pervasive** 240:15
**pet** 359:9
**peveich** 6:10 83:16
95:9 117:11 122:2
122:5,25 123:16
123:24 125:14
127:5,8 129:18,23
**peveich's** 125:22
**pharma** 1:14
188:4 190:13
191:20
**pharmaceutical**
3:2,21 4:3,3,4
173:18 206:15
226:16 227:8
228:4 333:9,13,21
340:15 366:11
376:24 377:4,9
379:23 380:9,12
382:21,24 383:3,7
383:25 392:25

393:6,12
**pharmaceuticals**
3:12 4:2
**pharmacies**
265:23 273:14
280:10 324:16
327:10 340:20,21
**pharmacist** 47:12
51:3,14,23 327:17
349:18
**pharmacists** 47:12
**pharmacy** 149:15
327:17 328:9
340:17,18 349:25
362:14 363:7
**phil** 170:22
**philadelphia** 4:11
**philosophy** 175:10
175:24 176:2,4,5
176:23
**phone** 18:6 92:23
309:23 388:19
404:3
**photo** 53:8
**phrase** 56:3 64:19
79:25 92:3 117:2
117:15,18 161:20
176:23,24 335:25
**physical** 48:8
316:8 317:5
356:19
**physically** 48:13
315:22
**physician** 6:18
53:24 144:1,13
148:23 150:25
175:15 182:22
197:13 199:1
210:20 211:6,12
211:20 212:3
213:20 214:8,10

227:20 257:22
259:22 273:12
307:18 313:17
324:19 325:11
326:25 328:9
329:7 349:5,13
361:22 364:16
375:12,13,21
382:12 388:9
391:9 396:5
**physician's** 212:21
366:12 393:2,8
**physicians** 8:7
39:8 50:15 51:1,7
52:20 54:25
144:20,25 145:2
149:14,23,23,25
151:9 157:18
176:18 178:9,17
179:10,15 181:17
181:18 182:11,23
185:3,19 186:8
187:21 188:2,12
189:12 190:11
192:1,7 194:5
197:1,16 198:21
198:25 205:22
206:17,19 208:14
208:25 213:24,25
215:2,18,18,19,25
216:20 226:24
228:4 245:3,15
261:20 268:3
279:25 307:22
313:25 324:13
327:9 329:6 348:5
386:5 388:4,8,12
390:9,10,14
391:15 392:7,12
392:20,21 393:4

**picture** 71:11
347:14
**piece** 175:15
**pieces** 325:5
**pill** 52:19,25 53:2
53:5,11,15 54:8,22
256:14 268:6
313:23 320:7
325:8 327:1
356:21 370:14
**pills** 149:15 151:7
215:1,7 216:3
225:2 231:19
260:21 268:1
270:20 271:16
272:10,20,23
273:18 274:13,14
276:13 289:9,9,12
295:5 296:3
297:16 300:14
302:9 314:2,4
324:15 325:9
326:13 331:5
334:17 339:10,12
339:13,19,19,25
340:5 362:9,18
363:1
**pink** 31:15,16
**pipeline** 262:9
**pittsburgh** 3:5
**pizza** 358:15
371:16
**placard** 326:3
**place** 48:16 50:10
58:15 61:17 65:1
90:2 103:18,19
109:14 138:1
223:24 279:8
310:11 402:21
**placebo** 261:18

**placed** 325:13
**places** 60:2 228:1
**plaintiff** 27:18
46:19
**plaintiff's** 32:16
**plaintiffs** 26:14
**plan** 96:23 107:21
213:12 274:22
310:6 373:7 388:5
**planned** 101:2
167:7,25
**planning** 60:7
139:11 180:19
**plans** 107:21
218:7
**play** 45:3 89:13
276:18 290:23
**played** 207:23
366:12
**player** 306:10
**playing** 297:23
398:9
**plays** 95:12 326:9
375:17
**pleasant** 2:6
**please** 17:10 18:6
18:25 19:15 30:18
63:22 64:1 99:7
108:19 118:10
135:7 199:19
249:25 269:23
293:17 315:24,25
339:18 369:3
383:5 384:1
404:12,12
**pleasure** 358:19
371:2,9
**pllc** 1:22
**plugged** 388:20
**plumber** 339:21

**plural** 197:19
**plus** 40:24 334:24
**podiatrists** 392:12
392:22
**point** 21:19 47:9
53:23 56:9 58:11
101:17 107:25
123:3 143:18
147:6 148:18,25
176:22 183:22
188:2,19,21
192:22 197:5
198:24 208:9
214:23 237:23
247:21 257:20
258:9 268:14
269:9,9 270:15,17
276:18 279:24
280:5 287:22
317:8 324:6
326:11 327:9,22
328:6,20 329:23
355:21 371:6
379:21 385:15
**pointing** 235:3
**points** 207:15
**police** 27:1,6 32:20
57:14 267:15
339:18
**policing** 276:11
**policy** 75:1,6
150:18 168:24
169:17 243:16
251:12 277:19
279:8 312:15
350:6,9
**political** 38:1
**politicians** 92:14
**poll** 364:21
**polling** 364:10

**[polster - prescription]**

polster 1:9
polysubstance
  161:14,18
pop 302:19
popular 337:20
population 45:12
  119:4 182:6 298:4
  303:2 338:3
porter 4:4 18:19
portion 111:9
  116:14 210:6
portray 335:12
position 57:22
  66:22 78:20,21
  79:12 88:15 91:20
  139:2 277:25
  278:6,8 279:17
  309:15 310:24
  381:13
positions 278:7,12
positive 261:16
  302:8 371:8
positives 379:25
possession 75:15
possible 96:14
  108:24 113:8
  128:17 143:11
  167:18 253:7
  268:14 319:10
  399:3
possibly 45:8 97:9
  141:16
post 216:1
posted 147:5
postings 216:1
potent 335:18
  370:19
potential 226:6
  348:2,15 378:21
potentially 113:7
  161:24 197:14

207:3 225:7
  278:19 348:19
potentials 379:24
powerpoint 172:7
practice 25:8
  38:12,16 39:19
  40:2,4 41:7,12,15
  41:21 42:2,10,21
  53:19 54:7,22
  69:14 72:7 79:12
  168:4 185:14
  189:13 212:21
  240:25 241:5
  246:4,19 310:2
  320:9 346:17
  349:23 351:20
  377:13 390:22,24
practices 55:10
  94:1 152:17 178:1
  199:14 200:3
  211:4 219:20
  388:10 390:19
practitioners
  182:25
pre 34:16
precincts 339:18
preconceived
  398:3
predates 208:13
predecessor
  138:12
predetermined
  101:23
predict 157:8
  158:13 291:6
predicted 203:7
predisposed 160:9
  160:21 303:2
predisposition
  155:23 157:2,4
  177:21 291:10

pregnancy 262:23
preparation 95:6
  95:11
prepare 95:2
  111:7 222:6
preparing 386:16
prescribe 39:15
  42:20 47:17 51:16
  149:6,7 150:4
  174:20 177:4
  178:2 182:11
  194:6,9 197:16
  205:22 211:15
  212:3,8,12 214:3
  219:19 226:15
  240:10 241:14
  245:18,18 261:21
  310:12 311:5
  312:12 347:21,22
  350:4 364:17
  378:14
prescribed 43:2,6
  43:6 47:14 48:2
  48:15 49:1 50:20
  51:25 153:3 182:1
  194:1 209:15
  210:8 211:11,15
  213:16 265:20
  266:15,20 267:5
  300:20 328:22
  349:4 362:4
prescriber 273:12
prescriber's
  157:12
prescribers
  182:24 241:11
  244:14 268:7
  329:24
prescribes 153:3
  211:11

prescribing 8:8
  47:25 50:10,11,14
  51:1,20 150:12
  153:6 158:7 178:1
  178:13 182:3
  185:3 186:16
  192:17 197:22
  199:8,14 200:2
  213:25 214:2
  215:23 245:13
  246:15 257:22
  258:3 259:13
  268:7 311:16,24
  327:1 329:3 330:6
  349:5 366:13
  377:14 388:9
  391:16 392:7
  393:2,8,19
prescription 1:6
  6:18 7:9 17:6
  144:1,13 146:8
  149:20 178:14
  181:25 194:24
  208:9 209:16
  210:4 214:9
  224:21 227:9
  232:19 240:10
  241:13 246:16
  247:5,16 251:13
  256:3 257:15
  259:14 260:3,15
  261:3 266:23
  269:18 270:10
  271:13,21 273:22
  281:4,6,11,12,20
  281:21 283:16,23
  285:20,24 286:10
  286:12 287:7,11
  287:13,24 288:1
  288:18 289:1
  294:22 295:23

297:6 298:24
300:9 301:3,22
302:1 304:3,11
305:22 306:15
318:22 322:8
328:21 333:25
334:3,5 336:12,17
336:22 337:13
339:4 349:4,15,20
350:1,13,16,17,21
353:22 359:21,23
361:20,21 362:4,9
362:18,20 363:1,6
363:12,18 364:3
365:10,14 376:21
377:10 378:6
379:2,7,13,17,19
380:22 381:4,15
381:21 382:1,6,10
382:15,18 383:4,8
384:3 404:6 405:3
406:3
**prescriptions**
50:23 52:15 55:2
55:7,12 145:2
149:2 193:20
232:5 276:1
305:17 324:7
325:1 327:6
328:23
**presence** 359:25
402:15
**present** 4:14
107:19 171:5,18
306:24,24
**presentation** 8:2
30:23 137:5,11
152:16 171:25
172:14 221:14,22
222:7,18 223:3,10
224:18 366:17

367:2,10,14,21
368:10,12,18,25
370:3,13,22
**presentations** 29:2
29:6,9 172:3
344:18
**presented** 70:9
91:15 95:23 96:2
146:4,24 159:10
166:10
**presenters** 131:18
**preserve** 75:14,17
**press** 7:2 183:19
185:8 220:16
228:12,13,18
229:5,19 323:17
**pressed** 217:3
**pressure** 178:6,7
179:9,10 181:11
181:14 182:10
184:22 188:11
194:5,9,10 215:2
**pressures** 178:16
182:8 215:20
221:19
**presumably** 29:13
103:15 113:11
285:25
**presume** 297:25
298:5
**presupposes**
288:25
**presupposing**
289:4
**pretend** 22:2
107:17 272:2
**pretty** 56:24 85:8
85:9 114:9 127:14
128:14 130:3
149:11 184:5
209:24 212:1,22

213:9 222:8
240:21 247:11
261:11 274:14
289:22 290:5
301:17 306:12
329:13 353:11
355:22 364:20
371:19
**prevent** 121:3
150:1 224:5
232:21
**prevented** 27:12
**preventing** 273:13
**prevention** 60:8
81:1 102:10 160:1
**previously** 80:12
142:18 205:23
**prey** 219:17
**preying** 246:25
**primarily** 237:20
**primary** 48:24
50:15 145:1
149:17 186:9
193:2
**print** 74:19 374:23
**printed** 369:11,15
369:15
**printout** 135:20
**prior** 25:5 33:9
56:20 61:14 85:12
106:2 175:18,20
177:2 178:17
180:19 181:3
188:17 271:25
277:25 279:21
294:16 310:4
327:13
**prioritized** 102:21
**prison** 304:16
356:6

**private** 25:7 32:6
39:19,22 41:21
42:2,10 104:3
179:19,23 189:13
246:4 320:9
390:19,22,24
**probably** 21:5,13
26:11 27:9 33:15
43:25 52:22 84:11
88:18 91:17
113:14 140:3
154:18 187:11
188:4 195:17
197:9 212:18,25
213:12 216:13
217:16 222:20,21
225:12 243:25
245:8 250:10
263:17 264:1
272:23 274:14,15
280:16 286:15,16
313:7,20 328:14
329:13 341:11
361:16 376:19,23
395:11
**probate** 30:8
**problem** 53:25
64:14 138:18
182:9 185:25
188:24 208:11,19
215:4,5 225:13
251:8 257:1
302:12 312:19
314:1 340:3
**problematic**
352:19
**problems** 53:2
69:5
**procedure** 285:8
300:1 401:7 405:5
406:5

proceeding 32:10
46:16
process 45:1 48:7
56:21 68:1 69:11
78:20 89:20 93:2
96:4,9 102:15,19
103:12 108:9
109:3,11 111:11
147:20 158:12
193:6 218:18
219:16 225:10
261:12,24 263:7
264:2 265:1
270:16 279:8
285:8 290:10,12
299:25 329:15
341:24 358:13
377:18,23 378:1
processes 199:7
204:20 214:17
217:6,7,15 218:2
272:1
processing 83:3,5
produced 28:15
131:25 133:16,20
133:22,24 134:3
140:24,25 172:17
292:14 333:12,20
333:24
product 139:5
227:10,20 232:9
335:16,17,18
378:3
production 95:21
229:20 232:8
369:16 404:16,17
404:22
profession 206:20
237:21
professional 29:3
37:11 91:6 258:6

332:25
professionals
354:2
profile 149:1
program 45:14
77:7 79:20 81:19
93:23 99:17 120:3
121:2 146:18
148:23
programs 6:5
47:10 59:1 117:25
118:1,12,13
178:19 239:19
267:23 319:18
progress 323:11
323:15
project 99:20
100:4
projected 99:13
104:12 113:17
114:21
projects 140:8
384:20
prominently
371:24
promising 323:11
promote 91:8
190:14,14
promoted 226:2
330:13 379:25
promoting 339:17
promotion 380:16
380:17
promotions
367:24
pronounced
148:10
pronouncing
210:15
proper 281:10
349:6 356:11

properties 49:24
153:16 154:25
209:17 226:14
227:11,21 349:15
proportion 82:24
121:11 267:24
proportions 101:3
proposals 314:10
proposed 97:1
312:6 313:8 389:3
prosecution 46:19
46:23
protect 216:7
protected 245:5
263:5
protocol 300:1
proud 105:6
proven 261:14
provide 66:5,17,24
109:22 112:9
116:12 168:7
193:11 245:14
254:22 319:24
320:3
provided 19:3
66:4 68:11,22
116:11 133:25
134:6 237:14
296:17 374:20
provider 158:3
196:1 240:9 259:7
267:5 286:11
provider's 312:11
providers 93:25
108:2,3,4,10
109:19,23 178:2
182:1 195:9
209:15 276:7
310:12
provides 94:5
299:13

providing 69:22
79:17 82:9,9
124:7 239:23
pry 88:14,15
psychiatric 30:5
36:21 37:10 39:5
39:8 43:24 44:2,5
44:8 45:4,4 47:7
47:18 48:2,4
174:21 178:20
193:16 307:22
343:20
psychiatrically
302:17
psychiatrist 29:19
38:4 72:10 235:4
309:22 330:6
psychiatrists 27:4
30:7,10 36:2 40:6
44:23 138:23
142:20 145:1
159:8 186:9 193:3
244:1 308:19
384:11
psychiatry 25:8
35:3,6,10,15,15,23
36:7,7,9,10,12,18
36:19,25 37:2,4,13
41:22 42:2,11
45:2 56:22 309:11
343:5 359:13
psychologist 40:1
79:6 249:6
psychologists 41:8
psychology 34:17
34:23 36:17
psychopharmac...
49:16
psychosis 193:12
ptsd 40:24

**public** 23:6,7
36:13,14 61:2,4,14
67:10 73:25 74:7
92:22,24 120:22
120:24 204:20
208:14,17 209:5
214:17 215:3
217:6,7,10,15,16
218:1,18 234:6
251:21 252:24
279:7 308:9,15,17
308:21,24,25
350:5,9 363:11,16
363:18 364:1,10
365:16 384:22
402:6 403:14
405:10,18 406:15
406:23 407:23
**publically** 254:4
373:18
**publication**
397:14
**publications**
299:17
**publicly** 253:24
350:1
**publish** 364:23
369:20 396:8
399:7
**published** 203:4
203:11 343:17
**pull** 149:13 198:13
328:12
**pulled** 167:15
233:22
**pulling** 61:20
**pulse** 175:17
182:17
**pulsipher** 3:8
18:23,23

**punitive** 310:3
**purchase** 335:2
**purdue** 1:14
**purely** 212:5
**purporting** 298:22
**purpose** 21:9,22
21:23 59:19 60:12
60:16 93:11 149:4
215:17 261:15
328:18 330:7
**purposed** 365:2
**purposes** 23:23
27:25 28:7 59:3,8
70:4 100:23
101:24 102:20
123:18 126:25
129:13 131:6
144:4 166:21
167:1 204:1 220:1
228:19 234:23
241:25 247:6,14
257:9 271:21
282:8 291:21
298:12 307:10
314:24 322:17
332:4,8 338:16
367:3 372:12
387:12 391:18
**pursuant** 134:3
401:3,6
**purview** 96:7
**push** 216:18
326:15
**pushed** 192:17,18
244:12 302:8
**pushes** 197:16
**pushing** 180:12
194:21 214:25
326:11
**put** 36:8 56:5 61:6
81:23 130:15

131:1 142:24
144:8 149:9
164:18,19 242:3
245:1 274:5 279:8
279:21 304:25
312:18 365:1
373:17 391:21
397:20 398:10
399:22
**puts** 109:9
**putting** 98:13
181:14 270:1
314:1 356:21
362:22

**q**

**qualified** 317:13
402:8
**quality** 317:11
**quarter** 369:25
**quarterly** 81:24
110:8,13 168:6
171:1 369:24
**question** 23:20
30:17 53:13 62:12
63:9,13,17,19,25
64:4,4,19 71:23,25
73:1 98:25 99:8
99:10 101:20
104:9 117:9 118:9
118:11 125:19
127:16 132:17,19
154:12 158:20
160:10,14,17,24
165:24 173:3
174:19 189:9,16
193:6 199:24
201:18 203:10,12
207:9,14,21
213:14 221:13
222:24 223:12,17
223:23 224:3

227:4,6 230:22
249:18,23 250:3
250:13 251:4
270:5,7 271:1,2,8
271:10 279:16
284:11,17 285:10
285:18 291:2
294:12 306:1,3
331:11 341:15
368:23 385:21
395:9,15,18
**questioning** 200:8
**questions** 30:11
31:10 79:16 98:4
132:5,10 158:6
183:24 284:6
342:15,20 366:10
375:24 385:15
386:16,21 389:3
395:5,12 399:10
400:1
**quickly** 141:16
143:10 145:19
158:19 263:22
**quinones** 226:21
**quit** 170:24 355:6
355:11 375:12
**quite** 49:17 105:6
110:21 192:24
262:21 397:1,22
**quota** 229:21
231:13
**quote** 210:18
308:3
**quotes** 163:1
227:14 302:11
335:15

**r**

**r** 170:14,14 174:24
**rachel** 3:13

rachel.byrnes
3:16
radar  94:14
raise  92:18
raised  143:15
raises  389:19
rampant  325:19
ran  36:25 62:22
randomly  36:2,3
range  40:22,24,24
71:4 237:2
rappaport  36:25
rare  51:10 163:12
rate  181:13 185:4
205:23 364:22
365:25 366:3
386:7 392:13,17
395:3 396:18,22
reach  92:6 296:16
300:3 386:8
reached  165:23
256:25 320:21
reaches  202:20
255:10
reaching  256:22
318:24
reaction  126:13
329:4
reactive  38:20
read  20:7,10 31:16
118:10,25 119:1
141:24 175:13
199:21 203:6,10
204:24 205:13
227:25 233:4,17
233:19 239:25
245:22 247:19,22
254:25 255:1
270:4 274:3,3
294:11 297:1
300:15 301:14

310:3 311:19
341:12 374:7
378:5,7 383:14
388:10 393:3
405:5,6,12 406:5,6
406:17
readily  161:2
reading  115:2
155:7 226:18
245:24 284:3,7,8
285:3 404:20
real  21:6,12,12
62:16 66:9 224:21
260:24 330:7
373:23,24 374:4
374:25
reality  130:20
realize  219:9
realized  167:12
253:5 366:3
really  24:11 31:20
32:21 34:24 36:13
37:8,24 49:19
51:20 53:14 58:4
58:7 69:12 76:12
79:11 80:8 81:11
89:2 92:2 93:22
94:13 101:20
103:13 111:25
119:21 138:13
140:10 162:1
170:7 177:5,13,14
181:14,15,15,16
184:5 185:2 188:8
188:9 194:16,23
197:15 206:22
214:24 215:18
221:16 223:9
247:25 252:4,7
257:19 259:2
269:8,14 270:17

278:6 279:15
290:16 325:18
328:11 329:5
330:16 339:23
341:9 358:10,13
368:7 395:14
396:17
reason  45:7 50:18
57:2 58:19 80:13
130:5 188:15
199:11,25 253:9
273:9 288:3
301:20,24 329:21
337:19 358:6
395:13 404:15
406:8 407:3
reasonable  58:12
reasons  58:15
125:15 185:2
205:17 214:5
269:8 327:4
329:20
recall  21:24 49:3
75:23 76:21 87:25
88:7 92:8,20
94:12 117:12
124:18 126:10,11
126:12,13 127:13
127:25 130:19,24
131:1,15,18,20
132:6,14,19
134:21,25 136:5
137:24 138:3
139:17 140:17
142:7,12 144:14
146:23 150:19
152:19,25 169:25
186:25 196:22
213:22 222:17
234:17 235:13
245:24 296:18,22

298:19 299:1
316:2,3 330:10
341:8 363:12
366:14,20 370:5
377:14,19 378:10
378:13 379:5
receipt  404:19
receive  74:18
75:12 85:3 93:2
97:7 101:22 147:3
332:24 393:16
received  75:21
158:21 186:19
305:17 387:2
391:23 393:22
398:2
receives  85:17,23
receiving  230:1
286:10
receptor  359:15
359:24
receptors  357:20
358:23 359:6
recess  86:5 196:9
275:10 342:5
399:17
recipient  397:4
recipients  389:9
389:12
recluse  315:24
recognize  367:9
recognized  63:4
251:22
recollection  140:3
346:9
recommendation
39:12
recommendations
48:23 238:10
251:12

**recommended**
152:24
**record** 17:2,11
19:12,13,16 57:18
86:2,3,7 98:14
104:14 123:9,12
133:3 134:1
135:16 136:3
144:11 164:18
196:7,11 275:7,8
275:12 284:6
285:2 331:13
342:3,7,12 376:1,5
386:11 394:6,18
399:14,15,19,21
399:23 400:4
406:9
**recording** 284:19
**recordkeeping**
112:8
**records** 31:7
258:13
**recovery** 60:2
151:20 360:4
373:14 375:18
**recreationally**
163:1
**recruited** 151:18
**reduced** 328:16,24
402:14
**reduces** 229:9
**reducing** 231:16
**reed** 4:9 18:21
**reedsmith.com**
4:12
**refer** 37:3 116:2
175:12 214:20
344:17 378:16
**reference** 29:1
41:21 70:16 83:19
122:2 165:4 175:9

231:8 236:1,12
241:2 243:20
244:19 254:8
266:9 320:3 383:9
385:15 404:7
405:2 406:2
**referenced** 122:3
233:3 238:8
256:10 387:21
402:14,18 405:11
406:15
**references** 243:8
243:16 275:16
327:24
**referencing**
135:10
**referral** 325:24
**referred** 49:8
52:24 165:15
185:6 207:7,18
211:19 229:6
241:6 244:16
260:13,16 266:24
294:14 296:24
318:25
**referring** 103:20
200:21 202:14
205:3,5 206:7
215:9 247:13
296:7 321:23
323:21 390:4
396:3
**refers** 45:6 65:21
117:4,19 118:7
198:7 229:19
316:12 323:19
327:23 328:20
329:23 344:2,12
**refined** 245:9
**reflect** 97:12 104:7
115:17 172:24

252:5
**reflected** 97:25
99:12 100:1
103:16 118:22
363:9
**reflecting** 135:2
**reflects** 112:23
344:23
**refugees** 92:25
93:2
**refute** 132:3 135:3
**regard** 230:25
298:14
**regarding** 349:6
349:14,18 363:18
377:9 382:9,24
384:24 401:2,11
**regardless** 134:16
**region** 145:23
**registered** 131:23
132:1,12 133:16
135:2,5,10 329:25
**registering** 131:20
**regular** 50:19
67:20 74:14
194:14
**regularly** 39:17,17
68:9,15 85:9
**regulating** 210:18
**regulatory** 186:16
189:11 232:17
380:5
**rehab** 148:15
**reimburse** 198:14
**reimbursement**
182:22 197:8
198:7
**reinforcement**
371:9
**reintroduce**
376:11

**relapse** 360:5
**relate** 29:18 75:18
118:22 119:16
150:22
**related** 40:11 47:2
83:8 86:20 117:14
118:24 124:13
126:1,7 137:19,25
139:23 144:12
203:1,17 205:6,10
242:7 248:1 249:9
250:5 251:22
256:23 336:22
337:13 338:1
339:6 365:10,13
377:5 380:21
382:25
**relates** 1:11
387:20
**relating** 112:25
381:21 384:3
**relation** 40:14
65:1 122:13
**relations** 308:10
**relationship** 84:19
88:19 89:8 164:7
164:12
**relationships**
315:23
**relative** 286:6,14
286:22 287:2
370:15 403:2
**relatively** 60:14
62:24 125:7
170:15
**relatives** 157:20
**release** 7:3,20
45:15 80:12
220:16 228:13,13
228:18 229:5,19
262:18 322:15,21

322:24 323:18
358:25 359:16
**released** 45:13
324:2 359:1
**relevant** 341:14
**reliability** 280:8
305:8
**reliable** 392:17
399:3
**reliably** 277:2
**relied** 254:22
**relief** 197:6,22
244:12 245:15
316:9
**relying** 306:4
**remaining** 329:14
**remarks** 145:10
**remember** 52:18
53:7,25 75:21
81:10 133:8
144:10 169:20
171:24 217:1
230:1 233:13
275:17 278:20
279:2 325:7
376:25 379:6
385:17
**remembered**
126:12
**remembering**
223:20
**reminded** 133:13
**render** 46:1
119:13 158:4
**rendering** 67:17
68:8
**renewed** 96:21
**rent** 105:9
**reorient** 342:25
**repeat** 199:19
249:25 383:5

398:18
**repeated** 375:2
**rephrase** 199:22
**report** 6:5 7:4,9
22:16,18 47:13
51:15 58:25 59:9
78:7 84:7 89:7,14
141:21 184:9
198:11 234:21
235:10 238:11
239:6 247:4,15,19
248:9 253:13
273:2 282:16
**reported** 51:23
333:11
**reporter** 5:8 33:7
33:9 195:6 199:21
234:1,3,14 284:22
405:7
**reporter's** 5:7
402:1
**reporting** 22:11
234:9,13 277:12
278:1 305:9
**reports** 22:10,22
41:8 72:23,25
109:12 138:6
140:23 142:8
293:24 297:14
306:22 322:24,25
333:11 334:10,14
**represent** 95:20
131:24 369:14
376:13
**representative**
174:17,24 308:1,4
311:22 312:9
313:9,9 333:4
377:5,9
**representatives**
206:15

**represented**
135:15
**representing**
302:7
**represents** 133:10
324:14
**reps** 174:21
226:16 228:3,4
376:24 377:4
**request** 69:12 76:2
76:23 124:12,22
125:12 128:22
222:4 406:9,11
**requested** 111:6
124:8 125:5
368:19 370:4
401:1,6,10
**requesting** 77:21
**requests** 79:18
**require** 204:20
214:17 215:12
310:4 375:2
**required** 35:20
111:25 148:25
149:24 151:11
179:4 193:14
205:21 218:9
273:15 279:20
298:7 404:25
**requirement**
151:9 259:4
277:13
**requirements**
150:10 181:16
216:10,19
**requiring** 214:20
219:18
**research** 69:14
79:24 141:15
262:10,19 264:7
299:17 343:7

359:9 366:9 368:7
381:18 383:23
384:2,16,17,20
**reserve** 114:5
146:19 152:13
**residency** 35:9,10
158:23 159:4
**resident** 346:18,23
362:7
**residential** 77:6
81:6 120:2
**residents** 60:9
94:5 267:6
**resign** 213:10
**resolution** 214:16
**resolutions** 204:19
**resolve** 221:16
**resource** 319:17
**resources** 151:20
268:7 319:20
**respect** 143:12
146:8 199:13
200:2 203:16
217:7 244:7 265:2
279:16 289:10
305:8 310:1
369:21
**respected** 146:5
151:23 152:11
187:21 188:9
189:12 201:9
211:6 238:3
**respectively**
300:22
**respirations**
175:17
**respond** 155:19
319:7 364:16
390:14
**responded** 395:19

responds  309:8
response  128:21
  130:4 137:7 154:6
  224:13 303:24
  358:19 359:2
  364:22 365:25
  366:2 385:20
  386:7 392:13,16
  395:3 396:18,21
  398:7
responses  366:8
  395:9
responsibilities
  79:2 86:22 142:1
  252:21
responsibility
  47:2 87:5 110:6
  138:8 170:21
responsible  95:5
  145:6,13
responsive  57:8,10
rest  75:5 175:21
  193:10 318:4
  353:25 354:8
restore  45:22
restricting  314:12
  314:13
restrictions
  310:11
restrictive  310:20
result  20:4 173:22
  177:17 179:8
  180:9 204:17
  205:2,15 209:7
  214:16 333:12
  362:8 363:1
  374:19
resulted  26:7
resulting  355:3
results  300:17,17
  344:23 365:25

386:17 387:1
391:22 392:18
393:23 394:23
395:14 396:10
397:19 398:1
retail  363:7
retained  5:8 26:6
  26:13 27:14,17
  32:16 42:16 191:7
retired  368:1
retrospectively
  188:22
return  224:6
returned  404:19
returning  229:16
revamped  44:24
revenue  97:13
  104:18 113:17,21
  114:19,21,25
reversal  175:2
reverse  43:14
reversed  198:1
revert  357:22
review  20:13
  25:14,25 68:2
  75:9 76:25 77:13
  89:20,24 90:22
  95:16 139:4
  172:13 191:7
  213:2 261:23
  293:17 365:23
  381:15 397:16
  401:2,6 404:13
  405:1 406:1
reviewed  75:10
  89:17 290:22
  299:13 378:12
  380:17 392:4
  397:7 399:4
reviewing  90:18
  164:21 207:22

379:18
reviews  50:19 90:4
  195:19 198:12
revised  55:25
  59:23,25 244:19
  245:23
reward  155:4,6,9
  156:1 157:5 163:2
  289:25 291:11,12
  291:14 371:9
rewarded  155:15
reyes  146:13
  159:25 242:6
  244:1 246:1,2
rice  2:3 17:13,16
  17:19
rich  374:5
rid  44:7 163:20
  217:11 218:11
  334:17 339:10
  357:6
riding  155:7
right  28:13,21
  29:12 35:9 43:8
  43:10 45:19 63:24
  70:17 78:4,8,12,22
  79:16,22 81:3
  83:21 84:1 90:5
  94:14,24 97:19,22
  100:7,11,18
  104:19 105:20
  106:22 108:2
  109:19,24 110:2
  114:18 115:2,24
  116:20 119:7
  125:18,19,20,23
  126:2 127:17
  128:7 129:7 130:8
  130:11,14 132:22
  133:3 134:5 135:4
  135:18 136:9,12

136:21 137:12,16
140:21,22 141:17
143:21 145:10
146:10 147:22
148:8 151:13
152:6,17 153:13
159:14 160:11
165:5 166:24
169:22 174:5,14
177:25 178:5
180:23 182:12
183:8 184:1,1
189:2 190:19,20
190:22,23 192:13
193:21 194:24
202:11 205:9,12
207:21 210:9,12
221:5,11 222:24
223:10 224:7,13
229:17 231:9,10
231:13 232:2,6,14
232:21 235:4
236:12,22 237:21
238:12 242:8,13
242:20,25 243:10
243:13,22 245:21
247:17 248:4,21
248:25 250:15,21
250:21,25 251:1
251:14 253:25
254:8 255:12,16
255:17,21 256:11
256:18 257:23
258:17,22,25
259:8,16,20 260:6
260:17 261:4
262:14 264:5
265:12,20 266:3
266:11,16 267:6,7
271:9 275:2 276:2
276:9,15,21,23

279:9 280:11,13
280:19 281:1,8,15
281:22 282:19,22
283:19,24 285:3
285:22 286:2,12
286:14,24 287:4
287:13,22 288:1
288:15,22 289:16
290:9,11 292:4,21
295:8,15,25 298:2
298:17 299:21
300:10 301:7
302:1 304:13
305:3 306:18
307:4 309:5
310:15,17 311:6,9
312:25 314:8
316:17 317:6,16
319:8,25 320:1
321:8,14 322:3
323:6 324:3,24
327:17 328:2
329:2 331:2,7,20
333:21 334:11
336:7,9,19,24
337:2,6,14 341:13
343:24 353:18
354:13,18 356:4
372:25 374:6,22
377:10,15,23
379:4 380:14
382:4 383:15
384:18,19 386:1
387:4 388:1,6,10
388:25 389:9,24
391:2,23,25
392:14 393:3,10
393:14,16,20,24
393:25 394:10,25
397:1

**rigorous** 261:12
262:13,19 299:17
366:8 377:23
**ring** 132:2
**risk** 348:18 360:5
364:7
**risks** 158:11
269:12 348:20
349:6,20 382:9
**risperidone**
191:22
**road** 53:9 366:5
**rocket** 301:23
**role** 6:17 20:2,3
40:17 47:20 52:7
56:19 67:1 79:15
85:8 86:9 89:5
95:13 108:20
143:25 144:13
159:6 195:15
200:22 278:6,10
278:11,19 279:25
326:22 350:6
366:12 375:18
**roll** 221:20
**rollins** 4:10 18:20
18:20
**room** 21:1,3 22:25
68:17 92:24 93:5
183:21 215:25
217:18
**root** 156:25
164:24 165:3,11
326:14
**rope** 315:15
**rotation** 36:20
**rotations** 158:24
**rough** 107:3
**route** 160:3 291:9
**routes** 159:22

**routine** 46:4
**rpr** 1:24
**rude** 64:6,7,8 99:5
**rules** 191:12 216:4
216:18 317:20
326:8 329:19
342:19 401:3,7
405:5 406:5
**run** 51:14 52:8
84:25 110:8,13
120:13 254:15,16
278:19 295:19
334:4 347:14
**running** 384:19
**runs** 159:25 170:3
293:5
**rush** 302:24
**russ** 88:14

**s**

**s** 19:18,18 83:21
174:24 404:16
406:8,8 407:3
**sacrificed** 196:1
**sacrifices** 352:20
**sad** 82:12 169:3
371:18
**sadistic** 372:5
**sadly** 207:4 268:18
269:11 364:21
**safe** 199:4 209:2,6
261:7 262:5 264:4
264:11 365:17
**safely** 40:18
**safety** 190:3 208:9
262:2 363:11
**sake** 331:12,24
**salaries** 105:9
182:23 185:19
**salary** 182:25
183:7 185:1 195:9

**sales** 232:8
**sam** 226:21
**samer** 152:3
**sample** 365:3
**san** 3:9
**sandwich** 358:15
**sane** 46:12
**sanity** 46:8
**sarah** 238:15
**sat** 233:9
**satisfaction** 183:1
183:16,23 185:6
185:21 214:4
226:4 364:19
**satisfied** 185:16
**save** 121:1 263:22
**saw** 50:21 53:4,7
56:10 65:3 96:10
122:2 124:20
203:4 248:16
249:12 250:10
296:25 297:2,3
299:6 326:2 366:2
381:7 383:18
**saying** 63:1 79:19
92:9 98:8 99:2
103:13 128:5
129:24 140:2
178:1 182:23
183:3 184:12
188:10 189:23,24
189:25 210:18
211:19 220:22
223:20 287:9
295:7 302:2 303:4
304:15,20 305:2
311:21 316:6
321:7 328:22
333:17 338:2
**says** 33:10 55:19
55:25 59:17 66:3

69:15 102:8
104:13,18 112:4
113:16 115:3
116:23 117:22
119:1,2,19 136:22
172:8 197:5 211:3
215:6 231:3
232:23 236:15,23
236:24 239:7,21
240:2,24,25 243:5
244:11 255:4
256:9 259:20
282:11,15 283:4
284:2 285:11,23
286:5,21 287:1,6
288:10 307:25
309:25 315:14,17
317:3 319:15
320:15 323:8,22
324:6 328:1 329:2
333:8 336:8,11
339:1 355:25
373:6 374:3,15,22
389:23 390:2
392:9,13,25 393:7
395:2,24
**sc** 2:6
**scale** 193:8 194:14
345:4
**scams** 256:15
**scan** 359:10
**scans** 359:10,24
**scene** 366:19
**schedule** 96:11
308:2
**scheme** 274:22
**schizophrenia**
40:23
**school** 34:5,6,21
35:2 36:19 49:10
49:12,13,23 56:22

153:12 169:13
306:10
**schools** 50:2,5
121:3
**science** 155:21
157:5 158:17,20
259:19,20 289:21
301:23 398:21,24
399:4
**scientific** 198:18
201:16,24,25
290:7 291:2 365:2
365:6 384:17
**scioto** 252:5
**scope** 87:2 111:5
111:16,17,20
**scores** 183:1 214:5
293:13
**screen** 157:21
307:3
**screened** 304:1
**script** 172:8
191:24
**scrutiny** 245:6
397:16
**scuba** 302:23
**se** 24:17
**seal** 403:6 405:15
406:21
**search** 253:11
**searches** 254:17
**searching** 254:13
**second** 28:20
41:20 238:14
327:22 333:7
358:6
**section** 59:25
120:9 197:1
300:17 344:2
374:2 394:4

**see** 28:12,24 29:25
30:3 42:3 43:9
53:2,4,6 55:18
59:10,20,23 60:6
65:22 70:7,10
74:5,13 76:11
77:25 78:2 80:23
81:22 92:12
100:24 103:1
104:16,25 106:18
108:25 110:19
111:1 113:16
114:24 115:15
116:5,6,24 124:1,3
124:6,10,11,15,17
125:22 127:6,9
129:21,24 135:6
135:11 136:20,25
137:7 146:14
148:11 160:11
164:2 167:3 173:3
173:11 175:10
182:3 194:20
197:4 204:7,17,18
207:10,12 208:3,4
210:20 220:8,16
220:17,18,19,20
229:7,11,12 231:5
231:6,23,25 232:3
235:25 236:4,10
236:24,25 237:11
237:18,20,24
243:6,18,19
244:14,21 248:19
253:25 255:4,5
256:3 263:25
270:5 282:11,13
283:1,9,10,17
286:6,22 287:2,7
288:10,11,12
293:18 294:7

295:12 300:16,17
300:23 301:3
304:4,6 306:15,23
308:6,11 309:19
310:7,8 311:17,18
312:5 315:8,15,25
316:1,14,16,17,19
316:25 317:23
318:8 319:13
320:15 321:17,20
322:22 323:1,11
324:8 325:16
328:24 330:1,22
332:11 333:14
336:7,10,13
337:10 338:24
339:6 345:22
359:16 362:1,14
362:17 367:17,19
368:13,15 369:9
369:10 370:11
373:2,7 374:22
384:20 387:2
389:6,25 390:4
394:23 395:5,21
**seeing** 51:24 53:11
53:13 70:19
120:15 124:18
126:10 189:5
235:13 311:25
323:11 334:10
346:7 378:10
**seek** 268:10,20
269:10 270:19
272:24 289:11
**seeker** 288:22
318:3,16
**seeking** 329:11
331:1
**seen** 57:1,5 59:15
59:16 95:13 96:5

96:9 109:12
154:17 160:6
192:1 227:12
233:3 235:11
236:19 237:8
252:9 259:4
267:24 296:1
299:16 301:16
322:25 323:15
359:8,14,17
361:18,22 380:20
381:3 382:23
383:2,6,9,11
**sees**  81:25 111:8
**segment**  303:1,10
338:3
**select**  34:19
**selected**  70:25
**self**  256:9 305:9
**sell**  210:6 268:16
274:23 281:14
317:20 319:1
**selling**  162:13
260:22 281:17
**semesters**  396:1
**send**  41:17 48:20
85:5,6 235:5
294:11 396:13,14
**sends**  309:3
316:21
**sense**  20:11 102:3
102:4 103:4
160:24 165:16
178:25 186:10
193:9,13 199:22
208:15 291:5
318:17 358:14
**sensitive**  357:25
**sent**  147:19 293:12
293:17 294:15
307:15 316:19

**sentence**  66:3
250:21,22 311:13
392:24 395:21
**separate**  21:9
41:15 53:24 60:5
84:6 88:24,24
89:4,5 150:17
180:2 216:12
289:14
**separately**  228:14
**separation**  90:3
**september**  7:20
222:20 322:15,21
368:13,21 369:7
369:13,19 370:4
**sequentially**
372:20
**serious**  48:8
240:21 241:9
378:21
**seriously**  182:17
321:19
**serve**  239:12
261:14
**service**  39:7 60:2
66:4 69:12,22
94:3 109:19 111:3
111:4 115:18
119:15 120:12
185:12 335:15
**services**  6:6 7:12
20:1 56:15 59:1
60:8,10 66:6,15,17
66:25 67:18 68:8
68:19,22 71:3
79:17 80:6,15
81:7 83:1,23 84:1
84:11,22 85:20
87:1 89:19,23
90:11 94:5 101:14
104:25 105:15,25

106:11,17 107:15
116:16 118:21
119:12,19 120:7
282:1,7 374:6
384:9
**session**  21:4 23:2
73:6,23 74:3,7
**set**  25:16,17 26:4
44:24 59:6 145:4
162:14 167:21,23
191:18,18 200:9
233:20 241:17
252:17 253:6,14
289:25 298:21
319:2 350:9,10
403:6
**sets**  60:4 351:14
**setting**  38:5 39:25
53:3 179:25 231:4
231:12 304:16
327:16,17 345:23
346:2,10,14 347:2
390:11,15
**settle**  32:7
**settled**  27:9
**seven**  326:6
360:11 396:16
**severe**  40:23 319:6
344:17 345:7
346:22 351:14,24
**sex**  355:19 371:20
**sfy**  282:15 283:4
**shane**  93:21
254:21
**shapiro**  89:12,15
125:2,5
**shapiro's**  128:21
**share**  67:9 253:18
253:19,20
**shared**  253:23

**shares**  151:15
**sharing**  138:17
**shaw**  119:25
148:15 307:16,20
**sheet**  372:21
404:14 406:7,10
406:18 407:1
**sheriff's**  27:7
**shift**  103:5
**shifted**  178:2,6
309:16
**ship**  102:16
**shooting**  335:9
**shop**  272:2,9
**shopping**  149:3
150:1 268:5 273:1
273:14,21 275:17
275:19,22 277:3
280:13,15 327:23
328:1,4,16 330:25
340:2
**short**  51:12 211:22
396:11,20
**shot**  356:23
**show**  63:14 64:5
132:7 135:18
149:13 165:19
193:7 235:22
254:15 281:24
291:24 373:12
**showed**  109:8
132:11 193:18,25
**shower**  317:23
**showing**  133:16
169:6 267:3 294:4
334:8 370:18
**shown**  404:16
**shows**  65:5 131:25
133:20 370:14,15
**shut**  52:22 268:5,5
272:17 313:23

325:8
shutting 272:25
327:1
sick 200:24
side 53:8 67:21
82:4,18 113:11
163:19,20 243:5
283:19 321:11,12
321:14 341:11
sign 53:8 91:13
175:17 178:25
180:22 181:10,19
181:22 186:11
187:19 210:19
211:20 212:1
216:19,22 225:23
226:3 302:8
330:16,21
signature 401:5
403:13 404:15
signed 405:13
406:18
significant 224:22
304:1 344:24
352:15
significantly 328:2
signing 330:19
404:20
signs 181:9
silence 219:11
similar 27:7 130:3
172:2 197:9 257:3
264:16 271:25
273:11 295:14
361:16
similarly 268:8
280:9
simple 289:22
291:10 357:25
simply 93:5
317:17 347:7

sincerely 404:21
single 106:21
169:20
sir 363:24 404:10
sit 22:21 84:24
230:3 251:17
381:11
site 36:3
sites 56:10
sitting 68:5 142:25
186:24 249:7
250:4,13 299:1
346:8 378:13
situation 27:8
241:15 275:23
276:6,15 286:9
311:4 316:12
317:6 321:11
322:7
situations 213:23
six 25:2 69:18 71:6
96:21 138:15
167:17 256:13
277:22 345:6,7
359:23 360:4
sized 58:12
skin 302:19
skip 235:24
skipping 392:12
skoda 7:1 92:21
219:24 220:8,10
220:15 228:11
229:6
skoda's 224:13
sleep 149:6
slide 7:6 191:17,18
222:6 233:20
241:21 242:5,11
242:23 243:2,16
246:1 367:17
370:22 371:2

slides 146:24,24
147:4,15 369:5
slightly 165:24
189:9 203:9 227:5
slip 31:15,17
slot 152:4
slow 181:13
216:14
small 39:19 246:3
296:4 303:6,10
320:9
smaller 296:4
303:9 340:1
smalley 78:12,19
81:2
smiley 193:8
smith 1:19 4:9 5:4
6:3,25 8:2 17:5
18:2,8,21 19:2,7,9
19:17,18 28:5,9
42:6 53:14 64:12
78:1 86:8 107:15
115:13 130:19
133:4 134:23
136:6,25 160:20
164:22 166:25
184:6 196:13
204:5 219:24
227:17 228:22
242:3 275:14
285:17 292:9
332:7 342:8 367:2
376:6 385:12,14
399:25 402:10
404:8 405:4,9
406:4,13 407:20
smith's 184:13
smoker's 359:16
smoking 356:22
smoothly 80:8

smorgasbord
339:24
sneaking 280:23
sniffles 269:5
snort 302:19
358:12
snorted 304:21
soccer 297:23
social 89:22 90:11
199:2 264:18,22
352:20
solicit 389:8
solid 129:24 130:8
solutions 4:2
116:23 117:13,22
119:2 404:1 407:1
solve 313:11
somebody 46:2
77:15 79:10
103:12 113:12
121:17 122:9
151:14,17 154:10
156:14 157:23
161:20 162:25
164:2 170:20
172:10 175:21
181:3 210:7 223:1
230:7 240:14
259:3 268:16
276:3 280:20,20
281:4,15 290:24
297:4 303:13
305:22 306:6
309:13,14,18
319:4 321:18,19
325:15 326:5
335:11 343:11
355:24 357:23
362:3 371:15
396:5

**somebody's** 172:8
**someone's** 360:18
**somewhat** 367:15
**sonnhalter** 124:1
 367:20,23
**soon** 141:9 397:23
**sorry** 18:7,9 21:23
 36:17 46:21,22
 47:23 62:11 63:8
 67:14 71:21 76:5
 79:5 141:6 169:10
 216:13 218:23
 220:11 228:24
 251:19 308:25
 326:2,7 329:10
 331:10 332:13
 368:3 387:18
 391:7
**sort** 82:15 164:9
 224:2 226:20
 278:12 317:11
 384:16
**sorts** 179:4
**sought** 44:2
**sound** 88:23 312:2
 319:3 399:3
**sounds** 120:8
 312:3,4 345:9
 399:13
**source** 118:16
 122:1 351:5
**sources** 97:13,24
 100:10 114:3
 115:11 226:19
 231:5 385:1
**south** 1:22 4:5
**southern** 56:16
 252:4
**speak** 125:11
 191:24 244:24
 284:20

**speaker** 146:12,20
 148:1 151:13
**speakers** 145:14
 145:18 146:23
 188:4 257:4
**speaking** 152:4
 284:20
**speaks** 106:13
 230:5 236:20
**special** 59:19 60:5
 60:12
**specialist** 53:18
 93:19 148:14
 156:9,21 159:18
 193:4 234:6 238:4
 246:3 272:3
**specialists** 93:7,12
 145:24 159:11,14
 246:9 254:20
 384:6
**specialize** 36:16
 37:13
**specialty** 48:21
 152:13 159:20
 319:23
**specific** 53:15 54:6
 54:20 77:21,22
 88:7 100:22
 101:17,24 102:6
 111:16,16 140:24
 156:14 158:22
 189:12 192:12
 195:7 206:7
 213:15 214:8,9
 216:15 227:5,18
 234:8 245:20
 254:8 264:4
 299:25 346:9
 349:9 362:7,24
**specifically** 35:11
 44:15 102:9

111:23,24 116:3
 117:7 118:6
 119:22 120:18
 121:13 143:2
 153:9 166:4
 202:13 205:9
 236:2 256:14
 264:18 267:18
 295:12 299:10
 308:5 316:3
 321:23,24 340:12
 370:6 376:18
**specifications**
 260:10
**specifics** 312:1
**specified** 402:22
**speculation**
 107:11
**speech** 99:3 125:9
**speed** 87:10
 142:23
**spell** 19:15
**spend** 77:15 98:24
 101:7,12 105:6,11
 108:19 112:6
 162:10 245:4
 352:4
**spending** 67:8
 77:14 120:19
 126:15 160:4
**spent** 67:4 74:25
 79:10 92:14
 101:14,19 103:17
 103:18,18 106:4
 109:14 113:9
 114:2,8,9 115:11
 117:24
**sphere** 120:24
**spite** 257:6
**spoke** 148:10
 152:11

**sporadic** 367:16
**spotted** 237:25
**sprague** 308:4
**sprague's** 308:1
 311:15,23
**sprain** 240:19
**sprained** 175:21
 209:8 297:23
**sprains** 177:10
**square** 4:10
**squarely** 80:25
**ss** 402:3
**ssab** 89:19 90:8,10
**ssri** 348:7
**ssris** 347:23
**st** 93:15
**stack** 252:11
**staff** 23:15 42:9
 53:7 72:17 75:9
 82:24 193:4 221:1
 221:4
**stage** 356:15
**stairs** 317:21
 318:15
**stamp** 104:15
**stand** 45:9,17 46:2
 397:16
**standard** 111:22
 197:12,15 200:18
 201:25 370:6
 390:13
**standards** 179:1,9
 180:1,10 185:24
 186:17 192:24
 197:7,23 198:12
 199:8 202:25
 203:14 212:2,19
 212:21 213:3,4
 239:18 389:20,23
 390:3,10 391:10
 391:12

**stands**  58:17
249:19 300:16
301:20,24 381:9
**start**  23:18 30:18
43:12 71:22 103:7
139:8 141:8
160:10 177:15
179:10 180:16,17
184:21 188:13,16
201:20 219:5
226:7 246:23,24
272:18 274:23
289:8 292:3
301:21 330:22
339:14 387:25
**started**  34:20,21
37:1 43:14 48:16
61:19 62:1,5 65:4
130:21 139:20
140:4,7,11 141:13
142:24 143:19
144:19,23,24,24
167:16 169:4
185:17 228:12
251:9 257:1 268:1
296:3,5 297:20
301:8 315:4 323:9
323:23 324:17
327:11 330:19
340:5
**starting**  65:6
121:4 167:7 277:9
**starts**  33:17 204:6
237:12 307:15
315:7 372:19,21
373:2
**state**  17:10 19:15
22:21 30:5 38:13
38:16 40:5 43:24
44:2,5 45:5 46:16
56:10,17,17 58:11

66:10 71:11 82:11
83:20 84:4,20
85:3,18 100:6,9
102:6,8 115:11
116:12,14,18
125:9 133:11
137:20 168:25
178:20 235:17
243:17 244:6
250:12 252:1,14
255:12 278:2
282:17,22 323:10
323:19 324:16
330:10 339:25
346:4 402:2,7
403:15 405:10
406:15
**stated**  227:19
270:2 381:24
**statement**  66:23
226:11 237:3
301:18 350:7
405:13,14 406:19
406:19
**statements**  188:23
227:7,8 382:5,14
**states**  1:1 17:8
142:6 174:3,5
182:4 229:14
243:18 244:7,12
262:12 265:4
341:3
**statewide**  326:21
**statistic**  288:4
289:5 298:21
**statistical**  164:1
201:17,17 296:17
298:4,12 300:1
343:3
**statistics**  154:18
165:19 189:5

297:3,8 298:1
300:3 301:12,16
304:8 305:10
306:5
**status**  38:23
**statute**  19:4
**stay**  65:16 77:10
**steadily**  336:23
**stealing**  280:20,25
**steering**  102:16
**stenotypy**  402:15
**step**  51:6
**stepping**  91:10
**steps**  87:9
**steve**  311:12
**sticker**  246:22
247:12
**stigma**  44:6
217:11 218:5,5,11
219:7
**stigmatized**
218:15
**stimulants**  43:6
**stivers**  372:1
**stock**  304:25
**stolen**  286:21
**stone**  177:9 224:23
**stop**  98:22 99:6
223:15,18,20
224:25 225:14
313:2,15,25
**stopped**  50:5
223:14 225:2
331:4
**stopping**  63:19
348:13,16
**stops**  348:6
**stores**  2:16
**stories**  373:15,24
374:10

**story**  374:1
**straightforward**
290:6
**stranger**  288:11
**streaming**  155:7
**streamlined**  263:7
**street**  1:22,22 2:12
2:22 3:4,9 4:5,11
19:20 163:23
260:11,16,25
266:2 267:20
268:15 270:22,23
271:18 272:20
281:20 296:5
298:25 304:10
334:21,21,22
335:3 337:18
340:8 351:8
362:19
**streets**  333:19
**strength**  370:15
**strep**  354:9
**strickland**  248:20
248:23 253:14
255:9
**strickland's**  324:1
**strike**  23:17
201:19
**stringent**  212:2
**strong**  169:14
301:17 311:15,23
**stronger**  335:21
**structure**  22:19
75:1,2 359:24
**structuring**  79:22
**struggling**  374:12
**student**  396:25
**studied**  206:11
264:13,18
**studies**  262:19
264:21 296:1,3,7

297:11 359:14
384:18 398:15,25
**study** 206:10,18
294:25 304:25
305:3 364:1,10
385:16 394:10,12
394:24 395:3,22
395:25 397:20
**stuff** 41:10 74:19
77:17 95:15
142:22 147:19
172:22 208:13
381:1
**stumble** 195:16
**style** 234:9,13
**sub** 93:23
**subcommittee**
144:22 168:15,21
168:24 169:2,13
238:20 277:20
**subcommittees**
167:17 168:8,12
169:18 171:9,10
**subcomponent**
150:16
**subject** 76:24
87:11 124:3
136:20 137:18
139:5 143:20
152:20 251:23
261:22 262:1
283:14 289:18
**submit** 41:16
111:5,12 365:22
397:11,13
**submitted** 128:20
**submitting** 397:6
**subpar** 68:24
**subpoena** 134:4
**subscribed** 405:10
406:14 407:21

**subsequent** 256:25
**substance** 43:3
119:19,25 121:14
149:8 150:6
155:20 157:24
158:1 161:24
162:11,11,12
163:17 164:4,14
273:8,11 281:12
287:21 290:1,2,18
291:7,13 298:25
338:7 344:2,6
347:8 349:7
351:16 352:2,2,3
352:11,16,22
353:1 355:2,3,4,15
356:20 357:4,7,8
357:14,20,24
358:1,2,12,17
359:7 362:18
375:6
**substances** 77:10
113:7 154:25
155:10 160:22
161:3 162:4,6
163:9 164:2 177:3
229:10 230:7,12
231:17 232:14
243:21 244:8
261:2 265:9 291:1
302:25 306:24
330:9 338:7
348:22,24 351:7
358:24,25
**substantiating**
304:7
**subtle** 73:4
**suddenly** 101:11
169:5 175:25
183:6 208:23
348:11

**sued** 340:10 341:6
**suffer** 219:11
**suffering** 186:18
315:13 319:6
**suggest** 134:18
140:20 141:1
304:8
**suggested** 134:6
249:15 385:23
**suggesting** 190:1
292:25 300:6
**suggestions**
129:20 318:1
**suggests** 135:10
**suicidality** 378:24
**suicide** 76:9,16
85:7 102:10
348:18
**suite** 2:18,22 3:14
4:11 404:2
**summa** 72:10,13
72:15 93:14
152:14,15
**summarized** 166:9
**summary** 7:22,24
59:18 65:20 91:25
100:2 104:13,21
332:2,10 338:13
338:21
**summit** 1:12 2:2
6:3,6,7,8,10,13,15
6:16,19,20,22,24
7:1,8,15,17,19 8:1
8:4,6,9 17:13,16
17:19 19:25 21:8
21:25 22:5,7
23:10,21,22 24:20
27:3 28:6,15 38:9
53:3,5,16,19 54:6
54:21 55:6,11,15
56:8,13 57:4,24

58:2,20 59:2,10
60:18,25 61:5
62:8 63:5 64:14
66:1,21 70:2,3,8
72:1 76:21 80:11
83:8 84:20 85:17
85:23 86:10,13
88:20 89:9,9 91:2
91:5 93:25 94:6
97:12 100:11,14
101:21 103:20,22
104:2 105:13,23
108:5 109:17
112:23 115:19
116:19 119:8
120:17,22 122:12
122:16 123:17
124:9,13,21,24
126:1,7,24 129:12
131:6,11 133:19
133:20,24 134:9
136:16,22 137:15
139:3,11,20
140:12 142:2
143:3,12,20 144:3
145:25 147:23
148:5 150:9
164:23,25 166:1,4
166:11,18,20
167:2,5,22,23
168:1 171:17
172:4,25 173:15
176:12 195:8,24
196:21 203:25
207:13,24,25
219:25 221:8
233:7,22 234:10
234:15 241:24
251:19,20,24
252:2,6,15,18,19
252:23 256:24

265:8 266:14
267:3,6,10,17
277:16,24 278:2
278:11 279:6,19
291:20 292:16
294:10,18,21
295:11,14 299:5,8
299:11,15,19
301:9,10,13,16
307:9 314:23
316:13 327:5
333:2 338:15
341:16,21 346:18
346:23 349:2,4,13
361:18 362:8,25
363:7 364:1
369:19 372:11,19
373:6 382:13,19
383:20 384:6,21
387:11 391:17
**superior** 404:1
**supply** 151:2
232:20 325:18,18
**support** 80:15
305:6 356:12
**supported** 233:21
**supporting** 304:24
**supports** 374:7
**supposed** 75:8
80:3 281:3,6
**supreme** 31:3
**sure** 19:17 22:4
30:3,15 31:6,16
33:3 39:4 42:22
48:8 55:23 65:18
67:1,6,23 74:17,24
77:13 79:15,22
80:2,8 82:25
83:10,15 86:25
88:5 90:15,18
93:9,20 95:13

107:23 108:23
109:12 112:17
117:3,15 119:4,23
120:1 121:19
122:22 124:20
133:2 138:11
142:6 147:1,12
149:2,16,24,25
163:13 170:1
173:16,20 175:20
178:16 179:5,22
185:14 187:25
199:4 208:6 210:3
211:12,17 213:1
215:21 219:4,14
222:8,11,16 224:3
230:14 238:3
240:14 248:11
255:2 261:12
262:9 271:6
273:10 274:14
279:11 281:17
297:7 298:6
304:19 306:14
320:18 325:3
326:21 333:6
346:4 347:18
348:9 362:20
367:8 377:1
378:20 380:2
384:5 386:10
388:16,16,20
390:22 392:4
394:21 398:19
**surely** 298:13
**surgeon** 317:13
**surgeries** 317:4,12
317:14
**surprise** 62:19
126:17 168:14

**surprised** 139:16
153:18 187:17
379:10
**surprising** 330:22
**surprisingly** 29:18
**surrounding**
94:11
**survey** 68:10
179:2,25 183:23
183:24 184:2,15
364:14,15,25
365:4,13,21 366:6
366:11 385:16,25
386:4,6,12,14,17
387:20 388:5
389:4,12,14,15
391:23 392:11
393:23 395:12
396:13,16 397:20
**surveying** 8:7
198:25 391:15
392:6
**surveys** 183:16
184:12 185:6,18
185:21 364:19
**survive** 355:15,19
**suspect** 217:18
245:3 246:11
292:9
**sustain** 41:4
**swear** 18:25
**switch** 226:9
337:25
**sworn** 19:4 402:10
405:10,13 406:14
406:18 407:21
**symptoms** 343:10
348:12
**syndrome** 348:7
**synthetic** 223:7
266:24 267:2

**system** 41:2 44:7
44:24 45:5 50:21
58:5,8 67:5 68:14
89:1 93:21 137:6
155:5,6,9 156:1
161:8 163:2 211:1
212:17 223:5
232:13 250:12
262:13 269:2
289:25 291:11,12
291:14 341:19
357:21 358:19
360:20 361:5,9
371:10
**systematic** 363:25
**systems** 72:15
110:11 164:18
182:21 213:1

**t**

**t** 19:18 170:14
**table** 20:10 340:25
**tainted** 268:17
**take** 17:4 69:16
87:9 91:23 99:21
126:4 154:7 156:5
167:13 182:17
190:13 196:5
202:5 207:12
208:6 216:14
230:20 235:1
258:16 259:23
260:22 267:8
269:12 274:13
278:6,11 291:13
292:21 317:22
321:18 342:1
354:10 357:3,8,14
359:9 360:19
367:6 368:23
**taken** 1:21 52:14
86:5 163:3 170:7

196:9 206:14
223:24 275:10
278:19 325:9
342:5 359:20
398:14 399:17
402:21
**takes**  231:22
263:10 280:7
**talk**  23:8 31:1,5,14
32:22 62:5 76:7
83:4,13 85:9
94:22 102:25
103:9 104:1
107:14 108:15
110:18,25 125:10
136:2 152:22
156:24 157:3
165:10 172:11
176:3 186:7 188:5
194:4,20 202:12
206:5 217:5
225:19 242:11
252:2 264:10
265:7 272:25
275:22 280:12
289:15 394:9
**talked**  109:16,21
109:22 179:16
180:21 189:10
192:21 200:14
205:19 219:1
255:20 256:1,7,17
281:18,21 295:1
323:3 327:23
351:11 357:19
370:10 377:17
395:4
**talking**  23:9 24:1
33:13,17 41:25
62:1 96:17 103:12
110:22,23 144:19

161:5 165:12
173:25 176:5
194:21 205:10
216:9 225:21
226:19 243:10
244:25 253:21
257:7 258:11
260:1 261:1 265:2
265:9,14 271:9
275:22 283:15
284:15 285:7
318:21 358:18
363:12 378:15
384:5,16
**talks**  192:3 197:18
238:6
**tallman**  303:13,23
**tape**  123:3,6
**tapes**  37:6,7
**target**  105:10
**targeted**  116:23
117:13 119:2,22
**tariq**  3:13 18:16
**tariq.naeem**  3:15
**task**  6:21 7:4,10
61:20 81:24
117:16 125:14
138:6 139:4,8,11
139:14 140:24
141:21 144:22
150:17 166:19
167:3,6,9,15,16,17
167:23 168:1,13
169:1,4 170:4,4,10
171:5,17 172:4,25
176:12 196:20
207:13 234:22
235:11,16 236:4,9
237:4,15 238:12
238:20 239:12
247:5,16 248:8,24

251:11 252:17
253:6,13 255:8
256:21 257:5
267:13 278:17
293:6,11,25 324:1
354:23 381:14
384:12
**taught**  50:2
**tax**  66:9 102:13
**teach**  50:4
**teaching**  36:14
50:6
**team**  27:2 57:13
66:11 67:19 76:13
103:1 109:7
110:22 198:25
**technical**  165:18
165:22
**technique**  396:12
**technology**  360:2
**ted**  237:24
**telemetry**  48:11
**tell**  22:14 30:2
39:2 40:13 51:4
51:11,15 57:6
66:22 90:1 101:8
110:7 128:1 144:7
151:5,16 164:13
164:14 168:10
179:17 183:15
188:21 190:7
217:3 230:16
269:3 271:5 274:8
278:12 292:13
302:16 305:18
312:6 317:16
354:2,5,6 371:19
372:15 381:7
382:17 384:1
**telling**  51:8 171:7
206:24 268:23

319:18 330:15
373:15,24
**tells**  343:13
**ten**  149:11 237:9
354:10 356:6
360:11
**tend**  168:5 174:20
244:2 308:20
**tends**  168:5
**tennis**  240:19
**tens**  126:15
**term**  45:8 46:13
165:7,18,22
200:13,19 201:16
201:18,23 225:9
250:20 318:16
344:9,16 384:15
**terminology**  264:9
**terms**  52:15 61:7
76:1 100:21 103:5
113:9 116:6,17
178:10 201:17
203:1 225:20
233:6 258:3
259:12 300:2
307:1 314:12
326:24 330:25
333:24 342:19
349:1,14 350:15
351:14 358:22
359:5,24 363:15
365:8 366:4 371:8
376:23
**terrible**  245:21
**terrific**  321:22
**territory**  335:10
335:11
**test**  36:8,8 157:7
157:13 158:18
**tested**  260:9

**testified** 32:1,10
98:9 129:2 134:20
194:7 249:12
394:16
**testify** 30:8 134:23
193:24 402:11
**testifying** 25:21
31:21
**testimonials**
373:19
**testimony** 19:24
24:23 25:1,5
26:20 29:23 32:21
35:12 61:10 62:3
62:9 63:2 64:12
112:12 130:17
140:1,10,16 143:8
190:20 193:15
200:17 249:11
250:8 269:21
270:3,12 377:19
387:21 394:19
402:13,18 405:6,7
406:6,9,12
**testing** 261:23
262:13
**teva** 3:2,21 18:5
18:12 376:13,16
376:22 377:1,5
**texas** 31:3
**text** 374:2
**thalidomide**
262:21 263:3
**thank** 19:13 121:5
172:9 196:14
332:14,16 375:24
399:9,25 400:2
**thankfully** 37:20
**thanks** 210:20
385:8

**thanksgiving**
73:19
**theft** 256:15 275:2
280:19
**theories** 163:24
**theory** 396:16
**therapy** 39:25
79:21 241:1 317:5
**thing** 30:12 31:7
31:15 53:10 60:15
169:3 173:10
206:16 208:17
215:8 218:11
223:13,23 240:2
247:1 248:9
252:14 278:12
311:9 313:24
385:25
**things** 24:14 30:14
35:5,6 39:9 54:16
61:13 69:8 75:7
76:10 80:2,8 85:2
88:6 108:16,18
110:18,19 111:1
117:17,23 140:4
155:16 164:22
166:1 171:16
180:18 191:16
194:18 205:19
225:23 226:4
227:2,25 242:18
246:8 253:23
263:19 269:12
273:24 274:21,23
278:7 279:14
313:22 340:2
343:8 347:23
354:22 359:17
367:25 371:8,12
381:24 398:13

**think** 20:19,20
21:20 22:4 26:25
36:20 37:17,25
41:7 50:1 54:11
57:7 58:22 60:24
61:9 64:25 71:24
75:23 77:20,25
82:15,18 83:20
84:5 85:1 89:23
92:11 93:17 94:20
102:13 107:20
108:22 111:2,14
112:12 122:3
124:25 128:9,11
130:5,13 138:15
138:25 142:13
149:9 155:24
157:9 167:20
170:8,14 173:14
174:22 176:1,18
177:25 178:9,12
178:22 182:2
187:17 188:10,20
189:17 190:9,9,18
192:1,8 195:5
196:5 198:21,22
203:20 208:5
209:19 211:22,25
212:10 213:14
215:14 217:24
223:19 227:25
229:16 230:5,23
233:21 235:7
240:20 243:3
246:21 248:16
249:5 252:3
256:10 257:16
261:11 263:14
266:10 269:13,16
269:24,25 270:8
270:13 271:2

274:21 275:5
277:6 279:11
284:6,9,18 289:21
289:23 290:4,5,17
293:7 296:18
299:16,18 301:15
301:17,22 303:7
306:9 312:18
313:19 318:10,13
320:20 321:25
324:25 327:13,20
328:10 330:13,21
331:7 333:16
334:23 337:20
339:8 345:5
360:25 361:1
378:7 380:23,25
383:9 385:20
387:7,20 388:25
390:8 391:9
394:16 395:8
396:4,15 397:14
**thinking** 58:14
154:17 162:11,19
162:20 237:7
268:13 269:15
290:15,15,16
352:2,25 358:5
368:20
**thinks** 317:16
**third** 106:5 134:4
209:25 248:18
276:22 283:18
328:20 392:9
**thirds** 106:3 323:8
395:20
**thirty** 404:19
**thomas** 93:15
303:13
**thorough** 127:14
128:14 130:3,7

149:11 353:11
364:21 377:23
**thought** 24:12
33:14 34:20 37:17
56:23 57:21 58:15
62:11 92:3 136:9
146:9 162:19
189:14 193:23
216:15 219:16
225:1 233:10
270:16 271:3
279:24 329:15
335:5 336:1
358:13 364:23
365:5 385:17
397:15 398:7
**thoughts** 153:10
308:23 392:20
**thrasher** 93:22
144:17 145:8,9,13
146:13 151:18
168:15 247:20
248:15 254:20,24
364:14 365:1,22
386:4,16,19 388:3
388:13 392:1
394:21,24 397:3
397:15
**thrasher's** 394:17
**three** 4:10 32:6
33:21 40:7 44:5
47:7,10,23 56:10
65:25 78:6 91:17
100:6 114:3
149:17 256:2
267:14 312:5
320:10 345:5
360:14
**threshold** 202:21
**throat** 354:9

**throw** 77:16
190:25
**throwing** 189:18
**thrown** 192:9
**thwarted** 318:21
**ticked** 121:7
**tie** 185:18
**tied** 90:17 117:16
183:1 184:14
**ties** 383:3,7
**time** 17:3 21:15
26:19 32:9 39:11
46:20,25 50:8
51:3,12,19 61:12
61:21,24,25 62:4
62:14,25 64:9,11
65:7 76:21 84:5
92:14 93:4,6
98:24 114:10
120:19 136:4
138:2,11 145:21
156:6 160:5,6
162:10 163:10
171:12 179:3
183:8 184:17
187:22 188:22
189:15,23 191:6
191:22 192:25
194:18 195:11
199:15 200:4
203:4 208:6,12
209:7 210:24
218:10 226:5
230:20 233:2
237:2 245:4
248:21 258:9
262:21 275:5
276:25 285:16
293:7 296:14,23
297:7 298:8,11,19
298:20 300:7

323:21 324:18
325:7 326:12
331:15 334:9
352:5,15 368:16
369:18,19 373:14
375:24 379:12,13
381:2,6 384:3
395:25 396:11,18
398:25 399:19
400:3 402:21
**timeframe** 202:19
**timeframes**
142:11
**times** 24:25 26:10
26:12 30:7 32:4,5
33:22 73:12 102:5
108:14 161:25
169:1 219:11
223:2 234:1,3,14
268:1 295:22
355:24 367:11
375:7 380:18
396:15,16
**title** 80:5 137:14
229:9 231:16
242:10,17 249:2
371:2 392:6
**tjc** 210:18 211:20
211:24
**today** 19:24 24:1
24:23 25:5 54:5
62:3 63:1,21
64:13 81:15 106:8
123:21 143:1
160:19 162:20
204:13 205:19
218:16 221:18
225:1,24 230:4
249:4,7 250:4,14
251:17 252:10
256:11 257:7

265:4 266:6 272:4
299:1 308:2
329:17 346:8
351:11 358:15
374:15 378:13
381:11 400:1,3
**today's** 17:2
268:17 376:9
**todd** 72:6
**told** 53:18 81:8
118:6 161:8
182:15 186:11
193:5,5 220:22
221:6,7 224:9
272:4 349:13,18
353:23 396:11
**toledo** 44:4,15
47:8 48:22,23
49:4
**tolerance** 154:8
**tom** 294:1,3
**tone** 253:3
**tool** 150:1 329:7
330:15
**tools** 277:1
**tooth** 325:22
**toothache** 272:11
**toothaches** 272:14
**top** 70:20 207:10
236:13 237:7,9
243:5 246:24
282:11 309:17
321:7 332:18
333:8 373:5
379:25
**topic** 37:19 76:18
93:1 94:18 213:24
289:14 371:18
**topics** 29:10,13
58:3 77:23 223:1

torok  4:14
total  122:12
    124:23 125:25
    126:5,6 230:6
    263:14 360:6
touched  81:17
    209:12 213:14
touching  68:14
tougher  310:18
town  148:19
tox  307:3
toxic  261:13
toxicology  262:3
    306:22
track  57:18 295:4
    334:7 342:24
tracked  333:13
tracking  232:13
trafficked  333:20
    333:25
train  27:2 30:9
trained  148:6
    185:4 186:13
    226:5
training  27:11
    29:14 44:24 57:14
    81:1 158:22 177:2
    177:7 345:21
    347:4 351:12
    393:15
trajectory  297:17
tranquilizer
    266:18
transactions
    232:14
transcribed
    402:16 405:7
transcript  5:1
    401:3,6,9,11
    404:12,13 405:5
    405:12 406:5,11

406:17
transcription
    402:17
transcripts  192:6
translate  392:19
traveled  131:12
treat  39:20 40:25
    42:25 45:10,11,21
    101:14 152:23
    187:19 194:19
    206:25 221:20
    240:20 241:11
    244:2,8 245:10
    246:4,5,9,10,13,14
    265:16 276:12
    290:13 302:12
    317:17 353:17
    385:7
treated  82:5
    113:12 158:24
    183:20,21 209:3
    224:6 225:21
treating  45:3
    160:5 195:13
    240:9 245:2
    290:13 319:23
    320:17 349:12
treatment  57:9,15
    58:8 60:8,20 77:6
    81:6 103:22 104:2
    116:12 119:24,25
    120:3,6,10 121:13
    121:14 151:20
    160:1 161:21
    162:1,5,7 175:6
    183:13 184:1
    186:19 189:1
    227:3 239:9
    243:22 244:20
    259:21 290:19
    312:22 320:22

321:1,2 354:3,8,25
    356:7,13 374:20
    375:3
treatments  106:6
    230:8
treats  80:16 239:6
tremendously
    182:2
trend  65:6 294:4
trends  200:23
    295:13,14 337:18
trial  32:8 37:8
    45:9,17,19,23,24
    46:2 191:10
trials  263:20
tricked  184:4
    355:13
tried  57:18 172:21
    301:25 365:3
    397:20
tries  246:7 336:16
    362:17
trigger  163:1
    371:8
trouble  53:24 54:3
true  57:7 85:22
    154:4,12 156:8
    175:20 206:17
    246:6 252:10
    254:1,1,3 267:11
    269:4 295:25
    301:12 347:2,3
    352:9 355:20
    356:4 357:19
    358:16 398:14,14
    398:21 402:17
truly  168:3 270:16
    270:17 341:9
trust  272:21
trustees  22:11
    90:20

truth  259:18
    402:11,11,12
try  20:9 58:4,7
    83:14 138:4,23
    139:4 143:11
    147:14 157:21
    165:11,13 166:2
    193:9 195:21
    213:12 248:3
    251:12 253:11
    269:17 270:9
    271:12,16 272:16
    279:25 290:2
    297:15 302:5,15
    302:25 306:5
    313:11 321:19
    335:20 355:5,10
    365:4 395:16
trying  91:11 92:14
    138:8 141:9 158:4
    187:22 189:8,13
    193:11 236:9
    242:19 245:4
    252:22 271:4
    272:9 273:18,21
    275:25 276:19
    300:2 313:2
    319:15 332:19
    333:5 338:6
    350:22 352:15
    358:3 398:8
tucker  3:12,18
    18:13
tucker.hunter
    3:20
tuckerellis.com
    3:15,16
turn  28:20 32:25
    43:8 94:24 97:10
    99:21 114:17
    125:21 132:23

200:12 207:5
237:11 243:1
248:18 255:3
282:25 283:8
291:11,13 333:7
336:5 368:22
370:22 388:1
394:2
**turned** 155:6,10
156:6 157:14
163:4 169:6 207:2
320:23 371:14,15
**turns** 156:1
318:22 320:2,15
338:8
**tv** 162:14 274:24
319:1 380:24
**twelfth** 2:12
**twice** 23:12 162:25
**twisted** 306:11
**two** 20:20 44:20
44:20 61:13 72:14
77:23 78:25 84:6
88:18 92:24
104:23 105:4
106:3 110:11
115:22 116:2
159:22 169:25
173:16 174:7
181:19 185:2
197:25 222:21,22
252:18 255:23
268:23,24 269:8
296:9,12,13 297:2
310:1,1 317:3
323:8 325:22,24
329:20 344:25
345:5,6 358:8
388:4,12 393:11
395:20

**twofold** 329:5
**tylenol** 179:13
**type** 30:22 37:15
58:3 175:2 239:10
264:14,16 279:7
354:12
**types** 50:20 69:5
77:1 111:20 177:4
245:20 313:1
344:6 348:22
**typically** 263:9
267:19 323:4
**typing** 33:10

### u

**u** 19:18
**u.s.** 262:20 263:5
267:1 333:10
379:17
**uh** 28:16,25 30:1
32:14 33:5 127:20
233:14 237:17
307:17 317:24
323:16 324:21
327:3 393:17
396:2
**ultimately** 24:19
47:12 75:4 103:3
107:19 116:19
148:24 315:5
**umadaop** 119:23
**unclear** 395:15
**undergraduate**
34:3,4
**undermined**
398:15
**underpinning**
31:2
**understand** 22:2
24:15 42:13 45:20
74:21 85:16 91:23
100:15 107:18

138:4 141:24
143:8,11 158:2
165:11,13 176:11
176:13 187:5,7
189:8 194:1
195:22 199:3
211:18 217:10,19
223:4,13 248:3,7
252:22 253:11
271:14 275:21
286:8 289:23
295:15 316:5
317:8 342:20
345:13 351:21
390:6
**understanding**
19:22 31:4 64:24
91:24 96:8,25
106:2 114:16
115:7 116:21
125:4 142:10
151:25 154:5
155:3 198:20
201:15,23 202:15
206:8 232:25
233:4,15,21
245:19 251:21
262:15 267:16,19
271:5 301:6
340:13 378:19
**understood** 23:8
25:20 87:4 101:16
193:15 216:2
227:4 231:11,15
248:11 261:1
346:22
**undertake** 139:3
254:18
**undertaken**
143:10 164:23
166:2 294:18

295:10,12 301:10
363:25
**undertaking** 142:7
143:18
**undertreated**
175:16 186:1
187:23
**undertreatment**
189:15
**unethical** 280:17
**unfamiliar** 93:1
**unfettered** 212:5
257:17 259:18
**unfortunate**
155:13
**unfortunately**
65:9 88:17 223:7
253:10 284:9
**uniform** 164:20
**unintentional**
339:3
**unit** 93:16 158:25
159:1
**united** 1:1 17:7
174:3,5 182:4
243:18 244:7
262:12 265:4
341:3
**units** 44:20,20
**university** 34:1
48:22 146:19
201:9
**unlawful** 281:13
286:18,24 287:4
288:15,20
**unofficial** 279:5
**unscrupulous**
52:20
**untreated** 185:25
187:24 189:15

**update** 296:19
**updated** 379:14
**updates** 370:5
**updating** 369:5
**upper** 114:17
**upsurge** 227:1
**upward** 65:6
**usage** 277:18
 337:16
**use** 40:19 47:2
 74:25 82:6 83:6
 89:1 94:10 100:23
 101:25 102:9,22
 113:13,13 119:19
 119:21 120:1,5
 121:4 124:14,23
 126:1,7 150:11
 151:9 154:3,13,24
 161:15,19,20
 162:2,25 163:17
 164:11 169:4
 172:7 175:5 177:5
 185:16 189:6
 194:24 206:3
 207:1 208:12
 216:20 222:9
 227:1 241:12
 243:21 244:8
 254:7 256:2 257:3
 257:18,19 264:14
 265:11 268:1,14
 273:14,15 275:6
 279:20 280:2,10
 281:3,5,14 290:17
 300:9,19 304:13
 305:12 306:12
 307:2 314:12
 322:7 325:3
 329:25 336:23
 338:4 343:4,8
 344:2,5,6,9,12,16

 344:18,21,23
 345:11,13 346:1
 346:13,18 347:7,8
 347:13 348:6,23
 349:6 350:11,15
 350:17,18,21
 351:3,13,15,16,23
 352:6,11,22 355:2
 356:16 357:7
 371:11,17 372:16
 385:5,6 386:7
**user's** 361:5,9
**users** 355:3,4
 357:7
**uses** 97:18,21
 153:23 172:6
 250:20 261:8
 262:6 264:4
 347:12
**usual** 138:20
 162:23
**usually** 48:21 68:4
 68:5,18 99:24
 170:25 188:8
 198:11,25 360:10
 371:19,21
**utilities** 105:9

**v**

**v** 1:13 72:11 292:7
 293:4 404:6 405:3
 406:3
**va** 187:1,2,11,17
 240:25
**vacant** 78:24
**valium** 43:4
**value** 92:4 185:20
 327:15 395:14
**vanished** 54:3
**vantage** 56:9
 58:11 120:7

**variable** 393:11
**variation** 155:22
**varies** 263:17
**variety** 160:22
**various** 29:9,9
 140:8 159:7
 226:19 267:9
 268:6 291:1 345:1
 354:23 358:24
 364:11 371:8
**vary** 360:21
**vast** 267:24 289:8
 289:13
**vegetables** 180:3
**veracity** 304:17
**verify** 79:8
**veritext** 404:1,7
 407:1
**veritext.com.**
 404:17
**version** 28:17
 148:21 185:20
 187:18 266:23
 269:10 335:4
 338:22
**versus** 31:3 113:13
 157:14 333:25
 356:6 362:18
**vet** 79:18 386:21
**veteran** 241:3
**veterans** 241:8
**vetted** 40:20
**vicious** 198:16
**vicodin** 176:1
 179:11 180:18
 182:7 224:20
**video** 9:1 374:15
**videographer** 4:14
 17:1 18:25 86:3,6
 123:2,5,8,11 196:7
 196:10 275:8,11

 342:3,6 376:1,4
 399:15,18 400:4
**videotaped** 1:18
 17:4
**view** 94:13 146:3
 153:6 195:11
 196:1,2 240:5
 259:10 269:10
 279:25 312:13
 314:11 320:7
 327:5,5 334:13
 392:16
**viewing** 274:10
**views** 232:18
 279:4,13
**village** 167:13
**virtually** 119:5
**visit** 44:13 68:7
 80:2
**visited** 377:4
**vitae** 6:2 28:4,10
**vital** 175:17
 178:25 180:22
 181:9,10,19,22
 186:10 187:19
 210:19 211:20,25
 216:19,22 225:23
 226:3
**vivitrol** 174:25
 175:3 304:2
**volume** 328:23

**w**

**wacker** 3:23
**wade** 76:11 95:12
 96:16 109:9
**wade's** 138:12
**wait** 30:16 33:16
 63:16 71:21 81:5
 81:11 92:12
 145:20 215:4
 387:17

| | | | |
|---|---|---|---|
| **waiting** 81:6,12,14 | 396:10 | 303:9,14 306:16 | 94:7 116:18 |
| **waived** 404:20 | **wanting** 305:5 | 312:20 319:16,19 | 136:17 138:21 |
| **wal** 2:16 | **wants** 180:7 | 324:5,15,22 326:1 | 139:10,13,14,16 |
| **walk** 68:18 216:2 | 242:11 318:14 | 329:19 333:19 | 139:18 140:18,19 |
| 275:6 317:21 | 319:5,21 | 335:1 341:25 | 142:17 145:22 |
| 318:15 | **war** 314:6 | 343:14 359:6 | 172:14 177:1 |
| **walmart** 2:16 | **warning** 378:11 | 376:10 378:8 | 189:7 224:19 |
| 17:22,24 340:24 | 378:19,24 379:3,8 | 381:24 392:10 | 253:6 272:5 |
| **wane** 337:19,23 | **warnings** 349:14 | 395:19 | 304:21 314:11 |
| **want** 63:15,20,23 | 378:16 379:22 | **ways** 69:6,20 | 324:22 328:12 |
| 69:8 77:12,15 | **washington** 2:13 | 110:23 150:21 | 334:22 384:9 |
| 88:23 92:4 97:10 | **waste** 64:9 136:3 | 216:7 267:9 | 392:21 |
| 98:6 102:9 112:5 | **wasting** 64:11 | 272:23 281:22 | **west** 3:3,23 5:5 |
| 128:1 132:7,10,23 | **watch** 37:5 80:7 | 287:16 289:11 | 18:3,3 19:20 |
| 135:14,22 144:7 | 191:15 334:7 | 326:10 | 376:7,11 385:8 |
| 145:20 152:22 | 380:24 | **wc.com** 2:14,14,15 | **westbrook** 2:5 |
| 155:15 176:21 | **watching** 82:8 | **we've** 23:11 77:17 | **western** 146:18 |
| 183:10 185:16 | 200:23 | 105:10 161:7 | 152:13 |
| 190:7 191:19 | **water** 355:18 | 193:2 205:19 | **wet** 101:6 |
| 192:8 196:25 | **wax** 337:19,23 | 207:18 301:15 | **wheel** 332:16 |
| 206:22 216:4 | **way** 33:21,24 | **website** 147:6,7,12 | **whereof** 403:5 |
| 217:22 219:7 | 54:11 58:14 65:7 | 373:18 | **whiskey** 356:23 |
| 230:22 235:24 | 69:15 79:24 80:3 | **week** 39:20 40:9 | **wholesale** 341:2,5 |
| 239:16 249:10 | 89:14 93:20 95:14 | 73:19,19 81:9 | 341:19 |
| 265:16 268:21,23 | 100:8,24 106:23 | 162:25 175:22 | **wide** 161:3 298:4 |
| 272:8,21 276:11 | 112:6 144:25 | 222:21 326:6 | **williams** 2:10 18:1 |
| 281:24 283:13 | 151:4 157:22 | **weekend** 366:20 | **willing** 373:16 |
| 284:16,24 285:6 | 181:20,24 186:13 | **weeks** 48:18 156:5 | 398:10 |
| 289:14 312:5 | 191:15 193:9,10 | 222:21 325:22 | **window** 263:15 |
| 318:2,4 330:17,18 | 200:7 208:19 | **weighs** 309:19 | **winner** 35:7 |
| 335:19 347:18 | 221:16,21 223:22 | **weird** 22:1 185:20 | **wise** 370:17 |
| 364:18 372:16 | 224:4,6,24 225:14 | 335:4 | **wisely** 74:25 |
| 375:12 394:2 | 225:21 240:5 | **welcome** 86:8 | **wish** 111:4 |
| 399:20 | 245:7 249:13 | 196:15 | **wishes** 94:5 |
| **wanted** 26:1 35:2 | 251:3 259:11 | **wendy** 1:24 3:3 | **withdrawal** |
| 58:19 125:9 | 272:15,16 273:3 | 18:3 376:11 402:6 | 268:24 269:1 |
| 134:17 141:15,23 | 273:15 274:2 | 403:14 | 348:4,7,9 358:6 |
| 142:5 149:23,25 | 276:10 278:25 | **wendy.feinstein** | 360:9 |
| 169:8 223:9 245:1 | 283:18 286:17 | 3:6 | **withstand** 365:5 |
| 248:2,10 313:11 | 289:2 291:6 295:2 | **went** 21:3 33:25 | **witness** 2:3 17:20 |
| 320:18 373:1 | 296:21 302:24 | 79:12 87:16 91:14 | 19:1 25:11,12,13 |

25:16,23 26:6,17
46:15 63:11 64:3
64:6,8 98:12,19,21
118:4 134:19
230:19 235:5
249:18 284:10,23
285:17 332:17,19
385:11 402:9,14
402:15,19 403:5
404:8,12 405:1,4
405:11 406:1,4,15
**witness's** 401:2
**witness'** 404:15
**woman** 170:9
316:11 318:10,13
319:16,19
**women** 169:6
**wondered** 53:18
**wonders** 188:5
**word** 44:8 165:21
250:22 251:14
255:16 290:1
292:21 357:6
369:1 388:6
**wording** 40:19
395:4
**words** 22:16 37:14
99:16 257:21
270:1 273:7 310:9
370:24 393:10
**work** 19:25 27:20
29:18 33:2 37:15
38:1,2,3,8,10 39:7
40:3 41:1,3,14
42:12,15,16 43:10
44:2,17,22 45:11
45:20 54:4 57:17
58:16 61:20 66:20
99:17 102:9 111:6
111:17,20 120:11
120:24 139:4

167:18 168:25
169:23 180:9
183:17 187:2
251:9,11 267:17
278:16 308:20
313:16 352:21
362:6 390:11
**worked** 30:4
119:20 178:20
240:17 304:16
320:19 334:16
367:24
**worker's** 40:2,10
320:10
**workers** 41:5
199:2
**working** 20:3 22:5
42:7 44:11 46:18
58:2 84:4 120:19
125:8 136:8 141:8
187:15 212:16
386:15 388:4,13
390:15 396:6
397:10
**works** 72:24 80:14
151:18 201:1
238:21,23 270:5
**world** 32:6 173:17
174:7 262:14
268:17 374:25
**world's** 182:5,6
**worried** 270:24
**worry** 226:6
332:21
**worse** 281:17
317:6
**worth** 219:9 387:1
**wounds** 241:9
**wow** 62:2,15 127:9
127:11,19,22
128:2,4 189:5

313:13
**wrap** 181:20
**write** 127:11 176:8
176:22 204:15
214:14 220:21
311:11,14 319:2
392:2
**writer** 176:24
**writes** 124:7
210:17 220:18
293:16 303:24
307:24 309:24
315:12 316:24
317:8,25 321:6
**writing** 228:3
395:12 397:5
**writings** 142:8
**written** 35:24
112:7 248:20
382:19 383:18
397:2
**wrong** 188:21
189:7,23 292:13
298:5
**wrote** 20:17,21
123:24 127:8,13
127:17,21 128:13
129:23 172:10
205:1 231:11
392:4,5 394:21,22

**x**

**x** 69:19 77:4
191:16 202:18
215:7 343:11
347:12

**y**

**y** 170:13
**yeah** 26:11 46:6
46:17,24 59:15
68:12 72:22 73:17

83:22 94:2 103:4
105:20 115:3
122:5 129:3
136:24 152:10
154:18 158:10,17
161:1 163:12
165:17 169:25
171:10 195:5
205:7 208:7 211:3
211:8 226:1
232:23 234:13
235:22 242:17,18
246:2 249:2 259:2
259:17 266:17
267:13 275:19
280:22 281:3
282:24 293:1
295:17 296:3
303:6 304:20
305:5 309:9,15
312:3,4 319:4
324:5 331:4
332:20 337:3,5
340:21 353:11
357:1 373:16
379:5 391:7 392:1
392:19 397:22
398:24
**year** 26:21 32:12
51:4 73:12 95:3
96:20 102:17,17
124:19 127:6
139:1 170:8,19
187:16 202:24
203:3,13,19
229:21 231:13,23
252:18 263:15
282:17,18,22
283:23 285:21
287:10 306:10,14
360:6 368:2 373:6

380:2
**years**　30:4,5 49:5
56:12 59:16 69:17
81:18 88:18 91:17
96:22 114:8,19
120:14 122:14
124:15,24 126:8
131:22 149:11
178:21 179:20
190:10 191:21
225:3,18 256:25
263:13,14,16,17
268:8 309:16
312:5,22 356:6
381:5 393:3,5
**yep**　336:25 394:5
**yesterday**　276:13
**young**　169:6
**younger**　378:23
**youth**　169:2,13,17

**z**

**zach**　18:11
**zachary**　3:23
**zachary.lazar**
3:25
**zealand**　173:20,20
**zero**　325:21
328:11 390:22
**zip**　52:9 149:9,10
**zoloft**　348:13
**zombies**　357:13
**zone**　314:6
**zoo**　266:20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.