Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL | ) | |
| PRESCRIPTION | ) | MDL No. 2804 |
| OPIATE LITIGATION | ) | |
| _____ | ) | Case No. |
| | ) | 1:17-MD-2804 |
| | ) | |
| THIS DOCUMENT RELATES | ) | Hon. Dan A. |
| TO ALL CASES | ) | Polster |

TUESDAY, OCTOBER 16, 2018

HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of Eric

Stahmann, held at the offices of BARTLIT BECK

HERMAN PALENCHAR & SCOTT LLP, 54 West

Hubbard, Suite 300, Chicago, Illinois,

commencing at 9:05 a.m., on the above date,

before Carrie A. Campbell, Registered

Diplomate Reporter, Certified Realtime

Reporter, Illinois, California & Texas

Certified Shorthand Reporter, Missouri &

Kansas Certified Court Reporter.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential – Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**





REDACTED

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 20

1    A.   There were probably others, but
2  I can't recall offhand.
3    Q.   Any types of reports
4  identifying suspicious orders or orders of
5  any size or frequency that were red flagged?
6    A.   There were reports that were
7  run for suspicious orders and orders of
8  interest.
9    Q.   And when you say "That were
10 run," were they not automated?
11   A.   They were automated.
12   Q.   And explain to me what data was
13 pulled in those reports identifying red flags
14 or suspicious orders.
15       MR. STOFFELMAYR:  Objection to
16   the form.  Foundation.
17       THE WITNESS:  So I never
18   actually pulled -- I never actually
19   provided -- put the data inside the
20   reports.  They were automated, so the
21   orders that were in these reports were
22   only orders of interest based off of
23   what the DEA's general description of
24   a suspicious order was.
25

Page 21

1  QUESTIONS BY MR. MOUGEY:
2    Q.   Explain to me what your
3  understanding of what the DEA's description
4  of an order of interest was.
5        MR. STOFFELMAYR:  Objection to
6    form.  Foundation.
7        THE WITNESS:  I only know what
8    the -- my understanding of -- my
9    interpretation of it, and my
10   interpretation may not be what legal's
11   representation or interpretation is.
12 QUESTIONS BY MR. MOUGEY:
13   Q.   Sure.  And that's what I
14 understand.
15       I'm asking you today in your
16 role as a senior analyst at Walgreens, do you
17 have an understanding of what the DEA's
18 definition of an order of interest was?
19       MR. STOFFELMAYR:  Same
20   objection.
21       THE WITNESS:  My role today, I
22   do.
23       Back then, I did not.
24 QUESTIONS BY MR. MOUGEY:
25   Q.   What is your understanding

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  today of the DEA's definition of an order of
2  interest?
3      A.   From my understanding, it's any
4  order of an unusual size, frequency or
5  deviates from normal movement.
6      Q.   And when between 2006 when you
7  began at Walgreens until today did you
8  develop an understanding of what the DEA's
9  definition of order of interest was?
10     A.   When I took my role as a
11 manager for pharmaceutical integrity.
12     Q.   If you'd, please, sir, turn to
13 page 2 of 3 of your CV.
14          Under the section Walgreens,
15 six years, nine months, project manager,
16 pharmacy loss prevention --
17          MR. MOUGEY:  Corey, could you
18 pull this up, please?
19 QUESTIONS BY MR. MOUGEY:
20     Q.   And you held that role
21 approximately six years and nine months,
22 correct, sir?
23     A.   Correct.
24     Q.   And the title on your CV,
25 project manager, pharmacy loss prevention,

Page 23

1  correct?
2      A.   Yes.
3      Q.   Beginning in June of 2012 to
4  February of 2013, correct?
5      A.   I don't remember exactly, but
6  that sounds correct.
7      Q.   All right.  Let's walk through
8  some of these bullets.  The first
9  bullet that --
10          MR. STOFFELMAYR:  I'm sorry,
11 did you say he was a project manager
12 for six years?  Because that's --
13          THE WITNESS:  Yeah, I was not a
14 project manager for six years.  I was
15 with Walgreens for six years at that
16 time.
17          MR. STOFFELMAYR:  You see what
18 I mean?  He was a project manager for
19 however many months, but that up there
20 is the whole time he was at Walgreens.
21          MR. MOUGEY:  Sure, I appreciate
22 that.
23          MR. STOFFELMAYR:  You see what
24 I mean?
25 QUESTIONS BY MR. MOUGEY:

Page 24

1      Q.   Project manager at pharmacy
2  at -- pharmacy loss prevention from June
3  of 2012 to February of '13, correct?
4      A.   That's about right.
5      Q.   And you had been at Walgreens
6  at the end of that tenure as project manager
7  six years and nine months, correct?
8      A.   Correct.
9      Q.   And let's walk through some of
10 the bullets under your role as project
11 manager.
12          Very first bullet, "Compile and
13 interpret data for internal pharmacy theft
14 cases and for statistical purposes to monitor
15 diversion," correct, sir?
16     A.   That's correct.
17     Q.   Would you please explain what
18 your understanding of what diversion is in
19 the pharmacy context?
20     A.   Diversion can be a multiple of
21 things.  So basically any loss out of the
22 pharmacy, so whether it's customer diversion,
23 employee diversion; it can mean a lot of
24 different things.
25     Q.   How about diversion in the

Page 25

1  supply chain that opiates or pills are used
2  for illegal purposes at the practitioner
3  level?
4      A.   I don't know how we would be
5  able to capture diversion from that
6  standpoint.
7      Q.   Walk me through what --
8  statistical purposes to monitor diversion,
9  explain to me what you mean by that mean.
10     A.   So statistical purposes, so
11 to -- the reports we ran -- or I ran provided
12 data outside of what those automated
13 exception reports were.
14          So to monitor diversion, if
15 there were continuous negative adjustments
16 happening at a pharmacy, it would help to
17 determine whether or not there's -- something
18 internally is happening, either procedurally
19 where stores aren't posting orders correctly
20 or just something incorrectly happening at
21 the store level that could cause these
22 negative adjustments.
23          Part of my job was to help
24 those field leaders determine whether or not
25 there's actual loss happening or diversion

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1   happening at the pharmacy or if there's
2   something operationally that's happening at
3   the pharmacy that needs to be corrected.
4       Q.   So definition of diversion as a
5   project manager at Walgreens was -- continue
6   to be the employee pilfering and manual
7   adjustments, et cetera, at the pharmacy
8   level, correct, sir?
9       A.   Correct.
10          MR. STOFFELMAYR:  Objection to
11      the form.  Give me a second.
12  QUESTIONS BY MR. MOUGEY:
13      Q.   Go to the fourth bullet,
14  "Intimate work with statistical software and
15  databases, including, but not limited to,
16  Access, Excel, Oracle, WebSDL, IC Plus, SIMS,
17  EDW, Mobius and Business Objects."
18          Do you see that, sir?
19      A.   I do.
20      Q.   And explain to me what Mobius
21  is.
22      A.   My understanding, it is an
23  application that houses reports.
24      Q.   And what kind of reports?
25      A.   The reports that were in there

Page 27

1   were from human resources, basically any
2   report that was in there - human resources,
3   employee relations, employee background
4   information.  They had a whole bunch of
5   different reports in there.
6       Q.   Did you say Mobius in the
7   context of diversion?
8       A.   I did not.
9       Q.   Did you store reports in Mobius
10  in the context of diversion?
11      A.   I did not.
12      Q.   Did anyone at Walmart {sic}
13  that you're aware of store reports regarding
14  diversion on Mobius?
15          MR. STOFFELMAYR:  I think you
16      mean Walgreens.
17          MR. MOUGEY:  Did I say Walmart?
18      Yeah.
19  QUESTIONS BY MR. MOUGEY:
20      Q.   Did you -- were you aware of
21  any reports being stored in Mobius regarding
22  diversion?
23      A.   I am not aware.
24      Q.   So you never pulled any reports
25  out of Mobius having to do with diversion

Page 28

1   while at Walgreens?
2       A.   Not to diversion, no.
3       Q.   Any reports pulled out of
4   Mobius while you were at Walgreens in the
5   context of orders of interest or suspicious
6   reports?
7       A.   Yes.
8       Q.   All right.  Now, when I just
9   asked you the question of whether or not you
10  had pulled any reports out of Mobius while at
11  Walgreens regarding diversion, you answered
12  no.  And I asked in the context of interest
13  of orders or suspicious reports, you answered
14  yes.
15          Tell me what the difference is
16  in your mind.
17      A.   Orders of interest or
18  suspicious orders don't necessarily mean
19  diversion or theft.
20      Q.   They are potential -- the
21  reports are a means or mechanism to identify
22  red flags or potential areas of interest,
23  correct, sir?
24      A.   Which reports?
25      Q.   Any reports.

Page 29

1           MR. STOFFELMAYR:  Objection to
2       the form.
3           Go ahead.
4           THE WITNESS:  The report -- the
5       reports in Mobius that I pulled were
6       only for orders of interest or
7       suspicious orders.
8   QUESTIONS BY MR. MOUGEY:
9       Q.   And did you not use those
10  reports out of Mobius to identify potential
11  areas of diversion?
12      A.   I did not.
13      Q.   What specific reports did you
14  pull out of Mobius at Walgreens?
15      A.   The only report that I pulled
16  were the orders of interest and suspicious
17  orders report.
18      Q.   All right.  And what is
19  captured in those reports?
20      A.   Orders that -- based off of
21  those generic DEA identification of what a
22  suspicious order is, orders that were orders
23  of interest based off of those generic
24  descriptions for the DEA suspicious orders.
25      Q.   You understand in databases

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    that there's fields with specific information
2    in them, correct?
3        A.    I do.
4        Q.    And in your intimate work with
5    statistical software and databases, you
6    understand that those fields can be --
7    specific fields can be pulled and reports run
8    to turn data into information, correct, sir?
9            MR. STOFFELMAYR:  Objection to
10   the form.
11           THE WITNESS:  Can you rephrase
12       that for me, please?
13   QUESTIONS BY MR. MOUGEY:
14       Q.    There's a ton of transactional
15   data at Walgreens on a day-to-day basis
16   regarding opiates, correct, sir?
17       A.    There is.
18       Q.    There's a significant amount of
19   data at Walgreens with pharmaceutical
20   transactions in general, correct, sir?
21       A.    Correct.
22       Q.    And the reports were used to
23   pull specific fields to assist Walgreens to
24   identify areas of potential diversion,
25   correct, sir?

Page 31

1        A.    Correct.
2        Q.    And you understand that those
3    reports pulled specific fields of data to
4    assist Walgreens in its job to identify
5    suspicious orders, correct, sir?
6        A.    Correct.
7        Q.    And, sir, would you please
8    explain to me what fields, what information
9    was pulled to populate a report to assist
10   Walgreens with identifying suspicious orders?
11           MR. STOFFELMAYR:  Objection to
12       the form.  Foundation.
13           THE WITNESS:  So I do not know
14       what was actually populated in those
15       Mobius reports.  I just pulled them,
16       burned them on a CD and sent them off
17       to the individual DEA local offices
18       and to our distribution centers.
19   QUESTIONS BY MR. MOUGEY:
20       Q.    So you performed no analysis on
21   any of those reports?
22       A.    That is correct.
23       Q.    You have no earthly idea what
24   was in the reports?
25           MR. STOFFELMAYR:  Objection to

Page 32

1    the form.
2            THE WITNESS:  I don't remember
3        exactly what our -- what was in those
4        reports.
5    QUESTIONS BY MR. MOUGEY:
6        Q.    Do you remember generally what
7    was in those reports?
8        A.    Generally, yes.
9        Q.    What generally was in those
10   reports?
11       A.    Orders of interest and
12   potential suspicious orders.
13       Q.    Define for me what an order of
14   interest was or a potential suspicious order.
15           MR. STOFFELMAYR:  Objection to
16       the form.  Foundation.
17           THE WITNESS:  So I don't -- my
18       definition of an order of interest is
19       an order that could potentially be --
20       based off those -- DEA definition of
21       what's a suspicious order, an order of
22       interest could lead to an order of
23       interest based off of our -- or a
24       suspicious order based off of the DEA
25       definition.

Page 33

1    QUESTIONS BY MR. MOUGEY:
2        Q.    How frequently were you pulling
3    those reports off of Mobius and forwarding
4    them to the DEA?
5        A.    On a monthly basis.
6        Q.    Were you aware if anyone at
7    Walgreens was reviewing those reports that
8    were sent to the DEA?
9        A.    I don't know if anybody from
10   Walgreens were reviewing those reports.
11       Q.    Did anybody come back to you
12   and ask you for additional information on any
13   of those reports from Walgreens?
14       A.    Personally, no.
15       Q.    Did anybody send you an e-mail
16   or ask for any additional information on any
17   of those reports from Walgreens?
18       A.    No.
19       Q.    Okay.  Let's continue down to
20   the paragraph that begins with, "Facilitate
21   activities."
22           Do you see where I am?
23       A.    Yes.
24       Q.    "Facilitate activities and
25   projects for HCLP team leads and analysts,

9 (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 proactively support loss prevention manager
2 investigations across the country with data
3 requests."
4         Let's stop right there. Okay?
5         So part of your role as project
6 manager at Walgreens was to pull data
7 requests for project managers across the
8 country, correct?
9     A.    Correct.
10    Q.    Your role was not limited to
11 any geographical space or region as a project
12 manager, correct?
13    A.    At that time, no.
14    Q.    And you continue on in that
15 sentence, it says, "In content expert advice
16 as it pertains to compliance, fraud, waste
17 and abuse with the Walgreens family of
18 companies."
19        Sir, what expert advice were
20 you providing to Walgreens as it pertains to
21 compliance, fraud, waste and abuse with the
22 Walgreens family of companies?
23    A.    The advice I was providing were
24 for the field leadership.  If they were
25 investigating suspected losses at their

Page 35

1 pharmacy, I was able to provide my expertise
2 as a pharmacy tech to explain the workflow of
3 how a prescription is entered, filled and
4 what that looks like in keystrokes.
5         So if there's anything that
6 diverts from those average keystrokes, I can
7 identify those and bring those to the
8 attention of the local field leadership, who
9 would then perform their either interview or
10 investigation to a specific employee.
11    Q.    Okay.  Let me go back to the
12 suspicious order reports or the order of
13 interest reports that you were forwarding to
14 the DEA.
15        What -- what years did you --
16 did you pull those reports?
17    A.    I can't recall exactly when.
18    Q.    Just generally, what years did
19 you pull those reports?
20    A.    It was when I was working in --
21 towards the later end of my career in loss
22 prevention.  So probably 2011, 2012.
23    Q.    Have you had an opportunity to
24 review what period of time Walgreens sent
25 those reports to the DEA outside of when that

Page 36

1 was your area of responsibility?
2    A.    I did not, no.
3    Q.    Was there anyone else that you
4 were aware of that was also sending the
5 reports for suspicious orders or orders of
6 interest to the DEA?
7    A.    Yes.
8    Q.    And who else was that?
9    A.    At the time it was my
10 manager/supervisor, Marcie Ranick.
11    Q.    And how did you -- is it
12 Ranick?
13    A.    Ranick.
14    Q.    How did you and Ms. Ranick
15 divide responsibilities over who sent the
16 orders of interest or suspicious orders to
17 the DEA?
18    A.    She did it for a period of time
19 before I was in loss prevention, asset
20 protection, and then towards the end of my
21 career, she kind of delegated that role or
22 that responsibility to me.
23    Q.    All right.  The next bullet on
24 your CV, "Serve as the subject matter expert
25 on all systems, applications and initiatives

Page 37

1 related to the inventory movement and
2 associated functions that can cause and/or
3 monitor pharmacy health/" -- I'm sorry,
4 "pharmacy/health care shrink.  Examples would
5 include, but are not limited to, point of
6 sale systems, inventory management, cash
7 management, prescription monitoring and
8 processing, internal theft, DEA requirements,
9 corporate programs, regulatory issues and
10 operation policies," correct, sir?
11    A.    That's what it states here,
12 yes.
13    Q.    And for the second time on the
14 second page of your CV, you have used the
15 word "expert" to describe your areas of
16 responsibility, correct, sir?
17    A.    For those applications, yes.
18    Q.    And one of those applications
19 included the DEA requirements, correct, sir?
20    A.    That is correct.
21    Q.    And, sir, what was your
22 understanding of what the DEA requirements
23 were during your tenure at Walgreens in
24 relation to the prescription of opiate,
25 Schedule II or Schedule III?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1          MR. STOFFELMAYR:  Objection to
2   the form.
3          THE WITNESS:  I can't recall
4   specifically what those requirements
5   were at that particular time.
6   QUESTIONS BY MR. MOUGEY:
7      Q.   I'm assuming that while you
8   were at Walgreens, you received significant
9   training regarding your areas of
10  responsibility, but more specifically the DEA
11  requirements regarding Schedule II and
12  Schedule III narcotics?
13     A.   I was not.
14     Q.   You were not trained on what
15  the DEA requirements were on Schedule II and
16  Schedule III requirements?
17     A.   I was not.
18     Q.   And what study or academic
19  background do you have that you would
20  indicate that you had subject matter
21  expertise on DEA requirements?
22     A.   I have not had any education or
23  background regarding those.
24     Q.   The last bullet point on this
25  page, "Serves as a subject matter expert on

Page 39

1   all systems."
2          Sitting here today, is that an
3   accurate and truthful statement regarding
4   your areas of expertise at Walgreens?
5      A.   In my role, yes, at the time.
6      Q.   In your role as understanding
7   and having an expertise as far as the DEA
8   requirements, is that a truthful statement,
9   sir?
10     A.   It is a truthful statement for
11  my role in loss prevention, asset protection.
12     Q.   And is it a truthful statement,
13  sir, that you have subject matter expertise
14  on regulatory issues and operation policies?
15     A.   As my role in asset protection,
16  loss prevention, yes.
17     Q.   Is it also a truthful or
18  accurate statement, sir, that you have
19  subject matter expertise on Walgreens'
20  corporate programs?
21     A.   Those pertain to my role in
22  loss prevention, asset protection, yes.
23     Q.   And, sir, is it also a truthful
24  or accurate statement that you have subject
25  matter expertise regarding prescription

Page 40

1   monitoring and processing?
2      A.   Yes, in my role that pertains
3   to loss prevention and asset protection.
4      Q.   And in your role as loss
5   prevention and asset protection, you had
6   day-to-day responsibilities regarding
7   Schedule II and Schedule III opiates,
8   correct, sir?
9      A.   Those were part of my daily
10  responsibilities, yes.
11     Q.   If you turn to the first page
12  of your CV.  Beginning in February of 2013,
13  you were promoted to manager of
14  pharmaceutical integrity, correct, sir?
15     A.   That is correct.
16     Q.   Do you have an understanding of
17  why or when the pharmaceutical integrity
18  group at Walgreens was created?
19     A.   I do.
20     Q.   And why is that?
21     A.   It was part of the settlement
22  agreement with the DEA on the memorandum of
23  agreement.
24     Q.   And when were you informed that
25  the pharmaceutical integrity group was being

Page 41

1   created as a result of the MOA, memorandum of
2   agreement?
3      A.   When was I informed?
4      Q.   Yes, sir.
5      A.   I was informed when I joined
6   the team.
7      Q.   All right.  So let's walk
8   through your areas of responsibility as
9   manager of the pharmaceutical integrity -- is
10  it a department?  Group?  What would you
11  refer to it as?
12     A.   Department.
13     Q.   So your first bullet,
14  "Responsible for managing, creating and
15  managing controlled substance dispensing,
16  monitoring and reporting programs," correct,
17  sir?
18     A.   That is correct.
19     Q.   Would you please explain what
20  you mean by the first bullet?
21     A.   So our team manages the
22  monitoring of controlled substances that are
23  going into the pharmacies and out of the
24  pharmacies.  So we have an application called
25  a CSO KPI that handles that for our team.  It

Highly Confidential - Subject to Further Confidentiality Review

Page 42      **REDACTED**

1    automatically populates an application with
2    what the store receives and what they
3    dispense.
4         Q.    Was that system in place prior
5    to the creation of the pharmaceutical
6    integrity department?
7         A.    I do not believe it was.
8         Q.    The second bullet, "Develops,
9    recommends and implements programs,
10   procedures and techniques which will identify
11   and minimize loss of company assets and
12   ensure the safety, compliance and security of
13   the ordering and dispensing of controlled
14   substances," correct, sir?
15        Did I read that right?
16        A.    That's correct.
17        Q.    Would you please explain what
18   you mean by the second bullet?
19        A.    Our team was instrumental in
20   developing our policies and procedures
21   revolving around good faith dispensing and
22   target drug, good faith dispensing policies.
23        Q.    Were the good faith dispensing
24   policies in place prior to the implementation
25   of the pharmaceutical integrity department?

Page 43

1         A.    It was not.  Well, those
2    specific policies and procedures were not in
3    place, but we did have policies regarding
4    good faith dispensing.
5         Q.    Would you agree with me, sir,
6    that the policies in place at the
7    implementation of the pharmacy --
8    pharmaceutical integrity department were
9    significantly more robust prior to -- I'm
10   sorry, after the MOA with the DEA?
11        A.    They were more robust.
12        Q.    Sir, the third bullet,
13   "Responsible for investigating/reporting
14   potential violations of law, regulations or
15   company policy applicable to controlled
16   substances to the appropriate business
17   centers, units and director of pharmaceutical
18   integrity," correct, sir?
19        MR. STOFFELMAYR:  Sorry, where
20   are you?  The third bullet?
21        MR. MOUGEY:  The -- yes.
22        MR. STOFFELMAYR:  I'm sorry,
23   okay.
24   QUESTIONS BY MR. MOUGEY:
25        Q.    Third bullet, did I read that

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential – Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential – Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



46 (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential – Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



49 (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

Page 197

1  padlocked by the DEA at this point in time?
2      A.   I was not.
3      Q.   Were you aware that the DEA had
4  locked the building based on its conclusions
5  that Walgreens continually violated its
6  obligations under the CSA?
7          MR. STOFFELMAYR:  Objection to
8      the form.
9          Go ahead.
10         THE WITNESS:  Sorry.  I was not
11     aware until after I was part of
12     pharmaceutical integrity team.
13  QUESTIONS BY MR. MOUGEY:
14     Q.   When you say you were not
15  aware, you were not aware that the DEA locked
16  the distribution center in Jupiter, Florida,
17  so Walgreens could not enter?
18         MR. STOFFELMAYR:  Objection to
19     the form.
20         THE WITNESS:  That's correct.
21     I was not aware until after I joined
22     the pharmaceutical integrity team.
23  QUESTIONS BY MR. MOUGEY:
24     Q.   And after you joined the
25  pharmaceutical integrity treatment discussed

50  (Pages 194 to 197)

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  in this memorandum of agreement as part of
2  this substantial fine, what were you told by
3  Walgreens about the Jupiter center being
4  locked by the DEA?
5          MR. STOFFELMAYR: Mr. Stahmann,
6  the question is fine.  I just want to
7  caution you, and I don't know if this
8  is the case, but if any of what you
9  were told you were told by lawyers for
10  the company or people passing on
11  information from lawyers to the
12  company, don't go into that.  We can
13  sort that out.
14          Go ahead and answer the
15  question with that caveat.
16          THE WITNESS:  So I was told by
17  my supervisor why the DEA came and
18  closed down the Jupiter Distribution
19  Center.
20  QUESTIONS BY MR. MOUGEY:
21      Q.    And what was that explanation?
22      A.    That they had some concerns
23  about our distribution or dispensing of
24  controlled substances.
25      Q.    And were you told that it was

Page 199

1  closed down, or were you told that it was put
2  under lock and key by the DEA excluding
3  Walgreens from their own distribution center?
4      A.    I don't recall the exact words
5  that were used.
6      Q.    Any description, closed down
7  versus that it was locked up by the DEA.  Was
8  anybody -- did anybody explain that to you
9  from Walgreens?
10          MR. STOFFELMAYR:  Objection to
11  the form.
12          THE WITNESS:  Again, yeah.  No,
13  I don't remember the specific words
14  that were used.
15  QUESTIONS BY MR. MOUGEY:
16      Q.    And I'm not asking you if you
17  remember the specific words.
18          Did anybody from Walgreens tell
19  you that the Jupiter Distribution Center had
20  been locked up by the DEA?
21      A.    Not in so many words, but, yes.
22      Q.    Sir, please turn to page 23, if
23  you aren't there already.
24          It's titled "Order to Show
25  Cause and Immediate Suspension of

Page 200

1  Registration."
2      A.    I see it.
3      Q.    It's titled "Order to Show
4  Cause and Immediate Suspension of
5  Registration."
6          Do you see that?
7      A.    I do.
8      Q.    And under Notice, "It's hereby
9  given to inform Walgreen Corporation of the
10  immediate suspensions of Drug Enforcement
11  Administration certificate of registration,"
12  provides a number, "pursuant to US Code,
13  because such registration constitutes an
14  imminent danger to the public health and
15  safety."
16          Do you see that, sir?
17      A.    I do.
18      Q.    Were you aware that the DEA had
19  concluded that the Jupiter Distribution
20  Center constituted an imminent danger to
21  public health and safety?
22      A.    At some point in my time with
23  pharmaceutical integrity, yes, I was made
24  aware.
25      Q.    And you understand that as part

Page 201

1  of this order to show cause and immediate
2  suspension, that the DEA was suspending the
3  Jupiter Distribution Center's license to
4  distribute controlled substances, correct?
5      A.    Yes, I was made aware.
6      Q.    And under paragraph 1, DEA
7  explains that "Walgreens operates more than
8  7,800 Walgreens retail pharmacies in the
9  United States," correct, sir?
10      A.    I don't recall how many at the
11  time.  I know we're -- that that number has
12  changed.
13      Q.    Do you understand -- well,
14  let's put it this way.  There's several
15  thousand Walgreens across the country,
16  correct, sir?
17      A.    That is correct.
18      Q.    Do you understand what the word
19  "systemic" means?
20      A.    I do.
21      Q.    What does the word "systemic"
22  mean?
23      A.    Pertaining to a system.
24      Q.    Meaning that the entire system
25  has problems; it's a systemic problem,

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    correct, sir?
2           MR. STOFFELMAYR:  Objection to
3    the form.
4           THE WITNESS:  According to the
5       definition of systemic, I don't know
6       if that is what is mentioned here or
7       the context -- the context of what is
8       mentioned here.
9    QUESTIONS BY MR. MOUGEY:
10      Q.    Did anyone at Walgreens as part
11   of the pharmaceutical integrity department
12   advise you that there were systemic problems
13   according to the DEA and with Walgreens'
14   system?
15      A.    No.
16      Q.    At any point in time ever in
17   pharmaceutical -- your experience in
18   pharmaceutical integrity department, did
19   anyone advise you the DEA believed there were
20   systemic problems with Walgreens' performance
21   and obligations under the CSA?
22      A.    No.
23      Q.    Sir, if you turn to page 11.
24         MR. MOUGEY:  I'm sorry.  I said
25      11, I meant 33.  I apologize, page 33.

Page 203

1           MR. STOFFELMAYR:  3 as in the
2       small numbers in the lower right?
3           MR. MOUGEY:  The small numbers,
4       yes.
5    QUESTIONS BY MR. MOUGEY:
6       Q.    Under paragraph 23, on page 33,
7    "Voluntarily -- voluntary dispensing
8    restrictions enacted either in anticipation
9    of or in reaction to regulatory action do not
10   indicate to me that respondent and its parent
11   company have recognized and adequately
12   reformed the systemic shortcomings discussed
13   herein."
14         Do you see that, sir?
15      A.    I do.
16      Q.    Don't you think that if the DEA
17   believed there were systemic shortcomings
18   with Walgreens, that as a manager in the
19   pharmaceutical integrity department you would
20   have been advised of that fact?
21         MR. STOFFELMAYR:  Objection to
22      the form.
23         THE WITNESS:  I do not know
24      what the DEA was thinking.
25

Page 204

1    QUESTIONS BY MR. MOUGEY:
2       Q.    As part of your job description
3    where you are designing and implementing new
4    policies and procedures to avoid diversion,
5    don't you think it would have been important
6    for you to understand the belief --
7    understand that DEA believed there were
8    systemic shortcomings with Walgreens' system?
9       A.    That is valuable information,
10   yes.
11      Q.    If you would, sir, please turn
12   back to page 23 and 24, and let me direct
13   your attention to paragraph 2.  "Since at
14   least 2009" --
15         Do you see that, sir?
16      A.    I do.
17      Q.    -- "The State of Florida has
18   been the epicenter of a notorious,
19   well-documented epidemic of prescription drug
20   abuse.
21         Yet, sir, you weren't aware of
22   the epidemic of opiate drug abuse until you
23   began in the pharmaceutical integrity
24   department, correct, sir?
25      A.    That is correct.

Page 205

1       Q.    "In July of 2011, the Florida
2    Surgeon General declared a public health
3    emergency based on the prescription pill
4    epidemic which resulted in an average of
5    seven overdose deaths per day in Florida."
6         Do you see that, sir?
7       A.    I do.
8       Q.    Yet you weren't advised by
9    Walgreens management of the opiate epidemic
10   in the State of Florida before you started
11   the pharmaceutical integrity department,
12   correct, sir?
13      A.    Correct.
14      Q.    Now, sir, do you have any
15   understanding of whether or not there was a
16   problem with pills, Schedule II and III
17   narcotics, being diverted out of Florida
18   pharmacies into other states?
19      A.    I am not aware, no, or was not
20   aware.
21      Q.    Even sitting here today, were
22   you aware that Schedule II and III narcotics
23   were being diverted from Florida pharmacies
24   into other states?
25         MR. STOFFELMAYR:  Objection to

52 (Pages 202 to 205)

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1    the form.
2         THE WITNESS:  Can you define
3    diversion for me, your definition of
4    diversion?
5    QUESTIONS BY MR. MOUGEY:
6         Q.    You want me to define diversion
7    for you?
8         A.    Because it can mean so many
9    different things.  That's why I'm asking.
10         Q.    Pills that are not ending up in
11   a legitimate home and out into the stream of
12   commerce.  Did -- that pills were being
13   diverted from legitimate patients into the
14   hands of kids, that were being diverted into
15   the hands of drug dealers and making their
16   way into other states.
17         MR. STOFFELMAYR:  Objection to
18   the form.
19         THE WITNESS:  So are you asking
20   me if I was aware that that was
21   happening?
22   QUESTIONS BY MR. MOUGEY:
23   Q.    Yes, sir.
24   A.    Yes, I was aware that people
25   were using opioid medications not for their

Page 207

1    intended use.
2         Q.    And not just for -- not just
3    for their intended use, but were you aware
4    that Florida was the epicenter of a notorious
5    well-documented epidemic of description drug
6    abuse, and those pills were migrating to
7    other states?
8         A.    I was made aware of that during
9    my time in pharmaceutical integrity.
10         Q.    So not until 2013?
11         A.    Correct.
12         Q.    And, sir, what were you told by
13   Walgreens about the migration of pills from
14   Florida pharmacies into other states?
15         A.    We were made aware of some of
16   the drug-seeking behavior of some of the
17   patients and how -- some of the techniques
18   that they use to obtain prescriptions not for
19   a legitimate medical purpose and made aware
20   of some prescribers that were not writing
21   prescriptions for legitimate medical purpose.
22         Q.    So at that point in time, in
23   2013, did you make a study or analyze the
24   systems set in place at Walgreens to minimize
25   or avoid the diversion of Schedule II and III

Page 208

1    narcotics?
2         MR. STOFFELMAYR:  Objection to
3    the form.
4         THE WITNESS:  I personally did
5    not, no.
6    QUESTIONS BY MR. MOUGEY:
7         Q.    You never went back and looked
8    prior to '13 what Walgreens was doing prior
9    to the agreed-upon creation of the
10   pharmaceutical integrity department?
11         A.    That was not part of my role,
12   so, no, I did not.
13         Q.    Did you ask anybody, Well, what
14   were we doing before the pharmaceutical
15   integrity department was created by agreement
16   between the DEA and Walgreens?
17         A.    I did not.
18         Q.    You never went back and looked
19   at the systems in place to avoid diversion
20   prior to you starting in the pharmaceutical
21   integrity department?
22         MR. STOFFELMAYR:  Objection to
23   the form.
24         Go ahead.
25         THE WITNESS:  That was not part

Page 209

1    of my role, no.
2    QUESTIONS BY MR. MOUGEY:
3         Q.    Have you ever looked through
4    this document that I have in front of you and
5    identified the discussion about the migration
6    of pills from Florida pharmacies to other
7    states?
8         A.    No.
9         Q.    Are you aware of how big a
10   problem it was in Florida that pills were
11   migrating from Florida pharmacies to other
12   states?
13         A.    I was not aware of the size of
14   the problem, no.
15         Q.    If you would, sir, please turn
16   to page 41, and it says, "Summary of
17   testimony."  It's the Deputy Assistant
18   Administrator, Joseph Rannazzisi, says he's
19   from the DEA.
20         Do you see that, sir?
21   A.    Yes.
22         Q.    And, sir, this is a submission
23   from the government's prehearing statement.
24         Do you see that, sir?
25   A.    I do.

53 (Pages 206 to 209)

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1      Q.    And do you know who
2   Mr. Rannazzisi is?
3      A.    Just according to what he puts
4   under his title, so I get -- yes.
5      Q.    Let's look at the last sentence
6   of the second paragraph.  It says, "Each year
7   roughly 5.1 million people abuse narcotic
8   pain relievers in the United States."
9          Do you see that, sir?
10     A.    I do.
11     Q.    And, sir, you've heard the
12  saying that a chain is only as strong as its
13  weakest link, correct, sir?
14     A.    I have heard that.
15     Q.    So meaning that if the strength
16  of the chain is only going to be able to
17  handle the pressure as the weakest link in
18  the chain, correct?
19     A.    I have heard that, yes.
20     Q.    So if there's a hole or a soft
21  spot in the Walgreens pharmacies, the
22  diversion efforts are only as good as the
23  softest or weakest distribution --
24  pharmacies, correct, sir?
25         MR. STOFFELMAYR:  Objection to

Page 211

1      form.  Foundation.
2          THE WITNESS:  I don't -- I
3      don't know how you can make that
4      assumption.
5   QUESTIONS BY MR. MOUGEY:
6      Q.    Yes, sir.
7          Because you think that's a
8   reach?  You think that I'm just speculating
9   that the -- that the pharmacy -- that
10  Walmart -- I'm sorry, Walgreens Pharmacy is
11  only as strong as its weakest pharmacy?
12     A.    Yeah, again, I cannot agree to
13  that assumption.
14     Q.    Yes, sir.
15         Am I speculating -- do you
16  think I'm speculating when I'm making that
17  statement?
18         MR. STOFFELMAYR:  Objection to
19     the form.
20         THE WITNESS:  I don't know what
21     you're intending.
22  QUESTIONS BY MR. MOUGEY:
23     Q.    Paragraph, "Beginning in late
24  2008 and continuing to the present, there's
25  been a significant rise in the number of

Page 212

1   rogue pain clinics whose complicit doctors
2   were initially permitted to dispense millions
3   of dosage units of oxycodone and other abused
4   drugs directly from the clinics."
5          Did I read that correctly?
6      A.    You did.
7      Q.    And Mr. Rannazzisi goes on to
8   testify that, "Florida is the epicenter for
9   these illegal pain clinics."
10         Do you see that, sir?
11     A.    Yes.
12     Q.    "DEA state and local law
13  enforcement investigations reveal that
14  thousands of drug seekers flocked these
15  Florida-based pain clinics to obtain their
16  supply of oxycodone."
17         Do you see that, sir?
18     A.    I do.
19     Q.    And if you go on to the next --
20  sir, turn to page 128.
21     Q.    128?
22     Q.    128, which is in Appendix C,
23  and this is a summary of the testimony of
24  Ms. Langston, diversion program manager in
25  the Miami field division.

Page 213

1          Do you see that, sir?
2      A.    I do.
3      Q.    And on the bottom of page 128,
4   "Ms. Langston will testify to DEA findings
5   that Walgreens 03629 has dispensed controlled
6   substances to customers residing in numerous
7   states and commonwealths outside of Florida."
8          Do you see that, sir?
9      A.    I do.
10     Q.    "She will testify that
11  Walgreens 03629's dispensing to out-of-state
12  customers is particularly problematic when
13  one considers information developed by DEA
14  that is a result of long-standing
15  prescription monitoring programs in Kentucky
16  and Ohio, and with the increased difficulty
17  in obtaining controlled substances from
18  licensed physicians in these jurisdictions,
19  many individuals have found creative ways to
20  circumvent state prescription monitoring
21  programs."
22         Do you see that, sir?
23     A.    Yes.
24     Q.    Did you have an understanding
25  during your tenure at Walgreens that addicts

54 (Pages 210 to 213)

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    were seeking pills in states that did not
2    have monitoring programs mandated by the
3    states?
4        A.    Yes.
5        Q.    And they go on in page 129, "As
6    a result of the restricted access to
7    controlled substances in their states, many
8    individuals from Ohio, Kentucky and other
9    states have traveled by the carloads to pain
10   clinics located in Florida to obtain
11   prescriptions for oxycodone."
12       Do you see that, sir?
13       MR. STOFFELMAYR:  Objection to
14   form.
15       THE WITNESS:  I do see that
16   here.
17   QUESTIONS BY MR. MOUGEY:
18       Q.    So it's impossible to simply
19   say, Well, this is a Florida problem,
20   confined to Florida, because it was crystal
21   clear that pills were migrating to other
22   states from the weakest pharmacies, correct,
23   sir?
24       MR. STOFFELMAYR:  Objection to
25   the form.  Foundation.

Page 215

1        THE WITNESS:  Yeah.  I can't
2    speculate that or agree with that
3    statement.
4    QUESTIONS BY MR. MOUGEY:
5        Q.    You understand that as of
6    January 9, 2013, the date of this summary of
7    testimony, that the DEA was relaying that
8    they had uncovered evidence that pills were
9    migrating to other states for addicts
10   traveling by the carloads, correct, sir?
11       MR. STOFFELMAYR:  Objection to
12   the form.
13       THE WITNESS:  I do see that,
14   that that's what they're implying,
15   yes.
16   QUESTIONS BY MR. MOUGEY:
17       Q.    And, sir, you understand that
18   that is why the CSA required that due
19   diligence was performed on suspicious orders
20   before they were shipped, correct, sir?
21       MR. STOFFELMAYR:  Objection to
22   form.  Foundation.
23       THE WITNESS:  I don't know the
24   definition or interpretation of the
25   regs or the CSA.

Page 216

1    QUESTIONS BY MR. MOUGEY:
2        Q.    Yes, sir, I understand that.
3        Do you understand, though, sir,
4    that -- that part of the diversion issue in
5    Florida was carloads of addicts traveling to
6    pharmacies that were dispensing Schedule II
7    and Schedule III narcotics?
8        MR. STOFFELMAYR:  Objection to
9    the form.
10       THE WITNESS:  I understand now
11   that that was one of the problems,
12   yes.
13   QUESTIONS BY MR. MOUGEY:
14       Q.    Yes, sir.
15       And during your time at
16   Walgreens, did you ever perform any analysis
17   to try to identify suspicious orders that
18   would point to red flags with addicts coming
19   from out of town by the carloads?
20       A.    I personally did not, no.
21       Q.    Do you know of anyone that was
22   performing any analysis of all of the data
23   maintained by Walgreens to identify
24   suspicious orders from addicts traveling from
25   foreign states to secure Schedule II and

Page 217

1    Schedule III narcotics in Florida pharmacies?
2        A.    I do not know how the data
3    would be able to identify an addict versus
4    someone who is a snowbird.
5        Q.    Well, wouldn't it be relatively
6    easy to look at Walgreens' prescription data
7    to identify out of state customers?
8        A.    It is.
9        Q.    It would be relatively simple,
10   wouldn't it?
11       A.    It is.
12       Q.    It would be relatively simple
13   to have a data pull with the ages of those
14   customers, correct?
15       A.    That can be done, yes.
16       Q.    And it would also be relatively
17   simple to pull the doctors that wrote the
18   prescriptions for these potential red flags,
19   correct, sir?
20       A.    It is easy to pull prescriber
21   information, yeah.
22       Q.    So if you had a number of pill
23   seekers coming from a foreign jurisdiction,
24   they'd have to present their driver's license
25   at Walgreens, correct, sir?

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

Page 222

**REDACTED**

11       Q.     Stahmann 7.
12              Do me a favor, don't put away
13    the Stahmann 6.  Just keep it in front of
14    you.
15              Stahmann 7, just look at the
16    first page, and you recognize the names of
17    the e-mails on this first page as Walgreens
18    employees, correct, sir?
19       A.     Yes.
20       Q.     Markets 3 and 28, what does
21    that reference, sir?  Do you see that at the
22    top of the page?
23       A.     Those are -- markets are
24    individual -- are identified by individual
25    numbers stating where in the region of the

Page 223

1    country they are.
2       Q.     Do you know where those are off
3    the top of your head, markets 3 and 28?
4       A.     Not off the top of my head.
5       Q.     Okay.  And if you would turn to
6    the second page, it says, "Market 3, pharmacy
7    meeting."
8       A.     I do see that.
9       Q.     On the bottom right-hand corner
10   of this document are WAG, and then there's a
11   series of numbers, if you could turn to 996.
12   And you see there's a badge in the left-hand
13   corner of Bates numbered 996 that says
14   "Sheriff's Office, Sarasota County."
15              Do you see that?
16       A.     I do see that.
17       Q.     It says, "How much money is in
18   doctor shopping?"
19              Do you see that, sir?
20       A.     I do.
21       Q.     And it says, "Office visit, the
22   cost is $250," right?
23       A.     According to this, yes.
24       Q.     "Pills received, 180, cost at
25   pharmacy, $270."

Page 224

1              Do you see that, sir?
2       A.     I do.
3       Q.     So the total outlay is $520,
4    correct, according to the Sarasota Sheriff's
5    Office, correct?
6       A.     Yes.  If they supplied that
7    information, then, yes.
8       Q.     Yes, sir.
9              And the price of 30-milligram
10   OxyContin on the street is about $15 a pill.
11              Do you see that, sir?
12       A.     I do.
13       Q.     Times 180 pills, it's $2,700,
14   correct?
15       A.     Sounds about right, yes.
16       Q.     And then profit is $2,100 a
17   month, correct?
18       A.     I do see that.
19       Q.     Now -- and it says there's
20   more.  Do you see that on the bottom?
21       A.     I do.
22       Q.     Flip to the next page.  You see
23   at the bottom where it says -- and I'm on
24   Bates number 997.
25              At the bottom it says, "This is

Page 225

1    big business."

**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential – Subject to Further Confidentiality Review

REDACTED



Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**



61 (Pages 238 to 241)

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review





**REDACTED**

REDACTED



Highly Confidential – Subject to Further Confidentiality Review

**REDACTED**





Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Page 272

1    during a certain amount of time.
2        Q.    Yes, sir.  And exactly right.
4             You would agree with me, sir,
5    that Stahmann 8, Bates number 007 and 008,
6    pharmacists at Walgreens were bonused based
7    on the amount of prescriptions they filled,
8    correct, sir?
9        A.    Total amount of prescriptions
10   they filled, yes.
11       Q.    Yes, sir.
12            And you would agree with me
13   that when the pharmacist was making a
14   decision whether or not to fill a
15   prescription of Schedule II and III narcotics
16   for a pill seeker, that this was a financial
17   conflict of interest?
18            MR. STOFFELMAYR:  Objection to
19       the form.  Foundation.
20            THE WITNESS:  I can't speak on
21       behalf of the pharmacists if the
22       decision whether or not to fill a
23       prescription was based off their
24       financial conflict of interests.
25

Page 271

1        I was a subject matter expert.
2    QUESTIONS BY MR. MOUGEY:
3        Q.    Thank you.
4             And you'll agree with me, sir,
5    on page 12 of Stahmann 6, that beginning in
6    2014 Walgreens will exclude any accounting
7    for controlled substance prescriptions
8    dispensed by a particular pharmacy from bonus
9    computations for pharmacists and pharmacy
10   technicians at the pharmacy, correct, sir?
11       A.    I do see that.
12       Q.    And the document I just put in
13   front of you, sir, Stahmann 8, is an example
14   of the bonus calculation for pharmacists at
15   Walgreens, correct, sir?
16       A.    I believe that's what it is,
17   yes.  I don't know if it's the current one --
18   but it is --
19       Q.    It's one of them, correct, sir?
20       A.    It's one of them.
21       Q.    And you can see based on Bates
22   number WAG08, that pharmacists were bonused
23   based on the number of prescriptions they
24   wrote, correct, sir?
25       A.    That they filled, at a --

Page 273

1    QUESTIONS BY MR. MOUGEY:
2        Q.    And I'm not asking you to
3    provide testimony based on what pharmacies
4    thought -- pharmacists thought.
5             As the manager of
6    pharmaceutical integrity and the project
7    manager, do you believe that it was a
8    conflict of interest for pharmacists to be
9    bonused on the number of scripts they filled
10   for Schedule II and III narcotics?
11            MR. STOFFELMAYR:  Objection to
12       the form.
13            THE WITNESS:  I can't possibly
14       be able to validate whether or not
15       pharmacists felt filling or refusing
16       prescriptions, if there was any
17       financial motive behind it.
18   QUESTIONS BY MR. MOUGEY:
19       Q.    Do pharmacists get paid if they
20   don't fill a Schedule II and III narcotic
21   prescription?
22       A.    Yes.
23       Q.    Do they get bonused as much if
24   they refuse to fill a number of Schedule II
25   and III -- Schedule II and III narcotic

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1   prescriptions as if they don't?
2        A.    They do not get paid as much.
3        Q.    And underneath -- do you see
4   the overview section on the first page?
5        A.    Yes.
6        Q.    Do you agree with the statement
7   that the best evidence of a well-run pharmacy
8   is the increase in prescriptions from
9   pharmacy sales, which are the result of not
10  only price, promotion, location and product,
11  but also customer service, employee
12  development, leadership and innovative ideas?
13       MR. STOFFELMAYR:  Objection to
14  form.  Foundation.
15       THE WITNESS:  Are you asking me
16  if I agree with that statement?
17  QUESTIONS BY MR. MOUGEY:
18       Q.    Yes, sir.
19       MR. STOFFELMAYR:  Same
20  objections.
21       THE WITNESS:  I do not agree
22  with that statement.  They're leaving
23  out customer safety.
24  QUESTIONS BY MR. MOUGEY:
25       Q.    But you agree that the -- you

Page 275

1   don't have a problem with the best evidence
2   of a well-run pharmacy is the increase in
3   prescriptions?
4        A.    I do have an issue with that,
5   yes.
6        Q.    That's not the best evidence of
7   a well-run pharmacy, is it?
8        A.    It is not.
9        Q.    And quite frankly, increase in
10  prescriptions should not even be a metric in
11  a well-run pharmacy, correct, sir?
12       MR. STOFFELMAYR:  Objection to
13  the form.  Foundation.
14       THE WITNESS:  I don't know what
15  the best evidence for a well-run
16  pharmacy is.
17  QUESTIONS BY MR. MOUGEY:
18       Q.    But what I asked you, sir, is
19  that an increase in prescriptions should not
20  even be a metric in a well-run pharmacy,
21  correct, sir?
22       MR. STOFFELMAYR:  Objection to
23  form.  Foundation.
24       THE WITNESS:  I don't know what
25  metrics should be used to identify a

Page 276

1   well-run pharmacy.
2   QUESTIONS BY MR. MOUGEY:
3        Q.    Your job was to identify red
4   flags in pharmacies, correct, sir?
5        MR. STOFFELMAYR:  Objection to
6   the form.  Foundation.
7        THE WITNESS:  It was not.
8        MR. STOFFELMAYR:  Give me a
9   chance, sorry.
10  QUESTIONS BY MR. MOUGEY:
11       Q.    Your job was not to identify
12  potential red flags in pharmacies?
13       A.    It was not, no.  We helped
14  pharmacists identify red flags.
15       Q.    Well, if you're going to help a
16  pharmacist identify red flags, your job is to
17  identify them to provide them to the
18  pharmacists, correct, sir?
19       MR. STOFFELMAYR:  Objection to
20  the form.
21       THE WITNESS:  No.
22  QUESTIONS BY MR. MOUGEY:
23       Q.    Go to page 13 in paragraph 2,
24  the sentence that begins with, "Walgreens
25  agrees not to ship."

Page 277

1        Do you see that, sir?
2        About three-quarters of the way
3   down the page on the right-hand side?
4        A.    Yes.
5        Q.    "Walgreens agrees not to ship
6   any order of interest or suspicious order in
7   whole or in part and until Walgreens resolves
8   the reasons that caused it to designate an
9   order as an order of interest or a suspicious
10  order," correct, sir?
11       A.    I do see that, yes.
12       Q.    Do you have any reason to
13  believe that Walgreens was not shipping an
14  order of interest or a suspicious order in
15  2012?
16       MR. STOFFELMAYR:  Objection to
17  the form.
18       THE WITNESS:  I don't know what
19  Walgreens was doing in 2012.  I know
20  we started to get out of the
21  distribution business at that time
22  period.
23  QUESTIONS BY MR. MOUGEY:
24       Q.    Bear with me one second,
25  Mr. Stahmann.  I'm sorry, I got -- all right.

70 (Pages 274 to 277)

Page 278

1    If you would, sir, please turn to page 77. I
2    apologize. I just missed -- now I figured
3    out what I did. If you can go back to the --
4         MR. STOFFELMAYR: Sorry, what
5    page?
6         MR. MOUGEY: Page 26.
7    QUESTIONS BY MR. MOUGEY:
8    Q.    All right. Paragraph 9 on
9    page 26, begins with "Respondent's practice"?
10   A.    I'm there.
11   Q.    Okay. "Respondent's practice
12   with regard to suspicious order reporting was
13   to send to the local DEA field office a
14   monthly report labeled 'suspicious controlled
15   drug orders.'"
16        Do you see that, sir?
17   A.    Yes.
18   Q.    Do you have reason to believe
19   that the suspicious controlled drug orders
20   were the reports that you were burning on a
21   CD and sending out?
22   A.    Yes, I believe that's what this
23   is referring to.
24   Q.    Those were the reports you were
25   sending out?

Page 279

1    A.    Yes.
2    Q.    And how do you know those were
3    the reports you were sending out?
4    A.    Because the title of the
5    reports were labeled "suspicious controlled
6    substance orders," I believe.
7    Q.    Okay. Now, do you know if you
8    have access to those historical order reports
9    that you sent to the DEA?
10   A.    Access to those reports now?
11   Q.    Yes, sir.
12   A.    I do not know if we have
13   access. I know we were -- we can produce one
14   of the reports, but I do not know historical
15   access or if they're automatically purged
16   during a certain time frame.
17   Q.    Do you -- are you aware in 2017
18   of whether or not you could pull those
19   suspicious order reports that you were
20   sending to the DEA?
21   A.    In 2017, I believe we were
22   unable to pull those reports.
23   Q.    You were unable to pull those
24   reports?
25        Did you --

Page 280

1    A.    During a certain time frame,
2    yes.
3    Q.    Did you store those reports
4    anywhere that you had access to them or any
5    sampling of those reports?
6    A.    I may have had some stored in
7    my e-mail.
8    Q.    Some stored in your e-mail?
9    A.    Yes.
10   Q.    Do you -- how far back does
11   your -- do you not delete e-mails?
12   A.    It cannot, no. Part of my
13   e-mails are on legal hold.
14   Q.    Do you know how long they have
15   been on legal hold?
16   A.    Various times. There's been
17   gaps, but probably ever since I started in
18   loss prevention, there's been periods on and
19   off of being on legal hold.
20   Q.    So you started in loss
21   prevention in 2012?
22   A.    That sounds about right, yes.
23   Q.    Okay. So in 2012, was it your
24   practice that as you pulled and sent those
25   suspicious order reports to store them

Page 281

1    anywhere?
2    A.    No, because they were -- since
3    they were burned on a CD, the only storage of
4    those were on that Mobius application.
5    Q.    Okay. And do you have an
6    understanding of what period of time is still
7    on the Mobius application as far as the
8    suspicious order reports?
9    A.    I do not know.
10   Q.    Do you have an estimate of what
11   period in time?
12   A.    I don't. I don't know if or
13   when they're purged or if there's an
14   automatic purging time frame.
15        (Walgreens-Stahmann Exhibit 9
16        marked for identification.)
17   QUESTIONS BY MR. MOUGEY:
18   Q.    I'll hand you what I've -- I'll
19   mark as Stahmann Exhibit 9.
20        Do you see this is an e-mail
21   from yourself to yourself?
22        Do you see that?
23   A.    I do.
24   Q.    And the subject is "CD
25   orders-2."

71 (Pages 278 to 281)

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    A.   I see that.
2    Q.   What does that mean?
3    A.   I can't recall why -- what that
4  subject means.
5    Q.   All right.  And the date of
6  this e-mail is August 16, 2017, correct?
7    A.   That is correct.
8    Q.   And if you would flip the page,
9  does this appear to be the suspicious order
10  report that you were responsible for pulling,
11  burning on a CD and sending to the DEA, along
12  with the distribution centers?
13    A.   This does appear to be one of
14  those reports, yes.
15    Q.   Okay.  Was it -- are there
16  different kinds of reports, or was this the
17  suspicious controlled drug orders that DEA
18  mentions in page 26 of Stahmann 6?
19    A.   I believe this is one of the
20  reports.  There may have been a -- there
21  may -- the reports may have been broken down
22  by area so we would know who to send to.
23    Q.   All right.  You see in the
24  bottom left-hand side of this page where it
25  says, "Report available in Mobius."

Page 283

1    A.   Yes.
2    Q.   And did you in August of 2017
3  go on Mobius and pull this report?
4    A.   No.
5    Q.   All right.  Where do you think
6  you found this report?
7    A.   To be complete -- I can't say
8  for certain, but I think I pulled this from
9  an e-mail that I may have sent out in
10  preparation or for -- due to a legal ask.
11  They asked if I could --
12       MR. STOFFELMAYR:  Stop.
13    Don't -- don't get into what anyone
14    asked you legally.
15  QUESTIONS BY MR. MOUGEY:
16    Q.   Why did you send it to
17  yourself?
18    A.   I think that was the only way
19  that I can get that data.
20    Q.   Where was the data when you
21  pulled it?
22    A.   It was stored -- I don't
23  remember, but the data resides in Mobius.
24    Q.   Right.
25       So you had to access Mobius to

Page 284

1  pull the data, correct?
2    A.   At one time, yes.
3    Q.   And I'm talking about in August
4  of 2017.  Did you have to access Mobius to
5  pull the data?
6    A.   No, because I was unable to.
7    Q.   Okay.  So but you tried?
8    A.   We definitely looked into it,
9  yes.
10    Q.   All right.  So where do you
11  believe that you found this report?
12    A.   I can't recall exactly how.
13    Q.   And you didn't store these
14  reports as you sent them or keep them in a
15  file or anything along those lines?
16    A.   No, they were just burned on a
17  CD, so it's possible that I had a copy of a
18  CD and then e-mailed me that -- the data from
19  the CD.
20    Q.   Who e-mailed you the data from
21  the CD?
22    A.   I could have e-mailed myself,
23  so just -- I don't know exactly, but that's
24  how I'm envisioning this could have went.
25    Q.   And I'm sorry if I'm being slow

Page 285

1  here, but -- so you found this report, you
2  believe, in an old e-mail?
3       MR. STOFFELMAYR:  Objection to
4    the form.
5       THE WITNESS:  I believe I found
6    the report on an old CD and then
7    transferred the file to myself via
8    e-mail.
9  QUESTIONS BY MR. MOUGEY:
10    Q.   Okay.  So you had no practice
11  of filing or storing the CDs as you burned
12  them and sent them to the DEA?
13    A.   No.
14    Q.   If you ever wanted to go back
15  and look at historical suspicious orders, how
16  would you do it?
17       MR. STOFFELMAYR:  Objection to
18    the form.
19       THE WITNESS:  At the time, you
20    can -- we could have went back in
21    Mobius to look at the data that was
22    currently stored or not purged in
23    Mobius.
24  QUESTIONS BY MR. MOUGEY:
25    Q.   Okay.  So up to what point in

72 (Pages 282 to 285)

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1    time could you access Mobius and pull
2    historical suspicious controlled drug orders?
3        A.    Personally, it was up until the
4    time that I left asset protection.  My access
5    was taken away once I transferred to
6    pharmaceutical integrity.
7        Q.    So you're not saying that the
8    reports were purged, but you just didn't have
9    any access?
10       A.    I personally did not have
11   access, no.
12       Q.    Now, help me to understand
13   that, because you went to and moved to the
14   pharmaceutical integrity department that was
15   responsible for overseeing diversion.
16            Why would you not have access
17   to the platform with the suspicious order
18   reports?
19            MR. STOFFELMAYR:  Objection to
20       the form.  Foundation.
21            THE WITNESS:  When I
22       transferred to RX integrity, we were
23       not reporting suspicious orders via
24       those CDs and Mobius.
25

Page 287

1    QUESTIONS BY MR. MOUGEY:
2        Q.    But if you wanted historical
3    data to go back and look at patterns, would
4    that not have been helpful?
5        A.    Our team did not look at the
6    historical suspicious orders.
7        Q.    Walk me through a couple
8    samples of -- what I've done here is this is
9    an approximately 25,000-page report.
10            Okay?
11            So is that consistent with your
12   recollection of what you were burning onto a
13   CD and sending to the DEA once a month?
14       A.    To be honest, I cannot
15   recollect how large the files were or
16   page-wise.  I just basically burned the data
17   on a CD and sent it off.  I didn't dive into
18   each individual report or CD, so I don't know
19   if this is a --
20       Q.    Did you even look at it?
21       A.    I would look at it briefly, but
22   just to see if the data transferred to the
23   CD, but that's about the extent.
24       Q.    But in order to know if it
25   transferred to the CD, wouldn't you have to

Page 288

1    look at it?  Do I have three pages or 3,000
2    pages or 18?
3            You had no -- you didn't look
4    at it for any content or what was -- what was
5    in the report?
6        A.    I did not look at the content.
7    I may have looked to see -- if only three
8    pages transferred to the CD, then I knew
9    there was something wrong with the data.
10       Q.    What was the scope of
11   nationally where you were pulling these
12   suspicious order reports from?
13       A.    What do you mean by "scope"?
14       Q.    I mean, did you -- was it for
15   every state?  Every region?
16       A.    They were for the chain length.
17   It was for all of Walgreens.
18       Q.    The entire Walgreens?
19       A.    Correct.
20       Q.    And where would you send them?
21   What DEA would you send them to?
22       A.    We would send them to all the
23   local DEA offices that had their office
24   listings on the DEA web page and then also to
25   our individual distribution centers.

Page 289

1        Q.    All right.  So you would send
2    the entire country suspicious controlled drug
3    orders to every DEA field office?
4        A.    That is correct.
5        Q.    And now, let's go back to
6    page 26 of Stahmann 6.
7            Okay?
8            It says, "Respondent's practice
9    with" -- I'm sorry.
10            MR. STOFFELMAYR:  Give me a
11       second.
12            MR. MOUGEY:  Yeah, my bad.
13            MR. STOFFELMAYR:  Got it.  Are
14       you there?
15            MR. MOUGEY:  Are you there?
16            THE WITNESS:  Yep.  Okay.
17   QUESTIONS BY MR. MOUGEY:
18       Q.    Page 626, paragraph 9,
19   "Respondent's practice with regard to
20   suspicious order reporting was to send to the
21   local DEA field office a monthly report
22   labeled 'Suspicious Drug Controlled Orders.'
23   Two reports were provided:  One for
24   suspicious orders of Schedule II drugs;
25   another for suspicious orders of drugs in

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1   Schedules III and V.  These reports were
2   transmitted on respondent's behalf from
3   Walgreens corporate headquarters in
4   Deerfield, Illinois."
5         So you think for the period of
6   time that you were responsible, that's you
7   sending those out?
8       A.   Yes.
9       Q.   And respondent's suspicious
10  order report for December 2011 appears to
11  include suspicious orders placed by its
12  customers for the past six months, okay?
13        But you don't have any
14  recollection of what time scope you were
15  pulling the suspicious control orders,
16  correct?
17        MR. STOFFELMAYR:  Objection to
18  form.
19        THE WITNESS:  I was only tasked
20  to pull the reports monthly, so I do
21  not know how much information was
22  contained on those reports.
23  QUESTIONS BY MR. MOUGEY:
24      Q.   The report for just suspicious
25  orders of Schedule II drugs is 1,712 pages.

Page 291

1         Do you see that?
2       A.   I do.
3       Q.   That's a lot of pages with a
4   lot of suspicious orders, right?
5         MR. STOFFELMAYR:  Objection to
6   form.
7         THE WITNESS:  It's a lot of
8   pages.  I don't know if each one of
9   those orders is a, quote/unquote,
10  suspicious order.
11  QUESTIONS BY MR. MOUGEY:
12      Q.   And sitting here today, you
13  don't know what the formula was for
14  identifying suspicious orders, do you?
15      A.   That is correct.
16      Q.   Now, you recall our going
17  through the DEA letters earlier that a rigid
18  formula is not really helpful with
19  identifying suspicious orders, correct?
20        MR. STOFFELMAYR:  Objection to
21  form.  Foundation.
22        THE WITNESS:  I don't recall
23  those exact words being used.
24  QUESTIONS BY MR. MOUGEY:
25      Q.   If you'd go back to the DEA

Page 292

1   letters, tell me what exhibit number that is.
2   I think it's 5, Stahmann 5.
3       A.   Got it.
4       Q.   Got it?
5       A.   Yep.
6       Q.   Okay.  Look at the paragraph
7   that begins with "registrants" and the very
8   last paragraph of Stahmann 5 dated June 12,
9   2012.
10      A.   I see that.
11      Q.   "Registrants who rely on rigid
12  formulas to identify whether an order is
13  suspicious may fail to detect suspicious
14  orders," right?
15      A.   I do see that.
16      Q.   "For example, this system might
17  not identify suspicious orders placed by a
18  pharmacy if that pharmacy placed unusually
19  large orders from the beginning."
20        That makes sense, right?
21        MR. STOFFELMAYR:  Objection to
22  the form.
23        THE WITNESS:  I don't know if
24  that makes sense in the context it's
25  used because that doesn't necessarily

Page 293

1   mean that because a pharmacy placed
2   large orders that are suspicious or
3   that since they were placing large
4   orders from the beginning we weren't
5   able to detect suspicious orders.
6   QUESTIONS BY MR. MOUGEY:
7       Q.   Well, it's not categorical, but
8   the point of this process with suspicious
9   order reporting was to identify red flags,
10  right?
11        MR. STOFFELMAYR:  Objection to
12  the form.
13        THE WITNESS:  The purpose of
14  the suspicious order report is to
15  report based off of a formula orders
16  of interest that could lead to
17  suspicious orders.
18  QUESTIONS BY MR. MOUGEY:
19      Q.   And then perform due diligence
20  on those orders before they were shipped as
21  we went through earlier, correct?
22        MR. STOFFELMAYR:  Objection to
23  form.
24        THE WITNESS:  Due diligence was
25  performed, to my knowledge, don't know

74 (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    by who, on those orders, yes.
2    QUESTIONS BY MR. MOUGEY:
3        Q.    And prior to being shipped,
4    correct?
5            MR. STOFFELMAYR:  Objection to
6        form.  Foundation.
7            THE WITNESS:  I don't know if
8        that's actually what -- I don't know
9        who was responsible for that type
10       of --
11   QUESTIONS BY MR. MOUGEY:
12       Q.    And I'm not asking you who was
13   responsible.  What I'm asking is what the
14   requirement was, and the due diligence was
15   performed prior to the shipment being
16   actually -- the order being shipped, correct?
17           MR. STOFFELMAYR:  Objection to
18       form.  Foundation.
19           THE WITNESS:  I believe that's
20       what the requirements stated, but that
21       was not part of my expertise as to
22       interpret regulations.
23   QUESTIONS BY MR. MOUGEY:
24       Q.    All right.  Let's go back to
25   Stahmann 6, and middle of the page, the

Page 295

1    sentence underneath paragraph 9 on the
2    right-hand side says, "The reports are based
3    on a formula that assigns an average monthly
4    order for a particular drug" --
5            MR. STOFFELMAYR:  You better
6        give him a second.  He's still on --
7            THE WITNESS:  What page are you
8        on, I'm sorry?
9    QUESTIONS BY MR. MOUGEY:
10       Q.    I'm sorry.  Page 26.
11       A.    26.
12       Q.    Paragraph 9.
13       A.    Got it.  Okay.
14       Q.    "The reports are based on a
15   formula that assigns an average monthly order
16   for a particular drug which is then
17   multiplied by a DEA factor, which is always
18   three regardless of the drug or the average
19   order amount, resulting in a trigger amount
20   above which orders for the month are reported
21   as suspicious, along with a listing of all
22   orders placed for the particular drug by the
23   reported pharmacy for the month in which the
24   trigger amount was exceeded."
25       Do you see that?

Page 296

1        A.    I do see that.
2        Q.    Now, Stahmann 8, the report
3    that you e-mailed yourself on August 16,
4    2017, you would flip to Bates number 380?
5        A.    Exhibit 9, I think --
6        Q.    Is it 9?
7        A.    Yeah.
8        Q.    Stahmann 9, if you go to Bates
9    number 380, top of that page is titled "Sales
10   District 277."
11       A.    Yes.
12           MR. STOFFELMAYR:  I'm sorry,
13       give me a second to catch up.  It's
14       380 at the bottom?
15           Okay.  I got it figured out
16       now.
17   QUESTIONS BY MR. MOUGEY:
18       Q.    And the store address is 6410
19   Broadway Avenue, Cleveland, Ohio.
20       Do you see that?
21       A.    I do see that.
22       Q.    And then you can see below, you
23   see the NDC number?
24       A.    I do.
25       Q.    What's the NDC number mean?

Page 297

1        A.    It is an identifying number.
2    It's a national -- I forgot what the acronym
3    means, but it's basically a way to identify a
4    certain product.
5        Q.    And --
6        A.    It's national drug code.
7        Q.    And you can see below or
8    adjacent to that, 6, which is the oxycodone,
9    6 times 3 is 18.
10       Do you see that?
11       A.    I see that.
12       Q.    But as you were shipping these
13   reports on CDs to the DEA, you didn't know
14   what the multiplier DEA factor was, correct?
15           MR. STOFFELMAYR:  Objection to
16       the form.
17           THE WITNESS:  I did not know
18       what the DEA factor meant, and I did
19       not dive deeply into these reports
20       when I sent them.
21   QUESTIONS BY MR. MOUGEY:
22       Q.    I mean, I'm not asking you to
23   deeply dive.  You didn't even know that they
24   were multiplied by 3 and what the criteria
25   was for the thresholds, correct?

75 (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review

Page 298  **REDACTED**

1      A.    Correct, I did not.
2      Q.    Okay.  So below that, you see
3    the date ordered, 6/29, 6/22, 6/15, 6/8, 6/1.
4           Do you see that?
5      A.    I do.
6      Q.    And the quantity, 7, 4, 3, 5,
7    9, right?
8      A.    Yes.
9      Q.    So how would you determine --
10   how would one determine how many dosage units
11   are in each of those quantities?
12     A.    Via the NDC on the top, it says
13   plus 500.  That's the number of dosage units
14   per bottle.
15     Q.    Did you not have access to the
16   NDC codes to import those into your database
17   to identify how many pills those are?
18     A.    We did have that information.
19     Q.    You did?
20     A.    Yes.
21     Q.    Do you understand or know
22   whether the DEA had the NDC codes imported
23   into ARCOS so it could tell how many dosage
24   units were part of that quantity?
25     A.    I don't know if the DEA had

Page 299

1    that information.
2      Q.    Would you think that would be
3    helpful to provide the number of dosage units
4    in your report to the DEA?
5           MR. STOFFELMAYR:  Objection to
6      the form.  Foundation.
7           THE WITNESS:  I don't know if
8      that would be helpful or not.  I don't
9      know if that would be helpful or not
10     to them.
11   QUESTIONS BY MR. MOUGEY:
12     Q.    Go back to your experience as
13   law enforcement.  Wouldn't you want to know
14   if that's -- I mean, is that seven bottles of
15   three pills or seven bottles of 80 pills?
16   Wouldn't you want to know?
17     A.    Yes, and it states here on the
18   report how many dosage units are in the
19   bottle.
20     Q.    Where do you see that?
21     A.    Right next to oxycodone 5/325
22   tab, Watson brand, plus 500, that's the
23   dosage units.
24     Q.    Where do you see that?
25     A.    Right under average order, "DEA

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**





**REDACTED**



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential – Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

103 (Pages 406 to 409)

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential – Subject to Further Confidentiality Review



REDACTED

Highly Confidential – Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS