Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE:  NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | |
| | : | |
| APPLIES TO ALL CASES | : | NO. |
| | : | 1:17-MD-2804 |
| | : | |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

February 15, 2019

- - -

        Videotaped deposition of
GEORGE STEVENSON, taken pursuant to
notice, was held at the offices of
McCarter & English, LLP, 1600 Market
Street, Philadelphia, Pennsylvania,
beginning at 9:11 a.m., on the above
date, before Michelle L. Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

| | Page 2 |
|---|---|

```
 1    APPEARANCES:
 2
      SEEGER WEISS, LLP
 3    BY:  JENNIFER SCULLION, ESQ
           KSENIYA LEZHNEV, ESQ
 4    77 Water Street, 8th Floor
      New York, New York 10005
 5    (212) 584-0780
      Jscullion@seegerweiss.com
 6    klezhnev@seegerweiss.com
 7    Representing the Plaintiffs
 8    BRANSTETTER, STRANCH & JENNINGS, PLLC
      BY:  JOE P. LENISKI, JR , ESQ
 9    223 Rosa L. Parks Avenue, Suite 200
      Nashville, Tennessee 37203
10    (615) 254-8801
      Joeyl@bsjfirm.com
11    Representing the TN Plaintiffs
12
      McCARTER & ENGLISH, LLP
13    BY:  AMY M. VANNI, ESQ
      1600 Market Street, Suite 3900
14    Philadelphia, Pennsylvania 19103
      (215) 979-3848
15    avanni@mccarter.com
16       - and -
17    McCARTER & ENGLISH, LLP
      BY:  HAYLEY J. REESE, ESQ
18    Renaissance Centre
      405 N King Street, 8th Floor
19    Wilmington, Delaware 19801
      (302) 227-6308
20    hreese@mccarter.com
      Representing the Defendants, Endo Health
21    Solutions; Endo Pharmaceuticals, Inc ;
      Par Pharmaceutical Companies, Inc  f/k/a
22    Par Pharmaceutical Holdings, Inc  and the
      Witness
23
24
```

| | Page 4 |
|---|---|

```
 1    TELEPHONIC/STREAMING APPEARANCES:
      (Cont'd.)
 2
 3
      ROPES & GRAY, LLP
 4    BY:  SEAN B. KENNEDY, ESQ.
      800 Boylston Street
 5    Boston, Massachusetts 02199
      (617) 951-7234
 6    sean.kennedy@ropesgray.com
      Representing the Defendant, Mallinckrodt
 7
 8    ULMER BERNE, LLP
      BY:  SANDRA MILLER BENOIT, ESQ.
 9    65 East State Street
      Columbus, OH 43215
10    (614) 229-0016
      sbenoit@ulmer.com
11    Representing the Defendant, Teva
      Pharmaceuticals, Inc. Cephalon Inc,
12    Watson Laboratories, Actavis LLC, Actavis
      Pharma, Inc.
13
14
15
16
17
18
19
20
21
22
23
24
```

| | Page 3 |
|---|---|

```
 1    APPEARANCES:  (Cont'd.)
 2
      PIETRAGALLO GORDON ALFANO BOSICK &
 3    RASPANTI, LLP
      BY:  ASHLEY KENNY, ESQ.
 4    1818 Market Street, Suite 3402
      Philadelphia, Pennsylvania 19103
 5    (215) 320-6200
      Ak@pietragallo.com
 6    Representing the Defendant, Cardinal
      Health
 7
 8
      TELEPHONIC/STREAMING APPEARANCES:
 9
10    JONES DAY
      BY:  EDWARD M. CARTER, ESQ.
11    325 John H. McConnell Boulevard
      Columbus, Ohio 43215
12    (614) 281-3906
      Emcarter@jonesday.com
13    Representing the Defendant, Walmart
14
      COVINGTON & BURLING, LLP
15    BY:  JOSEPH HYKAN, ESQ.
           AMBER CHARLES, ESQ.
16    850 Tenth Street, NW
      Suite 586N
17    Washington, D.C. 20001
      (202) 662-5769
18    jhykan@cov.com
      acharles@cov.com
19    Representing the Defendant, McKesson
      Corporation
20
21    JACKSON KELLY, PLLC
      BY:  SANDRA K. ZERRUSEN, ESQ.
22    50 South Main Street, Suite 201
      Akron, Ohio 44308
23    (330) 252-9060
      Skzerrusen@jacksonkelly.com
24    Representing the Defendant, AmerisourceBergen
```

| | Page 5 |
|---|---|

```
 1    ALSO PRESENT:
 2
      Carolyn Johnson
 3    (Paralegal - Seeger Weiss)
 4    Sandra Di Iorio, Esq.
      (Endo)
 5
 6
 7    VIDEOTAPE TECHNICIAN:
 8    Bill Geigert
 9
      LITIGATION TECHNICIAN
10
      Bradley Smith
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
 1                - - -
 2             I N D E X
 3                - - -
 4
 5        .
          Testimony of:
 6
             GEORGE STEVENSON
 7
 8        By Ms. Scullion      21
 9        By Ms. Vanni        527
10
11
12                - - -
13            E X H I B I T S
14                - - -
15
16   NO.       DESCRIPTION        PAGE
17   Endo
     Stevenson-1  Curriculum Vitae    21
18       George R. Stevenson
19   Endo
     Stevenson-2  Subpoena to Testify  37
20
     Endo
21   Stevenson-3  GeneriCo Board of    68
         Directors
22
23
24
```

Page 7

```
 1                - - -
 2        E X H I B I T S  (Cont'd)
 3                - - -
 4
 5   NO.       DESCRIPTION        PAGE
 6   Endo
     Stevenson-4  E-mail, 1/25/07    81
 7       Subject, Stevenson
         2006 Performance
 8       Appraisal
         Endo 2006 Performance
 9       Management
         ENDO-OPIOID_MDL-
10       00860303-11
11   Endo
     Stevenson-5  E-mail Thread    107
12       3/8/07
         Subject, Opana
13       On Hand Quantities at
         McKesson (QVL)
14       ENDO-OPIOID_MDL-
         05554625-28
15
16   Endo
     Stevenson-6  Trade Organization   113
17       Memberships
         OpCom 4/28/04
18       ENDO-OPIOID_MDL-
         04137718
19   Endo
     Stevenson-7  Form 10-K     160
20       Endo Pharmaceuticals
         Holdings
21
     Endo
22   Stevenson-8  Endo Pharmaceuticals  176
         Company Overview
23       April 2004
         ENDO-OPIOID_MDL-
24       04137944
```

Page 8

```
 1                - - -
 2        E X H I B I T S  (Cont'd)
 3                - - -
 4
 5   NO.       DESCRIPTION        PAGE
 6   Endo
     Stevenson-9  E-mail Thread    200
 7       1/24/07
         Subject, Percocet
 8       Price Increase Effective
         2/1/07 Approved by EPC
 9       ENDO-OPIOID_MDL-
         03571186-92
10
     Endo
11   Stevenson-10 Percocet Quarterly   203
         Business Review
12       Fourth Quarter 2002
         ENDO-OPIOID_MDL-
13       04910731
14   Endo
     Stevenson-11 (Skipped)
15
     Endo
16   Stevenson-12 GAO, OxyContin     247
         Abuse and Diversion
17       And Efforts to Address
         The Problem
18       ENDO-OPIOID_MDL-
         03256655-17
19
     Endo
20   Stevenson-13 E-mail Thread     260
         9/8/03
21       Subject, EN3218
         Quota Request and
22       Risk Management Questions
         ENDO-OPIOID_MDL-
23       03002818-19
24
```

Page 9

```
 1                - - -
 2        E X H I B I T S  (Cont'd)
 3                - - -
 4
 5   NO.       DESCRIPTION        PAGE
 6   Endo
     Stevenson-14 E-mail Thread    274
 7       9/29/03
         Subject, Final DEA
 8       Presentation
         Endo Pharmaceuticals
 9       Meeting with Drug
         Enforcement Administration
10       9/30/03
         ENDO-OPIOID_MDL-
11       03005612
12   Endo
     Stevenson-15 Risk Management Plan  284
13       For Opioid Analgesics
         Oxycodone ER
14       1/15/04
         ENDO-OPIOID_MDL-
15       04137306-413
16   Endo
     Stevenson-16 Risk Management Plan  286
17       For Opioid Analgesics
         Oxycodone ER
18       2/19/04
         ENDO-OPIOID_MDL-
19       01500831-36
20
     Endo
21   Stevenson-17 Endo Pharmaceuticals  297
         To Continue to Market
22       Its Bioequivalent
         Version of OxyContin
23
24
```

3  (Pages 6 to 9)

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
 1              - - -
 2        E X H I B I T S  (Cont'd )
 3              - - -
 4
 5   NO      DESCRIPTION       PAGE
 6   Endo
     Stevenson-18 Form 10-K        302
 7              Fiscal Year Ended
                12/31/06
 8
     Endo
 9   Stevenson-19 Corporate Reputation  308
                Management
10              Cohn & Wolfe Healthcare
                5/14/04
11              ENDO-OPIOID_MDL-
                04137791
12
     Endo
13   Stevenson-20 E-mail Thread       313
                8/20/03
14              Subject, Risk
                Management Plan
15              Submission
                ENDO-OPIOID_MDL-
16              01709808-18
17   Endo
     Stevenson-21 You Want a       321
18              Description of Hell?
                OxyContin's 12-Hour
19              Problem
20   Endo
     Stevenson-22 Endo Health       326
21              Solutions Supplemental
                Objections and Responses
22              Preliminary Statement
23
24
```

Page 11

```
 1              - - -
 2        E X H I B I T S  (Cont'd )
 3              - - -
 4
 5   NO      DESCRIPTION       PAGE
 6   Endo
     Stevenson-23 Drug Abuse, Current  334
 7              Concepts and Research
 8
     Endo
 9   Stevenson-24 E-mail Thread       338
                3/6/08
10              Subject, Opana
                ENDO-OPIOID_MDL-
11              06175127-29
12   Endo
     Stevenson-25 Letter, 7/10/00     346
13              To McCormick from
                Patterson
14              RE, IND 56,919
                Numorphan
15              ENDO-OPIOID_MDL-
                00156150-51
16
     Endo
17   Stevenson-26 E-mail Thread       351
                10/20/06
18              Subject, Project
                Pizza
19              ENDO-OPIOID_MDL-
                00856825-31
20
21   Stevenson-27 E-mail Thread       364
                10/27/06
22              Subject, Project
                Pizza Update
23              ENDO-OPIOID_MDL-
                02230226-28
24
```

Page 12

```
 1              - - -
 2        E X H I B I T S  (Cont'd )
 3              - - -
 4
 5   NO      DESCRIPTION       PAGE
 6   Endo
     Stevenson-28 E-mail Thread       378
 7              4/5/06
                Subject, Examples
 8              ENDO-OPIOID_MDL-
                03924784
 9
     Endo
10   Stevenson-29 Endo Contribution    397
                Margin Report
11              ENDO-OPIOID_MDL-
                00000008
12
     Endo
13   Stevenson-30 E-mail Thread       411
                5/3/06
14              Subject, New
                NCPA Pharmacist
15              Research Study
                ENDO-OPIOID_MDL-
16              00877265-66
17   Endo
     Stevenson-31 E-mail Thread       417
18              2/12/04
                Subject, Urgent Re
19              Opioid Education
                Materials
20              ENDO-OPIOID_MDL-
                02255008-09
21
22
23
24
```

Page 13

```
 1              - - -
 2        E X H I B I T S  (Cont'd )
 3              - - -
 4
 5   NO      DESCRIPTION       PAGE
 6   Endo
     Stevenson-32 E-mail Thread       426
 7              3/23/04
                Subject, Pharmacist
 8              Educational
                Initiative Update
 9              ENDO-OPIOID_MDL-
                02255384-88
10
     Endo
11   Stevenson-33 E-mail Thread       427
                5/21/04
12              Subject, Opioid
                Patient Brochure
13              Production Ready
                ENDO-OPIOID_MDL-
14              02255803-12
15   Endo
     Stevenson-34 E-mail Thread       463
16              7/1/03
                Subject, Agency Contact
17              Report, Oxymorphone
                ER and IR
18              ENDO-OPIOID_MDL-
                01716696-97
19
     Endo
20   Stevenson-35 E-mail Thread       469
                7/14/03
21              Subject, Action Plan
                To Prevent Diversion
22              ENDO-OPIOID_MDL-
                01692316-21
23
24
```

4  (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

```
1            - - -
2     E X H I B I T S (Cont'd)
3            - - -
4
5   NO.       DESCRIPTION        PAGE
6   Endo
    Stevenson-36 Memo, 4/1/04      476
7              Cohn & Wolfe
               Subject, Proactive
8              Media Relations
               Review & Recommendations
9              ENDO-OPIOID_MDL-
               04137641-42
10
    Endo
11  Stevenson-37 E-mail Thread     480
               4/7/04
12             Subject, Kentucky
               State Programs and
13             OxyContin Abuse
               ENDO-OPIOID_MDL-
14             03256784-86
15  Endo
    Stevenson-38 E-mail Thread     489
16             4/23/04
               Subject, E-mailing
17             8494968
               ENDO-OPIOID_MDL-
18             03389105-07
19  Endo
    Stevenson-39 E-mail Thread     495
20             4/28/04
               Subject, Actiq Abuse
21             In PA
               ENDO-OPIOID_MDL-
22             02843461-62
23
24
```

Page 16

```
1            - - -
2     DEPOSITION SUPPORT INDEX
3            - - -
4
5   Direction to Witness Not to Answer
6   PAGE   LINE
    None.
7
8   Request for Production of Documents
9   PAGE   LINE
    None.
10
11  Stipulations
12  PAGE   LINE
    None.
13
    Questions Marked
14
    PAGE   LINE
15  None.
16
17
18
19
20
21
22
23
24
```

Page 15

```
1            - - -
2     E X H I B I T S (Cont'd.)
3            - - -
4
5   NO.      DESCRIPTION       PAGE
6   Endo
    Stevenson-40 E-mail Thread     500
7              5/21/04
               EN3218 Preparedness
8              Next Steps
               ENDO-OPIOID_MDL-
9              02843475-80
10  Endo
    Stevenson-41 E-mail Thread     510
11             5/22/07
               Subject, FDA News Drug
12             Daily Bulletin
               ENDO-OPIOID_MDL-
13             05554689-93
14  Endo
    Stevenson-42 COLT Staff Minutes   516
15             5/24/07
               ENDO-OPIOID_MDL-
16             01915705-06
17  Endo
    Stevenson-43 McKesson 867     520
18             Opana Data Aug
               To Present 11/3/06 xls
19             ENDO-OPIOID_MDL-04139984
20
21
22
23
24
```

Page 17

```
1            - - -
2        MS. VANNI:  This is Amy
3   Vanni, I represent Endo and the
4   witness.  We learned today that
5   Ms. Scullion previously
6   represented Apothecon, a division
7   of BMS, and more particularly,
8   represented or participated in
9   representing Mr. Stevenson, our
10  deponent today, at a deposition
11  involving an unrelated drug,
12  related to his employment at
13  Apothecon.
14       We're allowing the
15  deposition to move forward, but
16  ask that in the course of the
17  deposition, that Ms. Scullion met
18  with Mr. Stevenson, that she not
19  use any confidential information
20  that she may have obtained from
21  him during her representation here
22  today.
23       MS. SCULLION:  And as I
24  explained off the record
```

5  (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    previously, I did represent, as an
2    associate at a prior law firm,
3    Apothecon.  And I do recall
4    Mr. Stevenson, meeting him in the
5    course of that.  I don't recall
6    representing you personally during
7    a deposition.  But I'm -- I'm just
8    saying I don't recall.
9        As Ms. Vanni explained, the
10   representation with respect to
11   Apothecon did not concern any
12   opioid product, did not concern
13   any pain product; the product at
14   issue there was a generic warfarin
15   sodium product.  And the nature of
16   the lawsuit was an antitrust
17   action.  And again I was an
18   associate, that was at Solomon,
19   Zauderer, Ellenhorn, Frischer &
20   Sharp.
21       And I have no intention
22   whatsoever of using any
23   confidential information I
24   obtained during the course of that

Page 19

1    representation for today's
2    deposition.
3        MS. VANNI:  Thank you.
4        MS. SCULLION:  Just to be
5    clear, my understanding that the
6    statement has been made on the
7    record, but that there's no
8    intention of trying to strike the
9    testimony or deem the deposition
10   in any way unusable based on that
11   prior unrelated representation.
12       MS. VANNI:  That's based on
13   your representation that you will
14   not use any confidential
15   information, that's true.
16       MS. SCULLION:  Okay.  If at
17   any point today there's any
18   concern that I am, I would ask
19   that that be made vocal, so I know
20   and we can resolve it.
21       So, again, I don't want to
22   waste the witness's time, my time,
23   the deposition time, if there's
24   going to be any concern about the

Page 20

1    testimony.
2        MS. VANNI:  Agreed.
3        MS. SCULLION:  Okay.  Great.
4    Thanks.  I appreciate that.
5        THE VIDEOGRAPHER:  Good
6    morning.  We are now on the
7    record.
8        My name is Bill Geigert, I'm
9    a videographer for Golkow
10   Litigation Services.
11       Today's date is February 15,
12   2019.  And the time is 9:11 a.m.
13       This video deposition is
14   being held in Philadelphia,
15   Pennsylvania, in the matter of
16   National Prescription.
17       The deponent is George
18   Stevenson.
19       Counsel will be noted on the
20   stenographic record.
21       The court reporter is
22   Michelle Gray and she will now
23   swear in the witness.
24           - - -

Page 21

1        ... GEORGE STEVENSON,
2    having been first duly sworn, was
3    examined and testified as follows:
4           - - -
5        EXAMINATION
6           - - -
7    BY MS. SCULLION:
8        Q.   Good morning, Mr. Stevenson,
9    I introduced myself to you briefly off
10   the record.  And again, as you know, we
11   met before, my name is Jennifer Scullion.
12       A.   Good morning, Jennifer.
13   Nice to see you.
14       Q.   Very nice to see you as
15   well.
16       Mr. Stevenson, I'm going to
17   hand you what's been marked as Exhibit
18   Number 1.
19       (Document marked for
20       identification as Exhibit
21       Endo-Stevenson-1.)
22   BY MS. SCULLION:
23       Q.   Mr. Stevenson, Exhibit
24   Number 1 was handed to us just before the

6  (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    deposition began today.  Can you identify
2    Exhibit Number 1 please?
3        A.   It's my CV.
4        Q.   Okay.  So this is a copy of
5    your current CV?
6        A.   Yes.
7        Q.   And this is something you
8    drafted yourself?
9        A.   Yes.
10       Q.   And to the best of your
11   knowledge, it's accurate and complete?
12       A.   Yes, yes.
13       Q.   We're going to get into some
14   of the preliminaries, but just as a
15   reminder in a deposition, if you can let
16   me finish my questions, and then you
17   begin your answers.  The primary reason
18   for that is that Michelle, our court
19   reporter, will otherwise not be able to
20   take down both of our statements.
21            Does that make sense?
22       A.   Thanks -- thanks for
23   reminding me.
24            Sorry, Michelle.

Page 23

1        Q.   Terrific.  Okay.
2            Mr. Stevenson, have you been
3    deposed before?
4        A.   Yes.
5        Q.   Approximately how many
6    times?
7        A.   Let me see, probably -- let
8    me see, there was -- somewhere in the
9    neighborhood of five or six.
10       Q.   Have you ever been deposed
11   before with respect to any opioid
12   products?
13       A.   No.
14       Q.   Okay.  Have you ever been
15   deposed before with respect to any
16   controlled substances?
17       A.   No.
18       Q.   Have you been deposed at all
19   with respect to any work you did with
20   Endo?
21       A.   No.
22       Q.   All right.  Can you tell me
23   just very generally, as best you can
24   recall, the nature of the proceedings in

Page 24

1    which you were deposed before?
2        A.   There was -- I don't
3    remember the year.  There was an AWP
4    pricing case that I gave a deposition
5    for.
6        Q.   Which -- which employer was
7    that in connection with?
8        A.   It was -- it was in
9    conjunction with Geneva, which became
10   Sandoz, and Bristol-Myers Squibb,
11   Apothecon also rep -- was represented
12   there because some of it referred to
13   them.  So it was like a dual deposition
14   where both were there.
15       Q.   Okay.
16       A.   And then before that I gave
17   several depositions with respect to
18   warfarin sodium in the case with BMS and
19   their Apothecon subsidiary versus Barr
20   Laboratories.  And before that I gave a
21   deposition in a private matter.
22       Q.   And putting aside
23   depositions, have you ever testified in
24   court in connection with your employment

Page 25

1    with Endo?
2        A.   No.
3        Q.   Have you given any -- any
4    sworn testimony of any kind in writing
5    with respect to your work at Endo?
6        A.   No.
7        Q.   All right.  And just to
8    be -- really make sure, did you ever
9    testify before the New York Attorney
10   General, New York Attorney General with
11   respect to your work for Endo?
12       A.   No.
13       Q.   Are you represented by
14   counsel today?
15       A.   Yes, I am.
16       Q.   Who is that?
17       A.   McCarter English, Amy Vanni.
18       Q.   Fantastic.  Okay.  And let's
19   just go over some of the basics for
20   deposition.
21            As I said, I'm going to be
22   asking you questions.  And I'm going to
23   ask you to answer and answer orally.  Is
24   that all right?

7  (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1      A.   That's fine.
2      Q.   Okay.  So we can't have
3  shaking of heads and mm-hmms and
4  unh-unhs.  Do you understand that?
5      A.   I do.
6      Q.   Terrific.  And as we
7  discussed, we need to try and avoid
8  talking over each other.  Okay?
9      A.   I will.
10     Q.   Thank you.  And from time to
11 time, Ms. Vanni may have objections.
12 Unless she instructs you not to answer
13 and you choose to follow that
14 instruction, you're going to need to
15 answer the question despite any
16 objection.  Do you understand that?
17     A.   I do.
18     Q.   Terrific.  And is there any
19 reason that you can't give your best
20 testimony today?  For example, are you
21 taking any medications that might
22 interfere with your cognitive skills
23 today?
24     A.   No.

Page 27

1      Q.   Okay.  If at any point
2  today, you don't understand a question
3  that I ask, would you please let me know
4  that?
5      A.   Be glad to.
6      Q.   Terrific.  Thank you very
7  much.  Did you do anything to prepare for
8  today's deposition?
9      A.   I met with -- I met with
10 Ms. Vanni, yes.
11     Q.   And when was that?
12     A.   Over several days in the
13 last couple of weeks.
14     Q.   You say several days.  Was
15 it more than two days?
16     A.   It might have been.  I don't
17 know.  It depends on how you define a
18 day.
19     Q.   On how many different days,
20 putting aside how -- length of day, on
21 how many different occasions did you meet
22 with Ms. Vanni?
23     A.   I think a total of three
24 days.

Page 28

1      Q.   And that was over the last
2  week or more than a week?
3      A.   Somewhere in the
4  neighborhood of the last two weeks.
5      Q.   Okay.  Was there anyone else
6  present at the meetings you had with
7  Ms. Vanni?
8      A.   Yes.  And then you want
9  to -- Sandra was there and --
10     MS. REESE:  Kelly Reese.
11 BY MS. SCULLION:
12     Q.   Fantastic.  Okay.  Was there
13 anyone else other than counsel?
14     A.   There was -- no, there
15 was -- other than counsel, no.
16     Q.   Okay.  Was anyone joined by
17 phone other than counsel?
18     A.   No one joined by phone, no.
19     Q.   Okay.  And did you review
20 documents in the course of your
21 preparation for today's deposition?
22     A.   I did.
23     Q.   Did any of those documents
24 refresh your recollection about any of

Page 29

1  the events that took place when you were
2  employed with Endo?
3      A.   I would say honestly
4  vaguely.  I didn't have some -- I didn't
5  have some, you know, burst of memory that
6  it all of the sudden jolted my brain that
7  says, oh, yeah, absolutely that's crystal
8  clear now.  I mean, I -- it came back a
9  little bit.  But remember we're going
10 back -- you know, I left Endo in -- in
11 August of 2007, so it's -- you know, it
12 was already going -- it's 11 and a half
13 years.  It's going on 12 years.
14     Q.   I understand.
15     A.   So a lot of the -- I started
16 in '03.  So if you add those years in,
17 you're looking at, you know, close to
18 16 years.
19     Q.   Understood.  You said that
20 your recollection may have been refreshed
21 even just vaguely on some things.  Can
22 you tell me what kinds of things you have
23 a little bit more recollection on having
24 prepared?

8  (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1      A.   I don't have any -- I can't
2   give you specific examples.  Just in
3   general terms, you know, I saw documents
4   that, you know, some dealt with the
5   brand.  I had nothing to do with the
6   brand.  So I was -- our focus was -- my
7   focus was on generics.
8      Q.   You say you have nothing to
9   do with the brand -- I apologize.  Did
10  you finish?
11     A.   I think so, yes.
12     Q.   I apologize.  I think I
13  started to talk over you.  You said you
14  had nothing to do with the brand.  The
15  brand there, are you referring to Opana?
16     A.   Well, just brands in
17  general.  Brands -- Endo had the brand --
18  Endo's brand division or group, which
19  was, you know, 95 percent of the company,
20  maybe more, had, you know, opioids and
21  non-opioids.  But they were the brand.
22  And I didn't have anything to do with
23  that activity.  So the brands were the
24  brands.  And they did their things.

Page 31

1   Completely different business in
2   generics.  It's completely different
3   models, completely different everything.
4      Q.   Okay.  We'll look a few -- a
5   few documents later, because I think
6   we've seen some involvement that you had
7   with some of the branded products.  We'll
8   look at that a little bit later.
9           In terms of preparing for
10  the deposition, did you yourself go back
11  and look at any documents on your own
12  outside of what Ms. Vanni or counsel may
13  have shown to you?
14     A.   I don't have any documents
15  of my own.  So there was nothing to
16  review.
17     Q.   Okay.  You don't keep any
18  diaries or journals that you would have
19  gone back to look at, or did you go back
20  to look at?
21     A.   I don't -- I didn't -- no, I
22  don't have any of those journals or
23  diaries.  Notebooks I left at Endo.  When
24  I left, I left.  You know, I had boxes of

Page 32

1   personal photographs and things of my
2   wife and kids and left.
3      Q.   Okay.  Terrific.  Did you
4   speak with anyone else other than counsel
5   in preparation for the deposition about
6   the work that you did with Endo?
7      A.   No.
8      Q.   Since you left Endo, have
9   you been in touch with any of your former
10  colleagues?
11     A.   No.  You know, they -- I'm a
12  big believer in antitrust.  And, you
13  know, we -- you know, I never -- as a
14  matter of fact I saw some yesterday when
15  I was there.  And I haven't seen them in,
16  you know, 12 years, whatever it's been
17  since I left.  So, no, other than I would
18  wave to them at a convention or
19  something, you know, we didn't have any
20  conversations.
21     Q.   You didn't have any ongoing
22  personal relationship with anybody?
23     A.   No.
24     Q.   And you said that you saw

Page 33

1   some folks yesterday.  So in the course
2   of going for preparation for the
3   deposition, you saw other folks from
4   Endo?
5      A.   As I was leaving.  You know,
6   as I was leaving, I got to spend five or
7   10 minutes with former colleagues that
8   were in the -- whatever department
9   they're in now, at the time they were in
10  the finance department.  "Hi, how are
11  you?  You know, how are you doing?  You
12  look great."  That kind of stuff.
13     Q.   Got it.  Who were those
14  folks that you said hi to?
15     A.   They would have been Mary Jo
16  Magrone and it was -- the other one was
17  Jody Travis.
18     Q.   And you said you recall them
19  from your time at Endo; is that right?
20     A.   Yeah, they were there when I
21  left.
22     Q.   And they're -- were they in
23  the finance department when you were
24  there?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    A.   Yeah, they were in the
2  finance department.
3    Q.   Okay.  Got it.  Anyone else
4  that you -- that you said hello to at
5  Endo?
6    A.   Guy Donatiello, but he's
7  part of their legal counsel team.  He was
8  the -- he was the IP lawyer then.  He's
9  still the IP lawyer.
10   Q.   Got it.
11   A.   Not that that's a bad thing.
12   Q.   It's not a bad thing at all.
13       Okay.  At some point, I
14 assume you were contacted to inform you
15 that you were going to be deposed in this
16 case.  Before you were contacted about
17 the deposition, had you heard about this
18 case?
19   A.   Vaguely, whatever I heard in
20 the press, that you know -- to be honest,
21 not very much.
22   Q.   Okay.  What do you recall
23 hearing about it?
24       MS. VANNI:  Object to form.

Page 35

1        THE WITNESS:  Just the
2  various -- the various government
3  entities were pursuing, you know,
4  different pharmaceutical
5  companies.  More or less, that's
6  just it, you know.
7  BY MS. SCULLION:
8    Q.   Okay.  And what's your
9  understanding of what the governmental
10 entities are pursuing the companies for?
11   A.   I didn't really pay that
12 much attention to it.  I'm not involved
13 with opioids.  You know, when I was
14 Kremers Urban, I wasn't involved in
15 opioids.  Controlled drugs, yes, but not
16 opioid.
17       So, you know, I didn't -- I
18 don't believe most of the stuff that I
19 read in the press anyway.  So I didn't
20 really -- I didn't really focus on it.
21   Q.   Do you have -- do you have
22 an understanding that the case at its
23 core involves allegations concerning the
24 opioid epidemic in this country?

Page 36

1        MS. VANNI:  Object to form.
2        THE WITNESS:  I understand
3  based on -- based on our meeting
4  with counsel, yes.
5        MS. VANNI:  I just want
6  to -- I just want to remind you.
7  Don't disclose anything that we
8  personally discussed.
9        THE WITNESS:  Yeah, yeah,
10 yeah, yeah.
11 BY MS. SCULLION:
12   Q.   Okay.  Outside of this
13 litigation, are you generally familiar
14 with the fact that there's an opioid
15 epidemic in the country?
16       MS. VANNI:  Object to form.
17       THE WITNESS:  Only what I've
18 heard on TV that there's a problem
19 with opioids.
20       MS. SCULLION:  Okay.  Can I
21 have the subpoena, please.
22 BY MS. SCULLION:
23   Q.   Mr. Stevenson, were you
24 provided a copy of the subpoena that was

Page 37

1  served in this case for your deposition
2  and documents?
3    A.   I -- yes, I was -- I was
4  shown a copy, yes.  Mm-hmm.
5    Q.   Okay.
6        (Document marked for
7        identification as Exhibit
8        Endo-Stevenson-2.)
9  BY MS. SCULLION:
10   Q.   Let me hand you what's been
11 marked as Exhibit Number 2.  Exhibit
12 Number 2, Mr. Stevenson, is a copy of the
13 subpoena to testify at deposition in a
14 civil action.  It's addressed to you,
15 care of Arnold & Porter Kaye Scholer.  Do
16 you understand that Arnold & Porter Kaye
17 Scholer is also counsel for Endo in this
18 case?
19   A.   Yes.
20   Q.   Okay.  Terrific.  And is
21 the -- did you see the subpoena before
22 today's deposition?
23   A.   Yes.
24   Q.   All right.  And you

10 (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 understand that in addition to asking for
2 your testimony, it asks for documents?
3     A.   What kind of documents?
4     Q.   Sure.  Sorry.  Let's go
5 to -- on the very first page of
6 Exhibit 2, you see where it says in
7 italics on the left-hand side
8 "production"?
9     A.   Yes.
10     Q.   And it says, "You or your
11 representative must produce the
12 documents, electronically-stored
13 information, or objects identified in
14 Attachment A prior to the date of the
15 deposition but no later than February 10,
16 2019."
17       Do you see that?
18     A.   Yes.
19     Q.   Okay.  And if you turn back
20 in Exhibit 2 to what's labeled at the top
21 Attachment A.
22     A.   Yes.
23     Q.   And then you'll see that
24 page, and then really the next page under

Page 39

1 Roman Numeral II, documents requested,
2 there's five categories of documents.
3       The question is just, did
4 you search for documents that might be
5 responsive to the subpoena?
6     A.   I never had a personal
7 e-mail.  I only got one when I stopped
8 working at Kremers Urban as the president
9 and CEO.  I never had one before that.
10 So whatever was on my e-mail was at Endo.
11 I left it there.  And they have it all.
12 So I never stored -- for that very
13 reason.  I didn't want to have documents
14 at home.
15     Q.   Okay.
16     A.   I don't have any documents
17 to search for.
18     Q.   Terrific.  And then at the
19 bottom of that same page, it asks for
20 tangible things, Roman Numeral III,
21 tangible things.
22     A.   Yes.
23     Q.   The question here is, did
24 you have any samples of promotional

Page 40

1 materials or educational materials from
2 Endo at home?
3     A.   No.
4     Q.   Okay.
5     A.   Because first of all, in
6 generics, we don't do promotion.
7 Generics is a different business.
8 That's -- the brand business does
9 promotion.
10       And we didn't have any
11 educational -- that's what the brand
12 does.  They had educational material when
13 they called on physicians or whatever
14 they have in their -- you know, in their
15 arsenal when they visited physicians.
16 But in generics we didn't have that.  You
17 know, it's generics.  It's more of a
18 shoestring operation from a cost
19 standpoint, pricing standpoint.  So all
20 those things which are very expensive
21 would not be in the generics business.
22
23
24

Page 41

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 46

1
2
3
4
5
6      Q.   Got it.  Okay.
7          All right.  You mentioned
8    that you left Endo in August of 2007.
9    And just to be sure, do you have any
10   current financial connections with Endo
11   or Par?
12       A.   No.
13       Q.   All right.  Do you hold any
14   stock in either company?
15       A.   No.
16       Q.   Okay.  Are you being paid
17   for your time in connection with this
18   deposition at all?
19       A.   No.  I tried, but no.
20       Q.   Good for you.
21       A.   But I'll take -- I'll
22   definitely take a donation if you want to
23   make one.
24       Q.   Well, do you have an

Page 47

1    expectation of being paid in connection
2    with your testimony?
3        A.   No.  In all seriousness, no.
4        Q.   Okay.  And I -- I heard what
5    you said, but just so we're clear on the
6    record.  You have no expectation of
7    anyone making a donation to anyone on --
8    on your behalf --
9        A.   No.
10       Q.   -- in connection with the
11   deposition?
12       A.   I'm not expecting any
13   remuneration from anybody.
14       Q.   Okay.  Okay.  That has come
15   up in recent cases.  That's why I asked
16   the question.  Not in this case.
17       MS. SCULLION:  Sandra is
18       looking at me like what is she
19       talking about.
20       MS. VANNI:  Yeah.
21   BY MS. SCULLION:
22       Q.   You currently for -- I'm
23   sorry, you're currently chairman of the
24   board for GeneriCo; is that right?

Page 48

1        A.   That's correct.
2        Q.   Does GeneriCo currently have
3    any business relationships with Endo?
4        A.   No.
5        Q.   Does it have any business
6    relationship with Par?
7        A.   No.
8        Q.   Is GeneriCo currently
9    negotiating any potential relationship
10   with either Endo or Par?
11       A.   No.
12       Q.   Okay.  Does GeneriCo have
13   any involvement in the pain industry?
14       A.   No.
15       Q.   Okay.  And -- and by
16   definition, they're also not in any
17   opioids, correct?
18       A.   No.  No opioids.
19       Q.   All right.  Okay.  Do you
20   currently have any positions in any
21   industry groups other than being a member
22   of any industry group?
23       A.   Nope.
24       Q.   Are you -- are you currently

Page 49

1    personally a member of any industry
2    groups?
3        A.   No.  I get an e-mail
4    everyday about the generic industry.  I
5    still get it from the -- the successor to
6    GPhA, it's now called Association of
7    Accessible Medicines.  I still get their
8    daily brief or whatever it's called.  But
9    just, you know, that's it.
10       Q.   Is that still called The
11   Pink Sheet?
12       A.   No.  They have -- they have
13   an update on everything in the
14   pharmaceutical business or generic
15   business and...
16       Q.   Okay.  Let's go back to
17   Exhibit Number 1, your CV.
18       A.   Sure.
19       Q.   And as we go through today,
20   just, it will help to keep a pile of
21   exhibits.  Because we might come back to
22   them.
23       A.   Okay.
24       Q.   Just to give you the

13 (Pages 46 to 49)

Page 50

1    heads-up there.
2          So just -- just starting
3    back on the last page of Exhibit 1,
4    you -- you, it looks like, were born and
5    raised in Philly?
6          A.   No.  Actually I was born in
7    Haddington, Scotland, but --
8          Q.   Okay.
9          A.   -- I was six weeks old when
10   I came over.  My parents came over.
11         Q.   Terrific.  And then you were
12   raised here?
13         A.   Yeah, I grew up in Northeast
14   Philadelphia.
15         Q.   Okay.  And you -- then you
16   went to St. Joe's?
17         A.   Yes.
18         Q.   And on to Drexel, right?
19         A.   Yeah.
20         Q.   All right.  I also see that
21   you, for a period -- good period of time,
22   you were an associate professor at Drexel
23   for economics and marketing; is that
24   right?

Page 51

1          A.   15 years, yeah.
2          Q.   Terrific.  And did you
3    include teaching there on pharmaceutical
4    marketing?
5          A.   No, no, no.  I taught
6    economics.  I taught undergraduate --
7    well, the marketing was related into a
8    couple economics courses.  It wasn't a
9    direct marketing course.
10         Q.   Okay.
11         A.   It was mostly microeconomics
12   and macroeconomics, and then some
13   international business courses which were
14   more marketing oriented so that's why I
15   wrote that.
16         Q.   Terrific.  Okay.  And then
17   just looking back at your employment
18   history, you start off at ASTM, right,
19   for a period?
20         A.   Correct.
21         Q.   You went onto SUN Company?
22         A.   Right.
23         Q.   Neither of those positions
24   obviously involved any -- any opioid

Page 52

1    products, right?
2          A.   No opioids, no.
3          Q.   Okay.  And then you went to
4    United Research Laboratories, right?
5          A.   Correct.
6          Q.   It says you were group
7    manager for contracts, marketing, and
8    pricing.  Did -- did that position have
9    anything to do with any opioid products?
10         A.   We may have had a C-V or
11   C-IV drug.  But, you know, it's a long
12   time ago.  I don't remember.
13         Q.   Okay.
14         A.   It was -- we didn't have
15   C-II.
16         Q.   And just so we're all clear,
17   C-II, C-IV, C-V, these are references to
18   the schedules under the federal
19   Controlled Substances Act, correct?
20         A.   Right, yes.
21         Q.   And C-II, that is a fairly
22   restricted category that's scheduled,
23   correct?
24         A.   Very restricted.

Page 53

1          Q.   Okay.  And we're going to
2    talk about them more, but some of the
3    products that you were involved with at
4    Endo were -- were C-II products, correct?
5          A.   Correct.
6          Q.   So Endocet was a C-II
7    product, correct?
8          A.   Correct.
9          Q.   Sorry.  Morphine sulfate
10   extended-release was a C-II, correct?
11         A.   Correct.
12         Q.   Generic oxycodone ER was a
13   C-II, correct?
14         A.   Correct.
15         Q.   Okay.  And then we -- we
16   said Endocet, Endo was also selling
17   Percocet at the time you were working
18   with them?
19         A.   That was the brand.
20         Q.   Right.
21         A.   Okay.
22         Q.   That was a brand.  That was
23   a C-II, correct?
24         A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    Q.   All right.  And that was the
2  brand equivalent of Endocet, right?
3    A.   Well, actually Endocet was
4  the generic equivalent of Percocet.
5  That's --
6    Q.   Well put.  Okay.
7         And -- and each of those,
8  they were an oxycodone APAP combo
9  product; is that right?
10   A.   Oxycodone IR was
11 acetaminophen, or APAP combo product,
12 yeah.
13   Q.   Right.  Thank you.
14   A.   For -- with respect to
15 Endocet.
16   Q.   Understood.
17   A.   And Percocet.
18   Q.   Right.
19   A.   Percocet was -- was the
20 brand name for the generic chemical
21 entity.
22   Q.   Right.  And then I mentioned
23 earlier Opana.  You recall that while you
24 were employed with Endo, it sold two

Page 55

1  products, one called Opana, and another
2  one called Opana ER?
3    A.   I had nothing -- yeah, I --
4  they were selling it, but I had nothing
5  to do with that.
6    Q.   Okay.  And I'm just -- if
7  you can just answer the questions as I
8  ask them.  I -- if you don't have
9  anything to do with it, you'll let me
10 know.  But I'm just making sure you
11 recall that they sold those products.
12   A.   Yes.  Yeah.
13   Q.   Okay.
14   A.   So the -- the answer, to be
15 clear, they sold the products --
16   Q.   Right.
17   A.   -- that was the brand
18 people.
19   Q.   Right.
20   A.   I didn't have anything to do
21 with generics.
22   Q.   Okay.
23   A.   So it wasn't a generic
24 product.

Page 56

1    Q.   Okay.  And -- but you recall
2  that Opana and Opana ER were also C-II
3  products?
4    A.   Yes.
5    Q.   Okay.  Okay.  So sorry.
6         So after your position at
7  United Research Labs, you then joined
8  Apothecon, which was a division of
9  Bristol-Myers Squibb, correct?
10   A.   Yeah.  Mm-hmm.
11   Q.   All right.  And you were
12 there from 1996 to 2000, correct?
13   A.   Correct.
14   Q.   And your time there did not
15 involve any controlled substances,
16 correct?
17   A.   No controlled substances.
18   Q.   Okay.  And then moving ahead
19 to Page 2 of your CV.
20   A.   Excuse me.  Can I go back?
21   Q.   Yes, go ahead.  Absolutely.
22   A.   You -- controlled substances
23 or opioids?
24   Q.   Let's just start with --

Page 57

1  let's talk about opioids.  Any opioids
2  at -- at Apothecon?
3    A.   No.  For the record, they
4  did have a controlled substance which was
5  methylpheniate which is a C-II, but it's
6  for attention deficit.
7    Q.   Thank you very much.  I
8  appreciate that.
9         And then you joined, after
10 Apothecon, you joined Sandoz, correct?
11   A.   Yes.
12   Q.   All right.  And at Sandoz
13 did you have responsibility for any
14 opioid products?
15   A.   No.  I have to think about
16 it.  Excuse me, I have to think about it
17 for one moment.
18   Q.   Sure.
19   A.   I would say no.
20   Q.   Okay.  If at any -- if at
21 some point today, it occurs to you, will
22 you just let me know?
23   A.   Be glad to.
24   Q.   Okay.  Thanks a lot.

15  (Pages 54 to 57)

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    And then -- and then after
2    Sandoz, you joined Endo Pharmaceuticals.
3    And that was in 2003, correct?
4        A.   That's correct.
5        Q.   All right.  And you stayed
6    with Endo, you said, August 2007, right?
7        A.   Correct.
8        Q.   And were you vice president
9    generics business and trade affairs for
10   that entire period?
11       A.   No.  I was the vice -- I was
12   vice president of generics for the entire
13   period.  The trade affairs was the last,
14   I would say, nine months or so, ten
15   months.  They had, like, a little
16   reorganization at the time.  At the time
17   when I arrived at Endo -- and this is
18   just for the record, but, you know, when
19   I arrived at Endo, they had a director of
20   corporate accounts.  And they -- under
21   corporate accounts, they had managed care
22   accounts, which, you know, for people who
23   don't know who they are, they're the
24   Aetnas, CIGNAs and United Healthcares and

Page 59

1    Blue Cross Blue Shields kind of accounts.
2    They're called managed care.
3            And then they had what's
4    called the trade accounts, which are the
5    wholesalers, AmerisourceBergen, McKesson,
6    those kind of accounts, plus the chains,
7    the CVS, Walgreens, Rite Aids of the
8    world.  And they had that all under
9    corporate accounts.
10           When the director of
11   corporate accounts left, which I believe,
12   from my recollection, is sometime in late
13   2006, to pursue another opportunity, the
14   feeling at the time was to segregate the
15   retail accounts from the managed care
16   accounts because they wanted to have more
17   of a focus on managed care.  And they
18   thought the retail accounts were a
19   distraction to managed care for the
20   individuals involved.  So because of my
21   knowledge and experience in retail
22   accounts, they asked me to have those
23   three people report to me.
24           So for the last -- from,

Page 60

1    let's say, November or somewhere in that
2    time frame of '06 until the time I left,
3    I then had trade affairs.
4        Q.   Okay.  And you've used the
5    terms trade and retail.  Those refer to
6    the same thing, and that is the chains?
7        A.   Chains and wholesalers,
8    yeah.
9        Q.   Okay.
10       A.   They're commonly called the
11   trade.
12       Q.   Okay.  And so you -- so I
13   just want to make sure I understand.  So
14   the trade/retail would include, as you
15   said, wholesalers like AmerisourceBergen,
16   correct?
17       A.   Correct.
18       Q.   McKesson?
19       A.   Correct.
20       Q.   Cardinal Health?
21       A.   Cardinal Health.
22       Q.   All right.  Would it also
23   include the national chains such as Rite
24   Aid?

Page 61

1        A.   Yes.
2        Q.   Walgreens?
3        A.   Yes.
4        Q.   Walmart?
5        A.   Yes.
6        Q.   Okay.  So now I think I have
7    an understanding of what we are talking
8    about.
9        A.   And all that's commonly
10   called, for ease of -- for those of us in
11   the business, the trade.
12       Q.   Fantastic.  Okay.
13           And before taking on the
14   responsibilities for -- formally as --
15   for trade affairs, had you had experience
16   working with the trade in the past, I
17   think you said?
18       A.   Yes.
19       Q.   Okay.  All right.  How did
20   you come to join Endo in 2003?
21       A.   I was recruited.
22       Q.   Who recruited you?
23       A.   Oh, I don't remember.  It
24   was a recruiting firm in Philadelphia.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1      Q.   Okay.  It wasn't anyone
2  specific at Endo that recruited you?
3      A.   No.
4      Q.   Did you know anyone at Endo
5  before you joined?
6      A.   I might have known them from
7  being in the business.  You know, I
8  may -- oh, yeah, they are at Endo.  No, I
9  didn't have any personal relationship
10  with anybody.
11      Q.   Okay.  When you -- when you
12  did join Endo, did was there anyone
13  specific within Endo who hired you?
14      A.   The decision was made by
15  Peter Lankau, who was the CEO of the
16  company.
17      Q.   Okay.  When you joined Endo,
18  was Carol Ammon still with the company?
19      A.   Yes, actually, I misspoke.
20  Carol Ammon was the president and CEO,
21  and Peter was the VP of business
22  operations.  But Carol was phasing out,
23  and Peter was going to become the new
24  CEO.  So I said he was the CEO of the

Page 63

1  company.  He was responsible the
2  hiring -- for my hiring into the company.
3      Q.   Okay.  Carol Ammon, she was
4  one of the cofounders of Endo; is that
5  right?
6      A.   Yes.
7      Q.   Right.  Had you -- did you
8  meet with her personally when you worked
9  at Endo?
10      A.   Oh, yes.  Yes.  I went
11  through the interview process with her.
12      Q.   Fair to say Ms. Ammon was
13  very knowledgeable about her business?
14          MS. VANNI:  Objection to
15      form.
16          THE WITNESS:  She was very
17      knowledgeable, yes.
18  BY MS. SCULLION:
19      Q.   She was, to your knowledge,
20  pretty involved in the strategies that
21  helped get Endo off the ground?
22          MS. VANNI:  Object to form.
23          THE WITNESS:  I would say
24      she was knowledgeable in the

Page 64

1  strategies, yeah.
2  BY MS. SCULLION:
3      Q.   And you said you left Endo
4  in August of 2007.  Why did you leave
5  Endo?
6      A.   The opportunity to become
7  the president and CEO of Kremers Urban
8  Pharmaceuticals.
9      Q.   Were you asked to leave
10  Endo?
11      A.   No.
12      Q.   Did anyone suggest that you
13  leave Endo?
14      A.   No.  Came, I think, as a
15  complete shock that I left.
16      Q.   And as you said, then you
17  went straight from Endo to Kremers Urban,
18  correct?
19      A.   Right.  They were a
20  subsidiary of UCB, which is a
21  Brussels-based biotech.  We were the
22  generic division of the United States.
23      Q.   And you stayed with Kremers
24  Urban for about 11 years, through 2016.

Page 65

1  I'm sorry, nine years to 2016.
2      A.   Yes.
3      Q.   Bad math.  Sorry about that.
4      A.   That's all right.  It's
5  okay.  You're forgiven.
6      Q.   Thank you.  And you were
7  president and CEO there, as you said,
8  correct?
9      A.   Correct.
10      Q.   Did Kremers Urban
11  Pharmaceuticals, while you were president
12  and CEO, sell any opioid products?
13      A.   No.
14      Q.   And did it have any
15  relationship with Endo during that
16  period?
17      A.   No.
18      Q.   With Par?
19      A.   No.
20      Q.   And then you left Kremers
21  Urban -- I'm sorry, when did you leave
22  Kremers Urban?  It says 2016.  But when?
23      A.   I left when Lannett acquired
24  Kremers Urban, and the day of the close,

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    you know, I left.  They had a CEO, and I
2    had a contract and employment agreement.
3    And so, you know, I was a -- we had a
4    mutual understanding that it was -- you
5    know, as I told their CEO, there can only
6    be one CEO at a time.  So I understood.
7         So I had a noncompete for a
8    year, and then I was asked -- I had the
9    opportunity to become the chairman of the
10   board of GeneriCo, which is a generic
11   startup.  And I'm still in that capacity
12   to this day.
13        Q.   Got it.  And just -- so I
14   think you mentioned, but in -- sometime
15   in 2016, Lannett acquired Kremers Urban;
16   is that right?
17        A.   No.
18        Q.   2015?
19        A.   2015.
20        Q.   Right.
21        A.   I think the transaction was
22   announced in September.  And the close
23   was on or about December 1st of 2015.
24        Q.   Yes.

Page 67

1         A.   By the time that I processed
2    the paperwork and all that stuff, it was
3    into 2016 when I left, officially left
4    the company.
5         Q.   Okay.  And then you said you
6    had a noncompete.  So you just sort of
7    didn't have employment for that year
8    during the noncompete; is that right?
9         A.   Correct.
10        Q.   Okay.  And then you said
11   that you joined GeneriCo as chairman of
12   the board in 2017, right?
13        A.   Correct.
14        Q.   And I think that you
15   confirmed before.  But again, GeneriCo
16   has -- does it have any opioid products?
17        A.   No opioids.
18        Q.   Is it working on any opioid
19   products, without specifying?
20        A.   No, they're not.
21        Q.   All right.
22        MS. SCULLION:  Could I have
23   Tab 62, please.
24        (Document marked for

Page 68

1    identification as Exhibit
2    Endo-Stevenson-3.)
3    BY MS. SCULLION:
4         Q.   I want to hand you what's
5    been marked as Exhibit Number 3.
6         A.   Okay.
7         Q.   And, Mr. Stevenson, do you
8    see Exhibit Number 3 is, I'll represent
9    to you it's a printout from GeneriCo's
10   website.  It's a description of the board
11   of directors.  Have you seen this before?
12        A.   Probably.  Not in printed
13   form.  But yes.
14        Q.   All right.  You see at the
15   bottom of the first page, the heading,
16   board of directors, and on the left-hand
17   side, that's you, George R. Stevenson,
18   chairman of the board, correct?
19        A.   That's me, yes.
20        Q.   All right.  And then there's
21   a brief bio under your name that starts
22   at the bottom of the first page, and it
23   continues onto the next page.  I just
24   want to confirm that you agree with

Page 69

1    what's stated in the bio here.
2         It says in the second
3    sentence, "Mr. Stevenson brings deep
4    generic and brand pharmaceutical
5    experience to the GeneriCo board and is a
6    seasoned and successful executive with
7    over 20 years of leadership in this
8    dynamic marketplace."
9         That's an accurate
10   characterization of you, correct?
11        A.   Yes.  I understand the brand
12   business, yes.  So yeah, I would say yes,
13   that's -- that's accurate.
14        Q.   If you'll go a little
15   further down the bio sort of summarizes
16   your work experience.  If you go towards
17   the bottom of the bio.  It says, "As vice
18   president of Endo generic products,
19   George was charged with full
20   responsibility for the generics business
21   including strategy, account management,
22   marketing, and the identification and
23   development of new products."
24        Is that also an accurate

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    description of your time at Endo?
2         A.   Yes.
3         Q.   Can you just explain to me,
4    when it refers here to marketing in the
5    generics business, what did that mean,
6    when you were at Endo?
7         A.   It doesn't mean -- there's a
8    difference -- what it means is that it
9    mostly deals with the pricing and getting
10   business into accounts.  It's not what
11   normally is referred to as marketing like
12   on the brand side where there's
13   promotion.  There's no promotional in
14   generics because you're competing against
15   yourself.  There's normally no more than
16   one.  So there's no sense in promotion.
17   There's no sales -- there's no sales, you
18   know, paraphernalia that's given out.
19   There's no representation to doctors.
20           On the brand side, they have
21   thousands or hundreds or whatever number
22   of sales reps that are calling
23   physicians.  On generics, we had three
24   national account executives.

Page 71

1           So marketing and generics is
2    completely different than what is
3    normally involved in the brand; however,
4    the marketing is, make sure people know
5    you have the product, that you're coming
6    with the product.  And it's more getting
7    the product placed in the trade accounts,
8    as we described them earlier.
9           Essentially in generics,
10   that's what marketing is.
11        Q.   Okay.  So if I understand
12   you correctly, on the brand side, there's
13   marketing that takes the form of sales
14   representatives, for example, going out
15   to detail healthcare providers about the
16   product, correct?
17        A.   Correct.
18        Q.   Okay.  And they might be
19   using specific promotional materials in
20   the course of doing that?
21        A.   Yeah.  They would use
22   specific promotional materials, which are
23   very strictly controlled.  Where the
24   scientific people, we talked about

Page 72

1    earlier, helped develop those, or
2    developed those, based on the
3    FDA-approved label, okay, so -- otherwise
4    they can get in big trouble.
5           So you can only promote
6    what's on the label.  You cannot promote
7    anything other than what's on the label.
8         Q.   Right.
9         A.   So that's what they do.
10   Yes.
11        Q.   All right.  And just to make
12   sure we are on the same page on promoting
13   according to the label.  I mean, I've
14   heard the phrase that the label defines
15   the product, is that something you've
16   heard?
17           MS. VANNI:  Object to form.
18           THE WITNESS:  Yeah.
19   BY MS. SCULLION:
20        Q.   Yeah?
21        A.   I would say some people use
22   that phrase, yeah.
23        Q.   Okay.  And -- and it's very
24   clear that a company cannot promote its

Page 73

1    product inconsistent with what's in the
2    label approved by the FDA, correct?
3           MS. VANNI:  Object to form.
4           THE WITNESS:  Yes.
5    BY MS. SCULLION:
6         Q.   Okay.  To do that is called
7    off-label marketing, correct?
8         A.   Yes.
9         Q.   It's unlawful, correct?
10           MS. VANNI:  Object to form.
11           THE WITNESS:  Yes.
12   BY MS. SCULLION:
13        Q.   Would you agree that it's
14   also unethical?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  It's a
17   judgment call.  I guess so.  I --
18   I don't know.  I wasn't involved
19   in it.
20   BY MS. SCULLION:
21        Q.   Okay.
22        A.   So, you know, in every
23   Pharma company I worked at, they went to
24   great lengths, okay.  I was part of the

19 (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    brand Pharma company in Bristol-Myers
2    Squibb, in Sandoz -- Geneva Sandoz was
3    part of Novartis, at Endo, wherever it
4    was, the brand company went to great
5    lengths and spent tremendous amounts of
6    money to make sure that the sales reps
7    promoted according to the label.
8            And anybody who went off
9    that script was -- was severely punished,
10   including -- up to and including
11   termination.
12       Q.   Okay.
13       A.   And actually went to great
14   lengths, I know at Endo, in monitoring
15   that kind of activity to make sure that
16   did not occur.  Because Endo, in the big
17   scheme of things, was not that big a
18   company and they couldn't -- they didn't
19   want to have any issues along the lines
20   you described.
21           So most pharmaceutical
22   companies take the same approach.  They
23   go to great lengths to ensure that that
24   off-label promotion does not happen.

Page 75

1        Q.   Okay.  Now, as you said,
2    when you were at Endo, you were not
3    personally professionally involved in the
4    sales and promotion of the branded
5    products, correct?
6        A.   Correct.
7        Q.   Okay.  So then, that was
8    describing the marketing for branded.
9    Then you were explaining to me what
10   marketing means on the generic side.
11           To make sure I understand,
12   that involves marketing to the trade
13   accounts in order to, to what, to be
14   stocked by them, to placed by them?  What
15   are you marketing them for?
16       A.   Yeah.  You know, we -- yeah,
17   that they know we have the product,
18   that -- that we're always searching for
19   opportunities to get product, you know,
20   does somebody need product, do they not
21   like their current supplier.  You know,
22   under CDA we would tell them about future
23   products.  I don't know if we did that at
24   Endo, but, you know, I'd done that

Page 76

1    before.  When I was at Kremers, we did
2    that where, you know, under a CDA, a
3    large account, we would tell them this is
4    what we're working on in the pipeline, to
5    get their reaction, is that something
6    they'd be interested in.  And also to let
7    them know it was coming, you know, so
8    that they -- that's the kind of
9    marketing.
10           We did some reminder ads in
11   journals which were, you know, they were
12   very expensive.  In the case of Endo, I
13   remember they -- you know, they called
14   them three-piece, three-piece entities
15   because of all the different things that
16   had to go into the ads because they
17   were -- it was -- it was an opioid, which
18   was standard.  So we didn't run that many
19   of them, because it was -- it was
20   expensive.  You know, 30-, 40,000.  In
21   the generics business that's -- that's a
22   lot of money.  The ad budget is not
23   that -- normally not that high.
24           So, yeah, that's the kind

Page 77

1    of, you know, pricing, you know, we
2    talked about pricing and how we can, you
3    know, work something involving getting --
4    with our product to make sure that if we
5    were challenged by our competition, you
6    know, how we could retain the business
7    and -- and customer relations, customer
8    interaction.  That was -- in generic,
9    more or less, that's what marketing is.
10       Q.   Okay.  And I'm sorry, you
11   mentioned a CDA.  Is that like a
12   confidentiality agreement?
13       A.   Confidentiality, yeah.
14       Q.   Great, thanks.  And I think
15   you were explaining to me that in terms
16   of getting and retaining the trade
17   business, that one of the important
18   things you were focused on was the
19   relationship with that trade customer,
20   correct?
21           MS. VANNI:  Object to form.
22           THE WITNESS:  Yes.
23   BY MS. SCULLION:
24       Q.   And that -- that was true

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    while you were at Endo?
2        A.    It's been true before Endo
3    and after Endo and at Endo.
4        Q.    Okay.  And is -- was part of
5    the relationship providing educational
6    materials that could be used for example,
7    at pharmacies?
8        A.    No.
9        Q.    Okay.  Did --
10            MS. SCULLION:  I thought the
11        door was opening, it's not.
12    BY MS. SCULLION:
13        Q.    Did -- did Endo -- strike
14    that.  We'll look at some of the
15    documents in a bit.
16            MS. SCULLION:  Can I have
17        Tabs 26 and 27, please.
18    BY MS. SCULLION:
19        Q.    I want to go back and talk
20    more about your -- your role at Endo and
21    what it entailed.  Hopefully I'm not
22    going to knock the computer out with my
23    binder here.
24            Okay.

Page 79

1            MS. SCULLION:  Why don't you
2        mark 27 and then 26.
3    BY MS. SCULLION:
4        Q.    So I think you were
5    explaining to me that you didn't have
6    promotional responsibility for any of the
7    brand products.  But you were involved in
8    helping get Opana, for example, stocked
9    in the trade accounts, correct?
10            MS. VANNI:  Object to form.
11            THE WITNESS:  This -- the
12        role of the national account
13        executives that visit the trade
14        accounts, their -- their role on
15        the brand side is to make sure the
16        account is stocked.  That's all
17        they do.  They make sure their
18        account is stocked with the
19        product.  Because if you don't
20        have the product in the account,
21        you can't sell it.  And so their
22        job -- that's all the national
23        account executives do on the brand
24        side, is they make sure the

Page 80

1        product is stocked.
2    BY MS. SCULLION:
3        Q.    And -- I'm sorry.
4        A.    So there was no promotional
5    activity by the national account
6    executives to anybody.
7        Q.    But you -- but you had
8    responsibility for the national account
9    executives getting Opana, and Opana ER to
10    be clear, stocked in the trade accounts,
11    correct?
12            MS. VANNI:  Object to form.
13            THE WITNESS:  To be honest,
14        getting them stocked when they --
15        I don't know if I had assumed
16        the -- I don't remember from the
17        time when I took over trade
18        affairs, whether or not Opana had
19        launched or didn't launch.  I
20        don't remember that.
21            So if it -- if it hadn't
22        launched, then yes.  If not, then
23        I just took over the role of
24        supervising them.

Page 81

1    BY MS. SCULLION:
2        Q.    Okay.
3        A.    And it wasn't -- their role
4    in the brand side was, if I had to divide
5    their time, their time was generics.
6    They were there to work on generics.
7            The brand -- their brand
8    role was a de minimus kind of role.  It
9    wasn't that significant, other than the
10    stocking.
11        Q.    Okay.
12            (Document marked for
13        identification as Exhibit
14        Endo-Stevenson-4.)
15    BY MS. SCULLION:
16        Q.    Let me show you what's been
17    marked as Exhibit 4.  And we may be out
18    of order here, but we'll get to it in
19    terms of exhibit numbers.
20            MS. SCULLION:  Is it good?
21        Okay.
22    BY MS. SCULLION:
23        Q.    Mr. Stevenson, I've handed
24    you Exhibit 4.  And for the record, the

21 (Pages 78 to 81)

Page 82

1    Bates number is ENDO-OPIOID_MDL-00860303.
2         And just so you know, I'm
3    just reading the small numbers in the
4    bottom right corner for the record, so
5    people on the phone can follow.
6         Mr. Stevenson, do you
7    recognize Exhibit Number 4?
8         A.   Well, it's my 2006
9    performance appraisal.
10        Q.   Right.  And it's -- this is
11   an e-mail from you to David Kerr
12   attaching your 2006 performance
13   appraisal, correct?
14        A.   Yes.
15        Q.   Okay.  And who was Mr. Kerr
16   when you sent this e-mail, what was his
17   position?
18        A.   He was the vice president of
19   business operations I believe.
20        Q.   He was your boss
21   effectively?
22        A.   Yes, he was my boss.
23        Q.   And let's turn to the actual
24   performance appraisal itself, which

Page 83

1    begins in the attachment at 860304.  I
2    just want to page back through this.  If
3    you turn back through the document.  If
4    you go to Page 6, in the lower right-hand
5    corner?
6         A.   Page 6.  Yes.
7         Q.   And before I ask you about
8    the particulars on this page, am I
9    correct in understanding, this is
10   something you would have -- you would
11   have filled out in terms of saying to
12   Mr. Kerr, here was my objective and here
13   is how I explain how I have or haven't
14   achieved that particular objective this
15   year; is that right?
16        A.   Yes, that's -- yeah.  You
17   know, for clarity normally the employee,
18   at my level, would complete what I
19   thought.  And he would, you know, have a
20   meeting and we would see if there was
21   some agreement with what he thought with
22   what I wrote, et cetera, and then it'd be
23   finalized, yes.
24        Q.   Okay.  So I'm on Page 6.

Page 84

1    And looking in the left-hand column,
2    lists a number of objectives for the
3    year.  And let's go down to the third
4    row.  Do you see it says successfully
5    launched products?
6         A.   Yes.
7         Q.   And it identifies this as a
8    corporate objective.  And the corporate
9    objective there was "achieve
10   $17.5 million in Opana and Opana ER net
11   factory sales in 2006," correct?
12        A.   Correct.
13        Q.   All right.  And then you've
14   indicated on the right-hand side that
15   that was achieved.  And, in fact, it was
16   about, approximately $18.8 million in net
17   factory sales, correct?
18        A.   Yes.  What's -- that's
19   what's there, that's correct.
20        Q.   Okay.  And then the next row
21   down, successfully launched products,
22   Corporate Objective 1.
23        Now here it says, "Manage
24   Project Pizza to achieve documented

Page 85

1    stocking of Opana and Opana ER in
2    12,000" -- it looks like it's supposed to
3    say pharmacies.  Do you see that?
4         A.   Yes.  Yes.
5         Q.   And then on the
6    right-hand -- oh sorry.  Go over to the
7    right on that same row, do you see in
8    terms of describing fulfillment of the
9    objective it says, "Managed Project Pizza
10   team and documented Opana and Opana ER
11   stocked in 12,100 pharmacies as of
12   12/31/06."
13        Do you see that?
14        A.   Yes.
15        Q.   Do you recall Project Pizza?
16        A.   Not really.  I mean it
17   was -- not really.
18        Q.   Okay.  Do you recall though
19   that there was a project that you oversaw
20   to document stocking of Opana and Opana
21   ER in about 12,000 pharmacies as of -- as
22   of 2006?
23        MS. VANNI:  Object to form.
24        THE WITNESS:  To be honest,

22 (Pages 82 to 85)

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    I didn't.  No, I saw some
2    documentation in the last day or
3    so.  But I -- I really don't
4    recall any details about it, you
5    know.
6    BY MS. SCULLION:
7        Q.    Fair enough.  You have no
8    reason to doubt the accuracy of what you
9    wrote here in this performance appraisal,
10   correct?
11       A.    No, I don't.  There's no
12   reason to doubt it, no.
13       Q.    And this description of an
14   effort to document stocking of Opana and
15   Opana ER in 12,000 pharmacies, that's
16   consistent with what you just explained
17   to me about one of the roles of -- that
18   you had at Endo, correct?
19           MS. VANNI:  Object to form.
20           THE WITNESS:  It was a role
21   I had in the last ten months or so
22   before I left, yes.  It was
23   overseeing the stocking portion of
24   the brand business that the

Page 87

1    national account executives were
2    responsible for.
3    BY MS. SCULLION:
4        Q.    Okay.  Now, let's just stay
5    in the document -- same document for a
6    moment.  If you'll go up to Page 5.
7    Looking at the top of Page -- yeah, Page
8    5 -- excuse me -- the first row.
9           It says, "The objective is
10   increase Endo penetration and
11   entrenchment in key strategic accounts."
12          Do you see that?
13       A.    Yes.
14       Q.    And then under that it says,
15   "Actively participate in NACDS, HDMA and
16   GPhA in leadership position."
17          Did I read that correctly?
18       A.    Yes.
19       Q.    And then -- let's stick on
20   that for a minute.  What is NACDS?
21       A.    National Association of
22   chain drug stores.
23       Q.    Okay.  That was an industry
24   group for the trade?

Page 88

1        A.    It's an industry group for
2    the chains.  And they have two meetings
3    per year, which suppliers, which -- you
4    know, whoever the pharmaceutical company
5    is, attends.  And it can be both for the
6    pharmacy end and for the non-pharmacy
7    end.  It's a pretty big -- they're pretty
8    big meetings every -- twice a year.
9    Once -- one in the spring, one is coming
10   up in April/May, and one in the summer.
11       Q.    Got it.  And that was listed
12   here, the "Actively participate in
13   NACDS," was listed as increasing Endo
14   penetration and entrenchment in key
15   strategic accounts.  How would actively
16   participating in NACDS serve that goal?
17       A.    By attending those meetings
18   and meeting with customers, and, you
19   know, showing the flag.  We used to take
20   a booth and have a booth.  And most
21   companies take a booth, and then the
22   customers come to your booth.  And you
23   have a discussion.  You show the flag.
24   You are actively participating.

Page 89

1           It's expensive.  There was
2    always somebody that would say, you know,
3    was it really worth it and that kind of
4    stuff.  So when I -- you know, that was a
5    goal when we established objective that,
6    you know, my belief was, from a generic
7    perspective, if you're not there, if your
8    absence is missed, you'll be -- that will
9    be noticed.  If everybody in the business
10   is there, and you're not there, that's a
11   problem.
12          So when I wrote this, you
13   know, to go back, generics in Endo
14   Pharmaceuticals was a very small portion
15   of their business compared to their brand
16   business.
17          So to go to have a booth at
18   NACDS, it's expensive.  To have people to
19   go to NACDS is expensive.  There's always
20   someone questioning, you know, since
21   generics was a small part of the
22   business, was it worth it.
23          So when I wrote the
24   objective, it was designed to say, if you

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

```
 1    want to be -- have a player in generics
 2    and entrench yourself as a generic
 3    player, then you have to participate in
 4    these groups.
 5        Q.   So for someone who's not as
 6    familiar with the generic industry as
 7    obviously you are, why would being at a
 8    meeting like NACDS be important to the
 9    generic business as opposed to simply
10    competing based on price?  Why would that
11    be important?
12        A.   Well, first of all, you
13    don't just compete based on price.
14    That's not what you want.  When you
15    compete, you know, you compete based on
16    how well you supply the product, how
17    responsible your customer service is.
18         These big accounts are busy.
19    You know, they don't sit around all day
20    saying, gee whiz, it's 9:30 and Endo
21    hasn't called me yet.  That's not what
22    happens.  They're extremely busy.
23         Supply is a big issue for
24    them, especially on big products,
```

Page 91

```
 1    whatever the product might be, opiate or
 2    non-opiate, doesn't make any difference.
 3    If they have a fast-moving product or a
 4    big product and someone can't supply it,
 5    it's a very big problem.
 6         I use the example in
 7    Seymour, Indiana, was where -- when I was
 8    at KU, where our manufacturing
 9    headquarters was located.
10        Q.   Sorry, and KU is Kremers
11    Urban?
12        A.   Kremers Urban.
13        Q.   Thank you.
14        A.   A town of 50,000.  On one
15    corner is a CVS, and right across is a
16    Walgreens.  So there's a lot of
17    competition.  And if you can't supply,
18    that's going to get -- you're going to
19    get noticed.  So we don't just compete on
20    price.  You don't want to just compete on
21    price.  You want to compete on other
22    things.
23         And that's part of, you
24    know, what -- if you want to call it
```

Page 92

```
 1    marketing in generics, the overall, you
 2    know, your image, the overall ability to
 3    service the account.  That's more of the
 4    marketing approach.
 5         So by going to an NACDS, if
 6    you're not there, you're going to be
 7    missed, because they're going to know you
 8    are not there.  Just you notice who's not
 9    there.  If somebody is not there, you
10    will notice it if you're in the business.
11         So it was important to go to
12    NACDS.  It was important to go to HDMA.
13    And it was obviously important to go to
14    GPhA.
15        Q.   Okay.  And we'll come to
16    those --
17        A.   Yeah, I understand.
18        Q.   -- organizations in a -- in
19    a minute.  But so if I understand you
20    correctly, in terms of not just competing
21    on price, but competing, you said, based
22    on your ability to service the accounts?
23        A.   Multiple factors.
24        Q.   Okay.  And so would speed of
```

Page 93

```
 1    customer service of processing orders be
 2    an important factor?
 3        A.   Yes.
 4        Q.   And an ability to just be
 5    responsive to orders as they come in,
 6    that would be an important factor?
 7        A.   Yes.  Yes.
 8        Q.   Okay.
 9        A.   That's -- yeah.
10        Q.   Fair to say customers really
11    don't want to hear that when they place
12    an order, there's a problem with you
13    processing their order, right?
14         MS. VANNI:  Object to form.
15         THE WITNESS:  Correct.  Most
16    customers, I don't remember or
17    don't recall what it was at that
18    time.  But today, it's a
19    requirement that you service
20    98 percent of their purchase
21    orders.
22    BY MS. SCULLION:
23        Q.   I'm sorry.  What does that
24    mean?
```

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1        A.    Number of lines in a PO, a
2    purchase order -- I'm sorry I used -- a
3    purchase order comes in with a number of
4    lines.  So the definition of a backorder
5    percentage, 98 percent is based on number
6    of lines ordered based on number of lines
7    filled.
8        Q.    And if you don't meet that
9    98 percent, what happens?
10       A.    They'll send you a bill.
11   You have to pay the difference.  Today --
12   again, I don't remember what it is back
13   in that time.  But some accounts, I
14   think, had already started -- it was a
15   big issue, supply.  It was one thing to
16   differentiate.
17             But to finish my sentence,
18   if you don't supply, then they will send
19   you a bill for your price versus the next
20   lowest price generic.  That's usually
21   what happens.
22             And it's an order for you to
23   be open and honest about how soon you can
24   supply, because if you want to pay them,

Page 95

1    great.  They'll keep the spot for you
2    open until you can supply again.
3             But it's designed to be
4    financially painful so that if you can't
5    supply, that you'll say I can't supply
6    and give up the business.  And then once
7    you give it up, you won't get it back.
8             So it's designed that
9    they're not out of product, because they
10   have a lot of pharmacies, a lot of
11   stocking, a lot of issues and they don't
12   want to have an issue with being out of
13   stock.  Being out of stock is the worst
14   thing you can do.
15             So part of how we
16   differentiate ourselves wherever I have
17   worked is we've been able to supply 95,
18   98 percent.  Okay.
19             Now, over time, it used to
20   be 95, if I recall correctly, and, you
21   know, they have become more aggressive
22   now, and it moved more to 98 percent.  So
23   they give you very little leeway for
24   error.

Page 96

1        Q.    Okay.  And I think you said,
2    do you recall whether the 95 percent
3    level was in place when you were at Endo?
4        A.    I don't recall.
5        Q.    Okay.
6        A.    But it's possible.
7        Q.    Okay.  But putting aside the
8    95, 98 percent, do you recall though when
9    you were at Endo and in part working with
10   the trade accounts, that there still was
11   a focus in the trade accounts on the
12   level of customer service that was being
13   provided?
14       A.    Yes.
15       Q.    Okay.  That was -- and
16   again, regardless of whether there's a
17   95 percent threshold or not, still at
18   that time when you were with Endo, the
19   trade accounts didn't want to have
20   hassles, for lack of a better word, with
21   their orders, right?
22       A.    Correct.
23       Q.    They wanted their orders to
24   be taken and processed, right?

Page 97

1        A.    Correct.
2        Q.    No questions asked?
3             MS. VANNI:  Object to form.
4             THE WITNESS:  Well, that's
5    what their expectation was.
6    BY MS. SCULLION:
7        Q.    Right.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

25  (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 106

10      MS. SCULLION:  Oh, actually,
11  you know, right now is actually we
12  can take a quick break.  I mean
13  it's probably almost an hour,
14  right?  Yeah, let's take a quick
15  break.
16      THE VIDEOGRAPHER:  Off the
17  record, 10:19.
18      (Short break.)
19      THE VIDEOGRAPHER:  We are
20  back on the record at 10:32.
21      MS. SCULLION:  Can I have
22  Tab 29.
23      (Document marked for
24  identification as Exhibit

Page 107

1      Endo-Stevenson-5.)
2  BY MS. SCULLION:
3      Q.   I'm going to hand you what's
4  been marked as Exhibit Number 5.
5  Exhibit 5 for the record is Bates-stamped
6  ENDO-OPIOID_MDL-05554625.
7      Mr. Stevenson, do you see

Page 108

Page 109

Highly Confidential - Subject to Further Confidentiality Review



Page 110

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 111

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 112

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 113

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13          MS. SCULLION:  Can I have
14     Tab 60, please.
15          (Document marked for
16     identification as Exhibit
17     Endo-Stevenson-6.)
18 BY MS. SCULLION:
19     Q.   Mr. Stevenson, I'm going to
20 hand you what's been marked as Exhibit
21 Number 6.
22     A.   Okay.
23     Q.   And Exhibit Number 6, let me
24 just orient you to the document a little
```

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    bit.  On the first page of Exhibit 6
2    is -- you see at the top it says document
3    metadata.  This is a document produced
4    from the document system we used to store
5    all the documents that Endo and other
6    parties have produced to us in the
7    litigation.  And this is indicating the
8    metadata, electronic metadata associated
9    with the document.
10          And from time to time today,
11   I might be showing you these metadata
12   pages to help you understand what the
13   document is.
14          If you look on this first
15   page of Exhibit 6, under the first box,
16   do you see document identification, that
17   first box at the top?
18       A.   Yes.
19       Q.   Okay.  And if you'll go down
20   to the bottom of that box, you'll see a
21   line that says custodian.  Do you see
22   that?
23       A.   Yes.
24       Q.   And it says your name there.

Page 115

1    Do you see that?
2        A.   Yes.
3        Q.   And just so you understand,
4    that's an indication that, according to
5    the metadata produced with the document
6    in this litigation, the document came
7    from your custodial file at -- at Endo.
8    So I'm just pointing it out to you so you
9    have some understanding.
10       A.   Okay.  Thank you.
11       Q.   Okay?  Great.
12          MS. VANNI:  So then to be
13   clear, Counsel, can I ask a
14   question?
15          MS. SCULLION:  Sure.
16          MS. VANNI:  This information
17   on this first page, document
18   metadata --
19          MS. SCULLION:  Yeah.
20          MS. VANNI:  -- this is
21   information that's stored in your
22   system though?
23          MS. SCULLION:  It is stored
24   in our system.  It is based on the

Page 116

1    metadata that is provided in
2    accordance with the ESI protocol.
3    So the metadata itself is what was
4    coming from Endo in the
5    production.
6          MS. VANNI:  Okay.
7          MS. SCULLION:  Okay?  Thank
8    you.
9          MS. VANNI:  Thank you.
10         MS. SCULLION:  Sure.
11   BY MS. SCULLION:
12       Q.   If we go then to the
13   substance of the exhibit itself, you turn
14   to the second page of Exhibit 6.  And you
15   see this is a PowerPoint entitled Trade
16   Organization Memberships?
17       A.   Yes.
18       Q.   And it says at the bottom
19   here, OpCom 4/28/04.  Do you remember
20   what OpCom was at Endo in April of 2004?
21       A.   It was the operations
22   committee of the company.  Some people
23   would call it the executive committee.
24   It was the operations committee of the

Page 117

1    company.
2        Q.   Were you ever a member of
3    the OpCom?
4        A.   No.
5        Q.   Okay.  And let's turn
6    through the exhibit.  Next page.  Page 2
7    of the PowerPoint identifies two trade
8    organizations.  One is PhRMA.  And the
9    second is the Generic Pharmaceutical
10   Association.  Do you see that?
11       A.   Yes.
12       Q.   And the Generic
13   Pharmaceutical Association, that's the
14   one that we were just discussing a few
15   minutes ago, correct?
16       A.   Correct.
17       Q.   All right.  Apologies.
18          Are you familiar with --
19   with PhRMA as well as the Generic
20   Pharmaceutical Association?
21       A.   How do you define familiar?
22       Q.   Have you been involved with
23   PhRMA yourself?
24       A.   No.

30  (Pages 114 to 117)

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    Q.   Okay.
2    A.   It's a -- it's a brand.
3  It's the brand -- trade association for
4  the brand PhRMA industry.
5    Q.   Okay.  Then do you recall
6  any discussions at Endo about whether
7  Endo should be a member of PhRMA when you
8  were there?
9    A.   Yes, I do.
10    Q.   So let's look at that.  If
11  you'll turn to page 12 of --
12    A.   Can I just offer one
13  additional comment?
14    Q.   Sure.
15    A.   I sat in meetings where
16  PhRMA was discussed.  I wasn't involved
17  in the decision or any representation of
18  whether Endo should join PhRMA or not.  I
19  just want to be clear about that.
20    Q.   You were in the meetings
21  though, where it was discussed?
22    A.   Well, this meeting it was
23  discussed.  That's the point of this
24  meeting obviously.

Page 119

1    Q.   All right.  And you think
2  this was a meeting you would have
3  attended?
4    A.   Well, it had GPhA, so I
5  would have been there.  If I remember
6  this meeting correctly, it was discussing
7  the -- the benefits belonging to a
8  member.  Endo had two businesses, the
9  brand business, generics business.  Do I
10  belong -- should the brand business Endo
11  belong to PhRMA to support its brand
12  business, and should it belong to GPhA to
13  support its generics business.  So that's
14  what this is about.
15    Q.   Okay.  Fair enough.  So
16  let's go to page 12 of the PowerPoint.
17  If you look in the lower right-hand
18  corner you'll see the page numbers.
19    A.   Yep.  Okay.
20    Q.   Make sure we are literally
21  on the same page.  The top of the page
22  says critical issues, right?
23    A.   Yes.
24    Q.   All right.  And the bullet

Page 120

1  point here says, "Our industry is among
2  the most heavily regulated in the U.S.,
3  and what happens in Washington matters a
4  lot."
5    Do you see that?
6    A.   Yes.
7    Q.   And then the next bullet
8  point under that says, "Having access to
9  the knowledge and influence of PhRMA can
10  support us to sustaining and growing the
11  business."
12    Did I read that correctly?
13    A.   Yes.
14    Q.   And was that, what's written
15  there, was that generally a topic that
16  was discussed at Endo when you were
17  there?
18    MS. VANNI:  Object to form.
19    THE WITNESS:  This PhRMA is
20  the brand business.
21  BY MS. SCULLION:
22    Q.   Right.
23    A.   Okay.  So I'm not -- I
24  wasn't involved with PhRMA.  So you can

Page 121

1  ask me all the questions you want about
2  PhRMA, but, you know, I -- this is not my
3  area.  This was directed from the brand
4  people to the leadership of the company,
5  whether Endo should belong to PhRMA.
6    Q.   Understood.
7    A.   Okay.
8    Q.   But just to -- just to make
9  sure though, do you recall discussions
10  about Endo being interested in
11  potentially being a member of PhRMA,
12  because having access to the knowledge
13  and influence of PhRMA can support Endo
14  in sustaining and growing the business?
15    A.   Well, I would have heard it
16  at this meeting if it came up, yeah.  So
17  I mean it came up.  PhRMA is -- is
18  designed to support the brand PhRMA
19  industry and their members in PhRMA.
20  That's what they do.
21    Q.   And -- and it does that, as
22  this document indicates, in part, by
23  access to knowledge, correct?
24    A.   Yeah, I didn't write this.

31 (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    I assume that's right.
2        Q.    Okay.
3        A.    Again, I'm not focused on
4    PhRMA.  I don't know what they did or
5    didn't do --
6        Q.    Sure.
7        A.    -- directly because I
8    wouldn't have been involved in PhRMA.
9        Q.    And just to the extent that
10   you do know, is it accurate that one of
11   the things that would be -- that Endo is
12   interested in was the influence of PhRMA
13   supporting Endo in sustaining and growing
14   its business?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  If they had
17           joined, if they had joined, yes.
18   BY MS. SCULLION:
19       Q.    Okay.  And then, on the --
20   staying on the same page, next bullet
21   point it says, "The industry is under
22   fire by politicians and the press."
23           Did I read that correctly?
24       A.    Yes.

Page 123

1        Q.    And then it discusses in
2    terms of PhRMA, "PhRMA is working on a
3    series of initiatives to help turn around
4    negative perceptions of the industry."
5           Do you see that?
6        A.    Yes.
7        Q.    And -- and again,
8    understanding that it wasn't your
9    particular focus, but were you aware that
10   Endo had an interest in potentially
11   joining PhRMA because of PhRMA's
12   initiatives to help turn around negative
13   perceptions of the industry?
14           MS. VANNI:  Object to form.
15           THE WITNESS:  If Endo was
16           going to join PhRMA, I don't think
17           that was the sole reason.  There
18           would have been multiple reasons
19           to have -- belong to PhRMA, as
20           PhRMA is effectively the lobbying
21           organization for the brand PhRMA
22           industry.  So any negative or
23           positive perceptions, whatever
24           exist, PhRMA would be involved.

Page 124

1    They are involved in -- that's
2    what their members want from them.
3    They are the trade association for
4    the PhRMA brand business.
5    BY MS. SCULLION:
6        Q.    Okay.  And -- and so as you
7    said, there could have been multiple
8    reasons Endo was interested in
9    potentially joining PhRMA, but one of
10   those would have been PhRMA's work
11   helping to turn around negative
12   perceptions of the industry, right?
13           MS. VANNI:  Object to form.
14           THE WITNESS:  To the extent
15           they existed.  I have no idea what
16           existed at the time, so --
17   BY MS. SCULLION:
18       Q.    In terms of negative
19   perceptions?
20       A.    Yes.
21       Q.    Thank you.  Got it.
22           If you look then to Page 14
23   of the presentation.  It's entitled at
24   the top, What PhRMA Can Do For Endo.

Page 125

1           Do you see that?
2        A.    Yes.
3        Q.    As you were just
4    referencing, the very first bullet point
5    here is, "Lobby important bills in
6    Congress and state legislatures,"
7    correct?
8        A.    Yes.  That's what they do.
9        Q.    Okay.  And then the next is,
10   "Present industry view to FDA" -- that's
11   the Food and Drug Administration,
12   correct?
13       A.    Correct.
14       Q.    "NIH" -- National Institute
15   of Health, correct?
16       A.    Correct.
17       Q.    CMS is?
18       A.    Center for Medicare, I think
19   Services.  I think it's Center For -- I
20   get lost in the alphabet.
21       Q.    Okay.
22       A.    But I think that's what it
23   is, Center For Medicare Services.
24       Q.    Okay.  And that's another --

32  (Pages 122 to 125)

Page 126

1     again, to the extent of your
2     understanding, that's another thing that
3     PhRMA could do for a brand company like
4     Endo, right?
5              MS. VANNI:  Object to form.
6              THE WITNESS:  Well, it's not
7          just for Endo.  For any brand
8          pharmaceutical company.
9     BY MS. SCULLION:
10         Q.    Who was a member?
11         A.    Who was a member.
12         Q.    Okay.
13         A.    Should they decide to join.
14         Q.    Understood.
15               And the third bullet says,
16    "Interact with professional associations
17    on key issues."
18               Do you see that?
19         A.    Yes.
20         Q.    What are professional
21    associations referred to here?  What does
22    that mean?
23               MS. VANNI:  Object to form.
24               THE WITNESS:  I don't -- I

Page 127

1     don't know what all the
2     professional associations would
3     be.  American Medical Association.
4     People -- American whatever, okay.
5     So that -- that's what a -- that's
6     whatever professional association
7     is, that is involved in the
8     pharmaceutical healthcare
9     business.
10    BY MS. SCULLION:
11         Q.    Did you -- medical
12    associations?
13         A.    I have no idea.  You know, I
14    have no idea what it would have been.
15         Q.    Okay.  Now, let's go to
16    Page 17 of the presentation.
17         A.    Okay.
18         Q.    Now, this is -- begins part
19    of the presentation that does concern
20    Generic Pharmaceutical Association.
21               Do you see that?
22         A.    Yes.  But for the record,
23    Endo, to my knowledge when I was there
24    never joined PhRMA.

Page 128

1          Q.    So again on Page 17, we're
2     talking about the Generic Pharmaceutical
3     Association.  Do you see that?
4          A.    Yes.  Yes.
5          Q.    All right.  And you said you
6     are familiar with Generic Pharmaceutical
7     Association, right?
8          A.    Yes.
9          Q.    All right.  And I apologize,
10    we may have -- I might have asked this
11    before, have you ever held any office,
12    official position within G Pharma?
13         A.    Yes, but not while at Endo.
14         Q.    What position did you hold?
15         A.    I was on the board of
16    directors.
17         Q.    And when was that?  Is it --
18    is it in your -- probably on your CV?
19         A.    No, it's not on -- not on
20    there.  I don't believe.
21         Q.    Okay.
22         A.    I -- I'm going to say 2010
23    to 2012 or '13 -- some -- I don't know.
24    It was two, two -- two, two-year terms if

Page 129

1     I remember right.
2          Q.    And that was while you were
3     with -- with Kremers Urban?
4          A.    Correct.
5          Q.    So you are pretty familiar
6     with -- with the organization?
7          A.    Yes.
8          Q.    All right.  And so the first
9     bullet point here, it -- the first bullet
10    point here says, in terms of the mission
11    of the Generic Pharmaceutical
12    Association, "Promote the common
13    interests of its members and the general
14    welfare of the pharmaceutical industry."
15               Is that an accurate
16    statement of one part of the Generic
17    Pharmaceutical Association's mission?
18               MS. VANNI:  Object to form.
19               THE WITNESS:  Yes.
20    BY MS. SCULLION:
21         Q.    And when it says common
22    interests of its members, that refers to
23    the common interests that the various
24    generic pharmaceutical manufacturers

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1     would have?
2           MS. VANNI:  Object to form.
3           THE WITNESS:  It refers to
4     the common interests of making
5     sure that the generic industry
6     voice was heard.  The PhRMA voice
7     was much stronger because they had
8     more money.  Their lobbying
9     efforts were much stronger.  The
10    brand PhRMA companies were trying
11    to prevent brands from going
12    generic.
13          So they were -- there was a
14    lot of lobbying with respect to
15    that, how to find loopholes in
16    Hatch-Waxman, which is the law
17    that governs the generic
18    pharmaceutical business in the
19    United States.
20          It had to do with FDA rules
21    that were coming up to make sure
22    they're -- you know, understand
23    them.  These were all common
24    interests that were, you know,

Page 131

1     every company shared on a broad
2     basis.  So -- and how do we get
3     our message out to the politicians
4     who, you had a lot of -- a lot of
5     money from lobbying by PhRMA.  And
6     because of their -- their size and
7     their -- the money available
8     compared to the generic business,
9     which was much smaller, the
10    generic association was much
11    smaller, you know, what is the
12    common interest of how we
13    communicate the benefits of
14    generics to the public.
15    BY MS. SCULLION:
16          Q.   Got it.  Let's go to the
17    next page where it discusses the members.
18          A.   Yep.
19          Q.   And it says the three types
20    of membership, the first being
21    manufacturer.  That would be a
22    manufacturer like Endo if Endo had
23    joined, right?
24          A.   We did join GPhA.

Page 132

1           Q.   You did join?  Okay.  Thank
2     you.
3           A.   But not PhRMA, just for the
4     record.
5           Q.   And then bulk supplier, that
6     would be the suppliers of the API?
7           A.   That would be the supplier
8     of -- the API suppliers, yes.
9           Q.   Okay.  And then on the
10    associates that we have generic
11    distributor.  Is a generic distributor
12    just a distributor of generics?
13          A.   Yeah.  That would be -- that
14    would be like an ANDA, there's a company
15    that all they do is distribute -- you
16    know, they don't -- they're a generic
17    distributor.  There may be others.  I
18    don't know.  I'm not familiar with all of
19    them.
20          Q.   Is there a distinction
21    between a generic distributor and -- and
22    distributors in general.  So for example,
23    you mentioned ANDA.  Is there a
24    difference between ANDA and McKesson?

Page 133

1           A.   Yes.
2           Q.   Okay.  Can you explain what
3     that is?
4           A.   Well, the central difference
5     is that a sole distributor cannot do
6     chargebacks, and the wholesaler can.  So
7     that's the effect -- I mean, that's the
8     way I describe it.  So, you know, there
9     could be other differences, but, you
10    know, that's the way I think of it.  I
11    could be wrong, but that's the way I
12    think of it.
13          Q.   And so if I understand
14    correctly, when it says generic
15    distributors, that refers to what you're
16    calling a sole distributor?
17          A.   Correct.
18          Q.   And ANDA is one such example
19    of a sole distributor?
20          A.   At the time, yes.
21          Q.   All right.  You also
22    mentioned chargebacks.  You have some
23    familiarity with chargebacks, correct?
24          A.   Yes.

34  (Pages 130 to 133)

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1      Q.   All right.  We'll talk about
2   that a little bit later.  I just want to
3   make sure I understood that.
4            The next bullet point here
5   is CRO.  What's a CRO?
6      A.   Contract research
7   organization.
8      Q.   And what is that?
9      A.   Somebody that would do
10  pivotal -- pilot and pivotal biostudies.
11  You know, I don't know -- I don't
12  remember if they all exist anymore.  But
13  if you want to do a pilot biostudy or
14  pivotal biostudy you have to go to
15  somebody who can do that work.  And you
16  would -- you would they are called
17  contract research organizations.
18     Q.   Okay.  Consultants I think
19  is self-explanatory.  Pharm brokers is
20  the last one.  What is that?
21     A.   Pharm broker would be
22  somebody that tries to put two companies
23  together that has a need for -- you know,
24  you have a product of -- in a particular

Page 135

1   therapeutic area, and I have a need for
2   that product.  They hear.  They try to
3   put us together.  So these were associate
4   members that they allowed to participate.
5      Q.   Okay.  And then let's just
6   go to the next page, 19, which discusses
7   privileges of full membership.  You said
8   Endo did become a member of GPhArma
9   (sic).  Did it become a full member?
10     A.   Yes.
11     Q.   Okay.  And so endo enjoyed
12  the privileges listed here?
13           MS. VANNI:  Object to form.
14           THE WITNESS:  Yes, if we
15      choose to take advantage.
16      Basically, my membership was going
17      to the meetings, period, at that
18      point in time.
19  BY MS. SCULLION:
20     Q.   Okay.  First bullet point
21  discusses participation in key industry
22  committees affecting areas such as
23  regulatory and logistics.
24           Did Endo participate in any

Page 136

1   key industry committees?
2      A.   No.
3      Q.   And I think you explained
4   Endo did not become a member of the board
5   of GPhArma (sic) while you were there?
6      A.   No.
7      Q.   Okay.  If you'll go to Page
8   21 of the presentation.  And that's
9   entitled, "Why is membership in both
10  organizations important?"
11           Are we on the same page?
12     A.   Yep.
13     Q.   Terrific.  And it says,
14  "Endo has both significant brand and
15  generic business."
16           And that was true, correct?
17     A.   Yes.
18     Q.   It says, "Strategic vision
19  is to expand both brands and generics,"
20  correct?
21     A.   Correct.
22     Q.   And as of April of 2004 when
23  this presentation was put together, that
24  was true, correct?

Page 137

1      A.   Yes.
2      Q.   And why was membership in
3   GPhArma (sic), how did that many relate
4   to this strategic vision to expand --
5   let's just take the generics business for
6   Endo?
7      A.   Who is GPhArma (sic)?
8      Q.   I'm sorry, Generic
9   Pharmaceutical Association?
10     A.   Okay.  I'm sorry.  Can you
11  repeat the question?
12     Q.   Why was membership in the
13  Generic Pharmaceutical Association
14  important, as it says here, to the
15  strategic vision to expand the generic
16  business for Endo?
17     A.   In order to make sure that
18  we were aware of all the different
19  activities affecting the generic industry
20  as a whole.  Not just in Endo, but, you
21  know, normally at a GPhA meeting, as I
22  said before, you had the FDA commissioner
23  come.  You had the head of OGD, which is
24  the Office of Generic Drugs, come.  You

35  (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    have had the secretary of HHS come.  You
2    know, you had a lot of people that came
3    with information and made presentations.
4         So it was an informational
5    kind of meeting.  And that information,
6    it was important to hear that firsthand.
7    And that's why -- you know, that's why it
8    was important to belong.
9         Q.   Did those meetings also give
10   members the opportunity to interact with
11   some of the officials that you just
12   described?
13        MS. VANNI:  Object to form.
14   BY MS. SCULLION:
15        Q.   To speak to them?
16        A.   Yeah.  I mean, we could
17   shake their hand and talk to them if we
18   wanted to.
19        Q.   Okay.  Was that important to
20   helping Endo's strategic vision to expand
21   the generic business?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  It was -- it
24   wasn't that significant.  You're

Page 139

1    not going to talk to the FDA
2    commissioner for very long other
3    than, "Hi, how are you."  So, no,
4    that was -- it was more to hear
5    what they had to say, what their
6    vision was about where the FDA was
7    going with respect to inspections
8    and different things that they
9    were involved in.
10        The big issue was the length
11   of time for approval, was a big
12   issue.  They would always address
13   that.  And there was a lot of
14   people that would ask questions
15   about when is the FDA going to
16   speed up generic approval.  So
17   things like that.
18        So it was more to hear what
19   their position was.  The audience
20   members could ask questions, and
21   that was -- if you call that
22   interaction, you know, that's the
23   only really interaction other than
24   say, "Hi, how are you?"

Page 140

1    BY MS. SCULLION:
2         Q.   Got it.  Now, but as an
3    organization, the Generic Pharmaceutical
4    Association, was it also the idea that
5    the organization could effectively lobby
6    the FDA and other government officials
7    with respect to the interests of the
8    generic industry, some of which you just
9    described?
10        MS. VANNI:  Object to form.
11        THE WITNESS:  I disagree --
12   I disagree with the word
13   "lobbying."  You don't --
14   BY MS. SCULLION:
15        Q.   How would you describe --
16        A.   -- lobby the FDA.
17        Q.   Sure.  How would you --
18        A.   You can --
19        Q.   -- describe it then?
20        A.   You can interact with the
21   FDA and ask them -- give them your point
22   of view.  And they can either agree with
23   your point of view or say I completely,
24   totally disagree.  And then they tell you

Page 141

1    what to do.  And basically you either do
2    it or you don't get your product
3    approved.
4         Q.   Okay.  I wasn't speaking of
5    any particular product though.  But was
6    one of the roles of the Generic
7    Pharmaceutical Association to interact
8    with -- let's just start with the FDA, to
9    try to advance the interests of the
10   generic industry as a whole --
11        MS. VANNI:  Objection.
12   BY MS. SCULLION:
13        Q.   -- not to any particular
14   product?
15        MS. VANNI:  Object to form.
16        THE WITNESS:  I don't agree
17   with the word "advance."  I don't
18   know what's meant by the word
19   "advance."  The -- purpose of
20   the GPhA was to represent its
21   interest to the members.  A big
22   issue was, and until recently when
23   the user fee concept got up and
24   running to a greater degree, there

36  (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    was a great deal of time required
2    to get a generic approved.
3        So you would spend a lot of
4    money on the science and then have
5    to wait for it to be filed at the
6    FDA.  And it could take two or
7    three years before you would get
8    approval.  The feeling was that
9    should be faster.  So that was a
10   big issue.
11   BY MS. SCULLION:
12       Q.   Okay.
13       A.   So those kinds of things.
14   The common interests, the common
15   interests is product approvals with the
16   FDA and then interacting with the
17   government where possible to advance the
18   idea of generics, knowing we were much
19   financially outgunned by the pharma
20   industry.
21       Q.   Understood.  Let's go to the
22   next page, 22.  This page is headed
23   "Value of Membership in PhRMA and GPhA."
24       Do you see that?

Page 143

1        A.   Yes.
2        Q.   Okay.  And again, just
3    focusing on the right-hand column which
4    gives checkmarks for the various points
5    for GPhA.  I just want to confirm that
6    you agree that as of April 2004, each of
7    these was a value of membership of the
8    GPhA.
9        The first is, "Advocacy of
10   strategic issues affecting Endo,"
11   correct?
12       A.   By the GPhA, yes.
13       Q.   Okay.  The next is, "CI
14   opportunities."  Is that competitive
15   intelligence opportunities?
16       A.   Yes.
17       Q.   And you agree that was a
18   value of membership in GPhA?
19       A.   Yeah.  You could hear
20   things --
21       Q.   Right.
22       A.   -- that was affecting the
23   business.
24       Q.   Okay.  And the next bullet

Page 144

1    point, "Access of influential policy
2    makers and legislators."
3        Do you agree that was a
4    value of membership in the GPhA?
5        A.   Yes.  Hearing their
6    presentations, as I testified to, yes.
7        Q.   Okay.  The next bullet
8    point, "Ability to influence legislation
9    and rulemaking affecting Endo."
10       You agree that was a value
11   of membership in the GPhA?
12       A.   It was, but I don't recall
13   we ever used that.
14       Q.   Okay.  And then the last
15   bullet point is, "Opportunity for
16   business."
17       Was that also a value of
18   membership in the GPhA?
19       A.   It was a small benefit.
20   There might have been a business
21   development opportunity that you might
22   hear about by going.  There might have
23   been, maybe you can meet with the CRO you
24   didn't know the capacity to do a

Page 145

1    scientific study, things like that.
2        Q.   Okay.  You can put the
3    exhibit to the side for just a moment.
4        MS. SCULLION:  Can I get Tab
5    19 and Tab 75.
6    BY MS. SCULLION:
7        Q.   When you joined Endo in
8    2003, Endo was already selling certain
9    prescription opioids, correct?
10       A.   Yes.
11       Q.   And the principal one was --
12   was Percocet, right?
13       MS. VANNI:  Object to form.
14       THE WITNESS:  It all depends
15   on how you define principal.  It
16   would depend on the revenue.
17   Another big product at the time
18   that was increasing was Lidoderm.
19   BY MS. SCULLION:
20       Q.   I just want to focus in on
21   the prescription opioids.  Lidoderm was
22   not an opioid, correct?
23       A.   Correct.
24       Q.   All right.  Percocet was an

Page 146

1    opioid, we said, right?
2         A.    It was a brand opioid, yes.
3         Q.    Right.  And there was also
4    Endocet, right?
5         A.    Yes.
6         Q.    Was Endo already selling
7    Endocet when you joined?
8         A.    Yes.
9         Q.    Okay.  And I just want to
10   make sure I understand, Endocet was a
11   generic equivalent to the branded product
12   Percocet, correct?
13        A.    Yes.
14        Q.    Were there other generic
15   equivalents to Percocet on the market at
16   the same time as Endocet, that were sold
17   by other companies other than Endo?
18        A.    Yes.
19        Q.    Why did Endo have both
20   Percocet and Endocet, why was it selling
21   a generic version of its own product?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  Well, the
24   reason is that there was a generic

Page 147

1    competitor.  And they had a
2    generic business.  So you can
3    either let the money all go to
4    your competitor and -- or you can
5    participate in the generic market.
6         The brand business, once it
7    goes generic, is going to be
8    converted.  So the brand
9    doesn't -- there's not two -- you
10   know, I call it a pie.  Okay.  So
11   once there's -- once there is a
12   generic competitor to Percocet,
13   Percocet sales are going to
14   decline.
15        And normally the erosion
16   factor -- 47, 48 states have
17   automatic generic substitutional
18   rules.  So when you walk into a
19   pharmacy, unless the doctor writes
20   "dispense as written" or "brand
21   medically necessary," if the
22   generic is available, you are
23   going to get the generic.  So they
24   write the brand on the script.

Page 148

1    They don't know if a generic
2    exists or not.  And they -- some
3    patients say, hey, I don't want
4    the generic.  So they don't know
5    if exists or not, they write
6    "dispense as written," or "brand
7    medically necessary."  You go into
8    the pharmacy, and if a generic's
9    available, unless that's written
10   at the bottom of the script by the
11   physician, you will automatically
12   get, by law, in 47, 48 states, I
13   forget the exact number, you will
14   get the generic.
15        So the Percocet brand
16   business was going to decline and
17   it was going to be replaced, the
18   volume of Percocet was going to
19   convert, if you look at it as a
20   flavor of a pie, the Percocet
21   flavor was going to convert to the
22   generic flavor.  Okay.  So the pie
23   stays the same, but the flavor
24   changes.

Page 149

1         So rather than see their
2    brand business reduced and
3    declined before my time, they --
4    they launched the Endocet generic,
5    which was the same as the brand
6    Percocet by -- it was AB-rated.
7    And as a result of that, they were
8    able to participate in the generic
9    market and minimize the financial
10   impact of the loss of revenue for
11   brand Percocet.
12   BY MS. SCULLION:
13        Q.    Okay.  And AB-rated, just to
14   make it clear, means pharmaceutically
15   equivalent batch?
16        A.    Yes.  Bioequivalent.
17        Q.    Thank you.
18        And so if I understand
19   correctly, by having both Endocet and
20   Percocet available, Endo was hedging
21   against the decline in its branded
22   Percocet share of the market and
23   replacing at least some of that with
24   Endocet?

38 (Pages 146 to 149)

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1      MS. VANNI: Object to form.
2      THE WITNESS: I don't know
3  if I would use the word hedging.
4  It's -- it's participating, it's
5  offsetting.
6  BY MS. SCULLION:
7      Q.   Fair enough. Okay. So it
8  wouldn't -- it wouldn't have as much of a
9  decline in its overall sales of an
10  oxycodone APAP product, because some
11  would now be Endocet instead of Percocet?
12      A.   Right.
13      Q.   Okay. And you explained
14  that there were other generic versions of
15  Percocet on the market at the same time
16  as Endocet. Was there any advantage to
17  Endo in having the trademarked name
18  Endocet for its generic version?
19      A.   No, none at all. That was
20  done before I got there.
21      Q.   Okay. And so in terms of
22  competing with the other generic versions
23  of Percocet that were on the market, how
24  did Endo compete?

Page 151

1      MS. VANNI: Object to form.
2      THE WITNESS: How --
3  BY MS. SCULLION:
4      Q.   Sorry. How did Endocet --
5  how did Endocet compete with the other
6  generic versions on the market?
7      MS. VANNI: Object to the
8  form.
9      THE WITNESS: What do you
10  mean by how -- compete? How do
11  you mean? I'm sorry, I don't
12  understand.
13  BY MS. SCULLION:
14      Q.   Sure. That's okay. I think
15  you explained earlier that there -- the
16  national account executives interacted
17  with the wholesalers or the trade to get
18  the product stocked. Did Endo -- did
19  Endo's national account executives
20  effectively compete with national account
21  executives from other manufacturers to
22  get Endocet stocked as the generic
23  version of Percocet instead of one of the
24  others?

Page 152

1      A.   I think we're mixing the
2  brand business and the generic business.
3  The brand business focused on stocking.
4  That's all they do.
5      Q.   Got it.
6      A.   They have nothing to do with
7  price. They have nothing to do with
8  anything but stocking, period. That's
9  why 9 -- maybe that's 5, 8 percent of
10  their time is involved with the brand on
11  stocking.
12      Once the brand is stocked,
13  basically it's just maintenance. Okay.
14  On the generic side it's more
15  complicated. So I think to answer your
16  question, how we competed was we had to
17  have a competitive price. We had to
18  supply, do all the -- you know, the -- do
19  all the necessary customer service things
20  from supply, interaction with the
21  account. And that's what the national
22  account executives would do.
23      Normally in the big
24  accounts, it also took -- I was involved

Page 153

1  more in the generic side because I had in
2  many cases, if not all cases, a personal
3  relationship with these folks going back
4  from my, already by that time, many years
5  of experience in the generic business.
6  Now, most of them had -- hadn't changed.
7  And so Endo was perceived when I got
8  there as a smaller generic company,
9  basically a little niche player focused
10  in at that time in -- mostly in control
11  drugs. Over time we tried to change that
12  before I left where we tried to expand
13  the vision for Endo and get involved in
14  other non-opioid drugs. But at the time,
15  that was how Endo was perceived, and we
16  were able to compete because we supplied
17  product. We had good customer service.
18  We interacted well with -- with the
19  customer. We were responsive. All those
20  things that you need to do to get
21  business in the generic market.
22      Q.   Okay.
23      A.   We were open and
24  transparent. We didn't play games.

39  (Pages 150 to 153)

Page 154

1   These things may not sound important.
2   But to a large account, they are very
3   important.
4        Q.   And I'm trying to ask the
5   question I was asking a little more
6   clearly I hope.
7        A wholesaler like McKesson,
8   would it be distributing more than one
9   generic version of Percocet or it would
10  just choose one?
11       A.   Well, McKesson -- any
12  wholesaler is going to carry multiple
13  labels.  What's in -- what they are
14  carrying in -- in their DCs is normally
15  in response to the contracts that are
16  loaded for that product for a respective
17  account.
18       So there's -- you know,
19  we -- on the opioid market, you had -- we
20  had customers who we shipped to,
21  DEA-approved facilities --
22       Q.   DEA?
23       A.   Yeah, they're all -- you
24  can't --

Page 155

1        Q.   I just --
2        A.   I'm sorry, DEA-approved
3   facilities, licensed facilities.  And
4   then we also went to the customer's
5   customer, which were the chains and
6   customers that did not have a vault.
7        So in the case -- in the
8   case of McKesson, they -- I have no idea
9   how many labels they carried of the same
10  product, but we were not the only label
11  they carried in the warehouse.  Might
12  have been great if they had been, but
13  that's not the way they work.  Not -- or
14  in fairness, for the record, neither does
15  Cardinal or AmerisourceBergen.
16       Q.   Okay.  What determined
17  ultimately whether a prescription for
18  oxycodone APAP got filled with -- if it
19  got filled with a generic, whether it got
20  filled with Endocet versus another
21  generic version?  That's what I'm trying
22  to understand.
23       How -- how is it determined
24  what pill actually went to the patient?

Page 156

1        MS. VANNI:  Object to form.
2        THE WITNESS:  It starts with
3   the doctor.  The doctor -- a
4   DEA-licensed physician writes a
5   prescription.  The patient takes
6   that to a pharmacy.  CVS, Rite
7   Aid, Walgreens, whoever, you know,
8   wherever -- it could be an
9   independent pharmacy.
10  BY MS. SCULLION:
11       Q.   Let's start with one of the
12  chains.
13       A.   Okay.  So --
14       Q.   CVS.
15       A.   CVS.  Takes it to a CVS.
16  CVS fills that product.  Okay.  They --
17  normally in the pharmacies they have a
18  safe or a secure drawer for controlled
19  drugs, whether it's opioid -- if it's a
20  C-II -- not all C-II are opioids.  They
21  have it in what's called a safe or a C-II
22  drawer that's under lock and key.
23       And if you ripple that
24  effect, then because they don't have a

Page 157

1   vault, they then have a designated,
2   what's called -- the official name is
3   prime vendor or wholesaler that they have
4   a contract loaded with to supply that
5   particular pharmacy.
6        So, then that wholesaler has
7   those products in the DC, and they ship
8   the product to the chain or to the
9   pharmacy direct.
10       Q.   Can we -- let's -- let's
11  stick with CVS, okay.  So if CVS, if a
12  CVS pharmacy was going to fill a
13  prescription with a generic version of
14  Percocet.
15       A.   Yes.
16       Q.   Would that -- would the CVS
17  pharmacy have only one generic version of
18  Percocet on hand to -- to fill that
19  prescription?
20       MS. VANNI:  Object to form.
21       THE WITNESS:  Yes.
22  BY MS. SCULLION:
23       Q.   Okay.  How -- how was it
24  determined which of the various generic

Page 158

1  versions CVS was using?
2         Did Endo have a relationship
3  with CVS that said you're going to use
4  Endocet, for example?
5         A.  Well, we never say we're
6  going to use it.  We are honored to have
7  their business if we were fortunate to
8  get their business.
9         Q.  Understood.  Okay.  Fine.
10  But would there be exclusive -- you'd be
11  the exclusive supplier?
12         A.  At the time.  Now they're --
13  they don't do exclusive anymore, because
14  they are so big.  But at the time you
15  were exclusive, yes.
16         Q.  Okay.  And did Endo compete
17  with other generic manufacturers of these
18  oxycodone APAP drugs, compete to get the
19  exclusives with different chains?
20         MS. VANNI:  Object to form.
21         THE WITNESS:  Yes.
22  BY MS. SCULLION:
23         Q.  How, and what was the
24  competing based on for that contract?

Page 159

1         A.  What I testified a moment
2  ago, it was based on, you have to have a
3  competitive price, how you did business,
4  all the customer service, all that, okay.
5         Q.  Okay.  And so the price that
6  CVS was paying was determined based on
7  the contract between Endo and CVS; is
8  that right?
9         A.  Yeah, I don't know that I
10  would call it a contract.  But yes, it
11  was -- it was an agreement on the price.
12         Q.  Okay.  A price agreement.
13  Fair enough?
14         A.  Yeah, among other things.
15  There might have been also involved --
16  well, in the case of opioids it wouldn't
17  be effective because they didn't buy
18  direct.  But under a non-opioid, it would
19  also involve cash terms or prompt payment
20  terms and things like that.  So there
21  might have been other, you know, things
22  like that that might have been involved.
23         If there was a rebate
24  associated with it, what was the rebate

Page 160

1  at the time.  Things like that.  It
2  wasn't just about price.  You don't want
3  to just compete on price.
4         Q.  Okay.  Understood.  Okay.
5         MS. SCULLION:  I apologize.
6  Can I have Tab 49?
7  BY MS. SCULLION:
8         Q.  So we were talking about
9  the -- sorry about that -- the opioid
10  products that Endo was selling when you
11  joined.  We talked about Percocet,
12  Endocet --
13         A.  You know, what -- oh, in
14  Endo as a whole or the generic division?
15         Q.  Endo as a whole.  Endo as a
16  whole.  I mean, you were familiar with
17  Endo was selling Percocet at the time
18  that it was selling Endocet, right?
19         A.  Yes.  I was familiar with
20  it.
21         (Document marked for
22         identification as Exhibit
23         Endo-Stevenson-7.)
24  BY MS. SCULLION:

Page 161

1         Q.  Let me hand you what's been
2  marked as Exhibit Number 7.  And Exhibit
3  Number 7 is a copy of Endo's Form 10-K
4  for the fiscal year-ending December 31,
5  2004.
6         And Mr. Stevenson, if you
7  can turn to the second page of the
8  exhibit, you'll see the cover page that
9  shows it's the 10-K.
10         A.  Yep.
11         Q.  Do you see that?
12         A.  I see it.  Yes, I do.
13         Q.  I just want to use this.  If
14  we go back to page -- Page 10.  It's a
15  little hard to find it in the printout.
16  If you look at page numbers at the bottom
17  of the page, you'll see Page 9 on the
18  left side.
19         A.  Yes.
20         Q.  The next page is Page 10.
21         A.  Yes.
22         Q.  And looking at the top of
23  Page 10, looking at the chart that lists
24  a number of products.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1           Do you see that?
2      A.   Yes.
3      Q.   And I thought this would be
4  a useful place to remind us of what Endo
5  was selling.  Now, this is as of fiscal
6  year 2004, granted.  But we see second
7  from the top, Percocet, right?
8      A.   Yes.
9      Q.   And again, that's -- it says
10  oxycodone/acetaminophen, right?
11      A.   Yes.
12      Q.   Next one is Percodan, and
13  that's oxycodone/aspirin, right?
14      A.   Yes.
15      Q.   Okay.  And going down four
16  more, we see Endocet, and there we see
17  oxycodone/acetaminophen again, right?
18      A.   Yes.
19      Q.   Next one is morphine sulfate
20  ER?
21      A.   Yes.
22      Q.   You see that?  And that's
23  morphine sulfate, right?
24      A.   Yes.

Page 163

1      Q.   And that's an
2  extended-release version?
3      A.   Yes.
4      Q.   Do you recall that's the
5  generic equivalent to Purdue's MS Contin?
6      A.   Yes.
7      Q.   All right.  Next is -- we
8  see oxymorphone ER.  Do you see -- and it
9  says oxymorphone hydrochloride.  Now, as
10  of the date of this 10-K, it says it only
11  had an approvable letter.
12           Do you see that?
13      A.   Yes.
14      Q.   And the next one is
15  oxymorphone IR.  And again, only has an
16  approvable letter at this time.
17           Do you see that?
18      A.   Yes.
19      Q.   Do you recall those are the
20  products that became Opana ER and Opana?
21           MS. VANNI:  Object to form.
22           THE WITNESS:  Yes.
23  BY MS. SCULLION:
24      Q.   Okay.  Going down to the end

Page 164

1  of the list, you see oxycodone ER and you
2  see in terms of active ingredients there
3  it lists oxycodone?
4      A.   Yes.
5      Q.   And again, at the time of
6  this 10-K, it lists as being approved
7  subject to ongoing litigation.
8           Do you see that?
9      A.   Yes.
10      Q.   And that refers to Endo's,
11  at this time, proposed -- sorry -- at
12  this time approved but not yet launched
13  generic version of OxyContin, right?
14      A.   Yes.
15      Q.   And I just want to draw your
16  attention to the active ingredients for
17  Percocet and for the oxycodone ER.  They
18  both contain oxycodone, correct?
19      A.   Yes.
20      Q.   But the oxycodone ER is pure
21  oxycodone, not a mixture with
22  acetaminophen or aspirin, right?
23           MS. VANNI:  Object to form.
24           THE WITNESS:  It's not a

Page 165

1  combination drug.
2  BY MS. SCULLION:
3      Q.   Okay.  If you will go to the
4  next page of Exhibit -- is it 7?  Is that
5  right?  Sorry, I didn't write down
6  numbers.
7           If you go to the next page
8  of Exhibit 7, you see at the top, a
9  discussion of Percocet.  And Endo states
10  here, "We consider Percocet to be a gold
11  standard of pain management."
12           Do you see that?
13      A.   Yes.
14      Q.   And that was true, right?
15  That was a true statement?
16           MS. VANNI:  Object to form.
17           THE WITNESS:  I can only
18  testify to that Percocet was
19  widely used, even by dentists.  If
20  you have a toothache and they give
21  you a Percocet, it's probably
22  5/325.  So does that mean it's a
23  gold standard?  I don't know how
24  they define gold standard.

Page 166

1      I wasn't there when they
2  wrote this, or if I was, I wasn't
3  involved in it.
4  BY MS. SCULLION:
5      Q.   Okay.  No dispute.  That's
6  how Endo described Percocet in its 10-K
7  filed with the SEC?
8      A.   That's how Endo described
9  it, yeah.
10      Q.   Right.  And it goes on, just
11  to remind ourselves of the history,
12  explains that Endocet -- I'm sorry --
13  Percocet was launched in 1976, correct?
14      A.   That's what it says.
15      Q.   And that was approved for
16  the treatment of moderate to moderately
17  severe pain, right?
18      A.   Yes.
19      Q.   And then it explains that
20  Percocet has faced generic competition
21  for nearly 20 years.  Do you see -- and
22  that was right?  That was accurate,
23  correct?
24      MS. VANNI:  Object to form.

Page 167

1      THE WITNESS:  I assume.
2  BY MS. SCULLION:
3      Q.   Okay.  Then it says, "In
4  2004, according to the IMS national
5  prescription audit, approximately
6  17.9 million new prescriptions for this
7  combination of oxycodone HCl and
8  acetaminophen were written for the brand
9  name Percocet."
10      Did I read that correctly?
11      A.   Yes.
12      Q.   Okay.  So what Endo is
13  saying is that nearly 20 years into
14  generic competition, doctors are still
15  writing it as Percocet brand name in
16  large part, right?
17      MS. VANNI:  Object to form.
18      THE WITNESS:  Yes.  But
19      doctors, for the record, write the
20      brand name on the script, even if
21      the generic exists.
22  BY MS. SCULLION:
23      Q.   Right.  And then through
24  generic substitution rules or laws, it

Page 168

1  may be substituted with a generic version
2  at the pharmacy, right?
3      A.   By law, it has to be
4  substituted.
5      Q.   In the states that you
6  referred to?
7      A.   Well, 47 or 48 out of 50,
8  unless the brand -- writes "brand
9  medically necessary" or "dispense is
10  written."
11      Q.   Okay.  And the reference
12  here to IMS national prescription audit,
13  you also referred to IMS earlier today.
14  Can you explain what IMS was?
15      A.   IMS was -- I don't know what
16  the letters stand for anymore.  But
17  basically they were -- they gathered data
18  from stores, prescription data, and --
19  which was units, they could break it down
20  into -- down to extended-release, or they
21  could break it down into tablets and
22  capsules, you know, if you have to.
23      Q.   I think you've lost your
24  microphone.  There you go.

Page 169

1      A.   They can break it down into
2  tablets and capsules if they had to.  And
3  that data became, you know, widely used
4  by both the brand and the pharmaceutical
5  industry to understand how their product
6  was doing with respect to sales and
7  demand.
8      Q.   Did you use IMS data when
9  you were with Endo?
10      A.   IMS (sic) contracted to buy
11  IMS data.  You buy -- the pharmaceutical
12  companies buy the data.
13      Q.   I'm sorry.  I think you said
14  IMS.  You meant to say Endo contracted to
15  buy --
16      A.   Well, contracted is maybe
17  not the right -- Endo purchased IMS data.
18      Q.   Okay.  And did you use the
19  IMS data that Endo purchased when you
20  were with Endo?
21      A.   Endo had a -- yeah, Endo --
22  the forecasting group used the IMS data.
23      Q.   Did you from time to time
24  look at the IMS data as part of your

43 (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    responsibilities?
2        A.   Probably did.
3        Q.   Okay.  And as you said, the
4    IMS data would -- could be broken down
5    into, as -- units as small as the actual
6    tablets right?
7        A.   Tablets or capsules, yeah.
8        Q.   So you could purchase data
9    that would tell you the number of tablets
10   or capsules being sold in any given zip
11   code for example, right?
12       MS. VANNI:  Object to form.
13       THE WITNESS:  I don't know
14       about zip code.  I never saw any
15       data going to zip code.
16   BY MS. SCULLION:
17       Q.   Okay.  What's the geographic
18   region -- smallest geographic region you
19   recall that you looked at?
20       A.   United States of America.
21       Q.   You looked at the entire --
22       A.   Yeah.
23       Q.   Okay.  That was for your
24   generic business?

Page 171

1        A.   Generics don't care about
2    states, to be honest.  There's no
3    reflection on the states.
4        Q.   Okay.
5        A.   It's -- remember, we sell to
6    national accounts.
7        Q.   Got it?
8        A.   So they have their business
9    nationally.  CVS, AmerisourceBergen,
10   McKesson, Cardinal, they sell nationally.
11   They don't sell just to Pennsylvania and
12   New Jersey.  The brand business focuses
13   on -- regions are divided that way.  But
14   generics is not -- is the United States,
15   the whole United States.
16       Q.   Got it.
17       A.   I never saw data by zip
18   code.
19       Q.   Okay.
20       A.   And I don't even know that
21   Endo had it that small.
22       Q.   You just don't know one way
23   or the other?
24       A.   I know on generics I never

Page 172

1    saw any zip code data.
2        Q.   But you don't know what the
3    brand side saw?
4        A.   I don't know -- the brand
5    side as far as I knew mostly focused --
6    the brand companies that I'm familiar
7    with focused on scripts.  Okay.  So --
8    and every company that I worked in that
9    had a brand, which were -- you know,
10   whether it be BMS or Novartis or
11   whomever, they focus on TRx's and new
12   Rx's.  That was the --
13       Q.   And that's prescription
14   levels, right?
15       A.   That's prescription level.
16   The generics focused on tablets and
17   capsules.
18       Q.   Got it.  Let's go to the
19   next page of Exhibit 7.  And going down
20   to the last third of the page where it
21   says "generic products."
22       Do you see that?
23       A.   Yes.
24       Q.   Looking in the second

Page 173

1    paragraph, it says, "Our generic
2    portfolio is currently comprised of
3    products that cover a range of
4    indications, most of which are focused in
5    pain management."
6        I think you described that
7    earlier, that most of Endo's generics, at
8    least as of 2004, were focused in pain
9    management, correct?
10       A.   Yes.
11       MS. VANNI:  I'm sorry,
12       Counsel.  Where are you?
13       MS. SCULLION:  I'm sorry.
14       So we're on page 11.
15       MS. VANNI:  Okay.  Thank
16       you.
17       MS. SCULLION:  The top says
18       table of contents.
19       MS. VANNI:  Okay.  Got it.
20       MS. SCULLION:  And then you
21       see where it says "generic
22       products"?
23       MS. VANNI:  Yeah.
24       MS. SCULLION:  That's where

44  (Pages 170 to 173)

Page 174

1    we are.  Okay.  So we're in the
2    second paragraph.
3    BY MS. SCULLION:
4        Q.   The next sentence goes on to
5    say, "One of our generic products is
6    morphine sulfate extended-release
7    tablets, which accounted for 10 percent
8    of our total net sales in 2004."
9        Did I read that correctly?
10    A.   Yes.
11    Q.    So that was a significant
12    product, it was 10 percent of total net
13    sales, right?
14        MS. VANNI:  Object to form.
15        THE WITNESS:  If they put it
16    in the 10-K, again, I don't know
17    if I was here at the time or not.
18    I guess I was.  It was 2004.
19        Yeah, it was -- it was -- I
20    guess you could call it
21    significant.
22    BY MS. SCULLION:
23    Q.   Okay.  And then it says, "In
24    addition, we have a generic oxycodone

Page 175

1    hydrochloride and acetaminophen product,
2    Endocet, which accounted for 19 percent
3    of our total net sales in 2004."
4        Do you see that?
5    A.   Yes.
6    Q.   And again, that would be a
7    significant -- that was a significant
8    product then, 19 percent of net sales,
9    right?
10        MS. VANNI:  Object to form.
11        THE WITNESS:  I guess I'm
12    struggling with what "significant"
13    means.  It all depends on how you
14    define "significant."
15    BY MS. SCULLION:
16    Q.   Okay.  Then we'll just stick
17    with the numbers.  It was almost --
18    Endocet was almost 20 percent of total
19    net sales for Endo in 2004, right?
20    A.   Yes.
21    Q.   All right.  So combined,
22    these two generic opioids were almost a
23    third, it's 29 percent of net sales,
24    right?

Page 176

1    A.   Yes.
2    Q.   Okay.
3    A.   Are we done with the 10-K?
4    Q.   For now, but do hold onto
5    it, because I think we're going to come
6    back to it for other questions later.
7        (Document marked for
8        identification as Exhibit
9        Endo-Stevenson-8.)
10    BY MS. SCULLION:
11    Q.   Okay.  Mr. Stevenson, I'm
12    going to hand you what's been marked as
13    Exhibit Number 8.
14    A.   Okay.
15    Q.   And Exhibit Number 8, again
16    is -- we have the metadata page as the
17    first page.  And again you can see in
18    that top box under document
19    identification, the last line custodian,
20    that it says your name?
21    A.   Yeah, yes.
22    Q.   Just so I can orient you
23    where this is coming from.
24        The Bates number for the

Page 177

1    record is ENDO-OPIOID_MDL-04137944.
2        If you go to the first page
3    of -- of the PowerPoint.  Do you see it's
4    entitled Endo Pharmaceuticals Company
5    Overview?  And it's in April of 2004.  Do
6    you see that?
7    A.   Yes.
8    Q.   Okay.  Going to Page 2 of
9    the PowerPoint, it lists management and
10    senior staff.
11    A.   Yes.
12    Q.   And at the bottom under
13    commercial senior management, you see
14    yourself listed there, second from the
15    bottom on the left?
16    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 198

Page 200

```
1        (Document marked for
2     identification as Exhibit
3     Endo-Stevenson-9.)
4   BY MS. SCULLION:
5        Q.   I'm going to hand you what's
6   been marked as Exhibit Number 9.
7        MS. VANNI:  Thank you.
8        MS. SCULLION:  Sure.
9   BY MS. SCULLION:
10        Q.   And Exhibit Number 9 is
11  Bates-stamped ENDO-OPIOID_MDL-03571186.
12  Do you recognize Exhibit Number 9,
13  Mr. Stevenson?
14        A.   How do you define recognize?
15        Q.   Let's try this.  Do you see
16  that at the top of Exhibit Number 9 is an
17  e-mail from yourself to David Kerr again?
18        A.   Yes.
19        Q.   Okay.  And this is in
20  January of 2007, right?
21        A.   Yes.
22        Q.   And by this point, I think
23  you explained, you had taken on the
24  additional responsibilities with respect
```

Page 199

```
21        Q.   Okay.  I want to come back
22  to Percocet.
23        MS. SCULLION:  Can I have
24     Tab 27.
```

Page 201

```
1   to the trade group; is that right?
2        A.   Yes.
3        Q.   Okay.  And this e-mail
4   concerns Percocet price increase
5   effective February 1st, 2007; is that
6   right?
7        A.   Apparently, yes.
8        Q.   Okay.  If we can put that
9   aside for the moment.
10        MS. SCULLION:  Tab 61.
11  BY MS. SCULLION:
12        Q.   Mr. Stevenson -- I'm sorry.
13  Were you reading something?
14        A.   No, not really.
15        Q.   Okay.  If you are reading
16  anything, I'm going to need to ask you
17  what you're reading --
18        A.   Okay.  No, I wasn't reading
19  anything.
20        Q.   -- because I need to know
21  what you're looking at while we're in
22  looking -- while we're in the deposition.
23        A.   I wasn't reading anything.
24        Q.   Okay.  So we talked about
```

Highly Confidential - Subject to Further Confidentiality Review



**Page 202**

```
 1   when you joined Endo, Endo was selling
 2   both Percocet and Endocet.
 3
 ...
22   BY MS. SCULLION:
23        Q.   Okay.
24             (Document marked for
```

**Page 203**

```
 1        identification as Exhibit
 2        Endo-Stevenson-10.)
 3   BY MS. SCULLION:
 4        Q.   I'm going to hand you what's
 5   been marked as Exhibit 10.
 6             Exhibit 10 is Bates-stamped
 7   ENDO-OPIOID_MDL-04910731.
 8             And if you'll turn to the
 9   first page of the PowerPoint, you see
10   it's Endo Pharmaceuticals Percocet.  And
11   it's the quarterly business review of the
12   fourth quarter 2002, correct?
13        A.   Correct.
14        Q.   Okay.  And let's turn to, if
15   you look in the upper right-hand corner
16   we have some numbers that say E 513?
17        A.   Yes.
18        Q.   It makes it a little bit
19   easier --
20        A.   Okay.
21        Q.   -- to navigate.
22             I apologize.  I lost my
23   page.  Hold on one second.
24             Right.  If you can go to
```

**Page 204**

```
 1   page E 513.8.
 2        A.   .8.
 3        Q.   Upper right-hand corner.
 4        A.   Okay.
```

**Page 205**

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 210
```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 212
```
 1
 2
 3
 4
 5
 6
 7    Q.   Okay.
 8         MS. SCULLION:  Can I have
 9    Tab 48.
10    BY MS. SCULLION:
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 211
```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 213
```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

54 (Pages 210 to 213)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 218

Page 220

BY MS. SCULLION:

Page 219

MS. VANNI:  Object to form.

Page 221

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review





Page 226

Page 228

Page 227

Page 229

BY MS. SCULLION:
    Q.    Okay.  Now let's go back
though.  We were talking about the pie
concept of brand and generic.  Okay.  I
just want to get back to that.
    A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review



Page 230

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 232

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 231

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 233

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18   Q.   All right.  Understood.
19       MS. VANNI:  Whenever you are
20   at a logical stopping place, I
21   think lunch is here.  We've been
22   going almost two hours I think.
23       MS. SCULLION:  Yeah, this is
24   fine.  This is actually a fine
```

59 (Pages 230 to 233)

Highly Confidential - Subject to Further Confidentiality Review

Page 234

```
 1      place to stop.
 2          MS. VANNI:  Yeah?  You're
 3    sure?
 4          MS. SCULLION:  Yeah.
 5          THE VIDEOGRAPHER:  Off the
 6    record, 12:15.
 7             - - -
 8          (Lunch break.)
 9             - - -
10          THE VIDEOGRAPHER:  We are
11    back on the record at 1 o'clock.
12             - - -
13            EXAMINATION
14             - - -
15    BY MS. SCULLION:
16        Q.   Welcome back, Mr. Stevenson.
17    You understand that you're still under
18    oath?
19        A.   I do.
20        Q.   Good.  Thank you.  I want to
21    focus now on the generic oxycodone
22    extended-release product, generic
23    OxyContin.
24        A.   Okay.
```

Page 235

```
 1        Q.   Do you recall that product?
 2        A.   Yes.
 3        Q.   Okay.  And that was a
 4    product that you had responsibility for,
 5    correct?
 6        A.   Yes.
 7        Q.   Okay.  And OxyContin was a
 8    product that Purdue originally had
 9    developed and sold, correct?
10        A.   It was -- yeah, it was a
11    brand product that was marketed by Purdue
12    Pharma.
13
14
15
16
17
18
19
20
21
22
23
24
```



Page 236

Page 237



Highly Confidential - Subject to Further Confidentiality Review



Page 242
```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 244
```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 243
```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 245
```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   BY MS. SCULLION:
24      Q.   Okay.  And now, by the time
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 246

Page 248

1    Okay?  Thank you.
2        (Document marked for
3    identification as Exhibit
4    Endo-Stevenson-12.)
5    BY MS. SCULLION:
6        Q.   Let me show you what's been
7    marked as Exhibit 12.
8        A.   Are we done with the 10-K?
9        Q.   For the moment, yeah.
10       A.   Okay.
11       Q.   And Exhibit 12, for the
12   record, is Bates-stamped
13   ENDO-OPIOID_MDL-03256655.
14       Mr. Stevenson, do you see
15   that Exhibit 12 states on its cover
16   that's a December 2003 GAO report and
17   entitled Prescription Drugs, OxyContin
18   Abuse and Diversion and Efforts to
19   Address the Problem?
20       A.   Yes.
21       Q.   If you could just skim over
22   it just to tell me if you have any
23   recollection of ever having read the
24   report or any part of it?

Page 247

Page 249

1        A.   No, I've never seen it
2    before.
3        Q.   Did you ever hear anyone
4    discuss the GAO report?
5        A.   No.
6        Q.   Let's -- let's go to Page 9
7    of the report.  If you'll look on the
8    bottom of the page, you'll see the page
9    numbers.
10       A.   Oh, 9.  Okay.
11       Q.   Yeah.
12       A.   I thought you were going to
13   test my Roman numeral skills.
14       Q.   I'm sure you would do better
15   than me.  We already saw my math skills
16   are not great.
17       A.   Okay.  Page 9.
18       Q.   You got it.  And, again, to
19   make sure we're on the same page, in the
20   middle of that page is a paragraph that
21   begins "OxyContin sales and prescriptions
22   grew rapidly."
23       Are we on the same page?
24       A.   Yes, yes.

23       MS. SCULLION:  Let me just
24   show it to you, just to make sure.

Page 250

1    Q.   Okay.  So the sentence there
2  says, "OxyContin sales and prescriptions
3  grew rapidly following its market
4  introduction in 1996."
5         And a little further down in
6  the paragraph states, "In both 2001 and
7  2002, oxy sales exceeded $1 billion and
8  prescriptions were over 7 million."
9         Do you see that?
10   A.   I see that's what it says,
11 yes.
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 251

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19    Q.   The next paragraph refers
20 to, I think, something that you were also
21 discussing, which is media reports of
22 OxyContin abuse and diversion began to
23 surface in 2000.
24         Is that consistent with what

Page 252

1  you recall in terms of what you were
2  referring to as media reports of abuse of
3  the use of OxyContin?
4    A.   I don't remember the year.
5  But, you know, I just remember media
6  reports.  When it occurred, I don't know
7  when I first picked up on it.
8    Q.   Okay.  And it goes onto
9  explain that, "These media" -- "These
10 reports first appeared in rural areas of
11 some states, generally in the Appalachian
12 region."  Do you see that?
13   A.   Yes.
14   Q.   Do you recall that
15 Appalachia in particular had a lot of
16 reports of OxyContin abuse -- abuse and
17 diversion?
18       MS. VANNI:  Object to form.
19       THE WITNESS:  No, I don't
20    recall that.
21 BY MS. SCULLION:
22   Q.   Okay.  And then it says in
23 the next sentence, "Rural communities in
24 Maine, Kentucky, Ohio, Pennsylvania,

Page 253

1  Virginia, and West Virginia were
2  reportedly being devastated by the abuse
3  and diversion of OxyContin."
4         Do you see that?
5    A.   Yes.
6    Q.   In the early 2000s, were you
7  living in Pennsylvania?
8    A.   Yes.
9    Q.   Do you recall there being
10 reports about rural communities within
11 Pennsylvania being devastated by the
12 abuse and diversion of OxyContin?
13   A.   Not -- not really.  I mean,
14 I -- as I testified, I just recall, you
15 know, general media -- media accounts.
16 Where -- I don't -- I can't recall any
17 specific location.
18   Q.   Okay.  But you have no
19 reason to doubt that, again, the accuracy
20 of what the GAO is reporting in terms of
21 rural communities in these states,
22 including Ohio, Pennsylvania, West
23 Virginia, reportedly being devastated?
24       MS. VANNI:  Object to form,

64  (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    foundation.
2         THE WITNESS: I have no --
3    no reason to doubt that's what's
4    being written there.
5    BY MS. SCULLION:
6         Q.   Okay. And if we go onto the
7    next page, 10, the paragraph continues.
8    And just going down, third line from the
9    top. The sentence that begins, or
10   states, "Pain patients, teens, and
11   recreational drug users who had abused
12   OxyContin reportedly entered drug
13   treatment centers sweating and vomiting
14   with withdrawal."
15        Did I read that correctly?
16        A.   Yes.
17        Q.   And so this is talking about
18   not only recreational drug users -- those
19   would be people using it for nonmedical
20   purposes, right? A recreational drug
21   user is a person using it for nonmedical
22   purposes, right?
23        A.   Are you asking me to testify
24   that's written here? I'm sorry.

Page 255

1         Q.   No, I'm asking -- I'm just
2    asking just your understanding of the
3    phrase "recreational drug users." That
4    would refer to nonmedical users, right?
5         A.   I guess. I assume. I guess
6    you can interpret it that way.
7         Q.   Okay. And the GAO explains
8    that, in addition to recreational drug
9    users, there also were pain patients who
10   were reportedly entering drug treatment
11   centers, correct? That's what the GAO is
12   reporting?
13        MS. VANNI: Object to form.
14        THE WITNESS: Where is that
15   located?
16   BY MS. SCULLION:
17        Q.   The sentence says pain
18   patients.
19        A.   Pain patients.
20        Q.   "Pain patients, teens, and
21   recreational drug users."
22        A.   Okay.
23        Q.   Do you see that?
24        MS. VANNI: She's referring

Page 256

1    to right here.
2         THE WITNESS: Yeah, I know.
3    I see that. But the last
4    question, I'm trying to find where
5    it's --
6    BY MS. SCULLION:
7         Q.   Sure. So as long as we are
8    on the same page, let me start again.
9         So the GAO is reporting
10   that, in addition to recreational drug
11   users, there also were pain patients who
12   were reportedly entering drug treatment
13   centers sweating and vomiting from
14   withdrawal?
15        A.   Oh, and recreation -- "who
16   had abused OxyContin reportedly entered
17   drug treatment centers sweating and
18   vomiting from withdrawal."
19        Yes, that's what it says.
20        Q.   Okay.
21        A.   I'm not sure. Did I answer
22   your question?
23        Q.   Yes. That's what it says.
24   That's what GAO is reporting. And pain

Page 257

1    patients, those would be people under
2    medical supervision, right? They're a
3    patient?
4         MS. VANNI: Object to form.
5         THE WITNESS: Pain patients
6    would be somebody under a
7    physician's care, yes.
8    BY MS. SCULLION:
9         Q.   And next sentence discusses
10   reports concerning West Virginia.
11        The next sentence says, "The
12   media also reported on deaths due to
13   OxyContin."
14        Do you see that?
15        A.   Yes.
16        Q.   And that was also true,
17   right, that their media was report that
18   go there were deaths from OxyContin?
19        MS. VANNI: Objection.
20        THE WITNESS: I don't --
21   again, I wasn't following it that
22   closely. You know, there was --
23   there was always a potential for
24   abuse on a -- on any drug.

65 (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1  BY MS. SCULLION:
2      Q.   Okay.  Let's go down then to
3  the next paragraph.  Looking at the very
4  last sentence of the next paragraph,
5  which states, "The most recent data
6  available from DEA show that as of
7  February 2002, the agency had verified
8  146 deaths nationally involving OxyContin
9  in 2000 and 2001."
10         Do you see that?
11     A.   Yes.
12     Q.   And you have no reason to
13  doubt the accuracy, again, of what GAO is
14  reporting there, right?
15     A.   No.
16         MS. VANNI:  Object to form.
17         THE WITNESS:  No doubt.  No
18  reason to doubt.
19  BY MS. SCULLION:
20     Q.   Before you joined Endo, had
21  you ever -- had any of the products that
22  you've been involved in, any of the
23  pharmaceutical products you had been
24  involved in, had death rates of that

Page 259

1  level, 146 deaths in two years?
2         MS. VANNI:  Object to form.
3         THE WITNESS:  I have no
4  idea.
5  BY MS. SCULLION:



Page 260

1
2
3
4
5
6
7
8
9
10
11
12         MS. SCULLION:  Can I have
13  Tab 1 and Tab 54, please.
14         (Document marked for
15  identification as Exhibit
16  Endo-Stevenson-13.)
17  BY MS. SCULLION:
18     Q.   Mr. Stevenson, I'm going to
19  hand you what's been marked as
20  Exhibit 13.
21     A.   Okay.
22     Q.   And Exhibit 13 is
23  Bates-stamped ENDO-OPIOID_MDL-03002818.
24         And, Mr. Stevenson, do you

Page 261

1  recognize Exhibit 13 as a series of
2  e-mails in September of 2003 that
3  involved you as well as others at Endo?
4     A.   Yes.
5     Q.   Okay.  Let's go to the last
6  page of Exhibit 13.
7     A.   Is that the back page?
8     Q.   It is.  And this is the page
9  at the very top, has an e-mail from Dan
10  Carbery, dated September 5th, 2003,
11  6:35 p.m.
12     A.   Yes.
13     Q.   Okay.  And it's addressed to
14  yourself and to MaryAlice Raudenbush,
15  correct?
16     A.   Yes.
17     Q.   And who was Dan Carbery at
18  that time?  What was his position?
19     A.   I think he was VP of
20  operations.
21     Q.   Okay.  And Ms. Raudenbush,
22  who was she?
23     A.   She was the head of
24  regulatory affairs.

Page 262

1    Q.   There's cc'd on here, Jill
2  Connell.
3    A.   Connell.
4    Q.   Connell.  Thank you.  I keep
5  doing that.  Jill Connell.  Do you recall
6  Ms. Connell's position?
7    A.   She worked for Dan Carbery.
8  I don't remember her exact title.
9    Q.   Okay.  And Sue Tolen, do you
10  remember who she was?
11    A.   No.



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 274

4   BY MS. SCULLION:
5       Q.   Okay.
6           MS. SCULLION:  Do we have
7       Tab 54?  Thank you.
8   BY MS. SCULLION:
9       Q.   And you were part of those
10  discussions with the DEA, correct, not
11  the teleconference, but the subsequent
12  discussion?
13      A.   I was at the -- I was at the
14  meeting with the DEA, yes.
15      Q.   Okay.  Let me hand you --
16  are you okay?
17      A.   Yeah, I'm fine.
18          (Document marked for
19      identification as Exhibit
20      Endo-Stevenson-14.)
21  BY MS. SCULLION:
22      Q.   Let me hand you what's been
23  marked as Exhibit 14.
24      A.   Having bifocals are not --

Page 275

1   they're not everything that they're
2   cracked up to be.
3       Q.   I have tried them, they did
4   not work for me.
5           So Exhibit 14 is
6   Bates-stamped ENDO-OPIOID_MDL-03005612.
7           And, Mr. Stevenson, do you
8   see that Exhibit 14 starts with an e-mail
9   from Sue Tolen to Dan Carbery, yourself,
10  Bob Barto, and Jill Connell?
11      A.   Yes.

Page 276

Page 277

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 282

Page 284

21    that, the risk management, the
22    clean one?
23        Sorry, one second.
24        (Document marked for

Page 283

Page 285

1    identification as Exhibit
2    Endo-Stevenson-15.)
3    BY MS. SCULLION:
4        Q.    Mr. Stevenson, let me hand
5    you what's been marked as Exhibit 15.
6        A.    Thank you.
7        Q.    Again, Exhibit 15, we've
8    started with a metadata page so you can
9    see at the top again in the document
10    identification box under custodian, you
11    are listed there.
12        A.    Oh, yeah, I'm sure it was in
13    my file.
14        Q.    Okay.  And I'll acknowledge
15    at the bottom of the page, I think
16    there's some -- maybe some --
17        MS. VANNI:  Wite-Out.
18    BY MS. SCULLION:
19        Q.    -- Wite-Out.  It is just a
20    remnant of, I think, Kseniya having
21    e-mailed the information, which we're
22    happy to show you.  And the body of the
23    document itself, which begins at
24    ENDO-OPIOID_MDL-04137306.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1        Do you see this is a risk
2   management plan for opioid analgesics
3   focused on oxycodone ER?
4        A.   Yes.
5        Q.   And it's a red-line.  It's a
6   marked-up, right?
7        A.   Yes.
8        Q.   Okay.  But at least based on
9   the metadata, you would have at least
10  seen this markup, right?
11       A.   Yeah.
12           MS. VANNI:  Object to form.
13           THE WITNESS:  I already
14       testified.  I already testified to
15       that.
16  BY MS. SCULLION:
17       Q.   Yep.  I just want to be able
18  to show it to you there.
19           MS. SCULLION:  And then the
20       actual clean version?  It's a
21       little easier to read.  All right.
22           (Document marked for
23       identification as Exhibit
24       Endo-Stevenson-16.)

Page 287

1   BY MS. SCULLION:
2        Q.   Let me hand you what's been
3   marked as Exhibit 16.  Exhibit 16 is
4   Bates-stamped ENDO-OPIOID_MDL-01500831,
5   and this is a clean copy --
6   non-marked-up -- a clean copy of the risk
7   management plan for opioid analgesics,
8   focused on oxycodone ER.
9        Do you see that?
10       A.   Yes.
11       Q.   Okay.  If you'll go to
12  page -- again, we've marked these in the
13  upper right-hand corner with E0778
14  number.  If you go to Page E0778.5 in the
15  upper right-hand corner.
16       A.   Yes.



Page 288

Page 289

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 294

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 296

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 295

```
 1        Q.    Okay.  Let's put aside the
 2   risk management plan for the moment.  I
 3   want to go back and now just talk about
 4   generic oxycodone and Endo's plans around
 5   that product.
 6            We looked at the GAO report.
 7   You don't recall seeing it, right?
 8        A.    Correct.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 297

```
 1
 2            Let's take this -- going to
 3   take it one step at a time.
 4            MS. SCULLION:  Can I have
 5   Tab 47.
 6            (Document marked for
 7   identification as Exhibit
 8   Endo-Stevenson-17.)
 9   BY MS. SCULLION:
10        Q.    So let me hand you what's
11   been marked as Exhibit 17.  And
12
13
14
15
16
17
18
19
20
21
22
23
24
```



75  (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 302

```
13    didn't have to -- the feeling was
14    there was a risk to the company by
15    pulling the market, the product
16    off the market right away.  And
17    that wasn't desirable to do that.
18    At the same time we also knew we
19    had this issue to deal with.  And
20    so, my recollection is that that
21    led to discussions with Purdue
22    Pharma that led to us being able
23    to continue to market the product
24    until December 31, 2006.
```

Page 303

```
 1        MS. SCULLION:  Okay.  Let's
 2    go to Tab 63.
 3        (Document marked for
 4    identification as Exhibit
 5    Endo-Stevenson-18.)
 6    BY MS. SCULLION:
 7     Q.   Let me hand you what's been
 8    marked as Exhibit 18.
 9        Exhibit 18 is a copy of Endo
10    Pharmaceuticals 10-K for the fiscal year
11    ended December 31, 2006.
12        MS. SCULLION:  18, right?
13    BY MS. SCULLION:
14     Q.   And, Mr. Stevenson, let me
15    take you to Page 15 of the 10-K.
16     A.   Okay.
17     Q.   And under the heading,
18    Generic Products, the second paragraph
19    again discusses the -- you're not on the
20    page, hold on.  I'll wait till you are
21    there.
22     A.   Okay.  I'm there.
23
24
```

Page 304

Page 305

Page 306



Page 308

```
 8        Q.    Okay.  Well, let's take a
 9   look at that.
10           MS. SCULLION:  Can I have
11      Tab 66, please.  Let's not use
12      that one then.
13           Let me have tab 68, please.
14           (Document marked for
15      identification as Exhibit
16      Endo-Stevenson-19.)
17   BY MS. SCULLION:
18      Q.    I'll hand you what's been
19   marked as Exhibit 19.
20           MS. VANNI:  Thank you.
21   BY MS. SCULLION:
22      Q.    And Exhibit 19, again, we
23   have the metadata on the front to show
24   that this was coming from your custodial
```

Page 307

Page 309

```
 1   file.  And then if you turn to the first
 2   page of the exhibit, you see it's a
 3   presentation by Cohn & Wolfe Healthcare
 4   dated May 14th, 2004, the subject of
 5   which is corporate reputation management?
 6      A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 314

```
1
2          (Document marked for
3       identification as Exhibit
4       Endo-Stevenson-20.)
5   BY MS. SCULLION:
6       Q.   Let me quickly show you
7   Exhibit 20, only to help you -- to help
8   you understand the 3202.  Exhibit 20 is
9   ENDO-OPIOID_MDL-01709708.  And this is an
10  e-mail from Mr. Barto to a variety of
11  folks.  And you are cc'd.
12      Do you see that?
13      A.   Yes.  It looks to me like
14  most of the people on this list were vice
15  presidents, not all perhaps, but yeah.
16
17
18
19
20
21
22
23
24
```

Page 316

```
1   this is the generic oxycodone product.
2   The first element -- sorry, the first
3   item listed in the situations is, "Opioid
4   category synonymous with abuse."
5       Do you see that?
6       A.   Yes.
7       Q.   And that was a concern
8   Endo -- that was something that Endo was
9   concerned about at the time, right, there
10  was an opioid category that was kind of
11  synonymous with abuse?
12          MS. VANNI:  Object to form.
13          THE WITNESS:  Well, I can't
14      testify to that.  This was written
15      by some marketing firm.  And that
16      was what they wrote down on a
17      piece of paper.  That doesn't mean
18      that Endo agreed with it.
19  BY MS. SCULLION:
20      Q.   Were you concerned that the
21  opioid category was becoming synonymous
22  with abuse?
23      A.   To be honest, no, because I
24  saw it as helping people relieve their
```

Page 315

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16      Okay.  So going back to
17  Exhibit 19.  There is a page a couple
18  pages back that's headed "Situation for
19  Launching 3218" at the top.
20      A.   Okay.
21      Q.   Do you see that?
22      A.   Yeah.
23      Q.   And what's identified here
24  is a situation for launching.  Again,
```

Page 317

```
1   pain, pain management.
2       Q.   Did you think that concerns
3   about abuse of opioids at that time were
4   overstated?
5           MS. VANNI:  Object to form.
6           THE WITNESS:  I didn't think
7       they were overstated or
8       understated.
9   BY MS. SCULLION:
10      Q.   Okay.  All right.  Let's go
11  to the case study section, which begins
12  on the next page.  If you can turn back,
13  the first case study concerns Monsanto.
14  The next says Purdue Pharma.  The third
15  case study here is Endo.
16      Do you have that one?
17      A.   Yes.
18      Q.   All right.  And what's
19  described here is -- in the first bullet
20  point is, "AG Pappert issues press
21  release on April 22nd, warning of new
22  wave of abuse from generic OxyContin."
23      Did I read that correctly?
24      A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1          Q.   And then it indicates that,
2   "An AP article was released at 3:40
3   focused on concerns of the Attorney
4   General," correct?
5          A.   Yes, that's what it says.
6          Q.   All right.  Then it
7   indicates that at 3:45, five minutes
8   later, Endo coordinates an interview with
9   Dr. Galer and AP reporter.
10         Do you see that?
11         A.   Yes.
12         Q.   And Dr. Galer, that was
13  Dr. Brad Galer, right?
14         A.   Yes.
15         Q.   And who was he at Endo at
16  the time?
17         A.   I don't remember his exact
18  title, but he was involved in the science
19  side of the business.
20         Q.   Okay.  The science side of
21  the business is -- five minutes after
22  release of an article that's discussing
23  concerns from the Attorney General, State
24  of Pennsylvania, the science side of Endo

Page 319

1   is on the phone with an AP reporter.
2   That's what this is indicating, right?
3          MS. VANNI:  Object to form.
4          THE WITNESS:  That's what it
5      indicates.  I don't know if that
6      happened.  I have no way of
7      knowing.
8   BY MS. SCULLION:
9          Q.   Then we see, at 4:38, so
10  less than an hour after the first AP
11  article, a second AP article now is
12  released.  And it's described as having
13  a, quote, "balanced messages."
14         Do you see that, closed
15  quote?
16         A.   Yes.
17         Q.   And the first balanced
18  message indicated for the second AP
19  article is, "OxyContin has been a godsend
20  to patients suffering from severe,
21  long-lasting pain."
22         Did I read that correctly?
23         A.   Yes.
24         MS. SCULLION:  Can I have

Page 320

1      Tab 77.
2   BY MS. SCULLION:
3          Q.   Now, you are aware that for
4   some people, OxyContin was not a godsend,
5   right?
6          MS. VANNI:  Object to form.
7          THE WITNESS:  I'm aware of
8      what I testified to earlier, that
9      there was abuse -- some of --
10     there was abuse of OxyContin by
11     some.  But that they were in the
12     overwhelmingly vast minority
13     compared to the number of people
14     that took, in this case OxyContin
15     to manage their pain.
16  BY MS. SCULLION:
17         Q.   You are aware, are you not,
18  that for some people who took OxyContin
19  under a physician's direction, not
20  abusing it, but under direction, that
21  they described OxyContin as hell.  You
22  are aware of that, right?
23         MS. VANNI:  Object to form
24     and foundation.

Page 321

1          THE WITNESS:  No, I'm not
2      aware of that.
3   BY MS. SCULLION:
4          Q.   Okay.
5          (Document marked for
6      identification as Exhibit
7      Endo-Stevenson-21.)
8   BY MS. SCULLION:
9          Q.   Let me show you Exhibit 21.
10         And Exhibit 21 is a copy of
11  a May 5, 2016 article from the LA Times.
12  And it's titled "You want a description
13  of hell:  OxyContin's 12-hour problem."
14         Do you see that?
15         A.   Yes.
16         Q.   Did you read this article
17  when it came out?
18         A.   No.  It was -- in May, May
19  5, 2016, I was in my noncompete phase.
20         Q.   Okay.  Your -- I won't ask
21  you to read it now since you haven't read
22  it before.  But fair to say that, at
23  least according to this article, certain
24  patients described OxyContin as -- as

81  (Pages 318 to 321)

Page 322

1    hell and not a godsend, right?
2              MS. VANNI:  Object to form.
3              THE WITNESS:  Well, yeah, I
4    just -- for the record, I think
5    it's pure speculation to know
6    whether they abused a product or
7    didn't abuse a product, whether
8    they took an opioid like
9    OxyContin, drank alcohol, or -- or
10   did other nefarious things that
11   were contra to the indication on
12   the label.
13             So the title could be
14   misleading.  I don't know what
15   caused their hell, the 12 hours of
16   hell, just for the record.
17   BY MS. SCULLION:
18        Q.   Now, going back to
19   Exhibit 19.
20        A.   19.
21        Q.   Yep.
22        A.   Be good at numbers.
23        Q.   I'm getting better.
24             Same page we were just on,

Page 323

1    which discusses the AP article that came
2    out, second AP article after Endo
3    coordinated an interview between
4    Dr. Galer and the AP reporter.
5              The third bullet point with
6    respect to balanced messages in that
7    article says, "The company, Endo, plans
8    to monitor for prescription data for
9    signs of abuse and tell doctors that the
10   medication should not be overprescribed."
11             Do you see that?
12        A.   Yes.
13        Q.   Now, I think you've
14   mentioned and testified to rather a
15   number of times, with respect to generic
16   oxycodone ER, Endo wasn't going to be
17   telling doctors anything, right?  Endo is
18   not directly communicating with
19   physicians concerning that generic
20   product, right?
21             MS. VANNI:  Object to form.
22             THE WITNESS:  They were not
23   promoting it.  I do not know if
24   they sent out informational

Page 324

1    material to doctors.  That I don't
2    recall.
3    BY MS. SCULLION:
4         Q.   Did you ever see any
5    informational materials that went out
6    directly to doctors concerning --
7         A.   I don't recall --
8         Q.   Sorry.
9              -- concerning generic
10   oxycodone ER?
11        A.   I don't recall any.
12        Q.   Do you recall seeing any
13   "Dear Doctor" letters concerning generic
14   oxycodone ER that told the doctors
15   that -- that that medication should not
16   be overprescribed?
17        A.   I don't recall any.
18        Q.   Okay.  And turn the page --
19        A.   But I -- can I -- I do want
20   to stipulate though, it says --
21        Q.   I'm so sorry, I apologize,
22   Mr. Stevenson.  Your counsel will have
23   the opportunity to ask you questions, and
24   I'm certain that she will.  So I'm trying

Page 325

1    to move on to the next part of this
2    document.  Sorry.
3              The recommendations section
4    on -- starts with communications
5    imperatives.  Do you see that?
6         A.   Yes.
7         Q.   And do you see that one of
8    the communications imperatives identified
9    a must have as part of a crisis
10   preparedness program is, looking at the
11   third bullet point, "A strategy to
12   neutralize critics/activists."
13             Do you see that?
14        A.   Yes.
15        Q.   Those are pretty strong
16   words, right, neutralize?
17             MS. VANNI:  Object to form.
18             THE WITNESS:  I didn't write
19   them.  They were written by a PR
20   firm.
21   BY MS. SCULLION:
22        Q.   Well -- just to make sure we
23   are on the same page.  This was, in fact,
24   a PR firm that Endo hired.  But I -- I

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    will show you.  I know you said you don't
2    remember.  Let me show you, so you know
3    the basis on which we are saying that.
4    You don't have to take my word for it.
5            (Document marked for
6            identification as Exhibit
7            Endo-Stevenson-22.)
8    BY MS. SCULLION:
9        Q.   Let me show you what's been
10   marked as Exhibit 22.
11           And Exhibit 22 is a copy of
12   Endo Health Solutions Inc. and Endo
13   Pharmaceutical Inc.'s -- excuse me, Endo
14   Pharmaceuticals Inc.'s supplemental
15   objections and responses to plaintiffs'
16   second set of interrogatories numbers --
17   and I'm not going to read the series of
18   numbers.
19           If you'll go to Page 35.
20       A.   Can I just ask a question?
21       Q.   Absolutely.
22       A.   What -- what is the date of
23   this document?
24       Q.   Sure.  The date of this

Page 327

1    document is November 15, 2018.
2        A.   2018, okay.
3        Q.   Correct.  If you'll go to
4    Page 34.
5        A.   34.
6        Q.   And I'm looking at
7    Interrogatory Number 31.
8        A.   34, okay.
9        Q.   Okay.  And this is an
10   interrogatory, you can see, that asks
11   Endo to identify all vendors, including
12   but not limited to, public relations
13   firms you have retained for purposes
14   relating to opioids.  And it -- it asks
15   for certain details.
16           And on the next page, 35,
17   you see listed under vendor, Cohn &
18   Wolfe.  It says, "/GCI Health."  And it
19   identifies the purpose for hiring that
20   vendor as marketing and promotional
21   materials, public relations.
22           Do you see that?
23       A.   Yes.
24       Q.   Okay.  So let's go back

Page 328

1    to --
2        A.   But Cohn & Wolfe did not do
3    any marketing or promotional materials
4    for the generic business, just for --
5        Q.   That's fine.
6        A.   For the record.
7        Q.   That's fine.
8            Here, here we're looking in
9    Exhibit 19 at what is more traditionally
10   called public relations.
11       A.   Yes.
12       Q.   Okay.  So let's -- we were
13   on the page communications imperatives.
14       A.   Yes.
15       Q.   And the strategy to
16   neutralize critics/activists, right?
17       A.   Yes.
18       Q.   Just getting us back to
19   where we are.
20           Now, again, what's written
21   here is to neutralize the critics and
22   activists.  It doesn't say for example,
23   engage in a thoughtful debate, right?
24           MS. VANNI:  Object to form.

Page 329

1            THE WITNESS:  I had no way
2    of controlling what somebody
3    writes in a PowerPoint
4    presentation who worked for
5    another firm.
6    BY MS. SCULLION:
7        Q.   Just asking.  It doesn't say
8    that, right, it doesn't say engage in a
9    thoughtful debate, right?
10           MS. VANNI:  Object to form.
11           THE WITNESS:  No, it says
12   neutralize, as we've already said
13   five times.
14   BY MS. SCULLION:
15       Q.   It doesn't say give
16   considered attention to the concerns of a
17   community devastated by the opioid
18   epidemic, it doesn't say that, right?
19           MS. VANNI:  Objection to
20   form.
21           THE WITNESS:  No, it doesn't
22   say that.
23   BY MS. SCULLION:
24       Q.   Says neutralize the critics

83  (Pages 326 to 329)

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    and -- and activists, right?
2        A.   Yes, that's what it says.
3        Q.   Right.  And common
4    understanding of the term "neutralize"
5    means to stop something from being
6    effective, right?
7        MS. VANNI:  Object to form.
8        THE WITNESS:  I don't know
9        how the -- what the intent of the
10       meaning was in the PowerPoint
11       presentation, since I didn't write
12       it.
13   BY MS. SCULLION:
14       Q.   That's -- that's an
15   understanding of what the -- the term
16   "neutralize" does mean:  Stop something
17   from being effective?
18       MS. VANNI:  Object to form.
19       THE WITNESS:  One could have
20       numerous, numerous definitions.
21       Who knows what was in the state of
22       mind of the individual who wrote
23       it.
24   BY MS. SCULLION:

Page 331

1        Q.   Well, the one thing we do
2    know is they -- they wrote that there
3    must -- the must have was a strategy to
4    neutralize critics and activists.  That's
5    what they did write, right?
6        MS. VANNI:  Object to form.
7        THE WITNESS:  That's what
8        they wrote, yes.
9    BY MS. SCULLION:
10       Q.   Okay.  And then if you'll go
11   two more pages in.  This is part of the
12   presentation of options for media
13   strategy for the 3218 launch.
14       Do you see that?
15       A.   What does it say at the top?
16       Q.   Media strategy for 3218
17   launch, three options?
18       A.   Media -- media launch tab,
19   do you reckon that is what it is?
20       MS. VANNI:  It's not up on
21       the screen.
22   BY MS. SCULLION:
23       Q.   Oh.  That's the one.  Media
24   strategy for 3218 launch, three options.

Page 332

1    I probably told you to go back too far.
2    I apologize.
3        A.   Okay.  Let's start over
4    again.
5        Q.   Yeah.
6        A.   Oh, is that it?
7        Q.   That's it.  Thank you.  I
8    apologize, we don't have page numbers.
9        A.   That's all right.  No
10   problem.  My mistake.
11       Q.   This section is talking
12   about three options for a media strategy.
13   And again, this is for the launch of
14   generic oxycodone ER product, right?
15       A.   Yes.
16       Q.   Okay.  And then if you go to
17   the next page, in discussing the pros and
18   cons of one option, which is to conduct
19   top tier briefings, do you see under the
20   cons section, fourth bullet point down
21   is, "Endo 'blues' story emerges."
22       Do you see that?
23       A.   Yes.
24       Q.   And if you go to the next

Page 333

1    page, which is discussing another
2    potential media strategy option.  Again,
3    under the cons we see listed, "Endo
4    'blues' story emerges."
5        Do you see that?
6        A.   Yes.
7        Q.   And same thing on the last
8    potential strategy under the cons, "Endo
9    'blues' story emerges."
10       Do you see that?
11       A.   Yes.
12       Q.   And that was a reference to
13   the history of abuse of the oxymorphone
14   pills in the '60s and '70s, right?
15       MS. VANNI:  Objection,
16       foundation.
17       THE WITNESS:  I have no
18       knowledge what it is.  I've never
19       heard of it before.
20   BY MS. SCULLION:
21       Q.   You never heard anyone talk
22   about a prior version of oxymorphone
23   being called "the blues"?
24       A.   No.  I have never heard that

84  (Pages 330 to 333)

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    before.
2        Q.   Okay.
3            MS. SCULLION:  Can I have
4    tab -- Tab 74 and 72.
5            (Document marked for
6        identification as Exhibit
7        Endo-Stevenson-23.)
8    BY MS. SCULLION:
9        Q.   Let me first hand you what's
10   been marked Exhibit 23.
11           Exhibit 23 is an excerpt
12   from a book called "Drug Abuse:  Current
13   concerns and research."
14       A.   What is the date of this
15   document?
16       Q.   If you'll turn to the second
17   page of the exhibit, you can see that
18   this was a book that was copyrighted in
19   1972.
20       A.   Okay.  Thank you.
21       Q.   And again I don't
22   have all the page numbers, so it's a
23   little bit hard to direct you.  But,
24   yeah, in the upper right-hand corner we

Page 335

1    have numbers E137.  Do you see those
2    numbers?
3        A.   I'm sorry, I don't see them.
4    Do you see them?
5            MS. VANNI:  Where is it?
6    I'm sorry.
7            MS. SCULLION:  Sure.  You
8    have these -- upper right-hand
9    corner.
10           THE WITNESS:  I have to get
11   through the --
12           MS. SCULLION:  You have
13   these little numbers that say
14   E137.
15           THE WITNESS:  Oh, at the
16   back.  I see.
17           MS. SCULLION:  Yeah.
18           THE WITNESS:  Okay.  Sorry.
19   BY MS. SCULLION:
20       Q.   Sure.  And so --
21       A.   I'm sorry.  What is the
22   page?
23       Q.   E137.1.
24       A.   Yeah.

Page 336

1        Q.   And this is indicated to be
2    Chapter 35 of this book.  And it is
3    entitled "Oxymorphone Abuse Among
4    Narcotic Addicts."
5            Do you see that?
6        A.   Yes.
7        Q.   And it discusses in the
8    first line, "Numorphan (oxymorphone), a
9    narcotic analgesic developed and first
10   marketed by Endo Laboratories in 1966 has
11   become a drug abuse" -- "a drug of abuse
12   among a sizable segment of the narcotic
13   addict population."
14           Do you see that?
15       A.   Yes.
16       Q.   Okay.  And I think we
17   discussed earlier, oxymorphone was the
18   opioid Endo used in the Opana IR and ER
19   products, right?
20           MS. VANNI:  Object to form.
21           THE WITNESS:  It was a brand
22       product, which I had no
23       involvement.
24   BY MS. SCULLION:

Page 337

1        Q.   I'm just asking the -- you
2    understand that was the same opioid,
3    right?
4            MS. VANNI:  Object to form,
5        foundation.
6            THE WITNESS:  To be honest,
7        you know, I haven't done -- what
8        the derivative is or what was the
9        predecessor of it, I really don't
10       know.  It wasn't my focus.
11   BY MS. SCULLION:
12       Q.   Sure.  We saw earlier in the
13   10-K though that oxymorphone was listed
14   as one of the products that Endo was
15   marketing during your time there?
16       A.   Oh, yeah.  They were
17   marketing several products when I was
18   there.
19       Q.   Okay.  And then if you look
20   under the heading "Background," you'll
21   see in the second paragraph, it says, "On
22   the street Numorphan can be identified by
23   its various subculture names Numorphine,
24   Blue Morphine, Blue Morphan, or Blues."

85  (Pages 334 to 337)

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1        Do you see that?
2    A.   Yes.
3    Q.   If you go to the next page.
4    E137.2, under the heading "The Prevalence
5    of Numorphan Abuse," do you see it says,
6    "The abuse of Numorphan appears to be
7    rather widespread geographically.
8    Without any systematic attempt to gather
9    case histories, we have discovered
10   Numorphan addicts in Florida, Kentucky,
11   Pennsylvania, and New York."
12        Do you see that?
13   A.   Yes.
14        MS. SCULLION:  Let's look at
15   Tab 72.
16        (Document marked for
17        identification as Exhibit
18        Endo-Stevenson-24.)
19   BY MS. SCULLION:
20   Q.   I'll show you what's been
21   marked as Exhibit 24.  Exhibit 24 is
22   Bates-stamped ENDO-OPIOID_MDL-06775127.
23        MS. VANNI:  Just note my
24        objection to the extent that this

Page 339

1        postdates his employment.
2        MS. SCULLION:  Understood.
3    BY MS. SCULLION:
4    Q.   If you go down to the bottom
5    of the first page of Exhibit 24.  I just
6    want to direct your attention to the
7    e-mail.  It's from Robert Reder to a
8    variety of folks.  And it is dated
9    March 6, 2008.
10        Do you see that?
11   A.   Yes.
12   Q.   Okay.  And let's turn to the
13   next page.  You'll see that Dr. Reder is
14   forwarding an item from the New York
15   press entitled "Opana:  A Brief History."
16        Do you see that?
17   A.   Yeah.  Yes.
18   Q.   And just for orientation,
19   the first paragraph states, "Opana, a
20   powerful painkiller that went on the
21   market less than two years ago, is twice
22   as strong as OxyContin with a potential
23   for addiction that rivals the
24   prescription drug that has ravaged the

Page 340

1    lives of thousands of abusers."
2        Do you see that?
3    A.   I see that's what it says.
4    Q.   Okay.  And you were aware
5    that Opana was twice as strong as
6    OxyContin, right?
7        MS. VANNI:  Object to form
8    foundation.
9        THE WITNESS:  No, I was not
10   aware of that.
11   BY MS. SCULLION:
12   Q.   Any reason to doubt the
13   accuracy of that?
14        MS. VANNI:  Objection.
15        THE WITNESS:  I have no idea
16   who Mr. Elzweig is.  I have no --
17   I have no knowledge of what he
18   based his article on.  So I do not
19   know that it was twice as large,
20   one third as large or less.  I
21   have no -- again, as I testified
22   before, whether it's -- what is
23   this drug called?  Numorphan or
24   oxy -- oxymorphone, that's a brand

Page 341

1    product, not a generic.
2        So my involvement was only
3    in the stocking of the product
4    once I took over trade affairs in
5    late '06.  I had no other
6    involvement with the product.  I
7    didn't follow the product.  I
8    wasn't involved in strategic
9    discussions about the product, how
10   the product was promoted or
11   anything else involving the
12   product.
13        You know, I may have gotten
14   copies of documents because I was
15   at the VP level.  What did I do?
16   I put it in my file.  Okay, great.
17   They sent me a document.  It has
18   to go somewhere.  So I put it in
19   my folder.
20        But I was not involved with
21   these brand products whether it
22   was Percocet, oxymorphone ER,
23   Numorphan.
24        MS. VANNI:  And just for the

86 (Pages 338 to 341)

Highly Confidential - Subject to Further Confidentiality Review

Page 342

```
1        record, I just want to note that
2    you missed my objection, on the
3    "any reason to doubt" question.
4    BY MS. SCULLION:
5        Q.   But we did see earlier in
6    your performance evaluation that you were
7    involved with Opana, at least to the
8    extent of, as you said, facilitating
9    the --
10       A.   Stocking.
11       Q.   -- relationships with the
12   trade on stocking, right?
13       A.   Stocking, yes.  I agree.
14       Q.   Right.  And that was -- and
15   that was an important part of the launch
16   of Opana ER, right, getting that stocked?
17           MS. VANNI:  Object to form.
18           THE WITNESS:  Well, you have
19       to have it stocked, yes.
20   BY MS. SCULLION:
21       Q.   Right.  And when you were
22   helping get that drug stocked, are you
23   telling me that you were not aware that
24   Opana -- that oxymorphone had a history
```

Page 343

```
1    of abuse in the 1960s and '70s under the
2    name Blues?
3            MS. VANNI:  Object to form.
4            THE WITNESS:  I was not
5        aware of that.  I've never heard
6        of that before.
7    BY MS. SCULLION:
8        Q.   Okay.  And just, again, to
9    draw your attention in Exhibit 24 to the
10   last paragraph of the article.
11       A.   Oh, 24.  That's this one?
12       Q.   That's the article, right.
13       A.   The last paragraph?
14       Q.   Right.  Which explains,
15   "This isn't the first time that
16   oxymorphone hydrochloride has been
17   available in tablet form.  Until it was
18   taken off the market in the 1970s, it was
19   available in 10-milligram tablets under
20   the brand name Numorphan."
21           Did I read that correctly?
22       A.   Yes.
23       Q.   Okay.  And it goes on to
24   say, "That was the drug referred to as
```

Page 344

```
1    'Blues' in the 1989 Gus Van Sant film,
2    Drugstore Cowboy, about a family of
3    traveling drug addicts set in the early
4    1970s."
5            Did I read that correctly?
6        A.   Yes.
7        Q.   Mr. Stevenson, so sitting
8    here today, you're telling me that during
9    the time that you were helping Endo get
10   oxymorphone tablets stocked out in the
11   retail drug chains, no one made you aware
12   of this history of abuse of that opioid,
13   right?
14           MS. VANNI:  Objection.
15           THE WITNESS:  I was not
16       aware of -- I was not aware of
17       anything involving Numorphan.
18       That never came up during my
19       tenure there.
20   BY MS. SCULLION:
21       Q.   Okay.  Fair to say that in
22   terms of the relationships that you were
23   discussing are important to develop with
24   the trade, that you never informed anyone
```

Page 345

```
1    in your trade relationships that
2    oxymorphone, in fact, had a history of
3    abuse in the 1960s and '70s, right?
4            MS. VANNI:  Objection.
5            THE WITNESS:  We were
6        stocking an FDA-approved product.
7        The FDA approved a product, and
8        what -- and what the goal was, was
9        to make sure that the product was
10       stocked.  That was, while an
11       important aspect of the product
12       launch, it was not a significant
13       activity for myself.  It was
14       basically in the hands of three
15       national account executives who
16       reported to me at the time.  And
17       that was our only involvement with
18       oxymorphone.
19   BY MS. SCULLION:
20       Q.   Understood.  The question is
21   just, factually, I assume from your prior
22   answers that it's fair to say that when
23   your national account executives were
24   interacting with the trade to get Opana
```

87 (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review

Page 346

```
 1    and Opana ER stocked, as part of the
 2    launch, they were not telling the trade
 3    that that opioid had a history of abuse
 4    in the 1960s or '70's?  Just factually
 5    that didn't happen?
 6             MS. VANNI:  Objection.
 7             THE WITNESS:  They would not
 8    be telling them that.
 9             (Document marked for
10    identification as Exhibit
11    Endo-Stevenson-25.)
12    BY MS. SCULLION:
13       Q.   Let me hand you what's been
14    marked -- sorry.  Do I have an extra copy
15    of this?  Yeah, I do.
16             Let me hand you what's been
17    marked as Exhibit 25.
18             MS. VANNI:  Thank you.
19    BY MS. SCULLION:
20       Q.   Exhibit 25 is Bates-stamped
21    ENDO-OPIOID_MDL-00156150.
22             And, Mr. Stevenson, have you
23    seen Exhibit 25 before?
24       A.   No.
```



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 350



Page 352

BY MS. SCULLION:
     Q.   Let me hand you what has
been marked as Exhibit 26.  Exhibit 26 is
Bates-stamped ENDO-OPIOID_MDL-00856825.
        And Mr. Stevenson, do you
see this is an e-mail from you to
Mr. Kerr on October 20th, 2006, subject
matter "Project Pizza"?
     A.   Yes.

Page 351

Asked and answered.
     THE WITNESS:  Not to my
knowledge.
     MS. SCULLION:  Okay.  We've
been going for a while.  This is a
good time for a quick break.
     THE VIDEOGRAPHER:  Off the
record, 2:40.
     (Short break.)
     THE VIDEOGRAPHER:  We are
back on the record at 2:58.
BY MS. SCULLION:
     Q.   Welcome back, Mr. Stevenson.
You understand that you're still under
oath?
     A.   Yes, I do.
     (Document marked for
identification as Exhibit
Endo-Stevenson-26.)

Page 353

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 362

Page 364

```
 1      A.   23?  Oh.
 2      Q.   No, no.  I have Tab 23.  I'm
 3  going to get it to you.  It's a lot of
 4  numbers.
 5          (Document marked for
 6      identification as Exhibit
 7      Endo-Stevenson-27.)
 8  BY MS. SCULLION:
 9      Q.   I'll hand you what's been
10  marked as Exhibit 27.  And Exhibit 27 is
11  Bates-stamped ENDO-OPIOID_MDL-02230226.
12          And, Mr. Stevenson, do you
13  recognize Exhibit 27 as a series of
14  e-mails from you to various folks in late
15  October 2006?
16      A.   Yes.
17      Q.   All right.  Let's start on
18  the next to last page of the exhibit.  At
19  the bottom it says -- 227 is the last
20  three digits of the number.
21      A.   Yes.
22      Q.   Okay.  And let's start
23  with -- with your e-mail at the bottom of
24  the page, which again is from you to
```

Page 363

Page 365

```
 1  Mr. Kerr and it's cc'd to Mark Baglin.
 2          Do you recall his position
 3  at the time?
 4      A.   No, I don't.
```

```
19  Okay.
20      A.   That's what I -- I have to
21  review it again.  I...
22      Q.   Thank you.  Okay.
23          Let's go to Tab 23.  You can
24  put this one aside for now.
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review





Page 370

Page 371

```
 5      Q.   Okay.
 6          MS. SCULLION:  And can we
 7      take -- can we go off the record
 8      really quickly?
 9          THE VIDEOGRAPHER:  Off the
10      record.  3:15.
11          (Short break.)
12          THE VIDEOGRAPHER:  We are
13      back on the record at 3:19.
14      BY MS. SCULLION:
15      Q.   Sorry for that brief
16      interruption.
```

Page 372

Page 373

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 378

8          MS. SCULLION:  Can I have
9     Tab 9, please.
10          (Document marked for
11     identification as Exhibit
12     Endo-Stevenson-28.)
13     BY MS. SCULLION:
14          Q.   I'll hand you what's been
15     marked as Exhibit Number 28.  And
16     Exhibit 28 is Bates-stamped
17     ENDO-OPIOID_MDL-03924784.  And do you see
18     that Exhibit 28 begins with an e-mail,
19     again, from you to David Kerr, and this
20     time it's dated April of 2006?
21          A.   Yes.

Page 380

Page 379

Page 381

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 394

Page 396

Page 395

Page 397

```
 1
 2
 3              MS. SCULLION:  Can I have
 4      Tab 52, please.  Make sure we have
 5      the same document.  Because these
 6      can get a little bit tricky.
 7              (Document marked for
 8      identification as Exhibit
 9      Endo-Stevenson-29.)
10   BY MS. SCULLION:
11      Q.   I'll hand you what's been
12   marked as Exhibit Number 29.
13           And, Mr. Stevenson, if
14   you'll turn to the second page of
15   Exhibit 29, you'll see at the top, that
16   it's entitled "Endo Contribution Margin
17   Report - Period."
18           Do you see that?
19      A.   Yes.
20      Q.   Now, I'll represent to you
21   that this is a format of this data that
22   was produced to us by Endo in this
23   litigation in response to our request for
24   financial reporting from Endo.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1    And I just want to draw your
2 attention to this first page.  You'll see
3 on the product line, indicates that
4 it's -- Endocet is the product, right?
5    A.   Yes.
6    Q.   Okay.  And then we see a
7 number of lines in the chart.  It starts
8 with the gross revenues and then goes
9 through a number of the line items that
10 we discussed when we were looking at the
11 McKesson summary.
12    Do you see that?
13    A.   Yes.
14    Q.   But there's -- there's a new
15 line item in here that we haven't
16 discussed in detail yet.  We referred to
17 it earlier.  That's the chargebacks.  Do
18 you see that the fourth line down under
19 revenue?
20    A.   Yes.
21    Q.   It says chargebacks.  Can
22 you explain what chargebacks were in this
23 context for -- context for Endocet?
24    A.   Well, it's the same concept

Page 399

1 for any product, whether it's an opioid
2 or not.  It's the difference between the
3 WAC, the wholesale acquisition cost, and
4 the contract price --
5    Q.   Okay.
6    A.   -- for the number of bottles
7 sold through their -- whatever the
8 respective wholesaler's program was to
9 the independent pharmacists.
10    Q.   Okay.
11    A.   Or whatever -- not only -- I
12 shouldn't say independent pharmacists.
13 Whatever -- whoever they sold out to, if
14 the contract was loaded, there was a
15 contract price.  The WAC was the WAC.
16 And the respective contract price was
17 whatever the respective contract price
18 was for Contract 1, 2, 3, 4, 5.  And then
19 there was another -- another pharmacy
20 chain or whatever might have been
21 Contract 1, 2, 3, 4, 5, 6, however it was
22 numbered.
23    And every -- every
24 respective contract had a price.  That

Page 400

1 was their contract price.  And so if the
2 WAC was $80, and the contract price was
3 $40.  There would be a $40 chargeback
4 submitted to Endo to -- for the number --
5 for the number of bottles sold -- sold to
6 that contract number.
7    Q.   Okay.  Again, let me see if
8 I can just break that down to make sure I
9 actually understand how that all worked,
10 because it was a lot.  It was very
11 helpful.  But so, again, the WAC is the
12 wholesale acquisition cost, right?
13    A.   Yes.
14    Q.   And that's the price across
15 the board, the same WAC across the board
16 that Endo sets for a product, right?
17    A.   Yes.
18    Q.   Okay.  And then the contract
19 price you referred to, in the context of
20 a product like Endocet, would that be the
21 contract between Endo and -- let's start
22 with the retail pharmacy chain?
23    A.   It wouldn't be to the retail
24 pharmacy chain.  It would be to the

Page 401

1 wholesaler.  The chargeback goes to the
2 wholesaler, not to the --
3    Q.   The contract price is the
4 price that the wholesaler has contracted
5 for?
6    A.   No.  No.  It's the price
7 that Endo has with the respective chain
8 or wholesaler program.
9    Q.   Okay.
10    A.   So McKesson had One Stop, or
11 whatever it was called in those days.
12 ABC had a different program.  Cardinal
13 had -- I forget, Generic Alliance.  I
14 forget all the names now.
15    And they -- if a contract
16 was loaded for those programs, it was
17 given a unique number.  And its price was
18 loaded.  The wholesaler bought it at WAC.
19 And they sent you a chargeback for the
20 number of bottles sold --
21    Q.   Through that program?
22    A.   -- through that program
23 based on what the WAC price was minus
24 what the contract price.  That was called

Highly Confidential - Subject to Further Confidentiality Review

Page 402

```
 1   the chargeback.
 2       Q.   Okay.  And when they were
 3   calculating the chargeback, that had to
 4   be based on that wholesaler's sales
 5   through that particular program under
 6   that contract price, right?
 7       A.   Number.
 8       Q.   Okay.  And did Endo get data
 9   telling it how those chargebacks were
10   calculated?  In other words, to see which
11   sales through the program justified the
12   chargeback that the wholesaler was asking
13   for?
14           MS. VANNI:  Object to form.
15           THE WITNESS:  Endo got
16       chargeback data that was
17       primarily -- matter of fact, as
18       far as I know, exclusively used
19       for financial verification.
20       That's who -- that's what
21       chargeback data was for, to
22       validate claims.
23   BY MS. SCULLION:
24       Q.   Right.  And let me make
```

Page 403

```
 1   sure.  The chargeback data that Endo got,
 2   it wouldn't just be a summary of the
 3   chargeback.  It would be actually, like
 4   you said, a validation of all the sales
 5   from the wholesaler out that justified
 6   that chargeback?
 7       A.   Yes.
 8       Q.   Okay.  So would that be
 9   another piece of data that Endo had about
10   its customers' customers?
11           MS. VANNI:  Object to form.
12           THE WITNESS:  Yes, it would
13       be another data point, yes.
14   BY MS. SCULLION:
15       Q.   Okay.  And you said that was
16   used in finance to verify the claims,
17   right?
18           MS. VANNI:  Objection.
19           THE WITNESS:  It was
20       especially used to validate claims
21       for customers' customers.  So if
22       there was -- there's a line on
23       here called "price equalization,"
24       for example, which refers to --
```

Page 404

```
 1   which is a shelf stock.
 2           So the price declines in the
 3   market, and they have 100 bottles
 4   on the shelf, they want to have
 5   the bottles on the shelf be the
 6   same price as their new price.
 7           Okay.  And as a result of
 8   that you would get a claim for
 9   that, and they would say, "We had
10   900 bottles on the shelf when the
11   price change went into affect."
12   And if it's a direct account, you
13   can validate that because you know
14   from what you shipped them.
15           So if it's a chain with a
16   vault, you can validate that.  If
17   it's a chain or customer without a
18   vault and they make that claim, to
19   pass an audit which is always
20   important to do, and verify that
21   the claim was a legitimate claim,
22   finance would use chargeback data
23   to validate the claim.
24   BY MS. SCULLION:
```

Page 405

```
 1       Q.   Okay.  Thank you.  If you
 2   can turn a few pages back -- let's see.
 3   One, two, three, four, five, six, seven.
 4   There's a page that lists the product at
 5   the top at Numorphan.
 6       A.   Numorphan, okay.
 7           MS. VANNI:  Sorry, Counsel,
 8       what page was that?
 9           MS. SCULLION:  Well, it
10       doesn't have page numbers.
11           THE WITNESS:  You have to
12       find it.
13           MS. SCULLION:  It's about
14       seven pages back.
15           THE WITNESS:  Okay, yeah.
16           MS. SCULLION:  They are
17       hopefully in alphabetical order.
18           THE WITNESS:  It's there.
19           MS. VANNI:  Gotcha.
20   BY MS. SCULLION:
21       Q.   Okay.  You are on the -- on
22   the page that has the product listed as
23   Numorphan?
24       A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1      Q.   Okay.  And you see that for
2   this fiscal year, it's 2006, it does
3   indicate that year-to-date there were
4   392,000, a little bit more, in sales of
5   Numorphan during that year?
6      A.   That's what it shows, yeah.
7      Q.   Okay.  And again you recall
8   that we saw the name Numorphan come up in
9   the article about oxymorphone abuse,
10  correct?
11         MS. VANNI:  Object to form.
12         THE WITNESS:  Yes, I recall
13     the article.
14  BY MS. SCULLION:
15     Q.   Okay.  Do you have any
16  understanding about what Numorphan
17  product is referred to in this
18  contribution margin report?
19     A.   I have no idea.
20     Q.   Okay.  Let's go -- turn
21  another page back and you'll see at the
22  top, the product Opana ER.
23     A.   I see Opana.  Is there
24  supposed to be an Opana ER?

Page 407

1      Q.   Yeah.  If you go to the next
2   page, you'll see an Opana ER.
3      A.   Okay.
4      Q.   All right.  And here it's
5   just representing that the stub last five
6   months of 2006 for Opana ER.  Do you see
7   that?
8      A.   Yes.
9      Q.   Okay.  And here, I just want
10  to ask you about a few more of the -- of
11  the lines indicated on the left-hand
12  side.  We talked about a lot of them.
13         You mentioned price
14  equalization.  The next line is sales
15  promotions.  What was sales promotions?
16     A.   I don't know.  I wasn't
17  involved with Opana or Opana ER, other
18  than stocking.  That's my only
19  involvement.
20     Q.   You know what, fair enough.
21  Let's go -- let's go to the next page
22  then, which is oxycodone.
23     A.   And I assume this is
24  oxycodone ER; is that correct?

Page 408

1      Q.   I will tell you in this set
2   it's the only oxycodone page there is.
3   So that's my understanding.
4      A.   Okay.
5      Q.   Okay.  So again, let's look
6   down the line for price -- sorry, for
7   sales promotions.  And you'll see, just
8   for Period 1, 2.6 million, a little bit
9   more.  Do you see that?
10     A.   Yes.
11     Q.   What was sales promotions?
12     A.   I'm sure it was -- you know,
13  had to do with stocking.
14     Q.   So that would be --
15     A.   That's the only promotion
16  that we would ever -- you know, they put
17  it into a convenient P&L line.  But
18  that's only -- we didn't promote to
19  doctors.  So generics do not promote to
20  physicians, ever.
21     Q.   Just going down a few more
22  lines.  There's a reference to
23  distribution fees?
24     A.   Yes.

Page 409

1      Q.   And are -- are those the
2   percentage fees under the distributor --
3   distributor services agreement we talked
4   about earlier?
5      A.   I -- I'm assuming.  You
6   know, I'm assuming that's what it is.  I
7   don't know -- I don't know what -- I
8   haven't seen these P&Ls before, so...
9      Q.   Okay.  And then two more
10  lines down underneath that is an
11  administration fee.  Do you see that?
12     A.   Yes.
13     Q.   What was administration fee
14  separate from distribution fee?
15     A.   You know, I don't recall the
16  specifics.  It was some customers or
17  wholesaler -- whoever it was, they had --
18  they called it an admin fee?  I don't
19  remember what it was all for.  It was
20  just another fee, another charge, you
21  know, cost of doing business on the
22  account.
23     Q.   From your perspective it's
24  another thing you had to compete on for

103 (Pages 406 to 409)

Highly Confidential - Subject to Further Confidentiality Review

Page 410

```
 1    the account?
 2         A.   Well --
 3              MS. VANNI:  Object to form.
 4              THE WITNESS:  Yes.  It's
 5    another thing that we had to -- at
 6    the end of the day you had to get
 7    to a net price.  Okay.  So we
 8    listed these things out in order
 9    to make sure all the different
10    deductions were accounted for in
11    order that we get to a net price.
12    When we know the net price then we
13    know we can calculate our
14    profitability.  So when you take
15    all the deducts out and you get to
16    a net price, and you take off your
17    cost of goods, you now can
18    determine your profitability.
19    BY MS. SCULLION:
20         Q.   Okay.  So from your
21    perspective it didn't really much matter
22    which of the deducts it went into, as
23    long as, in the end, you got to a net
24    price that you can make a deal on?
```

Page 411

```
 1              MS. VANNI:  Object to form.
 2              THE WITNESS:  As long as we
 3    got to net price that was
 4    profitable and attractive to the
 5    company.  And if it wasn't
 6    attractive to the company, we
 7    would have walked away.
 8    BY MS. SCULLION:
 9         Q.   Sure.  Understood.  But
10    again -- again, you get to a net price
11    that you would be willing to make a deal
12    on?
13         A.   Yes.
14         Q.   Okay.
15              MS. SCULLION:  Can I have
16    Tab 11, please.
17    BY MS. SCULLION:
18         Q.   You can put that aside.
19    Thank you very much.
20              (Document marked for
21    identification as Exhibit
22    Endo-Stevenson-30.)
23    BY MS. SCULLION:
24         Q.   I'll hand you what's been
```

Page 412

```
 1    marked Exhibit 30.  And Exhibit 30 is
 2    Bates-stamped ENDO-OPIOID_MDL-00877265.
 3              Mr. Stevenson, drawing your
 4    attention to the bottom e-mail.  It's
 5    from a Chris Cresswell to you, Ron
 6    Wickline, and Mark Gossett in May of
 7    2006.  Do you see that?
 8         A.   Yes.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```



Page 413

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 414

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 416

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 415

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 417

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12     Q.   Fair enough.
13          MS. SCULLION:  Can I have
14     Tabs 2 and 4, please.
15          (Document marked for
16     identification as Exhibit
17     Endo-Stevenson-31.)
18     BY MS. SCULLION:
19          Q.   Let me hand you what's been
20     marked as Exhibit 31.  And Exhibit 31 is
21     Bates-stamped ENDO-OPIOID_MDL-02255008.
22          And, Mr. Stevenson, do you
23     see that Exhibit 31 is a series of
24     e-mails between yourself and
```

Highly Confidential - Subject to Further Confidentiality Review



Page 418

1    Miss Kitlinski in February of 2004?
2        A.    Yeah -- yes.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 426

9    MS. SCULLION:  Can I have
10   Tab 4, please.
11       (Document marked for
12   identification as Exhibit
13   Endo-Stevenson-32.)
14   BY MS. SCULLION:
15       Q.   I'll hand you what's been
16   marked as Exhibit 32.  Exhibit 32 is
17   Bates-stamped ENDO-OPIOID_MDL-02255384.
18       And Mr. Stevenson, do you
19   recognize Exhibit 32 as a series of
20   e-mails concerning pharmacist educational
21   initiative update in March of 2004?
22       A.   That's what it says.
23       Q.   Okay.  Let's go to --
24   actually, I apologize.  We don't need to

Page 428

1    BY MS. SCULLION:
2        Q.   Welcome back, Mr. Stevenson.
3        Let me hand you what's been
4    marked as Exhibit 33.  And Exhibit 33 is
5    Bates-stamped ENDO-OPIOID_MDL-02255803.
6        Mr. Stevenson, do you
7    recognize -- sorry, do you see that
8    Exhibit 33 is an e-mail from Carey Aron
9    to yourself and a few other folks in May
10   of 2004?
11       A.   Yes.
12       Q.   And the subject matter here
13   is opioid patient brochure - production
14   ready.  Do you see that?
15       A.   Yes.
16       Q.   All right.  And at the
17   bottom of the e-mail you'll see Carey
18   Aron is identified as the associate
19   director of clinical development
20   education and scientific affairs.
21       Do you see that?
22       A.   For Endo.
23       Q.   Yes.
24       A.   Yes.

Page 427

1    do that one.  That's okay.  I apologize.
2        MS. SCULLION:  I think I
3    have the wrong document there,
4    because my numbers are not
5    matching up.
6    BY MS. SCULLION:
7        Q.   You know what?  You can put
8    this exhibit aside.  We may or may not
9    come back to it.
10       MS. SCULLION:  Don't worry
11   about it.  We'll move on.  That's
12   all right.
13       Can I have Tab 69, please.
14       Before we even start, do you
15   want to take a quick break?  Take
16   a quick break and come back in.
17       THE VIDEOGRAPHER:  Off the
18   record, 4:11.
19       (Short break.)
20       THE VIDEOGRAPHER:  We are
21   back on the record at 4:25.
22       (Document marked for
23   identification as Exhibit
24   Endo-Stevenson-33.)

Page 429

1        Q.   Just giving you some
2    orientation here.  Let me go back to the
3    body of the e-mail.  I apologize.  Is
4    Carey man or woman?  Do you remember?
5        A.   I beg your pardon?  Could
6    you say that again?
7        Q.   Do you remember if Carey was
8    a man or woman?
9        A.   To be honest, I don't.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 454

Page 455

Page 456

1       - - -
2       EXAMINATION
3       - - -
4    BY MR. LENISKI:
5       Q.   Good afternoon,
6    Mr. Stevenson.  My name is Joe Leniski.
7    We were introduced earlier.  I'm from the
8    State of Tennessee, and I represent
9    plaintiffs in the State of Tennessee.
10   I'm going to follow up with some
11   questions for you today.
12       How are you feeling?  Okay?
13       A.   I'm feeling great.
14       MR. LENISKI:  We have a
15   standing objection, the Tennessee
16   plaintiffs do, to these
17   depositions, which I'll adopt
18   here, due to a number of different
19   issues, lack of notice, lack of
20   document production, because
21   different civil rules of procedure
22   apply in Tennessee.
23       And I will adopt that
24   objection, as I have in other

Page 457

1    depositions.  And nonetheless, in
2    the spirit of cooperating with the
3    MDL and under the protocol
4    established by that court, we're
5    here today to ask questions.
6       If there's no response,
7    I'll --
8       MS. VANNI:  No objection.
9       MR. LENISKI:  -- continue.
10      MS. VANNI:  So noted.
11      MR. LENISKI:  Thank you.
12   BY MR. LENISKI:
13      Q.   Before your deposition,
14   Mr. Stevenson, we asked Endo's lawyers if
15   you had any knowledge that was specific
16   to the State of Tennessee.  And they
17   responded that your responsibilities
18   while you were at Endo were national in
19   scope and not particular to Tennessee,
20   and that you didn't -- effectively, you
21   didn't have any Tennessee-specific
22   knowledge that you gained while you were
23   at Endo.
24      Do you agree with that

Page 455 lines 11-24:
11      MS. SCULLION:  I have no
12   further questions for you today.
13   Thank you for your time.
14      THE WITNESS:  Okay.
15      MS. SCULLION:  I think we're
16   going to take a quick break and my
17   colleague from Tennessee will be
18   asking some questions.
19      THE WITNESS:  Okay.
20      THE VIDEOGRAPHER:  Off the
21   record, 4:48.
22      (Short break.)
23      THE VIDEOGRAPHER:  We are
24   back on the record at 4:55.

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1    statement?
2        A.   Absolutely true.
3        Q.   Okay.  So, for example,
4    during your tenure at Endo, while you may
5    not have had specific knowledge, did you
6    know that Endo did sell its opioid
7    products in the State of Tennessee?
8        A.   Endo sold their products
9    nationally, so including Tennessee.
10       Q.   Okay.  What did you know
11   about opioid abuse rates in Tennessee
12   during your time at Endo?
13       A.   Nothing.
14       Q.   While employed at Endo, did
15   you have any understanding of the level
16   of opioid use in Tennessee relative to
17   other states?
18       A.   No.
19       Q.   While employed at Endo, did
20   you have any understanding of the level
21   of opioid abuse in Tennessee relative to
22   other states?
23       A.   No.
24       Q.   While employed at Endo, did

Page 459

1    you know that opioid abuse rates -- or
2    have any understanding that opioid abuse
3    rates were higher in Tennessee than
4    almost anywhere else in the country?
5            MS. VANNI:  Object to form.
6            THE WITNESS:  No.
7    BY MR. LENISKI:
8        Q.   Now, most of my clients are
9    district attorneys in the State of
10   Tennessee.  They represent districts in a
11   part of Tennessee that we refer to as
12   Appalachia.  Have you heard of Appalachia
13   before?
14       A.   Yes.
15       Q.   Okay.  And do you have a
16   general understanding that parts of
17   Tennessee are located in Appalachia?
18       A.   I always thought Appalachia
19   was located in Tennessee.  But yes.
20       Q.   Certainly is.  I think it's
21   a wider region.  Do you understand other
22   states would also be included in the
23   region known as Appalachia?
24       A.   I guess so, if I think about

Page 460

1    it now, yes.
2        Q.   And basically it's just a
3    range of -- is a range of -- the region,
4    rather, around the Appalachian Mountains.
5        A.   Okay.
6        Q.   Did you gain any -- while
7    you were employed at Endo, did you gain
8    any understanding about opioid use in
9    Appalachia?
10       A.   No.
11       Q.   Did you learn anything
12   during your time at Endo of opioid abuse
13   rates in Appalachia relative to other
14   areas of the country?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  No.
17   BY MR. LENISKI:
18       Q.   Okay.  So you did not have
19   any understanding while you were at Endo
20   that the level of opioid abuse in
21   Appalachia was relatively higher than
22   other parts of the country?
23           MS. VANNI:  Object to form.
24           THE WITNESS:  No.  I had no

Page 461

1        knowledge of that.
2    BY MR. LENISKI:
3        Q.   Okay.  I also represent
4    individual infants and toddlers in
5    Tennessee who were born afflicted with
6    neonatal abstinence syndrome, or what's
7    called NAS, because their mothers abused
8    opioids while pregnant.  Have you ever
9    heard of neonatal abstinence syndrome?
10       A.   No.
11       Q.   Okay.  Did you ever hear the
12   term "epidemic" used to describe opioid
13   use in this country while you were
14   employed at Endo?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  I'm not sure
17   when I heard -- when I was at Endo
18   I heard the word "epidemic."  I
19   can't -- I can't testify to that.
20   I've heard it recently in the
21   news.  But I would say when I was
22   at Endo, I can't recall that.
23   BY MR. LENISKI:
24       Q.   Okay.  So was the term

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1    "opioid epidemic" ever used, to your
2    knowledge, at Endo while you were
3    employed there?
4            MS. VANNI:  Object to form.
5            THE WITNESS:  To my
6        knowledge, no.
7    BY MR. LENISKI:
8        Q.   Did you ever hear the term
9    "epidemic" to describe Opana use in this
10   country while you were employed at Endo?
11       A.   No.
12       Q.   Do you recall being asked
13   questions early today about the 2003
14   meetings between Endo and the DEA and FDA
15   with respect to oxymorphone ER and IR?
16           MS. VANNI:  Objection.
17           THE WITNESS:  I was not
18       at -- I wasn't at a DEA involving
19       oxymorphone IR and ER.
20   BY MR. LENISKI:
21       Q.   I'm sorry.  I think you were
22   asked questions about MDL counsel about
23   generic OxyContin that Opana -- or that
24   Endo was launching in 2003.  Do you

Page 463

1    recall that?
2        A.   We were hoping to launch in
3    2003.  We launched it in June of '05.
4        Q.   Okay.  Did you have any
5    involvement or any responsibilities
6    relative to Endo's launch of oxymorphone
7    ER or IR around that time frame of 2003?
8        A.   No.
9            (Document marked for
10       identification as Exhibit
11       Endo-Stevenson-34.)
12   BY MR. LENISKI:
13       Q.   There's copies there for
14   your attorney.
15       A.   Oh, sorry.
16           MS. VANNI:  You don't need
17       to apologize.
18   BY MR. LENISKI:
19       Q.   I handed the witness a
20   document that we've identified as
21   Exhibit 34 to his deposition.  This is
22   ENDO-OPIOID_MDL-01716696.
23           MS. VANNI:  Is this one
24       page, Counsel?

Page 464

1            MR. LENISKI:  It's one page.
2    It's double-sided.
3            MS. VANNI:  I think you just
4    had an extra copy.  Thank you.
5    BY MR. LENISKI:
6        Q.   I've handed you Exhibit 34,
7    which is a series of e-mails that are
8    dated between June 30, 2003, and
9    July 1st, 2003.  The very first e-mail on
10   the chain, which is on the second page of
11   Exhibit 34, is from Bob Barto.  And it's
12   subject "Agency contact report,
13   oxymorphone ER and IR."
14           Do you see that?
15       A.   Which one is it?  Where is
16   Bob Barto?  Oh, yeah, there -- sorry.
17   Yeah.  Okay.
18       Q.   Did you find that?
19       A.   Yes.
20       Q.   And who is Bob Barto?
21       A.   I don't know exactly.  Based
22   on the documents that I've seen, he was
23   involved in regulatory affairs.
24       Q.   His e-mail reads, "Please

Page 465

1    see attached agency contact report
2    regarding oxymorphone ER and IR trade
3    name submission and risk management
4    plan."
5            Did I read that correctly?
6        A.   Yes.
7        Q.   The e-mail directly above
8    that is from Debbie Travers to Scott
9    Shively.  And Miss Travers, who was
10   copied on or a recipient of Mr. Barto's
11   e-mail below is forwarding this e-mail to
12   Scott Shively.  And who was Scott
13   Shively?
14       A.   He was the vice president of
15   brand marketing.
16       Q.   Okay.  So you were on the
17   generic side at Endo and he was on the
18   brand side; is that correct?
19       A.   Yes.
20       Q.   Okay.
21       A.   I was copied on here as a
22   convenience.  I wasn't involved in the
23   product, but...
24       Q.   Well, you are jumping ahead

Page 466

1    a little bit.  We'll get there, but
2    there's an e-mail from Ms. Travers to
3    Mr. Shively.  And she says, "Here it is.
4    They claim that our risk management plan
5    is not enough.  But were nice enough to
6    point us in the right direction."
7            Did I read that correctly?
8        A.   Yes.
9        Q.   Okay.  And then Mr. Shively
10   writes back -- or actually he actually
11   sends an e-mail to both Debbie Travers
12   and then a number of individuals
13   including MaryAlice Raudenbush.
14       A.   Yes.
15       Q.   Raudenbush -- later on
16   June 30, 2003.  Do you see that e-mail?
17       A.   Yes, I do.
18       Q.   And he says, "MaryAlice,
19   'really deficient' with regard to our
20   risk management plan does not sound very
21   good.  It seems we have a lot of work to
22   do."
23           Did I read that correctly?
24       A.   Yes.

Page 467

1        Q.   Okay.  Miss Raudenbush
2    writes back to Mr. Shively, also on
3    July 1st, 2003, correct?
4        A.   Yes.
5        Q.   And she says, "Scott, FDA
6    indicated that we have the right elements
7    but these are 'soft.'  Our plan as
8    currently presented is quite vague and
9    lacks direction.  It appears we also need
10   to address diversion from multiple
11   angles, i.e., tracking prescriptions by
12   region, trends, et cetera, as well as the
13   actual distribution of our products from
14   Memphis."
15           Did I read that correctly?
16       A.   Yes.
17       Q.   Okay.  And then Mr. Shively
18   in the final e-mail on this exhibit
19   responds to MaryAlice Raudenbush, and he
20   copies you and a number of other
21   individuals.
22           He writes, "MaryAlice,
23   thanks, that helps a bit.  My big concern
24   all along has been that we would be asked

Page 468

1    to 'track' prescriptions/patients.
2    Depending on what this translates to it
3    can be very laborious and very expensive
4    (a patient registry is the extreme case).
5    If it is just regional, that is
6    manageable, i.e., looking for 'macro
7    trends' and areas for concern."
8            Did I read that correctly?
9        A.   Yes.
10       Q.   Do you recall receiving that
11   e-mail?
12       A.   No.
13       Q.   Do you know why you were
14   copied on the e-mail from Mr. Shively?
15       A.   Because he brought up at the
16   last sentence, "We have to do the same
17   for 3218," which would be oxycodone ER.
18   So he was just asking a question whether
19   or not this would now be required.
20       Q.   Okay.  And --
21       A.   He was filling me in on
22   that, I guess so I would be aware of it.
23       Q.   Okay.  Do you recall
24   responding to Mr. Shively --

Page 469

1        A.   I don't.
2        Q.   -- about his question --
3        A.   No.
4        Q.   -- in this e-mail?
5        A.   No.
6        Q.   Okay.  And do you remember
7    what the answer was whether the same
8    would be required for the -- for Endo's
9    generic launch of OxyContin to track
10   prescriptions in patients?
11       A.   I don't remember.
12       Q.   Did you have any
13   responsibilities with respect to
14   implementing any system for tracking
15   prescriptions or patients for either
16   oxymorphone ER and IR or what's numbered
17   here as 3218 which is the generic
18   OxyContin?
19       A.   No.  Just as I testified to
20   numerous times today, oxymorphone ER and
21   IR was a brand.  I was not involved with
22   the brand other than for stocking of the
23   product in late '06 and into '07.
24       Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review



Page 470

1        (Document marked for
2     identification as Exhibit
3     Endo-Stevenson-35.)
4  BY MR. LENISKI:
5     Q.  I'm handing the witness
6  what's been identified as Exhibit 35 to
7  his deposition.  This is
8  ENDO-OPIOID_MDL-01692316.
9        Mr. Stevenson, would you
10  agree this is an e-mail from Sue Tolen to
11  a number of individuals including
12  yourself dated July 14, 2003?
13     A.  Yes.
14
15
16
17
18
19
20
21
22
23
24

Page 471

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 472

(pages 1–24, blank)

Page 473

9  BY MR. LENISKI:
10     Q.  Do you recall discussing the
11  contents of this attachment to this
12  e-mail in Exhibit 35 with any of the
13  individuals listed on the e-mail?
14     A.  No.
15     Q.  Do you recall if you did
16  anything at all with the information that
17  Miss Tolen forwarded you that we see in
18  Exhibit 35?
19     A.  No.
20     Q.  While employed at Endo was
21  it your practice to circulate news
22  articles about Endo's products to your
23  coworkers at Endo?
24     A.  No.  I wouldn't say it's a

Highly Confidential - Subject to Further Confidentiality Review

Page 474

```
1    practice, no.
2        Q.   Okay.  Do you recall doing
3    just that, circulating news reports from
4    the internet or other sources to your
5    colleagues at Endo while you were
6    employed there?
7        A.   I have no recollection.
8        Q.   Okay.  Were reports in the
9    news and elsewhere about -- about abuse
10   of Endo's products occurring in the
11   country relevant to your work at Endo?
12       A.   I'm sorry, could you restate
13   that, please?
14       Q.   Were reports in the news and
15   elsewhere about the abuse of Endo's
16   products occurring in the country
17   relevant to your work at Endo?
18           MS. VANNI:  Object to form.
19           THE WITNESS:  I never saw
20       any article about the abuse of an
21       Endo product.
22   BY MR. LENISKI:
23       Q.   Were reports in the news and
24   elsewhere about the abuse of opioids
```

Page 476

```
1    respect to whatever work they were
2    performing for Endo?
3        A.   I may have sat in a
4    presentation that they made, a Cohn &
5    Wolfe presentation, I may have sat in a
6    meeting.  But I wasn't involved in
7    anything else that Cohn & Wolfe did.
8        Q.   Okay.  So to your knowledge,
9    were you involved in the retention of
10   Cohn & Wolfe to perform services on
11   behalf of Endo?
12           MS. VANNI:  Objection.
13       Asked and answered.
14           THE WITNESS:  No, I was not
15       involved.
16   BY MR. LENISKI:
17       Q.   I've handed you what we've
18   marked as Exhibit 36.  This is
19   ENDO-OPIOID_MDL-04137641.  Do you
20   recognize this document?
21       A.   No.
22           (Document marked for
23       identification as Exhibit
24       Endo-Stevenson-36.)
```

Page 475

```
1    generally occurring in the country
2    relevant to your work at Endo?
3            MS. VANNI:  Object to form.
4            THE WITNESS:  How do you
5        define relevant?
6    BY MR. LENISKI:
7        Q.   Well, is it information that
8    you either did use or would have used in
9    performing your job duties at Endo?
10       A.   No.
11       Q.   Okay.  You were asked some
12   questions earlier today about an entity
13   known as Cohn & Wolfe.  Do you recall
14   that?
15       A.   Yes.
16       Q.   Do you remember when
17   approximately Endo retained Cohn &
18   Wolfe's services?
19       A.   No.  I have no idea.
20       Q.   Okay.  Were you involved in
21   retaining Cohn & Wolfe to work with Endo?
22       A.   No.
23       Q.   Did you participate in
24   meetings with Cohn & Wolfe employees with
```

Page 477

```
1    BY MR. LENISKI:
2        Q.   And I'll represent to you
3    this is something that was located in
4    your custodial file.
5            Do you know why you would
6    have had this document in your custodial
7    file?
8        A.   Somebody sent it to me,
9    because, you know, I was at the VP level
10   and -- and Endo people kept the VP level
11   informed.  So I just got a copy of it.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review



| Page 478 | Page 480 |
|---|---|
| 1 | 1    Q.    Okay.  Do you have any |
| 2 | 2   knowledge as you sit here today as to why |
| 3 | 3   Endo retained Cohn & Wolfe Healthcare to |
| 4 | 4   perform proactive media relations on its |
| 5 | 5   behalf surrounding the launch of generic |
| 6 | 6   OxyContin? |
| 7 | 7    A.    I don't have any -- any idea |
| 8 | 8   what the underlying basis of it was. |
| 9 | 9    Q.    Do you recall receiving |
| 10 | 10   communications from Cohn & Wolfe, |
| 11 | 11   subsequent to this date of April 1st, |
| 12 | 12   2004, concerning reports of OxyContin |
| 13 | 13   abuse? |
| 14 | 14    A.    No.  I have no recollection |
| 15 | 15   of that. |
| 16 | 16        (Document marked for |
| 17 | 17        identification as Exhibit |
| 18 | 18        Endo-Stevenson-37.) |
| 19 | 19   BY MR. LENISKI: |
| 20 | 20    Q.    I've handed you what's been |
| 21 | 21   marked as Exhibit 37 to your deposition. |
| 22 | 22   This is ENDO-OPIOID_MDL-03256784. |
| 23 | 23 |
| 24 | 24 |

Page 479

Page 481

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 486

Page 488

| Line | |
|---|---|
| 20 | Q.   Okay.  Do you recall taking |
| 21 | any actions with regard to what we see in |
| 22 | Exhibit 37, the information forwarded to |
| 23 | Endo by Lucy Lu (sic) at Cohn & Wolfe? |
| 24 | MS. VANNI:  Objection. |

Page 487

Page 489

| Line | |
|---|---|
| 1 | THE WITNESS:  No, I don't, |
| 2 | no.  I have no recollection. |
| 3 | BY MR. LENISKI: |
| 4 | Q.   Okay.  Do you recall any |
| 5 | discussions at Endo about the information |
| 6 | Ms. Lu forwarded in Exhibit 37? |
| 7 | A.   I have no recollection. |
| 8 | (Document marked for |
| 9 | identification as Exhibit |
| 10 | Endo-Stevenson-38.) |
| 11 | BY MR. LENISKI: |
| 12 | Q.   I handed the witness what we |
| 13 | identified as Exhibit 38.  It's |
| 14 | ENDO-OPIOID_MDL-03389105. |
| 15 | Mr. Stevenson, I've handed |
| 16 | you Exhibit 38.  It is a series of |
| 17 | e-mails attaching a -- what looks to be a |
| 18 | news report.  First e-mail in the |
| 19 | sequence is from an individual named -- |
| 20 | at the very bottom of the first page, |
| 21 | Peter Lankau, L-A-N-K-A-U, to Scott |
| 22 | Shively, yourself, and Mr. Andrzejewski |
| 23 | dated April 23rd, 2004, correct? |
| 24 | A.   Correct. |

Highly Confidential - Subject to Further Confidentiality Review



Page 490

```
1        Q.   Who is Peter Lankau?
2        A.   He was -- he was the
3   president.  He might have been the CEO by
4   this time.  I don't remember the exact
5   day he became the CEO.  He became the CEO
6   when Carol Ammon retired.
7        Q.   Okay.  And he's forwarding
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 494

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 496

```
1   correctly?
2        A.   Yes.
3        Q.   Okay.  And do you know who
4   Patty Leitch was?
5        A.   No, I don't remember off the
6   top of my head.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 495

```
1
2
3
4
5
6
7
8
9
10
11
12        Q.    Okay.
13             (Document marked for
14        identification as Exhibit
15        Endo-Stevenson-39.)
16   BY MR. LENISKI:
17        Q.   I've handed you Exhibit 39,
18   which is ENDO-OPIOID_MDL-02843461.
19             It's an e-mail from Patty
20   Leitch to a number of individuals,
21   including yourself, dated April 28, 2004.
22   The subject is Actiq abuse in
23   Pennsylvania.
24             Have I represented that
```

Page 497

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 498

Page 500

```
 8      Q.   Okay.  Have you ever heard
 9   the term "crisis binder"?
10      A.   No.
11         (Document marked for
12   identification as Exhibit
13   Endo-Stevenson-40.)
14   BY MR. LENISKI:
15      Q.   I've handed the witness what
16   we've marked as Exhibit 40.  This is an
17   e-mail -- it's a few e-mails.  First one
18   is -- the top of the first page is from
19   Patty Leitch to you, Mr. Stevenson, and
```

Page 499

Page 501

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS



Page 506

22    Q.    Okay.  Do you know if you
23  forwarded Ms. Leitch's e-mail to anyone
24  at Endo?

Page 507

1        A.    No, I don't -- I don't
2  recall.  I doubt I would have.
3        Q.    Was it your practice to file
4  away or otherwise save articles such as
5  this media report from Ms. Leitch
6  concerning generic OxyContin as part of
7  your job responsibilities?
8        MS. VANNI:  Object to form.
9        THE WITNESS:  I don't think
10  I would call it -- you know, I got
11  e-mails and whatever given to me,
12  and I filed them away.
13  BY MR. LENISKI:
14        Q.    When you say you filed them
15  away, what do you mean by that?
16        A.    Well, it was either on my
17  e-mail, on my -- you know, whatever the
18  computer electronically, or it could have
19  been in a folder.  You know, somebody
20  goes to a meeting, and they hand --
21  sorry -- they hand you a document, you go
22  back to your office, you put it in a
23  folder.  Or I gave it to my assistant,
24  put it in a -- you know, like you have

Page 508

1  manila folder.  Put it in a manila
2  folder, put it in my filing cabinet.
3        Q.    Did you have any folders on
4  your e-mail program where media reports
5  like the one we see from Mrs. Leitch in
6  Exhibit 40 were saved, to your knowledge?
7        A.    No, I don't have any
8  knowledge.  We're going back, you know,
9  12 years.
10        Q.    Sure.  Do you recall ever
11  giving a direction that such media
12  reports were supposed to be filed in a
13  particular way, either electronically or
14  in paper or otherwise?
15        A.    No.
16        Q.    Okay.  Are you aware how
17  much Endo paid Cohn & Wolfe for their
18  services?
19        A.    No.
20        Q.    So you had no -- did you
21  have any role whatsoever in determining
22  what compensation Endo would pay to
23  Cohn & Wolfe for their services?
24        MS. VANNI:  Objection.

Page 509

1        THE WITNESS:  As I testified
2  already several times I wasn't
3  involved in Cohn & Wolfe.  I have
4  no idea -- you can put a knife in
5  my throat, I couldn't tell you
6  what Endo paid them.
7  BY MR. LENISKI:
8        Q.    I won't do that today.
9        A.    Okay.
10        MS. VANNI:  Today.
11  BY MR. LENISKI:
12        Q.    Do you know how long Endo
13  utilized Cohn & Wolfe's services?
14        A.    No.
15        Q.    Did you independently
16  monitor news reports about opioids after
17  the date of, for example, Exhibit 40,
18  which is May of 2004?
19        A.    No.
20        Q.    I'm going to show you a
21  document, which unfortunately, for some
22  reason, I don't have copies of.  But it's
23  a document which is Bates-stamped
24  ENDO-OPIOID_MDL-05554689.

Highly Confidential - Subject to Further Confidentiality Review

Page 510

```
1          MR. LENISKI:  Can I ask that
2    it be put on your screen?
3          MS. VANNI:  You don't have a
4    copy for him?
5          MR. LENISKI:  I don't.
6          THE WITNESS:  I'll read
7    through my bifocals.
8          MR. LENISKI:  Has it been
9    pulled up?  Okay.  I'm going to
10   ask that that be entered as
11   Exhibit 41 to your deposition --
12        (Document marked for
13   identification as Exhibit
14   Endo-Stevenson-41.)
15        MR. LENISKI:  -- even though
16   we don't have a paper copy of it.
17   BY MR. LENISKI:
18        Q.   This is an e-mail from
19   yourself to David Kerr dated May 22,
20   2007, correct?
21        A.   Yes.
22        Q.   And you are forwarding
23   what's called FDA News Drug Daily
24   Bulletin, correct?
```

Page 512



Page 511

```
1          A.   Yes.
2          Q.   Who is David Kerr?
3          A.   He was the vice president of
4    business operations, who was my immediate
5    boss.
6          Q.   Okay.  And did he oversee
7    both generic and branded business at
8    Endo?
9          A.   Yes.
```

Page 513

Highly Confidential - Subject to Further Confidentiality Review



Page 514

Page 516

1  again.
2      Q.   COLT, C-O-L-T, staff was at
3  Endo?
4      A.   No.
5      Q.   This is the last document I
6  have I don't have a copy of.  But I'm
7  going to ask that
8  ENDO-OPIOID_MDL-01915705, please, be
9  shown.
10         (Document marked for
11      identification as Exhibit
12      Endo-Stevenson-42.)
13  BY MR. LENISKI:
14      Q.   This is -- we'll have it
15  identified as Exhibit 42.  The document
16  at the top reads "COLT staff minutes,
17  Thursday, May 24, 2007," correct?

Page 515

Page 517

22      Do you know what COLT Staff
23  was at Endo?
24      A.   I'm sorry.  What?  Say that

Page 518

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 520

```
 1        Q.   Okay.  And that was data
 2   that -- correct, that Endo received from
 3   wholesalers and distributors about those
 4   wholesalers and distributors' customers
 5   who received Endo product?
 6        A.   Yes.  Sales out, yes.
 7        Q.   Okay.
 8           (Document marked for
 9        identification as Exhibit
10        Stevenson-43.)
11   BY MR. LENISKI:
12        Q.   Was it -- was it part of
13   your job responsibilities to receive and
14   review 867 data received from Endo's
15   wholesale and distributor customers?
16        A.   No, I -- I didn't review it
17   or receive it.
18        Q.   I've handed the witness
19   what's been identified as Exhibit 43 to
20   this deposition.
21           This is -- this is a native
22        file, I'll represent.  Bates-stamped
23
24
```

Page 519

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
```
18        Q.   That's fair enough.  Okay.
19   I'm done with that.
20           Do you recall being asked
21   questions this morning, or I should say
22   this afternoon, about what was called 867
23   data?
24        A.   867 data, yes, I do.
```

Page 521

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



| Page 526 | Page 528 |
|---|---|
| 1 | 1  Q.   Good evening, Mr. Stevenson. |
| 2 | 2  A.   Good evening. |
| 3 | 3  Q.   It's been a long day.  Are |
| 4 | 4  you okay? |
| 5 | 5  A.   Oh, I'm fine. |
| 6 | 6  Q.   I just have a few questions |
| 7 | 7  for you. |
| 8 | 8       I want to direct your |
| 9 | 9  attention to an exhibit that Ms. Scullion |
| 10 | 10  marked during your cross-examination. |
| 11 | 11  It's Plaintiffs' Exhibit 33.  Do you have |
| 12 | 12  that in front of you? |
| 13 | 13  A.   Yes. |
| 14 | 14  Q.   You were asked a series of |
| 15 | 15  questions about this document.  Do you |
| 16 | 16  recall that line of questioning? |
| 17 | 17  A.   Yes. |
| 18 | 18  Q.   And in particular, if I can |
| 19 | 19  direct your attention to MDL |
| 20 | 20  ENDO-OPIOID_MDL-02255807. |
| 21 | 21  A.   Yes. |

Page 527

11       MR. LENISKI:  I don't have
12  any more questions at this time.
13       THE WITNESS:  Okay.
14       MS. VANNI:  Take a
15  five-minute break.
16       THE VIDEOGRAPHER:  Going off
17  the record at 5:59.
18       (Short break.)
19       THE VIDEOGRAPHER:  We are
20  back on the record at 6:15.
21          - - -
22       EXAMINATION
23          - - -
24  BY MS. VANNI:

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1
2          k you.
3          MS. VANNI:  I have no
4    further questions for you,
5    Mr. Stevenson.
6          THE VIDEOGRAPHER:  Going off
7    the record at 6:16.
8          MS. SCULLION:  So I have no
9    questions for the witness.
10         We did skip Exhibit Number
11   11.  That's inadvertent.  It was
12   not used.
13         MS. VANNI:  Thank you.
14         THE VIDEOGRAPHER:  That
15   concludes the deposition.  The
16   time is 6:17.
17         (Excused.)
18         (Deposition concluded at
19   approximately 6:17 p.m.)
20
21
22
23
24

Page 532

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8          After doing so, please sign
9    the errata sheet and date it.
10         You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14         It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 531

1
2          CERTIFICATE
3
4
5          I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
          It was requested before
8    completion of the deposition that the
     witness, GEORGE STEVENSON, have the
9    opportunity to read and sign the
     deposition transcript.
10
11
12   _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  February 20, 2019
16
17
18        (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

Page 533

1          - - - - - -
          E R R A T A
2          - - - - - -
3
4    PAGE  LINE  CHANGE
5    ____  ____  _____
6          REASON:  _____
7    ____  ____  _____
8          REASON:  _____
9    ____  ____  _____
10         REASON:  _____
11   ____  ____  _____
12         REASON:  _____
13   ____  ____  _____
14         REASON:  _____
15   ____  ____  _____
16         REASON:  _____
17   ____  ____  _____
18         REASON:  _____
19   ____  ____  _____
20         REASON:  _____
21   ____  ____  _____
22         REASON:  _____
23   ____  ____  _____
24         REASON:  _____

134  (Pages 530 to 533)

Highly Confidential - Subject to Further Confidentiality Review

Page 534

```
 1
 2            ACKNOWLEDGMENT OF DEPONENT
 3
 4        I,_____, do
 5     hereby certify that I have read the
 6     foregoing pages, 1 - 535, and that the
 7     same is a correct transcription of the
 8     answers given by me to the questions
 9     therein propounded, except for the
10     corrections or changes in form or
11     substance, if any, noted in the attached
12     Errata Sheet.
13
14
15     _____
16     GEORGE STEVENSON            DATE
17
18
19     Subscribed and sworn
       to before me this
20     _____ day of _____, 20____.
21     My commission expires:_____
22
       _____
23     Notary Public
24
```

Page 535

```
 1            LAWYER'S NOTES
 2     PAGE  LINE
 3     ____ ____ _____
 4     ____ ____ _____
 5     ____ ____ _____
 6     ____ ____ _____
 7     ____ ____ _____
 8     ____ ____ _____
 9     ____ ____ _____
10     ____ ____ _____
11     ____ ____ _____
12     ____ ____ _____
13     ____ ____ _____
14     ____ ____ _____
15     ____ ____ _____
16     ____ ____ _____
17     ____ ____ _____
18     ____ ____ _____
19     ____ ____ _____
20     ____ ____ _____
21     ____ ____ _____
22     ____ ____ _____
23     ____ ____ _____
24     ____ ____ _____
```