1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION

3

     _____
4

     IN RE:  NATIONAL PRESCRIPTION     MDL No. 2804
5    OPIATE LITIGATION                 Case No. 17-md-2804

6

     This document relates to:        Judge Dan
7                                      Aaron Polster

8    The County of Cuyahoga v. Purdue
     Pharma, L.P., et al.
9    Case No. 17-OP-45005

10   City of Cleveland, Ohio vs. Purdue
     Pharma, L.P., et al.
11   Case No. 18-OP-45132

12   The County of Summit, Ohio,
     et al. v. Purdue Pharma, L.P.,
13   et al.
     Case No. 18-OP-45090

14   _____

15

16

17

18        Videotaped Deposition of Matthew Strait

19                   Washington, D.C.

20                    May 31, 2019

21                     9:05 a.m.

22

23

24   Reported by:  Bonnie L. Russo

25   Job No. 3404564

Page 2

1      Videotaped Deposition of Matthew Strait held

2      at:

3

4

5                      Williams & Connolly, LLP

6                      725 12th Street, N.W.

7                      Washington, D.C.

8

9

10     Pursuant to Notice, when were present on behalf

11     of the respective parties:

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1     APPEARANCES:
 2
 3     On behalf of the U.S. Department of Justice and
       the Witness:
 4
       NATALIE A. WAITES, ESQ.
 5     U.S. Department of Justice
       Civil Division
 6     175 N Street, NE
       Room 10.222
 7     Washington, DC 20002
       202-616-2964
 8     natalie.a.waites@usdoj.gov
                -and-
 9     MARIAMA C. SPEARS, ESQ.
       U.S. Department of Justice
10     Drug Enforcement Administration
       Office of Chief Counsel
11     8701 Morrissette Drive
       Springfield, Virginia 22152
12     202-598-6204
       mariama.c.spears@usdoj.gov
13
       On behalf of Plaintiffs:
14
       TIFFANY R. ELLIS, ESQ.
15     MICHAEL PIGGINS, ESQ.
       WEITZ & LUXENBERG
16     3011 W. Grand Boulevard
       Suite 2150
17     Detroit, Michigan 48202
       313-800-4170
18     tellis@weitzlux.com
19     On behalf of Purdue Pharma, L.P.
20     MELANIE MACKAY, ESQ.
       DECHERT, LLP
21     35 West Wacker Drive
       Suite 3400
22     Chicago, Illinois 60601
       312-646-5817
23     melanie.mackay@dechert.com
24
25
```

Page 4

```
 1      APPEARANCES (CONTINUED):
 2
        On behalf of Johnson & Johnson and Janssen
 3      Pharmaceuticals, Inc.
 4      MATT WALLACE, ESQ.
        (Via Teleconference)
 5      O'MELVENY & MYERS, LLP
        400 South Hope Street, 18th Floor
 6      Los Angeles, California 90071
        213-430-7508
 7      mwallace@omm.com
                  -and-
 8      JEFFREY C. SINDELAR, JR., ESQ.
        (Via Teleconference)
 9      TUCKER ELLIS, LLP
        950 Main Avenue
10      Suite 1100
        Cleveland, Ohio 44113
11      216-592-5000
        jeffrey.sindelar@tuckerellis.com
12
        On behalf of Walmart, Inc.
13
        NEAL J. STEPHENS, ESQ.
14      (Via Teleconference)
        JONES DAY
15      1755 Embarcadero Road
        Palo Alto, California 94303
16      650-739-3939
        nstephens@jonesday
17                -and-
        PATRICK J. BEISELL, ESQ.
18      (Via Teleconference)
        JONES DAY
19      77 West Wacker
        Chicago, Illinois 60601
20      312-269-4066
        pbeisell@jonesday.com
21
22
23
24
25
```

Page 5

```
 1      APPEARANCES (CONTINUED):
 2      On behalf of Rite Aid of Maryland:
        JOHN P. LAVELLE, JR.
 3      (Via Teleconference)
        MORGAN, LEWIS & BOCKIUS, LLP
 4      1701 Market Street
        Philadelphia, Pennsylvania 19103
 5      215-963-4824
        john.lavelle@morganlewis.com
 6
 7
        On behalf of Cardinal Health, Inc.:
 8
        JENNIFER WICHT, ESQ.
 9      BRAD MASTERS, ESQ.
        WILLIAMS & CONNOLLY, LLP
10      725 12th Street, N.W.
        Washington, D.C. 20005
11      202-434-5000
        jwicht@wc.com
12      bmasters@wc.com
13
        On behalf of CVS Indiana, LLC and CVS Rx
14      Services, Inc.:
15      ANTHONY M. RUIZ, ESQ.
        ZUCKERMAN SPAEDER, LLP
16      1800 M Street, N.W.
        Suite 1000
17      Washington D.C. 20036
        202-778-1800
18      aruiz@zuckerman.com
19
20      On behalf of AmerisourceBergen Drug
        Corporation:
21
        BRIAN T. HIMMEL, ESQ.
22      (Via Teleconference)
        REED SMITH, LLP
23      225 Fifth Avenue
        Pittsburgh, Pennsylvania 15222
24      412-288-3131
        bhimmel@reedsmith.com
25
```

Page 6

```
 1      APPEARANCES (CONTINUED):
 2
        On behalf of McKesson Corporation:
 3
        MEGHAN E. MONAGHAN, ESQ.
 4      COVINGTON & BURLING, LLP
        One CityCenter
 5      850 Tenth Street, N.W.
        Washington, D.C. 20001
 6      202-662-6000
        mmonaghan@cov.com
 7
 8      On behalf of H.D. SMITH:
 9      KATHLEEN MATSOUKAS, ESQ.
        (Via Teleconference)
10      BARNES & THORNBURG, LLP
        11 South Meridian Street
11      Indianapolis, Indiana 46204
        317-261-7863
12      kathleen.matsoukas@btlaw.com
13
        On behalf of Anda, Inc.
14
        KRISTINA J. MATIC, ESQ.
15      (Via Teleconference)
        FOLEY & LARDNER, LLP
16      777 East Milwaukee, Wisconsin 53202
        414-297-5913
17      kmatic@foley.com
18
19      On behalf of HBC:
20      ROBERT M. BARNES, ESQ.
        (Via Teleconference)
21      MARCUS & SHAPIRA, LLP
        One Oxford Centre, 35th Floor
22      301 Grant Street
        Pittsburgh, Pennsylvania 15219
23      412-338-5224
        rbarnes@marcus-shapira.com
24
25
```

```
                                                   Page  7

 1
        ALSO PRESENT:
 2
        Renee A. Bacchus, Esq., United States
 3      Department of Justice, United States Attorney's
        Office
 4      David M. Finkelstein, Esq., United States
        Department of Justice, Civil Fraud Section
 5      Johne Rzodkiewicz, Intern
        Jeff Swaine (Via Teleconference)
 6      Daniel Russo, Videographer
        Solomon Francis, IT Specialist
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

1                    C O N T E N T S
2       EXAMINATION OF MATTHEW STRAIT            PAGE
3       BY MR. MASTERS                           13
4                                                113
5       BY MS. ELLIS                             70
6
7
8                        EXHIBITS
9       Exhibit 1   Notice of Videotaped         14
                    Deposition of Matthew Strait
10
        Exhibit 2   Letter dated 5-24-19         15
11
        Exhibit 3   Report to Congressional      23
12                  Requesters
13      Exhibit 4   Pharmacist's Manual          47
14      Exhibit 5   Testimony Before the         52
                    Committee on the
15                  Judiciary, U.S. Senate
16      Exhibit 6   Letter dated                 56
                    stamped 6-9-17
17                  US-DEA-00026731-733
18      Exhibit 7   E-Mail dated 2-26-18         61
                    Attachment
19                  US-DEA-00026897-902
20      Exhibit 8   GAO-15-471                   65
                    US-DEA-00026833-834
21
        Exhibit 9   E-Mail dated 4-27-16         80
22                  Attachment
                    US-DEA-00026799-803
23
        Exhibit 10  E-Mail dated 12-20-16        85
24                  Attachment
                    US-DEA-00026803-810
25

```
1        EXHIBITS (CONTINUED):

2

3        Exhibit 11   E-Mail Chain                  99
                      dated 2-20-14
4                     MCKMDL00538072-076
5        Exhibit 12   E-Mail Chain                 104
                      dated 10-13-14
6                     CAH_MDL2804_02423059-064
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 10

1              P R O C E E D I N G S

2

3              THE VIDEOGRAPHER:  Good morning.

4              We are going on the record at 9:05

5         a.m. on May 31st, 2019.

6              Please note that the microphones are

7         sensitive and may pick up whispering, private

8         conversations and cellular interference.

9         Please turn off all cell phones or place them

10        away from the microphones as they can interfere

11        with the deposition audio.  Audio and video

12        recording will continue to take place unless

13        all parties agree to go off the record.

14             This is Media Unit 1 of the video

15        recorded deposition of Matthew Strait, taken by

16        counsel for defendant the matter of In Re:

17        National Prescription Opiate, filed in the

18        United States District Court for the Northern

19        District of Ohio, Eastern Division, Case No.

20        17-MD-2804.

21             This deposition is being held at

22        Williams & Connolly, located at 725 12th

23        Street, Northwest, Washington, D.C.

24             My name is Daniel Russo from the

25        firm Veritext Legal Solutions, and I'm your

Page 11

1      videographer today.  The court reporter is

2      Bonnie Russo from the firm Veritext Legal

3      Solutions.

4                  Counsel and all present in the room

5      and everyone attending remotely will now state

6      their appearances and affiliations for the

7      record, please.

8                  MR. MASTERS:  Brad Masters, Williams

9      & Connolly, for Cardinal Health.

10                 MS. WICHT:  Jennifer Wicht, Williams

11     & Connolly, for Cardinal Health.

12                 MR. RUIZ:  Anthony Ruiz, Zuckerman

13     Spaeder, on behalf of CVS Indiana, LLC, and CVS

14     Rx Services, Inc.

15                 MS. MONAGHAN:  Megan Monaghan from

16     Covington & Burling on behalf of McKesson.

17                 MS. MACKAY:  Melanie Mackay from

18     Dechert for Purdue.

19                 MR. PIGGINS:  Michael Piggins from

20     Weitz & Luxenberg on behalf of the plaintiffs.

21                 MS. ELLIS:  Tiffany Ellis, Weitz &

22     Luxenberg, on behalf of the plaintiffs.

23                 MR. MASTERS:  Yeah.  Go ahead.

24                 MR. RZODKIEWICZ:  Johne Rzodkiewicz,

25     DOJ.

Page 12

1                MR. FINKELSTEIN:  David Finkelstein,

2      Department of Justice.

3                MS. SPEARS:  Mariama Spears, Drug

4      Enforcement Administration.

5                MS. BACCHUS:  Renee Bacchus, United

6      States Attorney's Office for the Northern

7      District of Ohio on behalf of DOJ and DEA.

8                MS. WAITES:  Natalie Waites on

9      behalf of DOJ and DEA.

10               MR. STRAIT:  And Matthew Strait,

11     DEA.

12               THE VIDEOGRAPHER:  Can everyone

13     remotely please state their name.

14               MS. MATSOUKAS:  Yes.  This is

15     Kathleen Matsoukas from Barnes & Thornburg on

16     behalf of H.D. Smith.

17               MR. BARNES:  Robert Barnes, Marc &

18     -- Marcus & Shapira on behalf of HBC Service

19     Company.

20               MR. BEISELL:  Patrick Beisell from

21     Jones Day on behalf of Wal-Mart.

22               MR. SWAINE:  Jeff Swaine --

23               (Telephone audio malfunction.)

24               MR. HIMMEL:  Brian Himmel,

25     AmerisourceBergen Drug Corporation.

Page 13

1             MR. SINDELAR:  Jeff Sindelar from

2      Tucker Ellis on behalf of Johnson & Johnson and

3      Janssen Pharmaceuticals.

4             MR. WALLACE:  Matt Wallace of

5      O'Melveny & Myers on behalf of Johnson &

6      Johnson and Janssen.

7             MR. LAVELLE:  John Lavelle, on

8      behalf of Rite Aid of Maryland.

9             MR. STEPHENS:  Neil Stephens for

10     Jones Day for Wal-Mart.

11            MS. MATIC:  Kristina Matic, Foley &

12     Lardner, for Anda.

13            THE VIDEOGRAPHER:  Will the court

14     reporter please swear in the witness.

15

16                MATTHEW STRAIT,

17            being first duly sworn, to tell the

18     truth, the whole truth and nothing but the

19     truth, testified as follows:

20

21            THE VIDEOGRAPHER:  You may proceed,

22     Counsel.

23       EXAMINATION BY COUNSEL FOR CARDINAL HEALTH

24            BY MR. MASTERS:

25       Q.   Good morning, Mr. Strait.

1          Thank you for being here today.

2     A.    Good morning.

3     Q.    Have you ever been deposed before?

4     A.    No.

5     Q.    No.  This is your first time.

6     A.    Yes.

7     Q.    So just real quick, some ground

8     rules.  We'll try not the talk over each other

9     so the court reporter doesn't have too hard of

10    a time.

11          And if you have any questions about

12    my questions, feel free to ask me.

13          If -- if counsel objects, you should

14    still answer the question unless -- unless

15    you're instructed not to.  Oftentimes these

16    objections are just for the record later.

17          Any question before we proceed?

18    A.    No.

19    Q.    Okay.  How long have you been at the

20    Drug Enforcement Administration?

21    A.    In August it will be 20 years.

22          MR. MASTERS:  I'm introducing what

23    will be marked as -- as Exhibit 1.

24          (Deposition Exhibit 1 was marked for

25    identification.)

```
1              BY MR. MASTERS:
2         Q.    Have you seen this document before?
3         A.    I have.
4         Q.    Do you recognize it as the notice of
5    deposition for today's deposition?
6         A.    Yes.
7              MR. MASTERS:  One more housekeeping
8    document before we get underway.
9              I'm showing you what has been marked
10   as Exhibit 2.
11             (Deposition Exhibit 2 was marked for
12   identification.)
13             BY MR. MASTERS:
14        Q.    Can you identify this document?
15        A.    This was my authorization to
16   participate in the capacity in which I would be
17   authorized to participate today.
18        Q.    And have you seen this document
19   before?
20        A.    I have.
21        Q.    Okay.  I'd like to direct your
22   attention to Page 8, the section titled Topic
23   21, referring to your communications relating
24   to -- relating to and efforts to comply with
25   the reports and recommendations contained in
```

1    the following GAO reports.

2              Do you see that?

3         A.   Yes.

4         Q.   When it says "your," you understand

5    that that is referring to the Drug Enforcement

6    Administration, correct?

7         A.   Correct.

8         Q.   And that today testifying here, you

9    are testifying on behalf of the Drug

10   Enforcement Administration.

11        A.   Correct.

12        Q.   So when we -- so when I refer to

13   "you" in this deposition, unless I refer

14   specifically to you, I'm referring to the Drug

15   Enforcement Administration, correct?

16        A.   Yes.

17        Q.   Do you understand that the subject

18   matter on which you are authorized to be -- to

19   -- to testify today is -- is included here in

20   this section under Topic 21?

21        A.   Yes.

22        Q.   What is your current position at the

23   Drug Enforcement Administration?

24        A.   I am the senior policy advisor to

25   the assistant administrator for the diversion

1    control division.

2         Q.    And what is your responsibility as

3    the senior policy advisor?

4         A.    I report directly to the assistant

5    administrator and advise him on policy matters

6    that are relevant to the diversion control

7    program, the mission of the program.

8         Q.    Okay.  Prior to your current role as

9    senior policy advisor, what was your role at

10   Drug Enforcement Administration?

11        A.    I've had several roles over the last

12   20 years.  And I can get into as much or as

13   little detail as -- as you like about those.

14        Q.    Let's -- let's take the last let's

15   say five years.

16        A.    Okay.  I've been back in the

17   diversion control program since June of 2017

18   serving in the capacity I'm in now.

19               Prior to that, for two and a half

20   years prior to, I was the section chief for

21   DEA's congressional affairs section and

22   therefore had the liaison responsibilities for

23   the agency with congress.

24        Q.    When you say "liaison

25   responsibilities," can you give me a little

1    more detail about what that means?

2        A.    Sure.  So in -- in congress's role

3    of doing oversight over the federal government,

4    including DEA, my roles would have been

5    prepping witnesses for congressional testimony,

6    providing formal or informal views on

7    legislative proposals that affected DEA, and

8    also working with the interagency on issues of

9    interest in which other agencies might be

10   testifying or working with congress on matters

11   that impact DEA.

12       Q.    The Government Accountability Office

13   is a legislative agency, correct?

14       A.    Yes.

15       Q.    So in your role as liaison between

16   DEA and congress, did your responsibilities

17   intersect with the Government Accountability

18   Office?

19       A.    Yes.

20       Q.    Were -- would you have been aware of

21   investigations and reports of the Government

22   Accountability Office into the Drug Enforcement

23   Administration?

24       A.    Yes.

25       Q.    And what was the nature of your role

1    as -- as a liaison in that intersection between

2    the Drug Enforcement Administration and the

3    GAO?

4        A.    When these GAO investigations were

5    requested, they were requested by members of

6    congress.  And I would not have had a role in

7    the day-to-day interactions with GAO.

8            But following the release of those

9    reports, they were the subject of congressional

10   hearings that -- that ensued shortly

11   thereafter.  And so that would have been my

12   role, is -- is prepping witnesses for that

13   testimony.

14       Q.    Can you explain for the jury what

15   the Government Accountability Office is?

16           MS. WAITES:  Objection.  Scope.

17           And I'll just say, when I say

18   "scope," just to be shorthand, I'm saying it's

19   outside the scope of the 30(b)(6) designation.

20           MR. MASTERS:  Sure.

21           THE WITNESS:  The GAO largely is

22   charged with assisting congress in their

23   oversight role.  So in my times -- in many

24   instances, from -- from my experience, GAO

25   reports or requests come from members of

1      congress as they try to understand better

2      things that they hear from the general public.

3                  BY MR. MASTERS:

4          Q.    In your experience, how does the GAO

5      go about its -- it's role in -- in oversight?

6          A.    I believe they're very methodical.

7      I think they do really good work.

8          Q.    And -- and what kind of work do they

9      -- so you mentioned earlier that members of

10     congress may request the GAO to investigate

11     something.

12                 When you say "they're very

13     methodical," what do you -- what do you mean by

14     that?

15         A.    Just the way they go about doing

16     their business.  The work that they do, they

17     generally come in, have a kick-off meeting with

18     the -- the subject of their investigation, the

19     agency.  They ask a number of very deliberative

20     questions.  They seek responses in -- in

21     certain time frames.  And there's oftentimes a

22     very persistent exchange of information

23     throughout their audit period.

24                 They're very good at controlling

25     deadlines and helping congress get their

1    responses in -- in a timely fashion.

2         Q.    When the GAO investigates let's say

3    the Drug Enforcement Administration and issues

4    recommendations, does the -- does -- does the

5    DEA take those recommendations seriously?

6         A.    Absolutely.  Yes.

7         Q.    Does -- does the DEA have an

8    obligation to respond to particular

9    recommendations that the GAO makes?

10        A.    Yes.

11        Q.    Are there internal processes for

12   addressing GAO recommendations?

13        A.    Absolutely.  Yes.

14        Q.    As a matter of course -- well, let

15   me ask it this way:  What is typical -- what

16   are the kinds of internal processes for

17   responding to GAO recommendations?

18        A.    Well, DEA has a whole GAO audit

19   liaison team whose sole function is to ensure

20   that GAO is getting, one, responses to their

21   questions during the audit time frame when a --

22   when a report is under consideration; but then

23   also, on follow-up, once recommendations are

24   made, our audit liaison team is consistently

25   working with the program office to what we call

1    close out a recommendation.

2        Q.    And what does it mean to close out a

3    recommendation?

4        A.    It means to address to the

5    satisfaction of GAO the recommendations that

6    they've made.

7        Q.    Now, typically when the -- when the

8    GAO investigates an issue, they will give the

9    agency an opportunity to respond before

10   releasing their report; is that correct?

11       A.    That's correct.

12             MS. WAITES:  Objection.  Vague.

13             Just make sure I...

14             BY MR. MASTERS:

15       Q.    In your experience, that is -- that

16   is true of the GAO's handling of investigations

17   relating to the DEA, correct?

18       A.    Yes.

19       Q.    And then the GAO will -- strike

20   that.

21             The -- the DEA will then have an

22   opportunity to respond, right?

23       A.    Yes.

24       Q.    And the GAO, if there is a response,

25   will respond to the response in their report,

                                                        Page 23

1    right?

2         A.    GAO takes DEA's response in

3    consideration and may or may not make changes

4    to their final report.  But they generally do

5    comment in their report as to their agreement

6    or disagreement with -- with comments made by

7    the -- by the DEA.

8              (Deposition Exhibit 3 was marked for

9    identification.)

10             BY MR. MASTERS:

11        Q.    I'm handing you what has been --

12   hold on a second -- what has been marked as

13   Exhibit 3.

14             Can you identify this document?

15        A.    This is the GAO's report known in

16   the -- known by GAO as GAO 15471.

17        Q.    And you -- you have seen this report

18   before, correct?

19        A.    Correct.

20        Q.    When did you first become aware of

21   this report?

22        A.    Back in 2015.

23        Q.    That was when the report was issued?

24        A.    Yes.

25        Q.    Were you aware of the -- of the

1      investigation prior to the issuance of this

2      report?

3           A.    In my capacity in our congressional

4      affairs office, I was aware that the -- the

5      study was being undertaken.  But I was not

6      aware of when it was going to culminate, when

7      it was going to be issued.

8                 MR. MASTERS:  Okay.  Great.

9                 Can we go off the record real quick

10     to address this ELMO issue.

11                THE VIDEOGRAPHER:  We are going off

12     the record.

13                The time is 9:21.

14                (A short recess was taken.)

15                THE VIDEOGRAPHER:  We are going back

16     on the record.

17                The time is 9:24.

18                You may proceed, Counsel.

19                BY MR. MASTERS:

20          Q.    Turning to Page 1 of the report --

21     or I should say the -- the very first page, the

22     summary, the first full paragraph, the second

23     sentence from the bottom states:  "Federal

24     internal control standards call for adequate

25     communication with stakeholders."

1             Do you see that?
2        A.    Second from the bottom.  I -- of the
3    first full paragraph?
4        Q.    Yes.
5        A.    "Federal" -- yes.
6        Q.    Does the DEA agree with that
7    statement?
8        A.    Yes.
9        Q.    In this study the GAO was asked by
10   members of congress to review the adequacy of
11   DEA's communications and guidance with
12   distributors and pharmacies about their
13   regulatory responsibilities, correct?
14       A.    And practitioners.
15       Q.    Sorry.  And practitioners.
16             So they were asked to look at the
17   communications and guidance between DEA and
18   distributors, pharmacies and practitioners?
19       A.    Correct.
20       Q.    And to conduct its investigation
21   into the communication and guidance with these
22   registrants, what did the GAO do?
23       A.    They did a --
24             MS. WAITES:  Objection.  Vague.
25             THE WITNESS:  They did a survey.

1      They conducted a survey for each of the

2      registrant populations.

3                  BY MR. MASTERS:

4          Q.    Was that a nationally representative

5      survey?

6          A.    They called it generalizable.  They

7      interviewed -- they sent the survey out to 200

8      distributors, 300 pharmacies and 400

9      practitioners.

10                But for a point of consideration,

11     300 pharmacies, we have about 71,000 pharmacies

12     presently.  With our practitioner community, we

13     have 1.7 million prescribers at present.  So

14     they -- they did 400.  And they -- they used a

15     statistical model to -- to make it

16     generalizable to the public.

17         Q.    And what about with distributors;

18     how many distributors are there?

19         A.    200 of -- presently -- in the report

20     they refer to 9 -- over 900, I think 945.  But

21     on the controlled substance side, we have 750.

22         Q.    Okay.  And same -- same with

23     distributors as -- as with pharmacies and --

24     and practitioners; they used a statistical

25     model to make it generalizable with respect to

1      distributors, right?

2           A.    That's what's in their report, yes.

3           Q.    They also interviewed 26 national

4      associations and other nonprofit organizations,

5      correct?

6           A.    Correct.

7           Q.    And they interviewed 16 government

8      agencies from four different states?

9           A.    That is correct.

10          Q.    And in addition to the web-based

11     surveys of all those registrants you mentioned,

12     the national associations and the government

13     agencies, the GAO also reached out to DEA for

14     its perspectives on communications and guidance

15     to registrants, correct?

16          A.    That is correct.

17          Q.    I'd like to direct your attention to

18     Page 6 of the report, the full paragraph

19     beginning with "We also obtained."

20               It -- it states:  "We also obtained

21     documents from and interviewed DEA Office of

22     Diversion Control officials who have oversight

23     responsibility for DEA registrants and are

24     engaged in addressing prescription drug abuse

25     and diversion issues to learn about how DEA

1      interacts with its registrants and other

2      nonfederal stakeholders and to obtain DEA's

3      perspectives on information from our survey

4      results and interviews with nonfederal

5      stakeholders."

6              Did I read that correctly?

7          A.    Yes.

8          Q.    Is that consistent with the DEA's

9      understanding of GAO's engagement with DEA in

10     the course of this investigation?

11         A.    Yes.

12         Q.    That report indicates that the GAO

13     interviewed DEA Office of Diversion Control

14     officials, correct?

15         A.    Correct.

16         Q.    Who was interviewed?

17         A.    I don't know specifically the names

18     of the individuals that were interviewed, but

19     they would have been senior officials within

20     the diversion control.

21              At the time it was the Office of

22     Diversion Control.  Now they are the Diversion

23     Control Division.

24         Q.    And these senior officials would

25     have had personal knowledge and understanding

Page 29

1    of the communications and guidance that DEA had

2    given to registrants in the past, correct?

3         A.    Absolutely.  Yes.

4         Q.    It also indicates that -- that GAO

5    obtained and reviewed documents from the Drug

6    Enforcement Administration, correct?

7         A.    Yes.

8         Q.    What documents did they obtain?

9         A.    Well, I -- I believe they were

10   referred to throughout the report -- some of

11   the documents -- they talked about a Know Your

12   Customer document in 2011.  And I'm not -- I'm

13   not certain of what other types of documents

14   they would have specifically asked for and

15   reviewed.

16        Q.    One of the issues that the GAO was

17   investigating was the adequacy of DEA's

18   guidance to distributors relating to suspicious

19   order monitoring, correct?

20        A.    Yes.

21        Q.    Did the GAO issue any

22   recommendations concerning DEA's guidance to

23   wholesale distributors relating to suspicious

24   order monitoring and reporting?

25        A.    Let me go back to read the

Page 30

1    recommendation.

2              Recommendation 2 was to --

3         Q.    Can -- before you begin, can you let

4    me know which page you're reading from?

5         A.    Sure.  I'm on Page 44 of the report.

6         Q.    Okay.  Great.  I'm sorry.  Please

7    continue.

8         A.    Recommendation 2 was:  "Solicit

9    input from distributors or associations

10   representing distributors and develop

11   additional guidance for distributors regarding

12   their roles and responsibilities for suspicious

13   orders monitoring and reporting."

14        Q.    Now, in your understanding of the

15   GAO's report, that recommendation encompassed

16   both additional communications with

17   distributors and additional written guidance,

18   correct?

19              MS. WAITES:  Objection.  Misstates

20   the document.  Mischaracterizes the document.

21              THE WITNESS:  I just want to go back

22   and read specifically.

23              "Solicit input and develop

24   additional guidance for distributors."

25              It doesn't necessarily, as I

1       understand, separate between whether it be

2       verbal or whether it be in writing.

3                   BY MR. MASTERS:

4           Q.    Okay.  Did -- did the report say

5       that some of the distributors wanted more

6       guidance?

7           A.    Yes.

8           Q.    In fact, more than half of the

9       distributors who responded to the open-ended

10      questions in the survey said they needed more

11      communication, information and inter --

12      interactions with DEA, correct?

13          A.    Yes.  I believe that's on Page 26 of

14      the report, if I'm not mistaken.

15          Q.    That is correct.  You have a great

16      memory.

17                  In the middle of paragraph beginning

18      with "Furthermore," it says:  "Furthermore, in

19      response to an open-ended question about what

20      additional interactions they would find helpful

21      to have with DEA, more than half of the

22      distributors that offered comments said they

23      needed more communication or information from

24      or interactions with DEA."

25                  Did I read that correctly?

1          A.     That -- that looks correct, yes.

2          Q.     Did the GAO say that the DEA was

3     giving more written guidance to pharmacies and

4     physicians than it was to distributors?

5          A.     I think that's a fair

6     characterization.  The report discussed the

7     pharmacist manual and the practitioner's

8     manual, which were written publications on the

9     diversion web site.  And there is no such

10     manual for DEA registered distributors.

11          Q.     Let's -- let's go ahead and turn to

12     that section of the report.  It's one page over

13     on Page 25.

14          A.     Uh-huh.

15          Q.     Would you please read for the record

16     the first two sentences of the second

17     paragraph.

18          A.     "Some survey responses indicate that

19     additional guidance for distributors regarding

20     suspicious orders monitoring and reporting, as

21     well as more regular communication, would be

22     beneficial.

23               For example, while DEA has created

24     guidance manuals for pharmacists and

25     practitioners, the agency has not developed a

1    guidance manual or a comparable document for

2    distributors."

3         Q.    Did the GAO conclude that additional

4    guidance for distributors regarding suspicious

5    order monitoring and reporting would be

6    beneficial?

7         A.    Their recommendation is as we had

8    previously discussed.

9         Q.    And -- and the GAO found

10   specifically that that additional guidance

11   would be beneficial, correct?

12        A.    Well, if they are making a

13   recommendation, then they are recommending that

14   the DEA take action on that front.

15        Q.    Okay.  Great.

16             And -- and just going back to Page

17   25, the first sentence indicates that -- well,

18   I'll -- I'll strike that.

19             Was the GAO concerned that, in the

20   absence of clear guidance, distributors may be

21   setting conservative thresholds on the amount

22   of controlled substances that they will sell to

23   pharmacies.

24             MS. WAITES:  Objection.  Vague.

25   Lacks foundation.

```
 1              THE WITNESS:  I -- I don't want to
 2      get into the head of GAO.  I actually don't
 3      know the answer to your question.
 4              BY MR. MASTERS:
 5         Q.   Let's turn to Page 27 of the report,
 6      the second paragraph about two-thirds of the
 7      way down, beginning with "Additionally."
 8              Do you see that?
 9         A.   I do.
10         Q.   Can you read that sentence?
11         A.   "Additionally, in the absence of
12      clear guidance from DEA, our survey data show
13      that many distributors are setting thresholds
14      on the amount of certain controlled substances
15      that can be ordered by their customers, i.e.,
16      pharmacies and practitioners, which can
17      negatively impact pharmacies and ultimately
18      patients' access."
19         Q.   Does the DEA agree with that
20      statement?
21         A.   I would say that this sentence is
22      talking about what distributors told GAO.  And
23      I think that G -- we would agree that arbitrary
24      thresholds set by a pharmacy -- or excuse me --
25      by a distributor could create supply access
```

1    issues.

2              But on the flip side, I would say

3    that those types of arbitrary thresholds could

4    actually create oversupplies as well.

5         Q.    And here the GAO, in -- in response

6    to the surveys, is observing that the

7    thresholds are restricting supply, correct?

8         A.    They're quote -- I -- I take this

9    statement to be quoting from one of the survey

10   respondents.  And it's unclear whether -- oh,

11   that was a chain pharmacy corporate office

12   survey.

13             I was going say I was unclear as to

14   whether it was a -- a distributor or a pharmacy

15   that was actually indicating that.

16        Q.    So the -- so the -- the pharmacy

17   surveys are showing that -- are showing to --

18   to GAO that these -- that the absence of clear

19   guidance is resulting in distributors setting

20   thresholds that are -- that's restricting the

21   supply of these drugs and ultimately negatively

22   impacting pharmacies and patient access,

23   correct?

24             MR. SMITH:  Objection.

25   Mischaracterizes the document.

1          THE WITNESS:  And I was going to say

2      I -- I would push back on that -- the way that

3      you offered that.  Because I think you're

4      inferring that the lack of guidance has

5      resulted in these distributors setting

6      arbitrary thresholds.

7          That is a business decision that is

8      being made by distributors.  And so I can't

9      necessarily say that this document connects one

10     with the other.

11         BY MR. MASTERS:

12     Q.    So in the GAO's view though, "In the

13     absence of clear guidance from DEA, our survey

14     data show that many distributors are setting

15     thresholds on the amount of certain controlled

16     substances that can be ordered by their

17     customers," correct?

18     A.    That is a correct repeat of that

19     sentence.  But it does -- it's coming from the

20     survey results.  So it's coming from, in this

21     case, a pharmacy or a corporate pharmacy.

22     Q.    And the GAO is connecting that to

23     the absence of clear data -- or clear guidance,

24     right?

25     A.    I -- I -- I don't -- I don't

1    necessarily agree with that assertion.

2         Q.    Okay.  GAO was provided -- or GAO

3    provided DEA with a draft of this particular

4    report prior to its publication, correct?

5         A.    Correct.

6         Q.    And Mr. Joseph Rannazzisi responded

7    in a letter on behalf of DEA, correct?

8         A.    That is --

9         Q.    And who --

10        A.    -- correct.

11        Q.    -- who is Joseph Rannazzisi?

12        A.    So Joseph Rannazzisi, at the time

13   this report came out, was the deputy assistant

14   administrator for the diversion control -- or

15   the Office of Diversion Control.  So he would

16   have been the person who ran the diversion --

17   the diversion control program.

18        Q.    And -- and DEA's position was that

19   additional guidance was not necessary?

20        A.    That is correct.  DEA explained the

21   multitude in -- of ways in which its already

22   communicated in this case with distributors.

23        Q.    And DEA's position was that the --

24   the text of the suspicious order regulation

25   itself was sufficiently straightforward,

1     correct?

2          A.    It had been in place for 40 -- at

3     the time of this publication, probably 45

4     years; and that it was well understood by our

5     DEA registrant community; and that we did not

6     see a -- a need to expand upon it.

7          Q.    And -- and be -- in part because the

8     DEA's position was that it was sufficiently

9     straightforward.

10         A.    I -- I think that's correct, yes.

11         Q.    And the -- but the GAO found in its

12    survey that many registrants did not feel that

13    it was well understood and, in fact, wanted

14    more guidance, correct?

15         A.    Survey respondents did show that

16    they would like more guidance.

17         Q.    More than half of the distributors

18    who -- who commented on that said -- said that,

19    right?

20         A.    Yeah.  And I -- I want to make a

21    point of clarification on that.

22              If -- if we -- if we go to Table 21,

23    which is something that I think is -- is

24    necessary to point out -- remember we have 750

25    controlled substance distributors at present.

1    The survey asked a number of questions.  And
2    then it's asked some open-ended questions.  And
3    you're obviously referring to the open-ended
4    questions.
5             But like we said at the outset, they
6    sent 200 surveys out to distributors.  They
7    received 77 responses on a question to
8    distributors about guidance that -- that DEA
9    provided.
10             And to your point, there was a
11    portion of those 77 who asked for more
12    guidance.
13        Q.    Fair enough.
14             The DEA also told the GAO that,
15    short of providing arbitrary thresholds to
16    distributors, it cannot provide more specific
17    suspicious orders guidance because the
18    variables that indicate a suspicious order
19    differ among distributors and their customers,
20    correct?
21        A.    Can -- can you point that out on
22    the --
23        Q.    Sure.  Page -- give me one second.
24    It's -- it's in the -- the letter that Joseph
25    Rannazzisi sent.  On Page 81 of the report,

Page 40

1     Page 5 of the letter.

2          A.     Okay.

3          Q.     Second -- or first full paragraph,

4     last sentence.

5               Would you read that for the record?

6          A.     Sure.

7               "Short of providing arbitrary

8     thresholds to distributors, DEA cannot provide

9     more specific suspicious orders guidance as the

10    variables that indicate an order is suspicious

11    are very fact-intensive and differ from

12    distributor to distributor and from customer to

13    customer."

14         Q.     Can you explain what that means?

15         A.     Yes, I -- I can.  So DEA -- we have

16    long understood that distributors would like

17    nothing more than for DEA to tell them how much

18    an average pharmacy should be able to purchase.

19    And then they could use DEA's assessment as

20    a -- to set a threshold.  And that would give

21    them the opportunity to, you know, basically

22    say that that's a DEA-established threshold.

23               What we've said is, with 71,000

24    DEA-registered pharmacies and 18,000 hospitals

25    and 1,700 narcotic treatment programs, all of

1     the types of customers that distributors sell

2     to, we can't do that.

3              Because, quite frankly, the

4     circumstances on what is appropriate for one

5     pharmacy may be completely different than the

6     requirements of another pharmacy.  It's based

7     on the population.  It's based on the types of

8     patients that are bringing prescriptions in to

9     pharmacies or -- or being dispensed or

10    administered at hospitals.  It's the based on a

11    number of different factors.

12             And pharmacies that are around the

13    corner from one another may have vastly

14    different profiles that are acceptable.

15             So DEA feels very strongly that that

16    is something that only a distributor can know.

17    Because a distributor is going to have much

18    more of a working knowledge of who their

19    customers are, more so than DEA.

20             And I would argue that, if you end

21    up setting an arbitrary limit on how much can

22    be distributed by -- if DEA were to do this,

23    you could inadvertently create a shortage of a

24    situation if that amount is not sufficient.  Or

25    on the flip side, if the -- if that number is

Page 42

1    too high, you could actually create overages;

2    and therefore, DEA is of the opinion that

3    increases in availability could have the

4    unintended consequence of increasing diversion

5    and abuse.

6         Q.    And so DEA was not willing to

7    provide additional guidance -- more specific

8    suspicious order guidance than what is in the

9    regulation itself?

10        A.    At the time that this letter went

11   out, that is accurate.

12        Q.    And the regulation itself defines a

13   suspicious order as an order of unusual size,

14   deviating substantially from the normal

15   pattern, or an order of unusual frequency,

16   correct?

17        A.    That's sounds correct.

18        Q.    And -- and the regulation does not

19   say what an unusual size means, correct?

20             MS. WAITES:  Objection.  Scope.

21             THE WITNESS:  It does not go on to

22   define any of those terms.

23             BY MR. MASTERS:

24        Q.    And at the time that this letter was

25   written, the DEA had not provided additional

1    specific written guidance as to what unusual

2    size, frequency or pattern means, correct?

3              MS. WAITES:  Objection.  Scope.

4              THE WITNESS:  That is correct.

5    Although I want the qualify that by saying

6    nothing as it pertains to what I think they

7    distributors wanted, which was something in

8    writing.

9              DEA was certainly increasing its

10   liaison opportunities with the distributor

11   community in terms of distributor conferences

12   that we held in '13, '15 and '16; kind of

13   one-on-one engagements through what's known as

14   our distributor initiative, which we initiated

15   back in 2011 and continues to this day.

16             And so I think, with a very limited

17   registrant population -- they represent, what,

18   0.06 percent of our DEA registrant population,

19   if not slightly less -- that the one-on-one

20   interaction we believe in -- in a -- in a

21   person-to-person, face-to-face environment

22   is -- is better.

23       Q.    But no written -- but you mentioned

24   no additional written guidance, correct?

25       A.    At the time of this letter, no.

1       Q.    Okay.  In its report GAO responded

2    to the DEA's letter, right?

3       A.    Can you repeat the question.

4       Q.    In -- in its report, the GAO

5    addressed what the DEA said in its letter,

6    correct?

7       A.    Yes.

8       Q.    And notwithstanding the DEA's

9    comments on the draft report, the GAO still

10   found that the DEA could provide additional

11   guidance to distributors, right?

12      A.    Can you point to what -- what you're

13   referring to?

14      Q.    Turning to Page 44, it says:

15   "Agency comments and our evaluation."

16      A.    Yeah.

17      Q.    Do you see that?

18      A.    Yes, I do.

19      Q.    And so this is the section in which

20   the GAO is responding to the Department of

21   Justice's response, correct?

22      A.    Yes.

23      Q.    And on page 45, it acknowledges

24   the -- the DEA's concerns about our second

25   recommendation to solicit input from

Page 45

1      distributors or associations representing

2      distributors and to develop additional guidance

3      for distributors, right?

4            A.    Yes.

5            Q.    Then on page -- well, let's -- let's

6      walk through some of these.

7                  It goes on to say that -- to repeat

8      what we just talked about, that short of

9      providing arbitrary thresholds to distributors,

10     it cannot provide more specific suspicious

11     orders guidance, right?

12           A.    Yes.

13           Q.    The -- the GAO is summarizing the

14     DEA's letter.

15           A.    The DEA's comment.  That's correct.

16           Q.    And it says:  "Instead, DEA

17     highlighted regulations that require

18     distributors to design and operate systems to

19     disclose suspicious orders," right?

20           A.    Correct.  Yes.

21           Q.    And it says:  "However, according to

22     DEA's customer service plan for registrants,

23     DEA is responsible for developing guidance for

24     registrants regarding the CSA and its

25     regulations.  And the agency was able to create

Page 46

1      such guidance for pharmacy and practitioner

2      registrants."

3                Did I read that correctly?

4         A.     That is correct.

5         Q.     Turning to Page 46, that same

6      paragraph toward the end, the GAO -- well,

7      would you please read the sentence beginning

8      with "Therefore."

9         A.     "Therefore, we continue to believe

10     that DEA could provide additional written

11     guidance for distributors that could be more

12     widely accessible to all distributor

13     registrants."

14        Q.     So here the GAO is not only

15     recommending additional guidance but additional

16     written guidance, correct?

17        A.     Correct.

18        Q.     And the GAO had -- had found that

19     the DEA has created guidance manuals for

20     pharmacists and practitioners like doctors but

21     not distributors, right?

22        A.     Yes.

23        Q.     Is it true that the DEA had created

24     manuals for pharmacists and practitioners about

25     their regulatory obligations?

1          A.     Yes.

2                 (Deposition Exhibit 4 was marked for

3      identification.)

4                 BY MR. MASTERS:

5          Q.     I'm showing you what has been marked

6      as Exhibit 4.

7                 Why don't you keep that report close

8      and hand.  Because we'll --

9          A.     Come back to it?

10         Q.     -- be coming back to it.  Thanks.

11                Can you identify this document?

12         A.     This is DEA's pharmacist manual.

13         Q.     So this is one of the -- one of the

14     two manuals that we just spoke about that DEA

15     has provided to -- to registrants but not to

16     distributors, correct?

17         A.     Yeah.  We would not provide this to

18     distributors.  But yes, we -- this is a

19     document that is provided for the benefit of

20     our 71,000 retail pharmacies nationwide.

21         Q.     And if we turn to -- just after

22     the -- the table of contents, at -- at -- let's

23     see.  Where is this?  Actually, just before the

24     table of contents.  This is the very second

25     page of the document -- notes that:  "This

1   manual has been prepared by the Drug

2   Enforcement Administration Office of Diversion

3   Control as a guide to assist pharmacists in

4   their understanding of the federal Controlled

5   Substances Act and its implementing regulations

6   as they pertain to the pharmacy profession."

7          Did I read that correctly?

8       A.    That is correct.

9       Q.    And this manual is a total of --

10  let's see -- 79 pages, correct?

11      A.    Correct.

12      Q.    And it provides additional written

13  -- additional written guidance to pharmacists

14  about how they can comply with the CSA and its

15  regulations in -- in the course of their

16  profession, correct?

17          MS. WAITES:  Objection.  Scope.

18          THE WITNESS:  It is a summary

19  document of the rules and regulations

20  pertaining to DEA registrants.

21          BY MR. MASTERS:

22      Q.    And it explains those -- those --

23  those regulations and -- and gives them

24  guidance on how to follow them in their

25  professional practice, correct?

1              MS. WAITES:  Objection.  Scope.

2              BY MR. MASTERS:

3      Q.    That's what we just read.

4      A.    Yeah.  I -- I'm -- I'm -- that's

5  fine.  Yes.  I agree.

6      Q.    Okay.  And is it also true that, at

7  the time of this report, DEA had not developed

8  a guidance manual or comparable document to the

9  one we just looked at for distributor

10  registrants?

11      A.    Yes.

12      Q.    And GAO here recommended that you

13  create one.

14              MS. WAITES:  Objection.

15  Mischaracterizes the document.

16              THE WITNESS:  GAO recommended

17  additional written guidance or additional

18  guidance.  And that is something that is

19  currently required in order to close out this

20  remaining open recommendation.

21              BY MR. MASTERS:

22      Q.    And has DEA provided that to

23  distributors yet?

24      A.    It's deliberative.  We are

25  actually -- as you may know, in fall of 2017,

1    DEA -- the Department of Justice added to its

2    unified agenda suspicious order reporting as a

3    regulatory priority.  So there will be written

4    guidance in the form of a notice of proposed

5    rule making published in the Federal Register.

6    And that's an effort that was added to the

7    unified agenda in the fall of '17.

8         Q.    And has -- has -- as of today, what

9    is the status of this recommendation from the

10   GAO?

11            MS. WAITES:  Objection.

12            To the extent it calls for

13   privileged information, you cannot respond.

14   But if you can respond without disclosing

15   privileged information, that's fine.

16            THE WITNESS:  I will be very

17   careful.  Because obviously, as a deliberative

18   document, we can't talk about the details of

19   what may or may not be in it.  But it does

20   remain under review within the executive

21   branch.

22            BY MR. MASTERS:

23        Q.    So as of today, DEA has not provided

24   to -- to -- to distributors the additional

25   written guidance called for by the GAO in this

                                                            Page 51

1      report?

2           A.    Beyond the stuff that we've already

3      discussed pertaining to our continued efforts

4      to work with registrants directly, put --

5      barring that aside, yes.

6                 The reg -- the regulation, once

7      published, we understand from GAO, will be the

8      basis by which this recommendation can be

9      closed.

10          Q.    And just to be clear, as of today,

11     the DEA has not provided the additional written

12     guidance that GAO recommended to distributors

13     as of today, correct?

14                MS. WAITES:  Objection.  Asked and

15     answered.

16                THE WITNESS:  It remains an open

17     recommendation.

18                MR. MASTERS:  Okay.  Could we take a

19     quick break?

20                MS. WAITES:  Yes.

21                THE VIDEOGRAPHER:  We are going off

22     the record.

23                This is the end of Media Unit No. 1.

24                The time is 9:59.

25                (A short recess was taken.)

Page 52

1              THE VIDEOGRAPHER:  We are back on

2     the record.

3              This is the beginning of Media Unit

4     No. 2.

5              The time is 10:14.

6              You may proceed, Counsel.

7              (Deposition Exhibit 5 was marked for

8     identification.)

9              BY MR. MASTERS:

10     Q.    I'm showing you what has been marked

11     Exhibit 5.

12              Can you identify this document?

13     A.    Yes.  This is GAO 16-737T.  This was

14     congressional testimony provided by Diana

15     Maurer to the senate Homeland Security

16     Committee, I believe -- I'm sorry -- Committee

17     of the Judiciary.

18     Q.    And -- and -- sorry.

19              And who is Diana Maurer?

20     A.    Her title here is director for

21     homeland security and justice at the GAO.

22     Q.    And she was providing testimony to

23     congress on behalf of the GAO regarding prior

24     GAO reports and recommendations for the Drug

25     Enforcement Administration, correct?

1          A.    Correct.

2          Q.    Were you aware of this testimony

3     when it was given?

4          A.    Yes.  Because DEA had a witness as

5     well.

6          Q.    Okay.  Did you review this report in

7     preparation for today's testimony?

8          A.    I did.

9          Q.    Turning to Page 19.  Ms. Maurer, on

10    behalf of the GAO, is commenting on the DEA's

11    efforts to comply with the recommendation in

12    the report we were discussing a moment ago,

13    correct?

14         A.    Could you point to the paragraph?

15         Q.    The paragraph -- the second full

16    paragraph.

17         A.    The second full paragraph.  I

18    have --

19         Q.    So beginning the sentence "In

20    commenting" --

21         A.    "In commenting."

22         Q.    -- "on our report."

23              So I'll ask my question again.

24              Ms. -- Ms. Maurer, on behalf of the

25    GAO, is commenting here on the DEA's efforts to

1    comply with the recommendation in the report we

2    were discussing a moment ago, correct?

3         A.    Correct.

4         Q.    And it notes that:  "In April 2016,

5    DEA provided information about ongoing efforts

6    to educate distributors about their roles and

7    responsibilities for monitoring and reporting

8    suspicious orders, such as their distributor

9    conferences, and noted that it plans to host a

10   yearly training for distributors."

11             Did I read that correctly?

12        A.    That is correct.

13        Q.    Would you please read the next two

14   sentences?

15        A.    "However, DEA" noted -- "However" --

16   excuse me.

17             "However, DEA did not mention any

18   plans to develop and distribute additional

19   guidance for distributors.  We continue to

20   believe that a guidance document similar to the

21   one offered for pharmacies and practitioners

22   could help distributors further understand and

23   meet their role and responsibilities under the

24   CSA."

25        Q.    Is it true that at that time the DEA

1    had not mentioned any plans to develop and

2    distribute additional guidance for

3    distributors?

4         A.    My recollection is that the

5    correspondence that she's referring to in April

6    2016, we were recommending closing the

7    recommendation based on some of the conferences

8    that we were hosting; and that that -- we

9    thought that that was sufficient.

10             And as she had stated in her

11   testimony, and as it became understood shortly

12   thereafter, in order to close the

13   recommendation, we understood that we would

14   need to be doing something in writing.

15        Q.    Okay.  When you say as it was made

16   clear shortly thereafter, that in order to

17   close the recommendation, you would -- the DEA

18   would need to provide something in writing,

19   what are you referring to?

20        A.    So as we had discussed, our GAO

21   audit liaison team had regular correspondence

22   with GAO with the goal of closing out

23   recommendations.  And that correspondence is in

24   writing.  And it's relatively routine.

25             So I am recounting my review of

Page 56

1      those internal communications that went back

2      and forth to GAO where we had actually, on more

3      than one occasion, sought to close this

4      recommendation based on the -- the conferences

5      that we just referenced.

6                    And it -- that's why I say it became

7      clear that they wanted something in writing.

8                    (Deposition Exhibit 6 was marked for

9      identification.)

10                   BY MR. MASTERS:

11         Q.    I'm showing you what has been marked

12      as Exhibit 6.

13                   Can you identify this document?

14         A.    Just as I had previously stated,

15      this is an example of the types of

16      correspondence that DEA -- in this case this

17      came from our chief compliance officer, who had

18      the O -- the GAO audit liaison team underneath

19      her.  This would have been that -- that routine

20      correspondence as the agency works the closeout

21      recommendations.

22         Q.    And specifically this is called a --

23      a -- a Drug Enforcement Administration status

24      report, correct?

25         A.    Yes.  They are referred to as status

Page 57

1       reports.
2           Q.     And in this status report, DEA is
3       providing an update on actions taken to address
4       the GAO's report and recommendations, correct?
5           A.     Correct.  At this time in June of
6       2017, none of the recommendations had been
7       closed.
8           Q.     And as you indicated a moment ago,
9       Recommendation No. 2, which is what related to
10      guidance to distributors, had not been closed
11      because the GAO felt that the DEA needed to
12      provide written guidance in order to close the
13      recommendation, correct?
14              MS. WAITES:  Objection.  Misstates
15      prior testimony.
16              THE WITNESS:  So this is the -- this
17      is -- this response on Page 2 represents the
18      agency's discussion about the regulatory
19      drafting efforts that it was undertaking.
20              BY MR. MASTERS:
21          Q.    My -- my question is a little
22      different.
23              You -- you mentioned a moment ago
24      that the -- that, as of June 2017, none of the
25      recommendation had been closed.

1              And I -- I'm -- I'm ask -- asking if

2      that -- well -- that that is because, in the

3      GAO's view, the -- the DEA needed to provide

4      written guidance, and the DEA had not done that

5      as of this point, correct?

6         A.    That's -- my understanding is that

7      the GAO did not -- declined to close out

8      Recommendation 2 based on previous status

9      reports.

10        Q.    Got it.

11             So let's turn to the DEA's response

12     to Recommendation No. 2.

13             Here the DEA states that it is:

14     "reviewing and revising current regulations

15     regarding suspicious orders, which will include

16     guidance for distributors regarding their roles

17     and responsibilities for monitoring and

18     reporting."

19             Did I read that correctly?

20        A.    That is correct.

21        Q.    So in response to the GAO's

22     recommendation to develop additional written

23     guidance, DEA was not proposing to develop a

24     guidance manual or comparable document to the

25     one that exists for pharmacists and

1    practitioners, correct?

2        A.    I think that gets a little bit at

3    some of the predecisional stuff that I have to

4    raise some concerns.  I -- I don't really feel

5    I can answer that question.

6        Q.    In -- in the DEA status report, it

7    mentions nothing -- in this document, the DEA

8    mentions nothing about plans to develop a

9    guidance manual or comparable document to the

10   pharmacist and practitioner manual, correct?

11       A.    A plain reading of that first

12   sentence talks about regulations.

13       Q.    Instead, in order to satisfy the

14   GAO's recommendation to develop additional

15   written guidance, DEA planned to revise the

16   existing suspicious order regulations, correct?

17             MS. WAITES:  Objection to the extent

18   it calls for privileged information.

19             THE WITNESS:  Clearly the -- the --

20   the clear language says that "we are seeking to

21   revise our regulations."

22             BY MR. MASTERS:

23       Q.    And that these new regulation would

24   include additional guidance for distributors

25   regarding their roles and responsibilities for

1    monitoring and reporting, correct?

2        A.    A Federal Register Notice that seeks

3    to revise regulations on the books for 45 years

4    would obviously have to include extensive

5    information, which is often considered as the

6    public considers how they want to comment.  In

7    -- in this case, the -- the public would be our

8    DEA registered distributor.

9        Q.    And the distributors would have an

10   opportunity to comment on this additional

11   guidance, correct?

12       A.    Absolutely.  All formal rule making

13   takes place under notice and comment rule

14   making procedures.  So the public will

15   absolutely have an opportunity to comment.

16       Q.    And that -- and given that -- and

17   this is the first time that these regulations

18   would be revised, correct?

19       A.    Based on --

20            MS. WAITES:  Objection.  Scope.

21            THE WITNESS:  I was going to say,

22   based on my understanding -- and I didn't do a

23   fulsome analysis of the regulatory history on

24   this.  But my understanding is -- is that these

25   regs came into play somewhere between '70 and

1      '73 and have not really been revised in our

2      regulations since that time.

3              BY MR. MASTERS:

4          Q.   And the next sentence indicates that

5      a preliminary draft of proposed regulations has

6      been written and is pending editing, review and

7      approval by management within the diversion

8      control division, correct?

9          A.   That is what it says, yes.

10             (Deposition Exhibit 7 was marked for

11     identification.)

12             BY MR. MASTERS:

13         Q.   Showing you what has been marked as

14     Exhibit 7.

15             Can you identify this document?

16         A.   This appears to be another status

17     update from our audit liaison folks to GAO

18     dated February 20th, 2018.

19         Q.   So this is a -- another status

20     report --

21         A.   Correct.

22         Q.   -- similar to the one we just

23     reviewed, correct?

24         A.   Yes.

25         Q.   If -- if we turn to the second page

1    of the letter, which is -- which contains DEA's
2    response regarding the second recommendation,
3    it now notes that the DEA reviewed and revised
4    the current regulation regarding suspicious
5    orders, correct?
6        A.    Correct.
7        Q.    So before it was the DEA is
8    reviewing and revising, and now it's in the
9    past tense, right?
10       A.    Correct.
11       Q.    And the -- I guess I should have
12   asked when was this letter written?
13       A.    It was written February 20th of
14   2018.
15       Q.    And as of February 20th, 2018, when
16   was the revised regulation on track to be
17   published in the Federal Register?
18       A.    The revision of the current
19   regulation regarding suspicious orders is on
20   track to be published in the Federal Register
21   by the end of the third quarter for fiscal year
22   2018.  So that would be June 30th, 2018.
23       Q.    And -- and what does -- what does it
24   mean to be -- for a regulation to be published
25   in the Federal Register?

Page 63

1          A.     That means -- to us it mean a notice

2     of proposed rule making would be ready to be

3     published for public comment on or before that

4     time frame.

5          Q.     That still has -- as of today,

6     sitting here today, the revised regulation that

7     the DEA indicated was on track to be published

8     by the end of the third quarter fiscal year

9     2018, June 30th, still has not been published

10     for -- in the Federal Register, correct?

11          A.     Yes.  If -- if we go back to

12     Exhibit 6, I like DEA's response.  Because the

13     last two or three sentences to Recommendation 2

14     talks about some executive orders that present

15     a, quote, potential obstacle to publication.

16               "These new executive branch

17     directives may restrict the promulgation of new

18     regulations or may delay the approval process

19     for any new regulation.  These directives

20     include January 20th, 2017, White House

21     memorandum and February 2nd, 2017, Office of

22     Management and Budget memorandum."

23          Q.     Okay.  So -- so those were potential

24     obstacles.

25          A.     Correct.

1      Q.    And in -- in that -- in that update,

2    you wrote:  "Absent these potential obstacles,

3    DEA anticipates the additional review, notice,

4    comment and final publication in the Federal

5    Register will be completed by the end of the

6    third quarter fiscal year 2018."

7      A.    I think what we were trying to say

8    is there's a qualifier.

9      Q.    Sure.

10     A.    If -- absent these kind of

11   interagency or White House directives, we could

12   do it by then.  However, as -- as -- where

13   you're going with this question, I just want to

14   say that that is a -- a reasonable -- excuse

15   me -- that is a cause for why there's been

16   delays?

17     Q.    In -- in your next letter you don't

18   mention any of those obstacles.

19     A.    Correct.

20     Q.    You instead say that it's on track

21   to be published, right?

22     A.    Correct.

23     Q.    And in August of 2018, the DEA

24   provided GAO with an additional update

25   indicating that the regulation would not be

1      published at the end of the third quarter

2      fiscal year 2018, correct?

3                  MS. WAITES:  Objection.  Lacks

4      foundation.

5                  THE WITNESS:  Yeah.  I -- I would

6      need to see that.

7                  MR. MASTERS:  Sure.

8                  (Deposition Exhibit 8 was marked for

9      identification.)

10                 BY MR. MASTERS:

11     Q.    Showing you what has been marked as

12     Exhibit 8.  It's a -- a double-sided document.

13                 The Bates stamp for this document is

14     US-DEA 00026833, correct?

15     A.    Correct.

16     Q.    Can you identify this document?

17     A.    This is taken from the GAO's web

18     site.  And it represents a summary and status

19     of reports and open recommendations.

20     Q.    And specifically the status report

21     -- the status of -- that the GAO is referring

22     to here is the status of recommendations

23     relating to the 2015 report that the DEA --

24     that more DEA information about registrants'

25     controlled substances roles could improve their

1     understanding and help ensure access, correct?

2          A.    Correct.

3          Q.    At the bottom there, it appears that

4     there is a table with the column on the left

5     describing the recommendation and the column on

6     the right describing the status and comments

7     from GAO; is that correct?

8          A.    Yes.

9          Q.    And the second recommendation, which

10    again is the one relating to distributors,

11    appears to cover the end of the first page and

12    onto the second page, right?

13         A.    Yes.

14         Q.    And at this point, the -- the GAO's

15    web site indicates that the status of that

16    second recommendation is open, correct?

17         A.    Yes.

18         Q.    And in the -- in the GAO's comments,

19    it states that:  "In February 2018, DEA

20    reported that the agency had reviewed and

21    revised the current regulation regarding

22    suspicious orders and that the revised draft

23    rule was undergoing internal DEA review.  DEA

24    reported in August 2018 that they anticipated

25    sending the draft rule to the Department of

1    Justice's Office of Legal Policy by the end of

2    the first quarter of fiscal year 2019."

3              Did I read that correctly?

4        A.    That is correct.

5        Q.    What does it mean to send a

6    regulation to the Department of Justice's

7    Office of Legal Policy?

8        A.    As part of our -- as part of the

9    regulatory drafting process, we always like to

10   make sure the public knows that it is not DEA's

11   ability to just publish something on its own.

12   There is often -- or not often -- in every

13   instance extensive collaboration.

14             That collaboration first takes place

15   with the Department of Justice, which is our

16   parent organization.  And then there is

17   interagency coordination that's facilitated by

18   the Office of Management and Budget, which is

19   OMB.

20             That OMB review is going to be

21   reviews by agencies that would be involved,

22   like the Department of Health and Human

23   Services in the case of controlled substance

24   regulation.

25             So our -- this update is indicating

1    that, by the end of the first quarter, we had

2    hoped to have that draft sent to the Department

3    of Justice.

4         Q.     And --

5         A.     And specifically the Office of Legal

6    Policy, who oversees the reg drafting efforts

7    for all the subcomponents within the Department

8    of Justice.

9         Q.     Thank you.

10              And that is a step that takes place

11   prior to final publication in the Federal

12   Register, correct?

13        A.     Absolutely.  It takes place prior to

14   publication of the notice.  And it takes place

15   prior to the publication of a final rule.

16        Q.     So here in the August 2018 update

17   that is being described by the GAO, the DA --

18   the DEA is suggesting that it is no longer on

19   track to publish the regulation in the Federal

20   Register by the end of the fiscal year 2018,

21   correct?

22        A.     That's correct.

23        Q.     In fact, now it would be not until

24   the first quarter fiscal year 2019 that the

25   regulation would even be delivered to the

1      Office of Legal Policy, right?

2           A.    That's correct.

3           Q.    Since -- since -- well, so here we

4      are today, the second quarter of 2019, May

5      31st.

6                 Has the DEA sent the regulation to

7      the Office of Legal Policy?

8                 MS. WAITES:  Objection.

9                 If it's privileged, do not respond.

10                THE WITNESS:  Yeah.  I -- I -- I

11     don't -- that's going to get into deliberative

12     process.  And I don't feel comfortable

13     responding to that question.

14                BY MR. MASTERS:

15          Q.    Okay.  As of now, the second quarter

16     of 2019, May 31st, and -- and almost four years

17     after the GAO recommended that the DEA provide

18     additional written guidance to distributors,

19     has the DEA published a revised regulation in

20     the Federal Register?

21          A.    No.

22          Q.    Has the DEA published a guidance

23     manual or comparable document to the one that

24     exists for pharmacists and practitioners?

25          A.    No.

1            MR. MASTERS:  We could go off the

2     record real quick just to make sure that I

3     don't have any more questions.  But I think I

4     might be done.

5            THE VIDEOGRAPHER:  We are going off

6     the record.

7            The time is 10:36.

8            (A short recess was taken.)

9            THE VIDEOGRAPHER:  We are back on

10    the record.

11            The time is 10:57.

12            You may proceed, Counsel.

13            MR. MASTERS:  Mr. Strait, at this

14    time I have no further questions.  Thank you

15    for your time.

16            THE WITNESS:  Thank you.

17       EXAMINATION BY COUNSEL FOR PLAINTIFFS

18            BY MS. ELLIS:

19       Q.   Good morning, Mr. Strait.

20       A.   Good morning.

21       Q.   My name is Tiffany Ellis.  I

22    represent the plaintiffs in this case.

23            I just have a few follow-up

24    questions for you this morning.

25       A.   Okay.

1          Q.    I want you to flip to the back page

2     of Exhibit 3, please.  Well, I guess the last

3     page, to be technical.

4               The first section under that -- I'm

5     at page -- it reads "The GAO's Mission."

6               Could you read that for me, please.

7          A.    Sure.

8               "The Government Accountability

9     Office, the audit evaluation and investigative

10    arm of congress, exists to support congress in

11    meeting its constitutional responsibilities and

12    to help improve the performance and

13    accountability of the federal government for

14    the American people.  GAO examines the use of

15    public funds; evaluates federal programs and

16    policies; and provides analyses,

17    recommendations and other assistance to help

18    congress make informed oversight, policy and

19    funding decisions.  GAO's commitment to good

20    government is reflected in its core values of

21    accountability, integrity and reliability."

22         Q.    Would you agree that that's the

23    mission of the GAO?

24         A.    Yes.

25         Q.    Essentially it's to -- it's the

1      audit, evaluation, investigative arm of

2      congress; is that right?

3             A.    Yes.

4             Q.    The GA -- GAO is not responsible for

5      enforcing the Controlled Substances Act, is it?

6             A.    No.

7             Q.    And when the GAO did this report

8      that we've been talking about today, Exhibit 3,

9      it wasn't looking at whether registrants were

10     in compliance with the Controlled Substances

11     Act, was it?

12            A.    No.

13            Q.    It wasn't looking at whether those

14     registrants have reported suspicious orders to

15     the DEA?

16            A.    No.

17            Q.    It wasn't looking at whether

18     registrants had maintained adequate suspicious

19     order monitoring systems, was it?

20            A.    No.

21            Q.    Would you agree that, whether

22     registrants do these things, such as report

23     suspicious orders and maintain adequate

24     suspicious order monitoring systems, relate to

25     whether and -- whether or how well the DEO --

Page 73

1    DEA can do its job in stopping diversion?

2              MS. WAITES:  Objection.  Scope.

3              MS. MONAGHAN:  Objection to form.

4              BY MS. ELLIS:

5         Q.    I'd like to direct you to Page 77 of

6    the report, Exhibit 3, and No. 1 of the letter

7    there.

8              Could you read the first sentence of

9    that paragraph, please.

10        A.    Of recommend -- of the first comment

11   that DEA made or the first sentence of the

12   first paragraph?

13        Q.    I'm looking specifically at Page 77,

14   the letter to Linda Kohn dated May 25th,

15   2015 --

16        A.    Uh-huh.

17        Q.    -- following "With respect to the G"

18   -- "GAO report, DEA wishes to emphasize the

19   following important facts."

20        A.    Yep.  Okay.

21              And read No. 1?

22        Q.    Yes, please.

23        A.    DEA's Office of Diversion Control is

24   responsible for administering and enforcing the

25   provisions of the CSA as they pertain to

1      ensuring the availability of controlled

2      substances for legitimate uses while preventing

3      their availability for diversion.  The office

4      is not charged with reducing the illicit demand

5      for controlled substances."

6          Q.    Would you agree that that's the

7      responsibility of the DEA's Office of Diversion

8      Control?

9              MS. MONAGHAN:  Object to form.

10             THE WITNESS:  Yes.

11             BY MS. ELLIS:

12         Q.    What is the role of the DEA?

13             MS. WAITES:  Objection.  Vague.

14     Scope.

15             MS. MONAGHAN:  Object to form.

16             BY MS. ELLIS:

17         Q.    Let me direct you to Page 67 of the

18     report, Exhibit 3.

19         A.    Sorry.  What page?

20         Q.    Page 67.

21         A.    Okay.

22         Q.    I may have the may -- wrong

23     reference here.

24             But would you agree that the DEA's

25     role is the -- is the primary agency

1    responsible for coordinating the drug

2    enforcement activities of the United States?

3         A.    As it pertains to pharmaceutical

4    drugs containing controlled substances, yes.

5         Q.    It's a law enforcement agency?

6         A.    It is.

7         Q.    Can the DEA take administrative

8    enforcement actions against registrants?

9              MS. WAITES:  Objection.

10             MR. MASTERS:  Objection.  Scope.

11             MS. WAITES:  Scope.

12             MS. MONAGHAN:  Object to form.

13             THE WITNESS:  Yes.

14             BY MS. ELLIS:

15        Q.    You were asked some questions

16   earlier about the difference between pharmacies

17   and distributors.  I want to direct your

18   attention back to that portion of your

19   testimony.

20             Do you recall?

21        A.    Yes.

22        Q.    Do you know how many registrants

23   there are total?

24        A.    Currently we have 1.815 million

25   registrants.

Page 76

1       Q.   Do you know how many of those are
2     pharmacies?
3       A.    Approximately 71,000.
4       Q.   Do you know how many of those are
5     distributors?
6       A.    Right now -- I think I said 750, but
7     it might be 715.  But it is somewhere between
8     715 and 750.
9       Q.    715 to 750 distributors and 71,000
10    pharmacies.
11          Does the number of distributors
12    versus the number of pharmacies affect the way
13    the DEA communicates with each of those
14    different groups of registrants at all?
15          MS. WAITES:  Objection.  Scope.
16          MR. MASTERS:  Objection.  Form.
17          THE WITNESS:  Yes.
18          BY MS. ELLIS:
19      Q.   How so?
20      A.    Obviously, with a -- with 1.8
21    million registrants, DEA has limited resources,
22    and it does need to think about how best to
23    prioritize those resources.
24          With our -- that portion of our drug
25    supply chain that handle the largest volumes of

Page 77

1        controlled substances, i.e., our manufacturers

2        and our distributors, our engagement with them

3        tends to be more in person, one-on-one, and --

4        and very much routine in terms of the frequency

5        by which we conduct audits and inspections of

6        those registrants.

7                 And because of sheer numbers, our

8        guidance to those other portions of our

9        registrant community that are larger, i.e.,

10       pharmacies, and prescribers, we do have to rely

11       more on providing them guidance on our

12       diversion control web site.  And of course we

13       do still engage with them in person by offering

14       all sorts of different training opportunities.

15           Q.    So larger numbers of registrants

16       require greater efforts?

17                 MS. MONAGHAN:  Objection.

18                 MS. WAITES:  Objection.  Scope.

19                 MS. MONAGHAN:  Object to form.

20                 MS. ELLIS:  Let's me rephrase.

21                 BY MS. ELLIS:

22           Q.    Let -- let's go to the -- Page 2,

23       the summary, I guess, of Exhibit 3.

24                 What GAO recommends, this first

25       sentence on the bottom-left corner:  "GAO

1      recommends that DEA takes three actions to

2      improve communication with" a -- "with and

3      guidance for registrants about their CSA roles

4      and responsibilities."

5            A.      Sorry.  Did you say page --

6            Q.      The summary page.

7            A.      Oh, the summary page.

8            Q.      Yes.

9            A.      Okay.  And I'm sorry.  Where was

10     that directive?

11           Q.      Just what GAO recommends.

12           A.      Oh, yes.

13           Q.      You would agree that this report is

14     focused on guidance for registrants about their

15     CSA roles and responsibilities, correct?

16           A.      Yes.

17           Q.      And your testimony today has been

18     focused on this report, right?

19           A.      Correct.

20           Q.      Is the nature of the responsibility

21     for pharmacies different than that for

22     distributors under the CSA?

23                   MS. WAITES:  Object to form.  Scope.

24                   MS. MONAGHAN:  Objection.  Scope.

25                   MS. WAITES:  Calls for legal

1    conclusion.
2              BY MS. ELLIS:
3        Q.    Are you aware if -- are you aware if
4    pharmacies and distributors are subject to
5    different regulations under the CSA?
6              MS. MONAGHAN:  Object to form.
7              MS. WAITES:  Objection.  Scope.
8    Calls for legal conclusion.
9              THE WITNESS:  Yes.
10             BY MS. ELLIS:
11       Q.    Are you aware whether pharmacies
12   have different reporting requirements to the
13   DEA than distributors?
14             MS. MONAGHAN:  Object to form.
15   Scope.  Calls for legal conclusion.
16             MS. WAITES:  Object to scope.
17             THE WITNESS:  I am familiar with the
18   fact that all registrant classes have different
19   requirements in terms of reporting and
20   recordkeeping.  So the requirements on one
21   class of registrants, i.e., distributors, is
22   different than the requirements for another
23   class, pharmacies.
24             MS. ELLIS:  Earlier you discussed
25   some of the things that the DEA -- some of the

Page 80

1      actions that the DEA had taken in response to
2      the GAO's report.  I want to ask you some
3      additional questions about what the DEA -- DEA
4      had done after this report at -- was issued.
5                  I'm marking for the record
6      Exhibit 9.
7                  (Deposition Exhibit 9 was marked for
8      identification.)
9                  MS. WAITES:  Do you have a copy for
10     me?
11                 MS. ELLIS:  I'm sorry.  I think I
12     just handed the other two down that way.  I
13     apologize.
14                 BY MS. ELLIS:
15         Q.    Exhibit 9 is a e-mail that I believe
16     you reviewed in advance of today's deposition.
17     The Bates number is cut off a little at the
18     bottom, but for the record it's
19     US-DEA-00026799.
20                 Do you recall reviewing this
21     document?
22         A.    Yes.
23         Q.    On the second page of the document,
24     it appears to be a letter.
25                 What is this letter?

1       A.     This would have been one of the

2    status update letters from our GAO audit

3    liaison section to GAO.  And this one was dated

4    April 27th, 2016, which means that it would

5    have been very -- within a year or right around

6    a year after the report came out.

7       Q.     Is this the first status update

8    letter that you're aware was issued following

9    the report?

10      A.     No.  Actually, the -- there is a

11   reference to the -- in the first paragraph to a

12   status response congressional letter dated

13   September 21st, 2015.

14             And what that means to me is that

15   congress probably wrote to ask about the

16   status.  And in DEA's response to congress, it

17   would have sent a CC copy to GAO.

18      Q.     So that -- that would have been

19   different than this type of letter?

20      A.     Correct.  But it could have been

21   similar.

22      Q.     Similar but not directly to GAO.

23             Okay.  I want to direct you to the

24   next page of the document, Section 2.

25             What is your understanding of the

Page 82

1      DEA response in Section 2?

2               What is this in response to?

3          A.    Page 2, this is DEA's response to

4      Recommendation 2 about guidance for -- for

5      distributors and those associations

6      representing distributors on their suspicious

7      order monitoring reporting obligations.

8          Q.    You were asked a lot of questions

9      this morning about whether the DE -- DEA had

10     issued any written guidance to distributors

11     between the time that the report was issued and

12     today.

13              Does this section describe other

14     actions that the DEA took to educate

15     distributors about their responsibilities under

16     the CSA?

17         A.    Yes.

18         Q.    And what are some of the actions

19     that the DEA took during this time frame as

20     outlined in this letter?

21         A.    So the first paragraph talks about

22     DEA's distributor conference, which it held in

23     2013, and then, as indicated here, held in 2015

24     and 2016.

25              The -- obviously what we go on to

1    say is that information provided during these

2    conferences are published on DEA's web site.

3              The third paragraph talks about

4    DEA's work with the National Association of

5    Boards of Pharmacy and a number of other

6    stakeholder groups, which includes some

7    associations representing various aspects of

8    our registrant population on a consensus

9    document entitled "Stakeholders, Challenges and

10   Red-Flag Warning Signs Related to Prescribing

11   and Dispensing of Controlled Substances."

12        Q.    Were all of these efforts by the DEA

13   to comply with the GAO's recommendation to

14   provide distributors further guidance under the

15   CSA?

16        A.    Yes.

17        Q.    Were some of these written?

18        A.    To the extent that the distributor

19   conference presentations were -- are generally

20   PowerPoint presentations and therefore are --

21   are written documents, yes.

22              And the -- the NABP document, I

23   actually did take a look at that.  I did not

24   see where DEA was actually noted as an author,

25   which is the reason I didn't mention it during

Page 84

1    my -- my remarks earlier.  So that I'm -- I'm

2    not certain I can say with certainty that that

3    would have constituted written DEA guidance.

4        Q.    You mentioned, I think, in your

5    earlier answer something about a distributor

6    initiative and working directly with

7    distributors.

8            Do you recall that testimony?

9        A.    Absolutely.  Yes.

10        Q.    Would -- would this be a part of

11    that?

12        A.    So actually the distributor

13    initiative is separate from the issues that are

14    outlined in this response.  But certainly DEA

15    has indicated that one of the main ways in

16    which it interacts with the distributor

17    community is through what's called the

18    distributor initiative, which I believe began

19    in 2006.

20            And this is direct, one-on-one

21    engagement with DEA registered distributors.

22    And that's different from the distributor

23    conference, which is a -- a number of DEA

24    registered distributors coming to a venue free

25    of charge, you know, to -- to receive

Page 85

1      presentations from DEA and to collaborate with

2      DEA on -- on issues.

3              MS. ELLIS:  Now marking for the

4      record Exhibit 10.  US-DEA-00 -- I'm sorry.

5      US-DEA-00026803.

6              (Deposition Exhibit 10 was marked

7      for identification.)

8              BY MS. ELLIS:

9      Q.     Is this also a document that you

10     reviewed in preparation for today's testimony?

11     A.     It is.

12     Q.     And this is dated December 20th,

13     2016?

14     A.     Correct.

15     Q.     What is this e-mail and its

16     attachment?

17     A.     This document actually -- the e-mail

18     that's on the front page would have been from

19     the GAO audit liaison team sending what is an

20     update memorandum to our counterparts over at

21     GAO.

22     Q.     So is this an -- a subsequent update

23     to the one that we just discussed?

24     A.     Correct.  In fact, on the first

25     paragraph, it said "DEA provided its previous

Page 86

1      status response on April 27th, 2016.  And

2      that's what this Exhibit 9 was.

3          Q.    And what is the date of the letter

4      attached to that e-mail?

5          A.    It's December 20th, 2016.

6          Q.    I'll direct you to the second page

7      of the letter under Heading 2.

8                Is this an additional update as to

9      what the DEA was doing in response to the GAA

10     -- GAO's recommendation that the DEA provide

11     more specific guidance to distributors with

12     respect to their roles and responsibilities for

13     suspicious order monitoring?

14         A.    Yes.  This would have included

15     things that the agency was doing in an attempt,

16     and as the last paragraph reads, based on

17     the -- the preceding three paragraphs,

18     requesting closure of the recommendation, based

19     on this -- the preceding information.

20         Q.    And I forgot to ask you.

21               In that previous Exhibit 9, did the

22     DEA also request closure of the recommendation?

23         A.    It did.

24         Q.    Did the DEA feel at that time it had

25     done -- did the DEA -- strike that.

Page 87

1          Why did the DEA request closure of

2     the recommendation in Exhibit 9 or at the time

3     of Exhibit 9?

4          A.    DEA reported in its response that

5     it:  "request closure of this recommendation

6     based upon DEA's actions to obtain input from

7     distributors and associations representing

8     distributors.  DEA will continue collaborating

9     with these businesses and associations through

10    regularly scheduled conferences and by working

11    with NABP and the coalition of stakeholders to

12    provide ongoing guidance to distributors

13    regarding their roles and responsibilities for

14    monitoring and reporting suspicious orders."

15         Q.    And you were just reading from the

16    document, Exhibit 9, right?

17         A.    Correct.

18         Q.    Now, in Exhibit 10, did the DEA also

19    request closure of this recommendation?

20         A.    It -- it did -- or we did, yes.

21         Q.    What did -- what did you base that

22    request on?

23         A.    It actually looks very similar to

24    the -- to the preceding update.  So we -- I'll

25    read it for the benefit of the group.

Page 88

1              "DEA requests closure of this

2       recommendation based upon DEA's actions to

3       obtain input from distributors and associations

4       representing distributors.  DEA will continue

5       collaborating with these businesses and

6       associations through regularly scheduled

7       conferences and provide ongoing guidance to

8       distributors regarding their roles and

9       responsibilities for monitoring and reporting

10      suspicious orders."

11          Q.    In addition to the efforts described

12      in Exhibit 9, it appears that, in the third

13      paragraph of Exhibit 10, beginning with "DEA

14      has continued to work with distributors," there

15      is the description of two additional

16      conferences in 2016; is that right?

17          A.    Correct.

18          Q.    Could you read that aloud for the

19      jury, please.

20          A.    Sure.

21              "DEA has continued its work with

22      distributors and associations by meeting with

23      industry upon request and providing guidance

24      and discussion related to suspicious orders.

25      DEA held two distributors and one reverse

1      distributors conference in 2016.  These

2      conferences provided DEA with an excellent

3      opportunity to engage its distributor

4      registrants, attachment 4, about their roles

5      and responsibilities for monitoring and

6      reporting suspicious orders.  DEA plans to host

7      yearly training for distributors and reverse

8      distributors, which will answer questions on

9      these issues."

10          Q.    I want to direct you to Table 21

11     that you discussed earlier in Exhibit 3.  And

12     that is on page --

13          A.    66?

14          Q.    -- 66 -- thank you -- of the report.

15               In your earlier testimony, I believe

16     you made the -- you clarified to say that the

17     GAO's recommendation, as you understood it, was

18     based on the response outlined in this table;

19     is that right?

20          A.    Yes.  And some -- and some of the --

21     the -- they had an open-ended question, and

22     then they had objective measures.  And Table 21

23     was representing answers to objective measures

24     in their survey.

25          Q.    And in Table 21, this reflects that

1    there were 77 total responses from

2    distributors; is that right?

3         A.    Yes.  I see one other thing that --

4    on this table representing distributors saying

5    that there may have been 78 responses.  But

6    yes, 77 or 78 of the 200 that were -- that

7    received the opportunity to respond to their

8    survey.

9         Q.    And you said a few moments ago that

10   there's between, now, 715 to 750 distributors.

11              Was that number different at the

12   time that this report was issued?

13        A.    Yeah.  The -- the number that's used

14   in the report is I believe 954.  And I believe

15   the distinction there -- because I didn't go

16   back and look at where we were in 2014.  But I

17   believe the difference is I'm talking about

18   controlled substance distributors.

19              We also have a population of

20   registrants that are involved in the

21   distribution of List I chemicals.  So I'm

22   excluding the List I chemical population from

23   my numbers.

24        Q.    Would the number -- what would the

25   number of controlled substances distributors

Page 91

1    have been around the time that this report was

2    issued, if you know?

3         A.   I think it would have been

4    comparable to what -- the numbers that we have

5    now.  I don't think we've seen any drastic

6    changes in the size of our registrant

7    population for DEA-registered distributors.

8         Q.   So directing your attention back to

9    Table 1.

10             Of those that responded to the

11   survey -- let's look at this first line here.

12             Here you see the 77 responses,

13   correct, is in respect to the DEA's Know Your

14   Customer guidance, right?

15        A.   Yes.

16        Q.   Okay.  And what is the total number

17   of distributors that they said -- that thought

18   that the DEA's feedback was very or moderately

19   helpful?

20        A.   So it's about two --

21             MS. MONAGHAN:  Object to form.

22             THE WITNESS:  It's approximately

23   two-thirds of the registrants that did respond

24   to this question indicated that they found

25   DEA's guidance to be very or moderately

Page 92

```
 1      helpful.
 2              BY MS. ELLIS:
 3          Q.   A majority.
 4          A.   A majority, yes.
 5          Q.   And how many, according to this
 6      chart, found that it was only slightly or not
 7      helpful at all?
 8              MR. MASTERS:  Object to form.
 9              MS. MONAGHAN:  Object to form.
10              THE WITNESS:  The number here is 28
11      of 77.
12              BY MS. ELLIS:
13          Q.   I want to direct your attention to
14      Page 6 of Exhibit 3.
15              Earlier I believe you read for the
16      record the sentence starting the second
17      paragraph with "We also obtained documents
18      from"?
19          A.   Yes.
20          Q.   Were -- were you personally involved
21      in that process?
22          A.   No.
23          Q.   Are you -- and I believe you
24      testified that you're not aware of who at the
25      DEA was involved in that process?
```

1        A.    That is correct.  I'm not aware.

2        Q.    Do you know what occurred during

3   that meeting as far as the feedback that was

4   solicited from the DEA by the GAO?

5        A.    There were probably multiple

6   meetings.  But I'm not familiar with what

7   transpired during each of those meetings.

8        Q.    Do you know if the DEA had any

9   feedback into who would -- who the participants

10  in the survey would be?

11            MS. MONAGHAN:  Object to form.

12            THE WITNESS:  I have reason to

13  believe that the people who would have been

14  involved are no longer with the agency.  So

15  I -- I don't really have a good way of trying

16  to reconcile that.

17            BY MS. ELLIS:

18       Q.    So you don't know if the DEA had

19  input into who the participants in the survey

20  were?

21       A.    Oh.

22            MS. MONAGHAN:  Objection.  Form.

23            THE WITNESS:  I do believe we had

24  input as to who would be participating in those

25  meetings, yes.

1          BY MS. ELLIS:

2      Q.    Do you know if the DEA had input

3    into what the survey questions would be?

4      A.    No.  We did not have access to the

5    questions.

6      Q.    Do you know if the DEA had input

7    into which states would be selected for

8    participation in the survey?

9              MS. MONAGHAN:  Object to form.

10             THE WITNESS:  I don't know the

11   answer to that question.

12             BY MS. ELLIS:

13     Q.    Do you know of anyone at the DEA

14   who -- who would know the answer to that

15   question besides you?

16     A.    I believe the people who would know,

17   like I said previously, have since retired.  So

18   I don't -- I don't know of anybody.

19     Q.    Do you know when the DEA first

20   learned that the GAO was working on this

21   report?

22     A.    Go back and see if I can find it in

23   the -- I'm sorry.  I don't know the answer to

24   that question.

25     Q.    Are you aware of whether the GA

```
 1    [sic] solicited input from registrants into the
 2    content of the survey?
 3              MS. MONAGHAN:  Object to form.
 4              THE WITNESS:  I don't know the
 5    answer to that question, no.
 6              BY MS. ELLIS:
 7        Q.    Would that surprise you?
 8              MR. MASTERS:  Objection.
 9              THE WITNESS:  Yes.  That would
10    probably surprise me a little bit.
11              BY MS. ELLIS:
12        Q.    Are you aware that the GAO solicited
13    input into this report and the survey as early
14    as July of 2013 --
15              MS. MONAGHAN:  Object to form.
16              MR. MASTERS:  Object to form.
17              BY MS. ELLIS:
18        Q.    -- from registrants?
19        A.    Can you repeat that.
20        Q.    Are you aware that the GAO solicited
21    input into the survey and report from
22    registrants as early as July of 2013?
23              MS. WAITES:  Objection.  Foundation.
24              MR. MASTERS:  Objection.  Scope.
25    Objection.  Form.
```

```
 1              THE WITNESS:  And the answer is no.

 2              BY MS. ELLIS:

 3        Q.    Are you aware that in August of 2013

 4     the GAO participated in a conference call with

 5     the HDMA staff regarding this report?

 6              MS. WAITES:  Objection.  Foundation.

 7              MR. MASTERS:  Objection.  Scope.

 8     Objection.  Form.

 9              THE WITNESS:  No.  I am not aware.

10              BY MS. ELLIS:

11        Q.    What is the HDMA; do you know?

12              MS. WAITES:  Objection.  Scope.

13              MS. MONAGHAN:  Objection.  Scope and

14     form.

15              THE WITNESS:  HDMA is now HDA.  And

16     I believe they're the Healthcare Distributor

17     Alliance.

18              BY MS. ELLIS:

19        Q.    Are you aware that this report by

20     the GEO -- GAO -- pardon me -- incorporated the

21     feedback from certain industry associations?

22              MS. WAITES:  Objection.  Foundation.

23              MS. MONAGHAN:  Objection.  Form and

24     foundation and scope.

25              MR. MASTERS:  Objection.  Vague.
```

1           THE WITNESS:  Can -- can you repeat

2     that question.

3           BY MS. ELLIS:

4      Q.    Yes.  We'll just go to the document.

5           Let's go back to the summary page in

6     Exhibit 3.  It's the second page of the

7     document.

8           The last sentence on the left-hand

9     side says:  "The" GEO [sic] "administered

10    nationally representative web-based surveys to

11    DEA-registered distributors, individual

12    pharmacies, chain pharmacy corporate offices,

13    and practitioners.  GAO also interviewed

14    officials from DEA, 26 national associations

15    and other nonprofits and 16 government agencies

16    in four states."

17          You see that.

18     A.    Yes, I do.

19     Q.    Are you aware of which associations

20    and nonprofits those were?

21     A.    I believe they were listed as

22    potential -- oh, no, they weren't listed.  No.

23    So I don't know which -- which associations.

24     Q.    So you don't to know if the HDMA or

25    now called the HDA was one of the participants

```
 1      in the study?
 2                   MS. MONAGHAN:  Object to form and
 3      foundation.
 4                   THE WITNESS:  I don't know.  But I
 5      had reason to believe that they certainly would
 6      have been one of the associations.
 7                   BY MS. ELLIS:
 8          Q.    Why is that?
 9                   MS. MONAGHAN:  Object to form.
10                   THE WITNESS:  HDA represents
11      manufacturers and distributors of controlled
12      substances.  They are obviously an important
13      association that we need to be working with.
14                   And during my time as the head of
15      our congressional affairs section, I -- I knew
16      that they were on Capital Hill talking
17      extensively to members of congress about their
18      representatives' concerns over the amount of
19      communication that they had with DEA.
20                   BY MS. ELLIS:
21          Q.    You said they were on the hill
22      talking about their representatives' concern
23      over the amount of communication that they had
24      with the DEA.
25                   What do you mean?
```

Page 99

1               MS. MONAGHAN:  Object to form.

2       Scope.

3               THE WITNESS:  So HDMA, HDA is a --

4       is a lobbying firm that represents the

5       interests of -- of their clients on Capital

6       Hill.  And they were very vocal.  And they've

7       actually testified alongside DEA witnesses at

8       hearings in which these -- these issues were

9       brought up in terms of communication with the

10      agency.

11              BY MS. ELLIS:

12         Q.    Do you understand that they've tried

13      to influence the way the DEA communicates with

14      registrants?

15              MR. MASTERS:  Object to form.

16      Object to scope and foundation.

17              MS. WAITES:  Object to scope and

18      foundation.

19              THE WITNESS:  Yes.

20              (Deposition Exhibit 11 was marked

21      for identification.)

22              BY MS. ELLIS:

23         Q.    I'm handing you, for the record,

24      what's been marked as Exhibit 11, Bates

25      numbered page MCKMMDL 00538072.

                                        Page 100

1                What is the subject line of the

2       e-mail that you have in front of you?

3            A.    "Inquiry from Government

4       Accountability Office Regarding Distributor

5       Interaction With DEA."

6            Q.    Could you read the first sentence of

7       the second paragraph, please.

8            A.    "In August 2013, HDMA staff

9       participated in a conference call with the GAO

10      team tasked with pulling this report together.

11      During this" --  I'm sorry.

12                Did you say --

13           Q.    You can go on.

14           A.    "During this meeting, HDMA staff

15      gave a general overview of the industry's

16      efforts to prevent diversion."  At that -- "At

17      the time we furnished them with testimony we

18      provided to the Energy and Commerce Committee

19      as well as the list of questions we had

20      submitted DEA seeking further clarity on

21      suspicious order monitoring and due diligence

22      protocols."

23           Q.    The next paragraph starts with

24      "Specific follow-up questions from the" GE --

25      "GAO."

Page 101

1            Could you read that, please, for the

2       jury.

3            A.    "We are preparing the survey

4       questionnaire now and planning our sampling

5       methodology and have a couple of questions we'd

6       like your input on.  A, if an individual

7       DEA-registered distributor location received

8       our survey, how likely would they be willing

9       and able to complete it?  We have heard, for

10      example, that chain drug stores would likely

11      not want their individual stores to respond to

12      our survey.  Instead they prefer (insist on)

13      sending one corporate response.  B, do the

14      individually registered locations have direct

15      interaction with DEA and/or other federal

16      agencies; or is that more likely to happen at

17      the corporate level?"

18           Q.    And who is on the To line of this

19      e-mail there at the top?

20           A.    I see a representative from

21      AmerisourceBergen, a individual from Cardinal

22      Health, individual from Smith Drug, another

23      Cardinal Health individual, somebody from

24      Mutual Drug, somebody from HD Smith, somebody

25      from McKesson, and another individual from

Page 102

1    AmerisourceBergen.

2        Q.    Are the companies that you just

3    named, are you aware that those are registrants

4    of the DEA?

5        A.    Yes.

6            MS. WAITES:  Objection.  Scope.

7            THE WITNESS:  Yes.

8            BY MS. ELLIS:

9        Q.    And who's the From line there on

10   that e-mail?

11       A.    It is from Pat Kelly, who is with

12   HDA.

13       Q.    And what's the date on that e-mail?

14       A.    February 20th, 2014.

15       Q.    Are you aware if the DEA was asked

16   for input on these questions around February

17   20th, 2014?

18       A.    I am --

19            MS. MONAGHAN:  Object to form.

20            THE WITNESS:  I am not aware.

21            BY MS. ELLIS:

22       Q.    Do you know if they were?

23       A.    I don't know.

24       Q.    You mentioned earlier what the DEA

25   probably would have a series of conversations

Page 103

1    with the GA -- GAO about this survey and the
2    report, correct?
3         A.    Yes.
4         Q.    But you don't know when the dates of
5    those would have been?
6         A.    No.  And I -- I imagine that those
7    conversations would have been through the audit
8    liaison section, which would have not really
9    been part of my involvement at the time.
10        Q.    Was the DEA invited to be at any of
11   the meetings where the GAO solicited input from
12   industry representatives?
13              MR. MASTERS:  Objection.
14   Foundation.
15              THE WITNESS:  I don't know.
16              BY MS. ELLIS:
17        Q.    Was the G -- was the DEA privy to
18   the attendee list of any of the industry
19   representatives that were participants in these
20   meeting with the GAO?
21              MR. MASTERS:  Objection.  Form.
22   Foundation.
23              THE WITNESS:  My understanding is
24   that DEA provided access to the CSA
25   registration database.  And that's the basis by

1    which GAO decided what their generalizable

2    sample would be for purposes of administering

3    the survey.

4              BY MS. ELLIS:

5        Q.    So the entire database?

6        A.    Correct.

7        Q.    Not necessarily -- that would not be

8    the specific list of who participated in the

9    discussions with the GAO, correct?

10             MS. MONAGHAN:  Object to form.

11             THE WITNESS:  I -- I don't know the

12   answer to that.

13             BY MS. ELLIS:

14       Q.    Do you know who Rob Giacalone is?

15       A.    No, I don't.

16             (Deposition Exhibit 12 was marked

17   for identification.)

18             BY MS. ELLIS:

19       Q.    Handing you what's been marked for

20   the record as Exhibit 12.

21             Are you aware that the GAO held a

22   meeting with industry representatives,

23   including CSA, registrants in October of 2014?

24             MS. MONAGHAN:  Object to form and

25   foundation.

Page 105

1              THE WITNESS:  I am not, no.

2              BY MS. ELLIS:

3         Q.    Would you read the first two

4    sentences of the top of that e-mail for me,

5    please.

6         A.    Starting with "I'll ask Carl"?

7         Q.    Yes.

8         A.    "I'll ask Carl.  As to HDMA, here

9    are my thoughts."

10             Keep going.

11        Q.    Yes, please.

12        A.    Okay.  "First, in my discussions

13   with HDMA, they have told me that they were

14   involved in helping to create the survey.  So

15   I'm assuming they have already provided their

16   input to the GAO.  Second, not sure if this

17   meeting at NASCSA is just for industry (and not

18   trade groups) given it's targeted specifically

19   towards industry representatives.  I can ask

20   HDMA if they are going/got an invitation."

21             Keep going?

22        Q.    Sure.  Go ahead.

23        A.    "Lastly, not sure we want Linden

24   there at this event if we're trying to keep a

25   low profile (and not sure he can go without

1     specifying for whom he is attending)."

2              Keep reading?

3        Q.    Just go ahead and --

4        A.    Okay.

5        Q.    -- read the next two sentences.

6        A.    "My overall concern with this is

7     that we got burned before with the GAO.  And

8     I'm not sure how much we want to be perceived

9     as being on the front end with them.  I think

10    we've worked towards coordinating a common

11    theme from our industry colleagues (via our

12    work groups, Purdue, et cetera.  Just not sure

13    the downside of the potentially irritating DEA

14    is worth the added benefit of showing up at

15    this meeting where DEA reps most likely will be

16    present at the NASCSA meeting.  If you think

17    other" -- "otherwise, let's decide who should

18    go.  Thanks, Bob."

19       Q.    Do you know if DEA reps were present

20    at that NASCSA meeting?

21              MS. WAITES:  Objection.  Scope.

22              MS. MONAGHAN:  Objection.

23    Foundation and form.

24              THE WITNESS:  I don't.  I don't know

25    the answer.

```
 1              BY MS. ELLIS:
 2         Q.    Do you know whether there was any
 3    concerted effort by registrants to influence
 4    the GAO's report?
 5              MR. MASTERS:  Objection.  Form.
 6    Foundation.  Scope.
 7              MS. WAITES:  Objection.  Calls for
 8    speculation.
 9              THE WITNESS:  I don't know.
10              BY MS. ELLIS:
11         Q.    I want to direct your attention to
12    Exhibit 8.
13         A.    Was this -- was this part of Exhibit
14    12?
15         Q.    It was.
16         A.    Okay.
17         Q.    It's an attachment to the e-mail.
18    Thank you.
19              You discussed this exhibit earlier
20    on the record.
21              Do you recall?
22         A.    Yes.
23         Q.    And what was -- what is this again?
24         A.    This is a GAO summary.  It's
25    available on their web site.  And it talks
```

Page 108

1    about the -- the summary of the GAO report and

2    then the status of recommendations.  In this

3    case, for this particular report, there were

4    three recommendations.  So below is the

5    recommendation -- the three recommendations and

6    their status.

7        Q.    Recommendation 2, which we discussed

8    in depth today, was for the DEA to provide more

9    guidance to registrations -- or registrants and

10   associations representing registrants regarding

11   their roles and responsibilities for suspicious

12   order monitoring, correct?

13       A.    Yes.  Yes.

14       Q.    Back on the first page.

15            (Phone interruption.)

16            MS. ELLIS:  I think we have -- you

17   may want to mute your phone on the conference

18   line.

19            (Discussion held off the

20   stenographic record.)

21            MS. ELLIS:  Can we go off the record

22   for just one moment, please.

23            THE VIDEOGRAPHER:  We are going off

24   the record.

25            This is the end of Media Unit No. 2.

Page 109

1              The time is 11:43.

2              (A short recess was taken.)

3              THE VIDEOGRAPHER:  We are going back

4       on the record.

5              This is the start of Media Unit No.

6       3.

7              The time is 11:44.

8              You may proceed, Counsel.

9              BY MS. ELLIS:

10       Q.    We were just discussing Exhibit 8,

11       which is the GAO summary available on their web

12       site regarding the GAO report we've been

13       discussing today.

14              I would like to direct your

15       attention to midway through the first

16       paragraph.  And there is a sentence there

17       starting with "Of those."

18              Do you see it?

19       A.    Yes.

20       Q.    Could you read that aloud, please.

21       A.    "Of those registrants that have

22       interacted with DEA, most were generally

23       satisfied with those interactions.  For

24       example, 92 percent of distributors that

25       communicated with DEA field office staff found

Page 110

1    them 'very' or 'moderately' helpful.  However,

2    some distributors, individual pharmacies and

3    chain pharmacy corporate office want improved

4    guidance from and additional communication with

5    DEA about their CSA roles and responsibilities.

6    For example, 36 of 55 distributors commented

7    that more communication or information from or

8    interactions with DEA would be helpful.  DEA

9    officials indicated that they do not believe

10   there is a need for more registrant guidance or

11   communication."

12        Q.    Do you understand that sentence to

13   be the support for the GAO's Recommendation 2

14   in that report?

15        A.    The --

16             MR. MASTERS:  Objection.

17             THE WITNESS:  The 36 of 55?

18             MS. ELLIS:  Yes.

19             THE WITNESS:  I don't have a way of

20   knowing what GAO was thinking in terms of

21   crafting their recommendations.  So I can't

22   answer your question.

23             BY MS. ELLIS:

24        Q.    Let's look at the second paragraph.

25   If you could read that aloud, please.

Page 111

1           A.    "Officials GAO interviewed from 14
2      of 16 state government agencies and 24 of 26
3      national associations said they interact with
4      DEA through various methods.  13 of 14 state
5      agencies and 10 of 17 national associations
6      that commented about their satisfaction with
7      DEA interactions said they were generally
8      satisfied.  However, some associations wanted
9      improved DEA communication."
10          Q.    The next paragraph goes on to put a
11     number on that, quote, some associations,
12     doesn't it?  The next sentence?
13               MS. WAITES:  Object to form.
14               BY MS. ELLIS:
15          Q.    Go ahead and read the next sentence
16     for the jury.
17          A.    Okay.
18               "Because the additional
19     communication that four associations want
20     relates to their members' CSA roles and
21     responsibility, improved DEA communication with
22     and guidance for registrants may address some
23     of the associations concerns."
24               So yes to your question.  Four is
25     the number.

Page 112

1        Q.    So is it your understanding that
2      Recommendation 2 was based, in part, on
3      feedback from four associations?
4                MS. WAITES:  Objection.  Calls for
5      speculation.
6                MS. MONAGHAN:  Yeah.  Objection.
7      Form.  Foundation.
8                THE WITNESS:  Yeah.  Like I said, I
9      don't know what -- what specifically GAO was
10     thinking here.  But it certainly seems
11     reasonable that -- that these concerns raised
12     by these associations may have informed their
13     decision making.
14               MS. ELLIS:  I have no further
15     questions at this time.
16               THE VIDEOGRAPHER:  We are going off
17     the record.
18               The time is 11:48.
19               (A short recess was taken.)
20               THE VIDEOGRAPHER:  We are going back
21     on the record.
22               This is the start of Media Unit No.
23     3.
24               The time is 12:05.
25               You may proceed, Counsel.

Page 113

1            MR. MASTERS:  We only have a few

2       minutes.  We'll be as brief as possible.

3        FURTHER EXAMINATION BY COUNSEL FOR CARDINAL

4                         HEALTH

5            BY MR. MASTERS:

6       Q.    Earlier today you were asked some

7       questions about HDA and HDMA?

8       A.    Yes.

9       Q.    Are you aware or have knowledge of

10      HDA or HDMA's membership structure?

11           MS. WAITES:  Objection.  Scope.

12           THE WITNESS:  No.

13           BY MR. MASTERS:

14      Q.    Are you aware of any of its missions

15      relating to and with respect to its

16      representative members?

17           MS. WAITES:  Objection.  Scope.

18           THE WITNESS:  No.

19           BY MR. MASTERS:

20      Q.    You don't have any -- any knowledge

21      about the activities that HDMA or HDA engages

22      in other than the work that you mentioned on

23      Capitol Hill?

24           MS. WAITES:  Objection.  Scope.

25           THE WITNESS:  Correct.

Page 114

```
1              BY MR. MASTERS:
2         Q.    Earlier today, when the plaintiffs
3     were questioning you, you were shown a document
4     reflecting questions from the GAO.  I -- I -- I
5     can't recall the exhibit.
6         A.    11?
7         Q.    11.  Yes.  That's it.  Exhibit 11.
8              And you were directed to some
9     specific questions -- some specific follow-up
10    questions from the GAO.
11             Is that -- do you recall that?
12        A.    Yes.
13        Q.    Do these follow-up questions from
14    the GAO go to the substance of the survey
15    questions or to the process by which the survey
16    would be administered?
17             MS. WAITES:  Objection.  Vague.
18    Calls for speculation.  Scope.
19             THE WITNESS:  I -- I actually don't
20    know.
21             BY MR. MASTERS:
22        Q.    Based on -- based on the plain
23    language, are -- is the -- is the GAO
24    requesting information about how to maximize
25    the responsiveness of the survey?
```

1984-22

07/24/19

```
1              Is that -- would that be a fair way
2      to characterize what they're seeking here?
3              MS. WAITES:  Objection.  Calls for
4      speculation.  Scope.  Foundation.
5              THE WITNESS:  Based on what I'm
6      reading in Question A, the only thing that
7      seems to maybe address your question is how
8      likely would they, who I -- I assuming are the
9      distributors, to be willing to or able to
10     complete the survey.
11             BY MR. MASTERS:
12        Q.   Is there anything improper about the
13     GAO soliciting input on how to maximize the
14     responsiveness of their survey?
15             MS. WAITES:  Objection.  Calls for
16     speculation.
17             THE WITNESS:  No.  But I don't --
18     I'm not even certain that was -- that's called
19     into question is --
20             BY MR. MASTERS:
21        Q.   You were also shown a document
22     reflecting a communication from DEA to GAO on
23     December 20th, 2016.  I believe it was
24     Exhibit 10.
25        A.   Yes.
```

1        Q.    And on the second page of the
2      letter -- I'll just go ahead and show you
3      this -- this has some of my highlighting, but I
4      want to direct you to the -- the paragraph --
5      the second paragraph of DEA's response states
6      that:  "The GAO survey was conducted in 2015
7      prior to new DEA leadership, including a new
8      acting administrator and new management for the
9      diversion control division.  DEA's new
10     management met with industry leaders on
11     February 29th, 2016.  Since then DEA has
12     continued to work with the industry and
13     improved communication on these issues."
14            Did I read that correctly?
15        A.    Yes.
16        Q.    In -- in the DEA's response to the
17     GAO and the DEA's status report to the GAO, why
18     did the DEA referenced [sic] new leadership and
19     new management?
20        A.    So there was a -- a recognition that
21     in -- was it July of 2015 DEA got a new
22     administrator.  That was shortly after the
23     former administrator, Michele Leonhart,
24     retired.  And one of Acting Administrator
25     Rosenberg's first orders of business was to

1    work more in a collaborative fashion with our

2    registrant community.

3                    And so, in -- in -- along that side,

4    he also decided to identify a new person that

5    would run the diversion control program.  And

6    that resulted in the former head of diversion

7    retiring.

8        Q.    And this introduction of new

9    management and new leadership in the DEA Office

10   of Diversion Control and at the DEA resulted in

11   improved communications on these issues, fair?

12                   MS. WAITES:  Objection.

13   Mischaracterizes prior testimony.

14                   THE WITNESS:  The February 29th,

15   2016 meeting was a listening session.  So this

16   was our opportunity to basically hear from our

17   trade associations as to things that they

18   wanted to communicate with DEA about.

19                   BY MR. MASTERS:

20       Q.    And the DEA's new management felt

21   that that was a priority?

22       A.    That was something we absolutely

23   wanted to do, yeah.

24                   And I would say that, under the

25   leadership of Acting Administrator Rosenberg,

1    that was a priority, yes.

2         Q.    You also mentioned the distributor

3    initiative as one of the ways in which the DEA

4    communicates in a one-on-one basis with

5    registrants, correct?

6         A.    Yes.

7         Q.    When was the last time that the DEA

8    held a distributor initiative briefing with

9    Cardinal Health?

10              MR. SMITH:  Objection.  Scope.

11              THE WITNESS:  I don't know.

12              BY MR. MASTERS:

13        Q.    When was the last time that the DEA

14   held a distributor initiative briefing with

15   AmerisourceBergen Drug Corporation?

16              MS. WAITES:  Objection.  Scope.

17              THE WITNESS:  Same answer.  I don't

18   know.

19              BY MR. MASTERS:

20        Q.    When was the last time the DEA held

21   a distributor initiative -- initiative briefing

22   with McKesson?

23              MS. WAITES:  Objection.  Scope.

24              THE WITNESS:  And I'll -- I'll

25   ask -- I don't know the answer.

Page 119

1            But as a point of clarification, are
2     we talking about an individual McKesson
3     registration location, or are we talking about
4     the corporation at large, which would encompass
5     all their registrations?
6            BY MR. MASTERS:
7        Q.    We're talking about the -- the
8     distributor initiative briefing.
9        A.    Yeah.  Because that's done at a --
10    at a registrant-specific location.  So I don't
11    know the answer to your question.
12           But just as a point of
13    clarification, if -- if each of these
14    distributors have 20-plus distribution
15    locations, we wouldn't necessarily do the
16    distributor initiative with the corporation at
17    large; it would generally be done with each
18    individual location.
19       Q.    Are you aware that distributor
20    initiative briefings with the corporation at
21    large were, in fact, held in 2005 with Cardinal
22    Health, AmerisourceBergen and McKesson?
23           MS. WAITES:  Objection.  Foundation.
24    Scope.
25           And after this, we're going to stop

Page 120

1    questions, both because you're out of time,

2    this is someone else's topic, and we said that

3    we are not going to talk about individual

4    meetings with distributors.

5              So --

6              MR. MASTERS:  My --

7              MS. WAITES:  If you have another

8    wrap-up question or two, I'll allow it.  But

9    we're not going to continue with this line of

10   questioning.

11             MR. MASTERS:  My understanding from

12   the authorization on this topic that -- that

13   the witness would be off -- prepared to talk

14   about the foundation -- or the basis of the

15   DEA's response to the GAO in its draft --

16   when -- when it provided the draft report.

17             And one of the responses that the GA

18   -- that the DEA gave in its report was, in

19   emphasizing the communication, they referenced

20   the distributor initiative briefings that began

21   in 2005.  And I'm simply probing the basis

22   for -- for that statement.

23             MS. WAITES:  We've been very clear

24   that these depositions are not going to cover

25   specific individual meetings.  And if you

1    wanted to cover that, the appropriate person

2    would have been -- would have been Mr.

3    Provosnik.

4              So this line of questioning is

5    certainly not appropriate for Mr. Strait.  If

6    you have another question regarding the GAO

7    report, I'm fine with that.  But you're also

8    out of time.

9              BY MR. MASTERS:

10       Q.   One final question:  Counsel for

11   plaintiffs at -- at Exhibit 9, I believe it

12   was, reviewed a status report from April 27th,

13   2016, in which the DEA listed a number of

14   communications that it -- or a number of

15   efforts that it took to comply with the GAO's

16   recommendation.

17              And I just want to confirm for the

18   record that the GAO, in response to this

19   letter, did not close the recommendation,

20   correct?

21       A.   They did not close the

22   recommendation despite our request that they do

23   so.

24       Q.   And in -- and in June of 2016, the

25   GAO stated that additional written guidance is

Page 122

1    still -- has still not occurred and is -- and

2    is needed in order to satisfy and close the

3    recommendation, correct?

4               MS. WAITES:  Objection.  Misstates

5    the document.

6               THE WITNESS:  I would just refer you

7    to the -- the plain language in -- in Exhibit

8    8, which talks about the status as indicated by

9    GAO on their web site.  And I can read that if

10   you'd like.

11              BY MR. MASTERS:

12       Q.    Which -- which is still open,

13   correct?

14       A.    It is still open, yes.

15              MR. MASTERS:  No further questions.

16   Thank you.

17              THE VIDEOGRAPHER:  We are going off

18   the record.

19              The time is 12:15.

20              (Discussion held off the record.)

21              THE VIDEOGRAPHER:  We are back on

22   the record.

23              The time is 12:16.

24              We are off the record at 12:16 p.m.

25              And this concludes today's testimony

1      given by Matthew Strait.

2                  The total number of media units used

3      was three and will be retained by Veritext

4      Legal Solutions.

5                  (Whereupon, the proceeding was

6      concluded at 12:16 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 124

1          CERTIFICATE OF NOTARY PUBLIC

2              I, Bonnie L. Russo, the officer before

3      whom the foregoing deposition was taken, do

4      hereby certify that the witness whose testimony

5      appears in the foregoing deposition was duly

6      sworn by me; that the testimony of said witness

7      was taken by me in shorthand and thereafter

8      reduced to computerized transcription under my

9      direction; that said deposition is a true

10     record of the testimony given by said witness;

11     that I am neither counsel for, related to, nor

12     employed by any of the parties to the action in

13     which this deposition was taken; and further,

14     that I am not a relative or employee of any

15     attorney or counsel employed by the parties

16     hereto, nor financially or otherwise interested

17     in the outcome of the action.

18

19                    _Bonnie L. Russo_____

20                  Notary Public in and for

21                  the District of Columbia

22

23     My Commission expires:  June 30, 2020

24

25

```
                                                     Page 125
 1                    Veritext Legal Solutions
                          1100 Superior Ave
 2                            Suite 1820
                        Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4
     June 5, 2019
 5
     To: Natalie A. Waites
 6
     Case Name: In Re: National Prescription Opiate Litigation v.
 7
     Veritext Reference Number: 3404564
 8
     Witness:  Matthew Strait        Deposition Date:  5/31/2019
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2

   ASSIGNMENT REFERENCE NO: 3404564
 3 CASE NAME: In Re: National Prescription Opiate Litigation v.
   DATE OF DEPOSITION: 5/31/2019
 4 WITNESS' NAME: Matthew Strait
 5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
 6 my testimony or it has been read to me.
 7      I have made no changes to the testimony
   as transcribed by the court reporter.
 8

   _____        _____
 9 Date                         Matthew Strait
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15
        I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
                 _____
18               Notary Public
19               _____
                 Commission Expiration Date
20
21
22
23
24
25
```

```
 1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 3404564
 3  CASE NAME: In Re: National Prescription Opiate Litigation v.
    DATE OF DEPOSITION: 5/31/2019
 4  WITNESS' NAME: Matthew Strait
 5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7       I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s).
 9       I request that these changes be entered
    as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____       _____
    Date                        Matthew Strait
14
         Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18       in the appended Errata Sheet;
         They signed the foregoing Sworn
19       Statement; and
         Their execution of this Statement is of
20       their free act and deed.
21       I have affixed my name and official seal
22  this _____ day of_____, 20____.
23       _____
         Notary Public
24
         _____
25       Commission Expiration Date
```

Page 128

1                    ERRATA SHEET

              VERITEXT LEGAL SOLUTIONS MIDWEST

2                 ASSIGNMENT NO: 3404564

3    PAGE/LINE(S) /        CHANGE       /REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

     _____      _____

20   Date                        Matthew Strait

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22   DAY OF _____, 20_____ .

23                   _____
                     Notary Public

24

                     _____

25                   Commission Expiration Date

**[& - 2nd]**                                                                 Page 1

| & |
| --- |
| **&**   2:5 3:15 4:2,5 5:3,9 6:4,10,15,21 10:22 11:9,11,16 11:20,21 12:15,17 12:18 13:2,5,5,11 |

| 0 |
| --- |
| **0.06**   43:18 |
| **00**   85:4 |
| **00026731-733**     8:17 |
| **00026799**   80:19 |
| **00026799-803**     8:22 |
| **00026803**   85:5 |
| **00026803-810**     8:24 |
| **00026833**   65:14 |
| **00026833-834**     8:20 |
| **00026897-902**     8:19 |
| **00538072**   99:25 |
| **02423059-064**   9:6 |

| 1 |
| --- |
| **1**   8:9 10:14 14:23 14:24 24:20 51:23 73:6,21 91:9 |
| **1,700**   40:25 |
| **1.7**   26:13 |
| **1.8**   76:20 |
| **1.815**   75:24 |
| **10**   8:23 85:4,6 87:18 88:13 111:5 115:24 |
| **10-13-14**   9:5 |
| **10.222**   3:6 |
| **1000**   5:16 |
| **104**   9:5 |

**10:14**   52:5
**10:36**   70:7
**10:57**   70:11
**11**   6:10 9:3 99:20 99:24 114:6,7,7
**1100**   4:10 125:1
**113**   8:4
**11937**   124:19
**11:43**   109:1
**11:44**   109:7
**11:48**   112:18
**12**   9:5 104:16,20 107:14
**12-20-16**   8:23
**12:05**   112:24
**12:15**   122:19
**12:16**   122:23,24 123:6
**12th**   2:6 5:10 10:22
**13**   8:3 43:12 111:4
**14**   8:9 111:1,4
**15**   8:10 43:12
**15-471**   8:20
**15219**   6:22
**15222**   5:23
**15471**   23:16
**16**   27:7 43:12 97:15 111:2
**16-737t**   52:13
**17**   1:5,9 10:20 50:7 111:5
**1701**   5:4
**175**   3:6
**1755**   4:15
**18**   1:11,13
**18,000**   40:24
**1800**   5:16
**1820**   125:2
**18th**   4:5

**19**   53:9
**19103**   5:4

| 2 |
| --- |
| **2**   8:10 15:10,11 30:2,8 52:4 57:9 57:17 58:8,12 63:13 77:22 81:24 82:1,3,4 86:7 108:7,25 110:13 112:2 |
| **2-20-14**   9:3 |
| **2-26-18**   8:18 |
| **20**   14:21 17:12 119:14 126:16 127:22 128:22 |
| **200**   26:7,19 39:6 90:6 |
| **20001**   6:5 |
| **20002**   3:7 |
| **20005**   5:10 |
| **20036**   5:17 |
| **2005**   119:21 120:21 |
| **2006**   84:19 |
| **2011**   29:12 43:15 |
| **2013**   82:23 95:14 95:22 96:3 100:8 |
| **2014**   90:16 102:14 102:17 104:23 |
| **2015**   23:22 65:23 73:15 81:13 82:23 116:6,21 |
| **2016**   54:4 55:6 81:4 82:24 85:13 86:1,5 88:16 89:1 115:23 116:11 117:15 121:13,24 |
| **2017**   17:17 49:25 57:6,24 63:20,21 |
| **2018**   61:18 62:14 62:15,22,22 63:9 |

**64**:6,23 65:2 66:19,24 68:16,20
**2019**   1:20 10:5 67:2 68:24 69:4 69:16 125:4
**202-434-5000**   5:11
**202-598-6204**   3:12
**202-616-2964**   3:7
**202-662-6000**   6:6
**202-778-1800**   5:17
**2020**   124:23
**20th**   61:18 62:13 62:15 63:20 85:12 86:5 102:14,17 115:23
**21**   15:23 16:20 38:22 89:10,22,25
**213-430-7508**   4:6
**215-963-4824**   5:5
**2150**   3:16
**216-523-1313**     125:3
**216-592-5000**   4:11
**21st**   81:13
**22152**   3:11
**225**   5:23
**23**   8:11
**24**   111:2
**25**   32:13 33:17
**25th**   73:14
**26**   27:3 31:13 97:14 111:2
**27**   34:5
**27th**   81:4 86:1 121:12
**28**   92:10
**2804**   1:4,5 10:20
**29th**   116:11 117:14
**2nd**   63:21

[3 - additional]

**3**

**3** 8:11 23:8,13
71:2 72:8 73:6
74:18 77:23 89:11
92:14 97:6 109:6
112:23
**30** 19:19 124:23
**300** 26:8,11
**301** 6:22
**3011** 3:16
**30th** 62:22 63:9
**31** 1:20
**312-269-4066** 4:20
**312-646-5817** 3:22
**313-800-4170** 3:17
**317-261-7863** 6:11
**31st** 10:5 69:5,16
**3400** 3:21
**3404564** 1:25
125:7 126:2 127:2
128:2
**35** 3:21
**35th** 6:21
**36** 110:6,17

**4**

**4** 8:13 47:2,6 89:4
**4-27-16** 8:21
**40** 38:2
**400** 4:5 26:8,14
**412-288-3131** 5:24
**412-338-5224** 6:23
**414-297-5913** 6:16
**44** 30:5 44:14
**44113** 4:10
**44114** 125:2
**45** 38:3 44:23 60:3
**45005** 1:9
**45090** 1:13
**45132** 1:11

**46** 46:5
**46204** 6:11
**47** 8:13
**48202** 3:17

**5**

**5** 8:14 40:1 52:7
52:11 125:4
**5-24-19** 8:10
**5/31/2019** 125:8
126:3 127:3
**52** 8:14
**53202** 6:16
**55** 110:6,17
**56** 8:16

**6**

**6** 8:16 19:19 27:18
56:8,12 63:12
92:14
**6-9-17** 8:16
**60601** 3:22 4:19
**61** 8:18
**65** 8:20
**650-739-3939** 4:16
**66** 89:13,14
**67** 74:17,20

**7**

**7** 8:18 61:10,14
**70** 8:5 60:25
**71,000** 26:11 40:23
47:20 76:3,9
**715** 76:7,8,9 90:10
**725** 2:6 5:10 10:22
**73** 61:1
**750** 26:21 38:24
76:6,8,9 90:10
**77** 4:19 39:7,11
73:5,13 90:1,6
91:12 92:11
**777** 6:16

**78** 90:5,6
**79** 48:10

**8**

**8** 8:20 15:22 65:8
65:12 107:12
109:10 122:8
**80** 8:21
**81** 39:25
**85** 8:23
**850** 6:5
**8701** 3:11

**9**

**9** 8:21 26:20 80:6
80:7,15 86:2,21
87:2,3,16 88:12
121:11
**900** 26:20
**90071** 4:6
**92** 109:24
**94303** 4:15
**945** 26:20
**950** 4:9
**954** 90:14
**99** 9:3
**9:21** 24:13
**9:24** 24:17
**9:59** 51:24

**a**

**a.m.** 1:21 10:5
**aaron** 1:7
**ability** 67:11
**able** 40:18 45:25
101:9 115:9
**absence** 33:20
34:11 35:18 36:13
36:23
**absent** 64:2,10
**absolutely** 21:6,13
29:3 60:12,15
68:13 84:9 117:22

**abuse** 27:24 42:5
**acceptable** 41:14
**access** 34:18,25
35:22 66:1 94:4
103:24
**accessible** 46:12
**accountability**
18:12,17,22 19:15
71:8,13,21 100:4
**accurate** 42:11
**acknowledge**
126:11 127:16
**acknowledges**
44:23
**act** 48:5 72:5,11
126:14 127:20
**acting** 116:8,24
117:25
**action** 33:14
124:12,17
**actions** 57:3 75:8
78:1 80:1 82:14
82:18 87:6 88:2
**activities** 75:2
113:21
**added** 50:1,6
106:14
**addition** 27:10
88:11
**additional** 30:11
30:16,17,24 31:20
32:19 33:3,10
37:19 42:7,25
43:24 44:10 45:2
46:10,15,15 48:12
48:13 49:17,17
50:24 51:11 54:18
55:2 58:22 59:14
59:24 60:10 64:3
64:24 69:18 80:3
86:8 88:15 110:4

111:18 121:25
**additionally** 34:7
34:11
**address** 22:4
24:10 57:3 111:22
115:7 125:15
**addressed** 44:5
**addressing** 21:12
27:24
**adequacy** 25:10
29:17
**adequate** 24:24
72:18,23
**administered**
41:10 97:9 114:16
**administering**
73:24 104:2
**administration**
3:10 12:4 14:20
16:6,10,15,23
17:10 18:23 19:2
21:3 29:6 48:2
52:25 56:23
**administrative**
75:7
**administrator**
16:25 17:5 37:14
116:8,22,23,24
117:25
**advance** 80:16
**advise** 17:5
**advisor** 16:24 17:3
17:9
**affairs** 17:21 24:4
98:15
**affect** 76:12
**affiliations** 11:6
**affixed** 126:15
127:21
**agencies** 18:9 27:8
27:13 67:21 97:15

101:16 111:2,5
**agency** 17:23
18:13 20:19 22:9
32:25 44:15 45:25
56:20 66:20 74:25
75:5 86:15 93:14
99:10
**agency's** 57:18
**agenda** 50:2,7
**ago** 53:12 54:2
57:8,23 90:9
**agree** 10:13 25:6
34:19,23 37:1
49:5 71:22 72:21
74:6,24 78:13
**agreement** 23:5
**ahead** 11:23 32:11
105:22 106:3
111:15 116:2
**aid** 5:2 13:8
**al** 1:8,10,12,13
**alliance** 96:17
**allow** 120:8
**alongside** 99:7
**aloud** 88:18
109:20 110:25
**alto** 4:15
**american** 71:14
**amerisourceberg...**
5:20 12:25 101:21
102:1 118:15
119:22
**amount** 33:21
34:14 36:15 41:24
98:18,23
**analyses** 71:16
**analysis** 60:23
**anda** 6:13 13:12
**angeles** 4:6
**answer** 14:14 34:3
59:5 84:5 89:8

94:11,14,23 95:5
96:1 104:12
106:25 110:22
118:17,25 119:11
**answered** 51:15
**answers** 89:23
**anthony** 5:15
11:12
**anticipated** 66:24
**anticipates** 64:3
**anybody** 94:18
**apologize** 80:13
**appear** 126:11
127:15
**appearances** 3:1
4:1 5:1 6:1 11:6
**appears** 61:16
66:3,11 80:24
88:12 124:5
**appended** 127:11
127:18
**appropriate** 41:4
121:1,5
**approval** 61:7
63:18
**approximately**
76:3 91:22
**april** 54:4 55:5
81:4 86:1 121:12
**arbitrary** 34:23
35:3 36:6 39:15
40:7 41:21 45:9
**argue** 41:20
**arm** 71:10 72:1
**aruiz** 5:18
**aside** 51:5
**asked** 25:9,16
29:14 39:1,2,11
51:14 62:12 75:15
82:8 102:15 113:6

**asking** 58:1
**aspects** 83:7
**assertion** 37:1
**assessment** 40:19
**assignment** 126:2
127:2 128:2
**assist** 48:3
**assistance** 71:17
**assistant** 16:25
17:4 37:13
**assisting** 19:22
**association** 83:4
98:13
**associations** 27:4
27:12 30:9 45:1
82:5 83:7 87:7,9
88:3,6,22 96:21
97:14,19,23 98:6
108:10 111:3,5,8
111:11,19,23
112:3,12 117:17
**assuming** 105:15
115:8
**attached** 86:4
127:7
**attachment** 8:18
8:22,24 85:16
89:4 107:17
**attempt** 86:15
**attendee** 103:18
**attending** 11:5
106:1
**attention** 15:22
27:17 75:18 91:8
92:13 107:11
109:15
**attorney** 124:15
**attorney's** 7:3
12:6
**audio** 10:11,11
12:23

| | | | c |
|---|---|---|---|
| **audit** 20:23 21:18 21:21,24 55:21 56:18 61:17 71:9 72:1 81:2 85:19 103:7 | 122:21 125:15 **barnes** 6:10,20 12:15,17,17 **barring** 51:5 **base** 87:21 | 121:11 **beneficial** 32:22 33:6,11 **benefit** 47:19 87:25 106:14 | **c** 3:9 4:8 8:1 10:1 **ca** 125:25 **cah** 9:6 **california** 4:6,15 |
| **audits** 77:5 **august** 14:21 64:23 66:24 68:16 96:3 100:8 **author** 83:24 | **based** 27:10 41:6,7 41:10 55:7 56:4 58:8 60:19,22 86:16,18 87:6 88:2 89:18 97:10 | **best** 76:22 **better** 20:1 43:22 **beyond** 51:2 **bhimmel** 5:24 **bit** 59:2 95:10 | **call** 21:25 24:24 96:4 100:9 **called** 26:6 50:25 56:22 84:17 97:25 115:18 |
| **authorization** 15:15 120:12 **authorize** 127:11 **authorized** 15:17 16:18 | 112:2 114:22,22 115:5 **basically** 40:21 117:16 **basis** 51:8 103:25 | **bmasters** 5:12 **boards** 83:5 **bob** 106:18 **bockius** 5:3 **bonnie** 1:24 11:2 | **calls** 50:12 59:18 78:25 79:8,15 107:7 112:4 114:18 115:3,15 **capacity** 15:16 |
| **availability** 42:3 74:1,3 **available** 107:25 109:11 **ave** 125:1 | 118:4 120:14,21 **bates** 65:13 80:17 99:24 **began** 84:18 120:20 | 124:2 **books** 60:3 **bottom** 24:23 25:2 66:3 77:25 80:18 **boulevard** 3:16 | 17:18 24:3 **capital** 98:16 99:5 **capitol** 113:23 **cardinal** 5:7 11:9 11:11 13:23 |
| **avenue** 4:9 5:23 **average** 40:18 **aware** 18:20 23:20 23:25 24:4,6 53:2 79:3,3,11 81:8 | **beginning** 27:19 31:17 34:7 46:7 52:3 53:19 88:13 **behalf** 2:10 3:3,13 3:19 4:2,12 5:2,7 | **brad** 5:9 11:8 **branch** 50:21 63:16 **break** 51:19 **brian** 5:21 12:24 | 101:21,23 113:3 118:9 119:21 **careful** 50:17 **carl** 105:6,8 **case** 1:5,9,11,13 |
| 92:24 93:1 94:25 95:12,20 96:3,9,19 97:19 102:3,15,20 104:21 113:9,14 119:19 | 5:13,20 6:2,8,13 6:19 11:13,16,20 11:22 12:7,9,16,18 12:21 13:2,5,8 16:9 37:7 52:23 | **brief** 113:2 **briefing** 118:8,14 118:21 119:8 **briefings** 119:20 120:20 | 10:19 36:21 37:22 56:16 60:7 67:23 70:22 108:3 125:6 126:3 127:3 **cause** 64:15 |
| **b** | 53:10,24 **beisell** 4:17 12:20 12:20 | **bringing** 41:8 **brought** 99:9 | **cc** 81:17 **cell** 10:9 |
| **b** 19:19 101:13 **bacchus** 7:2 12:5,5 **back** 17:16 23:22 24:15 29:25 30:21 33:16 36:2 43:15 | **believe** 20:6 29:9 31:13 43:20 46:9 52:16 54:20 80:15 84:18 89:15 90:14 | **btlaw.com** 6:12 **budget** 63:22 67:18 **burling** 6:4 11:16 **burned** 106:7 | **cellular** 10:8 **centre** 6:21 **certain** 20:21 29:13 34:14 36:15 84:2 96:21 115:18 |
| 47:9,10 52:1 56:1 63:11 70:9 71:1 75:18 90:16 91:8 94:22 97:5 108:14 109:3 112:20 | 90:14,17 92:15,23 93:13,23 94:16 96:16 97:21 98:5 110:9 115:23 | **business** 20:16 36:7 116:25 **businesses** 87:9 88:5 | **certainly** 43:9 84:14 98:5 112:10 121:5 |

certainty 84:2
certificate 124:1
   127:11
certification 126:1
   127:1
certify 124:4
cetera 106:12
chain 9:3,5 35:11
   76:25 97:12
   101:10 110:3
challenges 83:9
change 125:13,14
   127:8 128:3
changes 23:3 91:6
   125:12 126:7
   127:7,9
characterization
   32:6
characterize 115:2
charge 84:25
charged 19:22
   74:4
chart 92:6
chemical 90:22
chemicals 90:21
chicago 3:22 4:19
chief 3:10 17:20
   56:17
circumstances
   41:4
city 1:10
citycenter 6:4
civil 3:5 7:4 126:5
   127:5
clarification 38:21
   119:1,13
clarified 89:16
clarity 100:20
class 79:21,23
classes 79:18

clear 33:20 34:12
   35:18 36:13,23,23
   51:10 55:16 56:7
   59:20 120:23
clearly 59:19
cleveland 1:10
   4:10 125:2
clients 99:5
close 22:1,2 47:7
   49:19 55:12,17
   56:3 57:12 58:7
   121:19,21 122:2
closed 51:9 57:7
   57:10,25
closeout 56:20
closing 55:6,22
closure 86:18,22
   87:1,5,19 88:1
coalition 87:11
collaborate 85:1
collaborating 87:8
   88:5
collaboration
   67:13,14
collaborative
   117:1
colleagues 106:11
columbia 124:21
column 66:4,5
come 19:25 20:17
   47:9
comfortable 69:12
coming 36:19,20
   47:10 84:24
comment 23:5
   45:15 60:6,10,13
   60:15 63:3 64:4
   73:10
commented 38:18
   110:6 111:6

commenting 53:10
   53:20,21,25
comments 23:6
   31:22 44:9,15
   66:6,18
commerce 100:18
commission
   124:23 126:19
   127:25 128:25
commitment
   71:19
committee 8:14
   52:16,16 100:18
common 106:10
communicate
   117:18
communicated
   37:22 109:25
communicates
   76:13 99:13 118:4
communication
   24:25 25:21 31:11
   31:23 32:21 78:2
   98:19,23 99:9
   110:4,7,11 111:9
   111:19,21 115:22
   116:13 120:19
communications
   15:23 25:11,17
   27:14 29:1 30:16
   56:1 117:11
   121:14
community 26:12
   38:5 43:11 77:9
   84:17 117:2
companies 102:2
company 12:19
comparable 33:1
   49:8 58:24 59:9
   69:23 91:4

complete 101:9
   115:10
completed 64:5
   125:15
completely 41:5
compliance 56:17
   72:10
comply 15:24
   48:14 53:11 54:1
   83:13 121:15
computerized
   124:8
concern 98:22
   106:6
concerned 33:19
concerning 29:22
concerns 44:24
   59:4 98:18 111:23
   112:11
concerted 107:3
conclude 33:3
concluded 123:6
concludes 122:25
conclusion 79:1,8
   79:15
conduct 25:20
   77:5
conducted 26:1
   116:6
conference 82:22
   83:19 84:23 89:1
   96:4 100:9 108:17
conferences 43:11
   54:9 55:7 56:4
   83:2 87:10 88:7
   88:16 89:2
confirm 121:17
congress 17:23
   18:10,16 19:6,22
   20:1,10,25 25:10
   52:23 71:10,10,18

72:2 81:15,16
98:17
**congress's**  18:2
**congressional**  8:11
17:21 18:5 19:9
24:3 52:14 81:12
98:15
**connecting**  36:22
**connects**  36:9
**connolly**  2:5 5:9
10:22 11:9,11
**consensus**  83:8
**consequence**  42:4
**conservative**
33:21
**consideration**
21:22 23:3 26:10
**considered**  60:5
**considers**  60:6
**consistent**  28:8
**consistently**  21:24
**constituted**  84:3
**constitutional**
71:11
**contained**  15:25
**containing**  75:4
**contains**  62:1
**content**  95:2
**contents**  47:22,24
**continue**  10:12
30:7 46:9 54:19
87:8 88:4 120:9
**continued**  4:1 5:1
6:1 9:1 51:3 88:14
88:21 116:12
**continues**  43:15
**control**  17:1,6,17
24:24 27:22 28:13
28:20,22,23 37:14
37:15,17 48:3
61:8 73:23 74:8

77:12 116:9 117:5
117:10
**controlled**  26:21
33:22 34:14 36:15
38:25 48:4 65:25
67:23 72:5,10
74:1,5 75:4 77:1
83:11 90:18,25
98:11
**controlling**  20:24
**conversations**
10:8 102:25 103:7
**coordinating**  75:1
106:10
**coordination**
67:17
**copy**  80:9 81:17
**core**  71:20
**corner**  41:13
77:25
**corporate**  35:11
36:21 97:12
101:13,17 110:3
**corporation**  5:20
6:2 12:25 118:15
119:4,16,20
**correct**  16:6,7,11
16:15 18:13 22:10
22:11,17 23:18,19
25:13,19 27:5,6,9
27:15,16 28:14,15
29:2,6,19 30:18
31:12,15 32:1
33:11 35:7,23
36:17,18 37:4,5,7
37:10,20 38:1,10
38:14 39:20 42:16
42:17,19 43:2,4,24
44:6,21 45:15,20
46:4,16,17 47:16
48:8,10,11,16,25

51:13 52:25 53:1
53:13 54:2,3,12
56:24 57:4,5,13
58:5,20 59:1,10,16
60:1,11,18 61:8,21
61:23 62:5,6,10
63:10,25 64:19,22
65:2,14,15 66:1,2
66:7,16 67:4
68:12,21,22 69:2
78:15,19 81:20
85:14,24 87:17
88:17 91:13 93:1
103:2 104:6,9
108:12 113:25
118:5 121:20
122:3,13
**corrections**  125:12
127:17
**correctly**  28:6
31:25 46:3 48:7
54:11 58:19 67:3
116:14
**correspondence**
55:5,21,23 56:16
56:20
**counsel**  3:10 10:16
11:4 13:22,23
14:13 24:18 52:6
70:12,17 109:8
112:25 113:3
121:10 124:11,15
**counterparts**
85:20
**county**  1:8,12
126:10 127:15
**couple**  101:5
**course**  21:14
28:10 48:15 77:12
**court**  1:1 10:18
11:1 13:13 14:9

126:7
**cov.com**  6:6
**cover**  66:11
120:24 121:1
**covington**  6:4
11:16
**crafting**  110:21
**create**  34:25 35:4
41:23 42:1 45:25
49:13 105:14
**created**  32:23
46:19,23
**csa**  45:24 48:14
54:24 73:25 78:3
78:15,22 79:5
82:16 83:15
103:24 104:23
110:5 111:20
**culminate**  24:6
**current**  16:22 17:8
58:14 62:4,18
66:21
**currently**  49:19
75:24
**customer**  29:12
40:12,13 45:22
91:14
**customers**  34:15
36:17 39:19 41:1
41:19
**cut**  80:17
**cuyahoga**  1:8
**cvs**  5:13,13 11:13
11:13

**d**

**d**  10:1
**d.c.**  1:19 2:7 5:10
5:17 6:5 10:23
**da**  68:17
**dan**  1:6

[daniel - direct]

**daniel** 7:6 10:24
**data** 34:12 36:14
36:23
**database** 103:25
104:5
**date** 86:3 102:13
125:8 126:3,9,19
127:3,13,25
128:20,25
**dated** 8:10,16,18
8:21,23 9:3,5
61:18 73:14 81:3
81:12 85:12
**dates** 103:4
**david** 7:4 12:1
**day** 4:14,18 12:21
13:10 19:7,7
43:15 126:16
127:22 128:22
**days** 125:18
**dc** 3:7
**de** 82:9
**dea** 8:17,19,20,22
8:24 12:7,9,11
18:4,7,11,16 21:5
21:7,18 22:17,21
23:7 25:6,17
27:13,21,23,25
28:9,13 29:1
31:12,21,24 32:2
32:10,23 33:14
34:12,19 36:13
37:3,7,20 38:5
39:8,14 40:8,15,17
40:22,24 41:15,19
41:22 42:2,6,25
43:9,18 44:5,10
45:16,23 46:10,19
46:23 47:14 48:20
49:7,22 50:1,23
51:11 53:4 54:5

54:15,17,25 55:17
56:16 57:2,11
58:3,4,13,23 59:6
59:7,15 60:8 62:3
62:7 63:7 64:3,23
65:14,23,24 66:19
66:23,23 68:18
69:6,17,19,22
72:15 73:1,11,18
74:12 75:7 76:13
76:21 78:1 79:13
79:25 80:1,3,3,19
82:1,9,14,19 83:12
83:24 84:3,14,21
84:23 85:1,2,4,5
85:25 86:9,10,22
86:24,25 87:1,4,8
87:18 88:1,4,13,21
88:25 89:2,6 91:7
92:25 93:4,8,18
94:2,6,13,19 97:11
97:14 98:19,24
99:7,13 100:5,20
101:7,15 102:4,15
102:24 103:10,17
103:24 106:13,15
106:19 108:8
109:22,25 110:5,8
110:8 111:4,7,9,21
115:22 116:7,11
116:18,21 117:9
117:10,18 118:3,7
118:13,20 120:18
121:13
**dea's** 17:21 23:2
25:11 28:2,8
29:17,22 37:18,23
38:8 40:19 44:2,8
44:24 45:14,15,22
47:12 53:10,25
58:11 62:1 63:12

67:10 73:23 74:7
74:24 81:16 82:3
82:22 83:2,4 87:6
88:2 91:13,18,25
116:5,9,16,17
117:20 120:15
**deadlines** 20:25
**dear** 125:10
**december** 85:12
86:5 115:23
**dechert** 3:20 11:18
**dechert.com** 3:23
**decide** 106:17
**decided** 104:1
117:4
**decision** 36:7
112:13
**decisions** 71:19
**declined** 58:7
**deed** 126:14
127:20
**deemed** 125:19
**defendant** 10:16
**define** 42:22
**defines** 42:12
**delay** 63:18
**delays** 64:16
**deliberative** 20:19
49:24 50:17 69:11
**delivered** 68:25
**demand** 74:4
**deo** 72:25
**department** 3:3,5
3:9 7:3,4 12:2
44:20 50:1 66:25
67:6,15,22 68:2,7
125:22
**deposed** 14:3
**deposition** 1:18
2:1 8:9 10:11,15
10:21 14:24 15:5

15:5,11 16:13
23:8 47:2 52:7
56:8 61:10 65:8
80:7,16 85:6
99:20 104:16
124:3,5,9,13 125:8
125:11 126:1,3
127:1,3
**depositions** 120:24
**depth** 108:8
**deputy** 37:13
**describe** 82:13
**described** 68:17
88:11
**describing** 66:5,6
**description** 88:15
**design** 45:18
**designation** 19:19
**despite** 121:22
**detail** 17:13 18:1
**details** 50:18
**detroit** 3:17
**develop** 30:10,23
45:2 54:18 55:1
58:22,23 59:8,14
**developed** 32:25
49:7
**developing** 45:23
**deviating** 42:14
**diana** 52:14,19
**differ** 39:19 40:11
**difference** 75:16
90:17
**different** 27:8 41:5
41:11,14 57:22
76:14 77:14 78:21
79:5,12,18,22
81:19 84:22 90:11
**diligence** 100:21
**direct** 15:21 27:17
73:5 74:17 75:17

81:23 84:20 86:6
89:10 92:13
101:14 107:11
109:14 116:4
**directed**  114:8
**directing**  91:8
**direction**  124:9
**directive**  78:10
**directives**  63:17
63:19 64:11
**directly**  17:4 51:4
81:22 84:6
**director**  52:20
**disagreement**  23:6
**disclose**  45:19
**disclosing**  50:14
**discussed**  32:6
33:8 51:3 55:20
79:24 85:23 89:11
107:19 108:7
**discussing**  53:12
54:2 109:10,13
**discussion**  57:18
88:24 108:19
122:20
**discussions**  104:9
105:12
**dispensed**  41:9
**dispensing**  83:11
**distinction**  90:15
**distribute**  54:18
55:2
**distributed**  41:22
**distribution**  90:21
119:14
**distributor**  34:25
35:14 40:12,12
41:16,17 43:10,11
43:14 46:12 49:9
54:8 60:8 82:22
83:18 84:5,12,16

84:18,22 89:3
96:16 100:4 101:7
118:2,8,14,21
119:8,16,19
120:20
**distributors**  25:12
25:18 26:8,17,18
26:23 27:1 29:18
29:23 30:9,10,11
30:17,24 31:5,9,22
32:4,10,19 33:2,4
33:20 34:13,22
35:19 36:5,8,14
37:22 38:17,25
39:6,8,16,19 40:8
40:16 41:1 43:7
44:11 45:1,2,3,9
45:18 46:11,21
47:16,18 49:23
50:24 51:12 54:6
54:10,19,22 55:3
57:10 58:16 59:24
60:9 66:10 69:18
75:17 76:5,9,11
77:2 78:22 79:4
79:13,21 82:5,6,10
82:15 83:14 84:7
84:21,24 86:11
87:7,8,12 88:3,4,8
88:14,22,25 89:1,7
89:8 90:2,4,10,18
90:25 91:7,17
97:11 98:11
109:24 110:2,6
115:9 119:14
120:4
**district**  1:1,1
10:18,19 12:7
124:21
**diversion**  16:25
17:6,17 27:22,25

28:13,20,22,22
32:9 37:14,15,16
37:17 42:4 48:2
61:7 73:1,23 74:3
74:7 77:12 100:16
116:9 117:5,6,10
**division**  1:2 3:5
10:19 17:1 28:23
61:8 116:9
**doctors**  46:20
**document**  1:6 15:2
15:8,14,18 23:14
29:12 30:20,20
33:1 35:25 36:9
47:11,19,25 48:19
49:8,15 50:18
52:12 54:20 56:13
58:24 59:7,9
61:15 65:12,13,16
69:23 80:21,23
81:24 83:9,22
85:9,17 87:16
97:4,7 114:3
115:21 122:5
**documents**  27:21
29:5,8,11,13 83:21
92:17
**doing**  18:3 20:15
55:14 86:9,15
**doj**  11:25 12:7,9
**double**  65:12
**downside**  106:13
**draft**  37:3 44:9
61:5 66:22,25
68:2 120:15,16
**drafting**  57:19
67:9 68:6
**drastic**  91:5
**drive**  3:11,21
**drug**  3:10 5:20
12:3,25 14:20

16:5,9,14,23 17:10
18:22 19:2 21:3
27:24 29:5 48:1
52:24 56:23 75:1
76:24 101:10,22
101:24 118:15
**drugs**  35:21 75:4
**due**  100:21
**duly**  13:17 124:5

**e**

**e**  6:3 8:1,18,21,23
9:3,5 10:1,1 80:15
85:15,17 86:4
100:2 101:19
102:10,13 105:4
107:17
**earlier**  20:9 75:16
79:24 84:1,5
89:11,15 92:15
102:24 107:19
113:6 114:2
**early**  95:13,22
**east**  6:16
**eastern**  1:2 10:19
**editing**  61:6
**educate**  54:6
82:14
**effort**  50:6 107:3
**efforts**  15:24 51:3
53:11,25 54:5
57:19 68:6 77:16
83:12 88:11
100:16 121:15
**ellis**  3:14 4:9 8:5
11:21,21 13:2
70:18,21 73:4
74:11,16 75:14
76:18 77:20,21
79:2,10,24 80:11
80:14 85:3,8 92:2
92:12 93:17 94:1

94:12 95:6,11,17
96:2,10,18 97:3
98:7,20 99:11,22
102:8,21 103:16
104:4,13,18 105:2
107:1,10 108:16
108:21 109:9
110:18,23 111:14
112:14
elmo 24:10
else's 120:2
email 125:17
embarcadero 4:15
emphasize 73:18
emphasizing
120:19
employed 124:12
124:15
employee 124:14
enclosed 125:11
encompass 119:4
encompassed
30:15
ended 31:9,19
39:2,3 89:21
energy 100:18
enforcement 3:10
12:4 14:20 16:5
16:10,15,23 17:10
18:22 19:2 21:3
29:6 48:2 52:25
56:23 75:2,5,8
enforcing 72:5
73:24
engage 77:13 89:3
engaged 27:24
engagement 28:9
77:2 84:21
engagements
43:13

engages 113:21
ensued 19:10
ensure 21:19 66:1
ensuring 74:1
entered 127:9
entire 104:5 126:5
127:5
entitled 83:9
environment
43:21
errata 125:13,18
127:7,10,18 128:1
esq 3:4,9,14,15,20
4:4,8,13,17 5:8,9
5:15,21 6:3,9,14
6:20 7:2,4
essentially 71:25
established 40:22
et 1:8,10,12,13
106:12
evaluates 71:15
evaluation 44:15
71:9 72:1
event 105:24
examination 8:2
13:23 70:17 113:3
examines 71:14
example 32:23
56:15 101:10
109:24 110:6
excellent 89:2
exchange 20:22
excluding 90:22
excuse 34:24
54:16 64:14
executed 127:10
execution 126:14
127:19
executive 50:20
63:14,16

exhibit 8:9,10,11
8:13,14,16,18,20
8:21,23 9:3,5
14:23,24 15:10,11
23:8,13 47:2,6
52:7,11 56:8,12
61:10,14 63:12
65:8,12 71:2 72:8
73:6 74:18 77:23
80:6,7,15 85:4,6
86:2,21 87:2,3,16
87:18 88:12,13
89:11 92:14 97:6
99:20,24 104:16
104:20 107:12,13
107:19 109:10
114:5,7 115:24
121:11 122:7
exhibits 8:8 9:1
existing 59:16
exists 58:25 69:24
71:10
expand 38:6
experience 19:24
20:4 22:15
expiration 126:19
127:25 128:25
expires 124:23
explain 19:14
40:14
explained 37:20
explains 48:22
extensive 60:4
67:13
extensively 98:17
extent 50:12 59:17
83:18

f

face 43:21,21
facilitated 67:17

fact 31:8 38:13
40:11 68:23 79:18
85:24 119:21
factors 41:11
facts 73:19
fair 32:5 39:13
115:1 117:11
fall 49:25 50:7
familiar 79:17
93:6
far 93:3
fashion 21:1 117:1
february 61:18
62:13,15 63:21
66:19 102:14,16
116:11 117:14
federal 18:3 24:23
25:5 48:4 50:5
60:2 62:17,20,25
63:10 64:4 68:11
68:19 69:20 71:13
71:15 101:15
feedback 91:18
93:3,9 96:21
112:3
feel 14:12 38:12
59:4 69:12 86:24
feels 41:15
felt 57:11 117:20
field 109:25
fifth 5:23
filed 10:17
final 23:4 64:4
68:11,15 121:10
financially 124:16
find 31:20 94:22
125:11
fine 49:5 50:15
121:7
finkelstein 7:4
12:1,1

**firm** 10:25 11:2
  99:4
**first** 13:17 14:5
  23:20 24:21,22
  25:3 32:16 33:17
  40:3 59:11 60:17
  66:11 67:2,14
  68:1,24 71:4 73:8
  73:10,11,12 77:24
  81:7,11 82:21
  85:24 91:11 94:19
  100:6 105:3,12
  108:14 109:15
  116:25
**fiscal** 62:21 63:8
  64:6 65:2 67:2
  68:20,24
**five** 17:15
**flag** 83:10
**flip** 35:2 41:25
  71:1
**floor** 4:5 6:21
**focused** 78:14,18
**foley** 6:15 13:11
**foley.com** 6:17
**folks** 61:17
**follow** 21:23 48:24
  70:23 100:24
  114:9,13
**following** 16:1
  19:8 73:17,19
  81:8
**follows** 13:19
**foregoing** 124:3,5
  126:13 127:18
**forgot** 86:20
**form** 50:4 73:3
  74:9,15 75:12
  76:16 77:19 78:23
  79:6,14 91:21
  92:8,9 93:11,22

94:9 95:3,15,16,25
  96:8,14,23 98:2,9
  99:1,15 102:19
  103:21 104:10,24
  106:23 107:5
  111:13 112:7
**formal** 18:6 60:12
**former** 116:23
  117:6
**forth** 56:2
**forward** 125:15
**found** 33:9 38:11
  44:10 46:18 91:24
  92:6 109:25
**foundation** 33:25
  65:4 95:23 96:6
  96:22,24 98:3
  99:16,18 103:14
  103:22 104:25
  106:23 107:6
  112:7 115:4
  119:23 120:14
**four** 27:8 69:16
  97:16 111:19,24
  112:3
**frame** 21:21 63:4
  82:19
**frames** 20:21
**francis** 7:6
**frankly** 41:3
**fraud** 7:4
**free** 14:12 84:24
  126:14 127:20
**frequency** 42:15
  43:2 77:4
**front** 33:14 85:18
  100:2 106:9
**full** 24:22 25:3
  27:18 40:3 53:15
  53:17

**fulsome** 60:23
**function** 21:19
**funding** 71:19
**funds** 71:15
**furnished** 100:17
**further** 54:22
  70:14 83:14
  100:20 112:14
  113:3 122:15
  124:13
**furthermore**
  31:18,18

## g

**g** 10:1 34:23 73:17
  103:17
**ga** 72:4 94:25
  103:1 120:17
**gaa** 86:9
**gao** 8:20 16:1 19:3
  19:4,7,21,24 20:4
  20:10 21:2,9,12,17
  21:18,20 22:5,8,19
  22:24 23:2,16,16
  25:9,22 27:13
  28:12 29:4,16,21
  32:2 33:3,9,19
  34:2,22 35:5,18
  36:22 37:2,2
  38:11 39:14 44:1
  44:4,9,20 45:13
  46:6,14,18 49:12
  49:16 50:10,25
  51:7,12 52:13,21
  52:23,24 53:10,25
  55:20,22 56:2,18
  57:11 58:7 61:17
  64:24 65:21 66:7
  68:17 69:17 71:14
  71:23 72:4,7
  73:18 77:24,25
  78:11 81:2,3,17,22

85:19,21 93:4
  94:20 95:12,20
  96:4,20 97:13
  100:9,25 103:1,11
  103:20 104:1,9,21
  105:16 106:7
  107:24 108:1
  109:11,12 110:20
  111:1 112:9 114:4
  114:10,14,23
  115:13,22 116:6
  116:17,17 120:15
  121:6,18,25 122:9
**gao's** 22:16 23:15
  28:9 30:15 36:12
  57:4 58:3,21
  59:14 65:17 66:14
  66:18 71:5,19
  80:2 83:13 86:10
  89:17 107:4
  110:13 121:15
**ge** 100:24
**general** 20:2
  100:15
**generalizable** 26:6
  26:16,25 104:1
**generally** 20:17
  23:4 83:19 109:22
  111:7 119:17
**geo** 96:20 97:9
**getting** 21:20
**giacalone** 104:14
**give** 17:25 22:8
  39:23 40:20
**given** 29:2 53:3
  60:16 105:18
  123:1 124:10
**gives** 48:23
**giving** 32:3
**go** 10:13 11:23
  20:5,15 24:9

29:25 30:21 32:11
38:22 42:21 63:11
70:1 77:22 82:25
90:15 94:22 97:4
97:5 100:13
105:22,25 106:3
106:18 108:21
111:15 114:14
116:2
**goal** 55:22
**goes** 45:7 111:10
**going** 10:4 24:6,7
24:11,15 33:16
35:13 36:1 41:17
51:21 60:21 64:13
67:20 69:11 70:5
105:10,20,21
108:23 109:3
112:16,20 119:25
120:3,9,24 122:17
**good** 10:3 13:25
14:2 20:7,24
70:19,20 71:19
93:15
**government** 18:3
18:12,17,21 19:15
27:7,12 71:8,13,20
97:15 100:3 111:2
**grand** 3:16
**grant** 6:22
**great** 24:8 30:6
31:15 33:15
**greater** 77:16
**ground** 14:7
**group** 87:25
**groups** 76:14 83:6
105:18 106:12
**guess** 62:11 71:2
77:23
**guidance** 25:11,17
25:21 27:14 29:1

29:18,22 30:11,17
30:24 31:6 32:3
32:19,24 33:1,4,10
33:20 34:12 35:19
36:4,13,23 37:19
38:14,16 39:8,12
39:17 40:9 42:7,8
43:1,24 44:11
45:2,11,23 46:1,11
46:15,16,19 48:13
48:24 49:8,17,18
50:4,25 51:12
54:19,20 55:2
57:10,12 58:4,16
58:23,24 59:9,15
59:24 60:11 69:18
69:22 77:8,11
78:3,14 82:4,10
83:14 84:3 86:11
87:12 88:7,23
91:14,25 108:9
110:4,10 111:22
121:25
**guide** 48:3

**h**

**h.d.** 6:8 12:16
**half** 17:19 31:8,21
38:17
**hand** 47:8 97:8
**handed** 80:12
**handing** 23:11
99:23 104:19
**handle** 76:25
**handling** 22:16
**happen** 101:16
**hard** 14:9
**hbc** 6:19 12:18
**hd** 101:24
**hda** 96:15 97:25
98:10 99:3 102:12
113:7,10,21

**hdma** 96:5,11,15
97:24 99:3 100:8
100:14 105:8,13
105:20 113:7,21
**hdma's** 113:10
**head** 34:2 98:14
117:6
**heading** 86:7
**health** 5:7 11:9,11
13:23 67:22
101:22,23 113:4
118:9 119:22
**healthcare** 96:16
**hear** 20:2 117:16
**heard** 101:9
**hearings** 19:10
99:8
**held** 2:1 10:21
43:12 82:22,23
88:25 104:21
108:19 118:8,14
118:20 119:21
122:20
**help** 54:22 66:1
71:12,17
**helpful** 31:20
91:19 92:1,7
110:1,8
**helping** 20:25
105:14
**hereto** 124:16
**high** 42:1
**highlighted** 45:17
**highlighting** 116:3
**hill** 98:16,21 99:6
113:23
**himmel** 5:21 12:24
12:24
**history** 60:23
**hold** 23:12

**homeland** 52:15
52:21
**hope** 4:5
**hoped** 68:2
**hospitals** 40:24
41:10
**host** 54:9 89:6
**hosting** 55:8
**house** 63:20 64:11
**housekeeping** 15:7
**huh** 32:14 73:16
**human** 67:22

**i**

**i.e.** 34:15 77:1,9
79:21
**identification**
14:25 15:12 23:9
47:3 52:8 56:9
61:11 65:9 80:8
85:7 99:21 104:17
**identify** 15:14
23:14 47:11 52:12
56:13 61:15 65:16
117:4
**illicit** 74:4
**illinois** 3:22 4:19
**imagine** 103:6
**impact** 18:11
34:17
**impacting** 35:22
**implementing**
48:5
**important** 73:19
98:12
**improper** 115:12
**improve** 65:25
71:12 78:2
**improved** 110:3
111:9,21 116:13
117:11

**inadvertently** 41:23
**include** 58:15 59:24 60:4 63:20
**included** 16:19 86:14 125:13
**includes** 83:6
**including** 18:4 104:23 116:7
**incorporated** 96:20 127:12
**increases** 42:3
**increasing** 42:4 43:9
**indiana** 5:13 6:11 11:13
**indianapolis** 6:11
**indicate** 32:18 39:18 40:10
**indicated** 57:8 63:7 82:23 84:15 91:24 110:9 122:8
**indicates** 28:12 29:4 33:17 61:4 66:15
**indicating** 35:15 64:25 67:25 125:13
**individual** 97:11 101:6,11,21,22,23 101:25 110:2 119:2,18 120:3,25
**individually** 101:14
**individuals** 28:18
**industry** 88:23 96:21 103:12,18 104:22 105:17,19 106:11 116:10,12
**industry's** 100:15

**inferring** 36:4
**influence** 99:13 107:3
**informal** 18:6
**information** 20:22 28:3 31:11,23 50:13,15 54:5 59:18 60:5 65:24 83:1 86:19 110:7 114:24
**informed** 71:18 112:12
**initiated** 43:14
**initiative** 43:14 84:6,13,18 118:3,8 118:14,21,21 119:8,16,20 120:20
**input** 30:9,23 44:25 87:6 88:3 93:19,24 94:2,6 95:1,13,21 101:6 102:16 103:11 105:16 115:13
**inquiry** 100:3
**insist** 101:12
**inspections** 77:5
**instance** 67:13
**instances** 19:24
**instructed** 14:15
**integrity** 71:21
**intensive** 40:11
**inter** 31:11
**interact** 111:3
**interacted** 109:22
**interaction** 43:20 100:5 101:15
**interactions** 19:7 31:12,20,24 109:23 110:8 111:7

**interacts** 28:1 84:16
**interagency** 18:8 64:11 67:17
**interest** 18:9
**interested** 124:16
**interests** 99:5
**interfere** 10:10
**interference** 10:8
**intern** 7:5
**internal** 21:11,16 24:24 56:1 66:23
**interruption** 108:15
**intersect** 18:17
**intersection** 19:1
**interviewed** 26:7 27:3,7,21 28:13,16 28:18 97:13 111:1
**interviews** 28:4
**introducing** 14:22
**introduction** 117:8
**investigate** 20:10
**investigates** 21:2 22:8
**investigating** 29:17
**investigation** 20:18 24:1 25:20 28:10
**investigations** 18:21 19:4 22:16
**investigative** 71:9 72:1
**invitation** 105:20
**invited** 103:10
**involved** 67:21 90:20 92:20,25 93:14 105:14

**involvement** 103:9
**irritating** 106:13
**issuance** 24:1
**issue** 22:8 24:10 29:21
**issued** 23:23 24:7 80:4 81:8 82:10 82:11 90:12 91:2
**issues** 18:8 21:3 27:25 29:16 35:1 84:13 85:2 89:9 99:8 116:13 117:11

**j**

**j** 4:13,17 6:14
**janssen** 4:2 13:3,6
**january** 63:20
**jeff** 7:5 12:22 13:1
**jeffrey** 4:8
**jeffrey.sindelar** 4:11
**jennifer** 5:8 11:10
**job** 1:25 73:1
**john** 5:2 13:7
**john.lavelle** 5:5
**johne** 7:5 11:24
**johnson** 4:2,2 13:2 13:2,5,6
**jones** 4:14,18 12:21 13:10
**jonesday** 4:16
**jonesday.com** 4:20
**joseph** 37:6,11,12 39:24
**jr** 4:8 5:2
**judge** 1:6
**judiciary** 8:15 52:17
**july** 95:14,22 116:21

**june** 17:17 57:5,24
62:22 63:9 121:24
124:23 125:4
**jury** 19:14 88:19
101:2 111:16
**justice** 3:3,5,9 7:3
7:4 12:2 50:1
52:21 67:15 68:3
68:8
**justice's** 44:21
67:1,6
**jwicht** 5:11

**k**

**kathleen** 6:9 12:15
**kathleen.matsou...**
6:12
**keep** 47:7 105:10
105:21,24 106:2
**kelly** 102:11
**kick** 20:17
**kind** 20:8 43:12
64:10
**kinds** 21:16
**kmatic** 6:17
**knew** 98:15
**know** 28:17 29:11
30:4 34:3 40:21
41:16 49:25 75:22
76:1,4 84:25 91:2
91:13 93:2,8,18
94:2,6,10,13,14,16
94:18,19,23 95:4
96:11 97:23,24
98:4 102:22,23
103:4,15 104:11
104:14 106:19,24
107:2,9 112:9
114:20 118:11,18
118:25 119:11
**knowing** 110:20

**knowledge** 28:25
41:18 113:9,20
**known** 23:15,16
43:13
**knows** 67:10
**kohn** 73:14
**kristina** 6:14
13:11

**l**

**l** 1:24 124:2
**l.p.** 1:8,10,12 3:19
**lack** 36:4
**lacks** 33:25 65:3
**language** 59:20
114:23 122:7
**lardner** 6:15 13:12
**large** 119:4,17,21
**largely** 19:21
**larger** 77:9,15
**largest** 76:25
**lastly** 105:23
**lavelle** 5:2 13:7,7
**law** 75:5
**leaders** 116:10
**leadership** 116:7
116:18 117:9,25
**learn** 27:25
**learned** 94:20
**left** 66:4 77:25
97:8
**legal** 10:25 11:2
67:1,7 68:5 69:1,7
78:25 79:8,15
123:4 125:1 128:1
**legislative** 18:7,13
**legitimate** 74:2
**leonhart** 116:23
**letter** 8:10,16 37:7
39:24 40:1 42:10
42:24 43:25 44:2
44:5 45:14 62:1

62:12 64:17 73:6
73:14 80:24,25
81:8,12,19 82:20
86:3,7 116:2
121:19 125:19
**letters** 81:2
**level** 101:17
**lewis** 5:3
**liaison** 17:22,24
18:15 19:1 21:19
21:24 43:10 55:21
56:18 61:17 81:3
85:19 103:8
**limit** 41:21
**limited** 43:16
76:21
**linda** 73:14
**linden** 105:23
**line** 91:11 100:1
101:18 102:9
108:18 120:9
121:4 125:13
127:7 128:3
**list** 90:21,22
100:19 103:18
104:8
**listed** 97:21,22
121:13 127:7,17
**listening** 117:15
**listing** 127:7
**litigation** 1:5
125:6 126:3 127:3
**little** 17:13,25
57:21 59:2 80:17
95:10
**llc** 5:13 11:13
**llp** 2:5 3:20 4:5,9
5:3,9,15,22 6:4,10
6:15,21
**lobbying** 99:4

**located** 10:22
**location** 101:7
119:3,10,18
**locations** 101:14
119:15
**long** 14:19 40:16
**longer** 68:18 93:14
**look** 25:16 83:23
90:16 91:11
110:24
**looked** 49:9
**looking** 72:9,13,17
73:13
**looks** 32:1 87:23
**los** 4:6
**lot** 82:8
**low** 105:25
**luxenberg** 3:15
11:20,22

**m**

**m** 5:15,16 6:20 7:4
**mackay** 3:20
11:17,17
**madam** 125:10
**mail** 8:18,21,23
9:3,5 80:15 85:15
85:17 86:4 100:2
101:19 102:10,13
105:4 107:17
**main** 4:9 84:15
**maintain** 72:23
**maintained** 72:18
**majority** 92:3,4
**making** 33:12 50:5
60:12,14 63:2
112:13
**malfunction** 12:23
**management** 61:7
63:22 67:18 116:8
116:10,19 117:9
117:20

**manual** 8:13 32:7
32:8,10 33:1
47:12 48:1,9 49:8
58:24 59:9,10
69:23
**manuals** 32:24
46:19,24 47:14
**manufacturers**
77:1 98:11
**marc** 12:17
**marcus** 6:21,23
12:18
**mariama** 3:9 12:3
**mariama.c.spears**
3:12
**marked** 14:23,24
15:9,11 23:8,12
47:2,5 52:7,10
56:8,11 61:10,13
65:8,11 80:7 85:6
99:20,24 104:16
104:19
**market** 5:4
**marking** 80:5 85:3
**mart** 12:21 13:10
**maryland** 5:2 13:8
**masters** 5:9 8:3
11:8,8,23 13:24
14:22 15:1,7,13
19:20 20:3 22:14
23:10 24:8,19
26:3 31:3 34:4
36:11 42:23 47:4
48:21 49:2,21
50:22 51:18 52:9
56:10 57:20 59:22
61:3,12 65:7,10
69:14 70:1,13
75:10 76:16 92:8
95:8,16,24 96:7,25
99:15 103:13,21

107:5 110:16
113:1,5,13,19
114:1,21 115:11
115:20 117:19
118:12,19 119:6
120:6,11 121:9
122:11,15
**matic** 6:14 13:11
13:11
**matsoukas** 6:9
12:14,15
**matt** 4:4 13:4
**matter** 10:16
16:18 21:14
**matters** 17:5
18:10
**matthew** 1:18 2:1
8:2,9 10:15 12:10
13:16 123:1 125:8
126:4,9 127:4,13
128:20
**maurer** 52:15,19
53:9,24
**maximize** 114:24
115:13
**mckesson** 6:2
11:16 101:25
118:22 119:2,22
**mckmdl005380...**
9:4
**mckmmdl** 99:25
**md** 1:5 10:20
**mdl** 1:4
**mdl2804** 9:6
**mean** 20:13 22:2
62:24 63:1 67:5
98:25
**means** 18:1 22:4
40:14 42:19 43:2
63:1 81:4,14

**measures** 89:22,23
**media** 10:14 51:23
52:3 108:25 109:5
112:22 123:2
**meet** 54:23
**meeting** 20:17
71:11 88:22 93:3
100:14 103:20
104:22 105:17
106:15,16,20
117:15
**meetings** 93:6,7,25
103:11 120:4,25
**megan** 11:15
**meghan** 6:3
**melanie** 3:20
11:17
**melanie.mackay**
3:23
**members** 19:5,25
20:9 25:10 98:17
111:20 113:16
**membership**
113:10
**memorandum**
63:21,22 85:20
**memory** 31:16
**mention** 54:17
64:18 83:25
**mentioned** 20:9
27:11 43:23 55:1
57:23 84:4 102:24
113:22 118:2
**mentions** 59:7,8
**meridian** 6:10
**met** 116:10
**methodical** 20:6
20:13
**methodology**
101:5

**methods** 111:4
**michael** 3:15
11:19
**michele** 116:23
**michigan** 3:17
**microphones** 10:6
10:10
**middle** 31:17
**midway** 109:15
**midwest** 125:17
128:1
**million** 26:13
75:24 76:21
**milwaukee** 6:16
**minutes** 113:2
**mischaracterizes**
30:20 35:25 49:15
117:13
**mission** 17:7 71:5
71:23
**missions** 113:14
**misstates** 30:19
57:14 122:4
**mistaken** 31:14
**mmonaghan** 6:6
**model** 26:15,25
**moderately** 91:18
91:25 110:1
**moment** 53:12
54:2 57:8,23
108:22
**moments** 90:9
**monaghan** 6:3
11:15,15 73:3
74:9,15 75:12
77:17,19 78:24
79:6,14 91:21
92:9 93:11,22
94:9 95:3,15
96:13,23 98:2,9
99:1 102:19

104:10,24 106:22
112:6
**monitoring** 29:19
29:24 30:13 32:20
33:5 54:7 58:17
60:1 72:19,24
82:7 86:13 87:14
88:9 89:5 100:21
108:12
**morgan** 5:3
**morganlewis.com**
5:5
**morning** 10:3
13:25 14:2 70:19
70:20,24 82:9
**morrissette** 3:11
**multiple** 93:5
**multitude** 37:21
**mute** 108:17
**mutual** 101:24
**mwallace** 4:7
**myers** 4:5 13:5

**n**

**n** 3:6 8:1,1 10:1
**n.w.** 2:6 5:10,16
6:5
**nabp** 83:22 87:11
**name** 10:24 12:13
70:21 125:6 126:3
126:4,15 127:3,4
127:21
**named** 102:3
**names** 28:17
**narcotic** 40:25
**nascsa** 105:17
106:16,20
**natalie** 3:4 12:8
125:5
**natalie.a.waites**
3:8

**national** 1:4 10:17
27:3,12 83:4
97:14 111:3,5
125:6 126:3 127:3
**nationally** 26:4
97:10
**nationwide** 47:20
**nature** 18:25
78:20
**ne** 3:6
**neal** 4:13
**necessarily** 30:25
36:9 37:1 104:7
119:15
**necessary** 37:19
38:24
**need** 38:6 55:14,18
65:6 76:22 98:13
110:10
**needed** 31:10,23
57:11 58:3 122:2
**negatively** 34:17
35:21
**neil** 13:9
**neither** 124:11
**new** 59:23 63:16
63:17,19 116:7,7,8
116:9,18,19,21
117:4,8,9,20
**nonfederal** 28:2,4
**nonprofit** 27:4
**nonprofits** 97:15
97:20
**normal** 42:14
**northern** 1:1
10:18 12:6
**northwest** 10:23
**notarized** 125:14
**notary** 124:1,20
125:25 126:10,18
127:15,23 128:23

**note** 10:6 125:12
**noted** 54:9,15
83:24
**notes** 47:25 54:4
62:3
**notice** 2:10 8:9
15:4 50:4 60:2,13
63:1 64:3 68:14
**notwithstanding**
44:8
**nstephens** 4:16
**number** 20:19
39:1 41:11,25
76:11,12 80:17
83:5 84:23 90:11
90:13,24,25 91:16
92:10 111:11,25
121:13,14 123:2
125:7,13
**numbered** 99:25
**numbers** 77:7,15
90:23 91:4 127:7

**o**

**o** 8:1 10:1 56:18
**o'melveny** 4:5
13:5
**object** 74:9,15
75:12 77:19 78:23
79:6,14,16 91:21
92:8,9 93:11 94:9
95:3,15,16 98:2,9
99:1,15,16,17
102:19 104:10,24
111:13
**objection** 19:16
22:12 25:24 30:19
33:24 35:24 42:20
43:3 48:17 49:1
49:14 50:11 51:14
57:14 59:17 60:20
65:3 69:8 73:2,3

74:13 75:9,10
76:15,16 77:17,18
78:24 79:7 93:22
95:8,23,24,25 96:6
96:7,8,12,13,22,23
96:25 102:6
103:13,21 106:21
106:22 107:5,7
110:16 112:4,6
113:11,17,24
114:17 115:3,15
117:12 118:10,16
118:23 119:23
122:4
**objections** 14:16
**objective** 89:22,23
**objects** 14:13
**obligation** 21:8
**obligations** 46:25
82:7
**observing** 35:6
**obstacle** 63:15
**obstacles** 63:24
64:2,18
**obtain** 28:2 29:8
87:6 88:3
**obtained** 27:19,20
29:5 92:17
**obviously** 39:3
50:17 60:4 76:20
82:25 98:12
**occasion** 56:3
**occurred** 93:2
122:1
**october** 104:23
**offered** 31:22 36:3
54:21
**offering** 77:13
**office** 3:10 7:3
12:6 18:12,18,22
19:15 21:25 24:4

[office - person]                                                                                    Page 16

27:21 28:13,21
35:11 37:15 48:2
63:21 67:1,7,18
68:5 69:1,7 71:9
73:23 74:3,7
100:4 109:25
110:3 117:9
**officer** 56:17
124:2
**offices** 97:12
**official** 126:15
127:21
**officials** 27:22
28:14,19,24 97:14
110:9 111:1
**oftentimes** 14:15
20:21
**oh** 35:10 78:7,12
93:21 97:22
**ohio** 1:1,10,12
4:10 10:19 12:7
125:2
**okay** 14:19 15:21
17:8,16 24:8
26:22 30:6 31:4
33:15 37:2 40:2
44:1 49:6 51:18
53:6 55:15 63:23
69:15 70:25 73:20
74:21 78:9 81:23
91:16 105:12
106:4 107:16
111:17
**omb** 67:19,20
**omm.com** 4:7
**once** 21:23 51:6
**ongoing** 54:5
87:12 88:7
**op** 1:9,11,13
**open** 31:9,19 39:2
39:3 49:20 51:16

65:19 66:16 89:21
122:12,14
**operate** 45:18
**opiate** 1:5 10:17
125:6 126:3 127:3
**opinion** 42:2
**opportunities**
43:10 77:14
**opportunity** 22:9
22:22 40:21 60:10
60:15 89:3 90:7
117:16
**order** 29:19,24
33:5 37:24 39:18
40:10 42:8,13,13
42:15 49:19 50:2
55:12,16 57:12
59:13,16 72:19,24
82:7 86:13 100:21
108:12 122:2
**ordered** 34:15
36:16
**orders** 30:13
32:20 39:17 40:9
45:11,19 54:8
58:15 62:5,19
63:14 66:22 72:14
72:23 87:14 88:10
88:24 89:6 116:25
**organization**
67:16
**organizations** 27:4
**outcome** 124:17
**outlined** 82:20
84:14 89:18
**outset** 39:5
**outside** 19:19
**overages** 42:1
**overall** 106:6
**oversees** 68:6

**oversight** 18:3
19:23 20:5 27:22
71:18
**oversupplies** 35:4
**overview** 100:15
**oxford** 6:21

**p**

**p** 5:2 10:1
**p.m.** 122:24 123:6
**page** 8:2 15:22
24:20,21 27:18
30:4,5 31:13
32:12,13 33:16
34:5 39:23,25
40:1 44:14,23
45:5 46:5 47:25
53:9 57:17 61:25
66:11,12 71:1,3,5
73:5,13 74:17,19
74:20 77:22 78:5
78:6,7 80:23
81:24 82:3 85:18
86:6 89:12 92:14
97:5,6 99:25
108:14 116:1
125:13,15 127:7
128:3
**pages** 48:10
**palo** 4:15
**paragraph** 24:22
25:3 27:18 31:17
32:17 34:6 40:3
46:6 53:14,15,16
53:17 73:9,12
81:11 82:21 83:3
85:25 86:16 88:13
92:17 100:7,23
109:16 110:24
111:10 116:4,5
**paragraphs** 86:17

**pardon** 96:20
**parent** 67:16
**part** 38:7 67:8,8
84:10 103:9
107:13 112:2
127:9
**participants** 93:9
93:19 97:25
103:19
**participate** 15:16
15:17
**participated** 96:4
100:9 104:8
**participating**
93:24
**participation** 94:8
**particular** 21:8
37:3 108:3
**parties** 2:11 10:13
124:12,15
**pat** 102:11
**patient** 35:22
**patients** 34:18
41:8
**patrick** 4:17 12:20
**pattern** 42:15 43:2
**pbeisell** 4:20
**pending** 61:6
**pennsylvania** 5:4
5:23 6:22
**people** 71:14
93:13 94:16
**perceived** 106:8
**percent** 43:18
109:24
**performance**
71:12
**period** 20:23
**persistent** 20:22
**person** 37:16
43:21,21 77:3,13

117:4 121:1
**personal** 28:25
**personally** 92:20
　126:11 127:15
**perspectives** 27:14
　28:3
**pertain** 48:6 73:25
**pertaining** 48:20
　51:3
**pertains** 43:6 75:3
**pharma** 1:8,10,12
　3:19
**pharmaceutical**
　75:3
**pharmaceuticals**
　4:3 13:3
**pharmacies** 25:12
　25:18 26:8,11,11
　26:23 32:3 33:23
　34:16,17 35:22
　40:24 41:9,12
　47:20 54:21 75:16
　76:2,10,12 77:10
　78:21 79:4,11,23
　97:12 110:2
**pharmacist** 32:7
　47:12 59:10
**pharmacist's** 8:13
**pharmacists** 32:24
　46:20,24 48:3,13
　58:25 69:24
**pharmacy** 34:24
　35:11,14,16 36:21
　36:21 40:18 41:5
　41:6 46:1 48:6
　83:5 97:12 110:3
**philadelphia** 5:4
**phone** 108:15,17
　125:3
**phones** 10:9

**physicians** 32:4
**pick** 10:7
**piggins** 3:15 11:19
　11:19
**pittsburgh** 5:23
　6:22
**place** 10:9,12 38:2
　60:13 67:14 68:10
　68:13,14
**plain** 59:11 114:22
　122:7
**plaintiffs** 3:13
　11:20,22 70:17,22
　114:2 121:11
**plan** 45:22
**planned** 59:15
**planning** 101:4
**plans** 54:9,18 55:1
　59:8 89:6
**play** 60:25
**please** 10:6,9 11:7
　12:13 13:14 30:6
　32:15 46:7 54:13
　71:2,6 73:9,22
　88:19 100:7 101:1
　105:5,11 108:22
　109:20 110:25
　125:11,11
**plus** 119:14
**point** 26:10 38:21
　38:24 39:10,21
　44:12 53:14 58:5
　66:14 119:1,12
**policies** 71:16
**policy** 16:24 17:3
　17:5,9 67:1,7 68:6
　69:1,7 71:18
**polster** 1:7
**population** 41:7
　43:17,18 83:8
　90:19,22 91:7

**populations** 26:2
**portion** 39:11
　75:18 76:24
**portions** 77:8
**position** 16:22
　37:18,23 38:8
**possible** 113:2
**potential** 63:15,23
　64:2 97:22
**potentially** 106:13
**powerpoint** 83:20
**practice** 48:25
**practitioner** 26:12
　46:1 59:10
**practitioner's** 32:7
**practitioners**
　25:14,15,18 26:9
　26:24 32:25 34:16
　46:20,24 54:21
　59:1 69:24 97:13
**preceding** 86:17
　86:19 87:24
**predecisional** 59:3
**prefer** 101:12
**preliminary** 61:5
**preparation** 53:7
　85:10
**prepared** 48:1
　120:13
**preparing** 101:3
**prepping** 18:5
　19:12
**prescribers** 26:13
　77:10
**prescribing** 83:10
**prescription** 1:4
　10:17 27:24 125:6
　126:3 127:3
**prescriptions** 41:8
**present** 2:10 7:1
　11:4 26:13 38:25

63:14 106:16,19
**presentations**
　83:19,20 85:1
**presently** 26:12,19
**prevent** 100:16
**preventing** 74:2
**previous** 58:8
　85:25 86:21
**previously** 33:8
　56:14 94:17
**primary** 74:25
**prior** 17:8,19,20
　24:1 37:4 52:23
　57:15 68:11,13,15
　116:7 117:13
**prioritize** 76:23
**priority** 50:3
　117:21 118:1
**private** 10:7
**privileged** 50:13
　50:15 59:18 69:9
**privy** 103:17
**probably** 38:3
　81:15 93:5 95:10
　102:25
**probing** 120:21
**procedure** 126:5
　127:5
**procedures** 60:14
**proceed** 13:21
　14:17 24:18 52:6
　70:12 109:8
　112:25
**proceeding** 123:5
**process** 63:18 67:9
　69:12 92:21,25
　114:15
**processes** 21:11,16
**production** 125:15
　125:17,22

**profession**  48:6,16
**professional**  48:25
**profile**  105:25
**profiles**  41:14
**program**  17:7,7,17
  21:25 37:17 117:5
**programs**  40:25
  71:15
**promulgation**
  63:17
**proposals**  18:7
**proposed**  50:4
  61:5 63:2
**proposing**  58:23
**protocols**  100:22
**provide**  39:16
  40:8 42:7 44:10
  45:10 46:10 47:17
  55:18 57:12 58:3
  69:17 83:14 86:10
  87:12 88:7 108:8
**provided**  37:2,3
  39:9 42:25 47:15
  47:19 49:22 50:23
  51:11 52:14 54:5
  64:24 83:1 85:25
  89:2 100:18
  103:24 105:15
  120:16
**provides**  48:12
  71:16
**providing**  18:6
  39:15 40:7 45:9
  52:22 57:3 77:11
  88:23
**provisions**  73:25
**provosnik**  121:3
**public**  20:2 26:16
  60:6,7,14 63:3
  67:10 71:15 124:1
  124:20 126:10,18

127:15,23 128:23
**publication**  37:4
  38:3 63:15 64:4
  68:11,14,15
**publications**  32:8
**publish**  67:11
  68:19
**published**  50:5
  51:7 62:17,20,24
  63:3,7,9 64:21
  65:1 69:19,22
  83:2
**pulling**  100:10
**purchase**  40:18
**purdue**  1:8,10,12
  3:19 11:18 106:12
**purposes**  104:2
**pursuant**  2:10
**push**  36:2
**put**  51:4 111:10

**q**

**qualifier**  64:8
**qualify**  43:5
**quarter**  62:21
  63:8 64:6 65:1
  67:2 68:1,24 69:4
  69:15
**question**  14:14,17
  31:19 34:3 39:7
  44:3 53:23 57:21
  59:5 64:13 69:13
  89:21 91:24 94:11
  94:15,24 95:5
  97:2 110:22
  111:24 115:6,7,19
  119:11 120:8
  121:6,10
**questioning**  114:3
  120:10 121:4
**questionnaire**
  101:4

**questions**  14:11,12
  20:20 21:21 31:10
  39:1,2,4 70:3,14
  70:24 75:15 80:3
  82:8 89:8 94:3,5
  100:19,24 101:5
  102:16 112:15
  113:7 114:4,9,10
  114:13,15 120:1
  122:15
**quick**  14:7 24:9
  51:19 70:2
**quite**  41:3
**quote**  35:8 63:15
  111:11
**quoting**  35:9

**r**

**r**  3:14 10:1
**raise**  59:4
**raised**  112:11
**ran**  37:16
**rannazzisi**  37:6,11
  37:12 39:25
**rbarnes**  6:23
**reached**  27:13
**read**  28:6 29:25
  30:22 31:25 32:15
  34:10 40:5 46:3,7
  48:7 49:3 54:11
  54:13 58:19 67:3
  71:6 73:8,21
  87:25 88:18 92:15
  100:6 101:1 105:3
  106:5 109:20
  110:25 111:15
  116:14 122:9
  126:5,6,12 127:5,6
  127:17
**reading**  30:4
  59:11 87:15 106:2
  115:6 125:19

**reads**  71:5 86:16
**ready**  63:2
**real**  14:7 24:9 70:2
**really**  20:7 59:4
  61:1 93:15 103:8
**reason**  83:25
  93:12 98:5 125:14
  127:8 128:3
**reasonable**  64:14
  112:11
**recall**  75:20 80:20
  84:8 107:21 114:5
  114:11
**receipt**  125:18
**receive**  84:25
**received**  39:7 90:7
  101:7
**recess**  24:14 51:25
  70:8 109:2 112:19
**recognition**
  116:20
**recognize**  15:4
**recollection**  55:4
**recommend**  73:10
**recommendation**
  22:1,3 30:1,2,8,15
  33:7,13 44:25
  49:20 50:9 51:8
  51:17 53:11 54:1
  55:7,13,17 56:4
  57:9,13,25 58:8,12
  58:22 59:14 62:2
  63:13 66:5,9,16
  82:4 83:13 86:10
  86:18,22 87:2,5,19
  88:2 89:17 108:5
  108:7 110:13
  112:2 121:16,19
  121:22 122:3
**recommendations**
  15:25 21:4,5,9,12

21:17,23 22:5
29:22 52:24 55:23
56:21 57:4,6
65:19,22 71:17
108:2,4,5 110:21
**recommended**
49:12,16 51:12
69:17
**recommending**
33:13 46:15 55:6
**recommends**
77:24 78:1,11
**reconcile** 93:16
**record** 10:4,13
11:7 14:16 24:9
24:12,16 32:15
40:5 51:22 52:2
70:2,6,10 80:5,18
85:4 92:16 99:23
104:20 107:20
108:20,21,24
109:4 112:17,21
121:18 122:18,20
122:22,24 124:10
127:9
**recorded** 10:15
**recording** 10:12
**recordkeeping**
79:20
**recounting** 55:25
**red** 83:10
**reduced** 124:8
**reducing** 74:4
**reed** 5:22
**reedsmith.com**
5:24
**refer** 16:12,13
26:20 122:6
**reference** 74:23
81:11 125:7 126:2
127:2

**referenced** 56:5
116:18 120:19
126:11 127:15
**referred** 29:10
56:25
**referring** 15:23
16:5,14 39:3
44:13 55:5,19
65:21
**reflected** 71:20
**reflecting** 114:4
115:22
**reflects** 89:25
**reg** 51:6 68:6
**regarding** 30:11
32:19 33:4 45:24
52:23 58:15,16
59:25 62:2,4,19
66:21 87:13 88:8
96:5 100:4 108:10
109:12 121:6
**register** 50:5 60:2
62:17,20,25 63:10
64:5 68:12,20
69:20
**registered** 32:10
40:24 60:8 84:21
84:24 91:7 97:11
101:7,14
**registrant** 26:2
38:5 43:17,18
77:9 79:18 83:8
91:6 110:10 117:2
119:10
**registrants** 25:22
27:11,15,23 28:1
29:2 38:12 45:22
45:24 46:2,13
47:15 48:20 49:10
51:4 65:24 72:9
72:14,18,22 75:8

75:22,25 76:14,21
77:6,15 78:3,14
79:21 89:4 90:20
91:23 95:1,18,22
99:14 102:3
104:23 107:3
108:9,10 109:21
111:22 118:5
**registration**
103:25 119:3
**registrations**
108:9 119:5
**regs** 60:25
**regular** 32:21
55:21
**regularly** 87:10
88:6
**regulation** 37:24
42:9,12,18 51:6
59:23 62:4,16,19
62:24 63:6,19
64:25 66:21 67:6
67:24 68:19,25
69:6,19
**regulations** 45:17
45:25 48:5,15,19
48:23 58:14 59:12
59:16,21 60:3,17
61:2,5 63:18 79:5
**regulatory** 25:13
46:25 50:3 57:18
60:23 67:9
**relate** 72:24
**related** 57:9 83:10
88:24 124:11
**relates** 1:6 111:20
**relating** 15:23,24
22:17 29:18,23
65:23 66:10
113:15

**relative** 124:14
**relatively** 55:24
**release** 19:8
**releasing** 22:10
**relevant** 17:6
**reliability** 71:21
**rely** 77:10
**remain** 50:20
**remaining** 49:20
**remains** 51:16
**remarks** 84:1
**remember** 38:24
**remotely** 11:5
12:13
**renee** 7:2 12:5
**repeat** 36:18 44:3
45:7 95:19 97:1
**rephrase** 77:20
**report** 8:11 17:4
21:22 22:10,25
23:4,5,15,17,21,23
24:2,20 26:19
27:2,18 28:12
29:10 30:5,15
31:4,14 32:6,12
34:5 37:4,13
39:25 44:1,4,9
47:7 49:7 51:1
53:6,12,22 54:1
56:24 57:2,4 59:6
61:20 65:20,23
72:7,22 73:6,18
74:18 78:13,18
80:2,4 81:6,9
82:11 89:14 90:12
90:14 91:1 94:21
95:13,21 96:5,19
100:10 103:2
107:4 108:1,3
109:12 110:14
116:17 120:16,18

[report - russo]

121:7,12

**reported** 1:24
66:20,24 72:14
87:4

**reporter** 11:1
13:14 14:9 126:7

**reporting** 29:24
30:13 32:20 33:5
50:2 54:7 58:18
60:1 79:12,19
82:7 87:14 88:9
89:6

**reports** 15:25 16:1
18:21 19:9,25
52:24 57:1 58:9
65:19

**represent** 43:17
70:22

**representative**
26:4 97:10 101:20
113:16

**representatives**
98:18,22 103:12
103:19 104:22
105:19

**representing**
30:10 45:1 82:6
83:7 87:7 88:4
89:23 90:4 108:10

**represents** 57:17
65:18 98:10 99:4

**reps** 106:15,19

**request** 20:10
86:22 87:1,5,19,22
88:23 121:22
127:9,11

**requested** 19:5,5

**requesters** 8:12

**requesting** 86:18
114:24

**requests** 19:25
88:1

**require** 45:17
77:16

**required** 49:19
125:25

**requirements** 41:6
79:12,19,20,22

**resources** 76:21
76:23

**respect** 26:25
73:17 86:12 91:13
113:15

**respective** 2:11

**respond** 21:8 22:9
22:22,25 50:13,14
69:9 90:7 91:23
101:11

**responded** 31:9
37:6 44:1 91:10

**respondents** 35:10
38:15

**responding** 21:17
44:20 69:13

**response** 22:24,25
23:2 31:19 35:5
44:21 57:17 58:11
58:21 62:2 63:12
80:1 81:12,16
82:1,2,3 84:14
86:1,9 87:4 89:18
101:13 116:5,16
120:15 121:18

**responses** 20:20
21:1,20 32:18
39:7 90:1,5 91:12
120:17

**responsibilities**
17:22,25 18:16
25:13 30:12 54:7
54:23 58:17 59:25

71:11 78:4,15
82:15 86:12 87:13
88:9 89:5 108:11
110:5

**responsibility**
17:2 27:23 74:7
78:20 111:21

**responsible** 45:23
72:4 73:24 75:1

**responsiveness**
114:25 115:14

**restrict** 63:17

**restricting** 35:7,20

**resulted** 36:5
117:6,10

**resulting** 35:19

**results** 28:4 36:20

**retail** 47:20

**retained** 123:3

**retired** 94:17
116:24

**retiring** 117:7

**returned** 125:18

**reverse** 88:25 89:7

**review** 25:10
50:20 53:6 55:25
61:6 64:3 66:23
67:20 125:12
126:1 127:1

**reviewed** 29:5,15
61:23 62:3 66:20
80:16 85:10
121:12

**reviewing** 58:14
62:8 80:20

**reviews** 67:21

**revise** 59:15,21
60:3

**revised** 60:18 61:1
62:3,16 63:6
66:21,22 69:19

**revising** 58:14
62:8

**revision** 62:18

**right** 22:22 23:1
27:1 36:24 38:19
44:2,11 45:3,11,19
46:21 62:9 64:21
66:6,12 69:1 72:2
76:6 78:18 81:5
87:16 88:16 89:19
90:2 91:14

**rite** 5:2 13:8

**road** 4:15

**rob** 104:14

**robert** 6:20 12:17

**role** 17:8,9 18:2,15
18:25 19:6,12,23
20:5 54:23 74:12
74:25

**roles** 17:11 18:4
30:12 54:6 58:16
59:25 65:25 78:3
78:15 86:12 87:13
88:8 89:4 108:11
110:5 111:20

**room** 3:6 11:4

**rosenberg** 117:25

**rosenberg's**
116:25

**routine** 55:24
56:19 77:4

**ruiz** 5:15 11:12,12

**rule** 50:5 60:12,13
63:2 66:23,25
68:15

**rules** 14:8 48:19
126:5 127:5

**run** 117:5

**russo** 1:24 7:6
10:24 11:2 124:2

**rx**  5:13 11:14
**rzodkiewicz**  7:5
  11:24,24

**s**

**s**  8:1 10:1 125:15
  127:8,8 128:3
**sample**  104:2
**sampling**  101:4
**satisfaction**  22:5
  111:6
**satisfied**  109:23
  111:8
**satisfy**  59:13 122:2
**saying**  19:18 43:5
  90:4
**says**  16:4 31:18
  44:14 45:16,21
  59:20 61:9 97:9
**scheduled**  87:10
  88:6
**scope**  19:16,18,19
  42:20 43:3 48:17
  49:1 60:20 73:2
  74:14 75:10,11
  76:15 77:18 78:23
  78:24 79:7,15,16
  95:24 96:7,12,13
  96:24 99:2,16,17
  102:6 106:21
  107:6 113:11,17
  113:24 114:18
  115:4 118:10,16
  118:23 119:24
**seal**  126:15 127:21
**second**  23:12
  24:22 25:2 32:16
  34:6 39:23 40:3
  44:24 47:24 53:15
  53:17 61:25 62:2
  66:9,12,16 69:4,15
  80:23 86:6 92:16

97:6 100:7 105:16
  110:24 116:1,5
**section**  7:4 15:22
  16:20 17:20,21
  32:12 44:19 71:4
  81:3,24 82:1,13
  98:15 103:8
**security**  52:15,21
**see**  16:2 25:1 34:8
  38:6 44:17 47:23
  48:10 65:6 83:24
  90:3 91:12 94:22
  97:17 101:20
  109:18
**seek**  20:20
**seeking**  59:20
  100:20 115:2
**seeks**  60:2
**seen**  15:2,18 23:17
  91:5
**selected**  94:7
**sell**  33:22 41:1
**senate**  8:15 52:15
**send**  67:5
**sending**  66:25
  85:19 101:13
**senior**  16:24 17:3
  17:9 28:19,24
**sensitive**  10:7
**sent**  26:7 39:6,25
  68:2 69:6 81:17
**sentence**  24:23
  33:17 34:10,21
  36:19 40:4 46:7
  53:19 59:12 61:4
  73:8,11 77:25
  92:16 97:8 100:6
  109:16 110:12
  111:12,15
**sentences**  32:16
  54:14 63:13 105:4

106:5
**separate**  31:1
  84:13
**september**  81:13
**series**  102:25
**seriously**  21:5
**service**  12:18
  45:22
**services**  5:14
  11:14 67:23
**serving**  17:18
**session**  117:15
**set**  34:24 40:20
**setting**  33:21
  34:13 35:19 36:5
  36:14 41:21
**shapira**  6:21 12:18
**shapira.com**  6:23
**sheer**  77:7
**sheet**  125:13 127:7
  127:10,18 128:1
**short**  24:14 39:15
  40:7 45:8 51:25
  70:8 109:2 112:19
**shortage**  41:23
**shorthand**  19:18
  124:7
**shortly**  19:10
  55:11,16 116:22
**show**  34:12 36:14
  38:15 116:2
**showing**  15:9
  35:17,17 47:5
  52:10 56:11 61:13
  65:11 106:14
**shown**  114:3
  115:21 125:16
**sic**  95:1 97:9
  116:18
**side**  26:21 35:2
  41:25 97:9 117:3

**sided**  65:12
**signature**  124:19
  125:14
**signed**  126:13
  127:18
**signing**  125:19
**signs**  83:10
**similar**  54:20
  61:22 81:21,22
  87:23
**simply**  120:21
**sincerely**  125:21
**sindelar**  4:8 13:1,1
**sir**  125:10
**site**  32:9 65:18
  66:15 77:12 83:2
  107:25 109:12
  122:9
**sitting**  63:6
**situation**  41:24
**size**  42:13,19 43:2
  91:6
**slightly**  43:19 92:6
**smith**  5:22 6:8
  12:16 35:24
  101:22,24 118:10
**sole**  21:19
**solicit**  30:8,23
  44:25
**solicited**  93:4 95:1
  95:12,20 103:11
**soliciting**  115:13
**solomon**  7:6
**solutions**  10:25
  11:3 123:4 125:1
  128:1
**somebody**  101:23
  101:24,24
**sorry**  25:15 30:6
  52:16,18 74:19
  78:5,9 80:11 85:4

94:23 100:11
**sorts** 77:14
**sought** 56:3
**sounds** 42:17
**south** 4:5 6:10
**spaeder** 5:15
11:13
**spears** 3:9 12:3,3
**specialist** 7:6
**specific** 39:16 40:9
42:7 43:1 45:10
86:11 100:24
104:8 114:9,9
119:10 120:25
**specifically** 16:14
28:17 29:14 30:22
33:10 56:22 65:20
68:5 73:13 105:18
112:9
**specifying** 106:1
**speculation** 107:8
112:5 114:18
115:4,16
**spoke** 47:14
**springfield** 3:11
**staff** 96:5 100:8,14
109:25
**stakeholder** 83:6
**stakeholders**
24:25 28:2,5 83:9
87:11
**stamp** 65:13
**stamped** 8:16
**standards** 24:24
**start** 109:5 112:22
**starting** 92:16
105:6 109:17
**starts** 100:23
**state** 11:5 12:13
111:2,4 126:10
127:15

**stated** 55:10 56:14
121:25
**statement** 25:7
34:20 35:9 120:22
126:13,14 127:19
127:19
**states** 1:1 7:2,3,4
10:18 12:6 24:23
27:8,20 58:13
66:19 75:2 94:7
97:16 116:5
**statistical** 26:15
26:24
**status** 50:9 56:23
56:25 57:2 58:8
59:6 61:16,19
65:18,20,21,22
66:6,15 81:2,7,12
81:16 86:1 108:2
108:6 116:17
121:12 122:8
**stenographic**
108:20
**step** 68:10
**stephens** 4:13 13:9
13:9
**stop** 119:25
**stopping** 73:1
**stores** 101:10,11
**straightforward**
37:25 38:9
**strait** 1:18 2:1 8:2
8:9 10:15 12:10
12:10 13:16,25
70:13,19 121:5
123:1 125:8 126:4
126:9 127:4,13
128:20
**street** 2:6 3:6 4:5
5:4,10,16 6:5,10
6:22 10:23

**strike** 22:19 33:18
86:25
**strongly** 41:15
**structure** 113:10
**study** 24:5 25:9
98:1
**stuff** 51:2 59:3
**subcomponents**
68:7
**subject** 16:17 19:9
20:18 79:4 100:1
**submitted** 100:20
**subscribed** 126:10
127:14 128:21
**subsequent** 85:22
**substance** 26:21
38:25 67:23 90:18
114:14
**substances** 33:22
34:14 36:16 48:5
65:25 72:5,10
74:2,5 75:4 77:1
83:11 90:25 98:12
**substantially**
42:14
**sufficient** 41:24
55:9
**sufficiently** 37:25
38:8
**suggesting** 68:18
**suite** 3:16,21 4:10
5:16 125:2
**summarizing**
45:13
**summary** 24:22
48:18 65:18 77:23
78:6,7 97:5
107:24 108:1
109:11
**summit** 1:12

**superior** 125:1
**supply** 34:25 35:7
35:21 76:25
**support** 71:10
110:13
**sure** 18:2 19:20
22:13 30:5 39:23
40:6 64:9 65:7
67:10 70:2 71:7
88:20 105:16,22
105:23,25 106:8
106:12
**surprise** 95:7,10
**survey** 25:25 26:1
26:5,7 28:3 31:10
32:18 34:12 35:9
35:12 36:13,20
38:12,15 39:1
89:24 90:8 91:11
93:10,19 94:3,8
95:2,13,21 101:3,8
101:12 103:1
104:3 105:14
114:14,15,25
115:10,14 116:6
**surveys** 27:11 35:6
35:17 39:6 97:10
**suspicious** 29:18
29:23 30:12 32:20
33:4 37:24 39:17
39:18 40:9,10
42:8,13 45:10,19
50:2 54:8 58:15
59:16 62:4,19
66:22 72:14,18,23
72:24 82:6 86:13
87:14 88:10,24
89:6 100:21
108:11
**swaine** 7:5 12:22
12:22

swear   13:14
sworn   13:17 124:6
    126:10,13 127:14
    127:18 128:21
systems   45:18
    72:19,24

**t**

t   5:21 8:1,1
table   38:22 47:22
    47:24 66:4 89:10
    89:18,22,25 90:4
    91:9
take   10:12 17:14
    21:5 33:14 35:8
    51:18 75:7 83:23
taken   10:15 24:14
    51:25 57:3 65:17
    70:8 80:1 109:2
    112:19 124:3,7,13
takes   23:2 60:13
    67:14 68:10,13,14
    78:1
talk   14:8 50:18
    120:3,13
talked   29:11 45:8
talking   34:22 72:8
    90:17 98:16,22
    119:2,3,7
talks   59:12 63:14
    82:21 83:3 107:25
    122:8
targeted   105:18
tasked   100:10
team   21:19,24
    55:21 56:18 85:19
    100:10
technical   71:3
teleconference   4:4
    4:8,14,18 5:3,22
    6:9,15,20 7:5

telephone   12:23
tell   13:17 40:17
tellis   3:18
tends   77:3
tense   62:9
tenth   6:5
terms   42:22 43:11
    77:4 79:19 99:9
    110:20
testified   13:19
    92:24 99:7
testify   16:19
testifying   16:8,9
    18:10
testimony   8:14
    18:5 19:13 52:14
    52:22 53:2,7
    55:11 57:15 75:19
    78:17 84:8 85:10
    89:15 100:17
    117:13 122:25
    124:4,6,10 126:6,7
    127:6,9,12
text   37:24
thank   14:1 68:9
    70:14,16 89:14
    107:18 122:16
thanks   47:10
    106:18
theme   106:11
thing   90:3 115:6
things   20:2 72:22
    79:25 86:15
    117:17
think   20:7 26:20
    32:5 34:23 36:3
    38:10,23 43:6,16
    59:2 64:7 70:3
    76:6,22 80:11
    84:4 91:3,5 106:9
    106:16 108:16

thinking   110:20
    112:10
third   62:21 63:8
    64:6 65:1 83:3
    88:12
thirds   34:6 91:23
thirty   125:18
thornburg   6:10
    12:15
thought   55:9
    91:17
thoughts   105:9
three   63:13 78:1
    86:17 108:4,5
    123:3
threshold   40:20
    40:22
thresholds   33:21
    34:13,24 35:3,7,20
    36:6,15 39:15
    40:8 45:9
tiffany   3:14 11:21
    70:21
time   14:5,10 20:21
    21:21 24:13,17
    28:21 37:12 38:3
    42:10,24 43:25
    49:7 51:24 52:5
    54:25 57:5 60:17
    61:2 63:4 70:7,11
    70:14,15 82:11,19
    86:24 87:2 90:12
    91:1 98:14 100:17
    103:9 109:1,7
    112:15,18,24
    118:7,13,20 120:1
    121:8 122:19,23
timely   21:1
times   19:23
title   52:20

titled   15:22
today   11:1 14:1
    15:17 16:8,19
    50:8,23 51:10,13
    63:5,6 69:4 72:8
    78:17 82:12 108:8
    109:13 113:6
    114:2
today's   15:5 53:7
    80:16 85:10
    122:25
told   34:22 39:14
    105:13
top   101:19 105:4
topic   15:22 16:20
    120:2,12
total   48:9 75:23
    90:1 91:16 123:2
track   62:16,20
    63:7 64:20 68:19
trade   105:18
    117:17
training   54:10
    77:14 89:7
transcribed   126:7
transcript   125:11
    125:12 126:5,12
    127:5,11,17
transcription
    124:8
transpired   93:7
treatment   40:25
tried   99:12
true   22:16 46:23
    49:6 54:25 124:9
truth   13:18,18,19
try   14:8 20:1
trying   64:7 93:15
    105:24
tucker   4:9 13:2

tuckerellis.com
4:11
turn  10:9 32:11
34:5 47:21 58:11
61:25
turning  24:20
44:14 46:5 53:9
two  17:19 32:16
34:6 47:14 54:13
63:13 80:12 88:15
88:25 91:20,23
105:3 106:5 120:8
type  81:19
types  29:13 35:3
41:1,7 56:15
typical  21:15
typically  22:7

u

u.s.  3:3,5,9 8:15
uh  32:14 73:16
ultimately  34:17
35:21
unclear  35:10,13
undergoing  66:23
underneath  56:18
understand  16:4
16:17 20:1 31:1
51:7 54:22 99:12
110:12
understanding
28:9,25 30:14
48:4 58:6 60:22
60:24 66:1 81:25
103:23 112:1
120:11
understood  38:4
38:13 40:16 55:11
55:13 89:17
undertaken  24:5
undertaking  57:19

underway  15:8
unified  50:2,7
unintended  42:4
unit  10:14 51:23
52:3 108:25 109:5
112:22
united  1:1 7:2,3,4
10:18 12:5 75:2
units  123:2
unusual  42:13,15
42:19 43:1
update  57:3 61:17
64:1,24 67:25
68:16 81:2,7
85:20,22 86:8
87:24
usdoj.gov  3:8,12
use  40:19 71:14
uses  74:2

v

v  1:8,12 125:6
126:3 127:3
vague  22:12 25:24
33:24 74:13 96:25
114:17
values  71:20
variables  39:18
40:10
various  83:7 111:4
vastly  41:13
venue  84:24
verbal  31:2
veritext  10:25
11:2 123:3 125:1
125:7 128:1
veritext.com.
125:17
versus  76:12
video  10:11,14
videographer  7:6
10:3 11:1 12:21

13:13,21 24:11,15
51:21 52:1 70:5,9
108:23 109:3
112:16,20 122:17
122:21
videotaped  1:18
2:1 8:9
view  36:12 58:3
views  18:6
virginia  3:11
vocal  99:6
volumes  76:25
vs  1:10

w

w  3:16
wacker  3:21 4:19
waites  3:4 12:8,8
19:16 22:12 25:24
30:19 33:24 42:20
43:3 48:17 49:1
49:14 50:11 51:14
51:20 57:14 59:17
60:20 65:3 69:8
73:2 74:13 75:9
75:11 76:15 77:18
78:23,25 79:7,16
80:9 95:23 96:6
96:12,22 99:17
102:6 106:21
107:7 111:13
112:4 113:11,17
113:24 114:17
115:3,15 117:12
118:16,23 119:23
120:7,23 122:4
125:5
waived  125:19
wal  12:21 13:10
walk  45:6
wallace  4:4 13:4,4

walmart  4:12
want  30:21 34:1
38:20 43:5 60:6
64:13 71:1 75:17
80:2 81:23 89:10
92:13 101:11
105:23 106:8
107:11 108:17
110:3 111:19
116:4 121:17
wanted  31:5 38:13
43:7 56:7 111:8
117:18,23 121:1
warning  83:10
washington  1:19
2:7 3:7 5:10,17
6:5 10:23
way  20:15 21:15
34:7 36:2 76:12
80:12 93:15 99:13
110:19 115:1
ways  37:21 84:15
118:3
wc.com  5:11,12
we've  40:23 51:2
72:8 91:5 106:10
109:12 120:23
web  27:10 32:9
65:17 66:15 77:12
83:2 97:10 107:25
109:11 122:9
weitz  3:15 11:20
11:21
weitzlux.com  3:18
went  42:10 56:1
west  3:21 4:19
whispering  10:7
white  63:20 64:11
wholesale  29:23
wicht  5:8 11:10,10

widely  46:12
williams  2:5 5:9
 10:22 11:8,10
willing  42:6 101:8
 115:9
wisconsin  6:16
wishes  73:18
witness  3:3 13:14
 19:21 25:25 30:21
 34:1 36:1 42:21
 43:4 48:18 49:16
 50:16 51:16 53:4
 57:16 59:19 60:21
 65:5 69:10 70:16
 74:10 75:13 76:17
 79:9,17 91:22
 92:10 93:12,23
 94:10 95:4,9 96:1
 96:9,15 97:1 98:4
 98:10 99:3,19
 102:7,20 103:15
 103:23 104:11
 105:1 106:24
 107:9 110:17,19
 112:8 113:12,18
 113:25 114:19
 115:5,17 117:14
 118:11,17,24
 120:13 122:6
 124:4,6,10 125:8
 125:11 126:1,4,11
 127:1,4,15
witnesses  18:5
 19:12 99:7
witness'  125:14
work  20:7,8,16
 51:4 83:4 88:14
 88:21 106:12
 113:22 116:12
 117:1

worked  106:10
working  18:8,10
 21:25 41:18 84:6
 87:10 94:20 98:13
works  56:20
worth  106:14
wrap  120:8
writing  31:2 43:8
 55:14,18,24 56:7
written  30:17 32:3
 32:8 42:25 43:1
 43:23,24 46:10,16
 48:12,13 49:17
 50:3,25 51:11
 57:12 58:4,22
 59:15 61:6 62:12
 62:13 69:18 82:10
 83:17,21 84:3
 121:25
wrong  74:22
wrote  64:2 81:15

y

yeah  11:23 38:20
 44:16 47:17 49:4
 65:5 69:10 90:13
 112:6,8 117:23
 119:9
year  62:21 63:8
 64:6 65:2 67:2
 68:20,24 81:5,6
yearly  54:10 89:7
years  14:21 17:12
 17:15,20 38:4
 60:3 69:16
yep  73:20

z

zuckerman  5:15
 11:12
zuckerman.com
 5:18

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.