Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF OHIO

 3                    EASTERN DIVISION

 4                       - - -

 5    IN RE:  NATIONAL           :

      PRESCRIPTION               :  MDL No. 2804

 6    OPIATE LITIGATION          :

      _____ :  Case No.

 7                               :  1:17-MD-2804

      THIS DOCUMENT RELATES      :

 8    TO ALL CASES              :  Hon. Dan A. Polster

 9                       - - -

10             Thursday, January 3, 2019

11       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

12

                       - - -

13

14        Videotaped deposition of JILL A. STRANG, held

15    at the offices of Cavitch, Familo & Durkin,

16    1300 East Ninth Street, Cleveland, Ohio, commencing at

17    8:57 a.m., on the above date, before Carol A. Kirk,

18    Registered Merit Reporter and Notary Public.

19

20                       - - -

21

22             GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

23                  deps@golkow.com

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  A P P E A R A N C E S:
 2   On behalf of the Plaintiffs:
 3        COHEN & MALAD, LLP
          BY:  EDWARD "NED" B. MULLIGAN, V, ESQUIRE
 4            nmulligan@cohenandmalad.com
          One Indiana Square, Suite 1400
 5        Indianapolis, Indiana  46204
          317-636-6481
 6            and
          LEVIN PAPANTONIO THOMAS MITCHELL
 7        RAFFERTY & PROCTOR P.A.
          BY:  JEFF GADDY, ESQUIRE (via teleconference)
 8            jgaddy@levinlaw.com
          316 South Baylen Street, Suite 600
 9        Pensacola, Florida  32502
          205-435-7000
10
11   On behalf of Discount Drug Mart:
12        CAVITCH FAMILO & DURKIN
          BY:  TIMOTHY JOHNSON, ESQUIRE
13            tjohnson@cavitch.com
          1300 East Ninth Street, 20th Floor
14        Cleveland, Ohio  44114
          216-621-7860
15
16   On behalf of the Cardinal Health, Inc.:
17        PORTER WRIGHT MORRIS & ARTHUR LLP
          BY:  JILL G. OKUN, ESQUIRE
18            jokun@porterwright.com
          950 Main Avenue, Suite 500
19        Cleveland, Ohio  44113
          202-443-2508
20
21   On behalf of the AmerisourceBergen:
          JACKSON KELLY PLLC
22        BY:  SANDRA K. ZERRUSEN, ESQUIRE
              skzerrusen@jacksonkelly.com
23        50 South Main Street, Suite 201
          Akron, Ohio  44308
24        330-252-9060
```

```
 1    On behalf of HBC (via teleconference and live stream):
 2         MARCUS & SHAPIRA LLP
           BY:  MOIRA CAIN-MANNIX, ESQUIRE
 3             cain-mannix@marcus-shapira.com
           One Oxford Center, 35th Floor
 4         301 Grant Street
           Pittsburgh, Pennsylvania  15219-6401
 5         412-338-3344
 6
      On behalf of Walmart (via teleconference and live
 7    stream):
 8         JONES DAY
           BY:  SHUBHA M. HARRIS, ESQUIRE
 9             shubhaharris@jonesday.com
           90 South Seventh Street, Suite 4950
10         Minneapolis, Minnesota  55402
           612-217-8800
11
12    On behalf of Endo Pharmaceuticals, Inc. and
      Endo Health Solutions Inc. (via teleconference and
13    live stream):
14         ARNOLD & PORTER KAYE SCHOLER, LLP
           BY:  TIFFANY M. IKEDA, ESQUIRE
15             tiffany.ikeda@apks.com
           777 S. Figueroa Street, Suite 4400
16         Los Angeles, California  90017
           213-243-4000
17
18    On behalf of Johnson & Johnson and
      Janssen Pharmaceuticals:
19
           TUCKER ELLIS LLP
20         BY:  ERICA M. JAMES, ESQUIRE
               erica.james@tuckerellis.com
21         950 Main Avenue, Suite 1100
           Cleveland, Ohio  44113
22         216-592-5000
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   On behalf of McKesson:

 2           ULMER & BERNE, LLP

             BY:  GREGORY C. DJORDJEVIC, ESQUIRE

 3               gdjordjevic@ulmer.com

             1660 West 2nd Street, Suite 1100

 4           Cleveland, Ohio  44113

             216-583-7000

 5

 6

 7   ALSO PRESENT:

 8           Tom McConnell, Discount Drug Mart

             Haley Roach, Cohen & Malad

 9           Darnell Brown, Videographer

             Cory Smith, Trial Technician

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        VIDEOTAPED DEPOSITION OF JILL A. STRANG

 2              INDEX TO EXAMINATION

 3   WITNESS                                    PAGE

 4   JILL A. STRANG

 5      CROSS-EXAMINATION BY MR. MULLIGAN:        11

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       VIDEOTAPED DEPOSITION OF JILL A. STRANG
 2                   INDEX TO EXHIBITS
 3   DDM-STRANG        DESCRIPTION                    PAGE
 4   DDM-Strang 1   Plaintiffs' Notice of Oral        19
                    Videotaped Fact Deposition of
 5                  Jill Strang
 6   DDM-Strang 2   Discount Drug Mart, Inc.         118
                    Responses to Plaintiffs' First
 7                  Set of Interrogatories
 8   DDM-Strang 3   Letters to Registrant from       134
                    Mr. Rannazzisi, dated February
 9                  7, 2007 and December 27, 2007,
                    Bates-stamped DDM00068279
10                  through 68284
11   DDM-Strang 4   Controlled Drug Report,          154
                    Bates-stamped DDM00053148
12
     DDM-Strang 5   Controlled Drug Report,          156
13                  Bates-stamped DDM00053129
                    through 53144
14
     DDM-Strang 6   Document titled "Shipments       163
15                  Greater Than .99% of Average
                    Movement Based on 06/2016,"
16                  Bates-stamped DDM00053912
                    through 53932
17
     DDM-Strang 7   Controlled Substances Model      165
18                  Policy, Bates-stamped
                    DDM00031932 through 31965
19
     DDM-Strang 8   E-mail string ending with an     168
20                  e-mail to Mr. Devens from
                    Ms. Strang, dated 4/2/2014,
21                  Bates-stamped DDM00092440
22   DDM-Strang 9   Controlled Substances Model      168
                    Policy, Bates-stamped
23                  DDM00091606 through 91629
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)

 2   DDM-STRANG      DESCRIPTION                 PAGE

 3   DDM-Strang 10  Rx Operational/Procedure     196
                    Bulletin to All Pharmacists,
 4                  Technicians, and Interns from
                    Pharmacy Operations, dated
 5                  September 9, 2015, Bates-
                    stamped DDM00012909 through
 6                  12919

 7   DDM-Strang 11  E-mail string ending with an 200
                    e-mail to Mr. Briscoe from
 8                  Ms. Strang, dated 4/5/2016,
                    Bates-stamped DDM00174768 and
 9                  174769

10   DDM-Strang 12  E-mail string ending with an 206
                    e-mail to Ms. Strang from
11                  Ms. Kreiner, dated 1/20/17,
                    Bates-stamped DDM00074952
12                  through 74953

13   DDM-Strang 13  Inventory Controls Policy    209
                    Adopted 12/1/2016, Bates-
14                  stamped DDM00000467 through 469

15   DDM-Strang 14  E-mail string ending with an 217
                    e-mail to Ms. Strang from
16                  Mr. Briscoe, dated 5/22/2017,
                    Bates-stamped DDM00003560
17                  through 3562

18   DDM-Strang 15  E-mail to Mr. McConnell from  223
                    Mr. Stuyck, dated 1/17/2018,
19                  Bates-stamped DDM00178756
                    through 178761
20
     DDM-Strang 16  E-mail to Mr. Ratycz and others 230
21                  from Mr. Muha, dated 2/2/2018,
                    Bates-stamped DDM00453459
22
     DDM-Strang 17  Document titled "Confidential. 238
23                  Attention:  Chief Pharmacist,"
                    Store #5, dated 5/5/08,
24                  Bates-stamped DDM00440505
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INDEX TO EXHIBITS (CONT'D)
 2   DDM-STRANG       DESCRIPTION                        PAGE
 3   DDM-Strang 18  E-mail to Mr. Boodjeh and           252
                    others from Mr. Wilkins, dated
 4                  6/13/2013, with attachment,
                    Bates-stamped DDM00015156
 5                  through 15161
 6   DDM-Strang 19  E-mail to All Pharmacists from      265
                    Mr. Nameth, dated 9/24/2013,
 7                  with attachment, Bates-stamped
                    DDM00110147
 8
     DDM-Strang 20  E-mail string ending with an        271
 9                  e-mail to Messrs. Ratycz and
                    Nameth from Mr. Wilkins, dated
10                  10/16/2013, Bates-stamped
                    DDM00168903 and 168904
11
     DDM-Strang 21  E-mail to Ms. Cooper from           276
12                  Ms. Strang, dated 2/6/2014,
                    Bates-stamped DDM00074107 and
13                  74108
14   DDM-Strang 22  E-mail string ending with an        286
                    e-mail to Ms. Anderson and
15                  others from Mr. Nameth, dated
                    9/22/2014, Bates-stamped
16                  DDM00058459 and 58460
17   DDM-Strang 23  E-mail to Ms. Strang from           289
                    Ms. Arend, dated 5/7/2015,
18                  Bates-stamped DDM00106436
19   DDM-Strang 24  E-mail to Mr. Briscoe and           291
                    Ms. Strang from Ms. Arend,
20                  dated 10/26/15, Bates-stamped
                    DDM00013132 and 13133
21
     DDM-Strang 25  E-mail string ending with an        295
22                  e-mail to Ms. Biancardi and
                    others from Mr. Ratycz, dated
23                  4/4/2007, Bates-stamped
                    DDM00355119
24
```

Highly Confidential - Subject to Further Confidentiality Review

1

    DDM-Strang 26  Discount Drug Mart, Inc.,       298

2                Organizational Chart,

                   Bates-stamped DDM00001047

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
1                    - - -

2             P R O C E E D I N G S

3                    - - -

4          THE VIDEOGRAPHER:  Good morning.

5      We are now on the record.  My name is

6      Darnell Brown, and I'm the videographer

7      with Golkow Litigation Services.

8          Today's date is January 3, 2019,

9      and the time is 8:57 a.m.  This video

10     deposition is being held in Cleveland,

11     Ohio, in the matter of National

12     Prescription Opioid Litigation for the

13     United States District Court for the

14     Northern District of Ohio.  The deponent

15     is Jill Strang.

16          Counsel, please identify

17     yourselves for the record.

18          MR. MULLIGAN:  Edward Mulligan and

19     Haley Roach for Plaintiffs.

20          MR. JOHNSON:  Tim Johnson for

21     Discount Drug Mart.

22          MS. JAMES:  Erica James of Tucker

23     Ellis on behalf of Janssen

24     Pharmaceuticals and Johnson & Johnson.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1               MS. ZERRUSEN:  Sandy Zerrusen of

 2          Jackson Kelly on behalf of

 3          AmerisourceBergen.

 4               MR. DJORDJEVIC:  Greg Djordjevic,

 5          Ulmer & Berne, on behalf of McKesson.

 6               MS. OKUN:  Jill Okun, Porter

 7          Wright, on behalf of Cardinal Health.

 8               THE VIDEOGRAPHER:  Counsel on the

 9          phone.

10               MS. CAIN-MANNIX:  Yes.  This is

11          Moira Cain-Mannix from Marcus & Shapira

12          LLP on behalf of HBC Services Company.

13               MR. MULLIGAN:  Is that everybody?

14               All right.  The gang is all here.

15               THE VIDEOGRAPHER:  The court

16          reporter is Carol Kirk who will now

17          swear in the witness.

18                       - - -

19               JILL A. STRANG

20   being by me first duly sworn, as hereinafter

21   certified, deposes and says as follows:

22               CROSS-EXAMINATION

23   BY MR. MULLIGAN:

24          Q.   Good morning, Ms. Strang.
```

1          A.    Good morning.

2          Q.    I appreciate you being here today.

3                My name is Edward Mulligan.  I'm a

4     lawyer at Cohen & Mallad in Indianapolis, and I

5     represent the Plaintiffs in this litigation.

6                Would you please state your full

7     name for the record.

8          A.    Jill Ann Strang.

9          Q.    Is that A-n-n-e?

10         A.    A-n-n.  No E.

11         Q.    No E?

12         A.    No E.

13         Q.    Okay.  And what's your current

14    occupation?

15         A.    I'm the pharmaceutical buyer and

16    the pharmacy warehouse supervisor at Discount

17    Drug Mart.

18         Q.    Pharma buyer and pharmaceutical --

19         A.    Warehouse supervisor, manager.

20         Q.    How long have you had those two

21    roles -- well, strike that.

22                Would you describe those as two

23    roles, or is it one role that has two titles?

24         A.    Two roles.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2      A.    Because the buying part of it is

3  one side of my job.  The other side is managing

4  the warehouse every day on the -- every day with

5  my crew.

6      Q.    Okay.  So are you -- as the

7  pharmacy warehouse supervisor, do you manage

8  everybody who's located in the warehouse?

9      A.    Yes, in the pharmacy warehouse.

10      Q.    Okay.  And are you the only

11  pharmacy buyer?

12      A.    Yes.

13      Q.    And how long have you had those

14  two titles?

15      A.    Twenty-one years.

16      Q.    Okay.  You had them both for the

17  entirety of the --

18      A.    Yes.

19      Q.    -- your time there?

20      A.    Yes.

21      Q.    And did you hold a different

22  position at -- I'm going to call it DDM for

23  purposes of today; is that fair?

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    Okay.  And that refers to Discount

 2    Drug Mart?

 3           A.    Yes.

 4           Q.    All right.  So have you been at

 5    DDM for more than 21 years?

 6           A.    Yes, I've been there for 33 years.

 7           Q.    Okay.  And what was your title

 8    prior to the two you just mentioned?

 9           A.    When I first started, I worked at

10    one of our store locations.  And then I came up

11    to corporate and I've been there for 25 years.

12    And before the job that I'm holding right now, I

13    worked in operations of DDM and I was assistant

14    to the director of operations.

15           Q.    Okay.  We'll get back to that

16    later, but I just wanted to kind of get a

17    picture as to what you've done there.

18           A.    Okay.

19           Q.    What year did you start there?

20           A.    I started in 1985.

21           Q.    And what's your -- I assume when

22    you go to work in the morning, you go to the

23    warehouse?

24           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1           Q.    And is that in Medina?

2           A.    Yes.

3           Q.    Is that warehouse physically

4      located near the corporate headquarters?

5           A.    Yes.  It's inside the corporate

6      headquarters.

7           Q.    Okay.  So when you go to work, you

8      go to the same place that Mr. McConnell --

9           A.    Yes.

10          Q.    -- and Mr. Ratycz --

11          A.    Right.

12          Q.    -- go to?

13          A.    Yes.  Correct.

14          Q.    Okay.

15               MR. JOHNSON:  Okay.  You need to

16          slow down a little bit.

17          A.    Oh, sorry.

18          Q.    That's all right.  It's sort of

19     one of those things where you're in conversation

20     and you're trying to fill the space.  But if you

21     sat there and counted to three and then gave me

22     an answer, I'm okay with that, too.

23          A.    Okay.  I'm excited I know the

24     answers.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    These --

2               MR. JOHNSON:  They're only going

3        to get harder.

4               THE WITNESS:  Okay.

5               MR. MULLIGAN:  Well, I don't know.

6    BY MR. MULLIGAN:

7        Q.    Okay.  I think you -- we chatted a

8    little bit before the deposition about those

9    kind of rules, right?

10       A.    Yes.

11       Q.    Okay.  And I asked you if you had

12   been deposed before and I think you said you

13   weren't sure if it was a deposition, but you had

14   given testimony at some point?

15       A.    Yes, I have.

16       Q.    Okay.  When was that?

17       A.    Back in 1991 or '92.

18       Q.    Okay.  What was that related to?

19       A.    I was a resident advisor in -- at

20   Bowling Green State University.

21       Q.    Okay.

22       A.    And a young lady on my floor -- it

23   was a rape case.

24       Q.    Oh, no.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    And so I was questioned because I
 2    was -- happened to be the person that picked her
 3    up from the scene.  So I was disposed from her
 4    lawyer and the other lawyer.
 5              Q.    So that was part of a civil suit?
 6              A.    Yeah.  It never went to trial --
 7              Q.    Mm-hmm.
 8              A.    -- but I did have to sit and talk
 9    with the lawyers.
10              Q.    So it would be fair to say that
11    you provided facts type testimony about what
12    happened?
13              A.    Yes.
14              Q.    Okay.  All right.  And you
15    understand you're under oath today, correct?
16              A.    Correct.  Yes, sir.
17              Q.    And you understand that means you
18    have to tell the truth and nothing but the
19    truth, right?
20              A.    Yes.
21              Q.    Okay.  And we're -- you're getting
22    better with the verbal answers, so I'll just
23    remind you, you know, to say "yes" and "no" as
24    opposed to shaking your head and obviously wait
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to let me finish my question.  And we'll -- like

 2    I said, we'll try to do our best to remind you

 3    if we get off track, okay?

 4         A.    Yes.

 5         Q.    It's also not a marathon.  So

 6    we'll take breaks.  Likely some bathrooms breaks

 7    and a lunch break.  My only request is that if

 8    we're on a document, that we finish the

 9    document, or if there's a question pending, that

10    you answer the question before we take a break,

11    okay?

12         A.    Okay.

13         Q.    I'm going to use a couple

14    abbreviations today just to make things go

15    faster.  One of them is going to be suspicious

16    order monitoring, I'm going to refer to as SOM;

17    is that fair?

18         A.    Yes.

19         Q.    Or I may refer to it in the long

20    version, but I'm going to try to be efficient.

21    Obviously we talked about DDM for Discount Drug

22    Mart?

23         A.    Yes.

24         Q.    Okay.  And Controlled Substances
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Act, I may refer to as the CSA; is that fair?

 2            A.    Yes.

 3            Q.    Okay.  All right.  I'm going to

 4    hand you -- or Ms. Roach is going to hand you

 5    what she's marking as Exhibit 1.

 6                          - - -

 7            (DDM-Strang Exhibit 1 marked.)

 8                          - - -

 9            Q.    And this is Plaintiffs' Notice of

10    Oral Videotaped Fact Deposition of Jill Strang.

11    And, again, you can look at the hard copy or you

12    can look at the screen as well.  He's typically

13    going to highlight what we're talking about.

14                  Have you ever seen this document

15    before?

16            A.    Yes.

17            Q.    Okay.  When was the first time you

18    saw it?

19            A.    When it was sent to me when I was

20    told that this case would be on January 3rd.

21            Q.    Okay.  And what did you do, if

22    anything, to prepare for today's deposition?

23            A.    I read the depositions of Jason

24    Briscoe and Pete Ratycz, and I met with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Mr. Johnson to prepare myself for today.

 2          Q.    Okay.  And did you select those

 3   deposition transcripts to review or did somebody

 4   select them for you?

 5          A.    They were sent to me --

 6          Q.    Okay.

 7          A.    -- for review.

 8          Q.    Were they sent to you by a lawyer?

 9          A.    Yes.

10          Q.    Okay.  Were you provided with any

11   other deposition transcripts?

12          A.    No.

13          Q.    Okay.  Did you read those

14   transcripts from front to back?

15          A.    Yes.

16          Q.    Okay.  They were long, weren't

17   they?

18          A.    Yes.

19          Q.    And how much time would you say

20   you spent reading those transcripts?

21          A.    Probably about six to eight hours.

22          Q.    Okay.  Each or total?

23          A.    Total.

24          Q.    Okay.  Did you read them in one
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   fell swoop or did you read one and then the

 2   other?

 3         A.    I read Jason's first and then

 4   about a week later, I received Mr. Ratycz's.

 5         Q.    Okay.  Any particular reason why

 6   you felt the need to read those depositions

 7   before your deposition today?

 8         A.    Number one, so I could see the

 9   process, and the other was to see what subjects

10   they were talking about, if they pertained to

11   me.

12         Q.    Okay.  So one of the things that

13   we're doing here today is we're here to probe

14   what your personal knowledge is, and so

15   obviously the fact that you've reviewed those

16   depositions makes it a little more difficult,

17   because potentially some of your knowledge now

18   includes their knowledge.

19               So I guess what I would ask you

20   is, if I ask you a question and you only know

21   the answer because of something you read in one

22   of those depositions, would you please let me

23   know that?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1         Q.    Okay.  And I'll probably ask those

2    follow-ups.  But in case I don't, you know, if

3    your knowledge is limited solely to the fact

4    that you've read it in a deposition, I'd like

5    you to let me know.

6               Is that fair?

7         A.    That's fair.  Thank you.

8         Q.    Were there any topics that you

9    identified in either of those depositions that

10   you felt pertains to you, as you stated?

11        A.    Yes.

12        Q.    And what were those topics?

13        A.    Anything associated with the

14   distribution center.

15        Q.    Okay.  Anything else?

16        A.    No.

17        Q.    Okay.  What about suspicious order

18   monitoring?

19        A.    Yes, but we do have -- we do have

20   procedures and a system in place, but pertaining

21   to what they talked about, I'm the end user of

22   that.  So I had my own of what I wanted to say

23   about it, although they touched on it.

24        Q.    Okay.  So you can color in some of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the lines that they only could give us the

 2    framework for?

 3            A.    Yes.

 4            Q.    Okay.  And -- okay.  We'll get to

 5    that.  Would it be fair to say that your --

 6    strike that.

 7                  Okay.  Did you review anything

 8    else in preparation for today's deposition?

 9            A.    Not really, no.

10            Q.    Okay.  So I had a friend who went

11    across the border once when we were underage and

12    the customs agent turned to us and said, "Do you

13    guys have anything to declare?"

14                  And we had a trunk full of alcohol

15    and -- it wasn't mine.

16                  And the guy said, "Do you have

17    anything to declare?"

18                  And my friend's response was, "Not

19    really."

20                  And then he turned around and

21    looked around.

22                  So I want to follow up on that.

23    When you say "not really," what do you mean?

24            A.    I did not have any other documents
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to read.

 2            Q.    Okay.

 3            A.    I wrote our policies and

 4    procedures, so I didn't really review them, but

 5    I -- in my head told -- you know, I kind of went

 6    through what we -- what our policies and

 7    procedures are for the warehouse, because I

 8    wanted to be prepared for today.

 9            Q.    Okay.  So in preparation for

10    today's deposition, you read the transcript of

11    Jason Briscoe's deposition?

12            A.    Yes.

13            Q.    And then you read the transcript

14    of Pete Ratycz's deposition?

15            A.    Yes.

16            Q.    Okay.  And in both of those

17    depositions they discussed what DDM's policies

18    and procedures are regarding suspicious order

19    monitoring, correct?

20            A.    Yes.

21            Q.    Okay.  And it sounds like you also

22    sort of jogged your memory without looking at

23    anything as to what those were?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  So did you make any efforts

 2     to go and look at any documents that may have

 3     been on your system or in your e-mail related to

 4     suspicious order monitoring?

 5              A.    No, because I know that the one

 6     particular sentence in one of the depositions

 7     was something that I wrote myself.

 8              Q.    Okay.

 9              A.    And that was something that I --

10     that was the only particular line that might

11     have pertained to suspicious order monitoring.

12     I don't know the exact sentence, but --

13              Q.    So you saw a sentence in one of

14     those depositions that described or quoted a

15     policy that you had written?

16              A.    Yes.

17              Q.    And did you go and look at that

18     document?

19              A.    I did, but not -- actually, the

20     document was -- the wording was already in the

21     deposition.

22              Q.    Okay.  And so I -- just I want to

23     just make sure I fully understand what you did.

24              A.    Yes.
```

1      Q.    Would it be fair to say that other

2   than looking at those two depositions, that you

3   didn't look at a single paper document relating

4   to DDM's suspicious order monitoring policies in

5   preparation for your deposition?

6      A.    I did not.

7      Q.    Okay.  If you were to go look at

8   DDM's suspicious order monitoring policies,

9   where would you have gone to look?

10     A.    In my personnel file in my

11  computer.

12     Q.    Okay.  And so those are electronic

13  files?

14     A.    Yes.

15     Q.    And how many documents would you

16  have to look at to see what -- to read about

17  that policy?

18     A.    There are, I believe, 16 or 17

19  different documents.

20     Q.    Are they all currently in place or

21  in force?

22     A.    Yes.

23     Q.    Okay.  And do you know whether all

24  of those documents have been provided to your

Highly Confidential - Subject to Further Confidentiality Review

```
 1   counsel to be produced?

 2           A.    I don't know.

 3                 MR. JOHNSON:  If they're on the

 4           system, they would have been part of her

 5           custodial file, I assume.

 6           A.    It was part of our --

 7                 MR. JOHNSON:  That would have been

 8           searched.

 9           A.    It was part of our VAWD

10   accreditation.

11           Q.    Okay.  So if we ask for your VAWD

12   accreditation file, that -- and you were to

13   produce that, that would include all of those

14   documents?

15           A.    Yes.

16           Q.    Okay.  Have you always been the

17   owner of those --

18           A.    Yes.

19           Q.    I'm sorry.  Have you always been

20   the owner of DDM's suspicious order monitoring

21   policies?

22           A.    Can you repeat that?

23           Q.    Sure.  Have you -- and when I say

24   "owner," I mean the person who maintains them
```

Highly Confidential - Subject to Further Confidentiality Review

1    and sort of makes sure that they're in order.

2              Have you always been the owner of

3    DDM's suspicious order monitoring policies and

4    procedures?

5         A.    Yes.

6         Q.    Okay.  Has DDM's suspicious order

7    monitoring policies and procedures always

8    included 16 to 17 documents?

9         A.    When we -- when I wrote them, they

10   were just a couple years ago, so that was the

11   first of something in writing, so I'm going to

12   say yes.

13        Q.    Okay.  So currently DDM does have

14   written policies and procedures regarding

15   suspicious order monitoring?

16        A.    Yes.

17        Q.    Okay.  And so you hesitated and

18   I'm -- why did you hesitate?

19        A.    Because it's in the policy, but

20   it's not step by step in the policy.

21        Q.    So it's like a 30,000-foot view

22   description of how it works?

23        A.    Yes.

24        Q.    Okay.  So it doesn't necessarily

Highly Confidential - Subject to Further Confidentiality Review

```
 1    provide the person implementing the policy with

 2    every step they need to take?

 3           A.    Yes.

 4           Q.    It's sort of a brushstrokes?

 5           A.    Yes, because it was new at the

 6    time that VAWD -- I was following their template

 7    of how to write the policies and procedures, and

 8    that's when the one sentence came into play that

 9    I took it as an SOM for purchase -- or for

10    selling outside of our company.

11           Q.    Okay.  So let me -- what does VAWD

12    stand for?

13           A.    Verified accredited wholesaler

14    distributor.

15           Q.    Okay.  And so the VAWD

16    accreditation is something you need to get to

17    sell to another entity other than a DDM store?

18           A.    Yes, that could -- that's true.

19           Q.    Okay.  So would it be fair to say

20    that the first time DDM had suspicious order

21    monitoring policies and procedures in writing

22    was to obtain an accreditation to help sell

23    outside the company?

24           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.     Okay.  So the same would be true

2     that prior to that effort DDM didn't have any

3     written suspicious order monitoring's policies

4     and procedures?

5              A.     Nothing in writing.

6              Q.     And to write those policies and

7     procedures, did you have to use some sort of a

8     template that was provided?

9              A.     Yes.

10             Q.     Okay.  And did the policies and

11    procedures that you wrote deviate in any

12    substantial way from the templates that you were

13    provided with?

14             A.     No.

15             Q.     Okay.  Do you know the date when

16    you first sought the VAWD accreditation?

17             A.     It was May of 2017.  I had worked

18    on it for about nine months, nine, ten months.

19             Q.     Okay.  And did DDM get the VAWD

20    accreditation?

21             A.     Yes, we did.

22             Q.     So part of your job today includes

23    selling products to -- as a wholesaler to other

24    businesses?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    No.

 2                  MR. JOHNSON:  Objection.

 3            Q.    Okay.  So what did the VAWD

 4      accreditation allow DDM to do?

 5            A.    So the VAWD accreditation was

 6      presented to us that if we were not VAWD

 7      accredited, that certain insurance companies,

 8      third-party insurance companies, would not cover

 9      particular drugs or -- I don't know the word to

10      use but -- so we felt that we should be a part

11      of that so that we could continue to service our

12      stores, but by no means did that mean we were

13      selling outside of our stores.

14            Q.    Okay.  And when you say "insurance

15      companies," you're talking about health

16      insurance companies wouldn't cover drugs that

17      your customers needed unless you had that

18      accreditation?

19            A.    Yes, because they wanted our

20      facility to meet all the standards of VAWD.

21            Q.    Okay.  So would it be fair to say

22      that DDM made the decision to put suspicious

23      order monitoring policies and procedures in

24      writing in order to improve its ability to sell
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   certain products to customers?

 2           A.    Yes.

 3           Q.    Okay.  All right.  So I'm going

 4   to -- I want to go back to what we were talking

 5   about earlier, which was how you prepared for

 6   the deposition.

 7                 So you reviewed the depositions?

 8           A.    Yes.

 9           Q.    And you thought about -- what was

10   it, your memory?

11           A.    Mm-hmm.

12           Q.    And you didn't look at any other

13   documents?

14           A.    No.

15           Q.    No e-mails?

16           A.    Yes, e-mails that were sent to me

17   yesterday.

18           Q.    Okay.  And would those have been

19   e-mails from an attorney?

20           A.    Yes.

21           Q.    Okay.  And I don't need to know

22   about what was in those e-mails.

23                 Did those e-mails include any

24   documents that were from Discount Drug Mart?
```

```
 1          A.    No.

 2          Q.    Okay.  Did you review any of the

 3    deposition exhibits to the two depositions?

 4          A.    I did not.  Whatever was

 5    mentioned -- I don't think I was copied on any

 6    attachments.  I do know that Mr. Johnson showed

 7    me some, but nothing was ever -- I didn't read

 8    anything.  They were just face value.

 9          Q.    So you were shown some documents

10    during your preparation with Mr. Johnson?

11                Okay.  Do you know how many --

12                MR. JOHNSON:  You have to answer

13          out loud.

14          A.    Yes.

15          Q.    Do you know how many documents?

16          A.    Ten.

17          Q.    Okay.  Do you know what any of

18    those documents were?

19          A.    No.

20          Q.    So was he just waving them around

21    or did he actually have you look at them?

22          A.    He had me look at them, but I

23    didn't -- I wasn't -- I had never seen them

24    before and they didn't pertain to my job --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.

 2              A.    -- or to today.  So he flipped

 3   them over and put them back in the folder.

 4                    MR. MULLIGAN:  You picked the

 5              wrong documents, Tim.

 6                    MR. JOHNSON:  Apparently.  We did

 7              look at policy 112, though, which I

 8              assume we're going to talk about, which

 9              she had seen before.

10                    MR. MULLIGAN:  I got that

11              impression.  Thanks.

12   BY MR. MULLIGAN:

13              Q.    Did any of those documents refresh

14   your recollection about anything that we're

15   going to talk about today?

16              A.    No.

17              Q.    Okay.  And I assume you know what

18   we're going to talk about today?

19              A.    Yes.

20              Q.    You're doing well.

21                    When did you meet with

22   Mr. Johnson?

23              A.    I met with him on Monday.

24              Q.    Okay.  And how long did you meet
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with him for?

 2          A.    Two hours.

 3          Q.    Did you meet with him here?

 4          A.    No.

 5          Q.    In Medina?

 6          A.    Medina.

 7          Q.    Okay.  And was anybody else in

 8   that meeting?

 9          A.    Yes.  Mr. McConnell and Joe Muha,

10   but not for the two hours.  We only talked for

11   15 minutes and then Joe left.  We talked for the

12   remainder of the time.  I left.  And then Joe

13   talked to them.  We had separate meetings.

14          Q.    Okay.  Who's Mr. Muha?

15          A.    He is our corporate counsel.

16          Q.    Okay.  Were any of the Boodjehs

17   present for any of those meetings?

18          A.    They were not.

19          Q.    Did you talk to any of them about

20   your deposition?

21          A.    No.

22          Q.    Okay.  Do you interface or

23   interact with any of the Boodjehs in your

24   day-to-day operations?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    Do I?

2              Q.    Yeah.

3              A.    Yes.

4              Q.    Okay.  And in what way?

5              A.    I mean, I do talk to them.  It's

6    not so much in the pharmacy aspect.  I mean, I

7    see them every day at the office.

8              Q.    Okay.

9              A.    Yeah.

10             Q.    Have you ever had any discussions

11   with any of them about DDM's suspicious order

12   monitoring?

13             A.    No.

14             Q.    They've never asked you once about

15   what DDM does to monitor suspicious orders?

16             A.    No.

17             Q.    Okay.  And if they were going to

18   ask anybody at DDM, would you be the person to

19   ask?

20             A.    I think they would go to Pete or

21   Jason first.

22             Q.    Okay.  Do you know whether they've

23   ever had any conversations with Peter or Jason

24   about suspicious order monitoring?
```

```
 1          A.    No.

 2          Q.    Have you ever sent copies of those

 3   policies you drafted in an e-mail that would

 4   have included them?

 5          A.    No.

 6          Q.    Any particular reason?

 7          A.    No.  I just sent them to Jason.

 8   Pete and Jason.

 9                (Reporter clarification.)

10          A.    Pete and Jason.

11          Q.    Which one of the Boodjeh brothers

12   is -- oversees the pharmacy operations?

13          A.    Doug Boodjeh.

14          Q.    Okay.  And there's three of them,

15   right?

16          A.    Yes.

17          Q.    Is it Doug?

18          A.    Dave.

19          Q.    Dave.

20          A.    Don.

21          Q.    And Don.  Three Ds?

22          A.    Yes.

23          Q.    What do Dave and Don do?

24          A.    Dave is the director of operations
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and Don is a supervisor -- and I don't know his

 2    title, but he is a supervisor and a buyer, and I

 3    don't know his title.

 4            Q.    Is Doug the COO?

 5            A.    Yes.

 6            Q.    So that's chief operating officer?

 7            A.    Yes.

 8            Q.    Okay.  And so he's in charge of

 9    operations?

10            A.    Yes.

11            Q.    Okay.  Is he the head honcho?

12            A.    Yes.

13                  MR. JOHNSON:  Objection.

14            Q.    Everybody knows what that means.

15                  All right.  Did you review the

16    complaint in this case?

17            A.    I'm sorry?

18            Q.    Did you review the complaint in

19    this case?

20            A.    No.

21            Q.    Do you generally have an

22    understanding as to what the claims are in this

23    case?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    And what is that?

 2              A.    That we are trying to -- from our

 3     distribution center, that there's -- I'm trying

 4     to think of the words that I want to use.

 5                    That we're trying to say that we

 6     are abiding by all the rules for suspicious

 7     order monitoring to our customers who are our

 8     stores.  And the overall picture is because of

 9     the opioid problem, that we're trying to defend

10     ourself on that.

11              Q.    Okay.  And I understand what

12     you're -- that sounds more like what you're

13     perceiving your defense is.

14              A.    Okay.

15              Q.    Would that be fair?

16              A.    Sure.  Yes.

17              Q.    Okay.  Are you -- do you have any

18     knowledge or understanding as to what the claims

19     are in this case?

20              A.    Not directly, no.

21              Q.    Okay.  And I think you said that

22     DDM is trying to say that they are abiding by

23     all the rules and suspicious order monitoring

24     requirements.  Do you -- is it your testimony --
```

```
 1    well, strike that.

 2              Do you believe that DDM did comply

 3    with those rules and requirements?

 4         A.    Yes.

 5         Q.    Okay.  And can you think of any

 6    time or any instance where you had concerns

 7    about whether DDM had fully complied with or

 8    carried out its obligations regarding suspicious

 9    order monitoring?

10         A.    Can you say that one more time?

11              MR. JOHNSON:  Objection.

12         Q.    Can you think of any time where

13    DDM did not comply with its suspicious order

14    monitoring obligations?

15              MR. JOHNSON:  Objection.

16         A.    No.

17         Q.    Had anybody at DDM or anywhere

18    else ever raised any concerns about whether

19    DDM's suspicious order monitoring policies were

20    adequate?

21         A.    No.

22         Q.    Anybody at the DEA ever mention to

23    you or anyone else at DDM that you know of that

24    DDM's suspicious order monitoring policies and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    procedures were not adequate?

 2           A.    No.

 3           Q.    Has anyone at the DEA ever told

 4    you or anyone else that you know of at DDM that

 5    DDM's suspicious order monitoring policies were

 6    adequate?

 7           A.    They never said they weren't, and

 8    when they would come in for investigations, like

 9    they do, they never mentioned that, no.

10           Q.    Okay.  Did you ever describe to

11    anybody at the DEA what DDM's suspicious order

12    monitoring policies were?

13           A.    In writing, no.  But in talking,

14    yes.

15           Q.    Okay.  So you had discussions with

16    DEA agents at some point about what you were

17    doing to monitor for suspicious orders?

18           A.    When they would come in to do

19    their investigation random, they would not so

20    much bring up a suspicious order monitoring

21    system, but they would do an inventory, and we

22    would go through the procedures of what we do on

23    a daily basis to make sure that we were catching

24    any order errors or anything that may have
```

```
 1   looked out of line.

 2           Q.    So is the discussion based more on

 3   how you make sure that you know where all of

 4   your products are?

 5           A.    Yes.

 6           Q.    Okay.  Which -- and you understand

 7   that suspicious order monitoring is broader than

 8   that piece of it, right?

 9           A.    Yes.

10           Q.    Okay.  That's just one piece of

11   the pie, right?

12           A.    Yes.

13           Q.    Okay.  Other than your meeting

14   with Mr. Johnson on Monday -- was it Monday?

15           A.    Mm-hmm, yes.

16           Q.    -- did you meet with anybody at

17   DDM prior to your deposition, other than the

18   individuals who were present at that meeting?

19           A.    No.

20           Q.    So you didn't have a discussion

21   with Mr. McConnell about this deposition?

22           A.    No, other than the date.

23           Q.    Other than on Monday?

24           A.    Other than the date and that we
```

1    would be riding together.

2         Q.    Okay.  And so that conversation

3    didn't contain anything other than the date and

4    how you'd get here?

5         A.    Yes.

6         Q.    Okay.  How did you get here?

7         A.    I met Mr. McConnell by Rockside

8    Road and we drove together.

9         Q.    Okay.  And I assume there wasn't

10   an attorney present in that vehicle?

11        A.    No.

12        Q.    Okay.  What did you and

13   Mr. McConnell discuss on your ride in this

14   morning?

15        A.    That there was light traffic, his

16   retirement, how cold it was outside, very

17   nonchalant.

18        Q.    Did he make any efforts to

19   reassure you about how this deposition would go

20   today?

21        A.    I mean, he did say, "You're going

22   to do fine.  Relax."

23             Because I tend to have anxiety, so

24   he did make me feel -- and it was comforting to

```
 1    ride with him down here, to not have to come

 2    downtown by myself.

 3            Q.    Did you discuss with him any --

 4    any sort of topics regarding suspicious order

 5    monitoring or anything like that?

 6            A.    No.

 7            Q.    Okay.  And so he didn't provide

 8    any sort of guidance to you as to how maybe you

 9    should respond to certain questions?

10            A.    Not at all, no.

11            Q.    Did he refresh your recollection

12    as to any of the issues related to suspicious

13    order monitoring?

14            A.    No.

15            Q.    Okay.  So you said you reviewed

16    those two depositions, right?

17            A.    Yes.

18            Q.    Did you -- obviously you know

19    other individuals have been deposed?

20            A.    Yes.

21            Q.    And how do you know that?

22            A.    Mr. Muha was in our meeting.

23            Q.    Okay.

24            A.    And I do believe that Mr. Nameth
```

Highly Confidential - Subject to Further Confidentiality Review

1    is also going to be deposed.

2         Q.    Okay.  Are you aware that

3    Mr. McConnell was deposed?

4         A.    Yes.

5         Q.    Did you read his deposition?

6         A.    No, I did not.  It was not

7    provided to me.

8         Q.    Was there anything in either

9    Mr. Briscoe or Mr. Ratycz's deposition that you

10   felt was not completely accurate or that needed

11   to have clarification?

12        A.    Only the one sentence that I wrote

13   myself in VAWD about us not selling outside of

14   the company.

15        Q.    And we'll get to that.

16              So that -- was his explanation not

17   correct, or was the actual sentence that he

18   was -- I mean asked about not correct?

19        A.    The sentence was in my -- my

20   interpretation of what VAWD was asking me to

21   fill out for that particular section.  And I

22   felt that they did understand the sentence.

23              They said it was poorly written,

24   but when I looked back at it, I could have added

Highly Confidential - Subject to Further Confidentiality Review

```
 1    a few more words, but I knew that we only sell

 2    to our stores.

 3              So when I wrote that sentence, to

 4    me, when VAWD was asking if I -- if we saw

 5    anything -- any kind of payment that associated

 6    with criminal activity, I associated that with

 7    outside of our company, which we do not sell

 8    outside of Discount Drug Mart.  So when I wrote

 9    that sentence, that was my interpretation of it.

10         Q.   And my understanding, from his

11    deposition, is that that explanation is

12    something that the two of you guys came up with

13    together; is that correct?

14              MR. JOHNSON:  Objection.

15         A.   He asked me about it, but I

16    came -- that was my -- I wrote every word in all

17    of those documents.

18         Q.   But your explanation that when you

19    wrote that, it was within a specific context,

20    and had you known it would be used in these

21    depositions, you would have added words to the

22    end, that's an explanation that you came up with

23    with Mr. Ratycz, correct?

24         A.   Yes.
```

```
 1            Q.    Okay.

 2            A.    I would have clarified it a little

 3     more.

 4            Q.    Okay.  Do you know what controlled

 5     substances are?

 6            A.    Yes.

 7            Q.    Okay.  What are they?

 8            A.    They are mandated by the DEA, and

 9     there's different policies and procedures and

10     recordkeeping associated with them, and they're

11     under their own license.

12            Q.    Okay.  Would it be fair to say

13     that they are scheduled under the Controlled

14     Substances Act by Congress?

15            A.    Yes.

16            Q.    And that's because they have

17     dangerous properties; would that be fair?

18            A.    Yes.

19            Q.    And so strict oversight and

20     regulations needed to ensure that people aren't

21     hurt?

22            A.    Yes.

23            Q.    And that includes really knowing

24     where they are at all times, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    Okay.  And that's to prevent

 3    against diversion?

 4            A.    Yes.

 5            Q.    And what -- do you know what

 6    diversion is?

 7            A.    Yes.

 8            Q.    What is it?

 9            A.    Diversion is when you are

10    illegally selling product to someone and they're

11    not using it for the sole purpose of what it was

12    intended with the prescription.

13            Q.    Okay.  So it would be sort of any

14    improper use -- would it be fair to say that

15    it's a little broader than that, that it would

16    be any improper use of a controlled substance?

17            A.    Yes.

18            Q.    Okay.  And that could occur

19    through theft of a drug --

20            A.    Yes.

21            Q.    -- right?

22                  Or a doctor overprescribing it for

23    somebody, giving them more than they could

24    possibly use safely?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    Okay.  And obviously there's other

 3    ways that drugs can be diverted, correct?

 4          A.    Yes.

 5          Q.    Okay.  Have you ever received any

 6    training at DDM on the Controlled Substances

 7    Act?

 8          A.    No.

 9          Q.    And so where did -- how did you

10    learn about the Controlled Substances Act?

11          A.    I mean, I've read pieces of it and

12    I follow every rule that we've ever -- you know,

13    when DEA comes to visit.  I follow all the

14    policies and procedures.  You know, that's about

15    it.

16          Q.    So you're the prior pharmacy buyer

17    for DDM, right?

18          A.    Mm-hmm.  Yes.

19          Q.    And that's for 78 stores, right?

20    77?

21          A.    74.

22          Q.    74.  Okay.

23              MR. MULLIGAN:  At one point it was

24          77, wasn't it, or has it always been 74?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JOHNSON:  74 I think we've

 2          been working with.

 3                    MR. MULLIGAN:  Okay.  I always get

 4          that wrong.

 5  BY MR. MULLIGAN:

 6          Q.    Okay.  So you're the primary

 7  pharmacy buyer for DDM's 74 stores, correct?

 8          A.    Yes.

 9          Q.    Okay.  And you run the warehouse,

10  right?

11          A.    Yes.

12          Q.    And so you are the primary person

13  who oversees the movement of controlled

14  substances within DDM, right?

15          A.    Yes.

16          Q.    Okay.  But DDM has never provided

17  you with any training or education regarding the

18  Controlled Substances Act?

19                    MR. JOHNSON:  Objection.

20          A.    No.

21          Q.    But you're generally aware that

22  the Controlled Substances Act requires DDM to

23  provide effective controls and procedures to

24  guard against theft and diversion of controlled
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    substances, right?

 2         A.    Yes.

 3         Q.    Okay.  And how did you learn that?

 4         A.    I rely on Pete Ratycz and Jason

 5    Briscoe and their knowledge of all of the laws

 6    and what we should be following, and I have

 7    always, from the day I started until today,

 8    followed the rules.

 9         Q.    And I'm not suggesting that you

10    don't follow them.  I just want to know where

11    you learned this information from.

12         A.    Over the years, I've learned

13    whether DEA visits, recordkeeping, keeping, you

14    know, history --

15         Q.    Okay.

16         A.    -- of all the -- of all the

17    orders, you know, maintaining all of the

18    information.

19         Q.    So it would be fair to say that

20    your knowledge regarding DDM's obligations under

21    the CSA are based on on-the-job training?

22         A.    Yes.

23         Q.    Okay.  And maybe water cooler

24    conversations or e-mails?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    Yes.

2          Q.    Okay.  Have you ever received any

3    training from DDM regarding how to protect

4    against diversion?

5          A.    No.

6          Q.    Have you provided training to

7    anybody else at DDM about how to protect against

8    diversion?

9          A.    Yes.

10         Q.    And who have you provided that to?

11         A.    The people that pull in our

12   control cage.

13         Q.    Okay.  So those would be warehouse

14   workers who are pulling controlled substances

15   out of the locked area where you keep them?

16         A.    Yes.

17         Q.    Okay.  And what was the nature and

18   scope of the training that you provided

19   regarding diversion?

20         A.    Again, on-the-job training,

21   watching for order errors that might come

22   across.  A lot of the women that pull have been

23   there for 20 years, so doing the job they know

24   if something looks like it should be brought to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    my attention or to Jason or Pete's attention.

 2         Q.    Okay.

 3         A.    But it's definitely on-the-job

 4    training.

 5         Q.    Would it be fair to say that the

 6    sort of focus of that training would be, keep

 7    that door locked and to make sure that these

 8    orders are correct?

 9         A.    Can you say that again?

10         Q.    Sure.  Would it be fair to say --

11    and I'm just -- you know, tell me if I'm

12    wrong -- would it be fair to say that the focus

13    of that on-the-job training is, keep that locked

14    area locked and double check to make sure the

15    numbers that are on the orders are actually what

16    the stores want?

17         A.    Yes.

18         Q.    Okay.  Is there anything else that

19    you would have discussed in diversion training

20    with those individuals?

21         A.    No.  And I do want to add that

22    those individuals are the only ones that are

23    allowed inside of the controlled area.  They're

24    registered basically with the DEA.  I have all
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   their names on it.  And everybody else --

 2   there's four people.

 3          Q.    Okay.  Do you recall a time when

 4   the DEA came in and asked you guys to reinforce

 5   that locked area?

 6          A.    We -- yes.

 7          Q.    Okay.  Wasn't there an instance

 8   where you could stick a broom handle in through

 9   the slatting and --

10          A.    Yes.  We needed to add more

11   plexiglass --

12                MR. JOHNSON:  Let him get his

13          question all the way out.

14          Q.    My understanding was that there

15   was a time in the recent past where -- maybe not

16   so recent -- where you could take a broom handle

17   and push it through maybe -- maybe if you

18   explain -- tell me if I'm wrong -- through the

19   cage and open the door from the inside; is that

20   correct?

21                MR. JOHNSON:  Objection.

22          Go ahead.

23          A.    The door itself is a chain-link

24   fence --
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.     Okay.

 2          A.     -- with a push bar to get out of

 3   the cage.  And from the side, if you stuck a

 4   broom in there, you could dislodge the door.  So

 5   the fix that we had to make was to put

 6   plexiglass up, just clear plexiglass.

 7          Q.     Okay.

 8          A.     And then that was fixed.

 9          Q.     Okay.  Do you remember when that

10   was?

11          A.     I'm going to say six to eight

12   years ago.

13          Q.     Do you know whether anybody ever

14   accessed the locked area when they weren't

15   supposed to?

16          A.     No.

17          Q.     And so you've never had any

18   inventory issues relating to that locked area at

19   any time?

20          A.     No.

21          Q.     Is there a reason why you're

22   looking at him?

23          A.     Because I thought he was going to

24   tell me to stop talking.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JOHNSON:  Well, she answered
 2           no to the question.  I mean, I think it
 3           was, no, no one's ever taken any or does
 4           she know whether or not, and it was a
 5           no.  I didn't know which --
 6                    MR. MULLIGAN:  Oh, good.
 7           Q.    Yeah.  See, I -- sometimes I ask
 8  bad questions, and that was an instance.
 9                    MR. JOHNSON:  Well, it needed a
10           follow-up.
11                    MR. MULLIGAN:  I gotcha.
12  BY MR. MULLIGAN:
13           Q.    Are you aware of any times when
14  there were inventory issues in the warehouse
15  regarding, like, an opioid?
16           A.    No.
17                    MR. MULLIGAN:  Okay.  That would
18           presumably include whether there were or
19           whether she knew.
20                    MR. JOHNSON:  Right.  Okay.  But
21           we didn't know that.
22                    MR. MULLIGAN:  Right.  No.  I
23           appreciate -- I appreciate you.
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MULLIGAN:

 2          Q.    Based on your understanding of the

 3    Controlled Substances Act, would you agree that

 4    DDM has a duty to identify and prevent

 5    diversion?

 6          A.    Yes.

 7          Q.    Okay.  And you would also agree

 8    that in the event that DDM did identify

 9    diversion or suspicious orders, that DDM had a

10    duty to report those?

11          A.    Yes.

12          Q.    Okay.  And that would be to the

13    DEA and the State of Ohio?

14          A.    Yes.

15          Q.    Okay.  And do you believe that DDM

16    complied with those duties at all times?

17          A.    Yes.

18          Q.    And you agree that part of that

19    includes the responsibility to ensure proper

20    dispensing of controlled substances, correct, at

21    the store level?

22          A.    Yes.

23          Q.    And so who at DDM would be

24    primarily responsible for ensuring that DDM was
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    complying with and fulfilling its obligations

 2    under the Controlled Substances Act?

 3                    MR. JOHNSON:  In distribution or

 4            at the stores or what's --

 5                    MR. MULLIGAN:  Let's start with

 6            distribution.

 7            A.    Distribution, Pete Ratycz is on

 8    the license, and I'm the supervisor, so it would

 9    be me as well.

10            Q.    So you and Pete?

11            A.    Mm-hmm, yes.

12                    MR. JOHNSON:  Is that a "yes"?

13            Okay.

14            Q.    I suspect that your comment that

15    he's on the license suggests that he's

16    responsible on paper, but really it probably

17    falls on you?

18            A.    Yes.

19            Q.    Would that be fair?

20            A.    Yes, fair.

21            Q.    Okay.  So it would be fair to say

22    you're primarily responsible for ensuring that

23    DDM complies with the CSA on a distribution

24    level?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1             A.    Yes.

 2             Q.    Okay.  And what about on the store

 3     level?  Who's responsible for ensuring that the

 4     stores comply with the Controlled Substances

 5     Act?

 6             A.    I would say that's Pete --

 7             Q.    Okay.

 8             A.    -- Ratycz and Jason Briscoe.

 9             Q.    Obviously your counsel drew that

10     distinction.  I'm curious if you can explain to

11     me what the difference is between the CSA -- or

12     DDM's obligations under the CSA on a

13     distribution level and at a store level.  Can

14     you describe for me where the rubber meets the

15     road on those two?

16             A.    On my side, on the distribution

17     side, my obligation is to make sure that

18     everything we're sending out to our stores is

19     fulfilling the requirements.  After it leaves

20     the distribution center, I can't say.  I rely on

21     the pharmacists and their professional knowledge

22     and all the rules that apply to that.  That's

23     where it meets for me.  Once it leaves the

24     warehouse -- I mean, I make sure that everything
```

Highly Confidential - Subject to Further Confidentiality Review

 1    is distributed correctly.  They take care of the

 2    dispensing.

 3            Q.    So a minute ago you told me that

 4    Jason and Pete were responsible for making sure

 5    the diversion wasn't occurring at the store

 6    level, correct?

 7            A.    Yes.

 8            Q.    Okay.  So I want to just make sure

 9    I'm clear.  Is it -- are Jason and Pete

10    responsible for it or are the store pharmacists

11    responsible for it?  What's your understanding?

12            A.    The store pharmacist is ultimately

13    responsible, but Pete and Jason are their

14    supervisors.  So -- and I'm sorry that I

15    didn't -- I misunderstood before.

16            Q.    No.  That's okay.  I'm just trying

17    to understand.

18            A.    Yeah.

19            Q.    So it would be fair to say that

20    you're responsible for complying with the CSA

21    from the minute the drug gets to the warehouse

22    to the minute it leaves the warehouse, or is it

23    broader than that?

24            A.    No -- yes.

1          Q.     That's it?

2          A.     That's it.

3          Q.     So those would be the bookends.

4  So the minute that truck drives away, Jill is no

5  longer responsible for preventing diversion;

6  would that be fair?

7          A.     After I've done my part, I would

8  say that's fair.

9          Q.     Okay.

10         A.     And that's an added layer to after

11 I've sent the order, then the rules need to be

12 followed at the store.

13         Q.     Okay.  And so once those drugs

14 arrive at the store, it would be the chief

15 pharmacist at the store in conjunction with Pete

16 and Jason who would be responsible for ensuring

17 that there was no diversion taking place there?

18         A.     Yes.

19         Q.     Okay.  Have you ever been involved

20 in -- well, strike that.

21                Do you communicate with the chief

22 pharmacists?

23         A.     I do.

24         Q.     And in what context?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    They call if they need -- if they

2      have questions, if they need something.  I do

3      communicate with all of the stores.

4              Q.    Is it mostly a, "Hey, Jill, we

5      need this many bottles of this drug and it

6      didn't show up on time or we need it by this

7      date"?

8                    Is that mostly what it's like?

9              A.    Every day when the trucks are

10     there, if they need something, if they have

11     questions about different topics, recalls.  I

12     mean, I talk to everybody about all the topics.

13             Q.    Okay.

14             A.    Daily.

15             Q.    Do you also communicate or act as

16     an intermediary between DDM and distributors or

17     manufacturers?

18             A.    I do.

19             Q.    Because you're the buyer, right?

20             A.    Yes.

21             Q.    So you're the primary person

22     communicating with them, at least on the front

23     end, to get product, correct?

24             A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  Presumably somebody else

 2   pays invoices later and they probably

 3   communicate with their financial department, but

 4   you're primarily communicating with them on a

 5   drug procurement level, right?

 6              A.    Yes.

 7              Q.    And that would include, you know,

 8   issues regarding diversion and suspicious order

 9   monitoring?

10              A.    Yes.

11              Q.    And drug thresholds and things

12   like that?

13              A.    Yes.

14              Q.    Okay.  And as the individual at

15   DDM primarily responsible for suspicious order

16   monitoring on the distribution end, you agree

17   that DDM has an obligation to monitor orders and

18   shipments for suspicious -- or that look

19   suspicious or may have red flags?

20              A.    Yes.

21              Q.    Indicative of diversion?

22              A.    Yes.

23              Q.    Okay.  So tell me what -- and I'm

24   just going to talk generally speaking.  I'm not
```

Highly Confidential - Subject to Further Confidentiality Review

1    necessarily limiting it to you, but I can ask

2    follow -- I'll ask follow-ups, but describe for

3    me what DDM's policies and procedures are

4    regarding the diversion of opioids.

5            A.    Are you referring to when they

6    order from me, from the distribution center?

7            Q.    Just kind of -- what I'd like you

8    to do is give me a full picture of what DDM does

9    to prevent diversion and comply with the CSA.

10           A.    Okay.  So what we do is, the

11   stores order weekly.

12           Q.    Okay.

13           A.    It is ordered through a system

14   called Pioneer.  It gives them a recommended

15   order.  Each store can set their own minimums

16   and maximums on that.  So that way, you know,

17   everything is -- certain stores -- depending on

18   how much they've been dispensing.  That order is

19   sent over.

20                 As soon as they send the order,

21   they receive back a document that says, "Order

22   items over six-week average."  They're given the

23   opportunity right there to review any items.

24   Sometimes it has no items.  I've seen a few that

```
 1    have just antibiotics on them, you know, nothing

 2    controlled.  And, you know, they ordered three

 3    bottles instead of two bottles.  But they are

 4    given that chance to review if anything

 5    populates over a six-week average.  They have

 6    the opportunity to send that to me.

 7                   As we get the orders, prior to

 8    2016, we had a -- it was called a pick ticket.

 9    It was a manual way of pulling.  And the pullers

10    would -- you know, if it says they wanted two of

11    this, they'd put two, and they'd manually write

12    a two.  Items on that pick ticket would have an

13    asterisk next to it if it could have been on the

14    six-week average report, over six-week average.

15                   It was very rare that any controls

16    would show up on that.  The other items --

17    unless something -- again, the pullers know

18    their product.  You know, if they wanted -- if

19    they normally pull one, two or three of

20    something and all of a sudden somebody wants 20

21    of something, that would be brought to my

22    attention.

23                   In our system, I have history of

24    every item.  So I would go into the history of
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    that particular store and the chain of all --

2    the whole chain.  So I could see if that order

3    was an order error or I could see if -- you

4    know, if it meant a call to the store, which

5    usually I would call the store, based off of

6    their history.

7              And then if the store said, "Oh,

8    no, no.  We'd prefer to have -- and we only need

9    two of those," let's say.  We would manually

10   change that, and that got turned in to be

11   invoiced, so it never left the building, you

12   know, the product was shipped with the changes.

13             As far as controls, same thing,

14   same exact procedure.  You know, if there was

15   any changes, we would make the change before it

16   left the building.

17             If I had a store -- and this is

18   just as an example.  If I had a store that I

19   thought every week was ordering something and

20   for whatever reason it was every week I was

21   calling the same store, I would then go to Jason

22   and Pete.  That was usually never the case.

23             We usually resolved what that

24   issue was, you know, whether it was -- it might
```

 1    have said, you know, eleven instead of one or

 2    whatever.  But we would fix that.  It was

 3    invoiced, and that would be the procedure for

 4    it.

 5              Once everything is invoiced, we

 6    always made sure that the invoice was in with

 7    the control tote, all changes were done, and

 8    we'd leave.

 9         Q.    Okay.  I appreciate that.

10              Was that -- did the scope of what

11    you did, what you just described, has that

12    changed at any time?

13         A.    It has only because in 2016, we

14    went to a voice-activated pulling system.

15         Q.    Okay.

16         A.    And so now instead of having the

17    manual paper in front of you, it's read -- the

18    slot is read to the puller.  They have a check

19    digit that they read back to them to say that

20    they are pulling the correct item.  The voice

21    activation says "pull two."  They say "grab

22    two."  It's confirmed and they put it in the

23    tote.

24         Q.    And what you're talking about

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right now is just the accuracy of pulling the

 2    right amount that's needed, right?

 3            A.    And the accuracy of the drug

 4    pulled.

 5            Q.    Okay.  Which -- and my question

 6    had to do with suspicious order monitoring and

 7    diversion, right?

 8            A.    Yes.

 9            Q.    So certainly that's -- those --

10    that type of precision would prevent against

11    inventory problems or theft, right?

12            A.    Mm-hmm.

13            Q.    But it wouldn't address other

14    issues like associated with suspicious orders,

15    right?

16            A.    Not this part of it, no.

17            Q.    Okay.  And so I want to just make

18    sure I'm clear.  As it relates to suspicious

19    orders, what you would do is you would get a --

20    was it a weekly report?

21            A.    No.  The store would get the -- as

22    soon as they sent their order --

23            Q.    Okay.

24            A.    -- they would get a report, right,
```

1    about that order and what items might be over a

2    six-week average.

3            Q.    Okay.  So let's say store number 1

4    sends in an order for hydrocodone, and this

5    obviously would have been prior to 2014 when it

6    became Schedule II, right?

7            A.    Yes.

8            Q.    Okay.  So store number 1 sends in

9    an order for hydrocodone and it exceeds what

10   their prior six-week average is.  Does it have

11   to exceed it by a certain percent?

12           A.    It must have -- to be on that

13   form, it has to be the six-week average.  So if

14   they ordered one, one, one, and then two, it

15   might hit the six-week average --

16           Q.    And that would be --

17           A.    -- if it's above.

18           Q.    Okay.  It would have to be

19   99 percent above the six-week average; is that

20   right?

21           A.    I don't know.

22           Q.    You're not sure.  Okay.

23                 So as far as you know, if it was

24   above the six-week average, then the Pioneer

1    would automatically spit out a report that would

2    go to them, to the store?

3         A.    It would go to the store.

4         Q.    Okay.  Would it come to you?

5         A.    Not unless -- not unless they sent

6    it to me.

7         Q.    Not unless the store sent it to

8    you?

9         A.    Exactly.

10        Q.    Okay.  So store 1 submits an order

11   for hydrocodone, and let's say in your example

12   they order one bottle a week for the prior six

13   weeks, okay?

14        A.    Yes.

15        Q.    And then on the seventh week they

16   order two bottles, right?

17        A.    Yes.

18        Q.    Okay.  And this is just my

19   hypothetical.  They would then get a report from

20   Pioneer that says, "Hey, this order is greater

21   than your six-week average," fair?

22        A.    Yes, yes.

23        Q.    Okay.  But you wouldn't get that

24   report, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I do not.

 2          Q.    Okay.  And the only way you would

 3   learn that they were ordering more than their

 4   six-week average would be if the chief

 5   pharmacist contacted you and told you about it,

 6   correct?

 7          A.    Yes.

 8          Q.    Okay.  And so was there anybody at

 9   DDM corporate or in the warehouse that would

10   also be notified when one of those reports was

11   generated?

12          A.    Yes -- not when the report was

13   generated.  If the order was pulled as two, as

14   in your example, monthly there was a report that

15   Tom Nameth and Jason Briscoe would look at, and

16   they would contact that store and inquire, you

17   know, as to why.

18          Q.    Okay.

19          A.    If there was more patients or

20   whatever, and they would have the ability to

21   answer back as to why.

22          Q.    You'd agree that that's sort of

23   more of a retrospective report, correct?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  So all the drugs that are

 2     listed on that report have already been shipped

 3     out, right?

 4              A.    Yes.

 5              Q.    Okay.  And so the only potentially

 6     prospective report would be the six-week average

 7     report, right?

 8              A.    That, and the knowledge of the

 9     person pulling.  If it was two bottles instead

10     of one bottle, but if there were five, six,

11     seven bottles, that would definitely be in

12     question.

13              Q.    Okay.  But you're just relying on

14     someone's memory at that point, right?

15              A.    And their knowledge of our stores.

16              Q.    Okay.  And there's 74 of them,

17     right?

18              A.    Yes.

19              Q.    Okay.  And so let's say a

20     pharmacist gets this, you know, six-week average

21     report, and they ordered one bottle and this

22     time they order two and they get it and they're

23     like, "Well, I know, you know, this is legit."

24                    Were there ever instances where
```

```
 1    they would just, you know, file that report away

 2    and not do anything further, that you know of?

 3            A.    That I know of, yes.

 4            Q.    Okay.  And so did DDM require the

 5    chief pharmacist to take any action when they

 6    received a report like that?

 7            A.    No.  It's up to their discretion.

 8            Q.    Okay.  And it was sort of a, "Hey,

 9    heads up, your average is this, but this time

10    you ordered that.  Just wanted to make sure that

11    was right."

12            A.    Yes.

13            Q.    Okay.  And so in that sense, I

14    think this phrase we've used before is it was

15    kind of a fat-finger report to make sure there

16    were no typing errors?

17            A.    Yes.

18                  MR. JOHNSON:  That's a term that

19            you have used.

20                  MR. MULLIGAN:  Well, other people

21            have used it, too.  I think one of your

22            witnesses used it once.

23                  MR. JOHNSON:  Only in response to

24            the questioning.
```

```
 1                    MR. MULLIGAN:  I like it.

 2   BY MR. MULLIGAN:

 3         Q.    Okay.

 4         A.    And that is what we call it.

 5         Q.    You do call it that?

 6                    MR. MULLIGAN:  Well, there we go.

 7                    MR. JOHNSON:  There you go.

 8                    MR. MULLIGAN:  Your objection is

 9         now gone.  Thank you.  That's funny.

10   BY MR. MULLIGAN:

11         Q.    Okay.  So you do call that the

12   fat-finger report?

13         A.    Well, not all the time.

14         Q.    Okay.

15         A.    If you see an eleven and they

16   really wanted one, back when they used to order,

17   that could have been typed in that way.

18   That's --

19         Q.    You mean they held the one down a

20   little bit too --

21         A.    Yes, to us an order error, and we

22   definitely questioned those.

23         Q.    Okay.  Was that the primary

24   purpose of that six-week average report, was to
```

Highly Confidential - Subject to Further Confidentiality Review

1   make sure that you didn't send eleven bottles to

2   a pharmacist who really just wanted one?

3            A.    Yes.

4            Q.    Okay.  And so would it be fair to

5   say that that six-week average report, at least

6   for your purposes, wasn't really part -- wasn't

7   really something that you used to monitor for

8   suspicious orders?

9            A.    It was one of the layers that we

10  used at store level to raise the fact that there

11  might be one or two items on there that you may

12  want or may not want due to the eleven and one

13  example.

14           Q.    Okay.  But it wasn't a report that

15  you got every week and you looked at every one

16  and you call all the pharmacists?

17           A.    No.

18           Q.    Okay.  So it was really just left

19  to the pharmacist to make sure that they were

20  getting what they wanted to get and it was sort

21  of a check to make sure you didn't ship ten

22  bottles when they only wanted one?

23           A.    It was definitely a tool that they

24  could use.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Okay.  But it wasn't really part
 2    of Jill Strang's suspicious order monitoring --
 3            A.    It was not part of mine.  It was a
 4    layer to --
 5                  MR. JOHNSON:  Let him get his
 6            questions all the way out.
 7            Q.    So that six-week average report
 8    wasn't part of yours or corporate's suspicious
 9    order monitoring tools?
10            A.    No.
11            Q.    Okay.  And, again, you'd agree
12    that was the only report that was actually
13    prospective.  It was a report that generated
14    before the drugs were shipped, correct?
15            A.    Yes.
16            Q.    Okay.  And I think you mentioned a
17    different report.  It was a monthly report,
18    correct?
19            A.    Yes.
20            Q.    Okay.  And that was a report that
21    was generated monthly by either Tom or Jason?
22            A.    It was an automatic report that
23    was given to Tom, and then when Tom retired,
24    Jason took it over, that they could review it to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   see if there were any increases in families of
 2   drugs, I suppose.
 3            Q.    Was that report on a store level
 4   or a chain level; do you know?
 5            A.    Chain.  It was by store but for
 6   the whole chain.
 7            Q.    Okay.  And it was automatically
 8   generated each month?
 9            A.    Yes.
10            Q.    And it was e-mailed by Pioneer
11   to -- how was that done?
12            A.    I think it was generated at
13   corporate.
14            Q.    Okay.  So it sounds like you
15   weren't part of that process?
16            A.    I was not.
17            Q.    Okay.  Have you ever looked at
18   that report?
19            A.    I've seen it, but I've never
20   analyzed it, and I've never done anything with
21   it.
22            Q.    Okay.  So you're not the person to
23   ask about that?
24            A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  And so your

 2   responsibilities wouldn't include reviewing or

 3   analyzing that report or communicating with

 4   physicians about what they're ordering?

 5          A.    No.

 6          Q.    Okay.  And it sounds like unless a

 7   physician contacted you and said, "I ordered the

 8   wrong number," you wouldn't be involved in

 9   discussing the size or quantity of their orders

10   otherwise, right?

11          A.    Yeah.  No.

12          Q.    Okay.  Just fulfilling them?

13          A.    Yes.

14          Q.    Okay.  Have you at any time ever

15   played any role in reporting suspicious orders

16   that were placed within the DDM business?

17          A.    No.

18          Q.    Okay.  Do you know who's

19   responsible for complying with the CSA's

20   reporting obligations?

21          A.    I would say Jason Briscoe.

22          Q.    Okay.  Jason?

23          A.    Mm-hmm.

24          Q.    And prior to Jason, would it have
```

Highly Confidential - Subject to Further Confidentiality Review

1    been Tom Nameth?

2          A.    Yes.

3          Q.    Okay.  Do you know, does Pete play

4    any role in that?

5          A.    I would assume yes, but I do not

6    know the answer to that.

7          Q.    Okay.  So we've talked about --

8    strike that.

9                So on a corporate level, would it

10   be fair to say that the primary way that DDM

11   monitors the movement of controlled substances

12   is via that one-month report that either Jason

13   or Tom would look at?

14               MR. JOHNSON:  Objection.

15         A.    Can you repeat that?

16         Q.    Sure.  It wasn't a good question.

17               From a corporate level, would it

18   be fair to say that the primary way that DDM

19   monitored the movement of controlled substances

20   was by way of that one-month report that Jason

21   or Tom would review?

22               MR. JOHNSON:  Objection.

23         A.    No.

24         Q.    Okay.  And explain to me why you

Highly Confidential - Subject to Further Confidentiality Review

1    say no.

2          A.    Because we have a process in place

3    with multiple layers from the time that the

4    order is sent to us to the time that the

5    pharmacist has an option if he does or

6    doesn't -- or she -- wants to reduce anything

7    that may show up on that report.

8                Then it goes through us

9    interacting at the pharmacy warehouse, whether

10   we're pulling the item or we have a question

11   about the item.

12               Then we have the layer of the

13   pharmacists that were questioning if something

14   does look -- an order error --

15         Q.    Okay.

16         A.    -- before it's pulled, invoiced

17   and leaves our premises.

18         Q.    So I'm talking about what is done

19   at the corporate level.  So in the C-Suite,

20   right, you know what I'm talking about, like

21   from the top down?  We talked about -- we talked

22   about two reports.  We talked about the six-week

23   average report, right?

24         A.    Mm-hmm.

```
 1              Q.    And the only person that gets that

 2    or has an option to take action on that report

 3    is the chief pharmacist at a store, right?

 4              A.    Yes.

 5              Q.    Okay.  So let's put that aside.

 6    The only other report we've talked about is this

 7    one-month report that's pulled to see what is

 8    happening on a chain level, right?

 9              A.    Yes.

10              Q.    And that's a retrospective report,

11    right?

12              A.    Yes.

13              Q.    Are there any other reports that

14    DDM generates or looks at, that you know of, to

15    identify potential suspicious orders or

16    diversion?

17              A.    Not reports, no.

18              Q.    Okay.  Do you know whether anyone

19    at DDM has ever identified a suspicious order

20    involving an opioid?

21              A.    No.

22              Q.    Do you know whether DDM has ever

23    reported a suspicious order to the DEA or the

24    State of Ohio?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    No.

 2          Q.    You don't know or they have not?

 3          A.    They have not.

 4          Q.    Okay.  And did you learn that from

 5   reading those depositions or did you know that

 6   prior to that?

 7          A.    Both.

 8          Q.    Okay.  So you knew it and then

 9   that -- depositions confirmed it?

10          A.    Yes.

11          Q.    Okay.  Does that concern you at

12   all?

13          A.    No.

14                MR. JOHNSON:  Objection.

15          Q.    Have you ever had any concerns

16   about whether DDM's systems were sufficient to

17   catch suspicious orders and maybe that's why you

18   didn't have any?

19          A.    Can you repeat that?

20          Q.    Have you ever had any concerns

21   about whether DDM's suspicious order monitoring

22   policies and procedures were sufficient such

23   that they -- sufficient to catch suspicious

24   orders?
```

```
 1                  MR. JOHNSON:  Objection.

 2                  Go ahead.

 3        A.    I think your --

 4        Q.    I'll ask the question again.

 5        A.    I feel like you're asking two

 6   separate things.

 7        Q.    Let me ask it again.

 8              Have you ever had any concern

 9   about whether DDM's suspicious order monitoring

10   policies were sufficient to catch suspicious

11   orders?

12                  MR. JOHNSON:  Objection.

13        A.    I have not had any concerns.

14        Q.    Okay.  Zero orders is pretty good,

15   isn't it?

16        A.    Yes.

17        Q.    I mean, you're aware that there's

18   a nationwide opioid epidemic, correct?

19        A.    Yes.

20        Q.    And that's why we're here?

21        A.    Yes.

22        Q.    And that means that diversion has

23   been rampant; would that be fair?

24                  MR. JOHNSON:  Objection.
```

```
 1              A.    Yes.

 2              Q.    Okay.  But in the 21 years that

 3     you've been the pharmacy buyer and the warehouse

 4     head, there's never been a single suspicious

 5     order that went through DDM, that you know of?

 6              A.    No.

 7              Q.    And you don't see any -- you don't

 8     think that that's suspicious itself?

 9              A.    No.

10              MR. JOHNSON:  Objection.

11              Q.    Are you aware of what the

12     suspicious order monitoring policies and

13     procedures are of distributors or other chain

14     drugstores?

15              A.    I'm aware of them.  I don't know

16     the exact wording of them.

17              Q.    Okay.  Do you know whether they're

18     stronger or weaker than DDM's policies and

19     procedures?

20              MR. JOHNSON:  Objection.

21              A.    I know our wholesaler does have

22     procedures in place to stop orders that they may

23     feel are suspicious.  However, I will say that

24     working for as long as I have at Discount Drug
```

Highly Confidential - Subject to Further Confidentiality Review

1    Mart and with the crew that I have and policies

2    that we have in place that we do on a daily

3    basis, I don't think in my -- because I've been

4    there for as long as I have been, that anything

5    that left our facility was any type of

6    suspicious orders.

7           Q.    It sounds like you have a lot of

8    faith in your people, right?

9           A.    I do.

10          Q.    Okay.  And so DDM -- would it be

11   fair to say that DDM's policies and procedures

12   regarding suspicious order monitoring involves a

13   lot of trust?

14          A.    Yes.

15          Q.    And a lot of faith that people are

16   doing what they're supposed to be doing?

17          A.    Yes, including our stores.

18          Q.    Okay.  And you indicated that

19   there was a distributor that maybe had their own

20   policies and procedures that they imposed upon

21   you guys?

22          A.    Yes.

23          Q.    Okay.  And would that -- well,

24   what would -- strike that.

Highly Confidential - Subject to Further Confidentiality Review

 1                   We'll talk about that later.

 2                   So what we've been talking about,

 3     those two reports, have those -- have the way

 4     that those have been used and reviewed, has that

 5     been consistent in your time?

 6          A.    Yes.

 7          Q.    Okay.  And so I assume that that

 8     hasn't changed much since that VAWD

 9     accreditation happened in 2016?

10          A.    No.

11          Q.    Okay.  Did you basically put that

12     stuff down on paper for the purposes of the VAWD

13     accreditation, what you did?

14          A.    The procedures that I wrote?

15          Q.    Correct.

16          A.    Yes.

17          Q.    Okay.  Do you recall -- so we've

18     got these two reports, right?

19          A.    Yes.

20          Q.    Okay.  And as you told me, I think

21     really the one-month report is really the one

22     that maybe is used more heavily for -- to

23     identify suspicious orders or diversion, right?

24          A.    I wouldn't say it's used more

```
 1    heavily, but it is a part of the process.

 2            Q.    Okay.  Was there ever any --

 3    strike that.

 4                  I'm assuming you read in the

 5    depositions that have occurred that there was

 6    some discussion about the third -- a third piece

 7    of what's done, and that's due diligence?

 8            A.    Yes.

 9            Q.    Okay.  And I imagine that due

10    diligence would be -- and tell me if I'm wrong.

11    It would be Jason and Pete looking at that

12    one-month report and determining whether

13    something needs to be investigated; would that

14    be one example?

15            A.    Yes, one example.

16            Q.    Another example would be a

17    pharmacist looking at the six-week average

18    report to determine whether they meant to

19    actually order that number of drugs, right?

20            A.    Yes.

21            Q.    Okay.  Was there ever any due

22    diligence that you did related to specifically

23    suspicious order monitoring or diversion?

24            A.    Reviewing -- if an order looked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    like an order error and it was brought to my
 2    attention, yes, I did everything I could to make
 3    sure that it was not leaving the facility
 4    without being legitimate.
 5         Q.   Okay.  And I think we're sort of
 6    crossing topics.  I'm specifically asking as it
 7    relates to suspicious order monitoring.
 8              So did you ever have any role
 9    where you would need to call the pharmacist to
10    ensure that -- to inquire about anything other
11    than, "Was this the number you wanted?"
12         A.   Repeat that.
13         Q.   Sure.  I assume you interacted
14    with pharmacists, right?
15         A.   Yes.
16         Q.   Did you ever contact a pharmacist
17    and say, "You know, this prescription seems
18    large.  Are you sure this is right?  Have you
19    called the doctor?"  Or were your discussions
20    solely limited to, "Is this the right number
21    that you wanted?"
22         A.   Only the right --
23              MR. JOHNSON:  Objection.
24         Q.   Go ahead.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Only the right number.  I have

2    nothing to do with the prescribers.

3          Q.    Okay.

4          A.    I have nothing to do with anything

5    other than fulfilling their order based on their

6    professional opinion and what they need.

7          Q.    Okay.  So would it be fair to sum

8    up your role in that respect as your purpose was

9    to make sure that the right number of things

10   went to the right place based on what people

11   wanted?

12         A.    Yes.

13         Q.    Okay.  And so you wouldn't have

14   done any due diligence regarding the

15   identification of a suspicious order?

16         A.    My due diligence was to look up

17   the store's history before I even called them.

18         Q.    So explain to me how that would

19   happen without the store calling you?

20         A.    Somebody would bring that to my

21   attention.  One the pullers would say, "This

22   order says they want ten.  I don't pull more

23   than two of these."

24         Q.    All right.  So the only instance

1    where the due diligence would occur or start

2    with you would be if your puller said, "I'm used

3    to store 6 getting two bottles but they want ten

4    now"?

5            A.    That is one reason, yes.

6            Q.    Okay.  Or the pharmacist would

7    call you and say, "Hey, I just got this

8    report" -- let me finish.

9                  MR. JOHNSON:  Yeah.

10           A.    I know.  I didn't say anything.

11           Q.    -- and it says, "Ten bottles, but

12   I really only wanted two bottles."

13           A.    Correct.

14           Q.    Okay.  And in both of those

15   instances -- well, we talked about the first --

16   we talked about the latter one.  But the first

17   one, if your puller comes to you and says, "Hey,

18   they -- it looks like -- I think this one has

19   ordered too many," you would go look at their

20   history?

21           A.    Definitely.

22           Q.    Okay.

23           A.    I look at the chain's history, and

24   I look at the store's history.

1          Q.    Okay.  And if that information

2     suggested to you that their order probably was a

3     fat-finger order, you then call the pharmacist

4     and said, "Hey, did you mean to get this many?"

5          A.    Yes.

6          Q.    Okay.  But you wouldn't inquire

7     beyond that level as it relates to, "Is that

8     what you meant to order?"

9                Right?

10         A.    Yes.

11         Q.    Okay.  Did you ever interact with

12    Jason or Pete about identifying suspicious

13    orders other than -- not orders that were maybe

14    just mistakenly entered but ones that had

15    indicia of suspicion?

16         A.    No.

17         Q.    Okay.  Were you ever asked to look

18    at or run reports to determine whether there

19    were any suspicious orders occurring or whether

20    further investigation was needed?

21         A.    No.

22         Q.    Okay.  Are there reports you could

23    have run to see whether that was occurring?

24         A.    No.

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.    Could you have run a report that

 2    would show -- well, I think you could have, but

 3    confirm for me -- whether you could have run a

 4    report to see -- strike that.  That was just

 5    terrible.

 6                Could you have accessed a report

 7    that would have showed you how many opioids were

 8    going to a particular store on a given month?

 9          A.    Yes.

10          Q.    Could you have run a report that

11    would have shown how much they were ordering

12    over time?

13          A.    I could not run the reports.

14          Q.    Okay.

15          A.    I would have to inquire about

16    those.  Somebody else would run the reports.

17    And I probably would have gone to Jason about

18    that.

19          Q.    Okay.  Do you know what any of the

20    red flags are for a suspicious order?

21          A.    Yes.

22          Q.    Can you tell me what some of them

23    are?  I'll have to make a list.

24          A.    It's not a very long list because

1    I can only think of one that -- again, double

2    digits on an order for a particular item that

3    normally is only pulled in ones or twos.  I

4    mean, that to me is a red flag.  At my level, at

5    the distribution center, that's my red flag.

6           Q.    Okay.  Are you aware just

7    personally of any other red flags which might be

8    indicia of diversion?

9           A.    At store level, yes.

10          Q.    Okay.  What would those be?

11          MR. JOHNSON:  I'm going to object

12          to this.

13          But go ahead and answer.

14          A.    Yeah.  Well, that's what I -- I

15   mean, that is not my expertise.  I'm not a

16   pharmacist.

17          Q.    That's okay.  I'm not asking for

18   your expert opinion.  I'm asking you what --

19   just what you know.

20          I mean, you know what a pill mill

21   is, right?

22          A.    Yes.

23          Q.    Okay.  And what is a pill mill?

24          A.    A pill mill is where they are

Highly Confidential - Subject to Further Confidentiality Review

```
 1    diverting pills.

 2            Q.    So a doctor maybe whose providing

 3    prescriptions to people who don't need them?

 4            A.    Don't need them.  Sorry.  Yes.

 5            Q.    Or writing prescriptions that are

 6    too large?

 7            A.    Yes.

 8            Q.    Or writing prescriptions that have

 9    too frequent fill dates maybe?

10            A.    Yes.

11            Q.    Or writing two prescriptions that

12    the person then can fill at two separate stores?

13            A.    Yes.

14            Q.    Okay.  So are you aware of all

15    those, or did I just feed them to you?

16            A.    You reminded me.

17            Q.    Okay.

18            A.    I'm sorry.

19            Q.    No.  That's okay.

20                  But those are things that you

21    don't look for in your role at DDM, right?

22            A.    No.

23            Q.    Okay.  What, if anything, would

24    you do if one of your pullers came to you and
```

Highly Confidential - Subject to Further Confidentiality Review

1    said, "Store 1 usually orders one bottle.  This

2    month they've ordered four"?  What would you do

3    at that point?

4            A.    At that point, I would definitely,

5    again, check the history to see what is going

6    on.  Call the store.  Ask for their professional

7    opinion on why -- you know, "Has there been an

8    increase, has there been any other triggers as

9    to why you need four times the amount that you

10   normally order?"

11             On some occasions, maybe not that

12   much, somebody will say, "Well, it didn't get

13   ordered the week prior.  I don't know why.  So

14   I'm trying to catch up with my order."  So that

15   would even out the average.  That's all I can

16   think of.

17           Q.    So long as the pharmacist provided

18   you with an explanation, you would defer to them

19   on their judgment?

20           A.    Yes, I would.

21           Q.    Okay.  And so you wouldn't -- you

22   wouldn't ask to look any deeper than that,

23   right?

24           A.    No, because I -- again, if I'm

Highly Confidential - Subject to Further Confidentiality Review

```
1    sending out the bottles and the pills, there's a

2    legitimate dispensing procedure, and after it

3    leaves the facility, if they say they need that

4    because of, you know, prescriptions, then I'm

5    going to entrust that once it leaves the

6    facility, that it is accounted for.

7         Q.   So if they said, "Well, there's a

8    doctor that's sending us more people and we just

9    need them to fill the prescriptions," that was

10   enough?

11        A.   If it was -- yes.

12        Q.   Okay.

13             MR. JOHNSON:  Is this a good time

14        for a break?

15             MR. MULLIGAN:  Sure.

16             THE VIDEOGRAPHER:  The time is now

17        10:15.  Going off the record.

18             (Recess taken.)

19             THE VIDEOGRAPHER:  The time is now

20        10:28.  Back on the record.

21   BY MR. MULLIGAN:

22        Q.   Hi, Ms. Strang.  We're back after

23   the break.  Are you ready to go?

24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  I asked you previously

 2      about a situation where one of your four pullers

 3      at the warehouse would come to you and say,

 4      "Hey, store 1 ordered four bottles this week,

 5      usually they only order one."

 6                    Do you remember that?

 7              A.    Yes.

 8              Q.    Okay.  And my understanding is

 9      that what you would do at that point is you

10      would look at their order history first, right?

11              A.    Yes.

12              Q.    And then you would contact the

13      pharmacist to make sure that that's what they,

14      in fact, needed, correct?

15              A.    Yes.  And I'd also like to add

16      that with the technician -- and I call her

17      technician.  With the puller's knowledge on that

18      order, they probably would have had an asterisk

19      next to that item identifying it as an over

20      six-week average, so that would also been --

21      because I'm so used to now with the voice

22      activation.

23              Q.    Right.

24              A.    At that time there was the paper
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    copy, which emulates what the stores were

 2    getting as far as them being able to make a

 3    decision if they wanted that or not.

 4          Q.    Okay.  Obviously we took a break,

 5    right?  And you went and you spoke with your

 6    counsel and Mr. McConnell, right?

 7          A.    Yes.

 8          Q.    And was there anything that you

 9    were told in that room that refreshed your

10    recollection about anything?

11          A.    That.

12          Q.    Okay.  So when you went on break,

13    they reminded you of that fact and now you've

14    given it to me, correct?

15          A.    No.  It was that I kept saying

16    that I was not receiving the report, and I don't

17    receive the store's report.

18          Q.    Okay.

19          A.    But those numbers do show up as an

20    asterisk, which I did mention earlier --

21          Q.    Okay.

22          A.    -- as far as making it an over

23    six-week average amount.

24          Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    And I wanted to --

 2              Q.    But there's no report that's

 3   generated that shows that.  That's what comes

 4   out with each specific order, right, or your

 5   pullers are looking at that?

 6              A.    On their pick ticket.

 7              Q.    Okay.  And I assume you don't look

 8   at every pick ticket, right?

 9              A.    No.

10              Q.    Okay.  Is there any policy and

11   procedure at DDM, when that greater than

12   six-week average report is produced to the

13   pharmacist, that requires them to communicate

14   that to the pharmacy operations team at

15   corporate?

16              A.    No.

17              Q.    Okay.  And if you're informed by a

18   puller that there's an order that has an

19   asterisk on it, is there any policy and

20   procedure that requires you to share that

21   information with pharmacy operations at the

22   corporate headquarters?

23              A.    No, because I do -- I investigate

24   it myself.
```

1          Q.    Okay.  And your investigation

2     includes calling the pharmacist to make sure

3     that's the actual correct number that they

4     wanted, right?

5          A.    And -- yes.  And looking up their

6     prior history.

7          Q.    Okay.  But you would do that first

8     to see whether the order made sense, right?

9          A.    Yes.

10         Q.    And that was maybe an indicia that

11    they had typed in something wrong?

12         A.    Yes.

13         Q.    Okay.  Have you ever been a part

14    of any sort of investigation into whether --

15    into a potential order -- strike that.

16              Have you ever been part of any

17    sort of investigation or inquiry at DDM

18    regarding a potentially suspicious order?

19         A.    No.

20         Q.    Okay.  Have you ever been part of

21    an investigation into a DDM store where there

22    was a belief that diversion may be taking place?

23              MR. JOHNSON:  Objection.

24              Go ahead and answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    No.

 2              Q.    Okay.  Are you aware of any

 3   potentially suspicious orders that were

 4   identified by anybody at DDM ever?

 5              A.    No.

 6              Q.    Are you aware of any sort of

 7   investigations or inquiries that were ever done

 8   of a DDM store by DDM that they believed may be

 9   assisting in diversion?

10                   MR. JOHNSON:  Objection.

11              Q.    Or permitting diversion?

12                   MR. JOHNSON:  Objection.

13              A.    No.

14              Q.    Okay.  Would you have been

15   involved in something like that if that had

16   occurred?

17              A.    No.

18              Q.    And why is that?

19              A.    Because I am on the distribution

20   side, and anything happening at store level

21   would be handled by the supervisors and the

22   pharmacists at that store.

23              Q.    Do you think that if there was a

24   store that DDM suspected was permitting
```

1    diversion, they would have informed you as the

2    pharmacy warehouse supervisor and said, "Hey, we

3    need to stop shipping this stuff to this store

4    because there's a problem"?

5         A.    Yes, but they may have made me --

6    sometimes they don't -- well, I shouldn't say

7    "sometimes."

8              I may not be aware because they

9    are trying to investigate themselves, so we're

10   going to run the policies and procedures as

11   normal, not letting me know, not letting the

12   pullers know, if there was reason to believe

13   that they were trying to catch a diversion.

14        Q.    And you're not aware of --

15        A.    That is an example.

16        Q.    Okay.  But you're not aware of

17   that ever occurring, correct?

18        A.    No.

19        Q.    Has anybody at DDM corporate ever

20   told you that a certain store was being -- that

21   DDM was imposing certain limitations on a

22   store's ability to order a controlled substance?

23        A.    No.

24        Q.    Okay.  Has DDM ever had thresholds

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of drugs that a store could order in a given

 2    period of time?

 3            A.    No.

 4            Q.    From you, right?

 5            A.    From me.

 6            Q.    And when I say "you," I mean the

 7    distribution center.

 8            A.    Correct.  No.

 9            Q.    Okay.  But other distributors or

10    manufacturers have imposed thresholds on DDM

11    stores in terms of what they could order in a

12    given time period, correct?

13                 MR. JOHNSON:  Objection.

14            A.    Based on our history, yes.

15            Q.    Okay.  Have you ever been involved

16    in a discussion with anybody at DDM about

17    whether a particular order was suspicious or

18    not?

19            A.    No.

20            Q.    Are you aware of any order that

21    anyone at DDM ever identified as possibly or

22    potentially suspicious regardless of whether it

23    was determined to be actually suspicious after

24    the fact?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    No.

 2              Q.    Okay.  And other than the things

 3    we've talked about already, is there anything

 4    else that DDM does to monitor for suspicious

 5    orders?

 6              A.    No.

 7              Q.    Was there ever a time when DDM

 8    strengthened its suspicious order monitoring

 9    policies and procedures other than just putting

10    them in writing?

11                    MR. JOHNSON:  Objection.

12              A.    They strengthened them with that

13    report.

14              Q.    Which report are you talking

15    about?

16              A.    The one that prints at the store

17    level, and the asterisk showing up on the pick

18    ticket.

19              Q.    That's the six-week average

20    report?

21              A.    The report that prints at the

22    store.  And then the actual pick ticket that the

23    pullers pull from with the asterisks on it that

24    would be more of a six-week average, that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    strengthened -- however many years ago I don't

2    know, but that strengthened another layer to

3    help us with that.

4            Q.    With what?

5            A.    With seeing if -- with giving the

6    pharmacy an option to see if something was an

7    order error or for us to bring to my attention

8    if something was an order error.

9            Q.    Okay.  An order error is different

10   than a suspicious order, right?

11           A.    Yes.

12           Q.    Okay.  And do you know when that

13   six-week average report was added?

14           A.    I do not know.

15           Q.    Okay.  So there's not any you can

16   recall that would be -- that was added to

17   strengthen specifically the suspicious order

18   monitoring procedures that DDM uses?

19                 MR. JOHNSON:  Objection.

20           A.    When it was added, it was a nice

21   tool to use at the store level and for us at the

22   distribution center, and that's --

23           Q.    But you'd agree there's nothing

24   specific about that report that would identify
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    an order as suspicious, correct?

 2           A.    No.

 3           Q.    Okay.  And I'm assuming, based on

 4    the testimony you just gave me, that there was

 5    never a time where you or anyone at DDM stopped

 6    a -- or suspended a shipment of a controlled

 7    substance based on a concern that it was

 8    suspicious, correct?

 9           A.    Correct.

10           Q.    Do you know whether any DDM

11    pharmacist has refused to fill a prescription on

12    the belief that it was suspicious?

13                 MR. JOHNSON:  Objection.

14           A.    I do not.

15           Q.    You don't know?  Do you know who

16    would know that?

17           A.    Peter or Jason.

18           Q.    Are you aware of the procedures

19    that they have in place with their pharmacists

20    to, you know, communicate about orders that a

21    pharmacist determined were suspicious?

22           A.    I do not, other than that report

23    that Jason uses on a monthly basis to ask about

24    that, but on a specific occasion, no, I do not.
```

```
 1    I do not -- I'm not involved in that.

 2          Q.    When you communicate with

 3    pharmacists about, you know, "Hey, was this

 4    order what you meant to order," would you

 5    provide them with any sort of forms, or would

 6    that communication be oral?

 7          A.    Oral.

 8          Q.    Okay.  Did you ever send an

 9    e-mail?

10          A.    No.

11          Q.    Any reason why it would be oral

12    and not be an e-mail?

13          A.    Because an e-mail -- I needed an

14    answer right then and there so we could pull the

15    order, we could reduce the order, and have it

16    invoiced and ready to go for the day, because

17    we'd be waiting on that.

18          Q.    So you're in the midst of filling

19    this order and you catch this glitch and you --

20    everything has to stop until you resolve it so

21    you pick up the phone and you call them?

22          A.    Yes.

23          Q.    Okay.  Do you know whether DDM has

24    ever identified a pill mill?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JOHNSON:  Objection.

 2           A.    I do not know that.

 3           Q.    Okay.

 4                    THE VIDEOGRAPHER:  Counsel on the

 5           phone, could you put your phone on mute,

 6           please.

 7   BY MR. MULLIGAN:

 8           Q.    Do you know whether DDM -- other

 9   than that one-month report -- ever analyzed data

10   that it collected regarding the movement of

11   controlled substances to determine whether

12   diversion was taking place?

13           A.    I do not know.

14           Q.    You don't know?  Okay.

15           A.    No.

16           Q.    Were you ever involved in any sort

17   of internal audit regarding the sale of opioids

18   to identify patterns regarding prescriptions?

19           A.     Repeat that, please.

20           Q.     Have you ever been involved in any

21   sort of DDM audit or investigation to look at

22   opioid sales to determine whether there were any

23   patterns that may reflect diversion was taking

24   place?
```

Highly Confidential - Subject to Further Confidentiality Review

1              MR. JOHNSON:  Objection.

2              You can answer.

3         A.    No.

4         Q.    Okay.  I know you said that you've

5    never identified a suspicious order, correct?

6         A.    Correct.

7         Q.    And you don't know of anyone at

8    DDM who has ever identified a suspicious order,

9    correct?

10        A.    Correct.

11        Q.    Have you or anyone ever identified

12   a possible suspicious order that required

13   additional due diligence or investigation?

14        A.    No.

15        Q.    If someone said to you, "I think

16   this order is potentially suspicious," what

17   would you do?  Would you know what to do?  Is

18   there a policy or procedure that says what the

19   next steps are?

20        A.    There is not a written policy, but

21   I would definitely go to my supervisor and make

22   them aware of it.

23        Q.    And that would be Jason and Pete?

24        A.    Correct.

1          Q.     Do you know whether any of the --

2    well, strike that.

3                 So my understanding is in

4    something like October of 2014, opioids became a

5    Schedule II; is that fair?

6          A.     Hydrocodone?

7          Q.     Yeah, hydrocodone.  I'm sorry.

8    Correct.

9          A.     Yes.

10         Q.     And so at that point, you guys

11   only had a license for III to VI?

12         A.     V.

13         Q.     V?  Okay.

14                And so what did that mean for you

15   as the pharmacy buyer?

16         A.     For me, it meant that we could no

17   longer have any of the hydrocodones at our

18   warehouse.  We do not carry a C-II license.  We

19   do not have a vault.  So I could not order any

20   more into our warehouse.

21         Q.     So where did DDM stores get their

22   hydrocodone from at that point?

23         A.     After it became C-II?

24         Q.     Mm-hmm.

```
 1              A.     From -- we were with Cardinal at

 2      that -- Cardinal wholesaler.

 3              Q.     Okay.  And where do DDM pharmacies

 4      get their hydrocodone today?

 5              A.     McKesson.

 6              Q.     Okay.  And was there another

 7      distributor that came into play there at some

 8      point in the middle?

 9              A.     Not our primary wholesaler, no.

10              Q.     Okay.  And what do you mean by

11      that?

12              A.     I do believe there was a

13      pharmacy -- I can't think of their name.  There

14      was a secondary for a little while there, and I

15      don't know if it was in 2014, but there was a

16      secondary wholesaler that a few of our stores

17      were using, but Cardinal was at 2014 and

18      McKesson was 2017.

19              Q.     Would that have been Anda?

20              A.     Yes.

21              Q.     Did the stores go directly to

22      those distributors to get hydrocodone or did

23      they have to go through you?

24              A.     Directly to the wholesaler.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  Did you play any role at

2     all in monitoring what the stores were ordering

3     from the distributors?

4          A.     No.

5          Q.     Do you know, did anybody at DDM

6     corporate play any role in sort of overseeing

7     what the stores were ordering from the

8     distributors?

9          A.     I don't know.

10         Q.     Did those distributors have any

11    suspicious order monitoring policies that you

12    learned about at any time?

13         A.     Yes.

14         Q.     And what were they?

15         A.     Cardinal used to send a report for

16    any stores that hit the threshold of certain

17    items.  It was more of an informative e-mail.

18         Q.     What do you mean by "informative"?

19         A.     It listed what stores were hitting

20    their threshold, like, you know, whether they're

21    hitting an 85 percent, you know, they never hit

22    the 100.  It gave them a warning, and that was

23    sent to Jason Briscoe and myself.

24         Q.     So when DDM switched over to

1     Cardinal, Cardinal imposed thresholds on DDM

2     stores for hydrocodone?

3         A.     Controls.

4         Q.     Okay. All controlled substances?

5         A.     Yes.

6         Q.     Okay. That was the first time

7     that DDM ever had any controlled substance

8     thresholds, correct?

9         MR. JOHNSON: Objection.

10        A.     Through a wholesaler.

11        Q.     Did you ever have any thresholds

12     not through a wholesaler?

13        A.     No.

14        Q.     Okay. So it was the first time

15     there were ever any thresholds for controlled

16     substances imposed on DDM's stores, correct?

17        A.     Through the wholesaler, yes.

18        Q.     You keep qualifying it with

19     "through the wholesaler," but I'm just asking,

20     was there ever any other time where there were

21     thresholds on what a DDM store could get

22     regarding controlled substances?

23         MR. JOHNSON: Objection.

24        A.     No.

1         Q.    Okay.  So you'd agree the first

2    time that DDM stores had to deal with thresholds

3    for controlled substances was when hydrocodone

4    went to a Schedule II and DDM started using

5    these distributors, correct?

6         A.    For hydrocodones?

7         Q.    For any controlled substance.

8         A.    Yes.

9         Q.    Okay.  Do you know whether any of

10   the distributors ever reported an order placed

11   by a DDM pharmacist as suspicious to the DEA or

12   the State of Ohio?

13            MR. JOHNSON:  Objection.

14       A.    I don't know.

15       Q.    So you have no recollection of any

16   order for a controlled substance ever being cut

17   to a DDM store?

18            MR. JOHNSON:  Objection.

19       A.    Probably being cut, but not -- I

20   don't know about it being --

21            MR. JOHNSON:  Reported?

22       A.    Reported.  Thank you.  Reported.

23       Q.    So you are aware of instances

24   where one of the distributors actually cut an

```
 1   order that was placed by a DDM store?

 2          A.    When I would get the e-mail.

 3          Q.    Okay.  And how often would that

 4   occur?

 5          A.    Not very often, but it would

 6   happen.

 7          Q.    Okay.  How often were stores

 8   ordering from -- controlled substances from

 9   those distributors at that time; do you know?

10          A.    With Cardinal, it was three days a

11   week, I believe.

12          Q.    So you'd place an order three

13   different days a week?

14          A.    Yes.

15          Q.    And did you play any role in

16   monitoring those orders?

17          A.    No.

18          Q.    But it sounds like you did receive

19   the e-mails if an order was cut or if Cardinal

20   had a problem with it?

21          A.    If it was reaching the threshold,

22   I got the e-mail, so did Jason, and we would let

23   the store know that they were potentially

24   reaching their threshold.  It could be -- it
```

```
 1    could have been the last day of the month.

 2         Q.    So would your role in that process

 3    be simply to forward that e-mail to the

 4    pharmacist?

 5         A.    Yes.

 6         Q.    Did you do anything more to

 7    determine whether the order that was placed was

 8    appropriate or not?

 9         A.    Jason would look into those.

10         Q.    As far as you know?

11         A.    Yes.

12         Q.    Do you know what Jason did to look

13    into those orders?

14         A.    I do not.

15         Q.    Okay.  So when the switch to

16    Cardinal happens, if a store hit their threshold

17    before the time ran out, before it reset, right,

18    you'd get an e-mail that would say, "We've cut

19    this order."

20               Is that right?

21         A.    Yes.

22         Q.    And then you would just forward

23    that to the pharmacist, correct?

24         A.    I would let them know that, yes,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    they're reaching their threshold and that's all.

 2           Q.    Okay.

 3           A.    I would just forward it to them.

 4           Q.    And if anything else happened, it

 5    would have been Jason or -- it would have been

 6    Jason at that point, right?

 7           A.    Jason.

 8           Q.    Okay.  But you don't know what

 9    Jason would have done?

10           A.    No.

11           Q.    Did Jason ever follow up back with

12    you?

13           A.    No, he did not, but I do know that

14    he would call the store and investigate it, but

15    I don't know the exact terminology and I don't

16    know exactly what happened after that.  I just

17    know that he took it upon himself to -- you

18    know, I made sure the store knew about it and he

19    would investigate it.

20           Q.    Do you know that from reading his

21    deposition?

22           A.    No.

23           Q.    You just know that --

24           A.    I just know that that's what he
```

1    would do with it.

2         Q.    Okay.  Did DDM have any policies

3    and procedures about what needed to be done to

4    follow up on an order that was cut by Cardinal?

5         A.    No.

6         Q.    Okay.  All right.  Ms. Roach is

7    going to hand you what she's marking as

8    Exhibit 2, which is DDM's Responses to

9    Plaintiffs' First Set of Interrogatories.

10                    - - -

11         (DDM-Strang Exhibit 2 marked.)

12                    - - -

13   BY MR. MULLIGAN:

14        Q.    And you can either look at the

15   paper document or the screen if you want.  I'm

16   only going to direct you to a couple of these.

17   You're more than welcome to read the whole

18   thing, but it will take a while.  I promise you

19   I'll just look at a couple, okay?

20        A.    Okay.

21        Q.    Have you ever seen this document

22   before?

23        A.    I have not.

24        Q.    Did you assist in the preparation

Highly Confidential - Subject to Further Confidentiality Review

1    of this document; do you know?

2         A.   No.

3         Q.   Okay.  If you go to -- if you go

4    to the back, there's a verification page that's

5    signed by Mr. McConnell.  Did you ever have any

6    discussions with him about answering any of

7    these questions?

8         A.   No.

9         Q.   Okay.

10             MR. JOHNSON:  Because she doesn't

11        know what the questions are at this

12        point, but ...

13             MR. MULLIGAN:  That's fair.

14   BY MR. MULLIGAN:

15        Q.   I just wanted to know if he said,

16   "I have to answer these interrogatories.  Can

17   you help me with it?"  That didn't happen.

18        A.   No.

19        Q.   Okay.  Have you ever searched your

20   own paper or electronic files for any e-mails or

21   documents that would be responsive to our

22   requests in this case?

23        A.   I did not.

24        Q.   Okay.  Do you know if somebody

Highly Confidential - Subject to Further Confidentiality Review

```
 1   else did?

 2          A.    Yes.

 3          Q.    And who was that?

 4          A.    Keith Miller, our head of IT.

 5          Q.    And when was that done; do you

 6   know?

 7          A.    Two months ago.

 8          Q.    Were you given any instructions

 9   about retaining copies of documents or e-mails

10   or anything like that?

11          A.    I was not.

12          Q.    Okay.  Do you know what a

13   litigation hold is?

14          A.    No.

15          Q.    Okay.  You've never heard the term

16   "litigation hold"?

17          A.    I may have heard of it, but I

18   don't know what it is.

19          Q.    Okay.  Has anybody ever told you

20   as the pharmacy warehouse supervisor to retain

21   all documents regarding the movement of

22   controlled substances?

23          A.    I do not take care of all that.

24   That is through our computer department.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.      Okay.  So you couldn't get rid of

 2     that stuff even if you wanted to?

 3              A.      I don't even know where it is.

 4              Q.      Okay.  Let's look at Interrogatory

 5     Number 1.  Do you see -- do you see under

 6     "Response" it says "Discount Drug Mart" and then

 7     it has an address?

 8              A.      Yes.

 9              Q.      This question is asking for the

10     name and address of distribution centers, and I

11     just want you to confirm that that's where you

12     go to work every day?

13              A.      Yes.

14              Q.      Okay.  And I think, as you

15     indicated before, that's actually basically the

16     same location as the headquarters, correct?

17              A.      Correct.

18              Q.      Okay.  So if you wanted to go talk

19     to Pete Ratycz, would you just walk up some

20     stairs or take an elevator?

21              A.      He's two offices over from there.

22              Q.      Perfect.

23              A.      Yep, same hallway.

24              Q.      Okay.  Let's look at Interrogatory
```

1    Number 4.  And we've already talked about this

2    today.  But this says, "Please identify any

3    orders you received" -- and "you" I'll just

4    represent to you for this document means DDM,

5    okay, but I'm going to ask you about you

6    specifically.

7              It says, "Please identify any

8    orders you received that were at any point

9    identified as a possible suspicious order."  And

10   then it says, "For each of those, identify the

11   following information."  And then the response

12   is "None."

13             And that's consistent with what

14   you've told me, right?

15        A.    Yes.

16        Q.    Okay.  And so there wouldn't have

17   ever been an instance at DDM where anybody had

18   to do any due diligence regarding a possible

19   suspicious order because none was ever

20   identified, correct?

21        A.    Correct.

22        Q.    In response to -- well, strike

23   that.

24             Did Jason or Pete ever contact you

```
 1    and say, "We've been looking at this one-month

 2    report and this -- we have some concerns about

 3    this particular store's ordering habits.  We

 4    would like you to impose a threshold on them."

 5              MR. JOHNSON:  It's really a

 6         12-month report, isn't it?  You're

 7         referring to the --

 8              MR. MULLIGAN:  Oh.  Is it?

 9              MR. JOHNSON:  Yeah.  It's a

10         rolling 12-month report.

11              MR. MULLIGAN:  I guess I meant the

12         monthly report.

13              MR. JOHNSON:  Yeah, everybody's

14         been calling it different things,

15         but ...

16    BY MR. MULLIGAN:

17         Q.    Yeah.  So I'm talking about the --

18    I'm talking about the report that they generate

19    each month that showed the ordering history for

20    the prior year; is that correct?

21         A.    Correct.

22         Q.    Okay.  Was there ever a time where

23    either Tom Nameth, Jason Briscoe, or Pete Ratycz

24    contacted you and said, "We've been looking at
```

Highly Confidential - Subject to Further Confidentiality Review

1    this report we generate monthly and we have

2    concerns about the way that this particular

3    store is ordering controlled substances.  We'd

4    like to impose a threshold or take some other

5    action"?

6            A.    No.

7            Q.    Did you ever learn of any issues

8    that they identified from that report regarding

9    possible diversion or suspicious ordering?

10           A.    No.

11           Q.    Okay.  So correct me if I'm wrong.

12   As far as you know, the two reports that DDM

13   uses as part of their process have never

14   identified a suspicious order or even a possible

15   suspicious order, correct?

16           A.    Correct.

17           Q.    If you look at Interrogatory

18   Number 5.  This asks to, "Identify any persons

19   who reviewed or analyzed data regarding the

20   distribution and/or dispensing of opioids or

21   your opioid products."

22                 I'm not going to read the whole

23   thing.  But if you turn to the next page,

24   there's just four individuals.  It's Tom Nameth,

Highly Confidential - Subject to Further Confidentiality Review

1    yourself, Jason Briscoe, and Pete Ratycz.

2                    Do you see that?

3         A.    Yes.

4         Q.    Do you know of anybody else that

5    would be involved in analyzing data regarding

6    distribution of opioids?

7         A.    No.

8         Q.    Okay.  And it sounds like your

9    analysis would have been limited to, is this

10   amount of drugs actually what the pharmacist

11   wanted, correct?

12        A.    Correct.

13        Q.    Okay.  Let's go to Interrogatory

14   Number 12.  And this asks to, "Identify any

15   threshold or controlled substance limit and all

16   personnel who are responsible for establishing

17   or approving thresholds or controlled substance

18   limits as well as any overrides or

19   modifications."

20                    Do you see that?

21        A.    Yes.

22        Q.    And the answer is "None."  I

23   assume that's consistent with your testimony

24   where you said that DDM never had any

Highly Confidential - Subject to Further Confidentiality Review

```
1    thresholds, right?

2            A.    Correct.

3            Q.    And the only thresholds were ones

4    that were imposed by third-party distributors or

5    manufacturers, right?

6            A.    Say that again.

7            Q.    The only thresholds that were ever

8    placed on a DDM store were by Cardinal or

9    another manufacturer or distributor, right?

10                 MR. JOHNSON:  Objection.

11                 MR. MULLIGAN:  What's the basis?

12                 MR. JOHNSON:  How does she know

13           that?

14                 MR. MULLIGAN:  Well, I mean, she's

15           already testified to it.  I'm just

16           confirming.

17                 MR. JOHNSON:  Okay.

18           A.    Wholesalers, yes.

19           Q.    Okay.  Did DDM have the ability to

20    or play any role in identifying overrides or

21    modification procedures for those thresholds,

22    that you know of?

23           A.    For the wholesalers?

24           Q.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    No.

2              Q.    Okay.  And do you know whether the

3    wholesalers would permit an override based on

4    some justification provided by the store?

5              A.    Yes.

6              Q.    And --

7              A.    If -- go ahead.

8              Q.    Go ahead.

9              A.    If Jason did his research and

10   found that it was a legitimate, they did need

11   another bottle of 100 of something, if there was

12   an investigation on it, he would call the

13   wholesaler or in writing -- I don't know.

14             Q.    Okay.

15             A.    And they would -- they needed a

16   reason.

17             Q.    Okay.  And that would be -- that

18   would be his province, right?

19             A.    Yes.

20             Q.    Okay.  Do you recall ever -- any

21   pharmacist ever complaining when DDM moved to

22   Cardinal and all of a sudden there were

23   thresholds imposed on the controlled substances?

24             A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Do you recall that the -- did any

 2   stores have to change their ordering habits once

 3   the switch was made to Cardinal to avoid having

 4   their orders get cut?

 5            A.    I do not know that.

 6            Q.    Okay.  When the change was made to

 7   Cardinal, do you know whether -- strike that.

 8                  Did DDM -- let me start again.

 9                  When hydrocodone became a

10   Schedule II and DDM started ordering from

11   Cardinal, were there any other wholesalers or

12   distributors that stores could get hydrocodone

13   from?

14            A.    When we were with Cardinal, other

15   than Anda, if that was even a choice, that would

16   be it.

17            Q.    Okay.  Are you aware of any

18   instance where a DDM store ordered -- had an

19   order cut and then ordered product from a --

20            A.    I do not -- sorry.

21            Q.    -- from a backup distributor?

22            A.    I don't know that.

23            Q.    You don't know?

24            A.    No.
```

```
 1              Q.    Okay.  Was that permitted?

 2              A.    I don't know.

 3              Q.    Was there any policies and

 4    procedure that said at the time you could only

 5    order from Cardinal?

 6              A.    Not that I know of.

 7              Q.    Okay.  Were you involved at all in

 8    helping to transition DDM stores from your

 9    distribution center over to Cardinal for the

10    purposes of hydrocodone?

11              A.    No.

12              Q.    Okay.  Do you know who was

13    responsible for that?

14              A.    I would say Jason and Pete.

15              Q.    Let's go to Interrogatory 14.

16    This says to, "Identify all persons who were

17    responsible for administering, overseeing,

18    developing, or implementing any and all

19    policies, procedures, et cetera, designed to

20    detect and report suspicious orders or to

21    maintain effective controls against diversion of

22    controlled substances."

23                   Do you see that?

24              A.    Yes.
```

1          Q.    And the response identifies Tom

2    Nameth, P.J. Ferut --

3                MR. JOHNSON:  Ferut.

4          Q.    -- Ferut, Jill Strang, Jason

5    Briscoe, Pete Ratycz, and Keith Miller.

6                Do you see that?

7          A.    Yes.

8          Q.    Do you know what each of these

9    individuals did as it relates to that activity?

10   I mean, obviously we talked about what you did.

11   And I'm just curious if you know the scope of

12   what everybody else did.

13               MR. JOHNSON:  I'm going to object.

14               But go ahead.

15               MR. MULLIGAN:  What's the basis of

16         your objection?

17         A.    Well, P.J. -- oh, sorry.

18               MR. MULLIGAN:  Tim --

19               MR. JOHNSON:  What's -- I'm sorry?

20               MR. MULLIGAN:  What's the basis of

21         your objection?

22               MR. JOHNSON:  You haven't

23         established a foundation of knowledge

24         that she would know what everybody in

Highly Confidential - Subject to Further Confidentiality Review

```
 1            the organization is doing.  If you're --
 2                 MR. MULLIGAN:  Well, I asked.
 3                 MR. JOHNSON:  -- you're asking her
 4            what their duties are, isn't that better
 5            to ask the individuals?
 6                 MR. MULLIGAN:  Well, I asked her
 7            if she knew what their duties were.
 8                 MR. JOHNSON:  Okay.
 9                 MR. MULLIGAN:  That was the
10            premise of the question.
11     BY MR. MULLIGAN:
12            Q.    You can answer.
13            A.    Keith and P.J. are our computer IT
14     people.  Pete, Jason, and Tom held the
15     responsibilities that we've talked about, and
16     then myself.
17            Q.    Okay.  So I appreciate that that's
18     what their titles were or that's what their
19     positions were, but do you know what they did as
20     it relates to suspicious order monitoring?
21            A.    No.
22            Q.    Okay.  And I think earlier you
23     testified that there are 16 or 17 documents at
24     DDM which go in great detail about what DDM's
```

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious order monitoring policies are,

2    correct?

3                    MR. JOHNSON:  Objection.

4           A.    No.

5           Q.    Okay.  So clarify that for me.

6           A.    There were 16 or 17 documents

7    about VAWD, one of which that's in that

8    procedure is about suspicious ordering.  There's

9    nothing in writing about suspicious ordering, to

10   my knowledge.

11          Q.    Okay.  So DDM has no written

12   policies and procedures regarding suspicious

13   order monitoring?

14          A.    Other than what I wrote in VAWD,

15   no.

16          Q.    Which was something you wrote as

17   part of an application to get an accreditation,

18   correct?

19          A.    Yes.

20          Q.    But that's not actively used to

21   train people or to control what happens at DDM

22   regarding suspicious orders, correct?

23          A.    No.

24          Q.    Okay.  And so would it be fair to

```
 1    say that other than what we've talked about you

 2    do, you're not really aware of what anybody else

 3    does regarding suspicious order monitoring,

 4    other than Tom and Jason look at that monthly

 5    report that reflects the year -- last year

 6    history?

 7            A.    And I do know that P.J. and Keith

 8    report to ARCOS.

 9            Q.    They make sure that information

10    goes into the system?

11            A.    Yes, yes.

12            Q.    Do you interact with these

13    people --

14                  MR. JOHNSON:  If you keep watching

15            that TV, you're going to get seasick.

16                  THE WITNESS:  Sorry.

17                  MR. JOHNSON:  Okay.

18    BY MR. MULLIGAN:

19            Q.    Do you interact with these people

20    on a daily or weekly basis regarding suspicious

21    orders?

22            A.    No.

23            Q.    Okay.  Has anybody at DDM or

24    outside of DDM ever indicated to you that they
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were concerned that DDM was in violation of the

 2    Controlled Substances Act?

 3                  MR. JOHNSON:  Objection.

 4         A.    No.

 5         Q.    Other than maybe that instance

 6    where the door wasn't -- the door could be

 7    opened with a broom handle?

 8                  MR. JOHNSON:  Objection.  I'm not

 9           sure that's a violation, but assuming it

10           is.

11         Q.    Do you know whether that is a

12    violation of the Controlled Substances Act?

13         A.    I do not.

14         Q.    Do you recall getting a letter

15    from the DEA regarding that?

16         A.    I believe Pete and Jason get those

17    letters, and I thought it was a modification to

18    what we had in place.

19         Q.    Okay.  So you're not sure whether

20    that was a violation or not?

21         A.    No.

22         Q.    Okay.  All right.  Ms. Roach is

23    going to hand you what I've marked as Exhibit 3.

24                        - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (DDM-Strang Exhibit 3 marked.)

 2                        -  -  -

 3              MR. MULLIGAN:  Make sure you don't

 4         cover the Bates number.

 5   BY MR. MULLIGAN:

 6         Q.    And this is -- this is DDM Bates

 7   number 68279, and it's a letter from the U.S.

 8   Department of Justice to the DEA.

 9              Do you see that?

10         A.    Yes.

11         Q.    Have you ever seen this document

12   before?

13         A.    I don't know if this was the

14   particular document, but I did see something on

15   the deposition about this letter.

16         Q.    Okay.

17         A.    Maybe pieces of it were in there.

18         Q.    So --

19              MR. JOHNSON:  There's actually two

20         letters here.

21              MR. MULLIGAN:  That's right.

22              MR. JOHNSON:  I think this

23         happened before, but yeah.

24              MR. MULLIGAN:  I took one of them
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            off.  There's two.  So there's one dated

2            December 27, 2007, and then another

3            dated February 7, 2007.  And the second

4            one is DDM68281.

5   BY MR. MULLIGAN:

6            Q.   So the only time you would have

7   seen this document would have been in relation

8   to preparing for today?

9            A.   Yes.

10           Q.   Or at least learned about what is

11  in it?

12           A.   And I did not read it.

13           Q.   Okay.  All right.  It says, "Dear

14  Registrant, this letter is being sent to every

15  entity in the United States registered with the

16  DEA to manufacture and distribute controlled

17  substances."

18               Do you see that?

19           A.   Yes.

20           Q.   And that would include DDM, right?

21           A.   Yes.

22           Q.   Okay.  "The purpose of this letter

23  is to reiterate the responsibilities of

24  controlled substance manufacturers and
```

```
 1    distributors to inform DEA of suspicious orders

 2    in accordance with 21 C.F.R. 1301.74(b)."

 3                 Do you see that?

 4         A.    Yes.

 5         Q.    Are you familiar with what that

 6    regulatory section discusses?

 7         A.    No.

 8         Q.    Okay.  It says, "In addition to,

 9    and not in lieu of, the general requirement

10    under 21 U.S.C. 823 that manufacturers and

11    distributors maintain effective controls against

12    diversion, DEA regulations require all

13    manufacturers and distributors to report

14    suspicious orders of controlled substances."

15                 Do you see that?

16         A.    Yes.

17         Q.    And I think earlier you agreed

18    that DDM did have an obligation to report

19    suspicious orders, correct?

20         A.    Correct.

21         Q.    Okay.  Do you believe that DDM's

22    suspicious order monitoring controls were

23    effective?

24         A.    Yes.
```

1          Q.     Okay.  And if you go to the third

2     paragraph, it says, "The regulation also

3     requires the registrant inform the local DEA

4     division office of suspicious orders when

5     discovered by the registrant."

6                 Do you see that?

7          A.     Yes.

8          Q.     Okay.  What controls did DDM have

9     in place that would have permitted DDM to report

10    suspicious orders to the local DEA office when

11    they were discovered?

12                MR. JOHNSON:  Objection.

13                Go ahead.

14                Objection.

15    BY MR. MULLIGAN:

16          Q.     Strike that.  Let me ask the

17    question differently because I think this is a

18    little bit vague, and we'll let it speak for

19    itself.

20                But what controls did DDM have in

21    place to permit it to report potentially

22    suspicious orders to the DEA before they were

23    filled and sent to the store?

24                MR. JOHNSON:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Can you ask that again, please?

2        Q.    What controls did DDM have in

3   place that would ensure that it was able to

4   report potentially suspicious orders to the DEA

5   before those orders were filled?

6              MR. JOHNSON:  Objection.

7        A.    Other than basing it on -- there

8   was nothing except the six-week average report

9   and the pharmacist's intervention on it.

10       Q.    Are you aware of any time that a

11  pharmacist reported a suspicious order to the

12  DEA?

13       A.    No.

14       Q.    And, again, that monthly report,

15  which is based on the prior history, would have

16  been generated after the orders were shipped

17  so --

18       A.    After the -- sorry.

19       Q.    Right?

20       A.    Yes.

21       Q.    And so if something in there

22  looked suspicious, it would be, "We have to fix

23  it for the next time."  Right?

24       A.    It was being -- it was a tool used

 1    to be proactive for a possible -- I don't know

 2    the word I want.  It was a tool to be used to --

 3    I don't know the words I want here.

 4                 Jason would use that, and if the

 5    family of a particular drug seemed out of line,

 6    he could investigate it --

 7         Q.    Okay.  But that --

 8         A.    -- if he wanted.

 9         Q.    Whatever looked funny in that

10    report would have already happened, right?

11         A.    Correct.

12         Q.    All right.  So the next sentence

13    says, "Filing a monthly report of completed

14    transactions, for example, excessive purchase

15    report or high unit purchases does not meet the

16    regulatory requirements to report suspicious

17    orders."

18                 Do you see that?

19         A.    I'm reading it.

20         Q.    It's the third paragraph, second

21    sentence.

22                 (Reporter clarification.)

23         A.    I'm reading.

24         Q.    Do you see it on the screen?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Yes.

 2            Q.    Okay.  Were you --

 3            A.    Can you repeat what you said,

 4    because I was reading it as you were saying.

 5            Q.    Sure.  Were you aware that filing

 6    a monthly report of completed transactions,

 7    i.e., a report that showed excessive purchases

 8    or high unit purchases, didn't meet regulatory

 9    requirements to report suspicious orders?

10            A.    No.

11            Q.    Okay.  Do you know whether the

12    orders that were flagged in your six-week

13    average report were transmitted to the DEA?

14            A.    Say that again.

15            Q.    Were the orders that showed up on

16    your six-week average report as asterisks or

17    larger than normal, was that information ever

18    provided to the DEA; do you know?

19            A.    No.

20            Q.    It was not?  Okay.

21                  And in fact, it looks like, from

22    this sentence, that sending that information to

23    the DEA wouldn't have been sufficient to meet

24    the regulatory requirements of a suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    order, correct?

 2            A.    Right.  And, again, it was a tool

 3    that we were using to point out quantities.

 4            Q.    Right.  But you guys weren't using

 5    it to identify suspicious orders, correct?

 6                  MR. JOHNSON:  Objection.

 7            A.    Order errors.

 8            Q.    Right.  But that -- you weren't

 9    using that report to identify suspicious orders,

10    correct?

11            A.    Correct.

12            Q.    Was that a "yes"?

13                  MR. JOHNSON:  Objection.

14            A.    Yes.

15                  MR. JOHNSON:  Go ahead.

16            Q.    So the next sentence says,

17    "Registrants are reminded that their

18    responsibility does not end merely with the

19    filing of a suspicious order report."

20                  Do you see that?

21            A.    Yes.

22            Q.    And then it says, "Registrants

23    must conduct -- conduct an independent analysis

24    of suspicious orders prior to completing a sale
```

Highly Confidential - Subject to Further Confidentiality Review

 1   to determine whether the controlled substances

 2   are likely to be diverted from legitimate

 3   channels."

 4              Do you see that?

 5        A.    Yes.

 6        Q.    Are you aware of any time that

 7   anyone at DDM ever did that?

 8        A.    Completing a sale means from the

 9   distribution center to the store?  Or is a sale

10   a sale --

11        Q.    A sale is a sale.

12        A.    -- at the store level?  At the

13   store level?

14        Q.    Either.

15              MR. JOHNSON:  I'll object as to

16        the store level.

17              But answer if you can.

18        A.    From the distribution center to

19   the store, no.  There was no reason to.

20        Q.    There was no reason to what?

21        A.    To conduct an independent analysis

22   of a suspicious order.

23        Q.    Because you had -- there had never

24   been an instance where you became aware that

Highly Confidential - Subject to Further Confidentiality Review

```
 1   there was a potentially suspicious order,

 2   correct?

 3          A.    Correct.

 4          Q.    The last sentence says, "Reporting

 5   of an order as suspicious will not absolve the

 6   registrant of responsibility if the registrant

 7   knew or should have known that the controlled

 8   substances were being diverted."

 9                Do you see that?

10          A.    Yes.

11          Q.    So would you agree that this says

12   that even if you did report, that's not enough

13   if you knew or should have known the stuff was

14   being diverted, correct?

15                MR. JOHNSON:  Objection.  It says

16          what it says.

17                MR. MULLIGAN:  Well, I'm just

18          asking her.

19          A.    Yes.

20   BY MR. MULLIGAN:

21          Q.    All right.  If you go to the next

22   paragraph, it says, "The regulation" -- which is

23   the C.F.R. we're talking about -- "specifically

24   states that suspicious orders include orders of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    an unusual size, orders deviating substantially

 2    from a normal pattern and orders of an unusual

 3    frequency."

 4              Do you see that?

 5         A.    Yes.

 6         Q.    Okay.  So my understanding of your

 7    six-week average report is that that would

 8    identify orders of an unusual size or that

 9    deviated from a normal pattern.

10              Do you agree with that?

11         A.    I would not.

12         Q.    You don't agree with it?

13         A.    No.

14         Q.    Tell me why.

15         A.    A normal pattern is -- they sent

16    weekly orders, so that's their normal pattern.

17    Unusual frequency, again, we only distributed

18    once a week.  Unusual size, to us, you know, I

19    would investigate and look at their history.  It

20    was not a suspicious order.  It was an order

21    error on the side of the store transmitting

22    their order over and me investigating their

23    history.  That's the way I read that sentence.

24         Q.    Okay.  I appreciate that.  My
```

Highly Confidential - Subject to Further Confidentiality Review

1    question was a little bit different.

2           A.    Okay.

3           Q.    We talked all about your six-week

4    average report today, correct?

5           A.    Yes.

6           Q.    And the entire purpose of that

7    report is to identify orders that are of an

8    unusual or larger size than normal, correct?

9           A.    Greater than their six-week

10   average, yes.

11          Q.    So the only thing showing up there

12   is an order that's different than usual, right,

13   and larger, specifically?

14          A.    Yes.

15          Q.    Okay.  And correct me if I'm

16   wrong, but you never did anything to investigate

17   whether any of those orders were suspicious or

18   related to diversion, correct?

19          A.    I treated them all as order errors

20   before they left the distribution center.

21          Q.    So is that a "yes"?

22                You never did any due diligence

23   into anything that showed up on that six-week

24   average report to determine whether those orders

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were part of a diversionary scheme or were

 2    suspicious in any way, correct?

 3                  MR. JOHNSON:  Objection.

 4         Q.     You can answer.

 5         A.     Say that again.  Sorry.

 6         Q.     So you never did any due diligence

 7    or looked at anything -- strike that.  That's

 8    what happens when you read your question back.

 9                  When you had that six-week average

10    report, if someone gave it to you, you never did

11    anything to investigate whether those unusual or

12    larger orders were part of some diversionary

13    scheme, correct?

14                  MR. JOHNSON:  Objection.

15         A.     Correct.

16         Q.     Because you saw them as potential

17    order errors but you never considered that they

18    could be suspicious, correct?

19                  MR. JOHNSON:  Objection.

20         A.     Correct.

21         Q.     All right.  If you look at the

22    third sentence there, it says, "For example, if

23    an order deviates substantially from a normal

24    pattern, the size of the order does not matter
```

```
 1    and the order should be reported as suspicious."

 2              Do you see that?

 3        A.   Yes.

 4        Q.   And DDM never did that, correct?

 5        A.   No.

 6        Q.   Okay.  But you're aware of -- I

 7    mean, it was pretty common for there to be

 8    orders that deviated from a normal pattern,

 9    because that's the whole purpose of that

10    six-week average report, correct?

11        A.   Yes.

12        Q.   All right.  If you go further down

13    in the paragraph, about halfway down the middle,

14    the sentence starts with, "The size of an order

15    alone, whether or not it deviates from a normal

16    pattern, is enough to trigger the registrant's

17    responsibility to report the order as

18    suspicious."

19              Do you see that?

20        A.   Yes.

21        Q.   Okay.  But that's not something

22    that DDM ever did, correct?

23              MR. JOHNSON:  Objection.

24              Go ahead.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    We did not consider them

 2   suspicious.

 3              Q.    Okay.  But this sentence says that

 4   a deviation in size of an order is enough to

 5   trigger the responsibility to report, correct?

 6              A.    Correct.

 7              Q.    But DDM never did that, right?

 8              A.    Not based on the tools we were

 9   using, no.

10              Q.    And that's because your tools were

11   not designed to identify suspicious orders

12   before they were shipped, correct?

13              MR. JOHNSON:  Objection.

14              A.    They were to, again, create --

15   create as a tool to use as a reason to

16   investigate the history of the store, whether it

17   was a controlled substance or not a controlled

18   substance, to count as an order error before it

19   left the distribution center.

20              Q.    Right.  The tools that you had

21   were designed to improve operational

22   efficiencies, correct?

23              A.    Correct.

24              Q.    Not to identify suspicious orders
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    before they were fulfilled?

2              MR. JOHNSON:  Objection.

3         Q.    I think you've already answered

4    this.  I'm just asking you again.  I probably

5    shouldn't be, but ...

6         A.    That's okay.  I guess

7    suspicious -- when we're dealing with our

8    customers, which are our stores, knowing the

9    history of what we have -- sorry.  No, they were

10   not suspicious.  They were order errors and

11   treated as order errors and investigated.  And I

12   did my due diligence.

13        Q.    And I'm not accusing you of not

14   doing anything.  I'm just trying to understand

15   what you did.

16        A.    Right.

17        Q.    Okay.  Okay.  If you go to page --

18   the second page, at the top it says,

19   "Registrants that rely on rigid formulas to

20   define whether an order is suspicious may be

21   failing to detect suspicious orders."

22              Do you see that?

23        A.    Yes.

24        Q.    Okay.  And the next sentence says,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   "For example, a system that identifies orders as

 2   suspicious only if the total amount of a

 3   controlled substance ordered during one month

 4   exceeds the amount ordered the previous month by

 5   a certain percentage or more is insufficient."

 6              Do you see that?

 7        A.    Yes.

 8        Q.    And that more or less describes

 9   your six-week average report, although with

10   different time frames, correct?

11        A.    Correct.

12        Q.    And so you'd agree that this is

13   saying that that six-week average report would

14   be insufficient to identify suspicious orders

15   under the regulations, correct?

16              MR. JOHNSON:  Objection.

17        A.    Can you repeat that, please?

18        Q.    You agree that this sentence

19   describes a report similar to the six-week

20   average report, correct?  I think you just said

21   that.

22        A.    It is based on the average, yes.

23        Q.    Okay.  And so you'd agree that

24   this letter says that the six-week average
```

Highly Confidential - Subject to Further Confidentiality Review

1    report that was generated at DDM would be

2    insufficient to identify suspicious orders under

3    the regulations, correct?

4              MR. JOHNSON:  Objection.  Once

5         again, it says what it says.

6              MR. MULLIGAN:  That's fine, Tim.

7         I'm just asking her the question.

8    BY MR. MULLIGAN:

9         Q.    Is this news to you?

10        A.    No, but I'm reading it as, is it

11   insufficient.  Is our report insufficient.

12        Q.    Right.

13        A.    And I'm reading this to say,

14   during one month exceeds the amount ordered the

15   previous month.  So I believe our six-week

16   average covers a six-week average.

17        Q.    Okay.  So the only thing that

18   you've identified that's different between the

19   report they're sort of describing here and your

20   report is that yours covers two more weeks,

21   right?

22        A.    Yes.

23        Q.    Okay.  But that report does

24   identify orders that exceed the history by a

```
 1    certain percentage; does it not?

 2            A.    I didn't write it, but yes.

 3            Q.    Okay.  And the next sentence says,

 4    "This system fails to identify orders placed by

 5    a pharmacy if the pharmacy placed unusually

 6    large orders from the beginning of its

 7    relationship with the distributor."

 8                  Do you see that?

 9            A.    Mm-hmm, yes.

10            Q.    Okay.  And so what this -- this is

11    identifying a flaw in a report like that, which

12    is, it won't flag an order if the store already

13    has a pattern of ordering too much.

14                  Does that make sense?

15            A.    And what is an unusually large

16    order?

17            Q.    Well, I don't know.  But you would

18    agree with that, right, that the six-week

19    average report -- if the stores were ordering

20    more than they should and they continue that

21    pattern, then the six-week average report

22    wouldn't flag that store as engaging in any

23    suspicious activity, right?

24            A.    Correct.
```

1            Q.    Did you ever have access to any

2    documents or information that would show which

3    prescriptions were being -- the orders were

4    being used to fill at a store level?

5            A.    No.

6            Q.    Okay.

7                  MR. MULLIGAN:  I'm not going to

8            use that second letter.

9    BY MR. MULLIGAN:

10           Q.    All right.  Ms. Roach is going to

11   hand you what I've marked as Exhibit 4.  And

12   this is DDM53148.

13                         - - -

14         (DDM-Strang Exhibit 4 marked.)

15                         - - -

16           Q.    And you can look at the paper or

17   the screen.

18           A.    Okay.

19           Q.    So this is a -- it looks like it's

20   titled "Controlled Drug Report."

21                  Do you see that?

22           A.    Yes.

23           Q.    Do you know what that is?

24           A.    I do not know.

1          Q.     Have you ever seen this report

2     before?

3          A.     No.

4          Q.     Okay.  Underneath that it says,

5     "Transactions involving movement of inventory

6     into the warehouse."

7                 Do you see that?

8          A.     Yes.

9          Q.     So you're the pharmacy warehouse

10    supervisor, right, but you haven't seen this

11    report?

12         A.     Not this particular report, no.

13         Q.     Okay.  And when you say that, you

14    mean the specific report with this information

15    or this type of report?

16         A.     This type of report.

17         Q.     Okay.  Do you know who would have

18    used or looked at this type of report?

19         A.     No.

20         Q.     Okay.  And do you know what this

21    report would be used for?

22         A.     A product that's, I would assume,

23    coming into the warehouse.

24         Q.     Have you ever looked at a report

1    that showed product coming into the warehouse?

2          A.    No.

3          Q.    Who at the warehouse that you

4    manage is responsible for, you know, reviewing

5    these reports to see what's in the warehouse?

6          A.    I mean, accounts payable would

7    have some of this information, but I do not know

8    anybody that reviews this particular report.

9          Q.    Okay.  So you don't have any idea

10   what would cause these specific orders to show

11   up on this report?

12         A.    Unless someone was running what

13   our ordering pattern was from Sandoz, if this is

14   transactions involving movement of inventory

15   into our warehouse.  That's the only time that I

16   would -- but I've never seen this report before.

17         Q.    Okay.  We're going to hand you

18   what's marked as Exhibit 5.

19                        - - -

20      (DDM-Strang Exhibit 5 marked.)

21                        - - -

22         Q.    This is a similar but slightly

23   different document.  This is --

24                MR. MULLIGAN:  Do you guys have a

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Bates on yours?  Mine's cut off.

 2                   MR. JOHNSON:  Yes.  It's

 3              DDM00053129.

 4    BY MR. MULLIGAN:

 5         Q.   Ms. Strang, have you ever seen

 6    this report before?

 7         A.   No.

 8         Q.   Okay.  And so this is just like

 9    the last one, except it says, "Transactions

10    involving movement of inventory out of the

11    warehouse by NDC number."

12                   Do you see that?

13         A.   Yes, I do.

14         Q.   Okay.  And so this is not a report

15    that you would have reviewed as pharmacy

16    warehouse supervisor?

17         A.   No.

18         Q.   Okay.  Do you know who would have

19    been responsible for reviewing a report like

20    this?

21         A.   I do not.

22         Q.   Is it possible that this is

23    something that would have been available to the

24    corporate people if they wanted to look at it to
```

1    see what was happening?

2         A.    Yes.

3         Q.    Okay.  And if you look -- it looks

4    like it shows specific drugs.  At least on the

5    first page, it talks about alprazolam.

6              Do you see that?

7         A.    Yes.

8         Q.    And it shows the form that it was

9    in, tab, and the size is 100.

10             Do you see that?

11        A.    Yes.

12        Q.    And that class, does that refer to

13   Schedule IV?

14        A.    Yes.

15        Q.    Okay.  And then there's a

16   number -- what's that number refer to; do you

17   know?

18        A.    I do not know that number.

19        Q.    Okay.  And then there's an NDC

20   number, right?

21        A.    Mm-hmm.

22        Q.    And then there's a quantity.

23   Would that quantity be like bottles, do you

24   think?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    Okay.  So it would be 200 tablet

 3   bottles?

 4          A.    Yes.

 5          Q.    Okay.  And then it says "to

 6   location."

 7                Do you see that?

 8          A.    Yes.

 9          Q.    And it says "DDM Chesterland"?

10          A.    Yes.

11          Q.    And then for some of them there --

12   at least there's a store number, right?

13          A.    Yes.

14          Q.    Okay.  So -- but you're not

15   familiar with this report at all, right?

16          A.    No.

17          Q.    Did you ever review any reports

18   regarding the movements of controlled substances

19   in and out of the warehouse?

20          A.    The only reports that I use are my

21   ordering sheets that I have.

22          Q.    So orders that would be placed

23   with you by stores or that you would place with

24   a distributor?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    That I would place with the

2    manufacturers.

3          Q.    Okay.  And then those would be

4    things that you would fill orders that were

5    provided by stores, right?

6          A.    The items would come into our

7    warehouse.  We'd receive them, put them away,

8    that's where we would pull the orders from.

9          Q.    Okay.  And I looked -- the date on

10   this is March 2015 to September 2015.

11          Do you see that at the top on the

12   first page?

13          A.    Yes.

14          Q.    Okay.  And so it wouldn't be

15   surprising, then, that we wouldn't see anything

16   on here regarding hydrocodone, right, because at

17   that point it was a Schedule II?

18          A.    Yes.

19          Q.    And so it would be shipped

20   directly from the distributor or the wholesaler

21   directly to the stores?

22          A.    Yes.

23          MR. JOHNSON:  I'm going to object.

24          As far as I can see, everything on here

Highly Confidential - Subject to Further Confidentiality Review

```
 1          is a Schedule IV.

 2               MR. MULLIGAN:  What's the basis of

 3          your objection?

 4               MR. JOHNSON:  Well, I mean, I

 5          don't -- are these opiates?  I mean,

 6          it's just an inventory report on --

 7          which we don't know the -- we don't know

 8          the origin of it, and it's on something

 9          that has nothing to do with this

10          lawsuit.

11               MR. MULLIGAN:  I think the

12          testimony is pretty clear about the

13          document.  I'm just asking her if she's

14          ever seen the report before.  I'm not

15          trying to trick anybody.

16               MR. JOHNSON:  Well, no, but you

17          were referencing -- you were referencing

18          to controlled substances, and I don't

19          think there's any listed on here.

20               MR. MULLIGAN:  Right.  And I --

21          that was my question.  I said there

22          aren't any controlled substances on here

23          and it's likely that, at least as it

24          relates to hydrocodone, it wouldn't
```

```
1              appear on here because of the date.  It

2              was already a Schedule II and they

3              didn't handle them then.

4                   MR. JOHNSON:  Well, yes, okay.  I

5              see what you're saying.  Okay.  I accept

6              it.

7                   MR. MULLIGAN:  Okay.

8                   MR. JOHNSON:  There were no

9              Schedule III anyhow at that time, right?

10  BY MR. MULLIGAN:

11         Q.   Hydrocodone was Schedule II in

12  2015, correct?

13         A.   Yes.

14         Q.   Okay.

15                  MR. JOHNSON:  Oh, based on this

16             date.  I gotcha.  Okay.

17  BY MR. MULLIGAN:

18         Q.   Were those two documents that we

19  just looked at, were they part of DDM's

20  suspicious order monitoring policies and

21  procedures?

22         A.   I don't know.

23         Q.   Okay.  But you were the owner of

24  that, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I'm going to say no only based on

2    that I've never seen knew these before.

3          Q.     Okay.

4          A.     They could probably be run if we

5    needed to do a history, but I did not ever see

6    these before.

7          Q.     Do you know whether anyone at DDM

8    ever reviewed these reports or did any due

9    diligence to determine whether these stores were

10   ordering drugs appropriately?

11              MR. JOHNSON:  Objection.

12         A.     I don't know.

13         Q.     Okay.  I'm going to hand you

14   Exhibit 6 now -- or Ms. Roach will.

15                    - - -

16      (DDM-Strang Exhibit 6 marked.)

17                    - - -

18         Q.     This is DDM53912.  If you look at

19   the top it says, "Shipments greater than

20   99 percent of average movements."

21              Do you see that?

22         A.     Yes.

23         Q.     Is this that six-week greater than

24   average report that we've been talking about?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    No.

2            Q.    Okay.  What is this report?

3            A.    I don't know.

4            Q.    Okay.  If you look on the left, it

5    says "Cremens."

6                  Do you see that?

7            A.    Yes.

8            Q.    Who is that?

9            A.    She works in the IT department.

10           Q.    Okay.  And do you know why her

11   name would appear on this report?

12           A.    She probably ran it for

13   somebody --

14           Q.    Okay.

15           A.    -- upon request.

16           Q.    And so this, it looks like, is

17   related solely to controlled drugs.

18                 Do you see that at the top?

19           A.    Yes.

20           Q.    Okay.  But you've never seen this

21   document before?

22           A.    I have not.

23           Q.    Okay.  So you don't know what this

24   document would be used for?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    I do not.

2           Q.    Do you know whether this report

3    was used as part of suspicious order monitoring

4    policies and procedures at DDM?

5           A.    I do not.

6           Q.    Do you know what the percentage

7    increase -- what percentage increase is required

8    for an order to show up on the report that goes

9    to the pharmacist that we were talking about?

10          A.    I don't.

11                MR. JOHNSON:  Six-week report?

12                MR. MULLIGAN:  Yeah.

13          A.    I don't.

14          Q.    You don't?

15                So as far as you know, it could be

16   25 percent increase would trigger that report to

17   the pharmacist or it could be 200 percent,

18   right?

19          A.    I didn't write it, so I don't

20   know.

21                        - - -

22           (DDM-Strang Exhibit 7 marked.)

23                        - - -

24          Q.    Okay.  All right.  Let's look at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Exhibit 7.  This is DDM31932.  I'm not going to

 2    ask you about much of anything in this document,

 3    so you're welcome to read it if you want, but

 4    what I really want to ask is, have you seen this

 5    before?

 6            A.    The only time I saw the front of

 7    this was when Mr. Johnson showed me if I've ever

 8    seen it before, and I have not.

 9            Q.    And you've never seen this before?

10            A.    I have never seen this before.

11            Q.    So you don't -- you don't have any

12    understanding of what the contents are other

13    than the fact that it says "Controlled

14    substances model policy"?

15            A.    Yeah.  Right.  Correct.

16            Q.    Did anybody at DDM ever ask you to

17    draft a controlled substances policy?

18            A.    No.

19            Q.    Did you ever draft a controlled

20    substances policy?

21                  MR. JOHNSON:  Other than the VAWD,

22         I guess.

23            A.    Correct.

24                  MR. MULLIGAN:  I'd like it if she
```

```
 1              would -- can testify.

 2         A.    But that's exactly what I was

 3    going to say.

 4         Q.    Okay.

 5         A.    Other than VAWD and -- no, nothing

 6    else has ever been written about it.

 7         Q.    Okay.  Do you know what the Chain

 8    Drug Consortium is?

 9         A.    I do.

10         Q.    And what is it?

11         A.    It was a group of pharmacies.  At

12    one time point in time there was -- when they

13    would -- I don't know how to explain it.  But

14    they would meet and discuss topics related to

15    pharmacy.  I know that there was some -- they

16    would pull together, a while ago, all of our

17    vials and, you know, the usages and maybe get

18    better pricing on vials or supplies.

19              But I was never involved in

20    anything with the Chain Drug Consortium, other

21    than I did -- I was involved with the buying of

22    generics.

23         Q.    Okay.  Did they serve in any sort

24    of -- did it operate in some ways like a group
```

```
 1    purchasing organization, maybe?

 2           A.    No -- well, yes and no.  I was not

 3    involved with anything other than the generics

 4    part of it, and we would put all of our usages

 5    together and send out a bid.

 6           Q.    Okay.  Did they have a committee

 7    or something that would discuss or meet about or

 8    draft suspicious order monitoring policies?

 9           A.    I do not know that.

10           Q.    Okay.

11                         - - -

12        (DDM-Strang Exhibits 8 and 9 marked.)

13                         - - -

14           Q.    I'm going to hand you Exhibit 8

15    and 9.  Exhibit 8 is DDM92440.  And Exhibit 9 is

16    DDM91606.

17                 And I'm going to start with

18    Exhibit 8.

19                 MR. JOHNSON:  Okay.  Give us a

20           second here.

21           A.    Okay.

22           Q.    Are you ready?

23           A.    Mm-hmm.

24           Q.    Okay.  So Exhibit 8 is an e-mail
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   dated April 2, 2014.

 2              Do you see that?

 3        A.    Yes.

 4        Q.    And that's from you to Troy

 5   Devens.

 6              Do you see that?

 7        A.    Yes.

 8        Q.    Who is Troy Devens?

 9        A.    Must have been our sales rep at

10   that time.

11        Q.    From Ascend Laboratories.

12              Was that a wholesaler?

13        A.    No.

14        Q.    Who was that?

15        A.    A manufacturer.

16        Q.    Okay.  And it says, "Forward

17   control -- under subject, "Forward controlled

18   drug policy."

19              Do you see?

20        A.    Yes.

21        Q.    And then it looks like it was a

22   forward from an e-mail that Tom Nameth sent to

23   you, and the subject there was "Controlled drug

24   policy."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2          A.    Yes.

 3          Q.    Okay.  And I'll represent to you

 4    that Exhibit 9 is the attachment to that e-mail.

 5    So let's turn to Exhibit 9.

 6                    Do you recall forwarding this

 7    document?

 8          A.    I must have.  I do not remember.

 9          Q.    Okay.  So this document looks a

10    lot like Exhibit 7, which was that chain drug

11    controlled substance policy we looked at.  But

12    this one says, "Discount Drug Mart controlled

13    substances model policy."

14                    Do you see that?

15          A.    Yes.

16          Q.    Did you have any role in drafting

17    this?

18          A.    I did not.

19          Q.    Have you ever reviewed this

20    document?

21          A.    I didn't.

22          Q.    Have you ever provided any

23    training to anybody on this document?

24          A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Do you know whether DDM ever

 2    trained anybody at DDM regarding the policies --

 3              A.    Not that I --

 4              Q.    -- in this document?

 5              A.    Sorry.

 6              Q.    It's okay.

 7              A.    Not that I know of.

 8              Q.    Okay.  Do you know why Tom Nameth

 9    would have provided this to you to forward to

10    Tony?

11              A.    To Troy there.

12              Q.    Troy.  I'm sorry.

13              A.    That's okay.

14                    I do not remember other than maybe

15    they asked if we had something in place, and I

16    do not remember, especially reading through

17    this, no.

18              Q.    Okay.  Was this ever part of DDM's

19    suspicious order monitoring policies and

20    procedures?

21              A.    Not to my knowledge.

22              Q.    Okay.  And you were one of the

23    point people for that, right?

24              A.    Yes.
```

```
 1              Q.    Okay.  So if anybody would know

 2    about whether this was relative to suspicious

 3    order monitoring at DDM, you would know, right?

 4              A.    Yes.

 5              Q.    Let's go to page 3.  And look at

 6    the second paragraph, second sentence.

 7                    It says, "A corresponding

 8    responsibility rests with the pharmacist to

 9    ensure that controlled substance prescriptions

10    are issued for a legitimate medical purpose by

11    an individual practitioner in the usual course

12    of professional practice."

13                    Do you see that?

14              A.    Yes.

15              Q.    Do you know whether anyone at DDM

16    on the corporate level did anything to ensure

17    that the pharmacists at the stores were

18    complying with this responsibility?

19              A.    My answer is yes, but I don't know

20    what that would be, because that was not my job

21    title.

22              Q.    So you're just assuming that

23    somebody double checked them, but you don't know

24    for sure?
```

```
 1              A.    I don't know what policies we have

 2    in place for that.

 3              Q.    Okay.  And I only want to know

 4    what you know, so I don't want you to --

 5              A.    That's what I know.

 6              Q.    Okay.  I don't want you to guess.

 7              A.    I don't know -- yeah, I don't want

 8    to guess because I don't know, but I will say

 9    there has to be a policy in place.

10              Q.    Okay.  Under "Education and

11    training" down below, there's a sentence that

12    says, "All personnel who handle controlled

13    substances or responsible in some manner,

14    including field supervision, will receive

15    controlled substance education and training."

16                   Do you see that?

17              A.    Yes.

18              Q.    And my understanding from your

19    testimony today is the training you received was

20    just on-the-job training, correct?

21              A.    Correct.

22              Q.    Do you know whether any of your

23    pullers received formalized controlled substance

24    education and training?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.    On the job.

2              Q.    On the job.  And that was provided

3    by you?

4              A.    Yes.

5              Q.    Okay.  The next sentence says,

6    "Understanding legal obligations related to

7    controlled substances, awareness,

8    identification, proper handling, recognizing red

9    flags, and fair and empathetic treatment of all

10   of our customers are the responsibility of our

11   store team members and the corporate and field

12   staff that support our store teams."

13             Do you see that?

14             A.    Yes.

15             Q.    And so what was done at DDM to

16   ensure that all these individuals had an

17   understanding of legal obligations regarding

18   controlled substances and these other issues,

19   that you know of?

20             MR. JOHNSON:  I'm going to object.

21             Doesn't this paragraph relate to just

22             pharmacists?

23             MR. MULLIGAN:  So, Tim, if you

24             want to object to form, I mean, I'm okay
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          with that.

 2               MR. JOHNSON:  Okay.

 3               MR. MULLIGAN:  I don't -- I --

 4          we're sort of getting to a point now

 5          where you're suggesting answers to her,

 6          and I would rather that if you want to

 7          object to the form, that's fine.  She

 8          can answer it.

 9     A.    Can I say something?

10               MR. JOHNSON:  Well, no.  I mean --

11               MR. MULLIGAN:  Hold on.  Hold on.

12               MR. JOHNSON:  -- you read

13          everything -- you had her read

14          everything but the -- practically but

15          the first sentence that clearly says

16          that this relates, I believe, to

17          pharmacists.

18               MR. MULLIGAN:  Tim -- again, Tim,

19          I think it's only appropriate for you to

20          object to form, but if you -- the last

21          part of that sentence says, "The

22          respon -- or the responsibility of our

23          store team members and the corporate and

24          field staff that support our store
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            teams."

 2   BY MR. MULLIGAN:

 3            Q.    Would you agree that you and your

 4   pharmacy warehouse people fall under the

 5   corporate and field staff definition?  I mean,

 6   you work at the corporate headquarters, don't

 7   you?

 8            A.    Yes.

 9            Q.    Okay.  And you and your -- the

10   people that you supervise support your store

11   teams, correct?

12            A.    Correct.

13            Q.    Okay.  Do you know what, if

14   anything, was done at DDM or by DDM to ensure

15   that all these individuals had an understanding

16   of the legal obligations regarding controlled

17   substances and the other issues identified in

18   this sentence?

19            A.    Yes.

20            Q.    What?

21            A.    At corporate, again, we used all

22   the tools that we could, on-the-job training,

23   experience, knowing our stores, our customers.

24   I cannot say at store level, but at store level,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I know pharmacists, when we have pharmacist

 2    meetings, we did have people that came in and

 3    talked about the controlled substance, you know,

 4    policies and procedures to follow.  And then

 5    speakers that come in, training, as far as that

 6    went.

 7                But for us, it was the tools and

 8    the on-the-job training of ensuring that we were

 9    fulfilling the orders the way they should have

10    been.

11          Q.    So on-the-job training was the

12    bulk of it?

13          A.    Yes.

14          Q.    What -- can you remember a time

15    when there was any speaker that came to discuss

16    the Controlled Substances Act or DDM's

17    obligations under that act?

18          A.    I believe at the pharmacists'

19    meetings, yes, but not to corporate for the --

20    for my pharmacy warehouse.

21          Q.    And when you say you believe, it

22    sounds like you're guessing.

23          A.    I want -- yes, there was somebody

24    that has talked about all of this at the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   pharmacist meetings.

 2           Q.    Okay.  Do you recall when that

 3   was?

 4           A.    I do not.

 5           Q.    Do you know where it was?

 6           A.    We did have some speakers come to

 7   the corporate office and we do have off-site

 8   meetings twice a year.

 9           Q.    Okay.  And where are the off-site

10   meetings twice a year?

11           A.    They're at Weymouth Country Club.

12   Weymouth Country Club and those -- that's the

13   only -- there have been other locations but

14   that's the ones that I know of.

15           Q.    Are those just day-long meetings?

16   Do you play golf?

17           A.    No.

18           Q.    No golf?

19           A.    No.

20           Q.    That's too bad.

21                 Who goes to those?

22           A.    All of the pharmacists.  There are

23   some interns that go to those.  All of the

24   pharmacy supervisors, and all of the corporate
```

1    pharmacy.

2            Q.    Do you go?

3            A.    I do go.

4            Q.    Do your pullers go?

5            A.    No, they do not.  Mostly because

6    they have to stay and pull the orders.

7            Q.    Okay.  If you go to the next page,

8    page 4.  It's about a third of the way down.  It

9    says, "Corporate distribution center supervisors

10   and loss prevention employees who are involved

11   in controlled substance handling shall complete

12   a training program, electronic or otherwise,

13   that includes the following."

14           Do you see that?

15           A.    Yes.

16           Q.    Are you aware of any training

17   program, formalized training program, that is

18   given to these people regarding controlled

19   substance handling?

20           A.    From myself at the distribution

21   center, no.  But supervisors and loss prevention

22   and store level, I do not know.

23           Q.    Okay.  And it lists some things

24   that the training program needs to address, and

Highly Confidential - Subject to Further Confidentiality Review

1    the last one says, "Policies and procedures to

2    report potential issues with controlled

3    substances."

4              Do you see that?

5       A.    Yes.

6       Q.    Are you aware of any policies and

7    procedures regarding the reporting of potential

8    issues with controlled substances?

9       A.    No.

10      Q.    So obviously you forwarded this

11   document, but you don't necessarily know what it

12   was for and you don't think it's ever really

13   been used; is that fair?

14      A.    I don't know if it's been used,

15   but I do know that Tom sent it and I forwarded

16   it.  Whether it was upon their request or Tom

17   had talked to somebody and said, "Hey, do you

18   have their e-mail?  Could you just forward this

19   document?"

20              But I did not -- I don't remember

21   it.

22      Q.    And I think you said it was

23   forwarded to a wholesaler?

24      A.    No, no.  A manufacturer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    A manufacturer.  Did manufacturers

 2      require proof that you guys had written policies

 3      regarding controlled substances before they

 4      would provide them to your stores?

 5              A.    Say that again.  I'm sorry.

 6              Q.    Did -- would it be common for a

 7      distributor or a manufacturer to require that

 8      you provide proof of written policies and

 9      procedures regarding controlled substances

10      before they would supply them?

11              A.    It was not mandated, but they

12      could ask.

13              Q.    Okay.  Do you recall any other

14      instance where you would have provided some

15      written documentation to a distributor or

16      wholesaler or manufacturer to show that DDM

17      actually had policies and procedures regarding

18      controlled substances?

19              A.    I do not.

20              Q.    Okay.  Let's go to page 8.  At the

21      bottom it says, "Documenting steps to verify

22      controlled substance prescriptions."

23                    Do you see that?

24              A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    And it says, "An order purporting

2    to be a prescription that is not issued for

3    legitimate medical purpose is not a prescription

4    and the pharmacist knowingly filling such a

5    purported prescription shall be subject to

6    penalties for violations of the law."

7              Do you see that?

8         A.    Yes.

9              Q.    Is that your general understanding

10   as to how the Controlled Substances Act works?

11             MR. JOHNSON:  Objection.

12             Go ahead.

13        A.    I don't know if that's exactly

14   part of the act, but I would assume, yes.

15             Q.    Okay.  But you -- but that would

16   be something that you'd defer to a pharmacist

17   on?

18        A.    Yes.

19             Q.    Okay.  All right.  Let's go to

20   page 9.  And I'll just -- this document talks

21   about steps that must be taken to ensure the

22   validity of controlled substances, and the first

23   couple looks like they relate to pharmacists so

24   I want to skip that, but if you go to the
```

```
 1    "Additional Step" section at the bottom.

 2                   It says, "Any steps taken by the

 3    pharmacist to verify controlled substance

 4    prescriptions must be documented" -- that's

 5    underlined and bolded -- "on the prescription

 6    itself or in the pharmacy management system."

 7                   Do you have any knowledge of that?

 8         A.    No, because it's the

 9    prescriptions.

10         Q.    Okay.  So you don't have any

11    interaction or you don't ever look at

12    prescriptions or any type of justification or

13    documentation that's created regarding a

14    prescription?

15         A.    I do not.

16         Q.    Okay.  And you're never notified

17    if a pharmacist has identified a prescription

18    that they think might be suspicious?

19         A.    No, I'm not.

20         Q.    Do you know what happens when a

21    pharmacist refuses to fill a prescription?

22         A.    I do not.

23         Q.    And you're not involved in that

24    process?
```

1          A.    I am not.

2          Q.    If you go to page 11, this

3    discusses, "Additional prevention techniques to

4    avoid filling a fraudulent or forged

5    prescription."

6               And, again, I'll acknowledge that

7    this, I think, is directed more toward

8    pharmacists, but what I want to ask you is, at

9    the bottom it discusses red flags.  And if you

10   go to the next page, there's more of them.

11              I'm just wondering if you've ever

12   received any training on these red flags or how

13   to look for them or follow up on them.

14              Or would that be more of a

15   pharmacists --

16         A.    That is more of a pharmacist,

17   because if I look at all of these, I would not

18   have any interaction with stolen prescription

19   pads, impersonating prescribing authorities or

20   altered prescriptions -- it's nothing with the

21   distribution center.

22         Q.    Okay.  And you have no way to

23   identify whether a prescriber had written an

24   abnormally large or unusual quantity for a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    controlled substance, correct?

 2         A.    Correct.

 3         Q.    Because you just get an order that

 4    says, "I want six bottles of 100 pills"?

 5         A.    Yes.

 6         Q.    And you don't know where those are

 7    going?

 8         A.    No.

 9         Q.    Okay.  And none of the reports

10    that you have at the distribution center allow

11    you to identify that, correct?

12         A.    Say that again, please.

13         Q.    None of the reports that you

14    review in your role at the distribution center

15    identify -- would identify an unusually large

16    prescription to an individual patient, correct?

17         A.    A prescription to an individual

18    patient, no.

19         Q.    Okay.

20         A.    I have no idea, but the store

21    ordering six bottles, yes.

22         Q.    So the only flag that you'd ever

23    see would be, "This store ordered more than they

24    usually do"?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Correct.

 2              Q.     Okay.  When a store orders more

 3     than they usually do, do you save those records

 4     anywhere, or is there a file created for that?

 5              A.     There is not.  Once the order has

 6     been invoiced and changes have been made, that

 7     is the only record we have of what left the

 8     building for that particular store.

 9              Q.     Okay.  So a -- let's say a --

10     let's go back to our previous hypothetical where

11     store 1 orders one bottle per week of

12     hydrocodone, 100 tabs, and in week seven they

13     order two, right?  The pharmacist gets the

14     report of that and that's a six-week average

15     report, right?

16              A.     Correct.

17              Q.     Okay.  And the only way you'd know

18     about that is if either the pharmacist called

19     you to say, "Yeah, this is the right number," or

20     if your puller saw the asterisks and told you

21     about it, correct?

22              A.     Correct.

23              Q.     And then you would then call the

24     pharmacist to say, "Hey, did you mean to order
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    two, or did you only need one?"

 2            A.    Correct.

 3            Q.    Okay.

 4            A.    And, again, I'm basing that on

 5    when it leaves the building, his professional

 6    judgment and, again, the prescription, that he's

 7    doing his job -- his or her job.

 8            Q.    Or you assume that they're doing

 9    their job, right?

10            A.    Yes.

11            Q.    You can't do it for them?

12            A.    No.

13            Q.    Okay.  And so once you would have

14    that conversation with the pharmacist, and let's

15    say they said, "Oh, we only meant to order" --

16    strike that.

17                  Let's say they said, "Oh, actually

18    we do want two bottles," what would you then do?

19            A.    I would -- I still had previously

20    looked at their history.  If they usually

21    ordered one and it's two, I would ask them, you

22    know, "Is there reasoning behind this?"

23                  They would say, you know, "I have

24    a few more customers on this particular
```

Highly Confidential - Subject to Further Confidentiality Review

1    medication.  A doctor has been writing for it."

2    Whatever the reasoning is.  And I would trust

3    that, you know, they're not ordering 12, they're

4    ordering two, and I would go ahead and send that

5    and I would approve it.

6           Q.    Okay.  And what would then

7    happen -- would there be any documentation of

8    that interaction?

9           A.    No.

10                MR. JOHNSON:  Objection.

11                THE WITNESS:  I'm sorry.

12          A.    No.

13          Q.    Okay.

14          A.    Because the order would be filled

15   with the two.  So if there was anything that we

16   needed to go back in history on, that would be

17   part of their history, and it would be part of

18   their invoice.

19          Q.    Okay.  So really the buck stops

20   with the pharmacist's explanation or confirming

21   that the quantity is correct?

22          A.    If the quantity is within reason,

23   one or two, yes.  If it was an extreme amount,

24   which, again, is an order error, the eleven,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    make it a one, I'd reduce it.  It would be

 2    invoiced.  It's on record that they only got

 3    one.

 4          Q.    Do you ever recall an instance

 5    where there was an order flagged for a

 6    substantial increase that was then approved?

 7          A.    No.

 8          Q.    Okay.  If you go to page 19 at the

 9    bottom.  And I'll just represent that on -- you

10    can look at it -- page 18.  It says, "Three

11    corporate level components, corporate office

12    personnel responsibilities."  And then the next

13    page, at the bottom it says, "Suspicious order

14    monitoring."

15          Do you see that?

16          A.    Yes.

17          Q.    Have you ever seen this part of

18    this document before?

19          A.    No.

20          Q.    Okay.  And it says, "These

21    procedures detail the steps our company will

22    take to determine if store ordering is

23    suspicious and the actions our company will take

24    to identify and correct a store's ordering."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   Do you see that?

 2          A.    Yes.

 3          Q.    But you're not sure what we're

 4   about to read, are you, because you haven't seen

 5   this before, right?

 6          A.    No.

 7          Q.    Okay.  "The IS department" -- do

 8   you know what that is?

 9          A.    No.

10          Q.    Okay.  Sounds like it's probably

11   just a generic term, right?

12          A.    Yes.

13          Q.    That wouldn't be relevant to DDM?

14          A.    I have not heard of that.

15          Q.    You've never heard of an IS

16   department?

17          A.    No.

18          Q.    Okay.  "Has in place automated

19   systems that use the DEA approved formulas for

20   calculating the order quantity, which if

21   exceeded in one month, may be considered

22   excessive or suspicious and require company

23   action to determine the validity of the order

24   and the corrective action required."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2          A.    Mm-hmm, yes.

 3          Q.    I think you mentioned earlier that

 4   nobody at the DEA had -- to your knowledge, had

 5   ever approved the formulas that DDM was using to

 6   monitor suspicious orders, correct?

 7                    MR. JOHNSON:  Objection.

 8          A.    Say that again, please.  I

 9   didn't --

10          Q.    I think you said that no one at

11   the DEA had ever either disapproved or approved

12   of what you guys were doing to monitor for

13   suspicious orders, right?

14          A.    Correct.  When they would ask what

15   we were using to, you know, fulfill the orders

16   that we are, that's what we would show them, and

17   they never disagreed or agreed.  They knew we

18   had a tool in place.

19          Q.    Okay.  So to the extent that this

20   document purports to tell Troy that you used

21   DEA-approved formulas, you wouldn't have any --

22   that would not seem to be correct to you,

23   correct?

24          A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  That is not correct, right?

 2              A.    I didn't write --

 3              Q.    Okay.

 4              A.    -- the program, but I'm going to

 5      say --

 6                    MR. JOHNSON:  I'm going to object.

 7              I mean, there's nobody that said this is

 8              our policy, so ...

 9                    MR. MULLIGAN:  Well, I mean --

10                    MR. JOHNSON:  I know it says it on

11              the front of it.

12                    MR. MULLIGAN:  Again, I would

13              really appreciate if you could limit

14              your objections to form, but this is a

15              policy that she forwarded to a

16              wholesaler.  So I'm entitled to ask her

17              about it.

18                    MR. JOHNSON:  I'm just saying

19              there's, then, no witness that says this

20              is their policy.

21                    MR. MULLIGAN:  And that's a

22              speaking objection, and I'd appreciate

23              it if you'd just limit it to form.

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MULLIGAN:

 2        Q.   Do you remember reading that DEA

 3   document that said that a report that just

 4   identified an increase by a percentage from a

 5   prior month was not sufficient for monitoring

 6   suspicious orders?

 7        A.   The one that I just reviewed?

 8        Q.   The one that we looked at earlier

 9   today.  Do you remember that letter from the

10   DEA?

11        A.   Yes.

12        Q.   Okay.  And so it would actually

13   appear that the report that's being discussed

14   here wouldn't be sufficient to meet those

15   requirements as laid out in that letter,

16   correct?

17             MR. JOHNSON:  Objection.

18        A.   I will say both of these documents

19   I've never been involved with.

20        Q.   Okay.

21        A.   So the director of operations at

22   that time was handling all of this.

23        Q.   But you don't know whether this

24   document was ever a policy -- as far as you
```

Highly Confidential - Subject to Further Confidentiality Review

1  know, it wasn't a DDM policy or procedure ever?

2          A.   Shown to me, no.

3          Q.   Okay.  And I think as you

4  testified earlier, that if you were engaged

5  enough in DDM's suspicious order monitoring

6  policies, that if there was one, you'd know

7  about it, right?

8          A.   Correct.

9          Q.   Okay.  So is it possible that this

10  was just provided to the wholesaler to check a

11  box with them to say, "Hey, we've got something

12  in writing.  Here it is."

13              MR. JOHNSON:  Objection.

14              Go ahead and answer.

15          A.   The manufacturer.

16          Q.   Correct.

17          A.   Possibly, or they wanted to see --

18  because it -- it is policies written, I don't

19  know if the director of operations was going to

20  follow through and place it for all of us to

21  make it a true policy.

22          Q.   Okay.  But I think as you

23  testified earlier that as of even today, DDM

24  doesn't have any written suspicious order

Highly Confidential - Subject to Further Confidentiality Review

```
 1   monitoring policies or procedures, right?

 2           A.    Not that I was aware of, no.

 3           Q.    So as far as you know, this could

 4   have just been forwarded to the wholesaler to

 5   satisfy what they needed so you could get drugs

 6   for your stores?

 7           A.    I can't say that --

 8                 MR. JOHNSON:  Objection to that.

 9                 You can answer the question.

10           A.    I can't say that because I don't

11   remember why it was forwarded.

12           Q.    Okay.

13                 MR. MULLIGAN:  How do you feel

14           about lunch?  Do you want to do lunch

15           now?

16                 MR. JOHNSON:  Yeah, it's as good

17           as any.

18                 MR. MULLIGAN:  Okay.

19                 THE VIDEOGRAPHER:  The time is

20           12:09.  Going off the record.

21                        - - -

22           Thereupon, at 12:09 p.m. a lunch

23           recess was taken until 12:52 p.m.

24                        - - -
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                           Thursday Afternoon Session

                             January 3, 2019

 2                           12:52 p.m.

 3                                - - -

 4                   THE VIDEOGRAPHER:  The time is

 5         12:52.  Back on the record.

 6    BY MR. MULLIGAN:

 7         Q.    All right.  We're back after

 8    lunch.

 9                   Are you ready to go, Ms. Strang?

10         A.    Yes.

11         Q.    Okay.  Great.  Let's start with an

12    exhibit.  I'm going to have Ms. Roach hand you

13    what she's marking as Exhibit 10.

14                                - - -

15         (DDM-Strang Exhibit 10 marked.)

16                                - - -

17    BY MR. MULLIGAN:

18         Q.    And this is DDM12909.  And at the

19    top it says, "Rx operational procedure bulletin

20    Discount Drug Mart."  And the subject is

21    "Controlled substance quality assurance."

22                   Do you see that?

23         A.    Yes.

24         Q.    Have you ever seen this before?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    No.

2          Q.    So do you know whether this

3   relates to suspicious order monitoring?

4          A.    I do not, because it was sent to

5   all the pharmacists, technicians and interns,

6   and I do not believe I was given a copy of this.

7          Q.    Okay.  And so to the extent that

8   you're the process owner for suspicious order

9   monitoring, would you expect to have been

10  included in the drafting and distribution of

11  this policy?

12         A.    No.

13         Q.    And why is that?

14         A.    It was handled by either Tom or

15  Jason at the time.

16         Q.    So it would be fair to say that

17  your role in suspicious order monitoring is

18  limited solely to the distribution center?

19         A.    Yes.

20         Q.    So anything that has to do with

21  how pharmacists evaluate prescriptions and

22  monitor for diversion, you would not be involved

23  in that?

24         A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    And that would be something that

2      would be spearheaded by the pharmacy operations

3      group, which would be Jason and/or Tom?

4              A.    Yes.

5              Q.    And Pete?

6              A.    Yes.

7              Q.    If you look down right above where

8      it says "Policy."

9                    Do you see that paragraph?

10                   It says, "Recently the DEA has

11     made it clear that they are serious about

12     decreasing controlled substance abuse by making

13     tramadol a controlled drug, making hydrocodone

14     products Schedule II, and increasing audits on

15     pharmacies to ensure responsible dispensing."

16                   Do you see that?

17             A.    Yes.

18             Q.    Do you recall any discussions at

19     DDM around that time regarding the need to

20     strengthen DDM's suspicious order monitoring

21     policies and procedures?

22             A.    No.

23             Q.    Okay.  And, again, underneath

24     that, under "Policy," it says, "The policies to
```

Highly Confidential - Subject to Further Confidentiality Review

1    prevent drug abuse and diversion by providing

2    pharmacies with tools and procedures that

3    support legitimate patient care while minimizing

4    the potential for prescription drug abuse."

5              Do you see that?

6         A.    Yes.

7         Q.    And the warehouse had no role in

8    this policy, right?

9         A.    Our role was to do our job --

10        Q.    Okay.

11        A.    -- so they could do their job and

12   follow this.

13        Q.    And to the extent that a

14   pharmacist documented any red flags or anything

15   like that, that wouldn't be something that you

16   would be notified about or would be required to

17   review, correct?

18        A.    Correct.

19        Q.    Do you know who would be

20   responsible for that?

21        A.    I would say Jason Briscoe.  Also

22   the supervisor to the store.

23                    - - -

24        (DDM-Strang Exhibit 11 marked.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      - - -

 2            Q.    All right.  I'm going to hand you

 3    what has been marked as Exhibit 11.  This is DDM

 4    174768.  And we're going to look at the

 5    e-mail -- not the very bottom of the page but

 6    the one just above it.  It's from Jason to you.

 7                  Do you see that?

 8            A.    Yes.

 9            Q.    That's April 4, 2016, and Pete

10    Ratycz was copied.  And Jason says, "Jill, can

11    you forward me our SOMP" -- I suppose that's

12    suspicious order monitoring policy or procedure.

13    Does that abbreviation ring a bell to you?

14            A.    It doesn't.  But that's probably

15    what it does stand for.

16            Q.    Okay.  "Or point me to the area it

17    would be housed in the share drive.  I'll take a

18    look and determine what we are able to share

19    with your buddy Troy.  Thanks, Jason."

20            A.    Okay.

21            Q.    Do you recall this e-mail?

22            A.    I do not.

23            Q.    Okay.  And this is a different

24    Troy than the last one we were talking about,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right?

 2            A.    I believe so, yes.

 3            Q.    Okay.

 4                  MR. JOHNSON:  You can take a

 5            look -- a minute to look at it if you'd

 6            like.

 7                  THE WITNESS:  Okay.

 8            Q.    I'm just going to ask you a couple

 9    just pointed questions.  You're welcome to look

10    at it.

11                  MR. JOHNSON:  I just noticed Troy

12            Bruce.

13                  MR. MULLIGAN:  Yeah.  I think it

14            was Troy Devens maybe.  It was --

15            A.    That was from Ascend.  This Troy

16    is from another pharmacy that was in the PVA

17    group with me.

18            Q.    Okay.  So this is another pharmacy

19    asking you guys what your suspicious order

20    monitoring policies and procedures were?

21            A.    Yes.

22            Q.    Okay.  So they were kind of like a

23    peer store?

24            A.    I think, if I'm -- let me read
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   this.  They were setting up their own

 2   warehousing and distribution and they wanted

 3   some guidance on what we had or what we might be

 4   following to write their own policy.

 5           Q.   Okay.  And so then he e-mailed

 6   Jason and asked what DDM's policies were, right?

 7   And then Jason e-mailed you and said, "Can you

 8   forward me the DDM SMOP or show me where it

 9   would be on the share drive," right?

10           A.   Yes.

11           Q.   Okay.  And then you wrote back and

12   said, "I don't even know if we have anything in

13   writing?"

14                Do you see that?

15           A.   Yes.

16           Q.   And it sounds like you know now,

17   based on your testimony earlier today, that

18   there isn't anything in writing, correct?

19           A.   No.  And I'd also like to say

20   that's why I never reviewed the controlled

21   substances model policy.  That's why I said I

22   don't think there's anything in writing.

23                If Tom had that and I did forward

24   it to somebody, I didn't adapt that as a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   warehouse policy.  I read it more as a

 2   pharmacist and a director of operations policy

 3   with our pharmacists.

 4          Q.    Are you referring to another

 5   document now?

 6          A.    No.

 7          Q.    Are you referring to a document we

 8   looked at earlier?

 9          A.    Exhibit --

10                MR. JOHNSON:  Exhibit 9?

11          A.    This one (indicating).  9.

12          Q.    Yeah.  Did you have a conversation

13   with anybody at lunchtime that would have

14   refreshed your recollection about that policy?

15          A.    No.

16          Q.    Are you changing any of your

17   answers about that policy?

18          A.    No.

19                MR. JOHNSON:  Exhibit 9 you're

20                referring to?

21                MR. MULLIGAN:  Well, I mean, she

22                just brought up another document that we

23                weren't even looking at, so I'm just

24                trying to understand --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     I'm sorry.  That was the document

 2    that I was referring to.

 3              Q.     Okay.

 4              A.     The Exhibit Number 9.

 5              Q.     All right.  So going back to 11,

 6    my question was, you wrote, "I don't even know

 7    if we have anything in writing?"

 8                     Correct?

 9              A.     Yes.

10              Q.     And you've also testified today

11    that you did not then, nor do you now, have

12    anything in writing, correct?

13              A.     Correct.

14              Q.     Okay.  And then it says, "For some

15    reason, I thought it was a report

16    Keith/computers designed and it just printed out

17    suspicious orders over a certain quantity like

18    Cardinal's report."

19                     Do you see that?

20              A.     Yes.

21              Q.     Does that accurately describe the

22    scope of DDM's suspicious order monitoring

23    policies?

24              A.     I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  So it looks like as of

 2    April 2016 you didn't know what DDM's suspicious

 3    order monitoring policies were, based on this

 4    e-mail, correct?

 5              A.    Based on this e-mail, no.

 6              Q.    Okay.  And what I just asked you

 7    now if this description -- it looks like you

 8    were guessing -- if that was accurate as to what

 9    DDM's policies are now, you said you didn't

10    know, right?

11              A.    Correct.

12              Q.    So then Jason responds to you and

13    says, "Has DEA ever asked us to produce a

14    policy?  I'll check with P.J."

15              Do you know, did the DEA ever ask

16    DDM to produce a policy?

17              A.    No.

18              Q.    Okay.

19              A.    Not that I know of.

20              Q.    And you wrote, "Check with P.J.,

21    but I don't think they ever wanted anything in

22    writing."

23              Do you see that?

24              A.    Right.  Meaning they suggested to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    show us something in writing, not that they --

 2    that they didn't want us to have something in

 3    writing.

 4          Q.    Okay.

 5          A.    Yeah, just the policy itself.

 6          Q.    So based on that document and the

 7    testimony you just gave me, it sounds like you

 8    don't actually know what the nature and extent

 9    of DDM's SOM policies are, correct?

10          A.    Correct.

11          Q.    All right.  Let's go to

12    Exhibit 12, which is DDM74952.

13                        - - -

14          (DDM-Strang Exhibit 12 marked.)

15                        - - -

16          Q.    There's two pages here, but the

17    second page is just a bunch of gibberish so

18    we're going to look at the bottom of the first

19    page.

20                This is an e-mail from Pete Ratycz

21    on January 20, 2017 that was ultimately

22    forwarded to you, but I want to look at this

23    e-mail.

24                It says, "Chris, I think we need
```

Highly Confidential - Subject to Further Confidentiality Review

1    to reemphasize our controlled substance program

2    at the upcoming pharmacist meeting.  Also, we

3    need to look at developing reporting to help us

4    effectively identify outliers and/or suspicious

5    store ordering."

6              Do you see that?

7         A.    Yes.

8         Q.    And, again, this is dated

9    January 20, 2017, correct?

10        A.    Yes.

11        Q.    So that was just about two years

12   ago.  So this would suggest that as of January

13   of 2017, DDM did not have reporting to help it

14   effectively identify outliers and/or suspicious

15   store ordering, correct?

16             MR. JOHNSON:  Objection.

17        A.    I would say that to develop it

18   more than what we were currently using.

19        Q.    Well, you're reading the word

20   "more" in there, aren't you?  That word doesn't

21   appear there, does it?

22        A.    No.

23        Q.    Okay.  So it just says, "We need

24   to look at developing," which doesn't even say

```
 1    "We need to develop," it says "we need to

 2    consider developing" --

 3           A.    Okay.

 4           Q.    -- "reporting to help us

 5    effectively identify outliers and/or suspicious

 6    store ordering," correct?

 7               MR. JOHNSON:  Objection.

 8           Q.    Does DDM have reporting now that

 9    helps it effectively identify outliers and/or

10    suspicious store ordering, that you know of?

11           A.    Other than what I've used myself,

12    I do not know.

13           Q.    Okay.  Do you know why this was

14    forwarded to you?

15           A.    I do not.

16           Q.    Did you do anything with this

17    e-mail?

18           A.    I did not.

19           Q.    Did you assist in looking at

20    developing reporting that we were discussing

21    earlier?

22           A.    No.  I think we -- somebody would

23    have been letting me know that he was going to

24    be doing audits for those stores.  That's all.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    And the subject of this e-mail is,

2    "DEA fines Costco 11.75 million over laxed U.S.

3    pharmacies controls."

4              Do you see that?

5         A.    Yes, I do.

6         Q.    Did you know about that at all?

7         A.    No.

8         Q.    Are you aware that other

9    distributors and pharmacies have been fined by

10   the DEA for not having strong enough suspicious

11   order monitoring policies and procedures?

12        A.    Yes, but I don't know specifics.

13   But yes, I do know of that.

14        Q.    We're going to look at Exhibit 13

15   now, which is DDM467.

16                   - - -

17        (DDM-Strang Exhibit 13 marked.)

18                   - - -

19        MS. HARRIS:  Excuse me.  This is

20        Shubha Harris on behalf of Walmart.  I'm

21        having a hard time hearing the witness.

22        If you could place the speaker, perhaps,

23        closer to her.

24        MR. MULLIGAN:  She moved the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          microphone up.  Hopefully that will
2          work.
3                  MS. HARRIS:  Thank you.
4                  THE VIDEOGRAPHER:  She's hearing
5          it from the phone.
6                  MR. MULLIGAN:  Oh.  I gotcha.
7                  MR. JOHNSON:  You can't get it
8          much closer --
9                  THE WITNESS:  I'll speak up.
10                 MR. JOHNSON:  -- without
11         rearranging a lot of stuff.
12                 THE WITNESS:  I'll speak up.
13                 MR. JOHNSON:  Yeah, you do need to
14         do that because there's people down
15         there, too, so ...
16                 THE WITNESS:  Okay.
17                 MR. MULLIGAN:  All right.  We'll
18         do our best.
19                 MS. HARRIS:  If you can move it a
20         little closer, it would be fine.  Thank
21         you.
22                 MR. MULLIGAN:  Yeah.  We hear you.
23         We're sort of limited in our options,
24         but we'll work on it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I assume you can hear me, right?

 2                    MS. HARRIS:  Yes.  I can hear you

 3           really well.

 4    BY MR. MULLIGAN:

 5           Q.    Okay.  So we're on Exhibit 13.

 6    Have you seen this document before?

 7           A.    Yes.

 8           Q.    Is this one that you reviewed in

 9    preparation for your deposition today?

10           A.    Yes.

11           Q.    Okay.  And this is a -- looks like

12    a policy document?

13           A.    Yes.

14           Q.    Regarding inventory controls?

15           A.    Yes.

16           Q.    And did you draft this?

17           A.    I did.

18           Q.    And my understanding is you

19    drafted this as part of the VAWD application?

20           A.    Yes.

21           Q.    Or accreditation?

22           A.    Yes.

23           Q.    Okay.  And it says, "Date adopted

24    12/1 of '16," correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Yes.

2            Q.    And the date updated was 3/1 of

3    '17, correct?

4            A.    Correct.

5            Q.    So it looks like you drafted the

6    policy, adopted it, and then it was then updated

7    at a later date?

8            A.    Correct.

9            Q.    And this would reflect the updated

10   version?

11           A.    Yes.

12           Q.    Do you know what was updated

13   between the date it was adopted and the date it

14   was updated?

15           A.    I started all the documents and

16   then when I knew that I had to have them

17   finalized, 3/1/17 was the adopted date.

18           Q.    Okay.  So ...

19           A.    I worked on this for months.

20           Q.    Okay.

21           A.    All of the policies.

22           Q.    So you spent months drafting this

23   stuff?

24           A.    All of the policies, yes, not just
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this one page.
 2          Q.    Okay.  And so the purpose of this
 3    policy was "Processes to identify any inventory
 4    concerns, cycle counts, losses or theft,"
 5    correct?
 6          A.    Correct.
 7          Q.    So this document describes what
 8    DDM's process was to identify things that could
 9    be indicia of suspicious orders, right?
10          A.    Correct.
11          Q.    Okay.  So it says, "Discount Drug
12    Mart only distributes to their own stores.  We
13    do not sell any items outside of our own
14    company, so there is no policy in place for
15    ordering patterns or payment amounts that would
16    identify potential diversion or criminal
17    activity."
18                Do you see that?
19          A.    Yes.
20          Q.    Okay.  And you have an explanation
21    for me about what that means.  And my
22    understanding is your testimony is that this is
23    not correct; is that right?
24          A.    No.  My explanation to this is, I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was following a template from VAWD, and in the

 2    template it mentioned payment terms, payment

 3    amounts, identifying potential diversion or

 4    criminal activity.  So when I read that, I wrote

 5    that we do not sell outside of our own stores.

 6              And the way I interpreted it was,

 7    if I was selling to an outside source and I sold

 8    them $10,000 payment, they would pay for that,

 9    and the next month they bought $50,000 of the

10    exact same item, that would be the red flag of,

11    "Wait a minute.  Something is wrong here."

12              I do not receive any payments from

13    our stores, and everything that we had -- and

14    then -- so then that's why I wrote the next

15    sentence, "We do have a six-week ordering on

16    hand balance in place for our stores."

17              I interpreted that the first two

18    sentences for outside of Discount Drug Mart, and

19    we do not sell outside of Discount Drug Mart.

20    So I do not have a policy and I did not write

21    one.  I probably could have put, "If we were to

22    sell outside of Discount Drug Mart," but I did

23    not write that because we don't sell outside of

24    Discount Drug Mart.  So I did not spend time to
```

1    clarify that.

2         Q.    And that language that you added

3    is exactly the same language that Mr. Ratycz

4    testified should have been there, and that's

5    based on a discussion the two of you had

6    together?

7         A.    Yes.

8         Q.    Okay.  But you would agree that

9    there is -- there is no policy in place at DDM

10   that identifies potential diversion or criminal

11   activity, correct?

12              MR. JOHNSON:  Objection.

13        A.    We use our reports the best that

14   we can and our experience and the store's

15   history and the professional judgment of the

16   pharmacists to make sure that everything leaving

17   the distribution center is legal and it's used

18   in the intent that it's for.

19        Q.    I understand what may or may not

20   happen, and that's what you've testified to.

21   I'm asking you if there's a policy in place that

22   is meant or designed to identify possible

23   diversion or criminal activity.

24              MR. JOHNSON:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1                    Go ahead.

2          A.    The tools that we use are what we

3    have in place and our experience and on-hand

4    training, and anything that we see as an order

5    error is brought to the pharmacist's attention.

6    And for me, I don't consider those potential

7    diversion or criminal activity if I'm not

8    distributing it to them.

9          Q.    What do you mean by that?

10         A.    That if I'm questioning what is

11   going to leave the distribution center, that

12   it's justified -- justified, and I'm using the

13   tools that we are given, plus my experience,

14   plus the history, anything in place that would

15   stop that from going to our stores as potential

16   diversion or criminal activity.

17         Q.    Would you agree that at the

18   distribution center, the way that your role is

19   set up now, you don't have the tools to identify

20   whether there's diversion taking place at your

21   level?

22              MR. JOHNSON:  Objection.

23         A.    At my level, I'm doing the best I

24   can to justify what the orders are and what they

```
 1   need.  I do not know after it leaves the

 2   facility, that's at the store level, and I do

 3   not know.

 4          Q.    But the information you interact

 5   with on a daily basis, you don't personally have

 6   the tools to identify whether diversion is

 7   occurring, correct?

 8               MR. JOHNSON:  Objection.

 9          A.    If you mean reporting, the

10   reports, no.

11          Q.    I just mean in general.  I mean,

12   is there anything that you do on a daily basis

13   that would help you identify suspicious orders

14   or that diversion is occurring?

15               MR. JOHNSON:  Objection.

16          A.    No.

17                     - - -

18          (DDM-Strang Exhibit 14 marked.)

19                     - - -

20          Q.    Okay.  We're going to hand you

21   Exhibit 14, which is DDM3560.  We're going to

22   start on the second page about halfway down.

23   This is an e-mail from John Redmond to you on

24   May 20, 2017.
```

1              Do you see that?

2        A.   Yes.

3        Q.   Who is that, John Redmond?  It

4   looks like his e-mail is @mac.com.

5        A.   I am thinking that this is a

6   representative from McKesson that came to talk

7   to us because -- I don't see that.  I don't

8   know.  I don't know.  I don't remember.

9        Q.   So earlier we talked about how DDM

10  started using Cardinal to get controlled

11  substances because of the Schedule II issue,

12  right?

13       A.   Mm-hmm.  I'm sorry.  I wanted to

14  read through this so I could answer.

15       Q.   Yeah.

16            MR. JOHNSON:  Do you want to take

17       a minute to look at it?

18       Q.   Go ahead.

19       A.   Yeah, please just so I can ...

20  Oh, okay.  Okay.

21       Q.   Okay.  Are you ready?

22       A.   After reading it, yes.

23       Q.   Okay.  All right.  So earlier we

24  talked about how DDM started using Cardinal to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    get controlled substances because of the

 2    Schedule II issue, right?

 3            A.    Yes.

 4            Q.    Do you remember that?

 5            A.    Yes.

 6            Q.    Okay.  And you told me that you

 7    used Cardinal and then at one point it was

 8    switched to McKesson, right?

 9            A.    Yes.  We did switch a year ago,

10    October '17, to McKesson.

11            Q.    It was a year ago in October 2017?

12            A.    October '17 is when we started.

13            Q.    So this e-mail is in May of 2017.

14    Would that suggest that this is sort of

15    preliminary stages of that switch?

16            A.    No.  This is the VAWD surveyor,

17    now that I read through the e-mail.

18            Q.    Okay.

19            A.    And I apologize because I didn't

20    remember his name.

21            Q.    Yeah, no worries.

22                  Okay.  So it says, "Hi, Jill.  Can

23    we set up a time next week so you can walk me

24    through a couple of these reports?"
```

1        Do you know what reports he's

2   referring to?

3        A.    The only thing I can think of is

4   the ones that we have talked about, the six-week

5   average and an example of the 12-month rolling

6   controlled substance monitoring report.

7        Q.    And that's something you would

8   have had to have gotten from Jason or Pete?

9        A.    Yes.

10        Q.    Okay.  And so then it says --

11   okay.  So this -- he's asking for a time to talk

12   to you about those reports, which I presume you

13   supplied to him, correct?

14        A.    Yes.

15        Q.    Okay.  And I'm guessing -- and

16   tell me if I'm wrong -- you would have supplied

17   those reports to them as sort of an example of

18   what DDM's SOMP policies were, right?

19        A.    Yes.

20        Q.    Okay.  And that would be in

21   support of your VAWD accreditation?

22        A.    Right.

23        Q.    And so then he writes back, "I

24   don't see what is suspicious and/or how it is

1   followed up on if the ordering is out of the

2   norm."

3            Do you see that?

4       A.   Yes.

5       Q.   Okay.  Do you know what he's

6   talking about there?

7       A.   I'm assuming he looked at the

8   reports and it didn't mean anything to him

9   because the reports might have a couple items on

10  there.  And then Jason's -- I mean, unless you

11  don't know what the report is for, you're not

12  going to be able to use it.

13      Q.   Is this an e-mail that you looked

14  at in preparation for your deposition today?

15      A.   No, I didn't, because I would

16  have --

17           MR. JOHNSON:  Slow down.

18      A.   I'm sorry.

19           No.

20      Q.   Okay.  But he's expressing to you

21  that he can't figure out what -- how these

22  reports identify any suspicious order, correct?

23      A.   According to this e-mail, yes.

24      Q.   Okay.  And then you wrote back and

Highly Confidential - Subject to Further Confidentiality Review

1   said -- you forwarded it to Jason, actually, and

2   said, "Jason this is the VAWD surveyor and the

3   suspicious reports we sent to him."

4           Correct?

5       A.  Correct.

6       Q.  Okay.  And then he wants to know

7   what other reports you provided, right?

8       A.  Yes.

9       Q.  And then you wrote back and said,

10  "Just your suspicious report in electronic

11  form."

12          Do you see that?

13      A.  Yes.

14      Q.  Okay.  So I'm assuming that you

15  just provided the one-month -- the monthly

16  report because that's really the only one that

17  relates to suspicious order monitoring?

18      A.  Yes.

19      Q.  Okay.  And then he writes back and

20  says, "What about the greater than six-week

21  average report?"

22          Do you see that?

23      A.  Yes.

24      Q.  That's your report, right, that

Highly Confidential - Subject to Further Confidentiality Review

1    we've talked about today?

2           A.    Yes, yes.

3           Q.    And then you wrote, "He didn't ask

4    for that one.  I just told him about it and he

5    was fine with it."

6           A.    And I must have explained that one

7    to him and showed him a copy of it.

8           Q.    Okay.

9           A.    And then knowing that Jason

10   probably wasn't there when he was at the

11   warehouse, and he said, "Well, you can just send

12   it to me electronically."  But I did notice on

13   the e-mail he sent it on a Saturday.  So I think

14   he --

15          Q.    So did Mr. Redmond or anybody else

16   that was involved in the VAWD accreditation

17   have -- were they provided with an explanation

18   as to how those reports were used to identify

19   suspicious orders?

20          A.    Jason, I believe, did talk to him

21   about that.

22          Q.    But you weren't involved in that?

23          A.    I was not involved in that because

24   I don't use the report.

```
 1                    MR. JOHNSON:  Sunshine.

 2                    MR. MULLIGAN:  Yeah.

 3                         - - -

 4           (DDM-Strang Exhibit 15 marked.)

 5                         - - -

 6   BY MR. MULLIGAN:

 7           Q.    All right.  I'm going to hand you

 8   Exhibit 15, which is DDM178756.  I'll represent

 9   that you're not on this e-mail.  I just wanted

10   to show you something.

11           A.    Okay.

12           Q.    This is an e-mail from Rob Stuyck

13   to Tom McConnell, who was in the room earlier,

14   and it says, "Insights from recent Cardinal,

15   McKesson, and ABC investor presentations."

16                 Do you see that?

17           A.    Yes.

18           Q.    Have you ever seen this e-mail

19   before?

20           A.    No.

21           Q.    All right.  If you go to the third

22   page, about halfway down it says "Opioids."  And

23   this is from one of these presentations.  And it

24   says, "Over the last couple years we have
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    reported hundreds of thousands of suspicious

2    orders and customers."

3                 Do you see that?

4         A.    Yes.

5         Q.    Are you aware that other entities

6    in the supply chain had reported hundreds of

7    thousands of suspicious orders under the

8    Controlled Substances Act?

9         A.    No.

10        Q.    Okay.  Does that cause you concern

11   about the fact that DDM has never reported a

12   single one?

13        A.    No.

14              MR. JOHNSON:  Objection.

15        Q.    And why is that?

16        A.    Because I think we've taken all

17   measures to make sure that that doesn't happen.

18        Q.    So is it your testimony today that

19   there's nothing more DDM could have done to

20   identify possible suspicious orders?

21              MR. JOHNSON:  Objection.

22        A.    I think we did -- we used the

23   tools that we have to question an order error

24   when and if it was on a report or when it was on
```

Highly Confidential - Subject to Further Confidentiality Review

1  the pick ticket when it was asterisked.  I think

2  that we did a very good job of not letting it

3  leave the distribution center.

4          Q.    And I'm not disputing whether you

5  did a good job of catching order errors.  What

6  I'm asking is, do you think DDM did everything

7  it could have possibly done to identify

8  suspicious orders that would be indicia that

9  diversion was taking place within its business?

10              MR. JOHNSON:  Objection.

11         A.    I think we did everything we could

12  at the distribution level, yes.

13         Q.    Do you think DDM in general did

14  everything that they could have done to identify

15  and report suspicious orders?

16              MR. JOHNSON:  Objection.

17         A.    At the distribution center, yes.

18  Outside of that, I do not know.

19         Q.    And even though you were the

20  keeper of the suspicious order monitoring

21  policies and procedures, you don't know whether

22  more could have been done outside of the narrow

23  scope of the distribution center?

24              MR. JOHNSON:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Correct?

 2                 MR. JOHNSON:  Objection.

 3          A.     Although there was nothing in

 4   writing, I still believe we did everything we

 5   could.

 6          Q.     Did DDM possess information that

 7   it could have analyzed to help it identify

 8   suspicious orders that it did not use?

 9                 MR. JOHNSON:  Objection.

10          A.     I don't know.

11          Q.     Okay.  Well, you don't know what

12   information Pete and Jason looked at, right?

13          A.     I don't know.

14          Q.     Okay.  So how can you take a

15   position on whether DDM did everything it could

16   have done to identify suspicious orders if you

17   don't know what information they considered?

18                 MR. JOHNSON:  Objection.

19          A.     Because I don't know what other

20   information is available to make an educated

21   judgment on how to move forward with the orders.

22   We used what we had, and the trust of the

23   pharmacists doing their professional judgment,

24   and I know you're not questioning that, but
```

1    that's how I -- we've looked at it over this

2    time.

3            Q.    So the crux of the suspicious

4    order monitoring policy is, "We trust the

5    pharmacist to make a good judgment"?

6            A.    I do.

7            Q.    Okay.  But that's really -- that's

8    really what the DDM suspicious order monitoring

9    policies and procedures rise and fall on, right?

10                MR. JOHNSON:  Objection.

11            A.    There has to be a level of trust.

12    There has to be a level of we -- I'm shipping

13    only to our stores.  Once it leaves the

14    facility, I'm trusting that they are doing their

15    job to make sure that there is no suspicious

16    orders, prescriptions, any of the red flags.

17                My job is at the distribution

18    center, and I've used everything I can, as of

19    today, to make sure that those orders do not go

20    out.

21            Q.    What orders are you talking about?

22            A.    Any order errors.

23            Q.    Right.  So order errors; but we're

24    not talking about order errors, we're talking

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about suspicious orders, right?  And you don't

 2    have the tools to identify a suspicious order,

 3    right?

 4              MR. JOHNSON:  Objection.

 5         Q.   I mean, you've already testified

 6    to that.  I'm just trying to clarify.

 7              MR. JOHNSON:  Objection.

 8              MR. MULLIGAN:  What's the basis of

 9         your objection?

10              MR. JOHNSON:  She hasn't testified

11         to that.

12              MR. MULLIGAN:  She has testified

13         to that.

14              MR. JOHNSON:  Well, the transcript

15         will bear it out.

16              MR. MULLIGAN:  Okay.

17         A.   I did not consider them -- I

18    consider them order errors.

19         Q.   Okay.  You considered anything

20    that looked abnormal to be an order error,

21    correct?

22         A.   Correct.

23         Q.   Okay.  You never considered

24    whether they could be suspicious orders or part
```

```
 1    of a diversionary scheme, correct?

 2            A.    Not when the orders were, again, a

 3    quantity of one and they're ordering two or a

 4    quantity of two and they're ordering three.

 5            Q.    Well, that's just an example,

 6    though.

 7            A.    It is an example.

 8            Q.    Did you ever identify any order

 9    from any store that you treated as potentially

10    suspicious?

11            A.    No.

12                        - - -

13            (DDM-Strang Exhibit 16 marked.)

14                        - - -

15            Q.    All right.  Let's look at

16    Exhibit 16, which is DDM453459.  This is an

17    e-mail dated February 2018, so less than a year

18    ago, from Joe Muha to Pete Ratycz, Keith Miller,

19    Jason Briscoe, and yourself.

20                  Do you see that?

21            A.    Yes.

22            Q.    And the subject is, "SOM is

23    becoming a bigger deal."

24                  Do you see that?
```

```
 1            A.    Yes.

 2            Q.    Was suspicious order monitoring a

 3    big deal before February 2018?

 4            A.    Yes.

 5            Q.    And why was it a big deal?

 6            A.    Because it is.  Because it is --

 7    it was a big deal.  It is a big deal, and we

 8    take it seriously.  But any orders that I've

 9    seen have not been suspicious.

10            Q.    That's not what I asked you.  I

11    asked you -- you said that suspicious order

12    monitoring is a big deal, right?

13            A.    Yes.

14            Q.    Okay.  And I asked you why is it a

15    big deal?

16            A.    Because we need to do our job to

17    make sure that anything that we're distributing

18    from our distribution center is not adding to

19    that problem.

20            Q.    Okay.  And this e-mail suggests

21    that it's becoming -- it has become a bigger

22    deal in around the 2018 time frame, right?

23                  Do you agree with that?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           Q.    Do you think that that means that

2     it's -- well, how did you perceive that subject?

3     What did you perceive that to mean?

4           A.    I perceived that it is becoming a

5     bigger deal, but I'm still doing everything we

6     can the exact same that I was doing last week

7     and two months ago.  It's just as serious today

8     as it was two years ago, three years ago, ten

9     years ago.

10          Q.    And so you're doing the same thing

11    you were doing ten years ago?

12          A.    Yes.

13          Q.    And despite the fact that we saw

14    an e-mail where Mr. Ratycz said that you guys

15    needed to develop further reporting to

16    effectively identify suspicious orders, you guys

17    are doing the same thing as you were ten years

18    ago, right?

19                MR. JOHNSON:  Objection.

20          A.    We are at the distribution center.

21          Q.    Okay.

22          A.    If he wants to tighten up or make

23    a policy for something else or develop maybe a

24    stronger policy for us.  Today, that's what
```

Highly Confidential - Subject to Further Confidentiality Review

1    we're doing.

2         Q.    Do you know whether anything has

3    been done to draw up more effective controls to

4    identify suspicious orders, like he mentioned

5    that was needed in that e-mail?

6         A.    I don't know.

7              MR. JOHNSON:  Objection.

8              THE WITNESS:  I'm sorry.

9              MR. JOHNSON:  Go ahead.

10        A.    I don't know because that could

11   deal with store level and pharmacists.  And,

12   again, distribution center.

13        Q.    Okay.  So I know you've been

14   distinguishing between the store and corporate

15   and then distribution.  But at the beginning of

16   the deposition today, you told me that you were

17   the one responsible for DDM's suspicious order

18   monitoring policies and procedures, correct?

19             MR. JOHNSON:  Objection.

20        A.    I am, but nobody told me to have

21   it in writing.  I'm in charge of making sure

22   that the orders go out with history and making

23   sure that they're all --

24        Q.    Okay.  So when you say you're

```
 1   responsible --

 2           A.    -- input properly.

 3           Q.    -- for DDM suspicious order

 4   monitoring policies and procedures, you mean

 5   within the silo of the distribution center,

 6   correct?

 7           A.    Yes.

 8           Q.    You don't have any responsibility

 9   for what the pharmacy operations people do and

10   what the pharmacists do, correct?

11           A.    I think there is -- I think we're

12   all responsible for each part of our job.  They

13   do overlap a little bit, but, again, when the

14   orders come in, that's my job.  When they're

15   filled, that's my job.  And when they leave,

16   that's my job.

17           Q.    Okay.

18           A.    And the invoicing is my job.

19   After that, that's up to the pharmacy

20   operations.  And before that, obviously these

21   reports were created to help us.

22           Q.    Okay.  And I just want to -- I'm

23   just looking for clarification.

24           A.    Yeah.
```

```
 1              Q.    I haven't heard anything today

 2    where you said, "This is what I do to help

 3    identify suspicious orders."  It seems to me

 4    like your role is to make sure that what's

 5    ordered was ordered right and that it's

 6    fulfilled, but it doesn't seem like there's any

 7    part of your job that goes beyond that into the

 8    realm of, "Is this suspicious or not?"

 9              Is that fair?

10              MR. JOHNSON:  Objection.

11         A.    No.  Because I think suspicious --

12    it depends on, again, the quantity and what the

13    orders are coming through as.  Am I contacting

14    the same stores all the time?  Am I talking to

15    the same pharmacists all the time?  There's two

16    pharmacists at every store, so it's nice to

17    verify that sometimes.  The history.  All the

18    history.

19         Q.    But you're just looking at that to

20    see whether they made a typo, right?

21              MR. JOHNSON:  Objection.

22         A.    Correct.  But I would assume that

23    I could also tell, if that was an order error,

24    I'm cutting it off at the pass before they even
```

1    get the product.

2           Q.    Right.  But that may not have

3    anything to do with diversion, right?

4           A.    Maybe not, but maybe.

5           Q.    Okay.  I just -- I'm just trying

6    to understand because I -- you said you're

7    responsible for suspicious order monitoring

8    policies and procedures in the beginning, which

9    was broad, and then now it's just within the

10   silo of distribution.  But I -- you haven't told

11   me anything that would suggest that you actually

12   do anything to identify suspicious orders other

13   than to identify typos in orders; is that fair?

14                MR. JOHNSON:  Objection.

15          A.    No.  I think that my job is, if

16   there is something that shows up on a report and

17   someone wants it to be cut, that's part of my

18   job.  If one of my pullers that have had

19   experience for years doing this and they see an

20   asterisk on an order or they brought something

21   to my attention, that was my job.

22                Did I ever think that that was

23   suspicious?  No.  Once I investigated it,

24   history, talked to the pharmacist, I mean, did

Highly Confidential - Subject to Further Confidentiality Review

```
 1   my due diligence, I would never say that there

 2   was ever a suspicious order.  It was always, "We

 3   ordered six of these ointments and we only want

 4   two."

 5                   "I ordered three bottles of this

 6   of 30.  We only need one."  There was never

 7   anything that was a red flag of multiple weeks,

 8   multiple huge quantities, multiple controls.

 9                   It's very rare that we have a

10   control that someone's like, "Oh, no, no, we

11   only wanted one."  It's more along the lines of

12   everything else.  So I watch those orders.  I'm

13   told about those orders, and I feel like I am

14   doing our due diligence at the distribution

15   center.

16        Q.    To make sure that the pharmacies

17   get what they ordered, right?  To make sure that

18   what you send them is what they actually need?

19        A.    What they actually need.

20        Q.    Okay.  It's not your job to

21   second-guess what the pharmacy is ordering?

22        A.    It's my job to trust who I work

23   with, that every day when I talk to all these

24   people -- and they call more often than just
```

Highly Confidential - Subject to Further Confidentiality Review

1    once a year -- that I'm going to trust their

2    judgment, yes.

3           Q.    Okay.  So you don't second-guess

4    what pharmacies are ordering, you just verify

5    that what they ordered is what they need?

6           A.    I do verify.

7           Q.    Is that a "yes"?

8           A.    Yes.

9           Q.    Okay.  I'm going to hand you

10   Exhibit -- well, actually, hold on.  Let me ask

11   a couple questions.

12               Did you ever exchange documents

13   with the pharmacists at stores regarding, let's

14   say, an order that was higher than normal?

15          A.    No.

16          Q.    Okay.

17          A.    I'm sorry.  What kind of document?

18          Q.    Well, any document.  Did you --

19          A.    They would send me their six-week

20   average, over average, and would -- there's

21   mark -- you know, they would mark it down.

22   That's the only thing that I've ever had on

23   paper that they would send to me.  And it says

24   my name at the top of that report.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    Okay.  I'm going to hand you

2    Exhibit 17, which is DDM440505.

3                          - - -

4              (DDM-Strang Exhibit 17 marked.)

5                          - - -

6              Q.    This looks like a form.  At the

7    top it says "Confidential.  Attention chief

8    pharmacist."

9                    Do you see that?

10             A.    Yes.

11             Q.    And then it's got a store number

12   and a date.  Have you ever seen this document

13   before?

14             A.    This particular one, no.  The

15   actual piece of paper that before it's filled

16   out, I do know that Tom Nameth was responsible

17   for this before he retired.

18             Q.    So you didn't create this?

19             A.    I did not.

20             Q.    And you didn't train people on how

21   to fill it out?

22             A.    No.

23             Q.    Do you know who did?

24             A.    The director of operations,
```

1    pharmacy operations, is who I would say.

2          Q.    So probably Tom Nameth, but you

3    don't know for sure?

4          A.    No.

5          Q.    Did you ever work with these

6    documents?

7          A.    No.

8          Q.    Okay.  So let's look at this.

9    This is dated May of 2008 and it's for store 5.

10   Do you see that?

11         A.    Yes.

12         Q.    And it says, "The Drug Enforcement

13   Agency" -- which is the DEA -- "has requested

14   that Discount Drug Mart pharmacy operations

15   maintain records of controlled substances

16   purchases that exceed an average of purchases

17   calculated from the previous 12 months or that

18   deviate substantially from normal average per

19   month."

20               Do you see that?

21         A.    Yes.

22         Q.    And the next line says, "The

23   April 2008 report indicates an increase in

24   purchases of hydro" -- do you know what that's

Highly Confidential - Subject to Further Confidentiality Review

```
 1    referring to?

 2           A.    I'm sorry.  I lost where you're

 3    at.

 4           Q.    If you look at the highlighted --

 5                 MR. JOHNSON:  It's right on the

 6           screen.

 7           A.    Yes.  Okay.

 8           Q.    Is that hydrocodone?

 9           A.    Yes.

10           Q.    Okay.  And it has, it looks like,

11    an NDC number after that?

12           A.    Yes.

13           Q.    And it says, "Your average monthly

14    purchases of this item are three bottles.  This

15    month eleven bottles were ordered."

16                 Do you see that?

17           A.    Yes.

18           Q.    Okay.  Is that the type of

19    information that would be spit out on the

20    six-week average report?

21           A.    I don't know.

22           Q.    So do you have any idea what

23    context this document was used in?

24                 MR. JOHNSON:  You have to answer
```

1          out loud.

2          A.    No.  I'm thinking.

3               MR. JOHNSON:  Oh, okay.  Sorry.  I

4          didn't mean to rush you.

5          A.    No, no, no.

6               No, other than Tom using that --

7     the controlled monitoring 12-month rolling

8     report.

9          Q.    Okay.  At least on this document,

10    it suggests that the store averaged three

11    bottles a month and then they were at eleven in

12    this given month, correct?

13         A.    Correct.

14         Q.    And if you had gotten a report

15    like that at your warehouse, you would have

16    called them and said, "Did you mean to order

17    eleven?  Or, "You usually order three."  Right?

18         A.    This probably would have been

19    weekly.

20         Q.    Okay.

21         A.    So if they ordered one bottle and

22    they were ordering two, and then it added up to

23    the eleven, you know, somehow.  I'm just doing

24    the math.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Well, it actually says "this

 2    month."  So it says, "Your average monthly

 3    purchase of this item are three bottles."

 4            A.    Right, but I don't think they

 5    ordered three bottles and got eleven.  I think

 6    the average monthly purchases.  They order

 7    weekly.  So over a span of four weeks, they

 8    would order three:  One, one, one.  Perhaps here

 9    it was two, two, two and three, and ended up

10    with -- that's how I'm taking it.  It wasn't a

11    three bottle order and they got eleven.  It was

12    a weekly order over four or five weeks.

13            Q.    So are you saying to me that it's

14    possible that this increase wouldn't have shown

15    up on your six-week average report?

16            A.    It's possible because it was

17    weekly.

18            Q.    Okay.

19            A.    But it's going to average itself

20    out again.

21            Q.    Well, you think --

22            A.    Well, one -- well, right.

23            Q.    Do you know whether this order was

24    cut?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    I don't know.

 2            Q.    Okay.  So then it says, "Please

 3    verify this quantity and provide appropriate

 4    explanation as to the necessity of the increase.

 5    Thank you for your immediate response to this

 6    request."

 7                  Do you see that?

 8            A.    Yes.

 9            Q.    Okay.  In April 2008, would store

10    number 5 have been ordering hydro from the

11    distribution center?

12            A.    In 2008?

13            Q.    Yes.

14            A.    Yes, possibly.

15            Q.    Okay.  And so this is a form

16    that's being sent out in response to an order

17    being sent to the distribution center, correct?

18            A.    Again, I don't think it was one

19    order, but yes.

20            Q.    Okay.  But you haven't seen this

21    document before, right?

22            A.    No.

23            Q.    Okay.  Does it surprise you to see

24    a document like this regarding an increased
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   order to your distribution center that you've

 2   never seen before?

 3           A.    No, because, again, if it was

 4   weekly orders --

 5           Q.    I know -- let's move past that

 6   weekly order part.

 7           A.    Okay.

 8           Q.    I'm not asking you that question.

 9           A.    Okay.

10           Q.    All right.

11           A.    But that's what I think would have

12   triggered --

13           Q.    You're the director of pharmacy

14   buying --

15           A.    Yes.

16           Q.    -- and you're the pharmacy

17   distribution supervisor, right?

18           A.    Mm-hmm, yes.

19           Q.    You run the distribution center,

20   right?

21           A.    Correct.

22           Q.    Okay.  Stores at this time would

23   place orders for hydrocodone, which is the

24   subject of this litigation, to your distribution
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   center, correct?

 2          A.     Correct.

 3          Q.     Okay.  And you have a report that

 4   identifies when stores order more than they

 5   usually do, right?

 6          A.     Correct.

 7          Q.     Okay.  And this is a form that

 8   someone is sending to this store to say, "Hey,

 9   you're ordering a lot more than usual," right?

10          A.     This form, yes.

11          Q.     Okay.  And you've never seen this

12   form before, right?

13          A.     I've seen it, but not filled out.

14          Q.     Okay.  When have you seen it?

15          A.     I don't -- probably back when this

16   was actually -- I did not create this report.

17   Someone created it.  I knew that it existed

18   because of the 12-month average report.  And if

19   there was something on that that triggered them

20   to call a store or fill this out, this would get

21   filled out.

22                 I never saw it when it was filled

23   out.  That was up to the director of pharmacy

24   operations, the pharmacists, and probably the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    supervisor at that time.

 2           Q.    Okay.  It looks like this is sort

 3    of a duplication of what your efforts might have

 4    been, which would be to call the pharmacist to

 5    make sure that the order was correct, right?

 6                 MR. JOHNSON:  Objection.

 7           Q.    It's basically asking for an

 8    explanation for why you have ordered more,

 9    right?

10           A.    Yes.

11           Q.    And is that what you would do if

12    you saw it on the report or your puller told

13    you, you'd call the store and ask why they

14    needed the increase, right?

15           A.    Yes.

16           Q.    Okay.  And if you look below, it

17    looks like the chief pharmacist from store 5

18    responded?

19           A.    Yes.

20           Q.    Okay.  And it looks like it was

21    about nine days later.  And the explanation for

22    the increased order says, "Had two or three

23    prescriptions for larger amounts than usual.

24    Quantities were verified with physicians."
```

```
 1                    Do you see that?

 2         A.    Yes.

 3         Q.    Do you -- is that -- if you had

 4   called and asked for an explanation, would that

 5   have been an appropriate explanation for the

 6   increase?

 7         A.    Again, the order was not three and

 8   we filled eleven.  If it would have been a

 9   weekly order that we would be reviewing, if we

10   filled one or two bottles per week, I don't

11   think there would have been a phone call.

12         Q.    That's not what I -- that's not

13   the question I asked you.  I'm asking you a very

14   specific question.

15         A.    Okay.

16         Q.    My question is, if a store ordered

17   more than normal and you called the pharmacist,

18   and the pharmacist said to you, "Oh, I had two

19   or three prescriptions for larger amounts than

20   usual and the quantities for those prescriptions

21   were verified with the physician," would that

22   have been sufficient for you to then go ahead

23   and ship out the eleven bottles?

24         A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    It wouldn't have been?

 2          A.    Not if there was that much of an

 3    increase from three to eleven.

 4          Q.    Okay.  So what would you have done

 5    next?

 6          A.    I would have -- to me, if it was

 7    that much of a quantity increase, if it was

 8    brought to my attention, and if I did my job to

 9    do the history, I would go to Jason or Tom.  Tom

10    was here at that time.  I would have went to Tom

11    and I would have said, "Hey, something doesn't

12    make sense here, that much."

13          Q.    Okay.  But you don't know whether

14    more explanation was provided than this,

15    correct?

16          A.    I do not know.

17          Q.    Okay.  And I think you've

18    testified that -- and everybody has -- that DDM

19    never had a suspicious order ever, right?

20          A.    No.

21          Q.    So that would suggest that this

22    was resolved in some way or determined to not be

23    suspicious, right?

24          A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.

 2              A.    To my knowledge.  Again, I'm not

 3     involved in this part of it.

 4              Q.    But you would agree that this sort

 5     of appears to be somewhat of a duplication of

 6     what you're doing when you're calling the stores

 7     yourself, right?

 8              MR. JOHNSON:  Objection.

 9              A.    Yes.  I'm verifying amounts, but,

10     again, if it was that much of a jump, that's --

11     that doesn't make sense to me.

12              Q.    Do you have any idea who followed

13     up on this?

14              A.    Other than Tom, no.

15              Q.    Okay.  Do you know how many forms

16     like this were filled out in the history of DDM?

17              A.    I do not.

18              Q.    So you don't have any idea who was

19     responsible for evaluating the adequacy of those

20     explanations, correct?

21              MR. JOHNSON:  Objection.

22              MR. MULLIGAN:  What's the

23          objection?

24              MR. JOHNSON:  Other than Tom
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            Nameth?  You just asked her and she

2            answered it.

3                    MR. MULLIGAN:  She guessed that it

4            was Tom Nameth.  I'm just asking if she

5            knows who would have made the final --

6                    MR. JOHNSON:  She said it was Tom

7            Nameth --

8            A.    Tom Nameth.

9                    MR. JOHNSON:  -- given at that

10           point in time --

11           A.    The director of pharmacy

12   operations.

13   BY MR. MULLIGAN:

14           Q.    But you're assuming that, right?

15   You don't know -- you haven't even seen this

16   document before today, right?

17           A.    This is -- unfortunately, I know

18   Tom's handwriting, but this is filled out by Tom

19   because of that other report.  So I would assume

20   that Tom was responsible for following up with

21   that answer.  And I do know that -- I'm sure

22   there's other tools that he uses to make sure

23   that that was legit, whether he got copies of

24   prescriptions, whether John provided something,
```

```
 1    I don't know.

 2           Q.    I don't want you to speculate, I

 3    really don't.

 4           A.    Okay.

 5           Q.    I just want to know what you know.

 6           A.    Okay.  I don't know.

 7           Q.    That's why I'm asking the

 8    follow-up questions, because I don't -- I'm

 9    hearing you use words that suggest that you're

10    speculating, and I don't -- I really don't want

11    you to speculate.

12           A.    Okay.

13           Q.    I just want to know what you know,

14    and that's it.

15           A.    That's fine.

16           Q.    And we can ask Tom other stuff.

17                 So -- but it does sound like this

18    is Tom's handwriting?

19           A.    Correct.

20           Q.    Okay.  And that would be the stuff

21    in this section here?

22           A.    Correct.

23           Q.    Okay.  Is that his handwriting

24    down below, too?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I believe -- I don't know, but I

 2      believe that's John Vedrody's, but I do not

 3      know.

 4              Q.    You think it's the pharmacist's?

 5              A.    Yes.

 6              Q.    Okay.  So we should ask Tom Nameth

 7      about these forms?

 8              A.    Yes.

 9                         - - -

10              (DDM-Strang Exhibit 18 marked.)

11                         - - -

12              Q.    Okay.  We can skip that one.

13              Q.    Okay.  Let's -- we're going to

14      look at Exhibit 18.  I'm skipping a document.

15      It's DDM15156.

16                    This is an e-mail sent on -- we're

17      going back in time a little bit.  I apologize.

18      June of 2013.

19                    Do you see that?

20              A.    Yes.

21              Q.    And this is from Brandon Wilkins

22      at Cardinal Health --

23              A.    Yes.

24              Q.    -- to a number of you at DDM,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right?

 2            A.    Correct.

 3            Q.    And this e-mail includes Doug

 4    Boodjeh, right?

 5            A.    Yes.

 6            Q.    And he's the COO?

 7            A.    Yes.

 8            Q.    And if you look at the subject, it

 9    says, "Discount Drug Mart/Cardinal Heath

10    Business Review Takeways."

11                 Do you see that?

12            A.    Yes.

13            Q.    And I -- tell me if I'm wrong.  It

14    looks like this is about the time that you guys

15    starting engaging with them to switch over to

16    hydrocodone?

17            A.    I don't know.

18            Q.    Okay.  Do you know what --

19                 THE COURT REPORTER:  Can we go off

20            the record?

21                 MR. MULLIGAN:  Yeah.

22                 THE VIDEOGRAPHER:  The time is now

23            1:46.  Going off the record.

24                 (Recess taken.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE VIDEOGRAPHER:  The time is now
 2        1:59.  Back on the record.
 3   BY MR. MULLIGAN:
 4        Q.    All right.  So we had some
 5   technical difficulties.  I think we're good to
 6   go.
 7                  We were looking at Exhibit 18.  Do
 8   you have that in front of you?
 9        A.    Yes.
10        Q.    Okay.  And this is DDM15156,
11   right?  Do you see in the bottom right there?
12        A.    Yes.
13        Q.    Okay.  And this is an e-mail from
14   Cardinal Health to yourself and a number of
15   other individuals at DDM, correct?
16        A.    Yes.
17        Q.    Do you recall this e-mail?
18        A.    I do not.
19        Q.    Do you recall meeting with people
20   from Cardinal Health?
21        A.    Yes.  We had our business
22   review --
23        Q.    And what's a --
24        A.    -- shortly before this.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    What's a business review?

 2              A.    Quarterly Cardinal would come up

 3     to our office to meet and we would discuss all

 4     of our -- all the business for that quarter,

 5     from the previous quarter, along with other

 6     subjects that they would want to bring up, so

 7     that way we could discuss them as a group.

 8              Q.    Okay.  And it says in the e-mail,

 9     "We discussed a wide range of topics and

10     opportunities for the future, so please let us

11     know if we have missed anything here."

12              Do you see that?

13              A.    Yes.

14              Q.    And then there's a list of, it

15     looks like, nine different things that were

16     discussed at the meeting?

17              A.    Yes.

18              Q.    Which occurred the day before this

19     e-mail, correct?  It's the first sentence.

20              A.    I don't have a date on there

21     but -- oh, right here.

22              Q.    There?

23              A.    Yes.

24              Q.    Okay.  And topic number 9 says,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      "Suspicious order monitoring."

 2              Do you see that?

 3      A.    Yes.

 4      Q.    And does that suggest to you that

 5   suspicious order monitoring was discussed at

 6   that meeting with Cardinal?

 7      A.    Yes.

 8      Q.    Do you recall that discussion?

 9      A.    I do not recall this discussion,

10   but I do know that there were discussions on

11   information that they may have needed from us.

12      Q.    Did Cardinal ever express any

13   opinion about the adequacy of DDM's suspicious

14   order monitoring policies?

15              MR. JOHNSON:  Objection.

16      A.    Can you clarify that?

17      Q.    Do you know -- I mean, you met

18   with Cardinal, right?

19      A.    Yes.

20      Q.    And one of the topics that was

21   discussed was suspicious order monitoring,

22   correct?

23      A.    Yes.

24      Q.    Do you know whether Cardinal had
```

 1   any recommendations for what DDM should be doing

 2   to strengthen its suspicious order monitoring

 3   policies?

 4            MR. JOHNSON:  Objection.

 5        A.    From our stores to our

 6   distribution center or from -- to the

 7   wholesaler, just direct to the wholesaler?

 8        Q.    Just in general.

 9        A.    I do not remember.

10        Q.    Okay.  But it looks like they felt

11   the need to provide you with criteria that they

12   look at when monitoring orders and setting

13   thresholds.

14            Do you see that?

15            MR. JOHNSON:  Objection.

16            MR. MULLIGAN:  What's the

17        objection?

18            MR. JOHNSON:  This -- the way I

19        read this, the suspicious order

20        monitoring system they're talking about

21        is Cardinal's.

22            MR. MULLIGAN:  Yeah, that's --

23            MR. JOHNSON:  This isn't an

24        evaluation of Discount Drug Mart's

Highly Confidential - Subject to Further Confidentiality Review

```
 1          suspicious ordering --

 2               MR. MULLIGAN:  You're right.  And

 3          I'm asking her about the e-mail.  I

 4          mean --

 5               MR. JOHNSON:  Okay.  Well, your

 6          questions, at least to me --

 7               MR. MULLIGAN:  I don't --

 8               MR. JOHNSON:  -- seem to imply

 9          that --

10               MR. MULLIGAN:  I don't understand

11          the basis of your objection, and I think

12          that's where we're --

13               MR. JOHNSON:  Okay.  Well, I'm

14          trying to explain it to you.

15               MR. MULLIGAN:  Okay.  I still

16          don't understand it, though.

17               MR. JOHNSON:  Okay.  As I read

18          this e-mail, it looks -- number 9,

19          suspicious order monitoring, I

20          believe --

21               MR. MULLIGAN:  I think the problem

22          here, Tim, is I think your objection

23          needs to be to form.  I don't want to

24          hear a whole colloquy about like what --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            that's what I want to know.  What's the

 2            form objection?

 3                 MR. JOHNSON:  Well, you're not --

 4            I'm objecting, but you're not allowed to

 5            misrepresent what the document is or

 6            what --

 7                 MR. MULLIGAN:  I'm not.

 8                 MR. JOHNSON:  -- or what she says.

 9                 MR. MULLIGAN:  What did I

10            misrepresent?

11                 MR. JOHNSON:  Well, you're

12            implying by your questions that Cardinal

13            was somehow evaluating Discount Drug

14            Mart's SOM system, suspicious order

15            monitoring.

16                 MR. MULLIGAN:  No.  I asked her if

17            they ever did.

18                 MR. JOHNSON:  I don't think you

19            did ask that question.

20                 MR. MULLIGAN:  Okay.  Well, I did.

21            So I really -- we've been doing great,

22            okay, so far, but we're getting to the

23            point now where you're starting to

24            impede my deposition.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    So if you want to object to form,

 2           you can do that.  She can testify.

 3                    MR. JOHNSON:  I just object.  You

 4           asked me what --

 5                    MR. MULLIGAN:  And you haven't

 6           given me --

 7                    MR. JOHNSON:  -- the basis was.

 8                    MR. MULLIGAN:  You haven't given

 9           me a basis of your form objection, and

10           I'm trying to make sure my question is

11           okay.  Apparently my question is okay.

12           You just don't want me to ask her about

13           the document.

14                    MR. JOHNSON:  No, that's not --

15           you're totally mischaracterizing.

16                    MR. MULLIGAN:  I'm not.  I

17           asked --

18                    MR. JOHNSON:  Well, I --

19                    MR. MULLIGAN:  Let's continue,

20           okay?  And if you want to object, you

21           can do it.

22                    MR. JOHNSON:  Go on.  If you want

23           to clear it up, fine.

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. MULLIGAN:

 2          Q.    Okay.  This is an e-mail that you

 3   received after a meeting with Cardinal Health,

 4   right?

 5          A.    Correct.

 6          Q.    Okay.  And the meeting took place

 7   the day before this e-mail was sent, right?

 8          A.    Correct.

 9          Q.    Okay.  And it identifies the

10   things that were discussed at the meeting,

11   right?

12          A.    Correct.

13          Q.    And one of those things was

14   suspicious order monitoring, correct?

15          A.    Correct.

16          Q.    Okay.  And my question to you was,

17   did Cardinal ever express any concern or raise

18   any issues related to how DDM was conducting

19   suspicious order monitoring?

20          A.    And that's when I answered I don't

21   remember, but I don't think it was anything from

22   the stores to us.

23          Q.    And I don't know what that means.

24   So explain it to me.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I don't think they were
 2   questioning our system, our ordering system.
 3              Q.    Okay.
 4              A.    I think they were just presenting
 5   to us what they needed to have in place or what
 6   they wanted to improve on for Cardinal to our
 7   stores.
 8              Q.    Okay.  So somehow they knew that
 9   you guys needed to do something different to
10   satisfy them, correct?
11              A.    I do not know that.
12              Q.    Okay.  All right.  So but they
13   did -- and this is the question I think that was
14   objected to.  They did provide you, which it
15   says right here, "Attached are the criteria that
16   we" -- which is Cardinal -- "look at when
17   monitoring orders and setting thresholds,"
18   right?
19              A.    I do see that, yes.
20              Q.    Okay.  And at this time, DDM had
21   no thresholds that they applied to their stores,
22   correct?
23              A.    From Cardinal?
24              Q.    From DDM.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    We did not at DDM.

2            Q.    Okay.  Cardinal was the one who

3    imposed thresholds on your stores, correct?

4            A.    Correct.

5            Q.    And it says, "Brandon to

6    communicate with Tom and Jill as needed."

7                  Right?

8            A.    Yes.

9            Q.    And that's you?

10           A.    That's me.

11           Q.    Okay.  And if you look up under

12   "Attachments," it says, "Suspicious order

13   monitoring criteria PPTX," which is PowerPoint,

14   right?

15           A.    Yes.

16           Q.    Okay.  So let's go to page -- it's

17   Bates number 15160, and this is the specifics of

18   objective criteria, it seems, that Cardinal uses

19   to identify or monitor for suspicious orders,

20   correct?

21           A.    Yes.

22           Q.    Did you ever look at these -- this

23   information as it relates to DDM's distribution

24   of controlled substances?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I did not because the majority of

2    these are C-IIs that we do not carry.

3          Q.     Okay.

4          A.     And this was something that they

5    presented to us from their side to our stores,

6    so I looked at it solely as a wholesaler,

7    national average, objective criteria.  It all

8    came from Cardinal.

9          Q.     Okay.  So if you look at -- if you

10   look at, let's say, like halfway down, the one

11   that says, "Percentage of all prescriptions that

12   is oxycodone and hydrocodone prescriptions."

13             Do you see that?

14         A.     Yes.

15         Q.     And it looks like the national

16   average is 4.5 percent of all prescriptions

17   would be associated with those two drugs.

18             Do you see that?

19         A.     That's -- yes, I do see that.

20         Q.     And then the 95th percentile is

21   14 percent, correct?

22         A.     I do see that.

23         Q.     So somebody who would fall in the

24   14th percent box would be filling more of that

1    drug than the national average?

2             A.    Correct.

3             Q.    Okay.  Did -- when hydrocodone was

4    still a Schedule III, did DDM ever do anything

5    to determine where it fell relative to the

6    national average, that you know of?

7             A.    I did not, and I do not know.

8             Q.    Once you got this PowerPoint from

9    Cardinal, did you do anything with it?

10            A.    I don't remember.

11                  MR. MULLIGAN:  All right.  We're

12            going to look at, I think, 19, right?

13                         -  -  -

14            (DDM-Strang Exhibit 19 marked.)

15                         -  -  -

16            Q.    This is DDM110147.  This is an

17   e-mail dated September 24th, 2013 from Tom

18   Nameth to all pharmacists.  And then you're also

19   copied on there with a number of other people.

20                  Do you see that?

21            A.    Yes.

22            Q.    Okay.  And this says, "Subject:

23   DEA quantity purchase limits."

24                  Do you see?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   Yes.

 2          Q.   All right.  And it says, "All

 3   Pharmacists:  Attached is specific store

 4   information from Cardinal regarding purchase

 5   limits on certain C-II" -- which is Schedule II

 6   controlled substances, right?

 7          A.   Yes.

 8          Q.   Okay.  And then it says, "The

 9   column that states Oxycodone SBC is the

10   threshold specifically for oxycodone

11   15-milligram and 30-milligram."

12               Correct?

13          A.   Yes.

14          Q.   All right.  And it says -- do you

15   remember seeing this e-mail?

16          A.   I do not remember this.

17          Q.   You don't.  Okay.

18               The next sentence says, "This is a

19   threshold within the total oxycodone drug

20   family.  Both oxycodone and morphine limits are

21   listed in yellow."

22               Do you see that?

23          A.   Yes.

24          Q.   All right.  And if you actually
```

```
 1    turn to the next two pages, they didn't print

 2    out in yellow, but I'll represent that those --

 3    the last two columns were yellow.

 4          A.    Yeah.

 5          Q.    Have you ever seen that -- those

 6    threshold limits?

 7          A.    No.

 8          Q.    Did you play any role in setting

 9    those thresholds?

10          A.    No.

11          Q.    Do you know whether those were set

12    by Cardinal?

13          A.    I do not know.

14          Q.    Okay.  You don't have any idea?

15          A.    Because they're C-IIs, I do not.

16          Q.    Okay.  And then it says, "These

17    figures are determined from guidelines offered

18    by the DEA."

19                Do you see that?

20          A.    Yes.

21          Q.    Were you aware the DEA offered

22    guidelines to suggest thresholds that should be

23    set for these drugs?

24          A.    No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    If you had been aware of those,

 2   would you have urged DDM to set thresholds?

 3              A.    For these C-IIs?

 4              Q.    Correct.  Or for any controlled

 5   drug.

 6              A.    I would have discussed it with Tom

 7   or Jason.

 8              Q.    Did you ever have that discussion

 9   with them?

10              A.    No.

11              Q.    Okay.  Then it says, "Many store

12   orders from Cardinal have recently been cut back

13   due to the purchase limits being placed on

14   them."

15              Do you see that?

16              A.    Yes.

17              Q.    Okay.  So that suggests that once

18   these C-IIs were being obtained from Cardinal

19   and Cardinal imposed thresholds, that many of

20   DDM's stores' orders were getting cut, correct?

21              A.    Correct.

22              Q.    Okay.  Which would suggest that,

23   at least as far as Cardinal was concerned, that

24   DDM stores were ordering too much C-II for what
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    they should be getting?

2              MR. JOHNSON:  Objection.

3         A.    I can't say.  I can't answer that.

4         Q.    Well, I mean, it's just sort of

5    common sense, right?  I mean, if you have no

6    thresholds and no suspicious orders, and then

7    you move to a distributor who puts thresholds on

8    you and they start cutting orders, that suggests

9    that, at least for their purposes, what those

10   stores were getting before was too much?

11             MR. JOHNSON:  Objection.

12        Q.    Is that fair?

13        A.    It's fair.  But being a C-II, I

14   did not have anything to do with that.

15        Q.    Okay.  So you had nothing to do

16   with it, but you would agree with my premise;

17   right?

18             MR. JOHNSON:  Objection.

19        A.    Going off the chart, yes.

20        Q.    Okay.  And then it says -- this is

21   an instruction to the pharmacists from Tom

22   Nameth, "If you hit your Cardinal limit, do not

23   order from another supplier, Anda, since the DEA

24   may monitor your purchases and investigate your
```

1    purchase history."

2              Do you see that?

3         A.    Yes.

4         Q.    Do you ever recall a time when a

5    store ordered from another supplier when it hit

6    a Cardinal limit?

7         A.    I do not know.

8         Q.    Do you know where I would go to

9    find that out?

10         A.    There has to be history, but I do

11   not know --

12         Q.    Okay.

13         A.    -- because I don't create those

14   reports or anything like that.

15         Q.    Prior to these thresholds getting

16   put in place, did anyone at DDM ever cut an

17   order that was not associated with a typo, that

18   you know of?

19         A.    No.

20                   - - -

21         (DDM-Strang Exhibit 20 marked.)

22                   - - -

23         Q.    We'll do Exhibit 20, which is DDM

24   168903.  This is an e-mail dated about a month

Highly Confidential - Subject to Further Confidentiality Review

```
 1    later, October 2013, from Brandon Wilkins at

 2    Cardinal Health to -- well, I'm looking at the

 3    last one, I guess.  Let's go down below here.

 4    Let's start at the bottom of the first page.

 5    I'm sorry.

 6              Okay.  So this is from Shirlene

 7    Justus.  Do you know who that is?

 8         A.    I do not.

 9         Q.    Okay.  It's to Brandon Wilkins.

10    Do you know who that is?

11         A.    Yes.  He was our representative

12    for Cardinal.  He was our account rep at that

13    time.

14         Q.    Okay.  And so it says -- do you

15    generally recognize the content that's in this

16    e-mail?

17         A.    No.

18         Q.    Okay.  So this is an October 16,

19    2013 e-mail that says, "Discount Drug Mart

20    number 18," which is in Independence.  It says,

21    "Hi, Brandon.  This customer's order for 3200

22    dosage units of oxycodone caused the customer to

23    exceed its maximum accrual limit for oxycodone

24    this accrual period."
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Do you see that?

 2        A.    Yes.

 3        Q.    All right.  And then it says, "The

 4   order for 3200 dosage units has been cut.

 5   Reported as suspicious to the DEA and will not

 6   be shipped."

 7              Do you see that?

 8        A.    Yes.

 9        Q.    Okay.  "Prior to that order, the

10   customer received 4600 dosage units of oxycodone

11   for this accrual period.  After review of

12   available information, I have determined that a

13   threshold adjustment is not warranted and the

14   customer's threshold will remain at 7500."

15              Do you see that?

16        A.    I do.

17        Q.    Okay.  So it looks like Cardinal

18   is saying to Store 18, "No, your threshold is

19   7,500.  This order of 3,200 would have put you

20   over the max and we're going to cut that.  We're

21   going to automatically report it to the DEA as

22   suspicious," correct?

23        A.    That's what it says, yes.

24        Q.    Okay.  So this would indicate
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that, at least under Cardinal's suspicious order

 2    monitoring policy, that DDM has had a suspicious

 3    order, correct?

 4              MR. JOHNSON:  Objection.

 5         A.   I don't know, because I'm --

 6         Q.   Well, Cardinal determined that

 7    this was suspicious and reported it to the DEA,

 8    right, based on what this e-mail says?

 9         A.   But it does not --

10         Q.   But is not an answer to that

11    question.

12         A.   Okay.  Say it again, please.

13              MR. JOHNSON:  You've got to let

14         her finish.

15         A.   That's okay.

16         Q.   You can answer it and then say

17    "but," if you want, and I'll move to strike

18    that, but "but" is not an answer to that

19    question.  So let me ask the question again.

20              This document indicates that

21    Cardinal identified an order placed by a DDM

22    store as suspicious and reported it to the DEA,

23    correct?

24              MR. JOHNSON:  Objection.  It says
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            what it says.

2        A.    It does say that.

3        Q.    Okay.  And you'd agree with that,

4    right?

5              MR. JOHNSON:  Objection.

6        Q.    Are you aware of any time that

7    Cardinal reported a DDM store order as

8    suspicious to the DEA?

9        A.    Myself, no.

10       Q.    You've -- before right now, you

11   had no knowledge that this ever happened?

12       A.    No.

13       Q.    Okay.  All right.  If you look at

14   the top e-mail, this is from Brandon to Pete and

15   Tom Nameth.  And it says, "Gentlemen, I guess

16   it's about that time of month.  Please see the

17   below regarding number 18's cut oxycodone

18   order."

19             Do you know what he means by "it's

20   that time of month"?

21       A.    My interpretation is that

22   everything was usually set -- reset on the 22nd

23   of the month, and because they hit their

24   threshold, that's my interpretation.  I do not
```

Highly Confidential - Subject to Further Confidentiality Review

 1    know that, though, because I've never seen this

 2    before.  Reading it --

 3            Q.    You've never seen any e-mail like

 4    this before ever?

 5            A.    No.

 6            Q.    Okay.  So before five minutes ago,

 7    you never knew that Cardinal had ever cut and

 8    reported an order placed by a DDM store?

 9            A.    I knew they might do it, but I did

10    not see this form of an e-mail.

11            Q.    Okay.  You thought they might do

12    it but you didn't know that they had, right?

13            A.    I know that there were thresholds,

14    but I do not know that they -- I never knew

15    whenever they reported it to the DEA.  I never

16    knew that.  Because that was outside of my -- I

17    wasn't part of the C-IIs, and I was only with

18    our distribution center.  And I wasn't on the

19    e-mail.

20            Q.    Okay.

21                          - - -

22            (DDM-Strang Exhibit 21 marked.)

23                          - - -

24            Q.    I'm going to hand you Exhibit 21.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    This is DDM74107.  We're -- there's two pages,

 2    but we're going to just be on the first page.

 3    This is dated February 6th, 2014.  So a couple

 4    months later.  It's an e-mail from Aimee Cooper

 5    to you.  It says, "Subject:  Order pending."

 6              And it says, "Good morning, Jill.

 7    We currently have an order pending for you on

 8    hydrocodone."

 9              Do you see that?

10         A.    Yes.

11         Q.    Have you seen this before?  I

12    assume you have, you're on it.

13         A.    I have seen it, but I do not

14    remember it.

15         Q.    Okay.  Did you review this in

16    preparation for your deposition?

17         A.    No.

18         Q.    All right.  And then it says, "The

19    order shows a significant increase to your

20    normal ordering pattern.  This represents four

21    times your normal order quantities.  Can you

22    please provide an explanation to the increase?

23    Could you also please provide how many suppliers

24    you have on this product?"
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      Do you see that?

 2          A.    Yes.

 3          Q.    Do you know what this is referring

 4   to?

 5          A.    It is referring to an order on

 6   hydrocodone, and I believe my answer to her was,

 7   "I cut down on my 100 size and we picked up the

 8   larger size.  So if I was ordering 24 500s, I

 9   may have ordered 96 500s, and I was eliminating

10   the 100 count out of the warehouse."

11          Q.    It looks like your response e-mail

12   says "also," which suggests to me that there was

13   another -- maybe you responded once, then you

14   responded with another --

15          A.    Yeah, I don't -- that's what --

16   yeah, I don't understand that.

17          Q.    Okay.

18          A.    But that's -- when it says, "I

19   have cut down on the 100s and ordered larger

20   sizes," I'm dwindling down on the hundreds and

21   I'm ordering the larger sizes, because I might

22   have had -- I might have been ordering 300

23   hundreds and now I'm -- instead of all of the

24   labor involved with that, I ordered larger sizes
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    of that particular item.

2           Q.    So we're talking about bottles of

3    tablets?

4           A.    Bottles.

5           Q.    Right?

6           A.    Of tablets.

7           Q.    Of tablets?

8           A.    Yes.

9           Q.    Okay.  So maybe you're ordering

10   300 bottles of 100 tablets?

11          A.    I'm making that number up, but

12   yes.  A higher --

13          Q.    I'm just saying hypothetically.

14          A.    Hypothetically a higher number of

15   hundreds instead of us pulling five to equal

16   500, I went to the larger size to get rid of the

17   labor of receiving, putting away and pulling

18   more hundreds than just a bottle of -- one

19   bottle of 500 for that quarter.

20          Q.    So based on this e-mail and your

21   recollection, is it your testimony that you

22   didn't actually order four times the number of

23   tablets; it's just sort of a switcheroo?

24   Explain -- I'm just trying to understand --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    That's my understanding of this,

 2     because that is how I have handled things

 3     before.  If we ordered larger quantities of a

 4     smaller size, we do a conversion.  And if I've

 5     always ordered like -- and I'm making these

 6     numbers up, but if I ordered 24 bottles of 500,

 7     I might have ordered 96 bolts of 500 and not

 8     ordered the smaller size.

 9            Maybe I was ordering whatever the

10     equivalent of that is, but, you know, maybe I

11     was ordering 600 bottles or whatever it was.

12     You know what I'm saying?  And then I converted

13     it to the 500s.

14            Q.    So here's -- there's two parts of

15     this that I don't get.

16            A.    Okay.

17            Q.    Okay.  She's saying that you are

18     ordering four times your normal order

19     quantities, right?  And that could only mean two

20     things.  You're either ordering four times as

21     many pills or four times as many bottles.  It's

22     one or the other, right?

23            A.    Four times as many bottles.

24            Q.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Larger bottles.

 2              Q.      Okay.  So you're ordering four

 3    times as many bottles, but your response is that

 4    you've cut down on it and you've ordered larger

 5    sizes.  So if you had -- if you're ordering

 6    larger bottles and more -- four times more, that

 7    would suggest that you're ordering exponentially

 8    more tablets.

 9              Do you see what I'm saying?

10              A.      I do, but I know what I'm saying

11    as well.  If I ordered a large quantity of a

12    smaller size, I'm converting that to the 500

13    count.  I mean, I could have been ordering 1200

14    bottles of 100.  I am ordering more of the

15    larger size, which could be four times the

16    amount.  I might have always ordered 24 bottles

17    of 500.  I raised that.  I'm getting rid of the

18    hundreds.  They're going to leave the warehouse.

19              Q.      But in that situation, nothing has

20    increased.  Your tablets are the same,

21    hypothetically, but your bottle count went down.

22    So that doesn't jibe with what she's telling you

23    in this e-mail.  That's what I don't understand.

24              A.      I believe she's saying -- and I'm
```

```
 1    sorry.  She's saying I'm ordering more quantity

 2    of pills -- well, no, because I'm ordering more

 3    of the larger size to compensate for the smaller

 4    size that I used to carry.

 5            Q.    But her e-mail indicates that your

 6    order was four times larger than normal.  So

 7    either your bottles -- you had four times more

 8    bottles or four times more pills, and your

 9    explanation doesn't address either of those

10    situations.  So that's what I'm -- that's where

11    I'm lost.

12            A.    Ask me another question --

13            Q.    Because if you --

14            A.    -- because I -- that's the only

15    way I can explain it, so I want --

16            Q.    Okay.  So let's say hypothetically

17    that she's identified that instead of ordering

18    100 pills you ordered 400.

19            A.    Okay.

20            Q.    Okay.  And she's saying, "Hey, you

21    ordered 400 pills this month instead of 100.

22    What's going on?"

23                  And you wrote back and said, "I've

24    cut down on the hundreds and ordered larger
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sizes."

 2              So I don't understand how that is

 3    an explanation for ordering more tablets.

 4       A.    Because I probably didn't order

 5    100 count size bottles, so for every five

 6    bottles of 100, I converted it to one bottle of

 7    500.

 8       Q.    Okay.  So in that instance, you

 9    would have the same number of tablets but a

10    quarter as many -- or a fifth as many bottles,

11    right, which is not four times your normal order

12    quantities.

13              Do you see what I'm saying?

14              We're going in circles, but your

15    explanation doesn't answer that question, and I

16    guess I just wanted to know --

17       A.    But she's basing it off of that

18    when I bought the larger sizes -- maybe I only

19    used to buy 12 or 24 of them, and she's saying,

20    this represents four times your normal order

21    quantities, because if you multiply out how many

22    more 500s I'm getting rather than not ordering

23    the 100s, that's where she's saying it's four

24    times greater.  So --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Let's do this:  When she says

 2    "four times your normal order quantities," is

 3    that bottles or pills?

 4              A.    It is bottles of the larger size.

 5              Q.    So she's saying you're ordering

 6    four times more bottles and they're a bigger

 7    size, too, so way more pills?

 8              A.    No.  No, because my 100s are gone

 9    now, and that's why I put, "I'm converting my

10    100s to my 500s."  I'm not ordering 100s

11    anymore.  So I have to -- for every 500s, I

12    converted to the larger size.

13                    And she's saying, "Wow, your order

14    for your larger sizes is higher."

15                    That's why I wrote back, "I'm not

16    going to carry the 100s anymore or I might only

17    carry very little."

18                    So I did a conversion and I'm

19    ordering more 500-count bottles.  So I'm

20    ordering not more pills because I'm not ordering

21    the 100s as well.  I'm ordering more of the

22    larger quantity so we're pulling one bottle

23    instead of five small ones.

24              Q.    Okay.  So would your order include
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   orders for 100 bottle -- 100 tablet bottles and

 2   500 tablet bottles, is that what you're saying?

 3   And so then you just went like this

 4   (indicating)?  Is that --

 5          A.    I probably did not order 100s on

 6   this order.

 7          Q.    Okay.  But when she says "four

 8   times your normal quantity," you're talking

 9   about bottles?

10          A.    Yes.

11          Q.    Okay.

12          A.    The larger bottles.

13          Q.    And was your explanation here

14   sufficient for her, that you recall?

15          A.    I do not remember, but being that

16   I -- they do conversions like that for us,

17   especially when they look at my 100s history,

18   and then they figure out the conversion.  And,

19   yes, usually this would suffice because they do

20   by per pill.

21          Q.    What is the -- who is Aimee

22   Cooper?

23          A.    She is the representative that

24   used to be at Qualitest.  So she was like the
```

1    customer service -- she probably received the

2    order.  They analyze it.  They ask questions, if

3    there are any.  And then they ship it out.

4            Q.    Is she from Endo Pharmaceuticals?

5            A.    No.  She's from Qualitest.  And

6    Qualitest was owned by Endo.

7            Q.    Okay.  Did -- were you getting

8    this hydrocodone from Endo?

9            A.    From Qualitest.

10           Q.    Okay.  You were also getting

11   hydrocodone at this time from Cardinal, right?

12           A.    I was not.  What's the date?  No.

13   No.

14           Q.    This was before it became

15   Schedule II?

16           A.    This was before everything.

17           Q.    Okay.

18           A.    Yep.

19                        - - -

20           (DDM-Strang Exhibit 22 marked.)

21                        - - -

22           Q.    All right.  We're on Exhibit 22.

23   This is DDM58459.  And we're going to start on

24   the first page at the bottom.  This is an e-mail

```
 1    from Laura Shinkle to Leslie Arend on

 2    September 22, 2014.

 3               Do you see that?

 4         A.    Yes.

 5         Q.    Do you know who those people are?

 6         A.    I do not know Laura, but I do know

 7    Leslie was our -- another account rep after

 8    Brandon for Cardinal.

 9         Q.    Okay.  And this e-mail, if you

10    look at the top, was eventually forwarded to

11    you.

12               Do you see that?

13         A.    Yes.

14         Q.    Okay.  And it says, "Good

15    afternoon.  The below order placed 9/21 caused

16    the customer to exceed its maximum accrual limit

17    for the drug family specified for accrual period

18    ending 9/21.  The order has been cut, reported

19    as suspicious to the DEA and will not be

20    shipped."

21               Do you see that?

22         A.    Yes.

23         Q.    And then it says underneath that,

24    drug family is hydrocodone, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes.

2          Q.    And the threshold limit was 6000,

3    right?

4          A.    Mm-hmm.

5          Q.    And that --

6          A.    Yes.

7          Q.    And then the order that was tried

8    to be placed was double the threshold limit at

9    12,000, right?

10         A.    Yes.

11         Q.    Okay.  And you got this e-mail,

12   right?

13         A.    I did.

14         Q.    So does this refresh your

15   recollection about Cardinal cutting orders

16   placed by DDM stores and reporting them to the

17   DEA as suspicious?

18         A.    I do not remember this e-mail, but

19   because I am not directly involved with this, I

20   did not commit it to memory that it was

21   suspicious, sent to the DEA, the thresholds, all

22   of that, because it was from the wholesaler.

23         Q.    Do you know why Tom would copy you

24   and Jason on this?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    To make us aware because he was --

 2   let me see here.  I think just to make us aware.

 3              Q.    Okay.  Well, when you would get an

 4   e-mail like this, you didn't pay much attention

 5   to it, right?

 6              A.    For this one, I did not because it

 7   was one of our stores and it was not my position

 8   to investigate or to look into any of this --

 9              Q.    Okay.  So you --

10              A.    -- because it was Cardinal to the

11   store.

12              Q.    You didn't do any due diligence to

13   determine whether this store was behaving

14   appropriately?

15              A.    I did not.

16                        - - -

17         (DDM-Strang Exhibit 23 marked.)

18                        - - -

19              Q.    Okay.  This is Exhibit 23, which

20   is DDM106436.  And this is an e-mail from Leslie

21   Arend to you directly, copying Jason Briscoe and

22   Pete Ratycz.

23              A.    Mm-hmm.

24              Q.    And it's dated May 7, 2015.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Do you see that?

 2          A.    Mm-hmm, see.

 3          Q.    Okay.  And it says, "Hi, Jill.

 4   Please see the below order for DDM number 33.

 5   I'm guessing on the quantity order it was a fat

 6   finger, but it may be best to verify with the

 7   store."

 8                    Do you see that?

 9          A.    Yes.

10          Q.    And then down below it says, "The

11   customer's order for 24,500 dosage units of

12   hydrocodone caused the customer to exceed its

13   maximum accrual limit of hydrocodone for the

14   accrual period."

15                    Right?

16          A.    Yes.

17          Q.    And then it says that, "That order

18   was cut, reported as suspicious to the DEA and

19   will not be shipped."

20                    Right?

21          A.    Correct.

22          Q.    Okay.  And after reviewing the

23   available information, Leslie determined that a

24   threshold adjustment was not warranted and that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the customer's threshold would remain at 19,000,

 2    right?

 3         A.    Correct.

 4         Q.    Okay.  Did you do anything to

 5    investigate this cut and reported suspicious

 6    order?

 7         A.    I did not because, again, it was

 8    from the wholesaler to the store, so Jason

 9    probably took it from here.

10         Q.    Okay.  But you agree this is just

11    another example of a suspicious order that's

12    been reported to the DEA and cut by Cardinal,

13    right?

14         A.    Yes.  Okay.  And I do want to say

15    that she says, "Was it a fat-finger order?"  So

16    some of these --

17         Q.    Well, she's saying it could have

18    been, right?

19         A.    Could have been.

20         Q.    Okay.

21         A.    Yes.

22         Q.    But you'd agree that this order

23    was cut, reported as suspicious to the DEA and

24    was not shipped, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.

 2          Q.    And that was because it exceeded

 3   Cardinal's thresholds?

 4          A.    Yes.

 5                      - - -

 6          (DDM-Strang Exhibit 24 marked.)

 7                      - - -

 8          Q.    Okay.  24 is DDM13132.  This is an

 9   e-mail from Leslie Arend at Cardinal Health

10   again to you and Jason Briscoe.

11                Do you see that?

12          A.    Yes.

13          Q.    And this is dated October of 2015.

14   And the importance is high.  And it says, "Good

15   morning, Jill and Jason.  Our QRA team has

16   requested store visits for DDM stores 76, 69, 71

17   and 30."

18                Do you see that?

19          A.    Yes.

20          Q.    Do you know why Cardinal Health

21   would request a store visit to -- for specific

22   stores?

23          A.    I do not.

24          Q.    Did you question why they would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    need to visit these stores?

 2           A.    Jason took those.  Jason or Pete

 3    would take this.

 4           Q.    So this isn't something that you

 5    would have dealt with?

 6           A.    Not at all.

 7           Q.    And then it says down below, "Pat

 8    Kelly from Cardinal Health will be performing

 9    the site visits.  He has requested to have the

10    information below by next Tuesday at which point

11    he can coordinate a day, time for a site visit."

12                 Do you see that?

13           A.    Yes, I do.

14           Q.    All right.  And if you look below,

15    he's asking each pharmacy to provide a

16    three-month controlled substance dispensing

17    report for all C-IIs through C-Vs.  The only

18    data he needs is the NDC, drug name, DEA code,

19    and amount dispensed.

20                 Do you see that?

21           A.    I do.

22           Q.    Okay.  And then if you go to the

23    next page -- let me ask this question.  Would it

24    have been easy to gather that information?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    I would not, but I would assume

 2    that they could request the report from our IT

 3    department.

 4            Q.    Okay.

 5            A.    And, in fact, that's what Jason

 6    would have had to do, and I'm also not involved

 7    in any site visits.  So I think Jason took this

 8    one.

 9            Q.    Okay.  All right.  And if you go

10    down further, it asks for answers to the below

11    questions for each one.  It says, 1 is, "Average

12    total number of all prescriptions dispensed per

13    day, including both controlled and

14    non-controlled."

15                  Do you see that?

16            A.    Yes.

17            Q.    And that's information that DDM

18    can gather and provide?

19            A.    Yes.

20            Q.    Okay.  And 2 is, "Average number

21    of controlled substances C-II through C-V

22    prescriptions dispensed per day."

23                  Do you see that?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And DDM has that information as

 2    well?

 3            A.    I believe so, yes.

 4            Q.    Okay.  3 is, "Average number of

 5    all prescriptions paid for in cash per day."

 6                  Do you see that?

 7            A.    Yes.

 8            Q.    Do you know why they'd want that

 9    information?

10            A.    I do not.

11            Q.    Do you know the significance of a

12    prescription being paid for in cash?

13            A.    No.

14            Q.    All right.  4 is, "Average number

15    of controlled substance C-II through C-V

16    prescriptions paid for in cash per day."

17                  Do you see that?

18            A.    Yes.

19            Q.    Okay.  And 5 is, "How many days

20    per month is the pharmacy open for business?"

21                  Do you see that?

22            A.    Yes.

23            Q.    All right.  I mean, all that

24    information is stuff that you guys at DDM could
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    gather and provide, right?

 2           A.    Yes.

 3           Q.    Okay.  Did you ever consider any

 4    of that to be information, or did anybody else

 5    ever consider that to be information as part of

 6    the DDM suspicious order monitoring policies and

 7    procedures?

 8                 MR. JOHNSON:  Objection.

 9           A.    I don't know.

10                      - - -

11           (DDM-Strang Exhibit 25 marked.)

12                      - - -

13           Q.    Exhibit 25 is DDM355119.  This is

14    an e-mail chain that you were eventually added

15    to.  If you look at the bottom, it's from Holly

16    Turner to Pete Ratycz.

17                 Do you know who Holly Turner is?

18           A.    I believe she's a pharmacist for

19    us.

20           Q.    Okay.  And this is in April of

21    2007, and the subject was "Vicodin counts."

22                 Do you see that?

23           A.    Yes.

24           Q.    It says, "Pete, here are the pill
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    counts that you wanted."

 2              And then she provides counts of

 3    Vicodin, brand, and generic, correct?

 4         A.   Yes.

 5         Q.   Do you -- well, let's go -- look

 6    to the next e-mail.  So then Pete responds -- or

 7    it looks like he forwards it to Lisa Biancardi,

 8    Laura Taylor, and you, correct?

 9         A.   Yes.

10         Q.   And copies Tom Nameth.  And it

11    looks like this relates to DDM Number 32, right?

12         A.   Correct.

13         Q.   And the sentences starts, "When it

14    rains, it pours.  Now DDM 32.  At least it's not

15    a two-year span."

16              Do you know what that's referring

17    to?

18         A.   I do not.

19         Q.   You have no idea?

20         A.   No, I don't.

21         Q.   Okay.  Would this suggest that

22    Vicodin pills were missing and that this had

23    been happening in multiple stores?

24              MR. JOHNSON:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I do not know.

 2              Q.    Okay.  If you go up above, there's

 3     no top to this e-mail.  All we have is

 4     "Importance high."  And it says, "Number 32 did

 5     not return any Vicodin or Vicodin ES to return

 6     solutions."

 7                    Do you see that?

 8              A.    Yes.

 9              Q.    Okay.  Do you know what the

10     significance of that is?

11              A.    If they had any outdated returns.

12              Q.    Okay.  But you have no idea what

13     this e-mail is talking about?

14              A.    I do not, other than my name on it

15     and I would have given them the report they

16     wanted, and I would have requested a report from

17     ABC.

18                              - - -

19              (DDM-Strang Exhibit 26 marked.)

20                              - - -

21              Q.    Okay.  Exhibit 26 is my last one.

22     This is the DDM organizational chart.  If you

23     had to, where would you put yourself on this?

24              A.    I would be under Pete Ratycz, vice
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    president.

 2           Q.    So would we basically draw a line

 3    down under the Pete Ratycz and put a box here

 4    for Jill?

 5           A.    Correct.

 6           Q.    And would you be on the same level

 7    as Dave Svenson and Nimesh Patel?

 8           A.    No.

 9           Q.    Above or below?

10           A.    Probably -- well, some might say

11    I'm on the same level, but I would say below.

12    But I'd probably -- they're running -- Nimesh is

13    running Gentry Health.  I'm running the

14    warehouse.  Dave is running Home Health Care.

15           Q.    Okay.  And the warehouse, does

16    that include more than just prescription drugs?

17           A.    Our warehouse -- I run the

18    prescription -- the pharmacy warehouse.

19           Q.    Okay.

20           A.    And we are attached to the main

21    warehouse.

22           Q.    So your warehouse only has

23    prescription drugs in it?

24           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  And you report directly to

 2    Pete?

 3              A.    Yes.

 4              Q.    And you have for the 21 years

 5    you've been in that role?

 6              A.    There was someone else before him.

 7    I don't -- I think him and Tom flip-flopped

 8    positions.

 9              Q.    Okay.  Do you know who that was?

10              A.    Well, Forrest was -- Forrest Stout

11    was one of the names.  I've got to go back a

12    ways.  And then Tom and then Pete.

13              Q.    Okay.  And Pete reports to Doug

14    Boodjeh, right, who's the COO?

15              A.    Yes.

16              Q.    And under Doug Boodjeh's

17    responsibilities, that includes pharmacy, right?

18              A.    Yes.

19              Q.    Okay.  What's the highest level of

20    education that you have?

21              A.    A college degree.

22              Q.    Where did you go to college?

23              A.    Bowling Green State University.

24              Q.    Okay.  And did you graduate?
```

Highly Confidential - Subject to Further Confidentiality Review

1            A.    I did.

2            Q.    And what was your major?

3            A.    My major was liberal arts.  I

4    started as a business degree and ended with

5    liberal arts.

6            Q.    Okay.  Do you have a master's

7    degree?

8            A.    No.

9            Q.    Okay.  Do you have any education

10   after your undergraduate?

11           A.    No.

12           Q.    Do you have any -- so your degree

13   wasn't science-based?

14           A.    No.

15           Q.    Okay.  So you don't have a

16   pharmacy degree --

17           A.    I do not.

18           Q.    -- or PharmD?  Okay.

19                 MR. JOHNSON:  You jumped out on

20          his question again.

21                 THE WITNESS:  Sorry.

22           Q.    All right.  And after you -- what

23   year did you graduate Bowling Green?

24           A.    1993.

```
 1              Q.    Okay.  And what was your first job

 2    after you graduated?

 3              A.    I've worked for Discount Drug Mart

 4    for 33 years.  So I worked for the store all the

 5    way through college.  And then I went to our

 6    corporate office in 1993, and I was the

 7    assistant to the director of operations for two

 8    years right out of college.

 9              Q.    Okay.  So you worked at DDM in

10    college.  And then as soon as you graduated, you

11    went to the corporate headquarters?

12              A.    Yeah.  I've worked there -- I

13    worked all my teenage years, all through high

14    school, all through -- yeah.  I was 14.

15                    So I've been there.  And then I

16    decided to try for -- to apply at corporate, and

17    then I got that job.  Then I was asked to take

18    over the pharmacy warehouse and the pharmacy

19    buying.  I worked in the warehouse for two years

20    as a puller and watched all the behind the

21    scenes and knew what I could improve on.  And

22    then I became the buyer and the pharmacy

23    supervisor in November of 1997.

24              Q.    You anticipated a lot of my
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   questions there.

 2         A.    Sorry.

 3         Q.    No.  That's good.

 4               Do you report to anybody else

 5   other than Pete?

 6         A.    No.

 7         Q.    Did you ever meet with Doug

 8   Boodjeh?

 9         A.    I mean, I meet with him because he

10   owns the company, but not --

11         Q.    What kind of a context would you

12   meet with him?

13         A.    Just to say "hi" and "how are

14   things going" and how am I doing.

15         Q.    Are there ever any sort of like

16   scheduled DDM corporate meetings that occur on a

17   regular basis?

18         A.    No, no.  I was -- I was thinking

19   you were going towards the wholesaler that we

20   meet quarterly, but no.

21         Q.    Okay.

22         A.    Discount Drug Mart -- no.  We

23   every once in a while have a department head

24   meeting.  But other than that, no.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Have you ever sat in a meeting

 2   with any of the Boodjehs to discuss DDM's

 3   obligations under the Controlled Substances Act?

 4          A.    No.

 5          Q.    Have you ever discussed that topic

 6   with them at all?

 7          A.    No.

 8          Q.    Have you ever been included on an

 9   e-mail in which that topic was being discussed?

10          A.    Not with them, no.

11          Q.    Do you know whether they play any

12   role in making sure that DDM fulfills its

13   obligations under the Controlled Substances Act?

14          A.    I do not, no.

15          Q.    Would you expect that they do?

16                MR. JOHNSON:  Objection.

17          A.    I don't know.

18          Q.    How closely do you work with

19   Mr. Ratycz?

20          A.    Close.  I'm in the same hallway.

21          Q.    You said that you're two offices

22   away from each other, right?

23          A.    Yes.

24          Q.    Was Tom Nameth two offices away
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    from you, too?

 2           A.    Yes.   We've remodeled since then.

 3    But, yes, we were all in the same hallway.

 4           Q.    How often would you discuss with

 5    Mr. Ratycz DDM's obligations to monitor

 6    suspicious orders under the Controlled

 7    Substances Act?

 8           A.    We didn't.

 9           Q.    You didn't?

10           A.    We didn't.

11           Q.    You never discussed that with him?

12           A.    I do not believe so, no.

13           Q.    Okay.  Did you ever discuss DDM's

14    obligations to monitor suspicious orders under

15    the Controlled Substances Act with Tom Nameth?

16           A.    I'm sure we have.

17           Q.    Do you recall any instance where

18    you did?

19           A.    I do not recall.  He's been

20    retired for quite a few years.

21           Q.    How often do you discuss DDM's --

22    if at all, DDM's obligations to monitor

23    suspicious orders under the Controlled

24    Substances Act with Jason Briscoe?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Same as Tom.  Even when I was

 2    writing VAWD and all of that, I didn't have

 3    sit-down conversations and lengthy meetings

 4    about any of it, so I ...

 5            Q.    So you think you did; you just

 6    don't remember it?

 7            A.    I honestly do not remember.

 8            Q.    And aside from the VAWD

 9    accreditation, do you recall -- ever recall a

10    time where you discussed it with any of them?

11            A.    No.

12                  MR. MULLIGAN:  Let's just go off

13            the record for a second, and let's see

14            if I have any other questions, and then

15            I may be done.

16                  THE VIDEOGRAPHER:  The time is now

17            2:43.  Going off the record.

18                  (Recess taken.)

19                  THE VIDEOGRAPHER:  The time is now

20            2:46.  Back on the record.

21    BY MR. MULLIGAN:

22            Q.    Okay.  So we talked about a lot of

23    stuff today that you and others did at DDM

24    regarding suspicious order monitoring, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Correct.

 2          Q.    Is there anything else that

 3   anybody at DDM did that you know of that we

 4   haven't talked about?

 5          A.    Not that I know of.

 6          Q.    Okay.  And I know you said your

 7   understanding of the Controlled Substances Act

 8   you sort of acquired through on-the-job

 9   training, correct?

10          A.    Correct.

11          Q.    And is it your testimony today

12   that DDM's suspicious order monitoring policies

13   and procedures satisfied its obligations under

14   the Controlled Substances Act?

15                MR. JOHNSON:  Objection.

16          A.    I know -- they're not in writing,

17   but I do believe that we did follow what we

18   needed to do.

19          Q.    So it's your -- it's your

20   testimony and your belief that DDM fulfilled its

21   obligations under the Controlled Substances Act,

22   correct?

23                MR. JOHNSON:  Objection.

24          A.    For the orders coming to the
```

```
 1    warehouse and leaving the distribution center,

 2    yes.

 3              Q.    Okay.  So within your box?

 4              A.    Yes.

 5              Q.    You don't know outside of that?

 6              A.    Yes.

 7              Q.    Okay.  And it's also your

 8    testimony that there's nothing else that DDM

 9    could have done to identify suspicious orders or

10    prevent diversion other than what it did do,

11    correct?

12              MR. JOHNSON:  Objection.

13              A.    I don't know.

14              Q.    You don't know?  So maybe there

15    were things you could have done.  You just don't

16    know what they are?

17              A.    Anything could always be improved.

18    But I feel that what we were doing was

19    identifying the order errors that we needed to

20    identify.

21              Q.    So your testimony is that you

22    think what DDM did was sufficient, but you don't

23    know whether there's more you could have done;

24    is that fair?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    I don't know.

 2              Q.    So you don't have any -- you're

 3    not taking any position about whether there's

 4    more that DDM could have done to prevent against

 5    diversion?  You can't emphatically say that

 6    there wasn't?

 7              A.    Looking at everything the way I

 8    see it come through, no.  I think -- I used what

 9    I had and the tools that we have in place.

10              Q.    Having seen those documents

11    where -- when Cardinal posts thresholds, orders

12    started getting cut left and right, does that

13    make you think that maybe DDM could have done

14    more prior to that time?

15              MR. JOHNSON:  Objection.

16              A.    I do not.

17              Q.    You don't think they could have

18    done anything more?

19              MR. JOHNSON:  I guess objection.

20              It's the same question, I guess, but ...

21              A.    I'm trying to think.

22              Q.    I think she's thinking about

23    something.

24              A.    I'm trying to think, but -- the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    orders that we get are order errors.  They're

 2    not suspicious orders when they're ordering, you

 3    know, two instead of one, and we're looking at

 4    the history.

 5              So to set thresholds, that's what

 6    Cardinal does because they don't -- we're a

 7    number -- we're a number to them.  For me, our

 8    stores are our customers.  And I know the busy

 9    ones.  I know the ones that are not as busy.  I

10    know all of the pharmacists.  So I feel that had

11    we had thresholds in place, of course, we would

12    have used them, but we didn't.  And I base all

13    of our knowledge, all of the intervention of

14    everybody involved, including from the

15    pharmacists when they placed the order to all of

16    the tools until it left the distribution center,

17    that we did everything we could that it was not

18    a suspicious order.  It was if there were any

19    order errors.  As few as there were, they were

20    not suspicious.

21         Q.    But you didn't do anything to

22    determine whether they were suspicious or not,

23    right?  I mean, you've already said that today.

24              MR. JOHNSON:  Objection.
```

```
 1              Q.    I'm just trying to understand
 2   because you're using "order errors" and
 3   "suspicious orders" as the same, but I --
 4              A.    No.
 5              Q.    I think they're different, right?
 6              A.    They are different, but any order
 7   error -- when I looked at all the tools that I
 8   was given, we made the judgment call.  And --
 9   and if I sent out an extra bottle of something
10   and it went to the store, it's that store's
11   responsibility to make sure that those
12   prescriptions and everything was lawful.  And,
13   again, using the reports that we have, if it
14   didn't seem that way, you know, there was
15   follow-up on that.
16              Q.    Okay.  So my question to you was,
17   having seen the documents where Cardinal imposed
18   thresholds, does that make you think DDM could
19   have done more prior to that time?
20              MR. JOHNSON:  Objection.
21              Q.    Because we saw thresholds were put
22   in place.  All of a sudden, orders are getting
23   cut and reported to the DEA.  Presumably that's
24   the first time any DDM order had ever been
```

1    reported to the DEA, right?

2          A.    Correct, from -- well, I should

3    say from them.  I can't base what their orders

4    were.  I don't know if that was a fat finger.  I

5    don't know if that was them intentionally trying

6    to get something.  I don't know.  But that --

7    those quantities are not what we see at the

8    warehouse.

9          Q.    Well, you'd agree that Cardinal --

10   Cardinal, unlike DDM, reported fat-finger

11   reports to the DEA, didn't they?

12               MR. JOHNSON:  Objection.

13         A.    They reported them as suspicious.

14         Q.    Correct.  But DDM never did that,

15   right?

16         A.    We never had --

17               MR. JOHNSON:  Objection.

18               THE WITNESS:  I'm sorry.

19               MR. JOHNSON:  Go ahead.

20         A.    We looked at it as an order error,

21   and we confirmed what the store really needed.

22         Q.    So Cardinal -- in terms of

23   reporting, Cardinal's system was more sensitive,

24   and they reported more to the DEA than DDM did,

```
 1    right?

 2                    MR. JOHNSON:  Objection.

 3         A.    I would say that because they're a

 4    bigger entity than us, and they have way more

 5    customers, that they are only basing it on true

 6    numbers.

 7         Q.    Well, you're speculating with

 8    that.  I'm just asking you whether they were --

 9    they were reporting orders that you wouldn't

10    have reported; is that fair?

11                    MR. JOHNSON:  Objection.

12         A.    It's not fair.

13         Q.    Explain that to me.

14         A.    Because it's not that I wouldn't

15    have reported it.  I confirmed something that

16    was an order error based on the quantity.

17    Again, if we go back to an example of a huge

18    quantity, but they're so few and far between

19    when they do come up, that when I can -- when I

20    feel good about looking at their history and

21    confirming it with the pharmacist and confirming

22    it with everybody else in our chain, you know,

23    as far as history.

24         Q.    You're going in circles around me,
```

```
 1    and I know what --

 2            A.    Sorry.

 3            Q.    -- you're doing, and it's okay.

 4    But we can go back and look at a document.

 5                  Do you remember the document where

 6    they notified you guys that there was an order

 7    that was cut, it was reported to the DEA as

 8    suspicious, and it wasn't shipped, and then they

 9    said, "Maybe it was a fat finger," right?

10            A.    Correct.

11            Q.    So they already reported it to the

12    DEA before they asked whether it was a fat

13    finger, right?

14            A.    They cut it.

15            Q.    Yeah.  But you -- if it had been

16    you, there wouldn't have been a threshold.  You

17    would have looked at it, and then you would have

18    done some diligence, due diligence, and then

19    you -- well, you didn't, because you never

20    did -- you would not have reported that to the

21    DEA, right?

22            A.    I did do my due diligence.

23            Q.    But you didn't ever report

24    anything to the DEA?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I did not.

 2        Q.    Okay.  You would identify the fat

 3   finger situation, fix it or resolve it, work it

 4   out, but it wouldn't get reported; whereas

 5   Cardinal reports it, and then after the fact,

 6   you've got to go and figure out what happened,

 7   right?

 8        A.    Yes.  Probably because, again, we

 9   know our customers.  So our customers are the

10   stores, and I'm -- I'm not going to look at it

11   as -- I'm going to look at it as "Let's fix

12   this" because it was wrong when it came over.

13        Q.    Okay.  And so I'm going back to my

14   question I asked you before, which is you would

15   agree, based on these documents, that Cardinal's

16   reporting system to the DEA was more sensitive

17   than DDM's in that they would report more stuff

18   than you would?

19              MR. JOHNSON:  Objection.

20        A.    They see way more orders than I

21   do.

22        Q.    That's not an answer to my

23   question.

24        A.    But I don't know how to answer
```

1    your question.

2           Q.    Okay.  That fat finger one that

3    they cut, would you have reported that to the

4    DEA?

5           A.    No, because it would --

6                 MR. JOHNSON:  Objection.

7                 But go ahead.

8           A.    No, because it wouldn't -- when it

9    came over, it would have been investigated and

10   looked at --

11          Q.    Right.

12          A.    -- and stopped before it left the

13   distribution center.

14          Q.    Right.

15          A.    They just automatically cut.

16          Q.    But they didn't send it either,

17   did they?

18          A.    They automatically cut it.  They

19   didn't even ask any questions.

20          Q.    Right.  So they cut it, didn't

21   ship it, and reported it.  You would have

22   called, stopped it, but not reported it, fair?

23          A.    Fair, as an order, yes.

24          Q.    And you -- because you've never

Highly Confidential - Subject to Further Confidentiality Review

```
 1   reported a single suspicious order to the DEA

 2   ever, right?

 3           A.    Correct.

 4                 MR. MULLIGAN:  Okay.  No further

 5       questions.

 6                 THE VIDEOGRAPHER:  The time is now

 7       2:55.  This concludes the deposition.

 8       Going off the record.

 9          (Signature not waived.)

10                        - - -

11          Thereupon, at 2:55 p.m., on Thursday,

12   January 3, 2019, the deposition was concluded.

13                        - - -

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      CERTIFICATE

 2   STATE OF OHIO        :

                              SS:

 3   COUNTY OF _____:

 4

 5            I, JILL A. STRANG, do hereby certify that I

 6   have read the foregoing transcript of my

 7   cross-examination given on January 3, 2019; that

 8   together with the correction page attached hereto

 9   noting changes in form or substance, if any, it is

10   true and correct.

11                    _____

                         JILL A. STRANG

12

13            I do hereby certify that the foregoing

14   transcript of the cross-examination of JILL A. STRANG

15   was submitted to the witness for reading and signing;

16   that after he had stated to the undersigned Notary

17   Public that he had read and examined his

18   cross-examination, he signed the same in my presence

19   on the _____ day of _____, 2019.

20

                      _____

21                       NOTARY PUBLIC - STATE OF OHIO

22

23   My Commission Expires:

24   _____, _____.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    CERTIFICATE
2   STATE OF OHIO        :
                                   SS:
3   COUNTY OF FRANKLIN   :
4           I, Carol A. Kirk, a Registered Merit
    Reporter and Notary Public in and for the State of
5   Ohio, duly commissioned and qualified, do hereby
    certify that the within-named JILL A. STRANG was by me
6   first duly sworn to testify to the truth, the whole
    truth, and nothing but the truth in the cause
7   aforesaid; that the deposition then given by him was
    by me reduced to stenotype in the presence of said
8   witness; that the foregoing is a true and correct
    transcript of the deposition so given by him; that the
9   deposition was taken at the time and place in the
    caption specified and was completed without
10  adjournment; and that I am in no way related to or
    employed by any attorney or party hereto or
11  financially interested in the action; and I am not,
    nor is the court reporting firm with which I am
12  affiliated, under a contract as defined in Civil Rule
    28(D).
13
            IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my seal of office at Columbus, Ohio
    on this 8th day of January 2019.
15
16
17
18                    _____
                      CAROL A. KIRK, RMR
19                    NOTARY PUBLIC - STATE OF OHIO
20  My Commission Expires:  April 9, 2022.
21                    - - -
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2   I, JILL A. STRANG, have read the transcript

     of my deposition taken on the 3rd day of January 2019,

 3   or the same has been read to me.  I request that the

     following changes be entered upon the record for the

 4   reasons so indicated.  I have signed the signature

     page and authorize you to attach the same to the

 5   original transcript.

 6   Page  Line  Correction or Change and Reason:

 7   ____  ____  _____

 8   ____  ____  _____

 9   ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

23   ____  ____  _____

24   Date _____ Signature _____
```