Page 1

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF OHIO
3               EASTERN DIVISION
4
5          ~~~~~~~~~~~~~~~~~~~~~
6
7    IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
     OPIATE LITIGATION
8                                     Case No.
                                      17-md-2804
9
                                      Judge Dan Aaron
10                                    Polster
11   This document relates to:
12   The County of Summit, Ohio, et al. v. Purdue
     Pharma L.P., et al.
13
     Case No. 18-OP-45090 (N.D. Ohio)
14
15
          ~~~~~~~~~~~~~~~~~~~~~
16
             Videotaped Deposition of
17
                JEFFREY STURMI
18
             November 15, 2018
19                9:09 a.m.
20
21
                Taken at:
22
             Hilton Garden Inn
23          1307 East Market Street
                Akron, Ohio
24
           Stephen J. DeBacco, RPR

Page 2

```
1  APPEARANCES:
2
3  On behalf of the City of Akron, Summit
   County, and the Witness:
4
5     Motley Rice LLC, by
      JODI WESTBROOK FLOWERS, ESQ.
      TOPE O. LEYIMU, ESQ.
6     TAMMY RIVERS, ESQ.
      28 Bridgeside Boulevard
7     Mt. Pleasant, South Carolina 29464
      (843) 216-9163
8     jflowers@motleyrice.com
      (843) 216-9107
9     tleyimu@motleyrice.com
10
11 On behalf of McKesson Corporation:
12    Covington & Burling LLP, by
      LAURA FLAHIVE WU, ESQ.
13    STEPHEN F. RAIOLA, ESQ.
      One CityCenter
14    850 Tenth Street, Northwest
      Washington, D.C. 20001-4956
15    (202) 662-5982
      lflahivewu@cov.com
16    (202) 662-5786
      sraiola@cov.com
17
   On behalf of Walmart, Inc.:
18
      Jones Day, by
19    KRISTIN S.M. MORRISON, ESQ.
      North Point
20    901 Lakeside Avenue
      Cleveland, Ohio 44114-1190
21    (216) 586-7375
      kmorrison@jonesday.com
22
         ~ ~ ~ ~ ~
23
24
25
```

Page 3

```
1  APPEARANCES, Continued:
2
   On behalf of CVS Rx Services, Inc., and
3  CVS Indiana, LLC:
4     Zuckerman Spaeder LLP, by
      STEVEN N. HERMAN, ESQ.
5     1800 M Street Northwest, Suite 1000
      Washington, D.C. 20036-5807
6     (202) 778-1883
      sherman@zuckerman.com
7
8  On behalf of Endo Health Solutions, Inc.,
   and Endo Pharmaceuticals, Inc.:
9
      Baker Hostetler, by
10    CAROLE S. RENDON, ESQ.
      Key Tower
11    127 Public Square, Suite 2000
      Cleveland, Ohio 44114-1214
12    (216) 861-7420
      crendon@bakerlaw.com
13
14 On behalf of AmerisourceBergen, via
   Veritext Virtual:
15
      Reed Smith, LLP, by
16    NICHOLAS R. RODRIGUEZ, ESQ.
      Three Logan Square
17    1717 Arch Street, Suite 3100
      Philadelphia, Pennsylvania 19103
18    (215) 241 7947
      nrodriguez@reedsmith.com
19
         ~ ~ ~ ~ ~
20
21
22
23
24
25
```

Page 4

```
1  APPEARANCES, Continued:
2
   On behalf of Cephalon, Inc.; Teva
3  Pharmaceuticals USA, Inc.; Actavis, LLC;
   Actavis Pharma, Inc. F/k/a Watson Pharma,
4  Inc.; and Watson Laboratories, Inc., via
   teleconference:
5
      Morgan, Lewis & Bockius LLP, by
6     JANE E. DUDZINSKI, ESQ.
      77 West Wacker Drive
7     Chicago, Illinois 60601
      (312) 324-1125
8     jane.dudzinski@morganlewis.com
9        ~ ~ ~ ~ ~
10
11 ALSO PRESENT:
12    Will Hawkins, Williams & Connolly
      Shaun Crum, Legal Videographer
13
         ~ ~ ~ ~ ~
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1        TRANSCRIPT INDEX
2
3  APPEARANCES.............................    2
4
5  INDEX OF EXHIBITS ......................    6
6
7  EXAMINATION OF JEFFREY STURMI
8  By Ms. Wu................................    16
9  By Mr. Raiola............................   257
10 By Ms. Rendon............................   261
11 By Mr. Herman............................   323
12
13 REPORTER'S CERTIFICATE..................   341
14
15 EXHIBIT CUSTODY
16 EXHIBITS RETAINED BY THE COURT REPORTER
17
18
19
20
21
22
23
24
25
```

## Page 6

INDEX OF EXHIBITS

NUMBER         DESCRIPTION         MARKED

Exhibit 1  5/25/2018 E-Mail from Jeff ... 83
        Sturmi Re: Akron Recovery
        Court Information, with
        Attached Recovery Court
        Participant Handbook,
        AKRON_001105240 to 001105287

Exhibit 2  9/5/2017 E-Mail from Jeff .... 101
        Sturmi to Aaron DeBord Re:
        Recovery Court Check In,
        AKRON_001102890

Exhibit 3  Web Printout Titled "Drug .... 105
        Court, A Program Offered
        Through Akron Municipal
        Court and Oriana House,
        Inc."

Exhibit 4  January 2016 E-Mail Chain .... 113
        Re: Follow-Up on Treatment
        Providers, AKRON_001115119
        to 001115122

Exhibit 5  11/22/2016 E-Mail from Jeff .. 122
        Sturmi Re: SAMSHA
        Enhancement Drug Court
        Grant, AKRON_001103385 to
        001103387

Exhibit 6  2/22/2011 E-Mail Chain Re:  .. 146
        Drug Information, with
        Attached Document Titled
        "Drug Abuse Trends in the
        Akron-Canton Region,"
        AKRON_001109379 to 001109392

Exhibit 7  4/16/2018 E-Mail Chain ....... 154
        Between Jeff Sturmi and
        Shaina Rochford Re:
        Interview, AKRON_001104338
        to 001104342

## Page 7

Exhibit 8  Document Titled "Akron ....... 168
        Municipal Court Drug Court
        Preliminary Screening,"
        AKRON_000226917

Exhibit 9  Document Titled "Drug Court .. 185
        Case History," Case No.
        12CRB03563

Exhibit 10  12/22/2011 Document Titled ... 192
        Akron Municipal Court Felony
        Drug Court Costs Invoice,"
        AKRON_000225302

Exhibit 11  Document Titled "2018 Budget . 197
        Plan, City of Akron, Ohio"

Exhibit 12  Summit County and City of .... 200
        Kron, Ohio Plaintiff's First
        Amended Responses and
        Objections to Distributor
        Defendants' Third set of
        Interrogatories

Exhibit 13  The City of Akron, Ohio ....... 204
        Plaintiff's Supplemental
        Responses and Objections to
        Distributor Defendants'
        Interrogatory No. 18
        Pursuant to Special Master
        Cohen's October 23, 2018
        Order

Exhibit 14  September 2016 E-Mail Chain .. 210
        Re: ATP Memo -
        Changes/Eligibility
        Modifications, with
        Attachment, AKRON_001102114
        to 01102116

Exhibit 15  May/June 2016 E-Mail Chain .. 215
        Re: Project Information
        Needed by 6/6/16,
        AKRON_001100947 to 001100949

## Page 8

Exhibit 16  6/27/2017 E-Mail Chain Re: ... 220
        For Immediate Release,
        County of Summit Awarded
        Nearly $1 Million, etc.,
        with Attachment,
        SUMMIT_001274385 to
        001274391

Exhibit 17  9/14/2015 E-Mail from Julie .. 225
        Ellison Re: Addiction
        Treatment Program, With
        Attached "Advisory Committee
        Roster and Participation
        Agreement," AKRON_001114874
        to 001114879

Exhibit 18  3/26/2015 E-Mail from Libby .. 235
        Ellis Re: SAMSHA Drug Court
        Grant Proposal, with
        Attachment, AKRON_001114483
        to 001114548

Exhibit 19  Spreadsheet Titled "Drug ..... 241
        Cases 2006-2018 Detail,"
        AKRON_000004078

Exhibit 20  Web Printout Titled "2018 .... 258
        Session Descriptions"

Exhibit 21  June 2017 E-Mail Chain Re: ... 284
        ATP Funding Opportunity,
        AKRON_001103864 to 001103866

Exhibit 22  9/15/2017 E-Mail from Alexa .. 304
        Montesano Re: IBH Event on
        9/14/17, AKRON_001102789

Exhibit 23  9/5/2014 E-Mail from Lisa V. .. 323
        DiSabato-Moore Re: Handouts
        for Friday's Meeting, With
        Attachment, SUMMIT_000027031
        to 000027041

Exhibit 24  7/12/2017 MyTownNEO Article .. 336
        Titled "Summit County Drug
        Courts are Boosting
        Services"

## Page 9

INDEX OF VIDEO OBJECTION

OBJECT                          PAGE
objection............................ 22
object............................... 23
object............................... 23
object............................... 23
object............................... 24
objection............................ 25
object............................... 26
object............................... 27
object............................... 29
object............................... 31
object............................... 31
object............................... 33
object............................... 34
object............................... 35
object............................... 38
object............................... 40
object............................... 41
object............................... 41
object............................... 41
object............................... 41
object............................... 42
object............................... 43
object............................... 48
object............................... 48
object............................... 49
object............................... 49
object............................... 51
object............................... 56
object............................... 57
object............................... 57
object............................... 57
object............................... 58
object............................... 59
object............................... 60
object............................... 60
object............................... 61
object............................... 61
object............................... 62
object............................... 64
objection............................ 64
object............................... 67
objection............................ 67
object............................... 67
object............................... 68

Page 10

1 object..................... 68
  object..................... 74
2 object..................... 75
  object..................... 77
3 object..................... 78
  object..................... 78
4 object..................... 78
  object..................... 79
5 object..................... 80
  object..................... 89
6 object..................... 90
  object..................... 91
7 object..................... 92
  object..................... 93
8 object..................... 94
  object..................... 94
9 object..................... 95
  object..................... 96
10 object..................... 96
  object..................... 97
11 object..................... 97
  object..................... 97
12 object..................... 97
  object..................... 98
13 object..................... 99
  object..................... 99
14 object..................... 99
  object..................... 100
15 object..................... 103
  object..................... 103
16 object..................... 104
  object..................... 106
17 object..................... 107
  object..................... 109
18 object..................... 109
  object..................... 110
19 object..................... 110
  object..................... 111
20 object..................... 117
  object..................... 119
21 object..................... 119
  object..................... 121
22 object..................... 121
  object..................... 124
23 object..................... 124
  object..................... 125
24 object..................... 125
  object..................... 126
25 object..................... 127

Page 11

1 object..................... 127
  objection.................. 127
2 object..................... 127
  object..................... 128
3 object..................... 128
  object..................... 129
4 object..................... 129
  object..................... 130
5 object..................... 130
  object..................... 131
6 object..................... 131
  object..................... 132
7 object..................... 132
  object..................... 132
8 object..................... 132
  object..................... 133
9 object..................... 133
  object..................... 134
10 object..................... 134
  object..................... 134
11 object..................... 135
  object..................... 135
12 object..................... 137
  object..................... 138
13 object..................... 138
  object..................... 139
14 object..................... 140
  object..................... 140
15 object..................... 140
  object..................... 141
16 object..................... 141
  object..................... 141
17 object..................... 142
  object..................... 142
18 object..................... 143
  object..................... 143
19 object..................... 143
  object..................... 144
20 object..................... 144
  object..................... 145
21 object..................... 145
  object..................... 150
22 object..................... 151
  object..................... 151
23 object..................... 152
  object..................... 152
24 object..................... 153
  object..................... 153
25 object..................... 154

Page 12

1 object..................... 157
  object..................... 157
2 object..................... 158
  object..................... 158
3 object..................... 158
  objection.................. 161
4 object..................... 161
  object..................... 163
5 object..................... 164
  object..................... 165
6 object..................... 167
  object..................... 180
7 object..................... 180
  object..................... 181
8 objection.................. 181
  object..................... 181
9 object..................... 183
  object..................... 183
10 object..................... 183
  object..................... 184
11 object..................... 189
  object..................... 190
12 object..................... 193
  object..................... 194
13 object..................... 194
  object..................... 195
14 object..................... 195
  object..................... 198
15 object..................... 198
  object..................... 198
16 object..................... 199
  object..................... 199
17 object..................... 200
  object..................... 200
18 object..................... 201
  object..................... 202
19 object..................... 206
  objection.................. 206
20 object..................... 206
  object..................... 207
21 object..................... 208
  object..................... 210
22 object..................... 214
  object..................... 227
23 object..................... 232
  object..................... 233
24 object..................... 234
  object..................... 235
25 objection.................. 235

Page 13

1 object..................... 239
  object..................... 239
2 object..................... 240
  object..................... 241
3 object..................... 242
  object..................... 243
4 object..................... 245
  objection.................. 245
5 object..................... 246
  object..................... 246
6 object..................... 247
  object..................... 253
7 object..................... 260
  object..................... 261
8 object..................... 265
  object..................... 273
9 object..................... 277
  object..................... 278
10 object..................... 278
  object..................... 279
11 object..................... 280
  object..................... 282
12 object..................... 282
  object..................... 284
13 object..................... 289
  object..................... 290
14 object..................... 291
  object..................... 291
15 object..................... 292
  object..................... 292
16 object..................... 293
  object..................... 293
17 object..................... 295
  object..................... 295
18 object..................... 296
  object..................... 298
19 object..................... 299
  object..................... 300
20 object..................... 303
  object..................... 303
21 object..................... 308
  object..................... 309
22 object..................... 310
  object..................... 311
23 object..................... 311
  object..................... 311
24 object..................... 312
  object..................... 312
25 object..................... 313

Veritext Legal Solutions
www.veritext.com
888-391-3376

Page 14

1 object.................................... 313
  object.................................... 314
2 object.................................... 315
  objection.............................. 317
3 object.................................... 320
  object.................................... 321
4 object.................................... 326
  object.................................... 327
5 object.................................... 328
  object.................................... 328
6 object.................................... 333
  object.................................... 335
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 15

1        THE VIDEOGRAPHER:  The date is
2 November 15, 2018.  We're on the record at
3 a.m.
4        This is the deposition of Jeffrey
5 Sturmi in the matter of In Re: National
6 Prescription Opiate Litigation, in the United
7 States District Court, Northern District of
8 Ohio, Eastern Division.
9        Will counsel please state
10 appearances for the record.
11        MS. LEYIMU:  This is Tope Leyimu
12 with Motley Rice.  I'm on behalf of the
13 witness, City of Akron, and County of Summit.
14        MS. FLOWERS:  This is Jodi Flowers
15 on behalf of the County of Summit and the City
16 of Akron, and the witness.
17        MS. RIVERS:  Tammy Rivers, Summit
18 County, and the City of Akron.
19        MS. MORRISON:  Kristin Morrison,
20 Jones Day, on behalf of Walmart.
21        MR. HAWKINS:  Will Hawkins from
22 Williams & Connolly on behalf of Cardinal
23 Health.
24        MR. HERMAN:  Steve Herman from
25 Zuckerman Spaeder on behalf of CVS Indiana LLC

Page 16

1 and CVS Rx Services.
2        MS. HARTMAN:  Ruth Hartman on
3 behalf of Endo Pharmaceuticals and Endo Health
4 Solutions.
5        MS. RENDON:  Carole Rendon, Baker
6 Hostetler, also on behalf of the Endo
7 Defendants.
8        MR. RAIOLA:  Stephen Raiola,
9 Covington & Burling, on behalf of McKesson.
10        MS. WU:  Laura Wu, also of
11 Covington, on behalf of McKesson.
12        THE VIDEOGRAPHER:  Will counsel on
13 the phone please state appearances for the
14 record.
15        MR. RODRIGUEZ:  Nicholas Rodriguez
16 of Reed Smith on behalf of AmerisourceBergen.
17        MS. DUDZINKSI:  Jane Dudzinski of
18 Morgan Lewis on behalf of the Teva Defendants.
19        JEFFREY STURMI, of lawful age, called for
20 examination as provided by the Federal Rules of
21 Civil Procedure, being by me first duly sworn,
22 as hereinafter certified, deposed and said as
23 follows:
24        EXAMINATION OF JEFFREY STURMI
25 BY MS. WU:

Page 17

1    Q.   Good morning, Mr. Sturmi.
2    A.   Good morning.
3    Q.   I'm Laura Wu, as you heard, and
4 I'll be taking your deposition today.
5        Could you state your current
6 employment?
7    A.   Yes.  I work for the Akron
8 Municipal Court with the City of Akron.
9    Q.   And what is your current title?
10    A.   My current title is the deputy
11 chief probation officer.
12    Q.   For the record, could you please
13 state your address?
14    A.   Yes.  My add- --- my home address is
15 3195 Marquette Street Northwest.  That's in
16 Uniontown, Ohio 44685.
17    Q.   Thank you.  Mr. Sturmi, have you
18 ever been deposed before?
19    A.   I have not.
20    Q.   Have you ever testified in court or
21 another proceeding?
22    A.   I have.
23    Q.   How many times have you testified
24 in court?
25    A.   Hundreds.

5 (Pages 14 - 17)

Page 18

1    Q.    What are -- at a high level, what's
2 the nature of the testimony that you've given
3 in court?
4    A.    I manage the Akron Municipal Drug
5 Court Program, so there's a weekly session that
6 we operate, and so often we're on the record
7 testifying to a variety of information.
8    Q.    Would you consider yourself
9 providing factual testimony in the weekly
10 status hearings you just described?
11    A.    Yes.
12    Q.    Does your testimony ever relate to
13 the use of opioid drugs?
14    A.    Yes.
15    Q.    What is the nature of your
16 testimony relating to opioid drugs at these
17 weekly sessions?
18    A.    It depends on the situation.
19 Depends on the client that we're discussing.
20 So it's a lot of variables involved in that.
21    Q.    Is your testimony limited to fact
22 testimony given in your capacity as a probation
23 officer?
24    A.    Not sure what you mean by that
25 question.

Page 19

1    Q.    Certainly.  Let me rephrase.
2        In what capacity do you provide
3 testimony at the weekly status hearings?
4    A.    As the manager, you know, of that
5 program.  So, you know, I work for the judge,
6 and so often he is asking a variety of
7 questions related to the clients that we serve.
8    Q.    Do you typically testify at every
9 weekly status hearing?
10    A.    There is all kinds of discussion
11 that's taking place during the drug court
12 session, so I don't know whether you would
13 classify that as testimony.  But it is in a
14 courtroom and it's on the record.
15    Q.    Understood.
16        Now, you said that you've never sat
17 for a deposition before, so I'd like to go over
18 some ground rules before we move further into
19 our day.
20        I'm going to be asking you
21 questions, and you'll be giving answers.  As
22 you know, you're under oath.  The court
23 reporter is here to record our conversation
24 today, so I ask that you try to wait before I
25 finish a question to answer, and I'll do the

Page 20

1 same.  That will give us a nice, clear record.
2 Understood?
3    A.    Understood.
4    Q.    During the day today, you can take
5 a break when you need one.  The only exception
6 to that is that if there's a question pending,
7 I'll ask for you to answer.
8        And there's one more exception, if
9 you have a question about privilege and you
10 need to consult with your attorney, you can do
11 that at any time.
12        Is there any reason that you can't
13 give truthful testimony today?
14    A.    No.
15    Q.    Mr. Sturmi, what did you do to
16 prepare for your deposition today?
17    A.    I met with counsel on a couple of
18 occasions.  I also reviewed the complaint.
19    Q.    On how many occasions did you meet
20 with counsel?
21    A.    Approximately three.
22    Q.    When was the first time you met
23 with counsel in preparation?
24    A.    Approximately five weeks ago.
25    Q.    For -- with whom did you meet?

Page 21

1    A.    With the counsel that's present
2 here.  With Motley Rice.
3    Q.    Was anyone else present at that
4 meeting?
5    A.    There was other counsel that was
6 present that's not present here.  I don't
7 remember that person's name.
8    Q.    Was there -- were there any
9 non-lawyers who were involved in that meeting?
10    A.    No.  All were counsel.
11    Q.    For how long did you meet with
12 counsel?
13    A.    Ranged, you know, roughly from two
14 hours to no longer than, you know, four.
15    Q.    When was your second meeting with
16 counsel in preparation for this deposition?
17    A.    Approximately a couple weeks ago.
18    Q.    Who was involved in that second
19 session?
20    A.    The same counsel that's present
21 here today.
22    Q.    Was there anyone else involved in
23 that meeting?
24    A.    I don't recall that.
25    Q.    How about the third prep session?

6 (Pages 18 - 21)

1 When was that?
2     A.    Third prep session was yesterday.
3     Q.    Who was involved in that meeting?
4     A.    The same three counsel that are
5 present here today.
6     Q.    Was anyone else involved in that
7 meeting?
8     A.    No.
9     Q.    How long did you meet?
10     A.    Oh, approximately two hours.
11     Q.    You mentioned that you reviewed the
12 complaint.  Did you review any other documents
13 in preparation for this deposition?
14     A.    Yes.
15     Q.    What documents?
16     A.    Documents that counsel showed to
17 me.
18     Q.    Do you -- did any of those
19 documents refresh your recollection?
20         MS. FLOWERS:  Objection --
21         MS. LEYIMU:  Object to form.
22         MS. FLOWERS:  -- as to -- to the
23 extent this calls for attorney-client privilege
24 or anything that we discussed during the
25 deposition.

1         I just need you to be real careful
2 about answering that, okay?  So answer her
3 question, but I'm going to caution you not to
4 disclose the contents of what we discussed.
5     A.    Could you repeat the question?
6     Q.    Did any of the documents you
7 reviewed refresh your recollection?
8     A.    No.
9         MS. LEYIMU:  Object to the form.
10     Q.    Did you do anything else in
11 addition to the meetings you've identified in
12 your review of documents to prepare for this
13 deposition?
14     A.    No.
15     Q.    Did you talk with anyone other than
16 attorneys to help you prepare for this
17 deposition?
18         MS. LEYIMU:  Object to the form.
19     A.    I did not.  I did not.
20     Q.    Did you do any independent reading?
21         MS. LEYIMU:  Object to the form.
22     A.    No.
23     Q.    Mr. Sturmi, you mentioned your
24 review of the complaint in preparation for this
25 deposition.  Had you reviewed the complaint

1 prior to your prep for today?
2         MS. LEYIMU:  Object to the form of
3 the question.
4     A.    No.
5     Q.    Were you involved in the -- strike
6 that.
7         Did you provide any facts to
8 counsel in connection with drafting of the
9 complaint?
10     A.    I did not.
11     Q.    Were you involved in Akron's
12 decision to bring this lawsuit?
13     A.    No.
14     Q.    Were you involved in the selection
15 of outside counsel for this lawsuit?
16     A.    I was not.
17     Q.    When did you first become aware of
18 this lawsuit?
19     A.    I was advised several months ago by
20 my supervisor that there was a meeting being
21 conducted in the Akron probation department to
22 discuss the pending opioid litigation as it
23 related to the City of Akron.
24     Q.    Who's the supervisor that you just
25 referenced?

1     A.    Chief Probation Officer Tony
2 Ingram.
3     Q.    And when did Mr. Ingram advise you
4 of the meeting you referenced?
5     A.    My recollection it was the day
6 prior of the meeting.
7     Q.    About when did that meeting occur?
8     A.    Several months ago.
9     Q.    Did you attend the meeting
10 concerning the litigation?
11     A.    I did at his request.
12     Q.    What was the subject of the
13 meeting?
14         MS. FLOWERS:  Objection.  I'm going
15 to have to counsel the witness again to be
16 careful about disclosing any attorney-client
17 impressions or work product that you may have
18 gained during that meeting.
19         You can answer the question.
20     A.    It was a very general, you know,
21 meeting to advise of the litigation.  It was a
22 very general, you know, meeting.  There was
23 counsel present.  City of Akron counsel, you
24 know, was present.  Like I said, my boss was
25 present.  Judge Oldham, who is our drug court

Page 26

1 judge, was present.  But it was a very general
2 meeting.
3     Q.    When you said -- referenced your
4 boss, do you mean Mr. Ingram?
5     A.    Correct.
6     Q.    You also referenced Judge Oldham?
7 Is that Judge Jon Oldham?
8     A.    That's correct.
9     Q.    Who else participated in this
10 meeting?
11     A.    There was three, I believe, counsel
12 from the Akron law department.  There was, I
13 believe, one counsel from Motley Rice.
14 Obviously, myself, Mr. Ingram, Judge Oldham,
15 and I believe the last person that I recall
16 being there was Akron Chief City Prosecutor
17 Gert Wilms.
18     Q.    Did you receive any written
19 materials during this meeting?
20     A.    I don't recall that.
21     Q.    Have you participated in any other
22 meetings about this litigation?
23     A.    No.
24         MS. LEYIMU:  Object to the form.
25         THE WITNESS:  I'm sorry.

Page 27

1     Q.    Were you involved in providing
2 information in connection with Akron's
3 interrogatory responses in this litigation?
4         MS. LEYIMU:  Object to the form.
5         You can answer.
6     A.    No.
7     Q.    Mr. Sturmi, I'm going to go through
8 a little bit more background now.
9         Where are you from originally?
10     A.    I was born and raised in Cuyahoga
11 Falls, Ohio.
12     Q.    Could you please describe the
13 highest level of education you've attained?
14     A.    A bachelor of science degree from
15 the University of Akron.
16     Q.    What was the subject matter of your
17 studies?
18     A.    Political science, criminal
19 justice.
20     Q.    When did you graduate from
21 University of Akron?
22     A.    1994.
23     Q.    In addition to your BS, have you
24 received any other advanced degrees?
25     A.    Not advanced degrees, no.

Page 28

1     Q.    Have you obtained any professional
2 licenses?
3     A.    I have.
4     Q.    Could you describe those?
5     A.    Yes.  The Ohio Credentialing Board
6 has a licensure process for substance abuse,
7 and so I went through that process and earned
8 the current licensure of LCDC III, which is an
9 acronym that stands for licensed chemical
10 dependency counselor.
11     Q.    When did you obtain that license?
12     A.    I first obtained that license in
13 1998.  It was an LCDC I, and then there's a
14 process to go up from there.
15     Q.    What type of training, if any, did
16 you undertake in order to obtain that license?
17     A.    There's a requirement for training
18 workshop hours.  There is a requirement of both
19 a written and oral presentation to the Ohio
20 Credentialing Board.
21     Q.    What was the subject matter of the
22 presentation you made to the Ohio Credentialing
23 Board?
24     A.    It was an oral presentation as far
25 as a client that you were serving, and you had

Page 29

1 to demonstrate the various domains in chemical
2 dependency and, you know, how to assist that
3 client.
4     Q.    You mentioned a requirement of
5 workshop hours to obtain your certification.
6 With whom did you work to obtain those hours?
7     A.    Well, through, you know, my current
8 employment, there's a variety of training and
9 workshops that are available to me, so I
10 selected those on subject matters that had
11 interest, you know, for me.
12     Q.    Was there any formal educational
13 component involved in obtaining that license?
14         MS. LEYIMU:  Object to the form of
15 the question.
16     A.    I'm not sure what you mean by that
17 question.  Do you mean having a degree?
18     Q.    Did you have to take any classes,
19 for example?
20     A.    No, not specific classes.
21     Q.    You mentioned that there are
22 additional levels to the certification you
23 have.  When did you receive -- did you receive
24 higher levels?
25     A.    I did.

8 (Pages 26 - 29)

Page 30

1    Q.    What was the next highest level you
2  achieved?
3       A.    So it just goes up, you know, that
4  ladder.  You know, LCDC I to LCDC II to LCDC
5  III.
6       Q.    When did you achieve the -- the
7  second license category?
8       A.    I don't recall.  I don't recall
9  that date.
10      Q.    What was involved in achieving that
11  second license status?
12      A.    You know, I -- I -- trying to think
13  of the difference between, you know, I, II, and
14  III.  My recollection is that you had to take a
15  multiple choice written test.  I believe that
16  was for I.
17           I don't recall the distinction
18  between earning II.
19           I know that the oral case plan
20  presentation was a requirement for III.  That
21  was my recollection.
22      Q.    What do the different levels of
23  licensure allow you to do?
24      A.    They don't allow me to do anything
25  other than assist me in my current job duties

Page 31

1  and understand substance abuse addiction a
2  little better.
3       Q.    You mentioned a multiple choice
4  test that you took in connection with license
5  level I.  What was the subject matter of that
6  test?
7       A.    Again, my recollection was it was
8  general substance abuse questions.  Just a
9  variety of questions to demonstrate your
10  knowledge, you know, on substance abuse.
11      Q.    When you reference substance abuse,
12  are you referencing any broader literature or
13  study?
14           MS. LEYIMU:  Object to the form.
15      A.    I don't understand that question.
16      Q.    When you say "substance abuse,"
17  what are you referring to?
18      A.    An individual that uses substances
19  that becomes problematic.
20      Q.    So at a high level, you were being
21  tested on your knowledge of individuals that
22  use substances in a problematic way; is that
23  right?
24           MS. LEYIMU:  Object to the form.
25      A.    Could you repeat the question?

Page 32

1       Q.    Sure.  So at a high level, you were
2  being tested on your knowledge of individuals
3  that use substances in a problematic way; is
4  that right?
5       A.    I don't know the answer to that
6  question.
7       Q.    What knowledge did you have to
8  display in order to obtain your license?
9       A.    Well, I had to pass, you know, the
10  written test and complete the oral test.
11      Q.    And what were the general subject
12  matters on which you were tested?
13      A.    General information as it relates
14  to substance abuse, and further, the treatment
15  of a client that may be suffering from a
16  substance abuse disorder.
17      Q.    Earlier you mentioned domains of
18  chemical dependency; is that right?
19      A.    Yes, I recall that.
20      Q.    What are domains of chemical
21  dependency?
22      A.    You know, my recollection was
23  essentially you start with an assessment of the
24  individual, and then it moves on to there, as
25  far as a diagnosis of that, a potential

Page 33

1  referral, what type of referral would be
2  generated, what type of counseling would be
3  recommended, after-care and post treatment.
4       Q.    What are the domains of chemical
5  dependency?  Is there a list?
6           MS. LEYIMU:  Object to the form.
7       A.    I don't specifically remember, you
8  know, those domains.
9       Q.    How did you learn about the domains
10  of chemical dependency?
11      A.    Like -- just like in college, you
12  know, opening a book and studying for an exam.
13      Q.    What types of books or other
14  material did you study in order to prepare for
15  your license exams?
16      A.    My recollection is they had study
17  guides that were available.  You could either
18  purchase them, get them on hard copy or an
19  online.
20      Q.    Were those study guides provided by
21  the board of certification?
22      A.    They were made available by the
23  Ohio Credentialing Board, yes.
24      Q.    Who runs the Ohio Credentialing
25  Board?

9 (Pages 30 - 33)

Page 34

1    A.    I have no knowledge of who runs
2 that board.
3    Q.    Do you know who issues the chemical
4 dependency license?
5         MS. LEYIMU:  Object to the form.
6    A.    Well, you know, the -- their name
7 is -- is the State of Ohio Credentialing Board,
8 so I would think that, you know, whoever makes
9 up that board and has that ability to do so.
10    Q.    Do you have to undertake any
11 ongoing training to maintain your license?
12    A.    I do.
13    Q.    What -- what's the nature of that
14 training?
15    A.    My recollection of the requirement
16 of maintaining an LCDC III licensure is a
17 minimum of 40 substance abuse training hours
18 every two years.
19    Q.    When did you obtain the LCDC III
20 licensure?
21    A.    I don't recall that specific date.
22 It's been several years.
23    Q.    More than five years?
24    A.    More than five years.  Yeah.  I --
25    Q.    More than --

Page 35

1    A.    I obtained the LCDC I in 1998, so,
2 you know, probably sometime after 2000.
3    Q.    Where did you obtain training hours
4 to maintain your license?
5    A.    Again, a variety of workshops that
6 are a part of, you know, my job.  We're often
7 given or provided with workshops and training
8 to assist both myself and our staff in our
9 everyday duties.
10    Q.    Who provides the workshops?
11    A.    Any number, you know, of
12 individuals, you know, run those training
13 workshops.  The Ohio Supreme Court.  We attend
14 quite a bit of training that is run by the Ohio
15 Supreme Court.
16    Q.    Do these trainings have to be
17 certified by the Ohio Credentialing Board?
18         MS. LEYIMU:  Object to the form.
19    A.    I don't know if they do or don't.
20    Q.    How do you track the trainings that
21 you've undertaken to maintain your license?
22    A.    I keep the copies of the
23 certificates in a file.  And when it gets
24 closer to my licensure, you know, being due,
25 I'm given notification of that by the Ohio

Page 36

1 Credentialing Board, fill out an application
2 and identify the dates, the training, and the
3 hours that I earned to make sure, obviously,
4 I've made it up to the magic 40.
5    Q.    Do you typically receive written
6 handouts at these trainings?
7    A.    Less so now with technology.  So a
8 lot of training workshops that I attend now are
9 going green, so they're not providing, you
10 know, written, you know, copies of PowerPoints
11 and things of that nature.  So more and more
12 are electronic.
13    Q.    What's the last training that you
14 attended?
15    A.    The last training that I attended,
16 my recollection, was it was the Ohio State
17 University Institute of Addiction Studies.
18    Q.    When was that training?
19    A.    That was in July of 2018.
20    Q.    What was the subject matter of that
21 training?
22    A.    Well, it was a -- as its title
23 indicates, you know, Institute of Addiction
24 Studies, so there was a variety of tracks and
25 workshops to choose from that I could attend.

Page 37

1 But the focus of that particular conference was
2 addiction studies.
3    Q.    What do you mean by "addiction
4 studies"?
5    A.    Substance abuse addiction.
6    Q.    Did that training include the study
7 of opioid addiction?
8    A.    Yes.  There were several sessions
9 that -- that that was part of -- part of the
10 training, yes.
11    Q.    Did you attend those aspects of the
12 training?
13    A.    Yes.  I recall, you know, attending
14 a -- a few different workshops, but certainly
15 the subject matter, you know, opiates was --
16 was part of that.
17         MS. LEYIMU:  Can we go off the
18 record for a second?
19         THE VIDEOGRAPHER:  Going off the
20 record at 9:36 a.m.
21         (Off-the-record discussion.)
22         THE VIDEOGRAPHER:  Back on the
23 record at 9:37 a.m.
24    Q.    Mr. Sturmi, you were describing a
25 workshop that you attended in 2018 about

10 (Pages 34 - 37)

Page 38

1 substance abuse, correct?
2     A.    Correct.
3     Q.    You were also describing workshops
4 that you attended concerning opiates.  Are
5 opiates the same as opioids?
6          MS. LEYIMU:  Object to the form.
7     A.    I believe they are.
8     Q.    Just to make sure that I'm using a
9 common vocabulary as we march forward today,
10 what is your understanding of an opioid?
11    A.    My understanding of an opioid is
12 that it is a -- primarily a pain narcotic
13 medication that is provided for pain relief.
14    Q.    To your knowledge, are there
15 prescription opioids?
16    A.    Yes.
17    Q.    Could you name some that -- with
18 which you are familiar?
19    A.    Sure.  OxyContin, Vicodin,
20 Percocet, Darvocet, morphine.
21    Q.    How about non-prescription opioids?
22 Are you familiar with any drugs that fall into
23 the opioid family that are non-prescription?
24    A.    Yes.
25    Q.    Could you name any of those?

Page 39

1     A.    Heroin, Fentanyl, carfentanil.
2     Q.    What is the basis for your
3 knowledge about opioids?
4     A.    Well, obviously, in the course of
5 my -- my job position and job duties, I have
6 educated, you know, myself through a variety
7 of, you know, manners, in -- in determining
8 what opioids are and how that's becoming an
9 issue for our court, and, in particular, the
10 drug court that I help to manage.
11    Q.    So now that we have our terminology
12 clarified, I want to go back to talking about
13 the conference you attended on substance abuse.
14         What was the nature of the opioid
15 workshops that you attended?
16    A.    My recollection was, you know, one
17 that I attended spoke to updates on
18 medication-assisted treatment.
19    Q.    What do you mean by
20 "medication-assisted treatment"?
21    A.    Clients that are dealing with an
22 opiate addiction sometimes access
23 medication-assisted treatment to assist them
24 with their opioid addiction.
25    Q.    What type of treatment was

Page 40

1 discussed during this training?
2     A.    Discussed the current
3 medication-assisted treatment that was being
4 utilized in the state of Ohio, and there was
5 discussion about those treatment regimens and
6 how, you know, the presenter, you know, opined
7 those were going.
8     Q.    Did you attend any other workshops
9 at this training related to opioids?
10    A.    I don't recall other specific
11 opioid sessions.  You know, it was several
12 months ago, so.
13    Q.    How many other trainings in the
14 last five years have you attended that relate
15 to opioids?
16         MS. LEYIMU:  Object to the form.
17    A.    In the past five years?
18    Q.    Yes.
19    A.    Well, I'll attend, you know, at
20 least, you know, two or three workshops a year.
21 And those workshops, they'll certainly have
22 addiction as part of the training regimen.
23 Many of them have breakout sessions, you know,
24 that speak to opiates or issues related to
25 that.

Page 41

1          It's difficult for me to determine
2 how many sessions I went to that were specific
3 to opiates versus just general addiction-related
4 trainings.
5     Q.    Do you have any particular
6 education that relates to opioids?
7          MS. LEYIMU:  Object to the form of
8 the question.
9     A.    I would say just the education that
10 is provided to me through my licensure.
11    Q.    And that didn't require any higher
12 education, correct?
13         MS. LEYIMU:  Object to the form.
14    A.    Did not require it, no.
15    Q.    Do you have any specialized
16 training relating to drug diversion?
17    A.    No.
18    Q.    Do you have any specialized
19 training relating to pharmacy?
20         MS. LEYIMU:  Object to the form.
21    A.    No.
22    Q.    Do you have any specialized
23 training relating to medicine?
24         MS. LEYIMU:  Object to the form.
25    A.    Other than the trainings that speak

11 (Pages 38 - 41)

Page 42

1  to medication-assisted treatment.
2      Q.   Who provide- -- who provided those
3  trainings related to medication-assisted
4  treatment?
5      A.   A variety of vendors.
6      Q.   Were they doctors?
7      A.   Often.
8      Q.   And did -- do you personally have
9  any medical training?
10        MS. LEYIMU:  Object to the form of
11  the question.
12      A.   Other than the training workshops
13  that I've attended that that's been the subject
14  matter.
15      Q.   Have you pursued any higher
16  education related to medicine?
17      A.   I have not.
18      Q.   Have you pursued any higher
19  education related to pharmacy?
20      A.   I have not.
21      Q.   Mr. Sturmi, what was your first
22  employment upon graduation from the University
23  of Akron in 1994?
24      A.   At that time I was employed by the
25  Portage County Juvenile Court.

Page 43

1      Q.   What was the nature of your
2  employment?
3      A.   At that time, I was an intensive
4  probation officer.
5      Q.   What were your job duties as an
6  intensive probation officer?
7      A.   My recollection was that I had a
8  caseload with a maximum of 15 clients.  These
9  juveniles were charged with very serious felony
10  offenses, and so it was -- it was an
11  opportunity for those clients to remain in the
12  community as opposed to being committed to the
13  Ohio Department of Youth Services.  And as part
14  of that, it required intensive supervision,
15  which meant a minimum of three contacts with
16  that client per week.
17      Q.   Did any of those clients suffer
18  from substance abuse?
19      A.   Yes.
20      Q.   Do you recall the categories of
21  drugs that were used by your clients?
22      A.   In 19 --
23        MS. LEYIMU:  Object to the form.
24        You can answer.
25      A.   My recollection was it was a

Page 44

1  variety of drugs.
2      Q.   What did that variety include?
3      A.   Alcohol, marijuana, cocaine,
4  prescription medications.
5      Q.   When you reference prescription
6  medications, did that include any prescriptions
7  that fall into the class of opioids you
8  referenced earlier?
9      A.   Yes.
10      Q.   How did you identify what drugs
11  your clients used?
12      A.   Primarily through drug testing and
13  interviews.
14      Q.   Did the court record the results of
15  drug tests for your clients?
16      A.   I don't recall how they collected
17  that data.  I know that we kept probation files
18  that had that information.
19      Q.   How about the interview
20  information?  Did you keep those records for
21  the court?
22      A.   Yes.  Those were, again, probation
23  files:  Interviews conducted with the
24  juveniles, and part of that would be substance
25  abuse-related questions, trying to determine if

Page 45

1  they were or were not suffering from any type
2  of substance abuse disorder.
3      Q.   In your role as an intensive
4  probation officer, did you have any reporting
5  duties related to substance abuse?
6      A.   I don't recall having any specific
7  duties related to that.
8      Q.   In your role as an intensive
9  probation officer, did you provide any
10  substance abuse programming?
11      A.   Not personally.  We had a substance
12  abuse counselor on staff, so we would routinely
13  refer those clients to that unit.
14      Q.   When did you leave your job as an
15  intensive probation officer?
16      A.   I received a job opportunity as an
17  adult probation officer with the City of Akron
18  in 1996.
19      Q.   What was the nature of your job as
20  an adult probation officer for the City of
21  Akron?
22      A.   Supervise misdemeanor offenders
23  that were placed on probation supervision by
24  one of the judges from our court.
25        I would also conduct presentence

12 (Pages 42 - 45)

Page 46

1  investigations as ordered and directed, you
2  know, by the court.
3       We also conducted -- we term them
4  as sealing-of-record investigations. Those are
5  the three primary job responsibilities.
6    Q.   Did you have any job responsibil- --
7  job responsibilities related to substance
8  abuse?
9    A.   Not specific to substance abuse,
10  no.
11   Q.   About how many clients did you have
12  at one time in your role as a probation
13  officer?
14   A.   As an adult general supervision,
15  you know, probation officer, we would have
16  caseloads in the neighborhood of 50 to 100 per
17  PO.
18   Q.   Did you have any responsibilities
19  for screening your clients for substance abuse?
20   A.   Yes.  I -- you know, by screening,
21  you know, that would be a part of any interview
22  process as we're trying to ascertain what the
23  issue is with the offender.  So a part of that
24  interview were specific questions related to
25  their use of alcohol and/or drugs.

Page 47

1    Q.   Did you have any responsibilities
2  for coordinating or implementing drug testing
3  for your clients?
4    A.   We made referrals for drug testing.
5  We ordered individuals to submit to drug
6  testing as part of that job.
7    Q.   Did you have any responsibilities
8  for reporting substance abuse?
9    A.   Yes.  If there were indicators that
10  an individual was suffering from a substance
11  abuse issue, then we would staff those cases.
12  Often --
13       THE WITNESS:  Sorry, sir.
14       THE REPORTER:  Staff those what?
15   A.   Staff those cases with other
16  probation officers or supervisors, and
17  depending upon the issue, would make an
18  appropriate referral.
19   Q.   Did you have any responsibilities
20  for recording the type of substance abuse used
21  by your clients -- you're -- I'm sorry -- the type of
22  substance used by your clients?
23   A.   Typically, we would indicate what
24  substance or substances the client was
25  reporting issues with; and then we would often

Page 48

1  receive collateral information from friends or
2  family or community members that were reporting
3  what that, you know, client may be using; and
4  then we would also utilize drug testing as a
5  mechanism to determine whether that client was
6  being honest and what substance or substances
7  may be in their system.
8    Q.   Was there any standardized
9  reporting mechanism for identifying the
10  substance or substances that your clients were
11  abusing?
12       MS. LEYIMU:  Object to the form.
13   A.   Other than the -- the drug testing
14  that would confirm what substances were in that
15  client's system, you know, that was the main
16  way that we would make that determination.
17   Q.   Did you have any responsibilities
18  for data aggregation related to your client's
19  substance abuse?
20       MS. LEYIMU:  Object to the form.
21   A.   Other than recording, you know,
22  that information in the normal course of
23  business in that client's probation file.
24   Q.   You mentioned multiple substances
25  used by clients.  Was it common for your

Page 49

1  clients in probation to use more than one
2  chemical substance?
3       MS. LEYIMU:  Object to the form.
4    A.   It's difficult for me to answer.
5  There's lots of clients that I worked with over
6  the years that use multiple substances.
7  There's lots of clients that I have, you know,
8  worked with that utilize just one particular
9  drug of choice.
10   Q.   Would there be any data source to
11  consult in order to identify the substances
12  used by your clients in probation?
13       MS. LEYIMU:  Object to the form.
14   A.   Again, we primarily use drug
15  testing as a mechanism to verify what is or is
16  not, you know, present in that offender's
17  system.
18   Q.   When did you leave your job as an
19  adult probation officer in Akron?
20   A.   Well, I didn't leave it.  I was
21  promoted in 2003, so you, you know, chief
22  retired, you know, at that time, and so I was
23  promoted to the position of deputy chief in
24  1993.
25   Q.   Just for clarity, were you promoted

13 (Pages 46 - 49)

Page 50

1  in 2003 or 1993?
2      A.  Yeah.  I was hired in '96, and was
3  promoted in 2003, roughly seven years later.
4      Q.  Thank you.
5      A.  Uh-huh.
6      Q.  How did your responsibilities
7  change when you were promoted in 2003?
8      A.  Well, obviously, I was a
9  supervisor, you know, of the department.  One
10 of the main jobs that changed for me is I
11 became the Akron Drug Court program manager.
12     Q.  How much of your time was devoted
13 to the drug court?
14     A.  In the neighborhood of, you know,
15 75 percent.  50 to 75 percent, in that
16 ballpark.
17     Q.  And what was the nature of your
18 other responsibilities that filled the other,
19 about, 25 percent of your time?
20     A.  I would assist as needed with our
21 general, you know, POs.
22         I would work with any and all
23 developmentally disabled clients that came to
24 the attention of our court, so that became a
25 subject of expertise to assist the court with

Page 51

1  those often difficult clients.
2          I also assisted with the referral
3  process on competency evaluations for
4  individuals that were ordered for competency.
5      Q.  You mentioned developmental- ---
6  developmentally disabled clients.  Are those
7  clients of the drug court?
8      A.  Not historically.  Depending upon
9  their level of disability, it would be very
10 difficult, you know, for those clients to
11 adhere to the intensive level of supervision
12 and cognitive requirements.  So to my
13 recollection, we did not serve developmentally
14 disabled clients, you know, in the drug court
15 program.
16     Q.  Has there been any change in the
17 nature of your role in probation since 2003?
18         MS. LEYIMU:  Object to the form.
19     A.  Well, things often change.
20 Certainly the makeup of our department, you
21 know, has changed.
22         But my primary job responsibilities
23 remained the same as far as, you know, managing
24 the Akron Recovery Court program.  That's the
25 name of our program now, so it's switched from

Page 52

1  the Akron Drug Court to the Akron Recovery
2  Court approximately two years ago.
3          Helping our general POs, and
4  assisting as requested by the chief probation
5  officer.
6      Q.  Has there been any change in your
7  title since 2003?
8      A.  No, that title has remained the
9  same.
10     Q.  And who do you report to presently?
11     A.  I report to the chief probation
12 officer.
13     Q.  And who is currently the chief
14 probation officer?
15     A.  Tony Ingram.
16     Q.  What are your responsibilities for
17 managing the recovery court?
18     A.  Well, I maintain, you know,
19 probation files on those clients; attend a
20 weekly drug court session; we staff, you know,
21 cases every week in a telephone conference
22 call; obviously, attend the drug court session;
23 and assist as requested by the current
24 presiding drug court judge.
25     Q.  Who is the current presiding drug

Page 53

1  court judge?
2      A.  Judge Oldham.
3      Q.  How long has he served in that
4  role?
5      A.  Judge Oldham has been the presiding
6  judge of the drug court for, I want to say,
7  about three years.
8      Q.  Who was the judge prior to that
9  time?
10     A.  Judge Oldfield.
11     Q.  And do you know Judge Oldfield's
12 tenure with the court?
13     A.  How long she was with us?
14     Q.  Correct.
15     A.  Gosh, I believe Judge Oldfield was,
16 you know, with the Akron Municipal Court for,
17 you know, approximately four to five years.
18     Q.  Is the recovery court a specialized
19 court of the Akron Municipal Court?
20     A.  It is.  It's a -- classified as a
21 specialized docket.
22     Q.  Do you work with other areas of the
23 Akron Municipal Court?
24     A.  I do.
25     Q.  What's the nature of your work with

14 (Pages 50 - 53)

Page 54

1 other areas of the Akron Municipal Court?
2     A.    You know, often I receive requests
3 from the -- you know, we have six judges that
4 work for the Akron Municipal Court, so I will
5 receive any number of requests from those
6 judges for assistance with, you know, a case
7 that perhaps they're working on.
8     Q.    What is the relationship between
9 the recovery court and the rest of the
10 municipal court?
11    A.    Well, it's one of our five
12 specialized dockets, so you know, it's -- it's
13 certainly a part of our court.  But, you know,
14 we -- we are involved in other specialized
15 dockets as well.
16    Q.    What are the other specialized
17 dockets that you've referenced?
18    A.    The other specialized dockets that
19 the Akron Municipal Court operates is -- well,
20 we have a drug court.  We have an OVI court or
21 DUI court.  We have a mental health court.  We
22 have a family intervention court, which used to
23 be called domestic violence, you know, court,
24 but it's now called the family intervention
25 court.  And our newer specialized docket is

Page 55

1 valor court, which is a veteran's treatment
2 court.
3     Q.    Do you participate in any of those
4 specialized courts, other than the recovery
5 court?
6     A.    Occasionally, as requested by that
7 respective presiding judge.  So if there's a
8 special need or they want my involvement, you
9 know, I -- I will certainly attend those
10 sessions or work with a client as requested by
11 that judge.
12    Q.    What types of services do you
13 provide to the other specialized dockets?
14    A.    Primarily, they are questions
15 related to substance abuse, you know,
16 treatment, opinions, recommendations.  You
17 know, often judges will contact me when one of
18 their clients in a specialized docket is
19 suffering from what appears to be a -- you
20 know, a serious substance abuse issue.
21    Q.    Does the drug court share resources
22 with the rest of the municipal court system?
23    A.    We do.  We do.
24    Q.    Does the recovery court have its
25 own budget?

Page 56

1     A.    I'm not involved, you know, in the
2 budgeting process.  I know that we receive a
3 variety of funding, each of our specialized
4 dockets, from a number of different sources.  I
5 don't believe any of the specialized dockets
6 have their own, quote, "general budget."
7     Q.    So is it right that the recovery
8 court participates in the overall municipal
9 court budget?
10    MS. LEYIMU:  Object to the form.
11    A.    That's my understanding.
12    Q.    Who's responsible for the municipal
13 court budget?
14    A.    Our court administrator.
15    Q.    Who currently serves in that role?
16    A.    Montrella Jackson.
17    Q.    Do you provide Montrella Jackson
18 with information relating to the needs of the
19 Recovery Court for budget purposes?
20    A.    We have a yearly budget meeting:
21 All supervisors, the chief probation officer,
22 myself, all of the six judges.  So we certainly
23 provide input on regular budgetary, you know,
24 questions.  But I don't submit any particular
25 documents, you know, for that -- for that

Page 57

1 purpose.
2     Q.    Have you ever made any request to
3 increase funding for the recovery court?
4     MS. LEYIMU:  Object to the form.
5     A.    I certainly recall having
6 conversations about the ability to identify and
7 provide more resources.  In particular, you
8 know, looking at grants or other means to -- to
9 receive monies.
10    Q.    Do you know what portion of the
11 recovery court is funded by monies obtained
12 outside of the Akron municipal budget?
13    MS. LEYIMU:  Object to the form.
14    A.    I do not.
15    Q.    Do you have personal involvement in
16 obtaining grant money for the recovery court?
17    A.    I'm sorry.  Could you repeat that
18 question?
19    Q.    Do you have involvement in
20 obtaining grant funds for the recovery court?
21    A.    Not directly.  I don't -- I don't
22 write grants.
23    Q.    Are you aware of the sources of
24 funds for the recovery court?
25    MS. LEYIMU:  Object to the form.

15 (Pages 54 - 57)

Page 58

1     A.   I am.
2     Q.   For the year 2018, what are the
3 sources of funding for the recovery court?
4     A.   You know, my recollection of -- of
5 that funding is general budget, out of court;
6 we receive some funds from the Summit County
7 ADM Board; and we are currently receiving a
8 SAMHSA drug court enhancement grant.
9     Q.   What is the Sum- -- Summit County
10 ADM Board?
11     A.   Summit County ADM Board of Akron
12 stands for the Alcohol, Drug and Mental Health
13 Board, so they are the county's, you know,
14 funding mechanism to assist with alcohol and
15 drug and mental health needs.
16     Q.   How does the recovery court obtain
17 funds from the Summit County ADM Board?
18          MS. LEYIMU:  Object to the form.
19     A.   I don't know the specifics of how
20 those monies, you know, are -- are funneled,
21 you know, to our court.  I'm not involved in
22 that process.
23     Q.   Do you know what portion of your
24 current budget is funded by the Summit County
25 ADM Board?

Page 59

1     A.   I do not.
2          MS. LEYIMU:  Object to the form.
3     Q.   Who would know that information?
4     A.   I would think Ms. Jackson, the
5 court administrator.
6     Q.   You also mentioned another grant.
7 Could you remind me of its name?
8     A.   Sure.  It's a federal grant,
9 technically from SAMHSA, which is the federal
10 substance abuse mental health, you know,
11 agency.  They offer a variety of -- of grants
12 to specialized dockets, and we applied for and
13 were awarded one of those grants.
14     Q.   Were you involved in applying for
15 the SAMHSA grant?
16     A.   I was involved in some plenary
17 meetings to discuss that grant.  But I did not
18 write the grant, and it was not awarded
19 directly to our court.
20     Q.   To what entity was the grant
21 awarded?
22     A.   It was awarded to the Oriana House,
23 Incorporated.
24     Q.   When was that grant obtained?
25     A.   Approximately a year -- a little

Page 60

1 over a year ago.
2     Q.   Do you know the amount of funding
3 received through the SAMHSA grant?
4     A.   You know, my --
5          MS. LEYIMU:  Object to the form.
6          THE WITNESS:  I'm sorry.
7          MS. LEYIMU:  You can answer.
8     A.   My recollection was that, you know,
9 it was a three-year grant at approximately
10 $1 million.
11     Q.   What portion of that $1 million is
12 allocated to the recovery court?
13          MS. LEYIMU:  Object to the form.
14     A.   I don't have knowledge of that.
15     Q.   Who would?
16     A.   The Oriana House, you know,
17 Incorporated, who managed that -- that grant.
18     Q.   In the current budget year 2018,
19 are there any other sources of funding of which
20 you are aware, outside of the Akron municipal
21 budget?
22     A.   Not to my knowledge.
23     Q.   You mentioned Oriana House.  What
24 is Oriana House?
25     A.   They are a nonprofit community

Page 61

1 corrections company.
2     Q.   What is the relationship between
3 Oriana House and the recovery court?
4          MS. LEYIMU:  Object to the form.
5     A.   We contract with them for case
6 management services.
7     Q.   What does case management for the
8 recovery court include?
9     A.   Essentially, if you're a client in
10 the drug court program, it means that you're
11 going to be physically meeting with that case
12 manager on multiple occasions during any given
13 week.
14     Q.   What type of services does the
15 coordinator provide to drug recovery court
16 clients?
17          MS. LEYIMU:  Object to the form of
18 the question.
19     A.   I'm sorry.  Can you repeat that
20 question?
21     Q.   I'll rephrase.
22          What types of direct services do
23 the Oriana House coordinators provide to
24 recovery court clients?
25          MS. LEYIMU:  Object to the form.

16 (Pages 58 - 61)

Page 62

1    A.    You know, the case managers will,
2 you know, meet with the clients.  They will
3 make referrals in consultation with the rest of
4 the recovery court team.  The Oriana House
5 operates a number of programs that include IOP
6 or substance abuse, you know, treatment.  They
7 also operate their own drug testing lab.  And
8 they also offer, you know, education,
9 employment, housing assistance.
10    Q.    What is the financial relationship
11 between Oriana House and the recovery court?
12        MS. LEYIMU:  Object to the form of
13 the question.
14    A.    The City of Akron has a contract,
15 you know, with the Oriana House to pay for the
16 services that they provide.
17    Q.    Do you know if that money comes
18 from the municipal court budget?
19    A.    I do not.
20    Q.    Who would know that?
21    A.    Again, I would think, you know,
22 Ms. Jackson, who's our court administrator.
23 That's one of her main, primary jobs.
24        MS. LEYIMU:  Can we take a break?
25 We've been going for about an hour now.

Page 63

1        MS. WU:  Sure.
2        THE VIDEOGRAPHER:  Going off the
3 record at 10:10 a.m.
4        (A recess was taken.)
5        THE VIDEOGRAPHER:  Back on the
6 record at 10:30 a.m.
7 BY MS. WU:
8    Q.    Mr. Sturmi, are you ready to
9 restart your deposition?
10    A.    Yes.
11    Q.    Mr. Sturmi, what is the
12 jurisdiction of the recovery court in Akron?
13    A.    Initially, it -- it's the
14 jurisdiction of the Akron Municipal Court and
15 the cities that encompass that.  Did you want
16 me to list those?
17    Q.    Yes.
18    A.    Okay.  So it would be the City of
19 Akron, the City of Fairlawn, Bath Township,
20 Richfield Township, Springfield Township, and a
21 very small part of Mogadore.
22        The reason I said "initially" is a
23 little over a year ago we entered into an
24 agreement to assist the Stow Municipal Court.
25 They could make referrals to the Akron Recovery

Page 64

1 Court.  So we thereby involved, you know, more
2 communities in Summit County that could take
3 advantage of the resources that we provide.
4    Q.    What is the nature of the financial
5 relationship between the Akron Recovery Court
6 and the other local jurisdictions you just
7 identified?
8        MS. LEYIMU:  Object to the form.
9    A.    Could you repeat the question?
10    Q.    What is the nature of the financial
11 relationship between the Akron Recovery Court
12 and the local jurisdictions you just
13 identified?
14        MS. LEYIMU:  The same objection.
15    A.    To my knowledge, the Akron Recovery
16 Court receives no financial monies from those
17 jurisdictions.  It's a service that we provide
18 as part of being part of the municipal court.
19    Q.    Is there any memorandum of
20 understanding in place between Akron and any of
21 those jurisdictions you just identified?
22    A.    The only MOU that I'm aware of was
23 drafted specific to our relationship with the
24 Stow Municipal Court, just because that's --
25 that's not something that's usual.  That's

Page 65

1 something that's out- -- outside the norm.
2    Q.    What makes it outside the norm?
3    A.    Courts, you know, rarely cross
4 jurisdiction.  So, you know, cases that are
5 part of the Stow Municipal Court, you know,
6 typically they're going to be handled with that
7 respective judge, with that respective court.
8        Because the Stow Municipal Court
9 does not operate a current drug court
10 specialized docket, there was meetings and
11 discussions, and it was determined that that
12 was a service that we would like to provide to
13 enable, you know, those clients to receive
14 services.
15    Q.    Who made the determination that
16 Stow clients could be referred to the Akron
17 Recovery Court?
18    A.    You know, my recollection, you
19 know, was there was some initial meetings
20 between Judge Oldfield, who at the time was our
21 presiding Akron Recovery Court judge, and Judge
22 Kim Hoover, who was, and still is, a judge with
23 the Stow Municipal Court.
24    Q.    Did you participate in the
25 determination to build a relationship between

17 (Pages 62 - 65)

Page 66

1 Stow and the Akron Recovery Court?
2     A.   I was part of -- of those meetings,
3 yes.
4     Q.   What was your contribution to that
5 process?
6     A.   I think primarily because it was so
7 unique.  To my knowledge, there's no other
8 municipal courts that cross jurisdiction lines,
9 you know, to allow clients to receive those
10 services.  So really, it was just providing
11 education and information on what our program
12 was, how we operate, and how that could
13 potentially help the clients that they serve.
14     Q.   When did Stow obtain rights to
15 refer clients to the Akron Recovery Court?
16     A.   I don't specifically recall that
17 date, but it's been, you know, a little over a
18 year.
19     Q.   Does Stow contribute financially to
20 the Akron Recovery Court?
21     A.   They do not.
22     Q.   How many clients of the Akron
23 Recovery Court are Stow referrals currently?
24     A.   Currently, we just have one Stow
25 Municipal Court client.

Page 67

1     Q.   And is it your testimony that Akron
2 funds the services provided to the Stow re- --
3 Stow referral to the Akron Municipal Court?
4        MS. LEYIMU:  Object to the form.
5     A.   Could you repeat the question,
6 please?
7     Q.   Is it your testimony that Akron
8 funds the services provided to the client
9 referred by Stow to the Akron Recovery Court?
10     A.   We do provide services to those
11 clients, yes.
12     Q.   Do you know the cost of services
13 provided to the Stow referral to the Akron
14 Recovery Court?
15     A.   I --
16        MS. LEYIMU:  Objection.
17     A.   I don't have any knowledge of that.
18     Q.   Where would we look to identify the
19 cost of services provided to non-Akron
20 residents?
21        MS. LEYIMU:  Object to the form of
22 the question.
23     A.   My suggestion would be perhaps to
24 have discussion with the Stow Municipal Court
25 administrator, who's responsible for budgeting

Page 68

1 and things of that nature.
2     Q.   During the conversations prior to
3 executing an MOU with Stow, did you raise any
4 concerns about the Akron Recovery Court's
5 capacity to take referrals from Stow?
6        MS. LEYIMU:  Object to the form of
7 the question.
8     A.   I don't recall, you know, having
9 concerns about, you know, the capa- -- you
10 know, that capacity.
11        My recollection was we were going
12 to see where we were at after one year.  You
13 know, obviously our -- our goal is to provide
14 services to as many clients as we can.
15 However, we certainly needed to make sure that
16 the numbers that were coming from Stow did not
17 become, quote, "problematic," an issue, or in
18 any way, shape, or form reduced our ability to
19 provide services to clients that live within
20 the jurisdiction of the Akron Municipal Court.
21     Q.   Did you have any concerns about the
22 recovery court's financial capacity to serve
23 client -- clients referred by Stow?
24        MS. LEYIMU:  Object to the form of
25 the question.

Page 69

1     A.   I did not have any specific
2 concerns about that, no.
3     Q.   Mr. Sturmi, you described the
4 geographic jurisdiction of the recovery court.
5 What are the other aspects of the jurisdiction?
6 Who comprises the client population?
7     A.   Anybody in the drug court, ma'am?
8     Q.   Yes.
9     A.   Okay.  Anybody that's arrested
10 within that jurisdiction.  So if they're
11 charged with, you know, a misdemeanor criminal
12 offense, that is what brings them, potentially,
13 you know, into the, you know -- well, it
14 doesn't -- it brings them into the jurisdiction
15 of the court, and then it's up to the way that
16 that case is processed as to whether that
17 client may or may not enter, you know, the
18 recovery court.
19     Q.   Could you describe the process for
20 referral of a client to the recovery court?
21     A.   Sure.  We have a number of ways of
22 trying to identify a potential recovery court
23 client.  Our initial screening process begins
24 with a staff member that scans our arrest
25 sheets on a daily basis, and we are

18 (Pages 66 - 69)

Page 70

1 specifically looking for offenders that are
2 charged with misdemeanor drug offenses.
3     Q.  What happens once the staff member
4 scans the arrest sheets for offenders charged
5 with misdemeanor drug offenses?
6     A.  They complete, you know, a form.
7 It's called the Akron Recovery Court
8 Preliminary Screening Form.  That form has the
9 defendant's name, the case number or case
10 numbers, the charges that they're charged with.
11 They also conduct a background check, you know,
12 on that individual to check for any wants or
13 warrants.  They look at their prior history and
14 try and make an assessment as to whether that
15 person could be eligible, you know, for the
16 program.
17     Q.  Who are the individuals who conduct
18 the screening process?
19     A.  Other Akron probation officers.
20 The primary individual who does that is
21 Probation Officer Alissa Streeter.
22     Q.  Is there anyone else who's involved
23 in the screening process?
24     A.  Yes, depending upon staffing.  You
25 know, we have backup staff that will conduct

Page 71

1 those preliminary screens on an as-needed basis
2 if Officer Streeter is out of the office, you
3 know, on whatever time she may be on.
4     Q.  Following the initial screening,
5 what happens next in terms of considering a
6 client for referral to the recovery court?
7     A.  Depending upon whether they are in
8 custody or not, most of the clients that --
9 that come to our attention are not in custody.
10 These are misdemeanor charges, so they're often
11 given summonses.
12     So when they're ordered to come to
13 their specific arraignment on that charge, we
14 are aware of that.  We are monitoring that
15 case.  And if that client shows up in
16 arraignment court, either myself or another
17 staff member will go up to interview that
18 client.
19     Q.  All right.  What is the subject of
20 the interview?
21     A.  A brief introduction, discussion
22 about the client potentially coming to a -- we
23 would term it as a recovery court screen.  Our
24 recovery court program is a voluntary one, so,
25 you know, if the client wants to learn more

Page 72

1 about recovery court, then they're scheduled
2 for the next available recovery court session,
3 which is typically every Thursday at 9:00 a.m.
4     So that client would sign an
5 appearance slip.  We would give them a packet
6 of information:  a pamphlet about recovery
7 court, my business card, and certainly a copy
8 of their appearance slip that orders them to
9 come back to court.
10     Q.  You mentioned the screening
11 process.  Could you describe that?
12     A.  Sure.  When that client would come
13 to a drug court session, they would first just
14 watch some of the drug court session just so
15 they could get an idea of how it operates.  You
16 know, I can sit there and tell them about what
17 recovery court is, but we find it's much more
18 helpful for them to view it.
19     In addition to that, they speak
20 with legal counsel that the court provides.
21     And then they meet with a
22 representative from the Oriana House admissions
23 department, who conducts a screen interview,
24 where we're getting some additional demographic
25 information and we're scheduling that person

Page 73

1 for a full substance abuse assessment.
2     Q.  Is there paperwork involved in the
3 initial screen process?
4     A.  Yes.
5     Q.  Could you describe what documents
6 are included?
7     A.  Well, the screening packet is -- is
8 a document that's provided by the Oriana House,
9 Incorporated.  So that document has, again,
10 general demographic information:  client's
11 name, the case number, date of birth, soc.,
12 address.  Certainly, they're activated in our
13 computer system so we can start tracking, you
14 know, that case.
15     And in addition to that, you know,
16 the packet itself would have some family
17 health, education, employment type of
18 questions.  It would also, you know, ask what
19 substance or substances that client, you know,
20 has been using, how often, when is the last
21 time they used.
22     Q.  Where is that information recorded
23 in the recovery court system?
24     A.  It's not recorded in the recovery
25 court system.  It's a paper document that is

19 (Pages 70 - 73)

Page 74

1 certainly put in the defendant's probation
2 file.
3     Q.   Is there any work that the recovery
4 court does to verify the substances identified
5 by clients referred to the recovery court?
6        MS. LEYIMU:  Object to the form.
7     A.   Well, certainly they're going to
8 interview and ask the -- the client questions
9 about those substances.
10        In addition to that, the substance
11 abuse assessment, that's done at a different
12 date, time and location.  A drug test is -- is
13 administered at that time to help to try to
14 verify, you know, the information that that
15 client may be self-reporting.  So that is one
16 mechanism.
17    Q.   Does the screening process involve
18 any inquiry into a referred client's
19 prescription drug history?
20    A.   There -- there is, you know,
21 questions related to what medication or
22 medications that client may currently be
23 taking.
24    Q.   Is there any effort made by the
25 recovery court staff to determine the source of

Page 75

1 those medications?
2        MS. LEYIMU:  Object to the form of
3 the question.
4     A.   If the client enters the program,
5 then we initiate communication with any doctor
6 that is prescribing medication to our client,
7 but not in the screening process.  Only if they
8 enter the program.
9     Q.   So let's continue our march through
10 the process.
11        What happens following the initial
12 screening?
13    A.   The turnaround time, you know, is
14 approximately two weeks.  So we have a drug
15 court session today, right now, that's going
16 on.  So a client that's being screened today
17 for the Akron Recovery Court program will sign
18 an appearance slip to return in two weeks.
19        The reason that there's that
20 two-week time frame is primarily to give the
21 client the opportunity to complete that
22 substance abuse assessment.  That substance
23 abuse assessment is a lengthy interview,
24 approximately two-plus hours.
25        And that assessment is sent to me

Page 76

1 and reviewed by the recovery court team prior
2 to that client entering the program at their
3 admission hearing.
4     Q.   And when you review those forms,
5 what are you looking for?
6     A.   Well, I'm looking for any and all
7 information that can help me better understand
8 that client's history.  So I'm looking at any
9 number of factors.  I'm looking at where does
10 the client live?  What's their family
11 situation?  What's their education?  What's
12 their employment?
13        Certainly, I'm specifically looking
14 at their substance abuse, you know, history.
15 What's their self-reported use?  What do the
16 UDS, you know, tests show?  The assessment will
17 provide a diagnosis, and it will give a
18 recommended level of care.
19    Q.   Now, let's circle back to the
20 assessment that you mentioned.  Who conducts
21 the assessment?
22    A.   Our assessments are conducted by
23 the Oriana House assessment center, so it is
24 the Oriana House, Incorporated.
25    Q.   What is the substance of the

Page 77

1 assessment conducted by Oriana staff?
2        MS. LEYIMU:  Object to the form of
3 the question.
4     A.   Do you mean what do they do during
5 that assessment?
6     Q.   What information from the
7 assessment is reported to you at the recovery
8 court?
9     A.   The assessment is approximately a
10 15-page document.  That document will include,
11 again, demographic information:  family
12 background, health, education, employment,
13 prior criminal history, and substance abuse
14 history.
15    Q.   Is there a drug testing component
16 of that assessment?
17    A.   Yes.
18    Q.   Could you describe that for us?
19    A.   It's a urine drug screen that's
20 collected at the Oriana House assessment
21 center.
22    Q.   How is the information from the
23 assessment reported to the recovery court?
24    A.   It's provided to me in a hard-copy
25 document.

20 (Pages 74 - 77)

Page 78

1    Q.    Is that information inputted into
2  any recovery court data systems?
3         MS. LEYIMU:  Object to the form.
4    A.    No, not to my knowledge.
5    Q.    Do potential clients referred to
6  the recovery court have to sign any waivers of
7  confidentiality?
8    A.    They sign releases of information
9  to allow that assessment, which, you know, is a
10  confidential document, to be shared with me and
11  the recovery court team.
12    Q.    Does the assessment document become
13  part of the public court file?
14    A.    It does not.
15         MS. LEYIMU:  Object to the form.
16    A.    It does not.  It's a confidential
17  document.
18    Q.    Does the assessment include an
19  inquiry into the sources of drugs used by
20  potential clients of the recovery court?
21         MS. LEYIMU:  Object to the form of
22  the question.
23    A.    Yes.  There are questions that are
24  asked related to how and when and what
25  substances that client has used in their life.

Page 79

1    Q.    And how is that information
2  reported in the assessment document?
3    A.    It's part of that assessment
4  doc- -- document that looks like a graph.  It
5  will list, you know, the drug, when it was
6  first used, when it was last used, and how
7  often that client is reporting use.
8    Q.    As the administrator for the drug
9  court, do you have any data-recording
10  responsibilities that relate to the screening
11  and assessment of clients referred to the
12  recovery court?
13         MS. LEYIMU:  Object to the form.
14    A.    No.
15    Q.    When you review the screening
16  information and assessment, what factors do you
17  consider in order to determine admission to the
18  recovery court?
19    A.    Pretty simply, you have to be
20  diagnosed with a substance use disorder.
21    Q.    Are there any other factors that
22  you consider beyond the diagnosis?
23    A.    Sure.  You know, we -- we're going
24  to look at, you know, if that person, you know,
25  has any other mental health, you know,

Page 80

1  disabilities, physical health disabilities.
2  Anything that may hinder their ability to be
3  successful in the program.
4    Q.    Are there concrete factors that you
5  are required to consider in order to determine
6  eligibility for participation in the recovery
7  court?
8         MS. LEYIMU:  Object to the form.
9    A.    Yes.
10    Q.    Where are those recorded?
11    A.    They're recor- -- they're recorded
12  in our policy and procedure handbook.
13    Q.    And what are those other factors?
14    A.    It's primarily a substance abuse,
15  you know, diagnosis.  The client has to have a
16  substance use disorder as defined by, you know,
17  the DSM-IV.
18    Q.    Who is responsible for making a
19  final eligibility determination for the
20  recovery court?
21    A.    We collectively do that as a drug
22  court team.  So we will staff, you know, any
23  pending admission.  We conduct a weekly
24  conference call every Wednesday at 9:00 a.m.,
25  and during that conference call, part of that

Page 81

1  conference call is to discuss the potential
2  admissions that are scheduled for that
3  particular session.
4    Q.    Who participates in those weekly
5  conference calls?
6    A.    Myself, Judge Oldham, and several
7  members from the Oriana House drug court team.
8         Do you want me to name those folks?
9    Q.    Yes, please?
10    A.    Emily Beers, who is the program
11  manager for the Oriana House.  Caseworkers
12  Carmen Bivins, caseworker Evelyn Williams, and
13  recovery court -- recovery coach Marie Burger.
14    Q.    You referred to the recovery court
15  team.  Are there any other members of that team
16  beyond those you just identified?
17    A.    Yes.
18    Q.    Who are those other recovery court
19  team members?
20    A.    Sure.  Other team members are
21  representative from the Akron Police
22  Department.  They assign one of their
23  detectives from the Akron Police Department
24  SNUD unit.  It's an acronym that stands for
25  Street Narcotics Uniform Detail.  So that

21 (Pages 78 - 81)

1 officer is part of that team and will attend,
2 you know, every recovery court session.
3        In addition to that, the assistant
4 Akron City prosecutor that is assigned to Judge
5 Oldham's court.  That person is currently
6 Mr. Ben Carro.  And then also a representative
7 from the legal defender's office.  The current
8 legal defender that's assigned to Judge
9 Lombardi's [sic] court is Marcus Lombardi.
10     Q.   Mr. Sturmi, could you tell us the
11 name of the SNUD representative?
12     A.   Yes. It's Detective Brian, his
13 last name is Nida.
14     Q.   Of the recovery team members you
15 just identified, which ones of them are
16 employed by the Akron Municipal Court system?
17     A.   Judge Oldham, myself, Ben Carro,
18 Detective Nida.
19     Q.   Detective Nida is an employee of
20 the Akron Municipal Court?
21     A.   Oh, I apologize.  City of -- of --
22 City of Akron.  So the Akron Municipal Court is
23 specific to Judge Oldham and myself.
24     Q.   Are there any other members of the
25 recovery court team who are employed by the

1 municipal court system?
2     A.   Yes.  I apologize.  I have a
3 probation aide that works with me as well.  His
4 name is Adam Krutko.
5     Q.    Are there any other probation
6 officers who serve on the recovery court team?
7     A.   Not at the present time, no.
8        MS. WU:  I'd like to ask the court
9 reporter to mark our first exhibit, which is,
10 for the record, AKRON 001105240.
11        - - - - -
12        (Thereupon, Deposition Exhibit 1,
13        5/25/2018 E-Mail from Jeff Sturmi
14        Re: Akron Recovery Court
15        Information, with Attached recovery
16        court Participant Handbook,
17        AKRON_001105240 to 001105287, was
18        marked for purposes of
19        identification.)
20        - - - - -
21     Q.   Mr. Sturmi, before we dig into
22 Exhibit 1, I just wanted to clarify one of your
23 past answers.
24        You made a reference to Judge
25 Lombardi's courtroom.  Did you mean --

1     A.   Judge Oldham.
2     Q.   Judge Oldham.
3     A.   Yes.
4     Q.   Thank you.
5     A.   Uh-huh.
6     Q.   Mr. Sturmi, do you recognize the
7 document marked as Exhibit 1?
8     A.   Yes.
9     Q.   What is it?
10     A.   It's the Akron Municipal Recovery
11 Court Participant Handbook.
12     Q.   Did you have involvement in
13 preparing the material included in Exhibit 1?
14     A.   To a limited extent, yes.
15     Q.   What was the nature of your
16 involvement?
17     A.   Essentially, working with our chief
18 probation officer with drafting, you know, this
19 document.
20     Q.   How often is this document updated?
21     A.   Typically, you know, once a year,
22 you know, we're taking a look at all of our
23 materials.  It's as part of our Supreme Court
24 of Ohio certification.
25     Q.   You mentioned the Supreme Court of

1 Ohio certification.  To what are you referring?
2     A.   The Ohio Supreme Court now requires
3 courts that identify themselves as a
4 specialized docket to go through a
5 certification process.
6     Q.   What does that certification
7 process involve?
8     A.   It's rather extensive.  You know,
9 it's -- you -- you certainly have to fill out,
10 you know, an application and then attach
11 supporting documents.  This is one of those.
12 You know, they require a participant handbook.
13        Once they've reviewed those
14 materials, then they will schedule site visits.
15 So they will physically come out and observe,
16 you know, all of the workings of your
17 specialized docket, which would include any
18 team meetings that you conduct, and certainly
19 the session itself.
20     Q.   How often is the recovery court
21 required to complete certification with the
22 supreme court?
23     A.   The State of Ohio has, you know,
24 three different certification terms, one-year,
25 two-year, and three-year.  And it's random in

Page 86

1 how they -- in how they determine how -- how
2 long that -- that certification will last
3 before you're required to go through
4 recertification.
5 Q. When was the last time the recovery
6 court completed certification?
7 A. As part of their processes, they
8 require any time a new judge comes to that
9 specialized docket, that requires a
10 recertification. So we did that when Judge
11 Oldham became the presiding recovery court
12 judge. I don't recall that specific date.
13 Again, approximately, you know, two to three
14 years ago.
15 Q. And when was the last time prior to
16 two to three years ago that the recovery court
17 completed certification?
18 A. The initial certification was, you
19 know, approximately two years prior to that.
20 Judge Oldfield was the judge at that time.
21 Q. And was that the first
22 certification the recovery court had completed?
23 A. That's correct.
24 Q. Am I correct that no certification
25 was required prior to that time?

Page 87

1 A. Correct. Prior to that no
2 certification was required.
3 Q. Mr. Sturmi, I'd like to ask you to
4 flip forward a couple of pages to the Bates
5 stamp --
6 Mr. Sturmi, do you know what a
7 Bates stamp is? It's the number down at the
8 bottom.
9 A. Okay. I got it. Thank you.
10 Q. I just want to make sure we're
11 speaking the same language.
12 The one that ends 5256.
13 A. Okay.
14 Q. We're looking at a document titled
15 "Akron Municipal Recovery Court Policy and
16 Procedure" -- "Procedure Manual."
17 Are you familiar with this
18 document?
19 A. I am.
20 Q. What is it?
21 A. It is the Policy and Procedure
22 Manual for the Akron Recovery Court. This
23 document is required as part of that
24 certification process.
25 Q. Were you involved in assembling the

Page 88

1 materials presented in this portion of
2 Exhibit 1?
3 A. There was a number of individuals
4 that were involved in that process. I was one
5 of them.
6 Q. I'd like to march through some
7 aspects of this document.
8 If you look at the first substantive
9 page following the table of contents, which is
10 marked AKRON 001105259, in the overview
11 paragraph --
12 A. Okay.
13 Q. -- the third sentence reads, "It is
14 centered on the concept of therapeutic
15 jurisprudence."
16 Do you have an understanding of the
17 term "therapeutic jurisprudence"?
18 A. I do.
19 Q. What is it?
20 A. The idea that the court, and in
21 particular the judge, can, by their
22 involvement, help assist an offender in a
23 unique way.
24 Q. What's unique about that
25 assistance?

Page 89

1 MS. LEYIMU: Object to the form.
2 A. My opinion on that would be simply
3 most offenders that come to the attention of a
4 court see a judge once or twice and their case
5 is resolved.
6 The difference in a specialized
7 docket and therapeutic jurisprudence is that
8 that client is going to have much more contact
9 with that respective judge. They're going to
10 develop a relationship, you know, with that
11 court, with the staff, but, in particular, with
12 the judge. So it's a different way of doing
13 business.
14 Q. Now, I'd like to ask you to look at
15 the next page, ending 5260. At the top of the
16 page we see a section titled "Goals and
17 Objectives."
18 Do you see that, Mr. Sturmi?
19 A. I do.
20 Q. Goal No. 3 reads, "Increase the
21 number of recovery court participants who
22 complete treatment."
23 In the year 2018, how many drug
24 court clients do you have?
25 A. At the present time, we have

23 (Pages 86 - 89)

Page 90

1 approximately 42 clients in our program.
2    Q.    And how many clients have you had
3 complete treatment in the year 2018?
4    A.    That would be difficult for me to
5 determine.
6    Q.    Where would you look to determine
7 that information?
8    A.    If I have, you know, specific data
9 requests, I will either work with the probation
10 aide to determine that, or I will reach out to
11 the Oriana House, who also maintains their own
12 records.
13    Q.    You mentioned that you have 42
14 clients currently.  Is that more or less than
15 you had in 2017?
16        MS. LEYIMU:  Object to the form.
17    A.    I -- I don't know the answer to
18 that question.  I -- I think that it's pretty
19 consistent.  It -- it generally hovers in
20 that -- in that 40 to 50 area.
21    Q.    Is there a cap on the number of
22 drug court -- I'm sorry -- recovery court
23 clients you are able to accept?
24    A.    I don't know if we'd ever say no,
25 but I know the goal, you know, has been that

Page 91

1 the ratio from the client to the caseworker
2 should never be greater than 35 to 1.
3        So if we ever got to the point --
4 which we have, you know, many, many years
5 ago -- if that number was higher, then we would
6 approach the Oriana House or the Summit County
7 ADM Board about the potential of having another
8 caseworker assigned.
9    Q.    What is the highest number of
10 clients you have seen in the recovery court?
11    A.    Boy, you know, I started managing
12 the doc- -- you know, that docket in -- you
13 know, in 2003.  I don't know if it's, you know,
14 ever been higher than the target goal of
15 roughly 70 at any given time.
16    Q.    In your experience with the
17 recovery court, have you ever had to turn away
18 a potential client due to resources concerns?
19        MS. LEYIMU:  Object to the form.
20    A.    I don't have a recollection of
21 that, no.
22    Q.    Now, if we stay on the same page
23 ending 5260, if we move down to "target
24 population."
25    A.    Yes, ma'am.

Page 92

1    Q.    It says, "The recovery court
2 targets offenders for admission who are
3 addicted to illicit drugs or alcohol and are at
4 a substantial risk for re-offending,"
5 et cetera, et cetera.
6        Do you see where I'm reading,
7 Mr. Sturmi?
8    A.    I do.
9    Q.    Do you have an understanding of the
10 reference to illicit drugs?
11    A.    I do.
12    Q.    What is your understanding?
13    A.    That they would be deemed illegal
14 by the State of Ohio as determined by the Ohio
15 Revised Code.
16    Q.    Does this reference to illicit
17 drugs include prescription opioids?
18        MS. LEYIMU:  Object to the form.
19    A.    It can.
20    Q.    In what circumstances would this
21 reference to illicit drugs include prescription
22 opioids?
23    A.    If an individual is using or
24 abusing a prescription drug that they got on
25 the street, they purchased on the street, they

Page 93

1 potentially stole from a family friend or
2 relative that had that medication in their
3 house.
4    Q.    Could this reference to illicit
5 drugs include the use of drugs prescribed by an
6 individual's own physician?
7        MS. LEYIMU:  Object to the form.
8    A.    Not typically.
9    Q.    Why is that?
10    A.    Well, if the individual was taking
11 their medication properly and was not
12 transporting that medication improperly in a
13 car, then they wouldn't have been charged with
14 a criminal drug offense.
15    Q.    Are you aware of any clients of the
16 drug court -- drug court who have misused
17 prescriptions prescribed by that individual's
18 own physician?
19    A.    Over the course of years, you know,
20 I've interviewed, you know, hundreds, perhaps
21 thousands of clients.  So, yes, you know, I
22 certainly recall, you know, conversations with
23 clients where they self-reported to me that
24 they used their prescription in an improper
25 manner.

24 (Pages 90 - 93)

1    Q.    And where is that information
2 recorded?
3         MS. LEYIMU:  Object to the form.
4    A.    Depending upon the circumstances,
5 it can be recorded in probation notes.  It can
6 be recorded in screening packets.
7    Q.    Do you have any systematic way of
8 reporting the misuse of prescription drugs?
9         MS. LEYIMU:  Object to the form of
10 the question.
11    A.    Not a current systematic way.  Not
12 a certain form or report.
13    Q.    Is there any way to obtain
14 aggregate data concerning drug recovery court
15 clients' use of prescription drugs?
16    A.    I don't have that mechanism at the
17 present time.
18    Q.    Have you ever had that mechanism?
19    A.    No one's ever requested, you know,
20 that specific, you know, information, so, no.
21    Q.    Mr. Sturmi, I'd like to ask you to
22 look a few pages further in the document to the
23 page ending 5266.
24    A.    Okay.
25    Q.    And we see that -- I'm sorry.  I'm

1 having some mic trouble -- that there's a
2 carryover sentence from the prior page related
3 to capacity, and it reads, "It is recommended
4 that the recovery court program not exceed the
5 target active caseload of 100 offenders."
6         Do you see where I'm reading?
7    A.    I do see that.
8    Q.    Is that an accurate statement of
9 the recovery court's target caseload?
10         MS. LEYIMU:  Object to the form.
11    A.    It appears that it is because it's
12 in the document.
13    Q.    Are you involved in identifying the
14 target caseload for the recovery court?
15    A.    Yes, I'm part of that discussion.
16    Q.    How was the target caseload
17 identified?
18    A.    Well, as I had indicated earlier,
19 you know, that target caseload had -- had
20 always, you know, been around 70.  You know, my
21 recollection of why this now says 100 is
22 because of the potential collaboration with the
23 Stow Municipal Court, so we were planning for
24 the possibility of an increase in our numbers
25 and trying to make sure that we were prepared

1 for that.
2    Q.    Did you have to seek any additional
3 funds in order to provide resources to a
4 potential additional set of clients totaling
5 about 30?
6         MS. LEYIMU:  Object to the form of
7 the question.
8    A.    We did not.  You know, the staff
9 that we had in place was sufficient to serve
10 the clients that were assigned to this
11 caseload.
12    Q.    You mentioned that the current
13 client population total is 42; is that correct?
14    A.    That's correct.
15    Q.    What explains the additional slack
16 in the caseload currently?
17         MS. LEYIMU:  Object to the form of
18 the question.
19    A.    Very difficult, you know, for me to
20 answer that question because, you know, this
21 docket is a voluntary one.  So for a client to
22 enter this program, they have to be willing to
23 engage.  And it's -- you know, it's -- it's an
24 intensive program, so some clients don't --
25 don't choose to access our program because of

1 that.
2    Q.    But it is the case that you have
3 additional capacity to provide services to more
4 clients of the recovery court, correct?
5         MS. LEYIMU:  Object to the form of
6 the question.
7    A.    At the present time, we do.
8    Q.    Do you recall how many clients the
9 recovery court had in 2017?
10         MS. LEYIMU:  Object to the form.
11 Asked and answered.
12    A.    Again, my -- my guesstimate, you
13 know, would still hover around that 40 to -- to
14 50.  In that ballpark.
15    Q.    How about in 2016?
16         MS. LEYIMU:  Object to the form.
17    A.    I don't recall there being any
18 particular spike or decrease, so I think, you
19 know, staying in that 40 to 50 range has been
20 pretty consistent for several years.
21    Q.    What is the highest number of
22 clients you recall?
23         MS. LEYIMU:  Object to the form.
24 Asked and answered.
25    A.    You know, I'm trying to think.  You

25 (Pages 94 - 97)

Page 98

1  know, when I first took over the -- the docket
2  in 2013, our caseloads, you know, may have been
3  a little bit higher.  You know, 60, you know,
4  certainly no more than 70.
5       I think one of the main reasons
6  that was the case is our model has changed.
7  You know, the Akron Recovery Court used to be a
8  felony reduction model.  The Summit County
9  Court of Common Pleas did not operate a drug
10  court.
11       So when an individual was charged
12  with a felony 4 or felony 5, if they wished to
13  receive services, that charge would be amended
14  to a misdemeanor of the first degree -- it's
15  called attempted drug abuse -- and then they
16  would enter the program.
17     Q.   When -- when did the felony
18  reduction program mission end?
19         MS. LEYIMU:  Object to the form.
20     A.   Gosh.  Maybe approximately 2005.  A
21  couple years after I took over, in that
22  ballpark, you know.  The Summit County Court of
23  Common Pleas decided that they were going to
24  operate a felony drug court program, so that
25  model changed.

Page 99

1     Q.   Did the number of recovery court
2  participants in Akron reduce following the
3  Summit drug court institution?
4     A.   It -- it did.
5     Q.   By -- by how many participants?
6         MS. LEYIMU:  Object to the form.
7     A.   Approximately 10, 20.  So it
8  dropped from 70 to that 40 or 50.
9     Q.   In your time with the Akron
10  Recovery Court, what is the highest number of
11  clients you recall participating in the
12  recovery court program?
13         MS. LEYIMU:  Object to the form.
14  Asked and answered.
15     A.   Again, my recollection is that 70,
16  75 mark.
17     Q.   Have you ever -- do you recall a
18  circumstance in which the recovery court has
19  turned away a potential client due to resources
20  constraints?
21         MS. LEYIMU:  Object to the form.
22  Asked and answered again.
23     A.   I previously answered that
24  question.
25     Q.   Could you answer it again, please?

Page 100

1     A.   Could you repeat the question
2  again?
3     Q.   Certainly.  Do you recall a
4  circumstance in which the recovery court has
5  turned away a potential client due to resources
6  constraints?
7     A.   No, I don't recall that.
8     Q.   Are you currently undertaking any
9  efforts to increase the number of clients
10  participating in the recovery court?
11         MS. LEYIMU:  Object to the form.
12     A.   You know, in the past, you know,
13  year, one of the changes we made was to
14  personally meet with and talk with clients that
15  appear in our arraignment court.  Our previous
16  model did not include that personal touch, so
17  to speak.
18       We would give a client a form that
19  explained the recovery court, but they were
20  expected to make that decision in our
21  arraignment court without any discussion with
22  our staff.
23       So we felt that it would be better
24  served if a representative of our department
25  met with and at least introduced ourselves to

Page 101

1  that client so we could better explain what
2  recovery court was as opposed to them just
3  looking at a document.
4         MS. WU:  I'd like to mark a second
5  exhibit.
6         The court reporter is marking AKRON
7  001102890.
8         - - - - -
9         (Thereupon, Deposition Exhibit 2,
10         9/5/2017 E-Mail from Jeff Sturmi to
11         Aaron DeBord Re:  Recovery court
12         Check In, AKRON_001102890, was
13         marked for purposes of
14         identification.)
15         - - - - -
16     Q.   Mr. Sturmi, what is Exhibit 2?
17     A.   It's an e-mail.
18     Q.   Okay.  I see that it's dated
19  September 5, 2017; is that correct?
20     A.   Yes, that's correct.
21     Q.   And it's an e-mail from you to
22  Aaron DeBord; is that correct?
23     A.   Yes.
24     Q.   Who is Aaron DeBord?
25     A.   Mr. DeBord is the assistant court

26 (Pages 98 - 101)

1 administrator with the Stow Municipal Court.

2 Q. What was the purpose of your e-mail
3 communication to Mr. DeBord?

4 A. It was just to check in with him as
5 far as how the collaboration, you know, was
6 going with the Stow Municipal Court as it
7 related to referrals that they had generated
8 and any current clients that were in the
9 program.

10 Q. Now, if I can call your attention
11 to the second paragraph in your e-mail, it
12 reads, "We currently have 35 active clients in
13 the Akron RC program, which is low for us. I
14 just wanted to reach out to you to see if you
15 could help with some additional referrals from
16 the court."

17 Have I read that correctly?

18 A. Correct.

19 Q. Is it correct that 35 active
20 clients in the Akron Recovery Court program is
21 low?

22 A. That was my opinion, you know, at
23 that time.

24 Q. Does this refresh your recollection
25 that there were about 35 clients of the

1 recovery court program in 2017?

2 MS. LEYIMU: Object to the form.

3 A. Certainly would appear that that
4 would be accurate because it's -- it's in the
5 e-mail that I authored.

6 Q. Why did you want to obtain
7 additional referrals for the recovery court?

8 A. Well, I think that we're -- we're
9 always looking to provide resources to clients
10 that are struggling with a substance abuse
11 disorder, so this was just an effort to reach
12 out to -- to make sure that we weren't missing
13 clients that could receive those services.

14 Q. In years such as 2017, when the
15 recovery court operates well below its target
16 population cap, does the recovery court operate
17 at a budget surplus?

18 A. Again, I'm not involved, you know,
19 in -- in the budget process, so the numbers
20 don't impact what we do in any way.

21 Q. Do you know if the recovery court
22 has to return funds where it performs below its
23 target population?

24 MS. LEYIMU: Object to the form of
25 the question.

1 A. I'm not aware of that, no.

2 MS. FLOWERS: Excuse me. Just for
3 the record, Counselors, I think that this
4 particular document, Exhibit 2, has some
5 people's names in it. I'd like to redact them
6 for purposes of HIPAA, if there's no objection.
7 I just -- there's two -- two people who are
8 being treated names I just would like to black
9 out.

10 MS. WU: Certainly. For the court
11 reporter, why don't we leave Exhibit 2 out of
12 the deposition record for the time being and we
13 can work it out later.

14 MS. FLOWERS: Thank you.

15 MS. WU: Thank you for pointing
16 that out.

17 Q. Mr. Sturmi, do you believe that the
18 recovery court offers any cost savings to the
19 City of Akron?

20 MS. LEYIMU: Object to the form.

21 A. I do.

22 Q. Could you describe the cost
23 savings?

24 A. Well, drug court, you know,
25 historically has -- has always championed

1 themselves on reducing costs as it relates
2 primarily to incarceration. So you know, the
3 goal is to treat offenders as opposed to them
4 cycling in and out of jail or prisons.

5 Q. Have you ever attempted to quantify
6 the economic savings that the recovery court
7 offers Akron?

8 A. Not me personally. I know that
9 that process is attempted, you know, by various
10 entities, whether it's the National Drug Court
11 Institute or sheriffs, you know. So there's --
12 there's always an effort to -- to quantify
13 that, so I think the public is aware as to why
14 specialized dockets operate.

15 MS. WU: I'd like to mark as Sturmi
16 Exhibit 3 what I will represent is a printout
17 from the Akron Municipal Court website. For
18 that reason, it has no Bates stamp.

19 - - - - -

20 (Thereupon, Deposition Exhibit 3,
21 Web Printout Titled "Drug Court, A
22 Program Offered Through Akron
23 Municipal Court and Oriana House,
24 Inc.", was marked for purposes of
25 identification.)

27 (Pages 102 - 105)

Page 106

1      - - - - -
2      Q.    Mr. Sturmi, are you familiar with
3  the material identified as Exhibit 3?
4      A.    Yes.
5      Q.    What is it?
6      A.    It is an informational document
7  that is placed on our court's website.
8      Q.    Now, if we turn to the second page
9  of this printout of the website, it reads,
10  "Incarceration of drug-using offenders costs
11  approximately $20,000 per person per year.  In
12  contrast, a comprehensive drug court system
13  typically costs less than $2,500 annually for
14  each offender."
15      Have I read that accurately?
16      A.    Yes.
17      Q.    Is this purported cost savings
18  consistent with your own knowledge?
19      MS. LEYIMU:  Object to the form of
20  the question.
21      A.    I don't have knowledge of these
22  numbers because I didn't author it.  I didn't
23  draft it.
24      Q.    Do you have any reason to doubt the
25  cost savings that are published on the recovery

Page 107

1  court website?
2      MS. LEYIMU:  Object to the form.
3      A.    I don't have any cause to think
4  that it's inaccurate, but again, I didn't -- I
5  didn't author it.
6      Q.    Do you know who did?
7      A.    I don't.
8      Q.    You mentioned earlier that the
9  recovery court was originally -- originally a
10  felony reduction program; is that correct?
11      A.    That's correct.
12      Q.    Could you describe what a felony --
13  felony reduction program entails?
14      A.    If the offender was charged with a
15  felony drug offense as determined by the Ohio
16  Revised Code -- typically, at the time it was
17  targeting F4s and F5s, and again, those are as
18  defined by the Ohio Revised Code.  There are
19  five current felony desig- -- designations, so
20  those are the, quote, "lower-level, non-violent
21  offenses."
22      In 1995 -- I wasn't a part of that
23  at that time -- the determin- -- the
24  determination was made to start, you know, the
25  Akron Drug Court program.  I believe, you know,

Page 108

1  the goal at that time was to provide a
2  treatment court for offenders charged with
3  those felony drug offenses and allow them and
4  their cases to be transferred to the municipal
5  court, which at the time was the only operating
6  drug court in the state of Ohio.
7      So the amendment would be made from
8  an F4, an F5 to an M1, attempted drug abuse,
9  and the client would plead guilty to that
10  charge, but their sentence would be held in
11  abeyance, and if they completed the drug court
12  program, then that plea would be vacated and
13  the case would be dismissed.
14      Q.    When did the felony reduction
15  program of the recovery court end?
16      A.    Again, I don't have a specific
17  recollection of -- of that.  It was a few
18  years, you know, after, you know, I started to
19  manage, you know, the program.  So the decision
20  was made by the Summit County Court of Common
21  Pleas that they wanted to start, you know, a
22  drug court docket.
23      So they then kept those F4s and F5s
24  in the jurisdiction of, you know, where the
25  case originated from, and, you know, there was

Page 109

1  no amendment made by prosecutors.  So, you
2  know, those clients would no longer be referred
3  to the Akron Municipal Court.
4      Q.    Was there a change in the target
5  client population made after there was a change
6  in the mission statement to stop the felony
7  reduction program?
8      MS. LEYIMU:  Object to the form of
9  the question.
10      A.    Yes, there was.
11      Q.    What was the adjustment?
12      A.    Well, we needed to be able to
13  identify clients that were charged with
14  misdemeanor drug offenses that were already in
15  our jurisdiction to provide those services.
16      Q.    So did the target population
17  decrease?
18      MS. LEYIMU:  Object to the form.
19      A.    I can't speak to whether it
20  decreased.  You know, we had to find a new
21  creative way to help identify clients that were
22  already in our court's jurisdiction that may be
23  suffering from a drug issue.
24      Q.    Do you recall any change in the
25  target population, which was based on a change

28 (Pages 106 - 109)

Page 110

1 in the felony reduction program?
2        MS. LEYIMU:  Object to the form.
3     A.   I don't recall that ever being a
4 part of those conversations.  You know, we were
5 still operating, you know, the drug court.  We
6 just needed to change the way that we
7 identified, screened for, and potentially had
8 clients enter the program.
9     Q.   If we look back at Exhibit 3,
10 Mr. Sturmi, I'd like to call your attention to
11 the history of the -- the drug court.
12     A.   Uh-huh.
13     Q.   It says, "It is a collaborative
14 effort between Summit County courts, the Akron
15 Police Department, the Akron prosecutor's
16 office, the public defender's office, the Akron
17 municipal probation department, the Summit
18 County Alcohol, Drug Abuse and Mental Health
19 Board and Oriana House, Inc."; is that correct?
20     A.   Yes, that's correct.
21     Q.   What is the nature of the
22 relationship between the recovery court and the
23 Summit County ADM Board?
24        MS. LEYIMU:  Object to the form.
25     A.   Our relationship, you know, with

Page 111

1 the ADM Board, you know, has primarily been one
2 of assistance, guidance.  Certainly, the ADM
3 Board, they're a funding source for treatment
4 agencies in Summit County.  They fund certain
5 programs for the Oriana House, Inc.  So, you
6 know, my understanding is that the Summit
7 County ADM Board provides funding to the Oriana
8 House, Inc., for the services that they
9 provide.
10     Q.   And is that funding provided for
11 recovery court clients?
12     A.   Yes.  It's based upon, you know,
13 the number of clients that we serve, you know,
14 and the Oriana House, you know, reports those
15 numbers to the ADM Board.
16     Q.   Do you consider the recovery court
17 a treatment agency?
18        MS. LEYIMU:  Object to the form.
19     A.   Could you repeat the question,
20 please?
21     Q.   Certainly.  You mentioned treatment
22 agencies in your prior response, correct?
23     A.   Correct.
24     Q.   Do you consider the recovery court
25 itself to be a treatment agency?

Page 112

1     A.   No.  I don't -- I don't view the
2 recovery court itself as a, quote, "treatment
3 agency."
4     Q.   What qualifies as a treatment
5 agency?
6     A.   I would identify a treatment agency
7 as an alcohol and drug treatment program that
8 is licensed, certified by the Ohio Department
9 of Mental Health and Addiction Services, or
10 OMHAS.
11     Q.   What treatment services, if any,
12 does the recovery court provide its clients?
13     A.   We make referrals to treatment
14 agencies.  We're not in the business of -- of
15 providing treatment directly to clients.
16     Q.   To which treatment agencies do you
17 currently refer recovery court clients?
18     A.   We have a number of treatment
19 agencies that we refer, you know, here in
20 Summit County.
21     Q.   Could you identify those treatment
22 service providers?
23     A.   Sure.  The Summit County Public
24 Health District, Akron UMADAOP, the Community
25 Health Center, Oriana House, Inc., IBH

Page 113

1 Addiction Treatment Services, Summa Health
2 hospital.
3        Those are the main, you know,
4 treatment bodies.  There are others, but those
5 are the ones that are coming to my
6 recollection.
7     Q.   I'd like to -- I'm going to go
8 through a list.  I'm going to ask you to unpack
9 some of these acronyms for me.
10     A.   Sure.
11        MS. WU:  So we're going to mark as
12 Exhibit 4 AKRON 001115119.
13        - - - - -
14        (Thereupon, Deposition Exhibit 4,
15        January 2016 E-Mail Chain Re:
16        Follow-Up on Treatment Providers,
17        AKRON_001115119 to 001115122, was
18        marked for purposes of
19        identification.)
20        - - - - -
21     Q.   Mr. Sturmi, what is Exhibit 4?
22     A.   It's an e-mail communication.
23     Q.   If I can call your attention to the
24 second e-mail, which appears on 5119, and
25 that's the second e-mail reading from the top

29 (Pages 110 - 113)

1 of the page.  It's an e-mail dated January 5,
2 2016, from you to Brooke Singletary, among
3 others; is that correct?
4     A.   Yes, that's correct.
5     Q.   Who -- who is Brooke Singletary?
6     A.   My recollection of Ms. Singletary
7 is she worked for a company called TRI, and the
8 Akron Recovery Court had received a funding
9 through OMHAS for a program called the
10 Addiction Treatment Program or ATP.  And
11 Ms. Singletary was responsible for collecting
12 data, you know, for OMHAS.  So OMHAS hired, you
13 know, TRI to essentially be the -- the data
14 keepers, you know, for that particular funding
15 project.
16     Q.   I'm going to ask for a little bit
17 of help here.  So what is the organiza- --
18 organization you've referred to as OMHAS?
19     A.   It's the Ohio Department of Mental
20 Health and Addiction Services.  So it's the
21 state agency here in Ohio that licenses, you
22 know, administers both substance abuse and
23 mental health treatment, you know, in the state
24 of Ohio.
25     Q.   And you mentioned TRI.  What's TRI?

1     A.   That's an acronym for Treatment
2 Research Institute, and that is whom
3 Ms. Singletary works for.
4     Q.   TRI is not an Akron entity,
5 correct?
6     A.   That's correct.
7     Q.   You also mentioned ATP.  What does
8 ATP refer to?
9     A.   So that's an acronym for Addiction
10 Treatment Program.
11     Q.   What is the Addiction Treatment
12 Program?
13     A.   So the ATP program, you know,
14 started approximately, you know, three, maybe
15 four years ago.  It was a pilot program that,
16 again, was under OMHAS.  Summit County was one
17 county that was identified to receive, you
18 know, this particular, you know, program.
19          Essentially, initially what it was,
20 it provided financial assistance to refer
21 clients that were diagnosed with an opiate use
22 disorder or an alcohol use disorder for
23 possible assistance with medication-assisted
24 treatment.
25     Q.   What involvement, if any, does the

1 recovery court have with the ATP?
2     A.   We provide -- we continue to -- to
3 be a part of that project, so we have some
4 reporting requirements.  Individuals that meet
5 that criteria that are diagnosed with an opiate
6 use disorder or alcohol use disorder are
7 automatically added to that project.
8          So Mr. Krutko, you know, who is,
9 again, a colleague and assistant of mine, you
10 know, one of his job duties is to comply with
11 that reporting requirement, to identify clients
12 that enter the Akron Recovery Court that meet
13 that diagnosis.
14     Q.   What services do recovery court
15 clients obtain through the ATP program?
16     A.   It has changed, you know, over the
17 year-- well, the last couple years.  And so
18 while it initially was specific to
19 medication-assisted treatment for primarily
20 individuals that were not receiving Medicaid,
21 they would pay, you know, for, you know, that
22 medication.  Now it has expanded to include
23 additional recovery resources.
24          Those recovery resources are
25 somewhat broad.  The way it works is if a

1 client is in ATP, you know, identified person
2 and they enter the Akron Recovery Court, the
3 treatment agency that provides their treatment
4 can bill the ATP project for a variety of
5 services.
6     Q.   Does the recovery court have any
7 funding obligations for the ATP program?
8          MS. LEYIMU:  Object to the form.
9     A.   Do we have a funding requirement --
10 in other words, are you asking me do we pay
11 them?
12     Q.   Correct.  Does the recovery court
13 expend any funds --
14     A.   We do not.
15     Q.   -- in order to participate --
16 participate with the ATP program?
17     A.   We do not.
18     Q.   So looking back at Exhibit 4, I'd
19 like to look at the list of outpatient
20 treatment agencies.
21     A.   Okay.
22     Q.   What's referenced as outpatient
23 treatment agencies?
24     A.   I'm sorry.  So you're asking me
25 what is an outpatient treatment agency as a

Page 118

1 general, or are you asking me specific to these
2 listed agencies?
3     Q.   Certainly.  Mr. Sturmi, in your
4 e-mail, you identify a list of outpatient
5 treatment agencies, correct?
6     A.   Yes, uh-huh.
7     Q.   What are those outpatient treatment
8 agencies?
9     A.   The Oriana House, Inc., Rigel
10 Recovery Service- -- Services, Summit
11 Psychological Associates, the Community Health
12 Center, the Summit County Public Health
13 District, Akron UMADAOP, and Akron General
14 Edwin Shaw Rehabilitation Hospital.
15     Q.   And I believe that's the same list
16 that you had just recited to me a few moments
17 ago, with the exception of Akron General Edwin
18 Shaw Rehabilitation Hospital; is that right?
19     A.   Correct.  My recollection is they
20 removed themselves, you know, as a provider for
21 ATP, because it was sold to the Cleveland
22 Clinic.
23     Q.   What is the nature of the
24 relationship between the recovery court and the
25 outpatient treatment agencies listed on

Page 119

1 Exhibit 4?
2     A.   I'm not sure what you mean by that.
3 Relationship as far as what is our involvement
4 with them?
5     Q.   Yes.  What is your involvement with
6 the outpatient treatment agencies that you've
7 listed here on Exhibit 4?
8     A.   Sure.  It is --
9         MS. LEYIMU:  Object to the form.
10 You can answer.
11     A.   If a client, you know, who enters
12 the Akron Recovery Court is recommended for an
13 outpatient level of care, then this is
14 typically one of the agencies that we would
15 refer them to.
16     Q.   Are these the agencies that provide
17 direct care services to the recovery court
18 client population?
19     A.   They are.
20     Q.   Do you fund the agencies listed on
21 Exhibit 4, the outpatient treatment agencies?
22         MS. LEYIMU:  Object to the form.
23     A.   I don't have any knowledge that we
24 fund any of these agencies with anything, other
25 than the Oriana House, Incorporated, whom the

Page 120

1 City of Akron has contracts with.
2     Q.   And those contracts are separate
3 from the recovery court; is that correct?
4     A.   That's correct.
5     Q.   Also, looking at your e-mail on
6 Exhibit 4, there's a list of residential
7 treatment agencies.  Do you see that,
8 Mr. Sturmi?
9     A.   I do, yes.
10     Q.   What are the entities listed as
11 residential treatment agencies on Exhibit 4?
12     A.   There are just two.  IBH, or
13 Interval Brotherhood Home.  They're now called
14 IBH Addiction Services.  And then the second is
15 RAMAR, which is an acronym for a gentleman that
16 I think, you know, funded the actual facility
17 where RAMAR sits, but RAMAR is owned and
18 operated by the Community Health Center.
19     Q.   And again, what is the nature of
20 the relationship between the recovery court and
21 these residential treatment agencies listed on
22 Exhibit 4?
23     A.   If a client was in the Akron
24 Recovery Court and they were deemed to be in
25 need of residential care, these are the two

Page 121

1 agencies that we could refer them to.  So those
2 clients could potentially enter and receive
3 services at this residential treatment agency.
4     Q.   So is it correct that the recovery
5 court outsources all addiction direct care
6 services for its client population?
7         MS. LEYIMU:  I'll object to the
8 form of the question.
9     A.   Yes.  We -- we do not provide
10 direct services through the Akron Municipal
11 Court or our probation department.
12     Q.   And is it correct that the recovery
13 court provides no funding to these outside --
14 outside entities?
15         MS. LEYIMU:  Object to the form.
16     A.   That's my understanding, yes.
17         MS. LEYIMU:  Is this a good
18 stopping point?  Been going for a little over
19 an hour.
20         MS. WU:  Sure.  Okay, sure, we can
21 go off the record.
22         THE VIDEOGRAPHER:  Off the record
23 at 11:41 a.m.
24         (A recess was taken.)
25         - - - - -

31 (Pages 118 - 121)

Page 122

1    (Thereupon, Deposition Exhibit 5,
2    11/22/2016 E-Mail from Jeff Sturmi
3    Re: SAMSHA Enhancement Drug Court
4    Grant, AKRON_001103385 to 001103387,
5    was marked for purposes of
6    identification.)
7    - - - - -
8    THE VIDEOGRAPHER:  Back on the
9 record at 12:13 p.m.
10 BY MS. WU:
11    Q.   Mr. Sturmi, the court reporter has
12 marked as Exhibit 5 a document marked as AKRON
13 001103385.  Do you have that document?
14    A.   I do.
15    Q.   Do you recognize the document?
16    A.   I'm just going to review it for a
17 couple minutes.
18    Q.   Yes.
19    A.   Okay.
20    Q.   What is Exhibit 5?
21    A.   It's an e-mail with an attached
22 document.
23    Q.   Am I correct that the e-mail is
24 from you to Judge Oldfield?
25    A.   That's correct, yes.

Page 123

1    Q.   And it's dated November 22, 2016;
2 is that right?
3    A.   It is, yes.
4    Q.   There's also a copy on this e-mail,
5 Julie Ellison; is that right?
6    A.   Correct.
7    Q.   Who is Ms. Ellison?
8    A.   Ms. Ellison was Judge Oldfield's
9 personal bailiff.
10    Q.   The subject of the e-mail is
11 "SAMHSA enhancement drug court grant."  What is
12 the SAMHSA enhancement drug court grant?
13    A.   SAMHSA, you know, had provided a
14 grant opportunity for existing drug courts that
15 were looking to enhance their services.  So
16 basically our court, as well as the Turning
17 Point Program, which is the felony drug court
18 program, had made a decision to apply for that
19 SAMHSA grant.
20    Q.   What is SAMHSA?
21    A.   So SAMHSA is the federal substance
22 abuse mental health treatment agency.  Or, you
23 know, I shouldn't say treatment agency, but
24 they're -- they're basically the federal agency
25 that operates substance abuse, mental health

Page 124

1 education and programming.
2    Q.   Did the recovery court in fact
3 complete an application for SAMHSA funding in
4 2016?
5    A.   We did.
6    Q.   Did you receive SAMHSA funding
7 in -- in response to that application?
8    A.   We did.
9    Q.   How much funding did you receive --
10 receive through the SAMHSA enhancement grant?
11    MS. LEYIMU:  Object to the form.
12    A.   Again, I wasn't party to the
13 discussions on -- on the exact amounts of that.
14 My recollection was, you know, it was, I
15 believe, a three-year grant, and the grant was
16 for roughly a total of 1 -- $1 million, in
17 that -- in that area.
18    Q.   Were you involved in obtaining the
19 SAMHSA grant?
20    MS. LEYIMU:  Object to the form.
21    A.   Only in the extent that I attended
22 an occasional meeting to discuss, you know, the
23 process of that grant, but I did not
24 participate in the grant writing.
25    Q.   Prior to 2016, were SAMHSA funds

Page 125

1 available to the Akron Recovery Court?
2    MS. LEYIMU:  Object to the form.
3    A.   I think that SAMHSA grants are
4 always available, you know, to public entities
5 that wish to apply.
6    Q.   Prior to 2016 had the recovery
7 court ever applied to obtain SAMHSA funds?
8    MS. LEYIMU:  Object to the form.
9    A.   I don't have a recollection, you
10 know, of the Akron Recovery Court applying for
11 any such grant.
12    Q.   If I can call your attention to the
13 attachment to the e-mail in Exhibit 5, it's
14 marked AKRON 001103386.
15    A.   Yes.
16    Q.   Are you familiar with this portion
17 of the document?
18    A.   Yes.
19    Q.   What is it?
20    A.   Again, my recollection was that the
21 SAMHSA grant required this document as part --
22 as part of the application process.  So I was
23 assisting Judge Oldfield with completing this
24 particular task that was given to me by the
25 grant writers.

32 (Pages 122 - 125)

Page 126

1    Q.   Who was primarily responsible for
2  preparing the SAMHSA grant application?
3    A.   The Oriana House, Incorporated.
4    Q.   Who made the decision that the
5  Akron Recovery Court would apply for the SAMHSA
6  grant?
7    A.   I wasn't a party to those
8  discussions, so I really can't answer that
9  question.
10    Q.   Would Judge Oldfield have that
11  knowledge?
12       MS. LEYIMU:  Object to the form.
13    A.   I don't know.
14    Q.   If I can call your attention to the
15  last paragraph on the -- this page ending 3386.
16    A.   Okay.
17    Q.   The second sentence reads, "The
18  probation officer is familiar with the need for
19  data collection and experienced in using data
20  collection tools such as Excel databases.
21  Databases for screening and eligibility are
22  currently updated by the probation officer on a
23  weekly basis.  The ARC court also has reporting
24  capabilities through the use of its proprietary
25  database for offender information."

Page 127

1       Mr. Sturmi, what is the proprietary
2  database referenced in this SAMHSA grant
3  application?
4       MS. LEYIMU:  Object to the form.
5    A.   I -- I don't know.
6    Q.   Who is the probation officer
7  identified in this SAMHSA Grant application as
8  having data collection responsibilities?
9       MS. LEYIMU:  Object to the form.
10    A.   I believe it's referring to me.
11    Q.   What data collection
12  responsibilities do you have?
13    A.   Very limited data responsibilities
14  specific to me.  The Oriana House,
15  Incorporated, has data that is required, and
16  they are the primary data keepers, you know,
17  and have historically been so.
18    Q.   Do you, as the probation officer
19  identified in the SAMHSA application, use a
20  proprietary database --
21       MS. LEYIMU:  Objection.
22    Q.   -- in connection with your recovery
23  court work?
24       MS. LEYIMU:  Object to the form of
25  the question.

Page 128

1    A.   Not to my knowledge.
2    Q.   Do you use any databases in your
3  work in connection with the recovery court?
4       MS. LEYIMU:  Object to the form.
5    A.   The Akron Municipal Court probation
6  department operates a database that is, I
7  believe, owned and operated by CourtView.
8  Initially it was called GBS, and I believe they
9  were purchased by CourtView.
10       But that is our, you know, database
11  that we utilized -- that we utilize primarily
12  for probation notes.  So if any client that is
13  placed on probation, which would include
14  recovery court, is entered, you know, into that
15  database, a picture of the client, you know, is
16  attached, and then a running chronology of
17  notes, you know, would be generated.
18    Q.   Do you believe that's the prop- --
19  proprietary database referenced in the SAMHSA
20  Grant application?
21       MS. LEYIMU:  Object to the form.
22    A.   I didn't author it, so I can't
23  speak to that.  I have no knowledge of that.
24    Q.   Do you know who authored this draft
25  that you sent to Judge Oldfield?

Page 129

1    A.   My recollection was that it was,
2  you know, provided to me by the grant writers
3  from the Oriana House, Incorporated.
4    Q.   Who at Oriana House participated in
5  the grant-writing process?
6       MS. LEYIMU:  Object to the form.
7    A.   The main individual that -- that I
8  have worked with, and who is present in
9  recovery court sessions on a somewhat regular
10  basis now, his name is Alex Dorman.
11    Q.   What is Mr. Dorman's position?
12    A.   I don't know what his title is, but
13  I know that his primary job responsibilities
14  are -- are grant writing and research.
15    Q.   What type of research does
16  Mr. Dorman conduct?
17    A.   I can't speak to that.
18    Q.   You mentioned that Oriana House is
19  the primary data keep- -- keeper for the
20  recovery court; is that right?
21    A.   That's correct.
22    Q.   What types of data does Oriana
23  House maintain for recovery court clients?
24       MS. LEYIMU:  Object to the form.
25    A.   They would keep data as it relates

33 (Pages 126 - 129)

Page 130

1 to the number of clients that are screened for
2 the program, the number of clients that
3 declined the program, number of clients that
4 were found ineligible for the program,
5 certainly clients that are admitted to the
6 program, and then general tracking data as far
7 as retention success rates, graduation, you
8 know, rates, that type of data.
9    Q.   Do you have access to that data
10 maintained by Oriana House for the recovery
11 court?
12       MS. LEYIMU:  Object to the form of
13 the question.
14    A.   I have access to it, so if I have
15 specific data questions, then, yes, I would
16 contact the Oriana House to make whatever
17 request, you know, was necessary.
18    Q.   Do you know in what format they
19 maintain the recovery court data?
20       MS. LEYIMU:  Object to the form.
21    A.   I have no knowledge of what their
22 database is or their capabilities.
23    Q.   Does Oriana House have any
24 requirements for providing reports to the
25 recovery court?

Page 131

1       MS. LEYIMU:  Object to the form.
2    A.   I'm not aware of specific
3 requirements other than you, you know, if the judge
4 or myself, you know, requests data, that it's
5 provided in a timely manner.
6    Q.   To whom do you make data requests
7 at Oriana House?
8    A.   Typically to Emily Beers, who is
9 the Oriana House program manager for drug
10 court.
11    Q.   Now, Mr. Sturmi, if I could ask you
12 to turn to the next page, which ends in 3387.
13    A.   Okay.
14    Q.   About halfway through the last
15 paragraph it says, "Many of our clients are
16 dually diagnosed and so we welcome the
17 opportunity to partner with our Summit County
18 mental health treatment providers."
19       Have I read that correctly?
20    A.   Yes.
21    Q.   How do you understand the reference
22 to dually diagnosed?
23       MS. LEYIMU:  Object to the form.
24    A.   My understanding of that term would
25 be someone that is diagnosed with both a

Page 132

1 substance abuse and a mental health disorder.
2    Q.   Do you know what proportion of the
3 current recovery court population would qualify
4 as dually diagnosed?
5       MS. LEYIMU:  Object to the form.
6    A.   I would say a lot.
7    Q.   Could you give us a percentage?
8       MS. LEYIMU:  Object to the form.
9    A.   It would be difficult for -- for me
10 to -- to give a percentage, but I would say
11 it's the majority.  It's a lot.
12    Q.   Where would that dual diagnosis be
13 reported?
14       MS. LEYIMU:  Object to the form.
15    A.   Primarily the initial assessment,
16 which not only provides a diagnosis of a
17 person's substance abuse, but it would also
18 provide a diagnosis for mental health disorder.
19    Q.   Does the recovery court provide
20 referrals for mental health services in
21 addition to addiction treatment services?
22    A.   We --
23       MS. LEYIMU:  Object to the form.
24       You can answer.
25    A.   We do.

Page 133

1    Q.   Who are the providers with whom you
2 partner for mental health services?
3    A.   It's expanded, you know, over the
4 years.  Primarily in Summit County, it's two
5 agencies.  Community Support Services, they
6 primarily work with clients that have a severe
7 or serious mental health disorder.  The second
8 agency that we work with quite a bit is called
9 Portage Path Behavioral Health, but there have
10 been some additional vendors that have started
11 to be added to the Akron area.
12    Q.   In connection with your work for
13 the recovery court, have you kept any data
14 which tracks the number of clients who are
15 dually diagnosed with addiction and mental
16 health illness?
17       MS. LEYIMU:  Object to the form of
18 the question.
19    A.   Not to my knowledge, no.
20    Q.   Do you know where we could look if
21 we wanted to find that information?
22       MS. LEYIMU:  Object to the form.
23    A.   I'm not aware, you know, of -- of
24 where that particular, you know, data could be
25 obtained, other than, you know, the Oriana

34 (Pages 130 - 133)

Page 134

1 House, you know, Incorporated.  Again, if the
2 client is diagnosed with a mental health
3 disorder, that would be recorded on their
4 substance abuse assessment.
5      Q.   Are you aware of any literature
6 which links substance abuse with mental
7 illness?
8          MS. LEYIMU:  Object to the form of
9 the question.
10      A.   I'm not sure what you mean by that.
11      Q.   Are you aware of any literature
12 which finds a cause between mental health
13 illnesses and addiction?
14          MS. LEYIMU:  Object to the form of
15 the question.
16      A.   I'm not aware of any specific
17 documentation.  I think that there's general
18 consensus that often those run hand in hand.
19      Q.   And when you reference general
20 consensus, whose consensus are you referencing?
21          MS. LEYIMU:  Object to the form.
22      A.   Oh, the various training workshops,
23 you know, that I've attended, you know, have
24 spoken to that.  Just by my experience by
25 interviewing the number of clients that I've

Page 135

1 interviewed, seeing the increase in high-risk,
2 high-need offenders whom we are targeting, you
3 know, in recovery court.  The clients that
4 we're serving today are much more in need of
5 services than they were 10 years ago.
6      Q.   To what do you account that
7 increase in the need for services in the
8 recovery court client population?
9      A.   At the present time?
10      Q.   Well, do you track the reason for
11 increases in client needs?
12      A.   Not --
13          MS. LEYIMU:  Object to the form of
14 the question.
15      A.   Not in a -- in a data-related
16 manner, but certainly in the multitude of
17 interviews that me and our staff conducts, you
18 know, that's certainly always a part of those
19 questions.
20      Q.   So you're talking about an
21 impressionistic view of the increase in needs;
22 is that right?
23          MS. LEYIMU:  Object to the form.
24      A.   What I would say is myself and
25 members of our recovery court team are

Page 136

1 consistently, constantly asking questions with
2 our clients to determine their needs, because
3 their needs change.  Their needs change from
4 the date of the assessment to the next month
5 and the month thereafter.
6          So that is where, you know, I base
7 that response on.
8      Q.   Over what period of time have you
9 observed an increase in the needs of the
10 recovery court population?
11      A.   Well, I don't think, you know,
12 from -- from my perspective, my opinion is
13 they've significantly increased since we've had
14 to deal with the opiate epidemic that is
15 present here in Summit County.
16      Q.   What do you mean by "opiate
17 epidemic" in that last response?
18      A.   As our -- as numbers -- well, just
19 in reference to when the Summit County ADM
20 Board and our treatment providers started to
21 see a significant increase in the amount of
22 clients that we serve with an opiate use
23 disorder, as that related to increase in
24 arrests, as that related to, sadly, a huge
25 increase in overdose and deaths in Summit

Page 137

1 County, that -- that information, obviously,
2 was available, and once it started to become an
3 issue, then our county, you know, helped, you
4 know, to -- to identify that.
5      Q.   Was there ever a time that opiate
6 use, to use your term, was not a problem in
7 Akron?
8          MS. LEYIMU:  Object to the form.
9      A.   I'm sure there's always been some
10 level of an opiate, you know, use issue in
11 Summit County.  However, that dramatically
12 changed here in Summit County, you know,
13 roughly six years ago, in that ballpark, we
14 started to see those increases.
15          In particular, you know, the Summit
16 County ADM Board formed an Opiate Task Force.
17 I believe that started in 2014.  So that was a
18 pretty clear sign, you know, when the agency
19 that is charged with that task to help all of
20 our treatment providers, when they formed the
21 Summit County Opiate Task Force, that was a
22 clue, you know, that we had a major issue going
23 on.
24      Q.   What is the dramatic change that
25 happened around 2012 that you referenced in

35 (Pages 134 - 137)

Page 138

1 your last answer?
2        MS. LEYIMU:  Object to the form of
3 the question.
4    A.    I would say when courts, treatment
5 agencies started to identify more and more
6 clients that were coming to their attention for
7 having an opiate use disorder, that was
8 exacerbated by overdose, whether that client
9 lived or died, you know.  So data has always
10 been received by the -- by the coroner's
11 office, but that information started that
12 process.
13    Q.    What data are you referring to
14 which reflects an increase in the number of
15 individuals with an opiate use disorder?
16        MS. LEYIMU:  Object to the form.
17    A.    The data that -- that I would --
18 would come back to is, again, the countless
19 interviews that I've conducted or our recovery
20 court staff have conducted with clients that
21 are reporting opiate use disorders.
22        Combine that with arrest rates,
23 charges, and in particular, overdose data,
24 that's what led, I would think, the Summit
25 County ADM Board, you know, to sound the alarm.

Page 139

1    Q.    When you said the Summit County ADM
2 Board sounded the alarm, what specific actions
3 are you referencing?
4    A.    The -- the start of -- of the
5 Summit County Opiate Task Force.
6    Q.    Other than the start of the Summit
7 County Opiate Task Force, what facts do you
8 reference in connection with your statement
9 that the opiate epidemic started in 2012?
10        MS. LEYIMU:  Object to the form.
11    A.    Again, I would just come back to
12 what I've already indicated.  You know, we saw
13 a marked increase in arrests.  We saw a marked
14 increase in clients that were reporting opiate
15 use disorders.  And that information, you know,
16 was supported by data that we received from
17 Summit County ADM Board as it related to
18 overdoses.
19    Q.    Mr. Sturmi, you mentioned a marked
20 increase in arrests.  Do you mean arrests
21 related to opioid substances?
22    A.    Certainly in some occasions, yes.
23    Q.    Where would we look at data which
24 tracks an increase in arrests related to opioid
25 encounters?

Page 140

1        MS. LEYIMU:  Object to the form.
2    A.    I would think the Akron Police
3 Department or the Akron Municipal Court's
4 Information System.  We term that as AMCIS.
5    Q.    Do you personally have access to
6 AMCIS?
7    A.    Yes.
8    Q.    To your knowledge, does AMCIS
9 categorize law enforcement encounters by the
10 type of drug involved?
11    A.    No, not to my knowledge.  It's a --
12 it's an older, somewhat antiquated database.
13    Q.    So if we wanted to verify the
14 number of arrests that involved an opioid
15 substance, how would we do that?
16        MS. LEYIMU:  Object to the form of
17 the question.
18    A.    That would be a question you'd have
19 to ask an IT person.
20    Q.    Do you know of any system to which
21 you have access, which tracks law enforcement
22 encounters based on the drug involved?
23        MS. LEYIMU:  Object to the form.
24        You can answer.
25    A.    I don't have knowledge of that, no.

Page 141

1    Q.    You also mentioned reported opioid
2 use disorders by clients.  Can you identify any
3 aggregate data source which reflects the number
4 of reported opioid -- op- -- excuse me, opioid
5 use disorders by recovery court clients?
6        MS. LEYIMU:  Object to the form of
7 the question.
8    A.    Not a specific database, no.
9    Q.    Is there anywhere that we could
10 look in order to identify the number of
11 recovery court reported -- recovery court
12 client opioid use disorders?
13        MS. LEYIMU:  Object to the form.
14    A.    I can't speak to whether the Oriana
15 House does or does not track that information.
16    Q.    Does the recovery court track that
17 information?
18    A.    Not specifically, no.
19    Q.    Does it generally?
20        MS. LEYIMU:  Object to the form.
21    A.    Not at the present time.
22    Q.    The last data source that you
23 referenced was ADM overdose death reports; is
24 that right?
25    A.    That's correct.

36 (Pages 138 - 141)

Page 142

1    Q.   How is that information reported?
2    A.   The Summit County Public Health
3  district collects that data in -- in
4  communication with the Summit County medical
5  examiner's office.
6    Q.   Does the overdose data maintained
7  by ADM identify the drugs involved in the
8  overdose?
9       MS. LEYIMU:  Object to the form.
10   A.   I can't speak to that.  You'd have
11  to, you know, inquire with, you know, the
12  agencies that oversee that data.
13   Q.   Are there any other sources of data
14  which lead you to formulate your opinion that
15  the opioid -- opiate epidemic began in 2012?
16      MS. LEYIMU:  Object to the form.
17   A.   I use that as a benchmark.  It's
18  very difficult to look at a calendar and
19  pinpoint a specific day, you know, that, you
20  know, this particular issue, you know, started
21  in our community.
22      But as -- as I look at, you know,
23  the calendar and looking at those other factors
24  in speaking with the various colleagues that I
25  work with, and the fact that the Summit County

Page 143

1  ADM Board started an Opiate Task Force in 2014,
2  you know, that's where I base that information
3  from.
4    Q.   Earlier today you testified that
5  when you worked as a juvenile probation
6  officer, you had clients that abused opioids;
7  is that correct?
8       MS. LEYIMU:  Object to the form of
9  the question.
10   A.   That's my recollection, yes.
11   Q.   Do you believe that there was a
12  problem with opioid abuse in Akron in the late
13  1990s?
14      MS. LEYIMU:  Object to the form of
15  the question.
16   A.   I can't speak to that because I
17  didn't work for the City of Akron at that time.
18   Q.   I -- I apologize.  Let me rephrase
19  that question.
20      Do you believe that there was a
21  problem with opioid abuse in Summit County in
22  the late 1990s?
23      MS. LEYIMU:  Object to the form of
24  the question.
25   A.   Again, I -- I didn't -- I didn't

Page 144

1  work -- well, I started in '96, you know, so
2  you're saying late 1990s?
3    Q.   Correct.
4    A.   Okay.  I wasn't aware, in the first
5  two or three years of my career with the City
6  of Akron, that it was a specific, you know,
7  problem that it is -- or what I perceive it to
8  be -- today or in the recent past years.
9    Q.   But as a probation officer in the
10  late 1990s in Summit County, you had encounters
11  with clients who used opioids, correct?
12      MS. LEYIMU:  Object to the form.
13   A.   I had clients that -- that used any
14  number, you know, of substances, and opiates,
15  you know, certainly was one of them.
16   Q.   In the -- the data sources that you
17  referenced, do you know if there's any
18  reporting or distinction drawn between
19  prescription opioids and non-prescription
20  opioids?
21      MS. LEYIMU:  Object to the form.
22   A.   I'm not aware of any specific tool
23  that identifies that.
24   Q.   Is that -- is that distinction
25  between prescription opioids and

Page 145

1  non-prescription opioids important to your work
2  with the recovery court?
3       MS. LEYIMU:  Object to the form.
4    A.   I think that any information that
5  we glean from our clients is -- is helpful
6  as -- as we determine the best way to provide
7  services to them.
8       So knowing whether they started,
9  you know, with prescription medication or
10  medications that they purchased on the street
11  is -- is helpful, you know, to our team.
12   Q.   Do you have any system for tracking
13  the number of clients that were introduced to
14  prescription opioids with a valid prescription?
15      MS. LEYIMU:  Object to the form.
16   A.   Not a specific, you know,
17  instrument that we use or a data collection
18  tool, no.
19   Q.   Is there a gener- -- general data
20  collection tool you use?
21   A.   Not that I'm aware of, no.
22      MS. WU:  All right.  So I'd like to
23  mark -- have the court reporter mark as
24  Exhibit 6, AKRON 001109379.
25         - - - - -

37 (Pages 142 - 145)

Page 146

1      (Thereupon, Deposition Exhibit 6,
2    2/22/2011 E-Mail Chain Re:  Drug
3    Information, with Attached Document
4    Titled "Drug Abuse Trends in the
5    Akron-Canton Region,"
6    AKRON_001109379 to 001109392, was
7    marked for purposes of
8    identification.)
9         - - - - -
10        MS. FLOWERS:  What number is this?
11       MS. WU:  Six.
12    Q.   Mr. Sturmi, are you familiar with
13  the document marked as Exhibit 6?
14    A.   Yes.
15    Q.   What is it?
16    A.   The State of Ohio operates OSOM,
17  which is an acronym for Ohio Substance Abuse
18  Monitoring, that collects data from any number
19  of sources.  I can't speak to how its
20  collected.  But it's shared with criminal
21  justice professionals in an effort to show
22  trends of drug or drug use that may be
23  occurring in -- in, you know, different
24  jurisdictions in the state of Ohio.
25    Q.   And looking at the first page of

Page 147

1  Exhibit 6, ending 9379 in the Bates stamp, I
2  see we're looking at an e-mail from you to, at
3  the top, Doug Powley, and it's dated February
4  22, 2011; is that correct?
5    A.   Yes, ma'am, uh-huh.
6    Q.   Who is Mr. Powley?
7    A.   At the time, Mr. Powley was the
8  chief Akron City prosecutor.
9    Q.   What was the purpose of your e-mail
10  to Mr. Powley?
11    A.   Just to share, you know, this
12  report with Mr. Powley.  Mr. Powley, you know,
13  was certainly involved in starting the Akron
14  Drug Court program, so just wanting to share
15  with him, you know, trends that were
16  potentially coming into the community.
17    Q.   Now, if we look further down on the
18  same page, we see another e-mail from you to a
19  numb- -- a number of recipients also dated
20  February 22, 2011.
21        Could you identify for us the
22  recipients of this second e-mail?
23    A.   By name or just, you know, how or
24  why I sent it to them?
25    Q.   If you could identify them by name

Page 148

1  and position.
2    A.   Okay.  So this was an e-mail that I
3  simply forwarded to the Akron probation
4  department staff at that time.
5        Elizabeth Delagrange, she was our
6  secretary.
7        Matt Esterle was an Akron City
8  probation officer.
9        Lori Florin was an Akron City
10  probation officer.
11        Jill Forster was an Akron City
12  probation officer.
13        Tony Ingram is our chief probation
14  officer.
15        Hanne Muri was a probation
16  assistant.
17        Staci Rouse, you know, was our
18  community service coordinator.
19        Michelle Smith was an Akron City
20  probation officer.
21        Danny Sojourner was an Akron City
22  probation officer.
23        Alissa Streeter was an Akron City
24  probation officer.
25        Judy Wallace was an Akron City

Page 149

1  probation officer.
2        And Kelly Warner was our office
3  manager.
4    Q.   Were any of those recipients you
5  just identified specifically employed by the
6  Akron Recovery Court?
7    A.   At that time I don't recall anybody
8  assisting me with the management of that
9  docket.  Jill Forster, I believe her title at
10  that time was director of specialty courts.  So
11  she was a manager of our various, you know,
12  specialized dockets, so certainly I'd have a
13  little bit more communication with her as it
14  related to, you know, drug court information or
15  drug court data.  But she wasn't specifically
16  working on the docket.
17    Q.   In your e-mail to the probation
18  team, you write, "This report has some
19  interesting information on current drug use and
20  availability trends in our area."
21        Do you recall what you thought was
22  interesting about the report?
23    A.   I don't.  I mean, this report is,
24  you know, over seven years old.
25    Q.   So let's look at the report,

38 (Pages 146 - 149)

1 Mr. Sturmi.  So staying on Exhibit 6, could you
2 please turn to the page ending with the Bates
3 stamp 9383.
4     A.    Okay.
5     Q.    And here it says -- if I can call
6 your attention to the first column, the last
7 paragraph, it reads, "Powdered cocaine
8 reportedly is used in combination with alcohol,
9 benzos, ecstasy, heroin, aka speedball when
10 shot together, and marijuana.  Is that correct?
11     A.    Yes, I see that.
12     Q.    Do you recall that heroin was used
13 in combination with other drugs as of 2011?
14         MS. LEYIMU:  Object to the form of
15 the question.
16     A.    It doesn't indicate that in this
17 report.  At least in that section.
18     Q.    What do you believe this section
19 indica- -- indicates?  Sorry.
20     A.    Well, just trends in the
21 Akron-Canton region.
22     Q.    Is that -- are the trends reported
23 here consistent with your recollection?
24     A.    Yes, I think that -- my
25 recollection is that was a drug that was

1 primarily an issue in -- in the Akron area at
2 that time.
3     Q.    So -- so heroin was primarily a
4 drug that was in use in Akron as of 2011; is
5 that correct?
6         MS. LEYIMU:  Object to the form of
7 the question.
8     A.    I'm sorry.  Could you repeat the
9 question?
10     Q.    Sure.  Is it your recollection that
11 heroin was a drug, in your words, primarily
12 used in Akron in 2011?
13         MS. LEYIMU:  Object to the form.
14     A.    It -- it was in use, you know.  The
15 report indicates that further down in the
16 paragraph, that it was typically used in
17 combination with powdered cocaine.  So there
18 was some indication that there was heroin use,
19 although somewhat on a limited basis, but
20 that's what the report says.
21     Q.    From the data records of the
22 recovery court where heroin is used in
23 connection with another substance, such as
24 cocaine, would you categorize that as opioid
25 abuse?

1         MS. LEYIMU:  Object to the form of
2 the question.
3     A.    If an individual was charged with
4 or admitted use of heroin, we would classify
5 that as an opiate use, yes.
6     Q.    And if we look at the next page,
7 which ends 9384, in the second column it says
8 "Heroin Current Trends."  Do you see -- see
9 that heading?
10     A.    Yes.
11     Q.    And, "Across the region, it was
12 widely reported that the popularity and use of
13 heroin is rising."
14         Is that report consistent with your
15 knowledge of the use of heroin in Akron in
16 2011?
17         MS. LEYIMU:  Object to the form of
18 the question.
19     A.    It's tough for me to, you know,
20 remember seven years ago what -- what that
21 trend was, you know.  I think I indicated that
22 2012 seemed to be somewhat of a benchmark, but,
23 you know.
24     Q.    Is there any data that you would
25 recommend we look at in order to identify data

1 trends as to drugs used in Akron?
2         MS. LEYIMU:  Object to the form.
3     A.    My only suggestion is looking at
4 the very report that we're looking at.  They --
5 they generate these reports all the time.  So
6 you can pull OSAMN, you know, trends from their
7 website.
8     Q.    Okay.  Are there any other data
9 sources that you would consult in order to
10 identify or measure the popularity of drugs
11 used in Akron?
12         MS. LEYIMU:  Object to the form.
13     A.    Not specific data sources.  But,
14 you know, remember, we -- we routinely work
15 with our Akron Police Department, SNUD, and
16 narcotics units, you know, so we're constantly
17 talking to the detectives that are on the
18 street that are making these arrests, and
19 they're often the very best providers of that
20 information.
21         It's nice to look at data.  It's
22 important.  But that's why we have an Akron
23 police detective assigned, you know, to the
24 recovery court team.  Part of that is to
25 determine trends and what they're seeing on the

39 (Pages 150 - 153)

Page 154

1 streets.
2     Q.    Is that because street drugs play
3 an important role in the drug abuse that you
4 observe in Akron?
5         MS. LEYIMU:  Object to the form of
6 the question.
7     A.    All drugs, you know, are important
8 to what we do in the Akron Recovery Court.
9         MS. WU:  So I think we're now up to
10 Exhibit 7?  Okay.  Good.  I can count.
11        So we're going to mark as Exhibit 7
12 a document identified as AKRON 001104338.
13            - - - - -
14        (Thereupon, Deposition Exhibit 7,
15         4/16/2018 E-Mail Chain Between Jeff
16         Sturmi and Shaina Rochford Re:
17         Interview, AKRON_001104338 to
18         001104342, was marked for purposes
19         of identification.)
20            - - - - -
21     Q.    Mr. Sturmi, do you recognize the
22 document which has been marked as Exhibit 7?
23     A.    I'm still reviewing it.
24     Q.    Okay.
25     A.    Yes, I have a recollection of this.

Page 155

1     Q.    Okay.  What is Exhibit 7?
2     A.    It was e-mail communication that I
3 had received from Judge Oldham's judicial
4 clerk.  I believe her name is Shaina.  Shaina
5 was a law student at the University of Akron.
6 So she had asked me to participate in basically
7 an interview, just some written questions, and
8 then I responded to those.  And so that's what
9 this is.
10     Q.    And you -- you mentioned Shaina.
11 Is that Shaina Rochford?
12     A.    Yes.  I believe -- yeah,
13 Ms. Rochford.
14     Q.    Or Rochford.  And did Ms. Rochford
15 use the e-mail address that we see on
16 Exhibit 7, clerkj6@akronohio.gov?
17     A.    That's correct.  That was her
18 e-mail designation.  Each judge has, you know,
19 a clerk number, and Judge Oldham is Clerk -- or
20 is Judge No. 6.
21     Q.    What was that nature of the
22 interview questions that Ms. Rochford posed to
23 you?
24     A.    Just from my recollection, you
25 know, they were general -- I can't speak to

Page 156

1 whether she was doing a paper or some sort of
2 presentation, you know, for, you know, class,
3 but she wanted my opinions on these questions.
4     Q.    So if I can call your attention to
5 the attachment which starts on the page ending
6 4340, staying with Exhibit 7.
7     A.    Okay.
8     Q.    About halfway down the page, it
9 reads, "Have you seen any changes over the
10 years in regards to recovery court, such as the
11 types of drugs and the types of defendants?"
12        Is that Ms. Rochford's question to
13 you?
14     A.    Yes, it is.  Uh-huh.
15     Q.    Then the following text that
16 starts, "Yes," is that your response?
17     A.    Yes, that's correct.
18     Q.    You write that "From 2003 to 2007
19 it was primarily crack and powder cocaine"; is
20 that correct?
21     A.    Yes.
22     Q.    What is the basis for your opinion
23 that cocaine was the primary drug abused by
24 recovery court clients during the period 2003
25 to 2007?

Page 157

1         MS. LEYIMU:  Object to the form.
2     A.    It would be the same, you know,
3 that it is today.  So, you know, we're talking
4 to our Akron police partners.  We're looking at
5 arrest numbers, arrest charges, just trying to
6 get a -- a -- you know, a basis of what are the
7 primary drugs of choice in the community.  In
8 the Akron community, and Summit County
9 particularly.
10     Q.    Do you have any opinion as to why
11 cocaine was common in the recovery court
12 population for the period 2003 to 2007?
13         MS. LEYIMU:  Object to the form.
14     A.    I do not.
15     Q.    Is cocaine still a drug used or
16 abused by clients of the recovery court today?
17     A.    It is.
18     Q.    Staying in the same paragraph, you
19 write, "2007 to 2012 it moved to
20 methamphetamine"; is that right?
21     A.    That's correct.
22     Q.    What is the basis for your opinion
23 that from 2007 to 2012 methamphetam- --
24 methamphetamine was a drug commonly used by
25 recovery court clients?

40 (Pages 154 - 157)

Page 158

1        MS. LEYIMU:  Object to the form.
2    A.    Again, it would go back to
3  interviewing the client, speaking with our
4  partners with the Akron Police Department,
5  looking at arrest data.
6    Q.    And does the arrest data that you
7  just referenced identify the drug involved in a
8  law enforcement encounter?
9    A.    Yes, it -- it -- it does.
10    Q.    Where is that reported?
11        MS. LEYIMU:  Object to the form.
12    A.    What the individual's charged with,
13  or the more specific, you know, explanation of
14  what the arrest, you know, was?
15        I mean, obviously, an individual is
16  charged with the offense, and a lot of times
17  the offense specifically identifies the drug
18  that they were alleged to have been in
19  possession of.  So that's certainly, you know,
20  one mechanism, you know, to determine that.
21    Q.    Have you referred to any data
22  sources in order to inform your opinion that
23  meth was popular with recovery court clients
24  from 2007 to 2012?
25        MS. LEYIMU:  Object to the form.

Page 159

1        MS. FLOWERS:  Objection.  I'm
2  sorry, but you're asking a fact witness for an
3  opinion.  I don't think that's proper.
4        Go ahead.
5        MS. WU:  Ms. Flowers, I'm asking
6  him for the basis of the opinion set forth in
7  the exhibit that we have here.  He's provided
8  the --
9        MS. FLOWERS:  Okay.
10        MS. WU:  -- opinion outside the
11  context of this litigation.
12        MS. FLOWERS:  I don't think we're
13  going to debate whether that's his opinion or
14  not versus fact.  I just think that as a
15  general proposition, asking his opinion in
16  this -- in this context is improper.
17        MS. WU:  Well, let me -- let me see
18  if I can rephrase my question to --
19        MS. FLOWERS:  Okay.
20        MS. WU:  -- make clear that I'm
21  asking for the basis as set forth in this
22  document.
23        MS. FLOWERS:  Okay.
24  BY MS. WU:
25    Q.    Mr. Sturmi, did you consult any

Page 160

1  data sources in order to formulate your opinion
2  that meth was a commonly used drug for the
3  period 2007 to 2012?
4    A.    So once again, my response would be
5  all -- all of the mechanisms that -- that I
6  have at my disposal:  interviewing clients that
7  I serve; speaking with my coworkers about what
8  they're seeing; seeing what type of clients are
9  starting to come into recovery court; what is
10  their diagnosis; is there an increase in
11  methamphetamine diagnosis; talking with our
12  partners, you know, with the Akron Police
13  Department.  So, you know, there's lots of --
14  of mechanisms that I would, you know, look at.
15        But in fairness, this was a
16  response to a question from a judicial clerk.
17  I'm just trying to complete that in a timely
18  manner, so I'm not spending hours and hours,
19  you know, on this document.  I'm spending, you
20  know, 5, 10, 15, 20 minutes, however long it
21  took, to -- to assist with giving my opinion at
22  that time.
23    Q.    Has your opinion changed as to the
24  prevalence of the use of meth with recovery
25  court clients during the period 2007 to 2012?

Page 161

1    A.    Has it changed in what regard?
2    Q.    Is your opinion, as you sit here
3  today, different from it was when you wrote the
4  contents of Exhibit 7?
5    A.    Again, I don't really understand
6  the question.
7    Q.    As -- as you sit here today,
8  Mr. Sturmi, do you have the opinion that
9  methamphetamine was a drug commonly used by
10  recovery court clients for the period 2007 to
11  2012?
12        MS. FLOWERS:  The same objection.
13    A.    Yes, it -- it -- that -- that was,
14  you know, the case, you know, at that time.
15  And I think that's -- you know, my -- my
16  opinion stands, you know, during that time
17  frame, that that appeared to be the trend, you
18  know, in the Akron/Summit County area.
19    Q.    To what do you attribute the
20  prevalence of the use of methamphetamine during
21  the period 2007 to 2012?
22        MS. LEYIMU:  Object to the form.
23    A.    I can't speak to, you know, what
24  specifically created the -- that increase,
25  other than any other drug trend, you know.

41 (Pages 158 - 161)

Page 162

1    Drug dealers will constantly come
2  into areas and, you know, flood the market with
3  their product. So, you know, whether Mexican
4  cartels decided they wanted to, you know,
5  conduct business in Akron, whether folks
6  started going online and trying to, you know,
7  make a methamphetamine lab, you know, I just
8  know that during that time frame, we saw a
9  marked increase in the amount of clients that
10  were coming to our attention for
11  methamphetamine use.
12    Q.   Is methamphetamine still among the
13  drugs used by recovery court clients?
14    A.   Yes.
15    Q.   Now, going back to Exhibit 7, you
16  continue, "2012 to present it has moved to
17  opiates."
18    What facts -- fact or database
19  sources formed the basis for your opinion that
20  opiates were popular drugs among recovery court
21  clients for the period of 2012 and forward?
22    A.   Again, it would be the same sources
23  that I had earlier, you know, identified; you
24  know, the extensive amount of interviews that
25  I've conducted with clients; assessment data

Page 163

1  that I've reviewed; arrest reports;
2  communication with our police department;
3  Summit County ADM Board's involvement.
4  Reviewing, you know, data in that regard.
5    Q.   And does the data that you're
6  referencing distinguish between the drugs
7  involved in an encounter?
8    MS. LEYIMU:  Object to the form.
9    A.   I don't have a specific
10  recollection of -- of that being broken down.
11  You know, we speak about opiates, it could be
12  any number of opiates.
13    Q.   As used in Exhibit 7, which we're
14  looking at, when you use the term "opiates,"
15  are you distinguishing between prescription
16  drugs and non-prescription drugs?
17    A.   I don't believe so, otherwise I
18  would put that, you know, in the response.
19    Q.   Now, if we could turn to the next
20  page of Exhibit 7, which ends 4341.  I'd like
21  to call your attention to the second complete
22  paragraph.  That reads, "Why do you believe
23  that opioid epidemic [sic] has become
24  prevalent?"
25    Is that Ms. Rochford's question to

Page 164

1  you, Mr. Sturmi?
2    A.   That's my recollection, yes.
3    Q.   And then in response you write,
4  "Interestingly, I think that question is
5  answered in the book entitled Dreamland by Sam
6  Quinones"; is that correct?
7    A.   Yes.  That's my -- that's my
8  recollection of the response.
9    Q.   What does Dreamland -- how does the
10  book Dreamland inform your opinion about the
11  opioid epidemic?
12    MS. LEYIMU:  Object to the form.
13    A.   Well, you know, in -- in some of
14  the trainings and workshops that I attended at
15  that time, you know, Mr. Quinones, I recall him
16  being, you know, at those conferences.  So, you
17  know, his -- his book and his opinions were
18  pretty widely known, and so in the course of my
19  job, I certainly wanted to review, you know,
20  that book, and found it to be interesting,
21  as -- as any piece of information is
22  interesting as we're trying to determine, you
23  know, what's going on.
24    Q.   Are there -- is Dreamland
25  consistent with your personal -- the facts

Page 165

1  reported in Dreamland consistent with your
2  experience with the Akron Recovery Court?
3    MS. LEYIMU:  Object to the form of
4  the question.
5    A.   You know, I would -- I would
6  hesitate to say that my opinions are based upon
7  one author and one book.
8    You know, again, I try and -- I try
9  and formulate my opinions by looking at lots of
10  different information, lots of different data.
11  So this book was just another piece in trying
12  to educate myself on potentially why this
13  particular individual felt, you know, that the
14  opiate epidemic started or was created.
15    But his opinions aren't mine.  He's
16  just an author, and I -- I reviewed a book,
17  something that I do routinely.
18    Q.   Do you recall at which trainings
19  Mr. Quinones appeared?
20    A.   My recollection is that he may
21  have, you know, been at an OSU Institute of
22  Addiction Studies, but I don't have a specific
23  recollection.  I just remember, you know, that
24  he was there and gave one of the breakout
25  sessions.

42 (Pages 162 - 165)

Page 166

1    Q.   Do you recall about when that event
2  occurred?
3    A.   Several years ago.  Wasn't
4  recently.  I don't recall when his book was
5  written, but, you know, I'm sure it was, you
6  know, a few times, you know -- or it was after
7  that.
8    Q.   Have you encountered Mr. Quinones
9  at any other -- other events?
10    A.   No.  I've never met Mr. Quinones.
11  I've never spoken with him.
12         MS. WU:  Do you want to stop here
13  for a lunch break?
14         MS. LEYIMU:  I think that's
15  perfect.
16         MS. WU:  I think that lunch has
17  arrived.
18         THE VIDEOGRAPHER:  Off the record
19  at 1:10 p.m.
20          (Luncheon Recess.)
21         THE VIDEOGRAPHER:  Back on the
22  record at 2:01 p.m.
23  BY MS. WU:
24    Q.   Mr. Sturmi, I'd like to ask you to
25  take Exhibit 7 once again.

Page 167

1    A.   Okay.
2    Q.   Okay.  And when we left off, we
3  were looking at the second page of the exhibit,
4  which ends in the Bates stamp of 4340.
5    A.   Okay.
6    Q.   If I can call your attention back
7  to the second paragraph -- or second question,
8  which reads, "Have you seen any changes over
9  the years in regards to recovery court, such as
10  the types of drugs and the types of
11  defendants?"
12         Do you see where I'm reading?
13    A.   Yes, I do.
14    Q.   We spent some time earlier talking
15  about your response.
16         If I wanted to scientifically check
17  the opinions that you've set forth with regard
18  to the types of drugs used by recovery court
19  defendants, how would I do so?
20         MS. LEYIMU:  Object to the form of
21  the question.
22    A.   I don't know the mechanism to
23  scientifically check that.  You know, I think
24  that my responses here are from my life
25  experiences and the multitude of clients and

Page 168

1  professionals that I've worked with over the
2  years.
3    Q.   And I'd like to ask the court
4  reporter to mark Exhibit 8, which is identified
5  as AKRON 000226917.
6         - - - - -
7         (Thereupon, Deposition Exhibit 8,
8         Document Titled "Akron Municipal
9         Court Drug Court Preliminary
10         Screening," AKRON_000226917, was
11         marked for purposes of
12         identification.)
13         - - - - -
14    Q.   Mr. Sturmi, are you familiar with
15  the type of document, which has been marked as
16  Exhibit 8?
17    A.   Yes, I am.
18    Q.   What is it?
19    A.   It's what we would term as the
20  Akron Recovery Court preliminary screening
21  form.
22    Q.   Now, I'd like to ask you to just
23  walk through some of the data which is recorded
24  on -- on this form.
25    A.   Yep.

Page 169

1    Q.   So at the top, we see the
2  "Offender," "Case Number," then I see
3  "Offense."  What is that field?
4    A.   What the individual was charged
5  with.  So any charges that are part of that
6  case.  Could be a -- as is with this particular
7  case, there were two counts on the case.
8    Q.   Where do you and your staff look in
9  order to determine the offense to populate this
10  screening worksheet?
11    A.   The screener, you know, is
12  specifically targeting -- targeting any
13  misdemeanor drug offense.
14    Q.   Is it possible that a recovery
15  court applicant might be charged with
16  additional offenses that are not reflected on
17  the screener?
18    A.   No.  If -- if this, you know, form
19  is completed, then, you know, any charge that's
20  part of that case number should be listed on
21  the document.
22    Q.   Where does the person filling out,
23  the screener, identify those charges?
24    A.   Typically, by looking at the AMCIS,
25  Akron Municipal Court's Information System, so

43 (Pages 166 - 169)

Page 170

1 the court's, you know, general database.  In
2 addition to that, she's also going to review
3 the actual court file, so the hard copy of the
4 court file.
5     Q.    So next we see "CCH Run."  What is
6 that?
7     A.    It's an acronym for criminal case
8 history.
9     Q.    What does that refer to?
10     A.    It's basically an FBI leads
11 computer check.  So we do a nationwide, you
12 know, criminal history check, primarily looking
13 for wants, warrants, and, you know, things that
14 we wouldn't see just by looking at AMCIS.
15     Q.    What is the purpose of running the
16 CCH check?
17     A.    Obviously, just to get an idea of
18 the offender's prior history; again, to check
19 for any active, you know, wants or warrants;
20 and to see if the client would at lea- -- would
21 at least meet the initial threshold for entry
22 into the Akron recovery court's IILC track, or
23 Track 1.
24     Q.    What do you mean by IILC or Track
25 1?

Page 171

1     A.    It's a newer, you know, program
2 that we implemented approximately two years
3 ago.  The Ohio Revised Code allows for certain
4 offenders charged with offenses that are
5 substance abuse-related, they potentially could
6 have that case dismissed and sealed if they
7 successfully complete the program.
8     Q.    How many of the current recovery
9 court clients participate in the Track 1
10 program?
11     A.    Of our -- I didn't look at hard
12 numbers, you know, but typically we hover
13 around that 75 to 80 percent are Track 1s.  The
14 remaining balance are what we would term as
15 Track 2 or probation track.
16     Q.    And what do you mean by Track 2?
17     A.    Essentially what Track 2 is, is the
18 same program, the same services, but they're
19 not going to be eligible for the intervention
20 in lieu of conviction because of any number of
21 factors that's determined by the Ohio Revised
22 Code.  We didn't want to prevent somebody from
23 coming into the recovery court docket based
24 solely upon their prior record, you know.
25     Q.    What would be a disqual- --

Page 172

1 disqualifying factor from a prior record?
2     A.    In reference to Track 1?
3     Q.    Yes.
4     A.    The -- the main ones are crimes of
5 violence.  Depending upon, you know, pending
6 charges in other courts, you know, can create
7 issues.  If the offender is on any type of
8 probation or parole, you know, that can, you
9 know, be a disqualifying factor.  Most of the
10 time it's the offense itself.  It may be an
11 enhanceable offense.  It's not permissible, you
12 know, as defined by the Ohio Revised Code's
13 IILC statute.
14     Q.    When did the recovery court
15 institute the Track 1 option?
16     A.    It was approximately three years
17 ago.  Judge Oldfield was the -- so it might
18 have been a little over three.  You know, maybe
19 more like three and a half to four years ago,
20 because she, you know, was instrumental in --
21 in making that change.
22     Q.    Now, continuing to march through
23 the screening form, next is "FBI Number."  What
24 is that?
25     A.    If an individual has an FBI record

Page 173

1 of any kind, then the FBI assigns that offender
2 with a unique identifying number.
3     Q.    And what is the purpose in tracking
4 that FBI number?
5     A.    It's really for -- for purposes of
6 running, you know, the report.  You know, in
7 other words, this client may come back to us in
8 a year or two, and so when we sit down at our
9 LEADS computer terminal to run another criminal
10 case history, instead of just having to input
11 dates of birth, soc. numbers, all of those, you
12 can just input the FBI number and it's a much
13 more efficient way to get that report.
14     Q.    You referenced the LEADS terminal.
15 For the record, could you tell us what you're
16 talking about?
17     A.    Yeah.  The LEADS terminal, that
18 acronym stands for Law Enforcement Automated
19 Data System.  It's a computer system linked
20 through the Ohio Bureau of Criminal
21 Investigation and Identification.  Our
22 department went through an application process
23 to obtain that LEADS terminal.  There are
24 several LEADS terminals, you know, located in
25 the Akron Municipal Court.  We operate one of

44 (Pages 170 - 173)

Page 174

1 them for investigative purposes only.
2     Q.    So next is the "BCI Number."
3 What's that?
4     A.    So that's an acronym for Bureau of
5 Criminal Investigation.  The Ohio Bureau of
6 Criminal Investigation.  And likewise, if an
7 individual has a record that's been reported to
8 BCI, they assign a unique qualifying number
9 that again allows our staff a much more
10 efficient way to run that check if we have to
11 run in if we -- you know, if we have to run it
12 again.
13     Q.    So next we see "Arresting Agency."
14 What does that record?
15     A.    It's the agency that arrested the
16 individual for this particular case.  So it
17 identifies the jurisdiction, the actual law
18 enforcement agency that made that arrest.
19     Q.    So on Exhibit 8, I see the APD, the
20 Akron Police Department, is filled in.  Are
21 there any other arresting agencies that would
22 fall under the -- that might have arrested one
23 of your potential clients?
24     A.    Yes.
25     Q.    What are those?

Page 175

1     A.    The other jurisdictions that --
2 that we serve are Springfield Township,
3 Lakemore Village Township, which is a -- they
4 changed their charter recently.  Springfield
5 and Lakemore were one and now they're back to
6 being split, so they do have a separate police
7 department.  So Lakemore Village Police
8 Department, the Fairlawn Police Department, the
9 Bath Township Police Department, the Richfield
10 Township Police Department, occasionally but
11 rarely the Mogadore Police Department.  They
12 have a very small part of their city that's
13 within Summit County, but some of it's in
14 Portage County.  And then, lastly, the
15 University of Akron Police Department, who also
16 are within our jurisdiction.
17     Q.    If we drop down to the next
18 register is "Record of Criminal Convictions."
19 What information is to be entered into those
20 fields?
21     A.    You know, again, general helpful
22 information, because typically the person --
23 the main reason that we draft this is for
24 judges, you know, to look at, so they're
25 getting a quick snapshot of that offender's

Page 176

1 history.  So next to "Report of Criminal
2 Convictions," it has "DUI Convictions," "DUS,"
3 which is driving under suspension convictions,
4 "Number of Prison Sentences," and then the
5 rest, I think, is relatively self-explanatory.
6         There's "Akron Municipal Record,"
7 "Yes."  "How many number of misdemeanors."
8 "Contempt" on separate cases.  And then we're
9 also, underneath that, looking at some of our
10 surrounding cities and counties that we have
11 found a lot of our clients have records in.
12     Q.    So the list with a "Yes," "No"
13 column, that's simply a record of where else
14 the potential client has a criminal record; is
15 that right?
16     A.    That's correct.  It's indicating
17 that in those particular jurisdictions, we did
18 it -- we did a check on their websites, and
19 they either, you know, did or did not have a
20 record.
21     Q.    Now, if we look to the right of
22 that register, there's free text.  What's
23 inputted into this area of the screening form?
24     A.    So our screener, you know, is going
25 to list, to the best of his or her ability, the

Page 177

1 year that the charge occurred, the
2 jurisdiction, and what the offense was.
3         In certain circumstances that
4 screener may be able to list a disposition or a
5 sentence.  Lots of times they're not.  Again,
6 this is just a screening form, so it gives us a
7 place to start.
8     Q.    Now, if we drop down, it says
9 "Offender meets eligibility requirements,
10 scheduled for drug court."
11         Who determines whether or not the
12 referred client meets the eligibility --
13 eligibility requirements?
14     A.    Initially, it's the -- the Akron
15 probation officer that's assigned that task,
16 which at the present time, you know, is
17 Probation Officer Alissa Streeter.  So she, you
18 know, is aware of what the criteria is for
19 IILC.  And then, obviously, it lists, you know,
20 if the person is not eligible, and again, it's
21 going to show why that person is not -- not
22 eligible, at least for Track 1.
23     Q.    In addition to Ms. Streeter, is
24 there anyone else who has responsibilities for
25 completing screening forms?

45 (Pages 174 - 177)

1    A.    Yes.  We do have overflow staff,
2 you know, for when Officer Streeter is not
3 available.
4    Q.    Do you ever undertake the screening
5 process?
6    A.    On limited occasions.  Only when
7 necessary, because you're coming in 5:30 in the
8 morning.
9    Q.    About how often do you -- about how
10 many times in the last year did you complete a
11 screening form?
12    A.    Anywhere from maybe two to five.
13    Q.    How about in previous years?  Is
14 that same occurrence average for you?
15    A.    I did more when we first, you know,
16 utilized this form.  Primarily because I wanted
17 to make sure that I understood it.  You know as
18 the manager of the program, I think it's
19 important, you know, for me to understand all
20 aspects, or as most of the aspects of the
21 program that I can, and certainly this form was
22 one of them.
23       So, you know, I -- I had done
24 several of them just to make sure that the flow
25 worked and that, you know, most importantly,

1 the judges that primarily use this document,
2 that they were pleased with that product.
3    Q.    When did the recovery court
4 institute this screening form?
5    A.    You know, it's changed over the
6 years.  As far as when we first started
7 flagging cases, tough for me to put a specific
8 time frame on that, but, you know, obviously
9 this form is dated 2012, you know.  So that
10 sounds about the time that we started utilizing
11 this form.
12       And our efforts were really just to
13 help flag the case.  Our court files are
14 congested with a lot of documents, so all these
15 forms have different colors.  This -- this
16 document is normally blue.
17    Q.    Is this form maintained only in
18 hard copy?
19    A.    No.
20    Q.    Where else is it maintained, or how
21 else is it maintained?
22    A.    It's scanned and attached into the
23 probation department software program.  We term
24 that as GBS.
25    Q.    Prior to 2012 what document, if

1 any, did the recovery court use for screening?
2    A.    Prior to the implementation of this
3 0form, I believe that meant that we remained a
4 felony reduction program, so there wasn't much
5 screening to do.  The clients were identified
6 only by offense.
7       So if they were charged with that
8 felony drug offense, it automatically triggered
9 a referral to drug court.
10    Q.    So there was no screening form
11 prior to 2012?
12       MS. LEYIMU:  Object to the form.
13    A.    Yeah, again, I can't speak to the
14 specific time frame.  But, you know, my
15 recollection was, you know, that once our model
16 changed from a felony reduction to a
17 misdemeanor specific, that we needed to
18 identify and -- and use a form for those case
19 files.
20    Q.    How many screener forms were
21 completed during the last year?
22       MS. LEYIMU:  Object to the form of
23 the question.
24    A.    I don't have specific knowledge of
25 that.

1    Q.    Where would we look if we wanted to
2 obtain that information?
3       MS. LEYIMU:  Object to the form.
4    A.    The Oriana House, Incorporated, has
5 that data.
6    Q.    Does the recovery court have access
7 to that data?
8    A.    Upon request.  I don't have a
9 direct link.  It's a separate computer system.
10    Q.    Does Oriana -- does Oriana House
11 maintain data on behalf of the recovery court?
12       MS. LEYIMU:  Objection.  Form of
13 the question.
14    A.    Again, my recollection, since the
15 program started in 1995, is that at that time
16 was one of their job responsibilities, and that
17 remains so today.
18    Q.    So is it the case that the recovery
19 court has outsourced certain data-keeping
20 functions to Oriana House?
21       MS. LEYIMU:  Object to the form.
22    A.    Yes.
23    Q.    And the recovery court maintains
24 access to the records that are maintained by
25 Oriana House for the recovery court, correct?

Page 182

1    A.    That is correct.
2    Q.    Once the probation officer
3 completes the screening form, what happens
4 next, in terms of filing the form?
5    A.    In the court file, ma'am?
6    Q.    Yes.
7    A.    Yeah.  So the hard copy is placed
8 in the court file.  It's flagged with a -- a
9 flag just as, you know, you would flag any
10 document.  Again, that's to help our judge or
11 other court folks to be aware that this is a
12 potential Akron Recovery Court client.
13         I'm given a copy of this.  That
14 triggers my own process of tracking that case.
15    Q.    Do you review each of the screening
16 forms that you receive?
17    A.    I do.
18    Q.    For what purpose do you review the
19 screening forms?
20    A.    Number one, just to obviously see
21 if a client is at least initially found to be
22 preliminarily eligible, then I'm putting the
23 date and time of their eligibility on a
24 scheduling board to monitor that case status.
25    Q.    Is there any entry on the screening

Page 183

1 form that calls for the identification of the
2 substance abused by the potential client?
3         MS. LEYIMU:  Object to the form.
4    A.    If the individual was charged with
5 an offense defined by the Ohio Revised Code,
6 yes, there are certain occasions where you
7 would see -- you know, an example would be
8 possession of, you know, a misdemeanor drug
9 offense.  A Schedule, you know, II, III, the
10 different schedules that they determine.
11 Obviously, for it to be a misdemeanor, it would
12 have to meet that criteria.  But there are
13 occasions where the offense, you know, would
14 specify what they were charged with.
15    Q.    Is there any substance identified
16 on Exhibit 8?
17         MS. LEYIMU:  Object to the form.
18    A.    No, there's not a specific
19 substance identified.
20    Q.    And that is consistent with the
21 requirements for filling out the screening
22 form, correct?
23         MS. LEYIMU:  Object to the form.
24    A.    Yeah.  The requirements of this
25 form indicate that the screener has to identify

Page 184

1 the charge that they were charged with by the
2 arresting agency as defined by the Ohio Revised
3 Code or a local city code.
4    Q.    And the charge itself does not
5 necessarily identify the drug involved in the
6 law enforcement encounter?
7    A.    Not always.  Not necessarily.
8 Correct.
9    Q.    If you wanted to obtain all
10 screening forms in the probation system, how
11 would you access them?
12         MS. LEYIMU:  Object to the form of
13 the question.
14    A.    Hard copies of these?
15    Q.    Let me take a step back,
16 Mr. Sturmi.
17         You mentioned that the screening
18 forms are scanned after completion; is that
19 correct?
20    A.    That's correct.
21    Q.    After they're scanned, how are they
22 saved electronically?
23    A.    They're uploaded.  A GBS entry is
24 made, so, you know, I would see this case
25 number, so if I typed in either the defendant's

Page 185

1 name or the case number, this would come up.
2         As I go into the log of that
3 database, there's the ability to review an
4 attachment, and that is where this form -- I
5 would see it electronically there.
6    Q.    Are you able to print documents
7 from the GBS database?
8    A.    Yes.
9         MS. WU:  All right.  So I'd like to
10 mark as Exhibit -- 9?  Exhibit 9 a document
11 marked as AKRON 000227333.
12         - - - - -
13         (Thereupon, Deposition Exhibit 9,
14         Document Titled "Drug Court Case
15         History," Case No. 12CRB03563, was
16         marked for purposes of
17         identification.)
18         - - - - -
19    Q.    Mr. Sturmi, are you familiar with
20 the type of document which has been marked as
21 Exhibit 9?
22    A.    I am.
23    Q.    What is it?
24    A.    So this is part of our GBS
25 database.  This is a printout of the log.  We

47 (Pages 182 - 185)

1 would term this as a log. It's a chronological
2 probation note history.
3    Q.   Who is responsible for generating
4 the content in this case history?
5    A.   Different staff members.
6 Secretarial staff is initially inputting the
7 case and identifying the party and what the
8 individual was charged with.
9         And then, if that offender is
10 placed into the recovery court, then the
11 probation officer, typically me or Mr. Krutko
12 in -- in his job duties, are then adding, you
13 know, different chronological data as needed.
14    Q.   How is the information inputted
15 into this form sourced?
16    A.   I'm not sure what you mean by
17 "sourced."
18    Q.   How is this information populated?
19 Where does it come from?
20    A.   Just a -- you mean the data as far
21 as inputting on the keyboard or you mean
22 where -- where are we getting the information?
23    Q.   Where are you getting the
24 information?
25    A.   Okay. So we're getting the

1 information from any number of factors. As an
2 example, on this case, the person entered the
3 program April 19, 2012, so we're recording the
4 fact that they entered the program.
5         Positive drug screens are provided
6 to our department from the Oriana House lab.
7 And then typically, you know, the probation
8 aide is entering that data as he -- as he or
9 she receives it.
10    Q.   So if we now go to the entry that's
11 dated 4/26/2012. The "Type" column reads
12 "DCUDS results." What's that?
13    A.   Drug court urine drug screen
14 result.
15    Q.   And then there's an entry. What
16 does that entry report?
17    A.   In that same -- in other words, the
18 "Positive MJ"?
19    Q.   Yes.
20    A.   So that's an acronym for a positive
21 marijuana test, and then underneath that a
22 positive opiate test.
23    Q.   Is there any distinction drawn
24 between prescription opioids and
25 non-prescription opioids as reported on this

1 form?
2    A.   No.
3    Q.   Now, if we turn to the second page
4 of this document, it ends 27 -- 27334, we go to
5 the entry for July 10, 2012, we see a sanction.
6 What does a sanction report?
7    A.   So sanction, in a drug court model
8 we have graduated sanctions and rewards, so
9 this is a notation that on this particular day,
10 this individual was scheduled for a sanction
11 No. 2 for some sort of violation of the program
12 rules.
13    Q.   Who would be responsible for
14 identifying sanctions for input into the case
15 history?
16    A.   Well, our team, you know, is
17 staffing these cases each week. So anybody
18 that's coming to appear at a drug court
19 session, we're staffing that case the day
20 before, and depending upon why that client is
21 appearing, that would trigger the information
22 that the judge sees. That's what this document
23 really is for. You know, this document is in
24 front of Judge Oldham as the client is
25 appearing, so he can look at that and get a

1 snapshot of why this person is appearing before
2 him.
3    Q.   Who has access to this case
4 information?
5    A.   The probation department staff, and
6 certainly the judge upon his or her request.
7    Q.   Is this information available in
8 the municipal court docket?
9    A.   No. It's a confidential document.
10    Q.   Now, if we look at the entry for --
11 the second entry for October 9, 2012, the typed
12 column reads "Closed." What does that
13 indicate?
14    A.   That, you know, we closed pursuant
15 to our policies and procedures.
16    Q.   What does it mean for the client
17 when a case is closed?
18        MS. LEYIMU:  Object to the form.
19 Vague.
20        You can answer.
21    A.   It basically just means that, you
22 know, we have officially closed that case on
23 any number of different factors. It looks
24 like, on this particular case, it was closed
25 because a warrant was issued for that person's

Page 190

1 arrest.
2    Q.   Do you know how many drug court
3 case histories were generated within the last
4 year?
5    A.   I -- I don't.
6    Q.   Where would we look if we wanted to
7 find that information?
8        MS. LEYIMU:  Object to the form.
9    A.   I'm not sure I -- I understand the
10 question.
11    Q.   If you wanted to know how many drug
12 court histories your department generated last
13 year, how would you answer that question?
14    A.   I don't think very well because I
15 still don't understand the question.  So are
16 you saying how -- how would I print this out?
17    Q.   If you wanted -- do you know how
18 many case histories were recorded in 2018?
19    A.   Not off the top of my head.
20    Q.   If you wanted to find out how many
21 were created in 2018, how would you do that?
22    A.   Again, I think I'm confused on --
23 on your question.  Are you asking how many
24 clients were activated into the drug court?
25 Because we don't always print these documents.

Page 191

1 It just depends.
2    Q.   Does every client in the recovery
3 court have an active case history?
4    A.   Yes.
5    Q.   Are there case histories for any --
6 do you maintain case histories for clients who
7 have been terminated from the drug court
8 program?
9    A.   Yes.  Any client that was ever
10 activated into drug court, we have a case
11 history on them.
12    Q.   How do you access those case
13 histories?  Through what system?
14    A.   The GBS probation department
15 software program.
16        MS. WU:  All right.  I'd like to
17 mark as Exhibit 10 --
18        MS. FLOWERS:  If you're -- are you
19 finished with that -- with this one for a
20 minute?
21        MS. WU:  Yes.
22        MS. FLOWERS:  I would just like
23 to -- I'm not sure whether this contains HIPAA
24 or not, and I'd just like to reserve the right
25 on the record in case it does, to redact the

Page 192

1 name.
2        MS. WU:  Sure.  Again, just for
3 clarity on the record, I think the parties have
4 agreed that these documents are not subject to
5 HIPAA, but we can certainly take it off --
6 offline.
7        MS. FLOWERS:  Thank you.
8        MS. WU:  So I'd like to mark as
9 Exhibit 10 AKRON 000225302.
10        - - - - -
11    (Thereupon, Deposition Exhibit 10,
12    12/22/2011 Document Titled Akron
13    Municipal Court Felony Drug Court
14    Costs Invoice," AKRON_000225302, was
15    marked for purposes of
16    identification.)
17        - - - - -
18    A.   Okay.
19    Q.   Mr. Sturmi, are you familiar with
20 the document identified as Exhibit 10?
21    A.   Well, it's been quite some time
22 since I've seen this type of document, but,
23 yeah, this appears to be an AMCIS-generated
24 computer document that shows the breakdown of
25 court costs.

Page 193

1    Q.   You mentioned AMCIS.  What is
2 AMCIS?
3    A.   It's the Akron Municipal Court's
4 Information System.
5    Q.   To whom were the court costs on
6 Exhibit 10 charged?
7        MS. LEYIMU:  Object to the form.
8    A.   To whom was the client?  The
9 defendant, ma'am?
10    Q.   To whom was the invoice marked as
11 Exhibit 10 issued?
12    A.   It was issued to a Mr. Robert A.
13 Guthrie.
14    Q.   Was Mr. Guthrie a client of the
15 recovery court?
16    A.   It appears that he was; however, I
17 don't have a recollection of Mr. Guthrie, and
18 this is a 2011 case.
19    Q.   I see that it notes that
20 Mr. Guthrie is a defendant in the municipal
21 courts; is that correct?
22    A.   Yes.
23    Q.   And the document reads "Felony Drug
24 Court Costs Invoice," correct?
25    A.   Yes, that's correct.

49 (Pages 190 - 193)

Page 194

1    Q.    What is a felony drug court costs
2 of invoice?  What is it?
3    A.    I can't really speak to that.  I
4 don't -- this isn't -- this isn't a form that
5 I'm familiar with.  I don't generate it.  I'm
6 assuming Mr. Laria and the Akron municipal
7 clerk of courts, you know, utilizes this, so
8 this is not a document that I'm familiar with.
9    Q.    Does the recovery court charge its
10 clients for court services?
11         MS. LEYIMU:  Object to the form of
12 the question.
13    A.    Yes.  They're -- they're assessed
14 court costs.
15    Q.    Do you review the court costs
16 charged to your clients?
17         MS. LEYIMU:  Object to the form of
18 the question.
19    A.    No.
20    Q.    Who is responsible for charging
21 recovery court clients for court costs?
22    A.    I believe that would be Mr. Laria,
23 the Akron municipal clerk of court.
24    Q.    Do you know how many invoices were
25 issued to your clients last year?

Page 195

1         MS. LEYIMU:  Object to the form of
2 the question.
3    A.    I don't have specific knowledge of
4 that total number, but anybody that entered the
5 Akron Recovery Court would -- would have been
6 assessed, you know, court costs on that case.
7    Q.    Do you know the total amount of
8 fees invoiced to recovery court clients last
9 year?
10         MS. LEYIMU:  Object to the form of
11 the question.
12    A.    Do you mean with -- what that
13 amount was?
14    Q.    Correct.
15    A.    It's, you know, changed, obviously,
16 over the years.  At the present time, the fee
17 for Akron Recovery Court costs are -- is $145.
18    Q.    And that's $145 assessed to each
19 client of the recovery court?
20    A.    That's correct.
21    Q.    Are there additional charges that
22 may be charged to a recovery court client?
23    A.    There are.
24    Q.    What are those other categories of
25 charges?

Page 196

1    A.    Primarily -- well, not primarily.
2 There are two.  One is a probation supervision
3 fee, so any individual that is placed on
4 probation is required to pay a probation
5 supervision fee.  That fee is $120 or $10 per
6 month of probation service.
7         Often our clients are with us
8 longer than 12 months.  We do not continue to
9 charge.  In other words, that meter does not
10 keep running.  It's $120 whether you're with us
11 12 months or 24 months or 36 months.
12    Q.    You mentioned there was a second
13 category of charges.  What's that second
14 category?
15    A.    The second category is an Oriana
16 House program fee that our contract agency
17 charges the client.  Those monies do not come
18 to our court and are not receipted or processed
19 with the Akron municipal clerk of court or the
20 cashier's office.
21    Q.    And when you say that the monies
22 are charged by the contract agency, do you mean
23 Oriana House is charging those fees?
24    A.    That's correct, yes.
25    Q.    Mr. Sturmi, for that second

Page 197

1 category of charges charged directly by Oriana
2 House, how much does Oriana House charge each
3 client?
4    A.    The current program fee is $20 per
5 month.  Typically, it's a $260, you know, fee.
6    Q.    So that would be $260 annually?
7    A.    That's correct.
8         MS. WU:  So I'd like to mark as
9 Exhibit 11 the 2018 budget plan for the City of
10 Akron.  This is a public document with no Bates
11 stamp.
12         - - - - -
13         (Thereupon, Deposition Exhibit 11,
14         Document Titled "2018 Budget Plan,
15         City of Akron, Ohio", was marked for
16         purposes of identification.)
17         - - - - -
18    Q.    Mr. Sturmi, are you familiar with
19 the document which has been marked as
20 Exhibit 11?
21    A.    I've seen, you know, this document
22 maybe a couple times in my career.  Again, I'm
23 not involved in the budgeting process.  That's
24 not a job task of mine.
25    Q.    So I'd like to call your attention

50 (Pages 194 - 197)

Page 198

1 to page 187 of the budget document.
2    A.   Okay.
3    Q.   Now, from pages 187 through 195, we
4 see municipal court budget information.  Are
5 you familiar with the -- this municipal court
6 budget?
7         MS. LEYIMU:  Object to the form of
8 the question.
9    A.   I'm familiar in the sense that, you
10 know, I know what it is, but it's not a
11 document that I have, really, any involvement
12 with.
13    Q.   Is the recovery court's budget a
14 subsection of this broader municipal court
15 budget?
16         MS. LEYIMU:  I'll object to the
17 form.
18    A.   I don't see any particular notation
19 that has that.
20    Q.   Do you have any involvement in
21 providing budget information for the recovery
22 court?
23         MS. LEYIMU:  Object to the form.
24 Asked and answered.
25    A.   Not specifically, other than,

Page 199

1 again, each year the managers of each
2 department meet to talk about, you know,
3 budgets and wish lists and all that good stuff,
4 but I don't -- I don't present any specific
5 data or reports for that.
6    Q.   Have you personally ever requested
7 funding which was denied?
8         MS. LEYIMU:  Object to the form.
9    A.   I don't have any recollection of
10 that.
11    Q.   Other than money from the City of
12 Akron, how is the recovery court funded?
13         MS. LEYIMU:  Object to the form.
14 Asked and answered.
15    A.   You know, my understanding of -- of
16 how, you know, the recovery court is funded is,
17 again, primarily through the general budget of
18 the Akron Municipal Court, and then additional
19 funding from the Summit County ADM Board.
20 Those are the two primary, you know, funding
21 sources.  Occasionally, we would get a grant or
22 something of that nature, but those are -- are,
23 you know, the main ones.
24    Q.   Do you have any knowledge of the
25 trend in the size of the municipal court's

Page 200

1 budget, year over year?
2         MS. LEYIMU:  Object to the form.
3    A.   I don't.  I don't have any specific
4 knowledge of that.
5    Q.   Have you had any involvement in
6 identifying grants for the recovery court?
7         MS. LEYIMU:  Object to the form.
8    A.   My only involvement is reviewing
9 e-mail communication that is occasionally sent
10 to me that identifies that, you know, grants
11 are being released.  So if and when I become
12 aware of those, I will forward those, you know,
13 to the appropriate staff for their review.
14         MS. WU:  All right.  So I'd like to
15 mark as Exhibit 12 this Summit and Akron's
16 First Amended Responses and Objections to the
17 Distributor Defendants Third Set of
18 Interrogatories.
19             - - - - -
20         (Thereupon, Deposition Exhibit 12,
21         Summit County and City of Kron, Ohio
22         Plaintiff's First Amended Responses
23         and Objections to Distributor
24         Defendants' Third set of
25         Interrogatories, was marked for

Page 201

1         purposes of identification.)
2             - - - - -
3    Q.   Mr. Sturmi, are you familiar with
4 the document identified as Exhibit 12?
5    A.   I don't have a recollection of
6 specifically reviewing this document.
7    Q.   Were you involved in preparing this
8 inform- -- the information set forth in Exhibit
9 12?
10         MS. LEYIMU:  Object to the form.
11         MS. FLOWERS:  Objection to the --
12 to the extent it calls for attorney-client
13 privilege.
14         Go ahead and answer.
15    A.   I'm sorry.  Could you repeat the
16 question?
17    Q.   Were you involved in preparing the
18 information set forth in Exhibit 12?
19    A.   I don't have any recollection of
20 that, no.
21    Q.   Mr. Sturmi, I'd like to call your
22 attention to page 15 of Exhibit 12.
23    A.   Okay.
24    Q.   First, we go back to page 14,
25 there's an interrogatory which reads, "Specify

51 (Pages 198 - 201)

Page 202

1  each category of injury, e.g., increased cost
2  of law enforcement, fire, emergency services,
3  et cetera, for which you" -- meaning Summit or
4  Akron -- "claim damages in the litigation, and
5  provide a computation of damages for each
6  category of injury alleged.  For each category
7  of injury, identify all persons with knowledge
8  about such damages."
9        Do you see where I've read?
10     A.  Yes, I do.
11     Q.  Okay.  Now, on page 15 you see
12  there's a response from Summit and Akron; do
13  you see that?
14     A.  Yes.
15     Q.  And that response carries over to
16  page 16 of Exhibit 12, correct?
17     A.  Correct.
18     Q.  The third bullet on page 16 reads,
19  "Costs associated with increased burden on
20  Plaintiffs' drug courts"; is that correct?
21     A.  Yes, that's correct.
22     Q.  Do you know what increased burden
23  on Plaintiffs' drug courts is referenced here
24  on page 16?
25        MS. LEYIMU:  I'll object to the

Page 203

1  form of the question.
2        MS. WU:  Can you assert the basis
3  for your form objection?
4        MS. LEYIMU:  He is not familiar
5  with this document.  He did not help to put
6  this document together, as he's just testified.
7        MS. WU:  That's not a form
8  objection, Counsel.
9        MS. LEYIMU:  It lacks foundation.
10  It is.  He can answer.  I'm just object- -- I'm
11  objecting for the record.
12        MS. WU:  Well, again, that's not a
13  proper form objection.
14     Q.  You may answer, Mr. Sturmi.
15     A.  Can you repeat the question,
16  please?
17     Q.  Certainly.  Do you have any
18  knowledge of the increased burden on
19  Plaintiffs' drug courts, which are referenced
20  on page 16 of Exhibit 12?
21     A.  I do not.
22        MS. WU:  Now I'd like to mark
23  Exhibit 13, which is the City of Akron, Ohio,
24  Plaintiff's Supplemental Responses and
25  Objections to Distributor Defendants

Page 204

1  Interrogatory No. 18.
2        - - - - -
3        (Thereupon, Deposition Exhibit 13,
4        The City of Akron, Ohio Plaintiff's
5        Supplemental Responses and
6        Objections to Distributor
7        Defendants' Interrogatory No. 18
8        Pursuant to Special Master Cohen's
9        October 23, 2018 Order, was marked
10        for purposes of identification.)
11        - - - - -
12     Q.  Mr. Sturmi, are you familiar with
13  Exhibit 13?
14     A.  I am not.
15     Q.  Did you provide any information in
16  order to prepare Exhibit 13?
17     A.  No.
18     Q.  Now, I'd like to call your
19  attention to page 5.  And it -- I'll read the
20  interrogatory posed for the record, which is,
21  "Specify each category of injury, e.g.,
22  increased cost of law enforcement, fire,
23  emergency services, et cetera, for which you,
24  the City of Akron, claim damages in the
25  litigation, and provide a computation of

Page 205

1  damages for each category of injury alleged.
2  For each category of injury, identify all
3  persons with knowledge of such damages."
4        And then, below that, we see the
5  response from the City of Akron.  Do you
6  follow?
7     A.  Yes.
8     Q.  Now, I'd like to ask you to turn to
9  page 6, which is part of the City of Akron's
10  response.
11     A.  Okay.
12     Q.  At the bottom of page 6, it reads,
13  "Plaintiff's computation is as follows:  Past
14  damages related to department costs, including
15  the City of Akron police department, fire
16  department, emergency medical services,
17  municipal court, corrections, law enforcement,
18  police, fire, safety, communications, health
19  costs, related to the provision of health
20  services related to Plaintiff's residents' use,
21  abuse, and overdose from opioids and the lost
22  tax revenue, $340 billion [sic]."
23        Do you have any knowledge of how
24  the computation set forth in this bullet was
25  made?

52 (Pages 202 - 205)

Page 206

1    MS. FLOWERS:  Objection.  Lack of
2  foundation.
3    A.   I do not.
4    Q.   Do you have any knowledge of the
5  costs associated with the municipal court,
6  which are referenced on page 6 of Exhibit 13?
7    MS. FLOWERS:  The same objection.
8    A.   Again, I was not involved, you
9  know, in that computation or process.
10    Q.   Okay.  Are you aware of any costs
11  imposed on the recovery court specifically
12  based on opioid use in Akron?
13    A.   Money costs or social costs or --
14  that's a rather vague term.
15    Q.   Sure.  Are you aware of any
16  financial costs imposed on the recovery court
17  specifically based on opioid use in Akron?
18    A.   Aware in what regard?
19    Q.   Are you aware of any dollars
20  expended by the recovery court in connection
21  with opioid abuse in Akron?
22    A.   Yes.
23    Q.   How many dollars?
24    MS. LEYIMU:  Object to the form.
25    MS. FLOWERS:  Objection.

Page 207

1    A.   I can't quantify that.  I can only
2  speak to, you know, there are costs associated
3  with the -- the treatment of the individuals
4  that are in our program.  We don't do it for
5  free.  It's not -- it's not free, so, you know,
6  the services that we provide cost money.
7    Q.   Which portion of your services do
8  you attribute to the abuse of opioids within
9  Akron?
10    MS. LEYIMU:  Object to the form.
11    A.   Could you repeat the question,
12  please?
13    Q.   Sure.  Let me try again.
14    Do you have any basis upon which to
15  apportion the amount of your direct
16  expenditures from the recovery court have been
17  expended due to the abuse of opioids in Akron?
18    A.   I don't have the specific
19  computation of money.  What I can speak to is
20  that significant time, energy, and resources,
21  whether that's myself or other members of the
22  recovery court team, spend a lot of our days
23  dealing with clients that are suffering with an
24  opiate use disorder, and because these clients
25  are high risk, high need, they demand a lot of

Page 208

1  attention, a lot of services.
2    Q.   Do you have any basis upon which to
3  apportion the amount of resources, to use your
4  terminology, that the recovery court has
5  expended due to the abuse of opioids in Akron?
6    MS. LEYIMU:  Object to the form.
7    A.   I would say that for the past
8  several years, the Akron Recovery Court has
9  expanded [sic] a lot of resources on this
10  problem.
11    Q.   Do you have any way to apportion
12  the proportion of your resources that have been
13  spent in response to opioid abuse in Akron?
14    A.   I don't have a way of -- of
15  quantifying the computation.  Again, what I
16  would say is the individuals that work in the
17  Akron Recovery Court spend a lot of their time,
18  energy, and resources dealing with, working
19  with, treating and assisting offenders that
20  have been identified as in need of services and
21  who have been diagnosed with an opiate use
22  disorder.
23    Q.   Do you have any basis upon which to
24  apportion the amount of recovery court
25  resources -- again, to use your terminology --

Page 209

1  that the recovery court has expended due to the
2  specific abuse of prescription opioids in
3  Akron?
4    A.   Again, I don't have a specific way
5  to quantify that.  I just know that dealing
6  with the clients that I deal with every day,
7  especially clients that have been identified as
8  having an opiate use disorder, demand a lot of
9  my time and a lot of my staff's time because
10  these clients have significant needs.
11    Q.   Are there any records that one
12  could consult in order to apportion the amount
13  of recovery court resources which have been
14  expended to address prescription opioid abuse
15  in Akron?
16    A.   That's difficult for me to answer.
17  You know, that's not my expertise, you know.
18    The bottom line is I just can say
19  that for the past several years, the opioid,
20  you know, epidemic that has occurred and
21  continues to occur here in Summit County has
22  exhausted a lot of our -- our staff's time,
23  because, again, these clients that have an
24  opiate use disorder are high risk, high need,
25  and need a number of services.

53 (Pages 206 - 209)

Page 210

1    Q.    I'm going to ask my question again.
2         Are there any records that one
3    could consult in order to apportion the amount
4    of recovery court resources that you have
5    expended to address prescription opioid abuse
6    in Akron?
7         MS. LEYIMU:  Object to the form.
8    A.    I'm not aware of any specific way
9    to determine that.
10   Q.    Are you aware of anyone within the
11   municipal court system who would have that
12   expertise?
13   A.    Not to my knowledge.
14        MS. WU:  Okay.  Exhibit 14, AKRON
15   001102114.
16        - - - - -
17        (Thereupon, Deposition Exhibit 14,
18        September 2016 E-Mail Chain Re: ATP
19        Memo - Changes/Eligibility
20        Modifications, with Attachment,
21        AKRON_001102114 to 01102116, was
22        marked for purposes of
23        identification.)
24        - - - - -
25   Q.    Mr. Sturmi, are you familiar with

Page 211

1    the document identified as Exhibit 14?
2    A.    I have a recollection of -- of
3    seeing this document, yes.
4    Q.    What is it?
5    A.    It's initially an e-mail indicating
6    that there were changes to the ATP program
7    through the Ohio Department of Mental Health
8    and Addiction Services.
9    Q.    Is this the OMHAS ATP program that
10   you referenced in your testimony earlier today?
11   A.    Yes, it is.
12   Q.    When did the recovery court start
13   to participate in the ATP program?
14   A.    The initial, you know, ATP project,
15   I believe, started in roughly 2015 or 2016, in
16   that ballpark.
17   Q.    What benefits has the recovery
18   court obtained through participation in the ATP
19   program?
20   A.    Well, potentially the benefits, you
21   know, are additional resources to a client that
22   is found eligible, you know, for this
23   particular project.
24   Q.    What types of resources does the
25   ATP program make available to recovery court

Page 212

1    clients?
2    A.    Initially it was specific to
3    medication-assisted treatment, paying for
4    medication-assisted treatment, for any client
5    that either didn't have insurance to pay that
6    or were not receiving Medicaid.
7    Q.    In its current form, what does the
8    ATP program provide to recovery court clients?
9    A.    It expanded the number of
10   medication-assisted treatments that the project
11   would potentially pay for.  So it now includes
12   Vivitrol, Suboxone, methadone.
13   Q.    Does it provide any non-medication
14   services to recovery court clients?
15   A.    It can and it does.
16   Q.    What are those other services?
17   A.    There is, you know, a list --
18   although this speaks to including that list,
19   I'm not seeing the form that I'm accustomed to
20   seeing that actually lists all of those.  You
21   know, this just speaks in a little bit more
22   general terms as far as wanting to expand it,
23   but I'm not seeing the -- the specifics of that
24   in this form.
25   Q.    Do you know of any document that

Page 213

1    provides a list of the Addiction Treatment
2    Program benefits to recovery court
3    participants?
4    A.    Yeah, I recall seeing a form that
5    listed; you know, I believe it was termed
6    "recovery supports."
7    Q.    To the best of your recollection,
8    what are those non-medication,
9    treatment-related services?
10   A.    Yeah.  It -- it spoke to expansion
11   as far as potentially -- an example would be
12   housing assistance.  If -- if it could be
13   demonstrated that that client could benefit
14   from receiving monies, potentially, to -- to
15   get into some sort of apartment complex or
16   recovery housing.  There was the ability to
17   obtain transportation assistance, whether that
18   was bus passes, Uber, you know, to try and help
19   that offender get from point A to point B.
20        I think one of the last examples
21   that I recall was obtaining educate -- or
22   employment-specific assistance that, you know,
23   if that person needed monies for a uniform or
24   for, you know, things of that nature.  There
25   was an allowance for that.

54 (Pages 210 - 213)

Page 214

1     Q.   Does participation in the ATP
2  program defray the costs that the recovery
3  court would -- would otherwise incur to service
4  its clients?
5          MS. LEYIMU:  Object to the form.
6     A.   Sadly, I have not seen that.  The
7  ATP project, you know, has not been utilized
8  in -- in the manner that I would have hoped
9  that it would have been.  It requires the
10 treatment provider to provide the funds first
11 and then bill the ADM Board, and to my
12 knowledge, treatment agencies have not been
13 making a lot of those requests.
14    Q.   And just to clarify, the recovery
15 court itself is not a treatment provider,
16 correct?
17    A.   That's correct.  We're not
18 permitted, you know, to apply for those funds.
19    Q.   Does the recovery court receive
20 other grants?
21    A.   Not at the present time.  And we --
22 again, we -- we're always looking for abilities
23 to increase our services and -- and assist our
24 clients.  So we're always open and receptive to
25 receiving additional monies, but at the present

Page 215

1  time I'm not aware of any specific grants that
2  are in the working.  No applications have been
3  processed.
4     Q.   Do you have any responsibilities
5  for identifying grants for application?
6     A.   Not specifically, no.
7     Q.   Who has those responsibilities?
8     A.   The Akron Municipal Court employs a
9  community outreach coordinator.  Her name is
10 Nicole Hagy.  I believe one of her job tasks
11 are to investigate, you know, possible funding,
12 you know, sources; not just for the Akron
13 Recovery Court, but for any parts of the our
14 court system that could benefit from a grant.
15         MS. WU:  So I'd like to mark as
16 Exhibit 15, AKRON 001100947.
17         - - - - -
18         (Thereupon, Deposition Exhibit 15,
19         May/June 2016 E-Mail Chain Re:
20         Project Information Needed by
21         6/6/16, AKRON_001100947 to
22         001100949, was marked for purposes
23         of identification.)
24         - - - - -
25    Q.   Mr. Sturmi, do you recognize

Page 216

1  Exhibit 15?
2     A.   I'm still reviewing.
3     Q.   Okay.
4     A.   Okay.  I've reviewed it.
5     Q.   Okay.  What is Exhibit 15?
6     A.   It's some e-mail communication that
7  speaks to another funding mechanism through the
8  Ohio Department of Mental Health and Addiction
9  Services.
10    Q.   What's the funding mechanism
11 referenced in Exhibit 15?
12    A.   I believe the term of this is the
13 "payroll subsidy project."
14    Q.   Are you familiar with the payroll
15 subsidy project?
16    A.   In a very generic way.  I'm -- I'm
17 aware of it, but I don't -- I don't have a lot
18 of involvement with it.
19    Q.   What's your knowledge of the
20 payroll subsidy project?
21    A.   My understanding is that for
22 specialized dockets that are certified through
23 the Ohio Supreme Court, that the Ohio
24 Department of Mental Health and Addiction
25 Services provides some funding to assist courts

Page 217

1  with whatever they determine they want to use
2  those funds for.
3          Our court, I believe, primarily
4  uses the payroll subsidy project in the manner
5  that -- that it's titled.  You know, part of
6  each staff that is on our specialized dockets,
7  a proportion of their salary is paid for, at
8  least temporarily, through this project.
9     Q.   When did the recovery court first
10 participate in the payroll subsidy project?
11    A.   I want to say it's been at least,
12 you know, two or three years.
13    Q.   Was the payroll subsidy project
14 available prior to that time?
15    A.   Not to my knowledge, no.  It was
16 somewhat of a newer, you know, project that --
17 that OMHAS, you know, came out with.
18    Q.   What portion of the recovery court
19 payroll is currently funded by the payroll
20 subsidy project?
21    A.   I can't speak to that.  I know that
22 for me, because certainly a part of my salary
23 is a part of that, it's, I believe -- because I
24 know I have to complete a report.  That report
25 has changed.  It's more generic.  It's even an

55 (Pages 214 - 217)

Page 218

1 online, you know, survey program.
2        But the bottom line is I believe
3 that our court applies for between 50 to 75
4 percent, you know, of my payroll, you know, to
5 be paid for through that.
6    Q.   Where would we look to determine
7 what portion of the recovery court payroll is
8 currently funded by the payroll subsidy
9 project?
10    A.   I believe those records, you know,
11 would be accessible through the Ohio Department
12 of Mental Health and Addiction Services or
13 through the Akron Municipal Court
14 administrator, Montrella Jackson.
15    Q.   Now, if we look at the very top
16 e-mail, an e-mail from Judge Oldfield on
17 Exhibit 15, it reads, "There are specific
18 reporting requirements for the use of these
19 funds," the payroll subsidy project funds.
20        What are the reporting requirements
21 provided in connection with the payroll
22 subsidy project?
23    A.   The only requirements that I recall
24 is submitting a form to OMHAS twice a month,
25 and that form requires us to identify the name

Page 219

1 of the docket, what type of docket it is, to
2 determine how many clients were served during
3 that specific reporting period, which I believe
4 was six months; hence, why it's two times a
5 year.
6        And in addition to that, initially
7 the reports asked for more specific data as far
8 as clients that graduated from the program;
9 clients that were still in the program that
10 were being carried over, for lack of a better
11 term, to the next reporting period;
12 approximately how much time the staff member
13 was -- was spending on that docket.  And, you
14 know, the last recollection I had was,
15 obviously, identifying what my salary was and
16 then approximating what the request, you know,
17 was going to be made for that subsidy.
18    Q.   Do you main- -- maintain copies of
19 the reports that you've prepared in connection
20 with the payroll subsidy project?
21    A.   They're all electronic now, you
22 know.  My recollection is, you know, yeah,
23 each -- each program coordinator would keep a
24 copy of that document.
25    Q.   And who's the coordinator for the

Page 220

1 recovery court?
2    A.   I am.
3    Q.   So you personally maintain the
4 reports for the payroll subsidy project?
5    A.   I don't recall if I specifically
6 have a copy of that document, if Mr. Ingram has
7 a copy of that document, or if Montrella
8 Jackson has a copy of that document, but I'm
9 pretty certain that somebody in our court has a
10 copy of that document.
11        MS. LEYIMU:  Is this a good time to
12 take a break?  We've been going for over an
13 hour now.
14        MS. WU:  Sure, that's fine.
15        MS. LEYIMU:  Great.
16        THE VIDEOGRAPHER:  Off the record
17 at 3:13 p.m.
18     (A recess was taken.)
19        - - - - -
20     (Thereupon, Deposition Exhibit 16,
21     6/27/2017 E-Mail Chain Re: For
22     Immediate Release, County of Summit
23     Awarded Nearly $1 Million, etc.,
24     with Attachment, SUMMIT_001274385 to
25     001274391, was marked for purposes

Page 221

1     of identification.)
2        - - - - -
3        THE VIDEOGRAPHER:  Back on the
4 record at 3:40 p.m.
5 BY MS. LEYIMU:
6    Q.   Mr. Sturmi, you have in front of
7 you Exhibit 16, which is SUMMIT 001274389.
8        Mr. Sturmi, I see you've taken a
9 moment to look at this document.  Are you
10 familiar with Exhibit 16?
11    A.   Yes.
12    Q.   What is it?
13    A.   It's a -- well, the initial is an
14 e-mail just indicating that the Summit County
15 was going to do a press release to announce the
16 awarding of the SAMHSA drug court enhancement
17 grant.
18    Q.   What is SAMHSA?
19    A.   It's the federal Substance Abuse
20 Mental Health Services Administration.
21 Essentially a -- the federal arm that assists
22 in substance abuse and mental health, you know,
23 treatment or programming.
24    Q.   What is the nature of the grant,
25 which is announced in the press release at

56 (Pages 218 - 221)

Page 222

1 Exhibit 16?
2     A.  Well, it speaks to the fact that it
3 was awarded.  It speaks to the fact that it was
4 a multi-jurisdictional drug court program, so
5 this wasn't exclusive to the -- to the Akron
6 Recovery Court.  It also included the Summit
7 County Turning Point Program.
8     Q.  What is --
9     A.  And --
10     Q.  -- the -- I'm sorry, Mr. Sturmi.
11 Please go ahead.
12     A.  I was just going to indicate, you
13 know, it speaks to the main -- or a couple of
14 the goals of the grant.  In other words, why
15 did we ask for the money?  You know, what were
16 the enhancements that we were looking to
17 receive?
18     Q.  What is the Turning Point Program?
19     A.  The Turning Point Program is a drug
20 court model that's run at the Summit County
21 Court of Common Pleas.  They are very, very
22 similar with the Akron, you know, recovery
23 court program.
24         They also share the same case
25 management, so they are also a contract agency

Page 223

1 with the Oriana House, Incorporated.
2     Q.  Does the recovery -- I'm sorry, the
3 Summit Turning Point Program have a separate
4 agreement for services with Oriana House?
5     A.  I can't speak to that.  I don't
6 know what their agreement is.
7     Q.  Why did the Turning Point court and
8 recovery court team together in seeking SAMHSA
9 funds?
10     A.  You know, we were looking, as,
11 hopefully any drug court is, at getting better,
12 at improving, trying to provide additional
13 resources to our clients.
14     Q.  What additional resources were you
15 hoping to provide to the recovery court
16 clients?
17     A.  The main enhancements were -- was a
18 new drug court testing protocol called "Call to
19 Test."  Essentially it's a program that
20 requires clients that are in either of the
21 programs to call in on a daily basis.  They
22 input a pin that's exclusive to them, and then
23 the computer program would let that client know
24 whether they were or were not selected for a
25 random drug test that day.

Page 224

1     Q.  Is that Call to Test program
2 currently in place for the recovery court?
3     A.  It is.
4     Q.  When was it instituted?
5     A.  We had a rollout -- was it in
6 January?  January?  I'm trying to think of the
7 exact -- because it's -- it's been not quite a
8 year.  So I -- I want to say maybe February or
9 March, you know, is when it actually went live.
10 But in that ballpark.  Not quite a year.
11     Q.  Does the recovery court fund the
12 Call to Test program using SAMHSA funds?
13     A.  We do.
14     Q.  What's the total amount of SAMHSA
15 funds that the recovery court received from
16 SAMHSA?
17     A.  I don't have knowledge of that.
18     Q.  Who would have that information?
19     A.  I would think the Oriana House
20 grant writers that wrote it.
21     Q.  Does the municipal court keep track
22 of grant money received by its courts?
23     A.  I don't know if they do.  I don't.
24 I would think that there's a mechanism to -- to
25 record that.

Page 225

1     Q.  Do you know what portion of the
2 almost million dollars that SAMHSA provided to
3 Summit and Akron has been awarded to the Akron
4 Recovery Court?
5     A.  I do not.
6         MS. WU:  I'd like to mark as
7 Exhibit 17 AKRON 001114874.
8         - - - - -
9         (Thereupon, Deposition Exhibit 17,
10         9/14/2015 E-Mail from Julie Ellison
11         Re: Addiction Treatment Program,
12         With Attached "Advisory Committee
13         Roster and Participation Agreement,"
14         AKRON_001114874 to 001114879, was
15         marked for purposes of
16         identification.)
17         - - - - -
18     A.  Okay.
19     Q.  Mr. Sturmi, are you familiar with
20 Exhibit 17?
21     A.  I have a recollection of this.
22     Q.  What is it?
23     A.  It's an e-mail communication from
24 then Akron Recovery Court presiding Judge
25 Oldfield's bailiff, Julie Ellison, that was

57 (Pages 222 - 225)

1 responding to a request for information for the
2 initial ATP project that looks like it was
3 implemented in roughly 2015.
4    Q.   And that's the same ATP project
5 that you testified to earlier today, correct?
6    A.   That's correct, yes.
7    Q.   I'd like to call your attention to
8 the third page of this document, ending in
9 4877.
10   A.   Okay.
11   Q.   It's titled "OMHAS ATP 2015 Initial
12 Inquiry Questionnaire." Were you involved in
13 preparing answers to this questionnaire?
14   A.   Yes, to a limited extent. I recall
15 the court requesting to obtain, you know, data,
16 you know, on some of these questions where,
17 obviously, you're seeing data-related
18 responses.
19   Q.   Were you responsible for providing
20 the data responsive to OMHAS requests?
21   A.   In this document or as a general --
22   Q.   In this document.
23   A.   I wasn't the only person that was
24 involved in that, but, yes, I was part of that
25 process.

1    Q.   If I can call your attention to
2 Item No. 3 on 4877, it reads, "Please indicate
3 the number of court participants your drug
4 court serves annually."
5        And then the information below
6 reads, "Akron Municipal Drug Court serves
7 approximately 135 offenders each year."
8    A.   Okay. I see that.
9    Q.   Were you involved in obtaining the
10 average number of offenders served?
11   A.   I don't have a specific
12 recollection of that. I know that this
13 document was shared with the Oriana House,
14 Incorporated, so my belief was that, as with
15 many data requests, we would go to our partners
16 with the Oriana House to either obtain that or
17 receive whatever information they had, and
18 that's, I believe, what we did.
19   Q.   Do you recall how many clients the
20 recovery court had in 2015?
21       MS. LEYIMU: Object to the form of
22 the question.
23   A.   Again, that -- that number can be
24 skewed as far as it's the total number of
25 clients that we served during that year. So

1 there's lots of clients that come into our
2 program but exit very quickly, and
3 consequently, clients that, you know, are with
4 us for an extended period of time.
5    Q.   Is it the case that the 135
6 offenders identified on this page reflects an
7 aggregate number for the year?
8    A.   My recollection of that would have
9 been if we determined the number was 135, that
10 that means that in that calendar year there
11 were 135 individuals that at one point were
12 active in recovery court.
13   Q.   So in -- so in that year there were
14 more than the target 100 clients in the
15 recovery court?
16   A.   It would appear so.
17   Q.   If we wanted to check that
18 information, where would we look?
19   A.   Again, I would think that the
20 Oriana House, Incorporated, would be the best
21 place to obtain that and determine where that
22 number came from.
23   Q.   Does the recovery court itself
24 maintain data about the clients it serves?
25   A.   To a limited extent. But again,

1 since our program started in 1995, that -- that
2 policy and procedure was put in place, that the
3 Oriana House was going to be the primary data
4 collection agency; that our court was not going
5 to -- to keep that data.
6    Q.   So if you personally wanted to
7 obtain information about the number of clients
8 served, you would ask Oriana House to provide
9 that data to you?
10   A.   That's correct.
11   Q.   Now, No. 4 on this page ending 4877
12 reads, "Please estimate the current number of
13 opioid/heroin-addicted court participants who
14 would be appropriate for an integrated drug
15 court treatment."
16       In response, it reads, "Currently,
17 approximately 40 of our 60 active participants
18 are opioid/heroin addicted."
19   A.   Yes, I see that.
20   Q.   Does this answer reflect that there
21 were 60 active clients at the time that you
22 prepared this questionnaire?
23   A.   Yeah. My -- my recollection of
24 that is at this specific time, you know, we did
25 a search of how many active clients that we

Page 230

1 had, which appears to be 60, and then we went
2 through each of those 60 cases, and to the best
3 of our ability determined whether those
4 individuals, you know, had -- had the diagnosis
5 for an opiate use disorder.  It looks like that
6 determination was 40 of those 60 participants
7 met that criteria.
8    Q.   I want to break down the process
9 for providing this response.
10       How did you identify the 60 active
11 participants for the recovery court program?
12    A.   Well, again, it's three years ago,
13 so, you know, we would have gotten a computer-,
14 you know, generated number first, and then in
15 reference to trying to determine whether they
16 appeared to have or did have an opiate use
17 disorder, we would have went through every one
18 of those files and likely just did it the
19 old-fashioned way, you know, and marked for
20 each case whether that person was being treated
21 for that -- that type of disorder.
22    Q.   Now, you mentioned a
23 computer-generated report as the first step.
24 How would that report be generated?
25    A.   It would be a simple data request

Page 231

1 to the Oriana House requesting a current count
2 of active recovery court clients.
3    Q.   The second part of the process you
4 identified was a manual review of client files.
5    A.   That's correct.
6    Q.   What files did your team review in
7 order to identify a diagnosis?
8    A.   We would have looked at each one of
9 their probation files that are kept in the
10 probation department.  We would have reviewed
11 their substance abuse -- substance assessment,
12 and then looked at that assessment to determine
13 their diagnosis.
14    Q.   Short of that manual review
15 process, would there be any other way to
16 identify the number of clients who have been
17 identified as opioid or heroin addicted?
18    A.   Not to my knowledge.
19    Q.   In responding to Inquiry No. 4, did
20 your team differentiate between clients
21 addicted to prescription opioids and
22 non-prescription opioids?
23    A.   I don't believe that we did.  Even
24 the question itself doesn't differentiate.  It
25 says opioids/heroin, so.

Page 232

1    Q.   Do the sub- -- substance abuse
2 assessments you referenced provide the basis to
3 differentiate between addiction to prescription
4 and non-prescription opioids?
5    A.   No.  If a client is diagnosed with
6 an opiate use disorder, they're diagnosed with
7 an opiate use disorder.  It may speak to their
8 history and use of substances, but the DSM-IV,
9 you know, diagnostic criteria doesn't have
10 that.
11    Q.   If I were to ask you the same
12 question, please estimate the current number of
13 opioid heroin-addicted court participants as of
14 now, in 2018, could you answer that question as
15 you sit here today?
16       MS. LEYIMU:  Object to the form.
17    A.   Obviously, it would be much -- much
18 more prudent for me to review each one of those
19 files, but if you're requesting a guesstimate
20 of our current caseload of, you know,
21 approximately 42 clients, I would say in the
22 neighborhood of 30 would be opiate use disorder
23 diagnosis, in that ballpark.
24    Q.   Is that estimate based on review of
25 the substance assessment that you referred to

Page 233

1 earlier?
2    A.   It's -- it's -- as I sit here
3 today, I would come to that number just by
4 knowing the vast caseload -- or the current
5 caseload that we are supervising, that the vast
6 majority of that roster carry with it an opiate
7 use disorder, and a diagnosis that was deemed
8 as such in their assessment.
9    Q.   If we wanted to scientifically test
10 the number of clients who are currently
11 diagnosed as addicted to an opioid, how would
12 we test those numbers?
13       MS. LEYIMU:  Object to the form of
14 the question.
15    A.   I think the only way to do that
16 would be what we just discussed.  You know,
17 looking at their probation file and determining
18 what their diagnosis indicates.
19    Q.   Is it possible for the recovery
20 court team to identify each client who has been
21 diagnosed with an opioid addiction?
22    A.   Yes.
23    Q.   How would you do that?
24    A.   Well, again, we -- we have a copy
25 of their assessment, so that's the first, most

59 (Pages 230 - 233)

Page 234

1 significant piece, so that diagnosis is there.
2 But obviously just talking with, getting to
3 know these clients.  We see them on average,
4 you know, two to four times a week, so, you
5 know, the caseworkers in particular get to know
6 these clients very, very well.
7      Q.   In the context of this litigation,
8 have you been asked to identify the -- the
9 substance assessment records for all recovery
10 court clients diagnosed with an opioid
11 addiction?
12      A.   There's been no -- no request made
13 to me for that data.
14      Q.   But that is data that could be
15 produced, correct?
16           MS. LEYIMU:  Object to the form.
17           MS. FLOWERS:  Object to form.
18      A.   I think that any data could be
19 produced.
20      Q.   You have access to the substance --
21 substance assessment records that include
22 diagnoses, correct?
23      A.   That is correct, yes.
24      Q.   And those could be produced in this
25 litigation?

Page 235

1           MS. FLOWERS:  Objection.
2           MS. LEYIMU:  Object to form.
3      A.   I can't speak to whether
4 confidential drug and alcohol assessments can
5 or cannot be produced in reference to this
6 litigation.  That's not for me to determine.  I
7 know that the document is confidential.
8      Q.   And you haven't been asked to
9 collect that information?
10           MS. FLOWERS:  Objection.  Lack of
11 foundation.
12      A.   I believe I already answered that
13 question.  The answer was no.
14           MS. WU:  So I'd like to mark as
15 Exhibit 18 a document identified as AKRON
16 001114483.
17           - - - - -
18           (Thereupon, Deposition Exhibit 18,
19           3/26/2015 E-Mail from Libby Ellis
20           Re: SAMSHA Drug Court Grant
21           Proposal, with Attachment,
22           AKRON_001114483 to 001114548, was
23           marked for purposes of
24           identification.)
25           - - - - -

Page 236

1      Q.   Mr. Sturmi, actually, before we dig
2 into Exhibit 18, I have one more question about
3 Exhibit 17.
4      A.   Okay.
5      Q.   Do you know if any of the 40
6 clients identified as having an opioid
7 addiction on Exhibit 17 were dually diagnosed
8 with an addiction to any other substance?
9      A.   I would say that it's likely that
10 they carried with another substance abuse
11 diagnosis.  Many of our clients, you know, have
12 other substance abuse diagnoses.  It's -- it's,
13 obviously, each client is different.
14      Q.   If we wanted to determine how many
15 of those 40 clients had a dual diagnosis, how
16 would we identify that information?
17      A.   The only mechanism that I'm aware
18 of is to be able to review their assessment and
19 the diagnosis that that clinician had -- you
20 know, had prescribed or had indicated.
21      Q.   Thank you.
22      A.   Sure.
23      Q.   All right.  So now on to Exhibit
24 18.  Mr. Sturmi, are you familiar with the set
25 of documents identified as Exhibit 18?

Page 237

1      A.   Again, I have a -- certainly a
2 recollection of who Ms. Ellis was and what this
3 exhibit is.
4      Q.   Who is Ms. Ellis?
5      A.   At that -- at that time, she worked
6 for the Community Health Center.  I don't
7 recall what her title was, but she worked with
8 Jan Wagner, who's listed as -- you know, copied
9 on this e-mail.  Ms. Wagner at that time was
10 the C- -- COO or the CEO of the Community
11 Health Center.
12      Q.   And what is the nature of the
13 communication identified as Exhibit 18?
14      A.   Again, my recollection was that in
15 2015, the court -- the Akron Drug Court had
16 looked at a SAMHSA enhancement grant, and that
17 this is an RFP for that.  And that the person
18 that was writing this is Ms. Ellis, who works
19 for the Community Health Center, so they have
20 their own grant writers at that particular
21 treatment agency.
22      Q.   I'd like to call your attention to
23 one piece of this document, which starts at
24 AKRON 001114533.  And it's an attachment to the
25 e-mail, which is titled "SAMHSA Treatment Drug

60 (Pages 234 - 237)

1 Court's Proposal Draft One."
2     A.   And that's 4533?
3     Q.   Correct.
4     A.   Okay.
5     Q.   Now, the second to last paragraph
6 on this page, it reads, "Most clients served
7 have a co-occurring disorder as well as a
8 history of trauma.  Admissions to the program
9 are typically individuals with multiple
10 substance addictions and significant long-term
11 behavioral problems."
12     A.   I see that.
13     Q.   Were you involved in drafting this
14 language?
15     A.   No, I did not draft this language.
16     Q.   Is this language consistent with
17 your experience with the Akron Recovery Court?
18     A.   It's a difficult question, you
19 know, for me to answer, because, again, each
20 client is -- is different.  I think this is a
21 little bit more of a general, dare I say, grant
22 writing, you know, communication.  But that's
23 what Ms. Ellis chose to put in the document.
24     Q.   If we wanted to test the statement
25 that most clients served by the recovery court

1 question, please?
2     Q.   Do you agree with the statement
3 that admissions to the program are typically
4 individuals with multiple substance addictions?
5     A.   I would say that the majority of
6 clients that we serve do have multiple
7 substance use disorders.
8     Q.   In order to test that statement,
9 would we look at the substance assessment
10 records that you referred to earlier today?
11         MS. LEYIMU:  Object to the form.
12     A.   That's one mechanism.  But, again,
13 assessments aren't perfect documents.
14     Q.   Where else could we look to verify
15 that statement?
16     A.   Well, a clinician would have to
17 make the diagnosis, so there'd have to be some
18 sort of assessment that would list that.
19     Q.   Other than the -- the substance
20 assessment documents that you referred to
21 earlier today, are there any other documents
22 maintained by the recovery court that include
23 diagnosis information?
24     A.   Certainly, we -- we do have
25 communication with treatment providers, and

1 have a co-occurring disorder, how would we test
2 that assertion?
3         MS. LEYIMU:  Object to the form of
4 the question.
5     A.   You'd have to determine that they
6 have a co-occurring disorder.  There would have
7 to be some documentation that showed that they
8 suffered from multiple -- you know, whether
9 that was, you know, obviously mental health
10 disability as well as -- as a substance abuse
11 issue.
12     Q.   Would that information be recorded
13 on the substance assessment records that you've
14 referenced earlier today?
15     A.   Lots of times it is.  Sometimes it
16 is not, because the client doesn't disclose
17 that.  Sometimes we don't determine other
18 disorders until we get to know that client, you
19 know, better, while they're in our program.
20     Q.   Do you agree with the statement
21 that admissions to the program are typically
22 individuals with multiple substance addictions?
23         MS. LEYIMU:  Object to the form.
24 Asked and answered.
25     A.   I'm sorry.  Could you repeat the

1 that would include mental health, you know,
2 treatment agencies.  And so, there certainly is
3 an occasion for a clinician or an agency to
4 identify that a client that they are serving to
5 suffering from a mental health disability
6 and -- and has a specific mental health
7 diagnosis.
8     Q.   Is that information aggregated in
9 any form?
10         MS. LEYIMU:  Object to the form.
11     A.   Not to my knowledge.
12         MS. WU:  So I'd like to mark as
13 Exhibit 19 a printout from a document produced
14 as a native Excel document, AKRON 000004078.
15         - - - - -
16         (Thereupon, Deposition Exhibit 19,
17         Spreadsheet Titled "Drug Cases
18         2006-2018 Detail," AKRON_000004078,
19         was marked for purposes of
20         identification.)
21         - - - - -
22     A.   Okay.
23     Q.   Mr. Sturmi, are you familiar with
24 Exhibit 19?
25     A.   I am not.

1    Q.    Do you know if this document
2 reflects data extracted from the Akron
3 Municipal -- Municipal Court database?
4         MS. LEYIMU:  Object to the form.
5    A.    It appears that this data is
6 consistent with the Akron Municipal Court
7 Information System, or AMCIS, but I don't -- I
8 don't know.  I didn't -- I didn't pull it.  I
9 didn't run it.
10    Q.    Now, I'd like to call your
11 attention to the column labeled "Offense
12 Description."  Do you see that?
13    A.    I do.
14    Q.    Is this the offense description
15 information that you identified as possibly
16 identifying the substance involved in a law
17 enforcement encounter?
18    A.    Well, on this document, it is
19 specific to 2006.  It's interesting that it
20 says "Drug court cases 2006 to 2018," yet it
21 only lists 2006 cases.  These are all '06
22 cases.
23    Q.    So here's -- my question is, is the
24 "Offense Description" field the data source
25 that you would consult in order to identify the

1 substance involved in a law enforcement
2 encounter?
3    A.    Yes.  If this came from AMCIS, we
4 would use this information to determine what
5 they were criminally charged with.
6    Q.    Do any of these offense
7 descriptions include a reference to an opioid
8 substance?
9    A.    Okay.  So I've reviewed that.
10         And again, your -- your question?
11 Could you repeat it, please?
12    Q.    Do any of these offense
13 descriptions include a reference to an opioid
14 substance?
15    A.    Not specifically a reference to
16 opiates in the offense description.
17    Q.    Do they include -- do they
18 generally include a reference to opiates in the
19 offense description?
20         MS. LEYIMU:  Object to the form.
21    A.    Occasionally, depending upon what
22 the individual's charged with.
23    Q.    Could you provide an example of a
24 general reference to opiates in the offense
25 description?

1    A.    You mean on here or --
2    Q.    Correct, yes.
3    A.    Oh.  I misunderstood.  So I thought
4 you said are there offenses.
5         No.  On -- on these -- on these
6 documents, on these cases cited here, there's
7 not specific reference in the offense
8 description that states opioids.
9    Q.    But going to where you were headed,
10 outside of Exhibit 19, are there offense
11 descriptions that specifically reference
12 opioids?
13    A.    There are.
14    Q.    What are they?
15    A.    An example would be drug abuse
16 Vicodin, possession of Vicodin.
17    Q.    Are there other law enforcement
18 encounters that would include an opioid that
19 don't reference opioid in the offense
20 description?
21    A.    There would.
22    Q.    So looking at the offense
23 description doesn't tell us if an opioid was
24 involved in a law enforcement encounter,
25 correct?

1         MS. LEYIMU:  Object to the form.
2    A.    It can.
3    Q.    But it doesn't necessarily provide
4 that information, correct?
5         MS. FLOWERS:  Objection.
6    A.    Again, it can, and it does.
7    Q.    But it -- it does not always
8 identify the substance involved.
9    A.    Clear- -- clearly, it does not
10 always, but it can.
11    Q.    Mr. Sturmi, do you use e-mail for
12 your job with the recovery court?
13    A.    I do.
14    Q.    What is your e-mail address?
15    A.    It's jsturmi@akronohio.gov.
16    Q.    When did you first receive that
17 e-mail account?
18    A.    Well, when I started, you know,
19 with the City of Akron, I got a thank you note
20 way back in 1996.  Yeah, pretty certain we had
21 e-mails back then.  I know my e-mail address
22 has changed, because it used to be some
23 God-awful lengthy -- you know, so I know it's
24 been its current e-mail address for several
25 years.

Page 246

1     Q.    Do you know when your e-mail
2  address changed?
3     A.    I don't recall, you know, when the
4  City made that change, but I know that we were
5  thankful for it.
6     Q.    Was it within the last five years?
7     A.    I would say it was -- it would have
8  been in the last five years.  I think that's,
9  yeah, reasonable.
10    Q.    What is the oldest e-mail that's
11 currently accessible to you today, in year?
12         MS. LEYIMU:  Object to the form.
13    Q.    Are you able to access e-mails back
14 to 1996?
15    A.    Well, I don't -- I certainly don't
16 keep e-mails that long for obvious reasons.
17 There's only so much memory, you know, on my
18 computer, so.  But I have dated e-mails, but
19 not back to 1996, to my knowledge.
20    Q.    Do you know what the oldest e-mail
21 you're able to access?
22         MS. LEYIMU:  Object to the form.
23    A.    I don't, as I -- as I sit here
24 today.  I'd have to be sitting at my computer,
25 you know, looking at it.

Page 247

1     Q.    Do you know if you can access any
2  e-mails that predate 2012?
3     A.    I don't know if -- if I'm able to
4  do that.
5     Q.    Outside of your e-mail, what
6  record-keeping systems do you employ?
7          MS. LEYIMU:  Object to the form of
8  the question.
9     A.    At work, notes, and utilizing the
10 probation department software system.
11    Q.    And what are the software systems
12 that you employ?
13    A.    We utilize our GBS probation
14 software program.  That's --
15    Q.    And are there any --
16    A.    -- the primary --
17    Q.    I'm sorry, Mr. Sturmi.
18    A.    That's okay.
19    Q.    Are there any other programs that
20 you use in connection with your work for the
21 recovery court?
22    A.    The only other program, you know,
23 that -- that I utilize is an Excel, you know,
24 file, and that's only to track clients that are
25 in residential care, that are in residential

Page 248

1  drug treatment.
2     Q.    Does anyone else have access to
3  that Excel file?
4     A.    Not without my consent or
5  permission, no.
6     Q.    What hard copy files do you keep in
7  connection with your work for the recovery
8  court?
9     A.    Only -- only the documents that are
10 in the client probation file.
11    Q.    Do you ever text for work?
12    A.    No.
13    Q.    Did you receive a notice to
14 preserve documents in connection with this
15 litigation?
16    A.    Yes, I recall receiving that
17 document.
18    Q.    Were you --
19    A.    That e-mail.
20    Q.    Were you involved in collecting
21 documents for purposes of this litigation?
22    A.    Not -- not specifically.  We
23 received a request to pull probation files, and
24 I assigned that task to probation aides.
25         So, yes, I mean, I recall getting a

Page 249

1  request for -- I think it was drug court files
2  from X -- X amount of time to X amount of time,
3  and -- and we produced all those documents.
4     Q.    Did the hard copy files that your
5  probation aide collected include substance
6  assessment forms?
7     A.    I believe they did.
8     Q.    Do you know if those have been
9  produced in this litigation?
10    A.    My understanding is that all
11 documents requested have been produced.
12    Q.    Do you keep any non e-mail
13 electronic files, such as PowerPoint documents?
14    A.    No.
15    Q.    Do you keep a file of documents
16 that you have received in connection with
17 trainings related to substance abuse?
18    A.    I don't recall keeping anything
19 electronically.  I think the only reason I
20 pause at that is you had asked an earlier
21 question in reference to tracking my training
22 hours.  I have a recollection of, as it gets
23 closer to when those certifications are due, I
24 will create a simple Word document that would
25 list, you know, those dates and times and

63 (Pages 246 - 249)

1 compute the hours.
2     Q.   Do you keep a hard-copy file of
3 training materials?
4     A.   Typically.
5     Q.   Did you collect those materials for
6 purposes of this litigation?
7     A.   Yes.  You know, once again, any and
8 all documents that were requested by me or my
9 office were produced.
10    Q.   Mr. Sturmi, do you participate in
11 any task forces?
12    A.   I do.
13    Q.   Which ones?
14    A.   The Summit County Opiate Task
15 Force.
16    Q.   What is the nature of your
17 involvement in the Summit County Opiate Task
18 Force?
19    A.   You know, I attended, you know, at
20 the request of, at that time, our drug court
21 judge and have attended ever since.  They're
22 quarterly meetings that are typically conducted
23 at the Summit County ADM Board.
24        In addition to that, I'm a member
25 of the Summit County Criminal Justice

1 Subcommittee -- so that task force, as with
2 many task force, developed subcommittees with
3 certain expertise, and so I serve currently on
4 the criminal justice subcommittee of that task
5 force.
6     Q.   What is the work of the criminal
7 justice subcommittee of the task force?
8     A.   It's made up of a variety of law
9 enforcement folks, fellow probation officers,
10 other staff involved in drug court dockets.
11 Obviously law enforcement, so we have various
12 chiefs of police, detectives.  And we have
13 certain goals, agenda items that we address.
14 And at every task force meeting, that
15 subcommittee reports out.
16    Q.   What are the nature of the reports
17 that your subcommittee generates?
18    A.   Mostly just, you know, verbal
19 reports as far as, hey, here are the things
20 that we've, you know, been talking about or
21 been discussing.  Just trying to provide the
22 greater majority of folks what we're working
23 on.
24    Q.   When did you start participating in
25 the Summit Opiate Task Force?

1     A.   My recollection was, you know, when
2 it started, you know, in 2014.
3     Q.   Were you involved in the creation
4 of the task force?
5     A.   No.
6     Q.   Do you know why the task force was
7 created?
8     A.   Not specifically.  I can
9 guesstimate why it was developed.
10    Q.   What is the purpose of the task
11 force?
12    A.   I think primarily, you know, public
13 awareness.  The ability for Summit County and
14 the variety of professionals and citizens that
15 live in Summit County that want to learn more
16 about the opiate epidemic in our community.
17    Q.   Do you think that the task force
18 has been successful?
19    A.   I don't know if I can quantify, you
20 know, whether it's been successful.  I would
21 say that it's -- it's successful in the sense
22 that there are lots of people that attend.  And
23 certainly, tasks are being completed.  And, you
24 know, I view it as being, you know, helpful.  I
25 don't know if "successful" would be the

1 terminology that I would use.
2     Q.   How do you believe it's been
3 helpful?
4     A.   I think that it's -- it's been
5 helpful because it's enabled all of the
6 professionals to be in a better position, if
7 they're in public-speaking venues or in
8 whatever capacity they're in the community, to
9 at least be able to share what Summit County is
10 doing to combat that issue.
11    Q.   Has Akron committed resources to
12 the task force?
13        MS. LEYIMU:  Object to the form of
14 the question.
15    A.   Well, they -- they send me and
16 other, you know, individuals that work for the
17 City of Akron, so I guess I would consider that
18 a resource.  I'm being paid while I'm there.
19    Q.   Do you keep track of the time that
20 you spend on tasks for the Opiate Task Force?
21    A.   Not specifically, no.  It's just
22 another part of my job duties.
23    Q.   Do you in any way account for the
24 time that you spend servicing clients of the
25 recovery court that have been diagnosed with an

Page 254

1 opioid addiction?
2     A.   It's a very difficult, you know,
3 number to determine.  A lot of variables
4 involved.  I know that a significant amount of
5 my time is dedicated to assisting people that
6 are suffering with an opiate use disorder,
7 because, once again, you know, we're dealing
8 with extremely high-risk, high-need offenders.
9     Q.   I appreciate that.  My question is
10 a little bit different.
11          Do you in any way track the time
12 that you spend servicing clients who have been
13 diagnosed with an opioid addiction?
14     A.   No, not specifically.
15     Q.   Are you familiar with the Akron
16 Quick Response Team?
17     A.   I am.
18     Q.   What is it?
19     A.   A Quick Response Team essentially
20 is a group, typically, that consists of a
21 representative from the local fire department,
22 from the local police department -- so
23 typically, it's going to be a police officer or
24 a detective; a firefighter, typically a medic;
25 and then the third person is a substance abuse

Page 255

1 counselor.
2          My understanding of a QRT is that
3 when an individual has an overdose in Summit
4 County -- and, thankfully, they survive from
5 that overdose -- that that information is
6 shared with that respective QRT team, as long
7 as there is one in that jurisdiction, and
8 that that team would physically go out to the
9 address of the overdose victim within typically
10 a couple days of the overdose and they're
11 discharged from the hospital, to inquire about
12 receiving assistance.
13     Q.   Do you participate in the QRT for
14 Akron?
15     A.   I do not.
16     Q.   Does anyone from the recovery court
17 participate in that team?
18     A.   Not at the present time.
19     Q.   In previous years, did anyone from
20 the recovery court participate in the Akron
21 QRT?
22     A.   No.
23     Q.   A short while ago we were talking
24 about the Summit Opiate Task Force.
25          Do you have -- maintain documents

Page 256

1 related to your work in connection with the
2 task force?
3     A.   Not specifically.
4     Q.   If you have -- do you take notes at
5 task force meetings?
6     A.   Occasionally.
7     Q.   Do you keep those notes?
8     A.   I don't throw -- I don't throw them
9 away, so, you know, my -- my sense is, yes, you
10 know, I -- I would have, you know, those
11 documents.  You know, it just depends on what
12 was going on that particular day.  There's lots
13 of data and information that's -- you know,
14 that's presented at, you know, the task force,
15 so.
16     Q.   Do you keep reports that you've
17 received in connection with your work for the
18 task force?
19     A.   I've tried to reduce any and all
20 written documentation, trying to embrace
21 technology, so I rarely keep hard copies of
22 anything.
23     Q.   Have you collected your notes and
24 reports from the task force for purposes of
25 this litigation, whether they be hard copy or

Page 257

1 electronic?
2     A.   Any and all, you know, requests
3 for -- for data from me, you know, I provided.
4 I can't speak to whether that did or did not
5 include, you know, information in referenced to
6 the Summit County Opiate Task Force.
7     Q.   Okay.
8     A.   I know that I turned over literally
9 hundreds of documents, so.
10          MS. WU:  And could we go off the
11 record for just a moment?  I just want to pass
12 the mic, if that's okay.
13          THE VIDEOGRAPHER:  Going off the
14 record at 4:31 p.m.
15     (An off-the-record discussion was held.)
16          THE VIDEOGRAPHER:  Back on the
17 record at 4:32 p.m.
18          EXAMINATION OF JEFFREY STURMI
19 BY MR. RAIOLA:
20     Q.   Good afternoon, Mr. Sturmi.  As I
21 mentioned this morning, my name is Stephen
22 Raiola.  I'm also with Covington & Burling on
23 behalf of McKesson.  I just have a few
24 questions for you.
25          Earlier this morning you testified

65 (Pages 254 - 257)

Page 258

1 a little bit about how you've received, I
2 think, every two years, or you've gone to
3 trainings every two years as part of your
4 continuing education for your license; is that
5 correct?
6     A.    That's correct, yes.
7     Q.    And I believe you mentioned that
8 you attended a training sometime this summer,
9 July 2018; is that correct?
10    A.    Yes.  My recollection is that I
11 attended the 2018 Ohio State University
12 Institute of Addiction Studies.  That's
13 typically a conference that I try to attend
14 each summer.
15        MR. RAIOLA:  Okay.  We're just
16 waiting for one copy of the document for you.
17        THE WITNESS:  Sure.
18        - - - - -
19        (Thereupon, Deposition Exhibit 20,
20        Web Printout Titled "2018 Session
21        Descriptions", was marked for
22        purposes of identification.)
23        - - - - -
24    Q.    The court reporter has just marked
25 as Exhibit 20 a public document.  It's not

Page 259

1 Bates-stamped?
2        And this is a printout of the
3 20- -- 2018 session descriptions from the
4 Addiction Studies Institute.
5        Do you recognize this document?
6     A.    Yes, I have a recollection of this
7 document.
8     Q.    What is it?
9     A.    It was an online description of the
10 training sessions that one could attend,
11 obviously, if they were attending this
12 conference.
13    Q.    And -- and the conference you're
14 referring to is the July 2018 Addiction Studies
15 Institute training that you attended; is that
16 correct?
17    A.    Yes, that's correct, uh-huh.
18    Q.    Okay.  Can you turn to page -- can
19 you turn to page 5 of this document -- or I
20 guess page 4 of this document?
21    A.    What would be at the top?
22    Q.    On the -- on the bottom of the
23 page -- so on the top of the page is "A6,
24 Ethics from a Legal Perspective" --
25    A.    Yes.

Page 260

1     Q.    -- but if you look at the bottom,
2 A8, it says, "Opiate use and abuse in the
3 context of illegal," and on the top of the next
4 page it says, "drug culture."
5        Do you see that?
6     A.    I do.
7     Q.    Did you attend this -- this module
8 of the training at all?
9     A.    I don't believe that I selected
10 this particular session, no.
11    Q.    Okay.  And if you look in the
12 middle of the page in this -- or of the
13 description of A8, there's a sentence that
14 begins -- it's about midway into that
15 paragraph -- that says, "The opioid epidemic is
16 not the result of any one thing but a set of
17 interacting events that cannot be simply
18 explained by any one event, e.g., physician
19 overprescribing."
20        Do you see that?
21    A.    I do.
22    Q.    Would you agree with that
23 statement?
24        MS. LEYIMU:  Object to the form.
25    A.    I'm not sure if I -- if I would

Page 261

1 specifically agree with that statement.
2 Obviously, I didn't author it.
3     Q.    Do you have any basis to disagree
4 with that statement?
5        MS. LEYIMU:  Object to the form of
6 that question.
7     A.    Other than I didn't -- I didn't
8 author it.
9        MR. RAIOLA:  Okay.  I'm done.
10       MS. WU:  Do you want to take a
11 quick break just to let us rearrange?
12       MS. LEYIMU:  Sure.
13       MS. WU:  If that's okay?
14       THE WITNESS:  Fine by me.
15       THE VIDEOGRAPHER:  Off the record
16 at 4:37 p.m.
17        (A recess was taken.)
18       THE VIDEOGRAPHER:  Back on the
19 record at 4:57 p.m.
20       EXAMINATION OF JEFFREY STURMI
21 BY MS. RENDON:
22    Q.    Mr. Sturmi, as I mentioned earlier
23 this morning, my name is Carole Rendon, and I
24 represent the Endo Defendants in this
25 litigation.

66 (Pages 258 - 261)

1        I had a quick question about
2 Exhibit 20, which I think is right in front of
3 you.
4        You testified that you did not
5 attend the one section that you were asked
6 about.  My memory is it was A8.  And so my
7 question is to you is, looking through there,
8 can you tell us which -- which one of the
9 sections you did attend?
10    A.   Sure.  Specific to just the "A"?
11    Q.   Correct.
12    A.   Okay.
13    Q.   In that track, which one did you
14 select?
15    A.   Okay.  I attended A2, "Addiction in
16 the Family, Using a Strength-Based Model for
17 Treatment and Recovery."  That was the full-day
18 one.
19        Is that what you were referring to,
20 or the B?
21    Q.   No.  Correct, the A track.
22    A.   Yes.
23    Q.   Did anybody else from the drug
24 court attend this training?
25    A.   I'm trying to think if there were

1 any other representatives.
2        No.  The reason is we had a drug
3 court session, you know, that week, and so we
4 couldn't peel additional staff to attend.  Sent
5 myself, but still had to have the session
6 proceed, so I was the only one.
7    Q.   Okay.  In your work for the
8 recovery court in Akron, how much contact do
9 you have with the prosecutor of the City of
10 Akron?
11    A.   The assistant?  The assistant city
12 prosecutors, or the chief city prosecutor, or
13 all of them?
14    Q.   The chief city prosecutor,
15 Ms. Wilms?
16    A.   I certainly see Ms. Wilms on a
17 regular basis.  I don't have a ton of contact
18 with her unless there's a need-based reason for
19 me to communicate with her.
20    Q.   So is there somebody else within
21 the city prosecutor's office that you have more
22 regular contact with?
23    A.   Well, each of our judges are
24 assigned an assistant city prosecutor for their
25 courtroom, so because most of my time is spent

1 with Judge Oldham, I'm generally dealing with
2 the assistant city prosecutor that's assigned
3 to that respective court.
4    Q.   And that assistant city prosecutor
5 is also responsible for the recovery court; is
6 that correct?
7    A.   That's correct.
8    Q.   And that individual, I know you
9 mentioned his name earlier, but I have
10 forgotten it.
11    A.   Yeah.  And it changes because they
12 rotate their prosecutors about every six
13 months, but at the present time his name is
14 Ben; his last name is Carro.
15    Q.   And how do you spell that, please?
16    A.   C-a-r-r-o.
17    Q.   And so focusing for a minute on
18 your conversations with Ms. Wilms -- because
19 she's been the city prosecutor for a number of
20 years, correct?
21    A.   She has.
22    Q.   So although your room prosecutor
23 changes periodically, she, in her position, has
24 been steady and has not changed; is that right?
25    A.   That's correct.

1    Q.   And so one of the things I'd like
2 to understand is how often the two of you talk
3 about trends that you're seeing in the city of
4 Akron that might affect her work as the
5 prosecutor or your work as the probation
6 officer in charge of the recovery court.
7    A.   Not a significant amount of time.
8    Q.   Can you give me a rough estimate of
9 how often a week you might talk to her?
10    A.   Sometimes not at all.
11    Q.   Is it the kind of thing where you
12 have a set monthly meeting or quarterly meeting
13 to make sure that whatever trends she's seeing
14 from her position as the city prosecutor you're
15 aware of and vice versa?
16        MS. LEYIMU:  Object to the form.
17        You can answer.
18    A.   What I would say is we meet on an
19 as-needed basis, depending upon the
20 circumstances, whether that's a request from
21 her or request from me.
22        We don't have set staff meetings,
23 you know, with her.  I see her in various
24 community functions that I go to.  She's a
25 member of the Summit County Opiate Task Force.

67 (Pages 262 - 265)

Page 266

1 But I don't have regular meetings with her.
2     Q.   When's the last time that you had a
3 meeting with her regarding the opioid situation
4 in the city of Akron?
5     A.   I don't recall a specific meeting
6 with, you know, Ms. Wilms to -- to address
7 that.
8     Q.   What about the Summit County
9 Prosecutor's Office?  Do you have any ongoing
10 working relationship with members of the Summit
11 County Prosecutor's Office?
12     A.   I have no involvement with Summit
13 County Prosecutor's Office.
14     Q.   What about the Akron Division of
15 Police?
16     A.   I have regular contact with our
17 police department, primarily through the SNUD
18 detective that's assigned to the Akron Recovery
19 Court program.
20     Q.   And in connection with your
21 communications with the Akron Division of
22 Police, how often are you talking about trends
23 that the police department is seeing and/or
24 trends that you're seeing so that you can make
25 sure you're on the same page with respect to

Page 267

1 addressing the opioid issue in the city of
2 Akron?
3     A.   Well, that detective is -- is at
4 every drug court session.  We -- we are
5 typically running weekly.  Occasionally we'll
6 take, you know, a week off.  So I communicate
7 with Detective Nida or the assigned SNUD
8 detective every Thursday.
9          We'll talk about any number of
10 things.  Certainly, in that conversation, if
11 there are issues going on or trends or things
12 that that detective feels that -- that I or our
13 court needs to know, then he shares that.
14 That's obviously why he's a member of our team.
15     Q.   And is that information shared with
16 you in writing or just orally?
17     A.   Typically, it's -- it's verbal.
18     Q.   Okay.  And do you do anything to
19 document that information that you've received
20 so you can make sure the rest of the team is
21 aware of it?
22     A.   No, I don't record that in any
23 written form.
24     Q.   What about your counterpart at the
25 drug court in the City of Cleveland?  Do you

Page 268

1 have any contact with her?
2     A.   I don't know who you're referring
3 to.
4     Q.   Becky Leckler.
5     A.   I don't know who Becky Leckler is.
6     Q.   Have you ever met with anybody
7 who's involved in either the City of
8 Cleveland's equivalent drug court or Cuyahoga
9 County's drug court and/or recovery court?
10     A.   The only individual that I've
11 communicated with through the Cleveland
12 Municipal Drug Court is a gentleman by the name
13 of Wallace Green.
14     Q.   And what have your communications
15 with Mr. Green been?
16     A.   Limited.  Main reason, recently
17 Mr. Green contacted me via e-mail to inquire
18 whether or not the Akron Recovery Court team
19 would like to participate in a training that's
20 put on by the National Drug Court Institute.
21 The term of that is a drug court tune-up, and
22 so essentially, the National Drug Court
23 Institute provides staff that will come to the
24 jurisdiction and will present a two-day, you
25 know, training workshop to essentially look at,

Page 269

1 you know, your current programs and policies
2 and provide whatever advice or expertise
3 that -- that they wish to provide.
4     Q.   Did you take advantage of that
5 opportunity?
6     A.   We have applied for that training.
7 That's why Mr. Green reached out to me.  They
8 require at least three drug courts', you know,
9 teams to participate before they'll dispatch,
10 you know, their staff of, you know, roughly
11 four individuals that will come in and actually
12 produce the training.
13     Q.   Will there be any cost to the City
14 of Cleve- -- to the City of Akron associated
15 with that training if you are awarded the
16 training that you've requested?
17     A.   There's not a specific cost.
18 That's one of the benefits.  You know, the
19 National Drug Court Institute is -- is a -- is
20 a great partner, you know, with -- with drug
21 courts, and so they -- they offer a lot of
22 assistance to -- to us.
23     Q.   Have you received assistance in the
24 past from the National Drug Court Institute?
25     A.   We have.

68 (Pages 266 - 269)

Page 270

1    Q.    What kind of assistance have you
2 received from them?
3    A.    It's the very -- the very same
4 training that we're talking about.  You know,
5 they came out to Akron and we were the host of
6 a drug court tune-up, you know, approximately
7 three years ago.
8    Q.    Do you recall which other drug
9 courts participated with you in that drug court
10 tune-up?
11    A.    My recollection was a Cuyahoga
12 County -- I don't believe it was a Cleveland
13 muni drug court, because I certainly don't
14 remember Mr. Green being there.  But I think it
15 was the Cuyahoga County drug court, and I
16 believe it was the Medina, you know, drug
17 court.
18         We hosted it in Akron, and I was
19 essentially the -- the contact person that
20 coordinated the site location, assisted the
21 NDCI staff, you know, with accommodations,
22 making sure that they were taken care of.
23 Basically was -- was the person responsible
24 for, you know, providing, you know, the
25 location and offering it to these other drug

Page 271

1 courts.
2    Q.    In connection with that prior drug
3 court tune-up, was there any cost to the City
4 of Akron?
5    A.    No, not specifically cost to the
6 City of Akron.
7    Q.    Did you find the training
8 beneficial?
9    A.    Yeah.  My recollection is, is that
10 it was beneficial.  It was helpful.
11    Q.    Did you change any of the policies
12 or practices of the drug court as a result of
13 that training?
14    A.    My recollection was that we made a
15 concerted effort to make sure that our legal
16 defender was more involved in that process.
17 Our legal defenders are very busy, so we wanted
18 to make sure that they knew how important it
19 was that, you know, they be a part of the team,
20 be a part of any pre-court team meetings.  That
21 was one point of emphasis.  And -- and that --
22 that has transpired.  That has worked.
23    Q.    So they have become more involved?
24    A.    They have.
25    Q.    And have you found that to be

Page 272

1 beneficial?
2    A.    We have.
3    Q.    Are there any other policies or
4 practices of the drug court that you changed as
5 a result of that training you received?
6    A.    I don't recall any specific major
7 changes to what we were doing.  Not that -- not
8 that we've figured it out or, you know, we --
9 we're perfect, but, you know, we've been in
10 business for -- since -- since 1995, so, you
11 know, we do know what we're doing and the
12 program that we operate is a sound one.
13         But as I said earlier, if you're
14 not looking to improve, if you're not looking
15 to get better, then you're lazy.
16    Q.    Have you received any other
17 resources or support from the National Drug
18 Court Institute, other than the tune-up that
19 you described?
20    A.    Other than their, you know, online,
21 you know, literature, that -- that they will
22 provide as far as their opinions, you know, on
23 certain topics, they run a national conference
24 every year.  So we -- we like to have
25 representation, you know, at that national drug

Page 273

1 court conference.
2         You know, last two years Judge
3 Oldham has attended, and several members of our
4 recovery court team have attended.
5         I have attended the national drug
6 court conference on a number of occasions.  I
7 have not attended in the past, oh, probably
8 three or four years.  Some of those were due to
9 financial constraints, you know, in our travel
10 budget in the probation department.  Some were
11 related to personal matters with my family.
12    Q.    Do you, whether it's yourself
13 personally or others within the recovery court
14 system, maintain documents that would show who
15 attended which year, what the agenda was,
16 et cetera?
17    A.    Not specifically, no.
18    Q.    So there's no way to go back and
19 figure out, 10 years ago, who attended the
20 annual conference?
21         MS. LEYIMU:  Object to the form.
22    A.    Not a mechanism that I'm aware of,
23 no.
24    Q.    You indicated that your drug court
25 has been up and running for quite a while and

Page 274

1 that you are very confident in the way that you
2 operate.  What have you done to share your
3 expertise with others in the Northeast Ohio
4 region?
5      A.   We've been contacted, you know, on
6 a number of occasions from jurisdictions that
7 have an interest in starting, you know, a drug
8 court program.  And so on multiple occasions,
9 with Judge Oldham's permission, we share any
10 and all documents that -- that we have.  That
11 would include our policy and procedure manual,
12 our client handbook, all of our forms.
13          We've had lots of individuals
14 across the state come and observe the Akron
15 Recovery Court just to see how we operate.
16          We're -- we're one of -- of a few
17 municipal drug courts.  There's lots of drug
18 courts, you know, in the state of Ohio, but not
19 many municipal drug courts.  Most are at the
20 felony, common pleas court level.
21      Q.   Did you help Cleveland get its
22 municipal drug court up and running?
23      A.   No.  We had no involvement with the
24 Cleveland, you know, drug court's operation.  I
25 don't know when or how long they've been in

Page 275

1 existence, but I don't have any recollection
2 of -- you know, of -- of that.
3      Q.   What about the Cuyahoga County Drug
4 Court?
5      A.   No.
6      Q.   Same question, did you have any
7 involvement in helping stand up or provide
8 advice to Cuyahoga County when they were
9 creating their recovery court?
10      A.   No, not to my recollection.
11      Q.   How much interaction do you have
12 with federal law enforcement?
13      A.   Minimal.
14      Q.   And with whom do you have that
15 interaction?
16      A.   On occasion, when a person is under
17 investigation, we may be contacted by, you
18 know, federal authorities, whether that's a
19 federal agent or a federal probation officer.
20 But those are extremely limited circumstances.
21      Q.   Have you ever received any training
22 or other resources from the Drug Enforcement
23 Administration?
24      A.   I don't recall, you know, ever
25 receiving any training from the DEA.

Page 276

1      Q.   What about from the FBI?
2      A.   No, I don't recall that.
3      Q.   Have you sought or received any
4 resources from the Department of Justice?
5      A.   No.
6      Q.   Have you ever asked either the DEA
7 or FBI for training?
8      A.   Not specifically, no.
9      Q.   And what about just generally, have
10 you ever asked either the DEA or the FBI for
11 information about trends that they're seeing in
12 the general Northeast Ohio region with respect
13 to drugs and drug patterns?
14      A.   In reference to the various
15 workshops, you know, that I attend, there are
16 often representatives from the DEA that are
17 talking about the very things that you just
18 indicated.  So depending upon that workshop,
19 that may be a breakout session, you know, such
20 as drug court trends.  You know, I have a
21 recollection of that.
22      Q.   Well, I assume it would be
23 important for you, in your position, to know if
24 there are certain trends that law enforcement
25 is seeing with respect to drugs that are

Page 277

1 suddenly becoming prevalent in the community
2 that you need to be aware of.  Carfentanil
3 comes to mind.  Would you agree with me that
4 that would be helpful for you to know?
5          MS. LEYIMU:  Object to the form.
6      A.   I think it's always helpful to --
7 to know potential, you know, drug court trends.
8      Q.   Have you ever reached out to the
9 local resident agent in charge of the local DEA
10 office to introduce yourself and make that
11 connection?
12      A.   No.
13      Q.   And what about the FBI?
14      A.   No.
15      Q.   Have you seen a lot of issues with
16 carfentanil in the Akron area?
17      A.   Not sure what you mean by "a lot."
18      Q.   Is carfentanil a significant
19 problem in the city of Akron, to the extent
20 that you are aware?
21      A.   I think that there's certainly been
22 report- -- reported use of carfentanil in the
23 Akron/Summit County area that's part of this
24 epidemic.
25      Q.   Have you seen that in connection

70 (Pages 274 - 277)

Page 278

1 with any of the clients in the recovery court
2 of the City of Akron?
3     A.   I don't recall specifically Akron
4 Recovery Court clients admitting or reporting
5 use of carfentanil. It's more of a general
6 it's in -- it's in the area, it may be leading
7 to overdoses, you know, things of that nature.
8     Q.   Have you seen clients of the Akron
9 Recovery Court reporting the use of Fentanyl?
10    A.   I have.
11    Q.   And what percentage, would you say,
12 of your current clients have reported the use
13 of Fentanyl?
14        MS. LEYIMU:  Object to the form.
15    A.   It's very difficult for me to
16 answer that question.  I -- I don't know.  I
17 can't -- I can't quantify that.  I can only say
18 that there's been reported use of Fentanyl.
19    Q.   Is it a significant percentage of
20 the population of the clients of the drug
21 court, or is it a pretty rare and odd
22 phenomenon?
23        MS. LEYIMU:  Object to the form.
24    A.   Again, I -- I would -- I would be,
25 you know, cautious in trying to quantify that.

Page 279

1        What I would say is in the number
2 of interviews that myself and our recovery
3 court staff are involved in, there's certainly
4 been clients that have reported use of
5 Fentanyl.  But they report, you know, lots of
6 different uses of opiates.
7     Q.   And we could find that out if we
8 looked at the assessment files; is that
9 correct?
10    A.   If -- if they reported that.
11    Q.   If they reported it, it would be
12 recorded in the assessment files; is that
13 right?
14    A.   It should be.
15    Q.   And so if we looked at the
16 assessment files, you would be able to see
17 whether or not somebody had reported the prior
18 use of Fentanyl or carfentanil, correct?
19        MS. LEYIMU:  Object to the form of
20 the question.
21    A.   Once again, if they report that
22 use, that should be recorded in -- in that
23 document.
24    Q.   The same question with respect to
25 heroin.  Is there a significant percentage of

Page 280

1 the clients of the Akron Recovery Court who
2 report using heroin?
3        MS. LEYIMU:  Object to the form.
4     A.   There are certainly a percentage of
5 our clients that report use of heroin, just as
6 they report use of prescription opioid
7 medications.
8     Q.   And with respect to heroin, if they
9 report using heroin, that would be recorded in
10 those assessment files, correct?
11    A.   Correct.  Just as it would be
12 recorded if they reported use of pills or
13 opiate pain medications.
14    Q.   And if they report the use of
15 pills, what do you do to determine where they
16 obtained those pills, if anything?
17    A.   Well, we ask them.
18    Q.   Anything else?
19    A.   We inquire as far as the health
20 condition that they report as to why they are
21 taking that medication.  We inquire about how
22 long that condition, you know, has occurred.
23 And we inquire about, you know, their plans
24 moving forward, you know, dealing with that.
25    Q.   Do the clients of the recovery

Page 281

1 court report to you the purchase of
2 prescription opioids illegally on the street?
3     A.   Occasionally.
4     Q.   And --
5     A.   They -- they report all kinds of
6 things.
7     Q.   And if that's reported, that would
8 also be contained in those assessment files,
9 correct?
10    A.   If they reported that use during
11 the assessment, it would be recorded.
12    Q.   What if -- so that brings up
13 an interest- -- an interesting question.  You
14 indicated earlier today that sometimes it takes
15 a while to establish a rapport with a client
16 where they will be more forthcoming about all
17 of the different drugs they've used and where
18 they've obtained them.  Is that an accurate
19 statement?
20    A.   Yes, that's an accurate statement.
21    Q.   When they provide that information
22 subsequent to the initial assessment, where is
23 that information recorded?  Or is it?
24    A.   Depending upon the information and
25 the degree that they're reporting, on occasion

71 (Pages 278 - 281)

Page 282

1 we may have that client reassessed.
2       An assessment, you know, is a
3 working document.  You don't just have one
4 assessment and that's your assessment forever.
5 Because people change and their drug addiction
6 changes, so, on occasion, reassessments are
7 conducted.
8    Q.   Would the reassessment be contained
9 in the same paper file as the original
10 assessment?
11       MS. LEYIMU:  Object to the form.
12    A.   It would be kept in the
13 confidential probation file.
14    Q.   So all of this information about
15 the reporting, both in the initial assessment
16 and subsequent reporting if there's a
17 subsequent assessment, is all contained in that
18 probation file, correct?
19       MS. LEYIMU:  Object to the form.
20    A.   To the records that I control, yes.
21 I can't speak to what the Oriana House case
22 manager may record or how they record it.
23    Q.   I'm just asking about your -- your
24 records at this point.
25    A.   Uh-huh.

Page 283

1    Q.   Is it kept anywhere else within
2 your records, other than in the probation file?
3    A.   No.
4    Q.   The meetings of the drug court, the
5 weekly meetings of the drug court, are those
6 recorded?
7    A.   No.
8    Q.   So there's no transcript available?
9    A.   Correct.
10    Q.   I'm going to ask you to take a look
11 at what was previously marked as Exhibit 6.
12    A.   These are no longer in order, so --
13    Q.   Take a minute.  It's an e-mail that
14 you sent to Doug Powley on February 22nd of
15 2011.
16    A.   Okay.  I have that, ma'am.
17    Q.   Okay.  And I'm not going to go back
18 through the whole document, but I'm going to
19 ask you to turn to page 6 of the attachment.
20 It is Bates No. 001109386.
21    A.   I have that.
22    Q.   Okay.  And I'm going to direct your
23 attention to the heading that says "Prescription
24 Opioids, Current Trends."  Do you see that?
25    A.   I do.

Page 284

1    Q.   And it indicates there that
2 "Prescription opioids are highly available in
3 the region.  Participants consistently reported
4 street availability of these drugs as 'very
5 high.'"
6       Do you see that?
7    A.   I do.
8    Q.   And is that consistent with your
9 experience in late 2010, early 2011, the trends
10 in the city of Akron, which was part of the
11 Akron-Canton region?
12       MS. LEYIMU:  Object to the form.
13    A.   That's my recollection.  So, you
14 know, it's a long time ago, but.
15    Q.   We've talked a little bit today
16 about funding for the drug court.
17    A.   Uh-huh.
18    Q.   I'm going to have you look at what
19 we're going to mark as Exhibit 21 for your
20 deposition.
21       - - - - -
22       (Thereupon, Deposition Exhibit 21,
23       June 2017 E-Mail Chain Re: ATP
24       Funding Opportunity, AKRON_001103864
25       to 001103866, was marked for

Page 285

1       purposes of identification.)
2       - - - - -
3    Q.   And the first page has the Bates
4 No. 001103864.  Do you see that?
5    A.   I do, yeah.
6    Q.   Okay.  And this is an e-mail chain
7 from June of 2017, correct?
8    A.   Yes.
9    Q.   Do you recall this -- this e-mail
10 exchange?
11    A.   I need to review it.
12    Q.   Okay.  Please do.
13    A.   Okay.  I've had a chance to review
14 that.
15    Q.   Who's Kimberly Patton?
16    A.   Ms. Patton works for the Summit
17 County ADM Board.
18    Q.   And I see that the first e-mail is
19 from Ms. Patton on June 8th of 2017 to you and
20 a group of other folks, correct?
21    A.   Correct.
22    Q.   And she's talking about an ATP
23 funding opportunity, is she not?
24    A.   Correct.
25    Q.   And in her e-mail, she says that

Page 286

1 she wants to take this opportunity to reach out
2 to you and see if your court may be interested
3 in participating in the Addiction Treatment
4 Program through the Ohio Department of Mental
5 Health and Addiction Services to provide
6 funding for recovery supports to individuals
7 that are part of your specialty docket.
8     Correct?
9     A.   Correct.
10     Q.    And then she lists the four bullet
11 points, four different requirements that your
12 specialty docket must meet in order to be
13 eligible for this funding.  Do you see those?
14     A.   I do.
15     Q.    Does the Akron -- City of Akron
16 Recovery Court meet all four of those criteria?
17     A.   Yes.
18     Q.    So you would have been eligible for
19 this funding; is that correct?
20     A.   Correct.
21     Q.    And then, in response to her e-mail
22 just a couple days later, on June 12th, you
23 indicate that you want to talk to her about how
24 the ATP funds could be used; is that -- is that
25 right?

Page 287

1     A.   Yes.
2     Q.    Do you know if you ever had that
3 conversation with her?
4     A.   We did.
5     Q.    And who was present for that
6 conversation?
7     A.   My recollection, the individuals
8 that were present for that meeting -- it was
9 conducted at the ADM Board.  Ms. Patton was
10 there.  There was a representative from their
11 financial office, an accountant, I believe.
12 Myself and Tony Ingram, my supervisor, the
13 chief probation officer.
14     Q.    And tell me, if you would, please,
15 what you recall learning about this funding
16 opportunity at that meeting.
17     A.   Well, what's interesting about the
18 ATP project is this was basically ATP round
19 two.  We had already received ATP funds in the
20 fiscal year prior to this.  So that ended, so
21 all of the reporting requirements of the ATP
22 also ended.
23        And so what was interesting about
24 this opportunity is it expanded services to
25 include additional recovery supports other than

Page 288

1 medication-assisted treatment.
2     Q.    And that's the information that you
3 learned at the meeting with Ms. Patton at the
4 ADM Board?
5     A.   That was part of the -- of the
6 reason for the call.  My recollection is that,
7 you know, she sent this e-mail on June 8th and
8 wanted a commitment from our court by June
9 13th.  So that's five days.  That's awfully
10 fast in the criminal justice system.  We don't
11 move that fast.
12        So we needed to slow this process
13 down and have a better understanding of what
14 ATP round two would be before we committed the
15 type of resources that the ATP project
16 required, which is a significant amount of data
17 entry that requires staff to do it.
18     Q.    What data was required for ATP
19 round one?
20     A.   It was, you know, the requirements
21 that -- that were determined, you know, by
22 OMHAS.  Again, they contracted with TRI, the
23 Treatment Research Institute, and so that data
24 would be any number of requirements:
25 certainly, the client, you know, case

Page 289

1 information, what they were diagnosed with.  I
2 didn't enter the data, so I can't speak to all
3 of the requirements, but I know that it was
4 labor intensive.
5     Q.    Who did enter that data?
6     A.   Probation aide that was assigned to
7 that task.
8     Q.    And that person's name is?
9     A.   I believe it was -- no, yeah.  It
10 was Mr. Krutko.  Adam Krutko.
11     Q.    And do you know if Mr. Krutko kept
12 track of the time that he spent specifically on
13 the task of entering the data that was required
14 for ATP round one?
15     A.   I don't believe there was any
16 specific mechanism to record that.
17     Q.    So there's no way to track how many
18 hours it took him to do the data entry; is that
19 correct?
20     A.   That's correct.
21        MS. LEYIMU:  Object to the form.
22     Q.    The data that he entered, was it
23 turned into reports that were provided to OMHAS
24 or others?
25     A.   I don't have knowledge of -- of

73 (Pages 286 - 289)

1 what they did with that data. I just know that
2 it was an online program that was provided to
3 us through TRI, and that was a database that
4 they operated, and -- and we provided the
5 information that they requested.
6    Q.   When you provided the information
7 that they requested, did you lose the ability
8 to retrieve that information? In other words,
9 once it was sent, could you go back and get it?
10 Did it still exist in your systems?
11        MS. LEYIMU: Object to the form.
12    A.   Again, I -- I wasn't the person
13 that was responsible for that data entry. I
14 have no knowledge of how that data was kept or
15 the retrieval, you know, ability of it.
16    Q.   So you never looked at what was
17 being provided to OMHAS, pursuant to ATP1?
18    A.   I received weekly reports from ATP.
19 That confirmed that we were in compliance with
20 the reporting requirements.
21    Q.   Did you ever see the data that was
22 actually being reported to OMHAS and others to
23 comply with ATP1?
24    A.   I don't have a specific
25 recollection of reviewing any -- any data

1 related to that.
2    Q.   Do you know where that data is
3 today?
4    A.   I -- I don't know who the current
5 ATP data research company is. I believe it's
6 TRI. It's the same company.
7    Q.   Do you know if the reports that you
8 provided, the data that you provided to TRI,
9 still exists within the information systems of
10 the Akron Recovery Court?
11        MS. LEYIMU: Object to the form.
12    A.   That was a separate database, we
13 didn't operate it. It was an online database.
14 We were given training on how to input the
15 data, and that's what we did.
16    Q.   So let me -- let me try again,
17 because I'm obviously not being clear in my
18 question.
19        If you wanted to get the reports,
20 the information that you submitted to TRI in
21 connection with ATP1, can you get that
22 information today?
23        MS. LEYIMU: Object to the form.
24    A.   I don't -- I don't have knowledge
25 of that. I never made that request.

1    Q.   Who would know whether or not you
2 can still access that information?
3    A.   OMHAS or TRI.
4    Q.   Is there somebody who operates the
5 IT system for the Akron Recovery Court who
6 could look to see whether or not it's still
7 accessible on your end?
8        MS. LEYIMU: Object to the form.
9    A.   I don't know. I'm not an IT
10 person.
11    Q.   Do you have an IT person?
12    A.   We do.
13    Q.   And who is that?
14    A.   We have two individuals that work
15 for the Akron Municipal Court: Larry Lee and a
16 newer gentleman. It's Jeffrey, and I believe
17 Jeffrey's last name is Crawford.
18    Q.   Do you know if anybody in
19 connection with this litigation asked Mr. Lee
20 or Mr. Crawford to try to access the data that
21 was provided to TRI in response to ATP1?
22        MS. LEYIMU: Object to the form.
23    A.   I have no knowledge of that.
24    Q.   Did you make that request?
25    A.   No.

1    Q.   Did you ask anybody else --
2        MS. LEYIMU: Object to the form.
3    Q.   -- if they could still access that
4 data?
5        MS. LEYIMU: Object to the form.
6    A.   Again, I -- I did not make that
7 request.
8    Q.   So you've met with Ms. Patton. Do
9 you know if you met with her -- I would assume
10 you met with her after her e-mail of June 12th
11 of 2017; is that accurate?
12    A.   That's accurate.
13    Q.   Do you know approximately when you
14 met with her?
15    A.   It would have been roughly within
16 one to two weeks.
17    Q.   Did you ultimately participate in
18 ATP2?
19    A.   We did.
20    Q.   You did or did not?
21    A.   We did.
22    Q.   Okay. And when did you apply for
23 the grant monies associated with ATP2?
24    A.   Well, let's see. This indicated
25 that -- they list it as their fiscal year '18,

74 (Pages 290 - 293)

Page 294

1  so as far as when it officially restarted, you
2  know, approximately beginning of 2018.
3     Q.   How much money does the Akron
4  Recovery Court receive through ATP2?
5     A.   The Akron Recovery Court received
6  no money from the ATP project.  We never have.
7     Q.   That money goes to the Oriana
8  House; is that correct?
9     A.   No.  The funding mechanism is that
10  the treatment agency that's assigned to that
11  client must pay the initial whatever --
12  whatever it is, whether, in ATP No. 1, it was
13  the monies that would have to be paid for
14  medication-assisted treatment if that client
15  didn't have insurance or didn't have Medicaid.
16  And then, the ADM Board would receive funds
17  from OMHAS, and they would then funnel the
18  money back to the treatment agency.
19     Q.   So this is additional money that's
20  available for treatment for clients of the
21  Akron Recovery Court; is that correct?
22     A.   That's how it is written up.
23     Q.   And how much money is available as
24  a result of your receiving funding through
25  ATP2?  Not you personally, but how much money

Page 295

1  is available to the clients of the Akron
2  Recovery Court through ATP2?
3        MS. LEYIMU:  Object to the form.
4     A.   I can't quantify that.  I just know
5  that just as with ATP No. 1, we have not seen
6  clients accessing these funds.  The treatment
7  agencies aren't making, you know, those
8  requests for services, for whatever reason.
9  Whether it's paperwork, whether it's manpower,
10  whether it's issues, you know, I just know
11  that, unfortunately, it seems to be, you know,
12  underutilized.
13     Q.   So the money is there; it's just
14  not being used?
15        MS. LEYIMU:  Object to the form.
16     A.   I just know that, you know, the
17  treatment agencies that are assigned and have
18  been approved as ATP providers are not making
19  many requests for those funds.
20     Q.   Are the funds available?
21     A.   To my knowledge, they're available,
22  but I don't manage the program.
23     Q.   So to your knowledge, the funds are
24  available, but they're not being utilized; is
25  that an accurate statement?

Page 296

1        MS. LEYIMU:  Object to the form.
2     A.   Yeah, what I would say is the
3  program exists, but I have not seen clients
4  receiving the services.
5     Q.   What are you doing to ensure that
6  the clients of the recovery court know that
7  these services are available?
8     A.   Well, we refer them to ATP
9  treatment agencies that have entered into
10  contracts, you know, to apply for those
11  services.  So if the client is ATP-eligible --
12  which not everybody is, but if they're eligible
13  for the ATP project, then our staff is making
14  sure that at least the treatment agency that
15  they're being referred to is an ATP provider.
16  It's up to that treatment agency to make the
17  requests for whatever services they're
18  requesting.
19     Q.   What, if anything, are you or your
20  staff doing to ensure that the ATP providers
21  know that this funding exists?
22     A.   Again, that's not -- that's not,
23  you know, in the -- in the job -- you know, in
24  my job, you know, description.  That's the ADM
25  Board and the treatment agencies.

Page 297

1        So it's the ADM Board's, you know,
2  responsibility to, you know, continue to
3  communicate, you know, with those treatment
4  agencies, and, you know, as far as whether they
5  are or not accessing those funds, you know,
6  that's -- you know, that's not my
7  responsibility.
8     Q.   In your e-mail to Emily Beers, you
9  say, quote, "I hate to turn down any monies,
10  but unless someone can convince me of the
11  merits of this program and how it can help our
12  clients, I will probably recommend that we do
13  not continue with this ATP project.  Also, with
14  the fact that we just received the three-year
15  SAMHSA grant, just not sure if it's worth it,"
16  close quote.
17        Do you see that?
18     A.   I do.
19     Q.   And the three-year SAMHSA grant
20  that you're talking about, that is the one that
21  we've been discussing here today that was a
22  million dollars over the course of three years;
23  is that right?
24     A.   That's correct, yes.
25     Q.   And not worth it because you

75 (Pages 294 - 297)

Page 298

1 already had the SAMHSA grant in place?
2       MS. LEYIMU:  Object to the form.
3    A.   What I -- what I would say is "not
4 worth it" is related to the time that was
5 required by our staff that was unfunded for
6 Mr. Krutko, you know, to input that data on a
7 daily basis.  If the clients, you know, weren't
8 receiving the services, we were trying to
9 balance, you know, the need for that.
10    Q.   Did the SAMHSA grant cover the same
11 type of services that the ATP2 grant would
12 cover, or are they separate?
13    A.   They were, you know, separate.
14    Q.   So it wasn't that the ATP2 grant
15 was duplicative of the money that you had
16 already received from SAMHSA?
17    A.   Duplicative, you know, again, the
18 SAMHSA was an enhancement grant that enhanced
19 specific items.  The ATP project was different.
20 You know, they -- they weren't the same things.
21    Q.   How many hours each day does your
22 staff member spend entering data for the ATP2
23 project?
24    A.   I couldn't quantify that.  You
25 know, Mr. Krutko, you know, would have to

Page 299

1 answer that question.
2    Q.   Have you ever asked Mr. Krutko how
3 many hours a day he spends entering data for
4 the ATP2 grant?
5    A.   Well, I think initially we had some
6 discussion as far as, you know, how many hours,
7 you know, he guesstimated that that was taking.
8    Q.   With respect to the ATP2 grant?
9    A.   With respect to the ATP1.
10    Q.   So focusing on the ATP2 grant, the
11 one that's currently in place, have you ever
12 asked Mr. Krutko how many hours per day he
13 spends entering data for the ATP2 grant?
14    A.   Not specifically, no.
15    Q.   Have you ever asked him to
16 guesstimate for the ATP2 grant?
17    A.   No.  Once the court made the
18 decision that we were going to proceed, you
19 know, with engaging in the ATP No. 2, it became
20 a moot point.
21    Q.   Because it was going to happen
22 whether you wanted it to or not.
23    A.   The judge- --
24       MS. LEYIMU:  Object to the form.
25    A.   The judge -- judges had made the

Page 300

1 decision to proceed and that we were going to
2 be a part of that project.
3    Q.   Do you know how many hours each day
4 Mr. Krutko spends entering data with respect to
5 the AT2 -- ATP2 project?
6       MS. LEYIMU:  Object to the form.
7 Asked and answered.
8    A.   I do not.
9    Q.   Earlier today you were talking
10 about the felony reduction program.  And as I
11 understood that, that was a program that
12 existed before the County had its own drug
13 court; is that correct?
14    A.   That's correct.
15    Q.   And pursuant to that program,
16 people who were charged with low-level drug
17 felonies that didn't involve violence could
18 have their felony reduced to a misdemeanor, and
19 in exchange, would participate in the Akron
20 Recovery Court; is that right?
21    A.   That's correct.
22    Q.   That was not the only way that you
23 could participate in the Akron Recovery Court,
24 was it?
25    A.   Initially, yes.  It was exclusively

Page 301

1 a felony reduction program.
2    Q.   So if you were charged with a
3 misdemeanor drug possession, you couldn't
4 participate, but if you were charged with a
5 felony drug possession, you could?
6    A.   That's correct.
7    Q.   For how long was that the system
8 that was in place?
9    A.   Well, from -- from its existence in
10 1995 to when the model changed, which -- trying
11 to think of, you know, exactly when that
12 occurred.  I'd have to -- I'd have to review,
13 you know, that -- that information, but I --
14 you know, my recollection is that the Turning
15 Point Program has been in existence, you know,
16 since sometime in 2000.  2010, you know.
17    Q.   I'm sorry.  Did you say sometime in
18 2000, 2010?  That's --
19    A.   I was just trying to --
20    Q.   -- like a 10-year time frame.
21    A.   No.  I was just trying to think
22 of -- you know, I didn't start managing, you
23 know, the Akron Drug Court program until 2003.
24 It was a felony reduction model at that time,
25 you know.  I don't recall when that specific

76 (Pages 298 - 301)

Page 302

1 change occurred.
2     Q.    But to your memory it occurred
3 whenever the Turning Point Program was up and
4 running?
5     A.    Absolutely.
6     Q.    So if we figured out when that was,
7 we would know when it changed from a
8 felony-only program to people charged with
9 misdemeanors could enter the drug court?
10    A.    Correct.  I received a phone call
11 from Mr. Powley, the chief city prosecutor at
12 that time, informing me that they were no
13 longer going to be amending charges to an M1
14 attempted drug abuse for purposes of referral
15 to the Akron Drug Court program.  Obviously,
16 the clients that were in the program were going
17 to remain, but starting on whatever that magic
18 date was, that model was changing.
19    Q.    And from that date forward, people
20 who were initially charged with a misdemeanor
21 could participate in the drug court; is that
22 correct?
23    A.    That's correct.
24    Q.    Do you think that there's an
25 advantage to people who are charged with a

Page 303

1 misdemeanor having the opportunity to
2 participate in drug court?
3     A.    Yes.
4     Q.    Was there any process in place by
5 which somebody who was charged with a
6 misdemeanor could, in a weird fashion, ask to
7 be charged with felony instead so that it could
8 be reduced to a misdemeanor and they could
9 participate in drug court?
10    A.    I don't re- --
11        MS. LEYIMU:  Object to the form of
12 the question.
13    A.    I don't recall anybody asking for a
14 case to be re-filed as a felony for purposes of
15 entry into the drug court.  That's certainly
16 not my recollection.
17    Q.    So it was felonies only?
18        MS. LEYIMU:  Object to the form.
19 Asked and answered.
20    A.    That's the way that the model, you
21 know, was -- was written up.
22    Q.    Do you know if the model that was
23 used in the City of Cleveland was similar or
24 different?
25    A.    I have no knowledge of what the

Page 304

1 Cleveland drug court's program is.  I don't
2 manage it.
3     Q.    And on that e-mail that I just
4 showed you that we marked as Exhibit 21, just
5 so I'm clear, who is Emily Beers?
6     A.    Emily Beers is employed by the
7 Oriana House, Incorporated.  She is the program
8 manager for the caseworkers for both the
9 Turning Point Program and the Akron Recovery
10 Court.  So she is the boss of the caseworkers
11 used in both programs.
12        - - - - -
13        (Thereupon, Deposition Exhibit 22,
14        9/15/2017 E-Mail from Alexa
15        Montesano Re: IBH Event on 9/14/17,
16        AKRON_001102789, was marked for
17        purposes of identification.)
18        - - - - -
19    A.    Okay.
20    Q.    Sir, that is an e-mail from Alexa
21 Montesano to you and others dated September 15,
22 2017, correct?
23    A.    That's correct.
24    Q.    Do you recall this e-mail
25 communication?

Page 305

1     A.    I do.
2     Q.    Who is Alexa Montesano?
3     A.    At the time, Ms. Montesano was a
4 probation officer with the City of Akron, and
5 she was assigned to the drug court docket with
6 me.
7     Q.    And you say "at the time."  Where
8 is she assigned now?
9     A.    She is no longer employed with the
10 City of Akron.
11    Q.    When did she leave her employ with
12 the City of Akron?
13    A.    She left employment with the City
14 of Akron approximately five months ago.
15    Q.    And do you know where she is now?
16    A.    She accepted a position as an agent
17 with the State of Ohio investigative unit.
18 Ohio Investigative Unit.  So she --
19    Q.    Working for BCI?
20    A.    It's -- it's -- it's the State of
21 Ohio, so she is a state police officer.  It's
22 an agency that not a lot of people have
23 awareness of.
24        But the Ohio Investigative Unit is
25 an undercover law enforcement agency that

77 (Pages 302 - 305)

Page 306

1 investigates any number of illegal activities,
2 including underage alcohol consumption, drugs,
3 gambling, prostitution.
4    Q.   And she was reporting to you and a
5 group of other folks about an IBH event that
6 she had attended the evening before; is that
7 correct?
8    A.   Yes, that's what -- that's what she
9 indicated.
10    Q.   What is an IBH event?
11    A.   IBH is an acronym for Interval
12 Brotherhood Home.  It is one of the residential
13 drug treatment agencies that operate in Summit
14 County.
15    Q.   And it appears to me that one of
16 the things she was reporting to all of you was
17 some data that she received at that event; is
18 that correct?
19    A.   That's what it appears.
20    Q.   And in her e-mail to you, she
21 indicates that 52 percent of users use heroin.
22 Do you see that?
23    A.   I do see that.
24    Q.   20 percent methamphetamines,
25 correct?

Page 307

1    A.   That's what she indicated.
2    Q.   19 percent alcohol?  Is that what
3 she said?
4    A.   Yes.
5    Q.   5 percent crack cocaine?
6    A.   Correct.
7    Q.   And then she also indicated that
8 the statistics discovered that 88 percent of
9 users used more than one substance; is that
10 right?
11    A.   That's what she indicated.
12    Q.   And is that consistent with the
13 client base in 2017 of the Akron Drug Court?
14    A.   I don't know who authored these
15 stats.  The event was at IBH.  It was an open
16 house event.  So I remember sending her to this
17 event in my absence because I was not
18 available.  So she got this information from
19 the presentation, but I have no knowledge of
20 who or -- who authored these stats or the
21 presentation itself.
22    Q.   So that wasn't my question.
23        My question is the statistics that
24 she reported to you, are those consistent with
25 what you were seeing in the client population

Page 308

1 of the Akron Recovery Court in the fall of
2 2017?
3        MS. LEYIMU:  Object to the form.
4    A.   I can't really speak to that.
5    Q.   Because --
6    A.   I don't know.
7    Q.   And -- and you don't know because
8 you don't know what percentage of the clients
9 of the recovery court were using heroin?
10    A.   I take issue with the 52 percent of
11 users use heroin.  I don't think that's an
12 accurate -- I don't think that's an accurate
13 percentage.
14    Q.   What percentage do you think is
15 accurate?
16    A.   I would say that a better use of
17 that percentage would have spoken to a general
18 use of opiates.  What I don't see in these
19 stats is use of opiates.  Because I guarantee
20 you that everybody that's listed here of this
21 100 percent, there's no way that 52 percent
22 were only using heroin.
23    Q.   Well, it says, does it not, that 88
24 percent were using more than one substance,
25 correct?

Page 309

1    A.   Again, I didn't -- I didn't author
2 the e-mail, so.
3    Q.   So you don't have any idea where
4 any of this information came from or --
5    A.   No knowledge.
6    Q.   -- whether or not it's accurate?
7    A.   Correct.
8    Q.   Okay.  What about the fact that
9 they reported -- whoever it was that was
10 speaking at this IBH event that you sent Ms.
11 Montesano to reported that 53 percent of males
12 suffer from significant recurring trauma, while
13 47 percent suffer from some trauma.  Do you see
14 that report?
15    A.   I do.
16    Q.   And is that consistent with the
17 client base of the Akron Recovery Court?
18        MS. LEYIMU:  Object to the form.
19    A.   We don't have specific trauma data
20 to point to.  We don't track specific trauma.
21 Trauma is very difficult to determine.  Lots --
22 for lots of reasons.  Clients often don't
23 disclose trauma.
24    Q.   So trauma is one of those things
25 that tends to be underreported by your clients,

78 (Pages 306 - 309)

Page 310

1 correct?
2     A.   I would say that that's accurate.
3     Q.   And trauma is one of the dual
4 diagnoses that we've been talking about today;
5 is that correct?
6         MS. LEYIMU:  Object to the form.
7     A.   No, not specifically.  You know,
8 trauma -- a client that has suffered from
9 trauma doesn't automatically mean that they're
10 diagnosed with a mental health disorder.
11    Q.   So there could be a universe of
12 people who are not diagnosed with a specific
13 mental health disorder but have, in fact,
14 suffered trauma in the past?
15    A.   I would agree that's an accurate
16 statement, yes.
17    Q.   Have you ever looked into the
18 Cuyahoga County recovery court and the
19 population that they serve?
20    A.   No.  I don't work for them.
21    Q.   I -- I wasn't suggesting that you
22 work for them.  I was suggesting that it's a
23 very similar type of a program, and I was just
24 wondering if you've ever looked at that program
25 to see what they're doing and how they operate?

Page 311

1         MS. LEYIMU:  Object to the form.
2     A.   No, I have not.
3     Q.   And so I take it your answers would
4 be the same with respect to the percentage of
5 women, 78 percent of women suffer from
6 significant or recurring trauma; you have no
7 idea whether or not your client base fits in
8 this model or not?
9         MS. LEYIMU:  Object to the form.
10    A.   I don't.
11    Q.   What did you do with -- if
12 anything, with the information that
13 Ms. Montesano provided to you in this e-mail?
14        MS. LEYIMU:  Object to the form of
15 the question.
16    A.   I remember reviewing it.  I
17 remember reading it, because she sent it to me,
18 but beyond that, I -- you know, I didn't do
19 anything with it.
20    Q.   Did you share it with anyone else?
21    A.   I don't believe I forwarded the
22 e-mail.
23    Q.   Do you know if you did anything to
24 follow up and find out who had presented these
25 statistics at the IBH event?

Page 312

1     A.   I don't have a recollection of
2 that, no.
3     Q.   Did you do anything to try to
4 determine whether or not the statistics in this
5 e-mail were, in fact, accurate?
6         MS. LEYIMU:  Object to the form.
7     A.   Again, I don't have a recollection
8 of that, no.
9     Q.   You just read the e-mail.
10    A.   I read the e-mail.
11    Q.   Do you keep track of all the
12 community events that you attend that relate to
13 the opioid crisis as you've described it?
14        MS. LEYIMU:  Object to the form.
15 Asked and answered.
16    A.   To the best of my ability.  You
17 know, I attend a number of events, so it's --
18 it's difficult to quote, "track" or record
19 every one of those.
20    Q.   Where do you generally keep track
21 of those events?
22    A.   If it was a training workshop, then
23 typically that would -- that would be something
24 that I would keep as -- as far as proof of that
25 certificate for my licensure.

Page 313

1     Q.   So I'm talking more about community
2 events like the one we were just looking at in
3 Exhibit 21, this IBH event.
4     A.   No, I --
5     Q.   If you attend a community event --
6     A.   Uh-huh.
7     Q.   -- that's related to the opioid
8 crisis, do you keep a record of that anywhere?
9     A.   No.
10    Q.   Do you have a calendar that you
11 keep at the office?
12    A.   Yes.
13    Q.   And would your calendar reflect
14 your attendance at events related to the opioid
15 crisis?
16        MS. LEYIMU:  Object to the form.
17    A.   It may.
18    Q.   Have you done anything to review
19 your calendar to see if there are any entries
20 on your calendar that are relevant to the
21 issues that -- in this litigation?
22        MS. LEYIMU:  Object to the form of
23 the question.
24    A.   No.  I was asked to provide, you
25 know, copies of any and all training workshops

Page 314

1 that I attended, and I produced those.
2    Q.   But nobody asked you to provide any
3 information with respect to community events
4 that you attended.
5        MS. LEYIMU:  Object to the form.
6    A.   I don't remember that being a
7 request.
8    Q.   Do you sometimes, at these
9 community events, make presentations yourself?
10   A.   Rarely.  Mostly, I'm just
11 attending.  You know, the most recent community
12 event that we attended, it was a panel
13 interview.
14   Q.   And you were interviewed as part of
15 that panel?
16   A.   I was part of the panel, yes.
17   Q.   And did you prepare notes or
18 anything in advance of that panel presentation?
19   A.   No.  It was a pretty informal
20 question and answer.  General members from the
21 community, you know, came if they had
22 questions, you know, about the opiate epidemic.
23   Q.   Where did that presentation take
24 place?
25   A.   It was at a community church, you

Page 315

1 know, in Akron.  I don't remember the -- the
2 name of the church.
3    Q.   When was this event?
4    A.   Several months ago.
5    Q.   And if you referenced your
6 calendar, you might be able to tell us exactly
7 when it was?
8        MS. LEYIMU:  Object to the form of
9 the question.
10   A.   If I recorded that on my calendar,
11 then, yes, I would be able to determine that.
12   Q.   Who else was on the panel with you?
13   A.   Judge Oldham.
14   Q.   Just the two of you?
15   A.   I believe -- let me think about
16 that -- there were two additional members that
17 were -- that were a part of -- of that panel.
18 One was Carmen Bivins, who is an Oriana House
19 caseworker, and then the other member was Marie
20 Burger, who is our recovery coach.
21   Q.   Were there any handouts made
22 available to the individuals who attended that
23 presentation?
24   A.   I don't recall there being handouts
25 a party to that.

Page 316

1    Q.   Was there a PowerPoint presentation
2 used as part of the presentation that day?
3    A.   Wallace Green, who is the director
4 of the Cleveland Drug Court, was part of the
5 panel, and I do recall that he had a
6 PowerPoint.
7    Q.   Was the panel during the day or in
8 the evening?
9    A.   It was in the evening.
10   Q.   Was it a weekday or a weekend?
11   A.   It was a weekday.
12   Q.   And do you know approximately how
13 many people attended the panel presentation?
14   A.   Probably in the neighborhood of,
15 you know, 50 to maybe 75.  It was what I would
16 term as, you know, relatively well attended.
17   Q.   In addition to Mr. Green, anybody
18 else on the panel?  Because we're up to five
19 people.
20   A.   Yes, there were other members, you
21 know, on the panel.  There was a doctor from, I
22 believe it was the Summa emergency room.  I
23 don't recall his name.  And I believe there was
24 also another physician that worked primarily
25 with pregnant females that were dealing with an

Page 317

1 opiate addiction.
2    Q.   Do you know if anybody recorded the
3 presentation that evening?
4    A.   I don't recall whether that was
5 recorded or not.
6    Q.   Have you attended any other
7 presentations on issues related to this
8 litigation in this calendar year that you can
9 recall?
10       MS. LEYIMU:  Objection to form.
11       Object to the form.  Sorry.
12   A.   No.  I believe that's the only
13 specific community event that -- that I
14 participated in, was invited to.
15   Q.   Have you sent any other members of
16 your staff to attend other presentations this
17 calendar year in your place?
18   A.   No.  I don't have a recollection
19 of -- of requesting one of my staff attend
20 specifically in my absence.
21   Q.   How about just attending in
22 general, whether it was in your absence or not?
23   A.   Well, we have staff attend training
24 workshops all the time.
25   Q.   And do they share the information

80 (Pages 314 - 317)

Page 318

1 that they receive at those workshops with other
2 people associated with the Akron Recovery
3 Court?
4     A.    Depending upon the subject matter,
5 sometimes.
6     Q.    And how is that done?  Do you have
7 staff meetings where you share new information
8 that you've learned?
9     A.    Correct.  So, you know, probation
10 officer staff meetings are done, obviously,
11 whenever the chief, you know, schedules those,
12 at least once every few months.
13         And individuals that had been to
14 training during that time frame, the
15 expectation is that they at least speak about,
16 you know, what that training was.  There's no
17 requirement of presenting documents or
18 PowerPoints, but at least sharing something
19 that hopefully they learn from that training.
20     Q.    Are there agendas associated with
21 these meetings?
22     A.    Sometimes.  That's up to the chief.
23 He runs them.
24     Q.    When you receive the agenda, do you
25 receive it in a hard copy form or by e-mail?

Page 319

1     A.    My recollection is that typically,
2 you know, we would receive a hard copy at the
3 meeting itself.
4         Some- -- you know, I have a vague
5 rec- -- a vague recollection of occasionally
6 receiving an e-mail communication, you know,
7 where that agenda, you know, would be
8 available, but it seems more recently our
9 probation officer staff meetings have not had a
10 formal agenda.
11     Q.    Did you present at a staff meeting
12 information that you learned from the OSU
13 training that you attended this summer?
14     A.    I have a recollection of sharing,
15 you know, with the staff that I attended, you
16 know, that training.  But I don't believe that,
17 you know, I presented them with any specific
18 information.
19     Q.    Is your calendar an electronic
20 calendar or a hard-copy calendar?
21     A.    It's a hard-copy calendar.
22     Q.    Do you keep calendars from past
23 years, or do you throw them away at the end of
24 the calendar year?
25     A.    I keep them.

Page 320

1     Q.    And are those kept in a file in
2 your office?
3     A.    They're in my office.
4         MS. LEYIMU:  Is this a good
5 breaking point?  Or if you don't have much
6 longer, then we can keep going.
7         MS. RENDON:  I do not have much
8 longer.
9         MS. LEYIMU:  Okay.  Let's keep --
10         MS. RENDON:  I may not have
11 anything else.
12         MS. LEYIMU:  Okay.  Let's...
13     Q.    Other than yourself and the judge,
14 who else within your department has knowledge
15 with respect to the number of clients who
16 you're seeing and what types of drugs they're
17 addicted to?
18         MS. LEYIMU:  Object to the form of
19 the question.
20     A.    I'm sorry.  Could you repeat the
21 question, ma'am?
22     Q.    Yeah.  Probably not very well
23 stated.
24         So one of the things that we've
25 obviously been struggling with is trying to

Page 321

1 figure out how we could determine exactly how
2 many of the clients who are in the Akron
3 Recovery Court currently or in the past are
4 addicted to heroin, let's say, for example.
5 And you have some limited knowledge.  I know
6 the judge has some knowledge.
7         And my question is, who else within
8 the Akron Recovery Court would be able to help
9 us answer those questions?
10         MS. LEYIMU:  I'll object to the
11 form.
12     A.    I would say that as a general
13 whole, you know, myself; Mr. Krutko, who
14 occasionally, you know, conducts interviews,
15 you know, either in my absence or if I'm
16 dealing with another, you know, issue;
17 certainly Judge Oldham; and I believe our
18 caseworkers, you know, that are working with
19 these clients on a day-to-day basis, because
20 they're the ones that are meeting with them
21 again, two, three, sometimes four times a week,
22 you know, depending upon the issue.  So they
23 get to know those clients extremely well.
24     Q.    Last question.  Where within your
25 office are the probation files physically kept?

81 (Pages 318 - 321)

Page 322

1    A.   They're physically kept -- if
2 they're active, then they're kept in -- in the
3 probation office, so my office.
4        So if you're active at the present
5 time in the Ak- -- in the Ak- -- in the Akron
6 Recovery Court program, they're kept, you know,
7 in a file cabinet, you know in my office.
8        If the case is closed, you know,
9 whether they completed the program, the case is
10 on warrant status, they graduated, then they're
11 kept in our file room that's also physically
12 located on the mezzanine level of the Akron
13 probation department.
14    Q.   And how far back do those files go?
15    A.   I believe, you know, our record
16 retention speaks to 10 years of a hard copy.
17    Q.   And if I could just have one
18 moment.
19        MS. LEYIMU:  Sure.
20        MS. RENDON:  That's all I have for
21 you, so we can take a quick break while we
22 switch the microphone.
23        MS. LEYIMU:  Sure.
24        THE WITNESS:  Okay.
25        THE VIDEOGRAPHER:  Going off the

Page 323

1 record at 6:06 p.m.
2        (A recess was taken.)
3        - - - - -
4        (Thereupon, Deposition Exhibit 23,
5        9/5/2014 E-Mail from Lisa V.
6        DiSabato-Moore Re: Handouts for
7        Friday's Meeting, With Attachment,
8        SUMMIT_000027031 to 000027041, was
9        marked for purposes of
10       identification.)
11       - - - - -
12       THE VIDEOGRAPHER:  Back on the
13 record at 6:21 p.m.
14       EXAMINATION OF JEFFREY STURMI
15 BY MR. HERMAN:
16    Q.   All right.  Mr. Sturmi, again my
17 name is Steve Herman.  I introduced myself at
18 the beginning of the deposition --
19    A.   Yes, sir.
20    Q.   -- but it's been a little bit.
21 Again, I represent CVS Indiana LLC and CVS Rx
22 Services.  And I just have a few more questions
23 for you.
24       The court reporter has just handed
25 you Exhibit 23.

Page 324

1        MS. FLOWERS:  Excuse me.
2    Q.   Have you seen this document before?
3        MR. HERMAN:  Oh, you --
4        MS. FLOWERS:  Can we get a copy?
5 Thank you.
6    A.   Yeah, just -- just now, you know,
7 reviewing it.  So just give me a quick minute.
8    Q.   Sure.  Take your time.
9    A.   Okay, sir.
10    Q.   Okay.  And -- all right.
11 Mr. Sturmi.  What is this document?
12    A.   It was an e-mail from Lisa
13 DiSabato-Moore, who at the time was the chair
14 of the criminal justice subcommittee of the
15 Opiate Task Force.  So she had sent this e-mail
16 with the attached documents.
17    Q.   And, Mr. Sturmi, this e-mail was
18 sent on September 5, 2014; is that correct?
19    A.   That's correct.
20    Q.   And were you a recipient of this
21 e-mail?
22    A.   I believe I was.  I'm just looking
23 for my name.
24    Q.   Direct your attention to the fourth
25 line down in the two --

Page 325

1    A.   Yes, I see it.  Yes.
2    Q.   Okay.  And do you recall receiving
3 this information?
4    A.   I do.  I have a recollection of
5 that.
6    Q.   And I believe this information
7 relates to information received at the Summit
8 County Opiate Task Force Criminal Justice
9 Subcommittee meeting; is that correct?
10    A.   That's correct.
11    Q.   And I think you testified earlier
12 you were a member of that subcommittee?
13    A.   Correct.
14    Q.   All right.  And I'd like to direct
15 your attention to the agenda on the second
16 page, Bates number ending in 7032.
17    A.   Okay.
18    Q.   And do you see the long-term goal
19 listed on that page?
20    A.   Yes.
21    Q.   What is the long-term goal listed
22 on this agenda of the Opioid Task Force
23 Criminal Subcommittee -- Criminal Justice
24 Subcommittee?
25    A.   It -- it was reported as enhanced

82 (Pages 322 - 325)

Page 326

1  legal consequences for traffickers.
2      Q.   Okay.  And do you understand
3  traffickers to refer to drug traffickers?
4      A.   Correct.
5      Q.   And drug traffickers are
6  individuals who usually engage in illegal
7  conduct?
8          MS. LEYIMU:  Object to the form.
9      A.   Yes.
10     Q.   Okay.  Well, what is your
11  definition of a drug trafficker?
12     A.   Well, it's an individual that
13  engages in the sale or trafficking of drugs.
14     Q.   Okay.  And do you recall why the
15  long-term goal of the criminal justice
16  subcommittee was enhanced legal consequences
17  for traffickers?
18     A.   My recollection, you know -- and
19  this was one of the very first meetings, you
20  know, of the committee, but the makeup of the
21  committee initially was a lot of law
22  enforcement and a representative from the
23  attorney general's office.
24          So they collectively voiced their
25  frustration, you know, in the current Ohio

Page 327

1  penalties for trafficking.  They felt that they
2  could be stronger.
3      Q.   And did they -- do you recall them
4  expressing that the penalties need to be
5  stronger because drug traffickers were
6  contributing to the opioid problem in Summit
7  County?
8          MS. LEYIMU:  Object to the form.
9      A.   I believe that -- you know, again
10  it was a long time ago, but I think that was,
11  you know, part of -- of, yes, their -- their
12  opinion at that time.
13     Q.   Okay.  Has it been your experience
14  that drug traffickers contribute to the opiate
15  problem in Summit County?
16     A.   I would say that any individual
17  that's engaged in drug trafficking contributes,
18  you know, to the opiate issue that we're having
19  in Summit County, so, yes.
20     Q.   And I'd like to direct your
21  attention to the second page, 7033.  And do you
22  understand what this page shows?
23     A.   Let me take just a minute to review
24  it.
25          Okay.

Page 328

1      Q.   What do you understand this page of
2  information that was provided to you to show?
3      A.   It's, you know, data that speaks to
4  OARRS report that relays dosages of medications
5  that are prescribed.
6      Q.   Okay.  And are the dosages of the
7  medication prescribed that it's showing opiates
8  and pain relievers?
9      A.   That's what it indicates, yes, sir.
10     Q.   And do you recall earlier today you
11  testified that in 2014, you saw data that, for
12  you, sounded the alarm about the opioid issue
13  in Summit County as part of your work with the
14  task force?
15          MS. LEYIMU:  Object to the form.
16     A.   Could you repeat the question, sir?
17     Q.   Yeah, sure.
18          Do you recall earlier today that
19  you testified that in 2014 you saw data that
20  sounded the alarm for you as part of your work
21  with the Opiate Task Force?
22          MS. LEYIMU:  Object to the form.
23     A.   Yeah.  My recollection was that as
24  part of some of the initial Summit County
25  Opiate Task Force meetings that I attended,

Page 329

1  there was a multitude of information,
2  presenters, and some data that indicated that
3  there was issues, you know, going on with the
4  use of opiates in Summit County, sir.
5      Q.   And did this data about the
6  dosages, some of that information that
7  indicated to you that there was an issue going
8  on with opioids in Summit County?
9      A.   I don't recall reviewing this
10  particular document, you know, at that time.
11          I mean, you know, obviously when
12  you go to any one of these meetings, you get a
13  packet of information, and this is, you know,
14  roughly four years ago.
15     Q.   All right.  You can set that aside.
16          And we were just looking at data
17  pulled from the OARRS system, correct?
18     A.   That's correct.  That's what --
19     Q.   Okay.
20     A.   -- Ms. DiSabato-Moore indicated.
21     Q.   And does the Akron -- I believe you
22  testified earlier that the Akron Drug Court has
23  access to the OARRS system as well.
24     A.   I did not indicate that earlier.
25     Q.   Does --

83 (Pages 326 - 329)

Page 330

1    A.    That's not -- that's not my
2 recollection.
3    Q.    The Akron Drug Court doesn't have
4 access to the OARRS system?
5    A.    Not at -- not at the present time.
6 There are individuals, specifically the Akron
7 Police Department, that have access to OARRS.
8 But that's not something that we have, you
9 know, started or implemented.
10    Q.    Can I direct your attention to
11 Exhibit 1.  And do you have Exhibit 1 in front
12 of you, Mr. Sturmi?
13    A.    We'll find it.
14        MS. LEYIMU:  Big stack.
15    A.    I have it.
16    Q.    Okay.  And can I direct your
17 attention to the page ending in Bates No. 5283?
18 And specifically the last paragraph on that
19 page.
20    A.    I do see it, yes.
21    Q.    And do you see the last sentence on
22 that -- well, let me -- again, Exhibit 1 is the
23 Akron Municipal recovery court policy and
24 procedure manual.  That's one of the
25 attachments?

Page 331

1    A.    Correct.
2    Q.    And we're -- that's what we're
3 looking at right now?
4    A.    Yes.
5    Q.    And do you see the last sentence
6 where it says, "If necessary, court personnel
7 will utilize the Ohio Automated Rx Reporting
8 System, OARRS, report to track participants'
9 prescription medication and identify any areas
10 of concern, such as drug-seeking behaviors"?
11    A.    I do see that, yes.
12    Q.    And so does the Akron Drug Court
13 have the ability to utilize the OARRS system?
14    A.    We do.
15    Q.    Okay.  So your testimony a second
16 ago, you just weren't recalling this, that you
17 can access OARRS?
18    A.    Well, to clarify, I'm not
19 personally on the OARRS reporting system.
20    Q.    Okay.
21    A.    Akron?  Detective Nida from the SNUD
22 unit is, so he will routinely, you know, run
23 OARRS reports at the court's request, if we
24 have concerns, you know, about that.  But
25 myself or members of our -- other members of

Page 332

1 our team, you know, are not -- are not part of
2 the OARRS system.
3    Q.    Have -- have you requested access
4 to the OARRS system?
5    A.    We've talked about it.  You know,
6 we have not implemented it.  You know,
7 primarily because, you know, we didn't feel
8 that there was a specific need with the fact
9 that we're to be able to obtain that data
10 through the Akron Police Department's
11 investigative, you know, narcotics and
12 detective unit.
13    Q.    Okay.  And if you do make a request
14 to access that information for a client, would
15 that be recorded anywhere?
16    A.    I don't -- I don't recall there
17 being a specific, any type of form, no.
18    Q.    Would -- so how do you get the
19 information when you request that a report be
20 run for a client?
21    A.    It would be a verbal request, you
22 know, to, you know, a detective.
23    Q.    Okay.  So you make a verbal request
24 and the detective runs the OARRS report?
25    A.    That is, you know, that process,

Page 333

1 but we -- we utilize that system rarely.
2    Q.    Okay.  And in the rare
3 circumstances where you do utilize that system,
4 once a detective has run the report, do they
5 provide the report to you?
6    A.    No.  They're not -- they don't
7 provide me with any type of copy of the OARRS
8 report.
9    Q.    So how do you get the information
10 that the detective receives off the report?
11    A.    Verbally.
12    Q.    Okay.  And that file -- that sheet,
13 I take it, doesn't become part of the
14 probation -- the client's file?
15    A.    That's correct, sir.
16    Q.    Why don't you run an OARRS report
17 for every client?
18        MS. LEYIMU:  Object to the form.
19    A.    You know, the only thing that I can
20 say in reference to that is, historically,
21 that's not something that our -- that our court
22 has ever done.  We have had some discussion,
23 you know, about that.  Part of the issue was
24 because I'm not a police officer or detective,
25 you know, that wasn't permitted.

84 (Pages 330 - 333)

Page 334

1    Now, that has changed.  The Ohio
2  Supreme Court, through the specialized docket
3  section, has made drug courts at -- at the
4  request of the presiding drug court judge, he
5  has to make that request, that, you know, we
6  could start, you know, running those reports.
7        As a team, you know, we need to
8  discuss that, you know, further, because I do
9  see that as an enhancement, you know, to the
10  program.
11    Q.   And do you know when the Ohio
12  Supreme Court made that change?
13    A.   It -- relatively recently.  You
14  know, I remember being at -- they have a
15  specialized docket training every year.
16  Typically, that's in November.  And so I did
17  not attend the specialized docket training this
18  past year.  I did attend the year prior, and I
19  have a recollection of that being a subject
20  matter.  So that would have been roughly
21  November of 2017.
22    Q.   Okay.  So your best recollection is
23  the supreme court made that change sometime in
24  2017?
25    A.   That's correct, sir, yeah.

Page 335

1    Q.   Okay.  And I think you said you
2  would see the ability to access the OARRS
3  system as an enhancement.  Why would it be an
4  enhancement?
5    A.   Well, I think that any data, any --
6  any ability for us, if -- if we have concerns
7  that, you know, a client may be engaged, you
8  know, in doctor-shopping or trying to obtain
9  prescription medications in an improper, you
10  know, manner, having that information certainly
11  could be beneficial.
12    Q.   And what about knowing whether
13  they'd had prescription medicine via legitimate
14  prescription in the past?
15        MS. LEYIMU:  Object to the form of
16  the question.
17    A.   Do I think that would be helpful?
18    Q.   Yes.
19    A.   Again, I welcome any -- any
20  information that helps glean a client's use of
21  medications that may have, you know, led to
22  further issues that they're having.  So I view
23  the -- you know, one's prescription drug use,
24  certainly, as helpful in determining whether or
25  not that client may be at a higher risk, you

Page 336

1  know, to have further problems, especially as
2  it relates to opiates.
3    Q.   Do you recall a moment ago being --
4  not -- maybe not a moment ago, but a little
5  while ago being asked about trauma?  There was
6  an e-mail with statistics about trauma?  You
7  said trauma is very difficult to determine.  Do
8  you recall that testimony?
9    A.   I do, yes.
10    Q.   Okay.  Do you recall an article in
11  July -- on July 12, 2017 called "Summit County
12  Drug Courts are Boosting Services"?
13    A.   I'd have to see it.
14        MR. HERMAN:  Okay.  Why don't we
15  mark this as Exhibit 24.
16        - - - - -
17        (Thereupon, Deposition Exhibit 24,
18        7/12/2017 MyTownNEO Article Titled
19        "Summit County Drug Courts are
20        Boosting Services", was marked for
21        purposes of identification.)
22        - - - - -
23    Q.   And I'd just direct your attention
24  to the third page.  Feel free to look at the
25  whole article, obviously.

Page 337

1    A.   Yeah, just getting a baseline.
2        Okay.  Yeah, I have a recollection
3  of this.  Okay.
4    Q.   Okay.  And do you recall that you
5  were quoted in this article?
6    A.   A vague recollection, you know, of
7  that, yes.
8    Q.   Well, you see that there's some
9  quotes attributed to you?
10    A.   I do see that --
11    Q.   Okay.
12    A.   -- at the top of page 3, sir.
13    Q.   And the third paragraph, which is a
14  quote attributed to you says, quote, "What we
15  have found over the years is most of our
16  clients who have drug dependency and drug
17  addiction issues, when we start peeling back
18  the onion, so to speak, we find that they have
19  pretty significant trauma in their lives,
20  whether that's physical abuse, verbal abuse, or
21  lots of times sexual abuse.  We do a really
22  good job providing drug treatment services for
23  our clients, but we didn't do as good a job for
24  our clients mentally," close -- close quotes.
25        Do you recall providing that quote?

85 (Pages 334 - 337)

Page 338

1     A.   I do.
2          MR. HERMAN:  No further questions.
3  I'm going to pass the witness, I guess.
4          MS. LEYIMU:  We'll consult for a
5  minute and then let you know.
6          Let's go off the record for a
7  second.
8          THE VIDEOGRAPHER:  Off the record
9  at 6:38 p.m.
10        (Off-the-record discussion.)
11         THE VIDEOGRAPHER:  Back on the
12  record at 6:38 p.m.
13         MS. LEYIMU:  We have no further
14  questions for this witness.
15         MR. HERMAN:  Just one last thing to
16  put on the record.
17         We're going to be following up with
18  a request for documents, and we reserve the
19  right to hold the deposition open and recall
20  the witness, if necessary.
21         MS. FLOWERS:  We don't agree to
22  hold the deposition open.  We've produced over
23  300,000 pages for this witness alone, so the
24  deposition is adjourned.
25         Thank you, Mr. Sturmi.

Page 339

1          MS. RENDON:  And for the record,
2  the Manufacturers share in that position with
3  respect to the documents, and we'll follow up
4  in writing as we have been in the course of the
5  depositions and indicate to which documents we
6  think we are missing.  And I think we have from
7  the witness where some of those are located,
8  and then we can try to move forward with that.
9          MS. FLOWERS:  Plaintiffs' position
10  is that all responsive documents have been
11  produced.
12         MS. RENDON:  I hear you.  And we'll
13  get it to you in writing what we think we're
14  missing.
15         MS. FLOWERS:  Thank you, sir.
16         THE WITNESS:  Thank you.
17         MR. HERMAN:  Thank you.
18         THE VIDEOGRAPHER:  Off the record
19  at 6:39 p.m.
20        (Deposition concluded at 6:39 p.m.)
21          ~ ~ ~ ~ ~
22
23
24
25

Page 340

1  Whereupon, counsel was requested to give
2  instructions regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5          SIGNATURE:
6  Transcript review was requested pursuant to the
7  applicable Rules of Civil Procedure.
8
9          TRANSCRIPT DELIVERY:
10  Counsel was requested to give instructions
11  regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 341

1          REPORTER'S CERTIFICATE
2  The State of Ohio,   )
3                       SS:
4  County of Cuyahoga.  )
5
6          I, Stephen J. DeBacco, a Notary
7  Public within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, JEFFREY STURMI,
10  was by me first duly sworn to testify the
11  truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19          I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

86 (Pages 338 - 341)

Page 342

1         I do further certify that I am not
2   a relative, counsel or attorney for either
3   party, or otherwise interested in the event of
4   this action.
5         IN WITNESS WHEREOF, I have hereunto
6   set my hand and affixed my seal of office at
7   Cleveland, Ohio, on this 20th day of
8   November, 2018.
9
10
11
12
13
14      Stephen J. DeBacco, Notary Public
15      within and for the State of Ohio
16
17  My commission expires September 30, 2022.
18
19
20
21
22
23
24
25

Page 343

1              Veritext Legal Solutions
                   1100 Superior Ave
2                      Suite 1820
                   Cleveland, Ohio 44114
3                   Phone: 216-523-1313
4
    November 20, 2018
5
    To: Temitope O. Leyimu, Esq.
6
    Case Name: In Re: National Prescription Opiate Litigation v.
7
    Veritext Reference Number: 3104515
8
    Witness: Jeffrey Sturmi     Deposition Date:  11/15/2018
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 344

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 3104515
3   CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 11/15/2018
4   WITNESS' NAME: Jeffrey Sturmi
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7    I have made no changes to the testimony
    as transcribed by the court reporter.
8
9   Date            Jeffrey Sturmi
10    Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15
    I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
18      Notary Public
19
        Commission Expiration Date
20
21
22
23
24
25

Page 345

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 3104515
3   CASE NAME: In Re: National Prescription Opiate Litigation
    DATE OF DEPOSITION: 11/15/2018
4   WITNESS' NAME: Jeffrey Sturmi
5    In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7    I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9    I request that these changes be entered
    as part of the record of my testimony.
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
    Date            Jeffrey Sturmi
14
        Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18      in the appended Errata Sheet;
        They signed the foregoing Sworn
19      Statement; and
        Their execution of this Statement is of
20      their free act and deed.
21      I have affixed my name and official seal
22  this _____ day of_____, 20____.
23
        Notary Public
24
        Commission Expiration Date
25

87 (Pages 342 - 345)

Page 346

1          ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 11/15/2018
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19

   _____   _____
20 Date          Jeffrey Sturmi
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date

Veritext Legal Solutions
www.veritext.com                                    888-391-3376

**[& - 15]**

| & | |
|---|---|
| **&** | 2:11 4:5,12 |
| | 15:22 16:9 257:22 |

| **0** | |
|---|---|
| **000004078** | 8:13 |
| | 241:14,18 |
| **000027031** | 8:21 |
| | 323:8 |
| **000027041** | 8:21 |
| | 323:8 |
| **000225302** | 7:7 |
| | 192:9,14 |
| **000226917** | 7:2 |
| | 168:5,10 |
| **000227333** | 185:11 |
| **001100947** | 7:22 |
| | 215:16,21 |
| **001100949** | 7:22 |
| | 215:22 |
| **001102114** | 7:19 |
| | 210:15,21 |
| **001102789** | 8:18 |
| | 304:16 |
| **001102890** | 6:8 |
| | 101:7,12 |
| **001103385** | 6:16 |
| | 122:4,13 |
| **001103386** | 125:14 |
| **001103387** | 6:16 |
| | 122:4 |
| **001103864** | 8:16 |
| | 284:24 285:4 |
| **001103866** | 8:16 |
| | 284:25 |
| **001104338** | 6:22 |
| | 154:12,17 |
| **001104342** | 6:23 |
| | 154:18 |
| **001105240** | 6:5 |
| | 83:10,17 |

| **001105259** | 88:10 |
|---|---|
| **001105287** | 6:5 |
| | 83:17 |
| **001109379** | 6:20 |
| | 145:24 146:6 |
| **001109386** | 283:20 |
| **001109392** | 6:20 |
| | 146:6 |
| **001114483** | 8:10 |
| | 235:16,22 |
| **001114533** | 237:24 |
| **001114548** | 8:11 |
| | 235:22 |
| **001114874** | 8:7 |
| | 225:7,14 |
| **001114879** | 8:8 |
| | 225:14 |
| **001115119** | 6:13 |
| | 113:12,17 |
| **001115122** | 6:13 |
| | 113:17 |
| **001274385** | 8:3 |
| | 220:24 |
| **001274389** | 221:7 |
| **001274391** | 8:4 |
| | 220:25 |
| **01102116** | 7:20 |
| | 210:21 |
| **06** | 242:21 |
| **0form** | 180:3 |

| **1** | |
|---|---|
| **1** | 6:3 8:2 60:10,11 |
| | 83:12,22 84:7,13 |
| | 88:2 91:2 124:16 |
| | 124:16 170:23,25 |
| | 171:9 172:2,15 |
| | 177:22 220:23 |
| | 294:12 295:5 |
| | 330:11,11,22 |
| **10** | 7:5 99:7 135:5 |
| | 160:20 188:5 |

| | 191:17 192:9,11 |
|---|---|
| | 192:20 193:6,11 |
| | 196:5 273:19 |
| | 301:20 322:16 |
| **100** | 10:14 46:16 |
| | 95:5,21 228:14 |
| | 308:21 |
| **1000** | 3:5 |
| **101** | 6:6 |
| **103** | 10:15,15 |
| **104** | 10:16 |
| **105** | 6:9 |
| **106** | 10:16 |
| **107** | 10:17 |
| **109** | 10:17,18 |
| **10:10** | 63:3 |
| **10:30** | 63:6 |
| **11** | 7:8 197:9,13,20 |
| **11/15/2018** | 343:8 |
| | 344:3 345:3 346:2 |
| **11/22/2016** | 6:14 |
| | 122:2 |
| **110** | 10:18,19 |
| **1100** | 343:1 |
| **111** | 10:19 |
| **113** | 6:12 |
| **11472** | 342:13 |
| **117** | 10:20 |
| **119** | 10:20,21 |
| **11:41** | 121:23 |
| **12** | 7:9 196:8,11 |
| | 200:15,20 201:4,9 |
| | 201:18,22 202:16 |
| | 203:20 336:11 |
| **12/22/2011** | 7:5 |
| | 192:12 |
| **120** | 196:5,10 |
| **121** | 10:21,22 |
| **122** | 6:14 |
| **124** | 10:22,23 |

| **125** | 10:23,24 |
|---|---|
| **126** | 10:24 |
| **127** | 3:11 10:25 |
| | 11:1,1,2 |
| **128** | 11:2,3 |
| **129** | 11:3,4 |
| **12:13** | 122:9 |
| **12crb03563** | 7:4 |
| | 185:15 |
| **12th** | 286:22 |
| | 293:10 |
| **13** | 7:13 203:23 |
| | 204:3,13,16 206:6 |
| **130** | 11:4,5 |
| **1307** | 1:23 |
| **131** | 11:5,6 |
| **132** | 11:6,7,7,8 |
| **133** | 11:8,9 |
| **134** | 11:9,10,10 |
| **135** | 11:11,11 227:7 |
| | 228:5,9,11 |
| **137** | 11:12 |
| **138** | 11:12,13 |
| **139** | 11:13 |
| **13th** | 288:9 |
| **14** | 7:17 201:24 |
| | 210:14,17 211:1 |
| **140** | 11:14,14,15 |
| **141** | 11:15,16,16 |
| **142** | 11:17,17 |
| **143** | 11:18,18,19 |
| **144** | 11:19,20 |
| **145** | 11:20,21 |
| | 195:17,18 |
| **146** | 6:17 |
| **15** | 1:18 7:21 15:2 |
| | 43:8 77:10 160:20 |
| | 201:22 202:11 |
| | 215:16,18 216:1,5 |
| | 216:11 218:17 |
| | 304:21 |

**150** 11:21
**151** 11:22,22
**152** 11:23,23
**153** 11:24,24
**154** 6:21 11:25
**157** 12:1,1
**158** 12:2,2,3
**16** 5:8 8:1 202:16
202:18,24 203:20
220:20 221:7,10
222:1
**161** 12:3,4
**163** 12:4
**164** 12:5
**165** 12:5
**167** 12:6
**168** 7:1
**17** 1:8 8:5 225:7,9
225:20 236:3,7
**1717** 3:17
**18** 1:13 7:15 8:9
204:1,7 235:15,18
236:2,24,25
237:13 293:25
**180** 12:6,7
**1800** 3:5
**181** 12:7,8,8
**1820** 343:2
**183** 12:9,9,10
**184** 12:10
**185** 7:3
**187** 198:1,3
**189** 12:11
**19** 8:12 43:22
187:3 241:13,16
241:24 244:10
307:2
**190** 12:11
**19103** 3:17
**192** 7:5

**193** 12:12
**194** 12:12,13
**195** 12:13,14 198:3
**197** 7:8
**198** 12:14,15,15
**199** 12:16,16
**1990s** 143:13,22
144:2,10
**1993** 49:24 50:1
**1994** 27:22 42:23
**1995** 107:22
181:15 229:1
272:10 301:10
**1996** 45:18 245:20
246:14,19
**1998** 28:13 35:1
**1:10** 166:19
**1s** 171:13

**2**

**2** 5:3 6:6 101:9,16
104:4,11 171:15
171:16,17 188:11
299:19
**2,500** 106:13
**2/22/2011** 6:17
146:2
**20** 8:14 99:7
160:20 197:4
258:19,25 259:3
262:2 306:24
343:4 344:16
345:22 346:22
**20,000** 106:11
**200** 7:9 12:17,17
**2000** 3:11 35:2
301:16,18
**20001-4956** 2:14
**2003** 49:21 50:1,3
50:7 51:17 52:7
91:13 156:18,24
157:12 301:23

**20036-5807** 3:5
**2005** 98:20
**2006** 242:19,20,21
**2006-2018** 8:12
241:18
**2007** 156:18,25
157:12,19,23
158:24 160:3,25
161:10,21
**201** 12:18
**2010** 284:9 301:16
301:18
**2011** 147:4,20
150:13 151:4,12
152:16 193:18
283:15 284:9
**2012** 137:25 139:9
142:15 152:22
157:19,23 158:24
160:3,25 161:11
161:21 162:16,21
179:9,25 180:11
187:3 188:5
189:11 247:2
**2013** 98:2
**2014** 137:17 143:1
252:2 324:18
328:11,19
**2015** 211:15 226:3
226:11 227:20
237:15
**2016** 6:12 7:17,21
97:15 113:15
114:2 123:1 124:4
124:25 125:6
210:18 211:15
215:19
**2017** 8:15 90:15
97:9 101:19 103:1
103:14 284:23
285:7,19 293:11

**304:22** 307:13
308:2 334:21,24
336:11
**2018** 1:18 7:8,16
8:14 15:2 36:19
37:25 58:2 60:18
89:23 90:3 190:18
190:21 197:9,14
204:9 232:14
242:20 258:9,11
258:20 259:3,14
294:2 342:8 343:4
**202** 2:14,15 3:6
12:18
**2022** 342:17
**204** 7:13
**206** 12:19,19,20
**207** 12:20
**208** 12:21
**20th** 342:7
**21** 8:15 284:19,22
304:4 313:3
**210** 7:17 12:21
**214** 12:22
**215** 3:18 7:21
**216** 2:21 3:12
**216-523-1313**
343:3
**216-9107** 2:8
**216-9163** 2:7
**22** 8:17 9:3 123:1
147:4,20 304:13
**220** 8:1
**225** 8:5
**227** 12:22
**22nd** 283:14
**23** 7:16 8:19 9:3,4
9:4 204:9 323:4
323:25
**232** 12:23

**233**  12:23
**234**  12:24
**235**  8:9 12:24,25
**239**  13:1,1
**24**  8:22 9:5 196:11
   336:15,17
**240**  13:2
**241**  3:18 8:12 13:2
**242**  13:3
**243**  13:3
**245**  13:4,4
**246**  13:5,5
**247**  13:6
**25**  9:5 50:19
**253**  13:6
**257**  5:9
**258**  8:14
**26**  9:6
**260**  13:7 197:5,6
**261**  5:10 13:7
**265**  13:8
**27**  9:6 188:4
**273**  13:8
**27334**  188:4
**277**  13:9
**278**  13:9,10
**279**  13:10
**28**  2:6
**280**  13:11
**2804**  1:7,8
**282**  13:11,12
**284**  8:15 13:12
**289**  13:13
**29**  9:7
**290**  13:13
**291**  13:14,14
**292**  13:15,15
**293**  13:16,16
**29464**  2:7
**295**  13:17,17

**296**  13:18
**298**  13:18
**299**  13:19
**2:01**  166:22

### 3

**3**  6:9 89:20 105:16
   105:20 106:3
   110:9 227:2
   337:12
**3/26/2015**  8:9
   235:19
**30**  96:5 232:22
   342:17
**300**  13:19
**300,000**  338:23
**303**  13:20,20
**304**  8:17
**308**  13:21
**309**  13:21
**31**  9:7,8
**310**  13:22
**3100**  3:17
**3104515**  343:7
   344:2 345:2
**311**  13:22,23,23
**312**  4:7 13:24,24
**313**  13:25 14:1
**314**  14:1
**315**  14:2
**317**  14:2
**3195**  17:15
**320**  14:3
**321**  14:3
**323**  5:11 8:19
**324-1125**  4:7
**326**  14:4
**327**  14:4
**328**  14:5,5
**33**  9:8
**333**  14:6

**335**  14:6
**336**  8:22
**3386**  126:15
**3387**  131:12
**34**  9:9
**340**  205:22
**341**  5:13
**35**  9:9 91:2 102:12
   102:19,25
**36**  196:11
**38**  9:10
**3:13**  220:17
**3:40**  221:4

### 4

**4**  6:12 98:12
   113:12,14,21
   117:18 119:1,7,21
   120:6,11,22
   229:11 231:19
   259:20
**4/16/2018**  6:21
   154:15
**4/26/2012**  187:11
**40**  9:10 34:17 36:4
   90:20 97:13,19
   99:8 229:17 230:6
   236:5,15
**41**  9:11,11,12,12
**42**  9:13 90:1,13
   96:13 232:21
**43**  9:13
**4340**  156:6 167:4
**4341**  163:20
**44114**  343:2
**44114-1190**  2:20
**44114-1214**  3:11
**44685**  17:16
**45090**  1:13
**4533**  238:2
**47**  309:13

**48**  9:14,14
**4877**  226:9 227:2
   229:11
**49**  9:15,15
**4:31**  257:14
**4:32**  257:17
**4:37**  261:16
**4:57**  261:19

### 5

**5**  6:14 98:12
   101:19 114:1
   122:1,12,20
   125:13 160:20
   204:19 259:19
   307:5 324:18
**5/25/2018**  6:3
   83:13
**50**  46:16 50:15
   90:20 97:14,19
   99:8 218:3 316:15
**51**  9:16
**5119**  113:24
**52**  306:21 308:10
   308:21
**5256**  87:12
**5260**  89:15 91:23
**5266**  94:23
**5283**  330:17
**53**  309:11
**56**  9:16
**57**  9:17,17,18
**58**  9:18
**586-7375**  2:21
**59**  9:19
**5:30**  178:7

### 6

**6**  5:5 6:17 145:24
   146:1,13 147:1
   150:1 155:20
   205:9,12 206:6

283:11,19
**6/27/2017**  8:1
220:21
**6/6/16**  7:22 215:21
**60**  9:19,20 98:3
229:17,21 230:1,2
230:6,10
**60601**  4:7
**61**  9:20,21,21
**62**  9:22
**64**  9:22,23
**662-5786**  2:15
**662-5982**  2:14
**67**  9:23,24,24
**68**  9:25 10:1
**6:06**  323:1
**6:21**  323:13
**6:38**  338:9,12
**6:39**  339:19,20

**7**

**7**  6:21 154:10,11
154:14,22 155:1
155:16 156:6
161:4 162:15
163:13,20 166:25
**7/12/2017**  8:22
336:18
**70**  91:15 95:20
98:4 99:8,15
**7032**  325:16
**7033**  327:21
**74**  10:1
**75**  10:2 50:15,15
99:16 171:13
218:3 316:15
**77**  4:6 10:2
**778-1883**  3:6
**78**  10:3,3,4 311:5
**79**  10:4
**7947**  3:18

**8**

**8**  7:1 168:4,7,16
174:19 183:16
**80**  10:5 171:13
**83**  6:3
**843**  2:7,8
**850**  2:13
**861-7420**  3:12
**88**  307:8 308:23
**89**  10:5
**8th**  285:19 288:7

**9**

**9**  7:3 185:10,10,13
185:21 189:11
**9/14/17**  8:18
304:15
**9/14/2015**  8:5
225:10
**9/15/2017**  8:17
304:14
**9/5/2014**  8:19
323:5
**9/5/2017**  6:6
101:10
**90**  10:6
**901**  2:20
**91**  10:6
**92**  10:7
**93**  10:7
**9379**  147:1
**9383**  150:3
**9384**  152:7
**94**  10:8,8
**95**  10:9
**96**  10:9,10 50:2
144:1
**97**  10:10,11,11,12
**98**  10:12
**99**  10:13,13,14

**9:00**  72:3 80:24
**9:09**  1:19
**9:36**  37:20
**9:37**  37:23

**a**

**a.m.**  1:19 15:3
37:20,23 63:3,6
72:3 80:24 121:23
**a2**  262:15
**a6**  259:23
**a8**  260:2,13 262:6
**aaron**  1:9 6:7
101:11,22,24
**abeyance**  108:11
**abilities**  214:22
**ability**  34:9 57:6
68:18 80:2 176:25
185:3 213:16
230:3 252:13
290:7,15 312:16
331:13 335:2,6
**able**  90:23 109:12
177:4 185:6
236:18 246:13,21
247:3 253:9
279:16 315:6,11
321:8 332:9
**absence**  307:17
317:20,22 321:15
**absolutely**  302:5
**abuse**  6:19 28:6
31:1,8,10,11,16
32:14,16 34:17
37:5 38:1 39:13
43:18 44:25 45:2
45:5,10,12 46:8,9
46:19 47:8,11,20
48:19 55:15,20
59:10 62:6 73:1
74:11 75:22,23
76:14 77:13 80:14

98:15 103:10
108:8 110:18
114:22 123:22,25
132:1,17 134:4,6
143:12,21 146:4
146:17 151:25
154:3 171:5
205:21 206:21
207:8,17 208:5,13
209:2,14 210:5
221:19,22 231:11
232:1 236:10,12
239:10 244:15
249:17 254:25
260:2 302:14
337:20,20,21
**abused**  143:6
156:23 157:16
183:2
**abusing**  48:11
92:24
**accept**  90:23
**accepted**  305:16
**access**  39:22 96:25
130:9,14 140:5,21
181:6,24 184:11
189:3 191:12
234:20 246:13,21
247:1 248:2 292:2
292:20 293:3
329:23 330:4,7
331:17 332:3,14
335:2
**accessible**  218:11
246:11 292:7
**accessing**  295:6
297:5
**accommodations**
270:21
**account**  135:6
245:17 253:23

accountant 287:11
accurate 95:8
  103:4 281:18,20
  293:11,12 295:25
  308:12,12,15
  309:6 310:2,15
  312:5
accurately 106:15
accustomed
  212:19
achieve 30:6
achieved 30:2
achieving 30:10
acknowledge
  344:11 345:16
acronym 28:9
  81:24 115:1,9
  120:15 146:17
  170:7 173:18
  174:4 187:20
  306:11
acronyms 113:9
act 344:14 345:20
actavis 4:3,3
action 342:4
actions 139:2
activated 73:12
  190:24 191:10
active 95:5 102:12
  102:19 170:19
  191:3 228:12
  229:17,21,25
  230:10 231:2
  322:2,4
activities 306:1
actual 120:16
  170:3 174:17
adam 83:4 289:10
add 17:14
added 116:7
  133:11

addicted 92:3
  229:13,18 231:17
  231:21 232:13
  233:11 320:17
  321:4
addiction 8:5 31:1
  36:17,23 37:2,3,5
  37:7 39:22,24
  40:22 41:3 112:9
  113:1 114:10,20
  115:9,11 120:14
  121:5 132:21
  133:15 134:13
  165:22 211:8
  213:1 216:8,24
  218:12 225:11
  232:3 233:21
  234:11 236:7,8
  254:1,13 258:12
  259:4,14 262:15
  282:5 286:3,5
  317:1 337:17
addictions 238:10
  239:22 240:4
adding 186:12
addition 23:11
  27:23 72:19 73:15
  74:10 82:3 132:21
  170:2 177:23
  219:6 250:24
  316:17
additional 29:22
  72:24 96:2,4,15
  97:3 102:15 103:7
  116:23 133:10
  169:16 195:21
  199:18 211:21
  214:25 223:12,14
  263:4 287:25
  294:19 315:16

address 17:13,14
  73:12 155:15
  209:14 210:5
  245:14,21,24
  246:2 251:13
  255:9 266:6
  343:15
addressing 267:1
adhere 51:11
adjourned 338:24
adjournment
  341:22
adjustment
  109:11
adm 58:7,10,11,17
  58:25 91:7 110:23
  111:1,2,7,15
  136:19 137:16
  138:25 139:1,17
  141:23 142:7
  143:1 163:3
  199:19 214:11
  250:23 285:17
  287:9 288:4
  294:16 296:24
  297:1
administered
  74:13
administers
  114:22
administration
  221:20 275:23
administrator
  56:14 59:5 62:22
  67:25 79:8 102:1
  218:14
admission 76:3
  79:17 80:23 92:2
admissions 72:22
  81:2 238:8 239:21
  240:3

admitted 130:5
  152:4
admitting 278:4
adult 45:17,20
  46:14 49:19
advance 314:18
advanced 27:24
  27:25
advantage 64:3
  269:4 302:25
advice 269:2 275:8
advise 25:3,21
advised 24:19
advisory 8:6
  225:12
affect 265:4
affixed 342:6
  344:15 345:21
aforesaid 341:12
afternoon 257:20
age 16:19
agencies 111:4,22
  112:14,16,19
  117:20,23 118:2,5
  118:8,25 119:6,14
  119:16,20,21,24
  120:7,11,21 121:1
  133:5 138:5
  142:12 174:21
  214:12 241:2
  295:7,17 296:9,25
  297:4 306:13
agency 59:11
  111:17,25 112:3,5
  112:6 114:21
  117:3,25 121:3
  123:22,23,24
  133:8 137:18
  174:13,15,18
  184:2 196:16,22
  222:25 229:4

237:21 241:3
294:10,18 296:14
296:16 305:22,25
**agenda** 251:13
273:15 318:24
319:7,10 325:15
325:22
**agendas** 318:20
**agent** 275:19
277:9 305:16
**aggregate** 94:14
141:3 228:7
**aggregated** 241:8
**aggregation** 48:18
**ago** 20:24 21:17
24:19 25:8 40:12
52:2 60:1 63:23
86:14,16 91:5
115:15 118:17
135:5 137:13
152:20 166:3
171:3 172:17,19
230:12 255:23
270:7 273:19
284:14 305:14
315:4 327:10
329:14 331:16
336:3,4,5
**agree** 239:20
240:2 260:22
261:1 277:3
310:15 338:21
**agreed** 192:4
**agreement** 8:7
63:24 223:4,6
225:13
**ahead** 159:4
201:14 222:11
**aide** 83:3 90:10
187:8 249:5 289:6

**aides** 248:24
**ak** 322:5,5
**aka** 150:9
**akron** 1:23 2:3 6:3
6:5,8,10,13,16,19
6:20,22 7:1,2,6,7,8
7:13,19,22 8:7,10
8:13,16,18 15:13
15:16,18 17:7,8
18:4 24:21,23
25:23 26:12,16
27:15,21 42:23
45:17,21 49:19
50:11 51:24 52:1
52:1 53:16,19,23
54:1,4,19 57:12
58:11 60:20 62:14
63:12,14,19,25
64:5,11,15,20
65:16,21 66:1,15
66:20,22 67:1,3,7
67:9,13,19 68:4,20
70:7,19 75:17
81:21,23 82:4,16
82:20,22,22 83:10
83:14,17 84:10
87:15,22 88:10
98:7 99:2,9 101:6
101:12 102:13,20
104:19 105:7,17
105:22 107:25
109:3 110:14,15
110:16 112:24
113:12,17 114:8
115:4 116:12
117:2 118:13,13
118:17 119:12
120:1,23 121:10
122:4,12 125:1,10
125:14 126:5
128:5 133:11

137:7 140:2,3
143:12,17 144:6
145:24 146:5,6
147:8,13 148:3,7,9
148:11,19,21,23
148:25 149:6
150:21 151:1,4,12
152:15 153:1,11
153:15,22 154:4,8
154:12,17 155:5
157:4,8 158:4
160:12 161:18
162:5 165:2 168:5
168:8,10,20
169:25 170:22
173:25 174:20
175:15 176:6
177:14 182:12
185:11 192:9,12
192:14 193:3
194:6,23 195:5,17
196:19 197:10,15
199:12,18 202:4
202:12 203:23
204:4,24 205:5,15
206:12,17,21
207:9,17 208:5,8
208:13,17 209:3
209:15 210:6,14
210:21 215:8,12
215:16,21 218:13
222:5,22 225:3,3,7
225:14,24 227:6
235:15,22 237:15
237:24 238:17
241:14,18 242:2,6
245:19 253:11,17
254:15 255:14,20
263:8,10 265:4
266:4,14,18,21
267:2 268:18

269:14 270:5,18
271:4,6 274:14
277:16,19,23
278:2,3,8 280:1
284:10,11,24
286:15,15 291:10
292:5,15 294:3,5
294:21 295:1
300:19,23 301:23
302:15 304:9,16
305:4,10,12,14
307:13 308:1
309:17 315:1
318:2 321:2,8
322:5,12 329:21
329:22 330:3,6,23
331:12 332:10
**akron's** 24:11 27:2
200:15 205:9
**akronohio.gov**
155:16
**akronohio.gov.**
245:15
**al** 1:12,12
**alarm** 138:25
139:2 328:12,20
**alcohol** 44:3 46:25
58:12,14 92:3
110:18 112:7
115:22 116:6
150:8 235:4 306:2
307:2
**alex** 129:10
**alexa** 8:17 304:14
304:20 305:2
**alissa** 70:21
148:23 177:17
**alleged** 158:18
202:6 205:1
**allocated** 60:12

**allow** 30:23,24
66:9 78:9 108:3
**allowance** 213:25
**allows** 171:3 174:9
**amcis** 140:4,6,8
169:24 170:14
192:23 193:1,2
242:7 243:3
**amended** 7:10
98:13 200:16,22
**amending** 302:13
**amendment** 108:7
109:1
**amerisourceberg...**
3:14 16:16
**amount** 60:2
136:21 162:9,24
195:7,13 207:15
208:3,24 209:12
210:3 224:14
249:2,2 254:4
265:7 288:16
**amounts** 124:13
**announce** 221:15
**announced** 221:25
**annual** 273:20
**annually** 106:13
197:6 227:4
**answer** 19:25 20:7
23:2 25:19 27:5
32:5 43:24 49:4
60:7 90:17 96:20
99:25 119:10
126:8 132:24
138:1 140:24
189:20 190:13
201:14 203:10,14
209:16 229:20
232:14 235:13
238:19 265:17
278:16 299:1

314:20 321:9
**answered** 97:11
97:24 99:14,22,23
164:5 198:24
199:14 235:12
239:24 300:7
303:19 312:15
**answering** 23:2
**answers** 19:21
83:23 226:13
311:3
**antiquated** 140:12
**anybody** 69:7,9
149:7 188:17
195:4 262:23
268:6 292:18
293:1 303:13
316:17 317:2
**apartment** 213:15
**apd** 174:19
**apologize** 82:21
83:2 143:18
**appear** 100:15
103:3 188:18
228:16 344:11
345:15
**appearance** 72:5,8
75:18
**appearances** 2:1
3:1 4:1 5:3 15:10
16:13
**appeared** 161:17
165:19 230:16
**appearing** 188:21
188:25 189:1
**appears** 55:19
95:11 113:24
192:23 193:16
230:1 242:5
306:15,19

**appended** 345:11
345:18
**applicable** 340:7
**applicant** 169:15
**application** 36:1
85:10 124:3,7
125:22 126:2
127:3,7,19 128:20
173:22 215:5
**applications** 215:2
**applied** 59:12
125:7 269:6
**applies** 218:3
**apply** 123:18
125:5 126:5
214:18 293:22
296:10
**applying** 59:14
125:10
**apportion** 207:15
208:3,11,24
209:12 210:3
**appreciate** 254:9
**approach** 91:6
**appropriate** 47:18
200:13 229:14
**approved** 295:18
**approximately**
20:21,24 21:17
22:10 52:2 53:17
59:25 60:9 75:14
75:24 77:9 86:13
86:19 90:1 98:20
99:7 106:11
115:14 171:2
172:16 219:12
227:7 229:17
232:21 270:6
293:13 294:2
305:14 316:12

**approximating**
219:16
**april** 187:3
**arc** 126:23
**arch** 3:17
**area** 90:20 124:17
133:11 149:20
151:1 161:18
176:23 277:16,23
278:6
**areas** 53:22 54:1
162:2 331:9
**arm** 221:21
**arraignment**
71:13,16 100:15
100:21
**arrest** 69:24 70:4
138:22 157:5,5
158:5,6,14 163:1
174:18 190:1
**arrested** 69:9
174:15,22
**arresting** 174:13
174:21 184:2
**arrests** 136:24
139:13,20,20,24
140:14 153:18
**arrived** 166:17
**article** 8:22 336:10
336:18,25 337:5
**ascertain** 46:22
**aside** 329:15
**asked** 78:24 97:11
97:24 99:14,22
155:6 198:24
199:14 219:7
234:8 235:8
239:24 249:20
262:5 276:6,10
292:19 299:2,12
299:15 300:7

303:19 312:15
313:24 314:2
336:5
**asking** 19:6,20
117:10,24 118:1
136:1 159:2,5,15
159:21 190:23
282:23 303:13
**aspects** 37:11 69:5
88:7 178:20,20
**assembling** 87:25
**assert** 203:2
**assertion** 239:2
**assessed** 194:13
195:6,18
**assessment** 32:23
70:14 73:1 74:11
75:22,23,25 76:16
76:20,21,23 77:1,5
77:7,9,16,20,23
78:9,12,18 79:2,3
79:11,16 132:15
134:4 136:4
162:25 231:11,12
232:25 233:8,25
234:9,21 236:18
239:13 240:9,18
240:20 249:6
279:8,12,16
280:10 281:8,11
281:22 282:2,4,4
282:10,15,17
**assessments** 76:22
232:2 235:4
240:13
**assign** 81:22 174:8
**assigned** 82:4,8
91:8 96:10 153:23
177:15 248:24
263:24 264:2
266:18 267:7

289:6 294:10
295:17 305:5,8
**assignment** 344:2
345:2 346:2
**assigns** 173:1
**assist** 29:2 30:25
35:8 39:23 50:20
50:25 52:23 58:14
63:24 88:22
160:21 214:23
216:25
**assistance** 54:6
62:9 88:25 111:2
115:20,23 213:12
213:17,22 255:12
269:22,23 270:1
**assistant** 82:3
101:25 116:9
148:16 263:11,11
263:24 264:2,4
**assisted** 39:18,20
39:23 40:3 42:1,3
51:2 115:23
116:19 212:3,4,10
270:20 288:1
294:14
**assisting** 52:4
125:23 149:8
208:19 254:5
**assists** 221:21
**associated** 202:19
206:5 207:2
269:14 293:23
318:2,20
**associates** 118:11
**assume** 276:22
293:9
**assuming** 194:6
**at2** 300:5
**atp** 7:18 8:16
114:10 115:7,8,13

116:1,15 117:1,4,7
117:16 118:21
210:18 211:6,9,13
211:14,18,25
212:8 214:1,7
226:2,4,11 284:23
285:22 286:24
287:18,18,19,21
288:14,15,18
289:14 290:18
291:5 294:6,12
295:5,18 296:8,11
296:13,15,20
297:13 298:19
299:19
**atp1** 290:17,23
291:21 292:21
299:9
**atp2** 293:18,23
294:4,25 295:2
298:11,14,22
299:4,8,10,13,16
300:5
**attach** 85:10
**attached** 6:4,18
8:6 83:15 122:21
128:16 146:3
179:22 225:12
324:16 345:7
**attachment** 7:19
8:3,10,21 125:13
156:5 185:4
210:20 220:24
235:21 237:24
283:19 323:7
**attachments**
330:25
**attained** 27:13
**attempted** 98:15
105:5,9 108:8
302:14

**attend** 25:9 35:13
36:8,25 37:11
40:8,19 52:19,22
55:9 82:1 252:22
258:13 259:10
260:7 262:5,9,24
263:4 276:15
312:12,17 313:5
317:16,19,23
334:17,18
**attendance** 313:14
**attended** 36:14,15
37:25 38:4 39:13
39:15,17 40:14
42:13 124:21
134:23 164:14
250:19,21 258:8
258:11 259:15
262:15 273:3,4,5,7
273:15,19 306:6
314:1,4,12 315:22
316:13,16 317:6
319:13,15 328:25
**attending** 37:13
259:11 314:11
317:21
**attention** 50:24
71:9 89:3 102:10
110:10 113:23
125:12 126:14
138:6 150:6 156:4
162:10 163:21
167:6 197:25
201:22 204:19
208:1 226:7 227:1
237:22 242:11
283:23 324:24
325:15 327:21
330:10,17 336:23
**attorney** 20:10
22:23 25:16

201:12 326:23
342:2
**attorneys** 23:16
**attribute** 161:19
207:8
**attributed** 337:9
337:14
**author** 106:22
107:5 128:22
165:7,16 261:2,8
309:1
**authored** 103:5
128:24 307:14,20
**authorities** 275:18
**authorize** 345:11
**automated** 173:18
331:7
**automatically**
116:7 180:8 310:9
**availability**
149:20 284:4
**available** 29:9
33:17,22 72:2
125:1,4 137:2
178:3 189:7
211:25 217:14
283:8 284:2
294:20,23 295:1
295:20,21,24
296:7 307:18
315:22 319:8
**ave** 343:1
**avenue** 2:20
**average** 178:14
227:10 234:3
**awarded** 8:2 59:13
59:18,21,22
220:23 222:3
225:3 269:15
**awarding** 221:16

**aware** 24:17 57:23
60:20 64:22 71:14
93:15 104:1
105:13 131:2
133:23 134:5,11
134:16 144:4,22
145:21 177:18
182:11 200:12
206:10,15,18,19
210:8,10 215:1
216:17 236:17
265:15 267:21
273:22 277:2,20
**awareness** 252:13
305:23
**awful** 245:23
**awfully** 288:9

**b**

**b** 213:19 262:20
**bachelor** 27:14
**back** 37:22 39:12
63:5 72:9 76:19
110:9 117:18
122:8 138:18
139:11 158:2
162:15 166:21
167:6 173:7 175:5
184:15 201:24
221:3 245:20,21
246:13,19 257:16
261:18 273:18
283:17 290:9
294:18 322:14
323:12 337:17
338:11 343:15
**background** 27:8
70:11 77:12
**backup** 70:25
**bailiff** 123:9
225:25

**baker** 3:9 16:5
**bakerlaw.com**
3:12
**balance** 171:14
298:9
**ballpark** 50:16
97:14 98:22
137:13 211:16
224:10 232:23
**base** 136:6 143:2
307:13 309:17
311:7
**based** 109:25
111:12 140:22
165:6 171:23
206:12,17 232:24
262:16 263:18
**baseline** 337:1
**basically** 123:16
123:24 155:6
170:10 189:21
270:23 287:18
**basis** 39:2 69:25
71:1 126:23
129:10 151:19
156:22 157:6,22
159:6,21 162:19
203:2 207:14
208:2,23 223:21
232:2 261:3
263:17 265:19
298:7 321:19
**bates** 87:4,7
105:18 147:1
150:2 167:4
197:10 259:1
283:20 285:3
325:16 330:17
**bath** 63:19 175:9
**bci** 174:2,8 305:19

**becky** 268:4,5
**becoming** 39:8
277:1
**beers** 81:10 131:8
297:8 304:5,6
**began** 142:15
**beginning** 294:2
323:18
**begins** 69:23
260:14
**behalf** 2:3,10,17
3:2,8,14 4:2 15:12
15:15,20,22,25
16:3,6,9,11,16,18
181:11 257:23
**behavioral** 133:9
238:11
**behaviors** 331:10
**belief** 227:14
**believe** 26:11,13
26:15 30:15 38:7
53:15 56:5 104:17
107:25 118:15
124:15 127:10
128:7,8,18 137:17
143:11,20 149:9
150:18 155:4,12
163:17,22 180:3
194:22 211:15
213:5 215:10
216:12 217:3,23
218:2,10 219:3
227:18 231:23
235:12 249:7
253:2 258:7 260:9
270:12,16 287:11
289:9,15 291:5
292:16 311:21
315:15 316:22,23
317:12 319:16
321:17 322:15

[believe - capabilities]                                                                                         Page 10

324:22 325:6
327:9 329:21
**ben** 82:6,17
264:14
**benchmark**
142:17 152:22
**beneficial** 271:8
271:10 272:1
335:11
**benefit** 213:13
215:14
**benefits** 211:17,20
213:2 269:18
**benzos** 150:9
**best** 145:6 153:19
176:25 213:7
228:20 230:2
312:16 334:22
**better** 31:2 76:7
100:23 101:1
219:10 223:11
239:19 253:6
272:15 288:13
308:16
**beyond** 79:22
81:16 311:18
**big** 330:14
**bill** 117:4 214:11
**billion** 205:22
**birth** 73:11 173:11
**bit** 27:8 35:14 98:3
114:16 133:8
149:13 212:21
238:21 254:10
258:1 284:15
323:20
**bivins** 81:12
315:18
**black** 104:8
**blue** 179:16

**board** 28:5,20,23
33:21,23,25 34:2,7
34:9 35:17 36:1
58:7,10,11,13,17
58:25 91:7 110:19
110:23 111:1,3,7
111:15 136:20
137:16 138:25
139:2,17 143:1
182:24 199:19
214:11 250:23
285:17 287:9
288:4 294:16
296:25
**board's** 163:3
297:1
**bockius** 4:5
**bodies** 113:4
**book** 33:12 164:5
164:10,17,20
165:7,11,16 166:4
**books** 33:13
**boosting** 8:23
336:12,20
**born** 27:10
**boss** 25:24 26:4
304:10
**bottom** 87:8
205:12 209:18
218:2 259:22
260:1
**boulevard** 2:6
**boy** 91:11
**break** 20:5 62:24
166:13 220:12
230:8 261:11
322:21
**breakdown**
192:24
**breaking** 320:5

**breakout** 40:23
165:24 276:19
**brian** 82:12
**bridgeside** 2:6
**brief** 71:21
**bring** 24:12
**brings** 69:12,14
281:12
**broad** 116:25
**broader** 31:12
198:14
**broken** 163:10
**brooke** 114:2,5
**brotherhood**
120:13 306:12
**bs** 27:23
**budget** 7:8 55:25
56:6,9,13,19,20
57:12 58:5,24
60:18,21 62:18
103:17,19 197:9
197:14 198:1,4,6
198:13,15,21
199:17 200:1
273:10
**budgetary** 56:23
**budgeting** 56:2
67:25 197:23
**budgets** 199:3
**build** 65:25
**bullet** 202:18
205:24 286:10
**burden** 202:19,22
203:18
**bureau** 173:20
174:4,5
**burger** 81:13
315:20
**burling** 2:11 16:9
257:22

**bus** 213:18
**business** 48:23
72:7 89:13 112:14
162:5 272:10
**busy** 271:17

**c**

**c** 237:10 264:16
**ca** 343:25
**cabinet** 322:7
**calendar** 142:18
142:23 228:10
313:10,13,19,20
315:6,10 317:8,17
319:19,20,20,21
319:24
**calendars** 319:22
**call** 52:22 80:24,25
81:1 102:10
110:10 113:23
125:12 126:14
150:5 156:4
163:21 167:6
197:25 201:21
204:18 223:18,21
224:1,12 226:7
227:1 237:22
242:10 288:6
302:10
**called** 16:19 54:23
54:24 70:7 98:15
114:7,9 120:13
128:8 133:8
223:18 336:11
**calls** 22:23 81:5
183:1 201:12
**canton** 6:19 146:5
150:21 284:11
**cap** 90:21 103:16
**capa** 68:9
**capabilities**
126:24 130:22

[capacity - changed]

**capacity** 18:22
19:2 68:5,10,22
95:3 97:3 253:8
**caption** 341:21
**car** 93:13
**card** 72:7
**cardinal** 15:22
**care** 33:3 76:18
119:13,17 120:25
121:5 247:25
270:22
**career** 144:5
197:22
**careful** 23:1 25:16
**carfentanil** 39:1
277:2,16,18,22
278:5 279:18
**carmen** 81:12
315:18
**carole** 3:10 16:5
261:23
**carolina** 2:7
**carried** 219:10
236:10
**carries** 202:15
**carro** 82:6,17
264:14
**carry** 233:6
**carryover** 95:2
**cartels** 162:4
**case** 1:8,13 7:4,4
30:19 54:6 61:5,7
61:11 62:1 69:16
70:9,9 71:15
73:11,14 89:4
97:2 98:6 108:13
108:25 161:14
169:2,6,7,7,20
170:7 171:6
173:10 174:16
179:13 180:18

181:18 182:14,24
184:24 185:1,14
185:15 186:4,7
187:2 188:14,19
189:3,17,22,24
190:3,18 191:3,5,6
191:10,12,25
193:18 195:6
222:24 228:5
230:20 282:21
288:25 303:14
322:8,9 343:6
344:3 345:3
**caseload** 43:8 95:5
95:9,14,16,19
96:11,16 232:20
233:4,5
**caseloads** 46:16
98:2
**cases** 8:12 47:11
47:15 52:21 65:4
108:4 176:8 179:7
188:17 230:2
241:17 242:20,21
242:22 244:6
**caseworker** 81:12
91:1,8 315:19
**caseworkers**
81:11 234:5 304:8
304:10 321:18
**cashier's** 196:20
**categories** 43:20
195:24
**categorize** 140:9
151:24
**category** 30:7
196:13,14,15
197:1 202:1,6,6
204:21 205:1,2
**cause** 107:3
134:12 341:12

**caution** 23:3
**cautious** 278:25
**cch** 170:5,16
**center** 76:23 77:21
112:25 118:12
120:18 237:6,11
237:19
**centered** 88:14
**ceo** 237:10
**cephalon** 4:2
**certain** 94:12
111:4 171:3 177:3
181:19 183:6
220:9 245:20
251:3,13 272:23
276:24
**certainly** 19:1
37:14 40:21 51:20
54:13 55:9 56:22
57:5 68:15 72:7
73:12 74:1,7
76:13 85:9,18
93:22 98:4 100:3
103:3 104:10
111:2,21 118:3
130:5 135:16,18
139:22 144:15
147:13 149:12
158:19 164:19
178:21 189:6
192:5 203:17
217:22 237:1
240:24 241:2
246:15 252:23
263:16 267:10
270:13 277:21
279:3 280:4
288:25 303:15
321:17 335:10,24
**certificate** 5:13
312:25 341:1

345:11
**certificates** 35:23
**certification** 29:5
29:22 33:21 84:24
85:1,5,6,21,24
86:2,6,17,18,22,24
87:2,24 344:1
345:1
**certifications**
249:23
**certified** 16:22
35:17 112:8
216:22
**certify** 341:8,19
342:1
**cetera** 92:5,5
202:3 204:23
273:16
**chain** 6:12,17,21
7:17,21 8:1,15
113:15 146:2
154:15 210:18
215:19 220:21
284:23 285:6
**chair** 324:13
**championed**
104:25
**chance** 285:13
**change** 50:7 51:16
51:19 52:6 109:4
109:5,24,25 110:6
136:3,3 137:24
172:21 246:4
271:11 282:5
302:1 334:12,23
343:13,14 345:8
346:3
**changed** 50:10
51:21 98:6,25
116:16 137:12
160:23 161:1

175:4 179:5
180:16 195:15
217:25 245:22
246:2 264:24
272:4 301:10
302:7 334:1
changes   7:18
100:13 156:9
167:8 210:19
211:6 264:11,23
272:7 282:6
343:12 344:7
345:7,9
changing   302:18
charge   71:13
98:13 108:10
169:19 177:1
184:1,4 194:9
196:9 197:2 265:6
277:9
charged   43:9
69:11 70:2,4,10
93:13 98:11
107:14 108:2
109:13 137:19
152:3 158:12,16
169:4,15 171:4
180:7 183:4,14
184:1 186:8 193:6
194:16 195:22
196:22 197:1
243:5,22 300:16
301:2,4 302:8,20
302:25 303:5,7
charges   70:10
71:10 138:23
157:5 169:5,23
172:6 195:21,25
196:13,17 197:1
302:13

charging   194:20
196:23
charter   175:4
check   6:7 70:11,12
101:12 102:4
167:16,23 170:11
170:12,16,18
174:10 176:18
228:17
chemical   28:9
29:1 32:18,20
33:4,10 34:3 49:2
chicago   4:7
chief   17:11 25:1
26:16 49:21,23
52:4,11,13 56:21
84:17 147:8
148:13 263:12,14
287:13 302:11
318:11,22
chiefs   251:12
choice   30:15 31:3
49:9 157:7
choose   36:25
96:25
chose   238:23
chronological
186:1,13
chronology
128:16
church   314:25
315:2
circle   76:19
circumstance
99:18 100:4
circumstances
92:20 94:4 177:3
265:20 275:20
333:3
cited   244:6

cities   63:15 176:10
citizens   252:14
city   2:3 7:8,9,13
15:13,15,18 17:8
24:23 25:23 26:16
45:17,20 62:14
63:18,19 82:4,21
82:22 104:19
120:1 143:17
144:5 147:8 148:7
148:9,11,19,21,23
148:25 175:12
184:3 197:9,15
199:11 200:21
203:23 204:4,24
205:5,9,15 245:19
246:4 253:17
263:9,11,12,14,21
263:24 264:2,4,19
265:3,14 266:4
267:1,25 268:7
269:13,14 271:3,6
277:19 278:2
284:10 286:15
302:11 303:23
305:4,10,12,13
citycenter   2:13
civil   16:21 340:3,7
344:5 345:5
claim   202:4
204:24
clarified   39:12
clarify   83:22
214:14 331:18
clarity   49:25
192:3
class   44:7 156:2
classes   29:18,20
classified   53:20
classify   19:13
152:4

clear   20:1 137:18
159:20 245:9
291:17 304:5
clearly   245:9
clerk   155:4,19,19
160:16 194:7,23
196:19
clerkj6   155:16
cleve   269:14
cleveland   2:20
3:11 118:21
267:25 268:11
270:12 274:21,24
303:23 304:1
316:4 342:7 343:2
cleveland's   268:8
client   18:19 22:23
25:16 28:25 29:3
32:15 43:16 47:24
48:3,5 55:10 61:9
66:25 67:8 68:23
69:6,17,20,23 71:6
71:15,18,22,25
72:4,12 73:19
74:8,15,22 75:4,6
75:16,21 76:2,10
78:25 79:7 80:15
89:8 91:1,18
96:13,21 99:19
100:5,18 101:1
108:9 109:5 117:1
119:11,18 120:23
121:6 128:12,15
134:2 135:8,11
138:8 141:12
158:3 170:20
173:7 176:14
177:12 182:12,21
183:2 188:20,24
189:16 191:2,9
193:8,14 195:19

195:22 196:17
197:3 201:12
211:21 212:4
213:13 223:23
231:4 232:5
233:20 236:13
238:20 239:16,18
241:4 248:10
274:12 281:15
282:1 288:25
294:11,14 296:11
307:13,25 309:17
310:8 311:7
332:14,20 333:17
335:7,25
**client's** 48:15,18
48:23 73:10 74:18
76:8 333:14
335:20
**clients** 19:7 39:21
43:8,11,17,21
44:11,15 45:13
46:11,19 47:3,21
47:22 48:10,25
49:1,5,7,12 50:23
51:1,6,7,10,14
52:19 55:18 61:16
61:24 62:2 65:13
65:16 66:9,13,15
66:22 67:11 68:14
68:19,23 71:8
74:5 78:5,20
79:11 89:24 90:1
90:2,14,23 91:10
93:15,21,23 94:15
96:4,10,24 97:4,8
97:22 99:11 100:9
100:14 102:8,12
102:20,25 103:9
103:13 109:2,13
109:21 110:8

111:11,13 112:12
112:15,17 115:21
116:11,15 121:2
129:23 130:1,2,3,5
131:15 133:6,14
134:25 135:3
136:2,22 138:6,20
139:14 141:2,5
143:6 144:11,13
145:5,13 156:24
157:16,25 158:23
160:6,8,25 161:10
162:9,13,21,25
167:25 171:9
174:23 176:11
180:5 190:24
191:6 194:10,16
194:21,25 195:8
196:7 207:23,24
209:6,7,10,23
212:1,8,14 214:4
214:24 219:2,8,9
223:13,16,20
227:19,25 228:1,3
228:14,24 229:7
229:21,25 231:2
231:16,20 232:21
233:10 234:3,6,10
236:6,11,15 238:6
238:25 240:6
247:24 253:24
254:12 278:1,4,8
278:12,20 279:4
280:1,5,25 294:20
295:1,6 296:3,6
297:12 298:7
302:16 308:8
309:22,25 320:15
321:2,19,23
337:16,23,24

**clinic** 118:22
**clinician** 236:19
240:16 241:3
**close** 297:16
337:24,24
**closed** 189:12,14
189:17,22,24
322:8
**closer** 35:24
249:23
**clue** 137:22
**coach** 81:13
315:20
**cocaine** 44:3 150:7
151:17,24 156:19
156:23 157:11,15
307:5
**code** 92:15 107:16
107:18 171:3,22
183:5 184:3,3
**code's** 172:12
**cognitive** 51:12
**cohen's** 7:16 204:8
**collaboration**
95:22 102:5
**collaborative**
110:13
**collateral** 48:1
**colleague** 116:9
**colleagues** 142:24
**collect** 235:9 250:5
**collected** 44:16
77:20 146:20
249:5 256:23
**collecting** 114:11
248:20
**collection** 126:19
126:20 127:8,11
145:17,20 229:4
**collectively** 80:21
326:24

**collects** 142:3
146:18
**college** 33:11
**colors** 179:15
**column** 150:6
152:7 176:13
187:11 189:12
242:11
**combat** 253:10
**combination**
150:8,13 151:17
**combine** 138:22
**come** 71:9,12 72:9
72:12 85:15 89:3
138:18 139:11
160:9 162:1 173:7
185:1 186:19
196:17 228:1
233:3 268:23
269:11 274:14
**comes** 62:17 86:8
277:3
**coming** 68:16
71:22 113:5 138:6
147:16 162:10
171:23 178:7
188:18
**commission**
342:17 344:19
345:25 346:25
**commissioned**
341:8
**commitment**
288:8
**committed** 43:12
253:11 288:14
**committee** 8:6
225:12 326:20,21
**common** 38:9
48:25 98:9,23
108:20 157:11

222:21 274:20
**commonly**  157:24
  160:2 161:9
**communicate**
  263:19 267:6
  297:3
**communicated**
  268:11
**communication**
  75:5 102:3 113:22
  142:4 149:13
  155:2 163:2 200:9
  216:6 225:23
  237:13 238:22
  240:25 304:25
  319:6
**communications**
  205:18 266:21
  268:14
**communities**  64:2
**community**  43:12
  48:2 60:25 112:24
  118:11 120:18
  133:5 142:21
  147:16 148:18
  157:7,8 215:9
  237:6,10,19
  252:16 253:8
  265:24 277:1
  312:12 313:1,5
  314:3,9,11,21,25
  317:13
**company**  61:1
  114:7 291:5,6
**competency**  51:3
  51:4
**complaint**  20:18
  22:12 23:24,25
  24:9
**complete**  32:10
  70:6 75:21 85:21

89:22 90:3 124:3
  160:17 163:21
  171:7 178:10
  217:24
**completed**  86:6,17
  86:22 108:11
  169:19 180:21
  252:23 322:9
  341:22 343:15
**completes**  182:3
**completing**  125:23
  177:25
**completion**  184:18
**complex**  213:15
**compliance**
  290:19
**comply**  116:10
  290:23
**component**  29:13
  77:15
**comprehensive**
  106:12
**comprises**  69:6
**computation**
  202:5 204:25
  205:13,24 206:9
  207:19 208:15
**compute**  250:1
**computer**  73:13
  170:11 173:9,19
  181:9 192:24
  223:23 230:13,23
  246:18,24
**concept**  88:14
**concern**  331:10
**concerning**  25:10
  38:4 94:14
**concerns**  68:4,9,21
  69:2 91:18 331:24
  335:6

**concerted**  271:15
**concluded**  339:20
**concrete**  80:4
**condition**  280:20
  280:22
**conduct**  45:25
  70:11,17,25 80:23
  85:18 129:16
  162:5 326:7
**conducted**  24:21
  44:23 46:3 76:22
  77:1 138:19,20
  162:25 250:22
  282:7 287:9
**conducts**  72:23
  76:20 135:17
  321:14
**conference**  37:1
  39:13 52:21 80:24
  80:25 81:1,5
  258:13 259:12,13
  272:23 273:1,6,20
**conferences**
  164:16
**confident**  274:1
**confidential**  78:10
  78:16 189:9 235:4
  235:7 282:13
**confidentiality**
  78:7
**confirm**  48:14
**confirmed**  290:19
**confused**  190:22
**congested**  179:14
**connection**  24:8
  27:2 31:4 127:22
  128:3 133:12
  139:8 151:23
  206:20 218:21
  219:19 247:20
  248:7,14 249:16

256:1,17 266:20
  271:2 277:11,25
  291:21 292:19
**connolly**  4:12
  15:22
**consensus**  134:18
  134:20,20
**consent**  248:4
**consequences**
  326:1,16
**consequently**
  228:3
**consider**  18:8
  79:17,22 80:5
  111:16,24 253:17
**considering**  71:5
**consistent**  90:19
  97:20 106:18
  150:23 152:14
  164:25 165:1
  183:20 238:16
  242:6 284:8
  307:12,24 309:16
**consistently**  136:1
  284:3
**consists**  254:20
**constantly**  136:1
  153:16 162:1
**constraints**  99:20
  100:6 273:9
**consult**  20:10
  49:11 153:9
  159:25 209:12
  210:3 242:25
  338:4
**consultation**  62:3
**consumption**
  306:2
**contact**  55:17 89:8
  130:16 263:8,17
  263:22 266:16

268:1 270:19
**contacted** 268:17
  274:5 275:17
**contacts** 43:15
**contained** 281:8
  282:8,17
**contains** 191:23
**contempt** 176:8
**content** 186:4
**contents** 23:4 88:9
  161:4
**context** 159:11,16
  234:7 260:3
**continue** 75:9
  116:2 162:16
  196:8 297:2,13
**continued** 3:1 4:1
**continues** 209:21
**continuing** 172:22
  258:4
**contract** 61:5
  62:14 196:16,22
  222:25
**contracted** 288:22
**contracts** 120:1,2
  296:10
**contrast** 106:12
**contribute** 66:19
  327:14
**contributes**
  327:17
**contributing**
  327:6
**contribution** 66:4
**control** 282:20
**conversation**
  19:23 267:10
  287:3,6
**conversations**
  57:6 68:2 93:22
  110:4 264:18

**conviction** 171:20
**convictions** 175:18
  176:2,2,3
**convince** 297:10
**coo** 237:10
**coordinated**
  270:20
**coordinating** 47:2
**coordinator** 61:15
  148:18 215:9
  219:23,25
**coordinators**
  61:23
**copied** 237:8
**copies** 35:22 36:10
  184:14 219:18
  256:21 313:25
**copy** 33:18 72:7
  77:24 123:4 170:3
  179:18 182:7,13
  219:24 220:6,7,8
  220:10 233:24
  248:6 249:4 250:2
  256:25 258:16
  318:25 319:2,20
  319:21 322:16
  324:4 333:7
**coroner's** 138:10
**corporation** 2:10
**correct** 26:5,8
  38:1,2 41:12
  53:14 86:23,24
  87:1 96:13,14
  97:4 101:19,20,22
  102:18,19 107:10
  107:11 110:19,20
  111:22,23 114:3,4
  115:5,6 117:12
  118:5,19 120:3,4
  121:4,12 122:23
  122:25 123:6

129:21 141:25
  143:7 144:3,11
  147:4 150:10
  151:5 155:17
  156:17,20 157:21
  164:6 176:16
  181:25 182:1
  183:22 184:8,19
  184:20 193:21,24
  193:25 195:14,20
  196:24 197:7
  202:16,17,20,21
  214:16,17 226:5,6
  229:10 231:5
  234:15,22,23
  238:3 244:2,25
  245:4 258:5,6,9
  259:16,17 262:11
  262:21 264:6,7,20
  264:25 279:9,18
  280:10,11 281:9
  282:18 283:9
  285:7,20,21,24
  286:8,9,19,20
  289:19,20 294:8
  294:21 297:24
  300:13,14,21
  301:6 302:10,22
  302:23 304:22,23
  306:7,18,25 307:6
  308:25 309:7
  310:1,5 318:9
  324:18,19 325:9
  325:10,13 326:4
  329:17,18 331:1
  333:15 334:25
  341:17
**corrections** 61:1
  205:17 343:12
  345:17

**correctly** 102:17
  131:19
**cost** 67:12,19
  104:18,22 106:17
  106:25 202:1
  204:22 207:6
  269:13,17 271:3,5
**costs** 7:6 105:1
  106:10,13 192:14
  192:25 193:5,24
  194:1,14,15,21
  195:6,17 202:19
  205:14,19 206:5
  206:10,13,13,16
  207:2 214:2
**counsel** 15:9 16:12
  20:17,20,23 21:1,5
  21:10,12,16,20
  22:4,16 24:8,15
  25:15,23,23 26:11
  26:13 72:20 203:8
  340:1,10 342:2
**counseling** 33:2
**counselor** 28:10
  45:12 255:1
**counselors** 104:3
**count** 154:10
  231:1
**counterpart**
  267:24
**counties** 176:10
**countless** 138:18
**counts** 169:7
**county** 1:12 2:3
  7:9 8:2,23 15:13
  15:15,18 42:25
  58:6,9,11,17,24
  64:2 91:6 98:8,22
  108:20 110:14,18
  110:23 111:4,7
  112:20,23 115:16

| | | | |
|---|---|---|---|
| 115:17 118:12 | 45:24 46:2 50:11 | 98:7,9,10,22,24 | 173:25 177:10 |
| 131:17 133:4 | 50:13,24,25 51:7 | 99:1,3,10,12,18 | 179:3,13 180:1,9 |
| 136:15,19 137:1,3 | 51:14,24 52:1,2,17 | 100:4,10,15,19,21 | 181:6,11,19,23,25 |
| 137:11,12,16,21 | 52:20,22,24 53:1,6 | 101:2,6,11,25 | 182:5,8,11,12 |
| 138:25 139:1,5,7 | 53:12,16,18,19,19 | 102:1,6,16,20 | 185:14 186:10 |
| 139:17 142:2,4,25 | 53:23 54:1,4,9,10 | 103:1,7,15,16,21 | 187:13 188:7,18 |
| 143:21 144:10 | 54:13,19,20,20,21 | 104:10,18,24 | 189:8 190:2,12,24 |
| 157:8 161:18 | 54:21,22,23,25 | 105:6,10,17,21,23 | 191:3,7,10 192:13 |
| 163:3 175:13,14 | 55:1,2,5,21,22,24 | 106:12 107:1,9,25 | 192:13,25 193:5 |
| 199:19 200:21 | 56:8,9,13,14,19 | 108:2,5,6,11,15,20 | 193:15,24 194:1,9 |
| 209:21 220:22 | 57:3,11,16,20,24 | 108:22 109:3 | 194:10,14,15,21 |
| 221:14 222:7,20 | 58:3,5,8,16,21 | 110:5,11,22 | 194:21,23 195:5,6 |
| 250:14,17,23,25 | 59:5,19 60:12 | 111:11,16,24 | 195:8,17,19,22 |
| 252:13,15 253:9 | 61:3,8,10,15,24 | 112:2,12,17 114:8 | 196:18,19 198:4,5 |
| 255:4 257:6 | 62:4,11,18,22 | 116:1,12,14 117:2 | 198:14,22 199:12 |
| 265:25 266:8,11 | 63:12,14,24 64:1,5 | 117:6,12 118:24 | 199:16,18 200:6 |
| 266:13 270:12,15 | 64:11,16,18,24 | 119:12,17 120:3 | 205:17 206:5,11 |
| 275:3,8 277:23 | 65:5,7,8,9,17,21 | 120:20,24 121:5 | 206:16,20 207:16 |
| 285:17 300:12 | 65:23 66:1,15,20 | 121:11,13 122:3 | 207:22 208:4,8,17 |
| 306:14 310:18 | 66:23,25 67:3,9,14 | 122:11 123:11,12 | 208:24 209:1,13 |
| 325:8 327:7,15,19 | 67:24 68:20 69:4 | 123:16,17 124:2 | 210:4,11 211:12 |
| 328:13,24 329:4,8 | 69:7,15,18,20,22 | 125:1,7,10 126:5 | 211:18,25 212:8 |
| 336:11,19 341:4 | 70:7 71:6,16,23,24 | 126:23 127:23 | 212:14 213:2 |
| 344:10 345:15 | 72:1,2,7,9,13,14 | 128:3,5,14 129:9 | 214:3,15,19 215:8 |
| **county's**  58:13 | 72:17,20 73:23,25 | 129:20,23 130:11 | 215:13,14 216:23 |
| 268:9 | 74:4,5,25 75:15,17 | 130:19,25 131:10 | 217:3,9,18 218:3,7 |
| **couple**   20:17 | 76:1 77:8,23 78:2 | 132:3,19 133:13 | 218:13 220:1,9 |
| 21:17 87:4 98:21 | 78:6,11,13,20 79:9 | 135:3,8,25 136:10 | 221:16 222:4,6,20 |
| 116:17 122:17 | 79:12,18 80:7,20 | 138:20 141:5,11 | 222:21,23 223:7,8 |
| 197:22 222:13 | 80:22 81:7,13,14 | 141:11,16 145:2 | 223:11,15,18 |
| 255:10 286:22 | 81:18 82:2,5,9,16 | 145:23 147:14 | 224:2,11,15,21 |
| **course**   39:4 48:22 | 82:20,22,25 83:1,6 | 149:6,14,15 | 225:4,24 226:15 |
| 93:19 164:18 | 83:8,14,16 84:11 | 151:22 153:24 | 227:3,4,6,20 |
| 297:22 339:4 | 84:23,25 85:2,20 | 154:8 156:10,24 | 228:12,15,23 |
| **court**   1:1 5:16 6:4 | 85:22 86:6,11,16 | 157:11,16,25 | 229:4,13,15 |
| 6:4,7,9,10,15 7:1,1 | 86:22 87:15,22 | 158:23 160:9,25 | 230:11 231:2 |
| 7:3,6,6 8:9 15:7 | 88:20 89:4,11,21 | 161:10 162:13,20 | 232:13 233:20 |
| 17:8,20,24 18:3,5 | 89:24 90:22,22 | 165:2 167:9,18 | 234:10 235:20 |
| 19:11,22 25:25 | 91:10,17 92:1 | 168:3,9,9,20 | 237:15,15 238:17 |
| 35:13,15 39:9,10 | 93:16,16 94:14 | 169:15 170:3,4 | 238:25 240:22 |
| 42:25 44:14,21 | 95:4,14,23 97:4,9 | 171:9,23 172:14 | 242:3,6,20 245:12 |

[court - data]                                                              Page 17

247:21 248:8
249:1 250:20
251:10 253:25
255:16,20 258:24
262:24 263:3,8
264:3,5 265:6
266:19 267:4,13
267:25 268:8,9,9
268:12,18,20,21
268:22 269:19,24
270:6,9,13,15,17
271:3,12,20 272:4
272:18 273:1,4,6
273:13,24 274:8
274:15,20,22
275:4,9 276:20
277:7 278:1,4,9,21
279:3 280:1 281:1
283:4,5 284:16
286:2,16 288:8
291:10 292:5,15
294:4,5,21 295:2
296:6 299:17
300:13,20,23
301:23 302:9,15
302:21 303:2,9,15
304:10 305:5
307:13 308:1,9
309:17 310:18
316:4 318:3 321:3
321:8 322:6
323:24 329:22
330:3,23 331:6,12
333:21 334:2,4,12
334:23 344:7
**court's**  68:4,22
95:9 106:7 109:22
140:3 169:25
170:1,22 193:3
198:13 199:25
238:1 274:24

304:1 331:23
**courtroom**  19:14
83:25 263:25
**courts**  8:23 55:4
65:3 66:8 85:3
110:14 123:14
138:4 149:10
172:6 193:21
194:7 202:20,23
203:19 216:25
224:22 269:8,21
270:9 271:1
274:17,18,19
334:3 336:12,19
**courtview**  128:7,9
**cov.com**  2:15,16
**cover**  298:10,12
**covington**  2:11
16:9,11 257:22
**coworkers**  160:7
**crack**  156:19
307:5
**crawford**  292:17
292:20
**create**  172:6
249:24
**created**  161:24
165:14 190:21
252:7
**creating**  275:9
**creation**  252:3
**creative**  109:21
**credentialing**  28:5
28:20,22 33:23,24
34:7 35:17 36:1
**crendon**  3:12
**crimes**  172:4
**criminal**  27:18
69:11 77:13 93:14
146:20 170:7,12
173:9,20 174:5,6

175:18 176:1,14
250:25 251:4,6
288:10 324:14
325:8,23,23
326:15
**criminally**  243:5
**crisis**  312:13 313:8
313:15
**criteria**  116:5
177:18 183:12
230:7 232:9
286:16
**cross**  65:3 66:8
**crum**  4:12
**culture**  260:4
**current**  17:5,9,10
28:8 29:7 30:25
40:2 52:23,25
58:24 60:18 65:9
82:7 94:11 96:12
102:8 107:19
132:3 149:19
152:8 171:8 197:4
212:7 229:12
231:1 232:12,20
233:4 245:24
269:1 278:12
283:24 291:4
326:25
**currently**  52:13
56:15 58:7 66:23
66:24 74:22 82:5
90:14 96:16 100:8
102:12 112:17
126:22 217:19
218:8 224:2
229:16 233:10
246:11 251:3
299:11 321:3
**custody**  5:15 71:8
71:9

**cuyahoga**  27:10
268:8 270:11,15
275:3,8 310:18
341:4
**cvs**  3:2,3 15:25
16:1 323:21,21
**cycling**  105:4

**d**

**d.c.**  2:14 3:5
**daily**  69:25 223:21
298:7
**damages**  202:4,5,8
204:24 205:1,3,14
**dan**  1:9
**danny**  148:21
**dare**  238:21
**darvocet**  38:20
**data**  44:17 48:18
49:10 78:2 79:9
90:8 94:14 114:12
114:13 126:19,19
127:8,11,13,15,16
129:19,22,25
130:6,8,9,15,19
131:4,6 133:13,24
135:15 138:9,13
138:17,23 139:16
139:23 141:3,22
142:3,6,12,13
144:16 145:17,19
146:18 149:15
151:21 152:24,25
153:8,13,21 158:5
158:6,21 160:1
162:25 163:4,5
165:10 168:23
173:19 181:5,7,11
181:19 186:13,20
187:8 199:5 219:7
226:15,17,20
227:15 228:24

229:3,5,9 230:25
234:13,14,18
242:2,5,24 256:13
257:3 288:16,18
288:23 289:2,5,13
289:18,22 290:1
290:13,14,21,25
291:2,5,8,15
292:20 293:4
298:6,22 299:3,13
300:4 306:17
309:19 328:3,11
328:19 329:2,5,16
332:9 335:5
**database** 126:25
127:2,20 128:6,10
128:15,19 130:22
140:12 141:8
162:18 170:1
185:3,7,25 242:3
290:3 291:12,13
**databases** 126:20
126:21 128:2
**date** 15:1 30:9
34:21 66:17 73:11
74:12 86:12 136:4
182:23 302:18,19
340:11 343:8
344:3,9,19 345:3
345:13,25 346:20
346:25
**dated** 101:18
114:1 123:1 147:3
147:19 179:9
187:11 246:18
304:21
**dates** 36:2 173:11
249:25
**day** 2:18 15:20
19:19 20:4 25:5
142:19 188:9,19

209:6 223:25
256:12 262:17
268:24 298:21
299:3,12 300:3
316:2,7 321:19,19
342:7 344:16
345:22 346:22
**days** 207:22
255:10 286:22
288:9 343:18
**dcuds** 187:12
**dea** 275:25 276:6
276:10,16 277:9
**deal** 136:14 209:6
**dealers** 162:1
**dealing** 39:21
207:23 208:18
209:5 254:7 264:1
280:24 316:25
321:16
**dear** 343:10
**death** 141:23
**deaths** 136:25
**debacco** 1:25
341:6 342:14
**debate** 159:13
**debord** 6:7 101:11
101:22,24,25
102:3
**decided** 98:23
162:4
**decision** 24:12
100:20 108:19
123:18 126:4
299:18 300:1
**declined** 130:3
**decrease** 97:18
109:17
**decreased** 109:20
**dedicated** 254:5

**deed** 344:14
345:20
**deemed** 92:13
120:24 233:7
343:19
**defendant** 193:9
193:20
**defendant's** 70:9
74:1 184:25
**defendants** 7:11
7:14 16:7,18
156:11 167:11,19
200:17,24 203:25
204:7 261:24
**defender** 82:8
271:16
**defender's** 82:7
110:16
**defenders** 271:17
**defined** 80:16
107:18 172:12
183:5 184:2
**definition** 326:11
**defray** 214:2
**degree** 27:14
29:17 98:14
281:25
**degrees** 27:24,25
**delagrange** 148:5
**delivery** 340:9,11
**demand** 207:25
209:8
**demographic**
72:24 73:10 77:11
**demonstrate** 29:1
31:9
**demonstrated**
213:13
**denied** 199:7
**department** 24:21
26:12 43:13 50:9

51:20 72:23 81:22
81:23 100:24
110:15,17 112:8
114:19 121:11
128:6 140:3 148:4
153:15 158:4
160:13 163:2
173:22 174:20
175:7,8,8,9,10,11
175:15 179:23
187:6 189:5
190:12 191:14
199:2 205:14,15
205:16 211:7
216:8,24 218:11
231:10 247:10
254:21,22 266:17
266:23 273:10
276:4 286:4
320:14 322:13
330:7 343:22
**department's**
332:10
**dependency** 28:10
29:2 32:18,21
33:5,10 34:4
337:16
**depending** 47:17
51:8 70:24 71:7
94:4 172:5 188:20
243:21 265:19
276:18 281:24
318:4 321:22
**depends** 18:18,19
191:1 256:11
**deposed** 16:22
17:18
**deposition** 1:16
15:4 17:4 19:17
20:16 21:16 22:13
22:25 23:13,17,25

[deposition - discuss]

63:9 83:12 101:9
104:12 105:20
113:14 122:1
146:1 154:14
168:7 185:13
192:11 197:13
200:20 204:3
210:17 215:18
220:20 225:9
235:18 241:16
258:19 284:20,22
304:13 323:4,18
336:17 338:19,22
338:24 339:20
341:20 343:8,11
344:1,3 345:1,3
**depositions** 339:5
**deputy** 17:10
49:23
**describe** 27:12
28:4 69:19 72:11
73:5 77:18 104:22
107:12
**described** 18:10
69:3 272:19
312:13
**describing** 37:24
38:3
**description** 6:2
242:12,14,24
243:16,19,25
244:8,20,23 259:9
260:13 296:24
**descriptions** 8:14
243:7,13 244:11
258:21 259:3
**desig** 107:19
**designation**
155:18
**designations**
107:19

**detail** 8:12 81:25
241:18
**detective** 82:12,18
82:19 153:23
254:24 266:18
267:3,7,8,12
331:21 332:12,22
332:24 333:4,10
333:24
**detectives** 81:23
153:17 251:12
**determin** 107:23
**determination**
48:16 65:15,25
80:19 107:24
230:6
**determine** 41:1
44:25 48:5 74:25
79:17 80:5 86:1
90:5,6,10 136:2
145:6 153:25
158:20 164:22
169:9 183:10
210:9 217:1 218:6
219:2 228:21
230:15 231:12
235:6 236:14
239:5,17 243:4
254:3 280:15
309:21 312:4
315:11 321:1
336:7
**determined** 65:11
92:14 107:15
171:21 228:9
230:3 288:21
**determines** 177:11
**determining** 39:7
233:17 335:24
**develop** 89:10

**developed** 251:2
252:9
**developmental**
51:5
**developmentally**
50:23 51:6,13
**devoted** 50:12
**diagnosed** 79:20
115:21 116:5
131:16,22,25
132:4 133:15
134:2 208:21
232:5,6 233:11,21
234:10 236:7
253:25 254:13
289:1 310:10,12
**diagnoses** 234:22
236:12 310:4
**diagnosis** 32:25
76:17 79:22 80:15
116:13 132:12,16
132:18 160:10,11
230:4 231:7,13
232:23 233:7,18
234:1 236:11,15
236:19 240:17,23
241:7
**diagnostic** 232:9
**died** 138:9
**difference** 30:13
89:6
**different** 30:22
37:14 56:4 74:11
85:24 89:12
146:23 161:3
165:10,10 179:15
183:10 186:5,13
189:23 236:13
238:20 254:10
279:6 281:17
286:11 298:19

303:24
**differentiate**
231:20,24 232:3
**difficult** 41:1 49:4
51:1,10 90:4
96:19 132:9
142:18 209:16
238:18 254:2
278:15 309:21
312:18 336:7
**dig** 83:21 236:1
**direct** 61:22
119:17 121:5,10
181:9 207:15
283:22 324:24
325:14 327:20
330:10,16 336:23
**directed** 46:1
**directly** 57:21
59:19 112:15
197:1
**director** 149:10
316:3
**disabato** 8:20
323:6 324:13
329:20
**disabilities** 80:1,1
**disability** 51:9
239:10 241:5
**disabled** 50:23
51:6,14
**disagree** 261:3
**discharged** 255:11
**disclose** 23:4
239:16 309:23
**disclosing** 25:16
**discovered** 307:8
**discuss** 24:22
59:17 81:1 124:22
334:8

**[discussed - drug]**                                                    Page 20

discussed 22:24
  23:4 40:1,2
  233:16
discussing 18:19
  251:21 297:21
discussion 19:10
  37:21 40:5 67:24
  71:21 95:15
  100:21 257:15
  299:6 333:22
  338:10
discussions 65:11
  124:13 126:8
dismissed 108:13
  171:6
disorder 32:16
  45:2 79:20 80:16
  103:11 115:22,22
  116:6,6 132:1,18
  133:7 134:3
  136:23 138:7,15
  207:24 208:22
  209:8,24 230:5,17
  230:21 232:6,7,22
  233:7 238:7 239:1
  239:6 254:6
  310:10,13
disorders 138:21
  139:15 141:2,5,12
  239:18 240:7
dispatch 269:9
display 32:8
disposal 160:6
disposition 177:4
disqual 171:25
disqualifying
  172:1,9
distinction 30:17
  144:18,24 187:23
distinguish 163:6

distinguishing
  163:15
distributor 7:11
  7:14 200:17,23
  203:25 204:6
district 1:1,2 15:7
  15:7 112:24
  118:13 142:3
diversion 41:16
division 1:3 15:8
  266:14,21
doc 79:4 91:12
docket 53:21
  54:25 55:18 65:10
  85:4,17 86:9 89:7
  91:12 96:21 98:1
  108:22 149:9,16
  171:23 189:8
  219:1,1,13 286:7
  286:12 305:5
  334:2,15,17
dockets 54:12,15
  54:17,18 55:13
  56:4,5 59:12
  105:14 149:12
  216:22 217:6
  251:10
doctor 75:5
  316:21 335:8
doctors 42:6
document 1:11
  6:18 7:1,3,5,8
  73:8,9,25 77:10,10
  77:25 78:10,12,17
  79:2,4 84:7,19,20
  87:14,18,23 88:7
  94:22 95:12 101:3
  104:4 106:6
  122:12,13,15,22
  125:17,21 146:3
  146:13 154:12,22

159:22 160:19
168:8,15 169:21
179:1,16,25
182:10 185:10,14
185:20 188:4,22
188:23 189:9
192:12,20,22,24
193:23 194:8
197:10,14,19,21
198:1,11 201:4,6
203:5,6 211:1,3
212:25 219:24
220:6,7,8,10 221:9
226:8,21,22
227:13 235:7,15
237:23 238:23
241:13,14 242:1
242:18 248:17
249:24 258:16,25
259:5,7,19,20
267:19 279:23
282:3 283:18
324:2,11 329:10
documentation
  134:17 239:7
  256:20
documents 22:12
  22:15,16,19 23:6
  23:12 56:25 73:5
  85:11 179:14
  185:6 190:25
  192:4 236:25
  240:13,20,21
  244:6 248:9,14,21
  249:3,11,13,15
  250:8 255:25
  256:11 257:9
  273:14 274:10
  318:17 324:16
  338:18 339:3,5,10

doing 89:12 156:1
  253:10 272:7,11
  296:5,20 310:25
dollars 206:19,23
  225:2 297:22
domains 29:1
  32:17,20 33:4,8,9
domestic 54:23
dorman 129:10,16
dorman's 129:11
dosages 328:4,6
  329:6
doubt 106:24
doug 147:3 283:14
draft 106:23
  128:24 175:23
  238:1,15
drafted 64:23
drafting 24:8
  84:18 238:13
dramatic 137:24
dramatically
  137:11
drawn 144:18
  187:23
dreamland 164:5
  164:9,10,24 165:1
drive 4:6
driving 176:3
drop 175:17 177:8
dropped 99:8
drug 6:9,15,18,19
  7:1,3,6 8:9,12,23
  18:4 19:11 25:25
  39:10 41:16 44:12
  44:15 47:2,4,5
  48:4,13 49:9,14
  50:11,13 51:7,14
  52:1,20,22,24,25
  53:6 54:20 55:21
  58:8,12,15 61:10

[drug - educate]

61:15 62:7 65:9
69:7 70:2,5 72:13
72:14 74:12,19
75:14 77:15,19
79:5,8 80:21 81:7
89:23 90:22 92:24
93:14,16,16 94:14
98:9,15,24 99:3
104:24 105:10,21
106:10,12 107:15
107:25 108:3,6,8
108:11,22 109:14
109:23 110:5,11
110:18 112:7
122:3 123:11,12
123:14,17 131:9
140:10,22 146:2,4
146:22,22 147:14
149:14,15,19
150:25 151:4,11
154:3 156:23
157:15,24 158:7
158:17 160:2
161:9,25 162:1
168:9 169:13
177:10 180:8,9
183:8 184:5
185:14 187:5,13
187:13 188:7,18
190:2,11,24 191:7
191:10 192:13
193:23 194:1
202:20,23 203:19
221:16 222:4,19
223:11,18,25
227:3,6 229:14
235:4,20 237:15
237:25 241:17
242:20 244:15
248:1 249:1
250:20 251:10

260:4 262:23
263:2 267:4,25
268:8,9,12,20,21
268:22 269:8,19
269:20,24 270:6,8
270:9,13,15,16,25
271:2,12 272:4,17
272:25 273:5,24
274:7,17,17,19,22
274:24 275:3,22
276:13,20 277:7
278:20 282:5
283:4,5 284:16
300:12,16 301:3,5
301:23 302:9,14
302:15,21 303:2,9
303:15 304:1
305:5 306:13
307:13 316:4
326:3,5,11 327:5
327:14,17 329:22
330:3 331:10,12
334:3,4 335:23
336:12,19 337:16
337:16,22

**drugs** 18:13,16
38:22 43:21 44:1
44:10 46:25 78:19
92:3,10,17,21 93:5
93:5 94:8,15
142:7 150:13
153:1,10 154:2,7
156:11 157:7
162:13,20 163:6
163:16,16 167:10
167:18 276:13,25
281:17 284:4
306:2 320:16
326:13

**dsm** 80:17 232:8

**dual** 132:12
236:15 310:3
**dually** 131:16,22
132:4 133:15
236:7
**dudzinksi** 16:17
**dudzinski** 4:6
16:17
**due** 35:24 91:18
99:19 100:5
207:17 208:5
209:1 249:23
273:8
**dui** 54:21 176:2
**duly** 16:21 341:7
341:10
**duplicative** 298:15
298:17
**dus** 176:2
**duties** 30:25 35:9
39:5 43:5 45:5,7
116:10 186:12
253:22

**e**

**e** 4:6 6:3,6,12,14
6:17,21 7:17,21
8:1,5,9,15,17,19
83:13 101:10,17
101:21 102:2,11
103:5 113:15,22
113:24,25 114:1
118:4 120:5 122:2
122:21,23 123:4
123:10 125:13
146:2 147:2,9,18
147:22 148:2
149:17 154:15
155:2,15,18 200:9
210:18 211:5
215:19 216:6
218:16,16 220:21

221:14 225:10,23
235:19 237:9,25
245:11,14,17,21
245:21,24 246:1
246:10,13,16,18
246:20 247:2,5
248:19 249:12
268:17 283:13
284:23 285:6,9,18
285:25 286:21
288:7 293:10
297:8 304:3,14,20
304:24 306:20
309:2 311:13,22
312:5,9,10 318:25
319:6 323:5
324:12,15,17,21
336:6
**e.g.** 202:1 204:21
260:18
**earlier** 32:17 44:8
95:18 107:8 143:4
162:23 167:14
211:10 226:5
233:1 239:14
240:10,21 249:20
257:25 261:22
264:9 272:13
281:14 300:9
325:11 328:10,18
329:22,24
**early** 284:9
**earned** 28:7 36:3
**earning** 30:18
**east** 1:23
**eastern** 1:3 15:8
**economic** 105:6
**ecstasy** 150:9
**educate** 165:12
213:21

educated  39:6
education  27:13
  41:6,9,12 42:16,19
  62:8 66:11 73:17
  76:11 77:12 124:1
  258:4
educational  29:12
edwin  118:14,17
efficient  173:13
  174:10
effort  74:24
  103:11 105:12
  110:14 146:21
  271:15
efforts  100:9
  179:12
either  33:17 71:16
  90:9 176:19
  184:25 212:5
  223:20 227:16
  268:7 276:6,10
  321:15 342:2
electronic  36:12
  219:21 249:13
  257:1 319:19
electronically
  184:22 185:5
  249:19
eligibility  7:18
  80:6,19 126:21
  177:9,12,13
  182:23 210:19
eligible  70:15
  171:19 177:20,22
  182:22 211:22
  286:13,18 296:11
  296:12
elizabeth  148:5
ellis  8:9 235:19
  237:2,4,18 238:23

ellison  8:5 123:5,7
  123:8 225:10,25
email  343:17
embrace  256:20
emergency  202:2
  204:23 205:16
  316:22
emily  81:10 131:8
  297:8 304:5,6
emphasis  271:21
employ  247:6,12
  305:11
employed  42:24
  82:16,25 149:5
  304:6 305:9
employee  82:19
employment  17:6
  29:8 42:22 43:2
  62:9 73:17 76:12
  77:12 213:22
  305:13
employs  215:8
enable  65:13
enabled  253:5
enclosed  343:11
encompass  63:15
encounter  158:8
  163:7 184:6
  242:17 243:2
  244:24
encountered  166:8
encounters  139:25
  140:9,22 144:10
  244:18
ended  287:20,22
endo  3:8,8 16:3,3
  16:6 261:24
ends  87:12 131:12
  152:7 163:20
  167:4 188:4

energy  207:20
  208:18
enforcement
  140:9,21 158:8
  173:18 174:18
  184:6 202:2
  204:22 205:17
  242:17 243:1
  244:17,24 251:9
  251:11 275:12,22
  276:24 305:25
  326:22
engage  96:23
  326:6
engaged  327:17
  335:7
engages  326:13
engaging  299:19
enhance  123:15
enhanceable
  172:11
enhanced  298:18
  325:25 326:16
enhancement  6:15
  58:8 122:3 123:11
  123:12 124:10
  221:16 237:16
  298:18 334:9
  335:3,4
enhancements
  222:16 223:17
ensure  296:5,20
entails  107:13
enter  69:17 75:8
  96:22 98:16 110:8
  116:12 117:2
  121:2 289:2,5
  302:9
entered  63:23
  128:14 175:19
  187:2,4 195:4

289:22 296:9
  345:9
entering  76:2
  187:8 289:13
  298:22 299:3,13
  300:4
enters  75:4 119:11
entire  344:5 345:5
entities  105:10
  120:10 121:14
  125:4
entitled  164:5
entity  59:20 115:4
entries  313:19
entry  170:21
  182:25 184:23
  187:10,15,16
  188:5 189:10,11
  288:17 289:18
  290:13 303:15
epidemic  136:14
  136:17 139:9
  142:15 163:23
  164:11 165:14
  209:20 252:16
  260:15 277:24
  314:22
equivalent  268:8
errata  343:13,18
  345:7,10,18 346:1
especially  209:7
  336:1
esq  2:5,5,6,12,12
  2:19 3:4,10,16 4:6
  343:5
essentially  32:23
  61:9 84:17 114:13
  115:19 171:17
  221:21 223:19
  254:19 268:22,25
  270:19

establish  281:15
esterle  148:7
estimate  229:12
  232:12,24 265:8
et  1:12,12 92:5,5
  202:3 204:23
  273:16
ethics  259:24
evaluations  51:3
evelyn  81:12
evening  306:6
  316:8,9 317:3
event  8:18 166:1
  260:18 304:15
  306:5,10,17
  307:15,16,17
  309:10 311:25
  313:3,5 314:12
  315:3 317:13
  342:3
events  166:9
  260:17 312:12,17
  312:21 313:2,14
  314:3,9
everybody  296:12
  308:20
everyday  35:9
exacerbated  138:8
exact  124:13 224:7
exactly  301:11
  315:6 321:1
exam  33:12
examination  5:7
  16:20,24 257:18
  261:20 323:14
examiner's  142:5
example  29:19
  183:7 187:2
  213:11 243:23
  244:15 321:4

examples  213:20
exams  33:15
exceed  95:4
excel  126:20
  241:14 247:23
  248:3
exception  20:5,8
  118:17
exchange  285:10
  300:19
exclusive  222:5
  223:22
exclusively  300:25
excuse  104:2
  141:4 324:1
executed  345:10
executing  68:3
execution  344:14
  345:19
exhausted  209:22
exhibit  5:15 6:3,6
  6:9,12,14,17,21
  7:1,3,5,8,9,13,17
  7:21 8:1,5,9,12,14
  8:15,17,19,22 83:9
  83:12,22 84:7,13
  88:2 101:5,9,16
  104:4,11 105:16
  105:20 106:3
  110:9 113:12,14
  113:21 117:18
  119:1,7,21 120:6
  120:11,22 122:1
  122:12,20 125:13
  145:24 146:1,13
  147:1 150:1
  154:10,11,14,22
  155:1,16 156:6
  159:7 161:4
  162:15 163:13,20
  166:25 167:3

168:4,7,16 174:19
  183:16 185:10,10
  185:13,21 191:17
  192:9,11,20 193:6
  193:11 197:9,13
  197:20 200:15,20
  201:4,8,18,22
  202:16 203:20,23
  204:3,13,16 206:6
  210:14,17 211:1
  215:16,18 216:1,5
  216:11 218:17
  220:20 221:7,10
  222:1 225:7,9,20
  235:15,18 236:2,3
  236:7,23,25 237:3
  237:13 241:13,16
  241:24 244:10
  258:19,25 262:2
  283:11 284:19,22
  304:4,13 313:3
  323:4,25 330:11
  330:11,22 336:15
  336:17
exhibits  5:5,16 6:1
exist  290:10
existed  300:12
existence  275:1
  301:9,15
existing  123:14
exists  291:9 296:3
  296:21
exit  228:2
expand  212:22
expanded  116:22
  133:3 208:9 212:9
  287:24
expansion  213:10
expectation
  318:15

expected  100:20
expend  117:13
expended  206:20
  207:17 208:5
  209:1,14 210:5
expenditures
  207:16
experience  91:16
  134:24 165:2
  238:17 284:9
  327:13
experienced
  126:19
experiences
  167:25
expertise  50:25
  209:17 210:12
  251:3 269:2 274:3
expiration  344:19
  345:25 346:25
expires  342:17
explain  101:1
explained  100:19
  260:18
explains  96:15
explanation
  158:13
explanatory  176:5
expressing  327:4
extended  228:4
extensive  85:8
  162:24
extent  22:23 84:14
  124:21 201:12
  226:14 228:25
  277:19
extracted  242:2
extremely  254:8
  275:20 321:23

**[f - flip]** Page 24

**f**

f 2:12 4:3
f4 108:8
f4s 107:17 108:23
f5 108:8
f5s 107:17 108:23
facility 120:16
fact 18:21 124:2
 142:25 159:2,14
 162:18 187:4
 222:2,3 297:14
 309:8 310:13
 312:5 332:8
factor 172:1,9
factors 76:9 79:16
 79:21 80:4,13
 142:23 171:21
 187:1 189:23
facts 24:7 139:7
 162:18 164:25
factual 18:9
fairlawn 63:19
 175:8
fairness 160:15
fall 38:22 44:7
 174:22 308:1
falls 27:11
familiar 38:18,22
 87:17 106:2
 125:16 126:18
 146:12 168:14
 185:19 192:19
 194:5,8 197:18
 198:5,9 201:3
 203:4 204:12
 210:25 216:14
 221:10 225:19
 236:24 241:23
 254:15
family 38:23 48:2
 54:22,24 73:16

76:10 77:11 93:1
 262:16 273:11
far 28:24 32:25
 51:23 102:5 119:3
 130:6 179:6
 186:20 212:22
 213:11 219:7
 227:24 251:19
 272:22 280:19
 294:1 297:4 299:6
 312:24 322:14
fashion 303:6
fashioned 230:19
fast 288:10,11
fbi 170:10 172:23
 172:25 173:1,4,12
 276:1,7,10 277:13
february 147:3,20
 224:8 283:14
federal 16:20 59:8
 59:9 123:21,24
 221:19,21 275:12
 275:18,19,19
fee 195:16 196:3,5
 196:5,16 197:4,5
feel 332:7 336:24
feels 267:12
fees 195:8 196:23
fellow 251:9
felonies 300:17
 303:17
felony 7:6 43:9
 98:8,12,12,17,24
 107:10,12,13,15
 107:19 108:3,14
 109:6 110:1
 123:17 180:4,8,16
 192:13 193:23
 194:1 274:20
 300:10,18 301:1,5
 301:24 302:8

303:7,14
felt 100:23 165:13
 327:1
females 316:25
fentanyl 39:1
 278:9,13,18 279:5
 279:18
field 169:3 242:24
fields 175:20
figure 273:19
 321:1
figured 272:8
 302:6
file 35:23 48:23
 74:2 78:13 170:3
 170:4 182:5,8
 233:17 247:24
 248:3,10 249:15
 250:2 282:9,13,18
 283:2 320:1 322:7
 322:11 333:12,14
filed 303:14
files 44:17,23
 52:19 179:13
 180:19 230:18
 231:4,6,9 232:19
 248:6,23 249:1,4
 249:13 279:8,12
 279:16 280:10
 281:8 321:25
 322:14
filing 182:4
fill 36:1 85:9
filled 50:18 174:20
filling 169:22
 183:21
final 80:19
financial 62:10
 64:4,10,16 68:22
 115:20 206:16
 273:9 287:11

financially 66:19
find 72:17 109:20
 133:21 190:7,20
 271:7 279:7
 311:24 330:13
 337:18 343:11
finds 134:12
fine 220:14 261:14
finish 19:25
finished 191:19
fire 202:2 204:22
 205:15,18 254:21
firefighter 254:24
first 7:10 16:21
 20:22 24:17 28:12
 42:21 72:13 79:6
 83:9 86:21 88:8
 98:1,14 144:4
 146:25 150:6
 178:15 179:6
 200:16,22 201:24
 214:10 217:9
 230:14,23 233:25
 245:16 285:3,18
 326:19 341:10
fiscal 287:20
 293:25
fits 311:7
five 20:24 34:23
 34:24 40:14,17
 53:17 54:11
 107:19 178:12
 246:6,8 288:9
 305:14 316:18
flag 179:13 182:9
 182:9
flagged 182:8
flagging 179:7
flahive 2:12
flip 87:4

**flood**   162:2
**florin**   148:9
**flow**   178:24
**flowers**   2:5 15:14
  15:14 22:20,22
  25:14 104:2,14
  146:10 159:1,5,9
  159:12,19,23
  161:12 191:18,22
  192:7 201:11
  206:1,7,25 234:17
  235:1,10 245:5
  324:1,4 338:21
  339:9,15
**focus**   37:1
**focusing**   264:17
  299:10
**folks**   81:8 162:5
  182:11 251:9,22
  285:20 306:5
**follow**   6:12 113:16
  205:6 311:24
  339:3
**following**   71:4
  75:11 88:9 99:2
  156:15 338:17
**follows**   16:23
  205:13
**force**   137:16,21
  139:5,7 143:1
  250:15,18 251:1,2
  251:5,7,14,25
  252:4,6,11,17
  253:12,20 255:24
  256:2,5,14,18,24
  257:6 265:25
  324:15 325:8,22
  328:14,21,25
**forces**   250:11
**foregoing**   341:16
  341:21 344:13

345:18
**forever**   282:4
**forgotten**   264:10
**form**   22:21 23:9
  23:18,21 24:2
  26:24 27:4 29:14
  31:14,24 33:6
  34:5 35:18 38:6
  40:16 41:7,13,20
  41:24 42:10 43:23
  48:12,20 49:3,13
  51:18 56:10 57:4
  57:13,25 58:18
  59:2 60:5,13 61:4
  61:17,25 62:12
  64:8 67:4,21 68:6
  68:18,24 70:6,8,8
  74:6 75:2 77:2
  78:3,15,21 79:13
  80:8 89:1 90:16
  91:19 92:18 93:7
  94:3,9,12 95:10
  96:6,17 97:5,10,16
  97:23 98:19 99:6
  99:13,21 100:11
  100:18 103:2,24
  104:20 106:19
  107:2 109:8,18
  110:2,24 111:18
  117:8 119:9,22
  121:8,15 124:11
  124:20 125:2,8
  126:12 127:4,9,24
  128:4,21 129:6,24
  130:12,20 131:1
  131:23 132:5,8,14
  132:23 133:17,22
  134:8,14,21
  135:13,23 137:8
  138:2,16 139:10
  140:1,16,23 141:6

141:13,20 142:9
  142:16 143:8,14
  143:23 144:12,21
  145:3,15 150:14
  151:6,13 152:1,17
  153:2,12 154:5
  157:1,13 158:1,11
  158:25 161:22
  163:8 164:12
  165:3 167:20
  168:21,24 169:18
  172:23 176:23
  177:6 178:11,16
  178:21 179:4,9,11
  179:17 180:10,12
  180:18,22 181:3
  181:12,21 182:3,4
  183:1,3,17,22,23
  183:25 184:12
  185:4 186:15
  188:1 189:18
  190:8 193:7 194:4
  194:11,17 195:1
  195:10 198:7,17
  198:23 199:8,13
  200:2,7 201:10
  203:1,3,7,13
  206:24 207:10
  208:6 210:7 212:7
  212:19,24 213:4
  214:5 218:24,25
  227:21 232:16
  233:13 234:16,17
  235:2 239:3,23
  240:11 241:9,10
  242:4 243:20
  245:1 246:12,22
  247:7 253:13
  260:24 261:5
  265:16 267:23
  273:21 277:5

278:14,23 279:19
  280:3 282:11,19
  284:12 289:21
  290:11 291:11,23
  292:8,22 293:2,5
  295:3,15 296:1
  298:2 299:24
  300:6 303:11,18
  308:3 309:18
  310:6 311:1,9,14
  312:6,14 313:16
  313:22 314:5
  315:8 317:10,11
  318:25 320:18
  321:11 326:8
  327:8 328:15,22
  332:17 333:18
  335:15
**formal**   29:12
  319:10
**format**   130:18
**formed**   137:16,20
  162:19
**forms**   76:4 177:25
  179:15 180:20
  182:16,19 184:10
  184:18 249:6
  274:12
**formulate**   142:14
  160:1 165:9
**forster**   148:11
  149:9
**forth**   159:6,21
  167:17 201:8,18
  205:24
**forthcoming**
  281:16
**forward**   38:9 87:4
  162:21 200:12
  280:24 302:19
  339:8 343:15

**forwarded** 148:3
311:21
**found** 130:4
164:20 176:11
182:21 211:22
271:25 337:15
**foundation** 203:9
206:2 235:11
**four** 21:14 53:17
115:15 172:19
234:4 269:11
273:8 286:10,11
286:16 321:21
329:14
**fourth** 324:24
**frame** 75:20
161:17 162:8
179:8 180:14
301:20 318:14
**free** 176:22 207:5
207:5 336:24
344:14 345:20
**friday's** 8:20
323:7
**friend** 93:1
**friends** 48:1
**front** 188:24 221:6
262:2 330:11
**frustration** 326:25
**full** 73:1 262:17
**functions** 181:20
265:24
**fund** 111:4 119:20
119:24 224:11
**funded** 57:11
58:24 120:16
199:12,16 217:19
218:8
**funding** 8:16 56:3
57:3 58:3,5,14
60:2,19 111:3,7,10

114:8,14 117:7,9
121:13 124:3,6,9
199:7,19,20
215:11 216:7,10
216:25 284:16,24
285:23 286:6,13
286:19 287:15
294:9,24 296:21
**funds** 57:20,24
58:6,17 67:2,8
96:3 103:22
117:13 124:25
125:7 214:10,18
217:2 218:19,19
223:9 224:12,15
286:24 287:19
294:16 295:6,19
295:20,23 297:5
**funnel** 294:17
**funneled** 58:20
**further** 19:18
32:14 94:22
147:17 151:15
334:8 335:22
336:1 338:2,13
341:19 342:1

## g

**gained** 25:18
**gambling** 306:3
**garden** 1:22
**gbs** 128:8 179:24
184:23 185:7,24
191:14 247:13
**gener** 145:19
**general** 25:20,22
26:1 31:8 32:11
32:13 41:3 46:14
50:21 52:3 56:6
58:5 73:10 118:1
118:13,17 130:6
134:17,19 145:19

155:25 159:15
170:1 175:21
199:17 212:22
226:21 238:21
243:24 276:12
278:5 308:17
314:20 317:22
321:12
**general's** 326:23
**generally** 90:19
141:19 243:18
264:1 276:9
312:20
**generate** 153:5
194:5
**generated** 33:2
102:7 128:17
190:3,12 192:23
230:14,23,24
**generates** 251:17
**generating** 186:3
**generic** 216:16
217:25
**gentleman** 120:15
268:12 292:16
**geographic** 69:4
**gert** 26:17
**getting** 72:24
175:25 186:22,23
186:25 223:11
234:2 248:25
337:1
**give** 20:1,13 72:5
75:20 76:17
100:18 132:7,10
265:8 324:7 340:1
340:10
**given** 18:2,22 35:7
35:25 61:12 71:11
91:15 125:24
182:13 291:14

341:13,18
**gives** 177:6
**giving** 19:21
160:21
**glean** 145:5
335:20
**go** 19:17 27:7
28:14 37:17 39:12
71:17 85:4 86:3
113:7 121:21
158:2 159:4 185:2
187:10 188:4
201:14,24 222:11
227:15 255:8
257:10 265:24
273:18 283:17
290:9 322:14
329:12 338:6
**goal** 68:13 89:20
90:25 91:14 105:3
108:1 325:18,21
326:15
**goals** 89:16 222:14
251:13
**god** 245:23
**goes** 30:3 294:7
**going** 19:20 23:3
25:14 27:7 36:9
37:19 40:7 61:11
62:25 63:2 65:6
68:11 74:7 75:15
79:23 89:8,9
98:23 102:6 113:7
113:8,11 114:16
121:18 122:16
137:22 154:11
159:13 162:6,15
164:23 170:2
171:19 176:24
177:21 210:1
219:17 220:12

[going - hesitate]

221:15 222:12
229:3,4 244:9
254:23 256:12
257:13 267:11
283:10,17,18,22
284:18,19 299:18
299:21 300:1
302:13,16 320:6
322:25 329:3,7
338:3,17
**good** 17:1,2
121:17 154:10
199:3 220:11
257:20 320:4
337:22,23
**gosh** 53:15 98:20
**gotten** 230:13
**graduate** 27:20
**graduated** 188:8
219:8 322:10
**graduation** 42:22
130:7
**grant** 6:16 8:10
57:16,20 58:8
59:6,8,15,17,18,20
59:24 60:3,9,17
122:4 123:11,12
123:14,19 124:10
124:15,15,19,23
124:24 125:11,21
125:25 126:2,6
127:2,7 128:20
129:2,5,14 199:21
215:14 221:17,24
222:14 224:20,22
235:20 237:16,20
238:21 293:23
297:15,19 298:1
298:10,11,14,18
299:4,8,10,13,16

**grants** 57:8,22
59:11,13 125:3
200:6,10 214:20
215:1,5
**graph** 79:4
**great** 220:15
269:20
**greater** 91:2
251:22
**green** 36:9 268:13
268:15,17 269:7
270:14 316:3,17
**ground** 19:18
**group** 254:20
285:20 306:5
**guarantee** 308:19
**guess** 253:17
259:20 338:3
**guesstimate** 97:12
232:19 252:9
299:16
**guesstimated**
299:7
**guidance** 111:2
**guides** 33:17,20
**guilty** 108:9
**guthrie** 193:13,14
193:17,20

**h**

**hagy** 215:10
**half** 172:19
**halfway** 131:14
156:8
**hand** 134:18,18
342:6
**handbook** 6:5
80:12 83:16 84:11
85:12 274:12
**handed** 323:24
**handled** 65:6

**handouts** 8:20
36:6 315:21,24
323:6
**hanne** 148:15
**happen** 299:21
**happened** 137:25
**happens** 70:3 71:5
75:11 182:3
**hard** 33:18 77:24
170:3 171:11
179:18 182:7
184:14 248:6
249:4 250:2
256:21,25 318:25
319:2,20,21
322:16
**hartman** 16:2,2
**hate** 297:9
**hawkins** 4:12
15:21,21
**head** 190:19
**headed** 244:9
**heading** 152:9
283:23
**health** 3:8 15:23
16:3 54:21 58:12
58:15 59:10 73:17
77:12 79:25 80:1
110:18 112:9,24
112:25 113:1
114:20,23 118:11
118:12 120:18
123:22,25 131:18
132:1,18,20 133:2
133:7,9,16 134:2
134:12 142:2
205:18,19 211:7
216:8,24 218:12
221:20,22 237:6
237:11,19 239:9
241:1,5,6 280:19

286:5 310:10,13
**hear** 339:12
**heard** 17:3
**hearing** 19:9 76:3
**hearings** 18:10
19:3
**held** 108:10
257:15
**help** 23:16 39:10
66:13 74:13 76:7
88:22 102:15
109:21 114:17
137:19 179:13
182:10 203:5
213:18 274:21
297:11 321:8
**helped** 137:3
**helpful** 72:18
145:5,11 175:21
252:24 253:3,5
271:10 277:4,6
335:17,24
**helping** 52:3 275:7
**helps** 335:20
**hereinafter** 16:22
**hereunto** 342:5
**herman** 3:4 5:11
15:24,24 323:15
323:17 324:3
336:14 338:2,15
339:17
**heroin** 39:1 150:9
150:12 151:3,11
151:18,22 152:4,8
152:13,15 229:13
229:18 231:17,25
232:13 279:25
280:2,5,8,9 306:21
308:9,11,22 321:4
**hesitate** 165:6

**hey** 251:19
**high** 18:1 31:20
32:1 135:1,2
207:25,25 209:24
209:24 254:8,8
284:5
**higher** 29:24
41:11 42:15,18
91:5,14 98:3
335:25
**highest** 27:13 30:1
91:9 97:21 99:10
**highly** 284:2
**hilton** 1:22
**hinder** 80:2
**hipaa** 104:6
191:23 192:5
**hired** 50:2 114:12
**historically** 51:8
104:25 127:17
333:20
**histories** 190:3,12
190:18 191:5,6,13
**history** 7:4 70:13
74:19 76:8,14
77:13,14 110:11
170:8,12,18
173:10 176:1
185:15 186:2,4
188:15 191:3,11
232:8 238:8
**hold** 338:19,22
**home** 17:14
120:13 306:12
**honest** 48:6
**hoover** 65:22
**hoped** 214:8
**hopefully** 223:11
318:19
**hoping** 223:15

**hospital** 113:2
118:14,18 255:11
**host** 270:5
**hosted** 270:18
**hosteler** 3:9 16:6
**hour** 62:25 121:19
220:13
**hours** 21:14 22:10
28:18 29:5,6
34:17 35:3 36:3
75:24 160:18,18
249:22 250:1
289:18 298:21
299:3,6,12 300:3
**house** 6:10 59:22
60:16,23,24 61:3
61:23 62:4,11,15
72:22 73:8 76:23
76:24 77:20 81:7
81:11 90:11 91:6
93:3 105:23
110:19 111:5,8,14
112:25 118:9
119:25 126:3
127:14 129:3,4,18
129:23 130:10,16
130:23 131:7,9
134:1 141:15
181:4,10,20,25
187:6 196:16,23
197:2,2 223:1,4
224:19 227:13,16
228:20 229:3,8
231:1 282:21
294:8 304:7
307:16 315:18
**housing** 62:9
213:12,16
**hover** 97:13
171:12

**hovers** 90:19
**huge** 136:24
**huh** 50:5 84:5
110:12 118:6
147:5 156:14
259:17 282:25
284:17 313:6
**hundreds** 17:25
93:20 257:9

**i**

**ibh** 8:18 112:25
120:12,14 304:15
306:5,10,11
307:15 309:10
311:25 313:3
**idea** 72:15 88:20
170:17 309:3
311:7
**identification**
83:19 101:14
105:25 113:19
122:6 146:8
154:19 168:12
173:21 183:1
185:17 192:16
197:16 201:1
204:10 210:23
215:23 221:1
225:16 235:24
241:20 258:22
285:1 304:17
323:10 336:21
**identified** 23:11
64:7,13,21 74:4
81:16 82:15 95:17
106:3 110:7
115:17 117:1
127:7,19 149:5
154:12 162:23
168:4 180:5
183:15,19 192:20

201:4 208:20
209:7 211:1 228:6
231:4,17 235:15
236:6,25 237:13
242:15
**identifies** 144:23
158:17 174:17
200:10
**identify** 36:2
44:10 49:11 57:6
67:18 69:22 85:3
109:13,21 112:6
112:21 116:11
118:4 137:4 138:5
141:2,10 142:7
147:21,25 152:25
153:10 158:7
169:23 180:18
183:25 184:5
202:7 205:2
218:25 230:10
231:7,16 233:20
234:8 236:16
241:4 242:25
245:8 331:9
**identifying** 48:9
95:13 173:2 186:7
188:14 200:6
215:5 219:15
242:16
**ii** 30:4,13,18 183:9
**iii** 28:8 30:5,14,20
34:16,19 183:9
**iilc** 170:22,24
172:13 177:19
**illegal** 92:13 260:3
306:1 326:6
**illegally** 281:2
**illicit** 92:3,10,16
92:21 93:4

**illinois** 4:7
**illness** 133:16
  134:7
**illnesses** 134:13
**immediate** 8:1
  220:22
**impact** 103:20
**implementation**
  180:2
**implemented**
  171:2 226:3 330:9
  332:6
**implementing**
  47:2
**important** 145:1
  153:22 154:3,7
  178:19 271:18
  276:23
**importantly**
  178:25
**imposed** 206:11
  206:16
**impressionistic**
  135:21
**impressions** 25:17
**improper** 93:24
  159:16 335:9
**improperly** 93:12
**improve** 272:14
**improving** 223:12
**inaccurate** 107:4
**incarceration**
  105:2 106:10
**include** 37:6 44:2
  44:6 61:8 62:5
  77:10 78:18 85:17
  92:17,21 93:5
  100:16 116:22
  128:13 234:21
  240:22 241:1
  243:7,13,17,18

244:18 249:5
257:5 274:11
287:25
**included** 73:6
84:13 222:6
343:13
**includes** 212:11
**including** 205:14
212:18 306:2
**incorporated**
59:23 60:17 73:9
76:24 119:25
126:3 127:15
129:3 134:1 181:4
223:1 227:14
228:20 304:7
345:12
**increase** 57:3
89:20 95:24 100:9
135:1,7,21 136:9
136:21,23,25
138:14 139:13,14
139:20,24 160:10
161:24 162:9
214:23
**increased** 136:13
202:1,19,22
203:18 204:22
**increases** 135:11
137:14
**incur** 214:3
**independent** 23:20
**index** 5:1,5 6:1 9:1
**indiana** 3:3 15:25
323:21
**indica** 150:19
**indicate** 47:23
150:16 183:25
189:13 222:12
227:2 286:23
329:24 339:5

**indicated** 95:18
139:12 152:21
236:20 273:24
276:18 281:14
293:24 306:9
307:1,7,11 329:2,7
329:20
**indicates** 36:23
150:19 151:15
233:18 284:1
306:21 328:9
**indicating** 176:16
211:5 221:14
343:13
**indication** 151:18
**indicators** 47:9
**individual** 31:18
32:24 47:10 70:12
70:20 92:23 93:10
98:11 129:7 152:3
158:15 165:13
169:4 172:25
174:7,16 183:4
186:8 188:10
196:3 255:3 264:8
268:10 326:12
327:16
**individual's** 93:6
93:17 158:12
243:22
**individuals** 31:21
32:2 35:12 47:5
51:4 70:17 88:3
116:4,20 138:15
207:3 208:16
228:11 230:4
238:9 239:22
240:4 253:16
269:11 274:13
286:6 287:7
292:14 315:22

318:13 326:6
330:6
**ineligible** 130:4
**inform** 158:22
164:10 201:8
**informal** 314:19
**information** 6:4
6:18 7:21 18:7
27:2 32:13 44:18
44:20 48:1,22
56:18 59:3 66:11
72:6,25 73:10,22
74:14 76:7 77:6
77:11,22 78:1,8
79:1,16 83:15
90:7 94:1,20
126:25 133:21
137:1 138:11
139:15 140:4
141:15,17 142:1
143:2 145:4 146:3
149:14,19 153:20
164:21 165:10
169:25 175:19,22
181:2 186:14,18
186:22,24 187:1
188:21 189:4,7
190:7 193:4 198:4
198:21 201:8,18
204:15 215:20
224:18 226:1
227:5,17 228:18
229:7 235:9
236:16 239:12
240:23 241:8
242:7,15 243:4
245:4 255:5
256:13 257:5
267:15,19 276:11
281:21,23,24
282:14 288:2

289:1 290:5,6,8
291:9,20,22 292:2
301:13 307:18
309:4 311:12
314:3 317:25
318:7 319:12,18
325:3,6,7 328:2
329:1,6,13 332:14
332:19 333:9
335:10,20
**informational**
106:6
**informing** 302:12
**ingram** 25:2,3
26:4,14 52:15
148:13 220:6
287:12
**initial** 65:19 69:23
71:4 73:3 75:11
86:18 132:15
170:21 211:14
221:13 226:2,11
281:22 282:15
294:11 328:24
**initially** 63:13,22
115:19 116:18
128:8 177:14
182:21 186:6
211:5 212:2 219:6
299:5 300:25
302:20 326:21
**initiate** 75:5
**injury** 202:1,6,7
204:21 205:1,2
**inn** 1:22
**input** 56:23
173:10,12 188:14
223:22 291:14
298:6
**inputted** 78:1
176:23 186:14

**inputting** 186:6,21
**inquire** 142:11
255:11 268:17
280:19,21,23
**inquiry** 74:18
78:19 226:12
231:19
**institute** 36:17,23
105:11 115:2
165:21 172:15
179:4 258:12
259:4,15 268:20
268:23 269:19,24
272:18 288:23
**instituted** 224:4
**institution** 99:3
**instructions** 340:2
340:10
**instrument** 145:17
**instrumental**
172:20
**insurance** 212:5
294:15
**integrated** 229:14
**intensive** 43:3,6,14
45:3,8,15 51:11
96:24 289:4
**interacting** 260:17
**interaction** 275:11
275:15
**interest** 29:11
274:7 281:13
**interested** 286:2
342:3
**interesting** 149:19
149:22 164:20,22
242:19 281:13
287:17,23
**interestingly**
164:4

**interrogatories**
7:12 200:18,25
**interrogatory**
7:15 27:3 201:25
204:1,7,20
**interval** 120:13
306:11
**intervention** 54:22
54:24 171:19
**interview** 6:22
44:19 46:21,24
71:17,20 72:23
74:8 75:23 154:17
155:7,22 314:13
**interviewed** 93:20
135:1 314:14
**interviewing**
134:25 158:3
160:6
**interviews** 44:13
44:23 135:17
138:19 162:24
279:2 321:14
**introduce** 277:10
**introduced** 100:25
145:13 323:17
**introduction**
71:21
**investigate** 215:11
**investigates** 306:1
**investigation**
173:21 174:5,6
275:17
**investigations**
46:1,4
**investigative**
174:1 305:17,18
305:24 332:11
**invited** 317:14
**invoice** 7:6 192:14
193:10,24 194:2

**invoiced** 195:8
**invoices** 194:24
**involve** 74:17 85:7
300:17
**involved** 18:20
21:9,18,22 22:3,6
24:5,11,14 27:1
29:13 30:10 54:14
56:1 58:21 59:14
59:16 64:1 70:22
73:2 87:25 88:4
95:13 103:18
124:18 140:10,14
140:22 142:7
147:13 158:7
163:7 184:5
197:23 201:7,17
206:8 226:12,24
227:9 238:13
242:16 243:1
244:24 245:8
248:20 251:10
252:3 254:4 268:7
271:16,23 279:3
**involvement** 55:8
57:15,19 84:12,16
88:22 115:25
119:3,5 163:3
198:11,20 200:5,8
216:18 250:17
266:12 274:23
275:7
**iop** 62:5
**issue** 39:9 46:23
47:11,17 55:20
68:17 109:23
137:3,10,22
142:20 151:1
239:11 253:10
267:1 308:10
321:16,22 327:18

**issue** 328:12 329:7
333:23
**issued** 189:25
193:11,12 194:25
**issues** 34:3 40:24
47:25 172:7
267:11 277:15
295:10 313:21
317:7 329:3
335:22 337:17
**item** 227:2
**items** 251:13
298:19
**iv** 80:17 232:8

**j**

**j** 1:25 341:6
342:14
**jackson** 56:16,17
59:4 62:22 218:14
220:8
**jail** 105:4
**jan** 237:8
**jane** 4:6 16:17
**jane.dudzinski** 4:8
**january** 6:12
113:15 114:1
224:6,6
**jeff** 6:3,6,14,21
83:13 101:10
122:2 154:15
**jeffrey** 1:17 5:7
15:4 16:19,24
257:18 261:20
292:16 323:14
341:9 343:8 344:4
344:9 345:4,13
346:20
**jeffrey's** 292:17
**jflowers** 2:8
**jill** 148:11 149:9

**job** 30:25 35:6
39:5,5 43:5 45:14
45:16,19 46:5,6,7
47:6 49:18 51:22
116:10 129:13
164:19 181:16
186:12 197:24
215:10 245:12
253:22 296:23,24
337:22,23
**jobs** 50:10 62:23
**jodi** 2:5 15:14
**jon** 26:7
**jones** 2:18 15:20
**jonesday.com**
2:21
**jsturmi** 245:15
**judge** 1:9 19:5
25:25 26:1,6,7,14
52:24 53:1,2,5,6,8
53:10,11,15 55:7
55:11 65:7,20,21
65:21,22 81:6
82:4,8,17,23 83:24
84:1,2 86:8,10,12
86:20,20 88:21
89:4,9,12 122:24
123:8 125:23
126:10 128:25
131:3 155:3,18,19
155:20 172:17
182:10 188:22,24
189:6 218:16
225:24 250:21
264:1 273:2 274:9
299:23,25 315:13
320:13 321:6,17
334:4
**judges** 45:24 54:3
54:6 55:17 56:22
175:24 179:1

263:23 299:25
**judicial** 155:3
160:16
**judy** 148:25
**julie** 8:5 123:5
225:10,25
**july** 36:19 188:5
258:9 259:14
336:11,11
**june** 7:21 8:15
215:19 284:23
285:7,19 286:22
288:7,8 293:10
**jurisdiction** 63:12
63:14 65:4 66:8
68:20 69:4,5,10,14
108:24 109:15,22
174:17 175:16
177:2 255:7
268:24
**jurisdictional**
222:4
**jurisdictions** 64:6
64:12,17,21
146:24 175:1
176:17 274:6
**jurisprudence**
88:15,17 89:7
**justice** 27:19
146:21 250:25
251:4,7 276:4
288:10 324:14
325:8,23 326:15
**juvenile** 42:25
143:5
**juveniles** 43:9
44:24

**k**

**k** 4:3
**keep** 35:22 44:20
129:19,25 196:10

219:23 224:21
229:5 246:16
248:6 249:12,15
250:2 253:19
256:7,16,21
312:11,20,24
313:8,11 319:22
319:25 320:6,9
**keeper** 129:19
**keepers** 114:14
127:16
**keeping** 181:19
247:6 249:18
**kelly** 149:2
**kept** 44:17 108:23
133:13 231:9
282:12 283:1
289:11 290:14
320:1 321:25
322:1,2,6,11
**key** 3:10
**keyboard** 186:21
**kim** 65:22
**kimberly** 285:15
**kind** 173:1 265:11
270:1
**kinds** 19:10 281:5
**kmorrison** 2:21
**knew** 271:18
**know** 19:4,5,12,22
21:13,14 25:20,22
25:24 29:2,7,11
30:3,4,12,13,19
31:10 32:5,9,22
33:8,12 34:3,6,8
35:2,6,11,12,19,24
36:10,10,23 37:13
37:15 39:6,7,16
40:6,6,11,19,20,23
44:17 46:2,15,20
46:21 48:3,15,21

**[know - know]**

49:7,16,21,22 50:9
50:14,21 51:10,14
51:21,23 52:18,20
53:11,16,17 54:2,3
54:6,12,13,23 55:9
55:15,17,20 56:1,2
56:23,25 57:8,10
58:4,13,19,20,21
58:23 59:3,10
60:2,4,8,16 62:1,2
62:6,8,15,17,20,21
64:1 65:3,4,5,13
65:18,19 66:9,17
67:12 68:8,9,10,13
69:11,13,13,17
70:6,11,15,25 71:3
71:25 72:16 73:14
73:15,18,19 74:14
74:20 75:13 76:14
76:16 78:9 79:5
79:23,24,24,25
80:15,16,22 82:2
84:18,21,22 85:8
85:10,12,16,23
86:13,19 87:6
89:10 90:8,17,24
90:25,25 91:4,11
91:12,13,13,13
93:19,20,21,22
94:19,20 95:19,20
95:20 96:8,19,20
96:23 97:13,19,25
98:1,2,3,3,7,22
100:12,12 102:5
102:22 103:18,21
104:24 105:2,8,9
105:11 107:6,24
107:25 108:18,18
108:19,21,24,25
109:2,20 110:4,5
110:25 111:1,6,12

111:13,14 112:19
113:3 114:12,13
114:14,22,23
115:13,14,18,18
116:8,10,16,21,21
117:1 118:20
119:11 120:16
123:13,23 124:14
124:22 125:4,10
126:13 127:5,16
128:10,14,15,17
128:24 129:2,12
129:13 130:8,17
130:18 131:3,4
132:2 133:3,20,23
133:24,25 134:1
134:23,23 135:3
135:18 136:6,11
137:3,4,10,12,15
137:18,22 138:9
138:25 139:12,15
140:20 142:11,11
142:19,20,20,22
143:2 144:1,6,14
144:15,17 145:9
145:11,16 146:23
147:11,12,15,23
148:17 149:11,14
149:24 151:14
152:19,21,23
153:6,14,16,23
154:7 155:18,25
156:2,2 157:2,3,6
158:13,14,19,20
160:12,13,14,19
160:20 161:14,14
161:15,16,18,23
161:25 162:2,3,4,6
162:7,8,23,24
163:4,11,18
164:13,15,16,17

164:19,23 165:5,8
165:13,21,23
166:5,6,6 167:22
167:23 169:11,18
169:19 170:1,12
170:13,19 171:1
171:12,24 172:5,6
172:8,9,12,18,20
173:6,6,24 174:11
175:21,24 176:19
176:24 177:16,18
177:19 178:2,15
178:17,19,23,25
179:5,8,9 180:14
180:15 182:9
183:7,8,9,13
184:24 186:13
187:7 188:16,23
189:14,22 190:2
190:11,17 194:7
194:24 195:6,7,15
197:5,21 198:10
198:10 199:2,15
199:16,20,23
200:10,12 202:22
206:9 207:2,5
209:5,17,17,20
211:14,21,22
212:17,21,25
213:5,18,22,24
214:7,18 215:11
215:12 217:5,12
217:16,17,21,24
218:1,4,4,10
219:14,16,22,22
221:22 222:13,15
222:22 223:6,10
223:23 224:9,23
225:1 226:15,16
227:12 228:3
229:24 230:4,13

230:14,19 232:9
232:20 233:16
234:3,4,5,5 235:7
236:5,11,20 237:8
238:19,22 239:8,9
239:18,19 241:1
242:1,8 245:18,21
245:23,23 246:1,3
246:4,17,20,25
247:1,3,22,23
249:8,25 250:7,19
250:19 251:18,20
252:1,2,6,12,19,20
252:24,24,25
253:16 254:2,4,7
256:9,10,10,11,13
256:14 257:2,3,5,8
263:3 264:8
265:23 266:6
267:6,13 268:2,5
268:25 269:1,8,10
269:10,18,20
270:4,6,16,21,24
270:24 271:19
272:8,9,11,11,20
272:21,22,25
273:2,9 274:5,7,18
274:24,25 275:2
275:18,24 276:15
276:19,20,23
277:4,7,7 278:7,16
278:25 279:5
280:22,23,24
282:2 284:14
287:2 288:7,20,21
288:25 289:3,11
290:1,15 291:2,4,7
292:1,9,18 293:9
293:13 294:2
295:4,7,10,10,11
295:16,16 296:6

296:10,21,23,23
296:24 297:1,2,3,4
297:5,6 298:6,7,9
298:13,17,20,25
298:25 299:6,7,19
300:3 301:11,13
301:14,15,16,22
301:23,25 302:7
303:21,22 305:15
307:14 308:6,7,8
310:7 311:18,23
312:17 313:25
314:11,21,22
315:1 316:12,15
316:16,21 317:2
318:9,11,16 319:2
319:4,6,7,15,16,17
321:5,13,14,15,16
321:18,22,23
322:6,7,8,15 324:6
326:18,20,25
327:9,11,18 328:3
329:3,10,11,13
330:9 331:22,24
332:1,5,6,7,11,22
332:22,25 333:19
333:23,25 334:5,6
334:7,8,9,11,14
335:7,8,10,21,23
336:1 337:6 338:5
**knowing** 145:8
233:4 335:12
**knowledge** 31:10
31:21 32:2,7 34:1
38:14 39:3 60:14
60:22 64:15 66:7
67:17 78:4 106:18
106:21 119:23
126:11 128:1,23
130:21 133:19
140:8,11,25

152:15 180:24
195:3 199:24
200:4 202:7
203:18 205:3,23
206:4 210:13
214:12 216:19
217:15 224:17
231:18 241:11
246:19 289:25
290:14 291:24
292:23 295:21,23
303:25 307:19
309:5 320:14
321:5,6
**known** 164:18
**kristin** 2:19 15:19
**kron** 7:10 200:21
**krutko** 83:4 116:8
186:11 289:10,10
289:11 298:6,25
299:2,12 300:4
321:13

**l**

**l.p.** 1:12
**lab** 62:7 162:7
187:6
**labeled** 242:11
**labor** 289:4
**laboratories** 4:4
**lack** 206:1 219:10
235:10
**lacks** 203:9
**ladder** 30:4
**lakemore** 175:3,5
175:7
**lakeside** 2:20
**language** 87:11
238:14,15,16
**laria** 194:6,22
**larry** 292:15

**lastly** 175:14
**late** 143:12,22
144:2,10 284:9
**laura** 2:12 16:10
17:3
**law** 26:12 140:9
140:21 155:5
158:8 173:18
174:17 184:6
202:2 204:22
205:17 242:16
243:1 244:17,24
251:8,11 275:12
276:24 305:25
326:21
**lawful** 16:19
**lawsuit** 24:12,15
24:18
**lawyers** 21:9
**lazy** 272:15
**lcdc** 28:8,13 30:4,4
30:4 34:16,19
35:1
**lea** 170:20
**lead** 142:14
**leading** 278:6
**leads** 170:10 173:9
173:14,17,23,24
**learn** 33:9 71:25
252:15 318:19
**learned** 288:3
318:8 319:12
**learning** 287:15
**leave** 45:14 49:18
49:20 104:11
305:11
**leckler** 268:4,5
**led** 138:24 335:21
**lee** 292:15,19
**left** 167:2 305:13

**legal** 4:12 72:20
82:7,8 259:24
271:15,17 326:1
326:16 343:1
346:1
**legitimate** 335:13
**lengthy** 75:23
245:23
**letter** 343:19
**level** 18:1 27:13
30:1 31:5,20 32:1
51:9,11 76:18
107:20 119:13
137:10 274:20
300:16 322:12
**levels** 29:22,24
30:22
**lewis** 4:5 16:18
**leyimu** 2:5 15:11
15:11 22:21 23:9
23:18,21 24:2
26:24 27:4 29:14
31:14,24 33:6
34:5 35:18 37:17
38:6 40:16 41:7
41:13,20,24 42:10
43:23 48:12,20
49:3,13 51:18
56:10 57:4,13,25
58:18 59:2 60:5,7
60:13 61:4,17,25
62:12,24 64:8,14
67:4,16,21 68:6,24
74:6 75:2 77:2
78:3,15,21 79:13
80:8 89:1 90:16
91:19 92:18 93:7
94:3,9 95:10 96:6
96:17 97:5,10,16
97:23 98:19 99:6
99:13,21 100:11

103:2,24 104:20
106:19 107:2
109:8,18 110:2,24
111:18 117:8
119:9,22 121:7,15
121:17 124:11,20
125:2,8 126:12
127:4,9,21,24
128:4,21 129:6,24
130:12,20 131:1
131:23 132:5,8,14
132:23 133:17,22
134:8,14,21
135:13,23 137:8
138:2,16 139:10
140:1,16,23 141:6
141:13,20 142:9
142:16 143:8,14
143:23 144:12,21
145:3,15 150:14
151:6,13 152:1,17
153:2,12 154:5
157:1,13 158:1,11
158:25 161:22
163:8 164:12
165:3 166:14
167:20 180:12,22
181:3,12,21 183:3
183:17,23 184:12
189:18 190:8
193:7 194:11,17
195:1,10 198:7,16
198:23 199:8,13
200:2,7 201:10
202:25 203:4,9
206:24 207:10
208:6 210:7 214:5
220:11,15 221:5
227:21 232:16
233:13 234:16
235:2 239:3,23

240:11 241:10
242:4 243:20
245:1 246:12,22
247:7 253:13
260:24 261:5,12
265:16 273:21
277:5 278:14,23
279:19 280:3
282:11,19 284:12
289:21 290:11
291:11,23 292:8
292:22 293:2,5
295:3,15 296:1
298:2 299:24
300:6 303:11,18
308:3 309:18
310:6 311:1,9,14
312:6,14 313:16
313:22 314:5
315:8 317:10
320:4,9,12,18
321:10 322:19,23
326:8 327:8
328:15,22 330:14
333:18 335:15
338:4,13 343:5
**lflahivewu** 2:15
**libby** 8:9 235:19
**license** 28:11,12
28:16 29:13 30:7
30:11 31:4 32:8
33:15 34:4,11
35:4,21 258:4
**licensed** 28:9
112:8
**licenses** 28:2
114:21
**licensure** 28:6,8
30:23 34:16,20
35:24 41:10
312:25

**lieu** 171:20
**life** 78:25 167:24
**likewise** 174:6
**limited** 18:21
84:14 127:13
151:19 178:6
226:14 228:25
268:16 275:20
321:5
**line** 209:18 218:2
324:25 343:13
345:7 346:3
**lines** 66:8
**link** 181:9
**linked** 173:19
**links** 134:6
**lisa** 8:19 323:5
324:12
**list** 33:5 63:16
79:5 113:8 117:19
118:4,15 120:6
176:12,25 177:4
212:17,18 213:1
240:18 249:25
293:25
**listed** 118:2,25
119:7,20 120:10
120:21 169:20
213:5 237:8
308:20 325:19,21
345:7,17
**listing** 345:7
**lists** 177:19 199:3
212:20 242:21
286:10
**literally** 257:8
**literature** 31:12
134:5,11 272:21
**litigation** 1:7 15:6
24:22 25:10,21
26:22 27:3 159:11

202:4 204:25
234:7,25 235:6
248:15,21 249:9
250:6 256:25
261:25 292:19
313:21 317:8
343:6 344:3 345:3
**little** 27:8 31:2
59:25 63:23 66:17
98:3 114:16
121:18 149:13
172:18 212:21
238:21 254:10
258:1 284:15
323:20 336:4
**live** 68:19 76:10
224:9 252:15
**lived** 138:9
**lives** 337:19
**llc** 2:4 3:3 4:3
15:25 323:21
**llp** 2:11 3:4,15 4:5
**local** 64:6,12 184:3
254:21,22 277:9,9
**located** 173:24
322:12 339:7
**location** 74:12
270:20,25
**log** 185:2,25 186:1
**logan** 3:16
**lombardi** 82:9
**lombardi's** 82:9
83:25
**long** 21:11 22:9
53:3,13 86:2
160:20 238:10
246:16 255:6
274:25 280:22
284:14 301:7
325:18,21 326:15
327:10

**longer** 21:14 109:2
196:8 283:12
302:13 305:9
320:6,8
**look** 67:18 70:13
79:24 84:22 88:8
89:14 90:6 94:22
110:9 117:19
133:20 139:23
141:10 142:18,22
147:17 149:25
152:6,25 153:21
160:14 169:8
171:11 175:24
176:21 181:1
188:25 189:10
190:6 218:6,15
221:9 228:18
240:9,14 260:1,11
268:25 283:10
284:18 292:6
336:24
**looked** 231:8,12
237:16 279:8,15
290:16 310:17,24
**looking** 57:8 70:1
76:5,6,8,9,13
87:14 101:3 103:9
117:18 120:5
123:15 142:23
146:25 147:2
153:3,4 157:4
158:5 163:14
165:9 167:3
169:24 170:12,14
176:9 214:22
222:16 223:10
233:17 244:22
246:25 262:7
272:14,14 313:2
324:22 329:16

331:3
**looks** 79:4 189:23
226:2 230:5
**lori** 148:9
**lose** 290:7
**lost** 205:21
**lot** 18:20 36:8
132:6,11 158:16
176:11 179:14
207:22,25 208:1,9
208:17 209:8,9,22
214:13 216:17
254:3 269:21
277:15,17 305:22
326:21
**lots** 49:5,7 160:13
165:9,10 177:5
228:1 239:15
252:22 256:12
274:13,17 279:5
309:21,22 337:21
**low** 102:13,21
300:16
**lower** 107:20
**lunch** 166:13,16
**luncheon** 166:20

---

**m**

**m** 3:5
**m1** 108:8 302:13
**ma'am** 69:7 91:25
147:5 182:5 193:9
283:16 320:21
**madam** 343:10
**magic** 36:4 302:17
**mail** 6:3,6,12,14
6:17,21 7:17,21
8:1,5,9,15,17,19
83:13 101:10,17
101:21 102:2,11
103:5 113:15,22
113:24,25 114:1

118:4 120:5 122:2
122:21,23 123:4
123:10 125:13
146:2 147:2,9,18
147:22 148:2
149:17 154:15
155:2,15,18 200:9
210:18 211:5
215:19 216:6
218:16,16 220:21
221:14 225:10,23
235:19 237:9,25
245:11,14,17,21
245:24 246:1,10
246:20 247:5
248:19 249:12
268:17 283:13
284:23 285:6,9,18
285:25 286:21
288:7 293:10
297:8 304:3,14,20
304:24 306:20
309:2 311:13,22
312:5,9,10 318:25
319:6 323:5
324:12,15,17,21
336:6
**mails** 245:21
246:13,16,18
247:2
**main** 48:15 50:10
62:23 98:5 113:3
129:7 172:4
175:23 199:23
219:18 222:13
223:17 268:16
**maintain** 34:11
35:4,21 52:18
129:23 130:19
181:11 191:6
219:18 220:3

228:24 255:25
273:14
**maintained**
130:10 142:6
179:17,20,21
181:24 240:22
**maintaining** 34:16
**maintains** 90:11
181:23
**major** 137:22
272:6
**majority** 132:11
233:6 240:5
251:22
**makeup** 51:20
326:20
**making** 80:18
153:18 172:21
214:13 270:22
295:7,18 296:13
**males** 309:11
**manage** 18:4
39:10 108:19
295:22 304:2
**managed** 60:17
**management** 61:6
61:7 149:8 222:25
**manager** 19:4
50:11 61:12 81:11
131:9 149:3,11
178:18 282:22
304:8
**managers** 62:1
199:1
**managing** 51:23
52:17 91:11
301:22
**manner** 93:25
131:5 135:16
160:18 214:8
217:4 335:10

manners 39:7
manpower 295:9
manual 87:16,22
231:4,14 274:11
330:24
manufacturers
339:2
march 38:9 75:9
88:6 172:22 224:9
marcus 82:9
marie 81:13
315:19
marijuana 44:3
150:10 187:21
mark 83:9 99:16
101:4 105:15
113:11 145:23,23
154:11 168:4
185:10 191:17
192:8 197:8
200:15 203:22
215:15 225:6
235:14 241:12
284:19 336:15
marked 6:2 83:18
84:7 88:10 101:13
105:24 113:18
122:5,12,12
125:14 139:13,13
139:19 146:7,13
154:18,22 162:9
168:11,15 185:11
185:16,20 192:15
193:10 197:15,19
200:25 204:9
210:22 215:22
220:25 225:15
230:19 235:23
241:19 258:21,24
283:11 284:25
304:4,16 323:9

336:20
market 1:23 162:2
marking 101:6
marquette 17:15
master 7:15 204:8
material 33:14
84:13 106:3
materials 26:19
84:23 85:14 88:1
250:3,5
matt 148:7
matter 15:5 27:16
28:21 31:5 36:20
37:15 42:14 318:4
334:20
matters 29:10
32:12 273:11
maximum 43:8
mckesson 2:10
16:9,11 257:23
md 1:8
mdl 1:7
mean 18:24 26:4
29:16,17 37:3
39:19 77:4 83:25
119:2 134:10
136:16 139:20
149:23 158:15
170:24 171:16
186:16,20,21
189:16 195:12
196:22 244:1
248:25 277:17
310:9 329:11
meaning 202:3
means 57:8 61:10
189:21 228:10
meant 43:15 180:3
measure 153:10
mechanism 48:5,9
49:15 58:14 74:16

94:16,18 158:20
167:22 216:7,10
224:24 236:17
240:12 273:22
289:16 294:9
mechanisms 160:5
160:14
medic 254:24
medicaid 116:20
212:6 294:15
medical 42:9
142:4 205:16
medication 38:13
39:18,20,23 40:3
42:1,3 74:21 75:6
93:2,11,12 115:23
116:19,22 145:9
212:3,4,10,13
213:8 280:21
288:1 294:14
328:7 331:9
medications 44:4
44:6 74:22 75:1
145:10 280:7,13
328:4 335:9,21
medicine 41:23
42:16 335:13
medina 270:16
meet 20:19,25
21:11 22:9 62:2
72:21 100:14
116:4,12 170:21
183:12 199:2
265:18 286:12,16
meeting 8:20 21:4
21:9,15,23 22:3,7
24:20 25:4,6,7,9
25:13,18,21,22
26:2,10,19 56:20
61:11 124:22
251:14 265:12,12

266:3,5 287:8,16
288:3 319:3,11
321:20 323:7
325:9
meetings 23:11
26:22 59:17 65:10
65:19 66:2 85:18
250:22 256:5
265:22 266:1
271:20 283:4,5
318:7,10,21 319:9
326:19 328:25
329:12
meets 177:9,12
member 69:24
70:3 71:17 219:12
250:24 265:25
267:14 298:22
315:19 325:12
members 48:2
81:7,15,19,20
82:14,24 135:25
186:5 207:21
266:10 273:3
314:20 315:16
316:20 317:15
331:25,25
memo 7:18 210:19
memorandum
64:19
memory 246:17
262:6 302:2
mental 54:21
58:12,15 59:10
79:25 110:18
112:9 114:19,23
123:22,25 131:18
132:1,18,20 133:2
133:7,15 134:2,6
134:12 211:7
216:8,24 218:12

[mental - municipal]

221:20,22 239:9
241:1,5,6 286:4
310:10,13
**mentally**  337:24
**mentioned**  22:11
23:23 29:4,21
31:3 32:17 48:24
51:5 59:6 60:23
72:10 76:20 84:25
90:13 96:12 107:8
111:21 114:25
115:7 129:18
139:19 141:1
155:10 184:17
193:1 196:12
230:22 257:21
258:7 261:22
264:9
**merits**  297:11
**met**  20:17,22
100:25 166:10
230:7 268:6 293:8
293:9,10,14
**meter**  196:9
**meth**  158:23 160:2
160:24
**methadone**  212:12
**methamphetam**
157:23
**methamphetamine**
157:20,24 160:11
161:9,20 162:7,11
162:12
**methamphetami...**
306:24
**mexican**  162:3
**mezzanine**  322:12
**mic**  95:1 257:12
**michelle**  148:19
**microphone**
322:22

**middle**  260:12
**midway**  260:14
**midwest**  343:17
346:1
**million**  8:2 60:10
60:11 124:16
220:23 225:2
297:22
**mind**  277:3
**mine**  116:9 165:15
197:24
**minimal**  275:13
**minimum**  34:17
43:15
**minute**  191:20
264:17 283:13
324:7 327:23
338:5
**minutes**  122:17
160:20
**misdemeanor**
45:22 69:11 70:2
70:5 71:10 98:14
109:14 169:13
180:17 183:8,11
300:18 301:3
302:20 303:1,6,8
**misdemeanors**
176:7 302:9
**missing**  103:12
339:6,14
**mission**  98:18
109:6
**misunderstood**
244:3
**misuse**  94:8
**misused**  93:16
**mj**  187:18
**model**  98:6,8,25
100:16 180:15
188:7 222:20

262:16 301:10,24
302:18 303:20,22
311:8
**modifications**  7:19
210:20
**module**  260:7
**mogadore**  63:21
175:11
**moment**  221:9
257:11 322:18
336:3,4
**moments**  118:16
**money**  57:16
62:17 199:11
206:13 207:6,19
222:15 224:22
294:3,6,7,18,19,23
294:25 295:13
298:15
**monies**  57:9,11
58:20 64:16
196:17,21 213:14
213:23 214:25
293:23 294:13
297:9
**monitor**  182:24
**monitoring**  71:14
146:18
**montesano**  8:18
304:15,21 305:2,3
309:11 311:13
**month**  136:4,5
196:6 197:5
218:24
**monthly**  265:12
**months**  24:19 25:8
40:12 196:8,11,11
196:11 219:4
264:13 305:14
315:4 318:12

**montrella**  56:16
56:17 218:14
220:7
**moore**  8:20 323:6
324:13 329:20
**moot**  299:20
**morgan**  4:5 16:18
**morganlewis.com**
4:8
**morning**  17:1,2
178:8 257:21,25
261:23
**morphine**  38:20
**morrison**  2:19
15:19,19
**motley**  2:4 15:12
21:2 26:13
**motleyrice.com**
2:8,9
**mou**  64:22 68:3
**move**  19:18 91:23
288:11 339:8
**moved**  157:19
162:16
**moves**  32:24
**moving**  280:24
**mt**  2:7
**multi**  222:4
**multiple**  30:15
31:3 48:24 49:6
61:12 238:9 239:8
239:22 240:4,6
274:8
**multitude**  135:16
167:25 329:1
**muni**  270:13
**municipal**  6:10
7:1,6 17:8 18:4
53:16,19,23 54:1,4
54:10,19 55:22
56:8,12 57:12

60:20 62:18 63:14
63:24 64:18,24
65:5,8,23 66:8,25
67:3,24 68:20
82:16,20,22 83:1
84:10 87:15 95:23
102:1,6 105:17,23
108:4 109:3
110:17 121:10
128:5 140:3 168:8
169:25 173:25
176:6 189:8
192:13 193:3,20
194:6,23 196:19
198:4,5,14 199:18
199:25 205:17
206:5 210:11
215:8 218:13
224:21 227:6
242:3,3,6 268:12
274:17,19,22
292:15 330:23
**muri** 148:15
**mytownneo** 8:22
336:18

**n**

**n** 3:4
**n.d.** 1:13
**name** 21:7 34:6
38:17,25 51:25
59:7 70:9 73:11
81:8 82:11,13
83:4 129:10
147:23,25 155:4
185:1 192:1 215:9
218:25 257:21
261:23 264:9,13
264:14 268:12
289:8 292:17
315:2 316:23
323:17 324:23

343:6 344:3,4,15
345:3,4,21
**named** 341:9
**names** 104:5,8
**narcotic** 38:12
**narcotics** 81:25
153:16 332:11
**national** 1:7 15:5
105:10 268:20,22
269:19,24 272:17
272:23,25 273:5
343:6 344:3 345:3
**nationwide** 170:11
**native** 241:14
**nature** 18:2,15
34:13 36:11 39:14
43:1 45:19 50:17
51:17 53:25 64:4
64:10 68:1 84:15
110:21 118:23
120:19 155:21
199:22 213:24
221:24 237:12
250:16 251:16
278:7
**ndci** 270:21
**nearly** 8:2 220:23
**necessarily** 184:5
184:7 245:3
**necessary** 130:17
178:7 331:6
338:20
**need** 20:5,10 23:1
55:8 120:25
126:18 135:2,4,7
207:25 208:20
209:24,25 254:8
263:18 277:2
285:11 298:9
327:4 332:8 334:7

**needed** 7:22 50:20
68:15 71:1 109:12
110:6 180:17
186:13 213:23
215:20 265:19
288:12
**needs** 56:18 58:15
135:11,21 136:2,3
136:3,9 209:10
267:13
**neighborhood**
46:16 50:14
232:22 316:14
**never** 19:16 91:2
166:10,11 290:16
291:25 294:6
**new** 86:8 109:20
223:18 318:7
**newer** 54:25 171:1
217:16 292:16
**nice** 20:1 153:21
**nicholas** 3:16
16:15
**nicole** 215:10
**nida** 82:13,18,19
267:7 331:21
**non** 21:9 38:21,23
67:19 107:20
144:19 145:1
163:16 187:25
212:13 213:8
231:22 232:4
249:12
**nonprofit** 60:25
**norm** 65:1,2
**normal** 48:22
**normally** 179:16
**north** 2:19
**northeast** 274:3
276:12

**northern** 1:2 15:7
**northwest** 2:13
3:5 17:15
**notarized** 343:14
**notary** 341:6
342:14 343:25
344:10,18 345:15
345:23 346:23
**notation** 188:9
198:18
**note** 186:2 245:19
343:12
**notes** 94:5 128:12
128:17 193:19
247:9 256:4,7,23
314:17
**notice** 248:13
**notification** 35:25
**november** 1:18
15:2 123:1 334:16
334:21 342:8
343:4
**nrodriguez** 3:18
**numb** 147:19
**number** 6:2 35:11
54:5 56:4 62:5
69:21 70:9 73:11
76:9 87:7 88:3
89:21 90:21 91:5
91:9 97:21 99:1
99:10 100:9
111:13 112:18
130:1,2,3 133:14
134:25 138:14
140:14 141:3,10
144:14 145:13
146:10,18 147:19
155:19 163:12
169:2,20 171:20
172:23 173:2,4,12
174:2,8 176:4,7

182:20 184:25
185:1 187:1
189:23 195:4
209:25 212:9
227:3,10,23,24
228:7,9,22 229:7
229:12 230:14
231:16 232:12
233:3,10 254:3
264:19 267:9
273:6 274:6 279:1
288:24 306:1
312:17 320:15
325:16 343:7,13
**numbers** 68:16
70:10 95:24
103:19 106:22
111:15 136:18
157:5 171:12
173:11 233:12
345:7

**o**

**o** 2:5 264:16 343:5
**oarrs** 328:4
329:17,23 330:4,7
331:8,13,17,19,23
332:2,4,24 333:7
333:16 335:2
**oath** 19:22
**object** 9:2,3,4,4,5
9:6,6,7,7,8,8,9,9
9:10,10,11,11,12
9:12,13,13,14,14
9:15,15,16,16,17
9:17,18,18,19,19
9:20,20,21,21,22
9:22,23,24,25 10:1
10:1,2,2,3,3,4,4,5
10:5,6,6,7,7,8,8,9
10:9,10,10,11,11
10:12,12,13,13,14

10:14,15,15,16,16
10:17,17,18,18,19
10:19,20,20,21,21
10:22,22,23,23,24
10:24,25 11:1,2,2
11:3,3,4,4,5,5,6,6
11:7,7,8,8,9,9,10
11:10,11,11,12,12
11:13,13,14,14,15
11:15,16,16,17,17
11:18,18,19,19,20
11:20,21,21,22,22
11:23,23,24,24,25
12:1,1,2,2,3,4,4,5
12:5,6,6,7,7,8,9,9
12:10,10,11,11,12
12:12,13,13,14,14
12:15,15,16,16,17
12:17,18,18,20,20
12:21,21,22,22,23
12:23,24 13:1,1,2
13:2,3,3,4,4,5,5,6,6
13:7,7,8,8,9,9,10
13:10,11,11,12,12
13:13,13,14,14,15
13:15,16,16,17,17
13:18,18,19,19,20
13:20,21,21,22,22
13:23,23,24,24,25
14:1,1,2,3,3,4,4,5
14:5,6,6 22:21
23:9,18,21 24:2
26:24 27:4 29:14
31:14,24 33:6
34:5 35:18 38:6
40:16 41:7,13,20
41:24 42:10 43:23
48:12,20 49:3,13
51:18 56:10 57:4
57:13,25 58:18
59:2 60:5,13 61:4

61:17,25 62:12
64:8 67:4,21 68:6
68:24 74:6 75:2
77:2 78:3,15,21
79:13 80:8 89:1
90:16 91:19 92:18
93:7 94:3,9 95:10
96:6,17 97:5,10,16
97:23 98:19 99:6
99:13,21 100:11
103:2,24 104:20
106:19 107:2
109:8,18 110:2,24
111:18 117:8
119:9,22 121:7,15
124:11,20 125:2,8
126:12 127:4,9,24
128:4,21 129:6,24
130:12,20 131:1
131:23 132:5,8,14
132:23 133:17,22
134:8,14,21
135:13,23 137:8
138:2,16 139:10
140:1,16,23 141:6
141:13,20 142:9
142:16 143:8,14
143:23 144:12,21
145:3,15 150:14
151:6,13 152:1,17
153:2,12 154:5
157:1,13 158:1,11
158:25 161:22
163:8 164:12
165:3 167:20
180:12,22 181:3
181:21 183:3,17
183:23 184:12
189:18 190:8
193:7 194:11,17
195:1,10 198:7,16

198:23 199:8,13
200:2,7 201:10
202:25 203:10
206:24 207:10
208:6 210:7 214:5
227:21 232:16
233:13 234:16,17
235:2 239:3,23
240:11 241:10
242:4 243:20
245:1 246:12,22
247:7 253:13
260:24 261:5
265:16 273:21
277:5 278:14,23
279:19 280:3
282:11,19 284:12
289:21 290:11
291:11,23 292:8
292:22 293:2,5
295:3,15 296:1
298:2 299:24
300:6 303:11,18
308:3 309:18
310:6 311:1,9,14
312:6,14 313:16
313:22 314:5
315:8 317:11
320:18 321:10
326:8 327:8
328:15,22 333:18
335:15
**objecting** 203:11
**objection** 9:1,3,5
9:23,24 11:1 12:3
12:8,19,19,24,25
13:4 14:2 22:20
25:14 64:14 67:16
104:6 127:21
159:1 161:12
181:12 201:11

203:3,8,13 206:1,7
206:25 235:1,10
245:5 317:10
**objections** 7:11,14
200:16,23 203:25
204:6
**objectives** 89:17
**obligations** 117:7
**observe** 85:15
154:4 274:14
**observed** 136:9
**obtain** 28:11,16
29:5,6 32:8 34:19
35:3 58:16 66:14
94:13 103:6
116:15 125:7
173:23 181:2
184:9 213:17
226:15 227:16
228:21 229:7
332:9 335:8
**obtained** 28:1,12
35:1 57:11 59:24
133:25 211:18
280:16 281:18
**obtaining** 29:13
57:16,20 124:18
213:21 227:9
**obvious** 246:16
**obviously** 26:14
36:3 39:4 50:8
52:22 68:13 137:1
158:15 170:17
177:19 179:8
182:20 183:11
195:15 219:15
226:17 232:17
234:2 236:13
239:9 251:11
259:11 261:2
267:14 291:17

302:15 318:10
320:25 329:11
336:25
**occasion** 241:3
275:16 281:25
282:6
**occasional** 124:22
**occasionally** 55:6
175:10 199:21
200:9 243:21
256:6 267:5 281:3
319:5 321:14
**occasions** 20:18,19
61:12 139:22
178:6 183:6,13
273:6 274:6,8
**occur** 25:7 209:21
**occurred** 166:2
177:1 209:20
280:22 301:12
302:1,2
**occurrence** 178:14
**occurring** 146:23
238:7 239:1,6
**october** 7:16
189:11 204:9
**odd** 278:21
**offender** 46:23
88:22 106:14
107:14 126:25
169:2 172:7 173:1
177:9 186:9
213:19
**offender's** 49:16
170:18 175:25
**offenders** 45:22
70:1,4 89:3 92:2
95:5 105:3 106:10
108:2 135:2 171:4
208:19 227:7,10
228:6 254:8

**offending** 92:4
**offense** 69:12
93:14 107:15
158:16,17 169:3,9
169:13 172:10,11
177:2 180:6,8
183:5,9,13 242:11
242:14,24 243:6
243:12,16,19,24
244:7,10,19,22
**offenses** 43:10
70:2,5 107:21
108:3 109:14
169:16 171:4
244:4
**offer** 59:11 62:8
269:21
**offered** 6:9 105:22
**offering** 270:25
**offers** 104:18
105:7
**office** 71:2 82:7
110:16,16 138:11
142:5 149:2
196:20 250:9
263:21 266:9,11
266:13 277:10
287:11 313:11
320:2,3 321:25
322:3,3,7 326:23
342:6
**officer** 17:11
18:23 25:1 43:4,6
45:4,9,15,17,20
46:13,15 49:19
52:5,12,14 56:21
70:21 71:2 82:1
84:18 126:18,22
127:6,18 143:6
144:9 148:8,10,12
148:14,20,22,24

149:1 177:15,17
178:2 182:2
186:11 254:23
265:6 275:19
287:13 305:4,21
318:10 319:9
333:24
**officers** 47:16
70:19 83:6 251:9
**official** 344:15
345:21
**officially** 189:22
294:1
**offline** 192:6
**oh** 22:10 82:21
134:22 244:3
273:7 324:3
**ohio** 1:2,12,13,23
2:20 3:11 7:8,10
7:13 15:8 17:16
27:11 28:5,19,22
33:23,24 34:7
35:13,14,17,25
36:16 40:4 43:13
84:24 85:1,2,23
92:14,14 107:15
107:18 108:6
112:8 114:19,21
114:24 146:16,17
146:24 171:3,21
172:12 173:20
174:5 183:5 184:2
197:15 200:21
203:23 204:4
211:7 216:8,23,23
218:11 258:11
274:3,18 276:12
286:4 305:17,18
305:21,24 326:25
331:7 334:1,11
341:2,7 342:7,15

343:2

**okay** 23:2 63:18
69:9 87:9,13
88:12 94:24
101:18 117:21
121:20 122:19
126:16 131:13
144:4 148:2 150:4
153:8 154:10,24
155:1 156:7 159:9
159:19,23 167:1,2
167:5 186:25
192:18 198:2
201:23 202:11
205:11 206:10
210:14 216:3,4,5
225:18 226:10
227:8 236:4 238:4
241:22 243:9
247:18 257:7,12
258:15 259:18
260:11 261:9,13
262:12,15 263:7
267:18 283:16,17
283:22 285:6,12
285:13 293:22
304:19 309:8
320:9,12 322:24
324:9,10 325:2,17
326:2,10,14
327:13,25 328:6
329:19 330:16
331:15,20,21
332:13,23 333:2
333:12 334:22
335:1 336:10,14
337:2,3,4,11

**old** 149:24 230:19

**older** 140:12

**oldest** 246:10,20

**oldfield** 53:10,15
65:20 86:20
122:24 125:23
126:10 128:25
172:17 218:16

**oldfield's** 53:11
123:8 225:25

**oldham** 25:25 26:6
26:7,14 53:2,5
81:6 82:17,23
84:1,2 86:11
155:19 188:24
264:1 273:3
315:13 321:17

**oldham's** 82:5
155:3 274:9

**omhas** 112:10
114:9,12,12,18
115:16 211:9
217:17 218:24
226:11,20 288:22
289:23 290:17,22
292:3 294:17

**once** 70:3 84:21
85:13 89:4 137:2
160:4 166:25
180:15 182:2
250:7 254:7
279:21 290:9
299:17 318:12
333:4

**one's** 94:19 335:23

**ones** 82:15 113:5
172:4 199:23
250:13 321:20

**ongoing** 34:11
266:9

**onion** 337:18

**online** 33:19 162:6
218:1 259:9
272:20 290:2

291:13

**op** 1:13 141:4

**open** 214:24
307:15 338:19,22

**opening** 33:12

**operate** 18:6 62:7
65:9 66:12 98:9
98:24 103:16
105:14 173:25
272:12 274:2,15
291:13 306:13
310:25

**operated** 120:18
128:7 290:4

**operates** 54:19
62:5 72:15 103:15
123:25 128:6
146:16 292:4

**operating** 108:5
110:5

**operation** 274:24

**opiate** 1:7 15:6
39:22 115:21
116:5 136:14,16
136:22 137:5,10
137:16,21 138:7
138:15,21 139:5,7
139:9,14 142:15
143:1 152:5
165:14 187:22
207:24 208:21
209:8,24 230:5,16
232:6,7,22 233:6
250:14,17 251:25
252:16 253:20
254:6 255:24
257:6 260:2
265:25 280:13
314:22 317:1
324:15 325:8
327:14,18 328:21

328:25 343:6
344:3 345:3

**opiates** 37:15 38:4
38:5 40:24 41:3
144:14 162:17,20
163:11,12,14
243:16,18,24
279:6 308:18,19
328:7 329:4 336:2

**opined** 40:6

**opinion** 89:2
102:22 136:12
142:14 156:22
157:10,22 158:22
159:3,6,10,13,15
160:1,21,23 161:2
161:8,16 162:19
164:10 327:12

**opinions** 55:16
156:3 164:17
165:6,9,15 167:17
272:22

**opioid** 18:13,16
24:22 37:7 38:10
38:11,23 39:14,24
40:11 139:21,24
140:14 141:1,4,4
141:12 142:15
143:12,21 151:24
163:23 164:11
206:12,17,21
208:13 209:14,19
210:5 229:13,18
231:17 232:13
233:11,21 234:10
236:6 243:7,13
244:18,19,23
254:1,13 260:15
266:3 267:1 280:6
312:13 313:7,14
325:22 327:6

328:12

**opioids**  38:5,15,21
39:3,8 40:9,15
41:6 44:7 92:17
92:22 143:6
144:11,19,20,25
145:1,14 187:24
187:25 205:21
207:8,17 208:5
209:2 231:21,22
231:25 232:4
244:8,12 281:2
283:24 284:2
329:8

**opportunity**  8:16
43:11 45:16 75:21
123:14 131:17
269:5 284:24
285:23 286:1
287:16,24 303:1

**opposed**  43:12
101:2 105:3

**option**  172:15

**oral**  28:19,24
30:19 32:10

**orally**  267:16

**order**  7:16 28:16
32:8 33:14 49:11
79:17 80:5 96:3
117:15 141:10
152:25 153:9
158:22 160:1
169:9 204:9,16
209:12 210:3
231:7 240:8
242:25 283:12
286:12

**ordered**  46:1 47:5
51:4 71:12

**orders**  72:8

**organiza**  114:17

**organization**
114:18

**oriana**  6:10 59:22
60:16,23,24 61:3
61:23 62:4,11,15
72:22 73:8 76:23
76:24 77:1,20
81:7,11 90:11
91:6 105:23
110:19 111:5,7,14
112:25 118:9
119:25 126:3
127:14 129:3,4,18
129:22 130:10,16
130:23 131:7,9
133:25 141:14
181:4,10,10,20,25
187:6 196:15,23
197:1,2 223:1,4
224:19 227:13,16
228:20 229:3,8
231:1 282:21
294:7 304:7
315:18

**original**  282:9

**originally**  27:9
107:9,9

**originated**  108:25

**osamn**  153:6

**osom**  146:16

**osu**  165:21 319:12

**outpatient**  117:19
117:22,25 118:4,7
118:25 119:6,13
119:21

**outreach**  215:9

**outside**  24:15
57:12 60:20 65:1
65:2 121:13,14
159:10 244:10

247:5

**outsourced**  181:19

**outsources**  121:5

**overall**  56:8

**overdose**  136:25
138:8,23 141:23
142:6,8 205:21
255:3,5,9,10

**overdoses**  139:18
278:7

**overflow**  178:1

**overprescribing**
260:19

**oversee**  142:12

**overview**  88:10

**ovi**  54:20

**owned**  120:17
128:7

**oxycontin**  38:19

**p**

**p.m.**  122:9 166:19
166:22 220:17
221:4 257:14,17
261:16,19 323:1
323:13 338:9,12
339:19,20

**packet**  72:5 73:7
73:16 329:13

**packets**  94:6

**page**  9:2 77:10
88:9 89:15,16
91:22 94:23 95:2
106:8 114:1
126:15 131:12
146:25 147:18
150:2 152:6 156:5
156:8 163:20
167:3 188:3 198:1
201:22,24 202:11
202:16,18,24
203:20 204:19

205:9,12 206:6
226:8 228:6
229:11 238:6
259:18,19,20,23
259:23 260:4,12
266:25 283:19
285:3 325:16,19
327:21,22 328:1
330:17,19 336:24
337:12 343:13,15
345:7 346:3

**pages**  87:4 94:22
198:3 338:23

**paid**  217:7 218:5
253:18 294:13

**pain**  38:12,13
280:13 328:8

**pamphlet**  72:6

**panel**  314:12,15
314:16,18 315:12
315:17 316:5,7,13
316:18,21

**paper**  73:25 156:1
282:9

**paperwork**  73:2
295:9

**paragraph**  88:11
102:11 126:15
131:15 150:7
151:16 157:18
163:22 167:7
238:5 260:15
330:18 337:13

**parole**  172:8

**part**  35:6 37:9,9
37:16 40:22 43:13
44:24 46:21,23
47:6 54:13 63:21
64:18,18 65:5
66:2 78:13 79:3
80:25 82:1 84:23

**[part - pharmaceuticals]**

86:7 87:23 95:15
107:22 110:4
116:3 125:21,22
135:18 153:24
169:5,20 175:12
185:24 205:9
217:5,22,23
226:24 231:3
253:22 258:3
271:19,20 277:23
284:10 286:7
288:5 300:2
314:14,16 315:17
316:2,4 327:11
328:13,20,24
332:1 333:13,23
345:9
**participant** 6:5
83:16 84:11 85:12
**participants** 89:21
99:2,5 213:3
227:3 229:13,17
230:6,11 232:13
284:3 331:8
**participate** 55:3
65:24 117:15,16
124:24 155:6
171:9 211:13
217:10 250:10
255:13,17,20
268:19 269:9
293:17 300:19,23
301:4 302:21
303:2,9
**participated** 26:9
26:21 129:4 270:9
317:14
**participates** 56:8
81:4
**participating**
99:11 100:10

251:24 286:3
**participation** 8:7
80:6 211:18 214:1
225:13
**particular** 37:1
39:9 41:5 49:8
56:24 57:7 81:3
88:21 89:11 97:18
104:4 114:14
115:18 125:24
133:24 137:15
138:23 142:20
165:13 169:6
174:16 176:17
188:9 189:24
198:18 211:23
234:5 237:20
256:12 260:10
329:10
**particularly** 157:9
**parties** 192:3
**partner** 131:17
133:2 269:20
**partners** 157:4
158:4 160:12
227:15
**parts** 215:13
**party** 124:12
126:7 186:7
315:25 342:3
**pass** 32:9 257:11
338:3
**passes** 213:18
**path** 133:9
**patterns** 276:13
**patton** 285:15,16
285:19 287:9
288:3 293:8
**pause** 249:20
**pay** 62:15 116:21
117:10 196:4

212:5,11 294:11
**paying** 212:3
**payroll** 216:13,14
216:20 217:4,10
217:13,19,19
218:4,7,8,19,21
219:20 220:4
**peel** 263:4
**peeling** 337:17
**penalties** 327:1,4
**pending** 20:6
24:22 80:23 172:5
**pennsylvania** 3:17
**people** 104:7
252:22 254:5
282:5 300:16
302:8,19,25
305:22 310:12
316:13,19 318:2
**people's** 104:5
**perceive** 144:7
**percent** 50:15,15
50:19 171:13
218:4 306:21,24
307:2,5,8 308:10
308:21,21,24
309:11,13 311:5
**percentage** 132:7
132:10 278:11,19
279:25 280:4
308:8,13,14,17
311:4
**percocet** 38:20
**perfect** 166:15
240:13 272:9
**performs** 103:22
**period** 136:8
156:24 157:12
160:3,25 161:10
161:21 162:21
219:3,11 228:4

**periodically**
264:23
**permissible**
172:11
**permission** 248:5
274:9
**permitted** 214:18
333:25
**person** 26:15
70:15 72:25 79:24
82:5 106:11 117:1
140:19 169:22
175:22 177:20,21
187:2 189:1
213:23 226:23
230:20 237:17
254:25 270:19,23
275:16 290:12
292:10,11
**person's** 21:7
132:17 189:25
289:8
**personal** 57:15
100:16 123:9
164:25 273:11
**personally** 42:8
45:11 100:14
105:8 140:5 199:6
220:3 229:6
273:13 294:25
331:19 344:11
345:15
**personnel** 331:6
**persons** 202:7
205:3
**perspective**
136:12 259:24
**pharma** 1:12 4:3,3
**pharmaceuticals**
3:8 4:3 16:3

**pharmacy** 41:19
  42:19
**phenomenon**
  278:22
**philadelphia** 3:17
**phone** 16:13
  302:10 343:3
**physical** 80:1
  337:20
**physically** 61:11
  85:15 255:8
  321:25 322:1,11
**physician** 93:6,18
  260:18 316:24
**picture** 128:15
**piece** 164:21
  165:11 234:1
  237:23
**pills** 280:12,15,16
**pilot** 115:15
**pin** 223:22
**pinpoint** 142:19
**place** 19:11 64:20
  96:9 177:7 224:2
  228:21 229:2
  298:1 299:11
  301:8 303:4
  314:24 317:17
  341:20
**placed** 45:23
  106:7 128:13
  182:7 186:10
  196:3
**plaintiff's** 7:10,13
  200:22 203:24
  204:4 205:13,20
**plaintiffs** 202:20
  202:23 203:19
  339:9
**plan** 7:8 30:19
  197:9,14

**planning** 95:23
**plans** 280:23
**play** 154:2
**plea** 108:12
**plead** 108:9
**pleas** 98:9,23
  108:21 222:21
  274:20
**pleasant** 2:7
**please** 15:9 16:13
  17:12 27:12 67:6
  81:9 99:25 111:20
  150:2 203:16
  207:12 222:11
  227:2 229:12
  232:12 240:1
  243:11 264:15
  285:12 287:14
  343:11,11
**pleased** 179:2
**plenary** 59:16
**plus** 75:24
**po** 46:17
**point** 2:19 91:3
  121:18 123:17
  213:19,19 222:7
  222:18,19 223:3,7
  228:11 271:21
  282:24 299:20
  301:15 302:3
  304:9 309:20
  320:5
**pointing** 104:15
**points** 286:11
**police** 81:21,23
  110:15 140:2
  153:15,23 157:4
  158:4 160:12
  163:2 174:20
  175:6,7,8,9,10,11
  175:15 205:15,18

251:12 254:22,23
  266:15,17,22,23
  305:21 330:7
  332:10 333:24
**policies** 189:15
  269:1 271:11
  272:3
**policy** 80:12 87:15
  87:21 229:2
  274:11 330:23
**political** 27:18
**polster** 1:10
**popular** 158:23
  162:20
**popularity** 152:12
  153:10
**populate** 169:9
**populated** 186:18
**population** 69:6
  91:24 96:13
  103:16,23 109:5
  109:16,25 119:18
  121:6 132:3 135:8
  136:10 157:12
  278:20 307:25
  310:19
**portage** 42:25
  133:9 175:14
**portion** 57:10
  58:23 60:11 88:1
  125:16 207:7
  217:18 218:7
  225:1
**pos** 50:21 52:3
**posed** 155:22
  204:20
**position** 39:5
  49:23 129:11
  148:1 253:6
  264:23 265:14
  276:23 305:16

339:2,9
**positive** 187:5,18
  187:20,22
**possession** 158:19
  183:8 244:16
  301:3,5
**possibility** 95:24
**possible** 115:23
  169:14 215:11
  233:19
**possibly** 242:15
**post** 33:3
**potential** 32:25
  69:22 78:5,20
  81:1 91:7,18
  95:22 96:4 99:19
  100:5 174:23
  176:14 182:12
  183:2 277:7
**potentially** 66:13
  69:12 71:22 93:1
  110:7 121:2
  147:16 165:12
  171:5 211:20
  212:11 213:11,14
**powder** 156:19
**powdered** 150:7
  151:17
**powerpoint**
  249:13 316:1,6
**powerpoints**
  36:10 318:18
**powley** 147:3,6,7
  147:10,12,12
  283:14 302:11
**practices** 271:12
  272:4
**pre** 271:20
**predate** 247:2
**pregnant** 316:25

**preliminarily**
182:22
**preliminary** 7:2
70:8 71:1 168:9
168:20
**prep** 21:25 22:2
24:1
**preparation** 20:23
21:16 22:13 23:24
**prepare** 20:16
23:12,16 33:14
204:16 314:17
**prepared** 95:25
219:19 229:22
**preparing** 84:13
126:2 201:7,17
226:13
**prescribed** 93:5
93:17 236:20
328:5,7
**prescribing** 75:6
**prescription** 1:7
15:6 38:15,21,23
44:4,5 74:19
92:17,21,24 93:24
94:8,15 144:19,19
144:25 145:1,9,14
145:14 163:15,16
187:24,25 209:2
209:14 210:5
231:21,22 232:3,4
280:6 281:2
283:23 284:2
331:9 335:9,13,14
335:23 343:6
344:3 345:3
**prescriptions** 44:6
93:17
**presence** 341:15
**present** 4:11 21:1
21:3,6,6,20 22:5

25:23,24,25 26:1
49:16 83:7 89:25
94:17 97:7 129:8
135:9 136:15
141:21 162:16
177:16 195:16
199:4 214:21,25
255:18 264:13
268:24 287:5,8
319:11 322:4
330:5
**presentation**
28:19,22,24 30:20
156:2 307:19,21
314:18,23 315:23
316:1,2,13 317:3
**presentations**
314:9 317:7,16
**presented** 88:1
256:14 311:24
319:17
**presentence** 45:25
**presenter** 40:6
**presenters** 329:2
**presenting** 318:17
**presently** 52:10
**preserve** 248:14
**presiding** 52:24,25
53:5 55:7 65:21
86:11 225:24
334:4
**press** 221:15,25
**pretty** 79:19 90:18
97:20 137:18
164:18 220:9
245:20 278:21
314:19 337:19
**prevalence** 160:24
161:20
**prevalent** 163:24
277:1

**prevent** 171:22
**previous** 100:15
178:13 255:19
**previously** 99:23
283:11
**primarily** 38:12
44:12 49:14 55:14
66:6 75:20 80:14
105:2 111:1
116:19 126:1
128:11 132:15
133:4,6 151:1,3,11
156:19 170:12
178:16 179:1
196:1,1 199:17
217:3 252:12
266:17 316:24
332:7
**primary** 46:5
51:22 62:23 70:20
127:16 129:13,19
156:23 157:7
199:20 229:3
247:16
**print** 185:6 190:16
190:25
**printout** 6:9 8:14
105:16,21 106:9
185:25 241:13
258:20 259:2
**prior** 24:1 25:6
53:8 68:2 70:13
76:1 77:13 86:15
86:19,25 87:1
95:2 111:22
124:25 125:6
170:18 171:24
172:1 179:25
180:2,11 217:14
271:2 279:17
287:20 334:18

**prison** 176:4
**prisons** 105:4
**privilege** 20:9
22:23 201:13
**probably** 35:2
273:7 297:12
316:14 320:22
**probation** 17:11
18:22 24:21 25:1
43:4,6 44:17,22
45:4,9,15,17,20,23
46:12,15 47:16
48:23 49:1,12,19
51:17 52:4,11,14
52:19 56:21 70:19
70:21 74:1 83:3,5
84:18 90:9 94:5
110:17 121:11
126:18,22 127:6
127:18 128:5,12
128:13 143:5
144:9 148:3,8,10
148:12,13,15,20
148:22,24 149:1
149:17 171:15
172:8 177:15,17
179:23 182:2
184:10 186:2,11
187:7 189:5
191:14 196:2,4,4,6
231:9,10 233:17
247:10,13 248:10
248:23,24 249:5
251:9 265:5
273:10 275:19
282:13,18 283:2
287:13 289:6
305:4 318:9 319:9
321:25 322:3,13
333:14

**problem** 137:6
143:12,21 144:7
208:10 277:19
327:6,15
**problematic** 31:19
31:22 32:3 68:17
**problems** 238:11
336:1
**procedure** 16:21
80:12 87:16,16,21
229:2 274:11
330:24 340:7
344:5 345:5
**procedures** 189:15
**proceed** 263:6
299:18 300:1
**proceeding** 17:21
**process** 28:6,7,14
46:22 51:3 56:2
58:22 66:5 69:19
69:23 70:18,23
72:11 73:3 74:17
75:7,10 85:5,7
87:24 88:4 103:19
105:9 124:23
125:22 129:5
138:12 173:22
178:5 182:14
197:23 206:9
226:25 230:8
231:3,15 271:16
288:12 303:4
332:25
**processed** 69:16
196:18 215:3
**processes** 86:7
**produce** 269:12
**produced** 234:15
234:19,24 235:5
241:13 249:3,9,11
250:9 314:1

338:22 339:11
**product** 25:17
162:3 179:2
**production** 343:15
343:17,22
**professional** 28:1
**professionals**
146:21 168:1
252:14 253:6
**program** 6:9 8:6
18:5 19:5 50:11
51:15,24,25 61:10
66:11 70:16 71:24
75:4,8,17 76:2
80:3 81:10 90:1
95:4 96:22,24,25
98:16,18,24 99:12
102:9,13,20 103:1
105:22 107:10,13
107:25 108:12,15
108:19 109:7
110:1,8 112:7
114:9,10 115:10
115:12,13,15,18
116:15 117:7,16
123:17,18 130:2,3
130:4,6 131:9
147:14 171:1,7,10
171:18 178:18,21
179:23 180:4
181:15 187:3,4
188:11 191:8,15
196:16 197:4
207:4 211:6,9,13
211:19,25 212:8
213:2 214:2 218:1
219:8,9,23 222:4,7
222:18,19,23
223:3,19,23 224:1
224:12 225:11
228:2 229:1

230:11 238:8
239:19,21 240:3
247:14,22 266:19
272:12 274:8
286:4 290:2
295:22 296:3
297:11 300:10,11
300:15 301:1,15
301:23 302:3,8,15
302:16 304:1,7,9
310:23,24 322:6,9
334:10
**programming**
45:10 124:1
221:23
**programs** 62:5
111:5 223:21
247:19 269:1
304:11
**project** 7:21
114:15 116:3,7
117:4 211:14,23
212:10 214:7
215:20 216:13,15
216:20 217:4,8,10
217:13,16,20
218:9,19,22
219:20 220:4
226:2,4 287:18
288:15 294:6
296:13 297:13
298:19,23 300:2,5
**promoted** 49:21
49:23,25 50:3,7
**proof** 312:24
**prop** 128:18
**proper** 159:3
203:13
**properly** 93:11
**proportion** 132:2
208:12 217:7

**proposal** 8:10
235:21 238:1
**proposition**
159:15
**proprietary**
126:24 127:1,20
128:19
**prosecutor** 26:16
82:4 147:8 263:9
263:12,14,24
264:2,4,19,22
265:5,14 302:11
**prosecutor's**
110:15 263:21
266:9,11,13
**prosecutors** 109:1
263:12 264:12
**prostitution** 306:3
**protocol** 223:18
**provide** 19:2 24:7
42:2 45:9 55:13
56:17,23 57:7
61:15,23 62:16
64:3,17 65:12
67:10 68:13,19
76:17 96:3 97:3
103:9 108:1
109:15 111:9
112:12 116:2
119:16 121:9
132:18,19 145:6
202:5 204:15,25
207:6 212:8,13
214:10 223:12,15
229:8 232:2
243:23 245:3
251:21 269:2,3
272:22 275:7
281:21 286:5
313:24 314:2
333:5,7

**provided** 16:20 33:20 35:7 38:13 41:10 42:2 67:2,8 67:13,19 73:8 77:24 111:10 115:20 123:13 129:2 131:5 159:7 187:5 218:21 225:2 257:3 289:23 290:2,4,6 290:17 291:8,8 292:21 311:13 328:2

**provider** 118:20 214:10,15 296:15

**providers** 6:13 112:22 113:16 131:18 133:1 136:20 137:20 153:19 240:25 295:18 296:20

**provides** 35:10 72:20 111:7 117:3 121:13 132:16 213:1 216:25 268:23

**providing** 18:9 27:1 36:9 66:10 112:15 130:24 198:21 226:19 230:9 270:24 337:22,25

**provision** 205:19

**prudent** 232:18

**psychological** 118:11

**public** 3:11 78:13 105:13 110:16 112:23 118:12 125:4 142:2 197:10 252:12

253:7 258:25 341:7 342:14 344:10,18 345:15 345:23 346:23

**published** 106:25

**pull** 153:6 242:8 248:23

**pulled** 329:17

**purchase** 33:18 281:1

**purchased** 92:25 128:9 145:10

**purdue** 1:12

**purported** 106:17

**purpose** 57:1 102:2 147:9 170:15 173:3 182:18 252:10

**purposes** 56:19 83:18 101:13 104:6 105:24 113:18 122:5 146:7 154:18 168:11 173:5 174:1 185:16 192:15 197:16 201:1 204:10 210:22 215:22 220:25 225:15 235:23 241:19 248:21 250:6 256:24 258:22 285:1 302:14 303:14 304:17 323:9 336:21

**pursuant** 7:15 189:14 204:8 290:17 300:15 340:3,6

**pursued** 42:15,18

**put** 74:1 163:18 179:7 203:5 229:2 238:23 268:20 338:16

**putting** 182:22

**q**

**qrt** 255:2,6,13,21

**qualified** 341:8

**qualifies** 112:4

**qualify** 132:3

**qualifying** 174:8

**quantify** 105:5,12 207:1 209:5 252:19 278:17,25 295:4 298:24

**quantifying** 208:15

**quarterly** 250:22 265:12

**question** 18:25 19:25 20:6,9 23:3 23:5 24:3 25:19 29:15,17 31:15,25 32:6 41:8 42:11 57:18 61:18,20 62:13 64:9 67:5 67:22 68:7,25 75:3 77:3 78:22 90:18 94:10 96:7 96:18,20 97:6 99:24 100:1 103:25 106:20 109:9 111:19 121:8 126:9 127:25 130:13 133:18 134:9,15 135:14 138:3 140:17,18 141:7 143:9,15,19,24 150:15 151:7,9 152:2,18 154:6

156:12 159:18 160:16 161:6 163:25 164:4 165:4 167:7,21 180:23 181:13 184:13 190:10,13 190:15,23 194:12 194:18 195:2,11 198:8 201:16 203:1,15 207:11 210:1 227:22 231:24 232:12,14 233:14 235:13 236:2 238:18 239:4 240:1 242:23 243:10 247:8 249:21 253:14 254:9 261:6 262:1,7 275:6 278:16 279:20,24 281:13 291:18 299:1 303:12 307:22,23 311:15 313:23 314:20 315:9 320:19,21 321:7 321:24 328:16 335:16

**questionnaire** 226:12,13 229:22

**questions** 19:7,21 31:8,9 44:25 46:24 55:14 56:24 73:18 74:8,21 78:23 130:15 135:19 136:1 155:7,22 156:3 226:16 257:24 314:22 321:9 323:22 338:2,14

**[quick - recognize]**

**quick** 175:25 254:16,19 261:11 262:1 322:21 324:7
**quickly** 228:2
**quinones** 164:6,15 165:19 166:8,10
**quite** 35:14 133:8 192:21 224:7,10 273:25
**quote** 56:6 68:17 107:20 112:2 297:9,16 312:18 337:14,14,25
**quoted** 337:5
**quotes** 337:9,24

**r**

**r** 3:16 264:16,16
**raiola** 2:12 5:9 16:8,8 257:19,22 258:15 261:9
**raise** 68:3
**raised** 27:10
**ramar** 120:15,17 120:17
**random** 85:25 223:25
**range** 97:19
**ranged** 21:13
**rapport** 281:15
**rare** 278:21 333:2
**rarely** 65:3 175:11 256:21 314:10 333:1
**rates** 130:7,8 138:22
**ratio** 91:1
**rc** 102:13
**reach** 90:10 102:14 103:11 286:1

**reached** 269:7 277:8
**read** 102:17 106:15 131:19 202:9 204:19 312:9,10 344:5,6 344:12 345:5,6,17
**reading** 23:20 92:6 95:6 113:25 167:12 311:17 343:19
**reads** 88:13 89:20 95:3 102:12 106:9 126:17 150:7 156:9 163:22 167:8 187:11 189:12 193:23 201:25 202:18 205:12 218:17 227:2,6 229:12,16 238:6
**ready** 63:8
**real** 23:1
**really** 66:10 126:8 161:5 173:5 179:12 188:23 194:3 198:11 308:4 337:21
**rearrange** 261:11
**reason** 20:12 63:22 75:19 105:18 106:24 135:10 175:23 249:19 263:2,18 268:16 288:6 295:8 343:14 345:8 346:3
**reasonable** 246:9
**reasons** 98:5 246:16 309:22

**reassessed** 282:1
**reassessment** 282:8
**reassessments** 282:6
**rec** 319:5
**recall** 21:24 26:15 26:20 30:8,8,17 32:19 34:21 37:13 40:10 43:20 44:16 45:6 57:5 66:16 68:8 86:12 93:22 97:8,17,22 99:11 99:17 100:3,7 109:24 110:3 149:7,21 150:12 164:15 165:18 166:1,4 213:4,21 218:23 220:5 226:14 227:19 237:7 246:3 248:16,25 249:18 266:5 270:8 272:6 275:24 276:2 278:3 285:9 287:15 301:25 303:13 304:24 315:24 316:5,23 317:4,9 325:2 326:14 327:3 328:10,18 329:9 332:16 336:3,8,10 337:4,25 338:19
**recalling** 331:16
**receipt** 343:18
**receipted** 196:18
**receive** 26:18 29:23,23 36:5 48:1 54:2,5 56:2 57:9 58:6 65:13 66:9 98:13 103:13

115:17 121:2 124:6,9,10 182:16 214:19 222:17 227:17 245:16 248:13 294:4,16 318:1,24,25 319:2
**received** 27:24 45:16 60:3 114:8 138:10 139:16 155:3 224:15,22 248:23 249:16 256:17 258:1 267:19 269:23 270:2 272:5,16 275:21 276:3 287:19 290:18 294:5 297:14 298:16 302:10 306:17 325:7
**receives** 64:16 187:9 333:10
**receiving** 58:7 116:20 212:6 213:14 214:25 248:16 255:12 275:25 294:24 296:4 298:8 319:6 325:2
**receptive** 214:24
**recertification** 86:4,10
**recess** 63:4 121:24 166:20 220:18 261:17 323:2
**recipient** 324:20
**recipients** 147:19 147:22 149:4
**recited** 118:16
**recognize** 84:6 122:15 154:21 215:25 259:5

[recollection - recovery]

**recollection** 22:19
23:7 25:5 30:14
30:21 31:7 32:22
33:16 34:15 36:16
39:16 43:7,25
51:13 58:4 60:8
65:18 68:11 91:20
95:21 99:15
102:24 108:17
113:6 114:6
118:19 124:14
125:9,20 129:1
143:10 150:23,25
151:10 154:25
155:24 163:10
164:2,8 165:20,23
180:15 181:14
193:17 199:9
201:5,19 211:2
213:7 219:14,22
225:21 227:12
228:8 229:23
237:2,14 249:22
252:1 258:10
259:6 270:11
271:9,14 275:1,10
276:21 284:13
287:7 288:6
290:25 301:14
303:16 312:1,7
317:18 319:1,5,14
325:4 326:18
328:23 330:2
334:19,22 337:2,6
**recommend**
152:25 297:12
**recommendations**
55:16
**recommended**
33:3 76:18 95:3
119:12

**recor** 80:11
**record** 15:2,10
16:14 17:12 18:6
19:14,23 20:1
37:18,20,21,23
44:14 46:4 63:3,6
83:10 104:3,12
121:21,22 122:9
166:18,22 171:24
172:1,25 173:15
174:7,14 175:18
176:6,13,14,20
191:25 192:3
203:11 204:20
220:16 221:4
224:25 247:6
257:11,14,15,17
261:15,19 267:22
282:22,22 289:16
312:18 313:8
322:15 323:1,13
338:6,8,10,12,16
339:1,18 345:9
**recorded** 73:22,24
80:10,11 94:2,5,6
134:3 168:23
190:18 239:12
279:12,22 280:9
280:12 281:11,23
283:6 315:10
317:2,5 332:15
**recording** 47:20
48:21 79:9 187:3
**records** 44:20
90:12 151:21
176:11 181:24
209:11 210:2
218:10 234:9,21
239:13 240:10
282:20,24 283:2

**recovery** 6:3,4,7
51:24 52:1,17
53:18 54:9 55:4
55:24 56:7,19
57:3,11,16,20,24
58:3,16 60:12
61:3,8,15,24 62:4
62:11 63:12,25
64:5,11,15 65:17
65:21 66:1,15,20
66:23 67:9,14
68:4,22 69:4,18,20
69:22 70:7 71:6
71:23,24 72:1,2,6
72:17 73:23,24
74:3,5,25 75:17
76:1 77:7,23 78:2
78:6,11,20 79:12
79:18 80:6,20
81:13,13,14,18
82:2,14,25 83:6,14
83:15 84:10 85:20
86:5,11,16,22
87:15,22 89:21
90:22 91:10,17
92:1 94:14 95:4,9
95:14 97:4,9 98:7
99:1,10,12,18
100:4,10,19 101:2
101:11 102:20
103:1,7,15,16,21
104:18 105:6
106:25 107:9
108:15 110:22
111:11,16,24
112:2,12,17 114:8
116:1,12,14,23,24
117:2,6,12 118:10
118:24 119:12,17
120:3,20,24 121:4
121:12 124:2

125:1,6,10 126:5
127:22 128:3,14
129:9,20,23
130:10,19,25
132:3,19 133:13
135:3,8,25 136:10
138:19 141:5,11
141:11,16 145:2
149:6 151:22
153:24 154:8
156:10,24 157:11
157:16,25 158:23
160:9,24 161:10
162:13,20 165:2
167:9,18 168:20
169:14 170:22
171:8,23 172:14
179:3 180:1 181:6
181:11,18,23,25
182:12 186:10
191:2 193:15
194:9,21 195:5,8
195:17,19,22
198:13,21 199:12
199:16 200:6
206:11,16,20
207:16,22 208:4,8
208:17,24 209:1
209:13 210:4
211:12,17,25
212:8,14 213:2,6
213:16 214:2,14
214:19 215:13
217:9,18 218:7
220:1 222:6,22
223:2,8,15 224:2
224:11,15 225:4
225:24 227:20
228:12,15,23
230:11 231:2
233:19 234:9

238:17,25 240:22
245:12 247:21
248:7 253:25
255:16,20 262:17
263:8 264:5 265:6
266:18 268:9,18
273:4,13 274:15
275:9 278:1,4,9
279:2 280:1,25
286:6,16 287:25
291:10 292:5
294:4,5,21 295:2
296:6 300:20,23
304:9 308:1,9
309:17 310:18
315:20 318:2
321:3,8 322:6
330:23
**recurring** 309:12
311:6
**redact** 104:5
191:25
**reduce** 99:2
256:19
**reduced** 68:18
300:18 303:8
341:14
**reducing** 105:1
**reduction** 98:8,18
107:10,13 108:14
109:7 110:1 180:4
180:16 300:10
301:1,24
**reed** 3:15 16:16
**reedsmith.com**
3:18
**refer** 45:13 66:15
112:17,19 115:8
115:20 119:15
121:1 170:9 296:8
326:3

**reference** 31:11
44:5 83:24 92:10
92:16,21 93:4
131:21 134:19
136:19 139:8
172:2 230:15
235:5 243:7,13,15
243:18,24 244:7
244:11,19 249:21
276:14 333:20
343:7 344:2 345:2
**referenced** 24:25
25:4 26:3,6 44:8
54:17 117:22
127:2 128:19
137:25 141:23
144:17 158:7
173:14 202:23
203:19 206:6
211:10 216:11
232:2 239:14
257:5 315:5
341:13,18 344:11
345:15
**referencing** 31:12
134:20 139:3
163:6
**referral** 33:1,1
47:18 51:2 67:3
67:13 69:20 71:6
180:9 302:14
**referrals** 47:4 62:3
63:25 66:23 68:5
102:7,15 103:7
112:13 132:20
**referred** 65:16
67:9 68:23 74:5
74:18 78:5 79:11
81:14 109:2
114:18 158:21
177:12 232:25

240:10,20 296:15
**referring** 31:17
85:1 127:10
138:13 259:14
262:19 268:2
**reflect** 229:20
313:13
**reflected** 169:16
**reflects** 138:14
141:3 228:6 242:2
**refresh** 22:19 23:7
102:24
**regard** 161:1
163:4 167:17
206:18
**regarding** 266:3
340:2,11
**regards** 156:10
167:9
**regimen** 40:22
**regimens** 40:5
**region** 6:19 146:5
150:21 152:11
274:4 276:12
284:3,11
**register** 175:18
176:22
**regular** 56:23
129:9 263:17,22
266:1,16
**rehabilitation**
118:14,18
**relate** 18:12 40:14
79:10 312:12
**related** 19:7 24:23
40:9,24 41:3 42:3
42:16,19 44:25
45:5,7 46:7,24
48:18 55:15 74:21
78:24 95:2 102:7
135:15 136:23,24

139:17,21,24
149:14 171:5
205:14,19,20
213:9 226:17
249:17 256:1
273:11 291:1
298:4 313:7,14
317:7
**relates** 1:11 32:13
41:6 105:1 129:25
325:7 336:2
**relating** 18:16
41:16,19,23 56:18
**relationship** 54:8
61:2 62:10 64:5
64:11,23 65:25
89:10 110:22,25
118:24 119:3
120:20 266:10
**relative** 93:2 342:2
**relatively** 176:5
316:16 334:13
**relays** 328:4
**release** 8:1 220:22
221:15,25
**released** 200:11
**releases** 78:8
**relevant** 313:20
**relief** 38:13
**relievers** 328:8
**remain** 43:11
302:17
**remained** 51:23
52:8 180:3
**remaining** 171:14
**remains** 181:17
**remember** 21:7
33:7 152:20
153:14 165:23
270:14 307:16
311:16,17 314:6

315:1 334:14
**remind** 59:7
**removed** 118:20
**rendon** 3:10 5:10
16:5,5 261:21,23
320:7,10 322:20
339:1,12
**repeat** 23:5 31:25
57:17 61:19 64:9
67:5 100:1 111:19
151:8 201:15
203:15 207:11
239:25 243:11
320:20 328:16
**rephrase** 19:1
61:21 143:18
159:18
**report** 52:10,11
94:12 147:12
149:18,22,23,25
150:17 151:15,20
152:14 153:4
173:6,13 176:1
187:16 188:6
217:24,24 230:23
230:24 277:22
279:5,21 280:2,5,6
280:9,14,20 281:1
281:5 309:14
328:4 331:8
332:19,24 333:4,5
333:8,10,16
**reported** 76:15
77:7,23 79:2
93:23 132:13
141:1,4,11 142:1
150:22 152:12
158:10 165:1
174:7 187:25
277:22 278:12,18
279:4,10,11,17

280:12 281:7,10
284:3 290:22
307:24 309:9,11
325:25
**reportedly** 150:8
**reporter** 5:16
19:23 47:14 83:9
101:6 104:11
122:11 145:23
168:4 258:24
323:24 344:7
**reporter's** 5:13
341:1
**reporting** 45:4
47:8,25 48:2,9
74:15 79:7 94:8
116:4,11 126:23
138:21 139:14
144:18 218:18,20
219:3,11 278:4,9
281:25 282:15,16
287:21 290:20
306:4,16 331:7,19
**reports** 111:14
130:24 141:23
153:5 163:1 199:5
219:7,19 220:4
251:15,16,19
256:16,24 289:23
290:18 291:7,19
331:23 334:6
**represent** 105:16
261:24 323:21
**representation**
272:25
**representative**
72:22 81:21 82:6
82:11 100:24
254:21 287:10
326:22

**representatives**
263:1 276:16
**request** 25:11 57:2
130:17 181:8
189:6 219:16
226:1 230:25
234:12 248:23
249:1 250:20
265:20,21 291:25
292:24 293:7
314:7 331:23
332:13,19,21,23
334:4,5 338:18
345:9,11
**requested** 52:4,23
55:6,10 94:19
199:6 249:11
250:8 269:16
290:5,7 332:3
340:1,6,10
**requesting** 226:15
231:1 232:19
296:18 317:19
**requests** 54:2,5
90:9 131:4,6
214:13 226:20
227:15 257:2
295:8,19 296:17
**require** 41:11,14
85:12 86:8 269:8
**required** 43:14
80:5 85:21 86:3
86:25 87:2,23
125:21 127:15
196:4 288:16,18
289:13 298:5
343:25
**requirement**
28:17,18 29:4
30:20 34:15
116:11 117:9

318:17
**requirements**
51:12 116:4
130:24 131:3
177:9,13 183:21
183:24 218:18,20
218:23 286:11
287:21 288:20,24
289:3 290:20
**requires** 85:2 86:9
214:9 218:25
223:20 288:17
**research** 115:2
129:14,15 288:23
291:5
**reserve** 191:24
338:18
**resident** 277:9
**residential** 120:6
120:11,21,25
121:3 247:25,25
306:12
**residents** 67:20
205:20
**resolved** 89:5
**resource** 253:18
**resources** 55:21
57:7 64:3 91:18
96:3 99:19 100:5
103:9 116:23,24
207:20 208:3,9,12
208:18,25 209:13
210:4 211:21,24
223:13,14 253:11
272:17 275:22
276:4 288:15
**respect** 266:25
276:12,25 279:24
280:8 299:8,9
300:4 311:4 314:3
320:15 339:3

**respective** 55:7
65:7,7 89:9 255:6
264:3
**responded** 155:8
**responding** 226:1
231:19
**response** 111:22
124:7 136:7,17
156:16 160:4,16
163:18 164:3,8
167:15 202:12,15
205:5,10 208:13
229:16 230:9
254:16,19 286:21
292:21
**responses** 7:10,14
27:3 167:24
200:16,22 203:24
204:5 226:18
**responsibil** 46:6
**responsibilities**
46:5,7,18 47:1,7
47:19 48:17 50:6
50:18 51:22 52:16
79:10 127:8,12,13
129:13 177:24
181:16 215:4,7
**responsibility**
297:2,7
**responsible** 56:12
67:25 80:18
114:11 126:1
186:3 188:13
194:20 226:19
264:5 270:23
290:13
**responsive** 226:20
339:10
**rest** 54:9 55:22
62:3 176:5 267:20

**restart** 63:9
**restarted** 294:1
**result** 187:14
260:16 271:12
272:5 294:24
**results** 44:14
187:12
**retained** 5:16
**retention** 130:7
322:16
**retired** 49:22
**retrieval** 290:15
**retrieve** 290:8
**return** 75:18
103:22
**returned** 343:18
**revenue** 205:22
**review** 22:12
23:12,24 76:4
79:15 122:16
164:19 170:2
182:15,18 185:3
194:15 200:13
231:4,6,14 232:18
232:24 236:18
285:11,13 301:12
313:18 327:23
340:2,6 343:12
344:1 345:1
**reviewed** 20:18
22:11 23:7,25
76:1 85:13 163:1
165:16 216:4
231:10 243:9
**reviewing** 154:23
163:4 200:8 201:6
216:2 290:25
311:16 324:7
329:9
**revised** 92:15
107:16,18 171:3

171:21 172:12
183:5 184:2
**rewards** 188:8
**rfp** 237:17
**rice** 2:4 15:12 21:2
26:13
**richfield** 63:20
175:9
**rigel** 118:9
**right** 31:23 32:4
32:18 56:7 71:19
75:15 118:18
123:2,5 129:20
135:22 141:24
145:22 157:20
176:15,21 185:9
191:16,24 200:14
236:23 262:2
264:24 279:13
286:25 297:23
300:20 307:10
323:16 324:10
325:14 329:15
331:3 338:19
**rights** 66:14
**rising** 152:13
**risk** 92:4 135:1
207:25 209:24
254:8 335:25
**rivers** 2:6 15:17,17
**robert** 193:12
**rochford** 6:22
154:16 155:11,13
155:14,14,22
**rochford's** 156:12
163:25
**rodriguez** 3:16
16:15,15
**role** 45:3,8 46:12
51:17 53:4 56:15
154:3

**rollout** 224:5
**room** 264:22
316:22 322:11
**roster** 8:7 225:13
233:6
**rotate** 264:12
**rough** 265:8
**roughly** 21:13
50:3 91:15 124:16
137:13 211:15
226:3 269:10
293:15 329:14
334:20
**round** 287:18
288:14,19 289:14
**rouse** 148:17
**routinely** 45:12
153:14 165:17
331:22
**rpr** 1:25
**rules** 16:20 19:18
188:12 340:3,7
344:5 345:5
**run** 35:12,14
134:18 170:5
173:9 174:10,11
174:11 222:20
242:9 272:23
331:22 332:20
333:4,16
**running** 128:16
170:15 173:6
196:10 267:5
273:25 274:22
302:4 334:6
**runs** 33:24 34:1
318:23 332:24
**ruth** 16:2
**rx** 3:2 16:1 323:21
331:7

**s**

**s** 3:10 343:15
  345:8,8 346:3
**s.m.** 2:19
**sadly** 136:24 214:6
**safety** 205:18
**salary** 217:7,22
  219:15
**sale** 326:13
**sam** 164:5
**samhsa** 58:8 59:9
  59:15 60:3 123:11
  123:12,13,19,20
  123:21 124:3,6,10
  124:19,25 125:3,7
  125:21 126:2,5
  127:2,7,19 128:19
  221:16,18 223:8
  224:12,14,16
  225:2 237:16,25
  297:15,19 298:1
  298:10,16,18
**samsha** 6:15 8:9
  122:3 235:20
**sanction** 188:5,6,7
  188:10
**sanctions** 188:8,14
**sat** 19:16
**saved** 184:22
**savings** 104:18,23
  105:6 106:17,25
**saw** 139:12,13
  162:8 328:11,19
**saying** 144:2
  190:16
**says** 92:1 95:21
  110:13 131:15
  150:5 151:20
  152:7 177:8
  231:25 242:20
  260:2,4,15 283:23

285:25 308:23
  331:6 337:14
**scanned** 179:22
  184:18,21
**scans** 69:24 70:4
**schedule** 85:14
  183:9
**scheduled** 72:1
  81:2 177:10
  188:10
**schedules** 183:10
  318:11
**scheduling** 72:25
  182:24
**science** 27:14,18
**scientifically**
  167:16,23 233:9
**screen** 71:23 72:23
  73:3 77:19 187:13
**screened** 75:16
  110:7 130:1
**screener** 169:11
  169:17,23 176:24
  177:4 180:20
  183:25
**screening** 7:2
  46:19,20 69:23
  70:8,18,23 71:4
  72:10 73:7 74:17
  75:7,12 79:10,15
  94:6 126:21
  168:10,20 169:10
  172:23 176:23
  177:6,25 178:4,11
  179:4 180:1,5,10
  182:3,15,19,25
  183:21 184:10,17
**screens** 71:1 187:5
**seal** 342:6 344:15
  345:21

**sealed** 171:6
**sealing** 46:4
**search** 229:25
**second** 21:15,18
  30:7,11 37:18
  101:4 102:11
  106:8 113:24,25
  120:14 126:17
  133:7 147:22
  152:7 163:21
  167:3,7,7 188:3
  189:11 196:12,13
  196:15,25 231:3
  238:5 325:15
  327:21 331:15
  338:7
**secretarial** 186:6
**secretary** 148:6
**section** 89:16
  150:17,18 262:5
  334:3
**sections** 262:9
**see** 68:12 89:4,16
  89:18 92:6 94:25
  95:6,7 101:18
  102:14 120:7
  136:21 137:14
  147:2,18 150:11
  152:8,8 155:15
  159:17 167:12
  169:1,2 170:5,14
  170:20 174:13,19
  182:20 183:7
  184:24 185:5
  188:5 193:19
  198:4,18 202:9,11
  202:13 205:4
  221:8 227:8
  229:19 234:3
  238:12 242:12
  260:5,20 263:16

265:23 274:15
  279:16 283:24
  284:6 285:4,18
  286:2,13 290:21
  292:6 293:24
  297:17 306:22,23
  308:18 309:13
  310:25 313:19
  325:1,18 330:20
  330:21 331:5,11
  334:9 335:2
  336:13 337:8,10
**seeing** 135:1
  153:25 160:8,8
  211:3 212:19,20
  212:23 213:4
  226:17 265:3,13
  266:23,24 276:11
  276:25 307:25
  320:16
**seek** 96:2
**seeking** 223:8
  331:10
**seen** 91:10 156:9
  167:8 192:22
  197:21 214:6
  277:15,25 278:8
  295:5 296:3 324:2
**sees** 188:22
**select** 262:14
**selected** 29:10
  223:24 260:9
**selection** 24:14
**self** 74:15 76:15
  93:23 176:5
**send** 253:15
**sending** 307:16
**sense** 198:9 252:21
  256:9
**sent** 75:25 128:25
  147:24 200:9

263:4 283:14
288:7 290:9
309:10 311:17
317:15 324:15,18
**sentence** 88:13
95:2 108:10
126:17 177:5
260:13 330:21
331:5
**sentences** 176:4
**separate** 120:2
175:6 176:8 181:9
223:3 291:12
298:12,13
**september** 7:17
101:19 210:18
304:21 324:18
342:17
**serious** 43:9 55:20
133:7
**serve** 19:7 51:13
66:13 68:22 83:6
96:9 111:13
136:22 160:7
175:2 240:6 251:3
310:19
**served** 53:3
100:24 219:2
227:10,25 229:8
238:6,25
**serves** 56:15 227:4
227:6 228:24
**service** 64:17
65:12 112:22
118:10 148:18
196:6 214:3
**services** 3:2 8:24
16:1 43:13 55:12
61:6,14,22 62:16
65:14 66:10 67:2
67:8,10,12,19

68:14,19 97:3
98:13 103:13
109:15 111:8
112:9,11 113:1
114:20 116:14
117:5 118:10
119:17 120:14
121:3,6,10 123:15
132:20,21 133:2,5
135:5,7 145:7
171:18 194:10
202:2 204:23
205:16,20 207:6,7
208:1,20 209:25
211:8 212:14,16
213:9 214:23
216:9,25 218:12
221:20 223:4
286:5 287:24
295:8 296:4,7,11
296:17 298:8,11
323:22 336:12,20
337:22
**servicing** 253:24
254:12
**serving** 28:25
135:4 241:4
**session** 8:14 18:5
19:12 21:19,25
22:2 52:20,22
72:2,13,14 75:15
81:3 82:2 85:19
188:19 258:20
259:3 260:10
263:3,5 267:4
276:19
**sessions** 18:17
37:8 40:11,23
41:2 55:10 129:9
165:25 259:10

**set** 7:11 96:4 159:6
159:21 167:17
200:17,24 201:8
201:18 205:24
236:24 260:16
265:12,22 329:15
342:6
**seven** 50:3 149:24
152:20
**severe** 133:6
**sexual** 337:21
**shaina** 6:22
154:16 155:4,4,10
155:11
**shape** 68:18
**share** 55:21
147:11,14 222:24
253:9 274:2,9
311:20 317:25
318:7 339:2
**shared** 78:10
146:20 227:13
255:6 267:15
**shares** 267:13
**sharing** 318:18
319:14
**shaun** 4:12
**shaw** 118:14,18
**sheet** 333:12
343:13 345:7,10
345:18 346:1
**sheets** 69:25 70:4
**sheriffs** 105:11
**sherman** 3:6
**shopping** 335:8
**short** 231:14
255:23
**shot** 150:10
**show** 76:16 146:21
177:21 273:14
328:2

**showed** 22:16
239:7 304:4
**showing** 328:7
**shown** 343:16
**shows** 71:15
192:24 327:22
**sic** 82:9 163:23
205:22 208:9
**sign** 72:4 75:17
78:6,8 137:18
**signature** 340:5
342:13 343:14
**signed** 344:13
345:18
**significant** 136:21
207:20 209:10
234:1 238:10
254:4 265:7
277:18 278:19
279:25 288:16
309:12 311:6
337:19
**significantly**
136:13
**signing** 343:19
**similar** 222:22
303:23 310:23
**simple** 230:25
249:24
**simply** 79:19 89:2
148:3 176:13
260:17
**sincerely** 343:21
**singletary** 114:2,5
114:6,11 115:3
**sir** 47:13 304:20
323:19 324:9
328:9,16 329:4
333:15 334:25
337:12 339:15
343:10

**[sit - spending]** Page 55

sit 72:16 161:2,7
173:8 232:15
233:2 246:23
site 85:14 270:20
sits 120:17
sitting 246:24
situation 18:18
76:11 266:3
six 54:3 56:22
137:13 146:11
219:4 264:12
size 199:25
skewed 227:24
slack 96:15
slip 72:5,8 75:18
slow 288:12
small 63:21
175:12
smith 3:15 16:16
148:19
snapshot 175:25
189:1
snud 81:24 82:11
153:15 266:17
267:7 331:21
soc 73:11 173:11
social 206:13
software 179:23
191:15 247:10,11
247:14
sojourner 148:21
sold 118:21
solely 171:24
solutions 3:8 16:4
343:1 346:1
somebody 171:22
220:9 263:20
279:17 292:4
303:5
somewhat 116:25
129:9 140:12

151:19 152:22
217:16
sorry 26:25 47:13
47:21 57:17 60:6
61:19 90:22 94:25
117:24 150:19
151:8 159:2
201:15 222:10
223:2 239:25
247:17 301:17
317:11 320:20
sort 156:1 188:11
213:15 240:18
sought 276:3
sound 138:25
272:12
sounded 139:2
328:12,20
sounds 179:10
source 49:10
74:25 111:3 141:3
141:22 242:24
sourced 186:15,17
sources 56:4 57:23
58:3 60:19 78:19
142:13 144:16
146:19 153:9,13
158:22 160:1
162:19,22 199:21
215:12
south 2:7
spaeder 3:4 15:25
speak 40:24 41:25
72:19 100:17
109:19 128:23
129:17 141:14
142:10 143:16
146:19 155:25
161:23 163:11
180:13 194:3
207:2,19 217:21

223:5 232:7 235:3
257:4 282:21
289:2 308:4
318:15 337:18
speaking 87:11
142:24 158:3
160:7 253:7
309:10
speaks 212:18,21
216:7 222:2,3,13
322:16 328:3
special 7:15 55:8
204:8
specialized 41:15
41:18,22 53:18,21
54:12,14,16,18,25
55:4,13,18 56:3,5
59:12 65:10 85:4
85:17 86:9 89:6
105:14 149:12
216:22 217:6
334:2,15,17
specialty 149:10
286:7,12
specific 29:20
34:21 40:10 41:2
45:6 46:9,24
64:23 69:1 71:13
82:23 86:12 90:8
94:20 108:16
116:18 118:1
127:14 130:15
131:2 134:16
139:2 141:8
142:19 144:6,22
145:16 153:13
158:13 163:9
165:22 179:7
180:14,17,24
183:18 195:3
199:4 200:3

207:18 209:2,4
210:8 212:2
213:22 215:1
218:17 219:3,7
227:11 229:24
241:6 242:19
244:7 262:10
266:5 269:17
272:6 289:16
290:24 298:19
301:25 309:19,20
310:12 317:13
319:17 332:8,17
specifically 33:7
66:16 70:1 76:13
141:18 149:5,15
158:17 161:24
169:12 198:25
201:6 206:11,17
215:6 220:5
243:15 244:11
248:22 252:8
253:21 254:14
256:3 261:1 271:5
273:17 276:8
278:3 289:12
299:14 310:7
317:20 330:6,18
specifics 58:19
212:23
specified 341:21
specify 183:14
201:25 204:21
speedball 150:9
spell 264:15
spend 207:22
208:17 253:20,24
254:12 298:22
spending 160:18
160:19 219:13

| | | | |
|---|---|---|---|
| **spends** 299:3,13 | **staffing** 70:24 | 305:20,21 341:2,7 | 67:2,3,9,13,24 |
| 300:4 | 188:17,19 | 342:15 344:10 | 68:3,5,16,23 95:23 |
| **spent** 167:14 | **stamp** 87:5,7 | 345:15 | 102:1,6 |
| 208:13 263:25 | 105:18 147:1 | **stated** 320:23 | **street** 1:23 2:13 |
| 289:12 | 150:3 167:4 | **statement** 95:8 | 3:5,17 17:15 |
| **spike** 97:18 | 197:11 | 109:6 139:8 | 81:25 92:25,25 |
| **split** 175:6 | **stamped** 259:1 | 238:24 239:20 | 145:10 153:18 |
| **spoke** 39:17 | **stand** 275:7 | 240:2,8,15 260:23 | 154:2 281:2 284:4 |
| 213:10 | **standardized** 48:8 | 261:1,4 281:19,20 | **streeter** 70:21 |
| **spoken** 134:24 | **stands** 28:9 58:12 | 295:25 310:16 | 71:2 148:23 |
| 166:11 308:17 | 81:24 161:16 | 344:13,14 345:19 | 177:17,23 178:2 |
| **spreadsheet** 8:12 | 173:18 | 345:19 | **streets** 154:1 |
| 241:17 | **start** 32:23 73:13 | **states** 1:1 15:7 | **strength** 262:16 |
| **springfield** 63:20 | 107:24 108:21 | 244:8 | **strike** 24:5 |
| 175:2,4 | 139:4,6 177:7 | **statistics** 307:8,23 | **stronger** 327:2,5 |
| **square** 3:11,16 | 211:12 251:24 | 311:25 312:4 | **struggling** 103:10 |
| **sraiola** 2:16 | 301:22 334:6 | 336:6 | 320:25 |
| **ss** 341:3 | 337:17 | **stats** 307:15,20 | **student** 155:5 |
| **staci** 148:17 | **started** 91:11 | 308:19 | **studies** 27:17 |
| **stack** 330:14 | 108:18 115:14 | **status** 18:10 19:3,9 | 36:17,24 37:2,4 |
| **staff** 35:8 45:12 | 133:10 136:20 | 30:11 182:24 | 165:22 258:12 |
| 47:11,14,15 52:20 | 137:2,14,17 138:5 | 322:10 | 259:4,14 |
| 69:24 70:3,25 | 138:11 139:9 | **statute** 172:13 | **study** 31:13 33:14 |
| 71:17 74:25 77:1 | 142:20 143:1 | **stay** 91:22 | 33:16,20 37:6 |
| 80:22 89:11 96:8 | 144:1 145:8 162:6 | **staying** 97:19 | **studying** 33:12 |
| 100:22 135:17 | 165:14 179:6,10 | 150:1 156:6 | **stuff** 199:3 |
| 138:20 148:4 | 181:15 211:15 | 157:18 | **sturmi** 1:17 5:7 |
| 169:8 174:9 178:1 | 229:1 245:18 | **steady** 264:24 | 6:3,7,15,21 15:5 |
| 186:5,6 189:5 | 252:2 330:9 | **stenotypy** 341:14 | 16:19,24 17:1,17 |
| 200:13 217:6 | **starting** 147:13 | **step** 184:15 230:23 | 20:15 23:23 27:7 |
| 219:12 251:10 | 160:9 274:7 | **stephen** 1:25 2:12 | 37:24 42:21 63:8 |
| 263:4 265:22 | 302:17 | 16:8 257:21 341:6 | 63:11 69:3 82:10 |
| 268:23 269:10 | **starts** 156:5,16 | 342:14 | 83:13,21 84:6 |
| 270:21 279:3 | 237:23 | **steve** 15:24 323:17 | 87:3,6 89:18 92:7 |
| 288:17 296:13,20 | **state** 15:9 16:13 | **steven** 3:4 | 94:21 101:10,16 |
| 298:5,22 317:16 | 17:5,13 34:7 | **stole** 93:1 | 104:17 105:15 |
| 317:19,23 318:7 | 36:16 40:4 85:23 | **stop** 109:6 166:12 | 106:2 110:10 |
| 318:10 319:9,11 | 92:14 108:6 | **stopping** 121:18 | 113:21 118:3 |
| 319:15 | 114:21,23 146:16 | **stow** 63:24 64:24 | 120:8 122:2,11 |
| **staff's** 209:9,22 | 146:24 258:11 | 65:5,8,16,23 66:1 | 127:1 131:11 |
| | 274:14,18 305:17 | 66:14,19,23,24 | 139:19 146:12 |

150:1 154:16,21
159:25 161:8
164:1 166:24
168:14 184:16
185:19 192:19
196:25 197:18
201:3,21 203:14
204:12 210:25
215:25 221:6,8
222:10 225:19
236:1,24 241:23
245:11 247:17
250:10 257:18,20
261:20,22 323:14
323:16 324:11,17
330:12 338:25
341:9 343:8 344:4
344:9 345:4,13
346:20
**sub** 232:1
**subcommittee**
251:1,4,7,15,17
324:14 325:9,12
325:23,24 326:16
**subcommittees**
251:2
**subject** 25:12
27:16 28:21 29:10
31:5 32:11 36:20
37:15 42:13 50:25
71:19 123:10
192:4 318:4
334:19
**submit** 47:5 56:24
**submitted** 291:20
**submitting** 218:24
**suboxone** 212:12
**subscribed** 344:10
345:14 346:21
**subsection** 198:14

**subsequent** 281:22
282:16,17
**subsidy** 216:13,15
216:20 217:4,10
217:13,20 218:8
218:19,21 219:17
219:20 220:4
**substance** 28:6
31:1,8,10,11,16
32:14,16 34:17
37:5 38:1 39:13
43:18 44:24 45:2
45:5,10,11 46:7,9
46:19 47:8,10,20
47:22,24 48:6,10
48:19 49:2 55:15
55:20 59:10 62:6
73:1,19 74:10
75:22,22 76:14,25
77:13 79:20 80:14
80:16 103:10
114:22 123:21,25
132:1,17 134:4,6
140:15 146:17
151:23 171:5
183:2,15,19
221:19,22 231:11
231:11 232:1,25
234:9,20,21 236:8
236:10,12 238:10
239:10,13,22
240:4,7,9,19
242:16 243:1,8,14
245:8 249:5,17
254:25 307:9
308:24
**substances** 31:18
31:22 32:3 47:24
48:6,10,14,24 49:6
49:11 73:19 74:4
74:9 78:25 139:21

144:14 232:8
**substantial** 92:4
**substantive** 88:8
**success** 130:7
**successful** 80:3
252:18,20,21,25
**successfully** 171:7
**suddenly** 277:1
**suffer** 43:17
309:12,13 311:5
**suffered** 239:8
310:8,14
**suffering** 32:15
45:1 47:10 55:19
109:23 207:23
241:5 254:6
**sufficient** 96:9
**suggesting** 310:21
310:22
**suggestion** 67:23
153:3
**suite** 3:5,11,17
343:2
**sum** 58:9
**summa** 113:1
316:22
**summer** 258:8,14
319:13
**summit** 1:12 2:3
7:9 8:2,3,21,23
15:13,15,17 58:6,9
58:11,17,24 64:2
91:6 98:8,22 99:3
108:20 110:14,17
110:23 111:4,6
112:20,23 115:16
118:10,12 131:17
133:4 136:15,19
136:25 137:11,12
137:15,21 138:24
139:1,5,6,17 142:2

142:4,25 143:21
144:10 157:8
161:18 163:3
175:13 199:19
200:15,21 202:3
202:12 209:21
220:22,24 221:7
221:14 222:6,20
223:3 225:3
250:14,17,23,25
251:25 252:13,15
253:9 255:3,24
257:6 265:25
266:8,10,12
277:23 285:16
306:13 323:8
325:7 327:6,15,19
328:13,24 329:4,8
336:11,19
**summonses** 71:11
**superior** 343:1
**supervise** 45:22
**supervising** 233:5
**supervision** 43:14
45:23 46:14 51:11
196:2,5
**supervisor** 24:20
24:24 50:9 287:12
**supervisors** 47:16
56:21
**supplemental** 7:13
203:24 204:5
**support** 133:5
272:17
**supported** 139:16
**supporting** 85:11
**supports** 213:6
286:6 287:25
**supreme** 35:13,15
84:23,25 85:2,22
216:23 334:2,12

[supreme - test]                                                                  Page 58

334:23
**sure** 18:24 29:16
  32:1 36:3 38:8,19
  59:8 63:1 68:15
  69:21 72:12 79:23
  81:20 87:10 95:25
  103:12 112:23
  113:10 119:2,8
  121:20,20 134:10
  137:9 151:10
  166:5 178:17,24
  186:16 190:9
  191:23 192:2
  206:15 207:13
  220:14 236:22
  258:17 260:25
  261:12 262:10
  265:13 266:25
  267:20 270:22
  271:15,18 277:17
  296:14 297:15
  322:19,23 324:8
  328:17
**surplus** 103:17
**surrounding**
  176:10
**survey** 218:1
**survive** 255:4
**suspension** 176:3
**switch** 322:22
**switched** 51:25
**sworn** 16:21
  341:10 344:10,13
  345:14,18 346:21
**system** 48:7,15
  49:17 55:22 73:13
  73:23,25 82:16
  83:1 106:12 140:4
  140:20 145:12
  169:25 173:19,19
  181:9 184:10

191:13 193:4
  210:11 215:14
  242:7 247:10
  273:14 288:10
  292:5 301:7
  329:17,23 330:4
  331:8,13,19 332:2
  332:4 333:1,3
  335:3
**systematic** 94:7,11
**systems** 78:2
  247:6,11 290:10
  291:9

**t**

**table** 88:9
**take** 20:4 29:18
  30:14 62:24 64:2
  68:5 166:25
  184:15 192:5
  220:12 256:4
  261:10 267:6
  269:4 283:10,13
  286:1 308:10
  311:3 314:23
  322:21 324:8
  327:23 333:13
**taken** 1:21 63:4
  121:24 220:18
  221:8 261:17
  270:22 323:2
  341:20
**takes** 281:14
**talk** 23:15 100:14
  199:2 265:2,9
  267:9 286:23
**talked** 284:15
  332:5
**talking** 39:12
  135:20 153:17
  157:3 160:11
  167:14 173:16

234:2 251:20
  255:23 266:22
  270:4 276:17
  285:22 297:20
  300:9 310:4 313:1
**tammy** 2:6 15:17
**target** 91:14,23
  95:5,9,14,16,19
  103:15,23 109:4
  109:16,25 228:14
**targeting** 107:17
  135:2 169:12,12
**targets** 92:2
**task** 125:24
  137:16,19,21
  139:5,7 143:1
  177:15 197:24
  248:24 250:11,14
  250:17 251:1,2,4,7
  251:14,25 252:4,6
  252:10,17 253:12
  253:20 255:24
  256:2,5,14,18,24
  257:6 265:25
  289:7,13 324:15
  325:8,22 328:14
  328:21,25
**tasks** 215:10
  252:23 253:20
**tax** 205:22
**team** 62:4 76:1
  78:11 80:22 81:7
  81:15,15,19,20
  82:1,14,25 83:6
  85:18 135:25
  145:11 149:18
  153:24 188:16
  207:22 223:8
  231:6,20 233:20
  254:16,19 255:6,8
  255:17 267:14,20

268:18 271:19,20
  273:4 332:1 334:7
**teams** 269:9
**technically** 59:9
**technology** 36:7
  256:21
**teleconference** 4:4
**telephone** 52:21
**tell** 72:16 82:10
  173:15 244:23
  262:8 287:14
  315:6
**temitope** 343:5
**temporarily** 217:8
**tends** 309:25
**tenth** 2:13
**tenure** 53:12
**term** 46:3 71:23
  88:17 131:24
  137:6 140:4
  163:14 168:19
  171:14 179:23
  186:1 206:14
  216:12 219:11
  238:10 268:21
  316:16 325:18,21
  326:15
**termed** 213:5
**terminal** 173:9,14
  173:17,23
**terminals** 173:24
**terminated** 191:7
**terminology** 39:11
  208:4,25 253:1
**terms** 71:5 85:24
  182:4 212:22
**test** 30:15 31:4,6
  32:10,10 74:12
  187:21,22 223:19
  223:25 224:1,12
  233:9,12 238:24

239:1 240:8
**tested** 31:21 32:2
  32:12
**testified** 17:20,23
  143:4 203:6 226:5
  257:25 262:4
  325:11 328:11,19
  329:22
**testify** 19:8 341:10
**testifying** 18:7
**testimony** 18:2,9
  18:12,16,21,22
  19:3,13 20:13
  67:1,7 211:10
  331:15 336:8
  341:13,17 344:6,7
  345:6,9,12
**testing** 44:12 47:2
  47:4,6 48:4,13
  49:15 62:7 77:15
  223:18
**tests** 44:15 76:16
**teva** 4:2 16:18
**text** 156:15 176:22
  248:11
**thank** 17:17 50:4
  84:4 87:9 104:14
  104:15 192:7
  236:21 245:19
  324:5 338:25
  339:15,16,17
**thankful** 246:5
**thankfully** 255:4
**therapeutic** 88:14
  88:17 89:7
**thing** 260:16
  265:11 333:19
  338:15
**things** 36:11 51:19
  68:1 170:13
  213:24 251:19

265:1 267:10,11
276:17 278:7
281:6 298:20
306:16 309:24
320:24
**think** 30:12 34:8
  59:4 62:21 66:6
  90:18 97:18,25
  98:5 103:8 104:3
  105:13 107:3
  120:16 125:3
  134:17 136:11
  138:24 140:2
  145:4 150:24
  152:21 154:9
  159:3,12,14
  161:15 164:4
  166:14,16 167:23
  176:5 178:18
  190:14,22 192:3
  213:20 224:6,19
  224:24 228:19
  233:15 234:18
  238:20 246:8
  249:1,19 252:12
  252:17 253:4
  258:2 262:2,25
  270:14 277:6,21
  299:5 301:11,21
  302:24 308:11,12
  308:14 315:15
  325:11 327:10
  335:1,5,17 339:6,6
  339:13
**third** 7:11 21:25
  22:2 88:13 200:17
  200:24 202:18
  226:8 254:25
  336:24 337:13
**thirty** 343:18

**thought** 149:21
  244:3
**thousands** 93:21
**three** 3:16 20:21
  22:4 26:11 40:20
  43:15 46:5 53:7
  60:9 85:24,25
  86:13,16 115:14
  124:15 144:5
  172:16,18,19
  217:12 230:12
  269:8 270:7 273:8
  297:14,19,22
  321:21
**threshold** 170:21
**throw** 256:8,8
  319:23
**thursday** 72:3
  267:8
**time** 20:11,22
  42:24 43:3 46:12
  49:22 50:12,19
  53:9 65:20 71:3
  73:21 74:12,13
  75:13,20 83:7
  86:5,8,15,20,25
  89:25 91:15 94:17
  97:7 99:9 102:23
  104:12 107:16,23
  108:1,5 135:9
  136:8 137:5
  141:21 143:17
  147:7 148:4 149:7
  149:10 151:2
  153:5 160:22
  161:14,16 162:8
  164:15 167:14
  172:10 177:16
  179:8,10 180:14
  181:15 182:23
  192:21 195:16

207:20 208:17
209:9,9,22 214:21
215:1 217:14
219:12 220:11
228:4 229:21,24
237:5,9 249:2,2
250:20 253:19,24
254:5,11 255:18
263:25 264:13
265:7 266:2
284:14 289:12
298:4 301:20,24
302:12 305:3,7
317:24 318:14
322:5 324:8,13
327:10,12 329:10
330:5 341:20
**timely** 131:5
  160:17
**times** 17:23
  158:16 166:6
  177:5 178:10
  197:22 219:4
  234:4 239:15
  249:25 321:21
  337:21
**title** 17:9,10 36:22
  52:7,8 129:12
  149:9 237:7
**titled** 6:9,18 7:1,3
  7:5,8 8:12,14,23
  87:14 89:16
  105:21 146:4
  168:8 185:14
  192:12 197:14
  217:5 226:11
  237:25 241:17
  258:20 336:18
**tleyimu** 2:9
**today** 17:4 19:24
  20:4,13,16 21:21

22:5 24:1 38:9
75:15,16 135:4
143:4 144:8 157:3
157:16 161:3,7
181:17 211:10
226:5 232:15
233:3 239:14
240:10,21 246:11
246:24 281:14
284:15 291:3,22
297:21 300:9
310:4 328:10,18
**ton** 263:17
**tony** 25:1 52:15
148:13 287:12
**tool** 144:22 145:18
145:20
**tools** 126:20
**top** 89:15 113:25
147:3 169:1
190:19 218:15
259:21,23 260:3
337:12
**tope** 2:5 15:11
**topics** 272:23
**total** 96:13 124:16
195:4,7 224:14
227:24
**totaling** 96:4
**touch** 100:16
**tough** 152:19
179:7
**tower** 3:10
**township** 63:19,20
63:20 175:2,3,9,10
**track** 35:20
135:10 141:15,16
170:22,23,24
171:9,13,15,15,16
171:17 172:2,15
177:22 224:21

247:24 253:19
254:11 262:13,21
289:12,17 309:20
312:11,18,20
331:8
**tracking** 73:13
130:6 145:12
173:3 182:14
249:21
**tracks** 36:24
133:14 139:24
140:21
**trafficker** 326:11
**traffickers** 326:1,3
326:3,5,17 327:5
327:14
**trafficking** 326:13
327:1,17
**training** 28:15,17
29:8 34:11,14,17
35:3,7,12,14 36:2
36:8,13,15,18,21
37:6,10,12 40:1,9
40:22 41:16,19,23
42:9,12 134:22
249:21 250:3
258:8 259:10,15
260:8 262:24
268:19,25 269:6
269:12,15,16
270:4 271:7,13
272:5 275:21,25
276:7 291:14
312:22 313:25
317:23 318:14,16
318:19 319:13,16
334:15,17
**trainings** 35:16,20
36:6 40:13 41:4
41:25 42:3 164:14
165:18 249:17

258:3
**transcribed**
341:16 344:7
**transcript** 5:1
283:8 340:3,6,9,11
343:11,12 344:5
344:12 345:5,11
345:17
**transcription**
341:17
**transferred** 108:4
**transpired** 271:22
**transportation**
213:17
**transporting**
93:12
**trauma** 238:8
309:12,13,19,20
309:21,23,24
310:3,8,9,14 311:6
336:5,6,7 337:19
**travel** 273:9
**treat** 105:3
**treated** 104:8
230:20
**treating** 208:19
**treatment** 6:12 8:6
32:14 33:3 39:18
39:20,23,25 40:3,5
42:1,4 55:1,16
62:6 89:22 90:3
108:2 111:3,17,21
111:25 112:2,4,6,7
112:11,13,15,16
112:18,21 113:1,4
113:16 114:10,23
115:1,10,11,24
116:19 117:3,3,20
117:23,25 118:5,7
118:25 119:6,21
120:7,11,21 121:3

123:22,23 131:18
132:21 136:20
137:20 138:4
207:3 212:3,4
213:1,9 214:10,12
214:15 221:23
225:11 229:15
237:21,25 240:25
241:2 248:1
262:17 286:3
288:1,23 294:10
294:14,18,20
295:6,17 296:9,14
296:16,25 297:3
306:13 337:22
**treatments** 212:10
**trend** 152:21
161:17,25 199:25
**trends** 6:19 146:4
146:22 147:15
149:20 150:20,22
152:8 153:1,6,25
265:3,13 266:22
266:24 267:11
276:11,20,24
277:7 283:24
284:9
**tri** 114:7,13,25,25
115:4 288:22
290:3 291:6,8,20
292:3,21
**tried** 256:19
**trigger** 188:21
**triggered** 180:8
**triggers** 182:14
**trouble** 95:1
**true** 341:16
**truth** 341:11,11,12
**truthful** 20:13
**try** 19:24 70:14
74:13 165:8,8

207:13 213:18
258:13 291:16
292:20 312:3
339:8
**trying** 30:12 44:25
46:22 69:22 95:25
97:25 157:5
160:17 162:6
164:22 165:11
223:12 224:6
230:15 251:21
256:20 262:25
278:25 298:8
301:10,19,21
320:25 335:8
**tune** 268:21 270:6
270:10 271:3
272:18
**turn** 91:17 106:8
131:12 150:2
163:19 188:3
205:8 259:18,19
283:19 297:9
**turnaround** 75:13
**turned** 99:19
100:5 257:8
289:23
**turning** 123:16
222:7,18,19 223:3
223:7 301:14
302:3 304:9
**twice** 89:4 218:24
**two** 21:13 22:10
34:18 40:20 52:2
75:14,18,20,24
85:25 86:13,16,19
104:7,7 120:12,25
133:4 144:5 169:7
171:2 173:8
178:12 196:2
199:20 217:12

219:4 234:4 258:2
258:3 265:2
268:24 273:2
287:19 288:14
292:14 293:16
315:14,16 321:21
324:25
**type** 28:15 33:1,2
39:25 45:1 47:20
47:21 61:14 73:17
129:15 130:8
140:10 160:8
168:15 172:7
185:20 187:11
192:22 219:1
230:21 288:15
298:11 310:23
332:17 333:7
**typed** 184:25
189:11
**types** 33:13 55:12
61:22 129:22
156:11,11 167:10
167:10,18 211:24
320:16
**typically** 19:8 36:5
47:23 65:6 72:3
84:21 93:8 106:13
107:16 119:14
131:8 151:16
169:24 171:12
175:22 186:11
187:7 197:5 238:9
239:21 240:3
250:4,22 254:20
254:23,24 255:9
258:13 267:5,17
312:23 319:1
334:16

**u**

**uber** 213:18
**uds** 76:16
**uh** 50:5 84:5
110:12 118:6
147:5 156:14
259:17 282:25
284:17 313:6
**ultimately** 293:17
**umadaop** 112:24
118:13
**underage** 306:2
**undercover**
305:25
**underneath** 176:9
187:21
**underreported**
309:25
**understand** 31:1
31:15 76:7 131:21
161:5 178:19
190:9,15 265:2
326:2 327:22
328:1
**understanding**
38:10,11 56:11
64:20 88:16 92:9
92:12 111:6
121:16 131:24
199:15 216:21
249:10 255:2
288:13
**understood** 19:15
20:2,3 178:17
300:11
**undertake** 28:16
34:10 178:4
**undertaken** 35:21
**undertaking** 100:8
**underutilized**
295:12

**unfortunately**
295:11
**unfunded** 298:5
**uniform** 81:25
213:23
**uniontown** 17:16
**unique** 66:7 88:23
88:24 173:2 174:8
**unit** 45:13 81:24
305:17,18,24
331:22 332:12
**united** 1:1 15:6
**units** 153:16
**universe** 310:11
**university** 27:15
27:21 36:17 42:22
155:5 175:15
258:11
**unpack** 113:8
**updated** 84:20
126:22
**updates** 39:17
**uploaded** 184:23
**urine** 77:19
187:13
**usa** 4:3
**use** 18:13 31:22
32:3 46:25 49:1,6
49:14 76:15 79:7
79:20 80:16 93:5
94:15 115:21,22
116:6,6 126:24
127:19 128:2
136:22 137:6,6,10
138:7,15,21
139:15 141:2,5,12
142:17 145:17,20
146:22 149:19
151:4,14,18 152:4
152:5,12,15
155:15 160:24

**[use - way]** Page 62

161:20 162:11
163:14 179:1
180:1,18 205:20
206:12,17 207:24
208:3,21,25 209:8
209:24 217:1
218:18 230:5,16
232:6,7,8,22 233:7
240:7 243:4
245:11 247:20
253:1 254:6 260:2
277:22 278:5,9,12
278:18 279:4,18
279:22 280:5,6,12
280:14 281:10
306:21 308:11,16
308:18,19 329:4
335:20,23
**users** 306:21 307:9
308:11
**uses** 31:18 217:4
279:6
**usual** 64:25
**usually** 326:6
**utilize** 48:4 49:8
128:11 247:13,23
331:7,13 333:1,3
**utilized** 40:4
128:11 178:16
214:7 295:24
**utilizes** 194:7
**utilizing** 179:10
247:9

**v**

**v** 1:12 8:19 323:5
343:6
**vacated** 108:12
**vague** 189:19
206:14 319:4,5
337:6

**valid** 145:14
**valor** 55:1
**variables** 18:20
254:3
**variety** 18:7 19:6
29:8 31:9 35:5
36:24 39:6 42:5
44:1,2 56:3 59:11
117:4 251:8
252:14
**various** 29:1 105:9
134:22 142:24
149:11 251:11
265:23 276:14
**vast** 233:4,5
**vendors** 42:5
133:10
**venues** 253:7
**verbal** 251:18
267:17 332:21,23
337:20
**verbally** 333:11
**verify** 49:15 74:4
74:14 140:13
240:14
**veritext** 3:14
343:1,7 346:1
**veritext.com.**
343:17
**versa** 265:15
**versus** 41:3 159:14
**veteran's** 55:1
**vice** 265:15
**vicodin** 38:19
244:16,16
**victim** 255:9
**video** 9:1
**videographer** 4:12
15:1 16:12 37:19
37:22 63:2,5
121:22 122:8

166:18,21 220:16
221:3 257:13,16
261:15,18 322:25
323:12 338:8,11
339:18
**videotaped** 1:16
**view** 72:18 112:1
135:21 252:24
335:22
**village** 175:3,7
**violation** 188:11
**violence** 54:23
172:5 300:17
**violent** 107:20
**virtual** 3:14
**visits** 85:14
**vivitrol** 212:12
**vocabulary** 38:9
**voiced** 326:24
**voluntary** 71:24
96:21

**w**

**wacker** 4:6
**wagner** 237:8,9
**wait** 19:24
**waiting** 258:16
**waived** 343:19
**waivers** 78:6
**walk** 168:23
**wallace** 148:25
268:13 316:3
**walmart** 2:17
15:20
**want** 39:12 53:6
55:8 63:15 81:8
87:10 103:6
166:12 171:22
217:1,11 224:8
230:8 252:15
257:11 261:10
286:23

**wanted** 83:22
102:14 108:21
133:21 140:13
156:3 162:4
164:19 167:16
178:16 181:1
184:9 190:6,11,17
190:20 228:17
229:6 233:9
236:14 238:24
271:17 288:8
291:19 299:22
**wanting** 147:14
212:22
**wants** 70:12 71:25
170:13,19 286:1
**warner** 149:2
**warrant** 189:25
322:10
**warrants** 70:13
170:13,19
**washington** 2:14
3:5
**watch** 72:14
**watson** 4:3,4
**way** 31:22 32:3
48:16 68:18 69:15
88:23 89:12 94:7
94:11,13 103:20
109:21 110:6
116:25 145:6
173:13 174:10
208:11,14 209:4
210:8 216:16
230:19 231:15
233:15 245:20
253:23 254:11
273:18 274:1
289:17 300:22
303:20 308:21

ways   69:21
we've   62:25
  136:13 220:12
  251:20 272:8,9
  274:5,13 284:15
  297:21 310:4
  320:24 332:5
  338:22
web   6:9 8:14
  105:21 258:20
website   105:17
  106:7,9 107:1
  153:7
websites   176:18
wednesday   80:24
week   43:16 52:21
  61:13 75:20
  188:17 234:4
  263:3 265:9 267:6
  321:21
weekday   316:10
  316:11
weekend   316:10
weekly   18:5,9,17
  19:3,9 52:20
  80:23 81:4 126:23
  267:5 283:5
  290:18
weeks   20:24 21:17
  75:14,18 293:16
weird   303:6
welcome   131:16
  335:19
went   28:7 41:2
  173:22 224:9
  230:1,17
west   4:6
westbrook   2:5
when's   266:2
whereof   342:5

widely   152:12
  164:18
williams   4:12
  15:22 81:12
willing   96:22
wilms   26:17
  263:15,16 264:18
  266:6
wish   125:5 199:3
  269:3
wished   98:12
witness   2:3 15:13
  15:16 25:15 26:25
  47:13 60:6 159:2
  258:17 261:14
  322:24 338:3,14
  338:20,23 339:7
  339:16 341:9,14
  341:15,18 342:5
  343:8,11 344:1,4
  344:11 345:1,4,15
witness's   340:2
witness'   343:14
women   311:5,5
wondering   310:24
word   249:24
words   117:10
  151:11 173:7
  187:17 196:9
  222:14 290:8
work   17:7 19:5
  25:17 29:6 50:22
  53:22,25 54:4
  55:10 74:3 90:9
  104:13 127:23
  128:3 133:6,8,12
  142:25 143:17
  144:1 145:1
  153:14 208:16
  247:9,20 248:7,11
  251:6 253:16

256:1,17 263:7
  265:4,5 292:14
  310:20,22 328:13
  328:20
worked   49:5,8
  114:7 129:8 143:5
  168:1 178:25
  237:5,7 271:22
  316:24
working   54:7
  84:17 149:16
  208:18 215:2
  251:22 266:10
  282:3 305:19
  321:18
workings   85:16
works   83:3 115:3
  116:25 237:18
  285:16
worksheet   169:10
workshop   28:18
  29:5 37:25 268:25
  276:18 312:22
workshops   29:9
  35:5,7,10,13 36:8
  36:25 37:14 38:3
  39:15 40:8,20,21
  42:12 134:22
  164:14 276:15
  313:25 317:24
  318:1
worth   297:15,25
  298:4
write   57:22 59:18
  149:18 156:18
  157:19 164:3
writers   125:25
  129:2 224:20
  237:20
writing   124:24
  129:5,14 237:18

238:22 267:16
  339:4,13
written   26:18
  28:19 30:15 32:10
  36:5,10 155:7
  166:5 256:20
  267:23 294:22
  303:21
wrote   161:3
  224:20
wu   2:12 5:8 16:10
  16:10,25 17:3
  63:1,7 83:8 101:4
  104:10,15 105:15
  113:11 121:20
  122:10 145:22
  146:11 154:9
  159:5,10,17,20,24
  166:12,16,23
  185:9 191:16,21
  192:2,8 197:8
  200:14 203:2,7,12
  203:22 210:14
  215:15 220:14
  225:6 235:14
  241:12 257:10
  261:10,13

| x |
| --- |
| x   249:2,2,2 |

| y |
| --- |

yeah   34:24 50:2
  155:12 173:17
  180:13 182:7
  183:24 192:23
  213:4,10 219:22
  229:23 245:20
  246:9 264:11
  271:9 285:5 289:9
  296:2 320:22
  324:6 328:17,23

[yeah - zuckerman.com]                                    Page 64

334:25 337:1,2
**year**   40:20 58:2
 59:25 60:1,9,18
 63:23 66:18 68:12
 84:21 85:24,25,25
 89:23 90:3 100:13
 106:11 116:17
 124:15 173:8
 177:1 178:10
 180:21 190:4,13
 194:25 195:9
 199:1 200:1,1
 219:5 224:8,10
 227:7,25 228:7,10
 228:13 246:11
 272:24 273:15
 287:20 293:25
 297:14,19 301:20
 317:8,17 319:24
 334:15,18,18
**yearly**   56:20
**years**   34:18,22,23
 34:24 40:14,17
 49:6 50:3 52:2
 53:7,17 86:14,16
 86:19 91:4 93:19
 97:20 98:21
 103:14 108:18
 115:15 116:17
 133:4 135:5
 137:13 144:5,8
 149:24 152:20
 156:10 166:3
 167:9 168:2 171:2
 172:16,19 178:13
 179:6 195:16
 208:8 209:19
 217:12 230:12
 245:25 246:6,8
 255:19 258:2,3
 264:20 270:7

273:2,8,19 297:22
 319:23 322:16
 329:14 337:15
**yep**   168:25
**yesterday**   22:2
**youth**   43:13

**z**

**zuckerman**   3:4
 15:25
**zuckerman.com**
 3:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.