Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION

 3

     IN RE: NATIONAL          )
 4   PRESCRIPTION             )   MDL No. 2804
     OPIATE LITIGATION        )
 5   _____  )   Case No.
                              )   1:17-MD-2804
 6                            )
     THIS DOCUMENT RELATES )   Hon. Dan A.
 7   TO ALL CASES             )   Polster

 8

               FRIDAY, JANUARY 4, 2019
 9

     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10            CONFIDENTIALITY REVIEW
11                    - - -
12          Videotaped deposition of Ramona
13   Sullins, held at the offices of JONES DAY, 77
14   West Wacker Drive, Chicago, Illinois,
15   commencing at 7:31 a.m., on the above date,
16   before Carrie A. Campbell, Registered
17   Diplomate Reporter, Certified Realtime
18   Reporter, Illinois, California & Texas
19   Certified Shorthand Reporter, Missouri &
20   Kansas Certified Court Reporter.
21                    - - -
             GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1      A P P E A R A N C E S :
 2
 3   CARELLA, BYRNE, CECCHI, OSTEIN,
     BRODY & AGNELLO, P.C.
 4   BY: ZACHARY S. BOWER
         zbower@carellabyrne.com
 5       DAVID GILFILLAN
         dgilfillan@carellabyrne.com
 6       MICHAEL INNIS
         (VIA TELECONFERENCE)
 7   5 Becker Farm Road
     Roseland, New Jersey 07068
 8   (973) 994-1700
 9   Counsel for Plaintiffs
10
11   WILLIAMS & CONNOLLY LLP
     BY: JOSEPH BUSHUR
12       jbushur@wc.com
         (VIA TELECONFERENCE)
13   725 Twelfth Street, N.W.
     Washington, DC 20005
14   (202) 434-5331
15   Counsel for Cardinal Health, Inc.
16   TABET DIVITO ROTHSTEIN
     BY: KYLE A. COOPER
17       kcooper@tdrlawfirm.com
18   209 South LaSalle Street, 7th Floor
     Chicago, Illinois 60604
19   (312) 762-9495
20   Counsel for McKesson Corporation
21   JONES DAY
     BY: TARA FUMERTON
22       tfumerton@jonesday.com
23       JOANNE CACERES
         jcaceres@jonesday.com
24   77 West Wacker
     Chicago, Illinois 60601-1692
25   (312) 782-3939
     Counsel for Walmart
```

Page 3

```
 1   MARCUS & SHAPIRA LLP
     BY: DARLENE M. NOWAK
 2       nowak@marcus-shapira.com
         (VIA TELECONFERENCE)
 3   301 Grant Street, 35th Floor
     Pittsburgh, Pennsylvania 15219-6401
 4   (412) 338-4690
 5   Counsel for HBC
 6
 7   ARNOLD & PORTER
     BY: SETH WIENER
 8       Seth.Wiener@arnoldporter.com
         (VIA TELECONFERENCE)
 9   601 Massachusetts Avenue, NW
     Washington, DC 20001-3743
10   (202) 942-5000
     Counsel for Endo Pharmaceuticals
11   Inc., and Endo Health Solutions Inc.
12
13   JACKSON KELLY PLLC
     BY: SYLVIA WINSTON NICHOLS
14       sylvia.winston@jacksonkelly.com
         (VIA TELECONFERENCE)
15   150 Clay Street, Suite 500
     Morgantown, West Virginia  26501
16   (304) 284-4138
17   Counsel for AmerisourceBergen
18   ALSO PRESENT:
19   WALMART LEGAL
     BY: PAUL D. MORRIS
20       Paul.Morris@walmartlegal.com
     702 Southwest 8th Street, M.S. #0215
21   Bentonville, Arkansas  72716-0215
     (479) 204-9118
22   In-house Counsel for Walmart
23   VIDEOGRAPHER:
24       Stephan Hoog,
25       Golkow Litigation Services
```

Page 4

```
 1              INDEX
 2                          PAGE
 3   APPEARANCES................................  2
 4   EXAMINATIONS
 5     BY MR. BOWER............................  9
 6
 7
 8            EXHIBITS
 9   No.     Description           Page
     Walmart    E-mail(s),              75
10   Sullins 1  WMT_MDL_000009183 -
               WMT_MDL_000009185
11   Walmart    E-mail(s),              93
     Sullins 2  WMT_MDL_000009319 -
12             WMT_MDL_000009320
13   Walmart    E-mail(s),             106
     Sullins 3  WMT_MDL_000009321 -
14             WMT_MDL_000009323
15   Walmart    E-mail(s),             129
     Sullins 4  WMT_MDL_000049760 -
16             WMT_MDL_000049761
17   Walmart    E-mail(s),             158
     Sullins 5  WMT_MDL_000010215
18
     Walmart    E-mail(s),             180
19   Sullins 6  WMT_MDL_000017581 -
               WMT_MDL_000017582
20
     Walmart    E-mail(s),             212
21   Sullins 7  WMT_MDL_000009834 -
               WMT_MDL_000009837
22
     Walmart    E-mail(s),             220
23   Sullins 8  WMT_MDL_000009224 -
               WMT_MDL_000009232
24
25
```

Page 5

```
 1   Walmart    E-mail(s),             235
     Sullins 9  WMT_MDL_000010287 -
 2             WMT_MDL_000010288
 3   Walmart    E-mail(s),             239
     Sullins 10 WMT_MDL_000017502 -
 4             WMT_MDL_000017503
 5   Walmart    E-mail(s),             248
     Sullins 11 WMT_MDL_000047871
 6
 7   Walmart    E-mail(s),             255
     Sullins 12 WMT_MDL_000016232 -
 8             WMT_MDL_000016234
 9   Walmart    E-mail(s),             260
     Sullins 13 WMT_MDL_000047753 -
10             WMT_MDL_000047788
11   Walmart    E-mail(s),             274
     Sullins 14 WMT_MDL_000009267 -
12             WMT_MDL_000009269
13   Sullins 15 WMT_MDL_000016554 -    284
     Walmart    E-mail(s),
14             WMT_MDL_000016558
15   Walmart    E-mail(s),             288
     Sullins 16 WMT_MDL_000011626 -
16             WMT_MDL_000011629
17   Walmart    E-mail(s),             320
     Sullins 17 WMT_MDL_000003683
18   Walmart    E-mail(s),             325
     Sullins 18 WMT_MDL_000022799 -
19             WMT_MDL_000022805
20   Walmart    E-mail(s),             331
     Sullins 19 WMT_MDL_000028014 -
21             WMT_MDL_000028015
22   Walmart    E-mail(s),             337
     Sullins 20 WMT_MDL_000009161 -
23             WMT_MDL_000009162
24   Walmart    E-mail(s),             345
     Sullins 21 WMT_MDL_000017458 -
25             WMT_MDL_000017459
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1  Walmart    E-mail(s),
   Sullins 22  WMT_MDL_000017434 -
2             WMT_MDL_000017435
3  Walmart    E-mail(s),
   Sullins 23  WMT_MDL_000002717
4
   Walmart    E-mail(s),
5  Sullins 24  WMT_MDL_000007345
6  (Exhibits attached to the deposition.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1      MR. MORRIS:  Paul Morris from
2  Walmart legal department.
3      MS. CACERES:  Joanne Caceres
4  from Jones Day on behalf of Walmart.
5      MS. FUMERTON:  Tara Fumerton
6  from Jones Day on behalf of Walmart
7  and the witness.
8      VIDEOGRAPHER:  The folks on the
9  phone?
10     MR. BUSHUR:  Joseph Bushur of
11 Williams & Connolly on behalf of
12 Cardinal Health.
13     MS. NOWAK:  Darlene Nowak,
14 Marcus & Shapira, on behalf of HBC
15 Services.
16     MR. WIENER:  Seth Wiener of
17 Arnold & Porter Kay Scholer on behalf
18 of Endo Health Solutions, Inc., Endo
19 Pharmaceuticals, Inc., Par
20 Pharmaceutical, Inc., and Par
21 Pharmaceutical Companies, Inc.
22     VIDEOGRAPHER:  The court
23 reporter today is Carrie Campbell.
24     Can you please swear in the
25 witness?

Page 7

1      VIDEOGRAPHER:  We are now on
2  the record.
3      My name is Stephan Hoog.  I'm
4  the videographer for Golkow Litigation
5  Services.
6      The date today is January 4,
7  2019.  The time is 7:31 a.m., as
8  indicated on the video screen.
9      This video deposition is being
10 held in Chicago, Illinois, in the
11 matter of In Re: National Prescription
12 Opiate Litigation for the US District
13 Court, Northern District of Ohio.
14     The deponent is Ramona Sullins.
15     Will counsel please introduce
16 themselves for the video record.
17     MR. BOWER:  Good morning.  Zach
18 Bower, Carella Byrne, on behalf of
19 plaintiffs.
20     MR. GILFILLAN:  David
21 Gilfillan, Carella Byrne, on behalf of
22 plaintiffs.
23     MR. COOPER:  Kyle Cooper from
24 Tabet DiVito Rothstein on behalf of
25 McKesson Corporation.

Page 9

1      RAMONA SULLINS,
2  of lawful age, having been first duly sworn
3  to tell the truth, the whole truth and
4  nothing but the truth, deposes and says on
5  behalf of the Plaintiffs, as follows:
6
7      VIDEOGRAPHER:  Please proceed.
8
9      DIRECT EXAMINATION
10 QUESTIONS BY MR. BOWER:
11     Q.    Good morning, Ms. Sullins.  How
12 are you today?
13     A.    Doing good, thank you.
14     Q.    Have you ever given a
15 deposition before?
16     A.    No.
17     Q.    So I'm sure your attorney
18 informed you of kind of the ground rules for
19 today, but we'll go over a few of the
20 important ones, okay, and let me know if you
21 don't understand any.
22     Okay?
23     A.    Okay.
24     Q.    The first and probably most
25 important is just to let me finish my

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  questions and allow your attorney a chance to
2  object to any question before you answer.
3          Okay?
4      A.    Okay.
5      Q.    And also, I'd ask that if you
6  don't understand any question today, you ask
7  me to rephrase the question or let me know
8  that you don't understand before answering.
9          Do you understand that?
10     A.    I do understand that.
11     Q.    Okay.  So if you do answer a
12  question, I will assume that you did
13  understand the question.
14         Okay?
15     A.    Okay.
16     Q.    And also, please, if the answer
17  calls for a yes or no, provide the answer
18  verbally without shaking your head or nodding
19  your head so the court reporter can take down
20  your answer.
21         Okay?
22     A.    Okay.
23     Q.    Is there any reason that you
24  cannot testify truthfully today?
25     A.    No.

Page 11

1      Q.    Are you taking any medication
2  that would prevent you from testifying
3  truthfully today?
4      A.    No.
5      Q.    Have you ever provided any
6  statements under oath on behalf of Walmart?
7      A.    No.
8      Q.    Never provided a declaration or
9  anything like that?
10     A.    No.
11     Q.    When did you first learn you
12  would be giving a deposition in this case?
13     A.    I don't recall the actual date.
14     Q.    Do you recall the approximate
15  date?
16     A.    No.  Whenever I got the -- the
17  notice in the e-mail.
18     Q.    You got an e-mail from someone
19  at Walmart?
20     A.    Yes.
21     Q.    Okay.  Who sent you that
22  e-mail?
23     A.    I believe it was Carl.
24     Q.    Okay.  And how did you prepare
25  for today's deposition?

Page 12

1      A.    I met with our counsel.
2      Q.    Okay.  When was the first time
3  you met with your counsel?
4      A.    It was back in November when
5  the original deposition was scheduled.
6      Q.    Okay.  And when did that
7  meeting take place?  Do you recall
8  approximately -- strike that.
9      A.    Before -- before Thanksgiving.
10     Q.    And your deposition in this
11  case was rescheduled, correct?
12     A.    Correct.
13     Q.    Okay.  Do you recall
14  approximately how long before that initial
15  deposition was scheduled you first met with
16  counsel?
17     A.    The one time I met with counsel
18  was in November.
19     Q.    November.
20         About how many days before the
21  initial deposition was scheduled did that
22  meeting take place?
23     A.    I don't recall.  It might have
24  been a week.
25     Q.    Okay.  And approximately how

Page 13

1  long was that meeting?
2      A.    About four hours.
3      Q.    Had you scheduled an additional
4  meeting with counsel to prepare for that
5  initial deposition date?
6          MS. FUMERTON:  Objection.
7      Form.
8          THE WITNESS:  There was a
9      meeting scheduled for the deposition.
10  QUESTIONS BY MR. BOWER:
11     Q.    What about anything else prior
12  to the deposition?
13         Was there a meeting that you
14  all had planned to have prior to the
15  deposition?
16     A.    No, just the prep.
17     Q.    When was that prep to occur?
18     A.    The four hours.
19     Q.    So that prep had already
20  occurred; is that correct?
21     A.    That's correct.
22     Q.    Okay.  So you had not planned
23  to meet with your counsel the day before that
24  deposition; is that correct?
25     A.    I believe there was.  I don't

Page 14

1 recall.

2 Q. You believe there was a meeting

3 scheduled, but you're not sure?

4 A. That's correct.

5 Q. Okay. Since that initial

6 four-hour meeting, have you done anything

7 else to prepare for today's deposition?

8 A. Just met with them yesterday.

9 Q. Okay. And how long was that

10 meeting?

11 A. Approximately seven, eight

12 hours.

13 Q. And who did you meet with?

14 A. Tara.

15 Q. Anyone else?

16 A. Joanne was there. Paul was

17 there.

18 Q. Anyone else?

19 A. I don't know her name. I think

20 her name's Tina.

21 Q. Do you remember whether they

22 were counsel for Walmart or outside counsel?

23 A. They were part of Jones Day.

24 Q. Jones Day.

25 Was there anyone on the phone?

Page 15

1 A. I don't know anybody that

2 chimed in.

3 Q. Was there a phone call open?

4 A. There was.

5 Q. Okay. Do you know who was on,

6 listening in to that phone?

7 A. No, I don't.

8 Q. Do you know why there was a

9 phone open?

10 MS. FUMERTON: Objection to the

11 extent that you're starting to get

12 into conversations with counsel. But

13 to the extent she can answer

14 otherwise, that's fine.

15 THE WITNESS: To -- it was our

16 counsel, Walmart.

17 QUESTIONS BY MR. BOWER:

18 Q. There was in-house counsel from

19 Walmart on the phone?

20 A. Yes.

21 Q. That's your understanding?

22 A. That was my understanding.

23 Q. Okay. That meeting took place

24 in Chicago?

25 A. Yes. It happened yesterday.

Page 16

1 Q. Did you review documents during

2 that meeting?

3 A. We did.

4 Q. Did you review documents that

5 refreshed your recollection for the testimony

6 you will provide today?

7 A. No.

8 Q. What was the purpose of

9 reviewing documents?

10 MS. FUMERTON: Objection to the

11 extent that she has -- her

12 understanding from reviewing documents

13 is based on communications with

14 counsel, so I'll instruct her not to

15 answer that question unless she can

16 answer it without revealing

17 attorney-client communications.

18 QUESTIONS BY MR. BOWER:

19 Q. Can you answer the question?

20 A. No.

21 Q. Okay. Have you ever been asked

22 to provide counsel with documents for this

23 case?

24 A. Not that I recall.

25 Q. Has anyone asked you whether

Page 17

1 you have documents that might be relevant to

2 this case?

3 MS. FUMERTON: Again, I object

4 to the question to the extent that

5 you're asking her about questions --

6 communications with counsel, and I'm

7 going to instruct her not to answer

8 that question.

9 MR. BOWER: Well, that

10 question -- that question she can

11 answer. It's a yes or no question.

12 QUESTIONS BY MR. BOWER:

13 Q. The question is this: Have you

14 been asked to provide documents that may be

15 responsive to this case?

16 MS. FUMERTON: Well, you're

17 asking may be responsive to this case.

18 You're not getting to the

19 communications with counsel.

20 You should have asked, which I

21 think you already did, "Have you been

22 asked to produced documents in

23 connection with the case?" That's a

24 yes or no question, which she can

25 answer.

Page 18

1    THE WITNESS: No.
2 QUESTIONS BY MR. BOWER:
3    Q.    Have you ever spoken with
4 anyone at Walmart about this case?
5    A.    No.
6    MS. FUMERTON: Again, just give
7 me a second to object.
8    To the extent it's outside of
9 communications with counsel in
10 preparation for the deposition.
11    THE WITNESS: No.
12 QUESTIONS BY MR. BOWER:
13    Q.    Okay. Are you aware of whether
14 other Walmart employees have given testimony
15 in this case?
16    A.    Can you repeat the question?
17    MR. BOWER: Can you just read
18 it?
19    (Court Reporter read back
20 question.)
21    MS. FUMERTON: And again, I'm
22 going to object to the question to the
23 extent that you're asking about any
24 communications with counsel.
25    But to the extent that she has

Page 19

1 knowledge outside of those
2 communications, she can answer the
3 question.
4    THE WITNESS: No.
5 QUESTIONS BY MR. BOWER:
6    Q.    Is your answer affected by
7 communications with counsel and your
8 counsel's instructions not to answer
9 concerning those communications?
10    MR. BOWER: It's a yes or no
11 question. She's allowed to answer
12 whether she had knowledge of other
13 folks giving testimony. That's not a
14 privileged correspondence. There's no
15 legal advice being provided.
16    So I'll ask it again.
17 QUESTIONS BY MR. BOWER:
18    Q.    Are you aware of whether other
19 Walmart employees have provided testimony in
20 this case?
21    MS. FUMERTON: I disagree with
22 your assertion of the law. I object
23 to the question to the extent that it
24 would invade communications with
25 counsel.

Page 20

1    To the extent that she's, for
2 example, talked to other folks at
3 Walmart about whether or not they've
4 given deposition testimony, I think
5 that's fair game, but I do not agree
6 with you that you can ask her
7 questions about communications with
8 counsel.
9    Just because it's a yes or no
10 question does not mean that it does
11 not invade privilege.
12    But to the extent you can
13 answer the question outside of
14 communications with counsel, please go
15 ahead.
16    THE WITNESS: No.
17 QUESTIONS BY MR. BOWER:
18    Q.    Well, I'll ask it more
19 directly. Did counsel tell you who's been
20 deposed in this case?
21    MS. FUMERTON: Again, I
22 instruct you not to answer that
23 question on the basis of
24 attorney-client privilege.
25

Page 21

1 QUESTIONS BY MR. BOWER:
2    Q.    Are you going to follow those
3 instructions and not answer the question?
4    A.    I'm going to follow the
5 instructions.
6    Q.    Do you know whether the
7 documents you reviewed in preparation for
8 your deposition were produced in this case?
9    MS. FUMERTON: I -- to the
10 extent that you're asking about
11 specific documents that she reviewed
12 with counsel, I think it's
13 inappropriate for you to ask her to
14 identify those documents.
15 QUESTIONS BY MR. BOWER:
16    Q.    I'm not asking -- just to be
17 clear, I'm not asking her to identify
18 document. I'm just asking whether you know
19 the documents that you acknowledge you
20 reviewed were produced to plaintiffs in this
21 case.
22    A.    I have no idea.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 26

Page 28

17 QUESTIONS BY MR. BOWER:
18    Q.   When did you first begin
19 working at Walmart?
20    A.   1988.
21    Q.   Can you briefly describe for us
22 your educational background after high
23 school?
24    A.   I took a couple of non-credited
25 courses.

Page 27

Page 29

1    Q.   When did you graduate high
2 school?
3    A.   1987.
4    Q.   So you went to work for Walmart
5 after graduating high school; is that
6 correct?
7    A.   Correct.
8    Q.   What was your first job at
9 Walmart?
10    A.   I was an order filler.
11    Q.   And where was -- where were you
12 located at that time?
13    A.   Plainview, Texas.
14    Q.   And how long did you -- strike
15 that.
16       What was your next job at
17 Walmart after an order filler?
18    A.   I loaded trailers.
19    Q.   What do you mean by "loaded
20 trailers"?
21    A.   I physically loaded
22 televisions, dog food, paint, into a trailer,
23 floor-loaded it.
24    Q.   Was that at a Walmart
25 distribution center?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 A. Yes.
2 Q. Which distribution center was
3 that?
4 A. 6012.
5 Q. And where is that distribution
6 center located?
7 A. Plainview, Texas.
8 Q. And just briefly can you
9 describe what you did as an order filler?
10 A. I filled orders for the store.
11 Q. What do you mean by you "filled
12 orders for the store"?
13 Can you describe that with more
14 specificity?
15 A. So I filled like makeup, yarn,
16 tools; placed those in a box and shipped
17 them.
18 Q. Were those online orders?
19 A. No.
20 Q. Where were the orders coming
21 from?
22 A. The stores that were aligned to
23 that distribution center.
24 Q. Okay. So you're also -- the
25 role you described of filling orders was also

Page 31

1 at the distribution center; is that correct?
2 A. That's correct.
3 Q. Okay. And then what was the
4 next position you held at Walmart?
5 A. I went into quality assurance.
6 Q. Okay. And approximately what
7 time period was that?
8 A. 1990.
9 Q. And where were you located at
10 that time?
11 A. Plainview, Texas.
12 Q. And how long did you hold that
13 role in quality assurance?
14 A. I don't recall how long I held
15 the role.
16 Q. Approximately how long?
17 A. Maybe two years.
18 Q. And just generally speaking,
19 what were your duties and responsibilities in
20 quality assurance?
21 A. Inventory control, cycling the
22 inventory, problem solving with freight that
23 didn't have a home. Mostly just inventory
24 related.
25 Q. And were there any specific

Page 32

1 products or areas of the business you were
2 responsible for?
3 A. Not -- not at that time.
4 Q. Was this at the same DC?
5 A. Yes.
6 Q. Who did you report to at this
7 time?
8 A. I don't recall.
9 Q. And you held that role for
10 approximately two years, until approximately
11 1992?
12 A. Yes.
13 Q. What was your next role at
14 Walmart?
15 A. I was a supervisor.
16 Q. What did you supervise?
17 A. The associates in the order
18 filling area.
19 Q. How long did you hold that
20 role?
21 A. Until approximately 1995.
22 Q. And then what role did you take
23 on in 1995?
24 A. I was a manager trainee.
25 Q. And what does that mean?

Page 33

1 A. I was in the processes of
2 learning how to run a department.
3 Q. Does Walmart have specific
4 training for its prospective managers?
5 A. It did at that time.
6 Q. And you were chosen to
7 participate in that training, correct?
8 A. Correct.
9 Q. That was in 1995,
10 approximately?
11 A. Approximately.
12 Q. And where did that training
13 take place?
14 A. Palestine, Texas.
15 Q. And what type of training
16 occurred?
17 A. Leadership training.
18 Q. Anything else?
19 A. Manpower, forecasting,
20 administrative.
21 Q. What do you mean when you
22 say -- strike that.
23 Can you describe what
24 leadership training is?
25 A. So it would have been like how

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  do you handle, you know, your interviewing
2  skills; how do you, you know, write different
3  disciplinary things. I'm trying to think
4  what else was in there.
5      Q.    And I realize this is going
6  back a ways. I'm just trying to get a
7  general sense of what you were --
8      A.    That was --
9      Q.    That's fine.
10          And then do you have any
11  recollection with respect to what kind of the
12  other areas were, the manpower, forecasting,
13  administrative, what just generally those
14  involved?
15     A.    Just knowing how to read the --
16  the associates' attendance, how to forecast,
17  you know, based on the volume coming in, how
18  many people do you need, how long is it going
19  to take to do the work. That was the
20  manpower forecasting.
21     Q.    And how long did the training
22  last?
23     A.    I believe it was -- I want to
24  say six weeks. I don't recall how long the
25  training was.

Page 35

1      Q.    Okay. And then after you
2  received this training, did you take a
3  different position at Walmart?
4      A.    Then I had an area to run.
5      Q.    Okay. And what area was that?
6      A.    The marking room.
7      Q.    Can you describe what the
8  marking room is?
9      A.    So it was when goods came in to
10  Walmart, they weren't ticketed, so we would
11  ticket those -- that merchandise, and the
12  majority of it was apparel and shoes.
13     Q.    And what do you mean by
14  "ticketed"?
15     A.    Showed the price tags on them.
16     Q.    Was this position also at the
17  DC?
18     A.    Yes.
19     Q.    And these were products that
20  were sold to Walmart by manufacturers or
21  suppliers?
22     A.    Yes.
23     Q.    And how long did you have that
24  role?
25     A.    Maybe a year.

Page 36

1      Q.    So until approximately 1996 at
2  some point you switched again?
3      A.    Yes.
4      Q.    Okay. What was your next role?
5      A.    I was a QA manager. QA,
6  quality assurance.
7      Q.    Can you just describe for us
8  very briefly what that means?
9      A.    So it's the inventory, so on
10  the -- you would have responsibility for all
11  the inventory and the associates that
12  reported up through that process.
13     Q.    How long did you have that
14  role, approximately?
15     A.    Maybe about six or seven
16  months.
17     Q.    And then you switched again; is
18  that correct?
19     A.    I moved.
20     Q.    Oh, you moved where you lived;
21  is that --
22     A.    Yes.
23     Q.    And where did you move?
24     A.    To Loveland, Colorado.
25     Q.    Did you continue to work for

Page 37

1  Walmart in Loveland, Colorado?
2      A.    Yes.
3      Q.    Okay. What did you do there?
4      A.    I'm sorry?
5      Q.    What did you do in Loveland?
6  I'm sorry.
7      A.    So I was an area manager as
8  well.
9      Q.    And how long did you have that
10  role in Loveland, approximately?
11     A.    I lived in -- so I got there in
12  May of '96, and I left in April of '97.
13     Q.    You left Loveland in April
14  of '97; is that correct?
15     A.    That's correct.
16     Q.    Okay. And where did you go at
17  that point?
18     A.    I went to Hope Mills, North
19  Carolina.
20     Q.    Was that move a result of a
21  change in Walmart jobs?
22     A.    No. It was distribution as
23  well.
24     Q.    Okay. That move was for
25  personal reasons not related to your

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 employment at Walmart; is that correct?
2　　A.　That's correct.
3　　Q.　So now you're in North
4 Carolina, still working for Walmart on the
5 distribution side, correct?
6　　A.　Correct.
7　　Q.　Was that also a distribution
8 center in North Carolina?
9　　A.　Yes.
10　　Q.　And are you still a manager, an
11 area manager, there?
12　　A.　Yes.
13　　Q.　Okay.　And what was the next
14 role you had at Walmart?
15　　A.　So then I transferred back to
16 Plainview, Texas, in October of '97, and I
17 had an area manager position there as well.
18　　Q.　And then how long did you hold
19 that position back in Texas?
20　　A.　Until 2004.
21　　Q.　And what change occurred in
22 2004?
23　　A.　I moved to Bentonville,
24 Arkansas.
25　　Q.　And then what position did

Page 39

1 you -- strike that.
2　　　Did you change positions at
3 that point?
4　　A.　I did.
5　　Q.　Okay.　And what was your new
6 position?
7　　A.　I worked in merchandise
8 support.
9　　Q.　Is that at a DC in Bentonville?
10　　A.　No, that was in the home
11 office.　That was in the logistics building.
12　　Q.　And can you just describe
13 generally what your duties and
14 responsibilities were for that role in
15 merchandise support?
16　　A.　So I had responsibility for all
17 of the apparel and shoes and the flow of
18 those -- that product from supplier to
19 distribution center.
20　　Q.　And is that for all of the
21 Walmarts in the world?
22　　A.　In all the US apparel DCs.
23　　Q.　So you were responsible for
24 getting the apparel to the DCs; is that
25 correct?

Page 40

1　　A.　I worked with -- I was a
2 liaison between merchandising and logistics.
3　　Q.　And what sort of things would
4 you do on a day-to-day basis?
5　　A.　I would meet with the buyers to
6 find out when they were flowing product into
7 the distribution centers and determine when
8 those were going to hit.　Because with
9 apparel it's seasonal, so there was four
10 seasons that you had to flow through; so you
11 have, you know, the winter season, you -- it
12 was a certain specific time frame.　If there
13 was inventory left in the distribution
14 center, that you partnered with them to try
15 to flow that into the stores.
16　　Q.　During this time period, was
17 there a database or any other electronic
18 system that Walmart used to manage its
19 inventory?
20　　　MS. FUMERTON:　Objection.
21 Form.
22 QUESTIONS BY MR. BOWER:
23　　Q.　I'll strike that.
24　　　How did Walmart manage its
25 inventory in 2004?

Page 41

1　　　MS. FUMERTON:　Objection.
2 Form.



12　　Q.　Did you receive at that point
13 any -- or strike that.
14　　　At any point did you receive
15 specific training with respect to merchandise
16 inventory management?
17　　A.　I did.
18　　Q.　Okay.　When was that?
19　　A.　When I came in 2004.
20　　Q.　Did that training occur in
21 Bentonville?
22　　A.　Yes.
23　　Q.　And how long did you hold that
24 position?
25　　A.　Till 2008.

Highly Confidential - Subject to Further Confidentiality Review



Page 42

1    Q.    And then what was the change in
2  2008?
3    A.    I moved over to the pharmacy.
4    Q.    And what was your title in
5  2008?
6    A.    I was senior manager on the
7  pharmacy team.
8    Q.    Was that your title in 2008,
9  senior manager in the pharmacy team?
10    A.    I don't know what it said.
11    Q.    What were your duties and
12  responsibilities in connection with that
13  role?

Highly Confidential - Subject to Further Confidentiality Review



Page 50



Page 51



6    Q.    And you believe that occurred
7  sometime in 2010; is that correct?
8    A.    '10 or '11.  I don't recall.
9    Q.    Before that rollout occurred,
10  did Walmart have a monitoring program in
11  place?
12    A.    Yes.
13    Q.    And what was that program?
14    A.    I believe it was a 405 report,
15  and they monitored orders as they came in.
16    Q.    Okay.  And what do you mean
17  by -- when you say "they monitored orders as
18  they came in," what does that mean?
19    A.    So the distribution center did
20  and the associates did.
21    Q.    Are the associates at the
22  distribution center?
23    A.    Yes.
24    Q.    Okay.  Anyone other than the
25  associates at the distribution center that

Page 52

1  would monitor orders?
2        MS. FUMERTON:  Objection.
3    Form.
4  QUESTIONS BY MR. BOWER:
5    Q.    And I'm just trying -- just so
6  the record is clear, I'm just trying to
7  understand your answer.
8        You said "the distribution
9  center did and the associates did."  Are
10  those two different things in your mind?
11    A.    They're all at the distribution
12  center.
13    Q.    And what were the associates
14  doing prior to the rollout of Reddwerks?
15    A.    So my understanding is that
16  they would -- they would let their manager
17  know if they saw an order that was out of the
18  ordinary.
19    Q.    What do you mean by "out of the
20  ordinary"?
21    A.    Like, for example, ReliOn
22  insulin, we had orders that would -- where
23  the pharmacy would think that they were
24  ordering ten vials of insulin, and they
25  actually ordered a hundred of them because

Page 53

1  they were in packs of ten.  So those would be
2  examples of what they would bring to their
3  attention.
4    Q.    And in fact, Walmart had an
5  automatic cut for those instant orders,
6  correct?
7        MS. FUMERTON:  Objection.
8    Form.
9        Go ahead.
10        THE WITNESS:  For the what now?
11  QUESTIONS BY MR. BOWER:
12    Q.    For those insulin orders that
13  you just -- the example that you just
14  provided, Walmart actually had an automatic
15  cut for those orders, didn't they?
16        MS. FUMERTON:  Objection.
17    Form.
18        THE WITNESS:  It was a manual
19    cut; it wasn't automatic.
20  QUESTIONS BY MR. BOWER:
21    Q.    A manual cut that was
22  automatically applied to insulin orders,
23  correct?
24        MS. FUMERTON:  Objection.
25    Form.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    THE WITNESS:  They would call
2  the store to inform them that they had
3  placed -- if they really wanted a
4  hundred because, I mean, the
5  refrigerator didn't hold a hundred.
6  QUESTIONS BY MR. BOWER:
7    Q.    Right.
8        And that was specific to
9  insulin, correct?
10    A.    That's correct.
11    Q.    Okay.  What about with respect
12  to Schedule II narcotics, what were the DCs
13  doing in 2008?
14        MS. FUMERTON:  Objection.
15  Form.
16        THE WITNESS:  My understanding
17  is they would do the same thing with
18  that.
19  QUESTIONS BY MR. BOWER:
20    Q.    And where does that
21  understanding come from?
22    A.    Just from when I was training
23  in 2008, when I was out at the DCs training.
24    Q.    Okay.  So what specifically did
25  you learn in connection with your training

Page 55

1  that the DCs were doing for Schedule II
2  narcotics?
3        MS. FUMERTON:  Objection.
4  Form.
5        THE WITNESS:  So again, they
6  would look at that paper and let their
7  supervisor or manager know that this
8  appears to be out of the ordinary or
9  unusual.
10  QUESTIONS BY MR. BOWER:
11    Q.    And at that point -- and we're
12  talking 2008, correct?
13    A.    Yes.
14    Q.    At that point, how was DC 6045
15  receiving orders?  They were paper, correct?
16    A.    So those would come in
17  electronically.  They're printed on paper.
18    Q.    They would come in
19  electronically once a day?
20    A.    That's correct.
21    Q.    And then they would print it on
22  paper at the DC?
23    A.    That's correct.
24    Q.    And then what would happen to
25  those papers?

Page 56

1    A.    Well, first they would print
2  the 222 form, sign those, and then that and
3  the paper order would be put together in a
4  packet, and the associates would fill orders
5  based on that paper order.
6    Q.    And was it the practice for the
7  orders to be filled and shipped the same day
8  they came in?
9    A.    Yes.
10    Q.    And approximately how many
11  orders came in to DC 6045 on a daily basis
12  during this time period?
13    A.    I don't recall how many orders
14  came in.
15    Q.    Would it have been in the
16  hundreds of orders?  Could it have been in
17  the hundreds of orders per day?
18    A.    Well, they filled store
19  order -- store only got an order once a week
20  of C-IIs.  So if you divide it up, however
21  many stores we had at the time, that's how
22  many orders they would -- processed, four
23  days a week.
24    Q.    That's fine.
25        You said four days a week?

Page 57

1    A.    Yes.
2    Q.    So, for example, if there were
3  4,000 stores, approximately a thousand orders
4  a day, correct?
5    A.    Potentially.
6    Q.    And just so the record's clear,
7  you mentioned a couple reports.  I just want
8  to go through just what those reports are.
9        What is a 222?
10    A.    It's a DEA 222 form to move
11  C-II drugs.
12    Q.    Okay.  And what is a 405
13  report?
14    A.    So it was a report that the
15  distribution used.  I don't know what they --
16  I don't know what all it had on there.  I
17  know that they used it.
18    Q.    And how do you know that they
19  used it?
20    A.    Because when it didn't generate
21  one month, they pinged me to help them get it
22  generated.
23    Q.    Do you know why they pinged you
24  to help get them generated?
25    A.    Because of the systems

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 background that I had.
2    Q.    And what systems backgrounds do
3 you have?
4    A.    It was mainly knowing how the
5 orders would come in, some of the jobs that
6 were run for certain reports. So I would
7 partner with maybe my -- I had contacts over
8 in the IT department, so they would ask me to
9 ping somebody over in IT to let them know
10 that a report didn't run.
11    Q.    And I just want to put a time
12 frame on that answer.
13        What time frame would you ping
14 folks in IT to run a report?
15        MS. FUMERTON:  Objection.
16    Form.
17        THE WITNESS:  That happened to
18    be one incident. I don't know when it
19    occurred.
20 QUESTIONS BY MR. BOWER:
21    Q.    Okay. Other than the 405
22 reports and the DC associates reviewing the
23 orders, prior to the role of Reddwerks, was
24 Walmart doing anything else to review orders
25 for Schedule II narcotics?

Page 59

1        MS. FUMERTON:  Objection.
2    Form.
3        THE WITNESS:  I don't know.
4 QUESTIONS BY MR. BOWER:
5    Q.    Anything else that you're aware
6 of that was being done?
7        MS. FUMERTON:  Objection.
8    Form.
9        THE WITNESS:  I don't know.
10 QUESTIONS BY MR. BOWER:
11    Q.    Well, you visited DC 6045 in
12 2008, correct?
13    A.    I did.
14    Q.    Okay. At that point did you
15 see anything else being done in connection
16 with reviewing orders placed by the
17 pharmacies for Schedule II narcotics?
18        MS. FUMERTON:  Objection.
19    Form.
20        THE WITNESS:  Not that I
21    recall.
22 QUESTIONS BY MR. BOWER:
23    Q.    Okay. And did someone at DC
24 6045 tell you that they would have the
25 associates review the orders on a daily

Page 60

1 basis?
2    A.    That was part of the training
3 that -- when I was learning how to -- they
4 filled orders. They told me and so did the
5 associates.
6    Q.    Okay. So who told you that?
7    A.    I don't recall the manager that
8 would have said it.
9    Q.    Was it the manager at 6045 or
10 your manager for the training?
11    A.    No, it was the managers that
12 were supervisors at 6045.
13    Q.    Mike Mullin?
14    A.    He was a general manager. I
15 don't know.
16    Q.    Okay. Do you know who had
17 responsibility at 6045 for making sure the
18 associates would review the orders for
19 Schedule II narcotics?
20    A.    I don't know.
21    Q.    Are you aware of any instance
22 where the associates flagged an order for
23 Schedule II narcotics as potentially
24 suspicious?
25        MS. FUMERTON:  Objection.

Page 61

1    Form.
2        THE WITNESS:  I don't know.
3 QUESTIONS BY MR. BOWER:
4    Q.    Was that part of your training?
5    A.    I spent a day there. I --
6 doing the order filling process. That day we
7 didn't. I don't know of anything else that
8 would have been done.
9    Q.    What about since that day?
10        MS. FUMERTON:  Objection.
11    Form.
12        THE WITNESS:  I don't know. It
13    wouldn't have been anything that would
14    have come to me.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 66

Page 67

14    MS. FUMERTON:  Zach, we've been
15  going for about an hour.  Would it be
16  okay --
17    MR. BOWER:  Can we just have a
18  few minutes just to round out her
19  employment history and then we'll --
20    MS. FUMERTON:  Sure.
21    MR. BOWER:  I just wanted -- so
22  we can switch topics after the break.
23  QUESTIONS BY MR. BOWER:
24    Q.    So you held this position
25  beginning in 2008 where you were senior

Page 68

1  manager for the pharmacy team.
2        How long did you hold that
3  position?
4    A.    That's what I currently do.
5    Q.    You still have that -- what's
6  your current title?
7    A.    Senior manager, department
8  supply chain.  We just changed it from
9  logistics to supply chain.
10        MR. BOWER:  It might take a
11    little longer to go through subsequent
12    duties and responsibilities, so why
13    don't we take a break and we can
14    finish up after.
15        MS. FUMERTON:  Okay.
16        VIDEOGRAPHER:  Going off the
17    record at 8:33 a.m.
18     (Off the record at 8:33 a.m.)
19        VIDEOGRAPHER:  We're back on
20    the record at 8:47 a.m.
21  QUESTIONS BY MR. BOWER:
22    Q.    Okay.  I just want to finish
23  up, hopefully fairly briefly, your roles at
24  Walmart.
25        So from 2008 to the present,

Page 69

1  you've had the same title, essentially; is
2  that correct?
3    A.    That's correct.

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 94

Page 95

Page 96

⁴  Q.  Do you recall -- strike that.

⁵  All right.  Are you aware the

⁶ country is undergoing an opioid epidemic?

⁷  A.  I am aware of that.

⁸  Q.  When did you become aware of

⁹ that?

¹⁰  A.  I don't know exactly when.

¹¹ I've seen it in the news.

¹²  Q.  Did you ever discuss it at

¹³ work?

¹⁴  A.  No.

Page 97

Highly Confidential - Subject To Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Page 106

Page 108

Page 107

Page 109

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 114

Page 116

Page 115

Page 117



Page 118

Page 120

Page 119

Page 121

24  QUESTIONS BY MR. BOWER:
25      Q.    Were you aware in July of 2012

1  that oxycodone was creating an opioid
2  epidemic in this country?
3          MS. FUMERTON:  Objection.
4  Form.
5          THE WITNESS:  I was not aware.
6  QUESTIONS BY MR. BOWER:
7      Q.    Hadn't seen any news reports on
8  it prior to this time period?
9      A.    I don't recall.



Highly Confidential - Subject to Further Confidentiality Review



Page 126

Page 128

19    MS. FUMERTON:  Is this a good
20    transition point?  Because we've been
21    going about an hour and 20 minutes
22    now.
23        MR. BOWER:  Sure, we can take a
24    break.  I don't know what your
25    schedule is, but if we keep taking

Page 127

Page 129

1    15-minute breaks an hour, we're not
2    going to be done by 4, so...
3        MS. FUMERTON:  Well, it wasn't
4    15 minutes last time, I checked.  But
5    in any event, we'll keep the breaks
6    short, and we'll keep lunch short,
7    too.
8        MR. BOWER:  Okay.
9        VIDEOGRAPHER:  Going off the
10    record.  It's 9:54 a.m.
11    (Off the record at 9:54 a.m.)
12        VIDEOGRAPHER:  We're back on
13    the record at 10:07 a.m.
14        (Walmart-Sullins Exhibit 4
15    marked for identification.)
16  QUESTIONS BY MR. BOWER:
17    Q.    Okay.  Ms. Sullins, we're back
18    on the record.

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



17        MR. BOWER:  We can take a
18   break.
19        VIDEOGRAPHER:  Going off the
20   record at 10:54 a.m.
21   (Off the record at 10:54 a.m.)
22        VIDEOGRAPHER:  We're back on
23   the record at 11:06 a.m.
24   QUESTIONS BY MR. BOWER:
25        Q.    Okay.  We're back on the

**Page 174**

1  record.  I just wanted to talk a minute,
2  ma'am, about the oath that you've taken
3  today.
4          Okay?
5      A.    Yes.
6      Q.    You understand the nature of
7  that oath?
8      A.    Yes.
9      Q.    You understand that your
10 obligation is to tell the whole truth and
11 nothing but the truth?  Do you understand
12 that?
13     A.    Yes.
14     Q.    So, for example, when you say
15 you don't remember, you have to have a basis
16 for that statement.
17         Do you understand that?
18         MS. FUMERTON:  Objection to the
19     instruction and the question.
20         THE WITNESS:  I understand
21     that.
22 QUESTIONS BY MR. BOWER:



**Page 175**

10         So you're misstating her --
11     yes, it is absolutely what she said.
12         MR. BOWER:  I appreciate your
13     speaking objection, but I would also
14     ask that you refrain from those in the
15     future.
16         MS. FUMERTON:  Well, I would
17     ask that you refrain from
18     mischaracterizing the witness'
19     testimony.
20         MR. BOWER:  There's a reason
21     that you're only allowed for speaking
22     objections.  I would just ask you to
23     abide by that obligation.
24         MS. FUMERTON:  You also have an
25     obligation not to misrepresent the

**Page 176**

1  record.
2          MR. BOWER:  And that's why
3      you're free to make an objection.
4      Right?
5          So you're free to make your
6      objections, but I would appreciate if
7      you didn't have speaking objections.
8          MS. FUMERTON:  You're the one
9      that's keeping talking right now.
10 QUESTIONS BY MR. BOWER:

**Page 177**

2      Q.    Do you know what ARCOS is?
3      A.    Yes.
4      Q.    What is ARCOS?
5      A.    Sales and purchases.
6      Q.    Do you know whether Walmart
7  reports information to the DEA?
8      A.    Yes.
9      Q.    Do you know how Walmart reports
10 that information?
11     A.    They report it monthly.
12     Q.    And who creates the reports?
13     A.    It's created through a job in
14 the system, so it's an automatic report that
15 gets put on a server.  We take that data and
16 upload it into the DEA's website.
17     Q.    And who has the responsibility
18 at Walmart to physically do the uploading of
19 the data?
20     A.    There was an individual on our
21 team that did that.



Page 178

Page 180

Page 179

Page 181

```
 2        But take your time to review it
 3   and then -- before answering the question.
 4   It looks like there's maybe two copies of the
 5   document --
 6        MS. FUMERTON:  I was just
 7   trying to figure out if that was
 8   supposed to be the case, or was it --
 9        MR. BOWER:  I don't think so,
10   but I think they're also identical, so
11   I don't know if it's...
12        MS. FUMERTON:  It looks like
13   from the attachments --
14        MR. BOWER:  There's only one,
15   right?
16        MS. FUMERTON:  This should be
17   only one.
18        MR. BOWER:  Yeah.  So we can
19   either pull it out or --
20        MS. FUMERTON:  Why don't we
21   pull it out.
22        MR. BOWER:  -- investigate.
23   Yeah.  Okay.
24        MS. FUMERTON:  At a break,
25   we'll just double-check.  We'll do a
```

Highly Confidential - Subject to Further Confidentiality Review



Page 182

1  comparison.
2      MR. BOWER:  Yes, that's --
3  either way is fine.  I don't have any
4  questions on the second one anyways
5  because that would have been my
6  assumption, so...
7      And we can remove yours at the
8  break --
9      MS. FUMERTON:  Okay.
10      MR. BOWER:  -- so we don't have
11  to worry about it now.
12  QUESTIONS BY MR. BOWER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 194

5          MS. FUMERTON:  Objection.
6     Form.
7          MR. BOWER:  Are you objecting
8     that the slides on this e-mail were
9     sent to the people on the e-mail?
10          MS. FUMERTON:  I'm objecting
11     because you continuously do not listen
12     to her answers and misrepresent the
13     testimony, because she said that there
14     were other people involved in the
15     team, and then you keep trying to
16     reduce it to a smaller number.
17          MR. BOWER:  I don't reduce it.
18     QUESTIONS BY MR. BOWER:

Page 195

18          MS. FUMERTON:  Objection.
19     Form.  And I object to what you're
20     asking because you're going back to
21     the original question that you asked.
22          And she said, "Let me look to
23     see if I had any responsibility," and
24     you said you were going to withdraw
25     that question, and then you came back

Page 196

1     and insisted that she answer the
2     question.
3          So if you want her to answer
4     whether she had responsibility for
5     anything in the slides, you need to
6     allow her time to review the slides.
7          MR. BOWER:  I would ask, again,
8     for no speaking objections.
9          MS. FUMERTON:  And I am going
10     to again ask you to stop
11     misrepresenting her testimony and the
12     record.
13          Are you objecting to letting
14     her have time to review the slides?
15          MR. BOWER:  I never did.
16          MS. FUMERTON:  Yes, you did.
17          MR. BOWER:  I just asked the
18     question.
19          MS. FUMERTON:  You withdrew the
20     question.
21          MR. BOWER:  I withdrew the
22     question.
23          MS. FUMERTON:  And now you
24     asked again.
25          MR. BOWER:  Now -- let me clear

Page 197

1     up the record, because now you've made
2     a long record that's inaccurate, which
3     is frequent in this case.
4          I withdrew the question.  I
5     asked some foundational questions and
6     then asked the question again, at
7     which point you interjected your long
8     speaking objection which is
9     inappropriate.
10     QUESTIONS BY MR. BOWER:
11          Q.    So I'll ask again.  And I've
12     given you plenty of time today to review
13     every document.  All I'm asking you is, did
14     you have any responsibility in connection
15     with anything represented in these slides?
16          MS. FUMERTON:  And you can take
17     the time to review the slides.
18          MR. BOWER:  And while she's
19     reviewing, I would appreciate if we
20     could end the speaking objections
21     because it's getting out of hand.
22          MS. FUMERTON:  It's not getting
23     out -- and, Zach, again, you cannot
24     withdraw when she says, "Give me a
25     minute to review," and you say, "I'll

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 withdraw the question," then come back
2 and ask.  You have to give her time to
3 review the slides.
4     MR. BOWER:  I never didn't give
5 her time.
6     MS. FUMERTON:  I'm not going to
7 let you railroad her into questions
8 that are unfair.
9     MR. BOWER:  Look, it's pretty
10 clear that your speaking objections
11 are strategic, so if they keep going,
12 we're going to have to find some
13 relief because it's inappropriate.
14     MS. FUMERTON:  Is your
15 misrepresenting the record strategic?
16     MR. BOWER:  I am not.  I
17 withdrew a question.  I asked
18 foundational questions then asked the
19 question again.
20     MS. FUMERTON:  All I'm asking
21 is for time to review the document.
22     MR. BOWER:  Then that should be
23 the nature of your statement, not a
24 long colloquy.



Highly Confidential - Subject to Further Confidentiality Review



Page 202

Page 204

Page 203

3   Q.   Okay.  Were you aware in 2013
4   that the country was in the middle of an
5   opioid crisis?
6   A.   I don't know when I became
7   aware of it.
8   Q.   Do you recall being aware of it
9   at this time?
10   A.   No, I don't recall that.

Page 205



Highly Confidential - Subject to Further Confidentiality Review



Page 210

10    MR. BOWER:  I'm not sure what
11  time it is.  Do you want to keep going
12  or do you want to do --
13    MS. FUMERTON:  No, this is a
14  good time to stop for lunch.  I just
15  wanted to be mindful because we do
16  have the 4:00 cutoff.
17    MR. BOWER:  Well, I mean --
18    MS. FUMERTON:  You took the
19  other break after we had just taken a
20  30-minute break, so --
21    MR. BOWER:  I took a
22  five-minute break.  I'm allowed to
23  take a five-minute break.
24    MS. FUMERTON:  I'm not saying
25  you're not, but I'm just saying --

Page 211

1    MR. BOWER:  We will be done
2  when we're done.  I'm not agreeing to
3  less than my time on the record.
4    MS. FUMERTON:  Well, then let's
5  just take -- we'll take a short
6  lunch --
7    MR. BOWER:  That's fine.
8    MS. FUMERTON:  -- and --
9    MR. BOWER:  You can take a
10  five-minute lunch if you want.
11    MS. FUMERTON:  We had this
12  conversation --
13    MR. BOWER:  We did, and
14  that's --
15    MS. FUMERTON:  -- before the
16  scheduling.
17    MR. BOWER:  -- why I said
18  before we were taking three 15-breaks
19  this morning.
20    MS. FUMERTON:  We did not take
21  a 15-minute break, but the record will
22  show what we took.
23    MR. BOWER:  They both were like
24  14 minutes.
25    MS. FUMERTON:  No, they were

Page 212

1  not.
2    VIDEOGRAPHER:  Going off the
3  record at 11:41 a.m.
4    (Off the record at 11:41 a.m.)
5    VIDEOGRAPHER:  We're back on
6  the record at 12:06 p.m.
7    (Walmart-Sullins Exhibit 7
8  marked for identification.)
9  QUESTIONS BY MR. BOWER:
10    Q.  Okay.  We're back on the
11  record.
12    Do you understand that you're
13  still under oath?
14    A.  Yes.

Page 213

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 238

Page 239

Page 240

Page 241

Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Page 258

Page 259

Page 260

1  MR. BOWER: Okay. So we've
2  been going about an hour. We'll take
3  a break. I'll pull out those
4  documents. We'll have to go through
5  them. Okay?
6      MS. FUMERTON: Okay.
7      VIDEOGRAPHER: Going off the
8  record at 1:13 p.m.
9   (Off the record at 1:13 p.m.)
10     VIDEOGRAPHER: We're back on
11  the record at 1:30.
12     (Walmart-Sullins Exhibit 13
13  marked for identification.)
14  QUESTIONS BY MR. BOWER:
15    Q.   Okay. I'm going to hand you
16  what's been marked as Exhibit 13. It's a
17  rather long document, so take a few minutes
18  and look at it.
19     MS. FUMERTON: Zach, did you
20  correct the other document during the
21  break?
22     MR. BOWER: No, I did not.
23     MS. FUMERTON: That's fine. As
24  long as we just do it by the end of
25  the day.

Page 261

1      MR. BOWER: Yeah.
2  QUESTIONS BY MR. BOWER:

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 270

Page 272

<sup>1</sup> just using however you -- whatever you
<sup>2</sup> meant purchase order, that's what I
<sup>3</sup> mean.

Page 271

<sup>2</sup>    Q.    What is the longest -- strike
<sup>3</sup> that.
<sup>4</sup>        Let's say someone needed to
<sup>5</sup> look back as far as possible for purchase
<sup>6</sup> orders.
<sup>7</sup>        Where would they go?
<sup>8</sup>        MS. FUMERTON:  Objection.
<sup>9</sup> Form.
<sup>10</sup> QUESTIONS BY MR. BOWER:
<sup>11</sup>    Q.    I'll strike that.
<sup>12</sup>        Let's say someone wanted to
<sup>13</sup> look back as far as they could go for
<sup>14</sup> purchase orders for C-IIs, okay?  Where would
<sup>15</sup> they go?
<sup>16</sup>        MS. FUMERTON:  Objection.
<sup>17</sup> Form.
<sup>18</sup> QUESTIONS BY MR. BOWER:
<sup>19</sup>    Q.    And I'm talking now about any
<sup>20</sup> time period.
<sup>21</sup>        MS. FUMERTON:  My objection is
<sup>22</sup> actually different.  It's to the use
<sup>23</sup> of the term "purchase order."  I just
<sup>24</sup> want to make sure you're not talk --
<sup>25</sup>        MR. BOWER:  That's fine.  I'm

Page 273



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 282

Page 284

Page 283

Page 285

Highly Confidential - Subject to Further Confidentiality Review



Page 286

Page 288

Page 287

Page 289

25          MS. FUMERTON:  Let me just give

Highly Confidential - Subject to Further Confidentiality Review



Page 290

```
 1   some clarification because there's
 2   actually sort of two e-mails and
 3   then --
 4        MR. BOWER:  Why don't we not
 5   have testimony from counsel on the
 6   record.  If we need to clarify it off
 7   record, we can do it, but...
 8        MS. FUMERTON:  Well, okay.
 9   Well, I didn't question -- I object to
10   the question then because I think it's
11   unclear.
12        THE WITNESS:  What was your
13   question?
14   QUESTIONS BY MR. BOWER:
```

Page 291

Page 292

Page 293

Highly Confidential - Subject to Further Confidentiality Review





Page 298

Page 300

1   she can answer if you're not restating
2   your question.
3       And if you are restating your
4   question, I object to the third
5   question and the supplement.

Page 299

14      MS. FUMERTON:  Objection.
15   Form.  Lack of foundation.
16   QUESTIONS BY MR. BOWER:
17      Q.    Well, you just don't recall,
18   right?
19      MS. FUMERTON:  Objection.
20   Form.
21   QUESTIONS BY MR. BOWER:
22      Q.    Could have happened?
23      MS. FUMERTON:  Objection to the
24   three questions that have been asked.
25   She hasn't -- if I make an objection,

Page 301

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 310

Page 311

Page 312

5      MS. FUMERTON: Objection. Form
6   and misstates her testimony.
7      I've been giving a lot of
8   leeway for you to go at this many
9   ways, as I understand you have that,
10  but at some point it becomes harassing
11  if you keep asking the same question
12  and misstating the testimony every
13  time.
14     MR. BOWER: She's not answering
15  the question. So let me just try it
16  one more time --
17     MS. FUMERTON: I disagree.
18     MR. BOWER: -- and then we'll
19  just ask to read back the question.
20  Okay.
21  QUESTIONS BY MR. BOWER:

Page 313

Highly Confidential - Subject to Further Confidentiality Review



Page 314

Page 315

Page 316

Page 317

```
13        MS. FUMERTON:  Lack of
14   foundation.
15        MR. BOWER:  Can you read
16   back -- I move to strike that answer.
17   Can you please read back the question?
18        MS. FUMERTON:  Zach, it's
19   fundamentally unfair, if somebody's
20   repeatedly telling you they don't
21   recall something, whether or not it's
22   an accurate statement.
23        She's answered that seven ways
24   from Sunday as to she does not
25   recall --
```



Page 318

1  MR. BOWER:  The question isn't
2  whether --
3  MS. FUMERTON:  -- the
4  conversation.  You asked whether or
5  not it's accurate.
6  MR. BOWER:  I would appreciate
7  the speaking objections to end, okay?
8  It's not -- and just to be clear, my
9  question isn't whether you recall the
10 statement.  The question is whether
11 the statement is an accurate
12 statement.
13 MS. FUMERTON:  Objection.  Form
14 and lack of foundation.

Page 320

5  MS. FUMERTON:  We've been going
6  about an hour.  Can we take a -- if
7  you're moving on.
8  MR. BOWER:  Sure.  Okay.
9  MS. FUMERTON:  It will be a
10 short break.  I just need to use the
11 restroom.
12 VIDEOGRAPHER:  Going off the
13 record at 2:35 p.m.
14  (Off the record at 2:35 p.m.)
15 VIDEOGRAPHER:  We're back on
16 the record at 2:48 p.m.
17  (Walmart-Sullins Exhibit 17
18 marked for identification.)
19 QUESTIONS BY MR. BOWER:
20 Q.    Back on the record, Exhibit 17.

Page 319

Page 321

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject To Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 338

Page 340

Page 339

Page 341



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



**Page 358**

**Page 360**

5   Q.    And before we go to the next
6   exhibit, you must have been aware in 2016
7   that the nation was in an opioid crisis,
8   weren't you?
9        MS. FUMERTON:  Objection.
10   Form.
11        THE WITNESS:  That the nation
12   was?
13   QUESTIONS BY MR. BOWER:
14   Q.    Was in the middle of an opioid
15   epidemic, a crisis.
16        MS. FUMERTON:  Objection.
17   Form.
18        THE WITNESS:  I don't know
19   when -- when I learned of that from
20   the news, but --
21   QUESTIONS BY MR. BOWER:
22   Q.    Do you disagree that the nation
23   was in the middle of an opioid crisis in
24   2016?
25        MS. FUMERTON:  Objection.

**Page 359**

**Page 361**

1   Form.
2        THE WITNESS:  I don't know when
3   I learned of that from the news.
4        (Walmart-Sullins Exhibit 23
5   marked for identification.)
6   QUESTIONS BY MR. BOWER:



Highly Confidential - Subject to Further Confidentiality Review



Page 366

Page 368

Page 367

Page 369

Highly Confidential - Subject to Further Confidentiality Review





Page 374

Page 376

17     MS. FUMERTON:  Zach, I think
18  you have like two or three minutes.  I
19  don't know if we can get a -- want to
20  go off the record for a second to get
21  a check on the time?
22     VIDEOGRAPHER:  Going off the
23  record at 3:51 p.m.
24  (Off the record at 3:51 p.m.)
25     VIDEOGRAPHER:  We're back on

Page 375

Page 377

1  the record at 3:58 p.m.
2  QUESTIONS BY MR. BOWER:
3     Q.    Ms. Sullins, I just have a few
4  more questions, closing up some questions
5  from this morning.

Highly Confidential - Subject to Further Confidentiality Review





Page 382

Page 384

7      MS. FUMERTON:  Okay.  Can we go
8  off the record for a second?
9      VIDEOGRAPHER:  Going off the
10  record at 4:05 p.m.
11  (Off the record at 4:05 p.m.)
12      VIDEOGRAPHER:  We're back on
13  the record at 4:07 p.m.
14      CROSS-EXAMINATION
15  QUESTIONS BY MS. FUMERTON:
16      Q.    Good afternoon, Ms. Sullins.  I
17  just have a couple of questions to follow up
18  on some of the questions that Mr. Bower asked
19  you earlier.
20      A.    Okay.

Page 383

Page 385

25

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



**Page 390**

7      MS. FUMERTON:  I have no
8  further questions.
9      MR. BOWER:  I just have a
10  couple of follow-ups.  Do you want to
11  switch back?
12      MS. FUMERTON:  Let's go off the
13  record.  Your rules.
14      VIDEOGRAPHER:  Going off the
15  record at 4:12 p.m.
16   (Off the record at 4:12 p.m.)
17      VIDEOGRAPHER:  We're back on
18  the record at 4:13 p.m.
19      REDIRECT EXAMINATION
20  QUESTIONS BY MR. BOWER:

**Page 391**

**Page 392**

21      MR. BOWER:  I have nothing
22  further.
23      MS. FUMERTON:  Okay.  I
24  literally have like two questions just
25  to follow up on what you said.  Are we

**Page 393**

1  really going to switch?
2      MR. BOWER:  Yeah.
3      MS. FUMERTON:  Okay.  Can we go
4  off the record?
5      VIDEOGRAPHER:  Going off the
6  record at 4:15 p.m.
7   (Off the record at 4:15 p.m.)
8      VIDEOGRAPHER:  We're back on
9  the record at 4:15 p.m.
10      RECROSS-EXAMINATION
11  QUESTIONS BY MS. FUMERTON:
12      Q.    Ms. Sullins, just a couple
13  quick questions.

Highly Confidential - Subject to Further Confidentiality Review

Page 394

8  MS. FUMERTON: I have no
9  further questions.
10  MR. BOWER: I have nothing
11  further.
12  VIDEOGRAPHER: Going off the
13  record at 4:16 p.m.
14  This concludes the videotaped
15  deposition of Ramona Sullins.
16  (Deposition concluded at 4:16 p.m.)
17  – – – – – – –
18
19
20
21
22
23
24
25

Page 396

1  INSTRUCTIONS TO WITNESS
2
3  Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the
6  appropriate space on the errata sheet for any
7  corrections that are made.
8  After doing so, please sign the
9  errata sheet and date it. You are signing
10  same subject to the changes you have noted on
11  the errata sheet, which will be attached to
12  your deposition.
13  It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt
16  of the deposition transcript by you. If you
17  fail to do so, the deposition transcript may
18  be deemed to be accurate and may be used in
19  court.
20
21
22
23
24
25

Page 395

CERTIFICATE

1
2
3  I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime
4  Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement
5  of the examination, Ramona Sullins was duly
sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.
7  I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
ability.
10
11  I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
12  nor counsel of any of the parties to this
action, and that I am neither a relative nor
13  employee of such attorney or counsel, and
that I am not financially interested in the
action.
14
15
16
17  CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
California Certified Shorthand
19  Reporter #13921
Missouri Certified Court Reporter #859
20  Illinois Certified Shorthand Reporter
#084-004229
21  Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
22  Notary Public
23  Dated: January 8, 2019
24
25

Page 397

1  ACKNOWLEDGMENT OF DEPONENT
2
3
4  I,_____, do
hereby certify that I have read the foregoing
5  pages and that the same is a correct
transcription of the answers given by me to
6  the questions therein propounded, except for
the corrections or changes in form or
7  substance, if any, noted in the attached
Errata Sheet.
8
9
10
11
12
_____
Ramona Sullins          DATE
13
14
15  Subscribed and sworn to before me this
16  _____ day of _____, 20 _____.
17  My commission expires: _____
18
19  Notary Public
20
21
22
23
24
25

Page 398

```
1      _ _ _ _ _ _ _
              ERRATA
2      _ _ _ _ _ _ _
3   PAGE  LINE  CHANGE/REASON
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25
```

Page 399

```
1      _ _ _ _ _ _ _
           LAWYER'S NOTES
2      _ _ _ _ _ _ _
3   PAGE  LINE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25
```