Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
------------------------    )
IN RE: NATIONAL             ) MDL No. 2804
PRESCRIPTION OPIATE         )
LITIGATION                  ) Case No.
------------------------    ) 1:17-MD-2804
                            )
THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster
ALL CASES                   )
------------------------    )
```

HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VIDEOTAPED DEPOSITION OF

REX SWORDS

December 21, 2018

Chicago, Illinois

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



43 (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS



Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Golkow Litigation Services - 877.370.DEPS

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1  drug?
2     A.   National Drug Code.
3     Q.   National Drug Code identifying specific
4  information about the controlled substance,
5  correct?
6     A.   Well, it identifies specific information
7  about the product.
8     Q.   The product.  And in this case in the
9  override form that we are looking at would be
10 Schedule II or Schedule III, right?
11    A.   Well, the NDC refers to the manufacturer
12 and the product.  So, it would be whoever the
13 product manufacturer in this example is for
14 oxycodone APAP 525.
15    Q.   Right.
16    A.   I don't know who it is.  That's who it
17 would have been.
18    Q.   The "UPC Code" is?
19    A.   That's a little different.  That's
20 actually the bar code.  Information on the bottle
21 itself, not necessarily the NDC number as well.
22    Q.   And then the "PLN Number"?
23    A.   That's an internal number used for
24 grouping particular categories together.  I never

Page 343

1  use it.  I don't know what actually -- it's got
2  some function.  I don't know what it is.
3     Q.   We can see in column H the actual drug
4  name?
5     A.   Yes.
6     Q.   Whether it's a combination drug,
7  whenever it is, is listed in column H; and we can
8  see for those few entries are all oxycodone,
9  correct?
10    A.   Correct.
11    Q.   And then the "Requested Quantity" is 3
12 and the "Request Reason Code" is 2?
13    A.   Correct.
14    Q.   Tell me what the requested -- what's the
15 quantity refer to?
16    A.   The number of units of stock units being
17 requested.
18    Q.   All right.  So, and that obviously
19 correlates with the NDC code, correct?
20    A.   Correct.
21    Q.   And then the request reason code.  Where
22 can I -- what are the reason codes?  That's a bad
23 question.
24         Where can I find out what the reason

Page 344

1  codes are?
2     A.   Well, Tasha's team could certainly tell
3  you what the reason codes are.
4     Q.   Are they written somewhere?
5     A.   It's probably part of the system.  So,
6  they have a drop-down.  They'd select a reason
7  code.  Whatever I select corresponds to a No. 2 is
8  out of stock.  No. 3 is whatever.  Right.
9     Q.   So, if I go to the very far U -- just
10 bear with me and let your eye go down that line all
11 the way down to U.  Was it U?  Yes.  U.  All the
12 way down the right-hand column.
13         Do you see how it -- there is almost
14 like a line with the explanations?
15    A.   Yes.
16    Q.   And they all end in, not all, but a lot
17 of them, "Override approved.  Your order was sent
18 directly to your DC"?
19    A.   Yes.
20    Q.   Now, does that -- does U correlate with
21 the "Request Reason Code"?
22    A.   Yes.  I believe it does.
23    Q.   I could kind of match up if I went
24 through here and matched them up, whatever is

Page 345

1  entered maybe would have a drop-down menu so you
2  would click and then it would populate in U?
3     A.   I don't know.  That's possible, but I
4  don't know for sure.
5     Q.   Very unlikely that whoever is from
6  Pharmaceutical Integrity is typing in the same
7  notes in U over and over and over again?
8     A.   Well, I mean, even if you just use the
9  first two, you can kind of say that logic doesn't
10 work, right, because the reason request is 2 and 2
11 and you have got two different order statuses over
12 here.  So, they don't correspond.
13    Q.   How do you think U is populated?
14    A.   I think that's a text or free form that
15 the individual under column S is entering.
16    Q.   All right.  So, the information that's
17 in both J under "Request Reason Code" and U is what
18 would give Pharmaceutical Integrity information if
19 you were looking back about why the override was
20 approved or disapproved, correct?
21    A.   That's my understanding.
22    Q.   And this -- the information put into
23 these has to be -- it's important, is it not?
24    A.   It certainly serves a purpose, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    Q.   More than serves a purpose.  I mean, the
2  override form is can this store exceed the ceiling
3  limits that we've placed on it and that's -- this
4  is a representation of Walgreens Pharmaceutical
5  Integrity talking to the store, correct?
6    A.   As well as their supervisor.
7    Q.   Yes, sir.
8    A.   That's why you have column Q with the
9  sort of the request description, right?  The stores
10 don't necessarily get to request directly.  It's
11 the supervisor of that store that has to initiate
12 the request.
13   Q.   All right.  So, maybe J and K match up.
14 So, J and K correlate.  So, and I missed that
15 earlier.
16        Request reason code 22, emergency
17 situation, emergency situation, right?
18   A.   That could be.
19   Q.   So, emergency situation, and that could
20 be just about anything I would think, right?  That
21 doesn't really give you a lot of information,
22 emergency situation, does it?
23   A.   I'm sure it's a drop-down selection they
24 have.

Page 347

1    Q.   Okay.  And then L, "Pack Size."  What's
2  that mean?
3    MR. STOFFELMAYR:  Where do you see that?
4    MR. MOUGEY:  L, after K.  K, L.
5    MR. STOFFELMAYR:  I'm sorry.  Column L.
6  BY MR. MOUGEY:
7    Q.   "Pack Size."
8    A.   The unit size.  Appears to be the unit
9  size.
10   Q.   And M, "UOM"?
11   A.   I don't know what that -- I don't know
12 what that stands for.
13   Q.   Unit order monitoring?
14   A.   I don't --
15   Q.   You don't know?
16   A.   I have no idea.
17   Q.   Next one, "DC Number"?
18   A.   Um-hmm.
19   Q.   What's that?
20   A.   That would be distribution center that
21 they're serviced out of.
22   Q.   Okay.  And then --
23   A.   Is my understanding.
24   Q.   O, "Control Drug Class"?

Page 348

1    A.   Correct.
2    Q.   What's that mean?
3    A.   That would be their schedule.
4    Q.   Okay.  P, "Request Status Code."
5    A.   I don't know.  My -- I don't want to
6  guess.  I don't know what it means.
7    Q.   Okay.  And then "Request Status
8  Description," and you can see here which ones were
9  approved and they say "DM approved," "Rx approved,"
10 "DM approved," right?
11   A.   Yes.
12   Q.   And DM is the divisional manager?
13   A.   District manager.
14   Q.   District manager.  And I'm a little
15 confused.  I thought they were getting approved by
16 Pharmaceutical Integrity?
17   A.   They are, but -- so, the process, we
18 don't let the stores just make the call.  They have
19 to talk to their leadership over them in the area
20 and say I need a request to exceed my ceiling for
21 these -- this product.  The DM has to go in and
22 make that request to us.
23        So, there is -- it's another -- it's
24 another level, layer of approval process.

Page 349

1    Q.   So, it goes through the DM first and
2  then it goes through Pharmaceutical Integrity?
3    A.   Correct.
4    Q.   And then the request --
5    A.   I believe they actually, the way it
6  works, is the store submits the request.  It goes
7  to the DM.  They have to approve it.  They can
8  approve it or decline it.  If it declines, it just
9  goes back to the store.  If they approve it, then
10 it routes to Pharmaceutical Integrity for review.
11   Q.   Okay.  And "Request Status Role" and
12 then obviously we went through the "Request Status
13 Comments," U, at the end, right?
14   A.   Correct.
15   Q.   Now, I could be mistaken, but I believe
16 that the earliest entry we have been able to find
17 on any override form is September 13.  Okay.  So,
18 I'm looking at column B.  I'm not asking you to...
19        But do you have any understanding of
20 when these override forms or anything similar to
21 this documenting the reasons the ceilings were
22 allowed to be overridden were captured prior to
23 Pharmaceutical Integrity?
24   A.   I don't, no.

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    Q.   You don't know or you didn't ask?
2    A.   I don't know.  I don't know where they
3    would have been documented.
4    Q.   Was your charge to come in just to start
5    a whole new operation?
6    A.   Yes.
7    Q.   I don't want anyone to look in the
8    rearview mirror.  Start from scratch?
9    MR. STOFFELMAYR:  Objection to the form.
10   BY THE WITNESS:
11   A.   That wasn't how it was described to me.
12   It was described --
13   BY MR. MOUGEY:
14   Q.   How was it described?  You went to
15   Villanova undergrad?
16   A.   No.
17   Q.   Where did you go?
18   A.   I did not.  I took executive --
19   Q.   New Mexico?
20   A.   Correct.
21   Q.   So, you come in in '12.  Walgreens has
22   several thousand stores at that point, right?
23   A.   Yeah.
24   Q.   It has hundreds of thousands of

Page 351

1    employees, correct?
2    A.   Um-hmm.
3    Q.   It had been distributing controlled
4    substances through distribution centers for a long
5    period of time, correct?
6    A.   Yes.
7    Q.   It was in the middle of a significant
8    investigation by the DEA, correct?
9    A.   Yes.
10   Q.   As a matter of fact, it looked like the
11   case may actually get tried about the same time
12   that Pharmaceutical Integrity was being created,
13   correct?
14   A.   Yes.
15   Q.   There was preparation for an actual
16   administrative proceeding with the DEA, correct?
17   A.   Yes.
18   Q.   And you personally were preparing as a
19   possible witness in that case, were you not?
20   A.   I was.
21   Q.   And, so, you were intimately aware of
22   the pressure Walgreens was under in '12 and early
23   '13 with what you referred to earlier as gaps in
24   its system, correct?

Page 352

1    A.   Yes.
2    Q.   And I think it would be fair to say that
3    there was some significant sense of urgency when
4    you took over with Pharmaceutical Integrity.  Is
5    that fair?
6    A.   That's fair.
7    Q.   And as you became educated about what
8    was going on nationally, did you come to understand
9    the significance of the opiate epidemic across the
10   country?
11   A.   Yes.
12   Q.   And you could see that year after year
13   after year for at least a decade that deaths had
14   been increasing, correct?
15   MR. STOFFELMAYR:  Objection to the form.
16   BY THE WITNESS:
17   A.   Yes.
18   BY MR. MOUGEY:
19   Q.   And you were being educated internally
20   through PowerPoints and whatever else from your --
21   from Walgreens that opiate overdoses had overtaken
22   even motor vehicle accidents as a leading cause of
23   death, correct?
24   A.   Yes.

Page 353

1    Q.   And do you know anyone, just socially,
2    kids, family, that you know throughout your network
3    socially of people who have been impacted by the
4    opiate crisis?
5    A.   Yes.
6    Q.   And do you have -- I'm not -- don't
7    tell -- I'm not asking names or anything else.
8    But do you have people that you know or
9    your kids know or spouse knows that had problems
10   with opiate abuse?
11   A.   Yes.
12   Q.   Do you know specifically people -- I'm
13   not asking names -- but that had overdosed?
14   A.   Yes.
15   Q.   Do you or your kids or your social
16   network know people who had overdosed?
17   A.   Yes.
18   Q.   Do you know people who had died?
19   A.   Yes.
20   Q.   So, you understood when you took over in
21   Pharmaceutical Integrity the significance of the
22   national crisis and the import of the task at hand?
23   A.   I certainly was educated, yes.
24   Q.   Did it give you pause for concern about

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1   the gaps that Walgreens had in its suspicious order
2   monitoring system on the distributor side when you
3   took over?
4       A.   Certainly I wanted -- my job as I saw it
5   was to improve the process and close whatever gaps
6   that may exist to make it a more -- more robust
7   process.
8       Q.   Did any of your team members have -- and
9   I'm saying team in the Pharmaceutical Integrity
10  Department.  I realize you had more areas under
11  your auspices than that.
12       But did any of the team members in
13  Pharmaceutical Integrity have backgrounds in
14  compliance?
15      A.   Not that I'm aware of.
16      Q.   It was a combination of people that had
17  pharmaceutical backgrounds, technical backgrounds
18  and some loss prevention.  Is that fair?
19      A.   Pharmacy backgrounds, what I would call
20  people that were strong with data and analytics and
21  loss prevention.  That would generally surmise who
22  they were.
23      Q.   So -- this is my word.  You tell me if
24  it's wrong.

Page 355

1       You and Tasha Polster assembled a SWAT
2   team, so to speak, of some different areas of
3   specialty.  Is that fair?
4       A.   Well, we certainly hoped to get the
5   right talent in the right place.
6       Q.   Okay.  And you selected Tasha Polster,
7   an administrative assistant, correct?
8       Tasha Polster and an administrative
9   assistant was part of the team, right?
10      A.   I'm not following you.
11      Q.   I'm going to walk through them.  I am
12  looking through the org chart in my head.  Bear
13  with me.
14       You have got Tasha Polster, right?
15      A.   Um-hmm.
16      Q.   You have four managers underneath Tasha,
17  correct?
18      A.   Correct.
19      Q.   And they were each in charge of
20  geographic locations, correct?
21      A.   That's correct.
22      Q.   Underneath one of them is a business
23  analyst, correct?
24      A.   Correct.

Page 356

1       Q.   And there was -- I forget the exact
2   title, but there were also four spots in the org
3   chart underneath the business analysts initially
4   that weren't filled, is that?
5       A.   There was -- we did a high-level sketch
6   when we first started out as what we thought it
7   might look like, yes.
8       Q.   So, Tasha, four business analysts and
9   four managers, so approximately eight people, give
10  or take.  Does that sound about right?
11      A.   Yeah.
12      Q.   Made a fairly significant dent in a
13  matter of months on the amount of scheduled
14  narcotics, opiates that went from Walgreens across
15  the country.  Fair?
16      A.   Well, I think we certainly stood up a
17  number of policies and processes and tools that
18  impacted the dispensing of opioids across the
19  country, yes.
20      Q.   And that was just in a matter of months?
21      A.   Six, eight months, nine months,
22  something like that.
23      Q.   Did you ever get to the point where you
24  were, after you saw what the impact in the opiate

Page 357

1   crisis was across the country as you were being
2   educated starting Pharmaceutical Integrity, get to
3   the point where you were frustrated or upset with
4   how did this happen in the company that I had spent
5   32 years with and how did it get this bad?
6       MR. STOFFELMAYR:  Objection to the form.  Go
7   ahead.
8   BY THE WITNESS:
9       A.   I think there were a number of
10  frustrations not only with, you know -- just in
11  general it's a very complex issue, as I'm sure
12  you're aware.  And as I came up to speed on what it
13  was, I would say that I was frustrated in many ways
14  with what was going on.
15       I was frustrated with the DEA's
16  interaction with us.  I was frustrated with what
17  some pharmacists would do on this.  I was
18  frustrated with -- there was -- it's a -- it's a
19  significant issue.
20      Q.   And Walgreens tapped you and your
21  experience after whatever that point in time was,
22  20 plus years at Walgreens, I need you to assemble
23  a team and I need you to come in and help fix that,
24  and did you ever get to the point where you, "Why

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  in the world did Walgreens not do this ten years
2  ago"?
3       MR. STOFFELMAYR: Objection to the form.
4  BY THE WITNESS:
5       A.  I wouldn't say I got to that point.
6  BY MR. MOUGEY:
7       Q.  There was nothing stopping Walgreens
8  from doing what Rex Swords and Tasha Polster did in
9  2013 from doing that at the very beginning of the
10  opiate crisis ten years earlier, correct?
11       MR. STOFFELMAYR: Objection to the form.
12  BY MR. MOUGEY:
13       Q.  There was nothing stopping Walgreen from
14  doing what you did 10, 11, 12, 13 years earlier,
15  correct?
16       MR. STOFFELMAYR: Objection to the form.
17  BY THE WITNESS:
18       A.  No.
19  BY MR. MOUGEY:
20       Q.  It was a culture issue at Walgreens that
21  said, in response to DEA investigations, in
22  response to a case about to get tried, that
23  Walgreens assembled you and asked you to put
24  together a team to close the gaps, correct?

Page 359

1       MR. STOFFELMAYR: Objection to the form. Go
2  ahead.
3  BY THE WITNESS:
4       A.  I wouldn't characterize it as a culture
5  issue.  I would characterize it more as an
6  awareness issue.
7  BY MR. MOUGEY:
8       Q.  And Walgreens throughout the 2000s
9  profited from a dramatically increasing opiate
10  business at its pharmacies around the country and
11  the profits from the controlled substances it sold
12  went to its bottom lines -- bottom line and didn't
13  take any steps until as dramatic as was taken in
14  2013 to close the gaps, correct?
15       MR. STOFFELMAYR: Objection to the form.
16  BY THE WITNESS:
17       A.  Well, I'm not sure I -- it sounded like
18  a statement, not a question to me.  Is there -- is
19  there a question?
20  BY MR. MOUGEY:
21       Q.  Yes.  What took Walgreens until 2013 to
22  put together eight people out of hundreds of
23  thousands of employees to close the gaps on its
24  suspicious order monitoring policies and

Page 360

1  procedures?
2       A.  Again, I think --
3       MR. STOFFELMAYR: Objection to the form. Go
4  ahead.
5       THE WITNESS:  I'm sorry.
6  BY THE WITNESS:
7       A.  Again, I think it was an awareness.
8  This was an issue of national proportion and what
9  happened in Florida really sort of caught people
10  off guard, and we did our best at that time as a
11  company to react to it as quickly as we could.
12  BY MR. MOUGEY:
13       Q.  When you say it took Walgreens off
14  guard, I asked you earlier about your awareness of
15  Congressional hearings that began in late '90s,
16  early 2000s.  Don't you think somebody at Walgreens
17  should have been aware of Congressional
18  investigations that occurred 12, 13 years prior to
19  you coming on board?
20       A.  I don't -- I don't have an opinion on
21  that.  It's -- I don't know what -- what they
22  should or shouldn't have done or what we do as far
23  as monitoring Congressional investigations.
24       Q.  Do you have a -- Walgreens pays for a

Page 361

1  team of lobbyists, does it not?
2       A.  We do have lobbyists, yes.
3       Q.  Yes, sir.  And you would think that
4  anybody with their ear to the ground in DC would
5  know that there was a raging opiate epidemic
6  roaring through the 2000s, would you not?
7       MR. STOFFELMAYR: Objection to the form.
8  BY THE WITNESS:
9       A.  I think, you know, lobbyists do what
10  lobbyists do.  I'm not a lobbyist.  I don't know.
11  BY MR. MOUGEY:
12       Q.  Walgreens.  You would think Walgreens
13  with its hundreds of thousands of employees and
14  several thousand stores have an awareness of
15  a raging opiate epidemic through the 2000s and have
16  taken action prior to 2013, would you not?
17       MR. STOFFELMAYR: Objection to the form.
18  BY THE WITNESS:
19       A.  Again, I don't have an opinion on it.
20       MR. MOUGEY: Kaspar, if I could take -- let me
21  take five minutes.  I have got a couple docs.  I
22  want to organize them.  My goal is to try to be
23  done in the next 45 minutes.  Does that work for
24  the cat?

91 (Pages 358 to 361)

Highly Confidential - Subject to Further Confidentiality Review

Page 362  **REDACTED**

1    MR. STOFFELMAYR:  Yes.
2    MR. MOUGEY:  Okay.
3    THE VIDEOGRAPHER:  We are going off the record
4  at 3:10 p.m.
5        (WHEREUPON, a recess was had
6          from 3:10 to 3:39 p.m.)
7    THE VIDEOGRAPHER:  We are back on the record
8  at 3:39 p.m.
9  BY MR. MOUGEY:
10    Q.   We talked about 340B just for a few
11  minutes earlier.  340B.  When did Walgreens -- let
12  me use the word "participating."  I don't know if
13  that's the right word.
14        But when did Walgreens participate in
15  the distribution of Schedule II/Schedule III
16  opiates in 340B?
17    A.   I don't know the dates.  I don't know
18  the dates on.  We have participated broadly in 340B
19  for years.  I'm not sure.
20    Q.   You don't remember?
21    A.   I'm not involved in 340B, so I don't
22  know the dates.
23    Q.   Who would -- what part of the
24  organizational structure at Walgreens would you

Page 363

1  consider to be the -- would know about the 340B
2  program?
3    A.   There is actually a 340B team.
4    Q.   Is there?
5    A.   Yes.
6    Q.   Do you know who's on it?
7    A.   Carl Meehan is the senior director for
8  340B.
9    Q.   Carl Meehan.  And who else is on the
10  team?
11    A.   I don't know the rest of them.  I know
12  the leader.
13    Q.   You know Carl?
14    A.   I know, yeah, I know Carl.
15    Q.   So, it's a big enough business segment
16  that there's at least a team that's designed to
17  manage that process?
18    A.   Yes.
19    MR. MOUGEY:  I don't have any further
20  questions.
21    MR. STOFFELMAYR:  If you don't mind, when you
22  are answering, just --
23    THE WITNESS:  Look at the camera.
24    MR. STOFFELMAYR:  Don't look at me because it

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

Page 375



REDACTED



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

**REDACTED**

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

**REDACTED**

REDACTED

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

REDACTED

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

**REDACTED**

**REDACTED**

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 412



REDACTED

Highly Confidential - Subject to Further Confidentiality Review

**REDACTED**

**REDACTED**

REDACTED

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

**REDACTED**

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

REDACTED

**REDACTED**

**REDACTED**

Highly Confidential - Subject to Further Confidentiality Review

REDACTED

REDACTED

**REDACTED**