1           THE UNITED STATES DISTRICT COURT

           FOR THE EASTERN DISTRICT OF OHIO

2                  EASTERN DIVISION

3                    -  -  -

4    IN RE:  NATIONAL     :

     PRESCRIPTION OPIATE :    MDL NO. 2804

5    LITIGATION          :

     -----------------------------------------

6                       :    CASE NO.

     THIS DOCUMENT       :    1:17-MD-2804

7    RELATES TO ALL CASES:    Hon. Dan A. Polster

8                    -  -  -

9           Wednesday, November 28, 2018

10                   -  -  -

11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12              CONFIDENTIALITY REVIEW

13                   -  -  -

14         Videotaped deposition of JOSEPH

15   TOMKIEWICZ, taken pursuant to notice, was held

16   at Golkow Litigation Services, One Liberty

17   Place, 1650 Market Street, Suite 5150,

18   Philadelphia, Pennsylvania 19103, beginning at

19   9:58 a.m., on the above date, before Lisa V.

20   Feissner, RDR, CRR, Notary Public.

21

22                    -  -  -

23           GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

|  | Page 2 |
|---|---|

```
 1  APPEARANCES:
 2  BARON & BUDD, P.C.
    BY: MARK PIFKO, ESQUIRE
 3  BY: STERLING CLUFF, ESQUIRE
    15910 Ventura Boulevard
 4  Suite 1600
    Encino, California 91436
 5  (818) 839-2333
    mpifko@baronbudd.com
 6  scluff@baronbudd.com
    -- Representing the MDL Plaintiffs
 7
 8  BARON & BUDD, P.C.
    BY: WILLIAM G. POWERS, ESQUIRE
 9  (via teleconference / live stream)
    600 New Hampshire Avenue NW
10  Suite 10-A
    Washington, DC 20037
11  (202) 333-4562
    wpowers@baronbudd.com
12  -- Representing the MDL Plaintiffs
13
    WAGSTAFF & CARTMELL, LLP
14  BY: THOMAS P. CARTMELL, ESQUIRE
    BY: ANDREW N. FAES, ESQUIRE
15  4740 Grand Avenue
    Suite 300
16  Kansas City, Missouri 64112
    (816) 701-1100
17  tcartmell@wcllp.com
    afaes@wcllp.com
18  -- Representing the MDL Plaintiffs
19
    SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
20  BY: MARK G. CRAWFORD, ESQUIRE
    BY: UZAIR SALEEM, ESQUIRE
21  One Sansome Street
    Suite 2830
22  San Francisco, California 94104
    (415) 546-7300
23  mcrawford@skikos.com
    usaleem@skikos.com
24  -- Representing the MDL Plaintiffs
```

|  | Page 4 |
|---|---|

```
 1  APPEARANCES:  (Continued)
 2  MORGAN LEWIS & BOCKIUS, LLP
    BY: ADAM M. HAMMOUD, ESQUIRE
 3  BY: RICHARD G. SHEPHARD, JR., ESQUIRE
    1701 Market Street
 4  Philadelphia, Pennsylvania 19103
    (215) 963-5000
 5  adam.hammoud@morganlewis.com
    richard.shephard@morganlewis.com
 6  -- Representing the Teva Defendants
 7
    REED SMITH LLP
 8  BY: ROBERT A. NICHOLAS, ESQUIRE
    BY: JEFFREY R. MELTON, ESQUIRE
 9  and
    BY: SHANNON E. McCLURE, ESQUIRE
10  (via teleconference / live stream)
    BY: ANNE E. ROLLINS, ESQUIRE
11  (via teleconference / live stream)
    1717 Arch Street
12  Suite 3100
    Philadelphia, Pennsylvania 19103
13  (215) 851-8100
    rnicholas@reedsmith.com
14  jmelton@reedsmith.com
    smcclure@reedsmith.com
15  arollins@reedsmith.com
    -- Representing the AmerisourceBergen
16     Defendants
17
    COVINGTON & BURLING LLP
18  BY: MARINA DALIA-HUNT, ESQUIRE
    3000 El Camino Real
19  10th Floor
    Palo Alto, California 94306-2112
20  (650) 632-4700
    mdaliahunt@cov.com
21  -- Representing the Defendant
       McKesson Corporation
22
23
24
```

|  | Page 3 |
|---|---|

```
 1  APPEARANCES:  (Continued)
 2  ROBBINS GELLER RUDMAN & DOWD, LLP
    BY: ANDREA FIORE, ESQUIRE
 3  655 West Broadway
    Suite 1900
 4  San Diego, California 92101
    (619) 231-1058
 5  andrea.fiore@gmail.com
    -- Representing Plaintiffs
 6
 7  BRANSTETTER, STRANCH & JENNINGS, PLLC
    BY: BENJAMIN A. GASTEL, ESQUIRE
 8  223 Rosa L. Parks Avenue
    Suite 200
 9  Nashville, Tennessee 37203
    (615) 254-8801
10  beng@bsjfirm.com
    -- Representing the Plaintiffs in the
11     Dunaway and Staubus Tennessee
       State Court actions
12
13  WILLIAMS & CONNOLLY, LLP
    BY: MIRANDA PETERSEN, ESQUIRE
14  725 Twelfth Street, N.W.
    Washington, DC 20005
15  (202) 434-5000
    mpetersen@wc.com
16  -- Representing the Cardinal Health
       Defendants
17
18  JONES DAY
    BY: SARAH G. CONWAY, ESQUIRE
19  555 South Flower Street
    Fiftieth Floor
20  Los Angeles, California 90071-2300
    (213) 489-3939
21  sgconway@jonesday.com
    -- Representing the Walmart Defendants
22
23
24
```

|  | Page 5 |
|---|---|

```
 1  APPEARANCES:  (Continued)
 2  ALLEGAERT BERGER & VOGEL LLP
    BY: CHRISTOPHER ALLEGAERT, ESQUIRE
 3  111 Broadway
    20th Floor
 4  New York, New York 10006
    (212) 571-0550
 5  callegaert@abv.com
    -- Representing Rochester Drug
 6     Cooperative, Inc.
 7
    ALSO PRESENT:
 8
    Christopher J. Casalenuovo, Esquire
 9  -- In-house counsel, AmerisourceBergen
10  David Lane, Videographer
11  Zach Hone, Trial Technician
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                - - -
 2          I N D E X
 3
 4  Testimony of: JOSEPH TOMKIEWICZ
 5    By Mr. Pifko        15
      By Mr. Cartmell      134
 6    By Mr. Gastel        459
      By Mr. Hammoud       502
 7
 8                - - -
          E X H I B I T S
 9
                  - - -
10  TEVA-TOMKIEWICZ
    EXHIBIT NO.   DESCRIPTION        PAGE
11
12  001   E-mail chain, top e-mail from
          Tomkiewicz to rxnews@listserve.com,
13        Sent: 9/16/2010,
          Subject: Re: [RxNews] Oxy's
14        CAH_MDL2804_00855083 - 00855084
15  002   E-mail chain, top e-mail from
          Hazewski to Breitmayer et al.,
16        Sent: Thu, 29 Sep 2011
          Subject: FW: Oxycodone Allocation
17        ABDCMDL00280711 - 00280712
18  003   PowerPoint slide deck titled
          DEA Compliance Organization
19        March 18, 2014
          TEVA_MDL_01464603
20  004   Letter from Rannazzisi, U.S.
21        Department of Justice
          dated February 7, 2007
22        TEVA_MDL_A_01039159 - 01039162
23  005   PowerPoint slide deck titled
          Suspicious Order Monitoring,
          Joseph Tomkiewicz, Diversion
24        Operations Manager, 2014
          TEVA_MDL_A_02923616
```

```
 1
 2          E X H I B I T S
               (cont'd)
 3
 4  TEVA-TOMKIEWICZ
    EXHIBIT NO.   DESCRIPTION        PAGE
 5
 6  006   SOP-8277: Suspicious Order
          Monitoring - DEA Order Holds
 7        TEVA_MDL_A_02660892 - 02660899
 8  007   SOP-8278: Suspicious Order
          Monitoring - Do Not Ship List
 9        TEVA_MDL_A_01061094 - 01061098
10  008   SOP-8279: Suspicious Order
          Monitoring - Customer Due Diligence
11        TEVA_MDL_A_02660918 - 02660924
12  009   SOP-8280: Suspicious Order
          Monitoring - Customer Site Visits
13        TEVA_MDL_A_02660932 - 02660936
14  010   SOP-8489: Suspicious Order
          Monitoring - DEA Order Holds -
15        Locations Other Than New Britain,
          PA and North Wales, PA
16        TEVA_MDL_A_03160173 - 02160175
17  011   E-mail from Benkert to Tomkiewicz
          Sent: 1/7/2014, Subject: SOM Documents
18        TEVA_MDL_A_03478588
19  012   Letter from Buzzeo to McGinn
          dated September 25, 2012
20        TEVA_MDL_A_01060005 - 01060012
21  013   Teva Pharmaceuticals North America
          Order Management, DEF OPS
22        Enhancements, Functional Design
          Specification
23        TEVA_MDL_A_03479111 - 03479127
24
```

```
 1
 2          E X H I B I T S
               (cont'd)
 3
 4  TEVA-TOMKIEWICZ
    EXHIBIT NO.   DESCRIPTION        PAGE
 5
 6  014   E-mail chain, top e-mail from
          McGinn to Edwards et al., Sent:
 7        8/19/15, Subject: FW: Global
          Internal Audit: DEA - Final Report
 8        TEVA_MDL_A_02475564 - 02475585
 9  015   PowerPoint slide deck, SOM and
          Current Cases, Joseph Tomkiewicz,
10        DEA Compliance Manager, 2017
11  016   SOP-8277: Suspicious Order
          Monitoring - DEA Order Holds,
12        Revision Number 01
          TEVA_MDL_A_01158453 - 01158462
13  017   E-mail chain, top e-mail from
          Shanahan to Baeder,
14        Sent: 10/16/2015, Subject: RE:
          PO# 1031374 for the OXYCODONE product.
15        TEVA_MDL_A_02063729 - 02063733
16  018   E-mail from Tomkiewicz to
          Everingham Sent: 3/2/2018,
17        Subject: PowerPoint, with
          Attachment: 2017 Joe Tomkiewicz
18        PDMA Conference - v2.pptx
          TEVA_MDL_A_02480387
19
    019   E-mail chain, top e-mail from
20        McGinn to Tomkiewicz, Sent: Friday,
          October 16, 2015, Subject: RE: PO#
21        1031374 for the OXYCODONE product
          TEVA_MDL_A_01056272 - 01056278
22
    020   E-mail chain, top e-mail from
23        McGinn to Shanahan, Sent:
          10/16/2015, Subject: FW: PO# 1031374
24        for the OXYCODONE product
```

```
 1
 2          E X H I B I T S
               (cont'd)
 3
 4  TEVA-TOMKIEWICZ
    EXHIBIT NO.   DESCRIPTION        PAGE
 5
 6  021   Document, top line: 10:10 call
          returning Jen King's call
 7        TEVA_MDL_A_02063728
 8  022   E-mail chain, top e-mail from
          Tomkiewicz to McGinn,
 9        Sent: 10/28/2015, Subject: RE:
          Publix Anda weekly call
10        TEVA_MDL_A_01462200 - 01462203
11  023   Document, top line: [10/30/2015
          12:10 PM] Marianne Geiger:
12        TEVA_MDL_A_01056182
13  024   Letter from Tomkiewicz to
          DEA/Spears dated December 1, 2014,
14        Re: Suspicious Order Report
          TEVA_MDL_A_02342525
15  025   Internal Memorandum To: McGinn,
          From: Tomkiewicz, Date: November 21,
16        2014, Subject: Richie Pharmacal
          APAP/Codeine Orders
17        (Bates illegible)
18  026   Letter from Tomkiewicz to
          DEA/Spears dated June 25, 2015,
19        Re: Suspicious Order Report
          TEVA_MDL_A_02063701
20
    027   Letter from Tomkiewicz to Richie
21        Pharmacal dated January 22, 2016
          TEVA_MDL_A_01046053
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

```
1                    - - -
2          DEPOSITION SUPPORT INDEX
3                    - - -
4   Direction to Witness Not to Answer
    Page Line    Page Line    Page Line
5   46  12
6
    Request for Production of Documents
7   Page Line    Page Line    Page Line
    (None)
8
9   Stipulations
    Page Line    Page Line    Page Line
10  11  2
11
    Question Marked
12  Page Line    Page Line    Page Line
    (None)
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 11

```
1                    - - -
2          (It is hereby stipulated and agreed
3   by and among counsel that sealing,
4   filing and certification are waived; and
5   that all objections, except as to the
6   form of the question, will be reserved
7   until the time of trial.)
8                    - - -
9          VIDEO OPERATOR:  We're now on the
10  record.  My name is David Lane,
11  videographer for Golkow Litigation
12  Services.  Today's date is November
13  28th, 2018.  Our time is 9:58 a.m.
14         This deposition is taking place in
15  Philadelphia, Pennsylvania in the matter
16  of National Prescription Opiate
17  Litigation, MDL.  Our deponent today is
18  Joseph Tomkiewicz.
19         Counsel will be noted on the
20  stenographic record.  The court reporter
21  today is Lisa Feissner, who will now
22  swear in the witness.
23         (The witness was placed under
24  oath.)
```

Page 12

```
1          MR. PIFKO:  Good morning.  My name
2   is Mark Pifko -- oh, sorry, I forgot.
3   Counsel for one of the state court cases
4   wanted to say something.
5          MR. GASTEL:  My name is Ben Gastel
6   from Branstetter, Stranch & Jennings in
7   Nashville, Tennessee representing the
8   plaintiffs in the Dunaway versus Purdue
9   case in Cumberland County State Court,
10  Tennessee, and the Staubus versus Purdue
11  case in Sullivan County, Tennessee.
12  Those were cross-noticed by Teva today
13  to this -- in this deposition.
14         Pursuant to the order entered by
15  Judge Polster in MDL 2804, Teva was
16  required to perform a number of
17  important tasks by specific deadlines
18  with regard to all cross-notice parties.
19  The Tennessee plaintiffs object that
20  Tennessee -- that Teva has flagrantly
21  ignored their duties pursuant to Judge
22  Polster's order.  Specifically, Teva was
23  required to produce Mr. Tomkiewicz's
24  complete and total custodial file by
```

Page 13

```
1   November 14th, 14 days in advance of
2   this noticed deposition.  The
3   plaintiffs -- the discovery vendor did
4   not receive any discovery from Teva in a
5   timely manner and was not able to begin
6   ingesting Teva data until Wednesday,
7   November 21st, just seven days before
8   this deposition.  The complete file to
9   the Tennessee plaintiffs was not fully
10  ingested for review until November 24th.
11         14 days before this deposition,
12  Teva was also required to inform the
13  Tennessee plaintiffs whether
14  Mr. Tomkiewicz has personal knowledge of
15  state-specific issues, including
16  possibly state-specific documents in the
17  custodian file.  Teva stated that
18  Mr. Tomkiewicz has no Tennessee-specific
19  knowledge.  The Tennessee plaintiffs
20  believe that this statement is patently
21  untrue, and at best, intentionally
22  misleading.
23         By failing to abide by those
24  crucial protocol, Teva has prejudiced
```

Page 14

1 the Tennessee plaintiffs' ability to
2 prepare for this deposition today.
3 Furthermore, the Tennessee claims at
4 issue are different and require
5 different elements and require different
6 discovery areas of inquiry than the MDL.
7 Also, the Tennessee Rules of Civil
8 Procedure do not place any time
9 restrictions on the length of these
10 depositions.
11     The Tennessee plaintiffs also
12 requested two hours to depose
13 Mr. Tomkiewicz in addition to MDL's
14 deposition time as required by the order
15 from Judge Polster. Teva has not
16 responded to this request.
17     For each of these reasons, the
18 Tennessee plaintiffs object to this
19 deposition going forward today in these
20 Tennessee cases and reserve the right to
21 redepose Mr. Tomkiewicz if necessary.
22     Thank you, Mark.
23     MR. HAMMOUD: We note the objection
24 for the record, but we would follow up

Page 15

1 and say we did not receive any notice
2 that the Tennessee counsel would need
3 two additional hours for deposition as
4 required by the protocol, and that would
5 be our objection.
6     MR. PIFKO: Does anyone else want
7 to state any objections before we start?
8     JOSEPH TOMKIEWICZ,
9 having been first duly sworn, was examined and
10 testified as follows:
11     EXAMINATION
12 BY MR. PIFKO:
13     Q. All right. My name is Mark Pifko.
14 I represent the plaintiffs in the MDL. Can
15 you -- let's start by, can you please state and
16 spell your name for the record?
17     A. Sure. Joseph Tomkiewicz,
18 J-O-S-E-P-H, T-O-M-K-I-E-W-I-C-Z.
19     Q. Have you ever had your deposition
20 taken before?
21     A. Yes.
22     Q. Okay. How long ago was your
23 deposition last taken?
24     A. Two or three years ago.

Page 16

1     Q. What was that in connection with?
2     A. West Virginia, in conjunction with
3 AmerisourceBergen.
4     (Reporter interruption.)
5     Q. The West Virginia Attorney General
6 sued AmerisourceBergen, correct?
7     A. As far as I know, yes, correct.
8     Q. Okay. And you were deposed in
9 connection with that litigation?
10     A. Yes.
11     Q. Have you been deposed any other
12 times?
13     A. Yes.
14     Q. When was the last time before the
15 West Virginia AG situation?
16     A. It was in the early 2000s.
17     Q. And what was that concern?
18     A. That was concerning a pharmacy in
19 the state of Hawaii over returned and reuse of
20 medications.
21     Q. Did you work for one of the parties
22 involved in that litigation?
23     A. Yes.
24     Q. Who was your employer at that time?

Page 17

1     A. PharMerica.
2     Q. Any other times you've been
3 deposed?
4     A. No.
5     Q. I assume that in preparing for this
6 deposition, you were -- went over the ground
7 rules, but I'll just go over a couple of high
8 points so that we're all on the same page here.
9     Let's make sure we don't talk over
10 each other. You know, you can see there's a
11 lot of people in the room, people want to have
12 objections. The court reporter can only write
13 down what one person is saying at a time. So
14 if two people are talking at once, it makes it
15 hard for us to get a clear record, okay?
16     A. Mm-hmm.
17     Q. And then the other thing is we need
18 to make sure we get an audible verbal response
19 from you to the questions.
20     A. Oh, yes.
21     Q. So again, she can't -- if you shake
22 your head like you would in a normal
23 conversation, she can't write that down. So
24 that makes it also difficult, okay?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.   Yes.
2    Q.   Last thing, as far as that kind of
3 issue, please be sure to say yes or no if
4 you're trying to answer a yes-or-no question,
5 rather than shaking your head or shrugging your
6 shoulders or something like that because,
7 again, she can't understand that, and then if
8 you say uh-huh or huh-uh, it reads almost the
9 same.  So try to state clearly if you're saying
10 yes or no instead of uh-huh or huh-uh, okay?
11    A.   Yes.
12    Q.   And then last thing, you understand
13 that you're under oath, right?
14    A.   Yes, I do.
15    Q.   Okay.  Your testimony here is under
16 penalty of perjury.  You understand that?
17    A.   Yes, I do.
18    Q.   Is there any reason why you believe
19 this deposition shouldn't go forward?
20    A.   No.
21    Q.   Are you undergoing any treatment or
22 taking any medication that would impair your
23 ability to tell the truth?
24    A.   No.

Page 19

1    Q.   Are you undergoing any treatment or
2 taking any medication that would impair your
3 memory?
4    A.   No.
5    Q.   All right.  You joined
6 AmerisourceBergen in approximately 2008; is
7 that correct?
8    A.   I actually had two stints with
9 AmerisourceBergen.  As a corporate
10 investigator, I joined them in 2008.
11    Q.   Okay.  And you worked for them at
12 some point before that?
13    A.   Yes.
14    Q.   When was that?
15    A.   That was approximately 1999 to
16 somewhere around early 2002.
17    Q.   When you worked for
18 AmerisourceBergen in 1999 to 2002, what did you
19 do?
20    A.   I was a regulatory affairs
21 specialist.
22    Q.   Where were you physically located
23 at that time?
24    A.   I was in Tampa, Florida and

Page 20

1 Chicago, Illinois.
2    Q.   Tampa first and then Chicago?
3    A.   Yes.
4    Q.   What was the time period roughly
5 that you were in Tampa for AmerisourceBergen?
6    A.   I was in Tampa until June of 2001.
7    Q.   There was a merger between the
8 Bergen corporation and Amerisource, correct?
9    A.   Yes.
10    Q.   Who did you work for in 1999?
11    A.   Bergen Brunswig.
12    Q.   Who did you report to when you
13 worked for the Bergen Brunswig corporation?
14    A.   I reported to Sharon Hartman, and
15 then I reported to Julianne Hom, H-O-M.
16    Q.   And your title was regulatory
17 affairs specialist?
18    A.   Yes.
19    Q.   What's your highest level of
20 education?
21    A.   I completed several years of
22 college but did not graduate.
23    Q.   Where did you go to high school?
24    A.   I went to high school in Laona,

Page 21

1 Wisconsin.
2    Q.   Where you attended college, was
3 that all at the same place?
4    A.   No.  I attended two different
5 colleges.
6    Q.   Okay.  Where was the first place
7 you attended college?
8    A.   First one was in Kansas City,
9 Missouri.
10    Q.   What school did you attend?
11    A.   Well, it was the Missouri Institute
12 of Technology and then became a DeVry location.
13    Q.   It became DeVry while you were
14 there or after?
15    A.   Yes, while I was there.
16    Q.   Okay.  What were you studying
17 there?
18    A.   Electronic -- electrical
19 engineering.
20    Q.   What were the years that you were
21 there?
22    A.   I was there from '84 to early '86.
23    Q.   And then you attended college
24 somewhere else as well?

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  A.  Yes.
2  Q.  Where was that?
3  A.  Wisconsin-Milwaukee.
4  Q.  And what were the years that you
5 were there?
6  A.  '87 to '90.
7  Q.  What did you study there?
8  A.  English.
9  Q.  But you didn't finish there?
10  A.  Correct.
11  Q.  Okay.  And what did you do in 1990?
12  A.  In terms of --
13  Q.  You got a job somewhere?
14  A.  Well, I had a job, but I -- I was
15 also playing in a band, and we had a record and
16 a music video.
17  Q.  So in 1999 -- prior to 1999, where
18 were you working?
19  A.  I worked for PharMerica.
20  Q.  Okay.  What was the time period
21 that you worked for PharMerica?
22  A.  Well, PharMerica became PharMerica
23 in '96.  Before that, part of it was known as
24 Pharmacy Corporation of America.  I started

Page 23

1 with Pharmacy Corporation of America in '87.
2  Q.  What were you doing for them then?
3  A.  I started as an IT technician and
4 became a pharmacy technician, and then I was
5 transferred to the corporate office, where I
6 was a contract administrator and negotiated
7 generics purchasing contracts.
8  Q.  How long did you work -- so then
9 you worked for PharMerica, in various
10 iterations of it, from 1987 to 1999?
11  A.  Correct.
12  Q.  Did you have any involvement in
13 regulatory affairs at the PharMerica
14 corporation?
15  A.  Yes, I did.
16  Q.  Okay.  When did you start having
17 responsibilities that included regulatory
18 affairs?
19  A.  That was while I was with Bergen
20 Brunswig.  Bergen Brunswig had purchased
21 PharMerica.
22  Q.  Oh, okay.  So what I'm trying to
23 get at was, when was the first time that you
24 had a job where your responsibilities included

Page 24

1 regulatory affairs?
2  A.  That would have been '99, when I
3 started with Bergen Brunswig.
4  Q.  So Bergen bought the PharMerica
5 corporation?
6  A.  Correct.
7  Q.  Okay.  Did your job change at that
8 time, or --
9  A.  Well, yes -- well, not at the time
10 of the purchase, but it was shortly after the
11 purchase that I moved to the regulatory affairs
12 department.
13  Q.  Okay.  Did you have to physically
14 move cities as well?
15  A.  No.
16  Q.  Okay.  So your jobs at the
17 PharMerica corporation were in Tampa?
18  A.  Correct -- not all of them.  I had
19 started in Milwaukee in an actual pharmacy,
20 where I was an IT technician and then a
21 pharmacy technician.
22      And then when I moved to the
23 corporate headquarters, which at the time was
24 in Boulder, Colorado, that's when I was a

Page 25

1 contract administrator and negotiated
2 purchasing contracts.
3      In '96, the headquarters moved to
4 Tampa, Florida, and I moved to Tampa, Florida
5 at that time.
6  Q.  Okay.  So when the Bergen Brunswig
7 Corporation bought PharMerica, sometime after
8 that, you transitioned into a regulatory
9 affairs role, correct?
10  A.  Correct, correct.
11  Q.  Did you receive any special
12 training to transition into the regulatory
13 affairs role?
14  A.  There was ongoing training.  There
15 was peer training.  There was training that was
16 conducted by -- because we reported into the
17 legal department, training conducted by the
18 attorneys of the company.
19  Q.  What was your specific
20 responsibility when you first became a
21 regulatory affairs specialist?
22  A.  I was responsible for performing
23 on-site regulatory audits of pharmacies that
24 were owned by Bergen Brunswig, which were

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 primarily PharMerica locations, but there were
2 also what were called Stadtlanders. That was
3 another specialty pharmacy group that Bergen
4 owned at that time, and so conducted audits at
5 those sites as well.
6 Q. I want to take a second to talk
7 about your preparation for this deposition.
8 Did you meet with attorneys to prepare for this
9 deposition?
10 A. Yes.
11 Q. Did you meet with AmerisourceBergen
12 attorneys to prepare for this deposition?
13 A. Yes.
14 Q. You currently are employed by Teva;
15 is that correct?
16 A. Correct.
17 Q. Did Teva tell you you had to meet
18 with AmerisourceBergen attorneys?
19 A. No.
20 Q. When did you first make contact
21 with AmerisourceBergen attorneys?
22 A. I don't remember the exact date.
23 It was maybe a couple weeks ago.
24 Q. Was that contact made directly, or

Page 27

1 did that come through someone at Teva?
2 A. I don't remember.
3 Q. When you met with
4 AmerisourceBergen -- well, okay. So the first
5 time that you interacted with someone
6 representing AmerisourceBergen, was that on the
7 phone or in person?
8 A. I don't think it was a phone call.
9 I don't think I had a phone call.
10 Q. Were there attorneys from Teva
11 present at that meeting?
12 A. No.
13 Q. So it was just you and
14 AmerisourceBergen attorneys?
15 A. Correct. The attorneys
16 representing me and an AmerisourceBergen
17 attorney.
18 Q. Well, let's just make it easy. Can
19 you recall the names of anyone who was at that
20 meeting?
21 A. Bob, who is with Reed Smith --
22 Jeff? Jason?
23 MR. NICHOLAS: You got it. Jeff.
24 THE WITNESS: And then Chris from

Page 28

1 AmerisourceBergen.
2 BY MR. PIFKO:
3 Q. Chris, the in-house attorney for
4 AmerisourceBergen?
5 A. Correct.
6 Q. Okay. Bob, who is sitting next to
7 you?
8 A. Yes.
9 Q. Okay. Jeff, who is down the table?
10 A. Yes.
11 Q. Just, again, we're stating things
12 for the record so that --
13 A. Yes.
14 Q. They can't see the gestures that
15 you're making.
16 A. Oh, sorry.
17 Q. Anyone else that was there that you
18 can think of?
19 A. No.
20 Q. Okay. Where did that meeting
21 occur?
22 A. That occurred at Reed Smith's
23 office.
24 Q. About how long was that meeting?

Page 29

1 A. About four hours.
2 Q. Did you have to get time off from
3 Teva to participate in that meeting?
4 A. No. There was no vacation time
5 taken for that meeting at all.
6 Q. Was that during your normal working
7 hours, or was it after work?
8 A. Normal working hours.
9 Q. Okay. But Teva let you not attend
10 work to go to this meeting?
11 A. Yes.
12 Q. Okay. Did you have to tell anyone
13 at Teva that you were going to go to this
14 meeting?
15 A. Oh, my boss was aware.
16 Q. Okay. And you said that you needed
17 to not be at your job so you could meet with
18 AmerisourceBergen attorneys?
19 A. Yes.
20 Q. And they said that was okay?
21 A. Yes.
22 Q. Did they show you any documents
23 when you were at that meeting?
24 A. Yes.

Page 30

1    Q.   E-mails and things?
2    A.   Yes.
3    Q.   Okay.  Did they should you any
4  documents that refreshed your recollection
5  about past events?
6    A.   Some, yes.
7    Q.   Can you recall what any of those
8  were?
9    A.   Yes.
10   Q.   Can you describe them?
11   A.   Oh, sure.  There were some e-mails,
12 printouts of e-mails.  Mostly, printouts of
13 e-mails.
14   Q.   The e-mails that refreshed your
15 recollection about past events, do you remember
16 what they were about?
17   A.   Oh, yes.
18   Q.   Can you tell me?
19   A.   Oh, sure.  There was one about a
20 pain clinic in Ohio that I had visited and had
21 done an on-site investigation.
22   Q.   What was the name of that pain
23 clinic?
24   A.   Summit Pain Clinic.

Page 31

1    Q.   What was the e-mail about that you
2  reviewed?
3    A.   I can't remember specifically.
4    Q.   There was a problem with this pain
5  clinic in Ohio?
6    A.   A problem?  Not a problem, per se.
7    Q.   You visited it.  What was the
8  purpose of your visit?
9    A.   I visited it because of the volume
10 of oxycodone being purchased by the pain clinic
11 had appeared to be that it could be something
12 that could be unusual.
13   Q.   Do you remember the approximate
14 time period of that visit?
15   A.   Not specifically.
16   Q.   But the e-mail you reviewed would
17 have the dates on it?
18   A.   Yes.
19   Q.   Okay.  Any other e-mails that you
20 reviewed in that meeting that refreshed your
21 recollection about past events?
22   A.   Actually, nothing specific that I
23 can remember specifically like Summit.
24   Q.   Okay.  Did you meet with

Page 32

1  AmerisourceBergen attorneys on any other
2  occasions other than that meeting?
3    A.   No.
4    Q.   You weren't obligated to meet with
5  them by anyone?
6    A.   I was not obligated to meet with
7  them.
8    Q.   You still have loyalty to
9  AmerisourceBergen Corporation?
10   A.   What do you mean by "loyalty"?
11   Q.   Well, why did you take time off
12 your job and meet with people if you didn't
13 have to do it?
14   A.   Sometimes you do things that -- not
15 because you have to but because you're asked
16 to.
17   Q.   Who asked you to?
18   A.   Would have been -- well, I'm
19 guessing it was AmerisourceBergen, but I can't
20 remember exactly who posed the question to me.
21   Q.   But when they asked you, you were
22 willing to do so even though you didn't have
23 to?
24   A.   Oh, sure.

Page 33

1    Q.   Why was that?
2    A.   Because I felt like my testimony
3  was needed.
4    Q.   What I'm trying to get at is, why
5  did you feel like you needed to meet with
6  Amerisource people to prepare for the
7  testimony?
8       MR. NICHOLAS:  I'll object at this
9    point as asked and answered several
10   times already.
11      Go ahead.
12      THE WITNESS:  Because there may
13   have been some things needed to review
14   prior that may refresh my memory about
15   some events.
16 BY MR. PIFKO:
17   Q.   Do you understand yourself to be
18 represented here today by AmerisourceBergen
19 attorneys?
20   A.   I understand myself to be
21 represented by Bob and Jeff, who are not
22 AmerisourceBergen attorneys.
23   Q.   Okay.  But you understand they're
24 outside counsel for AmerisourceBergen in this

Page 34

1  litigation?
2      A.  Yes.
3      Q.  Okay.  Did you spend any other time
4  reviewing AmerisourceBergen documents aside
5  from the meeting that you had with counsel?
6      A.  No.
7      Q.  Did you do anything else to prepare
8  for the deposition --
9      A.  No.
10      Q.  -- as far as AmerisourceBergen
11  goes?
12      A.  As far as AmerisourceBergen, no.
13      Q.  Did you like working at
14  AmerisourceBergen Corporation?
15      A.  Yes.
16      Q.  Did you feel like they treated you
17  fairly?
18      A.  Yes.
19      Q.  Where is your current address?
20      A.  Quakertown, Pennsylvania.
21      Q.  Did you ever live in New Jersey?
22      A.  No.
23      Q.  How long have you been at the
24  Quakertown, Pennsylvania location where you

Page 35

1  live?
2      A.  11 months.
3      Q.  Where did you live before that?
4      A.  Furlong, Pennsylvania.
5      Q.  How long did you live there?
6      A.  About four years.
7      Q.  Where were you living in 2013?
8      A.  2013, I was living in Aurora,
9  Illinois.
10      Q.  You were working for
11  AmerisourceBergen at that time?
12      A.  Correct.



Highly Confidential - Subject to Further Confidentiality Review





Page 42

Page 44

Page 43

Page 45

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review







Page 58

Page 60

Page 59

Page 61

Highly Confidential – Subject to Further Confidentiality Review



Page 62

20    A.  No, I don't recall anything with
21  Publix.
22    Q.  Did you talk to any other
23  AmerisourceBergen company -- customers about
24  the investigation?

Page 63

1    A.  I don't recall.
2    Q.  You left AmerisourceBergen while --
3  shortly after this -- DEA first contacted you,
4  correct?
5    A.  Correct.
6    Q.  Did this investigation have
7  anything to do with your departure?
8    A.  No.
9    Q.  What was the basis for your
10  departing the company?
11    A.  I was recruited by Teva.
12    Q.  Did anyone at AmerisourceBergen
13  tell you that you were violating company
14  policies at any point?
15    A.  Not that I recall.
16    Q.  No one ever said that you had to
17  leave the company because you were not
18  complying with diversion control policies?
19    A.  No.
20    MR. PIFKO:  I want to take a short
21  break.
22    MR. NICHOLAS:  Okay.
23    VIDEO OPERATOR:  Going off the
24  record.  The time is 10:45 a.m.

Page 64

1    (Recess from 10:45 a.m. until
2  10:54 a.m.)
3    VIDEO OPERATOR:  Back on the record
4  at 10:54 a.m.
5  BY MR. PIFKO:
6    Q.  You knew, in connection with your
7  role at AmerisourceBergen, that certain
8  narcotic pills were subject to abuse by people,
9  correct?
10    A.  Oh, yes.
11    Q.  When did you first become aware of
12  that information?
13    A.  That would have been back when I
14  first started in pharmacy in '87.
15    Q.  Okay.  And --
16    A.  Or even before that, just --
17    Q.  Well, let's -- let's move forward a
18  little bit.  You knew that oxy 15 and oxy 30s
19  were pills that were particularly abused by
20  people, correct?
21    MR. NICHOLAS:  Object to the form.
22    THE WITNESS:  Yes.
23  BY MR. PIFKO:
24    Q.  When did you first learn that

Page 65

1  information?
2    MR. NICHOLAS:  Same objection.
3    Go ahead.
4    THE WITNESS:  And I don't recall
5  specifically.
6  BY MR. PIFKO:
7    Q.  In 2008 you knew that, though,
8  correct?
9    MR. NICHOLAS:  Same objection.
10    Go ahead.
11    THE WITNESS:  Yeah, I would have.
12  BY MR. PIFKO:
13    Q.  You participated in listservs where
14  people shared information about abuse, correct?
15    A.  Yes.
16    Q.  And that was a regular part of your
17  job to follow that kind of information?
18    A.  Yes.
19    Q.  And you also knew that people who
20  had trouble with addiction issues would try to
21  circumvent the timed-release mechanisms on
22  pills, correct?
23    MR. NICHOLAS:  Object to the form.
24    THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 66

BY MR. PIFKO:

1 Q. And so you knew that certain
2 immediate-release pills were preferred by
3 people who had addiction problems, correct?
4     MR. NICHOLAS: Same objection.
5     THE WITNESS: Yes.
6 BY MR. PIFKO:
7 Q. And then you were aware of whether
8 certain timed-release pills were more or less
9 easy to circumvent?
10    MR. NICHOLAS: Object to the form.
11    THE WITNESS: Not in 2008.
12 BY MR. PIFKO:
13 Q. Okay. When did you first learn
14 about that?
15 A. That would be around the time that
16 Purdue Frederick reformulated their OxyContin.
17 Q. Okay. When was that?
18 A. I can't remember specifically.
19 Q. Around 2012?
20 A. It could have been, yes.
21 Q. And so you knew that
22 immediate-release pills, in particular oxy 15
23 and oxy 30, were more prone to diversion,

Page 67

1 correct?
2     MR. NICHOLAS: Object to the form.
3     THE WITNESS: Potentially more
4     prone to diversion, yes.
5 BY MR. PIFKO:
6 Q. At AmerisourceBergen, one of the
7 ways you communicate is by e-mail, correct?
8 A. Correct.
9 Q. But AmerisourceBergen also has an
10 instant messaging system, correct?
11 A. Correct.
12 Q. And you used that regularly to
13 communicate with your colleagues at
14 AmerisourceBergen?
15 A. Occasionally.
16 Q. You said you had a little bit of an
17 IT background earlier?
18 A. Yes.
19 Q. Do you know -- I want to understand
20 the functionality of the instant messaging
21 system. So when you log on to your computer at
22 AmerisourceBergen, it would log you on to this
23 messaging system as well?
24 A. Yes.

Page 68

1 Q. Okay. And you could click on any
2 employee's name and a box would pop up and you
3 could send messages back and forth to them?
4 A. I could, yes.
5 Q. To your knowledge, when was the
6 first time AmerisourceBergen had that system?
7 A. Oh, I don't recall.
8 Q. The whole time you were there?
9 A. May have.
10 Q. And they definitely had it when you
11 left the company, correct?
12 A. Yes.
13 Q. To your knowledge, all the
14 employees that you interacted with would use
15 that from time to time?
16    MR. NICHOLAS: Object to the form,
17    and foundation.
18    THE WITNESS: I don't recall if all
19    would use it.
20 BY MR. PIFKO:
21 Q. Okay. But you used it to
22 communicate with people?
23 A. Sometimes, yes.
24 Q. About issues in your job?

Page 69

1 A. Could have.
2 Q. Going back to this U.S. attorney
3 investigation, did you communicate with anyone
4 about the U.S. attorney investigation on your
5 Teva e-mail?
6 A. I don't recall.
7 Q. You weren't able to access your
8 AmerisourceBergen e-mails after you left the
9 company, correct?
10 A. That's correct.
11 Q. So it's impossible that, to the
12 extent that you were having discussions about
13 meetings with the U.S. attorney or DEA agents,
14 that any of those would have occurred -- to the
15 extent they were after you worked for
16 AmerisourceBergen, they couldn't have been on
17 your AmerisourceBergen account, correct?
18 A. That would be correct.
19 Q. Do you have a personal e-mail
20 account?
21 A. Yes.
22 Q. Is that the same account you've had
23 for some time?
24 A. No.

Highly Confidential - Subject to Further Confidentiality Review



Page 70

1    Q.  Back at that time in 2014, do you
2  remember what personal e-mail account you had?
3    A.  Yes.
4    Q.  What was that, like Gmail or
5  Hotmail or --
6    A.  Oh, no, it was actually a domain
7  that my wife owned.
8    Q.  Okay.  What was the name of it?
9    A.  Well, the e-mail address was
10  Joe@marvindog.com.
11    Q.  Was that your wife's business or
12  just a personal thing she set up?
13    A.  That was her business.
14    Q.  The server was under her control?
15    A.  Well, it was a -- the actual
16  physical server was not under her control.
17    Q.  Like through some service she
18  hired?
19    A.  Yes.
20    Q.  Does she still have that domain?
21    A.  No.
22    Q.  When did she stop maintaining that
23  domain?
24    A.  That domain went away maybe a year

Page 71

1  and a half, two years ago.
2    Q.  Did you ever use that e-mail
3  address to communicate with anyone from
4  AmerisourceBergen?
5    A.  I could have.
6    Q.  During the time that you worked for
7  AmerisourceBergen?
8    A.  No.
9    Q.  Okay.  But after you worked for
10  AmerisourceBergen, you might have used it to
11  communicate with people?
12    A.  Could have, yes.
13    Q.  Did you -- do you have any specific
14  memories of specific people from
15  AmerisourceBergen that you communicated with
16  after you left the company?
17    A.  No.
18    Q.  Who were the people in 2013 when
19  you left the company that you worked closest
20  with?
21    A.  From AmerisourceBergen?
22    Q.  Yeah.
23    MR. NICHOLAS:  Object to the form.
24    Go ahead.

Page 72

1    THE WITNESS:  So it would be Ed
2  Hazewski, Kevin Kreutzer --
3    (Reporter interruption.)
4    THE WITNESS:  Ed Hazewski, Liz
5  Garcia, Eric Martin, Marcelino
6  Guerreiro, Kevin Kreutzer.
7  BY MR. PIFKO:
8    Q.  Do you think you would have
9  communicated with any of them on your personal
10  e-mail after you left the company?
11    A.  I don't recall anything specific.
12    Q.  If you communicated with someone,
13  it would have -- would it -- it would have been
14  those people, though?
15    A.  Probably, yes.
16    Q.  Ed, was he your boss at the time?
17    A.  Yes.

Page 73

Page 74

1   A. No. To Chicago.

2   Q. Okay, to Chicago. You mentioned

3 Mr. Kreutzer as someone who you interacted with

4 at AmerisourceBergen?

5   A. Correct.

6   Q. Did you know that he also worked at

7 Teva?

8   A. Yes.

9   Q. Okay. And you -- he reported to

10 the same person at that time?

11   A. To Colleen?

12   Q. Yeah.

13   A. Yes.

14   Q. Was he part of how you made the

15 introduction with the company?

16   A. No.

17   Q. When did you have a -- discussions

18 with Mr. Kreutzer about the fact that he worked

19 for Teva?

20     MR. NICHOLAS: Object to the form.

21     THE WITNESS: That would have been

22     when I gave notice to AmerisourceBergen

23     that I was leaving AmerisourceBergen.

24 BY MR. PIFKO:

Page 75

6   Q. Did you tell anyone at Teva when

7 you were starting the job that you were

8 being -- having discussions with the U.S.

9 attorney and the DEA?

10   A. Yes.

11   Q. Who did you tell?

12   A. My boss, my supervisor.

13   Q. You told the person who hired you

14 or you were interviewing with?

15   A. Yes.

16   Q. So you told them that before they

17 hired you?

18   A. I don't recall.

19   Q. Okay. Who was the -- the name of

20 the -- your boss at that time?

21   A. Colleen McGinn.

22   Q. Okay. So let's -- well, let's back

23 up for a second. At some point you moved from

24 Tampa to Pennsylvania for AmerisourceBergen?

Page 76

1   Q. Okay. And he said, oh, I worked

2 there, too?

3   A. Oh, well, I knew that he had worked

4 there.

5   Q. Oh, okay. Oh, and so you went and

6 talked to him and said, I'm joining -- I'm

7 doing --

8   A. Yes.

9   Q. Okay. Did he tell you what he did

10 for them?

11   A. Didn't have any specific

12 conversations that I remember.

13   Q. Did he work in diversion control?

14   A. It was my position that I'm

15 currently in that he was in.

16   Q. Okay. Did you understand that you

17 were replacing him?

18   A. Yes.

19   Q. Did he tell you that he was

20 terminated from Teva?

21   A. I don't recall a specific

22 conversation. But I did know that he was

23 terminated.

24   Q. What was the basis for how you knew



Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 he was terminated?
2       MR. NICHOLAS:  Object to the form.
3       Go ahead.
4       THE WITNESS:  He had called Ed at
5 AmerisourceBergen essentially looking
6 for a job.
7 BY MR. PIFKO:
8    Q.  And he told Ed he had been
9 terminated and he needed work?
10      MR. NICHOLAS:  Object to the form.
11      THE WITNESS:  And I don't know
12 that.
13 BY MR. PIFKO:
14    Q.  Okay.  But you know that he
15 communicated that he was terminated in that
16 discussion?
17      MR. NICHOLAS:  Same objection.
18      THE WITNESS:  And that's correct.
19 BY MR. PIFKO:
20    Q.  And how did you know that?
21    A.  Ed told me.
22    Q.  Was there concern about hiring him
23 because he had been terminated?
24      MR. NICHOLAS:  Object to the form.

Page 79

1       THE WITNESS:  I don't remember.
2 BY MR. PIFKO:
3    Q.  Did you have any understanding
4 about why he was terminated?
5    A.  I don't recall.
6    Q.  So let's back up.  Let's talk about
7 your -- so you said in -- you became a
8 regulatory affairs specialist in 1999?
9    A.  Correct.
10    Q.  Okay.  And that involved auditing
11 of facilities?
12    A.  Correct.
13    Q.  After the -- you said you had that
14 position from 1999 to 2002, correct?
15    A.  With Bergen Brunswig, and then the
16 position moved -- well, the whole department
17 moved back to PharMerica.
18    Q.  Okay.  But at that time PharMerica
19 was owned by AmerisourceBergen corporation?
20    A.  Correct.
21    Q.  And so then you worked for
22 PharMerica from 2002 to 2008?
23    A.  Correct.
24    Q.  And what was your job there?

Page 80

1    A.  It was the same position,
2 regulatory affairs specialist.
3    Q.  And you were doing audits there?
4    A.  Correct.
5    Q.  And then in 2008, you moved over to
6 AmerisourceBergen corporation?
7    A.  Correct.
8    Q.  And your job was a corporate
9 investigator?
10    A.  Correct.
11    Q.  What was your -- what were your
12 responsibilities at that time?
13    A.  As corporate investigator?
14    Q.  Yeah.
15    A.  Performing new customer due
16 diligence and reviewing orders for suspicious
17 order monitoring.
18    Q.  Had you ever conducted new customer
19 due diligence before having that job?
20    A.  No.
21    Q.  That was your first time doing
22 that?
23    A.  Correct.
24    Q.  And then you also were responsible

Page 81

1 for reviewing orders for suspicious order
2 monitoring, you said?
3    A.  Correct.
4    Q.  Had you ever done that before?
5    A.  No.
6    Q.  Were you aware that
7 AmerisourceBergen had an enforcement action
8 taken against it by the DEA in 2007?
9    A.  I don't remember any specifics
10 around it.  I do remember an action, but I
11 don't know any of the specifics around it.
12    Q.  When you took on this corporate
13 investigator role, that wasn't part of the
14 discussion?
15    A.  Correct.  Not that I recall.
16    Q.  Okay.  So let's talk about -- well,
17 how long did you have that role as -- the title
18 of corporate investigator?
19    A.  That was until -- it was sometime
20 in -- at the end of 2012, I believe.
21    Q.  And then what job did you take on
22 at that point?
23    A.  Diversion program manager.
24    Q.  You held that from 2012 to the time

Page 82

1 you left?
2     A.   Correct.
3     Q.   When you were a corporate
4 investigator from 2008 to 2012, who did you
5 report to?
6     A.   Ed Hazewski.
7     Q.   And where were you physically
8 located?  In Illinois?
9     A.   I was in Illinois, yes.
10     Q.   How many people were in the office
11 there with you?
12     A.   In Illinois?  I don't recall.
13     Q.   Were there other members of the
14 diversion control team in Illinois with you?
15     A.   No.
16     Q.   You were the only one?
17     A.   Correct.
18     Q.   The other people in the office, did
19 you have any understanding of what they did in
20 that office?
21     A.   In the office where I was
22 physically located?
23     Q.   Yeah.
24     A.   A general understanding, yes.

Page 83

1     Q.   What did you understand that they
2 did?
3     A.   It was general duties related to
4 the distribution center.
5     Q.   Okay.  So it was specific to that
6 specific distribution center?
7     A.   Correct.
8     Q.   Your office was in the distribution
9 center?
10     A.   Correct.
11     Q.   But your responsibilities were not
12 limited to that distribution center?
13     A.   Correct.
14     Q.   They -- you had national
15 responsibilities?
16     A.   Correct.
17     Q.   Did you understand there to be a
18 specific reason why you were located there?
19     A.   Because I lived there.
20     Q.   Okay.
21     A.   Yeah.
22     Q.   That was your preference?
23     A.   Yes, that was my preference.
24     Q.   So you'd never performed new

Page 84

1 customer due diligence before, you said.  How
2 did you get trained to perform that function?
3     A.   It was on-the-job training.
4     Q.   Who trained you?
5     A.   Ed Hazewski, and I think Kevin
6 Kreutzer may have as well.
7     Q.   They were both working there when
8 you joined the company in 2008?
9     A.   Yes.
10     Q.   So let's talk about performing the
11 new customer due diligence.  Did they have that
12 Form 590 at the time when you joined?
13     A.   Yes.
14     Q.   Okay.  What specifically were you
15 doing with respect to new customer due
16 diligence?
17     A.   Well, reviewing the form, reviewing
18 the information that was presented on the form,
19 looking for proper licensure, reviewing the
20 information on the form, conducting searches
21 looking for any adverse information on the
22 potential customer.
23     Q.   When you say "adverse information,"
24 what do you mean?

Page 85

1     A.   That could be information based on,
2 you know, discipline on their license, or it
3 could be, for example, their phone number
4 showing up on a website somewhere that might
5 indicate that some sort of diversion activity
6 could possibly be occurring.
7     Q.   Did you understand where the Form
8 590s came from that you were looking at?
9     A.   What do you mean, where it came
10 from?
11     Q.   So you'd get piles of Form 590s to
12 look at, correct?
13     A.   Well, a couple a week, sure.  Yeah.
14 I don't know if I'd say "piles."
15     Q.   Okay.  How did you receive them,
16 hard copy or by e-mail?
17     A.   Generally via e-mail.
18     Q.   Okay.  So they would e-mail them to
19 you, and that's how you would know that you
20 were going to review those?
21     A.   Correct.  There was an e-mail box
22 for different regions, and the forms would be
23 e-mailed to those regional e-mail boxes that --
24 several investigators had access to all those

Page 86

1 e-mail boxes.

2 Q. Were you responsible for a specific
3 e-mail box?

4 A. For a specific region, yes.

5 Q. Okay. What was your region?

6 A. I do remember having the East Coast
7 for a while, but it moved around a bit.

8 Q. So there were changes in the
9 regions that you were responsible for?

10 A. Correct, correct.

11 Q. At various points you had
12 responsibility for regions all over the
13 country?

14 A. Correct, different regions.

15 Q. About -- do you recall how
16 frequently you changed regions?

17 A. I don't recall. Although I had at
18 one point been taken off of being responsible
19 for a region and I more did sort of at-large
20 investigations, new customer due diligence
21 investigations.

22 Q. Approximately what time period was
23 that?

24 A. I don't remember.

Page 87

1 Q. So did you understand that sales
2 representatives would send these forms to these
3 e-mail addresses?

4 A. Yes.

5 Q. Did you ever call the sales reps to
6 ask them questions?

7 A. I don't recall any specifically,
8 but I'm sure I did at some point.

9 Q. Did you ever call the customers
10 directly to ask them questions?

11 A. No.

12 Q. Were you prohibited from doing
13 that?

14 A. No.

15 Q. Is it AmerisourceBergen's policy
16 for you to first direct inquiries to the
17 salespeople?

18 A. It may have been.

19 Q. So you don't remember contacting
20 any customers?

21 A. From the 590 process, I don't
22 recall any.

23 Q. But you do recall discussing them
24 with salespeople from time to time?

Page 88

1 A. No specifics, but I do recall
2 discussing with salespeople, yes.

3 Q. So you were focused on looking if
4 the customer's license was up to date?

5 A. That was one of the pieces of
6 information, correct.

7 Q. And then you said you did some
8 Internet research about the pharmacy to see if
9 you could see any issues of concern there?

10 A. Correct.

11 Q. Were there specific websites that
12 you looked at?

13 A. Nothing specific other than I used
14 Google a lot.

15 Q. Were there websites that discussed
16 the diversion that you would look at?

17 A. Yes.

18 Q. Do you remember the names of any of
19 those?

20 A. Bluelight.

21 Q. Bluelight?

22 A. Yes.

23 Q. Do you remember how that was
24 spelled?

Page 89

1 A. Common spelling,
2 B-L-U-E-L-I-G-H-T-dot-R-U at the time. It was
3 a Russian-based site.

4 Q. Okay. And that was a site where
5 people who were looking for illegal pills
6 could -- would go and have discussions?

7 A. Not just pills. Many different
8 drugs. But yes.

9 Q. And so you would look on that site
10 to see if a pharmacy was mentioned?

11 A. I never saw a pharmacy on that
12 site, but -- mostly they talked about trends.

13 Q. What kind of trends do you remember
14 being discussed?

15 A. I do remember discussion of abusers
16 trying to crack Purdue's time-release mechanism
17 when they reformulated OxyContin.

18 Q. And you remember also discussions
19 about the types of pills that people who were
20 addicted preferred?

21 A. Yes.

22 Q. And so you would -- how often would
23 you visit that website?

24 A. I couldn't say. Hard to recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  Q.  Regularly?
2  A.  It was fairly regularly, yes.
3  Q.  Like once a week?
4  A.  Maybe once a week, yes.
5  Q.  Okay.  And did you report
6  information that you learned on that website
7  back up to your boss?
8  A.  I'm sure I did.
9  Q.  Did you write memos or summaries of
10 it, or just send e-mails?
11 A.  It probably would have been
12 e-mails.
13 Q.  And those would have been sent to
14 Ed?
15 A.  Ed and other investigators.
16 Q.  Was there like a distribution list
17 for investigators that you would use?
18 A.  Not that I recall.
19 Q.  Okay.  You'd just have to write all
20 their names in there --
21 A.  Yeah.
22 Q.  -- on your own?  Any other websites
23 that you looked at?
24 A.  Erowid.

Page 91

1  Q.  What's that?
2  A.  It's a similar type, E-R-O-W-I-D, I
3  believe.  And that may have been a .org, but I
4  don't recall specifically.
5  Q.  And you looked at that regularly as
6  well?
7  A.  That one less regularly.
8  Q.  What type of information did you
9  get from Erowid?
10 A.  It was similar information.
11 Q.  Both of those websites, you looked
12 at them the entire time from 2008 to 2012 when
13 you were an investigator?
14 A.  Yes.
15 MR. HAMMOUD:  Object to the form.
16 Go ahead.
17 BY MR. PIFKO:
18 Q.  And how about later when you were a
19 diversion program manager?
20 A.  Yes.
21 Q.  So you looked at those websites the
22 entire time that you worked for
23 AmerisourceBergen?
24 MR. HAMMOUD:  Object to the form.

Page 92

1  Go ahead.
2  THE WITNESS:  I don't recall when I
3  started looking at those.  But through
4  the end of my employment there, I did.
5  BY MR. PIFKO:
6  Q.  How did you learn about those
7  websites?
8  A.  I don't recall.
9  Q.  Any other sites?
10 A.  Nothing specific I can think of.
11 Q.  Did you look for information about
12 specific pharmacies on Erowid?
13 A.  Erowid was more about illicit
14 drugs.  So there was very little discussion
15 about pills.
16 Q.  But there was some discussion of
17 pills on that website?
18 MR. NICHOLAS:  Object to the form.
19 THE WITNESS:  I do believe there
20 was some.
21 BY MR. PIFKO:
22 Q.  So you looked at licensing
23 information, you looked on those websites when
24 you got the Form 590s.  What else did you look

Page 93

1  at?  Googling, you said.
2  A.  May have used various secretaries
3  of state's websites looking at ownership.
4  Q.  What was the purpose of looking at
5  ownership?
6  A.  Well, to see if, you know,
7  potentially there is hidden ownership where,
8  you know, there -- where the 590 may not have
9  accurate information on who really owns a
10 pharmacy.
11 Q.  The Form 590 provided information
12 about top prescribers from the pharmacy?
13 A.  It could.
14 Q.  Okay.  Not in all cases?
15 A.  Not in all cases.
16 Q.  If they provided information about
17 that, would you look them up?
18 A.  Yes.
19 Q.  And was it an every occasion where
20 there was top prescribers you would look them
21 up or just from time to time?
22 A.  Oh, it -- from what I recall, every
23 instance where there was a prescriber listed, I
24 would look up the prescriber.

Page 94

1    Q.   Okay.  And what would you look up
2  the prescribers for?
3    A.   Verifying their DEA registration,
4  look for their state license, look for any
5  discipline that they may have.  I'd also look
6  for them to see if there's any chatter about
7  them, you know, essentially Googling, you know,
8  their name, maybe their office number, just to
9  see if I can find chatter somewhere on the
10 Internet about them.
11   Q.   How about the product mix that the
12 pharmacy was purchasing, their purchase
13 history, did you look at that?
14   A.   Not in all cases.
15   Q.   Okay.  In some cases?
16   A.   In some cases, yes.
17   Q.   What were circumstances where you'd
18 look at their prescribing or purchasing
19 patterns?
20   A.   Where if they were looking for a
21 large number of controlled substances.
22   Q.   Why was that something you'd be
23 interested in?
24   A.   As far as the mix of products that

Page 95

1  they were buying?  To -- you know, looking for
2  anything that may indicate that they're only
3  looking for one specific controlled substance,
4  which could be an issue.
5    Q.   Why would that be an issue?
6    A.   Because that could indicate that
7  they're only dispensing, you know, one product
8  that they're looking to dispense, which could
9  indicate that there is something wrong with the
10 pharmacy.
11   Q.   So if they're only buying opioids,
12 for example, or buying a high ratio of opioids,
13 that could be a sign that the pharmacy is
14 engaged in diversion, correct?
15   A.   Not necessarily.
16   Q.   But it could be a sign, though?
17   A.   Oh, it would be something to look
18 at.
19   Q.   That would be a red flag?
20   A.   It could be, yes.
21   Q.   So then when you looked at these
22 Form 590s, did you -- you get one in, you do
23 this investigation, then is there a summary or
24 a report or something that you do with that

Page 96

1  afterwards?
2    A.   There would be a summary and either
3  an approval or denial message that would go
4  out.
5    Q.   Okay.  And that's an approval or
6  denial of whether the -- AmerisourceBergen is
7  going to do business with them?
8    A.   I can't recall if it was fully
9  doing business with them or if it was just for
10 controlled substances.  I can't recall if it
11 was, you know, for all business or just
12 controlled substances.
13   Q.   So it's either they're approved to
14 generally do business with them or they're
15 approved to buy controlled substances from
16 AmerisourceBergen?
17   A.   Well, I can't recall.
18   Q.   But those are possible things
19 that --
20   A.   Those could be possible --
21       MR. NICHOLAS:  Object to the form.
22       (Reporter interruption.)
23       MR. NICHOLAS:  Yeah, just let him
24 finish his question before you answer,

Page 97

1  and give me one second in case I want to
2  object to the question.
3       (Reporter interruption.)
4       THE WITNESS:  Yes, it could be
5  possible.
6  BY MR. PIFKO:
7    Q.   Any other outcomes of your
8  investigation?
9       MR. NICHOLAS:  Object to the form.
10      THE WITNESS:  I don't recall that.
11 BY MR. PIFKO:
12   Q.   Did you ever look at Form 590s for
13 existing customers?
14   A.   Occasionally.
15   Q.   Under what circumstances would you
16 look at a Form 590 for an existing customer?
17   A.   If we felt we needed to get updated
18 information about a customer.
19   Q.   Do you understand circumstances
20 that would lead AmerisourceBergen to want to
21 get updated information for a company -- or a
22 customer?
23   A.   Oh, if they had increased in
24 controlled substance purchases, we may ask for

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 an updated 590 for a customer, depending upon
2 how old the 590 was.
3     Q.  Is there like a threshold that
4 would deem it to be old?
5     A.  Not that I recall.
6     Q.  Do you remember ever evaluating
7 what time period, like, you would think of was
8 the -- would make it old enough to need
9 updating?
10        MR. NICHOLAS:  Object to the form.
11        THE WITNESS:  And I don't recall.
12 BY MR. PIFKO:
13     Q.  Was the review process they did
14 with an existing customer the same as what
15 you'd do with a new customer?
16     A.  I don't recall specifically, but I
17 believe it was.
18     Q.  Did that happen less frequently?
19     A.  That's hard to say.  I can't recall
20 the frequency.
21     Q.  So you feel like you were looking
22 at new customers and existing customers
23 relatively equally?
24     A.  No, I don't believe it was

Page 99

1 relatively equally.  It was, you know, more
2 that we were looking at new customers.  But I
3 don't recall the exact frequency.
4     Q.  If you made a recommendation to
5 reject doing business with a customer, was
6 there someone else who had final approval, or
7 was that the end of the decision?
8     A.  Well, from what I recall, I believe
9 when I was an investigator, Ed had final
10 approval.  But I don't ever recall anyone being
11 overridden of a recommendation of a denial.
12     Q.  How would you communicate those
13 recommendations?
14     A.  Via e-mail, from -- I believe.
15     Q.  Did you ever use the instant
16 messaging system?
17     A.  To -- for approval or denial?
18     Q.  Right.
19     A.  Not that I ever recall.
20     Q.  Did you ever use the instant
21 messaging system to discuss questions or
22 concerns about the Form 590s?
23     A.  I don't recall.
24     Q.  But you could have?

Page 100

1        MR. NICHOLAS:  Object to the form.
2        THE WITNESS:  It's possible, but --
3 it's possible.
4 BY MR. PIFKO:
5     Q.  When you communicated with sales
6 representatives about Form 590s, did you do
7 that by e-mail?
8     A.  Generally that would have been done
9 via e-mail.
10     Q.  Okay.  Did you do that by instant
11 messaging?
12     A.  I don't ever recall instant
13 messaging a sales rep.
14     Q.  Okay.  Did you talk to them on the
15 phone?
16     A.  I may have.  I know I have had
17 conversations with sales reps via the phone.
18     Q.  The process we've been talking
19 about, about reviewing the Form 590s, that was
20 the same during the entire time that you had
21 the responsibility for reviewing them?
22     A.  I believe so.
23     Q.  Then you said you also had a job of
24 reviewing orders for the suspicious order

Page 101

1 monitoring program, correct?
2     A.  Correct.
3     Q.  That was at the same time as you
4 were reviewing the Form 590s?
5     A.  Correct.
6     Q.  So let's talk about that process.
7 What was the mechanism by which you would get
8 an order to review?
9     A.  Oh, the actual sort of computer
10 system mechanism?
11     Q.  Yeah, like -- what I'm trying to
12 get at is, I'm you, I'm sitting in a chair or
13 however, I'm going -- I'm looking at paper,
14 like how does the process work?
15     A.  The system we had up front, I don't
16 recall exactly how it looked or how we got the
17 information.  I do recall that roughly every
18 hour there would be orders that would be pended
19 for review.  And -- but as far as how the
20 mechanism actually worked, I don't remember
21 that.
22     Q.  Did you have to go to a different
23 location to perform that function for your job?
24     A.  No.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  Q.  You did that from your same desk
2  where you'd do all your other work?
3  A.  Correct.
4  Q.  So you'd get some sort of e-mail,
5  or did you have to log on to another kind of
6  system to access the order reviews?
7  A.  It would have been logging on to
8  another system.
9  Q.  Do you remember the name of that
10  system?
11  A.  I believe it was called Metastorm.
12  Q.  And was that the same system the
13  entire time that you reviewed suspicious --
14  potentially suspicious orders?
15  A.  No.
16  Q.  What were the various iterations?
17  A.  The other system would have been
18  SAP.
19  Q.  Okay.  Metastorm was first?
20  A.  Correct.
21  Q.  And then SAP was after?
22  A.  Correct.
23  Q.  And they instituted that
24  sometime -- the SAP system around 2012?

Page 104

1  A.  Oh, correct.
2  Q.  Okay.  Or they could also send it
3  up to you or someone on your team for review?
4  A.  Correct.
5  Q.  So you'd get these orders.  What do
6  you see in the order?
7  A.  I don't remember specifically what
8  information I could see on the order.
9  Q.  It would tell you the customer?
10  A.  I'm sure it did, yeah.
11  Q.  The order quantity?
12  A.  I'm sure.
13  Q.  The type of substance being
14  ordered?
15  A.  I'm sure, with NDC number, yes.
16  Q.  The threshold?
17  A.  I don't remember if it showed the
18  threshold or not.

Page 103

Page 105





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review

Page 114



13    Q.   What was the basis for calculating
14 the thresholds?
15    A.   I don't remember.
16    Q.   You are aware that
17 AmerisourceBergen had a methodology where it
18 calculated thresholds by multiplying the
19 average by 300 percent?
20         MR. NICHOLAS:  Object to the form.
21         THE WITNESS:  I do know that the
22    DEA recommended a 300 percent threshold
23    of historical purchases.
24 BY MR. PIFKO:

Page 115

1    Q.   That 300 percent of historical
2 purchases was a way that AmerisourceBergen
3 calculated thresholds?
4         MR. NICHOLAS:  Object to the form.
5         THE WITNESS:  From what I recall,
6    AmerisourceBergen followed that DEA
7    recommendation.
8 BY MR. PIFKO:
9    Q.   Was that 300 percent of average
10 used with the oxy 30 thresholds?
11    A.   I don't recall.
12    Q.   When you say it was recommended by
13 the DEA, what's your basis for that
14 understanding?
15    A.   Documentation from the DEA
16 specifically calling out 300 percent.
17    Q.   What documentation are you
18 referring to?
19    A.   I don't recall, but they had it
20 available on their website.  I don't recall if
21 it's the deadiversion.gov website or the U.S.
22 DOJ website, but it was available via their
23 website.
24    Q.   In 2013, AmerisourceBergen took on

Page 116

1 business from Walgreens that it didn't have
2 before, correct?
3    A.   Correct.
4    Q.   Were you part of that transition
5 process?
6    A.   Yes, I was.
7    Q.   There was something called the
8 Walgreens C-II playbook or something like that.
9 Have you heard of that before?
10        MR. NICHOLAS:  Object to the form.
11        THE WITNESS:  And I don't recall
12    that.
13 BY MR. PIFKO:
14    Q.   Okay.  Do you remember there being
15 something about some sort of playbook about the
16 process for transitioning Walgreens accounts to
17 AmerisourceBergen?
18    A.   I don't recall.
19    Q.   But you were part of the team that
20 helped transition Walgreens accounts to
21 AmerisourceBergen?
22    A.   Correct.
23    Q.   Who else worked on that team?
24    A.   I don't recall specifically.  It

Page 117

1 may have been the entire department, CSRA
2 department.  It may have been only certain
3 people within the CSRA department, but I don't
4 remember specifically who.
5    Q.   Do you recall that there were
6 meetings with Walgreens, your counterparts at
7 Walgreens, who were responsible for diversion
8 control?
9    A.   Yes.
10    Q.   Do you remember the names of any of
11 those people?
12    A.   Tasha Polster.
13    Q.   Anyone else?
14    A.   Don't recall any other names.
15    Q.   Did you ever meet with Tasha
16 Polster?
17    A.   Yes.
18    Q.   She came to your offices?
19    A.   She came to my office once.
20    Q.   Okay.  What happened in that
21 meeting?
22    A.   I don't recall.
23    Q.   Did you give her a tour of your
24 distribution facility?

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    A.  I don't recall, but I'm sure I did.

2    Q.  Did you discuss with her how

3 AmerisourceBergen's order monitoring program

4 functioned?

5    A.  I don't recall specifics.

6    Q.  How about generally?

7    A.  I don't even recall generally.

8    Q.  Do you recall explaining to her

9 what the due diligence process was at

10 AmerisourceBergen?

11    A.  I may have.

12    Q.  Do you recall discussing Form 590s

13 with her?

14    A.  I don't recall that.

15    Q.  Do you recall about when that

16 meeting occurred?

17    A.  I think it was warm outside.

18    Q.  Sometime in 2013?

19    A.  It could have been.  I'm sure it

20 was, but I don't recall when.

21    Q.  Which facility did she visit?

22 Where were you at the time?  In Illinois?

23    A.  Correct.

24    Q.  What was the name of that facility?

Page 119

1    A.  Romeoville.

2    Q.  Do you recall that it was

3 AmerisourceBergen's practice to share

4 thresholds for the Walgreens stores with them?

5    MR. NICHOLAS:  Object to the form.

6    THE WITNESS:  I don't recall that.

7 BY MR. PIFKO:

8    Q.  Are you aware that that occurred?

9    MR. NICHOLAS:  Object to the form.

10    THE WITNESS:  I don't recall that.

11 BY MR. PIFKO:

12    Q.  At that time, you were still

13 reporting to Mr. Hazewski?

14    A.  Correct.

15    Q.  Do you recall having regular

16 meetings with the Walgreens diversion control

17 team?

18    A.  I was included in a couple

19 meetings, but as far as regular, I don't think

20 there were enough to say that it was regular.

21    Q.  Okay.  When did those meetings

22 start?

23    A.  Don't recall.

24    Q.  Was it before or after

Page 120

1 AmerisourceBergen began servicing the

2 Walgreens?

3    A.  I do think there may have been one

4 before, but I can't recall specific.

5    Q.  Okay.  And those would have been in

6 2013?

7    A.  Could have been, but I don't

8 recall.

9    Q.  Do you recall Walgreens having a

10 specialized Form 590?

11    A.  I don't recall.

12    Q.  Do you recall discussions about

13 Cardinal Health servicing some of the Walgreens

14 stores prior to AmerisourceBergen servicing

15 them?

16    A.  I don't recall.

17    Q.  Do you recall discussions about

18 some of the Walgreens pharmacies that

19 AmerisourceBergen was going to be servicing

20 were accounts that Cardinal Health couldn't

21 service anymore?

22    A.  Don't recall.

23    MR. PIFKO:  All right.  Let's take

24 a short break.

Page 121

1    VIDEO OPERATOR:  Going off the

2 record, 11:50 a.m.

3    (Recess from 11:50 a.m. until

4 12:10 p.m.)

5    VIDEO OPERATOR:  Back on the

6 record.  The time is 12:10 p.m.

7    (Exhibit Teva-Tomkiewicz-001 marked

8 for identification and attached to the

9 transcript.)

10 BY MR. PIFKO:

11    Q.  Handing you what's marked as

12 Exhibit 1.

13    For the record, it's a document

14 Bates labeled from Cardinal's production,

15 CAH_MDL2804_00855083 through 84.

16    MR. NICHOLAS:  This having been

17 produced by Cardinal, has --

18    MR. PIFKO:  It's from him, so

19 it's -- it's from him.

20    MR. NICHOLAS:  Okay.

21 BY MR. PIFKO:

22    Q.  You can take as much time as you

23 want to read it, but I just had some quick

24 questions that are more about some of the

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  format of the e-mail than the actual substance
2  of it.
3       It mentions --
4       MR. NICHOLAS:  Take your time and
5  read the document.
6  BY MR. PIFKO:
7       Q.  I just wanted to ask you, it
8  mentions, RxNews listserv.  Can you tell me
9  what that is?
10      A.  That's a listserv for NADDI.
11      Q.  Okay.  Do you know who else
12 receives e-mails from that?
13      A.  No, I don't.
14      Q.  Okay.  And so this e-mail is from
15 you to the listserv?
16      A.  Correct.
17      Q.  So from time to time, you would
18 post things that you were aware of to that
19 listserv?
20      A.  Very rarely.
21      Q.  Okay.  Then the substance here, do
22 you know where this is from?  You can take a
23 minute --
24      MR. NICHOLAS:  I'm going to ask

Page 123

1       that he now be permitted to read this
2       thing if you're going to ask him
3       questions about it.
4       THE WITNESS:  Well, actually, I'm
5       good with this.  Yeah, I --
6       MR. NICHOLAS:  Are you sure?
7       THE WITNESS:  Oh, yeah, I remember
8       this.  Yeah.
9       MR. NICHOLAS:  Okay.
10      THE WITNESS:  Certainly.  This was
11      from Bluelight.
12 BY MR. PIFKO:
13      Q.  Okay.  And so from time to time,
14 you could get information like this, and you
15 could share it with other people?
16      A.  Correct.  That's what we discussed
17 earlier about using Bluelight as a reference
18 for abusers and abuser trends.
19      Q.  When you shared this kind of
20 information with other people in
21 AmerisourceBergen, you'd send them an e-mail,
22 too, or were they on the listserv?
23      A.  For internal AmerisourceBergen, I
24 would use internal AmerisourceBergen.

Page 124

1       Q.  Okay.
2       A.  Again, posting to this listserv was
3  very rare.  I think there may have been one
4  other time where I posted something to it.
5       Q.  But you received other postings
6  from it?
7       A.  Yes.
8       Q.  Are people from the other big three
9  distributors on it as well?
10      A.  Don't know.
11      Q.  You don't know from posting?  You
12 don't remember seeing postings from any of
13 them?
14      A.  Don't recall.
15      Q.  Were you a member of NADDI?
16      A.  Yes.
17      Q.  Did you get e-mails from other
18 NADDI members besides this?
19      A.  I don't recall any outside of the
20 listserv.
21      Q.  Do you know who Jack Crowley is?
22      A.  Jack Crowley, was he with Purdue?
23      Q.  Yeah.
24      A.  As you can tell by my hesitancy, I

Page 125

1  don't think I've spoken with him in a long
2  time, if I've ever spoken with him.
3       Q.  Okay.  But you knew who he was,
4  that you knew he was from Purdue?
5       A.  Yeah, I believe so.
6       Q.  Would he e-mail from time to time
7  on NADDI issues?
8       A.  I don't recall.  I don't recall.
9       Q.  Do you have a recollection of how
10 you knew who he was, he was with Purdue?
11      A.  No, I don't.
12      Q.  Okay.  Have you ever spoken to him?
13      A.  I think I may have spoken to him
14 once.
15      Q.  When was that?
16      A.  Don't recall.
17      Q.  At a conference?
18      A.  Phone call.
19      Q.  Okay.  Do you know what you spoke
20 to him about?
21      A.  Don't recall specifically.
22      Q.  How about generally?
23      A.  Generally, I think it was about a
24 pharmacy but can't recall.

Page 126

1    Q.  He called you to provide some
2  information about a pharmacy he was concerned
3  about?
4        MR. NICHOLAS:  Object to the form.
5     Go ahead.
6        THE WITNESS:  That would be no.  He
7     was looking for information on a
8     pharmacy.
9  BY MR. PIFKO:
10    Q.  Okay.  Did you go to any NADDI
11 conferences?
12    A.  Yes.
13    Q.  How often did you go to those?
14    A.  It was infrequent.  Last one I
15 think was, like, 2009.
16    Q.  Prior to that, did you go
17 regularly?
18    A.  Not regularly, no.
19    Q.  There were other members of the
20 pharmaceutical industry at these conferences?
21    A.  A few.  Mostly, it was law
22 enforcement.
23    Q.  Okay.  Do you remember any other
24 people and companies that participated in those

Page 127

1  meetings?
2     A.  I do remember one back -- it was
3  sometime around the year 2000, where a medical
4  affairs person -- medical doctor from Purdue
5  attended.
6     Q.  Anyone else?
7     A.  No other one that I can recall.
8     Q.  Do you remember anything about what
9  that medical doctor from Purdue communicated
10 about at the conference?
11    A.  I can remember the communication he
12 got.
13    Q.  What was that?
14    A.  It was from beat law enforcement
15 officers, and they -- he got a lot of people
16 yelling at him.
17    Q.  That was in 2010, you said?
18    A.  No, no.  This was sometime around
19 2000, 2001.
20    Q.  Oh, okay.
21    A.  Yeah.
22    Q.  Do you remember that person's name?
23    A.  No.
24    Q.  You just remember they were upset

Page 128

1  with him?
2     A.  Oh, yes.
3     Q.  How come?
4     A.  Over OxyContin abuse.
5     Q.  You remember OxyContin abuse being
6  an issue back in 2001?
7     A.  Yes, approximately 2001.
8     Q.  What was the issue that you were
9  aware of?
10       MR. NICHOLAS:  Object to the form.
11       THE WITNESS:  Just that abusers
12    liked OxyContin.
13 BY MR. PIFKO:
14    Q.  How did you come to learn that?
15       MR. NICHOLAS:  Same objection.
16       THE WITNESS:  I don't recall
17    specifically.
18 BY MR. PIFKO:
19    Q.  So you basically remember this
20 person being heckled at the conference, kind
21 of?
22    A.  Yes.
23    Q.  Do you remember anyone else who was
24 there?

Page 129

1     A.  No, I sure don't.
2        (Exhibit Teva-Tomkiewicz-002 marked
3     for identification and attached to the
4     transcript.)
5  BY MR. PIFKO:
6     Q.  All right.  I'm handing you what's
7  marked as Exhibit 2.
8        For the record, it's a two-page
9  document Bates labeled ABDCMDL00280711 and 12.
10    Take your time to review it.
11    A.  (Reviewing documents.)
12       Okay, I'm good.
13    Q.  Do you remember the discussion in
14 this e-mail?
15    A.  No, I don't.
16    Q.  Ed Hazewski sends it to some
17 people.  Those are all people in the diversion
18 control department?
19    A.  Correct.
20    Q.  He says, FYI regarding OX and HY
21 allocations.  Do you see that?
22    A.  Yes.
23    Q.  That's oxy and hydrocodone?
24    A.  Yes.

Page 130

1 Q. What's an allocation?

2 A. An allocation, that would be a

3 limitation that a manufacturer places on a

4 distributor.

5 Q. Okay. What's your understanding of

6 why they placed those limitations?

7 A. Because the products were in short

8 supply.

9 Q. Okay. Because there's a quota from

10 the federal government about how much can be

11 produced?

12 MR. NICHOLAS: Object to the form.

13 THE WITNESS: That's what it

14 appears to me.

15 BY MR. PIFKO:

16 Q. You see here towards the bottom of

17 the page, there's an e-mail from Tara Rasch?

18 A. Yes.

19 Q. Do you know who she is?

20 A. No.

21 Q. It says here she's director of

22 generic prescription replenishment at

23 AmerisourceBergen Drug Company.

24 Do you see that?

Page 131

1 A. Yes.

2 Q. Okay. Is that an area of the

3 company you have any familiarity with?

4 A. I don't recall ever having a

5 conversation with anyone with -- in that

6 department.

7 Q. She says here -- among other things

8 in her e-mail, she says, We are hearing reasons

9 for the issues ranging from the DEA has lowered

10 the quota amounts to try to reduce abuse of

11 pain medications.

12 Do you see that?

13 A. Yes.

14 Q. Do you recall any discussions about

15 DEA lowering quotas to address abuse issues?

16 MR. NICHOLAS: Object to the form.

17 THE WITNESS: And that's going to

18 be no.

19 BY MR. PIFKO:

20 Q. At the top here, it says, from

21 Steve Mays, I have also heard from my sources

22 that DEA is using quotas as a "tool" in their

23 so-called "manufacturer initiative" to force

24 manufacturers to implement wholesaler due

Page 132

1 diligence and diversion control programs like

2 we have to.

3 Do you see that?

4 A. Yes.

5 Q. Do you have an understanding about

6 what he's talking about there?

7 A. Not specifically, no.

8 Q. How about generally?

9 A. Generally, I have a general idea

10 what he's talking about.

11 Q. What's that?

12 A. That he has heard from people that

13 DEA is using quota to force manufacturers to

14 have a -- well, a due diligence and diversion

15 control program.

16 Q. When he says, like we do, was that

17 your understanding, that manufacturers didn't

18 have diversion control programs prior to this

19 time?

20 MR. NICHOLAS: Object to the

21 conform.

22 THE WITNESS: I have no knowledge

23 of that.

24 BY MR. PIFKO:

Page 133

1 Q. Do you have an understanding about

2 how DEA was using quotas as that kind of tool?

3 MR. NICHOLAS: Object to the form.

4 THE WITNESS: And I have no

5 knowledge of that.

6 BY MR. PIFKO:

7 Q. If you go to the second page here,

8 they're talking about specific allocations in

9 this chart. Are you familiar with this kind of

10 data?

11 A. No.

12 Q. No?

13 Do you have an understanding about

14 why Ed would have been sharing allocation

15 information with you?

16 MR. NICHOLAS: Object to the form.

17 THE WITNESS: Don't recall.

18 BY MR. PIFKO:

19 Q. Were allocations pertinent to your

20 role as a diversion control person?

21 A. Not that I recall.

22 MR. PIFKO: All right. Well, I

23 think I'm done with my questioning for

24 you. Some other people are going to ask

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 you some questions.

2 VIDEO OPERATOR: Going off the

3 record. The time is 12:23 p.m.

4 (Recess from 12:23 p.m. until

5 12:56 p.m.)

6 VIDEO OPERATOR: We're back on

7 record. The time is 12:56 p.m.

8 EXAMINATION

9 BY MR. CARTMELL:

10 Q. Good afternoon, Mr. Tomkiewicz. My

11 name is Tom Cartmell. How are you today?

12 A. Just fine.

13 Q. I represent the Teva defendants in

14 this case, and I'm going to be asking you some

15 follow-up questions now about your time working

16 for Teva. Do you understand that?

17 MR. HAMMOUD: Objection. I think

18 you said you represent the Teva

19 defendants.

20 MR. CARTMELL: Oh, start over.

21 Start over.

22 MR. HAMMOUD: Making sure we're

23 clear on the record.

24 MR. CARTMELL: You do.

Page 135

1 Take that all back. Start over.

2 BY MR. CARTMELL:

3 Q. Mr. Tomkiewicz, I represent the

4 plaintiffs in this case, and I'm here today to

5 take your deposition about your time working at

6 Teva. Do you understand that?

7 A. Yes.

8 Q. Okay. You've been doing a great

9 job testifying so far today, and just so you

10 know, you're still under oath. Do you

11 understand that?

12 A. Yes.

13 Q. And I want to make sure we're

14 communicating. So if I ever ask you a question

15 you don't understand, go ahead and feel free to

16 interrupt me. I'll restate it or rephrase it

17 so that we can make sure we're communicating.

18 Okay?

19 A. Okay.

20 Q. Okay. Now, you're here today with,

21 I think on your left side, two Teva attorneys.

22 Is that right?

23 A. Who also represent me.

24 Q. Okay. Those are your lawyers in

Page 136

1 this litigation; is that correct?

2 A. Correct.

3 Q. And then earlier, you were being

4 asked questions about your time prior to

5 working at Teva at a wholesale distributor

6 called AmerisourceBergen; is that correct?

7 A. Correct.

8 Q. And you were represented at that

9 time by a lawyer from AmerisourceBergen; is

10 that correct?

11 A. Right. But representing me

12 personally, yes.

13 Q. Okay. So today you have three

14 lawyers here representing you; is that fair?

15 A. Four.

16 Q. Four? I'm sorry. Okay. I missed

17 one. So you have a lot of lawyers here today.

18 A. Yes, yes.

19 Q. Okay. Now, the four lawyers that

20 are here today and have been representing you

21 in this case, can you estimate for me how much

22 time you have spent with them prior to today

23 preparing for your deposition in this case?

24 A. Certainly. For AmerisourceBergen,

Page 137

1 it was about four hours. For Teva, it was

2 maybe six hours.

3 Q. Okay. So a total of ten hours with

4 the lawyers preparing for your testimony today;

5 is that right?

6 A. That's about correct, yes.

7 Q. Okay. And I take it, during those

8 prep sessions with your lawyers, you were

9 reviewing documents; is that fair?

10 A. Reviewed some documents, yes.

11 Q. Okay. Did you maintain those

12 documents in your possession?

13 A. No, not in my possession.

14 Q. Okay. Do you remember specifically

15 any of the documents related to your time at

16 Teva that you reviewed?

17 A. I can't think of any specific.

18 Sorry.

19 Q. So as you sit here today -- strike

20 that.

21 When were these meetings for ten

22 hours with the four lawyers?

23 A. With Teva, it was yesterday. With

24 AmerisourceBergen, it was Monday.

Page 138

1    Q.   Okay.  And so I take it yesterday,
2  you reviewed some documents?
3    A.   Reviewed some documents.
4    Q.   And Monday, two days ago, I take it
5  you reviewed documents; is that correct?
6    A.   Yes.
7    Q.   But is your testimony that today,
8  as you sit here today, you can't remember a
9  single document you reviewed?
10    A.   For Teva?  I can't remember which
11  ones they were.  If I saw them again, I'd
12  probably recognize them.  But yeah.
13    Q.   Nothing?
14    A.   I can't.  Sorry.
15    Q.   Blank slate?
16    A.   Pretty much, yes.
17    Q.   Well, maybe I'll refresh your
18  recollection on some things as we go through
19  some documents.  Okay?
20       Now, I want to ask you about and go
21  over your prior employment before coming to
22  work with Teva.  But I don't want to put words
23  in your mouth, so if I ever mischaracterize
24  something, then go ahead and interrupt me, and

Page 139

1  I'll restate it.
2       But it sounds like, from your
3  testimony --
4       Oh, and you have given a
5  deposition, as you said, in another case
6  involving opioids, a case that was brought by
7  the State of West Virginia; is that right?
8    A.   That is correct.
9    Q.   And that was a deposition that you
10  gave -- was it a couple years ago, maybe?
11    A.   A couple years ago, yes.
12    Q.   All right.  And you were a witness
13  in that who was testifying on behalf of
14  AmerisourceBergen; is that right?
15    A.   That is correct.
16    Q.   Okay.  So you understand this
17  process, I take it.
18    A.   Yes.
19    Q.   Okay.  Now, if I understand from
20  reading that deposition and hearing your
21  testimony today, it sounds like you started
22  working in the area of diversion control or DEA
23  compliance in 2008.  Is that right?
24    A.   Specifically to DEA compliance,

Page 140

1  yes.
2    Q.   Okay.  And that was at a company
3  called AmerisourceBergen, right?
4    A.   Correct.
5    Q.   And AmerisourceBergen is an
6  extremely large wholesale distributor in the
7  United States; is that correct?
8       MR. HAMMOUD:  Object to the form.
9       THE WITNESS:  That's a fair
10       assessment.
11  BY MR. CARTMELL:
12    Q.   Okay.  And I say "extremely large"
13  because it's a multi-billion-dollar company.
14  Correct?
15       MR. NICHOLAS:  Object to the form.
16       MR. HAMMOUD:  Object to the form.
17       THE WITNESS:  They're a
18       multi-billion-dollar company, yes.
19  BY MR. CARTMELL:
20    Q.   Okay.  That employer for you,
21  AmerisourceBergen, was a company that, when you
22  were working there, was actually a distributor
23  of opioid narcotic drugs; is that correct?
24    A.   That was part of their business,

Page 141

1  yes.
2    Q.   Okay.  And I take it you know, from
3  your experience in the industry, that
4  AmerisourceBergen was one of the largest
5  wholesale distributors of opioid narcotic
6  drugs.  Is that fair?
7       MR. HAMMOUD:  Object to the form.
8       THE WITNESS:  That's a fair
9       assessment, yes.
10  BY MR. CARTMELL:
11    Q.   Okay.  So you worked there from
12  2008 in, I think you said, diversion control,
13  correct?
14    A.   Well, for the corporate security
15  and regulatory affairs department.
16    Q.   Okay.  And from 2008 until the time
17  you left AmerisourceBergen.  Was that in the
18  end of 2013?
19    A.   Correct, end of 2013.
20    Q.   So you worked there for about five
21  and a half years?
22    A.   I'll do the math.
23    Q.   Maybe it was four and a half years.
24    A.   Four and a half, yeah.



Page 142

1 Q. Okay. Sorry about that.

2 A. A little less than four and a half.

3 Q. Okay. And at all times during that

4 period, meaning 2008 to the end of 2013, part

5 of your job involved diversion control or DEA

6 compliance with opioids, correct?

7 A. Correct.

8 Q. In other words, you were somebody

9 who was working there who was trying to make

10 sure that AmerisourceBergen was complying with

11 the laws in the United States related to the

12 sale and distribution of these high-risk opioid

13 drugs, correct?

14 MR. HAMMOUD: Object to the form.

15 Calls for a legal conclusion.

16 THE WITNESS: It's a fair

17 assessment.

18 BY MR. CARTMELL:

19 Q. Okay. And there are laws that

20 apply to somebody like a distributor,

21 AmerisourceBergen, or a manufacturer and seller

22 of these high-risk opioid narcotics, correct?

23 A. That is correct.

24 Q. Okay. And we'll talk about those

Page 143

1 in a minute.

2 But is it true that at some point

3 during 2008 through 2013, you were promoted by

4 AmerisourceBergen to be the manager of the

5 diversion department?

6 A. Of the diversion control program,

7 yes.

8 Q. And it sound like, from your

9 testimony, you were in that position for a

10 little over a year. Is that right?

11 A. Yes, that is correct.

12 Q. Okay. And during that time that

13 you were managing the department that was

14 charged with the responsibility of making sure

15 that AmerisourceBergen was in compliance with

16 the laws of the United States for the sale of

17 these high-risk opioids -- you've talked about

18 how the processes were -- the systems were in

19 place at that time, correct?

20 MR. NICHOLAS: Object to the form.

21 MR. HAMMOUD: Object.

22 THE WITNESS: That's a fair

23 assessment.

24 BY MR. CARTMELL:

Page 144

1 Q. Okay. And we'll talk a little bit

2 more about that, but I want to understand

3 something.

4 Is it true that you started work at

5 Teva in January of 2014?

6 A. Correct.

17 BY MR. CARTMELL:

18 Q. Okay. Was there a time when Teva,

19 as a company, actually first started to recruit

20 you to come work at Teva?

21 MR. HAMMOUD: Object to the form.

22 THE WITNESS: Yes, they recruited

23 me to work there.

24 BY MR. CARTMELL:

Page 146

1   Q.   In other words, they reached out to
2   you and said that they were interested in you
3   interviewing and potentially coming to work at
4   Teva?
5       A.   Yes.
6       Q.   And was that Colleen McGinn?
7       A.   It wasn't Colleen who reached out
8   to me.
9       Q.   Who was it?
10      A.   It was an outside recruiting firm.
11      Q.   Okay.  Now, do you think that was a
12  time before you actually had the Drug
13  Enforcement agents knock on your door?
14      A.   Don't recall.  Don't recall.
15      Q.   Could it have been before that that
16  you were actually in active recruitment by
17  Teva?
18          MR. HAMMOUD:  Objection to the
19      form.
20          THE WITNESS:  I don't recall.
21  BY MR. CARTMELL:
22      Q.   Okay.  Could be; you just don't
23  remember?
24      A.   Exactly.  I don't recall.

Page 147

███
████
█████
████
█████
████
██
███
██

11  BY MR. CARTMELL:
12      Q.   So it's possible that you didn't
13  even tell Teva.  Is that fair?
14      A.   It's possible.
15      Q.   Isn't that something that you think
16  Teva actually would like to know before hiring
17  you to become their new manager related to
18  diversion control of their opioids?
19          MR. HAMMOUD:  Object to the form.
20          THE WITNESS:  And I don't think
21      it's relevant.
22  BY MR. CARTMELL:
23      Q.   You don't think that's relevant?
24      A.   No.

Page 148

1       Q.   Okay.  Now, ultimately, when -- let
2   me ask you, did you have to go to Teva and
3   interview with some people?
4       A.   Yes.
5       Q.   Who did you interview with?
6       A.   With Colleen McGinn and Mike
7   Edwards, and I think there was an HR person as
8   well.
9       Q.   And I suspect since you started in
10  early January of 2014, you likely would have
11  gotten the job in 2013, maybe the end, around
12  the holidays or something?
13      A.   Correct.
14      Q.   Okay.  And so let's talk a little
15  bit about your time now at Teva.  And what was
16  the position that you were hired for?
17      A.   For my current position as DEA
18  compliance manager in charge of the suspicious
19  order monitoring program.
20      Q.   Okay.  The department is called DEA
21  compliance; is that right?
22      A.   Correct.
23      Q.   And that was a department that had
24  been in existence prior to the time they hired

Page 149

1   you; is that right?
2       A.   Correct.
3           MR. HAMMOUD:  Object to the form.
4   BY MR. CARTMELL:
5       Q.   Oh, one other thing I wanted to ask
6   you about.  You had been working in DEA
7   compliance since 2008 or for approximately six
8   years before you started, correct?
9       A.   Specifically DEA compliance, yes.
10      Q.   And one of the individuals who
11  trained you to become a DEA compliance expert,
12  so to speak -- would you agree that you became,
13  over time, a DEA compliance expert?
14          MR. HAMMOUD:  Object to the form.
15          THE WITNESS:  I would hope so.
16  BY MR. CARTMELL:
17      Q.   Okay.  But one of the people who
18  first trained you in that job so that you could
19  become an expert on DEA compliance was a guy
20  named -- did you say Kevin Kreutzer?
21      A.   Kevin Kreutzer, yes.
22      Q.   Okay.  And he worked at
23  AmerisourceBergen with you during that time
24  that he was training you; is that right?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    A.  Correct.
2    Q.  And was he in management there?
3    A.  No.
4    Q.  Okay.  But he was a superior to
5 you?
6    A.  A superior?  The same position.
7    Q.  Okay.  At any rate, it turns out
8 that Kevin Kreutzer, who had actually trained
9 you, had gone to work at Teva before you went
10 to Teva; is that right?
11    A.  That is correct.
12    Q.  And I think you might have this
13 memory from talking to him, but isn't it true
14 that Mr. Kreutzer only worked at Teva for a
15 short period of time?
16    A.  That is correct.
17    Q.  Was it less than a year?
18    A.  I believe it was less than a year,
19 yes.
20    Q.  And Mr. Kreutzer, I think, was
21 hired to be the manager of the suspicious
22 orders and the monitoring program in the DEA
23 compliance department at Teva; is that right?
24    MR. HAMMOUD:  Object to the form.

Page 151

1    THE WITNESS:  That is correct.
2 BY MR. CARTMELL:
3    Q.  Okay.  So your former colleague who
4 had trained you went to Teva, and then was
5 fired from Teva as the manager of the
6 suspicious order monitoring program in the DEA
7 compliance department prior to the time that
8 you went there; is that right?
9    MR. HAMMOUD:  Object to the form.
10 Assumes facts not in evidence.
11    THE WITNESS:  That's what I
12    understand.
13 BY MR. CARTMELL:
14    Q.  Okay.  And then he comes back to
15 AmerisourceBergen before you leave; is that
16 right?
17    A.  That is correct.
18    Q.  And then is it true, then, that
19 Teva reached out to you after that to try to
20 fill the spot that Mr. Kreutzer had been
21 terminated from?
22    A.  That is correct.
23    MR. HAMMOUD:  Object to the form.
24 BY MR. CARTMELL:

Page 152

1    Q.  Okay.  And that, again, was to be
2 the manager of the suspicious order monitoring
3 program in the DEA compliance department at
4 Teva; is that right?
5    A.  That is correct.
6    Q.  Okay.  All right.  So in January of
7 2014, when you say you were a part of the DEA
8 compliance department, how big was that
9 department at Teva?
10    MR. HAMMOUD:  Object to the form.
11    THE WITNESS:  In terms of how many
12    people we had at the time?
13 BY MR. CARTMELL:
14    Q.  Yes, sir.
15    A.  Oh, all total, there may have been
16 a dozen, 15.
17    (Exhibit Teva-Tomkiewicz-003 marked
18    for identification and attached to the
19    transcript.)
20 BY MR. CARTMELL:
21    Q.  I'm going to hand you what's been
22 marked as Exhibit 3.  And I just have a few
23 questions about this.
24    MR. HAMMOUD:  Tom, do you have a

Page 153

1    Bates number for this?
2    MR. FAES:  It is 01464603, starting
3    with TEVA_MDL_.
4 BY MR. CARTMELL:
5    Q.  Mr. Tomkiewicz, I will represent to
6 you that Exhibit 3 is a PowerPoint presentation
7 that was produced to us in this lawsuit by
8 Teva, and it's titled DEA Compliance
9 Organization, with a date of March 18th, 2014.
10    Do you see that?
11    A.  Yes.
12    Q.  And I take it that this is a type
13 of slide deck or PowerPoint presentation that
14 would routinely be presented to employees of
15 the DEA compliance department at Teva; is that
16 fair?
17    MR. HAMMOUD:  Object to the form.
18    THE WITNESS:  And that's fair.
19 BY MR. CARTMELL:
20    Q.  Okay.  And March 18, 2014, this is
21 shortly after the time you started working at
22 Teva; is that right?
23    A.  That's correct.
24    Q.  And I want to refer you to the

Page 154

1 second page of this that talks about the
2 current DEA compliance organization. And this
3 just has an organizational chart, just to give
4 the jury some reference, of where you were
5 working when you started to go to work at Teva.
6 And as you see, Colleen McGinn looks like she
7 was the director of that department; is that
8 right?
9     A.  Correct.
10     Q.  Okay.  So she would have been, I
11 take it, your boss, so to speak?
12     A.  Correct.
13     Q.  Okay.  And then there's -- I
14 counted.  There's -- it looks like there's 16
15 employees on this org chart.  Is that your
16 understanding as how big the DEA compliance
17 department was?
18     A.  Correct.  That's what I said,
19 thinking it was about 12 to 15, yes.
20     Q.  Okay.  And you're here, you'll see
21 Joe Tomkiewicz, and it calls you the SOM
22 manager.  What does that stand for?
23     A.  Suspicious order monitoring.
24     Q.  Okay.  And that's an -- NW means

Page 155

1 New Wales; is that right?
2     A.  North Wales.
3     Q.  I'm sorry, North Wales.  That's the
4 location or the office where you were working;
5 is that right?
6     A.  Correct.
7     Q.  Okay.  And tell us what suspicious
8 order monitoring manager entailed, or what was
9 that position that you filled at that time?
10     A.  Well, it was developing new
11 policies for the department, for suspicious
12 order monitoring, encompassing everything that
13 a suspicious order monitoring what I felt
14 should encompass, which encompasses new
15 customer due diligence, ongoing due diligence
16 of customers, monitoring of orders, and we
17 also -- one of the things that I did was worked
18 to create a new computer algorithm to assist in
19 identifying orders that may be suspicious.
20     Q.  Okay, thank you.  And we'll talk a
21 little bit more in detail about that.
22         But is it fair to say that at this
23 time in 2014 when you went to work for Teva
24 that Teva was a very large pharmaceutical

Page 156

1 company?
2     A.  That's a fair assessment.
3         MR. HAMMOUD:  Object to form.
4     Sorry.
5 BY MR. CARTMELL:
6     Q.  A multi-billion-dollar corporation.
7 Is that fair?
8     A.  That's fair.
9     Q.  Okay.  And the DEA compliance
10 department was in existence in part because
11 Teva, as a manufacturer and seller of
12 pharmaceuticals or drugs, was selling, among
13 other things, high-risk opioid narcotics; is
14 that right?
15         MR. HAMMOUD:  Object to the form.
16         THE WITNESS:  Well, not quite.  I
17     don't think you can say "high risk"
18     because really any controlled substance
19     has a risk of addiction.  That's why
20     they're controlled.
21 BY MR. CARTMELL:
22     Q.  Okay.  And the only reason I use
23 "high risk" is we'll see there's a presentation
24 that you gave that you used that word, okay?

Page 157

1 So you would agree with me that opioids are
2 high risk, correct?
3         MR. HAMMOUD:  Object to the form.
4 BY MR. CARTMELL:
5     Q.  Let me restate it.  Would you agree
6 with me, though, that opioids are high risk for
7 diversion or abuse?
8         MR. HAMMOUD:  Object to the form.
9         THE WITNESS:  Insomuch as they are
10     any controlled substance, yes, I would
11     agree with that.
12 BY MR. CARTMELL:
13     Q.  Okay.  So when I say "high-risk
14 opioid narcotics," can we agree that I'm
15 referring to high risk in a sense of they're
16 high risk for diversion and abuse by
17 individuals?
18         MR. HAMMOUD:  Object to the form.
19         THE WITNESS:  And I wouldn't agree
20     with that.  I would categorize high risk
21     in the way that I have historically used
22     it to mean the specific opioid products
23     that abusers really actively seek out.
24 BY MR. CARTMELL:

Page 158

1    Q.  Okay.  Meaning some opioids are
2   more high risk than others; fair to say?
3    A.  Well, again, any opioid, any
4   controlled substance is at risk of diversion
5   and is at risk of abuse, which is explicitly
6   why they are a controlled substance.  But there
7   are certain products that abusers will seek
8   out.
9    Q.  Okay.  And those are the ones that
10  you would call high risk?
11   A.  That's -- those are ones that
12  generally historically that I've called high
13  risk, yes.
14   Q.  Okay.  So let me rephrase my
15  question just -- and I'll take that phrase out
16  of there so it's not confusing.
17   A.  Yeah.
18   Q.  And I hope you're okay with it.
19  But is it fair to say that when you were hired
20  at Teva, there was a DEA compliance department
21  or organization in place because Teva had
22  chosen to manufacture and sell and distribute
23  opioid narcotic drugs?  Fair to say?
24       MR. HAMMOUD:  Object to the form.

Page 159

1        THE WITNESS:  I would say that's
2        fair.
3   BY MR. CARTMELL:
4    Q.  Okay.  And it's called the DEA
5   compliance department, which stands for Drug
6   Enforcement Agency, right?
7    A.  I thought it was Administration.
8    Q.  Oh, sorry.  Let me start over.
9        It's called the DEA compliance
10  department because it's -- it stands for what,
11  DEA?
12   A.  I believe it's Drug Enforcement
13  Administration.
14   Q.  Okay.  And there are laws that the
15  Drug Enforcement Administration has been told
16  by Congress they have the authority and the
17  responsibility to enforce related to the sale
18  and marketing -- or excuse me, related to the
19  distribution and sales of opioid narcotic
20  drugs, right?
21       MR. HAMMOUD:  Object to the form.
22       THE WITNESS:  And I got lost in the
23       question.
24  BY MR. CARTMELL:

Page 160

1    Q.  Let me strike it.  It was a
2   confusing question.
3        It's called the Drug Enforcement
4   Agency compliance department --
5    A.  Administration, I believe.
6    Q.  Or Administration.
7        -- because the DEA is charged with
8   the duty and responsibility to enforce the laws
9   related to the sale and distribution of opioid
10  drug narcotics, correct?
11       MR. HAMMOUD:  Object to the form,
12  calls for a legal conclusion.
13       THE WITNESS:  Yeah, and the naming
14  of the department is something that --
15  because really I don't think that we're
16  limited to strictly DEA, and I wouldn't
17  want to be limited to strictly DEA.
18  There may be some other things that, you
19  know, I may observe, and I'm not going
20  to limit it to strictly DEA issues.
21       But, you know, generally the
22  primary responsibility is related to
23  DEA-related issues.
24  BY MR. CARTMELL:

Page 161

1    Q.  Okay.  And primarily your
2   responsibilities as the suspicious order
3   monitoring manager, was that mostly related or
4   entirely related to the distribution of
5   opioids?
6        MR. HAMMOUD:  Object to the form.
7        THE WITNESS:  No, not to -- not
8   limited to opioids.
9   BY MR. CARTMELL:
10   Q.  Would it also include nonopioid
11  narcotics?
12   A.  Well, nonopioid controlled
13  substances, because there are controlled
14  substances that are not opioids, not narcotics.
15   Q.  Okay.  When you were hired by Teva
16  in January of 2014 to be the suspicious order
17  monitoring manager, was that a new position
18  created for you?
19       MR. HAMMOUD:  Object to the form,
20  lacks foundation.
21       THE WITNESS:  That Teva created for
22  me?
23  BY MR. CARTMELL:
24   Q.  Yes.

Page 162

1    A.  No.
2    Q.  But there wasn't a suspicious order
3  monitoring manager in place prior to the time
4  you arrived; is that fair?
5        MR. HAMMOUD:  Object to the form.
6        THE WITNESS:  Not at the exact
7        moment because it was Kevin Kreutzer.
8  BY MR. CARTMELL:
9    Q.  And Kevin Kreutzer had been
10  terminated?
11    A.  That was my understanding, yes.
12    Q.  Do you remember how long that
13  period of time was that that position was
14  unfilled?
15    A.  No, I sure don't.
16    Q.  If you'd go to the next page,
17  page 3, it looks like there is a proposed DEA
18  compliance organization, and I guess I was
19  going to ask you, at this time were they
20  reorganizing the department; do you remember?
21    A.  I don't remember.
22    Q.  The only thing I saw here as far as
23  changes was it looks like Gail Martin was moved
24  down to CS specialist under Tim Hilden and she

Page 163

1  had previously been up by Colleen McGinn, and
2  then Eric Schmidt was moved under Pat Shields
3  as the import/export specialist.  Is that fair
4  to say?
5    A.  That's fair to say, yes.
6    Q.  Okay.  But this change to the
7  organizational structure, that wouldn't affect
8  you; is that correct?
9    A.  No, that -- I don't believe that
10  affected me at all.
11    Q.  And were you the only suspicious
12  order manager at Teva at the time you were
13  hired?
14    A.  Yes.
15    Q.  And was there ever another, and to
16  this day has there ever been another,
17  suspicious order manager at Teva while you've
18  been there?
19    A.  No.
20    Q.  Okay.  A few questions about you
21  being hired real quick, and one is, I take it
22  you have a personnel file at Teva?
23    A.  I'm sure I do.  Never seen it.
24    Q.  Are you reviewed periodically or on

Page 164

1  an annual basis?
2    A.  Yes.
3    Q.  Okay.  Is part of your compensation
4  bonuses?
5    A.  Yes.
6    Q.  And what is your bonus based on?
7        MR. HAMMOUD:  Object to the form.
8        THE WITNESS:  It's based on my
9        performance review and profitability of
10        the company.
11  BY MR. CARTMELL:
12    Q.  In other words, part of your bonus
13  is based on the amount of profits the company
14  has?
15    A.  Correct.
16    Q.  And that has to do with the amount
17  of opioid -- or excuse me, all drugs that are
18  sold by the company, correct?
19    A.  Correct, all drugs.
20    Q.  And opioids included, correct?
21    A.  Can be, yes.
22    Q.  So there is an incentive-based
23  system at Teva today, and has been at all times
24  while you've been there, that incentivizes

Page 165

1  people by giving bonuses based on the amount of
2  drugs the company sells, including opioid
3  narcotics, correct?
4        MR. HAMMOUD:  Object to the form.
5        THE WITNESS:  Well, not
6        necessarily.  Because I would say
7        that -- I know that there have been some
8        SKUs, opioids that the company has lost
9        money on.  And so if we were to sell
10        fewer of those, it would improve
11        profitability.
12  BY MR. CARTMELL:
13    Q.  I understand.  But on a global
14  basis, thinking about the amount of profits
15  being tied to the amount of sales the company
16  has, that's your understanding, correct?
17    A.  That is correct, yeah.
18    Q.  That opioids, like all of the other
19  products, drugs, pharmaceuticals that are sold
20  by Teva, the more that is sold, at least of the
21  profitable products, the more bonus its
22  employees will receive, correct?
23        MR. HAMMOUD:  Object to the form.
24        THE WITNESS:  Potentially.

Page 166

1    Potentially.  I don't know the formula.
2  BY MR. CARTMELL:
3    Q.  Okay.  And actually, that reminds
4  me to ask you, do you know how profitable the
5  opioid narcotics are to the company?
6    A.  No, I don't.
7    MR. HAMMOUD:  Object to the form.
8  BY MR. CARTMELL:
9    Q.  Have you ever seen anything there
10  in the materials or documents that states that
11  the sale of opioids are 85 percent profitable
12  to the company?
13    A.  I've never seen anything like that.
14    Q.  Okay.  Now, we're going to talk
15  more about the law related to the sales and
16  distribution of opioid narcotics, but first I
17  want to ask you, personally to you, do you
18  believe that this country is in the middle of
19  an opioid epidemic?
20    MR. HAMMOUD:  Object to the form.
21    THE WITNESS:  Based on overdose
22    death rates that I see, I can say that
23    it's perfectly consistent with that,
24    yes.

Page 167

1  BY MR. CARTMELL:
2    Q.  Okay.  And how long do you think
3  this country has been in an opioid overdose and
4  death-related epidemic?
5    A.  That's a tough question.  And I
6  don't really think it's a fair question because
7  it's using the term "epidemic," and we can see
8  through -- overdose death rates over the last
9  couple of years have climbed pretty
10  dramatically.  But is it fair to say -- you
11  know, where is the cut-off of when you start
12  calling something an epidemic?  And I'm not
13  diminishing that there's an issue, because I do
14  believe very strongly that there's an issue, as
15  you've seen through my work, but, you know,
16  using the term "epidemic," it's -- is an unfair
17  statement.
18    Q.  Okay.  You called it an issue; is
19  that right?
20    A.  Oh, it's a very serious issue, yes.
21    Q.  Well, tell us, then, just how long
22  you think this very serious issue related to
23  opioid overdoses and deaths has gone on in
24  America.

Page 168

1    MR. HAMMOUD:  Object to the form.
2    THE WITNESS:  Yeah, and again,
3    we're getting into semantics about when
4    someone considers something a serious
5    issue.  I think something is a serious
6    issue if I think any of my product is
7    ending up in the street.
8  BY MR. CARTMELL:
9    Q.  Okay.  And that's been going on for
10  more than ten years; is that right?
11    A.  Decades.  Decades.
12    Q.  And we'll talk about --
13    A.  Pre-dating the Controlled
14  Substances Act.
15    Q.  Okay.  You're talking about before
16  1970?
17    A.  Oh, yes.
18    Q.  Okay.  Now, as far as this opioid
19  epidemic, has that affected your community?
20    MR. HAMMOUD:  Object to the form.
21    THE WITNESS:  My wife's best friend
22    growing up is an opioid addict, yes.
23  BY MR. CARTMELL:
24    Q.  So I take it, and I was going to

Page 169

1  ask you, it's also affected your family; is
2  that fair to say?
3    A.  My family?
4    MR. HAMMOUD:  Object to the form.
5    THE WITNESS:  I don't know anyone
6    in my family who is a -- has an issue
7    with opioids.
8  BY MR. CARTMELL:
9    Q.  But you have good friends?
10    A.  Oh, yeah, my -- like I said, my
11  wife's best friend growing up.
12    Q.  Okay.  Would you agree with me that
13  the abuse and addiction of both prescription
14  and nonprescription opioids is a serious
15  problem?
16    A.  Well, of course.
17    Q.  And it affects the health, social,
18  and economic welfare of all individuals,
19  communities, and companies?
20    MR. HAMMOUD:  Object to the form.
21    THE WITNESS:  I would say that's a
22    fair assessment.
23  BY MR. CARTMELL:
24    Q.  And you mentioned that opioid

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 deaths continue to rise; is that right?
2     A.   That is correct.
3     Q.   And in part that's because opioids
4 continue to be diverted and abused, correct?
5         MR. HAMMOUD:  Object to the form.
6         THE WITNESS:  The rates that I've
7     seen involving prescription opioids have
8     appeared to be relatively flat over the
9     last several years.
10 BY MR. CARTMELL:
11     Q.   Staying at the same level, is that
12 what you mean?
13     A.   Correct, correct.
14     Q.   In other words, you're not saying
15 that it's going down --
16     A.   Correct.
17     Q.   -- you're just saying that it's
18 been flat?
19     A.   Correct.  And I'm not saying it's
20 not an issue either.
21     Q.   You're saying it's a serious issue,
22 aren't you?
23     A.   Oh, it's a very serious issue, yes.
24     Q.   Would you agree, and I think you

Page 171

1 said this, that the opioid epidemic is
2 worsening?
3         MR. HAMMOUD:  Object to the form,
4     mischaracterizes prior testimony.
5         THE WITNESS:  Yeah, it -- in terms
6     of what I see with heroin and illicit
7     fentanyl -- and that's fentanyl that's
8     not produced for medical purposes -- I
9     see pretty dramatic increases in those
10     products.
11 BY MR. CARTMELL:
12     Q.   And would you agree with me that
13 the opioid epidemic must be addressed in part
14 through the manufacturers --
15         MR. HAMMOUD:  Objection.
16 BY MR. CARTMELL:
17     Q.   -- of the opioids?
18     A.   Well, I think my program has been
19 part of helping to solve the problem.
20     Q.   Right.  In other words, you would
21 agree with me that in order to solve this
22 problem, the manufacturers -- and I'm not
23 eliminating any others -- but are a part of
24 that solution and have responsibility to do

Page 172

1 their duty to try to limit the amount of
2 diverted opioids.  Would you agree with that?
3         MR. HAMMOUD:  Object to the form.
4         THE WITNESS:  Oh, from -- yeah, we
5     have a different responsibility to help
6     prevent diversion.
7 BY MR. CARTMELL:
8     Q.   Okay.  Let's talk about
9 specifically what the law says that duty and
10 responsibility is for manufacturers of opioids.
11 I talked about this a little bit, but let me
12 start from the beginning, if I can, because I
13 want to make this very clear to the jurors, and
14 understandable.
15         Is it true that the sale of opioid
16 narcotic drugs is regulated by the law in
17 America?
18     A.   That's fair.
19         MR. HAMMOUD:  Object to the form.
20 BY MR. CARTMELL:
21     Q.   And for opioid narcotic drugs like
22 the ones that Teva sells and distributes, those
23 are called controlled substances; is that
24 right?

Page 173

1         MR. HAMMOUD:  Object to the form.
2         THE WITNESS:  That is correct.
3 BY MR. CARTMELL:
4     Q.   Okay.  And what does it mean for a
5 drug or a pharmaceutical like the opioids
6 produced by Teva and sold by Teva, what does it
7 mean to be a controlled substance?
8     A.   From my understanding, it is that
9 it's a -- that the manufacture, sale,
10 distribution of the products are controlled
11 federally by the federal government and that --
12 and as part of what's called the closed
13 distribution system.
14     Q.   Okay.  And I think you mentioned
15 this, but Congress actually passed what's
16 called the Controlled Substances Act that
17 governs and regulates the sale of opioid
18 narcotics and controlled substances?
19         MR. HAMMOUD:  Object to the form.
20         THE WITNESS:  Correct.
21 BY MR. CARTMELL:
22     Q.   Okay.  And I think you mentioned
23 this, too, but the Controlled Substances Act
24 went into effect in 1970; is that right?

Page 174

1    A.   That's correct.
2    Q.   Okay.  I want to actually hand you
3 Exhibit 4 in this case and ask you a few
4 questions about this document.
5        (Exhibit Teva-Tomkiewicz-004 marked
6        for identification and attached to the
7        transcript.)
8 BY MR. CARTMELL:
9    Q.   This was a document that was
10 produced in this litigation by Teva from their
11 internal files, and I just have a few questions
12 about this letter for you.
13       This is a letter dated --
14       MR. HAMMOUD:  Can you give him a
15       second to read the document.
16 BY MR. CARTMELL:
17    Q.   Mr. Tomkiewicz, have you seen this
18 letter before?
19    A.   Yes, I have.
20    Q.   In other words, you're familiar
21 with this letter based on your experience in
22 the industry related to diversion control of
23 opioid narcotics?
24    A.   Yes, I've seen it and have a copy

Page 175

1 of it.
2    Q.   Okay.  Now, I think actually we
3 found this letter in your file.  But as you see
4 here, this is from the U.S. Department of
5 Justice Drug Enforcement Administration.
6        Do you see that?
7    A.   Yes.
8    Q.   And we talked -- you kept calling
9 it the administration; I kept calling it the
10 agency.  I apologize.
11    A.   Administration, yeah.
12    Q.   But this is the entity that is --
13    A.   I've been wrong before.
14    Q.   Don't worry.  I am all the time.
15 But this is the entity that is charged with the
16 duty to enforce the act, the Controlled
17 Substances Act, correct?
18    A.   My understanding, yes.
19    Q.   Okay.  And I want to go through a
20 few things here.  The date of this is actually
21 February 7th of 2007.
22       Do you see that?
23    A.   Yes.
24    Q.   So that's actually over ten years

Page 176

1 ago, correct?
2    A.   Correct.
3    Q.   And this is a letter from, if you
4 look at the last page, somebody named Joseph
5 Rannazzisi.
6        Do you see that?
7    A.   Yes.
8    Q.   Okay.  And that's a name that
9 you're familiar with, right?
10    A.   Yes.
11    Q.   And is it true that this letter and
12 maybe some of the additional letters from
13 Mr. Rannazzisi have become well-known to
14 manufacturers and distributors of opioid
15 narcotics?  Is that fair?
16       MR. HAMMOUD:  Object to the form.
17       THE WITNESS:  I would say that that
18       is fair, yeah.
19 BY MR. CARTMELL:
20    Q.   Okay.  Now, you weren't working at
21 Teva at this time, but let me go through this
22 and ask you some questions about it.  But first
23 it states, Dear sir or madam, this letter is
24 being sent to every commercial entity in the

Page 177

1 United States registered with the Drug
2 Enforcement Administration to distribute
3 controlled substances.
4        Now, let me ask you, is it true
5 that a pharmaceutical company like Teva or a
6 distributor like AmerisourceBergen, they have
7 to register with the DEA in order to be allowed
8 to sell or distribute opioid narcotics?
9        MR. HAMMOUD:  Object to the form.
10       THE WITNESS:  Or manufacture.
11 BY MR. CARTMELL:
12    Q.   Or manufacture?
13    A.   Correct.
14    Q.   Okay.  It states, The purpose of
15 this letter is to reiterate the responsibility
16 of controlled substance distributors in view of
17 the prescription drug abuse problem our nation
18 currently faces.
19       Do you see that?
20    A.   Yes.
21    Q.   And we've already talked about
22 that, but clearly back in 2007, at that point
23 already our nation was faced with an opioid
24 addiction and abuse problem, correct?

Page 178

1  MR. HAMMOUD: Object to the form,
2  lacks foundation.
3  THE WITNESS: Well, I'd say that's
4  a fair assessment.
5  BY MR. CARTMELL:
6  Q. Okay. And then it states, As each
7  of you is undoubtedly aware, the abuse or
8  nonmedical use of controlled prescription drugs
9  is a serious and growing health problem in this
10  country.
11  And we've talked about that, and
12  you agree with that, correct?
13  A. Oh, yes.
14  Q. The next paragraph states, The
15  CSA -- and that would be the Controlled
16  Substances Act, right?
17  A. My understanding, yes.
18  Q. -- was designed by Congress to
19  combat diversion by providing for a closed
20  system of drug distribution in which all
21  legitimate handlers of controlled substances
22  must obtain a DEA registration, and as a
23  condition of maintaining such registration,
24  must take reasonable steps to ensure that their

Page 179

1  registration is not being utilized as a source
2  of diversion.
3  Do you see that?
4  A. Yes.
5  Q. Distributors are, of course, one of
6  the key components of the distribution chain.
7  If the closed system is to function properly as
8  Congress envisioned, distributors must be
9  vigilant in deciding whether a prospective
10  customer can be trusted to deliver controlled
11  substances only for lawful purposes. This
12  responsibility is critical as Congress has
13  expressly declared that the illegal
14  distribution of controlled substances has a
15  substantial and detrimental effect on the
16  health and welfare of the American people.
17  Do you see that?
18  A. Yes.
19  Q. And what this is talking about is
20  that distributors of these drugs and
21  manufacturers of these drugs that are selling
22  these opioid narcotic drugs have a
23  responsibility to try to do everything they can
24  to prevent the diversion of the drugs they are

Page 180

1  manufacturing, selling, and distributing,
2  correct?
3  MR. HAMMOUD: Object to the form.
4  THE WITNESS: Well, I think, you
5  know, doing everything we can, I think
6  that's a fair assessment.
7  BY MR. CARTMELL:
8  Q. Okay. And then if you go to the
9  next page, I want to talk to you about the
10  second paragraph. Here's where it talks
11  specifically about manufacturers like Teva.
12  In the second sentence it says,
13  Moreover, all registrants -- manufacturers,
14  distributors, pharmacies, and practitioners --
15  share responsibility for maintaining
16  appropriate safeguards against diversion.
17  Nonetheless, given the extent of prescription
18  drug abuse in the United States, along with the
19  dangerous and potentially lethal consequences
20  of such abuse, even just one distributor that
21  uses its DEA registration to facilitate
22  diversion can cause enormous harm.
23  Do you agree with that?
24  A. Yes.

Page 181

1  Q. Okay.
2  Accordingly, the DEA will use its
3  authority to revoke or suspend registrations in
4  appropriate cases.
5  Do you see that?
6  A. Yes.
7  Q. And that's a fact, right, that DEA,
8  as the enforcer of the law, the Controlled
9  Substances Act, if they find that a
10  manufacturer of opioids or a seller or
11  distributor of opioids is allowing diversion or
12  ignoring diversion, or not taking on their duty
13  to try to prevent diversion and abuse of these
14  drugs, the DEA can take away the registration
15  from that company. Is that fair?
16  A. They have --
17  MR. HAMMOUD: Object to the form.
18  THE WITNESS: I believe they have
19  that ability, yes.
20  BY MR. CARTMELL:
21  Q. And taking away a company's reg --
22  DEA registration is a really big deal. Would
23  you agree with that?
24  A. Oh, I would agree with that, yes.

Page 182

1    Q.  Because if the registration for the
2  company, a company like Teva, is taken away by
3  the DEA, then that company no longer has the
4  ability to sell or distribute these opioid
5  narcotic drugs.  Is that fair?
6    A.  Or manufacture.
7    Q.  Or manufacture them, right?
8    A.  Correct.
9    Q.  The next paragraph, if you look at
10 the second sentence, states, Listed first among
11 these factors is the duty of distributors to
12 maintain effective controls against diversion
13 of controlled substances into other than
14 legitimate medical, scientific, and industrial
15 channels.
16     Do you see that?
17   A.  Yes.
18   Q.  And does that mean there is a duty
19 by distributors and manufacturers of these
20 opioids, and sellers of these opioid narcotic
21 drugs, that they have to have controls in place
22 in their organization to help prevent the
23 diversion and abuse of these drugs?  Is that
24 what that means?

Page 183

1      MR. HAMMOUD:  Object to the form.
2      MR. NICHOLAS:  Object to form.
3      THE WITNESS:  And I would say
4    that's a fair assessment.
5  BY MR. CARTMELL:
6    Q.  Okay.  If you go down to the next
7  paragraph, it states, The DEA regulations
8  require all distributors to report suspicious
9  orders of controlled substances.
10     Do you see that?
11   A.  Yes.
12   Q.  Now, you talked about you were
13 actually hired by Teva to be the manager of the
14 suspicious order monitoring; is that right?
15   A.  Of the suspicious order monitoring
16 program, yes.
17   Q.  And when we talk about suspicious
18 orders related to opioids, what are we talking
19 about?
20   A.  We're talking about orders that may
21 be of an unusual size, pattern, or frequency.
22   Q.  Okay.  And I think it says this
23 here.  Let's talk about it.
24     The registration -- or excuse me.

Page 184

1  The registrant shall design and operate a
2  system to disclose to the registrant suspicious
3  orders of controlled substances.
4      Would you agree with me that it's
5  the duty of Teva and all manufacturers and
6  sellers and distributors of these opioids to
7  design a system so that they can, to the best
8  of their ability, have suspicious orders
9  identified?
10     MR. HAMMOUD:  Object to the form.
11     THE WITNESS:  I would say that's a
12   fair assessment, yes.
13 BY MR. CARTMELL:
14   Q.  It then states that the registrant
15 shall inform the field division office of the
16 administration in his area of suspicious orders
17 when discovered by the registrant.
18     Do you see that?
19   A.  Yes.
20   Q.  And "the registrant" is talking
21 about -- in your case Teva would be the
22 registrant because they have a DEA
23 registration, right?
24   A.  Correct.

Page 185

1    Q.  So Teva, according to the law
2  that's been in place since the 1970s, has had,
3  one, the duty to design a system that's
4  effective in helping them to identify the
5  diversion of opioids, correct?
6      MR. HAMMOUD:  Object to the form.
7      THE WITNESS:  Controlled
8    substances, yes.
9  BY MR. CARTMELL:
10   Q.  Including opioids, right?
11   A.  Correct.
12   Q.  And also they've got to operate a
13 system that's effective in disclosing
14 suspicious orders that come to them for these
15 opioids, correct?
16   A.  Correct.
17   Q.  Okay.  And that's been going on --
18 that's been the duty of companies like Teva and
19 distributors of opioids, that duty has existed
20 since the 1970s, correct?
21     MR. HAMMOUD:  Object to the form.
22     THE WITNESS:  I'm not certain when
23   the reg came into effect, but I'll take
24   your word as an attorney.

Page 186

BY MR. CARTMELL:

Q. Well, you know that that -- and I don't mean to put words in your mouth, but I take it from your experience, you know that this duty that we've been talking about, to have a suspicious order monitoring system, one that is effective, that duty has been in effect since before the 1990s. Fair enough?

A. Oh, that's fair.

Q. If you go a couple paragraphs down, it says, Thus, in addition to reporting all suspicious orders, a distributor has a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other-than-legitimate medical, scientific, and industrial channels.

Do you see that?

A. Yes.

Q. And that's the law, right?

MR. HAMMOUD: Object to the form, calls for a legal conclusion.

THE WITNESS: And that's my understanding.

Page 187

BY MR. CARTMELL:

Q. I should say that's your understanding of the law as a suspicious order monitoring manager at Teva. Is that fair?

A. That is a fair assessment, yes.

Q. In other words, your understanding as the manager at Teva since 2014 has been that if your company determines that there are suspicious orders for opioid narcotic drugs that has come to your company, you have the duty to report that to the DEA, correct?

MR. HAMMOUD: Object to the form.

THE WITNESS: That is correct.

BY MR. CARTMELL:

Q. And is it true that you also have the duty -- when your company determines that one of your customers has a suspicious order, you have the duty to, in fact, stop that order from being shipped so that it won't likely be diverted out in the community?

MR. HAMMOUD: Object to the form, calls for a legal conclusion.

THE WITNESS: Yeah, I haven't heard that there's a regulatory requirement to

Page 188

stop it, but I will say that I don't ship anything that we have determined to be suspicious.

BY MR. CARTMELL:

Q. In other words, would you agree with me that the most prudent practice and the most responsible practice would be that if a company like Teva and its manager like you determines that orders are suspicious for these opioids that are narcotics and that you know can be diverted and abused so readily, the best practice and the most responsible practice would be not to ship those orders? Do you agree with that?

MR. HAMMOUD: Object to the form.

THE WITNESS: I would agree to that.

BY MR. CARTMELL:

Q. Okay. It then states, In a similar vein, given the requirement under Section 823(e) that a distributor maintain effective controls against diversion, a distributor may not simply rely on the fact that the person placing the suspicious order is a DEA

Page 189

registrant and turn a blind eye to the suspicious circumstances.

Do you see that?

A. Yes.

Q. In other words, that means that a company like Teva, if you have an order for opioids that you think may be suspicious and could likely be diverted or abused out in the communities, you can't turn a blind eye and just say, well, I'll go ahead and ship it because the person who made the order is registered with the DEA. You can't do that, right?

MR. HAMMOUD: Object to the form.

THE WITNESS: And I would say that yes, that is correct.

BY MR. CARTMELL:

Q. And just on the -- I don't want to go through them, but if you turn the page, Mr. Tomkiewicz, you'll see that there are actually some hints by the DEA here that were given to distributors and manufacturers of these opioids as far as some things that might be a clue that an order might be suspicious or

Page 190

1 may be ultimately diverted.
2        Do you see that?
3    A.  Yes.
4    Q.  You can see that they give
5 circumstances that might be indicative of
6 diversion, right?
7    A.  Correct.
8    Q.  And you're very familiar with those
9 circumstances, I take it?
10    A.  Yes, I'm familiar with them.
11    Q.  And you take those circumstances or
12 these hints that are given by the DEA into
13 consideration as the manager that is monitoring
14 suspicious orders.  Is that fair to say?
15    A.  These specifically, when I'm
16 reviewing -- when we're reviewing things that
17 might be suspicious, I wouldn't say we refer
18 back to this document, but they're often
19 included in, you know, how we review.
20    Q.  Okay.  In other words, you're
21 saying, I don't get the document out, but these
22 are some of the things we look for when we're
23 looking for a suspicious order of opioid
24 narcotic drugs, right?

Page 191

1    A.  Or any controlled substance, yes.
2    Q.  Okay.  Now, if you go back to the
3 first page, this letter, which is often
4 referred to as the Rannazzisi letter, was --
5 well, let me ask you if you agree with me.
6        This letter that was sent from the
7 Drug Enforcement Administration to all of the
8 manufacturers and sellers and distributors of
9 opioids, including the high-risk opioids that
10 are narcotics and easily diverted, this was
11 sort of a reminder to these manufacturers,
12 sellers, and distributors of the
13 responsibilities and duties they had to help
14 prevent diversions of opioids.  Would you agree
15 with that?
16        MR. HAMMOUD:  Object to the form.
17        THE WITNESS:  And I would not agree
18    with the assessment in your question
19    that certain high-risk, at least as I
20    define them, are easily diverted.  I --
21 BY MR. CARTMELL:
22    Q.  Okay, well, let me restate --
23    A.  -- I would --
24    Q.  Fair enough.

Page 192

1    A.  Yeah, I would reject that.
2    Q.  Fair enough.  Let me restate the
3 question.
4        Would you agree with me that this
5 letter that's often referred to as the
6 Rannazzisi letter was the Drug Enforcement
7 Agency sending a letter to manufacturers,
8 distributors, sellers of opioid narcotic drugs
9 as sort of a reminder and reiterating the
10 duties and responsibilities that they had to
11 try to prevent the diversion of opioid narcotic
12 drugs?  Fair enough?
13        MR. HAMMOUD:  Object to the form.
14        THE WITNESS:  And I would say
15    that's a fair assessment.
16 BY MR. CARTMELL:
17    Q.  Okay.  Do you know, as you sit here
18 today, when it was that Teva first started
19 selling or distributing opioids?
20    A.  No, I don't.
21    Q.  Do you have any clue?
22        MR. HAMMOUD:  Objection, asked and
23    answered.
24        THE WITNESS:  I have no idea.

Page 193

1 BY MR. CARTMELL:
2    Q.  Okay.  It should be noted, though,
3 I think, that when you arrived at Teva in 2014,
4 at that point I take it you know that they were
5 selling lots of different Class II opioid
6 products.  Is that fair?
7        MR. HAMMOUD:  Object to the form,
8    lacks foundation.
9        THE WITNESS:  And -- sorry, but I
10    don't like the term "lots."  I like
11    using numbers.
12 BY MR. CARTMELL:
13    Q.  Well, I counted, from the documents
14 I received, that today, Teva is selling, I
15 believe, 18 or 19 Class II opioid narcotic
16 drugs.  Is that consistent with your
17 understanding?
18    A.  That could be consistent, yes.
19    Q.  And I said "lots."  But when you
20 arrived in 2014, is it fair to say that Teva
21 was selling a number of different opioid --
22 Class II opioid narcotic drugs?  Fair to say?
23        MR. HAMMOUD:  Object to the form.
24        THE WITNESS:  I would say that's

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  fair to say.
2  BY MR. CARTMELL:
3      Q.  And fair to say that Teva sells and
4  distributes millions of prescriptions for
5  opioid narcotic drugs?  Fair?
6          MR. HAMMOUD:  Object to the form.
7          THE WITNESS:  We don't dispense
8      prescriptions.
9  BY MR. CARTMELL:
10     Q.  Bad question.  Thank you for
11 correcting that.
12         Is it fair to say that Teva sells
13 and distributes millions and millions of opioid
14 narcotic drug pills per year?
15         MR. HAMMOUD:  Object to the form.
16         THE WITNESS:  I haven't looked at
17     the specific number of dosage units, but
18     I'm sure it's in the millions.  But
19     beyond that, I couldn't say millions and
20     millions.  And to say -- we've sold a
21     good number of them.
22 BY MR. CARTMELL:
23     Q.  And I think I've seen data that
24 suggests that today, or since 2016, Teva has

Page 195

1  been, as far as the sales of opioid drugs,
2  about at the 9 to 10 percent of the sales are
3  of Teva opioid products.  Is that consistent
4  with your understanding?
5          MR. HAMMOUD:  Object to the form,
6      lacks foundation.
7          THE WITNESS:  I don't know that
8      offhand.
9  BY MR. CARTMELL:
10     Q.  But you agree that Teva is one of
11 the larger sellers and distributors of opioid
12 narcotic drugs in America, correct?
13     A.  I would say that's a fair
14 assessment, yes.
15     Q.  And those are all things that, when
16 you came to Teva, some of the things that you
17 looked into, I take it, and learned as you
18 started in your job as the new suspicious order
19 manager; is that right?
20     A.  Right.  Well, looking at the -- you
21 know, which specific products we were selling,
22 which, of course, was a different mix when I
23 started from what is currently being sold.
24     Q.  We talked about the law, the

Page 196

1  Controlled Substances Act, and the DEA
2  enforcement of a law related to the sales of
3  opioids in America.  And is it true that the
4  DEA has actually left the responsibility to the
5  manufacturers and sellers and distributors of
6  opioids to design, internally, systems to help
7  prevent opioid diversion?
8          MR. HAMMOUD:  Objection to the
9      form.
10         THE WITNESS:  Could you ask that
11     again?  I got lost in the question.
12 BY MR. CARTMELL:
13     Q.  Sure.  Is it true that the DEA has
14 left the responsibility or relies on the
15 manufacturers and distributors and sellers of
16 opioid narcotic drugs in America to develop the
17 systems to help divert -- their internal
18 systems to help divert opioids -- help to
19 prevent the diversion of opioids?
20     A.  So are --
21         MR. HAMMOUD:  Same objection.
22         THE WITNESS:  Yeah, are you saying
23     that the DEA has sort of left the
24     manufacturers on their own to develop

Page 197

1  their own system to detect potential
2  diversion?
3  BY MR. CARTMELL:
4      Q.  Let me restate the question to make
5  it more clear.
6          As we saw from the Controlled
7  Substances Act, it requires manufacturers like
8  Teva to develop internal systems that will
9  help, for one thing, identify suspicious orders
10 of opioids, right?
11     A.  Correct.
12     Q.  It also said in the Controlled
13 Substances Act that manufacturers like Teva who
14 sell opioids have to design systems internally
15 to help prevent the diversion of opioids,
16 correct?
17         MR. HAMMOUD:  Object to the form.
18         THE WITNESS:  Of any controlled
19     substance.
20 BY MR. CARTMELL:
21     Q.  Including opioids, right?
22     A.  Yes.
23     Q.  And is it true that the DEA
24 actually relies on Teva and the individual

Page 198

1 manufacturers and sellers and distributors of
2 opioids to, in fact, develop those systems and
3 make sure they have effective systems in place
4 and monitoring programs in place so that they
5 can help divert the -- or help prevent the
6 diversion of opioids?
7          MR. HAMMOUD:  Same objection.
8          THE WITNESS:  And I wouldn't say --
9     I couldn't say that the DEA relies on
10    manufacturers and distributors for that.
11    Because when it comes to suspicious
12    order monitoring, they really haven't
13    given any feedback.
14 BY MR. CARTMELL:
15    Q.  Okay.  But you know from the
16 Controlled Substances Act that you have to have
17 systems in place --
18    A.  Correct.
19    Q.  -- right?  And the DEA does not
20 develop those systems for you, correct?
21    A.  The DEA has not developed our
22 system, no.
23    Q.  Okay.  And so you are left as a
24 manufacturer, meaning Teva, of these opioids to

Page 199

1 develop those systems yourself, correct?
2    A.  Correct.
3    Q.   And the DEA does rely on each of
4 the companies like Teva to develop those
5 systems to help prevent opioid diversion,
6 correct?
7          MR. HAMMOUD:  Object to the form.
8          THE WITNESS:  Well, and again, I
9     can't say that the DEA relies on because
10    I don't know what the DEA is doing on
11    their end.  So in terms of, you know,
12    saying that the DEA relies on, you know,
13    manufacturers or distributors or even
14    down to pharmacies or practitioners, I
15    can't say that.
16 BY MR. CARTMELL:
17    Q.  Okay.  One of the things, though,
18 that companies like Teva, as we discussed, are
19 interested in is maximizing the sales of their
20 prescription drugs like opioids, including
21 opioids, correct?
22          MR. HAMMOUD:  Object to the form,
23    lacks foundation.
24          THE WITNESS:  Maximizing?  I think

Page 200

1     that's a horrible word for it.  No
2     offense, but...
3 BY MR. CARTMELL:
4    Q.  How would you describe it?
5    A.  Companies want to increase
6 profitability.  That's the reason why people
7 are in business.
8    Q.  Mr. Tomkiewicz, the DEA, as we saw,
9 has told Teva and companies like Teva who sell
10 and distribute opioids to set up systems that
11 will identify suspicious orders of opioids,
12 correct?
13    A.  Correct.
14    Q.  And they've asked those companies
15 to take it upon themselves to provide the
16 resources and actual processes to put in
17 effective types of monitoring programs to find
18 suspicious orders, correct?
19          MR. HAMMOUD:  Object to the form.
20          THE WITNESS:  I would say that's a
21    fair assessment.
22 BY MR. CARTMELL:
23    Q.  And these same companies that the
24 DEA has asked to set up these systems so that

Page 201

1 they can find these suspicious orders are
2 companies like Teva who, as you said, are
3 interested in maximizing their profits,
4 correct?
5    A.  I never said that.
6          MR. HAMMOUD:  Objection,
7    mischaracterizes his testimony.
8          THE WITNESS:  In fact, I
9    categorically denied the word
10    "maximize."
11 BY MR. CARTMELL:
12    Q.  How did you describe it?  I'll use
13 your words.
14    A.  I said that any company wants to
15 increase profits.  That's why you're in
16 business.
17    Q.  So these companies that the DEA has
18 asked to set up these systems to help prevent
19 the diversion of opioids are the same companies
20 that want to increase their profits, correct?
21    A.  I think that's a goal of business.
22    Q.  And part of increasing profits, as
23 we've discussed, is potentially, or can be,
24 increasing their sales, correct?

Page 202

1    A.  Correct.

2    Q.  So they're asking companies that
3 want to increase their sales and increase their
4 profits to set up systems that could, if they
5 find suspicious orders, decrease their sales,
6 correct?

7        MR. HAMMOUD:  Object to the form.

8        THE WITNESS:  Well, and that's --
9    that is correct.  I would say that's a
10    fair assessment.

11 BY MR. CARTMELL:

12    Q.  So these same companies that
13 they're saying that we want you to identify
14 these orders that are suspicious, and we want
15 you to make sure that they are stopped so
16 they're not diverted, are the same companies
17 that want to increase sales and increase
18 profits over time, correct?

19    A.  Well, it's going to be difficult to
20 increase sales if you don't have a DEA
21 registration.

22    Q.  I understand that, but my point is
23 simply that there is an inherent conflict in
24 that system, correct?

Page 203

1    A.  Well, that's what I'm saying.
2 There isn't an inherent conflict.

3    Q.  You don't believe that's a conflict
4 or sort of, so to speak, the fox guarding the
5 hen house?

6    A.  No.

7        MR. HAMMOUD:  Object to the form.

8        MR. CARTMELL:  How long have we
9    been going?

10        MR. HAMMOUD:  About an hour and
11    three minutes.

12        MR. CARTMELL:  Do you want to take
13    a quick break?

14        THE WITNESS:  A break sounds good.

15        MR. CARTMELL:  Like ten minutes?

16        VIDEO OPERATOR:  Going off the
17    record, 2 p.m.

18        (Recess from 2:03 p.m. until
19    2:15 p.m.)

20        VIDEO OPERATOR:  Back on record at
21    2:15 p.m.

22 BY MR. CARTMELL:

23    Q.  Mr. Tomkiewicz, we're back on the
24 record.  Are you ready to proceed?

Page 204

1    A.  Yes, I am.

2    Q.  I want to ask you a few more
3 questions about Exhibit 3.  I think it's in
4 front of you.  And this was the PowerPoint
5 presentation from March of 2014, which was just
6 a few months after you arrived at the company
7 to start working, correct?

8    A.  Correct.

9    Q.  And if we look at page 3, as we
10 discussed, there was a proposed DEA compliance
11 organization, and as we discussed, there was a
12 small restructuring or a few people moving
13 around, according to this proposed
14 organization; is that correct?

15    A.  Correct.

16    Q.  And did that small restructuring
17 occur at that time; do you know?

18    A.  I believe it did.

19    Q.  Okay.  And if you look at where you
20 are, Joe Tomkiewicz, it states under you, you
21 had one individual reporting to you, Matt
22 Benkert; is that right?

23    A.  That's correct.

24    Q.  And his position was -- it

Page 205

1 indicates he's an investigator; is that right?

2    A.  Correct.

3    Q.  So does that mean that he would be
4 somebody who would actually be involved in
5 investigating the suspicious orders?

6    A.  Potential suspicious orders.

7    Q.  Okay.

8    A.  Investigating orders to determine
9 if they're suspicious.

10    Q.  I got you.  Okay.  And we'll talk
11 about that process more, but I think what
12 you're talking about is orders would be
13 sometimes flagged or pulled aside or pended
14 after going through the computer system or the
15 algorithm, and then there would be an
16 investigation of that to see if it was
17 suspicious or not, correct?

18    A.  Correct.

19    Q.  Okay.  Now, how many actually of
20 the 16 employees in this organization or this
21 department were actually involved in the
22 investigation of suspicious orders or pended
23 orders?

24    A.  Oh, of pended orders?  It was

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 primarily -- primarily Matt and myself.
2     Q.  Okay.  So of the 16 individuals
3 indicated in the organization as of March of
4 2014, it sounds like what you were saying is
5 you and your direct -- well, the person who was
6 directly under you, Matt, were the two that
7 would actually take on the job of investigating
8 whether or not orders from customers for
9 opioids were suspicious or not.  Is that fair?
10     A.  That is fair.
11     Q.  Okay.  And if you go to the next
12 page of this PowerPoint, it talks about
13 predictions, and then it states, Controlled
14 substances - Teva, 13 sites with DEA
15 registrations.
16     Do you see that?
17     A.  Yes.
18     Q.  What does that mean?
19     A.  13 locations, each with an
20 individual DEA registration.
21     Q.  Okay.  And so you had 13 different
22 sites that were distributing opioids or
23 narcotics and were DEA registered; is that
24 correct?

Page 207

1     A.  No.
2     MR. HAMMOUD:  Object to the form.
3     THE WITNESS:  No, that's not
4    correct.
5 BY MR. CARTMELL:
6     Q.  Okay.  Well, 13 -- strike that.
7     It also states that you have a
8 total of 44 DEA registrations.
9     Do you see that?
10     A.  Yes.
11     Q.  Okay.  And so you had 16 people
12 that were in charge of what, with respect to
13 the DEA registrations?  Was it to make sure
14 they were in compliance?
15     MR. HAMMOUD:  Object to the form.
16     THE WITNESS:  Well, it depends upon
17    the person and their specific
18    responsibilities and their location.
19 BY MR. CARTMELL:
20     Q.  Okay.  As far as your DEA
21 compliance group, is it true that those 16
22 employees were located in lots of different
23 locations?
24     A.  In different locations, yes.

Page 208

1     Q.  Okay.  Was Colleen McGinn in the
2 same location as you?
3     A.  No.
4     Q.  Okay.  And where was she located?
5     A.  I believe she's in the Frazer
6 location.
7     Q.  Okay.  But there wasn't one
8 centralized location for all of the DEA control
9 employees; they were spread out among the
10 different offices, correct?
11     MR. HAMMOUD:  Object to the form.
12     THE WITNESS:  Correct.
13 BY MR. CARTMELL:
14     Q.  Is that correct?
15     A.  That's -- is correct.
16     Q.  It says, CS -- that stands for
17 controlled substances, correct?
18     A.  Yes.
19     Q.  -- represent X percent of Teva
20 sales.  What does that mean?
21     A.  I don't know specific.  I can make
22 a conjecture.
23     Q.  Okay.
24     A.  That this is a draft.

Page 209

1     Q.  Okay.  Do you know, though, what
2 percent of controlled substances was as far as
3 the sales of Teva at that time?
4     A.  No, I don't.
5     Q.  And then it says, DEA compliance
6 imperative.
7     What's your understanding of what
8 that means?
9     A.  Don't know.
10     Q.  Okay.  If you'd turn the page,
11 under predictions, it states -- and actually I
12 want to go to page 6.  It states, DEA culture
13 change.
14     Do you see that?
15     A.  Yes.
16     Q.  Was there a feeling inside the
17 company at that time that there had been a
18 culture change in the DEA related to the
19 enforcement of opioid diversion?
20     MR. HAMMOUD:  Object to the form.
21     THE WITNESS:  I don't remember
22    specific conversations about a culture
23    change, although, you know, I can say
24    from my own experience that I believe

Page 210

1    that it seemed like there was.
2    BY MR. CARTMELL:
3        Q.  Okay.  So the fact that this
4    PowerPoint presentation that's being given in
5    March of 2014 mentions a DEA culture change,
6    that was consistent with your feeling about
7    that time.  Is that fair?
8        A.  That's a fair assessment.
9        Q.  And was that feeling that you had
10   that the DEA -- the culture within the DEA was
11   changing and they were increasing or ramping up
12   their enforcement, was that a feeling
13   particularly related to manufacturers like
14   Teva?
15       MR. HAMMOUD:  Object to the form,
16       lacks foundation.
17       THE WITNESS:  That's hard to say
18       from, you know -- you know, what we may
19       have thought their focus was.  I
20       couldn't say one way or another.
21   BY MR. CARTMELL:
22       Q.  At any rate, it states here that
23   there was an increase in regulatory actions.
24       Do you see that?

Page 211

1        A.  Yes.
2        Q.  And it mentions that there were
3    record-setting fines by the DEA in 2013.
4        Do you see that?
5        A.  Yes.
6        Q.  And that's consistent with your
7    memory?
8        A.  Yes.
9        Q.  In other words, around this time in
10   2013, the DEA was fining, as sort of a
11   sanction, companies like manufacturers and
12   sellers and distributors of opioids, correct?
13       A.  Correct.
14       Q.  And they were doing that at a
15   record-setting pace, correct?
16       A.  What it seemed, yes.
17       Q.  Okay.  And then there was also
18   actions being taken by the DEA to revoke the
19   registrations, as is indicated here, correct?
20       A.  Yes.
21       Q.  Okay.  The next page talks about
22   DEA compliance, and it states that expertise
23   related to DEA compliance is only gained
24   through experience, and it typically takes

Page 212

1    three to five years to obtain competency.
2        Do you see that?
3        A.  Yes.
4        Q.  What does that mean?
5        A.  I couldn't say because I --
6        MR. HAMMOUD:  Object to the form.
7        THE WITNESS:  I didn't write it.
8    BY MR. CARTMELL:
9        Q.  Okay.  Who gave this; do you know?
10       A.  Don't know.  Like I said, I think
11   it's a draft.
12       Q.  Are you guessing that this was a
13   PowerPoint presentation that was ultimately
14   given by Colleen McGinn?
15       A.  It may have been.
16       Q.  Okay.  And then it talks about an
17   investment in developing staff and that
18   retention is critical.
19       Was that the company's focus at that
20   time to try to hire more DEA compliance
21   employees because there was a change in culture
22   at the DEA and they were enforcing more
23   actions?
24       MR. HAMMOUD:  Object to the form,

Page 213

1    calls for speculation.
2        THE WITNESS:  Yeah, and I don't
3        remember any discussion about that.
4    BY MR. CARTMELL:
5        Q.  Okay.  Once you became employed in
6    early 2014 by Teva as the manager of the
7    suspicious order monitoring program, did you
8    learn how many customers it was that Teva had
9    ordering opioid narcotics?
10       A.  Well, ordering controlled
11   substances.
12       Q.  How many, approximately, customers
13   did Teva have at that time?
14       A.  In terms of ship-to locations,
15   which would be individual registrant
16   locations -- so like, for example, if I'm
17   saying AmerisourceBergen -- I'm not saying
18   AmerisourceBergen is one, but it's going to
19   be -- each of their distribution centers is
20   going to be separate.  It was around 200
21   locations.
22       Q.  So 200 as you would classify as
23   customers, approximately, at that time?
24       MR. HAMMOUD:  Object to the form.

Page 214

1       THE WITNESS:  And again, not
2   customers but locations where we would
3   ship, registrants.
4   BY MR. CARTMELL:
5       Q.  I understand.  But are you talking
6   about 200 separate locations that orders would
7   come in from, approximately?
8       A.  Correct, correct.
9       Q.  And when you started at Teva as the
10  manager of the suspicious order monitoring
11  program, approximately how many orders would
12  Teva receive for these opioid narcotic drugs on
13  a monthly basis; do you know?
14      A.  Offhand, I don't know.
15      Q.  Do you have any idea?
16      A.  Oh, I couldn't speculate.
17      Q.  We may look at some documents that
18  talk about that later.
19      Okay.  So let's go back in time and
20  put this in perspective.  But January of 2014,
21  you come to Teva with experience, having been a
22  manager of suspicious order monitoring and
23  diversion control of opioids from your days at
24  AmerisourceBergen, correct?

Page 215

1       A.  Correct.
2       MR. HAMMOUD:  Object to the form.
3   BY MR. CARTMELL:
4       Q.  And as a part of that, I think you
5   mentioned previously in your testimony earlier
6   that there was a program at AmerisourceBergen
7   that was in place to try to identify suspicious
8   orders of opioids, correct?
9       A.  Controlled substances.
10      Q.  Including opioids, correct?
11      A.  Correct, correct.
12      Q.  And you understand in this case
13  we're just talking about Class II opioids?
14      A.  What do you mean, in this case?
15      MR. HAMMOUD:  Object to the form.
16  BY MR. CARTMELL:
17      Q.  Did you have an understanding that
18  in this lawsuit, in this case against Teva,
19  that we are focusing on or the subject of that
20  is the sales and marketing and distribution of
21  Class II opioids?
22      MR. HAMMOUD:  Object to the form.
23      THE WITNESS:  I've heard that.  But
24      from my perspective, I look at all

Page 216

1   controlled substances.
2   BY MR. CARTMELL:
3       Q.  I understand.  But when I talk
4   about the sale and distribution of opioids, I'm
5   talking about the opioids that we're referring
6   to in this case.  And I just want to make sure
7   you understand that.
8       A.  Okay.  And I just want it to be
9   clear that when I talk about suspicious order
10  monitoring, I'm not talking strictly about
11  opioids; I'm talking about all controlled
12  substances.
13      Q.  I understand.
14      A.  And certain noncontrolleds.
15      Q.  Okay.  So you come to Teva with
16  this experience of actually working in a system
17  that had been set up to satisfy the Controlled
18  Substances Act as far as a suspicious order
19  monitoring program, correct?
20      MR. HAMMOUD:  Object to the form,
21      calls for a legal conclusion.
22      THE WITNESS:  Correct.
23  BY MR. CARTMELL:
24      Q.  And when you got to Teva, I take it

Page 217

1   you had to become familiar with whether or not
2   they had a suspicious order monitoring program
3   already in place, correct?
4       A.  No.  I had to work -- because there
5   was a suspicious order monitoring program in
6   place, but one of the things that I was tasked
7   with coming in was improving the system.
8       Q.  Okay.  Let me follow up on that.
9       A.  Yeah.
10      Q.  Is it fair to say then, when you
11  were being recruited by Teva and interviewing
12  with them, the individuals that you talked to,
13  including Colleen McGinn, told you that they
14  were going to bring you in as someone with
15  expertise related to suspicious order
16  monitoring?
17      A.  Yes.
18      Q.  Okay.  And that they were going to
19  bring you to Teva as -- with that expertise in
20  hopes that you could help them improve their
21  suspicious order monitoring program?
22      A.  Yes.
23      Q.  Okay.  And make it more robust, for
24  example?

Page 218

1    A.  Well, that would be an improvement.
2        MR. HAMMOUD:  Object to the form.
3  BY MR. CARTMELL:
4    Q.  One way to say that's an
5  improvement, correct?
6    A.  Yeah.  Yeah, that's a fair
7  assessment.
8    Q.  Okay.  And with the hopes that you
9  could bring your expertise from your work at
10 AmerisourceBergen to not only improve the
11 program but to make sure that it was in
12 compliance with the DEA, fair?
13   A.  Well, that's a -- sort of a root
14 function of it, yes.
15   Q.  So yes, right?
16   A.  Yes, to ensure compliance.
17   Q.  Okay.  And so when you got there,
18 though, you said there was a program.
19 Obviously you had to do your investigation to
20 determine, for example, what Teva had been
21 doing with respect to suspicious order
22 monitoring, for example, as far as due
23 diligence, for example, correct?
24   A.  Correct.

Page 219

1    Q.  You had to determine how and when
2  or whether they were actually identifying
3  suspicious orders of opioids from their
4  customers, correct?
5        MR. HAMMOUD:  Object to the form.
6        THE WITNESS:  Well, yeah, and I
7    don't think that that's a fair
8    assessment because the -- because they
9    did have a system to help -- sorry, I
10   stutter.  They did have a system in
11   order to detect suspicious orders of
12   controlled substances.  So it -- and the
13   idea was that it was going to be
14   replaced with something new.  And there
15   were other programs that were looked at,
16   commercial programs, but when I came in,
17   I decided that we should go with a
18   program of my own design.
19 BY MR. CARTMELL:
20   Q.  Great.  I'll follow up on that
21 then.  That's a lot of information.  But let me
22 know if I'm correct in this statement, based on
23 my review of the documents.
24       When you were hired, you were asked

Page 220

1  to come in and to make changes to their
2  suspicious order monitoring program, correct?
3    A.  Correct.
4    Q.  Okay.  And over the next year and a
5  half when you came over and became the manager
6  of the suspicious order monitoring program,
7  you, in fact, did make multiple changes to the
8  program, correct?
9    A.  Correct.
10   Q.  All changes that you thought made
11 the program better, correct?
12   A.  Correct.
13   Q.  And more in compliance with the
14 DEA, correct?
15       MR. HAMMOUD:  Objection, calls for
16   a legal conclusion.
17       THE WITNESS:  No, no, that's not a
18   fair assessment.
19 BY MR. CARTMELL:
20   Q.  Okay.  Well, let me -- let me --
21 let's go through this and we'll talk about
22 that.
23       When you were at AmerisourceBergen,
24 were you involved there in drafting their

Page 221

1  standard operating procedures for their
2  suspicious order monitoring program?
3    A.  No.
4    Q.  Okay.  They existed, it's just that
5  you were not involved in drafting those, fair?
6    A.  Correct.
7    Q.  And those were standard operating
8  procedures that governed the actual suspicious
9  order monitoring program, correct?
10   A.  I would like to say that they
11 describe the process.
12   Q.  Okay.  But they were --
13   A.  Not necessarily govern but describe
14 the process.
15   Q.  I understand.  If somebody were to
16 ask AmerisourceBergen, did you have standard
17 operating procedures that would tell how the
18 process worked or how it was supposed to work,
19 there were those policies in effect, correct?
20   A.  I would say that's fair, yes.
21   Q.  Okay.  You mentioned previously
22 that you were also involved in the due
23 diligence that was being done at
24 AmerisourceBergen when they were trying to

Page 222

1 identify whether or not orders that came into
2 AmerisourceBergen for opioids were potentially
3 suspicious, correct?
4 　　A. I got lost in the question. Sorry.
5 　　Q. Let me start over. You've also
6 testified earlier that you were involved in due
7 diligence at AmerisourceBergen related to
8 whether or not certain orders that
9 AmerisourceBergen would receive were
10 suspicious, correct?
11 　　A. Well, due diligence implies
12 customer due diligence. So as far as due
13 diligence in reviewing a suspicious order, I
14 just want to clarify that that language isn't
15 typically used in the review of an order that
16 is held for manual investigation. There may be
17 due diligence performed as part of an
18 investigation, but not necessarily.
19 　　Q. My fault. Let me try to clarify
20 that. A suspicious order monitoring program
21 has lots of different facets to the program,
22 correct?
23 　　A. Correct.
24 　　Q. In other words, one that is

Page 223

1 effective and one that you believe is
2 appropriate, correct?
3 　　A. One?
4 　　　MR. HAMMOUD: Object to the form.
5 BY MR. CARTMELL:
6 　　Q. Let me strike it. A program that
7 you believe -- for suspicious order monitoring
8 that you believe is appropriate and in
9 compliance with the DEA has multiple facets to
10 the program, correct?
11 　　　MR. HAMMOUD: Object to the form,
12 　　calls for a legal conclusion.
13 　　　THE WITNESS: It could be a fair
14 　　assessment.
15 BY MR. CARTMELL:
16 　　Q. Okay. In other words, it's not
17 just the new orders coming in, going through a
18 program on the computer, an algorithm, that's
19 not the only facet or part of the program,
20 correct?
21 　　A. That is correct.
22 　　Q. Another facet of an appropriate
23 DEA-compliant suspicious order monitoring
24 program would include due diligence, for

Page 224

1 example, on new clients?
2 　　A. Yes.
3 　　Q. And also would include due
4 diligence once you have pended orders that
5 potentially are suspicious, due diligence to
6 determine whether or not those orders are, in
7 fact, suspicious, correct?
8 　　　MR. HAMMOUD: Object to the form.
9 　　　THE WITNESS: And again, I wouldn't
10 　　call it due diligence. I would call it
11 　　an investigation.
12 BY MR. CARTMELL:
13 　　Q. Okay. I see. But all of those
14 things you were doing at AmerisourceBergen
15 before you came over to Teva, correct?
16 　　　MR. HAMMOUD: Object to the form.
17 　　　THE WITNESS: Correct.
18 BY MR. CARTMELL:
19 　　Q. Okay. I saw your deposition
20 previously in the West Virginia Attorney
21 General case against AmerisourceBergen and I
22 believe you testified that you had experience
23 before you came to Teva from AmerisourceBergen
24 with reporting suspicious orders of opioids to

Page 225

1 the DEA, correct?
2 　　A. That is correct.
3 　　Q. In other words, while you were at
4 AmerisourceBergen, I think you testified in
5 your deposition that you had been involved in
6 investigating and reporting hundreds of
7 suspicious orders per month to the DEA,
8 correct?
9 　　A. Correct.
10 　　Q. So fair to say, and I just want to
11 make it clear, prior to coming to Teva, you
12 had, as the manager and investigator over the
13 years at that company, been involved in
14 reporting hundreds of suspicious orders to the
15 DEA, fair?
16 　　A. That is correct.
17 　　Q. Okay. And I take it you also had
18 experience from your time as manager at
19 AmerisourceBergen or investigator there with
20 actually finding suspicious orders for opioids
21 from customers and actually stopping the
22 shipment of those opioid narcotic drugs. Is
23 that fair?
24 　　　MR. HAMMOUD: Object to the form.

Page 226

1    THE WITNESS:  Well, if something
2    was identified as suspicious, the order
3    should be stopped.
4  BY MR. CARTMELL:
5    Q.  And that's the policy, right?
6    A.  Correct.
7    Q.  Or was?
8    A.  Correct, correct.
9    Q.  Now, let's talk about Teva's
10  suspicious order monitoring program.  Would you
11  agree with me that before you showed up to Teva
12  in 2014, Teva was substantially out of
13  compliance when it came to monitoring and
14  reporting suspicious orders from customers of
15  high-risk opioid narcotics?
16    MR. HAMMOUD:  Object to the form,
17    calls for a legal conclusion.
18    THE WITNESS:  And that would be no.
19  BY MR. CARTMELL:
20    Q.  Okay.  Let's talk about -- strike
21  that.
22    Would you agree with me that the
23  suspicious order monitoring program at Teva,
24  when you started as the manager in 2014, was

Page 227

1  deficient in some respects?
2    MR. HAMMOUD:  Object to the form,
3    calls for a legal conclusion.
4    THE WITNESS:  I would say no.
5  BY MR. CARTMELL:
6    Q.  You talked about making
7  improvements to the program and changes to the
8  program.
9    When you arrived at Teva in 2014 as
10  the new manager of the suspicious order
11  monitoring program, were there any standardized
12  or standard operating procedures for the
13  program in effect?
14    A.  There were procedures, just not
15  written.
16    Q.  Let me see if I understand you.
17  There were oral understandings of ways that the
18  program would work, but there was nothing in
19  writing?
20    A.  There was -- there were no formal
21  standard operating procedures.
22    Q.  Okay.  So let me restate the
23  question just to make sure for the record we're
24  clear.

Page 228

1    When you arrived at Teva in 2014 as
2  the new manager of the standard -- or excuse
3  me -- the suspicious order monitoring program,
4  is it true that there were no formal standard
5  operating procedures for the program in place?
6    A.  I would say -- I wouldn't say
7  formal.  I would say there were no written.
8    Q.  Okay.  Were you surprised?
9    A.  No.
10    Q.  Had you ever worked anyplace before
11  that had a suspicious order monitoring program
12  that didn't have formal written standard
13  policies?
14    A.  Well, I only worked with suspicious
15  order monitoring at two places.
16    Q.  And the place you had worked
17  before, as we discussed, had those, correct?
18    A.  Right.
19    Q.  And would you agree with me that if
20  an audit had been done of Teva when you arrived
21  to audit the suspicious order monitoring
22  program that there would have been a finding of
23  out of compliance by Teva without standard
24  operating procedures for the suspicious order

Page 229

1  monitoring program?
2    MR. HAMMOUD:  Objection to the
3    form.  Calls for a legal conclusion.
4    THE WITNESS:  Well, in terms of
5    that question, that would be
6    speculation, and I would say probably.
7  BY MR. CARTMELL:
8    Q.  Okay.  Just so it's clear, you
9  agree with me that when you arrived when there
10  were no standard operating procedures in the
11  suspicious order monitoring program at Teva,
12  your belief would have been that if an audit
13  would have been done by the DEA, the company
14  would have been found to be noncompliant at
15  that point.  Fair?
16    MR. HAMMOUD:  Same objection.
17    THE WITNESS:  No.  No, I wouldn't
18    say that that's fair.
19  BY MR. CARTMELL:
20    Q.  "Out of compliance," didn't you
21  just say that?
22    A.  No, I didn't say "out of
23  compliance."
24    Q.  Okay.

Page 230

1    MR. HAMMOUD: Objection.
2    Mischaracterizes the prior testimony.
3    BY MR. CARTMELL:
4        Q. Mr. Tomkiewicz, I just asked you a
5    question: Would you agree with me that if an
6    audit had been done at Teva when you arrived to
7    audit the suspicious order monitoring program,
8    that there would have been a finding of out of
9    compliance by Teva without standard operating
10   procedures for the suspicious order monitoring
11   program?
12       There was an objection, and your
13   answer was: Well, in terms of that question,
14   that would be speculation, and I would say
15   probably.
16       Correct? Was that your testimony
17   at that time?
18       A. So I didn't say that it was out of
19   compliance. I said it could be considered
20   probably.
21       Q. In other words, rather than saying
22   for certain that it would have been out of
23   compliance, your belief is that it probably
24   would have been considered out of compliance?

Page 231

1        MR. HAMMOUD: Objection. Calls for
2    a legal conclusion.
3        THE WITNESS: It could have been.
4    It could have been.
5    BY MR. CARTMELL:
6        Q. Actually, you said "probably,"
7    correct?
8        A. Let me clarify that to "could have
9    been."
10       Q. Okay. At any rate, when you showed
11   up to Teva, one of the first things that you
12   decided needed to be done to improve the
13   suspicious order monitoring program at Teva as
14   a manager of that program was to draft and
15   develop written standardized operating
16   procedures for the program, correct?
17       A. Written standardized procedures,
18   yes.
19       Q. Okay. And why was it that you
20   thought those standardized operating procedures
21   were necessary?
22       MR. HAMMOUD: Objection.
23       Mischaracterizes his prior testimony.
24   BY MR. CARTMELL:

Page 232

1        Q. Go ahead.
2        A. Because I felt that the process
3    should be written down.
4        Q. Okay. Why is that the most prudent
5    way to go with respect to the procedures for a
6    suspicious order monitoring program?
7        MR. HAMMOUD: Objection to the
8    form.
9        THE WITNESS: Yeah, I don't think
10       that's limited to a suspicious
11       order monitoring program. If you have a
12       formal procedure in something, you
13       should write it down.
14   BY MR. CARTMELL:
15       Q. Is that so that the people who are
16   responsible and have duties to work within that
17   program have a place where they can go and know
18   for certain what is supposed to transpire, what
19   their duties are?
20       A. That's not been my experience.
21       MR. FAES: This is
22   TEVA_MDL_A_02923616.
23       MR. HAMMOUD: Just for the record,
24       was that marked confidential as of the

Page 233

1    produced slip sheet, or was it --
2        MR. FAES: I'd have to check on
3    that.
4        (Exhibit Teva-Tomkiewicz-005 marked
5    for identification and attached to the
6    transcript.)
7    BY MR. CARTMELL:
8        Q. Mr. Tomkiewicz, I've handed you
9    what's been marked as Exhibit 5. And so you
10   know, this is a PowerPoint presentation that
11   was produced to us in this litigation by Teva,
12   and it actually comes from your files.
13       Do you recognize this?
14       A. Yes.
15       Q. I want to ask you a few questions
16   about this. But as you see, the title of your
17   presentation is Suspicious Order Monitoring,
18   correct?
19       A. Correct.
20       Q. And the date of this is in 2014.
21       Do you see that?
22       A. Yes.
23       Q. Is your belief or memory that
24   shortly after you became the manager of the

Highly Confidential – Subject to Further Confidentiality Review

Page 234

1 department related to suspicious order
2 monitoring of opioids or Class II narcotics
3 that you gave this presentation?
4 　　A. Yes.
5 　　　　MR. HAMMOUD: Object to the form.
6 BY MR. CARTMELL:
7 　　Q. Okay. And did you give this
8 presentation to the entire department, all 16
9 of the individuals -- or 15 others in the
10 department?
11 　　A. Yeah, that is correct --
12 　　Q. Okay.
13 　　A. -- as well as customer service --
14 　　Q. Okay.
15 　　A. -- a number of customer service
16 people.
17 　　Q. Now, customer service, we'll talk
18 about this more a little bit later, but the
19 customer service department is separate from
20 the DEA compliance department; is that correct?
21 　　A. Correct.
22 　　Q. Okay. And is the customer service
23 department made up of individuals who are in
24 sales?

Page 235

1 　　A. I don't know how they're actually
2 structured, you know, what part of sales or if
3 they're considered sales. I don't know that.
4 　　Q. But I take it you do know that
5 customer service representatives are the ones
6 who typically will have contact related to
7 orders and sales of the medications. Is that
8 fair?
9 　　A. That is fair, yes.
10 　　Q. Okay. You're just saying you don't
11 know whether or not their department
12 specifically falls under sales or marketing or
13 whatever department, correct?
14 　　A. That is correct. That is correct.
15 　　Q. All right. So if you look at your
16 presentation, I want to ask you a few questions
17 about this.
18 　　　　And if you'd go to page 4, the
19 title of this slide is What Happens If You
20 Screw Up?
21 　　　　Do you see that?
22 　　A. Yes.
23 　　Q. And then on this, I guess there are
24 the names of lots -- or several distributors --

Page 236

1 there's a couple pharmacies as well -- who are
2 distributors of opioid medications; is that
3 right?
4 　　A. Correct. And other medication,
5 yes.
6 　　Q. Okay. And when you said, "What
7 Happens If You Screw Up," what did you mean?
8 　　A. I talked about that -- fines that
9 these companies had been paying and actions
10 taken against them.
11 　　Q. And was -- were the fines and
12 actions taken against them fines that were put
13 in place and actions taken by the Drug
14 Enforcement Administration?
15 　　A. That is correct.
16 　　Q. Okay. And the claims being that
17 these organizations, including
18 AmerisourceBergen, had violated the Controlled
19 Substance Act in some way?
20 　　　　MR. NICHOLAS: Object to the form.
21 　　　　THE WITNESS: And that had a
22 　　　　settlement, although AmerisourceBergen
23 　　　　did not have a settlement.
24 BY MR. CARTMELL:

Page 237

1 　　Q. I understand.
2 　　　　But the claim was that there had
3 been violations of the Controlled Substance
4 Act by these --
5 　　　　MR. NICHOLAS: Object to the form.
6 　　　　MR. HAMMOUD: Object to the form.
7 　　　　THE WITNESS: No.
8 　　　　MR. CARTMELL: Can I -- just let
9 　　　　me --
10 　　　　MR. NICHOLAS: Sorry.
11 BY MR. CARTMELL:
12 　　Q. -- the claims in these actions that
13 the Drug Enforcement Administration had brought
14 were that there were violations of the
15 Controlled Substances Act?
16 　　　　MR. NICHOLAS: Object to the form.
17 　　　　THE WITNESS: All I can speak to is
18 　　　　the amount of settlement, the amount of
19 　　　　fines that four of these had paid.
20 BY MR. CARTMELL:





Page 238

Page 240

22  Q.  Okay.  Now, if you turn to page 37,
23  this slide is titled What's Next? and asks the
24  question, What does the future hold?

Page 239

Page 241

1       Do you see that?
2       A.  Yes.
3       Q.  And you created this slide?
4       A.  Mm-hmm.
5       Q.  Incidentally, this presentation
6  that you created was in the course and scope of
7  your employment at Teva, correct?
8       A.  Yes.
9       Q.  Okay.  And you maintained it in
10  your files for that purpose; is that fair?
11       A.  Well, yeah.
12       Q.  Okay.  You say, What does the
13  future hold?  And the first thing you mention
14  here is, SOPs, or standard operating
15  procedures, correct?
16       A.  Yes.
17       Q.  That's what we talked about, is
18  when you came in, because the system or the
19  process at Teva at that time didn't have any
20  written standard operating procedures, one of
21  the first things you intended to do was put
22  those it would effect in writing, correct?
23       A.  To write them.
24       Q.  Okay.  And, in fact, I think you

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 did that --
2 A. Because there were already
3 procedures in effect, just not written down.
4 Q. Right. There was nowhere where
5 somebody could go and see written standard
6 operating procedures related to what needed to
7 be done in that program, correct?
8 MR. HAMMOUD: Object to the form.
9 THE WITNESS: Well, written --
10 there were no written SOPs.
11 BY MR. CARTMELL:
12 Q. Okay. And, in fact, I'm going to
13 hand you --
14 In fact, actually, you were
15 involved thereafter or shortly thereafter in
16 helping to write those; is that right?
17 A. Yes, that is correct.
18 Q. And I think the records reflect --
19 and I'll hand you those -- that in August of
20 2014, those standard operating procedures that
21 applied to the suspicious order monitoring
22 program were put into effect. Is that
23 consistent with your memory?
24 MR. HAMMOUD: Object to the form.

Page 243

1 THE WITNESS: Well, the written
2 formal procedures were introduced into
3 the system. Those were descriptions of
4 the process that was already in place.
5 MR. CARTMELL: Object and move to
6 strike the last part of your answer.
7 BY MR. CARTMELL:
8 Q. If you can, just answer my question
9 for the record.
10 And, in fact, in August of 2014, at
11 that time, for the first time, formal written
12 standard operating policies for the suspicious
13 order monitoring system were put into effect,
14 correct?
15 MR. HAMMOUD: Object to the form.
16 BY MR. CARTMELL:
17 Q. Is that correct?
18 A. I would say written procedures were
19 put into place.
20 Q. Okay.
21 A. Not the procedures were put into
22 place. Just that the formal were entered into
23 the system.
24 (Exhibits Teva-Tomkiewicz-006

Page 244

1 through Teva-Tomkiewicz-008 marked for
2 identification and attached to the
3 transcript.)
4 BY MR. CARTMELL:
5 Q. I'm going to hand you what's been
6 marked as Exhibit 6 and 7 and 8. And I really
7 don't have any questions for you at this time
8 about these policies.
9 And we'll show the jury, for
10 example, policy 8277, which is the policy
11 titled Suspicious Order Monitoring - DEA Order
12 Holds.
13 Do you see that?
14 A. Yes.
15 Q. And this was one of the policies
16 that you helped draft; is that right?
17 A. Right.
18 Q. If you go to the last page, this
19 one that we found in your documents is
20 unsigned. But is your memory that, in fact,
21 this -- oh, I'm sorry. Let's go to the last
22 page. Strike that.
23 And, in fact, if you look at page 7
24 of 8, there is a signature here that this

Page 245

1 policy was put into effect. Is that Colleen
2 McGinn's signature?
3 A. Yes.
4 Q. And the date of the policy being
5 effective is August 1st, 2014; is that right?
6 A. Correct.
7 Q. Okay. We don't need to go through
8 all of these policies, but just for the record,
9 is that your understanding, that those policies
10 were all put into effect at that time?
11 MR. HAMMOUD: Object to the form.
12 THE WITNESS: Formalized into
13 effect.
14 (Exhibits Teva-Tomkiewicz-009 and
15 Teva-Tomkiewicz-010 marked for
16 identification and attached to the
17 transcript.)
18 BY MR. CARTMELL:
19 Q. I'm also going to hand you exhibits
20 9 and 10, which are also suspicious order
21 monitoring standard operating procedures.
22 Do you see that?
23 And you were also involved in
24 writing those and putting those into effect in

Page 246

1  August of 2014, correct?
2      A.  Yes, that is correct.
3      Q.  So is it fair to say, sir, that
4  Teva had a suspicious order monitoring program
5  since before you were there for several years
6  but never had written standard operating
7  procedures for that program?
8      A.  I would say that's a fair
9  assessment.
10     Q.  Another part or facet to the
11 suspicious order monitoring program that you
12 had at AmerisourceBergen was a computer
13 algorithm; is that correct?
14     A.  Yes.
15     Q.  And when you got to Teva, did Teva
16 also have a computer algorithm to aid in the
17 process of identifying potentially suspicious
18 orders for opioids?
19     A.  Yes.
20     Q.  Now, I think, from my review of the
21 documents, the computer algorithm that was in
22 place when you showed up to Teva in 2014 was
23 called the SORDS system.  Is that right?
24     A.  Yes.

Page 247

1      Q.  And that's all capitals S-O-R-D-S;
2  is that right?
3      A.  Yes.
4      Q.  And I think -- is it true that that
5  stands for Suspicious ORDerS?
6      A.  That was my understanding.
7      Q.  Okay.  And you've mentioned this
8  previously, but part of when -- strike that.
9          When you were hired, one of the
10 things you discussed doing to improve Teva's
11 suspicious order monitoring program was
12 updating the computer algorithm that would
13 assist with identifying potentially suspicious
14 orders, correct?
15     A.  That is correct.
16     Q.  Okay.  I take it you felt like it
17 was outdated at that time.
18         MR. HAMMOUD:  Object to the form.
19         THE WITNESS:  No.
20 BY MR. CARTMELL:
21     Q.  At any rate, you thought that there
22 was an improved algorithm that you could put in
23 place that would be better.  Fair enough?
24         MR. HAMMOUD:  Object to the form.

Page 248

1          THE WITNESS:  That I could do
2      something better.
3  BY MR. CARTMELL:
4      Q.  Okay.  And before we talk about
5  that system that you put in place, the SORDS
6  system that was in place at Teva when you
7  arrived, was that a system that Teva actually
8  designed and developed; do you know?
9      A.  That's my understanding.
10     Q.  Okay.  And the only reason I ask
11 is, there was a merger -- or an acquisition, I
12 think, is a better way to say it, of Teva --
13 Teva acquired a company called Cephalon.  Are
14 you familiar with that?
15     A.  Yes.
16     Q.  Okay.  Do you know whether or not
17 Teva was the company who designed or developed
18 the SORDS computer algorithm to identify
19 suspicious orders for opioids or whether
20 Cephalon did that?
21         MR. HAMMOUD:  Object to the form.
22         THE WITNESS:  I'm not certain when
23     it was done, whether it was before or
24     after the acquisition of Cephalon,

Page 249

1      because that was before my time.
2  BY MR. CARTMELL:
3      Q.  Okay.  So you're not certain
4  whether that was Cephalon's program or Teva's
5  program?
6      A.  I'm not certain.
7      Q.  Okay.  And do you have any idea how
8  long that system had been in effect prior to
9  the time you arrived?
10     A.  No.
11     Q.  Once you -- strike that.
12         Tell us what the SORDS system did
13 or what that system was designed to do --
14         MR. HAMMOUD:  Object to the form.
15 BY MR. CARTMELL:
16     Q.  -- the one that was in effect when
17 you arrived.
18     A.  Well, it was designed to assist in
19 detecting suspicious orders.
20     Q.  Okay.  And how would that system
21 work?
22     A.  The system worked on a -- looked at
23 a customer's history and did a certain
24 calculation based on the customer's history to

Page 250

1 flag an order for additional investigation.
2      Q.  Okay.  After you arrived in 2014 at
3 Teva, did you come to know that, actually, Teva
4 had hired an outside consultant to do an
5 evaluation or assessment of their suspicious
6 order monitoring program?
7      A.  Yes.
8          MR. HAMMOUD:  Object to the form.
9 Lacks foundation.
10         THE WITNESS:  Yes.
11 BY MR. CARTMELL:
12     Q.  How was it that you learned that?
13     A.  I was told during my interview that
14 this group was brought in.
15         (Exhibits Teva-Tomkiewicz-011 and
16         Teva-Tomkiewicz-012 marked for
17         identification and attached to the
18         transcript.)
19 BY MR. CARTMELL:
20     Q.  I'm handing you, sir, Exhibits 11
21 and 12, and I will represent to you that these
22 were documents that were produced to the
23 plaintiffs in this litigation by Teva from
24 their internal files.  Okay?

Page 251

1          And the first document, which is
2 Exhibit -- is it 12?
3      A.  12, yes.
4      Q.  I'm sorry.  The first document I
5 want to ask you about is Exhibit 11.
6      A.  Oh, okay.
7      Q.  Exhibit 11 is a e-mail from Matthew
8 Benkert to you.  Do you see that?
9      A.  Yes.
10     Q.  And this is in 2014?
11     A.  Correct.
12     Q.  And it states that the attachment
13 is --
14         Well, there's several, I believe,
15 attachments.  Do you see that?
16     A.  Yes.
17     Q.  Do you know if one of the
18 attachments to this was the report from the
19 outside consultant who Teva hired to do an
20 assessment of their suspicious order monitoring
21 program?
22         MR. HAMMOUD:  Object to the form.
23         THE WITNESS:  And I believe it's --
24 Exhibit 12 is one of these listed as

Page 252

1 Cegedim Teva SOM Review, I believe.
2 BY MR. CARTMELL:
3      Q.  Okay.  So at any rate, it looks
4 like, from this e-mail, that as part of the
5 attachments to this e-mail in Exhibit 11 was
6 the report which is sometimes referred to as
7 the Buzzeo report; is that right?
8          MR. HAMMOUD:  Object to the form.
9          THE WITNESS:  I can't recall
10         references to a Buzzeo report, so I --
11         but I've seen this, yes, obviously.
12 BY MR. CARTMELL:
13     Q.  Okay.  I believe that this report
14 that is signed by Ronald Buzzeo was in your
15 custodial file that was produced to us in this
16 litigation.  Is that consistent with your
17 understanding?
18     A.  Oh, yes.  I'm certain that, yeah, I
19 have this filed.
20     Q.  Okay.  And was your understanding
21 that Teva hired Mr. Buzzeo and others to check
22 into their suspicious order monitoring program
23 in 2012?
24     A.  Yes.

Page 253

1          MR. HAMMOUD:  Object to the form.
2 Lacks foundation.
3 BY MR. CARTMELL:
4      Q.  You can answer.
5      A.  So yes, yes.
6      Q.  And at that time, is it true that
7 one of the things that Ronald Buzzeo and his
8 team from --
9          Is it Cegedim?
10     A.  Cegedim.
11     Q.  Is Cegedim a consulting company?
12     A.  Yes.  They're part of IMS/IQVIA
13 now.
14     Q.  Okay.  And one of the things that
15 they were asked to consult with Teva about was
16 the adequacy of their suspicious order
17 monitoring program, correct?
18     A.  Well, looking for improvements.
19     Q.  And to give recommendations about
20 areas that they thought needed improvements,
21 fair?
22     A.  And sell their system.
23     Q.  Pardon me?
24     A.  And sell their system.

Page 254

1  Q.  Okay.  Are you familiar with
2  Mr. Buzzeo?
3  A.  Yes.  I've met him several times.
4  Q.  Okay.  And he has expertise related
5  to suspicious order monitoring systems,
6  correct?
7       MR. HAMMOUD:  Object to the form.
8       THE WITNESS:  I would agree to
9  that.
10  BY MR. CARTMELL:
11  Q.  And, in fact, he's a frequent
12  speaker on diversion control and suspicious
13  order monitoring programs; is that right?
14  A.  Yes.
15  Q.  Okay.  Have you been to his
16  programs that he speaks at?
17  A.  I've been to a couple, yes.
18  Q.  I want to ask you some questions
19  about this.  This is dated September 18,
20  2012.  And it's a letter from Mr. Buzzeo, the
21  consultant, to Colleen McGinn; is that right?
22  A.  Yes.
23  Q.  If you'd go to the --
24  A.  Well, actually, I'd like to read

Page 255

1  through it to refamiliarize myself with it
2  because it's been a few years since I've read
3  it.
4  Q.  Okay.
5  A.  (Reviewing documents.)
6  Q.  I'm not going to ask you anything
7  about the last couple of pages.
8  A.  Okay.  I'm almost done.
9    (Reviewing documents.)
10  I think I'm good.
11  Q.  Mr. Tomkiewicz, Exhibit 12, as we
12  stated, is from September of 2012, and it's a
13  letter from the outside consultant, Ronald
14  Buzzeo, to the director of the DEA compliance
15  department and your boss, Colleen McGinn,
16  correct?
17  A.  Correct.
18  Q.  And if you see, it states, Dear
19  Ms. McGinn:  Enclosed is our report regarding
20  Teva Pharmaceutical's suspicious order
21  monitoring system.
22  A.  Yes.
23  Q.  As noted in the report, Teva has a
24  rudimentary SOM system with a process for

Page 256

1  opening new accounts and pending orders
2  pursuant to calculations performed by a
3  computer program known as SORDS, Suspicious
4  ORDerS.
5    Do you see that?
6  A.  Yes.
7  Q.  And we were talking about that
8  computer program that Teva was using when you
9  came as the manager of the department or
10  suspicious order monitoring manager at that
11  time, correct?
12  A.  Well, in this -- and I wasn't sure
13  what the date was, but it talked about the
14  SORDS 2 improvement that was done, which was
15  done sometime after this.
16  Q.  And we'll talk about that.
17  A.  Yeah.
18  Q.  First, let me ask you -- we'll get
19  there.
20  A.  Yeah.
21  Q.  Let me ask you this question.  One
22  of the things that the outside expert
23  consultant, Ronald Buzzeo, looked at in Teva's
24  suspicious order monitoring program was the

Page 257

1  computer program SORDS, I and II, correct?
2  A.  Correct.
3  Q.  Okay.  And if you turn to page 3 of
4  the report, the outside expert consultant,
5  Mr. Buzzeo, entered a finding or provided a
6  finding to them.
7    It states, As noted previously,
8  Teva uses a computer model known as Suspicious
9  ORDerS, SORDS, to evaluate customer orders
10  electronically for suspicious order
11  characteristics.
12    Do you see that?
13  A.  Yes.
14  Q.  Okay.  And you now know, based on
15  your review of this document, that the outside
16  expert consultant found multiple deficiencies
17  in the SORDS 1 and 2 computer systems, correct?
18  A.  No.
19       MR. HAMMOUD:  Object to the form.
20       THE WITNESS:  Yeah, I wouldn't say
21  "deficiencies."  I would say, you know,
22  avenues for improvement.
23  BY MR. CARTMELL:
24  Q.  Okay.  Well, I'm using Mr. Buzzeo's

Page 258

1 words. And if you turn the page to page 4, he
2 talks about, in the second paragraph,
3 additional deficiencies.
4         Do you see that?
5     A. Mm-hmm.
6     Q. So it is true, isn't it, that
7 Mr. Buzzeo, at least according to him, the
8 outside consultant, the expert who reviewed
9 their system, found several deficiencies in the
10 SORDS 1 and 2 programs, correct?
11    A. I would say he used the term
12 "deficiencies."
13    Q. Okay. If you look at the last
14 sentence on the previous page, page 3, under
15 his Finding, it states, According to customer
16 service manager Marianne Geiger, the system --
17 referring to SORDS pends less than ten orders a
18 week.
19        Do you see that?
20    A. Yes.
21    Q. And so in 2012, at the time that
22 this system, the SORDS system, was being
23 reviewed by the outside expert consultant of
24 all the orders from customers for opioids that

Page 259

1 Teva was getting, their system in place at that
2 time was only flagging or pending, it sound
3 like, ten orders a week.
4         Do you see that?
5     A. Yes.
6     Q. And you know from your experience
7 in the industry and talking about this
8 procedure to groups and societies and things
9 like that, that your system, for example, at
10 AmerisourceBergen, was flagging or pending
11 hundreds of potentially suspicious orders a
12 week, correct?
13    A. True. But you can't compare the
14 two systems.
15    Q. Okay. And we'll talk more about
16 that.
17        It states, In June of 2012, Teva
18 initiated a SORDS improvement project.
19        And at that time, they were working
20 on SORDS 2.
21        Do you see that?
22    A. Yes.
23    Q. And at this time, SORDS 2 was not
24 in place. It had not yet been transferred from

Page 260

1 SORDS 1 to SORDS 2, correct?
2     A. That's what it appears, yes.
3     Q. Okay. So we know as of 2012, they
4 hadn't even updated SORDS 1, correct?
5     A. Correct. That's what it appears.
6     Q. Okay. Do you know when it was that
7 they transferred from SORDS 1 to SORDS 2?
8     A. No.
9     Q. Okay. But at any rate, this
10 outside expert consultant looked at both
11 SORDS 1 and 2 and found multiple deficiencies
12 with both, correct?
13    A. I would say he used the word
14 "deficiency."
15    Q. Okay. It states, SORDS 2 is an
16 improvement over SORDS 1. Orders are
17 individually evaluated. Also, orders are
18 normalized for package size. However, the
19 orders are not normalized across different NDC
20 numbers.
21        And is one of the things that you
22 did when you came in is, you changed and
23 updated the system to include NDC numbers?
24        MR. HAMMOUD: Object to the form.

Page 261

1         THE WITNESS: To include NDC
2     numbers?
3 BY MR. CARTMELL:
4     Q. Yeah.
5     A. No. That's not a -- that's not a
6 correct statement with the way the program
7 works.
8     Q. Okay.
9         This means, for example, that a
10 customer could order frequent smaller amounts
11 of hydrocodone in three or four different
12 products and avoid a violation of the three
13 standard deviation rule.
14        Do you see that?
15    A. That's on -- which page was that
16 on?
17    Q. It's on the bottom of page 3.
18    A. Bottom of page 3.
19        Yes.
20    Q. Okay. And so hydrocodone, it was
21 talking about. That's an opioid; is that
22 correct?
23    A. Correct.
24    Q. Okay. And one that Teva was

Page 262

1  selling?
2        MR. HAMMOUD:  Object to the form.
3     Lacks foundation.
4        THE WITNESS:  I believe so.
5  BY MR. CARTMELL:
6     Q.  Okay.  And so the point was here
7  that this system at the time, SORDS, was not
8  sensitive enough to necessarily catch an opioid
9  suspicious order, correct?
10       MR. HAMMOUD:  Object to the form.
11       THE WITNESS:  Yeah, I wouldn't be
12    able to speculate in that manner.
13 BY MR. CARTMELL:
14    Q.  You don't know; is that fair?
15    A.  No, I don't know.
16    Q.  Okay.  It then states on the next
17 page, page 4, on the second paragraph,
18 Additional deficiencies were also noted during
19 the review process.  Three standard deviations
20 in particular are insufficient to identify
21 orders that may be suspicious.  Three
22 deviations in particular -- excuse me.  Three
23 standard deviations will only identify three
24 out of 1,000 orders.

Page 263

1        Do you see that?
2     A.  Yes.
3     Q.  And would you agree with that
4  statement, that a system set up that had a
5  threshold of three standard deviations would
6  not be sufficient to necessarily catch
7  suspicious orders of opioids?
8        MR. HAMMOUD:  Object to the form.
9     Mischaracterizes the document.
10       THE WITNESS:  I wouldn't say that.
11 BY MR. CARTMELL:
12    Q.  Do you know for sure?
13    A.  I would say that I don't like any
14 calculation that's based on three standard
15 deviations that -- that differs from sort of a
16 mass standard of two standard deviations.  But,
17 also, you have to look at, you know, two
18 standard deviations from what?
19    Q.  Okay.  But the system based on
20 three standard deviations, as you just said,
21 you don't like that type of system, correct?
22    A.  I don't like that math.
23    Q.  Okay.
24    A.  Yeah.  I wouldn't say I don't like

Page 264

1  that system.  I don't like the math.
2     Q.  Is part of the reason you don't
3  like it, though, because it might not be strict
4  enough necessarily to catch some suspicious
5  orders?
6     A.  Well, it depends.
7        MR. HAMMOUD:  Object to the form.
8  BY MR. CARTMELL:
9     Q.  It just depends?
10    A.  It depends, yeah.
11    Q.  Okay.
12    A.  It depends upon, you know, two,
13 three standard deviations from what?  What is
14 the underlying math behind it?
15    Q.  Okay.
16    A.  If I don't know the underlying math
17 behind it, I can't say one way or another.
18    Q.  Okay.  So it might or might not
19 catch suspicious orders, correct?
20       MR. HAMMOUD:  Object to the form.
21       THE WITNESS:  Any system, really,
22    might not catch a suspicious order.
23 BY MR. CARTMELL:
24    Q.  Okay.

Page 265

1        The system further fails to
2  identify frequency or pattern, two items
3  specifically contained in the legal definition
4  of a suspicious order.
5        Do you see that?
6     A.  Yes.
7     Q.  And would you agree with me that an
8  adequate system for identifying suspicious
9  orders needs to actually identify abnormal
10 frequencies of orders or abnormal patterns of
11 opioid orders?
12    A.  Not the way that this is written,
13 because he's talking about the computer system.
14 The overall system should, but I don't believe
15 that it's appropriate for a computer algorithm
16 to look for frequency or pattern or size.
17    Q.  Do you think a computer algorithm
18 can identify abnormal frequency orders of
19 opioids?
20    A.  I think it would be very, very
21 difficult.  I haven't seen one yet.
22    Q.  Now, did you ever talk to
23 Mr. Buzzeo about his findings of deficiencies
24 in the SORDS system?

Page 266

1     A.  No.  I never talked with Ron about
2  this particular document.
3     Q.  Now, even though the outside expert
4  consultant believed that their system in place
5  had several deficiencies, that SORDS system or
6  SORDS 2 system --
7     A.  SORDS 2.
8     Q.  -- stayed in place until the middle
9  of the year in 2015, correct?
10    A.  March 1st, 2015.
11    Q.  Okay.  So it was two and a half
12 years longer, after the outside consultant told
13 the company that there were deficiencies in
14 their algorithm or their system to try to
15 identify suspicious orders of opioids -- it was
16 two and a half years until they instituted what
17 you have described as a better system, correct?
18    A.  Well, I hope my system is better.
19    Q.  More -- an improved system,
20 correct?
21    A.  I'd say an improved system.
22    Q.  A more robust system, correct?
23       MR. HAMMOUD:  Object to the form.
24       THE WITNESS:  I would hope so.

Page 267

1  BY MR. CARTMELL:
2     Q.  Okay.  And, in fact, if you go back
3  to, sir, Exhibit 678 --
4     A.  Is that the PowerPoint?
5     Q.  Yes.
6     A.  Okay.
7     Q.  We were talking about your
8  PowerPoint and What's Next? when you came in in
9  2014, at page 37.
10       And not only did you put in place
11 written standard operating procedures for the
12 program, but you also updated SORDS, correct?
13    A.  That that was in the future, yes.
14    Q.  Okay.  And from this time in 2014,
15 is it fair to say that it was about a year and
16 three months until you were able to do that?
17    A.  Until the updated algorithm was in
18 place, yes.
19       MR. CARTMELL:  Okay.  677, please.
20       (Exhibit Teva-Tomkiewicz-013 marked
21       for identification and attached to the
22       transcript.)
23 BY MR. CARTMELL:
24    Q.  I'm going to hand you what's been

Page 268

1  marked as Exhibit 13.  Sir, Exhibit 13 is a
2  document that was produced to us in this
3  litigation from Teva's internal files, and it's
4  titled Order Management, DEF OPS Enhancements
5  Functional Design Specification.
6       Do you see that?
7     A.  Yes.
8     Q.  Now, the system that you ended up
9  putting in place for suspicious order
10 monitoring was called DEF OPS; is that correct?
11    A.  Correct.
12    Q.  And that stands for what?
13    A.  Defensible Order Pending System.
14    Q.  What do you mean, Defensible Order
15 Pending System?  What do you mean by
16 "defensible," I guess, is what I'm asking.
17    A.  That we hoped that it would
18 withstand scrutiny.
19    Q.  Withstand scrutiny by the DEA?
20    A.  Anyone.
21    Q.  Any outside agency that might be
22 doing an audit?
23    A.  Anyone.
24       MR. HAMMOUD:  Object to the form.

Page 269

1  BY MR. CARTMELL:
2     Q.  Including the DEA?
3     A.  Including.
4     Q.  Okay.  Well, who else would
5  potentially scrutinize your suspicious order
6  monitoring system?
7     A.  Well, National Association of
8  Boards of Pharmacy.
9     Q.  Anybody else?
10    A.  Potentially, a state -- well, state
11 boards of pharmacy.
12    Q.  Okay.  So you wanted a system put
13 in place that would be defensible if there was
14 an audit by those State pharmacy organizations
15 or the DEA, correct?
16    A.  I'd say that would make them happy.
17    Q.  Okay.  And defensible in that they
18 would feel like you were doing an adequate job
19 of suspicious order monitoring, correct?
20       MR. HAMMOUD:  Object to the form.
21       THE WITNESS:  And it's hard to put
22    too much emphasis on the word
23    "defensible," because it was mostly
24    chosen because it sounded good with

Page 270

1    Order Pending System. It just made a
2    good-sounding name.
3  BY MR. CARTMELL:
4        Q.  But your words were, you wanted
5    something that was defensible if there was
6    scrutiny on the program, correct?
7        A.  Yes --
8           MR. HAMMOUD:  Object to the form.
9           THE WITNESS:  -- that looked good
10          and made agencies happy.
11  BY MR. CARTMELL:
12       Q.  Okay.  This is a document that you
13   reviewed and approved, I take it; is that
14   correct?
15       A.  Correct.
16       Q.  And if you look at page 3 of 17,
17   specifically, you're indicated on the document,
18   you'll see there, as one of the individuals who
19   reviewed and approved this document.
20       A.  Yes.
21       Q.  Do you see that?
22       A.  Yes.
23       Q.  I have very few questions about
24   this, but I want to talk briefly about this

Page 271

1  Summary.  Did you actually write this document?
2        A.  No.  No, I did not write this
3    document.
4        Q.  If you look at 1.0 Summary, there's
5    a discussion --
6        A.  On what page?
7        Q.  On page 5 of 17.
8           Near the bottom of the first
9    paragraph, it states, DEA registration, record
10   keeping, and suspicious order reporting
11   requirements apply to importers, exporters,
12   manufacturers, distributors, and certain
13   retailers of 41 listed chemicals.
14          Do you see that?
15       A.  Yes.
16       Q.  And that's a statement that you
17   agree with, I take it, that those DEA
18   requirements apply to manufacturers like Teva,
19   correct?
20       A.  I'd say that's a fair assessment.
21       Q.  Through a combination of industry
22   outreach and voluntary compliance measures, DEA
23   strives to control chemical diversion in
24   partnership with industry and the public.

Page 272

1        Do you see that?
2        A.  Yes.
3        Q.  And when it refers to "industry,"
4    that's talking about the pharmaceutical
5    manufacturers, the wholesale distributors, the
6    pharmacies, and all those entities that are in
7    the distribution chain of the opioid narcotics,
8    correct?
9        A.  I would agree with that, yes.
10       Q.  Next paragraph states, Original
11   SORDS design evaluated individual order
12   line/item quantity for each ship to against
13   three upper control limits with a designated
14   value of order UCL --
15          That means "upper control limit,"
16   right?
17       A.  Yes.
18       Q.  -- monthly UCL, and quarterly UCL.
19   If any calculated order line/item and ship to
20   exceeded one of three upper control limits,
21   then the order line would be placed on DEA
22   excessive usage hold.
23          Do you see that?
24       A.  Yes.

Page 273

1        Q.  This original design was too
2    granular and difficult to manage, and
3    therefore, a new project was floated to
4    redesign the tool.
5           Do you see that?
6        A.  Yes.
7        Q.  And that's talking about what we
8    have discussed, that when you came in, part of
9    your job was to update the system, update
10   SORDS, and come up with a better, new design
11   for the suspicious order monitoring program,
12   including the computer algorithm, right?
13          MR. HAMMOUD:  Object to the form.
14          THE WITNESS:  And correct, to
15          improve the program.
16  BY MR. CARTMELL:
17       Q.  The purpose of this document is to
18   develop new enhancements outlined hereinafter
19   to the original SORDS 1 and II systems,
20   hereinafter referred to as DEF OPS.  This new
21   suspicious order monitoring tool will be more
22   robust.
23          Do you see that --
24       A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    Q.  -- in operational efficiencies and
2  proactively monitoring customer order patterns
3  when placing orders for control and some
4  noncontrolled substances.
5        Do you see that?
6    A.  Yes.
7    Q.  And you agree with that, I take it?
8    A.  It's a fair assessment, yes.
9    Q.  Okay.  How did the new DEF OPS
10  computer algorithm that you helped design and
11  develop and put in place at Teva -- how did
12  that make the program better or improved and
13  more robust?
14    A.  Well, I think it improved what I
15  call the signal-to-noise ratio.  And that's
16  orders that were pended for investigation that
17  really didn't need to be pended for
18  investigation.
19        And so it provided orders that were
20  more -- that had, you know, higher likelihood
21  of possibly being suspicious or ones that had
22  more specific red flags about them.
23    Q.  Okay.  And do you know -- I think
24  there's documents discussing this, but -- the

Page 275

1  number of items or orders that were pended or
2  flagged by SORDS 1 and II, at least as of 2012,
3  I should say, was indicated in Buzzeo's report
4  to be approximately ten a week?
5        Do you remember that?
6    A.  For SORDS 1, yes.
7    Q.  Yes.
8        And do you know how many orders
9  were pended per SORDS 2?
10    A.  Offhand, no.
11    Q.  Okay.  Do you know whether or not
12  your new program that was put in place called
13  DEF OPS ended up flagging or pending more or
14  less than SORDS 2?
15    A.  It seems to be not a whole lot
16  different in terms of numbers of orders pended,
17  but I'd have to go take a look specifically to
18  see, you know, the ultimate numbers.
19        But, of course, I'm looking now,
20  and we have, you know, additional controlled
21  substances that we're reviewing currently.
22        At the time, the number of orders
23  being reviewed, I believe, went down, but the
24  number of manual -- deeper investigations went

Page 276

1  up.
2    Q.  Okay.  We'll talk about that.  But
3  there's documents that describe that, correct?
4    A.  Oh, I'm sure there are.
5    Q.  Okay.  And is your testimony that
6  when DEF OPS went into play, it was flagging
7  less than SORDS 2, or do you know?
8    A.  I can't remember specifically.
9    Q.  You don't know one way or the
10  other?
11    A.  As I sit here, I don't know one way
12  or the other, yeah.
13    Q.  Okay.  I also want to ask you about
14  the due diligence, as you described, that Teva
15  had been doing related to suspicious order
16  monitoring prior to the time you became the
17  manager at Teva.  Okay?
18    A.  Okay.
19    Q.  Do you, as you sit here today,
20  recall to what extent Teva was doing due
21  diligence on new clients or new customers?
22    A.  Well, when I came in, it was my
23  understanding that there hadn't been a new
24  customer approved or even brought on in years.

Page 277

1    Q.  How many years?
2    A.  Don't know how many years.  It was
3  described as, in years.
4    Q.  So your testimony is that there was
5  no need for any due diligence related to new
6  clients at Teva prior to 2014 because for
7  years, there hadn't been any new clients?
8        MR. HAMMOUD:  Object to the form.
9        THE WITNESS:  Well, that's how it
10        was described to me.
11  BY MR. CARTMELL:
12    Q.  Who told you that?
13    A.  I can't remember who.  May have
14  been Matt.  May have been Marianne.
15    Q.  Okay.  I want to ask you a little
16  bit more about the report from Mr. Buzzeo.
17        Sir, if you can go to page 1 of
18  Mr. Buzzeo's report related to the suspicious
19  order monitoring program at Teva, the bottom
20  paragraph, the first sentence states, New
21  accounts are opened infrequently, and there is
22  minimal due diligence.
23        Do you see that?
24    A.  Correct.  Correct, yes.

Page 278

1    Q.  But you were told that they had not
2  had new accounts or customers in years?
3    A.  That's what I believe, I was told
4  something similar to that, when I came aboard.
5    Q.  Okay.  What would you have
6  expected, based on your experience and
7  expertise in suspicious order monitoring
8  programs, for Teva to do as far as due
9  diligence when it had a new customer account?
10    A.  What would I have expected them to
11  have done prior to me joining Teva?  I don't
12  recall seeing any file on a new customer.
13    Q.  I'm asking, based on your
14  experience.  Because this report reflects that
15  Mr. Buzzeo and his team were told that there
16  were new accounts, but they were infrequent,
17  correct?
18    A.  Yes, infrequent --
19    Q.  Okay.  So --
20    A.  -- which I don't believe is
21  inconsistent with what I was told when I came
22  aboard.
23    Q.  Okay.  So when they had a new
24  customer, as far as due diligence, to have a

Page 279

1  sufficient, robust suspicious order monitoring
2  program, what due diligence would you have
3  expected them to do when they had new accounts?
4        MR. HAMMOUD:  Object to the form.
5        THE WITNESS:  Well, again, I can't
6    do any sort of conjecture on it because
7    I had never seen a new customer due
8    diligence file when I came on board.  So
9    I can't say, you know, what they had
10    been doing or whether it was effective.
11    I can't say that.
12  BY MR. CARTMELL:
13    Q.  If you go to page 2, Findings and
14  Recommendations, the outside consultant,
15  Mr. Buzzeo, states, Teva has approximately 200
16  active accounts.
17        Do you see that?
18    A.  Yes.
19    Q.  And that's consistent with what you
20  testified to previously, correct?
21    A.  Correct.
22    Q.  Okay.  And then the second
23  paragraph states, The current process for
24  conducting due diligence on new and existing

Page 280

1  accounts consists of checking the NTIS database
2  to determine whether customers are adequately
3  registered with the DEA and performing
4  business/credit inquiries.
5        Do you see that?
6    A.  Yes.
7    Q.  Okay.  So based on this report, you
8  can see that prior to you arriving, or in 2012,
9  if they had a new account, all they would do is
10  check to see if it -- if that individual
11  customer was registered with the DEA and then
12  look to see -- at their credit report.
13        That's what that says, correct?
14        MR. HAMMOUD:  Object to the form.
15        THE WITNESS:  No.  Business
16    inquiries in addition to credit
17    inquiries.
18  BY MR. CARTMELL:
19    Q.  What do you interpret "business
20  inquiries" to --
21    A.  Oh, I can't interpret that.  It
22  could be adequate, could not be adequate.  I
23  don't have enough information to say.
24    Q.  It states, Currently, there are no

Page 281

1  site reviews, and no additional information is
2  collected.
3        Do you see that?
4    A.  Yes.
5    Q.  And Mr. Buzzeo felt like that was
6  not an appropriate -- or that was a deficient
7  system related to due diligence, correct?
8        MR. HAMMOUD:  Object to the form.
9        THE WITNESS:  Well, Ron Buzzeo felt
10    that that was Ron Buzzeo's opinion.
11  BY MR. CARTMELL:
12    Q.  Okay.  And would you agree with
13  that opinion?
14    A.  I don't have enough information to
15  form an opinion.
16    Q.  It states, The amount of initial
17  due diligence information should be expanded to
18  include at a minimum the following items for
19  existing and potential customers:  Initial
20  client screening with a questionnaire, to be
21  followed with an on-site visit and a more
22  detailed questionnaire, to solicit detailed
23  information regarding customers' individual SOM
24  programs and assurances to safeguard against

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  the diversion of controlled substances.
2       Do you see that?
3       A.  Yes.
4       Q.  Okay.  And you mentioned
5  previously, I think, that due diligence on new
6  clients and even on existing clients is
7  important or an important part of the
8  process --
9       A.  Oh, yes.
10      Q.  -- to determine whether or not
11 orders that are coming from them that had been
12 flagged may be suspicious orders, correct?
13      MR. HAMMOUD:  Object to the form.
14      THE WITNESS:  I would say that
15      that's a correct assessment.
16 BY MR. CARTMELL:
17      Q.  And as you believed when you came
18 to Teva and from your experience -- part of the
19 things you were doing is, you were doing
20 Internet searches, for example, correct?
21      A.  Correct.
22      Q.  And from time to time, based on
23 your testimony in the West Virginia case, you
24 were doing on-site visits, correct?

Page 283

1       A.  Correct.
2       Q.  All of those things were important
3  for you, as a suspicious order monitoring
4  manager and investigator, to help you
5  determine, in fact, whether these orders coming
6  from pharmacies or other customers were, in
7  fact, suspicious, correct?
8       A.  Correct.
9       Q.  And based on Mr. Buzzeo's report,
10 Teva wasn't doing any of that before you got
11 there, correct?
12      MR. HAMMOUD:  Object to the form.
13      THE WITNESS:  Like I said, I hadn't
14      seen the results of any new customer due
15      diligence.  I don't know if this was
16      speaking hypothetically, what they would
17      do, or what they had been doing.  I
18      can't tell that from this.
19 BY MR. CARTMELL:
20      Q.  Do you think that this is actually
21 talking hypothetically?
22      A.  I said it could be.
23      Q.  Well, it states what their actual
24 process is, doesn't it?

Page 284

1       A.  Well, like I said, I haven't seen
2  the results of their process anywhere.
3       Q.  Okay.  But I take it when you got
4  there, to improve and better their suspicious
5  order monitoring program at Teva, you made sure
6  that they were doing increasing amounts of due
7  diligence, correct?
8       A.  That is correct.
9       Q.  You made sure that they were doing,
10 like Mr. Buzzeo said, much more due diligence
11 for new customers or existing customers,
12 correct?
13      MR. HAMMOUD:  Object to the form.
14      THE WITNESS:  We had increased due
15      diligence, yes.
16 BY MR. CARTMELL:
17      Q.  And it was your brief that that was
18 important so that you could try to find out,
19 these suspicious orders, whether or not there
20 was a likelihood of diversion of these opioids?
21      A.  Well, it's to know the customer
22 better.
23      Q.  And why is it important to know the
24 customer better?

Page 285

1       A.  To determine whether an order that
2  may be flagged, you know, could be suspicious;
3  is this part of their --
4       Q.  Go ahead.  I'm sorry.
5       A.  Yeah.
6       -- is this part of their normal
7  business?  Because something that could look
8  suspicious for one customer might be different
9  from another customer.
10      And one thing that's important to
11 remember is that, you know, with the on-site
12 visits at AmerisourceBergen, that's at the
13 pharmacy level.  Teva doesn't sell to
14 pharmacies.
15      Q.  Let me follow up on what you said.
16      But, actually, go back, if you
17 would, sir, to Exhibit 678, which was --
18      MR. FAES:  He means 5.
19      MR. CARTMELL:  Strike that.  Strike
20      that.  Let me start over.
21 BY MR. CARTMELL:
22      Q.  Sir, go back, if you would, to
23 Exhibit 5, which is your PowerPoint that you
24 gave in 2014 to the team at Teva under What's

Page 286

1 Next?
2 We've talked about that you, when
3 you came in, actually put in place standard
4 operating procedures that were not in place
5 when you got there --
6 A. Are you on page 37?
7 Q. -- correct?
8 MR. HAMMOUD: I'm sorry. He's
9 looking for the page. Can you repeat
10 the question?
11 BY MR. CARTMELL:
12 Q. We've talked about that you put in
13 place standard operating procedures in writing,
14 formalized those, that were not in place when
15 you got there, correct?
16 A. No. There were procedures in
17 place. They were just not written down.
18 Q. Right.
19 So if somebody wanted to find out
20 what the procedures are, they'd have to go to
21 somebody and ask them what the procedures are,
22 correct?
23 A. Yes.
24 Q. And hope that they included

Page 287

1 everything about the procedure and didn't
2 forget anything, correct?
3 A. Well, correct, sure.
4 Q. Much better policy to have it in
5 writing, correct?
6 A. Oh, yes.
7 MR. HAMMOUD: Object to the form.
8 BY MR. CARTMELL:
9 Q. We talked about you also updated
10 and revamped and improved the computer system
11 that was in place and made it more robust,
12 correct?
13 A. I would hope so.
14 Q. We -- also here under What's Next?
15 What Does the Future Hold?, you talk about
16 Customer Road Show --
17 You see that?
18 A. Yes.
19 Q. -- and Customer Risk Evaluation.
20 Do you see that?
21 A. Yes.
22 Q. And those are things that you were
23 doing to increase the actual due diligence in
24 your department, correct?

Page 288

1 A. Correct.
2 Q. And those things were important,
3 you thought -- in other words, going actually
4 to see and visit customers and sending out
5 questionnaires, risk evaluation questionnaires,
6 for example -- so that you could do your best
7 to determine whether or not there was
8 suspicious orders for these opioid narcotics,
9 correct?
10 MR. HAMMOUD: Object to the form.
11 THE WITNESS: No, that's not
12 correct.
13 BY MR. CARTMELL:
14 Q. How was I wrong?
15 A. Well, because we don't do
16 questionnaires, because, again, we're not
17 dealing with pharmacies. So a
18 one-size-fits-all questionnaire is
19 inappropriate.
20 Q. Go ahead.
21 A. Additionally, doing a customer road
22 show, while we have had face-to-face meetings
23 with some customers, doing a full road show,
24 meeting every customer face to face, not

Page 289

1 something that, ultimately, I determined was
2 either necessary or would improve the program.
3 Q. So the customer road show that you
4 refer to here, that has to do with actually
5 gaining due diligence on your customers; is
6 that correct?
7 A. No. That was more doing just
8 face-to-face meetings with customers to put a
9 face to names.
10 Q. Does it have anything to do with
11 know your customer better?
12 A. It could. But, ultimately, I
13 determined that it wasn't something that was
14 going to improve the program in any meaningful
15 way.
16 Q. So how did you -- or what did you
17 do at Teva to better their program and -- to
18 allow Teva to know their customer better?
19 A. Well, most of the customers are
20 long-term customers, and we know them very well
21 anyway.
22 Q. Did you do anything to improve that
23 aspect of due diligence?
24 A. Of knowing who the current

Page 290

1  customers were?
2      Q.  Yes.
3      A.  Well, other than talking to them --
4  and, again, because it's a relatively small
5  industry, I know knew a lot of people anyway.
6  And at various conferences, you see a lot of
7  the same people, and so we know who they are.
8      Q.  You also mention here on your slide
9  that the future held training, correct?
10     A.  Correct.
11     Q.  And is it your understanding, based
12 on your knowledge of what was going on at Teva
13 as far as their suspicious order monitoring
14 program, that there was no real training going
15 on before you arrived?
16         MR. HAMMOUD:  Object to the form.
17         THE WITNESS:  And I would say no,
18     that's not correct.
19 BY MR. CARTMELL:
20     Q.  Were you coming in, though, and
21 trying to enhance and improve and more
22 frequently train the members that were within
23 the department?
24     A.  No.

Page 291

1      Q.  Did you increase at all the amount
2  of training that was provided to the
3  individuals in the department?
4          MR. HAMMOUD:  Object to the form.
5          THE WITNESS:  Within the
6      department?  No.  Training isn't --
7      well, training of the department isn't
8      something normally that I do, other than
9      when we have department meetings and
10     sort of status updates of suspicious
11     order monitoring is done.
12 BY MR. CARTMELL:
13     Q.  Do you know whether or not Teva was
14 training customer service representatives who
15 were involved in suspicious order monitoring
16 prior to the time you arrived?
17     A.  That, I don't know.
18     Q.  Did you, when you got there,
19 though, make sure that the suspicious order
20 monitoring program included training of the
21 customer service representatives who were
22 involved?
23     A.  Yes.
24     Q.  And did you see that as an

Page 292

1  improvement of the program?
2      A.  Yes.
3          MR. HAMMOUD:  About ready for a
4      break?
5          MR. CARTMELL:  What's that?  Break?
6      Let's do it.
7          VIDEO OPERATOR:  Going off the
8      record, 3:43.
9          (Recess from 3:43 p.m. until
10     4:00 p.m.)
11         VIDEO OPERATOR:  Back on record.
12     The time is 4:00 p.m.
13 BY MR. CARTMELL:
14     Q.  Mr. Tomkiewicz, we're back on the
15 record.  Are you ready to proceed?
16     A.  I'm ready.
17     Q.  Okay.  So we were talking about
18 before the break all of the things that you did
19 when you came to Teva to try to improve the
20 suspicious order monitoring program that they
21 had in place, correct?
22     A.  Correct.
23     Q.  And we went through, as you noted
24 in your PowerPoint that you presented to the

Page 293

1  team, the things that you said you were going
2  to do in the future, things like standard
3  operating procedures, increasing customer due
4  diligence, update the SORDS program, customer
5  risk evaluations, training, customer road show,
6  all those things, correct?
7      A.  Correct.
8      Q.  And the goal for you was to improve
9  the program so that you could help the DEA by
10 identifying suspicious orders of opioids and
11 try to stop those orders that you believed were
12 likely to be diverted out in the communities,
13 correct?
14     A.  That were --
15         MR. HAMMOUD:  Object to the form.
16         THE WITNESS:  Well, that were
17     suspicious.  And not just the DEA, but
18     help to improve society.
19 BY MR. CARTMELL:
20     Q.  Right.
21     A.  Yeah.
22     Q.  That's a good point.  I mean, you
23 want to have a very robust, very good
24 suspicious orders monitoring program in place

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 at Teva because you want to help society by
2 getting as many opioids off the streets that
3 are going to be diverted, correct?
4         MR. HAMMOUD:  Object to the form.
5         THE WITNESS:  And not just
6     preventing products from getting out of
7     the legitimate supply channels, but also
8     ensuring that the products are going to
9     the right people.
10 BY MR. CARTMELL:
11     Q.  Right.
12         And the goal, though, of a very
13 effective, robust suspicious order monitoring
14 program is to identify suspicious orders,
15 correct?
16     A.  That's one facet of it, yes.
17     Q.  And then when you identify those,
18 you can do your investigation, all the things
19 you need to do, to determine whether or not you
20 need to stop that order, right?
21     A.  And report it as suspicious if we
22 stop it, yes.
23     Q.  Right.  And report it to the DEA.
24 That's the other thing you need to do, correct?

Page 295

1     A.  Correct.
2     Q.  Now, when you got to Teva, did you
3 learn that, in fact, their system of suspicious
4 order monitoring was simply not working?
5     A.  No, I wouldn't say that.
6     Q.  Well, as you stated, the whole goal
7 of the program was to identify suspicious
8 orders, correct?
9     A.  Correct.
10     Q.  And did you know or learn when you
11 got to Teva that even though they had been
12 selling opioids for years, they had not
13 identified one suspicious order in their
14 monitoring program?
15         UNIDENTIFIED SPEAKER:  I don't
16     believe that's correct.
17         MR. HAMMOUD:  Object to the form.
18         THE WITNESS:  And I don't believe
19     that's correct.  I believe there was at
20     least one order reported as suspicious.
21 BY MR. CARTMELL:
22     Q.  So your belief is that their
23 suspicious ordering program that was in place
24 before you got there and that should have been

Page 296

1 in place since the time they began selling and
2 distributing opioids --
3         Right?
4         MR. HAMMOUD:  Object to the form.
5         THE WITNESS:  Well, correct.
6 BY MR. CARTMELL:
7     Q.  Correct.  Because we know the law
8 requires that, correct?
9     A.  Correct.
10         MR. HAMMOUD:  Object to the form.
11 BY MR. CARTMELL:
12     Q.  Your understanding is that you
13 believe that that suspicious order monitoring
14 program had identified one suspicious order in
15 those several years?
16     A.  Correct.
17     Q.  And you believe that that is an
18 effective, robust suspicious order monitoring
19 program?
20     A.  Could have been.
21     Q.  Do you believe it was, when it
22 identified solely one suspicious order over
23 eight years that they've been selling opioids?
24     A.  I think that that is consistent

Page 297

1 with the industry.
2     Q.  Let's go back, if you would, to
3 Exhibit 12.
4         We've been looking at what the
5 outside expert consultant said about Teva's
6 suspicious order monitoring program when it was
7 reviewed in 2012, and I want to ask you about a
8 statement on the front page, first paragraph at
9 the bottom.
10         It states, Orders are also
11 investigated by staff prior --
12     A.  Wait.  First page?
13     Q.  Oh, I'm sorry.  On the cover page,
14 the letter.
15     A.  Cover page.
16     Q.  Sir, I want to ask you about the
17 cover letter from Mr. Buzzeo, the outside
18 consultant, who looked at, in 2012, Teva's
19 suspicious order monitoring program and
20 evaluated that.
21         If you look at the end of the first
22 paragraph, it states, Teva has never identified
23 a suspicious order, and thus, no orders have
24 ever been reported to the DEA.

Page 298

1    Do you see that?
2    A.  Correct.
3    Q.  So we know that as of September of
4  2012, several years after Teva had begun
5  selling opioid narcotics, they had never
6  reported -- or never identified a suspicious
7  order and never reported any to the DEA,
8  correct?
9    A.  Correct.
10    MR. HAMMOUD:  Object to the form.
11  BY MR. CARTMELL:
12    Q.  And if you turn the page to page 2,
13  it states, at the top of paragraph -- the first
14  paragraph, Teva has never reported any
15  suspicious order to the DEA, and there is no
16  program to review downstream distribution of
17  Teva products.
18    Do you see that?
19    A.  Yes.
20    Q.  Okay.  Now, you came from
21  AmerisourceBergen, and you testified that you
22  had been involved in reporting hundreds a
23  month, correct?
24    A.  Correct.

Page 299

1    Q.  At AmerisourceBergen, a distributor
2  of opioid narcotics, when you worked there as
3  the manager and investigator, your company was
4  reporting hundreds of suspicious orders of
5  opioid narcotics a month; is that fair?
6    A.  Correct.
7    Q.  But when you came to Teva, they had
8  never reported one, correct?
9    MR. HAMMOUD:  Objection.  Object to
10    the form.
11    THE WITNESS:  No.  I believe they
12    reported one.
13  BY MR. CARTMELL:
14    Q.  When was the one reported?
15    A.  I believe it was in 2013, but it
16  was before -- after this and before I started.
17    Q.  So even though you had reported
18  hundreds in your job as suspicious order
19  monitoring manager and investigator at
20  AmerisourceBergen and Teva, to your knowledge,
21  had only reported one in the eight years since
22  they had been selling and distributing opioids,
23  you believe Teva's suspicious order monitoring
24  program was working?

Page 300

1    A.  I believe so.
2    Q.  Now, did you know, from your
3  conversations or the documents that you've
4  reviewed in this case, that, in fact, Teva
5  never even started making reports of suspicious
6  orders until 2013?
7    MR. HAMMOUD:  Object to the form.
8    THE WITNESS:  I'm unaware of that.
9  BY MR. CARTMELL:
10    Q.  Is it fair to say, based on your
11  expertise as a suspicious order monitoring
12  manager and programs, that Teva had suspicious
13  orders or orders from customers that were
14  diverted prior to 2013?
15    MR. HAMMOUD:  Objection.
16  BY MR. CARTMELL:
17    Q.  Do you agree with that?
18    MR. HAMMOUD:  Object to the form.
19    Lacks foundation.
20    THE WITNESS:  Well, I'm certain
21    that product was being diverted.
22  BY MR. CARTMELL:
23    Q.  Okay.  So your point is not that
24  they didn't have suspicious orders that were

Page 301

1  being diverted; they simply didn't have a
2  system in place that was able to identify
3  those, correct?
4    A.  No, not at all.
5    MR. HAMMOUD:  Object to the form.
6  BY MR. CARTMELL:
7    Q.  When you were developing and
8  improving the suspicious order monitoring
9  program at Teva after 2014 and throughout 2015,
10  did you ever hire any outside consults or
11  experts to help you?
12    A.  No.
13    (Exhibit Teva-Tomkiewicz-014 marked
14    for identification and attached to the
15    transcript.)
16  BY MR. CARTMELL:
17    Q.  I'm going to hand you what's been
18  marked as Exhibit 14.  And I'll represent to
19  you, sir, that Exhibit 14 is a document that
20  was produced to the plaintiffs in this
21  litigation by Teva from their internal files.
22  Okay?
23    A.  Mm-hmm.
24    Q.  If you look at the first page of

Page 302

1 Exhibit 14, there's an e-mail, you'll see,
2 from --
3        Is it Itai?
4     A.  Itai.
5     Q.  -- Itai Rigbi to several
6 individuals, including your boss, Colleen
7 McGinn.
8        Do you see that?
9     A.  Yes.
10     Q.  And this is in August of 2015,
11 correct?
12     A.  Yes.
13     Q.  And at this time, you had been at
14 the company for, essentially, a year and eight
15 months?
16     A.  Yes.
17     Q.  It states, Dear all, Attached
18 please find the final audit report of the
19 Teva's DEA department.
20        Do you see that?
21     A.  Yes.
22     Q.  Okay.  And so it looks like in
23 2015, after you'd been there for a year and
24 eight months, there was actually an internal

Page 303

1 audit done by Teva of the department that you
2 were in; is that correct?
3     A.  Correct.
4     Q.  Okay.  And that's the DEA, as he
5 says, Drug Enforcement Administration,
6 department, correct?
7     A.  Correct.
8     Q.  All right.  And then it states
9 above, from Colleen McGinn to you and others on
10 August 19th, Attached is Itai's final report.
11     A.  Yes.
12     Q.  Sorry about that.
13        Do you see that?
14     A.  Yes.
15     Q.  So this is a report, I believe,
16 that was in your custodial file and was
17 produced.  You've seen this internal audit
18 report before today; is that correct?
19     A.  Yes, although I haven't reviewed it
20 in several years.
21     Q.  Were you involved in this internal
22 audit that was done at Teva in August of 2015?
23     A.  Yes, I was part of it.
24     Q.  And you were one of the individuals

Page 304

1 that was interviewed, correct?
2     A.  Yes.
3     Q.  And other individuals from your
4 department were interviewed as well; is that
5 right?
6     A.  Yes.
7     Q.  And tell me if I'm wrong, but this
8 individual, Mr. Rigbi --
9        Is that right?
10     A.  Yes, yes.  Mr. Rigbi, yes.
11     Q.  -- Mr. Rigbi actually worked for
12 the parent organization; is that correct?
13     A.  Well, Teva Pharmaceuticals in
14 Israel, yes.
15     Q.  In Israel?
16     A.  Yes.
17     Q.  Okay.  And so I take it that
18 Mr. Rigbi came from Israel over with a team to
19 perform this audit of your department.
20     A.  No.
21     Q.  Did he come just himself?
22     A.  Just himself.
23     Q.  Okay.  And why was this internal
24 audit done; do you know?

Page 305

1     A.  I can't remember the exact
2 circumstances.  I believe it was something to
3 do with our Forest plant.
4     Q.  What does that mean?
5     A.  That there was an issue with our
6 Forest plant, and in -- and in Israel, they
7 felt that they needed to do an audit of our DEA
8 compliance program.
9     Q.  Okay.  If you turn to -- actually,
10 it's page 4.  There's a section titled The DEA
11 Department.
12        Do you see that?
13     A.  Page 4?
14        MR. HAMMOUD:  I'm sorry.  What's
15     the Bates number?
16        MR. CARTMELL:  Last three digits,
17     567.
18 BY MR. CARTMELL:
19     Q.  It states, The DEA department is
20 responsible for handling all controlled
21 substances across U.S. pharma and R&D sites,
22 compliance with DEA agency regulations, and for
23 traceability of controlled substances to ensure
24 no diversions.

Page 306

1    Do you see that?
2    A.  Yes.
3    Q.  And that's an accurate statement of
4  the responsibility of the DEA department,
5  correct?
6    A.  I wouldn't say fully.  I wouldn't
7  say fully.
8    Q.  What would you disagree with in
9  that regard?
10    A.  Ensuring no diversions.  We try to
11  minimize diversion as much as we can trace,
12  but -- and I wish there were the ability to
13  prevent all diversion, but unfortunately, at
14  the manufacturer level, that's just not
15  possible.
16    Q.  Your responsibility and duty as a
17  manufacturer who is selling opioids is to do
18  your very best to try to prevent that, correct?
19    A.  Correct.
20    Q.  In total, 412 controlled substance
21  products are registered in all U.S. sites.
22    Do you see that?
23    A.  Yes.
24    Q.  So what does that mean?

Page 307

1    A.  That would be 412 different SKUs
2  that are registered across all sites.  And
3  that's not just products for sale, but that's
4  also products that -- in process, in the
5  manufacturing process.
6    Q.  Okay.  So I'm trying to understand.
7  Does that mean that there are 412 controlled
8  substance products that Teva was selling as of
9  this time in 2015?
10    A.  No.  No.  It just means that within
11  the system, there are 412 products that are
12  handled.  And it could -- and some of those are
13  in-process products that are never for sale to
14  the public but are moved between site and site.
15  And so they're in the system with a number, but
16  they're not products that are for sale.
17    Q.  Would the vast majority of that 412
18  likely be products for sale?
19    MR. HAMMOUD:  Object to the form.
20  BY MR. CARTMELL:
21    Q.  Or do you know?
22    A.  I don't know.
23    Q.  Okay.  Next bullet point states,
24  The department has 17 members who oversee the

Page 308

1  DEA compliance functions and processes for
2  Teva's registered facilities and maintain the
3  relationship with the DEA agency.
4    Do you see that?
5    A.  Yes.
6    Q.  The second-to-last -- I want to ask
7  you about the second-to-last bullet point.  It
8  says, The 17 team members are based in seven
9  different locations.
10    Is that correct?  That's the way it
11  was?
12    A.  Seems correct, yes.
13    Q.  Okay.  The team is responsible for
14  DEA activities in 11 pharma and R&D sites in
15  the U.S.
16    Do you see that?
17    A.  Yes.
18    Q.  On the next page, it states, Every
19  of the 11 sites has a dedicated DEA manager who
20  belongs to the DEA department and is
21  responsible for daily DEA activities at the
22  sites.  Some are responsible for several small
23  sites.
24    Is that correct?

Page 309

1    A.  Yes.
2    Q.  And so that gives the jury some
3  idea of how the individuals in your
4  department -- and there are now 17 as of
5  2015 -- are spread out among seven different
6  sites, correct?
7    A.  Correct.
8    Q.  Okay.  I want to ask you about the
9  findings of this internal audit.  And,
10  specifically, if you go to the page -- the last
11  three Bates numbers are 575.
12    Risk Management, do you see that?
13    A.  Oh, yes.
14    Q.  Now, this is an internal audit of
15  your department, the department that you are
16  the manager of suspicious order monitoring in,
17  and the findings of Mr. Rigbi, based on his
18  audit of your department, correct?
19    A.  Correct.
20    Q.  And one of the findings has to do
21  with the risk management in that department,
22  correct?
23    A.  Correct.
24    Q.  It states, The overall risk of the

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1 DEA operation is in noncompliance with DEA
2 requirements.
3        Do you see that?
4        A.  Yes.
5        Q.  So although you came on as a
6 manager to help with compliance at the DEA
7 specifically related to suspicious order
8 monitoring, as of 18 months after you got
9 there, according to your own internal audit,
10 your department was still not in compliance
11 with the DEA, correct?
12        A.  No.  That's not what that says.
13        Q.  Let me repeat what it says.
14        The overall risk of the DEA
15 operation is in noncompliance with DEA
16 requirements.
17        Do you see that?
18        A.  Yes.
19        Q.  Okay.  It then states, This can
20 lead to anything from issuing "letter of
21 admonition" up to withdrawal of the sites'
22 registrations.
23        Do you see that?
24        A.  Yes, that is correct.

Page 311

1        Q.  Okay.  Now, we talked earlier, but
2 one of the sanctions that the DEA can do if
3 you're not in compliance with the DEA is, they
4 can pull your registration, correct?
5        A.  Oh, yes.
6        Q.  And that's what that's referring
7 to, correct?
8        A.  That is correct.
9        Q.  It states, Various risks (security,
10 quota, suspicious monitoring, import/export,
11 and handling of documentations) are handled at
12 differing levels of performance, but not in an
13 overall methodological and orderly way.
14        Do you see that?
15        A.  Yes.
16        Q.  This was Teva's own internal audit
17 of the department, correct?
18        A.  Correct.
19        Q.  And one of the areas that it found
20 to be deficient and not operating in an overall
21 methodological and orderly way was the
22 suspicious monitoring operation that you were
23 manager of, correct?
24        A.  No.  I don't read that that way.

Page 312

1        Q.  It includes suspicious monitoring,
2 correct?
3        A.  He's listing all the duties of the
4 DEA compliance department.
5        Q.  And suspicious monitoring is the
6 one that you were manager of, correct?
7        A.  Correct, am manager of.
8        Q.  And were at the time, in 2015,
9 correct?
10        A.  Correct.
11        Q.  And it states all those areas --
12 those risks and those areas are handled at
13 different levels of performance but not in an
14 overall methodological and orderly way.
15        Do you see that?
16        A.  Yes.
17        Q.  It then states, There is no
18 organized overall risk management process, no
19 centralized and orderly list of DEA risks, and
20 no orderly heat-map of the risks that the DEA
21 department deals with.
22        Do you see that?
23        A.  Yes.
24        Q.  And do you agree with those

Page 313

1 findings by Mr. Rigbi?
2        A.  Not as you're characterizing them.
3        Q.  Well, I'm not trying to
4 characterize them.  I'm reading his words on
5 the paper.
6        A.  Well, certainly.  And what you're
7 saying isn't what I understand the meaning of
8 this to mean.
9        Q.  I'm actually not attributing
10 anything, other than I'm reading what he says.
11        Do you agree with what he says?
12        A.  I agree with what he says but not
13 how you're characterizing it.
14        Q.  Okay.  At any rate, this document
15 states that the DEA operation is in
16 noncompliance with DEA requirements, correct?
17        A.  No, that is not correct.
18        MR. HAMMOUD:  Objection.
19        THE WITNESS:  That is absolutely
20        untrue and not correct.
21 BY MR. CARTMELL:
22        Q.  The overall risk of the DEA
23 operation is in noncompliance with DEA
24 requirements.

Page 314

1    Do you see that?
2    A.  Let me clarify to how I read this,
3  that a risk in a DEA operation is in
4  noncompliance.  It's not saying that the DEA
5  operation of Teva is in noncompliance.
6    Q.  It says, The DEA operation is in
7  noncompliance with DEA requirements.
8    A.  Risk is in noncompliance.  And that
9  is an obvious opening statement, Risk is in
10  noncompliance.
11    Q.  Okay.  That portion of the DEA
12  operation, the risk portion of it, is in
13  noncompliance; is that what you're saying?
14    A.  I'm saying risk of any DEA
15  operation is in noncompliance.
16    Q.  Okay.  Do you agree with me that at
17  that point, this was a finding internally by
18  your own company, Teva, related to the DEA
19  department that you were in?
20    A.  Saying that we were generally in
21  noncompliance?
22    Q.  Yes.
23    A.  No.  I reject that.
24    Q.  Okay.  This is listed under

Page 315

1  category as High.  Do you see that?
2    A.  Yes.
3    Q.  One of the things that the auditor
4  internally at Teva was asked to do was to
5  determine the level of risk, the category of
6  risk that this finding was, correct?
7    A.  Certainly, yes.
8    Q.  If you go to the last page of
9  Exhibit 12 -- excuse me -- Exhibit 14, there's
10  Definitions of Risk Rankings.
11    Do you see that?
12    A.  Certainly.
13    Q.  And we know that this was
14  categorized as High, which means, This is a
15  serious internal control or risk management
16  issue that if not mitigated may, with a high
17  degree of certainty, lead to:  Substantial
18  losses; serious violation of corporate
19  strategies, policies or values --
20    Right?
21    A.  Correct.
22    Q.  -- serious reputation damage, such
23  as negative publicity in national or
24  international media --

Page 316

1    Right?
2    A.  Correct.
3    Q.  -- significant adverse regulatory
4  impact, such as loss of operating licenses or
5  material fines, right?
6    A.  Certainly.
7    Q.  As a high-risk issue, immediate
8  management attention is required.  The finding
9  is reported to the audit committee quarterly.
10    Do you see that?
11    A.  Certainly.
12    Q.  And so for how long was the risk
13  portion of the DEA operation in noncompliance
14  with DEA requirements; do you know?
15    MR. HAMMOUD:  Object to the form.
16    THE WITNESS:  Yeah, that -- the --
17    again, he's not saying that the DEA
18    department is in substantial
19    noncompliance.  That's not what he's
20    saying.  Additionally, the risk of being
21    in noncompliance is a high risk level.
22  BY MR. CARTMELL:
23    Q.  Okay.  And this observation by the
24  internal auditor was found to be high risk,

Page 317

1  correct?
2    MR. HAMMOUD:  Objection.  Asked and
3    answered.
4    THE WITNESS:  Yeah, that's been
5    asked and answered.  It's -- I'm not
6    saying that there's a finding -- that
7    he's finding high risk.  It's the
8    potential of being in noncompliance that
9    is high risk.
10  BY MR. CARTMELL:
11    Q.  Sir, we just read what the
12  potential risks are related to this finding,
13  correct?
14    A.  Exactly.
15    Q.  And it's high, and it's serious,
16  correct?
17    MR. HAMMOUD:  Objection.  Asked and
18    answered.
19    THE WITNESS:  Mm-hmm.
20  BY MR. CARTMELL:
21    Q.  Isn't that correct?
22    A.  I've answered that.  Yes.
23    Q.  Okay.  They also had a finding
24  related to the suspicious order monitoring; is

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1 that correct?
2       A.   Certainly.  Where is that?
3       Q.   That's at page -- the last three,
4 Bates 581.
5       A.   581.
6       Q.   Suspicious Order Monitoring.  It
7 states, In order to identify anomalous sales
8 activity, an overall process of reviewing all
9 sales orders is conducted by the DEF OPS.
10      Right?
11      A.   Yeah.
12           Actually, it's probably easier if I
13 just read it and --
14      Q.   That's okay.  I want to read it for
15 the jury, and then I'll follow up and ask you
16 questions.  Okay?
17           MR. HAMMOUD:  Can you give him a
18      second to read it --
19           THE WITNESS:  Yeah.
20           MR. CARTMELL:  Oh, I'm sorry.
21           MR. HAMMOUD:  -- for himself?
22 BY MR. CARTMELL:
23      Q.   Oh, I'm sorry.  I thought you meant
24 you'd rather me not read it.

Page 319

1       A.   Oh, no, no.  You can -- yeah.
2       Q.   Go right ahead.
3            THE WITNESS:  I just want to read
4       it first, yeah.
5            (Reviewing documents.)
6            Okay, I'm good.
7 BY MR. CARTMELL:
8       Q.   So the internal audit, one of the
9 things that was done was to take a look at your
10 suspicious order monitoring program that was in
11 place, correct?
12      A.   Correct.
13      Q.   And to assess whether or not that
14 was putting your company, Teva, at risk,
15 correct?
16      A.   Correct.
17      Q.   Okay.  And so Mr. Rigbi came in and
18 had interviews with you and, I think, Colleen
19 McGinn and several other individuals within
20 your department, correct?
21      A.   Correct.
22      Q.   It states, In order to identify
23 anomalous sales activity, an overall process of
24 reviewing all sales orders is conducted by the

Page 320

1 DEF OPS.
2            Do you see that?
3       A.   Yes.
4       Q.   Now, that is the computer algorithm
5 system that was put in place primarily because
6 of you when you came to be the manager,
7 correct?
8       A.   Correct.
9       Q.   And that was what you thought was
10 an improvement, more robust system to try to
11 help find suspicious orders, correct?
12      A.   Correct.
13      Q.   Okay.  If you go down a little bit,
14 it says, DEF OPS sifts through approximately
15 10,000 monthly order line items --
16           Do you see that?
17      A.   Yes.
18      Q.   -- and automatically releases
19 approximately 95 percent of the orders that fit
20 a customer's normal ordering pattern.
21           Do you see that?
22      A.   Yes.
23      Q.   And that's, I take it, consistent
24 with your memory of DEF OPS at this time, in

Page 321

1 2015.
2       A.   It's worded not the best, but Itai
3 is not a native English speaker.
4       Q.   Okay.  And I want to make a point
5 or ask a question here.
6            We saw from Mr. Buzzeo's report
7 about the SORDS previous computer algorithm,
8 and it made a statement that at that time,
9 SORDS, in 2012, was only pending or flagging --
10 what was it? -- 10 orders a week?
11           MR. HAMMOUD:  Objection.  Asked and
12      answered.
13           THE WITNESS:  Correct.
14 BY MR. CARTMELL:
15      Q.   That would be 40 a month, wouldn't
16 it?
17           MR. HAMMOUD:  Objection.
18           THE WITNESS:  I've never seen the
19      numbers, but I won't dispute it.
20 BY MR. CARTMELL:
21      Q.   Right.  And all I was doing was
22 simple math --
23      A.   Yeah.
24      Q.   -- that if it's 10 a week that are

Page 322

being flagged as potentially suspicious and there's four weeks in a month, then you have 40 a month. Correct?

A. Which is why I'm not disputing that at all.

Q. Okay. So SORDS, up until 2012, according to the documents, was pending or flagging approximately 40 a month, and your new system, DEF OPS, is flagging approximately 10,000 a month?

A. No, not flagging. Approximately 10,000 order lines were going through the system, and about 5 percent of those were being flagged for manual investigation.

Q. Okay. I apologize. I used the wrong figure to do the math.

A. I do that all the time.

Q. That's all right.

So of the 10,000 monthly orders that are coming through, approximately 95 of those just sail through the system, and they're not pended or flagged, correct?

A. Correct.

MR. HAMMOUD: Objection.

Page 323

BY MR. CARTMELL:

Q. The 5 percent -- the remaining 5 percent of the orders that did not pass that are pended or flagged, correct?

A. Correct.

Q. And 5 percent, I think, of 10,000 is -- what? -- 500?

A. Yes.

MR. HAMMOUD: Object to the form.

BY MR. CARTMELL:

Q. Okay. And so of note is that when we talked previously about the SORDS algorithm that was in place in 2012, it was noted by the consultant expert that SORDS, that algorithm, was only flagging or pending approximately 10 orders a week, correct?

A. Correct again.

Q. And if my math is right, that would be approximately 40 pended or flagged orders a month, correct?

A. Correct.

MR. HAMMOUD: Objection. Asked and answered.

BY MR. CARTMELL:

Page 324

Q. And your new system, DEF OPS, if this is correct, was pending or flagging approximately 500 a month, correct?

MR. HAMMOUD: Objection. Asked and answered multiple times.

THE WITNESS: Multiple times, yes.

BY MR. CARTMELL:

Q. Okay. And so we know that DEF OPS, when compared to SORDS, or SORDS 1 at least, was flagging or pending a lot more potentially suspicious orders than had been done at Teva previously, correct?

MR. HAMMOUD: Objection. Object to the form.

THE WITNESS: That is correct.

BY MR. CARTMELL:

Q. And is that some evidence to you, as you've said, that this was a better system that you put in place for the suspicious order monitoring algorithm?

MR. HAMMOUD: Object to the form.

THE WITNESS: I would hope. I would hope.

BY MR. CARTMELL:

Page 325

Q. Okay. It then states, The 5 percent are manually checked and placed on hold until they will be rechecked by trained team members of suspicious order monitoring, and then the release is enabled.

Right?

A. Correct.

Q. Okay. And just so the jury understands, that means 10,000 orders are coming through; 5 percent, or 500 of those, typically, on average, are going to be flagged as potentially suspicious.

Those are put on hold, and then you and your one other individual in your department who reports to you would further investigate those to decide whether or not to release the hold and let the opioids ship or whether or not they were suspicious and --

A. Well, controlled substance, because --

MR. HAMMOUD: Object to the form.

THE WITNESS: And, again to clarify, this is all controlled substances, not just opioids.

Page 326

BY MR. CARTMELL:

Q.  Okay.  So the 5 percent, or 500, you and one other individual would investigate those controlled substances to determine whether or not those should be held and not actually shipped to the customer because they're suspicious, right?

A.  Correct.

Q.  Okay.  It then states, The SOM unit investigates approximately 15 customers a month.

Do you see that?

A.  Yes.

Q.  And that would be the investigation done by you and one other individual; is that right?

A.  Well, that would be an inquiry to the customer, which could be through customer service.

Q.  Okay.  Explain what you mean by that.  In other words, if you have an order that is being held because it's potentially suspicious of these 500, if there's going to be a discussion with the actual customer, Teva's

Page 327

customer, was the policy at Teva that the customer service individual was the one who would have that contact with the client?

A.  The initial contact, yes.

Q.  Okay.  And that individual from customer service, as we discussed, is somebody who is involved in discussing sales with the clients, correct?

A.  Correct.

Q.  It then says, From a total share of delayed orders, only a small quantity are delayed for more than one day (approximately 25 orders a month).

Do you see that?

A.  Yes.

Q.  So of the 500 orders that might, on average, be held and flagged as potentially suspicious, about 25 of those are held longer than one day; is that right?

A.  Correct.  At the time, I'm sure that's an accurate number.

Q.  So you're completing all your investigations on almost all of those 500, approximately 475 of them, within one day?

Page 328

A.  Yes.

Q.  And many of those, I've seen from the documents, they're only held as potentially suspicious and then released within a matter of minutes, correct?

MR. HAMMOUD:  Object to the form.

THE WITNESS:  Can be.

BY MR. CARTMELL:

Q.  In fact, that's a large number of them, correct?

A.  Oh, yes, mm-hmm.

Q.  And then those final 25, of those, within the last year, there had only been two that were found to be suspicious orders, correct?

A.  That is correct.

Q.  Okay.  And this is in 2015, correct?

A.  Correct.

Q.  So if my math is right, you're going to have in a single year 120,000 orders for opioids, correct?

A.  No.

MR. HAMMOUD:  Objection.

Page 329

BY MR. CARTMELL:

Q.  120,000 line orders; is that right?

MR. HAMMOUD:  Object to the form.  Mischaracterizes prior testimony.

THE WITNESS:  Controlled substances.

BY MR. CARTMELL:

Q.  I'm sorry.  Let me start over.  I'm dense.

If my math is right, then based on this, your department is going to have 120,000 orders of controlled substances, including opioids, in a year, correct?

A.  Yes.

Q.  And of those in a year, do you believe, on average, the number of those that are found to be suspicious is two?

A.  Yes.

Q.  It then states, The manual testing process for the segment of suspicious orders and the release of approximately 5 percent of them is conducted by one person who has the authority to change the status of the orders from hold to release.

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1     Do you see that?
2     A.  Yes.
3     Q.  So if I understand that correctly,
4  does that mean that there is only one person in
5  the department that, after the investigations
6  of those orders that are thought to be
7  potentially suspicious, can make the decision
8  on whether or not to release those and ship the
9  orders of opioids or controlled substances or
10  decide that they're suspicious and stop that
11  shipment?
12     MR. HAMMOUD:  Object to the form.
13     THE WITNESS:  Yes, it can be.
14  BY MR. CARTMELL:
15     Q.  Well, it is just one person at this
16  time, right?
17     A.  Well, in terms of a deeper
18  investigation into a controlled substance, it
19  involves multiple people.
20     Q.  But I'm not asking about the
21  investigation.  I'm asking about the ultimate
22  decision on whether or not to ship the
23  controlled substances, including opioids.
24     That decision on who will make the

Page 331

1  decision either release the opioids into the
2  community, even though they were tagged
3  originally as potentially suspicious, or hold
4  those and not ship those, that -- at this time,
5  in 2015, that decision rested with one
6  individual, correct?
7     MR. HAMMOUD:  Object to the form.
8     Asked and answered.
9  BY MR. CARTMELL:
10     Q.  The final decision.
11     A.  Yeah, and are you saying that for
12  all orders that we investigated, that only one
13  person was making the decision?
14     Q.  No.  I'm talking about the decision
15  related -- whether or not to hold or release.
16     A.  The ultimate decision?
17     Q.  The ultimate decision.
18     A.  No, that's not one person.  There's
19  one person clicking a button.
20     Q.  It says, Granting exclusive
21  authority to a single person to release a
22  suspicious order constitutes a risk for
23  mistakes.
24     Do you see that?

Page 332

1     A.  Yes.
2     Q.  And it states that only one person
3  who -- had the authority to change the status
4  of the orders from hold to release.
5     Do you see that?
6     A.  Yes.
7     Q.  And is that true?  In 2015, there
8  was only one person who could change the status
9  of these potentially suspicious orders from
10  hold to release?
11     MR. HAMMOUD:  Objection.  Asked and
12     answered.
13     THE WITNESS:  And that's the
14     procedure in 2018 as well.
15  BY MR. CARTMELL:
16     Q.  Okay.  Do you agree with the
17  internal audit that says, Granting the
18  exclusive authority to a single person to
19  release a suspicious order constitutes a risk
20  for mistakes?
21     A.  No.
22     Q.  You disagree with this audit?
23     A.  I disagree with -- yeah, I disagree
24  with this audit.

Page 333

1     Q.  And this was your department that
2  was being criticized here, correct?
3     A.  Yes, yes.
4     Q.  You take a lot of pride in your
5  department, I take it.
6     THE WITNESS:  Well, I hope so.
7     MR. HAMMOUD:  Objection to the
8     form.
9     THE WITNESS:  Well, I hope so.
10  BY MR. CARTMELL:
11     Q.  This identifies the potential risk,
12  if you look at the next column, False approval
13  and release of suspicious sales orders.
14     Do you see that?
15     A.  Yes.
16     Q.  And, again, that's talking about
17  the potential that there are suspicious orders
18  that Teva, as a company, is missing and going
19  ahead and releasing those into the community,
20  correct?
21     A.  No.
22     MR. HAMMOUD:  Object to the form.
23     THE WITNESS:  No.
24  BY MR. CARTMELL:

Page 334

1  Q. This risk -- let me restate it.
2     This risk, where it says, False
3  approval and release of suspicious sales
4  orders, what does that mean to you?
5     A. I can tell you what my conversation
6  with Itai was.
7     Q. Really, what I want to hear is
8  what -- Mr. Rigbi's statement, where he says,
9  False approval and release of suspicious sales
10  orders -- is the risk associated with this
11  finding of your department.
12     A. And what he was talking about was
13  the final click of the button to release, that
14  he wanted two people there to witness the click
15  of the final button.
16     Q. Your testimony is that there could
17  be false -- mistakes, he was saying, if only
18  one person was pushing a button that went from
19  hold to release on an order?
20     MR. HAMMOUD: Object to the form.
21     Asked and answered.
22     THE WITNESS: That's exactly what
23  I'm saying.
24  BY MR. CARTMELL:

Page 335

1     Q. And he, Mr. Rigbi, when he did the
2  internal audit, categorized this risk as
3  moderate; is that correct?
4     A. Correct.
5     Q. If you look at the last page,
6  there's a description of what a moderate risk
7  is; is that correct?
8     A. Yes.
9     Q. And it states, This is an internal
10  control or risk management issue that could
11  lead to financial losses; loss of controls
12  within the organizational entity or process
13  being audited; reputation damage, such as
14  negative publicity or local or regional media;
15  adverse regulatory impact, such as public
16  sanctions or immaterial fines, adverse
17  regulatory -- or excuse me.
18     It then states, As a moderate risk
19  issue, timely management attention is
20  warranted. The finding should be reported to
21  the audit committee as necessary.
22     Do you see that?
23     A. Yes.
24     Q. And do you agree that this was a

Page 336

1  moderate risk, as defined here, this finding
2  about the suspicious order monitoring program?
3     A. No.
4     Q. You disagree with Mr. Rigbi's
5  findings, correct?
6     A. With the finding as written here,
7  yes. And I'm trying to find where that was.
8     Q. Why was it that even though the
9  internal audit found this to be a moderate risk
10  and that could lead to the false approval and
11  release of suspicious sales orders by only
12  having one individual who was pushing that
13  button, as you say -- why is it that you
14  decided not to have additional individuals, as
15  suggested, to be involved in that process?
16     A. Well, they are involved in the
17  process. I'm talking the actual physical
18  clicking of the button. That's what this was
19  discussing.
20     Q. I understand.
21     Why is it that even though the
22  internal found that that could be a risk of
23  you-all going ahead and missing a suspicious
24  order or sending out a suspicious order that

Page 337

1  should be held -- why is it that you decided
2  not to adopt the recommendation and change the
3  practice?
4     MR. HAMMOUD: Object to the form.
5     THE WITNESS: We felt it was
6     unnecessary, that there wasn't a risk of
7     accidentally shipping a suspicious order
8     through the process of one person
9     clicking the button.
10  BY MR. CARTMELL:
11     Q. Has there been any additional
12  audits or follow-up audits of your department,
13  the DEA department, since this 2015 internal
14  audit?
15     A. Our legal department instituted an
16  audit that's under -- that's privileged.
17     Q. When did that start?
18     A. That was last month, I believe, or
19  the month before.
20     Q. Have you received the results of
21  that audit?
22     A. Yes.
23     Q. Was that audit done in anticipation
24  of any sort of DEA investigation?

Page 338

1    A.  No.
2        MR. HAMMOUD:  Objection to the
3    form.
4  BY MR. CARTMELL:
5    Q.  Do you know why that audit was
6  done?
7        MR. HAMMOUD:  Objection to the
8    form.
9        THE WITNESS:  Because since this
10   internal audit, there was no audit of
11   the program done.
12 BY MR. CARTMELL:
13   Q.  Why was it that the next audit that
14 was done was done by the legal department?
15       MR. HAMMOUD:  Objection to the
16   form.
17       THE WITNESS:  You have to ask the
18   legal department.
19 BY MR. CARTMELL:
20   Q.  Was the process of the audit that
21 was undertaken by the legal department the same
22 process that Mr. Rigbi undertook?
23       MR. HAMMOUD:  Objection to the
24   form.

Page 339

1        THE WITNESS:  No.
2  BY MR. CARTMELL:
3    Q.  What was the difference?
4    A.  It was much more extensive.
5    Q.  Okay.  And has the result of that
6  actually come out yet?
7    A.  Yes.
8    Q.  Okay.  When did they come out?
9    A.  That was a couple weeks ago.
10   Q.  Was the audit at the request of
11 legal?
12   A.  Yes.
13   Q.  Okay.  And who was involved in that
14 audit, other than the lawyers for the company?
15   A.  Me, Colleen McGinn, Matt Benkert, I
16 think Tim Aleman, and Sarah Everingham.
17   Q.  Now, this 2015 internal audit that
18 we just went through that had the findings --
19 high risk findings related to the DEA
20 department and the moderate risk findings
21 related to the suspicious order monitoring
22 program, this was internal in nature, and these
23 findings were not provided to the DEA, correct?
24   A.  Not that I know of.

Page 340

1    Q.  Okay.  It's your understanding that
2  this was a confidential internal audit?
3    A.  I would assume.
4        (Exhibit Teva-Tomkiewicz-015 marked
5    for identification and attached to the
6    transcript.)
7  BY MR. CARTMELL:
8    Q.  I'm handing you what has been
9  marked as Exhibit 15.  And I'll represent to
10 you, sir, that this was a PowerPoint
11 presentation that was produced to the
12 plaintiffs in this lawsuit by Teva from their
13 internal files.  Okay?
14   A.  Yes.
15   Q.  And it looks like this is a
16 PowerPoint presentation that you gave in 2017.
17 Is that right?
18   A.  Yes.
19   Q.  This was created by you, correct?
20   A.  Yes.
21   Q.  And kept by you in the course of --
22 ordinary course of your employment at Teva?
23   A.  Yes.
24   Q.  Okay.  Who did you give this

Page 341

1  presentation to?
2    A.  To our internal DEA compliance
3  team.
4    Q.  Would that be all of the 16 or 17
5  employees that you have in that department?
6    A.  I think the number is less now, but
7  yes, it would be the entire DEA compliance
8  team.
9    Q.  Has the number of DEA compliance
10 employees at Teva decreased recently?
11       MR. HAMMOUD:  Object to the form.
12       THE WITNESS:  Yes.
13 BY MR. CARTMELL:
14   Q.  How so?
15   A.  We had an overall reduction in head
16 count, and we lost some people.
17   Q.  When did that occur?
18   A.  Oh, maybe a year ago, close to a
19 year ago, approximately.
20   Q.  Sometime in 2017?
21   A.  It could have been, yes.
22   Q.  And how many people from the DEA
23 compliance department actually were lost in
24 that downsizing?

Page 342

1  A. I think it may have been two or
2 three.
3  Q. So is your best guess, as you sit
4 here today, that the size of the DEA compliance
5 department is now somewhere around 12 or 13 or
6 14?
7  A. No. I don't know how many people,
8 because we had increased. Then we lost people.
9  Q. What's your best guess?
10  A. Could be about the same. Maybe 14,
11 maybe 15, maybe 16.
12  Q. Okay. If you turn to page --
13 strike that.
14    This presentation you gave is in
15 2017; is that right?
16  A. Yes.
17  Q. Do you remember when approximately
18 in 2017?
19  A. I think it was towards the end of
20 2017.
21  Q. If you turn to the internal page,
22 the very next page, which is the first page of
23 your presentation, it states, SOM, suspicious
24 order monitoring. And then you have a graph

Page 343

1 that you provide. It's titled Overdose Deaths
2 Involving Opioids, United States, 2000-2015.
3    Do you see that?
4  A. Yes.
5  Q. Okay. And if I'm reading this
6 correctly, the very top line, titled Any
7 Opioid, is a line that shows a rapidly
8 increasing number of overdose deaths in the
9 United States between 2000 and 2015 from all
10 opioids, whether prescription or not, correct?
11  A. I would say an increasing line,
12 yes.
13  Q. Okay. And then the second line
14 increases -- I don't want to put words in your
15 mouth, but -- pretty substantially from 2000
16 through 2011, goes down a little bit in '12 and
17 seems to be increasing a little after that. Is
18 that right?
19  A. I would say that it appears more
20 flat. There does show a slight increase
21 between 2013 and 2015, but that's still down
22 from 2011.
23  Q. Okay. And that line would indicate
24 the opioids that are prescribed opioids like

Page 344

1 some of the opioids that Teva sells and
2 contributes distributes, correct?
3    MR. HAMMOUD: Object to the form.
4    THE WITNESS: Certainly. That's a
5 fair assessment.
6 BY MR. CARTMELL:
7  Q. Why is it that you present that
8 slide to your team?
9  A. Because I want them to be aware of
10 the risks of not having a good program.
11  Q. "The risks," are you saying the
12 risks associated with not having a good
13 suspicious order monitoring program?
14  A. Correct, not being vigilant in what
15 we do, not being effective in what we do.
16 Certainly.
17  Q. And what do you mean by that? In
18 other words, are you saying to them that if
19 we're not vigilant, we can contribute to,
20 actually, the number of deaths that occur --
21  A. That's exactly what I'm saying.
22    MR. HAMMOUD: Object to the form.
23 BY MR. CARTMELL:
24  Q. Go ahead.

Page 345

1  A. That's exactly what I'm saying.
2  Q. Okay. So you're trying to impress
3 on your team that's involved in suspicious
4 order monitoring that you have to be very
5 diligent and do the very best you can to
6 identify all suspicious orders and investigate
7 those and not let those orders get to the
8 streets, fair?
9    MR. HAMMOUD: Object to the form.
10    THE WITNESS: It's an odd way of
11 saying it.
12    But generally, what I'm saying is
13 that this is how important I take this
14 business and what I'm doing and -- in
15 identifying things that are suspicious,
16 identifying customers that are
17 suspicious.
18    Because if I'm not vigilant and I
19 don't stand up strong for what I do
20 within the company, people are going to
21 die.
22    And, additionally, if I have an
23 ineffective program, one that goes the
24 other way wrong, then I have people with

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1   cancer, people in hospice, who are
2   sitting in pain.
3  BY MR. CARTMELL:
4      Q.   And I mentioned the opioids being
5  shipped by your company and others getting to
6  the streets, but it's not just getting to the
7  streets.  It's actually, if you miss suspicious
8  orders that are diverted ultimately, it's
9  getting to actual patients, correct?
10      MR. HAMMOUD:  Object to the form.
11  BY MR. CARTMELL:
12      Q.   Addicted patients.
13      A.   Addicted patients?
14      MR. HAMMOUD:  Object to the form.
15  BY MR. CARTMELL:
16      Q.   Let me strike that and restate it.
17      I mentioned that one of the risks
18  is that if you don't have a really effective
19  and good suspicious order monitoring program in
20  place -- that one risk of that is that you'll
21  miss suspicious orders, and the opioids will be
22  shipped and get to the streets.
23      Do you remember me saying that?
24      MR. HAMMOUD:  Object to the form

Page 347

1   again.
2      THE WITNESS:  Oh, I don't remember
3      you saying that, but that's a fair
4      assessment of missing a suspicious
5      order.
6  BY MR. CARTMELL:
7      Q.   And what I was saying was just
8  clarifying that -- and maybe it's not well said
9  and an odd way to say it, as you said, but --
10  the risk is also not only getting to the
11  streets, but the risk is that it gets to --
12  from diverters to addicted patients, correct?
13      MR. HAMMOUD:  Object to the form.
14      THE WITNESS:  Getting from -- I'm
15      not sure what you mean by an "addicted
16      patient," "from a diverter to an
17      addicted patient."  I'm not --
18  BY MR. CARTMELL:
19      Q.   You don't know what that means?
20      A.   I have no clue.
21      Q.   Okay.  Well, you know, from your
22  research and investigation that you did at Teva
23  and you did before that at AmerisourceBergen,
24  that all over the United States, for several

Page 348

1   years now, opioids that have been shipped from
2  manufacturers and distributors have ended up in
3  pharmacies that have then filled prescriptions
4  of those opioids to patients who are addicted
5  to opioids, correct?
6      MR. HAMMOUD:  Objection to the
7      form.  Vague.
8      THE WITNESS:  Oh, I'm certain.
9  BY MR. CARTMELL:
10      Q.   Okay.  And you also know from your
11  experience that if that happens from time to
12  time, as you showed in the chart on the
13  previous page and that is being shown the to
14  the jury, those addicted patients can overdose?
15      MR. HAMMOUD:  Object to the form.
16      THE WITNESS:  Any patient can
17      overdose.
18  BY MR. CARTMELL:
19      Q.   Okay.  That's my --
20      A.   Not just addicted.  Any patient can
21  overdose.
22      Q.   That's my only point.  We can move
23  on.
24      If you turn to the next page, this

Page 349

1   is your slide prepared by you in 2017, and this
2  actually has the suspicious orders that Teva
3  had reported to the DEA since you arrived as
4  the manager of the suspicious order monitoring
5  program; is that correct?
6      A.   Correct.
7      Q.   And so we know that the first year
8  that you were there --
9      And this -- the first year was
10  during a time that you were working on sort of
11  revamping and improving the process, correct?
12      A.   Correct.
13      Q.   You were putting in place --
14      A.   Well, I shouldn't limit it, because
15  I always want to continuously improve.
16      Q.   Right.
17      But you were new at that point and,
18  as you discussed, that's the time when you had
19  said when you were being hired -- and they told
20  you they were going to let you improve and make
21  it a better, more robust suspicious order
22  monitoring program, correct?
23      MR. HAMMOUD:  Objection to the
24      form.  Mischaracterizes prior testimony.

Page 350

BY MR. CARTMELL:

Q. You can answer.

A. I would say I was brought in to improve the program.

Q. Okay. And so during that year, 2014, your company, Teva, reported one suspicious order; is that correct?

A. Correct.

Q. Okay. During 2015, your company reported four, correct?

A. Correct.

Q. And, again, we know that during these years, Teva was getting thousands and thousands -- over a hundred thousand orders for controlled substances, correct?

A. Correct.

Q. Okay. And then in 2016, the year after the audit we just talked about, the internal audit, the suspicious order monitoring program at Teva didn't report a single suspicious order, correct?

A. Correct.

Q. If we just look at those three years -- strike that.

Page 351

And we know, from what you've seen previously as we've talked today, that in 2012 and before, they had not reported a single suspicious order to the DEA, correct?

A. That's correct.

Q. And you said there was one in 2013, correct?

A. I believe so, yes.

Q. So if we add that up from 2012 to 2016 -- and we'll talk about '17 in a minute -- that's one, two, three, four -- five years and six suspicious orders over those five years, correct?

A. Correct.

Q. And we know from the internal audit, if the numbers are accurate, that -- 120,000 orders a year. So if we do that multiplication times five, that's 600,000 orders, correct?

A. Certainly.

Q. And out of that 600,000 orders during the five years from 2012 to 2016, there were only six of those that were found to be suspicious by your company, correct?

Page 352

A. Correct.

Q. That's true even though you came from AmerisourceBergen, where you were reporting hundreds of suspicious orders monthly, correct?

A. That is correct.

Q. Okay. And then in 2017, you report that your company had reported 18 suspicious orders so far; is that right?

A. That is correct.

Q. And, again, you don't recall specifically when during the year this was done; is that right?

A. Correct. It was towards the end of the year.

Q. Okay. And so there was a definite uptick in the numbers of suspicious orders that you had found at that point?

A. Correct.

MR. HAMMOUD: Object to the form.

BY MR. CARTMELL:

Q. Okay. And what is your understanding of why, all of a sudden, in that one year, you had found three times as many

Page 353

suspicious orders as you had found in the prior five years at Teva?

A. Well, a couple reasons. One, seen a pattern in drug abuse had shifted. There were some additional products that abusers were seeking out, one of which is a noncontrolled substance called gabapentin. Which, when we saw suspicious orders for that product, we still reported them as suspicious, and so they're in that 18 number.

We also had some customers -- potential new customers due to bringing on some additional business that we terminated and reported their orders as suspicious.

And those particular customers, by the way, are still licensed in the states in which they do business, and they're still registered with the DEA. But we felt that they were not of a good risk for Teva to do business with, so we terminated their ability to purchase controlled substances for them.

Some of those customers had placed orders after the termination, attempted to place orders for those products, and we

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 reported those as suspicious as well.
2      Additionally, there was a couple
3 potential new customers that tried coming on
4 board and placing orders before being approved
5 that, ultimately, we denied them, and we
6 reported those orders as suspicious as well.
7     Q. Okay. Of these 18 suspicious
8 orders that you reported to the DEA in 2017,
9 did you ship the actual opioids out in any of
10 those?
11     MR. HAMMOUD: Object to the form.
12     THE WITNESS: And not just opioids
13     but other controlled substances and one
14     noncontrolled substance. And we did not
15     ship any of those.
16 BY MR. CARTMELL:
17     Q. How many of the 18 reports dealt
18 with opioid -- suspicious opioid orders?
19     A. Couldn't tell you offhand.
20 Couldn't tell you offhand.
21     Q. Do you have any idea?
22     A. I know there were some in there,
23 but I couldn't tell you offhand.
24     Q. Can you guesstimate?

Page 355

1     A. No, I can't guesstimate.
2     MR. HAMMOUD: Objection. Asked and
3     answered.
4 BY MR. CARTMELL:
5     Q. There's documents that would tell
6 us that, correct?
7     A. You have the reports, yeah.
8     Q. There would be reports from the
9 DEF OPS system?
10     A. No. The actual copies of the
11 reports that I've sent to the local office.
12     Q. Oh, you're talking about the
13 reports that you actually sent to --
14     A. DEA.
15     Q. -- the local Philadelphia --
16     A. Yes.
17     Q. -- DEA administration office?
18     A. Yes.
19     Q. Okay. And are those -- a copy of
20 those reports kept at Teva in your files?
21     A. Yes.
22     Q. Okay. Any of the 18 controlled
23 substance reports that you made to the DEA in
24 2017, was the product actually shipped in any

Page 356

1 of those, or was it held in all of those?
2     MR. HAMMOUD: Objection. Asked and
3     answered. And then objection to the
4     form.
5     THE WITNESS: Didn't ship any of
6     them.
7 BY MR. CARTMELL:
8     Q. Okay. What were the names of the
9 customers that you say in 2017 were new and
10 that you reported to the DEA?
11     A. EMED, DV Medical, Associated
12 Pharmacies, Inc., and I believe Rochester Drug
13 Corporation -- or Co-op. Not Corporation.
14 Co-op. I believe those are they.
15     Q. And is it true that of those 18
16 reports that you made in 2017, 12 of those
17 reports made to the DEA were reports on
18 Rochester Drugs?
19     A. Could have been. Could have been.
20     Q. And did any of the other reports
21 that you made in '17 -- were there multiple
22 reports for a single customer?
23     A. Could have been. Could have been.
24     Q. Do you remember who it was that you

Page 357

1 reported to the DEA, which customers it was, in
2 2015?
3     A. In 2015, I want to say Osborne
4 Drugs and, possibly, Richie Pharmacal.
5     Q. What was the reason for those
6 reports?
7     A. Felt the orders were suspicious.
8     Q. What were the drugs involved?
9     A. Don't remember.
10     Q. Were they opioids; do you know?
11     A. Don't remember.
12     MR. HAMMOUD: Objection.
13 BY MR. CARTMELL:
14     Q. If you go to the next page of your
15 2017 presentation to your team, there's what's
16 listed as a Red Flags, and it gives the Jones
17 Total Health Care Pharmacy and SND Health Care
18 Decision and Order. Tell us about that.
19     A. This was a piece that I used to
20 explain how if we have red flags on one of our
21 orders, I won't -- our department won't allow
22 it to be shipped until any red flags are
23 satisfied.
24     Q. Any and all red flags?

Page 358

1    A.  Any and all.
2    Q.  I want to ask you about that.
3  That's the policy that you're talking about for
4  DEA holds at Teva; is that true?
5    A.  Correct.
6        (Exhibit Teva-Tomkiewicz-016 marked
7        for identification and attached to the
8        transcript.)
9  BY MR. CARTMELL:
10   Q.  I'm going to hand you what's been
11 marked as Exhibit 16, which is a 2018 standard
12 operating procedure for Suspicious Order
13 Monitoring - DEA Order Holds.
14       You're familiar with that policy, I
15 take it.
16   A.  Yes.
17   Q.  And if you wouldn't mind turning to
18 page 3 of 8.
19       This talks about the process in
20 place as far as holding orders of controlled
21 substances like opioids and other controlled
22 substances as of 2018, I believe.
23       This is a 2018 policy.  Do you see
24 that?

Page 359

1    A.  Yes.
2    Q.  Okay.  And I don't think the policy
3  has ever changed between the time you arrived
4  in 2014 and this policy.  Has it?
5    A.  Not substantially.
6    Q.  Okay.
7    A.  I believe all the changes that I
8  made for 2016 were just clarifying wording.
9    Q.  Okay.  If you go to page 3 of 8, it
10 states at 6.2.2, If the order is not consistent
11 with the customer's previous order history and
12 there is not a previous explanation from the
13 customer, the DEA compliance team will notify
14 customer service to contact the customer for
15 clarification about the quantity ordered.
16       Do you see that?
17   A.  Yes.
18   Q.  And we talked about that.  Customer
19 service, again, is a different department than
20 your DEA compliance department, correct?
21   A.  Correct.
22   Q.  And those individuals in that
23 department are usually involved in dealing with
24 the customers from a sales standpoint, correct?

Page 360

1    A.  That is correct.
2    Q.  They provide the sales services to
3  the clients or the customers, correct?
4    A.  I don't know exactly what services
5  they provide, but I won't dispute that.
6    Q.  Okay.  It then says, Customer
7  service will contact the customer to request
8  the reason for the increase/change in ordering
9  pattern.
10       Do you see that?
11   A.  Yes.
12   Q.  And that's the policy, that if
13 there's going to be contact with a customer,
14 it's not going to be a DEA compliance
15 individual who is going to make that contact
16 with the customer; it's going to be somebody
17 from the customer service sales department who
18 does that, correct?
19   A.  Correct.
20       MR. HAMMOUD:  Object to the form.
21 BY MR. CARTMELL:
22   Q.  Is that correct?
23   A.  That is correct.
24   Q.  And it says, Questions posed by

Page 361

1  customer service to the customer will be
2  open-ended.
3        Do you see that?
4    A.  Yes.
5    Q.  Why is that?
6    A.  Because we don't want to lead the
7  customer as far as what a potential answer
8  should be.
9    Q.  Right.  Because if you lead them or
10 give any indication of what they should say
11 that's appropriate to have the order released,
12 then your program is not going to work, right?
13   A.  That's a fair assessment.
14   Q.  It then says, Customer service then
15 forwards that information on to the DEA
16 compliance team for review.
17       Right?
18   A.  Correct.
19   Q.  And if a customer does not
20 satisfactorily respond to the inquiry, the
21 appropriate sales associate will be contacted
22 and instructed to obtain an explanation from
23 the customer.
24       Do you see that?

Page 362

1    A.   Yes.
2    Q.   So now you're talking to -- strike
3  that.
4        At this point, we've got an order
5  from a customer that's being held because it's
6  potentially suspicious, right?
7    A.   Correct.
8    Q.   And you're asking your customer
9  service people, who usually deal with them on
10 sales, to get a reason to see whether or not
11 it's an adequate reason to release the order,
12 correct?
13   A.   Correct.
14       MR. HAMMOUD:  Objection to the
15 form.  Asked and answered.
16 BY MR. CARTMELL:
17   Q.   Correct?
18   A.   Correct.
19   Q.   If they don't give an adequate
20 answer to the customer service person, then you
21 send another person in to the customer that's
22 from sales, correct?
23   A.   Correct.
24   Q.   Why doesn't the DEA compliance

Page 363

1  individuals who have the most knowledge about
2  what diversion of opioids is -- why don't they
3  actually contact the client?
4        MR. HAMMOUD:  Objection to the
5  form.
6        THE WITNESS:  Well, because if we
7  were to notify the customer at first
8  contact that there is a DEA compliance
9  issue with their order, that -- if they
10 were, say, an unscrupulous customer --
11       And I'm not saying that any of my
12 customers are unscrupulous, because I'd
13 like to say that they are -- from what I
14 see, they're generally all above board.
15       -- that it -- an unscrupulous
16 person could then reverse-engineer the
17 orders and say, Oh, well, I've been
18 ordering this much, and it's -- and it
19 flagged their system.  So next time, I'm
20 going to change my ordering pattern,
21 reduce my orders in order to try to get
22 other orders through; may look for an
23 additional supplier to supplement, you
24 know, that particular product in order

Page 364

1  to get more product.
2        By flagging them that the DEA
3  department is looking at them, that
4  could be something that could alter
5  someone's pattern if someone were
6  behaving in a nefarious manner.
7  BY MR. CARTMELL:
8    Q.   Isn't it true, sir, that one of the
9  reasons why salespeople are the ones who
10 contact the customers to try to get information
11 about whether or not the order is suspicious
12 because the salespeople do not want to upset
13 the client and risk losing the sale?
14       MR. HAMMOUD:  Object to the form.
15 BY MR. CARTMELL:
16   Q.   Isn't that one of the reasons?
17       MR. HAMMOUD:  Calls for
18 speculation.
19       THE WITNESS:  Well, that could be a
20 definite reason as well, that notifying
21 a customer that a DEA investigation into
22 their practices --
23       And if it's something that --
24 which, on the most part, we get, you

Page 365

1  know, answers that, you know, satisfy,
2  you know, the red flag that we have
3  raised with the product.
4  BY MR. CARTMELL:
5    Q.   Now, once an order is being held,
6  it's not very difficult to get that hold
7  cleared, is it?
8    A.   It depends.
9    Q.   Look up 6.3, Clearing an Order from
10 Hold, DEA Compliance; An order may be released
11 in Oracle for fulfillment if it meets one or
12 more of the following criteria.
13       So it just has to meet one of these
14 criteria, right?
15   A.   Potentially.
16   Q.   It states, The order is within
17 previous purchasing history trends.  The order
18 has not exceeded all usual and customary
19 trends.
20       Do you see that?
21   A.   Yeah.
22   Q.   Total orders received are not more
23 than 10 percent over their usual and customary
24 limits.  The customer provides a reasonable

Page 366

1 explanation for the increase in orders.
2        Do you see that?
3    A.  Yep.
4    Q.  So all the customer has to do is
5 provide to the salespeople a reasonable
6 explanation, correct?
7    A.  Yes.
8    Q.  And then the catch-all here for
9 clearing an order is, Any other relevant data.
10       Do you see that?
11   A.  That is correct.
12   Q.  Okay.  So anything that's relevant
13 or determined to be relevant by the company is
14 a reason for clearing an order that had been
15 flagged for being suspicious, correct?
16   A.  As long as it's a reasonable
17 explanation and makes sense with what we know
18 about the customer, certainly.
19   Q.  Let's talk a little bit more about
20 your 2017 PowerPoint presentation.  And if you
21 turn to page 6, this is a slide having to deal
22 with recent cases.
23       And Mallinckrodt is a manufacturer
24 of opioids; is that correct?

Page 367

1    A.  Correct.
2    Q.  This is a slide that states,
3 Mallinckrodt agreed to pay record 35 million
4 settlement for failure to report suspicious
5 orders of pharmaceutical drugs and for
6 recordkeeping violations.
7        Do you see that?
8    A.  Yes.
9    Q.  What's the reason why you are
10 presenting this to your DEA compliance team?
11   A.  Because one of the requirements
12 that Mallinckrodt had in this settlement was
13 that they review chargeback data for -- to do a
14 retrospective analysis to look for potential
15 suspicious orders and report those, if needed.
16 And so that's what I was discussing with this
17 slide.
18   Q.  Is this, again, presented to your
19 team, in part, because you want to reiterate
20 the importance of having a very tight
21 suspicious order monitoring program?
22   A.  That's a very fair assessment.
23   Q.  If you turn the page, Active
24 Matters, you present to your team the Current

Page 368

1 Affairs; Senator Claire McCaskill on the opioid
2 epidemic:  pharma.
3        Quote -- it states, pharma --
4        Meaning pharmaceutical companies,
5 right?
6    A.  Correct.
7    Q.  -- ought to begin looking over
8 their shoulder.
9        Do you see that?
10   A.  Yes.
11   Q.  And then down below the picture, it
12 says, Senator Claire McCaskill says it's time
13 for pharmaceutical companies to start worrying
14 about their role in causing the opioid
15 epidemic, the deadliest drug overdose crisis in
16 U.S.
17       Do you see that?
18   A.  Yes.
19   Q.  And why do you present this to your
20 team?  Is it for the same reason?
21   A.  For the same reason, that and she
22 also wrote an op-ed in the USA Today
23 specifically calling out Teva for what she
24 claimed was that we weren't cooperating with

Page 369

1 her requests for data.
2    Q.  And that was because Senator
3 McCaskill actually sent a request to Teva's
4 attorneys asking for specific data to try to
5 determine whether or not they were complying
6 with the Controlled Substances Act and with the
7 rules relating to suspicious order monitoring,
8 and the lawyers for Teva refused to provide any
9 of those documents, correct?
10       MR. HAMMOUD:  Object to the form.
11       I'd also instruct the witness not
12       to reveal any privileged communications
13       between him and his lawyers.
14       THE WITNESS:  Again, that's
15       conversations with my attorneys, and I'm
16       not going to discuss conversations I had
17       with Teva attorneys.
18 BY MR. CARTMELL:
19   Q.  Well, you've seen the letter from
20 Teva's attorneys to Senator McCaskill, haven't
21 you?
22   A.  No.
23   Q.  You never saw those?
24   A.  No.  I --

Page 370

1    Q.   The Foley letters?
2    A.   No, I haven't seen them.
3    Q.   Okay.  Your next slide, Active
4  Matters, Current Affairs; Attorneys general
5  from 41 states hit back against opioid-pumping
6  big pharma firms.
7        Do you see that?
8    A.   Yep.
9    Q.   Now, all of these cases that you
10  present to your team, like the cases the
11  attorney generals have brought against the
12  pharmaceutical companies and the other cases,
13  reflect that the DEA, the federal government,
14  is starting to sort of crack down against the
15  pharmaceutical companies related to whether or
16  not they are reporting suspicious orders; is
17  that fair?
18        MR. HAMMOUD:  Objection to the
19        form.
20        THE WITNESS:  Crack down?  You mean
21        that they previously weren't enforcing
22        those regulations?
23  BY MR. CARTMELL:
24    Q.   Well, as we saw in the previous

Page 371

1  PowerPoint presentation from your department
2  that was in your file, there was thought to be
3  a change in the enforcement by the DEA,
4  correct?
5    A.   Well, there seemed to be a change
6  in attitude.  I don't know about enforcement.
7  Is that what you're suggesting, that the DEA
8  wasn't enforcing their regulations?
9    Q.   I'm suggesting that the DEA at some
10  point started to ramp up their enforcement
11  against pharmaceutical companies.  Is that
12  consistent with your belief?
13    A.   From what I've specifically seen, I
14  really haven't seen a change in enforcement.
15  I've seen enforcement, but in terms of --
16  because there's not, you know, that many, you
17  know, manufacturers of opioids.
18        You know, one -- you know, one data
19  point against, you know, Mallinckrodt is, you
20  know, that's a 100 percent increase in
21  enforcement against manufacturers.
22        So is that something that is
23  reflective of an increase of enforcement?
24  That, I don't know.

Page 372

1    Q.   If you turn to the next page, you
2  present to your team in Current Affairs, Meet
3  60 Minutes' DEA Whistleblower.
4        Do you see that?
5    A.   Yes.
6    Q.   It states, Why has the country's
7  opioid problem become a national emergency?  A
8  high-ranking whistleblower from the DEA
9  explains how the drug industry -- and
10  Congress -- fueled an epidemic.
11        Do you see that?
12    A.   Yes.
13    Q.   Why do you present that to your
14  team?
15    A.   Because that was, you know, part of
16  current affairs and the view of opioid
17  manufacturers in the news media.
18    Q.   It's true, though, you're trying to
19  reiterate and impress on your team the
20  importance of making sure that they are
21  following the law, correct?
22    A.   Oh, overall, yes.
23    Q.   And finding suspicious orders and
24  reporting them to the DEA, correct?

Page 373

1    A.   That's part of it, yes.
2    Q.   Okay.  And at that time, in 2017,
3  after looking at hundreds of thousands of
4  orders, before 2017, the company had only
5  reported five ever?
6    A.   That's correct.  That's correct.
7    Q.   I've got to ask you about your last
8  slide.  I've noticed from your documents that
9  this is your last slide on multiple
10  presentations that you've given.
11    A.   Yes.
12    Q.   And if I'm reading it correctly, it
13  says, Don't worry, Everything is going to be
14  amazing.  And then it --
15    A.   That's exactly -- yes.
16    Q.   It's got a bunch of, like -- I'm
17  guessing those are opioid pills --
18    A.   No.
19    Q.   -- Teva opioid pills.
20        MR. HAMMOUD:  Objection to the
21        form.
22        THE WITNESS:  No, they're not
23        opioids.
24  BY MR. CARTMELL:

Page 374

1    Q.  So I was wrong?  Those aren't
2  opioid pills?
3    A.  No, they're not opioids.
4    Q.  What are those?
5    A.  It's clonazepam.
6    Q.  And what is that?
7    A.  It's an anti-anxiety medication.
8    Q.  So what do you present -- or what
9  do you mean by this slide that you present
10  multiple times to your team?
11    A.  Oh, that I -- well, it's two
12  things, because if you notice, a lot of the
13  photographs that I've used in presentations
14  have been a lot of pictures of pills and some
15  illicit drugs.
16          And they're all taken from a single
17  thread on Reddit in about a 15-minute search
18  called, What drugs are you doing this weekend?
19  And these were pictures taken by what appeared
20  to be abusers of pills.
21          And some of them look very nice, in
22  very nice pictures, and I like to use them to
23  show, to demonstrate that our product is ending
24  up at the street and that we must be vigilant.

Page 375

1          But we believe we have a very good
2  program in place and that when we identify a
3  suspicious order, we take action, when
4  appropriate, against the customer and terminate
5  the customer, all of whom are still registered
6  by DEA and still shipping opioids, by the way,
7  but I don't believe that they're appropriate
8  for Teva to do business with.
9          So I believe our program is good.
10  That's what I'm saying here.
11    Q.  How many reports of suspicious
12  orders have you made to the DEA in 2018?
13    A.  Oh, I think it's close to 50.
14    Q.  50.
15          And who are the customers that you
16  reported in 2018?
17    A.  In 2018, I've reported Kroger.
18  I've reported Rochester Drug.  I've reported a
19  company called R&S Sales.  I have reported
20  McKesson.
21          And some of these orders aren't
22  orders that were even identified by the DEF OPS
23  system that we've found through other pieces.
24    Q.  Documents that we have been

Page 376

1  provided by Teva in this lawsuit from their
2  internal files suggest that in 2018, you have
3  made one, two, three, four, five, six, seven,
4  eight, nine -- ten suspicious order reports to
5  the DEA on Rochester Drug.  Does that seem
6  right to you?
7    A.  Yes, that sounds about right.
8    Q.  Okay.  But you made these orders,
9  actually, after you already knew that there was
10  an ongoing investigation related to Rochester
11  Drug, didn't you?
12          MR. HAMMOUD:  Objection to the
13      form.
14          THE WITNESS:  No.  We -- I had
15      terminated sales of controlled
16      substances to them before we learned
17      that there was an investigation into
18      them.
19  BY MR. CARTMELL:
20    Q.  But in 2018, when you terminated
21  those sales, you already knew of that
22  investigation, didn't you?
23    A.  No.  No.  I had terminated sales
24  before -- it was before we learned of the

Page 377

1  investigation into them.
2    Q.  So your testimony under oath is
3  that all of the reports you made on Rochester
4  to the DEA based on their suspicious orders
5  came after --
6    A.  No.
7    Q.  Excuse me.
8          -- came before you learned of an
9  investigation into that entity?
10    A.  Oh, no.  That's not what I'm saying
11  at all.
12    Q.  Okay.  I think you just told me a
13  minute ago that you made all those reports --
14    A.  No, that's not --
15    Q.  -- before you knew.
16    A.  No, that's not what I said.  I said
17  I stopped selling them controlled substances
18  before I knew.
19    Q.  Okay.  So what you're saying -- I
20  guess I misunderstood you.  What you're saying
21  is, every order thereafter, you would not allow
22  to go through?
23    A.  Correct, correct.
24    Q.  I got you.

Page 378

1 But when you stopped selling them,
2 at that point in time, you did not know about
3 the investigation into their sales --
4 A. Exactly.
5 Q. -- of opioids?
6 A. Exactly.
7 MR. HAMMOUD: Are we about at a
8 good place for a break?
9 MR. CARTMELL: We've been going for
10 an hour probably?
11 MR. HAMMOUD: A little over an
12 hour, yeah.
13 MR. CARTMELL: How far are we in?
14 VIDEO OPERATOR: 5:50. We've been
15 going for an hour and 22 minutes.
16 MR. CARTMELL: Yeah, let's take a
17 break.
18 MR. HAMMOUD: Okay. Thanks.
19 VIDEO OPERATOR: Going off the
20 record, 5:22.
21 (Recess from 5:22 p.m. until
22 5:38 p.m.)
23 VIDEO OPERATOR: Back on the record
24 at 5:38 p.m.

Page 379

1 BY MR. CARTMELL:
2 Q. Mr. Tomkiewicz, we're back on the
3 record. Are you ready to proceed?
4 A. I am ready.
5 Q. Okay. So I want to go back to
6 Exhibit 5. I forgot to ask you something about
7 that at page 37.
8 And we talked about this slide that
9 you created in 2014 for the things you were
10 going to do in the future for the program --
11 suspicious order monitoring program at Teva.
12 The last thing that we didn't talk
13 about was chargeback data. Do you see that?
14 A. Yes.
15 Q. Okay. So first of all, do you know
16 whether or not Teva was actually using
17 chargeback data to try to help them identify
18 suspicious orders prior to 2014, when you
19 started there?
20 A. I don't believe they were, but I
21 don't know for certain.
22 Q. Okay. Now, chargeback data, I
23 believe the DEA has said, is an advisable
24 resource to use in order to try to identify

Page 380

1 suspicious orders; is that correct?
2 A. That's my understanding, yes.
3 Q. Okay. And Teva, before the time
4 you got there, had chargeback data that they
5 could have used to try to help them identify
6 suspicious orders, correct?
7 A. That's correct.
8 Q. But they chose not to do that; is
9 that right?
10 MR. HAMMOUD: Objection. Object to
11 the form.
12 THE WITNESS: Yeah, I don't know.
13 BY MR. CARTMELL:
14 Q. But let me ask you this. When you
15 were at AmerisourceBergen and managing that
16 suspicious order monitoring program, did your
17 program include a review of chargeback data to
18 try to help you or assist you in identifying
19 suspicious orders?
20 A. Oh, not at all.
21 Q. You didn't use it?
22 A. Not at all, because --
23 And your question says that you
24 don't understand what chargeback data is.

Page 381

1 Q. My question says to you that I
2 don't understand what chargeback data is?
3 A. Yes.
4 Q. Exactly right.
5 A. Would you like me to explain it?
6 Q. Yes.
7 A. Okay. Chargeback data. What a
8 chargeback is, is when, say, my company,
9 Teva -- sorry for hitting the microphone --
10 when my company, Teva, contracts with either a
11 pharmacy, a hospital, a buying group that
12 represents pharmacies and we grant a contract
13 price on a product to, you know, that group,
14 that entity, then for a wholesaler who buys at
15 wholesale acquisition cost who services those
16 pharmacies with whom we have the contract, that
17 wholesaler, say, AmerisourceBergen, will
18 provide that product at the contract cost to
19 the pharmacy, the hospital, the entity, the
20 hospice, whomever, and then charge back the
21 difference back to Teva.
22 And then that contract price in the
23 data that comes back will have information on
24 the customer, the product, the quantity,

Page 382

1 information supporting that this product went
2 to this customer for that customer.
3          Now, what that doesn't include are
4 customers who don't have contracts, customers
5 who buy from wholesalers who buy at contract
6 price who aren't buying at wholesale
7 acquisition cost. It's not going to include
8 distributors are who are, say, owned by a large
9 retail chain.
10          And so from the wholesaler's
11 standpoint, when I was at AmerisourceBergen,
12 there was no need to review chargeback data
13 because we saw everything that we sold to the
14 customer.
15          Now, on the Teva side, we can
16 see -- you know, AmerisourceBergen, for
17 example, we can see where they sold our product
18 at contract price to their customers. But if a
19 customer isn't buying on contract price, we
20 don't see that.
21     Q.  I understand.
22          Really, what you're saying is, my
23 question was a dumb one, because it wouldn't
24 apply to wholesale distributors; they wouldn't

Page 383

1 use that; they don't need to use that data.
2     A.  Well, and I wouldn't use the
3 prejudicial term "dumb."
4     Q.  Okay.
5     A.  But maybe ignorant, but --
6     Q.  No, I do understand a little bit
7 about it, but that makes sense.
8     A.  Yeah.
9     Q.  So at any rate, when you arrived at
10 Teva in 2014, one of the other improvements to
11 the suspicious order monitoring program was
12 that you were going to have Teva start to
13 utilize the chargeback data to try to aid and
14 assist in identifying suspicious orders,
15 correct?
16          MR. HAMMOUD:  Object to the form.
17     Mischaracterizes prior testimony.
18          THE WITNESS:  I will say that's a
19     fair assessment, correct.
20 BY MR. CARTMELL:
21     Q.  Okay. And is there other data that
22 you believed that Teva should be using but they
23 weren't other than chargeback data to try to
24 assist with this?

Page 384

1          And there's something called 867
2 data; is that right?
3     A.  Yes, there's 867 data.
4     Q.  And did you start Teva into using
5 that type of data as well to try to identify
6 suspicious orders?
7     A.  I have started using 867 data, yes.
8     Q.  When was that started by the
9 company?
10     A.  I think that was in 2017 that I
11 started using that.
12     Q.  And has that also assisted Teva in
13 identifying suspicious orders?
14     A.  Not only suspicious orders but
15 suspicious customers of our customers.
16     Q.  And that's a good point.
17     A.  Yes.
18     Q.  What you just said is, by using
19 data like chargeback data and 867 data, your
20 company, Teva, can actually look downstream
21 from your customers at your customers'
22 customers, right?
23          MR. HAMMOUD:  Objection to the
24     form. Mischaracterizes prior testimony.

Page 385

1          THE WITNESS:  Well, it assists in
2     our investigations, yes.
3 BY MR. CARTMELL:
4     Q.  Right.
5          And I'm saying it assists in your
6 investigation of not only looking at whether
7 your customers are potentially asking for
8 suspicious orders, but it also can assist you
9 in looking downstream from your customer to
10 their customers to see whether or not they are
11 potentially violating the law, correct?
12          MR. HAMMOUD:  Objection to the
13     form.
14          Go ahead.
15          THE WITNESS:  I wouldn't say
16     "violating the law." Just looking for
17     patterns.
18 BY MR. CARTMELL:
19     Q.  I understand.
20          But if you do look at that data and
21 you find out that one of your
22 customer's customers, for example -- let's use
23 an example.
24          Teva has customers like

Page 386

1 AmerisourceBergen, correct?

2     A. Mm-hmm.

3     Q. A large wholesale distributor, as

4 we said, who distributes opioid narcotics all

5 over the United States, correct?

6     A. Correct.

7     Q. If Teva is looking at a potentially

8 suspicious order from AmerisourceBergen, for

9 example, and they do some investigation into

10 that and they find from that investigation --

11     For example, the top ten customers

12 of AmerisourceBergen, they might look into who

13 those people are, correct?

14     A. Correct.

15     Q. If you found out -- for example, if

16 AmerisourceBergen gave their top ten pharmacies

17 that they were selling to and during your

18 investigation, you found out that there were

19 suspicious things about those orders, that

20 would be investigation that I would categorize

21 as downstream investigation to your customer's

22 customer. Correct?

23     MR. NICHOLAS: Object to the form.

24 BY MR. CARTMELL:

Page 387

1     Q. Correct?

2     A. I would say that's a fair

3 assessment, yes.

4     Q. Okay. And if during that

5 investigation, you identify pharmacies who, it

6 looks like to you, are suspicious for diverting

7 opioids or violating the law or doctors who, it

8 looks suspicious to you, potentially are

9 diverting opioids or violating the law, you, as

10 Teva, have a duty to report that, correct?

11     MR. HAMMOUD: Objection to the

12     form. Calls for a legal conclusion.

13     THE WITNESS: Well, a couple points

14     of clarification.

15     I don't see prescribers with that

16     data, the 867 data level or at the

17     chargeback data. So unfortunately, I

18     don't see prescribers.

19     But I do see pharmacies, and if I

20     do see something that I would classify

21     as a suspicious order at that point --

22     For example, if I were to see an

23     invoice from a wholesaler to a pharmacy

24     that I would consider suspicious, I have

Page 388

1 reported orders like that, that it's not

2 my order, but it's my customer's order

3 to a pharmacy.

4 BY MR. CARTMELL:

5     Q. Your customer's customer?

6     A. My customer's customer, yes.

7     Q. And you have a duty, just like with

8 your customers, to report that if you believe

9 that is suspicious, correct?

10     MR. HAMMOUD: Objection to the

11     form. Calls for a legal conclusion,

12     asked and answered.

13     THE WITNESS: I would say I have a

14     duty to report suspicious orders.

15 BY MR. CARTMELL:

16     Q. Okay. Including if it's your

17 customer's customer, correct?

18     MR. HAMMOUD: Objection. Asked and

19     answered, calls for a legal conclusion.

20     THE WITNESS: And if I see a

21     suspicious order at my customer's

22     customer level, I will report it, and I

23     have reported it.

24 BY MR. CARTMELL:

Page 389

1     Q. And that's because it's your duty,

2 you believe, correct?

3     MR. HAMMOUD: Objection. Asked and

4     answered multiple times, calls for a

5     legal conclusion.

6 BY MR. CARTMELL:

7     Q. You can answer.

8     A. I have a duty to report suspicious

9 orders.

10     Q. Okay. Now, we talked a little bit

11 about the policy at Teva that you helped to

12 draft and put into effect in 2014 related to

13 suspicious order monitoring and, specifically,

14 holding of the orders to investigate and decide

15 whether or not they're suspicious and should be

16 shipped. We talked some about that. Do you

17 recall that?

18     A. Yes.

19     Q. Okay. As we know from the policy

20 that you put into effect at -- into writing at

21 Teva, that policy includes not only members of

22 the DEA compliance section that you work in,

23 but also members of parts of the company that

24 have sales as a part of their duties, correct?

Page 390

1    A.  And I'm sorry.  I think I know
2  where you're going, but I got lost in the
3  question.  Sorry.
4    Q.  And we also talked about from the
5  policy -- and we can pull it up if you want,
6  but it's the policy related to DEA order holds.
7  We talked about that.
8        People within the organization
9  outside of the DEA compliance section that have
10  duties or their jobs at Teva are sales in
11  nature, like customer service people and sales
12  reps, they're also involved in your procedure
13  there at Teva, right?
14    A.  Correct.
15    Q.  Okay.  Those people, as we've
16  discussed, are people that, you know, as a part
17  of their duties are trying to sell and make
18  profits from the sales for the company,
19  correct?
20    A.  That's a fair assessment.
21    Q.  Okay.  And are you aware that those
22  individuals who are involved in your suspicious
23  order monitoring program are also bonused,
24  potentially, based on the amount of sales of

Page 391

1  the company?
2    A.  I'd say that's possibly a fair
3  assessment, but I have no knowledge of, you
4  know, specific bonus structure.
5    Q.  Okay.  But you know from your
6  experience that those individuals who are
7  involved in the process that are the sales-type
8  people, those people sometimes are reluctant,
9  let's say, to agree to hold suspicious orders,
10  fair?
11    A.  No.  Good Lord, no.
12    Q.  You've never seen that?
13    A.  Reluctant to hold a suspicious
14  order?
15    Q.  Right.
16    A.  No.
17    Q.  Have there been times in your
18  experience where the sales force people who
19  you're dealing with with customers related to
20  potentially suspicious orders have at times
21  been reluctant to want to actually hold that
22  order?
23    A.  At the customer service level?
24    Q.  Yes.

Page 392

1    A.  I can think of a couple times
2  offhand where there has been a little bit of
3  pushback.
4        But I will say there's never been a
5  time that I've either been, you know,
6  overridden on a hold or I've changed my mind
7  based on just a salesperson or anyone with a
8  sales function saying, Oh, we need to ship
9  this; it's a new product.
10        If I'm not comfortable, if I have
11  red flags, it doesn't ship.
12    Q.  Okay.  But my question is, simply,
13  there are times when you do get pushback from
14  the salespeople who want to ship the order and
15  get the sales of the opioids?  There are times
16  when you have that pressure from the
17  salespeople, correct?
18        MR. HAMMOUD:  Objection to the
19        form.
20        THE WITNESS:  Certainly, I've had
21        that happen a couple of times.  Sure.
22  BY MR. CARTMELL:
23    Q.  Okay.  And, in fact, I think you've
24  given speeches over time related to the

Page 393

1  conflicts that exist in a suspicious order
2  monitoring program when you have people that
3  want to sell as many opioids as possible in
4  conjunction with a program of the people who
5  are trying to do their jobs and locate and stop
6  the orders of suspicious opioids.  Correct?
7    A.  I wouldn't characterize it that
8  way.
9        (Exhibit Teva-Tomkiewicz-018 marked
10        for identification and attached to the
11        transcript.)
12  BY MR. CARTMELL:
13    Q.  Okay.  Let me hand you what's been
14  marked as Exhibit 18.  I've handed you Exhibit
15  18, which I will represent to you is an e-mail
16  and attached PowerPoint presentation from the
17  internal files at Teva that were produced to us
18  in this case.  Okay?
19        And I believe, you'll see from the
20  cover page or the e-mail, this is a PowerPoint
21  presentation related to a 2017 presentation you
22  gave at a PDMA conference.  Is that right?
23    A.  That is correct.
24    Q.  What does PDMA stand for?

Page 394

1    A.  Prescription Drug Marketing Act.
2    Q.  Okay.  Is the PDMA a society that
3 you're a member of, or what is it?
4    A.  It's a group, primarily, that deals
5 with the marketing of not controlled
6 substances -- that's, actually, a small part of
7 it -- but direct marketing to physicians.
8    Q.  Okay.  And I take it that your
9 company, Teva, actually encourages you to speak
10 at events or speak to groups like this.  Is
11 that fair?
12        MR. HAMMOUD:  Objection to the
13    form.
14        THE WITNESS:  It encourages,
15    allows; in some cases, not allow.  But
16    yes, I've spoken at a number of
17    conferences.  Sure.
18 BY MR. CARTMELL:
19    Q.  What other conferences?
20    A.  I spoke at Buzzeo conference.  I
21 spoke again this year at the PDMA Sharing
22 Conference.
23    Q.  You said "Buzzeo conference."
24 We've talked about Ronald Buzzeo, the

Page 395

1 consultant; is that correct?
2    A.  Yes.
3    Q.  And he has an annual conference?
4    A.  Yes.  IMS/IQVIA has an annual
5 conference.
6    Q.  Okay.  And have you spoken at that
7 conference more than once?
8    A.  Just once.
9    Q.  Okay.  The title of this
10 presentation that you were giving in October of
11 2017 is, DEA:  Selling and Promoting High Risk
12 Drugs.
13    A.  Yes.
14    Q.  When you refer to "high-risk
15 drugs," what are you referring to?
16    A.  Any controlled substance.
17    Q.  Okay.  And I think previously I
18 used the term "high-risk drugs," I think, and I
19 think you told me at that time that when you
20 use "high-risk drugs," you're only referring to
21 a certain category of drugs that are easily
22 diverted.
23    A.  Exactly.
24    Q.  Okay.  But when I just asked you

Page 396

1 what you mean by "high-risk drugs," you're
2 talking here about any controlled substance,
3 correct?
4    A.  Right, because of the audience.
5    Q.  Okay.  And so what you're talking
6 about here is, though, primarily opioids,
7 correct?
8        MR. HAMMOUD:  Objection to the
9    form.
10        THE WITNESS:  No.  Any controlled
11    substance.
12 BY MR. CARTMELL:
13    Q.  Okay.  Well, if you turn the page
14 to page 2 of your presentation, again, you have
15 presented as your number one slide a slide that
16 deals with opioid addiction, correct, and
17 overdose?
18    A.  Correct.
19    Q.  Okay.  So is it fair to say that a
20 good portion of your talk is focused on the
21 opioid epidemic in America?
22        MR. HAMMOUD:  Objection to the
23    form.
24        Sorry.  Go ahead.

Page 397

1        THE WITNESS:  I would say a part of
2    it is talking about opioid epidemic,
3    yes.
4 BY MR. CARTMELL:
5    Q.  Okay.  Now, if you turn to
6 slide 20, you created this slide; is that
7 correct?
8    A.  Yes.
9    Q.  This slide, DEA:  Selling and
10 Promoting High Risk Drugs, it states, Managing
11 Conflicts.  And you identify three conflicts
12 here, correct?
13    A.  Potential conflicts, yes.
14    Q.  Okay.  Well, it says, Managing
15 Conflicts, not potential conflicts, correct?
16    A.  Certainly.
17    Q.  Okay.  And the three conflicts or
18 potential conflicts that you identify here, the
19 first is customers, right?
20    A.  Correct.
21    Q.  And there's -- a conflict between
22 what you're doing as a suspicious order
23 monitoring manager with customers is that
24 customers want the opioids they ordered, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1       MR. HAMMOUD: Objection to the
2 form.
3       THE WITNESS: And I wouldn't
4 categorize it as strictly opioids.
5 Customers have an expectation, based on
6 a patient need, of certain products and
7 certain volumes.
8 BY MR. CARTMELL:
9       Q. Right. And that's a conflict with
10 customers that -- in your position, as a
11 manager of the suspicious order monitoring
12 program at Teva, that's one of the conflicts
13 you have to manage, correct?
14       A. Where do you see the conflict?
15 Because I'm not understanding where you're
16 seeing the conflict.
17       Q. Well, I guess I probably should ask
18 you, because this is your slide that you
19 stated, Managing Conflicts, and you identified
20 customers.
21       A. Yes.
22       Q. So, apparently, when you created
23 this slide and presented it to lots of people
24 in the industry --

Page 399

1       The pharmaceutical industry, I take
2 it?
3       A. Yes.
4       MR. HAMMOUD: Objection to the
5 form.
6 BY MR. CARTMELL:
7       Q. Apparently, when you presented this
8 slide, you thought there may be a potential, at
9 least, conflict here with customers, correct?
10       A. Well, potentially a conflict with a
11 customer, yes.
12       Q. Okay. Another potential conflict
13 that you identified has to do with customer
14 service, correct?
15       A. Yes.
16       Q. Okay. And we know, from talking
17 about your policies at Teva, customer service
18 is a department at Teva, right?
19       A. Yes.
20       Q. Customer service is directly
21 involved in the process of trying to identify
22 suspicious orders at Teva, correct?
23       MR. HAMMOUD: Objection to the
24 form, mischaracterizes prior testimony.

Page 400

1       THE WITNESS: And I will say yes,
2 I'll accept that assessment.
3 BY MR. CARTMELL:
4       Q. Okay. And you identify it here as
5 another potential conflict, and I'm guessing
6 your conflict that you're identifying is that
7 customer service people who deal with sales of
8 opioids and part of their job is to sell as
9 many opioids as they can potentially can put
10 pressure on you and create a conflict for you.
11       MR. HAMMOUD: Objection to the
12 form.
13       THE WITNESS: Yeah, and I
14 completely reject that question as far
15 as people wanting to sell as many
16 opioids as they can. I categorically
17 reject that assessment of what Teva does
18 in any capacity.
19 BY MR. CARTMELL:
20       Q. Well, they potentially get paid
21 based on selling as many opioids as possible,
22 sir; isn't that correct?
23       MR. HAMMOUD: Objection to the
24 form.

Page 401

1       THE WITNESS: And we can also lose
2 our registration as well, and then
3 you're not selling any opioids or any
4 controlled substance and probably having
5 a very hard time maintaining or staying
6 in business.
7 BY MR. CARTMELL:
8       Q. But isn't that the conflict, that
9 you have a company -- from a sales perspective,
10 individuals who are trying to maintain
11 customers, increase profits, make the sales of
12 the opioids, versus your job, which is to make
13 sure you don't lose your registration by
14 violating the Controlled Substances Act? Isn't
15 that the conflict you're talking about?
16       MR. HAMMOUD: Object to the form.
17       THE WITNESS: No. And that's
18 minimizing the role of suspicious order
19 monitoring in terms of just strictly
20 looking to maintain a registration.
21 BY MR. CARTMELL:
22       Q. What's the conflict that you're
23 talking about managing related to customer
24 service?

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1  A.  Interpersonal conflict as far as
2  the lack of education of the importance of a
3  good suspicious order monitoring program and
4  why a suspicious order monitoring program is
5  needed.
6  Q.  You're saying that customer service
7  employees typically are not trained or don't
8  understand the importance of why a suspicious
9  order monitoring program is needed?
10  A.  No.
11  MR. HAMMOUD:  Objection to the
12  form.  Mischaracterizes the prior
13  testimony.
14  THE WITNESS:  Yeah, that's not what
15  I said at all.  There is importance of
16  training.
17  BY MR. CARTMELL:
18  Q.  What did you say?  Say it again,
19  please.
20  A.  I said there is an importance of
21  training --
22  Q.  No, no, no, no.  I don't mean to
23  interrupt you.
24  What is the conflict related to

Page 403

1  customer service that you need to manage that
2  you are presenting here?
3  A.  Oh, it's --
4  Q.  What's the conflict?
5  A.  It's an interpersonal -- it's a
6  potential for interpersonal conflict if you
7  don't educate these groups for either the
8  importance of either a suspicious order
9  monitoring program, anti-diversion efforts, or
10  you know, the -- well, the importance of, you
11  know, education in this staff.
12  Q.  Education to the customer service
13  people, right?
14  A.  To customer service people, to
15  sales, and to customers.
16  Q.  Okay.  And if you don't educate
17  them properly and these people don't understand
18  the importance of the suspicious order
19  monitoring program, then what is the conflict
20  that is created?
21  A.  That they don't understand what a
22  suspicious order monitoring program is doing.
23  Q.  And what's the conflict that's
24  created because of that?  Is it because they

Page 404

1  try to then pressure you and push you into
2  releasing suspicious orders --
3  MR. HAMMOUD:  Objection to the
4  form.
5  BY MR. CARTMELL:
6  Q.  -- if they really don't understand
7  it well enough?
8  MR. HAMMOUD:  Objection to the
9  form.
10  THE WITNESS:  Well, that could be a
11  potential.  That could be a potential.
12  BY MR. CARTMELL:
13  Q.  Okay.  So that's one type of
14  conflict you're talking about you may need to
15  manage?
16  A.  Correct.
17  Q.  Okay.  And then you say, finally,
18  that you need to manage a conflict related to
19  sales.
20  A.  Mm-hmm.
21  Q.  Is that the same type of issue?
22  A.  Exactly.
23  Q.  Because the salespeople,
24  potentially, if they're not properly educated

Page 405

1  and really don't understand the importance of
2  your suspicious order monitoring program, they
3  might create a conflict with you because they
4  might pressure you and push you to release
5  sales that you otherwise shouldn't, correct?
6  A.  Well, and I wouldn't characterize
7  the question that way, because, again, I
8  haven't released anything that I'm not
9  comfortable with, and I haven't -- and, you
10  know, no salesperson, no customer service
11  person, or -- and no customer has ever badgered
12  or cajoled me into releasing something where I
13  still thought there was a red flag.
14  Q.  Okay.  What you're saying is that,
15  though, the conflict is, if you don't educate
16  the salespeople and they don't know or
17  understand how important a suspicious order
18  monitoring program is, they might pressure you;
19  they might, you know, try to lean on you to get
20  rid of the hold.
21  But what you're saying is that if
22  they do that to you, then you're not going to
23  succumb to that pressure, correct?
24  MR. HAMMOUD:  Objection to the

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1    form.  Asked and answered.
2  BY MR. CARTMELL:
3      Q.  Is that correct?
4      A.  Oh, that is correct.
5      Q.  Okay.  All right.  But those are
6  potential conflicts that you speak about and
7  that you manage in your job at Teva as the head
8  of the suspicious order monitoring program,
9  correct?
10     A.  Correct.
11     Q.  Would you agree with me that you've
12 experienced times when the customer service
13 individuals have been reluctant to stop an
14 order for opioid sales?
15     A.  I can't think of a time when
16 customer service has been reluctant to hold
17 something.
18     Q.  Would you agree with me that
19 because reporting a customer can lead to the
20 company losing the customer, that can
21 potentially lead to a loss of profits?
22         MR. HAMMOUD:  Objection to the
23     form.
24         THE WITNESS:  That reporting a

Page 407

1    customer could lead to loss of profits?
2  BY MR. CARTMELL:
3      Q.  Yes.
4      A.  I haven't seen that.
5      Q.  Well, if you report a customer, you
6  may lose a customer, right?
7      A.  Depends upon the customer, because
8  I've reported customers that part of reporting
9  the suspicious order have also terminated that
10 customer from purchasing controlled substances.
11 So, you know, in that case, it doesn't matter
12 to me that we're losing some potential profits
13 in cutting off a customer.
14     Q.  Right.
15         But that's the case, though.  When
16 you terminate a customer and you don't ship an
17 order, you potentially are losing sales and
18 profits, correct?
19     A.  Oh, exactly.
20     Q.  Let me ask you this.  You
21 mentioned -- I have a list.  You mentioned who
22 the pharmacies or customers are that Teva,
23 through you, has reported to the DEA in the
24 last three or four years.

Page 408

1        Have you ever reported Publix, the
2  pharmacies at Publix, to the DEA?
3      A.  I can't recall specifically.
4      Q.  Okay.  Do you remember a time when,
5  actually, Publix was making orders for opioids
6  and you found those orders to be suspicious,
7  they were initially tagged, you did an
8  investigation into those orders, you found
9  those orders to be suspicious for a host of
10 reasons, and one of the higher-ups in the sales
11 department berated you worse than you've ever
12 been berated before?
13         MR. HAMMOUD:  Objection to the
14     form.
15         THE WITNESS:  Never saw a
16     suspicious order in relation to that.
17 BY MR. CARTMELL:
18     Q.  That's not my question.
19         Do you remember a time, though,
20 when you were berated worse than you'd ever
21 been before during an investigation of
22 suspicious orders and orders that you found to
23 be -- to have suspicious aspects to them, and
24 then you were berated by a higher-up in sales

Page 409

1  to try to release those orders?
2          MR. HAMMOUD:  Objection to the
3      form.  Asked and answered.
4  BY MR. CARTMELL:
5      Q.  Do you remember that?
6      A.  You have some mischaracterizations
7  there, several of them.
8          One, I do believe that I recall the
9  incident that you're discussing.  One -- the
10 being berated worse than I ever have, I've been
11 berated pretty badly.  This was probably not
12 even in the top ten, although for Teva, it was
13 probably the worst.
14         This was one where I had held some
15 orders for further review, and the higher-ups,
16 as you talked about, were very upset that I was
17 holding these orders.
18     Q.  Right.
19         And, ultimately, did you, in fact,
20 release those orders?
21     A.  After a thorough investigation,
22 including me discussing the issue with Publix.
23     Q.  Okay.  I want to talk about that,
24 and there's been some documents and e-mails

Page 410

1  produced in this case that I want to go through
2  with you.  This may be pretty tedious, but I
3  only want -- there's very limited things from
4  the e-mails that I want to ask you about.  But
5  I want to go through these.
6        (Exhibit Teva-Tomkiewicz-017 marked
7        for identification and attached to the
8        transcript.)
9  BY MR. CARTMELL:
10     Q.  And I'll start with giving you
11  Exhibit 17, which is an e-mail chain that was
12  produced from the internal files of Teva in
13  this lawsuit.
14        Now, before --
15        MR. HAMMOUD:  Have you had a chance
16  to read it?
17        THE WITNESS:  I'm good with it.
18  BY MR. CARTMELL:
19     Q.  Okay.  Before I ask you questions
20  about this, I kind of want to set the scene for
21  the jury.  In October of 2015, there was a time
22  when your department received several orders
23  from Publix, correct?
24     A.  Correct.

Page 411

1     Q.  And Publix, I think as some people
2  know, is a grocery chain that has lots of
3  stores in Florida, for example, correct?
4     A.  Correct.
5     Q.  But in these Publix grocery chains
6  they also have pharmacies; is that right?
7     A.  Correct.
8     Q.  Okay.  And at this time in October
9  of 2015, Publix pharmacies had actually been an
10  existing customer for Teva, correct?
11     A.  Correct.
12     Q.  Okay.  And you had a history with
13  Publix ordering opioid narcotics, correct?
14     A.  Well, controlled substances in
15  general, yes.
16     Q.  Including opioids, correct?
17     A.  Including opioids, yes.
18     Q.  And the story we're about to tell
19  has to do with them ordering opioid narcotics,
20  correct?
21     A.  Correct.
22     Q.  High-risk opioid narcotics --
23        MR. HAMMOUD:  Objection to the
24  form.

Page 412

1  BY MR. CARTMELL:
2     Q.  -- correct?
3     A.  Not at the high risk of what I
4  talked about at the beginning of products that
5  are highly sought by abusers.
6     Q.  Well, OxyContin 30 milligrams is
7  definitely a product that's high risk and
8  sought by abusers, correct?
9        MR. HAMMOUD:  Objection to form.
10        THE WITNESS:  No, no.  Oxycodone,
11  30-milligram.  OxyContin is an
12  extended-relief product that has a
13  mechanism to help prevent an abuser from
14  crushing up and getting the -- a full,
15  immediate release.  So there's a
16  difference in the product.
17  BY MR. CARTMELL:
18     Q.  Is oxycodone 30 milligrams one of
19  the types of products that is sought after by
20  abusers?
21     A.  Yes.
22     Q.  Okay.  And --
23     A.  Immediate release.
24     Q.  Okay.  And we're talking about that

Page 413

1  in this case with Publix, aren't we?
2     A.  No.
3     Q.  Okay.  The drugs that were being
4  sought by Publix, the opioids that were being
5  ordered by Publix, were they of the type
6  that -- and actual dosage that are sought by
7  abusers?
8     A.  Not of a dosage form that are
9  highly sought by abusers anymore.
10     Q.  Okay.  But at this time in 2015?
11     A.  No.
12     Q.  Okay.  We'll get to that.  So the
13  story starts, I think, if you look at the end
14  of the e-mail string, and we'll go back to
15  front, that somebody named Daniel Baker sends
16  an e-mail to Dawn Ward that says, Can you tell
17  me if this product is going to be warehoused in
18  Ohio, please?
19        Do you see that?
20     A.  Yes.
21     Q.  And Dawn Ward says, Hi Dan.  Yes,
22  this order is to be shipped and warehoused in
23  Ohio.  I've attached a copy of the order that
24  has the shipping address.

Page 414

1    Now, if you go -- if you go forward
2 and to the next e-mail from Dan Baker to Dawn
3 Ward -- and your understanding is that Dan
4 Baker is in the DEA -- is on the DEA team; is
5 that correct?
6    A. No, that's not correct.
7    Q. Oh, is he in sales?
8    A. He's a customer service rep -- was
9 a customer service rep.
10    Q. Okay. Strike that. Dan Baker, who
11 sends this e-mail on October 15th, is he a
12 customer service sales rep?
13    A. A customer service rep.
14    Q. Okay. It says, Dawn, our DEA team
15 is asking for the following; we need the
16 following from Publix: A list of their top 10
17 stores by oxycodone tablet volume, a breakdown
18 by SKU of their oxycodone ER and IR, and a list
19 of the top 5 prescribers, including DEA number,
20 at each of the 10 locations.
21    Do you see that?
22    A. Yes.
23    Q. So at this point it looks like --
24 tell me if I'm wrong -- that your department

Page 415

1 has flagged these Publix orders as potentially
2 suspicious. Is that fair?
3    A. Correct.
4    Q. Okay. And these orders were for
5 oxycodone, an opioid, correct?
6    A. Correct.
7    Q. If you go moving forward, on
8 Friday, October 16th, Jocelyn Baker has an
9 e-mail to Dan Baker. And Jocelyn Baker is the
10 director of national accounts and sales. Did
11 you know that?
12    A. Yes.
13    Q. So she's a salesperson, right?
14    A. Yes.
15    Q. She says -- and this goes -- e-mail
16 goes to Dan Baker, but it also -- now at this
17 point you've been added to the e-mail, correct?
18    A. That I've been added to the e-mail.
19    Q. Jocelyn Baker's e-mail to Dan Baker
20 and to several others --
21    A. Oh, yes.
22    Q. -- including you?
23    A. Yes.
24    Q. Okay. And she actually addresses

Page 416

1 you, and she says, Joe, Publix is an
2 established customer who sells some of our
3 other controls.
4    Meaning controlled substances,
5 right?
6    A. Correct.
7    Q. Is this really required? Also,
8 will you require this from my other 2
9 retailers?
10    It then says, This was not
11 presented to them in advance and may put this
12 award at risk.
13    Do you see that?
14    A. Yep.
15    Q. Meaning if you do this and you
16 investigate and want information from Publix
17 about these -- a list of their top 10 stores
18 and data like that, it could put the sale at
19 risk, correct?
20    A. That's what I understand her to
21 mean.
22    Q. Again, they are an established
23 customer selling controls. Please advice.
24    So this is a salesperson telling

Page 417

1 you, do we really have to hold this order,
2 because it could put the sale at risk, right?
3    A. Correct.
4    Q. Now, if you go to the next page,
5 you respond to that e-mail on October 16th,
6 2015 to Jocelyn, who's in sales, and you say,
7 Jocelyn, there are several red flags with this.
8 One, this is high-strength oxycodone ultimately
9 going to Florida, a well-established hotspot
10 for oxycodone abuse in the United States.
11    And I take it that Florida is -- at
12 that time, at least, you know, based on your
13 experience, that's a hotspot as far as
14 oxycodone abuse, correct?
15    A. Correct.
16    Q. Okay. And you're telling her
17 that's a red flag, that this may be a
18 suspicious order, correct?
19    A. Correct.
20    Q. Number two, the total quantities in
21 the Publix forecast put them significantly
22 above their peers as far as size and class of
23 trade are concerned.
24    What you mean there -- tell me if

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1 I'm wrong, but it sounds like what you mean
2 there is that the total quantities in their
3 forecast is well above what other pharmacies
4 are ordering; is that correct?
5      A.  It's significantly above.
6      Q.  Okay.  And is it a matter of
7 magnitude, standard deviations?  How big?  I
8 mean, is it a lot bigger?
9      A.  I don't recall specifically.
10      Q.  Okay.  That's fine.
11      A.  I don't recall specifically.
12      Q.  You then say, three -- another red
13 flag -- the breakdown by strength, with an
14 emphasis on 40-milligram, does not appear to be
15 normal for a retail pharmacy.  I would expect
16 the breakdown to be closer to that of Thrifty
17 White, where the emphasis is on lower
18 strengths.
19      Do you see that?
20      A.  Yes.
21      Q.  Tell me if I'm wrong, but what
22 you're saying there is, sometimes you have to
23 look at the actual strength that they're
24 ordering, and if they're ordering lots of the

Page 419

1 higher strengths, sometimes that can be a red
2 flag that there might be something fishy going
3 on.
4      A.  Yeah, and actually, the
5 40-milligram isn't the top strength.  It's the
6 second strength.
7      Q.  But what you're saying here is that
8 this strength and the breakdown is a red flag
9 to you potentially, right?
10      A.  Yes, uh-huh.
11      Q.  All right.  You then say -- I've
12 skipped a couple paragraphs, but it then says,
13 As far as Publix being an established customer,
14 please remember that Cardinal, McKesson,
15 Walgreens, and CVS are also established
16 customers, all of whom had serious DEA
17 penalties due to the handling of oxycodone in
18 the state of Florida.
19      Am I right that what you mean there
20 is, look, you can't just say because somebody
21 is an established customer that they're not
22 diverting drugs, right?
23      A.  Correct.
24      Q.  Because all of these others that

Page 420

1 you established, these other customers,
2 Cardinal, which is a huge wholesale
3 distributor, right?
4      A.  Yes.
5          MR. HAMMOUD:  Objection to the
6      form.
7 BY MR. CARTMELL:
8      Q.  McKesson, which is another
9 billion-dollar wholesale distributor of
10 opioids, correct?
11          MR. HAMMOUD:  Objection to the
12      form.
13          THE WITNESS:  Correct.
14 BY MR. CARTMELL:
15      Q.  Walgreens and CVS, which are among
16 the largest pharmacies in America, right?
17          MR. HAMMOUD:  Objection to the
18      form.
19 BY MR. CARTMELL:
20      Q.  Is that right?
21      Those are established customers of
22 Teva too, but they have all been investigated
23 and had problems related to their suspicious
24 order monitoring, is that right, or diverting

Page 421

1 drugs?
2      A.  Probably a combination in there.  I
3 can't speak to the specifics without actually
4 reviewing it.
5      Q.  Okay.  And then if you turn to the
6 next page, there's an e-mail at the bottom of
7 the page from Karin Shanahan, and she's
8 actually above your boss, Colleen McGinn,
9 correct?
10      A.  She was.
11      Q.  So higher-ups are now starting to
12 get --
13      A.  Oh, yes.
14      Q.  -- involved in this battle, aren't
15 they?
16      A.  Oh, yes.
17      Q.  Okay.  And she writes back to
18 Christine Baeder, who is one of the higher-ups
19 in sales, and says, Christine, I understand you
20 have some concerns regarding our suspicious
21 order monitoring program.  As you know, our
22 suspicious order monitoring program is designed
23 to ensure that Teva is not subjected to
24 penalties up to and including rescinding our

Highly Confidential – Subject to Further Confidentiality Review

Page 422

1 DEA licenses.
2      Do you see that?
3      A.   Yep.
4      Q.   That's what we were just talking
5 about, right?
6      A.   Oh, exactly.
7      Q.   And if somebody like Christine
8 Baeder is not properly educated on the
9 importance, that can kind of build this
10 pressure and potential conflict that we talked
11 about, correct?
12      A.   Oh, certainly.
13      Q.   And then if you go to the first
14 page of this e-mail string -- we're still on
15 October 16th -- Christine Baeder responds --
16 she's the higher-up from sales -- to Karin, and
17 says, Karin, thank you for reaching out.  I'm
18 happy to discuss.  My concern was about the
19 statement that Publix is diverting product.  I
20 think our new launches where we do not have
21 established history to compare to, we need a
22 more collaborative approach to ensure that we
23 are making responsible decisions.
24      And then below in the next

Page 423

1 paragraph it says, Oxy is not higher than
2 market share on other noncontrolled products.
3      What does that mean?
4      A.   She was referring to IMS data.
5      Q.   Okay.  What she's saying, though,
6 is she's saying, look, I disagree that oxy is a
7 red flag.
8      A.   No.  She's saying that she
9 disagrees that Publix's levels of purchases of
10 oxycodone were a red flag.
11      Q.   Okay.  Because she's saying -- why
12 is she disagreeing with that?
13      A.   Because she --
14      MR. HAMMOUD:  Objection to the
15 form.
16      THE WITNESS:  They had IMS data
17 indicating that this was -- that these
18 products were typical of what they had
19 been purchasing previously.
20 BY MR. CARTMELL:
21      Q.   Okay.  So what we've got now is
22 we've got a battle between sales and DEA
23 related to these Publix orders, correct?
24      A.   I wouldn't call it a battle.

Page 424

1      MR. HAMMOUD:  Objection to the
2 form.
3 BY MR. CARTMELL:
4      Q.   Okay.  Well, let's continue.  I'm
5 going to hand you Exhibit 19.
6      (Exhibit Teva-Tomkiewicz-019 marked
7 for identification and attached to the
8 transcript.)
9 BY MR. CARTMELL:
10      Q.   Exhibit 19 is another e-mail string
11 that was produced to us in this, and I want to
12 ask you a few questions about this.  On this
13 one, I'm just ask -- I want to ask you
14 questions on the first page because I think
15 we've covered the ones on the previous pages.
16 And I apologize for that, but when -- the way
17 these are produced to us, you know, we don't
18 get them all in one long screen -- string.
19      A.   Threading of e-mails can be
20 difficult, yes.
21      Q.   So we're still on Friday, and you
22 see at the bottom Colleen McGinn says to you,
23 Do you want to reach out to Publix directly or
24 do you want customer service to reach out?

Page 425

1      And then up above, you respond to
2 Colleen, who is your boss, and you say, I'm
3 always more than happy to be the one to contact
4 the customer directly - less chance of a
5 translation error that way.
6      Right?
7      A.   Correct.
8      Q.   But we know from your policy that
9 typically it was going to be customer service
10 who had the interaction with the client, the
11 customer, correct?
12      MR. HAMMOUD:  Objection to the
13 form.
14      THE WITNESS:  Well, for certain
15 investigations, but -- because this one
16 was escalated a bit.
17 BY MR. CARTMELL:
18      Q.   Okay.  Because there was pushback,
19 you might get involved and talk to the customer
20 in that situation?
21      A.   Correct, correct.
22      Q.   And then Colleen responds to you
23 again at the top and says, FYI, Christine
24 preferred they contact Publix to get the

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1  information.
2        Okay?  And she says the reason for
3  that is because she wanted to ensure that the
4  customer relationship was intact, right?
5      A.  Yes.
6      Q.  And we talked about that.  A lot of
7  times these salespeople don't want the DEA
8  department to contact their customers because
9  they want to make sure that the relationship
10  stays intact, correct?
11      A.  And that's a fair assessment.
12      Q.  Okay.  All right.
13        (Exhibit Teva-Tomkiewicz-020 marked
14  for identification and attached to the
15  transcript.)
16  BY MR. CARTMELL:
17      Q.  So let me hand you Exhibit 848 --
18  excuse me.  Let me hand you Exhibit 20.  We're
19  continuing on, and on this one, I have covered
20  everything below the first e-mail.  So I'm just
21  asking you about the first e-mail at the top.
22  This is an e-mail from Colleen McGinn to Karin
23  Shanahan.  And Karin Shanahan is who?
24      A.  Karin Shanahan was Colleen's boss.

Page 427

1  And if you --
2        MR. HAMMOUD:  Just give him one
3  second.
4        THE WITNESS:  Yeah, one second
5  because I'm trying -- because of
6  threading, I'm trying to place where
7  this e-mail was placed in conjunction
8  with these other e-mails.
9        So this is earlier in the day.
10        And -- okay, I'm good with where it is.
11  BY MR. CARTMELL:
12      Q.  Okay.  And this is an e-mail from
13  Colleen to Karin.  So now you've got your boss
14  who is going above her -- to her boss and
15  informing her boss that there is an issue
16  related to some orders, correct?
17      A.  Correct.
18      Q.  She says, Karin, we have an issue
19  with an order Publix placed for oxycodone.  The
20  order was held in the system for further
21  investigation because it's off the charts in
22  comparison to other customers of the same size.
23        Right?
24      A.  Correct.  That's what it says.

Page 428

1      Q.  And that's what you're talking
2  about.  This is an order that you found,
3  actually, and you told Colleen it was off the
4  charts, right?
5      A.  No, I did not say "off the charts."
6        MR. HAMMOUD:  Objection to the
7  form.
8  BY MR. CARTMELL:
9      Q.  Okay.  But at any rate, Colleen at
10  that point interpreted that this order or these
11  orders from Publix were off the charts.  That's
12  what she said, correct?
13      A.  I would say that's hyperbole.
14      Q.  Okay.  Two paragraphs down.
15        Apparently Christine Baeder berated
16  him today for making accusations of "criminal
17  activity" by the customer.  In Joe's words, he
18  hasn't received verbal abuse like that in
19  years.
20      A.  Yeah.
21      Q.  That's your boss saying that you
22  said that, right?
23      A.  Yeah.  Uh-huh.
24      Q.  Do you think you probably said

Page 429

1  that?
2      A.  Oh, I'm sure I probably did, yeah.
3      Q.  Okay.  And you think that's true,
4  that when this higher-up, Christine Baeder from
5  sales, talked to you, she berated you and gave
6  you verbal abuse like you hadn't had in years?
7      A.  Yes.
8      Q.  Is that fair?
9      A.  Oh, yes.
10      Q.  Christine is demanding that the
11  order be released.
12        This is what we're talking about,
13  the conflict, right, that salespeople want to
14  release these orders sometimes, right?
15        MR. HAMMOUD:  Objection to form.
16        THE WITNESS:  Correct.
17  BY MR. CARTMELL:
18      Q.  And wants a meeting with you today
19  or Monday at the latest.  I'm not very happy
20  about my people being verbally abused for doing
21  their job, and bullying them into releasing an
22  order, it's a slippery slope.
23        You see that?
24      A.  Yep.

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1    Q.  And you feel the same way, I
2  suspect?
3    A.  Oh, yes.  Yeah.
4    Q.  Okay.  Let's go to the next
5  exhibit.
6        (Exhibit Teva-Tomkiewicz-021 marked
7        for identification and attached to the
8        transcript.)
9  BY MR. CARTMELL:
10   Q.  Let's go to the next exhibit,
11  Exhibit 21.  Now, this looks a little
12  different.  This is not, in fact, an e-mail.
13  Is this a text?
14   A.  No.  These were my notes as
15  Christine was yelling at me.
16   Q.  Okay.  Okay.  So what was happening
17  was, you were on a phone call with Christine
18  Baeder?
19   A.  She called me, yes.
20   Q.  And Christine Baeder, she's a vice
21  president in the company, isn't she?
22   A.  Correct.
23   Q.  I mean, she's way up there, isn't
24  she?

Page 431

1    A.  Well, she's a vice president, yeah.
2    Q.  Okay.  There's a 10:10 call, and
3  it's about the Publix issue that we've been
4  talking about and those potentially suspicious
5  orders, right?
6    A.  Yes.
7    Q.  Okay.  And it says -- I want to go
8  down a little bit.
9        It says, Christine Baeder; berated,
10  unprofessional; didn't want to hear anything I
11  said.
12       Right?
13   A.  Correct.
14   Q.  She said that asking for data was
15  accusing the customer of doing illegal
16  activity.
17       And let me ask you that.  Were you
18  actually accusing Publix of criminal activity
19  at that point?
20   A.  Not at all.
21   Q.  Okay.  So she misinterpreted what
22  you were saying, right?
23   A.  Yes.
24   Q.  I offered to meet with the

Page 432

1  customer.  Christine said that under no
2  circumstance would that happen.
3        Is that right?
4    A.  That's what she said.
5    Q.  Okay.  Again, a salesperson who
6  doesn't want to risk losing the client,
7  correct?
8    A.  Correct, correct.
9    Q.  Christine said that I report to
10  TGO.
11       Who's TGO?
12   A.  Teva generic operations.
13   Q.  And that's who you report to?
14   A.  Not anymore.
15   Q.  Okay.  You did at the time?
16   A.  Yes.
17   Q.  Okay.
18       And Teva generic operations was
19  informed, so there was no need to inform DEA
20  compliance of the launch.
21       That's what she said, right?
22   A.  That's what she told me.
23   Q.  Christine said Publix has
24  0.8 percent overall market share and we (Teva)

Page 433

1  are trying to capture generic oxycodone market
2  share.
3        Her point there is that Publix is
4  potentially a very big or is a very big
5  customer, right?
6    A.  Yes.
7    Q.  With lots of sales, right?
8    A.  Correct.
9    Q.  And she didn't want to lose that --
10  those sales or that profit, correct?
11       MR. HAMMOUD:  Object to the form.
12       THE WITNESS:  I'm going to say
13       that's a fair assessment.
14       (Exhibit Teva-Tomkiewicz-022 marked
15       for identification and attached to the
16       transcript.)
17  BY MR. CARTMELL:
18   Q.  Let me hand you Exhibit 22.  Again,
19  this is another e-mail produced to us in this
20  lawsuit that deals with this story we're
21  talking about related to held potentially
22  suspicious orders from one of your customers,
23  Publix?
24   A.  Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1    Q.  And here I only need to ask you
2  questions about the top e-mail because we've
3  covered everything below it.
4    A.  No, we haven't covered everything
5  below it.
6    Q.  We haven't?
7    A.  No.  That's results of my review.
8    Q.  Oh, we're going to cover that.
9  We're going to cover that.  Okay.  I apologize
10  for that.  But that's coming in a later
11  exhibit, okay?  Okay.
12       So this is an e-mail from you to
13  Colleen McGinn.  Now we're up to October 28th,
14  so we're almost two weeks later, correct?
15    A.  Correct.  And the orders are still
16  held.
17    Q.  And you're still holding the orders
18  from Publix.
19       You state, Colleen -- to your boss,
20  Colleen -- based on previous investigations, I
21  think it is highly likely that at a corporate
22  level, Publix is not aware of these issues.  We
23  should schedule a face-to-face meeting with the
24  relevant Publix stakeholders to discuss their

Page 435

1  ongoing prescriber due diligence and related
2  diversion control efforts.
3       You say, I am comfortable releasing
4  the product we currently have on hold, provided
5  Publix agrees not to distribute our oxycodone
6  products to these nine locations.
7       That's meaning the locations that
8  you had investigated; is that correct?
9    A.  Correct.  That is correct.
10  Actually, there were ten locations but nine
11  that I wanted restricted.
12    Q.  Okay.  There were ten actual
13  pharmacies at Publix that were making orders
14  and you wanted nine of them restricted?
15    A.  Correct.
16    Q.  Okay.  I made a mistake.  I want to
17  now go down to and look at the e-mail below
18  that that this was in response to, okay?
19    A.  Okay.
20    Q.  Okay.  So this is again almost two
21  weeks later and you've still held these Publix
22  orders.
23    A.  Well, in a -- I have to give an
24  addition.  We were also holding orders for --

Page 436

1  all orders for Anda as well.
2    Q.  Okay.  And Anda is a distributor
3  that would provide them to Publix; is that
4  correct?
5    A.  Correct.  They were holding -- at
6  the time, they called it a virtual vault.  And
7  so they would manage the orders for them.  And
8  so the product would be shipped to Anda on
9  behalf of Publix.  And so we were holding not
10  only Publix orders that were to go through
11  Anda, but we were also holding all other Anda
12  orders as well.
13    Q.  Okay.  And the reason you were
14  holding, though, the Anda orders was because
15  your understanding was Anda was going to
16  distribute those to Publix, correct?
17       MR. HAMMOUD:  Objection to the
18       form.
19       THE WITNESS:  That -- on not all of
20       it, but that some of the product shipped
21       to Anda could be delivered to Publix.
22  BY MR. CARTMELL:
23    Q.  Okay.  Now, after you had held
24  these orders, you did an investigation of these

Page 437

1  orders to try to determine whether or not they
2  were suspicious, correct?
3    A.  Well, it wasn't really an
4  investigation into the order itself.  It was an
5  investigation into the overall oxycodone
6  business at these ten locations.
7    Q.  Let me restate it.  The orders were
8  held by -- was it DEF OPS at this time?
9    A.  No.  Well, it -- they would have
10  been held by DEF OPS, but I was aware that the
11  orders were coming prior to them hitting DEF
12  OPS.
13    Q.  Okay.  But your understanding is
14  that the computer algorithm, the new one -- the
15  updated one and improved computer algorithm
16  called DEF OPS actually flagged or pended these
17  orders from Publix, correct?
18    A.  For all customers who were ordering
19  this product.
20    Q.  Okay.  And after the orders were
21  flagged and pended and you knew about them, you
22  then, as the manager of the suspicious order
23  monitoring program, went and did an
24  investigation into -- more of an investigation

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1 into, frankly, your customers' customers,
2 right?
3    A.   Correct, the downstream pharmacies,
4 yes.
5    Q.   And part of the reason you did that
6 is because, as we said in prior e-mails, you
7 said there were red flags that made you want to
8 investigate further, correct?
9    A.   Correct.
10   Q.   Things like the dosage or the
11 breakdown of how they were ordering the
12 oxycodone, right?
13       MR. HAMMOUD:  Objection to the
14       form, asked and answered.
15       THE WITNESS:  Yeah, the -- you
16       know, the breakdown of strength on the
17       forecast.
18 BY MR. CARTMELL:
19   Q.   Right.  And also the fact that this
20 was in Florida, a place where you knew this
21 type of drug was sought after by abusers,
22 correct?
23   A.   Well --
24       MR. HAMMOUD:  Objection, asked and

Page 439

1 answered.
2       THE WITNESS:  Yeah, and Florida
3       wouldn't have been the only reason to
4       hold the product.
5 BY MR. CARTMELL:
6    Q.   It's just one red flag, right?
7    A.   It was just another red flag.
8    Q.   These red flags are what led you to
9 go further and do more investigation, correct?
10   A.   That red flag wouldn't have been
11 one to make me go further down the line.
12   Q.   What made you go further down the
13 line and do actual research into the customer's
14 customer?
15   A.   That was going to be the --
16 primarily the strength mix of what they were
17 looking for, that it was hyped [sic] to the
18 40-milligram product, that that was the top
19 strength that they were looking for.
20   Q.   And because you saw that they were
21 ordering so much of this 40-milligram, or one
22 of the higher strengths, you wanted to see
23 where these drugs were actually going from
24 Publix?

Page 440

1    A.   Well, and not the volume of it but
2 the ratio of the 40-milligram compared to the
3 20-milligram, the 10-milligram, the
4 80-milligram, that the 40 was the top one.  And
5 I felt that was unusual and warranted
6 investigation.
7    Q.   Okay.  And then you went to work
8 and you actually did -- like you said earlier,
9 I think, you got online and you did some
10 Google-type searches and things like that, did
11 you not?
12   A.   Well, did some Google searches,
13 looked at the -- you know, verified licenses of
14 prescribers, looked for -- you know,
15 essentially telling the story of who the
16 prescribers are of these products.  And not
17 necessarily the products that we were intending
18 to sell to Publix but actually the
19 immediate-release product that was another
20 company's product.  So what I was investigating
21 wasn't our product, it was another company's
22 product.
23   Q.   Okay.  Let's see what your
24 investigation found.  And you say that and

Page 441

1 summarize that in your e-mail below of
2 Wednesday, October 28th, to Colleen McGinn,
3 your boss, correct?
4    A.   Correct.  Because this primarily
5 involves another company's product, yes.
6    Q.   Okay.  And you say, On October 27,
7 2015, I received data concerning oxycodone
8 usage at Publix Super Market, Inc.  The data
9 comprised of total dosage units dispensed of
10 all oxycodone tablet SKUs for the month of
11 September 2015 for their top ten locations,
12 along with a list of the top five oxycodone
13 prescribers for each location.  The following
14 is an analysis of that data.
15       Right?
16   A.   Correct.
17   Q.   Okay.  And you had asked Publix,
18 right -- you had asked the salespeople to go to
19 Publix and get information relating to their
20 top ten locations, along with their top
21 prescribers, correct?
22   A.   Correct.
23   Q.   And Publix -- the salespeople were
24 able to get that data so that you could look at

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1  that data and analyze it to try to determine
2  whether or not there was suspicious orders
3  going on, right?
4      A.  No, not suspicious orders.
5      Q.  Suspicious activity?
6          MR. HAMMOUD:  Objection to the
7  form.
8          THE WITNESS:  Potentially
9      suspicious activity.
10 BY MR. CARTMELL:
11     Q.  Okay.  You state, There were ten
12 locations listed.  All stores are located in
13 the state of Florida.  Location 3210 is located
14 on the campus of Moffitt Cancer Center.
15         So that means one of the pharmacies
16 that Publix was on -- or one of the pharmacies
17 was on a cancer center premises?
18     A.  Correct.
19     Q.  All 3210-listed physicians are
20 associated with MCC; oxycodone products and
21 quantities at 3210 appear to be consistent with
22 a large oncology practice.  The balance of the
23 retail locations are typical retail, located
24 inside grocery stores.

Page 443

1      Right?
2      A.  Correct.
3      Q.  Oxycodone IR 30-milligram data was
4  examined due to its status as a highly
5  sought-after product among abusers and due to
6  its limited use in retail pharmacy.
7          Why were you using oxycodone IR
8  30-milligram data?
9      A.  Because the -- going back to that
10 ratio of strengths for the extended-release
11 product, because again, the product that we
12 were launching was an extended-release product,
13 was not an immediate-release product,
14 suggested, based on my experience, that there
15 were issues in the pharmacy with oxycodone
16 30-milligram immediate release.
17     Q.  "Issues" meaning what?
18     A.  Meaning that the -- filling for
19 prescribers who may have significant discipline
20 and may have lax prescribing habits.
21     Q.  There may be some sort of fishy or
22 suspicious things going on?
23     A.  Diversion, correct.
24         MR. HAMMOUD:  Objection to the

Page 444

1      form.
2  BY MR. CARTMELL:
3      Q.  Diversion?
4      A.  Potential diversion, yes.
5      Q.  Okay.  So what you found when you
6  looked at that data was that -- well, you
7  summarize it below --
8      A.  Oh, yes.
9      Q.  -- and I'll read it.
10         At each location, with the
11 exception of 0537 -- and there you list out all
12 this information --
13     A.  Yes.
14     Q.  -- their percentages -- oxycodone
15 IR 30, the highest strength immediate-release
16 oxycodone available, was the top oxycodone
17 product dispensed.  By contrast, at the cancer
18 center, the top oxycodone product dispensed was
19 IR 5 milligrams.
20         And so you can see at these
21 locations you looked at, they were dispensing
22 one of the higher milligrams when compared to a
23 cancer center, correct?
24     A.  Exactly.

Page 445

1      Q.  And that's suspicious to you,
2  correct?
3          MR. HAMMOUD:  Objection to the
4      form.
5          THE WITNESS:  And that is something
6      that I find consistent with diversionary
7      activity.
8  BY MR. CARTMELL:
9      Q.  Okay.  You state that for Dr. Ralph
10 Page -- strike that.
11         Then you also did inquiries into
12 the top prescribers, meaning doctors, at the
13 nine Publix stores uncovered -- or -- and you
14 uncovered some information, correct?
15     A.  Correct.
16     Q.  I'm going to ask that question
17 again.  Then you also did some further research
18 into the top doctors or prescribers at the nine
19 stores and uncovered some information about
20 those prescribers, correct?
21     A.  Correct.
22     Q.  Okay.  And you actually list those
23 out.  For example, Dr. Ralph Page, you looked
24 into him in Melbourne, Florida, and you found

Page 446

1  that he was operating a cash-only pain clinic
2  business.
3      A.  Yes.
4      Q.  140 up front, but he holds no pain
5  clinic license as required by the state,
6  correct?
7      A.  Correct.
8      Q.  That sounds pretty suspicious,
9  right?
10     A.  Yes.
11         MR. HAMMOUD:  Objection to the
12     form.
13 BY MR. CARTMELL:
14     Q.  Suspicious for diversionary
15 activity, correct?
16     A.  Could be.
17         MR. HAMMOUD:  Objection to the
18     form.
19 BY MR. CARTMELL:
20     Q.  You looked into Dr. Mahmoud
21 El-Tobgui and you found that he's an OB/GN
22 operating a pain clinic.  It's again a
23 cash-only pain clinic, correct?
24     A.  Correct.

Page 447

1      Q.  And you know from your experience
2  that that can be a red flag, correct?
3      A.  Correct.
4      Q.  You looked at Dr. Velleff.  He was
5  disciplined for abandoning a previous practice;
6  "carloads" of out-of-state patients in his
7  clinic getting prescriptions, correct?
8      A.  Correct.
9      Q.  And you know that that is a
10 potential red flag of a pill mill type of
11 situation, correct?
12     A.  Correct.
13     Q.  Pill mill -- this is significant
14 anecdotal evidence of pill mill activity with
15 his practice, is what you said, correct?
16     A.  Correct.
17     Q.  You looked at Dr. -- skipping
18 down -- Dr. Scott Hardoon.  He had a 600 cash
19 fee to enroll as a pain patient, and his
20 license -- strike that.
21         Another red flag, correct?
22     A.  Correct.
23     Q.  There is significant anecdotal
24 evidence that former pain patients belonging to

Page 448

1  Dr. J. Gayden (whose license was relinquished
2  due to overprescribing controlled substances
3  and trading prescriptions for sex with underage
4  patients) are now patients at this doctor's
5  clinic, correct?
6      A.  Correct.
7      Q.  Again, fishy, suspicious-type
8  behavior that could be associated with
9  diversionary activity, correct?
10         MR. HAMMOUD:  Objection to the
11     form.
12         THE WITNESS:  I would say it's
13     consistent with something that could be
14     a diversionary activity, exactly.
15 BY MR. CARTMELL:
16     Q.  Dr. Kevin Sheahan, you found that
17 his pain clinic practice is located in Atlanta,
18 which is 628 miles from this pharmacy, correct?
19     A.  Correct.
20     Q.  That's a red flag, isn't it?
21     A.  I would say that's a red flag.
22     Q.  Because when doctors are
23 prescribing pain -- opioid pain prescriptions
24 and people are driving 628 miles to pick them

Page 449

1  up, that's a red flag that there may be some
2  diversionary tactics or abuse going on,
3  correct?
4      A.  Oh, yeah.  Mm-hmm.
5      Q.  No question, right?
6          MR. HAMMOUD:  Objection to the
7      form.
8          THE WITNESS:  I would say that's a
9      fair assessment, yeah.
10 BY MR. CARTMELL:
11     Q.  Okay.  Then you looked at
12 Dr. Michael Mozzetti.
13         He runs an urgent care clinic that
14 anecdotally doesn't take urgent care or
15 emergency patients.  This is significant
16 anecdotal evidence of pill mill activity.
17         Correct?
18     A.  "There is," not "this is."
19     Q.  "There is."
20     A.  Yeah.
21     Q.  Okay.  So another doctor that you
22 looked into that's using these Publix
23 pharmacies, there's all kinds of red flags
24 showing and suspicion showing that there may be

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1  diversionary activity going on, correct?
2      A.  Correct.
3      Q.  You then -- if you go down to
4  Dr. Naglaa Abdel-Al, his practice is 78.3 miles
5  from the pharmacy.
6      A.  Her practice.
7      Q.  Excuse me.  Her practice is either
8  78.3 miles or 40.8 miles (according to the
9  Florida license) from the store.  And she was
10  disciplined in Arizona for abandoning an
11  anesthetized patient in order to inject/abuse a
12  sedative, resulting in her overdose.
13         You found that too?
14     A.  Oh, yes.
15     Q.  And then finally, Dr. McGaha, her
16  office appears to be 116 miles from the Publix
17  store where the opioids are being picked up?
18     A.  Correct.
19     Q.  All of this points to --
20         MR. HAMMOUD:  Objection to the
21  form.  Sorry.
22         MR. CARTMELL:  I didn't even ask
23  the question yet.
24  BY MR. CARTMELL:

Page 451

1      Q.  This data -- all of this data that
2  you were finding in your Internet searches and
3  the other websites that you were going to
4  showed that your customers' customers, these
5  doctors, looked like they may be diverting
6  opioids, correct?
7      A.  So why the hell do they still have
8  a license and are still registered with the
9  DEA?
10     Q.  Right.
11     A.  That's what I want to know, why
12  they continued to be licensed after being
13  disciplined in this manner, opening these sorts
14  of businesses, and it's up to me to go and
15  identify it.
16     Q.  Right.  And then you say that these
17  are huge red flags.
18         So this battle between you and
19  sales continues, correct?
20     A.  No.  This was pretty much the end
21  of the battle, as you call it.
22         (Exhibit Teva-Tomkiewicz-023 marked
23         for identification and attached to the
24         transcript.)

Page 452

1  BY MR. CARTMELL:
2      Q.  Well, let me hand you Exhibit 23.
3         MR. HAMMOUD:  Can you tell us where
4  we are in time?
5         VIDEO OPERATOR:  Three and a half
6  minutes left.
7         MR. CARTMELL:  How much?
8         MR. HAMMOUD:  Three and a half
9  minutes.
10        MR. CARTMELL:  Okay.  I'll try to
11  talk fast.
12  BY MR. CARTMELL:
13     Q.  Exhibit 23, this is another text
14  message, or is this IM messaging that you had?
15     A.  Yes.  This is an IM.  Uh-huh.
16  10/30.  Okay, so that's a couple days after
17  this.  Okay, I'm good.
18     Q.  A couple days after, you've done
19  your research and you see these red flags and
20  suspicious activity, and you decide that you're
21  still willing to release a portion of these
22  opioids that were going to go to Publix.
23     A.  Now --
24     Q.  Is that true?  First of all, answer

Page 453

1  that.
2      A.  Oh, for the opioids we had on hold?
3      Q.  Yes.
4      A.  Yes.  Yes.
5      Q.  In other words, you're still
6  talking to the sales side of the company, and
7  they're pressuring you to release these holds,
8  and at this point you had actually said that
9  you would be willing to release these opioids,
10  or a portion of these opioids, if you could
11  have an in-face, face-to-face visit with the
12  company, correct?
13     A.  To have a meeting with the company,
14  yes.  And it's important to note that these
15  prescribers weren't prescribing the product in
16  question that we had on hold, that they were
17  prescribing oxycodone 30-milligram immediate
18  release.
19     Q.  Okay.  Right.  But these are
20  doctors who are actually shopping at and get --
21  and writing prescriptions to the pharmacies
22  that you have said --
23     A.  That I don't want my product going
24  to until we have a conversation with them --

Highly Confidential - Subject to Further Confidentiality Review

Page 454

1    Q.  Right.
2    A.  -- and discuss their program,
3  correct.
4    Q.  Right.  Because these doctors are
5  using those pharmacies, right, and you know
6  that at this point, correct?
7    A.  Yes.
8    Q.  Okay.  And you've already flagged
9  them because you've said there were red flags
10 that showed it may be suspicious, correct?
11      MR. HAMMOUD:  Objection to the
12    form.
13 BY MR. CARTMELL:
14    Q.  Is that correct?
15    A.  That our orders may be suspicious?
16    Q.  Yeah.  You flagged them because
17 there were red flags.
18    A.  Oh, yes.  And red flags not
19 specifically with the order but with what I
20 thought was Publix' own system.
21    Q.  You say here, We can't have any of
22 the product going to Publix until we okay it,
23 the data was that bad.
24    A.  Correct.

Page 455

1    Q.  And ultimately, sir, is it true
2  that, in fact, you didn't report any of these
3  Publix pharmacies, did you?
4    A.  I didn't see any specific orders of
5  ours that were being filled by these
6  physicians.  Again, these physicians [sic] were
7  for a different product, for oxycodone
8  30-milligram immediate release, which was not
9  our product.
10    Q.  Is your testimony that if you find
11 suspicious activity that you say is that bad,
12 is clear in your mind, that even -- just
13 because it's not your product, you don't have
14 to report it to the DEA?
15      MR. HAMMOUD:  Objection to the
16    form.
17 BY MR. CARTMELL:
18    Q.  Is that your testimony?
19      MR. HAMMOUD:  Calls for a legal
20    conclusion.
21      THE WITNESS:  If I had seen an
22    order, I would have reported it for
23    those products.  But I did not see an
24    order for oxycodone 30-milligram

Page 456

1    immediate release because we did not
2    have that product at that time.
3  BY MR. CARTMELL:
4    Q.  So I want the jury to be clear
5  about this.  Even though you did this
6  investigation and found all of this data that
7  you found to be truly indicative and bad of
8  diversionary activity, and you knew doctors
9  were using those pharmacies for that purpose of
10 getting opioids, you released the product
11 because you said, that wasn't our product, so
12 we don't have to report it.  Correct?
13      MR. HAMMOUD:  Objection to the
14    form.
15      THE WITNESS:  And again, I did not
16    see anything suspicious specifically to
17    our product, to our orders.
18 BY MR. CARTMELL:
19    Q.  And so because it wasn't --
20    A.  So there was nothing to report.
21    Q.  -- your product, you didn't report
22 anything, did you?
23      MR. HAMMOUD:  Objection to the
24    form.

Page 457

1  BY MR. CARTMELL:
2    Q.  Did you?
3    A.  I didn't see any orders.  I had no
4  orders to report.
5    Q.  Publix ordered from your company --
6      MR. HAMMOUD:  Tom, time is up.
7      MR. CARTMELL:  Hold on.
8      MR. HAMMOUD:  I'll give you the
9    professional courtesy of one more
10    question, but that's it.
11 BY MR. CARTMELL:
12    Q.  Publix ordered from your pharmacy
13 generic 30 milligrams oxycodone, correct?
14    A.  Wrong.
15    Q.  What did they order from you?
16      MR. HAMMOUD:  That's it.  Time is
17    up.
18      THE WITNESS:  Time's up.
19      MR. CARTMELL:  I've got like three
20    questions.
21      MR. HAMMOUD:  Okay.  I'll give you
22    three questions.
23      THE WITNESS:  Extended-release
24    oxycodone.

Highly Confidential - Subject to Further Confidentiality Review

Page 458

BY MR. CARTMELL:

1 Q.  So these Publix pharmacies were
2 ordering opioids from your company, correct?
3 A.  Correct.
4 Q.  Those orders were flagged as
5 suspicious, and then you detailed to sales red
6 flags related to those orders, didn't you?
7 A.  Wrong.
8 MR. HAMMOUD:  Objection to the
9 form.
10 THE WITNESS:  Wrong.  They were not
11 flagged as suspicious.
12 BY MR. CARTMELL:
13 Q.  They were flagged as potentially
14 suspicious, correct?
15 MR. HAMMOUD:  Objection to the
16 form.
17 THE WITNESS:  I would say that
18 there was something that -- as I
19 previously said, that they were
20 indicative of things that I felt could
21 be deficient with Publix' program.
22 BY MR. CARTMELL:
23 Q.  Potentially suspicious, correct?

Page 459

1 MR. HAMMOUD:  Tom -- objection to
2 the form.  Move to strike the question.
3 THE WITNESS:  Any controlled
4 substance order is potentially
5 suspicious.
6 MR. CARTMELL:  That's all I have.
7 Thanks.
8 VIDEO OPERATOR:  Going off the
9 record, 6:49 p.m.
10 (Recess from 6:49 p.m. until
11 6:53 p.m.)
12 VIDEO OPERATOR:  Back on record at
13 6:53 p.m.
14 EXAMINATION
15 BY MR. GASTEL:
16 Q.  Mr. Tomkiewicz, my name is Ben
17 Gastel, and I represent plaintiffs in cases
18 that are pending in Tennessee.  So everyone I
19 represent is located in the state of Tennessee.
20 Have you ever been to the state of
21 Tennessee?
22 A.  Yes, I have.
23 Q.  Have you ever been there for work?
24 A.  Yes, I have.

Page 460

1 Q.  Have you ever done a site visit to
2 a customer of Teva's in Tennessee?
3 A.  No.
4 Q.  Do you recall what your business
5 was in Tennessee when you went there for work?
6 A.  Oh, certainly.  Back when I was
7 with PharMerica, and probably Bergen Brunswig,
8 you know, as we talked about earlier in the
9 day, we had pharmacies, owned pharmacies,
10 nursing home pharmacies that I audited.  And
11 then additionally when I was with
12 AmerisourceBergen, I had -- did some customer
13 site visits.
14 Q.  Is that all of the travel that you
15 did to Tennessee with regard to work-related
16 travel?
17 A.  Let's see.  I also attended a NADDI
18 conference in Gatlinburg.
19 Q.  Anything else you can remember?
20 Was that while you were with Teva?
21 A.  For NADDI?
22 Q.  Yes.
23 A.  Well, that's not the reason, that
24 I'm with Teva, as part of NADDI.  And that was

Page 461

1 years ago.  That was early 2000s.
2 Q.  Got it.  We've talked a lot about
3 diversion today.  What, in your mind, is a
4 diverted prescription opioid?
5 A.  You mean the specific product?
6 Q.  No, no, no, I mean just generally
7 when we talk about diversion.
8 A.  What is diversion?
9 Q.  What is diversion, in your mind?
10 A.  In my mind, diversion is anything
11 that -- well, in the -- from the controlled
12 substance standpoint -- sorry, I do stutter --
13 from a controlled substance standpoint, that
14 would be anything that is -- where the product
15 is moved outside of the closed system of
16 distribution until it gets to the ultimate end
17 customer.
18 Now, there is also contract
19 diversion, which is not necessarily controlled
20 substances, but that would be moving product
21 outside of a class of trade to a different
22 class of trade, a preferentially priced
23 product.
24 Q.  And why is it important that

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1 controlled substances, and specifically
2 opioids, stay within the closed system of
3 distribution?
4      A.   Now, are you talking from just a
5 philosophical standpoint?
6      Q.   I'm talking about your
7 understanding of why that's important.
8      A.   Well, and again, you know, that
9 becomes a philosophical question, you know, not
10 just a regulatory question, because that --
11 from my personal standpoint, you know,
12 that's -- well, a couple reasons.  With
13 controlled substances, it's to help keep
14 product in legitimate supply channels and to
15 keep them away from abusers.  From a contract
16 diversion standpoint, the primary risk there is
17 inflating costs to hospitals through gray
18 marketing of a short supply product.
19      Q.   And when you say "legitimate supply
20 channels," do you mean the legal supply
21 channels?
22      A.   Correct.  Correct.
23      Q.   I think that we saw a slide or we
24 saw a document earlier where you described

Page 463

1 Florida as a hotspot for opioid abuse.  Do you
2 recall that?
3      A.   For oxycodone.
4      Q.   Are you aware that Appalachia is
5 also a hotspot for opioid abuse?
6      A.   Oh, yes.
7      Q.   Have you ever heard of the
8 Appalachia High Intensity Drug Trafficking
9 Area?
10      A.   I'm not familiar with that term.
11      Q.   Are you aware that much of east
12 Tennessee falls in or lies adjacent to this
13 Appalachian corridor?
14      A.   Yes.
15      Q.   Does Teva treat orders that are
16 going to that area any differently than orders
17 going anywhere else?
18           MR. HAMMOUD:  Objection to the
19 form.
20           THE WITNESS:  And I can't think of
21 any -- well, from the -- well, I would
22 be hard-pressed to say that we take into
23 account any geographical areas as far as
24 the scrutiny of our system because

Page 464

1 generally people are people, and whether
2 the person is in Appalachia or the
3 person is in the Pacific Northwest or
4 the northeast of the country, pain is
5 going to be pain.  And so from a
6 geographic area -- well, in terms of our
7 system, we treat all geographic areas
8 the same.
9           So if we find something that is in
10 one geographic area, you know, with the
11 way that we do our peer comparisons,
12 we're comparing, you know, a customer
13 who may be servicing, you know, a lot of
14 pharmacies in the Appalachian area,
15 they're going to be compared to other
16 geographic areas.  So if, you know,
17 they're elevated compared to a different
18 geographic area, that is going to be
19 something that is more likely to be
20 further investigated.
21 BY MR. GASTEL:
22      Q.   But is that something that's built
23 in automatically to your algorithm?
24      A.   Yes, I built that into the

Page 465

1 algorithm.
2      Q.   You've talked a little bit today
3 about, again, how prescription opioid diversion
4 and abuse is a very serious issue.  I want to
5 drill down a little bit more on what you mean
6 by that.
7           Would you agree that it's a public
8 health concern whenever prescription opioids
9 are diverted and consumed for nonmedical
10 purposes?
11           MR. HAMMOUD:  Object to the form.
12           THE WITNESS:  I would say that's a
13 very fair assessment.  Um-hmm.
14 BY MR. GASTEL:
15      Q.   Would you agree that it's a public
16 health concern whenever prescription opioids
17 are consumed for nonmedical purposes?
18           MR. HAMMOUD:  Object to the form.
19           THE WITNESS:  And I would say
20 that's a fair assessment.
21 BY MR. GASTEL:
22      Q.   In your mind, what are the
23 nonmedical reasons why a person would consume a
24 prescription opioid?

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1    A.   To get high.
2    Q.   Any other reasons?
3    A.   I have anecdotally heard of pain
4  patients who have, you know, been terminated
5  from pain clinics who are still trying to seek
6  pain relief.  But in terms of diversion, I
7  can -- anything that goes outside of the
8  legitimate channel, I consider that the same
9  as -- you know, from my perspective, as a
10 patient getting high.  I'm not going to do an
11 allowance just because I think that, you know,
12 this might be a legitimate pain patient getting
13 product from an illicit channel.  I don't buy
14 it.
15    Q.   Would you agree that prescription
16 opioids are consumed for nonmedical purposes
17 throughout the United States?
18        MR. HAMMOUD:  Object to the form.
19        THE WITNESS:  I would say that's
20    probably a fair assessment, a very fair
21    assessment.
22 BY MR. GASTEL:
23    Q.   Would you say that that's also true
24 in the state of Tennessee?

Page 467

1    A.   I wouldn't exclude them.
2    Q.   Would you agree that ensuring
3  prescription opioids are not consumed for
4  nonmedical purposes is an important public
5  health concern?
6    A.   I would say that's a fair
7  assessment.
8    Q.   Would you agree that some consumers
9  of prescription opioids obtain those opioids
10 via illegal diversion for nonmedical purposes?
11    A.   I'm sorry, could you repeat that
12 one?
13    Q.   Sure.  Would you agree that some
14 consumers of prescription opioids obtain those
15 opioids via illegal diversion for nonmedical
16 purposes?
17    A.   Oh, yes.
18    Q.   And that happens throughout the
19 country, right?
20    A.   That's a fair assessment.
21    Q.   And that's been happening
22 throughout the state of Tennessee for a long
23 time too, correct?
24    A.   I would say that's a fair

Page 468

1  assessment.
2    Q.   And you talked a lot today about
3  how sometimes -- and I think the description
4  you used is, your product ends up on the
5  street.  Do you recall some of that testimony?
6    A.   Oh, yes.
7    Q.   When you say "your product," you
8  really mean Teva-produced prescription opioids,
9  right?
10    A.   I mean Teva-produced controlled
11 substances.
12    Q.   But that would include
13 Teva-produced prescription opioids, right?
14    A.   Well, the photographs that I've
15 seen, I haven't seen our opioids on them.  I
16 didn't see any of our opioids.  They were
17 benzodiazepines, primarily.
18    Q.   Well, I understand that you might
19 not have seen photographs of it, but you would
20 agree with me that that includes Teva-produced
21 prescription opioids, right?
22    A.   Oh, I'm certain that that's
23 happened, yes.
24    Q.   And so would you agree with me that

Page 469

1  despite Teva's efforts, the prescription
2  opioids that it produces have been placed in
3  diverted channels to consumers for use for
4  nonmedical purposes?
5        MR. HAMMOUD:  Object to the form.
6        THE WITNESS:  Yeah, and I'm not
7    certain what you mean, despite our
8    efforts.
9  BY MR. GASTEL:
10    Q.   Well, I'll just ask, would you
11 agree with me that the prescription opioids
12 that Teva produces have been diverted to
13 consumers for nonmedical purposes?
14    A.   Oh, yes.
15    Q.   And that happens throughout the
16 country, right?
17    A.   I'm certain that it has.
18    Q.   And it's certainly been happening
19 in Tennessee for quite some time, right?
20        MR. HAMMOUD:  Object to the form.
21        THE WITNESS:  Well, I can't say
22    that for certain for -- for the term
23    "quite some time."
24 BY MR. GASTEL:

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1    Q.   Well, since, let's say, at least
2  2014?
3    A.   I can't even say 2014.  And that's
4  because of the type of opioids that we had at
5  that time from 2014, 2015, 2016.  Generally the
6  opioids that we had weren't opioids that were
7  highly sought after by abusers.
8    Q.   Well, I understand that they might
9  not be highly sought after by abusers, but they
10  were undoubtedly diverted into channels for
11  consumers to use for nonmedical purposes, even
12  though they might not be the most sought-after
13  ones; is that fair to say?
14         MR. HAMMOUD:  Object to the form.
15         THE WITNESS:  I would say it's
16     definitely possible, yeah.
17  BY MR. GASTEL:
18    Q.   We've seen a lot of data today
19  about your suspicious order monitoring program.
20  Do you have an opinion as to what percentage of
21  prescription opioid orders that were made --
22  well, strike that.
23         Do you believe that Teva's
24  suspicious order monitoring program correctly

Page 471

1  flagged and stopped every order of prescription
2  opioids that was intended to be consumed for
3  nonmedical purposes?
4         MR. HAMMOUD:  Object to the form.
5         THE WITNESS:  That -- I can't
6     determine that.
7  BY MR. GASTEL:
8    Q.   Is that the goal of the suspicious
9  order monitoring program?
10         MR. HAMMOUD:  Object to the form.
11         THE WITNESS:  The goal of the
12     suspicious order monitoring program is
13     that it -- it's actually multifold.
14     It's to identify suspicious orders, it's
15     to maintain effective controls against
16     diversion.  And that's probably the
17     biggest one that I'm looking at is
18     working to prevent diversion.
19  BY MR. GASTEL:
20    Q.   Do you have any understanding of
21  opioid prescription rates in the state of
22  Tennessee?
23    A.   Prescription rates?  No.
24    Q.   Do you have -- have you ever

Page 472

1  reviewed a document published by the Tennessee
2  Department of Health on Tennessee's opioid
3  crisis?
4    A.   I may have, but I don't recall
5  specifically.
6    Q.   Are you aware that in -- as of
7  2013, 2014, the Tennessee Department of Health
8  estimated that there were 221,000 adults in
9  Tennessee using prescription pain relievers for
10  nonmedical purposes?
11    A.   I haven't heard that number.
12    Q.   Would you be surprised if that was
13  true?
14    A.   No.
15    Q.   Are you aware that in 2015, doctors
16  in Tennessee wrote more than 7.8 million opioid
17  prescriptions in the state of Tennessee?
18    A.   So why did Tennessee license them?
19  Why don't they revoke the license?
20    Q.   Well, I mean, we'll maybe ask the
21  Department of Health one day.  But are you
22  aware --
23    A.   That would be nice.
24    Q.   -- that that is the number of

Page 473

1  opioid prescriptions in the state of
2  Tennessee --
3         MR. HAMMOUD:  Object to the form.
4  BY MR. GASTEL:
5    Q.   -- in 2015?
6         MR. HAMMOUD:  Sorry.  Object to the
7     form.
8         THE WITNESS:  I'm not aware.
9  BY MR. GASTEL:
10    Q.   I think that we kind of covered
11  this a little bit earlier, but I want to make
12  sure that it's on the record that -- in your
13  mind, what is a suspicious order for
14  prescription opioids?
15         MR. HAMMOUD:  Object to the form.
16         THE WITNESS:  A suspicious order
17     for opioids is going to be a suspicious
18     order for really anything that I
19     monitor.  It's going to be something
20     that is going to be of an unusual size,
21     pattern, or frequency where I can't --
22     where unusual becomes something where
23     there's a red flag that I can't explain.
24     If I have a -- if I see a legitimate use

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1 for this product, a legitimate need for
2 the product, generally those sorts of
3 things are going to satisfy a red flag.
4 But in terms of opioids, you know, then
5 I'm looking at things like hospice and
6 cancer care, like in the last document
7 that I reviewed with the previous
8 attorney.
9 BY MR. GASTEL:
10 Q. So we saw some statistics about
11 your suspicious order monitoring program today
12 that showed that it reviews approximately
13 10,000 order lines each month?
14 A. At that time, correct.
15 Q. What is an order line? And how is
16 it different from an order, if at all?
17 A. Oh, well, an order line -- well, an
18 order may comprise of a number of different
19 products. You know, if we're talking
20 oxycodone, oxycodone 10-milligram, oxycodone
21 extended release 20-milligram, each of those
22 are going to be separate order lines within a
23 single order.
24 Q. And so you're tracking each one of

Page 475

1 those line items in the order. Is that what
2 you're saying?
3 MR. HAMMOUD: Object to the form.
4 THE WITNESS: Correct. We're
5 looking at each line of an order.
6 BY MR. GASTEL:
7 Q. Does your current version of the
8 algorithm incorporate any chargeback data?
9 A. Within the algorithm? No.
10 Q. And the algorithm uses historical
11 purchasing data as a baseline to determine
12 whether or not an order is suspicious?
13 MR. HAMMOUD: Object to the form.
14 THE WITNESS: No. It uses
15 historical data into -- to develop
16 statistical norms for customers across
17 like sciences and like business types.
18 BY MR. GASTEL:
19 Q. Does it use the entire historical
20 data that Teva has on a given customer, or does
21 it -- just flagging orders, say, for the last
22 12 months, 14 months, 16 months?
23 A. Well, the historical data used to
24 develop the model is from the previous 12

Page 476

1 months.
2 Q. How does that work?
3 MR. HAMMOUD: Object to the form.
4 THE WITNESS: In terms of how we're
5 looking at the previous 12 months or how
6 the algorithm looks at the previous 12
7 months?
8 BY MR. GASTEL:
9 Q. Yeah, like how does it -- I mean, I
10 assume that it's a computer-based system and
11 it's a software-based system.
12 A. Correct.
13 Q. So is it told to look at a given
14 customer's orders just for the last 12 months?
15 A. No. We have numbers that are built
16 into it that are compiled from historical
17 purchases, looking at not just the specific
18 customer but looking at the customer's peer
19 group by business type and by relative size.
20 And so we group customers into essentially
21 these pockets where we can develop a -- what we
22 consider to be a statistical norm for this
23 group of customers. In that way, you know,
24 we're comparing a customer, say, in Tennessee

Page 477

1 with a like customer across the country. So
2 if, for example, you know, something in
3 Appalachia is showing as being elevated
4 compared to the rest of the country, that's
5 going to be something that's going to be more
6 likely to be investigated into that customer in
7 Appalachia. Does that help?
8 Q. Yeah. Does the algorithm
9 incorporate information from Quintiles?
10 A. Quintiles? Well, Quintiles is now
11 called IQVIA, a part of IMS, and no, it
12 doesn't.
13 Q. Do you have access to IMS data?
14 A. I don't have access to IMS data,
15 but I do have access to EDI 867 data, which is
16 very similar.
17 Q. And you might have answered this
18 question earlier, but when did the algorithm
19 start incorporating the 867 data?
20 A. Well, the algorithm actually
21 doesn't incorporate the 867 data. Our
22 suspicious order monitoring program as a whole
23 incorporates reviewing 867 data.
24 Q. So at what point is the 867 data

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1 reviewed?
2     A.  Well, there's a couple different
3 facets in the way we review it.  One would be
4 specific to an investigation where we're
5 looking at a customer's order where, instead of
6 going to the customer and asking for data, it's
7 much quicker for us to go and look at the 867
8 data on that customer to find where a product
9 is ultimately -- you know, at what pharmacy the
10 product is being dispensed from.  The other is
11 doing a prospective review of different
12 controlled substances and finding just
13 nationally what pharmacies are purchasing these
14 products.
15     Q.  And we saw the document earlier
16 that in 2015 there were 10,000 order lines
17 watched every month, and then approximately 25
18 of those per month got held back for longer
19 than a day.  Do you remember that document?
20     A.  Correct.
21     Q.  Is that statistic accurate?
22     A.  At the time, I believe it was, yes.
23     Q.  And then we saw in 2015 this slide
24 in your PowerPoint deck that showed that you

Page 479

1 had made four suspicious ordering reports to
2 the DEA.  Do you recall that slide?
3     A.  Correct.
4         MR. HAMMOUD:  Objection to the
5     form.
6 BY MR. GASTEL:
7     Q.  Is that statistic correct?
8     A.  Yes, I believe it's correct.
9     Q.  So you hold -- in 2015, just using
10 these stats, you've held approximately 300
11 orders back for longer than a day.  Is that
12 fair?
13     A.  Correct.
14     Q.  You've reported four orders to the
15 DEA?
16     A.  Correct.
17     Q.  And those were never fulfilled,
18 correct?
19     A.  If they were reported as
20 suspicious, they were not filled.
21     Q.  What happens to the other roughly
22 296 orders?  Are those all sent to the customer
23 after the investigation?
24     A.  Most of them would have been sent.

Page 480

1 If they were not sent, it would have been for
2 some other reason other than the suspicious
3 order monitoring program.  But those were ones
4 where all the red flags were cleared.
5     Q.  So is it safe to say that the only
6 orders that you did not fulfill in 2015 were
7 the four that were reported to the DEA?
8         MR. HAMMOUD:  Object to the form.
9 BY MR. GASTEL:
10     Q.  For suspicious order monitoring
11 activity.
12     A.  Oh, I would say that's probably
13 correct.
14     Q.  So in 2013, when you had one
15 suspicious order report to the DEA, that was
16 the only order held back and not fulfilled for
17 suspicious order monitoring activity?
18         MR. HAMMOUD:  Object to the form,
19     calls for speculation.
20         THE WITNESS:  Yes, because I wasn't
21     in -- I wasn't there in 2013.  So I can
22     assume that it was not shipped but don't
23     know for certain.
24 BY MR. GASTEL:

Page 481

1     Q.  Sure.  What about in 2014 when you
2 were there with the one order that was reported
3 to the DEA, was that the only order that wasn't
4 fulfilled due to suspicious order monitoring
5 activity?
6     A.  That is correct.
7     Q.  And then in 2017 when you had the
8 18 reports, were those the only orders that you
9 did not fulfill due to suspicious order
10 monitoring activity?
11         MR. HAMMOUD:  Object to the form.
12         THE WITNESS:  And I'm going to say
13     correct.  And also, one -- a point of
14     clarification on the suspicious order
15     reports that I have reported.  Because I
16     have reported things through review of
17     867 data, which would be orders that we
18     did not fill but that some of our
19     customers may have filled, those,
20     because they weren't our orders that I
21     reported, that they were, you know,
22     someone else's orders that I saw were
23     suspicious and reported, those were
24     things that were filled but that Teva

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1 did not have control over determining
2 whether those were to be filled or not.
3 BY MR. GASTEL:
4 Q. In 2016, was Teva still processing
5 approximately 10,000 order lines per month?
6 A. Could have been.
7 MR. HAMMOUD: Object to the form.
8 BY MR. GASTEL:
9 Q. Would it have been more or less?
10 MR. HAMMOUD: Same objection.
11 THE WITNESS: Yeah, I'd have to go
12 and look to be certain.
13 BY MR. GASTEL:
14 Q. And how would you find that out?
15 A. Oh, I'd have to go into the system
16 and pull historic order reports and compile an
17 analysis of how many orders were reviewed, how
18 many lines were reviewed.
19 Q. For the 300 -- again, going back to
20 that 2015 data, for the 300 orders that were
21 flagged, investigated for longer than a day,
22 and then eventually not reported to the DEA but
23 then filled, presumably, are those tracked in
24 any Teva document?

Page 483

1 A. They would be. You know, we can
2 see how long a review of an order was.
3 Q. And is the result of the review
4 tracked anywhere in the system?
5 A. The result of the review of the
6 order, or reviewing for how long an order sat
7 on hold?
8 Q. Both.
9 A. Both. Well, one, we don't track --
10 we have the ability to, but I don't do any
11 metrics based on how long we hold an order,
12 because generally, if we're holding an order, I
13 don't really care about any customer service
14 issues based on holding it, and I don't want to
15 look like I'm caring about customer service
16 issues based on holding an order. So the time
17 that we spend holding an order, you know, for a
18 day, two days, weeks, because it can be weeks
19 sometimes, that doesn't matter to me. What
20 matters to me is the results of the
21 investigation and determining if this is a
22 product where we can't resolve a red flag and
23 it has to be reported as suspicious.
24 On the other side -- and I'm sorry,

Page 484

1 what was the other half of that?
2 Q. Well, I presume that there's an
3 investigation that's going on at that point --
4 A. Correct.
5 Q. -- with regard to the order. So is
6 the result of the investigation --
7 A. Oh, the result.
8 Q. -- the reason why it's released,
9 tracked anywhere?
10 A. Yes, that is maintained.
11 Q. And how is it maintained?
12 A. Well, a couple places. For the
13 specific order line, there will be a release
14 code and a free text piece that's maintained on
15 why a specific order line is held, or released.
16 Then additionally, if it's something where
17 we've gone to the customer, we maintain that
18 information, the -- you know, any materials
19 that we've gathered through that investigation
20 is maintained within the customer's file.
21 Q. We've seen several examples today
22 of you, specifically, asking Teva customers for
23 information on their customers.
24 A. Correct.

Page 485

1 Q. Do you recall ever having a
2 customer refuse that request?
3 A. Oh, yes.
4 Q. What do you do when a customer
5 refuses that request?
6 A. We cease all sales of controlled
7 substances, gabapentin, and List I chemicals
8 until they comply.
9 Q. And then how many customers has
10 that happened with, approximately?
11 A. Not very many. In the past year, I
12 can think of one offhand who refused to provide
13 that information.
14 Q. And then you stopped fulfilling
15 orders?
16 A. Correct.
17 Q. And then did the customer
18 ultimately give it and then you started redoing
19 it --
20 A. Yes.
21 Q. -- or refilling orders?
22 A. Yes, exactly.
23 Q. Do you ever recall an instance
24 where the customer refused to provide the

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1  information about its customers, you then
2  ceased filling orders, and then the customer
3  just simply never came back?
4      A.  Yes.
5          MR. HAMMOUD:  Objection to the
6  form.
7  BY MR. GASTEL:
8      Q.  And what customer do you recall
9  that happening with?
10     A.  Henry Schein.
11     Q.  And when did that happen?
12     A.  I'm trying to think when
13 specifically that happened.  That may have been
14 in the last year as well, which would make two
15 customers.  That could have been the end of
16 2017, beginning of 2018.
17     Q.  Any other customers where you can
18 recall that happened to?
19     A.  Well, again, there was one other
20 customer this year that that happened to, but
21 they ultimately provided the information pretty
22 quickly.
23     Q.  Any other customers, then, other
24 than the two you've mentioned?

Page 487

1      A.  Oh, yeah, there was one other that
2  didn't want to provide information, and we
3  ceased sales of controlled substances.
4      Q.  You mentioned Richie Pharmacal
5  earlier today?
6      A.  Yes.
7      Q.  Pharmacal?  I don't know if I'm
8  saying that right?
9      A.  Richie Pharmacal, yes.
10     Q.  I want to -- do you recall -- why
11 does that customer stick out in your mind?
12         MR. HAMMOUD:  Objection to the
13 form.
14         THE WITNESS:  They were the
15     suspicious order report -- the first
16     suspicious order report that I reported,
17     I believe, and we also terminated their
18     ability to order controlled substances
19     at that time.
20         (Exhibit Teva-Tomkiewicz-024 marked
21     for identification and attached to the
22     transcript.)
23 BY MR. GASTEL:
24     Q.  I'm going to show you Exhibit 24.

Page 488

1  Do you recall this document.
2      A.  Oh, yes.
3      Q.  This is the suspicious order report
4  that you sent to the Drug Enforcement
5  Administration, correct?
6      A.  Correct.
7      Q.  The document that we have is not
8  signed, but is this what you actually sent to
9  the DEA?
10     A.  Oh, they would have received a
11 signed copy.
12     Q.  I understand.  But it would have
13 been this letter, correct?
14     A.  Oh, yes.
15     Q.  And this relates to orders that
16 were attempted to be placed by Richie Pharmacal
17 in October 2014, correct?
18     A.  Correct.
19     Q.  And Richie Pharmacal is actually
20 located in Glasgow, Kentucky.
21     A.  Correct.
22     Q.  Do you know where Glasgow, Kentucky
23 is?
24     A.  I've been there, but that -- I

Page 489

1  can't remember specifically because I've been
2  to lots of places in Kentucky.
3      Q.  Did you do a site visit to Richie
4  Pharmacal?
5      A.  No.
6      Q.  Why have you been to Glasgow,
7  Kentucky then?
8      A.  When I worked for PharMerica, we
9  had a long-term care pharmacy in Glasgow and I
10 visited them.
11     Q.  Got it.
12     A.  Audited them.
13     Q.  Would you have flown or driven to
14 that?
15     A.  I would have flown there.
16     Q.  Do you recall if you flew into the
17 Nashville International Airport for that?
18     A.  I don't remember which airport.
19     Q.  The reason why I ask is that
20 Glasgow, Kentucky is actually very close to the
21 state of Tennessee, and probably the closest
22 regional airport to it is actually in
23 Nashville.
24         So I want to ask some questions

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1 about Richie Pharmacal.
2     (Exhibit Teva-Tomkiewicz-025 marked
3     for identification and attached to the
4     transcript.)
5 BY MR. GASTEL:
6     Q.  I'm going to show you another
7 exhibit, we'll mark it as Exhibit 25.  This is
8 an internal memo that Colleen McGinn sent to
9 you on November 21st, 2014.
10     A.  Oh, I sent it to Colleen.
11     Q.  Oh, I'm sorry.  And this, I assume,
12 was based on an investigation that you did
13 based on what would eventually be reported as
14 the Richie Pharmacal suspicious orders,
15 correct?
16     A.  Correct.
17     Q.  And you'll see that he had --
18 Richie Pharmacal has, I assume, provided you
19 some information about its customers.  Is that
20 fair to say?
21     A.  Correct.
22     Q.  And then you did an investigation
23 on its customers, correct?
24     A.  Correct.

Page 491

1     Q.  I want to direct your attention to
2 the last page of this exhibit.  Do you see the
3 reference to Dr. Trent Cross in Oneida,
4 Tennessee?
5     A.  Yes.
6     Q.  And it says in the first bullet
7 point, In the last six months, Richie sold
8 Dr. Cross 56,000 tablets of hydrocodone.
9     A.  Yes.
10     Q.  And in 2014, was Teva making
11 hydrocodone?
12     A.  No.  That was someone else's
13 hydrocodone.  Well, we did have a hydrocodone
14 with ibuprofen product, but we discontinued it
15 around this time.  I think before this.
16     Q.  And you sort of identify some other
17 interesting factors about Dr. Cross, including
18 that 69 percent of Richie's hydrocodone sales
19 to Dr. Cross were 10 milligrams, correct?
20     A.  Correct.
21     Q.  And then it says that he maintains
22 two offices, a Way-Less Weight Loss Clinic and
23 a Cross Medical Clinic?
24     A.  Correct.

Page 492

1     Q.  Why was that something that you
2 wanted to put in your report, if you recall?
3     A.  It seems unusual that a doctor
4 dealing with hydrocodone, the top strength of
5 hydrocodone, also operates a weight loss
6 clinic.  It doesn't seem to be consistent with
7 his practice.
8     Q.  And then do you see how it says,
9 Anecdotally appears to be a cash-only business?
10     A.  Yes.
11     Q.  Do you recall how you came to that
12 conclusion?
13     A.  Oh, well, that's through anecdotal
14 reports on the Internet, patients chattering
15 about the doctor and about how much they have
16 to pay to get in to see the doctor.  If you're
17 going to see the doctor, you know, be prepared
18 because it's going to be this much money.
19 Those sorts of things.
20     Q.  And then you have the anecdotal
21 comments down here.  Where did you find those?
22     A.  Well, they're actually listed.
23 Vitals.com, topics.com, a lot of topics.com.
24     Q.  And the reason why you put this in

Page 493

1 your memo is that I assume that you believe
2 that these were red flags for diversion
3 activity going on at Dr. Cross's medical
4 practice?
5     A.  Oh, yes.
6     Q.  Are you aware of whether or not
7 Dr. Cross ultimately lost his medical license?
8     A.  That I don't know.
9     Q.  Did you report any of the -- of
10 this related to Dr. Cross to the DEA?
11     A.  Yes, I did.
12     Q.  And do you know when you did that?
13     A.  It would have been around this
14 time.  And it was actually an unusual
15 situation, which is why I remember it, in which
16 it was one of the two times the DEA actually
17 contacted me about a suspicious order report.
18 And so someone from I think the Louisville
19 office had called me up -- and I have his name
20 somewhere, but, you know, it's a few years ago,
21 so I can't quite remember it -- and he asked
22 about details about Richie and why we cut them
23 off, and so I gave him the details, and I said,
24 you know, I have a whole file full of notes and

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1 things, send me a subpoena and I'll send you
2 all my notes. So he sent me a subpoena and I
3 sent him all this stuff.
4      (Exhibit Teva-Tomkiewicz-026 marked
5      for identification and attached to the
6      transcript.)
7 BY MR. GASTEL:
8      Q. And I'm going to show you another
9 exhibit which is Exhibit 26.
10      A. Does he still have his license?
11      Q. I believe it's been suspended,
12 but -- for a variety of reasons.
13      A. That's actually a good thing.
14      Q. This is another suspicious order
15 report that you sent to the DEA, correct?
16      A. Correct.
17      Q. Once again detailing Richie
18 Pharmacal, correct?
19      A. Correct.
20      Q. So between your original report to
21 the DEA in December of 2014 and this report in
22 December of 2015, do you know if Teva filled
23 any orders for Richie Pharmacal?
24      A. No controlled substance orders.

Page 495

1      Q. And then why did you have a second
2 report related to Richie Pharmacal then?
3      A. Well, because they placed an order
4 for these products.
5      Q. And what made it suspicious, in
6 your mind?
7      A. Well, actually, two things. The
8 first is that they're not allowed to receive
9 controlled substances from Teva. So the act of
10 placing an order in itself is suspicious. And
11 then the nature of the order I found highly
12 suspicious.
13      The -- if you notice, there's two
14 different dates, 6-23 and 6-24. The order on
15 6-23 for a small amount of a product called
16 estazolam. Estazolam isn't a highly abused
17 product. I don't know how other manufacturers
18 of estazolam view it, but that -- it's often
19 considered a very little abuse potential. It's
20 a Schedule IV, so it's, you know, farther down
21 on the schedule. But what it appeared to me in
22 a -- and I held that without reporting it on
23 that day because my suspicion said this was a
24 test order and they're going to try to order

Page 496

1 something else following up, just to see if
2 they get it through.
3      And the next day, orders came
4 through for buprenorphine with naloxone. And
5 so that helped to reinforce my suspicion that
6 that first one was a test order just to see if
7 they could place the order.
8      (Exhibit Teva-Tomkiewicz-027 marked
9      for identification and attached to the
10      transcript.)
11 BY MR. GASTEL:
12      Q. I'm going to show you Exhibit 27.
13 And this is a letter that you ultimately sent
14 to Richie Pharmacal, correct?
15      A. Correct.
16      Q. It says, In response to your recent
17 request, please be advised that Teva
18 Pharmaceuticals has decided to discontinue
19 sales of controlled substances to Richie
20 Pharmacal.
21      A. Correct.
22      Q. And this letter is dated
23 January 22nd, 2016.
24      A. Correct.

Page 497

1      Q. So prior to that, how did you
2 communicate to Richie Pharmacal that you were
3 not going to fill controlled substances orders
4 for them?
5      A. We did have phone calls with
6 Richie.
7      Q. And what prompted this letter of
8 January 22nd, 2016?
9      A. They kept asking, what can we do to
10 get back in your good graces, essentially. I'm
11 not saying that was the exact words they were
12 using. But that -- they kept placing calls to
13 different people within the company, you know,
14 what can we do to get turned back on, what can
15 we do to get turned back on. And I said,
16 there's nothing really you can do.
17      Q. Did you alert any of your other
18 customers not to send Teva product to Richie
19 Pharmacal?
20      A. No.
21      Q. I want to talk a little bit
22 specifically about some other parties specific
23 to the Tennessee action.
24      Have you ever heard of

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1 Dr. Abdelrahman Mohamed?
2    A. That one is not ringing a bell.
3    Q. What about Timothy Gowder?
4    A. Timothy Gowder? Not ringing a bell
5 either.
6    Q. What about Gary Arlan Moore?
7    A. That one's ringing a bell, but I
8 couldn't give you any details on it.
9    Q. Why do you think that that sounds
10 familiar?
11    A. It just sounds familiar to me.
12    Q. What about David Florence?
13    A. That one is not ringing a bell.
14    Q. Mark Murphy?
15    A. Mark Murphy. I know a Mark Murphy,
16 but he's not a physician in Tennessee. Former
17 DEA.
18    Q. Ed White?
19    A. Ed White? That one's not ringing a
20 bell.
21    Q. What about Pam White?
22    A. Pam White? Nah.
23    Q. Are you aware of medical
24 professionals in Tennessee being arrested for

Page 499

1 prescribing prescription opioids for nonmedical
2 reasons?
3    A. Yes.
4    Q. Do you recall any specific instance
5 of medical professionals being arrested in
6 Tennessee for that?
7    A. Yes.
8    Q. Do you remember specifically any
9 names of such people?
10    A. I do remember a couple names.
11 Well, I can remember one name offhand.
12    Q. What name do you remember?
13    A. Councill Rudolph.
14    Q. Do you know what part of Tennessee
15 Councill Rudolph practiced in?
16    A. I don't remember specifically.
17    Q. Are you aware of whether medical
18 professionals in Tennessee have been convicted
19 for prescribing prescription opioids for
20 nonmedical reasons?
21    A. Oh, unfortunately, I know that
22 Councill Rudolph was not convicted, but that --
23 I can't think of any offhand.
24    Q. Would it surprise you that that has

Page 500

1 happened?
2    A. He's been convicted now?
3    Q. No, no, no --
4    A. Oh.
5    Q. -- that a medical professional in
6 Tennessee has been convicted for prescribing
7 prescription opioids for nonmedical reasons.
8    A. Oh, would I be surprised that a
9 medical professional has been convicted?
10    Q. Yeah.
11    A. No, I wouldn't be surprised at all.
12    Q. Have you ever heard of Boatwright
13 Drugs?
14    A. No, that one's not ringing a bell.
15    Q. What about Super Drugs?
16    A. Super Drugs? Not ringing a bell
17 either.
18    Q. Nashville Pharmacy Services?
19    A. A slight bell.
20    Q. What about North Alabama Pain
21 Services?
22    A. That one is not ringing a bell.
23    Q. Lynnville Family Medical Clinic?
24    A. That name is familiar.

Page 501

1    Q. What do you recall about it?
2    A. I can't think of anything specific
3 other than I think I might have taken a look at
4 them at some point, but I can't remember
5 anything specific.
6    Q. Tennessee Pain Institute in Hixson,
7 Tennessee?
8    A. Institute -- that one's not ringing
9 a bell.
10    Q. Hamblen Neuroscience Center in
11 Hamblen, Tennessee?
12    A. No.
13    Q. What about Center Pointe in
14 Kingsport, Tennessee?
15       (Reporter interruption.)
16 BY MR. GASTEL:
17    Q. What about Center Pointe in
18 Kingsport, Tennessee?
19    A. That one is not ringing a bell
20 either. Those sound like medical practices.
21       MR. GASTEL: Subject to the
22 objection that I lodged earlier today, I
23 have no further questions for you
24 tonight.

Highly Confidential - Subject to Further Confidentiality Review

|  |  |
|---|---|
| Page 502 | Page 504 |

**Page 502**

1  VIDEO OPERATOR:  Going off the
2  record, the time is 7:34 p.m.
3  (A discussion was held off the
4  record.)
5  VIDEO OPERATOR:  We're back on the
6  record at 7:35 p.m.
7  EXAMINATION
8  BY MR. HAMMOUD:
9  Q.  Mr. Tomkiewicz, thank you for your
10  time today.  I just have a couple, brief
11  questions on redirect.
12  Are you aware of any suspicious
13  orders that Teva has received and released?
14  A.  No.
15  Q.  Are you aware of any suspicious
16  orders that Teva has received and not reported
17  to the DEA?
18  A.  No.
19  MR. HAMMOUD:  Thank you.  No
20  further questions.
21  MR. CARTMELL:  I don't have
22  anything further.
23  VIDEO OPERATOR:  This ends today's
24  deposition.  We're going off the record.

**Page 504**

C E R T I F I C A T E

1
2
3  I, Lisa V. Feissner, RDR, CRR, CLR,
4  Notary Public, certify that the foregoing is a
5  true and accurate transcript of the deposition
6  of said witness, who was first duly sworn by me
7  on the date and place hereinbefore set forth.
8
9  I further certify that I am neither
10  attorney nor counsel for, nor related to or
11  employed by, any of the parties to the action
12  in which this deposition was taken, and
13  further, that I am not a relative or employee
14  of any attorney or counsel employed in this
15  action, nor am I financially interested in this
16  case.
17
18
19  Lisa V. Feissner, RDR, CRR, CLR
    Notary Public
20  Dated: December 2, 2018
21
22  (The foregoing certification of this
    transcript does not apply to any reproduction
23  of the same by any means, unless under the
    direct control and/or supervision of the
24  certifying reporter.)

**Page 503**

1  The time is 7:36 p.m.
2  - - -
3  (Off the record at 7:36 p.m.)
4  - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 505**

INSTRUCTIONS TO WITNESS

1
2
3  Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  column on the errata sheet for any change made.
7  After doing so, please sign the errata
8  sheet and date it.
9  You are signing it subject to the
10  changes you have noted on the errata sheet,
11  which will be attached to your deposition.  You
12  must sign in the space provided.  The witness
13  need not be a notary public.  Any competent
14  adult may witness your signature.
15  It is imperative that you return the
16  original errata sheet to the deposing attorney
17  within thirty (30) days of receipt of the
18  deposition transcript by you.  If you fail to
19  do so, the deposition may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1  WITNESS NAME:    JOSEPH TOMKIEWICZ
   DEPOSITION DATE:   NOVEMBER 28, 2018
2
3              ERRATA
4  PAGE LINE  CHANGE          REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 508

1         LAWYER'S NOTES
2  PAGE LINE
3  _____ _____  _____
4  _____ _____  _____
5  _____ _____  _____
6  _____ _____  _____
7  _____ _____  _____
8  _____ _____  _____
9  _____ _____  _____
10 _____ _____  _____
11 _____ _____  _____
12 _____ _____  _____
13 _____ _____  _____
14 _____ _____  _____
15 _____ _____  _____
16 _____ _____  _____
17 _____ _____  _____
18 _____ _____  _____
19 _____ _____  _____
20 _____ _____  _____
21 _____ _____  _____
22 _____ _____  _____
23 _____ _____  _____
24 _____ _____  _____

Page 507

1      ACKNOWLEDGMENT OF DEPONENT
2
3     I hereby acknowledge that I have read
4  the foregoing deposition, pages 1 - 503, dated
5  November 28, 2018, and that the same is a true
6  and correct transcription of the answers given
7  by me to the questions propounded, except for
8  the changes, if any, noted on the attached
9  Errata.
10
11
12 SIGNATURE:
            JOSEPH TOMKIEWICZ
13
14 DATE:
15
16
17
18 WITNESSED BY:
19
20 DATE:
21
22
23
24