1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3    IN RE:  NATIONAL        :  MDL No. 2804
     PRESCRIPTION OPIATE     :
4    LITIGATION              :  Case No. 17-md-2804
     APPLIES TO ALL CASES    :  Hon. Dan A. Polster
5                            :
                             :
6

7                    HIGHLY CONFIDENTIAL

8        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

9

10                       - - - -

11                  DECEMBER 18, 2018

12                       - - - -

13      VIDEOTAPED DEPOSITION OF EUGENE TOMMASI,

14   taken pursuant to notice, was held at Marcus &

15   Shapira, One Oxford Center, 35th Floor, Pittsburgh,

16   Pennsylvania 15219, by and before Ann Medis,

17   Registered Professional Reporter and Notary Public in

18   and for the Commonwealth of Pennsylvania, on Tuesday,

19   December 18, 2018, commencing at 9:00 a.m.

20                       - - - -

21           GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
22                  deps@golkow.com

23

24

25

2

```
 1                    A P P E A R A N C E S

 2     On behalf of Plaintiffs

 3             WAGSTAFF & CARTMELL, LLP
               BY:  TYLER W. HUDSON, ESQUIRE
 4                  ERIC D. BARTON, ESQUIRE
               4740 Grand Avenue, Suite 300
 5             Kansas City, Missouri  64112
               816.701.1100
 6             thudson@wcllp.com
               ebarton@wcllp.com
 7
       On behalf of Defendant AmerisourceBergen Drug
 8     Corporation

 9             JACKSON KELLY, PLLC
               BY:  SYLVIA WINSTON NICHOLS, ESQUIRE
10             150 Clay Street, Suite 500
               P.O. Box 619
11             Morgantown, West Virginia  26501
               304.284.4138
12             sylvia.winston@jacksonkelly.com

13     On behalf of Defendant Cardinal Health, Inc.

14             PIETRAGALLO GORDON ALFANO BOSICK &
               RASPANTI, LLP
15             BY:  ADAM J. TRAGONE, ESQUIRE
               One Oxford Centre, 38th Floor
16             301 Grant Street
               Pittsburgh, Pennsylvania  15219
17             412.263.2000
               ajt@piegragallo.com
18
       On behalf of Defendants Endo Pharmaceuticals, Endo
19     Health Solutions and Par Pharmaceuticals

20             (By phone/Livestream)
               ARNOLD & PORTER KAYE SCHOLER LLP
21             BY:  ERICA GUTHRIE, ESQUIRE
               601 Massachusetts Avenue, NW
22             Washington, DC  20001-37453
               202.942.5743
23             erica.guthrie@arnoldporter.com

24

25
```

3

```
 1              A P P E A R A N C E S   (Continued)

 2    On behalf of Defendant HBC Service Company

 3              MARCUS & SHAPIRA, LLP
                BY:  ROBERT M. BARNES, ESQUIRE
 4              One Oxford Centre, 35th Floor
                Pittsburgh, Pennsylvania  15219
 5              412.471.3490
                rbarnes@marcus-shapira.com
 6
      On behalf of Defendant Mallinckrodt
 7
                (By phone/Livestream)
 8              ROPES & GRAY, LLP
                BY:  SARA E. BERINHOUT, ESQUIRE
 9                  FEIFEI (ANDREA) REN, ESQUIRE
                Prudential Tower
10              800 Boylston Street
                Boston, Massachusetts  02199-3600
11              617.951.7330
                sara.berinhout@ropesgray.com
12              andrea.ren@ropesgray.com

13    On behalf of Defendant McKesson Corporation

14              COVINGTON & BURLING, LLP
                BY:  RAJ PAUL, ESQUIRE
15              One CityCenter
                850 Tenth Street, NW
16              Washington, DC  20001-4956
                202.662.5807
17              rpaul@cov.com

18    On behalf of Defendant Walmart

19              (By phone/Livestream)
                JONES DAY, LLP
20              BY:  PATRICIA OCHMAN, ESQUIRE
                North Point
21              901 Lakeside Avenue
                Cleveland, Ohio  44114-1190
22              216.586.3939
                pochman@jonesday.com
23
      Also present
24
                Chris Ratano, videographer
25
```

4

1                     * I N D E X *

2    EUGENE TOMMASI                              PAGE

3      EXAMINATION BY MR. HUDSON              6, 50, 55
       EXAMINATION BY MR. BARTON                    39
4      EXAMINATION BY MR. BARNES              48, 54

5

6          * INDEX OF HBC-TOMMASI EXHIBITS *

7    NO.                 DESCRIPTION             PAGE
     Exhibit 1    Invitation to the presentation of    32
8                 Giant Eagle Pharmacy Year 2015 AOP/
                  Business Plan, 6/24/14
9                 HBC_MDL00034114 - 00034149

10   Exhibit 2    Email, 3/20/18, from L. Kolas to      36
                  G. Chunderlik, subject: Rhodes-
11                Distributor Questionnaire and
                  Supporting Docs, attaching Rhodes
12                questionnaire, GE SOM Program,
                  GE Officers and Directors List
13                HBC_MDL00030616 - 00030622

14                      - - - -

15

16

17

18

19

20

21

22

23

24

25

5

1                    P R O C E E D I N G S

2                         - - - -

3            THE VIDEOGRAPHER:  We are now on the

4     record.  My name is Chris Ratano.  I'm a

5     videographer for Golkow Litigation Services.

6     Today's date is December 18, 2018, and the time is

7     approximately 9:00.  This video deposition is

8     being held in Pittsburgh, PA at Marcus & Shapira,

9     LLP, One Oxford Centre, 35th Floor, in the matter

10    of National Prescription Opiate Litigation,

11    MDL No. 2804, Case No. 17-md-2804, United States

12    District Court, Northern District of Ohio, Eastern

13    Division.

14        The deponent today is Gene Tommasi.

15        Will counsel please identify themselves for

16    the record.

17            MR. HUDSON:  Ty Hudson of Wagstaff &

18    Cartmell for plaintiffs.

19            MR. BARTON:  Eric Barton of Wagstaff &

20    Cartmell for plaintiffs.

21            MR. TRAGONE:  Adam Tragone, Pietragallo,

22    for Cardinal Health.

23            MS. WINSTON:  Sylvia Winston from

24    Jackson Kelly for AmerisourceBergen.

25            MR. HUDSON:  Robert Barnes for HBC,

6

1    Marcus & Shapira.

2             THE VIDEOGRAPHER:  The court reporter

3    today is Ann Medis, and she will now please swear

4    in the witness.

5                    EUGENE TOMMASI,

6       having been first duly sworn, was examined

7              and testified as follows:

8                    EXAMINATION

9    BY MR. HUDSON:

10       Q.   Good morning, sir.  Could you please

11   state your name for the record.

12       A.   Yes.  It's Eugene Tommasi.

13       Q.   And, Mr. Tommasi, do you reside here in

14   the Pittsburgh area?

15       A.   I do.

16       Q.   And are you currently the executive vice

17   president and chief supply chain and development

18   officer for Giant Eagle?

19       A.   I'm not.

20       Q.   What is your current role at Giant

21   Eagle?

22       A.   I'm retired.

23       Q.   And when did you retire?

24       A.   June 30 of 2018.

25       Q.   Prior to retiring, were you the

7

```
 1    executive officer for supply chain and development
 2    at Giant Eagle?
 3         A.   Yes.
 4         Q.   And have you had your deposition taken
 5    before?
 6         A.   I might have.  I don't recall.
 7         Q.   Before we get going, let's just make
 8    sure then that we are on the same page about how a
 9    deposition works.
10         I'm going to be asking you questions, and
11    then you will be answering.  And from time to
12    time, counsel may object.  But unless your counsel
13    instructs you to answer -- not to answer the
14    question, I would ask you to answer the questions
15    you were asked.
16         Is that fair?
17         A.   Sounds fair.
18         Q.   You do understand that you're under oath
19    as if we were in a courtroom in front of a judge
20    and a jury?
21         A.   Yes.
22         Q.   If I ask a question and you answer, I'm
23    going to assume that you understood my question
24    unless you ask me to clarify.
25         Is that fair?
```

1       A.   It depends.

2       Q.   Well, let me put it to you this way.

3       If you don't understand my question, will you

4  let me know so I can kind of make sure I clarify

5  it so we're on the same page?

6       A.   Will do.

7       Q.   You're doing a good job of this, but, if

8  you can, give audible answers for the court

9  reporter.  She can't pick up on head shakes or

10  things like that, so if you can do that.

11       And then, lastly, if you need to take a break

12  at all, just let me know, and we can go off the

13  record.

14       A.   Okay.

15       Q.   What did you do to prepare for today's

16  deposition?

17       A.   Very little.

18       Q.   Were you shown any documents?

19       A.   Yeah.  I saw some documents, yes.

20       Q.   Did any of those refresh your

21  recollection?

22       A.   Not really.

23       Q.   Approximately how long did you spend

24  preparing for today?

25       A.   A couple hours.

9

 1        Q.   Have you read the complaint that was

 2    filed in this case?

 3        A.   I have not.

 4        Q.   Were you aware of the lawsuit prior to

 5    being contacted about this deposition?

 6        A.   I was not.

 7        Q.   Let me shift gears, then, to just ask

 8    you about your education.

 9        You've got a bachelor of science in economics

10    from Allegheny College?

11        A.   Correct.

12        Q.   And you began working at Giant Eagle in

13    about 1992?

14        A.   Correct.

15        Q.   What did you do after graduating from

16    college, but before you started working at Giant

17    Eagle?

18        A.   I worked for a food wholesaler.

19        Q.   What was the name of that food

20    wholesaler?

21        A.   Peter J. Schmitt.

22        Q.   How long did you work there?

23        A.   From '82 until I went to work for Giant

24    Eagle in '92.  Nine and a half years.

25        Q.   And at Giant Eagle in 1992, did you

1    start as the director of distribution?

2         A.   Yes.

3         Q.   And what were your roles and

4    responsibilities in that position?

5         A.   I was responsible for our frozen food

6    facility in Youngstown, Ohio, and a cigarette and

7    candy facility in West Newton, Ohio.

8         Q.   And then, in 1996, were you promoted to

9    the VP of retail development store planning?

10        A.   Correct.

11        Q.   And what were your roles and

12   responsibilities in that position?

13        A.   I was responsible for independent

14   retailing and store planning.

15        Q.   Did you have a specific region or was

16   it --

17        A.   For the company.

18        Q.   -- across the entire company?

19        A.   Yeah.

20        Q.   And then, in 2005, were you promoted to

21   senior vice president of retail operations?

22        A.   That's correct.

23        Q.   And tell me about your roles and

24   responsibilities as a senior vice president of

25   retail operations.

1      A.   I was responsible for the retail

2   operations of the Giant Eagle corporate and

3   independent stores.

4      Q.   And by "retail operations," does that

5   mean the supermarkets and convenience store

6   locations?

7      A.   At that time we didn't have convenience

8   store locations.  But I had, basically, just the

9   operations for the supermarket.

10      Q.   And, again, that was across the entire

11   company?

12      A.   Yes, sir.

13      Q.   At some point did Giant Eagle decide to

14   form a company called HBC Services Company?

15      A.   Yes.

16      Q.   Were you involved at all in the decision

17   to form that company?

18      A.   No.

19      Q.   Were you aware at the time that HBC

20   Service Company was an entity that was created

21   separate from Giant Eagle?

22          MR. BARNES:  Object to form.

23      I don't know if he knows whether it was

24   legal -- you mean a legal entity?

25          MR. HUDSON:  You can object.

1           MR. BARNES:  Object to form.

2           THE WITNESS:  I'm not sure what you

3    mean.

4    BY MR. HUDSON:

5       Q.   I mean, were you aware that Giant Eagle

6    had formed a different company called HBC Service

7    Corporation -- Service Company?

8           MR. BARNES:  Same objection.

9           THE WITNESS:  Yeah.  I was aware that we

10   formed an HBC company.

11   BY MR. HUDSON:

12      Q.   And do you know when that company was

13   formed?

14      A.   I don't recall the time, no.

15      Q.   Do you know why that company was formed?

16      A.   I don't have a specific why.

17      Q.   Do you have an understanding of what

18   operations -- or what the role was for HBC

19   Services Company?  In other words, why was the

20   company formed?

21      A.   They delivered goods to our stores.

22      Q.   Was HBC Service Company formed to be a

23   distributor?

24      A.   A wholesale -- yeah.  They were a

25   warehouse delivering goods to our stores.

13

1      Q.   And prior to the formation of HBC

2   Service Company, who was the wholesaler delivering

3   goods to the stores?

4      A.   I can't remember the name of the

5   company.  I think there might have been a couple

6   different wholesalers.

7      I wasn't in the wholesale end of the

8   business.  I was in the retail end.

9           MR. BARNES:  Just for clarification, are

10   we talking about grocery goods generally or

11   controlled substances, or both?

12           MR. HUDSON:  I don't think there's a

13   pending question.

14           MR. BARNES:  Well, I'm going to object.

15      Make sure you're clear about that.

16   BY MR. HUDSON:

17      Q.   So prior to HBC Service Company being

18   formed, was Giant Eagle in the business of acting

19   as a wholesaler at all?

20      A.   Yeah.  We were a wholesaler for

21   supermarket goods.

22      Q.   In conjunction with HBC Service Company

23   being formed, was there a warehouse that was built

24   in Washington, Pennsylvania?

25      A.   I don't believe there was a warehouse

1    built.

2        Q.   In conjunction with HBC Service Company

3    being formed, did they begin operating in a

4    warehouse in Washington, Pennsylvania?

5        A.   Yes.

6        Q.   Did HBC Service Company have employees?

7        A.   Yes.

8        Q.   Were all of those employees located at

9    the warehouse in Washington, Pennsylvania?

10       A.   I don't know that.

11       Q.   Do you have any knowledge about HBC

12   Service Company's role as a distributor of

13   opioids?

14       A.   I do not.

15       Q.   Do you have any knowledge of what

16   products HBC acted as a distributor for?

17            MR. BARNES:  Again, grocery versus

18   controlled substances, are you asking him to make

19   that clarification?

20            MR. HUDSON:  No.

21            MR. BARNES:  Then I'm going to ask you

22   to make that clarification.

23            THE WITNESS:  I didn't know of all the

24   products that were there.

25

1  BY MR. HUDSON:

2      Q.   In your role on the retail side of the

3  business, what interaction did you have with HBC

4  Service Company?

5      A.   None.

6      Q.   Do you know how many employees HBC

7  Service Company had?

8      A.   I don't.

9      Q.   Do you know who was the warehouse

10  supervisor at the HBC Service warehouse?

11      A.   No, I don't.

12      Q.   Do you know any of the employees at the

13  HBC Service warehouse who filled orders for

14  prescription drugs?

15      A.   I didn't.

16      Q.   Do you know whether HBC Service Company

17  obtained a license to act as a distributor of

18  controlled substances?

19      A.   No, I don't.

20      Q.   Do you know whether or not HBC Service

21  Company continues to have operations today?

22      A.   I believe they do for grocery and candy

23  products.

24      Q.   Do you know whether at some point HBC

25  Service Company stopped acting as a distributor of

16

1    prescription drugs or controlled substances?

2         A.   I'm sorry.  Did you say when?

3         Q.   Yes.

4         A.   I don't.

5         Q.   Is it your understanding that at some

6    point HBC Service Company did stop acting as a

7    distributor for prescription drugs and controlled

8    substances?

9         A.   I don't know what controlled substances

10   they distributed.

11        Q.   Do you have any knowledge about the --

12   and I want to focus in now on the dates between

13   2009 and early 2016.

14        It's my understanding that between 2009 and

15   early 2016, HBC Service Company acted as a

16   distributor of opioids.

17        Do you know whether that's true or not?

18             MR. BARNES:  Object to form.

19             THE WITNESS:  I would have to -- I

20   don't -- I believe they distributed to Giant

21   Eagles.

22   BY MR. HUDSON:

23        Q.   Do you have any knowledge about how the

24   physical supply chain worked in terms of the --

25   you know, the process of the prescription drugs

17

1    went from the manufacturer to the wholesaler or

2    distributor to the retail pharmacies?

3          A.   Not really, no.

4          Q.   Do you have any knowledge about the

5    relationship between Giant Eagle and McKesson or

6    Anda?

7          A.   I do not.

8          Q.   Do you have any knowledge about the

9    different FDA schedules for controlled substances,

10   in other own words, Schedule I, Schedule II,

11   Schedule III, Schedule IV, Schedule V?

12         A.   I know there -- I don't know what they

13   are or what the drugs are.  I've heard those

14   schedules before.

15         Q.   How did you hear those schedules or when

16   did you hear those schedules?

17         A.   Jeez, it's just sort of like -- I can't

18   tell you exactly where or how, but, you know, it's

19   just...

20         Q.   Being in the business at some point

21   along the way?

22         A.   I've heard about schedule, yeah.

23         Q.   How about the topic of opioids in

24   general, is that something -- have you heard the

25   phrase "the opioid crisis"?

18

```
 1        A.   Oh, yes.  I've heard it.

 2        Q.   And when did you first hear that?

 3        A.   Gosh.  I mean, I -- it's all over the

 4   news all the time.  So I can't give you an exact

 5   date.

 6        Q.   How about -- is that something that

 7   you've heard of for years?

 8        A.   Years?  I think over the past two or

 9   three.

10   ████████████████████████████████████████

11   ██████████████████████████████████████

12   ██████████

13   ██████████████

14   ███████████████████████████████████████████

15   ██████████████████████████████████████████

16   ████████████████

17   ██████████████████████████

18        Q.   Since -- tell me about from January of

19   2012 until your retirement.  You were an executive

20   vice president at Giant Eagle; is that right?

21        A.   Yes.

22        Q.   Just describe for me, if you could, the

23   chain of command or the corporate hierarchy within

24   the company during that time period.

25        In other words, you're an executive vice
```

19

```
1    president.  Just describe for me -- were there

2    other executive vice presidents?  Who did you

3    report to?

4         A.   I reported to the president of the

5    company.  And I believe at that time there might

6    have been one or two other executive VPs;

7    definitely one.

8         Q.   What was the title of the other

9    executive VP?

10        A.   Executive vice president of

11   merchandising and marketing.

12        Q.   When you shifted roles from executive

13   vice president of retail operations to executive

14   vice president of chief supply chain, did your

15   roles expand?

16        A.   They just changed.  That was basically

17   in my last year of working at Giant Eagle.  I was

18   scheduled to retire, so we moved other people into

19   the retail operations.

20        I took over that part of the business from a

21   standpoint mainly because of the real estate end

22   of the business and the, what we called,

23   independent Giant Eagle stores.  And the fellow

24   that ran the warehouses reported up through me on

25   an interim period.
```

20

1        I was preparing for retirement during that

2    phase of my career.

3    

4

5

6

7

8

9

10

11

12

13

14        Q.   As the senior VP of retail operations,

15    were there other executives at Giant Eagle who

16    reported to you that were responsible for the

17    pharmacy?

18        A.   There was a senior VP of pharmacy.  He

19    did not report to me.  And then there was a vice

20    president of pharmacy operations.  He reported to

21    me for a short period of time while we were

22    looking for a new senior VP of pharmacy.

23

24

25



21

1

2

3

4

5

6

7      Q.   Who was the senior vice president of

8  pharmacy?

9      A.   There were at that time Randy Heiser.

10     Q.   When you say -- just so the record is

11 clear, when you say "at that time," what time are

12 we talking about?

13     A.   The times that you were talking about.

14 I think it was 2012 is when you were talking about

15 that.

16     Q.   And then at some point did that change?

17     A.   Yes.

18     Q.   When did that occur?

19     A.   I don't know the date exactly.

20     Q.   Tell me what you do know.

21     A.   I'm retired.  What I do now?

22     Q.   No.  Sorry.  Tell me what you do -- what

23 you do know.  Sorry.

24

25

22



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      Q.    Do you have any knowledge about the

25  contracts between Giant Eagle and drug

23

1   manufacturers to purchase prescription drugs?

2       A.   No specific knowledge.

3       Q.   Do you know which particular

4   manufacturers Giant Eagle directly purchased from

5   in terms of prescription drugs?

6       A.   Jeez, I imagine there's a lot.

7       Q.   But in terms of the specifics, that

8   wasn't something that you --

9       A.   I don't know what specific drug was

10  purchased from what specific supplier.

11      Q.   Do you have any knowledge about the

12  relationship between Giant Eagle and McKesson or

13  Anda?

14      A.   Do I have any knowledge about the

15  relationship?

16      Q.   Yes.

17      A.   I know there was one.

18      Q.   Anything more specific than that?

19      A.   No.  Sorry.

20      Q.   You can only testify about what you

21  know.

22      Do you know whether or not there was ever an

23  effort within Giant Eagle or HBC to target pain

24  management as a corporate business opportunity?

25      A.   No.

24

1      Q.   Do you have any knowledge about the

2  Giant Eagle corporate goals for pharmacies in

3  terms of how to drive revenue?

4      A.   Not really.

5      Q.   Do you have any knowledge about the

6  federal laws and regulations that govern

7  distributors of opioids?

8      A.   I don't have any specific knowledge of

9  that, no.

10      Q.   Do you have any general knowledge of

11  that?

12      A.   I'm just aware that there probably are

13  some.

14      Q.   Do you have any knowledge of what

15  distributors of controlled substances are required

16  to do under the federal laws and regulations?

17      A.   I don't have any specific knowledge of

18  that, no.

19      Q.   Do you have any general knowledge of

20  that?

21      A.   Again, I'm just assuming there is

22  regulations.

23      Q.   Do you know whether or not HBC designed

24  and operated a system to identify suspicious

25  orders of controlled substances?

25

1        A.    I don't know whether they designed a

2    system.

3    

17   BY MR. HUDSON:

18       Q.    Other than any conversations or

19   communications you had with Giant Eagle attorneys,

20   do you have any knowledge about Giant Eagle or

21   HBC's operation of a system to identify suspicious

22   orders of controlled substances?

23       A.    I don't have any specific knowledge.

24       Q.    Again, do you have general knowledge?

25       A.    Well, very limited.

1        Q.    Could you just -- if you could -- and,

2    again, apart from any knowledge you gained from

3    communications with attorneys, could you tell me

4    what limited knowledge you have?

5        A.    That there's a system.

6        Q.    How did you learn there was a system?

7             MR. BARNES:  Same instruction.

8             THE WITNESS:  I mean, I don't know.  I

9    mean, I can't give you an exact.

10   BY MR. HUDSON:

11       Q.    To your knowledge, what did the system

12   consist of?

13       A.    I don't know that -- I don't really know

14   what the system consisted of.

15       Q.    Who was involved in operating the

16   system?

17       A.    I don't know that either.

18       Q.    What was the objective of the system?

19       A.    I'm trying to -- I really don't know.

20       Q.    Do you know whether the system was

21   successful or unsuccessful?

22       A.    I don't.

23       Q.    Do you know how the system operated?

24       A.    No.  I...

25       I do not, I should say.  I didn't answer.

27

```
1          Q.   Do you have any knowledge about any

2    investigations by Giant Eagle or HBC to address

3    suspicious orders of controlled substances?

4          A.   I don't.

5          Q.   Do you know whether or not Giant Eagle

6    or HBC engaged in any investigations of suspicious

7    orders of controlled substances?

8          A.   That I'm aware of, no.

9          Q.   Do you have any knowledge of the volume

10   of opioids shipped by HBC into retail pharmacies

11   in Summit County, Ohio?

12          MR. BARNES:  Same instruction.  Outside

13   the context of anything you might have learned

14   with Giant Eagle's lawyers.

15          THE WITNESS:  No.  I don't have any

16   knowledge.

17   BY MR. HUDSON:

18          Q.   Do you have any knowledge of the volume

19   of opioids shipped by HBC or Giant Eagle just in

20   general?

21          A.   I do not.

22          Q.   Do you know whether Giant Eagle or HBC

23   ever stopped a shipment of opioids because it was

24   suspected that there would be -- suspected of

25   diversion?
```

28

```
1        A.   I don't.

2        Q.   Do you know whether or not Giant Eagle

3   or HBC ever reported any orders to the DEA as

4   suspicious orders of opioids?

5             MR. BARNES:  Same instruction.

6             THE WITNESS:  I do not.

7   BY MR. HUDSON:

8        Q.   Do you have any knowledge of any

9   corporate controls that existed at Giant Eagle or

10  HBC to reduce the diversion of opioids?

11       A.   No, I don't.

12       Q.   Do you have any knowledge of any store

13  controls at the pharmacy operations level that

14  were aimed at reducing the diversion of opioids?

15       A.   No, not that I could think of.

16       Q.   Do you have any knowledge of any of the

17  warehouse controls put in place by Giant Eagle or

18  HBC to reduce the diversion of opioids?

19       A.   I don't have any specific knowledge.

20       Q.   Do you have any general knowledge?

21       A.   I don't have anything specific.  I mean,

22  I'm just assuming if there was laws that needed to

23  be followed, that we followed them.  But I -- you

24  know, I don't -- I don't know what the -- what the

25  systems were or anything like that.
```

1      Q.   Do you have any facts that you can point

2   to that would support your assumption that Giant

3   Eagle or HBC was following the law?

4      A.   I know that Giant Eagle, as a company,

5   follows the laws.  I know that that's we do.

6      That's my statement.

7      Q.   Is there anything more specific you can

8   say about your knowledge of efforts by Giant Eagle

9   or HBC to follow the laws that specifically apply

10  to the distribution of opioids?

11     A.   No.  I have nothing to...

12     Q.   Do you have any knowledge of any reports

13  that were sent by HBC or Giant Eagle to the DEA?

14     A.   I do not.

15     Q.   Let me hand you what I'm marking as

16  Tommasi Exhibit 1.  If you could take a minute and

17  look at that.

18          MR. HUDSON:  For the record, Tommasi

19  Exhibit 1 is a multi-page document that's

20  Bates-labeled HBC_MDL00032530 through 534.

21          MR. BARNES:  Ty, before you go any

22  further, we're going to object to the use of this

23  document.  I think it was intended to be a

24  privileged document and should not have been

25  produced.

1          MR. HUDSON:  I'll take this back then.

2     I don't think I need to mark it as an exhibit

3     then.

4          MR. BARNES:  I'm just taking down the

5     Bates numbers.  I'll double-check that at a break.

6          MR. HUDSON:  I know you sent us several

7     documents.  I apologize if this was on the list.

8          MR. BARNES:  The claw-back, you mean?

9          MR. HUDSON:  Yes.

10    BY MR. HUDSON:

11         Q.   Mr. Tommasi, do you know George

12    Chunderlik?

13         A.   I know George.

14         Q.   Is he an attorney?

15         A.   I don't believe so.

16         Q.   How about Joe Millward, do you know him?

17         A.   I do know Joe.

18         Q.   Is he an attorney?

19         A.   I don't believe so.

20         Q.   How about Darin Goodwiler?

21         A.   Yes.

22         Q.   He's an attorney?

23         A.   No, not that I know of.

24         Q.   Greg Carlson, he's not an attorney;

25    right?

31

```
 1        A.   Correct.  Not that I know of.

 2        Q.   And Debbie Krasnow, is she an attorney?

 3   Do you know who she is?

 4        A.   Yeah.  I know who she is.

 5        Q.   Is she in compliance?

 6        A.   I don't -- she's in the pharmacy -- on

 7   the pharmacy team.  I don't know what her specific

 8   role is.

 9        Q.   How about Dominic Bertucci?

10        A.   I know him, yes.

11        Q.   He's not an attorney; right?

12        A.   No.

13        Q.   Robbi Robinson?

14        A.   Yes.  She's an attorney.

15        Q.   She is an attorney?

16        A.   I do know that.

17        Q.   Do you know if she's in compliance?

18        A.   In compliance with what?

19        Q.   The compliance department.

20        A.   I don't know for sure.

21        Q.   How about Justin Zimmerman?

22        A.   Justin Zimmerman?  I do know Justin.  He

23   may be an attorney.  I'm not positive though.

24        Q.   How about Mary Gibson?

25        A.   Yes.
```

32

```
1          Q.   Do you know her?

2          A.   Yes.

3          Q.   Is she an attorney?

4          A.   You know, I think she may be an

5     attorney.

6          Q.   And Mike Bianco?

7          A.   Yes.

8          Q.   Is he an attorney?

9          A.   I do not believe he's an attorney.

10         Q.   And did you ever attend compliance

11    meetings?

12         A.   I don't recall attending a compliance

13    meeting.

14         Q.   In your role, did you have any interface

15    with the compliance department on any issues

16    relating to prescription drugs?

17         A.   No.

18              MR. HUDSON:  For the record, we've

19    withdrawn the exhibit that was initially marked as

20    Exhibit 1.

21              (HBC-Tommasi Exhibit 1 was marked.)

22    BY MR. HUDSON:

23    ███████████████████████████████

24    ████████████████████████████████████

25    ██████████
```





35





```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18          (HBC-Tommasi Exhibit 2 was marked.)
19   BY MR. HUDSON:
20
21
22
23
24
25
```



MR. HUDSON:  Let's just take a

five-minute break.  We'll go off the record.

THE VIDEOGRAPHER:  9:44.  We are off the

video record.

(Recess from 9:44 a.m. to 9:57 a.m.)

THE VIDEOGRAPHER:  9:57.  We are on the

video record.

MR. BARNES:  Ty, before you start, I do

want to confirm.

I confirmed during the break that Exhibit 1

is a privileged document.  It was intended to

be -- it has already been the subject of a

38

1   claw-back and/or will be the subject of a

2   claw-back.

3           MR. HUDSON:  Okay.  And just for the

4   record, we've withdrawn that.  So it's not

5   Exhibit 1.

6           MR. BARNES:  Okay.

7           MR. HUDSON:  So it's been withdrawn and

8   wasn't used.

9           MR. BARNES:  Thank you.

10  BY MR. HUDSON:

11      Q.   Mr. Tommasi, do you have any knowledge

12  about hydrocodone combination products?

13      A.   I don't.

14      Q.   Do you have any knowledge about

15  profitability of the pharmacy as it relates to

16  Giant Eagle's overall profitability?

17      A.   I don't.

18      Q.   Do you have any knowledge about any of

19  the opioids that were sold by Giant Eagle?

20      A.   I don't.

21          MR. BARNES:  Object to the form of the

22  question.

23      I think you know, Tyler, there's only one

24  opioid at issue in this case that was distributed

25  by HBC.





41



42





44



45



46





48

```
 1    questions.
 2                    EXAMINATION
 3    BY MR. BARNES:
 4        Q.  Mr. Tommasi, you were asked a few
 5    questions just a couple minutes ago about business
 6    meetings, and pharmacy meetings, and pharmacy
 7    profitability, and how it related to the stores
 8    generally.
 9        Do you recall those?
10        A.  Yes.
11        Q.  Do you recall any approach or strategy
12    by Giant Eagle to increase sales of opioids at any
13    time in any part of the company?
14        A.  No.
15        Q.  Were any executives or pharmacists or
16    employees ever bonused or incentivized to increase
17    the sale of opioids in any way, shape, or form?
18        A.  No.
19        Q.  You were asked a few questions about the
20    membership of the so-called pharmacy regulatory
21    review committee.
22        Do you remember those questions?  Who was
23    George Chunderlik, et cetera?
24        Do you remember that?
25        A.  Yeah.  I think a few minutes ago.
```



50







53



54





56



17      MR. BARNES:  Nothing further.  Thank

18  you.

19      THE VIDEOGRAPHER:  10:22.  We are off

20  the video record.  This concludes the video

21  deposition of Gene Tommasi.

22      (Whereupon, at 10:22 a.m., the taking of

23  the instant deposition ceased.)

24

25

57

1   COMMONWEALTH OF PENNSYLVANIA  )

2   COUNTY OF ALLEGHENY            )       SS:

3                C E R T I F I C A T E

4            I, Ann Medis, Registered Professional

5   Reporter, Certified Livenote Reporter and Notary

6   Public within and for the Commonwealth of

7   Pennsylvania, do hereby certify:

8            That EUGENE TOMMASI, the witness whose

9   deposition is hereinbefore set forth, was duly

10  sworn by me and that such deposition is a true

11  record of the testimony given by such witness.

12           I further certify the inspection,

13  reading and signing of said deposition were not

14  waived by counsel for the respective parties and

15  by the witness.

16           I further certify that I am not related

17  to any of the parties to this action by blood or

18  marriage and that I am in no way interested in the

19  outcome of this matter.

20           IN WITNESS WHEREOF, I have hereunto set

21  my hand this 21st day of December, 2018.

22

23       _____
                     Notary Public

24

25

58

1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                        After doing so, please sign

9    the errata sheet and date it.

10                        You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                        It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

59

```
1                    -   -   -   -   -
                     E  R  R  A  T  A
2                    -   -   -   -   -   -

3

4    PAGE   LINE   CHANGE

5    ____   ____   _____

6         REASON:   _____

7    ____   ____   _____

8         REASON:   _____

9    ____   ____   _____

10        REASON:   _____

11   ____   ____   _____

12        REASON:   _____

13   ____   ____   _____

14        REASON:   _____

15   ____   ____   _____

16        REASON:   _____

17   ____   ____   _____

18        REASON:   _____

19   ____   ____   _____

20        REASON:   _____

21   ____   ____   _____

22        REASON:   _____

23   ____   ____   _____

24        REASON:   _____
```

60

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4          I,_____, do

5    hereby certify that I have read the

6    foregoing pages, and that the same is

7    a correct transcription of the answers

8    given by me to the questions therein

9    propounded, except for the corrections or

10   changes in form or substance, if any,

11   noted in the attached Errata Sheet.

12

13

14   _____

15    EUGENE TOMMASI                    DATE

16

17

18   Subscribed and sworn
     to before me this
19   _____ day of _____, 20____.

20   My commission expires:_____

21

22   _____
     Notary Public

23

24