## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
- - -

IN RE:  NATIONAL         :   MDL NO. 2804
PRESCRIPTION OPIATE      :
LITIGATION               :
                         :
-----------------------------------------------
THIS DOCUMENT RELATES TO  :  CASE NO.
ALL CASES                 :  1:17-MD-2804
                          :
                          : Hon. Dan A.
                          : Polster
                  - - -
             March 15, 2019
                  - - -
HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
          CONFIDENTIALITY REVIEW

     Videotaped deposition of SCOTT D.
TOMSKY taken pursuant to notice, was held at the
offices of Golkow Litigation Services, One
Liberty Place, 51st Floor, 1650 Market Street,
Philadelphia, Pennsylvania, beginning at 9:31
a.m , on the above date, before Ann Marie
Mitchell, a Federally Approved Certified Realtime
Reporter, Registered Diplomate Reporter,
Registered Merit Reporter and Notary Public.

                  - - -

        GOLKOW LITIGATION SERVICES
   877.370.3377 ph | 917.591.5672 fax
            deps@golkow.com

## Page 2

```
 1   APPEARANCES:
 2
 3   SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
     BY:  MARK G  CRAWFORD, ESQUIRE
 4   BY:  P  DYLAN JENSEN, ESQUIRE
     One Sansome Street
 5   Suite 2830
     San Francisco, California 94104
 6   (415) 546-7300
     mcrawford@skikos.com
 7   djensen@skikos.com
     Representing the Plaintiffs
 8
 9
     ROBBINS GELLER RUDMAN & DOWD LLP
10   BY:  JULIE T  HOUGH, ESQUIRE
     655 West Broadway
11   Suite 1900
     San Diego, California 92101
12   (619) 231-1058
     Representing the Plaintiffs
13
14
     BRANSTETTER, STRANCH & JENNINGS, PLLC
15   BY:  BENJAMIN A  GASTEL, ESQUIRE
     223 Rosa L  Parks Avenue Suite 200
16   Nashville, Tennessee 37203
     (615) 254-8801
17   beng@bsjfirm.com
     Representing the Tennessee Plaintiffs
18
19
     MORGAN, LEWIS & BOCKIUS LLP
20   BY:  REBECCA J  HILLYER, ESQUIRE
     1701 Market Street
21   Philadelphia, Pennsylvania 19103
     (215) 963-5000
22   rebecca hillyer@morganlewis.com
     Representing Teva
23
24
```

## Page 3

```
 1   APPEARANCES (cont.'d):
 2
 3   JONES DAY
     BY:  SHUBHA M. HARRIS, ESQUIRE
 4   90 South Seventh Street
     Minneapolis, Minnesota 55402
 5   (612) 217-8800
     shubhaharris@jonesday.com
 6   Representing Walmart
 7
 8   PIETRAGALLO GORDON ALFANO BOSICK &
     RASPANTI, LLP
 9   BY:  DOUGLAS K. ROSENBLUM, ESQUIRE
     1818 Market Street
10   Suite 3402
     Philadelphia, Pennsylvania 19103
11   (215) 320-6200
     dkr@pietragallo.com
12   Representing Cardinal Health
13
14   APPEARANCES VIA TELEPHONE/STREAM:
15
16   ARNOLD & PORTER KAYE SCHOLER LLP
     BY:  HEATHER A. HOSMER, ESQUIRE
17   601 Massachusetts Avenue, NW
     Washington, DC 20001
18   (202) 942-5000
     heather.hosmer@arnoldporter.com
19   Representing Endo Health Solutions Inc.,
     Endo Pharmaceuticals Inc., Par
20   Pharmaceutical, Inc. and Par Pharmaceutical
     Companies, Inc.
21
22
23
24
```

## Page 4

```
 1   APPEARANCES VIA TELEPHONE/STREAM (cont.'d):
 2
 3   MARCUS & SHAPIRA LLP
     BY:  DARLENE M. NOWACK, ESQUIRE
 4   301 Grant Street, 35th Floor
     One Oxford Centre
 5   Pittsburgh, Pennsylvania 15219
     (412) 471-3490
 6   nowack@marcus-shapira.com
     Representing HBC Services
 7
 8
     GIBBONS P.C.
 9   BY:  PAUL E. ASFENDIS, ESQUIRE
     One Pennsylvania Plaza
10   37th Floor
     New York, New York 10119
11   (212) 613-2000
     pasfendis@gibbonslaw.com
12   Representing AmerisourceBergen Drug
     Corporation
13
14
     VIDEOGRAPHER:
15     WILLIAM GEIGERT
     ALSO PRESENT:
16     JOSEPH WILLS
       Precision Trial Services
17
18
19
20            - - -
21
22
23
24
```

## Page 5

```
 1                - - -
 2              I N D E X
 3                - - -
 4
 5   Testimony of:  SCOTT D. TOMSKY
 6   By Mr. Crawford          11
     By Ms. Hillyer           245, 284
 7   By Mr. Gasteel           246
 8
                  - - -
 9
             E X H I B I T S
10
                  - - -
11
12   NO.           DESCRIPTION          PAGE
13   Teva-      Scott Tomsky LinkedIn      18
     Tomsky-1   Profile, 2 pages
14
             Teva Opioid Market Share    59
15   Tomsky-2  Calculation:  All Opioids,
                Bates stamped
16              TEVA_MDL_A_00455086
                through
17              TEVA_MDL_A_00455094
18   Teva-      Organization Charts, Bates  70
     Tomsky-3   stamped
19              TEVA_MDL_A_03486562
                through
20              TEVA_MDL_A_03486593
21   Teva-      Email dated 10/28/2015,     102
     Tomsky-4   Bates stamped
22              TEVA_MDL_A_04344415, plus
                attachment, 50 pages
23
24
```

## Page 6

```
 1   Teva-      Email dated 7/27/2017,      130
     Tomsky-5   Bates stamped
 2              TEVA_MDL_A_09019329
                through
 3              TEVA_MDL_A_09019333 and
                TEVA_MDL_A_09019546
 4              through
                TEVA_MDL_A_09019551
 5
 6   Teva-      Transmittal of              130
     Tomsky-6   Advertisements and
 7              Promotional Labeling for
                Drugs and Biologics for
 8              Human Use, Bates stamped
                TEVA_MDL_A_04342838
 9              through
                TEVA_MDL_A_04342849
10   Teva-      Approval Package for:       144
     Tomsky-7   Application Number:
11              76-168, 171 pages
12   Teva-      Code of Federal             159
     Tomsky-8   Regulations Title 21,
13              Section 314 80, 6 pages
14   Teva-      Code of Federal             159
     Tomsky-9   Regulations Title 21,
15              Section 314 81, 8 pages
16   Teva-      Code of Federal             159
     Tomsky-10  Regulations Title 21,
17              Section 314 98, 4 pages
18   Teva-      Letter dated December 6,    207
     Tomsky-11  2005, 4 pages
19
20   Teva-      ANDA Approval and email     209
     Tomsky-12  dated June 03, 2016, Bates
21              stamped
                TEVA_MDL_A_02922022
22              through
                TEVA_MDL_A_02922025
23
24
```

## Page 7

```
 1   Teva-      Letter dated February 6,    213
     Tomsky-13  2004, 2 pages
 2
 3   Teva-      Letter dated June 25,       215
     Tomsky-14  2007, Bates stamped
 4              TEVA_MDL_A_10604467
                through
 5              TEVA_MDL_A_10604633
 6   Teva-      Supplement History          220
     Tomsky-15  Oxycodone Hydrochloride
 7              Tablets USP, 5 mg, 15 mg
                and 30 mg,
                TEVA_MDL_A_10602657
 8              through
                TEVA_MDL_A_10602670
 9
10   Teva-      Periodic Adverse Drug       224
     Tomsky-16  Experience Report, ANDA:
                076636,
11              TEVA_MDL_A_11065997
                through
12              TEVA_MDL_A_11066038
13   Teva-      Letter dated 07/11/2013,    233
     Tomsky-17  Bates stamped
14              Acquired_Actavis_00677901
                through
15              Acquired_Actavis_00677905
16   Teva-      Letter dated August 17,     234
     Tomsky-18  2011, Bates stamped
17              TEVA_MDL_A_10662653
                through
18              TEVA_MDL_A_10662655
19   Teva-      Letter dated 11/17/2017,    235
     Tomsky-19  Bates stamped
20              TEVA_MDL_A_08981645
                through
21              TEVA_MDL_A_08981651
22   Teva-      Letter dated 2014 12 29, 4  236
     Tomsky-20  pages
23
24
```

## Page 8

```
 1   Teva-      Industry Meeting to         238
     Tomsky-21  Discuss Opioid Analgesics
 2              REMS, 7 pages
 3   Teva-      Email chain, top one dated  240
     Tomsky-22  1/9/2017, Bates stamped
 4              TEVA_MDL_A_09655240
                through
 5              TEVA_MDL_A_09655244
 6   Teva-      Email chain, top one dated  253
     Tomsky-23  September 11, 2013, Bates
 7              stamped
                TEVA_MDL_A_11584417
 8              through
                TEVA_MDL_A_11584419
 9
10   Teva-      Email chain, top one dated  259
     Tomsky-24  11/1/2013, Bates stamped
11              TEVA_MDL_A_03487762
                through
12              TEVA_MDL_A_03487773
13   Teva-      Email chain, top one dated  270
     Tomsky-25  1/14/2014, Bates stamped
14              TEVA_MDL_A_10197053 and
                TEVA_MDL_A_10197054
15   Teva-      Email dated November 21,    274
     Tomsky-26  2017, Bates stamped
16              TEVA_MDL_A_11731225
                through
17              TEVA_MDL_A_11731228
18
19
20
21
22
23
24
```

## Page 9

```
 1                    - - -
 2          DEPOSITION SUPPORT INDEX
 3                    - - -
 4
         Direction to Witness Not to Answer
 5            Line
 6
 7
 8
 9       Request for Production of Documents
10           Page Line
11
12
13
                Stipulations
14            Line
15
16
17
18
            Question Marked
19            Line
20
21
22
23
24
```

## Page 10

```
 1          THE VIDEOGRAPHER:  Good morning.
 2  We are now on the record.  My name is
 3  Bill Geigert.  I'm a videographer for
 4  Golkow Litigation Services.  Today's date
 5  is March 5, 2019 --
 6          MS. HILLYER:  15.
 7          THE VIDEOGRAPHER:  Yeah, sorry.
 8  March 15, 2019, and the time is 9:31 a.m.
 9          This video deposition is being
10  held in Philadelphia, Pennsylvania, in
11  the matter of National Prescription
12  Opioid Litigation, for the United States
13  District Court, Northern District of
14  Ohio, Eastern Division.  The deponent is
15  Scott Tomsky.  Counsel will be noted on
16  the stenographic record.
17          The court reporter is Ann Marie
18  Mitchell, and she will now swear in the
19  witness.
20                    - - -
21          SCOTT D. TOMSKY, after having
22  been duly sworn, was examined and
23  testified as follows:
24                    - - -
```

## Page 11

```
 1                    - - -
 2              EXAMINATION
 3                    - - -
 4  BY MR. CRAWFORD:
 5      Q.   Good morning.
 6      A.   Good morning.
 7      Q.   My name is Mark Crawford, I
 8  represent the plaintiffs in the opioid
 9  litigation.
10          Can you please state your full
11  name?
12      A.   Scott David Tomsky.
13      Q.   And have you ever been deposed
14  before?
15      A.   Yes.
16      Q.   How many times?
17      A.   About a dozen.
18      Q.   And so you know the rules pretty
19  much.
20          It's you're under oath.  Correct?
21      A.   Correct.
22      Q.   And you know, because we have to
23  create a clean record, for me to finish my
24  question and I should wait for you to finish your
```

## Page 12

```
 1  answer so we're not talking over each other?
 2      A.   Yes.
 3      Q.   And if you don't understand a
 4  question, please feel free to ask me to clarify.
 5      A.   Yes.
 6      Q.   And you're welcome to take a
 7  break.  If you need to take one, just let me
 8  know.
 9      A.   Okay.
10      Q.   Can you please give me your home
11  address?
12      A.   Sure.
13
14      Q.   And who is your current employer?
15      A.   Teva.
16      Q.   What's the full name of your
17  employer?
18      A.   Teva USA.
19      Q.   Is it -- is that the legal name
20  of the company?
21      A.   I'm not exactly sure or certain
22  what the legal name of the company is.
23      Q.   And what's your work address?
24      A.   425 Privet Road, Horsham,
```

Page 13

1    Pennsylvania.
2        Q.    And did you have any meetings to
3    prepare for this deposition today?
4        A.    Yes.
5        Q.    And who did you meet with?
6        A.    Teva counsel, Becca Hillyer.
7        Q.    And was anyone else present?
8        A.    There was another attorney.  I
9    don't remember her name.
10       Q.    Was that at their offices here in
11   Philly?
12       A.    Yes.
13       Q.    And how long did the meet -- how
14   many meetings did you have?
15       A.    Just one yesterday.
16       Q.    And how long?
17       A.    It was from 9:30 in the morning
18   until roughly 3:00, 3:30 in the afternoon.
19       Q.    And that was yesterday, you said?
20       A.    Correct.
21             PHONE SPEAKER:  I'm sorry to
22   interrupt.
23             Would it be possible to move the
24   microphone closer to the witness, please?

Page 14

1             - - -
2             (A discussion off the record
3    occurred.)
4             - - -
5    BY MR. CRAWFORD:
6        Q.    Did you have any other meetings
7    with anybody about the deposition?
8        A.    No.  There may have been a phone
9    call, just asking me about my availability and
10   the fact that I'd be asked to be deposed.
11       Q.    And did you review any documents
12   for this deposition?
13       A.    Yes.
14       Q.    About how many?
15       A.    I don't know.  A couple dozen.
16       Q.    And generally what were they?
17             MS. HILLYER:  I'll just -- I
18   don't want him to get into the details of
19   what they were.  He can answer
20   categorically so that doesn't get into
21   the privilege.
22   BY MR. CRAWFORD:
23       Q.    Go ahead.
24       A.    Generally some emails, internal

Page 15

1    reports and documents, presentations.
2        Q.    How about, did you review any
3    annual reports?
4        A.    What kind of annual reports are
5    you asking?
6        Q.    To the FDA about your drugs.
7        A.    No.
8        Q.    How about approval letters or
9    approval packets?
10       A.    Approval letters.
11       Q.    And for which drugs?
12       A.    The buprenorphine/naloxone,
13   primarily that product.
14       Q.    And how -- general in your
15   department, what's your current position at Teva?
16       A.    So I'm vice president of North
17   American generic regulatory affairs.
18       Q.    And what's the name of your
19   department at Teva?
20       A.    Regulatory affairs.
21       Q.    And who is your immediate
22   superior?
23       A.    Michael Banks.
24       Q.    And what is his position?

Page 16

1        A.    He is in charge of global
2    regulatory affairs.
3        Q.    And who is his employer?
4        A.    I'm not sure.  I believe it's
5    Teva UK.
6        Q.    And is he based in the UK?
7        A.    That's correct.
8        Q.    And why are you reporting to
9    somebody in the UK?
10             MS. HILLYER:  Objection, calls
11   for speculation.
12             THE WITNESS:  I don't know.
13   That's my boss when I joined the company,
14   and it's who I've been reporting to since
15   I joined.
16   BY MR. CRAWFORD:
17       Q.    And he's -- he works for a
18   different company than your company, though.
19             MS. HILLYER:  Objection to form.
20   BY MR. CRAWFORD:
21       Q.    Is that correct?
22       A.    I believe so.
23       Q.    You think it's Teva UK.
24             Is there a full name for -- of

Page 17

1     the company he works for?
2          A.   I'm not certain.
3          Q.   And who does Mr. Banks report to
4     right now?
5          A.   He reports to the global head of
6     research and development.
7          Q.   And who is that?
8          A.   Her name is Hafrun.  And her last
9     name is Fridriksdottir.
10         Q.   And where is Ms. Fridriksdottir
11    located?
12         A.   In Parsippany, New Jersey.
13         Q.   And who is her employer?
14         A.   I'm not certain.
15         Q.   And do you have any opportunity
16    to interact with Ms. Fridriksdottir?
17         A.   Yes.
18         Q.   On a pretty regular basis, I mean
19    like at least once a week?
20              MS. HILLYER:  Objection to form.
21              THE WITNESS:  Yes.  Regularly,
22         once a week.
23    BY MR. CRAWFORD:
24         Q.   And generally what comes to mind

Page 18

1     as far as maybe the past month, what have your
2     meetings been about with Ms. Fridriksdottir?
3          A.   Status of applications.
4          Q.   And do you have any
5     responsibility -- first of all, let's go back.
6              Let's mark the first exhibit,
7     which will be a LinkedIn profile.
8                    - - -
9              (Deposition Exhibit No.
10             Teva-Tomsky-1, Scott Tomsky LinkedIn
11             Profile, 2 pages, was marked for
12             identification.)
13                   - - -
14    BY MR. CRAWFORD:
15         Q.   We're going to flash the
16    documents on the screen up here, and also I'll
17    provide you with a copy.
18         A.   Okay.
19              MS. HILLYER:  This is LinkedIn?
20              MR. CRAWFORD:  Yeah.
21              MS. HILLYER:  Doesn't look like
22         it.
23              MR. CRAWFORD:  I actually figured
24         out how to print a LinkedIn profile so it

Page 19

1          doesn't look like it's from a web page.
2          So you have to go to the little three
3          dots next to the name, and that gives you
4          an option.
5              MS. HILLYER:  Good to know.
6              MR. CRAWFORD:  Much cleaner.
7     BY MR. CRAWFORD:
8          Q.   Does this look like generally
9     what's on your LinkedIn page?
10         A.   Generally, yes.
11         Q.   And did you prepare this?
12         A.   Yes.
13         Q.   All right.  And this is your
14    current position here, July 2013 to the present,
15    Teva Pharmaceuticals, VP regulatory affairs,
16    generics, North America?
17         A.   Correct.
18         Q.   And is the rest of this
19    information, just scanning it, does that look
20    accurate to you?
21         A.   Yes.
22         Q.   Let me ask you briefly about your
23    compensation, current compensation.
24              Do you have a salary?

Page 20

1          A.   Yes.
2          Q.   And what is the base salary right
3     now?
4          A.   Roughly $315,000.
5          Q.   And do you also get stock options
6     or bonuses, stock as bonuses?
7          A.   Occasionally, yes.
8          Q.   And is there a cash type of bonus
9     that you can get -- achieve?
10         A.   Yes.
11         Q.   And what is the basis for -- or
12    criteria the company uses to provide you with
13    stock or cash bonuses?
14         A.   It's based on individual
15    performance, regulatory affairs group goals and
16    key performance indices, as well as company
17    performance.
18         Q.   And generally what are the
19    regulatory affairs goals that achieve or count
20    towards a bonus?
21         A.   Generally, new submissions that
22    are being made to the FDA.  The number of
23    first-to-file submissions that are made to FDA
24    and posted on the FDA website in a particular

Page 21

1  year.  Approvals.  Maintaining compliance with
2  FDA regulations with respect to filing of annual
3  reports.  And as well as, you know, development
4  of staff.
5          Q.    And who conducts a review for you
6  for this bonus?
7          A.    My boss in the UK, Michael Banks.
8          Q.    And is there generally a
9  performance review that you receive, a written
10  one?
11         A.    Yes.
12         Q.    And just last year, what was your
13  bonus that you received, the last bonus you
14  received?
15         A.    Roughly the -- I guess the payout
16  before taxes was roughly $137,000.
17         Q.    And any stock?
18         A.    Yes.
19         Q.    And how much was that?
20         A.    I honestly don't remember.
21  Roughly -- I don't -- I'm not certain.
22         Q.    Can you take a rough guess,
23  please?
24         A.    I believe somewhere in the range

Page 22

1  of $100,000 of stock.
2          Q.    And that would be of Teva Limited
3  stock?
4          A.    It is of Teva stock in the US,
5  whatever stock is on the stock exchange in the
6  US.
7          Q.    That would be Teva Pharmaceutical
8  Industries Limited?
9          A.    I'm not certain of the legal
10  entity.
11         Q.    Do you know who your parent
12  company is, of your employer?
13         A.    I mean, I don't get into the
14  legal entities.  There's so many type of legal
15  entities, so I'm honestly not certain.
16         Q.    Do you interface with any
17  regulatory personnel in Israel for the company?
18         A.    Yes, occasionally.
19         Q.    And who is that?
20         A.    It would be -- Osnat is her first
21  name.
22         Q.    How do you spell that?
23         A.    O-S-N-A-T.  Cohen is her last
24  name, C-O-H-E-N.

Page 23

1          Q.    And what's her position?
2          A.    I believe she's a director in
3  regulatory affairs.
4          Q.    Is it for Israel or global or --
5          A.    So she manages the regulatory
6  team that is in Israel.  So any submissions
7  coming out of Israel her team would work on.  And
8  if it's a submission coming to the US, they would
9  coordinate documents for the US team for the
10  filings.
11         Q.    So what do you mean by a
12  submission from Israel?  A drug that they want
13  approved in the US?
14         A.    So any product that is being
15  manufactured in Israel, if that product was going
16  to be submitted to the FDA, her team would manage
17  the documents and send them to my team here in
18  the US.
19         Q.    Is there anyone else in Israel
20  you've interfaced with, you know, personally
21  spoken with since you've arrived at the company
22  that you can recall?
23         MS. HILLYER:  Objection to form.
24         THE WITNESS:  Sure, I do.  I

Page 24

1  mean, I'll list everybody's name who I
2  worked in Israel with?
3  BY MR. CRAWFORD:
4          Q.    Yes, please.  That you've
5  interfaced with.
6          A.    Everybody that I spoke to in
7  Israel.
8          Q.    Right.  Of any substance.
9          MS. HILLYER:  Since 2013.
10         MR. CRAWFORD:  Yeah.
11  BY MR. CRAWFORD:
12         Q.    Maybe moving backwards, just who
13  you can remember.
14         MS. HILLYER:  In regulatory?  Do
15  you want to narrow it at all?
16         MR. CRAWFORD:  Let's start with
17  regulatory, yeah.
18         THE WITNESS:  So Sigal Molgan is
19  someone.
20  BY MR. CRAWFORD:
21         Q.    How do you spell their name?
22         A.    S-I-G-A-L.  I believe her last
23  name is spelled M-O-L-G-A-N, but I'm not certain.
24         Q.    What's her position?

Page 25

1      A.    She is just a part of the
2  regulatory affairs team in Israel.
3      Q.    And what were the discussions
4  about that you recall?
5      A.    Nothing of substance.  It was
6  about products.  So I can't specifically recall
7  what product we spoke about, but...
8      Q.    Anyone else?
9      A.    Sure.  Who else?  Daniella
10  Gutman.
11      Q.    And what's her position?
12      A.    She is in charge of research and
13  development in Israel.
14      Q.    And Gutman, how do you spell
15  that?
16      A.    G-U-T-M-A-N, I believe.
17      Q.    Do you recall the substance of
18  those conversations?
19      A.    Again, they would have been
20  product related, about a product that they were
21  working on for submission to the US.
22      Q.    Anyone else come to mind in
23  regulatory?
24      A.    I'm having a hard time recalling

Page 26

1  names, but there would have been several members
2  of the regulatory affairs team there that would
3  have supported submissions in some way.
4      Q.    How about other departments in --
5  I don't mean just small chitchat, anyone that
6  you've had, you know, kind of, you know, more
7  than a passing conversation, that you interfaced
8  with in Israel?
9          MS. HILLYER:  Objection to form.
10          THE WITNESS:  Yeah.  I mean, I
11      can't -- any conversations with anybody
12      in Israel would have been related to
13      product filings that were being prepared
14      for the US.
15  BY MR. CRAWFORD:
16      Q.    That helps.  Thank you.
17          Okay.  Prior to -- let me ask you
18  this:  So at Teva, do you have any responsibility
19  for opioid products currently?
20      A.    Can you clarify what you mean by
21  responsibility?
22      Q.    Well, let's go back to this
23  question.
24          What -- can you generally

Page 27

1  describe your duties at Teva?
2      A.    Sure.  So the regulatory affairs
3  team is the main liaison between FDA and the
4  company.  So the regulatory affairs teams
5  coordinate ANDA, my team in the generic space
6  coordinates ANDA submissions to the FDA.  So it
7  collects documents from the manufacturing sites
8  where a product is to be manufactured.  It puts
9  that information together into the ANDA format
10  that FDA expects.  It makes the submissions to
11  the FDA and works with FDA.  If FDA has any
12  follow-up questions, the regulatory affairs team
13  would receive that information from the FDA, it
14  would coordinate a call with internal
15  stakeholders who are responsible for that product
16  and coordinate a response back to FDA.
17          So it's getting products
18  approved.  It's maintaining compliance of
19  approved products in terms of filing annual
20  reports each year.  If there are any changes to
21  an application, any document that's been
22  previously submitted to FDA, the regulatory
23  affairs team will coordinate the updates and make
24  possibly supplemental submissions to the FDA for

Page 28

1  those products.  From a high level, that's what
2  the regulatory affairs team does.
3      Q.    So basically, as far as
4  interfacing directly with the FDA on issues, it's
5  primarily run through your department.  Right?
6          MS. HILLYER:  Objection to form.
7          THE WITNESS:  So the regulatory
8      affairs team manages the approval process
9      for new ANDAs and then maintaining
10      compliance in terms of submissions of
11      annual reports and keeping those
12      submissions up to date.
13  BY MR. CRAWFORD:
14      Q.    How about communications with the
15  FDA?  If the FDA wants to talk about a drug or
16  some issue, is it your department that generally
17  interfaces directly with them, or --
18      A.    It would depend.
19      Q.    Okay.
20      A.    It would depend.  If it was
21  related to an application we filed and a specific
22  question about that application, it would be us.
23  But it could also be the quality team.  If it was
24  related to a product complaint, it would go

Page 29

1   through the quality group.  If it was related to
2   an adverse event, it would go through the
3   pharmacovigilance group.
4       Q.    But any written submission to the
5   FDA generally runs through your department as far
6   as maybe final looking at it or approval or
7   signing it?
8       A.    Not necessarily --
9           MS. HILLYER:  Objection to form.
10          THE WITNESS:  Sorry.
11          MS. HILLYER:  That's okay.
12          THE WITNESS:  Not necessarily.
13  So, for example, for pharmacovigilance
14  activities, the pharmacovigilance team
15  would prepare all reports.  And then
16  before it goes to FDA, there is a
17  regulatory operations group, which is not
18  under my responsibility.  And they simply
19  take the content from the
20  pharmacovigilance team and submit it to
21  FDA via the FDA electronic gateway.
22  BY MR. CRAWFORD:
23      Q.    Where is the regulatory
24  operations group located?

Page 30

1       A.    There is a group located in
2   Horsham, Pennsylvania.  There is a group located
3   in Parsippany.  And then there's also some
4   individuals in India as well.
5       Q.    And then pharmacovigilance -- let
6   me go back.
7           So regulatory operations, that's
8   currently.
9           How about in the beginning when
10  you arrived, where was regulatory operations run
11  out of?
12      A.    So I would say when I began at
13  Teva in July of 2013, the regulatory -- so
14  regulatory operations was transitioning away from
15  the regulatory group and starting a shared
16  services group, how they are set up now.
17      Q.    And did that occur with the
18  Actavis acquisition or prior?
19      A.    No.  That was prior to the
20  Actavis.
21      Q.    And then pharmacovigilance, where
22  are those reports kind of managed or collected
23  up?
24          MS. HILLYER:  Objection to form.

Page 31

1           THE WITNESS:  Yeah, I'm not sure.
2           Can you clarify your question?
3   BY MR. CRAWFORD:
4       Q.    So there's a pharmacovigilance
5   aspect to -- they have to collect -- your company
6   has to collect the reports of adverse events.
7   Right?
8       A.    Correct.
9       Q.    And report them to the FDA,
10  potentially.  Right?
11      A.    Yes.
12      Q.    And so what departments are
13  involved in pharmacovigilance and where are they
14  located?
15          MS. HILLYER:  Objection to the
16          extent it calls for speculation.
17  BY MR. CRAWFORD:
18      Q.    Currently?
19      A.    The pharmacovigilance team is
20  responsible for those activities.  There are
21  pharmacovigilance personnel.  They were in the
22  Horsham site.
23          Actually they've recently moved
24  to the Parsippany, New Jersey site.

Page 32

1           But who else is involved from
2   pharmacovigilance outside of those two sites,
3   there are several, but I'm not certain where they
4   are all based.
5       Q.    Are any of them potentially
6   overseas?
7       A.    Yes.
8       Q.    And do you know where?
9       A.    I believe in Croatia and in
10  Israel.
11      Q.    What are their functions in
12  Croatia and Israel, do you know?
13          MS. HILLYER:  Objection, calls
14          for speculation.
15          THE WITNESS:  I'm not certain.
16  BY MR. CRAWFORD:
17      Q.    So as far as preparing or putting
18  together an application for a generic drug, an
19  ANDA, is your department involved in preparing or
20  drafting any sections or parts of that for the
21  FDA?
22      A.    So can you repeat your question?
23  Sorry.
24      Q.    Yeah.  Just -- your company

Page 33

1    prepares applications for generic drugs that are
2    called ANDAs, abbreviated new drug applications.
3    Correct?
4          A.   Yes.
5          Q.   And they're in writing,
6    presumably, and submitted to the FDA.  Correct?
7          A.   Correct.  Electronically.
8          Q.   And there are written portions of
9    it.
10         And I'm trying to find out if
11   your department is involved in preparing the
12   written portions of the ANDA?
13         A.   Yes.
14         Q.   Does your department draft it or
15   review it or is it a multi-department function?
16         MS. HILLYER:  Objection to form.
17         THE WITNESS:  Yeah, it's a
18         combination.  So my team works with the
19         R&D team, the research and development
20         team that's working on that product.
21         Certain sections will come in drafted
22         from the R&D department.  My team will
23         edit those documents to make sure that
24         the documents flow and are easy to read

Page 34

1          and consistent from one part of the
2          application to the next.
3          And then certain sections of the
4          ANDA my team would draft.
5    BY MR. CRAWFORD:
6          Q.   And then for -- once a drug is
7    approved, a generic drug, the company is required
8    at certain points to submit the annual reports.
9    Right?
10         A.   Yes.
11         Q.   And who prepares those annual
12   reports?  What's the process for putting one
13   together?
14         A.   Current process?
15         Q.   Yeah.
16         A.   So current process is much of
17   this activity has been moved overseas to India.
18         Q.   And is it -- what company does it
19   in India?
20         A.   I'm not certain of the legal
21   entity name.
22         Q.   Is it a Teva-related company or
23   is it a third-party company?
24         A.   It's Teva.

Page 35

1          Q.   So that department or -- in
2    India, they're putting together the annual
3    reports from various departments that are needed
4    to provide content for it.  Right?
5          A.   Yes.
6          Q.   Okay.  And then once that annual
7    report is prepared, do they send a copy -- and it
8    has to be submitted in the US, do they send a
9    copy to your department?
10         A.   Occasionally, yes.  If they have
11   any questions.  But for anything that's
12   straightforward and they don't have any
13   questions, then it would just be sent to the
14   regulatory operations team to be submitted to the
15   FDA.
16         Q.   Is there a person now in charge
17   of annual reports being submitted to the FDA for
18   US-approved generic drugs?
19         A.   Yes.
20         Q.   And who is that?
21         A.   Jill Pastore.
22         Q.   And she is in your location?
23         A.   Yes.
24         Q.   And does she oversee the people

Page 36

1    in India or --
2          A.   Yes.
3          Q.   Okay.  So who's the person in
4    India that's responsible for that?
5          A.   Her name is Ulka, U-L-K-A.  I
6    believe her last name is Chorge, C-H-O-R-G-E.
7          Q.   And is she actually located in
8    Mumbai?
9          A.   Yes.
10         Q.   And do you know what company she
11   works for?
12         A.   I'm not certain of the legal
13   entity.
14         Q.   So the annual reports she
15   prepares, are those ultimately reviewed by Ms.
16   Pastore or her team before they're submitted or
17   can they be submitted direct?
18         A.   So, again, it wouldn't be Jill
19   who would review them.  If there were any
20   questions specific to an annual report that the
21   team in Mumbai was working on, they would go to
22   the US regulatory person who was assigned that
23   project for questions.
24         But they can be submitted

Page 37

1    directly if there are no questions.
2        Q.    And the generic drug labels, the
3    package insert, is it your understanding that
4    they generally have to be the same or
5    substantively the same as the name-brand labels?
6        A.    Yes.
7        Q.    And if there's a change to the
8    name-brand label, is it your understanding that
9    your company needs to change the generic label to
10   substantively match the name-brand drug label?
11       A.    Yes.
12       Q.    And is there a process right now
13   to monitor those changes and to update the
14   generic labels for submission to the FDA?
15       A.    Yes.
16       Q.    And can you explain that process
17   now?
18       A.    Yes.  So the labeling team is a
19   part of my responsibility.  They're currently
20   based in North Wales, Pennsylvania and
21   Parsippany, New Jersey.  But they monitor the
22   FDA's website for any RLD updates to labels.
23       Q.    RLD being reference listed drug?
24       A.    Yes.

Page 38

1        Q.    And that's generally the name
2    brand drug.  Right?
3        A.    Yes.
4        Q.    But if it's withdrawn, it can be
5    another generic that the FDA designates.  Right?
6        A.    That's correct.
7        Q.    Go ahead.
8        A.    So they'll monitor the FDA
9    website for any products that we have approved
10   and even pending which are under review at FDA,
11   to ensure that the labeling is kept up to date.
12   And they'll make the changes and revisions to our
13   label.  And then they would make a -- if it's an
14   approved product, they would make a CBE
15   supplement submission to the FDA.  And if it's a
16   pending product, they would prepare the label and
17   work with the regulatory associate who's
18   responsible for that product to coordinate the
19   submission to the FDA for that pending product.
20       Q.    Right.  And by CBE, you mean
21   changes being effected, meaning that you could do
22   it automatically without FDA preapproval.  Right?
23       A.    That's correct.
24       Q.    Generally is there a target

Page 39

1    turnaround time between the RLD change and when
2    you would like to have the Teva change to the
3    generic label to the FDA?
4        A.    It varies.  So it's really
5    dependent on the types of changes that are made
6    for the RLD product.  If it's safety or labeling
7    changes, we try to do those more quickly in
8    accordance with a procedure.  But if it's
9    administrative changes, then, you know, those
10   would take a little bit longer and less priority.
11       Q.    If it's safety, what -- is there
12   a target time that you have for that?
13       A.    To turn it around within 30 days.
14       Q.    And is there a standard operating
15   procedure or guideline, written one, the company
16   has on that process?
17       A.    I believe so, yes.
18       Q.    Is there a standard operating
19   procedure written guideline for preparing annual
20   reports on those generic drugs?
21       A.    There would be a work
22   instruction, I believe.
23       Q.    Is that what it's officially
24   called in the company, a work instruction?

Page 40

1        A.    I believe so.  I'm not certain if
2    it's a standard operating procedure or a work
3    instruction.
4        Q.    But it is in writing?
5        A.    Yes.
6        Q.    Have you seen that before?
7        A.    Yes.
8        Q.    This process for updating the
9    label when the RLD does, has that always been
10   that way since you got there?  And if not, what
11   was it before?
12       A.    I'm sorry, can you repeat your
13   question?
14       Q.    Yeah.
15           So there's a process for updating
16   your label if there's a change by the brand or
17   the RLD.  And you just described it.
18           Has that process changed over the
19   time since you've been there, and if so, how has
20   it?
21       A.    It may have.  I'm not certain.
22   When I first joined the company, labeling wasn't
23   part of my team's responsibility.  And it became
24   part of my team's responsibility with the Actavis

Page 41

1    acquisition.  So I'm not certain if it's changed
2    since that time or not.
3         Q.    So that responsibility landed
4    with your department in about 2016 or '17?
5         A.    Roughly, yes.
6         Q.    Because Actavis was acquired --
7    the generic Actavis company was acquired in 2016
8    by Teva.  Right?
9         A.    That's correct.
10        Q.    And you're not sure what the
11   process was before it arrived at your department?
12        A.    No, I'm not certain.
13        Q.    What about -- you're familiar
14   with the term "REMS."  Right?
15        A.    Yes.
16        Q.    What does that stand for?
17        A.    Risk evaluation and mitigation
18   strategies.
19        Q.    Can you briefly describe what a
20   REMS is?
21        A.    Sure.  So REMS are put in place
22   to ensure that the benefits of the drug still
23   outweigh the risk when used -- when they're
24   prescribed by doctors, when they're used by

Page 42

1    patients and dispensed by legal pharmacists.
2         Q.    And the REMS process was a
3    process that was codified back in 2007 by
4    Congress.  Right?
5         A.    That's correct.
6         Q.    And it gave the FDA authority to
7    require a plan of some sort for -- for supporting
8    the safety of the drugs on the market.  Right?
9         A.    To ensure that the benefits of
10   the drug still outweigh the risks.  And that the
11   drugs that have been approved by FDA are still,
12   you know, prescribed and used as directed and as
13   according to the approved labeling by the FDA.
14        Q.    And currently there are REMS in
15   place for opioid products, at least some opioid
16   products manufactured and distributed by Teva.
17   Right?
18        A.    There's REMS in place for several
19   different kinds of products, but opioids being
20   one, yes.
21        Q.    Is part of the REMS process is
22   for those opioids, if you know, deal with kind of
23   educating doctors about the proper use and risks
24   associated with those opioid products?

Page 43

1         A.    I'm not certain of the specifics
2    of the opioid REMS.  I mean, I haven't been
3    closely involved in that process.
4         Q.    Have you reviewed them before?
5         A.    I have not reviewed it.
6         Q.    What department is responsible
7    for making sure Teva's obligations under those
8    plans are --
9         A.    So there's a REMS --
10        Q.    Go ahead.
11        A.    Sorry.  So there is a REMS group.
12   It's actually -- it was actually a part of the
13   commercial organization until October of 2018, of
14   which time it moved to my responsibility.
15        Q.    So "commercial," you mean the
16   marketing department?
17        A.    That's correct.  Sales and
18   marketing.
19        Q.    And why was it moved to your
20   department in October of 2018?
21        A.    Because I think it's pretty well
22   known that a single shared REMS, which we're
23   talking about here, has been -- become a -- kind
24   of a roadblock to regulatory approvals within the

Page 44

1    past several years.  The coordination efforts
2    between FDA and many of the manufacturers who are
3    involved in these REMS has really impacted
4    approval times.  So in order to better align and
5    ensure communications within the regulatory team
6    and the REMS team, it was moved to regulatory
7    affairs.
8         Q.    And that's your department.
9    Right?
10        A.    That's correct.
11        Q.    And explain to me how it was a
12   roadblock to regulatory approval, the REMS.
13        A.    Generally speaking --
14             MS. HILLYER:  I'm sorry.
15        Objection to form.
16             Go ahead.
17             THE WITNESS:  Generally speaking,
18        these REMS require coordination between
19        the brand company and a generic, and
20        sometimes several generic companies.  And
21        just negotiating that single shared REMS
22        has taken, you know, months, very long,
23        longer to -- which -- longer to occur and
24        happen than a typical goal date which the

Page 45

1     FDA assigns to an application.  So if
2     it's taking the REMS process an extremely
3     long time, if a goal date when FDA plans
4     to take an action on an application comes
5     up, the FDA will issue a deficiency
6     letter because the REMS is not yet
7     approved.
8  BY MR. CRAWFORD:
9     Q.    So it was the interfacing with
10  other manufacturers to get an acceptable REMS
11  that you could submit to the FDA that was holding
12  things up?
13     A.    That's part of it.  It's also
14  coordination from FDA and within FDA of the REMS
15  group at FDA and then the reviewing groups in the
16  Office of Generic Drugs.
17     Q.    So when you get approval of a
18  generic drug that has to have a REMS, a risk
19  evaluation and mitigation strategy, you have to
20  submit with your approval package a version of it
21  that -- if it's a class-wide REMS, that's -- that
22  is consistent with the class-wide REMS.  Right?
23     A.    That's correct.
24     Q.    But it's not something that the

Page 46

1     FDA gives to you and says, follow this directly.
2          It's something that you prepare
3  to submit that the FDA will approve and is
4  acceptable to them.  Right?
5          MS. HILLYER:  Objection to form.
6          THE WITNESS:  So it's something
7     that a generic applicant would have to
8     work with the reference listed drug
9     holder and any other manufacturers.
10  BY MR. CRAWFORD:
11     Q.    And so the delay was really when
12  you submitted -- there is a deadline, right, from
13  the time that the application for the generic
14  drug is submitted that the FDA is to take some
15  kind of action, either approving it or not
16  approving it.  Right?
17     A.    That's correct.
18     Q.    If one of the conditions of
19  approval was having an acceptable REMS, and you
20  didn't submit that, they would -- they would --
21  that deadline would come and they would just
22  simply not approve it and say it was deficient
23  because it didn't have a REMS.
24          Is that the concern?

Page 47

1     A.    Not necessarily that it wasn't
2  submitted.  It could be that it was submitted but
3  FDA still hasn't had an opportunity to complete
4  its review of it, or FDA may have further changes
5  that it would like to it.  So it could be a
6  number of variables.
7     Q.    Got it.  Okay.  Thank you.
8          So before the function was moved
9  to regulatory in October 2018 and it was in the
10  hands of the commercial department or marketing
11  department, what was the process for assuring
12  adherence to the REMS, do you know?
13          MS. HILLYER:  Objection to form.
14          THE WITNESS:  I'm not clear of
15     your question.
16  BY MR. CRAWFORD:
17     Q.    Okay.  So what did that -- part
18  of the department's function currently with
19  regard to the REMS is to make sure that the
20  company's compliant with the REMS provisions.
21  Right?
22          MS. HILLYER:  Objection to form.
23          THE WITNESS:  So no.  The REMS
24     team's responsibility is to work with the

Page 48

1     other manufacturers to have agreements in
2     place establishing the single shared
3     REMS.  So it's working with not only the
4     companies, it's working with vendors to
5     ensure that all the elements of the REMS
6     are in place.
7  BY MR. CRAWFORD:
8     Q.    Okay.  But the company either --
9  I mean, somehow the company has obligations, but
10  they're coordinating with other companies to
11  fulfill them.  Right?
12     A.    That's correct.
13     Q.    And I'm just asking what was the
14  process prior to coming to you within the
15  commercial or marketing department to make sure
16  Teva's obligations in coordination with the other
17  manufacturers were being complied with?
18          MS. HILLYER:  Objection to form.
19          THE WITNESS:  So again, prior to
20     it coming to my organization, I'm not
21     entirely clear what the processes were.
22     My team would just work with the REMS
23     associate that was responsible for a
24     product to make sure that we had the

Page 49

1    proper documents in our application.
2  BY MR. CRAWFORD:
3    Q.   So who was in charge with the
4  commercial or marketing department over the REMS
5  programs prior to coming to your department?  Is
6  there a person or individual who kind of was in
7  charge?
8    A.   So you're asking who the REMS
9  team reported to, which person?
10   Q.   Who was head of the REMS team
11  back then?
12   A.   It's the same person who's head
13  of the REMS team now, his name is Kishore
14  Durgen -- sorry, Kishore Gopu.
15   Q.   How do you spell that?
16   A.   G-O-P-U is his last name.
17   Q.   Is he based in Mumbai?
18   A.   No.
19   Q.   Where is he?
20   A.   He's in Parsippany.
21   Q.   Does he work -- do you know who
22  he works for?
23   A.   He works for Teva.  I'm not sure
24  of the legal entity name.

Page 50

1    Q.   All right.  And Kishore is
2  K-I-S-H-O-R-E?
3    A.   That's correct.
4    Q.   So he's head of the REMS team for
5  the opioid REMS?
6    A.   He's head of the REMS team for
7  all REMS.
8    Q.   And how long has he been in that
9  position, do you know?
10   A.   I'm not certain how many years.
11   Q.   At least since you've been there?
12   A.   Yes.
13   Q.   And who does he report to now?
14   A.   He reports to me.
15   Q.   And who did he report to prior to
16  you?
17   A.   Tim McFadden.
18   Q.   And where is Mr. McFadden
19  located?
20   A.   Parsippany.
21   Q.   And what is his position?
22   A.   I'm not sure what his title is.
23   Q.   But he's with the commercial or
24  marketing department?

Page 51

1    A.   Yes.
2    Q.   And so now you're really
3  responsible at least ultimately for the REMS
4  compliance.  Right?
5        MS. HILLYER:  Objection to form.
6        THE WITNESS:  So not for REMS
7    compliance.  I'm responsible for ensuring
8    that the components of the REMS and
9    what's required to be submitted to the
10   FDA has been submitted to the FDA.  But
11   maintaining compliance, again, these REMS
12   programs are quite complicated, they're
13   managed by third parties outside of Teva.
14   So they're the ones who would track and
15   do any of the, you know, compliance
16   checks.  But we would coordinate the data
17   from those companies and then submit
18   regular reports to FDA about that
19   compliance.
20  BY MR. CRAWFORD:
21   Q.   So your department is responsible
22  for the regular -- any regular reporting
23  requirements under REMS to the FDA?
24   A.   So again, yes.  We would collect

Page 52

1  the data from these third-party vendors who
2  manage the REMS components and we would -- and
3  actually, they put together even the reports and
4  send it to each of the companies participating in
5  that REMS.  And then my team would put a cover
6  letter on it and make that submission to the FDA.
7    Q.   And what are these companies?
8  What --
9        MS. HILLYER:  Objection to form.
10  BY MR. CRAWFORD:
11   Q.   Can you identify them?
12   A.   I'm sorry, can you repeat your
13  question?
14   Q.   What are the third-party vendors
15  who are doing this REMS function for you?
16   A.   I mean, I believe UBC is one.
17  McKesson is another.
18   Q.   McKesson?
19   A.   Yes.
20   Q.   Okay.
21   A.   But I'm not certain of any of the
22  other names.
23   Q.   So your department, if there's a
24  regular reporting requirement under the REMS,

Page 53

1  that comes through your department ultimately
2  then and now?
3      A.    So again, it wouldn't come from
4  my department.
5      Q.    Through.
6      A.    My department -- right.  My
7  department would receive the reports from these
8  vendors and make the submissions to the FDA.
9      Q.    Have you ever been deposed in an
10  opioid-related case?
11      A.    I mean, I've been deposed on
12  products that were of the subclass of opioids.
13      Q.    And can you generally tell me
14  what those cases were?  I mean, who was the
15  plaintiff and, you know, what were they about?
16      A.    I mean, the plaintiff was a
17  patient who allegedly took an opioid product and
18  had an event.
19      Q.    And where was that case based out
20  of?  Do you know what court or state?
21      A.    I'm not certain.
22      Q.    And when was that deposition?
23      A.    Last week, actually.
24      Q.    And where was that deposition?

Page 54

1      A.    It was in Philadelphia.
2      Q.    At Golkow or where?
3      A.    No.  Traurig.  I don't remember
4  the firm name, actually.
5      Q.    Was it the questioning attorney's
6  firm?
7      A.    I believe -- no, I believe it was
8  a Teva firm.
9      Q.    Do you remember the name of the
10  lawyer who took the deposition?
11      A.    No, I do not.
12      Q.    Any other opioid cases or
13  opioid-related cases that you were deposed in?
14      A.    None that come to mind.
15      Q.    Going back to Exhibit 1, which is
16  your LinkedIn page, you write in the summary,
17  "aggressively identifying opportunities," "proven
18  record."
19          What is that?  What opportunities
20  are you referring to?
21      A.    I think it's talking about
22  regulatory strategy.
23      Q.    What kind of strategies?
24      A.    When to make a submission, what

Page 55

1  should be included in the application, things
2  like that.
3      Q.    Okay.  And then it says, "proven
4  record of...driving profitable growth."
5          What do you do that drives
6  profitable growth?
7      A.    It's just trying to find
8  efficiencies in the work that we're doing.  It's
9  utilizing, you know, teams such as a team in
10  India to help with more administrative tasks in
11  terms of data entry and things like that,
12  lowering cost bases in the US.
13      Q.    And going down, you worked --
14  prior to Teva, you joined -- you were with
15  Ranbaxy.  Right?
16      A.    Yes.
17      Q.    And Ranbaxy manufactures generic
18  drugs, too?
19      A.    Yes, they did.
20      Q.    And your position was a vice
21  president, regulatory affairs, North America.
22  Correct?
23      A.    Yes.
24      Q.    And what was your

Page 56

1  responsibilities in that position?
2      A.    Similar to my current
3  responsibilities now.  Again, it was overseeing
4  the regulatory -- US generics regulatory affairs
5  team and the Canadian regulatory affairs team for
6  submissions to the FDA and as well as maintaining
7  compliance in terms of filing annual reports and
8  post-approval change supplements to the FDA.
9      Q.    And does Ranbaxy manufacture,
10  sell or distribute any opioid products?
11      A.    Ranbaxy's no longer in business.
12  They were bought by Sun Pharmaceuticals.  So I
13  believe when I was there they had some opioid
14  products, but I'm not certain if they still have
15  them or not.
16      Q.    What were those opioid products,
17  if you recall?
18      A.    I believe it was oxycodone as
19  well.  I'm not certain of any others.
20      Q.    Did you have any responsibilities
21  with regard to that product, either submitting
22  for approval or regular filings?
23      A.    Again, the team that I'm
24  responsible for would have managed those filings

Page 57

1  and submissions to the FDA.
2      Q.    And when were they bought out by
3  Sun?
4      A.    I'd say roughly 2015.
5      Q.    And you left in June of 2013.
6      Why did you leave for Teva?
7      A.    It was really a growth
8  opportunity for my career.
9      Q.    And were you recruited by Teva?
10     A.    A headhunter had called me.
11     Q.    Do you have any plans of leaving
12  Teva right now?
13     A.    No.
14     Q.    And then it looks like you were
15  senior director of regulatory at Ranbaxy from
16  December of '09 to February 2011.  Correct?
17     A.    Yes.
18     Q.    And before that, you were with
19  McNeil Consumer Healthcare.  Right?
20     A.    Yes.
21     Q.    Is that a J&J-related company?
22     A.    Yes.
23     Q.    And did you have -- did they,
24  McNeil Consumer Healthcare, manufacture, market,

Page 58

1  sell or distribute opioid products?
2      A.    No.  McNeil Consumer Healthcare
3  is the over-the-counter division of Johnson &
4  Johnson.
5      Q.    And before that, you were with
6  Ranbaxy again as director of regulatory.
7  Correct?
8      A.    Yes.
9      Q.    Any responsibility during this
10  period for opioid products?
11     A.    I'm not certain when those
12  submissions were done.  It's possible.
13     Q.    And your background, educational
14  background, is you went to Temple.
15     Is MS a master's of science,
16  QA/RA?
17     A.    Yes, that's correct.
18     Q.    So you actually had a three-year
19  stint in quality assurance/regulatory affairs as
20  your educational background.  Right?
21     A.    So the program at Temple is a
22  master's of science in quality and regulatory
23  affairs.
24     Q.    And then your bachelor's degree

Page 59

1  was bio and chemistry.  Correct?
2      A.    Yes.
3      Q.    Let's go back to a question, now
4  that I have a better understanding of the
5  structure of your department.
6      You know, certainly -- well, let
7  me -- let's do 306.  We'll mark the next exhibit.
8      - - -
9      (Deposition Exhibit No.
10     Teva-Tomsky-2, Teva Opioid Market Share
11     Calculation:  All Opioids, Bates stamped
12     TEVA_MDL_A_00455086 through
13     TEVA_MDL_A_00455094, was marked for
14     identification.)
15     - - -
16  BY MR. CRAWFORD:
17     Q.    So we've marked what is here
18  TEVA_MDL_A_00455086, which is some charts.  The
19  first page, "Teva Opioid Market Share
20  Calculation:  All Opioids," and then it goes on
21  to list opioid products on the following pages.
22     Have you ever seen a chart like
23  this before?
24     A.    I believe this is probably one of

Page 60

1  the documents that I saw yesterday.
2      Q.    And are you able to -- have you
3  ever seen one before yesterday?
4      A.    No.
5      Q.    Are you able to or have you ever
6  had occasion where you wanted to see a listing of
7  products in a certain class, say, opioids, and
8  have a list run for you of those products?
9      A.    No.
10     Q.    And then you see here a list of
11  various products, some being brand products.
12  Right?  Actiq and Fentora are brand products of
13  Teva.  Right?
14     A.    Yes.
15     Q.    And then the rest would be
16  generic products on this list.  Correct?
17     MS. HILLYER:  You want him to
18     look through the list on what page?
19  BY MR. CRAWFORD:
20     Q.    If you recall or if you want to
21  take some time and look, you're welcome to.
22     MS. HILLYER:  I'm just going to
23     object to lack of foundation.  He
24     testified he has no foundation for this

Page 61

1    document.
2         MR. CRAWFORD: Other than you saw
3    it yesterday, so...
4         MS. HILLYER: But he's never seen
5    it before.
6         MR. CRAWFORD: He did yesterday.
7    BY MR. CRAWFORD:
8         Q.   You did yesterday.  Right?
9         A.   I believe so.
10        MS. HILLYER: That doesn't
11   establish foundation.
12        THE WITNESS: Can you repeat your
13   question, please?
14   BY MR. CRAWFORD:
15        Q.   Just wondering if that's -- these
16   are generic opioid products, other than Actiq and
17   Fentora, listed on this page?
18        MS. HILLYER: On the first page?
19        MR. CRAWFORD: On all of the
20   pages.
21        MS. HILLYER: Take your time and
22   look through it.
23        THE WITNESS: I'm not sure if --
24   Fioricet looks like a brand product, too.

Page 62

1         I'm not sure what that is.
2    BY MR. CRAWFORD:
3         Q.   Well, I'll just focus on actually
4    what are in the -- listed in the chart starting
5    at page 3 of the document.
6         A.   Page 3 appear to be generic names
7    other than Actiq.
8         Q.   Yeah.  And Actiq, Fentora and you
9    mentioned Fioricet, which is on page 5, that's --
10   those are brands.  Right?
11        MS. HILLYER: Objection to form.
12        THE WITNESS: It appears so.
13   BY MR. CRAWFORD:
14        Q.   And so for these generic drugs --
15   some are -- some actually came over from Actavis,
16   right, when they were acquired by the company in
17   2016?
18        A.   Again, I would assume so.  I'm
19   not certain.  Again, yesterday was the first time
20   I saw this document.  I've never seen it before
21   other than that.
22        Q.   But your understanding is Teva
23   had some of its own generic opioid products prior
24   to Actavis' acquisition.  Right?

Page 63

1         A.   I believe so, yes.
2         Q.   And then when Actavis was
3    purchased, the generic Actavis/Watson entities,
4    Teva then now had some new generic opioid
5    products in its portfolio.  Correct?
6         A.   Yes.
7         Q.   So those new products were
8    basically -- came within the purview of your
9    department to ensure that the proper submissions
10   were made at some point.  Right?
11        A.   Yes.
12        Q.   To the FDA?
13        A.   Yes.
14        Q.   And what I want to know is -- so
15   there are ongoing submissions required for all
16   your generic products to the FDA, annual reports
17   and the like.  Right?
18        A.   Yes.
19        Q.   And is there any -- how is that
20   responsibility divided up within your regulatory
21   department?  Are certain individuals given kind
22   of responsibility for making sure those
23   submissions are made for individual drugs?  Or is
24   it one person or how does that work?

Page 64

1         MS. HILLYER: Objection to form.
2         THE WITNESS: So the way my team
3    is set up, it's set up by manufacturing
4    site or location and also by dosage form.
5    BY MR. CRAWFORD:
6         Q.   So if a generic is coming out --
7    a generic product is coming out of a certain
8    manufacturing site, how is that responsibility
9    allocated?  Is one of the sites Salt Lake City?
10   Is that a manufacturing site for the company?
11        A.   Yes.
12        Q.   So, for example, if a product is
13   coming out of Salt Lake City, being manufactured
14   there, how is the responsibility for submitting
15   ongoing reports and information to the FDA, how
16   is that allocated or assigned?
17        A.   So I have a team in Salt Lake
18   City that manufactures products that are
19   developed there and -- that manages products that
20   are developed there and manufactured there.
21        Q.   And is there somebody in Salt
22   Lake City responsible for putting together the
23   reports and making sure they're submitted to the
24   FDA?

Page 65

1      A.   Yes.
2      Q.   And is this a person that is
3  physically based in that location?
4      A.   Yes.
5      Q.   And is it somebody who's part of
6  your regulatory department?
7      A.   Yes.
8      Q.   And who is that for Salt Lake
9  City?
10     A.   The person who reports to me in
11  Salt Lake City, her name is Cherri Petrie, it's
12  C-H-E-R-R-I.
13     Q.   And then when she prepares or --
14  I don't want to say it that way, strike that.
15          Is she the one who signs the
16  annual reports for the drugs out of that
17  facility?
18     A.   So no.  Again, as we had covered
19  earlier, many of the annual reports now are done
20  by a team in Mumbai.
21     Q.   Right.
22     A.   So for annual reports, the team
23  in Mumbai would work on those.  If they had any
24  question, they would go to Cherri or her team.

Page 66

1  That's a team member that's been assigned that
2  product.
3      Q.   Does Teva have a manufacturing
4  facility in Irvine, California?
5      A.   Yes.
6      Q.   Is there a regulatory team there
7  as well?
8      A.   Yes.  There's two people there.
9      Q.   Who are they?
10     A.   Eric Sullivan and Joshua Childs.
11     Q.   And do they do the same thing,
12  same process you described for Salt Lake City?
13     A.   Yes.
14     Q.   And do they report to you?
15     A.   So they report to a person on my
16  team.
17     Q.   And who is that?
18     A.   Anil Sachdeva.
19     Q.   How do you spell that?
20     A.   Last name is S-A-C-H-D-E-V-A.
21     Q.   And he's located in Horsham?
22     A.   He's in Parsippany.
23     Q.   Is there any plan to move the
24  Horsham folks to Parsippany?

Page 67

1      A.   Yes.
2      Q.   And when is that supposed to be
3  completed?
4      A.   August 2019.
5      Q.   Is that where you're going to be
6  located?
7      A.   I'll be located in Parsippany.
8      Q.   Any plans to move physically your
9  residence?
10     A.   No.
11          MS. HILLYER:  We've been going
12  about an hour.
13          MR. CRAWFORD:  Take a little
14  break if you want.
15          MS. HILLYER:  Yeah.
16          THE VIDEOGRAPHER:  Off the
17  record, 10:28.
18          - - -
19          (A recess was taken from
20  10:28 a.m. to 10:44 a.m.)
21          - - -
22          THE VIDEOGRAPHER:  We are back on
23  the record at 10:44.
24  BY MR. CRAWFORD:

Page 68

1      Q.   Prior to the break, you were
2  talking about personnel that were located in Salt
3  Lake City and Irvine, regulatory personnel who
4  were responsible for some aspect of the FDA
5  reporting regarding products manufactured at
6  those sites.  Right?
7      A.   Yes.
8      Q.   And also too you talked prior to
9  that about a manufacturing site in Israel that
10  you interface with some people with.  Right?
11     A.   Yes.
12     Q.   Was it the same type of function,
13  where they were in charge of certain submissions
14  that would be made to the FDA with regard to
15  products manufactured at those sites?
16     A.   Yes.  They would help coordinate
17  documents from those sites related to those
18  products that were manufactured at those
19  locations.
20     Q.   And do you know where the
21  locations are in Israel?
22     A.   Kfar Sava, Israel, and Jerusalem.
23     Q.   How do you spell Kfar Sava?
24     A.   It's K-F-A-R, S-A-V-A.

Page 69

1    Q.    And are those -- do you know what
2    company owns those sites?
3    A.    I'm not sure of the legal entity.
4    Q.    Have you ever heard of the name
5    TAPI, T-A-P-I?
6    A.    Yes.
7    Q.    Is that one of the manufacturing
8    sites?
9    A.    No, that's an API division of
10   Teva.  It's -- T is Teva, API is active
11   pharmaceutical ingredient.  So it's called TAPI.
12   Q.    And just for the jury here, what
13   is an active pharmaceutical ingredient?  What are
14   they making?
15   A.    So an active pharmaceutical
16   ingredient is the drug substance.  So it's the
17   active ingredient in a product formulation.
18   Q.    And so then -- and that's a Teva
19   entity, TAPI.  Right?
20   A.    Yes.
21   Q.    And then that ingredient is
22   supplied to the other Teva manufacturing
23   facilities that then formulate the actual
24   product?

Page 70

1    A.    TAPI will sell API to many
2    companies.
3    Q.    Including Teva?
4    A.    Yes.
5          MR. CRAWFORD:  We'll mark the
6    next document here.
7               - - -
8          (Deposition Exhibit No.
9    Teva-Tomsky-3, Organization Charts, Bates
10   stamped TEVA_MDL_A_03486562 through
11   TEVA_MDL_A_03486593, was marked for
12   identification.)
13              - - -
14   BY MR. CRAWFORD:
15   Q.    So we've marked a series of org
16   charts here.
17         Have you ever seen this document?
18   A.    Yes.
19   Q.    And when did you last see it?
20   A.    I don't recall.
21   Q.    And this is dated July 8, 2013.
22         That's about the time you arrived
23   at the company.  Right?
24   A.    Yes.

Page 71

1    Q.    And does this look like,
2    scanning, to you generally what the structure of
3    the regulatory -- various regulatory affairs
4    departments were at Teva at the time?
5    A.    Yes.
6    Q.    And the first page references
7    James G. Ottinger, a senior vice president of
8    regulatory affairs, and under him is Michael
9    Banks, vice president, global generics and OTC.
10        Mr. Banks, you had testified, is
11   your current direct boss.  Right?
12   A.    Yes.
13   Q.    And then according to this chart
14   he reported at this time to Mr. Ottinger.  Right?
15   A.    Yes.
16   Q.    Where was Mr. Ottinger physically
17   located?
18   A.    In Frazer, Pennsylvania.
19   Q.    And do you know who employed him,
20   who his employer was?
21   A.    I don't know the legal entity.
22   Q.    And did you ever have a chance to
23   interface with Mr. Ottinger?
24   A.    Yes.

Page 72

1    Q.    And he's no longer with the
2    company.  Right?
3    A.    That's correct.
4    Q.    Who replaced him?
5    A.    Michael Banks.
6    Q.    And you still report directly to
7    Michael Banks then?
8    A.    Yes.
9    Q.    Did anyone fill Michael Banks'
10   position?
11   A.    No.
12   Q.    Mr. Banks is in the UK.  Right?
13   A.    Yes.
14   Q.    Then below that, below Mr. Banks,
15   you have Gary Buehler, vice president, global
16   regulatory intelligence and policy.
17        Do you know Mr. Buehler?
18   A.    Yes.
19   Q.    Where he is located?
20   A.    He's retired.
21   Q.    All right.  When did he retire,
22   about?
23   A.    Roughly 2015.
24   Q.    Did anyone take over his

Page 73

1  position?
2      A.   Not within regulatory.
3      Q.   How about another department?
4      A.   His responsibilities were kind of
5  split up.  We went through a restructuring, so
6  some of those activities are being done now by
7  the legal team.
8      Q.   And what is -- it says he was
9  global regulatory intelligence and policy.
10      What did that position entail?
11      A.   It's just collecting information,
12  new regulations, new policies that regulators
13  were looking at.  He had a strong focus on the US
14  because he was formerly the head of the Office of
15  Generic Drugs.
16      Q.   With the FDA.  Right?
17      A.   Yes.
18      Q.   Do you know when he joined the
19  company?
20      A.   I do not.
21      Q.   And then going back, just a few
22  things.
23      Were you -- we talked about
24  pharmacovigilance and how that -- how that was

Page 74

1  run when you arrived and currently.
2      Do you know how the
3  pharmacovigilance was run prior to your arrival?
4      A.   Can you be more specific?
5      Q.   Let's say prior to 2009 -- Teva
6  acquired Cephalon in 2009.  Correct?
7      MS. HILLYER:  Objection to form,
8      assumes facts not in evidence.
9      THE WITNESS:  Yeah.  I'm not
10      certain of the date of that acquisition.
11  BY MR. CRAWFORD:
12      Q.   How about prior to 2010, do you
13  know how the pharmacovigilance was run?
14      A.   No.
15      Q.   How about the REMS approval
16  process, say, prior to your arrival, how was that
17  run?
18      A.   I think we talked about earlier,
19  I'm not certain how it was operated.  It was part
20  of the commercial team.
21      Q.   I said approval.  Okay.  I said
22  approval process.
23      I mean REMS, you know,
24  compliance.

Page 75

1      MS. HILLYER:  Objection to form.
2  BY MR. CRAWFORD:
3      Q.   Do you know how that was run
4  prior to your arrival?
5      MS. HILLYER:  Sorry.
6      Objection to form.
7      THE WITNESS:  Again, no.
8  BY MR. CRAWFORD:
9      Q.   How about, do you know anything
10  about how reporting to the FDA was run, say, in
11  submitting annual reports for your drugs and so
12  on?  Do you have any knowledge about that?
13      A.   Can you be more specific, please?
14      Q.   Well, what the process was.  You
15  described the process for submitting annual
16  reports when you arrived.
17      Do you know, can you describe
18  that process, what existed prior to your arrival
19  and moving backwards from there?
20      A.   Yeah.  I mean, generally
21  speaking, the regulatory affairs teams, whether
22  it was in Horsham, Pennsylvania or if it was
23  Woodcliff Lake, New Jersey at that time, they
24  were responsible for coordinating the documents

Page 76

1  from the manufacturing sites and preparing the
2  annual reports, and then making the submissions
3  to the FDA.
4      Q.   How far back did that process
5  occur?
6      A.   I'm not certain.
7      Q.   DEA compliance, is there a DEA
8  compliance department at Teva?
9      A.   Yes.
10      Q.   Does regulatory have any role in
11  DEA compliance?
12      A.   No.
13      Q.   How about suspicious order
14  monitoring?
15      A.   No.
16      Q.   How about reporting to the FDA
17  information about its suspicious monitoring
18  program?
19      A.   I just want to clarify --
20      MS. HILLYER:  Hold on a second.
21  BY MR. CRAWFORD:
22      Q.   Go ahead.
23      A.   Sorry, I just want to clarify.
24      You want to know if regulatory

Page 77

1    has any responsibility?
2        Q.    Correct.
3        A.    Yeah.  Regulatory has no
4    responsibility, so I'm not aware.  For the
5    suspicious monitoring or even --
6        Q.    Is there any regulatory
7    requirement for opioids to report information to
8    the FDA about its suspicious order monitoring
9    program or interactions with the DEA?
10            MS. HILLYER:  Objection to form
11        and to the extent it calls for
12        speculation.
13            THE WITNESS:  Yeah.  I'm not
14        familiar with the process.  It's outside
15        of the scope of regulatory.
16    BY MR. CRAWFORD:
17        Q.    Right.  But I'm just wondering,
18    as far as your interactions with the FDA, say in
19    annual reports or anything like that, are you
20    required to report or do you report to the FDA
21    any of your interactions with the DEA or
22    suspicious order monitoring activities?
23        A.    So none of that information is
24    reported to the FDA in the drug product annual

Page 78

1    reports that the regulatory affairs team does,
2    but I'm sure Teva has proper processes in place
3    to do that sort of thing.
4        Q.    How do you know they have proper
5    processes?
6        A.    I mean, Teva takes compliance
7    very seriously.  So I mean...
8        Q.    Do you have personal knowledge
9    that they're complying with all the processes?
10        A.    I mean, again, it's outside the
11    scope of regulatory, so I'm not involved in those
12    things.
13        Q.    So you're just making an
14    assumption?
15            MS. HILLYER:  Objection to form.
16            THE WITNESS:  No.  I'm saying
17        that Teva is a company that is strong on
18        compliance.  We all have to do compliance
19        training.  And so I don't see how the
20        company wouldn't comply with those
21        regulations or requirements either.
22    BY MR. CRAWFORD:
23        Q.    Do you mean currently or in the
24    past or both?

Page 79

1        A.    It's always been a core value of
2    Teva, to maintain compliance.
3        Q.    All right.  Let's go back to
4    Exhibit 2.
5            MS. HILLYER:  3?
6            MR. CRAWFORD:  3, I'm sorry.
7        The next page.
8    BY MR. CRAWFORD:
9        Q.    Let me ask you this:  Is this
10    structure on page 1, is there a reorganization of
11    the regulatory structure after the Actavis
12    acquisition, or is this -- looking through this
13    chart, is this generally how it exists today?
14        A.    No.  There was a complete
15    restructuring.
16        Q.    So let's go to -- and when did
17    that occur, the 2016-2017 time period?
18        A.    Roughly, yes.
19        Q.    So let's go to the next page.
20    This is, again, 2013, Michael Banks.  That was
21    your direct boss at the time.  And you're down
22    there, Scott Tomsky, VP, US generic.
23            Do you see that?
24        A.    Yes.

Page 80

1        Q.    Was there a brand VP for US at
2    this time?
3        A.    Yes.
4        Q.    Who is that?
5        A.    The previous page.
6        Q.    All right.
7        A.    Because if you go back, again,
8    this is -- Michael Banks is vice president of
9    global generics and OTC.  So generics.  He had
10    nothing to do with brand.
11            So if you look under Jim Ottinger
12    on the first page, Susan Franks is vice president
13    of global branded products.
14        Q.    Got it.  She was the counterpart
15    to Mr. Banks then?
16        A.    Yes.
17        Q.    And was there a counterpart to
18    you in the branded area?
19        A.    It was set up very differently.
20    So it's a global group.  And it was broken up by
21    therapeutic area.
22        Q.    And is Ms. Franks, is she in
23    Parsippany or in the US?
24        A.    She left Teva.

Page 81

1    Q.    At this time, was she in the US?
2    A.    She was in the US.
3    Q.    So looking at page 2, you've
4  got -- your structure is -- there's one US person
5  here, and that's you.  Correct?
6    A.    Yes.
7    Q.    In this structure at this level.
8  Right?
9    A.    Yes.
10   Q.    Okay.  And then you've got
11 Roussell, Braeuner, Baader, Monvoisin, Spilsbury,
12 they are EU heads or directors or managers in
13 this chart.  Right?
14   A.    Yes.
15   Q.    And are they -- do they -- they
16 also report to Mr. Banks.  Correct?
17   A.    They did at this time.
18   Q.    At this time.
19       And then -- and then over on the
20 left, there's Alenka Lasic-Gasparevic, senior
21 director, global RA.
22       Would she be -- have been in
23 charge of the non-EU, non-US areas?
24   A.    Generally speaking, she led the

Page 82

1  regulatory team that was located in Croatia.
2    Q.    And who had responsibility for,
3  say, the non-US or non-North America, non-Europe
4  regulatory at this time?
5    A.    If you look further down, it's
6  Iris Meisner, international regulatory affairs.
7    Q.    Got it.  Okay.
8       And who had charge of Canada at
9  this time?
10   A.    There was another individual,
11 Mathi Mathivanan.  And I believe at that time --
12 actually, I'm not sure.  I'm not certain if he
13 was -- where he was reporting into.
14       I think was reporting -- no.  He
15 was.  He was reporting into the Canadian business
16 at that time.
17   Q.    Is there -- who is in charge of
18 Canada now at your level?
19   A.    I am.
20   Q.    All right.  So you -- so that's
21 dealing with Canadian regulatory authority
22 submissions.  Right?
23   A.    Yes.
24   Q.    And why are you in charge in

Page 83

1  Canada?
2    A.    As a part of the restructuring
3  with Actavis, it may have even happened prior to
4  Actavis, I was given responsibility for not only
5  US generics but also Canadian generics.
6    Q.    Are you in charge of any other
7  countries?
8    A.    No.
9    Q.    Who reports to you, directly
10 under you with regard to Canada?
11   A.    Mathi Mathivanan.
12   Q.    And he's in Canada?
13   A.    Yes.
14   Q.    What city?
15   A.    Toronto.
16   Q.    And briefly, who's the Canadian
17 regulatory authority?
18   A.    Health Canada.
19   Q.    Go to the next page.  That's
20 Alenka.
21       Is that a female, Alenka?
22   A.    Yes.
23   Q.    Okay.  Lasic-Gasparevic in
24 Zagreb, senior director, global RA.

Page 84

1       Does she have any -- do you
2  interface with her or does she have any
3  responsibility with regard to the US operations?
4    MS. HILLYER:  Objection to form,
5    compound.
6  BY MR. CRAWFORD:
7    Q.    Is her department or anything
8  like that?
9    A.    Sorry, can you repeat the
10 question?
11   Q.    Just trying to find out, her
12 department or she have any responsibilities with
13 regard to the US regulatory operations?
14   A.    Are you now or are you asking
15 back in 2013?
16   Q.    Back then.
17   A.    So back then, she would have
18 managed any regulatory team that was in Zagreb,
19 Croatia.  And if there was products that were
20 developed there or manufactured there that were
21 coming to the US, her team would have compiled
22 documents and sent them to my team.
23   Q.    Similar to Salt Lake City and
24 Irvine and Israel?

Page 85

1      A.    A little similar, yes.
2      Q.    Next.  My Bates numbers are cut
3  off here, so I'm going to try to direct you to
4  the correct page on that.
5            Would like to go to page 8 with
6  Iris --
7            MS. HILLYER:  Just give a Bates?
8            MR. CRAWFORD:  Yeah.  My
9      colleague can do that here.
10           MR. JENSEN:  Bates ending in 569.
11  BY MR. CRAWFORD:
12     Q.    Now, she was -- you had mentioned
13  she was your counterpart for the rest of the
14  world.  Right?
15           MS. HILLYER:  Objection to form.
16           THE WITNESS:  Yes.
17  BY MR. CRAWFORD:
18     Q.    I think we can move on to page 9.
19           This is you right here, under
20  regulatory affairs.  And you have Phil Erickson
21  below you and Pat Jaworski.
22           Is Mr. Erickson, is he still with
23  the company?
24     A.    No.

Page 86

1      Q.    When did he leave?
2      A.    Roughly 2015.
3      Q.    And do you know where he is now
4  working?
5      A.    I'm not certain.
6      Q.    Where was he based?
7      A.    He was based in Horsham,
8  Pennsylvania.
9      Q.    And he was legacy Teva.  He was
10  there when you arrived.  Right?
11     A.    Yes.
12     Q.    And do you know how far back or
13  how long he'd worked there?
14     A.    I believe more than 20 years.
15  Actually, it was more than 20 years.
16     Q.    Do you know if he's retired?
17     A.    I'm not certain.
18     Q.    Do you know why he left?
19     A.    His position with the
20  reorganization was no longer needed.
21     Q.    Now, Teva's cut jobs worldwide
22  pretty significantly in the last couple years.
23  Right?
24     A.    Yes.

Page 87

1      Q.    And are those layoffs completed
2  yet or are they still ongoing?
3            MS. HILLYER:  Objection to form.
4            THE WITNESS:  Most of them are
5      completed.
6  BY MR. CRAWFORD:
7      Q.    And that was about 14,000
8  employees worldwide?
9      A.    Roughly.
10     Q.    What was Mr. Erickson's role at
11  this time?  What were his duties?  And if you go
12  to the next page, I believe there's a tree
13  underneath him.
14     A.    Okay.
15     Q.    So if you could describe his
16  duties at this time.
17     A.    So at this time, there was two
18  regulatory affairs teams.  There was one in
19  Horsham, Pennsylvania for the US generics, and
20  there was one in Woodcliff Lake, New Jersey for
21  US generics.  So Phil was managing the team that
22  was in Horsham, Pennsylvania.
23     Q.    And this is his team below here
24  on this chart on page --

Page 88

1            MR. JENSEN:  Bates 571.
2  BY MR. CRAWFORD:
3      Q.    -- 571?
4      A.    Yes.
5      Q.    And Jill Pastore is down there on
6  the lower right.  Is she -- she was a director.
7            Is that her current position?
8      A.    Currently she is senior director.
9      Q.    And what is her job now?  What
10  are her duties?
11     A.    So she is senior director of
12  commercial regulatory and regulatory affairs
13  launch preparedness, it's called.
14     Q.    And what does that involve?
15     A.    So she oversees the team in
16  Mumbai who prepares the annual reports.  And her
17  team also manages tracking of various things,
18  approvals, generic drug user fee dates,
19  submissions that go into the FDA.  She also has
20  responsibility for the labeling team and the
21  artwork management team.
22     Q.    And what does the labeling team
23  do?
24     A.    So this is what we discussed

Page 89

1 earlier.  They monitor the FDA's website, they
2 prepare labeling to support the US generic
3 products.
4     Q.    And there's Siva Vaithiyalingam,
5 who is a director under Mr. Erickson.
6         Where is she located at the time?
7     A.    It's a he, actually.  And he was
8 located in Horsham, Pennsylvania.
9     Q.    What was his function?
10     A.    He was -- I believe at this time,
11 he was -- he was overseeing all submissions that
12 went to FDA.  He's a former FDAer, so he was
13 doing -- he was performing a quality review of
14 the applications before they went in, trying to
15 identify any questions that he had, since he was
16 a former FDA reviewer.
17     Q.    And then over on his level, Rob
18 Vincent, senior director, what was his position
19 or what did that entail?
20     A.    At that time, he was overseeing,
21 you know, many of the products that were being
22 managed by the team in Horsham.
23     Q.    What does that mean, managed by
24 the team?  Just approvals, ongoing compliance or

Page 90

1 reporting?
2     A.    So the way the team was set up is
3 a subset of applications that -- more or less the
4 legacy Teva applications were managed through
5 this team here.  And he oversaw this team.
6     Q.    Did that include opioid products?
7     A.    It would include all products.
8 It's possible -- yes.  So Teva -- the legacy Teva
9 opioid products would have been a subset of this
10 group.
11     Q.    Okay.  And going to the next
12 page, Pat Jaworski, was Pat a male or female?
13     A.    It's a woman.
14     Q.    Woman.
15         What was her responsibility?
16     A.    So she was responsible for the
17 regulatory affairs team that was located in
18 Woodcliff Lake, New Jersey that supported the US
19 generics submissions.  These are primarily the
20 legacy Barr and Ivax applications.
21     Q.    So that would mean she -- I mean,
22 what would she do with regard to those legacy
23 drugs?  Just oversee the ongoing submissions to
24 the FDA?

Page 91

1     A.    Yeah.  Again, her team would have
2 oversaw the regulatory affairs responsibility in
3 terms of submissions of new applications as well
4 as maintenance of the approved applications.
5     Q.    And Barr and Ivax were two
6 companies acquired by Teva back in the middish
7 2000s?
8     A.    I'm not sure when they were
9 acquired, but yes.
10     Q.    Ms. Jaworski, is she still with
11 the company?
12     A.    She is not.
13     Q.    Okay.  How about Mr. Vincent?
14     A.    I'm sorry?
15     Q.    Mr. Vincent --
16     A.    So you're going back to the
17 previous page?
18     Q.    Yeah.
19         Is he still with the company?
20     A.    He is not.
21     Q.    Let's go to -- and I'm not quite
22 sure the page.
23         MR. JENSEN:  It's the first
24     tabbed page, actually, with Terri

Page 92

1     Booth-Genthe at the top.
2         MR. CRAWFORD:  Yeah.
3         MS. HILLYER:  Ending 582?
4         MR. JENSEN:  Correct.
5 BY MR. CRAWFORD:
6     Q.    Yeah.  We'll go through these
7 final tabbed pages.
8         Is Terri a male or a female?
9     A.    She's a woman.
10     Q.    Okay.  And did we talk about her
11 previously?  I'm slipping memory on the names
12 here.
13     A.    No.
14     Q.    What is global regulatory
15 operations?  What's that function?
16     A.    So this is the team that
17 primarily manages all the electronic submissions
18 to the FDA.
19     Q.    And how about other regulatory
20 authorities for other countries?
21     A.    Yes.
22     Q.    And where is she located at this
23 time?
24     A.    At this time, she was located in

Page 93

1    Frazer, Pennsylvania.
2        Q.    Where is she right now, is she
3    with the company?
4        A.    She is not with Teva.
5        Q.    Do you know who she's with right
6    now?
7        A.    I do not.
8        Q.    Then go to the next page, we have
9    Javier Monvoisin, head of regulatory information
10   management.
11           At the time, where was Mr.
12   Monvoisin located?
13       A.    He was located in the UK.
14       Q.    Did he or his department perform
15   any functions with regard to the US generic
16   drugs?
17       A.    Yes.
18       Q.    And what were those functions?
19       A.    Again, it was submissions,
20   electronic submissions to the FDA as well as
21   other groups.
22       Q.    So just coordinating getting the
23   documents electronically submitted, or did they
24   have any role in the substantive preparation of

Page 94

1    what was submitted?
2        A.    It was also managing databases
3    and things like that.
4        Q.    What kind of databases?
5    Pharmacovigilance?
6        A.    No.  It was the regulatory
7    affairs database.
8        Q.    And what's in that database that
9    you recall?
10       A.    Global submission information, US
11   filings, again, has to do with when the
12   submission was submitted to FDA, any responses to
13   the FDA, details about manufacturers, API
14   suppliers, things like that.
15       Q.    So if you wanted a report, you
16   know, listing all the opioids and ANDA numbers
17   from your generic opioids, would that be the
18   person you would go to?  Or that department back
19   then?
20       A.    No.
21       Q.    Where would you go for that?
22       A.    My team would manage separate
23   spreadsheets for submissions for the FDA.
24       Q.    And where would they get their

Page 95

1    information from for that?
2        A.    They would generate them
3    themselves.  It was basically kept in Excel.  And
4    it just tracked all submissions and submissions
5    that were pending review with FDA, submissions
6    that were approved, applications that were
7    approved.  It was too difficult to get
8    information out of the global regulatory affairs
9    database.  So that was more for the global team
10   to have, but it wasn't really for the US region
11   to have.
12       Q.    The next page, Karen Kulagowska,
13   head of planning, metrics and reporting, what was
14   her function back then?
15       A.    So again, at this time, she
16   collected information from each of the different
17   regions with respect to what submissions went
18   into FDA with respect to the US and what
19   applications were approved.
20       Q.    And where was she based?
21       A.    In the UK.
22       Q.    And is she still with the
23   company?
24       A.    Yes.

Page 96

1        Q.    Okay.  Next is the next page,
2    Jean Zwicker, is it a female?
3        A.    I'm sorry?
4        Q.    Is she female?
5        A.    Yes.
6        Q.    Jean Zwicker, senior director,
7    GRA, that's global regulatory affairs.  Correct?
8        A.    Yes.
9        Q.    Compliance and administration.
10           Did she or her department have
11   any function or role with regard to the US
12   operations for generics?
13       A.    Yes.
14       Q.    And what was her role in this
15   department at this time?
16       A.    It would audit to make sure that,
17   for example, annual reports were being submitted
18   to the FDA in accordance with the regulations,
19   that labeling was being updated in accordance
20   with the regulations to the FDA.
21       Q.    Would there be -- was this an
22   annual audit or periodic audit that would be
23   performed?
24       A.    I'm not certain how often they

24  (Pages 93 to 96)

Page 97

1    occurred.
2         Q.   Have you ever seen an audit
3    report generated for your department from this
4    department here?
5         A.   Yes.
6         Q.   And when was the last one you
7    recall seeing?
8         A.   Several years ago.
9         Q.   And where was Ms. Zwicker located
10   at this time?
11        A.   Horsham, Pennsylvania.
12        Q.   Horsham.
13             And did she do audits of
14   regulatory affairs departments outside the US?
15        A.   I'm not certain.
16        Q.   Is she still with the company?
17        A.   No.
18        Q.   Next page is a senior director,
19   global submissions management.
20             Who eventually -- it says vacant,
21   but who eventually got this position, do you
22   recall?
23        A.   I'm not certain.
24        Q.   Do you know what this department

Page 98

1    does as far as anything that impacts the US?
2         A.   Yes.  This is the submission of
3    the electronic documents to the FDA.
4         Q.   And do you know where --
5    generally where these people are located on this
6    chart?
7         A.   If you look to the far left,
8    Kevin Tompkins, he was located in Frazer,
9    Pennsylvania.  Ryan Hernandez was in Horsham.
10   And you can see on here --
11        Q.   Yeah.  Frazer.
12        A.   Yep.
13        Q.   And Carrie Deming, North America,
14   was she in US?
15        A.   I'm not sure.
16        Q.   It says Michael Aviv, associate
17   director, Israel.  Correct?
18        A.   Yes.
19        Q.   And where was the person these
20   three reported to, Tompkins, Deming, Aviv, where
21   was that person located?
22        A.   I'm not certain.
23        Q.   Next page is Jamie Warner, vice
24   president of global labeling and brand

Page 99

1    management.
2              Where was -- again, these are
3    kind of unisex names, I apologize for having to
4    ask this, but is Jamie --
5         A.   A woman.
6         Q.   A woman.  Okay.
7              Is she -- where is she located at
8    this time?
9         A.   She was in Frazer, Pennsylvania.
10        Q.   What was her role or function?
11        A.   Global labeling and brand
12   management.
13        Q.   So that would be for not just US
14   labels, but other Teva entities throughout the
15   world.  Right?
16        A.   Yes.
17        Q.   And was part of her function to
18   make sure there was relatively uniform labels
19   across -- and consistent labels globally?
20        A.   Yes.
21        Q.   For the Teva products.  Right?
22        A.   Yes.
23        Q.   And did she have any obligations
24   or role in keeping the generic labels up to date

Page 100

1    with the brand or RLD labels in the US?
2         A.   Yes.
3         Q.   Was it her responsibility to -- I
4    mean ultimate responsibility with regard to that
5    function?
6         A.   No.  I mean, she wasn't actively
7    doing that.  She was overseeing the team.
8         Q.   Right.
9         A.   And Jane and Betty here were the
10   ones who were primarily doing that.
11        Q.   That's Jane Frahn, F-R-A-H-N, and
12   Betty Shieh?
13        A.   Yes.
14        Q.   And they were just doing the US
15   labels.  Right?
16        A.   Yes.
17        Q.   And Ms. Warner, is she still with
18   the company?
19        A.   No.
20        Q.   Do you know who has that role
21   right now, kind of overseeing the people that do
22   that?
23        A.   There's not a global role right
24   now.

Page 101

1    Q.    How about a US role?
2    A.    Yes.
3    Q.    Who is that again?
4    A.    Charlene Salmorin.
5    Q.    What's her last name?  How do you
6    spell it?
7    A.    S-A-L-M-O-R-I-N.
8    Q.    And then move on about three
9    pages to Jane Frahn.
10          MR. JENSEN:  It's Bates 590.
11   BY MR. CRAWFORD:
12   Q.    Ms. Frahn is the woman who was in
13   charge at the time of keeping the labels
14   consistent with the brand or RLD.  Right?
15   A.    Yes.
16   Q.    And she was based in
17   Pennsylvania?
18   A.    No.
19   Q.    Where was she based?
20   A.    She was based in Woodcliff Lake,
21   New Jersey.
22   Q.    Is she still with the company?
23   A.    Yes.
24   Q.    And does she still do the same

Page 102

1    thing?
2    A.    Yes.
3    Q.    Then the next page is Betty
4    Shieh, manager, generics labeling team.
5          She has the same function of
6    keeping the labels consistent.  Right?
7    A.    Yes.
8    Q.    That's all I have on that
9    document.
10         Let's go to the next one.
11                - - -
12         (Deposition Exhibit No.
13         Teva-Tomsky-4, Email dated 10/28/2015,
14         Bates stamped TEVA_MDL_A_04344415, plus
15         attachment, 50 pages, was marked for
16         identification.)
17                - - -
18   BY MR. CRAWFORD:
19   Q.    So we've marked
20   TEVA_MDL_A_04344415.
21         It's an email from James Ottinger
22   to Michael Banks, Mr. Tomsky here and others,
23   dated October 28, 2015.  "Subject:  FINAL slide
24   deck for RA work shop."

Page 103

1          MS. HILLYER:  Mark, does the
2    leads -- do you know the Bates for the
3    attachment?
4          MR. CRAWFORD:  I imagine it
5    followed directly from this email.  It's
6    probably the attachment there.
7          MS. HILLYER:  I just want to make
8    sure, because sometimes we've had issues
9    with that.
10         MR. CRAWFORD:  That's my
11   understanding.
12         MS. HILLYER:  Okay.
13   BY MR. CRAWFORD:
14   Q.    So we've got a pretty substantial
15   PowerPoint here.  It goes up to 97 pages.
16         But I had some questions.
17         Was this the plan for integrating
18   or restructuring regulatory affairs after or with
19   the anticipated Actavis acquisition?
20         Let me strike that.
21         What was this?  Is this familiar
22   to you, this PowerPoint?
23   A.    Yes.
24   Q.    And can you tell me what this was

Page 104

1    intended for?
2    A.    I believe this -- actually, I
3    know this was used for a meeting that Teva was
4    having with Actavis leadership in the period --
5    time frame of October 2015, introducing the
6    Actavis management in terms of how the Teva
7    organization regulatory affairs team was set up.
8    Q.    Did this have a -- or did this
9    presentation or workshop -- it says workshop.
10         Is this an RA workshop?  Is this
11   kind of what it was?
12         MS. HILLYER:  Objection to form.
13         THE WITNESS:  Yeah.  I mean, it
14         was a meeting -- I guess we could call it
15         a workshop since that's what it was
16         called.  But again, of the Teva
17         regulatory affairs team and management
18         from Actavis and their regulatory affairs
19         team.
20   BY MR. CRAWFORD:
21   Q.    Did this PowerPoint describe
22   Teva's existing regulatory structure or any
23   planned restructuring or both?
24   A.    This discussed the existing

Page 105

1    regulatory affairs team.  It didn't discuss plans
2    for restructuring of the team.
3        Q.    All right.  But after the
4    acquisition, the departments, regulatory affairs
5    departments were restructured.  Right?
6        A.    Yes.
7        Q.    And is there -- I couldn't find a
8    current org chart or how that's structured, but
9    can you generally describe the changes that were
10   made to the department with the restructuring?
11       A.    There were quite a few changes
12   made to the department, so I'm not certain what
13   you would like to know.
14       Q.    I understand.  Yeah.
15   Unfortunately, I could not find anything in the
16   document production about the restructuring or
17   what the current structure is.
18            So, you know, I apologize for
19   asking such a broad question, but I'd just like
20   to get your kind of -- what comes into mind as
21   some of the basic, fundamental changes that were
22   made to the department with the Actavis
23   integration and acquisition?
24            MS. HILLYER:  Objection to form.

Page 106

1            THE WITNESS:  Yeah, I mean, there
2    was -- again, there was a lot of changes.
3    There is new leadership, you know, from
4    Actavis that was put in charge of the
5    global R&D team.  And then regulatory
6    moved from reporting into someone who was
7    legacy Teva to someone who was legacy
8    Actavis.
9            And actually, there's been
10   several reorganizations since even the
11   close of the Actavis deal.
12   BY MR. CRAWFORD:
13       Q.    And so who comes to mind that
14   came over from Actavis that's in the current
15   regulatory affairs leadership?
16            MS. HILLYER:  Objection to form.
17            THE WITNESS:  So when you say
18   leadership, what do you mean?
19   BY MR. CRAWFORD:
20       Q.    Kind of your position or above.
21       A.    Currently at my position and
22   above, I don't believe there's anybody from
23   legacy Actavis in regulatory affairs.
24       Q.    And I'm talking about, you know,

Page 107

1    we just went through the 2013 chart and we had
2    all this operations overseas and stuff like that.
3            Are there any Actavis people
4    overseas that are heading up any of the types of
5    departments that we looked at that you know of?
6            MS. HILLYER:  Objection to form.
7            THE WITNESS:  I'm not certain.
8            We would need to look at the org charts
9            and go by each one.
10   BY MR. CRAWFORD:
11       Q.    How about in Pennsylvania and
12   Parsippany, are there any Actavis people kind of
13   in the level immediately below you that you can
14   think of?
15       A.    Yes.
16            MS. HILLYER:  From legacy
17   Actavis?
18            MR. CRAWFORD:  Yeah.
19            THE WITNESS:  Yes.
20   BY MR. CRAWFORD:
21       Q.    And who is that?
22       A.    Joyce DelGaudio.
23       Q.    And she is what position?
24       A.    Senior director of regulatory

Page 108

1    affairs.
2        Q.    What is her function or role?
3        A.    She manages a portfolio of
4    products that have to do with the nonsterile,
5    primarily solid oral dosage forms that are
6    manufactured in various sites.
7        Q.    And do these include opioid
8    products?
9        A.    Yes, I believe so.  Some of them.
10       Q.    And anyone else who comes to mind
11   kind of in the positions immediately below you
12   from Actavis?
13       A.    Yes.
14       Q.    Who else?
15       A.    Janet Vaughn.
16       Q.    What was her last name?
17       A.    Vaughn.
18       Q.    Janet Vaughn?
19       A.    Yes.
20       Q.    V-A-U-G-H-N?
21       A.    Yes.
22       Q.    And what is her role or function?
23       A.    She manages the portfolio of
24   products that are handled in the Florida

Page 109

1   manufacturing areas.
2       Q.    Is she based in Florida or up
3   in --
4       A.    Sorry?
5       Q.    Where is she based?
6       A.    She's based in Florida.
7       Q.    Is she out of one of the
8   manufacturing sites down there?
9       A.    She's at the research and
10  development site.
11      Q.    And where's that?
12      A.    Weston.
13      Q.    Anyone else come to mind,
14  Actavis, in a level below you?
15      A.    Cherri Petrie.
16      Q.    And what's her role or function?
17      A.    We talked about her before.  She
18  manages the team in Salt Lake City.
19      Q.    Yes.
20            Was Salt Lake City, was that a
21  Teva site before the acquisition?
22      A.    No.  This particular site was a
23  legacy Actavis site.
24      Q.    Did Teva have its own site in

Page 110

1   Salt Lake City?
2       A.    They did.  It was on the branded
3   side, though.
4       Q.    Right.  And does that still
5   exist, the branded?
6       A.    I'm not certain.  I don't deal
7   with it.
8       Q.    But the Salt Lake City site that
9   reports to you that we talked about is a generic
10  site that was an Actavis site before the
11  acquisition?
12      A.    Yes.
13      Q.    And there were certain Actavis
14  entities that are the ANDA holders for opioid
15  products.  Right?
16      A.    I'm sorry, can you repeat your
17  question?
18      Q.    Well, when there's an abbreviated
19  new drug application, there's generally a, what
20  do you call it, an applicant.  Right?
21      A.    Yes.
22      Q.    Or is there another word for it?
23      A.    An applicant.
24      Q.    And I'm just trying to find out

Page 111

1   if there are any -- you know, what the entities
2   are that you know of that were the -- that were
3   the applicants for the Actavis side that came in
4   for the opioid products?
5       A.    I'm not certain who the
6   applicants were for the opioid products.  Again,
7   Actavis used to file as Watson.  They filed as
8   Actavis Salt Lake City.  Some of them were filed
9   as Andrx, so I'm not certain.
10      Q.    If you wanted to find out, you
11  know, a list of opioid products that were Actavis
12  products, how would you go about getting that
13  list?
14      A.    I would probably go to each of my
15  direct reports and ask them for a list of opioid
16  products that they were managing.  All the opioid
17  products are managed within the US, so they would
18  come either from Florida or Salt Lake City,
19  primarily.
20      Q.    Is that where the opioid products
21  are made, those two facilities?
22      A.    Yeah.  Primarily all the opioids
23  are manufactured within the US, just because of
24  DEA regulations.

Page 112

1       Q.    How about -- there are opioids
2   distributed in Europe.  Correct?
3       A.    I'm not certain.  I don't have
4   responsibility for Europe.
5       Q.    So the only two facilities that
6   are manufacturing opioid products that are
7   distributed in the US for a Teva-related entity
8   are in Salt Lake City and Florida?
9       A.    I'm not certain.  There may be
10  some in Elizabeth, New Jersey as well as Forest,
11  Virginia.
12      Q.    How about in Irvine?
13      A.    No.  Irvine is a sterile
14  manufacturing facility.  I'm not aware of any
15  opioid products coming from that facility.
16      Q.    Have you ever heard of a company
17  called Teva Parenteral or Parenteral Medicines?
18      A.    Yes.
19      Q.    They're in Irvine.  Right?
20      A.    That's typically associated with
21  the Irvine facility, yes.
22      Q.    Getting back to Exhibit 4.  Let's
23  go to -- and the page numbers are in the upper
24  right here, so this is describing here page 1.

<table>
<tr><td>

**Page 113**

1  It's got the agenda.
2  And the second bullet point is,
3  "Generics RA Structure and Operating Principles."
4  Michael Banks is global, you're listed for North
5  America, and Jonathan Roussell is for European.
6  Does that mean that you guys were
7  talking at this workshop or that's just
8  identifying people in charge of the structures?
9  A.  I'm not certain I understand your
10  question.
11  Q.  Did you present or talk at this
12  workshop?
13  A.  Yes.
14  Q.  It is an agenda, so what was the
15  agenda item on this page in relation to your
16  listing on here?
17  A.  Again, I'm not clear on your
18  question.
19  Q.  Okay.  Was there an agenda for
20  this workshop?
21  A.  This appears to be the agenda.
22  Q.  Right.  And so what was your role
23  in the agenda?
24  A.  To present North America generics

</td><td>

**Page 114**

1  RA.
2  Q.  And so did Mr. Banks present on
3  global?
4  A.  Yes.
5  Q.  And then shared services
6  structure and operating principles, you've got
7  regulatory operations, that's Ms. Booth-Genthe.
8  And labeling and brand management, that's Ms.
9  Warner.
10  Did they present at this as well?
11  A.  Yes.
12  Q.  And shared services structure,
13  what does that mean?
14  A.  So again, the way Teva was set up
15  at this time is that there were shared services,
16  so meaning these groups, regulatory operations
17  and labeling brand management, would support --
18  would be a shared service for all the regulatory
19  teams.  So the North American team, the European
20  generics team and the global regulatory affairs
21  team.
22  Q.  Go to slide 2.  There seems to be
23  kind of a circle of boxes around the central box
24  called "Global Regulatory Affairs."  The title

</td></tr>
<tr><td>

**Page 115**

1  is, "Teva Regulatory Affairs -- Past State and
2  Transformation (2011-2015)."
3  Can you just describe what this
4  slide is trying to convey?
5  A.  Yes.  I mean, this was a slide
6  that would have been presented by Jim Ottinger.
7  So he's talking about how he created a global
8  regulatory affairs team, which would have
9  oversight, more or less, for all of these
10  different groups.
11  Q.  And where was global regular
12  (sic) affairs at this time in 2015 based out of?
13  A.  Frazer, Pennsylvania.
14  Q.  And so again, slide 3 is Mr.
15  Ottinger's slide.  He says, "Given our journey of
16  combining many RA groups into one, Teva
17  transformed the RA function to the following
18  overarching principles."
19  And he's talking about the,
20  skipping down, the shared services and creating a
21  global organization.
22  Was that something that Mr.
23  Ottinger felt like he had done with the company?
24  MS. HILLYER:  Objection, calls

</td><td>

**Page 116**

1  for speculation.
2  THE WITNESS:  I think it's clear
3  on here what he's saying, too, is
4  generics and brands are still very
5  different and he's setting up focus
6  areas.  So they're separate business
7  units that are under a common leadership,
8  but they clearly function independently
9  and separately.
10  BY MR. CRAWFORD:
11  Q.  Brands and generics.  Right?
12  A.  Yes.
13  Q.  And that's changed now; they're
14  combined.  Right?
15  MS. HILLYER:  Objection to form.
16  THE WITNESS:  No.  So I would say
17  still it's -- it's still the same.  I
18  mean, it's under one oversight and
19  leadership, but there's dark lines
20  between the two.  I mean, we don't
21  interact with the brand group at all.
22  BY MR. CRAWFORD:
23  Q.  It does say, "create shared
24  services."

</td></tr>
</table>

Page 117

1    So are there shared services
2 between the two groups?
3    A.   So again, yes.  Those are the
4 shared services that we've previously spoken
5 about and those are the ones that do the
6 submissions to the FDA.  It's only the regulatory
7 operations that it's a shared service.
8 Labeling -- the global labeling brand management
9 is no longer a shared service.
10    Q.   Go to slide 4, second bullet
11 point.  It says, "Create centers of excellence
12 for efficiencies and harmonization."
13        And then the third bullet point
14 below that is, "Create a GM COE in Israel."
15        What does that mean?
16    A.   I'm not certain.
17    Q.   What does COE stand for, do you
18 know?
19    A.   I'm not certain.
20    Q.   How about GM, global management?
21    A.   I'm not certain.  I don't know if
22 it's global management or growth markets.
23        I believe, actually -- it's
24 coming back to me.  I think it's growth market

Page 118

1 center of excellence in Israel.
2    Q.   Do you know what that means, for
3 what -- you know, what was --
4    A.   I think it's stating that -- it's
5 stating that the growth market regulatory
6 operations would be managed in Israel.
7    Q.   Growth market, what does that
8 mean?
9    A.   That means not US, not Europe.
10 It's other countries.
11    Q.   Developing type of countries?
12    A.   Exactly.
13    Q.   Page 8 kind of gives -- it says,
14 "Today's focus."  So it's got Mr. Ottinger at the
15 top.  It has global regulatory affairs.  And then
16 they're talking about global generics and OTC.
17        That's Mr. Banks, your boss.
18 Right?
19    A.   Yes.
20    Q.   And global regulatory operations.
21 I think we talked about that.  And then global
22 labeling and brand management.  That's Ms.
23 Warner.  Global intelligence and compliance,
24 Terri Stewart.

Page 119

1        I think we talked about Terri
2 Stewart.
3        Where is she located?
4    A.   So we have not previously spoken
5 about her.
6    Q.   Okay.  Is it she?
7    A.   It's a she.
8    Q.   And where is she located at this
9 time?
10    A.   She was in Washington, DC.
11    Q.   And did Mr. Buehler work
12 underneath her in global intelligence or in
13 intelligence?
14    A.   No.  So Mr. Buehler would have
15 retired by now.
16    Q.   I see.
17        Is Ms. Stewart still with the
18 company?
19    A.   No.
20    Q.   Has she been replaced?
21    A.   No.
22    Q.   So what does it mean by regular
23 shared services between these three operations?
24 Is it shared between brands and generics, or is

Page 120

1 it shared worldwide or both, or what does that
2 mean?
3        MS. HILLYER:  Objection to form.
4        THE WITNESS:  It was shared
5        between brand, generic and globally.
6 BY MR. CRAWFORD:
7    Q.   And then the next page, 9, global
8 regulatory affairs governance.
9        You've got senior VP global
10 regulatory affairs.
11        Is that, at this time, Mr.
12 Ottinger, right, as the top of the pyramid?
13    A.   Yes.
14    Q.   And then the executive leadership
15 team, it says, "L3 heads of functional areas (5),
16 plus HR and Finance Business Partners."
17        Were you one of the five heads
18 they're referring to here?
19    A.   No.
20    Q.   Where do you fall on this
21 pyramid?
22    A.   Senior leadership team.
23    Q.   Who were the five heads that you
24 recall at this time?

Page 121

1      A.    If you go back to page 8, it's
2    those five people that are under James Ottinger.
3      Q.    Got it.
4            Susan Franks, global branded
5    regulatory, where was she located?
6      A.    Yes.  We spoke about her before.
7    She was in Frazer, Pennsylvania.
8      Q.    Go to page 13.  It does say
9    leadership team there.
10           Are they talking about the senior
11   leadership team in this chart here, from the
12   chart on 9?
13     A.    This is describing the global
14   generic and OTC leadership team.
15     Q.    And are you part of this team?
16     A.    Yes.
17     Q.    And you're North American
18   generics here.  Right?
19     A.    Yes.
20     Q.    Go to number -- page 21.
21           Can you describe what this
22   chart -- if you -- did you make any presentation
23   off of these slides?  Were any of these your
24   slides, if you know?

Page 122

1      A.    My slides begin on slide 28.
2      Q.    And go till when?
3      A.    And go to 42.
4      Q.    Okay.  Slide 21, can you -- I
5    don't understand this slide.  It says, from
6    multiple sites, then an arrow to main centers,
7    and then it has a bunch of -- you know, looks
8    like factories there or something.  And then two
9    office buildings.
10           Can you describe what this is
11   trying to convey here?
12     A.    I didn't prepare this slide.
13           If you look at it in conjunction
14   with slide 20, it's talking about the growth
15   market regulatory affairs team.  It appears they
16   were split up between many sites and they created
17   two main centers.
18     Q.    Are any of these sites on the
19   left in the US?
20     A.    I don't believe so.
21     Q.    CA, is that California?
22     A.    It could be Canada.  I'm not
23   certain, though.
24     Q.    Go to page 27.

Page 123

1            It's global GNX, is that
2    generics?
3      A.    Yes.
4      Q.    And OTC summary.
5            OTC is over the counter.
6    Correct?
7      A.    Yes.
8      Q.    Looking down, it says, "Lobby,
9    influence and establish Teva access and
10   credibility with Agencies and Governmental
11   Organizations on regulation and policy working
12   closely with Teva Government Affairs."  Bullet
13   point, "Working with and coordinating Teva input
14   with all relevant associations and stakeholders"
15   and "Maximise Regional and Global collaboration
16   with HA's."
17           What is HA?
18     A.    Health authorities.
19     Q.    All right.  So what -- is this a
20   function -- one of the functions of one of the
21   regulatory department divisions?
22     A.    I'm not certain.  This was a
23   slide presented by Michael Banks, so I'm not
24   certain what he was discussing here.

Page 124

1      Q.    Could it have been the regulatory
2    intelligence function maybe?
3            MS. HILLYER:  Objection.
4    BY MR. CRAWFORD:
5      Q.    Within the regulatory department?
6            MS. HILLYER:  Objection, lack of
7    foundation, calls for speculation.
8            THE WITNESS:  I'm not certain.
9    The regulatory intelligence group wasn't
10   under him, so I'm not sure why he would
11   have been speaking about this.
12   BY MR. CRAWFORD:
13     Q.    Then 29, there's kind of a chart,
14   some type of organizational chart, head, NA
15   generics RA.
16           Is that Mr. Ottinger again?
17     A.    No.
18     Q.    Who was in that position?
19     A.    This is me.
20     Q.    That's you.  Okay.
21           So these -- down below is Irvine.
22           That's one of your manufacturing
23   facilities.  Right?
24     A.    Yes.

Page 125

1       Q.    And how does this Irvine facility
2    relate to you in this chart?
3       A.    Because if you see the steriles
4    products?
5       Q.    Yeah.
6       A.    So those are the sites that
7    support the sterile portfolio of products.
8    Irvine is one of those sites.  That's what I had
9    mentioned earlier as well.
10      Q.    Okay.  And Haarlem, Zagreb and
11   Godollo.
12            Haarlem is in The Netherlands.
13   Right?
14      A.    Yes.
15      Q.    Zagreb in Croatia.
16            Where is Godollo?
17      A.    Godollo is in Bucharest.
18      Q.    In where?
19      A.    Bucharest.
20      Q.    Bucharest, okay.  Romania.
21            So these are manufacturing sites
22   that -- where they had regulatory people that --
23   that made submissions to you or -- sorry.
24            It's what you described about

Page 126

1    having regulatory function in those sites for
2    drugs that were sold in the US?
3       A.    So not necessarily.
4       Q.    Right.
5       A.    So what this means is that there
6    are products that are coming from these sites to
7    the US.  There may or may not be regulatory
8    people at those sites.  But if there's not
9    regulatory people at those sites, then there's
10   regulatory people at this time either in
11   Horsham -- actually, only in Horsham,
12   Pennsylvania, that would work with other
13   functions to get the documents for those
14   submissions.
15      Q.    Got it.
16            Page 30, "Regulatory Affairs --
17   North American Generics."  It says, under the
18   second bullet point, "Compliance was suffering
19   under previous models," including "Untimely
20   submission of Annual Reports due to conflicting
21   priorities for pre and post."
22            Were you aware of any untimely
23   submissions of annual reports that was occurring
24   under Teva's previous model?

Page 127

1       A.    Yes.  So there was an issue with
2    filing annual reports on time.  That's what this
3    is discussing.  So for FDA, the regulations
4    require you submit annual reports within 60 days.
5    And the team was having trouble meeting the
6    compliance to submit those annual reports within
7    60 days because the teams were not split for
8    pre-approval and post-approval.  So they were
9    trying to manage all the pre-approval and
10   post-approval activities on the teams.  And with
11   priorities, you know, and the thing that suffered
12   was filing the annual reports on time.
13      Q.    And that's 60 days from the
14   anniversary date?
15      A.    Yes.  60 days from the
16   anniversary date of the approval.
17      Q.    And what is the bullet point,
18   "FDA enforcement and 483 observations within
19   industry"?  What was going on there with
20   compliance suffering under the previous model?
21      A.    So I was saying that I was aware
22   of other companies receiving 483 observations
23   from FDA during inspections for not filing annual
24   reports on time.  So that's why I was saying it

Page 128

1    was becoming a focus area for FDA and a focus
2    area for us to ensure that we maintain
3    compliance.
4       Q.    And was the FDA, was there ever
5    any kind of warning or enforcement or 483
6    observations with regard to Teva in particular
7    and its submission of annual reports?
8       A.    Not that I'm aware.
9       Q.    And wouldn't you feel this
10   untimely submission was corrected, this issue?
11   Or was it corrected?
12      A.    It was corrected.  It was
13   corrected in 2014 time frame.
14      Q.    And how was that corrected, by
15   combining the pre and post?
16      A.    So by separating actually the pre
17   and post, and having a dedicated post-approval
18   team that focused on submission of annual
19   reports.
20      Q.    And again, who is in charge of
21   the post-submission function?
22      A.    At that time?
23      Q.    Just when you reorganized and put
24   somebody in charge.

Page 129

1    A.    It was several people.  At one
2  point -- I mean, it changed from two to three
3  people.
4      Q.    How about when it was in the
5  untimely submission phase, who was in charge of
6  that?
7      A.    It was Robert Vincent.  We
8  covered him before on one of the org charts.
9      Q.    Right.  Thank you.
10       MR. CRAWFORD:  All right.  That's
11  all I have on that.
12       MS. HILLYER:  So we've been going
13  about an hour.  I was going to try to go
14  till noon if that would be a good lunch
15  breaking spot or --
16       MR. CRAWFORD:  Yeah, I think --
17       MS. HILLYER:  -- a quick document
18  to start --
19       MR. CRAWFORD:  Okay.  Yeah.
20  Let's try -- I've got two documents.  It
21  might be pretty quick and then we'll go
22  into the next section.
23       MS. HILLYER:  Is that okay for
24  you?

Page 130

1       THE WITNESS:  Yes.
2       MR. CRAWFORD:  That would be a
3  good breaking point then.
4       Why don't we just mark the next
5  two.
6          - - -
7      (Deposition Exhibit No.
8  Teva-Tomsky-5, Email dated 7/27/2017,
9  Bates stamped TEVA_MDL_A_09019329 through
10  TEVA_MDL_A_09019333 and
11  TEVA_MDL_A_09019546 through
12  TEVA_MDL_A_09019551, and Deposition
13  Exhibit No. Teva-Tomsky-6, Transmittal of
14  Advertisements and Promotional Labeling
15  for Drugs and Biologics for Human Use,
16  Bates stamped TEVA_MDL_A_04342838 through
17  TEVA_MDL_A_04342849, were marked for
18  identification.)
19          - - -
20  BY MR. CRAWFORD:
21      Q.    So we marked Exhibits 5 and 6.
22       Let's go to 5 first.
23       That would be -- it looks like an
24  email from Penny Levin to a number of people,

Page 131

1  including Mr. Tomsky here, dated July 27, 2017.
2       The subject is "Comments to the
3  Docket FDA Hatch Waxman Amendments."
4       Ms. Levin writes, "Hello All,
5  Below please find the presentations given by
6  Andy, Gregg, and Scott.  Also find attached are
7  the materials that were presented at the meeting
8  combined into one document."
9       I have put on here -- you'll
10  notice some document skip.  And just to avoid
11  chopping down a million trees, I put on just the
12  three presentations by Andy, Gregg and Scott on
13  the back, just to be selective here, but the
14  email is reproduced here in its entirety.
15       Do you recall these talking
16  points or presentations?
17      A.    Yes.
18      Q.    And what was the presentation
19  for?
20      A.    So this was an FDA public hearing
21  on advancing generic access and overcoming
22  barriers to generic competition.
23      Q.    And it looks like on the next
24  page, there's a GlobalMeet invite web meeting.

Page 132

1       Do you see that?
2      A.    Yes.
3      Q.    And are these -- do these take
4  place on a pretty regular basis, these global
5  meetings?
6       MS. HILLYER:  Objection to form.
7       THE WITNESS:  So it's not
8  necessarily a global meeting.  This is
9  the conference call service that Teva
10  utilizes to have conference calls.  It's
11  just called global meetings.
12  BY MR. CRAWFORD:
13      Q.    Generally it's got listed here a
14  bunch of dial-in numbers for all across the
15  world, including the US and other countries.
16       Was the intention for kind of all
17  the regulatory people on this call to dial in
18  that can make the call?  Or, I mean, what was the
19  intention here?
20      A.    No, no.  So --
21       MS. HILLYER:  Objection to form.
22       THE WITNESS:  Sorry.
23       MS. HILLYER:  Go ahead.
24       THE WITNESS:  So no.  I mean,

Page 133

1  again, this is just the standard service
2  that Teva uses for conference calls. It
3  sends out all these numbers for every
4  meeting, whether or not there's people in
5  those countries that are calling into the
6  call. But only the people who are
7  invited can call in, will have the access
8  numbers.
9  BY MR. CRAWFORD:
10  Q. I see.
11  So this was sent out just to the
12  people on the July 19th 5:20 p.m. email to
13  participate in this. Right?
14  A. Right. Because you never know
15  where any of these people are at any one time.
16  They could be traveling in any one of these
17  countries and need to dial in and access it. So
18  that's why the numbers are circulated.
19  Q. I get it.
20  So let's go to a Mr. Gregg
21  DeRosa's presentation?
22  What was Mr. DeRosa's position at
23  this time?
24  A. Generally speaking, he's in

Page 134

1  charge of bioequivalent studies.
2  Q. And where was he based?
3  A. He's currently based in
4  Parsippany, New Jersey.
5  Q. How about at this time, where was
6  he based? US?
7  A. US.
8  Q. Okay. And then he writes, kind
9  of about a little over midway through that one
10  sentence paragraph, "The other topic I want to
11  highlight here today is the need for definitive
12  criteria for the approval of generic AD opioids."
13  Is that abuse-deterrent opioids?
14  A. Yes.
15  Q. And did you have any involvement
16  at all in anything with regard to abuse-deterrent
17  opioids?
18  MS. HILLYER: Objection to form.
19  THE WITNESS: Can you clarify
20  your question?
21  BY MR. CRAWFORD:
22  Q. Are you familiar with
23  abuse-deterrent opioids and what they are?
24  A. Yes.

Page 135

1  Q. And did Teva develop any
2  abuse-deterrent opioids?
3  A. Yes.
4  Q. And did they get approval for any
5  abuse-deterrent opioids?
6  A. I'm not certain. I'm on the
7  generic side, I'm not certain.
8  Q. How about brand?
9  A. I believe so.
10  Q. And that's Vantrela?
11  A. Yes.
12  Q. And the company decided not to
13  market Vantrela. Right?
14  A. Yes, that's my understanding.
15  Q. You don't know why they didn't
16  market it?
17  A. I have no idea.
18  Q. But they got approval for it.
19  Right?
20  A. That's my understanding.
21  Q. That was run through your
22  department. Right?
23  A. That's not correct. That was
24  managed on the specialty side, the branded side.

Page 136

1  Q. Got it.
2  A. So I had no -- my team had no
3  responsibility for that.
4  Q. All right. But here they're
5  talking about generic abuse-deterrent opioids.
6  Was Teva developing generic
7  abuse-deterrent opioids at this time?
8  A. I believe so, yes.
9  Q. And had they submitted an
10  application for any abuse-deterrent opioids?
11  A. I believe so, yes.
12  Q. Have any been approved or were
13  any approved at this time?
14  A. I'm not certain. Again, we --
15  actually, I haven't said this, but we have a huge
16  portfolio of products. I mean, we have more than
17  1,300 approved applications, we have more than
18  250 pending applications. So I'm not certain in
19  this time period -- and even now, honestly, if --
20  what's approved and not approved, if it's an
21  abuse-deterrent opioid.
22  Q. Were there any issues with having
23  definitive criteria on getting abuse-deterrent
24  opioids approved? And if so, what were the

Page 137

1    issues?
2        A.    Yeah, I think FDA continues to
3    update its requirements and regulations.  It
4    publishes guidances on, you know, what is
5    required to be submitted.  But there's really a
6    lack of clarity in terms of what the equivalent
7    criteria are for these.
8            So I think that's what Gregg is
9    discussing in his topic here.
10       Q.    So it's like if there's a brand
11   and they have an abuse-deterrent property, the
12   question is, is what are the criteria for a
13   generic trying to have a similar abuse deterrent
14   property that would allow it to be approved.
15           Is that kind of the issue?
16           MS. HILLYER:  Objection to form.
17           THE WITNESS:  So FDA requires the
18       generic to behave the same as the brand,
19       but it's not certain in terms of, well,
20       how similar is similar enough.  So I
21       think that's what Gregg was talking to in
22       his discussion.
23   BY MR. CRAWFORD:
24       Q.    All right.  And then the next

Page 138

1    page, page 548 is your presentation.  Correct?
2        A.    Yes.  It wasn't a presentation.
3    It was just a talk.
4        Q.    So is this something that you
5    just read into the record when you were at the
6    meeting?
7        A.    Yes.
8        Q.    And just briefly describe to me
9    what GDUFA II is.
10       A.    GDUFA stands for generic drug
11   user fee amendments.  And GDUFA II is the second
12   five-year period of the generic drug user fee.
13       Q.    And briefly describe what GDUFA
14   is.
15       A.    So GDUFA has to do with the FDA's
16   collection of fees for applications that are
17   submitted for running the generic regulatory
18   process.  So FDA receives appropriations from the
19   government, but then those appropriations are
20   supplemented by fees.  And it's not only on the
21   generic side, but the generic user fees are
22   fairly new versus the specialty or branded user
23   fees.
24       Q.    So in exchange for the generics

Page 139

1    paying these fees, part of the GDUFA, I don't
2    know, guidelines or regulations are that FDA has
3    certain performance goals as well to speed the
4    process along; is that correct?
5        A.    Right.  The fees are to
6    supplement appropriations.  So FDA agreed to
7    review applications within a certain time frame.
8    And then they could either issue a deficiency or
9    an approval, depending on the quality of the
10   information in that filing.
11       Q.    And when it was passed, it was a
12   five-year timetable.  And then GDUFA II means
13   that they were trying to or did get it renewed
14   for five years?
15       A.    That's correct.
16       Q.    And was it renewed?
17       A.    Yes.
18       Q.    Then the last one, presentation,
19   is an Andy Boyer.
20           He talks on the second to last
21   paragraph about "Take" the example -- "for
22   example the requirement to provide paper labeling
23   and inserts with our medicines.  Modernizing the
24   labeling regulations to allow for e-labeling

Page 140

1    would reduce the cost of medicines and improve
2    the speed and accuracy of information for
3    patients.  These paper labels are a waste of our
4    time and resources.  More often than not they are
5    discarded by our customers and never reviewed in
6    their paper form by their intended audience,
7    physicians."
8            Is that an accurate statement, in
9    your view?
10       A.    I'm not certain.
11       Q.    So when Teva ships a product, a
12   generic product, it generally is shipped to
13   where, a wholesale distributor or a pharmacy, do
14   you know that end of it?
15       A.    I'm not involved in that part of
16   it, I'm not certain where it actually goes.
17       Q.    Let's go to Exhibit 6, please.
18           MS. HILLYER:  Do you just limit
19       it?  Because we're near -- we've been
20       going an hour and a quarter.
21           MR. CRAWFORD:  Very limited.
22       Probably less than five minutes.
23           PHONE SPEAKER:  Before we move on
24       to Exhibit 6, could you just tell us the

Page 141

1    Bates number for Exhibit 5?
2        MR. CRAWFORD: Okay. 5 was --
3        MS. HILLYER: Well, it's a
4    compilation.
5        MR. CRAWFORD: --
6    TEVA_MDL_A_09019329. And then a portion
7    of the attachment to that letter,
8    starting at Bates number, same prefix but
9    ending with 19546. And then moving to
10   the end of that document.
11       PHONE SPEAKER: Thank you.
12   BY MR. CRAWFORD:
13       Q.   If I can go briefly on this.
14       So here, this is a "Transmittal
15   of Advertisements and Promotional Labeling for
16   Drugs and Biologics for Human Use."
17       When you have an advertising or
18   promotional piece even for generics, you're
19   required, as a company, to submit that to the
20   FDA. Correct?
21       A.   Yes.
22       Q.   And this is a convention graphic
23   for a product hydromorphone HCI injection USP
24   CII. Correct?

Page 142

1        A.   It appears so.
2        Q.   And this is -- somebody signed
3    this, Jamie Warner, it looks like, for you.
4    Right?
5        A.   Yeah. So Jamie is the person we
6    covered earlier, who is in charge of brand
7    labeling and management.
8        Q.   Right. Have you signed any of
9    these personally?
10       A.   No.
11       Q.   Why does she sign for you? Why
12   doesn't she just sign for her?
13       A.   I have the same question,
14   honestly. I'm not sure, because I had no
15   involvement in it whatsoever.
16       Q.   So -- but this is the convention
17   graphic attached to it here that was submitted
18   with this. Right?
19       A.   It appears to be.
20       Q.   And then there's a label for the
21   product as well. Right?
22       A.   Yes.
23       Q.   Okay. And on the back of the
24   label, it says, kind of the second to last

Page 143

1    paragraph, under "Storage: Protect From Light,"
2    it says, "A Schedule Class II Narcotic. DEA
3    order form required." It says, "Manufactured by:
4    Hospira, Inc.," but then it says, "Manufactured
5    For: Teva Parenteral Medicines...Irvine,
6    California."
7        Do you have any idea why Hospira
8    is manufacturing this for Teva Parenteral?
9        A.   I'm not certain.
10       Q.   Did Teva Parenteral, was this --
11   were they the ANDA holder for this drug?
12       A.   I'm not certain. I'd have to
13   look at the ANDA.
14       Q.   If you wanted to look at the
15   ANDA, how would you go about doing that?
16       A.   So they're stored on a shared
17   drive within our network. And I would pull open
18   the application, I would look on a 356H form,
19   which lists the applicant.
20       Q.   And if you wanted to look at the
21   approval letter for a product, how would you go
22   about finding that?
23       A.   I would ask someone on my team to
24   find it, either the person who is responsible for

Page 144

1    that product -- primarily, that's who I would go
2    to.
3        Q.   So there are people on your
4    team -- when you say primarily responsible, are
5    these people in your location or are these people
6    at the manufacturing site that --
7        A.   It could be either/or.
8        Q.   All right.
9        MR. CRAWFORD: That's all I have
10   for this line of questioning, so we can
11   take a break for lunch.
12       MS. HILLYER: Okay.
13       THE VIDEOGRAPHER: Going off the
14   record at 12:04.
15       - - -
16       (A luncheon recess was taken from
17   12:04 p.m. to 12:38 p.m.)
18       - - -
19       (Deposition Exhibit No.
20   Teva-Tomsky-7, Approval Package for:
21   Application Number: 76-168, 171 pages,
22   was marked for identification.)
23       - - -
24       THE VIDEOGRAPHER: We are back on

Page 145

1    the record at 12:38.
2    BY MR. CRAWFORD:
3       Q.   Okay.  We marked the next
4    exhibit, Exhibit 7, which is "Approval Package
5    for:  Application Number:  76-168, Generic Name:
6    Oxycodone Hydrochloride Extended-release Tablets,
7    80 milligrams, Sponsor:  TEVA Pharmaceuticals
8    USA, Approval Date:  March 23, 2004."
9          Now, this was an approval
10   package.  There's no Bates number.  It's
11   something that we pulled off the FDA website.
12          So that is where this comes from.
13          But if we could take a look here.
14          Moving to the approval letter,
15   which is page 4, if you could go to that, it's
16   dated March 23, 2004.  That's a stamped date at
17   the top.  And it's a letter from Teva
18   Pharmaceuticals -- or to Teva Pharmaceuticals,
19   USA, attention Philip Erickson.  And it's signed
20   by Gary Buehler, director, Office of Generic
21   Drugs.
22          So this, again, we talked about
23   Mr. Erickson.
24          He was at the company in that org

Page 146

1    chart in 2013.  Right?
2       A.   Yes.
3       Q.   And then Mr. Buehler, who is at
4    the FDA here, you had mentioned he moved from the
5    FDA to Teva.
6          He was on that same org chart.
7    Right?  That org chart.  Right?
8       A.   Yes.
9       Q.   So this is -- it says, "This is
10   in reference to your abbreviated new drug
11   application (ANDA) dated May 8, 2001, submitted
12   pursuant to Section 505(j) of the Federal Food,
13   Drug, and Cosmetic Act (the Act), for Oxycodone
14   Hydrochloride Extended-release Tablets,
15   80 milligrams."
16          Are you -- and you could maybe
17   take a look at Exhibit 2.
18          Is this a product that Teva still
19   sells or markets right now, or at least as of
20   2016, Teva's chart?
21          MS. HILLYER:  Objection to the
22          extent it calls for speculation and lack
23          of foundation.
24          THE WITNESS:  Yeah.  Even if I

Page 147

1          looked at Exhibit 2, I don't know if it's
2          currently being manufactured or not.
3          Again, Teva has a vast portfolio of
4          products, over 1,000, close to 1,300
5          approved applications, so I'm not sure
6          which ones are actively being marketed or
7          not.
8    BY MR. CRAWFORD:
9       Q.   All right.  Well, go to page 8.
10   And you'll agree with me there does appear --
11          MS. HILLYER:  Of exhibit?
12          MR. CRAWFORD:  Of Exhibit 2, I'm
13          sorry.
14          MS. HILLYER:  Give him a second.
15   BY MR. CRAWFORD:
16       Q.   It's the chart of drugs.  Page 8,
17   the top two.
18          You agree with me that this chart
19   says -- reflects, "Oxycodone Hydrochloride
20   Extended-Release tablets (Generic OxyContin)."
21          The first two boxes state that.
22   Correct?
23       A.   Yes.
24       Q.   And then this approval is for

Page 148

1    ANDA 76-168, oxycodone hydrochloride extended
2    release tablets, 80 milligram.
3          You would agree with me that the
4    approval is at least for some type of generic
5    OxyContin.  Right?
6       A.   The approval is for generic
7    OxyContin, 80 milligrams.
8       Q.   Right.  And then do you know if
9    it's one of these two referenced in this chart,
10   the first one showing prescriptions starting in
11   2015 and then continuing into 2016, the second
12   one just in 2016?
13       A.   I have no idea.
14       Q.   Okay.  All right.  Are you aware
15   that Teva, prior to this date, that Teva had a
16   generic OxyContin approved?
17       A.   Prior to when?
18       Q.   Prior to today.
19       A.   Yes.
20       Q.   And were you aware prior to
21   reviewing the chart yesterday that Teva had a
22   generic OxyContin product?
23       A.   Approved?
24       Q.   Yeah.  Approved, yeah.

Page 149

1      A.    Yes.
2      Q.    What is your understanding of
3   when that product -- this shows an approval in
4   2004, Exhibit 7.  Correct?
5      A.    Yes.
6      Q.    And then Exhibit 2 has -- is
7   referencing the sales of prescriptions in -- just
8   in 2015 and 2016 for those top two boxes.  Right?
9          MS. HILLYER:  Same objections.
10  BY MR. CRAWFORD:
11     Q.    I'm looking at page 8.
12     A.    Right.  But I am looking at page
13  2 to understand what the chart is.  It says
14  "Script volume and share of Teva products
15  relative to all opioids."
16         So again, I'm not certain.  I
17  didn't prepare these charts.  I'm not -- I didn't
18  see them before yesterday, so I don't know what
19  these numbers are, other than script volume, I
20  guess.  I don't see where share is.
21     Q.    Well, share would be in that --
22  in the charts on 1 and 2.  It says, "Teva CII
23  opioid share."  And there's a percent.
24     A.    Okay.

Page 150

1      Q.    And then volume is above that.
2   Scripts.  And I assume that that type of number
3   is being carried over.  Certainly it isn't market
4   share.  It looks to me like script volume but,
5   you know, that's how I interpret it.
6          Do you interpret it that way?
7      A.    I'm not certain.
8      Q.    So do you have any recollection
9   of the generic OxyContin and whether that was
10  marketed prior to 2015?
11     A.    Yeah, I mean, I am not certain.
12  Again, we have over 1,300 approved products.  And
13  I don't get involved in the details of every
14  product.
15     Q.    I understand.
16         But I'm just wondering if you
17  have any knowledge or recollection of what was
18  happening with generic OxyContin and whether it
19  was being marketed or couldn't be marketed or
20  anything at all?
21     A.    No, nothing that stands out in my
22  memory.
23     Q.    Sure.  And that's all I want to
24  get, is just your memory.

Page 151

1      A.    Yeah.  I'm not certain.
2      Q.    If you don't, that's perfectly
3   okay.
4      A.    Right.
5      Q.    So moving on with the letter,
6   have you ever seen this approval letter before?
7      A.    This specific one, no, not that I
8   recall.
9      Q.    How about one for generic
10  OxyContin, have you ever seen an approval letter
11  for that?
12     A.    Not that I recall.
13     Q.    So it does say on the third
14  paragraph, the application is approved.
15         And so once an application is
16  approved -- I guess unless there's a court
17  injunction or something like that, Teva is free
18  to market the product.  Right?
19     A.    Yes.
20     Q.    Have you ever heard of a court
21  injunction or something preventing Teva from
22  marketing an FDA-approved generic opioid?
23     A.    An opioid specifically, I'm not
24  certain.

Page 152

1      Q.    But at least a generic product,
2   you've heard of a court stopping the marketing.
3   Right?
4      A.    Yes.
5      Q.    Even though it's FDA approved.
6   Right?
7      A.    Yes.
8      Q.    And that might be because there's
9   some kind of patent dispute or a dispute about
10  whether Teva could legally market it and not
11  infringe on the rights of a brand or another
12  manufacturer?
13     A.    Yes.
14     Q.    So going to page 3 of the letter,
15  the second paragraph there, starting with, "TEVA
16  is eligible for 180-day generic drug exclusivity
17  for Oxycodone Hydrochloride Extended-release
18  Tablets, 80 milligram, as provided for under the
19  Drug Price Competition and Patent Term
20  Restoration Act of 1984 (Hatch-Waxman Amendments)
21  in Section 505(j)(5)(B)(iv) of the Act.  This is
22  because the agency has concluded that TEVA was
23  the first ANDA applicant to submit a
24  substantially complete ANDA for Oxycodone

Page 153

1    Hydrochloride Extended-release Tablets, 80
2    milligram, containing paragraph IV certifications
3    to each patent listed in the "Orange Book."  This
4    exclusivity will begin to run from the date TEVA
5    begins commercial marketing of the drug product,
6    or upon the decision of a court holding the
7    patents which were the subjects of the paragraph
8    IV certifications to be invalid or not infringed;
9    whichever occurs first."
10           And then moving down, second
11   paragraph, the second line, "The Agency expects
12   that you will begin commercial marketing of this
13   drug product in a prompt manner."
14           So can you explain what this
15   180-day generic drug exclusivity is that's been
16   granted here?
17       A.    Sure.  So for generic applicants,
18   if you are the first generic applicant to file an
19   ANDA, and if FDA receives that application
20   wherein you are challenging patents that are
21   listed in the Orange Book, if you are able to
22   obtain approval, then you can potentially have a
23   period of 180-day generic exclusivity where you,
24   as an ANDA applicant and the brand, and typically

Page 154

1    the brand would also sell an authorized generic,
2    but you could be on the market for a period of
3    six months before any other generic applicants
4    can get approved.
5        Q.    And that's a competitive
6    advantage in the generic world, to have the
7    180-day exclusivity.  Right?
8            MS. HILLYER:  Objection to form.
9            THE WITNESS:  180-day exclusivity
10   is very important in the generics.
11   BY MR. CRAWFORD:
12       Q.    And why is that?
13       A.    Because it's an opportunity to be
14   on the market without any other generic
15   competition, other than possibly an authorized
16   generic by the brand.
17       Q.    An authorized generic meaning one
18   that the brand is allowing another manufacturer
19   to make it but as a generic.  Right?
20       A.    Not necessarily.  So it's -- an
21   authorized generic is when the brand in essence
22   packages its product and puts the label of
23   another generic applicant on it.
24           So another generic company isn't

Page 155

1    manufacturing it.
2        Q.    Right.
3        A.    The brand manufactures it and
4    uses the label for another generic company.
5        Q.    Okay.  So the authorized generic
6    is the company that it uses.
7            Is there a separate application
8    process to be an authorized generic --
9        A.    No.
10       Q.    -- or can you just adopt the
11   brand one?
12       A.    It's all managed under the brand
13   NDA.
14       Q.    Do you know if Teva -- is Teva an
15   authorized generic for any generic drugs that you
16   know of?
17       A.    Yes.
18       Q.    So do you know if Teva is an
19   authorized generic for any opioid products?
20       A.    I'm not certain.
21       Q.    So with this exclusivity, it does
22   say, "The Agency expects you will begin
23   commercial marketing of this drug product in a
24   prompt manner."

Page 156

1            That's because you would assume,
2    wouldn't you, that that then triggers the 180-day
3    period once you start marketing.  Right?
4            MS. HILLYER:  Objection to form.
5            THE WITNESS:  Can you repeat your
6    question, please?
7    BY MR. CRAWFORD:
8        Q.    Yeah.
9            Is -- the FDA wants Teva to begin
10   marketing the drug promptly.
11           Is that because, in your view and
12   expertise in the area of regulatory affairs, that
13   that's triggering the 180-day period.  Right?
14           MS. HILLYER:  Objection to form.
15           THE WITNESS:  My understanding is
16   that is because it would trigger the
17   exclusivity period to start to run.
18   BY MR. CRAWFORD:
19       Q.    Right.  The goal of this is to
20   incentivize drug companies to -- the exclusivity
21   is to incentivize drug companies to challenge
22   patents and get cheaper generics on the market,
23   and in return the FDA or the regulations grant
24   this exclusivity period for the successful

Page 157

1  manufacturer.  Correct?
2      A.    So the goal of this is to bring
3  safe, affordable, high quality, lower cost
4  generics to the market and increase competition
5  in the marketplace.
6      Q.    By -- increase competition by
7  bringing in a generic product where previously
8  there has only been a brand?
9      A.    Right.  But only if they
10  challenge patents and are able to bring the
11  product to market before those patents expire.
12      Q.    Right.  Then after 180 days,
13  presumably any company can issue a generic
14  version of a drug after 180 days.  Right?
15      A.    Not any company.  You would have
16  to submit an application to the FDA and FDA would
17  have to find it, you know, approvable.
18      Q.    Right.  Approvable meaning it's
19  bioequivalent.  Right?
20      A.    Correct.
21      Q.    And the same label, too?
22      A.    But it's not only bioequivalent,
23  but yes.  It has to have the same label.  It has
24  to be -- you have to show that you can

Page 158

1  successfully manufacture the product and have the
2  proper controls in place.
3      Q.    Right.  But any manufacturer can
4  make that attempt at that point in time to get
5  approval, right, after the 180 days is up?
6      A.    Yes.
7      Q.    So then moving to the top of the
8  last page.  It says, "Post-marketing reporting
9  requirements for this abbreviated application are
10  set forth in 21 CFR 314.80-81 and 314.98.  The
11  Office of Generic Drugs should be advised of any
12  change in the marketing status of the drug."
13          So in your view, is Teva, when it
14  gets an ANDA approval by the FDA, that it must
15  adhere to the reporting requirements of Sections
16  314.80 to 81 and 314.98?
17          MS. HILLYER:  Objection to form.
18          THE WITNESS:  Yes.  So yes.  I'm
19  not certain what is specifically stated
20  in these sections of the CFR without
21  looking at them, but yes, this is what I
22  spoke to earlier about ensuring
23  compliance and filing annual reports, as
24  well as the pharmacovigilance team filing

Page 159

1          adverse event reports and what have you.
2  BY MR. CRAWFORD:
3      Q.    Right.  And that's what 80 and 81
4  do, one is dealing with pharmacovigilance
5  reporting and the other is annual reporting.
6  Right?
7      A.    I'm not certain.
8          MS. HILLYER:  Objection to form.
9          THE WITNESS:  I'm sorry.
10  BY MR. CRAWFORD:
11      Q.    I've got them here.  Let's mark
12  them and just confirm them.
13              - - -
14          (Deposition Exhibit No.
15      Teva-Tomsky-8, Code of Federal
16      Regulations Title 21, Section 314.80, 6
17      pages; Deposition Exhibit No.
18      Teva-Tomsky-9, Code of Federal
19      Regulations Title 21, Section 314.81, 8
20      pages; and Deposition Exhibit No.
21      Teva-Tomsky-10, Code of Federal
22      Regulations Title 21, Section 314.98, 4
23      pages, were marked for identification.)
24              - - -

Page 160

1  BY MR. CRAWFORD:
2      Q.    So while we're marking this,
3  we've marked Exhibit 8, 9 and 10, which are the
4  three sections mentioned.  And Section 8 is
5  314.80.  Exhibit 9 is 3. -- 314.81.
6          These are kind of dense, but, I
7  mean, you're head of regulatory, you're familiar
8  with these provisions generally.  Right?
9      A.    Yes.
10      Q.    And 314.80, correct me if I'm
11  wrong, concerns -- you'll agree with me, it
12  concerns reporting adverse events, say 15-day
13  reports, and then quarterly and eventually annual
14  reports on adverse events.  Right?
15          MS. HILLYER:  Hold on one second.
16          I have -- my 8 and 10 are the
17  same.
18          Are yours different?
19          THE WITNESS:  No, they're
20  different.
21          MS. HILLYER:  So my 8 is section
22  80.
23          MR. CRAWFORD:  Right.  That's
24  correct.

1    MS. HILLYER:  9 is 81.
2    MR. CRAWFORD:  That's correct.
3    MS. HILLYER:  I must have -- I
4  just have a duplicate.
5    THE WITNESS:  You don't have a
6  10.
7    MS. HILLYER:  I don't have a 10.
8    MR. CRAWFORD:  Do you have 10?
9    MS. HILLYER:  No.
10    THE WITNESS:  No.
11    MR. JENSEN:  So you're missing
12  98?
13    MS. HILLYER:  Yes.
14    MR. CRAWFORD:  We'll throw it up
15  on the board and blow it up.  And you can
16  have my copy.
17    MS. HILLYER:  This is yours?
18    MR. CRAWFORD:  Yes.
19  BY MR. CRAWFORD:
20    Q.    So Exhibit 8, 314.80, dealing
21  with periodic reporting and 15-day reports of
22  adverse events.  Correct?
23    MS. HILLYER:  Is it just a
24  two-pager?

1    You tell me, but I think you have
2  two copies right there.
3    MR. CRAWFORD:  Oh.  That would
4  explain it.
5    THE WITNESS:  I have two copies,
6  too.
7    MS. HILLYER:  The actual exhibit
8  is two copies, too, so do you want --
9  just for the record.
10    MR. CRAWFORD:  Okay.
11    MS. HILLYER:  Thank you.  You
12  gave me yours.
13    Do you care?
14    MR. CRAWFORD:  No, I don't.
15  BY MR. CRAWFORD:
16    Q.    So -- and then 314.81 is a
17  different type of report that has to be
18  submitted.
19    That's the annual report.  Right?
20    A.    314.81 talks about NDA field
21  alert reports, as well as annual reports.
22    Q.    All right.  So down at the bottom
23  of the first page, annual reports, so it's your
24  understanding that that's separate from the

1  reports that are submitted with regard to 314.80.
2  Right?
3    A.    Yes.
4    Q.    And does Teva, is it its practice
5  to submit both the periodic and 15-day reports in
6  314.80, and also submit separately the annual
7  reports called for in 314.81?
8    A.    Yes.
9    Q.    And then 314.98 I think is a
10  provision that indicates both .80 and .81 are
11  applicable to ANDA holders or generics.  Right?
12  And we're looking at Exhibit 10.
13    A.    Yes.
14    Q.    All right.  So let's look at
15  Exhibit 9, which is the annual reports.
16    And this is applicable to both
17  generic and brand manufacturers, this section.
18  Right?
19    A.    Which section?
20    Q.    314.81.
21    A.    But which section?
22    Q.    Well, the entire section.
23    Both brands and generics have to
24  comply with the provisions of 314.81.  Right?

1    A.    So I can tell you, not
2  necessarily.
3    So if you look in 314.81(2)(vi),
4  for example, it talks about clinical data and (v)
5  talks about nonclinical data.  That information
6  isn't submitted in an ANDA annual report.
7    Q.    All right.  So that's starting on
8  page 3, about three paragraphs down.  Right?
9    A.    Yes.
10    Q.    So that's something that is not
11  generally submitted within a generic annual
12  report.  Right?
13    A.    Correct.  And even -- yes, yep.
14  Those two, (v) and (vi).
15    Q.    But above that, are there any --
16  the provisions above that are applicable to
17  generics and brands.  Right?
18    A.    Distribution data, summary,
19  labeling.  Distribution talks about authorized
20  generics, so I guess there could be a case where
21  a generic is allowing another manufacturer to
22  distribute a generic under their label.
23    Q.    Good point.
24    A.    I think it's very rare, but...

Page 165

1    Q.   Okay.  So you're saying (ii)(b)
2  might not apply to all generics.  It certainly
3  doesn't apply to a brand.  It's just a section
4  applicable to an authorized generic.  Right?
5    A.   Well, it would -- it would apply
6  to a brand.
7    Q.   Okay.
8    A.   And I guess some generics may
9  choose to distribute or allow another company to
10  distribute under their ANDA.  I'm sure it
11  happens.
12    Q.   So when you have -- when you have
13  an authorized generic, do you have to have an
14  ANDA number for the authorized generic drug that
15  you distribute, or do you just go under the NDA
16  number of the brand?
17    A.   So if you have an authorized
18  generic that's being distributed under an NDA, it
19  would all be associated with that NDA number.
20  But I'm saying I can foresee an example of when
21  an ANDA applicant also may choose, for some other
22  reason, to allow another manufacturer to
23  distribute under the ANDA an authorized generic.
24    Q.   So I'm trying to understand.

Page 166

1    Is there -- they might have an
2  ANDA for the same drug, just simply be an
3  authorized generic because the brand is making it
4  for that generic company?
5    A.   I'm not sure I understand what
6  you just said.
7    Q.   All right.  I'm just -- you were
8  talking about another generic manufacturer under
9  an ANDA that's for an authorized generic.  I
10  didn't understand that.
11    A.   So we spoke about an authorized
12  generic as it relates to an NDA, how they would
13  maybe supply the product to a generic company and
14  a generic company would give the brand company
15  its label to put on the NDA product.  So it would
16  be sold as an authorized generic.  Correct?
17    Q.   Right.
18    A.   So then there's another case that
19  I can foresee where an ANDA holder --
20    Q.   Of what?
21    A.   I'm sorry?
22    Q.   An ANDA holder of what?
23    A.   Of any product.
24    Q.   Okay.

Page 167

1    A.   Say -- I don't know, say
2  ibuprofen, for example.  Say I, Scott Tomsky,
3  have an ANDA for ibuprofen.  I may choose to say,
4  hey, here you go.  If you want to put your label
5  and distribute product under my ANDA, so that
6  could technically be an authorized generic as
7  well.
8    Q.   So a generic authorizing another
9  generic company to make its product under its
10  ANDA?
11    A.   So again, that other company
12  wouldn't make the product, it would just simply
13  put its label on the product that's being made
14  under the ANDA.
15    Q.   Got it.
16    Okay.  Going back to 314.81,
17  "Applicability."
18    It says, "Each applicant shall
19  make the reports for each of its approved
20  applications and abbreviated applications
21  required under this section and Section 505(k) of
22  the act."
23    (b) is "Reporting requirements.
24  The applicant shall submit to the Food and Drug

Page 168

1  Administration at the specified time two copies
2  of the following reports."
3    And skipping down to the bottom
4  of page 1 to 2, "Annual report."  It says, "The
5  applicant shall submit each year within 60 days
6  of the anniversary date of U.S. approval" --
7  again, that was the 60 days you referenced
8  earlier.  Right?
9    A.   That's correct.
10    Q.   -- "of the application, two
11  copies of the report to the FDA division
12  responsible for reviewing the application.  Each
13  annual report is required to be accompanied by a
14  completed transmittal Form FDA 2252 (Transmittal
15  of Periodic Reports for Drugs for Human Use), and
16  must include all the" relevant "information" --
17  "all the information required under this section
18  that the applicant received or otherwise obtained
19  during the annual reporting interval that ends on
20  the U.S. anniversary date.  The report is
21  required to contain in the order listed," colon.
22    So the first item is "Summary."
23  And it's required to provide "A brief summary of
24  significant new information from the previous

Page 169

1    year that might affect the safety, effectiveness,
2    or labeling of the drug product. The report is"
3    require -- "also required to contain a brief
4    description of actions the applicant has taken or
5    intends to take as a result of this new
6    information."
7           So are your annual reports as,
8    again, a business practice, do they contain this
9    summary that's just described in subdivision (i)?
10       A.   So an ANDA annual report will
11   contain a summary of new information related to:
12   If there was any changes to the approved
13   specification, if there was changes to any of the
14   manufacturing batch records, if there was a
15   supplement that was filed maybe to add another
16   API source that we talked about. Anything like
17   that.
18          So it would contain a summary,
19   but not necessary a summary of safety
20   information, which is stated here.
21       Q.   Why wouldn't it contain that?
22       A.   Because ANDAs aren't required to
23   generate safety or efficacy data.  That's only a
24   requirement of NDAs.

Page 170

1        Q.   What if the ANDA holder becomes
2    aware that its generic drugs are being abused or
3    misused, say in the case of an opioid, during
4    that one-year period, and that maybe the label
5    isn't -- and the doctors aren't properly
6    prescribing the drug.
7           Is that something that you feel
8    Teva would be required to put into its annual
9    report?
10          MS. HILLYER:  Objection to form.
11          THE WITNESS:  Can you break down
12       your question for me, please?
13   BY MR. CRAWFORD:
14       Q.   Okay.  So let's say Teva became
15   aware during that annual period that, say, its
16   generic OxyContin was being misprescribed and
17   abused and misused by patients to become addicted
18   or -- would -- and they became aware of that
19   information during that period.
20          Is that something that you feel
21   that Teva would be required to report in its
22   annual report?
23          MS. HILLYER:  Objection to form.
24          THE WITNESS:  So I can say from

Page 171

1        an ANDA perspective, generic applicants
2        primarily in their annual reports provide
3        a summary of the chemistry, manufacturing
4        and control changes, which is what I
5        described earlier, any changes that are
6        made during the reporting period as it
7        relates to anything that's already
8        approved in the application.
9           The scenario that you described I
10       would think would be something that would
11       be included in the other type of
12       reporting that we looked at in 314.80,
13       possibly.  But it's nothing that would be
14       submitted in a drug product annual report
15       like this for an ANDA.
16   BY MR. CRAWFORD:
17       Q.   But wouldn't knowledge about
18   abuse of its drug and misuse be information that
19   might affect the safety of the generic product?
20       A.   Again, I'm not certain.  Again,
21   what I'm saying is, in my years of doing
22   regulatory affairs and ANDAs, the information
23   that's required to be submitted in an ANDA annual
24   report pertains to the summary of the chemistry

Page 172

1    and manufacturing changes for a product.
2        Q.   But isn't the purpose of this
3    section to alert the FDA that there's a problem
4    with the safety of the drug or how it's being
5    prescribed so they could potentially or with the
6    manufacturer take corrective action?
7           MS. HILLYER:  Objection to form.
8           THE WITNESS:  No, that has not
9        been my experience.
10   BY MR. CRAWFORD:
11       Q.   And it does say that the report
12   is also required to contain a brief description
13   of actions the applicant has taken or intends to
14   take as a result of this new information.
15          So wouldn't you agree with me
16   that if, say, for the generic OxyContin, if that
17   was marketed prior to a REMS approval, and the
18   company became aware that a drug was being
19   misused or abused or misprescribed, say in the
20   case of an opioid drug, wouldn't, one, Teva be
21   required to report that in an annual report and
22   also report corrective steps it was taking?
23          MS. HILLYER:  Objection to form.
24          THE WITNESS:  So no, again, what

Page 173

1    I'm saying is that in my experience, in
2    my communications with FDA, is the
3    expectation that an ANDA applicant in its
4    annual report file changes related to the
5    chemistry and manufacturing controls.
6    And what that previous section was
7    talking about what would be what's
8    covered in Section 314.81(b)(1), which
9    talks about NDA field alerts, ANDA field
10   alert.
11       So if you receive a product
12   complaint with respect to maybe a product
13   not working or somebody didn't have
14   enough tablets in their bottle or maybe
15   the wrong imprint code was found in a
16   bottle, that's when it would trigger an
17   NDA field alert to be filed, and those
18   are the types of summary and information
19   that would be included in this annual
20   report.
21   BY MR. CRAWFORD:
22       Q.    And what section is that here?
23   Can you point that out?  You've mentioned it,
24   but it's --

Page 174

1        A.    I'm sorry, it's 314.81(B)(1), NDA
2    field alert.
3        Q.    And so what page is this on?
4        A.    It's on the first page.
5        Q.    So basically the field alert
6    report would be information concerning any
7    incident that causes the drug or its labeling to
8    be mistaken for or applied to another article.
9            So that's like a mistaken use of
10   the drug, they think it's some other drug or
11   something?
12       A.    So -- correct.  It could be that
13   somehow the wrong label was put on the product or
14   there was an error in the label that was on the
15   product.  So those are the type of events that
16   would have to be reported to FDA in a field
17   letter and then summarized again in the annual
18   report.
19       Q.    And then the second thing is,
20   "Information concerning any bacteriological
21   contamination, or any significant chemical,
22   physical, or other change or deterioration in the
23   distributed drug product, or any failure of one
24   or more distributed batches of the drug product

Page 175

1    to meet the specification established for it in
2    the application."
3            So that's concerning really
4    contamination or a defective batch of product.
5    Right?
6        A.    Right.  So that's talking about
7    if a patient receives a product and they look at
8    it and it turned brown and it's supposed to be
9    white.  Or if the manufacturing company had -- it
10   runs routine stability reports.  So if it ran a
11   report and it received a result that was outside
12   of the approved specification.  Those, again, are
13   instances that would trigger a field alert and
14   that type of information would be summarized in
15   this section.
16       Q.    Right.  And that has to be done
17   within three days.  Right?
18       A.    So the field alert needs to be
19   filed within three days.  But then the annual
20   report would capture a summary of any field
21   alerts that were filed within that one-year
22   reporting period that the annual report is
23   covering.
24       Q.    Right.  But that doesn't really

Page 176

1    cover the situation I'm talking about, you'd
2    agree, about Teva becoming knowledgeable that its
3    drug is being abused or misused or misprescribed
4    that's leading to addiction or some kind of
5    safety issue like that.  Right?
6            MS. HILLYER:  Objection to form.
7            THE WITNESS:  Again, the scenario
8        you described is not covered in ANDA
9        annual reports.
10   BY MR. CRAWFORD:
11       Q.    But it does say, you agree with
12   me, the summary is supposed to provide a summary
13   of significant new information from the previous
14   year that might affect the safety, effectiveness
15   or labeling of the drug product.  Right?
16           Are generic companies exempt from
17   that in any way?
18           MS. HILLYER:  Objection to form.
19           THE WITNESS:  So what I'm
20       saying -- so what I'm saying is yes, this
21       section of the regulation is for both
22       NDAs and ANDAs.  And there are different
23       responsibilities for NDA applicants
24       versus ANDA applicants.  And in my

1      experience in working with FDA and in the
2      industry for over 20 years, there's never
3      been a requirement in ANDA annual
4      reports, and nor is it FDA's expectations
5      that any safety or efficacy information
6      is reported in an ANDA annual report.
7      That is left to the NDA holder.
8  BY MR. CRAWFORD:
9      Q.   What about a name brand drug, if
10 they become aware of a safety issue with regard
11 to abuse or misuse in the prior year, would they
12 be expected, in your view as a regulatory person
13 with regulatory experience, to report that in
14 their annual report?
15      MS. HILLYER:  Objection to form,
16      calls for speculation, to the extent it's
17      outside of his purview.
18      THE WITNESS:  Yeah.  Again, I am
19      not certain.  I've worked in the generic
20      industry for 99 percent of my career.
21 BY MR. CRAWFORD:
22      Q.   All right.  So where -- is there
23 a written guidance or -- from the FDA or anything
24 in writing that you can point to that generic

1  manufacturers don't have to report the type of
2  safety information example I gave to you on abuse
3  and misuse?
4      A.   I'm not aware of anything
5  written.  I know I've specifically had
6  conversations with FDA about this when I was at
7  Ranbaxy.
8      Q.   Ranbaxy.
9           How about at Teva?
10     A.   No.
11     Q.   And who is the person at the FDA
12 you had the conversation with?
13     A.   His name was Peter Rickman.
14     Q.   And what was his position?
15     A.   He was a director in the Office
16 of Generic Drugs.
17     Q.   And is there anything in writing?
18 Did he confirm this in email or did you confirm
19 it in any kind of report with Ranbaxy?
20     A.   Not that I recall.
21     Q.   What was the context of when it
22 was raised?
23     A.   It was, again, confirming what
24 information had to be filed in an annual report.

1  I don't know how it came up.  There was some
2  discussion that was going on within the company
3  about what needed to be filed in an ANDA versus
4  an NDA annual report.  And, clearly, the clinical
5  and safety information.
6      Q.   But he said you don't have to
7  report any safety information other than the
8  clinical and safety information?
9      MS. HILLYER:  Objection to form.
10 BY MR. CRAWFORD:
11     Q.   I'm just trying to understand.
12          What did he tell you, you didn't
13 have to report that or just simply told you that
14 you had to report the clinical information?
15     A.   He said that the safety and
16 efficacy information is not applicable to an
17 ANDA.
18     Q.   Did he give a reason for that?
19     A.   No.  It's been a long-standing
20 position from the agency.
21     Q.   But it's never been put in
22 writing, as far as you're aware?
23     A.   Not that I'm aware of.
24     Q.   Did you hear it from anyone else

1  at the FDA that you didn't have to put this
2  information in an ANDA?
3      A.   No.  I spoke with him.
4      Q.   Just Mr. Rickman?
5      A.   Correct.
6      Q.   How many occasions did he tell
7  you this?
8      A.   It was one conversation that I
9  had with him.
10     Q.   Okay.  And was it -- was there a
11 specific safety issue that you ran by him about
12 whether you had to put it in or not?
13     A.   No.
14     Q.   It was just a general question?
15     A.   Correct.
16     Q.   All right.  The next section,
17 (ii)(a), "Distribution data," it says,
18 "Information about the quantity of the drug
19 product distributed under the approved
20 application, including that distributed to
21 distributors.  The information is required to
22 include the National Drug Code (NDC) number, the
23 total number of dosage units of each strength or
24 potency distributed (e.g., 100,000 over

Page 181

1    5 milligram tablets, 50,000 over 10 milliliter
2    vials), and the quantities distributed for
3    domestic use and the quantities distributed for
4    foreign use.  Disclosure of financial or pricing
5    data is not required."
6            Is that something that Teva,
7    through its normal business practices, includes
8    in its annual reports for its ANDAs?
9        A.   Yes.  Distribution data.
10       Q.   And who currently at Teva is
11   responsible for collecting this information and
12   putting it in the annual reports?
13       A.   So the regulatory team would
14   collect that from the supply chain and commercial
15   marketing team.
16       Q.   The regulatory team being the one
17   putting the annual report together?
18       A.   Yes.  But it -- it's collected --
19   I believe it's collected in the US, and then that
20   information is given to the team in India.
21       Q.   And where in the US is it
22   collected from?  What department?  I mean, from
23   all the charts we went through, does that -- do
24   you remember where that responsibility lies?

Page 182

1        A.   So I believe it's Jill Pastore
2    would still collect that data and then save it on
3    the shared drive and make it available to the
4    team in India.
5        Q.   And then these annual reports, if
6    you wanted to get a copy of an annual report, can
7    you personally go on the shared drive and pull it
8    up, or how do you get them for a drug?
9        A.   Yes, yes.
10       Q.   Do you just look up the drug and
11   there's a folder or a search pulls them up or
12   something?
13       A.   Yes.  I would search by the name
14   of a product or an ANDA number.
15       Q.   I would love to have an example,
16   but we have trouble finding them in the document
17   production, so I don't have an example to show
18   you, so we'll talk about it.  Either I can't find
19   them or they're not there, so --
20           MS. HILLYER:  I think we offered
21       to give you samples and told you to
22       follow up with us on which ones you
23       wanted samples of, and then you never
24       did.

Page 183

1            MR. CRAWFORD:  Well, I definitely
2    want them.
3            So, but let's --
4            MS. HILLYER:  I think we're a
5    little past that timeline.
6            MR. CRAWFORD:  Got it.
7            MS. HILLYER:  But we can talk
8    about that offline.
9            MR. CRAWFORD:  Understood.
10   BY MR. CRAWFORD:
11       Q.   Okay.  So the next section is
12   "Authorized generic drugs."  We kind of went
13   through that.  It says, "If applicable, the date
14   each authorized generic drug (as defined in...
15   314.3) entered the market, the date each
16   authorized generic drug ceased being distributed,
17   and the corresponding trade or brand name."
18           So that's a section that you
19   would fill out only if you were an authorized
20   drug.  Right?
21       A.   Only if you were distributing an
22   authorized generic under that application.
23       Q.   Right.  So -- so this -- so
24   basically, I'm just trying to understand.

Page 184

1            So if you were an authorized
2    generic, if Teva was, and -- from some brand, my
3    understanding of what an authorized generic is,
4    is that brand is making the drug and it's being
5    distributed by the generic under their name.
6    Right?
7        A.   Yes.
8        Q.   Does that generic have to file an
9    annual report for that?
10       A.   No.
11       Q.   That's filed by the brand?
12       A.   Correct.
13       Q.   And then this section would be
14   filled out by the brand?
15       A.   Correct.
16       Q.   All right.  And then third is,
17   "Labeling.  Currently used professional labeling,
18   patient brochures or package inserts (if any),
19   and a representative sample of the package
20   labels."
21           That is also included in these
22   annual reports as a practice.  Right?
23       A.   Yes.
24       Q.   All right.  That's all I have on

Page 185

1  those, but let's go back to Exhibit 7, which is
2  the approval package for the generic OxyContin.
3          Let's go to the label, which is a
4  couple of pages afterwards, under "Final printed
5  labeling."
6          So is this the label that was
7  approved for Teva in this package for this
8  generic OxyContin.
9          In your professional career of
10  seeing these approvals, is this generally how it
11  comes back to you?
12      A.    Yes, it appears to be.
13      Q.    And so this would be taking --
14  taking a look at the last page of the label, it
15  says, "Manufactured by Teva Pharmaceuticals USA."
16          So this would be Teva's label
17  dated June of '03.  Right?
18      A.    Yes.
19      Q.    All right.  And then again, to be
20  a generic drug, you're -- this is called -- when
21  it's approved, it's called the approved label.
22  Right?  Is that kind of a term of art, approved
23  label?
24      A.    Yes.

Page 186

1      Q.    And then there's other labeling,
2  too.  It's not necessarily a term of art,
3  approved label.
4          It could be considered labeling,
5  an advertisement or a "Dear Doctor" letter or
6  something.  Right?
7          MS. HILLYER:  Objection to form.
8          THE WITNESS:  It's possible.
9  BY MR. CRAWFORD:
10      Q.    Do you refer to those as approved
11  labels?
12      A.    I'm not sure I understand your
13  question.
14      Q.    Do you refer to an advertisement
15  as an approved label?
16      A.    No.  An advertisement would be
17  based on the approved labeling.
18      Q.    But it's still considered
19  labeling, because it has information about the
20  drug.
21          MS. HILLYER:  Objection to form.
22  BY MR. CRAWFORD:
23      Q.    Technically.  Correct?
24      A.    Generally speaking, it would be

Page 187

1  accompanied by the approved label as well.
2      Q.    Is a "Dear Doctor" letter, is
3  that considered technically labeling?
4          MS. HILLYER:  Objection to form.
5          THE WITNESS:  I don't know.  I
6      mean "Dear Doctor" letters aren't used on
7      the generic side, typically.  It's only
8      something that would be used on a branded
9      side.
10  BY MR. CRAWFORD:
11      Q.    Can a generic manufacturer send
12  out a "Dear Doctor" letter about a drug, in your
13  view?
14          MS. HILLYER:  Objection.
15      Objection to form, calls for a legal
16      conclusion.
17          THE WITNESS:  Yeah.  I'm not
18      certain.  I don't think it's ever been
19      done that I'm aware of.
20  BY MR. CRAWFORD:
21      Q.    Do you know if there's any
22  regulatory restriction precluding a generic drug
23  manufacturer from sending out a "Dear Doctor"
24  letter?

Page 188

1          MS. HILLYER:  Same objection.
2          THE WITNESS:  I'm not certain.
3  BY MR. CRAWFORD:
4      Q.    Can a generic drug company
5  communicate information to doctors about its
6  generic drugs consistent with its approved label?
7          MS. HILLYER:  Objection to form.
8          THE WITNESS:  Can you repeat your
9      question again?  Sorry.
10  BY MR. CRAWFORD:
11      Q.    Can a generic drug company
12  communicate information to doctors about its
13  generic drugs consistent with its approved label?
14      A.    I think so, but I don't know any
15  generic companies that have a sales team for
16  generics.
17      Q.    Do they have safety teams,
18  generic drug companies?
19          MS. HILLYER:  Objection to form,
20      calls for speculation.
21          THE WITNESS:  Yeah.  I'm not sure
22      what you mean by that.
23  BY MR. CRAWFORD:
24      Q.    Well, anyone in charge of safety,

Page 189

1    if there's a safety issue or a danger that comes
2    out, is there any kind of dedicated person
3    designed or that's -- that exists within Teva,
4    their generic side, to --
5            A.   I think what you're describing
6    is --
7            Q.   -- address those issues?
8            A.   Sorry.  I think what you're
9    describing is something that would be managed by
10   the pharmacovigilance team.
11           Q.   What if the company became aware
12   that its drug, its generic opioid products were
13   being abused or misused by doctors, and the
14   doctors did not appear to understand the proper
15   use of the drug or the safety risks with regard
16   to abuse and addiction, is it your view under the
17   regulations that Teva could send a "Dear Doctor"
18   letter or other information consistent with the
19   label to remind doctors how to properly use the
20   drugs and about its risks?
21           MS. HILLYER:  Objection to form.
22           THE WITNESS:  Yeah.  Again, I'm
23       not certain, especially for this class of
24       drugs, which already has a approved risk

Page 190

1    evaluation and mitigation strategy.
2    That's the whole goal, is to make sure
3    that there's proper balance of the
4    benefit/risk ratio and that the doctors
5    who are prescribing the products know how
6    to prescribe them and the patients that
7    are using them know how to use them and
8    so forth.
9    BY MR. CRAWFORD:
10           Q.   Right.  So that's one of the
11   objectives of a REMS program.  Right?
12           A.   Correct.
13           Q.   Is for doctors to know how to
14   properly use the drugs and what the risks are.
15   Right?
16           A.   Correct.
17           Q.   But before, for some of these
18   drugs, when this generic OxyContin was approved,
19   for instance, there was no REMS program for it.
20   Correct?
21           A.   I'm not certain.
22           MS. HILLYER:  Objection to form.
23           THE WITNESS:  Yeah.  I'm not
24       certain.  The timeline's really meshed

Page 191

1        together for me.
2    BY MR. CRAWFORD:
3            Q.   Well, REMS only came into effect
4    in 2007 when the FDA could require.  Right?
5            A.   Well, single shared REMS became
6    effective in 2007.  I'm not certain if there was
7    other REMS that were in effect prior to that.
8            Q.   Right.  I think under subpart H,
9    the FDA could require a risk management plan,
10   which is kind of a precursor, but only as part of
11   the approval process.  Right?
12           A.   For a brand product.  Correct.
13           Q.   Well, for generic products, too.
14   Right?
15           A.   Yeah.  Again, that's something
16   I'm not very familiar with.
17           Q.   REMS can apply and do apply to
18   generics.  Right?
19           A.   Yes.
20           Q.   And in fact, the current REMS in
21   place for the transmucosal opioid products and
22   the extended release and the immediate release
23   products all have REMS programs.  Right?
24           A.   I believe so, yes.

Page 192

1            Q.   And those apply to all generics
2    in those categories.  Right?
3            A.   Yes.
4            Q.   So my question is, is prior to
5    these REMS programs, which are mandatory.  Right?
6            A.   Right.
7            Q.   And each company submits its own
8    REMS consistent with what the FDA wants for the
9    class.  Right?
10           A.   So each company has to submit the
11   approved REMS -- the FDA approved REMS to its
12   application.  Yes.
13           Q.   That has to get approved as being
14   in conformity with what they want.  Right?
15           A.   Yes.
16           Q.   So before REMS were required, the
17   immediate release, for instance, didn't have a
18   REMS until 2018.  Right?
19           A.   I'm not --
20           MS. HILLYER:  Objection to form,
21       calls for speculation.
22           THE WITNESS:  Yeah.  I'm not
23       certain.
24   BY MR. CRAWFORD:

Page 193

1    Q.    But recently.  Right?
2    A.    I'm not certain on the timelines.
3    Q.    So before the approval of --
4  Teva's got immediate release opioid products they
5  sell.  Right?
6    A.    I believe so.
7    Q.    Okay.  So before the approval of
8  the REMS, and my question is, is could Teva, is
9  there anything in the regulations that would have
10  prohibited Teva from communicating with doctors
11  if they became aware that doctors may not have
12  been aware of the risks of opioid products or
13  they were using Teva products or -- or proper
14  use, that Teva could communicate with doctors
15  consistent with its label, safety and use
16  information?
17    MS. HILLYER:  Objection to form.
18    THE WITNESS:  If you could break
19    that down for me.
20  BY MR. CRAWFORD:
21    Q.    Okay.  So you mentioned REMS.
22  I'm trying to find out like before the REMS.
23    Immediate release had the REMS
24  program in 2018, I'll represent.

Page 194

1    So before REMS was issued, and
2  before a drug was subject to it, could a generic
3  drug company like Teva communicate with doctors
4  about safety information concerning its products,
5  as long as it's consistent with its approved
6  label?
7    MS. HILLYER:  Objection to form
8    on multiple levels, and assumes facts not
9    in evidence is one of them.
10    THE WITNESS:  That's just not the
11    typical practice.  I mean, a generic
12    company doesn't communicate with
13    physicians.  A generic company makes
14    available the products based on an NDA
15    and a brand product.
16    So the generic companies
17    aren't -- don't have salespeople.
18    They're not going out and talking to
19    doctors.  They're writing -- I mean,
20    they're manufacturing products.  And in
21    some cases, physicians will prescribe a
22    brand, but if there's a generic
23    available, it gets substituted either by
24    an insurance company or a pharmacy.  So

Page 195

1    generic companies don't go out and speak
2    to doctors.
3  BY MR. CRAWFORD:
4    Q.    So -- but if a generic company
5  becomes aware that its products are being
6  misprescribed or misused, who is going to tell
7  the doctor?  Whose responsibility is it then if
8  it's not the generic company's?
9    MS. HILLYER:  Objection to form.
10    THE WITNESS:  I'm not certain
11    what you're asking.  I mean, I think the
12    FDA has oversight over the, you know, the
13    drugs that are approved in the United
14    States and they have postmarketing
15    responsibility -- I mean, they put
16    postmarketing responsibility on the brand
17    companies, and FDA is aware of the same
18    information.  So generic companies would
19    rely on the FDA to make such decisions,
20    if there is additional steps which are
21    required.  In this case, assuming that's
22    why the REMS were put in place.
23  BY MR. CRAWFORD:
24    Q.    What if the FDA doesn't know?  I

Page 196

1  mean, isn't the manufacturer primarily
2  responsible for the safety of its product?
3    MS. HILLYER:  Objection to form.
4  BY MR. CRAWFORD:
5    Q.    Or is it the FDA that's primarily
6  responsible for the safety of generic products?
7    A.    Sorry, can you repeat your
8  question?
9    Q.    Who's responsible for the safety
10  of generic products?  Is it the generic
11  manufacturer that makes them or is it the FDA?
12  Or is it the brand?
13    MS. HILLYER:  Objection to form.
14    THE WITNESS:  I mean, FDA is
15    responsible for approving safe and
16    effective generic drugs.  And
17    manufacturers are responsible for
18    manufacturing safe and effective generic
19    drugs.
20  BY MR. CRAWFORD:
21    Q.    Right.  So -- but what if, after
22  it's approved by the FDA, it turns out that the
23  doctors aren't using the drugs, the generic drugs
24  safely, they're overprescribing it or they don't

Page 197

1  understand the safety risks.
2          Who's responsible for
3  communicating with the doctors, in your view, the
4  proper use and safety of the drug?
5          MS. HILLYER: Objection to form.
6          THE WITNESS: Each generic
7      company is going to have the same
8      information available to them that the
9      FDA would have available to them. FDA
10     would have the ability to see what's
11     happening. And FDA would be the one to
12     make such decisions, which again, in this
13     case, I believe they did in putting a
14     risk evaluation and mitigation strategy
15     in place.
16  BY MR. CRAWFORD:
17     Q.   Do you believe there's an opioid
18  epidemic right now?
19     A.   I'm not sure I have an opinion on
20  it.
21     Q.   There's certainly an opioid --
22  some kind of opioid crisis going on.
23          You understand that. Right?
24     A.   I think there's an issue with

Page 198

1  misuse of opioids. But I think if opioids are
2  prescribed properly by physicians and used
3  properly by patients and, you know, prescriptions
4  are filled by a licensed pharmacist, then they
5  are safe and effective as long as they're used
6  according to the approved label that FDA has
7  approved.
8      Q.   And at what point did you
9  personally become aware that they weren't being
10  properly used?
11          MS. HILLYER: Objection to form.
12          THE WITNESS: I don't have any
13      personal recollection of when.
14  BY MR. CRAWFORD:
15     Q.   What if the company became aware
16  they were being improperly used before the FDA
17  learned it? Who's responsible for telling the
18  FDA, one, and then who's responsible for trying
19  to correct it at that point in time?
20          MS. HILLYER: Objection to form.
21          THE WITNESS: Can you repeat your
22      question, please?
23  BY MR. CRAWFORD:
24     Q.   Yeah.

Page 199

1          So if the company learns about an
2  abuse or misuse problem with its opioids, a
3  generic drug company, who's responsible -- and
4  the FDA doesn't know about it yet, who's
5  responsible for alerting the FDA? First of all,
6  let's break it down.
7          Shouldn't the generic company
8  alert the FDA in its annual report on that safety
9  issue, whether it knows it or not?
10          MS. HILLYER: Objection to form.
11          THE WITNESS: How would the
12      company become aware of that information?
13  BY MR. CRAWFORD:
14     Q.   Because the company -- I mean,
15  the company -- the company sells the drug.
16  Right?
17     A.   Okay. The company sells the
18  drug, yes.
19     Q.   Right. So it's -- the company is
20  currently aware that there's an opioid crisis.
21  Right?
22     A.   How would --
23          MS. HILLYER: Objection to form.
24          THE WITNESS: So how would the

Page 200

1      company become aware that there was
2      misuse and abuse with its product?
3  BY MR. CRAWFORD:
4      Q.   Didn't the company try to develop
5  or want to develop an abuse-deterrent opioid?
6  You were involved in that. Right?
7          MS. HILLYER: Objection to form.
8          THE WITNESS: I wasn't involved
9      in the development of abuse-deterrent
10     opioids.
11  BY MR. CRAWFORD:
12     Q.   Right. But you were involved in
13  at least thinking about it from a regulatory
14  standpoint and getting them approved. Right?
15  You gave a talk on it. Right?
16          MS. HILLYER: Objection to form.
17          THE WITNESS: I didn't give a
18      talk on abuse-deterrent opioids.
19  BY MR. CRAWFORD:
20     Q.   I thought you did, with regard to
21  the difficulties in getting them approved.
22  Right?
23     A.   That's incorrect.
24     Q.   What was your talk about?

Page 201

1    A.   My talk was about GDUFA and other
2  barriers.  And I think you're referring to Gregg
3  DeRosa's talk.
4    Q.   Yeah, DeRosa.
5       But you were present for Mr.
6  DeRosa's talk.  Right?
7    A.   I was present, yes.
8    Q.   So you knew the company was
9  developing abuse-deterrent opioids.  Right?
10   A.   Okay.
11   Q.   So at some point the company must
12  have known that opioids were being abused.
13  Right?
14       MS. HILLYER:  Objection to form.
15       THE WITNESS:  As well as FDA.
16  BY MR. CRAWFORD:
17   Q.   Okay.  But I'm just asking at
18  some point the company knew.  Maybe it knew
19  before the FDA knew.  Correct?
20       MS. HILLYER:  Objection to form.
21       THE WITNESS:  But maybe it didn't
22    know before the FDA knew as well.
23  BY MR. CRAWFORD:
24   Q.   So my hypothetical is, if the FDA

Page 202

1  did know before -- or the company knew of the
2  abuse of its opioids that is selling in the
3  marketplace before the FDA, shouldn't it at least
4  put that in its annual report, that there's a
5  safety issue out there?
6       MS. HILLYER:  Objection to form.
7       THE WITNESS:  Again, we follow
8    the requirements and we submit to FDA
9    what's required to be submitted.  The
10    scenario that you're talking about
11    just -- it hasn't happened and I've never
12    thought about it before and I don't have
13    an opinion on it.
14  BY MR. CRAWFORD:
15   Q.   So don't you think, when the FDA
16  tells you in the approval letter that you're
17  supposed to follow 314.81, and 3148.1 -- .81
18  requires the company to report any safety issues
19  that comes up during a year, you're saying that
20  they don't have to put that in with regard to a
21  knowledge of an opioid abuse?
22       MS. HILLYER:  Objection to form.
23       THE WITNESS:  Again, I think as
24    we explained in pretty great detail

Page 203

1       there, 314.80 and 314.81 are common for
2       both NDAs and ANDAs and there are certain
3       requirements for NDAs that aren't
4       expected or required to be submitted for
5       ANDAs.
6  BY MR. CRAWFORD:
7    Q.   And that's your belief?
8    A.   Correct.
9    Q.   And so if the company becomes
10  aware that doctors aren't properly prescribing
11  their products, regardless of whether the FDA
12  knows or not, if there's no REMS out there,
13  shouldn't the company at least send something out
14  or try to educate doctors in the proper use of
15  their drugs?
16       MS. HILLYER:  Objection to form.
17       THE WITNESS:  Yeah.  I mean,
18    again, how would the company become aware
19    of such information?
20  BY MR. CRAWFORD:
21   Q.   They are aware that their
22  products are being abused.  Right?
23       MS. HILLYER:  Objection to form.
24  BY MR. CRAWFORD:

Page 204

1    Q.   We just went through that,
2  because they're making an abuse-deterrent opioid.
3  Right?
4       MS. HILLYER:  Objection to form.
5       THE WITNESS:  We just went
6    through that.  But I also said that when
7    the products are used according to their
8    prescribed labeling, when their
9    prescriptions are written properly by the
10    doctor, they're used properly by the
11    patients and they're distributed and
12    dispensed by a licensed pharmacist, that
13    they're used effectively.  So FDA is
14    aware of the same information that
15    companies are aware now about the misuse
16    and illegal drug use of these products.
17  BY MR. CRAWFORD:
18   Q.   So -- but you're saying if used
19  properly.
20       You know that they're not
21  being -- the company knows they're not being used
22  properly.  Right?
23       MS. HILLYER:  Objection to form.
24       THE WITNESS:  When they're --

Page 205

1      when they're obtained illegally and not
2      used according to the label, but that's
3      not why Teva would make a product or
4      other manufacturers do.  They make
5      products because FDA has determined them
6      to be safe and effective.  They're a very
7      effective treatment for people who need
8      management of pain for these types of
9      things.
10  BY MR. CRAWFORD:
11     Q.   So once -- when Teva learned that
12 their products are being abused, don't they --
13 doesn't the company have some obligation to go
14 out and try to tell doctors how to properly use
15 their products?
16     MS. HILLYER:  Objection to form.
17  BY MR. CRAWFORD:
18     Q.   In your view?
19     MS. HILLYER:  Objection to form.
20     And now asked and answered about four
21     times.
22     THE WITNESS:  I'm not sure what
23     else I could say further on this.
24  BY MR. CRAWFORD:

Page 206

1     Q.   Is there any -- in your view, as
2 a person who has been in the regulatory industry
3 over 20 years, that there's any regulatory
4 prohibition for a drug -- for a generic
5 manufacturer to go out, you know, when there's no
6 REMS, to go out and educate doctors in the proper
7 use of their drugs?
8     A.   I'm not certain.
9     MS. HILLYER:  Objection to form.
10     We've been going about an hour.
11     MR. CRAWFORD:  Do you want to
12 take a quick break?
13     MS. HILLYER:  Sure.
14     MR. CRAWFORD:  All right.
15     THE VIDEOGRAPHER:  Off the
16     record, 1:38.
17        - - -
18     (A recess was taken from
19 1:38 p.m. to 1:49 p.m.)
20        - - -
21     THE VIDEOGRAPHER:  We are back on
22 the record at 1:49.
23        - - -
24     (Deposition Exhibit No.

Page 207

1     Teva-Tomsky-11, Letter dated December 6,
2     2005, 4 pages, was marked for
3     identification.)
4        - - -
5     MS. HILLYER:  This is 11.
6  BY MR. CRAWFORD:
7     Q.   Exhibit 11 we've marked, it's a
8 December 6, 2005 letter to Teva Pharmaceuticals,
9 attention Philip Erickson.  It is from, again,
10 Mr. Buehler at the FDA.  And this again, no Bates
11 number, it was pulled from the FDA website.
12     So Mr. Buehler is writing now,
13 approving here oxycodone hydrochloride extended
14 release tablets, 10 milligram, 20 milligram and
15 40 milligram.  I believe the one we just read was
16 the 80 milligram approval.  So this is the
17 generic OxyContin at the lower doses.
18     Would you agree?
19     A.   Yes.
20     Q.   And this gives us some clues.
21     Go to the third page.
22     Mr. Buehler writes, "You have
23 notified the Agency of the district court's
24 summary judgment dated June 25, 2004, in favor of

Page 208

1 TEVA, dismissing the case on grounds of
2 unenforceability of the three patents.  The
3 Agency...is aware of the June 7, 2005 ruling by
4 the U.S. Court of Appeals for the Federal
5 Circuit, affirming the Opinion and Order of the
6 same district court in a related case, issued in
7 favor of Endo Pharmaceutical (Endo).  The Federal
8 Circuit ruling, among other things, permanently
9 enjoins Perdue, enforcing the '912, '042 and '295
10 patents.
11     "The decision on June 7, 2005, as
12 well as the first commercial marketing of the
13 product by Endo on the same day, triggered Endo's
14 180-day generic drug exclusivity period."
15     Skipping a bit, "Endo's 180-day
16 exclusivity for this...product expired on
17 December 4, 2005.  Therefore, under Section 505,"
18 et cetera, et cetera, "your ANDA is eligible for
19 full approval."
20     So it looks like there was -- you
21 agree with me -- a patent litigation which was
22 holding up the marketing of the drug at this
23 time.
24     Do you agree with that?

Page 209

1    MS. HILLYER: Objection, lack of
2  foundation, calls for speculation.
3    THE WITNESS: It appears so.
4  BY MR. CRAWFORD:
5    Q.   So it looks like, at least in
6  view at this time of Mr. Buehler, that the
7  decisions rendered in the district and court of
8  appeals allowed Endo to start marketing the drug
9  that they had an exclusivity period, because they
10  were first to market, that expired and then Teva
11  was free to start marketing its generic version.
12    Is that how you interpret this?
13    A.   Yes.
14    Q.   Again, this is subject to the
15  reporting requirements of CFR 314.80 to .81 and
16  314.98 there in the middle.  Correct?
17    A.   Yes.
18    Q.   Let's go to the next exhibit.
19    - - -
20    (Deposition Exhibit No.
21  Teva-Tomsky-12, ANDA Approval and email
22  dated June 03, 2016, Bates stamped
23  TEVA_MDL_A_02922022 through
24  TEVA_MDL_A_02922025, was marked for

Page 210

1  identification.)
2    - - -
3  BY MR. CRAWFORD:
4    Q.   We're marking Exhibit 12.
5    This is an ANDA approval from
6  Carol Holquist over at the FDA to Actavis
7  Laboratories Florida, Inc., attention Janet
8  Vaughn, director of regulatory affairs, dated --
9  well, it looks like on the last page there is an
10  email dated June 3, 2016 from Kevin Herkenham at
11  the FDA to regulatory affairs US, indicating that
12  the ANDA had been approved and attaching a PDF
13  copy of the approval letter.
14    So they were notifying, at least
15  Actavis here in your view, of the approval of
16  this product, which was a hydrocodone bitartrate
17  acetaminophen tablet.  Right?
18    A.   Yes.
19    Q.   So that -- I'm trying to
20  understand.
21    Is that -- that's Vicodin.
22  Right? Generic Vicodin?  Or Norco?  Do you know
23  what brand product that is?
24    A.   I'm not certain.

Page 211

1    Q.   And I'm trying to collaborate
2  or -- this is Actavis product, so we're talking
3  20 -- June 2016.
4    This is right about the time
5  Actavis was acquired by Teva.  Right?
6    A.   Roughly.
7    Q.   So this product came over from
8  the Actavis group.  Right?
9    A.   It would appear so, yes.
10    Q.   Do you know if this product is
11  still being marketed?
12    A.   I'm not certain.
13    Q.   Take a look at Exhibit 2, which
14  is that list again, on page 5.  I just want to
15  see if you agree that's the second product listed
16  on page 5, which is hydrocodone bitartrate and
17  acetaminophen tablets, class II controlled drug
18  schedule.
19    MS. HILLYER: Objection to form,
20  lack of foundation, calls for
21  speculation.
22  BY MR. CRAWFORD:
23    Q.   Do you think that's the same drug
24  there?

Page 212

1    A.   It's possible, but I'm not
2  certain.
3    Q.   In 2016, there are 9,092,709
4  prescriptions of that drug in that year.  Right?
5    A.   It appears so, yes.
6    Q.   So this represents, just looking
7  through, by far, the biggest seller of a class II
8  opioid product by Teva in 2016; is that right?
9    MS. HILLYER: Same objection.
10    THE WITNESS: Based on this
11  document, it looks like it.
12  BY MR. CRAWFORD:
13    Q.   So -- and it's close to a third
14  of their total relative -- it's 9 million out of
15  14.6 million of their Teva class II opioid volume
16  based on the second page.  Right?
17    A.   So I'm not certain, because the
18  first page shows 30 million.
19    Q.   That's all opioid products.  I
20  understand it that way.
21    And then the second page is just
22  the class II -- Schedule II opioids.  Right?
23    A.   Again, I'm not certain.  I'm not
24  familiar with this report.

Page 213

1    Q.    Okay.  Well, this generic
2  hydrocodone bitartrate and acetaminophen tablet,
3  that's a class II opioid.
4        You agree with me on that.
5  Right?
6    A.    According to this, yes.
7    Q.    Are you aware if this is still
8  being marketed, this drug?
9    A.    I think you just asked me that.
10  I'm not certain.
11    Q.    All right.  I'm sorry.  My memory
12  sometimes goes as far as what I've asked, so --
13  yeah, thank you.
14        Do you have any kind of knowledge
15  as you sit here of what Teva's current best
16  selling opioid, class II opioid is?
17        MS. HILLYER:  Objection to form.
18        THE WITNESS:  I do not.
19  BY MR. CRAWFORD:
20    Q.    Let's go to the next document.
21        - - -
22        (Deposition Exhibit No.
23    Teva-Tomsky-13, Letter dated February 6,
24    2004, 2 pages, was marked for

Page 214

1    identification.)
2        - - -
3  BY MR. CRAWFORD:
4    Q.    So we've marked Exhibit 13.
5  Again, this is a -- the prior exhibit was
6  TEVA_MDL_A_02922022.
7        This current one, again, pulled
8  from the FDA website, so it's not Bates stamped.
9        This is a February 2004 approval
10  for oxycodone hydrochloride tablets, 15 milligram
11  and 30 milligram.
12        This is a generic Roxicodone.
13  Right?
14    A.    That's what it says, yes.
15    Q.    Where does it say that?
16    A.    In the third paragraph, middle to
17  end of that third paragraph.
18    Q.    Okay.  That's good.  Yep.
19        Again, approved pursuant to the
20  CFR 314.80 to 81, and 314.98.  Correct?
21        MS. HILLYER:  Again, I'm just
22        going to object to foundation, among
23        other things.  This doesn't even say that
24        it's Teva.

Page 215

1  BY MR. CRAWFORD:
2    Q.    Well, Amide was acquired at some
3  point by Actavis.  Right?
4        MS. HILLYER:  Objection to the
5        extent it calls for speculation.
6        THE WITNESS:  Yeah.  I'm not
7        sure.
8  BY MR. CRAWFORD:
9    Q.    Again, Mr. Buehler is the one who
10  gave the approval.  Right?
11    A.    He's the head of the Office of
12  Generic Drugs, so he signs most of them, yes.
13    Q.    Right.  Okay.  Let's go to the
14  next exhibit.
15        Actually, not that one.  Skip
16  that.
17        So this one.
18        - - -
19        (Deposition Exhibit No.
20    Teva-Tomsky-14, Letter dated June 25,
21    2007, Bates stamped TEVA_MDL_A_10604467
22    through TEVA_MDL_A_10604633, was marked
23    for identification.)
24        - - -

Page 216

1  BY MR. CRAWFORD:
2    Q.    Right here we have a letter from
3  Actavis.  This is written by Jasmine Shah, VP,
4  regulatory and medical affairs, to Mr. Buehler at
5  the FDA.
6        This is Actavis submitting a
7  supplement as a changes being effected to seek
8  approval for a batch size scale-up from 110,000
9  to 3.5 million tablets for the 15 milligram
10  strength.
11        And this would be for the same
12  ANDA, 76-636, as the Roxicodone approval that we
13  looked at.  Correct?
14        MS. HILLYER:  Objection to form.
15        THE WITNESS:  Yes.
16  BY MR. CRAWFORD:
17    Q.    So that's a pretty hefty increase
18  in batch size.
19        Would you agree with me on that?
20        MS. HILLYER:  Objection.  Sorry.
21  BY MR. CRAWFORD:
22    Q.    From 110,000 to 3.5 million?
23        MS. HILLYER:  Objection to form.
24        THE WITNESS:  It's an increase in

Page 217

1     more than ten times the original batch
2     size, yes.
3  BY MR. CRAWFORD:
4     Q.    And why does a manufacturer need
5  to get approval for that type of increase in
6  batch size?
7     A.    I mean, the regulations are clear
8  in terms of what types of changes need to be
9  submitted to the FDA.  So, again, if you're
10  making any changes that have been previously
11  approved by FDA, and it falls into different
12  filing categories, either an annual report, in
13  this case, a CBE supplement, or sometimes a prior
14  approval supplement.
15     Q.    And CBE can just be done
16  unilaterally without preapproval.
17        They're just notifying the FDA of
18  the change in case the FDA wants to intervene.
19  Right?
20        MS. HILLYER:  Objection to form.
21        THE WITNESS:  Generally speaking.
22        But typically a company would wait 30
23        days before implementing such a change.
24  BY MR. CRAWFORD:

Page 218

1     Q.    That's generally the practice.
2  Right?
3        MS. HILLYER:  Objection to form.
4        THE WITNESS:  Yes.
5  BY MR. CRAWFORD:
6     Q.    All right.  And then go to the
7  third page.  Down at the bottom in bold, it says,
8  "This application may contain documentation
9  bearing 'Amide Pharmaceutical Inc.' name.  Please
10  note that Actavis Totowa LLC has acquired all
11  rights of Amide Pharmaceuticals Inc., since July
12  27, 2005."
13        So you'd agree with me that
14  Actavis, at least some Actavis entity, had
15  acquired the rights to this product after that
16  date?
17        MS. HILLYER:  Objection to form.
18  BY MR. CRAWFORD:
19     Q.    It looks like acquired Amide.
20  Right?
21     A.    Yes, it appears so.
22     Q.    So again, do you know if this is
23  a product that's being currently marketed by
24  Teva?

Page 219

1     A.    I do not.
2     Q.    I'm just trying to triangulate it
3  here with the chart that we have.
4        If you look at page 8, would
5  you --
6        MS. HILLYER:  Of Exhibit 2?
7        MR. CRAWFORD:  Yeah.
8  BY MR. CRAWFORD:
9     Q.    There is an oxycodone
10  hydrochloride tablet, generic Roxicodone, listed
11  in the middle of exhibit -- page 18.
12        And it starts up in 2016, which,
13  of course, is the year Actavis was acquired.
14  Right?
15     A.    Yes.
16     Q.    So do you think this -- is this
17  the same product as this NDA here?
18        MS. HILLYER:  Same objections,
19        lack of foundation, calls for
20        speculation.
21        THE WITNESS:  It's possible, but
22        I'm not certain.
23  BY MR. CRAWFORD:
24     Q.    Okay.  Let's go to the next

Page 220

1  exhibit.
2        - - -
3        (Deposition Exhibit No.
4  Teva-Tomsky-15, Supplement History
5  Oxycodone Hydrochloride Tablets USP, 5
6  mg, 15 mg and 30 mg, TEVA_MDL_A_10602657
7  through TEVA_MDL_A_10602670, was marked
8  for identification.)
9        - - -
10        MS. HILLYER:  Sorry.  What
11  number?
12        MR. CRAWFORD:  14.
13        MR. JENSEN:  15.
14        MR. CRAWFORD:  15, sorry.
15  BY MR. CRAWFORD:
16     Q.    This is TEVA_MDL_A_10602657.  It
17  is a Supplement History for oxycodone
18  hydrochloride tablets, ANDA 076-636.
19        Would you agree with me that this
20  is the supplement history for the Roxicodone ANDA
21  that we've just looked at in the prior two
22  exhibits?
23        MS. HILLYER:  Objection to form.
24        Prior two, meaning 13 and 14?

Page 221

1      MR. CRAWFORD:  Yeah.
2      THE WITNESS:  It appears to be.
3  BY MR. CRAWFORD:
4      Q.    Okay.  And so tell me what a
5  supplement -- have you ever seen one of these
6  reports before?
7      A.    No.
8      Q.    Do you know if there's any way to
9  generate within Teva currently a report of all
10  the supplement activity with regard to a
11  particular drug?
12      MS. HILLYER:  Objection to form.
13      THE WITNESS:  Yeah.  I'm not
14      certain.  I haven't seen it.  And I'm not
15      certain how it was pulled.  It could have
16      been manually put together.
17  BY MR. CRAWFORD:
18      Q.    But you don't know for sure?  You
19  don't -- you don't know whether it was manually
20  put together or generated somehow?
21      A.    Yeah.  I'm not certain.
22      Q.    If you look at the last page,
23  it's 12/12/17 is one of the dates for labeling
24  CBE.  So this looks like it was put together

Page 222

1  fairly recently.  And I'm just trying to find out
2  if there's -- if you wanted, as the head of the
3  US generics regulatory, a supplement history, how
4  would you go about doing that?
5      A.    I would ask the person who's
6  responsible for this product to provide it to me.
7      Q.    Is there an FDA contact log that
8  you're aware of that the company keeps?
9      A.    So there's -- typically, I would
10  guess those documents or any FDA contacts would
11  be saved -- actually, now they're just saved in
12  email.
13      But prior to current practices, I
14  think there was -- there was a -- hard copies
15  that were kept in binders.
16      Q.    So there's no database of FDA
17  contacts that you're aware of?
18      A.    No, not that I'm aware of.
19      Q.    So it's just kept in people's
20  email boxes, if they get one.  And if you want to
21  look it up, you've got to go through people's
22  emails?
23      A.    Correct.  Sometimes that
24  information would be kept in the global

Page 223

1  regulatory affairs database.  So it would just be
2  a line item that there was a call with FDA on
3  such and such a date and this is the contents of
4  what was discussed.  But I'm not sure if it would
5  be in detailed form.  You would have to pull the
6  actual email to find that information.
7      Q.    For the supplement submissions
8  and contacts, is that information kept in kind of
9  a single place in the company for each drug?
10      A.    Sorry, can you repeat your
11  question?
12      Q.    Like for supplemental ANDAs and
13  tracking them for purposes of keeping them in one
14  place, is there a place where information like
15  that is kept?
16      A.    So again, all the information
17  would be saved in the product shared drive.  And
18  then in the global regulatory affairs database,
19  every submission that goes to FDA, as well as
20  correspondence that come back to FDA, is entered
21  and logged into that database.
22      Q.    So there is a log of
23  correspondence that goes back and forth?
24      A.    Yes.

Page 224

1      Q.    And is that in like a database or
2  something?
3      A.    Yes.  It's the global regulatory
4  affairs database.  It's called Global Insight.
5      Q.    And so if you wanted to get all
6  the written exchanges between the FDA for a
7  particular drug, is there a way to kind of filter
8  the database for that?
9      A.    It's pretty difficult.  I think I
10  alluded to it earlier.  The global regulatory
11  database is pretty challenging to navigate and
12  even get reports ran, so that's why teams wind up
13  keeping a lot of their own manual tracking
14  sheets.  So it's possible, again, that this came
15  from a manual tracking sheet that somebody was
16  doing.
17      Q.    All right.  Let's go to the next
18  document.
19      - - -
20      (Deposition Exhibit No.
21  Teva-Tomsky-16, Periodic Adverse Drug
22  Experience Report, ANDA:  076636,
23  TEVA_MDL_A_11065997 through
24  TEVA_MDL_A_11066038, was marked for

Page 225

1    identification.)
2        - - -
3  BY MR. CRAWFORD:
4        Q.    So we've marked Exhibit 16, which
5  is a periodic adverse drug experience report for
6  the reporting period March 1, 2017 to February
7  28, 2018. It's for ANDA 076-636.
8            Again, this would be the generic
9  Roxicodone product that we have been discussing
10 the past few exhibits.  Correct?
11       A.    Yes, it appears so.
12       Q.    All right.  This is called a
13 PADER, right, P-A-D-E-R?
14       A.    That's correct.
15       Q.    And are these the reports
16 submitted pursuant to Section 314.80?
17       A.    That's correct.
18       Q.    And this is -- now I guess an
19 annual report at this stage of the marketing of
20 the drug.  Right?
21       A.    That's correct.
22       Q.    But it's not the annual report
23 that's submitted for 314.81.  Correct?
24       A.    That's correct.

Page 226

1        Q.    That's a separate type of report?
2        A.    Yes.
3        Q.    And this pretty much just lists
4  adverse events in prior 15-day reports and so on
5  that were discovered throughout the year.  Right?
6        A.    That's correct.
7        Q.    And then who -- let's see.
8            Is this report signed or verified
9  by anybody in the company?
10       A.    Yeah.  I'm not certain.  This is
11 a report that's put together by the
12 pharmacovigilance team, but I would think that
13 there would be a cover letter on this at least.
14       Q.    So it was prepared in Zagreb,
15 right, in Croatia?
16       A.    That's what it says, yes.
17       Q.    And what group --
18            It's the Teva periodic reports
19 and risk management center global patient safety
20 and pharmacovigilance group there that put this
21 together?
22       A.    That's what it says, yes.
23       Q.    This isn't a Teva USA company
24 that put this together.  Right?

Page 227

1            MS. HILLYER:  Objection to form,
2  lack of foundation.
3            THE WITNESS:  Yeah.  I'm not sure
4     who the legal entity is.
5  BY MR. CRAWFORD:
6        Q.    But it's Teva.  Right?  It's a
7  Teva company?
8        A.    Yes.
9        Q.    Are these reports generally, the
10 PADER reports, signed or verified by the company
11 when they're submitted as being accurate and
12 true?
13           MS. HILLYER:  Objection to form.
14           THE WITNESS:  Yes.
15 BY MR. CRAWFORD:
16       Q.    And the annual reports are, too.
17 They're signed and verified by the company.
18 Right?
19       A.    Yes.
20       Q.    And who verifies the annual
21 reports for the company?
22       A.    Which annual reports are you
23 referring to now?
24       Q.    For the opioids.

Page 228

1        A.    Which annual report?  Are you
2  talking about 314.80 or 314.81?
3        Q.    81.
4        A.    314.81, the practice currently?
5        Q.    Yes.
6        A.    Because the majority of them
7  would be signed off in India.
8        Q.    I got it.
9            Is that by a Teva entity in
10 India?
11       A.    Yes.
12       Q.    If you just go through the report
13 here, page 5, reports with fatal outcome.
14           That looks like there are several
15 cases of overdose and death.  Right?  Here on the
16 second page, from this drug?
17           MS. HILLYER:  I'm sorry, which
18     page are we on?
19           MR. CRAWFORD:  Page 6.
20 BY MR. CRAWFORD:
21       Q.    Or potentially from the drug.
22       A.    Allegedly, yes, it appears so.
23       Q.    And moving on to page 17, there's
24 a non-15-day report serious label.  Two of them

Page 229

```
 1    are for addiction to opioids, drug dependence.
 2         Do you see those two at the
 3    bottom?
 4         A.   Yes.
 5         Q.   So serious -- they're not
 6    reported within the 15 days because addiction is
 7    a side effect already in the label.  Right?
 8         A.   Correct.  That's my
 9    understanding.
10         Q.   But it's considered serious.
11              Serious is a defined term of art.
12    Right?
13         A.   Yes.
14         Q.   So serious means -- what does it
15    mean, hospitalization, death or affecting
16    pregnancy or something like that?
17         A.   I'm not certain.
18         Q.   So -- but addiction does fall
19    whatever under regulatory definition of serious.
20    Right?
21         A.   It appears so, yes.
22         Q.   And then moving on to --
23              MS. HILLYER:  I'm sorry,
24         objection to form on the last one.
```

Page 230

```
 1    BY MR. CRAWFORD:
 2         Q.   -- page 35, there is a report of
 3    some type of drug misuse here, where oxycodone at
 4    least was one of the drugs that the patient was
 5    taking.  Right?
 6              MS. HILLYER:  Objection to form.
 7              THE WITNESS:  Which one are you
 8         looking at?
 9    BY MR. CRAWFORD:
10         Q.   The first one.
11         A.   I see several drugs, including
12    heroin, so...
13         Q.   Right.  And oxycodone is one of
14    the drugs, too.  Right?
15         A.   Yes.
16         Q.   Do you have any idea how many
17    people who use heroin started on prescription
18    opioids, what the statistic is on that from the
19    CDC?
20              MS. HILLYER:  Objection to form.
21              THE WITNESS:  I do not.
22    BY MR. CRAWFORD:
23         Q.   Would 80 percent surprise you?
24              MS. HILLYER:  Objection to form.
```

Page 231

```
 1              THE WITNESS:  I've never heard
 2         any of those statistics, so I'm not
 3         familiar with it.
 4    BY MR. CRAWFORD:
 5         Q.   So the source says, "Spontaneous,
 6    health authority, patient-consumer."
 7              That just means that this report
 8    came into the company, Teva, through either a
 9    healthcare provider or a patient or a patient
10    family member.  Right?
11              MS. HILLYER:  Objection, lack of
12         foundation, calls for speculation.  He's
13         testified these reports don't come
14         through them.
15    BY MR. CRAWFORD:
16         Q.   Where did this report -- does
17    this source of the report listed here give you
18    any idea what the potential source was of the
19    report?
20              MS. HILLYER:  Same objections.
21              THE WITNESS:  Again, I'm not
22         familiar with this report, how things are
23         categorized, what this means.  I have no
24         responsibility for these or the team that
```

Page 232

```
 1         puts these together.
 2    BY MR. CRAWFORD:
 3         Q.   But this is submitted to the FDA.
 4    Right?
 5         A.   Yes.  And as we discussed
 6    earlier, the regulatory affairs team manages the
 7    new ANDA submissions and then the post-approval
 8    supplements and annual reports, but the
 9    pharmacovigilance team manages the drug safety
10    reports.
11         Q.   So they interface with the FDA
12    directly on these reports?
13         A.   Yes.
14         Q.   Understood.
15              But do you know what a
16    spontaneous report is, right, in the regulatory
17    parlance?
18         A.   Generally speaking.
19         Q.   Okay.  What's your understanding
20    of a spontaneous report?
21         A.   When a company receives or when
22    anybody receives a report of an adverse event
23    with a product.
24         Q.   Let's go to the next doc.
```

Page 233

```
 1            Actually, hold on.
 2            Well, okay, let's mark it.
 3            - - -
 4            (Deposition Exhibit No.
 5        Teva-Tomsky-17, Letter dated 07/11/2013,
 6        Bates stamped Acquired_Actavis_00677901
 7        through Acquired_Actavis_00677905, was
 8        marked for identification.)
 9            - - -
10   BY MR. CRAWFORD:
11        Q.    Okay.  We've marked Exhibit 17,
12   which is Bates Acquired_Actavis_00677901.
13        It's an approval letter to -- for
14   ANDA 079-046 dated July 11, 2013, written to
15   Actavis Elizabeth LLC by Kathleen Uhl at the FDA,
16   U-H-L.  And it's granting final approval of the
17   oxymorphone hydrochloride extended release
18   tablet.
19            That's again generic Opana ER.
20   Right?
21        A.    Correct.
22        Q.    And do you know if this drug
23   is -- and I understand you've said that you don't
24   know a lot of the drugs, but just personal
```

Page 234

```
 1   knowledge, do you know if this is a drug that is
 2   currently being marketed by the company?
 3        A.    I do not.
 4        Q.    Let's go to the next exhibit.
 5            - - -
 6            (Deposition Exhibit No.
 7        Teva-Tomsky-18, Letter dated August 17,
 8        2011, Bates stamped TEVA_MDL_A_10662653
 9        through TEVA_MDL_A_10662655, was marked
10        for identification.)
11            - - -
12   BY MR. CRAWFORD:
13        Q.    Again, this is -- we marked
14   another approval letter here,
15   TEVA_MDL_A_10662653.  It is ANDA number 076-709
16   for the fentanyl transdermal system.
17            This again would be an approval
18   letter for --
19        A.    This isn't an approval letter, at
20   least --
21        Q.    You're right.  It's approving --
22   it's submitting an electronic REMS.  Right?
23        A.    Correct.
24        Q.    But this would have been for a
```

Page 235

```
 1   product that was approved.  Right?
 2        A.    I mean, I'm not certain.  I would
 3   have to go back and look at the entire history.
 4        Q.    Right.  I could not find the
 5   approval letter.
 6            But are you aware if Teva is
 7   currently marketing a fentanyl transdermal
 8   system?
 9        A.    I'm not certain.
10        Q.    Or if it ever has?
11        A.    I believe it has, but I'm not
12   certain if it's currently manufactured or not.
13        Q.    Let's go to the next document.
14            - - -
15            (Deposition Exhibit No.
16        Teva-Tomsky-19, Letter dated 11/17/2017,
17        Bates stamped TEVA_MDL_A_08981645 through
18        TEVA_MDL_A_08981651, was marked for
19        identification.)
20            - - -
21   BY MR. CRAWFORD:
22        Q.    We've marked here a letter dated
23   November 17 -- or received November 17, 2017.
24   It's a letter to Janet Vaughn of Actavis
```

Page 236

```
 1   Laboratories FL Inc.  It's from Vincent Samsone
 2   from the FDA.
 3            So this is an approval letter for
 4   generic Abstral.  Right?
 5        A.    That's what the letter states,
 6   yes.
 7        Q.    And that's a TIRF product, a
 8   transmucosal -- some type of transmucosal
 9   product.  Right?
10            MS. HILLYER:  Immediate release.
11            MR. CRAWFORD:  Thank you.
12   BY MR. CRAWFORD:
13        Q.    Immediate release.
14        A.    It appears to say that on page 3.
15        Q.    So again, do you know if Actavis
16   or Teva has ever marketed this product and
17   whether it's currently being marketed?
18        A.    I'm not certain.
19        Q.    Okay.  Let's go to the next one.
20            - - -
21            (Deposition Exhibit No.
22        Teva-Tomsky-20, Letter dated 2014.12.29,
23        4 pages, was marked for identification.)
24            - - -
```

Page 237

```
 1    BY MR. CRAWFORD:
 2        Q.    This is an approval letter for
 3    morphine sulfate extended release capsules.
 4            I think it's for the brand name
 5    Kadian. Correct?
 6        A.    I am not certain by this letter.
 7        Q.    Do you know -- are you aware if
 8    Teva manufactures, markets or sells Kadian or a
 9    generic version of Kadian?
10        A.    Yeah. I'm not certain.
11        Q.    Is it possible that Teva
12    currently manufactures Kadian for Allergan at
13    this point in time?
14        A.    I'm not certain.
15        Q.    If Teva manufactured a product
16    for another company who is the NDA holder or an
17    ANDA holder and that company distributed it, who
18    would be responsible for making the regulatory
19    submissions on that drug?
20        MS. HILLYER:  Objection to form.
21    BY MR. CRAWFORD:
22        Q.    Do you know?  Is there kind of a
23    general rule?
24        A.    It would have to -- it would be
```

Page 238

```
 1    dependent on what product the -- what application
 2    the product is being manufactured under.
 3        Q.    So if it was being manufactured
 4    under an NDA -- let's take a hypothetical.
 5            So it was being manufactured for
 6    an NDA holder by Teva, who would be responsible
 7    for the regulatory submissions, the annual
 8    reports and PADERs?
 9        A.    So if it's being manufactured
10    under the NDA, meaning the NDA holder would have
11    filed a site change to, say, an ANDA holder, the
12    information would be filed to the NDA.
13        Q.    So that means the NDA holder is
14    filing it with the FDA?
15        A.    Yes.
16        Q.    All right.  Let's do this next
17    document here.
18            - - -
19            (Deposition Exhibit No.
20        Teva-Tomsky-21, Industry Meeting to
21        Discuss Opioid Analgesics REMS, 7 pages,
22        was marked for identification.)
23            - - -
24    BY MR. CRAWFORD:
```

Page 239

```
 1        Q.    So we marked -- again, this
 2    didn't come from the Teva production, but it's
 3    called, "Industry Meeting to Discuss Opioid
 4    Analgesics REMS."  It's Exhibit 21.
 5            It's minutes of a meeting held
 6    January 25, 2017.  It looks like it was attended
 7    by members of the FDA and other organizations,
 8    and then members of industry regarding opioid
 9    analgesics REMS.
10            Had you heard about this meeting
11    occurring?
12        A.    It's not familiar to me.
13        Q.    I see that there's no Actavis or
14    Teva attendee.
15            I'm just wondering why, if you
16    know, why they didn't attend this meeting?
17        A.    No, I'm not certain.
18        Q.    Who was head of the REMS group
19    there at the time at Teva?
20        A.    Again, it would have been Kishore
21    Gopu, who we discussed earlier.
22        MR. CRAWFORD:  Take a minute or
23    two, I think I'm almost done.
24        MS. HILLYER:  Okay.  We'll go off
```

Page 240

```
 1    the record.
 2        THE VIDEOGRAPHER:  Off the
 3    record, 2:28.
 4            - - -
 5            (A recess was taken from
 6        2:28 p.m. to 2:46 p.m.)
 7            - - -
 8        THE VIDEOGRAPHER:  We are back on
 9    the record at 2:46.
10            - - -
11            (Deposition Exhibit No.
12        Teva-Tomsky-22, Email chain, top one
13        dated 1/9/2017, Bates stamped
14        TEVA_MDL_A_09655240 through
15        TEVA_MDL_A_09655244, was marked for
16        identification.)
17            - - -
18    BY MR. CRAWFORD:
19        Q.    I just have one more document
20    here to look at.  It's TEVA_MDL_A_09655240.
21            It's an email chain, starting at
22    least the last one at the top, Brenda Hunsberger
23    to you and several others, dated January 9, 2017.
24    "Follow-Up Meeting:  Status Check - ANDA Holder
```

Page 241

1    Fee Clean-Up.  Attachments: All Teva Companies
2    and Product ANDA numbers" in an Excel
3    spreadsheet.
4           So this is just the email chain.
5           Can you tell me what this
6    interchange was about, as you recall?
7           A.   Sure.  As I recall, under the
8    Generic Drug User Fee Act, GDUFA II, FDA began
9    charging a program fee based on the number of
10   approved applications per company.
11          And there was three different
12   buckets.  There was small, medium and large.
13   Anybody with more than 20 approved applications
14   was considered to pay the large fee.
15          But it's not like each applicant
16   holder had to pay a fee.  For example, Actavis
17   didn't have to pay and Teva and Watson.  So you
18   can claim all those companies under the Teva
19   affiliate.
20          So the purpose of this was to
21   make sure that we collected all the different
22   applicants and put them under the bucket of Teva.
23       Q.   So you can say that a family of
24   related companies could be compiled together for

Page 242

1    the purposes of calculating the fees.
2           You wouldn't have to have, like
3    if you got 20 different ANDA holders that are all
4    owned by the same company, you didn't have to pay
5    20 different fees.  Right?
6        A.   Yes.
7        Q.   And so what you're doing here is
8    you're trying to compile all the various legacy
9    entities and the ANDAs that you hold and you're
10   trying to get that list generated.  Right?
11       A.   That's correct.
12       Q.   And did you successfully get that
13   list?
14       A.   Yes.
15       Q.   And who's Brenda -- did Ms.
16   Hunsberger send that list?
17       A.   So she's no longer with the
18   company.  Currently it's done by someone named
19   Megan Hughes.
20       Q.   What department is she in?
21       A.   It's in regulatory, it's called
22   the regulatory information management.
23       Q.   Are they based in Parsippany?
24       A.   Currently she's based in Frazer.

Page 243

1    Eventually, this position will be located in
2    Parsippany.
3        Q.   So this list that's attached is
4    basically just a list -- I haven't attached it,
5    it's a huge spreadsheet.
6           But to me, tell me if this is
7    accurate, it's a list of all the Teva-related
8    companies, including the Actavis entities,
9    Watson, Ivax, Barr, ones that they've acquired in
10   the past, and then there are ANDA numbers and
11   drug name below each company.
12          Is that what's being compiled
13   here?
14       A.   Generally speaking, yes.  This is
15   a list that was downloaded from the FDA's
16   website.
17       Q.   So this was compiled from the FDA
18   website or from an internal database?
19       A.   Yeah.  So this is a list that
20   would have came from the FDA, then each company
21   downloads that list and separates out all the
22   different entities that they want to claim as
23   being under one company.
24       Q.   So was this part of the fee

Page 244

1    process, was they gave you access to this, the
2    FDA?
3        A.   That's correct.
4        Q.   Is the public able to download
5    this?
6        A.   Yes.
7        Q.   So -- but who made the decision
8    or figured out what entities were Teva-related
9    entities?  Was that Ms. Hunsberger's department?
10       A.   No.  It was a compilation of
11   several people.  We worked with lawyers as well
12   to make sure that we were capturing all the Teva
13   entities.
14       Q.   And do you feel that this final
15   list captured all the Teva entities accurately?
16       A.   Yes.
17          MR. CRAWFORD:  All right.  That's
18   all I have.  Thank you.
19          THE VIDEOGRAPHER:  Going off
20   the --
21          MS. HILLYER:  No.  Stay on the
22   record.
23          THE VIDEOGRAPHER:  Okay.  Sorry.
24          MS. HILLYER:  Mr. Tomsky, I just

Page 245

1    have one brief redirect.
2              - - -
3           EXAMINATION
4              - - -
5    BY MS. HILLYER:
6        Q.   Earlier in response to Mr.
7    Crawford's questioning, you were talking about
8    conversations you had with an individual in
9    Israel.
10           Do you recall that?
11       A.   Yes.
12       Q.   And you mentioned that the
13   substance or the basis for those conversations
14   was the product filings prepared for the US.
15           Do you recall that?
16       A.   Yes.
17       Q.   Were any of those products opioid
18   products?
19       A.   No.  Because all the opioid
20   products are manufactured in the US.  And the
21   Israel team had nothing to do with those.
22           MS. HILLYER:  I have no further
23       questions at this time.
24           MR. CRAWFORD:  All right.  Me

Page 246

1    neither.
2              MS. HILLYER:  Do we have to go
3    off the record to swap?
4              THE VIDEOGRAPHER:  Yep, please.
5              Going off the record, 2:52.
6              - - -
7              (A discussion off the record
8    occurred.)
9              - - -
10             THE VIDEOGRAPHER:  We are back on
11   the record at 2:53.
12             - - -
13           EXAMINATION
14             - - -
15   BY MR. GASTEEL:
16       Q.   Good afternoon, Mr. Tomsky.  My
17   name is Ben Gasteel.  I represent a group of
18   plaintiffs in the state of Tennessee who are
19   pursuing cases that are slightly different than
20   the cases that Mr. Crawford had been asking you
21   questions throughout the day.
22           I'm going to go -- I'm not going
23   to spend as much time as Mr. Crawford did today,
24   so hopefully we can get out of here relatively

Page 247

1    quickly.
2              I'm going to do my best not to
3    cover anything that Mr. Crawford covered, but
4    there might be a little bit of overlap.
5              I want to begin, you testified
6    earlier about giving a deposition last week in a
7    case?
8              MS. HILLYER:  Sorry, Ben, before
9        you get too far into your questions, I
10       just want to place some objections on the
11       record --
12             MR. GASTEEL:  Sure.
13             MS. HILLYER:  -- as I know they
14       probably expected.
15           So we did not -- or the key
16       people relevant to working on the
17       Tennessee case from my firm did not
18       receive the cross-notice that you told me
19       about today.
20           I understand that your firm was
21       informed earlier this month about who
22       should be on the notification list.
23       Those people were not on the notification
24       list.  And then there was subsequent

Page 248

1    correspondence later in the month where
2    we told you that we did not cross-notice
3    Mr. Tomsky in the Tennessee action and we
4    objected to your questioning him here.
5    And there was no response received from
6    your firm.
7        So I understand that, you know,
8    you and I talked earlier off the record
9    that you guys believe you sent the
10   cross-notice.  Setting that aside, I'm
11   going to allow you guys to go ahead with
12   questioning Mr. Tomsky over our
13   objection, both to the relevancy of his
14   deposition and procedurally how we got to
15   being here, but with the understanding
16   that, you know, as the Tennessee case
17   proceeds, to the extent you later seek to
18   depose Mr. Tomsky, we're going to say
19   that this was your opportunity to do that
20   and we've now given you that -- and we'll
21   give you the opportunity to do that.
22           MR. GASTEEL:  So I'll just say
23   very shortly in response that we think
24   that we've properly cross-noticed Mr.

Page 249

```
 1          Tomsky in the deposition.  And to the
 2     extent that you, know, we may need to
 3     talk to him again, we'll continue to
 4     reserve that right.  But we're certainly
 5     here willing and able to ask him some
 6     questions today.
 7          MS. HILLYER:  Understood.
 8   BY MR. GASTEEL:
 9     Q.    With all of that out of the way,
10   Mr. Tomsky, you talked earlier today about giving
11   a deposition last week in an opioid-related case.
12          Do you recall that?
13     A.   Yes.
14     Q.   Do you recall the name of the
15   plaintiff in that case?
16     A.   I believe it was Guevnos.
17     Q.   I don't suppose you know how to
18   spell that?
19     A.   I could try.  I think it's
20   G-U-E-V-N-O-S.
21     Q.   And do you know if that case was
22   pending in federal or state court?
23     A.   I'm not certain.
24     Q.   Is Teva a defendant in that case?
```

Page 250

```
 1     A.    I believe so.
 2     Q.    Was it a Teva product that the
 3   plaintiff took that resulted in that lawsuit?
 4     A.    Allegedly.
 5     Q.    Mr. Crawford had previously asked
 6   you some questions about the current opioid
 7   epidemic and crisis that's going on in this
 8   country.
 9          Do you recall some of that
10   testimony?
11     A.    Yes.
12     Q.    Can you clarify, because I wasn't
13   sure about your testimony.
14          As VP of regulatory affairs of
15   generics at Teva, you knew that there was a
16   problem with abuse and misuse of prescription
17   opioids throughout the country.  Right?
18          MS. HILLYER:  Objection to form.
19          THE WITNESS:  I wouldn't say I
20     necessarily agree with that statement.
21     Can you reword?
22   BY MR. GASTEEL:
23     Q.    Well, do you believe that there
24   is a prescription opioid epidemic in this country
```

Page 251

```
 1   right now?
 2     A.    I believe there is an opioid
 3   epidemic related to the misuse and illicit use of
 4   drugs.
 5     Q.    And that would include
 6   prescription opioids?
 7     A.    Prescription opioids when they're
 8   obtained not from a prescriber or healthcare
 9   professional or what have you.
10     Q.    And that would be an example of
11   an abuse or a misuse of a prescription opioid.
12   Right?
13     A.    Illicit misuse, yes.
14          MS. HILLYER:  Ben, can you speak
15   up?
16          MR. GASTEEL:  Sure.
17   BY MR. GASTEEL:
18     Q.    Did you ever try to educate
19   yourself as to the reasons why there was large
20   scale abuse and misuse of prescription opioids?
21          MS. HILLYER:  Objection to form.
22          THE WITNESS:  No, I did not.
23   BY MR. GASTEEL:
24     Q.    Did you ever try to educate
```

Page 252

```
 1   yourself as to the places that were particularly
 2   prone to abuse and misuse of prescription
 3   opioids?
 4          MS. HILLYER:  Same objection.
 5          THE WITNESS:  No.
 6   BY MR. GASTEEL:
 7     Q.    While working with Teva as the VP
 8   of regulatory affairs generics, did you
 9   investigate at all the amount of Teva-produced
10   generic opioids that were filling prescriptions
11   in this country?
12     A.    No.
13          MS. HILLYER:  Objection to the
14     form.
15   BY MR. GASTEEL:
16     Q.    Prior to joining Teva, do you
17   recall having any knowledge about abuse and
18   misuse of prescription opioids?
19     A.    No.
20     Q.    Did the companies that you worked
21   for prior to Teva manufacture or produce
22   prescription opioids?
23     A.    So I believe Ranbaxy had
24   applications for these products.  Whether or not
```

Page 253

1  they are actively manufacturing them or
2  distributing them, I am not certain.
3      Q.    But they had at least an NDA or
4  an ANDA to make them?
5      A.    They had an ANDA.
6          - - -
7      (Deposition Exhibit No.
8      Teva-Tomsky-23, Email chain, top one
9      dated September 11, 2013, Bates stamped
10     TEVA_MDL_A_11584417 through
11     TEVA_MDL_A_11584419, was marked for
12     identification.)
13         - - -
14  BY MR. GASTEEL:
15     Q.    I hand you a document that we'll
16  mark as Exhibit 23.
17         MS. HILLYER:  Take your time to
18         look it over.
19         THE WITNESS:  Okay.
20  BY MR. GASTEEL:
21     Q.    Do you see that this is an email
22  from Gary Buehler to a variety of people,
23  including you, on September 11, 2013?
24     A.    Yes.

Page 254

1      Q.    And the email is forwarding an
2  email from the previous day.
3          Do you see that?
4      A.    Yes.
5      Q.    From a Mark Hendricks (sic) at
6  the GPHA?
7      A.    Yes.
8      Q.    What is the GPHA?
9      A.    The Generic Pharmaceutical
10  Association.
11     Q.    Is that a trade group that Teva
12  is part of?
13     A.    Yes.
14     Q.    And do they help Teva monitor
15  what's going on at the FDA?
16         MS. HILLYER:  Objection.
17  BY MR. GASTEEL:
18     Q.    With regard to generic
19  medications?
20         MS. HILLYER:  Objection to form.
21         THE WITNESS:  They're a generic
22         trade association and, sure, they help
23         disseminate information that's relevant
24         to the generic industry.

Page 255

1  BY MR. GASTEEL:
2      Q.    And do they lobby on behalf of
3  the industry?
4      A.    I believe so.  It's outside of my
5  area of scope, though.
6      Q.    I'm going to go through the email
7  that was forwarded to you.  It was referencing a
8  call that occurred on September 10, 2013.
9          Do you see that at the top of the
10  email, sir?
11     A.    Yes.
12     Q.    Do you recall whether or not you
13  were on this FDA call that this email summarizes?
14     A.    I do not recall.
15     Q.    Do you see that the first
16  paragraph states that:  The guidance focused on
17  class-wide likely changes and due postmarket
18  survey requirements for all extended-release and
19  long-acting opioid analgesics intended to treat
20  pain.
21         Did I read that correctly?
22     A.    More or less, yes.
23     Q.    And it says, "The FDA is invoking
24  its authority to require safety labeling changes

Page 256

1  and post market studies to combat the crisis of
2  misuse, abuse, addiction, overdose, and death
3  from those potent drugs that have harmed too many
4  patients and devastated too many families and
5  communities."
6          Did I read that correctly?
7      A.    Yes.
8      Q.    And that was attributed to --
9  that was a statement that was attributed to the
10  FDA commissioner at the time, Dr. Margaret
11  Hamburg.
12         Do you see that?
13     A.    Yes.
14     Q.    And then the email goes on to
15  talk about a letter that was received by NDA and
16  ANDA applicants.
17         Do you see that?
18         MS. HILLYER:  Where are you
19         looking?
20         THE WITNESS:  Yeah.  I'm not --
21         where are you?
22  BY MR. GASTEEL:
23     Q.    So at the bottom it says there's
24  a letter to applicant holders.

Page 257

1          MS. HILLYER:  The very last
2   paragraph?
3          MR. GASTEEL:  It's the last thing
4   in the email above the signature block.
5          THE WITNESS:  Okay.
6   BY MR. GASTEEL:
7      Q.   Do you see that?
8      A.   Yes.
9      Q.   Do you know if Teva received the
10  letter that was referenced in this email?
11     A.   Either way.  I mean, via this
12  email itself they would have received this
13  letter.
14     Q.   And then the email goes on, I
15  believe, in the fifth paragraph down, beginning,
16  "A safety labeling change was instituted."
17         Do you see that?
18     A.   Yes.
19     Q.   And it goes on to talk about new
20  requirements for a boxed warning of -- it says
21  addition, but I think it's meant to say
22  addiction, "abuse, and misuse, which can lead to
23  overdose and death."
24         Do you see that?

Page 258

1          MS. HILLYER:  I think he's here.
2          THE WITNESS:  Oh, okay.
3          Yes.
4   BY MR. GASTEEL:
5      Q.   Do you recall when the FDA
6   required these safety labeling changes?
7      A.   I'm not certain.
8      Q.   Do you know if Teva added that
9   label to its generic opioids at that time?
10         MS. HILLYER:  Objection to form.
11         THE WITNESS:  Again, as I had
12  testified earlier, I mean, we monitor the
13  FDA's website for labeling updates and
14  revisions and to keep our labeling in
15  line with the branded drug or the
16  reference listed drug holder.
17  BY MR. GASTEEL:
18     Q.   And according to this email, Teva
19  would have at least had knowledge as of September
20  of 2013 that the FDA commissioner thought that
21  there was an opioid crisis of misuse, abuse,
22  addiction, overdose and death.  Correct?
23         MS. HILLYER:  Objection to form.
24         THE WITNESS:  Sorry, can you

Page 259

1   repeat your question?
2   BY MR. GASTEEL:
3      Q.   Sure.
4          It says, according to this email,
5   Teva would have at least had knowledge as of
6   September of 2013 that the FDA commissioner
7   thought there was an opioid crisis of misuse,
8   abuse, addiction, overdose, and death.  Correct?
9          MS. HILLYER:  Same objection.
10         THE WITNESS:  Yes.
11             - - -
12         (Deposition Exhibit No.
13     Teva-Tomsky-24, Email chain, top one
14     dated 11/1/2013, Bates stamped
15     TEVA_MDL_A_03487762 through
16     TEVA_MDL_A_03487773, was marked for
17     identification.)
18             - - -
19  BY MR. GASTEEL:
20     Q.   I'm going to hand you a document
21  that we'll mark as Exhibit 24.  And it's an email
22  and attachment to the email.  And this is an
23  email chain from October 2013 regarding a
24  citizen's petition filed by various groups.

Page 260

1          Take as much time with this
2   document, sir, my question is going to be whether
3   or not you recall receiving this email.
4      A.   I mean, it doesn't stand out to
5   me that I recall immediately when we received it,
6   but sure, I mean, I'm on the email.
7      Q.   Any reason to doubt that you
8   received it?
9      A.   No.
10     Q.   Do you recall the citizen's
11  petition that's referenced in this document?
12     A.   I do not.
13     Q.   Just for the jury, sir, can you
14  briefly describe what an FDA citizen's petition
15  is?
16     A.   Sure.  So a citizen's petition is
17  a petition that's filed by anyone, any citizen of
18  the United States or advocacy group or what have
19  you.  It's opinions that are expressed and
20  written to the FDA to take into consideration.
21     Q.   And does Teva regularly track
22  citizen's petitions that have been filed with the
23  FDA?
24         MS. HILLYER:  Objection to form.

Page 261

1    THE WITNESS: Yes.
2  BY MR. GASTEEL:
3    Q.    And do you take positions on
4  citizen's petitions?  In other words, does Teva
5  file responses to citizen's petitions?
6    A.    I would say generally speaking we
7  don't.  These are petitions that are filed to FDA
8  for FDA to opine on.  There may have been cases
9  in the past where Teva has felt the need to
10 respond to one, but generally speaking we
11 typically don't respond to these citizen's
12 petitions.
13   Q.    Is it regulatory affairs that
14 tracks these citizen's petitions?
15   A.    So, at this time, it would have
16 the regulatory intelligence and policy group.
17   Q.    And who in the regulatory
18 intelligence and policy group would have been
19 responsible for tracking FDA petitions at this
20 time?
21   A.    It would be Gary Buehler or it
22 was also Gina Elton who was a part of his team
23 who is on this email.
24   Q.    Great.

Page 262

1    I want to flip to what I think is
2  the second page of that document.  It's the email
3  from Gina Elton to a variety of people, including
4  you, on Tuesday, October 29, 2013.
5    Do you see that?
6    A.    Yes.
7    Q.    And it says, "FYI -- this CP was
8  on our Watch List."
9    Did I read that correctly?
10   A.    Yes.
11   Q.    Do you know what that reference
12 to "on our Watch List" means?
13   A.    No.  I mean, I believe it has to
14 do with products -- if we have a pending or
15 approved products, therefore, we would want to
16 look at any citizen's petitions filed for any of
17 our pending or approved products.
18   Q.    And then if you flip to the next
19 page, the email kind of gives a brief summary of
20 what the citizen's petition sets forth.
21   Do you see that?
22   A.    Yes.
23   Q.    And then I want to begin with the
24 paragraph, it's kind of the last paragraph.  It

Page 263

1  says, "The CP opens with a discussion."
2    A.    Okay.
3    Q.    Do you see that?
4    And it says the CP -- and that's
5  a reference to the citizen's petition.  Right?
6    A.    That's correct.
7    Q.    "The citizen's petition opens
8  with a discussion of the current status of the
9  abuse epidemic and the current administration's
10 policy towards this problem."
11   Did I read that correctly?
12   A.    Yes.
13   Q.    And then it goes on to detail
14 some of the products that are referenced in
15 there.
16   Do you see the sentence
17 beginning, "Numerous other initiatives from other
18 Federal agencies"?  Or I'm sorry, the sentence
19 that begins, "The CP then discusses the specific
20 products."
21   A.    Yes.
22   Q.    And it says, "The CP then
23 discusses the specific products, oxycodone ER,
24 oxymorphone ER, and buprenorphine implant and the

Page 264

1  decisions made by the FDA regarding these
2  products."
3    Did I read that correctly?
4    A.    Yes.
5    Q.    And then it states, "While they
6  applauded the oxycodone decision, they were
7  highly critical of the oxymorphone and
8  buprenorphine implant decisions."
9    Did I read that correctly?
10   A.    Yes.
11   Q.    And then they state, and then it
12 goes on to state, "They state tat" -- I think
13 it's supposed to be that -- "recent FDA actions
14 indicate that the FDA is not acting in a manner
15 that adequately reflects the urgency of the
16 prescription drug abuse epidemic, and that the
17 FDA is not optimally exercising its regulatory
18 authority to enhance the Obama" Administration's
19 policies.
20   Did I read that correctly?
21   A.    Yes.
22   Q.    And then it goes on to state that
23 the applicants are seeking applications for
24 opioids without abuse-deterrent properties should

Page 265

1   not be approved and that the FDA should work with
2   sponsors to gather and report the needed data to
3   support new abuse-deterrent formulations.
4          Did I read that correctly?
5      A.   Yes.
6      Q.   What is your understanding of
7   abuse-deterrent formulations?
8      A.   Abuse-deterrent formulations,
9   meaning that it's more difficult to abuse than
10  normal, such as hard to crush, difficult to
11  snort, things like that.
12     Q.   And then do you see that the
13  summary then closes with, "It is difficult to
14  assess the overall impact on Teva.  It will
15  impact both the generic and brand opioid
16  programs-negatively for the generics and
17  positively for the brand."
18         Did I read that correctly?
19     A.   Actually, I didn't see where you
20  are.
21     Q.   It's the two last sentences of
22  that paragraph, sir.
23     A.   Yes.
24     Q.   Do you know why this citizen's

Page 266

1   petition would affect the generic Teva business
2   negatively?
3      A.   Again, without reading the
4   petition, I'm not certain.
5      Q.   And then is it because at that
6   time Teva did not manufacture any abuse-deterrent
7   formulations of generic opioids?
8          MS. HILLYER:  Objection to form,
9      calls for speculation.
10         THE WITNESS:  Yeah, I'm not
11     certain.
12  BY MR. GASTEEL:
13     Q.   Are you aware of any generic
14  opioids that Teva was producing then or has ever
15  produced, marketed and distributed that have
16  abuse-deterrent properties?
17         MS. HILLYER:  Objection to form.
18         THE WITNESS:  I don't believe so.
19  BY MR. GASTEEL:
20     Q.   Will you flip to -- I'm sorry.
21         Go back to the first page of the
22  email.
23         And then do you see that it
24  attaches the FDA opinion granting in part and

Page 267

1   denying in part this citizen's petition?
2      A.   Where are you?
3      Q.   It's on the attachments line
4   of --
5      A.   Oh, okay.
6      Q.   Do you see that?
7      A.   Yes.
8      Q.   And then if you flip to the
9   attachment, which I've included in your
10  Exhibit 24, you'll see the FDA decision.
11         Do you see that?
12     A.   Yes.
13     Q.   Will you flip to the second page,
14  and it says "Background"?
15     A.   Yes.
16     Q.   And it begins with, "Abuse and
17  misuse of prescription opioids is a public health
18  epidemic."
19         Did I read that correctly?
20     A.   Yes.
21     Q.   So it sounds like you disagree
22  with the FDA that abuse and misuse of
23  prescription opioids is a public health epidemic.
24         Do you disagree with that

Page 268

1   statement?
2          MS. HILLYER:  Objection to form.
3          THE WITNESS:  Sorry, can you
4      repeat your question?
5   BY MR. GASTEEL:
6      Q.   Do you agree or disagree with the
7   statement in this FDA ruling that "Abuse and
8   misuse of prescription opioids is a public health
9   epidemic"?
10     A.   I agree with that.
11     Q.   And that's going as far back as
12  2013.  Right?
13     A.   That's when this is from, yes.
14     Q.   And it says, "According to the
15  Centers for Disease Control and Prevention...
16  sales of prescription opioids in the United
17  States quadrupled from 1999 to 2010."
18         Did I read that correctly?
19     A.   Yes.
20     Q.   "Overdose deaths involving" those
21  "products increased commensurately over the same
22  period, from 4,030 to 16,651."
23         Did I read that correctly?
24     A.   Yes.

Page 269

1    Q.    "By 2010 prescription opioids
2    were involved in more than 75 percent of all
3    prescription drug-related overdose deaths."
4            Did I read that correctly?
5    A.    Yes.
6    Q.    Do those numbers trouble you,
7    sir?
8            MS. HILLYER:  Objection to form.
9            THE WITNESS:  I've never
10           considered those numbers before.  I never
11           thought about it.
12   BY MR. GASTEEL:
13   Q.    Well, as you're presented with
14   them today, do those numbers trouble you?
15           MS. HILLYER:  Same objection.
16           THE WITNESS:  Again, I don't have
17           an opinion on it.
18   BY MR. GASTEEL:
19   Q.    Will you flip to the next page,
20   beginning with section A, "Abuse-Deterrent
21   Opioids."
22   A.    Okay.
23   Q.    And it says, "FDA considers the
24   development of opioid analgesics with

Page 270

1    abuse-deterrent properties to be a public health
2    priority and supports that priority in several
3    ways."
4            Did I read that correctly?
5    A.    Yes.
6    Q.    Did Teva also think that
7    abuse-deterrent properties was important -- was a
8    public health priority in 2013?
9            MS. HILLYER:  Objection to form.
10           THE WITNESS:  I'm not certain.
11   BY MR. GASTEEL:
12   Q.    But at that time it was not
13   manufacturing any opioids that had
14   abuse-deterrent properties.  Correct?
15           MS. HILLYER:  Objection to form.
16           THE WITNESS:  I don't believe so.
17              - - -
18           (Deposition Exhibit No.
19           Teva-Tomsky-25, Email chain, top one
20           dated 1/14/2014, Bates stamped
21           TEVA_MDL_A_10197053 and
22           TEVA_MDL_A_10197054, was marked for
23           identification.)
24              - - -

Page 271

1    BY MR. GASTEEL:
2    Q.    You've just been handed a
3    document that we have marked as Exhibit 25.  And
4    it's an email from January 2014 from Gary Buehler
5    to a variety of people, including you.
6            Do you see that?
7    A.    Yes.
8    Q.    And it is also forwarding on an
9    email from Gina Elton from January 13, 2014.
10           Do you see that?
11   A.    Yes.
12   Q.    And then the email from Gina
13   Elton on Monday, January 13, 2014 has another one
14   of these tables that we saw in the previous
15   document.
16           Do you see that?
17   A.    Yes.
18   Q.    And it has formulated or
19   formatted it in the same way, and it again is
20   tracking another citizen's petition that has been
21   filed with the FDA.  Right?
22   A.    Yes, it appears so.
23   Q.    And then this one is from the
24   Pharmacists Planning Services is the entity that

Page 272

1    filed the citizen's petition.
2    A.    Yes.
3    Q.    And then the email from Mr.
4    Buehler to you and a variety of other people on
5    January 14, 2014 summarizes the citizen's
6    petition.
7            Do you see that?
8    A.    Yes.
9    Q.    And do you see the last -- I'm
10   sorry, the second to last paragraph, it says, "It
11   is clear that this CP is a protest by a highly
12   principled organization against the approval of
13   Zohydro ER because it did not contain
14   abuse-deterrent technology."
15           Did I read that correctly?
16   A.    Sorry, I didn't follow where you
17   are.
18   Q.    Sure.  It's the third paragraph
19   there, beginning "It is clear."
20   A.    Yes.
21   Q.    And then Mr. Buehler -- am I
22   saying his name correctly?
23   A.    Yes.
24   Q.    It's like the character in the

Page 273

1  film?
2  A.  Yes.
3  Q.  He closes that paragraph with a
4  claim that "Drug abuse in this country is an
5  epidemic."
6  Did I read that correctly?
7  A.  Yes.
8  Q.  "I do not believe that
9  abuse-deterrent products will solve the problem,
10  but they would certainly be a start in addressing
11  the impact of this problem."
12  Did I read that correctly?
13  A.  Yes.
14  Q.  Do you share that view, that
15  abuse-deterrent products will be a start in
16  addressing the impact of the drug abuse in this
17  country that Mr. Buehler was describing in this
18  email?
19  MS. HILLYER:  Objection to form.
20  THE WITNESS:  I haven't thought
21  about it.
22  BY MR. GASTEEL:
23  Q.  And then he closes that, "This CP
24  should not impact Teva."

Page 274

1  Do you see that?
2  A.  Yes.
3  Q.  Do you know why he thought that
4  this particular citizen's petition was not going
5  to impact Teva?
6  A.  I'm not certain.
7  Q.  Do you know how often you receive
8  these emails about citizen's petitions from the
9  FDA?
10  A.  So when Gary was here, we'd
11  receive them quite regularly.  But since Gary has
12  left, I would say they're few and far between.
13  Although the legal team has started taking over
14  the responsibility for circulating these.
15  Q.  Okay.  And best guess, about how
16  often do you receive these types of emails about
17  citizen's petitions at the FDA?
18  MS. HILLYER:  Objection to form.
19  THE WITNESS:  Roughly a couple
20  times a month maybe.
21  - - -
22  (Deposition Exhibit No.
23  Teva-Tomsky-26, Email dated November 21,
24  2017, Bates stamped TEVA_MDL_A_11731225

Page 275

1  through TEVA_MDL_A_11731228, was marked
2  for identification.)
3  - - -
4  BY MR. GASTEEL:
5  Q.  Do you see that -- this, sir?
6  This is an email that you sent on
7  November 21, 2017 to a variety of people I assume
8  at Teva.  Correct?
9  A.  Yes.
10  Q.  And with the subject "FDA issues
11  guidance on development of generic
12  abuse-deterrent opioids."
13  A.  Yes.
14  Q.  And it says, "All, Please see
15  below.  Attached is the guidance.  I have not"
16  reviewed yet, "but we will do so.  Wanted to
17  share with everyone ASAP."
18  Did I read that correctly?
19  A.  Yes.
20  Q.  So when this came out, you
21  thought that it was important to share to some of
22  your team at Teva.  Correct?
23  A.  Sure.  Any time any new guidances
24  come out from FDA, again, as the regulatory team

Page 276

1  is the liaison between FDA and the company, I
2  send out similar emails for any guidances that
3  are issued.
4  Q.  Sure.  And then you also included
5  the statement from the FDA commissioner, Dr.
6  Gottlieb.  Right?
7  A.  Yes.
8  Q.  Is Dr. Gottlieb still the FDA
9  commissioner today?
10  A.  For probably another couple of
11  weeks maybe.
12  Q.  And the statement begins, "As we
13  continue to confront the staggering human and
14  economic toll created by opioid abuse and
15  addiction, we're focused on taking actions that
16  reduce the scope of new addiction by decreasing
17  unnecessary exposure to opioids."
18  Did I read that correctly?
19  A.  Yes.
20  Q.  Did you agree when you forwarded
21  this testimony or this statement on to your
22  colleagues at Teva that there was a staggering
23  human and economic toll created by opioid abuse?
24  MS. HILLYER:  Objection to form.

Page 277

1  THE WITNESS: I didn't think
2  about it.
3  BY MR. GASTEEL:
4  Q.  And then again, this is talking
5  again about abuse-deterrent formulations of
6  prescription opioids.  And in the second
7  paragraph beginning with abuse with -- "Opioids
8  with abuse-deterrent formulations."
9  Do you see that?
10  A.  Yes.
11  Q.  His statement says, abuse --
12  "Opioids with abuse-deterrent formulations...are
13  intended to make certain types of abuse, such as
14  crushing a tablet to snort or dissolving a
15  capsule to inject, more difficult or less
16  rewarding."
17  Did I read that correctly?
18  A.  Yes.
19  Q.  Was that a concern because the
20  current versions of opioids on the market could
21  be easily crushed or snorted or injected?  Is
22  that part of the reason why the FDA is pushing
23  for the development of abuse-deterrent
24  formulations of prescription opioids?

Page 278

1  MS. HILLYER: Objection to form.
2  THE WITNESS: I believe so.
3  BY MR. GASTEEL:
4  Q.  And will you flip to the second
5  page of his statement.
6  And there's the first full
7  paragraph on that page beginning, "Transitioning
8  from the current market."
9  Do you see that?
10  A.  Yes.
11  Q.  His statement says,
12  "Transitioning from the current market, dominated
13  by conventional opioids, to one in which most
14  opioids have abuse-deterrent properties, holds
15  significant promise for a meaningful public
16  health benefit."
17  Did I read that correctly?
18  A.  Yes.
19  Q.  Did you agree with his statement,
20  that a meaningful public health benefit could be
21  obtained by moving to abuse-deterrent property
22  prescription opioids, as opposed to the
23  conventional opioids that have dominated the
24  market for the last several years?

Page 279

1  MS. HILLYER: Objection to form.
2  THE WITNESS: I didn't think
3  about it.
4  BY MR. GASTEEL:
5  Q.  And when the FDA commissioner in
6  this statement references "dominated by
7  conventional opioids," he's referencing the
8  prescription opioids that Teva has been
9  manufacturing for several years.  Correct?
10  MS. HILLYER: Objection to form
11  and calls for speculation.
12  THE WITNESS: He's referring to
13  opioids that do not have abuse-deterrent
14  properties.
15  BY MR. GASTEEL:
16  Q.  And that would be the types of
17  opioids that Teva has been manufacturing for
18  several years?
19  A.  Sure, yes.
20  Q.  You recall today that Mr.
21  Crawford had asked you a lot of questions
22  about -- I believe it's Exhibit 2, which is the
23  document that listed Teva's opioid products and
24  its share of -- market share of prescription

Page 280

1  opioids.
2  Do you recall that document and
3  testifying?
4  A.  Yes.
5  Q.  As we review some of these
6  documents about the FDA statements regarding
7  prescription opioids abuse and misuse, does it
8  concern you at all that Teva has made these
9  conventional opioids that are the source of this
10  problem, and continues to do so, without any
11  abuse-deterrent properties?
12  MS. HILLYER: Objection to form.
13  THE WITNESS: No.  These are
14  FDA-approved products that when
15  prescribed according to the FDA-approved
16  label, and taking into consideration the
17  FDA-approved warnings and precautions,
18  and when patients use them as directed,
19  and when licensed pharmacists dispense
20  them as directed, these medicines still
21  serve a medical need to patients who need
22  them.
23  BY MR. GASTEEL:
24  Q.  Sure.  But Teva is aware that

Page 281

1  there is large-scale abuse and misuse, in other
2  words, there's large scale use that is outside of
3  the process of people taking them as directed
4  when a licensed pharmacist dispenses them
5  pursuant to a valid prescription.  Right?
6        MS. HILLYER:  Objection to form.
7        THE WITNESS:  Yes.  And FDA is
8     aware of that information as well, and
9     that's why there's risk mitigation
10    strategies put in place as well.
11  BY MR. GASTEEL:
12      Q.    And those risk mitigation
13  strategies have been in place for several years.
14  Right?
15      A.    Yes.
16      Q.    And we've seen, at least as of
17  2017, the commissioner of the FDA, in statements
18  that you've forwarded to your colleagues at Teva,
19  is continuing to talk about the staggering human
20  and economic toll created by opioid abuse and
21  addiction.  Right?
22      A.    Correct.  But FDA still hasn't
23  pulled those products off the market yet.
24      Q.    And then Teva continues to

Page 282

1  market, sell and distribute those throughout the
2  country, including in states like the state of
3  Tennessee.  Right?
4      A.    I'm not certain, actually.
5      Q.    You're not certain as to whether
6  or not Teva continues to market, sell, distribute
7  and produce prescription opioids throughout the
8  country?
9      A.    I don't know which products Teva
10  is actively marketing right now, especially
11  specific to opioids, and as well as whether or
12  not they're sold in Tennessee or dispensed in
13  Tennessee.
14      Q.    Were you ever on an FDA advisory
15  committee regarding Opana ER?
16      A.    No.
17      Q.    Do you recall whether or not --
18  do you recall -- let me back up.
19        Do you know what Opana ER is?
20      A.    Yes.
21      Q.    What is it?
22      A.    Oxymorphone extended release.
23      Q.    And that was a branded product
24  that was manufactured by Endo Pharmaceuticals.

Page 283

1  Right?
2      A.    I believe so.
3      Q.    And then there was a generic
4  version of that product that Teva also produced.
5  Right?
6        MS. HILLYER:  Objection to form.
7        THE WITNESS:  I believe so.
8     Again, I'm not certain whether or not we
9     manufactured it.
10  BY MR. GASTEEL:
11      Q.    Do you recall anything
12  specifically about the reformulation of Opana ER
13  that included an abuse-deterrent property?
14      A.    Vaguely.
15      Q.    You don't recall anything
16  specifically about that?
17      A.    No.
18      Q.    Do you recall that, at some
19  point, Teva pulled an ANDA related to oxymorphone
20  ER tablets that was pending in front of the FDA
21  in and around 2017?
22        MS. HILLYER:  Objection to form.
23        THE WITNESS:  Pulled meaning
24     withdrew?

Page 284

1  BY MR. GASTEEL:
2      Q.    Yes.
3      A.    Nothing stands out in my mind
4  about it.
5        MR. GASTEEL:  Mr. Tomsky, I
6     believe that's all the questions I have
7     for you.
8        MS. HILLYER:  I just have one
9     follow-up.
10              - - -
11         EXAMINATION
12              - - -
13  BY MS. HILLYER:
14      Q.    Mr. Tomsky, when you referenced
15  that you received emails from Mr. Buehler
16  concerning citizen's petitions, and you mentioned
17  that you would receive them perhaps a couple of
18  times a month, were those concerning all
19  products, all generics?
20      A.    Yes.  Anything that Teva had
21  pending or approved.
22        MS. HILLYER:  Okay.  I have no
23     further questions.
24        THE VIDEOGRAPHER:  Okay.  That

Page 285

1  concludes today's deposition.  The time
2  is 3:30 p.m.
3      (Witness excused.)
4      (Deposition concluded at
5  approximately 3:30 p m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 286

1
2          CERTIFICATE
3
4
5      I HEREBY CERTIFY that the witness
was duly sworn by me and that the deposition is a
6  true record of the testimony given by the
witness.
7
8      It was requested before
completion of the deposition that the witness,
SCOTT D. TOMSKY, have the opportunity to read and
9  sign the deposition transcript.
10
11
12
13
    _____
14  ANN MARIE MITCHELL, a Federally
    Approved Certified Realtime
15  Reporter, Registered Diplomate
    Reporter, Registered Merit Reporter and
16  Notary Public
17
18
19      (The foregoing certification of
20  this transcript does not apply to any
21  reproduction of the same by any means, unless
22  under the direct control and/or supervision of
23  the certifying reporter.)
24

Page 287

INSTRUCTIONS TO WITNESS

1
2
3      Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8      After doing so, please sign the
9  errata sheet and date it.
10      You are signing same subject to
11  the changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13      It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt of
16  the deposition transcript by you.  If you fail to
17  do so, the deposition transcript may be deemed to
18  be accurate and may be used in court.
19
20
21
22
23
24

Page 288

1      - - - - - -
        E R R A T A
2      - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6      REASON:  _____
7  ____  ____  _____
8      REASON:  _____
9  ____  ____  _____
10      REASON:  _____
11  ____  ____  _____
12      REASON:  _____
13  ____  ____  _____
14      REASON:  _____
15  ____  ____  _____
16      REASON:  _____
17  ____  ____  _____
18      REASON:  _____
19  ____  ____  _____
20      REASON:  _____
21  ____  ____  _____
22      REASON:  _____
23  ____  ____  _____
24      REASON:  _____

Page 289

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4          I,_____, do
 5    hereby certify that I have read the foregoing
 6    pages, 1 - 289, and that the same is a correct
 7    transcription of the answers given by me to the
 8    questions therein propounded, except for the
 9    corrections or changes in form or substance, if
10    any, noted in the attached Errata Sheet.
11
12
13    _____
14    SCOTT D. TOMSKY              DATE
15
16
17    Subscribed and sworn
      to before me this
18    _____ day of _____, 20_____.
19    My commission expires:_____
20
      _____
21    Notary Public
22
23
24
```