1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3   IN RE:  NATIONAL      :  MDL No. 2804
     PRESCRIPTION OPIATE   :
 4   LITIGATION            :  Case No. 17-md-2804
                           :
 5   APPLIES TO ALL CASES  :  Judge Dan Aaron Polster
                           :
 6                         :

 7

 8                     HIGHLY CONFIDENTIAL

 9        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                       - - - -

12                   DECEMBER 13, 2018

13                       - - - -

14     VIDEOTAPED DEPOSITION OF HBC SERVICE COMPANY'S

15          DESIGNATED 30(B)(6) REPRESENTATIVE,

16                   JAMES TSIPAKIS,

17   taken pursuant to notice, was held at Marcus & Shapira,

18   One Oxford Center, 35th Floor, Pittsburgh, Pennsylvania

19   15219, by and before Ann Medis, Registered Professional

20   Reporter and Notary Public in and for the Commonwealth

21   of Pennsylvania, on Thursday, December 13, 2018,

22   commencing at 9:09 a.m.

23                       - - - -

24             GOLKOW LITIGATION SERVICES
         877.370.3377 phone | 917.591.5672 fax
25                   deps@golkow.com
```

2

1                    A P P E A R A N C E S

2    On behalf of Plaintiffs

3            LEVIN PAPANTONIO THOMAS  MITCHELL
             RAFFERTY PROCTOR, P.A.
4            BY:  JEFF R. GADDY, ESQUIRE
             316 South Baylen Street, Suite 600
5            Pensacola, Florida  32502
             800.277.1193
6            jgaddy@levinlaw.com

7            WAGSTAFF & CARTMELL, LLP
             BY:  TOM ROTTINGHAUS, ESQUIRE
8            AND  THOMAS SIDLINGER, ESQUIRE
             4740 Grand Avenue, Suite 300
9            Kansas City, Missouri  64112
             816.701.1100
10           trottinghaus@wcllp.com
             tsidlinger@wcllp.com
11

12   On behalf of Defendant AmerisourceBergen Drug
     Corporation
13
             REED SMITH, LLP
14           BY:  BRIAN T. HIMMEL, ESQUIRE
             Reed Smith Centre
15           225 Fifth Avenue
             Pittsburgh, Pennsylvania  15222
16           412.288.3131
             bhimmel@reedsmith.com
17

18   On behalf of Defendant Cardinal Health, Inc.

19           WILLIAMS & CONNOLLY LLP
             BY:  COLLEEN MCNAMARA, ESQUIRE
20           725 Twelfth Street, NW
             Washington, DC  20005
21           202.434.5013
             cmcnamars@wc.com
22

23

24

25

3

1          A P P E A R A N C E S   (Continued)

2     On behalf of Defendants Endo Pharmaceuticals, Endo
      Health Solutions and Par Pharmaceuticals

3
               (By phone/Livestream)
4              ARNOLD & PORTER KAYE SCHOLER LLP
               BY:  DAVID KOUBA, ESQUIRE
5              601 Massachusetts Avenue, NW
               Washington, DC  20001-37453
6              202.942.5743
               david.kouba@arnoldporter.com
7

8     On behalf of Defendant HBC Service Company

9              MARCUS & SHAPIRA, LLP
               BY:  THOMAS M. BARNES, ESQUIRE
10             AND  JOSHUA A. KOBRIN, ESQUIRE
               AND  DANIEL B. MULLEN, ESQUIRE
11                 (Video stream and realtime)
               One Oxford Centre, 35th Floor
12             Pittsburgh, Pennsylvania  15219
               412.471.3490
13             rbarnes@marcus-shapira.com
               kobrin@marcus-shapira.com
14             mullen@marcus-shapira.com

15
      On behalf of Defendant McKesson Corporation
16
               COVINGTON & BURLING, LLP
17             BY:  EMILY KVESELIS, ESQUIRE
               One CityCenter
18             850 Tenth Street, NW
               Washington, DC  20001-4956
19             202.662.5807
               ekveselis@cov.com
20

21    Also present

22             Chris Ratano, videographer

23

24

25

4

1                         * I N D E X *

2     THOMAS TSIPAKIS                              PAGE

3       EXAMINATION BY MR. GADDY                 8, 297
        EXAMINATION BY MR. ROTTINGHAUS              233
4       EXAMINATION BY MR. MR. BARNES          269, 309

5            * INDEX OF HBC-TSIPAKIS EXHIBITS *

6     NO.                 DESCRIPTION                PAGE
      Exhibit 1   First Notice of Deposition          10
7                 Pursuant to Rule 30(b)(6) and
                  Document Request Pursuant to
8                 Rule 30(b)(2) and Rule 34 to
                  Defendant HBC Service Company
9                 P-HBC-0001 - 0001.10

10    Exhibit 2   Second Notice of Deposition         13
                  Pursuant to Rule 30(b)(6) and
11                Document Request Pursuant to
                  Rule 30(b)(2) and Rule 34 to
12                Defendant HBC Service Company
                  P-HBC-0002 - 0002.14
13
      Exhibit 3   Letter, 10/15/18, J. Kobrin to      15
14                Liaison Counsel for Plaintiffs
                  and Defendants regarding topics
15                deponent has been designated for
                  in First and Second Notice
16                P-HBC-0009 - 0009.2

17    Exhibit 4   HBC Service Company's Responses      16
                  to Plaintiffs' (First) Set of
18                Combined Discovery Responses
                  P-HBC-0011 - 0011.20
19
      Exhibit 5   Legislative history leading up to    27
20                the Controlled Substance Act
                  MCK 30b6_06 - 001 - 102
21
      Exhibit 6   21 U.S.C. Section 823                34
22                P-GEN-0085 - 0085.6

23    Exhibit 7   DEA Drug Fact Sheet for              43
                  Hydrocodone
24                P-GEN-0086 - 0086.2

25

1      * INDEX OF HBC-TSIPAKIS EXHIBITS (Continued) *

2    NO.                 DESCRIPTION               PAGE
     Exhibit 8   GAO Report "Prescription Drugs      49
3                State Monitoring Programs Provide
                 Useful Tool to Reduce Diversion,"
4                May 2002
                 P1.1076 - 1076.27
5

     Exhibit 9   CFR Regulation 1301.74, Security    54
6                Requirements
                 P1.47 - 1.47.2
7

     Exhibit 10  Press release "Cardinal Health,     60
8                Incorporated agrees to pay $34
                 million to settle claims that it
9                failed to report suspicious sales of
                 widely abused controlled substances,"
10               10/2/08
                 P.1.48.1 - 1.48.2
11

     Exhibit 11  Reuters article "AmerisouceBergen   64
12               gets DEA distribution halt order,"
                 4/24/07
13               P-GEN-0091

     Exhibit 12  Giant Eagle Inventory Control -      75
14               Suspicious Order Policy
15               P-HBC-0012 - 0012.16

     Exhibit 13  Letter, 6/12/12, to registered     122
16               manufacturers and distributors
17               to controlled substances, re
                 suspicious orders
18               ABDCMDL00269683 - 00269694

     Exhibit 14  Giant Eagle threshold report       138
19               P-HBC-1032
20

     Exhibit 15  HBC Dosage Unit Distribution to    180
21               Cuyahoga County, Summit County, and
                 all of Ohio
22               P-HBC0015

     Exhibit 16  Emails re Daily HBC Suspicious     183
23               Orders
24               P-HBC-0013 - 0013.41

25

6

1      * INDEX OF HBC-TSIPAKIS EXHIBITS (Continued) *

2    NO.                    DESCRIPTION                    PAGE
     Exhibit 17  Email, 12/5/13, from J. Millward to   196
3                A. Mollica, et al., subject:  2401
                 HBC_MDL0032815 - 0032816
4
     Exhibit 18  Email chain, 8/20/15, from G.          199
5                Carlson to J. Jenson, et al.,
                 subject: FW: Thrifty White Notes
6                HBC_MDL00069566 - 00069571

7    Exhibit 19  Email, 11/16/15, from J. Millward      205
                 to P. Raub, et al., subject: SOM
8                and Controlled drug monitoring
                 HBC_MDL000049996
9
     Exhibit 20  Email chain, 3/29/16, from A.          210
10               Zakin to G. Chunderlik, et al.,
                 subject: RE: Giant Eagle / Buzzeo
11               PDMA: SOM Services Proposal
                 HBC_MDL00028498 - 00028500
12
     Exhibit 21  Email, 8/16, from J. Cornwell to       216
13               P. Raub, et al., subject:  Emailing:
                 Order_Item_Blocking_5-Dec_13.docx,
14               SuspiciousReporting.sql
                 HBC_MDL00086642 - 00086644
15
     Exhibit 22  Email, 11/21/16, from P. Raub to       219
16               M. Doerr, et al., subject: RE:
                 Suspicious Order Monitoring (SOM)
17               HBC-MDL00046220 - 00046228

18   Exhibit 23  Email chain, 1/10/14, from T.          240
                 Roahrig to J. Millward, subject: RE:
19               Daily HBC Suspicious Purchasing
                 Report - 01/09/14
20               HBC_MDL00039223

21   Exhibit 24  20140130_Daily_HBC_Controls            242
                 P-HBC-1055; 1054; 1059; 1052; 1053
22
     Exhibit 25   Letter, 4/28/14, to DEA, Re:          259
23                Pharmacy Profession Comments to
                  DEA Notice of Proposed Rulemaking
24                on the Rescheduling of Hydrocodone
                  Combination Products from Schedule
25                III to Schedule II

7

```
1                    P R O C E E D I N G S

2                         - - - -

3           THE VIDEOGRAPHER:  We are now on the

4    record.  My name is Chris Ratano.  Today's date is

5    December 13, 2018, and the time is approximately

6    9:09 a.m.

7        This video deposition is being held in

8    Pittsburgh, PA at Marcus & Shapira, LLP, One

9    Oxford Centre, 35th Floor, in the matter of

10   National Prescription Opioid Litigation, MDL No.

11   2804, Case No. 17-md-2804.

12       The deponent today is James Tsipakis.  All

13   counsel will be noted upon the stenographic

14   record.

15       The court reporter today, Ann Medis, will

16   please swear in the witness.

17                   JAMES TSIPAKIS,

18      having been first duly sworn, was examined

19              and testified as follows:

20           THE VIDEOGRAPHER:  You May proceed.

21           MR. GADDY:  Can we have all counsel who

22   is present identify themselves.

23       This is Jeff Gaddy for plaintiffs.

24           MR. ROTTINGHAUS:  Tom Rottinghaus for

25   plaintiffs.
```

1          MR. SIDLINGER:  Along with Thomas

2    Sidlinger for plaintiffs.

3          MS. KVESELIS:  Emily Kveselis from

4    Covington for McKesson.

5          MS. MCNAMARA:  Colleen McNamara,

6    Williams & Connolly, for Cardinal Health.

7          MR. HIMMEL:  Brian Himmel from Reed

8    Smith for AmerisourceBergen Drug Corporation.

9          MR. KOBRIN:  Josh Kobrin with Marcus &

10   Shapira for HBC Services Company.

11          MR. BARNES:  Robert Barnes, Marcus &

12   Shapira, HBC Service Company.

13                    EXAMINATION

14   BY MR. GADDY:

15       Q.   Good morning.  State your name, please.

16       A.   James Tsipakis.

17       Q.   And, Mr. Tsipakis, who do you work for?

18       A.   Giant Eagle.

19       Q.   And what's your position with Giant

20   Eagle?

21       A.   Head of pharmacy for Giant Eagle.

22       Q.   Okay.  Do you understand that you're

23   here to testify today on behalf of HBC?

24       A.   I do.

25       Q.   And do you understand that you've been

9

1    designated by HBC as a 30(b)(6) witness to testify

2    on behalf of the company HBC?

3         A.   I do.

4         Q.   So you understand the answers that you

5    give today will not be Jim Tsipakis's answers, but

6    they will be HBC's answers?

7         A.   I do.

8         Q.   Now, you mentioned you're employed by

9    Giant Eagle; correct?

10        A.   Yes.

11        Q.   Explain to me your understanding of the

12   relationship between Giant Eagle and HBC.

13        A.   Giant Eagle, as a company, owns HBC.

14        Q.   So HBC is a division of Giant Eagle?

15        A.   I'm not sure of the legal entities.  I

16   know Giant Eagle, as a company, owns HBC.

17        Q.   So the -- HBC and Giant Eagle are not

18   competitors.

19        A.   Giant Eagle owns HBC.  It's -- it's one

20   of our company assets.

21        Q.   How long has Giant Eagle owned HBC?

22        A.   I'm not exactly sure.

23        Q.   Is HBC still in business?

24        A.   HBC is still operating, yes.

25        Q.   Does HBC still distribute products to

1   Giant Eagle's pharmacies -- or, excuse me, Giant

2   Eagle stores?

3        A.   Yes.

4        Q.   Does HBC still distribute any narcotics

5   to Giant Eagle stores?

6        A.   It does not.

7        Q.   So not even noncontrolled narcotics?

8        A.   Prescription drugs, no.

9        Q.   Does it distribute over-the-counter

10  drugs to Giant Eagle stores?

11       A.   Yes.

12       Q.   I'm going to show you what's marked as

13  HBC 1.

14            (HBC-Tsipakis Exhibit 1 was marked.)

15  BY MR. GADDY:

16       Q.   I'll ask you if you recognize that

17  document.

18       This is the first notice of deposition.  Have

19  you seen this before?

20       A.   Yes.

21       Q.   And have you had the opportunity to

22  review this?

23       A.   Parts of it, yes.

24       Q.   If you turn to the -- do you see in the

25  upper right-hand corner, as you turn the pages,

11

1   there's going to be .2, .3, .4, as you go through

2   the page numbers.

3       Do you see that?

4       A.   Yes.

5       Q.   If you turn to .2.  And down at the

6   bottom of the bottom there's a heading that says

7   "Duty to Prepare."

8       Do you see that?

9       A.   Yes.

10      Q.   It says, "The testimony elicited in the

11  deposition represents HBC's knowledge, not the

12  individual deponent's knowledge."

13      Do you see that?

14      A.   Yes.

15      Q.   And that's consistent with your

16  understanding?

17      A.   Yes.

18      Q.   It goes on down to say that "HBC must

19  conduct a thorough investigation in response to

20  deposition notice and must prepare a witness to

21  testify to all matters known or reasonably

22  available to the organization."

23      Do you see that?

24      A.   Yes.

25      Q.   It then says that "If HBC designee is

1    not knowledgeable about the matters specified in

2    the deposition notice, it must, nonetheless,

3    prepare such designee to give knowledgeable,

4    binding answers."

5         Do you see that?

6         A.   Yes.

7         Q.   How long have you been with Giant Eagle?

8         A.   Since late October 2017.

9         Q.   Do you understand that this deposition

10   notice will cover activity going back to 2006?

11        A.   Yes.

12        Q.   And have you taken steps to prepare to

13   be able to answer questions about HBC's conduct

14   going back to 2006?

15        A.   Yes.

16        Q.   What did you do to prepare?

17        A.   Met with Giant Eagle's internal and

18   external counsel.  Spoke to employees within our

19   organization.  Looked through documents, and did a

20   diligence.

21        Q.   Let me ask you this.

22        When did you first find out you were going to

23   be the designee to testify here?

24        A.   Roughly, about four weeks ago.

25        Q.   And in the last four weeks, how much

1    time would you say you spent preparing for this

2    deposition?

3        A.   Forty to 50 hours.

4        Q.   If you would turn towards, for me,

5    please to .6.

6        Do you see at the top of the page it says,

7    "Subject Matters for Testimony"?

8        A.   Yes.

9        Q.   And are you prepared to give testimony

10   today on behalf of HBC on the topics listed there

11   all the way through N on the next page?

12       A.   Yes.

13       Q.   And for each of these topics, are you

14   prepared to give testimony going back to 2006?

15       A.   Yes.

16       Q.   I'm going to show you what I'll mark as

17   Exhibit No. 2 to your deposition here today.

18            (HBC-Tsipakis Exhibit 2 was marked.)

19   BY MR. GADDY:

20       Q.   Tell me if you recognize this document,

21   if you had an opportunity to review it before.

22       It is the second 30(b)(6) notice.

23       A.   I'm sorry.  Your question is?

24       Q.   Have you seen this before and had the

25   opportunity to review it?

14

1      A.   Parts of it, yes.

2      Q.   And I'll represent to you it has the

3  same obligations as far as requiring you to

4  prepare to provide responsive answers for the

5  relevant time period, which is back to 2006.

6      Did you do that for the topics that you're

7  going to testify about as it relates to this

8  notice as well?

9      A.   Is there specific areas that you'd like

10  to point me to that -- as you did on the previous

11  document?

12      Q.   Well, sure.  If you turn to page 8,

13  Topic 6, 7, and 8, are you prepared to testify on

14  those today?

15      A.   Yes.

16      Q.   And if you turn to page 9, on Topic 12,

17  are you prepared to testify on that today?

18      A.   Yes.

19      Q.   And then on page 10, Topics 17, 18, and

20  20, 21, and 22, are you prepared to testify on

21  those today?

22      A.   Yes.

23      Q.   And the 40 to 50 hours that you told me

24  you spent preparing earlier, was that -- did that

25  also include the time you spent preparing to

                                                              15

1    testify on these topics?

2         A.   Yes.

3              MR. BARNES:  Jeff, I'll note for the

4    record that he's prepared to testify on these

5    topics as may have been amended by the special

6    master.

7              MR. GADDY:  I'm also going to mark, for

8    the record, Exhibit No. 3.

9              (HBC-Tsipakis Exhibit 3 was marked.)

10   BY MR. GADDY:

11        Q.   I don't know if you had the opportunity

12   to see this before.

13        Is that familiar to you?

14        A.   No.

15        Q.   I won't ask you any questions about it,

16   Mr. Tsipakis.

17        You told me a few minutes ago that HBC no

18   longer distributes any prescription drugs to Giant

19   Eagle.

20        That's correct?

21        A.   Yes.

22        Q.   At some period of time, did HBC have a

23   license to distribute Schedules III, IV, and V

24   controlled substances?

25        A.   Yes.

1       Q.    What period of time?

2       A.    From -- my recollection is from 2009,

3   late 2009, through early 2016.

4       Q.    Are you telling me the time period that

5   they actually distributed hydrocodone products or

6   the period for which they had a license?

7       Do you understand the difference?

8       A.    Yes, sir.

9       HBC received a license to distribute earlier

10  in 2009, but did not begin distributing products

11  until late 2009.

12      Then it continued to supply product until it

13  was shut down -- till that portion was shut down

14  in 2016.

15      Q.    So the license was obtained by HBC prior

16  to 2009; correct?

17      A.    My understanding is the license for HBC

18  was obtained in early 2009.

19      Q.    Let me see if I can refresh your

20  recollection.

21      I'm going to show you what's been marked as

22  Exhibit 4 to your deposition.

23           (HBC-Tsipakis Exhibit 4 was marked.)

24  BY MR. GADDY:

25      Q.    This is HBC's responses to the first set

1    of combined discovery responses.

2         Have you seen this document before?

3         A.    Sure.

4         Q.    And this is HBC 11 for our internal

5    reference number.

6         A.    It looks somewhat familiar, yes.

7         Q.    Did you have any -- provide any

8    assistance in preparing the responses to these?

9         A.    May I glance through them to --

10        Q.    Of course.

11        A.    Looking through this, I don't recognize

12   any specific areas that I would have -- at least

13   from the surface, the quick read that I did, I

14   don't see specific areas that I would have added

15   to this.

16        Q.    Do you know whether or not you helped

17   gather any documents that would have been

18   responsive to either this or any of the other

19   discovery requests in the case?

20        Have you ever helped the attorneys gather

21   documents or collect documents?

22        A.    Can you help me?  Can you repeat the

23   question?

24        Q.    Sure.  So in this litigation, HBC has

25   produced documents to us.

18

```
1           Have you ever assisted with that in any way?

2           A.   I assisted in the form of allowing and

3    making sure that employees and folks that would

4    have information were available for whatever was

5    needed to gather the information for this case.

6           Q.   So you -- would it be fair to say you

7    acted as the liaison to different employees as

8    opposed to you personally gathering documents?

9           A.   I assisted -- being newer to the

10   company, there wasn't a lot of documents and

11   information that I had.

12          So certainly it was folks related to, within

13   the organization, that had different knowledge

14   needed.  And, as I said, we made sure that people

15   were available, information that was needed was

16   made available to -- to our attorneys and

17   certainly the folks helping prepare for the case.

18          Q.   If you would, turn to page 8 of that.

19          And I was asking you earlier about the dates

20   that HBC had a license to distribute controlled

21   substances.

22          Do you recall that?

23          A.   Yes.

24          Q.   And you agree that to have a license to

25   distribute controlled substances, you have to be
```

19

```
1    registered with the DEA?

2        A.   Yes.

3        Q.   If you look there in the middle of the

4    page it says that -- the question that's being

5    asked there is, "Please produce each of your

6    suspicious order monitoring system policies and

7    procedures since January 1, 2006."

8        Do you see that?

9        A.   Yes.

10       Q.   And I'll represent to you that this

11   first paragraph here is a series of -- series of

12   objections.

13       I'm going to take you about halfway down the

14   paragraph.  On the right side of the page there's

15   a sentence that starts, "HBC also..."

16       A.   "HBC also..."

17       Q.   Are you with me?

18       A.   Yes.

19       Q.   It says, "HBC also objects to the time

20   period of since January 1, 2006 as overly broad,

21   unduly burdensome, not proportional, not

22   relevant."

23       And it goes on to say, "HBC, which did not

24   provide services as a licensed distributor of

25   controlled substances until 2007."
```

20

1       Do you see that?

2       A.   I do.

3       Q.   Does that refresh your recollection that

4   HBC was -- actually was licensed by the DEA as a

5   registrant back in 2007?

6       And then if you continue to read, it says,

7   "They did not distribute any Schedule III opioids

8   until November of 2009."

9       A.   I do see that.

10      Q.   Do you know which month in 2007 HBC

11  became licensed by the DEA?

12      A.   I do not.

13          MR. BARNES:  Jeff, if it makes things

14  easier, that answer is going to be amended to

15  2009, because we have since learned that it was

16  2009.

17          MR. GADDY:  Okay.  When did you find

18  that out?

19          MR. BARNES:  During his prep.

20          MR. GADDY:  And you're telling me now in

21  the middle of the deposition?

22          MR. BARNES:  Well, I'm telling you --

23  I'm obviously telling you now.

24          MR. GADDY:  I mean, how long have you

25  known that?

1           MR. BARNES:  Probably about 48 hours.

2           MR. GADDY:  I got an email from Josh

3     last night and had a call with Josh two days ago.

4       It's fairly significant, don't you think?

5           MR. KOBRIN:  They never represented that

6     they distributed before 2009, so that probably

7     never came up and I never thought it was going to

8     be pertinent to this deposition.

9       It doesn't change any of our distribution

10    activities.

11          MR. GADDY:  Is there anything else you

12    all are going to be amending, before we keep

13    going, about any of these responses?

14          MR. BARNES:  Not that I can think of

15    right now.  If something comes to mind, I'll let

16    you know.

17          MR. GADDY:  Okay.  About 30 minutes ago

18    Josh gave me a new suspicious order that was

19    reported in 2013.

20      Are there any more suspicious orders?

21          MR. BARNES:  Yeah.  That was for a

22    Control III, which is irrelevant to the case.  We

23    thought we would give it to you anyway since you

24    wanted -- you seem to be interested in suspicious

25    orders.

22

```
 1        Are you complaining that you're getting a

 2     suspicious order or don't you want the IIIs at

 3     all?

 4              MR. GADDY:  I'm complaining that I'm

 5     getting it the morning of the deposition when

 6     discovery has been going on for five or six

 7     months.

 8        I'm asking if there's any more, that you're

 9     aware of, that haven't been given.

10              MR. BARNES:  If we find any more

11     irrelevant documents, we'll get them to you as

12     fast as we can.

13              MR. KOBRIN:  Just for the record, I

14     emailed you last night.  I told you that we

15     discovered it and I would have copies for you this

16     morning.  And we gave you those copies.

17              MR. GADDY:  I'm just asking if there's

18     anything else.

19              MR. KOBRIN:  Not to our knowledge at

20     this time.

21     BY MR. GADDY:

22        Q.  Mr. Tsipakis, what's your understanding

23     of the time period in which HBC did, in fact,

24     distribute Schedules III, IV, and V controlled

25     substances?
```

23

1      A.   From late 2009 to early 2016.

2      Q.   And to what businesses or entities did

3    HBC distribute controlled substances?

4      A.   To our own stores, Giant Eagle

5    pharmacies.

6      Q.   Did HBC distribute to any other

7    businesses, pharmacies, hospitals, physicians,

8    other than Giant Eagle stores?

9      A.   No.

10      Q.   During the time period that HBC

11    distributed Schedule III controlled substances,

12    would it be accurate to say that opioids, and,

13    more specifically, hydrocodone combination

14    products was one of the drugs that HBC

15    distributed?

16      A.   HBC only distributed hydrocodone

17    products as a Schedule III.  Once it was

18    reclassed, they no longer distributed those

19    products.

20      Q.   So the answer is, yes, from 2009 until

21    200- -- or, excuse me, until hydrocodone was

22    reclassified, HBC did distribute hydrocodone

23    combination products?

24      A.   From -- potentially from '09 through the

25    reclass, yes.

24

```
 1        Q.   Were there any Schedule III drugs that
 2   HBC refused to distribute?
 3            MR. BARNES:  Objection.  Relevance.
 4   Discovery master has held Schedule IIIs to be
 5   irrelevant.
 6            MR. GADDY:  You made your objection.
 7   You made your objection, Bob.
 8        The witness can answer the question.
 9            THE WITNESS:  Can you repeat the
10   question, please?
11   BY MR. GADDY:
12        Q.   Sure.  Are there any Schedule III drugs
13   that HBC refused to distribute?
14            MR. BARNES:  Objection.
15            THE WITNESS:  When you say "refused," I
16   don't understand.
17   BY MR. GADDY:
18        Q.   Sure.  Were there any Schedule III drugs
19   that HBC decided these drugs are addictive,
20   they're subject to abuse, we're not going to
21   distribute those drugs?
22            MR. BARNES:  Same objection.
23            THE WITNESS:  The product mix was based
24   on many factors.  There was no -- there was no --
25   there was no block on products, as any business
```

[12/13/2018] Tsipakis121318

25

```
 1    decides what products to carry in the warehouse or

 2    not.

 3         So I guess I'm still not understanding your

 4    question specifically.

 5    BY MR. GADDY:

 6         Q.   Okay.  I think it's fairly simple.

 7         I'm asking whether or not HBC made a decision

 8    to not distribute any particular drug that they

 9    were licensed and had the ability to distribute.

10         A.   Okay.  I understand now.

11         No.

12         Q.   Can you give me some examples of the

13    types of hydrocodone combination products that HBC

14    would have distributed?

15         A.   Hydrocodone-containing products.

16    Generic Vicodin products.  Certainly cough syrups

17    that had hydrocodone in it.  Different

18    formulations and different generic names,

19    et cetera.  Those types of products.

20         Q.   And Vicodin is a product that's a

21    combination of hydrocodone and acetaminophen?

22         A.   Correct.

23         Q.   Also Lortab, the same type of product?

24         A.   Yes.

25         Q.   Norco I think is the type of product?
```

1      A.   Yes.

2      Q.   And those are all types of drugs that

3  HBC would have distributed from 2009 until 2014

4  when the schedules changed.

5      A.   Yes.

6      Q.   Now, do you have an understanding of

7  HBC's responsibilities under the Controlled

8  Substance Act?

9      A.   I do, yes.

10     Q.   Is that something that you have in the

11  normal course of your job duties or is that

12  something that you had to prepare for today?

13     A.   Specifically to HBC, it's as a

14  registrant, so it has a duty to uphold all of the

15  laws that it's governed by, yes.

16     Q.   My question was a little bit different.

17     Did you have an understanding of those laws

18  and regulations in the course of your own position

19  with Giant Eagle or is that something that you had

20  to prepare for today?

21     And let me kind of explain what I'm asking.

22     You would agree that there's different rules

23  and regulations for pharmacies than there are for

24  distributors; correct?

25     A.   Yes.

27

1      Q.   And your position with Giant Eagle,

2  would it be fair to say, more relates to the

3  pharmacy side?

4      A.   My current position?

5      Q.   Yes.

6      A.   I'm responsible for the total pharmacy

7  operations.

8      Q.   Does that include the distribution of

9  Schedule II, III narcotics?

10     A.   I don't directly oversee the warehouse.

11  But certainly I have -- I'm a stakeholder within

12  the total company.

13     As an officer of the company, it -- I have an

14  obligation for all portions of the company,

15  including distribution, although I don't

16  day-to-day oversee that.

17     Q.   So did you have to prepare to be able to

18  testify today about HBC's responsibilities under

19  the Controlled Substance Act as it relates to its

20  role as a distributor?

21     A.   Yes.

22     Q.   I'm going to show you PGent 40, which

23  I'm going to mark as Exhibit No. 5.

24          (HBC-Tsipakis Exhibit 5 was marked.)

25

28

1    BY MR. GADDY:

2         Q.   And I'll represent to you this is the

3    legislative history leading up to the -- what's

4    commonly referred to as the Controlled Substance

5    Act.

6         Do you know if you've ever seen this document

7    before?

8         A.   Vaguely familiar.

9         Q.   Is HBC familiar and have an

10   understanding of the Controlled Substance Act?

11        A.   Yes.

12        Q.   If you turn to -- the numbering system

13   is a little bit different on this one.  You'll

14   have a dash.  And I'm on page -002, the second

15   page of the document.

16        Are you with me?

17        A.   Yes, sir.

18        Q.   If you go down about two-thirds,

19   three-fourths of the way down the page, there's a

20   section that says "Principal Purpose of this

21   Bill."

22        Do you see that?

23        A.   I'm sorry.  Where?  The second page?

24        Q.   Let me actually -- let me start at the

25   very top first.

29

1      A.   Okay.

2      Q.   At the very top of the page, see it's

3  got the HR, it's got the bill number, and then

4  below that it shows the session of Congress 1970?

5      A.   Yes.

6      Q.   Do you see that?

7      Does HBC understand that there's a Controlled

8  Substance Act which has been in effect since 1970?

9      A.   Yes.

10      Q.   Now, if you go down about three-fourths

11  of the way down the page, we get to a section, the

12  title is "Principal Purpose" of the bill.

13      A.   I see that.

14      Q.   And do you see there, it says, "This

15  legislation is designed to deal in a comprehensive

16  fashion with the growing menace of drug abuse in

17  the United States through providing authority for

18  increased efforts in drug abuse prevention and

19  rehabilitation of users, through providing more

20  effective means for law enforcement aspects of

21  drug abuse prevention and control, and by

22  providing for an overall balanced scheme of

23  criminal penalties for offenses involving drugs."

24      Do you see that?

25      A.   Yes.

30

1          Q.   Is that consistent with HBC's

2     understanding of the purposes of the Controlled

3     Substance Act?

4          A.   Yes.

5          Q.   If you would turn for me, please, to

6     -005.

7          And there -- at the top of the page you see

8     Title 2, Control and Enforcement?

9          Do you see that?

10         A.   Yes.

11         Q.   It says, "This bill provides for control

12     by the Justice Department of problems related to

13     drug abuse through registration of manufacturers,

14     wholesalers, retailers, and all others in the

15     legitimate distribution chain."

16         Do you see that?

17         A.   Yes.

18         Q.   And for our purposes here today, you

19     agree that HBC would be a wholesaler?

20         A.   Yes.

21         Q.   It goes on to say, "And it makes

22     transactions outside the legitimate distribution

23     chain illegal."

24         Do you see that?

25         A.   Yes.

1      Q.   What does that mean to HBC?

2           MR. BARNES:  I'm going to object to the

3      extent you're asking him to interpret the

4      Controlled Substances Act.

5           He's not a lawyer.  And it's outside the

6      scope of the special master's ruling.

7                THE WITNESS:  These aren't my words.

8      But certainly, from reading it, it would tell me

9      closed system, and certainly setting up the

10     framework of the interaction between the

11     government and manufacturers, wholesalers,

12     retailers.

13     BY MR. GADDY:

14     Q.   Is HBC familiar with the concept of a

15     closed system of distribution?

16     A.   Yes.

17     Q.   What does that mean?

18     A.   A closed system that has adequate

19     controls to prevent diversion and theft, and

20     making sure drugs are only -- prescription drugs

21     are -- are in that closed system, and not -- and

22     not ever outside of the system.

23     Q.   And why is that important?

24     A.   To prevent diversion and theft.

25     Q.   Why is it important to prevent diversion

32

1    and theft?

2         A.   I think it's obvious.  To make sure

3    medications and the drugs are going to the

4    intended users, intended...

5         Q.   Turn to page -008 for me, please.

6         The second full paragraph starts, "The bill

7    is designed..."

8         Do you see that?

9         A.   Yes.

10        Q.   It says, "The bill is designed to

11   improve the administration and regulation of

12   manufacturing, distribution, and dispensing of

13   controlled substances by providing for a closed

14   system of drug distribution for legitimate

15   handlers of such drugs."

16        Do you see that?

17        A.   Yes.

18        Q.   It says, "Such a closed system should

19   significantly reduce the widespread diversion of

20   these drugs out of legitimate channels into the

21   illicit market."

22        Is that consistent with your understanding of

23   the purpose of the Controlled Substance Act?

24             MR. BARNES:  Same objection.  Asking him

25   to interpret the Controlled Substances Act.

33

1    You're asking for a legal interpretation.

2              MR. GADDY:  Bob, all you got to do is

3    object.  I don't need to hear his objections --

4    your objections coming from him.

5              MR. BARNES:  Well, you may not need to

6    hear it, but whoever is going to rule on it is

7    going to hear it.

8              MR. GADDY:  You preserve your record by

9    objecting.

10             MR. BARNES:  Yeah.  And I'm going to put

11   the full record.

12        You're asking him to interpret the Controlled

13   Substances Act, which the special master has said

14   it's outside the purview of what you should be

15   asking.

16             THE WITNESS:  Could you repeat your

17   question, please?

18   BY MR. GADDY:

19        Q.   Sure.  It says, "Such a closed system

20   should significantly reduce the widespread

21   diversion of these drugs out of legitimate

22   channels into the illicit market."

23        Do you see that?

24        A.   Yes.

25        Q.   Is that consistent with HBC's

34

1   understanding of the purpose of the Controlled

2   Substances Act?

3           MR. BARNES:  Same objection.

4       Go ahead and answer.

5           THE WITNESS:  As I read it here, it's to

6   keep drug distribution safe and secure and prevent

7   diversion and theft in a closed system.

8   BY MR. GADDY:

9       Q.  My question is a little bit different.

10      Is that HBC's understanding?

11      A.  For what I just said, yes.  That's our

12  understanding, to have prescription drugs go to

13  legitimate -- where they need to go.

14      Q.  I'm going to show you what I'm going to

15  mark as Exhibit No. 6.

16          (HBC-Tsipakis Exhibit 6 was marked.)

17          MR. GADDY:  This is -- P-GEN-85 is our

18  internal number.

19  BY MR. GADDY:

20      Q.  This is 21 USC Section 823.

21      Are you familiar with this code?

22      A.  It's vaguely familiar.

23      Q.  And you testified earlier that in order

24  to distribute any controlled substances, HBC had

25  to be registered by the DEA; correct?

35

```
 1        A.   Correct.

 2        Q.   And you can start at the first page

 3   there.  Two-thirds down the page on the left side,

 4   we have the registration requirement; correct?

 5        A.   The 823 heading?

 6        Q.   Correct.

 7        A.   Correct.

 8        Q.   And then it goes on.  And the first one

 9   that it talks about is manufacturers of controlled

10   substances.  And they have to register, too;

11   correct?

12        A.   Yes.

13        Q.   If you turn the page for me, please, and

14   go to subsection (e).

15        A.   Yes.

16        Q.   There you see the distributors of

17   Schedule III, IV, and V controlled substances also

18   have to register with the DEA; is that correct?

19        A.   Correct.

20        Q.   It says, "The attorney general shall

21   register an applicant to distribute controlled

22   substances in Schedules III, IV, or V unless he

23   determines that the issuance of such registration

24   is inconsistent with the public interest."

25        Do you see that?
```

36

1        A.    Yes.

2        Q.    And then they list the factors to

3   determine.

4        And the first factor is "The maintenance of

5   effective controls against diversion of particular

6   controlled substances into other than legitimate

7   medical, scientific, and industrial channels."

8        Do you see that?

9        A.    Yes.

10        Q.    You agree that HBC was required to

11   maintain effective controls against diversion of

12   controlled substances even if they were only

13   distributing III, IV, or V substances?

14             MR. BARNES:  Objection.

15   BY MR. GADDY:

16        Q.    Correct?

17             MR. BARNES:  Same objection as prior.

18             THE WITNESS:  Yes.

19   BY MR. GADDY:

20        Q.    HBC didn't think that they weren't

21   required to have controls against diversion in

22   place because they were only distributing IIIs,

23   IVs, and Vs, did they?

24        A.    No.

25        Q.    Explain for me, please, from a wholesale

37

```
1    distributor perspective as far as infrastructure,

2    security, logistics, are there different

3    requirements if you're distributing III, IV, and V

4    scheduled drugs versus Schedule II?

5         A.   The requirements are commensurate on the

6    drugs that you're distributing.

7         In our case, we're distributing to our own

8    stores in a closed system.  So the controls -- I

9    guess the controls -- I mean, the obligations

10   are the obligations we follow.

11        So can you specifically word your question?

12        Q.   Sure.  Maybe that was confusing.

13        I'm asking if logistically, from an

14   infrastructure, as far as security requirements or

15   vault requirements as it relates to the DEA, are

16   the requirements different for a distributor who

17   is distributing Schedule II drugs versus a

18   distributor who is distributing III, IVs, and V.

19        A.   Thank you for the clarification.  I

20   understand the question.

21        Yes, there is.  Schedule IIs versus III

22   through V, there is a difference.

23        Q.   Can you generally describe those

24   differences for me?

25        A.   The differences, typically, the
```

38

```
 1    Schedule IIs are in a vault or a more -- the

 2    security requirements are different.  There's

 3    tighter controls and tighter requirements needed

 4    for Schedule II drugs.

 5        Q.   You mentioned a vault.  Are there any

 6    others that you're aware of?

 7        A.   Certainly, there's a whole host of them,

 8    yes.  But HBC never distributed Schedule II drugs.

 9        Q.   You mentioned the vault.  Are there any

10    other additional requirements or controls that are

11    in place for Schedule IIs as opposed to

12    Schedule IIIs?

13            MR. BARNES:  You mean generally or at

14    HBC?

15            MR. GADDY:  Generally in the

16    regulations.

17            THE WITNESS:  Yes.

18    BY MR. GADDY:

19        Q.   Do you know any of them?

20        Are you able to tell us any other than the

21    vault?

22        A.   I didn't prepare for those.

23        Q.   So no?

24        A.   No.

25        Q.   Now, even though HBC did not distribute
```

39

```
1    Schedule II drugs to Giant Eagle stores, Giant
2    Eagle pharmacies have dispensed Schedule II drugs
3    going back to 2006; correct?
4         A.   Dispensed, yes; correct.
5         Q.   And they would receive their Schedule II
6    drugs from wholesalers other than HBC?
7         A.   Yes.
8         Q.   They received Schedule II drugs from
9    McKesson?
10        A.   Yes.
11        Q.   From Anda?
12        A.   Yes.
13        Q.   Are there any other distributors that
14   supplied Giant Eagle pharmacies with Schedule II
15   drugs going back to 2006 that you're aware of?
16        A.   No.
17        Q.   You mentioned just a moment ago that HBC
18   was only distributing to Giant Eagle stores.  I
19   think you said only to their own stores.
20        Is that how you said it?
21        A.   Correct.
22        Q.   So from your perspective, HBC and Giant
23   Eagle are the same -- are one in the same?
24             MR. BARNES:  You mean legally?
25        If you're asking for a legal statement for
```

40

1   what the entity structures are, he hasn't been

2   produced to respond to that.

3   BY MR. GADDY:

4        Q.   You can answer the question.

5        A.   Giant Eagle owns HBC.  HBC is part of

6   Giant Eagle, so...

7        Q.   Even though HBC is only shipping to the

8   store that owns it, to Giant Eagle, you agree

9   they're still required to follow the federal law,

10  federal regulations as it relates to the

11  Controlled Substance Act?

12       A.   Of course, yes.

13       Q.   I want to go back to No. 5, which was

14  the Controlled Substance Act.

15       Flip for me, please, to page 034.  Do you see

16  there, under Section 2, where it says, "The

17  illegal importation, manufacture, distribution,

18  and possession, and improper use of controlled

19  substances have a substantial detrimental effect

20  on the public's health and general welfare."

21       Do you see that?

22       A.   Yes.

23       Q.   Does HBC agree with that?

24            MR. BARNES:  Objection.  Same objection.

25  Asking for a legal interpretation.

1        THE WITNESS:  As I read it, illegal

2    importation, stressing illegal, yes, I would

3    agree.

4    BY MR. GADDY:

5        Q.   Well, let me ask you:  Forgetting that

6    this language is in the Controlled Substance Act,

7    does HBC agree with the statement that the illegal

8    distribution, possession, and improper use of

9    controlled substances has a substantial

10   detrimental effect on the public's health and

11   welfare?

12       MR. BARNES:  Same objection.  Beyond the

13   scope of Special Master Cohen's ruling.

14       THE WITNESS:  Yes.

15   BY MR. GADDY:

16       Q.   Does HBC agree that as a distributor, as

17   one of the links in the closed system of

18   distribution, that HBC plays a critical role in

19   preventing the diversion of controlled substances?

20       MR. BARNES:  Same objection.

21       THE WITNESS:  We have an obligation to

22   make sure diversion doesn't happen, sure.

23   BY MR. GADDY:

24       Q.   Sure.  But you agree that HBC plays a

25   critical role in that process.

42

1        A.   We have an obligation and a role to make

2    sure the controlled substances that we distribute

3    stay in the closed system and get to the intended

4    recipient, yes.

5        Q.   And that they not get to people who were

6    not the intended recipients; correct?

7        A.   Yes.

8        Q.   Do you agree that it was no secret that

9    drugs, opioids such as hydrocodone combination

10   products, have a great potential for abuse?

11       A.   All drugs, if they're not used

12   appropriately, can have a detrimental effect.

13   But, certainly, hydrocodone products, if they're

14   abused, can have detrimental effects, sure.

15       Q.   HBC had an understanding that

16   hydrocodone products were addictive before they

17   started distributing those drugs back in 2009;

18   correct?

19       A.   As the -- HBC understands there's

20   different classes of drugs, Schedule II being the

21   most addictive other than Schedule I, and then the

22   further down the schedule, less addictive.

23       But, yes.  Generally, yes.

24       Q.   So HBC had an understanding that

25   hydrocodone combination products, like the ones we

43

1    talked about earlier, whether it's Vicodin or

2    Lortabs, or anything that hydrocodone is combined

3    with, HBC had an understanding, even before they

4    began to distribute those drugs, that those drugs

5    were addictive and subject to abuse.

6         A.   If they're misused, yes.

7         Q.   And you would agree that HBC has always

8    had that knowledge and understanding?

9              MR. BARNES:  Objection.

10        You, yourself, said this goes back to 2006,

11   and they didn't begin distributing until 2009.

12   BY MR. GADDY:

13        Q.   Go ahead.

14        A.   I think it's public knowledge,

15   certainly.  HBC -- it's public knowledge certainly

16   that they can be addictive, sure.

17        Q.   And that has been even before HBC

18   started distributing these drugs?

19        A.   Sure.

20        Q.   I'm done with that one.

21        I'm going to show you page N86, which I'm

22   going to mark as No. 7, I believe.

23             (HBC-Tsipakis Exhibit 7 was marked.)

24   BY MR. GADDY:

25        Q.   Do you recognize this type of document?

44

1          A.   It's vaguely familiar.

2          Q.   Up in the upper left-hand corner, do you

3     see the seal, DEA seal?

4          A.   Yes.

5          Q.   And you consider the DEA to be a

6     trustworthy source for information about

7     controlled substances?

8          A.   Sure, yes.

9          Q.   And you recognize this to be a drug fact

10    sheet for the drug hydrocodone?

11         A.   Yes.

12         Q.   And you would agree the DEA is a

13    trustworthy source about which drugs are diverted

14    or abused more than other drugs?

15         A.   Sure, yes.

16         Q.   You see at the bottom of the page it

17    says this is from the Drug Enforcement

18    Administration and then has the DEA website there

19    at the bottom of the page.  Do you see that?

20         A.   Yes.

21         Q.   Let's go to the very top part, the

22    overview.  Do you see where it says, "Hydrocodone

23    is the most frequently prescribed opioid in the

24    United States and is associated with more drug

25    abuse and diversion than any other licit or

1    illicit opioid."

2         Do you see that?

3         A.   Yes.

4         Q.   And was that HBC's understanding as

5    well?

6              MR. BARNES:  Can we get a timeframe for

7    both this document and your question?

8              MR. GADDY:  Sure.  We'll get there.

9              THE WITNESS:  So your question was

10   whether HBC knew the fact that it's the most

11   frequently prescribed opioid and whether it's the

12   one that's mostly abused?

13   BY MR. GADDY:

14        Q.   Correct.

15        A.   The exact fact of which ranks one or

16   two, et cetera, HBC understood that it's certainly

17   a drug that has had abuse certainly and it's high

18   on that list.  Exactly whether it's number one,

19   number two, I can't answer whether we had that

20   position or not.

21        Q.   Let's address the bottom of this.  If

22   you go to the second page -- I don't think the

23   document has a date on it, but if you go to the

24   second page, do you see there's the heading Legal

25   Status in the United States?

46

1          A.   Yes.

2          Q.   You see in the first line it says,

3     "Hydrocodone is a Schedule II narcotic that is

4     marketed in a multi-ingredient Schedule III

5     product."

6          Do you see that?

7          A.   Yes.

8          Q.   So that tells us that this document

9     certainly predates the scheduling change; correct?

10         A.   Well, if it says hydrocodone is a

11    Schedule II, that would mean that this would be

12    post-October 2014; right?

13         Q.   Well, pure hydrocodone has always been

14    Schedule II; right?  It's the hydrocodone

15    combination products that was III.  Do you agree

16    with that?

17         A.   Yes.

18         Q.   Does HBC have that understanding, that

19    pure hydrocodone has always been a Schedule II

20    narcotic?

21         A.   Yes.

22         Q.   Where it says that multi-ingredient

23    products such as hydrocodone and acetaminophen

24    would be a Schedule III product; correct?

25         A.   Yes.

47

1        Q.   So from this sentence, we know that this

2   document predates the scheduling change; correct?

3        A.   Yes.  Thank you.

4        Q.   Let's go back to the first page.  Again,

5   that first sentence says, "Hydrocodone is the most

6   frequently prescribed opioid in the United States

7   and is associated with more drug abuse and

8   diversion than any other licit or illicit opioid."

9        Do you see that?

10       A.   I do.

11       Q.   HBC from '09 to 2014 distributed

12   hydrocodone combination products; correct?

13       A.   Yes.

14       Q.   And did HBC have an understanding that

15   hydrocodone was associated with more drug abuse

16   and diversion than any other opioid?

17            MR. BARNES:  Is the question what HBC

18   distributed, hydrocodone combination products, or

19   are you talking about hydrocodone as a Schedule

20   II?

21            MR. GADDY:  I think my question was

22   clear.

23            THE WITNESS:  Just to make sure I have

24   it right, hydrocodone-containing products, so

25   Schedule III; correct?

48

```
1    BY MR. GADDY:
2         Q.   Yes.
3         A.   So generally, yes.
4         Q.   HBC had that understanding?
5         A.   Yes.
6         Q.   If you keep going down in that first
7    paragraph, it says, "Its analgesic potency is
8    similar to morphine."
9         Did HBC have that understanding?
10        A.   Where it says "looks like"?  I'm sorry.
11   Where are you at?
12        Q.   I skipped a sentence.  You can look up
13   on the screen, too.  He's got it highlighted for
14   you.
15        A.   Oh, thank you.
16        Q.   I told you that before we started.
17        A.   Thank you.  Yes, I see that.
18        Q.   And you actually have one here in front
19   of you, too.
20        A.   I'm sorry.  Thank you.
21        Q.   That even might be more helpful.
22        A.   That's much helpful.  Thank you.
23        Q.   And HBC always had that understanding
24   that the properties of hydrocodone is similar to
25   morphine; correct?
```

49

```
 1          A.   It's not exactly morphine, but it's

 2    similar, yes.

 3          Q.   I'm going to skip another sentence.

 4    Then it says, "There are numerous brand and

 5    generic hydrocodone products marketed in the

 6    United States.  All are combination products.  The

 7    most frequently prescribed combination product is

 8    hydrocodone and acetaminophen," it says, "for

 9    example, Vicodin, Lorcet and Lortab."

10          And those are some of the ones we talked

11    about earlier that HBC distributed; correct?

12          A.   Correct.

13          Q.   It says, "Other examples of combination

14    products include those containing aspirin,

15    ibuprofen and antihistamines."

16          Do you see that?

17          A.   Yes.

18          Q.   Again, those would have been the types

19    of Schedule III narcotics that HBC distributed to

20    Giant Eagle pharmacies; correct?

21          A.   Correct.

22          Q.   We talked a little bit about dates.  I'm

23    going to show you what I'm going to mark as

24    Exhibit No. 8.

25               (HBC-Tsipakis Exhibit 8 was marked.)
```

50

 1           MR. GADDY:  This is going to be P-GEN-55

 2    internally.

 3    BY MR. GADDY:

 4        Q.   And if you look at the very first page,

 5    do you see this is a report from the U.S. General

 6    Accounting Office?

 7        A.   Yes.

 8        Q.   And if you read just below there, it's a

 9    report to the Subcommittee on Oversight and

10    Investigations Committee on Energy and Commerce,

11    House of Representatives.  Do you see that?

12        A.   Yes.

13        Q.   You recognize this as being a report to

14    Congress?

15        A.   Yes.

16        Q.   And over on the left-hand side of the

17    page, do you see the date of May 2002?

18        A.   Yes.

19        Q.   So this was a full little over seven

20    years before HBC began distributing hydrocodone

21    products; correct?

22        A.   Yes.

23        Q.   And the title of the report is

24    Prescription Drugs, and it looks like it's going

25    to spend most of its time talking about monitoring

1    programs.

2         Do you see that?

3         A.    Yes.

4         Q.    And if you turn to .3, do you see it

5    starts with the date of May 17, 2002?

6         A.    Yes.

7         Q.    And then it starts in the body of the

8    letter, it says, "The increasing diversion of

9    prescription drugs for illegal use is a disturbing

10   trend in the nation's battle against drug abuse.

11   Prescription drug diversion is the channeling of

12   illicit pharmaceuticals for illegal purposes or

13   abuse."

14        Do you see that?

15        A.    Yes.

16        Q.    Do you know if HBC was aware of this

17   document when it began distributing hydrocodone

18   combination products in 2009?

19        A.    I do not.

20        Q.    They certainly could have been aware of

21   it if they wanted to; correct?

22        A.    I suppose, yes.

23        Q.    It goes on to say --

24             MR. BARNES:  Object.  Don't speculate.

25   If you know, you know.

52

```
 1              THE WITNESS:  I don't know.  I don't
 2    know whether they were aware of it.
 3              MR. GADDY:  Bob, if you want to make an
 4    objection, make an objection.  Please don't tell
 5    the witness how to answer the question.  I want
 6    his answers.
 7              MR. BARNES:  If you continue asking him
 8    questions outside the agreed scope and
 9    timeframe -- this is a 2002 document.  HBC didn't
10    begin distributing --
11              MR. GADDY:  Bob, if you want to have a
12    conversation off the record during a break, we can
13    do that.
14              MR. BARNES:  Can you explain why you're
15    asking about a 2002 document?
16    BY MR. GADDY:
17         Q.   Mr. Tsipakis, it goes on to say, "It can
18    involve activities such as doctor shopping by
19    individuals who visit numerous physicians to
20    obtain multiple prescriptions, illegal sales of
21    prescription drugs by physicians or pharmacists
22    and prescription forgery."
23         Do you see that?
24         A.   Yes.
25         Q.   Are those the types of -- is HBC aware
```

53

1    that those are the types of issues that can lead

2    to diversion?

3        A.   Sure, yes.

4        Q.   It goes on to say, "The most frequently

5    diverted prescription drugs are those that are

6    prone to abuse, addiction and dependence, such as

7    hydrocodone, the active ingredient in Lortab and

8    many other drugs."

9        Do you see that?

10       A.   Yes.

11       Q.   It then goes on to mention several

12   others, but the first one it mentioned was

13   hydrocodone.  And then it specifically referenced

14   a hydrocodone combination product; correct?

15       A.   Correct.

16       Q.   So was HBC aware going all the way back

17   to 2002, that hydrocodone products such as Lortab,

18   Vicodin that you mentioned earlier were some of

19   the most frequently diverted prescription drugs?

20            MR. BARNES:  Object to form.

21            THE WITNESS:  I think it was public

22   knowledge that those drugs were part of a drug

23   abuse problem and certainly being diverted.

24   BY MR. GADDY:

25       Q.   And that was public knowledge and

54

1    knowledge to HBC prior to when they got into the

2    business of distributing these drugs in 2009;

3    correct?

4            MR. BARNES:  Object to form.

5            THE WITNESS:  I can't -- I can't

6    speculate on what HBC knew or didn't know, but...

7    BY MR. GADDY:

8        Q.   Well, you agree it was public knowledge

9    though?

10       A.   Yes.

11       Q.   Now, as a registrant under the

12   Controlled Substance Act, HBC is aware that there

13   are certain federal regulations that they must

14   comply with; true?

15       A.   Yes.

16       Q.   And those regulations apply whether or

17   not you're a distributor of Schedule II drugs or

18   whether or not you're only a distributor of

19   Schedules III, IV and V drugs; correct?

20       A.   Correct.

21       Q.   I'm going to show you what I'll mark as

22   Exhibit No. 9.

23           (HBC-Tsipakis Exhibit 9 was marked.)

24   BY MR. GADDY:

25       Q.   This is -- you recognize this as being a

1    document from the DEA website?  I think you see

2    the seal up in the top left corner.

3         A.   Yes.

4         Q.   And do you recognize that what we're

5    looking at here comes from Title 21 of the Code of

6    Federal Regulations and is Regulation 1301.74?

7         Do you see that?

8         A.   Yes.

9         Q.   Is this a regulation that HBC is

10   familiar with?

11        A.   Yes.

12        Q.   Is this a regulation that HBC

13   understands that it must comply with as a

14   distributor of controlled substances?

15        A.   Yes; one of many, but, yes, this

16   particular one, yes.

17        Q.   And if you start in subsection (a), this

18   regulation says, "Before distributing a controlled

19   substance to any person who the registrant does

20   not know to be registered to possess the

21   controlled substance, the registrant shall make a

22   good faith inquiry..."

23        Do you see where I am there?

24        A.   Yes.

25        Q.   This really wasn't incredibly applicable

56

1   to HBC because they were only distributing to

2   Giant Eagle pharmacies; correct?

3        A.   Correct.

4        Q.   And obviously, HBC knew that all the

5   Giant Eagle pharmacies were registered; correct?

6        A.   Yes.

7        Q.   If we go on to the next paragraph, it

8   says, "The registrant shall design and operate a

9   system to disclose to the registrant suspicious

10  orders of controlled substances."

11       Do you see that?

12       A.   Yes.

13       Q.   "The registrant shall inform the field

14  division office of the Administration in his area

15  of suspicious orders when discovered by the

16  registrant.  Suspicious orders include orders of

17  unusual size, orders deviating substantially from

18  a normal pattern, and orders of unusual

19  frequency."

20       Do you see that?

21       A.   Yes.

22       Q.   And did HBC have an understanding that

23  prior to distributing any Schedule III narcotics

24  or Schedule IV narcotics or Schedule V narcotics,

25  that they had an obligation to design and operate

57

1    such a system that would disclose suspicious

2    orders?

3        A.    Yes.

4        Q.    And you agree that if HBC were to not

5    design and operate such a system, they would be in

6    violation of this regulation?

7            MR. BARNES:  Object to form.

8            THE WITNESS:  This is part of the

9    security requirements, but certainly this is one

10   component of the total -- the controlled substance

11   security provision to be deemed compliant.  So

12   this is part of the overall security measures that

13   you need to have, but yes.

14   BY MR. GADDY:

15       Q.    So if they did design and operate a

16   system to detect suspicious orders, they would be

17   violating this regulation?

18           MR. BARNES:  Object to the form.

19           THE WITNESS:  They needed to have a

20   system to disclose suspicious orders, yes, but it

21   needs to be in concert with the other requirements

22   as well.

23   BY MR. GADDY:

24       Q.    But if they didn't have a system to

25   detect suspicious orders, they would be in

58

```
 1   violation; correct?

 2              MR. BARNES:  Object to form.

 3              THE WITNESS:  They need to have a system

 4   to disclose suspicious orders, yes.

 5   BY MR. GADDY:

 6        Q.   And if they don't, they'd be in

 7   violation; correct?

 8              MR. BARNES:  Object to form.

 9              THE WITNESS:  Potentially be in

10   violation, yes.

11   BY MR. GADDY:

12        Q.   How could they not have a system -- what

13   do you mean by "potentially"?  How could they not

14   have a system and not be in violation?

15        A.   My understanding is you've given me one

16   subsection of the security provision, and I

17   believe the security provision has the registrant

18   has different obligations within it.

19        This particular piece that you're showing me

20   is one of them, but it's one factor of the total.

21   Your system needs to have a provision to disclose

22   suspicious orders to the registrant, yes.

23        Q.   And if you don't have a system that

24   discloses suspicious orders to the registrant, you

25   would be violation of this regulation; correct?
```

59

1           MR. BARNES:  Object to form.

2           THE WITNESS:  Potentially, yes.

3    BY MR. GADDY:

4        Q.  The word "potentially" is what I'm not

5    understanding.  How could you not have a system

6    that discloses suspicious orders but still be in

7    compliance with this?

8           MR. BARNES:  Same objection.  You're

9    asking him to interpret a regulation.

10          MR. GADDY:  You made your objection.

11          THE WITNESS:  You're asking me to broad

12   brush a statement that is a section of code.  This

13   code has multiple provisions within it, and the

14   suspicious order portion is one piece of it.

15       I'm sorry if I'm not understanding your

16   question.

17   BY MR. GADDY:

18       Q.  We certainly agree that HBC had an

19   obligation to design a system, operate a system

20   that would disclose to the registrant, HBC,

21   suspicious orders of controlled substances;

22   correct?

23       A.  Yes.

24       Q.  That obligation was in place whether

25   we're talking about Schedule II controlled

60

```
 1    substances or whether we're talking about Schedule

 2    III controlled substances; correct?

 3         A.    Correct.

 4         Q.    And HBC was aware of that back in 2009?

 5         A.    Yes.

 6         Q.    And was HBC aware back in 2009 that DEA

 7    was actively enforcing this regulation?

 8         A.    HBC was generally aware that the DEA was

 9    enforcing all of it.  I don't know its specific

10    enforcement activities, but I would imagine they

11    were enforcing all their provisions.

12         Q.    I'll show you what I'm going to mark as

13    Exhibit No. 10.

14              MR. GADDY:  It's PGent 75 internally.

15              (HBC-Tsipakis Exhibit 10 was marked.)

16    BY MR. GADDY:

17         Q.    This is a document, if you see in the

18    upper left-hand page, from the United States

19    Attorney's Office out of Colorado.  Do you see

20    that?

21         A.    Yes.

22         Q.    And it looks like a press release that

23    was posted on their website or something to that

24    effect.  Do you see that?

25         A.    Yes.
```

1      Q.    You see under the black box there, it's

2    got the date of October 2, 2008.  Do you see that?

3      A.    Yes.

4      Q.    And this was prior to HBC distributing

5    any hydrocodone combination products; correct?

6      A.    Yes.

7      Q.    The heading there says "Cardinal Health

8    Incorporated agrees to pay $34 million to settle

9    claims that it failed to report suspicious sales

10    of widely abused controlled substances."

11      Do you see that?

12      A.    Yes.

13      Q.    Was HBC aware of this settlement prior

14    to it beginning to distribute controlled

15    substances?

16      A.    I don't know.

17      Q.    It says in the first paragraph,

18    "Cardinal Health, Inc., one of the nation's

19    largest distributor of pharmaceutical drugs, has

20    agreed to settle allegations that it violated

21    federal reporting provisions relating to its

22    handling of certain controlled substances

23    regulated by the DEA.  Under the agreement between

24    the company and seven U.S. Attorney offices,

25    Cardinal Health agreed to pay 34 million in civil

62

 1    penalties for alleged violations of its

 2    obligations under the Controlled Substance Act."

 3        Do you see that?

 4        A.   Yes.

 5        Q.   In the next paragraph it goes to say,

 6    "Cardinal Health, which operates 27 DEA registered

 7    distribution facilities, failed to report to DEA

 8    suspicious orders of hydrocodone that it then

 9    distributed to pharmacies that filled illegitimate

10    prescriptions originating from rogue internet

11    pharmacy websites."

12        Do you see that?

13        A.   Yes.

14        Q.   Was HBC aware that in 2008, the DEA was

15    investigating and pursuing violation of the

16    regulation we just went over as it related to

17    distributors failing to report suspicious orders

18    of hydrocodone?

19            MR. BARNES:  Object to form.  Jeff, I'm

20    also going to ask you:  What topic are you on?

21    You're asking him about a Cardinal Health

22    settlement agreement.  He's not been produced to

23    talk about anything related to Cardinal.

24    BY MR. GADDY:

25        Q.   You can answer the question.

63

```
1              MR. BARNES:  Objection.  Outside the
2    scope of the 30(b)(6) topics.
3              THE WITNESS:  I'm not sure if HBC was
4    aware of the settlement or not.
5    BY MR. GADDY:
6         Q.   If you skip down to the bottom of the
7    page, in the second to last paragraph, it says,
8    "Hydrocodone is the generic name..."
9         Do you see that?
10        A.   I'm sorry.  Where are you at?
11        Q.   At the very bottom of the page.
12        A.   Yes.  I see it.  Thank you.
13        Q.   It says, "Hydrocodone is the generic
14   name of a prescription painkiller that is
15   classified under federal narcotics law as a
16   Schedule III controlled substance."
17        Do you see that?
18        A.   Yes.
19        Q.   Then in the next paragraph, it says,
20   "Hydrocodone is the most commonly diverted and
21   abused controlled pharmaceutical in the United
22   States."
23        Do you see that?
24        A.   Yes.
25        Q.   When HBC set about to design and operate
```

64

1    a system to disclose suspicious orders for their

2    hydrocodone products, which would have been

3    scheduled as III under the Controlled Substance

4    Act, did HBC take into account the fact that

5    hydrocodone was the most commonly diverted and

6    abused pharmaceutical in the United States?

7              MR. BARNES:  Object to form.

8              THE WITNESS:  HBC -- HBC when setting up

9    to distribute controlled substances did their due

10   diligence and set up their system to follow the

11   law.

12   BY MR. GADDY:

13       Q.   Did they take into account that they

14   were going to be distributing a drug which is the

15   most commonly diverted and abused controlled

16   pharmaceutical in the United States?

17       Did they take that into account when they set

18   up their system to disclose suspicious orders?

19             MR. BARNES:  Object to form.

20             THE WITNESS:  I don't know.

21   BY MR. GADDY:

22       Q.   I'm going to show you what I'll mark as

23   Exhibit No. 11.

24             (HBC-Tsipakis Exhibit 11 was marked.)

25

65

 1    BY MR. GADDY:

 2        Q.    I'll represent to you this is a Reuters

 3    article from April 2007.  Do you see the date

 4    there above the title?

 5        A.    Yes.

 6        Q.    The title is "AmerisouceBergen gets DEA

 7    distribution halt order."  Do you see that?

 8        A.    Yes.

 9        Q.    It goes on to say in the first paragraph

10    there that, "The U.S. Drug Enforcement

11    Administration has temporarily suspended its

12    Orlando, Florida distribution center's license to

13    distribute DEA controlled substances and listed

14    chemicals," talking about AmerisouceBergen.

15        Do you see that?

16        A.    Yes.

17        Q.    It goes on to say, "The DEA asserts that

18    AmerisouceBergen did not maintain effective

19    controls against diversion of controlled

20    substances, specifically hydrocodone."

21        Do you see that?

22        A.    Yes.

23        Q.    Did HBC take into account this

24    information that we've now seen with Cardinal

25    Health and now with AmerisouceBergen that the DEA

66

1    was investigating and sanctioning distributors for

2    not having systems that disclosed orders of

3    controlled substances?

4       Did HBC take that into account when designing

5    and operating their system that they put in place

6    prior to 2009?

7           MR. BARNES:  Object to form.  Outside

8    the scope of the 30(b)(6) topics.

9           THE WITNESS:  I can't tell you --

10          MR. KOBRIN:  I'll object to form, not

11   related to the scope of topics.

12   BY MR. GADDY:

13      Q.  Go ahead.

14      A.  I can't tell you if HBC had this in mind

15   or not.

16          MR. BARNES:  Jeff, this says page 1 of

17   10.  Are the other nine pages, are they deleted?

18          MR. GADDY:  This is the end of the

19   article.  The other nine pages were other

20   articles.

21   BY MR. GADDY:

22      Q.  I want to go back to those combined

23   discovery responses.  I think that was No. 4.  Did

24   you find it?

25      A.  Yes.

67

1       Q.   And if you would, turn for me again

2   please back to page 2.  We already looked at that

3   question earlier this morning.

4           MR. GADDY:  This is HBC 11 internally.

5   BY MR. GADDY:

6       Q.   And you recall we looked at this

7   earlier.  We're on .8.  Did I say 2?  I meant .8.

8   That's where question 2 is.

9       A.   Okay.

10      Q.   It says, "Please produce each of your

11  suspicious order monitoring system policies and

12  procedures since January 1, 2006 and identify the

13  Bates stamp range for each and please identify the

14  effective dates that each was in force and

15  effect."

16      Do you see that?

17      A.   Yes.

18      Q.   And if you turn to the next page, .9.

19      A.   Yes.

20      Q.   I'm going to start with the first full

21  paragraph on the page.  Are you with me?

22      A.   Starts "Subject to"?

23      Q.   Correct.  We got it up on the board

24  there.

25      A.   Oh, yeah.  Thank you.

68

1     Q.   It goes on to say towards the end of

2  that first line, it says, "HBC responds that

3  though it distributes Schedule III opioids that

4  were reclassified as Schedule II in 2014, it only

5  distributed such opioids during the period that

6  they were classified as Schedule III opioids."

7     Do you see that?

8     A.   Yes.

9     Q.   As far as having a system -- as far as

10  the requirement that HBC have a system to disclose

11  suspicious orders, that's irrelevant, correct,

12  whether they were II or III at the time they were

13  distributed?

14     A.   Correct.

15     Q.   It then goes on to say, "And it has not

16  sold or distributed products to any pharmacies

17  other than Giant Eagle pharmacies."

18     Do you see that?

19     A.   Yes.

20     Q.   And, again, as far as the requirement

21  that HBC design and operate a system that

22  discloses suspicious orders, that's also

23  irrelevant; correct?

24     A.   Yes.

25     Q.   It then goes on, and there are five hash

1  marks down below where certain -- it looks like it

2  gives a Bates range, and then it describes a date

3  range for a policy that it's directing us to.

4      Do you see that?

5      A.   Yes.

6      Q.   Did you have anything to do with pulling

7  these policies and procedures that are identified

8  here?

9      A.   Physically gathering them, is that your

10  question?

11      Q.   Yeah.

12      A.   I didn't specifically gather them, no.

13      Q.   Did you point anybody in the direction

14  of where to find these?

15      A.   Certainly we got the right subject

16  matter experts to point them in the direction,

17  yes.

18  ████████████████████████████

19  ████████████████████████████████████

20  ███████████████████████████████████

21  ██████████████████████████

22  ███████████████████████████████

23  ████████████████████

24  ███████████████████████████████████

25  ████████████████████████████████████

70







11      Q.    That's fair.  We talked earlier about

12  you had a duty to prepare for the deposition

13  today; correct?

14      A.    Yes.

15      Q.    You took that duty seriously?

16      A.    Absolutely.

17      Q.    You made a good faith effort to be able

18  to come in here and be prepared to testify and be

19  prepared to answer all the questions that you were

20  supposed to be prepared to answer; correct?

21      A.    Of course.

22      Q.    And you spent 40 to 50 hours getting

23  ready for this?

24      A.    Yes.

25      Q.    You talked to different subject matter

1    experts within Giant Eagle or HBC about the topics

2    that you needed to testify on today?

3        A.    Yes.







76



77







80







83











88











93





95

1    locations, and it could identify deviations from

2    those patterns.

3        Q.   How frequently were audits performed?

4        A.   Daily.

5        Q.   What was the purpose of an audit?

6        A.   To ensure the safety and security of the

7    drug product.  And, again, in that closed system

8    we talked about earlier, to make sure the product

9    was not diverted and going to its intended

10   recipient.

11       Q.   Your testimony is that from

12   November 2009 until the end of Octoberish of 2014,

13   that HBC performed daily audits of the warehouse?

14       A.   Daily audits of the counts in the

15   warehouse, yes.

16       Q.   And the purpose of the counts in the

17   warehouse was to make sure that everything that

18   was supposed to be in the warehouse was actually

19   there?

20       A.   Um-hum, yes.

21       Q.   You also mentioned that the warehouse

22   was aware of ordering patterns I think is how you

23   said it from the Giant Eagle pharmacies?

24       A.   Um-hum.

25       Q.   Yes?

96

1          A.   Yes.  Sorry, yes.

2          Q.   Who at the warehouse was aware of the

3     ordering patterns?

4          A.   So the warehouse had a superintendent of

5     the warehouse.  There was specialized, highly

6     trained individuals that worked the controlled

7     substance cage that were the same folks that

8     picked the orders day in and day out.

9          Q.   From 2009 until October 2014, was there

10    one superintendent of the warehouse, or were there

11    multiple?

12         A.   I believe there was one.

13         Q.   And who was that?

14         A.   Walter Durr.

15         Q.   So you said below Walter, there would

16    have been I think what you referred to as pickers?

17         A.   Folks who would fulfill the orders, yes.

18         Q.   In laymen's terms, can you describe to

19    me what a picker does?

20         A.   Sure.  An order comes in.  And for

21    whatever product they need to get, they go to the

22    shelf, the particular shelf in the warehouse, and

23    they pick the order.

24         Q.   Is it as simple as walking to a shelf

25    and there's a bottle of pills on the shelf, and

97

```
 1    they pick up the bottle?  Break it down for me,

 2    please.

 3        A.   There's a system certainly that there's

 4    an order well that generates what each store needs

 5    or has requested.  And then there's assistance, a

 6    device that they -- I don't know the exact name

 7    for it, but there's certainly a warehouse

 8    management system that they use.  And it's

 9    different slotting in the warehouse and they know

10    which slot to go to and how many to pick.

11        Q.   And then what?  They drop it in the tote

12    and put it on a truck?

13        A.   Yes.

14        Q.   And approximately -- let me back up.

15        How many different warehouses did HBC have

16    that were responsible for distributing Schedule

17    III narcotics?

18        A.   There's only one warehouse.

19        Q.   And what's the address for that

20    warehouse, for HBC's warehouse?

21        A.   I can't give you the exact -- I don't

22    know the exact address.

23        Q.   You know do the name of the road?

24        A.   No.

25        Q.   Approximately how many pickers would
```

98

```
1    have been working under Walter Durr in the

2    warehouse?

3         A.   My understanding is three to four.

4         Q.   And do you know if it was the same three

5    or four people during the lifetime of HBC serving

6    as a distributor of hydrocodone combination

7    products?

8         A.   I don't know if it was the same all the

9    way throughout.

10        Q.   Who were those people?

11        A.   I don't know their names.

12        Q.   Are any of them still that?

13        A.   The warehouse is no longer there

14   anymore, so no.

15        Q.   Did any of those people transfer over to

16   the Giant Eagle RX distribution center?

17        A.   I don't know.

18        Q.   Anybody else who -- I think my original

19   question was who would have been aware these

20   patterns of shipments, and you told me Mr. Durr.

21   Then you told me the pickers as well as; correct?

22        Anybody else that would have been aware of

23   the patterns of shipments to Giant Eagle

24   pharmacies?

25        A.   From the warehouse is your question?
```

99

1          Q.   This is all getting back to

2     identification of suspicious orders.  So my

3     question is:  From HBC who had that obligation to

4     identify suspicious orders?  And I think you've

5     identified Mr. Durr and these pickers.  But if I'm

6     missing somebody, I want you to tell me.

7          A.   So in our suspicious orders would have

8     been identified certainly from the warehouse,

9     certainly folks in corporate that were -- from the

10    procurement team buying into the warehouse.  They

11    would know if there's any spike in pattern of

12    product being demanded to be shipped to the

13    warehouse, et cetera.

14         It's not just the warehouse.  It's also the

15    folks that do the procurement of these products as

16    well would identify any deviation.  If all of a

17    sudden they're buying X and now they're being

18    asked to buy Y, they would identify that.

19         Q.   Was there any written list of items that

20    these people in procurement or people like

21    Mr. Durr, the superintendent of the warehouse,

22    were supposed to be on the lookout for?

23         A.   Not that I could find.

24         Q.   Was there any report that was generated

25    on a daily, weekly, monthly, yearly basis,

100

1    quarterly basis that Mr. Durr or these procurement

2    people could look at to evaluate the pattern of

3    orders?

4         A.   I'm sorry.  Can you ask that again?

5         Q.   What I'm asking about is whether or not

6    there was any report that was generated daily or

7    weekly or monthly or quarterly or annually that

8    was kind of on a set basis distributed to anybody,

9    whether it's Mr. Durr, whether it's these people

10   from procurement, whether it's the pickers, to

11   where they can have an opportunity to look at and

12   review the pattern of orders going to each of the

13   different pharmacies.

14        A.   Not that I could find specifically, but

15   certainly from the procurement side, et cetera,

16   there's reports of what they're buying and

17   selling, sure.

18        Q.   Explain to me what you mean by the

19   procurement side.

20        A.   So from the procurement side, the folks

21   in the warehouse don't do purchasing.  There's a

22   group that does purchasing.  So those folks that

23   do purchasing would absolutely know what's being

24   bought and what's being sold.

25        Q.   And who were those folks from 2009

1   through 2014?

2        A.   The specific people I don't know.

3        Q.   Are any of them still with the company?

4        A.   I don't know the folks that were

5   involved.

6        Q.   Was there a list that these folks in the

7   procurement or purchasing office had to be on the

8   lookout for as far as trends or spikes or anything

9   like that that they should flag and bring to

10  somebody's attention?

11       A.   So you're asking if there was a specific

12  list that I know of?

13       Q.   Sure.

14       A.   Not that I know of that I was able to

15  find.

16       Q.   Are you aware of -- let me back up and

17  ask you this:  Who did you talk to within HBC or

18  Giant Eagle to find out about this policy that was

19  in place from 2009 through July 2014?

20       A.   The policy or the system?  I'm sorry.

21       Q.   Sorry.  You're right.  There's not a

22  policy.  The system.

23       A.   So in the investigative piece, the

24  diligence, Walter was one of the folks that was

25  discussed about what happened during this









106

 1    system was that the superintendent, the pickers,

 2    the procurement folks who would be the only ones

 3    with HBC, right, that we just talked about?

 4         A.   HBC specific, yes.

 5         Q.   So the pickers, the superintendent and

 6    the procurement folks knew what to look for and

 7    looked for it.  Is that the system that HBC

 8    operated to detect suspicious orders?

 9         A.   The system also included the frontline

10    scrutiny and professional judgment of the

11    pharmacist filling prescriptions as well together

12    as one whole system, yes.

13         Q.   But otherwise, that's the system?

14         A.   That's the system.  And then over time,

15    the system was continually improved upon which

16    later added the thresholds and some IT

17    enhancements, et cetera, yes.

18         Q.   But when the first hydrocodone pills

19    started rolling out the door in 2009, the system

20    was that the superintendents, the pickers and the

21    procurement officers knew what to look for and

22    looked for it?

23              MR. BARNES:  I'm going to object.  You

24    keep misstating what he said in his prior answer.

25              MR. GADDY:  Bob, if you want to object,

1    you can object.

2            MR. BARNES:  I am.

3            MR. GADDY:  Well, limit it to that you

4    don't get to put words --

5            MR. BARNES:  Be fair with your question.

6    He told you about an integrated system about five

7    times now, and every time you ask him another

8    question, you leave out a piece of it.

9    BY MR. GADDY:

10        Q.   You can answer the question.

11        A.   As I stated, the system was an

12    integrated system.  Again, we're in a unique

13    situation.  We're distributing to our own stores.

14    We know our stores.  We know they're -- we have

15    line of sight on every prescription that comes

16    through our doors that we fill, and we fulfill

17    orders to those stores.

18        And we have chain of custody of product all

19    the way from the warehouse to our stores,

20    ultimately to the patients.  So what I'm telling

21    you is our system was integrated between store

22    controls, warehouse controls and corporate

23    controls.

24        Q.   You agree that the duties and

25    regulations that apply to the stores, the

1   pharmacies, are different than the regulations and

2   duties that apply to the distributor; correct?

3            MR. BARNES:  Object to form.

4            THE WITNESS:  They have different

5   duties, but they have a duty as well to have the

6   safety and security of controlled substances as

7   does our warehouse.

8   BY MR. GADDY:

9        Q.  Sure, but pharmacies -- do pharmacies

10  have a duty to detect suspicious orders?

11       A.   By definition, pharmacists' duty are to

12  fill legitimate prescriptions from legitimate

13  prescribers which would then necessitate orders

14  that are fulfilled from our warehouse.

15       Q.  You keep using the word "integrated."

16  Tell me what you mean by that.

17       A.   It's an integrated system that if you

18  think about it again, the stores are doing their

19  due diligence, making sure they're filling

20  legitimate prescriptions for legitimate needs,

21  right, that generate orders to our warehouse, and

22  we fulfill those orders.

23          So again, we have folks from the warehouse

24  monitoring and having controls, physical controls

25  as well as the controls we discussed.  You have

1   the folks on the procurement side with their

2   controls and the pieces that they're buying into

3   the warehouse and selling out of the warehouse, as

4   well as the folks in the store.  So that is the

5   system.

6        Q.   Did HBC provide any training to Mr. Durr

7   or the pickers that worked underneath him as far

8   as HBC's obligations under the Controlled

9   Substance Act?

10       A.   That I don't know.

11       Q.   Did HBC provide any training or

12  education to the procurement officers with

13  corporate I think you referred to it as on HBC's

14  obligations under the Controlled Substance Act?

15       A.   I don't know.

16       Q.   Do you know whether or not there was any

17  list -- you keep kind of saying that these

18  different people in these different roles knew

19  what to look out for.

20       Was there any list of those things that they

21  should be looking out for?

22       A.   There's no list that I could find, but I

23  think you established early on in the testimony

24  that these drugs were commonly known as drugs of

25  interest and certainly drugs that we needed to





112





114



115



116



1        A.    Yes.

2        Q.    I think you said that at some point in

3    time, there was a threshold program implemented?

4        A.    Yes.

5        Q.    When did HBC first start utilizing a

6    threshold program?

7        A.    A threshold program with some IT

8    enhancements were put into place roughly in 2013.

9        Q.    Do you know what month in 2013 or season

10   even?

11       A.    I don't recall exactly in 2013.

12       Q.    And were thresholds set for every

13   prescription drug or just controlled substances?

14       A.    Controlled substances.

15       Q.    And that included Schedule III

16   controlled substances?

17       A.    Yes.

18       Q.    How were thresholds established?  Let me

19   back up before you answer that.  I'm making an

20   assumption that threshold is a monthly ordering

21   threshold.  Am I wrong on that?

22       A.    So the threshold established was using

23   diligence that was ascertained at the time from

24   DEA that a 3X threshold to be established, a

25   monthly threshold, to your point, using 12 months

1    of trailing data, 3X the average for that month.

2        Q.   Let me say it back to you to make sure I

3    understand it.  This threshold program which was

4    first begun in 2013 set a threshold at 3 times the

5    average amount of that substance that was

6    distributed over the last 12 months?

7        A.   So 3X the company average for that

8    chemical.  So it was at the GPI level.  So the

9    chemical would include all the drugs having that

10   chemical in it, 3X using 12 months of trailing

11   data, 3X the company average for that chemical,

12   that product.

13       Q.   So you explained two things there.

14   First of all, it was based on the chemical?

15       A.   GPI level, yes.

16       Q.   Does that mean that Lortab and Vicodin

17   don't get different thresholds.  They're all under

18   the same threshold?

19       A.   It's all lumped together as one

20   threshold.

21       Q.   Because that's the same combination of

22   hydrocodone and acetaminophen?

23       A.   It's looking at the active ingredient,

24   yes.

25       Q.   As far as how the threshold is set, if

119

1    HBC had sold a hundred HCP products over a month

2    for the last 12 months, the threshold for the next

3    month would have been 300; is that fair?

4         A.   Well, the threshold was -- yes.  Let me

5    just play that back.  So it would be 3X again at

6    the GPI level of that GPI using the 12 months

7    worth of data, yes.

8         Q.   So months 1 through 12 Giant Eagle

9    pharmacies had ordered 100 hydrocodone combination

10   products?

11        A.   All included.

12        Q.   Correct.  Then in month 13 the threshold

13   would be 300?

14        A.   Well, it uses the average of the 12

15   months of data.  When the new month comes on, the

16   furthest out drops off.  It's a rolling 12 months

17   worth of data, yes.

18        Q.   But I have that math right, in month 13,

19   the threshold would be 300 because the prior 12

20   months, the average was 100?

21        A.   But again, it uses the last 12 months.

22   So assuming that it was a hundred all those

23   months, it would be 3X which would be 300, yes.

24        Q.   You said it was a rolling system.  So at

25   the 13th month, instead of HBC distributing a

120

1    hundred HCPs and it distributed 200, the threshold

2    for the 14th month would be different.  It would

3    not be the same 300 because that last month would

4    have affected the average; correct?

5         A.   Each datapoint adds to the average.  And

6    certainly the reason for that is there's

7    seasonality in our business as well where products

8    change over time, yes.  The demand for products

9    change over time.

10        Q.   When you say seasonality, do you mean

11   different times of years or do you mean --

12        A.   Yes.  Different times of year, cough and

13   cold season versus summer months, yes.

14        Q.   Is there a hydrocodone combination

15   product season?

16        A.   Well, certainly hydrocodone products in

17   cough syrups, it is more prevalent during cough

18   and cold season than it is during summer months.

19        Q.   I think I heard you mention that HBC

20   received guidance from the DEA that a 3 times

21   average was an appropriate threshold.

22        A.   What I said is during the due diligence

23   to set the threshold, information was derived from

24   the DEA published websites on a 3X threshold that

25   they used for list chemicals, and that's where our

1    3X number was derived from.

2         Q.    You're talking about the chemical

3    handler's manual?

4         A.    From what I -- to prepare for this, it

5    was based on written DEA inference on a website or

6    a manual, I'm not sure where it was derived from,

7    but the DEA itself was establishing a 3X

8    threshold, and the team adopted that rationale.

9         Q.    Are you testifying that the DEA had

10   suggested a 3X threshold for opioids?

11        A.    I'm testifying that the HBC warehouse

12   and the team involved found data that pointed to a

13   3X threshold tier, and that's what they adopted.

14        Q.    But for opioids.  That's my question.

15   Are you testifying that HBC had information from

16   the DEA that they were approving or ratifying or

17   blessing, whatever verb you want to use, a 3X

18   threshold in 2013 for opioids?

19        A.    No.  That is not what I'm saying.

20        Q.    Then help me understand.

21        A.    What I'm saying is in the diligence to

22   set the threshold, Giant Eagle inferred from

23   information that they gleaned from the website, a

24   manual, whatever it was, that established a 3X

25   threshold is where they want -- the DEA was -- the

1    DEA over the years has not been clear about what

2    their expectations were of any threshold.

3         So it left each registrant to set whatever

4    parameters and controls that they deemed

5    appropriate.  So our team used whatever they could

6    find that was reasonably available and reasonable

7    to set our thresholds.

8         Q.   The DEA never told HBC that a three

9    times average was appropriate; correct?

10        A.   Directly, no, never.

11        Q.   Did DEA indirectly tell HBC that a three

12   times average was appropriate?

13        A.   What I'm saying is the HBC set its

14   threshold based on information that it gleaned

15   from a DEA -- just like you showed me earlier, a

16   page from the DEA website.  There was information

17   that they used from DEA and inferred to use a 3X

18   threshold.

19        HBC set the threshold, but it wasn't just

20   some arbitrary number they picked.  There was

21   information they used to get to a 3X threshold.

22        Q.   I'll show you what I'll mark as No. 13.

23             (HBC-Tsipakis Exhibit 13 was marked.)

24   BY MR. GADDY:

25        Q.   I'm showing you a June 2, 2012 letter



124







127







130















137



138

1    are subject to; correct?

2         A.   I never said that we operated nor

3    followed the law any differently with our

4    responsibilities.

5         Q.   I'm on No. 14.  I'm going to show you

6    HBC 1032 which we're going to mark as Exhibit

7    No. 14 for today's deposition.

8         Is this an example of one of the threshold

9    reports that we've been talking about?

10              (HBC-Tsipakis Exhibit 14 was marked.)

11              THE WITNESS:  In this format, I'm having

12   trouble figuring out what this is.

13   BY MR. GADDY:

14        Q.   I'm giving it to you how it was given to

15   me.  I was hoping you could kind of explain some

16   of it to me.

17        Do you recognize this as being one of the

18   threshold reports that we've been talking about?

19        A.   I'm having difficulty.  I'm trying to

20   understand what I'm looking at.

21        Q.   Let's see if we can walk through it a

22   little bit.  It looks like it was maybe a

23   spreadsheet.  It looks like the left-hand column

24   is the pharmacy number?

25        A.   Yes.

1     Q.   Those numbers going down underneath

2  there, do those correspond with different Giant

3  Eagle stores?

4     A.   It appears so, yes.

5     Q.   I want to skip the vendor for a minute.

6  But the next one indicates month key, and it looks

7  like October of 2016 is the date of this report?

8     A.   Yes.

9     Q.   I couldn't see any way from this report

10  to determine when in October this report was run,

11  whether it was run on the 1st or the 15th or the

12  31st.  Do you know if there's a way to determine

13  that?

14     A.   Based on what I'm looking at, I agree.

15  I can't tell.

16     Q.   The next column says, I guess, it's GPI

17  10?

18     A.   Yes.

19     Q.   Can you explain what that is?

20     A.   Sure.  The GPI is the GPI class of the

21  drug.  I don't know which GPI -- this one, based

22  on what I'm reading here, I'm assuming this is

23  oxycodone, the GPI 10 for oxycodone.

24     Q.   And you were just talking about the top

25  one on the list?

1       A.   Yes.

2       Q.   And the next one says it looks like the

3   Total Shipped Quantity.  Do you see that?

4       A.   Yes.

5       Q.   And it lists the total shipped quantity

6   as 4500.  And the next column says Threshold

7   Quantity.  Do you see that?

8       A.   Yes.

9       Q.   And the threshold was 4200, so less than

10  the 4500; correct?

11      A.   From what I'm reading, yes.

12      Q.   And then at the next column, it has the

13  Product Name?

14      A.   Yes.

15      Q.   And then, finally, the column on the

16  right is the Schedule Number, and oxycodone

17  obviously is a Schedule II drug; correct?

18      A.   Yes.

19      Q.   Are you expecting there to be any

20  additional information on one of these threshold

21  reports?

22      A.   Again, I haven't seen this in this

23  format.  I'm sorry.  I just really don't know what

24  I'm looking at here.  I know that on the report

25  that the team would generate, it looked different

1    than this output.  I read the columns with you

2    here, but I just don't know.

3        Q.   Again, obviously, I don't work for Giant

4    Eagle or HBC, never have.  I've never seen one of

5    your internally-generated threshold reports.  This

6    is what was produced to us, and I was given a lot

7    of these.  So I'm trying to figure out if there's

8    something else I should be looking at and there's

9    something else that maybe should be provided that

10   can give me a better understanding of the

11   threshold reports.

12       We just went through the information that's

13   included on what I was provided.  Is there any

14   additional information on the reports that you're

15   used to looking at?

16       A.   I don't know any other information.

17   Again I'd be speculating.  It shows stores which I

18   recognize store numbers.  It's showing total

19   shipped, threshold quantity, product name and

20   everything we just discussed.  As far as how this

21   report was used and what native format it is -- I

22   do know things were things provided to you in

23   native format because some things were in the

24   system and they had do screenshots.

25       I honestly can't tell you exactly what this

142

1    is or how this was being used.

2        Q.    But if you were to go back to your

3    office and asked to see the threshold report for

4    October 2016, do you think that that report would

5    have any additional information than what I have

6    right here in front of me?

7        A.    I don't believe so.



143







146



147





149







152



153



154





156





158



159





1      A.   I haven't found anything that

2  specifically calls out that something needs to be

3  written down or documented or -- certainly there's

4  an expectation to investigate every one.

5      Q.   And I'm not asking you to point me to a

6  piece of paper as we're sitting here right now

7  today, but if I was to ask you can you justify why

8  this order for store 71 of Oxydo, which is a CII,

9  was shipped over threshold and that it wasn't

10  clawed back or it wasn't reported to the DEA,

11  would you have the ability to go and give me an

12  answer to what was done to approve that?

13      A.   Let me make sure I understand your

14  question.  Can you repeat it one more time,

15  please.

16      Q.   Sure.  Essentially, what I'm trying to

17  figure out is whether or not HBC or Giant Eagle

18  maintains any type of due diligence files.

19      For example, this order for store 71 for this

20  controlled II substance pops on this report, if

21  you wanted to go back now two years after the fact

22  and see what did we do to justify and clear that

23  order, is that possible?

24      A.   I don't know.

25      Q.   As you sit here today, is there any

162

1  requirement or procedure in place to do any

2  maintaining or logging of any type of due

3  diligence or investigatory type efforts to clear

4  or justify orders that were received that may be

5  over thresholds or may be otherwise indicative of

6  diversion?

7      A.   Yes.  Over time more systems were

8  developed and abilities, yes.

9      Q.   When did Giant Eagle or HBC put in place

10  a system that required employees to log or

11  maintain files that explained why particular

12  orders were cleared or not cleared?

13      A.   I can say from the diligence I had in

14  early 2017, a system was developed where

15  investigative notes and information could be

16  entered regarding orders that we wanted to look

17  at, orders of interest.

18      Q.   Prior to early 2017, HBC nor Giant Eagle

19  had any system that was dedicated to maintain

20  notes, reports or memos that would explain or

21  justify why particular orders were cleared or not

22  cleared?

23      A.   We didn't have a repository if that's

24  what you're asking.  There were certainly

25  definitive emails to the field, emails to the

```
 1   warehouse, things of sorts that clearly show a
 2   diligence of trying to run the ground on why an
 3   order happened or what triggered, sure.
 4        Q.   Can you say that that's the case for
 5   every order that ever popped up on one of these
 6   reports?
 7        A.   I can say after reviewing and talking to
 8   associates involved and folks that do report to
 9   me, that every order that pops up of interest is
10   investigated and either cleared or not.
11        Q.   But you can't tell me as you sit here
12   today whether or not there's any documentation to
13   prove or disprove whether or not any or all of
14   those investigations actually happened?
15        A.   I can tell you that I don't know that I
16   have specific for each line item on -- well, from
17   2017 on, I can tell you we have a repository that
18   was built.  Prior to that, I cannot.
19        Q.   That's probably the easiest way to do
20   this.  Prior to early 2017, Giant Eagle nor HBC
21   had any repository or location, whether it's
22   physical or digital, to maintain any type of due
23   diligence reports or efforts; correct?
24        A.   There was no central repository.
25   Certainly if there was folders or emails or things
```

164

1   that were kept -- I've seen some of them, so

2   definitely I know they exist.

3       Q.   So fair to say that these orders that

4   popped on these threshold reports that started

5   coming out back in 2013 would lead Giant Eagle or

6   HBC to start to do some type of due diligence; is

7   that correct?

8       A.   Yes.

9       Q.   From 2009 until 2013, when HBC was

10  distributing hydrocodone combination products,

11  what would lead to HBC doing any type of due

12  diligence on any of the orders that were received

13  from the stores?

14      A.   Certainly from as moved on, we improved

15  the processes and continued to add capabilities.

16  Your specific timeframe is what again, please?

17      Q.   2009 until the threshold reports started

18  being generated in 2013.

19      A.   So in addition to other controls, one of

20  the mechanisms we would use is the integrated

21  approach I mentioned earlier to disclose

22  suspicious orders to us, which would prompt

23  investigation, similar diligence, no difference in

24  diligence, and running to ground whether an order

25  of interest was suspicious or not.

1       Q.   And that integrated approach would

2   involve the superintendent of the warehouse, the

3   pickers at the warehouse and the procurement folks

4   from HBC's side; correct?

5       A.   And the stores, yes.

6       Q.   Store is not HBC, is it?

7       A.   The store is not HBC, but it's all part

8   of the same company, same system.  It's part of

9   our system.

10      Q.   But it's HBC who has the responsibility

11  to design and operate a system that detects

12  suspicious orders; correct?

13      A.   Correct.

14      Q.   Can you tell me between -- we can look

15  at that report, and we can -- assuming that in

16  October of 2016 Giant Eagle followed their

17  policies in place, if we estimate that there's 200

18  entries on that report, we could say that there

19  were 200 separate investigations done, due

20  diligence type investigations done in

21  October 2016; would that be fair?

22      A.   I can tell you just by looking at some

23  of them and understanding the report better, we

24  have stores that are filling 6000 prescription as

25  week that are averaged against stores that are

1   doing 300 a week.  So obviously, if you're doing

2   as a chain-wide average, you're going to have a

3   ton of false positives, which is predominantly a

4   lot of these orders on these reports.

5       Q.   Well, isn't that a reason why having a

6   chain-wide average isn't a very good idea?

7       A.   Again, it's our attempt to have a system

8   in place.  We're not just relying on a threshold.

9   We're relying on a total system of the threshold

10  being one of those controls.

11      Q.   Well, if you're relying on a system that

12  uses an average and you have some stores that do

13  300 scripts a week and some stores that do 6000

14  scripts a week, you would agree with me that

15  average probably isn't very helpful?

16      A.   I would agree with you it's probably

17  flawed and it could be done better, which is why

18  our second version of our threshold system was

19  improved.

20      Q.   How long did Giant Eagle and HBC utilize

21  this flawed version of the threshold report that

22  used a chain-wide average, from 2013 until when?

23      A.   To be clear, I didn't say this report

24  was flawed.  I said the methodology of averages

25  could lead to a false positive, which is what a

167

```
 1    lot of these reports -- lot of these orders on

 2    these reports are.

 3         Q.   How long did Giant Eagle and HBC use

 4    this report?

 5         A.   As I think was established earlier in

 6    testimony, this report started somewhere around

 7    2013.

 8         Q.   I'm sorry.  Until when?  Tell me if I'm

 9    wrong, but I think you said that you no longer use

10    a chain-wide average and now use a store average.

11         A.   Correct.

12         Q.   As we sit here today in 2018.

13         A.   Correct.

14         Q.   When did you stop using the chain-wide

15    average that you indicated is somewhat of a flawed

16    methodology that can produce false positives?

17         A.   It can produce false positives.  Till

18    2017.  We changed, early 2017.

19         Q.   So if we were to look at the life of

20    HBC's and Giant Eagle's threshold program, from

21    2009 to 2013, there was no threshold program.

22    From 2013 to 2017, there was a threshold program

23    based on a chain-wide average.  And from 2017

24    through present, there's a threshold program

25    that's based on individual stores' metrics setting
```

1    the threshold?

2        A.    Correct.

3        Q.    From 2009 to 2013, what would cause HBC

4    to perform a due diligence investigation?  What

5    about their system, what flags within the system

6    would cause HBC to perform a due diligence

7    investigation?

8            MR. BARNES:  Object to form.  Asked and

9    answered.

10       Go ahead.

11           THE WITNESS:  So as we established

12   earlier, we know what products are coming into our

13   warehouse, what products are going out to our

14   stores.  Any pattern that would show -- our

15   procurement team as well as the warehouse team, if

16   they saw a spike in orders or a deviation of sorts

17   from that, they would see that, and they would

18   recognize that.

19   BY MR. GADDY:

20       Q.    From 2009 to 2013, are you able to

21   identify for me any orders of hydrocodone

22   combination products that due diligence was ever

23   performed on?

24       A.    I'm sorry.  Ask that once more, please.

25       Q.    From 2009 until 2013, are you able to





171

```
 1   BY MR. GADDY:

 2       Q.   Does HBC agree that orders are not

 3   supposed to be shipped to the pharmacies until

 4   they have been deemed not suspicious?

 5            MR. BARNES:  Object to form.

 6        You can answer.

 7            THE WITNESS:  Again, in our system,

 8   since we have line of sight from the warehouse all

 9   the way out to the dispensing level, our

10   pharmacists are filling prescriptions pursuant to

11   legitimate prescriptions, which then generate

12   orders, and we ship those orders to the

13   pharmacies.

14   BY MR. GADDY:

15       Q.   My question is more about timing of the

16   shipping.  So we looked at some of these threshold

17   or we looked at one of these threshold reports.

18   And the reports indicate on their face that orders

19   of pills that exceeded the threshold were shipped

20   to the stores that were in excess of the

21   threshold.  And you told me that after the reports

22   are generated, they're looked at, and then some

23   level of investigation is done; is that correct?

24       A.   Correct.

25       Q.   You agree with me that any investigation
```

172

```
1    that was being done by Giant Eagle or HBC is

2    happening after the orders have been shipped;

3    correct?

4         A.   Perhaps, yes, perhaps.

5         Q.   Well, that's what the forms indicate;

6    correct?

7         A.   Well, some of them -- obviously looking

8    at some of these -- you mentioned this report is

9    on the 31st of the month.  So if you look at some

10   of these, as I testified earlier, some of these

11   would have already been cleared and some of them

12   you could already tell that there would be a false

13   positive.

14        So some of them you would have known -- you

15   would have known that -- you would have cleared

16   them early is what I'm trying to say knowing that

17   they were a false positive.

18        Q.   But by the time the procurement folks

19   see this report, the pills have already been

20   shipped; correct?

21        A.   They may have.  The report -- the report

22   generates early in the morning.  Stores don't

23   receive their orders till after they open.  So

24   they would have been shipped, but not received in

25   some cases, in transit.
```

173

```
 1        Q.   Break that down for me.  You state the

 2   reports are generated early in the morning.  What

 3   does that mean?

 4        A.   I'm not sure of the exact time, but

 5   certainly before our pharmacies open for business.

 6        Q.   What time do your pharmacies open for

 7   business?

 8        A.   Some open at 9:00.  Some open at

 9   8:00 generally.

10        Q.   Let me just ask it this way.  Did HBC or

11   Giant Eagle have any policy in place that any

12   orders that popped on the threshold report were

13   not shipped until they've been cleared?

14        A.   Not that I could find a policy.

15        Q.   They're still operating under the

16   threshold policy today.  Today are these orders

17   shipped or are they blocked merely because they

18   come up on the report, or are they shipped and

19   then the diligence is performed?

20        A.   So in our experience, having looked at

21   reports having looked at thresholds, we generated

22   very few suspicious orders over the timeframe that

23   we've been operating.  So I guess I'm trying to

24   understand.

25        In our environment, we're able to intercept,
```

174

```
 1    retrieve, quarantine product all the way up to the

 2    time it gets to the store, after it lands at the

 3    store, when in transit with the truck.  So we're

 4    able to intercept -- the change of title never

 5    happens.  Giant Eagle owns the product.  Giant

 6    Eagle ships the product.  Giant Eagle receives the

 7    product at the stores.  So I guess I'm just trying

 8    to follow your question.

 9         Q.   Frankly, I'm trying to following your

10    answer.  Because I said they're shipped before the

11    investigation happened, and your answer was, well,

12    the reports are generated early in the morning and

13    the pharmacies don't open until 8:00 or 9:00, so

14    maybe they haven't gotten there yet.

15         So my question is whether or not the orders

16    are shipped, whether or not there's a policy or a

17    rule, a procedure, that requires the orders to not

18    be shipped until somebody from procurement looks

19    at it and says, oh, that's a false positive, oh,

20    there's a justification for that.

21         Is there a policy, procedure or rule in place

22    that does such?

23         A.   No.

24         Q.   You mentioned just a few minutes ago

25    that I guess because you're shipping to your own
```

1   stores, I think the phrase you used was the title

2   never changes.

3        So what I'm asking about, are you aware of

4   instances where you've had to turn the truck

5   around and bring it back to the distribution

6   center because there's pills didn't need to go to

7   that store?

8        A.   In our history, we've only had very few

9   suspicious orders, so we haven't had an instance

10  where we needed to grab an order back.

11       Q.   You mentioned that you could go to a

12  store or quarantine an order at a store.  Has

13  there ever been an instance that you're aware of

14  where HBC or Giant Eagle has had to call the store

15  and tell them, don't open that tote, put that to

16  the side, we got to come, get it back from you

17  because that order shouldn't have been shipped?

18       A.   We haven't, but we've had instances

19  where we've shut off stores in the cases we've had

20  on our suspicious orders, shutting off stores from

21  being able to order any more product, either from

22  us or from our other wholesaler, our commercial

23  wholesaler.  So steps quickly can be put into

24  place.

25       Q.   And I'm going to ask you about the

176

1    history of suspicious order reports in just a

2    second.  So we'll get into that into a little bit

3    of detail.  You don't remember any times where you

4    had to turn a truck around, don't remember any

5    times where you had to call a pharmacy and ask

6    them to put a tote to the side and not open it;

7    that hasn't happened?

8          A.   Not that I've seen in what I've looked

9    at.

10         Q.   So every time that orders have been

11   flagged or popped on this threshold report going

12   back to 2013, they've always been shipped, and

13   they've never been brought back?

14         A.   As far as I can tell, no.

15         Q.   From 2013 till we sit here today, every

16   order that's ever popped on HBC's or Giant Eagle's

17   threshold report as being over threshold has

18   always been shipped, has never been reported to

19   the DEA and has never been brought back?

20              MR. BARNES:  Wait a minute.  Object to

21   form.

22   BY MR. GADDY:

23         Q.   Is that correct?

24              MR. BARNES:  This is one report with a

25   hundred --

177

1              MR. GADDY:  That's all I'm asking.  I'm

2      asking him the question, not you.

3              MR. BARNES:  Don't trick him.

4              THE WITNESS:  Can you ask the question

5      again, please?

6      BY MR. GADDY:

7          Q.   2013 through today, have there ever been

8      any controlled substances that have been flagged

9      on this report that have not been shipped to the

10     stores?

11             MR. BARNES:  Object to form.

12             THE WITNESS:  The orders that have been

13     flagged on this report were received by the

14     stores, is that your question?

15     BY MR. GADDY:

16         Q.   I think you answered my question.

17         So every report -- every entry that's flagged

18     here on this report was sent to the stores;

19     correct?

20         A.   Every entry on these stores, none of

21     them were flagged as suspicious.  They were all

22     investigated and cleared.

23         Q.   And that's fine if that's what the

24     answer is.  I'm just trying to make sure that's

25     clear.

1      A.   That is the answer.  I'm telling you

2  what happens.

3      Q.   Going back to 2013, as we sit here

4  today, every item that's showing up on this report

5  has been investigated and cleared?

6      A.   Yes.

7      Q.   From 2009 until 2014 -- here I'm only

8  asking about HBC; I'm not asking about the new

9  Giant Eagle distribution center -- do you have any

10  understanding of how many orders for hydrocodone

11  combination products HBC received from Giant Eagle

12  pharmacies?

13      A.   I'm sorry.  One more time.  2009 to

14  2014?

15      Q.   Sure.  I'm only asking about HBC.  I'm

16  not asking about the Giant Eagle facility.

17      Do you have an understanding as to how many

18  orders for hydrocodone combination products HBC

19  received from Giant Eagle pharmacies?

20      A.   How many orders HBC -- I'm sorry.  I'm

21  just trying to follow.  How many orders HBC

22  received?

23      Q.   Correct.

24      A.   From Giant Eagle pharmacies?

25      Q.   Correct.









183













189



190











195



196



197



198



1        MR. BARNES:  I'm going to object.  With

2   respect to the discovery cut-off, we're not going

3   to the present obviously.  We've indicated in our

4   discovery responses that we're filing a June 1,

5   2018 discovery cut-off.  So we would object to any

6   questions beyond that date generally.

7        THE WITNESS:  To answer your question,

8   up until the date of June 1st of 2018, two, two

9   orders.

10  BY MR. GADDY:

11      Q.   How many -- of those suspicious orders

12  that were reported, how many of those two orders

13  were for hydrocodone combination products?

14      A.   Zero.

15           (HBC-Tsipakis Exhibit 18 was marked.)

16  BY MR. GADDY:

17      Q.   I'm going to show what I'll mark as

18  Exhibit 18.

19           MR. GADDY:  It's HBC 1005 internally.

20  BY MR. GADDY:

21      Q.   And if you would start for me, please,

22  at the beginning of the email chain on page 2.

23      A.   .2?

24      Q.   Correct.  It starts about halfway down

25  the page with an email from Robert McClune.  Do

200

1    you see that?

2         A.   Yes.

3         Q.   The subject of the email is Thrifty

4    White Notes.  It says, "Team, I wanted to send a

5    note out regarding our trip to Thrifty White

6    yesterday in conjunction with the planned

7    warehouse move vault and refrigeration."

8         Do you see that?

9         A.   Yes.

10        Q.   What is Thrifty White?

11        A.   Thrifty White is another regional

12   pharmacy chain.

13        Q.   Is it white or right?

14        A.   White, Thrifty White.

15        Q.   What was the purpose in HBC and Giant

16   Eagle employees taking a visit to Thrifty White?

17        Let me ask you this:  Are you aware

18   independently without reviewing the email?

19        A.   No.

20        Q.   I'll withdraw the question.

21        So it says the team went to Thrifty White

22   yesterday.  Then it says in the next paragraph,

23   "Please chime into this email string with your

24   Thrifty White notes.  Do not worry about

25   duplication.  Just bring them."

201

```
 1          Do you see that?

 2          A.   Yes.

 3          Q.   And then if you look at the bottom of

 4    that page and flip to the next page, you just kind

 5    of see a set of bullet points, and there's a

 6    heading in that about Thrifty White notes.  Do you

 7    see that?

 8          A.   Yes.

 9          Q.   And if we flip through back to the first

10    page of the document, do you see the response from

11    Joe Millward who I think you said was head of the

12    compliance department?

13          A.   Yes.

14          Q.   And he writes, "Here are my notes."  And

15    the title of his notes are Thrifty White Visit

16    Notes 8/19/2015.  Are you with me?

17          Note number one is, "Keep engaged with the

18    DEA through all steps of the process."

19          Do you see that?

20          A.   Yes are.

21          Q.   His second note that he writes is, "It

22    is critical to have a robust suspicious order

23    monitoring program."

24          Do you see that?

25          A.   Yes.
```





204



205





207







210

1    of '15?

2        A.   Yes.

3        Q.   I'm going to show you what I will mark

4    as Exhibit No. 20.

5            (HBC-Tsipakis Exhibit 20 was marked.)

6            MR. GADDY:  This is HBC 1023, which

7    we're marking as Exhibit 20.

8    BY MR. GADDY:

9        Q.   And if we look at the first page, do you

10   recognize this to be an email from Adam Zakin in

11   March of 2016?

12       A.   Yes.

13       Q.   You can go ahead and turn to the back

14   page so we can get to the earliest email in the

15   chain.

16       Do you see it says, "Hello, Joseph and

17   George.  As a follow-up to our discussions, I have

18   attached our SOM solution proposal for your

19   review.  Once you've had a chance to review this

20   internally, we would welcome an opportunity to

21   talk through our two SOM options and answer any

22   questions you have."

23       Do you see that?

24       A.   Yes.

25       Q.   And it's from Gary at Buzzeo.  Do you

1   see that?

2       A.   Yes.

3       Q.   Do you know what Buzzeo is?

4       A.   Yes.

5       Q.   What is that?

6       A.   Buzzeo is the compliance arm of IQVIA.

7   They purchased Buzzeo years back.  I'm familiar

8   with them.

9       Q.   Do you know what the purpose of

10  Buzzeo -- what service it is that they provide?

11      A.   Consultant services that they provide.

12      Q.   And what he's indicating here I think as

13  we'll see as we go through, he wants to talk to

14  Joe Millward and George Chunderlik regarding

15  suspicious order monitoring programs; correct?

16      A.   Yeah.  He's a salesmen trying to pitch a

17  solution or a consultant or consulting engagement,

18  sure.

19      Q.   If we go back to the first page and we

20  go two-thirds of the way down, you see an email

21  from George Chunderlik.

22      A.   First page?

23      Q.   Yes, about two-thirds of the way down.

24  Are you with me, George Chunderlik on March 24,

25  2016?

1       A.    Um-hum.

2       Q.    And he says, "Hi, Adam and Bob.  I think

3  it would be" -- and to be clear -- never mind.

4       He's writing to Bob McClune and Adam Zakin;

5  correct?

6       A.    Yes.

7       Q.    Tell me who they are and what they do

8  within HBC or Giant Eagle.

9       A.    At the time of this email; correct?

10      Q.    Sure.

11      A.    So at the time of this email, Adam is

12  senior director of administration, which includes

13  the procurement team.  Bob works for Adam

14  basically on the procurement and analytics team.

15      Q.    Are they both still with the company?

16      A.    Yes.

17      Q.    George says, "I think it would be

18  worthwhile to talk to these guys about their SOM

19  program.  I'm curious to see their products.  I'm

20  going to set something up for us and include Jason

21  unless you have any objections."

22      Do you see that?

23      A.    Yes.

24      Q.    If you go back up to the top of the

25  page, you see Adam's response; correct?

213

1        A.    Yes.

2        Q.    He says, "We saw this.  We're not there.

3   At the end of day, the only thing it did that our

4   current system would not do was stop the orders

5   physically if there was a threshold."

6        Do you see that?

7        A.    Yes.

8        Q.    So in March of 2016, HBC or Giant Eagle,

9   their current system would not physically stop the

10  orders that rose above the threshold; correct?

11       A.    Correct.

12       Q.    This outfit was selling a product that

13  would have stopped the orders that were identified

14  as being above the threshold prior to them being

15  shipped to the store, correct, at least according

16  to George and Adam?

17       A.    I don't know what they were -- what they

18  looked at, what was presented.  So I can't

19  speculate what it does or doesn't do.

20       Q.    That's what Adam is representing they

21  did; correct?  He says, "The only thing it did

22  that our current system would not do was stop the

23  orders physically if there was a threshold."

24       A.    That's what it says here and he

25  represented here, yes.









218





220



221









225



226



227



228





230









234



235





237



238







241



242



243









1    threshold showing the total quantity shipped of

2    8514 with the threshold quantity being 6868.

3         A.   Yes.

4         Q.   You said before that you thought -- and

5    this again appears to have a chain-wide average

6    for the threshold quantity.

7         A.   Yes.

8         Q.   You said before that you thought using a

9    chain-wide average could lead to false positives?

10        A.   For sure, yes.

11        Q.   And by the same token, could using a

12   chain-wide average also lead to false negatives?

13        A.   I'm not a mathematician, but I believe

14   looking here at store 8 that you're asking on,

15   that's one of our busiest stores in the chain, and

16   I'm not surprised that it would have been over

17   threshold from looking at this number.

18        Q.   My question is a little different,

19   however.  Not looking just at store number 8 and

20   not looking at just at the information on this

21   spreadsheet, would you agree that while using a

22   chain-wide threshold can lead to false positives

23   for some stores, could it also lead to false

24   negatives or a sense of reassurance for some

25   stores that may actually be using or ordering a

1    lot more of a hydrocodone product than it normally

2    would?

3         A.   It's possible.

4         Q.   If we go to the next document in this

5    set, 1054, this is the end-of-the-month report for

6    December 2013.  If you'll go to the page with the

7    spreadsheet information on it, we see store number

8    8 again; is that right?

9         A.   Yes.

10        Q.   I think it's about four stores down.

11   Are you with me?

12        A.   Yes.

13        Q.   And for store number 8 this month, we

14   see a total shipped quantity of 14,663?

15        A.   Yes.

16        Q.   And a threshold quantity of 7175?

17        A.   Yes.

18        Q.   And if you do the math, correct me if

19   you think I'm wrong, but that appears to be a

20   little over six times the monthly average?

21        A.   Based on this threshold, yes.

22        Q.   Would you expect a daily or a report

23   like this to raise questions about store number 8

24   similar to the questions that were raised in

25   January of 2014?













255

1    this month of any emails by anyone asking anyone

2    to look into whether store 8 had any abnormal

3    ordering patterns for the hydrocodone products?

4        A.   I don't have any specific knowledge of

5    them or not.

6        Q.   I have one more spreadsheet I want to

7    ask you about, and it actually jumps forward.  It

8    fast forwards now to May of 2014.  Let me know

9    when you're with me.

10       A.   What number is that?

11       Q.   I think May of 2014.  Is that what you

12   have?

13       A.   Is it 1059 in the corner?

14       Q.   Yes, 1059.

15       A.   I'm tracking with you.

16       Q.   And if you'll go to the second page of

17   the spreadsheet again with me, again, you'll see

18   store number 8 about in the middle of that

19   spreadsheet.

20       And would you agree with me that the amount

21   shipped in this month of 10,879 exceeded the

22   threshold quantity, which was 5598?

23       A.   Yes.

24       Q.   And is it your understanding that even

25   as of 2016, the threshold quantity was still being

256

```
 1    applied as an average across the store chains?

 2         A.   Yes.

 3         Q.   I think I'm done with that exhibit.

 4         When talking about the threshold system that

 5    was put in place in 2013, I think I heard you

 6    earlier say that it was done to improve the system

 7    of monitoring for suspicious orders.

 8         A.   To add further layers, yes.

 9         Q.   Looking back, do you think back in 2013

10    putting the threshold system in place the way it

11    was put in place, that it was indeed an

12    improvement over what HBC had at that point in

13    time?

14         A.   It was an improvement that there was

15    automated reports, certainly some IT help to it in

16    some regards.

17         Q.   Because prior to 2013, there were no

18    automated reports; is that right?

19         A.   It was more a manual process, yes.

20         Q.   Not just more a manual process.  There

21    was no automated reporting coming out on a daily

22    basis; is that right?

23         A.   As far as I could find, no.

24         Q.   You may recall a little earlier today

25    that you were shown a couple of letters by the
```





259









262

263



264



265







268



269







272





274





276

1      A.   Yes.

2      Q.   Can you just briefly summarize those for

3  us?

4           MR. GADDY:  Objection to form.

5           THE WITNESS:  Certainly there was a lot

6  of pop-up pharmacies on the internet that the DEA

7  was cracking down on and certainly there wasn't a

8  valid patient/prescriber relationship, and the DEA

9  had ramped up regulatory efforts against those to

10  curb them or shut them down.

11  BY MR. BARNES:

12      Q.   Did HBC or Giant Eagle at any time ever

13  supply an internet pharmacy at any time?

14           MR. GADDY:  Objection to form.

15           THE WITNESS:  No.

16  BY MR. BARNES:

17      Q.   Now, with respect to the physical

18  structure of the HBC warehouse, did you have a

19  locked cage?

20      A.   Yes.

21      Q.   Was there controlled access to that

22  locked cage?

23      A.   Yes.

24      Q.   Was that locked cage inspected and

25  approved by the DEA?

1        A.    Yes.

2        Q.    Was admittance to the locked cage

3   limited to only certain personnel?

4        A.    Yes.

5        Q.    Was there limited entry for the number

6   of personnel?

7        A.    Yes.

8        Q.    What was that number, do you recall?

9        A.    Three or four individuals only.

10       Q.    Were they using any type of digital

11  inventory system with scanners and wrist bands and

12  things of that nature while they were inside the

13  controlled substance locked area?

14       A.    Yes.

15       Q.    Do you know the name of that system?

16       A.    I believe Volcom.  I think it's Volcom.

17       Q.    Can you spell that, please?

18       A.    V-O-L-C-O-M.

19       Q.    And is that system a form of a perpetual

20  inventory system?

21       A.    Yes.

22       Q.    Is that a type of internal control at

23  the warehouse?

24            MR. GADDY:  Objection to form.

25            THE WITNESS:  Sure, yes.

278

1    BY MR. BARNES:

2         Q.    The controlled substance orders that

3    were picked at the warehouse, the HBC warehouse,

4    were they doublechecked before shipping?

5         A.    Yes.

6         Q.    Were there physical safeguards to

7    prevent theft and diversion at that warehouse?

8         A.    Yes.

9         Q.    Even while picking the orders?

10        A.    Yes.

11        Q.    Can you just describe a few of them?

12        A.    So there would be daily audits,

13   backcounts.  The system would make sure that all

14   of the inventory would tie up.

15        Q.    So if there was any product missing,

16   would it be found fairly promptly?

17        A.    Oh, yes.

18        Q.    Was there a daily warehouse inventory

19   for controlled substances?

20        A.    Yes.

21        Q.    Were there security guards and cameras

22   throughout the facility?

23        A.    Yes, multiple.

24        Q.    Besides the daily inventories, were

25   their yearly inventories and biannual DEA

1    inventories?

2         A.   Yes.

3         Q.   Was the warehouse overseen by the Giant

4    Eagle audit and accounting department?

5         A.   Sure, yes.

6         Q.   You were asked a lot of questions about

7    due diligence performed in the 2009 to 2013 time

8    period.  In fact, Exhibit 12 you were shown a few

9    minutes ago and you were asked whether you could

10   identify specific investigations for line items on

11   these reports.

12        Do you recall those questions?

13        A.   Yes.

14        Q.   How many transactions like that are we

15   talking about in any given -- any given month and

16   year?

17        A.   Thousands, millions, many items.

18        Q.   And you can't remember every one of

19   them?

20        A.   No.

21        Q.   And you didn't attempt to memorize every

22   one of them in preparation for your deposition?

23        A.   No.

24        Q.   Have you ever heard of the term CSOS

25   ordering system?

1      A.   Yes.

2      Q.   Is that something that was used for the

3  warehouse facilities?

4      A.   Yes.

5      Q.   When did that program start being used?

6      A.   I believe 2015.

7      Q.   Does that program have the ability to

8  stop an order if it exceeds a threshold?

9      A.   Yes.

10      Q.   Are you familiar with the Supply Logic

11  software program?

12      A.   Yes.

13      Q.   Is that another program that Giant Eagle

14  used at these warehouses?

15      A.   Yes.

16      Q.   And what did that allow Giant Eagle or

17  the warehouses to do?

18      A.   It would allow for us to see the ins and

19  outs of inventory and flag anything that had any

20  risk or things to look at out of the ordinary.

21      Q.   Is that a form of an internal control?

22          MR. GADDY:  Objection to form.

23          THE WITNESS:  Yes.

24  BY MR. BARNES:

25      Q.   Was that part of the overall security

1    system that HBC considered when it was trying to

2    comply and complying with the security

3    requirement?

4              MR. GADDY:  Objection to form.

5              THE WITNESS:  Yes.  More further, they

6    would look at patterns.  They would look at pretty

7    holistically the patterns and any deviations.

8    BY MR. BARNES:

9        Q.   You're a pharmacist; is that correct?

10       A.   Yes.

11       Q.   What kind of degrees in pharmacy do you

12   have?

13       A.   Bachelor of science in pharmacy.

14       Q.   And were you a practicing pharmacist in

15   a store for a period of time?

16       A.   Yes.

17       Q.   Was that for a different chain,

18   Albertsons?

19       A.   Yes.

20       Q.   Are you familiar with dispensing

21   practices and things of that nature?

22       A.   Yes.

23       Q.   In your direct testimony upon

24   questioning by Mr. Gaddy, you referenced this

25   integrated control system, and you referenced

1    three parts to it, at the warehouse, at corporate

2    and at the stores.  Do you recall that testimony?

3         A.   Yes.

4         Q.   At the stores are there internal

5    controls over controlled substances?

6         A.   Sure, yes.

7         Q.   Are there physical controls over

8    controlled substances?

9         A.   Yes.

10        Q.   Does that include vaults -- I'm sorry --

11   not vaults, but safes and things of that nature?

12        A.   Locked cabinets and safes, yes.

13        Q.   And who's allowed access to those locked

14   cabinets and safes?

15        A.   Only the pharmacist.

16        Q.   Does Giant Eagle have a mechanism to

17   train pharmacists to keep tight control over

18   controlled substances?

19        A.   Yes.

20        Q.   And is that monitored by loss prevention

21   and internal audit?

22        A.   Yes.

23        Q.   And are pharmacists and pharmacy techs

24   trained and supervised?

25             MR. GADDY:  Objection to form.

283

```
 1            THE WITNESS:  Yes.
 2    BY MR. BARNES:
 3        Q.    Does Giant Eagle at the store level
 4    impose policies and procedures on the pharmacists
 5    and the pharmacy techs with respect to dispensing
 6    prescriptions?
 7        A.    Yes.
 8        Q.    Are you familiar with the DEA pharmacist
 9    manual?
10        A.    Of course, yes.
11        Q.    Is that something that's kept at every
12    Giant Eagle pharmacy?
13        A.    Yes.
14        Q.    And are the pharmacists required to
15    review it and sign off on it?
16        A.    Yes.
17        Q.    Does Giant Eagle have controlled
18    substance dispensing guidelines?
19        A.    Yes.
20        Q.    Do those guidelines include red flags,
21    things to watch for in terms of whether a
22    prescription is legitimate or not?
23        A.    Yes.
24        Q.    And are they required to review those
25    and sign off that they've been trained on it and
```

284

1  understand them?

2      A.   Yes.

3      Q.   And are all of Giant Eagle's pharmacists

4  licensed pharmacists with experience?

5          MR. GADDY:  Objection to form.

6          THE WITNESS:  Yes.

7  BY MR. BARNES:

8      Q.   Are there other manuals containing

9  policies at the store level related to controlled

10  substance other than the DEA pharmacist manual and

11  the controlled substance dispensing guidelines?

12      A.   Yes.

13      Q.   And do those policies include controls

14  over all controlled substances?

15      A.   Yes.

16      Q.   Do the stores interface with any

17  statewide systems to make sure that incoming

18  prescriptions are legitimate?

19      A.   Yes.

20      Q.   In the state of Ohio, is there a name

21  for that system?

22      A.   Sure.  It's the prescription drug

23  monitoring program, the OARRS program.

24      Q.   And is that something that the

25  pharmacists are trained to consult?

285

1        A.    Yes.

2        Q.    Will that provide some information about

3    things like doctor shopping and people coming in

4    from out of state, things of that nature?

5             MR. GADDY:  Objection to form.

6             THE WITNESS:  Yes.

7    BY MR. BARNES:

8        Q.    And do Giant Eagle pharmacists use that

9    system?

10       A.    Regularly, yes.

11       Q.    Is the activity at the store level

12   reported to the DEA in terms of prescriptions

13   filled?

14       A.    Yes, yes.

15       Q.    Is the DEA -- does the DEA from time to

16   time visit the stores?

17       A.    Sure, yes.

18       Q.    Do they perform surprise audits and

19   things of that nature?

20             MR. GADDY:  Objection to form.

21             THE WITNESS:  Audits or if they're

22   coming in for investigations or other things that

23   they're working on, sure, yes.

24   BY MR. BARNES:

25       Q.    Do of the boards of pharmacy of the

286

1   states also interface with the stores?

2       A.   Yes.

3       Q.   Does the Ohio Board of Pharmacy

4   interface with the Giant Eagle stores in these two

5   counties at issue?

6           MR. GADDY:  Objection to form.

7           THE WITNESS:  Yes.

8   BY MR. BARNES:

9       Q.   Do they perform surprise audits and

10  inspections?

11          MR. GADDY:  Objection to form.

12          THE WITNESS:  Absolutely, yes.

13  BY MR. BARNES:

14      Q.   To your knowledge, has there ever been a

15  problem raised by the DEA or the Ohio Board of

16  Pharmacy related to any of the Giant Eagle

17  pharmacies in these two jurisdictions?

18          MR. GADDY:  Objection to form.

19          THE WITNESS:  Not to my knowledge, no.

20  BY MR. BARNES:

21      Q.   Are there controls over incoming orders

22  into the stores, including orders from the other

23  distributors?  McKesson, I guess, was the main

24  distributor of controlled substance IIs for this

25  time period; is that correct?

287

1          A.   Correct.

2          Q.   And when those came into the stores,

3     were there special procedures over those incoming

4     orders?

5          A.   Yes.

6          Q.   Were they treated differently than other

7     incoming orders?

8          A.   Absolutely, yes.

9          Q.   Give us some samples of that.

10         A.   So those orders would need to be checked

11    in by a pharmacist, signed off on the pharmacist.

12    Right away when the couriers would drop off, it's

13    the expectation that the pharmacist would -- it

14    would be segregated.  They come in different totes

15    and they're handled differently.  And any

16    discrepancies are immediately noted or called in.

17         Q.   Is the pharmacist required to

18    immediately input -- update the store's controlled

19    substance inventory for incoming orders?

20         A.   Their onions?

21         Q.   Yes.

22         A.   Yes.

23         Q.   And when controlled substance

24    prescriptions are filled, is the inventory, the

25    store inventory immediately credited for the

1   outgoing prescription?

2       A.   Yes.

3       Q.   At the end of the day, is there a check

4   of the remaining balance of controlled substances

5   at the store?

6       A.   Yes, and especially even more so on

7   CIIs.  They're backcounted on every fill.

8       Q.   What does it mean to backcount every

9   fill?

10      A.   The system will prompt for how many

11  pills are left in the bottle.  So if you had a

12  hundred pills to start and you filled 50, you

13  would expect to have 50 left in that bottle.  So

14  the backcount would be to ensure that you had 50

15  left in that bottle and inputting that that you do

16  have, in fact, 50.

17      Q.   Are you familiar with the term monthly

18  narc audit?

19      A.   Yes.

20      Q.   What is that?

21      A.   The requirement that all of our

22  pharmacies do a full inventory of CII narcotics in

23  our stores and some other products as well, not

24  just can CIIs, but some CIIIs.

25      Q.   So you have the daily perpetual

1   inventory and the monthly narc audits?

2        A.   Yes.

3        Q.   You also have the annual audits or

4   inventories of controlled substances at every

5   store?

6        A.   The DEA requires an biannual inventory.

7   We do an annual inventory on top, yes.  We do a

8   yearly inventory instead of biannual.

9        Q.   Can you tell us what a PDL is?

10       A.   PDL is a pharmacy district leader.

11       Q.   And what do they do?

12       A.   They supervise the stores.  They're

13  basically a district manager that oversees the

14  stores for all aspects of ensuring Pharmacy

15  Practice Act, DEA, company policy.  They're the

16  oversight for the stores, direct oversight for the

17  stores.

18       Q.   Do they regularly visit the stores?

19       A.   Yes.

20       Q.   Do they conduct audits or inquiries

21  concerning their procedures and things of that

22  nature?

23       A.   They do audits.  We also have an

24  internal audit that quarterly visits the stores

25  for a myriad of things, but yes.

290

1          Q.    Is there any supervision of training of

2     pharmacists?

3          A.    Yes.

4          Q.    Is that something a PDL does?

5          A.    A PDL would definitely make sure any

6     training that needs to be done or computer-based

7     training is completed, and if there's any

8     remediation that's needed, that's their job to

9     make sure.

10         Q.    Do the stores work with local law

11    enforcement, police, board of pharmacy inspectors,

12    DEA agents?

13         A.    Oh, yes, all the time.

14              MR. GADDY:  Objection to form.

15    BY MR. BARNES:

16         Q.    Is that cooperative working

17    relationship?

18              MR. GADDY:  Objection to form.

19              THE WITNESS:  Very much so, yes.

20    BY MR. BARNES:

21         Q.    In working with local law enforcement

22    and DEA, have you been able to uncover people

23    attempting to pass bad scripts, things of that

24    nature?

25         A.    Yes.

291

1       Q.   Is there a pharmacy investigator?

2       A.   Yes.

3       Q.   Who is that?

4       A.   Rick Shaheen.

5       Q.   If how much experience does he have?

6       A.   He has a lot of experience.  He has a

7   background in law enforcement, attorneys general's

8   office, a very -- has a lot of contacts with DEA,

9   boards of pharmacy.  So he's been -- he's been in

10  the business a long time.

11      Q.   Does he spend a lot of time in the

12  stores?

13           MR. GADDY:  Objection to form.

14           THE WITNESS:  Yes.

15  BY MR. BARNES:

16      Q.   Does he also work individually with

17  local law enforcement and DEA?

18      A.   Yes.

19      Q.   Are you familiar with the term or the

20  acronym BOLO, B-O-L-O?

21      A.   Yes.

22      Q.   What is it?

23      A.   Be on the lookout for.  So he will send

24  out bulletins to the pharmacists when either law

25  enforcement will tell him that there's bad scripts

1    on the street or a prescription pad, for example,

2    if it's stolen or something, either if we have

3    information -- so Rick is involved with -- Rick

4    and Andrew, who work for Rick, are involved with

5    all of those activities and alert our stores as

6    soon as they know something and we disseminate

7    very quickly to all our stores.

8         Q.   And is that the type of information

9    that's also in the OARRS database, or is that

10   different?

11            MR. GADDY:  Objection to form.

12            THE WITNESS:  Different.

13   BY MR. BARNES:

14        Q.   Are there daily counts of certain drugs?

15        A.   Yes.

16        Q.   Does that include HCP, hydrocodone, or

17   HCP products?

18        A.   Yes.

19        Q.   Is there an electronic prescription

20   system with perpetual logs at the stores?

21        A.   Yes.

22        Q.   Is that a form of internal control?

23        A.   Yes.

24        Q.   Is there diversion training for pharmacy

25   employees on a yearly basis?

293

 1           MR. GADDY:  Objection to form.

 2           THE WITNESS:  Yes.

 3  BY MR. BARNES:

 4      Q.   Now, you were asked a lot of questions

 5  about so-called suspicious orders.  And I didn't

 6  hear a lot of questioning about diversion.

 7      Do you understand the term diversion?

 8           MR. GADDY:  Objection to the question,

 9  form of the question.

10           THE WITNESS:  Yes.

11  BY MR. BARNES:

12      Q.   What does the term diversion mean to

13  you?

14      A.   Diversion, theft, loss, things being

15  routed to folks that shouldn't have access to the

16  drugs or prescriptions.

17      Q.   If an order is suspicious, does that

18  mean it was diverted?

19           MR. GADDY:  Objection to form.

20           THE WITNESS:  No, not necessarily, no.

21  BY MR. BARNES:

22      Q.   In fact, what has HBC's and Giant

23  Eagle's experience been with respect to so-called

24  suspicious orders or flagged orders?  Have they

25  resulted in uncovering diversion?

294

1              MR. GADDY:  Objection to form.

2              THE WITNESS:  No.

3    BY MR. BARNES:

4         Q.   What happens to -- you were asked

5    questions on Exhibit 15 of these ████████dosage

6    units in Cuyahoga County.  What happened to those

7    ████████ units?  Where did they go?

8              MR. GADDY:  Objection to form.

9              THE WITNESS:  Assuming those were the ██

10   ████████ units that we dispensed out of HBC, they

11   were dispensed to patients that were pursuant --

12   on a valid prescription.

13   BY MR. BARNES:

14        Q.   And how about the dosage units that went

15   out to Summit County presuming that these numbers

16   are correct?

17             MR. GADDY:  Same objection.

18             THE WITNESS:  The same.  Every single

19   one of them would have been dispensed pursuant to

20   a prescription by a licensed practitioner for

21   those patients.

22   BY MR. BARNES:

23        Q.   In your direct questioning today, were

24   you shown at any time any evidence, any document,

25   any piece of paper by plaintiffs' counsel

295

 1    suggesting that any single one of these

 2    prescriptions was anything other than a legitimate

 3    prescription issued by a doctor who had a

 4    legitimate license to issue it?

 5              MR. GADDY:  Objection to form.

 6              THE WITNESS:  No.

 7    BY MR. BARNES:

 8        Q.    Were you shown any evidence at any time

 9    that any of these prescriptions caused anybody any

10    harm at any time in any jurisdiction?

11              MR. GADDY:  Objection to form.

12              THE WITNESS:  No.

13    BY MR. BARNES:

14        Q.    Did the DEA at any time inform HBC or

15    Giant Eagle that it was required to keep records

16    of every call, every conversation that was made

17    with respect to following up on orders of

18    interest?

19              MR. GADDY:  Objection to form.

20              THE WITNESS:  No.

21    BY MR. BARNES:

22        Q.    Did HBC and Giant Eagle keep those

23    records and emails in other types of files?

24        A.    Yes.

25        Q.    Is Giant Eagle's integrated system

1    designed to maintain the integrity of the closed

2    system of distribution from incoming at the

3    warehouse to outgoing at the stores?

4        A.   Yes.

5             MR. GADDY:  Objection to form.

6    BY MR. BARNES:

7        Q.   The system that was designed by Giant

8    Eagle, did you expect it to ever produce a

9    suspicious order?

10            MR. GADDY:  Objection to form.

11            THE WITNESS:  No.

12   BY MR. BARNES:

13       Q.   Before you had the threshold-based

14   system, you've already testified, I think, there

15   was one suspicious order?

16       A.   Yes.

17       Q.   And after you had the threshold-based

18   system, you had one suspicious order?

19       A.   One more, yes.

20       Q.   What does that tell you?

21            MR. GADDY:  Objection to form.

22            THE WITNESS:  That we had adequate

23   controls from the beginning.  Adding more layers

24   of controls didn't materially change the outcome

25   of the system we had in place.



298











303



304



305

1          Q.   You mentioned the pharmacy investigator,

2     Rick Shaheen; correct?

3          A.   Yes.

4          Q.   Does Mr. Shaheen have any training or

5     education in detecting or identifying suspicious

6     orders of controlled substances that would come

7     from pharmacies?

8          A.   Having met Mr. Shaheen and spending time

9     with Mr. Shaheen and looking at his very diverse

10    background, I feel he's absolutely qualified to do

11    investigations to support our operation, yes.

12         Q.   I'm not questioning his qualifications

13    as a law enforcement officer or as a pharmacy

14    investigator.  What I'm asking is a little bit

15    different.

16         I'm asking whether or not you're aware of him

17    having any training or experience or education as

18    it relates to HBC's duty under the Controlled

19    Substance Act to design and operate a system to

20    detect suspicious orders.

21         A.   That I do not know, no.

22         Q.   We agree that HBC was under no

23    obligation to utilize a threshold system in 2013;

24    correct?

25         A.   Correct.

1    Q.    But HBC chose to do so; correct?

2    A.    As one level of control, yes.

3    Q.    And this was touched on a little bit

4    earlier, but I think with me you indicated that

5    the original methodology was flawed and was a

6    system that could produce false positives;

7    correct?

8    A.    Certainly.  When you do an average, yes,

9    it's possible, yes.

10    Q.    Then you also were asked after lunch

11    whether or not that same system could produce

12    false negatives, and you agreed that was also a

13    possibility; right?

14    A.    Possible, yes.

15    Q.    I might get these numbers wrong, but I

16    believe the example you gave to me when I was

17    asking questions this morning was that you had

18    some pharmacies that wrote 6000 scripts per month,

19    and you had some pharmacies that wrote 300 scripts

20    per month.

21    A.    If you mean dispense, yes, but that's

22    not just controlled substances.  That's total

23    prescriptions.  But yes.

24    Q.    Sure.  So just like I think the example

25    you pointed out or maybe one of your higher volume







310

1

2

3

4

5          MR. BARNES:  I have nothing further.

6    Thank you.

7          THE VIDEOGRAPHER:  5:20 p.m.  We're off

8    the video record.  This concludes the video

9    deposition.

10          (Whereupon, at 5:20 p.m., taking of the

11    instant deposition ceased.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   COMMONWEALTH OF PENNSYLVANIA  )

2   COUNTY OF ALLEGHENY           )      SS:

3                    C E R T I F I C A T E

4            I, Ann Medis, Registered Professional

5   Reporter, Certified Livenote Reporter and Notary

6   Public within and for the Commonwealth of

7   Pennsylvania, do hereby certify:

8            That JAMES TSIPAKIS, the witness whose

9   deposition is hereinbefore set forth, was duly

10  sworn by me and that such deposition is a true

11  record of the testimony given by such witness.

12           I further certify the inspection,

13  reading and signing of said deposition were not

14  waived by counsel for the respective parties and

15  by the witness.

16           I further certify that I am not related

17  to any of the parties to this action by blood or

18  marriage and that I am in no way interested in the

19  outcome of this matter.

20           IN WITNESS WHEREOF, I have hereunto set

21  my hand this 18th day of December, 2018.

22

23                  _____
                                Notary Public

24

25

312

```
 1                      -  -  -  -  -

 2                   E  R  R  A  T  A

 3                      -  -  -  -  -

 4     PAGE   LINE    CHANGE

 5     ____  ____    _____

 6          REASON:  _____

 7     ____  ____    _____

 8          REASON:  _____

 9     ____  ____    _____

10          REASON:  _____

11     ____  ____    _____

12          REASON:  _____

13     ____  ____    _____

14          REASON:  _____

15     ____  ____    _____

16          REASON:  _____

17     ____  ____    _____

18          REASON:  _____

19     ____  ____    _____

20          REASON:  _____

21     ____  ____    _____

22          REASON:  _____

23     ____  ____    _____

24          REASON:  _____

25
```

313

1        ACKNOWLEDGMENT OF DEPONENT

2

3        I,_____, do hereby

4    certify that I have read the foregoing pages, and that

5    the same is a correct transcription of the answers

6    given by me to the questions therein propounded, except

7    for the corrections or changes in form or substance, if

8    any, noted in the attached Errata Sheet.

9

10

11    _____

12    [WITNESS NAME]                    DATE

13

14

15    Subscribed and sworn to

16    before me on this _____day

17    of_____,20___, by _____

18    _____,

19    proved to me on the basis of satisfactory
     evidence to be the person(s) who appeared before me.

20

21            Signature _____

22

23

24

25