Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

                FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3

     IN RE:  NATIONAL PRESCRIPTION    ) No. 17-md-2804

 4   OPIATE LITIGATION                ) MDL NO. 2804

                                      )

 5   APPLIES TO ALL CASES             ) Hon. Dan A. Polster

                                      )

 6

 7         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

 8                  CONFIDENTIALITY REVIEW

 9

              VIDEO DEPOSITION OF KEVIN VORDERSTRASSE

10

                     December 5, 2018

11                      9:12 a.m.

12

13

14         Reporter:  John Arndt, CSR, CCR, RDR, CRR

                    CSR No. 084-004605

15                   CCR No. 1186

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION OF KEVIN VORDERSTRASSE
    produced, sworn, and examined on December 5, 2018, at
 2  Stinson Leonard Street LLP, 7700 Forsyth Boulevard,
    Suite 1100, in the City of St. Louis, State of
 3  Missouri, before John Arndt, a Certified Shorthand
    Reporter and Certified Court Reporter.

 4
 5              APPEARANCES OF COUNSEL
 6
    On Behalf of Plaintiff:
 7        Keller Rohrback LLP
          1201 Third Avenue, Suite 3200
 8        Seattle, WA  98101
          (206) 623-1900
 9        BY:  DAVID J. KO, ESQUIRE
                dko@kellerrohrback.com
10              ERIKA KEECH, ESQUIRE
                ekeech@kellerrohrback.com
11
    On Behalf of Validus Pharmaceuticals:
12        Fox Rothschild LLP
          2000 Market Street, 20th Floor
13        Philadelphia, PA  19103
          (215) 299-2150
14        BY:  MAURA L. BURKE, ESQUIRE
                mburke@foxrothschild.com
15              (present via speakerphone)
16  On Behalf of McKesson:
          Covington & Burling LLP
17        One Front Street
          San Francisco, CA  94111
18        (415) 591-6000
          BY:  SARA SUNDERLAND, ESQUIRE
19              ssunderland@cov.com
                (present via videoconference)
20
    On Behalf of AmerisourceBergen:
21        Reed Smith LLP
          10 South Wacker Drive, 40th Floor
22        Chicago, IL  60606
          (312) 207-1000
23        BY:  M. PATRICK YINGLING, ESQUIRE
                mpyingling@reedsmith.com
24              (present via videoconference)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              APPEARANCES OF COUNSEL (CONTINUED)
 2
    On Behalf of Cardinal Health:
 3          Williams & Connolly LLP
            725 Twelfth Street, N.W.
 4          Washington, D.C. 20005
            (202) 434-5013
 5          BY:  JOSEPH S. BUSHUR, ESQUIRE
                 jbushur@wc.com
 6
    On Behalf of Mallinckrodt:
 7          Ropes & Gray LLP
            Three Embarcadero Center
 8          San Francisco, CA  94111
            (415) 315-6358
 9          BY:  ROCKY C. TSAI, ESQUIRE
                 rocky.tsai@ropesgray.com
10               JOSH GOLDSTEIN, ESQUIRE
                 josh.goldstein@ropesgray.com
11
    On Behalf of Walmart:
12          Jones Day
            901 Lakeside Avenue
13          Cleveland, OH 44114
            (216) 586-3939
14          BY:  ADAM HOLLINGSWORTH, ESQUIRE
                 ahollingsworth@jonesday.com
15
    On Behalf of Endo Pharmaceuticals:
16          Arnold & Porter Kaye Scholer, LLP
            250 West 55th Street
17          New York, NY  10019
            (212) 836-8000
18          BY:  REBECCA E. ZOLLER, ESQUIRE
                 rebecca.zoller@arnoldporter.com
19               (present via videoconference)
20  On Behalf of Tennessee Action:
            Branstetter, Stranch & Jennings, PLLC
21          223 Rosa L. Parks Avenue, Suite 200
            Nashville, TN  37203
22          BY:  TRICIA HERZFELD, ESQUIRE
                 triciah@bsjfirm.com
23
24
```

```
 1              APPEARANCES OF COUNSEL (CONTINUED)

 2

     Also present:  Donald Lohman
 3                  In-house Counsel for Mallinckrodt
                    Pharmaceuticals
 4
                    James Arndt, videographer
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
                    INDEX OF INTERROGATION
 2
    Examination by Mr. Ko                      Page 7
 3  Examination by Ms. Herzfeld                Page 239
 4
                    INDEX OF EXHIBITS
 5
    Exhibit Mallinckrodt-Vorderstrasse-001     Page 11
 6  (Notice of deposition)
 7  Exhibit Mallinckrodt-Vorderstrasse-002     Page 17
    (Mallinckrodt LLC/SpecGX LLC 30(b)(6)
 8  Deposition - K. Vorderstrasse)
    (MNK-T1_0007146199 - MNK-T1_000146210)
 9
    Exhibit Mallinckrodt-Vorderstrasse-003     Page 23
10  (LinkedIn profile for Kevin Vorderstrasse)
11  Exhibit Mallinckrodt-Vorderstrasse-004     Page 50
    (Rite Aid Supply Policy Agreement)
12  (MNK-T1_0000365268 - MNK-T1_0000365287)
13  Exhibit Mallinckrodt-Vorderstrasse-005     Page 70
    (Supply Chain Project-Integrichain)
14  (MNK-T1_0000387037 - MNK-T1_0000387039)
15  Exhibit Mallinckrodt-Vorderstrasse-006     Page 81
    (E-mail chain)
16  (MNK-T1_0004905464 - MNK-T1_0005905467)
17  Exhibit Mallinckrodt-Vorderstrasse-007     Page 100
    (U.S. Pain Market Update)
18  (MNK-T1_0000754547 - MNK-T1_0000754589)
19  Exhibit Mallinckrodt-Vorderstrasse-008     Page 112
    (E-mail chain)
20  (MNK-T1_0000432950 - MNK-T1_0000432952)
21  Exhibit Mallinckrodt-Vorderstrasse-009     Page 129
    (4-30-2013 e-mail)
22  (MNK-T1_0000658227 - MNK-T1_0000658228)
23  Exhibit Mallinckrodt-Vorderstrasse-010     Page 135
    (11-8-2012 e-mail)
24  (MNK-T1_0001958991)
```

1

                    INDEX OF EXHIBITS (CONTINUED)

2

   Exhibit Mallinckrodt-Vorderstrasse-011        Page 154
3  (October 2012 - September 2013 Sales
   Incentive Compensation Plan)
4  (MNK-T1_0000090085 - MNK-T1_0000090093)
5  Exhibit Mallinckrodt-Vorderstrasse-012        Page 164
   (October 2014 - December 2014 Sales
6  Incentive Compensation Plan)
   (MNK-T1_0000538136 - MNK-T1_0000538149)
7
   Exhibit Mallinckrodt-Vorderstrasse-013        Page 168
8  (FY2009 Specialty Generics Sales
   Incentive Plan Document)
9  (MNK-T1_0000259116 - MNK-T1_0000259134)
10 Exhibit Mallinckrodt-Vorderstrasse-014        Page 173
   (FY2009 Branded Product Sales
11 Representative Incentive Plan)
   (MNK-T1_0004252956 - MNK-T1_0004252962)
12
   Exhibit Mallinckrodt-Vorderstrasse-015        Page 177
13 (2011-2015 Strategic Plan)
14 Exhibit Mallinckrodt-Vorderstrasse-016        Page 229
   (E-mail chain with attached files)
15 (MNK-T1_0000855019 - MNK-T1_0000855037)
16 Exhibit Mallinckrodt-Vorderstrasse-017        Page 245
   (Sales Force Alignment and Placement
17 for MNK795 Launch)
18              (Exhibits are attached.)
19
20
21
22
23
24

```
 1              THE VIDEOGRAPHER:  We are now on the

 2    record.  My name is James Arndt.  I'm a videographer

 3    for Golkow Litigation Services.  Today's date is

 4    December 5th, 2018, and the time is 9:12 AM.  This

 5    video deposition is being held in St. Louis, Missouri,

 6    in the matter of the National Prescription Opiate

 7    Litigation for the United States District Court for the

 8    Northern District of Ohio, Eastern Division.  The

 9    deponent is Kevin Vorderstrasse.  Will counsel please

10    identify themselves?

11              MR. KO:  Good morning, everyone.  David Ko

12    of Keller Rohrback on behalf of the plaintiffs.

13              MS. KEECH:  Erika Keech from Keller

14    Rohrback on behalf of the plaintiffs.

15              MS. HERZFELD:  Tricia Herzfeld on behalf

16    of the Tennessee plaintiffs.

17              MR. HOLLINGSWORTH:  Adam Hollingsworth on

18    behalf of Walmart.

19              MR. BUSHUR:  Joseph Bushur on behalf of

20    Cardinal Health.

21              MR. GOLDSTEIN:  Joshua Goldstein on behalf

22    of Mallinckrodt LLC and SpecGX LLC.

23              MR. TSAI:  Good morning.  Rocky Tsai,

24    Ropes & Gray, on behalf of the witness and Mallinckrodt
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    LLC.

 2              [Discussion off the record.]

 3              THE VIDEOGRAPHER:  Will counsel on the

 4    phone please identify themselves?

 5              MR. YINGLING:  This is Patrick Yingling

 6    for AmerisourceBergen.

 7              MS. SUNDERLAND:  This is Sara

 8    Sunderland --

 9              MS. ZOLLER:  Rebecca Zoller --

10              MS. SUNDERLAND:  This is Sara

11    Sunderland for McKesson.

12              MS. ZOLLER:  Rebecca Zoller with Arnold &

13    Porter on behalf of the Endo and Par defendants.

14              MS. BURKE:  Maura Burke with Fox

15    Rothschild on behalf of Validus Pharmaceuticals.

16              THE VIDEOGRAPHER:  The court reporter is

17    John Arndt and he will now swear in the witness.

18

19         The witness, KEVIN VORDERSTRASSE, first having

20    been duly sworn, testified as follows:

21              QUESTIONS BY MR. KO:

22              [9:14 a.m.]

23         Q.   Good morning.

24         A.   Good morning.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Could you please state and spell your name

2    for the record?

3          A.      My name is Kevin Vorderstrasse.

4    V-O-R-D-E-R-S-T-R-A-S-S-E.

5          Q.      And Mr. Vorderstrasse, where do you

6    currently reside?

7          A.      I currently reside in St. Peters,

8    Missouri.

9          Q.      And Mr. Vorderstrasse, have you had your

10   deposition taken before?

11         A.      No, I have not.

12         Q.      It's your first time?  Congratulations.

13         A.      Thank you.

14         Q.      Let me go over some ground rules that are

15   important.  These court reporters here have the most

16   important job here, so it's very important that we try

17   and create a clean record to the extent that we can, so

18   I would please ask that you wait until I finish my

19   question before you respond, and I will likewise wait

20   until you finish your response before I move onto my

21   next question.  In other words, let's not talk over

22   each other.  Okay?

23         A.      Good.

24         Q.      And to the extent I ask a yes-or-no

Highly Confidential - Subject to Further Confidentiality Review

1    question and your answer is indeed yes or no, I would

2    ask that you make that clear and audible, rather than

3    simply shaking your head or otherwise revealing a

4    response that's inaudible.  Okay?

5         A.    Okay.

6         Q.    And from time to time, your counsel, Mr.

7    Tsai, might object to my questions, but I'd ask that

8    you please answer them unless he clearly instructs you

9    otherwise.  Okay?

10        A.    Okay.

11        Q.    And throughout the day we'll be taking

12   some breaks.  It will be a long one.  Hopefully it

13   won't be too long, but whenever you feel like you need

14   a break, please let me know and we'll try to do our

15   best to accommodate.

16        A.    Good.

17        Q.    And do you mind if I call you Kevin?

18        A.    No, that's perfectly fine.

19        Q.    Okay.  And Kevin, you were just sworn in,

20   but is there anything that you can think of today or

21   this morning that will prevent you from testifying

22   truthfully or honestly today?

23        A.    No.

24        Q.    Thank you.  I'm going to hand you a copy

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of what we're going to call KV Exhibit 1.

 2              [Exhibit Mallinckrodt-Vorderstrasse-001

 3              marked for identification.]

 4        Q.    Kevin, do you recognize that document?

 5        A.    Yes, I believe so.

 6        Q.    And what is it, to your understanding?

 7        A.    This is the notice of deposition from

 8    Mallinckrodt for the 30(b)6 deposition with a listing

 9    of topics.

10        Q.    And you understand that there are topics

11    that plaintiffs in this case have asked Mallinckrodt to

12    respond to and that you have been designated to testify

13    on some of these topics?  Is that your understanding?

14        A.    Yes.

15        Q.    And before we get into the actual topics,

16    as noted in this deposition, Mallinckrodt is defined as

17    Mallinckrodt PLC, Mallinckrodt LLC, and SpecGX LLC, and

18    I know that there is an ongoing dispute with respect to

19    the PLC that I'll note for the record and plaintiffs

20    reserve all rights with respect to the PLC, but for

21    today I understand that you're testifying on behalf of

22    the LLC and SpecGX LLC.  Is that correct?

23        A.    That's correct.

24        Q.    And today we'll also be looking at some
```

Highly Confidential - Subject to Further Confidentiality Review

 1    documents that reflect some Covidien e-mail addresses

 2    and some plan documents and marketing material that

 3    reflect Covidien materials.  Is it fair -- or can we

 4    agree for purposes of today that Mallinckrodt -- or

 5    excuse me -- that Covidien refers to Mallinckrodt LLC

 6    and SpecGX as well?

 7          A.    Yes, that makes sense to me.

 8          Q.    By the way, other than the LLC --

 9    Mallinckrodt LLC and SpecGX LLC and Covidien, are there

10    any other related entities that were involved with the

11    manufacturing and marketing and promotion of

12    prescription opioids that you are aware of?

13          A.    Not that I'm aware of.

14          Q.    And for the record, with respect to the

15    PLC, have you done -- have you had any communications

16    with any employees or individuals that work for the

17    PLC?

18                MR. TSAI:  I'll object for the record.  As

19    referenced, the governing court order makes clear that

20    claims with respect to foreign entities that did not

21    sell or distribute prescription opioids to the United

22    States is prohibited and in fact is the grounds for

23    sanctions.

24                That description applies precisely to PLC,

1    which is an Irish entity that never made, sold,

2    marketed, or distributed any prescription opioids to

3    the United States, much less to the Ohio jurisdictions

4    at issue.  So with that noted, as referenced, there's

5    negotiations about potentially dismissing PLC, and I

6    would note our objection for the record.

7         Q.    (By Mr. Ko)  So your attorney had a long

8    objection.  The question I would ask you to still

9    answer, unless he instructs you otherwise.  Have you

10   had any communications with any employees or

11   individuals that work for the PLC?

12        A.    I have in the past communicated with

13   individuals that work at the PLC, yes.

14        Q.    And approximately how many individuals?

15        A.    Approximately three to five.

16        Q.    And have any of these communications

17   involved, as your counsel described, communications

18   with respect to the marketing and distribution of

19   prescription opioids in the United States?

20        A.    Not that I can recollect.

21        Q.    Now, turning back to this notice, as we

22   discussed before, you have been designated to speak on

23   behalf of the company on some topics, and it is my

24   understanding that you have been designated to speak on

Highly Confidential - Subject to Further Confidentiality Review

```
 1    behalf of Mallinckrodt for Topics 10, 11 -- let's try

 2    this.  My understanding is that you have been

 3    designated to speak on behalf of Mallinckrodt for

 4    Topics 10, 11, and 12.  Is that correct?

 5          A.    That's correct.

 6          Q.    And also Topics 17 and 18?

 7          A.    That is correct.

 8          Q.    And also Topic 19?

 9          A.    Correct.

10          Q.    Let's see.  Topics 20, 21, and 22?

11          A.    Correct.

12          Q.    I believe you're also testifying on behalf

13    of Mallinckrodt for Topics 27 and 28.  Is that correct?

14    And I know there's a carveout in 27.  We'll get to that

15    in a second.

16          A.    Yes, that's correct.

17          Q.    And then Topics 29?

18          A.    Yes.

19          Q.    And I think lastly Topic 31.

20          A.    Yes, that's correct.

21          Q.    Are all those topics, we the exception of

22    the carveout in 27, topics that you will be testifying

23    on behalf of Mallinckrodt today?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Are there any other topics that I missed?

2          A.     No.

3          Q.     And then going back to Topic 27, it's my

4    understanding that you will be testifying as to that

5    topic with the exception of the phrase distribution and

6    diversion and suspicious order monitoring and

7    compliance.  So in other words -- let me rephrase.

8          A.     Uh-huh.

9          Q.     For Topic 27, you will be testifying on

10   behalf of Mallinckrodt for the following topic.  To the

11   extent not encompassed within other topics, your

12   marketing, promotion, sales, and pharmacovigilance

13   concerning your generic opioid products.

14         A.     Yes, that is correct.

15         Q.     Thank you.  Now, just for the record, so

16   you are testifying on behalf of Mallinckrodt and you're

17   providing corporate testimony on behalf of these

18   entities.  Do you understand that?

19         A.     Yes, I do.

20         Q.     And you're not testifying in your

21   individual capacity here today?

22         A.     Yes.

23         Q.     Can you describe to the court what you did

24   to prepare for this deposition?
```

```
 1         A.      In general I reviewed documents and had

 2   conversations with employees through counsel in order

 3   to refresh my memory or to learn topics with which I

 4   was not originally familiar, as well as reviewing

 5   documents that I was familiar with.

 6         Q.      And did you meet with counsel to prepare

 7   for this deposition?

 8         A.      Yes.

 9         Q.      And which counsel did you meet with?

10         A.      With counsel from Ropes & Gray.  Several

11   different attorneys.

12         Q.      Which attorneys?

13         A.      Bill Davison, Rocky Tsai, Josh Goldstein,

14   Andrew -- last name escapes me.  As well as others who

15   I can't recall their name at this point.

16         Q.      Was it Andrew O'Connor?

17         A.      Yes.  Thank you.

18         Q.      And approximately how many times did you

19   meet with them and for how long?

20         A.      We met on four different occasions.

21   Probably about 30 hours total.

22         Q.      Some good preparation, it sounds like.

23         A.      I think so.

24         Q.      Sorry.  I spoke over you.  I broke my own
```

```
 1    rule.  And as far as the conversations with employees

 2    you had -- why don't I do this?  Why don't I hand you

 3    what will now be marked as KV Exhibit 2?

 4                    [Exhibit Mallinckrodt-Vorderstrasse-002

 5                    marked for identification.]

 6          Q.    Does this document look familiar to you?

 7          A.    Yes, it does.

 8          Q.    And this document was produced to

 9    plaintiffs this morning in advance of the deposition,

10    and it appears based on what I can tell at the time

11    that it comprises of materials you reviewed, among

12    other things, and people you spoke to at Mallinckrodt

13    to prepare for this deposition.  Is that correct?

14          A.    That is correct.

15          Q.    And in terms of the individuals at

16    Mallinckrodt that you spoke with to prepare for this

17    deposition, there are some names that are listed in

18    this exhibit; is that correct?

19          A.    Yes.

20          Q.    And --

21                    MR. TSAI:  If I could just note for the

22    record, this Exhibit 2 was provided yesterday as well

23    as a courtesy copy provided this morning.

24                    MR. KO:  Okay.  Well, for the record, the
```

1    actual document was not sent to us until this morning.

2         Q.    (By Mr. Ko)   The people that are listed

3    here include Melissa Falcone, Kathy Schaefer, George

4    Kegler, Jeff Kilper, and I believe that's all.  Are

5    those the individuals that you spoke with in

6    preparation for this deposition today?

7         A.    So in preparation for the deposition I

8    spoke with Melissa Falcone on a conversation where Bill

9    Davison from Ropes & Gray was present, and I reviewed

10   documents provided by Kathy Schaefer, George Kegler,

11   and Jeff Kilper, which were provided to me by my

12   attorneys.

13        Q.    So the only person you actually spoke

14   with -- well, let's take a step back.  Is Ms. Falcone

15   an employee at Mallinckrodt?

16        A.    Yes, she is.

17        Q.    A current employee?

18        A.    Yes.

19        Q.    And other than Ms. Falcone, is there any

20   other current or former employee at Mallinckrodt that

21   you spoke with in preparation for this deposition?

22        A.    No.

23        Q.    And this KV Exhibit 2 also indicates or

24   reflects some materials that you reviewed, and as you

Highly Confidential - Subject to Further Confidentiality Review

```
1    just alluded to, you looked at some documents.  Does

2    this exhibit constitute the entirety of the documents

3    that you reviewed in preparation for this deposition?

4              MR. TSAI:  Object to the form.  Go ahead.

5         A.    This document provides a summary of the

6    documents which I reviewed.  It does not detail out

7    each individual document.

8         Q.    (By Mr. Ko)  Okay.  Were there any

9    personal documents you reviewed that are not contained

10   in the summary that you looked at in connection or in

11   preparation for this deposition?

12        A.    No.

13        Q.    In any of your meetings with your

14   attorneys or in your conversations with Ms. Falcone,

15   did you bring or raise any documents that are not

16   listed in this summary?

17        A.    No.

18        Q.    In terms of the documents that were

19   selected and are contained in the summary, did you

20   select any of the documents yourself, or were they all

21   provided by counsel or selected by counsel?

22        A.    All of the documents that I reviewed were

23   selected by counsel and provided by counsel.

24        Q.    Other than people at -- other than
```

Highly Confidential - Subject to Further Confidentiality Review

1    employees at Mallinckrodt, both current and former, or

2    your counsel, did you speak with anyone else in

3    connection with preparing for this deposition today?

4         A.    No, I did not.

5         Q.    What is your current position at

6    Mallinckrodt?

7         A.    My current position is senior director of

8    product management and analytics.

9         Q.    And what are your primary roles and

10   responsibilities in that -- in connection with that

11   position?

12        A.    I oversee the product management,

13   commercial analytics, and marketing activities in

14   support of our specialty generic segment, which

15   consists of our generic drugs, our addiction treatment

16   drugs, as well as our active ingredients business.

17        Q.    So isolating on your role as a product

18   manager, are the products you described insofar as

19   generic drugs, addiction treatment, and active

20   ingredients -- are those the products that you're

21   referring to that you manage?

22        A.    Yes, that's correct.

23        Q.    And then with respect to generic drugs,

24   are they all prescription opioids, or are there other

1    generic drugs that you are product manager for?

2        A.    We do manage drugs that are not

3    prescription opioids, yes.

4        Q.    And approximately how many relative to the

5    generic drugs?  And by how many, I mean -- why don't

6    you give the court an approximate percentage?  So about

7    how many of the products you manage are generic

8    prescription opioids relative to the other types of

9    generic drugs that you manage?

10       A.    Right.  So our generic drug portfolio

11   consists of roughly half generic opioids and half other

12   generic drugs.

13       Q.    Okay.  That's helpful.  Thank you.  And

14   then with respect to addiction treatment, are those all

15   products that are addiction treatment for opioid use

16   disorder?

17       A.    Yes, they are.

18       Q.    And do those include buprenorphine?

19       A.    Yes.

20       Q.    And methadone?

21       A.    Yes.

22       Q.    Does Mallinckrodt manufacture any Vivitrol

23   or naltrexone?

24       A.    Mallinckrodt manufactures the naltrexone

1    active ingredient.  We do not manufacture Vivitrol, and

2    we also manufacture generic naltrexone tablets.

3         Q.    And can you give the court a general

4    approximation as well of within the addiction treatment

5    space what percentage of drugs you manage relative to

6    the others?

7         A.    Addiction treatment, in terms of number of

8    products, is less than 10 percent of our portfolio.

9         Q.    And within that 10 percent, how much is --

10   approximately how much is dedicated to bup versus

11   methadone versus naltrexone?

12        A.    Methadone is on a product basis roughly a

13   third for each -- buprenorphine, methadone, and

14   naltrexone -- but in terms of overall volume sold,

15   methadone is the majority of the sales.

16        Q.    And has that generally been the case over

17   time since Mallinckrodt has manufactured and

18   distributed addiction treatment for opioid use

19   disorder-type drugs?

20        A.    That has generally been the case.  We have

21   only sold buprenorphine for the last several years, but

22   sold methadone before that.

23        Q.    And in terms of the overall -- in terms of

24   these drugs representing 10 percent of the overall

1   portfolio, has that grown -- has that increased or

2   decreased over time?

3        A.   I would say it has decreased over time as

4   the rest of the portfolio has grown.

5        Q.   And in connection with your role as a

6   product manager, how long have you been in that role?

7        A.   I've been in my current role for a year

8   and eight months.

9        Q.   And who do you primarily report to?

10       A.   My current supervisor is Karen Lasker.

11       Q.   And what's her position?

12       A.   She is the vice-president of commercial

13  operations for specialty generics.

14       Q.   And I won't ask all the people that report

15  to you, but generally speaking, what departments or

16  groups report to you?

17       A.   Generally speaking, product management,

18  commercial analytics, and marketing.

19       Q.   And approximately how many individuals do

20  you oversee and/or report to you?

21       A.   Eight.

22       Q.   I'm going to hand you a copy of what the

23  court reporter is going to mark as KV Exhibit 3.

24            [Exhibit Mallinckrodt-Vorderstrasse-003

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    marked for identification.]

 2          Q.    Kevin, does this document look familiar to

 3   you?

 4          A.    Yes, it does.

 5          Q.    I'll note for the record that it is your

 6   LinkedIn profile --

 7          A.    Uh-huh.

 8          Q.     -- as of a few days ago.  Does it appear

 9   to be the same as how you have posted this on your

10   LinkedIn website?

11          A.    Yes, this appears to be accurate.

12          Q.    And I won't go over in detail all these

13   things that you've done, but I do want to focus on a

14   few things that you list as your skills.  Is it fair to

15   say -- so in your LinkedIn profile you have your

16   summary where you list kind of the highlights of what

17   you do at Mallinckrodt, and then below that you list a

18   series of phrases, for lack of a better term, that talk

19   about the types of skills that you have.  Is that fair

20   to say?

21          A.    Yes, that's fair.

22          Q.    So in other words, commercial strategy is

23   something you have experience in?

24          A.    Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    And I want to focus on a few of these, in

2     particular return on investment marketing strategy,

3     which you can see up there on the screen.  Can you

4     describe to the court what you mean by that?

5     A.    So that -- the words you're referencing

6     are actually two separate items.

7     Q.    Okay.  That's helpful.

8     A.    Return on investment is separate from

9     marketing strategy.

10    Q.    Okay.  Well, then I won't bore everyone

11    with marketing strategy because we have a general

12    understanding of that, but why don't you describe to

13    the court in your terms what return on investment

14    means?

15    A.    In the context of my profile, return on

16    investment refers to my involvement in business

17    development and licensing projects and performing

18    financial analysis on the prospective acquisition of

19    products or companies.

20    Q.    And can you describe to the court why that

21    skill is important at Mallinckrodt?

22    A.    Mallinckrodt is a for-profit business, and

23    as such, when we look to make investments or acquire

24    assets, we want to make sure that we are investing an

Highly Confidential - Subject to Further Confidentiality Review

1    appropriate amount in order to make that investment

2    worth it for the company.

3         Q.    And have you performed -- can I call

4    return on investment ROI for purposes of the deposition

5    today?

6         A.    Yes, that's fine.

7         Q.    Have you performed ROI-type activities or

8    tasks at Mallinckrodt in connection with the

9    manufacture and sale and distribution of prescription

10   opioids?

11              MR. TSAI:  Object to the form.  Go ahead.

12        A.    I have performed return-on-investment

13   analysis relative to approval of projects for

14   development of new products, including opioids.

15        Q.    (By Mr. Ko)  So is it strictly just new

16   products that you've done ROI-type activities for, or

17   have you done any ROI type of activity in connection

18   with products that are already on the market or you're

19   already selling or manufacturing?

20        A.    I have only done ROI analysis on new

21   product or new business development opportunities.

22        Q.    And how about Mallinckrodt in general?  Do

23   they do ROI-type analysis on ongoing prescription

24   opioids that they sell and manufacture?

1    A.    Mallinckrodt does return on investment

2    analysis for activities such as capital projects,

3    capital investment in order to understand the potential

4    return on those investments to the extent that they

5    support manufacturing.

6    Q.    Do you know whether or not -- I know you

7    have some experience working in the specialty generics

8    space as you just indicated in your current role, and I

9    think -- I believe you've been in the generic space,

10   for lack of a better term, in the past.  Does

11   Mallinckrodt provide any ROI-type activities on its

12   generic portfolio?

13   A.    Again, we don't perform ROI activities on

14   the portfolio per se.  We do perform ROI activities on

15   new opportunity analysis, future looking, or on capital

16   investment analysis.

17   Q.    So generally speaking, the ROI-type

18   analysis that both you do and the company does is

19   dedicated to the new opportunities and

20   future-looking-type investments?

21   A.    Generally that's correct, yes.

22   Q.    Further down in your LinkedIn résumé, you

23   describe one of your skills as being data-driven

24   decision-making.  Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Yes.

 2        Q.     And that's one phrase this time; correct?

 3        A.     That is correct.

 4        Q.     And what do you mean -- can you explain to

 5   the court what you mean by data-driven decision-making?

 6        A.     That's a reflection of making decisions

 7   based upon an analysis of specific data, as opposed to

 8   solely based on strategic factors.

 9        Q.     And why is that generally important for a

10   company like Mallinckrodt to utilize data-driven

11   decision-making?

12        A.     Again, Mallinckrodt is a for-profit

13   business, and as such we want to make sure that our

14   decisions are made with an eye on profit and with an

15   eye on proper expenditure.

16        Q.     And is it just profit and proper

17   expenditure that -- I know we're speaking in general

18   terms, so -- but in terms of other categories that

19   impact the decisions that you make, is it simply just

20   profit and expenditure, or are there other things that

21   a company like Mallinckrodt looks at?

22        A.     We analyze many different sources of data

23   for many different reasons.  As a product manager and

24   generally in product management, we will look at
```

Highly Confidential - Subject to Further Confidentiality Review

1    data-driven decisions around forecasting future

2    production needs, around understanding price and other

3    market factors, and so it's not just relative to profit

4    but relative to other decisions that will drive the

5    business.

6           Q.    And when you speak about market factors,

7    is it typical for Mallinckrodt with respect to a

8    product or products or a portfolio of products to do

9    some sort of SWOT analysis with respect to that product

10   or portfolio?

11          A.    It is not routine, but we have

12   occasionally used SWOT analysis.

13          Q.    And by SWOT, you understand that I'm

14   talking about strengths, weaknesses, opportunities, and

15   threats?

16          A.    Yes.

17          Q.    And when you say it's not routine, are you

18   saying that it's not the norm for Mallinckrodt to do a

19   SWOT analysis with respect to its products or a

20   portfolio of products?

21          A.    We do not routinely conduct SWOT analysis

22   as a normal part of ongoing business.

23          Q.    And do you know why that's the case?

24          A.    That's not a tool that we have chosen to

1    implement as an across-the-board routine tool.

2         Q.    But you have done -- well, would you say

3    in your experience at Mallinckrodt -- have you done

4    SWOT analyses with respect to the opioid products that

5    Mallinckrodt manufactures?

6         A.    I cannot recall a specific SWOT analysis

7    relative to any opioid products.

8         Q.    Fair enough.  Going back to your

9    experience in the generic sector, I know right now you

10   said you've been in this role that you described to the

11   court for about a year and eight months.  You have

12   previous experience in the specialty generics portion

13   of the business; is that fair to say?

14        A.    Yes, that's correct.

15        Q.    And how long is that experience?

16        A.    So currently I have been in the specialty

17   generics business unit since late 2011 continuously in

18   various different roles.  Prior to that time I spent

19   about four years in our portfolio management and

20   strategy group, during which time some of my activities

21   were devoted to the generics business.  Prior to that I

22   spent about three years in the generics marketing group

23   in analytical roles.

24        Q.    That's helpful.  Thank you.  And with

Highly Confidential - Subject to Further Confidentiality Review

1    respect to Mallinckrodt's generic business,

2    approximately how many generic prescription opioids

3    does Mallinckrodt manufacture?

4          A.    We manufacture about a dozen different

5    products in various different strengths and dosage

6    forms.

7          Q.    And is oxycodone -- the generic version of

8    oxycodone one of the types of drugs that Mallinckrodt

9    manufactures?

10         A.    Yes, it is.

11         Q.    And in the dosage of 15 milligrams and 30

12   milligrams?

13         A.    Yes, that's correct.

14         Q.    Are there any other milligrams -- or any

15   other dosages that Mallinckrodt manufactures with

16   respect to generic oxycodone?

17         A.    With respect to generic oxycodone tablets,

18   we manufacture a five-milligram tablet as well.

19         Q.    And is it fair to say that the generic

20   version of the oxycodone, both in the 15-milligram and

21   the 30-milligram version -- are those your

22   bestselling -- are those Mallinckrodt's bestselling

23   generic drugs?

24         A.    It depends on I guess how you would define

```
 1   bestselling.  They are not our largest drugs either in

 2   volume or in sales dollars.

 3        Q.    Let's take sales dollars and revenue,

 4   then.  Was there any point in time from 2000 through

 5   two thousand -- to present which in oxy 15 and oxy 30,

 6   I'll call them for lack of a better term, were the

 7   highest revenue-producing drug at Mallinckrodt -- for

 8   Mallinckrodt?  Excuse me.

 9        A.    I do not have the specific numbers in

10   front of me.  I can't speak to that from memory.

11        Q.    Is it fair to say that Mallinckrodt

12   derives substantial revenue from the sale and

13   manufacture of oxy 15 and 30s?

14        A.    I would not say that we currently derive

15   substantial revenue from those products, no.

16        Q.    How about in the 2005 through 2010 time

17   period?  Would it be fair to say that Mallinckrodt

18   derived a substantial amount of revenue from the sale

19   and manufacture of oxy 15s and oxy 30s?

20        A.    During that time, oxycodone tablets would

21   have comprised a larger portion of our portfolio in

22   revenue.

23        Q.    And when you say larger portion --

24   relative to other drugs?
```

```
 1          A.     Relative to other drugs and our entire

 2    portfolio.

 3          Q.     And did Mallinckrodt also -- what other

 4    major types of prescription opioids in a generic form

 5    did -- or has Mallinckrodt manufactured during your

 6    tenure there?

 7          A.     So Mallinckrodt has manufactured

 8    hydrocodone with acetaminophen combination tablets,

 9    oxycodone with acetaminophen combination tablets,

10    morphine extended release tablets, methadone immediate

11    release tablets, hydromorphone release tablets.  And

12    there are others.

13          Q.     And when did Mallinckrodt get into the

14    generic space?  In other words --

15          A.     Uh-huh.

16          Q.      -- when was the first year that

17    Mallinckrodt manufactured a generic version of an

18    opioid?

19          A.     Mallinckrodt first manufactured generic

20    opioids in approximately 1995 or 1996.

21          Q.     Which version was that?

22          A.     I don't recall specifically what the first

23    product was that we manufactured.

24          Q.     When did Mallinckrodt first manufacture
```

1    the generic version of oxycodone?

2         A.    I don't know the exact year.

3         Q.    Was it early 2000s, approximately

4    speaking?

5         A.    Early 2000s is approximately correct.

6         Q.    And then how about the generic version of

7    that hydrocodone with acetaminophen?  When did

8    Mallinckrodt first manufacture that generic version?

9         A.    That was one of our first products.  That

10   would have been in or around 1995 or 1996.

11        Q.    And then how about with respect to

12   hydromorphone with acetaminophen?  When did that

13   first -- when did Mallinckrodt first manufacture that

14   generic version?

15        A.    We do not manufacture hydromorphone with

16   acetaminophen.

17        Q.    I'm sorry.  I think I misheard you.  When

18   did Mallinckrodt first manufacture the oxycodone with

19   acetaminophen generic version?

20        A.    Yes.  That was another one of our first

21   products.  That would have also been sometime in the

22   late 1990s.  1995, 1996.  Near that time.

23        Q.    And then with respect to the generic

24   version of the methadone immediate release tablets,

Highly Confidential - Subject to Further Confidentiality Review

```
 1   when did Mallinckrodt first manufacture that generic

 2   version?

 3         A.    Mallinckrodt has been manufacturing those

 4   tablets for -- well, I don't know exactly.  Since the

 5   early 2000s, I believe.

 6         Q.    Going back to -- just real quickly, going

 7   back to KV Exhibit 3, which is in front of you.

 8         A.    Uh-huh.

 9         Q.    It appears that you've spent your entire

10   career at Mallinckrodt.  Is that correct?

11         A.    That's correct.

12         Q.    And before you joined Mallinckrodt -- or

13   excuse me.  You joined Mallinckrodt right after you

14   graduated from Bradley university.  Is that correct?

15         A.    That's correct.

16         Q.    And you -- I also see that you have an MBA

17   from Wash U here in St. Louis.  And did you do that

18   while you were employed at Mallinckrodt?

19         A.    Yes, I did.

20         Q.    And did Mallinckrodt pay for that

21   schooling?

22         A.    Mallinckrodt paid for part of that.

23         Q.    Approximately how much?

24         A.    Approximately a third.
```

1     Q.     You can set that aside for now -- your KV

2   Exhibit 3.  It probably makes sense to keep 1 and 2 in

3   front of you just to refer to.

4     A.     Okay.

5     Q.     Can you describe to the court what your

6   understanding of a chargeback is?

7     A.     A chargeback is a financial transaction

8   which reconciles the difference between the acquisition

9   cost that a wholesaler pays for a product and the

10  contracted price that has been negotiated with the

11  manufacturer.

12    Q.     And is it just the wholesaler that's

13  involved, or can there another entity that is subject

14  to a chargeback?

15    A.     To my knowledge, chargebacks are only used

16  with wholesalers or distributors.

17    Q.     And referring back to KV Exhibit 2, it

18  indicates that for purposes of Topic 12, which relates

19  to chargebacks, among other things, you didn't review

20  any materials, but you're testifying about this topic

21  based on your own personal knowledge and that's it; is

22  that correct?

23    A.     That is correct.

24    Q.     Did Mallinckrodt maintain chargeback data?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     I'm not clear on what you mean by

 2   maintain.

 3        Q.     Did Mallinckrodt have and/or possess any

 4   chargeback data from distributors?

 5        A.     Mallinckrodt receives chargeback claims

 6   from distributors and processes those claims.

 7        Q.     And do you know if Mallinckrodt obtains

 8   chargeback data from any other entity other than

 9   wholesale distributors?

10        A.     I'm not aware of any other entity.

11        Q.     Do you have an understanding of what this

12   chargeback data consists of?

13        A.     In general terms, yes.

14        Q.     And what does it consist of?

15        A.     When a wholesaler submits a claim for a

16   chargeback, they provide us with the volume of product

17   sold by contract and the contract price associated with

18   each of those sales.

19        Q.     And in connection with this claim, does

20   the wholesaler also provide information about the

21   downstream customer that has purchased the product from

22   the distributor?

23        A.     The wholesalers provide some amount of

24   limited data about their downstream customer.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And when you say limited, what do you mean

2   by that?

3        A.    It varies depending upon the wholesaler or

4   the customer, and it could consist of information

5   relative to the identity of the customer purchasing the

6   product from the wholesaler, or in some cases it's --

7   no information is provided other than the contract

8   number.

9        Q.    And when you say it varies, does it vary

10   because the terms of the contracts between Mallinckrodt

11   and the distributor are all different, or does it vary

12   between distributors just decide what to provide to

13   you -- to Mallinckrodt?  Excuse me.

14        A.    Both of those characterizations are

15   generally correct.  The different wholesalers have

16   different policies for how they provide data and

17   different pharmacy customers for those wholesalers have

18   different policies about confidentiality and about the

19   amount of information that can be disclosed.

20        Q.    I know you -- in connection with Exhibit 2

21   you said that you're just testifying based on personal

22   knowledge, but over your career at Mallinckrodt have

23   you seen -- have you personally seen chargeback data or

24   files that reveal chargeback information?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I have seen files that contain chargeback

2  information, yes.

3    Q.    And do some of those files contain

4  information about the customer that purchases

5  Mallinckrodt opioids from distributors?

6    A.    The files that I have seen -- some of them

7  do contain aggregated or consolidated data about the

8  pharmacy customers.

9    Q.    And do they also contain information about

10  the quantity of pills that were purchased?

11    A.    The chargeback data presents package

12  quantity, so for each individual product, the number of

13  packages that were sold has to be reported.

14    Q.    And can you describe to the court what you

15  mean by package?

16    A.    The smallest selling unit of product is

17  how we price product and how it's quantified in sales

18  transactions.  That is usually, always in our case, a

19  bottle or box of tablets, capsules, or whatever the

20  dosage form is, so one package contains multiple

21  individual doses.

22    Q.    I see.  And do the -- does the chargeback

23  information that you reviewed in the past -- does it

24  also contain information about the dollar amount of the

1    transaction between the distributor and the purchaser

2    of the Mallinckrodt opioids?

3          A.    No, it does not.

4          Q.    You've never seen a chargeback sheet or

5    file or any kind of data that reveals the purchase

6    price between the distributor and the end user?

7          A.    No, I have not.

8          Q.    A moment ago you had described that your

9    understanding of a chargeback was that it represented

10   the difference between -- or it represented some

11   different amount between the distributor and the end

12   user on one hand and the purchase price between

13   Mallinckrodt and the distributor on the other.  Was

14   that a fair characterization of what you said

15   previously?

16         A.    I need to --

17         Q.    Why don't we do it this way?

18         A.    I need to make sure I unders -- I know

19   exactly which words you're using.  Let me restate.

20         Q.    Sure.

21         A.    The -- a chargeback represents the

22   difference between the agreed-upon contract price that

23   applies to a given sale from a wholesaler to a pharmacy

24   or a pharmacy chain and the acquisition cost that

1    wholesaler purchases the product from Mallinckrodt.

2         Q.    And with respect to the acquisition cost,

3    that is a cost agreed upon between the wholesaler and

4    Mallinckrodt; correct?

5         A.    The acquisition cost is effectively a list

6    price set by Mallinckrodt that is not negotiated.  It's

7    a set price.

8         Q.    That is either accepted or not accepted by

9    a wholesale distributor?

10        A.    It's a price that is set by Mallinckrodt.

11   There's no negotiation.

12        Q.    Right.  Fair enough.  So given your

13   understanding that a chargeback represents the

14   difference between the agreed-upon contract price that

15   applies to a given sale from a wholesaler to a

16   pharmacy, is it my understanding -- or am I correct

17   that you previously testified a moment ago that the

18   chargeback information you revealed did not reflect

19   that price?

20        A.    The --

21        Q.    Or those prices?  Sorry.

22        A.    The chargeback information that we receive

23   does not with certainty reflect the price actually

24   sold -- that the product was actually sold to the

1    pharmacy.  It reflects the contracted price between

2    Mallinckrodt and the wholesaler or Mallinckrodt and the

3    pharmacy chain that constitutes the chargeback owed on

4    that sale.

5            If a wholesaler negotiates something

6    separately with a pharmacy to either provide a higher

7    or lower price and sell the product at a different

8    price than the contract, that's within their rights in

9    managing their business.  We are contractually

10   obligated to pay the chargeback amount on those sales

11   regardless of the selling price that the wholesaler

12   sold it at.

13        Q.   I see.  And when a moment ago you said

14   that the chargeback information does not reflect with

15   certainty the price that the drug was actually sold,

16   what do you mean by that?

17        A.   For some contracts administered by the

18   wholesalers, those are contracts that Mallinckrodt has

19   entered into with a pharmacy chain for the acquisition

20   cost that that pharmacy is guaranteed from

21   Mallinckrodt.  That sale from the wholesaler to that

22   pharmacy chain should occur at that price, but we don't

23   have visibility to the actual price charged.

24        Q.   So your testimony is today that

1    Mallinckrodt never had any visibility to the actual

2    price that was charged between the distributor and the

3    downstream customer?

4         A.    To my knowledge that's correct.

5         Q.    And were chargebacks and/or chargeback

6    provisions contained in agreements between Mallinckrodt

7    and distributors with respect to the sale of generic

8    opioids that Mallinckrodt manufactured?

9         A.    So our agreements with wholesalers and

10   distributors define the terms around chargebacks, and

11   they apply broadly to our entire generics portfolio,

12   whether it's opioid products or non-opioid products.

13        Q.    Okay.  So in other words -- if they apply

14   broadly, did you -- well, let's take a step back.  Did

15   Mallinckrodt have any chargeback provisions with

16   distributors with respect to branded opioids that

17   Mallinckrodt manufactured and sold?

18        A.    It is my understanding that some branded

19   contracts did have chargebacks.

20        Q.    And process question.  When Mallinckrodt

21   obtained some of this chargeback information, do you

22   know how your company stored or housed this data and

23   information?  In other words, was it put into a central

24   repository or database?

1          A.    Generally the detailed sales data that was

2    received from wholesalers was processed through a

3    database -- the specific database has changed over

4    time -- and the rebate claim was processed through our

5    rebates processing team, and so -- and our rebates

6    processing system would also have information about the

7    chargeback transactions.

8          Q.    And with respect to the database or

9    databases that have been utilized to house this

10   information, do you know which databases those are?

11         A.    The -- over time the databases have

12   changed.  Our data warehouse, which we access through a

13   tool called Cognos, has contained that data over time,

14   as well as our pricing and rebate system, Model N.  And

15   we also use a third-party aggregator to summarize some

16   of the information.

17         Q.    And is that third -- what's the identity

18   of that third-party aggregator?

19         A.    That's ValueCentric.

20         Q.    Do you use the database J.D. Edwards at

21   all in connection with housing or maintaining

22   chargeback data?

23         A.    Yes, I believe the invoices for

24   chargebacks are processed through J.D. Edwards.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And has that been the case over time that

 2   you've been there?

 3          A.     To my knowledge, that's been the case for

 4   quite a while.  I don't know exactly when we started

 5   that.

 6          Q.     Going back to your testimony a moment ago

 7   when you said that there was a rebates claim processing

 8   team.  First of all, what's your understanding of the

 9   difference between a rebate and a chargeback?

10          A.     So a chargeback is a financial mechanism

11   to reconcile the difference between acquisition cost

12   and contract price.  A rebate is an additional discount

13   that is offered after sale and contingent upon sale but

14   can vary by customer or by contract.

15          Q.     And when you said it's an additional

16   discount that is offered, offered to whom?

17   Distributors?

18          A.     Primarily, yes, to distributors.

19          Q.     And what other entities?

20          A.     We have at times had rebate agreements in

21   place with pharmacy chains.

22          Q.     And with respect to chargebacks, is it

23   also fair to say that the chargeback amounts that you

24   would pay, that Mallinckrodt would pay, were primarily
```

1    provided to distributors?

2         A.    Yes, that's fair.

3         Q.    And you said before you had no

4    understanding of any other entities that Mallinckrodt

5    may have provided chargeback amounts to?

6         A.    That's correct.

7         Q.    And in connection with chargebacks in

8    particular, is it fair to say that Mallinckrodt

9    provided substantial sums to these distributors in the

10   2007 through 2012 time frame?

11              MR. TSAI:  Object to the form.  Go ahead.

12        A.    It depends upon the definition of

13   substantial, but the chargeback amount has at times or

14   can be, depending on the product, a fairly large amount

15   compared to the wholesale acquisition cost.

16        Q.    (By Mr. Ko)  And let's define -- can you

17   agree with me for purpose of this questioning that

18   substantial is defined as nine figures, so $100 million

19   or more?  Would you agree with me that Mallinckrodt has

20   paid amounts exceeding $100 million in chargebacks to

21   distributors in the 2007 through 2012 time period?

22        A.    Our chargeback payments during that time

23   period have been at least that much on occasion.

24        Q.    And have they exceeded $500 million in

Highly Confidential - Subject to Further Confidentiality Review

1    some years?

2         A.    I believe so.

3         Q.    Have they gone up to $700 million in some

4    years?

5         A.    I'm not familiar with the numbers with

6    that level of specificity, no.

7         Q.    And relative to the overall gross sales of

8    generic opioids, do the chargeback amounts represent at

9    least in some years a third to 40 percent of the total

10   gross sales figures?

11        A.    If we define gross sales as total sales at

12   wholesale acquisition cost, then that is probably

13   correct, yes.

14        Q.    Can you describe to the court why

15   Mallinckrodt was willing to pay such substantial

16   amounts in chargeback revenue to distributors?

17        A.    Well --

18             MR. TSAI:  Object to the form.  Go ahead.

19        A.    Thank you.  There are a couple of

20   different reasons.  Chargebacks, first of all, are an

21   industry standard, especially for generic drugs, and

22   chargebacks are a financial mechanism to again

23   reconcile between acquisition cost and a contract

24   price.  The contract price is a pre-negotiated number

1    which the wholesalers and distributors understand and

2    Mallinckrodt understands is due to them -- the

3    difference is due to them on every sale they make.

4              We do not book revenue at gross sales,

5    understanding that that chargeback claim is always

6    going to be paid on every unit that they sell.  The

7    wholesale acquisition cost is merely a away to provide

8    a consistent list price among all customers and the

9    chargeback is a way to deliver them financial value

10   based upon negotiated pricing.

11        Q.    (By Mr. Ko)  Is it fair to say that

12   Mallinckrodt had an interest in providing chargeback

13   amounts to distributors in order for the distributors

14   to continue distributing Mallinckrodt-manufactured

15   opioids?

16        A.    It was in Mallinckrodt's interest to abide

17   by our contract commitments, and our contracts with the

18   distributors specified how and when we would pay

19   chargebacks.

20        Q.    And aside from the contractual provisions,

21   as a marketing strategy -- from a marketing strategy

22   perspective or given your experience in product and

23   portfolio management, do you feel that it was important

24   for Mallinckrodt to continue paying chargeback amounts

1    in order to make sure that the distributors continued

2    distributing Mallinckrodt-manufactured opioids?

3         A.    The chargeback is a financial mechanism.

4    It's a number that is created in order to make the

5    distributor whole compared to their acquisition cost

6    relative to the contract price that's been negotiated.

7    The sale is predicated upon that negotiated price.  We

8    all understand that that price is the price for that

9    product, and the chargeback is merely a mechanism to

10   ensure that the numbers reconcile on both sides of the

11   transaction.

12        Q.    Did you have any communications with

13   distributors or any representatives of wholesale

14   distributors with respect to the chargeback provisions

15   in any particular agreement that Mallinckrodt had with

16   these entities?

17        A.    Answering on behalf of Mallinckrodt, yes,

18   Mallinckrodt does negotiate the terms of agreements,

19   including chargebacks.

20        Q.    And who was primarily responsible for

21   that?  In other words, what -- to the best of your

22   knowledge, what individuals or what department at

23   Mallinckrodt had that primarily -- primary

24   responsibility?

```
 1          A.     The primary responsibility for negotiating

 2     contracts with our customers lies with the national

 3     accounts team, and that national accounts team

 4     negotiates specifics based upon approval of management.

 5          Q.     And who was the head or the heads of the

 6     national account team at Mallinckrodt from, let's say,

 7     the 2007 through 2012 time period?

 8                 MR. TSAI:  I'll just note this is getting

 9     I think away from his -- the witness's assigned topics,

10     but go ahead.

11          A.     I have not prepared on the specific org

12     charts during those periods and can't recall exactly

13     who was in charge of the sales team during that time.

14          Q.     (By Mr. Ko)  Okay.  I'm going to hand you

15     a copy of what's going to be marked as KV Exhibit 4.

16                 [Exhibit Mallinckrodt-Vorderstrasse-004

17                 marked for identification.]

18          Q.     Kevin, do you recognize this agreement at

19     all?  Or excuse me.  Do you recognize this exhibit at

20     all?

21          A.     I recognize what it is.  I am not familiar

22     with the specific document.

23          Q.     I will represent for the record that this

24     appears to be a supply policy agreement between Rite
```

1   Aid and Mallinckrodt that was entered into January 1,

2   2010, and signed on January 12th, 2010.  Is that a fair

3   characterization of this document?

4          A.     That appears to be correct, yes.

5          Q.     And I believe I said January 10th, but I

6   think the agreement was signed on January 12th.

7          A.     Yes.

8          Q.     And for the record, KV Exhibit 4 begins at

9   MNK-T1_0000365268.  So Rite Aid, as we all know, is a

10  pharmacy; correct?

11         A.     Rite Aid is a pharmacy chain.  That's

12  correct.

13         Q.     And earlier you said that you were unaware

14  of any chargeback provisions between pharmacies and

15  Mallinckrodt.  Do you remember that?

16         A.     Yes.

17         Q.     Can you turn to Page 3 of this document

18  and Paragraph 10?  At Paragraph 10A, the agreement

19  states weekly generic chargebacks, Rite Aid and vendor,

20  vendor being Mallinckrodt, agree to the terms of the

21  weekly generic chargebacks as described in Exhibit 4.

22  Do you see that?

23         A.     I do.

24         Q.     So this appears to be an agreement that

 1    Mallinckrodt had with a pharmacy chain regarding

 2    chargebacks; is that fair?

 3          A.    That appears to be, yes.

 4          Q.    But you had no personal knowledge coming

 5    into this deposition that Mallinckrodt had such

 6    agreements with pharmacies; is that correct?

 7          A.    That's correct.

 8          Q.    And if we fast-forward to Exhibit 4 of

 9    this agreement, that is the Exhibit 4 that's referenced

10    in the Section 10A that we just looked at; is that

11    correct?

12          A.    Yes, I believe so.

13          Q.    And there are some details about the

14    weekly generic chargeback that Rite Aid and

15    Mallinckrodt are agreeing to; is that correct?

16          A.    Yes, it appears to be.

17          Q.    And at the bottom -- well, there are

18    various provisions and terms in this exhibit, but at

19    the bottom of that exhibit, the last paragraph -- why

20    don't you go ahead and read that last paragraph and let

21    me know when you're done?

22          A.    Okay.

23                MR. TSAI:  David, we've been going over an

24    hour now.  Is -- after we're done with this exhibit,

1    can we take a quick break?

2              MR. KO:   Sure.

3         A.    Okay.  I understand what this is.

4         Q.    (By Mr. Ko)  Okay.  So based on that last

5    paragraph that you read, would it be fair to say that

6    Rite Aid was providing some information to Mallinckrodt

7    in connection with the chargeback provisions contained

8    in this agreement?  Is that a fair characterization?

9         A.    It appears that they were, yes.

10        Q.    And this report in terms of frequency --

11   it was weekly; is that correct?

12        A.    That's what it states, yes.

13        Q.    And the information comprised -- the

14   information provided by Rite Aid to Mallinckrodt was

15   the result of an EDI feed.  Does that sound familiar to

16   you at all or do you know what that's referring to?

17        A.    I am familiar with what an EDI feed is,

18   yes.

19        Q.    And what is your understanding of an EDI

20   feed?

21        A.    An EDI feed is electronic data shared

22   between trading partners under an established standard

23   for exchanging transaction information or other

24   details.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And details of what in this -- in the

2    context of how you've seen it?

3        A.    Primarily EDI data that we use as a

4    pharmaceutical manufacturer consists of wholesaler

5    inventory data or wholesaler sales data.

6        Q.    And sales data reflecting the sales

7    between in this case a pharmacy and some downstream

8    customer?  Is that a fair characterization?

9        A.    In this case, the document states that the

10   EDI feed will be from Rite Aid's wholesalers --

11   wholesaler showing purchases of product by Rite Aid.

12       Q.    And so -- and presumably Rite Aid's

13   wholesaler here is referring to a distributor; correct?

14       A.    Yes, generally the wholesaler and

15   distributor are used interchangeably.

16       Q.    And so in this context it appears that

17   Rite Aid is providing some information from its

18   wholesaler and transferring that to Mallinckrodt

19   through this EDI feed?

20       A.    I read this to say that the wholesaler was

21   providing information about their sales to Rite Aid.

22       Q.    And Rite Aid would subsequently transfer

23   that information to Mallinckrodt; correct?

24       A.    I don't read this as Rite Aid transferring

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the information.
 2           Q.    In the third sentence it says a weekly
 3    report listing these purchases will be provided by Rite
 4    Aid to vendor.  Do you see that?  Did I read that
 5    correctly?
 6           A.    Yes.
 7           Q.    And then the next sentence goes on to say
 8    the transactions on this report will be the result of
 9    an EDI feed from Rite Aid's wholesaler showing these
10    purchases of product.  Did I read that correctly?
11           A.    That is correct.
12           Q.    So in this context it does appear that the
13    distributor is providing information to Rite Aid who
14    was then transferring that information over to
15    Mallinckrodt?
16           A.    In the general term of information, yes.
17    The EDI feed is -- I read is different from the weekly
18    report.
19           Q.    Fair enough, but the original source of
20    this information which pertains to purchases of
21    product, as this contract suggests, comes from the
22    wholesaler and then that information is transferred
23    over to Mallinckrodt; is that fair?
24           A.    Yes, that's fair.
```

1          Q.     And I know you said that you've never seen

2    one of these or have any experience understanding an

3    agreement containing a chargeback provision between

4    Rite Aid -- or a pharmacy and Mallinckrodt, but it

5    appears here in this paragraph that there are certainly

6    amounts that Mallinckrodt is willing to pay to a

7    pharmacy with respect to chargebacks; is that fair?

8          A.     The way I would characterize this is that

9    this is a different use of the term chargeback.

10   Chargeback is a collective term which generally

11   speaking means a reversal or a return of value to a

12   customer.  In this case, the process that's being

13   described is an instance where we had a negotiated

14   price with Rite Aid for the purchase of product on a

15   direct basis, but where they purchased product

16   indirectly for that given product at a higher price

17   from a wholesaler, and we would make them whole to

18   their direct price pre-negotiated with us on those

19   transactions.

20              So in the context of the typical use of

21   the term chargeback, we in Mallinckrodt would not

22   typically call this type of transaction a chargeback.

23   We would call this a cost differential agreement

24   similar to the kind of subtitle of this exhibit.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Nevertheless, this is an agreement titled

2    weekly generic chargeback, generic cost differential,

3    and at least as agreed upon between Mallinckrodt and

4    Rite Aid, this appears to be an agreement containing

5    chargeback amounts or provisions that Mallinckrodt is

6    willing to pay to a pharmacy in connection with the

7    distribution of Mallinckrodt opioids; is that fair?

8    A.    This exhibit defines the process whereby

9    Mallinckrodt makes whole the customer to provide them

10   the value that we've negotiated in advance that they

11   are eligible on every purchase.

12   Q.    And let me stop you right there.  By

13   customer we're talking about -- just so we're on the

14   same page, we're talking about Rite Aid here?

15   A.    In this case the customer was Rite Aid

16   pharmacy chain.

17   Q.    Correct.  Okay.  So Mallinckrodt is paying

18   a pharmacy chain an amount to, as you said, make them

19   whole pursuant to some sort of agreement to distribute

20   drugs; is that fair?

21   A.    We have agreed upon a purchase price for

22   Rite Aid for products -- for Mallinckrodt products.

23   This Exhibit and this agreement provides a mechanism

24   for us to ensure that they are able to purchase the

Highly Confidential - Subject to Further Confidentiality Review

1  price at that -- or purchase the product at that

2  pre-agreed price.

3      Q.    And I want to fast-forward before -- I

4  want to honor Rocky's request for a break to do, but

5  just real quickly, turn back to the beginning of the

6  document at Page -- the first page in Section 2B.  You

7  see where it says, no later than 90 days from the date

8  of the first purchase order issued by Rite Aid to

9  vendor, vendor being Mallinckrodt, Mallinckrodt must

10  have EDI capability to exchange purchase orders,

11  invoices, and advance shipment notices electronically

12  in accordance with Rite Aid specifications at a

13  minimum -- at minimum.  Did I read that correctly?

14      A.    Yes, you did.

15      Q.    And so there's another reference here to

16  EDI capability, and it appears that Rite Aid is

17  imposing some sort of requirements upon how the EDI

18  information is going to be transmitted to Mallinckrodt.

19  Is that fair?

20      A.    What Rite Aid is asking for here is

21  industry standard electronic data exchange around

22  orders.

23      Q.    And when you say industry standard, I just

24  want to make sure I understand what you're saying.

```
 1    Industry standard in the context of agreements between

 2    pharmacies, or industry standard in the context of

 3    agreements between distributors, or both?

 4                 MR. TSAI:  If I could just make a scope

 5    objection just for the record.  So Topic 12 relating to

 6    chargebacks is limited to, as written, with any

 7    pharmacy in a CT1 jurisdiction and/or manufacturer of

 8    controlled substances distributed in a CT1

 9    jurisdiction.  With that objection, you can answer.

10          A.    So in the pharmaceutical industry,

11    exchanges of order information between a manufacturer

12    and a purchasing warehouse often are conducted

13    electronically.  There are specific EDI standards for

14    that electronic data interchange, and at the time of

15    this agreement, Rite Aid purchased at least many of the

16    products from Mallinckrodt on a direct basis into their

17    warehouse to distribute to their pharmacies.  That

18    clause, to be, states that they expect within 90 days

19    that we can accomplish those transactions

20    electronically.

21                 MR. KO:  Thank you for that answer, and

22    I'll also note for the record that Rite Aid is a

23    pharmacy in a CT1 jurisdiction.  And with that we can

24    take a break.
```

Highly Confidential - Subject to Further Confidentiality Review

1          THE VIDEOGRAPHER:  We are going off the

2     record at 10:25 AM.

3          [A brief recess was taken.]

4          THE VIDEOGRAPHER:  We are back on the

5     record at 10:39 AM.

6     Q.    (By Mr. Ko)  And Kevin, welcome back from

7     the break.  Earlier you were testifying with respect to

8     chargeback agreements and rebate arrangements that

9     Mallinckrodt had with various entities.  Can you

10    generally describe to the court your awareness of any

11    other types of incentive programs that Mallinckrodt had

12    with either distributors or pharmacies?

13         MR. TSAI:  Object to the form.  Go ahead.

14    A.    So Mallinckrodt generally has agreements

15    with wholesalers which specify the fees for service

16    that we pay those wholesalers to distribute our

17    products, and the wholesalers also provide generic

18    sourcing programs to their pharmacy customers.  Those

19    sourcing programs have contracts with Mallinckrodt

20    which specify a negotiated contract price and any other

21    rebates or discounts for those sales.

22         In addition, we had similar contracts with

23    pharmacy wholes -- or pharmacy chains where we would

24    negotiate a price with them either for their direct

1    purchase of product into their warehouses for

2    distribution to their pharmacies or a contracted price

3    that they were guaranteeing when purchasing through a

4    wholesaler.

5         Q.    (By Mr. Ko)  And in connection with

6    Mallinckrodt's sale and manufacture of its opioid

7    products, did it also have any agreements with pharmacy

8    benefit managers?

9         A.    No, not for generic products.

10        Q.    Do you know whether or not -- strike that.

11   So with respect to its branded products, do you know

12   whether or not Mallinckrodt had agreements with

13   pharmacy benefit managers with respect to

14   Mallinckrodt-branded opioids?

15        A.    Yes, we did.

16        Q.    And which PB -- which pharmacy benefit

17   managers, which I'll call PBMs?

18        A.    I do not know specifically which PBMs we

19   had agreements with for the branded products.

20        Q.    Do you know who at Mallinckrodt would be

21   in charge of -- or what departments would be in charge

22   of the agreements Mallinckrodt had between -- or had

23   with PBMs with respect to branded opioids products

24   Mallinckrodt manufactured?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      At that time the market access team as

2    part of the brand business would have been responsible

3    for those contracts.  That team no longer exists.

4       Q.      And when you say at that time, what time

5    are you referring to?

6       A.      During the time period that we marketed

7    branded opioids.  Our last branded opioid we ceased

8    marketing in around the 2015 time period.

9       Q.      And which -- for the record, which branded

10   opioid was that?

11      A.      The last one was Xartemis XR.

12      Q.      And that is -- I've referred to is as

13   "Xart-emis," but you said it as --

14      A.      "Xar-temis" XR.

15      Q.      "Xar-temis."  Okay.  That's helpful to

16   know.  And by the way, when was -- when did

17   Mallinckrodt stop marketing Exalgo?

18      A.      Exalgo I believe we stopped marketing in

19   2014.

20      Q.      And just to actually round out the time

21   periods, when did Mallinckrodt begin marketing Exalgo?

22      A.      I don't know the exact date.  It's on or

23   around 2009, I believe.

24      Q.      And the same question with respect to

```
 1   "Xart-emis."  Can you say it again?

 2           A.     "Xar-temis."

 3           Q.     "Xar-temis."

 4           A.     We began marketing that in 2014.

 5           Q.     And then you pulled it off in 2014 as

 6   well, so it only lasted for a year?  Is that what

 7   you're saying?

 8           A.     That's correct.

 9           Q.     Going back to KV Exhibit 2.  We had a

10   discussion earlier this morning off the record about

11   some of the things that were contained in it, but there

12   is a response.  Do you see the response column that's

13   provided in this exhibit?

14           A.     Yes, I see that.

15           Q.     And it appears that there is -- we were

16   provided this document for the record, but it appears

17   that there is a response to the topic that you are

18   being designated to testify on.  Is that a fair

19   characterization of that column?

20           A.     That column summarizes the general

21   response that I'm prepared to talk to.

22           Q.     And can we incorporate by reference in

23   your testimony today all these responses?  Are you

24   comfortable doing that?
```

1          A.     Yes.

2          Q.     So in other words, the responses contained

3     in this document accurately reflect the responses you

4     would give in response to these topics?

5          A.     That's correct.

6          Q.     Do you know what 867 data is?

7          A.     Yes, 867 data is a -- is one of the EDI

8     standards that is related to sales data from

9     wholesalers to their pharmacy customers.

10         Q.     So is it strictly regulated -- in other

11    words, it's sales data between wholesalers and pharmacy

12    customers as far as your understanding?

13         A.     As far as my understanding, the primary

14    purpose of 867 data is to document information about a

15    transaction between a wholesaler and its customer.  In

16    this case, that would be pharmacies.

17         Q.     And what do you mean by in this case?

18         A.     EDI 867 is a broad standard that can be

19    used in any number of industries.  It's a general data

20    standard for electronic data interchange between

21    trading partners.  It could be used in other industries

22    beyond pharmaceuticals.

23         Q.     Understood, but just so I'm clear, 867

24    data could reveal more sales data than just between

Highly Confidential - Subject to Further Confidentiality Review

1  wholesalers and pharmacies; correct?  It could also

2  include wholesalers and other downstream purchasers of

3  pharmaceuticals?

4       A.    I would be speculating as to what the

5  identity of those purchasers would be.  My

6  understanding is that wholesalers sell their product to

7  pharmacies.

8       Q.    And by the way, for the record, what

9  does -- what is your understanding of what EDI stands

10  for?

11       A.    Electronic data interchange.

12       Q.    And was that an actual third-party vendor

13  that housed this type of data -- like in other words,

14  an actually entity called EDI, or is it a term of art

15  in the industry?

16       A.    So my understanding is that EDI is the

17  acronym used for the data interchange standard.  There

18  is a third party, a governing body, if you will,

19  industry association that handles data standards.  I'm

20  not familiar with the exact name of that organization,

21  but they specify these types of data standards.

22       Q.    And did Mallinckrodt purchase -- ever

23  purchase 867 data?

24       A.    We have agreements with our wholesalers

Highly Confidential - Subject to Further Confidentiality Review

1    and distributors for -- to pay them fees for service

2    provided.  One of those services that they provide is

3    to provide data on their sales transactions and on

4    their inventory.

5         Q.    And that data is 867 data?

6         A.    Among other pieces of data, yes.

7         Q.    Fair enough.  Fair enough.  So

8    Mallinckrodt didn't directly purchase the 867 data from

9    a third-party vendor, but acquired the data directly

10   from distributors or other entities pursuant to the

11   contracts Mallinckrodt had with those entities?

12        A.    Distributors and wholesalers provide the

13   data feed for EDI 867, yes.

14        Q.    To Mallinckrodt; correct?

15        A.    To Mallinckrodt.

16        Q.    And what is 852 data?

17        A.    Similarly, 852 data is a defined data

18   standard relative to understanding inventory and

19   movement of inventory within a wholesaler's

20   distribution network.  It allows us to see the quantity

21   of our products which are in stock at a given

22   distribution center of a wholesaler.  Gives us general

23   information about the quantities being moved throughout

24   their network or the quantities that they have on

1    order.

2         Q.    And similar to the 867 data, did

3    Mallinckrodt also acquire 852 data from wholesalers?

4         A.    852 data was provided to us from our

5    wholesalers as part of our fee-for-service agreements.

6         Q.    So just so the record is clear, if

7    pursuant to the fee-for-service agreements there was a

8    provision for the acquisition of 852 and 867 data,

9    Mallinckrodt was provided this information from a

10   distributor; correct?

11        A.    852 and 867 data is provided to us from

12   our distributors -- those that provide it.  Some

13   distributors do not provide that data, but it is all

14   covered in our agreements with those distributors.

15        Q.    And do you have a general understanding of

16   what time period -- or strike that.  Do you know when

17   Mallinckrodt first started obtaining either 852 or 867

18   data from distributors?

19        A.    No, I'm not familiar with when we began

20   obtaining that data.

21        Q.    Do you have a general understanding of

22   whether or not that was before the 2010 time period?

23        A.    Yes, it was prior to 2010.

24        Q.    Was it sometime between 2000 and 2010?

1          A.     Possibly.  I can't say for sure if it was

2   before or after 2000.

3          Q.     And who at Mallinckrodt would be

4   responsible for managing or administering the

5   acquisition of 852 or 867 data from a distributor?

6          A.     So a number of different groups would have

7   been involved.  Again, the national accounts team would

8   have been involved in negotiating the agreements.  The

9   finance team or the product management team would have

10  been involved in the decision to ask for such data from

11  the wholesaler or distributor, and then our information

12  technology, IT department, would have been responsible

13  for receiving the data and processing it into our data

14  warehouse.

15         Q.     Okay, that's helpful.  Thank you.  So

16  you're part of the product management team now and have

17  been in the past; correct?

18         A.     Correct.

19         Q.     And when you say that the product

20  management team would be involved in the decision to

21  acquire such data -- what were some of the reasons that

22  Mallinckrodt would decide to acquire this data?

23         A.     So I can't speak to that specifically.

24  Those decisions would have been made a very long time

Highly Confidential - Subject to Further Confidentiality Review

1    ago, and I'm not aware of any documents that documented

2    how that decision was made.

3         Q.    When you say that they were made a very

4    long time ago, are you saying that it was a business

5    decision by someone at Mallinckrodt that seems to be a

6    business practice over time that you simply abided by?

7         A.    We have acquired 867 and 852 data for

8    quite some time, and that has been a part of our

9    agreements with our distributors for a very long time

10   and has not been changed since.

11        Q.    Got it.  And you are still acquiring 852

12   and 867 data currently?

13        A.    That's correct.

14        Q.    And are you acquiring 867 and 852 data

15   with respect to opioid products that Mallinckrodt

16   manufactures and sells?

17        A.    We acquire those data for all of our

18   generic products.

19        Q.    Including Mallinckrodt opioids?

20        A.    Including -- yes, including Mallinckrodt

21   opioids.

22        Q.    It's just important that we don't talk

23   over each other.

24        A.    Sorry.

```
 1          Q.      That's okay.  I want to hand you a copy of

 2     what's going to be marked as KV Exhibit 5.  It's an

 3     e-mail with an attachment, so there's --

 4                  [Exhibit Mallinckrodt-Vorderstrasse-005

 5                  marked for identification.]

 6          Q.      I'm handing you -- the court reporter has

 7     just handed you KV Exhibit 5, which is Bates-stamped

 8     MNK-T1_0000387037, and is an e-mail exchange involving

 9     among others Karen Harper and Bill Ratliff dated July

10     18th, 2007.  Do you see that?

11          A.      Yes, I do.

12          Q.      And this e-mail also contains an

13     attachment.  Do you see that?

14          A.      Yes.

15          Q.      Attachment is titled supply chain project,

16     IntegriChain.  Have you ever heard of IntegriChain?

17          A.      Yes, I have.

18          Q.      What's your understanding of what

19     IntegriChain is?

20          A.      My understanding of IntegriChain is that

21     they are a third-party data aggregator that aggregates

22     EDI data for pharmaceutical companies.

23          Q.      And do you know whether or not

24     IntegriChain was -- did Mallinckrodt ever retain
```

1    IntegriChain at any time you were there for third-party

2    data aggregating purposes?

3            A.    We did not retain IntegriChain for

4    aggregation purposes relative to the commercial use of

5    that data.

6            Q.    Did you --

7            A.    I can't speak to any other use we might

8    have contracted for.

9            Q.    Fair enough.  Going back to the e-mail,

10   who's your -- can you describe to the court who Karen

11   Harper is?

12           A.    Karen Harper is our -- now director of DEA

13   compliance, at that time manager of DEA compliance.

14           Q.    Do you work with her at all?

15           A.    Yes.

16           Q.    In what capacity?

17           A.    General exchange of information relative

18   to DEA information, DEA issues, quota, things of that

19   nature.

20           Q.    And how frequent would you describe your

21   communications with her?  Daily?  Weekly?

22           A.    Monthly at best.

23           Q.    Monthly at best?  Okay.  And who's Bill

24   Ratliff?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Bill Ratliff was our head of security at

2     the time.  Not -- I'm not aware of what his exact title

3     was at that time.

4          Q.     And do you have any communications with

5     Mr. Ratliff?

6          A.     No.

7          Q.     Have you ever had any communications with

8     him?

9          A.     Not any more than just a passing hello.

10          Q.     So I understand that IntegriChain was not

11     retained for commercial purposes of data aggregation as

12     you understand it, but this attachment contains kind of

13     a, for lack of a better term, general scope of work

14     that they would -- that they were pitching Mallinckrodt

15     for.  Is that fair to say?

16          A.     I have not reviewed the document yet.

17          Q.     Why don't we take a look at the attachment

18     and look at the first sentence?

19          A.     Okay.

20          Q.     The title of this document says supply

21     chain project, IntegriChain, and the first sentence

22     says, in order to address the risks of abuse and

23     diversion at the pharmacy/patient level, we will need

24     better and further visibility into the supply chain.

1    Did I read that correctly?

2              MR. TSAI:  I would object as to scope.  We

3    have clearly delineated that Mr. Vorderstrasse is not

4    going to be testifying with respect to issues on

5    diversion, suspicious order monitoring, or DEA, CSA

6    compliance.  You'll get the opportunity with another

7    one of our three designees to delve into those issues,

8    so I'll just note that objection.

9              MR. KO:  And just to respond to that

10   objection, I understand the line that you're trying to

11   draw, Mr. Tsai, but the topics are much more broad and

12   expansive, as indicated in Exhibit -- KV Exhibits 1 and

13   2, and in this context it's very clear that Mr.

14   Vorderstrasse has been designated to speak on

15   information provided or received pertaining to 867 or

16   852 sales data, of which this refers to, so we will

17   continue to talk about this.

18        Q.    (By Mr. Ko)  And with that noted for the

19   record, Kevin, did I read that first sentence

20   correctly?

21        A.    Yes, you did.

22        Q.    And so it appears that IntegriChain is

23   approaching Mallinckrodt to present the ability to

24   access some data to better and further understand the

1    supply chain after Mallinckrodt manufactures a drug.

2    Is that a fair characterization?

3            A.    Again, I haven't read the whole document,

4    but it appears that they are talking about industry

5    data.

6            Q.    Industry data that will allow Mallinckrodt

7    to better and further understand visibility into the

8    supply chain; correct?

9            A.    That is what they're claiming in the

10   background.

11           Q.    Fair enough.  And among the proprietary

12   tools that IntegriChain is suggesting that it has the

13   ability to do, it is basically saying, if you look

14   further down, that they can aggregate a large level of

15   various forms of data, as reflected by those bullets in

16   the middle of that page.  Do you see that?

17           A.    I see that section.

18           Q.    And among the things that it is purporting

19   to do in the second-to-last bullet under the

20   proprietary tools section, it indicates that

21   IntegriChain has the ability to validate chargebacks

22   against 867 and fast non-retail save on audit fees.  Do

23   you see that?

24           A.    Yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    Do you have any understanding of how

 2   chargebacks can be validated against 867 sales data?

 3         A.    I am not clear on what they're proposing

 4   to do.

 5         Q.    And separate and apart from what they may

 6   have proposed to do, have you ever in your experience

 7   or do you have any understanding of how Mallinckrodt

 8   validates chargebacks against 867 data?

 9         A.    As part of our processing of chargebacks,

10   we do review 867 data to ensure that the quantities

11   reported as sold on 867 data total the quantities

12   provided on the chargeback invoice from the wholesaler

13   or distributor to ensure that the quantity or the

14   amount that they have submitted a claim for is

15   accurate.

16         Q.    And so -- thank you.  That's a very

17   helpful explanation.  Is it fair to say then that the

18   867 data is a -- I guess is a check- or a

19   validation-type tool to use to ensure that the

20   chargeback amounts being paid to the distributors are

21   accurate?

22         A.    We use 867 data to validate that the

23   quantities and prices submitted by the wholesalers are

24   accurate as represented in the 867 data.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And just to confirm, the 867 sales data

2  has information regarding the sales price between a

3  distributor and a downstream customer of that

4  distributor; correct?

5      A.     No, that's incorrect.  The 867 data shows

6  the contract identification and the contracted price

7  that that sale is eligible for based upon

8  Mallinckrodt's negotiated price for those contracts.

9      Q.     Thank you for that clarification.  The --

10  so the contracted price as between whom?

11      A.     The contracted price between Mallinckrodt

12  and the party which is responsible for that contract.

13  That party could be the wholesaler for the generic

14  sourcing program that they provide to their pharmacy

15  customers.  It could be a contract that Mallinckrodt

16  has with a pharmacy chain or with a buying group or

17  other entity that represents pharmacies.

18      Q.     That's helpful.  Thank you.  You can put

19  that aside.  Do you know if Mallinckrodt ever had

20  arrangements with -- or strike that.  Are you familiar

21  with the entity OptiSource?

22      A.     Yes.

23      Q.     And are you familiar with -- is it fair to

24  say that there's a buying group called OptiSource?  Or

Highly Confidential - Subject to Further Confidentiality Review

1    how would you -- why don't you describe to the court --

2           A.    Yeah.

3           Q.    -- what your understanding of OptiSource

4    is?

5           A.    OptiSource is a contracting entity that

6    represents multiple regional distributors.  That

7    distributor list that changed over time.  OptiSource

8    conducts negotiations and contracting with generic

9    suppliers to secure contracted pricing for those

10   wholesale customers.

11          Q.    And do you know whether -- thank you for

12   that explanation.  Did -- were there any other entities

13   that represented multiple regional distributors that

14   Mallinckrodt had arrangements with for the manu -- for

15   the sale of Mallinckrodt opioid products?

16                MR. TSAI:  Object to the form.  Go ahead.

17          A.    I'm trying to recall if there were other

18   specific entities which provided a similar contracting

19   service or contracting process with regional

20   distributors.  I can't recall any specific ones at this

21   time.

22          Q.    (By Mr. Ko)  Is it your general

23   understanding that there may have been other entities

24   or buying groups other than OptiSource that

1    Mallinckrodt may have had arrangements with to sell its

2    opioid products?

3        A.    We may have had other arrangements with

4    distributor buying groups similar to OptiSource from

5    time to time.

6        Q.    And would these buying groups provide --

7    or strike that.  Would there be any agreements or

8    provisions in the agreements between Mallinckrodt and

9    these buying groups that would contain provisions with

10   respect to chargebacks or 852 and 867 sales data?

11       A.    Perhaps.  These -- as distributors, these

12   would be entities that we had a fee-for-service

13   agreement with, and that may have included 852 or 867

14   data.

15       Q.    So as you can see, I'm just trying to get

16   a general understanding of what other entities that

17   Mallinckrodt had agreements with other than

18   distributors for these fee-for-service agreements that

19   you're describing, and so in addition to distributors

20   and in addition to pharmacies, as we described earlier,

21   there were these buying groups that Mallinckrodt had

22   relationships with as well that represented regional

23   distributors, as you said.  Is that correct?

24       A.    We did have arrangements with regional

Highly Confidential - Subject to Further Confidentiality Review

1    distributor groups, yes.

2         Q.    And you had arrangements with regional

3    distributor groups that potentially contained

4    chargeback provisions and agreements to acquire 852 and

5    867 sales data; is that correct?

6         A.    That is correct.

7         Q.    With respect to the 867 data in

8    particular, do you know for the agreements in which

9    Mallinckrodt had such agreements in place to acquire

10   this data -- do you know the frequency of which they

11   were acquiring 867 data from a distributor?

12        A.    So when we acquired 867 data, it was -- it

13   varied depending upon the distributor or depending upon

14   what time in the past, time period in the past when we

15   received that information.  It could be as quickly as

16   within a day or two or it maybe lagged by weeks or even

17   a month.

18        Q.    Do you know whether or not Mallinckrodt

19   obtained 867 data from Cardinal?

20        A.    I can't say that with certainty.

21        Q.    Do you have any understanding of whether

22   or not Mallinckrodt obtained 867 data from

23   AmerisourceBergen?

24        A.    I believe so, yes.

```
 1          Q.     And how about with respect to McKesson?

 2    Do you know whether or not Mallinckrodt obtained 867

 3    data from McKesson?

 4          A.     Yes, I believe so.

 5          Q.     And do you have an understanding of how

 6    frequent that data was provided?  Let's start with

 7    McKesson.  Do you know how frequent the 867 data was

 8    provided to Mallinckrodt by McKesson?

 9          A.     I don't know specifically throughout time

10    how often we've received that data.  At various

11    different times it's been within a day or two with

12    McKesson.

13          Q.     Generally speaking with respect to

14    distribut -- any distributor, what was the longest

15    period in which you recall the data being provided to

16    Mallinckrodt?

17          A.     The longest period would have been about a

18    month.

19          Q.     That's helpful.  Do you know who Carol --

20    I might not be saying this correctly, but Carol

21    Svejkosky is?

22          A.     Yes.  Carol Svejkosky, I believe.  I

23    believe she was in the finance department on the

24    branded team.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Did you have any communications with

 2   Carol?

 3          A.    Occasional communications over the years.

 4          Q.    And what were the nature of those

 5   communications?

 6          A.    I don't recall specifically, but they

 7   weren't routine communications.

 8          Q.    Sure.  I'm going to hand you a copy of

 9   what the court reporter will mark as KV Exhibit 6.

10                [Exhibit Mallinckrodt-Vorderstrasse-006

11                marked for identification.]

12          Q.    For the record, KV Exhibit 6 is an e-mail

13   exchange involving multiple people at

14   Mallinckrodt/Covidien, and the first page of that

15   document is Bates-stamped MNK-T1_0005905464, and

16   appears to be an e-mail exchange dated -- titled EDI

17   867 transmissions, Cardinal request, and it is dated in

18   the March 9th, 2012, time period.  Do you see that?

19          A.    Yes.

20          Q.    Feel free -- I have some pretty specific

21   questions based on this document, so feel free to

22   consult the whole thing if you need to, but hopefully

23   we can move things along by just asking and pointing

24   you to some specific areas.  So first of all, if you
```

1    look at pa -- if you look at the second page of this

2    e-mail, there's an e-mail from Carol, and it appears

3    that she is the director of contracts and government

4    reporting.  Do you see that?

5        A.    Yes.

6        Q.    And so I know earlier you said that she

7    was in finance and involved in generics.  Does this

8    refresh your recollection at all that she was actually

9    also a director in contracts and government reporting?

10       A.    Yes, somewhat.  I do remember that she was

11   involved in government pricing issues at one point.

12       Q.    And certainly this isn't a memory test of

13   every single person and what their titles were at

14   Mallinckrodt.  I know there were a lot of employees

15   there.  But in connection with Carol's role as a

16   director of contracts and government reporting, did you

17   have any communications with her, now that you see what

18   her role is in that position as director of contracts

19   and government reporting?

20       A.    So in a personal capacity I may have had

21   some communications with her over time, but I don't

22   recall specific communications.

23       Q.    Was there ever a time -- so with respect

24   to the 867 data, you had testified earlier -- and

Highly Confidential - Subject to Further Confidentiality Review

1   correct me if I'm wrong -- but the 867 data was

2   acquired by Mallinckrodt in connection with the

3   manufacture of its opioid products; correct?

4        A.   867 data was acquired by Mallinckrodt in

5   connection with the sales of our generic products,

6   including opioids, from wholesalers or distributors to

7   their customers.

8        Q.   And was -- did Mallinckrodt also obtain

9   867 data in connection with any other products it

10  manufactured other than its generic opioid products?

11       A.   I am not aware if we obtained 867 data for

12  our branded products.

13       Q.   And how about any other product that

14  Mallinckrodt manufactures in sales, including

15  non-opioids?  Do you know whether or not Mallinckrodt

16  obtained 867 data in connection with non-opioid

17  products it manufactured and sold?

18            MR. TSAI:  Objection to scope.  Go ahead.

19       A.   Mallinckrodt did obtain 867 data for all

20  of our generic products, including non-opioids, yes.

21       Q.   (By Mr. Ko)  Got it.  Thank you.  And was

22  there ever a time that you recall that Mallinckrodt did

23  not obtain this 867 data for its generic products?

24       A.   I do not recall exactly when we started

Highly Confidential - Subject to Further Confidentiality Review

1    receiving 867 data from specific customers.

2          Q.    Do you know whether or not the FDA ever

3    mandated or required Mallinckrodt to obtain such data,

4    such data being 867 data?

5          A.    I am personally not aware of FDA

6    requirements for 867 data and I haven't had a chance to

7    read this e-mail chain in full.

8          Q.    Do you have any understanding of -- so EDI

9    we discussed before was a data aggregator of lots of

10   things.  Does the term 844 data ring a bell to you at

11   all?

12         A.    Yes, I am generally familiar with what EDI

13   844 is.

14         Q.    And what's your general understanding of

15   that?

16         A.    That 844 data provides an additional level

17   of detail around our products -- the sales of our

18   products from distributors to their end customers.

19   Beyond that I'm not familiar with exactly what it

20   includes.

21         Q.    And do you know whether or not

22   Mallinckrodt had acquire -- ever acquired 844 data with

23   respect to its generic products?

24               MR. TSAI:  Objection to scope.  Go ahead.

```
1        A.    I believe that over the years we did

2   acquire some 844 data at some points in time.

3        Q.    (By Mr. Ko)  And similar to the 852 and

4   867 data, was the 844 data acquired via a distributor

5   or was it acquired via some other channel?

6              MR. TSAI:  Objection to scope.  Go ahead.

7        A.    844 data would have been supplied to

8   Mallinckrodt from our distributor customers.

9        Q.    (By Mr. Ko)  And do you know whether or

10  not either Cardinal, McKesson, or ABC had provi -- ABC

11  being AmerisourceBergen --

12       A.    Uh-huh.

13       Q.    -- had provided 844 data to Mallinckrodt

14  at any time with respect to Mallinckrodt's generic

15  products?

16             MR. TSAI:  Objection to scope.  Topic 11

17  does not include the subject of 844 data, but go ahead.

18       A.    844 data, as I mentioned, I'm not

19  completely familiar with when we acquired it, from

20  whom, or how we used those data, other than being aware

21  that we have acquired it from some distributors at some

22  point.

23       Q.    (By Mr. Ko)  You can put that aside.  Does

24  the -- I know earlier you had talked about some
```

```
 1    databases that had housed certain information, and I

 2    believe you had referred to Cognos?

 3         A.    Cognos is the data query tool that we use

 4    for our data warehouse.

 5         Q.    And approximately how long did -- or how

 6    long has Mallinckrodt utilized Cognos as its data query

 7    tool for its data warehouse?

 8         A.    For a very long time.  I don't know

 9    specifically when we started, but it was early 2000s.

10         Q.    And is it fair to say that among the data

11    it warehouses, includes sales data?

12         A.    Yes, sales data is included in our data

13    warehouse, yes.

14         Q.    And what about Essbase?  E-S-S-B-A-S-E.

15    Does that database sound familiar to you at all?

16         A.    Yes, I am generally familiar with what it

17    is.

18         Q.    And what is your understanding of what it

19    is?

20         A.    Essbase I believe was our financial system

21    or financial query tool which was used to -- by the

22    finance team to generate reports or analysis of

23    financial data.

24         Q.    And did you ever utilize Essbase in
```

Highly Confidential - Subject to Further Confidentiality Review

1    connection with any financial plans or documents you

2    were involved in connection with your marketing roles

3    at Mallinckrodt?

4         A.    I did not personally utilize Essbase, but

5    I would have received reports that were created by the

6    finance team using Essbase.

7         Q.    What about DART?  D-A-R-T.  Does that

8    database sound familiar to you at all?

9         A.    Yes.

10        Q.    And how did Mallinckrodt, if at all,

11   utilize that database?

12        A.    DART is our database for capturing and

13   paying invoices for purchases made in the normal course

14   of business such as office supplies, professional

15   services agreements.  Anything not production-related.

16        Q.    Got it.  Got it.  And earlier we talked

17   about the J.D. Edwards database.  Do you recall that?

18        A.    Yes.

19        Q.    Is there a -- I've seen references in

20   documents to JDE and JDA.  Is there a -- are those both

21   in reference to J.D. Edwards, or are those two

22   different things, if you know?

23        A.    JDE is the short form for J.D. Edwards.

24   JDA is a completely different system which is used for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    forecasting and planning production.

 2           Q.    Forecasting and planning production of

 3    what?

 4           A.    Manufacturing of our products.

 5           Q.    Including --

 6           A.    All of our generic products.

 7           Q.    What about with respect to branded

 8    products?  Any coverage there?

 9           A.    Yes, I believe JDA was used for

10    forecasting and planning of production of our branded

11    products or of ordering production from contract

12    manufacturing organizations.

13           Q.    And what about -- I'm sure you'll know

14    this -- IMS?  Mallinckrodt utilized IMS data with

15    respect to its -- the products it manufactured;

16    correct?

17           A.    Yes, Mallinckrodt utilized IMS data for

18    all of our products as well as full market analysis.

19           Q.    And I know that there have been various

20    iterations, if you will, of IMS and there's various

21    entities that are involved.  Can you describe for me

22    what entities Mallinckrodt purchased IMS or IMS-type

23    data from from the period in which -- from between the

24    period in which it first manufactured an opioid product
```

Highly Confidential - Subject to Further Confidentiality Review

1    to present?

2         A.    So I don't recall all of the names that

3    these entities used to have, but the primary names were

4    IMS Health and Wolters Kluwer and the predecessor

5    entities to Wolters Kluwer -- the database that they

6    provided.

7         Q.    Does the entity or database Xponent sound

8    familiar to you?

9         A.    Xponent is a database, if you will, that

10   is provided by IMS Health.

11        Q.    And so in connection with Mallinckrodt's

12   acquisition of IMS data it also acquired Xponent data;

13   is that fair to say?

14        A.    Mallinckrodt did acquire Xponent data in

15   support of our branded products.

16        Q.    So only in support of the branded

17   products?

18        A.    That's correct.

19        Q.    And the database ValueTrak.  Does that

20   ring a bell to you?

21        A.    Yes.  ValueTrak is the database provided

22   by ValueCentric, and that is the third-party EDI data

23   aggregator that we currently use.

24        Q.    So that -- so earlier we looked at

Highly Confidential - Subject to Further Confidentiality Review

1   IntegriChain as making a proposal to house data,

2   including EDI data, but as far as your knowledge,

3   Mallinckrodt never retained IntegriChain but instead

4   has retained ValueTrak to aggregate data, including EDI

5   data; correct?

6        A.   We have never to my knowledge retained

7   IntegriChain for those purposes.  The only third-party

8   aggregator I'm aware of is ValueCentric, who's

9   aggregated EDI data for us.

10       Q.   And that EDI data includes 852 and 867

11  data; correct?

12       A.   That is correct.

13       Q.   Now, we were talking a moment ago about

14  IMS data.  What's your general understanding of --

15  strike that.  What time period did Mallinckrodt to the

16  best of your knowledge acquire IMS data?

17       A.   To the best of my knowledge we began

18  acquiring IMS data around the year 2000 with historical

19  data starting in about 1998.

20       Q.   And it continues to purchase this data in

21  some form today; correct?

22       A.   Yes --

23       Q.   Mallinckrodt -- and it being Mallinckrodt?

24       A.   Right, Mallinckrodt continues to purchase

Highly Confidential - Subject to Further Confidentiality Review

```
 1   data from what is now IQVIA.

 2        Q.    And can you describe to the court why

 3   Mallinckrodt purchased IMS/IQVIA data in connection

 4   with its -- in connection with this portfolio?

 5        A.    Mallinckrodt purchased IMS or IQVIA data

 6   for a number of different purposes.  Relative to our

 7   generic portfolio, we purchased those data in order to

 8   understand the overall size of markets for individual

 9   products, to try to understand trends in those markets

10   and understand market share between either products or

11   competitors on individual generic products.  We used

12   that in support of both our currently -- then-current

13   commercialized products as well as evaluation of new

14   product opportunities.

15        Q.    So is it fair to say that Mallinckrodt

16   purchased IMS/IQVIA data in connection with both its

17   branded and generic opioid products?

18        A.    Mallinckrodt did purchase IMS or IQVIA

19   data for both brands and generics, yes.

20        Q.    And do you have any understanding of how

21   much Mallinckrodt paid to acquire this data on an

22   annual basis?

23        A.    I have a general understanding at

24   different points in time but don't have a comprehensive
```

Highly Confidential - Subject to Further Confidentiality Review

1    understanding in total.

2         Q.    Sure.  And what's your general

3    understanding?

4         A.    In the early 2000s, early to mid-2000s, we

5    spent something on the order of $100,000 or $200,000 a

6    year.  During the time period when we had Xponent data,

7    I know the IMS contract was in the low single-digit

8    millions per year, and today we spend -- I believe it's

9    a little bit over $300,000 per year for domestic IMS

10   data, which is used on a corporate-wide license for

11   products outside of SpecGX as well.

12        Q.    Okay.  I'm sorry to interrupt.  And do --

13   so it sounds like you also then pay for and receive

14   some international IMS data?

15        A.    We do as a company pay for and receive

16   XUS, international IMS data, yes.

17        Q.    And when did Mallinckrodt start paying for

18   international data?

19             MR. TSAI:  Object to the scope.

20        A.    I'm not sure exactly when we started.  We

21   have had access sporadically over the years to

22   international data.

23        Q.    (By Mr. Ko)  And who -- which department

24   was in charge of acquiring IMS data?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Originally, when we first started

 2   acquiring data, the generics product management team

 3   was acquiring that data.  In the 2007-2008 time frame

 4   we formed a corporate strategy and portfolio team which

 5   included a market research group and the responsibility

 6   for data transferred to that group at the time.  Since

 7   about 2016, that group was dissolved and now the

 8   corporate IT team is responsible for data purchases.

 9          Q.      And going back to when you were talking

10   about the generics product management team acquiring

11   this data, once they acquired it, who was it generally

12   disseminated to?  In other words, what teams at

13   Mallinckrodt would receive IMS data?

14          A.      Over time -- I can't speak to everyone --

15   but the primary groups would have been the product

16   management and marketing team, the national accounts

17   team, and business development.

18          Q.      And by the way, on the marketing team, did

19   Mallinckrodt distinguish marketing team between its

20   brand products and its generic products, or was there

21   just one marketing team that led both aspects of

22   Mallinckrodt's business?

23          A.      Mallinckrodt had separate product

24   management and marketing teams for all of our different
```

1    product categories over time, so generics and branded

2    teams were separate.  At various points in time we did

3    have a centralized marketing services team which

4    supported those groups, but the actual marketing and

5    product management functions were separate.

6              Q.    And the IMS data was shared within both

7    the generics and branded teams; is that correct?

8              A.    Some of the IMS data was shared.

9    National-level data was shared between the teams.

10   Xponent data was not shared.  It was held within and

11   used by only the brand team.

12             Q.    So the Xponent was not shared or was not

13   disseminated beyond the brand team at all, or just not

14   shared with the generic aspect of the business?

15             A.    So the Xponent data was not shared with

16   the generic team.  The Xponent data would have been

17   used to compile reports on the business or other types

18   of metrics which would have been reported up to

19   management.

20             Q.    Did the IMS data allow Mallinckrodt to

21   track number of contacts to physicians?

22             A.    No, IMS data does not track contact with

23   physicians.

24             Q.    Do you mean in the sense that -- well,

Highly Confidential - Subject to Further Confidentiality Review

1    let's take a step back.  Do you know whether or not IMS

2    had the capability of tracking the number of contacts

3    to physicians?

4             MR. TSAI:  Object to scope.  Object to

5    form.  Excuse me.  Go ahead.

6        A.    I am not aware if IMS had that capability.

7        Q.    (By Mr. Ko)  So as far as your

8    understanding is, Mallinckrodt did not purchase IMS

9    data to gain insight into the number of contacts sales

10   reps may have had with doctors?

11       A.    No, I am not aware of us purchasing that

12   data.

13       Q.    Do you know in connection with the IMS

14   data that Mallinckrodt purchased whether or not the

15   data could be aggregated by specialty in terms of

16   physician specialty and their prescribing habits?

17       A.    The IMS data which we purchased at both a

18   detailed level in Xponent and at a national level --

19   the prescription dispense data does have prescriber

20   specialty associated with that information.

21       Q.    And does the IMS data also allow

22   Mallinckrodt to track dosage?

23       A.    Can you elaborate on what you mean by --

24       Q.    Sure.  Have you heard of the term MME?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Yes, I have.

 2              Q.     And does -- and so the record is clear,

 3      what's your understanding of what MME is?

 4              A.     MME is morphine milligram equivalence.

 5      I've also seen milligram morphine equivalence.  It is a

 6      way to adjust the milligram strength or the strength of

 7      a given opioid into a common morphine equivalent

 8      number.

 9              Q.     And do you have any understanding of

10      whether or not Mallinckrodt acquired IMS data to track

11      and understand MME amounts of its products and its

12      competitors' products?

13              A.     Mallinckrodt did not acquire IMS data for

14      the purposes of tracking MMEs for either our products

15      or competitors.

16              Q.     Do you know whether or not any of the data

17      that IMS purchased contained MME amounts or -- yeah.

18                     MR. TSAI:  Objection to form.

19              Q.     (By Mr. Ko)  Strike that.  Do you know

20      whether or not the data that Mallinckrodt purchased

21      from IMS contained MME amounts?

22              A.     The data we purchased from IMS did not

23      contain MME data.

24              Q.     Did IMS -- currently IQVIA -- data allow
```

Highly Confidential - Subject to Further Confidentiality Review

 1    Mallinckrodt to track total sales of its products and

 2    its competitors' products?

 3         A.    IMS data allow Mallinckrodt to view an

 4    estimated total sales volume in terms of units of our

 5    products as well as our competitors' products at a full

 6    market U.S. market level.

 7         Q.    And how are you defining total sales

 8    volume?

 9         A.    So it depends on the time period you look

10    at, but a given product, IMS data would show the total

11    quantity sold based upon the IMS projection of what the

12    total market is, and they provide that data broken down

13    by manufacturer, by product, and by selling channel or

14    class of trade.

15         Q.    And when you said total quantity, what do

16    you mean by that?  How are you defining quantity?

17    Pills or MMEs, or how?

18         A.    So IMS provides a few different measures.

19    They track selling units, they track individual dosage

20    units, and they also provide the milligram strength for

21    each of those dosage units, and from that milligram

22    strength and total dosage units, they calculate a total

23    kilograms of active ingredient.

24         Q.    So just so I understand, you're defining

Highly Confidential - Subject to Further Confidentiality Review

 1    total quantity to include the milligram strength by --

 2    excuse me.  I just want to unpack kind of your answer

 3    here --

 4        A.    Uh-huh.

 5        Q.    -- because there's a lot of things that

 6    went into it.

 7        A.    Yeah.

 8        Q.    So in terms of total quantity and what you

 9    were purchasing from IMS, it included, among other

10    things, a total kilograms of active ingredient; is that

11    correct?

12        A.    One of the -- excuse me.  One of the data

13    elements that IMS provides in the dataset that we

14    purchase is a total-kilogram metric which they

15    calculate from the milligram strength of the given

16    product and the total quantity reported as sold for

17    that product, and it's a straight multiplication.

18        Q.    That's helpful.  And in addition to that,

19    you had also purchased from IMS individual dosage

20    units; correct?

21        A.    Our data feeds included both at the

22    package and dosage-unit level.

23        Q.    And have you ever heard of the term

24    extended unit?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.

 2          Q.     What's your understanding of extended

 3    unit?

 4          A.     Extended unit is the smallest measurable

 5    unit in a given package for sale.  So most often for a

 6    tablet product, an individual tablet is an extended

 7    unit.  For a liquid product it might be a milliliter,

 8    if that's how the product is packaged in terms of a

 9    milliliter quantity -- the smallest packaging unit.

10          Q.     And --

11          A.     Unit packaged.  I'm sorry.

12          Q.     And so in other words, would it be a fair

13    characterization that extended unit represents the

14    vehicle in which the opioid is delivered?  Like you

15    said, it could be either in a tablet or it could be in

16    liquid form or some other form?

17          A.     I would term it the individual dosage

18    unit.

19          Q.     Rather than extended unit?

20          A.     Let me clarify.  Extended unit means the

21    individual dosage unit of a given product.

22          Q.     And the individual dosage unit -- strike

23    that.  What -- how is the milligram amount factored

24    into an individual dosage unit?
```

1      A.     So in general terms, pharmaceutical

2   products are formulated to contain a certain amount of

3   active ingredient, and that amount is part of the

4   labeled dosage per unit, and that specific dosage is

5   captured in the data feed that we purchase from IMS.

6      Q.     I'm going to hand you a copy of what will

7   be marked as KV Exhibit 7.

8             [Exhibit Mallinckrodt-Vorderstrasse-007

9             marked for identification.]

10            MR. TSAI:  David, we've been going an hour

11  since the last break.  After this exhibit, can we take

12  another 10-minute break?

13            MR. KO:  Is it possible -- I don't know

14  the status on lunch, but is it possible to go up to

15  lunch?

16            THE VIDEOGRAPHER:  Yeah, we need to place

17  the order, though.

18            MR. KO:  Oh, we haven't placed the order.

19  Okay.  Well, that probably warrants a break.

20            MR. TSAI:  Okay.

21            MR. KO:  Sure, why don't we do it after

22  this document?

23      Q.     (By Mr. Ko)  So you've been handed a copy

24  of KV Exhibit 7 by the court reporter, and this exhibit

Highly Confidential - Subject to Further Confidentiality Review

```
1    I'll note for the record contains a cover e-mail and

2    attachment, and the cover e-mail is Bates-stamped

3    MNK-T1_0000754547.  And unless you need to refer to the

4    cover e-mail -- I mean, you're more than welcome to,

5    but I have mostly questions about this attachment that

6    is titled U.S. pain market update dated October 16th,

7    2012.  Does this document look familiar at all to you?

8         A.    This specific document does not look

9    familiar.  I recognize the general format and the data

10   that it appears to present.

11        Q.    And what type of data is it presenting?

12        A.    It is presenting an historical analysis of

13   IMS data.  Appears to be data that has been summarized

14   or analyzed in some way and presented at a market

15   segment level.

16        Q.    And when you said earlier that you

17   recognized the general format, what did you mean by

18   that?

19        A.    Meaning that the specific terms that are

20   included in various different points referring to data,

21   I know what those terms mean and understand -- from

22   what I've been able to read about some of the

23   commentary in here, I understand what is being talked

24   about.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     And if you comb through this document

2     starting with the first page, Page 2 --

3          A.     Uh-huh.

4          Q.     -- you'll see some graphs, and they

5     reveal some source material.  You see that on the

6     bottom right-hand corner?

7          A.     Yes.

8          Q.     And the source material includes IMS NSP

9     and NPA --

10         A.     Uh-huh.

11         Q.     -- October 2006 through July 2012.  Did I

12    read that correctly?

13         A.     Yes, you did.

14         Q.     So we talked about IMS.  What is your

15    understanding of NSP data?

16         A.     NSP stands for national sales

17    perspectives.  That is the dataset that IMS provides

18    which reports sales of pharmaceutical products to

19    pharmacies at a national level.  It provides product

20    aggregated at the most granular level at the selling

21    channel or class of trade.

22         Q.     And so it's data that is produced in

23    connection with Mallinckrodt's purchase of IMS data; is

24    that fair?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    It is purchased as part of our IMS data

 2   purchase, yes.

 3          Q.    And what about with respect to NPA?  What

 4   does NPA stand for?

 5          A.    NPA is national prescription audit.

 6   National prescription audit is the IMS database which

 7   provides a full U.S. market projection of product and

 8   prescriptions dispensed from pharmacies to patients.

 9   Again, it is product specific, but the most granular

10   level is at a selling channel level, and that

11   information does include specialty.

12          Q.    And by specialty, you mean by physician

13   specialty?

14          A.    Correct.  Prescriber specialty is captured

15   for the prescription dispense data.

16          Q.    And so similar to the NSP information,

17   Mallinckrodt acquired the NPA data in connection with

18   its purchases of IMS data; is that correct?

19          A.    That is correct.

20          Q.    And by the way, on this page, it's titled

21   U.S. pain market is flattening.  You have on the bottom

22   left-hand column some general commentary with respect

23   to the pain market.  Do you see that?

24          A.    I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    And again, going back to the beginning of

2   this document, it is dated October 16th, 2012, and so

3   this appears to be a reflection of Mallinckrodt's

4   perspective on the pain market at the time.  Is that

5   fair to say?

6        A.    This appears to be our aggregation of the

7   pain market as we defined it at that time, yes.

8        Q.    And then it indicates in the -- there are

9   two major bullets, but in the first bullet underneath

10  the second bullet there is a phrase there that

11  indicates that scrutiny of opioid prescribing is

12  increasing.  Do you see that?

13       A.    I do.

14       Q.    Do you have an understanding of what that

15  is referring to?

16       A.    I have a general understanding of what it

17  is referring to.

18       Q.    And what's your general understanding?

19       A.    That would refer to the -- during this

20  period of time when this report was generated that the

21  prescribing of opioids was being reevaluated from many

22  different sides to understand if the prescribing met

23  all of the expectations of everyone involved.

24       Q.    And when you say many different sides --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.      Yeah.

2        Q.       -- what do you mean by that?

3               MR. TSAI:  Objection to scope.

4        A.      My understanding during this period of

5   time, medical professionals, prescribers, medical

6   professional societies, FDA, others, were actively

7   looking at the use of opioids in the U.S. and trying to

8   form opinions about that use.

9        Q.      (By Mr. Ko)  And would it be fair to say

10   that this scrutiny also is increasing as a result of

11   abuse, diversion, and misuse of prescription opioids?

12              MR. TSAI:  Objection to scope.

13       A.      So the scrutiny for -- of opioids in the

14   U.S. has been a result of many factors over time.  I

15   can't speculate exactly what this comment is referring

16   to or exactly what was driving all of that scrutiny in

17   the marketplace.

18       Q.      (By Mr. Ko)  Sure.  But is it fair to say

19   that Mallinckrodt was aware that there was some

20   scrutiny with respect to opioid prescribing at least as

21   of October 16th, 2012, and according to this document;

22   correct?

23       A.      It's fair to say that according to this

24   document we were aware at this -- at the time of this
```

Highly Confidential - Subject to Further Confidentiality Review

1    document of scrutiny of opioid prescribing.

2         Q.    And would it be fair to say that scrutiny

3    includes the abuse, misuse, and diversion of

4    prescription opioids?

5              MR. TSAI:  Objection to scope.

6         A.    I can't say whether it would be fair to

7    say if scrutiny includes that, since I don't know the

8    details behind this comment.

9         Q.    (By Mr. Ko)  Putting aside this document,

10   the -- was Mallinckrodt ever concerned when it was

11   manufacturing its opioids regarding the abuse potential

12   and the misuse potential of its products?

13        A.    The abuse or misuse potential of opioids

14   is a very commonly understood fact about these

15   products.  They have a risk and they have a benefit.

16   The FDA and other professional groups do what they can

17   to ensure that prescribers are educated about those

18   risks.  We as a company do our part to make sure that

19   we communicate those risks when we get the chance to,

20   and we have understood for a long time our

21   responsibility as a provider of opioid products.

22        Q.    And when you say the abuse or misuse

23   potential of opioids is very commonly understood, would

24   you say that that was commonly understood by

Highly Confidential - Subject to Further Confidentiality Review

1    Mallinckrodt since the beginning of when it first

2    started manufacturing prescription opioids?

3          A.    To the best of my knowledge, even from the

4    time when we first manufactured prescription opioids,

5    those opioids were labeled with warnings around their

6    risks and it was understood that these products could

7    be abused.

8          Q.    And what about -- I understand your

9    reference to the labels, but the question was

10   specifically about the abuse and misuse potential of

11   opioid products.  Did Mallinckrodt understand when it

12   first started manufacturing opioid products in the

13   mid-1990s of their abuse and misuse potential?

14         A.    Mallinckrodt understood that abuse and

15   misuse of opioids was possible and that it occurred.  I

16   don't believe we had any specific data about the

17   specific potential of any of our individual products.

18         Q.    And when you say you don't have any

19   specific data, do you mean at that time or throughout

20   the time that Mallinckrodt manufactured opioid

21   products?

22         A.    I believe that at that time and throughout

23   the time that we manufactured opioid products, we did

24   not generate any data to draw conclusions on the

Highly Confidential - Subject to Further Confidentiality Review

```
1    specific abusability of any of our products.

2         Q.    And setting aside abuse and misuse, does

3    the concept or term diversion mean anything to you?

4              MR. TSAI:  Objection to scope.

5         A.    Yes, I am aware of the concept and the

6    term.

7         Q.    (By Mr. Ko)  What's your understanding of

8    diversion?

9              MR. TSAI:  Can I get a standing objection

10   on this line of questions about diversion as to scope?

11             MR. KO:  Sure.  And I'll respond to that

12   scope objection by referring you to -- sorry, Kevin.

13   Bear with us.  I'll respond to that standing objection

14   by reference to Topic 29, which Mallinckrodt designated

15   Kevin to testify on, which discusses among other things

16   Mallinckrodt's knowledge regarding the abuse, misuse,

17   and dependence of its opioid products.

18             MR. TSAI:  Which does not use the term

19   diversion, and diversion is a specific term used in

20   other topics for which you'll get an opportunity to ask

21   questions of our -- another designee.  But go ahead.

22        A.    My understanding of diversion is a term

23   that refers to the movement of opioid products into the

24   hands of people or into a location other than where
```

1    that product was intended to go.

2         Q.    (By Mr. Ko)  And do you know whether or

3    not Mallinckrodt investigated or generate -- strike

4    that.  Did Mallinckrodt ever investigate the diversion

5    potential of its opioid products at any time?

6         A.    I am not aware that we ever investigated

7    the diversion potential of our products.

8              MR. KO:  We can take a break.

9              THE VIDEOGRAPHER:  We are going off the

10   record at 11:51 AM.

11             [A brief recess was taken.]

12             THE VIDEOGRAPHER:  We are back on the

13   record at 12:38 PM.

14        Q.    (By Mr. Ko)  Welcome back from lunch,

15   Kevin.  I want to turn your attention back to Exhibit

16   2.

17        A.    Okay.

18        Q.    Gave you Exhibit 2.  And on Page 3, at the

19   bottom of Page 3, there's a reference to Topic 19.  Do

20   you see that?

21        A.    Yes.

22        Q.    And in connection with Topic 19, it

23   appears that you -- in addition to reviewing documents,

24   you received information from Kathy Schaefer, George

```
 1    Kegler, and Jeff Kilper.  Do you see that?

 2         A.    Yes.

 3         Q.    And as you alluded to earlier, this -- you

 4    didn't actually speak with them, but you received

 5    documents from them -- correct -- as selected by

 6    counsel?

 7         A.    As selected by counsel.  Received finance

 8    documents for review, which were compiled or put

 9    together in part by them.

10         Q.    And who is Kathy Schaefer?

11         A.    Kathy Schaefer is -- I guess she's our

12    treasurer now.

13         Q.    And treasurer of both the LLC --

14    Mallinckrodt LLC and SpecGX, or one over the other?

15         A.    I believe she's treasurer of the LLC.

16         Q.    And how about George Kegler?  Who is he?

17         A.    George Kegler was the vice-president of

18    finance for SpecGX.

19         Q.    And Jeff Kilper -- who is he?

20         A.    Jeff Kilper was or is senior director of

21    finance for SpecGX.

22         Q.    So I know we touched on this before, but

23    just so the record is clear, Mallinckrodt did in fact

24    maintain financial information and accounting
```

Highly Confidential - Subject to Further Confidentiality Review

1    information regarding marketing expenditures with

2    respect to its opioids that it manufactured; correct?

3         A.    We captured our marketing expenditures as

4    part of our general profit-and-loss documents for the

5    business.  For the branded products we generally

6    maintained a product-specific P & L where we would

7    allocate marketing costs specifically to products.  For

8    the generics business we did not allocate marketing

9    costs to specific products and captured those at a

10   whole department level.

11        Q.    And by whole department level, you had a P

12   & L for the entire generic line of business, in other

13   words; correct?

14        A.    That is correct.  Yes.

15        Q.    And with respect to -- actually, scratch

16   that, or strike that.  In addition to P & L statements,

17   were there any other types of financial statements that

18   Mallinckrodt possessed or maintained that tracked its

19   opioid products?

20        A.    From time to time in the generics

21   business, we would generate periodic sales reports

22   which were used to assess progress towards budget or

23   forecast, and that would cover all of our products in

24   the portfolio.  I am not familiar with the specific

Highly Confidential - Subject to Further Confidentiality Review

1    format for similar reports on the branded side of the

2    business, but I'm aware that similar reports were used.

3         Q.    And when you say that they're periodic, do

4    you have any idea or understanding of how frequent they

5    were?

6         A.    It has varied over time.  Weekly or

7    semiweekly, on occasion, monthly reports or even

8    quarterly business review reports.

9         Q.    And with respect to both the brand and

10   generic portfolio of Mallinckrodt, what department was

11   in charge of tracking this financial information?

12        A.    The finance department tracked it.

13        Q.    And were -- did the marketing department

14   ever have any involvement in preparing the financial

15   information we were discussing?

16        A.    The marketing department for the branded

17   side would have been involved in analysis of the

18   financial information relative to their plans or

19   targets for the year.  The product management team on

20   the generics side would have done the same -- analyzed

21   financial data relative to progress against targets.

22        Q.    The court reporter is going to hand you a

23   copy of what's been marked as KV Exhibit 8.

24                  [Exhibit Mallinckrodt-Vorderstrasse-008

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    marked for identification.]

 2          Q.    Now, for the record, the court reporter

 3   has handed you a copy of KV Exhibit 8, which is

 4   Bates-stamped MNK-T1_0000432950, an e-mail chain from

 5   October 15th, 2010, that contains an attachment, which

 6   is at MNK-T1_0000432952.  So it appears that this

 7   e-mail chain involves some financial statements

 8   involving the generic aspect of Mallinckrodt's business

 9   and involves among other people Randy Meisner.  Do you

10   know who Randy Meisner is?

11          A.    Yes, I do.

12          Q.    And who is he?

13          A.    Randy Meisner at this time was the

14   controller for the generics business.

15          Q.    And was he generally responsible for

16   creating financial statements including forecasts of

17   the generic side of the business?

18          A.    He was responsible for generating reports

19   on the financial state of the business and for

20   compiling and generating the financial forecast.

21          Q.    And did he have any responsibility with

22   respect to the branded aspect of Mallinckrodt's

23   business?

24          A.    Not to my knowledge.
```

1      Q.    And so he's attaching, as you can see,

2  some financial statements which I referred to earlier,

3  and the attachment appears to be some P & L statements

4  regarding the specialty generics line of Mallinckrodt's

5  business.  Is that correct?

6      A.    Yes, that's correct.

7      Q.    And earlier we had talked about

8  Mallinckrodt's gross sales with respect to its generic

9  line of business, and we have that captured here at

10  least in terms of actual numbers for fiscal year 2010

11  and some budget and expected numbers for 2011.  Is that

12  accurate?

13      A.    Yes, that appears accurate.

14      Q.    And can you remind the court your

15  definition of gross sales -- how you determined or how

16  you defined gross sales as it relates to the generic

17  business of Mallinckrodt?

18      A.    Conventionally we in the generics business

19  have defined a term which we call modified gross sales,

20  which is a reflection of the contract price for any

21  sales that occur on a direct basis and the wholesale

22  acquisition cost for sales that occur through

23  wholesalers.  Any direct sales would be sales into a

24  warehouse or distribution center that's run by a

1    pharmacy chain.

2         Q.    And is that definition captured in these

3    numbers here in terms of gross sales of specialty

4    generics?

5         A.    I don't have enough information in this

6    document to say whether that exact definition was used

7    for this gross sales.

8         Q.    Do you have any reason to doubt that this

9    is an annual profit-and-loss statement for the

10   specialty generics division, at least with respect to

11   actual fiscal year 2010 and forecasted numbers for

12   2011?

13        A.    It appears correct to me, yes.

14        Q.    And help me understand -- well, strike

15   that.  Underneath gross sales we have some line items

16   for chargebacks.  Do you see that?

17        A.    Yes.

18        Q.    And earlier we were talking about

19   substantial amounts Mallinckrodt was providing to

20   distributors for chargebacks.

21        A.    Uh-huh.

22        Q.    Do you see these numbers here on the

23   chargeback line item?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And so these are the amounts that

2    Mallinckrodt is paying to distributors pursuant to

3    those agreements that we had discussed earlier this

4    morning; is that correct?

5        A.    Yes, those are chargeback amounts pursuant

6    to the chargeback agreements.

7        Q.    So in 2010 the actual amount spent by

8    Mallinckrodt in terms of chargebacks paid to

9    distributors was approximately $700 million; is that

10   correct?

11       A.    Yes, that's correct.

12       Q.    And Mallinckrodt budgeted approximately

13   that same amount -- a little less, but approximately

14   $686 million for 2011; correct?

15       A.    Yes, that was the working budget.

16       Q.    And just so the record is clear, can

17   you -- or what is OCT LE?  Is that October --

18       A.    October, latest estimate.

19       Q.    And so for -- in other words, what that's

20   capturing is as of October that was the latest estimate

21   for the projection of that year, what the amount would

22   be?

23       A.    Correct.

24       Q.    And so for this two-year time period it

Highly Confidential - Subject to Further Confidentiality Review

1   appears that Mallinckrodt has both paid and is

2   expecting to pay anywhere from $660 to $700 million in

3   chargebacks to distributors; is that correct?

4          A.    Yes, that's correct.

5          Q.    And do you know before and after this time

6   whether or not that same -- that number was generally

7   the same?  Did it fluctuate significantly or was it

8   around the $650 to $700 million range?

9          A.    So I don't know if it was around the same

10  range, but as a proportion of gross sales it was likely

11  to be relatively consistent.

12         Q.    And thank you for that.  So as a

13  proportion of gross sales here we have -- at least in

14  actual 2010 numbers it was an amount that was over 50

15  percent.  I think if I do the math it's almost --

16         A.    Uh-huh.

17         Q.     -- it's like 50 -- approximately 57

18  percent of all the gross sales is represented in

19  chargebacks.  Is that correct?

20         A.    Yes, that appears to be correct.

21         Q.    And so that number that appears below the

22  gross sales number -- the gross less chargebacks --

23  without sounding too obvious, that is basically the

24  $1.3 million minus the 700K -- or $700 million in

```
 1    chargebacks?

 2         A.    Yes, that's correct math.

 3         Q.    And so when you said earlier that the

 4    relative proportion of chargebacks to sales remained

 5    pretty constant over time, do you mean to say that --

 6    or is one way of saying that that chargebacks

 7    represented approximately 50 to 60 percent of

 8    Mallinckrodt's gross sales on specialty generics

 9    throughout the relevant time period?

10         A.    It's my general understanding that

11    chargebacks have -- for generic products over the

12    relevant time frame have generally been somewhere in

13    the neighborhood of about half -- excuse me -- half of

14    the total gross sales.

15         Q.    That's helpful.  And below the line item

16    chargebacks you see that row rebates?

17         A.    Uh-huh.  Correct.

18         Q.    And we had discussed before the concept of

19    rebates, and so again, these are amounts Mallinckrodt

20    is paying to distributors in the form of rebates and/or

21    discounts as payment pursuant to the agreements

22    Mallinckrodt had with distributors; correct?

23         A.    Yes, all of these would be governed by

24    agreements with distributors.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    And just so we're clear -- and I want to

 2    make sure because we talked about both distributors and

 3    pharmacies earlier this morning -- on this line item,

 4    these rebates -- are they also solely with respect

 5    to -- are these amounts only being paid to distributors

 6    or do these amounts reflect any amounts paid to

 7    pharmacies as well?

 8            A.    From this document I don't have the detail

 9    to completely answer the question, but I would

10    interpret this to include rebates paid to wholesalers

11    and distributors as well as some rebates that were paid

12    to pharmacy chains.

13            Q.    And same question with respect to

14    chargebacks.  I know we had -- you had testified

15    earlier this morning that the chargeback amounts were

16    only provided to distributors, but to the extent that

17    there were also chargebacks provided to pharmacies,

18    does this amount presumably cover amounts paid to both

19    types of entities?

20            A.    So the -- excuse me.  The generic cost

21    differential that we discussed earlier relative to Rite

22    Aid -- I don't know where this would be captured in

23    these data just based upon what's outlined here.

24            Q.    By the way, the generic cost differential
```

Highly Confidential - Subject to Further Confidentiality Review

1    issue that we talked about earlier this morning that

2    existed between Mallinckrodt and Rite Aid -- did

3    looking at that contract earlier this morning refresh

4    your recollection at all as to other similar types of

5    agreements that Mallinckrodt had with other pharmacies

6    that were similar to the one we discussed?

7         A.    In general terms, we over the years in the

8    generics business have from time to time with chain

9    pharmacy customers offered what we term a wholesaler

10   differential.  That is the difference between the

11   acquisition price that we list for a customer for a

12   pharmacy chain at the distributor, so the price that

13   they can purchase the product for from the

14   distributor -- the difference between that price and

15   our agreed-upon contracted price that would apply to

16   direct sales to that chain pharmacy customer.

17              So if a chain pharmacy customer was unable

18   for whatever reason to purchase a product directly into

19   their warehouse and they had to go to a wholesaler to

20   purchase that product, that -- if that product was sold

21   to them at a higher price, the difference between that

22   higher price and the negotiated direct selling price we

23   would reimburse them for as a wholesaler differential.

24         Q.    That's helpful.  Turning further down that

```
 1    page, there are some line items that discuss the

 2    marketing budget of specialty generics.  Do you see

 3    that row that I'm highlighting here?

 4         A.    Yes.

 5         Q.    So it appears that relative to the overall

 6    expenses, the -- marketing was lower, but there's some

 7    marketing of specialty generics going on; is that fair

 8    to say?

 9         A.    We did conduct some marketing activities

10    for specialty generics in the form of attendance at

11    trade shows, providing selling materials to the sales

12    team to help them in communicating our product line to

13    the wholesalers and chain pharmacies, as well as some

14    product availability advertising that we would have

15    placed in trade publications.

16         Q.    So that's very helpful.  So the conduct

17    that you just described there -- those expenses are

18    captured in these numbers here?  Is that accurate?

19         A.    Those expenses are captured in addition to

20    the personnel expenses for anyone who was in product

21    management or marketing or market analytics functions.

22         Q.    And so just so the record is clear,

23    Mallinckrodt did engage in marketing of its specialty

24    generic products; is that correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Defining marketing as providing product

 2   information around availability of products and

 3   providing the sales team with documents necessary to

 4   communicate about our products with our wholesale

 5   customers, yes, we did engage in those types of

 6   marketing activities.

 7          Q.    And yes, you did engage in those types of

 8   marketing activities with respect to your generic line

 9   of business; is that correct?

10          A.    Yes, we engaged in those activities

11   relative to the marketing of our generic business.

12          Q.    Now, earlier this morning you had

13   testified about how Mallinckrodt had derived

14   substantial revenue from its generic portfolio.  Do you

15   recall that?

16          A.    Yes, I recall that.

17          Q.    And in particular I think you had said

18   that a fair amount of revenue was obtained by

19   Mallinckrodt through its sale of oxy 15s and oxy 30s.

20   Is that accurate?

21          A.    At different points in the past, oxycodone

22   15 milligram and 30 milligram have been at times a

23   small portion of our sales and at some times a slightly

24   larger portion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    And when they were a slightly larger

2    portion, that was approximately from the 2005 to 2010

3    time period; is that fair?

4          A.    I -- excuse me.  I would have to see the

5    detailed documents in order to understand if that's a

6    correct time period.

7          Q.    Do you have any understanding of the

8    general time period in which the oxy 15s and oxy 30s

9    were a source of substantial revenue for the company?

10         A.    I am not aware of a specific time period

11   where I would consider them a substantial source of

12   revenue.

13         Q.    Is it fair to say that Mallinckrodt has a

14   large market share of generic opioid products at this

15   time?

16         A.    At this time Mallinckrodt does have the

17   Number 1 market share of generic opioids in the U.S.

18         Q.    (By Mr. Ko)  And how long has

19   Mallinckrodt -- approximately how many years has

20   Mallinckrodt held the top spot in terms of generic

21   market share?

22         A.    We have currently held the top spot in

23   market share for less than a year.

24         Q.    And during the 2005 to 2012 time period,
```

Highly Confidential - Subject to Further Confidentiality Review

1   can you describe or can you explain to the court what

2   position or what rank Mallinckrodt may have been in

3   terms of generic market share?

4         A.   I don't have the specific numbers in front

5   of me, but I do know that during that time period we

6   were often Number 1 or Number 2 in the products that we

7   sold.

8         Q.   And products being the generic products?

9         A.   Generics products.  Correct.

10        Q.   And fast-forwarding back to present when

11   you said that Mallinckrodt currently has the Number 1

12   market share.  Do you have a general understanding of

13   what percentage that represents relative to the overall

14   market share -- or overall market?  Excuse me.

15        A.   Of the products that we currently sell to

16   the market, of the opioid products, I believe our

17   market share is approximately 30 percent.

18        Q.   And during the time period we were

19   discussing before when Mallinckrodt was either Number 1

20   or Number 2, what has been the general or approximate

21   percentage of Mallinckrodt's market share relative to

22   the rest of the market?

23        A.   During the time period where we were

24   Number 1 or Number 2, often we were between 15 and 20

Highly Confidential - Subject to Further Confidentiality Review

1   percent of the total market.

2        Q.    And did -- with respect to the generics,

3   did Mallinckrodt further delineate or differentiate

4   between regions or territories in the United States?

5        A.    We do not look at the generic business on

6   a regional or geographical level.

7        Q.    Do you look at your branded market on a

8   regional or geographical level?

9        A.    The branded products had a -- had

10  territories that was -- that were used by the selling

11  team to divide up resources and to set targets.

12       Q.    Just a few more questions on this

13  document, or maybe just one set of further questions.

14  On -- going back to the top of the page, do you see the

15  line item allowances?

16       A.    Yes.

17       Q.    And it appears that that ranges from

18  anywhere from $10 to $13 million during the relevant

19  time period of this document.  Can you describe to the

20  court what allowances are in the context of this

21  financial statement?

22       A.    The -- my understanding of how allowances

23  are summarized here is that the majority of these costs

24  would be what we term shelf stock allowances.  As

1   prices for our products decline, the inventory on hand

2   at the wholesalers -- it is revalued to a lower value

3   to match the new price, and that amount is credited to

4   them as a shelf stock allowance.

5          Q.    I see.  So it's -- strike that.  Going

6   back to the cover e-mail and your testimony about Mr.

7   Meisner, he was again responsible for creating some of

8   these financial forecasts, and did I hear you correctly

9   that he sometimes would create these on a weekly basis?

10         A.    So various different reports on the

11  business were created on a weekly basis.  Of the

12  reports included in this attachment, I'm not aware that

13  any of those were calculated with that frequency.

14         Q.    I see.  And going back to the cover

15  e-mail, there are some other people that I'd just like

16  to ask you about real quickly.  Who is Michael Gunning?

17         A.    Michael Gunning was the vice-president and

18  general manager of the generics business at that time.

19         Q.    And is he still with the company right

20  now?

21         A.    No, he's not.

22         Q.    And then Ginger Collier I understand to be

23  -- she was the director of the generics marketing

24  business; is that correct?

```
 1        A.    Yes, she was director of generics

 2   marketing at that time.

 3        Q.    Do you know whether or not she had any

 4   input or consulted with Randy in preparing the finances

 5   or the financial forecasts?

 6        A.    I do not know if Ginger was involved in

 7   any of these specific reports.  She may have been

 8   involved relative to asking for minor changes in

 9   formatting or general presentation of the reports.

10        Q.    And sorry to jump around, but going back

11   to the attachment, going back to the gross sales -- so

12   again here we have gross sales of the specialty

13   generics business amounting to approximately $1.3

14   billion throughout these two years.  How did that

15   compare to the gross sales of Mallinckrodt's branded

16   business?

17        A.    During this time that number would have

18   been larger than the branded business gross sales.

19        Q.    And can we talk about order of magnitude?

20   How much greater were gross sales in the specialty

21   generics business relative to the branded business of

22   Mallinckrodt?

23        A.    I don't know the exact proportions.

24   The -- during this time period, the branded business
```

Highly Confidential - Subject to Further Confidentiality Review

1   would have been probably 25 percent or less of the

2   sales of the combined two businesses -- branded and

3   generic.

4          Q.    Was there ever a time during the period in

5   which Mallinckrodt manufactured opioid products in

6   which the gross sales of its branded products exceeded

7   25 percent of the gross sales of Mallinckrodt's generic

8   products?

9          A.    I don't believe so.

10          Q.    So in other words, throughout the time

11   period in which Mallinckrodt was manufacturing opioids,

12   it's fair to say that the generic line of business

13   represented a substantial portion of the overall sales

14   of its opioid products; is that correct?

15          A.    So the sales of opioid products at -- it

16   depends on which number you're looking at.  On a net

17   basis, the sales of opioid products from the generics

18   business have generally always exceeded the net sales

19   from the branded opioids, but I can't say for sure that

20   that was true in every year.

21          Q.    Thank you for that clarification.  So just

22   so I understand, you're saying that the net sales with

23   respect to Mallinckrodt's branded opioid products was

24   greater than the net sales of Mallinckrodt's generic

Highly Confidential - Subject to Further Confidentiality Review

```
 1    products?
 2              MR. TSAI:  I'll just object as to scope.
 3    There's a specific topic about annual sales that the
 4    parties have agreed will be answered in writing.  But
 5    go ahead.
 6         A.    So no, I believe generally the opposite,
 7    that net sales of the -- our generic opioid products
 8    were almost always greater than the net sales of our
 9    branded opioid products, but I can't say for certain
10    that that was true in every year.
11         Q.    (By Mr. Ko)  Sure.  Sorry.  And I
12    misheard.
13         A.    That's okay.
14         Q.    So thank you for that clarification.  I'm
15    going to hand you now a copy of what will be marked as
16    KV Exhibit 9.
17              [Exhibit Mallinckrodt-Vorderstrasse-009
18              marked for identification.]
19         Q.    And so the record is clear, the KV Exhibit
20    9 represents an e-mail chain that starts at
21    MNK-T1_0000658227.  And it took us until 1:00 this
22    afternoon, but I have an e-mail which actually has your
23    name on it.
24         A.    Yeah, I noticed that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Do you see that?  Do you recognize this
 2   document at all?
 3          A.    I don't recognize this specific document,
 4   but I do know what it is discussing in general.
 5          Q.    And what is it discussing in general?
 6          A.    This is discussing some impending changes
 7   with the business with the Price Chopper grocery chain
 8   and changes that they were making relative to their
 9   chosen wholesaler source program.
10          Q.    And it sounds like there's some additional
11   groups that are referenced in this e-mail, but
12   actually, before I get to that, it looks like Lisa
13   Cardetti is sending this to the marketing team.  Do you
14   see that?
15          A.    Yes.
16          Q.    And you're a member of the marketing team?
17          A.    Correct.
18          Q.    And who is Lisa Cardetti?
19          A.    Lisa Cardetti at this time was a national
20   account manager, I believe -- regional account
21   manager -- for the generics business.  Part of the
22   national accounts team.
23          Q.    And in the second paragraph -- I guess
24   it's the third paragraph -- excuse me -- of this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   e-mail -- there's a reference to a cage/vault agreement
 2   effective October 2012.  Do you see that?
 3        A.    Yes.
 4        Q.    Can you describe to the court what types
 5   of cage/vault agreements Mallinckrodt had with other
 6   entities?
 7              MR. TSAI:  Objection as to scope.  Topic
 8   37G covers vault agreements, and that is another topic
 9   that the parties have specifically agreed will be
10   responded to in writing rather than testimony.  But go
11   ahead.
12        A.    From time to time, customers -- pharmacy
13   chains -- in this case a food store chain with pharmacy
14   operations -- from time to time those customers have
15   explored the ability to purchase controlled substances
16   directly from the manufacturer as opposed to through a
17   wholesaler.
18              In order to do so, they would need to
19   invest in cage and vault structures in their
20   distribution centers, and because the cost to
21   distribute products from Mallinckrodt directly to a
22   retail chain's distribution center was lower than
23   distributing through wholesalers, it was financially
24   desirable for us to take on those types of selling
```

Highly Confidential - Subject to Further Confidentiality Review

1    arrangements, and on occasion we did provide a type of

2    financial incentive or allowance which would help the

3    customer offset the cost of making this investment in

4    order to be able to purchase product directly to their

5    warehouse.

6         Q.    And so the cage and vault structure is an

7    actual physical structure that we're referring to?

8         A.    Yes, that's correct.

9         Q.    And why was it important for Mallinckrodt

10   to incentivize a direct customer or subsidize the

11   purchase of a cage and vault?

12             MR. TSAI:   Objection as to form and scope.

13   Go ahead.

14        A.    When pharmacy chains purchase product

15   through a wholesaler, off of a wholesaler generic

16   source program, the wholesaler negotiates price and

17   rebates with the manufacturer such as Mallinckrodt and

18   then sets a price for that pharmacy chain.

19             When they negotiate these programs, the

20   combined rebate structure that Mallinckrodt provides

21   provides a very low net purchasing price to the

22   wholesaler, but they're able to then mark up the

23   product as far as the market will bear when selling to

24   the pharmacy chain.  If we sell directly to the

1    pharmacy chain's warehouse, we are able to sell at a

2    higher net price than what we can sell through a

3    wholesaler generic source program, so it's a more

4    profitable contract for us.

5        Q.    (By Mr. Ko)  Do you have any understanding

6    of the amount of agreements that Mallinckrodt had

7    with -- for which Mallinckrodt would sell directly to

8    the pharmacy chain warehouse?

9        A.    I don't know the specific numbers or

10   proportion of our contracts which were direct selling

11   contracts to pharmacy chains.  I do know that that

12   proportion was greater in the past than it is today.

13       Q.    And when we talk about proportion, can you

14   give the court a general understanding of the

15   approximate percentage relative to all of the

16   agreements Mallinckrodt had?

17       A.    Relative to the number of agreements we

18   had, at its peak -- excuse me -- direct selling

19   contracts were probably 10 to 20 percent of our total

20   contracts and maybe as much as 30 or 40 percent of the

21   product volume that we sold.

22       Q.    And the product volume including branded

23   and generics, or are we just talking generics right

24   now?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    This is all specifically dealing with

 2    generics.

 3          Q.    And did you have a cage and vault

 4    provision in any of your agreements with pharmacy

 5    chains directly with respect to branded products that

 6    Mallinckrodt manufactured?

 7                MR. TSAI:  Objection to scope.

 8          A.    I am not aware of any branded cage

 9    programs or vault programs.

10          Q.    (By Mr. Ko)  And with respect to the

11    physi -- the actual physical cage and vault structure,

12    was one of the reasons that Mallinckrodt -- strike

13    that.  Was one of the reasons that a pharmacy chain

14    warehouse wanted a cage and vault structure to -- was

15    to prevent abuse and diversion of the opioid products

16    that Mallinckrodt manufactured?

17                MR. TSAI:  Objection to form and scope.

18          A.    The pharmacy chains needed a cage and

19    vault in their distribution centers because of DEA

20    licensing requirements relative to the storage and

21    distribution of controlled substances.  Those cages and

22    vaults are dictated by DEA and there are requirements

23    for what type of security has to be in place in order

24    to directly receive and distribute controlled substance
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    products.

 2          Q.    (By Mr. Ko)  And in the context of this

 3    e-mail, you had referred to Price Chopper being a

 4    grocery outlet with a pharmacy located at the

 5    groceries; is that correct?

 6          A.    Yes, that's correct.

 7          Q.    And by the way, where were Price Chopper

 8    stores located in the United States?

 9          A.    I am not familiar with all of the

10    locations of Price Chopper stores.  I do know that they

11    had stores located in Missouri and other midwestern

12    states, but I don't know all of the states

13    specifically.

14          Q.    You can set that aside.  I'm now going to

15    hand you a copy of what will be marked as KV Exhibit

16    10.

17                [Exhibit Mallinckrodt-Vorderstrasse-010

18                marked for identification.]

19          Q.    KV Exhibit 10 is an e-mail chain with

20    Bates-stamp MNK-T1_0001958991.  And this represents an

21    e-mail chain between Randy Meisner -- or from Randy

22    Meisner and several other people, including once again

23    yourself.  And it's dated November 8th, 2012.  We had

24    talked about Randy before, but in terms of the other
```

Highly Confidential - Subject to Further Confidentiality Review

1    people that are involved in this e-mail, including

2    yourself, how frequently did you meet to discuss

3    financial forecasts of the generic line of business?

4         A.    The frequency with which we would have met

5    to discuss financial forecasts would have varied, but

6    at a minimum once a month we would have discussed

7    financial forecast.

8         Q.    And generally speaking, the people

9    involved in this e-mail -- what departments did they

10   represent?  Are these all people within the generic

11   line of business at Mallinckrodt, or are there people

12   on here from other segments of Mallinckrodt's business?

13        A.    No, all of these people are -- were

14   involved in the generic business unit at that time.

15        Q.    And you said that you would meet at least

16   once a month.  Were there circumstances in which you

17   would meet more frequently than that?

18        A.    We may have met on several occasions,

19   several separate meetings, to discuss the financial

20   forecast as part of the normal monthly update cycle for

21   financial forecasts.  So in other words, it may have

22   taken us more than one meeting to work through

23   everything that we needed to discuss.

24        Q.    And what role did you play in the creation

```
 1   and/or input of any of these financial forecasts?

 2         A.    So at this time I was a product manager,

 3   and I would provide unit volume sales forecasts and

 4   price forecasts for the products for which I was

 5   responsible for so that those could be rolled up in the

 6   forecasting process.

 7         Q.    And who were these results generally

 8   shared with?

 9         A.    The results of the forecasts were shared

10   with the operations and planning teams to drive

11   production scheduling.  They were also shared with

12   business management to review the state of the

13   business, and on a quarterly basis forecasting results

14   were shared with senior management at the level above

15   the general manager of the business.

16         Q.    You can set that aside.  I want to switch

17   gears to a different topic.  Is it correct to say that

18   Mallinckrodt employed sales reps to market and sell its

19   prescription opioids?

20         A.    Mallinckrodt employed sales

21   representatives to market and sell our prescription

22   branded opioids.  We employ national account managers

23   to contract for the sale of our generic prescription

24   opioids to wholesalers and pharmacy chains.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Did you ever employ national account

 2   managers to contract for the sale of branded

 3   prescription opioids?

 4        A.    We had a national account trade team which

 5   negotiated the wholesaler fee-for-service agreements

 6   for distribution of the branded products through

 7   wholesalers.

 8        Q.    And approximately how many sales reps did

 9   Mallinckrodt employ to market and sell Mallinckrodt

10   prescription branded opioids?

11        A.    Over time, the number ranged from 50 to

12   about 200 sales reps for branded opioids.  They were --

13   there were always multiple products to -- for those

14   sales representatives to market.  Those weren't always

15   all opioid products.

16        Q.    With respect to the national account

17   managers that Mallinckrodt contracted for the sale of

18   the generic prescription opioids, approximately how

19   many did Mallinckrodt employ or utilize over the

20   relevant time period?

21        A.    Over the relevant time period, the size of

22   the team has changed.  At the -- at its largest, I

23   believe the national accounts team was about seven or

24   eight people for the generic products, and at its
```

1    smallest the team has been four.

2        Q.    So in other words, there were seven or

3    eight people at its peak that were primarily

4    responsible for marketing Mallinckrodt's generic

5    opioids?

6        A.    Seven or eight people who were primarily

7    responsible for direct contact with wholesaler and

8    pharmacy chain customers and negotiating agreements

9    with those customers.

10       Q.    So -- and thank you for that answer.  So

11   then is it fair to say when we're talking about

12   generics the primary way in which Mallinckrodt was able

13   to gain the market share that we were discussing before

14   was through its negotiations and communications with

15   distributors and pharmacies?

16       A.    So in general terms, generic products,

17   whether opioid or non-opioid, are sold primarily based

18   upon price and also based upon quality and service, so

19   ability to supply, ability to supply consistently with

20   high-quality product is essential for generic

21   companies, but as near commodity products, ultimately

22   the price is often a deciding -- a key deciding factor

23   for wholesalers and pharmacy chains.

24       Q.    And so with respect to the price,

1    isolating that separate and apart from quality and

2    service, was there any type of marketing done to --

3    directly to the pharmacies or distributors with respect

4    to Mallinckrodt products, or was it simply a price that

5    Mallinckrodt set and you had distributors essentially

6    take it or leave it?

7         A.    The prices for our products were always

8    negotiated between Mallinckrodt and the distributor or

9    wholesaler or the pharmacy chain.

10        Q.    And as you alluded to earlier, the primary

11   responsibility for the negotiation of these prices

12   rested with the national account managers; is that

13   correct?

14        A.    National account managers were primarily

15   responsible for the negotiation effort.  The product

16   management team was responsible for reviewing and

17   approving any prices that were offered and processing

18   that price through our contracting systems.

19        Q.    And how did Mallinckrodt divide up these

20   negotiations with distributors and wholesalers?  In

21   other words, let me ask it a different way.  Was there

22   any distinction done by region with respect to the

23   negotiations Mallinckrodt had with respect to prices

24   vis-à-vis the distributors and the pharmacies?

1        A.     Our negotiations for price and our

2    contracts for price with either wholesalers or with

3    pharmacy chains were considered to be company-wide, so

4    that those prices were available to the entire

5    wholesaler's business or the entire pharmacy chain's

6    business, not -- we never had anything that was

7    designated as specific to any given region.

8        Q.     Got it.  So just to make clear, there was

9    no adjustments made with respect to price based on a

10   particular region of where the distributor or the

11   pharmacy was located?

12       A.     The geographical region of the location of

13   the distributor or pharmacy chain was not used in

14   setting price.

15       Q.     So the price that would apply, for

16   example, in California, would apply with equal force to

17   a price that would be set in Ohio, for example?

18       A.     To the extent that a customer sold in both

19   of those states, yes, absolutely.

20       Q.     And can you -- turning -- or focusing

21   again on the national account managers, can you

22   describe to the court the general structure of that

23   team?  So we had national account managers at the top.

24   Who were the types of people and/or categories of

Highly Confidential - Subject to Further Confidentiality Review

1    people that were below them?

2         A.    So the general structure of our national

3    accounts team, we always had a leader of that team,

4    often -- usually a vice-president.  Below that were

5    either national account managers or national account

6    directors, and occasionally we had more junior

7    employees who were hired into that team as what we

8    termed regional account managers.

9              By regional account manager, that was not

10   to signify that they had a particular region of the

11   country, but that the customers that they dealt with

12   tended to be smaller customers and typically weren't

13   nationwide customers but typically were regional-type

14   customers.

15        Q.    And can you give the court a general

16   understanding of the approximate size of this group of

17   national account team members?

18        A.    So again, for the generics business, this

19   was a team that at minimum had three national account

20   directors and at most had seven or eight manager- and

21   director-level people.

22        Q.    And then in terms of the -- just once

23   again trying to get an understanding of the overall

24   structure of this team.  You said that there were also

1    some junior people that were brought in.  How many more

2    people are we talking?

3            A.    That would encompass the junior people --

4    that seven or eight number.

5            Q.    Thank you.  Going back to your testimony

6    earlier about the important drivers of these

7    discussions with distributors and pharmacies being

8    price, quality, and service, with respect to the latter

9    two categories, quality and service, what types of

10   marketing, if any, did Mallinckrodt do for those two

11   factors?

12           A.    Relative to our generic products over time

13   we occasionally created either physical marketing

14   materials which could be handed out at trade shows or

15   typically very similar materials which were published

16   in trade periodicals which talked very briefly about

17   the structure of Mallinckrodt, our history in the

18   marketplace, how we handle planning supply and

19   communicating with customers -- things of that nature.

20           Q.    So when we're talking quality and service,

21   we're talking quality and service of the Mallinckrodt

22   business from, I guess for lack of a better term, an

23   administrative perspective, and not necessarily the

24   quality and service of the underlying drugs in which

1    you were manufacturing?  Is that fair to say?

2         A.    Well, we communicated about our business

3    relative to how we ran the business, how we managed the

4    business, to help customers understand that the

5    products that they purchased from us would meet the

6    quality standards and would be supplied at the time

7    frame that they needed that product.  So if a

8    wholesaler placed an order with us, we wanted them to

9    be confident that they were going to get that order

10   when they wanted it.

11        Q.    Did Mallinckrodt do any marketing with

12   respect to the risks of its generic marketing or

13   generic opioid products?

14        A.    For any product-specific marketing

15   materials that we put together for our generic

16   products, opioid or not, any warning information, risk

17   information that was included in the FDA-approved

18   labeling materials was included in the marketing

19   materials, and those materials were always reviewed to

20   ensure that they were current.

21        Q.    And outside of the FDA-approved labeling

22   materials, was there any other additional marketing

23   materials that Mallinckrodt provided with respect to

24   its generic products?

1      A.    Mallinckrodt never provided

2   product-specific marketing materials for our generic

3   products which contained any information other than

4   what was approved relative to the product or what was

5   specific to our company.

6      Q.    Turning back to the sales reps that

7   Mallinckrodt utilized for purposes of its brand

8   products, approximately how many sales reps did

9   Mallinckrodt employ over the relevant time period with

10  respect to its branded opioids?

11     A.    So relevant to branded opioids, at the

12  smallest that sales team was approximately 50 reps and

13  at its largest was about 200.

14     Q.    And earlier we talked about Exalgo.

15  Approximately how many reps did Mallinckrodt utilize

16  with respect to marketing Exalgo from the 2009 through

17  2014 -- or was it 2015 that it discontinued?

18     A.    I believe 2014 was when we discontinued

19  marketing efforts.

20     Q.    So let me start so the record is clear.

21  So from the 2009 to 2015 time period how reps -- sales

22  reps did Mallinckrodt utilize to market Exalgo?

23          MR. TSAI:  I'm going to object to the

24  form.

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.    During that period, at peak, fifty --
2   about 200 sales reps were assigned to market Exalgo.
3         Q.    (By Mr. Ko)  And same question with
4   respect to Xartemis.  The -- how many sales reps did
5   Mallinckrodt utilize to market Xartemis?
6         A.    I don't know the exact number, and we only
7   sold that product for a short period of time, but I
8   believe we had no more than 50 sales reps on Xartemis
9   at any given time.
10        Q.    "Xar-temis."  I promise I'll say it
11  correctly.
12        A.    It took us a long time too.
13        Q.    And did Mallinckrodt distinguish by
14  territory or by region in the country -- strike that.
15  Were the sales reps divided by region or territory at
16  all?
17        A.    The sales reps on the branded products
18  were assigned territories throughout the country that
19  were generally confined to one geographic area.
20        Q.    And were there differentiations between
21  Exalgo and Xartemis, or was it the -- were the
22  territories generally the same for both products?
23        A.    The territories -- well, the period of
24  marketing for those two products did not overlap, and
```

Highly Confidential - Subject to Further Confidentiality Review

1    the sales territories were changed and reevaluated on

2    an annual basis, and I can't say for certain that there

3    weren't any territories that were identical from one

4    product to the next.

5        Q.    And who was responsible for reevaluating

6    the territories on an annual basis?

7        A.    We had a marketing analytics team on the

8    branded business that was specific to the branded

9    business which was responsible for coming up with sales

10   territories and selling targets which were then

11   approved by the sales and marketing management teams.

12       Q.    Now, in terms of the training of the sales

13   reps assigned to market branded products, can you

14   describe to the court what the general training

15   protocol was?

16       A.    So the general training protocol for the

17   branded sales reps involved product-specific training

18   so that they understood the features of the product,

19   they understood the FDA-approved labeling, the

20   indications, the risks, and the warnings, and then they

21   were also trained specifically on marketing materials

22   and other sales aids which were created for them, and

23   finally they were trained in general on many of the

24   same corporate-wide training initiatives that we have

1    relative to code of conduct, business ethics, as well

2    as industry guidelines on health care practitioner

3    interactions.

4         Q.    And who was responsible for training the

5    sales reps with respect to the risks and the warnings

6    of the branded opioid products Mallinckrodt

7    manufactured?

8         A.    Over time that changed, but we generally

9    had a training department who was responsible for that.

10        Q.    And who was -- describe to the court who

11   these individuals were at the training department.

12        A.    These were individuals who had subject

13   matter expertise in how to conduct training of sales

14   teams, and they coordinated that sales effort -- or

15   that training effort of the sales team -- sorry -- and

16   handled the documentation of the training.

17        Q.    And so were these individuals Mallinckrodt

18   employees, or were they third parties or consultants

19   that Mallinckrodt utilized to train?

20        A.    From time to time it could have been both.

21   In general we had Mallinckrodt employees who were

22   responsible for the training effort, but they may have

23   hired outside experts for certain topics.

24        Q.    And so going back specifically to the

Highly Confidential - Subject to Further Confidentiality Review

1    risks and warnings that were associated with some of

2    the Mallinckrodt branded opioid products, who was

3    specifically responsible for training sales reps with

4    respect to the risks and warnings?

5              MR. TSAI:  I'll just object as to scope.

6    I think this is getting a bit outside the sales

7    compensation topic.  But go ahead.

8         A.   So I have not prepared to be able to

9    answer specifics about who was responsible for what

10   aspect of training.

11        Q.   (By Mr. Ko)  And how -- earlier you were

12   describing the general training protocol.  Can you give

13   the court an understanding of how long it took for

14   Mallinckrodt to train sales reps?

15             MR. TSAI:  Same objection as to scope.

16        A.   Yeah, I do not have direct knowledge of

17   the length of time the training program took and not --

18   I have not prepared on the specifics.

19        Q.   (By Mr. Ko)  Who -- which department at

20   Mallinckrodt or what individuals would have the most

21   knowledge about the training that Mallinckrodt did of

22   its sales reps?

23             MR. TSAI:  Objection as to scope.

24        A.   The trained department we had in place at

Highly Confidential - Subject to Further Confidentiality Review

1    that time has been dissolved, and most of the people

2    who were involved with the branded business are no

3    longer with the company, so I'm not sure who to point

4    you to to be able to address that.

5         Q.    (By Mr. Ko)  And when was it dissolved?

6    You said the training program was dissolved.  Was it

7    the same time period that Xartemis and Exalgo came off

8    the market?

9         A.    When we ceased marketing Xartemis in or

10   around 2015, we dissolved the branded opioid sales team

11   and many of the related functions.

12             MR. TSAI:  We've been going about an hour

13   since the lunch break.  Could we take a quick break?

14             MR. KO:  Sure.

15             MR. TSAI:  Thanks.

16             MR. KO:  I actually need to take a break

17   myself.

18             THE VIDEOGRAPHER:  We are going off the

19   record at 1:41 PM.

20             [A brief recess was taken.]

21             THE VIDEOGRAPHER:  We are back on the

22   record at 1:50 PM.

23             MR. TSAI:  So I think we've been going

24   about three-and-a-half hours on the record.  Of course,

1    under the governing protocol for 30(b)6 depositions,

2    the time limit in aggregate for a 30(b)6 deposition

3    with more than one designee, as in this case -- we have

4    three -- is 14 hours on the record.  This is not a

5    personal percipient witness deposition, so there's no

6    production of an individual custodial file.  The topics

7    for which Mr. Vorderstrasse is designated are not

8    specific to any state in particular, with respect to

9    Tennessee, and Tennessee state counsel has not provided

10   any specific 30(b)6 or company witness topics after

11   receiving the cost notice.

12          So our position is that the deposition

13   protocol, Section 2A, which provides that examining

14   counsel shall confer prior to the deposition concerning

15   allocation of time to question a deponent, and that

16   counsel's failure to allocate time among themselves or

17   to enforce that allocation of time among themselves

18   during a deposition shall not constitute grounds to

19   extend a deposition.  All that, given the 14-hour

20   limit, we believe that applies in this case, and just

21   wanted to state our position for the record.

22          MR. KO:  And Tricia, I know you'll

23   probably respond and say something for the record, but

24   other than Section 2A of the deposition protocol,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Rocky, is there any other provision that you can point

 2    to that justifies your position or is that based solely

 3    on your interpretation of 2A?

 4              MR. TSAI:  Yeah, I don't think we have an

 5    agreement specifically with respect to Tennessee

 6    counsel as we did with the percipient depositions that

 7    have occurred before that would apply to this --

 8    today's 30(b)6 deposition.

 9              MR. KO:  Okay.  Well, our position is

10    that -- at least the plaintiffs in the MDL firmly

11    believe that any time given to a state court party

12    should not be accounted for in the 14-hour limit that

13    is provided for in this situation, and in addition I'll

14    note for the record that there is nothing in the

15    provisions of deposition protocol, Section 4, that talk

16    about dividing up the time in that manner.  I'll also

17    note that -- I believe in this case Mallinckrodt

18    cross-noticed this 30(b)6 deposition; is that correct?

19              MR. TSAI:  We did provide a cross-notice

20    in the Tennessee state cases and providing the topics

21    listed in the deposition notice, again, none of which

22    we believe are Tennessee-specific.

23              MR. KO:  Okay.  And it's my understanding

24    that the plaintiffs in the Tennessee case did not
```

```
 1    cross-notice this deposition.

 2               MS. HERZFELD:  We did not, no.  We intend

 3    to take our own 30(b)6 in our state case at a time

 4    that's relevant for us.

 5               MR. KO:  Okay.

 6               MS. HERZFELD:  We're here because we were

 7    cross-noticed by Mallinckrodt.

 8               MR. KO:  Okay.

 9               MS. HERZFELD:  And I intend to take my

10    time today.  I will also just make a point of letting

11    counsel know that we have exchanged a significant

12    number of e-mails back and forth letting counsel know

13    that we intended to participate today, that we intended

14    to take our two hours if necessary that would be in

15    addition to the time allocated to the MDL and not to be

16    shared to the MDL of your total 14 hours.

17               We weren't even aware of a total 14 hour,

18    because we're not involved in the MDL.  You all

19    cross-noticed us.  I am here.  It is now after lunch at

20    2:00 PM and this is the first time somebody has brought

21    up such an allocation issue, so we will certainly be

22    reserving our rights, and I intend to question the

23    witness today.

24               MR. KO:  All right.  And I would just add
```

1   that this is also the first time, at 2:00 PM on the day

2   of the deposition, that we were notified by

3   Mallinckrodt and opposing counsel that they are taking

4   the position that somehow a state case would impact or

5   have an effect on the 14-hour time limit clearly

6   provided to the plaintiffs in the MDL, so we highly

7   disagree with the fact that any time should be taken

8   away from the 14-hour limit provided by the court.

9   Ready to move on?

10          MR. TSAI:  Yes.

11          Q.    (By Mr. Ko)  Kevin, I'm going to -- well,

12  the court reporter's going to hand you a copy of what's

13  going to be marked as KV Exhibit 11.

14          [Exhibit Mallinckrodt-Vorderstrasse-011

15          marked for identification.]

16          Q.    Kevin, this is a copy of KV Exhibit 11,

17  Bates MNK-T1_0000090085, and this appears to be a sales

18  incentive compensation plan for sales reps at Covidien

19  for the fiscal year 2013.  Is that a fair

20  characterization of this document?

21          A.    I would clarify in that this applies to

22  branded sales representatives.

23          Q.    Sure.  So with respect to the branded

24  sales representatives, which is here delineated as

1   Specialty Pharmaceuticals, this is the sales incentive

2   compensation plan that governs their marketing of

3   branded -- Mallinckrodt branded opioids; is that

4   correct?

5        A.    This governs the sales incentive

6   compensation for those sales representatives for the

7   branded opioids.

8        Q.    By the way, do you recognize this document

9   at all?

10       A.    Yes, I do.

11       Q.    Have you seen it before?

12       A.    Yes.

13       Q.    And obviously this is with respect to

14  2013.  Did Covidien and/or Mallinckrodt have similar

15  plans for other years in which it sold and manufactured

16  branded pharmaceutical opioids?

17       A.    Yes, that is my understanding.  The sales

18  incentive plans were generally similar from year to

19  year.

20       Q.    And we discussed before the notion that

21  the branded sales reps would market not just opioids

22  but other branded products as well.  Do you remember

23  that?

24       A.    Right, our branded sales representatives

Highly Confidential - Subject to Further Confidentiality Review

```
1    were charged with marketing a number of products; some

2    of them were non-opioid.

3         Q.    And in this context, if you look at Page

4    5, some of those non-opioid products are mentioned; is

5    that correct?

6         A.    Yes, that is correct.

7         Q.    And what are those products?

8         A.    In this document it looks like Pennsaid

9    and Duexis and Sumavel.

10         Q.    And then there's also a reference to a

11    NSAID bucket.  Do you see that?

12         A.    Correct.

13         Q.    And then those are painkillers but not

14    opioids; is that correct?

15         A.    NSAIDs are non-opioid pain drugs of which

16    Pennsaid and Duexis were NSAIDs.

17         Q.    And was Sumavel an NSAID as well?

18         A.    I do not recall if it was or not.

19         Q.    By the way, who was responsible for

20    creating this plan?

21         A.    This plan was to my knowledge created by

22    the commercial analytics team for the branded business

23    with help from sales leadership.

24         Q.    And if you look at Page 8 and 9 of this
```

Highly Confidential - Subject to Further Confidentiality Review

1    plan --

2           A.    Uh-huh.

3           Q.     -- there's basically a weighting going on

4    to determine the compensation of a sales rep.  Do you

5    see that?

6           A.    Yes.

7           Q.    Is it fair to say that the primary weight

8    is given to Exalgo or the lone prescription opioid in

9    this bundle of Mallinckrodt products?

10          A.    It appears that for the four weightings

11   distributed or presented, Exalgo has the highest

12   percentage in all four.

13          Q.    And that percentage ranges anywhere from

14   between -- for the record, between 50 and 60 percent?

15          A.    Yes, that's correct.

16          Q.    And sorry to jump around --

17          A.    Uh-huh.

18          Q.     -- but to go back to Page 3 of this

19   document titled key facts.  There's references to TRxs.

20   Can you describe to the court and clarify what that

21   stands for?

22          A.    Yes.  So TRxs is a pharmaceutical industry

23   term likely coined by IMS which is an abbreviation for

24   total prescriptions.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And with respect to total prescriptions,

 2   it's clear that at least one primary metric that

 3   determined a sales representative's compensation was

 4   the amount of total prescriptions of Exalgo it had

 5   managed to convince a physician to prescribe.  Is that

 6   correct?

 7        A.    So the sales compensation plan and the

 8   sales representatives were compensated for the

 9   incentive portion of their compensation based upon the

10   number of prescriptions which were written by their

11   targeted physicians for the products that were included

12   in their targeting plan.

13        Q.    And the way in which Mallinckrodt was able

14   to track this information was through its purchase of

15   IMS data; is that correct?

16        A.    IMS data allowed us the visibility into

17   prescription patterns for our products.

18        Q.    And specifically it allowed Mallinckrodt

19   to understand the level of detail at the

20   physician-patient -- strike that.  The IMS data allowed

21   Mallinckrodt to understand at the physician-patient

22   level the amount or prescriptions that the prescription

23   was issuing of Mallinckrodt products?  Is that a fair

24   statement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    No, that's not correct.  The IMS data

 2   allowed us to see the number of prescriptions which

 3   were dispensed which had been written by a given

 4   physician.  We had no visibility into who the patients

 5   were, who received those prescriptions.

 6        Q.    Fair enough, and I certainly wasn't

 7   meaning to suggest that, so thank you for that

 8   clarification.  Other than the IMS data and as it

 9   pertains to the compensation structure of the sales

10   representatives, did Mallinckrodt otherwise track the

11   total amount of prescriptions of Exalgo that these

12   sales reps were able to have the physicians prescribe?

13             MR. TSAI:  Object to the form of the

14   question.

15        A.    Mallinckrodt tracked the total number of

16   prescriptions dispensed for Exalgo, as well as tracking

17   those prescriptions based upon which prescribers wrote

18   those prescriptions.

19        Q.    (By Mr. Ko)  And when you say Mallinckrodt

20   tracked the total number of prescriptions dispensed for

21   Exalgo, how did they do that?

22        A.    Mallinckrodt analyzed IMS data, Xponent

23   data, which provided us the identity of physicians or

24   other prescribers who were prescribing the products and
```

1    associated those prescriptions with those prescribers.

2         Q.    Other than the IMS and Xponent data, were

3    there any other sources of information Mallinckrodt

4    utilized in order to track the total number of

5    prescriptions dispensed of Exalgo?

6         A.    I'm not aware of any other data sources we

7    would have used.

8         Q.    And with respect to tracking the

9    prescriptions based upon which prescribers wrote Exalgo

10   prescriptions, did Mallinckrodt also similarly utilize

11   IMS and Xponent data to gather that information?

12        A.    IMS data was used by Mallinckrodt to

13   determine the number of prescriptions for any given

14   product written by individual physicians in the sales

15   territories.

16        Q.    And the total number of prescriptions

17   dispensed for Exalgo was a primary factor or a primary

18   basis for which sales reps were compensated; is that

19   correct?

20        A.    Sales representatives received incentive

21   compensation for achieving or exceeding the

22   prescription targets which were developed for the

23   physicians in their territory.  That incentive

24   compensation was generally a small portion of their

1    total compensation.  10 to 25 percent approximately of

2    a sales representative's total compensation could come

3    from the incentive plan.

4         Q.    And the remaining 75 to 90 percent -- what

5    did that consist of?

6         A.    That was a base salary.

7         Q.    And so other than the base salary, then

8    the 10 to 25 percent we're talking about a bonus- or

9    commission-type structure; is that correct?

10        A.    The -- it was a bonus structure based on

11   achieving certain defined targets.  Our sales

12   representatives were never commissioned on a

13   per-activity or per-script basis.

14        Q.    So in terms of the 10 to 25 percent that

15   represented the bonus of a sales rep's compensation,

16   was any of that 10 to 25 percent based on anything

17   other than the total amount of prescriptions of Exalgo?

18        A.    Yes, the bonus was also partially derived

19   from achieving prescribing results for the other

20   products that they were designated to represent,

21   Pennsaid, Duexis, and Sumavel in this plan.

22        Q.    But as we discussed before, Exalgo made up

23   the primary portion of that calculus, for lack of a

24   better term; correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Exalgo made up the largest percentage of
 2   the weighting of any given sales representative's
 3   territory, but the individual payout was based upon the
 4   attainment for all four products.  To the extent that
 5   Exalgo may not have been as successful in a given
 6   territory, Exalgo may not have driven the incentive
 7   comp for that sales rep.
 8        Q.    And earlier when you described targeting
 9   of physicians -- who determined which physicians to
10   target?
11        A.    Again, our commercial analytics team who
12   reviewed the Xponent data.  They developed the
13   territories and the targets, sometimes with the
14   assistance of outside consulting firms and always with
15   the input of sales management.
16        Q.    And with respect to the marketing of
17   Exalgo in particular, were there any other groups other
18   than the commercial analytics team that determined
19   which doctors to target?
20        A.    On occasion we used outside consulting
21   firms to assist in that process.
22        Q.    And who was in charge of the commercial
23   analytics team at the time that Exalgo was marketed?
24        A.    I am not 100 percent sure who was in
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    charge at that time, and I believe it changed during

 2    that period.

 3         Q.    Turning to -- oh, it changed in what

 4    sense?  That the individual --

 5         A.    The individual changed.

 6         Q.    I see.

 7         A.    Management changed.

 8         Q.    I'm turning to Page 6 of this plan.

 9    There's a reference to Special Achievement Award.  Do

10    you see that?

11         A.    Yes.

12         Q.    And do you have any understanding of who

13    is responsible for making that determination of who

14    received the Special Achievement Award?

15         A.    It's my understanding that that award was

16    given out based upon the collective opinion of sales

17    management.

18         Q.    And it was given to a sales rep based on

19    their performance, including total prescriptions sold

20    of Exalgo; correct?

21         A.    Well, as this specifies, this is in

22    recognition for behavioral excellence and for

23    demonstrating the behaviors that we were seeking in our

24    sales representatives as good representatives of the
```

1    company.  The amount of weight or the amount that

2    prescription performance factored into these is not

3    clear from this document, and I would conclude it

4    was -- had very little impact on these awards.

5         Q.    Was there any monetary amount in

6    connection with this Special Achievement Award provided

7    to the sales rep?

8         A.    As outlined here, the sales

9    representatives could receive no more than $2,500 for a

10   single award, and it appears that they were designed to

11   most often be $1,500 awards.

12        Q.    I'm going to now hand you a copy of what's

13   going to be marked as KV Exhibit 12.

14             [Exhibit Mallinckrodt-Vorderstrasse-012

15             marked for identification.]

16        Q.    The court reporter has handed you Exhibit

17   12, which is a cover e-mail containing three

18   attachments.  And for the record, the e-mail is located

19   at MNK-T1_0000538136.  There's a cover e-mail from

20   Terese Lafeber to Stacy Chick, CCing some others, and

21   there are some sales compensation plans attached to

22   this.  Do you see that, Kevin?

23        A.    Yes, I do.

24        Q.    And in particular, it appears that there

Highly Confidential - Subject to Further Confidentiality Review

 1    are three sales compen -- sales incentive compensation

 2    plans attached to this e-mail.  Do you recognize these

 3    documents at all?

 4         A.    I recognize them in general.  I don't

 5    believe I've reviewed these specific documents.

 6         Q.    Is it fair to say that these -- well,

 7    let's start with the first one.  The first one appears

 8    to be a sales incentive compensation plan for a

 9    regional sales director of the brand department at

10    Mallinckrodt; is that correct?

11         A.    Yes, I have that one.

12         Q.    And that's for the time period October

13    2014 through December 2014?

14         A.    That's correct.

15         Q.    And this particular plan is only for a

16    time period of three months, whereas the plan we looked

17    at before was a time period of a year.  Did

18    Mallinckrodt have plans that were -- it looks like

19    Mallinckrodt had plans that were less than one year

20    with respect to its sales incentive package; is that

21    correct?

22         A.    Based upon this document, that appears

23    correct.

24         Q.    And do you know -- do you have any

```
 1    understanding of how frequently over the course of a

 2    year it changed its sales incentive plans?  Was it

 3    quarter -- was it no more than quarterly, or was it

 4    more frequent than that?

 5         A.    In general, sales incentive plans were

 6    annual plans.  I am not aware of any changes more

 7    frequently than a quarterly update.

 8         Q.    And the three documents together are sales

 9    incentive plans with respect to regional sales

10    directors.  All three of them relate to regional sales

11    directors; is that correct?

12         A.    It appears one is regional sales director,

13    one's district sales manager, and one's field sales

14    specialist.

15         Q.    That's what I thought.  I'm actually

16    looking at a different version, so thank you for that

17    clarification.  And these are again all compensation

18    plans with respect to the branded portion amount of

19    Mallinckrodt's business; correct?

20         A.    Correct.

21         Q.    And is there a -- one moment here.

22               [Discussion off the record.]

23         Q.    And going to field sales specialists, is

24    that another term that Mallinckrodt used for a sales
```

Highly Confidential - Subject to Further Confidentiality Review

1    representative, or is there something different with

2    respect to a field sales specialist relative to a sales

3    rep?

4         A.    It's my understanding that those terms are

5    interchangable and that we changed to the field sales

6    specialist terminology most recently.

7         Q.    And I believe there is some mention of

8    Xartemis in these documents.  Is that correct?

9         A.    Yes.

10        Q.    So earlier we had talked about the sales

11   incentive plan with respect to Exalgo among other drugs

12   that Mallinckrodt manufactured.  This appears to be a

13   sales incentive plan with respect to Xartemis, among

14   other drugs; is that correct?

15        A.    This sales incentive plan covers Xartemis

16   and Pennsaid.

17        Q.    Also mentioned Ofirmev, I believe, in one

18   of those documents.  Actually, you can skip that.

19   That's not important.  Let's turn to -- or strike that.

20   Before we had talked about how Mallinckrodt through its

21   commercial analytics team had divided up the country by

22   territory --

23        A.    Uh-huh.

24        Q.    -- with respect to Exalgo.  I just want

Highly Confidential - Subject to Further Confidentiality Review

 1    to make sure that the answer applies with equal force

 2    with respect to Xartemis.  Was -- the same distinctions

 3    done by the commercial analytics team with occasional

 4    input from third parties apply with respect to Xartemis

 5    as well?

 6         A.   My understanding is that sales territories

 7    were generally developed in a similar manner for

 8    Xartemis as they were for any of the other branded

 9    products, so that field sales specialists in this case

10    had a designated territory generally in the same

11    geographic area that included a certain number of

12    specific physician targets.

13         Q.   You can set that aside.  I'm going to hand

14    you a copy of what's going to be marked as KV Exhibit

15    14.

16              THE REPORTER:  Oh, it's 13, actually.

17              MR. KO:  Oh, 13.  Okay.

18              [Exhibit Mallinckrodt-Vorderstrasse-013

19              marked for identification.]

20         Q.   (By Mr. Ko)  And for the record this

21    exhibit is MNK-T1_0000259116, and it is titled

22    specialty generic sales incentive plan document for

23    fiscal year 2009.  Do you recognize this document at

24    all?

 1          A.     I have not seen this particular document,

 2     but I do generally recognize what it is.

 3          Q.     And earlier we had gone over some

 4     specialty incentive plans for the branded drugs that

 5     Mallinckrodt manufactures.  Is it fair to say that this

 6     is a sales incentive plan with respect to the generic

 7     drugs that Mallinckrodt manufactures?

 8          A.     That appears to be correct.

 9          Q.     And earlier we had discussed the type of

10     marketing that was done by the generics department, and

11     if you look on page -- if you look on the second page

12     of this document, in purpose, it appears that the

13     purpose of this plan is to provide an incentive

14     opportunity to the specialty generic sales personnel,

15     as defined herein.  Do you see that?

16          A.     Yes, I do.

17          Q.     And would these speciality generic sales

18     personnel be the national account managers that we were

19     discussing earlier today?

20          A.     I would have to review the document to

21     understand exactly which personnel this applied to.

22          Q.     Well, and the reason I ask is actually --

23     I was looking at it before.  The definitions don't

24     actually define specialty generics sales personnel.

```
 1          A.     Okay.

 2          Q.     So I guess I can ask you generally,

 3   separate from this document, was there a sales

 4   incentive plan document that governed the compensation

 5   structure of the national account managers for the

 6   generic line of business at Mallinckrodt?

 7          A.     So it appears that that is farther back in

 8   this document, beginning on Page -- I guess it's

 9   effectively Page 5.  I'm sorry.  No.  Page 6.

10          Q.     Is that ending in Bates 18?

11          A.     121.

12          Q.     Or excuse me.

13          A.     Or 16.

14          Q.     Excuse me.  Yes.  So the record is clear,

15   we are looking at MNK-T1_0000259126.

16          A.     Well, I'm looking at 259121.

17          Q.     Okay.  Fair enough.

18          A.     And this would appear to be the incentive

19   plan for the retail national account managers which

20   would cover the generic product sold to the retail

21   channel wholesalers and pharmacy chains.

22          Q.     So the record is clear, Mallinckrodt had a

23   sales incentive compensation plan for its national

24   account managers; correct?
```

1        A.    For its generic national account managers,

2    yes.

3        Q.    And were there annual plans with respect

4    to the generic side of the business as well, or do you

5    recall if there were any more frequent plans than

6    annually?

7        A.    My understanding is it was always an

8    annual plan.

9        Q.    And if you turn to the page before the one

10   you're looking at that's ending in Bates 120, there's

11   also an incentive plan for national account managers

12   with respect to addiction treatment sales.  Do you see

13   that?

14       A.    Yes.

15       Q.    And so that governs the sale of the

16   various forms of addiction treatment for opioid use

17   disorder we were discussing earlier today; correct?

18       A.    This would cover the national account team

19   which called on addiction treatment clinics, primarily

20   methadone clinics, and specifically sold products into

21   that channel.

22       Q.    At this time was it -- did Mallinckrodt

23   primarily manufacture a generic form of methadone in

24   terms of the addiction treatment products it was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    manufacturing?

 2         A.    For our addiction treatment products, yes,

 3    it was primarily methadone at that time.

 4         Q.    And when did Mallinckrodt first begin to

 5    manufacture a generic version of methadone?

 6         A.    Mallinckrodt has been manufacturing

 7    generic methadone since I believe the early 1970s.

 8         Q.    And does it still continue to manufacture

 9    a generic version of methadone today?

10         A.    Yes, we do.

11         Q.    And do you have any understanding of what

12    market share Mallinckrodt generic methadone represents?

13         A.    Our general understanding is that in the

14    addiction treatment, methadone addiction treatment

15    clinics, our product represents about 60 to 65 percent

16    of that overall market.

17         Q.    Do you have any knowledge or did

18    Mallinckrodt acquire any knowledge about the abuse

19    potential of methadone?

20         A.    To my knowledge we have never studied the

21    abuse potential of methadone.

22         Q.    You can set that one aside.  I'm going to

23    now hand you a copy of what's going to be marked as KV

24    14.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    [Exhibit Mallinckrodt-Vorderstrasse-014

 2                    marked for identification.]

 3           Q.    For the record, KV Exhibit 14 is an e-mail

 4     with an attachment from Kevin Becker to several

 5     individuals from August 26, 2011, and the beginning

 6     Bates is MNK-T1_004252956, and the attachment is a

 7     branded sales rep incentive plan.  Kevin, have you --

 8     does this document look familiar to you at all?

 9           A.    No, this particular document does not.

10           Q.    Is it fair to characterize the attachment

11     as the sales representative incentive plan for

12     Mallinckrodt branded products from 2009?

13           A.    Yes, this appears to be the incentive plan

14     for the branded sales reps during that period.

15           Q.    And if you look at the measure, there's a

16     list of several drugs.  Exalgo and Xartemis are not

17     included here, but there's a reference to Magnacet.  Do

18     you see that?

19           A.    Yes, I do.

20           Q.    Is Magnacet a branded opioid that

21     Mallinckrodt manufactured?

22           A.    Yes, that is a branded opioid that we

23     manufactured at that time.

24           Q.    And when did Mallinckrodt first
```

Highly Confidential - Subject to Further Confidentiality Review

1    manufacture Magnacet?

2         A.    I don't know the exact start date, but I

3    believe we began selling that product shortly before

4    this document would have been created, shortly before

5    fiscal 2009.

6         Q.    So sometime approximately in the 2008 or

7    2009 time period was when Mallinckrodt first

8    manufactured Magnacet?

9         A.    Approximately at that time, yes.

10        Q.    And when -- and my understanding is that

11   Magnacet is no longer manufactured by Mallinckrodt.  Is

12   that correct?

13        A.    That is correct.

14        Q.    When did Magnacet come off market?

15        A.    It's my understanding that we only

16   marketed the product for a few years.  I believe by

17   around 2011 we had already ceased marketing.

18        Q.    By the way -- so we've gone over Exalgo

19   and Xartemis and now Magnacet.  Were there any other

20   branded opioids that Mallinckrodt manufactured other

21   than those three?

22        A.    The only other product that I am aware of

23   which contains an opioid is referenced in this

24   document.  It's TussiCaps, and TussiCaps is a

Highly Confidential - Subject to Further Confidentiality Review

1    prescription cough/cold product which combines

2    hydrocodone and an antihistamine, and it's used as a

3    cough suppressant.

4        Q.    And that's -- is that a liquid version of

5    hydrocodone and codeine, I believe?

6        A.    It is a capsule version, solid oral

7    version, of hydrocodone and chlorpheniramine.

8        Q.    And when did Mallinckrodt first

9    manufacture TussiCaps?

10       A.    On or around 2007, I believe.

11       Q.    And when did Mallinckrodt take TussiCaps

12   off market?

13       A.    We divested TussiCaps probably in around

14   the 2011 time frame.

15       Q.    So other than Exalgo, Xartemis, Magnacet,

16   and TussiCaps, were there any other branded opioids

17   that Mallinckrodt manufactured?

18       A.    Not to my knowledge.

19       Q.    Going back to the cover e-mail from Kevin

20   Becker -- between Kevin Becker and Steven Sage -- who's

21   Kevin Becker?

22       A.    I do not know for sure his title.  I know

23   he was a manager in the sales team.  I don't know if he

24   was a regional manager or a district manager.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And there's a senior sales specialist at

 2    Covidien also mentioned here, Steven Sage.  Do you know

 3    who he is?

 4          A.    I'm not aware of who he is.

 5          Q.    In the e-mail it describes his role, as we

 6    said, senior sales specialist.  It says Cleveland East.

 7    Do you see that?

 8          A.    I do.

 9          Q.    Did Mallinckrodt -- or was Cleveland East

10    one of the territories that Mallinckrodt may have

11    designated in terms of the sales reps it had in the

12    country?

13          A.    I don't have the specific information

14    around the sales territories at this time in order to

15    confirm, but I would conclude that that was to

16    represent his territory.

17          Q.    Are you aware of any territories in Ohio

18    that Mallinckrodt had designated for -- in connection

19    with its manufacture of branded opioids?

20          A.    I am aware that we had sales territories

21    in Ohio, but I don't know specifics.

22          Q.    And generally speaking, how many sales

23    territories did you have in Ohio?

24          A.    I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Fair to say you at least had a Cleveland

 2   East at some point?

 3          A.    That would appear to be correct.

 4          Q.    I am now going to hand you a rather

 5   voluminous document, but this one is going to be marked

 6   as KV 15.

 7                [Exhibit Mallinckrodt-Vorderstrasse-015

 8                marked for identification.]

 9          Q.    And because this is a native version, the

10   actual Bates-stamp is not on here, but I will represent

11   to everyone here that this document can be located at

12   MNK-T1_0000468961.  And this document is a Covidien

13   2011-2015 strategic plan for its pharmaceutical sector

14   dated May 28th, 2010.  Does this document look familiar

15   at all to you, Kevin?

16          A.    This document looks generally familiar.

17   I'm not sure if I have seen the entire document in the

18   past.

19          Q.    And when you say generally familiar, what

20   do you mean by that?

21          A.    I am familiar with the general format and

22   some of the content because I recognize those from

23   other presentations over time.  Since this was an

24   entire sector document, I would not have received this
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    entire document at the time and I haven't reviewed this

2    entire document in prep for this.

3           Q.    Fair enough.  In terms of the -- if you

4    look at the second page, there's a table of contents.

5    Do you see that?

6           A.    Yes.

7           Q.    And this document -- fortunately for you,

8    we're not going to go over each and every page, but

9    this document reveals a roadmap of the strategic --

10   among other things, the strategic imperatives of

11   Mallinckrodt's pharmaceutical segment.  Is that

12   correct?

13          A.    That appears correct, yes.

14          Q.    And the pharmaceutical segment of course

15   includes, as we've been discussing all day, both

16   branded and generic arms of the Mallinckrodt business.

17   Is that fair to say?

18          A.    Yes, that's correct.

19          Q.    Among other things, this document is

20   capturing, as the roadmap suggests, enablers and key

21   initiatives of the pharmaceutical business of

22   Mallinckrodt.  Is that correct?

23          A.    I see that, yes.

24          Q.    And it also is discussing the environment
```

Highly Confidential - Subject to Further Confidentiality Review

1   and competitive context of the pharmaceutical sector

2   for Mallinckrodt; correct?

3          A.     That's correct.

4          Q.     And lastly, this document also details the

5   financial results and impact of Mallinckrodt's

6   pharmaceutical business; is that correct?

7          A.     Yes.

8          Q.     Turn with me to Page 21 of this document.

9          A.     Okay.

10         Q.     You see some references here made to Steps

11  1, 2, and 3?

12         A.     Yes.

13         Q.     You see that?  And actually, before -- at

14  the top of the page there is a reference to U.S. WHO,

15  Steps 1 and 3.  What's your understanding of what the

16  U.S. WHO is referring to?

17         A.     So this is referencing to, from the view

18  of the United States market, the World Health

19  Organization's pain treatment steps and a breakdown of

20  the pain treatment market in the U.S. based upon those

21  steps.

22         Q.     And -- thank you for that.  And just so

23  the record is clear, WHO stands for World Health

24  Organization; correct?

1      A.    Yes, that's correct.

2      Q.    And can you give the court a general

3  description of what the Steps 1 through 3 entail?

4      A.    So the World Health Organization's pain

5  ladder, as it was referred to, attempted to provide a

6  context for the treatment of pain generally targeted

7  towards cancer patients or others with chronic pain in

8  a stepwise fashion, so it talked about NSAIDs,

9  non-opioid, nonsteroidal antiinflammatories for the

10  treatment of minor pain.  As pain escalated, it looked

11  at the use of weak opioids or opioid combination

12  products, and for the strongest pain, strong opioids.

13     Q.    And Mallinckrodt had lines of business or

14  products in all three of these steps or categories; is

15  that correct?

16     A.    Over time between the branded and generics

17  business we did cover all three steps.

18     Q.    And currently is Mallinckrodt still

19  manufacturing drugs in each of these categories?

20     A.    Mallinckrodt's generic business currently

21  manufactures and sells products which would fall under

22  Step 2 and Step 3.  In terms of Step 1, we do not sell

23  any finished pharmaceuticals, brand or generic, that

24  fit in Step 1.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.     So currently Mallinckrodt no longer

2  manufactures NSAIDs?

3     A.     Not within SpecGX or the brand or generic

4  business that we've been talking about today.  The

5  current branded business of Mallinckrodt does sell

6  Ofirmev, which you mentioned earlier, which would fit

7  in the Step 1 category.

8     Q.     I see.  And you also said in a previous

9  response that you -- in terms of Step 1, you do not

10  sell any finished pharmaceuticals.  Are you referring

11  to the fact that Mallinckrodt actually purchases

12  bulk -- or purchases narcotics in its raw form?

13     A.     No.  Step 1 would include products such as

14  acetaminophen and ibuprofen.  We do sell the bulk

15  active ingredient, acetaminophen and ibuprofen to

16  customers, as a bulk powder, not in a finished form.

17     Q.     And that's what I was referring to.

18  You've been more articulate than I have.  But in terms

19  of Step 1, just so the record is clear, currently

20  Mallinckrodt does not sell or manufacture a finished

21  NSAID product; is that correct?

22     A.     Correct, in terms of the parts of the

23  business that I'm representing today, with the

24  exception of the branded Ofirmev acetaminophen product,

Highly Confidential - Subject to Further Confidentiality Review

1    which is sold by our current branded business.

2         Q.    And is -- what entity sells that product?

3         A.    I believe that would fall under

4    Mallinckrodt LLC.

5         Q.    And I just want to clarify because you

6    said that -- you are here speaking on behalf of the LLC

7    as well; correct?  I thought we he had established that

8    earlier today.

9         A.    Yes.  I should clarify that in terms of

10   the scope that I've been given, that product was not

11   included in the preparation.

12        Q.    I see what you're saying.  But

13   Mallinckrodt LLC manufactures Ofirmev, just so I

14   understand; is that correct?

15        A.    And --

16              MR. TSAI:  Object to the scope.  Go ahead.

17        A.    To be perfectly clear, Mallinckrodt LLC

18   markets Ofirmev; they technically do not manufacture

19   it.

20        Q.    (By Mr. Ko)  Fair enough.  In terms of

21   these steps that are reflected here -- and this is of

22   course as of 2009, I believe -- around that time

23   period -- have these steps remained the same over time

24   by the World Health Organization?

```
 1           A.      I am not aware if the steps or the

 2    definitions have changed since 2009.

 3           Q.      Fast-forward to Page 29.  This appears to

 4    be a summary of how Mallinckrodt prepares its sales

 5    force.  Is that fair to say?

 6           A.      This appears to be a summary of how we

 7    built our branded sales force in the 2008-2009 time

 8    period.

 9           Q.      And thank you for that clarification.

10    This obviously relates specifically to the branded

11    sales force, and it appears that at least according to

12    this document the goal was to higher approximately 150

13    sales reps for Mallinckrodt's branded segment.  Is that

14    correct?

15           A.      That appears correct, yes.

16           Q.      And that appears to be from a pool of

17    approximately 15,000 résumés?

18           A.      Yes, that looks correct.

19           Q.      Do you know who was responsible for hiring

20    these sales reps?

21           A.      I do not know the particular individuals

22    at this time who would have been responsible, but it

23    would have been the existing sales management with the

24    input of human resources and others within the
```

Highly Confidential - Subject to Further Confidentiality Review

1    business.

2         Q.    And who was the director of sales

3    management at this time?  We're talking about in the

4    2009 to 2010 time period.

5         A.    Yeah, I'm not sure who that was at that

6    time.

7         Q.    Is there a manager of sales -- or is there

8    a director of sales management at this time at

9    Mallinckrodt?

10        A.    So the sales organization that was in

11   place to sell these particular branded products has

12   been dissolved.  There are sales organizations in place

13   to sell Mallinckrodt's other branded products that are

14   on the market today, but those are not the same teams.

15        Q.    By the way, I know that -- so all the

16   branded opioids have been taken off market by

17   Mallinckrodt.  Is Mallinckrodt currently developing or

18   thinking about manufacturing any additional branded

19   opioids?

20             MR. TSAI:  Object to scope.

21        A.    We are not in the process of preparing to

22   sell any new branded opioids.

23        Q.    (By Mr. Ko)  Going back to this document,

24   on the bottom left-hand corner, underneath eight

Highly Confidential - Subject to Further Confidentiality Review

1    training modules, there's a reference to REMS.  Do you

2    see that?

3         A.    Yes.

4         Q.    What's your understanding of REMS?

5         A.    REMS is an FDA acronym for risk evaluation

6    and mitigation strategies.

7         Q.    And who provided REMS training to these

8    sales reps?

9         A.    I do not know who specifically provided

10   REMS training to the sales reps at this time.

11        Q.    And with respect to the CARES Alliance,

12   what is that in reference to?

13        A.    I am not completely familiar with CARES

14   Alliance other than I know that it was a compilation of

15   educational materials for others outside of the company

16   which we provided as a reference to our sales team at

17   the time.

18        Q.    I see.  And when you say others outside

19   the company, what do you mean by that?

20        A.    It's my understanding this was an industry

21   or a reference document or reference program for health

22   care professionals and others within the pharmaceutical

23   industry, and we used those materials as well as

24   part -- as well for part of our training of our sales

Highly Confidential - Subject to Further Confidentiality Review

```
 1    employees.

 2         Q.    I see.  And are you aware of any other --

 3    strike that.  Was Mallinckrodt a member of the CARES

 4    Alliance as far as you know?

 5              MR. TSAI:  Object to scope.

 6         A.    Yeah, I do not know if we were a member.

 7    I'm not prepared on that.

 8         Q.    (By Mr. Ko)  Sure.  Do you have any

 9    understanding of any other entities that were part of

10    the CARES Alliance?

11              MR. TSAI:  Object to scope.

12         A.    No.

13         Q.    (By Mr. Ko)  And do you know who provided

14    the training to the sales reps on the CARES Alliance

15    training module that's identified here?

16              MR. TSAI:  Object to scope.

17         A.    No, I don't.

18         Q.    (By Mr. Ko)  Turn to the next page, 30.

19    It's titled creating new sales territories.  And

20    obviously we talked about some of the sales territories

21    before.  Here it indicates that there are approximately

22    250 territories designated by Mallinckrodt.  Do you see

23    that reference?

24         A.    Yes.  Yes, I do.
```

```
 1        Q.    And that seems to be the sum of

 2    territories that Mallinckrodt had designated for

 3    Exalgo, Pennsaid, and a, quote/unquote, existing

 4    territories category.  Do you see that?

 5        A.    That -- yes, it appears to be the sum of

 6    those three.

 7        Q.    And are these territories similar to the

 8    territories we were describing -- or we were discussing

 9    earlier in which you said the commercial analytics team

10    would reevaluate year after year or on an annual basis

11    how to divide up the country in terms of which regions

12    your sales reps would go to?

13        A.    So I can't tell specifically from the

14    information provided here, but this general process

15    appears to align with the general process I described

16    in terms of how we set territories.

17        Q.    And obviously this is before the

18    manufacture and sale of Xartemis, but did Xartemis add

19    to the territories that were designated by Mallinckrodt

20    or did Xartemis -- was Xartemis sold within the

21    existing territories that Mallinckrodt had designated?

22        A.    So it's my understanding that over time we

23    reviewed our sales territories and our alignment on an

24    annual basis and made changes as needed, and so between
```

1    2009 and the launch of Xartemis, there could have been

2    many changes, and I can't say for certain if any of the

3    territories remained the same, but I am fairly certain

4    that we had fewer than 250 territories for Xartemis.

5         Q.    So by the time two thousand and four -- by

6    the time we come to 2014 when Xartemis hits the market,

7    are you saying that there were no more than 250

8    territories total for the branded aspect of the

9    Mallinckrodt business, or are you saying there were

10   just no more than 250 territories for Xartemis in

11   particular?

12        A.    So relative to the sales territories that

13   applied to the sales team that sold Xartemis, there

14   were fewer than 250 territories in total, which

15   included the territories that -- where Xartemis was

16   sold.

17        Q.    I see.  Thank you.  Turn to Page 44 of

18   this document.  And I know that you had obviously

19   testified that you don't know much about the CARES

20   Alliance --

21        A.    Uh-huh.

22        Q.    -- so I'm not going to ask you questions

23   about that, but I just have a specific question about

24   the bottom left-hand corner.  It says one member of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    IWG, regulatory perspective, REMS police.  Do you see

 2    that?

 3         A.    Yes.

 4         Q.    Do you have any understanding of what IWG

 5    stands for?

 6         A.    IWG is typically a general three-letter

 7    abbreviation for industry working group.

 8         Q.    And so this seems to be a reference to an

 9    industry working group with respect to the REMS that we

10    were just discussing before?

11              MR. TSAI:  Object to scope.

12         A.    Without more detail -- talking points

13    behind this slide, I'm not sure what it's saying.

14         Q.    (By Mr. Ko)  And at any time in which

15    Mallinckrodt manufactured opioids, do you recall which

16    working groups or industry working groups Mallinckrodt

17    may have been a part of?

18              MR. TSAI:  Object to scope and form.

19         A.    No, I don't know specifics over time of

20    our industry working groups.

21         Q.    (By Mr. Ko)  Does the acronym ADIWG ring a

22    bell to you at all?

23         A.    Did you say ADI?

24         Q.    Correct.  ADIWG.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No.  I'm not sure I know what that is.

 2          Q.     By the way, on the second page there's a

 3    reference on the right-hand column to Ruby, Zircon, et

 4    cetera.  Do you see that?

 5          A.     Yes.

 6          Q.     What is Ruby in reference to?

 7          A.     Ruby was the code name during the

 8    development period for Xartemis.

 9          Q.     And how about Zircon?

10          A.     Zircon was the code name for a similar

11    product to Xartemis which ultimately was abandoned and

12    never launched.

13          Q.     And was that -- is that a product that's

14    also referred to as MNK-155 internally at Mallinckrodt?

15          A.     I believe that's the correct number.

16          Q.     And what were the primary differences

17    between Xartemis and the MNK-155?

18          A.     Xartemis was a combination of oxycodone

19    and acetaminophen.  MNK-155 was hydrocodone and

20    acetaminophen with a similar technology and dosage

21    form.

22          Q.     And were they both extended release?

23          A.     Yes, they were.

24          Q.     And with respect to Exalgo, that's also
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   extended release; correct?

 2        A.    Yes, Exalgo's extended release.

 3              MR. KO:  Can we actually take a quick

 4   break?

 5              MR. TSAI:  Sure.

 6              THE VIDEOGRAPHER:  We are going off the

 7   record at 2:53 PM.

 8              [A brief recess was taken.]

 9              THE VIDEOGRAPHER:  We are back on the

10   record at 3:10 PM.

11        Q.    (By Mr. Ko)  Kevin, thank you for your

12   patience throughout this day.  I see you still have

13   that document in front of you and I'll ask that you

14   keep it there because we're going to refer to it again,

15   but I want to follow up on some questions -- or I want

16   to follow up on a discussion we had earlier today about

17   the sales reps and their interactions with physicians.

18   What sort of directions or guidelines did Mallinckrodt

19   have for the sales representatives of its branded

20   opioids?

21        A.    Mallinckrodt had a training process where

22   we reviewed our sales aids with the sales team to help

23   them understand both the content and the appropriate

24   use of those sales aids.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And can I interrupt you just right now, or

 2     right here?  So what do you mean by sales aids?

 3          A.    At various different times we had

 4     documents or pamphlets or iPad applications which were

 5     used to review product information with physicians

 6     during a sales visit.  The sales team was trained on

 7     how to use those materials and the proper way to

 8     communicate with physicians, including ensuring that

 9     they stayed on message, that they understood the proper

10     way to discuss the labeling, and that they were aware

11     of how to handle questions that they were unable to

12     answer.

13          Q.    And who determined the content of the

14     sales aid?

15          A.    The content of the sales aid was typically

16     determined by the marketing team.

17          Q.    And did you have any direct involvement in

18     that?

19          A.    I did not.

20          Q.    And in terms of the sales aids being

21     shared with physicians, were there any sales aids for

22     patients?

23          A.    I am not aware of any specific sales aids

24     for patients.  The FDA-approved labeling included at
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    different times a medication guide or other patient

 2    instructions which were meant to be given to patients

 3    by pharmacies so that they would understand the details

 4    about using the product.

 5         Q.    Did Mallinckrodt do any marketing of its

 6    branded opioid drugs to patients directly?

 7         A.    No, we did not market any branded products

 8    to patients directly.

 9         Q.    And other than sales aids and/or other

10    marketing material to physicians, did Mallinckrodt

11    provide any marketing material to the public at large?

12         A.    Mallinckrodt did not advertise to the

13    public at large regarding our products or in general

14    terms.

15         Q.    And going specifically back to sales aids,

16    were there any other categories of people or entities

17    that Mallinckrodt prepared sales aids for other than

18    physicians?

19         A.    I am not aware of any specific sales aids

20    for anyone else.

21         Q.    And what types of reports or databases

22    were utilized to share the results of the sales reps'

23    performance in their communications with physicians?

24              MR. TSAI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          A.    So the sales representatives were provided

 2   reports and access to reports on their -- on the

 3   prescription results from their territories so that

 4   they could understand if they were hitting their

 5   targets for their incentive plan for that year, and

 6   that was all IMS Xponent data.

 7          Q.    (By Mr. Ko)  And who typically prepared

 8   those reports?

 9          A.    That was again prepared by the commercial

10   analytics team.

11          Q.    Based again on the IMS Xponent data?

12          A.    Yes, that's correct.

13          Q.    Exclusively, or primarily?

14          A.    To my knowledge, exclusively.

15          Q.    Other than those reports, were there any

16   other measures of performance that Mallinckrodt

17   provided to its sales reps regarding the prescriptions

18   of Mallinckrodt opioids?

19          A.    Not to my knowledge.

20          Q.    And how frequently were those reports

21   provided to the sales reps?

22          A.    I don't know if they were provided any

23   more frequently than monthly, but I believe they were

24   given monthly reports.  I don't know if any of those

1    reports were available in real time.

2           Q.    Turning back actually to the page that

3    you're on right there, on the bottom right-hand corner

4    there's a reference to pharmacovigilance.  Do you see

5    that?

6           A.    Yes.

7           Q.    What's your understanding of

8    pharmacovigilance?

9           A.    Pharmacovigilance is the function or the

10   process of collecting information about -- real-world

11   information on the safety of a product or any other

12   quality issues or adverse events related to a product.

13          Q.    And when you say adverse events, what are

14   you specifically referring to?

15          A.    So in broad terms as defined by FDA, an

16   adverse event is any unwanted event that occurs while a

17   person is receiving treatment from a given drug.

18          Q.    And what do you mean by unwanted event?

19          A.    Unwanted event would be anything that's

20   unusual for that person in terms of their health and

21   which isn't the intended effect from the drug.

22          Q.    And did Mallinckrodt perform -- or strike

23   that.  Did Mallinckrodt track adverse event reports?

24          A.    Yes, Mallinckrodt collected adverse event

1    information through our pharmacovigilance team and

2    reported that information to FDA.

3            Q.    And can you give the court a general

4    understanding of how large the pharmacovigilance team

5    was at Mallinckrodt?

6            A.    I don't know for sure how large the

7    pharmacovigilance team was specifically, but somewhere

8    on the order of five to 10 people is my understanding.

9            Q.    And was that true for the entire time

10   period in which Mall -- from -- between when

11   Mallinckrodt first started manufacturing drugs --

12   opioids to present?

13           A.    So I would say that initially when we

14   first began manufacturing generic opioids and when our

15   product line was smaller, we probably had fewer people.

16   I know we currently have fewer people than five, but

17   during the time when we marketed the branded opioids, I

18   believe we had a larger team.

19           Q.    And is the pharmacovigilance group

20   associated with the medical affairs group at all?

21           A.    It is a related function.  At times it has

22   been part of medical affairs, yes.

23           Q.    And what times were those?

24           A.    During the time periods when we had

1  branded products it was part of medical affairs.  Prior

2  to having branded products, we didn't have a formal

3  medical affairs group, and currently we no longer have

4  a medical affairs group related to the opioid products.

5         Q.    So is it fair to say that the medical

6  affairs group at Mallinckrodt existed between the 2008

7  and 2015 time period only?

8         A.    That I believe is generally true, but I

9  can't say that's the exact time frame.

10        Q.    In other words, Mallinckrodt had a medical

11  affairs department during the times in which it

12  manufactured a branded opioid?

13        A.    Yes, I believe that's correct.

14        Q.    And with respect to the adverse event

15  reports, do you have any understanding of what database

16  they are contained in?

17        A.    No, I don't know the specific database.

18        Q.    And is it your understanding that

19  Mallinckrodt nevertheless maintained all adverse events

20  reports?  Correct?

21        A.    Yes.

22        Q.    And how would Mallinckrodt obtain

23  knowledge of these adverse event reports?

24        A.    So we're all trained as a company to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    report anything that we receive from any channel, so

 2    these could be reports where someone calls the

 3    toll-free number that's on the bottle of product that

 4    we sell.  It could be a report that is referred by word

 5    of mouth from a pharmacist to a sales representative

 6    somehow, or it could be word of mouth that we as

 7    individual employees hear.

 8              But we also have as part of

 9    pharmacovigilance a surveillance process where we look

10    at published literature, medical studies, other types

11    of reports to try to gather information that way.

12         Q.    And again, all -- the people in the

13    pharmacovigilance were responsible for tracking all of

14    this; is that correct?

15         A.    Yes, that's the group responsible for

16    tracking.

17         Q.    And can you describe the general process

18    that Mallinckrodt undertook to elevate some of these

19    concerns more broadly across the business?

20         A.    When we received information about adverse

21    events, there are defined rules for how to handle those

22    events.  I am not prepared on the specifics of those

23    rules, but in certain cases certain activities are

24    required to be conducted which would require more broad
```

```
 1    communication within the company and potentially even

 2    notification of FDA.  The adverse events information

 3    was to my knowledge not generally reviewed within the

 4    business but more within the medical affairs or

 5    pharmacovigilance teams.

 6         Q.    And so you are sa -- if I understand you

 7    correctly, there was a set protocol or a set of defined

 8    rules which governed the process in which this

 9    information was to be reviewed by either

10    pharmacovigilance or the medical affairs group?

11         A.    Yes, we had approved company procedures on

12    how adverse events would be handled, tracked, reported.

13         Q.    During the time that Mallinckrodt had a

14    medical affairs department, who was the head of the

15    medical affairs unit?

16         A.    That person changed a couple of times.  I

17    can't recall specific names.

18         Q.    And approximately how large was the

19    medical affairs group?

20         A.    Medical affairs in total I believe was

21    probably somewhere in the neighborhood of 10 people.

22         Q.    And that's true for the two thousand --

23    roughly the 2008 through 2015 time period?

24         A.    I believe so.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    Were they all in the St. Louis or the

 2   Missouri office?

 3         A.    I can't say that for sure.  We may have

 4   had remote employees involved.

 5         Q.    Turn to the next page of that document.  I

 6   believe that should be Page 46.

 7         A.    Yes.

 8         Q.    You see that at least with respect to

 9   Exalgo there appears to be an Exalgo safety advisory

10   board?  Do you see that?

11         A.    Yes.

12         Q.    Do you know who determined who was going

13   to be on this board?

14         A.    No, I do not.

15         Q.    And the -- there's a reference to --

16   you'll see at the top left-hand corner of that box

17   there's a reference to Dr. Russell Portenoy.  Do you

18   know who he is?

19              MR. TSAI:  Object to the scope.

20         A.    I have heard of Dr. Portenoy.

21         Q.    (By Mr. Ko)  And it appears that

22   Mallinckrodt had retained him to be on the safety

23   advisory board for Exalgo.  Do you understand that to

24   be the case?
```

```
 1          A.     That appears correct from this document.

 2          Q.     Do you have any understanding of how long

 3    he was on the safety advisory board for Exalgo?

 4          A.     No, I don't.

 5          Q.     I actually wanted to ask you a question

 6    about deciles.  We see that frequently in the

 7    documents.  Can you describe to the court how

 8    Mallinckrodt utilized deciles in communication with its

 9    marketing of branded opioids?

10          A.     So we used deciles in order to identify

11    prescribers who we felt would be appropriate targets

12    for our marketing efforts for Exalgo and in order to

13    help in setting territories for the sales

14    representatives.

15          Q.     And I believe I've seen references to the

16    documents of deciles between one and 10.  Is that your

17    understanding of what the deciles were as designated by

18    Mallinckrodt?

19          A.     Yes, deciles are numbered from one to 10.

20          Q.     And can you describe to the court

21    generally speaking what that range represents?

22          A.     So it represents, depending on -- it

23    represents something different depending on what is

24    being analyzed, but it's generally groupings of
```

1    physicians based upon the number of prescriptions that

2    they write for whatever drugs are defined in the

3    analysis.

4         Q.    And is it fair to say that the higher the

5    decile, the higher the propensity of that doctor to

6    prescribe a certain drug?

7         A.    Generally the higher deciles are for those

8    prescribers that prescribe the designated drugs more

9    often.

10        Q.    And was there a general strategy at

11   Mallinckrodt with respect to its branded opioid

12   products to target doctors in the higher deciles?

13        A.    So with a product like Exalgo, Exalgo is a

14   strong opioid that's designated for a very specific

15   patient set, and it is targeted towards patients who

16   are on established opioid therapy.  Patients who are on

17   established opioid therapy are generally seen by

18   physicians who understand how to use opioids and who

19   understand the prescribing of strong opioids and the

20   risks associated.

21             In order to identify the physicians who

22   were likely prescribing the types of opioids, similar

23   to Exalgo where we felt that they would have patients

24   who were appropriate for Exalgo, we classify doctors

1   into deciles and looked at the higher deciles based

2   upon the definition we put in place to identify those

3   who are probably the best targets for Exalgo.

4         Q.    So with respect to Exalgo, was the

5   strategy at Mallinckrodt to target doctors in the

6   higher deciles?

7         A.    The strategy at Mallinckrodt was to target

8   prescribers who had an established history with

9   prescribing strong opioids and who had prescribing

10  patterns which indicated they understood how to use

11  those drugs.

12        Q.    And earlier you were talking about an

13  established opioid therapy plan or established opioid

14  therapy provided by a physician.  What is your

15  definition of an established opioid therapy plan?

16        A.    Exalgo is meant to be used by patients who

17  are not opioid naïve, which means they are currently

18  receiving opioid therapy and their bodies are tolerant

19  of opioids to a certain level.  It's a very strong

20  opioid and has to be used carefully, and physicians who

21  have little experience with prescribing opioids would

22  not be appropriate targets for our sales efforts.

23        Q.    And when you say strong opioid, I

24  understand that Exalgo was offered in a 32-milligram

Highly Confidential - Subject to Further Confidentiality Review

```
1    tablet.  There were other milligram tablets of Exalgo;

2    is that correct?

3         A.    Yes, that's correct.

4         Q.    And what was the general range?

5         A.    I believe it was eight to 32 milligrams.

6         Q.    And over time was it the case that the

7    milligram amounts went up throughout the duration of

8    the Exalgo -- throughout the duration of Mallinckrodt's

9    manufacture and sale of Exalgo?

10        A.    I'm not aware that we tracked the trends

11   in the prescribing of milligrams.

12        Q.    Let me ask it a different way.  Was --

13   when Exalgo first hit the market in 2008-2009, did

14   Mallinckrodt offer it in a 32-milligram form?

15        A.    We developed the 32-milligram form later

16   after the initial launch because feedback from

17   prescribers and the data that we had in the market

18   suggested that there was a certain portion of

19   prescribers who had patients who needed a stronger dose

20   and who were dosing two 16-milligram tablets a day.  In

21   order to ease the pill burden on patients and give

22   prescribers another option, we developed a 32-milligram

23   dose.

24        Q.    So initially when Exalgo first hit the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    market, the highest dosage it was provided in was a

 2    16-milligram tablet or capsule?

 3          A.    The highest dose tablet that it

 4    was provided in was 16 milligrams, but it was labeled

 5    to be dosed to the appropriate level based upon the

 6    decision of the prescriber.

 7          Q.    And the appropriate level was up to 32

 8    milligrams, or was it some other amount?

 9          A.    There was not a limit set in the labeling.

10          Q.    By the way, just for the record, this --

11    on this Page 46 that we're looking at, there's a

12    reference to HCPs.  Is that in reference to health care

13    practitioners?

14          A.    Health care practitioners.  Correct.

15          Q.    So synonymous with the physicians that

16    we're -- that are prescribing that we're talking about?

17          A.    HCPs is a broader term to encompass

18    physicians, physician's assistants, nurse

19    practitioners, others who have prescribing ability.

20          Q.    Fair enough --

21          A.    So that's what we use.

22          Q.     -- and thank you for that clarification.

23    And here it appears, at least based on the data that

24    Mallinckrodt has collected, there are approximately
```

Highly Confidential - Subject to Further Confidentiality Review

1    18,000 HCPs in Deciles 5 through 10 and 47,000 HCPs in

2    Deciles 3 through 4?

3         A.    Yes, that's --

4         Q.    And is this based on survey data or is

5    this the IMS -- is this based on IMS data?  Or what is

6    this based on?

7         A.    This would be based on an analysis of IMS

8    data looking at a defined set of products.

9         Q.    Are you familiar with the concept and term

10   chronic pain?

11        A.    Yes.

12        Q.    Was it generally the case that Exalgo was

13   marketed to individuals who were suffering from --

14   primarily suffering from chronic pain?

15             MR. TSAI:  Object to form.  Go ahead.

16        A.    Exalgo was marketed to physicians and

17   other health care practitioners who treated patients

18   who had chronic pain.  It was marketed to them for the

19   purposes of giving them another option to use with

20   patients who were appropriate for this type of therapy.

21        Q.    (By Mr. Ko)  Let me ask it a different

22   way.  Do you understand the distinction between chronic

23   pain and acute pain?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    And what's your understanding of that

2   distinction?

3          A.    Chronic pain is a condition that -- where

4   pain has persisted and is expected to persist for a

5   long period of time.  Acute pain is typically due to an

6   acute injury or a condition that will resolve in a

7   shorter period of time.

8          Q.    And with respect to your answer in which

9   you said long period of time, what's your understanding

10  of that period?  Do you have a -- do you or

11  Mallinckrodt have an understanding of what -- of how

12  long that time period is?

13         A.    There's no official definition for what

14  that time period is.  It's up to the health care

15  practitioner to decide if the patient that they are

16  treating has a condition which qualifies as a long

17  period of time or is a chronic condition and where they

18  think a long-acting product like Exalgo would be

19  appropriate.

20         Q.    And when you say that it's up to the

21  health care practitioner to decide, what sort of

22  guidance did Mallinckrodt provide to that practitioner

23  either in the form of sales aids or otherwise to make

24  that determination?
```

```
 1            A.     Mallinckrodt sales aids and sales

 2    communications provided information relative to the

 3    dosing frequency, relative to labeled information

 4    around how to convert patients from another opioid to

 5    Exalgo, and other information about the warnings and

 6    the risks of a product as strong as Exalgo, so that

 7    those health care practitioners could use that

 8    information along with their medical knowledge to make

 9    the decision.

10            Q.     And going back to the distinction between

11    acute pain and chronic pain, at least as you understand

12    it, is it fair to say that Exalgo was primarily

13    intended for patients with chronic pain?

14            A.     Exalgo is labeled for patients who need

15    pain medication over an extended period of time, and we

16    targeted our selling efforts to physicians who we

17    believe treated patients with chronic pain.

18            Q.     And in other words, Mallinckrodt did not

19    target physicians or did not otherwise market Exalgo

20    for acute pain treatment; correct?

21            A.     We did not market Exalgo for acute pain.

22            Q.     Conversely, Xartemis, however long its

23    shelf life was -- very brief -- that was marketed for

24    acute pain; correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    That's correct.

 2           Q.    And as we discussed earlier, was extended

 3    release; is that correct?

 4           A.    Also correct.

 5           Q.    And what was the highest dosage of

 6    Xartemis?

 7           A.    Xartemis was available in one dose,

 8    seven-and-a-half milligrams of oxycodone and 325

 9    milligrams of acetaminophen labeled to be dosed every

10    12 hours.

11           Q.    And during the short shelf life of

12    Xartemis in 2014, was that the only dosage amount that

13    Mallinckrodt offered?

14           A.    Yes.  That's correct.

15           Q.    And Xartemis -- you originally --

16    Mallinckrodt originally sought approval from the FDA

17    for Xartemis as an abuse deterrent formulation; is that

18    correct?

19           A.    That's correct.

20           Q.    And what's your understanding of abuse

21    deterrent formulation?

22           A.    Abuse deterrence as defined by FDA is --

23    are products with physical or chemical features

24    designed to either make abuse of the product more
```

Highly Confidential - Subject to Further Confidentiality Review

1    difficult or less desirable.

2         Q.    And which -- what type of features are we

3    talking about?  What are -- can you get into the

4    specifics?

5         A.    So I can't get into the specifics for

6    Xartemis, but in general these would be types of

7    features that would make it more difficult to

8    manipulate a product into a more abusable form.

9         Q.    And is the reason that you can't get into

10   the specifics for Xartemis because you weren't prepared

11   for that --

12        A.    Yes.

13        Q.     -- to speak on that topic today?

14        A.    Yes.

15        Q.    But you do know that Xartemis applied for,

16   as we discussed, but did not receive FDA approval as an

17   abuse deterrent formulation; correct?

18        A.    Yes, I'm aware of that.

19        Q.    But Mallinckrodt still marketed Xartemis

20   as having abuse deterrent properties; correct?

21             MR. TSAI:  Object to form.

22        A.    We marketed Xartemis based upon its

23   physical features.  We did not market Xartemis in terms

24   of having any proven abuse deterrent capabilities.

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    (By Mr. Ko)  Were there any materials that

 2   you reviewed in preparation for this deposition today

 3   in which you saw Xartemis as having abuse deterrent

 4   properties?

 5         A.    No, I don't recall any materials that

 6   referred to that.

 7         Q.    Going back to Exalgo, was there ever a

 8   moment or was there ever a time in which Mallinckrodt

 9   wanted to make Exalgo an abuse deterrent

10   formulation-type drug?

11         A.    It is my understanding that we studied

12   Exalgo for abuse deterrent properties.

13         Q.    And like Xartemis, did you apply to the

14   FDA for ADF approval for Exalgo?

15         A.    I don't know if we did or not.  I did not

16   prepare for that particular detail.

17         Q.    And who other than the branded side of the

18   business would know the specific properties of Exalgo

19   and Xartemis?

20         A.    What do you mean by specific properties?

21         Q.    Well, let's take the abuse deterrent

22   properties, for example, or the application to the FDA

23   for abuse deterrent formulation status.  Who was

24   responsible for making that application?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    The regulatory affairs team would have

2    been responsible for making the application to FDA.

3          Q.    Did the medical affairs department have

4    any input into that application process?

5          A.    I don't know if medical affairs has any

6    input into the regulatory applications.

7          Q.    And who was the head of the regulatory

8    affairs team during the 2009 through 2015 time period?

9          A.    Again, it changed during that time period.

10   I can't recall the name of the person in charge of the

11   branded efforts.

12         Q.    And approximately how large was the

13   regulatory affairs team during the 2009 through 2015

14   time period?

15         A.    Between branded and generic products --

16   and those organizations would have also had

17   responsibility for our active ingredients business --

18   over time that group was as many as I think 20 or 25

19   people.

20         Q.    And can you give the court a breakdown of

21   who may have been responsible for branded products

22   relative to generic products, or was such a distinction

23   made in that group?

24         A.    That distinction was made, but it did
```

Highly Confidential - Subject to Further Confidentiality Review

1    change fairly regularly, and I am not personally aware

2    of or don't personally recall who the brand leadership

3    was.

4         Q.    And with respect to the generic aspect of

5    the regulatory affair team or regulatory affairs team,

6    what was their primary responsibility?

7         A.    Regulatory affairs is primarily

8    responsible again for communicating with FDA on

9    product-related documents to be supplied to FDA, filing

10   applications for approval of generics, corresponding

11   with the agency.

12        Q.    And how frequently did the regulatory

13   affairs team have to correspond with the FDA on generic

14   products of Mallinckrodt?

15             MR. TSAI:  Objection to scope.  Go ahead.

16        A.    Frequently, regularly.  I don't know for

17   sure, but there was frequent communication.

18        Q.    (By Mr. Ko)  Was it any different for the

19   branded aspect of the regulatory affairs team?

20             MR. TSAI:  Objection to scope.

21        A.    I don't believe it was any different on a

22   per-product basis.  There were fewer branded products,

23   so the communication was probably less.

24        Q.    (By Mr. Ko)  And I know I asked you about

1    the head of the regulatory affairs department, but can

2    you recall any of the individuals who were higher up on

3    the regulatory affairs team in the 2009 through 2015

4    time period?

5         A.    So senior director of regulatory affairs

6    at that time or at least during part of that time was

7    Diane Servello.  She's no longer with the company.

8    Towards the end of her tenure I know she had

9    specifically generics responsibility.  Earlier in her

10   tenure she may have at least for part of that time had

11   brand responsibility as well.

12        Q.    So would you say that she had a lot of

13   responsibility with respect to communications made

14   between Mallinckrodt and the FDA?

15             MR. TSAI:  Object to scope.

16        A.    She would have been responsible for a

17   certain set of communications with FDA relative to

18   anything that had to do with our drug applications and

19   associated reports.

20        Q.    (By Mr. Ko)  And when you say certain set,

21   what do you mean?

22        A.    Certain communication was filed directly

23   with FDA by other teams and wouldn't necessarily have

24   gone through Ms. Servello.  Labeling information would

1    have been submitted directly by the labeling

2    department.  The adverse event reports would have come

3    from the pharmacovigilance team.

4          Q.    And would the pharmacovigilance team or

5    the labeling team interact with the regulatory affairs

6    team at all in connection with communications with the

7    FDA?

8          A.    There may have been a internal

9    communication or approval process.  I'm not sure of all

10   the specifics.

11         Q.    And in addition to Diane --

12         A.    Servello.

13         Q.    -- Servello, do you recall any other

14   individuals with responsibility for communicating with

15   the FDA?

16               MR. TSAI:  Object to scope.

17         A.    Yes.  More recently on the generic side,

18   our head of regulatory affairs is a gentleman by the

19   name of Donatus Ako-Arrey.  In the past we have had a

20   number of different leaders of that group.  I can't

21   recall all the names.

22         Q.    (By Mr. Ko)  And how long has that

23   individual been the head of regulatory affairs?

24         A.    About two years.

1          MR. KO:  And just to address Mr. Tsai's

2  objection to scope, I will note that Topic 31 indicates

3  that Mr. Vorderstrasse is here today to testify as to

4  statements made by Mallinckrodt to the FDA.

5          Q.   (By Mr. Ko)  In the -- as far as the

6  labeling department goes, who was in charge of the

7  labeling department from the 2009 through 2015 time

8  period?

9          A.   I am not aware of who was in charge of

10  that department.

11          Q.   Do you recall any names of people who had

12  responsibility with respect to labeling during that

13  time period?

14          A.   The one name I recall was Howard Tweet.

15          Q.   And what was his primary responsibility?

16          A.   He was a manager within labeling.  I don't

17  know the specific scope of his responsibilities.

18          Q.   By the way, during the 2009 through 2015

19  time period when -- you were working in the generics

20  division; correct?

21          A.   2009 to 2011 I was in the corporate

22  strategy team, and then subsequent to 2011 was in

23  generics.

24          Q.   And during the 2011 through two

1    thousand -- or from 2011 through present, have you had

2    interactions with the regulatory affairs group?

3          A.    Yes.

4          Q.    What are the nature of those interactions?

5          A.    So in product management, we review and

6    approve certain documents.  We review and approve the

7    physical product labels that go on packages.  We are

8    involved in other sorts of discussions about the timing

9    relative to potential approval of new products or

10   changes of existing products.

11         Q.    Going back to the discussion we were

12   having with respect to ADF -- these deterrent

13   formulations -- why did Mallinckrodt decide to enter

14   into that space?

15               MR. TSAI:  Object to the form.

16         A.    So Mallinckrodt evaluated and pursued

17   abuse deterrents in response to a number of factors,

18   including a general sense that industry health care

19   providers were interested in that technology and

20   interested in those types of products, as well as

21   statements from FDA about their interest in

22   manufacturers developing those technologies.

23         Q.    (By Mr. Ko)  And when would you say that

24   Mallinckrodt first started considered entering the ADF

Highly Confidential - Subject to Further Confidentiality Review

1    space?

2         A.    To my knowledge that was somewhere in the

3    2007 to 2009 time frame.

4         Q.    And as we discussed before, Exalgo never

5    obtained ADF status, but there was a decision to try

6    and push Exalgo as an ADF-type opioid at some point in

7    time; is that correct?

8         A.    No, there --

9              MR. TSAI:  Object to form.  Go ahead.

10        A.    There was a decision to evaluate Exalgo

11   for abuse deterrent properties.

12        Q.    (By Mr. Ko)  That's -- fair enough.  And

13   when was that -- approximately when was that evaluation

14   undertaken?

15        A.    I don't know the exact time period.  It

16   was early on in the Exalgo life cycle.

17        Q.    Sometime after 2009?

18        A.    Correct.  Sometime around that time.

19   2010.

20        Q.    And with respect to Xartemis, when did

21   Mallinckrodt first start evaluating Xartemis for

22   application of ADF status?

23        A.    I believe we did the abuse deterrent

24   studies and evaluations of Xartemis prior to approval,

1    prior to the initial approval of the drug.

2         Q.    And prior to the initial approval in 2014?

3         A.    Correct.

4         Q.    By the way, when specifically was Xartemis

5    approved?

6         A.    I don't know the exact date.  I do believe

7    it was in 2014.

8         Q.    And as we discussed it had -- it was just

9    the one year in which Xartemis was manufactured and

10   sold by Mallinckrodt.  When did it end, or when did

11   Mallinckrodt pull Xartemis from the market?

12        A.    We actively promoted Xartemis for about a

13   year, and after that time we continued to sell very

14   small quantities to wholesalers until early 2015, so --

15   I believe it was early -- no, early 2016.

16        Q.    So even though -- so when we talk about

17   Mallinckrodt pulling Xartemis off the market, there was

18   still nevertheless some small amount of sales to

19   distributors of Xartemis after that period of time?

20        A.    After we stopped the promotion on the

21   branded side there was a bit of residual sales, yes.

22        Q.    I see.  Very minimal?

23        A.    Correct.

24        Q.    And why did Mallinckrodt decide to pull

Highly Confidential - Subject to Further Confidentiality Review

1    Xartemis so quickly?

2         A.    It became quickly apparent that the market

3    was not accepting the product, didn't see the

4    advantages, and we weren't able to significantly grow

5    prescriptions.

6         Q.    And with respect to Exalgo -- Mallinckrodt

7    stopped promoting Exalgo, as you said, sometime around

8    2015 -- was there also a period of time in which it had

9    residual sales after it stopped marketing Exalgo?

10        A.    Yes.  Exalgo -- we ceased marketing of

11   Exalgo when generics for Exalgo launched and Exalgo as

12   a branded product -- we continued to sell it as a

13   branded product without any promotion until very

14   recently, and we also sold a generic version as well

15   during the time after we ceased promotion of the brand.

16        Q.    And so when did Mallinckrodt begin selling

17   the generic version of Exalgo?

18        A.    In the 2014 time frame.

19        Q.    And it continues to sell the generic form

20   today; correct?

21        A.    As of today, yes.

22        Q.    And what -- approximately what percentage

23   of its overall generic portfolio does the Exalgo

24   generic represent?

```
 1          A.      Exalgo generic represents very little.

 2   Probably one percent of our portfolio.

 3          Q.      In terms of the current generic portfolio,

 4   what are the primary generic opioids that represent

 5   Mallinckrodt's generic portfolio?  Strike that.  Today,

 6   what generic opioids represent the largest proportion

 7   of Mallinckrodt generic opioids?

 8          A.      So our largest generic product today in

 9   terms of volume and dollars is hydrocodone with

10   acetaminophen tablets followed I believe by

11   oxycodone with acetaminophen tablets.

12          Q.      And for the hydrocodone with

13   acetaminophen -- I've also seen it referred to as APAP

14   in the documents.

15          A.      Correct.

16          Q.      So for that, what percentage of the

17   overall portfolio does that represent?

18          A.      That -- I believe that product represents

19   roughly 10 percent of the dollars of our entire generic

20   sales and probably represents half of the unit volume.

21          Q.      And the unit volume being the --

22          A.      Meaning individual tablets sold.

23          Q.      Right.  I was just about to say we

24   discussed earlier today your definition of units as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    being individual tablets?

 2          A.    Yeah, that's correct for this case.

 3          Q.    And then same question with respect to the

 4    oxycodone with acetaminophen.  What percentage in terms

 5    of dollars does that represent relative to the overall

 6    generic portfolio today?

 7          A.    Generally I believe that's -- that

 8    product's roughly 10 to 15 percent of our total generic

 9    sales and probably 20 percent of our unit volume.

10          Q.    Got it.  So between the two, sounds like

11    by unit volume they represent about 70 percent of the

12    overall generic portfolio?

13          A.    I believe that's correct.

14          Q.    And anywhere from 20 to 25 percent in

15    terms of sales in dollars?

16          A.    That's correct.

17          Q.    Are you aware of any studies or research

18    talking about the primary ways in which opioids are

19    abused and misused?

20          A.    I am generally aware that those topics

21    have been studied by various different medical

22    professionals.  I'm not specifically aware of any

23    studies.

24          Q.    And if I told you that there were some
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   studies that were performed that -- assuming I can

 2   prove at trial that there were studies that establish

 3   that the primary way in which opioids are abused are

 4   through ingestion -- and by primary I mean over 50

 5   percent -- to what extent does an ADF opioid address

 6   that concern?

 7             MR. TSAI:  Object to the form of the

 8   question.

 9        A.    So first of all, it's a hypothetical

10   question --

11        Q.    (By Mr. Ko)  Sure.

12        A.     -- so I don't know how to evaluate that.

13   But ADF is a broad definition which changes as

14   available technology changes.  If a company was able to

15   develop an abuse deterrent formulation technology which

16   provided some level of resistance to oral abuse, that

17   would be -- obviously that would help provide that type

18   of deterrent.

19        Q.    Are you aware of any type of abuse

20   deterrent formulation technology which provides some

21   level of resistance to oral abuse?

22        A.    I am aware that there are companies who

23   are working to develop such technology, but there are

24   no currently approved products that incorporate
```

Highly Confidential - Subject to Further Confidentiality Review

1    something like that.

2         Q.    Did Mallinckrodt ever develop such

3    technology?

4         A.    Not to my knowledge.

5         Q.    Are you familiar with the concept that

6    Mallinckrodt marketed some of its branded opioids as --

7    well, Xartemis in particular as having less peaks and

8    valleys with respect to the onset of pain?

9         A.    I know that we communicated information

10   about the pharmacokinetic profile which showed a more

11   level blood levels of drug as compared to immediate

12   release products.

13        Q.    How about within the extended release

14   world?  Was there anything about Xartemis in terms of

15   peaks and valleys that were different than the other

16   extended release drugs on the market?

17             MR. TSAI:  Object to form.

18        A.    Xartemis was unique in that it was the

19   only extended release oxycodone with acetaminophen

20   combination product, so there was really no other

21   extended release product to compare to.

22        Q.    (By Mr. Ko)  With respect to the -- were

23   there representations made in the marketing materials

24   on Xartemis about that particular drug having fewer

```
 1   peaks and valleys regarding pain than other branded

 2   opioid drugs on the market?

 3        A.    I am not aware that the marketing

 4   statements made such claims relative to peaks and

 5   valleys of pain.

 6        Q.    Jumping back to the generic opioids that

 7   Mallinckrodt manufactured, we talked earlier today

 8   about oxy 15s and oxy 30s.  Do you recall that?

 9        A.    Yes.

10        Q.    And Mallinckrodt still continues to

11   manufacture and sell those products; is that correct?

12        A.    That is correct.

13        Q.    And have you ever heard of the term roxies

14   or blues?

15        A.    I believe I've heard of the term roxies.

16        Q.    You've never heard of the term blues?

17        A.    I don't think I have.

18        Q.    Have you ever heard of the term M's?

19        A.    No.

20        Q.    And so your understanding of roxies --

21   what's your understanding of that term?

22        A.    My understanding is that's a street name

23   for Roxicodone.

24        Q.    And what -- Roxicodone and what dosage?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    That I don't know.

 2          Q.    And is Roxicodone a generic version of

 3   oxycodone?

 4          A.    Roxicodone is a brand-name version of

 5   oxycodone that --

 6          Q.    That Mallinckrodt manufactured?

 7          A.    Mallinckrodt does manufacture Roxicodone

 8   and we do sell very small volumes of that product.

 9          Q.    Didn't Mall -- just let me make sure I get

10   this straight.  You said Roxicodone is a branded opioid

11   product; correct?

12          A.    It is a brand-name product that we have

13   never marketed or promoted with a sales force of any

14   kind.

15          Q.    But Roxicodone has a generic form as well;

16   correct?

17          A.    That's correct.

18          Q.    And Mallinckrodt manufactures and sells

19   that generic form; correct?

20          A.    That's correct.

21          Q.    And Mallinckrodt manufactured and sold the

22   generic version of Roxicodone from approximately what

23   time period or during what approximate time period?

24          A.    Approximately the late 1990s through
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    today.

2         Q.    And what -- we were talking about general

3    market share of the generic portfolio today of the

4    oxycodone APAP and the hydrocodone APAP.  What

5    percentage does Roxicodone represent of the overall

6    generic portfolio of Mallinckrodt?

7         A.    Are you referring to specifically to the

8    branded Roxicodone?

9         Q.    I'm referring specifically to the generic.

10        A.    Generic Roxicodone.  Generic Roxicodone

11   immediate release tablets, probably on the order of 10

12   percent of our total portfolio.

13        Q.    And during the 2007 through 2010 time

14   period, approximately what percentage did Roxicodone,

15   the generic version, represent of Mallinckrodt's

16   overall generic portfolio?

17        A.    I don't know offhand the specifics.  I

18   believe it was a slightly larger percentage than it is

19   today because we had fewer products in our portfolio

20   then.

21        Q.    Are you aware at all or have you seen any

22   information about the abuse and misuse of generic

23   roxies at any time?

24        A.    I am aware that there is abuse of generic
```

Highly Confidential - Subject to Further Confidentiality Review

1    oxycodone products.

2         Q.    And are you aware that there is specific

3    abuse of generic Roxicodone that Mallinckrodt

4    manufactured?

5         A.    I'm not personally aware of specific cases

6    of abuse of Mallinckrodt Roxicodone, but I know that in

7    general generic versions of oxycodone are abused.

8         Q.    And when we were talking earlier about

9    adverse events reports, I just want to be sure I

10   understand who may know the most about abuse of generic

11   Roxicodone that Mallinckrodt manufactured.  Which

12   department would most likely be aware of this

13   information, if any?

14        A.    Well, the pharmacovigilance team would

15   capture and track that information.

16        Q.    Would --

17        A.     -- as it's reported to us.

18        Q.    Sorry.  I didn't mean to interrupt.  Do

19   you know whether or not Karen Harper or Bill Ratliff

20   had any interactions with the pharmacovigilance

21   department?

22        A.    I don't know if they have or not.

23        Q.    Do you know whether or not DEA compliance

24   groups or departments at Mallinckrodt would interact

Highly Confidential - Subject to Further Confidentiality Review

```
 1    with the pharmacovigilance team?

 2         A.    Yeah, I'm not aware if they do or not.

 3               MR. KO:  Why don't we take a quick break?

 4    I think we've been going for a little over an hour.

 5               THE VIDEOGRAPHER:  We are going off the

 6    record at 4:03 PM.

 7               [A brief recess was taken.]

 8               THE VIDEOGRAPHER:  We are back on the

 9    record at 4:18 PM.

10         Q.    (By Mr. Ko)  Okay, Kevin.  Thank you for

11    your patience today.  I just have a few more questions

12    or a series of questions and then I will be done.

13         A.    Okay.

14         Q.    So thank you for your time.  The court

15    reporter has handed you a copy of what has been marked

16    as Exhibit KV 16.

17               [Exhibit Mallinckrodt-Vorderstrasse-016

18               marked for identification.]

19         Q.    And for the record, KV 16 is Bates-labeled

20    MNK-T1_0000855019, and it's an e-mail dated May 7th,

21    2013, and it contains an attachment titled Exalgo

22    marketing programs ROI.  Do you see that, Kevin?

23         A.    I do.

24         Q.    And we can turn to the e-mail for
```

Highly Confidential - Subject to Further Confidentiality Review

1    reference if you need to, but I mostly have questions

2    on the attachment.  Do you recognize this document at

3    all?

4           A.    No, I do not.

5           Q.    Earlier we had talked about your general

6    skill set including strategies with respect to return

7    on investment, and this appears to be a document that

8    is talking about Exalgo marketing -- the return on

9    investment of Exalgo marketing programs.  Is that fair?

10          A.    That is how they are titled, yes.

11          Q.    And generally speaking, can you describe

12   to the court why it was important for Mallinckrodt to

13   perform ROI-type analysis with respect to its opioid

14   products?

15          A.    Well, I'm not familiar with these

16   documents.

17          Q.    And actually, I have a few specific

18   questions on this document potentially, but I should

19   have just asked you directly.

20          A.    Uh-huh.

21          Q.    So let me ask you directly.  Why was it

22   important for Mallinckrodt to engage in ROI-type

23   analysis with respect to its opioid products?

24          A.    In general a business would engage in an

Highly Confidential - Subject to Further Confidentiality Review

 1    ROI analysis to understand if their investments, if

 2    their spend is achieving the results that they have

 3    expected up front.  Since I'm not familiar with this

 4    particular analysis, I don't know why it was conducted

 5    yet, but understanding that -- the purpose of an ROI

 6    analysis is to determine if the plan that you've put in

 7    place is delivering the results you expect.

 8         Q.   And to the best of your knowledge did

 9    Mallinckrodt perform RO-type analyses with respect to

10    Magnacet, TussiCaps, Exalgo, and Xartemis?

11              MR. TSAI:  Object to the form.

12         A.   To the best of my knowledge we did not

13    routinely perform ROI analysis on any of our branded

14    products.

15         Q.   (By Mr. Ko)  And what is your definition

16    of routinely perform?

17         A.   As a part of regular and recurring

18    business activities.

19         Q.   Did you perform any type of ROA analys --

20    ROI analysis in connection with your generic portfolio?

21         A.   I do not recall any ROI analysis of our

22    marketing efforts within generics.

23         Q.   And separate and apart from marketing

24    efforts, was there any kind of ROI-type analysis done

1    on any aspect of the generic line of Mallinckrodt's

2    business?

3           A.    We did do ROI analysis on capital

4    investment decisions to try to prospectively identify

5    if a particular investment would have a financial

6    benefit.  We may have conducted other ad hoc analyses

7    which were ROI-type analyses on other activities.

8           Q.    And for the former that you just

9    described, what was the baseline or denominator, for

10   lack of a better term, on that analysis of capital

11   investments?  In other words, what -- how were you

12   measuring your return on investment with respect to

13   capital investments?

14          A.    In general, capital investment decisions

15   are analyzed based upon the assessment of what the

16   incremental capability would be that we're putting in

17   place with the additional capital and a comparison of

18   that incremental revenue and profit benefit to the

19   actual cost of that capital.

20          Q.    And so when we're talking about capital

21   investments, is it fair to say that your capital

22   investment decisions as it relates to the generic side

23   of Mallinckrodt's business -- were these analyses done

24   in connection with acquiring a specific generic

Highly Confidential - Subject to Further Confidentiality Review

1   portfolio or product, or provide -- or can you provide

2   the context of what capital investments you're talking

3   about?

4        A.   So the type of capital investment analysis

5   I'm talking about would have been relative to

6   installation of new equipment or changes at the

7   manufacturing facility which would be needed to

8   increase capacity, for instance.

9        Q.   Going back to this document, the cover

10  e-mail, it appears that there's an e-mail exchange --

11  at least the top e-mail between Melissa Falcone and

12  Michael Wessler.  Do you see that?

13       A.   Yes.

14       Q.   Who's Michael Wessler?

15       A.   Michael Wessler was a -- either a product

16  manager or a marketing manager within the branded team.

17       Q.   And we talked earlier today about Melissa

18  Falcone, and you spoke with her in connection with

19  preparing for this deposition; correct?

20       A.   That's correct.

21       Q.   And it appears that she was a senior

22  product manager of Specialty Pharmaceuticals at

23  Mallinckrodt?

24       A.   Yes.

```
1          Q.    And remind me -- is that her current role

2    right now as well?

3          A.    No, that is not her current role any

4    longer.

5          Q.    What is her current role now?

6          A.    I am not certain of her exact title, but

7    she is involved in market access for Mallinckrodt's

8    current -- some of Mallinckrodt's current branded

9    products.

10         Q.    And did she have any involvement at any

11   time with respect to Mallinckrodt's generic portfolio?

12         A.    No, she had no direct involvement with the

13   generics portfolio.

14         Q.    And then going back to Exhibit 2, as we

15   discussed, you did speak with Ms. Falcone in connection

16   with preparing for this deposition.  Approximately how

17   long did you speak with her?

18         A.    I believe the conversation was less than

19   an hour.

20         Q.    And what did you discuss?

21               MR. TSAI:  Objection.  As testified, an

22   attorney was present, so I instruct the witness not to

23   reveal the substance of any attorney-client privileged

24   communications.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    (By Mr. Ko)  And did you -- are you going

 2     to follow that instruction?

 3              A.    Yes.

 4              Q.    And did you ever speak with Ms. Falcone

 5     outside of the presence of counsel?

 6              A.    Not in relation to this matter.

 7              Q.    Going back to Exhibit 2, I just want to

 8     understand more some of the materials you reviewed, and

 9     let's take Topic 10, for example.  It indicates here

10     that you reviewed Mallinckrodt's amended responses to

11     plaintiff's second set of interrogatories.  Do you see

12     that, on the far right-hand column?

13              A.    Yes.

14              Q.    Did you review any other court pleadings

15     or documents in connection with preparing for this

16     deposition today?

17              A.    Not to my knowledge, no.

18              Q.    Are you aware that -- well, you're aware

19     that there have been -- depending on how you count it,

20     but approximately 1,500 jurisdictions that have filed

21     suit in connection with the opioid crisis?

22              A.    Yes, I'm generally aware.

23              Q.    And do you understand that a lot of those

24     lawsuits include Mallinckrodt as a defendant?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Yes.

2          Q.     Have you read any of those complaints that

3    allege Mallinckrodt is responsible or at fault for the

4    opioid crisis?

5          A.     No, I have not.

6          Q.     You've not read any -- you understand that

7    discovery in this case in particular is happening in

8    part for certain bellwether trials that are scheduled

9    to occur next September?  Do you understand that?

10         A.     Yes, I understand that.

11         Q.     And do you know who those bellwethers are?

12         A.     Not specifically, no.

13         Q.     And do you understand that the bellwethers

14   are generally in northeast Ohio or include

15   jurisdictions in Ohio?

16         A.     That I'm aware of, yes.

17         Q.     And have you read the complaint that has

18   been filed by any of the bellwethers that will be going

19   to trial scheduled for next September?

20         A.     No, I have not read the complaint.

21         Q.     Why not?

22                MR. TSAI:  Object to form.

23         A.     Because I wasn't instructed that it was

24   necessary to read the complaint.
```

```
 1          Q.    (By Mr. Ko)  Apart from being instructed,

 2   were you curious at all about the allegations contained

 3   in that complaint about why Mallinckrodt is responsible

 4   for this crisis?

 5          MR. TSAI:  Object to form.

 6          A.    So in discussion with inside and outside

 7   counsel --

 8          MR. TSAI:  Wait.  Hold on.  If you're

 9   going to talk about discussions with counsel, I

10   instruct you not to answer.

11          A.    Okay.  Fair enough.

12          Q.    (By Mr. Ko)  Are you aware of any rulings

13   that have occurred in connection with the national

14   opioid litigation issued by either Judge Polster or

15   Special Master Cohen?

16          A.    I'm not aware of specific rulings.

17          Q.    Are you aware of a report and

18   recommendation issued by a magistrate judge in Ohio

19   regarding defendants' motions to dismiss?

20          MR. TSAI:  Objection as to scope of this

21   line of questions.  Go ahead.

22          A.    I'm not sure if I know anything about

23   that, no.

24          Q.    Sure.  So just to confirm, you haven't
```

Highly Confidential - Subject to Further Confidentiality Review

1    read any of the pleadings or orders that have been

2    issued in connection with the national opioid

3    litigation pending in Ohio; is that correct?

4         A.    So I have read the notice of deposition

5    which contains the topics on which I've prepared, and I

6    have read excerpts from what I believe is the main

7    complaint.

8         Q.    Oh, okay.  So you have reviewed the

9    complaint?

10        A.    I have not reviewed the complaint.  I've

11   read small portions of it.

12        Q.    And which portions did you review?

13        A.    I don't know for sure.  I had the

14   document.  I glanced at it.  So I've seen some of it.

15        Q.    And do you know which complaint you

16   reviewed?

17        A.    I don't know specifically what it was, no.

18        Q.    Other than the amended notice that is

19   reflected in Exhibit 1 and excerpts of the complaint,

20   have you reviewed or read any other court pleadings

21   from the national opioid litigation?

22        A.    No, I don't believe so.

23             MR. KO:  All right.  That's all I have for

24   you.  Thank you so much for your time.  Appreciate your

Highly Confidential - Subject to Further Confidentiality Review

1   patience.  Sadly, I think you're going to have more

2   questioning.  I just do want to note I think we're

3   going to just try and transition without taking a

4   break.

5           MR. TSAI:  Okay.

6           MR. KO:  But just so we note for the

7   record pursuant to the deposition protocol in this

8   case, which allows plaintiffs to take 30(b)6 deposition

9   testimony, when Mallinckrodt designates more than one

10  witness to testify as to the topics in Exhibit 1, the

11  court has allowed for 14 hours of questioning, and

12  today we have gone for approximately five hours and 40

13  minutes, I believe, so plaintiffs -- we'll note for the

14  record that plaintiffs have approximately eight hours

15  and 20, 25 minutes for the remaining two witnesses as

16  designated by Mallinckrodt.

17          THE VIDEOGRAPHER:  Do you want to go off

18  the record?

19          MR. KO:  I think we can just go briefly

20  off the record so that we can switch --

21          THE VIDEOGRAPHER:  We're going off the

22  record at 4:32 PM.

23          [Discussion off the record.]

24          THE VIDEOGRAPHER:  We are back on the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    record at 4:33 PM.

 2              QUESTIONS BY MS. HERZFELD:

 3         Q.   Okay.  Mr. -- it's "Vorderstrassee," as

 4    you say it?

 5         A.   Yes.

 6         Q.   You don't say "strassa" in the German way?

 7         A.   I don't, no.

 8         Q.   Do other people say it that way?

 9         A.   Sometimes.

10              MS. HERZFELD:  My name is Tricia Herzfeld

11    and I am one of the attorneys representing the

12    plaintiffs in the Tennessee state litigation.  Before

13    we get started today, I just want to put a couple of

14    objections on the record.  Number 1, I think my

15    objection to my time today being counted against the

16    MDL has already been stated, but I want to be very

17    clear that we've given plenty of sufficient notice to

18    Mallinckrodt about our intention to participate today,

19    in which we were invited by Mallinckrodt to participate

20    here, and it wasn't until 2:00 PM when the deposition

21    was already well underway that Mallinckrodt is for the

22    very first time raising this issue of having to share

23    time with the MDL, to which we of course object.

24              Secondarily, as has been our ongoing
```

1    objection to the depositions that we've been

2    cross-noticed to in this case, we believe that

3    Mallinckrodt has not appropriately followed the

4    guidelines set down by the MDL court for the

5    cross-noticing of us in these depositions, for the

6    providing of documents, and ensuring that we have

7    sufficient information to go forward to question these

8    witnesses about Tennessee issues for depositions where

9    we have been cross-noticed.  I'm sure counsel will want

10    to say something back as he always does, but those are

11    our objections.

12              MR. TSAI:  Just for the record, we

13    disagree with these characterizations and I -- we heard

14    earlier today that state counsel stated that she had

15    not reviewed the MDL order and in fact is intending to

16    take a second 30(b)6 deposition of the company, which

17    violates the principle underlying the court's orders,

18    and with that we reserve all rights accordingly.

19              MS. HERZFELD:  And I just want to be very

20    clear I didn't say I hadn't reviewed the MDL order.  I

21    said I wasn't subject to the 14 hours.  Our state

22    case is not part of the MDL.  We're under our own

23    jurisdiction, as you are aware.  We'll deal with that

24    in the state court issue, but we fully intend to take

Highly Confidential - Subject to Further Confidentiality Review

```
 1    our own 30(b)6, just to be clear.

 2              MR. KO:  And just so I'm not left out of

 3    the party, I concur -- I concur in Tricia's general

 4    objection that any time she takes today should not be

 5    counted against the 14 hours that we have been provided

 6    for pursuant to the clear terms of the MDL, and as

 7    noted by Tricia we were not given notice until 2:00

 8    today that Mallinckrodt was taking this position.

 9              MS. HERZFELD:  Okay.  Moving on, because I

10    think we all have flights to make.

11         Q.   (By Ms. Herzfeld)  Mr. Vorderstrasse, did

12    you do anything specifically to prepare for questions

13    about Tennessee for your deposition today?

14         A.   No, I did not.

15         Q.   Did you discuss with anybody any

16    particular issues about Mallinckrodt's business in

17    Tennessee in preparation for your deposition today?

18         A.   I discussed with my attorneys as part of

19    preparation the general concept of the issue relative

20    to Tennessee.

21         Q.   And so you have been prepared to answer

22    questions about Tennessee for your testimony today?

23         A.   I have been generally prepared to answer

24    some questions about Tennessee.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And what is your understanding of the

 2    state litigation in Tennessee?

 3          A.    Very minimal.  I know that it has

 4    something to do with drug trafficking laws, and that's

 5    about the extent of it.

 6          Q.    And do you have any idea who the

 7    plaintiffs are in the case?

 8          A.    Not specifically, no.

 9          Q.    What about generally?

10          A.    I don't know whether it's the state itself

11    or if there are others.

12          Q.    And what about drug trafficking laws do

13    you understand the lawsuit to be about?

14          A.    I really don't.  I just know that that's

15    generally what it's related to.

16          Q.    And other than your attorneys, did you

17    speak with anybody else about any drug trafficking

18    issues, as you said, or Mallinckrodt's businesses in

19    Tennessee before your deposition today?

20          A.    No.

21          Q.    Did you review the complaint or any other

22    documents from the Tennessee litigation before

23    testifying today?

24          A.    No.
```

```
 1          Q.    Have you seen any portion of it?

 2          A.    No.

 3          Q.    Has anybody summarized it for you?

 4          A.    No.

 5          Q.    Earlier today you were talking about

 6   procedures related to compensation -- it's Topic 10

 7   which you've been identified -- for folks that had

 8   oversight or control over marketing, sales,

 9   distribution of prescription opioids for the Case Track

10   1 jurisdictions.  Do you remember that general

11   testimony from this morning?

12          A.    Yes.

13          Q.    And does that compensation scheme -- is

14   that different at all for Tennessee?

15          A.    The compensation practices -- excuse me --

16   that we used for our branded sales representatives were

17   individualized, the territories were individualized

18   based upon sales representative, but the overall

19   compensation plan and the way it was built was

20   consistent throughout the country.

21          Q.    And what sales region was Tennessee?

22          A.    I don't know specifically how that region

23   was designated.

24          Q.    Do you know anything about it changing
```

1    over time?

2          A.    I don't know specifics about it changing

3    over time.  I am aware that the sales territories were

4    reevaluated on a periodic annual basis.

5          Q.    Have you ever heard somebody refer to a

6    sales territory called the Nashville district?

7          A.    No, I don't think so.

8          Q.    And who is responsible for dividing up the

9    various districts?

10         A.    The sales districting plan was assembled,

11   analyzed by the commercial analytics team and was

12   subsequently approved by sales management.

13              MS. HERZFELD:  And I'm going to hand you

14   what we're going to mark as Exhibit -- what number?

15              THE REPORTER:  17.

16              MS. HERZFELD:  17.

17              [Exhibit Mallinckrodt-Vorderstrasse-017

18              marked for identification.]

19         Q.    (By Ms. Herzfeld)  Have you had a chance

20   to take a look yet?

21         A.    Not the entire document.

22         Q.    Flip through.  Take your time.

23         A.    Okay.

24         Q.    Okay.  So I have just a couple questions.

1    I want to make sure I understand how you guys break

2    things down.  So within Mallinckrodt in your sales

3    force you have -- what is it -- regions and then

4    districts and then territories, all kind of getting

5    smaller as they go along; is that right?

6         A.    Yes, that's generally correct.

7         Q.    And so when you look at the second slide

8    here, and what it is I've shown you, which appears to

9    be the sales force alignment and placement for MNK795

10   launch, map reports for north central region, dated

11   October 24th, 2013.  Did I read that correctly?

12        A.    Yes, you did.

13        Q.    What is MNK795?

14        A.    MNK795 was the research program identifier

15   for the product which became Xartemis XR upon approval.

16        Q.    And was the map reports for the various

17   sales forces -- were those different for -- how do you

18   say it?  "Xart-emis"?

19        A.    "Xar-temis."

20        Q.    "Xar-temis"?  Than they were for

21   Mallinckrodt's other branded products, or were they

22   generally the same?

23        A.    So I can't say for sure how these differ

24   from past district and territory alignments, but we

Highly Confidential - Subject to Further Confidentiality Review

1     reevaluated the entire sales plan for the launch of

2     Xartemis, and as a result of that we drew specific

3     territories based upon our analysis of prescribers.

4              Q.     And were you personally involved in that

5     process?

6              A.     I was not.

7              Q.     And which team would have been involved in

8     that?

9              A.     This was formally known as the global

10    business insights and forecasting team, also referred

11    to as commercial analytics, which was a part of the

12    branded business group at that time.

13             Q.     And what's it called now?

14             A.     That group no longer exists.

15             Q.     Oh, that's one that no longer exists?

16    Okay.  Okay.  And so at least in 2013 these were the

17    regions, the districts, and the territories for at

18    least a certain section of the country?  That's what

19    we're looking at here; right?

20             A.     Yes, that's correct.

21             Q.     And so do you see if it says region north

22    central in the second slide on the first page?

23             A.     Yes.

24             Q.     Do you see the State of Tennessee included

Highly Confidential - Subject to Further Confidentiality Review

```
 1   in that?

 2        A.    I do.

 3        Q.    So would it appear from this document then

 4   that the State of Tennessee was included in the north

 5   central region?

 6        A.    Yes, I agree with that.

 7        Q.    Now, if you'll flip to the second page

 8   with me.

 9        A.    And actually I should clarify.

10        Q.    Yes, sir.

11        A.    It looks like most of Tennessee is in

12   north central region.  I don't know if the rest of

13   Tennessee was included elsewhere, just to --

14        Q.    Well, that's actually a very astute point.

15   It looks like Memphis is not, so that's a very good

16   point and I take it.  Flipping to the second page, it

17   says district Nashville, Tennessee.  Do you see where

18   I'm looking at?

19        A.    Uh-huh.

20        Q.    The very first slide?

21        A.    Yes.

22        Q.    And so going from -- you probably don't

23   know where Jackson, Tennessee, is, do you?  It's not on

24   the map.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yeah.

 2          Q.    I'll submit to you that Jackson is about

 3    halfway between Nashville and Memphis, so I'm going to

 4    kind of draw this line where the end of the blue is

 5    there and call it Jackson.  Going from most of

 6    Tennessee over to the east.  Does it look like most of

 7    Tennessee there is included within the district called

 8    Nashville, Tennessee?

 9          A.    Yes, it appears so.

10          Q.    And then the various territories are

11    included within that.  If you keep flipping with me,

12    you've got a couple territories there in North

13    Carolina.  If you flip to the next page, which is Page

14    4 of this exhibit, there is also a territory for

15    Knoxville, Tennessee, territory for Nashville,

16    Tennessee, territory for Chattanooga, Tennessee,

17    territory for Johnson City, Tennessee.  Keep flipping.

18    And then you've got north and south Nashville,

19    Tennessee.  Do you see all those?

20          A.    Yes, I do.

21          Q.    And those were all designated as separate

22    territories within the Nashville district; is that

23    correct?

24          A.    Yes, that's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         Q.    And did you have anything to do with those
2    designations?
3         A.    No, I did not.
4         Q.    And how many salespeople would cover each
5    territory?
6         A.    It's my understanding that each territory
7    would have one sales representative.
8         Q.    And would they sometimes have more than
9    one territory or did you generally do one per
10   territory?
11        A.    My general understanding is it's one per
12   territory.
13        Q.    And did you have anything to do with
14   receiving information from those salespeople from those
15   territories within Tennessee?
16        A.    No, I did not personally.
17        Q.    Did you oversee people who did?
18        A.    No, I did not.
19        Q.    So do you have any information about any
20   sales information that would have been coming from the
21   various territories in Tennessee making its way up
22   through the upper echelon of Mallinckrodt?
23        A.    I do not have any of that information, no.
24        Q.    Great.  Do you know who would?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    So that would be contained in our

 2   financial records.  In terms of individuals who might

 3   have that information, I'm not sure any individuals who

 4   would still be with the company who would have that

 5   information.

 6          Q.    Can you think of any names of people who

 7   are no longer with the company who might have that

 8   information?

 9          A.    I'm trying to think if this is the time

10   period when Ron Wickline was in charge of the sales

11   team.

12          Q.    Can you think of anybody else?

13          A.    I guess Hugh O'Neill was the president of

14   pharmaceuticals at the time.

15          Q.    Can you think of anybody else?

16          A.    Not specific names, no.

17          Q.    Have you ever been to Tennessee?

18          A.    I have been to Tennessee, yes.

19          Q.    Where have you been?

20          A.    Nashville, Memphis, Chattanooga.

21          Q.    And you just come as a visitor?  Do you

22   own property?

23          A.    Just a visitor.

24          Q.    And when's the last time you've been to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Tennessee?

 2         A.    I guess October.

 3         Q.    October of this year?

 4         A.    Yes.

 5         Q.    Oh, okay.  Where did you go?

 6         A.    I drove through.

 7         Q.    Have you ever been to upper east

 8    Tennessee, Appalachian region?

 9         A.    I've driven through that area.

10         Q.    What years?

11               MR. TSAI:  Objection to scope.

12         Q.    (By Ms. Herzfeld)  You can answer.

13         A.    Gosh, I guess it was probably 1995 or

14    1996.

15         Q.    Have you ever been to Tennessee for work?

16         A.    Yes.

17         Q.    And when would that have been?

18         A.    Approximately three -- three or four years

19    ago to the Memphis area.

20         Q.    Was that the only time for work that

21    you've come to Tennessee?

22         A.    I think I attended a conference there back

23    in the 1990s.

24         Q.    Other than the conference and the time
```

Highly Confidential - Subject to Further Confidentiality Review

1    going to Memphis?

2         A.    That was the only two times.

3         Q.    And what brought you to Memphis three or

4    four years ago for work?

5               MR. TSAI:  Objection to scope.  What topic

6    does this relate to?  What 30(b)6 topic does this

7    relate to?

8         Q.    (By Ms. Herzfeld)  You can answer the

9    question.

10        A.    I came to Memphis to visit two customers

11   in the generics business at that time.

12        Q.    And who were the two customers?

13        A.    McKesson was one, and AcelRx.  They were a

14   hospice provider.

15        Q.    And what brought you to visit those two

16   customers in Memphis?

17        A.    Just a general business discussion and

18   just a relationship meeting.

19        Q.    Who asked for the meeting -- them or you?

20              MR. TSAI:  Objection to scope.

21        A.    I don't recall.

22        Q.    (By Ms. Herzfeld)  And were either of

23   those customers folks that distributed Mallinckrodt's

24   opioid products?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      McKesson distributed our opioid products

2    and AcelRx purchased our opioid products for dispensing

3    to their pharmacy patients.

4          Q.      And were Mallinckrodt's opioid products

5    discussed at all during those two meetings?

6                  MR. TSAI:  Object to scope.

7          A.      I believe so.

8          Q.      (By Ms. Herzfeld)  What was the content of

9    those discussions?

10                 MR. TSAI:  Object to scope.

11         A.      I don't recall the content.

12         Q.      (By Ms. Herzfeld)  Were you selling?

13         A.      Those were not sales calls.  Those were

14   general relationship calls where we visited their

15   facilities to see their operation, and I'm sure in the

16   course of that visit we saw our product in their

17   distribution centers and discussed general comments

18   about how our products were either used or transported.

19         Q.      And were there -- was there any discussion

20   about diversion of Mallinckrodt opioids at either of

21   those meetings?

22                 MR. TSAI:  Object to scope.  Diversion is

23   outside the scope of the designated topics for this

24   witness.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.    I don't recall any such discussions.

 2           Q.    (By Ms. Herzfeld)  What about the abuse of

 3    Mallinckrodt opioids or opioids in general at those

 4    meetings?

 5           A.    I don't recall anything like that.

 6           Q.    Is there anything else about the

 7    discussions that you do recall?

 8                 MR. TSAI:  Object to scope.  Not a proper

 9    30(b)6 topic.

10           Q.    (By Ms. Herzfeld)  You can answer.

11           A.    No, I don't remember any other specifics.

12           Q.    And would there have been paperwork

13    associated with those meetings?

14                 MR. TSAI:  Object to scope.

15           Q.    (By Ms. Herzfeld)  A report or e-mail or

16    something you'd write on the way back?

17           A.    Something was probably generated, not

18    necessarily by myself, but by others who were there.

19           Q.    And if I were looking for those, where

20    would I look?

21                 MR. TSAI:  Object to scope.

22           A.    E-mails.

23           Q.    (By Ms. Herzfeld)  E-mails?  Okay.  And

24    you probably would have been copied on them, would be
```

Highly Confidential - Subject to Further Confidentiality Review

1    my guess?

2                    MR. TSAI:  Object to scope.

3          A.    That's possible.

4          Q.    (By Ms. Herzfeld)  So they weren't sales

5    calls, you didn't talk about diversion, you didn't talk

6    about abuse of opioids.  Did you talk about

7    chargebacks?

8                    MR. TSAI:  Object to scope.  Not a proper

9    30(b)6 question.  Go ahead.

10         A.    No, from my recollection we talked with

11   McKesson about their general operation, about any --

12   like any feedback that we had for them about the

13   ordering process, any feedback they had for us about

14   how product was packaged or shipped.  The visit with

15   AcelRx was relative to seeing their operation, talking

16   to them in general about their business and goals for

17   the future.  No specific decisions were made that I can

18   recall.

19         Q.    (By Ms. Herzfeld)  And as we talked

20   before, you said generally there were some differences

21   based on individual salespeople -- I'm paraphrasing

22   you, so tell me if I'm wrong here -- on their

23   compensation, but the general compensation scheme was

24   somewhat uniform; is that right?

```
 1        A.    So --

 2              MR. TSAI:  Object to form.  Go ahead.

 3        A.    So the compensation program was developed

 4   in a consistent manner.  The incentive compensation

 5   plan was set up consistently across territories.  The

 6   individual territory targets were set on a

 7   territory-by-territory basis, and so the goals that

 8   sales representatives were measured against were

 9   territory-specific.  The way they were compensated on

10   those goals was consistent.

11        Q.    (By Ms. Herzfeld)  And do you know

12   anything about the Nashville district and their goals

13   being different?  Do you know any of the specifics on

14   that?

15        A.    I do not.

16        Q.    And then earlier you talked about 852s or

17   867 sales plans.  Do you remember those conversations?

18        A.    We discussed 852 and 867 data.

19        Q.    Data.  Okay.  Did you have any companies

20   that had 852 or 867 arrangements with Mallinckrodt in

21   Tennessee?

22        A.    I am not aware if we had any customers in

23   Tennessee who had those arrangements.

24        Q.    And where could I look to find that
```

Highly Confidential - Subject to Further Confidentiality Review

1    information?

2        A.    The information about which customers

3    provided us with those data feeds would be contained

4    within the distribution agreements with those

5    customers.

6        Q.    And how could I find out which

7    distribution agreements were in Tennessee with you all?

8    I'm assuming there's a bazillion of them.  So are they

9    sorted in a way, are they in a database?  How do they

10   know within like a state territory?

11       A.    Well, so the distribution agreements

12   weren't set up on a state territory basis, and those

13   agreements were all national-level agreements, so you

14   would have to know who the entities are within

15   Tennessee that you were looking for and then find the

16   associated agreement.

17       Q.    Could you look from -- could you do it

18   from the back end and search and see what information

19   was being provided from Tennessee and then undo it that

20   way?

21       A.    I don't know if the EDI data streams

22   provide that kind of location information.

23       Q.    Who would know that?

24       A.    I'm trying to think of specific names.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Others within our company who handle those data streams
 2   would be in the IT department.  But I don't know who
 3   those actual individuals are.
 4        Q.    Somebody in the IT department?
 5        A.    (Nodding "yes.")
 6        Q.    Yes?
 7        A.    Yes.
 8        Q.    Great.  Was there any difference regarding
 9   the chargeback programs or incentive or rebate programs
10   or other contractual agreements between the
11   jurisdictions that you discussed earlier and Tennessee,
12   or was everything kind of the same?
13             MR. TSAI:  Object to form.
14        A.    All of our chargeback agreements and
15   customer agreements were set up for the full
16   corporation, so the -- if the company was a national
17   company, the agreement applied consistently across the
18   country.
19        Q.    (By Ms. Herzfeld)  And what about if it
20   wasn't a national company?  Say it was a regional
21   company or a smaller company.  Was there kind of a
22   standard agreement for that, or how would that work?
23        A.    All of these agreements were negotiated
24   agreements, most often were written on the distribution
```

Highly Confidential - Subject to Further Confidentiality Review

1   customer's paper, and so they started the process and

2   were in the format that they chose.  We negotiated

3   terms as part of establishment of the relationship, and

4   to the extent that these would be regional customers,

5   any of those regional distributor entities or regional

6   pharmacy chains, the agreement would apply consistently

7   throughout their entire region of business.

8        Q.    And if I wanted to find out who

9   specifically was getting chargebacks in Tennessee, how

10  would I find that out?

11       A.    Again, we would have to look at the

12  chargeback transactions and find any of those that were

13  Tennessee -- landed in Tennessee.

14       Q.    And who would I ask for that?  Would that

15  be IT or chargeback department?  Who would that be?

16       A.    That would be handled in our rebates

17  processing team.

18       Q.    And then earlier you were talking about

19  the various types of information you had, the reports,

20  like the IMS data, the various other reports that you

21  could receive.  Did you ever receive -- you meaning

22  Mallinckrodt -- ever receive data at a statewide level,

23  broken down by state?

24       A.    In the past, we did receive IMS data which

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were broken down at a state level for certain datasets,

 2    prescription data specifically.

 3         Q.    When you say in the past, when was that?

 4         A.    So during the period of time that we

 5    marketed branded opioid products, generally between

 6    about 2008-2009 and 2015 or 2016, at that time we did

 7    purchase what IMS refers to as subnational data, so

 8    either in the Xponent data which gave physician-level

 9    information, or in the subnational datasets.  Both of

10    those datasets could be aggregated by state.

11         Q.    And when you say it was broken down by

12    prescription datasets, what does that mean?

13         A.    Generally IMS provides two different data

14    feeds which we purchase.  One is sales information

15    relative to unit volumes, and that's unit volumes being

16    purchased by pharmacies, and then they also provide

17    prescription information which is a collection of

18    information and projection of total market relative to

19    prescriptions dispensed from pharmacies to patients.

20         Q.    And who would have been responsible for

21    reviewing that state-level information?

22         A.    That state-level information was reviewed

23    by the commercial analytics team or -- also called

24    global business insights and forecasting.  That team
```

Highly Confidential - Subject to Further Confidentiality Review

 1    would have had access to state-level data, and as

 2    necessary they would have looked at entire-state data.

 3    More often they aggregated by territory and region.

 4         Q.    So I'm going to try to put this in a

 5    little bit more understandable terms.  So that IMS data

 6    would show you from Tennessee -- I want to make sure

 7    I'm understanding you, because I don't do the pharmacy

 8    thing -- would show you, say, ox -- the generic

 9    oxycodone -- how much of that was going to an

10    individual pharmacy?

11         A.    IMS prescription data will show the number

12    of prescriptions filled for a given product, and state

13    was part of the identifier included.

14         Q.    So it would show how many prescriptions

15    were filled for oxycodone for the State of Tennessee?

16         A.    That would be one data point you could

17    analyze; correct.

18         Q.    Could you also do it by county?

19         A.    So in the Xponent dataset from IMS, we had

20    ZIP code-level information.  I don't know if county was

21    represented or if you'd have to aggregate.

22         Q.    But during those years -- I just want to

23    make sure I understand it.  So during those years when

24    you all were getting that IMS data, 2008 to 2009 to

1    roughly 2015, you would get, for example, how much

2    oxycodone was being prescribed and/or filled by ZIP

3    code?

4         A.    I'm not certain if we got that level of

5    data for prescribed.  There's -- there are two

6    different views to the prescription data that IMS

7    provides.  They do provide some view to prescribed

8    quantities, and then they do provide a view to

9    dispensed quantities.  The gap is the middle is

10   anything that just doesn't get filled at the pharmacy.

11   And I know that the dispensed data we received at a

12   detailed ZIP code level.  I don't know if we received

13   the prescriptions written data at that level.

14        Q.    And who would know that?

15        A.    That would probably at this point be a

16   matter of digging into the data and trying to find

17   what's in there.

18        Q.    And so responsible for that, for looking

19   at that data and kind of ingesting it, would have been

20   the commercial analytics team; is that right?

21        A.    That's correct.  Yes.

22        Q.    And do you know if the commercial

23   analytics team would communicate any of that

24   information to the sales team or to a suspicious order

Highly Confidential - Subject to Further Confidentiality Review

```
 1    monitoring team?

 2         A.    I know that commercial analytics

 3    summarized results by territory and provided those

 4    results to the sales team so that they could evaluate

 5    performance.

 6         Q.    What about communicating those numbers to

 7    the suspicious order monitoring folks?

 8              MR. TSAI:  Object to scope.

 9         A.    I am not aware if they did or not.

10         Q.    (By Ms. Herzfeld)  Who would know that?

11         A.    The people involved in suspicious order

12    monitoring would know that.

13         Q.    Do you know how long Mallinckrodt retains

14    that data?

15              MR. TSAI:  Object to form.

16         A.    How long we retain what?

17         Q.    (By Ms. Herzfeld)  The IMS data that you

18    received.

19         A.    Many of the datasets, including the ZIP

20    code-level Xponent data, were -- our data feed was lost

21    when we ended the contract.  We do have some archived

22    Xponent data.  I don't know -- I can't personally speak

23    to how complete that data is for the entire period of

24    time we sold these products.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    And do you know who would know where that

 2    information is?

 3          A.    So the data that we did have, the Xponent

 4    data that we did have has been produced.

 5          Q.    In the MDL?

 6          A.    I believe so.

 7          Q.    To your lawyers?  Yes?

 8          A.    Yes.

 9          Q.    And how do you know it's been produced?

10          A.    I was told that it has been.

11          Q.    Were you involved in producing it

12    personally?

13          A.    Not personally involved, no.

14          Q.    Were people that report to you involved in

15    producing it?

16          A.    I helped identify that it may still exist

17    and told people where to look.

18          Q.    Great.  Okay.  Fantastic.  And then

19    earlier on you were talking about -- strike -- hold on

20    for just one second.  Okay.  Earlier on you were

21    talking about different databases and reports that

22    Mallinckrodt consults in connection with the sale,

23    marketing, or distribution of its opioid products, and

24    when you talked about all of those, were there any
```

Highly Confidential - Subject to Further Confidentiality Review

1    specific reports other than the IMS data that we just

2    talked about that would have had to do with Tennessee?

3         A.    Outside of IMS data, I'm not aware of any

4    Tennessee-specific reports.

5         Q.    What about any reports that were created

6    or that you ever saw that would have to do with maybe

7    the Appalachian region of Tennessee or the Appalachian

8    region of the country?

9         A.    I'm not aware of any specific reports of

10   that nature.

11        Q.    What about regional reports?  Maybe the

12   U.S. south?  Did you ever see any regional reports

13   about opioid use or sales and marketing of opioids in

14   the south of the United States?

15        A.    No.

16        Q.    And when you were talking about your

17   marketing expenditures earlier, are those broken down

18   by region at all?

19        A.    No, our marketing expenditures for branded

20   products were at most broken down by the product, but

21   not detailed at a regional level.

22        Q.    Which reminds me.  I had a question from

23   earlier that I meant to follow up on.  When you talk

24   about branded opioid products, you talked about -- and

Highly Confidential - Subject to Further Confidentiality Review

```
 1   I'm going to totally mispronounce this.  It was the

 2   "Xart-emis"?

 3        A.    "Xar-temis."

 4        Q.    "Xar-temis"?  Okay.

 5        A.    Or "Xar-tem-is."

 6        Q.    "Xar-tem-is."  You say it differently than

 7   I do, and I'm sure you're correct and I've just read it

 8   too much.  Okay.  And then Exalgo?

 9        A.    Correct.

10        Q.    Am I saying that one right?

11        A.    Yes.

12        Q.    And then you talked a little bit about

13   Roxicodone being a branded opioid.  Is that right?

14        A.    Roxicodone itself is technically a branded

15   product.  It is classified as a brand by FDA, has that

16   brand name on the label.  Mallinckrodt owns the asset,

17   owns the rights to that product, and we do still

18   manufacture and sell that product in very small

19   quantities.  We have never promoted or marketed that

20   product.

21        Q.    And then there's also a generic of that

22   Roxicodone?

23             MR. TSAI:  Objection.  Asked and answered.

24   Duplicative.  Go ahead.
```

```
1          A.    Mallinckrodt and about 12 other companies

2   make a generic Roxicodone.

3          Q.    (By Ms. Herzfeld)  So now we've talked

4   about Xartemis -- probably still missed it up --

5   Exalgo, Roxicodone.  Were there other branded products

6   that Mallinckrodt had?

7                MR. TSAI:  Objection.  Asked and answered.

8   Duplicative.

9          A.    At one point in time we did also sell

10  Magnacet.

11         Q.    (By Ms. Herzfeld)  Okay.  Yeah.

12         A.    And we did sell a product that contained

13  an opioid but was not a pain product, and that's

14  TussiCaps.

15         Q.    We talked about those before.  Other than

16  that, anything else?  Those were kind of the --

17         A.    Those are the only ones.

18         Q.    Great.  Okay.  And do you know if the

19  marketing results for your branded products are broken

20  down by region at all?

21               MR. TSAI:  Objection to the term marketing

22  results.  Go ahead.

23         A.    Our sales results would have been broken

24  down by sales territory and by region, and that would
```

1    have been in terms of prescriptions of our products.

2          Q.    (By Ms. Herzfeld)  So when you were

3    talking before about kind of tracking your return on

4    investment, I want to make sure I understood that as

5    well.  So I want to -- I'm going to back it way up.

6    We're going to go real basic.  So Mallinckrodt

7    generally is going to spend some money on marketing its

8    products and trying to target people in order to get

9    them to prescribe their products; right?

10               MR. TSAI:  Objection to the form.

11         A.    We generally had a marketing budget for

12   our branded products in order to support our selling

13   efforts.

14         Q.    (By Ms. Herzfeld)  And then you can tell

15   if those marketing efforts have been successful or not

16   by how many prescriptions are written for your product

17   in a particular territory; is that right?

18               MR. TSAI:  Object to the form.

19         A.    In terms of analyzing specific marketing

20   efforts, it's really difficult to determine when an

21   individual marketing effort has been successful.  In

22   general, when we set our plans and our marketing

23   budgets, we looked at our overall expectations for the

24   amount of activity that our sales team was going to

1    make in a given year and the expectations around market

2    share or growth in market share for our products.  When

3    doing that, we determined what a reasonable marketing

4    budget would be based on the efforts that we thought

5    were needed and what those efforts cost.

6         Q.    (By Ms. Herzfeld)  And is any of that

7    broken down by region or state?

8         A.    No.

9         Q.    So everything is just kind of nationally

10   this is what we're doing?  You're not doing a different

11   marketing plan for a region, for example?

12        A.    No, all of our efforts were national

13   level.

14        Q.    You said before that you're aware of the

15   opioid crisis.  Are you aware specifically about the

16   opioid crisis in Tennessee?

17        A.    I am not aware of specific details about

18   the situation in Tennessee.

19        Q.    Have you ever heard of something called

20   neonatal abstinence syndrome?

21             MR. TSAI:  Objection to scope.

22        A.    I believe I have seen the term.

23        Q.    (By Ms. Herzfeld)  And what do you

24   understand it to be?

Highly Confidential - Subject to Further Confidentiality Review

 1        A.    I believe it is a situation involving

 2   neonates born to mothers who had been taking opioids

 3   prior to delivery and those neonates then being free of

 4   the opioid.

 5        Q.    Being free of the opioid?

 6        A.    Not receiving the opioid anymore, or

 7   however you want to say it.

 8        Q.    You're saying it in a various scientific

 9   way.  If you say it in another way, is it babies that

10   are born dependent on opioids to your understanding?

11        A.    To my understanding that's the resulting

12   condition, when a baby is born dependent upon opioids.

13        Q.    And do you know where Tennessee ranks in

14   the number of babies that are born with neonatal

15   abstinence syndrome?

16        A.    No, I don't.

17        Q.    When is the first time you think you've

18   heard about neonatal abstinence syndrome?

19        A.    The first time I heard the term I believe

20   was when reading the label for Exalgo.

21        Q.    Have you ever been involved in any

22   meetings or any discussions about neonatal abstinence

23   syndrome in any of Mallinckrodt's products?

24        A.    No, I have not.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    What about for opioids in general?

2        A.    No, I have not.

3        Q.    Have you ever heard of the acronym HIDTA?

4   H -- I'm sorry.  A-H-I-D-T-A.

5        A.    No, I don't think so.

6        Q.    Have you ever heard of something called

7   the Appalachian High-Intensity Drug Trafficking Area?

8              MR. TSAI:  Objection to scope.

9        A.    Yeah, I don't think so.

10       Q.    (By Ms. Herzfeld)  Do you know if anyone

11  at Mallinckrodt was looking at rates of NAS in east

12  Tennessee?

13       A.    I am not aware if anyone was looking at

14  that.

15       Q.    And who -- if I were to try to figure out

16  who would have been, do you know which department that

17  would have fallen under?

18       A.    So market surveillance of adverse events

19  would have been the responsibility of

20  pharmacovigilance.

21       Q.    And would that same department have also

22  been monitoring opioid-related deaths?

23       A.    That same department would have monitored

24  reports of deaths or other adverse events related to
```

```
1    specifically our products.

2         Q.    When you say specifically our products,

3    what do you mean?

4         A.    Relating specifically to reports involving

5    specific Mallinckrodt products as opposed to general

6    opioid reports.

7         Q.    So if it was oxycodone, if they didn't

8    know it was Mallinckrodt, you wouldn't necessarily have

9    been monitoring that, but if it's Mallinckrodt opioid,

10   then that's something that would have been monitored?

11        A.    It's my general understanding that the

12   pharmacovigilance processes didn't capture information

13   on unidentified products of that nature.

14        Q.    Do you know how products were identified

15   if somebody dies -- which product?

16        A.    I don't know the details of how that would

17   be identified.  I'm sure it would be different

18   depending on the case.

19        Q.    Earlier you were talking about the process

20   used to determine which medical professionals your

21   sales representatives would individually contact with

22   respect to your opioid products.  Do you remember that

23   conversation from earlier today?

24        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Do you know who the sales reps targeted in
2   Tennessee?
3        A.    I don't know specifically who they
4   targeted, no.
5        Q.    Do you know who would?
6        A.    I don't believe there's anyone at the
7   company who would know those specifics, and I don't
8   know if there are still documents that would have that.
9        Q.    Why would there not be documents about
10  that anymore?
11       A.    I'm just not aware of those documents.
12       Q.    And why would nobody from the company know
13  anymore?
14       A.    There are very few people still with our
15  company who sold these products in the past, and those
16  who are with the company were not directly involved
17  with that level of detail.
18       Q.    And when did you -- I'm sorry.  I think
19  you had said that before.  Was it 2015 that that
20  program stopped?
21       A.    Generally 2015 our marketing efforts
22  around branded opioids ceased.
23       Q.    And that would be your specific sales --
24  targeting of doctors for sales as well?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Targeting doctors for sales, creation of

 2  marketing materials and marketing plans.

 3        Q.    So you don't know if anyone was flagged

 4  for removal from a sales target list for Mallinckrodt

 5  in Tennessee?

 6        A.    I don't know specific to Tennessee, no.

 7        Q.    Do you know where I could find that

 8  information, or is your answer the same?

 9        A.    You would have to find the old sales

10  plans, and I don't know where those are kept.

11        Q.    Somebody in the sales department would

12  know?

13        A.    Well, sales department doesn't exist

14  anymore, so it would probably be captured in e-mails

15  and other collected correspondence.

16        Q.    To your knowledge there weren't any

17  documents that were destroyed by Mallinckrodt about

18  sales?

19        A.    Not to my knowledge, no.

20        Q.    So you didn't see anything there was like,

21  okay, the sales department's going away, let's get rid

22  of all the documents?

23        A.    I didn't hear of anything like that, no.

24        Q.    So hypothetically the documents should
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    still exist, just probably in a different spot?

 2              MR. TSAI:  Object to form.

 3         A.   Hypothetically.

 4         Q.   (By Ms. Herzfeld)  Did Mallinckrodt

 5    distribute opioids to online retailers?

 6              MR. TSAI:  Object to scope.  There's a

 7    specific topic about online pharmacies that's

 8    designated for a different witness.

 9              MS. HERZFELD:  Okay, but I think it's also

10    encompassed in Number 27.

11         Q.   (By Ms. Herzfeld)  So did Mallinckrodt

12    distribute opioids to online retailers?

13              MR. TSAI:  Object to scope.  27 reads to

14    the extent not encompassed with other topics, and

15    there's a specific topic about online.

16         Q.   (By Ms. Herzfeld)  Okay.  You can answer

17    the question?

18              MR. TSAI:  Same objection.

19         A.   I am not aware of ever selling opioids to

20    online retailers.

21         Q.   (By Ms. Herzfeld)  Have you ever heard of

22    a person named Abdelrahman Mohamed?

23         A.   No, I don't think so.

24         Q.   A prescriber in Tennessee?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Huh-uh.  No.

 2          Q.     What about Timothy Gouter (ph)?

 3          A.     No, I don't think so.

 4          Q.     So you haven't been involved in any

 5   discussions about Mr. Mohamed or Mr. Gouter?

 6          A.     No.

 7          Q.     What about Gary Arlenmore (ph)?

 8          A.     No, I don't believe so.

 9          Q.     Have you ever heard of a doctor named

10   David Florence?

11          A.     No.

12          Q.     He also had a very brief reality show

13   called DocStar.  Have you heard of DocStar?

14                 MR. TSAI:  Objection to scope.

15          A.     No, I've never heard of that.

16          Q.     (By Ms. Herzfeld)  What about Mark Murphy?

17          A.     No.

18          Q.     Ed White?

19          A.     I know a person named Ed White.  I don't

20   know if it's the same person.

21          Q.     Does the Ed White that you know live in

22   Tennessee?

23          A.     I don't believe so.

24          Q.     Does he operate a medical clinic of some
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   sort?

 2          A.    No, he does not.

 3          Q.    Different guy.  Okay.  What about Pam

 4   White?

 5                MR. TSAI:  Objection to scope.

 6          A.    No.

 7          Q.    (By Ms. Herzfeld)  Did you ever hear any

 8   discussions about any particular medical clinics or

 9   doctors' offices within Tennessee during your time at

10   Mallinckrodt?

11          A.    No, not that I can recall.

12          Q.    Were you involved at all in the DEA

13   investigation of Sunrise Wholesale in Delray Beach,

14   Florida?

15                MR. TSAI:  Objection to scope.  DEA

16   matters are specifically designated in other topics

17   designated for another witness.

18                MS. HERZFELD:  Okay.

19          A.    No, I was not involved.

20          Q.    (By Ms. Herzfeld)  Do you know what

21   Mallinckrodt's share was of the opioid market in

22   Tennessee?

23          A.    No, I do not.

24          Q.    And I'm going to give you some different
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    times.  From 2005 to 2010 did you know what the market

 2    share was of Mallinckrodt opioids in Tennessee?

 3         A.    No, we never analyzed share of opioid

 4    market in -- by state at all.

 5         Q.    And what about from 2010 to the present?

 6         A.    No, I do not know.

 7         Q.    Have you ever heard of Tennessee being

 8    referred to as ground zero for the opioid crisis?

 9         A.    No, I don't think so.

10         Q.    What about West Virginia?

11               MR. TSAI:  Objection to scope.

12         A.    I don't know if I've heard the specific

13    term ground zero, but I have heard about West Virginia.

14         Q.    (By Ms. Herzfeld)  Have you heard

15    generally about Appalachia, kind of West Virginia,

16    Kentucky, the mountain region, being particularly hard

17    hit by opioid abuse issues?

18         A.    I'm personally away from the news media

19    about the opioid issues in the Appalachia region.

20         Q.    And when do you think you first became

21    aware of that?

22         A.    I don't remember specifically.  If I had

23    to guess it would be somewhere around maybe 2010.

24         Q.    Do you know how you became aware of it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    The press and the news media.

2           Q.    Not through your official duties at

3    Mallinckrodt?

4           A.    No.

5           Q.    Have you ever heard of something called

6    the Oxy Express?

7                 MR. TSAI:  Objection to scope.

8           A.    No.

9           Q.    (By Ms. Herzfeld)  Have you heard about

10   I-75 being a drug trafficking corridor from Florida to

11   Ohio?

12                MR. TSAI:  Objection to scope.  This is

13   getting into diversion issues that are designated for a

14   different witness.

15                MS. HERZFELD:  Also has to do with abuse.

16          A.    I don't know if I've heard specifically

17   about I-75, no.

18          Q.    (By Ms. Herzfeld)  Have you heard

19   generally about there being some highway, some --

20   taking pills from Florida up north?

21          A.    I've heard generally about a pattern of

22   involvement with Florida.

23          Q.    And where did you hear that?

24          A.    Again, generally in the news media.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Q.     But not through your official involvement

 2     at Mallinckrodt?

 3          A.     Not that I can recall.

 4          Q.     So based on this information that you had

 5     from Appalachia being particularly hard hit by the

 6     opioid abuse epidemic and this kind of movement of

 7     pills going from Florida up north, was there any

 8     differential or different way that the Appalachian

 9     states were treated at all by Mallinckrodt in any of

10     the topics we've discussed today?

11                MR. TSAI:  Objection to the form of the

12     question.

13          A.     So when we -- in the generics business,

14     when we contract with our wholesale and distributor

15     customers or with pharmacy chains, we contract with

16     them based upon their entire scope of operation,

17     whether that's nationwide or regional, and we have

18     processes in place that allow us to work with them to

19     ensure that both sides are complying with the

20     regulations involved with shipment of the products that

21     we sell them.  If there are specific issues with an

22     individual distribution center or pharmacy chain or

23     other type of customer, we have processes in place to

24     address that.

```
 1              Q.    (By Ms. Herzfeld)  So that's a very long

 2     answer about very specific things, but my question is,

 3     was there any sort of a regional change that was made,

 4     like, hey, guys, we got this issue going on in

 5     Appalachia, so we're going to watch our customers'

 6     customers to see what's going on, who they're shipping

 7     to, or we're going to put out an alert to all of our

 8     customers that they need to watch their customers'

 9     customers to see what's going on in the Appalachian

10     region?  Was there any differential in that regard?

11              MR. TSAI:  Objection to the form of the

12     question.  Beyond the scope of the topics for this

13     witness.

14         A.    I am not aware of anything like that that

15     occurred and am not prepared to speak to that.

16         Q.    (By Ms. Herzfeld)  So -- but the topics

17     you did speak on today, though, having to do with

18     abuse, having to do with sales, having to do with

19     compensation, having to do with chargeback

20     information -- all the topics that you've talked about,

21     I just want to be clear that there wasn't any

22     differential that was for the Appalachian region or for

23     Tennessee.

24              MR. TSAI:  Objection to the form of the
```

```
 1   question.

 2          A.     Any of the programs that you mentioned

 3   relative to targeting and incentivizing the branded

 4   sales team or administering contracts with our

 5   distribution partners were all established at a

 6   national level consistent with our overall plans or

 7   business processes.

 8          Q.     (By Ms. Herzfeld)  So to piggyback off of

 9   that, and so nothing was -- nobody was treated

10   differently if they were in Appalachia or Tennessee?

11   You treated all states the same?

12                 MR. TSAI:  Objection to the form.

13          A.     Our decisions were made for individual

14   distributors or prescribers based upon the activity at

15   that particular customer or prescriber, and it was not

16   catered to a certain region but more to the specific

17   activity.

18          Q.     (By Ms. Herzfeld)  So I'm going to repeat

19   my question one more time so I can be really clear

20   about it.  I just want to know, for sales or for

21   compensation or incentives or any of those things that

22   you've talked about -- I understand you're saying

23   sometimes things are treated differently based on

24   individual circumstances, but from a regional or a
```

1    state level, everything was the same, nobody was

2    treated differently in Appalachia or Tennessee as they

3    were countrywide?

4                 MR. TSAI:  Objection to form.

5         Q.    (By Ms. Herzfeld)  It's just a yes or no.

6                 MR. TSAI:  Objection to form.

7         A.    I still will go back to my same answer

8    that the plans we put in place were consistent on a

9    nationwide basis and consistent across our business.

10   If there were individual health care practitioners or

11   individual distributors or wholesalers purchasing

12   product from us that did not abide by the agreements

13   that were in place, we took action on that specific

14   incident.  We did not take action on a regional basis

15   based upon other information.

16        Q.    (By Ms. Herzfeld)  Or on a statewide basis

17   based on other information?

18                THE WITNESS:  Or on a statewide basis.

19   That's correct.

20                MS. HERZFELD:  If we can just go off the

21   record for a minute, please.

22                THE VIDEOGRAPHER:  We are going off the

23   record at 5:31 PM.

24                [Whereupon the proceedings were

Highly Confidential - Subject to Further Confidentiality Review

```
1                    concluded.]

2                   [5:31 p.m.]

3                      [SIGNATURE RESERVED.]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3           I, JOHN ARNDT, a Certified Shorthand

 4   Reporter and Certified Court Reporter, do hereby

 5   certify that prior to the commencement of the

 6   examination, KEVIN VORDERSTRASSE was sworn by me to

 7   testify the truth, the whole truth and nothing but the

 8   truth.

 9           I DO FURTHER CERTIFY that the foregoing is a

10   true and accurate transcript of the proceedings as

11   taken stenographically by and before me at the time,

12   place and on the date hereinbefore set forth.

13           I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither a

16   relative nor employee of such attorney or counsel, and

17   that I am not financially interested in this action.

18

19

20           _____

21           JOHN ARNDT, CSR, CCR, RDR, CRR

22           CSR No. 084-004605

23           CCR No. 1186

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

2

3              I, KEVIN VORDERSTRASSE, the witness

4      herein, having read the foregoing testimony of the

5      pages of this deposition, do hereby certify it to be a

6      true and correct transcript, subject to the

7      corrections, if any, shown on the attached page.

8

9

10

11                              _____

12                              KEVIN VORDERSTRASSE

13

14

15    Sworn and subscribed to before me,

16    This _____ day of _____, 201_.

17

18

19    _____

20         Notary Public

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1

2                    DEPOSITION ERRATA SHEET

3

4    Page No._____Line No._____Change to:_____

5    _____

6    Reason for change:_____

7    Page No._____Line No._____Change to:_____

8    _____

9    Reason for change:_____

10   Page No._____Line No._____Change to:_____

11   _____

12   Reason for change:_____

13   Page No._____Line No._____Change to:_____

14   _____

15   Reason for change:_____

16   Page No._____Line No._____Change to:_____

17   _____

18   Reason for change:_____

19   Page No._____Line No._____Change to:_____

20   _____

21   Reason for change:_____

22

23   SIGNATURE:_____DATE:_____

24                    KEVIN VORDERSTRASSE