1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION
                    -   -   -
3
      IN RE:  NATIONAL        :   HON. DAN A.
4     PRESCRIPTION OPIATE     :   POLSTER
      LITIGATION              :
5                             :
      APPLIES TO ALL CASES    :   NO.
6                             :   1:17-MD-2804
                              :
7
            - HIGHLY CONFIDENTIAL -
8
      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
9
10                      VOLUME I
11

                     -   -   -
12
                 December 5, 2018
13
                     -   -   -
14
15           Videotaped deposition of
      GARY J. VORSANGER, Ph.D., M.D., taken
16    pursuant to notice, was held at the law
      offices of Drinker Biddle & Reath, 105
17    College Road East, Princeton, New Jersey,
      beginning at 9:26 a.m., on the above
18    date, before Michelle L. Gray, a
      Registered Professional Reporter,
19    Certified Shorthand Reporter, Certified
      Realtime Reporter, and Notary Public.
20
                     -   -   -
21
22          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1     APPEARANCES:
 2
 3         SIMMONS HANLY CONROY, LLC
           BY:  JAYNE CONROY, ESQ.
           112 Madison Avenue
 4         7th Floor
           New York, New York 10016
 5         (212) 784-6400
           jconroy@simmonsfirm.com
 6
               - and -
 7
           SIMMONS HANLY CONROY, LLC
 8         BY:  SARAH BURNS, ESQ.
           One Court Street
 9         Alton, Illinois 62002
           (618) 259-2222
10         Sburns@simmonsfirm.com
           Representing the Plaintiffs
11
12         O'MELVENY & MYERS, LLP
           BY:  CHARLES LIFLAND, ESQ.
13         400 South Hope Street, 18th Floor
           Los Angeles, California 90071
14         (213) 430-6665
           clifland@omm.com
15
               - and -
16
           O'MELVENY & MYERS, LLP
17         BY:  VINCENT S. WEISBAND, ESQ.
           Times Square Tower
18         7 Times Square
           New York, New York 10036
19         (212) 326-2000
           vweisband@omm.com
20         Representing the Defendants, Janssen
           and Johnson & Johnson and the
21         Witness
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      APPEARANCES:  (Cont'd.)
 2
        PIETRAGALLO GORDON ALFANO BOSICK &
 3      RASPANTI, LLP
        BY:  ALEXANDER M. OWENS, ESQ.
 4      1818 Market Street, Suite 3402
        Philadelphia, Pennsylvania 19103
 5      (215) 320-6200
        amo@pietragallo.com
 6      Representing the Defendant, Cardinal
        Health
 7
 8      TELEPHONIC APPEARANCES:
 9
        WEISMAN KENNEDY & BERRIS CO LPA
10      BY:  DANIEL P. GOETZ, ESQ.
        1600 Midland Building
11      101 W. Prospect Avenue
        Cleveland, Ohio 44115
12      (216) 781-1111
        dgoetz@weismanlaw.com
13      Representing the Plaintiffs
14
        ALLEGAERT, BERGER & VOGEL, LLP
15      BY:  MICHAEL S. VOGEL, ESQ.
        BY:  LOUIS A. CRACO, JR., ESQ.
16      111 Broadway, 20th Floor
        New York, New York  10006
17      (212) 616-7060
        mvogel@abv.com
18      lcraco@abv.com
        Representing the Defendant,
19      Rochester Drug Corporation
20
        COVINGTON & BURLING, LLP
21      BY:  LAUREN C. DORRIS, ESQ.
        850 10th Street, NW
22      Washington, DC 20001
        (202) 662-6000
23      ldorris@cov.com
        Representing the Defendant, McKesson
24      Corporation
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      TELEPHONIC APPEARANCES:   (Cont'd.)
 2
        JACKSON KELLY, PLLC
 3      BY:  GRETCHEN M. CALLAS, ESQ.
        500 Lee Street East
 4      Suite 1600
        Charleston West Virginia 25301
 5      (304) 340-1169
        Gcallas@jacksonkelly.com
 6      Representing the Defendant,
        AmerisourceBergen
 7
 8      ARNOLD & PORTER KAYE SCHOLER, LLP
        BY:  RYAN Z. WATTS, ESQ.
 9      601 Massachusetts Avenue, NW
        Washington, DC 20001
10      (202) 942-6609
        Ryan.watts@arnoldporter.com
11      Representing the Defendants, Endo
        Health Solutions Endo
12      Pharmaceuticals, Inc.; Par
        Pharmaceutical Companies, Inc. f/k/a
13      Par Pharmaceutical Holdings, Inc.
14
        FOX ROTHSCHILD, LLP
15      BY: EILEEN OAKES MUSKETT, ESQ.
        1301 Atlantic Avenue
16      Midtown Building, Suite 400
        Atlantic City, New Jersey 08401
17      (609) 348-4515
        Emuskett@foxrothschild.com
18      Representing the Defendant, Validus
        Pharmaceuticals
19
20      WILLIAMS & CONNOLLY, LLP
        BY:  JOSEPH S. BUSHUR, ESQ.
21      725 12th Street, NW
        Washington, D.C. 20005
22      (202) 434-5148
        Jbushur@wc.com
23      Representing the Defendant, Cardinal
        Health
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        TELEPHONIC APPEARANCES:  (Cont'd.)
 2

          HUGHES HUBBARD & REED, LLP
 3        BY:  TINA M. SCHAEFER, ESQ.
          2345 Grand Boulevard
 4        Kansas City, Missouri 64108
          (816) 709-4159
 5        tina.schaefer@hugheshubbard.com
          Representing the Defendant, UCB,
 6        Inc.
 7

          JONES DAY
 8        BY:  NICOLE LANGSTON, ESQ.
          77 West Wacker
 9        Chicago, Illinois 60601
          (312) 782-3939
10        nlangston@jonesday.com
          Representing the Defendant, Walmart
11

12        CLARK MICHIE, LLP
          BY:  BRUCE CLARK, ESQ.
13        103 Carnegie Center, Suite 300
          Princeton, New Jersey 08540
14        (609) 423-2144
          bruce.clark@clarkmichie.com
15        Representing the Defendant, Pernix
16

          ALSO PRESENT:
17

18        VIDEOTAPE TECHNICIAN:
19           Henry Marte
20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -
 2                I N D E X
 3                    -   -   -
 4

    Testimony of:
 5
            GARY J. VORSANGER, Ph.D., M.D.
 6
 7  By Ms. Conroy                      11
 8
 9
10
11                    -   -   -
12                E X H I B I T S
13                    -   -   -
14
15  NO.             DESCRIPTION          PAGE
16  Janssen
    Vorsanger-1  Notice of Deposition  13
17
    Janssen
18  Vorsanger-2  Curriculum Vitae      25
                 Gary J.
19               Vorsanger, Ph.D., M.D.
                 JAN-MS-02320343-54
20
    Janssen
21  Vorsanger-3  Center for Drug       209
                 Evaluation and Research
22               Approval Package
                 Duragesic
23               Fentanyl Transdermal
                 System
24               4/9/01
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -
 2             E X H I B I T S  (Cont'd.)
 3                      -   -   -
 4
 5   NO.              DESCRIPTION              PAGE
 6   Janssen
     Vorsanger-4   Center for Drug        246
 7                 Evaluation and Research
                   Approval Package
 8                 Duragesic
                   Fentanyl
 9                 2/7/08
10   Janssen
     Vorsanger-5   E-mail Thread          258
11                 12/9/02
                   Subject, Share of Voice
12                 Request from Pain
                   and Mycology
13                 JAN-MS-02125643-47
14   Janssen
     Vorsanger-6   E-mail Thread          266
15                 7/21/11
                   Subject, Per Your Request
16                 Nucynta BP Slides
                   & Attachment
17                 JAN-MS-02267733-34
18   Janssen
     Vorsanger-7   E-mail, 9/16/03        323
19                 Subject, Opioid Abuse
                   Ad Board Roadmap
20                 & Attachment
                   JAN-MS-02119672-87
21
     Janssen
22   Vorsanger-8   E-mail Thread          340
                   10/28/03
23                 Subject, Draft Program
                   & Attachment
24                 JAN-MS-02113206-19
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2         E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5   NO.             DESCRIPTION            PAGE
 6   Janssen
     Vorsanger-9  E-mail, 1/27/04      341
 7                Subject, Summary of
                  Abuse
 8                Advisory Committee
                  JAN-MS-02105452-28
 9
     Janssen
10   Vorsanger-10 E-mail, 9/23/03      391
                  Subject, Abuse Stuff
11                & Attachment
                  JAN-MS-00613131-33
12
     Janssen
13   Vorsanger-11 E-mail, 11/13/03     400
                  Subject, Draft of
14                Study Outlines
                  & Attachment
15                JAN-MS-00613204-05
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2            DEPOSITION SUPPORT INDEX

 3                    -   -   -

 4

 5   Direction to Witness Not to Answer

 6   PAGE    LINE
     None.

 7

 8   Request for Production of Documents

 9   PAGE    LINE
     None.

10

11   Stipulations

12   PAGE    LINE
     None.

13

14   Questions Marked

15   PAGE    LINE
     None.

16

17

18

19

20

21

22

23

24
```

```
1                    -   -   -

2              THE VIDEOGRAPHER:  We are

3        now on the record.  My name is

4        Henry Marte.  I'm a videographer

5        with Golkow Litigation Services.

6              Today's date is December 5,

7        2018, and the time is 9:26 a.m.

8              This videotaped deposition

9        is being held in Princeton, New

10        Jersey in the matter of National

11        Prescription Opiate Litigation.

12              The deponent today is Dr.

13        Gary Vorsanger.

14              All appearances are noted on

15        the stenographic record.

16              The court reporter, Michelle

17        Gray, will now administer the oath

18        to the witness.

19                    -   -   -

20    ... GARY J. VORSANGER, Ph.D., M.D.,

21    having been first duly sworn, was

22    examined and testified as follows:

23                    -   -   -

24                 EXAMINATION
```

Highly Confidential - Subject to Further Confidentiality Review

1                        -  -  -

2    BY MS. CONROY:

3         Q.    Good morning, Doctor.  My

4    name is Jayne Conroy.  I represent the

5    plaintiffs in this case.  And we're here

6    today in Princeton, New Jersey; is that

7    correct?

8         A.    Correct.

9         Q.    Have you ever been deposed

10   before?

11        A.    I have not.

12        Q.    Okay.  I'm sure your lawyer

13   gave you some of the ground rules, but if

14   at any point you don't understand what

15   I'm asking, you can ask me to rephrase or

16   if you can't hear me, let me know, or if

17   you need a break, let all of us know and

18   don't forget to unplug yourself from the

19   microphone, which we will forget to do.

20   But we'll try and remind you.

21            The only thing I think we

22   ask is that if I'm asking a question, you

23   wait until I finish.  And then I will try

24   not to step on your answer when I'm

Highly Confidential - Subject to Further Confidentiality Review

1    asking questions.  It makes it easier for

2    the court reporter for the record.

3         A.    Okay.

4         Q.    Who is your current

5    employer?

6         A.    So I'm currently

7    self-employed.

8         Q.    Okay.  And do -- is it -- do

9    you have a corporation or any sort of a

10   business?

11        A.    I have an LLC.

12        Q.    Okay.  And what's the name

13   of it?

14        A.    It's Crossroads Medical and

15   Scientific Consulting LLC.

16        Q.    And what is the business of

17   Crossroads Medical and Scientific

18   Consulting?

19        A.    Medical and scientific

20   consulting predominately to the

21   pharmaceutical industry.

22        Q.    What kind of consulting?

23        A.    So if there were questions

24   about clinical trial design or things

1    like that, that companies were needing

2    additional help on, then I'm able to, you

3    know, provide those type of support

4    services to them.

5           Q.    Okay.  And how long have you

6    had that business?

7           A.    It really began the

8    beginning of this year, 2018.

9           Q.    Do you have any clients

10   currently?

11          A.    I do not at the current

12   time.

13          Q.    Have you had any since you

14   started the business?

15          A.    I have not.

16          Q.    Let me show you what I've

17   marked as Exhibit 1.

18                (Document marked for

19                identification as Exhibit

20                Janssen-Vorsanger-1.)

21   BY MS. CONROY:

22          Q.    And let me just explain to

23   you.  If I'm going to be asking you

24   questions today about any documents,

Highly Confidential - Subject to Further Confidentiality Review

1    typically I will mark them as an exhibit.

2    You see there's a sticker there on the

3    bottom?

4            A.    Yes.

5            Q.    And hand them to you and

6    your lawyer will have a copy as well.

7                 And for purposes of

8    potentially any of the jurors or the

9    judge watching this video, they'll also

10   see it on a screen, it's just a little

11   bit hard for us to see it on the screen

12   here in the room.  But thankfully we have

13   hard copies.

14                Have you ever seen this

15   document before, Exhibit 1, which is the

16   amended deposition of Gary Vorsanger?

17   It's a deposition, we call it a

18   deposition notice.

19           A.    I have not.

20           Q.    When did you first hear

21   about this deposition, that there would

22   be a deposition of you?

23           A.    So I was contacted from one

24   of the Johnson & Johnson attorneys

Highly Confidential - Subject to Further Confidentiality Review

1    letting me know that I was being deposed.

2          Q.    And I'm sure your lawyer has

3    cautioned you.  I don't want you to tell

4    me anything that you have -- any

5    discussions you've had with your lawyers.

6    Okay?

7          A.    Right.

8          Q.    I just want to caution you

9    in case you blurt out, Mr. Lifland will

10   object if he thinks that may happen.

11   Okay?

12         A.    Okay.

13         MR. LIFLAND:  But you're

14         free to -- you're free to say you

15         were contacted at such and such a

16         date or you met with us at such

17         and such a date.  Just don't

18         disclose the substance of any

19         conversations you've had.

20         THE WITNESS:  Okay.

21   BY MS. CONROY:

22         Q.    Okay.

23         Approximately how long ago

24   was that phone call?

```
1          A.    Sometime in July of this
2   year.
3          Q.    And have you had any
4   face-to-face or telephone conferences
5   since that date about this deposition?
6          A.    Yes.
7          Q.    Okay.  Have you had any
8   face-to-face meetings?
9          A.    Yes.
10         Q.    And were they to prepare you
11  for this deposition?
12         A.    Yes.
13         Q.    And how many did you have?
14         A.    Several.
15         Q.    Did they begin sometime in
16  July?
17         A.    There was some discussion,
18  but the preparation for this took place
19  later on.
20         Q.    Okay.  Where do you live,
21  what city?
22         A.    I'm sorry?
23         Q.    Where do you live?
24         A.    Oh, I live in Yardley, PA,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Pennsylvania.

 2           Q.     Pennsylvania?

 3           A.     Yeah.

 4           Q.     How far away is that?

 5           A.     From Princeton?

 6           Q.     Yes.

 7           A.     About, about 40 minutes plus

 8    or minus.

 9           Q.     Okay.  So it's -- you can

10    drive here?

11           A.     Yes.

12           Q.     To where -- to where the

13    deposition is?

14           A.     Yes.

15           Q.     And where were the meetings

16    held?

17           A.     The meetings were held in

18    Titusville, New Jersey.

19           Q.     And how far away is

20    Titusville from Princeton where we are

21    today?

22           A.     I'm not sure.  It's -- it's

23    easily within travel distance by car.

24           Q.     Okay.  And so could you
```

1   drive to Titusville from Yardley?

2        A.    Yes, it's close.

3        Q.    And were they full day

4   meetings?

5        A.    I didn't keep track of the

6   time, but they -- they went on for a

7   little while.

8        Q.    Did you review any documents

9   at those meetings?

10       A.    Yes.

11       Q.    Did you bring any documents

12  to those meetings, documents that were in

13  your possession?

14       A.    I don't recall.  I don't

15  think so.

16       Q.    When did -- when were you

17  last employed by Johnson & Johnson?

18       A.    I retired from Johnson &

19  Johnson on June 30, 2017.

20       Q.    And when you retired, did

21  you bring any files home with you or have

22  any hard copies of any documents from

23  Johnson & Johnson?

24       A.    No, I did not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What about an e-mail

2    address.  Did you retain a Johnson &

3    Johnson e-mail address?

4    A.    No, I did not.

5    Q.    Did you retain any

6    electronic files from your years of

7    employment at Johnson & Johnson?

8    A.    No.  I have no files from my

9    work at J&J.

10    Q.    What about copies of things

11    like posters that were presented at the

12    American Pain Society or any other types

13    of posters that you worked on that you

14    presented, do you have copies of those at

15    home?

16    A.    I do not.  No, those were --

17    I did not take those with me.

18    Q.    Okay.  What about any

19    publications, copies of publications that

20    you authored or co-authored with others?

21    A.    No, I didn't take any of

22    those documents either.

23    Q.    And I mean -- when you say

24    no documents, that means electronic as

Highly Confidential - Subject to Further Confidentiality Review

1    well?

2        A.    Correct.  Printed and

3    electronic.

4        Q.    Okay.  Who was present at

5    the -- these deposition preparation

6    meetings?

7        A.    My attorneys.

8        Q.    And who are they?

9        A.    There were attorneys from

10   O'Melveny & Myers.

11       Q.    And when you said your

12   attorneys, are they your personal

13   attorneys?

14       A.    The attorneys for Janssen

15   and for myself.

16       Q.    And do you know their names?

17       A.    Yes.  They are sitting with

18   us now.

19       Q.    Okay.  So Mr. Lifland?

20       A.    Yes.

21       Q.    And, I'm sorry --

22            MR. LIFLAND:  Weisband,

23       W-E-I-S-B-A-N-D.  Vincent

24       Weisband.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. CONROY:

 2         Q.    You can put the notice away.

 3               Dr. Vorsanger, I have a

 4    picture of you.  Is that --

 5         A.    Yes.

 6         Q.    -- your picture?

 7         A.    It is.

 8         Q.    Okay.  I'm going to put it

 9    here, because I'm just going to write

10    down some of your credentials.

11               You are a medical doctor,

12    correct?

13         A.    That's correct.

14         Q.    And when did you graduate

15    from medical school?

16         A.    1984.

17         Q.    And whereabouts?

18         A.    Mount Sinai School of

19    Medicine.

20         Q.    And where was your

21    residency?

22         A.    When I attended medical

23    school?

24         Q.    Yes.
```

1     A.     I lived in Manhattan.  New

2  York.

3     Q.     And I saw that you are board

4  certified in what practice areas?

5     A.     I'm board certified in both

6  internal medicine and in anesthesiology.

7     Q.     Have you ever prescribed an

8  opioid for a patient?

9     A.     Yes.

10     Q.     And did you do that -- what

11  years did you do that?

12     A.     I would have done it when I

13  worked during my training in internal

14  medicine.  If I worked in the emergency

15  room, I may have written some

16  prescriptions for patients for opioid

17  pain medications at that point also.

18     Q.     Would that -- would that

19  have been in the -- in the late '80s,

20  early '90s?

21     A.     That would have been, yes,

22  that would have been from '84 to '87 or

23  thereabouts.

24     Q.     Okay.  And what opiates were

Highly Confidential - Subject to Further Confidentiality Review

1    available to prescribe from '84 to the --

2    '84 to '87?

3         A.    I don't recall.  I'd have to

4    check.

5         Q.    Were there long-acting

6    opioids at that time?

7         A.    It would have been short, I

8    think.  I believe.  Immediate release.

9         Q.    What -- what about modified

10   release opioids, would they have been

11   available at that time?

12        A.    I don't recall prescribing

13   such medications.  I might have written a

14   prescription for one of those, but I

15   don't recall.

16        Q.    And for what indications

17   would you have prescribed a short-acting

18   opioid from '84 to '87?

19        A.    If patients would have -- if

20   I would have seen them in the emergency

21   room and they presented with any kind of

22   muscle pain, sports trauma, something

23   like that.

24        Q.    So for -- not for a

Highly Confidential - Subject to Further Confidentiality Review

1   malignant or cancer pain, but you would

2   have prescribed for some sort of a pain

3   or chronic pain condition?

4          A.     Correct.

5          Q.     Did you have any patients

6   that were taking short-acting opioids

7   from '84 to '87 that took them on a

8   regular basis?

9          A.     I'd have to review my

10  records.  I don't recall.

11         Q.     Did you have -- I know you

12  mentioned the emergency room.  Did you

13  have patients that you followed from '84

14  to '87?

15         A.     I did.  When I -- when I was

16  doing my internal medicine training I

17  would have had a medical clinic.

18         Q.     And where was that located?

19         A.     Montefiore Hospital in New

20  York, in Bronx, New York.

21         Q.     And was that from '84 to

22  '87?

23         A.     Yes, I believe so.  The

24  dates are approximate.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    That's fine.  It might help

2   a bit.  Let me mark as the next exhibit.

3            (Document marked for

4        identification as Exhibit

5        Janssen-Vorsanger-2.)

6   BY MS. CONROY:

7        Q.    What I've marked as

8   Exhibit 2 is what appears to be, and I'm

9   going to ask you about it, a CV or

10  resumé.  And the Bates range is

11  JAN-MS-02320343 through 354.  Does this

12  look like your CV, Dr. Vorsanger?

13       A.    Yes, I'm reviewing it now.

14       Q.    Okay.

15       A.    Yes, this appears to be a

16  copy of a version of my CV.

17       Q.    And would you have prepared

18  it?

19       A.    Yes, I would have.

20       Q.    Okay.  And would it be fair

21  to say this -- well, can you -- it says

22  that it goes from August 2013 to the

23  present.  Do you see under where it says

24  you were therapeutic head?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    So I was the therapeutic

2  area lead for analgesia from -- and the

3  dates are approximate, from August 2013

4  until from U.S. rights for Nucynta were

5  sold in the range of 2015, thereabouts.

6  I don't have the exact dates in 2015.

7    Q.    Okay.  Do you think that

8  this CV covers up through that point in

9  2015?  Is there a way you can -- is there

10  way you can tell what date -- the end

11  date of this CV?

12    A.    So the end date of this CV

13  would have been -- you mean what I'm

14  defining as present?

15    Q.    Correct.

16    A.    Mm-hmm.  No, I don't have

17  that.  I would have to just define my

18  time as the therapeutic area lead for

19  analgesia for the dates that I've already

20  given you, approximate dates.

21    Q.    Okay.  So it would not be

22  later than some month in 2015?

23    A.    No, not for Nucynta.

24    Q.    So if we look toward the

Highly Confidential - Subject to Further Confidentiality Review

1    back on the page -- and just so, what we

2    might do during this deposition is

3    refer -- these are Bates numbers down

4    here in the bottom right-hand corner.  So

5    if you turn to Page 349.

6              MR. LIFLAND:  Just in case

7         the witness doesn't know what a

8         Bates number is, let's just

9         explain.  It's a number that when

10        we produce the documents, we stamp

11        just for our recordkeeping.  It's

12        not part of the original document.

13             THE WITNESS:  Okay.

14             MR. LIFLAND:  But it helps

15        us find the pages and the

16        documents that don't otherwise

17        have numbers.

18             THE WITNESS:  Okay.  Thank

19        you.  All right.

20   BY MS. CONROY:

21        Q.    And I think this is -- you

22   were talking about your internship and

23   residency in the Bronx at Montefiore, and

24   that was from '84 through --

Highly Confidential - Subject to Further Confidentiality Review

1      A.     So --

2      Q.     -- '87?

3      A.     Right.  So if you look under

4  internship and residency, it's exactly as

5  you said, Counsel.  '84 to '87.  And then

6  I had a second residency, and that

7  described my time as an intern and

8  resident in internal medicine,

9  culminating in me being board-certified

10 in internal medicine.

11             And from 1987 to 1990 I did

12 a second residency in anesthesia in

13 Boston at the Massachusetts General

14 Hospital.

15      Q.     And did you see -- did you

16 have patients of your own from 1987 to

17 1990 when you were doing your anesthesia

18 residency?

19      A.     I'm not clear on what the

20 question would be.

21      Q.     Did you have -- did you --

22 did you see patients to treat particular

23 patients during that residency?

24      A.     Most of those -- are you

Highly Confidential - Subject to Further Confidentiality Review

1    asking did I treat patients and

2    administer opioid analgesics during that

3    time or did I have a clinic?

4           Q.    Well, I wasn't being that

5    specific.

6           A.    Okay.

7           Q.    Did you -- were -- did

8    you -- were you employed by a hospital

9    and using anesthesia in surgical suites

10   or did you actually see patients and

11   treat them for whatever conditions -- any

12   condition at all?

13          A.    Yes.  I worked in a hospital

14   and treated patients administering

15   anesthesia in surgical suites during that

16   time.

17          Q.    Okay.  Did you have occasion

18   to prescribe any opioid analgesics to

19   individual patients for conditions other

20   than surgical anesthesia at that time?

21          A.    Not very much.  Most of it

22   was operating room work.

23          Q.    And then where did you go

24   after 1990?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    So from 1990 to 1993, I

2  worked as -- I was invited to come on

3  staff, and I was a staff anesthesiologist

4  at the Massachusetts General Hospital.

5    Q.    And I think if we go one

6  page earlier, 348, we can see that you

7  had, from 1990 to 1993, you were an

8  assistant in anesthesia at Mass General.

9  And then from '93 to '95 you became a

10  staff anesthesiologist at Concord

11  Hospital in Concord, New Hampshire; is

12  that correct?

13    A.    Yes.

14    Q.    Okay.  Did you see patients

15  outside of surgical anesthesia when you

16  were at Concord Hospital?

17    A.    No.

18    Q.    And then where did you go

19  from Concord Hospital?

20    A.    So in 1995, I transitioned

21  over to the pharmaceutical industry, and

22  I started working at Astra USA.

23    Q.    And what is Astra USA?

24    A.    Astra USA was a company

Highly Confidential - Subject to Further Confidentiality Review

1   that -- eventually Astra merged with

2   AstraZeneca.  But prior to that Astra USA

3   was a US -- a subsidiary of Astra.

4          Q.    And what were your -- and

5   that was in Westborough, Massachusetts?

6          A.    Yes.

7          Q.    And your title was medical

8   advisor, hospital division; is that

9   correct?

10         A.    That's correct.

11         Q.    And you did that for about

12  two years from February '95 to March of

13  '97?

14         A.    Yes.  Approximately.  Again,

15  the dates are approximate.

16         Q.    Okay.  And could you

17  describe for me what your -- what your

18  responsibilities were at Astra?

19         A.    Yes.  Astra was developing a

20  new local anesthetic at that time.  And

21  so I provided -- based on my clinical

22  expertise, provided information to them

23  to help them develop various documents to

24  inform prescribers about the medication

Highly Confidential - Subject to Further Confidentiality Review

1    as well, amongst other things.

2         Q.    Had you -- had you done

3    something like that before?

4         A.    No.  This is my first

5    opportunity to be a consultant and to

6    work with a company.

7         Q.    And was the local anesthetic

8    already approved by the FDA or was it in

9    the process of becoming approved?

10        A.    I don't recall at this

11   point.  It was close to approval.  It may

12   have been approved.  I think it was

13   peri-approval.  But I don't recall.

14        Q.    Okay.  And let's just -- I

15   think you listed out where you have R&D

16   here.

17              And you said you advised the

18   company.

19        A.    Yes.

20              MR. LIFLAND:  You're

21        referring to a different page than

22        the one he's got open there.

23   BY MS. CONROY:

24        Q.    Oh, I see.  So one -- go one

1    page earlier.

2              MR. LIFLAND:  One page

3         prior.

4    BY MS. CONROY:

5         Q.    347.

6         A.    Yes, thank you.

7         Q.    Do you see where it has

8    Astra USA?

9         A.    Yes.  I would have -- yes.

10   So a part of it would have been to

11   develop certain protocols for them, if

12   they were doing clinical studies as well.

13   So that was all part of my advising that

14   we talked about, advising the company

15   based on my expertise.

16        Q.    Okay.  Had you participated

17   in a clinical trial prior to your

18   employment at Astra?

19        A.    I would have -- as part of

20   my activities when I was a resident at

21   Mass General, some of my attending

22   physicians may have been conducting

23   clinical trials, and I might have been

24   providing patient care under their

Highly Confidential - Subject to Further Confidentiality Review

1  direction as part of clinical trials

2  activities.

3        Q.   Did you -- prior to your

4  work at Astra USA, did you ever seek, for

5  example, something like IRB approval for

6  a clinical trial?

7        A.   No, I did not.

8        Q.   Okay.  Did you ever work to

9  secure consent from patients for a

10 clinical trial prior to Astra?

11       A.   I don't recall whether I did

12 those activities, as I just described

13 when I was at Mass General working with

14 attending physicians on their studies.  I

15 don't recall.

16       Q.   Okay.  Were you ever listed

17 as an investigator in a clinical trial,

18 do you know, while you were at Mass

19 General?

20       A.   No, I was not.

21       Q.   Were you listed as an

22 investigator in any clinical trials while

23 you were at Astra USA?

24       A.   No, I was not.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.    Okay.  Did you ever secure

2    IRB approval for any clinical trials

3    while at Astra?

4       A.    No.

5       Q.    Do you know if IRB approval

6    was secured for the clinical trials that

7    were being conducted at Astra that you

8    were involved in?

9       A.    They would have been as a

10   matter of course for the company.

11      Q.    Do you personally know if

12   they were?

13      A.    I don't know that for a

14   fact, but that would have been part of

15   the process in doing studies at that

16   time, or continuing even to today.

17      Q.    Was -- I'm probably not

18   pronouncing it correct.  Naropin, was

19   that the drug that you were working on?

20      A.    Yes, Naropin.

21      Q.    Naropin?

22      A.    Naropin, yes.

23      Q.    And that was the local

24   anesthetic?

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Correct.

2       Q.      Okay.  And then the next

3  bullet point says you created and

4  reviewed research protocols for Phase III

5  commitments for two local anesthetics.

6  One was a neurological drug, and the

7  other was an intravenous -- intravenous

8  cardiovascular drug.  Were either of

9  those Naropin?

10      A.      I don't recall.

11      Q.      Was Naropin a neurological

12 drug?  Do you know?

13      A.      I don't recall.

14      Q.      Do you recall what Naropin

15 was used for?

16      A.      It's a local anesthetic.

17 But -- so I'm not sure exactly what my

18 reference is.  At that point, whether

19 there was another medication that I was

20 thinking of, I just -- I don't recall.

21      Q.      Okay.  You have a bullet

22 point that you revised packaged --

23 package inserts?

24      A.      Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What do you mean by that?

2    A.    So if there was a request

3 from the FDA to take a look at package

4 inserts and possibly make -- update them

5 with warnings or precautions, et cetera,

6 then I would have provided my expertise

7 as an anesthesiologist working with

8 physicians, working at the company to

9 revise the package insert.

10    Q.    So if I understand you

11 correctly, if the FDA had requested an

12 update, you would then go and speak to

13 clinicians about what?

14    A.    So if FDA -- if FDA had

15 requested an update of the company, then

16 the company physicians would have reached

17 out to me, based on my background and

18 expertise and use of local anesthetics to

19 provide them with some information about

20 current usage and appropriate usage of

21 the medication, and so that was

22 consult -- one of the consulting roles

23 that I would have had to the company.

24    Q.    Is it also correct that if,

Highly Confidential - Subject to Further Confidentiality Review

1   in your role with the company you had

2   identified some issue with one of the

3   local anesthetics or -- or any other

4   product you were working on, that's

5   something that you could yourself or your

6   company could bring to the FDA?

7          A.    I'm not sure I understand

8   your question.

9          Q.    I think you've mentioned

10  that if the FDA wanted a change to the

11  package insert --

12         A.    Right.

13         Q.    -- that you could then go

14  out -- you would then go out and discuss

15  with clinicians whatever that change

16  should be?

17         A.    Not necessarily.  My only

18  experience with administering local

19  anesthetics was an expertise that I would

20  bring to the company if they had

21  questions.  Company physicians could --

22  or other people at the company could

23  reach out to clinicians as well.  But

24  this was somewhat to provide counseling

1   to the inhouse physicians.

2       Q.    Did you just say -- to

3   provide counseling to the inhouse -- to

4   the inhouse physicians?

5       A.    Yes.  So they had employee

6   physicians working at the company.  They

7   were not anesthesiologists.  Didn't have

8   expertise in local anesthetics.

9           So if they had questions or

10  they needed advice on how you would

11  administer a local anesthetic, to which

12  would be appropriate patients, those are

13  the types of questions that I could help

14  them with to provide that background.

15          In addition, they would

16  reach out to their own clinical experts

17  working outside the company as well.

18      Q.    And would that be to assist

19  in the revision of a package insert for

20  that local anesthetic?

21      A.    It could be, if that was the

22  activity that was going on.

23      Q.    And my question is, I

24  understood you to first reference that

1    the FDA would have requested a revision

2    to a package insert, but what I would

3    like to know is whether or not it was

4    possible for Astra to revise the package

5    insert without consulting -- with --

6    without hearing first from the FDA?

7          A.    Yes.  If the company became

8    aware of new safety information or new

9    additional clinical information, they

10   would be in touch with FDA and engage in

11   a dialogue to say this is some of the

12   information that they would like to

13   include in the package insert as an

14   update.  And then they would agree with

15   FDA with that type of information.  So

16   they could reach out proactively if they

17   wanted to.  But the changes to the

18   package insert would have to be done in

19   agreement with FDA.

20         Q.    Sure.  But it -- if you or

21   any of the inhouse physicians were being

22   made aware of some problem out in the

23   field with that local anesthetic, you

24   could then contact the FDA about that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     We -- we could -- yes, we

2    could contact the FDA.  We would contact

3    the company and make them aware of what

4    we've observed.  And the company would

5    then engage in a dialogue with the FDA.

6          Q.     In fact, you would be

7    required to do that?

8          A.     Yes.  If there was --

9    especially if it was safety issues.

10         Q.     And is that true even today?

11         A.     Yes.

12         Q.     One of the bullet points

13    here is "attended investigators meetings

14    for two drugs."

15               What does that mean?

16         A.     So if there were clinical

17    studies that were being anticipated for

18    compounds, then there would be meetings

19    that would be convened with the clinical

20    investigators who would be participating

21    in the study.  And at those types of --

22    those are investigator meetings.  And at

23    those meetings they would review the

24    safety profile of the drug, review the

Highly Confidential - Subject to Further Confidentiality Review

1    protocol of the drug, again, and how to

2    had administer the drug safely and

3    effectively.

4         Q.    And then the next bullet

5    point says, "Helped to recruit leading

6    physician scientists for clinical

7    trials."

8              What -- can you explain to

9    me how you helped do that?

10        A.    So if there was an interest

11   in conducting a clinical trial with local

12   anesthetics, some of the people who a

13   company might be interested would be

14   clinicians who have experience with

15   clinical trials, as well as with the

16   compound.  And if these were people that

17   I know, I would have been able -- asked

18   by the company to reach out and explain

19   the protocol to them, the intent of the

20   study, and the design, and discuss and

21   see if there was interest.  This was

22   being done with other people at the

23   company besides myself.  But this was --

24   would be one of the activities that could

Highly Confidential - Subject to Further Confidentiality Review

1  go on as part of physician recruitment

2  for participating in controlled clinical

3  trials.

4      Q.    And would you -- by recruit,

5  you would -- you would go out and

6  interview those physicians or those

7  physician scientists to check, or to

8  review their suitability?

9      A.    There would be suitability

10  studies to identify whether there was

11  interest, whether the -- whether the

12  sites themselves have the personnel to be

13  able to effectively conduct a clinical

14  trial safely and effectively.

15          And again, there were other

16  people at the company who would be doing

17  that as well.  And I could provide some

18  information to them as requested, as part

19  of my consulting activities.

20      Q.    Do you recall while you were

21  at Astra whether, in fact, you were --

22  and I understand it wasn't just you, you

23  may have been part of a team -- that you

24  did, in fact, recruit some physicians for

Highly Confidential - Subject to Further Confidentiality Review

1    clinical trials?

2           A.    I'm sorry, I don't

3    understand your question.

4           Q.    Do you recall doing that at

5    AstraZeneca, recruiting physicians?

6           A.    Yes, to be clear, it wasn't

7    AstraZeneca.  It was Astra USA.

8           Q.    I'm sorry, Astra.

9           A.    I -- I don't recall specific

10   activities that I would have.  I can't

11   think of specific physicians for example,

12   who we might have contacted at that

13   point.  But these are activities that I

14   would have engaged in as part -- as part

15   of the discussion.

16          Q.    And did Astra at that time

17   have physicians that were already known

18   to you that might be available for a

19   clinical trial?

20          A.    I don't understand the

21   question.

22          Q.    Would there have been -- if

23   you had -- if you were looking for

24   physicians to conduct clinical trials for

1    a drug that you were working on at Astra,

2    would there have been a list of

3    physicians to contact?

4         A.    So are you asking whether

5    Astra would have had its own list of

6    investigators that they were interested

7    in, as well as people whom I might have

8    recommended?

9         Q.    Well, I see that you say

10   that you helped recruit --

11        A.    Yes.

12        Q.    -- leading physicians.

13             So yes, I am asking if there

14   were already some physicians that Astra

15   had on a list or knew or had conducted

16   clinical trials in addition to physicians

17   that you might recruit.

18        A.    I don't recall.  But

19   typically companies would identify

20   clinicians or people whom they would like

21   to have participating in their clinical

22   trials.  But I can't tell you that I

23   remember seeing a list, per se.

24        Q.    Okay.  And where you say

1    here, "Conducted initiation and site

2    visits"?

3            A.    Yes.

4            Q.    Is that of potential

5    clinical trial sites?

6            A.    Yes.

7            Q.    And then your final bullet

8    point here is that you "designed labeling

9    for a new local anesthetic after

10   consultations with former colleagues at

11   Mass. General Hospital and Brigham and

12   Women's Hospital."

13               What do you mean by designed

14   labeling?

15           A.    So the new local anesthetic

16   was Naropin, ropivacaine, and when I

17   reached out to some of the -- of my

18   colleagues in those two institutions, as

19   we -- there is required labeling that FDA

20   had, but we were interested in

21   understanding what are some of the other

22   types of information that would be

23   clinically important to people who would

24   be administering local anesthetics to

1    patients, and to see whether that type of

2    information would be appropriate for a

3    product label, and then the -- then the

4    company would have engaged in

5    conversations with FDA to see whether

6    that type of information would, again, be

7    appropriate for a label, for a product

8    label.

9         Q.    Next you have as a bullet

10   point, "Chairman, scientific and clinical

11   review committee."  And it looks like

12   that included the review of requests for

13   support for postmarketing studies.  Do

14   you see that?

15        A.    Yes.

16        Q.    What's a postmarketing

17   study?

18        A.    A postmarketing study would

19   be a study of a medication after the

20   product had been approved -- for -- for

21   the U.S. here would be approved by the

22   Food and Drug Administration, and

23   worldwide it would have been for the

24   appropriate regulatory authority for that

Highly Confidential - Subject to Further Confidentiality Review

1    country.

2          Q.    And where it says,

3    "Reviewing all requests for support for

4    postmarketing studies," what does that

5    mean?

6          A.    It means that individuals

7    would submit a -- either a protocol

8    concept or a paragraph or a summary of

9    the type of studies that they would like

10   to get support, financial support from a

11   company.  And those would go through a

12   review committee.

13               And I was the chairperson

14   for that committee to review the study

15   design, make sure it was scientifically

16   valid, understand the patient population

17   that would be studied, and the endpoints

18   that they were interested in studying.

19         Q.    And would you -- would you

20   yourself or with your team at Astra ever

21   actually draft protocols and then look

22   for clinicians to perform those

23   postmarketing studies?

24         A.    I don't recall the

1    activities that would have occurred back

2    then.

3            Q.    Is that -- is that typically

4    done by a pharmaceutical company, that

5    they may receive requests for

6    postmarketing studies as well as devise

7    postmarketing studies and then seek

8    clinicians to do them?

9            A.    It depends on the point in

10   time.  So today the companies, I think

11   for the most part, would not be engaged

12   in those activities.

13                At this time there may have

14   been an opportunity for companies to come

15   up with proposed designs to see if there

16   was interest.  But I don't recall.

17                So there -- there may have

18   been changes in terms of the requirements

19   of what companies were permitted to do.

20           Q.    Are companies not permitted

21   to do that now?

22           A.    So today companies typically

23   for post -- when they receive support for

24   postmarketing studies, those work --

1    those would be studies that would be

2    information that would be submitted by --

3    by an investigator, it would be reviewed

4    by the company.  It would be -- the

5    design and merit of it would be reviewed

6    by the company.

7              But the amount of input that

8    a company would basically be able to put

9    in today would -- might be very different

10   from what it would be in the '90s.

11        Q.    Would it be more -- would --

12   would that input be more or less?

13        A.    Today, less.

14        Q.    And you say today.  When

15   would that have started, that the input

16   would be less?

17        A.    I don't recall.

18        Q.    A year ago?  Ten years ago?

19        A.    Longer than that.  I don't

20   have an exact date.

21        Q.    Do you know why that is?

22        A.    I can't tell you for sure.

23        Q.    Can you tell me why you

24   think that is?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I think the intent was to

2    make sure that the companies funded it,

3    but that the ideas and the execution of

4    the study be done by the individuals for

5    whom who developed these protocols.

6         Q.    So is it your understanding

7    then that the company itself would not be

8    devising the protocol, but the

9    individuals who approached the company

10   about a particular study would design the

11   protocols?

12        A.    So just to be clear, we're

13   talking about postmarketing studies?

14        Q.    Yes.

15        A.    Yes, for postmarketing

16   studies, the idea would come from the

17   individual developing the protocol for

18   the postmarketing studies.  There may be

19   interest from the company for that type

20   of work.  But the actual developing of

21   the protocols and the execution of the

22   protocols would be done by the

23   investigator.

24        Q.    And at some point earlier in

Highly Confidential - Subject to Further Confidentiality Review

1    time it could be the company itself that

2    would design the protocol and then would

3    seek the investigator?

4         A.    I don't -- I don't recall

5    that.  I think there may have been

6    guidance, if it was requested by the

7    investigator.  I don't recall the company

8    writing a protocol and handing it out.  I

9    don't -- I don't know.

10        Q.    Would the company have had

11   a -- had involvement in the writing of a

12   protocol?

13        A.    That may have occurred,

14   again depending on the time that we are

15   talking about in the late '90s.  That

16   might have happened.

17        Q.    In any event, I think you

18   said at some point the company would

19   review the protocol; is that correct?

20        A.    Correct, to make sure it's

21   scientifically valid, yes.

22        Q.    And could the company, even

23   today, after review of a protocol, edit

24   the protocol?

1      A.    I'm not sure what the

2  question means.

3      Q.    I think you said that there

4  was less involvement in the creation of

5  protocols by companies.  It was done by

6  the actual investigator who would then

7  approach the company, correct?

8      A.    Yes.

9      Q.    So my question is when the

10  investigator comes to the company with a

11  protocol, and the company reviews the

12  protocol, is the company -- can the

13  company revise the protocol or make

14  suggestions for changes to the protocol?

15      A.    I think it depends on the

16  company.  It would be a

17  company-to-company decision.  So I

18  couldn't comment on what different

19  companies would have done back then or

20  even today.  I just don't know.

21      Q.    What about Johnson &

22  Johnson?

23      A.    When we reviewed these --

24  these, we base -- these were either

1    reviewed and accepted or reviewed and

2    rejected.

3         Q.    So Johnson & Johnson would

4    not have modified or revised protocols?

5         A.    Johnson & Johnson would not

6    have modified or revised the protocols.

7    It may have asked if there were other

8    things that may or may not be of

9    interest, but no we did not write the

10   protocols.

11        Q.    And was that true for your

12   entire tenure at Johnson & Johnson, as

13   far as you know?

14        A.    I don't recall going back

15   what it was like.  Certainly later on,

16   yes, that was true.

17        Q.    We're going to be looking at

18   some documents with your time at Janssen

19   and Johnson & Johnson.  So I might come

20   back to that a bit, because it might help

21   me with some of the dates.

22        A.    Okay.

23        Q.    Okay.  You also say here,

24   you designed and implemented a new

1   evaluation process to include

2   statisticians, regulatory, and legal

3   personnel, pharmacists, and physicians.

4               What is that referring to?

5   It's the second bullet point.

6           A.    When the -- we were

7   interested in having a certain structure

8   for the scientific and clinical review

9   committee.  And we wanted to make sure

10  that the individuals reviewing it, that

11  there were a number of different

12  individuals as well.  So statisticians

13  had always been part of the review, as I

14  recall.  We didn't necessarily have a

15  pharmacist as part of the review

16  committee.  So I added some other people

17  with different types of expertise to the

18  committee as well.

19          Q.    And what is the -- what is

20  the function of the -- let me ask --

21  well, let me ask you this first.

22              It says scientific and

23  clinical review committee.  Is that one

24  committee?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Yes.

2        Q.     And what is the -- what is

3    the role of the scientific and clinical

4    review committee?  And this is under your

5    Astra time.  But is it different?  Is

6    the -- is the scientific and clinical

7    review committee different from company

8    to company --

9        A.     Yes.

10        Q.     -- in your experience?

11        A.     Yes.

12        Q.     What was the -- what was the

13    purpose of the scientific and clinical

14    review committee at Astra?

15        A.     To review postmarketing

16    studies.

17        Q.     And this would be to review

18    protocols being presented by

19    investigative clinicians?

20        A.     Correct.

21        Q.     And then it says that you

22    worked with computer consultants to

23    develop a database to track ongoing

24    projects and adverse events.  Do you see

1   that?

2           A.      I do.

3           Q.      And would this be ongoing

4   projects that were under the purview of

5   the scientific and clinical review

6   committee?

7           A.      No.   This would be other

8   projects that were going on at Astra.   I

9   worked with a -- computer consultants to

10  develop a database to track the

11  activities themselves and to work to

12  ensure that we had adequate adverse event

13  reporting going on for all of those

14  activities.

15          Q.      What kinds of activities?

16  Give me an example of what some of those

17  activities would be?

18          A.      I don't recall at this

19  point.

20          Q.      Would it be clinical trials?

21          A.      The clinical trials would

22  have had their own processes in place at

23  Astra for reporting adverse events.   So I

24  don't think necessarily that would have

Highly Confidential - Subject to Further Confidentiality Review

1  been.  But if there were other types of

2  activities that would be going on, other

3  projects that would make sure that that

4  information was being tracked, timelines

5  and that type of a thing.

6        Q.    This -- I think that's what

7  I'm having difficulty with.

8            What kind of -- what kind of

9  projects other than a clinical trial

10 would you be tracking adverse events

11 within the company?

12        A.    It would have been in parts

13 from the scientific review committee as

14 well, to make sure there was a correct

15 adverse -- an adequate adverse event

16 reporting.

17            Whether there were other

18 activities that were going on as well as

19 part of the work that went on at Astra in

20 the hospital division at that time, then

21 we would have wanted to make sure that

22 the people involved were reporting

23 adverse events.

24        Q.    And these are adverse events

1    outside of clinical trials?

2         A.    These are adverse events

3    outside of -- yes, right.  The clinical

4    trials involved in the development of the

5    products would have had their own adverse

6    event reporting.

7              We wanted to make sure that

8    all the activities at the company where

9    there was a possibility that patients

10   would be exposed to the products, if

11   there were adverse events, that we were

12   capturing those accordingly and

13   appropriately.

14        Q.    And could that have been,

15   for example, if a practitioner called

16   Astra and said they had a particular

17   problem with one of the Astra products,

18   are those the particular adverse event

19   that you'd be talking about?

20        A.    Those would come through

21   their safety reporting group.  Again,

22   those processes were running well.  They

23   were in place as well.  But if there were

24   other activities that might have a

Highly Confidential - Subject to Further Confidentiality Review

1    clinical relevance that weren't actually

2    there, controlled clinical trials, it was

3    just again to make sure that they were

4    adequately capturing the adverse events.

5         Q.    Okay.  You also have a

6    section on marketing.

7              Do you see that?

8         A.    Yes.

9         Q.    And you have, "Established

10   and implemented budgetary guidelines for

11   postmarketing studies."  Would you agree

12   with me that postmarketing studies can be

13   used to market a product, a drug?

14        A.    Not necessarily.  They would

15   have to be controlled clinical trials

16   where we have adequate level of evidence

17   that would be appropriate for the FDA so

18   that they could be used.

19        Q.    So there would be very

20   specific guidelines with respect to a

21   clinical trial as to whether or not it

22   could be used for any promotional

23   activities?

24        A.    The FDA has guidelines about

Highly Confidential - Subject to Further Confidentiality Review

1    how -- what type of studies would need to

2    be done to be included in the label or

3    could be used for promotional activities.

4         Q.    And has that changed over

5    time?  Do you know?

6         A.    Has the FDA changed?

7         Q.    From -- well, I'm really

8    only interested, has it changed since

9    this bullet point when you were at Astra?

10   Has it changed over time from 1995 to the

11   present?

12        A.    So is your question, has the

13   FDA implemented changes in the

14   requirements in the nature of what

15   information would be appropriate for use

16   in promotional activities between 1995

17   and 2018?  Is that the question?

18        Q.    Well, that's pretty general.

19   But I'm asking more with respect to

20   clinical trials and promotional

21   activities.

22        A.    I'm sorry.  I apologize.

23   I'm still not understanding the question.

24        Q.    Sure.  The FDA had -- in

1    1995, when you were at Astra, the FDA had

2    very strict requirements with respect to

3    what clinical trial results could be used

4    for promotional activities, correct?

5         A.    Yes.

6         Q.    And that's true today,

7    correct?

8         A.    Yes.

9         Q.    So do you recall any changes

10   that took place with respect to the FDA

11   guidelines from 1995 to the present with

12   respect to what -- the requirements of a

13   clinical trial or its results being used

14   for promotional activities?

15        A.    I can't come up with

16   specific items, per se.  But the rigor

17   certainly would have increased with time.

18        Q.    So that the FDA would have

19   become stricter, correct?

20        A.    Yes.

21        Q.    But would you agree with me

22   that it was fairly strict in 1995?

23        A.    Yes.

24        Q.    Because it would require

1  that if any clinical trial results were

2  to be used for promotion, they would be

3  very strict guidelines as to what the

4  clinical trial had to look like, what

5  kind of result, what kind of oversight,

6  correct?

7       A.    Yes.

8            MR. LIFLAND:  Object to the

9       form of the question.  Be sure

10      that you wait for an objection

11      before you answer.  Thanks.

12           It's okay.  You can

13      continue.

14  BY MS. CONROY:

15      Q.    The second bullet point is

16  that you have provided medical expertise

17  to the product managers.  What's a

18  product manager?

19      A.    Those would have been

20  individuals in the -- who were in

21  marketing, would be responsible for the

22  product from a marketing perspective.

23      Q.    And is that -- is that term,

24  "product managers in the marketing

1  department," pretty general -- or pretty

2  much a standard term in the

3  pharmaceutical industry?

4        A.    It's a term that I've heard,

5  but I don't know if it's widely used in

6  all companies or not.  I've heard it at

7  other companies.

8        Q.    Do you know, did J --

9  Johnson & Johnson or Janssen have product

10 managers within the marketing department?

11       A.    I've heard of that title

12 used.

13       Q.    And when you say provided

14 medical expertise, that would have been

15 medical expertise with respect to

16 anesthesiology?

17       A.    It would have been medical

18 expertise around the local anesthetics

19 that they were marketing, to provide

20 information to them.

21       Q.    What about internal

22 medicine?

23       A.    If the questions came up.

24       Q.    Then you have "developed

1    strategies for the launching of a new

2    local anesthetic."

3              Do you see that, the third

4    bullet point?

5         A.    Yes.

6         Q.    That would have been

7    marketing strategies, correct?

8         A.    No.  That would have helped

9    them provide scientific and medical

10   information so that they would ensure

11   that the information in there was

12   medically accurate.

13             I'm not a marketing person,

14   so I would not have developed marketing

15   strategies.

16        Q.    But medically accurate for

17   their marketing strategy, correct?

18        A.    The information that was

19   included, we wanted to make sure it was

20   medically accurate.  That was my role.

21        Q.    And how would you -- how did

22   you perform that role?

23        A.    So if questions came up

24   about, is this correct to say medically,

1    is this medically accurate, then I would

2    review that and answer it.

3         Q.    Did you -- did you review

4    all of the marketing for the new local

5    anesthetic for medical accuracy?

6         A.    Excuse me.  I don't recall.

7         Q.    Did you review some of it?

8         A.    I would have reviewed it if

9    I was asked to review it.  I was not part

10   of a group, per se, that reviewed it on

11   an ongoing basis.  This would have been

12   as asked.

13        Q.    Later at Janssen did you

14   review any marketing material for medical

15   or scientific accuracy?

16        A.    Yes.

17        Q.    And was it similar to, at

18   Astra, that -- if you were asked to do

19   so, or did you have more direct

20   responsibility?

21        A.    At Janssen I had more direct

22   responsibility.

23        Q.    So, but you didn't need to

24   just be asked to do it, it was something

Highly Confidential - Subject to Further Confidentiality Review

1    that you would oversee generally?

2           A.    When I served on the

3    promotional review committee, that would

4    have been my -- part of my

5    responsibilities at Janssen.

6           Q.    Was there a promotional

7    review committee, if you recall, at

8    Astra?

9           A.    I don't recall.

10          Q.    And then your final bullet

11   point under marketing is "prepared

12   training modules for sales

13   representatives."

14              A training module is to help

15   to prepare sales representatives for

16   going out into the field and speaking to

17   clinicians; is that correct?

18          A.    A training module would have

19   contained scientific information about

20   the compound that would have been -- that

21   could have been used to educate a sales

22   representative.

23          Q.    And what would you do to

24   prepare a training module?

1          Let me ask it this way.

2     Would you have actually been preparing

3     the training module, or would you have

4     been asked to participate and prepare

5     sections of a training module?

6          A.    I don't recall.

7          Q.    Did you ever actually train

8     sales representatives at Astra by

9     speaking with them or preparing a video

10    or something like that, other than --

11    other than a written training module?

12         A.    I don't recall.

13         Q.    Are training modules

14    written, or were they at Astra?

15         A.    In those days I believe it

16    would have been written.

17         Q.    Have you ever done any sort

18    of video or web-based training for sales

19    representatives at any time in your

20    career?

21         A.    I might have.  I don't

22    recall.

23         Q.    What about preparing or

24    assisting in the creation or editing of

1    the written training module?  Have you

2    ever done that in your career other than

3    what you've referenced here at Astra?

4          A.    Could you explain your

5    question again a little more?

6          Q.    Sure.  Did you ever -- did

7    you ever prepare training modules for

8    sales representatives at Johnson &

9    Johnson?

10         A.    I don't recall preparing

11   them.  I may have reviewed them.  I think

12   that was part of your question.

13         Q.    Okay.  And did you review

14   them as part of the promotional review

15   committee at Johnson & Johnson or was it

16   separate from that?

17         A.    I would have reviewed those

18   materials as part of the activities at

19   Johnson & Johnson.

20         Q.    And at the promotional

21   review committee or elsewhere?

22         A.    At the promotional review

23   committee.

24         Q.    Was that the only time, at

1    the promotional review committee?

2         A.    Materials would have gone

3    through some -- a promotional review

4    committee for review.

5         Q.    And that's why you would see

6    them?

7         A.    Yes.

8         Q.    Okay.  Under medical

9    information, the third bullet point, it

10   says, "Provided medical and anesthesia

11   expertise to product surveillance

12   coordinators and to pharmacists at an

13   offsite location, product safety."

14             Do you see that?

15        A.    Yes, I do.

16        Q.    What's a product

17   surveillance coordinator?

18        A.    Astra had individuals who

19   would, when information came into the

20   company, would review adverse events and

21   sometimes they had required expertise on

22   local anesthetics to base -- to be able

23   to put together narratives that they

24   would submit to the FDA.  They may have

1    wanted someone with clinical background

2    to help.  That's what a product

3    surveillance -- it's a safety reporting

4    individual.

5               THE VIDEOGRAPHER:  Raise the

6          bottom of the page.

7               MS. CONROY:  Oh.  Thanks.

8    BY MS. CONROY:

9          Q.    And when you say expertise

10   to product surveillance coordinators, and

11   to pharmacists.  Were the pharmacists

12   part of the Astra safety reporting, or

13   was that different?

14         A.    Yes.  Many of those

15   individuals were -- were trained as

16   pharmacists.  And they also had contract

17   pharmacists working offsite as well who

18   answered questions and took in

19   information about adverse events.

20         Q.    And the offsite location,

21   was that -- product safety was located

22   offsite?

23         A.    They contracted with a

24   company that did -- received calls from

1    either -- I believe from consumers or

2    healthcare professionals about adverse

3    events.  So was not physically on site at

4    the company.  It was another company.

5        Q.    So that, that offsite

6    company that dealt with product safety,

7    had both pharmacists and product

8    surveillance coordinators?

9        A.    I believe that they -- some

10   of the product surveillance coordinators

11   had a pharmacy background.  But I don't

12   know that for a fact.

13            But we provide -- if there

14   were questions about local anesthetics

15   specifically that the company felt needed

16   my input, then as a consultant I would

17   answer those questions.

18       Q.    Okay.  And then in March of

19   1997 you went to Parexel?

20       A.    Yes.

21       Q.    That's the name of the

22   company.  It's located in Waltham, is on

23   Page 345.  It's just at the very bottom.

24   And if you turn that page to Page 346.

Highly Confidential - Subject to Further Confidentiality Review

1          It shows that you were the

2   associate medical director from March of

3   1997, when you left Astra, for about six

4   months, until September 1997.  Then you

5   became the medical director of worldwide

6   medical affairs for two years.  And then

7   senior medical director of North American

8   medical affairs from January of 2000, for

9   about nine months, until September,

10  correct?

11          A.    Yes.

12          Q.    And what kind of business

13  was --

14          A.    The dates are approximate,

15  just to make sure.

16          Q.    That's fine.

17                What kind of business was

18  Parexel?

19          A.    Parexel is a contract

20  research organization.

21          Q.    What does that mean?

22          A.    Contract research

23  organizations are companies that provide

24  support to the pharmaceutical industry.

Highly Confidential - Subject to Further Confidentiality Review

1    They may provide support to help them

2    develop their clinical drugs, as part of

3    helping with clinical trial design and

4    implementation, safety reporting.  They

5    may provide statistical and regulatory

6    support that would be contracted with a

7    pharmaceutical company for those types of

8    activities.

9            Q.    Did they provide

10   investigators?

11           A.    If a company requested that

12   a contract research organization try and

13   identify investigators for a clinical

14   trial, then a contract research

15   organization might go out and do a site

16   investigation, to reach out to certain

17   investigators to see if there's interest

18   in participating in a study.  Those are

19   some of the activities, not all that a

20   contract research organization would do.

21           Q.    And would this -- would --

22   was Parexel involved in -- let me ask.

23   Were you involved, while you were at

24   Parexel, in clinical trials before a

Highly Confidential - Subject to Further Confidentiality Review

1    product went on the market?

2          A.    Yes.

3          Q.    And were you also -- was

4    Parexel and your responsibilities at

5    Parexel concerning postmarketing studies?

6          A.    I don't recall if we did

7    post -- if I was involved in

8    postmarketing studies when I was at

9    Parexel.

10          Q.    Did Parexel participate in

11    postmarketing studies?

12          A.    I believe that those

13    activities would be part of the

14    activities that they could provide to a

15    pharmaceutical company, if such a request

16    was made.

17          Q.    And while at Parexel, you

18    worked -- I'm looking at R&D, research

19    and development.  You were involved with

20    clinical trials for several

21    cardiovascular drugs.  Do you see that?

22          A.    I'm sorry, where are you

23    looking?

24          Q.    I'm right under R&D.  And

1    then it says clinical trials experience.

2    And your first bullet point says that you

3    were the medical and safety monitor for

4    Phase II-B and III clinical trials?

5         A.    Yes.

6         Q.    Phase -- those are Phase II

7    and Phase III trials?

8         A.    Correct.  Yes, that's

9    correct.

10        Q.    What kind of cardiovascular

11   drugs?

12        A.    The drug was a beta blocker,

13   I believe it was carvedilol.

14        Q.    Okay.  And who manufactured

15   that drug?

16        A.    I don't remember who

17   manufactured it.

18        Q.    You would have been doing --

19   Parexel did not manufacture any drugs,

20   correct?

21        A.    That's correct.  There

22   was -- these were activities that were

23   done for a pharmaceutical company.

24        Q.    Okay.  Did you do any work

1  for Astra -- did Parexel do any work for

2  Astra?

3      A.   I personally was not

4  involved in any activities doing work for

5  Astra when I was at Parexel to the best

6  of my recollection.

7      Q.   Do you recall if you did any

8  work for Johnson & Johnson or Janssen?

9      A.   I do recall doing some work

10  for Janssen at the time.

11      Q.   Okay.  And what -- what kind

12  of products did you do work on for

13  Janssen while you were at Parexel?

14      A.   Janssen was developing a

15  product which was designed to be used to

16  treat postoperative pain.  And I was

17  involved as a Parexel employee working on

18  those programs for Janssen.

19      Q.   And was that product

20  approved by the FDA or was it -- or were

21  they seeking to get it approved?

22      A.   The product was in

23  development.

24      Q.   And do you know if it was

Highly Confidential - Subject to Further Confidentiality Review

1  ever approved?

2        A.    To the best of my knowledge

3  it has not.  But I'm not -- I'm not sure.

4        Q.    Was it an opioid?

5        A.    It was a system that was

6  designed to administer an opioid pain

7  medication to patients who had undergone

8  surgery.  It was post -- used for

9  postoperative pain.

10        Q.    Was it a device?

11        A.    Yes.

12        Q.    So I'm still on that first

13  bullet point.  At the very end of the

14  bullet point it says "and several pain

15  control products."

16              Would you have considered

17  that device a pain control product?

18        A.    Yes.

19        Q.    What other pain control

20  products were you involved in at Parexel?

21        A.    Part of my activities at

22  Parexel was I served as an -- in a

23  consulting role as a Parexel employee to

24  a number of companies that made -- were

1  developing pain products.  So they would

2  have come to me as part of those

3  activities.

4       Q.    Any opioid drugs?

5       A.    Yes.

6       Q.    And what were they?

7       A.    I think there was some work

8  for oxycodone, as I recall.  But I don't

9  remember.  Some of the other companies,

10 but I don't remember specifics.

11      Q.    Did you do any consulting

12 work at Parexel for Purdue Pharma?

13      A.    Yes.  They reached out to me

14 on one occasion to do some work with

15 them.

16      Q.    And do you recall what that

17 was, what that work was?

18      A.    It was one single project,

19 and I don't remember what the nature of

20 the project was.

21      Q.    It would -- it would have

22 involved an opioid though, correct?

23      A.    Correct.

24      Q.    What about Endo?

1        A.    I don't recall if it was

2  Endo or not.

3        Q.    Okay.  Mallinckrodt, do you

4  recall if you did any --

5        A.    No, I don't recall any work

6  from Mallinckrodt.  There were some other

7  opioid analgesics.  I believe those were

8  predominately pills.  But again, I don't

9  remember the specifics on which companies

10 had come -- had come to me.

11       Q.    OxyContin was on the market

12 at this time?

13       A.    I don't remember.  I don't

14 recall if this was immediate-release

15 oxycodone or for a controlled-release

16 oxycodone that they came to me for.

17       Q.    Okay.  Do you recall the

18 nature of the consulting work for Purdue

19 Pharma?  Would it -- would it have

20 involved a clinical trial or some type of

21 safety monitoring, or do you remember

22 what it was?

23       A.    I don't remember the

24 specifics.

1    Q.    Was that the first time that

2  you had worked -- strike that.

3          Had you worked with a

4  controlled-release Oxycodone product

5  prior to the project that Purdue Pharma

6  brought to Parexel?

7    A.    So to be clear, I wasn't --

8  I didn't recall whether it was an

9  immediate release or controlled-release.

10   Q.    I see.

11   A.    Right.

12   Q.    Do you recall if you worked

13 on a controlled-release opioid regardless

14 of the manufacturer while you were at

15 Parexel?

16   A.    I don't recall having those

17 activities while I was at Parexel.

18   Q.    What other pharmaceutical

19 companies do you recall working with that

20 had pain medications or devices while you

21 were at Parexel?

22   A.    I don't recall.

23   Q.    Okay.  You have -- the

24 second bullet point, product -- I'm

Highly Confidential - Subject to Further Confidentiality Review

1    sorry -- "protocol development and

2    implementation."

3                    Was that protocol

4    development for clinical trials for

5    developing products or for postmarket?

6         A.    The protocol development and

7    implementation would have been for --

8    well one thing that comes to mind is the

9    device for Janssen that I worked with the

10   people at Janssen on that.  There may

11   have been others as well.

12        Q.    The next bullet point you

13   have "medical and scientific input and

14   review into statistical analysis plans as

15   well as the preparation of ISS/ISE

16   documents."

17        A.    Yes.

18        Q.    What are those, ISS/ISE

19   documents?

20        A.    ISS is integrated summary of

21   safety.  And ISE is integrated summary of

22   efficacy documents.

23        Q.    And who are those being

24   prepared for?

1    A.    A number of different

2 pharmaceutical companies.  I don't have

3 the specifics as to which companies it

4 would have been.

5    Q.    And what would -- would

6 those summaries be used for by the

7 companies?

8    A.    As part of a submission to

9 FDA.

10    Q.    As part of a new drug

11 application?

12    A.    Yes.

13    Q.    Then you have extensive

14 clinical trials experience in the areas

15 of acute and chronic pain.  Is that also

16 in relation to the Janssen device?

17    A.    Yes.

18    Q.    Any other products that you

19 recall clinical trial experience?

20    A.    Not that come to mind

21 immediately.

22    Q.    Can you -- can you describe

23 for me what some of those clinical

24 trials -- what they were for the delivery

1    system, for the Janssen delivery system?

2         A.    The -- prescribe it -- how

3    to use the system in various patient

4    populations for postoperative pain.  It

5    may have been individuals undergoing

6    different types of surgeries.

7         Q.    Did you secure investigators

8    for them?

9         A.    I don't recall that as a

10   function that I might have performed for

11   Janssen.

12        Q.    Do you recall where any of

13   those patient populations were located

14   for those clinical trials?

15        A.    Those were studies that

16   would have been conducted in the U.S.  So

17   they would have been U.S. patients.

18        Q.    Did you do site visits, do

19   you recall, for those?

20        A.    I don't recall.

21        Q.    Do you recall how many

22   patients might have been involved in any

23   of those clinical trials?

24        A.    I don't have the exact

1    numbers.  I'd have to look at

2    documentation to see the protocols to

3    understand the proposed number and how

4    many were actually incorporated.

5         Q.    Were those clinical trials

6    actually carried out?

7         A.    I believe so.

8         Q.    Did you ever appear as one

9    of the investigators on any of those

10   clinical trials?

11        A.    I'm sorry, I didn't

12   understand the question.  Could you

13   repeat your question?

14        Q.    Sure.  When you were

15   involved in the extensive clinical trials

16   experience in the areas of acute and

17   chronic pain --

18        A.    Right.

19        Q.    -- would you yourself have

20   been listed as one of the investigators?

21        A.    No, I would not have been an

22   investigator.  But I would have been

23   involved in developing the protocols,

24   working to understand the patient --

Highly Confidential - Subject to Further Confidentiality Review

1    appropriate patient population, executing

2    the studies, obtaining information on

3    adverse event reporting, reviewing that,

4    all the clinical -- medical monitoring

5    that goes along with clinical studies.

6              So from the initiation of

7    protocol development all the way through

8    to study completion and involved in

9    preparing some of the documents, working

10   with companies to submit those to the

11   FDA.  I would have been involved in those

12   aspects.

13        Q.    And so you would have been

14   involved in potentially writing up what

15   had occurred at the clinical trial,

16   including adverse event reports and the

17   safety and efficacy results, if that was

18   what the trial encompassed?

19        A.    Depending on what the

20   company contracted with the CRO to do, I

21   certainly had those capabilities and

22   could do that.

23        Q.    And what does a CRO stand

24   for?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Contract research

2    organization.

3        Q.    And that's what Parexel was,

4    the contract --

5        A.    Yeah.

6        Q.    -- resource organization?

7        A.    Yes.

8              THE WITNESS:  Can I take a

9    break?

10             MS. CONROY:  Of course you

11   can.  Yes.

12             THE VIDEOGRAPHER:  All

13   right.  Stand by, please.  The

14   time is 10:39 a.m.  Going off the

15   record.

16          (Short break.)

17             THE VIDEOGRAPHER:  We are

18   back on the record.  The time is

19   10:53 a.m.

20   BY MS. CONROY:

21        Q.    Doctor, during the break

22   your counsel told me that you wanted to

23   clarify an answer --

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

 1      Q.     -- from this morning?

 2      A.     That's right.

 3      Q.     What was that?

 4      A.     We were talking earlier

 5   about postmarketing studies and I wanted

 6   to clarify the conversation to make sure

 7   we were talking about studies such as

 8   investigator-initiated studies, those

 9   type of postmarketing studies.

10             The companies themselves

11   engage in postmarketing clinical trials,

12   postmarketing studies.  And the

13   company-sponsored studies that are

14   postmarketing studies, the company is

15   involved in writing the protocol and

16   developing it.  So I wanted to make sure

17   that that distinction was clear between

18   two types of postmarketing studies.  They

19   may be controlled clinical trials that

20   are done by the company as postmarketing

21   studies or they may be

22   investigator-initiated studies.

23             And the point I was making

24   about the investigator-initiated studies

Highly Confidential - Subject to Further Confidentiality Review

1    are, with time, the companies had come to

2    a process where the involvement of the

3    company, for the investigator-initiated

4    studies, had become less.

5           Q.    So a controlled clinical

6    trial that was sponsored by the company,

7    the protocol would be developed by the

8    company?

9           A.    Yes.

10          Q.    And you were -- what -- you

11   were talking about it earlier, the

12   investigator-initiated study, that would

13   be a postmarketing study in a study that

14   was -- that study would still be paid for

15   by the company, correct?

16          A.    The company would, yes.

17   Depending on the arrangement with the

18   investigator, a company may pay for that

19   study, correct.

20          Q.    But the investigator would

21   develop the protocol?

22          A.    Yes.

23          Q.    The protocol would be

24   reviewed by the company?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.  And we talked about

2  that change at the time.

3    Q.    Okay.

4    A.    So I just wanted to make

5  sure that that was clear.

6    Q.    Doctor, do you recall

7  working with Dr. Reder, R-E-D-E-R, or

8  Dr. Kaiko, K-A-I-K-O, from Purdue Pharma?

9    A.    I remember those names.  And

10  I think that I may have been involved

11  with Dr. Kaiko.  Around -- when I talked

12  to you about the Purdue consulting

13  activity that I did, Parexel, that is a

14  name that comes to mind.  But I had also

15  indicated that I didn't recall exactly

16  the nature of the formulation or the

17  nature of the activity.

18    Q.    Do you recall a woman named

19  Lee Ann Storey?

20    A.    Yes, I believe Lee Ann

21  Storey was a -- is a medical writer I

22  believe.

23    Q.    Okay.  Do you know who --

24  who her employer is or was?

1    A.   I don't recall if she was a

2    medical writer for -- no, I don't recall

3    what her -- to answer your question, I

4    don't remember who her -- who her

5    employer was.

6         Q.   What's a medical writer?

7         A.   A medical writer is an

8    individual who -- who may be contracted

9    to do a variety of activities, either for

10   a pharmaceutical company or a contract

11   research organization, to write

12   protocols, study of reports, et cetera.

13        Q.   Do you have any memory of

14   her working either at or for -- or for

15   Purdue Pharma?

16        A.   I don't recall which company

17   she worked at.  I recall having some

18   interaction with her, but I don't

19   remember which company she worked at at

20   the time when I had that -- when I had

21   that interaction.

22        Q.   Do you recall your

23   interaction with Dr. Kaiko?

24        A.   Not clearly, no.

1    Q.    Have -- did you ever meet

2  him face-to-face?

3    A.    I might have, but I'm not

4  certain.

5    Q.    Do you recall if your

6  involvement with Dr. Kaiko extended after

7  Parexel?

8    A.    I don't have a recollection

9  of that.

10    Q.    Do you recall ever doing

11  tests on Oxycodone hydrochloride with

12  respect to blood plasma levels?

13    A.    I'm not sure I understand

14  the question.

15    Q.    Do you recall ever doing

16  tests while you were at Parexel or

17  overseeing tests or clinical trials with

18  respect to plasma levels of Oxycodone?

19    A.    I would not have been

20  providing oversight to those types of

21  activities for Purdue Pharma.

22         The study report that I

23  talked to you about, it may have provided

24  that type of information, but again I

1  don't recall the nature of the study

2  report.  But I would not have done those

3  type of studies and provided those type

4  of support activities to Purdue looking

5  at those types of levels.

6          Q.     When you say you wouldn't

7  have -- have done those types of studies

8  or support activities, what would you

9  have done for Purdue?

10         A.     So if Purdue provided me

11  with the data and wanted me to review it,

12  and depending on what they wanted to do

13  with the information.  So for example, if

14  they were going to go for a regulatory

15  claim, they may have asked me to review

16  it and see what I thought about the

17  information clinically.  But I would not

18  have been the person engaged in

19  conducting those studies.

20         Q.     And what would have been the

21  purpose for you to review the -- the data

22  from such studies?

23         A.     While I was at Parexel?

24         Q.     Correct.

1    A.    If they were interested in

2    doing regulatory submission for one of

3    their compounds, they may have gone to me

4    based on my background and expertise to

5    look at the data to see, was it, you

6    know, clinically -- did it make sense

7    clinically, and what -- that type of a

8    thing.  So that -- that's how I would do

9    it.  It would be review data that they

10   would have provided to me.

11        Q.    And would you have reviewed

12   that data for safety and/or efficacy?

13        A.    If I was asked to do so.

14        Q.    And what would the -- what

15   would the result be, a report that you

16   would send back to Purdue Pharma or

17   what -- what would -- what would you

18   actually do?  What would your work be?

19        A.    Depending on what they

20   contracted me to do.  They may ask me to

21   review it to see if the various elements

22   that might be of interest to a regulatory

23   body were contained in there.  Whether --

24   what types of additional studies might be

1    needed to have a more robust submission

2    to a regulatory authority.

3                It would really be depending

4    on what they had contracted me to ask --

5    you know, what the services they wanted

6    me to provide.

7         Q.    And I think you're

8    explaining the range of services.  But

9    what would be -- the range of services

10   would typically be, you would review the

11   data and then you may, in fact, give your

12   opinion as to the sufficiency of the data

13   for a regulatory finding?

14        A.    That could be one activity,

15   yes.

16        Q.    Would you have ever -- would

17   you -- strike that.

18                Is it possible that you

19   would have been asked by Purdue to assist

20   in the creation of protocols for such

21   clinical trials?

22                MR. LIFLAND:  Object to the

23        form of the question.

24                THE WITNESS:  Let me --

Highly Confidential - Subject to Further Confidentiality Review

```
 1         could you repeat the question for

 2         me, please?

 3   BY MS. CONROY:

 4         Q.    Sure.

 5              Could you have been asked by

 6   Purdue to assist in the creation of

 7   protocols for such clinical trials?  I'm

 8   talking about the clinical trials to make

 9   some sort of a regulatory submission.

10              MR. LIFLAND:  Same

11         objection.  You can answer.

12              THE WITNESS:  Typically I

13         think the structure of Purdue is

14         they have their own -- they have

15         their own experts doing those

16         types of activities.

17              And I don't recall reviewing

18         the protocol, per se.  And I -- I

19         certainly don't recall them coming

20         to me to develop a protocol from

21         the very beginning.

22              I might have been asked to

23         review a protocol, but I -- as I

24         said, they had their own inhouse
```

Highly Confidential - Subject to Further Confidentiality Review

1    experts who may have written their

2    own protocols or gone to other

3    people to write them.

4  BY MS. CONROY:

5       Q.    How do you know that they

6  had their own experts at Purdue?

7       A.    Because there were people at

8  the company who have background and

9  expertise in pain medicine.

10      Q.    Do you know who -- who those

11 individuals were?

12      A.    Well, I -- I -- there were

13 people that worked at Purdue.  I don't

14 know if they were in the protocol

15 development department.  But it was a

16 pain analgesia company.

17      Q.    Who did you know there?

18      A.    I had an opportunity to

19 interact with Dr. David Haddox.

20      Q.    And how -- on what occasions

21 did you interact with Dr. David Haddox,

22 H-A-D-D-O-X?

23      A.    Through the activities

24 predominately through RADARS.

Highly Confidential - Subject to Further Confidentiality Review

1    But I -- again, I don't know

2  whether Dr. Haddox was involved in

3  developing the protocols or not.  I don't

4  know that.

5    Q.   Okay.  Who else did you know

6  at Purdue?

7    A.   There was another person

8  that I don't recall his name.  He was in

9  their epidemiology group, but I don't

10  recall his name.

11    Q.   And you know Dr. Kaiko?

12    A.   I knew of Dr. Kaiko, yes.

13  But Dr. Kaiko was -- again, there might

14  have been another person.

15    Q.   Did you know Dr. Reder?

16    A.   I had met Dr. Reder and

17  spoken with him a few times.  I did not

18  know him well.

19    Q.   Did you ever meet Dr. Haddox

20  or Dr. Reder at any American Pain Society

21  meeting or American Pain Foundation

22  meetings?

23    A.   I don't recall.  I did

24  poster presentations as part of, again,

Highly Confidential - Subject to Further Confidentiality Review

1    scientific activities.  People would have

2    come up to me and asked me questions

3    about the scientific data that I was

4    presenting.  I don't remember everyone

5    who would have come to talk to me.  So

6    it's possible that they might have.  But

7    it doesn't come to mind specifically

8    talking about that.

9         Q.    So you don't recall anyone

10   from Purdue Pharma ever speaking to you

11   at any of -- at any of your poster

12   presentations or any of the other --

13        A.    No.  I'm sorry.  I thought

14   the question was do I remember having

15   specific conversations with those

16   individuals at the American Pain Society.

17   And I don't.

18             There may have been people

19   from Purdue Pharma who would have come as

20   a matter of being individuals

21   participating in the meeting who have

22   come by to speak -- to look at it.

23             They may or may not have had

24   badges indicating what their -- what

Highly Confidential - Subject to Further Confidentiality Review

1    companies they worked with.

2              So there may have been, but

3    I can't -- I don't -- I can't at this

4    point recollect a specific individual who

5    I might have had a discussion with.  It's

6    certainly possible.

7         Q.    Do you have a recollection

8    of knowing that someone from Purdue was

9    asking you questions about a particular

10   poster or findings of your own?

11        A.    There may have been somebody

12   from -- and I don't remember the name of

13   the person, scientist, who had questions

14   about some of the work that we had done.

15   But I -- that may have been -- that is

16   one that comes to mind.  But I don't

17   recall if there are others, no.

18        Q.    What about any individuals

19   from Mallinckrodt?  Do you recall

20   Mallinckrodt employees asking you any

21   questions or speaking to you at any of

22   your poster presentations?

23        A.    Not specifically individuals

24   from Mallinckrodt.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did you -- do you recall any

2    other instances when you would have had

3    conversations with individuals from

4    Mallinckrodt at any time during your

5    career?

6         A.    If they were participants of

7    some of the surveillance programs that we

8    had, such as RADARS, then they may have.

9    And I don't know whether Mallinckrodt was

10   a participant of RADARS or not.  But that

11   might have been a place.

12              I also served on the ACTTION

13   group.  ACTTION was a group of

14   individuals which was comprised of people

15   from the FDA, from industry, and from

16   academia.  And companies -- certain

17   companies provided representatives to

18   ACTTION.  I was one of the people from

19   Janssen.  There were -- from -- from

20   Janssen.  There were other Janssen people

21   who were there at other points in time.

22   And I might have spoken to somebody from

23   -- either from Mallinckrodt or from

24   Purdue at those meetings.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Is ACTTION A-C-T-I-O-N?

2      A.    I always get the spelling

3   wrong.  I have to look it up.  I think

4   it's -- so --

5      Q.    Well, let me ask it.  Is it

6   an acronym?

7      A.    It is, yes.  It's not

8   A-C-T-I-O-N.

9      Q.    What other companies are you

10  aware of today that manufactured and sold

11  opioids in the United States for chronic

12  pain?

13     A.    Endo Pharmaceuticals, Purdue

14  Pharma, Janssen, Mallinckrodt.  I'm sure

15  there may be others that I'm not

16  remembering.  Cephalon I believe.

17     Q.    Are you familiar with

18  Actavis?  Actavis, the name of that

19  company?

20     A.    I'm not familiar with that

21  company.

22     Q.    Watson?  Are you familiar

23  with that?

24     A.    Yes, I've heard of Watson.

1    Q.    Do you know if they

2    manufactured an opioid product for pain?

3    A.    I don't remember what

4    product they have.

5    Q.    What about Rhodes

6    R-H-O-D-E-S, a Rhodes Technologies?

7    A.    I'm not familiar with the

8    company.

9    Q.    Do you recall having any

10   involvement with respect to Oxycodone and

11   bioequivalence testing with morphine

12   while you were at Parexel?

13   A.    Could you clarify that

14   question for me?

15   Q.    Probably not.  So you know,

16   I'm -- what I'm asking is, do you have

17   any memory of having any involvement at

18   all while you were at Parexel with

19   evaluating or supervising or studying or

20   having your hands on anywhere

21   bioequivalency data with respect to

22   comparisons between oxycodone and

23   morphine or MS Contin or some type of

24   morphine drug?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    There was work that I had

2  done as part of a consulting activity

3  with Purdue.  And I don't remember the

4  nature of the work and whether there were

5  data that I might have looked at that

6  addressed that question.

7          But I did not perform or

8  oversee those types of -- that type of

9  work to acquire that data.  But it may

10 have been data that I reviewed, but I

11 simply don't remember.

12   Q.    So you don't remember

13 whether or not you -- you don't remember

14 what the purpose of the review of any of

15 that data might have been?

16   A.    I don't.

17   Q.    Okay.  But you do recall

18 that you looked at bioequivalency data?

19   A.    No, I don't remember the

20 nature of the data.  So I don't know if I

21 looked at bioequivalency data or not.

22   Q.    If I wanted to know what

23 involvement you had at Parexel with

24 respect to Purdue products, who would

Highly Confidential - Subject to Further Confidentiality Review

1   know that?

2          A.    I think you would need to

3   reach out to Parexel to see the

4   consulting agreement that was done for

5   one specific activity that I had and

6   describing that and then go from there.

7          Q.    Parexel is still in

8   business?

9          A.    Yes.

10         Q.    And do you have any

11  involvement with Parexel?  Do you know

12  anybody there anymore?

13         A.    No.

14         Q.    Are they still in Waltham?

15  Do you know?

16         A.    I believe so.

17         Q.    Do you -- did you ever

18  use -- did you ever use Parexel when you

19  were at Janssen?

20         A.    I recall that we were

21  looking to do some work and had a number

22  of different companies to bid on the

23  work.  And Parexel was one of the

24  companies that came by to bid on it.  But

1    I think we went with a different company.

2              So I don't recall any

3    specific activities with Parexel.  There

4    may have been small projects that we had

5    done with them.  But I don't recall that.

6    And it doesn't jump to mind.

7              Q.    Why did you leave Astra and

8    go to Parexel?

9              A.    I left Astra to go to

10   Parexel.  I was a consult -- I was an

11   advisor at Astra.  And I really wanted to

12   learn the clinical trials business.  And

13   I think the best way to do that is to go

14   and really learn about the pharmaceutical

15   industry, to go to a contract research

16   organization.  Because there I gained

17   expertise in protocol design, protocol

18   execution, implementation, a lot of

19   information on looking at how you do

20   medical monitoring, which was a big role

21   for me and many of the medical physicians

22   working at contract research

23   organizations, analyzing data, analyzing

24   adverse events, so really the full

1    breadth of activity that take place for

2    clinical trials.

3                    And I believe one of the

4    best places to do that is a contract

5    research organization.

6          Q.    However, the contract

7    research organization does not actually

8    conduct the clinical trial, correct?

9          A.    They can.  Sometimes they

10   can, yes.

11         Q.    Were --

12         A.    Yes.

13         Q.    So were you involved in that

14   as well?  Were you ever a participant --

15   you know, involved in the actual clinical

16   trial?

17         A.    So I would ask to clarify

18   what you mean by involved in a clinical

19   trial?

20         Q.    I don't mean as a subject.

21         A.    No, I -- no, I understand.

22                    Do you mean that I write --

23   so I can clarify, you mean did I write

24   protocols, develop them, interact with

Highly Confidential - Subject to Further Confidentiality Review

1    clinical sites, and then when the data

2    came in, analyze the data, looked at it,

3    helped to review study reports that may

4    have been written by medical writers and

5    then work with all those -- those type of

6    activities?

7         Q.    Those are all things that

8    you did, correct?

9         A.    Yes, that's correct.

10        Q.    What you did not do was you

11   were -- you never were at the clinical

12   site itself, you were never collecting

13   the data yourself from the patients or

14   the subjects in the clinical trial,

15   correct?

16        A.    That would have been done at

17   the sites.  I may have visited a clinical

18   site if there were concerns or issues

19   that I needed to speak to the

20   investigator on or if the investigator,

21   or their study coordinator -- a study

22   coordinator would be a person working

23   with the investigator on the study

24   execution.  I would certainly answer

1    those questions.

2              But I did not work at a site

3    specifically to collect data from

4    patients.

5         Q.    And why do you believe it's

6    better to gain an expertise at a clinical

7    research organization -- sorry, contract

8    resource organization rather than at an

9    actual pharmaceutical company?

10        A.    Companies are a wonderful

11   place to do it.  I think the breadth of

12   experience you get at a CRO would be

13   different because contract research

14   organizations work with a variety of

15   pharmaceutical companies.  So you really

16   have an opportunity to see how different

17   companies perform clinical trials.

18             So if you work at one

19   company, you may have a wonderful

20   experience on how that company works.

21   But if you want to see in the industry to

22   see how different companies run their

23   trials, then I believe a CRO, contract

24   research organization, is an excellent

1    place to do that.

2         Q.    So while you were at

3    Parexel, you would have had the

4    opportunity to gain insight into how

5    Purdue Pharma conducted clinical trials?

6         A.    If Purdue Pharma was a

7    company that was working with Parexel.

8              My interaction, as I've

9    already indicated, was just to provide

10   consulting work for a single project.

11   But for other companies where their

12   clinical programs might be run with a

13   company like Parexel, then one would have

14   had an opportunity to see the breadth of

15   clinical studies that they were putting

16   together, ultimately culminating in

17   regulatory submission for approval of the

18   product.

19        Q.    Were there any companies

20   that you recall that did just that, what

21   you were explaining for acute and chronic

22   pain?

23        A.    At Janssen.

24        Q.    While you were at Parexel?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And so you were able to see

3  how Janssen conducted clinical trials?

4    A.    Yes.

5          (Brief interruption.)

6          MS. CONROY:  I think whoever

7      is on the phone needs to put it on

8      mute.

9  BY MS. CONROY:

10    Q.    In 2000 you left Parexel and

11  went to Janssen, correct?

12    A.    Yes.

13    Q.    And why is that?

14    A.    I had an opportunity -- I

15  had worked with Janssen on -- on their

16  clinical studies.  I really liked the way

17  they conducted the -- the studies.  And I

18  had an opportunity to join their medical

19  affairs group and work on pain relief and

20  compounds which, as an anesthesiologist,

21  was of great interest to me.

22    Q.    And that's here on your CV,

23  October 2000 to March 2003.  You went in

24  as the director of medical development

Highly Confidential - Subject to Further Confidentiality Review

1    anesthesia -- analgesia and mycology?

2         A.    Yes.  I'm sorry.

3         Q.    Page 344.

4         A.    Thank you.  Let me circle

5    back.

6               Excuse me.

7               Yes, the dates are

8    approximate, but the October 2000 date is

9    correct.  The other -- the other date is

10   about when I had gone from being a

11   director to senior director are

12   approximate.

13        Q.    Okay.  And were you paid

14   more when you went to Janssen?

15        A.    Yes, I was.

16        Q.    And what was your -- what

17   was your pay structure, was there a base

18   salary?

19        A.    My pay structure where?

20        Q.    At Janssen.

21        A.    Oh.

22        Q.    When you went to Janssen.

23        A.    Yes, I had a salary and

24   other compensation.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What was your -- when you

2    started what was your other compensation,

3    just generally, you know, not --

4        A.    I had a bonus.  I think I

5    had stock options.

6        Q.    What was the bonus based on?

7        A.    It may have been related to

8    merit and performance I would think.  It

9    should -- that's typically how those

10   bonuses were given out.

11       Q.    Do you know if it was based

12   in any way on the performance of the

13   sales performance of any of the products

14   you were involved in?

15       A.    I don't know.  I don't know.

16   I -- I don't know.  I always assumed it

17   was related to my work, but I don't know

18   that.

19       Q.    Okay.  You don't -- is it

20   fair to say you don't know because you

21   never asked?

22       A.    Yes, that's fair to say I

23   don't know because I never asked.

24       Q.    Okay.  And did that

Highly Confidential - Subject to Further Confidentiality Review

1    continue, that basic structure, base

2    salary, a bonus, and stock options, until

3    you left in 2015?

4         A.    I left in 2017.

5         Q.    I'm sorry, 2017?

6         A.    Right.  Yes.

7         Q.    Did you become a shareholder

8    of Janssen when you were hired in October

9    of 2000 or was there some period of time

10   that you had to wait?

11        A.    There was a vesting period.

12        Q.    Do you recall what the

13   vesting period was?

14        A.    I'm not exactly sure.

15        Q.    Was it in -- was it months

16   or years?

17        A.    It was years.

18        Q.    But at some point you did

19   vest?

20        A.    Yes.

21        Q.    Okay.  And were you

22   100 percent vested at some point?

23        A.    Yes.

24        Q.    Do you still own -- was it

1    Johnson & Johnson stock or Janssen stock,

2    or both, do you know?

3         A.    Johnson & Johnson stock.  I

4    own Johnson -- Johnson & Johnson stock,

5    yes.

6         Q.    And do you still own it?

7         A.    Yes.

8         Q.    When you left in 2017, was

9    there any sort of severance agreement

10   with you?

11        A.    I'm not sure exactly if I'm

12   in a position to answer that or not.

13        Q.    Why is that?

14             MR. LIFLAND:  Can we take a

15        break?  I suspect he just has a

16        question about the extent that he

17        needs to get into personal

18        financial issues.

19             Maybe you can answer.

20   BY MS. CONROY:

21        Q.    Is that your concern, that

22   I'm going to ask you about personal

23   financial concerns?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Let me just ask you a

2     few questions first about the actual

3     agreement.

4               Is there a severance

5     agreement --

6          A.    Yes.

7          Q.    -- with Johnson & Johnson?

8          A.    I have one, yes.

9          Q.    And is it still in effect?

10         A.    No.

11         Q.    How long did it last?

12         A.    Eight months.

13         Q.    And did it have a financial

14    component?

15         A.    Yes.

16         Q.    Do you receive any -- do you

17    receive any monies from Janssen or

18    Johnson & Johnson today as a result of

19    that severance agreement?

20         A.    I do not.

21         Q.    Are you being paid today by

22    anybody?

23         A.    No, I'm not.

24         Q.    So you -- you are not being

```
 1    paid for your time?

 2         A.    I am not.

 3         Q.    Were you paid or do you

 4    expect to be paid for your time in

 5    preparing for this deposition?

 6         A.    No, I -- I do not.  And I

 7    have not been.

 8         Q.    What about your expenses to

 9    drive here, drive home, that sort of

10    thing?

11         A.    No.

12         Q.    Is your appearance here

13    today as a result of the severance

14    agreement?

15         A.    No, it's not related at all.

16         Q.    Why are you here?

17         A.    Because I was supposed.

18              MR. LIFLAND:  I suspect you

19         meant to say subpoenaed?

20              THE WITNESS:  Subpoenaed.

21    BY MS. CONROY:

22         Q.    Were you subpoenaed?

23              MR. LIFLAND:  A request was

24         made.  It was Exhibit 1.
```

Highly Confidential - Subject to Further Confidentiality Review

1                    THE WITNESS:  Yes.
2      BY MS. CONROY:
3            Q.    What do you understand this
4      lawsuit to be about?
5            A.    There are a number --
6                  MR. LIFLAND:  I would -- I
7            would just caution you to answer
8            only based on your knowledge
9            independent of your conversations
10           from counsel.
11                 THE WITNESS:  Understood.
12                 I don't know very much about
13           the lawsuit.  I understand there
14           were a number of companies that
15           were -- were lawsuit engaged for
16           activities around opioid related,
17           but I don't know the specifics of
18           the lawsuit.
19     BY MS. CONROY:
20           Q.    What do you know about it
21     generally?
22           A.    There were a number of
23     companies, as I said, that were -- that
24     are manufacturers and distribute opioid

Highly Confidential - Subject to Further Confidentiality Review

1    analgesics, and there are a number of

2    different area -- different groups of

3    people who were suing them, and so

4    this -- this is kind of a conglomerate of

5    that, of activities.

6            Q.    And do you have an

7    understanding of who it is who is suing

8    the manufacturers and the wholesalers?

9            A.    No, not exactly.

10           Q.    Any idea at all?

11           A.    No, not really.

12           Q.    Have you ever seen the

13   complaint?

14                 Do you know what that is?

15   Have you ever heard that word, complaint?

16           A.    Yes, I do.  I saw part of

17   the complaint, but I didn't go through it

18   in great detail.

19           Q.    Okay.  What did you see of

20   it, what part of it did you see?

21           A.    Just some of the -- just the

22   number of companies that were involved.

23   I got to see that.  And some of the

24   things that were listed about it.  But I

Highly Confidential - Subject to Further Confidentiality Review

1  did not go into -- I did not go through

2  it in detail.

3       Q.    Okay.  You didn't look at

4  who it was that was suing?

5       A.    No, I did not.

6       Q.    Do you know whether it's an

7  individual that's suing?

8       A.    I think it's a group of

9  individuals -- I think it's a group of

10  interested parties that are suing.  But I

11  don't know who those parties are.

12       Q.    Do you know why they are

13  interested?  Do you know why they are

14  interested parties?

15       A.    I think there's concern that

16  there may -- that they are alleging that

17  there may have been wrongdoing in terms

18  of the activities related to the

19  marketing of these products and there

20  were damages related to that.

21       Q.    Do you know how the parties

22  that are suing have been damaged?

23       A.    I think -- well, I think it

24  was alleged that there was inappropriate

Highly Confidential - Subject to Further Confidentiality Review

1    prescribing or inappropriate marketing,

2    things that may have led to people

3    getting -- getting medications where they

4    should not have or maybe given a false

5    sense of security of those medications,

6    and that led to people becoming addicted

7    to those medications.

8         Q.    Do you think it's addicted

9    individuals that are suing?

10             MR. LIFLAND:  Object to the

11        form of the question.

12             THE WITNESS:  No, I think --

13        I think there are groups of

14        individuals who are represented

15        who are concerned about people

16        that their -- either where they

17        live -- again, I don't -- what I

18        hope you're hearing is, I don't

19        really have a lot of knowledge

20        about this.  That's my -- that's

21        kind of what I'm saying.

22   BY MS. CONROY:

23        Q.    Have you read about this

24   lawsuit in the media?

1          A.     No, I have not.

2          Q.     So you haven't heard about

3   it in the media, you've --

4          A.     I have --

5          Q.     -- you only heard about it

6   from the contact about this deposition?

7          A.     I -- yes.

8          Q.     Do you know where the

9   lawsuit is pending?  Do you know what

10  court it's in?

11         A.     I don't.

12         Q.     What do you understand

13  was -- are the allegations with respect

14  to the marketing of the products?

15              MR. LIFLAND:  Object to the

16         form of the question.

17              THE WITNESS:  I'm sorry, I

18         didn't hear.

19              MR. LIFLAND:  I -- I just

20         objected.  You can answer.

21              THE WITNESS:  Oh.

22              I only -- my understanding

23         is that there may have been

24         inappropriate marketing, that's

1          all I know.

2     BY MS. CONROY:

3          Q.    Have you ever heard in the

4     past that there was inappropriate

5     marketing for example, of OxyContin by

6     Purdue Pharma?

7          A.    I've heard of that, that

8     allegation in the media.

9          Q.    Did -- were you aware that

10    they pled guilty to inappropriate

11    marketing?

12         A.    I had heard that.

13         Q.    When did you hear that?

14         A.    Sometime ago, I don't

15    remember the exact date.

16         Q.    Did you -- did you have, at

17    any time -- I'm not going to ask you if

18    you remember specifically now, but did

19    you at some point understand what -- why

20    Purdue Pharma pled guilty?

21         A.    No, I don't have the

22    specifics of the background that would

23    have led them to do that.

24         Q.    So you never looked into

Highly Confidential - Subject to Further Confidentiality Review

1    that?

2          A.    I did not.

3          Q.    Okay.  Do you know if

4    Janssen has ever been under any

5    investigation with respect to its

6    marketing of opioid analgesics?

7          A.    Not that I'm aware of.

8          Q.    Okay.  You never heard that?

9          A.    Not that I've heard that

10   there was an investigation.

11         Q.    Have you heard about any

12   sort of investigation or activity with

13   respect to Janssen's marketing of

14   opioids?

15         A.    Not that I'm -- no, I'm not

16   aware of an investigation in terms of the

17   marketing of their opioids.

18         Q.    When you -- what do you mean

19   when you use the term "investigation"?

20         A.    That's what -- I thought

21   that's what you had asked me.

22         Q.    I'm asking you, what -- when

23   you answered me and said, "I'm not aware

24   of any investigation," what do -- are you

Highly Confidential - Subject to Further Confidentiality Review

1    being specific about a criminal

2    investigation versus --

3         A.    No.

4         Q.    -- something else --

5         A.    No.

6         Q.    -- or just any -- you are

7    just talking about any kind of

8    investigation at all?

9         A.    Correct.  Correct.

10        Q.    What about any investigation

11   with respect to Mallinckrodt or Endo or

12   any of the other companies that you are

13   aware manufacture opioids?

14        A.    I'm not aware --

15             MR. WATTS:  Objection to

16        form.

17             THE COURT REPORTER:  Can I

18        ask who said that?

19             MS. CONROY:  Who was that?

20             MR. WATTS:  Ryan Watts.

21   BY MS. CONROY:

22        Q.    Do you know if there has

23   ever been a Corporate Integrity Agreement

24   in place at Janssen or Johnson & Johnson?

1    A.    Yes.

2    Q.    And do you -- do you

3    understand why that Corporate Integrity

4    Agreement was in place?

5    A.    Yes.

6    Q.    And why is that?

7    A.    There was a concern about

8    wrongdoing, I think about some of the

9    activities related potentially to

10   marketing.

11   Q.    Marketing of what?

12   A.    I don't know.  I just know

13   that there was a CIA.  I don't know all

14   the -- at this point, I don't remember.

15   I might have known at one time.

16   Q.    Is that with respect to any

17   product at Janssen, or do you know?

18   A.    I don't.

19   Q.    Was there any -- how do you

20   know there was a CIA?

21   A.    Because we were told there

22   was a Corporate Integrity Agreement.  We

23   had additional training on what that'd

24   be.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you had additional

2    training with respect to marketing?

3         A.    Actually I'd like to amend

4    something I said.  I think the Corporate

5    Integrity Agreement may have been related

6    to Risperdal.  I'm not certain about

7    that.  Your question earlier about -- was

8    investigating about opioids, if I'm

9    correct.  And I don't recall anything

10   with that.

11        Q.    Okay.  Was the CIA still in

12   effect, do you know, when you left

13   Janssen in 2017?

14        A.    I'm not sure when the CIA

15   was completed.  I know that I had taken

16   training, additional training for a

17   period of time.

18        Q.    And the training concerned

19   proper marketing?

20        A.    Proper marketing and a

21   number of different activities, yes.  It

22   was extensive training, which was

23   mandatory at the company.

24        Q.    Did you ever have anything

Highly Confidential - Subject to Further Confidentiality Review

1    to do with Risperdal?

2           A.    No.  I don't think so.  I

3    might have had -- well, at the company?

4    Is that what you're --

5           Q.    Yes.

6           A.    Right.  I might have been

7    involved in some consulting activities

8    for Janssen with Risperdal when I was at

9    Parexel.  But I interpreted your question

10   about whether I actually worked with

11   Risperdal as a Janssen employee.  Is that

12   what you were looking for?

13          Q.    I was.

14          A.    And I did not work on the

15   drug when I was there.

16          Q.    And what about when you were

17   on the promotional review committee.

18   Would you have had any occasion at that

19   time to review any of the marketing for

20   Risperdal?

21          A.    No, I did not.

22          Q.    Was your involvement in the

23   promotional review committee restricted

24   to pain products or opioid products?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I worked on opioid

2  analgesics, yes.

3          Q.    Just opioid analgesics?

4          A.    Correct.

5          Q.    But if we take a look at

6  Page 344 of your CV.  You were moving up.

7  You started in Titusville.  And then you

8  moved to Raritan; is that correct?

9          A.    Yes.  It was another campus.

10         Q.    Okay.  And did your

11  responsibilities change from 2005 when

12  you left Titusville and then you were in

13  Raritan?  Did your day-to-day

14  responsibilities change?

15         A.    I worked on a different

16  opioid analgesic in Raritan.  I may have

17  still had some activities related to the

18  compound that I was working on at that

19  point, which was Duragesic.  But I also

20  acquired new responsibilities for

21  tramadol.

22         Q.    When you were in Titusville,

23  did you work on Duragesic?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    That was up through January

2    of 2005?

3    A.    Yes.  I may have had some

4    additional residual activities with

5    Duragesic as well.  But more of my time

6    was spent with tramadol.  Because of my

7    background and experience with Duragesic,

8    I certainly may have been on certain

9    documents and asked to render opinions

10   about Duragesic after 2005.

11   Q.    When would you say -- I

12   realize this is approximate, we'll -- we

13   will look at documents.  Where would you

14   say you basically were finished with any

15   work on Duragesic?

16   A.    Around the time that the

17   drug went generic, approximately

18   around -- around 2005 or thereabouts.

19   The dates are approximate.  So I want to

20   be clear on that.

21   Q.    Okay.  And then were you

22   working on tramadol prior to 2005?  Or

23   let me ask this.  Was there -- was there

24   some sort of a crossover with Duragesic

Highly Confidential - Subject to Further Confidentiality Review

1    and tramadol?

2         A.    There was a little bit of a
3    crossover, yes.

4         Q.    Okay.  What were your
5    responsibilities with respect to
6    Duragesic when you -- if -- kind of give
7    me an overview of -- starting in 2000 --
8    Duragesic was around in 2000, correct?

9         A.    Yes.

10        Q.    -- up until it went generic
11   in 2005.  What -- give me an overview of
12   what involvement you had with that drug.

13        A.    So I was a medical director
14   working on the compound.  And then I
15   worked as a senior medical director as
16   well.  So I was responsible for
17   postmarketing activities to support the
18   clinical development of a compound.

19             I had worked on analysis of
20   clinical studies, clinical trials.  I
21   participated working with the regulatory
22   group on regulatory issues that may have
23   come up.  I worked with our outcomes
24   research group.  I was also involved in

1    working in one of my capacities at the

2    company, developing an acute surveillance

3    program for our opioid analgesics.  And

4    Duragesic was the first compound involved

5    in those activities for me.

6           Q.    And you had explained to me

7    earlier the types of postmarket work.

8    One of those would be company-sponsored

9    clinical trials?

10          A.    Yes, that's correct.

11          Q.    And you worked on those?

12          A.    Yes.  Those studies would

13   have been undergone -- those were

14   undertaken before I had gotten there.  So

15   it was finishing up that work.

16                I may have had activities

17   with the investigator-initiated studies

18   as well.  Remember we talked about

19   different types of postmarketing

20   activities, and I was involved, again,

21   working with our outcomes research group

22   developing information on

23   outcomes-related activities to support

24   the study.

Highly Confidential - Subject to Further Confidentiality Review

1    I would provide medical

2    information -- medical expertise to our

3    medical information group.  And I just

4    mentioned to you, I developed the acute

5    surveillance program for Duragesic.

6         Q.    Were you involved in any --

7    strike that.

8         Outcomes research, was

9    that -- was that connected with

10    promotional activities for the drug?

11         A.    No.  The promotional

12    activities for the drug would have been

13    carried out through the promotional

14    review committee.  The outcomes research

15    group was developing outcomes-related

16    data that might be used to provide

17    information to various groups.  Payers

18    might be interested, for example, and

19    other groups as well.  Provide also

20    information to clinicians that would be

21    of interest to them.

22         Q.    But you would not consider

23    that promotion?

24         A.    No.  The outcomes -- the

1    data that were generated from the

2    outcomes research group would not

3    necessarily have comported with the FDA

4    requirement for the level of evidence

5    that was needed to be used for

6    promotional purposes.  So that data was

7    supported and used in other types of --

8    for other -- other situations.

9         Q.    The FDA has to approve any

10   studies that will actually be used for

11   the marketing of a product, correct?

12        A.    I'm not sure I completely

13   understand your question.

14        Q.    If data is going to be used

15   to market a product --

16        A.    Yes.

17        Q.    -- the FDA must approve that

18   data or they have to approve the data and

19   say that it's appropriate for promotion?

20             MR. LIFLAND:  Object to the

21        form of the question.

22             THE WITNESS:  The data that

23        would be used for promotional

24        materials would have to be from

Highly Confidential - Subject to Further Confidentiality Review

1    well controlled studies, and

2    typically those are some of the

3    studies that would be used to

4    inform the product label.

5  BY MS. CONROY:

6    Q.    And the same would be true

7  of any postmarket studies; it would have

8  to be well controlled studies?

9    A.    If they were going to be

10  used for promotional purposes, yes.

11    Q.    And the FDA would need to

12  approve them, correct?

13    A.    Some of -- the information

14  would be sent down to FDA.  FDA would

15  have an opportunity to review it and

16  opine on it.  They may or may not

17  necessarily get back with a formal

18  approval.  But it would have been

19  submitted for FDA review.

20    Q.    You must submit it, correct,

21  if you're going to use it for promotional

22  material?

23    A.    Promotional materials that

24  would have been used would have been

1  submitted to what was DD -- what was

2  called DDMAC.  I forgot what their new

3  name would be.  FDA may or may not have

4  gotten back to the company as they would

5  review it.  And they had the option to

6  comment should they wanted to.

7        Q.    I understand that.  But

8  there would -- there's certainly a

9  requirement that Johnson & Johnson needs

10  to submit any materials to the FDA if

11  they're going to use it for promotional?

12        A.    Janssen would have certainly

13  submitted --

14            MR. LIFLAND:  Object to the

15        form of the question.  Sorry.  Go

16        ahead and answer.  I probably

17        talked over.  Did you get it?

18            THE COURT REPORTER:  No.

19            MR. LIFLAND:  Okay.  Give

20        your answer again.  Sorry.

21            THE WITNESS:  Janssen would

22        have done those activities.  Yes.

23  BY MS. CONROY:

24        Q.    They would need to submit to

1    the FDA?

2           A.    Yes.

3           Q.    Now, for what reason would

4    outcome data be given to payers?

5           A.    If there was a request for

6    that type of information.

7           Q.    Where would the request come

8    from?

9           A.    From the payers themselves,

10   there was information, for example, on

11   how the products might be used.  There

12   may be information how it would be used

13   as part of usual care.  That type of

14   information.  Payers was one group.  The

15   information could be provided to

16   prescribers as well and to a number of

17   different people who wanted to

18   understand -- have that type -- so that

19   would be some of the type of information

20   that would be used -- generated from the

21   outcomes research group.

22          Q.    And the outcomes research

23   group would actually generate data,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    They would generate data or

2   they may take data from clinical studies

3   where certain types of outcomes,

4   instruments, would be included in those

5   clinical trials.  So the example, quality

6   of life-type measures, those type of

7   things, would be included as a number of

8   instruments as part of a clinical study

9   and the outcomes research group would

10  take that data and analyze it.  So they

11  may generate the data from their own

12  studies or use data from clinical trials

13  that they could -- analyze and then use

14  as needed.

15    Q.    Any of the data that would

16  be used from a clinical trial, would that

17  clinical trial have to have been

18  submitted to the FDA?

19          MR. LIFLAND:  Object to the

20      form of the question.

21          Go ahead and -- if you can

22      answer it, or you can ask for

23      clarification.  I just made an

24      objection for the record.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  I would need a

2      clarification on the question.

3           MS. CONROY:  Please don't

4      coach the witness.

5   BY MS. CONROY:

6           Q.   If a data was used from a

7   clinical trial, would that data from the

8   clinical trial have to have been

9   submitted to the FDA?

10          A.   To be used for promotional

11  purposes?

12          Q.   To -- to be used for any

13  purpose at all.

14          A.   Not necessarily.

15          Q.   So it could be used as

16  outcomes data for example, a payer,

17  without having been submitted to the FDA?

18          A.   Yes.  If the data would have

19  come from a clinical trial and there was

20  a request from the payers or if there

21  were data they wanted to be discussed,

22  then they could do that.

23          Q.   And the distinction would be

24  whether or not that data was being used

Highly Confidential - Subject to Further Confidentiality Review

1    for promotion?

2         A.    So peer-to-peer

3    communications would -- would be

4    discussed if it was being used for

5    promotional purposes.  Again, those data

6    would need to be handled differently.

7         Q.    Who would that discussion --

8    where would that discussion take place as

9    to whether or not it was being used for

10   promotion?

11        A.    The decision on how it would

12   be used.  If it was going to be

13   incorporated as part of the promotional

14   materials, then it would certainly need

15   to have a different level of evidence

16   that FDA requires.  If it was being used

17   for peer-to-peer communications, it would

18   not necessarily be discussed with FDA.

19             The clinical trial data

20   though, keep in mind, would have been as

21   part of the -- the approval process would

22   have been discussed with FDA.  So the

23   results of the clinical studies, those

24   data could be shared with people.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What I was getting at with
2    respect to the clinical data, would all
3    of the data that was collected during a
4    clinical trial, for example quality of
5    life or other instrument data, would all
6    of that have been provided to the FDA?
7         A.    Yes.  All of that would be
8    submitted to FDA as part of the
9    submission process for approval of the
10   product.  So it won't be -- it would be
11   efficacy data, safety data.  Another
12   study would presumably be sent to them as
13   well, for FDA to review.
14        Q.    So if there was any quality
15   of life, for example data, that would
16   have been sent at the same time as the
17   clinical and the safety?
18        A.    That's my understanding.
19   That would be my understanding.
20        Q.    And where does that
21   understanding come from?
22        A.    Because we -- when you look
23   and see the information that would be
24   submitted, anything that related to the

1    compound and exposure to patients I think

2    would be submitted to the FDA.

3         Q.    Do you know if it was?

4         A.    The -- the new drug

5    applications are extensive.  There's a

6    lot of information in there.  I'm not

7    able to comment on everything that was

8    sent down.

9              But certainly all the safety

10   and efficacy information was shared with

11   FDA and the other information.  So I

12   can't say for certain that I saw that

13   data sent down to FDA.

14        Q.    So it's possible that, for

15   example quality of life data that would

16   be used for some outcomes research to be

17   provided to payers may not have been

18   provided to the FDA in the -- in the NDA?

19        A.    So the --

20              MR. LIFLAND:  Object to the

21        form of the question.

22              THE WITNESS:  The quality of

23        life information, it would have

24        been part of the information that

1          would be administered to patients

2          and that information would have

3          gone down to FDA.

4               The subsequent analysis that

5          would be done by an outcomes

6          research group and shared with

7          payers, those types of analysis

8          would not necessarily be shared

9          with FDA -- would not have been

10         shared with FDA.

11    BY MS. CONROY:

12         Q.    That's the analysis,

13    correct?

14         A.    Yes.

15         Q.    What I'm talking about is

16    all of the data that would ultimately be

17    analyzed for any purpose at Janssen, all

18    of that data would have been provided to

19    the FDA?

20         A.    Yes, I believe so.

21         Q.    What is a peer-to-peer --

22    what do you mean when you say

23    peer-to-peer?

24         A.    Peer -- peer-to-peer

1    discussions would be where it would be

2    individuals such as physicians,

3    pharmacists, or Ph.D.s would share that

4    information with healthcare providers or

5    pharmacists or Ph.D.s.  So it would be

6    non-promotional interaction.

7              Promotional interaction

8    might be with the sales force interacting

9    with healthcare providers.  Peer-to-peer

10   would be individuals with advanced

11   scientific and/or medical training

12   interacting specifically with healthcare

13   providers.

14        Q.    Someone such as yourself?

15        A.    Yes.

16        Q.    So if you're talking to a

17   physician about the attributes of a

18   Janssen product, that would not be

19   considered promotion?

20        A.    That had evolved with time.

21   At one time it was considered

22   peer-to-peer.  It's still peer-to-peer.

23   But because we -- I worked at the

24   company, later on, and I don't remember

1    the date when it changed, it would have

2    been handled as promotional materials.

3            Q.    Do you -- can you do it by

4    drug?  Do you know whether you would have

5    been able to have conversations,

6    peer-to-peer conversations concerning the

7    attributes of Duragesic without it being

8    considered a promotional conversation?

9            A.    I think early on in my time

10   at Janssen, I think it would have been a

11   peer-to-peer and we would have had those

12   types of conversations.

13               Later on, as I already

14   indicated, it would be considered

15   promotional.  I think by the time we got

16   to tapentadol, and I just simply don't

17   recall the date when it changed over.  I

18   don't recall.

19           Q.    I understand.  I'm just

20   trying to determine whether you can do it

21   by drug.  So you think by tapentadol,

22   there would not be any longer this

23   peer-to-peer --

24           A.    Counsel, I think so, but I

1    don't have the date in my head where I

2    can say definitely at this point in time

3    it went over.

4              Q.      Okay.

5              A.      Yep.

6              Q.      Who do you -- who do you put

7    in the category of payer?

8              A.      Individuals who would pay,

9    you know, insurance companies,

10   individuals like that, would be paying

11   for these products for their -- the

12   people in their plans, et cetera.

13             Q.      Managed care organizations?

14             A.      Yes.

15             Q.      Group purchasing

16   organizations --

17             A.      Yes.

18             Q.      -- would you approve that?

19             Hospital groups?

20             A.      Yes.

21             These are groups that I

22   didn't personally interact with.

23   Although I did have several advisory

24   boards with payers.  But this -- the

1  outcomes research group were responsible

2  for those activities.  There may have

3  been other people at the company as well,

4  but that was some of their activities.

5       Q.    So for some period of time,

6  the outcomes research group could have

7  conversations for example, with managed

8  care organizations and discuss the

9  attributes of Duragesic and it would not

10  be considered promotion?

11       A.    I think that's true.  I'm

12  not certain.  I'd have to check on that.

13       Q.    How would you check that?

14       A.    Well, I -- actually, I don't

15  know how I would check it at this point

16  in time.  But I think at one point in

17  time that might have been true.  But the

18  people who would have been in the

19  outcomes research group at that time

20  might have been pharmacists, Ph.D.s as

21  well.  So they were individuals with

22  advanced scientific and medical -- and/or

23  medical training.

24       Q.    So as long as someone in

1  Janssen had an advanced scientific or

2  medical degree, they could have

3  discussions about the attributes of a

4  product with a payer?

5       A.   If they were appropriately

6  trained on the product and were in a

7  position to do that.  So it would not --

8  it would be someone who was not on the

9  sales force.

10       Q.   So is that the distinction,

11  if someone is on the sales force and

12  talking about a product, that's

13  considered promotion?

14       A.   Today, people at the

15  company, if I was working at the company

16  today, wanted to engage in those

17  discussions, it would be considered

18  promotional.

19            I thought the conversation

20  we had was prior to implementing those

21  rules, earlier on, it would have been

22  people with appropriate scientific and

23  medical training who were trained on the

24  product and could speak authoritatively.

Highly Confidential - Subject to Further Confidentiality Review

1    And those are individuals would have been

2    able to have -- we already agreed I don't

3    have the date when the transition took

4    place.

5         Q.    I understand that, not

6    knowing the date.  But there is a date

7    when it turns -- when it becomes -- if

8    the company -- if anyone at the company

9    is saying it, it's considered promotion,

10   correct?

11        A.    Yes.

12        Q.    And that's what it is today?

13        A.    Yes.

14        Q.    At some point that changed

15   and you're not certain of that date?

16        A.    Correct.

17        Q.    Prior to that date, when it

18   changed, was the bright line whether the

19   sales -- someone from the sales force was

20   talking about the product versus a

21   scientific or medical person at the

22   company was talking about the product?

23        A.    Yes, I believe so.

24        Q.    Who would be able, at

1    Janssen, to tell me the date when that

2    changed?

3          A.    I don't know.

4          Q.    When it -- when it went from

5    sales -- you know, when it went from just

6    the sales force that couldn't do it to

7    the entire company?

8          A.    I don't know.

9          Q.    What department, do you

10   know?

11         A.    Regulatory affairs

12   presumably.

13         Q.    Do you recall a time when

14   you were informed or trained that any

15   statements by any -- by anyone at the

16   company would be considered promotional?

17         A.    I don't remember, no.

18         Q.    Do you recall how you

19   learned that?

20         A.    I might have asked the

21   question and said that -- because I was

22   presented scientific material and I

23   wanted to have clarity on how -- how

24   those conversations could take place and

Highly Confidential - Subject to Further Confidentiality Review

1    what venue that would be.  And someone

2    had explained to me that it would be

3    considered promotional and had to be

4    treated as such.

5         Q.    So at some point you

6    yourself took it upon yourself to ask

7    someone at Janssen if you could continue

8    to discuss peer-to-peer?

9         A.    Yes.

10        Q.    And then you were told you

11   could not?

12        A.    I was told that I -- how it

13   would be treated as promotional, yes.

14        Q.    So is it possible that for

15   some period of time you were doing that

16   and it was considered promotion while you

17   were doing it?

18        A.    No.  It would have either

19   come through the regulatory group or it

20   would have been because we were

21   disseminating scientific information, to

22   make sure that we had that ahead of time,

23   that I could safely do that.  No, I don't

24   believe so.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So as you sit here today,

2    you don't believe that you ever

3    inappropriately promoted a product?

4    A.    Not knowingly.

5    Q.    I see the term "Pri-Cara,"

6    P-R-I-C-A-R-A, unit of Ortho-McNeil

7    Pharmacies?

8    A.    Yes.

9    Q.    Was that -- was that a

10   company that was acquired?

11   A.    Johnson & Johnson had a

12   number of different operating companies.

13   Pri-Cara was one of those operating

14   companies in the U.S.

15   Q.    Did that make any difference

16   with respect to your base salary, your

17   bonus, your stock options, anything, the

18   fact that you were actually working in a

19   unit of Ortho-McNeil?

20   A.    No, it did not.

21   Q.    Let's look at the front page

22   please.  You say, "Provide top level

23   strategic leadership to CNS franchise

24   vice president and company president for

Highly Confidential - Subject to Further Confidentiality Review

1    all analgesic activities for Janssen CNS

2    franchise."

3              What does CNS stand for?

4         A.    Central nervous system.

5         Q.    The first bullet point,

6    develop the U.S. strategy for the

7    development and dissemination of

8    scientific data for a novel analgesic.

9         A.    Yes.

10        Q.    Was that -- what's the novel

11   analgesic you're referring --

12        A.    Tapentadol.

13        Q.    Tapentadol?

14        A.    Nucynta.

15        Q.    And that is an opioid pain

16   medication?

17        A.    Correct.

18        Q.    Is it immediate release,

19   modified release, extended release?

20        A.    There are two formulations.

21   There's an immediate release and an

22   extended release.

23        Q.    Did you work on both?

24        A.    Yes.

1       Q.    Which came first?

2       A.    The immediate release.

3       Q.    Next one is

4    responsibility -- I'm sorry --

5    "Responsible for the strategy to evaluate

6    the change in scheduling status."

7       A.    Excuse me, Counsel.  I hate

8    to interrupt you.  You had asked the

9    question of the timing of when we were --

10   became that we were aware that these were

11   all treated as promotional, that the

12   employees -- there may have been training

13   materials that came out from the company.

14   And I don't remember the dates of those.

15   But because of my interaction with the

16   regulatory affairs group, I worked with

17   them closely on promotional review

18   committee, that I might have become aware

19   of it before the training actually came

20   out.

21           And so that would have given

22   me additional information.  You asked

23   about when you would know and how did you

24   would take it upon yourself.  I wanted to

Highly Confidential - Subject to Further Confidentiality Review

1    give an explanation.

2          Q.    Okay.  So if I -- which

3    department at Janssen is responsible for

4    training materials for the employees?

5          A.    I don't know -- there is a

6    group that does that.  And I don't -- and

7    we can check.  But I know I checked with

8    regulatory myself.  I have a

9    recollection, I don't know if it's

10   correct, that there may have been -- that

11   that issue may have been addressed.  So

12   I'm a little hazy on it.  But I do

13   remember speaking to the regulatory

14   promotional person on the promotional

15   review committee and checking in about

16   that.  So I wanted to make sure I

17   clarified that.

18         Q.    Was it during the time that

19   you were on the promotional review

20   committee?

21         A.    Yes, I was on the

22   promotional review committee for some

23   time, so yes.

24         Q.    Okay.  Would it have been

Highly Confidential - Subject to Further Confidentiality Review

1  any training with respect to the

2  Corporate Integrity Agreement?

3          A.    It might have been.  I don't

4  know.  I'm not sure.

5          Q.    That's a possibility?

6          A.    It's possible.  But again,

7  I'm not certain.

8          Q.    And just to be clear, it's

9  possible during -- it's a possibility

10  that during the Corporate Integrity

11  Agreement training, that you learned that

12  peer-to-peer conversations would be

13  considered promotional activities?

14              MR. LIFLAND:  Object to the

15          form of the question.

16              THE WITNESS:  I'm not sure

17          during what period of time where

18          that would have been.

19  BY MS. CONROY:

20          Q.    I understand that.  My

21  question was, it's possible that it was

22  during the corporate integrity training

23  that you learned that peer-to-peer is

24  considered promotional?

1    MR. LIFLAND:  Object to the

2         form of the question.

3         THE WITNESS:  I can't

4         speculate.  I don't know.  I just

5         know it was promotional.  I don't

6         remember the nature of who or when

7         it came through.

8    BY MS. CONROY:

9    Q.    My question is, was it -- is

10   it possible that you learned that during

11   the Corporate Integrity Agreement

12   training?  Is that a possibility?

13        MR. LIFLAND:  Object to the

14        form of the question.

15        THE WITNESS:  I'm not sure.

16   BY MS. CONROY:

17   Q.    What are you not sure?

18   A.    I'm not sure when it took

19   place.

20   Q.    I understand that.  That's

21   why I'm asking you, is it possible that

22   it took place during the time that you

23   had Corporate Integrity Agreement

24   training?  Is that a possibility?

1          MR. LIFLAND:  Object to the

2     form of the question.

3          THE WITNESS:  I guess it's

4     possible.

5  BY MS. CONROY:

6     Q.    The second bullet point,

7  "Responsible for the strategy to evaluate

8  the change in scheduling status of an

9  opioid based upon the review and analysis

10  of complex data from a variety of

11  sources."

12          Do you see that?

13     A.    Yes.

14     Q.    And which opioid were you

15  looking to change the scheduling status?

16     A.    There was discussion

17  possibly about changing the scheduling

18  status of tapentadol.

19     Q.    And was it changed?

20     A.    No, it was not.

21     Q.    Third bullet point is,

22  "Implemented a first-time payer strategy

23  that opened the way for successful

24  partnering with payers and our medical

Highly Confidential - Subject to Further Confidentiality Review

1    team in the design and development of

2    data analyses relevant to this key

3    stakeholder."

4              Do you see that?

5         A.    Yes.

6         Q.    Okay.  I'm just going to

7    break that down a little bit.

8              What's -- what's a first

9    time-payer strategy, or is there

10   something -- are you talking about this

11   was the first time or is this something

12   known as a first-time payer?

13        A.    No.  This was a -- the

14   activities that went on with payers had,

15   as we had talked about, had been really a

16   lot of work by the outcomes research

17   group.  There was a lot of important

18   medical information that we thought would

19   be appropriate for payers.  And so we

20   discussed ways to try and understanding

21   the -- what requirements or requests

22   payers might have and to be able to

23   provide them with scientific data

24   accordingly.

Highly Confidential - Subject to Further Confidentiality Review

1    So that's why it was the

2  first time that the medical group had

3  been involved to provide, as requested,

4  information to payers.

5    Q.    What do you mean by "as

6  requested, information to payers"?

7    A.    So if payers had reached out

8  to the company or had interacted with

9  individuals at the company who regularly

10  worked with that group, if there was a

11  request for scientific information, then

12  they would have come to the medical group

13  and said, "Can you give us a presentation

14  on the clinical trial data?"  That type

15  of work.

16    Q.    Payers are responsible for

17  formularies, correct?

18    A.    The formulary committees, I

19  think, would have been different.  These

20  would have been insurance companies,

21  managed care, and those types of

22  individuals.

23    Q.    But managed care

24  organizations have formularies, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    They do.  But these weren't

2   direct interaction with the formulary.

3   That was not what -- these were not

4   people with whom we interacted.

5        Q.    Who were you interacting

6   with?

7        A.    People from companies like

8   Aetna.  You know, the medical -- the

9   medical directors at some of those

10  companies.

11       Q.    And is it your testimony

12  that the medical directors would not

13  inform the formularies?

14       A.    No.

15       Q.    For those companies?

16       A.    No, I'm not saying that at

17  all.  You asked who we interacted with.

18  That's who we interacted with, medical

19  directors.

20       Q.    And what -- what type of

21  individuals are we talking about?

22  Scientists?  Ph.D.s?

23       A.    Physicians.

24       Q.    M.D.s?

1        A.      Physicians.

2        Q.      Pharmacists?

3        A.      Could be, yes.

4        Q.      And they would have

5    questions about the Janssen opioids?

6        A.      The clinical trials data.

7    Yeah.  That you'd want to have an

8    understanding of the study design, what

9    the studies show, et cetera.

10        Q.      And these are the clinical

11    trials that were submitted to the FDA as

12    part of the new drug application?

13        A.      Could have been.  Could have

14    been other studies that were

15    postmarketing that were ongoing as well.

16        Q.      And if you're -- they would

17    not -- some of this could have been

18    outcomes research that was done after the

19    drug was approved?

20        A.      Yes.  Some of it could have

21    been.

22        Q.      And some of that outcomes

23    research may have been done either inside

24    the company or outside the company?

1      A.      These were usually studies

2   that would have been conducted by the

3   company outcomes group.

4      Q.      And those studies, those

5   outcomes, would be discussed with the

6   payers?

7      A.      If there was a request for

8   that type of information, yes.

9      Q.      And how does -- how would

10   that request come about?

11      A.      Well, let's say the medical

12   director said, do you have any

13   information on how the product would be

14   used in real world setting, how -- you

15   know, how do people get the drug, how do

16   they take the drug, that type of

17   information.  And then we would provide

18   that, again in a peer-to-peer

19   interaction.

20      Q.      Do you know what would have

21   initiated that request?

22      A.      It might have come through

23   the -- it might have come through the

24   people interacting.  Counsel, I also

Highly Confidential - Subject to Further Confidentiality Review

1    wanted to clarify one thing about

2    peer-to-peer versus promotional because I

3    want to make sure we do that correctly.

4              My understanding with that

5    would be -- on how we interacted with

6    them would be certainly if we were at

7    certain types of meetings later on, we

8    wanted to make sure that the material was

9    up to speed and consistent with our

10   promotional activities, where before that

11   there was a different requirement.

12        Q.    Before that, what you mean

13   by that is it did not have to be

14   submitted to the FDA, correct, the

15   materials that would be provided in a

16   peer-to-peer meeting?

17        A.    Right.  So the posters for

18   example would not necessarily -- would

19   not have been presented to FDA, yes,

20   that's correct.

21        Q.    They would not have been

22   presented to the FDA, but you -- at the

23   time we're talking about, you would have

24   been able to use the data from a poster

1    or the poster itself, you would have been

2    able to bring that to a meeting, discuss

3    it --

4            A.    Yes.

5            Q.    -- peer-to-peer?

6            A.    Yes, exactly.  And then

7    promote -- yes, that's correct, because

8    promotional activities would have been

9    done in a different place at the meeting.

10   Those were clearly defined as

11   promotional.  After the change, then all

12   of these -- again, in our interaction

13   with people would be treated more in a

14   promotional way in terms of the label,

15   how we would interact with people.

16           Q.    And you understood that to

17   be the company policy?

18           A.    That was my understanding,

19   yeah.

20           Q.    Do you know one way or the

21   other whether the rules at the FDA

22   changed?

23           A.    I don't know.

24           Q.    Sales -- and to be clear, a

1    sales representative could not talk about

2    results from a poster that was presented

3    unless that poster had been provided to

4    the FDA and -- well, provided to the FDA?

5         A.    Unless that poster had been

6    approved by the promotional review

7    committee for discussion, yes.

8              I'd like to take a break.

9         Q.    Let me -- before I do that,

10    I think -- I think I had a question on

11    the table.  And then you wanted to

12    clarify something.  I just didn't want to

13    forget it.  So if you can give me two

14    seconds.

15         A.    Sure.

16         Q.    I had asked you, do you know

17    what would have -- you told me that the

18    medical director would ask if you had

19    information about the product in a

20    real -- real world setting?  Do you

21    remember that --

22         A.    That would be the -- that

23    would be an example of the type of

24    outcomes information there would be.  The

Highly Confidential - Subject to Further Confidentiality Review

1    other type of data -- so the data that we

2    would share would be clinical trial data.

3    They would want to know, for example, if

4    we had various types, not only efficacy

5    data, safety data would be very

6    important.  They would want to have that.

7    If we had information on -- from outcomes

8    instruments that were included as part of

9    the clinical studies and they would share

10   that data with them as well.

11        Q.    And then what I had asked

12   you is, do you know who might have

13   initiated that request?

14        A.    So there were individuals at

15   the company that would have worked with

16   the managed care organizations.  And if

17   the managed care organizations were

18   interested in having clinical data, then

19   they -- in having a discussion with

20   clinical people, or the outcomes group,

21   then they would have requested, and

22   that's how that would have taken place.

23        Q.    And that's how they would

24   set up the meeting or whatever?

1    A.    Typically, yes.

2    Q.    And who -- what type of

3 individual at the company, what

4 department would they be in?

5    A.    I think some of them may be

6 involved in marketing.  But there may

7 have been other -- there may have been --

8 there may have been other -- the outcomes

9 research -- the outcomes group themselves

10 had individuals who also visited the

11 managed care organizations.  And these

12 were people who would have been PharmDs,

13 pharmacists as well.

14         So it was interacting at a

15 professional level as well as, you know,

16 again, people with marketing experience.

17 So there were multiple places in which

18 they would have interacted.

19    Q.    I see.  So there -- there

20 was no prohibition from anyone at Janssen

21 going out and meeting with these managed

22 care organizations or insurance groups,

23 and then if someone at that meeting said

24 I'd like to know more about the safety of

Highly Confidential - Subject to Further Confidentiality Review

1    this drug or the efficacy, then that --

2    you would consider that a request to get

3    involved and provide that information?

4           A.    Right.  So if there was --

5    if there was a -- right.  So the

6    individuals who routinely interacted with

7    these groups, again as part of their

8    responsibilities at the company, if there

9    was a request by those groups to get

10   additional information, that could be

11   provided to them.

12              MS. CONROY:  Okay.  Let's

13          take a break.  Thank you.

14              THE VIDEOGRAPHER:  Remove

15          your microphones.  The time is

16          12:06 p.m.  We are going off the

17          record.

18              (Lunch break.)

19              THE VIDEOGRAPHER:  We are

20          back on record.  The time is

21          1:06 p.m.

22   BY MS. CONROY:

23          Q.    Doctor, did you have any

24   conversations with Dr. Moskovitz after

1    his deposition?

2          A.    No, I did not.

3          Q.    Are you still in contact

4    with him at all?

5          A.    No, I am not.

6          Q.    Are you in contact with any

7    Johnson & Johnson or Janssen employees

8    after you left the company in 2017?

9          A.    I have one person from the

10   department that I worked at, Steve

11   Rodriguez.  He and I are friends

12   socially.

13         Q.    Okay.  Have you had any

14   conversations with anyone in the

15   department about anyone's deposition or

16   your -- what would have been your

17   upcoming deposition?

18         A.    No, I did not.

19         Q.    I saw on your resumé that

20   you are a member, if you look to Page

21   349, of the American Pain Society.

22               Do you see that?

23         A.    Under memberships and

24   societies?

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.    Yes.

2          A.    Yes.

3          Q.    And are you still a member?

4          A.    No, I'm not.

5          Q.    Okay.  When did you cease

6     being a member?

7          A.    A number of years ago.  I

8     had joined, and then just decided I

9     didn't want to pay the fees anymore for

10    it, so...

11         Q.    So was that something that

12    you joined personally?  It was not

13    something that was paid for by Janssen or

14    Johnson & Johnson?

15         A.    I don't remember if they

16    paid for it or not.  There were certain

17    things -- I assume that's -- yeah, I

18    don't remember.

19         Q.    Okay.  Do you recall that at

20    some point you made a decision not to be

21    a member anymore?

22         A.    Just because I didn't want

23    to incur the expense.  For no other

24    reason, yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Is there a publication or

2    anything that comes along with the

3    American Pain Society?

4    A.    I believe there is a journal

5    that they're associated with.

6    Q.    And so did you stop

7    subscribing to that as well when your

8    membership ended?

9    A.    Yes.

10    Q.    Did you -- was there any

11    reason to tell Janssen or Johnson &

12    Johnson that you were going to give up

13    your membership in the American Pain

14    Society?

15    A.    No.

16    Q.    But it was during the time

17    that you were employed at Janssen?

18    A.    I believe so.

19    Q.    The next is the American

20    Academy of Pain Medicine.  Are you still

21    a member of that academy?

22    A.    No.  No, I'm not.

23    Q.    And when did that cease?

24    A.    I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Around the same time as the

2  American Pain Society?

3    A.    Probably not that far

4  different in time.  I decided that I

5  didn't necessarily need to maintain a

6  membership there as well.  Again, for no

7  other reason than cost.

8    Q.    American Academy of Pain

9  Management, are you a member?

10    A.    No, I'm not.

11    Q.    Same situation as the

12  others?

13    A.    Yes.

14    Q.    Did you ever attend any of

15  the conferences conducted by the American

16  Pain Society, the American Academy of

17  Pain Medicine or the American Academy of

18  Pain Management?

19    A.    Yes.  I attended some of the

20  annual meetings for these societies.

21    Q.    And do you -- did you have

22  a -- did you attend them on any regular

23  basis?

24    A.    I tried to go annually if I

1    was able to do so.

2         Q.    Which ones would you try to

3    go to annually?

4         A.    The American Pain Society

5    was an important one.  And I don't

6    remember now if it was the American

7    Academy of Pain Medicine or the American

8    Academy of Pain Management.  But I went

9    to meetings with both, as I had

10   indicated.  But I don't -- it was at one

11   of those, and I don't remember which one

12   I had gone to more frequently.

13        Q.    I could barely hear you.

14   One of those, either the American Academy

15   of Pain Medicine or the American Academy

16   of Pain Management, one of those you went

17   to meetings more frequently --

18        A.    Yes.

19        Q.    -- than the other?

20        A.    Yes, that's correct, yes.

21        Q.    And where would those

22   meetings have been held?

23        A.    Throughout the United

24   States.

1      Q.    And approximately -- was

2  there, if you know, a difference in the

3  size of those meetings that were held

4  around the United States, among the

5  three, American Pain Society, American

6  Academy of Pain Medicine, and American

7  Academy of Pain Management?

8      A.    To the best of my

9  recollection, I think the American Pain

10  Society had a fairly large number of

11  people attending.  And the other

12  societies, had, I believe, fewer people

13  and with time that may have changed.

14  There may have been more people going.

15      Q.    Okay.  And do you recall

16  approximately how much it was to join any

17  of them?

18      A.    I don't.

19      Q.    Do you know if it was in the

20  hundreds of dollars or the thousands of

21  dollars?

22      A.    It would have either been

23  hundreds of dollars or maybe a thousand.

24  Somewhere around there.

1    Q.    Would that be a year?

2    A.    Yes.

3    Q.    And were there criteria to

4  join?

5    A.    I don't recall.  I don't

6  recall if you had to have some kind of a

7  background in medicine.  I don't

8  remember.

9    Q.    And was there -- were there

10  any tiers of membership in any of the

11  three, you know, for example that, you

12  know, a layperson could join and have

13  access to certain events or subscriptions

14  or publications, and then a medical

15  doctor would potentially have more

16  access, anything like that?

17    A.    Not that I recall.

18    Q.    Did you ever sit on any

19  committees for any of those -- any of

20  those three?

21    A.    I did not.  Not that I

22  recall.

23    Q.    What was the American

24  Society of Addiction Medicine?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    This was something that I

2    had joined.  I was interested in this

3    area.  I may have had a subscription for

4    a year or so.  I don't remember how long

5    I stayed with them.  It was a society

6    that I became more -- I learned about

7    them later on and it was something that I

8    had wanted to join.  And I joined for a

9    period of time.  I'm not a member of the

10   society anymore.

11        Q.    Okay.  Approximately when

12   did you become interested in addiction

13   medicine to warrant joining this?

14        A.    Well, for a long time I

15   didn't realize that this society existed.

16        Q.    What is the nature of the

17   society?  Who are the members, or at

18   least who are the members when you were a

19   member?

20        A.    I think there were people

21   who either treated people with addiction

22   or had an interest in addiction.

23        Q.    Do you know if Johnson &

24   Johnson paid for your membership?

1    A.    I don't recall.

2    Q.    Do you know if there were

3  corporate memberships of American Society

4  of Addiction Medicine?

5    A.    I don't know.

6    Q.    And did they have any kind

7  of annual or biannual meetings?

8    A.    I don't know for a fact that

9  they did.  I suspect that they did.  But

10 I don't know.

11   Q.    Okay.  Do you recall ever

12 attending one?

13   A.    I did not.

14   Q.    You did not attend?

15   A.    I did not attend, no.

16   Q.    What did you get for your

17 membership?

18   A.    It would have been

19 information about upcoming meetings,

20 things that were going on in the society

21 that I thought might have been

22 potentially of interest to me.

23   Q.    And was there anything of

24 interest?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I was interested in what

2    they were doing.  But I did not join any

3    of those -- any of those meetings or any

4    of those activities.

5          Q.    And did you learn what they

6    were doing?

7          A.    I read about some of the

8    things that would come in to me by e-mail

9    or other ways that they would have

10   contacted me.

11         Q.    Do you recall what any of

12   those were, things that they were doing?

13         A.    I don't offhand, not

14   specifically, events.

15         Q.    I know that you -- you have

16   a list of publications and poster

17   presentations.  If we take a look on Page

18   8 of your CV, you have a tapentadol IR

19   versus oxycodone IR.  I guess this is --

20   maybe you tell me, a publication that was

21   presented at the Fifth World Congress of

22   the WIP in New York?

23         A.    What page are you on?

24         Q.    I'm on Page 8 which is also

Highly Confidential - Subject to Further Confidentiality Review

1   530.  The very top one.

2              Fifth World Congress of the

3   WIP, New York 2009 in March.  Do you see

4   that?

5        A.    I do.

6        Q.    What's the WIP?

7        A.    I don't recall.  It's

8   "world" and "pain."  But I don't remember

9   what the I stands for.

10        Q.    Okay.  Something like

11   institute or something like that?

12        A.    It could have been, but I

13   don't want to guess.

14        Q.    Okay.  And was this a

15   publication or was it a poster?

16        A.    It was -- to the best of my

17   recollection it was a poster

18   presentation.

19        Q.    And this would have been

20   done -- the et al. means it was done with

21   some other co-authors?

22        A.    Yes.

23        Q.    And would this poster have

24   been done while -- as a part of your

1    employment at Johnson & Johnson?

2         A.    I'm not sure what -- I don't

3    understand the question.

4         Q.    This study, tapentadol IR

5    versus Oxycodone IR for low back or

6    osteoarthritis pain, dose escalation and

7    pain control, I take it there was some

8    sort of a study that was done to compare

9    those two drugs?

10        A.    That's correct.

11        Q.    And were -- was there a

12   clinical study done?

13        A.    Yes.

14        Q.    And was that clinical study

15   a Johnson & Johnson-sponsored study?

16        A.    Yes.

17        Q.    And it was not an

18   investigator -- it wasn't a postmarket

19   investigator study?

20        A.    Correct.

21        Q.    And so would you have been

22   involved at Johnson & Johnson with

23   respect to that clinical study?

24        A.    I'm not sure what you mean

Highly Confidential - Subject to Further Confidentiality Review

1    by involved.

2         Q.    Well, since you are an

3    author on it, on the poster, correct?

4         A.    Yes.

5         Q.    What involvement did you

6    have in order to become an author on the

7    poster?

8         A.    I analyzed the data and put

9    it together and helped write the poster.

10        Q.    Do you have a memory of who

11   collected the data for this poster?

12        A.    I don't.

13        Q.    Would there be records

14   somewhere that would show the clinicians

15   involved in collecting the low back or

16   osteoarthritis pain data with respect to

17   those two drugs?

18        A.    Yes.  This would have

19   been -- yes, it would have been possibly

20   done, if it's studied through the R&D

21   group.  They would have had the

22   information of the people working,

23   working on it.

24        Q.    And I think you told me

1    earlier today that you no longer have any

2    copies of any of the posters --

3         A.    That's correct.

4         Q.    -- that you presented?

5             Is there a reason for that?

6         A.    I had retired from the

7    company and I wasn't working directly

8    with the company anymore.  And I didn't

9    see the need to keep any of this

10   documentation.  It was published.  It was

11   in the public domain.  I can refer back

12   to it at any point in time if there was

13   interest in it.  So I didn't need to

14   retain a personal copy for myself

15   anymore.

16        Q.    And if you did want to get a

17   copy of it, how would you -- how would

18   you do that?

19        A.    I could go online and see if

20   it was available.  And then if I -- or I

21   could write -- just like anyone else,

22   write to the company and see if I could

23   get a copy of it as well.

24        Q.    So you could -- you could

Highly Confidential - Subject to Further Confidentiality Review

1    either write to Johnson & Johnson and ask

2    for a copy, or it may be available from

3    the fifth World Congress of the WIP?

4         A.    It might be.

5         Q.    I'm sorry?

6         A.    It might be, yes.

7         Q.    Have you ever tried to get a

8    copy of the poster?

9         A.    No, I have not.

10        Q.    Would there have been any

11   sort of a publication or abstract

12   presented along with the poster or

13   submitted along with the poster?

14        A.    Yes.  There would have been

15   the poster itself and/or an abstract.

16   And it's -- different societies work

17   differently.  Would have published it in

18   a -- in a volume.

19        Q.    And so you would anticipate

20   that there is a published version of this

21   poster in any company abstract somewhere?

22        A.    One -- one was done.  I

23   don't know from record retention in 2009

24   whether it would still be.  But, yes.

Highly Confidential - Subject to Further Confidentiality Review

1   With something like that -- different

2   societies work differently in terms of

3   how those were -- those were handled.

4          Q.    And when that poster was

5   presented, would you have -- would you

6   have been present and -- they -- they

7   blow these posters up very large,

8   correct, at -- at the conferences?

9          A.    Yes.

10          Q.    And would you have been

11   standing with the poster?

12          A.    I might have.

13          Q.    And if you -- if you were

14   there, would you have been there to

15   answer any questions about it?

16          A.    Yes.

17          Q.    Do you recall whether or not

18   you gave a presentation to the group

19   about the results of that poster that was

20   different from standing by the poster and

21   answering any questions?

22          A.    Could you clarify what you

23   mean by the group?

24          Q.    The -- was the World

1    Congress of the WIP, I assume that's a --

2    also a membership group that gets

3    together?

4            A.    You mean people who attended

5    the meeting?  You mean like a podium

6    presentation or something?

7            Q.    Well, I -- maybe I should

8    ask you first.  What is the fifth World

9    Congress of the WIP?  Is that a -- is

10    that a group of individuals that get

11    together or that did get together in New

12    York in 2000 -- 2009?

13            A.    Yes.

14            Q.    And so would there have been

15    a podium and a -- in some sort of an

16    auditorium?

17            A.    This -- this, I believe, was

18    just a poster presentation, yeah.

19            Q.    So individuals who attended

20    this congress could walk through a hall

21    and take a look at any of the posters

22    that were being presented?

23            A.    Correct.

24            Q.    Is that true -- I -- because

1    I see the next one down is another poster

2    comparing tapentadol concerning nausea

3    and vomiting.

4              Do you see that?

5         A.    Yes.

6         Q.    The next -- the next one

7    down?  Same thing, that was a poster that

8    was presented in the hall?

9         A.    Yes.

10        Q.    And the same thing for the

11   third one.  This one was analysis of

12   treatment discontinuation.  Do you see

13   that?

14        A.    Yes.

15        Q.    And that, same thing,

16   actually the top four, all of those were

17   presented in March of 2009 in New York?

18        A.    Yes.

19        Q.    And all four were posters?

20        A.    That is correct.

21        Q.    Take a look at the bottom of

22   the page.  There's several authors, you

23   are one of them.  Dose conversion for

24   immediate to extended-release tramadol.

1          Do you see that?

2     A.    Yes.

3     Q.    Presented at the American

4  Academy of Pain Management.

5          That would have been one of

6  the yearly meetings; is that correct?

7     A.    I didn't -- I didn't hear

8  you.

9     Q.    Would that be one of the

10  yearly meetings, the American Academy of

11  Pain Management?

12     A.    Yes.

13     Q.    And you would have -- and

14  that looks like that year in

15  September 2006 it was in Orlando,

16  Florida, correct?

17     A.    Yes, yes.

18     Q.    And would this have been a

19  poster, or -- do you recall, or was it an

20  abstract?

21     A.    I don't recall.

22     Q.    Do you recall if you made

23  any sort of a presentation to a group

24  from a podium?

1      A.      For this particular?

2      Q.      For that particular one.

3      A.      I -- no, I do not recall

4   that.

5      Q.      Would this be considered

6   peer-to-peer?

7      A.      Yes.

8      Q.      So would there be any reason

9   that you know in 2006 to present this

10  dose conversion for immediate to

11  extended-release tramadol data to the

12  FDA?

13     A.      This was based on a clinical

14  trial that was done by Janssen so those

15  data likely would have been presented to

16  FDA.

17     Q.      Okay.  Were you involved in

18  that clinical trial or only in the

19  presentation?

20     A.      I was not involved in the

21  clinical trial.  Only involved in

22  analyzing the data for the presentation.

23     Q.      Take a look at the next

24  page, 351.  I see the name Katz, NP Katz.

1 Is that Dr. Nat Katz?

2          A.     Yes, it is.

3          Q.     And was he someone that you

4 worked with while at Johnson & Johnson --

5 but he was not of Johnson & Johnson,

6 correct?

7          A.     He was not at Johnson &

8 Johnson.  And yes, I did work with him

9 when I was at Johnson & Johnson.

10          Q.     All right.  Are you still in

11 contact with him?

12          A.     No, I'm not at the moment.

13          Q.     And when is the last time

14 you spoke to him?

15          A.     I think I communicated with

16 him to tell him that I was retiring from

17 J&J.  From Janssen.

18          Q.     Do you know if he still

19 works with J&J?

20          A.     I don't know.

21          Q.     Was he still working with

22 J&J when you retired?

23          A.     I don't know.

24          Q.     When is the last time you

1  worked on a project with Dr. Katz?

2       A.    I don't recall.

3       Q.    Do you recall what the last

4  project was with Dr. Katz?

5       A.    No, I do not.

6       Q.    Certainly you would have

7  worked with him, from looking at this, in

8  2004, correct?

9       A.    Yes.

10       Q.    Did you work with Dr. Katz

11  with respect to tapentadol, do you

12  recall?

13       A.    I recall having some

14  conversations with him about tapentadol.

15       Q.    And that would also be with

16  respect to Nucynta?

17       A.    Yes.  So tapentadol and

18  Nucynta are -- are the same drug.

19       Q.    And did you -- do you recall

20  if Dr. Katz did any work on any clinical

21  studies for Nucynta or tapentadol?

22       A.    I don't recall.

23       Q.    Did you -- did he do

24  clinical study work, Dr. Katz?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes, he did.

2      Q.    Was he a site, clinical

3  study site?

4      A.    I believe that he was

5  associated with a site.  I don't know if

6  it was his site or not.

7      Q.    Is he in Boston?

8      A.    That's correct.  But he's

9  actually, I think, in Newton.

10     Q.    Newton?

11     A.    Yes.

12     Q.    If you take a look at the

13 first page again.  And we were talking

14 about payers before the lunch break, and

15 I think you told me that a payer could be

16 an insurance company, managed care

17 organization, hospital group.

18           Do you know if CVS is a

19 payer?

20     A.    I'm not sure I understand

21 your question.

22     Q.    Okay.  Do you know, you

23 listed out for me entities that you

24 understood from your employment at J&J

Highly Confidential - Subject to Further Confidentiality Review

1    that were considered payers?

2          A.    Yes.

3          Q.    Do you recall that

4    testimony?

5          A.    I do.

6          Q.    And you had listed out, you

7    told me, Aetna, some insurance companies,

8    some managed care organizations.  I asked

9    you about hospitals or hospital groups.

10   And you agreed that they could be payers?

11         A.    Yes.

12         Q.    Do you have -- do you have

13   any recollection if any chain pharmacies

14   were payers?

15         A.    That we worked with?  Is

16   that -- or just in general?

17         Q.    Well, either one?

18         A.    I don't remember who we

19   worked with, per se.  It certainly could

20   be people who could be considered payers.

21   But I don't recall if we worked with them

22   or not, if I worked with them.  That's

23   what I'm talking about.

24         Q.    Do you recall if Johnson &

Highly Confidential - Subject to Further Confidentiality Review

1   Johnson worked with any chain pharmacies?

2          A.    I don't know.

3          Q.    Do you know -- would you

4   consider a chain pharmacy to be in the

5   supply chain?

6          A.    I'm not sure what you mean

7   by that.

8          Q.    We're going to look at some

9   documents, some PowerPoints of yours that

10  reference supply chain, and supply chain

11  oversight and supervision.  And so I'm

12  talking about it in that context.

13         A.    Would they be part of the

14  supply chain?  Is that your question?

15         Q.    That's my question.

16         A.    Yes, I believe that they

17  would be.

18         Q.    But you don't have any

19  recollection yourself of working with any

20  particular chain pharmacy?

21         A.    Not myself, that I recall.

22         Q.    There would be no reason, if

23  there was information requested of you,

24  such as you were discussing with me that

Highly Confidential - Subject to Further Confidentiality Review

1    insurance company might have some

2    information about clinical trials or drug

3    attributes, there would be no reason if

4    CVS asked that question, that you

5    wouldn't provide that information to

6    them; is that true?

7         A.    It may not be -- it may not

8    have been me.  It might have been someone

9    else at the company.  But if there was a

10   request for scientific information, then

11   it would have been provided by the

12   appropriate people.

13        Q.    The next bullet point that

14   says, "Design the strategy with key

15   stakeholders to better understand the

16   data need of groups who develop quality

17   measures for analgesics to ensure that

18   data generated on our products inform

19   quality measures.  Do you see that bullet

20   point?

21        A.    I do.

22        Q.    Who is a key stakeholder?

23        A.    So this might have been, for

24   example, people who are working in

1    clinical practices and those types of

2    individuals as well.  And working

3    specifically with groups that might be

4    interested in developing quality measures

5    to understand the type of data needs that

6    they have.

7              So there were different

8    organizations that the company partnered

9    with.  I worked with those groups within

10   the organization to understand what they

11   might be.  The area of quality measures

12   for analgesia was one that was actually

13   in its infancy, it was early on.  There

14   were quality measures with -- and

15   replaced with other things, so we were

16   interested in understanding the needs

17   were of what those were particular

18   people.

19        Q.    Can you give me some

20   examples of quality measures for

21   analgesics?

22        A.    Yes.  Ensuring, for example,

23   measures of pain for patients with --

24   people with pain were done.

1    Understanding other types of measurements

2    that might be important to them as well,

3    what their level of functionality would

4    be, and what are the other types of

5    things that would show beneficial and

6    improvements with the product.

7           Q.     What about product risks

8    such as addiction or withdrawal syndrome?

9    Would they ever be considered quality

10   measures?

11          A.     They would need -- the

12   quality measures would really be the sum

13   of all of the effects of people might

14   have on it.  So certainly understanding

15   and asking those questions of patients,

16   soliciting that type of information, to

17   ensure that patient care was done in its

18   totality.  So not only were the

19   medications being given, but they were

20   looking for reduction in pain and for

21   side effects as well.

22          Q.     And those side effects could

23   include addiction?

24          A.     Yes, they could.

1    Q.    And abuse or misuse?

2    A.    That would be part of care

3  for a patient receiving any of these

4  types of pain medications, or should be.

5    Q.    Did you generate data on

6  your products with respect to pain

7  measurements?

8    A.    I'm not sure what you're

9  asking me.

10    Q.    I see that you designed a

11  strategy with the key stakeholders.  The

12  key stakeholders are clinicians and

13  others who are using the product,

14  correct?

15    A.    Yes.  And also, as I

16  indicated, people who were involved in

17  developing these types of measures.

18    Q.    And could they also be

19  payers?

20    A.    These were not payers, per

21  se.  Yeah.

22    Q.    To better understand the

23  data needs of groups who develop quality

24  measures --

1    A.    Yes.

2    Q.    -- for analgesics.

3    A.    Yes.

4    Q.    So did you ever develop

5    quality measures with respect to pain?

6    A.    No.  At this juncture we

7    were trying to understand the types of

8    measures that were potentially -- that

9    were available and the types of measures

10   that these groups would be interested in.

11         Again, these were groups

12   that were working with patient groups, et

13   cetera to understand the quality

14   measures.  But we did not develop

15   specific measures.

16   Q.    Okay.  And that's true as

17   well, you did not develop any specific

18   quality measures concerning addiction?

19   A.    That's correct.

20   Q.    And you did not develop any

21   specific quality measures concerning

22   abuse or misuse?

23   A.    Yes.

24   Q.    Yes, you did not?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    We did not.  Yes, we did

2  not.

3      Q.    Did you ever develop a

4  strategy to determine those quality

5  measures?

6      A.    No.  The intent was to work

7  with people who were actually doing --

8  developing quality measures,

9  understanding what their needs might be

10  and see if it -- early on, what are the

11  types of information that they may want

12  from us, but we did not do that

13  ourselves.

14      Q.    Okay.  Do you know if anyone

15  did it?

16      A.    I don't know.

17      Q.    Do you know to this day if

18  anyone did that?

19      A.    I don't know.

20      Q.    Are you aware of any studies

21  or measurements of addiction in patients?

22  With -- and I'm talking about with

23  respect to opioid products used for

24  chronic pain.

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Oh, there were -- there are

2  published studies on the signs and

3  symptoms of addiction, but I'm not -- or

4  things to be looking for.  But I'm not

5  aware of any specific studies.

6      Q.    That measured addiction?

7      A.    I'm not aware of studies

8  that measured addiction, per se.

9  Clinical trials, in some of them, would

10  sometimes include information, to answer

11  your question, on pill count to see

12  whether the medication, such as the

13  opioid pain medications, were

14  appropriately accounted for.  But that

15  would have been part of the clinical

16  trial itself.

17      Q.    You're not aware of any

18  actual measurements that were taken with

19  respect to, for example, rates of

20  addiction in patients taking chronic --

21  taking opioids for chronic pain?

22      A.    From a clinical trial?

23      Q.    From anything.

24      A.    No, I'm not aware.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And that's true through

2   today?  Well, is it true through 2017?

3      A.    I'm not aware of studies

4   that specifically looked at addiction as

5   a specific endpoint either on a

6   controlled clinical trial or in other

7   types of studies.

8      Q.    Okay.  Do you keep up with

9   the literature?

10      A.    I have.  But not as much

11   since I've been retired.  So the

12   information post-retirement is a little

13   bit different than what it had been

14   before.

15      Q.    Have you always kept up --

16   are you licensed to practice medicine in

17   Massachusetts?

18      A.    Yes.

19      Q.    And in New Jersey -- you

20   live in Pennsylvania?

21      A.    Yes.

22      Q.    What states are you licensed

23   in?

24      A.    In Massachusetts.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Just Massachusetts?

2      A.    Yes.

3      Q.    And you've kept that up?

4      A.    Yes.  I take the CME, et

5   cetera, to keep it up.  Yes.

6      Q.    And I didn't ask you, but

7   are you still a member of the Medical

8   Association of Massachusetts?

9      A.    Yes.

10     Q.    Any other associations that

11  you're currently a member of?

12     A.    No.

13     Q.    The fifth bullet point is

14  overall responsibility -- "Overall

15  responsible for medical lifecycle

16  planning for in-line analgesic

17  formations."

18           What does that mean?

19     A.    So the -- for a product,

20  for -- as products are developed, they go

21  through a lifecycle.  And what are the

22  possible ways that we might be able to

23  think about new indications or new ways

24  that they can be studied.

Highly Confidential - Subject to Further Confidentiality Review

1          So I was responsible for

2   looking at that and seeing where there

3   are new and different ways that we might

4   be able to think about studies to provide

5   information to healthcare providers and

6   others about the use of the products.

7          Q.    And was that through -- true

8   through 2017, when you left the company?

9          A.    I left the company in 2017,

10   but the work I did in analgesia ended

11   when the U.S. rights for Nucynta were

12   sold to another company.  I then worked

13   in infectious diseases for a period of

14   time.  And then after that, I went back

15   to doing some projects.  So I haven't

16   been specifically working in analgesia

17   since about 2015.

18          Q.    Okay.  Did your title change

19   at all in -- when you left analgesia and

20   went to infectious disease and special

21   products?

22          A.    So I was doing -- my title

23   was senior director for clinical

24   development and infectious disease.  And

Highly Confidential - Subject to Further Confidentiality Review

1    I did that for approximately a year and a

2    half.  And then between January and June

3    of 2017, I did some specific projects in

4    our central nervous system group.  But

5    they were not analgesia related.

6            Q.    And that basically updates

7    this, so from August 2013 to, if we

8    would -- this would be sometime in 2015

9    that you ended your analgesia work?

10           A.    That's correct.

11           Q.    Okay.  And then from 2015 to

12   January of 2016, you worked on infectious

13   diseases?

14           A.    Yes.  Through the end of

15   2016, and then the -- the first six

16   months between January and June or

17   thereabouts.

18           Q.    Oh, I see.

19           A.    I went back to work in the

20   central nervous system, medical -- U.S.

21   medical affairs group and worked on some

22   other projects before I retired.

23           Q.    And none of those involved

24   analgesics?

1       A.      Correct.

2       Q.      Did any of them involve

3    addiction or abuse?

4       A.      Not while I was with the

5    company.

6       Q.      And has anything occurred

7    after you left the company with respect

8    to looking into addiction or abuse?

9       A.      Not -- no.  Nothing --

10   not -- nothing at the moment.

11      Q.      Do you have something in the

12   works?

13      A.      Maybe.

14      Q.      Okay.  Are you -- I know you

15   said that you were not being paid for

16   your time.  Is your -- is your company

17   being paid?

18      A.      No.

19      Q.      Were you familiar with the

20   label that was prepared in 2001 when you

21   began -- around the time that you were

22   working under Duragesic, would that have

23   been something you were familiar with,

24   the FDA label?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I would have to look at the

2    data to see -- I would have to look at

3    the label to see.

4    Q.    What would you need to look

5    at the label --

6    A.    To familiarize myself.  I

7    haven't seen the label in a long time.

8    Q.    I'm not asking a question

9    about the label.  I'm just asking, as

10   part of your job responsibilities, would

11   the label have been something you were

12   familiar with?

13   A.    Oh, I understand now.  I

14   might have been asked to review a label

15   as -- as one of the people who worked in

16   U.S. medical affairs.

17   Q.    And I know in your files I

18   saw some review, some later review of

19   labels, some back and forth with respect

20   to the FDA.

21   A.    Yes.

22   Q.    Is there a time that you

23   would have been more involved in labeling

24   with respect to Duragesic?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    While I was working on the

2  compound prior to it becoming a generic,

3  I would have been involved in the label

4  conversations as these came along.

5    Q.    And when did the product

6  become generic?

7    A.    I think -- and the dates are

8  approximate.  Some time in the -- some

9  time in the 2005 time range.

10    Q.    And so at least as of 2005

11  you would have reviewed the label for

12  Duragesic?

13    A.    I -- I would have been one

14  of the label reviewers, yes.

15    Q.    And then when you became

16  involved with tapentadol and Nucynta,

17  would you have reviewed that label?

18    A.    Yes.

19    Q.    Would you have been -- would

20  you have been involved in the initial

21  drafting of that label for the approval

22  process?

23    A.    I don't know that I was.

24  No, I'm not -- I'm not sure that I was.

1    Q.    Is it fair to say that early

2    on in -- in the process, you would have

3    seen a label or a draft label for

4    Nucynta?

5    A.    When it was being submitted

6    to the FDA for approval?

7    Q.    Or anything.  I'm just

8    trying to get an understanding.  In your

9    role with Nucynta, is it something that

10    you would have seen the label --

11    A.    Yes, at some point.

12    Q.    -- typically?

13    A.    But -- yes.  But, yes,

14    certainly postapproval.

15    Q.    Okay.  Copies coming, but I

16    think I have enough of the 2001 label.

17    So -- but not many copies.

18        (Document marked for

19        identification as Exhibit

20        Janssen-Vorsanger-3.)

21    BY MS. CONROY:

22    Q.    I'm going to mark as

23    Exhibit 3 -- and I have a -- just to help

24    you.  What I've put up a Post-It note on

Highly Confidential - Subject to Further Confidentiality Review

1  one page I'm going to ask you about, but

2  you are free to look at the whole label.

3  But just make it easier to find what I'm

4  talking about.

5          And this Exhibit 3 is the

6  2001 approval package, approved label for

7  Duragesic.  The Bates number is

8  JAN-MS-02629790 through 824.

9          Does this look at all

10 familiar to you?

11     A.    Yes, it does.  Some time to

12 review it.

13     Q.    And I understand you may not

14 have seen it in exactly this form.  But

15 if the FDA approved this label format,

16 these words couldn't change, correct?

17     A.    Once we received the

18 approved label from FDA, yes, that would

19 be the label.

20     Q.    Okay.  So if I look on

21 Page 1 of the label, which is Bates

22 Number 797, there's -- says "Duragesic,

23 fentanyl transdermal system," and then

24 the controlled substance symbol.

1           Do you see that?

2       A.    Are -- are you on Page 1?

3       Q.    I'm on Page 1 of -- it's

4   797.

5       A.    I don't see 797.  I just see

6   Page 1.

7       Q.    Turn -- oh, I'm sorry.

8           MR. LIFLAND:  Bates numbers.

9           MS. CONROY:  I have a

10       different version.

11  BY MS. CONROY:

12       Q.    Yeah.  Do you see the one

13  with the -- oh, it looks like the same

14  thing.  Yes.  The black box, correct.

15           That's Page 1.  And it says,

16  "Full prescribing information"?

17       A.    Yes.

18           MR. LIFLAND:  If you want to

19       double-check that we're reading

20       off the same document?

21           MS. CONROY:  Yeah, I'm

22       right -- the Bates number is cut

23       off.  I'm on Page 1.

24           MR. LIFLAND:  Okay.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. CONROY:  Okay.  But it
 2       is the same -- this is the same
 3       document.  It just has that
 4       problem, if you don't --
 5              MR. LIFLAND:  Okay.  Well,
 6       maybe we --
 7              MS. CONROY:  We -- you know,
 8       we printed it at the hotel.  And
 9       if they don't do the right -- if
10       they don't have the right margins,
11       you can't get the Bates number.
12              MR. LIFLAND:  Why don't you
13       just read the Bates range into the
14       record and then we'll refer just
15       to the pages for --
16              MS. CONROY:  Sure.
17              MR. LIFLAND:  -- the native
18       page numbers in the document and
19       be able find our way through it.
20              MS. CONROY:  It's -- it's
21       JAN-MS-02629790 through 824, but
22       there are also page numbers on the
23       document.
24    BY MS. CONROY:
```

1    Q.    So what we're looking at

2    right now is Page 1, which is the full --

3    and it says, "Full prescribing

4    information for Duragesic."

5              Do you see that?

6    A.    Yes, I see it.  I'm looking

7    at Page 1.

8    Q.    Okay.  And this is a label

9    that would need to accompany every

10   Duragesic prescription until such time as

11   the FDA changed the label, correct?

12   A.    Yes.

13   Q.    And now if you would take a

14   look at Page 12.  And that's where I put

15   the Post-It note.

16              And this is the drug abuse

17   and dependence section.  Do you see that?

18   A.    I do.  Can I move the

19   Post-It up a little bit so I can read --

20   Q.    Oh, you can take it off

21   entirely.  I just used it to get you to

22   the right page.

23              I take it you have seen this

24   before today?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Okay.  So if you take a

3   look, the first sentence says, "Fentanyl

4   is a Schedule II controlled substance and

5   can produce drug dependence similar to

6   that produced by morphine."

7                 Do you see that?

8          A.     Yes.

9          Q.     Do you agree with that?

10         A.     I do.

11         Q.     "Duragesic fentanyl

12  transdermal system."

13                That means it's a patch,

14  right?

15         A.     Yes.

16         Q.     The transdermal system?

17                "Therefore, it has the

18  potential for abuse."  Do you agree with

19  that?

20         A.     Yes.

21         Q.     "Tolerance, physical and

22  psychological dependence may develop upon

23  repeated administration of opioids."

24                Do you agree with that?

1      A.     Yes.

2      Q.     "Iatrogenic addiction

3  following opioid administration is

4  relatively rare."

5            Do you agree with that?

6      A.     I do.

7      Q.     And what is your support for

8  that statement?

9      A.     Well, this is a statement

10  that had been in the package insert.  So

11  it would have been supported at that

12  time.  There were subsequent studies; I

13  believe that there was a Cochrane study

14  that was published.  There's an article

15  by Michael Fishbain and coworkers looking

16  at iatrogenic addiction as well.  And in

17  both of those taken together, it looks

18  like the rates of iatrogenic addiction

19  are -- were very low, are low.

20      Q.     All right.  Let me just

21  break that down a little bit.

22            So you understand that

23  this -- well, what do you understand

24  iatrogenic addiction to be?

1    A.    Iatrogenic addiction is

2    addiction that occurs as a consequence of

3    receiving a medication prescribed by a

4    health -- healthcare provider.

5    Q.    And you mentioned a

6    Dr. Fishbain?

7    A.    Dr. Fishbain.  An article

8    with Dr. Fishbain and co-workers looking

9    at iatrogenic addiction.

10    And there was also a

11    Cochrane review that was done.  I believe

12    Dr. Chou was the senior author on that

13    Cochrane review.  And both of those taken

14    together show low rates of iatrogenic

15    addiction.  So I think that statement,

16    even though this was 2001, those two

17    articles which I believe were published

18    much later, I don't remember the exact

19    year, confirm.  So I think that that

20    statement is correct.

21    Q.    Published after 2001 --

22    A.    Yes.  I think they were

23    after 2010.  I don't know the exact

24    dates, the dates are approximate, but I

1    think it was somewhere after -- after

2    that.  So a number of years later, that

3    certainly -- the data still seems to

4    support that statement.

5         Q.    But what was the support in

6    2001?

7         A.    I don't -- I don't know what

8    support FDA would have used to put that

9    in the label.

10        Q.    Well, did you agree with the

11   statement back in 2001?

12        A.    I did -- well, it was in

13   the -- it was in the label.  So I would

14   assume that the evidence would have

15   supported -- substantial evidence or at

16   least an understanding of to have it in

17   the label.  So there would have been no

18   reason for me to disagree with the

19   statement at that point.

20        Q.    That -- that support would

21   have come from Johnson & Johnson,

22   correct?

23        A.    It may have come from --

24   I -- I don't know where this section of

1  the label came from.  I don't know

2  whether this was information that was in

3  other product labels at the time.  I

4  would need to see those labels to be able

5  to comment on them.  Or whether this was

6  information that FDA had derived to

7  make -- so that they felt that this could

8  be put in the label.  I don't know the

9  origin of the -- of the language for you,

10  so I can't comment on it at this point,

11  without looking at other product labels.

12       Q.    Well, you -- you just told

13  me a few minutes ago that you were doing

14  quality measurements with respect to

15  addiction and abuse, correct?

16       A.    Those were done, yes, later

17  on.

18       Q.    Okay.  And did you have

19  occasion when you were doing those to

20  look at rates of iatrogenic addiction to

21  opioid medications?

22       A.    That wasn't -- that was not

23  a primary focus at that time.  It was

24  an -- an -- we wanted to understand the

1    types of information that the people who

2    were developing measures were looking at.

3    That was their responsibility.  We wanted

4    to see how we could support them.  We

5    weren't developing the measures.  We were

6    supporting the people and seeing them

7    provide information where we could, as

8    requested.

9          Q.    Okay.  Are you aware of

10   other studies other than Fishbain and

11   Cochrane?

12         A.    Those are the studies that I

13   think looked like at the level of -- and

14   events that were included in those two

15   were high enough quality that I felt

16   comfortable in the conclusions that they

17   drew.  There may have --

18         Q.    When --

19         A.    There may have been other

20   studies to answer your question.  But I

21   don't know.

22         Q.    When was the last time that

23   you looked at those two studies?

24         A.    Actually fairly recently.

1    Q.    What's fairly recently?

2    A.    Within the last month.

3 Couple weeks.

4    Q.    And for what reason were you

5 looking at those two studies?

6    A.    Iatrogenic addiction is an

7 area that I'm interested in.  And it was

8 something that I wanted to make sure that

9 I was up-to-date on.

10    Q.    Were you interested in

11 iatrogenic addiction while you were at

12 Johnson & Johnson?

13    A.    I was interested in abuse

14 very much so.  I created the -- as I

15 mentioned and gave testimony this

16 morning, I was responsible for helping,

17 working with the company to develop the

18 active surveillance program for our

19 opioid analgesics.

20    Q.    Did the active surveillance

21 program concern incidence of addiction in

22 patients taking opioids for chronic pain?

23    A.    More abuse than addiction.

24    Q.    Okay.  But you're interested

Highly Confidential - Subject to Further Confidentiality Review

1  in iatrogenic addiction for pain

2  patients?

3          A.     It's an area of interest of

4  mine.

5          Q.     Have you written in it or

6  have you --

7          A.     Have I written?

8          Q.     Well, let me ask you this.

9  Have you submitted any publications or

10 writings since you left Johnson & Johnson

11 on the subject?

12         A.     No, I have not.

13         Q.     Are you involved in any

14 clinical studies now with respect to this

15 subject?

16         A.     No.  I'm not.

17         Q.     Are you consulting with

18 anyone with respect to this subject?

19         A.     No.  But I am interested in

20 addiction in general.  And I'm

21 interest -- and I'm looking at ways that

22 I might be able to look at medications

23 that could be used to treat addiction.

24         Q.     I see.  Did you ever look at

1    any medications for the treatment of

2    addiction while you were at Johnson &

3    Johnson -- Johnson & Johnson?

4        A.    I'm sorry.  Repeat the

5    question.

6        Q.    Did you ever look at any

7    medications, the development or maybe

8    acquisition of any medications for the

9    treatment of addiction while you were at

10   Johnson & Johnson?

11       A.    No, I did not.

12       Q.    Are you looking at addiction

13   treatments that are drugs or medications

14   or devices or some sort of counseling?

15   Where would it fall?

16       A.    Medications, yeah.  And not

17   only medications, but also multimodal.

18   Not only -- but also psychological

19   counseling as well.

20       Q.    Are you working with anyone?

21       A.    Just me.

22       Q.    And are these medications

23   that are in development or a medication

24   in development, or is this the use of

1    existing medication?

2          A.     Existing medications.

3          Q.     And what are they?

4          A.     I can't -- it's something

5    that I'm working on now.  If I'm allowed

6    to, I prefer not to, because I'm

7    trying -- I'm thinking about potentially

8    seeking a patent for them.

9          Q.     Okay.  But let me -- let me

10   ask around it a little bit.  You are

11   talking about medications that have

12   already been approved by the FDA but you

13   would be seeking an indication that's

14   different?

15         A.     Correct.  Some of the

16   medications are approved for the

17   treatment of addiction, and I'm looking

18   at some novel combinations.  So as part

19   of that interest in addiction in general,

20   I'm also interested in iatrogenic

21   addiction.

22         Q.     Have you read Porter and

23   Jick?

24         A.     Yes, I have.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  What is your analysis

2  of that letter to the editor?

3    A.    Well, it was in fact a

4  letter to the editor describing a certain

5  patient population of hospitalized

6  patients.

7    Q.    Was it -- you described

8  Fishbain and Cochrane as high quality.

9  Would you --

10    A.    Yeah.  So I'm sorry.  To

11  clarify, so the Fishbain article is one

12  article.  The Cochrane review by Roger

13  Chou and other authors as well is the

14  second one.  So those are the two

15  articles.

16    Q.    Okay.  And you consider

17  both -- both of those articles to be of

18  high quality?

19    A.    I do.

20    Q.    And high quality with

21  respect to the incidence of iatrogenic

22  addiction in chronic pain patients taking

23  opioids?

24    A.    By high quality, in the

Highly Confidential - Subject to Further Confidentiality Review

1    level of evidence of the information that

2    they included from the studies to be able

3    to make the assertions that they -- the

4    conclusions that they had.

5          Q.    Did they both of addiction

6    as an endpoint?

7          A.    They were looking at rates

8    of addiction and some -- in these

9    patients.

10         Q.    And what was the patient

11   population?

12         A.    I'd have to go back and look

13   at it.  If the articles were here, I

14   could review and comment.

15         Q.    I think the Fishbain I'm

16   familiar with is from 1990.  Is there

17   something later that you recall?

18         A.    This was -- I think this was

19   a more recent article, if memory serves.

20         Q.    Do you know if the dataset

21   is more recent or just the article?

22         A.    I'd like to look at the

23   articles before I comment.

24         Q.    Okay.  Well, we'll try and

Highly Confidential - Subject to Further Confidentiality Review

1    find them.

2            A.    Okay.

3            Q.    And Cochrane and Chou are

4    the authors?

5            A.    No, so Cochrane is -- it's a

6    Cochrane analysis, and there are a number

7    of authors that put together that

8    analysis as part of the Cochrane review.

9    And Dr. Chou is one of the authors.

10           Q.    And do you know where that

11   was published?

12           A.    In Cochrane.  It was a

13   Cochrane analysis.

14           Q.    It's just called the

15   Cochrane analysis?

16           A.    I don't remember what the

17   title of the study is.  We can get is

18   that.  But it was published as part of a

19   Cochrane review.

20           Q.    Okay.  Who sponsored that

21   review?  Do you know?

22           A.    I'm not sure.  I'd have to

23   look and see what they said.  This would

24   have been done -- this is -- the

Highly Confidential - Subject to Further Confidentiality Review

1    Cochrane, as part of the information for

2    Cochrane reviews.

3           Q.    Okay.  And who -- who

4    sponsored the Fishbain -- Fishbain

5    article?

6           A.    I'd have to look and see.

7           Q.    You don't know off the top

8    of your head?

9           A.    No, I don't.

10          Q.    Do you know if Johnson &

11   Johnson ever sponsored Dr. Fishbain?

12          A.    I'm not understanding your

13   question.

14          Q.    Do you know if Johnson &

15   Johnson or Janssen ever provided any

16   consulting fees or whether Dr. Fishbain

17   was ever a key opinion leader or thought

18   leader or anything for Johnson & Johnson?

19          A.    I don't recall.

20          Q.    You know what I'm talking

21   about when I say key opinion leader?

22          A.    I do.

23          Q.    Okay.  And you -- as you sit

24   here today, you just don't know if

Highly Confidential - Subject to Further Confidentiality Review

1    Dr. Fishbain was?

2           A.    I know the name.  And I know

3    he is a thought leader in the area of

4    analgesia.  But I don't know him

5    personally.

6           Q.    Okay.  Do you know if, while

7    you were at Johnson & Johnson and while

8    you were involved with both Duragesic and

9    Nucynta, whether Dr. Fishbain was ever a

10   key opinion leader or thought leader?

11          A.    I don't know if he was.

12          Q.    Where does he practice?

13          A.    I'm not certain.

14          Q.    Have you ever met him?

15          A.    I have not.  I do not know

16   him personally.

17          Q.    How did you evaluate the

18   quality of both the Fishbain article and

19   the Cochrane review, the Cochrane

20   analysis that was in the review?

21          A.    So the description in the

22   articles of how they decided what studies

23   to include and what studies to exclude,

24   they talked about why they excluded them.

Highly Confidential - Subject to Further Confidentiality Review

1    They may not have had -- you know there

2    have been inadequate number of patients

3    or other criteria that they used, were

4    such that they came up with a number of

5    studies, and the criteria seemed

6    reasonable to me to define a high quality

7    of evidence.

8              But, again, in the absence

9    of that, without it in front of me, I

10   would not be able to go into a lot more

11   detail.

12        Q.    Yeah, I'm asking you,

13   generally, how you would evaluate the

14   quality of the research in an article.

15        A.    So if there are a lot of

16   open label studies.  If these studies had

17   a fair number of dropouts.  If sometimes

18   the studies don't predefine what their

19   endpoints are before they actually do the

20   analysis, those studies would have --

21   tend to have lower levels of evidence.

22              Studies which were

23   randomized, which would be very

24   important, studies where you predefine

Highly Confidential - Subject to Further Confidentiality Review

1    the endpoint ahead of time.  Certainly

2    studies that are double-blind

3    placebo-controlled would have the highest

4    level of evidence.

5              Those certainly would be the

6    type of studies that would be -- are ones

7    that I would find certainly more

8    impactful and wanted to focus on that

9    type of data.

10        Q.    Do you know if there are any

11   double-blind placebo-controlled addiction

12   studies with respect to pain patients,

13   chronic pain patients?

14        A.    No.  Not that I'm aware of.

15   Those types of studies can be very

16   difficult to conduct.

17        Q.    And that's because you would

18   be depriving a pain patient of analgesia,

19   correct?

20        A.    Well, you would have to

21   decide how you want to come up with

22   endpoints.  So I talked about ACTTION

23   earlier.  Remember that was the work

24   between FDA and government and industry.

Highly Confidential - Subject to Further Confidentiality Review

1            And the publication that I

2    participated in, which I think was

3    published in 2013, there may have been

4    one in 2010, they were still trying to

5    define endpoints and how you would define

6    addiction and abuse.  So I'm not aware of

7    any -- of the clinical trials that would

8    have been done before that, because here

9    the experts were meeting and trying to

10   understand how to define addiction.  And

11   as I mentioned to you, since about 2015 I

12   have not been directly involved in a lot

13   of this.

14            Q.    You also oversaw a group of

15   experts that met in 2003, correct --

16            A.    Yes.

17            Q.    -- to try to attempt to

18   define addiction and abuse and endpoints

19   with respect to those types of studies?

20            A.    Correct.  That's correct.

21            Q.    But you are -- you are

22   satisfied with the definitions of

23   addiction and abuse in Fishbain and the

24   Cochrane analysis?

1    A.    I'd have to go back and see

2    what those were done and how they

3    described it.  But the question about

4    clinical trials that you had just asked

5    would be to agree on definitions and

6    would be used.  And that certainly was

7    still being worked on by the ACTTION

8    group.

9         But I'm satisfied with the

10   outcome of the data as described by

11   Fishbain and from the Cochrane review.

12   Q.    As you sit here today, you

13   do not know the support for the statement

14   in the 2001 Duragesic label, correct?

15   A.    I don't know the origin of

16   the information leading to the statement.

17   Yes.

18   Q.    I didn't assume that you

19   would understand the origin.  I'm asking

20   you are unaware of the support for the

21   statement?

22   A.    Yes, I don't know what

23   information went in to make that

24   statement, yes.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    If I wanted to know that at

2   Johnson & Johnson, what support there was

3   for that statement, who would know?

4      A.    So what we have been talking

5   about is that this statement may have

6   originated from the FDA.  I don't know

7   where it came from.  So I don't know -- I

8   don't know whether J&J would have that

9   information or whether this would have

10  been information that FDA had come up

11  with to put this in the label.

12     Q.    Well, anything on the label

13  could have been used by a sales

14  representative, correct?

15     A.    Yes.

16     Q.    To promote the product,

17  correct?

18     A.    Yes.

19     Q.    And so would you agree with

20  me that if a physician asked a sales

21  representative for Johnson & Johnson what

22  the support was for this statement,

23  regardless of the origin, Johnson &

24  Johnson would have known that support by

Highly Confidential - Subject to Further Confidentiality Review

1    2001, correct?

2         A.    We would have -- we would

3    have been looking to understand where

4    that would have come from, yes.

5         Q.    Well, I understand you may

6    be interested in where it came from, but

7    what would be more important would be

8    what the actual support for the statement

9    would be, correct, for the healthcare

10   provider?

11        A.    So, if -- if a healthcare

12   provider wanted information on iatrogenic

13   addiction, then the company would have

14   developed a response, an approved

15   response, on the available information

16   from the published literature to support

17   this statement.

18             If you ask me specifically

19   where the support came for the statement

20   in the product label, I don't know

21   whether this was information that was

22   requested by FDA for us to put in based

23   on what they had, or whether this was

24   language that was generated by the

1    company that FDA agreed with.

2         Q.    Well, I understand that.

3    And that -- that information will be at

4    Johnson & Johnson, correct, in regulatory

5    or whoever was dealing with the FDA?

6         A.    There would be information

7    to support that statement at Johnson &

8    Johnson.  It may be in the regulatory

9    group.  It may have been information

10   about iatrogenic addiction that would

11   have been -- if it were a question, it

12   would have been -- there would have been

13   support for that from the medical

14   information group.

15        Q.    But someone at Johnson &

16   Johnson would have whatever information

17   is the support for that statement?

18        A.    There should have been some

19   type of support for that statement

20   somewhere.

21        Q.    And as you sit here, you

22   just don't know which group at Johnson &

23   Johnson would have it, but somebody would

24   have it?

Highly Confidential - Subject to Further Confidentiality Review

1        A.     Somebody would have support

2   for that information.  So somebody would

3   have published -- or be able to provide

4   information on the published literature

5   to support the rate -- very low rates of

6   iatrogenic addiction.

7        Q.     And do you recall ever

8   looking at that data yourself, that

9   published information yourself?

10       A.     At that time?

11       Q.     At that time.

12       A.     No.

13       Q.     And what caused you to go

14  to -- later to Fishbain and the Cochrane

15  analysis to look at that data?

16       A.     Well, there's a lot of

17  interest in iatrogenic addiction, some of

18  the more recent articles, and again some

19  of the articles that were published.  And

20  I'm not familiar completely with the

21  literature, but these are some articles

22  that talk about them.

23       Q.     And you just mentioned that

24  there was a lot of interest in iatrogenic

Highly Confidential - Subject to Further Confidentiality Review

1  addiction.  Where did that interest come

2  from?

3         A.    My interest?

4         Q.    No.  You've just mentioned

5  that there's -- "well, there's a lot of

6  interest in iatrogenic addiction."  And

7  so I was just curious, where is that

8  interest?  Where did you see that

9  interest?

10        A.    Well, there's concerns about

11  what's going on with the opioid crisis.

12  People want to understand, so that's...

13        Q.    Okay.  And when did that

14  begin, that interest in iatrogenic

15  addiction?

16        A.    I don't know.  I'm talking

17  about my only interest now.

18        Q.    Okay.  Do you know if there

19  was interest in the rates of iatrogenic

20  addiction at Johnson & Johnson during

21  your tenure with Duragesic and then with

22  Nucynta?

23        A.    I don't recall.

24        Q.    You don't recall if there

1    was any interest in iatrogenic addiction

2    rates?

3           A.    Well, there's no -- I -- I

4    don't know if -- there may have been

5    interest.  I just don't recall if there

6    was an interest in it.

7           Q.    Did you have an interest in

8    it?

9           A.    We -- I was -- I was

10   interested in understanding abuse.  There

11   were people were interested in -- we knew

12   that these compounds are addictive.  They

13   are Schedule II.  So the -- the abuse

14   potential of the compound has already

15   been defined in the law.

16              We were interested in the

17   abuse of the compound and it's relate --

18   I helped, as I've already mentioned and

19   gave testimony this morning, I helped to

20   develop the -- the active surveillance to

21   begin to have a better understanding of

22   that.  So there was an interest in

23   understanding abuse of our compound.

24           Q.    But you consider abuse to be

Highly Confidential - Subject to Further Confidentiality Review

1    different than iatrogenic addiction,

2    correct?

3         A.    Abuse is -- could be

4    different -- is different from iatrogenic

5    addiction.  Iatrogenic addiction is

6    addiction that occurs -- a consequence

7    after receiving a prescription.

8         Q.    Do you recall ever making

9    any statements with respect to the

10   expected or predicted rate of iatrogenic

11   addiction?

12        A.    I was asked to comment at

13   one time.  And the number that I gave was

14   incorrect.  I had commented to a -- a

15   member of -- one of our benefit risk

16   group of what I thought rates of

17   addiction were.  And I came up with a

18   number which was incorrect.

19        Q.    What was that number?

20        A.    I believe the number I gave

21   was about 5 percent, or 5 to 8 percent,

22   but that was not correct.  That was not

23   iatrogenic addiction.  That was addiction

24   in the general population.  And I believe

1    that -- that I was talking about rates of

2    alcoholism and other types.

3                So I -- I remember the

4    question.  And I remember I -- now, in

5    retrospect, I answered it incorrectly.

6          Q.    So when you gave the answer

7    of 5 to 8 percent, you were talking about

8    rates of iatrogenic addiction to

9    controlled substances?

10         A.    No.  The 5 to 8 percent that

11   I gave was addiction in the general

12   population, like alcoholism, not -- not

13   prescription drugs.

14         Q.    Okay.  Do you know the rate

15   of iatrogenic addiction to prescription

16   drugs?

17         A.    I would have used the

18   information for the two articles that

19   we've been talking about now.  And again,

20   it's low.

21         Q.    And what -- what is low?

22         A.    At the rate of approximately

23   1 to 4 percent or thereabouts.

24         Q.    1 percent to 4 percent?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yeah, or thereabouts.

2          Q.     Of the population of

3    patients taking opioids for chronic pain?

4          A.     Prescribed opioids for

5    chronic pain.

6          Q.     But you don't recall what

7    populations those articles looked at?

8          A.     I would have to look at them

9    again to comment.

10         Q.     And you would consider

11   4 percent to be low?

12         A.     I would.

13         Q.     Do you know if 4 percent

14   would be rare?

15         A.     I think there are

16   definitions that are used for rare for

17   adverse events.  And I don't know what

18   those numbers are.  I'd have to -- I'd

19   have to look those up.

20         Q.     Have you ever heard that

21   rare is less than 1 percent?

22         A.     Yes, I would have.

23         Q.     Would it be fair to say that

24   4 percent typically would not qualify as

Highly Confidential - Subject to Further Confidentiality Review

1    rare?

2              MR. LIFLAND:  Object to the

3         form of the question.

4              THE WITNESS:  I'd have to

5         look and see whether -- there are

6         standard criteria that are looked

7         at.  I would want to refer to

8         those before I comment on them.

9    BY MS. CONROY:

10        Q.    Okay.  And where would I

11   find that standard criteria?

12        A.    That may be -- I don't --

13   I'm not -- I don't know if those are

14   published anywhere.  But I think FDA has

15   written criteria for what they would call

16   rare -- at least for adverse events as

17   described in their package -- in the

18   package inserts.

19        Q.    Do you know if that

20   information is also available at Johnson

21   & Johnson or are there protocols that

22   would discuss that for clinical trials in

23   the evaluation of adverse events?

24        A.    I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Is that anything that you

2    ever looked at, would you ever have

3    determined in analyzing data from a

4    clinical trial whether or not certain --

5    a certain type of adverse event was rare

6    or not?

7    A.    I would -- I would have had

8    the criteria from the FDA with me to make

9    those determinations.  And I don't have

10   those today.  And I don't know what they

11   are offhand.

12   Q.    Okay.  But that's something

13   you would have used?

14   A.    That was something that we

15   would have referred to.

16   Q.    Okay.  The -- did you tell

17   me that the Fishbain article was in 2010?

18   A.    No.  I said both of those

19   articles were later.  I wouldn't -- I

20   don't -- I don't have -- the dates are

21   approximate.  I want to say it could have

22   been 2013 or somewhere around there.  I

23   didn't have an exact date.  That's what I

24   had commented.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  I remember a

2  Dr. Fishbain article from 1990.  It's not

3  that one, is it?

4    A.    No, I believe this was a

5  later article.

6    Q.    Okay.  Do you know the one

7  I'm talking about?

8    A.    I'm not aware of the 1990

9  article.  The ones that I took -- the two

10  that I reviewed are the ones that I have

11  been talking about.

12    Q.    Do you have copies of those

13  at home?

14    A.    I'm not sure.  I'd have to

15  check.

16    Q.    If -- I know we're going

17  forward tomorrow.  So I may ask you to

18  take a -- I will ask you to take a look

19  and see if you have those articles in

20  case we have difficulty finding those two

21  articles.

22    A.    I'll look and see if I have

23  it.

24    Q.    Okay.  They both -- would

Highly Confidential - Subject to Further Confidentiality Review

1    they both be available as far as you know

2    on PubMed or one of those?

3         A.    I don't know.  Possibly.

4         Q.    How would you find them?

5         A.    I -- I don't know if I --

6    how I would dig them up.  I don't.  But

7    I'll take a look if I have them.

8         Q.    Do you have access to PubMed

9    or any of those types of databases for

10   published articles?

11        A.    I read them online.  And

12   I -- if there are articles that I can't

13   get, I buy them.

14        Q.    So you buy them online?

15        A.    I -- the articles I have

16   bought online, yeah.

17        Q.    Do you know if -- were you

18   involved in the -- I don't have a copy

19   yet so we'll wait.

20             Let's mark the 2008 label.

21             I have no -- I think -- this

22   document has no Bates number.  I think I

23   just got it off the web.

24             (Document marked for

1    identification as Exhibit

2    Janssen-Vorsanger-4.)

3  BY MS. CONROY:

4        Q.    This is Exhibit 4.  This is

5  the approval package for Duragesic,

6  fentanyl.  The sponsor is the ALZA

7  Corporation.  Do you know what that

8  corporation is?

9        A.    Yes, ALZA Corporation.

10       Q.    And who is that?

11       A.    ALZA Corporation is a

12  corporation that worked with Janssen and

13  ALZA Corporation was purchased by

14  Johnson & Johnson.

15       Q.    Then if you turn to Page 26

16  and 27 which is the drug abuse and

17  addiction section.

18            Do you see that?

19       A.    Yes.

20       Q.    And would you have been

21  familiar with this label on or around

22  2008?

23       A.    Yes.

24       Q.    And do you recall working

Highly Confidential - Subject to Further Confidentiality Review

1    with the FDA with respect, or maybe you

2    didn't work directly with the FDA.  But

3    do you remember working on the back and

4    forth with the FDA about the language in

5    this label?

6           A.    Yes.

7           Q.    Then you see on Page 26, the

8    paragraph about addiction.

9                 Do you see that?

10          A.    I do.

11          Q.    And it goes over onto Page

12   27.

13                Do you see that?

14          A.    Yes.

15          Q.    I no longer see the sentence

16   with respect to iatrogenic addiction.  Do

17   you know if that sentence was removed

18   from the label?

19          A.    My understanding it was.

20          Q.    Okay.  And what is your

21   understanding of why it was removed?

22          A.    I don't know.  I don't know

23   why the label had changed.  And that

24   information was no longer present in the

Highly Confidential - Subject to Further Confidentiality Review

1    label.  I'm not -- I don't have

2    information as to why FDA made a decision

3    to remove that from the label.

4           Q.    Did you ever ask anyone?

5           A.    I did not.

6           Q.    Have you ever heard the term

7    pseudoaddiction?

8           A.    Yes.

9           Q.    Is it a term that you ever

10   used?

11          A.    Yes.

12          Q.    In what context did you use

13   that term?

14          A.    It's a description of people

15   with pain who manifest drug-seeking

16   behavior in an attempt to get better,

17   more effective pain control.

18          Q.    Has that ever been tested,

19   that hypothesis that drug-seeking

20   behavior is a result or a consequence of

21   inadequate pain management?

22          A.    So patients seek medications

23   for a variety of reasons.  There are

24   people who seek medication to abuse, seek

1    medication to divert.  But there are also

2    patients who seek medication to control

3    their pain.  I'm not aware of any

4    specific study to look at that.  But I

5    can say that in the current label, I

6    believe in Duragesic, on abuse, that

7    language is present.  Not with the term

8    pseudoaddiction, but that type of

9    behavior is described.

10        Q.    Behavior of patients who

11   drug seek to control pain?

12        A.    People who seek additional

13   pain medications to try and get -- I

14   believe that's in the section on abuse in

15   the current product label.  So the term

16   is not there, but the practice and

17   behavior coined around that term is in

18   the current label to the best of my

19   understanding.

20        Q.    Do you know if that

21   hypothesis -- I understand that it's

22   in -- the concept of seeking additional

23   opioid drugs to control pain is in the

24   label.  Do you have any knowledge of

Highly Confidential - Subject to Further Confidentiality Review

1    whether or not that has ever been tested?

2          A.    I am not certain of that.

3    No, I'm not certain of that.

4          Q.    Have you ever been involved

5    or read any clinical study or

6    investigational study or anything that

7    determined whether or not that hypothesis

8    was true?

9          A.    I have observed in clinical

10   practice, but I have not seen it in a

11   study.

12         Q.    And what you observed in

13   clinical practice back in Boston was that

14   when a patient was asking for additional

15   opioids, you determined that they were --

16   they were asking because they needed

17   additional pain control?

18         A.    It wasn't in Boston.  But

19   the idea was correct.  It was a patient

20   that presented with a painful condition,

21   and when their pain was under good

22   control, they did not seem -- they did

23   not seek any additional pain medication.

24         Q.    And was that -- what was the

Highly Confidential - Subject to Further Confidentiality Review

1    pain medication?

2         A.    It was an intravenous

3    opioid.  I don't remember which one.

4         Q.    So it was in a hospital

5    setting?

6         A.    Yes, that's correct.

7         Q.    Have you ever seen it in a

8    clinical setting with a chronic pain

9    patient taking an oral medication?

10        A.    No, I have not.

11        Q.    And have you ever seen --

12   have you seen any studies or

13   observational reports or anything that

14   validates that drug-seeking behavior for

15   pain control?

16        A.    I have not seen such a

17   study.

18        Q.    Have you ever read any of

19   the studies concerning AIDS patients and

20   their drug seeking behavior?

21        A.    I have not.

22        Q.    I'm sorry?

23        A.    No, I have not.

24        Q.    I may refresh your memory

Highly Confidential - Subject to Further Confidentiality Review

1    with some of those.  Do you remember

2    looking at some of those in the 2003 Ad

3    Board meetings to determine drug-seeking

4    behavior?

5        A.    Whether -- I'm sorry.  I

6    don't understand your question.

7        Q.    Do you recall looking at

8    some AIDS studies with respect to

9    drug-seeking behavior during the 2003 Ad

10   Board meetings?

11       A.    There may have been a

12   request for studies to look at that type

13   of behavior.  But I don't remember.  We

14   received quite a large number of studies

15   that we evaluated and I don't remember

16   all of them at this point.

17       Q.    Okay.  You can put the label

18   away.  Do you know if the label changed

19   again after 2008 for Duragesic?

20       A.    I don't know.

21       Q.    Doctor, I think I had asked

22   you earlier.  You're familiar with key

23   opinion leaders, correct?

24       A.    The term?

1      Q.    The term.

2      A.    I am.

3      Q.    And in your role at

4    Johnson & Johnson, you had some

5    involvement in the recruitment of key

6    opinion leaders; is that correct?

7      A.    Many of the key opinion

8    leaders were already there.  I might have

9    spoken and certainly engaged in

10   discussions with them.  I don't know if I

11   recruited people, but I might have.

12     Q.    Okay.  And what was the --

13   what's the purpose of a key opinion

14   leader?

15     A.    To provide information to

16   the company about questions that may come

17   up around our product.

18     Q.    And are they also

19   individuals who provide information, not

20   just to the company, but to individuals

21   outside the company about a product?

22     A.    They would be -- yes, they

23   would have an opportunity to hear our

24   clinical trial data and provide other

1   information as requested, as well.

2          Q.     They would speak to peers

3   about Johnson & Johnson products?

4          A.     If they did about J&J

5   products, it would be approved Janssen

6   materials.

7          Q.     Well, it would be approved

8   Janssen materials after a particular

9   time, correct?  Prior to that,

10  peer-to-peer would not have been -- or

11  are you talking about Janssen approval or

12  FDA approval?

13         A.     FDA approval.  FDA approval.

14         Q.     Okay.

15         A.     Yes.

16         Q.     So at some point -- we

17  discussed that this morning.  At some

18  point, there was a shift and they would

19  be required to use FDA-approved

20  materials?

21         A.     Typically though -- yes.

22  Typically, a lot of -- at least the work

23  that I had done, was discussing a lot of

24  our clinical trial data.  And some of

1    that -- much of that was pivotal data,

2    data from pivotal studies.

3           Q.    And that would have been

4    supplied to the FDA?

5           A.    Yes.  That would have been

6    as part of the product labeling.  Other

7    information could be shared with them as

8    well.

9           Q.    But KOLs would provide

10   information to peer groups like at

11   medical CME groups or in-service

12   meetings, things like that?

13          A.    Yes, at a time when the

14   companies were still involved in CME,

15   yes.

16          Q.    Well, that was -- the

17   company was involved in CMEs at least

18   through 2010.  Would that be fair?

19          A.    I don't know the date.  But

20   yes.

21          Q.    Certainly while you were

22   involved with Duragesic?

23          A.    Yes.  Yes.

24          Q.    Do you recall there being

1    involvement with CMEs while you were

2    involved with Nucynta?

3         A.    I don't remember.  There was

4    a transition time, and I don't recall.

5    It may have.  But I don't -- I don't want

6    to speculate.  I don't remember.

7         Q.    And KOLs are also used to --

8    as authors on publications, correct?

9         A.    If they provide -- if they

10   provided analysis and fit the JAMA

11   criteria for being authors, yes.

12        Q.    And what's the JAMA

13   criteria?

14        A.    They would have had to make

15   significant -- and there are a list of

16   criteria.  I'd have to have those in

17   front of me, Counsel, to be able to go

18   through all of them.  But very briefly in

19   top line, they would have had to make

20   significant contributions to the work to

21   be an author.  They might be involved in

22   the analysis of the data, discussing what

23   types of analysis should be done.  They

24   may have involved in running -- but

Highly Confidential - Subject to Further Confidentiality Review

1    there's a -- there's a list of criteria

2    that we could review.  And they would

3    have had to fit those criteria to be

4    eligible to be an author.

5         Q.    Okay.  And was that criteria

6    required throughout your tenure with

7    Duragesic and Nucynta?

8         A.    There was criteria that they

9    had to have active involvement in the

10   study to be put on it.  It may not have

11   been all the JAMA criteria.  But yeah,

12   they had to make significant

13   contributions to be honest on the paper.

14        Q.    So that was a -- that was a

15   Johnson & Johnson criteria?

16        A.    Well, they were JAMA

17   criteria, but the company itself had a

18   criteria that they had to make -- they

19   had to make significant input into the

20   article.

21        Q.    Was there -- is that in

22   writing anywhere?

23        A.    I don't -- I don't know.

24   That's what I -- that's the criteria that

1    I used when I had people on the papers.

2         Q.    Did you -- was there any

3    protocol with respect to that at Johnson

4    & Johnson or was that just something that

5    you yourself -- was that a policy of your

6    own or was it broader based than just

7    your policy at Johnson & Johnson?

8         A.    I don't recall.

9              MS. CONROY:  We'll mark as

10        Exhibit 5.

11             (Document marked for

12        identification as Exhibit

13        Janssen-Vorsanger-5.)

14   BY MS. CONROY:

15        Q.    Exhibit 5 is an e-mail

16   chain.  The top one dated December 9th of

17   2002.  It's JAN-MS-02125643 through 47.

18   And you are free to look through the

19   entire exchange.

20             But I'm going to go to the

21   very first e-mail from you,

22   Dr. Vorsanger, which is on the second to

23   last page.

24             And you say -- you're

1    sending an e-mail to Karen Krasznavolgyi,

2    which I've just butchered that name.  But

3    I'm kind of curious if you can pronounce

4    it?

5          A.    No.

6          Q.    On December 3rd.  And the

7    subject line is share of voice request

8    from pain and mycology.  What was share

9    of voice if you recall?

10         A.    Share of voice, I think,

11   would be the relative contribution, and

12   I'm block -- I don't have a good

13   definition to give you so I'm reaching

14   back now.

15               I think it would be for the

16   amount of the different opioid analgesics

17   that would be in the marketplace.

18         Q.    Okay.

19         A.    But there -- there are --

20   there may be more precise definitions.  I

21   don't have them.

22         Q.    And you say, "Hi Karen, I'm

23   taking the lead for pain and mycology."

24               Mycology is -- is fungal

1    infections, correct?

2            A.     That's correct.

3            Q.     Okay.  Did you have -- you

4    didn't have anything to do with that, did

5    you?

6            A.     I did not.

7            Q.     Okay.

8                   "On understanding

9    Duragesic's share of voice in the market

10   of long-acting opioids.  To better

11   understand this, we are interested in

12   defining the key journals where

13   publications on either Duragesic,

14   Percocet, or OxyContin may be found."

15                  So those three, Duragesic,

16   Percocet and OxyContin, would you

17   consider those to be long-acting opioids?

18           A.     Percocet, no.  Duragesic and

19   OxyContin, yes.

20           Q.     Okay.  And you are asking

21   her -- you -- if you look further on, you

22   want her to go back no more than five

23   years.  And you're not looking for the

24   specific publications, but rather the

1  journals where articles were published

2  about those three drugs, correct?

3          A.    Yes.

4          Q.    And then if she did her job,

5  you would get a list of the major

6  journals where papers related to these

7  products are published, correct?

8          A.    Yes.

9          Q.    And do you recall why you

10  wanted to know that?

11          A.    Well, this was early on.

12  And I had started at Janssen in 2000.

13  And wanted to understand the types of

14  journals that -- where these types of

15  publications would take place, and then

16  understand.  So as we began to do our --

17  and I'm kind of reaching back to think

18  about what I might have meant by share of

19  voice.  Here I think it was a publication

20  share of voice, not a market share of

21  voice, to decide what types of -- where

22  the journals we should be publishing --

23  where the places that people who --

24  prescribers who treat pain, what are the

1    types of articles, where are they being

2    published, so we could -- we could be

3    current with them.

4          Q.    And you wanted to be -- is

5    it fair to say that you wanted to at

6    least have as much of a presence in those

7    journals as your competitors?

8          A.    We wanted to have a presence

9    in the journals that -- of where the

10   people who prescribe pain medications

11   read, yes.

12         Q.    And that was because you

13   would be able to oversee publications and

14   assist getting those publications or get

15   articles published in those journals?

16         A.    Those would be journals

17   where -- where our clinical studies we

18   would submit to see if we could get those

19   published.

20         Q.    And that would be

21   company-sponsored clinical studies as

22   well as investigator studies?

23         A.    So the

24   investigator-initiated studies, when I

Highly Confidential - Subject to Further Confidentiality Review

1   was involved in that, we would reach out

2   to them and ask them where they would

3   like to publish their work.  The

4   company-sponsored studies, we wanted to

5   make sure that we were having our studies

6   published in some of the top tier

7   journals where the most people who get --

8   who are involved in pain management would

9   be reading those.  This is an idea of

10  seeing where do people tend to publish.

11       Q.    And would you be writing

12  those articles yourself, would you get

13  medical writers involved or would some of

14  the authors on the study be actually

15  writing the article?

16       A.    So I wrote some of the

17  articles.  I would co-write with some of

18  the other authors on the articles, and

19  some of the articles that perhaps would

20  be written by medical writers.  We would

21  be involved in organizing the data.

22  Instructing what should be put in there.

23  How it would be done.  And then working

24  through with them until the article was

Highly Confidential - Subject to Further Confidentiality Review

1    published so...

2         Q.    And would you have a list of

3    subject areas where you would like

4    articles to be written?

5         A.    Well, for the clinical trial

6    data from the primary studies, we would

7    just publish the studies.  If there were

8    other areas of interest that we wanted to

9    reach out then we would come up with

10   that.  That would be part of our

11   publication plan, yes.

12        Q.    And did you have a budget

13   for that publication plan?

14        A.    There was a budget.

15        Q.    And who would develop that

16   budget?

17        A.    I don't know who developed

18   it.  I was told about how much money I

19   had to spend.

20        Q.    Okay.  And then that -- then

21   you would follow that budget?

22        A.    Yes.

23        Q.    Do you know if marketing was

24   involved in that budget?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    The decisions for where the

2  publications would go would have been

3  done through U.S. medical affairs.  And I

4  don't know -- I don't know.

5    Q.    Okay.  If you look at the

6  individuals that are on this first

7  e-mail, were they all in your department

8  or what department was Karen in or Donna

9  or Surya?

10    A.    So Surya was in my

11  department.  I don't know who Karen K. is

12  anymore.  I don't recall.  And Donna

13  Haura, I forget where she is.

14    Q.    Was she in your department

15  do you know?

16    A.    I don't think so.  But I

17  don't remember where she was.

18    Q.    Do you have any recollection

19  of -- if you take a look at the second

20  page at the very bottom.  I'm looking at

21  644.  It says, "From the list" -- very

22  last sentence, "From the list by far the

23  most articles were printed in the

24  'Journal of Pain and Symptom Management'

Highly Confidential - Subject to Further Confidentiality Review

1    with a total of 118 references."

2             Do you see that?

3        A.   Mm-hmm, mm-hmm.

4        Q.   Do you recall that journal?

5        A.   Yes.

6        Q.   And do you know who

7    published that journal?

8        A.   I don't recall.

9        Q.   Have you ever been published

10   in that journal?

11       A.   I have.

12       Q.   We can put that one away.

13            Mark as Exhibit 6.

14   JAN-MS-02267733 through -- that might --

15   oh, and it's -- what's attached is a

16   native which is JAN-MS-02267734, with --

17   which is a five-page -- looks like a

18   PowerPoint.

19            (Document marked for

20        identification as Exhibit

21        Janssen-Vorsanger-6.)

22   BY MS. CONROY:

23       Q.    The top is an e-mail dated

24   July 21, 2011, to Charles Oh and yourself

Highly Confidential - Subject to Further Confidentiality Review

1   from Myoung Kim.  Do you see that?

2        A.    Yes.

3        Q.    And the -- attached are some

4   Nucynta BP slides.  Do you see that?

5        A.    Oh yeah.

6        Q.    What is a BP?

7        A.    This is from --

8        Q.    What department was Myoung

9   Kim in?

10       A.    So Myoung Kim was in

11  outcomes research.  But she then moved

12  over to be a therapeutic area leader for

13  analgesia.  And Charles Oh and I reported

14  into her.

15       Q.    Okay.  So she --

16       A.    She was in medical affairs

17  at this point.

18       Q.    Okay.  And you reported to

19  her?

20       A.    Correct.

21       Q.    Oh I see.  Actually we have

22  her title right there.

23             Now this has a 2012 business

24  plan for Nucynta and Nucynta ER.

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      ER is extended release?

3      A.      Correct.

4      Q.      And would you have been

5  involved in the drafting of this business

6  plan or the oversight?

7      A.      I would have provided some

8  information on what we had heard from

9  prescribers about the types of

10  information that they were deemed --

11  deemed to be scientific and medical

12  information that would be important for

13  the product.

14      Q.      Okay.  And some of those --

15  or let me ask you.  The first block here

16  says, "Establish Nucynta as new standard

17  in moderate/severe pain management."

18              Do you see that?

19      A.      Yes.

20      Q.      And that was a strategic

21  imperative for the business, correct?

22      A.      Some of this -- yes.  But

23  this may have been what people would like

24  to have, yes.  Some of these would be

Highly Confidential - Subject to Further Confidentiality Review

1    aspirational.

2         Q.    Okay.

3         A.    Yeah.

4         Q.    And so if this was an

5    aspirational imperative, one of the ways

6    to get there would be the strategic

7    drivers, right?  Do you see that on the

8    side?

9         A.    Yeah, that would be

10   important, yes.

11        Q.    Okay.  And to -- in order to

12   establish Nucynta as a new standard in

13   moderate to severe pain management, you

14   would want to, "Leverage significant SOV

15   to accelerate penetration/productivity

16   with target healthcare professionals and

17   sites of care (institutions and long-term

18   care facilities)."

19             Do you see that?

20        A.    Yes.

21        Q.    And what does SOV mean?

22        A.    Share of voice.

23        Q.    So you would want to have at

24   least as much presence in publications as

1    your competitors to be able to leverage

2    penetration and productivity with respect

3    to healthcare professionals and sites of

4    care, correct?

5            MR. LIFLAND:  Object to the

6        form of the question.

7            THE WITNESS:  We would want

8        to have appropriate information

9        published and be available to

10       individuals who were treating

11       patients to be able to be

12       knowledgeable enough about the

13       safety and efficacy of the

14       compound, to make and to use for

15       appropriate use in patients.

16   BY MS. CONROY:

17       Q.    And it would be important to

18   get that information published so it got

19   out to target HCPs and sites of care,

20   correct?

21       A.    Yes.

22       Q.    So one method, one driver

23   would be publications, correct?

24       A.    One method would be to make

1    sure that the available clinical data and

2    studies were available for these

3    individuals to review and make the

4    decisions about whether our products

5    would be appropriate for their patients.

6         Q.    Right.  And one of the

7    strategic drivers would be such

8    publications?

9         A.    Ensuring that we have

10   publications.

11        Q.    And then another driver

12   would be to, "Grow brand awareness

13   through print and online media."

14             So that would be electronic

15   publications as well, correct?

16        A.    Presumably.

17        Q.    Third driver is,

18   "Competitively differentiate versus

19   current standard of care (oxy)."

20             What's that getting at?

21        A.    To provide information --

22   again, we wanted to make sure that our

23   products were used for appropriate

24   patients who use as prescribed.  And to

1    provide information to understand where

2    the products may be similar and where the

3    products may be different, so that

4    healthcare providers could make informed

5    choices as to which drugs to use for

6    their patients.

7         Q.    But you were looking -- one

8    of the drivers would be to differentiate

9    yourself from oxy, correct?

10        A.    Well, the differentiation

11   would be to show the attributes of both

12   compounds to be able to have

13   non-prescribers understand why you would

14   choose one compound over another

15   compound.

16        Q.    And would one attribute be

17   potentially less abuse risk?

18        A.    Abuse was not something that

19   was discussed in a promotional venue.

20        Q.    Why is that?

21        A.    Because the level of

22   evidence, the types of studies that the

23   company had that discussed about abuse

24   were not sufficient to be used in

1   promotional materials according to FDA

2   standards.

3          Q.    So it would be wrong to

4   discuss abuse propensity or abuse rates

5   or any -- any type of differentiation

6   between products with respect to abuse?

7               MR. LIFLAND:  Object to the

8          form of the question.

9               THE WITNESS:  Could you

10         rephrase?  I'm not sure I

11         understand your question.

12  BY MS. CONROY:

13         Q.    Sure.  You said because --

14  you said abuse was not something that was

15  discussed in a promotional venue?

16         A.    Proactively, yes.

17         Q.    Proactively.  What does that

18  mean, proactively?

19         A.    If a question came up, the

20  sales force -- then the sales force

21  would -- the company standard was that

22  the sales force were instructed to refer

23  those questions to the medical

24  information group.  And the medical

Highly Confidential - Subject to Further Confidentiality Review

¹ information group is a group of mostly

² pharmacists and PharmDs and there would

³ be company-approved letters that could be

⁴ used.

⁵          Q.    With respect to abuse?

⁶          A.    Yes.

⁷          Q.    Okay.  But in the -- in the

⁸ promotional venue, you could not discuss

⁹ abuse because you didn't have the

¹⁰ level -- you didn't -- you say because

¹¹ the level of evidence of the types of

¹² studies that the company had that

¹³ discussed about abuse were not sufficient

¹⁴ to be used in promotional materials,

¹⁵ according to the FDA.

¹⁶          A.    Correct.  The materials that

¹⁷ described abuse were from the RADARS

¹⁸ publications and from the Inflexxion

¹⁹ publications.

²⁰          Q.    And those were not

²¹ sufficient -- the RADARS and the

²² Inflexxion publications were not

²³ sufficient according to the FDA to use in

²⁴ promotional materials with respect to

1    abuse, correct?

2         A.    That would -- that was the

3    company's thinking.

4         Q.    And so if someone did that

5    from Johnson & Johnson, Janssen, with

6    respect to Duragesic or Nucynta, that

7    would be wrong?

8              MR. LIFLAND:  Object to the

9         form of the question.

10             THE WITNESS:  We would need

11        to understand a venue and what it

12        happened and how and what the

13        nature of the conversation.  I'm

14        not able to address it in a

15        blanket statement.  I would need

16        to understand the circumstances.

17   BY MS. CONROY:

18        Q.    Well, the circumstances

19   would be using RADARS or Inflexxion data

20   in a promotional venue.

21        A.    The materials that were

22   prepared by the company for promotional

23   use did not have either RADARS or

24   Inflexxion data in those materials.

Highly Confidential - Subject to Further Confidentiality Review

1   Those are the approved materials that

2   Janssen created, did not have those data

3   in there.

4        Q.    And so if that data was

5   used, it would be in violation of the FDA

6   standards?

7        A.    I would need to understand a

8   little bit more on the circumstances

9   under how they were used.  But there were

10  not company -- they were not included in

11  company-approved materials.

12       Q.    What more would you need to

13  know?

14       A.    You said if they were used,

15  I would understand -- how were they used?

16  Under what circumstances were they used?

17       Q.    If -- if a sales

18  representative was using the data from

19  Inflexxion or RADARS in a promotional

20  venue, would that be --

21       A.    How would -- how would that

22  happen, Counselor?

23       Q.    I'm sorry?

24       A.    How would that -- how would

Highly Confidential - Subject to Further Confidentiality Review

1    that happen?  They would not be using

2    approved materials.  I'm trying to

3    envision what it would look like.

4         Q.    So that could never happen?

5         A.    It would not be a

6    company-approved or a company-condoned

7    activity.

8         Q.    And if a sales

9    representative did say something in a

10   promotional venue about Inflexxion or

11   RADARS data, that would be a violation of

12   the FDA standards?

13             MR. LIFLAND:  Object to the

14        form of the question.

15             THE WITNESS:  I would need

16        to understand the circumstances

17        under which that happened.

18   BY MS. CONROY:

19        Q.    Under what circumstances --

20        A.    Well, if a sales

21   representative, for example, said, "The

22   company monitors abuse using these two

23   systems," there's nothing wrong with

24   that.  They are not talking about data.

Highly Confidential - Subject to Further Confidentiality Review

1    So I would need to understand the nature

2    of the conversation that took place

3    between the healthcare provider and the

4    sales representative to be able to answer

5    that question.  I can't give you a

6    blanket answer.  I would need to

7    understand the circumstances under which

8    that took place.

9         Q.    Is that the answer that you

10   would give to a sales rep if they asked

11   that question?  If a sales rep said to

12   you, "Is it okay for me to use data from

13   RADARS and Inflexxion when I'm in a

14   promotional venue?" would you say, "I

15   need to understand exactly what you were

16   saying"?

17        A.    No.  The sales rep -- the

18   sales rep were trained on using approved

19   materials.  So that question should not

20   have come up.  If you're a salesperson,

21   you say, "Here are the company-approved

22   materials.  This is what you're going to

23   use to sell the product."

24        Q.    And if a sales

1    representative goes outside of the

2    approved sales materials, that's a

3    violation of the FDA standards, correct?

4              MR. LIFLAND:  Object to the

5         form of the question.

6              THE WITNESS:  If the -- if

7         the sales representative uses

8         non-company-approved materials.

9         And it's not a -- it's not a

10        behavior that's approved by the

11        company.

12   BY MS. CONROY:

13        Q.   Or by the FDA?

14        A.   I would have to find out

15   specifically what -- yes.

16        Q.   And Inflexxion and RADARS

17   data were not approved company materials

18   that could be used for promotion,

19   correct?

20        A.   The data -- the data that

21   were contained from those were not part

22   of the promotional materials that the

23   company used.

24        Q.   Could you competitively

Highly Confidential - Subject to Further Confidentiality Review

1    differentiate Duragesic or Nucynta from

2    oxy based on addiction rates?

3          A.    Not by the data that we used

4    in a promotional venue.

5          Q.    Were you able to use any of

6    the Fishbain or Cochrane analysis data

7    for promotional materials?

8          A.    I'd have to go back and look

9    at the promotional materials at the time

10   to see.

11         Q.    You don't recall?

12         A.    I don't recall that those

13   would have been studies that would have

14   been part of it.

15         Q.    Do you know if any of the

16   data from any of the clinical trials that

17   were performed as -- that became part of

18   the Cochrane analysis for Fishbain's

19   article were ever submitted to the FDA?

20         A.    I don't know.

21         Q.    Is that anything that you've

22   ever looked at?  Do you think you ever

23   knew that?

24         A.    Well, the two articles that

Highly Confidential - Subject to Further Confidentiality Review

1    I referenced would have been later on.

2    We talked about those as being later on.

3    2010, 2013.  So that would have been

4    after the time that I might have been --

5    well, I would have been out of

6    promotional review committee.  No.  Up

7    until '15 I don't remember seeing those

8    articles.  That doesn't mean they weren't

9    used.  I just don't remember.

10          Q.    Okay.  And a separate

11   question.  Do you recall when you looked

12   at those articles whether -- and the

13   analysis, whether or not any of the

14   clinical trials used in those articles

15   had been -- had been submitted to the

16   FDA?

17          A.    So those studies I've looked

18   at more recently.  I don't recall seeing

19   them earlier.  So I can't comment.  I

20   don't know.

21          Q.    You don't have a memory as

22   you sit here today of those two -- the

23   article and the analysis coming through

24   the promotional review board?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't have a memory of

2  that.

3    Q.    The next strategic driver

4  is, "Execute leading edge on label,

5  peer-to-peer education options to

6  complement personal promotion."

7         Do you see that?

8    A.    I do.

9    Q.    What does that mean?

10    A.    I'm not sure.

11    Q.    Peer-to-peer education would

12  be what you described to me before,

13  peer-to-peer between medical or

14  scientific-credentialed individuals at

15  the company with like individuals outside

16  the company?

17    A.    Yes.

18    Q.    What's personal promotion?

19    A.    That's what I'm not sure of.

20    Q.    And the last one on this one

21  is, "Deploy differential resourcing to

22  drive local market opportunities."

23         Do you see that?

24    A.    Yes.

1    Q.    Do you know what

2  differential resourcing is?

3         A.    I do not.

4         Q.    Do you know who would know

5  that?  What -- what department at Janssen

6  would know the answer to that?

7         A.    I'm not sure.

8         Q.    So are these marketing

9  terms?

10        A.    Yeah, I'm not sure.

11        Q.    It -- it says it's the

12  tapentadol market strategy.  So would --

13  would it be a fair assumption to assume

14  that someone in marketing would

15  understand what was here?

16        A.    I guess so.  I don't know.

17  These are not terms that I'm -- that I'm

18  familiar with.

19        Q.    Then the next strategic

20  imperative is to "drive broad and

21  competitive access and availability."

22             Do you see that?

23        A.    I do.

24        Q.    That's access and

Highly Confidential - Subject to Further Confidentiality Review

1  availability of tapentadol or Nucynta,

2  correct?

3        A.    Yes.

4        Q.    And so that -- that's to be

5  sure that if a patient has a prescription

6  for Nucynta, that they are able to fill

7  it, correct?

8        A.    Right.

9        Q.    And then under the strategic

10  drivers, it says, "Secure T2 formulary

11  access in targeted commercial and Part D

12  accounts."

13              Do you see that?

14        A.    I do.

15        Q.    T2 is Tier 2, correct?

16        A.    I believe so.  These are

17  marketing activities, so it -- I would

18  refer a lot of these to someone from the

19  marketing group who could probably

20  explain these better than I can as a

21  medical person.

22        Q.    Okay.  Do you have a general

23  understanding of the tiers in formulary

24  access?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I do not.

2          Q.     Okay.  Do you understand

3    Part D Medicare?

4          A.     No, I don't.

5          Q.     Not many people do, so...

6                 Next one is "accelerate

7    regional pull-through of national

8    formularies."

9                 Are you familiar with

10   national formularies?

11         A.     I -- yeah, no these are --

12   it's -- it's not an area -- I know what a

13   formulary is, but I don't know the

14   context as it's written here.

15         Q.     Okay.  The next one,

16   "Patient saving programs."  Do you know

17   anything about those?

18         A.     Those would be marketing

19   activities.

20         Q.     "Stocking and formulary

21   access"?

22         A.     Same.

23         Q.     "Ensure widespread pharmacy

24   stocking of all dose strengths"?

1        A.     Marketing related

2     activities.

3        Q.     Okay.   The next strategic

4     imperative is "demonstrate industry

5     leadership in advocacy for healthcare

6     providers and patient access."

7             Do you see that?

8        A.     Yes.

9        Q.     And would this be

10    organizations such as American Academy of

11    Pain Management, American Academy of

12    Pain -- what's the other one?   Management

13    and maintenance or -- pain medicine,

14    those types of organizations?

15       A.     I'm not exactly sure what

16    this is meant by.   I don't know if this

17    is advocacy just on the company, or

18    advocacy, working with advocacy groups.

19             The -- the third bullet I

20    think -- it just says, "Collaborate with

21    key patient advocacy organizations to

22    advance awareness of the undertreatment

23    of pain."

24             I -- I don't know exactly

Highly Confidential - Subject to Further Confidentiality Review

1    what advocacy means in this reference.

2         Q.    Are you familiar with any of

3    the key patient advocacy organizations?

4         A.    I had some familiarity when

5    I worked with them years ago, but I don't

6    remember what they did and our

7    interaction with them today.

8         Q.    Do you recall Partners

9    Against Pain?

10        A.    I heard the term, but I

11   don't remember the -- I don't remember in

12   what context.

13        Q.    Was that anything, even if

14   you don't remember the actual groups

15   today, was that anything that you would

16   have had involvement in, in your

17   day-to-day responsibilities?

18        A.    Not directly.  If there were

19   materials that went for promotional

20   review, I might have seen it.  But

21   otherwise I -- I just simply don't

22   recall.

23        Q.    Okay.  The last one there is

24   "influence development of quality

Highly Confidential - Subject to Further Confidentiality Review

1    measures in pain."

2              Is that pain scales and the

3    like?

4         A.    Equality measures we talked

5    a little bit about earlier, the types of

6    things that would be important to

7    patients and healthcare providers as

8    measurements that would be used as a

9    broadbase.  So that we -- there was a

10   uniform agreement for example, that

11   everybody would use pain measures or

12   other types of -- you know, identifying

13   and soliciting adverse events and other

14   types of quality measures that were being

15   put, ensuring good levels for pain

16   control, et cetera.

17        Q.    Okay.

18              The second bullet point.  Do

19   you know what an HPAD or SGA is?  Where

20   it says, "Develop national pain policy

21   platform to align local efforts of HPAD

22   and SGA"?

23        A.    I don't -- I don't know what

24   the terms are today.  I don't recall what

1    they might have stood for.

2         Q.    Okay.  And then the fourth

3    strategic imperative is, "Strengthen

4    differentiation and value through new and

5    compelling evidence."

6              Do you see that?

7         A.    I do.

8         Q.    Differentiation is how

9    Nucynta differs from its competitors,

10   correct?

11        A.    Yes.

12        Q.    Then the bullets here are,

13   "Generate new data for superior

14   effectiveness."

15             Do you see that?

16        A.    Yes.

17        Q.    That would be a clinical

18   study?

19        A.    Yes.

20        Q.    And it would have to be,

21   correct, in order to use that in a

22   promotional venue?

23        A.    Yes.

24        Q.    And it would need -- that

Highly Confidential - Subject to Further Confidentiality Review

1    data would need to go to the FDA?

2         A.    In order to be used

3    promotionally, it would have to fit the

4    FDA criteria.

5         Q.    Okay.  And in order to

6    differentiate between one drug, between a

7    competitor, and Nucynta, the clinical

8    study would need to be a head-to-head

9    study, correct?

10        A.    In order for it to have an

11   adequate level of evidence it would have

12   to be a study that would comport with an

13   FDA requirement for that specific area.

14        Q.    Okay.  So if you wanted to

15   say Nucynta was more effective in pain

16   relief than OxyContin for example, the

17   clinical study would have to measure both

18   of those?

19        A.    Both of those would have to

20   be active comparators in the --

21        Q.    In the --

22        A.    In the clinical trial.

23        Q.    In the study?

24        A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    "Filling data gaps, label

2    enhancement."

3              What does that mean?

4    A.    I think to ensure that the

5    label has the most up-to-date information

6    about the products.  Those would be based

7    on -- in conversations with the FDA, to

8    ensure that -- that that data as

9    appropriate would be available at least

10   for discussion to see if it could be put

11   in the label.

12   Q.    And that would, and we

13   talked about this earlier this morning,

14   that would also include safety

15   information or any concerns about the

16   drug, correct?

17   A.    If FDA had warranted and

18   decided that that would be appropriate

19   for dissemination to healthcare

20   providers, yes.

21   Q.    But as we -- as we spoke

22   this morning, there is nothing to prevent

23   J&J from bringing safety concerns to the

24   FDA?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Absolutely.

2     Q.     "Lower abuse potential."  Do

3  you see that?

4     A.     I do.

5     Q.     Was there an effort to find

6  new and compelling evidence with respect

7  to lower abuse potential?

8     A.     Some of this may refer to

9  looking at the abuse deterrent

10 formulations that we might be talking

11 about as one.

12    Q.     Did Nucynta ever receive an

13 abuse deterrent formulation indication

14 from the FDA?

15    A.     No.  We had -- the Nucynta

16 ER has an abuse deterrent system, but

17 the -- the types of studies that were

18 needed to be done to be able to do that

19 were studies that were not clear.

20           I had gone to FDA to ask the

21 question of what types of studies would

22 need to be done.

23           Now our data from a variety

24 of sources, including our own

Highly Confidential - Subject to Further Confidentiality Review

1   pharmacovigilance data and data from

2   RADARS and others, showed low mentions of

3   abuse in our immediate release

4   formulation.

5            So with the extended-release

6   formulation, in order to be able to show

7   a reduction in abuse was challenging

8   because the amount of abuse that we had

9   seen in the immediate release was low.

10  So if you're asking to put a formulation

11  in place to reduce it on an already low

12  level of abuse becomes challenging.  So

13  when that question -- we raised that

14  question with FDA and FDA said we need to

15  think more about that.

16       Q.    So at least as of 2012,

17  lower abuse potential, even though you

18  were seeing dose -- very low levels in

19  the RADARS and maybe even the Inflexxion

20  data, that could not be used for

21  promotion?

22       A.    Correct.  But it would be

23  used if a -- if a healthcare provider

24  wanted the information on abuse, that

1   type of information, there -- there was a

2   company-approved letter.  So that maybe

3   the information might have been

4   disseminated in those letters.

5          But I'd need to see those

6   letters to see what type of information

7   was actually contained.

8       Q.    And the healthcare

9   professional would need to -- to ask and

10  then the letter would come from J&J,

11  correct?

12      A.    It would come from the

13  medical information group at J&J.  But

14  the -- the card would have been -- so the

15  sales representative wouldn't have

16  fielded the question.  It would have sent

17  the card into the company and in response

18  to that request, the company would have

19  provided a letter, yes.

20      Q.    Okay.  "MOA

21  differentiation."

22          What does that mean?

23      A.    MOA I'm -- here, I'm

24  assuming, is mechanism of action.

Highly Confidential - Subject to Further Confidentiality Review

1     Q.    And is that the discussion

2    between the -- the dual mechanism of

3    action that was available with Nucynta?

4          A.    That -- the -- based on

5    animal studies?

6          Q.    Correct.

7          A.    That the -- in the product

8    label, they talk about dual mechanism of

9    action.  And that that dual mechanism of

10   action would be different from the -- the

11   opioid analgesia as described on some of

12   the other opioids.

13         Q.    And the hypotheses was that

14   the dual mechanism of action would

15   potentially lower the abuse potential?

16         A.    The hypothesis is that the

17   dual mechanism -- the hypothesis was that

18   the dual mechanism of action was such

19   that the analgesia was given both from

20   the norepinephrine reuptake inhibitory

21   properties as well as from the opioid

22   receptor properties.

23         Q.    And the -- the upshot of

24   that is there would be potentially less

1    euphoria, and consequently less abuse

2    potential?

3            A.    The hypothesis was that that

4    might be a reason.

5            Q.    Okay.  That was never

6    proven, correct?

7            A.    It wasn't proven, but we did

8    it here in the early days when the

9    immediate release formulation first came

10   to market, that we had reports from

11   healthcare providers that they initially

12   thought that the product didn't work and

13   when we went back and had them check pain

14   scores, the patients were experiencing a

15   reduction in pain intensity, but they

16   didn't experience some of the euphoria.

17   So those were some of the earlier things

18   that we had heard about in the immediate

19   release formulation.

20           Q.    Was it expected that

21   patients in an extended-release -- let me

22   ask you this.  Did the extended-release

23   have the dual mechanism of action?

24           A.    Yes.  So the

1    extended-release was the same compound.

2    It was tapentadol, but it was put in this

3    formulation that it would slow the

4    release.  That's why it was

5    extended-release.

6            Q.    But it was still a dual

7    mechanism?

8            A.    Yes.  Believed to be, based

9    on animal studies, correct.

10           Q.    Is Duragesic a dual

11   mechanism?

12           A.    It is not.  Duragesic is --

13   provides analgesia.  It's believed to

14   provide analgesia mostly from the

15   opioid -- from its primary -- its opioid,

16   direct opioid effect.

17           Q.    And were there reports of

18   euphoria with Duragesic versus less

19   euphoria with the immediate release

20   Nucynta?

21           A.    So, I don't have comparator

22   statement.  I didn't hear that one drug

23   had more euphoria than another one.  We

24   just heard from the field anecdotally

Highly Confidential - Subject to Further Confidentiality Review

1    that there were patients that reported

2    receiving less euphoria.

3              I'd like to take a break.

4         Q.    Let me just -- we can finish

5    this document if you've got two minutes?

6         A.    Okay.

7         Q.    Okay.  The mechanism of

8    action differentiation, that was not

9    something that could be promoted,

10   correct?

11        A.    The mechanism of action was

12   something that if people wanted specific

13   information on it, they would write --

14   they would have to go through the process

15   that I already described through medical

16   information.

17        Q.    If they went through that

18   process, was it -- was it all right for

19   Johnson & Johnson to respond that the

20   mechanism of action, that there was a

21   hypothesis that that would lower abuse

22   potential?

23        A.    I don't believe that was in

24   the letter.  I would have to look at the

Highly Confidential - Subject to Further Confidentiality Review

1    letter to comment on that, Counsel.

2         Q.    Okay.

3         A.    But there was a potential

4    hypothesis.  Again, that hypothesis was

5    not used as far as I know in promotional

6    interactions.

7              MS. CONROY:  Let's take a

8         break.

9              THE VIDEOGRAPHER:  Stand by,

10        please.  Remove your microphones.

11        The time is 3:05 p.m.  Off the

12        record.

13             (Short break.)

14             THE VIDEOGRAPHER:  We are

15        back on the record.  The time is

16        3:24 p.m.

17   BY MS. CONROY:

18        Q.    Doctor, the document you

19   have in front of you, you see that the

20   last strategic imperative has some red

21   outline around the top where it says,

22   "Strengthen differentiation and value

23   through new and compelling evidence"?

24        A.    Yes.

1    Q.    Do you see that?

2          And if you turn the page to

3    the next, Page 3 of the -- it's probably

4    a PowerPoint.  You'll see that that's

5    across the top, "Strengthen

6    differentiation and value through new and

7    compelling evidence."

8          Do you see that?

9    A.    Yes.

10   Q.    And then above that it says,

11   "MA and HECOR strategic drivers and

12   proposed studies."

13         Do you see that?

14   A.    Yes.

15   Q.    Is MA medical affairs?

16   A.    Yes.

17   Q.    And what is HECOR?

18   A.    It's health economics and I

19   don't remember what it is.  This would

20   have been another name for the outcomes

21   research group.

22   Q.    Okay.  So these are the --

23   these are the areas you would know

24   something about, correct?

Highly Confidential - Subject to Further Confidenfiality Review

1        A.    Yes.  This would be work

2   that would be done by either the medical

3   affairs group or the outcomes research

4   group, yes.

5        Q.    Okay.  So the strategic

6   driver of superior effectiveness, that

7   Nucynta worked better than other opioids,

8   the primary audience for that would be a

9   physician, do you see that?

10       A.    Yes.

11       Q.    And then the proposed study

12  was a superiority trial of

13  immediate-release Nucynta versus

14  OxyContin in osteoarthritis or lower back

15  pain.  Do you see that?

16       A.    Yes.

17       Q.    Do you know if that trial

18  was done?

19       A.    I don't believe the study

20  was done.  I don't believe that we had

21  conducted a superiority trial.  But it

22  was certainly proposed.

23       Q.    Okay.  Do you know why it

24  was not done?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't remember.

2    Q.    Do you know if it was

3    started?

4    A.    I don't think so.  But I'm

5    not sure.  But I don't think so.

6    Q.    Where would records be with

7    respect to whether or not that study was

8    started?

9    A.    It would be in the --

10   certainly would have been in the medical

11   affairs files.

12   Q.    Okay.

13   A.    But this would have been a

14   study that I might have been involved in

15   conducting and I don't recall us doing

16   that type of a study.

17   Q.    Okay.  The next one is the

18   "filling the data gaps, label

19   enhancement."  We talked a bit about that

20   a few minutes ago.

21   A.    Yes.

22   Q.    That audience would likewise

23   be a physician?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    You agree with that?

2    A.    Yes.

3    Q.    What's a switching trial?

4    A.    A switching trial would have

5    been on a patient being treated with one

6    opioid pain medication and switching to

7    another one.

8    Q.    And what's a high dose

9    trial?

10    A.    That would be looking at

11    potentially higher doses in patients

12    above what would be on the product label,

13    but those would require well-controlled

14    studies submitted to FDA.  And in

15    parentheses, PRD means that those studies

16    would have been done by our research and

17    development group, not the medical

18    affairs group.

19    Q.    Okay.  That's because they

20    would potentially be off-label?

21    A.    No.  It would be because

22    studies that were used for product

23    approval would be -- initial approval

24    would be done by -- at Janssen would be

Highly Confidential - Subject to Further Confidentiality Review

1   done at the R&D group.  We talked earlier

2   that medical affairs was responsible --

3   responsible for postapproval studies, and

4   since this would have been for a label

5   change with a new dose, this would have

6   been data submitted to FDA, and the

7   studies would have been done through that

8   group.

9          Q.    Okay.  Was the switching

10  trial ever done?

11         A.    The patients would have been

12  on one drug and switched over to another

13  one.  May -- it could have been whatever

14  the company was thinking about at the

15  time.  It could have been OxyContin to

16  Nucynta.  It could have been OxyContin to

17  Nucynta and then another arm Nucynta to

18  OxyContin, a variety of different

19  studies.  But you would switch from one

20  drug to another.

21         Q.    Do you know if that

22  switching trial was ever done?

23         A.    I don't think so, but I'm

24  not sure.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Do you know if -- do

2  you know if R&D ever did the high dose

3  trial?

4    A.    No.  I don't think so.

5  Given that the highest doses are still

6  the same as in the package insert that

7  they were at product approval, they were

8  not -- we didn't have a study with new

9  data that would have informed the package

10  insert.

11    Q.    Okay.  The strategic driver

12  of lower abuse potential, that audience

13  would be both the payer and the

14  physician.

15        Do you see that?

16    A.    Yes.

17    Q.    The first bullet point is,

18  "The Nucynta abuse potential (NAP) task

19  force 2011 to map out the master plan."

20        Was there a Nucynta abuse

21  potential task force?

22    A.    Not that I recall.

23    Q.    Do you know if there was

24  ever an abuse potential trial comparing

Highly Confidential - Subject to Further Confidentiality Review

1    Nucynta ER versus OxyContin?  Do you know

2    if that was ever conducted?

3          A.    No, not that I'm aware of

4    postapproval.

5          Q.    Would you be the person that

6    would be aware if that was done?

7          A.    I would have heard about it.

8          Q.    Okay.  Do you know why that

9    was not done?

10         A.    No, I don't.

11         Q.    The drug likability trial

12   versus OxyContin.  Do you know if that

13   was done?

14         A.    I'm not sure if we had done

15   this, if the study was done with

16   comparing people who were used to abusing

17   those drugs.  There may have been a

18   study, but I'm not sure.

19         Q.    Drug likability is with

20   respect to whether addicts like to use a

21   particular drug over another --

22         A.    Yes.

23         Q.    -- for abuse?

24         A.    Yes.  There may have been

Highly Confidential - Subject to Further Confidentiality Review

1    such a study, but I don't -- I just don't

2    remember.

3            Q.    If there was, would you have

4    been involved in it?

5            A.    I might have heard about it,

6    yes.

7            Q.    I think this means to be

8    RADARS, right?

9            A.    It's a typo, yeah.

10           Q.    Okay.  And "NAVIPPRO and

11   other observational studies."

12                 Do you see that?

13           A.    Yes.

14           Q.    And RADARS is a surveillance

15   program?

16           A.    Yes, that's right.

17           Q.    And what is NAVIPPRO?

18           A.    It's also a surveillance

19   program.  It's conducted through a

20   company called Inflexxion.

21           Q.    Oh, that's the Inflexxion?

22           A.    Yes.

23           Q.    Okay.  And that data was

24   collected, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Do you know if that data was

3    in fact used and provided to the payer

4    and physician audience?

5    A.    It would have been

6    through -- I'm not sure if it was

7    provided to a payer audience or not.  It

8    might have been as part of the data that

9    we had for patients.

10    Q.    And you had explained to me

11    the letter, you know, if a physician were

12    to request information about abuse.  Were

13    there other ways that a physician or a

14    payer would learn of the results of

15    observational studies using RADARS and

16    Inflexxion data?

17    A.    Well, I had published -- I

18    had published a study of 31 months of

19    RADARS for the immediate release.  And so

20    if they went online and typed in RADARS,

21    they might have found it that way.

22    Q.    Could a sales -- could a

23    sales rep provide that published study to

24    a physician or to a payer?

1    A.    No.

2    Q.    They'd have to ask for it?

3    A.    Yes.

4    Q.    Could it be shown in a

5 continuing medical education arena?

6         A.    I don't remember whether it

7 was or not.  And I don't remember when

8 the rules had changed.  We talked about

9 that earlier, about when the company

10 wasn't able to provide that data.  So

11 before that I don't want to speculate.  I

12 don't know.

13         Q.    Okay.  "Research partnership

14 with payers, payer tools, et cetera."

15              That would be a partnership

16 with an insurance company or a large

17 managed care organization or something

18 like that with respect to lower abuse

19 potential?

20         A.    So that is highlighted in

21 blue.  And if you note, the footnote says

22 "HECOR studies" in light blue.  So I'm

23 not certain what the outcomes group was

24 planning on doing with that type of

Highly Confidential - Subject to Further Confidentiality Review

1    information or what the nature of what

2    those studies might look like.

3            Q.    Do you have any recollection

4    of whether something like that was done

5    using data from any -- using any payer

6    data?

7            A.    I don't recall.

8            Q.    Is it your understanding

9    that there is payer data with respect to

10   abuse or misuse or addiction or any --

11   any types of data points with payers?

12           A.    I'm not aware of any.

13           Q.    Are you familiar with any of

14   the FDA-mandated post-surveillance

15   studies that are being conducted with

16   respect to abuse or addiction currently?

17           A.    A little bit.  I was

18   involved in some of the early discussions

19   and then I transitioned off and other

20   people at the company took those over.

21   So I'm not current, and I don't know

22   where they had left it.

23           Q.    When you were involved, were

24   you familiar at all with what datasets

Highly Confidential - Subject to Further Confidentiality Review

1   would be used?

2        A.     No.  I just remember a

3   discussion about which drugs they were

4   considering.  But that's -- that's the

5   extent of what I recall.

6        Q.     Do you ever -- were you

7   familiar or did you ever hear what

8   patient populations might be used or

9   what, you know -- like a veterans data or

10  Department of Defense data or anything

11  like that, that would be used for those

12  studies?

13       A.     I don't recall.  As I said,

14  I was on and off in a fairly early stage

15  where a lot of discussion was still

16  going.  That was sort of very draft in

17  those days.

18       Q.     And then the Nucynta ER and

19  classwide REMS.

20              Do you see that?

21       A.     I do.

22       Q.     Did you have any involvement

23  in the REMS?

24       A.     I had some involvement in

Highly Confidential - Subject to Further Confidentiality Review

1    the REMS.  Some the -- the active

2    surveillance programs that I had

3    developed, those were rolled into the

4    REMS and some of the other activities as

5    well.

6         Q.    And what does REMS stand

7    for?

8         A.    Risk -- risk evaluation and

9    mitigation strategy.

10        Q.    Then the special population

11   and mechanism of action differentiation,

12   that audience would be the physician, and

13   again, you have in light blue, that's an

14   outcomes research proposed study --

15        A.    Yes.

16        Q.    -- for a prospective

17   registry of patients with cancer pain.

18             Do you see that?

19        A.    I do.

20        Q.    Any knowledge whether that

21   was done?

22        A.    I don't.

23        Q.    The mechanism of action

24   differentiation pilot trials, smoking

1    cessation trial, and the testosterone

2    trial, what is your understanding of what

3    those pilot trials were attempting to

4    study?

5            A.    I'm not familiar with the

6    smoking cessation trial, per se.  For the

7    testosterone trial there is clinical

8    information that patients on prolonged

9    chronic opioid use may have reduced

10   libido.  We talked about the proposed

11   dual mechanism, and because of less

12   effect potentially at the opioid

13   receptor, less opioid effect, that

14   hypothesis was that there may be a less

15   effect for patients on their libido if

16   they were using medications such as

17   tapentadol.  That was a hypothesis.

18            The other thing I just want

19   to point out as we're talking about this,

20   is on the bottom, that this is a draft.

21   So it's unclear -- we've already

22   indicated that these studies may not have

23   been either initiated or gone on.  But

24   these were some of the things that were

1    proposed.

2         Q.    The fact that this is a

3    draft, that doesn't change any of the

4    answers that you've given to me?

5         A.    No, it doesn't.  But whether

6    the studies actually moved forward or

7    not, these were what were being proposed.

8         Q.    Okay.

9         A.    Yes.

10        Q.    Do you know if the

11   testosterone trial went forward?

12        A.    Not that I'm aware of.

13        Q.    If something like that went

14   forward, do you know if there's any

15   reason why an audience would not be

16   payers as well as physicians?

17        A.    No, I don't.

18        Q.    Then --

19        A.    It says primary audience on

20   the side.  So certainly other audiences

21   were possible.

22        Q.    Okay.  And then the final

23   one is, "Lower real world resource

24   utilization."

1           Do you see that?

2      A.     Yes.

3      Q.     Do you know what that means?

4      A.     Not exactly.

5      Q.     Let's see, if we look at the

6   bullets, if it -- if it helps jog your

7   memory.  What does MRU mean?

8      A.     Medical research

9   utilization.

10      Q.     And that's medical research

11   utilization data collected from Phase IV

12   trials?

13      A.     Right.

14      Q.     Do you see that?  And the

15   intended audience would be a payer?

16      A.     Yes.

17      Q.     And what type of data would

18   assist a payer from Phase IV trials?

19      A.      If the patterns from the

20   data would show, for example, how many

21   pills that people actually take a day.

22   For people participating in the study,

23   did they need to take it?  For an

24   immediate release, if it's every four to

Highly Confidential - Subject to Further Confidentiality Review

1    six hours, was the drug being used more

2    at every six hours or every four hours.

3    For -- depending on the medical

4    conditions that they have, how those

5    drugs would be used.

6              In addition it might be,

7    what is the type of care that went along

8    with it.  You know, doctor visits, things

9    like that.  So that type of data.

10             Utilization within the

11   healthcare system, those are some of the

12   things with medical research utilization.

13        Q.    Could that take -- could

14   that -- what was it?  Medical -- medical

15   research utilization data, could that

16   tell you how many pills a patient was

17   prescribed, and then you could determine

18   how many they took a day?

19        A.    Depending how accurate the

20   pill counts were, whether the people

21   actually recorded the pill counts, and

22   sometimes patients don't always remember

23   what they take.  So it's -- the study

24   wasn't designed specifically to address

Highly Confidential - Subject to Further Confidentiality Review

1    pill counts, per se.  They may have been.

2    But the -- the data -- the quality would

3    be -- would depend.

4         Q.    So you'd be getting that

5    data from -- from whatever was provided

6    in the Phase IV trials.  You'd be --

7    you'd be looking back at those trials to

8    try to determine if you could tell how

9    many pills for example, a patient took a

10   day?

11        A.    Right.  But keep in mind

12   that the studies would have included

13   exclusion criteria.  So people with a

14   history of significant psychiatric

15   disorder, people with a history of drug

16   addiction, would not be usually able to

17   participate in those studies.

18             So if you wanted to have

19   issues on rates of addiction for people

20   who have a history of addiction or some

21   of the medical conditions that would

22   predispose to do addiction, those people

23   would have been usually excluded from the

24   trials to have a very homogenous

Highly Confidential - Subject to Further Confidentiality Review

1    population.  So there -- it might be

2    limited in terms of how much it could

3    inform you on addiction.

4            Q.    Is it your understanding

5    that Fishbain and Cochrane did not have

6    those exclusions?

7            A.    I'd have to look at those

8    articles and -- to talk more about it.

9            Q.    And then the next two have

10   the light blue.  "A retrospective data

11   analyses, such as claims, EMR, medical

12   charts, of real world BID dosing and

13   medical resource utilization."  That's

14   something that would have been something

15   done by outcomes research?

16           A.    Yes.

17           Q.    And that would have been,

18   looking back, when it says retrospective

19   data analyses, looking back at any data

20   that existed to try to put together a

21   study or some sort of retrospective

22   study?

23           A.    I don't know if I would say

24   any data.  They sort of give some

1   examples, I think, of places where they

2   were thinking about going, claims data,

3   EMR, or medical charts, real -- real

4   world dosing.

5        Q.   So this would have been

6   potentially looking back at medical

7   charts of individuals who were prescribed

8   opioids for chronic pain?

9        A.   Again, that's -- that's what

10  it looks like.  I don't know.

11       Q.   And would it be fair to say

12  that a payer may, in fact, have those

13  medical charts, correct?

14       A.   It depends on the payer.  It

15  depends on the type of information they

16  collect.  They may have it, but it may be

17  very limited just to their own system.

18  They may be interested in hearing what's

19  happening in other groups to make the

20  data more generalizable.

21       Q.   And then studies examining

22  patient, healthcare providers,

23  satisfaction and preference.  Would those

24  be surveys that would be taken?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Presumably.

2        Q.      If you look on Page 5,

3    building evidence for lower abuse

4    potential.  And that would be of Nucynta,

5    correct?

6                It would be for Nucynta,

7    correct?

8        A.      Yeah, I'm looking at the

9    slide.

10       Q.      Okay.

11       A.      Yes.

12       Q.      And the mechanism of action

13   here, that would provide the reason to

14   believe that lower abuse potential was a

15   possibility, correct?

16       A.      This was the hypothesis that

17   would be used, yes.

18       Q.      What's the purpose of a --

19   of a slide like this with the cogs in the

20   wheel here?

21       A.      I didn't prepare the slide,

22   so I'm not exactly sure.  I think what

23   they are trying to show is that in order

24   to put the evidence together, that the

Highly Confidential - Subject to Further Confidentiality Review

1  evidence would need to be starting off

2  with a hypothesis and to try and see how

3  plausible it would be, one would need to

4  conduct rigorous studies confirming the

5  low abuse potential.  Some of those would

6  be studies as set forth by the FDA that

7  would need to be done.

8          Coupled with actual data

9  from -- from people who have been treated

10  with the medication.  And as the slide

11  indicates, data on addiction and other

12  information about it as well, including

13  overdose, deaths and other information

14  that would be acquired from the

15  community.

16      Q.    Would that be actual data on

17  addiction, overdose and deaths of

18  individuals on the drug?

19      A.    Presumably, or it may be on

20  other medications for comparative.  Those

21  data can be complicated though, because

22  for overdose, sometimes patients are on a

23  number of different substances leading to

24  the overdose.

Highly Confidential - Subject to Further Confidentiality Review

1    But the person who created
2  this slide felt that they were going to
3  use a combination of rigorous clinical
4  studies as well as actual data on people.
5    Q.    Were the rigorous clinical
6  studies ever done?
7    A.    Not to the best of my
8  knowledge.  There are other studies that
9  were done, rigorous studies, for the
10  extended-release formulation, showing
11  that it is very difficult to break into
12  the extended-release protective
13  mechanisms, but -- certainly those were
14  rigorous, but again some of the -- I'm
15  not sure what other studies they are
16  talking about.  So I -- I don't know
17  whether -- I am not aware of other
18  studies being done.
19    Q.    So you don't know if there
20  were rigorous studies done with respect
21  for example, concerning likability?
22    A.    We did a likability study
23  early on looking at it.  But there may
24  have been studies, rigorous studies later

Highly Confidential - Subject to Further Confidentiality Review

1    on in 2012.  There was -- those were some

2    studies, data from that likability study,

3    abuse potential study.  I'm not sure, it

4    says interim in 2014.  I don't know when

5    that study -- I don't have information

6    from that study to inform us today.

7         Q.    Okay.  Do you know what in

8    red here on the actual data on addiction,

9    it says, "Not enough data until 2015 or

10   later"?

11             Do you know why that is?

12        A.    I don't.

13        Q.    You can put that away.

14             MS. CONROY:  We'll mark as

15             Exhibit 7, JAN-MS-02119672 through

16             9687.

17             (Document marked for

18             identification as Exhibit

19             Janssen-Vorsanger-7.)

20   BY MS. CONROY:

21        Q.    This is -- Exhibit 7 is an

22   e-mail dated September 16 of 2003, to you

23   from Mo Sacoor.  Who is Mo Sacoor?

24        A.    Mo Sacoor is someone who

1    worked with Dr. Nathaniel Katz to put

2    together our 2003 abuse advisory board.

3         Q.    Abuse advisory board?

4    That's the Ad Board?

5         A.    Yes.

6         Q.    Okay.  So it would be opioid

7    abuse advisory board.

8             Is Mo Sacoor a -- a medical

9    doctor?

10        A.    He is a medical doctor by

11   training, but he runs a company that puts

12   together advisory boards.

13        Q.    Okay.

14        A.    Or did at that time.

15        Q.    And Nat Paul Katz.  That's

16   Dr. Katz who you've published with?

17        A.    Yes, that's correct.  From

18   Dartmouth, Massachusetts.

19        Q.    And in 2003 was he a key

20   opinion leader for Janssen?

21        A.    I believe so.

22        Q.    Would he have been paid as a

23   key opinion leader or have a consultancy

24   agreement whereby he was paid?

Highly Confidential - Subject to Further Confidentiality Review

```
1             A.      He would have had a

2    consultancy agreement as part of these

3    activities.

4             Q.      Who is ACohen@MMS-USINC.com?

5             A.      I don't know.

6             Q.      And it looks like, if you

7    turn the page, the Sacoor Medical Group,

8    international pharmaceutical industry

9    consultants, Chairman Dr. Sacoor, drafted

10   a roadmap for the advisory board

11   prescription opioid abuse in chronic

12   pain.

13            Do you see that?

14            A.      Yes.

15            Q.      And he says, "This document

16   has been prepared on the basis of a

17   detailed telephone briefing by Dr. Gary

18   Vorsanger and my subsequent detailed

19   discussion with Dr. Nat Katz."

20            Do you see that?

21            A.      Yes.

22            Q.      And any reason to doubt

23   that?

24            A.      No.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    "It's intended to convey my

2    understanding of the background as well

3    as the Ad Board objectives and to outline

4    the approach recommended as discussed and

5    agreed with Dr. Katz as being the most

6    appropriate in fulfilling Janssen's

7    goals."

8              Do you see that?

9    A.    Yes.

10    Q.    Is that what Dr. Sacoor's

11    assignment would have been back in 2003,

12    late summer, early September?

13    A.    Yes.

14    Q.    And if you take a look on

15    Page 4 of 13.  And you're free to look.

16    There's a -- there's a -- the roadmap has

17    a table of contents, and then action

18    steps, timetables, and roles.

19              Do you see that?

20              And it says, "Janssen are

21    launching a new product which will follow

22    on the heels of Duragesic's"?

23    A.    I'm sorry.  Action steps,

24    timetables, yes, okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  "Janssen are

2    launching a new product which will follow

3    on the heels of Duragesic."

4             Do you see that in the first

5    sentence?

6    A.    Yes.

7    Q.    Which product is that?

8    A.    Janssen was considering a

9    second product that would be similar to

10    Duragesic, but have a medication -- an

11    opioid antagonist that would be a part of

12    this new system.

13    Q.    And it was part of a patch

14    system?

15    A.    It would have been a patch.

16    Q.    Okay.  And it would have

17    been different.  It would have been --

18    would you have termed it a reservoir

19    patch or a matrix patch, what would you

20    call it?

21    A.    I don't remember.  I think

22    it was a matrix patch with this.  But I

23    don't recall.

24    Q.    Okay.  And it was expected

1    that the new product would have lower

2    abuse potential.  Is that -- is that fair

3    to say, or that was the hope?

4         A.    We wanted to make sure that

5    that would be the case.

6         Q.    Okay.  At this time you did

7    not know if that would be the case,

8    correct?

9         A.    Right.  We thought that it

10   would be, we wanted to have

11   well-controlled studies to begin to

12   address that question.

13        Q.    It says, if you look further

14   in the middle of the page, "Janssen would

15   like to come up with several studies

16   that, taken as a package with the drug

17   liking study, would convince clinicians

18   that it does have a product with lower

19   abuse potential.  The dilemma is that

20   there really is not a lot of good

21   methodology that is widely accepted for

22   the studies that need to be done."

23             Do you agree with that?

24        A.    Yes.

1      Q.    "The studies we're talking

2   about" -- and I'm reading, going on

3   here -- "will not be a part of the new

4   drug application submission package."

5            Do you see that?

6      A.    Mm-hmm.

7      Q.    So these studies would not

8   be something that would be going to the

9   NDA as part of the approval process,

10  correct?

11     A.    That's what it says.

12     Q.    But -- I'm sorry.  "However,

13  the quality and rigor of the science

14  needs to be something that Janssen can

15  put in front of the FDA or any other

16  regulatory body at some point in time."

17           Do you see that?

18     A.    Yes.

19     Q.    Have you seen this document

20  recently?

21     A.    No, I have not.

22     Q.    If you go to Page 6, under B

23  at the bottom of the page, there is a

24  header that says, "Clinical trial to

Highly Confidential - Subject to Further Confidentiality Review

1    assess the rates of addiction in patients

2    being prescribed various opioids."

3              Do you see that?

4         A.    Yes.

5         Q.    And then it says, "A key

6    problem here is that nobody really knows

7    how to define addiction."

8              Do you see that?

9         A.    Yes.

10        Q.    And is that something that

11   you discussed with Dr. Sacoor and

12   Dr. Katz?

13        A.    Yes.

14        Q.    And why wasn't there a

15   definition of addiction at this time?

16        A.    I think there was -- there

17   was definitions of addiction, but not a

18   definition that everybody could agree on.

19        Q.    Did individuals at Janssen

20   agree on a definition?

21              Or let me ask it this way.

22              Who is it that didn't agree

23   on the definition?

24        A.    I don't know how to answer

Highly Confidential - Subject to Further Confidentiality Review

1   that question.  I don't know what

2   different people thought about it in

3   terms of the definition of addiction.

4          Q.    How did you know that there

5   was -- that there was an issue with the

6   definition of addiction?

7          A.    Because this meeting was

8   convened with key experts.  Dr. Nathaniel

9   Katz is an expert in this area, and it

10  was generally acknowledge that there's

11  not a -- there's not a good definition of

12  addiction.

13         We also talked about the

14  ACTTION group in that publication that

15  came out in 2013 a decade later.  And

16  even at that point there was still not a

17  good agreement on experts on the

18  definition of addiction.

19         Q.    And that would make it

20  difficult to determine the abuse

21  potential, correct?

22         A.    No.  It would be difficult

23  to define and measure addiction in a

24  clinical trial when we're unable to get a

Highly Confidential - Subject to Further Confidentiality Review

1    specific agreement among people on what

2    addiction would be, unless we can come up

3    with a definition that people were

4    willing to accept for purposes of the

5    discussion.  But Dr. Sacoor identified

6    the challenge here.

7           Q.    You were comfortable with

8    Dr. Fishbain's and the Cochrane analyses'

9    definition of addiction, at least as of

10   whenever those studies came out in 2010

11   to 2013?

12          A.    I was comfortable with the

13   discussion that they put in.

14          Q.    And was there general

15   acceptance of their definition of

16   addiction?

17          A.    The articles that I

18   referenced earlier were considerably

19   later than when this advisory board took

20   place.

21          Q.    I was referencing when you

22   said as of 2013 it was still an issue.

23          A.    It was -- yes.  And it was

24   still under discussion.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  So the Cochrane and

2  Fishbain didn't solve the problem?

3    A.    I think the quality of the

4  evidence from the information that they

5  included on it were compelling for me.

6    Q.    Did they have a compelling

7  definition of addiction for you?

8    A.    Yes.

9    Q.    And do you know if their

10  definition has been widely accepted or

11  are there still issues with the

12  definition of addiction?

13    A.    I don't know.

14    Q.    You'll see that there's a

15  discussion on Page 6 going into Page 7

16  about what such study would potentially

17  look for and what kind of data would be

18  collected.  And then there would be an

19  adjudication process where an addiction

20  psychiatrist would sit in a room with a

21  pain management physician and would

22  receive information from all these

23  sources on all the patients that met a

24  certain threshold criteria.  They would

1    receive information from all these data

2    sources, put it all together, and decide

3    if this patient is addicted definitely,

4    probably, possibly, or not.

5              Do you see that?

6         A.    Yes.

7         Q.    And then it says, "It would

8    be just like adjudicating upper GI bleeds

9    or adjudicating thrombotic events or

10   whatever in clinical trials.  So there's

11   ample precedent for this approach.  This

12   would also be a ground-breaking

13   approach."

14             Do you see that?

15        A.    Yes.

16        Q.    So Janssen at this time was

17   looking into the ability to conduct one

18   or more clinical trials that would

19   attempt to quantify addiction in chronic

20   pain patients, correct?

21        A.    We were looking -- yes.

22        Q.    And then he says, "Clearly

23   one would need several thousand patients

24   requiring 30 to 40 centers."

Highly Confidential - Subject to Further Confidentiality Review

1              Do you see that?

2         A.    Yes.

3         Q.    Any reason to disagree with

4    that?

5         A.    No.

6         Q.    How many patients do you

7    believe were on opioids for chronic pain

8    or were prescribed opioids for chronic

9    pain in 2003?  Do you have a ballpark?

10        A.    I don't.

11        Q.    So we don't know -- as you

12   sit here today, you can't determine what

13   percentage several thousand patients

14   would be of the universe of patients on

15   chronic pain therapy, opioid chronic pain

16   therapy?

17        A.    To have individuals to fit

18   the criteria, this was an estimate they

19   had.  And then based on the number of

20   centers that would be available -- would

21   have the appropriate number of patients.

22        Q.    Okay.  Then it says,

23   "Janssen's (currently in planning)

24   several thousand patient studies could

1    potentially be the infrastructure

2    investigation for this type of trial.

3    However, for the purpose of our meeting

4    we certainly don't need to identify all

5    40 of these clinical trialists."

6              Do you see that?

7         A.    Yes.

8         Q.    So apparently Janssen

9    already had a several thousand patient

10   study that at least they were planning

11   that could potentially be used or that

12   you could add an endpoint of addiction

13   to.  Is that what that means?

14        A.    I don't know -- I don't know

15   what this -- I don't know what they're

16   referring to at this point.

17        Q.    Well, aside from -- what

18   you're saying is you don't know what --

19   what study was currently -- what several

20   thousand patient study was currently in

21   planning in 2003?

22        A.    Yes.

23        Q.    Without knowing what it was,

24   do you have any reason to doubt that

Highly Confidential - Subject to Further Confidentiality Review

1    there was a several thousand patient

2    study that was in planning at Janssen at

3    that time?

4         A.    I simply don't know.

5         Q.    Well, would Dr. Sacoor have

6    made that up?

7         A.    Currently in planning may

8    have meant we were thinking about it.  It

9    doesn't mean anything more than that.

10        Q.    Correct.  I think that's

11   what he says.  It's currently in

12   planning.

13             But would the idea here to

14   have added the addiction endpoint to

15   whatever several thousand patients study

16   was in planning, regardless of the state

17   of the planning?

18        A.    I'm sorry.  I'm not sure

19   what you're getting at with this.

20        Q.    Where it says, "Several

21   thousand patient study could potentially

22   be the infrastructure investigation for

23   this type of trial," what that means is

24   the patients that were being used

1   potentially in this -- currently in the

2   planning stage study at Janssen in 2003,

3   could be the same patient population for

4   this addiction study?

5        A.     No, I understand that.  I'm

6   just not aware there was a several

7   thousand patient study in 2003 that could

8   have been used for this purpose.  That's

9   why I'm saying I don't completely

10  understand what he's saying.  We may -- I

11  don't want to speculate on what might

12  have been.

13       Q.     Well, I think he is

14  speculating here.  He's saying it might

15  have been that there was such a study.

16            Do you have any reason to

17  doubt that there was such a study in

18  Dr. Sacoor's, Dr. Katz's, and in your

19  mind at this time?

20       A.     I'm not sure that there was

21  a --

22            MR. LIFLAND:  Object to the

23       form of the question.

24            THE WITNESS:  I don't recall

1          a study that he would have been

2          talking about, that they could

3          have piggy-backed off to use this

4          information.  I don't recall.

5   BY MS. CONROY:

6          Q.    If you go to Page 8, it's

7   the very next page.  There's also the

8   evaluation of diagnostic criteria.  And

9   this would be a study to evaluate

10  diagnostic criteria for addiction in the

11  setting of chronic pain treatment with

12  opioids.  Do you see that?

13         A.    Yes.

14         Q.    Do you know if any such

15  study has ever been done to develop

16  diagnostic criteria for addiction in the

17  setting of chronic pain treated with

18  opioids to date?

19         A.    I'm not aware of it at this

20  point.

21         Q.    Do you know, to date, if any

22  study similar to what is stated here in

23  Section B, "A clinical trial to assess

24  the rates of addiction in patients being

1    prescribed various opioids," has ever

2    been conducted by Janssen or Johnson &

3    Johnson?   Page 6.

4         A.    Not that I'm aware of.

5         Q.    You can put that away.

6              Let me give you a few of

7    these at once because they relate to one

8    another.

9              (Document marked for

10             identification as Exhibit

11             Janssen-Vorsanger-8.)

12   BY MS. CONROY:

13        Q.    I'm going to mark as

14   Exhibit 8 is what appears to be the --

15   I'll let you define it.  But I think it's

16   more or less the agenda of the Ad Board

17   meeting on November 3rd and 4th.  And

18   that is JAN-MS-02113207 through 219.

19             MS. CONROY:  And Exhibit 9

20             which is a January 27, 2004,

21             summary of the abuse advisory

22             board.  And that is

23             JAN-MS-02105452 through 628.

24             (Document marked for

1    identification as Exhibit

2    Janssen-Vorsanger-9.)

3  BY MS. CONROY:

4    Q.    So first of all, we have the

5  draft program.  And this is from Clare

6  Harte.  Who is she, do you remember?

7    A.    Clare Harte -- yes.  Clare

8  Harte was a project manager who worked

9  with me.

10    Q.    Okay.  And this was to Jim

11  Eckhardt, did he work -- was he a

12  coworker?

13    A.    Jim -- Jim Eckhardt is --

14  worked -- worked at Janssen.

15    Q.    Medical affairs?

16    A.    He was in marketing.

17    Q.    Marketing?

18    A.    Mm-hmm.

19    Q.    Okay.  Clare Harte was in

20  your department?

21    A.    Yes.

22    Q.    Barry Pritchard?

23    A.    Also in marketing.

24    Q.    Rick Blockinger?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I believe also in marketing.

2    Q.    And then to you as well?

3    A.    Yes.

4    Q.    And Clare says, "Here is the

5  final draft of the program.  Any

6  immediate comments are welcome.  An

7  official invite will be coming from Mo

8  Sacoor later this week."

9           It looks like Clare, a

10  little bit earlier in the day, had

11  cleaned up and spaced the agenda out a

12  bit for Dr. Sacoor.  Do you see that?

13    A.    Yes.

14    Q.    Do you recall attending this

15  Ad Board meeting?

16    A.    Yes.

17    Q.    In November of 2003?

18    A.    Yes.

19    Q.    Is this the -- who was

20  running this?  Were you -- were you the

21  host or was --

22    A.    I was.  This was a

23  Janssen-sponsored Ad Board.  I was the

24  host working with Dr. Sacoor and

1    Dr. Katz.

2         Q.    And had you hosted an Ad

3    Board prior to this date for Janssen?

4         A.    Probably, yes.

5         Q.    This is a key opinion leader

6    advisory board.  Would the individuals

7    who were in attendance from outside of

8    Janssen, would they either be paid for

9    their time to attend this or be under

10   some sort of a consulting agreement with

11   Janssen?

12        A.    They would have been under a

13   consulting agreement.

14        Q.    Every one of them?

15        A.    Yes.

16        Q.    If you take a look at

17   Page 4, at the 9:10 a.m. program, which

18   is called Icebreaker Number 2.

19   "Shortcomings in evidentiary base

20   relating to addiction in the setting of

21   prescription opioid therapy for chronic

22   pain."

23             And the questions that are

24   here are the bullet points.  "Are opioids

1   addictive when prescribed for chronic

2   pain?"

3            Was that a topic that you

4   acknowledged should be discussed among

5   the key opinion leaders?

6        A.   The icebreaker is more a way

7   of people introducing themselves as to

8   their interests.  And Dr. Passik thought

9   this would be something of interest to

10  the group.

11       Q.   And is it your best memory

12  that it was of interest to the group?

13       A.   Yes.

14       Q.   I'm sorry?

15       A.   Yes, it was.

16       Q.   And the -- then he asks,

17  "Have any previous studies addressed this

18  issue effectively?"  And that there's

19  historical confusion between prevalence

20  and incidence.  How to measure incidence

21  of addiction in clinical trials.  And the

22  implications and guidance for Janssen

23  clinical trials for its new opioid

24  analgesic.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    Yes.

3     Q.    Those were approved topics.

4  You -- you approved his discussion of

5  these topics, correct?

6     A.    Yes.

7     Q.    And who is Steven Passik?

8     A.    Dr. Passik is a pain

9  specialist, pain expert.  He has a

10 background in addiction medicine.  He

11 is -- as well, he's a psychologist.

12    Q.    And how did you know him?

13    A.    He was one of -- one of

14 the -- one of the Janssen key opinion

15 leaders.

16    Q.    Did you know him before you

17 went to Janssen?

18    A.    No.

19    Q.    Are you in any contact with

20 Dr. Passik today or as of 2015?

21    A.    Not directly as it relates

22 to this.  Dr. Passik was in a new role in

23 a -- in a company, and he and I

24 communicated briefly about that.

1    Q.    What -- what new company is

2  he in?

3    A.    I forget the name of the

4  company now.

5    Q.    What's his area?

6    A.    In pain management.

7    Q.    Pain management.  Does he

8  have anything to do with addiction

9  therapy?

10    A.    I don't know what he's doing

11  currently today.

12    Q.    He is not a medical doctor?

13    A.    I believe he is a Ph.D.

14    Q.    Do you know if he was a key

15  opinion leader for any company other than

16  Janssen at the time?

17    A.    I wouldn't have that

18  information.

19    Q.    Would you have known it at

20  the time for example, if he was also a

21  key opinion leader for Purdue Pharma?

22    A.    Not necessarily, no.

23    Q.    If you go to Page 6.

24  Icebreaker Number 5 at 10:00 a.m.  "The

1    terminology/semantics of prescription

2    opioid abuse."

3              And this is Dr. Jim Zacny.

4    Do you see that?

5         A.    Yes.

6         Q.    Do you know him?

7         A.    I met him around the Ad

8    Board activities and I knew of him.

9         Q.    And what was his specialty,

10   do you know?

11        A.    I don't recall now.

12        Q.    Okay.  Would you have known

13   at the time?

14        A.    Yes.

15        Q.    And he is going to talk

16   about addictionists versus pain

17   specialists versus scientists versus

18   ASAM.  What does that mean, ASAM?

19        A.    I'm not certain.

20        Q.    Okay.  DSM-IV is the

21   diagnostic manual, correct?

22        A.    Yes.

23        Q.    And that provides a

24   definition of -- of dependence or

1  substance abuse, that sort of thing?

2        A.    Yes.

3        Q.    Is ASAM a similar type of

4  diagnostic or method of diagnosing

5  addiction?

6        A.    I don't know what ASAM

7  stands for in this context.

8        Q.    We might see it further on.

9  I think I've seen the acronym elsewhere.

10        He says, "Can we establish

11  an acceptable common vocabulary for our

12  Ad Board?"

13        And then he says, "What are

14  the implications for Janssen's future

15  clinical trials, in terms of how the

16  outcomes that we're interested in should

17  be defined?  DSM-IV, the most widely used

18  and validated diagnostic criteria, still

19  refers to 'substance dependence

20  disorder,' which has been shown

21  convincingly to be completely irrelevant

22  to the chronic pain patient.

23        Do you see that?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Was that your understanding

2    at the time, that DSM-IV was irrelevant

3    to the chronic pain patient?

4    A.    I didn't have an opinion on

5    the matter.

6    Q.    Okay.  Take a look at the

7    11:00 a.m. Icebreaker Number 8, on Page

8    7.  Outcome measures in clinical trials

9    relevant to addiction to opioids in

10   chronic pain patients.  That's by --

11   being given by Bruce Rounsaville, M.D.

12   Who is that?

13   A.    I don't recall who this

14   individual is.

15   Q.    He would have been a KOL for

16   Janssen, right?

17   A.    He would have been someone

18   who we invited to this advisory board

19   based on his background.

20   Q.    And when he says, "Which

21   diagnostic criteria should be used in the

22   chronic pain population?" what he's

23   talking about is what's the best way to

24   tell if a patient is addicted to opioid

Highly Confidential - Subject to Further Confidentiality Review

1    pain medication, correct?

2         A.    That's what it would appear.

3         Q.    Then on Page 13, you gave

4    the -- you gave the wrap-up, and you

5    closed the advisory board after there

6    were open discussion on Tuesday,

7    November 4th, correct?

8         A.    Yes.

9         Q.    Okay.  Let's take a look at

10   Exhibit 9 that I've passed to you, right

11   there.  Did you prepare your own notes at

12   this meeting, do you know?

13        A.    I'm not sure what you're

14   asking me.

15        Q.    Did you prepare your own

16   notes of what the speakers were saying

17   and discussing at the November 3rd and

18   4th, 2003, Ad Board meeting?

19        A.    So part of the contract with

20   Dr. Sacoor was that people from either

21   his company or he may have hired medical

22   writers, I don't remember now, to record

23   the information.

24        Q.    So you wouldn't -- you

1    did -- you could listen.  You didn't need

2    to take notes.  You knew someone would be

3    taking notes.

4         A.    That's correct.  Yes.

5         Q.    And if you take a look at

6    this document, Exhibit 9, which is

7    JAN-MS-02105452 through 628, does this

8    appear to you to be the notes that

9    Dr. Sacoor said his group would take care

10   of?

11             And I'll say that the front

12   page is an e-mail dated January 27, 2004,

13   from you to Dr. Katz.  The subject line

14   is "Summary of abuse advisory board."

15   And then you say to Nat Katz, "Here is a

16   copy of the summary produced by Mo."

17             Do you see that?

18        A.    Yes.

19        Q.    So is that what you were

20   talking about?  These -- this would have

21   been the notes that were taken by

22   Dr. Sacoor at the meeting?

23        A.    I'd have to take a look at

24   the document to confirm.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Take -- yeah, take a look.

2    A.    This appears to be the

3    summary describing the people who

4    attended and some of the other content as

5    well.

6    Q.    Would they be some other

7    summary?

8    A.    No.  This looks -- appears

9    to be the summary.

10    Q.    Okay.  And I see it's the

11    attachment with the summary.  The summary

12    is called "Final to Janssen."  So as best

13    you can tell, this is the final summary

14    of that meeting provided by Dr. Sacoor?

15    A.    Correct.  I don't know if

16    it's complete.  But as best I can tell,

17    this is what it looks like.

18    Q.    Okay.  Take a look at Page 1

19    of 171 which is Bates 458.

20    It lists the Ad Board

21    objectives.  The main goals were, "To

22    discuss and develop a package of clinical

23    and other research studies/trials

24    designed to:

1            "Inform us about the

2    relative abuse liability potential of the

3    next generation of MRO" --

4    moderate-release opioids?  Is that what

5    that is?

6          A.    I'm not sure what the M

7    stands for.

8          Q.    Okay.  Or maybe

9    modified-release opioids?

10         A.    Modified-release opioids.

11         Q.    Duragesic was a

12   modified-release opioid?

13         A.    I don't remember.  I don't

14   remember how this term was used.

15   Certainly Duragesic is an

16   extended-release.

17         Q.    So that means that the

18   release would be modified in some -- in

19   some way, correct?

20         A.    Controlled -- released,

21   yeah.  But I -- this is not a term that

22   I -- that jumps -- that I recall at this

23   moment.

24         Q.    Okay.  "Inform us about the

1    relative abuse liability potential of the

2    next generation MRO analgesics for the

3    treatment of chronic pain."

4           A.    Mm-hmm.

5           Q.    "Be persuasive to clinicians

6    and regulators of the lower abuse

7    potential of the new generation of MRO

8    analgesics for chronic pain.

9                 "Secondly, select from the

10   above-mentioned package the four to five

11   key must-have studies, which to flesh out

12   in more detail, with more specific study

13   parameters relating to study design,

14   timelines and costs."

15                Do you see that?

16          A.    Yes.

17          Q.    Is that your memory of the

18   objectives?

19          A.    Yes.

20          Q.    If you could turn to Page 16

21   of 171.  Actually, Page 15 will make it a

22   little bit easier.

23                The document has sort of a

24   historic overview of the use of opioids

1    through the years.  And Phase II was the

2    early '80s and through the '90s, there in

3    the center of the page.  And, "Begin a

4    discussion of opioids for the management

5    of moderate to severe pain associated

6    with cancer, AIDS, and other advanced

7    medical illnesses."

8              Do you see that?

9         A.    Yeah.

10        Q.    And it says, "At the same

11   time there was a very gradual movement to

12   think about the use of opioids for

13   chronic nonmalignant pain."

14             Do you see that?

15        A.    Yes.

16        Q.    Is that your understanding

17   that it happened in the early '80s

18   through the early '90s?

19        A.    My understanding was more

20   late '80s than the '90s, but...

21        Q.    Okay.  And then it says,

22   "And this culminated in an important

23   watershed event which was the publication

24   of a consensus document jointly by the

1    American Pain Society and the American

2    Academy of Pain Medicine that essentially

3    said there is a subpopulation of patients

4    with chronic pain who should be treated

5    with opioids because they act like the

6    usual cancer patient.  They gain

7    sustained benefits without the loss of

8    efficacy due to tolerance or any other

9    factor.  Their side effects are tolerable

10   in a way that would be safe and

11   effective."

12               Do you see that?

13        A.    Yes.

14        Q.    And that was the -- that was

15   the understanding of the group, including

16   Janssen, on November 3rd and fourth in

17   2003, correct?

18               MR. LIFLAND:  Object to the

19        form of the question.

20               THE WITNESS:  I don't

21        understand the question.

22   BY MS. CONROY:

23        Q.    Was this Dr. Sacoor's

24   understanding?

1          A.    This was a summary of the

2    impressions of the people -- the key

3    opinion leaders who participated at the

4    meeting.

5          Q.    And does it also include the

6    opinions of, for example, yourself or

7    Dr. Sacoor?

8              MR. LIFLAND:  Object to the

9          form of the question.

10             THE WITNESS:  I don't know

11         what Dr. Sacoor's opinion was.  I

12         think this summarized what

13         Dr. Sacoor had and the people

14         working with him had heard from

15         the key opinion leaders

16         participating at the meeting.

17   BY MS. CONROY:

18         Q.    Okay.  Do you -- do you

19   agree that the consensus document was a

20   watershed moment?

21         A.    I don't have an opinion at

22   this point.

23         Q.    Okay.  If you take a look

24   further.  It says, "Abuse and addiction

1    as a potential, mentioned and were

2    already inhibiting them from going

3    forward so they had to get past it.  And

4    the oxycodone problem has led to a

5    wake-up call."

6                Do you see that?

7         A.    Yes.

8         Q.    What was the Oxycodone

9    problem in 2003, if you know?

10        A.    I'm assuming what this is is

11   there were more mentions of abuse of

12   oxycodone, that they are beginning to see

13   this or had seen this before.

14        Q.    Okay.  It goes on.  "At a

15   national level the goal is to continue to

16   identify those patients who would be

17   appropriate candidates for long-acting

18   opioid therapy and at the same time

19   recognize the need to have controls so

20   that abuse and diversion are minimized."

21                Do you see that?

22        A.    Yes.

23        Q.    You agree with that,

24   correct?

1          A.     Yes.

2          Q.     That -- that was true in

3    2003 and it's true today, correct?

4          A.     Yes.

5          Q.     "At an individual level,

6    what this means is that every patient who

7    is being considered a candidate for these

8    drugs has to undergo a risk assessment by

9    the clinician and an appropriate element

10   of the prescribing has to be risk

11   management."

12              Do you see that?

13         A.     Yes.

14         Q.     And that means managing the

15   risk of providing an opioid to an

16   individual patient, correct?

17         A.     Yes.

18         Q.     And that risk would include

19   that the patient might become addicted to

20   the opioid?  Is that one of the risks?

21         A.     Yes.

22         Q.     They might abuse the opioid

23   or misuse it?

24         A.     Yes.

1    Q.    Is that one of the risks?

2    A.    Yes.

3    Q.    Or it might be diverted?

4    A.    Yes.

5    Q.    And then it says, "So that

6  brings us to the next level, which is

7  what's going to happen now at the level

8  of the individual prescriber?

9         "The use of opioids is going

10  to continue to grow in primary care and

11  that is going to be contingent, of

12  course, on the facilitatory environment

13  on the part of the government and law

14  enforcement."

15         What does that mean,

16  facilitatory environment?

17    A.    I don't know what it means.

18    Q.    Okay, "driven by studies

19  most of which are going to be funded by

20  industry."

21         That means the studies would

22  be funded by the pharmaceutical industry,

23  correct?

24    A.    That -- that was the

1    impression of the people attending the

2    meeting.

3           Q.    And yours as well?

4           A.    I don't know.  Government

5    have a role as well.

6           Q.    "What the studies will show

7    hopefully is that there's an element of

8    safety and a manageable level of risk of

9    abuse that can be dealt with so

10   clinicians feel comfortable in selecting

11   patients for this therapy and then using

12   it over time."

13          Do you agree with that?

14          A.    Yes.

15          Q.    And in part, part of this Ad

16   Board was to come up with studies that

17   would allow clinicians and payers to

18   recognize a manageable level of risk

19   abuse that could be dealt with so that

20   they could feel comfortable selecting

21   patients for therapy and using it for

22   long-term care.

23          A.    Provided that the -- that

24   the clinicians continue to monitor the

Highly Confidential - Subject to Further Confidentiality Review

1   patients so that when the medications

2   were prescribed, they saw the patients

3   regularly and monitored them on an

4   ongoing basis.

5        Q.    And why would that be

6   important, to monitor the patients on an

7   ongoing basis?

8        A.    To look for the signs that

9   you already discussed, for adverse -- all

10  adverse events, including the ones that

11  you mentioned.

12       Q.    And if a physician sees

13  those signs, what should they do?

14       A.    They would manage the

15  patient appropriately.

16       Q.    What would that mean?

17       A.    It would depend on the

18  patient, it would depend on the

19  situation.  There's no generalization.

20  They would be -- they would have to be

21  monitoring those like other adverse

22  events.

23       Q.    What would be some of the

24  options once a physician identified signs

Highly Confidential - Subject to Further Confidentiality Review

1    of abuse or adverse events?

2         A.    They would have a

3    conversation with the patient about it.

4    Identify what the issues would be.

5    Sometimes patients would need to be

6    switched to other medications if they

7    were able to do so, to avoid that.  They

8    would sit and counsel -- certainly

9    education's a key role to explain to

10   patients the importance of using the

11   medications as prescribed and not abusing

12   those.  If there was signs of addiction,

13   then they would treat that.  They may

14   refer patients to get additional

15   psychological, psychiatric support for

16   their -- for the addiction, et cetera.

17        Q.    Would -- at that point would

18   a physician diagnose abuse or addiction?

19        A.    I'm not understanding your

20   question.

21        Q.    If the physician saw signs

22   of an adverse event related to abuse or

23   addiction, would the physician need to

24   diagnose abuse or addiction in the

1    patient in order to continue to deal with

2    those issues, for example to get

3    psychological support?

4         A.    You mean -- I'm still not

5    understanding your question.  I'm sorry.

6              Are you saying that they

7    need to have a diagnosis to be able to do

8    that?

9         Q.    Sure.

10        A.    Well, it -- that would be

11   part of their clinical impression of the

12   patients, to be able to do that.

13        Q.    Okay.  Go to Page 20.  And

14   this is the discussion of Dr. Passik's

15   icebreaker.  He talks about minimally

16   monitored drug-only pain therapy.  Do you

17   know what that is?

18        A.    I don't.

19        Q.    If you look on Page 21.

20   Dr. Passik goes on.  He says, "There are

21   multiple etiologies of those behaviors.

22   That is the problem we have in the pain

23   management setting.  We see a lot of

24   noncompliance, potentially aberrant

Highly Confidential - Subject to Further Confidentiality Review

1  behavior.  But how do we sort out which

2  ones are related to addiction and abuse

3  and which ones are related to inadequate

4  analgesia?"

5            That's what you were talking

6  to me about before, inadequate pain

7  control, correct?

8       A.    Yes.

9       Q.    And do you agree that those

10  were the issues that needed to be sorted

11  out?

12      A.    For -- yes, for patients who

13  were presenting requesting more pain

14  medication, that these are some of the

15  issues that need to be addressed.

16      Q.    And then if you turn the

17  page.  Dr. Passik goes on to talk about

18  some of the aberrant behavior.  But he

19  says, "We don't even know how common any

20  of these various ones are."

21            Do you see that?

22      A.    No, I don't.

23      Q.    Right in the -- right here

24  in the middle.  "So we see the whole

Highly Confidential - Subject to Further Confidentiality Review

1    spectrum" -- "spectrum.  We don't even

2    know how common any of these various ones

3    are."

4          A.    Right.  That's a comment

5    based on 2003.

6          Q.    Do we know how common they

7    are today?

8          A.    I don't know.

9          Q.    Do you know if anyone knows?

10         A.    I don't know.

11         Q.    What about in 2015, did you

12   know how common they were?

13         A.    I would have to consult the

14   literature to see.  I don't have that off

15   the top -- top of my head.

16         Q.    Did Janssen ever conduct any

17   studies to determine how common they

18   were?

19         A.    How common?

20         Q.    The issues that Dr. Passik

21   is talking about, abuse, misuse, aberrant

22   behavior.  If you look at the page

23   earlier, he explains a few of them.  Do

24   you know if --

1    A.    Not to the best of my

2    knowledge.

3    Q.    Janssen has not studied

4    this?

5    A.    Not to the best of my

6    knowledge.

7    Q.    But if we look at page --

8    you may need to look at the bottom of

9    Page 22.  He says something very

10   interesting.  "Cancer patients are

11   shifted towards lack of aberrant

12   behaviors.  Addicts with AIDS who have

13   pain are shifted towards aberrant

14   behavior.  And 6 to 10 percent of cancer

15   patients have some vulnerability to

16   addiction."

17   Do you see that?

18   A.    Yes.

19   Q.    Do you know the basis for

20   that percentage?

21   A.    I do not.

22   Q.    Then he says, "Same with

23   chronic pain patients.  Small subset,

24   somewhere between 6 and 10 percent are

1    having a lot of aberrant behavior."

2          A.    Excuse me.

3          Q.    Do you know where that

4    percentage comes from?

5          A.    I do not.

6          Q.    Do you think you knew at the

7    time?

8          A.    No.

9          Q.    Would you have asked?

10         A.    This -- we were gaining

11   information from our key opinion leaders.

12   So this was something we were collecting

13   on it.  But we did not -- I did not

14   pursue that with him.

15         Q.    Is it possible that this is

16   one of the studies that was available to

17   support the label that iatrogenic

18   addiction is relatively rare?

19         A.    I can't comment on that.  I

20   don't know.

21         Q.    Then there's a discussion of

22   pseudoaddiction.  And do you know if

23   there has ever been any study to

24   determine whether or not pseudoaddiction

1   occurs?

2        A.    I believe I addressed that

3   earlier.  I was not aware of such a

4   study.

5        Q.    Okay.  Look at Page 25.  And

6   if you look at the top -- you may need to

7   look at Page 24 for a little more

8   context.  Dr. Passik says, "So the issue

9   is very hard to figure out in the

10  clinical setting, but we see it everyday.

11  And it's not an empirically validated

12  notion particularly.  The original paper

13  from 1989 had only 28 cancer cases, when

14  Wiseman and Haddox first wrote the paper.

15  However, frequency of aberrant behavior

16  in chronic opioid therapy patients over a

17  six-month period, 45 percent of the

18  sample had aberrant behavior."

19            Do you see that?

20       A.    Yes.

21       Q.    Are you familiar with that

22  work?

23       A.    I am not.

24       Q.    Do you know who Dr. Wiseman

1    is?

2           A.    I do not.

3           Q.    Is Haddox H-A-D-D-O-X, or do

4    you know another Haddox with the C-K-S?

5           A.    This may have been spelled

6    incorrectly.

7           Q.    Did you do any follow-up to

8    determine the aberrant behavior in

9    chronic opioid therapy patients that was

10   reported to be 45 percent of the sample

11   over a six-month period?

12          A.    I don't understand your

13   question.

14          Q.    Did you do any follow-up to

15   try to determine where this data was

16   coming from, the aberrant behavior in

17   chronic opioid therapy patients over a

18   six-month period where it appears that

19   45 percent of that sample group had

20   aberrant behavior?

21          A.    Did I do any personal

22   follow-up?

23          Q.    Correct.

24          A.    No, I did not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Why is that?

2    A.    Because these were our

3  experts and they came in with this

4  information and were informing us based

5  on what their experience and their

6  reading was.  And the goal of the Ad

7  Board, as I've already discussed with

8  you, and you already mentioned, and it

9  seems to come up with a series of

10  studies.  So it was framing out some of

11  the very best information to see what are

12  the types of studies that would need to

13  be done.

14         So this was background based

15  on someone that already had clinical

16  experience or what they had -- so we

17  didn't go and validate each of the

18  statements of these people.  These were

19  world experts that were invited to this

20  meeting for this reason.

21    Q.    So you -- you accepted this

22  as valid information from these key

23  opinion leaders?

24         MR. LIFLAND:  Object to the

1    form of the question.

2             THE WITNESS:  It was

3    information that we -- we -- it

4    was information that the experts

5    had brought to us and we took it

6    as part of the information that --

7    to -- to gain -- to be able to

8    develop the studies that we've

9    already talked about.

10   BY MS. CONROY:

11        Q.    Okay.  It was your belief if

12   you needed to know more about it, you

13   could just call any one of these key

14   opinion leaders and they could have given

15   you that citation or whatever they were

16   basing that information on?

17        A.    If there was a need to

18   follow up on it for a specific reason, we

19   would have an opportunity to discuss that

20   with them if we needed to.

21        Q.    Right, because you didn't

22   believe that you actually needed to

23   validate it.  You accepted it as valid

24   when it was given to you?

1    MR. LIFLAND:  Object to the

2    form of the question.

3    THE WITNESS:  I think I've

4    already sort of addressed the

5    question, that these were -- these

6    were experts providing their

7    information, and I would not have

8    any reason not to believe what

9    they were suggesting.

10    Again, I could go -- we

11    could go back and do more if we

12    had a reason, which it didn't.

13  BY MS. CONROY:

14    Q.   Okay.  Page 28.  This is a

15  discussion based on Dr. Vaughan's

16  icebreaker about nationally available

17  datasets.  And what I want to ask you, in

18  your work at Janssen, were you ever

19  familiar with what's listed here as the

20  ARCOS data, A-R-C-O-S?  Is that anything

21  that you ever worked with or were

22  familiar with?

23    A.   I was familiar with it.  I

24  did not work with it.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  How did you become

2  familiar with it?

3    A.    I learned about it as an

4  informational database managed by DEA.

5    Q.    Did you ever have occasion

6  to use any of the data from ARCOS for any

7  purpose?

8    A.    It was used as part of the

9  information to monitor -- to monitor

10  about the availability of opioid.  But I

11  did not work with the database myself

12  directly.

13    Q.    Okay.  How about MPA?  Did

14  you ever use that database?

15    A.    I don't recall what MPA

16  stands for.

17    Q.    And it says that MPA looks

18  at the number of prescriptions, and then

19  if you look further on to Page 30.  It

20  says, "MPA helps us look at how many

21  prescriptions are being written."  Is it

22  possible that this is another acronym for

23  IMS?  Or is that what you understand IMS

24  to provide?

1    A.    I don't know.

2    Q.    Okay.  But MPA doesn't ring

3    a bell with you?

4    A.    Not at this point.

5    Q.    And would you agree with the

6    statement on Page 30 or have any reason

7    to doubt the statement that, "ARCOS is

8    the only way that we can track where

9    these drugs are moving around the nation

10   and in certain cases it's quite

11   informative to pinpoint where are the hot

12   spots of where these drugs are moving."

13            Any reason to disagree with

14   that?

15   A.    I don't have an opinion on

16   that at this point.

17   Q.    And you did at this point in

18   2003, you had ARCOS data available to you

19   at Janssen?

20   A.    I don't remember when I

21   started looking at ARCOS and when I

22   became aware of it.

23   Q.    At some point in your tenure

24   you had availability to ARCOS?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     At some point in my -- when

2   I -- working at Janssen, I became aware

3   of ARCOS and the type of data that it

4   tracks.

5          Q.     And did I understand you to

6   say that at some point you used some of

7   that data?

8          A.     No, I did not.  My testimony

9   is I did not use ARCOS myself.

10         Q.     Look at Page 32.  Up at the

11  top.  And I will tell you that this is --

12  if I can find it.  I'm not sure which

13  doctor's icebreaker this is.  But the

14  reference is, "Among those people who

15  misuse, what's the probability that you

16  become dependent?"

17                It says, "About half of

18  heroin misusers are dependent, so you can

19  look at about a 50 percent chance of

20  becoming dependent, and opioids just

21  about an 8 percent chance."

22                Do you see that?

23         A.     I do.

24         Q.     And is this the same answer,

1    that you would have accepted these

2    numbers as provided?

3           A.    These would -- again, as

4    I've already provided testimony, this was

5    the information that came in from our key

6    opinion leaders participating at the

7    meeting, and this was what their various

8    understanding would be.  I don't

9    comment -- I don't have a comment on the

10   numbers, per se at this point.

11          Q.    Okay.  Turn to Page 47.

12   This is the section on, "Can we all agree

13   on one definition of addiction?"

14                Do you see that?

15          A.    Yes.

16          Q.    "ASAM and the American Pain

17   Society" -- I still don't see what's

18   telling us what ASAM means.

19                MR. LIFLAND:  What page?

20                MS. CONROY:  47.

21   BY MS. CONROY:

22          Q.    It says, "The American

23   Academy of Pain Medication, that's one

24   definition I will describe."  And you see

1    that definition there in the middle of

2    the page?

3          A.    Yes.

4          Q.    And then it goes on to the

5    DSM-IV definition of dependent syndrome

6    and the International Classification of

7    Diseases" -- and that's an IDC -- ICD-10.

8                Do you see that?

9          A.    Mm-hmm, right.

10         Q.    You're familiar with all

11   three of those?

12         A.    I'm not sure what you're

13   asking me.

14         Q.    Are you familiar with the

15   three different definitions of

16   addiction/substance dependence?

17         A.    I'd have to look at it and

18   see which ones they are.  I'm certainly

19   familiar with the first one.

20         Q.    Okay.  You're familiar with

21   the ASAM definition?

22         A.    Yes.  This was -- yes, as

23   described here.

24                Okay.

1    Q.    Do you have a go-to

2  definition yourself?

3    A.    I tend to use the one that

4  was -- that came up with the ACTTION --

5  that we talked about at the ACTTION

6  group.  I liked that one.  And I like the

7  one that was used by these organizations.

8  I think the American Pain Society, APM.

9  I think this is -- this is a nice

10 characterization.

11   Q.    And that's instead of the

12 DSM-IV?

13   A.    This is the one I'm more

14 familiar with.  I wouldn't -- I can't

15 comment on one being better or worse.  I

16 think your question to me was which one

17 do I favor.  This is the one that I have

18 seen.

19   Q.    Okay.  The ASAM and the

20 American Pain Society?

21   A.    I'm not as familiar with the

22 DSM-IV.  So it's not one that I would

23 necessarily gravitate to.  But it's

24 another definition.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  Turn to Page 63.

2  This is looking at "Outcome measures in

3  clinical trials relevant to addiction to

4  opioids in chronic pain patients based on

5  Bruce Rounsaville's icebreaker."

6          And if you take a moment to

7  take a look at this page.  He's talking

8  about what types of things you would

9  measure to measure addiction to opioids

10  in chronic pain patients.

11          Do you see that?

12    A.    Mm-hmm, yes.

13    Q.    And he says, "In substance

14  abuse studies, what we typically do is

15  take a bunch of people who are already

16  addicted or who want to stop or who have

17  either stopped or we're trying to get

18  them to stop, and so most of our measures

19  really are relevant for that sort of

20  situation," which would be to stop

21  treatment altogether, correct?

22          MR. LIFLAND:  Object to

23      form.

24  BY MS. CONROY:

1    Q.    For the substance abuse

2    studies?

3              MR. LIFLAND:  Object to the

4         form of the question.

5              THE WITNESS:  It doesn't

6         talk, that I've seen, about what

7         action would be taken.

8    BY MS. CONROY:

9    Q.    Okay.  Well, then maybe he

10   makes it clearer.  He says, "As opposed

11   to taking a bunch of people, and you're

12   giving them medication for a particular

13   legitimate problem, chronic pain, and

14   then our outcome is going to be whether

15   they get into trouble or not."

16             Do you see that?

17   A.    Yes.

18   Q.    And that trouble would be

19   some sort of adverse event like addiction

20   or abuse?

21   A.    I don't have the full

22   context to be able to comment on that.

23   Q.    Okay.  If you take a look at

24   Page 72, where we begin to see some

1    recommended clinical studies.

2              They say, "Recommendations

3    to Janssen."  And the key opinion leaders

4    recommend that in any study that you do,

5    on the use or the abuse of opioids in

6    pain settings, it's crucially important

7    that the measure that is used is the

8    addiction severity index.

9              Do you see that?

10        A.    Yes.

11        Q.    Are you familiar with that?

12        A.    Briefly.

13        Q.    Have you ever designed or

14   reviewed a clinical trial that used an

15   addiction severity index?

16        A.    No.  A study -- this may

17   have been -- and I have to check and get

18   additional documentation to confirm, that

19   this type of information may have been

20   captured in the Inflexxion studies.  But

21   I would need to have additional

22   information to confirm that.  But I did

23   not do any -- I have not done clinical

24   studies myself.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    If it's in the Inflexxion

2    study, that would be potentially data

3    that you've seen but you would not have

4    had anything to do with the setup of the

5    Inflexxion studies?

6    A.    That's correct, yes.  And I

7    did not use it in clinical studies

8    myself, which was your question to me.

9    Q.    Okay.  And as far as you

10   know, Janssen has never used -- or J&J or

11   Janssen has never used the addiction

12   severity index in any clinical trials

13   that it either sponsored or accepted by

14   an investigator?

15          MR. LIFLAND:  Object to the

16       form of the question.

17          THE WITNESS:  To the best of

18       my knowledge, I have not seen

19       studies from Janssen where the

20       addiction severity index was used

21       in a controlled clinical trial.

22   BY MS. CONROY:

23   Q.    When you say controlled

24   clinical trial, are you making a

1    distinction between a controlled clinical

2    trial and just a clinical trial?

3            A.    No.   The same -- clinical

4    trial.

5            Q.    Same -- okay.

6            A.    I'm using them

7    interchangeably at this point.

8            Q.    Take a look at Page 132.

9    And this discusses a fifth clinical trial

10   to derive signals that are suggestive of

11   greater -- suggestive of greater or

12   lesser abuse liability from clinical

13   trials.  And it lists some signals.  Do

14   you see that?

15           A.    Yes.

16           Q.    Do you have any -- do you

17   know whether anything like this has been

18   done going back to clinical trials to see

19   if such signals exist at Janssen, Johnson

20   & Johnson?

21           A.    I'm unaware of that.  I

22   don't -- I don't know.

23           Q.    Would you have been aware of

24   it at least up through 2013-2014, if

1    there was anything underway to look for

2    abuse liability signals in clinical

3    trials that had been conducted with

4    respect to any J&J or Janssen opioids?

5                    MR. LIFLAND:  Object to the

6            form of the question.

7                    THE WITNESS:  I'm unable to

8            comment on that.

9    BY MS. CONROY:

10           Q.    Why not?

11           A.    Because I would have to have

12   an understanding of all of the studies

13   that are being done.  So it's possible.

14   But on the other hand, I may not.

15           Q.    Do you think that there

16   could have been, between the years 2000

17   and 2015, an analysis of clinical trials

18   at Janssen, Johnson & Johnson, looking

19   for signs at iatrogenic addiction and you

20   didn't know about it?

21           A.    It's likely that I would

22   have heard about it.  But again, looking

23   at the nature of the design of those

24   studies and how it would need to be done,

Highly Confidential - Subject to Further Confidentiality Review

1   it would be -- would be difficult to do.

2        Q.     That's not my question, not

3   how difficult it is.  My question was

4   simply, if there was a study being

5   performed or a group of studies at

6   Johnson & Johnson, Janssen, with respect

7   to iatrogenic addiction and opioids, is

8   it something you would have known about?

9        A.     Possibly.

10       Q.     Under what circumstances

11  would you not know about it?

12            MR. LIFLAND:  Object to the

13       form of the question.

14            THE WITNESS:  I -- it

15       depends on the nature of the

16       design and who was doing it.

17       You -- frequently I would be

18       consulted, but not always.

19  BY MS. CONROY:

20       Q.     Who would I -- who would I

21  ask to find out if there have been

22  studies with respect to iatrogenic

23  addiction to opioids, whether those were

24  studies to go back and look at signals in

1    existing clinical trials or new studies

2    that were being conducted, if not you,

3    who should I talk to?

4          A.     I don't know today.

5          Q.     Who would I have talked to

6    in 2013?

7          A.     Maybe some people in the

8    epidemiology group, but it could have

9    very well have been me, again.  But it

10   doesn't necessarily have to be me.

11         Q.     I understand that.  What I'm

12   trying to understand is here in 2003,

13   there is a discussion about how to go

14   back and look for signals in clinical

15   trials that had been conducted for signs

16   of iatrogenic addiction, unwarranted dose

17   escalation, and other items by Johnson &

18   Johnson, Janssen key opinion leaders.

19   And this is in 2003.

20         A.     Right.

21         Q.     If this was followed through

22   and some of these studies were done, or

23   just one of these studies were done, who

24   would have known about it?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I was someone who might have

2  known about it, and I was not aware of

3  such a study being done.

4    Q.    Is there someone I'm

5  missing?

6    A.    At this point, I don't know.

7    Q.    You don't know between 2015

8  to 2017?

9    A.    I don't know between 2015

10  and 2017.  And I don't know, as I had

11  commented, these studies, if they were

12  going to be done, may be done with a

13  number of different people at the

14  company.

15    Q.    So who are -- who are the

16  number of different people that would be

17  doing them that you wouldn't know about?

18    A.    As I said, it would be

19  likely that I would know about it, but

20  there may have been studies done by other

21  groups as well.  I'm not aware of it.  I

22  think my -- so my testimony is I wasn't

23  aware of such studies being done.  But

24  could they have been done by other

Highly Confidential - Subject to Further Confidentiality Review

1    people?  Possibly.  I don't know.

2          Q.    But you understand if I'm

3    trying to look to see if Johnson &

4    Johnson did any studies like this --

5          A.    Yes.

6          Q.    -- it's not particularly

7    useful for me for you to say maybe there

8    were others and I'm just not looking in

9    the right place.  So I'm trying to figure

10   out.  I understand you're not aware of

11   any studies that did this, correct?

12         A.    Correct.

13         Q.    But you're telling me that

14   maybe they were somewhere in the company?

15              MR. LIFLAND:  I'm going to

16         object to the form of the

17         question.

18              THE WITNESS:  I probably

19         would have known about such

20         studies if they would have taken

21         place.  But I can't say with

22         absolute certainty that such

23         studies weren't done.

24   BY MS. CONROY:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you have a feel for

2    where I would look to -- to be

3    100 percent sure that these studies were

4    not done?

5    A.    No, I'm not.  I'm not sure

6    where you would look.

7    Q.    They would have been

8    budgeted, right?

9    A.    They might have been

10   budgeted, yes.

11   Q.    Wouldn't they have to be

12   budgeted?

13   A.    Yes, yeah.  Somebody would

14   have to pay for it.  Absolutely.  Yes.

15   Q.    And they wouldn't be secret?

16   A.    No, absolutely not.  And

17   they would have been published if the

18   studies were undertaken.  And I'm not

19   aware of those publications.

20   Q.    You can put that document

21   away.

22         MR. LIFLAND:  We are coming

23         close to 5 o'clock.  I don't think

24         I want to go too much longer

Highly Confidential - Subject to Further Confidentiality Review

1    today.  We've got tomorrow set

2    aside.

3         MS. CONROY:  How about if

4    we -- I just have some more about

5    this ad group, some additional

6    documents, we just finish up this

7    section.  Are you okay?

8         MR. LIFLAND:  Are you okay

9    going a little bit more?

10        THE WITNESS:  Yes.

11        MR. LIFLAND:  That's fine.

12        MS. CONROY:  Then we can

13   just finish it off.

14        (Document marked for

15   identification as Exhibit

16   Janssen-Vorsanger-10.)

17   BY MS. CONROY:

18        Q.    I'm marking Exhibit 10.

19   JAN-MS-00613131.  Careful of the staple

20   on these.

21            This is an e-mail from just

22   before the -- right around the time that

23   you were setting the Ad Board up in

24   September of 2003.  And this is an e-mail

1    from Dr. Katz to you.  The Re line is

2    abuse stuff.  And he's attached a

3    proposal for a review article on

4    prescription opioid abuse, current

5    methodology and research agenda.  Do you

6    see that?

7            A.    Yes.

8            Q.    And you forwarded that on to

9    Clare Harte, who is also in your

10   department, correct?

11           A.    That's correct, yes.

12           Q.    Had you requested that

13   Dr. Katz provide you with this proposal?

14   Is that -- or is that the usual way that

15   it would work?

16           A.    Usually we would if there's

17   an area of interest and Dr. Katz knew

18   that I had an interest in abuse

19   culminating on the advisory board.  So --

20   but I can't -- I don't recall at this

21   time whether I'd asked for it or whether

22   he knew I was interested and provided me

23   with this.

24           Q.    And the -- the purpose --

1  the goal of the article was to review for

2  the pain management community the

3  critical concepts of prescription opioid

4  abuse.  Review the current status of

5  knowledge about prescription opioid abuse

6  in the community --

7          A.    I'm sorry, where are you

8  reading?  I'm sorry.

9          Q.    Right under Roman Numeral I.

10         A.    Okay.

11         Q.    Okay?

12               So he -- he lays out the

13  goals of the article.

14         A.    Right.

15         Q.    And then he says, "The

16  purpose is to prepare the minds of the

17  pain management community to expect and

18  value certain types of data in order to

19  be persuaded that one modified release

20  opioid product is less abusable/abused

21  than another."

22               Do you see that?

23         A.    I do.

24         Q.    And this was to position a

Highly Confidential - Subject to Further Confidentiality Review

1   Johnson & Johnson product in the market

2   so long as the clinical study was

3   accepted by the FDA for this purpose as

4   less abusable than a comparator product,

5   correct?

6          A.    I was to provide data so

7   that people can begin to understand the

8   type of information that would be needed

9   for them to make an informed decision on

10  which of the opioids would be appropriate

11  for those patients that they have.

12         Q.    And then following along

13  with that, you would have identified a

14  Johnson & Johnson product as being less

15  abusable using those criteria?

16         A.    If the data was supported

17  and FDA agreed on it, then the correct

18  studies would need to be done.

19         Q.    Were any such studies done?

20         A.    Not to my knowledge.

21         Q.    Do you know if any -- do you

22  know if the criteria was ever developed,

23  or what types of data would be used to

24  determine that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I need to see where this is

2   in position to the advisory board.

3      Q.     Sure.

4      A.     That would be good.  So the

5   e-mail that you're talking about now is

6   from the 23rd of September of '03, and

7   then early in January, and we had the Ad

8   Board in November.

9      Q.     Right.  So this -- this was

10  around the time that we saw some e-mails

11  between you, Dr. Sacoor, and Dr. Katz

12  kind of laying out the program?

13     A.     Right.  So I think the

14  dialogue was, this is some of the things

15  that we can think about.  And this may

16  have morphed into the advisory board.

17  Let's get some other people's opinion.

18  Let's understand the state of the art.

19  What are the things that people need to

20  be thinking about, and what are the types

21  of studies that would need to be done.

22     Q.     I see.  So this may in fact

23  have been the genesis for the Ad Board?

24     A.     I had interest in doing this

Highly Confidential - Subject to Further Confidentiality Review

1    as well, but this may have been certainly

2    part of the original conversations

3    related and tied into the advisory board

4    later on, yes.

5         Q.    Okay.  The RADARS data and

6    the Inflexxion data, did that become --

7    did those organizations develop data that

8    could be used to determine whether one

9    product is more or less abusable than

10   another?

11        A.    The RADARS data and the

12   Inflexxion data are monitoring programs

13   and would be part of other data that

14   would be presented to FDA as part of a

15   package.

16        Q.    And I understand that you

17   told me earlier that RADARS and

18   Inflexxion data could not be used in a

19   promotional venue to discuss the relative

20   abuse liability of a particular opioid,

21   correct?

22        A.    Yes.

23        Q.    Do you know if the RADARS or

24   Inflexxion data, however, was an attempt

Highly Confidential - Subject to Further Confidentiality Review

1    to come up with a type of data that could

2    then be used as criteria for a clinical

3    study on what would be more or less

4    abusable?

5         A.    No.  I think the RADARS data

6    and the Inflexxion data would have been

7    used as part of a package with other

8    information to inform the FDA as kind of

9    a suite of information to them to talk

10   about an abuse of liability.  But the

11   RADARS and Inflexxion data to my

12   recollection were not used specifically

13   to design a clinical trial.

14        Q.    And we looked at the

15   document that was the PowerPoint slide

16   that had one of the strategic drivers was

17   to show lower abuse potential of the

18   Johnson & Johnson opioid product.

19             Do you recall that?

20        A.    Yes.

21        Q.    And was that -- did that

22   come out of this type of proposal, do you

23   know, that driver?

24        A.    I'm not completely following

Highly Confidential - Subject to Further Confidentiality Review

1   your question, I'm sorry.

2        Q.    Okay.  Was this something

3   that was in the works for quite some time

4   to try to determine what type of -- what

5   types of datasets could determine lower

6   abuse potential of a Johnson & Johnson

7   product?

8        A.    I don't remember how long

9   that was in the works.  There was a lot

10  of interest in understanding the type of

11  abuse programs that would need to be done

12  which culminated into the advisory board.

13  But to answer your question, I don't know

14  how long that was in the works.

15       Q.    Do you know when RADARS and

16  Inflexxion data began to be provided to

17  the FDA by Johnson & Johnson?

18       A.    Shortly after we started

19  using those programs, that would have

20  been provided in either safety type

21  reports and as a way of communicating

22  what we were monitoring.

23       Q.    And were you involved in

24  that or was that a different department?

1    A.    No, I was involved with

2  that.

3    Q.    Were you involved with

4  Duragesic, or was it with Nucynta?

5    A.    I was involved in -- I'm

6  sorry, Counsel.  I'm not understanding

7  your question.

8    Q.    In providing RADARS and

9  Inflexxion data with respect to abuse

10  liability or surveillance information

11  provided to the FDA, were you involved

12  for all opioid products at Johnson &

13  Johnson, or did you have involvement with

14  providing that data for Duragesic or

15  Nucynta or something else?

16    A.    Initially, all opioid

17  products.

18    Q.    Okay.  So it was -- it was a

19  classwide submission?

20    A.    These were activities that

21  the company initiated without a

22  requirement to do so, to monitor opioid

23  analgesics, correct.

24    Q.    And around when did that

Highly Confidential - Subject to Further Confidentiality Review

1    begin?

2          A.    When the RADARS data became

3    available to us, which was approximately

4    2006 or thereabouts.

5          Q.    But no clinical studies had

6    been done using that data to date that

7    you're aware of?

8          A.    No, not that I'm aware of.

9          Q.    At Johnson & Johnson?

10         A.    At Johnson & Johnson,

11   correct.

12               (Document marked for

13               identification as Exhibit

14               Janssen-Vorsanger-11.)

15   BY MS. CONROY:

16         Q.    This is likewise in that

17   same time period, marked as Exhibit 11.

18   JAN-MS-006132014 through -- I think we've

19   got a native document here.  Well that's

20   the cover Bates range.  I'm not sure.

21   The rest of it doesn't have a Bates

22   number on it.

23               That's Exhibit 11.

24         A.    Okay.

1          Q.     There might be a native slip

2     sheet in there somewhere.  This is an

3     e-mail dated November 13th of 2003,

4     forwarding a draft of the study outlines

5     from you to Tricia Haertlein and Surya

6     Vangala.  Surya worked in your

7     department?

8          A.     Yes, she did.

9          Q.     What about Tricia?

10         A.     They both did.  Tricia

11    Haertlein was an administrative

12    assistant.  And Surya Vangala was a

13    project -- project manager.

14         Q.     Okay.  And you say,

15    "Attached, please find the draft of Nat's

16    paper."  That's Dr. Katz, right?

17         A.     Yes.

18         Q.     "I'm making changes to the

19    document, and Nat will be creating a

20    draft PowerPoint presentation."

21              Do you see that?

22         A.     Yes.

23              MS. CONROY:  Okay.  Here is

24         the slip sheet for the --

Highly Confidential - Subject to Further Confidentiality Review

1     Doctor, this won't make any
2     difference to you.
3         But the slip sheet for the
4     attachment to that e-mail is
5     JAN-MS-00613205.
6  BY MS. CONROY:
7     Q.    If you turn the page, in
8  this document, Dr. Katz was providing
9  more detail about the consensus meeting;
10 is that correct?
11    A.    Yeah.
12    Q.    It was about a week later,
13 or maybe almost two weeks later, and he
14 was developing a PowerPoint.
15        Do you know who the
16 PowerPoint was going to be shown to?
17    A.    I don't recall.
18    Q.    With Slide 2, he says, "The
19 results of the meeting, the key points.
20 The group did come to consensus on a
21 suite of studies."
22    A.    Yes.
23    Q.    "These studies should be
24 divided into two groups by timetable" --

Highly Confidential - Subject to Further Confidentiality Review

1  "by timeline, those that could

2  potentially be completed in less than a

3  year.  That would be abuse liability

4  studies, for example studies to predict

5  actual abuse.

6          "And two, those that would

7  require more than a year, studies of

8  actual abuse."

9          Do you see that?

10     A.    Yes.

11     Q.    And do you agree with that

12  timeline?

13     A.    Yes.  That was a timeline we

14  wanted them to organize the studies by.

15     Q.    And then he says in Roman

16  Numeral II-C, "The group agreed that

17  measures of actual abuse in the target

18  population, patients with chronic pain on

19  opioids and the community, were of

20  greater importance than studies of abuse

21  liability, which are designed to predict

22  actual abuse."

23          Do you see that?

24     A.    Yes.

1    Q.    And are you in agreement

2    with that, that actual abuse measurements

3    would be of greater importance to

4    physicians and payers than abuse

5    liability studies?

6    A.    I think both sets of studies

7    are important, but there was a paucity

8    information about what was going on in

9    the community.  So there was strong

10   interest in getting information on the

11   actual community.  That's what Dr. Katz

12   identifies here.

13   Q.    And then --

14   A.    But certainly both of them

15   are -- will be needed to have a robust

16   package of information to talk about

17   abuse liability.

18   Q.    Right.  And he says that.

19   Both are important.

20   A.    Yes.

21   Q.    But he says the actual abuse

22   was considered to be of greater

23   importance than the also important abuse

24   liability study.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes, that was his -- if that

2  was the conclusion of the meeting, then,

3  yeah.

4    Q.    Okay.  And what do you mean

5  by "and the community"?  What was the

6  strong interest in the community?  What

7  do they want to know?

8    A.    The people being treated

9  with the drugs, as opposed to doing abuse

10  liability studies, some of which may be

11  done in the laboratories for example.

12    Q.    So it would be actual

13  studies of pain patients in a particular

14  community, either low back pain

15  community, sickle cell community --

16    A.    Patients with pain.

17    Q.    -- whatever?

18    A.    Patients with pain, people

19  with pain, chronic pain, who are on

20  medications to treat their chronic pain.

21    Q.    And those studies were never

22  done, correct, as far as you know?

23    A.    To the best of my knowledge,

24  those studies were not done.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And that's both the

2    actual abuse studies as well as the abuse

3    liability studies designed to predict

4    actual abuse, correct?

5    A.    There were abuse

6    liability-type studies that were done for

7    tapentadol ER.  There were studies that

8    evaluated ways in which people might

9    abuse those.  So those were abuse

10   liability studies, again for tapentadol.

11   So those were done later on in the

12   other -- in another product.

13   Q.    Was that abuse liability of

14   the drug itself or the abuse liability in

15   the patient community?

16   A.    The abuse liability studies

17   would have been how -- which -- which

18   could be used to predict actual abuse.

19   So some of those may be -- to my best

20   understanding is some of those may be

21   laboratory-type studies.  And they may

22   also be studies in which they take people

23   who are abusers of the medications and

24   see how they might go about abusing the

1    medication.

2         Q.    How they would tamper with

3    it, correct?

4         A.    Yes, that's correct.

5         Q.    But as far as you know,

6    there were no -- there were no abuse

7    liability studies conducted in the

8    patient community concerning tapentadol

9    ER?

10        A.    I think we are talking

11   about, tapentadol was not -- we're

12   talking about Duragesic at this point.

13        Q.    Okay.

14        A.    Yeah.

15        Q.    But even -- but even to

16   this -- until 2015, regardless of the

17   drug, no such actual abuse or abuse

18   liability community studies have been

19   done for any Johnson & Johnson, Janssen

20   opioid product?

21        A.    There were abuse liability

22   studies --

23             MR. LIFLAND:  Object to the

24        form of the question.  Sorry, you

Highly Confidential - Subject to Further Confidentiality Review

1        can answer.

2              THE WITNESS:  There were

3        abuse liability studies, I

4        believe, that were done for

5        tapentadol.  I think, given the

6        years here in '03, my focus might

7        be on Duragesic.  And as far as I

8        know for Duragesic I don't recall

9        such studies.

10   BY MS. CONROY:

11        Q.    Okay.  In the tapentadol ER

12   studies, you recall lab studies and then

13   some studies that were done of

14   individuals who misused and abused the

15   product to determine how tamper resistant

16   the drug is?

17        A.    That's my -- I would have to

18   see documentation, but that was the

19   recollection that I have to support my

20   statement.

21        Q.    Okay.  Do you have any

22   recollection of there being a study using

23   tapentadol ER of chronic pain patients in

24   the -- in the community to determine or

Highly Confidential - Subject to Further Confidentiality Review

1    predict abuse liability in a community of

2    pain patients?

3            A.    Not that I recall.

4            Q.    And if you could turn to --

5    let's see.  It's number -- it's D.

6            A.    1D did you say?

7            Q.    It was just -- you'll see

8    there's a page that say C, "Ease of

9    extraction of active product."  Then if

10   you turn the page it says D, "Validation

11   of abuse-related constructs and outcome

12   measures"?

13           A.    Yes.

14           Q.    Did you find that?

15           A.    I do see that, yes.

16           Q.    Okay.  And it says, "Brief

17   description of the nature and purpose of

18   the studies.  The group recognized that

19   ultimately randomized controlled clinical

20   trials and epidemiological studies will

21   be the final arbiters of differences in

22   abuse liabilities between MROs.  The

23   group also recognized the fact there's

24   little agreement on what outcomes should

Highly Confidential - Subject to Further Confidentiality Review

1    be measured in such trials, terms such as

2    'abuse,' 'misuse,' 'aberrant drug

3    behaviors,' 'recreational use,' extra

4    medical abuse,' independence,' are often

5    bandied about, but there's little

6    agreement on what the syndromes of

7    concern are, what they should be called,

8    and there's absolutely no empiric work in

9    this area to define these syndromes."

10           Do you agree with that?

11           Or I'm sorry, do you see

12   that?

13        A.    Yes.

14        Q.    And this is --

15        A.    To answer your question, I

16   agree that this is what the group

17   consensus came up with.

18        Q.    Okay.  And so this was --

19   this was Dr. Katz's outline of what the

20   group came up with, and we also have the

21   January Dr. Sacoor consensus, and they --

22   they pretty much mesh.

23           Would you agree?

24        A.    Yes.

1      Q.    It goes on and says,

2   Dr. Katz says, "Furthermore, there's been

3   little work on predictors of negative

4   outcomes of opioid therapy or of opioid

5   abuse in the community.  No credible

6   clinical trial or epidemiological study

7   can proceed without preceding work done

8   on construct validation and instrument

9   develop" -- "development to measure these

10  constructs and predictors."

11          Do you see that?

12      A.    Yes.

13      Q.    And that would mean that you

14  would have to come up with some

15  definition that you were going to use and

16  some way of validating the work, correct?

17      A.    Yes.

18      Q.    And that's what this ad

19  group was looking at, ways to construct

20  those types of studies, correct?

21      A.    Yes.

22      Q.    Is there a reason why those

23  studies did not proceed?

24      A.    The -- the decision was that

1    we were going to focus on certain types

2    of studies that we -- that would be able

3    to provide some information to us around

4    abuse liability, so based on competing

5    priorities of what might be going on in

6    terms of clinical trials, et cetera.

7          Q.    So the -- the reason there

8    were -- there were competing priorities

9    was --

10         A.    There may have been at the

11   time.  Yeah.  Yes.

12         Q.    Let me just finish the

13   question.

14               So there were -- as best you

15   understand, there were competing

16   priorities with respect to which studies

17   Johnson & Johnson would go forward with

18   at the time and that's why the studies

19   that were discussed at the Ad Board did

20   not go forward?

21         A.    Some of the work did go

22   forward.  I think there was some work

23   that went on to look at likability.  I

24   think that was one of the projects that

1  came out of some of this discussion.  So

2  I believe some of the studies were done.

3  But all of the studies were not

4  implemented.

5          Q.    And the likability studies

6  were the -- the lab studies with respect

7  to how easy it was to crush or

8  dissolve --

9          A.    Those were later, those were

10  later in other compound.  But I think

11  there was one looking at differences on

12  the different types of formulations, but

13  I'd have to check on that.

14          Q.    Okay.  Were those studies

15  done by Johnson & Johnson?

16          A.    Those were studies that were

17  done by other people.

18          Q.    Were there individuals or

19  patients that were used in those studies

20  or were they lab studies?

21          A.    I don't recall.

22          Q.    Okay.  You can put that one

23  away.

24                MS. CONROY:  We'll end for

Highly Confidential - Subject to Further Confidentiality Review

1                   the day.
2                           MR. LIFLAND:  Okay.
3                           MS. CONROY:  Thank you,
4           Doctor.
5                           MR. LIFLAND:  We'll come
6           back tomorrow.
7                           THE VIDEOGRAPHER:  Stand by
8           please.  Remove your microphones.
9                           The time is 5:23 p.m.  Going
10          off the record.
11                          (Excused.
12                          (Adjourned at approximately
13          5:23 p.m.)
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2                      CERTIFICATE
 3
 4
 5           I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
 6   deposition is a true record of the
     testimony given by the witness.
 7
             It was requested before
 8   completion of the deposition that the
     witness, GARY J. VORSANGER, Ph.D., M.D.,
 9   have the opportunity to read and sign the
     deposition transcript.
10
11
12
     _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  December 10, 2018
16
17
18           (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4   over carefully and make any necessary

 5   corrections.  You should state the reason

 6   in the appropriate space on the errata

 7   sheet for any corrections that are made.

 8              After doing so, please sign

 9   the errata sheet and date it.

10              You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                  -   -   -   -   -   -

                     E R R A T A

2                  -   -   -   -   -   -

3

4      PAGE   LINE    CHANGE

5      _____  _____   _____

6          REASON: _____

7      _____  _____   _____

8          REASON: _____

9      _____  _____   _____

10         REASON: _____

11     _____  _____   _____

12         REASON: _____

13     _____  _____   _____

14         REASON: _____

15     _____  _____   _____

16         REASON: _____

17     _____  _____   _____

18         REASON: _____

19     _____  _____   _____

20         REASON: _____

21     _____  _____   _____

22         REASON: _____

23     _____  _____   _____

24         REASON: _____
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1
 2              ACKNOWLEDGMENT OF DEPONENT
 3
 4              I,_____, do
 5    hereby certify that I have read the
 6    foregoing pages, 1 - 419, and that the
 7    same is a correct transcription of the
 8    answers given by me to the questions
 9    therein propounded, except for the
10    corrections or changes in form or
11    substance, if any, noted in the attached
12    Errata Sheet.
13
14
15    _____
16     GARY J. VORSANGER, Ph.D., M.D.    DATE
17
18
19    Subscribed and sworn
      to before me this
20    _____ day of _____, 20_____.
21    My commission expires:_____
22

      _____
23    Notary Public
24
```

Highly Confidential - Subject to Further Confidentiality Review

1                          LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____    _____

4      _____  _____    _____

5      _____  _____    _____

6      _____  _____    _____

7      _____  _____    _____

8      _____  _____    _____

9      _____  _____    _____

10     _____  _____    _____

11     _____  _____    _____

12     _____  _____    _____

13     _____  _____    _____

14     _____  _____    _____

15     _____  _____    _____

16     _____  _____    _____

17     _____  _____    _____

18     _____  _____    _____

19     _____  _____    _____

20     _____  _____    _____

21     _____  _____    _____

22     _____  _____    _____

23     _____  _____    _____

24     _____  _____    _____